# EXHIBIT B

## Filed with Redactions

Page 1

1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
2                     CAMDEN VICINAGE
3
    IN RE: VALSARTAN,        §   MDL NO. 2875
4   LOSARTAN, AND            §
    IRBESARTAN PRODUCTS       §   HONORABLE ROBERT B. KUGLER
5   LIABILITY LITIGATION      §   DISTRICT COURT JUDGE
6
7
8            ORAL AND VIDEOTAPED DEPOSITION OF
                      JOHN L. QUICK
9                   JANUARY 27, 2022
10
11
12
13      ORAL AND VIDEOTAPED DEPOSITION OF JOHN L. QUICK,
14   produced as a witness at the instance of the
15   Defendants and duly sworn, was taken in the above
16   styled and numbered cause on Thursday,
17   January 27, 2022, from 9:33 a.m. to 7:00 p.m.,
18   before TAMARA CHAPMAN, CSR, RPR-CRR in and for the
19   State of Texas, reported by computerized stenotype
20   machine, at the offices of Slack Davis Sanger, LLP,
21   6001 Bold Ruler Way, Suite 100, Austin, Texas,
22   pursuant to the Federal Rules of Civil Procedure and
23   any provisions stated on the record herein.
24
25

Page 2

```
1              A P P E A R A N C E S
2
3  FOR THE PLAINTIFF(S):
      John R  Davis
4  SLACK DAVIS SANGER, LLP
      6001 Bold Ruler Way, Suite 100
5  Austin, Texas 78746
      512-795-8686
6  jdavis@slackdavis com
7
      Layne Hilton
8  Conlee S  Whiteley
      David J  Stanoch
9  KANNER & WHITELEY, L L C
      701 Camp Street
10 New Orleans, Louisiana 70130
      504-524-5777
11 l hilton@kanner-law com
      c whiteley@kanner-law com
12 d stanoch@kanner-law com
13
      Ruben Honik
14 HONIK LLC
      1515 Market Street, Suite 1100
15 Philadelphia, Pennsylvania 19102
      267-435-1300
16 ruben@honiklaw co
17
18 FOR PLAINTIFF MSP RECOVERY CLAIMS, SERIES, LLC:
      Charlie Whorton
19 RIVERO MESTRE, LLP
      2525 Ponce De Leon Boulevard, Suite 1000
20 Miami, Florida 33134
      305-445-2500
21 cwhorton@riveromestre com
22
23
24
25
```

Page 3

```
1              A P P E A R A N C E S
                  (Continued)
2
3  FOR TEVA PHARMACEUTICALS USA, INC , TEVA
      PHARMACEUTICAL INDUSTRIES LTD , ACTAVIS PHARMA,
4  INC , AND ACTAVIS LLC:
      Nilda Isidro
5  Glenn Kerner
      GREENBERG TRAURIG, LLP
6  One Vanderbilt Avenue
      New York, New York 10017
7  212-801-9200
      isidron@gtlaw com
8  kernerg@gtlaw com
9  Gregory Coates
      GREENBERG TRAURIG, LLP
10 500 Campus Drive, Suite 400
      Florham Park, New Jersey 07932
11 973-443-3269
      coatesg@gtlaw com
12
      Brian Rubenstein
13 GREENBERG TRAURIG, LLP
      1717 Arch Street, Suite 400
14 Philadelphia, Pennsylvania 19103
      215-988-7864
15 rubensteinb@gtlaw com
16
      Steven M  Harkins
17 Victoria Davis Lockard
      GREENBERG TRAURIG, LLP
18 Terminus 200
      3333 Piedmont Road NE, Suite 2500
19 Atlanta, Georgia 30305
      678-553-2100
20 harkinss@gtlaw com
      lockardv@gtlaw com
21
22 Rosemarie Riddell Bogdan
      MARTIN, HARDING & MAZZOTTI, LLP
23 P O Box 15141
      Albany, New York 12212
24 518-724-2207
      rosemarie bogdan@1800law1010 com
25
```

Page 4

```
1              A P P E A R A N C E S
                  (Continued)
2
3  FOR ZHEJIANG HUAHAI PHARMACEUTICAL, CO , LTD , SOLCO
      HEALTHCARE U S , LLC, AND PRINSTON PHARMACEUTICAL, INC :
4  Seth Goldberg
      DUANE MORRIS, LLP
5  30 South 17th Street
      Philadelphia, Pennsylvania 19103
6  215-979-1175
      sagoldberg@duanemorris com
7
8  Coleen W  Hill
      DUANE MORRIS, LLP
9  30 South 17th Street
      Philadelphia, Pennsylvania 19103
10 215-979-1164
      cwhill@duanemorris com
11
12
      FOR HUMANA INC  & HUMANA PHARMACY, INC :
13 Megan A  Zmick
      FALKENBERG IVES, LLP
14 230 W  Monroe, Suite 2220
      Chicago, Illinois 60606
15 312-566-4808
      maz@falkenbergives com
16
17
      FOR AUROBINDO PHARMA LTD :
18 Steven N  Hunchuck
      John Gisleson
19 MORGAN LEWIS
      One Oxford Centre, 32nd Floor
20 Pittsburgh, Pennsylvania 15219
      412-560-3300
21 steven hunchuck@morganlewis com
      john gisleson@morganlewis com
22
23
24
25
```

Page 5

```
1              A P P E A R A N C E S
                  (Continued)
2
3  FOR MCKESSON CORPORATION:
      Ellie Norris
4  D'Lesli M  Davis
      NORTON ROSE FULBRIGHT
5  2200 Ross Avenue, Suite 3600
      Dallas, Texas 75201
6  214-855-8000
      ellie norris@nortonrosefulbright com
7  dlesli davis@nortonrosefulbright com
8
9  FOR MAJOR PHARMACEUTICALS:
      Luke Bresnahan
10 Daniel T  Campbell
      CROWELL & MORING
11 1001 Pennsylvania Avenue, NW
      Washington, D C  20004
12 202-624-2500
      lbresnahan@crowell com
13 dcampbell@crowell com
14
15 FOR TORRENT PHARMA INC  & TORRENT PHARMACEUTICALS
      LIMITED:
16 Brittney Nagle
      KIRKLAND & ELLIS, LLP
17 601 Lexington Avenue
      New York, New York 10022
18 212-390-4210
      brittney nagle@kirkland com
19
      FOR CIGNA CORPORATION, EXPRESS SCRIPTS HOLDING
20 COMPANY & EXPRESS SCRIPTS, INC :
      Sarah L  Zimmerman
21 Matthew D  Knepper
      HUSCH BLACKWELL
22 190 Carondelet Plaza, Suite 600
      St  Louis, Missouri 63105
23 314-480-1500
      sarah zimmerman@huschblackwell com
24 matt knepper@huschblackwell com
25
```

2 (Pages 2 - 5)

Page 6

```
1              A P P E A R A N C E S
                    (Continued)
2
3  FOR HETERO LABS LTD:
      William P  Murtha, Jr
4     HILL WALLACK, LLP
      The Galleria
5     2 Bridge Avenue, Suite 211
      Red Bank, New Jersey 07701
6     732-924-8171
      wmurtha@hillwallack com
7
8     Eric Abraham
      HILL WALLACK, LLP
9     21 Roszel Road
      Princeton, New Jersey 08540
10    609-734-6358
      eabraham@hillwallack com
11
12
     FOR CAMBER PHARMACEUTICALS INC , KROGER CO , THE &
13   AVKARE, INC :
      Conor Donze
14    LEWIS BRISBOIS BISGAARD & SMITH, LLP
      550 E  Swedesford Road, Suite 270
15    Wayne, Pennsylvania 19087
      215-977-4093
16    conor donze@lewisbrisbois com
17
18  FOR AMERISOURCEBERGEN CORPORATION:
      Jeffrey D  Geoppinger
19    ULMER & BERNE, LLP
      312 Walnut Street, Suite 1400
20    Cincinnati, Ohio 45202
      513-698-5038
21    jgeoppinger@ulmer com
22
23
24
25
```

Page 7

```
1              A P P E A R A N C E S
                    (Continued)
2
3
     FOR PFIZER INC , VALEANT PHARMACEUTICALS
4    INTERNATIONAL, INC , BAUSCH & LOMB INCORPORATED, AND
     ATON PHARMA, INC :
5     Liza M  Walsh
      Christine I  Gannon
6     WALSH PIZZI O'REILLY FALANGA, LLP
      Three Gateway Center
7     100 Mulberry Street, 15th Floor
      Newark, New Jersey 07102
8     973-757-1100
      lwalsh@walsh law
9     cgannon@walsh com
10
11  FOR CVS HEALTH CO :
      Kara Kapke
12    BARNES & THORNBURG, LLP
      11 S  Meridian Street
13    Indianapolis, Indiana 46204
      317-231-6491
14    kara kapke@btlaw com
15
16  FOR H J HARKINS CO , INC :
      Geoffrey M  Coan
17    HINSHAW & CULBERTSON, LLP
      53 State Street, 27th Floor
18    Boston, Massachusetts 02109
      617-213-7000
19    gcoan@hinshawlaw com
20
21  FOR OPTUM, INC & OPTUMRX:
      Shevon D B  Rockett
22    DORSEY & WHITNEY, LLP
      51 West 52nd Street
23    New York, New York 10019
      212-415-9357
24    rockett shevon@dorsey com
25
```

Page 8

```
1              A P P E A R A N C E S
                    (Continued)
2
3  FOR ALBERTSONS COMPANIES LLC:
      Christopher B  Henry
4     BUCHANAN INGERSOLL & ROONEY PC
      Carillon Tower
5     227 West Trade Street, Suite 600
      Charlotte, North Carolina 28202
6     704-444-3475
      christopher henry@bipc com
7
8
     FOR MYLAN PHARMACEUTICALS INC , AND MYLAN
9  LABORATORIES, LTD :
      Frank H  Stoy
10    PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
      One Oxford Centre
11    301 Grant Street, 38th Floor
      Pittsburgh, Pennsylvania 15219
12    412-263-4397
      fhs@pietragallo com
13
14
     ALSO PRESENT:
15    Shane Ramirez, Videographer
      Jason Novak, Trial Tech
16    Tom Karwacki, Trial Tech
17
18
19
20
21
22
23
24
25
```

Page 9

```
1              I N D E X
2
                          PAGE
3
4  APPEARANCES                    2
5  JOHN L  QUICK
6  EXAMINATION
      By Ms  Isidro           12
7     By Mr  Goldberg          244
8
     CORRECTION PAGE           274
9  SIGNATURE PAGE             275
     REPORTER'S CERTIFICATION      276
10
11         E X H I B I T S
12                  PAGE LINE
     Exhibit 1,             28  15
13  Curriculum Vitae
      (No Bates - 6 pages)
14  Exhibit 2,             34  21
      Consulting Agreement
15    (No Bates - 4 pages)
      Exhibit 3,             37  4
16  Quick & Associates Invoices
      (No Bates - 7 pages)
17  Exhibit 4,             46  19
      Amended Notice of Videotaped
18  Deposition
      (No Bates - 9 pages)
19  Exhibit 5,             48  1
      Guidance for Industry, Presenting
20  Risk Information in Prescription
      Drug and Medical
21  Device Promotion
      (No Bates - 27 pages)
22  Exhibit 6,             48  21
      Expert Declaration of John L  Quick
23  (No Bates - 49 pages)
24
25
```

3 (Pages 6 - 9)

Page 10

    E X H I B I T S
       (Continued )

                      PAGE  LINE
3  Exhibit 7,              50   5
   M7(R1) Assessment and Control of DNA
4  Reactive (Mutagenic) Impurities in
   Pharmaceuticals To Limit
5  Potential Carcinogenic Risk
   (No Bates - 131 pages)
6  Exhibit 8,              85   1
   FDA Statement on FDA's ongoing
7  investigation into valsartan
   impurities and recalls and an update
8  on FDA's current
   findings
9  (No Bates - 7 pages)
   Exhibit 9,              98  25
10 Food and Drug Administration
   Compliance Program Guidance Manual
11 (No Bates - 31 pages)
   Exhibit 10,            103   1
12 Facts About the Current Good
   Manufacturing Practices (CGMPs)
13 (No Bates - 3 pages)
   Exhibit 11,            136  18
14 Chapter 5 FD&C Act Subchapter A
   Drugs and Devices Sec 501 [351]
15 (No Bates - 5 pages)
   Exhibit 12,            141  11
16 21 U S Code § 352 - Misbranded
   drugs and devices
17 (No Bates - 14 pages)
   Exhibit 13,            148  14
18 08/11/2000 Warning Letter
   (No Bates - 3 pages)
19 Exhibit 14,            162  13
   Inspection Observations
20 (No Bates - 2 pages)
   Exhibit 15,            199   3
21 Email chain originating 08/10/2018
   from Jens Nassall, Subject "FDA-483
22 observations from 2017 and current
   Valsartan situation"
23 (ZHP00912962 - ZHP00912967)
   Exhibit 16,            217  14
24 ZHP June 2015 Audit Report
   (TEVA-MDL2875-00399168 -
25 TEVA-MDL2875-00399246)

Page 11

    E X H I B I T S
       (Continued )

                      PAGE  LINE
3  Exhibit 17,            222   7
   ZHP May 2018 Audit Report
4  (TEVA-MDL2875-00118147 -
   TEVA-MDL2875-00118208)
5  Exhibit 18,            225   4
   Department of Health and Human
6  Services Inspection Report
   (10 pages - No Bates)
7  Exhibit 19,            245   4
   Establishment Inspection Report
8  (ZHP01427917 - ZHP01427974)
   Exhibit 20,            248   8
9  11/04/2021 Closeout Letter
   (No Bates - 2 pages)
10 Exhibit 21,            254  11
   Quality Risk Management Q9
11 (No Bates - 23 pages)
   Exhibit 22,            257  20
12 Standard Management Procedure
   (ZHP00000417 - ZHP00000470)
13 Exhibit 23,            261   8
   Change Request Form
14 (ZHP01843066 - ZHP01843119)
   Exhibit 24,            265   7
15 Standard Management Procedure
   (ZHP00469139 - ZHP00469162)
16 Exhibit 25,            270  10
   Excerpts of Videotaped Deposition of
17 Jucai Ge, April 29, 2021
   (No Bates - 4 pages)
18
19
20
21
22
23
24
25

Page 12

1          THE VIDEOGRAPHER:  Here begins the
2  deposition of John Quick.  Today's date is
3  January 27th, 2022.  The time is 9:33 a.m.
4          Will the court reporter please swear
5  in the witness?
6          THE REPORTER:  And will you introduce
7  yourselves for the record?
8          MS. ISIDRO:  Nilda Isidro from
9  Greenberg Traurig on behalf of defendant, Teva.
10         MR. KERNER:  I'm Glenn Kerner from
11 Greenberg Traurig, also on behalf of Teva.
12         MR. DAVIS:  John Davis, Slack Davis
13 Sanger, on behalf of the plaintiffs.
14         MS. HILTON:  Layne Hilton, Kanner &
15 Whiteley on behalf of the plaintiffs.
16         MS. WHITELEY:  Conlee Whiteley,
17 Kanner & Whiteley, on behalf of plaintiffs.
18         JOHN L. QUICK,
19 having been first duly sworn, testified as follows:
20         EXAMINATION
21 BY MS. ISIDRO:
22    Q.    Good morning, Mr. Quick.
23    A.    Good morning.
24    Q.    My name is Nilda Isidro.  I am from
25 law firm of Greenberg Traurig and I represent

Page 13

1  defendant, Teva.  We're meeting for the first time
2  this morning.  Correct?
3     A.    That's correct.
4     Q.    I'm going to be asking you some questions
5  today.  And if we could start, could you please
6  state your full name for the record.
7     A.    John Lowell Quick.
8     Q.    What is your current professional
9  address?
10    A.    W1800 County Road B, Genoa City,
11 Wisconsin 53128.
12    Q.    Thank you.  Mr. Quick, you've been
13 deposed before.  Correct?
14    A.    I have.
15    Q.    So you know how this goes, but I'm just
16 going to go over a few ground rules before we get
17 started.
18         As you know, there is a court reporter to
19 your left taking down everything that anyone in the
20 room says.  For that reason it's very important that
21 you answer verbally.  So, for example, saying "yes"
22 or "no," rather than nodding your head or saying
23 "uh-huh" or "uh-uh," just so that we can make sure
24 that the written transcript is clear.
25         It's also important that before you start

4 (Pages 10 - 13)

Page 14

1 to answer a question, you wait for me to finish
2 getting the question out completely, not anticipate
3 what I'm trying to ask. And this is, again, just so
4 that the court reporter isn't trying to take both of
5 us down talking at the same time.
6      If at any time you don't understand my
7 question or you don't hear me, please let me know.
8 I'm happy to repeat it or to clarify whatever might
9 be confusing about the question. But if you do
10 answer my question, I'm going to assume that you
11 understood it. Fair enough?
12   A.   Fair.
13   Q.   All right. If you need a break at any
14 time, please let me know. I would just ask that if
15 there is a question pending, we get the question
16 answered first and then we can take a break.
17      Do you have any questions at all -- oh,
18 one more thing. In addition to the folks in the
19 room, we have some folks on Zoom. So, for example,
20 when we're dealing with exhibits, there may be a
21 little bit of a pause as we wait for the exhibit to
22 get up on the Zoom as well. And there may be folks
23 asking questions on the Zoom later on. All right?
24      Is there any reason, as you sit here
25 today, why you may not be able to give accurate and

Page 15

1 truthful testimony?
2   A.   No.
3   Q.   You're not on any medications that might
4 impact your ability to give accurate and truthful
5 testimony?
6   A.   No, I'm not.
7      MS. ISIDRO: And, again, just
8 remember to let me finish my question before you
9 start to answer.
10      MR. DAVIS: And give me a little time
11 to place an objection, as appropriate, as well. So
12 build even more of a little delay in there. Thanks.
13   Q.   And do you want to read and sign the
14 deposition?
15   A.   I'm sorry?
16      MR. DAVIS: We can handle that at the
17 end, Nilda.
18      MS. ISIDRO: Okay. Sure.
19   Q.   All right. Mr. Quick, have you ever been
20 a party to a lawsuit?
21   A.   Maybe you can rephrase. I'm not sure.
22   Q.   Sure. Have you ever been the plaintiff
23 or the defendant in a lawsuit?
24   A.   No.
25   Q.   Have you -- aside from this litigation,

Page 16

1 have you ever been retained as an expert witness?
2   A.   Yes.
3   Q.   On how many occasions have you been
4 retained as an expert witness?
5   A.   Multiple occasions.
6   Q.   Can you approximate a number?
7   A.   Approximately five. It could be more or
8 less.
9   Q.   Fewer than ten?
10   A.   Fewer than ten.
11   Q.   Okay. And have you ever testified, prior
12 to today, at a deposition as an expert witness?
13   A.   Yes.
14   Q.   On how many occasions?
15   A.   Probably the same number.
16   Q.   So there haven't been any cases where you
17 were retained where you did not testify at
18 deposition?
19   A.   I don't believe so.
20   Q.   Okay. Have you ever testified at a
21 deposition other than as an expert witness?
22   A.   Yes.
23   Q.   On how many occasions?
24   A.   10, 15 times maybe.
25   Q.   When was the last time that you testified

Page 17

1 at a deposition not as an expert witness?
2   A.   I'm not certain, but maybe 15 years ago.
3   Q.   And what was the -- what was the context
4 for your being deposed at that time?
5   A.   Probably that -- I'm not certain the time
6 frames, but at that time it may have been related to
7 a situation at Baxter, my former employee, when they
8 asked me to testify on a situation that had occurred
9 when I was in an employ at the company.
10   Q.   So for the 10 to 15 times that you
11 testified not as an expert witness, did those all
12 relate to your employment at Baxter?
13   A.   No.
14   Q.   Okay. About how many of them related to
15 your employment at Baxter?
16   A.   Probably all of them, but maybe two or
17 three.
18   Q.   And what did those two or three that were
19 not related to Baxter relate to?
20   A.   We're going a long ways back. One
21 related to a situation with a contract manufacturer
22 in California. One related to a medical device
23 company. Those are the two I can recall.
24   Q.   And so in the matter involving the
25 contract manufacturer in California, what was the

5 (Pages 14 - 17)

Page 18

1 reason for you being deposed?
2    A.    The issue related to a -- one of their
3 customers. It was a contract dispute and the issue
4 related to whether they fulfilled their contract.
5 And so I was brought in as an expert on Q7 relative
6 to APIs.
7    Q.    Okay. So that was one of the instances
8 where you were deposed as an expert witness?
9    A.    Yes.
10    Q.    Okay. So focusing only on the times
11 where you were deposed not as an expert witness, you
12 said there were about 10 to 15 of those.
13        Is that right?
14    A.    No.
15    Q.    Okay.
16    A.    I said there were probably three or four.
17 Again, we're really stretching my memory. Some of
18 these go back years.
19    Q.    Okay. I want to make sure I understood
20 because what I had understood from your testimony
21 was that you had been deposed approximately five
22 times as an expert witness and then approximately 10
23 to 15 times not as an expert witness.
24    A.    Okay. That's probably right.
25    Q.    So were you ever deposed as a fact

Page 19

1 witness, so not as an expert, in connection with
2 anything other than your employment at Baxter?
3    A.    I don't believe so. I would qualify that
4 these were not characterized the way you're
5 characterizing them, at the time.
6    Q.    Okay. How were they -- how were they
7 characterized?
8    A.    I'm saying they were not characterized at
9 all.
10    Q.    Am I understanding that you didn't
11 necessarily know whether you were testifying as an
12 expert witness or as a fact witness?
13    A.    Well, to differentiate --
14        THE WITNESS: I'm sorry.
15        MR. DAVIS: I'm going to object for
16 the record. You can answer the question.
17    A.    The differentiation wasn't made at the
18 time.
19    Q.    Okay. So let me ask it this way.
20        When you're testifying as an expert
21 witness, is it always the case that you are retained
22 as an expert in that matter?
23    A.    Going back all those years, I honestly
24 don't know how I was retained. In some cases I was
25 actually working for the group where I was acting as

Page 20

1 an expert witness.
2    Q.    And would that have been in connection
3 with Baxter or something else?
4    A.    Something else.
5    Q.    And what was that?
6    A.    So the one I indicated was a medical
7 device company. One was a contract manufacturer in
8 California. There was another one that -- back in
9 the 2012 time frame, where I was an expert witness
10 for a private equity company. They were doing
11 battle with another private equity company over an
12 escrow. And so I was an expert witness. And that
13 situation related to sterile aseptic processing.
14    Q.    Okay. And in those instances the company
15 on whose behalf you were testifying was your
16 employer?
17        MR. DAVIS: Objection to the use of
18 the word "employer."
19    A.    I wasn't an employer. I was a
20 consultant. I was retained as a consultant.
21    Q.    Okay. But you were retained?
22    A.    Right.
23    Q.    When you're testifying as an expert or as
24 a consultant, you're compensated. Correct?
25    A.    That's correct.

Page 21

1    Q.    Have you ever provided deposition
2 testimony for which you were not compensated?
3    A.    I've had -- I've been at -- well, for
4 example, the Baxter deposition I referred to back
5 10, 15 years ago, I was not compensated for that.
6 It wasn't explained I was an expert witness. I was
7 just called to testify. I was not compensated for
8 that.
9    Q.    And what did that lawsuit involve, in
10 general terms?
11    A.    It related to a labeling issue with a --
12 one of the products that Baxter had. And it goes
13 back to the early '90s.
14    Q.    And you were deposed when in connection
15 with that case?
16    A.    Yes.
17    Q.    My question was you were deposed when in
18 connection with that case?
19    A.    Oh. I'm saying it was probably about 15
20 years ago. It was long after I left Baxter.
21    Q.    Okay. Have you ever testified at trial
22 as an expert witness?
23    A.    Yes.
24    Q.    On how many occasions?
25    A.    Once.

6 (Pages 18 - 21)

Page 22

1    Q.    And what case was that?
2    A.    This was the case on the aseptic
3 processing issues where the two private equity
4 groups were disputing the escrow amount.
5    Q.    When did that trial take place?
6    A.    I believe it was somewhere in the 20 --
7 2012 time frame.  If we need an exact date, I can
8 get an exact date.
9    Q.    What were -- what were the names of the
10 parties in that lawsuit?
11    A.    I don't recall offhand, but I can
12 certainly get that if we need that.
13    Q.    Okay.
14    A.    It's been a long time.  It's been ten
15 years.
16    Q.    Do you remember the name of the private
17 equity firm?
18    A.    I don't offhand.
19    Q.    Okay.  To your knowledge, have you ever
20 had your opinions excluded or limited by any court?
21    A.    Not that I'm aware of.
22    Q.    So we talked about at least two instances
23 where you were retained as a consultant.  That's the
24 contract manufacturer issue in California and the
25 medical device company issue.  Correct?

Page 23

1    A.    That's correct.  Just to clarify, though,
2 I've obviously been retained as a consultant for
3 many other situations where I was not testifying as
4 an expert witness.
5    Q.    Okay.  So these are the two that you
6 recall --
7    A.    Right.
8    Q.    -- where you did testify where you were
9 being retained as a consultant but you also
10 testified as an expert witness.  Correct?
11    A.    Correct.
12    Q.    And you also mentioned there were about
13 five instances where you have been retained as an
14 expert and testified as an expert at a deposition.
15 Correct?
16    A.    Correct.
17    Q.    Okay.  What was the last time, the most
18 recent time, that you testified as a retained expert
19 witness at a deposition?
20    A.    Two -- almost exactly two years ago.
21    Q.    What was that case?
22    A.    This was the hernia mesh case.
23    Q.    Were you testifying on behalf of the
24 plaintiff in that case?
25    A.    Yes.

Page 24

1    Q.    And prior to that, when was the last time
2 that you testified as an expert witness?
3    A.    Probably the situation I referred to back
4 in 2012.
5    Q.    Okay.  That was the contract manufacturer
6 issue?
7    A.    This was the two private equity groups.
8    Q.    Two private equity groups.
9    A.    Again, these were -- I'm trying to recall
10 from memory for long periods of time in the past.
11         MR. DAVIS:  And I just caution you
12 not to speculate.  If you don't remember something,
13 you don't remember it, but...
14    Q.    So prior to the case with the two private
15 equity groups, when was the last time before that
16 that you testified as an expert witness?
17    A.    The two cases that I referenced, one was
18 the medical device company and one was the contract
19 manufacturer.  I'm not sure which was first, which
20 was last.
21    Q.    And the case with the contract
22 manufacturer in California that one was
23 approximately when?
24    A.    It was approximately 15 years ago.
25    Q.    And how about the one with the medical

Page 25

1 device company?
2    A.    It was somewhere in the same time frame.
3    Q.    Do you recall providing testimony as an
4 expert witness at any time prior to that?
5    A.    I don't believe so, but I'm not certain.
6    Q.    In the matter involving the two private
7 equity groups, were you testifying on behalf of the
8 plaintiff or the defendant?
9    A.    That's a good question.  I'm not sure
10 which was which.
11    Q.    And in the matter involving the contract
12 manufacturer in California, were you testifying on
13 behalf of the plaintiff or the defendant?
14    A.    Probably the defendant in that case.
15         MR. DAVIS:  I'd caution you not to
16 speculate.  If you know, you know --
17    A.    I'm --
18         MR. DAVIS:  -- if you don't, you
19 don't.
20    A.    -- I'm not certain who was suing who
21 there, but...
22    Q.    Okay.  And in the matter involving the
23 medical device company, were you testifying on
24 behalf of the plaintiff or the defendant?
25    A.    Again, I'm -- I'm not certain.

7 (Pages 22 - 25)

Page 26

1    Q.   Are you listed in any databases of
2  experts?
3    A.   I'm sorry?
4    Q.   Are you listed in any databases of
5  experts?
6    A.   Not that I'm aware of.
7    Q.   Have you ever advertised for your
8  services as an expert?
9    A.   No.
10   Q.   Have you ever spoken or given a
11 presentation to a group of lawyers?
12       MR. DAVIS:  Objection; vague.
13       But you can answer.
14   A.   Maybe you want to clarify that a little.
15 What do you need clarification on?
16   A.   Well, I don't know.  You said a group of
17 lawyers.  I mean, I -- I deal with lawyers all the
18 time.
19   Q.   So other than in a matter where you've
20 been engaged as an expert, have you ever given a
21 presentation to a group of lawyers?
22       MR. DAVIS:  Same objection.
23       You can answer.
24   A.   Like I said, I deal with lawyers all the
25 time and so when you say "a presentation to a group

Page 27

1  of lawyers," it's not very clear what you're trying
2  to ask.
3    Q.   So -- so is that a "yes" --
4    A.   I don't know.
5    Q.   -- you have given a presentation to a
6  group of lawyers?  I mean, you said you deal with
7  lawyers all the time.
8    A.   So I -- so when you're saying a
9  presentation, so I deal with lawyers all the time.
10 And so when you're asking about giving a
11 presentation, I mean, I've had interactions with
12 groups of lawyers.  I'm -- I'm not really sure where
13 you're going with this, so I'm not sure how to
14 answer your question.
15   Q.   In what context do you deal with lawyers
16 all the time?
17   A.   So I -- I, again -- I'm involved very
18 heavily in diligence for groups that want to buy
19 another company and lawyers are involved in all of
20 these situations.
21   Q.   And are you -- in those instances, have
22 you been hired as a consultant to provide diligence?
23   A.   Yes.
24   Q.   So other than in a situation where you've
25 been hired as a consultant or hired as an expert,

Page 28

1  have you ever given a presentation to a group of
2  lawyers?
3    A.   Not that I'm aware of.
4    Q.   Have you ever spoken at a legal
5  conference?
6    A.   I did speak years ago at -- actually, I
7  think it's in my CV.  I forget the group.  We could
8  pull up my CV and we could look.  So there was a
9  presentation years ago.  I think it was -- I want to
10 believe a group sponsored it.  But this has been a
11 long time ago.
12   Q.   All right.
13       MS. ISIDRO:  Why don't we go ahead
14 and mark that CV as Exhibit 1.
15       (Exhibit 1 was marked.)
16       MR. DAVIS:  Are you going to have a
17 copy for me, Nilda?
18       MS. ISIDRO:  Yes, I am.  Just bear
19 with me as I'm actually marking the exhibit.
20       MR. DAVIS:  Thank you.
21   Q.   Mr. Quick, I've just handed you
22 Exhibit 1.  Is that your CV?
23   A.   Yes.
24   Q.   You said you would be able to locate that
25 presentation on your CV.  So if you could take a

Page 29

1  1 look and do that for me, please.
2  2    A.   (Pause.)
3  3        It's the last one on Page 6.  This was
4  4 the FDLI.
5  5    Q.   I see.  July 11, 1995?
6  6    A.   That's correct.
7  7    Q.   Okay.  That's the only time you've ever
8  8 spoken at a legal conference?
9  9    A.   I -- I believe that to be the case.
10 10   Q.   Are you affiliated with any expert
11 11 witness services?
12 12   A.   No.
13 13       (Discussion off the written record.)
14 14       MS. ISIDRO:  Why don't we go off the
15 15 record for a minute and take care of the issue.
16 16       THE VIDEOGRAPHER:  Off the record at
17 17 9:56 a.m.
18 18       (Break.)
19 19       THE VIDEOGRAPHER:  Back on the record
20       10:02  20 at      a.m.
21 21   Q.   Mr. Quick, have you ever done consulting
22 22 work for a pharmaceutical company?
23 23   A.   Yes.
24 24   Q.   How many times?
25 25   A.   I don't have a number.

8 (Pages 26 - 29)

Page 30

1   Q.   More than ten?
2   A.   More than ten.
3   Q.   More than 20?
4   A.   Probably.  I -- I really don't know.
5   Q.   In what context have you provided
6  consulting to pharmaceutical companies?
7   A.   Primarily as it relates to quality and
8  regulatory and/or diligence.
9   Q.   Have you ever provided consulting
10 services to any of the defendants in this
11 litigation?
12  A.   Yes.
13  Q.   Which ones?
14  A.   Mylan.
15  Q.   When was that?
16  A.   I put the dates -- I think the dates are
17 in the -- in the report.  If I had the report, I
18 could give you the exact dates.
19  Q.   Other than Mylan, have you ever provided
20 consulting services for any defendant in this
21 litigation?
22  A.   No.
23  Q.   And you've never provided consulting
24 services for Teva.  Correct?
25  A.   No, I've not, although I've been to Teva

Page 31

1  facilities as part of another situation.
2   Q.   And what situation was that?
3   A.   Diligence.
4   Q.   So you were providing diligence for
5  another entity regarding Teva?
6   A.   That's correct.
7   Q.   And that's disclosed in your report as
8  well.  Correct?
9   A.   Correct.
10  Q.   What percentage of your income is
11 generated through legal consulting?
12  A.   Would you repeat that, please?
13  Q.   What percentage of your income is
14 generated through legal consulting?
15      MR. DAVIS:  I'm going to -- before he
16 answers that, I'm going to object to that as vague.
17  A.   It's a -- it's a very complicated
18 situation.  All my consulting is done through
19 Quick & Associates.  I receive no salary as a result
20 of working for Quick & Associates.  I have a pension
21 from Baxter International, which is where my income
22 is.  There's -- it's -- if we want to spend the
23 time, I could get into the specifics as to how our
24 finances are handled.
25  Q.   What percentage of your time at Quick &

Page 32

1  Associates is spent on consulting in connection with
2  legal matters, lawsuits?
3   A.   Legal matters?
4   Q.   Uh-huh.
5   A.   Would you want to define what you mean
6  when you say "legal matters"?
7   Q.   I said "lawsuits."
8   A.   A low percentage.
9   Q.   25 percent?
10  A.   Probably less than that.
11  Q.   10 percent?
12  A.   Probably less than that.  I don't have a
13 number.
14  Q.   Are you currently consulting in
15 connection with any litigation, other than this one?
16  A.   Not that I'm aware of.
17  Q.   You would be aware of matters that you
18 are currently consulting on.  Correct?
19  A.   I am aware.  I do a lot of consulting for
20 a lot of different entities.  There's -- there's no
21 specific litigation that I'm aware of for any of
22 those.
23  Q.   How much money did you make last year
24 from serving as an expert witness?
25  A.   I don't have that number.

Page 33

1   Q.   How much money have you made so far this
2  year from serving as an expert witness?
3   A.   I've received nothing this year as a
4  result of serving as an expert witness.
5   Q.   Have you billed for any services rendered
6  as an expert witness over the course of this year so
7  far?
8   A.   In 2020?  No.
9   Q.   In 2022?
10  A.   2022, no.
11  Q.   In 2021, did you provide any consulting
12 or expert witness services in connection with any
13 litigation, other than this one?
14  A.   I don't believe so.
15  Q.   How much are you charging per hour for
16 your work in this case?
17  A.   $400 per hour for consulting, $500 for
18 depositions, and any trial work.
19  Q.   And is that $500 flat per hour for
20 depositions?
21  A.   What do you mean, "flat"?
22  Q.   500, not 540 or --
23  A.   $500, yes.
24  Q.   $500.
25  A.   I believe that's in the report as well.

9 (Pages 30 - 33)

Page 34

1    Q.   How do you track the time that you spend
2  on this litigation?
3    A.   How do I track?
4    Q.   Uh-huh.
5    A.   I track all of my time.  I've got a
6  internal spreadsheet system that I use, so I --
7  that's how I track it.
8    Q.   So you have records of all of the time
9  that you have spent on this matter.  Correct?
10    A.   I do.
11    Q.   And that includes your time spent during
12  calendar year 2022?
13    A.   Yes.
14    Q.   How often do you generate invoices in
15  connection with your work on this litigation?
16    A.   There is no predetermined frequency.
17    Q.   So how do you determine at any given
18  point when to issue an invoice?
19    A.   It's usually after some significant work
20  has occurred.  There is no set time frame.
21         (Exhibit 2 was marked.)
22    Q.   All right.  And we've marked as Exhibit 2
23  a document that has "Consulting Agreement" as the
24  title.  I'm handing it to you right now.  Please
25  take a look at that.

Page 35

1    A.   (Pause.)
2    Q.   Is that your consulting agreement in
3  connection with this litigation?
4    A.   It is.
5    Q.   And if you turn to the second page, there
6  is a heading for "Compensation."  Correct?
7    A.   Correct.
8    Q.   And that first section, 3.1, states that:
9  Compensation will be at the rate of $400 per hour
10  for consulting work.
11         That's -- you mentioned previously.
12  Correct?
13    A.   Correct.
14    Q.   And it also says:  There is an
15  alternative fee of $3,200 per day, regardless of the
16  number of hours in the day exceeding eight hours?
17    A.   Correct.
18    Q.   Have there been any instances in this
19  litigation where you have used that 3,200 per day in
20  a given day?
21    A.   I don't believe so, but, I -- I'd have to
22  go back and check.
23    Q.   And continuing in that section, it says
24  that:  For expert testimony work, i.e., trial
25  testimony or deposition testimony, the rate will be

Page 36

1  at $525 per hour.
2    A.   I see that.
3    Q.   Is that correct?
4    A.   That is correct, and what I said earlier
5  was incorrect.
6    Q.   Okay.  So your hourly rate for testimony,
7  including here today, is 525 an hour?
8    A.   That's correct.
9    Q.   And it also says that there is an
10  alternative fee of 4,200 -- $4,200 per day,
11  regardless of the number of hours in the day
12  exceeding eight hours?
13    A.   That's correct.
14    Q.   Does that apply for purposes of your
15  deposition at your deposition here today?
16    A.   Yes.
17         MR. DAVIS:  Assuming we exceed eight
18  hours.
19    Q.   But there is no reason that that
20  provision would not apply with respect to a day of
21  deposition testimony, including today, if we exceed
22  eight hours?
23    A.   That's correct.
24    Q.   I'm going to mark some invoices as the
25  next few exhibits.  Just bear with us a moment.  You

Page 37

1  know what, I'm going to do this as a composite
2  exhibit so we just mark a single exhibit.  Just bear
3  with me.
4         (Exhibit 3 was marked.)
5         MR. DAVIS:  Are you going to order
6  them in chronological order, Nilda?
7         MS. ISIDRO:  Sure, we can do that.
8    Q.   Okay.  So I'm handing you what's been
9  marked as Exhibit 3.  Can you confirm for me that it
10  contains seven pages of invoices?
11    A.   (Pause.)
12         Yes.
13    Q.   Great.
14         And the first invoice that's there is an
15  invoice from July 2nd, 2020.  Correct?
16    A.   Correct.
17    Q.   That's Invoice QA973?
18    A.   Correct.
19    Q.   And that invoice is for a total of
20  $12,400.  Correct?
21    A.   Correct.
22    Q.   And have you been paid on that invoice?
23    A.   Yes.
24    Q.   The full amount?
25    A.   Yes.

10 (Pages 34 - 37)

Page 38

1    Q.   Okay.  And the next invoice is
2 Invoice QA974 dated July 11th, 2020.
3    A.   (Pause.)
4    Q.   Is that right?
5    A.   That's right.
6    Q.   And that invoice is for a total of
7 $11,200.  Correct?
8    A.   That's correct.
9    Q.   Were you paid on that invoice?
10    A.   I was.
11    Q.   The full amount?
12    A.   The full amount.
13    Q.   Okay.  The next invoice is Invoice QA983.
14 Is that right?
15    A.   That's correct.
16    Q.   Dated October 4th, 2020?
17    A.   That's correct.
18    Q.   For a total amount of $19,600?
19    A.   That's correct.
20    Q.   Were you paid on that invoice?
21    A.   I was.
22    Q.   The full amount?
23    A.   The full amount.
24    Q.   The next invoice is Invoice No. QA990.
25 Is that right?

Page 39

1    A.   Yes.
2    Q.   Dated December 5th, 2020.  Correct?
3    A.   Yes.
4    Q.   For a total amount of $15,600?
5    A.   Yes.
6    Q.   Were you paid on that invoice?
7    A.   I was.
8    Q.   Were you paid the full amount?
9    A.   Yes.
10    Q.   The next one is Invoice QA1003.  Is that
11 right?
12    A.   That's correct.
13    Q.   Dated May 2nd, 2021?
14    A.   Yes.
15    Q.   For a total amount of $16,400?
16    A.   Yes.
17    Q.   Were you paid on that invoice?
18    A.   I was.
19    Q.   Were you paid the full amount?
20    A.   I was.
21    Q.   The next one is Invoice QA1016, dated
22 July 18, 2021.  Is that right?
23    A.   That's correct.
24    Q.   For a total amount of $4,400?
25    A.   Yes.

Page 40

1    Q.   Were you paid on that invoice?
2    A.   I was.
3    Q.   And were you paid the full amount?
4    A.   I was.
5    Q.   And the last invoice in Exhibit 3 is
6 Invoice QA1034, dated November 7th, 2021.  Is that
7 right?
8    A.   That's right.
9    Q.   And that's for $44,000.  Correct?
10    A.   Correct.
11    Q.   Were you paid on that invoice?
12    A.   I was.
13    Q.   Were you paid the full amount?
14    A.   I was.
15    Q.   Have you issued any invoices since that
16 November 7th, 2021, invoice?
17    A.   I don't believe so.
18    Q.   And have you issued any invoices, other
19 than the seven invoices that we have here in
20 Exhibit 3?
21    A.   Not that I'm aware of.
22    Q.   These invoices are addressed to
23 Plaintiffs' Steering Committee.  Correct?
24    A.   That's correct.
25    Q.   Who do you actually send your invoices to

Page 41

1 when you generate them?
2    A.   I send these to Rosemarie Bogdan.
3    Q.   And that's true for all of the invoices?
4    A.   That's -- yes.
5    Q.   Okay.  Following this November 7th, 2021,
6 invoice, have you spent time on this litigation?
7    A.   Yes.
8    Q.   How much time?
9    A.   I don't know.  I'd have to go back and
10 check my records.  I really don't know.  If we -- if
11 that's important, we could get that number.
12    Q.   Okay.  And after today, do you intend to
13 continue spending time on this litigation?
14        MR. DAVIS:  Objection; calls for
15 speculation, I suppose.
16    A.   It's -- it's -- I don't know, unless --
17 if I'm asked to, I probably would do so.
18    Q.   Is it --
19    A.   I haven't been asked, but I've -- if I
20 was, I probably would do so.
21    Q.   Is it your understanding -- is it your
22 understanding that your services will be ongoing
23 during the pendency of the litigation?
24        MR. DAVIS:  Objection.
25        You can answer.

11 (Pages 38 - 41)

Page 42

1    A.   We've had no concrete discussion that's
2 going to happen.  I'm assuming it probably would,
3 but...
4    Q.   And so looking at these invoices, these
5 seven invoices that are in Exhibit 3, through
6 November 7th of 2021, you've been paid $123,600 for
7 your work in connection with this litigation?
8    A.   I haven't added them up, but if that's
9 the number when they add up, that would be correct.
10    Q.   Who first contacted you in connection
11 with this litigation?
12    A.   Rosemarie.
13    Q.   And did you know Rosemarie before she
14 contacted you in connection with this litigation?
15    A.   No, I did not.
16    Q.   Did you have a relationship with any of
17 the plaintiffs' counsel or their firms prior to
18 this -- prior to being engaged to work on this
19 litigation?
20    A.   No.
21        THE WITNESS:  I'm sorry.
22        MR. DAVIS:  Just give me a little
23 time to place an objection.
24        THE WITNESS:  Okay.
25        MR. DAVIS:  So I'm going to object to

Page 43

1 that as vague.
2    Q.   When were you first contacted in
3 connection with this litigation?
4    A.   I don't have a date.
5    Q.   It would have been before July 2nd of
6 2020.  Correct?
7    A.   That's correct.
8    Q.   And, in fact, it would have been before
9 May 28th of 2020, which is the first date reflected
10 on that July 2nd, 2020, invoice.  Correct?
11    A.   That would be correct.
12    Q.   What were you asked to do when you were
13 contacted about this litigation?
14        MR. DAVIS:  I'm going to object.
15        But you can answer for now.
16        And I think the assignment he was
17 given is reflected in his declaration, but feel free
18 to answer.
19    A.   I was asked to -- again, we're going back
20 probably two years.  I was asked to do consulting
21 work in regard to this litigation.  I was asked what
22 documents I might need to review in the scope of
23 this, understanding where we were at that time.  I
24 provided a list of documents to Rosemarie that I
25 thought I would need in order to do a review.

Page 44

1    Q.   Were you provided with everything you
2 asked for?
3    A.   I don't believe so.  I don't believe all
4 the documents have yet been provided, but I don't --
5 I'm not certain.  I think most probably have, but
6 I'm not certain.
7    Q.   What did you request that was not
8 provided?
9    A.   I don't know.  It was a two-page list and
10 I have not checked off which ones were not provided.
11 I could probably made that determination if we need
12 that information.
13    Q.   You still have a copy of that list?
14    A.   I do.
15    Q.   I'm going to ask you to make sure you
16 preserve a copy of that list.
17    A.   I will.
18    Q.   In connection with your work on this
19 litigation, is there anyone who assists you with
20 research?
21    A.   No.
22    Q.   Have you reviewed the opinions of any of
23 plaintiffs' other experts in connection with this
24 litigation?
25    A.   No, I have not.

Page 45

1    Q.   Have you reviewed the opinions of any
2 defendants' experts in connection with this
3 litigation?
4    A.   No, I have not.
5    Q.   Were you provided with any assumptions
6 that you were asked to take as true in connection
7 with forming your litigations -- with forming -- let
8 me repeat that question from the beginning.
9        Were you provided with any assumptions
10 that you were asked to take as true in forming your
11 opinions in connection with this litigation?
12        MR. DAVIS:  Object to the form.
13        You can answer.
14    A.   I'm not sure I understand exactly what
15 you're asking.  Maybe you want to clarify?
16    Q.   In forming your opinions in connection
17 with this litigation, were there any facts that you
18 assumed to be true and did not independently verify?
19    A.   No, not that I'm aware of.
20        MR. DAVIS:  And same objection to
21 form on that question.
22    Q.   Have you ever communicated with any of
23 the plaintiffs in this litigation?
24    A.   No.
25    Q.   Have you ever communicated with any of

12 (Pages 42 - 45)

1 their medical providers?

2    A.   No, I have not.

3    Q.   In connection with this litigation have
4 you communicated with anyone at any of the defendant
5 companies?

6    A.   No, I have not.

7    Q.   Have you ever reviewed any of plaintiffs'
8 medical records?

9    A.   No, I have not.

10       MR. DAVIS:  We've been going about an
11 hour.  Do you want to take a break or...

12       MS. ISIDRO:  Sure.  We can take a
13 quick break.

14       THE VIDEOGRAPHER:  Off the record,
15 10:28 a.m.

16    (Break.)

17       THE VIDEOGRAPHER:  Back on the
18 record.  The time is 10:43 a.m.

19    (Exhibit 4 was marked.)

20    Q.   Mr. Quick, I am handing you Exhibit 4,
21 which is the notice of deposition -- the amended
22 notice of deposition for your deposition today.

23       Have you seen this before?

24    A.   I have.

25    Q.   And have you seen -- if you turn to

1 Page 6, there is a list of requests.  Have you seen
2 that before today?

3    A.   I have.

4    Q.   And did you assist in putting together
5 documents responsive to those requests?

6    A.   Yes.  I was provided a copy of this.  I
7 believe that you have been provided with responses
8 to these.

9    Q.   So you're aware that we received some
10 documents in response to these requests, and some
11 written responses in response to these requests a
12 couple of days ago?

13    A.   I am.

14    Q.   Did you assist in putting those together?

15       MR. DAVIS:  I'll object to the form
16 on that.

17       You can answer.

18    A.   I believe they provided documents to you
19 that were already available.  I didn't do any -- I
20 don't believe I did any special work on this as a
21 result of this.  They were already there.

22    Q.   I am marking as Exhibit 5 a document
23 that's titled:  Guidance for Industry Presenting
24 Risk Information in Prescription Drug and Medical
25 Device Promotion.

1    (Exhibit 5 was marked.)

2    Q.   Are you aware that this is one of the
3 documents that was produced in response to the
4 requests in your amended notice of deposition?

5    A.   There are a lot of documents.  I'm not
6 certain about this particular one.

7    Q.   Okay.  Is this a document that you
8 reviewed and relied on in forming your opinions in
9 this litigation?

10    A.   If I referenced it in my report or listed
11 in the report, I did.  If not, it was not.  I'd have
12 to go back and look to verify for certain.

13    Q.   Okay.

14       MR. DAVIS:  And I'll object to
15 compound on that.

16    Q.   All right.  Why don't we go ahead and
17 mark your report as the next exhibit, Exhibit No. 6.

18       And, Mr. Quick, I've just handed you
19 Exhibit No. 6.  Is this a copy of your report in
20 this litigation?

21    (Exhibit 6 was marked.)

22    A.   It is.

23    Q.   And behind the report itself, there is an
24 Exhibit A, is that right, following Page 37 of the
25 report?

1    A.   There is.

2    Q.   Is that -- and the title of that
3 Exhibit A is:  Materials Relied Upon for the
4 Declaration?

5    A.   That's correct.

6    Q.   Is that what you were referencing just a
7 few minutes ago when you said that if -- if
8 Exhibit 5 was listed in your report, then it was
9 something that you relied on?

10    A.   That's correct.

11    Q.   And do you see Exhibit 5 listed within
12 Exhibit A of your report?

13    A.   I don't see it, unless it was one of the
14 links on the websites.

15    Q.   Looking at the links, is it -- is
16 Exhibit 5 among any of those?

17    A.   I don't believe it is.

18    Q.   Okay.  So Exhibit 5 is not something that
19 you relied on in forming your opinions in connection
20 with this litigation?

21    A.   Well, the documents I relied on, or the
22 ones that are on the list, are the ones I footnoted.

23    Q.   Right.  And Exhibit 5 is not --

24    A.   It doesn't appear to be.

25    Q.   All right.  And we are marking as

13 (Pages 46 - 49)

Page 50

1 Exhibit 7 a document that is titled: M7(R1)
2 Assessment and Control of DNA Reactive (Mutagenetic)
3 Impurities in Pharmaceuticals to Limit Potential
4 Carcinogenic Risk.
5       (Exhibit 7 was marked.)
6   Q.   Mr. Quick, are you aware that this is one
7 of the documents that was produced to us as
8 responsive to the requests that were attached to
9 your amended notice of deposition?
10   A.   Are you asking if it's on my list?
11   Q.   No. I'm asking if you're aware that it
12 was one of the documents that was produced to us as
13 responsive to the requests that were attached to
14 your amended notice of deposition?
15   A.   I'm not certain.
16   Q.   So you do not know, one way or the other,
17 whether it was included?
18       MR. DAVIS:  I think whether it is
19 included is just a fact.  He can answer to whether
20 he's aware of it.
21       MS. ISIDRO:  I'm asking as to what he
22 was aware of.
23       MR. DAVIS:  Okay.  Sure.  Yeah.
24       MS. ISIDRO:  Right.
25   A.   I don't believe so.

Page 51

1   Q.   You don't know one way or the other or
2 you --
3   A.   No, I -- if it's --
4       MR. DAVIS:  I caution you not to
5 speculate.
6       THE WITNESS:  Okay.
7   A.   So I don't know.
8   Q.   Okay.  And is Exhibit 7 one of the
9 documents that you reviewed and relied on in forming
10 your opinions in this litigation?
11   A.   No.
12       MR. DAVIS:  Same objection, compound.
13   Q.   Is Exhibit 7 one of the documents that
14 you relied on in forming your opinions in this
15 litigation?
16   A.   No.
17   Q.   And I'll take back Exhibits 5 and 7.
18   A.   Which -- which one you want?
19   Q.   5 and 7.  Thank you.
20       And I'm going to hand you Exhibit 1
21 again, your CV.  If you can just take a quick look
22 at that and let me know if there are any updates to
23 your CV that are not reflected on Exhibit 1?
24       MR. DAVIS:  I'll object to that as
25 vague.

Page 52

1   A.   I'm not sure I understand what you're
2 asking.
3   Q.   Have there been any updates that should
4 be reflected on your CV that are not listed there?
5 Anything more recent, for example?
6   A.   No.
7   Q.   So the CV is complete and accurate as
8 reflected in Exhibit 1?
9       MR. DAVIS:  Object to form.
10       You can answer.
11   A.   That's correct.
12   Q.   Okay.  Turning back to the list of
13 documents that you relied on, Exhibit A to your
14 report?
15       MR. DAVIS:  For the record, that's
16 Exhibit 6.
17       MS. ISIDRO:  Correct.  Exhibit A
18 within Exhibit 6 to this deposition.
19   Q.   Are there any new materials that you have
20 reviewed in connection with this litigation since
21 putting together the list that's in front of you in
22 Exhibit A to Exhibit 6?
23       MR. DAVIS:  Object to form.
24       You can answer.
25   A.   I don't believe so.

Page 53

1   Q.   So, as you sit here today, you don't have
2 any updates to that list?
3   A.   Not that I'm aware of.
4   Q.   What did you do to prepare for this
5 deposition?
6   A.   Well, I reread my report.  We had
7 discussion yesterday afternoon and we had a call --
8       MR. DAVIS:  And I'll caution you not
9 to reveal the substance of those discussions.
10       THE WITNESS:  Okay.
11   A.   And there was a teleconference.
12   Q.   And when you say "we" had a discussion,
13 who are you referring to?
14   A.   The attorneys in this room.
15   Q.   And that does not include myself.
16 Correct?
17   A.   No, it did not include you.  That's
18 correct.
19   Q.   It also doesn't include my colleague,
20 Glenn Kerner.  Correct?
21   A.   That's correct.
22   Q.   And when you reference a teleconference,
23 can you please tell me who was on that
24 teleconference?  Who participated?
25   A.   The three attorneys on the right side of

14 (Pages 50 - 53)

Page 54

1 the room and some other folks. I don't recall who
2 else was on the call. We could get that list, but I
3 don't recall.
4    Q.   Do you know whether everyone who was on
5 that call was an attorney for the plaintiffs in this
6 litigation?
7    A.   I believe that to be the case.
8    Q.   To the best of your knowledge, there was
9 no one on that call who was not an attorney for the
10 plaintiffs in this litigation?
11   A.   That's correct.
12   Q.   Other than yourself. Right?
13   A.   Right.
14   Q.   Okay. Turning back to your CV,
15 Exhibit 1. You've been an independent consultant
16 from 2003 to the present?
17   A.   That's correct.
18   Q.   And has that been exclusively through
19 your own company?
20   A.   I'll clarify. There were one or two
21 situations where I was engaged by another consulting
22 firm to work with them, but it was still through my
23 own consulting firm.
24   Q.   And your own consulting firm is Quick &
25 Associates?

Page 55

1    A.   That's correct.
2    Q.   Does Quick & Associates have any
3 employees?
4    A.   So, to clarify, Quick & Associates
5 includes other unrelated businesses associated not
6 with this, though, and there are employees of
7 that -- those businesses.
8    Q.   When you say "not with this," what do you
9 mean by that?
10   A.   Not associated with the consulting
11 business.
12   Q.   Okay. And what businesses are those?
13   A.   Those would be businesses that my wife
14 has related to equestrian matters.
15   Q.   And those are housed under Quick &
16 Associates --
17   A.   That's right.
18   Q.   -- as well?
19   A.   They're sub -- they're sub -- they've got
20 subnames, but that they're -- they're not -- they're
21 separate.
22   Q.   Would it be fair to refer to the
23 consulting division of Quick & Associates or was
24 there a better way to refer to that?
25   A.   No, you can refer to Quick & Associates.

Page 56

1    Q.   Okay. So, aside from the equestrian
2 businesses that are within Quick & Associates, does
3 Quick & Associates have any employees?
4    A.   I'm the only person associated with
5 Quick & Associates for the consulting aspect.
6    Q.   Okay. So no employees other than
7 potentially yourself?
8    A.   That's correct.
9    Q.   And are you -- you don't consider
10 yourself an employee of Quick & Associates?
11   A.   That's correct.
12   Q.   Your primary focus within Quick &
13 Associates has -- for the past few years, has been
14 with 503(a) and 503(b) compounding pharmacies. Is
15 that correct?
16   A.   Among -- among other things.
17   Q.   But you do state in your CV that the
18 primary focus in the past several years have been
19 with 503(a) and 503(b) compounding pharmacies.
20 Correct?
21   A.   That -- that's what it says, but there
22 are a number of entities that I -- additional things
23 that I do.
24   Q.   Okay. So is it your testimony that that
25 statement is not accurate?

Page 57

1    A.   No, I'm not saying it's not accurate.
2    Q.   Okay. So that has been your primary
3 focus, but there are other activities that you
4 engage in as well?
5    A.   That's correct.
6    Q.   On Page 3 of your CV, the second bullet
7 point says: Engaged as independent expert witness
8 on Q7A (API Quality).
9        What did that -- what did that matter
10 involve?
11   A.   That's the matter we discussed earlier.
12   Q.   Which one? We discussed a few.
13   A.   This was with the firm in California who
14 was a contract manufacturer of monoclonal antibodies
15 and there was an issue with one of their customers
16 and I was called upon to prevent -- present an
17 expert testimony relative to Q7A at the time.
18   Q.   And the next bullet point below that in
19 your CV says: Engaged as expert witness on aseptic
20 processing in a litigation case.
21       Which case was that?
22   A.   That was a case we discussed that
23 occurred in 2012.
24   Q.   And if you could just refresh my memory,
25 that case in 2012, was that the medical device case?

15 (Pages 54 - 57)

Page 58

1 Was that a different case?
2    A.   The one in 2012 was the aseptic
3 processing case between the two private equity
4 firms.
5    Q.   Okay.  Is -- is that the matter in
6 connection with which you visited Teva or is that
7 unrelated?
8    A.   It -- it's unrelated.
9    Q.   Okay.  And then two bullet points down,
10 do you see where it says:  Have been preapproved by
11 the FDA and DOJ to assist a drug company in a
12 consent decree?
13    A.   I do.
14    Q.   What does that refer to?
15    A.   That refers to a company in St. Louis
16 that had been notified that the Department of
17 Justice wanted to enter into a consent decree with
18 the company.
19    Q.   What do you mean when you say that you
20 were "preapproved by the FDA and DOJ"?
21    A.   So they had to provide to DOJ and FDA an
22 individual who would be their consultant in regard
23 to this matter, which they did.
24    Q.   So they were free to choose?
25    A.   I'm sorry?

Page 59

1    Q.   They were free to chose whomever they
2 wished as a consultant?
3    A.   That's correct.
4    Q.   And they simply needed to inform FDA and
5 DOJ who that was going to be?
6    A.   That's correct.
7    Q.   And the second bullet point from the
8 bottom still on Page 3 of your CV, mentions:
9 Continued to work with former boss (past Baxter
10 chairman/CEO) and his private equity company focused
11 on the FDA regulated industry.
12       Who are you referring to there?
13    A.   Vernon Loucks.  I would note that he's
14 recently passed away.
15    Q.   Sorry to hear that.
16       Okay.  And prior to beginning your
17 consulting practice through Quick & Associates, you
18 were with Baxter for a number of years.  Correct?
19    A.   That's correct.
20    Q.   From 1966 through 2003?
21    A.   That's correct.
22    Q.   Other than your consulting work, is your
23 time at Baxter your only employment within the
24 pharmaceutical and medical device industry?
25    A.   That's correct.

Page 60

1    Q.   You've never worked for the FDA.
2 Correct?
3    A.   No, I have not.
4    Q.   Looking at your list of papers,
5 publications, presentations, and patents on Page 5,
6 starting on Page 5 of your CV, Pages 5 and 6.  The
7 most recent one is November/December 2015.  Is that
8 correct?
9    A.   That's correct.
10    Q.   And there hasn't been anything more
11 recent than that that isn't reflected here?
12    A.   That's correct.
13    Q.   Okay.  The items here are a mix of
14 publications and oral presentations.  Is that
15 correct?
16    A.   That's correct.
17    Q.   Did any of these relate to valsartan or
18 valsartan-containing drugs?
19    A.   No, they did not.
20    Q.   Did any of these relate to nitrosamines?
21    A.   No, they did not.
22    Q.   Do you have any formal education in the
23 regulatory or quality systems fields?
24    A.   Formal education, no.
25    Q.   Do any of your papers, publications, or

Page 61

1 presentations relate to testing for impurities?
2    A.   No.
3    Q.   Do you currently hold any professional
4 licenses?
5    A.   No.
6    Q.   And I know you testified earlier you've
7 never been employed by FDA.  Have you ever done any
8 consulting for FDA?
9    A.   No.
10    Q.   You're not a toxicologist.  Correct?
11    A.   No, I'm not.
12    Q.   You're not an epidemiologist?
13    A.   No, I'm not.
14    Q.   You're not a cancer biologist?
15    A.   No, I'm not.
16    Q.   You're not a statistician?
17    A.   No.
18    Q.   You're not an analytical chemist?
19    A.   I have a chemistry degree by education.
20    Q.   Okay.  Do you consider yourself an
21 analytical chemist?
22    A.   No.
23    Q.   Do you consider yourself an expert in
24 pharmacovigilance?
25    A.   No.

16 (Pages 58 - 61)

1    Q.    Are you a medical doctor?
2    A.    No.
3    Q.    Will you be offering any opinions in this
4  litigation about how nitrosamines are absorbed in
5  the human body?
6    A.    No, I am not.
7    Q.    Will you be offering any opinions in this
8  litigation about how nitrosamines are metabolized by
9  the human body?
10   A.    No, I will not.
11   Q.    Will you be offering any opinions in this
12 litigation as to whether or not valsartan is an
13 effective drug in the treatment of hypertension?
14   A.    No, I will not.
15   Q.    Would it be fair to say that your
16 opinions in this litigation are limited to your
17 analysis of CGMP protocols?
18        MR. DAVIS:  I'm going to object to
19 the extent that that misrepresents his report.
20        You can answer to the question.
21   A.    CGMP protocols, no.  The answer is no.
22   Q.    Okay.  How would you describe the scope
23 of your opinions in this litigation?
24   A.    My opinions relate to the compliance
25 aspects of the various companies related to CGMP as

1  it pertains to the whole class action.
2    Q.    Anything else?
3    A.    It's -- it was the GMP aspects.
4    Q.    And you won't be offering any causation
5  opinions in this litigation.  Correct?
6        MR. DAVIS:  I'm going to object to
7  the question.
8        You can answer.
9    A.    Would you like to explain that?
10   Q.    Sure.
11        You're not going to be offering any
12 opinions in this litigation on whether defendants'
13 products caused or contributed to any of plaintiffs'
14 alleged injuries.  Correct?
15   A.    No, I'm not.
16   Q.    Would it be fair to say that FDA plays an
17 active role in regulation of pharmaceuticals and
18 manufacture of pharmaceuticals?
19   A.    Plays a role?  Yes, that would be fair.
20   Q.    And the FDA has a spectrum of available
21 enforcement options.  Correct?
22   A.    Correct.
23   Q.    That includes ordering a recall?
24   A.    So, typically, FDA would not order a
25 recall.

1    Q.    Does that --
2    A.    They could do that.
3    Q.    So they do have the power to do that?
4    A.    They --
5    Q.    Sorry.  I just want to make sure that
6  it's audible on the record.  They do have the power
7  to do that?
8    A.    They do have the power.  Well, maybe I
9  should elaborate here, because that's not really the
10 case.
11        If the FDA believes a recall should
12 happen, they will say -- they will tell the firm
13 that they recommend that the firm recall a product,
14 and then the firm will voluntarily recall a product,
15 usually.
16   Q.    Does the FDA have the option of obtaining
17 an injunction?
18   A.    Going through the Department of Justice,
19 yes.
20   Q.    And does the FDA have the ability to stop
21 a manufacturer from distributing a product?
22   A.    If they go through the Department of
23 Justice, they would have that authority.
24   Q.    Does FDA have the power to seize product?
25   A.    They do.  It's not -- I'm not certain

1  whether they have to go through the Department of
2  Justice to seize the product or not, but they would
3  typically do that, I believe.  They do seize
4  product.
5    Q.    And does the FDA have the power to pursue
6  criminal prosecution?
7    A.    In conjunction with the Department of
8  Justice, yes.
9    Q.    Now, in your report, you discuss various
10 FDA guidelines.  Correct?
11   A.    Guidances.
12   Q.    Okay.  Only guidances, no guidelines?
13        MR. DAVIS:  I'll object to the
14 question as vague.
15   A.    So I'm not sure what I reference to what
16 are guidelines.  It's typically guidances.
17   Q.    Okay.  And is it your understanding that
18 the terms "guidance" and "guideline" are distinct in
19 discussing FDA -- in the FDA context?
20   A.    Well, typically, it's guidances.  I'm
21 not -- if -- we'd have to -- we'd have to talk about
22 what you mean, "guidelines."
23   Q.    Are you familiar with FDA ever having
24 issued something that is a guideline, rather than a
25 guidance?

17 (Pages 62 - 65)

Page 66

1    A.   Maybe. I don't recall.
2    Q.   21 CFR 210 and 21 CFR 211 set forth the
3  CGMP for pharmaceutical products. Correct?
4    A.   That's correct.
5    Q.   And several of your opinions in this case
6  refer to 21 CFR 210 and 211. Correct?
7    A.   Correct.
8    Q.   Is it fair to say that how a particular
9  company achieves the controls described in 21 CFR
10  210 and 211 is up to the company to decide.
11  Correct?
12       MR. DAVIS: Object to form.
13    A.   As long as they're compliant.
14    Q.   21 CFR 210 and 21 CFR 211 don't set forth
15  specific instructions on how to achieve the controls
16  that are described therein. Right?
17       MR. DAVIS: Object to form.
18    A.   The FDA -- FDA does describe those in the
19  guidances that they have in terms of how you meet
20  the requirements of 21 CFR 210 and 211.
21    Q.   So focusing solely on 21 CFR 210 and
22  21 CFR 211, those do not set forth specific
23  instructions on how to achieve the controls that are
24  described therein. Right?
25    A.   As you stated it, you're correct.

Page 67

1       MR. DAVIS: I'm going to object to
2  that.
3       THE WITNESS: I'm sorry.
4       MR. DAVIS: Give me a few moments to
5  object.
6    Q.   Now, you mentioned a moment ago that FDA
7  describes in guidances how you meet the requirements
8  of 21 CFR 210 and 211. Is that correct?
9    A.   That's correct.
10    Q.   And what guidances are you referring to?
11    A.   FDA has thousands of guidances, so I --
12  it's not just one guidance, there is -- there are
13  many guidances.
14    Q.   Are there any that you can think of, as
15  you sit here today, that provide specific
16  instructions on how to achieve the controls in
17  21 CFR 210?
18    A.   There is gui-- FDA has guidances on
19  almost every aspect of 210 and 211, so...
20    Q.   Okay. But as you sit here today, can you
21  think of a guidance that set forths -- that sets
22  forth specific instructions on how to achieve the
23  controls that are described in 21 CFR 210?
24       MR. DAVIS: Object to form.
25       You can answer.

Page 68

1    A.   So 210 and 211 cover a wide variety, a
2  wide range of aspects, okay, and so for almost all
3  of those, there would be a guidance.
4    Q.   Okay. As you sit here today, can you --
5    A.   Sure.
6    Q.   -- identify one?
7    A.   Sure.
8       FDA has a guidance on process validation.
9    Q.   Okay. And what is that guidance?
10       MR. DAVIS: Are you asking for the
11  cite or?
12       MS. ISIDRO: Yes.
13    A.   So what do you mean, "what is that
14  guidance," what --
15    Q.   Is there a formal title or a citation for
16  that guidance?
17    A.   I don't -- it's -- process validation is
18  the guidance.
19    Q.   Okay. And does that guidance provide
20  specific instructions on how to achieve the controls
21  that are described with respect to process
22  validation in 21 CFR 210 and 211?
23       MR. DAVIS: I'm going to -- same
24  objection, and vague as to your use of the term
25  "specific instructions."

Page 69

1       But you can answer.
2    A.   It provides the guidance on how to
3  conduct proper process validations for drug
4  companies.
5    Q.   Okay. So let me ask you this: Would a
6  drug company be able to take the FDA guidance on
7  process validation and implement it without having
8  any manufacturer-specific processes or details
9  included or added?
10       MR. DAVIS: Object to form.
11    A.   So what a company should do would be they
12  would develop standard operating procedures on how
13  to meet the requirements and the guidances.
14    Q.   And those standing -- standard operating
15  procedures are a necessary part of the process for
16  compliance with 21 CFR 210 and 211. Correct?
17    A.   Correct.
18    Q.   And those SOPs -- is it okay if we refer
19  to standard operating procedures as SOPs?
20    A.   Sure.
21    Q.   Okay. Those SOPs would be drafted by
22  each individual manufacturer. Correct?
23    A.   Correct.
24    Q.   They're not something that is issued in a
25  standard format by FDA, ready to implement?

18 (Pages 66 - 69)

Page 70

1    A.    That's correct.
2    Q.    Okay.  Your report discusses Form 483s.
3 Correct?
4    A.    That's correct.
5    Q.    FDA can sometimes inspect a
6 manufacturer's facility.  Right?
7    A.    That's correct.
8    Q.    And that's commonly referred to as an FDA
9 site inspection?
10    A.    Yes.
11    Q.    And upon conclusion of a site inspection
12 by FDA, the FDA investigator may issue a Form
13 FDA 483, based on what was observed during the
14 inspection.  Correct?
15    A.    That's correct.
16    Q.    Would you agree that Form 483s are
17 relatively common in the industry?
18        MR. DAVIS:  Object to form.
19    A.    Well, the term -- what do you mean,
20 "relatively common"?  Many companies do not get a
21 Form 483 after an inspection.
22    Q.    During your time at Baxter, did they ever
23 receive a Form 483?
24    A.    Yes.
25    Q.    And an FDA Form 483 is a list of

Page 71

1 observations made by the FDA inspector during the
2 inspection and presented to the most responsible
3 person of the inspected facility at the close of the
4 inspection.  Correct?
5    A.    Correct.
6    Q.    FDA 483 inspectional observations are
7 considered to be the opinion of the FDA
8 investigator.  Correct?
9        MR. DAVIS:  Object to form.
10    A.    Typically, before a FDA 483 is issued,
11 the investigator will confer with the center or his
12 office before issuing that.  So it would be probably
13 the opinion of the investigator, but also conferring
14 with the office.
15    Q.    FDA Form 483s do not represent a final
16 agency determination regarding compliance.  Correct?
17    A.    That's correct.
18    Q.    Your report also discusses warning
19 letters.  Is that right?
20    A.    That's correct.
21    Q.    A warning letter is sometimes issued by
22 the FDA as a result of an inspection and issuance of
23 a Form 483?
24    A.    That's correct.
25    Q.    But a warning letter does not always

Page 72

1 follow a Form 483.  Correct?
2    A.    That is correct.
3    Q.    Are Form 483s and warning letters issued
4 by the same division within FDA?
5    A.    I'm not sure I know what you mean by
6 "division."
7        Typically the drug group would handle the
8 drug aspects.  You wouldn't get a warning letter on
9 a drug product from the medical device group, for
10 example.
11    Q.    Okay.  Are you familiar with the Office
12 of Regulatory Affairs within FDA?
13    A.    Yes.
14    Q.    Does the Office of Regulatory Affairs
15 issue Form 483s?
16    A.    They can.
17    Q.    Does the Office of Regulatory Affairs
18 issue warning letters?
19    A.    They can.  Typically it would come from
20 the local office -- or the district office or
21 regional office.
22    Q.    Are you familiar with the FDA's
23 regulatory procedures manual?
24    A.    I've seen it, yes.  I've looked at it,
25 I've reviewed it.  It's extensive.

Page 73

1    Q.    And are you aware that the FDA's
2 regulatory procedure manual states that a warning
3 letter is informal and advisory?
4    A.    I think it says more than that, but we'd
5 have to go back and look at exactly what it says.
6    Q.    Would it be fair to say that a warning
7 letter communicates the agency's position on a
8 matter, but it does not commit the FDA to taking
9 enforcement action?
10        MR. DAVIS:  Object to form.
11    A.    It does not commit the FDA to take an
12 enforcement action beyond that.
13    Q.    And the FDA itself does not consider
14 warning letters to be final agency action on which
15 it can be sued.  Is that correct?
16        MR. DAVIS:  Object to form.
17    A.    There are additional actions beyond the
18 warning letter.
19    Q.    After a warning letter is issued, the FDA
20 reviews a manufacturer's response to the warning
21 letter.  Correct?
22    A.    Usually.
23    Q.    And what do you mean by "usually"?
24    A.    I mean, they can take action without
25 reviewing that.

19 (Pages 70 - 73)

Page 74

1    Q.   What sorts of actions could they take
2 without reviewing that?
3    A.   Well, they could go directly to some sort
4 of a consent decree or seizures or some other
5 action, depending on what it is.  But they would
6 usually review the warning letter response.
7         I will note, though, in many warning
8 letters they will put the fact that they're going to
9 initiate an import detention for those firms that
10 reside outside the United States in the warning
11 letter.
12    Q.   What does that entail?
13    A.   That means that those products from that
14 company cannot be imported to the United States.
15    Q.   So when the FDA reviews a company's
16 response to a warning letter, if the FDA is
17 satisfied with the company's response, does it close
18 out the warning letter?
19         MR. DAVIS:  Object to form.
20    A.   No, not usually.
21    Q.   So what happens once the FDA has reviewed
22 a company's response to a warning letter and the FDA
23 is satisfied with the response?
24    A.   They won't be satisfied until they come
25 back for an additional inspection, usually.

Page 75

1    Q.   And what is that based on, your statement
2 that they won't be satisfied usually until they come
3 back for an inspection?
4         (Simultaneous speaking.)
5    A.   The typical action by the FDA, in order
6 to close out a warning letter, is that they will
7 come back and do an inspection.  That's the typical
8 response from the FDA.
9    Q.   And when you say "that's the typical
10 response from the FDA," is that based on your
11 experience?
12    A.   Yes.
13    Q.   Based on anything else?
14    A.   Well, it's based on what they do.  It's
15 just history.
16    Q.   So just what you've observed over the
17 years in this industry?
18    A.   Yes.
19    Q.   In your report in this litigation you
20 refer to nitrosamines.  Correct?
21    A.   I do.
22    Q.   And are the nitrosamines you're referring
23 to NDMA and NDEA?
24    A.   Yes.
25    Q.   What sources did you learn to -- what

Page 76

1 sources did you use to learn about nitrosamines in
2 connection with this litigation?
3    A.   I reviewed the documents that were
4 provided by the company in response to my request.
5    Q.   And when you say "the documents that were
6 provided by the company," what company are you
7 referring to?
8    A.   The defendants.
9    Q.   So you reviewed documents produced by the
10 defendants in this litigation?
11    A.   I did.
12    Q.   Did the documents that you reviewed
13 include information about levels of impurities found
14 in each manufacturer's product?
15    A.   Well, we're talking a number of
16 defendants.  Some did, yes.
17    Q.   Did you review nitrosamine levels for
18 each defendant's products?
19    A.   No.  What I was tasked to do was to
20 determine the CGMP compliance of the various
21 companies.
22    Q.   And does that mean that you do -- you
23 would not view the levels of nitrosamines in the
24 product as relevant to that inquiry?
25         MR. DAVIS:  Object to form;

Page 77

1 mischaracterizes his testimony.
2    A.   Well, they're probably relevant because
3 that's the basis for many of the issues that the FDA
4 had with the companies.
5    Q.   So you did not review nitrosamine levels
6 for each defendant's products, but you do view that
7 information as relevant to your opinions?
8         MR. DAVIS:  Object to form;
9 mischaracterizes his testimony.
10    A.   No, I don't consider it to be relevant.
11 What I consider to be relevant are the CGMP aspects
12 of the various companies.  That was one component of
13 it, but it wasn't the determining factor for CGMP.
14         MS. ISIDRO:  Let's go ahead and take
15 a short break, five minutes.
16         MR. DAVIS:  Sure.
17         THE VIDEOGRAPHER:  Off the record.
18 The time is 11:33 a.m.
19         (Break.)
20         THE VIDEOGRAPHER:  We're back on the
21 record at 11:46 a.m.
22    Q.   Mr. Quick, one of the documents that you
23 relied on in your report was the FDA's guidance to
24 manufacturers of human drugs on controlled
25 nitrosamine impurities.  Correct?

20 (Pages 74 - 77)

Page 78

1  A.   If I reference -- I have to go back and
2  look.  If I reference it there, yes.  I don't recall
3  that, but, yes.
4  Q.   Well, let's take a look at your reliance
5  list in your report.
6  A.   Yes, I do see it.
7  Q.   Okay.  It's on Page 3, right, the second
8  item from the top?
9  A.   Right.
10  Q.   Yeah.  Okay.  Now, that guidance was not
11  released until 2021.  Correct?
12  A.   Yes.  That's the date that's stated here.
13  I don't know whether there is an earlier version of
14  it or not, but...
15  Q.   Okay.  So as you sit here right now, you
16  don't know one way or the other whether there was an
17  earlier version of the FDA's guidance on control of
18  nitrosamine impurities in human drugs?
19        MR. DAVIS: I'm going to object to
20  form and vague and ambiguous for draft or final.
21  A.   I'm not certain.
22  Q.   Are you aware of whether the FDA had set
23  any interim limits on nitrosamines?
24  A.   I didn't -- I didn't review the limits
25  that the FDA has set.  What I was reviewing were the

Page 79

1  CGMP aspects as it applied to all of the class
2  group.  That's what I was reviewing.  And the
3  particular limits of the nitrosamine was not
4  relevant to the CGMP aspect.
5  Q.   So as you sit here today you don't know
6  one way or the other whether there was an FDA
7  standard requiring testing for nitrosamines in the
8  2012 to 2018 period?
9  A.   There was a requirement for the
10  manufacturers to know their impurities and to
11  characterize the impurities that they would find in
12  the product.
13  Q.   But as you sit here today, you don't know
14  one way or the other whether the FDA had a standard
15  requiring testing for nitrosamine specifically in
16  2012 to 2018?
17        MR. DAVIS: I'm going to object to
18  the form.
19  A.   Again, as I stated, the FDA's expectation
20  was that the manufacturers would characterize the
21  impurities and define the impurities.  That was the
22  expectation.
23  Q.   Would that be part of the compendial
24  standards for a product?
25        MR. DAVIS: Object to form.

Page 80

1  A.   Well, it's a requirement for under Q7A
2  that you would know your impurity profiles.
3  Q.   And where would impurity profiles for a
4  particular product be set forth?
5  A.   I didn't catch the last part of that.
6        MS. ISIDRO: Can you read it back,
7  please?
8        (The requested material was read.)
9  A.   Well, the manufacturer is supposed to set
10  forth their own impurity profiles.
11  Q.   And where would the manufacturer do that?
12  Is that part of a submission to the FDA?
13  A.   It could be, but they're supposed to know
14  their own impurity profiles.  I mean -- so the FDA
15  would not know what those are.  The manufacturers
16  would know or should know.
17  Q.   Okay.  And are there specific standards
18  that are set forth for the composition of a
19  particular drug product?
20        MR. DAVIS: Object to form.
21        You can answer.
22  A.   Well, there are USP monographs.  And the
23  FDA -- the firms would put into their files what
24  they're going to do and the FDA would determine
25  whether those are acceptable for that or not.

Page 81

1        But I don't know.  There's -- I'm not
2  sure I understand exactly your use of the word
3  "standards."
4  Q.   Sure.  Does USP set forth testing
5  requirements for impurities in a particular drug
6  product?
7        MR. DAVIS: Object to form;
8  Incomplete question.
9  A.   They may.  I'm not certain.  But Q7 does.
10  That was the real point.
11  Q.   What determines the particular impurities
12  that a manufacturer has to test for with respect to
13  a specific drug product?
14        MR. DAVIS: Objection; vague.  Are
15  you referring to impurities or genotoxic impurities?
16  Q.   You can answer the question.
17  A.   Sorry.  Would you repeat the question?
18        MS. ISIDRO: Can you read it back,
19  please?
20        (The requested material was read.)
21  Q.   That's --
22        MR. DAVIS: Same objection; vague.
23  A.   Manufacturer is supposed to characterize
24  their impurities and know what they are.
25  Q.   How does that get implemented into the

21 (Pages 78 - 81)

Page 82

1 manufacturing process?
2          MR. DAVIS: Object to form. That --
3 vague.
4     A.   I'm not sure I understand what you're
5 trying to go with, with that.
6     Q.   So it's your testimony that a -- it's our
7 testimony that a manufacturer is supposed to
8 characterize the impurities associated with a
9 particular drug product to know what they are.
10 Correct?
11    A.   That's correct.
12    Q.   What happens once a manufacturer
13 identifies impurities during that process?
14    A.   Well, it depends what the impurities are
15 and determines what actions they should take. They
16 need to know what they are in the first place.
17    Q.   Okay. Are you familiar with the concept
18 of compendial standards for a pharmaceutical
19 product?
20    A.   Compendial products? Are we talking
21 about USP? Is that what we're talking about?
22    Q.   Just -- is -- is that what it means to
23 you?
24          MR. DAVIS: If he --
25    A.   I don't use that term.

Page 83

1          MR. DAVIS: He's asking for a
2 clarification.
3     Q.   What term do you use?
4     A.   USP monographs.
5     Q.   USP monographs.
6          Are impurities addressed within USP
7 monographs for a direct product?
8          MR. DAVIS: Objection to form and
9 vague as to the use of the word "impurities."
10    A.   I'd have to go back and review that. The
11 key point is they're addressed in Q7 as to -- as to
12 what a manufacturer should do.
13    Q.   As you sit here today, do you know
14 whether any -- do you know whether USP monographs
15 for any valsartan-containing product set forth any
16 standard for testing for nitrosamines in the 2012 to
17 2018 time period?
18          MR. DAVIS: Object to form.
19          You can answer.
20    A.   I didn't review that and it wasn't
21 necessary to review that based on the fact that I
22 was looking at the CGMP aspects as it pertained to
23 the class group.
24    Q.   Okay. So you did not view USP monographs
25 as relevant to the scope of your opinions?

Page 84

1     A.   No, I -- I didn't say that. I'm saying I
2 just didn't review that.
3     Q.   Okay.
4     A.   The -- the other thing I would add is
5 what I have in the report are examples. It's not an
6 exhaustive list.
7     Q.   We're going to get to the examples in
8 your report in -- in due course.
9          Are you aware that in 2018 FDA stated
10 that: The presence of NDMA was unexpected and was
11 thought to be related to changes in the way active
12 substance was manufactured?
13          MR. DAVIS: Object to form.
14    A.   I don't recall that exact term.
15    Q.   Did you review the July 2018 statements
16 that FDA issued regarding nitrosamines?
17    A.   I may have. I don't recall those.
18          MR. DAVIS: And I'll object to that
19 as vague. There were plenty of statements from the
20 FDA in 2018.
21          MS. ISIDRO: I'm going to mark as
22 Exhibit 8 an August 30, 2018, statement from FDA on
23 FDA's ongoing investigation into valsartan
24 impurities and recalls and an update on FDA's
25 current findings.

Page 85

1          (Exhibit 8 was marked.)
2     Q.   Have you seen this document before,
3 Mr. Quick?
4     A.   I may have, I'm not certain.
5     Q.   As you sit here today, you can't recall
6 one way or the other?
7     A.   Well, there are a lot of documents on
8 this subject so I may have seen this.
9     Q.   But you don't recall specifically as you
10 sit here today?
11    A.   I don't recall specifically this
12 document.
13    Q.   I'm going to turn your attention to the
14 third page of this press -- of this statement,
15 excuse me. And I'm going to draw your attention to
16 the second paragraph from -- excuse me.
17          I'm actually going to draw your attention
18 to the last paragraph at the bottom of that page.
19 About halfway through that do you see where it says:
20 Before we undertook this analysis, neither
21 regulators in our industry fully understood how NDMA
22 could form during this process?
23    A.   I see that.
24    Q.   So this was not something that FDA
25 understood --

22 (Pages 82 - 85)

Page 86

1        MR. DAVIS:  Object to form.
2    Q.   -- previously?
3        MR. DAVIS:  And calls for speculation
4 as well.
5    A.   Well, I'm not going to speak for FDA.  I
6 can read this -- what it said.  What it stated here.
7    Q.   Is it your understanding that FDA is
8 saying that is -- it is acknowledging that it did
9 not understand it previously?
10       MR. DAVIS:  Object to form, and calls
11 for speculation.
12    A.   That -- that I'll read you what it
13 saws here:  Before we undertook this analysis,
14 neither regulators in our industry understood how
15 NDMA could form during this process.
16       That's what it says.
17    Q.   And, in fact, FDA did not initially have
18 the analytical capability to measure nitrosamine
19 impurities.  Isn't that right?
20       MR. DAVIS:  Object to form.
21    A.   I don't know.
22    Q.   Well, let's take a look at the second
23 full paragraph on the third page of this statement.
24 That references F -- the fact that:  In St. Louis
25 the FDA maintains the most advanced pharmaceutical

Page 87

1 laboratory of any regulatory agency in the world.
2       Correct?
3    A.   That's what it says.
4    Q.   And further down in the paragraph it
5 states that:  To determine if valsartan products do
6 contain the NDMA impurity, CDER scientists have now
7 developed the gas chromatography mass spectrometry
8 head space testing method.
9       Correct?
10       MR. DAVIS:  Are you asking if he sees
11 that?
12    A.   I see that, yes, if that's what you're
13 asking.
14    Q.   So, in fact, FDA scientists had to
15 develop a new method in order to determine whether
16 valsartan products contained NDMA?
17       MR. DAVIS:  Object to form, and
18 mischaracterizes the statement.
19    A.   I'm not -- I'm not going to say I --
20       MR. DAVIS:  Let me finish my
21 objection first.  Yeah.  Object to form, and
22 mischaracterizes the statement in the document.
23       You -- you can answer.  It's okay.
24    A.   So I see what it says here, but I'm not
25 going to speak for the FDA.

Page 88

1    Q.   Are current industry standards relevant
2 to current good manufacturing processes?
3        MR. DAVIS:  Object to form.
4        You can answer if you understand it.
5    A.   If you want to talk about industry, what
6 industry standards you're referring to?
7    Q.   Are pharmaceutical industry standards
8 relevant to current good manufacturing practices in
9 the pharmaceutical industry?
10    A.   So you need to describe what you mean by
11 pharmaceutical standards, industry standards.
12 That's not -- that's not a typical term that would
13 be used.
14    Q.   Okay.  Are current testing capabilities
15 relevant to the question of current good
16 manufacturing practices in the pharmaceutical
17 industry?
18    A.   Probably not.
19    Q.   Why not?
20    A.   Because we're talking about current good
21 manufacturing practices, we're not talking about
22 testing methods.
23    Q.   Testing methods are completely irrelevant
24 to good manufacturing practices?
25    A.   I did not say that.

Page 89

1    Q.   Okay.  Then help me understand why,
2 because we're talking about current good
3 manufacturing practices and not testing methods,
4 testing capabilities are not relevant to current
5 good manufacturing practices?
6        MR. DAVIS:  Object to the form, and
7 mischaracterizes his testimony.
8    A.   Testing capabilities and good
9 manufacturing practices are two different things.
10    Q.   Okay.  Is -- they are two different
11 things.  Are they relevant to each other?
12       MR. DAVIS:  Objection; vague.
13       You can answer.
14    A.   I'm not going to say there's no
15 relevance, but I'm just saying they're two different
16 things.
17    Q.   If a test doesn't exist, can it form part
18 of current good manufacturing practices?
19    A.   Well, if a -- what you said makes no
20 sense.
21       MR. DAVIS:  Object to the
22 hypothetical, is contrary to --
23    A.   What you just stated really makes no
24 sense.
25    Q.   Why doesn't it make sense?

23 (Pages 86 - 89)

Page 90

1    A.   If something doesn't exist -- you want to
2  elaborate more what you're trying to say?
3    Q.   Well, if something doesn't exist, it
4  can't form part of good -- current good
5  manufacturing practices.  Right?
6        MR. DAVIS:  Object to form, and
7  presenting an improper hypothetical.
8    A.   I'm not sure where -- where you're going
9  with this, but they're not relevant to each other
10 based on what you're saying.
11   Q.   So you won't agree with me that if
12 something doesn't exist, it cannot form part of
13 current good manufacturing practices?
14       MR. DAVIS:  Object to form, that
15 mischaracterizations his testimony.
16       You can answer.
17   A.   If some -- if something doesn't exist,
18 then it obviously wouldn't be part of anything.
19   Q.   What is your understanding of adulterated
20 products in the context of pharmaceutical regulatory
21 compliance?
22   A.   If a firm fails to meet CGMPs -- there
23 are several aspects.  If a firm fails to meet CGMPs,
24 the product -- the products that they make in that
25 facility would be considered -- would be considered

Page 91

1  to be adulterated.
2    Q.   That is your complete understanding of
3  the term "adulterated products" in the
4  pharmaceutical context?
5    A.   No --
6        MR. DAVIS:  Object to form, if you
7  want him to look at his report, he's willing to look
8  at his report.
9    A.   Yeah.  I -- I -- I go into that in the
10 report.  There are other aspects of adulteration.
11   Q.   My question to you what is -- was, what
12 is your understanding of the term "adulterated
13 products" in the pharmaceutical context?
14       MR. DAVIS:  Object to form.
15       You can answer.
16   A.   So a product could be contaminated, that
17 would be adulteration.  Or the product could be fine
18 but if the firm failed to adhere to current good
19 manufacturing practices, the products that they are
20 making, by definition are adulterated.
21   Q.   Does FDA define adulterated products?
22   A.   I just defined it.
23   Q.   My question was, does FDA define it?
24   A.   They do.  The FDA states if the firm is
25 not manufacturing products in accordance with the

Page 92

1  current good manufacturing practices, the products
2  are adulterated.
3    Q.   Is there a particular regulation or other
4  place where FDA defines adulterated product?
5    A.   It states it many places.  And I think I
6  reference those in the report.
7    Q.   Okay.  Can -- do you still have your
8  report --
9    A.   Yes.
10   Q.   -- in front of you?
11       Can you show me where you reference that?
12   A.   Okay.  We'll have to go through here and
13 find it.
14       (Pause.)
15       Well, Section -- my Section 24 refers to
16 that.
17       MR. DAVIS:  For the record, are you
18 on Page 6, Mr. Quick?
19       THE WITNESS:  Yes, on Page 6.
20       MR. DAVIS:  Okay.
21   Q.   Does FDA also define the term
22 "misbranded"?
23       MR. DAVIS:  Object --
24   A.   That's separate.
25       MR. DAVIS:  Hang on, Mr. Quick.  Let

Page 93

1  me place an objection on the record.
2        So I'm going to object to form, and
3  vague as to your term -- use of the term "FDA
4  defining" something.
5        You can answer, Mr. Quick.
6        THE WITNESS:  So what was --
7        MS. ISIDRO:  If you could read back
8  the question and the answer that Mr. Quick started
9  to give before the objection.
10       (The requested material was read.)
11   A.   So I'm not sure I understand the
12 question.
13   Q.   Well, you said "That's separate."  What
14 do you mean?
15   A.   Yeah, I -- that was, like, five minutes
16 ago.  So, I mean, you may want to rephrase your
17 question.
18   Q.   Does FDA define the term "misbranded" in
19 the pharmaceutical context?
20       MR. DAVIS:  Object to form, and same
21 objection as to the use of the word "FDA defining"
22 something.
23   A.   Well, I've discussed misbranding in the
24 report here, and we can probably pull that up.
25       (Pause.)

24 (Pages 90 - 93)

Page 94

1        So relative to misbranding, on 27:  A
2   drug product may be declared misbranded if the label
3   is false or misleading in any -- in a way which
4   fails to reveal facts material with respect to
5   consequences which may result from use of the
6   article.
7        There may be another place, too.
8        (Pause.)
9   Q.   You said there may be another place, too.
10  Did you find another place?
11  A.   There may be, but I think that covers it.
12  Q.   Okay.  What do you understand to be the
13  difference between the terms "adulterated" and
14  "misbranded" in the pharmaceutical context?
15  A.   Well, if a product is misbranded, it's
16  considered to be adulterated.  Adulterated product
17  doesn't necessarily have to be misbranded.
18  Q.   Can you explain that further?
19  A.   What would you like me to explain?
20  Q.   Well, is that the only difference between
21  the terms?
22  A.   Well, as I said a few minutes ago, is I
23  explained to you how a product can be considered to
24  be adulterated.
25  Q.   Okay.

Page 95

1        MR. DAVIS:  And please let me get
2   some objections on the record.
3        And I'm going to object to form on
4   that.
5        You can answer.
6        THE WITNESS:  Okay.
7   A.   As I previously stated, a product can be
8   considered to be adulterated if the CGMPs were not
9   followed in the manufacturing of the product, even
10  if there is nothing wrong with the product.
11  Q.   What is your basis for that statement?
12  A.   FDA states that in numerous places.
13  Q.   Okay.  Can you identify one place where
14  FDA states that?
15  A.   Okay.  Well, one good example is
16  virtually every single warning letter states in the
17  warning letter, because CGMPs were not met, the
18  product is considered to be adulterated.
19       Any warning letter -- all the warning --
20  we can pull up any of the warning letters we're
21  talking about, and we would see that.
22  Q.   Any other basis for your statement with
23  respect to CGMPs and adulteration?
24       MR. DAVIS:  Just for clarification
25  for my purposes.  I might be lost here.  What's the

Page 96

1   statement exactly?
2        (Discussion off the written record.)
3        (The requested material was read.)
4        MR. DAVIS:  Thank you.
5        So what's -- is there a question
6   pending right now?
7        MS. ISIDRO:  Can you read back the
8   last question, please?
9        (The requested material was read.)
10  A.   So as I've indicated, the FDA states
11  that.  They also -- in almost virtually every
12  warning letter that's issued to a firm, they will
13  say in the warning letter that the product is
14  considered to be adulterated because CMG -- CM --
15  they were in violation of CGMPs.
16  Q.   Can you point to any warning letters
17  where FDA says that one product is adulterated
18  because of CGMP violations in connection with a
19  different product?
20  A.   So -- okay.
21       (Pause.)
22       Well, the examples in the warning letters
23  refer to the facility.  They don't refer to specific
24  products.
25       So, I mean, we could pull up any warning

Page 97

1   letter, and it would say that.
2        The other point I would pull up here,
3   which I state in my report relative to FDA's
4   statement.  This has to do with -- they say if --
5   this is No. 34:  FDA has formalized this in the
6   active pharmaceutical ingredient (API) process
7   inspection manual to further state "A firm is not in
8   a sufficient state of control if any one system as
9   defined in this program is found to be significantly
10  noncompliant of CGMPs such that the quality,
11  identity, and purity of the API resulting from that
12  system cannot be adequately assured."
13  Q.   What paragraph in your report are you
14  reading, sir?
15  A.   34.
16       (Reporter admonishment.)
17  Q.   You cite to some sources in that
18  Paragraph 34 that you were reading from.  Correct?
19       MR. DAVIS:  Excuse me, Counsel.
20  Somebody was shuffling paper when you asked the
21  question.  It was inaudible on our end.
22       MS. ISIDRO:  That was the witness.
23       Can we have that question read back,
24  please?
25       (The requested material was read.)

25 (Pages 94 - 97)

Page 98

1    A.   Correct.
2    Q.   Are those the sources from which you
3 obtained the quotes that you have in Paragraph 34?
4    A.   The quote -- I'm not sure which one of
5 those footnotes references where the quote came
6 from.  I'd have to go back and look at these
7 specific ones, but it came from an FDA source.
8    Q.   One of the sources that you cite there is
9 a 2005 PowerPoint presentation.  Is that correct?
10    A.   That's correct.  But the other one is the
11 compliance program manual.  That's the API
12 Compliance Program Manual.
13    Q.   And the statement that you're -- which of
14 the quotes are attributable to the program manual in
15 Paragraph 34?
16        MR. DAVIS:  Do you want him to look
17 at the program manual?
18        MS. ISIDRO:  Well, he's saying that
19 that's where they came from, so I'm asking him to
20 identify which ones came from that source.
21        MR. DAVIS:  Well, I think he said
22 that some of them came from that source.
23    A.   If we could pull up the document, we
24 could look at it, and I could show you.
25        (Exhibit 9 was marked.)

Page 99

1        MS. ISIDRO:  And we are marking as
2 Exhibit 9 FDA Compliance Program Guidance Manual
3 7356.002F.
4        MR. DAVIS:  Do you want to take a few
5 minutes to review the document?
6        THE WITNESS:  Yes.
7    A.   (Pause.)
8        So if we look at Page 8 and 9 in this
9 document, it refers to the various systems on Page 8
10 and 9.
11    Q.   Uh-huh.
12    A.   And if we go back to Page 7 --
13    Q.   Let me make sure I'm following you.  So
14 Page 8 and 9?
15    A.   Describes the systems.
16        MR. DAVIS:  Is there a question
17 pending?  You're not being asked to just describe
18 the document.  You're supposed to respond to
19 questions.
20    Q.   You may continue.
21    A.   So I go back to -- no, no.  He has
22 to -- he's only here to respond to your questions.
23    Q.   You started to say, "So if we look at
24 Pages 8 and 9 in this document, it refers to the
25 various systems."

Page 100

1        Are you referring to the enumerated list
2 on the bottom of Page 8 and the top of Page 9?
3    A.   I am.  And if we go back -- if we go back
4 to Page 7, and if we look at the second paragraph:
5 A firm is not in a sufficient state of control if
6 any one system as defined in this program is found
7 to be significantly noncompliant with CGMPs, such
8 that the quality, identity, and purity of the API
9 resulting from the system cannot be adequately
10 assured.
11    Q.   Now, that quote that you just read, that
12 refers to significantly noncompliant with CGMPs.
13 Correct?
14    A.   It says -- that's what it says.
15    Q.   It's not simply any noncompliance with
16 CGMPs.  Correct?
17    A.   It says -- it does say "significantly
18 noncompliant."
19    Q.   So how does that statement provide a
20 basis for your conclusion that any CGMP
21 noncompliance causes all products from a particular
22 facility to be considered adulterated?
23        MR. DAVIS:  Object to form,
24 mischaracterizes his testimony.
25        You can answer.

Page 101

1    Q.   And if I'm mischaracterizing your
2 opinion, please feel free to correct me.
3    A.   So I'm reading here what this guidance
4 document says.  What I'm referring to in my report,
5 relative to the class group that we're talking
6 about, has to do with CGMPs.
7        I'm just making the point here as to what
8 FDA says about any one of the systems.
9    Q.   Okay.
10    A.   That was the -- put in the context of
11 good manufacturing practices.
12    Q.   But you say in Paragraph 32 of your
13 report that:  FDA's official position regarding
14 CGMPs is that if a company is not complying with
15 CGMP regulations, any drug it makes is considered
16 adulterated under the law.
17    A.   Right.
18    Q.   So where is your basis for that
19 statement?
20    A.   So I go back to -- we can pull up --
21 there is other guidance documents.  I just probably
22 didn't reference it here.  You pull up any warning
23 letter, we're talking about right in the body, the
24 first body -- the first part of the warning letter,
25 it will talk about the products that are considered

26 (Pages 98 - 101)

Page 102

1 to be adulterated.
2          MR. DAVIS: And, again, object to the
3 form.
4     Q.   Do you have any support for that
5 statement in Paragraph 32, other than the body of
6 warning letters?
7          MR. DAVIS: The footnote.
8          MS. ISIDRO: I'm sorry. Are you
9 testifying?
10          MR. DAVIS: I mean, it's just
11 obvious. He's cited it in his report.
12          MS. ISIDRO: Are you testifying?
13          MR. DAVIS: Okay. You can answer the
14 question.
15     A.   I think it's -- I think it's actually --
16 let's see here. Yes, it's Footnote 8. So if we can
17 pull up Footnote 8 --
18     Q.   Okay.
19     A.   -- that document.
20          UNIDENTIFIED SPEAKER: Which document
21 are you referring to?
22          MR. DAVIS: It's not been marked as
23 an exhibit yet.
24     Q.   Let's mark this as Exhibit 10.
25          MR. DAVIS: 10.

Page 103

1          (Exhibit 10 was marked.)
2     Q.   Okay. I am handing you what's been
3 marked as Exhibit 10. Is this the document that's
4 cited in Footnote 8?
5     A.   It is.
6     Q.   Okay. Now, can you show me --
7     A.   Sure. Go to Page 2.
8     Q.   Okay.
9     A.   The last section in that page, the second
10 paragraph from the bottom.
11          It says: If a company is not complying
12 with CGMP regulations, any drug it makes is
13 considered adulterated under the law. This kind of
14 adulteration means that the drug was not
15 manufactured under conditions that comply with CGMP.
16 It does not mean that there is necessarily anything
17 wrong with the drug.
18     Q.   And that applies with respect to any drug
19 for which the CGMP regulations were not followed.
20          Correct?
21     A.   No, that's not correct. That's not what
22 I said. That's not what this says. You said
23 something different.
24     Q.   So any CGMP observation with respect to
25 any system does not automatically render a product

Page 104

1 adulterated. Correct?
2     A.   No --
3          MR. DAVIS: Object to form.
4     A.   -- that's not correct.
5          THE WITNESS: I'm sorry.
6          MR. DAVIS: Sorry.
7     A.   That's not correct.
8     Q.   Is it your opinion that a single minor
9 observation about a single product line in a 483
10 represents the FDA's determination that all products
11 manufactured at that facility are adulterated?
12          MR. DAVIS: Objection; improper
13 hypothetical.
14          You can answer.
15     A.   That's not what I've stated. What I'm
16 stating is what FDA has stated. Okay? And I'll say
17 it again.
18          If a company is not complying with CGMP
19 regulations, any drug it makes is considered
20 adulterated under the law. That's what the FDA
21 states. That's not what John Quick states. That's
22 what the FDA states.
23     Q.   And, again, those would have to be
24 significant CGMP violations, significant enough to
25 rise to that level. Correct?

Page 105

1     A.   It doesn't say that. It doesn't say that
2 here.
3     Q.   Okay.
4     A.   Okay.
5     Q.   But the other document we looked at does.
6 Correct?
7     A.   That was the document for Q7. They're
8 different documents.
9     Q.   Right. But the other document did say
10 that. Correct?
11          MR. DAVIS: For the record, are you
12 referring to Exhibit 9?
13     Q.   The FDA compliance program manual?
14     A.   Right.
15     Q.   Exhibit 9. Correct?
16     A.   No, Exhibit 11. I think it's Exhibit --
17 no. Yeah, it is. It's Exhibit 9 and 11.
18          MR. DAVIS: You're referring -- just
19 for clarification, I believe the witness is
20 referring to Footnote 11, which is marked as
21 Exhibit 9.
22     Q.   The FDA compliance program manual,
23 7356.002F. Correct?
24     A.   Right.
25     Q.   To determine if a product is adulterated

27 (Pages 102 - 105)

Case 1:19-md-02875-RMB-SAK    Document 2035-4    Filed 05/03/22    Page 29 of 203
PageID: 67560

Page 106

1  due to CGMP violations, you would need to look at
2  the specific violations. Correct?
3      A.  Well, again, I'll go back to what it says
4  here. It doesn't say that, okay, in terms of that.
5  So it doesn't say whether it's a minor thing or
6  major. It doesn't say that here. Okay?
7          But -- and the situation we're talking
8  about here, for the companies we're talking about --
9  and eventually we're probably going to get into
10 that -- is that there were a number of situations, a
11 number of examples I had here where there were CGMP
12 violations.
13         And, again, those are the things that the
14 FDA refers to as being adulterated. I was trying to
15 put it into the context of what you asked relative
16 to where the reference was with the FDA.
17     Q.  So, again, I just want to make sure that
18 I understand what your position is.
19         Is it your position that any individual
20 CGMP violation renders each and every product that
21 is manufactured at that facility where that CGMP
22 violation occurred adulterated?
23         MR. DAVIS:  Objection to form;
24 mischaracterizes his testimony so far in his report.
25     A.  That's not what my report --

Page 107

1          (Simultaneous speaking.)
2          MR. DAVIS:  You can answer.
3          THE WITNESS:  I'm sorry.
4          MR. DAVIS:  Wait for me to finish my
5  instruction.
6          Mischaracterizes his testimony and
7  his report.
8          You can answer.
9      A.  So that's not what my report says. My
10 report basically says that I'm referring to the
11 CG -- you're putting your hand up.
12         My report says that I'm referring to the
13 CGMP violations of the company relative to the class
14 group. That's what I'm referring to. I don't get
15 into the fact that those are adulterated. I don't
16 say that. I'm just talking about the violations as
17 they apply to the class group. I'm just referring
18 to what the FDA refers to -- as to these as, as
19 being adulterated.
20     Q.  So you're not rendering an opinion as to
21 any -- as to whether any product was adulterated?
22         MR. DAVIS:  Objection to form;
23 mischaracterizes his testimony and his report.
24     A.  So I'll say again what I just said, is
25 I'm referring to the GMP violations of the various

Page 108

1  companies relative to the class group, okay, in
2  regard to these various companies. And I'm pointing
3  out the FDA's interpretation of that is you have the
4  CGMP violations, the products are considered to be
5  adulterated.
6          I didn't say that the FDA says that for
7  CGMP -- CGMP violations. I'm not saying that these
8  products are adulterated. I'm saying that they
9  violated -- that they were not in compliance with
10 CGMPs.
11     Q.  So you're not saying that any
12 valsartan-containing drug was adulterated?
13     A.  No, I do not.
14         MR. DAVIS:  Objection.
15         THE WITNESS:  Sorry.
16         MR. DAVIS:  And mischaracterizes his
17 report.
18     A.  I didn't say that.
19         (Discussion off the written record.)
20         (The requested material was read.)
21     Q.  I just want to make sure -- withdrawn.
22         So just to clarify, are you stating that
23 it is the FDA's position that a single minor
24 observation about a single product line in a 483
25 represents FDA's determination that all products

Page 109

1  manufactured at that facility are adulterated?
2          MR. DAVIS:  Counsel, I'm going to
3  go -- you're reading the exact same question you
4  read two minutes ago. It's asked and answered.
5          You can answer it one more time,
6  Mr. Quick.
7      A.  Okay. So I'm not going to characterize
8  the FDA's interpretation of anything. I'm just
9  telling you what the FDA says about CGMP violations.
10 You're imposing a specific situation, which is not
11 what FDA -- that's not what the FDA says here. I'm
12 just telling you what the FDA does say about CGMP
13 violations relative to adulteration.
14         You're asking a question that's not posed
15 there.
16     Q.  Did you review specific CGMP violations
17 here?
18     A.  "Here" what?
19     Q.  In connection with this litigation.
20     A.  I'm sorry. In conjunction with what?
21     Q.  In connection with this litigation.
22     A.  Yes.
23         THE VIDEOGRAPHER:  I need to start a
24 new file. Can we take a break?
25         MS. ISIDRO:  Yes, we can take a

28 (Pages 106 - 109)

Page 110

1 break.
2          THE VIDEOGRAPHER: Off the record,
3 12:38 p.m.
4          (Break.)
5          THE VIDEOGRAPHER: We are back on the
6 record at 1:27 p.m. This marks the beginning of
7 Media Unit 2.
8    Q.  All right. Mr. Quick, you still have
9 Exhibit 6 in front of you, which is your report in
10 this litigation. Correct?
11   A.  Right.
12   Q.  Is it fair to say that roughly the first
13 half of your report, through Paragraph 100 on
14 Page 20, is it fair to say that that portion of your
15 report recounts your understanding of the FDA's
16 regulatory policies and procedures?
17         MR. DAVIS: Object to form.
18         You can answer.
19   A.  Yes, I believe that to be the case.
20   Q.  Okay. And then the remainder of your
21 report addresses specific issues with various
22 defendants in the present litigation. Correct?
23   A.  Yes.
24   Q.  Okay. Now, we've talked about Exhibit A
25 to your report.

Page 111

1    A.  Which exhibit?
2    Q.  Exhibit A to your report, the materials
3 relied upon for your declaration.
4          Did you put this list together yourself?
5    A.  Well, I -- I believe that this list
6 represents the footnotes that I used -- referenced
7 in the report. It's a summary of that. I didn't
8 specifically put this compilation together. I think
9 those -- that was a compilation of what was in the
10 footnotes.
11   Q.  So who created that compilation for you?
12   A.  I think it would have been the law firm.
13   Q.  And what about the report itself, did you
14 draft the report itself?
15   A.  Yes.
16   Q.  On your own?
17   A.  Yes. Let me, I'll clarify, there was
18 some formatting things that -- and the group
19 reviewed it, there was some formatting points that
20 they made in the -- in the report.
21   Q.  But as far as putting pen to paper or
22 keys to keyboard --
23   A.  It was my --
24   Q.  -- that was you?
25   A.  I did.

Page 112

1    Q.  Okay. Now, on Exhibit A, the materials
2 relied upon for your declaration, there are a number
3 of documents that were produced by the defendants in
4 this action. Correct?
5    A.  That -- that is right. Yes.
6    Q.  But these are not all of the documents
7 that were produced by the defendants in this action.
8 Correct?
9    A.  That is right, yes.
10   Q.  Okay. And how did you determine which
11 documents would be listed on your reliance list and
12 which ones would not?
13         MR. DAVIS: Object to form.
14   A.  Well, there was no specific conscious
15 determination as to which ones. I went through the
16 various GMP issues and I used the documents to refer
17 to those as part of the documents that I relied on.
18         And, again, the point is -- like I said this
19 morning, these are just examples.
20   Q.  When you say "these are just examples,"
21 what are you --
22   A.  The C --
23   Q.  -- referring to?
24   A.  The CGMP issues.
25   Q.  And you're referring now to the

Page 113

1 discussion after Paragraph 100 of your report?
2    A.  Yes.
3    Q.  Paragraphs 101 through 191 of your
4 report?
5    A.  Yes.
6    Q.  And you testified earlier that everything
7 that you relied on is either in the Exhibit A to
8 your report or in the footnotes to your report.
9 Correct?
10   A.  Yes.
11         (Discussion off the written record.)
12   Q.  Before marketing a new drug, the
13 manufacturer's sponsor has to submit a new drug
14 application to the FDA. Correct?
15   A.  Or an abbreviated new drug application.
16   Q.  Okay. But this is for a new drug?
17   A.  Oh, new drug, yes. New drug.
18   Q.  So new drug, new drug application.
19 Correct?
20   A.  That is right.
21   Q.  Okay. And the new drug application has
22 to demonstrate that the medication meets statutory
23 standards for safety and effectiveness. Correct?
24   A.  Yes.
25   Q.  And it also has to establish that it

29 (Pages 110 - 113)

Page 114

1 meets manufacturing and controls and labeling and so
2 forth?
3    A.   There are a number of things, among other
4 things, yes.
5    Q.   And the FDA has to grant its approval to
6 that new drug application before the new drug
7 product can be marketed.  Right?
8    A.   Yes.  The FDA has to approve the
9 application, yes.
10    Q.   Okay.  And a manufacturer of a generic
11 drug must submit an abbreviated new drug
12 application.  Correct?
13    A.   There -- there's some other
14 possibilities, but typically it would be an
15 abbreviated new drug application.
16    Q.   Okay.  And what are the other
17 possibilities you're --
18    A.   Well, I think that's a 5 --
19    Q.   -- referring to?
20    A.   I think it's 5 -- 503, 505(b)(3) or
21 something like that.  But typically, it'd be an
22 ANDA.
23    Q.   And the generic drug can only be marketed
24 after the FDA approves that application.  Correct?
25    A.   That's right.

Page 115

1    Q.   In order to obtain approval of an ANDA,
2 an applicant has to include, among many other
3 things, information to show that the drug is
4 bioequivalence to the reference listed drug.
5 Correct?
6    A.   Well, they've got to show it's
7 therapeutic equivalent and bioequivalence is part of
8 that.
9    Q.   So bioequivalence is one of the things --
10    A.   Right.
11    Q.   -- they have to show.  Right?
12    A.   Yes.
13    Q.   Okay.  And I'll just remind you, I know
14 we just came back from the lunch break, but I'll
15 just remind you to please wait until I finish my
16 question before starting your answer just so that
17 the court reporter can make sure that everything is
18 recorded accurately on the record.  Thank you.
19         And an ANDA applicant also has to include
20 information showing that the active ingredients of
21 the proposed generic drug are of the same
22 pharmaceutical or therapeutic class as those in the
23 RLD.  Right?
24    A.   Well, they have to show that they contain
25 identical amounts to the identical active drug

Page 116

1 ingredient.
2    Q.   Have you reviewed the ANDA for any
3 valsartan-containing drug products?
4    A.   I don't believe so.
5    Q.   Have you reviewed any of the
6 bioequivalence data associated with any of the ANDAs
7 for valsartan or valsartan-containing products?
8    A.   I don't believe so.  That was -- that was
9 not within the scope of what I was looking at.
10    Q.   Okay.  When a drug comes to market via
11 the ANDA process, the ANDA applicant typically
12 doesn't have to con -- to conduct or include
13 additional preclinical or clinical safety and
14 efficacy trials.  Correct?
15    A.   They could.  I'm not -- I'm not opining
16 on what -- what they may or may not have to do.  FDA
17 will ask questions when they're going through the
18 review process and -- so I'm not going to say there
19 would not be that possibility.
20    Q.   But under the -- the ANDA process,
21 generics are typically granted approval status based
22 on the safety and efficacy data that was previously
23 submitted by the drug innovator or the ANDA holder.
24 Right?
25    A.   That's my understanding, but that's not

Page 117

1 what I'm opining on, though.
2    Q.   Okay.  Are you aware of how FDA defines
3 active ingredient?
4    A.   Active ingredient is the ingredient
5 that's intended to treat the patient as opposed to
6 an inactive ingredient.
7    Q.   Would any component that provides
8 pharmacologic --
9         MS. ISIDRO:  I'll withdraw that
10 question.  Let's pause for a moment.  Just go off
11 the record for a moment.
12         THE VIDEOGRAPHER:  Off the record,
13 1:37 p.m.
14         (Break.)
15         THE VIDEOGRAPHER:  Back on the
16 record, 1:39 p.m.
17    Q.   Would you agree that any component that
18 provides pharmacologic activity or other direct
19 effects in the diagnosis, cure or mitigation,
20 treatment or prevention of disease or to affect the
21 structure or any function of the body, would qualify
22 as an active ingredient?
23         MR. DAVIS:  Objection.
24         You can answer.
25    A.   That sounds reasonable, but that's not

30 (Pages 114 - 117)

Page 118

1 what I'm opining on.
2 Q. Okay. And while an ANDA approved drug
3 will have the same active ingredient as the
4 reference listed drug, it may contain different
5 inactive ingredients as long as they don't interfere
6 with achieving bioequivalence of the active
7 ingredient --
8         MR. DAVIS: Objection.
9 Q. -- right?
10        MR. DAVIS: Object to form, and
11 misrepresents the -- the law.
12        You can answer.
13 A. So it -- it probably depends upon what it
14 is in terms of the application process. The FDA may
15 object to something. I don't know. It -- we're
16 trying to generalize something that might
17 be specific to a very individual drug.
18 Q. Would you agree that FDA does not require
19 the inactive ingredients of an ANDA approved drug to
20 be identical to the inactive ingredients of an NDA
21 approved drug?
22 A. I believe that to be correct but, again,
23 that's not what I'm opining on.
24 Q. Would you agree that each manufacturer of
25 valsartan in this litigation had to submit their own

Page 119

1 ANDA for -- for their generic products?
2 A. So there must be something else that
3 you're trying to get to here, but I -- I'm not sure
4 why you would ask that question. I mean, obviously
5 if you want to get approval, you've got to submit
6 your ANDA to the FDA to get approval.
7 Q. So it's not important why I'm asking the
8 question, I just need you to answer the question
9 that was asked.
10 A. Well, I mean, it sounds reasonable what
11 you're saying, but I may not be understanding fully
12 what you're asking.
13 Q. You would agree that each separate
14 manufacturer of a generic drug, including valsartan,
15 has to submit its own ANDA for approval of its
16 particular product. Correct?
17 A. That would sound to be reasonable.
18 Q. Okay. And each manufacturer would have
19 to submit its own bioequivalence studies in support
20 of its respective ANDA. Correct?
21        MR. DAVIS: I'm going to object to.
22 This -- this is outside the scope. He's says he's
23 not opining on bioequivalence data or he hasn't
24 looked at that, it's not part of his report. I
25 mean, every single answer he's given for the last

Page 120

1 ten minutes has been, "this is outside the scope."
2 So I'd say move on if it's not in his report.
3 Q. Do you remember the question or did we --
4 A. I do --
5 Q. -- need to have it read back?
6 A. I do remember the question. Again --
7 again, I'm not opining on that. FDA could come back
8 and ask for something else as part of the
9 application review process, so I don't know.
10 Q. But you would agree that each ANDA
11 applicant has to submit its own bioequivalence
12 studies?
13        MR. DAVIS: Objection; asked and
14 answered and he said it's outside the scope.
15        You can answer one more time.
16 A. So, as I said, it's not something I'm
17 opining on. The FDA, when you make a submission to
18 the FDA, they can come back and ask for additional
19 information. So I -- it's possible they could ask
20 for something else. I don't know.
21 Q. I understand you're referring to what FDA
22 may or may not ask to in follow-up. But in
23 submitting an ANDA initially, the respective
24 applicant has to submit bioequivalence studies in
25 support of that ANDA. Right?

Page 121

1 A. That sounds re- --
2        MR. DAVIS: Same objections.
3        You can answer.
4        THE WITNESS: Okay.
5 A. That sounds reasonable. Again, that's
6 outside the scope of what I've looked at.
7 Q. All right. Let's take a look at
8 Paragraph 16 of your report.
9 A. Okay.
10 Q. In this paragraph, which does have cer --
11 a number of subparagraphs, in this paragraph you
12 refer to FDA reviewers. Correct?
13 A. I'm referring to the FDA fact sheet,
14 which is where that information came from.
15 Q. But you do make reference in several
16 places to FDA reviewers. Correct?
17 A. Well, let's see. I need to take a look
18 at this.
19 Q. Just one example, if you look at
20 Paragraph -- at Subparagraph C, about halfway down,
21 there is a sentence starting with "FDA reviewers
22 will study."
23 A. B? You're referring to B?
24 Q. No, C as in Charlie.
25 A. Oh, C. Okay.

31 (Pages 118 - 121)

Page 122

1    It does say, yes, FDA reviewers.
2    Q.   Okay.  And so when you refer to "FDA
3  reviewers" in your report, is that what's also known
4  as review chemists?
5    A.   So, as I said before, what I'm
6  referencing here is what FDA states in their fact
7  sheet.  Okay?  That's -- I mean I'm just
8  paraphrasing what FDA says.  It could involve
9  chemists.
10    Q.   Okay.  But --
11    A.   It could involve others.
12    Q.   You're stating this in your report, and I
13  just want to get your understanding as to whether
14  the term "FDA reviewers," as it appears there in
15  Paragraph 16(c), whether that is what is also known
16  as a review chemists.
17        MR. DAVIS:  Objection; asked and
18  answered.  He has provided his understanding.  He
19  said "Could be chemists.  Could be others."  He
20  answered it.
21    A.   So I'll say the same thing again.  It
22  could include chemists.  It could include others.
23  It probably depends upon the application.  It
24  probably depends on who they want to have take a
25  look at the particular file.

Page 123

1    Q.   Does your term "FDA reviewers" include
2  inspectors?
3    A.   In the context here, this is referring to
4  the FDA review process, which would typically not
5  include -- and they -- I refer to "investigators."
6  The FDA -- I wouldn't use the term "inspectors" with
7  the FDA anyway.  They're FDA investigators.  This
8  would not include that term.
9    Q.   Okay.
10    A.   You would never refer to an FDA
11  investigator as an inspector.
12    Q.   Okay.  And reviewers would not actually
13  accompany investigators in the field.  Correct?
14    A.   Not always.  I think -- I believe sometimes
15  they have.  That's -- that would not be typical.
16    Q.   Okay.  Reviewers will send requests to
17  the Office of Regulatory Affairs at the time that an
18  application is nearing approval.  Right?
19    A.   That's right.
20    Q.   And that could be to arrange for CGMP
21  compliance inspection of the applicant's
22  manufacturing facilities?
23    A.   So here is how this process works.  It's
24  not quite the way you described it.
25    Q.   Okay.

Page 124

1    A.   They will ask -- they will ask the
2  office, "Is the firm in compliance" -- they'll ask
3  three things, is the firm in compliance, have they
4  had a recent inspection, does the firm require a
5  preapproval inspection, or is the firm out of
6  compliance?
7        And so, depending on what the answer is,
8  that will be their action.  If they have recently
9  had an inspection that was a good inspection, they
10  may not ask for a new preapproval inspection, they
11  may rely on the old one.
12        If -- most likely, they will have a
13  preapproval inspection.  Or, if there is something
14  out of compliance, they will say, "No, this should
15  not be approved."
16        It depends upon the individual
17  circumstance.
18        And if you notice, in a lot of the
19  warning letters, the FDA makes the statement, future
20  submissions will not -- basically, will not be
21  approved, until the warning letter is resolved.
22    Q.   Are you familiar with FDA's district
23  laboratories?
24    A.   I know they have laboratories.  Okay?
25  Have I been to one of the FDA district laboratories?

Page 125

1  No, I've not.
2    Q.   And do those FDA district laboratories
3  participate in essentially verifying that the
4  information submitted to the FDA is accurate?
5        MR. DAVIS:  Objection; vague.
6        You can answer.
7    A.   So I'm not certain exactly what these
8  laboratories would do in this review process.  They
9  may or may not do something.  I don't know.  They
10  may not even choose to use these laboratories.  I
11  don't know.  Probably depends upon the individual
12  application.
13    Q.   And would the activities of the FDA's
14  district laboratories be outside the scope of your
15  opinions, in your view?
16    A.   Well, it is outside the scope, because
17  I've not referenced them.
18    Q.   And you're not going to be offering any
19  opinions in this litigation that are outside the
20  scope of your report.  Right?
21        MR. DAVIS:  Well, hang on.  He has
22  submitted this Declaration For a Class
23  Certification.  You said "this litigation."  He may
24  very well offer another expert report in this
25  litigation, so I want to make that very clear.

32 (Pages 122 - 125)

Page 126

1    But, with that, you can answer.
2    THE WITNESS:  Sure.
3    A.    This is not a merits report.  This is a
4 declaration.  So if I -- if there is additional
5 reports, it may well extend beyond this.
6    Q.    Are you intending to offer any opinions
7 in this litigation with respect to the activities of
8 district laboratories, FDA district laboratories?
9    A.    Not as it pertains to this declaration.
10    Q.    Are you going to opine in this litigation
11 on the content of the ANDAs for valsartan or
12 valsartan-containing products?
13    MR. DAVIS:  Objection; calls for
14 speculation.  I'm not even sure how he can answer a
15 question like that.
16    A.    So I've not been asked to do anything
17 beyond this declaration at this point in time, so
18 the answer is I don't know.
19    Q.    Are you going to offer any opinions with
20 respect to what is required to be in ANDA?
21    MR. DAVIS:  Same objection.  And,
22 again, another objection on this is that we're not
23 required to disclose merits experts yet.  So if
24 that's what you're trying to do, is to get him to
25 disclose himself as a merits expert, I object to

Page 127

1 that, and I would probably instruct him not to
2 answer.
3    I don't think -- I don't see where
4 you're going with asking about what he might
5 hypothetically do in the future if we ask him.  He
6 doesn't know that.
7    Q.    In connection -- withdrawn.
8    Are you going to offer any opinions with
9 respect to whether the impurity profile of an ANDA
10 drug has to be exactly the same as the impurity
11 profile for a reference listed drug?
12    MR. DAVIS:  Same objection.
13    And I think I'm going to instruct the
14 witness not to answer it.
15    You're asking whether he might submit
16 a report in the future that addresses something
17 else, and we're not required to disclose experts yet
18 on that.  So, with that, I will -- I think I'm going
19 to make an instruction.
20    So you don't have to answer that.
21    MS. ISIDRO:  So --
22    MR. KERNER:  You're instructing the
23 witness, who is not your client, not to answer a
24 question?
25    MR. DAVIS:  Look, I mean, you know

Page 128

1 what, I'm going to withdraw the instruction, because
2 I don't see what he could possibly say.  Because he
3 has no idea what -- he hasn't been asked to do
4 anything like that, and it's -- this would call for
5 pure and utter speculation on his part.
6    So I don't see where you're going
7 with this question.  I think it's an utter waste of
8 time.  You've asked the same question five times in
9 a row now.  His answer is going to be the same.
10    But you can answer one more time.
11    MS. ISIDRO:  The record is clear that
12 I have not asked the same question five times in a
13 row.
14    And he has offered testimony that
15 there are certain things that are beyond the scope
16 of his opinions, and so we need to confirm that he
17 won't be opining beyond the opinions that he has
18 identified here today, absent proper disclosure in
19 the litigation.
20    MR. DAVIS:  But your question is
21 whether he's going to do so in this litigation, and
22 that's what I'm objecting to.  So if you want to
23 rephrase your question, you can rephrase it.
24    But as far as whether he's going to
25 at some point in the future render a merits expert

Page 129

1 report that may address some or all of those topics
2 or none of them, you know, that calls for wild
3 speculation, and he has no idea of how to answer
4 that.  And we're not required to disclose our
5 experts on that point.
6    MS. ISIDRO:  Can we just read back
7 the last question that was asked, and if there was
8 any answer to it, let's get that answer read back.
9    MR. DAVIS:  I'm going to make an
10 attorney-work-product objection as well to all those
11 prior questions.
12    (The requested material was read.)
13    A.    So the answer, again, as I said before,
14 is I don't know.  I've not been asked to do anything
15 beyond this declaration document that you have, so I
16 don't know.
17    Q.    Let's take a look at Paragraph 23 of your
18 report.
19    A.    Which one?
20    Q.    Paragraph 23.  And there is a reference
21 about halfway through the paragraph, where you say:
22 It is obvious that the regulations also take a much
23 broader approach to their view of adulteration,
24 including a manufacturer's compliance with CGMP,
25 which might prevent products from becoming

33 (Pages 126 - 129)

Page 130

1 contaminated in the first instance.
2      Can you explain what you mean by "much
3 broader approach to their view of adulteration"?
4      A.   Well, the point I made earlier relative
5 to adulterated product is the fact that CGMPs are
6 not being met, the product would be considered to be
7 adulterated.
8      If there was an example of adulteration
9 of the other sort from a contamination standpoint,
10 there might be a more in-depth review of CGMPs.
11     Q.   And did this broader approach that you
12 reference impact your opinion with respect to
13 whether the presence of NDMA or NDEA in defendants'
14 valsartan adulterated the valsartan products?
15          MR. DAVIS:  Object to form.
16     A.   So my opinions were based on the CGMPs
17 that I've observed through the review of the
18 documents.
19     Q.   And when you say "through your review of
20 the documents," are you referring to the documents
21 that are listed on Exhibit A to your report?
22     A.   I am.
23     Q.   Okay.  Is it your opinion that even a
24 particular lot of valsartan that did not contain any
25 detectable NDMA or NDEA was adulterated?

Page 131

1          MR. DAVIS:  Objection; incomplete
2 hypothetical.
3          You can answer.
4      A.   So what I said before is that the product
5 doesn't necessarily need to be adulterated to be
6 considered to be adulterated -- I mean, contaminated
7 to be considered adulterated if it's in violation of
8 CGMPs.
9      If it's in violation of CGMPs, the
10 products are considered to be adulterated.
11     Q.   And when you say "if its in violation of
12 CGMPs," does that "it" refer to the product?
13     A.   It refers to the way -- the quality
14 systems in the last spec in terms of CGMPs which
15 involve a number of different things.
16     But if the firm is in violation of CGMPs,
17 everything that they're making would be considered
18 to be adulterated.
19     I think we went through that this
20 morning.
21     Q.   So to be clear, is it your opinion that
22 if there was any CGMP violation anywhere in the
23 firm, a particular lot of valsartan coming from that
24 firm would be considered adulterated, even if it
25 contained no detectable nitrosamines whatsoever?

Page 132

1          MR. DAVIS:  Objection; incomplete
2 hypothetical, asked and answered many times this
3 morning.
4          You can answer again.
5      A.   So I'll restate again what I said before,
6 is that the position of the FDA is if the firm is
7 not operating according to the CGMPs, the products
8 that it's producing are considered to be
9 adulterated, regardless as to whether they're
10 contaminated or not.
11     Q.   So I understand that your answer refers
12 to the position of FDA.  You're not here speaking
13 for FDA today.  Correct?
14          MR. DAVIS:  He is speaking here about
15 his interpretation of the FDA's regulations.
16     Q.   My question was you're not here speaking
17 for FDA today.  Correct?
18     A.   Of course I'm not here to speak for FDA.
19     Q.   I didn't think it was a controversial
20 question.
21     And my question to you for that reason
22 was not what FDA's position is.  My question to you
23 was what is your opinion.
24     Is it your opinion that if a firm had a
25 CGMP violation anywhere in the firm, even if it was

Page 133

1 completely unrelated to valsartan, a particular lot
2 of valsartan coming from that firm would be
3 considered adulterated even if it contained no
4 detectable nitrosamines whatsoever?
5          MR. DAVIS:  Objection; asked and
6 answered again.  Objection; incomplete hypothetical.
7 Objection; relevance.
8          You can answer.
9      A.   So I've answered your question before,
10 but I'll answer it again.  Okay?
11     As I said before, if the CGMPs are not
12 being met, the products that are being produced,
13 regardless of whether there is contamination or not,
14 are considered to be adulterated.
15     Q.   And that's your opinion?
16     A.   Well -- so I base opinions on what the
17 regulatory requirements are.  I don't -- I don't --
18 as John Quick I don't dream up new regulations or
19 new guidance.  I don't do that.  I follow what FDA
20 says is the guidance and the regulation.
21     Q.   And so I'll ask again, is that your
22 opinion?
23          MR. DAVIS:  Hang on.  All these --
24 I'm restating all my objections, and he's clarified
25 what his opinion is.  Asked and answered again.

34 (Pages 130 - 133)

Page 134

1 Like what else do you want to hear?
2    A.   What do you want -- what do you want to
3 ask -- what do you want to hear again?
4    Q.   Let's look at Paragraph 25 of your
5 report, starting with the second sentence in that
6 paragraph.
7        You state:  For a facility to be in
8 compliance with CGMP -- or, actually, let me
9 rephrase that.
10        So looking at Paragraph 25, you have
11 quotation marks around the bulk of the language in
12 Paragraph 25.  Correct?
13    A.   I do, yes.
14    Q.   And you don't have a specific citation
15 going with those quotation marks, do you?
16    A.   There is no footnote there.
17    Q.   Okay.  You attribute this language
18 generally to the FD&C Act, but you don't specify
19 where in the FD&C Act it comes from?
20    A.   So it's probably one of the guidance
21 documents like we reviewed this morning where that
22 quote came.  This is not a quote that I put
23 together.  It's a quote from the FDA, so -- or
24 the -- or the act, so I'm not certain where that
25 came from.

Page 135

1    Q.   It's a quote from the act or from a
2 guidance document?
3    A.   Like I said, I'm not sure.  It was one of
4 the documents I reviewed.  It may have been in
5 another one of the documents I footnoted elsewhere.
6 I just didn't put a footnote here.
7    Q.   Okay.  So focusing on the FD&C Act,
8 Section 501 has to do with adulterated drugs and
9 devices.  Correct?
10    A.   I'm not certain.  I don't memorize these
11 numbers.
12    Q.   Does Section 502 have to do with
13 misbranded drugs and devices?
14    A.   Again we'll have to pull it up to look at
15 that.
16    Q.   As you sit here right now, without
17 looking at it, you're not sure one way or the other?
18    A.   Well, I've got like a hundred references
19 here.  And so if we're speaking to exactly what one
20 of them specifically states, we need to pull it up
21 and look at it and we can review it.
22    Q.   No.  My question was just does
23 Section 502 of the FD&C Act have to do with
24 misbranded drugs and devices?
25    A.   Okay.  We haven't looked at that, but

Page 136

1 I'll say okay.
2    Q.   You'll say "okay" or do you know one way
3 or the other?
4    A.   So for me to sit here and tell you that
5 specifically refers to that, without going back to
6 the reference, I can't tell you.
7    Q.   So you would have to look at Section 502
8 of the FD&C Act in order to know whether it deals
9 with misbranded drugs and devices?
10    A.   Right.  Just to make sure I'm giving you
11 a correct answer.
12        MR. DAVIS:  Objection;
13 mischaracterizes testimony.
14        (Discussion off the written record.)
15        MS. ISIDRO:  Okay.  So let's go ahead
16 and mark this as Exhibit 12?
17        MR. DAVIS:  I think -- 11, I think.
18        (Exhibit 11 was marked.)
19    Q.   And we've marked as Exhibit 11 a copy of
20 Sections 501 and 502 of the FD&C Act.  And looking
21 at Exhibit 11, can you now confirm that Section 501
22 of the FD&C Act has to do with adulterated drugs and
23 devices?
24    A.   I can.
25    Q.   And can you now confirm that Section 502

Page 137

1 of the FD&C Act has to do with misbranded drugs and
2 devices?
3    A.   That's -- that is correct.
4    Q.   And you can take as much time as you need
5 to look through this, but is your quoted language
6 from Paragraph 25, does it appear anywhere in
7 Sections 501 or 502 of the FD&C Act?
8        MR. DAVIS:  Do you want a moment to
9 review the document?
10    A.   Yes.  Because like I said -- like I told
11 you before, I'm not certain it came from this
12 document, because I'm not sure where it came from.
13 It may have come from another document like we
14 reviewed this morning.  But I'll be glad to look at
15 this.
16    Q.   As I said, feel free to look through it
17 and just let me know one way or the other whether
18 the language in Paragraph 25 comes from either of
19 these sections in Exhibit 11.
20    A.   (Pause.)
21        THE VIDEOGRAPHER:  Off the record,
22 2:09 p.m.
23        (Break.)
24        THE VIDEOGRAPHER:  Back on the
25 record, 2:11 p.m.                         0

35 (Pages 134 - 137)

Page 138

1    Q.   Mr. Quick, when we went off the record
2  you were taking some time to look through Exhibit 11
3  to see whether the quote in Paragraph 25 came from
4  either of the sections that are in Exhibit 11.
5        Did you have sufficient time to review?
6  Do you need additional time?
7    A.   I don't see that section in here.  I
8  didn't indicate it was here, so I'm not -- but I
9  don't see it here, to answer your question.
10   Q.   Okay.
11       MR. DAVIS:  If you like, on the next
12 break we can look for it and see what he's referring
13 to and get back to you on that.
14   Q.   All right.  Focusing on the last sentence
15 of Paragraph 25, that states that:  A facility must
16 have in place systems that ensure proper design,
17 monitoring, and control of manufacturing processes
18 and facilities.
19       Correct?
20   A.   That's what the statement says.
21   Q.   Does that refer to SOPs?
22   A.   It probably refers to a number of
23 different things.  The systems -- the manufacturing
24 system -- the manufacturing operation has got to be
25 in control, and it talks about the processes and

Page 139

1  facilities, so part of that would be SOPs.  But
2  you've got to follow the SOPs.
3    Q.   Did you review defendants' SOPs in
4  forming your opinions in this litigation?
5        MR. DAVIS:  Objection to the use of
6  the word "this litigation."
7    A.   So --
8        MR. DAVIS:  You can answer.
9    A.   -- I'm not sure whether any of these
10 reference documents included SOPs or not.  I know
11 I've requested SOPs, but I'm not sure whether I
12 reviewed those SOPs in the context of this
13 declaration.
14   Q.   As you sit here today, are you aware of
15 whether any specific defendant had a quality policy
16 in place?
17       MR. DAVIS:  Objection; vague.
18       You can answer.
19   A.   I'm not.  I'm not quite sure what you're
20 asking.  No, I did not look at whether they had a
21 quality policy or not.
22   Q.   As you sit here today, are you aware of
23 whether any defendant in this litigation had an SOP
24 relating directly to quality?
25   A.   Relating to what?

Page 140

1    Q.   To quality.
2    A.   I mean, quality is a large topic.  What
3  specific aspect of quality?
4    Q.   Any aspect of quality.
5    A.   Well, I'm sure that they have SOPs that
6  refer to some aspect of quality.  You'd almost have
7  to have that.  So, I mean -- I'm not sure -- your
8  question really doesn't make any sense.
9    Q.   In your answer there you're making an
10 assumption, right, when you say "I'm sure that."
11       Am I interpreting that correctly?  You're
12 making an assumption that they would --
13   A.   An assumption, yes.
14   Q.   But you haven't specifically reviewed any
15 SOP of any of the defendants relating to any aspect
16 of quality?
17   A.   No, I didn't say that.  What I said was
18 there may have been SOPs in the documents I
19 reviewed.  They're in the list here.  There may have
20 been SOPs in some of those documents.  I'm just
21 not -- I just don't recall that.
22   Q.   Are you familiar with Section -- with
23 21 U.S. Section 352?
24   A.   That number doesn't -- I don't recall
25 exactly what that number would be referring to.

Page 141

1        Is that a document I referenced?
2    Q.   Let's go ahead and mark a copy of
3  21 U.S.C. 352 as Exhibit 12.
4        MR. DAVIS:  I think we already have
5  that marked here in Exhibit 11.
6        MS. ISIDRO:  We do?
7        MR. DAVIS:  Yeah.  Section 502 is
8  21 U.S.C. 352.
9        MS. ISIDRO:  Let's go ahead and mark
10 this copy anyway, Exhibit 12.
11       (Exhibit 12 was marked.)
12   Q.   And 21 U.S.C. 352 deals with misbranded
13 drugs and devices.  Correct?
14   A.   I didn't -- I didn't hear the question.
15 Would you repeat it?
16   Q.   21 U.S.C. 352 deals with misbranded drugs
17 and devices.  Correct?
18   A.   That's correct, yes.
19   Q.   Does it -- does 21 U.S.C. 352 mention
20 anything with respect to purity of a drug product?
21   A.   If we want to spend the time to review
22 this we can, but I don't recall.
23   Q.   As you sit here today, you don't know one
24 way or the other?
25   A.   Well, it may.  If you want me to read the

36 (Pages 138 - 141)

Page 142

1 document --
2          MR. DAVIS: Yeah. Why don't you take
3 a few minutes to read the document.
4     A.   (Pause.)
5          I don't see a reference to purity in this
6 document.
7     Q.   There's no reference to purity, there's
8 no reference to impurities. Correct?
9     A.   I didn't see that in the document, yes.
10    Q.   FDA actually allows for the presence of
11 some unidentified or unspecified impurities with a
12 drug product below a certain threshold. Correct?
13         MR. DAVIS: Objection; vague, and
14 incomplete question.
15         You can answer.
16    A.   So that's not an area I was opining on,
17 in terms of whether they allow or don't allow that.
18 That may be the case, but that's not an area I was
19 opining on.
20    Q.   And so, as you sit here today, you can't
21 speak to that one way or the other?
22    A.   I can't speak to that. Right.
23    Q.   The purity of an API product is shown on
24 the certificate of analysis. Correct?
25         MR. DAVIS: Objection; vague, again.

Page 143

1          You can answer.
2     A.   So certificate of analysis has a number
3 of -- number of things that are reported on the
4 certificate of analysis.
5     Q.   And is purity of the API one of the
6 things?
7          MR. DAVIS: Objection.
8     A.   Well, typically it would be potency,
9 other things in there. Purity is probably not
10 something that would be on the C of A.
11    Q.   You say "probably" does that --
12    A.   I --
13    Q.   You're not sure one way or the other?
14    A.   I'm not sure.
15    Q.   Okay. Are you aware whether at any time
16 any valsartan products or valsartan-containing
17 products were determined to be subpotent by the FDA?
18    A.   I'm not aware of any situation. I mean,
19 that doesn't mean it didn't happen, I'm just not
20 aware of it.
21    Q.   Now, labeling of allowable impurities or
22 disclosing impurities in any amount on a marketed
23 drug product label is not something that's required
24 in an ANDA. Correct?
25         MR. DAVIS: Object to form.

Page 144

1          You can answer.
2     A.   So I know where you're going to go with
3 this. So the -- the --
4     Q.   I'm going to ask you to not try and guess
5 where I'm going with any question.
6     A.   Okay.
7     Q.   If you could just stick to answering --
8     A.   I'm not --
9     Q.   -- questions that are asked.
10    A.   I'm not sure. I haven't looked at what
11 actually is required on the labeling other than --
12 no.
13    Q.   Okay. So do you know one way or the
14 other whether labeling of product potency within
15 allowable limits is required by FDA?
16         MR. DAVIS: Object to form.
17         You can answer.
18    A.   If potency is what?
19    Q.   Do you know one way or the other whether
20 labeling of product potency within allowable limits
21 is required by FDA?
22    A.   Well, the potency would be on the
23 labeling.
24    Q.   And that is required by FDA. Right?
25    A.   Well, again, that's not something I'm

Page 145

1 opining on but, yes, I would assume so.
2     Q.   Okay. At any time did FDA require any
3 manufacturer to change it -- its approved labeling
4 to declare that NDMA or NDEA be listed as impurities
5 on their valsartan product labels?
6     A.   I don't know.
7     Q.   Mr. Quick, you're not taking the position
8 that any manufacturer ever purposefully added NDMA
9 or NDEA to their products as part of their
10 formulation. Correct?
11    A.   That they knowingly and purposely added,
12 no, I'm not taking that position.
13    Q.   Okay. And you're not offering any
14 opinions on the content of any of the valsartan
15 lab -- product labels. Correct?
16    A.   Other than the fact that I made the
17 comment that they're misbranded.
18    Q.   Now, let's take a look at Paragraph 30 in
19 your report.
20    A.   Okay.
21    Q.   You state in Paragraph 30 that: Because
22 the presence of NDMA and/or NDEA was not revealed in
23 the labeling, advertisements and/or patient booklets
24 given to consumers at the time of dispensing, this
25 also resulted in defendants' valsartan products

Page 146

1 being misbranded.
2      A.   That's what it says.
3      Q.   What is your basis for that statement?
4      A.   Because it's different from what the
5 branded product was, the Novartis product which did
6 not have these contaminants.
7      Q.   Do you know whether the branded product
8 was ever tested for NDMA or NDEA prior to July
9 of 2018?
10     A.   Well, what I do know is that Novartis
11 tested the ZHP product and found a contaminate in
12 June of 2018.
13     Q.   Do you know whether Novartis's product,
14 Novartis's brand product, was ever tested for the
15 presence of NDMA or NDEA prior to July of 2018?
16     A.   I do not know.
17          THE WITNESS:  Could we take like a
18 five -- five-minute break?
19          MS. ISIDRO:  Sure.
20          THE VIDEOGRAPHER:  Off the record.
21 The time is 2:27 p.m.
22          (Break.)
23          THE VIDEOGRAPHER:  Back on the
24 record.  The time is 2:39 p.m.
25     Q.   Mr. Quick, we've talked about CGMPs a bit

Page 147

1 today.  Right?
2      A.   We have.
3      Q.   The C in CGMPs stands for "current."
4 Right?
5      A.   That's right.
6      Q.   And that requires companies to use
7 technologies and systems that are up-to-date at the
8 current time.  Right?  The respective current time?
9      A.   Well, current refers to current.  So...
10     Q.   Look, you say in your report:  The C in
11 CGMPs as standing for current, requiring companies
12 to use technologies and systems that are --
13     A.   Right.
14     Q.   -- "up-to-date in order to comply with
15 the regulations..."
16     A.   Right.  That's correct.
17     Q.   And then, with respect to Paragraph 32, I
18 believe you stated earlier that if pulling up any
19 warning letter would be -- that basically any
20 warning letter would provide support for that
21 statement.  Right?
22     A.   Well, we also pulled up the other
23 document from FDA that stated the same thing this
24 morning, if you remember.
25     Q.   Okay.  But you had -- you had

Page 148

1 mentioned --
2      A.   I did.
3      Q.   -- warning letters?
4      A.   Warning letters would typically have
5 that.  Maybe not all warning letters, but warning
6 letters typically would.
7          (Reporter admonishment.)
8      Q.   Do you recall receiving any warning
9 letters from the FDA during your time at Baxter?
10     A.   Yes.
11          MS. ISIDRO:  Let's go ahead and mark
12 as Exhibit 13, a August 11th, 2000, warning letter,
13 CHI-29-00.
14          (Exhibit 13 was marked.)
15     Q.   I'll give you a moment to take a look at
16 Exhibit 13.  But when you're ready, this is a
17 warning letter that was sent to Baxter.  Correct?
18     A.   It was a warning letter sent to Baxter,
19 yes.
20     Q.   And this was during your time at Baxter?
21     A.   That's correct.
22     Q.   In fact, you're cc'd at the bottom of the
23 warning letter.  Correct?
24     A.   That's correct.
25     Q.   Do you recall receiving this letter?

Page 149

1      A.   We're talking something that occurred 22
2 years ago.  I don't -- no, I don't recall actually
3 receiving it.  I'm sure I did.
4      Q.   And this letter discusses that:  During
5 in -- inspection conducted at one of Baxter's
6 facilities, the investigators found serious
7 deviations from the current good manufacturing
8 practice regulations.
9          Correct?
10     A.   Where -- where are you reading?
11     Q.   In the first paragraph of the letter.
12     A.   The first paragraph.  Okay.
13          (Discussion off the written record.)
14     Q.   I'm just giving you a moment to read.
15 When you're ready to proceed, let me know.
16     A.   (Pause.)
17          Okay.
18     Q.   So you would agree that this letter
19 discusses that during inspection conducted at one of
20 Baxter's facilities, the investigators found a
21 series of deviations from the current good
22 manufacturing practice regulations?
23     A.   That's what it says, yes.
24     Q.   And, in fact, it says:  They found
25 serious deviations from the current good

38 (Pages 146 - 149)

Page 150

1 manufacturing practice regulations.
2     Correct?
3     A.   That's what it says, yes.
4     Q.   It goes on to enumerate a number of those
5 deviations.  Right?
6     A.   It does.
7     Q.   And it also says on the last page that:
8 The CGMP deviations that are identified are not to
9 be considered an all inclusive list of the
10 deficiencies at the facility.
11     Right?
12     A.   That's correct.  That's what it says.
13     Q.   Does the letter say anything about any
14 and every product that Baxter made at the same time
15 as -- as the observation that the investigators made
16 were adulterated?
17         MR. DAVIS:  Objection.
18     A.   It does.  First paragraph.
19     Q.   Did you consider, at the time that you
20 received this letter, that each and every product
21 that was made at that facility during the time that
22 these observations were in effect, were adulterated?
23     A.   We assumed that this applied to all the
24 products that were made at the facility, yes, we
25 did.

Page 151

1     Q.   Did the facility go on to, for example,
2 recall all of the product that it had on the market
3 at the time that had been manufactured at that
4 facility?
5     A.   Well, there's no recall.  But to answer
6 your question, we did consider all the products to
7 be adulterated.
8     Q.   Did it put a distribution hold on all
9 product manufactured at the facility?
10     A.   No, we did not.
11     Q.   And so you didn't initiate a recall, and
12 you didn't initiate in -- a distribution hold, yet
13 you considered all product manufactured at that
14 facility to be --
15     A.   We --
16     Q.   -- adulterated?
17     A.   So we took this letter very seriously.
18     Q.   So, again, my question was, you didn't
19 initiate a recall, and you didn't initiate a
20 distribution hold, yet you considered all of the
21 product manufactured at that facility to be
22 adulterated?
23     A.   Under the context of this, yes.
24     Q.   Would you agree that the impact of CGMP
25 violations depends on the nature of those violations

Page 152

1 and the specific drugs involved?
2         MR. DAVIS:  Objection to form, and
3 incomplete hypothetical.
4     A.   So I'm not quite sure I understand what
5 you mean by the question.
6     Q.   Would you agree with that statement?
7     A.   Well, I don't understand the statement.
8     Q.   Are you aware of whether FDA has ever
9 said that the impact of CGMP violations depends on
10 the nature of those violations and on the specific
11 drugs involved?
12     A.   I haven't seen that specific statement.
13     Q.   Let's look at Paragraph 41 of your
14 report.
15     A.   41?
16     Q.   Uh-huh.
17     A.   Okay.
18     Q.   You state in Paragraph 41 that:  The
19 decisions of the quality function should never be
20 overridden by higher levels of management.
21     Correct?
22     A.   That's correct.
23     Q.   When you say "quality function" there,
24 are you referring to the quality unit?
25     A.   I'm referring to the quality function.

Page 153

1     Q.   Are you familiar with something that is
2 called the "quality unit" and is referenced in
3 21 CFR 211?
4     A.   Yes.
5     Q.   Is that what you understand to be the
6 quality function?
7     A.   They would be one and the same.
8     Q.   Okay.
9     A.   So just to clarify that point.
10     Q.   Uh-huh.
11     A.   The intent is if the quality
12 decision makes -- if the quality unit makes the
13 decision, it should not be overridden by management
14 for any reason, senior management.  That's the
15 intent of that statement.  They should have total
16 autonomy to make those decisions.
17     Q.   Are you saying that there are no
18 possibilities under which management might have to
19 intervene in order to affirm the integrity of the
20 corporate quality system?
21         MR. DAVIS:  Objection; misrepresents
22 the testimony.
23     A.   That's not what I said.
24     Q.   Well, let me make sure I understand.
25     You said that if the quality unit makes a

39 (Pages 150 - 153)

Page 154

1 decision, it should not be overridden by management,
2 senior management for any reason. Correct?
3    A.  That is correct, yes.
4    Q.  What if senior management believes that
5 it is necessary to override the quality unit's
6 decision in order to affirm the integrity of the
7 corporate quality system?
8        MR. DAVIS:  Objection to form, and
9 incomplete hypothetical.
10       You can answer.
11   A.  Well, what you just said makes absolutely
12 no sense.
13   Q.  So it's your position that there is no
14 possibility that senior management would ever need
15 to intervene for legitimate reasons while also
16 affirming the corporate quality system?
17   A.  The last part of your statement just
18 contradicts the first part, so let me clarify this.
19 Okay?
20       Is that it's certainly acceptable for
21 senior management to have a discussion with the
22 quality unit about the decision, but they should not
23 override that decision.
24   Q.  Your statement requires an assumption
25 that the quality unit or the quality functions'

Page 155

1 decisions are always right. Correct?
2    A.  I'm saying that they are the final
3 decision, they should be the final decision. What
4 I'm saying, as I said before, it's perfectly
5 acceptable for senior management to have a
6 discussion with the quality unit, why did you make
7 this decision, let's talk about it.
8        But at the end of the day, the quality
9 unit should not be overridden by the decision.
10   Q.  Under any circumstances?
11   A.  Well, unless you've got a -- unless
12 you've got a quality person that's totally
13 incompetent and that's gone rogue, I mean, which if
14 you've got that situation, you have got a much
15 bigger problem in the company.
16   Q.  And if you had that situation, would it
17 be appropriate for senior management to intervene?
18       MR. DAVIS:  Objection; incomplete
19 hypothetical.
20       But you can answer.
21       THE WITNESS:  Okay.
22   A.  That is a crazy question, and the reason
23 that it's crazy is because senior management should
24 not have somebody in that position to begin with
25 that's not going to make intelligent decisions. So

Page 156

1 it's a problem with senior management then.
2    Q.  Well, you, yourself, said "unless you've
3 got a quality person that's totally incompetent
4 that's gone rogue. If you've got that situation,
5 you've got a much bigger problem."
6        But if you've got that situation, should
7 senior management intervene?
8    A.  Well, if you have that situation, then
9 management probably should intervene. You should
10 probably have a new quality person there. But that
11 should never have happened in the first place,
12 because management should have been following what
13 the quality function is doing, and they should have
14 recognized that problem before then. So that's --
15 this situation should never occur.
16   Q.  Once the problem -- if there is a
17 problem, once that problem is recognized, senior
18 management should intervene. Right?
19   A.  No, that's not what I said.
20   Q.  Are you saying that if senior management
21 recognizes a problem, it should not intervene?
22   A.  What I said was, the quality unit's
23 decision should almost always be final.
24       Your hypothesis here is you've got a
25 quality person that doesn't know what they're doing

Page 157

1 or is incompetent or the other thing. And my point
2 is, if that's the case, the management of the
3 company should have done something well before a
4 problem ever occurred in the first place.
5    Q.  You say "The quality unit's decision
6 should almost always be final."
7    A.  And that's correct.
8    Q.  Almost always is not always. Right?
9    A.  In the unlikely event as to what you said
10 here, if you've got -- I mean, if quality function
11 is often on a wild -- I mean, a rogue quality person
12 who's making erroneous decisions, that person should
13 not have been in that job in the first place, and
14 that person should have been replaced by management
15 is what I'm saying.
16       But the typical aspect would be the
17 quality -- here's the real point, is that in a lot
18 of companies, senior management will override
19 quality's decision because of business
20 considerations which should never be done.
21       It's okay to have a discussion with the
22 quality head, but you don't want to override that
23 quality unit's decision. That's the whole point
24 here.
25       THE WITNESS:  I'm sorry. Am I going

40 (Pages 154 - 157)

Page 158

1 too fast?
2       THE STENOGRAPHER:  You're fine.
3    Q.    All right.  Let's go to Subheading 3 of
4 your report, where you talk about:  Comprehensive
5 Quality Management System.
6    A.    Okay.
7    Q.    Still on Page 10.
8    A.    Sure.
9    Q.    At Paragraph 44, you discuss the topic of
10 SOPs as an element that's essential to forming the
11 core of a quality system.  Correct?
12    A.    Yes.
13    Q.    And at the top of Page 11, still under
14 Paragraph 44, you list some specific --
15    A.    Pertinent examples.
16    Q.    -- examples of SOPs that a company should
17 have.  Correct?
18    A.    Among others, yes.
19    Q.    Each individual manufacturer establishes
20 its own SOPs.  Correct?
21    A.    They should.
22    Q.    And so SOPs can and do vary from one
23 manufacturer to another.  Right?
24       MR. DAVIS:  Objection; asked and
25 answered earlier this morning.

Page 159

1       But you can answer it again.
2    A.    Well, of course they're going to vary,
3 because they're not all written by the same person,
4 but they should all be compliant with the
5 regulations and guidances.
6    Q.    As you sit here today, do you know
7 whether any of the defendants in this litigation had
8 SOPs on risk management?
9    A.    I believe that there were some, yes.
10    Q.    Are you aware of whether all defendants
11 had SOPs on risk management?
12    A.    I'm not certain whether they did or not.
13 They should have had those SOPs.  Whether they
14 actually had them, I'm not sure.
15    Q.    As you sit here today, do you know one
16 way or the other whether any particular defendant in
17 this litigation had SOPs regarding incoming raw
18 materials and release?
19    A.    If they had incoming what?
20    Q.    The second category at the top of
21 Page 11.
22    A.    Oh, okay.  Okay.
23    Q.    As you sit here today, do you know
24 whether any defendant in this litigation had SOPs on
25 incoming raw materials and release?

Page 160

1    A.    I'm not certain, but they should have had
2 these.
3    Q.    As you sit here today, do you know one
4 way or the other whether any defendant in this
5 litigation had SOPs on deviations or
6 nonconformances?
7    A.    I'm not certain.  But let me just
8 interject here for a second.  The real issue is
9 whether they were following their own SOPs or not.
10 That's the real issue.
11    Q.    As you sit here today, do you know
12 whether any defendant in this litigation had SOPs
13 regarding out-of-specification results?
14    A.    Again, same answer to the ones before,
15 they should have had these SOPs.  Whether they
16 actually have them, I'm not certain.  I mean, I know
17 some of these probably did, because some of these
18 are referenced at various places, but for me to tell
19 you for all of the defendants whether they had all
20 of these SOPs, I don't know whether they had all of
21 these SOPs.  My assumption is they probably did.
22    Q.    Okay.  And is your answer the same with
23 respect to all of the categories that you list at
24 the top of Page 11 --
25    A.    Yes.

Page 161

1    Q.    -- of your report?
2    A.    So I'll add a comment to that, though.
3 The real question in many cases is whether they were
4 adequate or not.
5    Q.    Would someone be able to determine an
6 SOP's adequacy without reviewing it?
7    A.    Without reviewing it?
8    Q.    Uh-huh.
9    A.    I mean, if you're going to determine it
10 to not be adequate, you'd have to review it, I mean,
11 or know the outcome, if it wasn't the right outcome.
12 I...
13    Q.    Let's go to Paragraph 46 of your report.
14 You state in Paragraph 46 that:  The number one
15 citation by FDA year after year is the following,
16 quote, procedures not in writing, comma, fully
17 followed, end quote.
18       Right?
19    A.    Right, that's what it says.
20    Q.    And you cite to a specific website
21 immediately following that.  Is that the reference
22 from which that quote comes?
23    A.    Yes.
24    Q.    And the website that's referenced there
25 in that paragraph, Footnote 15, is that an

41 (Pages 158 - 161)

Page 162

1  inspection observations website?
2     A.   What it is, it's a list -- it goes
3  through 21 CFR 211, and it lists the number of times
4  a firm has been cited for each of the areas, and the
5  failure to follow procedures or not having had the
6  procedures, it's always at the top of the list for
7  the number of instances where there have been
8  citations.
9     Q.   Let's go ahead and mark as --
10         MR. DAVIS:  14.
11    Q.   -- Exhibit 14 this web page with the
12 title:  Inspection Observations.
13         (Exhibit 14 was marked.)
14    Q.   Reviewing the content of this exhibit, is
15 this what you're referring to in Footnote 15?
16    A.   I'm not certain.  I'm looking at the
17 bottom.  It doesn't appear to be the same as the
18 reference footnote.
19    Q.   You are correct.  The URL is not the same
20 and I'll represent to you that when you type in the
21 URL in Footnote 15 --
22    A.   Okay.
23    Q.   -- it automatically redirects to the
24 footnote at the bottom of Exhibit 14.
25         MS. HILTON:  I'll confirm.

Page 163

1     Q.   So can you point me to where this quote
2  appears in this inspection observations web page?
3     A.   So in order to find that, you have to
4  click on the link for the specific year and then it
5  will detail out in order of occurrence the
6  observations and what they were for.
7     Q.   So your statement that the number one
8  citation by FDA, year after year, is based on your
9  review of the information that appears in each of
10 those links for any given year?
11    A.   So I did not go back and review every
12 single year here, but historically -- and I review
13 this periodically -- that it's typically the number
14 one citation for failure to follow your own
15 procedures.
16    Q.   So that's based on your experience?
17    A.   My experience.  But, I mean, that's --
18 you can go to the website and you will see the
19 number of occurrences and what they were for.  And
20 these are always at the top of the list, in terms of
21 number of occurrences.
22    Q.   Okay.  Let's go to Paragraph 47 in your
23 report.
24    A.   Okay.
25    Q.   In that paragraph you refer to two

Page 164

1  different warning letters.  Correct?
2     A.   I do.
3     Q.   And these warning letters were issued to
4  two different firms?
5     A.   That's correct.
6     Q.   Are you aware of whether either of those
7  firms made or makes valsartan-containing products?
8     A.   I don't believe.  I don't know for
9  certain, but I don't believe either one of these
10 make valsartan.
11    Q.   Okay.  And do these -- do these warning
12 letters have anything to do with nitrosamines at
13 all?
14    A.   As far as I know, they do not.  That was
15 not the intent of the reference.
16    Q.   Okay.  Are you aware whether either of
17 the firms who received these warning letters that
18 are referenced in Paragraph 47 manufactured solid
19 oral dose products?
20    A.   I'm not certain.
21    Q.   Okay.
22    A.   They may.  I'm not certain.  But that was
23 not really the relevance to putting that in, in the
24 first place.  The relevance was the fact that they
25 were cited for not using proper risk management.

Page 165

1     Q.   Let's go to Section E of your report.
2     A.   Section what?
3     Q.   Section E, as in Edward.
4     A.   Okay.
5     Q.   At Paragraph 76, and continuing through
6  Paragraph 95, your report recounts the type of
7  inspections that FDA conducts, right, and the
8  possible outcomes of those inspections?
9     A.   I do.
10    Q.   And it talks about what possible outcomes
11 might ensue if the FDA were to conclude that an
12 official action was indicated or an OAI status was
13 indicated.  Correct?
14    A.   I do.
15    Q.   Are you aware of whether any of the
16 facilities that manufactured valsartan-containing
17 products for the U.S. in the 2012 to the 2018 time
18 period were ever formally classified as OAI by FDA?
19    A.   Yes.
20    Q.   Which ones?
21    A.   Well, I know ZHP was.  And there may be
22 others, but I know ZHP was.
23    Q.   In the time period from 2012 to July
24 2018?
25    A.   The 2018 inspection was classified OAI.

42 (Pages 162 - 165)

Page 166

1    Q.    When did that inspection occur?  When in
2 2018?
3    A.    It was the summer of 2018.
4    Q.    Okay.  Are you aware of any others?
5    A.    There may be others.  I'm not certain.
6    Q.    As you sit here today, you're not aware
7 of any others?
8    A.    Well, I mean, it's not something I looked
9 at and reviewed.
10    Q.    So as you sit here today, you're not
11 aware of any others?
12    A.    That I can speak definitively to, yes,
13 you're right.  That doesn't mean there weren't any.
14        And I suspect that the warning letters --
15 typically a warning letter would not be issued
16 unless there was an OAI inspection.  And a number of
17 these firms had warning letters.
18    Q.    Are you speculating right now?
19    A.    I'm just telling you, typically a warning
20 letter would not be issued unless there was an OAI
21 inspection.  So a warning letter would not
22 usually -- a warning letter would very seldom ever
23 be issued for a VAI inspection.
24    Q.    But, again, as you sit here today, you're
25 not aware of that particular situation occurring

Page 167

1 with any defendant other than what you have
2 identified?
3    A.    It's not something I specifically
4 reviewed.
5    Q.    Okay.  So you're not aware --
6    A.    I -- okay.
7        MS. ISIDRO:  Let's go ahead and take
8 a five-minute break.
9        THE VIDEOGRAPHER:  Off the record.
10 The time is 3:10 p.m.                0
11        (Break.)
12        THE VIDEOGRAPHER:  Back on the
13 record.  The time is 3:26 p.m.
14    Q.    All right.  Mr. Quick, let's turn to
15 Section G of --
16    A.    Section what?
17    Q.    G as in girl, in your report.
18        (Discussion off the written record.)
19    Q.    You state in Paragraph 101 --
20        (Discussion off the written record.)
21    Q.    So, Mr. Quick, you state in Paragraph 101
22 that you have reviewed a set of documents related to
23 defendants' noncompliance with CGMPs in order to
24 determine whether these examples of noncompliance
25 with CGMPs are the type that would impact and be

Page 168

1 common to every valsartan product purchased by the
2 class members.  Do you see that?
3    A.    I see that.
4    Q.    I'm going to ask you about a few
5 different portions of that sentence.
6        When you say that you reviewed a set of
7 documents related to defendants' noncompliance with
8 CGMPs, what are you referring to?
9    A.    I'm referring to examples of
10 noncompliance with GMPs.  It wasn't all exhaustive.
11 There were examples.
12    Q.    How did you determine which examples you
13 would review?
14    A.    Well, there is no specific determination.
15 I went through all the defendants and I pulled out
16 examples that I thought were representative of what
17 I considered to be serious examples -- serious GMP
18 situations.
19    Q.    And the ones that you pulled out are the
20 ones that are listed in your report?
21    A.    They are.
22    Q.    Okay.  And in the second part of that
23 sentence it says that you went through that
24 exercise:  In order to determine whether these
25 examples of noncompliance with CGMPs are the type

Page 169

1 that would impact and be common to every valsartan
2 product purchased by the class members.
3        What do you mean by that?
4    A.    Well, I mean, we were talking about GMP
5 situations, not like somebody not wearing a hairnet.
6 Okay?  That would not be what I would be talking
7 about here.  These would be something that would
8 apply to everything.
9    Q.    So is it your position that a purported
10 noncompliance with respect to ZHP's API would impact
11 a product that contained Mylan's API?
12        MR. DAVIS:  Objection;
13 mischaracterizes his report.
14    A.    So when I refer -- for example, relative
15 to ZHP and, for example, Teva purchasing ZHP, we
16 were talking about all of the ZHP relative to Teva
17 that would apply to all of the class relative to
18 that situation.
19    Q.    So it's your position that the examples
20 that you've provided with respect to ZHP would
21 impact any product that utilized ZHP's API?
22    A.    Well, yes.  But to answer the question
23 you brought it out for, am I going back to say
24 relative to -- and, for example, the situation of
25 Teva and Mylan, I'm not referring back to Mylan,

43 (Pages 166 - 169)

Page 170

1 that's a separate thing. But for Teva and ZHP, all
2 of that would apply to the class group.
3    Q.   I'm not sure I understood that. Can you
4 clarify what you mean?
5    A.   So I'm not trying to -- I'm not trying to
6 represent that an issue with Mylan or an issue with
7 ZHP would apply to customers that -- a Mylan
8 product. However, if they're being sold the same
9 way and they're processed by Teva in the same way,
10 it would apply to all of the class group.
11    Q.   And so similarly, you're not taking the
12 position that in observation with respect to or an
13 alleged noncompliance with CGMPs by Teva would
14 impact a different ANDA holder's product?
15         MR. DAVIS:  Objection; incomplete
16 hypothetical.
17         But you can answer.
18    A.   Okay.  So we're talking about Teva versus
19 Torrent.  If we're talking about that, okay, for
20 example, I'm not trying to imply what Teva did or
21 did not do would impact what Torrent did.
22         The point is these GMP violations apply
23 to the whole class, in terms of -- and all the
24 pills, everyone that received the product.
25    Q.   All right.  So let's take a look at

Page 171

1 Paragraphs 104 through 106 in your report.
2    A.   Okay.
3    Q.   And here you are discussing observations
4 that were made by FDA in an establishment inspection
5 report in August of 2018.  Correct?
6    A.   I am.
7    Q.   This was the 2018 inspection that you
8 were referencing earlier?
9    A.   Yes.
10    Q.   At the time that these observations were
11 made, Teva had already initiated its product recall
12 of valsartan-containing products which utilized
13 ZHP's API.  Right?
14    A.   I'm not -- I'm not certain of the time
15 frames.
16    Q.   You don't know one way or the other
17 whether that recall was issued on July 16th of 2018?
18    A.   I'm not certain when the recall was
19 actually initiated.  I'm sure it's there someplace,
20 I just don't recall.
21    Q.   Okay.  Do you know whether -- do you know
22 whether FDA had any information about the presence
23 of NDMA exceeding 100 parts per million in 150 lots
24 of valsartan API from 2014 and 2015 prior to
25 receiving ZHP's response to the FDA's DMF

Page 172

1 information request letter from August of 2018?
2    A.   I'm not certain what information FDA had
3 or didn't have.  I'm aware of the document you're
4 referring to.
5    Q.   Okay.  So you don't -- you don't know one
6 way or the other whether that was known to FDA prior
7 to that response in 2018?
8    A.   So I -- it -- I'm not -- I'm not sure
9 how -- what relevance it has but, no, I'm not.
10    Q.   Okay.  And do you know whether that
11 information was known to any of the other defendants
12 in this litigation prior to 2018?
13         MR. DAVIS:  Object to form, and
14 potentially calls for speculation.
15         But you can answer.
16         THE WITNESS:  Okay.
17    A.   I'm not aware of it, but they should have
18 been aware.  So if you look at Section 105, this --
19 this is the situation that caused the problem with
20 ZHP, they made a critical change.  They
21 characterized it as critical, but when they made
22 their submission to the FDA, they called it a minor
23 change.  And this goes back to 2011 and this is what
24 the defendants that used the ZH products should have
25 been aware of.

Page 173

1    Q.   Beginning at Paragraph 129 and continuing
2 through to Paragraph 143, you discuss certain -- or
3 you make certain representations with respect to
4 Mylan.  Correct?
5    A.   Right.
6    Q.   You speak of risk assessments for
7 recovered solvents going back to --
8    A.   Which paragraph --
9    Q.   -- 2014?
10    A.   -- are you referring to --
11         MR. DAVIS:  I believe that's 129.
12         THE WITNESS:  Oh, 129.
13    Q.   Yeah.
14    A.   129.  Okay.
15    Q.   And you reference that with respect to
16 Unit 8.  Correct?
17    A.   It is.  That's what I reference here,
18 yes.
19    Q.   But the 2020 EIR for Mylan cited these
20 observations in the context of Unit 7.  Correct?
21         MR. DAVIS:  Objection;
22 mischaracterizes the -- the document.
23         But you can answer.
24    A.   So I'm not certain.  So in terms of the
25 linkage that you're trying to make, I'm not certain.

44 (Pages 170 - 173)

Page 174

1 We'd have to go back and look at the documents.
2    Q.   Do you know whether at the time of this
3 EIR, do you know one way or the other whether any
4 particular defendant was purchasing valsartan API
5 from Mylan?
6    A.   I don't know the time frames of when they
7 were purchasing.
8        MR. DAVIS:  Which EIR are you
9 referring to, for the record?
10   Q.   The EIR that you're referencing in
11 Paragraph 129?
12       MR. DAVIS:  Is there --
13       THE WITNESS:  Which --
14       MR. DAVIS:  Is there a EIR that's
15 being referenced at 129?
16   Q.   You're discussing observations from an
17 EIR in these paragraphs.  Correct?
18   A.   I didn't reference the EIR.  I
19 referenced -- I have other references relative to
20 the statements that I made in 129.
21   Q.   Do you know where those came from?
22       MR. DAVIS:  Where -- objection;
23 vague.
24   A.   So they came from References 61, 62, and
25 63.

Page 175

1    Q.   Okay.  So let me just ask it this way.
2 Are you aware of -- are you aware of a February 2020
3 EIR from Mylan?
4    A.   February 2020?
5    Q.   Yes.
6    A.   I may be.
7    Q.   Do you know whether any of the
8 observations you discuss with respect to Mylan in
9 your report come from that EIR?
10   A.   If they do, I would have referenced them
11 in the document here.
12   Q.   But as you sit here right now, you can't
13 specify which, if any, came from that EIR?
14   A.   No, but I did -- I do reference where the
15 statements came from.  And references 68, 69, and 70
16 all were from the 2020 EIR.
17   Q.   Okay.  And do you know which, if any, of
18 the defendants had currently active ANDAs for
19 products containing valsartan at the time of that
20 2020 EIR?
21       MR. DAVIS:  Objection; vague.
22 Objection to the form.
23       You can answer.
24   A.   So you're asking -- was the question --
25 maybe you want to rephrase the question?

Page 176

1    Q.   Sure.
2        Do you know whether any of the defendants
3 had withdrawn their ANDAs with respect to products
4 containing valsartan at the time -- by the time of
5 that February 2020 EIR?
6    A.   I'm not certain whether they did or not.
7        MR. DAVIS:  Same -- same objections.
8        THE WITNESS:  I'm sorry.
9    Q.   Okay.  Let's go to the section, starts at
10 the bottom of Page 28:  Evidence common to the class
11 of defendant Teva's noncompliance with CGMPs.
12       Do you see that section?
13   A.   I see that section, yes.
14   Q.   And are you aware that on June 20th of
15 2018, Teva was informed of the preference --
16 presence of a previously known impurity?  Previously
17 unknown impurity?
18   A.   It's what?





Page 177

15   Q.   As you sit here today, you don't know one
16 way or the other?
17   A.   No, I'm not certain.  No.  Like, I want
18 to say again --
19   Q.   Uh-huh.
20   A.   -- the statements I have in this report
21 are examples, okay, I didn't review everything,
22 they're examples that it was a class that applied to
23 all products, so I didn't review every possible area
24 of concern.

45 (Pages 174 - 177)



Page 178

14    Q.    Are you aware that Teva announced a
15    recall of certain named valsartan products made with
16    ZHP's API on or about July 16th of 2018?
17            MR. DAVIS:  Object to form.
18            You can answer.
19    A.    I'm not aware -- well, I probably have
20    seen that, but I'm not particularly aware of it.  It
21    wasn't pertinent to my report.

Page 179

14    Q.    Okay.  Are you aware one way or the other
15    whether Teva announced a recall regarding specified
16    valsartan products containing Mylan's API on
17    November 25th of 2018?
18            MR. DAVIS:  Object to form.
19            You can answer.
20    A.    The same answer as before.  Again, there
21    were a lot of documents around that period of time
22    that I may have seen, but they were not relevant to
23    my report.

Page 180

Page 181



Page 182

3     Q.   Did you review the reports of audits
4 conducted by Teva at ZHP?
5     A.   Yes.  I think I referenced these in here
6 as well.
7     Q.   Did you ensure that you had reviewed the
8 report of each and every audit that Teva performed
9 at ZHP?
10    A.   I don't know that I have reviewed every
11 audit.
12             MR. DAVIS:  Objection; outside the
13 scope.
14             And you can answer.
15    A.   I mean, I reviewed enough to see that
16 there were deficiencies in the way that the audits
17 were conducted.

Page 183

Page 184

Page 185

7     Q.   Are you aware that Teva had
8 risk-management SOPs in place in the relevant time
9 periods?
10    A.   Yes.  And I believe some of those
11 documents I've referenced.
12    Q.   And those risk-management SOPs were
13 called upon to manage the customer-API supplier
14 relationships with ZHP and Mylan.  Correct?
15    A.   I'm not sure that characterizes it
16 correctly, but...
17    Q.   Okay.  What's incorrect about that
18 characterization?
19    A.   Well, I -- I'm not -- I'm not certain,
20 because I didn't look at it in that light.  But if
21 you're asking the question was I aware that there --
22 that Teva had risk-management processes in place,
23 yes.

47 (Pages 182 - 185)

Page 186



2          MR. DAVIS:  Object -- I'm going to
3 object to the form.
4          You can answer.
5     A.   They did, but they didn't get the
6 information that they needed.
7     Q.   And these inspections were made according
8 to schedules established for audits of API
9 suppliers.  Correct?
10    A.   Well, I don't know that to be the case.
11 I don't know.
12    Q.   You don't know one way or the other?
13    A.   I don't know -- I don't know what --
14 you're asking the question whether they scheduled
15 the audits.  I don't know.
16         But the issue, though, is they failed to
17 uncover the issues that existed.

23    Q.   When you say "if it's here," you mean in
24 your report?
25    A.   Yeah, in the report, yeah.

Page 187

1     Q.   Do you know one way or another if it's
2 there?
3     A.   I don't recall.  I'd have to -- we'd have
4 to go back and look at all the references.
5          But the point is, if they had done the
6 audit the way I had suggested in 2011, they should
7 have been able to determine this critical change and
8 have investigated it.
9     Q.   Are you aware of what a DMF is, a drug --
10    A.   Yes.
11    Q.   What do you understand DMF to refer to?
12    A.   It's a Drug Master File.
13    Q.   And what is a Drug Master File?
14    A.   Drug Master File typically contains all
15 of the aspects relative to making whatever it is,
16 and it's by reference.  And the ANDA or NDA will
17 reference the DMF as a reference.  So if the FDA
18 does not approve a DMF, they'll approve the file
19 that references the DMF.
20    Q.   Okay.  What entity holds the DMF?
21    A.   What do you mean, "what entity"?
22    Q.   Would that be the entity that supplies
23 the API?
24    A.   Well, the API manufacturer probably has
25 DMFs.  I'm assuming Teva probably had DMFs.

Page 188

1     Q.   You're referring, in your response, to
2 the ANDA will reference the DMF.  What do you mean
3 there?
4     A.   Okay.  So when you're going to the
5 chemistry manufacturing control section of your ANDA
6 or NDA, you'll reference the DMF.  And, typically,
7 that's what you would do.  You don't actually
8 include that as part of the ANDA or the NDA because
9 it's by reference.
10    Q.   Okay.  So, for example, if a company like
11 Teva is obtaining API from a company like ZHP,
12 Teva's ANDA for the product that incorporates that
13 API would reference ZHP's DMF for that API.
14 Correct?
15    A.   Well, so I'm not -- so Teva's got -- I
16 mean, ZHP has their own file, they have a DMF that
17 references their own file.  So I'm not certain
18 whether the Teva ANDA would reference necessarily
19 the ZHP DMF.  I don't know.  I don't know whether
20 that would be the case or not, because I'm assuming
21 that Teva has their own DMF.





Page 190

3    Q.    Are you aware that DMFs are confidential?
4    A.    Well --
5            MR. DAVIS:  Object to form.
6            You can answer.
7    A.    Well, confidential in the fact that the
8    FDA is not going to release the DMF, if that's what
9    you're saying.  But the FDA is not going to release
10   the DMF to anybody.  But, I mean, ZHP could release
11   it to whoever they want to.
12   Q.    Is ZHP required by FDA to release it to
13   anyone?
14   A.    No, they're not required.
15   Q.    Okay.  And does FDA require ANDA holders
16   to obtain access to these confidential DMFs?
17           MR. DAVIS:  Object to form.
18   A.    Well, as I stated, Teva probably has
19   their own DMF, okay, which Teva would file as part
20   of their filings.  Okay?  So ZHP would have their
21   DMF.  So I doubt seriously if Teva's filing had the
22   ZHP DMF as part of it.
23           MR. DAVIS:  Let me caution you not to
24   speculate.
25           THE WITNESS:  Okay.  You're right.

Page 191

1    A.    Okay.  I don't know.  But you're asking
2    about if the FDA required it.  I think that was the
3    question?
4    Q.    Is it your position that FDA would
5    require any manufacturer of finished product that
6    incorporates ZHP's valsartan API to get access to
7    ZHP's DMF for that API?
8            MR. DAVIS:  Object to form.
9    A.    That's not necessarily a requirement.
10   The real point, though, is that Teva should have
11   understand -- understood the process that ZHP was
12   following, either by getting access to the DMF or by
13   getting the information when they came on their
14   audits.

Page 192

Page 193

49 (Pages 190 - 193)



Page 194

Page 196

1 beginning of Media Unit 3. Back on the record. The
2 time is 4:23 p.m.
3    Q.    Mr. Quick, I just want to make sure I
4 understand your testimony. It's your understanding
5 that ZHP had a DMF for valsartan API. Correct?
6    A.    I believe that they did. Either that or
7 they put it into their ANDA. So either one. They
8 either had DMF or they had an ANDA. They had some
9 sort of filing with the FDA.
10    Q.    Okay. And it's your understanding that
11 Teva had its own DMF for its valsartan ANDA?
12    A.    No, I didn't say that. I said I assume
13 that Teva most likely would have had their own DMF
14 to make the drug product. That's typically what a
15 pharmaceutical company would do. It's not a
16 requirement to have a DMF, so they may or may not
17 have had a DMF.
18    Q.    So you're saying that Teva may have had
19 its own DMF for its finished drug product, for its
20 valsartan?
21    A.    Yeah, for its drug product, yes. Again,
22 it's not a requirement by the FDA, but most drug
23 companies would do that.
24    Q.    Okay. Did you review the quality
25 agreement for active pharmaceutical ingredients that

Page 195

Page 197

1 was in place between Teva by way of Actavis and ZHP?
2    A.    I'm not certain whether I saw that or
3 not.
4    Q.    Okay. So as you sit here today, you're
5 not aware, one way or the other, whether it requires
6 that ZHP notify Teva/Actavis in writing upon the
7 receipt of a regulatory inspection report?
8    A.    So to answer that question, if there was
9 a quality agreement in place, that quality agreement
10 certainly should have spelled that out, okay, that
11 ZHP was required to do that. That would be a normal
12 component in a quality agreement between the two
13 entities.
14    Q.    You didn't check for that, did you?
15    A.    I don't think I saw it, but I'm saying in
16 that agreement, that's what they probably should
17 have had. I mean, it's a basic requirement for a
18 quality agreement.
19    Q.    Okay. And as you sit here today, you
20 don't know, one way or the other, whether that was
21 in the quality agreement between Teva, Actavis, and
22 ZHP?
23    A.    No.

19    (Discussion off the written record.)
20    MS. ISIDRO: Let's go off the record
21 a moment.
22    THE VIDEOGRAPHER: Off the record at
23 4:05 p.m.
24    (Break.)
25    THE VIDEOGRAPHER: This marks the

50 (Pages 194 - 197)



Page 198

Page 200

15    Q.    But you didn't review that agreement?
16    A.    Well, I didn't review it, but relative to
17  this it doesn't really matter because they should
18  have had it in the quality agreement, whether I
19  reviewed it or not.
20    Q.    Right.  But you don't know whether it was
21  in the quality agreement?
22    A.    I don't.  I don't know whether it was
23  there or not.
24    Q.    Okay.
25    A.    Right.

Page 199

Page 201

1    Q.    So it could have been, you just don't
2  know?
3    A.    That's right.  It could have been.  But
4  if it had been there, then they should have notified
5  them.

Veritext Legal Solutions

800-227-8440                                                973-410-4040



Veritext Legal Solutions

800-227-8440                                                                973-410-4040

Page 206

Page 208

18    Q.    Do you know whether Teva had any
19 valsartan product on the market at this time in
20 August of 2018?
21    A.    I don't know, but it's not relevant to --
22 to the report that I had.  And, again, as I
23 indicated, my report addresses the CGMP compliant
24 issues that were applicable to the entire class and
25 it's not -- I -- it's not exhaustive, and if I had

Page 207

Page 209

1 more documents I might include those in an updated
2 report if we were ever to have such one.
3    Q.    Would you agree that if Teva did not have
4 product on the market in August of 2018, no decision
5 that was made or not made in August of 2018 could
6 have impacted product received by class members?
7        MR. DAVIS:  Object to form, improper
8 hypothetical.
9    A.    So your -- your statement is an incorrect
10 statement because there's obviously -- I don't -- I
11 don't know what the expiration date is on the
12 valsartan.  So clearly there'd been product
13 distributed prior to that time, probably within
14 still expiration date, I don't know.  So I -- I
15 think -- I don't -- I think your statement is
16 incorrect.
17        MR. DAVIS:  I'd caution you not to
18 speculate again.
19        THE WITNESS:  Okay.
20    Q.    Would that be nonrecalled product that
21 you're referencing?
22        MR. DAVIS:  I'd caution the witness
23 not the speculate.
24        THE WITNESS:  Okay.
25    A.    I don't -- I don't know.  But my point



53 (Pages 206 - 209)



Page 210

1  is, it's not really relevant.  That's really what I
2  intended to say.
3      Q.   So it's not really relevant to you
4  whether there was any product on the market that
5  could've reached class members in August of 2018?

14     Q.   Let's take a look at Paragraph 150 of
15  your report?
16     A.   152?
17     Q.   150.
18     A.   150.  Okay.

Page 211

Page 212

6      Q.   The most serious level of observation
7  which Teva auditors could make during an audit is a
8  critical observation.  Correct?
9      A.   I don't -- I don't know whether that's
10 what's in the Teva -- Teva procedure or not.  I'm
11 not certain.
12     Q.   So you don't know how Teva defined a
13 serious observation?
14     A.   They talked about major and minor, so --
15     Q.   Excuse me.  You don't know how Teva
16 defined a major observation?
17     A.   It may have been in some of the documents
18 I've seen, but I just don't recall.
19     Q.   And you don't know how Teva defined a
20 minor observation?
21     A.   I'm sorry.  I just don't recall if I had
22 seen it.  I may have seen it.  I just don't recall.

Page 213

54 (Pages 210 - 213)



Page 214

1    Q.    Would it be fair to say that the actions
2  that you undertook to determine whether Teva's
3  reaction to the major and minor observations was
4  sufficient was to review the documents that you have
5  identified in Exhibit A to your report?
6          MR. DAVIS:  Object to form.
7    A.    So I'm not sure which documents I review
8  there.
9    Q.    But the documents that you reviewed in
10 connection with your report -- the documents that
11 you relied on in connection with your report are
12 listed in Exhibit A to your report?
13   A.    That is correct.



Veritext Legal Solutions

800-227-8440                                                                973-410-4040



Veritext Legal Solutions

800-227-8440                                                                                        973-410-4040



Page 226

Page 227

Page 228

Page 229

12    Q.    Okay.
13          (Reporter admonishment.)

Veritext Legal Solutions
800-227-8440                                                        973-410-4040



Page 230

Veritext Legal Solutions



Veritext Legal Solutions

Page 238



1 looking at?
2    Q.   I'm not looking at a particular section
3 right now.
4       Is that something that you recall
5 commenting on?
6    A.   I may have -- I may have commented on a
7 general way, at the beginning.  There may be other
8 areas.  You want to refer me to a certain aspect of
9 the report, I'd be glad to comment on it.
10    Q.   I'm going to reference you to Page 10 of
11 your report.  Do you see heading Roman Numeral III?
12    A.   Yes.
13    Q.   Competitiveness quality management
14 system?
15    A.   Right.
16    Q.   Do you see Roman Numeral II above at the
17 top of the page, it says:  Responsible and trained
18 quality department?
19    A.   I do.
20    Q.   Was there anything that you saw in any of
21 the documents that you reviewed that implies that
22 Teva does not have an adequately --
23       (Brief interruption.)
24       MR. DAVIS:  Let's go off the record.
25       MS. ISIDRO:  Yeah.  Off the record.

Page 240

Page 239

Page 241

1       THE VIDEOGRAPHER:  We're off the
2 record at 5:43 p.m.
3       (Break.)
4       THE VIDEOGRAPHER:  We're back on the
5 record at 5:48 p.m.                    0

20    Q.   You've commented on comprehensive quality
21 management systems.  Correct?
22    A.   Where are you referring?
23    Q.   Is that something that you recall
24 commenting on?
25    A.   I may have.  Can -- what section are you

61 (Pages 238 - 241)

Page 242



14    Q.    So as you sit here today, you can't
15 identify anything that implies that Teva does not
16 adequate -- did not adequately conduct risk
17 assessments per Q9, as you have described them?
18    A.    Because I've not necessarily looked at
19 all the appropriate documents that I could have
20 looked at.
21    Q.    Okay.  And you have commented on change
22 management systems in your Paragraph 49.  Correct?
23    A.    49?
24         Yes.
25    Q.    Was there anything that you saw in any

Page 243

1 documents that you reviewed that implies that Teva
2 does not have an adequate change management system,
3 as you have described it?
4    A.    Again, I did not review that specific
5 aspect of Teva to be able to make that
6 determination.
7    Q.    Okay.  And you have commented on process
8 validation at your Paragraph 57.  Correct?
9    A.    Yes.



17    Q.    Okay.  Anything else as to Teva with
18 respect to process validation?
19    A.    Nothing.  But that was just one example.
20 There could be more examples, if I had other
21 documents to review.
22    Q.    So if there are any other examples, it's
23 not something that you reviewed?
24    A.    I just didn't review it, yes.
25    Q.    Okay.  Okay.

Page 244

1         MS. ISIDRO:  All right.  I have no
2 further questions at this time, and I'll pass the
3 witness to the next questioner.
4         (Discussion off the written record.)
5         THE VIDEOGRAPHER:  Go off the record.
6         (Break.)
7         THE VIDEOGRAPHER:  Back on the
8 record.  The time is 5:54 p.m.  Back on the record.
9              EXAMINATION
10 BY MR. GOLDBERG:
11    Q.    Okay.  Mr. Quick, my name is Seth
12 Goldberg.  I'm with the law firm Duane Morris, and
13 we represent ZHP and a few of its affiliated
14 companies.
15         I'm going to ask you a few questions
16 about your report, and in particular the ZHP section
17 of your report, which starts on Page 20.
18         MR. GOLDBERG:  And I wanted to put
19 up Exhibit -- well, make sure for the -- for the
20 tech, this is Document No. 001 in our selection of
21 documents.
22    Q.    And while he's doing that, Mr. Quick, is
23 it -- when you look at this section of the ZHP
24 section, is it fair to say that you --
25         MR. DAVIS:  We might have an issue

Page 245

1 here.  Are you going to be able to read that, John?
2         THE WITNESS:  I cannot read it.
3         (Discussion off the written record.)
4         (Exhibit 19 was marked.)
5    Q.    This is the 2018 EIR report.  Are you
6 familiar with this document?
7    A.    This is the ZHP?
8    Q.    Correct.
9    A.    Okay.
10    Q.    Okay.  You cite to this document a number
11 of times in this section of the ZHP your opinions
12 regarding ZHP.  Do you see that?  Why don't you flip
13 through your report.
14    A.    I see that.
15    Q.    And most of your footnote cites refer to
16 this document.
17         MR. DAVIS:  Objection.
18    Q.    Do you see that?
19    A.    Yes, I do see that.  Some of them do,
20 you're correct.
21    Q.    Okay.  What do you understand this
22 document to be?
23    A.    This is the Establishment and Inspection
24 Report written by the FDA investigator that
25 inspected the ZHP facility in 2018.

62 (Pages 242 - 245)

Page 246

1   Q.   And this document, if you look at the
2  very back, it's signed and dated -- this is on
3  Page 974, 58 of 58 in the PDF -- it was signed and
4  dated by two investigators on August 20th, 2018. Do
5  you see that?
6   A.   I see that.
7   Q.   Okay.  Did you review any ZHP
8  communications with the FDA dated after August 20th,
9  2018?
10   A.   I may have.  I don't recall.
11   Q.   Well, I don't see any cited in your
12  report, so did you or didn't you?
13   A.   If it's not cited in my report, I didn't.
14   Q.   Okay.  What's a "warning letter
15  closeout"?
16   A.   Warning letter closeout would be when the
17  FDA has reviewed whatever has been done relative to
18  the warning letter to begin, they close out the
19  warning letter.
20   Q.   Did you review the warning letter
21  closeout that the FDA issued for ZHP related to this
22  EIR?
23   A.   I may have seen that.
24   Q.   Well, I just asked you if you looked at
25  any document after August 20th, 2018, and you said

Page 247

1  you didn't.
2   A.   No, I didn't --
3       MR. DAVIS:  Well, hang on.  Hang on,
4  Mr. Goldberg.  You asked if he reviewed any
5  communications with FDA after 2018.
6       MR. GOLDBERG:  Yeah, so --
7       MR. DAVIS:  I'm not sure a warning
8  letter -- a warning letter closeout would qualify.
9       MR. GOLDBERG:  Well --
10   A.   I'll tell you what I said.  I'll tell you
11  what I said, is that I may have reviewed some
12  documents.  I didn't refer to those documents in my
13  report.
14       (Discussion off the written record.)
15   Q.   Document No. 16.  Do you know what this
16  document is, sir?
17   A.   I'm reading it.
18       (Pause.)
19       It appears to be the closeout to the
20  warning letter.
21   Q.   Is this the first time you've seen this
22  document?
23   A.   As I said before, I may have seen it at
24  some point.  I'm not sure whether I saw it or not.
25   Q.   Yes or no, is this the first time you saw

Page 248

1  the document?
2   A.   I answered your question.  I said --
3       MR. DAVIS:  Asked and answered.
4   Q.   Why didn't you include it in your report?
5   A.   It wasn't relevant to my report.
6       MR. DAVIS:  Also, it was issued three
7  days before he signed his report.
8       (Exhibit 20 was marked.)
9   Q.   Why wouldn't the FDA closeout letter be
10  relevant to your report?
11   A.   What I cited in my report were examples
12  of CGMP deficiencies that occurred during the period
13  that I reviewed, and this occurred years after.
14       MR. DAVIS:  Hey, Seth, I'm noticing
15  there is not a Bates stamp on this document.  Is
16  this a document that ZHP has produced in this case?
17       (No audible response.)
18   Q.   Did you review any of the observation
19  responses, the specific observation responses that
20  ZHP provided to the FDA in connection with this EIR?
21   A.   The same applies to this.  I may have
22  seen some of those documents.  There were a lot of
23  documents that were provided.  This document --
24  those documents are not relevant to what my report
25  was about.

Page 249

1   Q.   When you say "there were a lot of
2  documents provided," could you give us a sense?
3  What does that mean?  Who provided them?  What are
4  you talking about?
5       MR. DAVIS:  Hang on, Seth.
6  Objection; asked and answered.  This is -- this was
7  covered at length this morning.  I don't think each
8  defendant gets a bite at the same apple when it's
9  already been covered once.
10       MR. GOLDBERG:  This wasn't covered
11  this morning.
12       MR. DAVIS:  It was.  It was, Seth.
13  It was covered this morning.
14       MR. GOLDBERG:  I'm not going to waste
15  time.
16   Q.   Which ZHP documents, other than the ones
17  you've identified in Exhibit A, were provided?
18   A.   The documents that I reviewed are the
19  ones that are in the -- in my report.
20   Q.   Okay.  So you didn't review the closeout
21  letter, because that wasn't in your report.  Right?
22       MR. DAVIS:  Well, hang on, Seth.  I
23  asked you a question.
24       MR. GOLDBERG:  No, no, no.
25       MR. DAVIS:  Has ZHP produced this

Page 250

1 document?
2
3        MR. GOLDBERG: Excuse me. Counsel,
4 Counsel, the witness just answered a question, and
5 I'm following up on that particular answer. That's
6 it. There is no reason for you to be speaking.
7        MR. DAVIS: Okay. You can answer the
8 question, Mr. Quick.
9    A.   I did not review this document relative
10 to my report.
11    Q.   And you didn't review any of the other
12 communications ZHP had with the FDA between the date
13 of the EIR and the closeout letter, because if you
14 had, you would have identified them in your report.
15 Right?
16    A.   I would have -- that's correct, I would
17 have identified them.
18    Q.   Looking at Paragraph 105 of your
19 report -- I'm sorry -- 104 of your report. You say
20 that: The FDA observed that ZHP failed to conduct a
21 formal risk assessment.
22        MR. GOLDBERG: You could pull that
23 document down that's up there.
24        MR. DAVIS: I'm going to -- now that
25 you've pulled it down, to the extent that's not been

Page 251

1 produced to us, I would request that be produced
2 with a Bates stamp.
3    Q.   Sir, did you -- do you need me to repeat
4 my question or --
5    A.   What was the question, please?
6    Q.   -- maybe I interrupted. So let me turn
7 your attention to 104. You say: The FDA observed
8 that ZHP failed to conduct a formal risk assessment
9 for the at-issue valsartan API manufacturing change.
10    Do you see that?
11    A.   I see it.
12    Q.   Okay. And you cite to the 2018 EIR that
13 we looked at. Right?
14    A.   That's correct.
15    Q.   Did you do anything to independently
16 assess whether ZHP conducted a formal risk
17 assessment, or are you just taking what the FDA is
18 saying and putting that into your report?
19    A.   I reviewed the documents that were
20 provided. I reviewed the FDA EIR. Obviously, I was
21 not on-site at ZHP to verify any of these documents,
22 and so that's where this -- that's where this came
23 from.
24    Q.   Which documents? You said you "reviewed
25 the documents provided," and I just want to be

Page 252

1 clear. You only reviewed what's on Exhibit A.
2 Right?
3    A.   That's correct.
4    Q.   Okay. So did you do -- did anything in
5 Exhibit A -- if you look at that list, did you do
6 anything to independently verify whether ZHP
7 conducted a formal risk assessment?
8        MR. DAVIS: Object to form.
9        You can answer.
10    A.   So my role was to come up -- was to
11 identify example -- examples of CH -- of CGMP
12 deficiencies that might apply to the entire class,
13 and not -- it was not exhaustive.
14        That may be part of a later scope in this
15 process, but that's -- I did not do an independent
16 review of any other aspects of the ZHP EIR.
17    Q.   Okay. So the answer to my question is,
18 no, you didn't do any independent assessment of
19 whether or not ZHP did a formal risk assessment.
20 Right?
21        MR. DAVIS: Objection. He's already
22 given his answer.
23    Q.   Sir, are you going to answer my question?
24    A.   The answer --
25    Q.   The answer is no.

Page 253

1    A.   I told you no before.
2    Q.   Okay. Where in the FDA regulations is
3 the phrase "formal risk assessment" defined?
4    A.   So I address that in my report. There
5 are numerous places.
6        (Pause.)
7        So FDA addresses this in Q9. They also
8 address it in the guidance "Control of Nitrosamine
9 Impurities in Human Drugs." And I reference that as
10 Footnote 17. And they've addressed very
11 specifically the amount of risk assessment.
12        And if you look at my Page 11, you will
13 see that. Risk assessments assess the risk in
14 marketed products and products under approved and
15 pending applications. Risk assessments should be
16 conducted in a timely manner based on the
17 prioritization of drugs. Manufacturers do not need
18 to submit risk assessment documents to the agency,
19 but they should retain these documents so they
20 are -- should be available if requested.
21        So that's where FDA cites this.
22    Q.   Does the FDA define with specificity the
23 requirements of a risk assessment?
24    A.   They may. I'm just not aware offhand
25 where that might be.

64 (Pages 250 - 253)

Page 254

1    Q.   The information you cited are not
2  specific requirements of a risk assessment.  Right?
3          MR. DAVIS:  Objection.
4    A.   So what -- what are you referring to?
5    Q.   Let me ask a different question.  Can we
6  pull up Exhibit Document No. 17.
7          MR. DAVIS:  For the record, this is
8  Exhibit 21.  Is that right?
9          MR. GOLDBERG:  Correct.  This should
10  be Exhibit 21.
11        (Exhibit 21 was marked.)
12    Q.   Do you see what the document is, sir?
13    A.   I do.  I do.
14    Q.   What is the document?
15    A.   It's quality risk management, Q9.
16    Q.   And this is the document you just
17  referred to a minute ago when you said the FDA talks
18  about risk assessment in Q9.  Right?
19    A.   That's right.
20    Q.   Okay.  Could you turn to Page 6 of this
21  document?
22    A.   I don't have the document in front of me.
23          MR. DAVIS:  Yeah, you're going to
24  have to hand control over to him.
25          I'm going to place just a procedural

Page 255

1  objection on the record that he's not even able to
2  review the entire document when it's presented to
3  him.
4    Q.   Sir, I'm turning your attention to Page 6
5  of Q9, which is a document you just referenced.
6  And, actually, if you look at the bottom of Page 5,
7  if you could turn to that, you'll see it says:  Risk
8  management methodology.
9          And why don't you take a second to review
10  paragraph -- this section, risk management
11  methodology, if you need to.
12    A.   (Pause.)
13          Okay.
14    Q.   Okay.  And if you look at Page 6 -- and
15  I'll just read this in the second paragraph.  It
16  says --
17          MR. DAVIS:  Can you enhance the image
18  so that he can actually see it?
19          MR. GOLDBERG:  Again, I'm not -- I
20  can't -- maybe the tech can.
21          MR. NOVAK:  You just have to tell me
22  what you're reading, so I know what you're reading
23  from.
24    Q.   It's a sentence that says:  Below is a
25  nonexhaustive list of some of these tools.

Page 256

1          Do you see that?
2    A.   I see that.
3    Q.   Okay.  And then if you go past that list,
4  it says:  It might be appropriate to adapt these
5  tools for use in specific areas pertaining to drug
6  substance and drug product quality.
7          It goes on to say:  Combined use provides
8  flexibility that can facilitate the application and
9  quality of risk management principals.  The degree
10  of rigor and formality of quality risk assessment
11  should reflect available knowledge and be
12  commensurate with the complexity and/or criticality
13  of the issue to be addressed.
14          You agree that the FDA does not restrict
15  to a specific list of components how a risk
16  assessment should be conducted?
17          MR. DAVIS:  Object to form.
18          You can answer.
19    A.   That's generally correct.
20    Q.   And that the FDA envisions that there
21  needs to be some flexibility in this process and
22  that it may be done in different ways depending on
23  the circumstances?
24          MR. DAVIS:  Object to form.
25          You can answer.

Page 257

1    A.   It can be done in different forms.
2    Q.   This document doesn't refer to a defined,
3  quote, formal risk assessment, does it?
4    A.   Well, I haven't read the entire -- if you
5  want me to spend the time to read the document, I
6  would.
7    Q.   Well, this Section 5 does not.  Correct?
8          MR. DAVIS:  Again, I'm going to state
9  my procedural objection that you're not even giving
10  him the opportunity to look at anything other than
11  what you've highlighted.
12    Q.   Do you agree?
13    A.   Based on what I'm seeing here, yes.
14    Q.   What is your support for the
15  conclusion that ZHP did not file -- follow its own
16  standard management procedure?
17          MR. DAVIS:  Object to form.
18          You can answer.
19    A.   So we need to pull up Footnote 40.
20        (Exhibit 22 was marked.)
21    Q.   Document No. 3.  That's Footnote --
22  that's the document at Footnote 40, sir.
23          Do you want to show me what you're
24  claiming is the support that ZHP did not follow its
25  own SMP?

65 (Pages 254 - 257)

Page 258

1    MR. DAVIS: I object to that, Seth.
2 He's not even able to control the document to show
3 you.
4    Q.   Well, your footnote says Page 11 of 17.
5    A.   Oh, 11, yes.
6        (Discussion off the written record.)
7        MR. DAVIS: For the record, counsel
8 has highlighted the top two paragraphs, it appears,
9 of Page 11 of this document.
10        Why don't you let counsel know when
11 you've read that and then you want counsel to
12 highlight the bottom portion of the document next.
13    A.   Yeah, why don't you highlight? Go ahead.
14 You can move on.
15        (Pause.)
16        This appears to be a different version of
17 the document than I have seen.
18    Q.   Sir, this is the document you cited,
19 ZHP0000417.
20    A.   I'm just saying it appears to be --
21    Q.   It goes on to --
22        (Simultaneous speaking.)
23    A.   I'm just saying it appears to be a
24 different document.
25    Q.   You're not seeing support for your

Page 259

1 conclusion on this page. Right?
2        MR. DAVIS: Object in the way it's
3 presented to the witness in piecemeal fashion, where
4 he's not even able to read the entire page in one
5 read. If you want, we can go off the record. I can
6 print that document and we can start with it.
7    Q.   Am I correct, sir, that you're not seeing
8 on Page 11 the support for this opinion?
9    A.   Well, we need to look at it as what they
10 actually did. And I think the issue was what they
11 actually did was simply checking boxes. And I think
12 the FDA referenced that in the EIR. And I also saw
13 that particular risk assessment document and I
14 agreed with them.
15    Q.   So the answer to my -- to my question is,
16 yes, this doesn't support your conclusion?
17        MR. DAVIS: Objection; totally
18 mischaracterizes his testimony.
19    A.   That's not what I said.
20    Q.   I asked you, am I correct that Page 11
21 doesn't support the language in Paragraph 108 that
22 you're citing?
23        MR. DAVIS: Objection;
24 mischaracterizes his testimony, and asked and
25 answered now.

Page 260

1    A.   This document needs to be reviewed in the
2 context of what ZHP actually did. And what they
3 actually did was do a series of check the boxes,
4 which I saw that document. If we look at that
5 document, you would see it. And the FDA also
6 referenced that in their inspection when they were
7 at ZHP and it's referenced in the 2018 EIR.
8    Q.   Did you review ZHP's response to that
9 particular part of the EIR?
10    A.   We've already been through that and I
11 told you I did not review the responses.
12        This is in the total context of --
13        MR. DAVIS: There's no question
14 pending.
15    Q.   Other than what the FDA said in the EIR,
16 did you review any particular document that supports
17 this conclusion at Paragraph 108 --
18    A.   As I said --
19    Q.   -- in your report?
20    A.   -- as I said, I reviewed the actual risk
21 assessment document that they actually did, which
22 the FDA cited. I reviewed that document. It is a
23 series of check the boxes.
24        (Reporter admonishment.)
25    Q.   Document No. 2 in our list. 2A is the

Page 261

1 translation of this document.
2        THE STENOGRAPHER: And don't forget
3 to give these exhibit numbers if you want to mark
4 them. I won't mention this again, but just for the
5 record. Thanks.
6    Q.   We can mark this as Exhibit 23. I'm
7 showing you the change request form document.
8        (Exhibit 23 was marked.)
9    Q.   When you say this was a "check the box,"
10 what do you mean by that?
11        MR. DAVIS: For the record, the
12 witness -- the type font in here is like 6.
13        I object to this procedure of doing
14 this. Like you're asking him very specific
15 questions about documents and not letting him
16 actually look at the document.
17        MR. GOLDBERG: Don't you have the
18 electronic version of the document? Isn't that how
19 this works?
20        MR. DAVIS: Well, look, I can't pull
21 it up right on command, Seth.
22        (Simultaneous speaking.)
23        MR. GOLDBERG: You can access the
24 electronic version of the document.
25        MR. DAVIS: I don't know what

66 (Pages 258 - 261)

Page 262

1 exhibits you're going to mark.
2         MR. GOLDBERG: Well, no, but when the
3 court reporter puts them up, Mr. Quick should be
4 able to review them.
5         MR. DAVIS: Yeah. He's looking --
6         MR. GOLDBERG: That's how we've done
7 that in the past.
8         MR. DAVIS: Well, let me explain to
9 you, Seth. He's about 30 feet away from the TV and
10 he's looking on an iPad. And unless you blow up the
11 document, he can't read the text. I can't read the
12 text. And he's not able to page through the
13 document to actually give it a good review. You're
14 just, you know, highlighting the portions you want
15 to show him. I think this is an improper procedure
16 for doing this.
17        MR. GOLDBERG: Well, these are
18 documents that he relied on to issue his expert
19 opinion and --
20        MR. DAVIS: Well, you have a
21 mechanism to hand control over to the witness.
22        MR. GOLDBERG: He has the documents
23 there.
24        MR. DAVIS: You want to hand control
25 to the witness so he can actually page through the

Page 263

1 document himself.
2         (Discussion off the written record.)
3         MR. GOLDBERG: Let's go off the
4 record.
5         THE VIDEOGRAPHER: Off the record at
6 6:26 p.m.
7         (Break.)
8         THE VIDEOGRAPHER: We're back on the
9 record at 6:42 p.m.
10    Q.   Mr. Quick, I'm -- I'm looking at
11 Paragraph 108 of your report. You say: The failure
12 to conduct the necessary and comprehensive risk
13 assessment to a critical manufacturing change was in
14 violation of ZHP's own risk man- -- management
15 procedure.
16        And you cite to this document, Page 11 of
17 17. What are you -- what are you citing this
18 document for?
19    A.   I'm looking at the document.
20        (Pause.)
21        It may have actually been Page 12 or --
22 let's see. Is it 12? Yeah. The format of risk
23 management includes special systematic and
24 nonspecial, nonsystematic for change control,
25 customer complaint investigation, deviation

Page 264

1 investigation.
2         It goes on about the type of -- the way
3 it should be formatted.

13    Q.   Other than the EIR and this document that
14 we've marked as Exhibit 22, did you review anything
15 else from the 2010, '11, '12 time frame when this
16 critical change or change control was happening to
17 independently determine whether ZHP followed its own
18 SOPs?

Page 265

5         MR. GOLDBERG: Can you pull up
6 Document No. 20, please?
7         (Exhibit 24 was marked.)
8         (Discussion off the written record.)
9         MR. DAVIS: For the record, the
10 witness has Exhibit 24 on a laptop.
11    Q.   Do you have it up, sir?
12    A.   I do.
13    Q.   Okay. Can you please -- have you seen
14 this document before?
15    A.   I'm not sure whether I have or not.
16    Q.   Well, this document isn't listed in
17 Exhibit A. So can we agree that you haven't
18 reviewed this document before?
19    A.   If it's not in Exhibit A, I probably have
20 not reviewed it.
21    Q.   Okay. This is the change control system
22 SMP. Do you see that?
23    A.   Yes.
24    Q.   Do you see Paragraph 1 of the document
25 refers to the -- explains the purpose?

67 (Pages 262 - 265)

Page 266

1    A.   I do.  I see that.



10        Do you see that?
11   A.   I do.
12   Q.   And if you can scroll down, in the page
13 ending 148, and you'll see the numbers 6, 6.1.  This
14 is the procedure page.  Correct?
15   A.   Okay.
16   Q.   You -- you --
17   A.   It's taking time to get there because
18 it's got to refresh as I go down the pages.
19        Okay.  I see Page 10.
20   Q.   You've done nothing to independently
21 determine whether ZHP satisfied the SOPs on this
22 Page 6 -- 6 -- on this Page 148.  Correct?
23        MR. DAVIS:  Object to form.
24        You can answer.
25   A.   Well, since I haven't had the chance to

Page 267

1 review it, then I haven't had the chance to evaluate
2 it.
3    Q.   So the answer is, yes, you haven't done
4 anything to independently assess whether ZHP
5 satisfied its internal SMPs?
6        MR. DAVIS:  Objection; asked and
7 answered and to form.
8    A.   I haven't because it wasn't provided to
9 be able to be reviewed.  If I had the time to review
10 this, maybe I could come to an opinion on that.
11   Q.   Turn to Paragraph -- you can pull that
12 document down -- Paragraph 111 of your report.  Did
13 you -- did you review an org chart for the ZHP
14 Tranon (phonetic) facility?
15   A.   I don't recall having reviewed it.
16   Q.   Well, again, it's not listed in
17 Exhibit A, so you'll agree you didn't review one.
18 Right?
19   A.   Right.  If it's not there, I probably
20 didn't.
21   Q.   Well, wait a second.  You keep qualifying
22 these answers and we're here at a deposition to be
23 specific, sir, you're an expert witness.  Okay.
24 We're going to be specific about this instead of
25 probables and I don't recall.

Page 268

1        MR. DAVIS:  Seth.
2    Q.   If it's not in Exhibit A --
3        MR. GOLDBERG:  Hang on.
4    Q.   If it's not in Exhibit A, you didn't
5 review it.  Right?
6        MR. DAVIS:  Objection;
7 mischaracterizes the report, mischaracterizes the
8 responses to the notice of deposition.
9        MR. GOLDBERG:  We don't need -- we
10 don't need a speaking objection.
11       MR. DAVIS:  No, I'm not --
12   Q.   If it's not in Exhibit A -- if it's not
13 in Exhibit A, you didn't review it.  Right?
14       MR. DAVIS:  Objection; facts not in
15 record, mischaracterizes his responses to the
16 notice, and mischaracterizes his testimony and asked
17 and answered.
18   Q.   I'm going to ask it again, sir.  You
19 agree that you didn't review it because if you did
20 it would be in Exhibit A.  Right?
21       MR. DAVIS:  Last -- last answer and
22 then you got to move on, Seth.
23       You can --
24   A.   I -- I didn't review it.
25   Q.   Your Section 111 says:  That the head of

Page 269

1 quality assurance -- I -- maybe you can -- what is
2 your -- what is the point of your Paragraph 111?



19   Q.   Did you read -- did you read the entire
20 deposition transcripts for these witnesses?
21   A.   No, I did not read the entire
22 depositions -- depositions.
23   Q.   How did you identify specific excerpts
24 then to rely on?
25       MR. DAVIS:  Objection to form.

68 (Pages 266 - 269)



Page 270

1    You can answer.
2    THE WITNESS: Okay.
3    A.   I was provided with particular sections
4  from the law firm that took the depositions.
5    MR. GOLDBERG: Could you pull up
6  exhibit -- sorry -- Document No. 24 which we'll mark
7  as Exhibit 25, I believe.
8    THE WITNESS: I'll try to get back
9  there.
10   (Exhibit 25 was marked.)
11   Q.   Okay.  Do you have that --
12   A.   No.
13   Q.   -- testimony in front of you?
14   A.   I do not.
15   Okay.  It's in front of me.
16   Q.   And your criticism in Paragraph 111, is
17  that Ms. Ge, the head of quality assurance was --
18  wasn't specific enough, wasn't certain enough about
19  whether the technology department provides a risk
20  assessment report.  That's your criticism?
21   A.   No, it's not.  Sorry.
22   MR. DAVIS: Objection;
23  mischaracterizes the report and the testimony, both
24  his testimony --
25   Q.   What is --

Page 271

1    MR. DAVIS: -- and Ms. Ge's
2  testimony.
3    Q.   What is your criticism?
4    A.   Okay.  Normally, I would've expected the
5  quality function to be handling risk assessments.
13   Q.   Did the FDA note that in its EIR?
14   MR. DAVIS: Objection -- no to that?
15   Okay.  No objection, you can answer.
16   A.   If we go back to what the FDA said which
17  I had before.
18   So the FDA noted during the 2018
19  inspection that ZHP's quality risk management and
20  standard management procedure did not clearly
21  delineate which risk managements and methods and/or
22  tools should be used.  And so they had problems with
23  the risk assessment.  Regardless of whether FDA did,
24  I -- I agree that there was a problem.
25   But the real -- the real point here,

Page 272

5    MR. DAVIS: We're getting close to
6  7 o'clock.
7    Q.   Is it your opinion -- is it your opinion
8  that the technology department should not have a
9  role in the risk assessment?
10   A.   No, I didn't say that and that's not my
11  opinion.
12   Q.   And would it -- is it your opinion that
13  the quality assurance shouldn't have oversight of
14  the risk assessment from a GMP standpoint?
15   A.   Well, I didn't say that either.
19   MR. DAVIS: Seth, we're at 7 o'clock
20  now, I believe.
21   MR. GOLDBERG: Okay.  Let me just get
22  to the end of this line of questioning.  I know
23  somebody needs to leave.  So let me just get to the
24  end of this specific questioning.
25   MR. DAVIS: You've got two minutes to

Page 273

1  wrap it up because our court reporter, we've got to
2  respect the fact that she has another obligation.
3    (Discussion off the written record.)
4    MR. GOLDBERG: It's okay.  We can go
5  off the record now.
6    THE VIDEOGRAPHER: Off the record at
7  7:00 p.m.
8    (Deposition adjourned at 7:00 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

69 (Pages 270 - 273)

Page 274

```
 1        UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
 2            CAMDEN VICINAGE
 3
    IN RE: VALSARTAN,     § MDL NO 2875
 4  LOSARTAN, AND         §
    IRBESARTAN PRODUCTS    § HONORABLE ROBERT B KUGLER
 5  LIABILITY LITIGATION   § DISTRICT COURT JUDGE
 6
 7        REPORTER'S CERTIFICATION
          DEPOSITION OF JOHN L  QUICK
 8        TAKEN JANUARY 27, 2022
 9  I, TAMARA CHAPMAN, Certified Shorthand Reporter in
10  and for the State of Texas, hereby certify to the
11  following:
12  That the witness, JOHN L  QUICK, was duly sworn by
13  the officer and that the transcript of the oral
14  deposition is a true record of the testimony given
15  by the witness;
16  That the original deposition was delivered to
17  NILDA ISIDRO;
18  That a copy of this certificate was served on all
19  parties and/or the witness shown herein on
20  _____
21  I further certify that pursuant to FRCP No
22  30(f)(i) that the signature of the deponent:
23  was requested by the deponent or a party before
24  the completion of the deposition and that the
25  signature is to be returned within 30 days from date
```

Page 275

```
 1  of receipt of the transcript.  If returned, the
 2  attached Changes and Signature Page contains any
 3  changes and the reasons therefor;
 4  was not requested by the deponent or a party
 5  before the completion of the deposition.
 6  I further certify that I am neither counsel for,
 7  related to, nor employed by any of the parties in
 8  the action in which this proceeding was taken, and
 9  further that I am not financially or otherwise
10  interested in the outcome of the action.
11  Certified to by me this 9th day of February, 2022.
12
13
14
15       Tamara Chapman, CSR, RPR-CRR
         CSR NO. 7248; Expiration Date: 12-31-22
16       Veritext Legal Solutions
         Firm Registration No. 571
17       300 Throckmorton Street, Suite 1600 Fort
         Worth, Texas  76102
18       800-336-4000
19
20
21
22
23
24
25
```

Page 276

```
 1  John R. Davis
 2  jdavis@slackdavis.com
 3           February 9, 2022
 4  RE:  In Re: Valsartan, Losartan, Et Al
 5  1/27/2022, John Quick (#5025079)
 6  The above-referenced transcript is available for
 7  review.
 8  Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25
```

Page 277

```
 1  In Re: Valsartan, Losartan, Et Al
 2  John Quick (#5025079)
 3       E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  John Quick              Date
25
```

70 (Pages 274 - 277)

Page 278

1  In Re: Valsartan, Losartan, Et Al

2  John Quick (#5025079)

3         ACKNOWLEDGEMENT OF DEPONENT

4    I, John Quick, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  John Quick              Date

13  *If notary is required

14         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15         _____ DAY OF _____, 20___.

16

17

18         _____

19         NOTARY PUBLIC

20

21

22

23

24

25

71 (Page 278)

[& - 19103]                                                                    Page 1

**&**

**&**   2:9 3:22 4:12
5:10,15,16,20 6:12
6:14,19 7:4,12,17
7:21,22 8:4,10
9:16 12:14,17
31:19,20,25 54:24
55:2,4,15,23,25
56:2,3,5,10,12
59:17

**0**

**0**   137:25 167:10
219:25 241:5
**001**   244:20
**02109**   7:18
**07102**   7:7
**07701**   6:5
**07932**   3:10
**08/10/2018**   10:21
**08/11/2000**   10:18
**08540**   6:9

**1**

**1**   9:12,19 10:6,11
28:14,15,22 29:1
51:20,23 52:8
54:15 265:24
**1-5-0**   210:19
**1/27/2022**   276:5
**10**   10:11 11:6,16
16:24 17:10 18:12
18:22 21:5 29:10
32:11 102:24,25
103:1,3 158:7
204:17 240:10
266:19
**100**   1:21 2:4 7:7
110:13 113:1
171:23
**1000**   2:19

**1001**   5:11
**10017**   3:6
**10019**   7:23
**10022**   5:17
**101**   113:3 167:19
167:21
**103**   10:11
**104**   171:1 250:19
251:7
**105**   172:18 250:18
264:10
**106**   171:1
**108**   259:21 260:17
263:11
**10:02**   29:20
**10:28**   46:15
**10:43**   46:18
**11**   7:12 10:13,15
11:10 29:5,11
105:16,17,20
136:17,18,19,21
137:19 138:2,4
141:5 158:13
159:21 160:24
253:12 258:4,5,9
259:8,20 263:16
264:15
**11,200**   38:7
**11/04/2021**   11:9
**1100**   2:14
**111**   267:12 268:25
269:2,3 270:16
**11:33**   77:18
**11:46**   77:21
**11th**   38:2 148:12
**12**   9:6 10:15 29:12
136:16 141:3,10
141:11 220:20
221:7,19 222:2
223:15,16,24
224:1 263:21,22

264:15
**12,400**   37:20
**12-31-22**   275:15
**12212**   3:23
**123,600**   42:6
**129**   173:1,11,12,14
174:11,15,20
**12:38**   110:3
**13**   10:17,19 29:13
148:12,14,16
**131**   10:5
**13288**   275:14
**136**   10:13
**13th**   206:20
**14**   10:17,17,19,23
29:14 162:10,11
162:13,24
**1400**   6:19
**141**   10:15
**143**   173:2
**147**   179:24 181:10
222:19,20
**148**   10:17 266:13
266:22
**149**   198:17 201:6
202:2,20 204:4
**15**   9:12 10:20
16:24 17:2,10
18:12,23 21:5,19
24:24 29:15
161:25 162:15,21
199:3,4 203:15
204:3 205:3,24
206:9 208:13,16
**15,600**   39:4
**150**   171:23 182:1
210:14,17,18
211:8
**151**   217:3 220:8
223:12 224:7,17
225:2,20 229:16

**15141**   3:23
**1515**   2:14
**152**   210:16 230:4
**15219**   4:20 8:11
**154**   195:9 222:16
222:18,19,25
223:4 224:25
231:24
**15th**   7:7
**16**   10:23 29:16
121:8 122:15
217:14,15 218:1
220:7 247:15
**16,400**   39:15
**1600**   275:17
**162**   10:19
**168**   222:21
**16th**   171:17
178:16
**17**   11:3 29:17
222:4,7,24 253:10
254:6 258:4
263:17
**1717**   3:13
**17th**   4:5,9
**18**   10:13 11:5
29:18 39:22
224:23 225:4,5,8
226:6
**1800law1010.com**
3:24
**187**   220:7 222:22
**19**   9:17 11:7 29:19
245:4
**19,600**   38:18
**190**   5:22
**19087**   6:15
**191**   113:3
**19102**   2:15
**19103**   3:14 4:5,9

[1966 - 2:27]                                                                Page 2

**1966** 59:20
**199** 10:20
**1995** 29:5
**1:27** 110:6
**1:37** 117:13
**1:39** 117:16

**2**

**2** 6:5 9:4,14 10:20
11:9 29:2 34:21
34:22 103:7 110:7
230:11,13 260:25
**20** 11:8,11 22:6
29:20 30:3 110:14
227:21 244:17
248:8 265:6
278:15
**200** 3:18
**2000** 148:12
**20004** 5:11
**2003** 54:16 59:20
**2005** 98:9
**2010** 264:15
**2011** 172:23
183:10,24 186:19
187:6 192:12
215:1 229:25
**2012** 20:9 22:7
24:4 57:23,25
58:2 79:8,16
83:16 165:17,23
191:17,25
**2013** 237:8,12
**2014** 171:24 173:9
**2015** 10:24 60:7
171:24 192:4
194:5 217:6
218:13 232:6
237:17,24 238:16
**2017** 10:22 197:25
198:3,7,11,20
199:12,24 200:3

201:7 202:12,25
203:7 204:6
205:16 210:9
233:3 234:17,23
235:8 236:5 238:6
238:13
**2018** 11:3 79:8,16
83:17 84:9,15,20
84:22 146:9,12,15
165:17,24,25
166:2,3 171:5,7,17
172:1,7,12 176:15
176:20 178:1,11
178:16,23 179:8
179:17 200:3
202:10 203:4,8
206:20 208:20
209:4,5 210:5
222:12 226:18
228:6 232:6 234:4
234:10,17,22
235:9,12,16 236:5
236:20 245:5,25
246:4,9,25 247:5
251:12 260:7
271:18
**202-624-2500** 5:12
**2020** 33:8 37:15
38:2,16 39:2 43:6
43:9,10 173:19
175:2,4,16,20
176:5
**2021** 11:17 33:11
39:13,22 40:6,16
41:5 42:6 78:11
**2022** 1:9,17 12:3
33:9,10 34:12
274:8 275:11
276:3
**20th** 176:14,20
246:4,8,25

**21** 6:9 9:14,22
10:16 11:10 29:21
66:2,2,6,9,14,14
66:20,21,22 67:8
67:17,23 68:22
69:16 140:23
141:3,8,12,16,19
153:3 162:3
237:12 254:8,10
254:11
**210** 66:2,6,10,14
66:20,21 67:8,17
67:19,23 68:1,22
69:16
**211** 6:5 66:2,6,10
66:14,20,22 67:8
67:19 68:1,22
69:16 153:3 162:3
**212-390-4210** 5:18
**212-415-9357** 7:23
**212-801-9200** 3:7
**214-855-8000** 5:6
**215-977-4093** 6:15
**215-979-1164** 4:10
**215-979-1175** 4:6
**215-988-7864** 3:14
**217** 10:23
**21st** 222:12 237:7
**22** 11:11 29:22
149:1 257:20
264:14
**2200** 5:5
**222** 11:3
**2220** 4:14
**225** 11:5
**227** 8:5
**23** 11:11,13 29:23
129:17,20 225:15
261:6,8
**230** 4:14

**24** 11:14 29:24
92:15 237:12
265:7,10 270:6
**244** 9:7
**245** 11:7
**248** 11:8
**24th** 237:8
**25** 10:9 11:16
29:25 32:9 134:4
134:10,12 137:6
137:18 138:3,15
270:7,10
**2500** 3:18
**2525** 2:19
**254** 11:10
**257** 11:11
**25th** 179:17
218:12 222:12
**26** 217:6
**261** 11:13
**265** 11:14
**267-435-1300** 2:15
**26th** 218:13
**27** 1:9,17 9:21
94:1 274:8
**270** 6:14 11:16
**274** 9:8
**275** 9:9
**276** 9:9
**27th** 7:17 12:3
**28** 9:12 176:10
**28202** 8:5
**2875** 1:3 217:17
274:3
**28th** 43:9
**29** 11:17
**29-00** 148:13
**2:09** 137:22
**2:11** 137:25
**2:27** 146:21

**2:39** 146:24
**2a** 260:25
**2nd** 37:15 39:13
43:5,10

**3**

**3** 9:15 10:13,18,20
29:3 37:4,9 40:5
40:20 42:5 57:6
59:8 78:7 114:20
158:3 196:1
257:21
**3,200** 35:15,19
**3.1** 35:8
**3.3** 223:5,13 224:8
**30** 4:5,9 84:22
145:18,21 262:9
274:22,25 276:17
**300** 275:17
**301** 8:11
**30305** 3:19
**305-445-2500** 2:20
**31** 10:11
**312** 6:19
**312-566-4808** 4:15
**314-480-1500** 5:23
**317-231-6491** 7:13
**32** 101:12 102:5
147:17
**32nd** 4:19
**33134** 2:20
**3333** 3:18
**34** 9:14 97:5,15,18
98:3,15
**351** 10:14
**352** 10:16 140:23
141:3,8,12,16,19
**3600** 5:5
**37** 9:15 48:24
**38th** 8:11
**3:10** 167:10

**3:26** 167:13
**3rd** 177:25

**4**

**4** 9:15,15,17 11:5,7
11:17 29:4 46:19
46:20
**4,200** 36:10,10
**4,400** 39:24
**40** 257:19,22
**400** 3:10,13 33:17
35:9
**41** 152:13,15,18
**412-263-4397** 8:12
**412-560-3300** 4:20
**44** 158:9,14
**44,000** 40:9
**45202** 6:20
**46** 9:17 161:13,14
**46204** 7:13
**47** 163:22 164:18
**48** 9:19,22
**483** 10:21 70:13,21
70:23,25 71:6,10
71:23 72:1 104:9
108:24 199:13,25
204:22 205:16
206:2
**483s** 70:2,16 71:15
72:3,15
**49** 9:23 242:22,23
**4:05** 195:23
**4:23** 196:2
**4:57** 217:21
**4th** 38:16

**5**

**5** 9:19 10:3,14,15
29:5 47:22 48:1
49:8,11,16,18,23
51:17,19 60:5,6,6
114:18,20 255:6

257:7
**50** 10:3
**500** 3:10 33:17,19
33:22,23,24
**501** 135:8 136:20
136:21 137:7
**502** 135:12,23
136:7,20,25 137:7
141:7
**5025079** 276:5
277:2 278:2
**503** 56:14,14,19,19
114:20
**504-524-5777** 2:10
**505** 114:20
**51** 7:22
**512-795-8686** 2:5
**513-698-5038** 6:20
**518-724-2207** 3:24
**525** 36:1,7
**52nd** 7:22
**53** 7:17
**53128** 13:11
**540** 33:22
**550** 6:14
**57** 243:8
**571** 275:16
**58** 246:3,3
**5:06** 217:24
**5:11** 219:22
**5:13** 219:25
**5:43** 241:2
**5:48** 241:5
**5:54** 244:8
**5th** 39:2 178:23

**6**

**6** 9:13,22 29:3,6
47:1 48:17,19,21
52:16,18,22 60:6
92:18,19 110:9
254:20 255:4,14

261:12 266:13,22
266:22
**6.1.** 266:13
**600** 5:22 8:5
**6001** 1:21 2:4
**601** 5:17
**60606** 4:14
**609-734-6358** 6:10
**61** 174:24
**617-213-7000** 7:18
**62** 174:24
**63** 174:25
**63105** 5:22
**678-553-2100** 3:19
**68** 175:15
**69** 175:15
**6:26** 263:6
**6:42** 263:9

**7**

**7** 9:16 10:3,9 11:3
11:14 29:7 50:1,5
51:8,13,17,19
99:12 100:4
173:20 272:6,19
**70** 175:15
**701** 2:9
**70130** 2:10
**704-444-3475** 8:6
**72** 225:14 226:16
227:13,16,25
228:11
**7248** 275:15
**732-924-8171** 6:6
**7356.002f.** 99:3
105:23
**74** 225:15,24
226:11,12,13
**75201** 5:5
**76** 165:5
**76102** 275:17

**78746**  2:5
**7:00**  1:17 273:7,8
**7th**  40:6,16 41:5
42:6 179:8

**8**

**8**  10:6 11:8,13
29:8 84:22 85:1
99:8,9,14,24 100:2
102:16,17 103:4
173:16 232:6
**80**  218:21
**800-336-4000**
275:18
**85**  10:6 199:6
**87**  218:6
**88**  217:11 218:3,7
222:9,23 225:11
225:15 227:5
**89**  230:12,13,17
231:16

**9**

**9**  9:18 10:9 29:9
98:25 99:2,8,10,14
99:24 100:2
105:12,15,17,21
225:15 276:3
**90s**  21:13
**95**  165:6
**973-443-3269**  3:11
**973-757-1100**  7:8
**974**  246:3
**98**  10:9
**9:33**  1:17 12:3
**9:56**  29:17
**9th**  178:11 275:11

**a**

**a.m.**  1:17 12:3
29:17,20 46:15,18
77:18,21

**abbreviated**
113:15 114:11,15
**ability**  15:4 64:20
183:5,21
**able**  14:25 28:24
69:6 161:5 180:11
181:22 183:7,15
184:1 187:7 193:3
215:18 220:25
221:2,21 223:23
223:25 226:3,17
226:19 227:9,14
228:21,23 229:2
231:12 233:22
234:2,8,13 235:4
235:19 236:13,19
236:20 243:5
245:1 255:1 258:2
259:4 262:4,12
267:9
**abraham**  6:8
**absent**  128:18
**absolutely**  154:11
202:13 234:18
**absorbed**  62:4
**acceptable**  80:25
154:20 155:5
**access**  190:16
191:6,12 192:18
192:20 261:23
**accompany**
123:13
**accuracy**  276:9
**accurate**  14:25
15:4 52:7 56:25
57:1 125:4
**accurately**  115:18
**achieve**  66:15,23
67:16,22 68:20
**achieves**  66:9

**achieving**  118:6
**acknowledgement**
278:3
**acknowledging**
86:8
**acknowledgment**
276:12
**acquiesced**  201:8
203:8 204:4
**acquiescence**
202:22 208:16
**act**  10:14 134:18
134:19,24 135:1,7
135:23 136:8,20
136:22 137:1,7
**actavis**  3:3,4 197:1
197:6,21
**acting**  19:25
**action**  63:1 73:9
73:12,14,24 74:5
75:5 112:4,7
124:8 165:12
211:5,15 213:15
213:25 215:21
216:8 275:8,10
**actions**  73:17 74:1
82:15 211:5 212:1
212:5 213:15,18
214:1
**active**  63:17 84:11
97:6 115:20,25
117:3,4,22 118:3,6
175:18 196:25
**actively**  232:1
**activities**  57:3
125:13 126:7
**activity**  117:18
**actual**  260:20
264:5,10,23
**adapt**  256:4

**add**  42:9 84:4
161:2
**added**  42:8 69:9
145:8,11
**addition**  14:18
**additional**  56:22
73:17 74:25
116:13 120:18
126:4 138:6
**additions**  278:6
**address**  13:9
129:1 239:4 253:4
253:8
**addressed**  40:22
83:6,11 253:10
256:13
**addresses**  110:21
127:16 208:23
253:7
**adequacy**  161:6
215:5,5
**adequate**  161:4,10
180:1,9,22 181:5
181:23 183:6,11
192:8,10,11
214:21 215:21
239:2 242:16
243:2,12
**adequately**  97:12
100:9 223:21
240:22 241:8
242:5,16
**adhere**  91:18
**adjourned**  273:8
**administration**
10:10
**admonishment**
97:16 148:7
229:13 260:24
**adulterated**  90:19
91:1,3,12,20,21

92:2,4 94:13,16,16
94:24 95:8,18
96:14,17 100:22
101:16 102:1
103:13 104:1,11
104:20 105:25
106:14,22 107:15
107:19,21 108:5,8
108:12 109:1
130:5,7,14,25
131:5,6,7,10,18,24
132:9 133:3,14
135:8 136:22
150:16,22 151:7
151:16,22
**adulteration** 91:10
91:17 95:23
103:14 109:13
129:23 130:3,8
**advance** 228:15
**advanced** 86:25
**advertised** 26:7
**advertisements**
145:23
**advisory** 73:3
**affairs** 72:12,14,17
123:17
**affect** 117:20
**affiliated** 29:10
244:13
**affirm** 153:19
154:6
**affirming** 154:16
**afternoon** 53:7
**agency** 71:16
73:14 87:1 198:20
253:18
**agency's** 73:7
**agenda** 206:13,17
206:18 207:2,21
207:23 208:1

**ago** 17:2 21:5,20
23:20 24:24 28:6
28:9,11 47:12
49:7 67:6 93:16
94:22 109:4 149:2
254:17
**agree** 70:16 90:11
117:17 118:18,24
119:13 120:10
149:18 151:24
152:6 209:3
256:14 257:12
265:17 267:17
268:19 271:24
**agreed** 259:14
**agreement** 9:14
34:23 35:2 180:20
180:24 194:9
195:17 196:25
197:9,9,12,16,18
197:21 198:16
200:5,10,15,18,21
210:11,13 231:21
233:1 239:16
241:11
**ahead** 28:13 48:16
77:14 136:15
141:2,9 148:11
162:9 167:7 199:4
258:13
**al** 276:4 277:1
278:1
**albany** 3:23
**albertsons** 8:3
**alert** 178:1,11
179:7
**alfano** 8:10
**alleged** 63:14
170:13 202:20,22
**allotted** 276:20

**allow** 142:17,17
216:13,25
**allowable** 143:21
144:15,20
**allows** 142:10
**alternate** 184:6
185:6
**alternative** 35:15
36:10
**alternatively**
206:5
**ambiguous** 78:20
**amended** 9:17
46:21 48:4 50:9
50:14
**amerisourceberg...**
6:18
**amount** 22:4
37:24 38:11,12,18
38:22,23 39:4,8,15
39:19,24 40:3,13
143:22 253:11
**amounts** 115:25
**analysis** 62:17
85:20 86:13
142:24 143:2,4
**analytical** 61:18
61:21 86:18
**anda** 114:22 115:1
115:19 116:2,11
116:11,20,23
118:2,19 119:1,6
119:15,20 120:10
120:23,25 126:20
127:9 143:24
170:14 187:16
188:2,5,8,12,18
190:15 196:7,8,11
**andas** 116:6
126:11 175:18
176:3

**announced** 178:14
179:15
**answer** 13:21 14:1
14:10 15:9 19:16
26:13,23 27:14
41:25 43:15,18
45:13 47:17 50:19
52:10,24 62:20,21
63:8 67:25 69:1
80:21 81:16 83:19
87:23 88:4 89:13
90:16 91:15 93:5
93:8 95:5 100:25
102:13 104:14
107:2,8 109:5
110:18 115:16
117:24 118:12
119:8,25 120:15
121:3 124:7 125:6
126:1,14,18 127:2
127:14,20,23
128:9,10 129:3,8,8
129:13 131:3
132:4,11 133:8,10
136:11 138:9
139:8,18 140:9
142:15 143:1
144:1,17 151:5
144:17 151:5
154:10 155:20
159:1 160:14,22
169:22 170:17
172:15 173:23
175:23 177:2
178:18 179:19,20
181:20 182:14
183:4,20 186:4
190:6 195:7,8
197:8 202:10
211:1 215:9
227:22,23 228:3
228:12 231:10

[answer - aspect]

238:23 250:5,7
252:9,17,22,23,24
252:25 256:18,25
257:18 259:15
266:24 267:3
268:21 270:1
271:15
**answered** 14:16
109:4 120:14
122:18,20 132:2
133:6,9,25 158:25
181:19 184:15
185:1 211:24
226:11 233:6
248:2,3 249:6
250:4 259:25
267:7 268:17
**answering** 144:7
**answers** 31:16
267:22
**antibodies** 57:14
**anticipate** 14:2
**anybody** 190:10
**anyway** 123:7
141:10
**api** 57:8 97:6,11
98:11 100:8
142:23 143:5
169:10,11,21
171:13,24 174:4
176:22 178:16,25
179:9,16 180:2,10
181:5 182:20
185:13 186:8
187:23,24 188:11
188:13,13 189:5,6
189:10,19,20
191:6,7 192:16,24
193:5 196:5
198:21 210:22
211:6,12,18,22

212:25 213:7,11
213:17 218:18
226:9 230:6,24
231:7 232:3,9,13
232:14 241:15
243:16 251:9
**apis** 18:6
**apparently** 208:6
226:20
**appear** 49:24
137:6 162:17
180:1 181:4
226:22 269:14
271:11 272:16
**appearances** 9:4
**appears** 122:14
163:2,9 205:23
213:14 231:25
247:19 258:8,16
258:20,23
**appended** 278:7
**apple** 249:8
**applicable** 208:24
276:8
**applicant** 115:2,19
116:11 120:11,24
**applicant's** 123:21
**application** 113:14
113:15,18,21
114:6,9,12,15,24
118:14 120:9
122:23 123:18
125:12 256:8
**applications**
253:15
**applied** 79:1
150:23 177:22
215:14 238:3
241:21
**applies** 103:18
242:13 248:21

**apply** 36:14,20
107:17 169:8,17
170:2,7,10,22
231:18 252:12
**appreciate** 204:1
**approach** 129:23
130:3,11
**appropriate** 15:11
155:17 180:3
181:6 213:25
242:19 256:4
**appropriately**
226:3
**approval** 114:5
115:1 116:21
119:5,6,15 123:18
266:8
**approve** 114:8
187:18,18 190:2
**approved** 118:2
118:19,21 124:15
124:21 145:3
223:20 253:14
**approves** 114:24
**approximate** 16:6
**approximately**
16:7 18:21,22
24:23,24
**april** 11:17 237:24
**arch** 3:13
**area** 142:16,18
177:23
**areas** 162:4 217:1
240:8 256:5
**arrange** 123:20
206:6
**arrived** 228:15
**arrow** 237:7,11
238:11
**article** 94:6 198:1
198:13

**aseptic** 20:13 22:2
57:19 58:2
**aside** 15:25 56:1
184:7,10
**asked** 17:8 41:17
41:19 43:12,19,20
43:21 44:2 45:6
45:10 97:20 99:17
106:15 109:4
119:9 120:13
122:17 126:16
128:3,8,12 129:7
129:14 132:2
133:5,25 144:9
158:24 181:18,19
184:14,25 185:2
192:21,21 193:4
194:15 204:2
211:23 226:10
233:5 246:24
247:4 248:3 249:6
249:23 259:20,24
267:6 268:16
**asking** 13:4 14:23
27:10 45:15 50:10
50:11,21 52:2
68:10 83:1 87:10
87:13 98:19
109:14 119:7,12
127:4,15 139:20
175:24 177:3
185:21 186:14
191:1 194:20
198:5 208:5 213:4
218:23 221:10
234:13 261:14
**aspect** 56:5 67:19
79:4 140:3,4,6,15
157:16 229:19
239:8 240:8 243:5

**aspects** 62:25 63:3
68:2 72:8 77:11
79:1 83:22 90:23
91:10 183:11
187:15 231:19
252:16
**assess** 216:20
239:11,13 251:16
253:13 267:4
**assessed** 241:10
**assessment** 10:3
50:2 250:21 251:8
251:17 252:7,18
252:19 253:3,11
253:18,23 254:2
254:18 256:10,16
257:3 259:13
260:21 263:13
264:21,25 266:7
269:6 270:20
271:23 272:9,14
272:18
**assessments** 173:6
242:1,5,17 253:13
253:15 271:5
**assignment** 43:16
**assist** 47:4,14
58:11
**assists** 44:19
**associated** 55:5,10
56:4 82:8 116:6
**associates** 9:16
31:19,20 32:1
54:25 55:2,4,16,23
55:25 56:2,3,5,10
56:13 59:17
**assume** 14:10
145:1 189:21
196:12
**assumed** 45:18
150:23

**assuming** 36:17
42:2 187:25
188:20
**assumption**
140:10,12,13
154:24 160:21
**assumptions** 45:5
45:9
**assurance** 269:1,4
270:17 272:13
**assured** 97:12
100:10
**atlanta** 3:19
**aton** 7:4
**attached** 50:8,13
275:2 276:11
**attachment**
230:11,13
**attention** 85:13,15
85:17 251:7 255:4
**attorney** 54:5,9
129:10 276:13
**attorneys** 53:14,25
**attributable** 98:14
**attribute** 134:17
**audible** 64:6
248:17
**audit** 10:24 11:3
180:9 181:24
182:8,11 183:6,11
187:6 191:16,25
192:3 206:5,12,16
207:1,5,15 208:1,1
208:2,9 212:7
216:7,21 217:5
218:11,12 220:18
221:20 222:11,11
223:13 226:17,18
227:14,20,21
228:2,4,6,7 229:20
230:10 232:5,14

233:8,11,15 234:6
238:15
**audited** 232:21
233:2 237:7,11
**auditing** 181:22
**auditor** 223:19
**auditors** 210:20
211:9,20 212:7
218:17 224:11
226:8
**audits** 180:22
182:3,16 185:25
186:8,15,18
191:14 192:5
194:4,6 210:21
211:20 214:18,21
215:23 216:4,9,12
224:21 226:3
237:23 238:6
239:15
**august** 84:22
148:12 171:5
172:1 202:10
203:8 206:20
208:20 209:4,5
210:5 246:4,8,25
**aurobindo** 4:17
**austin** 1:21 2:5
**authority** 64:23
237:7,11,20
**automatically**
103:25 162:23
**autonomy** 153:16
**available** 47:19
63:20 223:19
253:20 256:11
276:6
**avenue** 3:6 5:5,11
5:17 6:5
**avkare** 6:13

**aware** 22:21 26:6
28:3 32:16,17,19
32:21 40:21 45:19
47:9 48:2 50:6,11
50:20,22 53:3
73:1 78:22 84:9
117:2 139:14,22
143:15,18,20
152:8 159:10
164:6,16 165:15
166:4,6,11,25
167:5 172:3,17,18
172:25 175:2,2
176:14,20 177:4,5
177:8,25 178:3,7
178:14,19,20,22
179:3,6,14 183:25
185:7,21 186:18
187:9 190:3
191:15,19 193:25
194:2,3 195:9,12
195:13,15 197:5
197:24 198:5,10
198:12 199:11,23
200:2 229:18,23
232:18,25 233:1,2
233:7,10,14 237:6
237:10 253:24

**b**

**b** 1:4 8:3 9:11 10:1
11:1 13:10 56:14
56:19 114:20
121:23,23 274:4
**back** 17:20 18:18
19:23 20:8 21:4
21:13 24:3 29:19
35:22 41:9 43:19
46:17 48:12 51:17
52:12 54:14 73:5
74:25 75:3,7
77:20 78:1 80:6

81:18 83:10 93:7
96:7 97:23 98:6
99:12 100:3,3
101:20 106:3
110:5 115:14
117:15 120:5,7,18
129:6,8 136:5
137:24 138:13
146:23 163:11
167:12 169:23,25
172:23 173:7
174:1 177:13
179:2 183:9,10,24
184:4 187:4 195:6
196:1 201:12
202:3,6,7,14
213:22 216:11,24
217:23 219:24
222:20 227:12
229:22,25 234:3,3
237:1 241:4 244:7
244:8 246:2 263:8
264:4 270:8
271:16
**bank**  6:5
**barnes**  7:12
**base**  133:16
**based**  70:13 75:1
75:10,13,14 83:21
90:10 116:21
130:16 163:8,16
180:6,7,8,21
193:22 207:13
221:23 253:16
257:13
**bases**  181:16,19
236:22
**basic**  197:17
**basically**  107:10
124:20 147:19
206:14 220:23

227:1
**basis**  77:3 95:11
95:22 100:20
101:18 146:3
192:9 214:22
236:18
**bates**  9:13,15,16
9:18,21,23 10:5,9
10:11,13,15,17,18
10:20 11:6,9,11,17
199:5 207:9
217:16,16 218:2
222:5 248:15
251:2
**battle**  20:11
**bausch**  7:4
**baxter**  17:7,12,15
17:19 19:2 20:3
21:4,12,20 31:21
59:9,18,23 70:22
148:9,17,18,20
150:14
**baxter's**  149:5,20
**bear**  28:18 36:25
37:2 199:22
**becoming**  129:25
**beginning**  45:8
59:16 110:6 173:1
196:1 201:10
208:15 227:24
240:7
**begins**  12:1 199:5
217:16 218:1
222:5
**behalf**  12:9,11,13
12:15,17 20:15
23:23 25:7,13,24
**believe**  16:19 19:3
22:6 25:5 28:10
29:9 33:14,25
35:21 40:17 44:3

44:3 47:7,18,20
49:17 50:25 52:25
54:7 65:3 105:19
110:19 111:5
116:4,8 118:22
123:14 147:18
159:9 164:8,9
173:11 181:21
185:10 188:23
193:23 196:6
221:3,23 224:18
230:10,14,18
231:1 235:17,23
270:7 272:20
**believed**  269:5
271:6
**believes**  64:11
154:4
**benefit**  202:8
**berne**  6:19
**best**  54:8 183:4,21
**better**  55:24
269:10,17 271:10
**beyond**  73:12,17
126:5,17 128:15
128:17 129:15
**bigger**  155:15
156:5 225:25
**biggest**  231:19
**billed**  33:5
**billion**  194:19
**bioequivalence**
115:4,7,9 116:6
118:6 119:19,23
120:11,24
**biologist**  61:14
**bipc.com**  8:6
**bisgaard**  6:14
**bit**  14:21 146:25
**bite**  249:8

**blackwell**  5:21
**blow**  262:10
**body**  62:5,9
101:23,24 102:5
117:21
**bogdan**  3:22 41:2
**bold**  1:21 2:4
**booklets**  145:23
**bosick**  8:10
**boss**  59:9
**boston**  7:18
**bottom**  59:8 85:18
100:2 103:10
148:22 162:17,24
176:10 205:20
220:17 226:2
228:10 255:6
258:12
**boulevard**  2:19
**box**  3:23 261:9
264:6
**boxes**  259:11
260:3,23 264:25
**brand**  146:14
**branded**  146:5,7
**break**  14:13,16
29:18 46:11,13,16
77:15,19 109:24
110:1,4 115:14
117:14 137:23
138:12 146:18,22
167:8,11 195:24
217:22 219:23
241:3 244:6 263:7
**bresnahan**  5:9
**brian**  3:12
**bridge**  6:5
**brief**  240:23
**brisbois**  6:14
**brittney**  5:16

**brittney.nagle**
5:18
**broader**  129:23
130:3,11
**brought**  18:5
169:23
**btlaw.com**  7:14
**buchanan**  8:4
**build**  15:12
**bulk**  134:11
**bullet**  57:6,18 58:9
59:7
**business**  55:11
157:19
**businesses**  55:5,7
55:12,13 56:2
**buy**  27:18 182:2
211:12,18 212:3
213:11
**buying**  182:20
183:9 210:22
211:6,22 213:9,16
213:17

**c**

**c**  2:1 3:1 4:1 5:1
6:1 7:1 8:1 112:22
121:20,24,25
122:15 143:10
147:3,10
**c.whiteley**  2:11
**calendar**  34:12
**california**  17:22
17:25 20:8 22:24
24:22 25:12 57:13
**call**  53:7 54:2,5,9
128:4
**called**  21:7 57:16
153:2 172:22
185:13
**calls**  41:14 86:3,10
126:13 129:2

172:14 176:23,24
183:2 206:21
**camber**  6:12
**camden**  1:2 274:2
**camp**  2:9
**campbell**  5:10
**campus**  3:10
**cancer**  61:14
**capabilities**  88:14
89:4,8
**capability**  86:18
**carcinogenic**  10:5
50:4
**care**  29:15
**carillon**  8:4
**carolina**  8:5
**carondelet**  5:22
**case**  19:21 21:15
21:18 22:1,2
23:21,22,24 24:14
24:21 25:14 29:9
33:16 54:7 57:20
57:21,22,25,25
58:1,3 64:10 66:5
110:19 142:18
157:2 180:15,19
186:10 188:20
221:23 248:16
**cases**  16:16 19:24
24:17 161:3
**catch**  80:5
**categories**  160:23
**category**  159:20
**causation**  63:4
**cause**  1:16
**caused**  63:13
172:19
**causes**  100:21
**caution**  24:11
25:15 51:4 53:8
190:23 209:17,22

**cc'd**  148:22
**cder**  87:6
**cease**  213:9
**ceased**  182:20
183:9 212:25
213:7
**center**  7:6 71:11
**centre**  4:19 8:10
**ceo**  59:10
**cer**  121:10
**certain**  17:2,5 25:5
25:20,25 44:5,6
48:6,12 50:15
64:25 78:21 81:9
85:4 125:7 128:15
134:24 135:10
137:11 142:12
159:12 160:1,7,16
162:16 164:9,20
164:22 166:5
171:14,18 172:2
173:2,3,24,25
176:6 177:14,17
178:15 185:19
188:17 192:1,2
197:2 212:11
216:25 217:1
240:8 270:18
**certainly**  22:12
154:20 192:23
193:24 197:10
264:8
**certificate**  142:24
143:2,4 274:18
**certification**  9:9
125:23 274:7
**certified**  274:9
275:11
**certify**  274:10,21
275:6

**cfr**  66:2,2,6,9,14
66:14,20,21,22
67:8,17,23 68:22
69:16 153:3 162:3
**cg**  107:11
**cgannon**  7:9
**cgmp**  62:17,21,25
66:3 76:20 77:11
77:13 79:1,4
83:22 96:18
100:20 101:15
103:12,15,19,24
104:18,24 106:1
106:11,20,21
107:13 108:4,7,7
109:9,12,16
112:24 123:20
129:24 131:22
132:25 134:8
150:8 151:24
152:9 208:23
211:11 215:14
231:19 238:2
239:6 242:11
248:12 252:11
266:9
**cgmps**  10:12 90:22
90:23 95:8,17,23
96:15 97:10 100:7
100:12,16 101:6
101:14 108:10
130:5,10,16 131:8
131:9,12,14,16
132:7 133:11
146:25 147:3,11
167:23,25 168:8
168:25 170:13
176:11 179:13
**ch**  252:11
**chain**  10:21

**chairman** 59:10
**chance** 266:25
  267:1
**change** 11:13
  145:3 172:20,23
  183:10,23,24
  184:8,11,12,22
  187:7 188:22,23
  189:1,12,14,24,25
  190:1 192:12
  193:14,16,16
  194:1 215:1
  229:24 230:1,2
  242:21 243:2
  251:9 261:7
  263:13,24 264:5
  264:10,11,12,16
  264:16,22,23,23
  264:24 265:3,4,21
  266:5,7 272:1,2,4
  277:4,7,10,13,16
  277:19
**changed** 189:7,14
**changes** 84:11
  184:19 185:3
  192:15,16,22,23
  192:24 193:3,5
  266:3,3,6 275:2,3
  276:10 278:6
**chapman** 1:18
  274:9 275:15
**chapter** 10:14
**characterization**
  185:18 194:15
  239:19
**characterize** 79:11
  79:20 81:23 82:8
  109:7 188:24
  233:12 235:13
  236:15

**characterized**
  19:4,7,8 172:21
  188:23,25 189:13
  189:23,25 233:20
  235:5 236:14
  265:3 272:2,3
**characterizes**
  185:15
**characterizing**
  19:5
**charging** 33:15
**charlie** 2:18
  121:24
**charlotte** 8:5
**chart** 267:13
**check** 35:22 41:10
  197:14 206:4,25
  207:5 260:3,23
  261:9 264:6,25
**checked** 44:10
**checking** 259:11
**chemist** 61:18,21
**chemistry** 61:19
  188:5
**chemists** 122:4,9
  122:16,19,22
**chi** 148:13
**chicago** 4:14
**choose** 58:24
  125:10
**chose** 59:1
**christine** 7:5
**christopher** 8:3
**christopher.henry**
  8:6
**chromatography**
  87:7
**chronological** 37:6
**cigna** 5:19
**cincinnati** 6:20

**circumstance**
  124:17
**circumstances**
  155:10 198:19
  256:23
**citation** 68:15
  134:14 161:15
  163:8,14 217:9
**citations** 162:8
**cite** 68:11 97:17
  98:8 161:20
  198:25 201:12
  217:5,10 218:3
  221:10,14 229:9
  235:24 245:10
  251:12 263:16
**cited** 102:11 103:4
  162:4 164:25
  173:19 215:3
  225:14 229:10,10
  235:20,23 246:11
  246:13 248:11
  254:1 258:18
  260:22
**cites** 221:14
  245:15 253:21
**citing** 235:22
  259:22 263:17
**city** 13:10
**civil** 1:22
**claiming** 257:24
**claims** 2:18
**clarification** 26:15
  83:2 95:24 105:19
**clarified** 133:24
**clarify** 14:8 23:1
  26:14 45:15 54:20
  55:4 108:22
  111:17 153:9
  154:18 170:4

**class** 63:1 79:1
  83:23 101:5
  107:13,17 108:1
  115:22 125:22
  168:2 169:2,17
  170:2,10,23
  176:10 177:22
  208:24 209:6
  210:5 215:15
  231:18 238:3
  241:21 242:13
  252:12
**classified** 165:18
  165:25
**clear** 13:24 27:1
  125:25 128:11
  131:21 231:4
  252:1 269:18
**clearly** 209:12
  271:20
**click** 163:4
**client** 127:23
**clinical** 116:13
**close** 71:3 74:17
  75:6 246:18 266:8
  272:5
**closeout** 11:9
  246:15,16,21
  247:8,19 248:9
  249:20 250:13
**cm** 96:14
**cmg** 96:14
**coaching** 204:13
**coan** 7:16
**coates** 3:9
**coatesg** 3:11
**code** 10:16
**coleen** 4:8
**colleague** 53:19
**combined** 256:7

**come** 72:19 74:24
  75:2,7 120:7,18
  137:13 175:9
  206:16 207:14
  215:18 238:5
  252:10 267:10
**comes** 116:10
  134:19 137:18
  161:22
**coming** 131:23
  133:2 206:5,25
  207:14,25
**comma** 161:16
**command** 261:21
**commensurate**
  256:12
**comment** 145:17
  161:2 220:11
  240:9
**commented**
  238:24 239:20
  240:6 241:25
  242:21 243:7
**commenting**
  239:24 240:5
**comments** 215:12
**commit** 73:8,11
**committee** 40:23
**common** 70:17,20
  168:1 169:1
  176:10 232:12
**commonly** 70:8
**communicated**
  45:22,25 46:4
**communicates**
  73:7
**communications**
  246:8 247:5
  250:12
**companies** 8:3
  30:6 46:5 62:25

69:4 70:20 76:21
  77:4,12 106:8
  108:1,2 147:6,11
  157:18 196:23
  244:14
**company** 5:20
  17:9,23 20:7,10,11
  20:14 22:25 24:18
  25:1,23 27:19
  29:22 54:19 58:11
  58:15,18 59:10
  66:9,10 69:6,11
  74:14 76:4,6,6
  101:14 103:11
  104:18 107:13
  155:15 157:3
  158:16 188:10,11
  196:15
**company's** 74:15
  74:17,22
**compendial** 79:23
  82:18,20
**compensated**
  20:24 21:2,5,7
**compensation**
  35:6,9
**competitiveness**
  240:13
**compilation** 111:8
  111:9,11
**complaining** 229:6
**complaint** 263:25
**complete** 52:7
  91:2 278:8
**completed** 217:5
  276:17
**completely** 14:2
  88:23 133:1
**completion** 274:24
  275:5

**complexity** 256:12
**compliance** 10:10
  62:24 69:16 71:16
  76:20 90:21 98:11
  98:12 99:2 105:13
  105:22 108:9
  123:21 124:2,3,6
  124:14 129:24
  134:8 266:9
**compliant** 66:13
  159:4 208:23
**complicated** 31:17
**comply** 103:15
  147:14
**complying** 101:14
  103:11 104:18
**component** 77:12
  117:7,17 197:12
  198:15
**components**
  256:15
**composite** 37:1
**composition** 80:18
**compound** 48:15
  51:12
**compounding**
  56:14,19
**comprehensive**
  158:4 239:20
  241:8 263:12
  264:9
**computerized**
  1:19
**con** 116:12
**concept** 82:17
**concern** 177:24
**conclude** 165:11
**concluding** 217:6
**conclusion** 70:11
  100:20 212:24
  213:6 215:18

257:15 259:1,16
  260:17
**conclusions** 238:5
**concrete** 42:1
**conditions** 103:15
  210:12
**conduct** 69:3
  116:12 226:3,17
  242:5,16 250:20
  251:8 263:12
**conducted** 149:5
  149:19 182:4,17
  186:18 191:16,24
  192:3,5,7 194:4,6
  216:3,12 218:12
  224:21 251:16
  252:7 253:16
  256:16
**conducting** 214:21
  272:18
**conducts** 165:7
**confer** 71:11
**conference** 28:5
  29:8
**conferring** 71:13
**confidential** 190:3
  190:7,16
**confirm** 37:9
  128:16 136:21,25
  162:25
**confusing** 14:9
**conjunction** 65:7
  109:20 264:9
**conlee** 2:8 12:16
**connection** 19:1
  20:2 21:14,18
  32:1,15 33:12
  34:15 35:3 42:7
  42:10,14 43:3
  44:18,23 45:2,6,11
  45:16 46:3 49:19

52:20 58:6 76:2
96:18 109:19,21
127:7 214:10,11
237:15 248:20
**conor**  6:13
**conor.donze**  6:16
**conscious**  112:14
**consent**  58:12,17
74:4
**consequences**  94:5
**consider**  56:9
61:20,23 73:13
77:10,11 150:19
151:6 241:15
264:7 265:1
**considerations**
157:20
**considered**  71:7
90:25,25 94:16,23
95:8,18 96:14
100:22 101:15,25
103:13 104:19
108:4 130:6 131:6
131:7,10,17,24
132:8 133:3,14
150:9 151:13,20
168:17 183:23
**construction**
220:11,12 221:7
226:24 227:11
**consultant**  20:20
20:20,24 22:23
23:2,9 27:22,25
54:15 58:22 59:2
**consulting**  9:14
29:21 30:6,9,20,23
31:11,14,18 32:1
32:14,18,19 33:11
33:17 34:23 35:2
35:10 43:20 54:21
54:23,24 55:10,23

56:5 59:17,22
61:8
**consumers**  145:24
**contacted**  42:10
42:14 43:2,13
**contain**  87:6
115:24 118:4
130:24
**contained**  87:16
131:25 133:3
169:11
**containing**  60:18
83:15 108:12
116:3,7 126:12
143:16 164:7
165:16 171:12
175:19 176:4
177:10 179:9,16
**contains**  37:10
187:14 275:2
**contaminants**
146:6
**contaminate**
146:11
**contaminated**
91:16 130:1 131:6
132:10
**contamination**
130:9 133:13
**content**  126:11
145:14 162:14
**contention**  230:23
**context**  17:3 27:15
30:5 65:19 90:20
91:4,13 93:19
94:14 101:10
106:15 123:3
139:12 151:23
173:20 181:3
260:2,12

**continue**  41:13
99:20 180:17
239:19
**continued**  3:1 4:1
5:1 6:1 7:1 8:1
10:1 11:1 59:9
182:2 211:11,18
213:11
**continuing**  35:23
165:5 173:1
**contract**  17:21,25
18:3,4 20:7 22:24
24:5,18,21 25:11
57:14 232:8
**contradicts**  154:18
**contrary**  89:22
**contributed**  63:13
**contributing**
232:9
**control**  10:3 50:2
78:17 97:8 100:5
138:17,25 188:5
253:8 254:24
258:2 262:21,24
263:24 264:16,22
265:21 266:5
**controlled**  77:24
**controls**  66:9,15
66:23 67:16,23
68:20 114:1
**controversial**
132:19
**conversation**
184:16
**cooperation**  229:7
**copies**  184:19,24
276:14
**copy**  28:17 44:13
44:16 47:6 48:19
136:19 141:2,10
204:22 205:15

225:6 274:18
**core**  158:11
**corporate**  153:20
154:7,16
**corporation**  5:3
5:19 6:18
**correct**  13:2,3,13
20:24,25 22:25
23:1,10,11,15,16
29:6 30:24 31:6,8
31:9 32:18 34:9
35:6,7,12,13,17
36:3,4,8,13,23
37:15,16,18,20,21
38:7,8,15,17,19
39:2,12,23 40:9,10
40:23,24 42:9
43:6,7,10,11 49:5
49:10 52:11,17
53:16,18,20,21
54:11,17 55:1
56:8,11,15,20 57:5
59:3,6,18,19,21,25
60:2,8,9,12,15,16
61:10 63:5,14,21
63:22 65:10 66:3
66:4,6,7,11,25
67:8,9 69:16,17,22
69:23 70:1,3,4,7
70:14,15 71:4,5,8
71:16,17,20,24
72:1,2 73:15,21
75:20 77:25 78:11
82:10,11 87:2,9
97:18 98:1,9,10
100:13,16 101:2
103:20,21 104:1,4
104:7,25 105:6,10
105:15,23 106:2
110:10,22 112:4,8
113:9,14,19,23

[correct - davis]    Page 13

114:12,24 115:5
116:14 118:22
119:16,20 121:12
121:16 123:13
132:13,17 134:12
135:9 136:11
137:3 138:19
141:13,17,18
142:8,12,24
143:24 145:10,15
147:16 148:17,21
148:23,24 149:9
150:2,12 152:21
152:22 154:2,3
155:1 157:7
158:11,17,20
162:19 164:1,5
165:13 171:5
173:4,16,20
174:17 185:14
186:1,9 188:14
196:5 205:12
211:13 212:8
213:1 214:13
217:7 218:5 219:1
221:22 222:9,13
222:18 223:1
225:11,12,16
227:6 228:20
230:6 232:3,10
234:11 239:21
242:1,22 243:8
245:8,20 250:16
251:14 252:3
254:9 256:19
257:7 259:7,20
266:14,22 278:8
**correction** 9:8
**corrections** 278:6
**correctly** 140:11
185:16 269:10

**correspondence**
179:1
**could've** 210:5
**counsel** 42:17
97:19 109:2
203:21 204:10
250:3,4 258:7,10
258:11 275:6
276:14
**county** 13:10
**couple** 47:12
**course** 33:6 84:8
132:18 159:2
**court** 1:1,5 12:4
13:18 14:4 22:20
115:17 262:3
273:1 274:1,5
**cover** 68:1
**covered** 249:7,9
249:10,15
**covers** 94:11
**crazy** 155:22,23
**created** 111:11
**criminal** 65:6
**critical** 172:20,21
183:23 184:8,11
184:22 187:7
188:23 189:14,25
192:16,22,23
193:5,14,16,16
212:8 214:25,25
223:21 230:1
233:10,13,13
263:13 264:11,16
264:24 272:2
**criticality** 256:12
**criticism** 270:16
270:20 271:3
**crowell** 5:10
**crowell.com** 5:12
5:13

**crr** 1:18 275:15
**cs** 276:15
**csr** 1:18 275:15,15
**culbertson** 7:17
**cure** 117:19
**current** 10:8,12,22
13:8 84:25 88:1,2
88:8,14,15,20 89:2
89:4,18 90:4,13
91:18 92:1 147:3
147:8,8,9,9,11
149:7,21,25
**currently** 32:14,18
61:3 175:18
**curriculum** 9:13
**customer** 185:13
263:25
**customers** 18:3
57:15 170:7
**cv** 28:7,8,14,22,25
51:21,23 52:4,7
54:14 56:17 57:6
57:19 59:8 60:6
**cvs** 7:11
**cwhill** 4:10
**cwhorton** 2:21

**d**

**d** 5:21 6:18 9:1
**d'lesli** 5:4
**d.b.** 7:21
**d.c.** 5:11
**d.stanoch** 2:12
**dallas** 5:5
**daniel** 5:10
**dash** 217:17
**data** 116:6,22
119:23
**databases** 26:1,4
**date** 12:2 22:7,8
43:4,9 78:12
147:7,14 209:11

209:14 250:12
274:25 275:15
277:24 278:12
**dated** 38:2,16 39:2
39:13,21 40:6
246:2,4,8
**dates** 30:16,16,18
192:6
**david** 2:8
**davis** 1:20 2:3,4
3:17 5:4 12:12,12
12:12 15:10,16
19:15 20:17 24:11
25:15,18 26:12,22
28:16,20 31:15
36:17 37:5 41:14
41:24 42:22,25
43:14 45:12,20
46:10 47:15 48:14
50:18,23 51:4,12
51:24 52:9,15,23
53:8 62:18 63:6
65:13 66:12,17
67:1,4,24 68:10,23
69:10 70:18 71:9
73:10,16 74:19
76:25 77:8,16
78:19 79:17,25
80:20 81:7,14,22
82:2,24 83:1,8,18
84:13,18 86:1,3,10
86:20 87:10,17,20
88:3 89:6,12,21
90:6,14 91:6,14
92:17,20,23,25
93:20 95:1,24
96:4 97:19 98:16
98:21 99:4,16,21
100:23 102:2,7,10
102:13,22,25
104:3,6,12 105:11

105:18 106:23
107:2,4,22 108:14
108:16 109:2
110:17 112:13
117:23 118:8,10
119:21 120:13
121:2 122:17
125:5,21 126:13
126:21 127:12,25
128:20 129:9
130:15 131:1
132:1,14 133:5,23
136:12,17 137:8
138:11 139:5,8,17
141:4,7 142:2,13
142:25 143:7,25
144:16 150:17
152:2 153:21
154:8 155:18
158:24 162:10
169:12 170:15
172:13 173:11,21
174:8,12,14,22
175:21 176:7,23
178:17 179:18
181:14,18 182:12
183:1,18 184:14
184:25 186:2
190:5,17,23 191:8
193:8 194:12,17
195:3 199:14,17
201:23 202:7
203:10,17,22
204:1,7,15,25
206:21 209:7,17
209:22 210:24
211:23 214:6,19
215:7,24 217:8
218:20 220:13
221:9 222:14
223:6,8 225:8,21

226:10 231:8
232:15 233:5,24
236:7,9,23,25
239:17 240:24
244:25 245:17
247:3,7 248:3,6,14
249:5,12,22,25
250:7,24 252:8,21
254:3,7,23 255:17
256:17,24 257:8
257:17 258:1,7
259:2,17,23
260:13 261:11,20
261:25 262:5,8,20
262:24 265:9
266:23 267:6
268:1,6,11,14,21
269:25 270:22
271:1,14 272:5,19
272:25 276:1
**day** 35:15,16,19
35:20 36:10,11,20
155:8 226:21
228:15,16 275:11
278:15
**days** 47:12 248:7
274:25 276:17
**dcampbell** 5:13
**de** 2:19
**deal** 26:17,24 27:6
27:9,15
**dealing** 14:20
**deals** 136:8 141:12
141:16
**december** 39:2
60:7 191:16,25
**decide** 66:10
**decided** 208:8
**decision** 153:12,13
154:1,6,22,23
155:3,3,7,9 156:23

157:5,19,23 185:5
209:4
**decisions** 152:19
153:16 155:1,25
157:12
**declaration** 9:22
43:17 49:4 111:3
112:2 125:22
126:4,9,17 129:15
139:13
**declare** 145:4
278:4
**declared** 94:2
**decree** 58:12,17
74:4
**deemed** 278:6
**defendant** 12:9
13:1 15:23 25:8
25:13,14,24 30:20
46:4 139:15,23
159:16,24 160:4
160:12 167:1
174:4 176:11
249:8
**defendant's** 76:18
77:6
**defendants** 1:15
30:10 45:2 63:12
76:8,10,16 110:22
112:3,7 130:13
139:3 140:15
145:25 159:7,10
160:19 167:23
168:7,15 172:11
172:24 175:18
176:2
**deficiencies**
150:10 179:5
182:16 211:3,10
213:13,20,24
215:14,19 216:5

236:1 238:3 239:6
241:16 242:11
248:12 252:12
**deficiency** 193:7
**deficient** 210:12
211:10
**define** 32:5 79:21
91:21,23 92:21
93:18 253:22
**defined** 91:22 97:9
100:6 211:4,10
212:12,16,19
253:3 257:2
**defines** 92:4 117:2
**defining** 93:4,21
**definition** 91:20
**definitively**
166:12
**degree** 61:19
256:9
**delay** 15:12
**delineate** 271:21
**delivered** 274:16
**demonstrate**
113:22
**demonstrates**
216:8
**department** 11:5
58:16 64:18,22
65:1,7 239:12,14
239:18 240:18
269:6,8 270:19
271:7,8 272:8
**depending** 74:5
124:7 256:22
**depends** 82:14
118:13 122:23,24
124:16 125:11
151:25 152:9
**deponent** 274:22
274:23 275:4

276:13 278:3
**deposed** 13:13
  17:4 18:1,8,11,21
  18:25 21:14,17
  271:9
**deposing** 276:13
**deposition** 1:8,13
  9:18 11:16 12:2
  15:14 16:12,18,21
  17:1 21:1,4 23:14
  23:19 35:25 36:15
  36:15,21 46:21,22
  46:22 48:4 50:9
  50:14 52:18 53:5
  224:18,19 225:6
  267:22 268:8
  269:20 273:8
  274:7,14,16,24
  275:5
**depositions** 33:18
  33:20 220:23
  221:3,24 229:7
  269:14,22,22
  270:4
**depth** 130:10
**describe** 62:22
  66:18 88:10 99:17
**described** 66:9,16
  66:24 67:23 68:21
  123:24 239:3
  241:9 242:6,17
  243:3
**describes** 67:7
  99:15
**description** 269:5
  271:7
**design** 138:16
**detail** 163:5
  193:15 212:23
  213:5 220:4,24
  225:25

**details** 69:8 201:9
  202:21 203:1,9,15
  204:5 228:13
**detectable** 130:25
  131:25 133:4
**detection** 234:22
**detention** 74:9
**determination**
  44:11 71:16
  104:10 108:25
  112:15 168:14
  243:6
**determine** 34:17
  76:20 80:24 87:5
  87:15 105:25
  112:10 161:5,9
  167:24 168:12,24
  183:7 187:7
  213:18 214:2
  215:5 216:4
  264:17 266:21
**determined**
  143:17 231:14
**determines** 81:11
  82:15
**determining** 77:13
**develop** 69:12
  87:15
**developed** 87:7
  234:20
**deviation** 211:11
  263:25
**deviations** 149:7
  149:21,25 150:5,8
  160:5
**device** 9:21 17:22
  20:7 22:25 24:18
  25:1,23 47:25
  57:25 59:24 72:9
**devices** 10:14,16
  135:9,13,24 136:9

136:23 137:2
  141:13,17
**diagnosis** 117:19
**difference** 94:13
  94:20
**different** 32:20
  58:1 89:9,10,15
  96:19 103:23
  105:8 118:4
  131:15 138:23
  146:4 164:1,4
  168:5 170:14
  178:24 206:22
  218:16 254:5
  256:22 257:1
  258:16,24
**differentiate** 19:13
**differentiation**
  19:17
**difficult** 183:22
  224:21
**diligence** 27:18,22
  30:8 31:3,4
**direct** 83:7 117:18
**directly** 74:3
  139:24
**director** 269:4
**discharge** 180:4
  181:7
**disclose** 126:23,25
  127:17 129:4
**disclosed** 31:7
  198:18
**disclosing** 143:22
**disclosure** 128:18
**discover** 183:12
  184:13
**discuss** 65:9 158:9
  173:2 175:8 193:3
  269:10 271:10

**discussed** 57:11,12
  57:22 93:23
  221:16
**discusses** 70:2
  71:18 149:4,19
**discussing** 65:19
  171:3 174:16
**discussion** 29:13
  42:1 53:7,12 96:2
  108:19 113:1,11
  136:14 149:13
  154:21 155:6
  157:21 167:18,20
  195:19 217:13
  218:4 219:20
  244:4 245:3
  247:14 258:6
  263:2 265:8 273:3
**discussions** 53:9
**disease** 117:20
**dispensing** 145:24
**dispute** 18:3
**disputing** 22:4
**distinct** 65:18
**distributed** 209:13
**distributing** 64:21
**distribution** 151:8
  151:12,20 177:11
**district** 1:1,1,5
  72:20 124:22,25
  125:2,14 126:8,8
  274:1,1,5
**division** 55:23
  72:4,6
**dlesli.davis** 5:7
**dmf** 171:25 187:9
  187:11,17,18,19
  187:20 188:2,6,13
  188:16,19,21
  189:9,20,21 190:8
  190:10,19,21,22

191:7,12 192:18
192:20 193:2
196:5,8,11,13,16
196:17,19
**dmfs** 187:25,25
190:3,16
**dna** 10:3 50:2
**doctor** 62:1
**document** 34:23
47:22 48:7 50:1
85:2,12 87:22
98:23 99:5,9,18,24
101:4 102:19,20
103:3 105:5,7,9
129:15 135:2
137:9,12,13 141:1
142:1,3,6,9 147:23
172:3 173:22
175:11 177:6
178:5 198:25
199:5,17 201:13
201:17 203:11,12
203:14,18,23
204:8 210:8
217:16 218:1,3,21
218:24 219:1
222:5,8,24 229:15
230:17,19 231:3
233:25 244:20
245:6,10,16,22
246:1,25 247:15
247:16,22 248:1
248:15,16,23
250:1,9,23 254:6
254:12,14,16,21
254:22 255:2,5
257:2,5,21,22
258:2,9,12,17,18
258:24 259:6,13
260:1,4,5,16,21,22
260:25 261:1,7,16

261:18,24 262:11
262:13 263:1,16
263:18,19 264:5
264:13 265:6,14
265:16,18,24
267:12 270:6
**documentation**
207:4
**documents** 43:22
43:24 44:4 47:5
47:10,18 48:3,5
49:21 50:7,12
51:9,13 52:13
76:3,5,9,12 77:22
85:7 101:21 105:8
112:3,6,11,16,17
130:18,20,20
134:21 135:4,5
139:10 140:18,20
167:22 168:7
174:1 179:10,21
183:15 185:4,11
193:25 208:7
209:1 212:17
213:22 214:4,7,9
214:10,15,23
215:3,11 216:15
239:1 240:21
241:7 242:4,19
243:1,11,21
244:21 247:12,12
248:22,23,24
249:2,16,18
251:19,21,24,25
253:18,19 261:15
262:18,22
**doing** 20:10
156:13,25 195:16
231:23 232:18,19
241:14 244:22
261:13 262:16

269:16
**doj** 58:11,20,21
59:5
**donze** 6:13
**dorsey** 7:22
**dorsey.com** 7:24
**dose** 164:19
**doubt** 190:21
**draft** 78:20 111:14
**drafted** 69:21
**draw** 85:15,17
**dream** 133:18
**drive** 3:10
**drug** 9:20 10:10
47:24 58:11 62:13
69:3,6 72:7,8,9
80:19 81:5,13
82:9 94:2 101:15
103:12,14,17,18
104:19 108:12
113:12,13,15,16
113:17,17,18,18
113:21 114:6,6,11
114:11,15,23
115:3,4,21,25
116:3,10,23 118:2
118:4,17,19,21
119:14 127:10,11
141:20 142:12
143:23 187:9,12
187:13,14 196:14
196:19,21,22
256:5,6
**drugs** 10:14,16
60:18 77:24 78:18
135:8,13,24 136:9
136:22 137:1
141:13,16 152:1
152:11 253:9,17
**duane** 4:4,8
244:12

**duanemorris.com**
4:6,10
**due** 84:8 106:1
**duly** 1:15 12:19
274:12

**e**

**e** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1,14 7:1
7:1 8:1,1 9:1,11
10:1 11:1 165:1,3
277:3,3,3
**eabraham** 6:10
**earlier** 36:4 57:11
61:6 78:13,17
113:6 130:4
147:18 158:25
171:8 181:13
182:23 183:7,13
184:13 188:22
200:2 214:25
229:23
**early** 21:13
**education** 60:22
60:24 61:19
**edward** 165:3
**effect** 150:22
**effective** 62:13
241:12
**effectiveness**
113:23
**effects** 117:19
**efficacy** 116:14,22
**ehs** 266:9
**eight** 35:16 36:12
36:17,22
**eir** 173:19 174:3,8
174:10,14,17,18
175:3,9,13,16,20
176:5 245:5
246:22 248:20
250:13 251:12,20

252:16 259:12
260:7,9,15 264:13
271:13
**either** 113:7
137:18 138:4
164:6,9,16 186:21
191:12 196:6,7,8
210:11 224:3,4
226:2 227:10
272:15,17
**elaborate** 64:9
90:2
**electronic** 261:18
261:24
**element** 158:10
**ellie** 5:3
**ellie.norris** 5:6
**ellis** 5:16
**else's** 176:25
**email** 10:21 199:7
199:8 204:16
205:12,21 206:19
206:20,22 207:18
208:6,12,14
**emails** 235:13,18
235:21
**employ** 17:9
**employed** 61:7
275:7
**employee** 17:7
56:10
**employees** 55:3,6
56:3,6
**employer** 20:16,18
20:19
**employment** 17:12
17:15 19:2 59:23
**enabled** 183:12
**ends** 222:18,19
**enforcement**
63:21 73:9,12

**engage** 57:4
**engaged** 26:20
42:18 54:21 57:7
57:19
**enhance** 255:17
**ensue** 165:11
**ensure** 138:16
180:1,3 181:5,6
182:7 223:21
266:3,8
**entail** 74:12
**enter** 58:17
**entire** 208:24
215:15 231:18
238:3 242:13
252:12 255:2
257:4 259:4
269:19,21
**entities** 32:20
56:22 197:13
206:23
**entitled** 194:25
195:3
**entity** 31:5 187:20
187:21,22
**enumerate** 150:4
**enumerated** 100:1
**envisions** 256:20
**epidemiologist**
61:12
**equestrian** 55:14
56:1
**equipment** 223:17
223:21
**equity** 20:10,11
22:3,17 24:7,8,15
25:7 58:3 59:10
**equivalent** 115:7
**eric** 6:8
**errata** 276:11,13
276:17

**erratas** 276:15
**erroneous** 157:12
**escrow** 20:12 22:4
**especially** 192:16
**essential** 158:10
**essentially** 125:3
192:17
**establish** 113:25
**established** 186:8
**establishes** 158:19
**establishment**
11:7 171:4 245:23
**et** 276:4 277:1
278:1
**evaluate** 267:1
**event** 157:9
**eventually** 106:9
**evidence** 176:10
**exact** 22:7,8 30:18
84:14 109:3
234:16
**exactly** 23:20
45:14 73:5 81:2
96:1 125:7 127:10
135:19 140:25
184:17 189:2,18
227:1 228:14
**examination** 9:6
12:20 244:9
**examine** 243:14
**example** 13:21
14:19 21:4 52:5
72:10 95:15
121:19 130:8
151:1 169:14,15
169:24 170:20
188:10 226:1
227:3 243:19
252:11
**examples** 84:5,7
96:22 106:11

112:19,20 158:15
158:16 167:24
168:9,11,12,16,17
168:25 169:19
177:21,22 191:22
194:20,23,25
215:13 227:5
231:17 238:2
239:7 241:21
242:11 243:20,22
248:11 252:11
**exceed** 36:17,21
**exceeding** 35:16
36:12 171:23
**excerpts** 11:16
269:23
**exchange** 199:8
**excluded** 22:20
**exclusively** 54:18
**excuse** 85:15,16
97:19 212:15
250:3
**excuses** 218:16
**executed** 223:18
**exemplary** 194:19
**exercise** 168:24
**exhaustive** 84:6
168:10 208:25
215:13 226:1
242:12 252:13
**exhibit** 9:12,14,15
9:17,19,22 10:3,6
10:9,11,13,15,17
10:19,20,23 11:3,5
11:7,8,10,11,13,14
11:16 14:21 28:14
28:15,19,22 34:21
34:22 37:2,2,4,9
40:5,20 42:5
46:19,20 47:22
48:1,17,17,19,21

48:24 49:3,8,11,12
49:16,18,23 50:1,5
51:8,13,20,23 52:8
52:13,16,17,18,22
52:22 54:15 84:22
85:1 98:25 99:2
102:23,24 103:1,3
105:12,15,16,16
105:17,21 110:9
110:24 111:1,2
112:1 113:7
130:21 136:16,18
136:19,21 137:19
138:2,4 141:3,5,10
141:11 148:12,14
148:16 162:11,13
162:14,24 199:3,4
203:15 204:3
205:3,24 206:9
208:13,16 214:5
214:12 215:4
217:14,15 218:1
220:1,7 222:4,7,24
224:23 225:4,5,8
226:6 244:19
245:4 248:8
249:17 252:1,5
254:6,8,10,11
257:20 261:3,6,8
264:14 265:7,10
265:17,19 267:17
268:2,4,12,13,20
270:6,7,10
**exhibits** 14:20
36:25 51:17 262:1
**exist** 89:17 90:1,3
90:12,17 183:8
216:5
**existed** 186:17
229:20 234:17,17

**expectation** 79:19
79:22
**expected** 271:4
**experience** 75:11
163:16,17
**expert** 9:22 16:1,4
16:12,21 17:1,11
18:5,8,11,22,23
19:1,12,20,22 20:1
20:9,12,23 21:6,22
23:4,10,14,14,18
24:2,16 25:4 26:8
26:20 27:25 29:10
32:24 33:2,4,6,12
35:24 57:7,17,19
61:23 125:24
126:25 128:25
183:3 262:18
267:23
**experts** 26:2,5
44:23 45:2 126:23
127:17 129:5
**expiration** 209:11
209:14 275:15
**explain** 63:9 94:18
94:19 130:2
194:17 220:3
262:8
**explained** 21:6
94:23 231:15
**explains** 265:25
**explanations**
206:6
**exploiting** 204:16
**explore** 194:25
**express** 5:19,20
**expressly** 222:1,3
**extend** 126:5
**extended** 204:16
**extensive** 72:25

**extent** 62:19 195:1
250:25

**f**

**f** 86:24 274:22
**facilitate** 256:8
**facilities** 31:1
123:22 138:18
139:1 149:6,20
165:16 232:8
**facility** 70:6 71:3
90:25 96:23
100:22 104:11
106:21 109:1
134:7 138:15
150:10,21,24
151:1,4,9,14,21
231:5 237:18,24
238:7 245:25
267:14
**fact** 18:25 19:12
43:8 50:19 74:8
83:21 86:17,24
87:14 107:15
121:13 122:6
130:5 145:16
148:22 149:24
164:24 180:7,8
183:23 190:7
195:13 200:11
202:11 210:7
216:6,11,24
220:24 230:12,20
231:5,11,13,22
233:18 235:19,24
239:14 241:10,13
272:18 273:2
**factor** 77:13
**facts** 10:12 45:17
94:4 198:19
268:14

**failed** 91:18
186:16 214:24
250:20 251:8
**fails** 90:22,23 94:4
276:19
**failure** 162:5
163:14 263:11
**fair** 14:11,12
55:22 62:15 63:16
63:19 66:8 73:6
110:12,14 214:1
244:24
**falanga** 7:6
**falkenberg** 4:13
**falkenbergives.c...**
4:15
**false** 94:3
**familiar** 65:23
72:11,22 82:17
124:22 140:22
153:1 245:6
**far** 33:1,7 106:24
111:21 128:24
164:14 220:6
**fashion** 259:3
**fast** 158:1
**fd&c** 10:14 134:18
134:19 135:7,23
136:8,20,22 137:1
137:7
**fda** 10:6,21 58:11
58:20,21 59:4,11
60:1 61:7,8 63:16
63:20,24 64:11,16
64:20,24 65:5,10
65:19,19,23 66:18
66:18 67:6,11,18
68:8 69:6,25 70:5
70:8,12,12,13,25
71:1,6,7,10,15,22
72:4,12 73:8,11,13

73:19 74:15,16,21
74:22 75:5,8,10
77:3 78:22,25
79:6,14 80:12,14
80:23,24 84:9,16
84:20,22 85:24
86:5,7,17,25 87:14
87:25 91:21,23,24
92:4,21 93:3,18,21
95:12,14 96:10,17
97:5 98:7 99:2
101:8 104:16,20
104:22 105:13,22
106:14,16 107:18
108:6 109:9,11,11
109:12 113:14
114:5,8,24 116:16
117:2 118:14,18
119:6 120:7,17,18
120:21 121:12,13
121:16,21 122:1,2
122:6,8,14 123:1,4
123:6,7,7,10
124:19,25 125:2,4
126:8 132:6,12,13
132:17,18 133:19
134:23 142:10
143:17 144:15,21
144:24 145:2
147:23 148:9
152:8 161:15
163:3 165:7,11,18
171:4,22 172:2,6
172:22 187:17
189:12,15 190:1,8
190:9,12,15 191:2
191:4 195:11
196:9,22 198:19
205:16 233:2,12
233:17 237:23
238:6,9,15 245:24

246:8,17,21 247:5
248:9,20 250:12
250:20 251:7,17
251:20 253:2,7,21
253:22 254:17
256:14,20 259:12
260:5,15,22
264:12 265:2
271:13,16,18,23
272:3
**fda's**   10:6,8 72:22
73:1 77:23 78:17
79:19 84:23,24
97:3 101:13
104:10 108:3,23
108:25 109:8
110:15 124:22
125:13 132:15,22
171:25
**fdli**   29:4
**february**   175:2,4
176:5 238:13
275:11 276:3
**federal**   1:22
**fee**   35:15 36:10
**feel**   43:17 101:2
137:16
**feet**   262:9
**fewer**   16:9,10
**fhs**   8:12
**field**   123:13 178:1
178:10 179:7
**fields**   60:23
**file**   109:24 122:25
187:12,13,14,18
188:16,17 190:19
257:15
**filed**   189:12
**files**   80:23
**filing**   190:21 196:9

**filings**   190:20
**final**   71:15 73:14
78:20 155:2,3
156:23 157:6
225:10
**finances**   31:24
**financially**   275:9
**find**   79:11 92:13
94:10 163:3
183:22 218:24
**findings**   10:8
84:25 233:7,9
**fine**   91:17 158:2
**finish**   14:1 15:8
87:20 107:4
115:15
**finished**   191:5
196:19 220:1
**firm**   12:25 22:17
54:22,23,24 57:13
64:12,13,14 90:22
90:23 91:18,24
96:12 97:7 100:5
111:12 124:2,3,4,5
131:16,23,24
132:6,24,25 133:2
162:4 244:12
270:4 275:16
**firms**   42:17 58:4
74:9 80:23 164:4
164:7,17 166:17
**first**   12:19 13:1
14:16 24:19 35:8
37:14 42:10 43:2
43:9 82:16 87:21
101:24,24 110:12
130:1 149:11,12
150:18 154:18
156:11 157:4,13
164:24 178:1
189:24 206:8,9,17

206:19 208:15
218:3 224:24
228:15 247:21,25
**five**   16:7 18:21
23:13 77:15 93:15
128:8,12 146:18
146:18 167:8
184:16
**flat**   33:19,21
**flexibility**   256:8
256:21
**flip**   245:12
**floor**   4:19 7:7,17
8:11
**florham**   3:10
**florida**   2:20
**focus**   56:12,18
57:3
**focused**   59:10
**focusing**   18:10
66:21 135:7
138:14
**folks**   14:18,19,22
54:1 199:9
**follow**   72:1 120:22
133:19 139:2
162:5 163:14
257:15,24
**followed**   95:9
103:19 161:17
178:10 179:7
230:25 231:6
264:17
**following**   41:5
48:24 99:13
156:12 160:9
161:15,21 191:12
210:12 250:5
274:11
**follows**   12:19

**[font - give]**

**font** 204:17 261:12
**food** 10:10
**footnote** 102:7,16
  102:17 103:4
  105:20 134:16
  135:6 161:25
  162:15,18,21,24
  199:6 217:11
  218:3,6,7 219:1
  222:9,23 223:2
  225:11,12,15
  227:5 230:17
  231:16 245:15
  253:10 257:19,21
  257:22 258:4
**footnoted** 49:22
  135:5
**footnotes** 98:5
  111:6,10 113:8
  215:4
**foregoing** 278:5
**forget** 28:7 261:2
**form** 11:13 45:12
  45:21 47:15 52:9
  52:23 66:12,17
  67:24 69:10 70:2
  70:12,16,18,21,23
  70:25 71:9,15,23
  72:1,3,15 73:10,16
  74:19 76:25 77:8
  78:20 79:18,25
  80:20 81:7 82:2
  83:8,18 84:13
  85:22 86:1,10,15
  86:20 87:17,21
  88:3 89:6,17 90:4
  90:6,12,14 91:6,14
  93:2,20 95:3
  100:23 102:3
  104:3 106:23
  107:22 110:17

112:13 118:10
  130:15 143:25
  144:16 152:2
  154:8 172:13
  175:22 178:17
  179:18 186:3
  190:5,17 191:8
  199:13,25 209:7
  214:6,19 215:7,24
  217:8 218:20
  220:14 232:16
  252:8 256:17,24
  257:17 261:7
  266:23 267:7
  269:25
**formal** 60:22,24
  68:15 250:21
  251:8,16 252:7,19
  253:3 257:3
**formality** 256:10
**formalized** 97:5
**formally** 165:18
**format** 69:25
  263:22
**formatted** 264:3
**formatting** 111:18
  111:19 204:11
**former** 17:7 59:9
**forming** 45:7,7,10
  45:16 48:8 49:19
  51:9,14 139:4
  158:10
**forms** 257:1
**formulate** 214:15
**formulation**
  145:10
**fort** 275:17
**forth** 66:2,14,22
  67:22 80:4,10,18
  81:4 83:15 114:2
  179:2 237:1

**forths** 67:21
**found** 76:13 97:9
  100:6 146:11
  149:6,20,24
  182:24 184:6
  192:12 203:3
  216:18 223:16
  233:11
**four** 18:16 179:25
**frame** 20:9 22:7
  25:2 34:20 200:13
  235:9 264:15
**frames** 17:6
  171:15 174:6
**frank** 8:9
**frcp** 274:21
**free** 43:17 58:24
  59:1 101:2 137:16
**frequency** 34:16
**front** 52:21 92:10
  110:9 254:22
  270:13,15
**fulbright** 5:4
**fulfilled** 18:4
**full** 13:6 37:24
  38:11,12,22,23
  39:8,19 40:3,13
  86:23
**fully** 85:21 119:11
  161:16 221:15
**function** 117:21
  152:19,23,25
  153:6 156:13
  157:10 271:5
**functions** 154:25
**further** 87:4 94:18
  97:7 244:2 274:21
  275:6,9
**future** 124:19
  127:5,16 128:25

**g**

**g** 167:15,17
**galleria** 6:4
**game** 203:24
  204:10
**gannon** 7:5
**gas** 87:7
**gateway** 7:6
**gcoan** 7:19
**ge** 11:17 269:9
  270:17
**ge's** 271:1
**general** 21:10
  240:7
**generalize** 118:16
**generally** 134:18
  256:19
**generate** 34:14
  41:1
**generated** 31:11
  31:14
**generic** 114:10,23
  115:21 119:1,14
**generics** 116:21
**genoa** 13:10
**genotoxic** 81:15
**geoffrey** 7:16
**geoppinger** 6:18
**georgia** 3:19
**getting** 14:2
  180:17 191:12,13
  212:1 272:5
**girl** 167:17
**gisleson** 4:18
**give** 14:25 15:4,10
  30:18 42:22 67:4
  93:9 148:15 184:2
  192:22 206:6
  236:23 249:2
  261:3 262:13

**given**   26:10,20
   27:5 28:1 34:17
   35:20 43:17
   119:25 145:24
   163:10 180:14
   252:22 274:14
   278:9
**giving**   27:10
   136:10 149:14
   257:9
**glad**   137:14 240:9
**glenn**   3:5 12:10
   53:20
**gmp**   63:3 107:25
   112:16 168:17
   169:4 170:22
   179:4 215:19
   272:14
**gmps**   168:10
**go**   13:16 18:18
   28:13 29:14 35:22
   41:9 48:12,16
   64:22 65:1 73:5
   74:3 77:14 78:1
   82:5 83:10 91:9
   92:12 98:6 99:12
   100:3,3 101:20
   103:7 106:3 109:3
   117:10 136:15
   141:2,9 144:2
   148:11 151:1
   158:3 161:13
   162:9 163:11,18
   163:22 165:1
   167:7 174:1 176:9
   177:13 181:1
   184:4 185:5 187:4
   190:1 195:20
   199:4 201:6
   204:18 213:22
   215:17 216:25

217:18 222:20
   229:22 230:21
   232:5 234:3
   240:24 244:5
   256:3 258:13
   259:5 263:3
   266:18 271:16
   273:4
**goes**   13:15 21:12
   150:4 162:2
   172:23 222:22
   225:24 228:10
   256:7 258:21
   264:2,4,9
**going**   13:4,16
   14:10 17:20 19:15
   19:23 27:13 28:16
   31:15,16 36:24
   37:1,5 42:2,25
   43:14,19 44:15
   46:10 51:20 59:5
   62:18 63:6,11
   64:18 67:1 68:23
   74:8 78:19 79:17
   80:24 84:7,21
   85:13,15,17 86:5
   87:19,25 89:14
   90:8 93:2 95:3
   106:9 109:2,7
   116:17,18 119:21
   125:18 126:10,19
   127:4,8,13,18
   128:1,6,9,21,24
   129:9 134:15
   136:5 144:2,4,5
   155:25 157:25
   159:2 161:9 168:4
   169:23 173:7
   179:2 181:25
   183:9 186:2 188:4
   190:8,9 207:2,3,15

207:16 208:8,9
   212:3 213:17
   220:13 221:13
   225:5 226:20
   228:19 232:23
   234:7 236:9,17
   237:1,2 239:18
   240:10 244:15
   245:1 249:14
   250:24 252:23
   254:23,25 257:8
   262:1 267:24
   268:18
**goldberg**   4:4 9:7
   244:10,12,18
   247:4,6,9 249:10
   249:14,24 250:3
   250:22 254:9
   255:19 261:17,23
   262:2,6,17,22
   263:3 265:5 268:3
   268:9 270:5
   272:21 273:4
**good**   10:12 12:22
   12:23 25:9 88:2,8
   88:15,20,24 89:2,5
   89:8,18 90:4,4,13
   91:18 92:1 95:15
   101:11 124:9
   149:7,21,25
   262:13
**gordon**   8:10
**gotcha**   203:24
   204:9,12
**gotten**   192:18,20
   193:15 212:5
**grant**   8:11 114:5
**granted**   116:21
**great**   37:13
**greenberg**   3:5,9
   3:13,17 12:9,11,25

**greeting**   205:22
**gregory**   3:9
**ground**   13:16
**group**   19:25 26:11
   26:16,21,25 27:6
   28:1,7,10 72:7,9
   79:2 83:23 101:5
   107:14,17 108:1
   111:18 170:2,10
   237:19
**groups**   22:4 24:7,8
   24:15 25:7 27:12
   27:18
**gtlaw.com**   3:7,8
   3:11,15,20,20
**guess**   144:4
   198:13 225:25
**gui**   67:18
**guidance**   9:19
   10:10 47:23 65:18
   65:25 67:12,21
   68:3,8,9,14,16,18
   68:19 69:2,6
   77:23 78:10,17
   99:2 101:3,21
   133:19,20 134:20
   135:2 253:8
**guidances**   65:11
   65:12,16,20 66:19
   67:7,10,11,13,18
   69:13 159:5
**guideline**   65:18,24
**guidelines**   65:10
   65:12,16,22
**guys**   206:16 207:5
   208:9

**h**

**h**   7:16 8:9 9:11
   10:1 11:1 277:3
**hairnet**   169:5

**half** 110:13
**halfway** 85:19
  121:20 129:21
**hammered** 202:15
**hand** 51:20 107:11
  225:5 254:24
  262:21,24
**handed** 28:21
  48:18 218:21
**handing** 34:24
  37:8 46:20 103:2
  217:15,25
**handle** 15:16 72:7
**handled** 31:24
**handling** 271:5
**hang** 92:25 125:21
  133:23 247:3,3
  249:5,22 268:3
**happen** 42:2 64:12
  143:19
**happened** 156:11
  206:14
**happening** 264:16
**happens** 74:21
  82:12
**happenstance**
  203:7
**happy** 14:8
**hard** 216:16,20
**harding** 3:22
**harkins** 3:16 7:16
**harkinss** 3:20
**hctz** 178:2
**head** 13:22 87:8
  157:22 192:6
  268:25 269:7
  270:17 271:8
**header** 205:21
**heading** 35:6
  240:11

**health** 7:11 11:5
**healthcare** 4:3
**hear** 14:7 59:15
  134:1,3 141:14
  202:5
**heavily** 27:18
**help** 89:1
**henry** 8:3
**hereto** 278:7
**hernia** 23:22
**hetero** 6:3
**hey** 248:14
**higher** 152:20
**highlight** 258:12
  258:13
**highlighted**
  257:11 258:8
**highlighting**
  262:14
**hill** 4:8 6:4,8
**hillwallack.com**
  6:6,10
**hilton** 2:7 12:14,14
  162:25
**hinshaw** 7:17
**hinshawlaw.com**
  7:19
**hired** 27:22,25,25
**historically**
  163:12
**history** 75:15
  214:20
**hold** 61:3 151:8,12
  151:20 177:11
**holder** 116:23
**holder's** 170:14
**holders** 190:15
**holding** 5:19
**holds** 187:20
**honestly** 19:23

**honik** 2:13,14
**honiklaw.co** 2:16
**honorable** 1:4
  274:4
**hour** 33:15,17,19
  35:9 36:1,7 46:11
**hourly** 36:6
**hours** 35:16,16
  36:11,12,18,22
**housed** 55:15
**huahai** 4:3
**huh** 13:23 32:4
  34:4 99:11 152:16
  153:10 161:8
  177:19 198:9,23
**human** 11:5 62:5,9
  77:24 78:18 253:9
**humana** 4:12,12
**hunchuck** 4:18
**hundred** 135:18
**husch** 5:21
**huschblackwell...**
  5:23,24
**hypertension**
  62:13
**hypothesis** 156:24
**hypothetical**
  89:22 90:7 104:13
  131:2 132:2 133:6
  152:3 154:9
  155:19 170:16
  183:19 209:8
**hypothetically**
  127:5

## i

**i.e.** 35:24
**ich** 242:1 266:9
**idea** 128:3 129:3
  235:11
**identical** 115:25
  115:25 118:20

**identified** 128:18
  150:8 167:2 195:2
  211:9 213:13,20
  214:5 230:2
  231:20 233:18,19
  234:4 235:7,12
  249:17 250:14,17
  264:23
**identifies** 82:13
**identify** 68:6
  95:13 98:20 182:1
  204:2 233:22,23
  234:2 235:4,6
  236:13,14,16,19
  236:20 241:18,22
  242:15 252:11
  269:23
**identifying** 193:7
**identity** 97:11
  100:8
**ii** 240:16
**iii** 240:11
**illinois** 4:14
**image** 255:17
**immediately**
  161:21 180:5
**impact** 15:4
  130:12 151:24
  152:9 167:25
  169:1,10,21
  170:14,21 266:4
**impacted** 209:6
**implement** 69:7
  69:25
**implementation**
  266:8
**implemented**
  81:25
**implies** 239:1
  240:21 241:7
  242:4,15 243:1,11

[imply - instances]

**imply** 170:20
**import** 74:9
**important** 13:20
  13:25 41:11 119:7
**imported** 74:14
**imposing** 109:10
**improper** 90:7
  104:12 183:19
  209:7 262:15
**impurities** 10:4,7
  50:3 61:1 76:13
  77:25 78:18 79:10
  79:11,21,21 81:5
  81:11,15,15,24
  82:8,13,14 83:6,9
  84:24 86:19 142:8
  142:11 143:21,22
  145:4 253:9
**impurity** 80:2,3,10
  80:14 87:6 127:9
  127:10 176:16,17
  176:22 178:24
**inactive** 117:6
  118:5,19,20
**inadequacy** 216:9
**inadequate** 181:21
  216:4 239:15
**inaudible** 97:21
**include** 53:15,17
  53:19 76:13 115:2
  115:19 116:12
  122:22,22 123:1,5
  123:8 188:8
  191:22 209:1
  248:4
**included** 50:17,19
  69:9 139:10
  206:13 207:23
**includes** 34:11
  55:5 63:23 263:23

**including** 36:7,21
  119:14 129:24
  207:2 266:7
**inclusive** 150:9
**income** 31:10,13
  31:21
**incoming** 159:17
  159:19,25 230:5
  230:24 231:6
**incompetent**
  155:13 156:3
  157:1
**incomplete** 81:8
  131:1 132:1 133:6
  142:14 152:3
  154:9 155:18
  170:15
**incorporated** 7:4
**incorporates**
  188:12 191:6
**incorrect** 36:5
  185:17 209:9,16
**indented** 204:20
  205:7
**independent** 54:15
  57:7 252:15,18
**independently**
  45:18 251:15
  252:6 264:17
  266:20 267:4
**indiana** 7:13
**indianapolis** 7:13
**indicate** 138:8
**indicated** 20:6
  96:10 165:12,13
  191:21 208:23
  226:16 264:10,12
**individual** 58:22
  69:22 106:19
  118:17 124:16
  125:11 158:19

**individuals** 272:17
**industries** 3:3
**industry** 9:19
  47:23 59:11,24
  70:17 75:17 85:21
  86:14 88:1,5,6,7,9
  88:11,17 232:13
**inference** 221:18
  221:20 229:4
**inferring** 224:9
**info** 206:4,25
**inform** 59:4 200:6
**informal** 73:3
**information** 9:20
  44:12 47:24 76:13
  77:7 115:3,20
  120:19 121:14
  125:4 163:9
  171:22 172:1,2,11
  180:14,18 184:1,3
  186:6 191:13
  223:11 254:1
**informed** 176:15
  176:21 228:13
**informing** 228:18
**ingersoll** 8:4
**ingredient** 97:6
  116:1 117:3,4,4,6
  117:22 118:3,7
**ingredients** 115:20
  118:5,19,20
  196:25
**initially** 86:17
  120:23
**initiate** 74:9
  151:11,12,19,19
**initiated** 171:11
  171:19
**initiation** 266:7
**injunction** 64:17

**injuries** 63:14
**innovator** 116:23
**inquire** 232:1
**inquired** 193:14
**inquiries** 232:7
**inquiry** 76:24
**insisted** 207:17
**inspect** 70:5
**inspected** 71:3
  195:11 245:25
**inspection** 10:19
  11:6,7 70:9,11,14
  70:21 71:2,4,22
  74:25 75:3,7 97:7
  123:21 124:4,5,9,9
  124:10,13 149:5
  149:19 162:1,12
  163:2 165:25
  166:1,16,21,23
  171:4,7 197:7,25
  198:4,7,19 199:12
  199:24 200:3,7
  201:8 202:12,21
  203:7,16 204:6
  233:17 237:17
  238:9 245:23
  260:6 271:19
**inspectional** 71:6
**inspections** 165:7
  165:8 186:7
  200:12
**inspector** 71:1
  123:11
**inspectors** 123:2,6
  185:25
**instance** 1:14
  130:1
**instances** 18:7
  20:14 22:22 23:13
  27:21 35:18 162:7

**instruct**  127:1,13
**instructing**  127:22
**instruction**  107:5
  127:19 128:1
**instructions**  66:15
  66:23 67:16,22
  68:20,25
**insufficient**  264:8
  265:1
**integrity**  153:19
  154:6
**intelligent**  155:25
**intend**  41:12
**intended**  177:5
  177:10 210:2
**intending**  126:6
**intent**  153:11,15
  164:15
**interactions**  27:11
**interested**  275:10
**interfere**  118:5
**interim**  78:23
**interject**  160:8
**internal**  34:6
  267:5
**international**  7:4
  31:21
**interpretation**
  108:3 109:8
  132:15
**interpreting**
  140:11 207:8
  208:12,14
**interrupted**  251:6
**interruption**
  240:23
**intervene**  153:19
  154:15 155:17
  156:7,9,18,21
**introduce**  12:6

**investigated**  187:8
**investigation**  10:7
  84:23 177:12
  181:24 263:25
  264:1
**investigator**  70:12
  71:8,11,13 123:11
  245:24
**investigators**
  123:5,7,13 149:6
  149:20 150:15
  246:4
**invoice**  34:18
  37:14,15,17,19,22
  38:1,2,6,9,13,13
  38:20,24,24 39:6
  39:10,17,21 40:1,5
  40:6,11,16 41:6
  43:10
**invoices**  9:16
  34:14 36:24 37:10
  40:15,18,19,22,25
  41:3 42:4,5
**involve**  21:9 57:10
  122:8,11 131:15
**involved**  27:17,19
  152:1,11
**involving**  17:24
  25:6,11,22
**ipad**  262:10
**irbesartan**  1:4
  274:4
**irrelevant**  88:23
**isidro**  3:4 9:6 12:8
  12:8,21,24 15:7,18
  28:13,18 29:14
  37:7 46:12 50:21
  50:24 52:17 68:12
  77:14 80:6 81:18
  84:21 93:7 96:7
  97:22 98:18 99:1

102:8,12 109:25
  117:9 127:21
  128:11 129:6
  136:15 141:6,9
  146:19 148:11
  167:7 177:3
  194:14,24 195:5
  195:20 201:25
  202:3 203:20
  204:13 217:18
  221:13 225:9
  237:5 240:25
  244:1 274:17
**isidron**  3:7
**israel**  238:16
**issuance**  71:22
**issue**  18:2,3 21:11
  22:24,25 24:6
  29:15 34:18 57:15
  70:12 72:15,18
  160:8,10 170:6,6
  183:13 186:16
  194:7,10,16,21
  204:11 216:7
  230:8 231:2,5,13
  231:14 232:17,20
  232:24 233:17
  234:3,4 243:14
  244:25 251:9
  256:13 259:10
  262:18 264:4
  272:16
**issued**  40:15,18
  65:24 69:24 71:10
  71:21 72:3 73:19
  84:16 96:12 164:3
  166:15,20,23
  171:17 178:1
  246:21 248:6
**issues**  22:3 77:3
  110:21 112:16,24

180:12,13 182:24
  183:8 186:17
  195:1 208:24
  216:17,21 229:20
  231:20 271:10
**issuing**  71:12
**it'd**  114:21
**item**  78:8 225:10
**items**  60:13
**ives**  4:13

**j**

**j**  2:8 7:16
**january**  1:9,17
  12:3 237:7,12
  274:8
**jason**  8:15
**jdavis**  2:6 276:2
**jeffrey**  6:18
**jens**  10:21 199:8
  204:20
**jersey**  1:1 3:10 6:5
  6:9 7:7 274:1
**jerusalem**  231:5
**jgeoppinger**  6:21
**job**  157:13 181:21
  269:5 271:6
**john**  1:8,13 2:3
  4:18 9:5,22 12:2
  12:12,18 13:7
  104:21 133:18
  245:1 274:7,12
  276:1,5 277:2,24
  278:2,4,12
**john.gisleson**  4:21
**jr**  6:3
**jucai**  11:17
**judge**  1:5 274:5
**july**  29:5 37:15
  38:2 39:22 43:5
  43:10 84:15 146:8
  146:15 165:23

171:17 177:25
178:11,16
**june** 10:24 146:12
176:14,20 177:7
192:4 217:6
218:12 238:16
**justice** 58:17
64:18,23 65:2,8

**k**

**kanner** 2:9,11,11
2:12 12:14,17
**kapke** 7:11
**kara** 7:11
**kara.kapke** 7:14
**karwacki** 8:16
**keep** 267:21
**kerner** 3:5 12:10
12:10 53:20
127:22
**kernerg** 3:8
**key** 83:11
**keyboard** 111:22
**keys** 111:22
**kind** 103:13
**kirkland** 5:16
**kirkland.com** 5:18
**knepper** 5:21
**knew** 202:12
**know** 13:15,18
14:7,14 19:11,24
25:16,16 26:16
27:4 30:4 37:1
41:9,10,16 42:13
44:9 50:16 51:1,7
51:22 54:4 61:6
72:5 78:13,16
79:5,10,13 80:2,13
80:15,16,16 81:1
81:24 82:9,16
83:13,14 86:21
115:13 118:15

120:9,20 124:24
125:9,11 126:18
127:6,25 129:2,14
129:16 136:2,8
137:17 139:10
141:23 144:2,13
144:19 145:6
146:7,10,13,16
149:15 156:25
159:6,15,23 160:3
160:11,16,20
161:11 164:8,14
165:21,22 171:16
171:21,21 172:5
172:10 174:2,3,6
174:21 175:7,17
176:2 177:6,15
178:9 179:1
180:13 182:10
186:10,11,12,13
186:13,15 187:1
188:19,19 189:11
191:1 192:5,6,7
193:20 194:6,7
197:20 200:5,20
200:22 201:2
202:19 206:17,18
207:20 208:3,18
208:21 209:11,14
209:25 212:9,12
212:15,19 229:5
235:15 236:17
247:15 255:22
258:10 261:25
262:14 272:22
**knowingly** 145:11
**knowledge** 22:19
54:8 256:11
**known** 122:3,15
172:6,11 176:16
232:23

**kroger** 6:12
**kugler** 1:4 274:4

**l**

**l** 1:8,13 5:20 9:5
9:22 12:18 274:7
274:12
**l.hilton** 2:11
**l.l.c.** 2:9
**lab** 145:15
**label** 94:2 143:23
**labeling** 21:11
114:1 143:21
144:11,14,20,23
145:3,23
**labels** 145:5,15
**laboratories** 8:9
124:23,24,25
125:2,8,10,14
126:8,8
**laboratory** 87:1
**labs** 6:3
**lack** 214:17 215:5
229:7 231:21
**language** 134:11
134:17 137:5,18
259:21
**laptop** 265:10
**large** 140:2
**law** 12:25 101:16
103:13 104:20
111:12 118:11
244:12 270:4
**law.com** 2:11,11
2:12
**lawsuit** 15:20,23
21:9 22:10
**lawsuits** 32:2,7
**lawyers** 26:11,17
26:17,21,24 27:1,6
27:7,9,12,15,19
28:2

**layne** 2:7 12:14
**lbresnahan** 5:12
**lead** 212:24 213:6
**learn** 75:25 76:1
201:7 203:6 204:5
**learned** 197:24
198:3 199:12,24
**leave** 272:23
**left** 13:19 21:20
**legal** 28:4 29:8
31:11,14 32:2,3,6
275:16 276:23
**legitimate** 154:15
**length** 249:7
**leon** 2:19
**letter** 10:18 11:9
71:21,25 72:8
73:3,7,18,19,21
74:6,11,16,18,22
75:6 95:16,17,19
96:12,13 97:1
101:23,24 124:21
147:19,20 148:12
148:17,18,23,25
149:4,11,18
150:13,20 151:17
166:15,20,21,22
172:1 246:14,16
246:18,19,20
247:8,8,20 248:9
249:21 250:13
**letters** 71:19 72:3
72:18 73:14 74:8
95:20 96:16,22
102:6 124:19
148:3,4,5,6,9
164:1,3,12,17
166:14,17
**letting** 261:15
**level** 104:25 212:6

**levels**  76:13,17,23
    77:5 152:20
**lewis**  4:19 6:14
**lewisbrisbois.com**
    6:16
**lexington**  5:17
**liability**  1:5 274:5
**licenses**  61:4
**light**  185:20
**limit**  10:4 50:3
**limited**  5:15 22:20
    62:16
**limits**  78:23,24
    79:3 144:15,20
**lin**  225:7
**line**  9:12 10:2 11:2
    104:9 108:24
    225:15,15 226:2
    272:22 277:4,7,10
    277:13,16,19
**lines**  179:25 226:7
**link**  163:4
**linkage**  173:25
**links**  49:14,15
    163:10
**list**  43:24 44:9,13
    44:16 47:1 49:22
    50:10 52:12,21
    53:2 54:2 60:4
    70:25 78:5 84:6
    100:1 111:4,5
    112:11 140:19
    150:9 158:14
    160:23 162:2,6
    163:20 252:5
    255:25 256:3,15
    260:25
**listed**  26:1,4 48:10
    49:8,11 52:4
    112:11 115:4
    118:4 127:11

130:21 145:4
    168:20 214:12
    265:16 267:16
**listing**  193:2
**lists**  162:3
**litigation**  1:5
    15:25 30:11,21
    32:15,21 33:13
    34:2,15 35:3,19
    41:6,13,23 42:7,11
    42:14,19 43:3,13
    43:21 44:19,24
    45:3,11,17,23 46:3
    48:9,20 49:20
    51:10,15 52:20
    54:6,10 57:20
    62:4,8,12,16,23
    63:5,12 75:19
    76:2,10 109:19,21
    110:10,22 118:25
    125:19,23,25
    126:7,10 128:19
    128:21 139:4,6,23
    159:7,17,24 160:5
    160:12 172:12
    274:5
**litigations**  45:7
**little**  14:21 15:10
    15:12 26:14 42:22
    204:11
**livid**  202:14
**liza**  7:5
**llc**  2:14,18 3:4 4:3
    8:3
**llp**  1:20 2:4,19 3:5
    3:9,13,17,22 4:4,8
    4:13 5:16 6:4,8,14
    6:19 7:6,12,17,22
    8:10
**local**  72:20

**locate**  28:24
**lockard**  3:17
**lockardv**  3:20
**lomb**  7:4
**long**  17:20 21:20
    22:14 24:10 28:11
    66:13 118:5
**look**  28:8 29:1
    34:25 48:12 51:21
    73:5 78:2,4 86:22
    91:7,7 98:6,16,24
    99:8,23 100:4
    106:1 121:7,17,19
    122:25 127:25
    129:17 134:4
    135:14,21 136:7
    137:5,14,16 138:2
    138:12 139:20
    145:18 147:10
    148:15 152:13
    170:25 172:18
    174:1 177:13
    183:14 185:20
    187:4 192:25
    198:17 204:19
    208:10 210:14
    213:22 219:3
    222:21 223:3,5
    230:11,12,13
    239:7,9 241:19,24
    242:8 244:23
    246:1 252:5
    253:12 255:6,14
    257:10 259:9
    260:4 261:16,20
    264:22
**looked**  72:24
    105:5 119:24
    121:6 135:25
    144:10 166:8
    200:11 220:2

238:2 242:12,18
    242:20 246:24
    251:13
**looking**  42:4 49:15
    60:4 83:22 116:9
    134:10 135:17
    136:20 162:16
    179:24 181:12
    219:17 220:1
    224:25 226:5
    239:6,6 240:1,2
    242:11 250:18
    262:5,10 263:10
    263:19
**losartan**  1:4 274:4
    276:4 277:1 278:1
**lost**  95:25
**lot**  32:19,20 48:5
    85:7 124:18
    130:24 131:23
    133:1 157:17
    179:1,21 216:11
    216:15 248:22
    249:1
**lots**  171:23 230:22
**loucks**  59:13
**louis**  5:22 58:15
    86:24
**louisiana**  2:10
**low**  32:8
**lowell**  13:7
**luke**  5:9
**lunch**  115:14
**lwalsh**  7:8

**m**

**m**  3:16 5:4 7:5,16
**m7**  10:3 50:1
**machine**  1:20
**maintained**
    223:22

**maintains** 86:25
**maintenance**
223:14,15,17,17
223:18,19 224:3,8
224:10 226:21,24
227:11 228:19,24
229:2
**major** 5:9 106:6
182:1 210:20
211:4,9,20 212:14
212:16 213:19
214:3,17 215:22
**making** 91:20
101:17 131:17
140:9,12 157:12
187:15 189:5
200:2 211:25
221:9 232:7
264:22
**malta** 237:6,7,10
237:11,20 238:7
238:11
**man** 263:14
**manage** 185:13
266:5
**managed** 232:20
**management**
11:10,12,15
152:20 153:13,14
153:18 154:1,2,4
154:14,21 155:5
155:17,23 156:1,7
156:9,12,18,20
157:2,14,18 158:5
159:8,11 164:25
185:8,12,22
239:21 240:13
241:9 242:22
243:2 254:15
255:8,10 256:9
257:16 263:14,23

264:7 271:19,20
**managements**
271:21
**manner** 253:16
**manual** 10:10
72:23 73:2 97:7
98:11,12,14,17
99:2 105:13,22
**manufacture**
63:18 232:3,9
**manufactured**
84:12 103:15
104:11 106:21
109:1 151:3,9,13
151:21 164:18
165:16
**manufacturer**
17:21,25 20:7
22:24 24:5,19,22
25:12 57:14 64:21
69:8,22 80:9,11
81:12,23 82:7,12
83:12 114:10
118:24 119:14,18
145:3,8 158:19,23
187:24 191:5
**manufacturer's**
70:6 73:20 76:14
113:13 129:24
**manufacturers**
77:24 79:10,20
80:15 253:17
**manufacturing**
10:12 82:1 88:2,8
88:16,21,24 89:3,5
89:9,18 90:5,13
91:19,25 92:1
95:9 101:11 114:1
123:22 138:17,23
138:24 149:7,22
150:1 188:5 232:8

251:9 263:13
**march** 194:4
**mark** 28:14 36:24
37:2 48:17 84:21
102:24 136:16
141:2,9 148:11
162:9 199:4 261:3
261:6 262:1 270:6
**marked** 28:15
34:21,22 37:4,9
46:19 48:1,21
50:5 85:1 98:25
102:22 103:1,3
105:20 136:18,19
141:5,11 148:14
162:13 199:3
217:14 222:7
225:4 245:4 248:8
254:11 257:20
261:8 264:14
265:7 270:10
**market** 2:14
116:10 151:2
177:11 208:19
209:4 210:4
**marketed** 114:7
114:23 143:22
253:14
**marketing** 113:12
**marking** 28:19
47:22 49:25 99:1
**marks** 110:6
134:11,15 195:25
**martin** 3:22
**mass** 87:7
**massachusetts**
7:18
**master** 187:12,13
187:14
**material** 80:8
81:20 93:10 94:4

96:3,9 97:25
108:20 129:12
202:9
**materials** 49:3
52:19 111:2 112:1
159:18,25
**matt.knepper**
5:24
**matter** 17:24
19:22 25:6,11,22
26:19 34:9 57:9
57:11 58:5,23
73:8 200:17
235:10
**matters** 32:2,3,6
32:17 55:14
**matthew** 5:21
**maz** 4:15
**mazzotti** 3:22
**mckesson** 5:3
**mdl** 1:3 217:17
274:3
**mdl2875-00118...**
11:4 222:6
**mdl2875-00118...**
223:4
**mdl2875-00118...**
11:4
**mdl2875-00399...**
10:24 218:2
**mdl2875-00399...**
10:25
**mean** 26:17 27:6
27:11 32:5 33:21
55:9 58:19 65:22
68:13 70:19 72:5
73:23,24 76:22
80:14 88:10 93:14
93:16 96:25
102:10 103:16
119:4,10,25 122:7

[mean - multiple]                                                                    Page 28

127:25 130:2
131:6 140:2,7
143:18,19 152:5
155:13 157:10,11
160:16 161:9,10
163:17 166:8,13
169:3,4 170:4
176:24 182:15
184:5 186:23
187:21 188:2,16
190:10 195:8,15
197:17 207:6
213:10 216:16
224:3 227:19
228:5 230:15
241:19 249:3
261:10 269:13
**means** 74:13 82:22
103:14 242:8
**meant** 194:19
221:20 224:11
**measure** 86:18
**measures** 180:3
181:6
**mechanism**
262:21
**media** 110:7 196:1
**medic** 178:23
**medical** 9:20
17:22 20:6 22:25
24:18,25 25:23
46:1,8 47:24
57:25 59:24 62:1
72:9
**medication** 113:22
**medications** 15:3
**medicine's** 237:6
237:10,20
**meet** 66:19 67:7
69:13 90:22,23

**meeting** 13:1
**meets** 113:22
114:1
**megan** 4:13
**members** 168:2
169:2 209:6 210:5
**memorize** 135:10
**memory** 18:17
24:10 57:24
**mention** 141:19
232:7 261:4
**mentioned** 23:12
35:11 67:6 148:1
**mentions** 59:8
**merely** 194:23,25
**meridian** 7:12
**merits** 126:3,23,25
128:25 183:2
**mesh** 23:22
**mestre** 2:19
**met** 95:17 130:6
133:12
**metabolized** 62:8
**method** 87:8,15
**methodol** 235:15
**methodologies**
235:25 236:4
**methodology**
233:21 234:14,15
234:16,20 235:16
255:8,11
**methods** 88:22,23
89:3 237:3 271:21
**miami** 2:20
**middle** 205:8
**midst** 201:9
**million** 171:23
**mind** 176:25
**minor** 104:8 106:5
108:23 172:22
182:1 189:13,14

189:24,25 210:20
211:4,9,20 212:14
212:20 213:20
214:3,18 215:22
229:19 264:12
265:4 272:3
**minute** 29:15
146:18 167:8
217:19 254:17
**minutes** 49:7
77:15 93:15 94:22
99:5 109:4 120:1
142:3 184:16
199:15 272:25
**misbranded** 10:16
92:22 93:18 94:2
94:14,15,17
135:13,24 136:9
137:1 141:12,16
145:17 146:1
**misbranding**
93:23 94:1
**mischaracterizat...**
90:15
**mischaracterizes**
77:1,9 87:18,22
89:7 100:24
106:24 107:6,23
108:16 136:13
169:13 173:22
193:9 194:13
203:18 210:25
215:8 217:9
220:14 231:9
259:18,24 268:7,7
268:15,16 270:23
**mischaracterizing**
101:1 194:22
203:23 221:12
**misleading** 94:3

**misrepresents**
62:19 118:11
153:21
**missouri** 5:22
**mitigation** 117:19
**mix** 60:13
**moment** 36:25
67:6 117:10,11
137:8 148:15
149:14 195:21
199:22 208:7
**moments** 67:4
**monday** 206:20
**money** 32:23 33:1
**monitoring** 138:17
**monoclonal** 57:14
**monographs**
80:22 83:4,5,7,14
83:24
**monroe** 4:14
**morgan** 4:19
**morganlewis.com**
4:21,21
**moring** 5:10
**morning** 12:22,23
13:2 112:19
131:20 132:3
134:21 137:14
147:24 158:25
249:7,11,13
**morris** 4:4,8
244:12
**move** 120:2
221:16 222:4
224:24 258:14
268:22
**msp** 2:18
**mulberry** 7:7
**multiple** 16:5
211:9 221:10

**murtha** 6:3
**mutagenetic** 50:2
**mutagenic** 10:4
**mylan** 8:8,8 30:14
  30:19 169:25,25
  170:6,7 173:4,19
  174:5 175:3,8
  178:25 180:2,19
  180:20,24 181:6
  185:14,25 194:4,8
  194:11,21 195:10
  195:14,15,16,17
  230:6,24 231:7,22
  232:1,18 239:16
  241:11
**mylan's** 169:11
  179:9,16 232:6

**n**

**n** 2:1 3:1 4:1,18
  5:1 6:1 7:1 8:1 9:1
**nagle** 5:16
**name** 12:24 13:6
  22:16 244:11
  269:9
**named** 178:15
**names** 22:9
**nassall** 10:21
  199:8,12,24
  204:20
**nature** 151:25
  152:10
**nda** 118:20 187:16
  188:6,8
**ndea** 75:23 130:13
  130:25 145:4,9,22
  146:8,15 178:24
  233:16,23 234:23
**ndma** 75:23 84:10
  85:21 86:15 87:6
  87:16 130:13,25
  145:4,8,22 146:8

146:15 171:23
  233:15,23 234:23
**ne** 3:18
**near** 220:17
**nearing** 123:18
**necessarily** 19:11
  94:17 103:16
  131:5 188:18
  191:9 193:1
  215:16 231:13
  238:4 242:18
**necessary** 69:15
  83:21 154:5
  263:12 278:6
**need** 14:13 22:7,12
  26:15 43:22,25
  44:11 82:16 88:10
  106:1 109:23
  119:8 120:5
  121:17 128:16
  131:5 135:20
  137:4 138:6
  154:14 193:17
  251:3 253:17
  255:11 257:19
  259:9 268:9,10
**needed** 59:4
  180:18 186:6
  222:20
**needs** 256:21
  260:1 272:23
**neither** 85:20
  86:14 223:20
  275:6
**never** 30:23 60:1
  61:7 123:10
  152:19 156:11,15
  157:20 195:11
  198:18 202:12,25
  236:16

**new** 1:1 2:10 3:6,6
  3:10,23 5:17,17
  6:5,9 7:7,23,23
  52:19 87:15
  109:24 113:12,13
  113:15,16,17,17
  113:18,18,21
  114:6,6,11,15
  124:10 133:18,19
  156:10 234:19
  274:1
**newark** 7:7
**news** 197:25
  198:13
**nilda** 3:4 12:8,24
  15:17 28:17 37:6
  274:17
**nitrate** 269:11
**nitrosamine** 76:17
  77:5,25 78:18
  79:3,15 86:18
  216:6 237:3 253:8
**nitrosamines**
  60:20 62:4,8
  75:20,22 76:1,23
  78:23 79:7 83:16
  84:16 131:25
  133:4 164:12
  269:12
**nodding** 13:22
**noise** 233:20 235:5
  236:15,16
**noncompliance**
  100:15,21 167:23
  167:24 168:7,10
  168:25 169:10
  170:13 176:11
  231:19
**noncompliant**
  97:10 100:7,12,18

**nonconformances**
  160:6
**nonexhaustive**
  255:25
**nonrecalled**
  209:20
**nonspecial** 263:24
**nonsystematic**
  263:24
**normal** 197:11
**normally** 189:15
  271:4
**norris** 5:3
**north** 8:5
**norton** 5:4
**nortonrosefulbri...**
  5:6,7
**notary** 278:13,19
**note** 59:13 74:7
  271:13 276:10
**noted** 271:18
  278:7
**notice** 9:17 46:21
  46:22 48:4 50:9
  50:14 124:18
  268:8,16
**noticed** 198:20
**noticing** 248:14
**notification** 177:8
  178:23
**notified** 58:16
  198:14 201:4
**notify** 197:6
**notifying** 177:7
  200:12
**novak** 8:15 255:21
**novartis** 146:5,10
  234:3,4,8 235:7,11
  235:19,23,24
  236:4,20

**novartis's**  146:13
146:14
**november**  40:6,16
41:5 42:6 60:7
178:23 179:8,17
**number**  16:6,15
29:25 32:13,25
35:16 36:11 41:11
42:9 56:22 59:18
76:15 106:10,11
112:2 114:3
121:11 131:15
138:22 140:24,25
143:2,3 150:4
161:14 162:3,7
163:7,13,19,21
166:16 189:7
216:10 245:10
**numbered**  1:16
**numbers**  135:11
261:3 266:13
**numeral**  240:11
240:16
**numerous**  95:12
253:5
**nw**  5:11

**o**

**o**  237:11
**o'clock**  272:6,19
**o'reilly**  7:6
**oai**  165:12,18,25
166:16,20
**object**  19:15 31:16
42:25 43:14 45:12
47:15 48:14 51:24
52:9,23 62:18
63:6 65:13 66:12
66:17 67:1,5,24
69:10 70:18 71:9
73:10,16 74:19
76:25 77:8 78:19

79:17,25 80:20
81:7 82:2 83:18
84:13,18 86:1,10
86:20 87:17,21
88:3 89:6,21 90:6
90:14 91:6,14
92:23 93:2,20
95:3 100:23 102:2
104:3 110:17
112:13 118:10,15
119:21 126:25
130:15 143:25
144:16 172:13
178:17 179:18
186:2,3 190:5,17
191:8 203:10
209:7 214:6,19
215:7,24 217:8
218:20 220:13
232:15 236:9,25
239:18 252:8
256:17,24 257:17
258:1 259:2
261:13 266:23
**objecting**  128:22
**objection**  15:11
20:17 26:12,22
41:14,24 42:23
45:20 51:12 68:24
81:14,22 83:8
87:21 89:12 93:1
93:9,21 104:12
106:23 107:22
108:14 117:23
118:8 120:13
122:17 125:5
126:13,21,22
127:12 129:10
131:1 132:1 133:5
133:6,7 136:12
139:5,17 142:13

142:25 143:7
150:17 152:2
153:21 154:8
155:18 158:24
169:12 170:15
173:21 174:22
175:21,22 176:23
182:12 183:1,19
184:14,25 193:8
194:12,18 195:4
203:17 206:21
210:24 211:23
221:9 226:10
231:8 232:15
233:5,24 237:2
245:17 249:6
252:21 254:3
255:1 257:9
259:17,23 267:6
268:6,10,14
269:25 270:22
271:14,15
**objections**  95:2
121:2 133:24
176:7 204:8
**obligated**  200:6
**obligation**  273:2
**obligations**  180:4
181:7
**observation**
103:24 104:9
108:24 150:15
170:12 212:6,8,13
212:16,20 248:18
248:19
**observations**
10:19,22 71:1,6
150:22 162:1,12
163:2,6 171:3,10
173:20 174:16
175:8 210:21

211:20 212:24
213:5 214:3,18
215:6,22 216:22
233:11,12,14
**observed**  70:13
75:16 130:17
250:20 251:7
**obtain**  115:1
190:16
**obtained**  98:3
**obtaining**  64:16
188:11
**obvious**  102:11
129:22 193:24
**obviously**  23:2
90:18 119:4
209:10 251:20
**occasions**  16:3,5
16:14,23 21:24
**occur**  156:15
166:1
**occurred**  17:8
34:20 57:23
106:22 149:1
157:4 202:16
203:1 222:12
248:12,13
**occurrence**  163:5
**occurrences**
163:19,21
**occurring**  166:25
184:4 200:13
**october**  38:16
**offer**  125:24 126:6
126:19 127:8
**offered**  128:14
**offering**  62:3,7,11
63:4,11 125:18
145:13
**offhand**  22:11,18
253:24

**office** 71:12,14
72:11,14,17,20,20
72:21 123:17
124:2
**officer** 274:13
**offices** 1:20
**official** 101:13
165:12
**oh** 14:17 21:19
113:17 121:25
159:22 173:12
203:4 222:16
238:8 258:5
**ohio** 6:20
**okay** 15:18 16:11
16:20 17:14 18:7
18:10,15,19,24
19:6,19 20:14,21
21:21 22:13,19
23:5,17 24:5
25:22 29:7 36:6
37:8 38:1,13 41:5
41:12 42:24 48:7
48:13 49:18 50:23
51:6,8 52:12
53:10 54:14 55:12
56:1,6,24 57:2
58:5,9 59:16
60:13 61:20 62:22
65:12,17 67:20
68:2,4,9,19 69:5
69:18,21 70:2
72:11 78:7,10,15
80:17 82:17 83:24
84:3 87:23 88:14
89:1,10 92:7,12,20
94:12,25 95:6,13
95:15 96:20 101:9
102:13,18 103:2,6
103:8 104:16
105:3,4 106:4,6

108:1 109:7
110:20,24 112:1
112:10 113:16,21
114:10,16 115:13
116:10 117:2
118:2 119:18
121:4,9,25 122:2,7
122:10 123:9,12
123:16,25 124:24
130:23 133:10
134:17 135:7,25
136:1,2,15 138:10
143:15 144:6,13
145:2,13,20
147:15 149:12,17
152:17 153:8
154:19 155:21
157:21 158:6
159:22,22 160:22
162:22 163:22,24
164:11,16,21
165:4 166:4 167:5
167:6 168:22
169:6 170:18,19
171:2,21 172:5,10
172:16 173:14
175:1,17 176:9
177:21,25 178:9
178:22 179:14
180:21 181:11,20
181:21 184:18
185:17 186:20
187:20 188:4,10
189:1,22 190:15
190:19,20,25
191:1,23 195:8
196:10,24 197:4
197:10,19,24
199:11,19 200:24
201:19 202:17
203:2,5 205:2,4

206:7 209:19,24
210:18 211:2
213:10 215:10
216:23 217:12,25
218:9,10 219:12
219:14,19 220:6
221:5,25 222:4,16
222:23 223:3,10
224:15,23 226:5
227:4,16,24 228:8
229:12 234:25
235:2 237:5 238:6
241:25 242:21
243:7,17,25,25
244:11 245:9,10
245:21 246:7,14
249:20 250:7
251:12 252:4,17
253:2 254:20
255:13,14 256:3
257:14 265:13,21
266:2,15,19
267:23 269:3
270:2,11,15 271:4
271:15 272:21
273:4
**old** 124:11
**once** 21:25 74:21
82:12 156:16,17
199:11,23 249:9
**ones** 30:13 44:10
49:22,22 98:7,20
112:12,15 160:14
165:20 168:19,20
231:20 249:16,19
**ongoing** 10:6
41:22 84:23
**operating** 69:12
69:14,19 132:7
**operation** 138:24
224:14 229:3

239:15
**operations** 180:9
216:14
**opine** 126:10
**opining** 116:15
117:1 118:1,23
119:23 120:7,17
128:17 142:16,19
145:1
**opinion** 71:7,13
101:2 104:8
107:20 130:12,23
131:21 132:23,24
133:15,22,25
180:16 183:3
184:12 210:19
211:19 259:8
262:19 265:1
267:10 272:7,7,11
272:12
**opinions** 22:20
44:22 45:1,11,16
48:8 49:19 51:10
51:14 62:3,7,11,16
62:23,24 63:5,12
66:5 77:7 83:25
125:15,19 126:6
126:19 127:8
128:16,17 130:16
133:16 139:4
145:14 214:16
245:11
**opportunity**
257:10
**opposed** 117:5
**option** 64:16
**options** 63:21
211:7 212:2,4
**optum** 7:21
**optumrx** 7:21

[oral - particular]                                                          Page 32

**oral**  1:8,13 60:14
  164:19 274:13
**order**  37:5,6 43:25
  63:24 75:5 87:15
  115:1 136:8
  147:14 153:19
  154:6 163:3,5
  167:23 168:24
  184:13 214:15
  215:5 216:20
**ordering**  63:23
**org**  267:13
**organizational**
  238:24 239:3,4
**original**  183:9
  229:24 274:16
**originally**  230:2
**originating**  10:21
**orleans**  2:10
**outcome**  161:11
  161:11 275:10
**outcomes**  165:8,10
**outlined**  180:5
**outside**  74:10
  119:22 120:1,14
  121:6 125:14,16
  125:19 182:12
  236:10 237:4
**overall**  229:20
  232:9
**overridden**  152:20
  153:13 154:1
  155:9
**override**  154:5,23
  157:18,22
**oversight**  272:13
**oxford**  4:19 8:10

**p**

**p**  2:1,1 3:1,1 4:1,1
  5:1,1 6:1,1,3 7:1,1
  8:1,1

**p.m.**  1:17 110:3,6
  117:13,16 137:22
  137:25 146:21,24
  167:10,13 195:23
  196:2 217:21,24
  219:22,25 241:2,5
  244:8 263:6,9
  273:7,8
**p.o.**  3:23
**page**  9:2,8,9,12
  10:2 11:2 29:3
  35:5 44:9 47:1
  48:24 57:6 59:8
  60:5,6 78:7 85:14
  85:18 86:23 92:18
  92:19 99:8,9,12,14
  100:2,2,4 103:7,9
  110:14 150:7
  158:7,13 159:21
  160:24 162:11
  163:2 176:10
  199:20 203:19,19
  204:17,19,24
  205:1,3,8,21,23
  206:9,24 207:9,24
  208:13,15 218:21
  218:25 219:4
  220:2,7,15 222:1
  222:18,25 223:4
  223:11 224:16,25
  225:3,14,15,24
  226:11,12,13,16
  227:13,16,25
  240:10,17 244:17
  246:3 253:12
  254:20 255:4,6,14
  258:4,9 259:1,4,8
  259:20 262:12,25
  263:16,21 266:12
  266:14,19,22,22
  271:12 275:2

**p.m.**  277:4,7,10,13,16
  277:19
**pages**  9:13,15,16
  9:18,21,23 10:5,9
  10:11,13,15,17,18
  10:20 11:6,9,11,17
  37:10 60:6 99:24
  266:18
**paid**  37:22 38:9,20
  39:6,8,17,19 40:1
  40:3,11,13 42:6
**pan**  225:6
**paper**  97:20
  111:21
**papers**  60:4,25
**paragraph**  85:16
  85:18 86:23 87:4
  97:13,18 98:3,15
  100:4 101:12
  102:5 103:10
  110:13 113:1
  121:8,10,11,20
  122:15 129:17,20
  129:21 134:4,6,10
  134:12 137:6,18
  138:3,15 145:18
  145:21 147:17
  149:11,12 150:18
  152:13,18 158:9
  158:14 161:13,14
  161:25 163:22,25
  164:18 165:5,6
  167:19,21 173:1,2
  173:8 174:11
  179:24 181:1,2,8
  198:17 201:6
  202:18 204:4,20
  205:7 207:8
  210:14 211:8
  217:3 220:8
  223:12 224:7,17

**225:2,20 229:16**
  230:4 231:24
  242:22 243:8
  250:18 255:10,15
  259:21 260:17
  263:11 264:10
  265:24 267:11,12
  269:2 270:16
**paragraphs**  113:3
  171:1 174:17
  258:8
**paraphrasing**
  122:8
**park**  3:10
**part**  31:1 69:15
  79:23 80:5,12
  89:17 90:4,12,18
  101:24 112:17
  115:7 119:24
  120:8 128:5 139:1
  145:9 154:17,18
  168:22 188:8
  189:9 190:19,22
  201:17 204:3
  206:9 219:6
  220:15 226:12
  234:6 237:21
  252:14 260:9
**participate**  125:3
**participated**  53:24
**particular**  48:6
  66:8 79:3 80:4,19
  81:5,11 82:9 92:3
  100:21 119:16
  122:25 130:24
  131:23 133:11
  159:16 166:25
  174:4 181:17
  193:6 198:25
  210:6 240:2
  244:16 250:5

259:13 260:9,16
270:3
**particularly** 178:4
178:20 179:3
**parties** 22:10
274:19 275:7
**parts** 171:23
**party** 15:20 232:2
232:14,22 274:23
275:4
**pass** 206:12 244:2
**passed** 59:14
**patents** 60:5
**patient** 117:5
145:23
**pause** 14:21 29:2
35:1 37:11 38:3
92:14 93:25 94:8
96:21 99:7 117:10
137:20 142:4
149:16 199:18
201:20,22 219:8
225:23 247:18
253:6 255:12
258:15 263:20
**pc** 8:4
**pdf** 246:3
**peaks** 198:21
233:18,22 235:4
236:13
**pen** 111:21
**pendency** 41:23
**pending** 14:15
96:6 99:17 177:11
181:15 201:24
253:15 260:14
**pennsylvania** 2:15
3:14 4:5,9,20 5:11
6:15 8:11
**pension** 31:20

**people** 177:7
220:3
**percent** 32:9,11
**percentage** 31:10
31:13,25 32:8
**perfectly** 155:4
**performed** 182:8
210:21 211:21
230:22
**period** 79:8 83:17
165:18,23 179:21
226:21 248:12
**periodically**
163:13
**periods** 24:10
185:9
**person** 56:4 71:3
155:12 156:3,10
156:25 157:11,12
157:14 159:3
271:9
**personnel** 224:20
**pertained** 83:22
**pertaining** 256:5
**pertains** 63:1
126:9
**pertinent** 158:15
178:21
**pfizer** 7:3
**pharma** 3:3 4:17
5:15 7:4
**pharmaceutical**
3:3 4:3,3 29:22
30:6 59:24 66:3
82:18 86:25 88:7
88:9,11,16 90:20
91:4,13 93:19
94:14 97:6 115:22
196:15,25
**pharmaceuticals**
3:3 5:9,15 6:12

7:3 8:8 10:4 50:3
63:17,18
**pharmacies** 56:14
56:19
**pharmacologic**
117:8,18
**pharmacovigila...**
61:24
**pharmacy** 4:12
**philadelphia** 2:15
3:14 4:5,9
**phonetic** 267:14
**phrase** 253:3
**piecemeal** 259:3
**piedmont** 3:18
**pietragallo** 8:10
**pietragallo.com**
8:12
**pills** 170:24
**pittsburgh** 4:20
8:11
**pizzi** 7:6
**place** 15:11 22:5
42:23 82:16 92:4
93:1 94:7,9,10
95:13 138:16
139:16 156:11
157:4,13 164:24
183:1 185:8,22
197:1,9 237:2
254:25
**placed** 177:9
**places** 92:5 95:12
121:16 160:18
253:5
**plaintiff** 2:3,18
15:22 23:24 25:8
25:13,24
**plaintiffs** 12:13,15
12:17 40:23 42:17
44:23 45:23 46:7

54:5,10 63:13
**plan** 223:18,19
**playing** 203:24
204:9,12
**plays** 63:16,19
**plaza** 5:22
**please** 12:4 13:5
14:7,14 29:1
31:12 34:24 53:23
80:7 81:19 95:1
96:8 97:24 101:2
115:15 195:6
204:21 205:15
251:5 265:6,13
**plenty** 84:19
**point** 34:18 57:7
57:18 59:7 81:10
83:11 96:16 97:2
101:7 112:18
126:17 128:25
129:5 130:4 153:9
157:1,17,23 163:1
170:22 182:22
187:5 189:23
191:10 195:9
198:13 200:1
202:24 206:11
207:4 208:11
209:25 211:25
213:8,23,23 216:7
225:18,25 227:9
229:14,19 231:1
234:12 235:6
247:24 264:21
269:2,3,13 271:11
271:25
**pointing** 108:2
**points** 58:9 111:19
**policies** 110:16
**policy** 139:15,21

ponce  2:19
portion  110:14
  204:10 218:15
  258:12
portions  168:5
  226:5 262:14
posed  109:14
position  73:7
  101:13 106:18,19
  108:23 132:6,12
  132:22 145:7,12
  154:13 155:24
  169:9,19 170:12
  191:4 234:19
  269:10,17 271:10
possibilities
  114:14,17 153:18
possibility  116:19
  154:14
possible  120:19
  165:8,10 177:23
  239:8
possibly  128:2
potency  143:8
  144:14,18,20,22
potential  10:5
  50:3 178:24
potentially  56:7
  172:14 234:7
power  64:3,6,8,24
  65:5
powerpoint  98:9
practice  59:17
  149:8,22 150:1
  232:13
practices  10:12
  88:8,16,21,24 89:3
  89:5,9,18 90:5,13
  91:19 92:1 101:11
preapproval  124:5
  124:10,13

preapproved
  58:10,20
preclinical  116:13
predetermined
  34:16
prefatory  222:15
preference  176:15
premature  183:2
prepare  53:4
prescription  9:20
  47:24
presence  84:10
  130:13 142:10
  145:22 146:15
  171:22 176:16,21
  233:15
present  8:14 54:16
  57:16 110:22
presentation
  26:11,21,25 27:5,9
  27:11 28:1,9,25
  98:9
presentations  60:5
  60:14 61:1
presented  71:2
  218:16 223:19
  234:5 255:2 259:3
presenting  9:19
  47:23 90:7
preserve  44:16
press  85:14
prevent  57:16
  129:25
prevention  117:20
previously  35:11
  86:2,9 95:7
  116:22 176:16,16
  176:21 272:1
primarily  30:7
primary  56:12,18
  57:2 232:13

princeton  6:9
principals  256:9
prinston  4:3
print  259:6
printing  204:16
prior  16:11 24:1
  24:14 25:4 42:17
  42:18 59:16
  129:11 146:8,15
  171:24 172:6,12
  204:17 205:20
  206:24 207:24
  209:13
prioritization
  253:17
private  20:10,11
  22:3,16 24:7,8,14
  25:6 58:3 59:10
probables  267:25
probably  16:15
  17:5,16 18:16,24
  21:19 24:3 25:14
  30:4 32:10,12
  41:17,20 42:2
  43:20 44:5,11
  71:12 77:2 88:18
  93:24 101:21
  106:9 118:13
  122:23,24 125:11
  127:1 134:20
  138:22 143:9,11
  156:9,10 160:17
  160:21 178:19
  184:6 185:5
  187:24,25 189:21
  190:18 191:18
  197:16 209:13
  220:4 222:20
  242:8 265:19
  267:19

problem  155:15
  156:1,5,14,16,17
  156:17,21 157:4
  172:19 271:24
problems  271:22
procedural  254:25
  257:9
procedure  1:22
  11:12,15 73:2
  212:10 257:16
  261:13 262:15
  263:15 266:14
  271:20
procedures  69:12
  69:15,19 72:23
  110:16 161:16
  162:5,6 163:15
proceed  149:15
proceeding  275:8
process  68:8,17,21
  69:3,7,15 82:1,13
  85:22 86:15 97:6
  116:11,18,20
  118:14 120:9
  123:4,23 125:8
  184:20 189:3,4
  191:11 229:25
  243:7,12,15,18
  252:15 256:21
  264:23 266:5,6
processed  170:9
processes  69:8
  88:2 138:17,25
  185:22
processing  20:13
  22:3 57:20 58:3
produced  1:14
  48:3 50:7,12 76:9
  112:3,7 133:12
  248:16 249:25
  251:1,1

**producing** 132:8

**product** 64:13,14
  64:21,24 65:2,4
  72:9 76:14,24
  79:12,24 80:4,19
  81:6,13 82:9,19
  83:7,15 90:24
  91:16,17 92:4
  94:2,15,16,23 95:7
  95:9,10,18 96:13
  96:17,19 103:25
  104:9 105:25
  106:20 107:21
  108:24 114:7
  119:16 129:10
  130:5,6 131:4,12
  141:20 142:12,23
  143:23 144:14,20
  145:5,15 146:5,5,7
  146:11,13,14
  150:14,20 151:2,9
  151:13,21 168:1
  169:2,11,21 170:8
  170:14,24 171:11
  188:12 191:5
  192:16 196:14,19
  196:21 208:19
  209:4,6,12,20
  210:4 212:3
  226:18 227:20,20
  228:6 256:6 266:6

**products** 1:4
  21:12 63:13 66:3
  74:13 76:18 77:6
  82:20 87:5,16
  90:20,24 91:3,13
  91:19,21,25 92:1
  96:24 100:21
  101:25 104:10
  108:4,8,25 116:3,7
  119:1 126:12

129:25 130:14
  131:10 132:7
  133:12 143:16,17
  145:9,25 150:24
  151:6 164:7,19
  165:17 171:12
  172:24 175:19
  176:3 177:10,23
  178:15 179:8,16
  253:14,14 266:4
  274:4

**professional** 13:8
  61:3

**profile** 127:9,11

**profiles** 80:2,3,10
  80:14

**program** 10:10
  97:9 98:11,12,14
  98:17 99:2 100:6
  105:13,22 230:5,9
  230:24 231:6

**promotion** 9:21
  47:25

**pronouncing**
  269:9

**proper** 69:3
  128:18 138:16
  164:25 180:14

**propose** 206:4

**proposed** 115:21

**proposing** 207:13

**prosecution** 65:6

**protocols** 62:17,21

**provide** 27:22
  33:11 58:21 67:15
  68:19 100:19
  147:20 201:9
  202:21 203:9,15
  204:5 205:15
  206:2,15 207:14
  269:6

**provided** 21:1
  30:5,9,19,23 43:24
  44:1,4,8,10 45:5,9
  47:6,7,18 76:4,6
  122:18 169:20
  181:19 195:18
  202:15,25 204:21
  210:7,9 214:23
  227:5 230:1
  248:20,23 249:2,3
  249:17 251:20,25
  267:8 270:3

**providers** 46:1

**provides** 69:2
  117:7,18 224:16
  225:1 256:7
  270:19

**providing** 25:3
  31:4

**provision** 36:20

**provisions** 1:23

**public** 278:19

**publications** 60:5
  60:14,25

**pull** 28:8 93:24
  95:20 96:25 97:2
  98:23 101:20,22
  102:17 135:14,20
  219:9,17 230:16
  230:16 231:2
  250:22 254:6
  257:19 261:20
  265:5 267:11
  270:5

**pulled** 147:22
  168:15,19 250:25

**pulling** 147:18

**purchased** 168:1
  169:2 178:25

**purchasers** 232:13

**purchasing** 169:15
  174:4,7 212:25
  213:7

**pure** 128:5

**purity** 97:11 100:8
  141:20 142:5,7,23
  143:5,9

**purported** 169:9
  208:16 216:8

**purpose** 265:25
  266:2

**purposefully**
  145:8

**purposely** 145:11

**purposes** 36:14
  95:25

**pursuant** 1:22
  274:21

**pursue** 65:5
  213:25

**put** 30:16 74:8
  80:23 101:10
  106:15 111:4,8
  134:22 135:6
  151:8 196:7 242:7
  244:18

**puts** 262:3

**putting** 47:4,14
  52:21 107:11
  111:21 164:23
  251:18

**q**

**q7** 18:5 81:9 83:11
  105:7 266:9

**q7a** 57:8,17 80:1

**q9** 11:10 242:1,5
  242:17 253:7
  254:15,18 255:5

**qa** 206:4 223:20

**qa1003** 39:10

**[qa1016 - really]**                                          Page 36

**qa1016** 39:21
**qa1034** 40:6
**qa973** 37:17
**qa974** 38:2
**qa983** 38:13
**qa990** 38:24
**qualified** 231:12
**qualify** 19:3
  117:21 247:8
**qualifying** 267:21
**quality** 11:10 30:7
  57:8 60:23 97:10
  100:8 131:13
  139:15,21,24
  140:1,2,3,4,6,16
  152:19,23,24,25
  153:2,6,11,12,20
  153:25 154:5,7,16
  154:22,25,25
  155:6,8,12 156:3
  156:10,13,22,25
  157:5,10,11,17,22
  157:23 158:5,11
  180:20,24 194:9
  195:16 196:24
  197:9,9,12,18,21
  198:16 200:4,9,18
  200:21 210:10,13
  231:21 232:25
  239:12,13,16,18
  239:20 240:13,18
  241:8,11,12,15
  254:15 256:6,9,10
  266:4,6 269:1,4
  270:17 271:5,9,19
  272:13
**quality's** 157:19
**quenching** 269:11
**question** 14:1,2,7
  14:9,10,15,15 15:8
  19:16 21:17 25:9

27:14 45:8,21
  62:20 63:7 65:14
  81:8,16,17 88:15
  91:11,23 93:8,12
  93:17 96:5,8
  97:21,23 99:16
  102:14 109:3,14
  115:16 117:10
  119:4,8,8 120:3,6
  126:15 127:24
  128:7,8,12,20,23
  129:7 132:16,20
  132:21,22 133:9
  135:22 138:9
  140:8 141:14
  142:14 144:5
  151:6,18 152:5
  155:22 161:3
  169:22 175:24,25
  176:19 181:14
  184:7,10 185:21
  186:14 191:3
  195:5,7 197:8
  198:22 199:19,20
  199:23 201:23
  202:1,4,5 216:19
  222:15 223:9
  227:18,19 228:1,5
  234:1 248:2
  249:23 250:4,8
  251:4,5 252:17,23
  254:5 259:15
  260:13
**questioner** 244:3
**questioning**
  272:22,24
**questions** 13:4
  14:17,23 99:19,22
  116:17 129:11
  144:9 244:2,15
  261:15

**quick** 1:8,13 9:5
  9:16,22 12:2,18,22
  13:7,12 15:19
  28:21 29:21 31:19
  31:20,25 46:13,20
  48:18 50:6 51:21
  54:24 55:2,4,15,23
  55:25 56:2,3,5,10
  56:12 59:17 77:22
  85:3 92:18,25
  93:5,8 104:21
  109:6 110:8
  133:18 138:1
  145:7 146:25
  167:14,21 196:3
  203:25 204:2
  217:25 222:15
  244:11,22 250:8
  262:3 263:10
  274:7,12 276:5
  277:2,24 278:2,4
  278:12
**quickly** 237:1
**quite** 123:24
  139:19 152:4
  237:1
**quotation** 134:11
  134:15
**quote** 98:4,5
  100:11 134:22,22
  134:23 135:1
  138:3 161:16,17
  161:22 163:1
  257:3
**quoted** 137:5
**quotes** 98:3,14

**r**

**r** 2:1,3 3:1 4:1 5:1
  6:1 7:1 8:1 237:11
  237:11 276:1
  277:3,3

**r1** 10:3 50:1
**ramirez** 8:15
**randomly** 223:15
**range** 68:2
**raspanti** 8:10
**rate** 35:9,25 36:6
**raw** 159:17,25
**reached** 210:5
**reaction** 214:3
**reactive** 10:4 50:2
**read** 15:13 80:6,8
  81:18,20 86:6,12
  93:7,10 96:3,7,9
  97:23,25 100:11
  108:20 109:4
  120:5 129:6,8,12
  141:25 142:3
  149:14 195:6
  201:19 202:3,6,7,9
  226:12,15,15
  227:24 245:1,2
  255:15 257:4,5
  258:11 259:4,5
  262:11,11 264:19
  269:14,19,19,21
  276:9 278:5
**reading** 97:14,18
  101:3 109:3
  149:10 181:8
  215:25 247:17
  255:22,22 269:14
**ready** 69:25
  148:16 149:15
**real** 81:10 157:17
  160:8,10 161:3
  191:10 226:2
  271:25,25
**reality** 231:11
**really** 18:17 27:12
  30:4 41:10 64:9
  89:23 140:8

164:23 178:12
200:17 202:15
207:6 210:1,1,3
235:18
**reason** 13:20
14:24 18:1 36:19
132:21 153:14
154:2 155:22
192:13 250:6
276:11 277:6,9,12
277:15,18,21
**reasonable** 117:25
119:10,17 121:5
**reasons** 154:15
275:3
**recall** 17:23 22:11
23:6 24:9 25:3
54:1,3 63:23,25
64:11,13,14 66:1
78:2 84:14,17
85:5,9,11 140:21
140:24 141:22
148:8,25 149:2
151:2,5,11,19
171:11,17,18,20
178:15 179:15
187:3 198:2
212:18,21,22
213:21 220:2
227:1 235:14,17
237:13 238:20
239:23 240:4
246:10 267:15,25
**recalling** 238:18
**recalls** 10:7 84:24
201:10
**receipt** 197:7
275:1 276:18
**receive** 31:19
70:23 184:24

**received** 33:3 47:9
150:20 164:17
170:24 178:22
183:14 184:19
193:12,19,21
209:6
**receiving** 148:8,25
149:3 171:25
**recognized** 156:14
156:17
**recognizes** 156:21
**recollection**
199:15 218:23
233:25
**recommend** 64:13
**reconstructing**
220:18
**reconstruction**
221:19
**record** 1:23 12:7
13:6 19:16 29:13
29:15,16,19 46:14
46:18 52:15 64:6
77:17,21 92:17
93:1 95:2 96:2
105:11 108:19
110:2,6 113:11
115:18 117:11,12
117:16 128:11
136:14 137:21,25
138:1 146:20,24
149:13 167:9,13
167:18,20 174:9
183:2 194:14
195:19,20,22
196:1 217:13,18
217:20,24 218:4
219:20,21,25
223:18 237:2
240:24,25 241:2,5
244:4,5,8,8 245:3

247:14 254:7
255:1 258:6,7
259:5 261:5,11
263:2,4,5,9 265:8
265:9 268:15
273:3,5,6 274:14
**recorded** 115:18
**records** 34:8 41:10
46:8
**recounts** 110:15
165:6
**recovered** 173:7
232:19
**recovery** 2:18
195:10 232:2
**recycled** 195:14
**red** 6:5
**redirects** 162:23
**reduced** 230:5,8
230:23 231:6
**refer** 55:22,24,25
58:14 66:6 69:18
75:20 96:23,23
112:16 121:12
122:2 123:5,10
131:12 138:21
140:6 163:25
169:14 187:11
216:11,24 224:19
240:8 245:15
247:12 257:2
**reference** 53:22
65:15 78:1,2 92:6
92:11 101:22
106:16 115:4
118:4 121:15
127:11 129:20
130:12 136:6
139:10 142:5,7,8
161:21 162:18
164:15 173:15,17

174:18 175:14
187:16,17,17
188:2,6,9,13,18
211:15 218:25
219:1,10,13,15
220:6 224:6
225:19 230:5
238:21 240:10
253:9
**referenced** 24:17
48:10 111:6
125:17 141:1
153:2 160:18
161:24 164:18
174:15,19 175:10
182:5 185:11
186:21 191:18
199:6 216:24
221:4 222:9,17,24
222:25 225:11
226:6 227:13
230:17 231:15
238:19 255:5
259:12 260:6,7
276:6
**references** 86:24
98:5 135:18
174:19,24 175:15
187:4,19 188:17
207:21 214:24
216:10 217:10
219:10 220:5
229:5
**referencing** 49:6
122:6 171:8
174:10 209:21
220:16 228:9
234:10 235:21
**referred** 21:4 24:3
70:8 188:22
206:18 254:17

**referring** 53:13
59:12 67:10 75:22
76:7 81:15 88:6
100:1 101:4
102:21 105:12,18
105:20 107:10,12
107:14,17,25
112:23,25 114:19
120:21 121:13,23
123:3 130:20
138:12 140:25
152:24,25 162:15
168:8,9 169:25
172:4 173:10
174:9 179:11
184:11 188:1
199:20 207:20
217:3 220:20
226:14 239:22
254:4
**refers** 58:15 92:15
99:9,24 100:12
106:14 107:18
131:13 132:11
136:5 138:22
147:9 265:25
**reflect** 256:11
**reflected** 43:9,17
51:23 52:4,8
60:11
**refresh** 57:24
199:15 218:23
233:25 266:18
**refusal** 201:8
202:20,22 203:8
203:14 204:4
206:1 207:12
208:14
**refuse** 207:6
**refused** 184:2
206:15 208:6

216:11,13,25
**regard** 43:21
58:22 108:2
**regarding** 31:5
71:16 84:16
101:13 159:17
160:13 178:24
179:15 245:12
**regardless** 35:15
36:11 132:9
133:13 271:23
**regional** 72:21
**registration**
275:16
**regulated** 59:11
**regulation** 63:17
92:3 133:20
**regulations** 101:15
103:12,19 104:19
129:22 132:15
133:18 147:15
149:8,22 150:1
159:5 253:2
**regulators** 85:21
86:14
**regulatory** 30:8
60:23 72:12,14,17
72:23 73:2 87:1
90:20 110:16
123:17 133:17
197:7
**relate** 17:12,19
60:17,20 61:1
62:24
**related** 17:6,14,19
17:21,22 18:2,4
20:13 21:11 55:14
62:25 84:11
167:22 168:7
206:4,25 246:21
266:6 275:7

**relates** 30:7 202:1
202:20
**relating** 139:24,25
140:15
**relationship** 42:16
**relationships**
185:14
**relative** 18:5 57:17
94:1 97:3 101:5
106:15 107:13
108:1 109:13
130:4 169:14,16
169:17,24 174:19
179:12 187:15
200:16 229:6,20
232:19 235:25
241:13,14 243:15
246:17 250:9
264:25
**relatively** 70:17,20
229:19 234:7
**release** 159:18,25
190:8,9,10,12
**released** 78:11
**relevance** 89:15
133:7 164:23,24
172:9
**relevant** 76:24
77:2,7,10,11 79:4
83:25 88:1,8,15
89:4,11 90:9
178:4,13 179:4,12
179:22 185:8
208:21 210:1,3,6
235:18 248:5,10
248:24
**reliance** 78:4
112:11
**relied** 48:8 49:3,9
49:19,21 51:9,14
52:13 77:23 111:3

112:2,17 113:7
214:11 262:18
**rely** 124:11 269:24
**remainder** 110:20
**remember** 15:8
22:16 24:12,13
120:3,6 147:24
207:16 228:12,14
**remind** 115:13,15
**render** 103:25
128:25
**rendered** 33:5
**rendering** 107:20
**renders** 106:20
**repeat** 14:8 31:12
45:8 81:17 141:15
237:9 251:3
**repeatedly** 238:1
242:10
**rephrase** 15:21
93:16 128:23,23
134:9 175:25
**replaced** 157:14
**report** 10:24 11:3
11:6,7 30:17,17
31:7 33:25 48:10
48:11,17,19,23,25
49:8,12 52:14
53:6 62:19 65:9
70:2 71:18 75:19
77:23 78:5 84:5,8
91:7,8,10 92:6,8
93:24 97:3,13
101:4,13 102:11
106:24,25 107:7,9
107:10,12,23
108:17 110:9,13
110:15,21,25
111:2,7,13,14,20
113:1,4,8,8 119:24
120:2 121:8 122:3

122:12 125:20,24
126:3 127:16
129:1,18 130:21
134:5 145:19
147:10 152:14
158:4 161:1,13
163:23 165:1,6
167:17 168:20
169:13 171:1,5
175:9 177:20
178:1,11,13,21
179:4,8,12,23
181:1 182:8
186:24,25 194:13
194:18,22,22,25
195:2 197:7
198:18 208:22,23
209:2 210:15,25
212:23 213:4,5
214:5,10,11,12
215:4,8 217:3,5,9
218:12,15 220:14
221:10,12 222:11
223:12 224:17
225:2 228:2 229:9
229:17 230:4
231:15,24 235:20
236:11 237:4,15
237:22 238:19,22
240:9,11 242:7
244:16,17 245:5
245:13,24 246:12
246:13 247:13
248:4,5,7,10,11,24
249:19,21 250:10
250:14,19,19
251:18 253:4
260:19 263:11
267:12 268:7
270:20,23

**reported** 1:19
143:3
**reporter** 12:4,6
13:18 14:4 97:16
115:17 148:7
229:13 260:24
262:3 273:1 274:9
**reporter's** 9:9
274:7
**reports** 126:5
182:3 232:6 269:7
**represent** 12:25
71:15 162:20
170:6 244:13
**representations**
173:3
**representative**
168:16
**represents** 104:10
108:25 111:6
**request** 11:13 44:7
76:4 172:1 251:1
261:7
**requested** 80:8
81:20 93:10 96:3
96:9 97:25 108:20
129:12 139:11
192:14,15 199:13
199:25 202:9
206:2 208:7 210:8
253:20 274:23
275:4
**requests** 47:1,5,10
47:11 48:4 50:8
50:13 123:16
204:21
**require** 118:18
124:4 145:2
190:15 191:5
**required** 126:20
126:23 127:17

129:4 143:23
144:11,15,21,24
190:12,14 191:2
197:11 278:13
**requirement** 79:9
80:1 191:9 196:16
196:22 197:17
266:9
**requirements**
66:20 67:7 69:13
81:5 133:17
253:23 254:2
**requires** 147:6
154:24 197:5
**requiring** 79:7,15
147:11
**reread** 53:6
**research** 44:20
**reside** 74:10
**resolved** 124:21
**respect** 36:20
68:21 81:12 94:4
95:23 103:18,24
126:7,20 127:9
130:12 141:20
147:17 160:23
169:10,20 170:12
173:3,15 175:8
176:3 194:11
214:16 234:22
241:17 243:18
273:2
**respective** 119:20
120:23 147:8
**respond** 99:18,22
**response** 47:10,11
48:3 73:20 74:6
74:16,17,22,23
75:8,10 76:4
171:25 172:7
188:1 204:23

205:16,19,22
206:1,8 207:19
213:19 214:17
215:6,22 216:21
248:17 260:8
**responses** 47:7,11
248:19,19 260:11
268:8,15
**responsible** 71:2
239:11,17 240:17
**responsive** 47:5
50:8,13
**responsiveness**
193:23
**rest** 205:22
**restate** 132:5
204:7
**restating** 133:24
**restrict** 256:14
**result** 31:19 33:4
47:21 71:22 94:5
**resulted** 145:25
**resulting** 97:11
100:9 269:11
**results** 160:13
**retain** 253:19
**retained** 16:1,4,17
19:21,24 20:20,21
22:23 23:2,9,13,18
**return** 276:13,17
**returned** 274:25
275:1
**reveal** 53:9 94:4
**revealed** 145:22
**review** 43:22,25
74:6 76:17 77:5
78:24 83:10,20,21
84:2,15 99:5
109:16 116:18
120:9 122:4,16
123:4 125:8

130:10,17,19
135:21 137:9
138:5 139:3
141:21 161:10
163:9,11,12
168:13 177:21,23
182:3 186:22
189:15 190:1
196:24 200:4,15
200:16 207:25
214:4,7,15 218:22
223:16 225:21
237:18,23 238:4,6
238:15,22 242:9
243:4,21,24 246:7
246:20 248:18
249:20 250:9,11
252:16 255:2,9
260:8,11,16 262:4
262:13 264:14
267:1,9,13,17
268:5,13,19,24
276:7
**reviewed**  44:22
45:1 46:7 48:8
51:9 52:20 72:25
74:21 76:3,9,12
111:19 116:2,5
134:21 135:4
137:14 139:12
140:14,19 166:9
167:4,22 168:6
178:6,7 182:7,10
182:15 183:15
200:10,19 214:9
215:12 223:20
237:15 238:4
239:1 240:21
241:7 242:4 243:1
243:11,23 246:17
247:4,11 248:13

249:18 251:19,20
251:24 252:1
260:1,20,22
265:18,20 267:9
267:15
**reviewers**  121:12
121:16,21 122:1,3
122:14 123:1,12
123:16
**reviewing**  73:25
74:2 78:25 79:2
161:6,7 162:14
215:3 225:22
**reviews**  73:20
74:15
**riddell**  3:22
**right**  14:13,23
15:19 18:13,24
20:22 23:7 28:12
34:22,24 38:4,5,14
38:25 39:11,22
40:7,8 48:16,24
49:23,25 50:24
53:25 54:12,13
55:17 66:16,24
70:6 71:19 78:7,9
78:15 86:19 90:5
96:6 101:17,23
105:9,14,24 110:8
110:11 112:5,9
113:20 114:7,25
115:10,11,23
116:24 118:9
120:25 121:7
123:18,19 125:20
135:16 136:10
138:14 140:10
142:22 144:24
147:1,4,5,8,13,16
147:21 150:5,11
155:1 156:18

157:8 158:3,23
161:11,18,19
165:7 166:13,18
167:14 170:25
171:13 173:5
175:12 181:10
189:7 190:25
193:11 194:24
198:8 200:20,25
201:3,12,14,16
202:23 203:11,18
203:19,23 204:14
205:9 207:11
208:17 218:7,13
220:9,21 224:7,9
227:8,14,21 228:7
234:12 240:3,15
242:2 243:10
244:1 249:21
250:15 251:13
252:2,20 254:2,8
254:18,19 259:1
261:21 267:18,19
268:5,13,20
**rigor**  256:10
**rise**  104:25
**risk**  9:20 10:5
11:10 47:24 50:4
159:8,11 164:25
173:6 185:8,12,22
241:25 242:5,16
250:21 251:8,16
252:7,19 253:3,11
253:13,13,15,18
253:23 254:2,15
254:18 255:7,10
256:9,10,15 257:3
259:13 260:20
263:12,14,22
264:7,20,25 269:6
270:19 271:5,19

271:21,23 272:9
272:14,18
**rivero**  2:19
**riveromestre.com**
2:21
**rld**  115:23
**road**  3:18 6:9,14
13:10
**robert**  1:4 274:4
**rockett**  7:21
**rockett.shevon**
7:24
**rogue**  155:13
156:4 157:11
**role**  63:17,19
252:10 272:9
**roman**  240:11,16
**room**  13:20 14:19
53:14 54:1
**rooney**  8:4
**rose**  5:4
**rosemarie**  3:22
41:2 42:12,13
43:24
**rosemarie.bogdan**
3:24
**ross**  5:5
**roszel**  6:9
**roughly**  110:12
**routine**  185:25
**row**  128:9,13
**rpr**  1:18 275:15
**ruben**  2:13,16
**rubenstein**  3:12
**rubensteinb**  3:15
**ruler**  1:21 2:4
**rules**  1:22 13:16
**running**  224:4,4,6
224:13,14

**s**

**s** 2:1,3,8 3:1 4:1
5:1 6:1 7:1,12 8:1
9:11 10:1 11:1
277:3
**safety** 113:23
116:13,22
**sagoldberg** 4:6
**salary** 31:19
**sale** 177:10
**sanger** 1:20 2:4
12:13
**sarah** 5:20
**sarah.zimmerman**
5:23
**satisfied** 74:17,23
74:24 75:2 193:6
266:21 267:5
**saw** 197:2,15
215:17 220:23
238:1,25 240:20
241:6 242:3,25
243:11 247:24,25
259:12 260:4
**saws** 86:13
**saying** 13:21,22
19:8 21:19 27:8
57:1 84:1 86:8
89:15 90:10 98:18
108:7,8,11 119:11
153:17 155:2,4
156:20 157:15
190:9 192:9,17,19
192:20 193:10,12
194:21 196:18
197:15 198:3
208:4 219:12,16
232:21,22 236:18
251:18 258:20,23
**says** 13:20 35:14
35:23 36:9 56:21

57:7,19 58:10
73:4,5 85:19
86:16 87:3,24
96:17 100:14,14
100:17 101:4,8
103:11,22 106:3
107:9,10,12 108:6
109:9,11 119:22
122:8 133:20
138:20 146:2
149:23,24 150:3,7
150:12 161:19
168:23 200:1
205:11,14 211:17
218:14 221:3
223:2 224:2
230:15,19 232:4
232:11,17 240:17
255:7,16,24 256:4
258:4 266:2
268:25
**scheduled** 186:14
**schedules** 186:8
**scientists** 87:6,14
**scope** 43:22 62:22
83:25 116:9
119:22 120:1,14
121:6 125:14,16
125:20 128:15
182:13 236:10
237:4 252:14
**scripts** 5:19,20
**scroll** 266:12
**sec.501.** 10:14
**second** 35:5 57:6
59:7 78:7 85:16
86:22 100:4 103:9
134:5 159:20
160:8 168:22
204:19,25 205:3
205:23 208:13

217:17 222:8
255:9,15 267:21
**seconds** 236:23
**section** 35:8,23
92:15,15 103:9
135:8,12,23 136:7
136:21,25 138:7
140:22,23 141:7
165:1,2,3 167:15
167:16 172:18
176:9,12,13 188:5
204:11 223:13
226:13 228:1
239:25 240:2
244:16,23,24
245:11 255:10
257:7 268:25
**sections** 136:20
137:7,19 138:4
270:3
**see** 29:5 36:2
49:11,13 58:10
78:6 85:19,23
87:12,24 95:21
102:16 121:17
127:3 128:2,6
138:3,7,9,12 142:5
142:9 163:18
168:2,3 176:12,13
182:15 186:22
199:7 204:20
205:5,10,11,14
205:17,18,19,24
205:25 206:1,7,9
206:16 213:14
215:16 216:14,25
220:19,25 221:1,2
221:25 222:16
223:23 224:1,5,14
225:3 226:23
227:10 228:21,23

229:1,2 231:3
240:11,16 245:12
245:14,18,19
246:5,6,11 251:10
251:11 253:13
254:12 255:7,18
256:1,2 260:5
263:22 265:22,24
266:1,10,13,19
**seeing** 219:14
220:7 257:13
258:25 259:7
**seen** 46:23,25 47:1
72:24 85:2,8
152:12 178:20
179:10,22 184:21
184:21 193:22,25
198:2 202:11
212:18,22,22
233:9 246:23
247:21,23 248:22
258:17 265:13
**sees** 87:10
**seize** 64:24 65:2,3
**seizures** 74:4
**seldom** 166:22
**selected** 223:15
**selection** 244:20
**send** 40:25 41:2
123:16 207:3,3,7
208:11
**senior** 153:14
154:2,4,14,21
155:5,17,23 156:1
156:7,17,20
157:18
**sense** 89:20,24,25
140:8 154:12
249:2
**sent** 148:17,18
276:14

[sentence - sorry]                                                              Page 42

sentence  121:21
  134:5 138:14
  168:5,23 181:12
  202:1 255:24
separate  55:21
  92:24 93:13
  119:13 170:1
september  186:19
series  2:18 149:21
  260:3,23
serious  149:6,25
  168:17,17 212:6
  212:13 213:24
  215:19
seriously  151:17
  190:21
served  274:18
services  11:6 26:8
  29:11 30:10,20,24
  33:5,12 41:22
serving  32:24 33:2
  33:4
set  34:20 66:2,14
  66:22 67:21 78:22
  78:25 80:4,9,18
  81:4 83:15 167:22
  168:6
seth  4:4 244:11
  248:14 249:5,12
  249:22 258:1
  261:21 262:9
  268:1,22 272:19
sets  67:21
setting  184:7,10
seven  37:10 40:19
  42:5
shane  8:15
sheet  121:13 122:7
  276:11
shevon  7:21

short  77:15
shorthand  274:9
should've  207:17
  207:17 208:5,10
  210:7,9 232:21,22
  232:23 233:1
  234:2,8 235:4
show  92:11 98:24
  103:6 115:3,6,11
  115:24 192:24
  215:13 233:25
  257:23 258:2
  262:15
showing  115:20
  261:7
shown  142:23
  274:19
shuffling  97:20
side  53:25
sign  15:13 276:12
signature  9:9
  274:22,25 275:2
  275:14
signed  246:2,3
  248:7 276:20
significant  34:19
  104:24,24
significantly  97:9
  100:7,12,17
similarly  170:11
simply  59:4
  100:15 194:15
  211:8 259:11
  264:6
simultaneous  75:4
  107:1 228:25
  258:22 261:22
single  37:2 95:16
  104:8,9 108:23,24
  119:25 163:12

sir  97:14 247:16
  251:3 252:23
  254:12 255:4
  257:22 258:18
  259:7 265:11
  267:23 268:18
sit  14:24 53:1
  67:15,20 68:4
  78:15 79:5,13
  83:13 85:5,10
  135:16 136:4
  139:14,22 141:23
  142:20 159:6,15
  159:23 160:3,11
  166:6,10,24
  175:12 177:15
  191:20,23 192:2
  197:4,19 229:14
  236:3 241:18,22
  242:14
site  70:9,11 228:16
  251:21
situation  10:22
  17:7,8,21 20:13
  24:3 27:24 31:1,2
  31:18 106:7
  109:10 143:18
  155:14,16 156:4,6
  156:8,15 166:25
  169:18,24 172:19
  195:12 210:7
situations  23:3
  27:20 54:21
  106:10 168:18
  169:5 179:2
  181:23
slack  1:20 2:4
  12:12
slackdavis.com
  2:6 276:2

smith  6:14
smp  257:25
  265:22 266:3
smps  267:5
sodium  269:11
solco  4:3
sold  170:8
solely  66:21
solid  164:18
solutions  275:16
  276:23
solvent  195:10
  232:2
solvents  173:7
  195:14 232:19
somebody  97:20
  155:24 169:5
  176:25 232:22,23
  272:23
someplace  171:19
  226:25
sop  139:23 140:15
  264:20
sop's  161:6
sops  69:18,19,21
  138:21 139:1,2,3
  139:10,11,12
  140:5,18,20
  158:10,16,20,22
  159:8,11,13,17,24
  160:5,9,12,15,20
  160:21 185:8,12
  185:24 264:18
  266:21
sorry  15:15 19:14
  26:3 42:21 58:25
  59:15 64:5 67:3
  81:17 102:8 104:5
  104:6 107:3
  108:15 109:20
  157:25 176:8

[sorry - statements]                                                    Page 43

182:25 183:18
184:9 212:21
217:17 223:7
230:14 236:8
250:19 270:6,21
**sort** 74:3 130:9
196:9 203:4
205:21 269:15
**sorts** 74:1
**sound** 119:17
**sounds** 117:25
119:10 121:1,5
184:3,3
**source** 98:7,20,22
184:6
**sources** 75:25 76:1
97:17 98:2,8
**south** 4:5,9
**space** 87:8
**speak** 28:6 86:5
87:25 132:18
142:21,22 166:12
173:6
**speaker** 102:20
**speaking** 75:4
107:1 132:12,14
132:16 135:19
228:25 250:6
258:22 261:22
268:10
**speaks** 203:11
204:8
**spec** 131:14
**special** 47:20
263:23
**specific** 32:21
66:15,22 67:15,22
68:20,25 69:8
80:17 81:13 96:23
98:7 106:2 109:10
109:16 110:21

112:14 118:17
134:14 139:15
140:3 152:1,10,12
158:14 161:20
163:4 168:14
177:6 192:6
212:23 213:5
218:25 222:25
225:18 226:7,13
228:12 234:1
243:4 248:19
254:2 256:5,15
261:14 267:23,24
269:23 270:18
272:24
**specifically** 79:15
85:9,11 111:8
135:20 136:5
140:14 167:3
181:3 222:17,24
225:14 230:21
253:11
**specification**
160:13
**specificity** 253:22
**specifics** 31:23
**specified** 179:15
**specify** 134:18
175:13
**spectrometry** 87:7
**spectrum** 63:20
**speculate** 24:12
25:16 51:5 190:24
209:18,23
**speculating**
166:18
**speculation** 41:15
86:3,11 126:14
128:5 129:3
172:14 176:24
177:1 206:22

**spelled** 195:17
197:10
**spend** 31:22 34:1
141:21 257:5
**spending** 41:13
**spent** 32:1 34:9,11
41:6
**spoken** 26:10 28:4
29:8
**sponsor** 113:13
**sponsored** 28:10
**spreadsheet** 34:6
**st** 5:22 58:15 86:24
**stamp** 199:5
217:16 218:2
222:5 248:15
251:2
**standard** 11:12,15
69:12,14,19,25
79:7,14 83:16
198:15 257:16
271:20
**standardize** 266:5
**standards** 79:24
80:17 81:3 82:18
88:1,6,7,11,11
113:23
**standing** 69:14
147:11
**standpoint** 130:9
272:14
**stands** 147:3
**stanoch** 2:8
**start** 13:5,25 15:9
109:23 259:6
**started** 13:17 93:8
99:23 177:7
180:10
**starting** 60:6
115:16 121:21
134:5

**starts** 176:9
205:20 222:20,21
244:17
**state** 1:19 7:17
13:6 56:17 97:3,7
97:8 100:5 134:7
145:21 152:18
161:14 167:19,21
179:25 198:18
211:8 231:25
257:8 274:10
**stated** 1:23 66:25
78:12 79:19 84:9
86:6 89:23 95:7
104:15,16 147:18
147:23 180:21
190:18
**statement** 10:6
56:25 75:1 84:22
85:14 86:23 87:18
87:22 95:11,22
96:1 97:4 98:13
100:19 101:19
102:5 124:19
138:20 146:3
147:21 152:6,7,12
153:15 154:17,24
163:7 180:6 181:4
181:16,17 201:18
202:17 204:3
209:9,10,15
214:22 218:16
219:7 220:8
221:11,18 223:11
224:10,16 225:1
225:20 226:7
229:16
**statement's** 180:7
**statements** 84:15
84:19 174:20
175:15 177:20

224:20 226:25
229:22
**states** 1:1 35:8
73:2 74:10,14
87:5 91:24 92:5
95:12,14,16 96:10
104:21,21,22
122:6 135:20
138:15 223:13
274:1
**stating** 104:16
108:22 122:12
222:1
**statistician** 61:16
**status** 116:21
165:12
**statutory** 113:22
**steering** 40:23
**stenographer**
158:2 261:2
**stenotype** 1:19
**steps** 180:1 181:5
182:18
**sterile** 20:13
**steven** 3:16 4:18
**steven.hunchuck**
4:21
**stick** 144:7
**stop** 64:20 211:6
213:16,17
**stopped** 180:16
211:21
**stoy** 8:9
**street** 2:9,14 3:13
4:5,9 6:19 7:7,12
7:17,22 8:5,11
275:17
**stretching** 18:17
**string** 221:10,14
**structure** 117:21
238:25 239:3,5

**studies** 119:19
120:12,24
**study** 121:22
**styled** 1:16
**sub** 55:19,19
**subchapter** 10:14
**subheading** 158:3
**subject** 10:21 85:8
237:3
**submission** 80:12
120:17 172:22
**submissions**
124:20
**submit** 113:13
114:11 118:25
119:5,15,19
120:11,24 127:15
253:18
**submitted** 116:23
125:4,22 265:2,3
272:3
**submitting** 120:23
**subnames** 55:20
**subparagraph**
121:20
**subparagraphs**
121:11
**subpotent** 143:17
**subscribed** 278:14
**substance** 53:9
84:12 256:6
**sued** 73:15
**sufficiency** 214:16
214:17
**sufficient** 97:8
100:5 138:5 214:4
**suggest** 233:15
**suggested** 187:6
**suing** 25:20
**suite** 1:21 2:4,14
2:19 3:10,13,18

4:14 5:5,22 6:5,14
6:19 8:5 275:17
**summary** 111:7
**summer** 166:3
**supplement**
189:12,17,17,19
**supplied** 218:18
226:9
**supplier** 185:6,13
**suppliers** 180:2
181:5 186:9
232:14,22
**supplies** 187:22
**support** 102:4
119:19 120:25
147:20 201:15
217:7 220:8
224:16 225:1
226:7 229:16
257:14,24 258:25
259:8,16,21
**supports** 201:18
204:3 218:15
219:6 221:11
223:11 225:19
260:16
**suppose** 41:15
177:1
**supposed** 80:9,13
81:23 82:7 99:18
**sure** 13:23 15:18
15:21,22 18:19
24:19 25:9 27:12
27:13 37:7 44:15
45:14 46:12 50:23
52:1 63:10 64:5
65:15 68:5,7
69:20 72:5 77:16
81:2,4 82:4 90:8
93:11 98:4 99:13
103:7 106:17

108:21 115:17
119:3 126:2,14
135:3,17 136:10
137:12 139:9,11
139:19 140:5,7,10
143:13,14 144:10
146:19 149:3
152:4 153:24
158:8 159:14
170:3 171:19
172:8 176:1
185:15 189:11
191:24 195:3
196:3 214:7 219:5
221:15 232:24
236:24 237:25,25
238:17 244:19
247:7,24 265:15
**surprised** 202:11
**suspect** 166:14
**swear** 12:4
**swedesford** 6:14
**swiss** 178:23
**sworn** 1:15 12:19
274:12 278:14
**system** 34:6 97:8
97:12 100:6,9
103:25 138:24
153:20 154:7,16
158:5,11 240:14
241:9,13,15 243:2
265:21
**systematic** 263:23
**systems** 60:23
99:9,15,25 101:8
131:14 138:16,23
147:7,12 239:21
242:22

| t | | | |
|---|---|---|---|
| **t** 5:10 9:11 10:1 | 227:2 236:1 238:8 | 198:12 220:24 | **teva** 3:3,3 10:24 |
| 11:1 277:3,3 | 238:9 249:4 | 231:18 | 10:25 11:4,4 12:9 |
| **tablets** 178:2 | **talks** 138:25 | **test** 81:12 89:17 | 12:11 13:1 30:24 |
| **take** 14:4,16 22:5 | 165:10 254:17 | 269:8 | 30:25 31:5 58:6 |
| 28:25 29:15 34:25 | **tamara** 1:18 274:9 | **tested** 146:8,11,14 | 169:15,16,25 |
| 45:6,10 46:11,12 | 275:15 | **testified** 12:19 | 170:1,9,13,18,20 |
| 51:17,21 69:6 | **tasked** 76:19 | 16:11,20,25 17:11 | 171:11 176:15,21 |
| 73:11,24 74:1 | **team** 206:12 | 21:21 23:10,14,18 | 177:9 178:1,14,22 |
| 77:14 78:4 82:15 | **tech** 8:15,16 | 24:2,16 61:6 | 179:7,15 180:1,4,8 |
| 86:22 99:4 109:24 | 244:20 255:20 | 113:6 215:20 | 180:15,19,22,23 |
| 109:25 121:7,17 | **technologies** 147:7 | 269:4 | 181:4,7,21 182:2,4 |
| 122:24 129:17,22 | 147:12 | **testify** 16:17 17:8 | 182:8,18 183:25 |
| 137:4 142:2 | **technology** 269:6 | 21:7 23:8 203:21 | 184:5,12,23 185:4 |
| 145:18 146:17 | 269:7 270:19 | 269:8 | 185:7,22 186:18 |
| 148:15 167:7 | 271:7,8 272:8 | **testifying** 19:11,20 | 187:25 188:11,18 |
| 170:25 194:10 | **teleconference** | 20:15,23 23:3,23 | 188:21 190:18,19 |
| 199:14 210:14 | 53:11,22,24 206:6 | 25:7,12,23 102:9 | 191:10,16,24 |
| 215:21 219:3 | **tell** 53:23 64:12 | 102:12 | 192:3 193:4,23,25 |
| 223:3 230:8 255:9 | 136:4,6 160:18 | **testimony** 15:1,5 | 194:4,6,8,10 195:9 |
| **taken** 1:15 182:18 | 181:20 184:18 | 18:20 21:2 25:3 | 195:15,18 196:11 |
| 211:5,16 212:5 | 200:8 204:18 | 35:24,25,25 36:6 | 196:13,18 197:1,6 |
| 213:19 274:8 | 212:2 219:6 | 36:21 56:24 57:17 | 197:21,24 198:3 |
| 275:8 | 223:10 226:6 | 77:1,9 82:6,7 89:7 | 198:14 199:8 |
| **takes** 194:16,21 | 247:10,10 255:21 | 90:15 100:24 | 200:12 201:7,8 |
| **talk** 65:21 88:5 | **telling** 109:9,12 | 106:24 107:6,23 | 202:10,13,22 |
| 101:25 155:7 | 166:19 | 128:14 136:13 | 203:3,6,8 204:4,5 |
| 158:4 206:24 | **ten** 16:9,10 22:14 | 153:22 193:9 | 204:21 205:12 |
| 217:2 230:11,20 | 30:1,2 120:1 | 196:4 216:1,3 | 206:8,20 207:4,17 |
| **talked** 22:22 | **term** 68:24 70:19 | 225:19 229:15 | 207:19 208:7,15 |
| 110:24 146:25 | 82:25 83:3 84:14 | 231:9 259:18,24 | 208:16,18 209:3 |
| 212:14 | 88:12 91:3,12 | 268:16 270:13,23 | 210:8,11,20,22 |
| **talking** 14:5 76:15 | 92:21 93:3,3,18 | 270:24 271:2 | 211:4,9,10,17,19 |
| 82:20,21 88:20,21 | 122:14 123:1,6,8 | 274:14 276:9,18 | 211:21 212:7,10 |
| 89:2 95:21 101:5 | **terminus** 3:18 | 278:8 | 212:10,12,15,19 |
| 101:23 106:7,8 | **terms** 21:10 65:18 | **testing** 61:1 79:7 | 212:25 213:6,11 |
| 107:16 149:1 | 66:19 94:13,21 | 79:15 81:4 83:16 | 213:19,24 214:20 |
| 169:4,6,16 170:18 | 106:4 118:14 | 87:8 88:14,22,23 | 215:21 216:3,8,13 |
| 170:19 198:7 | 131:14 142:17 | 89:3,4,8 230:5,9 | 216:16,20,25 |
| 202:18 206:12 | 163:20 170:23 | 230:20,22,24 | 217:6,17 218:2,17 |
| 207:1,25 208:4 | 173:24 184:21 | 231:6 233:21 | 218:19 220:3 |
| | 193:22 194:8 | 235:15 237:3 | 222:6 223:4 |

224:11,20 226:2,8
226:9,23 229:6,21
229:23 230:3
231:2,13,22,25
232:5,18,21,24
236:1 238:15
239:1,5 240:22
241:7,10 242:4,15
243:1,5,12,14,17
**teva's** 176:11
185:24 188:12,15
190:21 207:20
214:2,17 215:6
216:9 230:10
231:5 239:11,13
**texas** 1:19,21 2:5
5:5 274:10 275:17
**text** 262:11,12
**thank** 13:12 28:20
51:19 96:4 115:18
**thanks** 15:12
261:5
**therapeutic** 115:7
115:22
**therefor** 275:3
**thing** 14:18 84:4
106:5 122:21
147:23 157:1
170:1 221:11
226:16 236:10
**things** 56:16,22
89:9,11,16 106:13
111:18 114:3,4
115:3,9 124:3
128:15 131:15
138:23 143:3,6,9
180:8 189:7
216:12,25 220:25
241:20
**think** 28:7,9 30:16
43:16 44:5 50:18

67:14,21 73:4
92:5 94:11 98:21
102:15,15 105:16
111:8,12 114:18
114:20 123:14
127:3,13,18 128:7
131:19 132:19
136:17,17 141:4
182:5 183:24
191:2 194:1
195:14 197:15
202:24,24 209:15
209:15 216:13
220:4 222:14
224:19 225:24
227:15 228:4
230:11 231:1,3
249:7 259:10,11
262:15
**third** 85:14 86:23
225:10 227:4
232:2,14,22
**thornburg** 7:12
**thought** 43:25
84:11 168:16
239:14 269:15,16
271:9
**thousands** 67:11
**three** 7:6 17:17,18
18:16 53:25 124:3
179:25 227:4
248:6
**threshold** 142:12
**throckmorton**
275:17
**thursday** 1:16
**time** 12:3 13:1
14:5,6,14 15:10
16:25 17:4,5,6
19:5,18 20:9 22:7
22:14 23:17,18

24:1,10,15 25:2,4
26:18,25 27:7,9,16
28:11 29:7 31:23
31:25 34:1,5,8,11
34:20 41:6,8,13
42:23 43:23 46:18
57:17 59:23 70:22
77:18 83:17 109:5
120:15 123:17
126:17 128:8,10
137:4 138:2,5,6
141:21 143:15
145:2,24 146:21
146:24 147:8,8
148:9,20 150:14
150:19,21 151:3
165:17,23 167:10
167:13 171:10,14
174:2,6 175:19
176:4,4 179:21
185:8 194:1 196:2
200:7,13 201:9
202:16 203:9
204:5 206:13
208:11,19 209:13
217:24 218:22
219:25 220:19
221:20 224:21
226:21,22 228:3
228:14 235:9
244:2,8 247:21,25
249:15 257:5
264:15 266:17
267:9 276:19
**timeframe** 276:8
**timely** 253:16
**times** 16:24 17:10
18:10,22,23 29:24
128:8,12 132:2
162:3 194:19
245:11

**title** 34:24 49:2
68:15 162:12
**titled** 47:23 50:1
**today** 13:5 14:25
16:12 36:7,15,21
41:12 46:22 47:2
53:1 67:15,20
68:4 79:5,13
83:13 85:5,10
128:18 132:13,17
139:14,22 141:23
142:20 147:1
159:6,15,23 160:3
160:11 166:6,10
166:24 177:15
191:23 192:2
194:19 197:4,19
207:18 215:20
216:1 229:14
236:3 241:18,22
242:14
**today's** 12:2
**told** 137:10 200:13
213:16 253:1
260:11
**tom** 8:16
**tools** 255:25 256:5
271:22
**top** 78:8 100:2
158:13 159:20
160:24 162:6
163:20 192:6
205:23 206:19
207:9 208:13
240:17 258:8
**topic** 140:2 158:9
184:15 227:2
**topics** 129:1
**torrent** 5:15,15
170:19,21

**total**  37:19 38:6,18
  39:4,15,24 153:15
  260:12
**totality**  264:19
**totally**  155:12
  156:3 259:17
**tough**  212:2
**tower**  8:4
**toxicologist**  61:10
**track**  34:1,3,5,7
**trade**  8:5
**trained**  239:12,18
  240:17
**tranon**  267:14
**transcript**  13:24
  225:6 274:13
  275:1 276:6,20
  278:5,8
**transcripts**  216:23
  220:3 269:20
**translation**  261:1
**traurig**  3:5,9,13
  3:17 12:9,11,25
**treat**  117:5
**treatment**  62:13
  117:20
**trial**  8:15,16 21:21
  22:5 33:18 35:24
**trials**  116:14
**true**  41:3 45:6,10
  45:18 274:14
  278:8
**truthful**  15:1,4
**try**  144:4 183:20
  216:16,21 236:14
  236:16 270:8
**trying**  14:3,4 24:9
  27:1 82:5 90:2
  106:14 118:16
  119:3 126:24
  170:5,5,20 173:25

202:25
**turn**  35:5 46:25
  85:13 167:14
  251:6 254:20
  255:7 267:11
**turned**  264:11
**turning**  52:12
  54:14 255:4
**tv**  262:9
**two**  17:16,18,23
  22:3,22 23:5,20,20
  24:7,8,14,17 25:6
  43:20 44:9 54:20
  58:3,9 89:9,10,15
  109:4 163:25
  164:4 179:24
  180:23 197:12
  206:22 219:9
  221:14 246:4
  258:8 272:25
**type**  162:20 165:6
  167:25 168:25
  204:17 261:12
  264:2
**typical**  75:5,7,9
  88:12 123:15
  157:16
**typically**  63:24
  65:3,16,20 71:10
  72:7,19 114:14,21
  116:11,21 123:4
  143:8 148:4,6
  163:13 166:15,19
  187:14 188:6
  196:14

**u**

**u.s.**  4:3 10:16
  140:23 165:17
  177:11
**u.s.c.**  141:3,8,12
  141:16,19

**uh**  13:23,23,23
  32:4 34:4 99:11
  152:16 153:10
  161:8 177:19
  198:9,23
**ulmer**  6:19
**ulmer.com**  6:21
**unable**  222:1
**unaware**  230:3
**uncover**  180:11
  181:22 186:17
  214:24 216:17,21
**uncovered**  216:7
**understand**  14:6
  45:14 52:1 81:2
  82:4 86:9 88:4
  89:1 93:11 94:12
  106:18 120:21
  132:11 152:4,7
  153:5,24 187:11
  191:11 192:25
  193:17 196:4
  231:23 245:21
**understanding**
  19:10 41:21,22
  43:23 65:17 86:7
  90:19 91:2,12
  110:15 116:25
  119:11 122:13,18
  196:4,10 232:12
  241:14
**understood**  14:11
  18:19,20 85:21,25
  86:14 170:3
  191:11 272:17
**undertook**  85:20
  86:13 214:2
**unexpected**  84:10
**unidentified**
  102:20 142:11
  198:21

**unit**  110:7 152:24
  153:2,12,25
  154:22,25 155:6,9
  173:16,20 196:1
  232:6
**unit's**  154:5
  156:22 157:5,23
**united**  1:1 74:10
  74:14 274:1
**unknown**  176:17
  176:22 233:18,22
**unredacted**
  204:22 205:15
**unrelated**  55:5
  58:7,8 133:1
**unspecified**
  142:11
**update**  10:7 84:24
  239:8
**updated**  209:1
**updates**  51:22
  52:3 53:2
**url**  162:19,21
**usa**  3:3
**use**  20:17 34:6
  68:24 76:1 81:2
  82:25 83:3,9 93:3
  93:21 94:5 123:6
  125:10 139:5
  147:6,12 237:21
  256:5,7
**usp**  80:22 81:4
  82:21 83:4,5,6,14
  83:24
**usually**  34:19
  64:15 73:22,23
  74:6,20,25 75:2
  166:22
**utilized**  169:21
  171:12

**utilizing** 232:1
**utter** 128:5,7

**v**

**vague** 26:12 31:16
43:1 51:25 65:14
68:24 78:20 81:14
81:22 82:3 83:9
84:19 89:12 93:3
125:5 139:17
142:13,25 174:23
175:21
**vai** 166:23
**valeant** 7:3
**validation** 68:8,17
68:22 69:7 243:8
243:13,15,18
**validations** 69:3
**valsartan** 1:3 10:7
10:22 60:17,18
62:12 83:15 84:23
87:5,16 108:12
116:3,7,7 118:25
119:14 126:11,12
130:14,14,24
131:23 133:1,2
143:16,16 145:5
145:14,25 164:7
164:10 165:16
168:1 169:1
171:12,24 174:4
175:19 176:4
177:10 178:2,15
178:25 179:16
182:2 189:6,10
191:6 196:5,11,20
198:21 208:19
209:12 211:6,12
211:18 213:11
218:18 220:22
226:9,18 227:20
227:20 228:6

229:24 230:6,24
231:7 232:3
243:16 251:9
274:3 276:4 277:1
278:1
**vanderbilt** 3:6
**variety** 68:1
**various** 62:25 65:9
76:20 77:12 99:9
99:25 107:25
108:2 110:21
112:16 160:18
230:22
**vary** 158:22 159:2
**vendor** 195:10
**vendors** 232:2,14
**verbally** 13:21
**verify** 45:18 48:12
251:21 252:6
276:9
**verifying** 125:3
**veritext** 275:16
276:14,23
**veritext.com**
276:15
**vernon** 59:13
**version** 78:13,17
258:16 261:18,24
**versus** 170:18
234:23
**vicinage** 1:2 274:2
**victoria** 3:17
**videographer** 8:15
12:1 29:16,19
46:14,17 77:17,20
109:23 110:2,5
117:12,15 137:21
137:24 146:20,23
167:9,12 195:22
195:25 217:20,23
219:21,24 241:1,4

244:5,7 263:5,8
273:6
**videotaped** 1:8,13
9:17 11:16
**view** 76:23 77:6
83:24 125:15
129:23 130:3
180:22 182:19
183:12 184:23
193:6 215:21
218:17 221:21
222:1 224:11
226:8
**violated** 108:9
**violation** 96:15
106:20,22 131:7,9
131:11,16,22
132:25 263:14
**violations** 96:18
104:24 106:1,2,12
107:13,16,25
108:4,7 109:9,13
109:16 151:15,25
152:9,10 170:22
**virtually** 95:16
96:11
**visited** 58:6
**vitae** 9:13
**voluntarily** 64:14

**w**

**w** 4:8,14 237:11
**w1800** 13:10
**wait** 14:1,21 107:4
115:15 223:6,8
267:21
**wallack** 6:4,8
**walnut** 6:19
**walsh** 7:5,6
**walsh.com** 7:9
**walsh.law** 7:8

**want** 15:13 18:19
26:14 27:18 28:9
31:22 32:5 45:15
46:11 51:18 64:5
88:5 90:1 91:7
93:16 98:16 99:4
106:17 108:21
119:5 122:13,24
125:25 128:22
134:1,2,2,3 137:8
141:21,25 157:22
175:25 177:17
181:1 183:16
184:17 190:11
191:21 196:3
199:14 202:5
218:22 219:3,9,17
221:15 233:24
240:8 251:25
257:5,23 258:11
259:5 261:3
262:14,24
**wanted** 58:17
226:23 244:18
**warning** 10:18
71:18,21,25 72:3,8
72:18 73:2,6,14,18
73:19,20 74:6,7,10
74:16,18,22 75:6
95:16,17,19,19,20
96:12,13,16,22,25
101:22,24 102:6
124:19,21 147:19
147:20 148:3,4,5,5
148:8,12,17,18,23
164:1,3,11,17
166:14,15,17,19
166:21,22 246:14
246:16,18,19,20
247:7,8,20

**washington** 5:11
**waste** 128:7
  249:14
**way** 1:21 2:4 19:4
  19:19 50:16 51:1
  55:24 78:16 79:6
  79:14 84:11 85:6
  94:3 123:24
  131:13 135:17
  136:2 137:17
  141:24 142:21
  143:13 144:13,19
  159:16 160:4
  170:9,9 171:16
  172:6 174:3 175:1
  177:16 178:9
  179:6,14 182:16
  186:12 187:1,6
  191:15,24 192:3
  193:20 194:3
  197:1,5,20,25
  198:6 200:5
  207:20 210:10
  240:7 259:2 264:2
**wayne** 6:15
**ways** 17:20 256:22
**we've** 34:22 42:1
  46:10 110:24
  136:19 146:25
  260:10 262:6
  264:14 273:1
**wearing** 169:5
**web** 162:11 163:2
**website** 161:20,24
  162:1 163:18
**websites** 49:14
**went** 112:15
  131:19 138:1
  168:15,23 226:4
**west** 7:22 8:5

**whatsoever**
  131:25 133:4
**whiteley** 2:8,9
  12:15,16,16,17
**whitney** 7:22
**whorton** 2:18
**wide** 68:1,2
**wife** 55:13
**wild** 129:2 157:11
**william** 6:3
**willing** 91:7
**wisconsin** 13:11
**wished** 59:2
**withdraw** 117:9
  128:1
**withdrawn** 108:21
  127:7 176:3
**witness** 1:14 12:5
  16:1,4,12,21 17:1
  17:11 18:8,11,22
  18:23 19:1,12,12
  19:14,21 20:1,9,12
  21:6,22 23:4,10,19
  24:2,16 25:4
  29:11 32:24 33:2
  33:4,6,12 42:21,24
  51:6 53:10 57:7
  57:19 67:3 92:19
  93:6 95:6 97:22
  99:6 104:5 105:19
  107:3 108:15
  121:4 126:2
  127:14,23 146:17
  155:21 157:25
  172:16 173:12
  174:13 176:8
  182:25 183:16
  190:25 199:16
  204:12,14 205:2
  209:19,22,24
  215:10 223:7

  225:22 236:8,24
  244:3 245:2 250:4
  259:3 261:12
  262:21,25 265:10
  267:23 270:2,8
  274:12,15,19
  276:8,10,12,19
**witnesses** 269:20
**wmurtha** 6:6
**word** 20:18 81:2
  83:9 93:21 139:6
**work** 29:22 33:16
  33:18 34:15,19
  35:10,24 42:7,18
  43:21 44:18 47:20
  54:22 59:9,22
  129:10
**worked** 60:1
**working** 19:25
  31:20
**works** 123:23
  261:19
**workshop** 218:17
  220:20 221:7,19
  222:2 223:15,16
  223:24 224:1,12
  226:8 227:10
  228:19
**workshops** 223:14
  226:23
**world** 87:1
**worth** 275:17
**would've** 202:13
  202:14 271:4
**wrap** 273:1
**write** 228:1
**writing** 161:16
  179:4,12 197:6
**written** 13:24
  29:13 47:11 96:2
  108:19 113:11

  136:14 149:13
  159:3 167:18,20
  195:19 217:13
  218:4 219:20
  244:4 245:3,24
  247:14 258:6
  263:2 265:8 273:3
**wrong** 95:10
  103:17
**wrote** 228:4

| x |
|---|

**x** 9:1,11 10:1 11:1

| y |
|---|

**y'all** 236:25
**yeah** 50:23 78:10
  87:21 91:9 93:15
  105:17 141:7
  142:2 173:13
  186:25,25 196:21
  199:16 205:6
  219:3 223:8
  240:25 247:6
  254:23 258:13
  262:5 263:22
**year** 32:23 33:2,3
  33:6 34:12 161:15
  161:15 163:4,8,8
  163:10,12
**years** 17:2 18:18
  19:23 21:5,20
  22:15 23:20 24:24
  28:6,9 43:20
  56:13,18 59:18
  75:17 149:2
  180:10 182:23
  183:6 210:21
  248:13
**yesterday** 53:7
**york** 3:6,6,23 5:17
  5:17 7:23,23

[z - zoom]                                                                    Page 50

| z |
| --- |

**z** 203:3
**zh** 172:24
**zhejiang** 4:3
**zhp** 10:24 11:3
146:11 165:21,22
169:15,15,16,20
170:1,7 172:20
177:7,9 180:2
181:5,22,24 182:2
182:4,9,21 183:8
183:10,23 184:2,5
184:19 185:14,25
186:19 188:11,16
188:19,24 189:11
189:12 190:10,12
190:20,22 191:11
191:16,25 192:4
192:12,15,22
193:23 196:5
197:1,6,11,22,25
198:14,18 199:9
199:13,25 200:5,6
200:11 202:14,21
202:25 203:15
205:12,20 206:15
206:20 208:5,12
210:11,12,22,23
211:6,12,18,21,22
212:2,3,5,25 213:7
213:12,16,24
215:1 216:4,5,11
216:18,24 217:6
218:16,18 224:22
226:4,9 229:8,21
230:1 231:23
233:2,19 234:5,7,8
234:14 235:3
236:2,13 238:10
239:15 241:14
243:15 244:13,16

244:23 245:7,11
245:12,25 246:7
246:21 248:16,20
249:16,25 250:12
250:20 251:8,16
251:21 252:6,16
252:19 257:15,24
260:2,7 264:17
265:2 266:21
267:4,13
**zhp's** 169:10,21
171:13,25 176:22
178:16 180:9
188:13 189:10
191:6,7 201:8
203:8 204:4 260:8
263:14 271:19
**zhp00000417**
11:12
**zhp00000470**
11:12
**zhp0000417**
258:19
**zhp00469139**
11:15
**zhp0091263**
207:10
**zhp00912962**
10:23 199:5
**zhp00912963**
204:19
**zhp00912967**
10:23
**zhp01427917**  11:8
**zhp01427974**  11:8
**zhp01843066**
11:14
**zhp01843119**
11:14
**zhp0469162**  11:15

**zimmerman**  5:20
**zmick**  4:13
**zoom**  14:19,22,23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 1

1          UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF NEW JERSEY

2               CAMDEN VICINAGE

3

   IN RE: VALSARTAN,      §   MDL NO. 2875

4   LOSARTAN, AND         §

   IRBESARTAN PRODUCTS    §   HONORABLE ROBERT B.

5   LIABILITY LITIGATION   §   KUGLER

                        DISTRICT COURT JUDGE

6

7          ORAL AND VIDEOTAPED DEPOSITION OF

               JOHN QUICK

8              JANUARY 28, 2022

9

10      ORAL AND VIDEOTAPED DEPOSITION OF JOHN QUICK,

11   produced as a witness at the instance of the Defendants

12   and duly sworn, was taken in the above styled and

13   numbered cause on January 28, 2022 from 8:00 a.m. to

14   12:09 p.m., before JANALYN ELKINS, CSR, in and for the

15   State of Texas, reported by computerized stenotype

16   machine, at the offices of Slack Davis Sanger, LLP, 6001

17   Bold Ruler Way, Suite 100, Austin, Texas, pursuant to

18   the Federal Rules of Civil Procedure and any provisions

19   stated on the record herein.

20

21

22

23

24

25

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

John R Davis
SLACK DAVIS SANGER, LLP
6001 Bold Ruler Way, Suite 100
Austin, Texas 78746
512-795-8686
jdavis@slackdavis com

Layne Hilton
Conlee S Whiteley
David J Stanoch
KANNER & WHITELEY, L L C
701 Camp Street
New Orleans, Louisiana 70130
504-524-5777
l hilton@kanner-law com
c whiteley@kanner-law com
d stanoch@kanner-law com

Ruben Honik
HONIK LLC
1515 Market Street, Suite 1100
Philadelphia, Pennsylvania 19102
267-435-1300
ruben@honiklaw co

FOR PLAINTIFF MSP RECOVERY CLAIMS, SERIES, LLC:

Charlie Whorton
RIVERO MESTRE, LLP
2525 Ponce De Leon Boulevard, Suite 1000
Miami, Florida 33134
305-445-2500
cwhorton@riveromestre com

---

Page 3

A P P E A R A N C E S
(Continued)

FOR TEVA PHARMACEUTICALS USA, INC , TEVA PHARMACEUTICAL
INDUSTRIES LTD , ACTAVIS PHARMA, INC , AND ACTAVIS LLC:

Nilda Isidro
Glenn Kerner
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
212-801-9200
isidron@gtlaw com
kernerg@gtlaw com

Gregory Coates
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
973-443-3269
coatesg@gtlaw com

Brian Rubenstein
GREENBERG TRAURIG, LLP
1717 Arch Street, Suite 400
Philadelphia, Pennsylvania 19103
215-988-7864
rubensteinb@gtlaw com

Steven M Harkins
Victoria Davis Lockard
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
678-553-2100
harkinss@gtlaw com
lockardv@gtlaw com

Rosemarie Riddell Bogdan
MARTIN, HARDING & MAZZOTTI, LLP
P O Box 15141
Albany, New York 12212
518-724-2207
rosemarie bogdan@1800law1010 com

---

Page 4

A P P E A R A N C E S
(Continued)

FOR ZHEJIANG HUAHAI PHARMACEUTICAL, CO , LTD , SOLCO
HEALTHCARE U S , LLC, AND PRINSTON PHARMACEUTICAL, INC :

Seth Goldberg
DUANE MORRIS, LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103
215-979-1175
sagoldberg@duanemorris com

Coleen W Hill
DUANE MORRIS, LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103
215-979-1164
cwhill@duanemorris com

FOR HUMANA INC & HUMANA PHARMACY, INC :

Megan A Zmick
FALKENBERG IVES, LLP
230 W Monroe, Suite 2220
Chicago, Illinois 60606
312-566-4808
maz@falkenbergives com

FOR AUROBINDO PHARMA LTD :

Steven N Hunchuck
John Gisleson
MORGAN LEWIS
One Oxford Centre, 32nd Floor
Pittsburgh, Pennsylvania 15219
412-560-3300
steven hunchuck@morganlewis com
john gisleson@morganlewis com

---

Page 5

A P P E A R A N C E S
(Continued)

FOR MCKESSON CORPORATION:

Ellie Norris
D'Lesli M Davis
NORTON ROSE FULBRIGHT
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
214-855-8000
ellie norris@nortonrosefulbright com
dlesli davis@nortonrosefulbright com

FOR MAJOR PHARMACEUTICALS:

Luke Bresnahan
Daniel T Campbell
CROWELL & MORING
1001 Pennsylvania Avenue, NW
Washington, D C 20004
202-624-2500
lbresnahan@crowell com
dcampbell@crowell com

FOR TORRENT PHARMA INC & TORRENT PHARMACEUTICALS, LTD :

Brittney Nagle
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
212-390-4210
brittney nagle@kirkland com

FOR CIGNA CORPORATION, EXPRESS SCRIPTS HOLDING COMPANY &
EXPRESS SCRIPTS, INC :

Sarah L Zimmerman
Matthew D Knepper
HUSCH BLACKWELL
190 Carondelet Plaza, Suite 600
St Louis, Missouri 63105
314-480-1500
sarah zimmerman@huschblackwell com
matt knepper@huschblackwell com

2 (Pages 2 - 5)

Page 6

```
 1        A P P E A R A N C E S
            (Continued)
 2
 3   FOR HETERO LABS LTD:
       William P  Murtha, Jr
 4     HILL WALLACK, LLP
       The Galleria
 5     2 Bridge Avenue, Suite 211
       Red Bank, New Jersey 07701
 6     732-924-8171
       wmurtha@hillwallack com
 7
 8     Eric Abraham
       HILL WALLACK, LLP
 9     21 Roszel Road
       Princeton, New Jersey 08540
10     609-734-6358
       eabraham@hillwallack com
11
12
     FOR CAMBER PHARMACEUTICALS INC , KROGER CO , THE &
13   AVKARE, INC :
       Conor Donze
14     LEWIS BRISBOIS BISGAARD & SMITH, LLP
       550 E  Swedesford Road, Suite 270
15     Wayne, Pennsylvania 19087
       215-977-4093
16     conor donze@lewisbrisbois com
17
18   FOR AMERISOURCEBERGEN CORPORATION:
       Jeffrey D  Geoppinger
19     ULMER & BERNE, LLP
       312 Walnut Street, Suite 1400
20     Cincinnati, Ohio 45202
       513-698-5038
21     jgeoppinger@ulmer com
22
23
24
25
```

Page 7

```
 1        A P P E A R A N C E S
            (Continued)
 2
 3
     FOR PFIZER INC , VALEANT PHARMACEUTICALS INTERNATIONAL,
 4   INC , BAUSCH & LOMB INCORPORATED, AND ATON PHARMA, INC :
       Liza M  Walsh
 5     Christine I  Gannon
       WALSH PIZZI O'REILLY FALANGA, LLP
 6     Three Gateway Center
       100 Mulberry Street, 15th Floor
 7     Newark, New Jersey 07102
       973-757-1100
 8     lwalsh@walsh law
       cgannon@walsh com
 9
10
     FOR CVS HEALTH CO :
11     Kara Kapke
       BARNES & THORNBURG, LLP
12     11 S  Meridian Street
       Indianapolis, Indiana 46204
13     317-231-6491
       kara kapke@btlaw com
14
15
     FOR H J HARKINS CO , INC :
16     Geoffrey M  Coan
       HINSHAW & CULBERTSON, LLP
17     53 State Street, 27th Floor
       Boston, Massachusetts 02109
18     617-213-7000
       gcoan@hinshawlaw com
19
20
     FOR OPTUM, INC  & OPTUMRX:
21     Shevon D B  Rockett
       DORSEY & WHITNEY, LLP
22     51 West 52nd Street
       New York, New York 10019
23     212-415-9357
       rockett shevon@dorsey com
24
25
```

Page 8

```
 1        A P P E A R A N C E S
            (Continued)
 2
 3   FOR ALBERTSONS COMPANIES LLC:
       Christopher B  Henry
 4     BUCHANAN INGERSOLL & ROONEY PC
       Carillon Tower
 5     227 West Trade Street, Suite 600
       Charlotte, North Carolina 28202
 6     704-444-3475
       christopher henry@bipc com
 7
 8
     FOR MYLAN PHARMACEUTICALS INC , AND MYLAN LABORATORIES,
 9   LTD :
       Frank H  Stoy
10     PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
       One Oxford Centre
11     301 Grant Street, 38th Floor
       Pittsburgh, Pennsylvania 15219
12     412-263-4397
       fhs@pietragallo com
13
14
     ALSO PRESENT:
15     Shane Ramirez, Videographer
       Jason Novak, Trial Tech
16         Tom Karwacki, Trial Tech
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1            INDEX
                              PAGE
 2
 3   Appearances                    2
 
     Examination by Mr  Goldberg        10
 4   Examination by Mr  Stoy            44
     Examination by Mr  Hunchuck        78
 5   Examination by Mr  Abraham        100
     Examination by Ms  Nagle          126
 6   Further Examination by Ms  Ididro  143
     Examination by Mr  Davis          147
 7
 8
 9
            EXHIBITS
10
     NO      DESCRIPTION           PAGE
11
     Exhibit 26   Min Li Deposition        25
12
     Exhibit 27   Jucai Ge Deposition      32
13
     Exhibit 28   Jun Du Deposition        37
14
     Exhibit 29   Linda Lin Deposition     39
15
     Exhibit 30   FDA Observation         106
16
     Exhibit 31   FDA Observation         106
17
     Exhibit 32   Objections and Responses
18       To Notice of Deposition         137
19   Exhibit 33   Production Documents and
                  Deposition Transcripts
20                Responsive to Request
                  No  6                   139
21
     Exhibit 34   Flash Drive             146
22
23
24
25
```

3 (Pages 6 - 9)

Page 10

1    (Witness previously sworn)
2        VIDEOGRAPHER:  Here begins the continuation
3  of the deposition of John Quick.  Today's date is
4  January 28, 2022.  We are on the record at 8:12 a.m.
5        EXAMINATION
6    Q.  (BY MR. GOLDBERG)  Good morning, Mr. Quick.
7    A.  Good morning.
8    Q.  We're going to pick up with the questioning
9  regarding the ZHP portion of your report that we were
10  discussing yesterday.  Just before we get started, we
11  sent you -- we sent plaintiff's counsel some documents
12  earlier this morning.  Did you look at those documents?
13    A.  I have not seen those documents.
14    Q.  Okay.  I want to ask you, in your report from
15  Pages 20 to 25, you've identified five areas that in
16  your opinion ZHP's CGMP's were deficient.  Am I correct?
17    A.  I'm not sure of five.  Probably -- if you say
18  it's five, it probably is five.  I didn't count the
19  number here.
20    Q.  Well, if you just look at the headings there,
21  there are five headings.  These are -- these are five
22  general areas.
23    A.  Okay.
24    Q.  So are these the five -- are these five
25  areas -- I guess are these five areas you are claiming

Page 11

1  ZHP's CGMP's were deficient?
2    A.  These are examples of the deficiencies.  These
3  are not necessarily all the deficiencies, but these are
4  examples.
5    Q.  Okay.  How did you come up with these examples?
6    A.  As I was reviewing documents, I picked
7  examples.  I didn't necessarily have any system to pick
8  these particular examples, but they were examples of the
9  CGMB deficiencies that I saw.
10    Q.  Did plaintiff's counsel identify these for you?
11    A.  No.
12    Q.  Did you discuss these five with plaintiff's
13  counsel?
14        MR. DAVIS:  I'm going to -- you can answer
15  the question, but I think we've agreed that
16  communications between the parties and the experts are
17  not subject to disclosure.
18        THE WITNESS:  Well, we've discussed the
19  report.  I don't know that we discussed these specific
20  ones.
21    Q.  (BY MR. GOLDBERG)  Okay.  Can we go through --
22  I just want to -- I just want to confirm the basis for
23  each of these because you said they were based on
24  the documents that you reviewed, right?
25    A.  Right.

Page 12

1    Q.  Let's look at the first one, the failure to
2  conduct the risk assessment.  This was based on -- it
3  looks like Footnote 35, the August 2018 FDA EIR that we
4  looked at yesterday, right?
5        MR. DAVIS:  Objection to form.  You can
6  answer.
7        THE WITNESS:  It was also based on my
8  review of what they actually did, the documents.
9    Q.  (BY MR. GOLDBERG)  Okay.  Which -- which
10  documents again?  Because I'm looking at Page 21 of your
11  report.  So you're citing to the EIR.
12        MR. DAVIS:  Object to form.  Is there a
13  question there?
14    Q.  (BY MR. GOLDBERG)  Yes.  Which documents other
15  than the EIR are you relying on for this point that ZHP
16  failed to conduct the risk assessment?
17    A.  Well, let's see, which document was that?  I
18  don't recall which document it was.  It was the document
19  where they had yes/no answers.  And it was also, I
20  think, the same document you had yesterday.
21    Q.  Okay.  So that -- that's the EIR is one and
22  then the change form, which was Exhibit 23, is what we
23  looked at yesterday, right?
24    A.  Well, I'm not sure which exhibit that was.
25    Q.  Well, that's the one that I showed you

Page 13

1  yesterday that you just referred to.  I'm just telling
2  you it's Exhibit 23.
3    A.  Okay.
4    Q.  So if that's the case, those are the two
5  documents that form the basis of this opinion, right?
6    A.  Well, there are -- there were a number of ZHP
7  documents that I looked at.  So I'm not sure that those
8  were the only ones.
9    Q.  Well, I'm asking you when you look at this
10  section, Paragraphs 104 through 109 at least on Pages 20
11  and 21, you're relying on the EIR and that Exhibit 23,
12  right?
13        MR. DAVIS:  Object to form.  Also
14  mischaracterizes the report.
15        You can answer.
16    Q.  (BY MR. GOLDBERG)  That was a question.
17    A.  Okay.  These are the footnotes I had for those
18  sections.  There are a number of other ZHP documents
19  that are in the attachment that I did, in fact, review,
20  and they may include some of those which are not
21  included as footnotes.  So I'm not saying that these
22  were the only documents that are in the footnotes.  I
23  reviewed the ZHP documents that are in the attachment --
24  I think it's Attachment A.
25    Q.  Which of the documents on Exhibit A support

4 (Pages 10 - 13)

Page 14

1  your conclusions in Paragraphs 104 through 109?
2      A.  Well, we'd have to go back and pull each of
3  these documents up and look through them because I'm not
4  sure which ones are which here because we just reference
5  the actual ZHP number.
6      Q.  Okay.  So when I look at Exhibit A, the
7  materials related to ZHP, all right, it looks like they
8  sort of follow in order of your opinions.  So the first
9  ZHP document you cite at Footnote 35 is the first
10  document here on Exhibit A, 7917.  Do you see that?
11     A.  I do.
12     Q.  Okay.  And then the next document you cite at
13  Footnote 36, and now we're -- we're tracking along this,
14  Footnote 36 is cited at Paragraph 105.  That appears as
15  the second document in Exhibit A.  Do you see that?
16     A.  I do see that.
17     Q.  Okay.  And then Footnotes 37 through 4 --
18  through 39, they -- they go back to that EIR, right?
19     A.  Through 30 -- 39, yes.
20     Q.  Yeah.  And then 40 and 41, they appear in
21  consecutive order on Exhibit A.  Okay?  And 40 is what
22  we introduced as Exhibit 23 yesterday.  All right?  Do
23  you agree with that?
24     A.  I'd have to go back and verify, but it sounds
25  to be accurate.

Page 15

1      Q.  Okay.  And 41 we introduced as Exhibit 22
2  yesterday, which was ZHP's SMPs related to the change
3  control.  Do you accept that representation?
4      A.  I'd have to go back and check it, but it sounds
5  to be correct.
6      Q.  Okay.  Then -- so -- so these are the documents
7  you're citing on -- from 104 to 109.  When we look at
8  Exhibit A, the next document after -- after what is 41,
9  which is 950, the next document on Exhibit A ends
10  with 896.  Do you see that?
11     A.  I do.
12     Q.  Okay.  I'll represent to you that that's an
13  email that relates to the unknown peaks that you discuss
14  later in your report.  Okay?  Did -- did you rely on
15  that in connection with your opinions from 104 to 109?
16         MR. DAVIS:  Object to form.
17         THE WITNESS:  As I indicated a minute or
18  two ago, I looked at the ZHP documents in totality to
19  rely on my opinions.  And so there may have been
20  sections in those -- other documents that I relied upon.
21     Q.  (BY MR. GOLDBERG)  What does the email
22  with un -- related to unknown peaks have to do with your
23  opinions with respect to the change control?
24         MR. DAVIS:  Object to form.
25         THE WITNESS:  Well, if we really want to

Page 16

1  discuss that, we need to pull the document up and take a
2  look at it.
3      Q.  (BY MR. GOLDBERG)  The next document on the
4  list which -- in Exhibit A which ends in 24, is also an
5  email related to -- unknown peaks.  And you cite this
6  later in your report at Footnote 45.  Again, I'm just
7  trying to identify the documents that you relied on for
8  this section of your report.  And it's okay if you said
9  I -- I relied on the EIR and the change control and I
10  relied on the unknown peak emails for that section of my
11  report.  I'm just trying to understand where -- where
12  you're -- where you're drawing your lines.
13         MR. DAVIS:  Object to form and object to
14  the use of the term "documents" as vague.  He's relied
15  on other things as well.
16         You can answer.
17         THE WITNESS:  So I relied on a number of
18  these documents for that opinion.
19     Q.  (BY MR. GOLDBERG)  If you relied on the unknown
20  peak related emails for this testimony, why didn't you
21  cite it here?
22     A.  I didn't necessarily put each of the -- a
23  footnote for each of the documents I reviewed for each
24  section.  I indicated some of those.  And as I've
25  indicated earlier, the points -- the examples in my

Page 17

1  report are just examples.  There are other deficiencies
2  that I had seen as I was reviewing the ZHP documents
3  that are not necessarily in my report because these are
4  just examples that applied to the entire class.
5      Q.  The -- let's -- let's go on.  So at least
6  you'll agree that for 104 through 108, the only
7  documents you cited as support for those paragraphs are
8  the EIR and the two change process documents we
9  discussed?
10     A.  What I would say is is those are the documents
11  I footnoted.
12     Q.  Okay.  And the -- if you go -- if you go on to
13  Paragraphs 110 through 112, and we'll -- this was an
14  area we discussed a little bit yesterday.  This is that
15  area where you're talking about the confusion that --
16  the apparent confusion, as you put it, between these
17  employees about the risk assessment?
18         MR. DAVIS:  Object --
19     Q.  (BY MR. GOLDBERG)  And there you're relying on
20  the testimony -- the portions of testimony that you cite
21  here, right?
22         MR. DAVIS:  Object to form.  Object to the
23  mischaracterization of his testimony yesterday.
24         You can answer.
25         THE WITNESS:  Well, that in addition into

5 (Pages 14 - 17)

Page 18

1 the other documents which -- which were cited in the EIR
2 as well. So just not those.
3     Q. (BY MR. GOLDBERG) Did you -- and then when we
4 go down to the unknown peaks, then you cite to -- you
5 cite to the four emails in the unknown at Footnote 44
6 and 45, right?
7     A. Those are the footnotes I cite in the report,
8 yes.
9     Q. Okay. In -- on Page 23 when you are talking
10 about this heading ZHP's Failure to Adequately Validate
11 the Valsartan Process Change, for these paragraphs,
12 you're again citing the EIR, right?
13     A. Those are the -- those footnotes reference the
14 EIR.
15     Q. Did you look at any testimony related to -- in
16 Paragraph 116, do you recall looking at any testimony in
17 relation to your conclusion that's referenced in
18 Paragraph 116?
19     A. I may have. I was provided the full
20 depositions for all of the individuals that were deposed
21 from ZHP and Princeton. I did review all of those and
22 there may have been other sections in there as well.
23 Those are exhaustive documents.
24     Q. I'm sorry. Your testimony today is that you
25 read the full deposition transcripts?

Page 19

1     A. No. That is not what I said. When I said I
2 reviewed, I didn't necessarily review every single
3 paragraph of those depositions. I skimmed through the
4 depositions.
5     Q. Okay. And yesterday you testified that
6 plaintiff's counsel provided you portions of testimony,
7 right?
8     A. No.
9     MR. DAVIS: Object to form. And object to
10 the mischaracterization of his testimony yesterday.
11     THE WITNESS: No, that is not what I said.
12 I was -- I was provided the full depositions for each of
13 those individuals.
14     Q. (BY MR. GOLDBERG) Mr. Quick, I just --
15 yesterday I asked you how did you identify specific
16 excerpts in the testimony. Well, first of all, I
17 said -- I asked you did you read the entire deposition
18 transcripts for these witnesses and you answered, no, I
19 did not read the entire depositions.
20     MR. DAVIS: Is there a question there?
21     Q. (BY MR. GOLDBERG) Are you -- are you changing
22 that testimony now?
23     A. No.
24     MR. DAVIS: Object to form. Object to the
25 mischaracterization that his testimony is changing

Page 20

1 somehow.
2     You can answer.
3     THE WITNESS: No.
4     Q. (BY MR. GOLDBERG) Are you changing your
5 testimony?
6     A. No, I am not changing that. I did not read the
7 entire deposition. I skimmed through the deposition. I
8 did not read the entire deposition. We're talking
9 hundreds of pages in some cases. I skimmed through that
10 for pertinent points.
11     Q. I asked you how did you identify the specific
12 excerpts you relied on and you said I was provided with
13 particular sections from the law firm that took the
14 depositions. Is that -- are you changing your
15 testimony?
16     MR. DAVIS: Object -- object to form.
17 Object to the mischaracterization that he's changing his
18 testimony.
19     You can answer.
20     THE WITNESS: So I asked about specific
21 sections, and I was directed to those sections by the
22 law firm.
23     Q. (BY MR. GOLDBERG) Did you try to determine
24 whether any of the portions of testimony that
25 plaintiff's counsel provided to you were contradicted by

Page 21

1 other portions of testimony?
2     MR. DAVIS: Object to form. You can
3 answer.
4     THE WITNESS: No, I did not do that. As I
5 indicated, I skimmed through the depositions. I didn't
6 necessarily look for that particular situation as you
7 are describing it.
8     Q. (BY MR. GOLDBERG) If -- if there was testimony
9 that contradicted portions of testimony that were
10 highlighted for you by plaintiff's counsel, would you
11 have wanted to know that in reaching your opinions?
12     MR. DAVIS: Object to form. Object to the
13 premise of the question.
14     You can answer.
15     THE WITNESS: I don't think it was
16 particularly relevant at the time. But if, in fact,
17 those were -- you directed those to me, I could probably
18 review those as potentially an update. But what -- what
19 was stated in depositions I think was pretty clear.
20     Q. (BY MR. GOLDBERG) What was stated in the
21 portions of testimony that plaintiff's counsel provided
22 to you was pretty clear, and that's your testimony?
23     MR. DAVIS: Object to form. Object to the
24 characterization that's underlying your question. You
25 can answer.

6 (Pages 18 - 21)



Page 22

1          THE WITNESS: No, that's not what I said.
2    What I said was I was provided the full depositions. I
3    asked for the relevant portions in the depositions were
4    and the attorneys provided me -- directed me to those
5    particular sections. I had the full entire deposition.
6          Q. (BY MR. GOLDBERG) Did you ever think -- did
7    you think that plaintiff's attorneys might -- might not
8    provide you the complete picture of the testimony when
9    they are providing you with what they think are the
10   relevant portions?
11         MR. DAVIS: Object to form.
12         You can answer.
13         THE WITNESS: So as I -- as I stated, I was
14   provided the full depositions. I skimmed through the
15   depositions. I was directed to specific areas. No, to
16   answer your question, I did not think that to be the
17   case. And as I also said -- as I have also said if this
18   were to proceed, I would probably do a more in-depth
19   review of the entire deposition. These depositions are
20   very lengthy.
21         Q. (BY MR. GOLDBERG) Let's pull up Exhibit 20 --
22   25.
23         MR. DAVIS: Is this one of the documents,
24   Seth?
25         MR. GOLDBERG: This was actually an

Page 23

1    exhibit we -- yes, you should have this. This was the
2    exhibit we -- we ended on yesterday. It was up
3    yesterday.
4          MR. DAVIS: This is -- oh, okay. All
5    right.
6          MR. GOLDBERG: This is Exhibit 25. This is
7    the testimony of Jucai Ge.
8          MR. DAVIS: One second, Seth. Let me hand
9    the document to the witness. Should we -- should we be
10   marking this or --
11         MR. GOLDBERG: This marked was an -- this
12   was marked as an exhibit yesterday.
13         MR. DAVIS: Okay. Okay.
14         MR. GOLDBERG: This was marked as
15   Exhibit 25 yesterday.
16         MR. DAVIS: So the witness for the record
17   has Jucai Ge's deposition excerpt that was sent to us
18   this morning.
19         Q. (BY MR. GOLDBERG) And I would like you to turn
20   to Page 276 of the testimony. And I would just like you
21   to read Line 5 and 6.

Page 24

5          Q. Okay. So is it -- it is your opinion when you
6    look at Lines 5 and 6 that Ms. Gi is unclear about who's
7    to provide a risk assessment report?
8          MR. DAVIS: Object to form and object to
9    the, you know, selective display of, you know, two pages
10   of a deposition transcript.
11         You can answer.
12         MR. GOLDBERG: Counsel -- Counsel, that's
13   speaking objection is completely inappropriate. And I'm
14   going to ask you now to just say objection to form. Say
15   vague. Okay. But you don't need to start to make
16   speeches. I'm asking -- I would like the question read
17   back and I would like an answer to the question.
18         (Requested question was read.)
19         MR. DAVIS: Same objections.
20         You can answer.
21         THE WITNESS: As I indicated in the report,
22   I still believe there was some confusion between those
23   two groups relative to the who was doing the risk
24   assessment, who was responsible for it. Even here she

Page 25

2    and normally, I would have expected the quality function
3    to have a more active role in the risk assessment. So I
4    still stand by the statements in the report.
5          MR. GOLDBERG: Okay. Can you turn -- can
6    we pull up Tab 20 -- Tab 25 which we'll mark as
7    Exhibit 26?
8          (Exhibit No. 26 was marked.)
9          MR. DAVIS: Which one is this?
10         MR. GOLDBERG: This is the testimony of Min
11   Li.
12         MR. DAVIS: For the record is -- is Jucai
13   Gi 25?
14         MR. GOLDBERG: Yes.
15         MR. DAVIS: Okay.
16         MR. GOLDBERG: And this, the testimony of
17   Min Li, will be Exhibit 26.
18         MR. DAVIS: Okay. For the record, I've
19   handed -- I've handed the witness Exhibit 26, which is a
20   two-page document.
21         THE REPORTER: Hold on. I need to mark it.
22         Q. (BY MR. GOLDBERG) Now, while we're doing that,
23   if you look at Paragraph 111 of your report, sir, you
24   say that Min Li, the head of the technology department,
25   would testify that it was actually Ms. Ge who would be,

Veritext Legal Solutions
800-227-8440                                                973-410-4040

Page 26

1  quote, in a better position to discuss the problem of
2  sodium nitrate quenching resulting in nitrosamines,
3  right? That's what your report says, right?
4      A. That's what the report says.
5      Q. Okay. Now when you look at the testimony of
6  Min Li on Page 107, he's asked, (Reading:) Well,
7  whatever you want to call it, he was correct that the
8  sodium nitrate quenching was creating nitrosamines which
9  was a serious GMP problem, correct? And Mr. Li's answer
10 is, (Reading:) In terms of a GMP, you know, Ms. Gi
11 would be in a better position.
12         So Mr. Li is being pretty clear that Ms. Gi
13 is the person to turn to with respect to the GMP, right?
14         MR. DAVIS: Object to form.
15         THE WITNESS: I'm not sure what's different
16 between what you're having me look at than what's in my
17 report.
18     Q. (BY MR. GOLDBERG) Well, your report takes out
19 of context the phrase in a better position and says
20 nothing about Mr. Li identifying Ms. Gi as the person to
21 talk to with respect to GMP, does it?
22         MR. DAVIS: Object to form. Object to the
23 characterization of his report.
24         THE WITNESS: So I still stand by the
25 statements that I believe there was confusion between

Page 27

1  the individuals as to who was responsible and who was
2  conducting the risk assessments.
3      Q. (BY MR. GOLDBERG) So my -- the answer to my
4  question is, you're correct, my report does not say that
5  Mr. Li directed -- directed -- identified Ms. Gi as the
6  person to talk to with respect to GMP, right?
7          MR. DAVIS: Same objections.
8      Q. (BY MR. GOLDBERG) Your report doesn't say
9  that?
10     A. Well, I'm not sure I understand exactly the
11 point that you're making here.
12     Q. Well -- okay. I want an answer to my question.
13         MR. DAVIS: Is -- is -- is there another
14 question?
15     Q. (BY MR. GOLDBERG) I want an answer to that
16 question. Your report --
17         MR. DAVIS: He's asked for clarification,
18 Seth.
19     Q. (BY MR. GOLDBERG) Your report does not say
20 that Ms. -- Li identified Ms. Gi as the person to
21 talk to with respect to GMP even though that's what his
22 testimony says, correct?
23         MR. DAVIS: Object to form, object to the
24 characterization.
25         You can answer.

Page 28

1          THE WITNESS: Again, I'm not sure what
2  you're asking me to agree to.
3      Q. (BY MR. GOLDBERG) Let's read back the
4  question.
5          (Requested question was read.)
6          MR. DAVIS: Restate my objections.
7          You can answer.
8          THE WITNESS: Well, if we're looking at
9  this particular section of transcript, that does not say
10 that.
11     Q. (BY MR. GOLDBERG) It doesn't say in terms of a
12 GMP Ms. Gi would be in a better position?
13     A. No, it does say that.
14     Q. But your report doesn't identify that, right?
15         MR. DAVIS: Object to form.
16         THE WITNESS: It does say that Ms. Gi would
17 be in a better position to discuss the problem.
18     Q. (BY MR. GOLDBERG) Your report doesn't say that
19 Mr. Li identified Ms. Gi as the person who would be in a
20 better position in terms of GMP, right?
21         MR. DAVIS: Object to form.
22         THE WITNESS: Well, if we're looking at the
23 transcript, the transcript is not stating that. I'm
24 not -- still I'm not sure what point you're trying to
25 make. The point I made in my report was that there was

Page 29

1  confusion between the two groups within the company as
2  to who was responsible and who was conducting the risk
3  assessment. That was the whole point out of that.
4      Q. (BY MR. GOLDBERG) Okay. Well -- and the point
5  of my question is, it doesn't seem like there's
6  confusion. Mr. Li in his testimony is identifying
7  Ms. Gi as the person who's in a better position with
8  respect to GMP, correct?
9          MR. DAVIS: Object to counsel's testifying.
10 Object to form.
11         You can answer.
12         THE WITNESS: Again, based on the documents
13 I read, I do think that there was confusion between
14 those parties.
15     Q. (BY MR. GOLDBERG) Answer my question, sir.
16         MR. DAVIS: He has answered your question,
17 Seth.
18         THE WITNESS: I just did.
19         MR. GOLDBERG: Counsel -- Counsel, enough.
20         MR. DAVIS: Objection, asked and answered.
21         MR. GOLDBERG: You're interfering -- you're
22 interfering with this testimony at this point. State
23 your objection. That's it.
24         MR. DAVIS: Objection, asked and answered.
25         MR. GOLDBERG: I want an answer to my

8 (Pages 26 - 29)

Page 30

1  question.
2    Q. (BY MR. GOLDBERG) I would like an answer to my
3  question.
4      MR. DAVIS: You can answer it one more
5  time. Do you even know what the question is?
6      THE WITNESS: Do you want to reread the
7  question?
8    Q. (BY MR. GOLDBERG) Mr. Li identified --
9  Mr. Li's testimony says that in terms of GMP, Ms. Gi
10 would be in a better position with respect to the risk
11 assessment, right?
12     MR. DAVIS: Objection, asked and answered.
13 Object to form.
14     You can answer.
15     THE WITNESS: Okay. If you're asking if
16 that particular sentence is in this transcript, the
17 answer is, no, it is not.
18   Q. (BY MR. GOLDBERG) Mr. Li says in terms of GMP
19 Ms. Gi would be in a better position. You agree with
20 that, right?
21   A. Well, are you asking me to agree with my
22 report?
23   Q. I'm asking you to agree with what I just asked
24 you, that Mr. Li's testimony says in terms of GMP Ms. Gi
25 would be in a better position.

Page 31

1    A. Yes, and that's what I said in my report.
2    Q. That's not what you said in your report.
3  That's the problem, sir. Your report leaves out the
4  fact that Mr. Li identified Ms. Gi as being in a better
5  position in terms of GMP.
6      MR. DAVIS: Object to form.
7    Q. (BY MR. GOLDBERG) Doesn't it?
8      MR. DAVIS: Object to counsel's testifying.
9      You can answer if there's a question there.
10     THE WITNESS: Yes, I'm not really sure what
11 you're trying to get here because my report indicates
12 that Dr. Li would testify it was actually Ms. Gi would
13 be in a better position to discuss the problem. That's
14 what I said in my report. I'm not sure what's different
15 between what I said in my report and what you just said.
16   Q. (BY MR. GOLDBERG) Let's go on to Exhibit --
17 this is Document 28. We'll mark this as Exhibit 27.
18     MR. DAVIS: Is this --
19     MR. GOLDBERG: This is the testimony --
20 John, this is the testimony from Jucai Ge.
21     MR. DAVIS: I thought this was previously
22 marked, Seth. Is this not previously marked? Oh, is
23 this a different excerpt?
24     I have a -- I have an April 29th printed
25 out, volume 3. Oh, Jucai Gi. Okay. I know --

Page 32

1      MR. GOLDBERG: No, this is --
2      THE REPORTER: Jucai Gi.
3      MR. GOLDBERG: This is -- yeah, that's
4  right. Yeah, it's a mistype -- it's a typo on her name.
5  It's Jucai Gi at least on this thing, volume 2.
6      MR. DAVIS: Oh, I see. I'm handing the
7  witness -- or I'm handing the court reporter to be
8  marked Exhibit 27.
9      (Exhibit No. 27 was marked.)
10   Q. (BY MR. GOLDBERG) Okay. You have that
11 document in front of you, sir?
12   A. I do.
13   Q. Okay. At Paragraph 114 of your report, you
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
19     Do you see that?
20   A. I do see that.
21   Q. This is one of the -- and then you cite to her
22 testimony at Section 46. Do you see that, at
23 Footnote 46?
24   A. I do.
25   Q. This is one of those portions of testimony that

Page 33

1  counsel highlighted for you?
2      MR. DAVIS: Object to form.
3      THE WITNESS: As -- as I said before, I
4  asked what sections that they could direct me to that
5  might be relevant, and this is one of the sections that
6  they directed me to.
7    Q. (BY MR. GOLDBERG) Okay. Could you read for
8  yourself Pages 169 of this testimony through 170? Just
9  take a minute to do that.
10   A. Okay.
11   Q. Okay. When -- when you look at that testimony,
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████████████
19     MR. DAVIS: Object to form.
20     THE WITNESS: Well, I have no idea what she
21 was actually thinking when she made these statements. I
22 do not know.
23   Q. (BY MR. GOLDBERG) That really doesn't answer
24 my question.
   ████████████████████████████

9 (Pages 30 - 33)

Page 34

8    A. Again --
9        MR. DAVIS: Object to form.
10       THE WITNESS: Again, as I indicated, I have
11   no idea what she was thinking. I just considered this
12   to be an appropriate analogy.
13   Q. (BY MR. GOLDBERG) Okay. So you -- you -- you
14   acknowledge it's an analogy, right?
15   A. She obviously was trying to make an analogy.
16   Q. Okay. It might not be a good analogy, right?
17   A. I'm sorry. I missed that.
18   Q. It might not have been a good analogy, right?
19   A. It might not have been a good analogy, correct.
24       MR. DAVIS: Object to form.
25       THE WITNESS: So you're asking me to try to

Page 35

1    understand what she was thinking when she made this and
2    I don't know.
3    Q. (BY MR. GOLDBERG) Okay. So you don't know,
4    but yet in your report you want to -- you reach some
5    conclusion about what she's saying, right?
6        MR. DAVIS: Object to form.
7        THE WITNESS: Well, that's -- that's not
8    what I said in 114.
9    Q. (BY MR. GOLDBERG) Do you feel like in --
10   in 114, did you fairly characterize Mrs. Gi's testimony
11   on 169 and 170?
12   A. I believe I did.
20       MR. DAVIS: Object to form. Objection,
21   asked and answered.
22       You can answer again.
23       THE WITNESS: Again, I'll say as I said
24   before, I have no idea what she was trying to accomplish
25   when she made this statement in the deposition.

Page 36

1    Q. (BY MR. GOLDBERG) Okay. Let's turn to
2    Page 1 -- I'm sorry, Page 23 of your report and I'm
3    looking at Paragraph 116. You can pull down that
4    testimony if you'd like. Paragraph 116.
5    A. Okay.
6    Q. You say, (Reading:) The real reason for making
7    this critical change was not so much in reducing isomer
8    conversion and increasing yield as had been stated, but
9    rather to save money.
10       And then you go on to quote the EIR which
11   quotes -- the EIR quote -- says -- I'm sorry. Let me --
12   let me ask that question differently.
13       You quote the EIR which quotes a statement
14   by Jun Du, the executive vice president of ZHP, correct?
15   A. That is correct.
16   Q. Okay. Did you look at Mr. Du's testimony about
17   what he said with respect to this statement?
18   A. I may have. But I was -- what I'm referencing
19   here is what he told the FDA investigator.
20   Q. Mr. Du's testimony is not listed as any of the
21   materials you reviewed. So you didn't review his
22   testimony?
23   A. Right. If it's not listed here, then I did not
24   review it.
25   Q. Did you review any -- do -- do you recall

Page 37

1    reviewing anybody's testimony as to this particular --
2    this particular portion of the EIR that you're reporting
3    from?
4    A. Well, there are a number -- there are a number
5    of transcripts that I was provided that I did -- as I
6    indicated, I did review. I've not -- I have no idea
7    whether I reviewed all of them -- exactly what I
8    reviewed at this point. But the situation here relative
9    to the statement was basically he was telling the FDA
10   investigator that the real intent for making this change
11   was to save money. That was the point of that
12   Section 116.
13   Q. Can we pull up document No. 31 in our list,
14   which we'll mark as Exhibit 28?
15       (Exhibit No. 28 was marked.)
16       MR. DAVIS: For the record I'm handing the
17   witness the May 28th Jun Du face page and one page of
18   deposition testimony.
19   Q. (BY MR. GOLDBERG) If you look, sir, Page 232
20   of that testimony --
21       MR. DAVIS: Seth, the court reporter has
22   just marked it and handed it to the witness.
23       Do you want to take a moment to review?
24       THE WITNESS: Sure. Okay. I'm looking
25   at 232.

10 (Pages 34 - 37)

Page 38

1    Q. (BY MR. GOLDBERG) In 232 Mr. Du says,
2  (Reading:) I did not state that the cost reduction
3  would cause dominant well market share.
4        Do you see that?
5    A. I do see that.
6    Q. Okay. This answer on Page 232 -- let me go
7  back.
8        At 231 plaintiff's counsel was reading to
9  Mr. Du the exact language that you quote at Page 116 of
10  your report. Do you see that?
11    A. I do see that.
12    Q. Okay. And Mr. Du says, (Reading:) I do not
13  agree with that -- this statement here. I did not make
14  such an apology, and I do not understand why it was
15  written here. I did not state that the cost reduction
16  would cause dominant world market share.
17        Do you see that?
18    A. I do see that.
19    Q. Is this the first time you've seen that Mr. Du
20  denies making this statement that -- that you've put in
21  Section 116?
22    A. This is the first time I've seen that
23  statement, yes.
24        MR. GOLDBERG: Okay. Can we pull up
25  document No. 32, please? And we'll mark this as

Page 39

1  Exhibit 29.
2        (Exhibit No. 29 was marked.)
3        MR. DAVIS: For the record, I'm handing the
4  court reporter to be marked the May 5th deposition face
5  page of Linda Lin and a couple of -- two pages of
6  deposition testimony.
7    Q. (BY MR. GOLDBERG) If you could look, sir, at
8  Pages 207, 208, 209, 210, I'll direct you to specific
9  portions, but...
10        MR. DAVIS: Do you want a few moments to
11  review since he's asking you to look at multiple pages?
12        THE WITNESS: Yes.
13        MR. DAVIS: Okay.
14    Q. (BY MR. GOLDBERG) And I'm going to ask you
15  about 207, 208, 209, 210.
16        MR. DAVIS: Okay. The witness is going to
17  read those pages.
18        THE WITNESS: Okay.
19    Q. (BY MR. GOLDBERG) Okay. On Page 208 -- well,
20  let's go down to 209. You see on 209, Ms. -- Ms. Lin --
21  do you know who Linda Lin is? Do you know what her role
22  was at ZHP?
23    A. There are a number of individuals. I'd have to
24  go back and determine what specific role she had. There
25  are a number of individuals, so...

Page 40

1    Q. Ms. Lin was the -- head of regulatory at
2  ZHP. She was asked on Page 209, she was read that same
3  portion of the EIR that you cite in 116. Do you see
4  that?
5    A. I do see that.
6    Q. And she says, (Reading:) In my recollection I
7  do not recall Mr. Du saying this to the FDA. This is
8  not what I can recall. And second, based on my
█████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████
13        Do you see that?
14    A. I do see that.
15    Q. Is this the first time you've seen testimony
16  from Ms. Lin that refutes the notion that Mr. Du said
17  what -- what you've quoted in Section 116 of your
18  report?
19    A. This is the first time I've read what -- what
20  you've just provided to me.
21    Q. Okay. I just want to ask you a few more
22  questions about your report.
23        Pages -- let's -- let's go to Section 4 in
24  your report, these -- these Paragraphs 117 through 126.
25  You rely on a 2010 email from Remonda Gergis, and this

Page 41

1  is at Paragraph 118 in the section entitled, "ZHP's
2  Failure to Adequately Train Quality Assurance." Am I
3  correct about that?
4        MR. DAVIS: Object to form.
5        THE WITNESS: Well -- well, 118 refers to
██████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████
11  where I see that in Section 118.
12    Q. (BY MR. GOLDBERG) That's the -- that's the
13  words that you used.
14    A. I'm just --
15    Q. The heading -- heading No. 4 says --
16    A. Oh, okay. Okay. At the top, yes. But I
17  thought we were referring to Section 118.
18    Q. Well, I'm -- I'm looking at this section of
19  your report. But you're relying on this 2010 email when
20  you're talking about ZHP's -- in your view ZHP's failure
21  to adequately train quality assurance personnel, right?
22        MR. DAVIS: Object to form.
23  Mischaracterizes the report.
24        You can answer.
25        THE WITNESS: So I am relying upon what

11 (Pages 38 - 41)

Page 42

1  Ms. Gergis, if I'm pronouncing her name correctly,
2  stated in that email, yes.
3      Q.  (BY MR. GOLDBERG)  And you're relying on it for
4  what purpose?
5      A.  Well, to show that ZH -- ZHP was an operation
6  out of control.
7      Q.  And her email is in 2010, right?
8      A.  Yes.
9      Q.  Is it your opinion that her email related to
10  ZHP's operations between 2010 and 2018?
11      A.  I'm relying on what she said relative to what
12  she saw in 2010.
13      Q.  Okay.  So your opinion is about ZHP in 2010,
14  right?
15          MR. DAVIS:  Object to form.  Object to the
16  mischaracterization.
17          THE WITNESS:  I'm relying on the fact of
18  what she found when she was there in 2010.  I believe
19  there's other statements.  But I think she came back a
20  year or two later and had similar situations.
21      Q.  (BY MR. GOLDBERG)  Did you -- if you look at
22  Paragraph 119, you cite another inspection by Ms. Gergis
23  in 2014, right?
24      A.  I do.
25      Q.  Okay.  And what do you rely on that inspection

Page 43

1  for?
2          MR. DAVIS:  Object to form.
3          THE WITNESS:  Well, I'm relying on the fact
4  that she came back in 2014 to do another inspection and
5  she observed similar CGMP issues.
6      Q.  (BY MR. GOLDBERG)  Did you identify any
7  instance between 2010 and 2014, the dates of these
8  documents, where the FDA found CGMP issues at ZHP?
9      A.  You know, as I've said a number of times, this
10  report only has examples of the CGMP examples that I
11  found.  It's not all exhaustive.  So the answer is I
12  have not looked at every possible document.  I looked at
13  specific examples relative to CGMP deficiencies that
14  applied to the class.
15      Q.  So the answer to my question is no?
16          MR. DAVIS:  Object to the
17  mischaracterization.
18          THE WITNESS:  I did not reference any --
19  any inspections in the period of time that you're
20  talking about in my report.
21      Q.  (BY MR. GOLDBERG)  Were you aware that the --
22  that the FDA did not find any objectionable CGMP
23  conditions at ZHP between 2010 and 2015?
24      A.  I did not review those documents relative to
25  this report.

Page 44

1          MR. GOLDBERG:  Okay.  I -- I'm going to
2  conclude my examination now.
3          THE WITNESS:  Take a break?
4          MR. DAVIS:  Do you want to take a break?
5          THE WITNESS:  Can we take a break?
6          MR. DAVIS:  Yeah.  The witness has
7  indicated he wants to take a five-minute break.  We've
8  been going for about an hour any ways.
9          VIDEOGRAPHER:  Off the record 9:09 a.m.
10          (Brief recess.)
11          VIDEOGRAPHER:  We are back on the record
12  at 9:18 a.m.
13          EXAMINATION
14      Q.  (BY MR. STOY)  Morning, Mr. Quick.
15      A.  Good morning.
16      Q.  My name is Frank Stoy, and I represent the
17  Mylan defendants in this litigation.  I'm going to ask
18  you some questions this morning about the portion of
19  your report and your opinions that pertain to Mylan.  Do
20  you understand that?
21      A.  Yes.
22      Q.  Okay.  Now I want to direct your attention
23  first to Page 36 of your report and specifically to
24  Paragraph 191.  Let me know when you're there.
25      A.  I am.

Page 45

1      Q.  Okay.  I see in the back part of that paragraph
2  where you say, (Reading:)  The corporate quality
3  assurance deficiencies described herein are the type of
4  quality assurance activities that would have impacted
5  each of the manufacturer defendants valsartan products
6  equally and in the same manner.
7          Did I read that correctly?
8      A.  You did.
9      Q.  Okay.  I want to ask you about this statement
10  as it pertains to my client.  Okay?
11          So earlier in your deposition, I -- I heard
12  you testify about a 2011 process change by ZHP; is that
13  correct?
14      A.  That's correct.
15      Q.  And -- and is it your understanding or your
16  belief that that process change lead to the presence of
17  the nitrosamine impurity in ZHP's API?
18      A.  It would appear to be the case.  My comment
19  ████████████████████████████████████████████
20  ████████████████████████████████████████████
21  ████████████████████████████████████████████
22  
23      Q.  Are you aware that ZHP used a different process
24  to manufacture valsartan API than my client, Mylan?
25      A.  I'd have to go back and review those documents.

12 (Pages 42 - 45)

Page 46

1    Q. So is your testimony that you're not sure as
2  you sit here today whether Mylan and ZHP used the same
3  process to manufacture valsartan API?
4    A. Again, I reviewed a lot of documents. We could
5  go look at those documents if we wanted to. I'm just
6  not certain at this point today this morning.
7    Q. Have you reviewed documents that reflect the
8  different processes used by the different manufacturers?
9    A. As I said before on this report, this report
10 only attempted to identify specific -- certain examples
11 to demonstrate the overall CGMP deficiencies that are
12 pertained to the class, and I have not reviewed
13 everything.
14   Q. So as you sit here today, you don't know
15 whether any of your observations regarding ZHP's
16 manufacturing process would apply to Mylan or not,
17 correct?
18       MR. DAVIS: Objection. Outside of the
19 scope. Asked and answered and he's not a process
20 chemist.
21       But you can try.
22       THE WITNESS: So as I've said, I've
23 reviewed the various documents and I put the CGMP
24 deficiencies as I've seen them. You're asking a very
25 specific question which I may or may not have seen, so

Page 47

1  the answer is I don't know because I may not have looked
2  at that because this was not an exhaustive report. It
3  was only to identify examples.
4    Q. (BY MR. STOY) Right. You weren't looking at
5  the different manufacturer's process chemistry; you were
6  just looking at GMP issues, correct?
7    A. Well, process changes do impact CGMP. I was --
8  but I was looking at the CGMP aspects.
9    Q. Are you aware of how the nitrosamine impurity
10 that was detected in Mylan's valsartan API was formed?
11   A. I may be, but that's not an area that I looked
12 at relative to my report.
13   Q. Did you ever review Mylan's root cause analysis
14 related to the nitrosamine impurity?
15   A. Well, I did review, as I indicate in my report,
16 the risk assessment that was conducted by Mylan.
17   Q. The risk assessment that you reference in your
18 report, I believe, was a 2014 document; is that correct?
19   A. I have to go back and make sure that's a
20 correct date. I'm not sure. If you say it's that date,
21 it probably is. But I'm not certain what the date was
22 without looking at the document.
23   Q. So if it was a -- assuming I'm correct that
24 it's a 2014 document, that document would not be Mylan's
25 root cause assessment with regard to the nitrosamine

Page 48

1  impurity that was detected in 2018, correct?
2    A. Well, I don't know, so I can't say correct
3  because I don't know. I'd have to go back and look at
4  the documents. Again, as I said I did not do an
5  exhaustive search of documents. My focus here was to
6  look at the specific examples of CGMP deficiencies that
7  apply to the class.
8    Q. Is it fair to say, sir, that if the root cause
9  assessment that Mylan conducted in 2018 is not listed on
10 Exhibit A to your report, then you didn't review it in
11 preparing your report, correct?
12   A. Well --
13       MR. DAVIS: Object to form.
14       You can answer.
15       THE WITNESS: So the documents that I
16 reviewed, again as I said, I didn't necessarily review
17 all documents. I only reviewed examples that I -- as I
18 said in my report, they were examples. It was not an
19 exhaustive report. It was not intended to be an
20 exhaustive report. If there were further work beyond
21 this on merits report, probably would get into that type
22 of thing.
23   Q. Sure. I understand that's your testimony. But
24 I also heard you testify yesterday that if it's not in
25 Exhibit A, I probably haven't reviewed it. Do you

Page 49

1  remember testifying to that?
2        MR. DAVIS: Object to form. Object to the
3  mischaracterizing his testimony.
4        You can answer.
5        THE WITNESS: Well, the documents that I've
6  included in my report are the documents that I reviewed
7  that are shown in Exhibit A.
8    Q. (BY MR. STOY) Right. And I don't see the 2018
9  root cause analysis that Mylan conducted in Exhibit A.
10 So if it's not in there, that means you probably didn't
11 review it, right?
12   A. If it's not in there, I did not review it for
13 the purposes of this report.
14   Q. Have you ever reviewed the results of Mylan's
15 internal testing for nitrosamine impurities in valsartan
16 API?
17   A. I -- I may have. But that was not the purpose
18 of this report. The purpose of this report was to
19 identify examples of CGMP deficiencies.
20   Q. (BY MR. STOY) Have you ever reviewed FDA's
21 published testing results for nitrosamine impurities in
22 Mylan's valsartan's finished dose?
23   A. I may have seen those documents, but that was
24 not particularly relevant to this particular report
25 relative to CGMP deficiencies.

13 (Pages 46 - 49)

Page 50

1    Q. Okay. So you may have seen those, you may not
2 have, but you didn't consider those documents in
3 preparing this report, correct?
4    A. That is correct.
5    Q. Have you ever reviewed Mylan's valsartan recall
6 notices?
7    A. I may have seen those, but that was not
8 pertinent to this report.
9    Q. Okay. So again, you wouldn't have considered
10 those in preparing this report, right?
11    A. That's correct because I was focusing on
12 examples of CGMP deficiencies that applied to the class.
13    Q. Generally speaking, do you understand that
14 Mylan recalled valsartan containing medications in
15 November and December of 2018?
16    A. I don't specifically remember that. But I know
17 there are number of recalls by number of manufacturers
18 in that timeframe.
19    Q. Are you aware, sir, that none of Mylan's
20 valsartan API contained NDMA above the FDA's allowable
21 intake limits?
22        MR. DAVIS: Object to form.
23        THE WITNESS: That's not something I
24 reviewed. What I reviewed were the CGMP deficiencies.
25 And I think as I said yesterday, the CGMP deficiencies

Page 51

1 would apply to all the products and wouldn't necessarily
2 matter whether they contained the contaminants or not.
3 The fact that the CGMP deficiencies would indicate that
4 all products were adulterated as I said yesterday. But,
5 no, that wasn't relevant to this particular report.
6    Q. (BY MR. STOY) Were you aware that the FDA had
7 set allowable intake limits for NDMA and NDEA?
8    A. There -- there are a number of documents that
9 the FDA has published relative to the allowable limits,
10 et cetera. But again, that was not relative to my
11 particular report.
12    Q. Sure. I'm not asking whether it was relevant
13 to your report. I'm asking whether you were aware of
14 it; yes or no?
15    A. I'm aware there were very certain limits set at
16 various times, but again, those are not documents that I
17 reviewed as part of my report.
18    Q. So you wouldn't know one way or the other
19 whether Mylan issued a recall for any medications
20 related to NDMA, correct?
21        MR. DAVIS: Object to form. Did you say
22 NDMA or NDEA, Frank?
23        MR. STOY: NDMA.
24        MR. DAVIS: Okay. Thank you. Object to
25 form.

Page 52

1        THE WITNESS: So again, I may have seen
2 those, but that wasn't a subject of my report. So I did
3 not review those documents relative to my report.
4        Again, I want to state again that my report
5 only list examples. It was not an exhaustive search of
6 everything. It was examples related to the CGMP
7 deficiencies related to class.
8    Q. Do you have an understanding as to whether all
9 of Mylan's valsartan API contained levels of NDEA that
10 was above FDA's allowable intake limits or is that not
11 something you consider?
12    A. Well, I didn't -- that -- that wasn't relative
13 to my report. The -- the one document I would probably
█████████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████████████
19 2012, 2013. So I'm aware of that. I'm not quite sure
20 how that relates to anything because that's not
21 necessarily relevant here.
22    Q. Sure. And that document you just mentioned,
23 that's a ZHP document, right?
24    A. That was a ZHP document, right.
25    Q. So that wouldn't have anything to do with

Page 53

1 Mylan, right?
2    A. Again, I didn't try to make the inference in my
3 report that it did.
4    Q. I'm sorry. I didn't -- I didn't hear your
5 answer.
6    A. I said I did not try to make that inference in
7 my report.
8    Q. Right. Because ZHP and Mylan are different API
9 manufacturers, correct?
10    A. Right.
11    Q. They have different supply chains, right?
12    A. That's correct.
13    Q. Would it affect your opinions one way or the
14 other if you learned that some of the batches of Mylan's
15 valsartan API contained NDEA levels below FDA's
16 allowable intake limits?
17        MR. DAVIS: Object to form. Object to the
18 extent it assumes facts not in evidence.
19        You can answer.
20        THE WITNESS: No, I would not because that
21 was not the purpose of my report. The purpose of my
22 report was to identify the GMP deficiencies that I
23 observed.
24    Q. (BY MR. STOY) And because you're not -- you
25 can't recall ever reviewing Mylan's NDEA testing, you're

14 (Pages 50 - 53)

Page 54

1 not aware one way or the other if there was a 20-fold
2 difference between the lowest detected level of NDEA and
3 the highest detected level of NDEA; is that right?
4        MR. DAVIS: Object to form.
5        THE WITNESS: Again, that's not -- not a
6 situation that I reviewed because it was not relevant to
7 identifying the CGMP deficiencies.
8     Q. (BY MR. STOY) So you don't think it's relevant
9 whether there was variance from one batch to the next
10 regarding the content of NDEA in Mylan's API. Is that
11 your testimony?
12        MR. DAVIS: Object to form. Object to the
13 extent it mischaracterizes his testimony.
14        THE WITNESS: That's -- that's not what I
15 said. If there were varying levels, it would certainly
16 indicate that there was something out of control which
17 you would want a consistent process. But that's not
18 something I reviewed relative to this report.
19     Q. (BY MR. STOY) Why is it that you don't think
20 that it's relevant whether the levels were different
21 from one batch to the next for the purposes of your
22 report?
23     A. Because I was identifying CGMP deficiencies.
24 And as I said before, relative to the CGMP deficiencies,
25 it's not relevant whether there was any contaminant at

Page 55

1 all if they were not made in a compliant manner.
2     Q. I want to talk a little bit about what you did
3 to form the basis for your opinions regarding Mylan.
4        Based on your report, it looks to me like
5 you went through certain documents and deposition
6 testimony that was provided to you by plaintiff's
7 counsel; is that correct?
8        MR. DAVIS: Object to form. Object to the
9 characterization.
10        You can answer.
11        THE WITNESS: Yes, these documents were
12 provided by plaintiff's counsel. As I said yesterday,
13 initially, when I started this process at the very
14 beginning, I had a list of documents that I thought
15 would be useful to review as part of this overall
16 process. This goes back some time ago. So it may have
17 been the documents I had requested. It may have been
18 other documents. So I'm not sure which -- which would
19 fall into which category. But the documents I reviewed
20 for the report are the ones that are listed in
21 Exhibit A.
22     Q. (BY MR. STOY) Right. And you -- I think you
23 testified earlier that with respect to the deposition
24 testimony you didn't review those documents in their
25 entirety; is that correct?

Page 56

1     A. That's not what I said. What I said was I was
2 provided with a complete transcripts and I skimmed
3 through the transcripts. I did not necessarily read
4 every sentence in the very extensive depositions
5 provided. I skimmed through and I asked for what --
6 where there might be specific references for the things
7 I was looking for. But if you -- I want to make sure
8 you understand that I didn't necessarily review every
9 sentence in the deposition. I wanted to review the
10 pertinent points relative to my report.
11     Q. How did you -- and I'm just asking with respect
12 to the Mylan deposition transcripts, how did you
13 determine which portions of those transcripts would
14 contain pertinent information?
15     A. So it's the same as I said before is I asked
16 counsel what sections might relate to the particular
17 aspects that I'm trying to review here, and they
18 directed me to those sections.
19     Q. And those were the sections or some of the
20 sections that ultimately appear in your report?
21     A. That's correct.
22     Q. In the text, correct?
23     A. That's correct.
24     Q. And with respect to -- so putting deposition
25 transcripts to one side, with respect to the documents

Page 57

1 that you referenced, how did you go about selecting
2 those documents for inclusion in your report?
3     A. So as I've indicated, I tried to pull up
4 examples that would relate to -- CGMP deficiencies that
5 related to the class, and again, I didn't necessarily
6 review other -- I may have reviewed other documents that
7 would also be relevant, but I only included examples in
8 my report.
9     Q. Did you read the full documents that are
10 included in your report?
11     A. Well, some of these documents are hundreds of
12 pages. So I reviewed the -- I reviewed the sections
13 that were relevant to the sections I referenced.
14     Q. And how did you -- same question as with the
15 deposition testimony, how did you go about determining
16 which sections were relevant?
17     A. Well, for example, let's go to my -- my
18 Paragraph 130. In that regard I reviewed the entire
19 document. This had to do with the risk assessment that
20 was eventually ultimately classified as low risk. I did
21 review that entire document because the entire document
22 was relevant to my report.
23     Q. Look specifically at Paragraph 131 in your
24 report.
25     A. Which paragraph?

15 (Pages 54 - 57)

Page 58

1    Q. Well, actually, first of all, I want to ask you
2  about Paragraphs 129 through 133 in your report --
3    A. Okay.
4    Q. Let me know when you're there.
5    A. I'm there.
6    Q. Okay. You made some statements here about
7  Mylan's internal operations, correct?
8    A. When you say, "internal operations," I make
9  reference to the risk assessment in 2014.
10   Q. Right. That would be an internal Mylan
11 document, correct?
12   A. That's correct.
13   Q. These observations that you make in 129
14 through 133 would not be pertinent to any other
15 defendant besides Mylan, correct?
16   A. That's probably the case because these were
17 Mylan risk assessments.
18   Q. Sure.
19       MR. DAVIS: Let me -- I'm going to place an
20 objection on that last question.
21       THE WITNESS: So I guess maybe to clarify
22 that it would be relevant to Mylan and the class related
23 to Mylan products.
24   Q. (BY MR. STOY) What do you mean by that?
25   A. Well, it -- it would relate to all the products

Page 59

1  and pills that were distributed by Mylan relative to the
2  specific issue.
3    Q. Look specifically at Paragraph 131 on Page 26
4  there. Take a second and read it for me. Not out loud.
5  Just to yourself.
6    A. Okay. I've read it.
7    Q. Okay. You make reference to some
8  chromatography testing of the solvent ortho-xylene; is
9  that correct?
10   A. I do.
11   Q. Did you personally review any of that
12 chromatography testing?
13   A. I did not review the specific chromatograms. I
14 did not review those. It wasn't relevant to my report
15 to review the specific chromatograms.
16   Q. So you did not undertake any analysis of
17 yourself of these so-called unknown peaks; is that
18 correct?
19   A. No, I relied on -- on the Mylan testimony to
20 indicate that they never investigated these unknown
21 peaks. That -- that was what I looked at. Mylan
22 themselves indicated they had not done a -- investigated
23 the unknown peaks.
24   Q. So you're not offering any opinion of whether
25 Mylan should or should not have investigated these

Page 60

1  peaks, correct?
2    A. My comment -- I'm sorry.
3        MR. DAVIS: Object to form. Go ahead.
4        THE WITNESS: So my comment is they should
5  have investigated these peaks and -- which is what the
6  FDA also got into as well. And so not properly
7  investigating these unknown peaks was the -- was the
8  issue. But I'm not offering an opinion on the specific
9  chromatograms.
10   Q. (BY MR. STOY) Right. You're just restating
11 what you think FDA said with regard to this --
12   A. No.
13   Q. -- because you didn't analyze them yourself,
14 right?
15       MR. DAVIS: Object to form. Objection to
16 the mischaracterization of his testimony.
17       THE WITNESS: No. What you said is not
18 correct. I also reviewed the depositions from the Mylan
19 employees relative to the situation.
20   Q. (BY MR. STOY) In Paragraph 132, which you just
21 referenced, you state that FDA made some observations
22 about unknown peaks in some document; is that right?
23   A. I do.
24   Q. Do you know if the unknown peaks that you
25 reference --

Page 61

1        THE REPORTER: Wait. I can't hear you.
2        THE WITNESS: I can't either.
3        MR. DAVIS: Sorry, Frank. We didn't get
4  that. Can you repeat the question?
5        MR. STOY: Sure. Can -- can you hear me
6  now?
7        MR. DAVIS: Yes.
8    Q. (BY MR. STOY) Do -- do you know if the unknown
9  peaks that you reference in Paragraph 132 are the same
10 ones referenced in Paragraph 131?
11   A. I'm not certain, but it's not particularly
12 relevant. The real key is that Mylan should have been
13 investigating these unknown peaks. So whether the same
14 or not is not relevant. The fact is that they weren't
15 properly investigated. That's the point I was making.
16   Q. Well, if they're not the same, how do you know
17 that they weren't properly investigated?
18       MR. DAVIS: Objection to form. Objection
19 to the mischaracterization of the testimony.
20       You can answer.
21       THE WITNESS: Mylan themselves in their
22 depositions basically stated that.
23   Q. (BY MR. STOY) How do you know that the
24 deposition testimony is referring to the same peaks?
25   A. I don't. But it's not relevant. It doesn't

16 (Pages 58 - 61)

Page 62

1  matter.
2      Q.  So your testimony is that any failure to
3  investigate any unknown peak anywhere in the company
4  somehow relates to valsartan?
5          MR. DAVIS:  Objection.
6      Q.  (BY MR. STOY)  I'm not following your
7  testimony, sir.
8          MR. DAVIS:  Object to form.  Objection to
9  the mischaracterization of his testimony.
10         THE WITNESS:  So what I said and I'll say
11  again is if in a chromatogram you have unknown peaks,
12  it's the responsibility of the company to investigate
13  and determine what those unknown peaks represent.
14     Q.  (BY MR. STOY)  And you don't know whether they
15  were investigated or not beyond what you read in
16  documents, right?
17     A.  Well, I'm referring back to what Mylan
18  themselves said.
19     Q.  Take a look on the next page.  You cite to an
20  FDA inspection document there, right?  I think it's --
21  it's in Footnote 68, 69, and 70, it's the same document;
22  is that right?
23     A.  That's right.
24     Q.  You quote some excerpts from that document,
25  correct?

Page 63

1      A.  I do.
2      Q.  Take a look at Paragraph 136 on Page 27.  Let
3  me know when you've had a chance to read it.
4      A.  Okay.
5      Q.  You're quoting the February 28, 2020 Unit 7 FDA
6  establishment inspection report in that paragraph,
7  correct?
8      A.  I am.
9      Q.  Tell me what analysis you performed related to
10  this document.
11         MR. DAVIS:  Object to the form.  Vague.
12         You can answer.
13         THE WITNESS:  I'm referencing what the FDA
14  found during the inspection of which they included in
15  their established inspection report.
16     Q.  (BY MR. STOY)  Right.  You're just quoting what
17  FDA says, right?
18     A.  I am quoting what FDA says, because I was not
19  in the facility, but the FDA was and they -- they issued
20  their report.
21     Q.  So you weren't able to do any independent
22  analysis to verify what FDA said, correct?  You're just
23  repeating what they put in the report?
24     A.  And I have no reason to believe that the FDA
25  was incorrect.

Page 64

1      Q.  Did you do anything else to render these
2  opinions that appear on this page as they pertain to
3  Mylan besides review this report?
4          MR. DAVIS:  Object to form.
5          THE WITNESS:  Well, I reviewed the
6  documents I've listed in my Exhibit A, which may include
7  other things.  And again, as I said before, these were
8  just examples.
9      Q.  (BY MR. STOY)  Are you aware of which Mylan
10  facilities manufacture valsartan API?
11     A.  I may be.  I just don't recall at hand.
12     Q.  Would you agree with me that FDA observations
13  at a facility that did not manufacture valsartan API
14  would not be relevant to your report?
15         MR. DAVIS:  Object to form.
16         THE WITNESS:  So my report addressed the --
17  addressed the points relative to CGMP deficiencies.
18  That's what was relevant, the CGMP deficiencies that
19  were observed.
20         MR. DAVIS:  Would you read my question
21  back, please, Madam Reporter?
22         (Requested question was read.)
23         THE WITNESS:  They would be --
24     Q.  (BY MR. STOY)  I would like you to answer that
25  question.

Page 65

1      A.  They would be relevant because of the
2  indicative of a corporate noncompliance.  So if it
3  occurs to one facility, it would probably occur at
4  another facility from a CGMP standpoint, and Mylan
5  should be responsible ensuring that all facilities are
6  CGMP compliant.
7      Q.  So it's your testimony that CGMP issues that
8  occur at one facility in a company -- in a global
9  company are also likely to occur at another facility in
10  a global company?
11         MR. DAVIS:  Object to form.  Objection to
12  the mischaracterization of his testimony.
13         THE WITNESS:  That's not what I said.  What
14  I said was if a CGMP deficiency occurs -- occurs in one
15  operation, most pharmaceutical companies would go and
16  investigate the other facilities to ensure they don't
17  have similar situation in those to facilities because
18  they could well have those situations.
19     Q.  (BY MR. STOY)  So my hand has facilities in,
20  let's say, Puerto Rico.  If the FDA goes into Puerto
21  Rico and makes observations about GMPs, it's your --
22  it's your position that Mylan then should initiate
23  investigations at all of its other facilities all over
24  the world?
25         MR. DAVIS:  Object to form.  Objection,

17 (Pages 62 - 65)

Page 66

1 incomplete hypothetical.
2         You can answer.
3         THE WITNESS: So if deficiencies are found
4 as for your example in a Puerto Rican facility, I think
5 Mylan should, in fact, go and investigate the similar
6 CGMP deficiencies occurring at other facilities. And I
7 believe that's the expectation of the agency, and I
8 would expect that to occur. And just going back to my
9 prior life at Baxter, that's what we did.
10        Q. (BY MR. STOY) So if you had FDA make
11 observations that were specific to one facility when you
12 were at Baxter, your testimony is that Baxter would
13 initiate investigations at all of its other
14 manufacturing facilities?
15        A. What I said -- what I said was if we had a
16 situation in one facility, we would -- had GMP
17 deficiencies, we would ensure that we examine the other
18 appropriate facilities to ensure we didn't have similar
19 deficiencies and/or put corrective actions in place not
20 have those situations.
21        Q. The report that -- let's go back to the Unit 7
22 EIR, which it comes from a 2020 inspection. You'd agree
23 with me that -- that the 2020 inspection occurred years
24 after the valsartan recall, correct?
25        A. It did occur after the recalls, yes.

Page 67

1         Q. And are you aware of the fact that at the time
2 of that inspection, Mylan's valsartan was back on the
3 market?
4         MR. DAVIS: Object to form and objection to
5 the mischaracterization of the facts.
6         THE WITNESS: So to answer your question, I
7 may be aware of it. That's not relevant to my report.
8         Q. (BY MR. STOY) Why is it not relevant to your
9 report?
10        A. Because in my report I used examples for CGMP
11 deficiencies that existed within Mylan, and whether they
12 were back on the marketplace at some point in the future
13 is not relevant to my report as to what happened at the
14 time I indicated there were CGMP deficiencies. All that
15 says is they eventually corrected them.
16        Q. Okay. But you're citing from a 2020 report and
17 a 2020 inspection that occurred after FDA had allowed
18 Mylan to return valsartan to the market, right?
19        MR. DAVIS: Object to form. Again,
20 objection to the mischaracterization of the facts.
21        THE WITNESS: I don't know the timing on
22 when valsartan came back to the -- Mylan's product came
23 back to market. Again, it's not relevant. The fact
24 that it came back is totally irrelevant to my report
25 relative to the CGMP deficiencies.

Page 68

1         Q. (BY MR. STOY) You don't know one way or the
2 other whether Unit 7 ever manufactured valsartan, right?
3         A. Again, no. And my -- but my point is -- and we
4 went through extensively yesterday in this deposition --
5 it doesn't matter if there is CGMP's deficiencies in a
6 facility. All of the -- all of the drug products
7 produced in that facility could be considered to be
8 adulterated. So if there's an issue in one part of the
9 facility, it would apply to other parts of the facility.
10        Q. Sure. But if that facility didn't make
11 valsartan, then it wouldn't apply to valsartan, right?
12        MR. DAVIS: Objection.
13        You can answer.
14        THE WITNESS: So again, my -- my -- my
15 comments related to CGMP deficiencies not necessarily
16 related to valsartan related to CGMP deficiencies, but
17 it does apply to the class. And the point was if there
18 was a deficiency -- hold on a second.
19        MR. DAVIS: Sorry. The witness lost his
20 microphone.
21        THE WITNESS: If there was a deficiency in
22 one part of the facility, there might be deficiencies in
23 another part of the facility.
24        Q. (BY MR. STOY) Okay. But that still doesn't
25 explain to me how that would apply to valsartan which if

Page 69

1 it was not manufactured at that facility.
2         MR. DAVIS: Object to form.
3         THE WITNESS: So I'm saying the same thing
4 again is that if there's a CGMP deficiency in one
5 operation in one part of the facility or another
6 facility, it should be the responsibility of the
7 pharmaceutical manufacturer to ensure that those
8 deficiencies are corrected across the operations, all
9 the operations.
10        But that's not -- that's not really the
11 subject of my report. I didn't get into that kind of
12 detail. My point is my report identified examples of
13 CGMP deficiencies. There may be others and if I had
14 additional information at some point, we would review
15 that information in light of this. This is not a merits
16 report. It's -- it's an attempt to identify examples of
17 CGMP deficiencies.
18        Q. (BY MR. STOY) Sure. But just to be clear, the
19 document that you are relying on on this page of your
20 report in order to form your opinions is this Unit 7 EIR
21 document, right?
22        MR. DAVIS: Object to form.
23        Q. (BY MR. STOY) That's the one you're quoting,
24 right?
25        A. That's -- that is the one I'm referencing. If

18 (Pages 66 - 69)

Page 70

1 you're referring to Section 136, that's the one I'm
2 referencing, yes.
3    Q. And you don't believe that the timing of when
4 FDA issued any warning letter to Mylan related to a
5 facility that manufactured valsartan, you don't believe
6 the timing of that is relevant to your report. Is that
7 your testimony?
8        MR. DAVIS: Objection to form and object,
9 vague and ambiguous.
10       You can answer.
11       THE WITNESS: The timing was not the aspect
12 of my report. The issue was identified what I
13 considered to be seriously GMP deficiencies that existed
14 and I reference those. But the timing relative to any
15 document that the FDA would have put out was not
16 particularly relevant to my examples that I reference in
17 my report.
18    Q. (BY MR. STOY) Could Mylan have returned to the
19 market with valsartan without FDA's approval to do so?
20       MR. DAVIS: Object to vague and ambiguous
21 as to Mylan's return to the market of valsartan.
22       You can answer.
23       THE WITNESS: I don't know. They may or
24 may not have been able to. I don't know because that
25 wasn't a topic that I reviewed as part of my report.

Page 71

1    Q. (BY MR. STOY) Well, I'm not -- I'm asking you
2 a more general question based on your, you know, 40-plus
3 years of experience in this industry.
4       When a -- when a company takes a product
5 off the market, can that company put the product back on
6 the market without FDA's approval?
7       MR. DAVIS: Object to form. Objection,
8 improper hypothetical. It's contrary to the facts of
9 the case.
10       THE WITNESS: So every example would be
11 different. So I -- you're giving me a hypothetical
12 situation. In some cases the FDA might want to approve
13 the product going back to the market. Other cases they
14 may not have to. It really depends. And again, it's
15 not relevant to what I was looking at and that was not a
16 topic, a focus I was looking at relative to my report
17 relative to the CGMP deficiencies.
18    Q. (BY MR. STOY) So you don't -- you don't know
19 whether Mylan ever went back on the market with
20 valsartan or not; is that your testimony?
21       MR. DAVIS: Object to -- sorry, Frank, I
22 didn't mean to cut you off there. Do you want to repeat
23 that?
24    Q. (BY MR. STOY) Sorry.
25       You do not know one way or the other

Page 72

1 whether Mylan ever went back on the market with
2 valsartan?
3    A. So I -- I may have seen that they went back to
4 the market. I don't know. But again, I'll say again it
5 wasn't relevant to the CGMP deficiencies that I was
6 reviewing and putting to my report.
7    Q. The FDA never placed Mylan on import letter,
8 correct?
9    A. I don't believe so, but I'm not certain. And
10 again, that's not relevant to my report.
11    Q. Are you aware that the facilities that
12 manufactured valsartan API continued to supply drug
13 products with FDA approval throughout the entire time
14 period that we've been discussing?
15    A. I'm not particularly aware of that. But again,
16 it's not relevant. All I'm going to say again what I
17 identified were examples of CGMP deficiencies. The
18 statement that you make is not relevant to my report and
19 it's not relevant to what I reviewed.
20    Q. Do you think the FDA would allow a drug
21 manufacturer to sell adulterated and misbranded products
22 in the United States?
23       MR. DAVIS: Object to form.
24       THE WITNESS: Well, it would depend upon
25 that particular situation and what the FDA determined.

Page 73

1 I'm not going to speak for the FDA, what the FDA may or
2 -- might or might not do.
3    Q. (BY MR. STOY) So you don't have an opinion on
4 that one way or the other?
5    A. I don't because it's not relevant, and I'm not
6 going to speak for the FDA. FDA does different things
7 relative to different circumstances. And I'm not going
8 to speak for the FDA.
9    Q. You testified yesterday that when you were at
10 Baxter, the FDA issued a warning letter to the company
11 in, I think, 2000; is that right?
12    A. I did -- so I can't -- you're a little --
13    Q. Oh, I'm sorry. I'm sorry. I apologize.
14       You -- you testified yesterday that when
15 you were with Baxter, the FDA issued a warning letter to
16 one of Baxter's facilities; is that right?
17    A. I was provided with a warning letter yesterday
18 that showed -- it showed that Baxter did receive a
19 warning letter, yes. I --
20    Q. Right. I think you were copied on that
21 document, right?
22    A. I was.
23    Q. And I believe you testified, and if I misstate
24 this, correct me, but I believe you testified that based
25 on that warning letter, you considered all the products

19 (Pages 70 - 73)

Page 74

1  manufactured at that facility to be adulterated as a
2  result of the warning letter. Is that your testimony?
3      A. So that -- I believe that's what I said
4  yesterday. But that's not particularly relevant to this
5  report.
6      Q. Okay. Well, I just want to unpack that a
7  little bit.
8          Do you believe that the warning letter
9  rendered all of Baxter's products adulterated
10 retrospectively?
11     MR. DAVIS: Object to form and vague and
12 ambiguous as to retrospectively.
13         You can answer.
14         THE WITNESS: You're asking me to give an
15 opinion on something that happened 22 years ago. I
16 don't recall.
17     Q. (BY MR. STOY) Okay. Well, you already gave
18 the opinion and you've restated it this morning that you
19 believe that that warning letter rendered all of
20 Baxter's products adulterated.
21     A. No, I did not say that.
22     Q. What did you say?
23     A. We're talking about that specific facility.
24     Q. Right. I'm sorry. At that specific facility,
25 right?

Page 75

1      A. Right. I believe that's what the warning
2  letter probably said so...
3      Q. Would that warning letter have rendered
4  products at other Baxter facilities adulterated?
5      A. I don't recall the exact circumstances of that
6  letter. I don't know and I don't want to speak to
7  something that happened 22 years ago.
8          MR. DAVIS: Frank, let me just place a
9  continuing objection on this. This was covered at
10 length yesterday. I don't think it's appropriate to --
11 for multiple attorneys to recover the same ground over
12 and over again.
13         MR. STOY: Well, I'm asking different
14 questions, John. But your -- your objection is noted.
15     Q. (BY MR. STOY) I want to understand, though,
16 do -- do you believe that the warning letter -- you're
17 not sure about retrospectively. What about -- did that
18 warning letter to Baxter render products manufactured at
19 that facility prospectively adulterated?
20         MR. DAVIS: Object to form. Again, vague
21 and ambiguous as to what you mean by "prospectively."
22         You can answer it if you understand it.
23         THE WITNESS: I don't recall. We're going
24 back some 22 years ago. We'd have to go back -- I don't
25 even have those files so I don't recall exactly what the

Page 76

1  situation was back then.
2      Q. (BY MR. STOY) Do you know if Baxter took any
3  products off the market as a result of that warning
4  letter?
5      A. I don't recall what Baxter did back in those
6  days. I don't know. I'm sure -- I'm sure if we wanted
7  to research that, we could determine whether, in fact,
8  that happened. But 22 years ago, I don't recall.
9      Q. Can you explain to me how it would be that the
10 FDA could permit adulterated products to be sold in the
11 United States under the FDCA?
12     A. No. I -- I'm not -- I'm not going to answer
13 that because I don't know because you're asking me to
14 speak for the FDA again, and I can't speak for the FDA.
15 Every circumstance would be different, and I'm not going
16 to speak for the FDA.
17     Q. But you've quoted the FDA extensively in your
18 report, right?
19     A. I quoted the FDA versus the investigator's
20 statements and the EIRs that I referenced.
21     Q. And you can't speak to the truth of those
22 statements one way or the other, right?
23         MR. DAVIS: Object to form.
24         THE WITNESS: I have no reason to believe
25 that any statements that were made in the EIRs are

Page 77

1  incorrect or misstated.
2      Q. (BY MR. STOY) Right. You wouldn't have any
3  reason to believe one way or the other, right?
4      A. Well, typically, in my experience the FDA when
5  they put in quotes in the EIRs, they are very specific.
6  And in all my years of experience, I've never seen those
7  to be incorrect statements.
8      Q. So when you were at Baxter, you never disagreed
9  with anything that the FDA put in a report?
10     A. That's not what I said.
11     Q. But that's my question.
12     A. Okay. So yes, we did disagree with the FDA on
13 many occasions. So I want to clarify.
14     Q. I'm sorry. What's your answer?
15     A. So to clarify, sometimes we would get reports
16 from the FDA that we did not agree with. We had
17 discussions, and the FDA would respond. Sometimes the
18 FDA agreed with us. Sometimes they didn't agree.
19         MR. STOY: Okay. I don't have any further
20 questions for you, Mr. Quick. Thank you.
21         THE WITNESS: Thank you.
22         MR. DAVIS: Anybody else?
23         UNIDENTIFIED SPEAKER: Is attorney's
24 counsel asking any questions.
25         UNIDENTIFIED SPEAKER: Let's give this a

20 (Pages 74 - 77)

Page 78

1 second because I do believe there are other counsel.
2 Why don't we go off the record for a minute.
3        VIDEOGRAPHER:  Off the record 10:00 a.m.
4     (Discussion off the record.)
5        VIDEOGRAPHER:  We are back on the record --
6 we are back on the record at 10:18 a.m.
7        MR. DAVIS:  Before you start, Steve, I just
8 want to place on the record that a break was commenced
9 at 10 o'clock a.m. and at the defendant's request and
10 we're now back on the record almost 20 minutes later.
11 Thanks.  You can start.
12        EXAMINATION
13   Q.  (BY MR. HUNCHUCK)  Mr. Quick, my name Steven
14 Hunchuck, and I'm going to ask you some questions
15 regarding the Aurobindo defendants and your opinions
16 about them.
17        If you could please pull up your report and
18 turn to Paragraph 173.
19   A.  Okay.
20   Q.  Okay.  At 173 it says, (Reading:)  Aurobindo
21 lacked competent quality management system in place to
22 adequately investigate the root cause of the nitrosamine
23 impurities.
24        THE REPORTER:  Can you speak up or get
25 closer to the mic?

Page 79

1        MR. DAVIS:  Hey, Steven, we're having
2 trouble hearing you.  You're either muffled.  It's like
3 a combination of being muffled and low volume.
4        MR. HUNCHUCK:  Sorry.
5   Q.  (BY MR. HUNCHUCK)  Looking at Paragraph 173
6 say, (Regarding:)  Aurobindo lacked the competent
7 quality management system in place to adequately
8 investigate the root cause in nitrosamine impurities.
9        Can you please explain the basis for your
10 statement "adequately investigated"?
11   A.  The reason for this is the FDA warning
12 letter that was issued --
13   Q.  I cannot hear you, Mr. Quick.
14        MR. DAVIS:  Can you not hear him, Steven?
15        MR. HUNCHUCK:  Try again, please.
16        MR. DAVIS:  Try your answer again, if you
17 remember the question.
18        THE WITNESS:  Yeah, I do.  The reason for
19 that statement is the FDA warning letter that was issued
20 to the company relative to the issues in this case.
21   Q.  (BY MR. HUNCHUCK)  Do you know what steps
22 Aurobindo took during that investigation?
23   A.  It's hard to hear you.
24        MR. GOLDBERG:  Counsel, just so you know,
25 the audio sequence is very delayed.  I know that the --

Page 80

1        MR. HUNCHUCK:  I'm getting a delay on your
2 end as well.
3        MR. GOLDBERG:  I believe that the reporter
4 had logged out during the break and logged back in.  And
5 I don't know if that had affected the audio or
6 something.  Maybe it would be a good idea to try and
7 have her leave again and rejoin and maybe that will fix
8 whatever issue we're having.
9        MR. HUNCHUCK:  If you want to go off the
10 record to fix this, we can do that.
11        VIDEOGRAPHER:  Off the record 10:21 a.m.
12     (Off the record.)
13        VIDEOGRAPHER:  We are back on the record
14 10:26 a.m.
15   Q.  (BY MR. HUNCHUCK)  Mr. Quick, going back to
16 Paragraph 173, what -- what steps did Aurobindo take to
17 investigate the route cause of the nitrosamine
18 impurities?
19   A.  Well, the reason -- the reason -- reason for my
20 statement there was the fact that the company received
21 the FDA warning letter.  If, in fact, there was an
22 adequate quality system -- quality adequate system
23 placed, they probably wouldn't have received a warning
24 letter.  And having reviewed what Lantech did, it was
25 very clear that the company did not do an adequate job

Page 81

1 of managing Lantech.
2   Q.  Well, what steps did Aurobindo take to
3 investigate the nitrosamine impurities?
4   A.  I didn't review all the steps that they -- that
5 they took or didn't take.  But whatever they did was
6 inadequate.
7   Q.  So you're basing your opinion on the FDA
8 warning letter then, correct?
9   A.  I'm also basing it on the warning letter that
10 went to Lantech after this occurred, and obviously, they
11 had the same issues with Lantech which, in fact, the
12 company should have known.
13   Q.  Do you know what was missing from Aurobindo's
14 investigation?
15        MR. DAVIS:  Object to form.
16        THE WITNESS:  Well, we could go through all
17 the issues in the warning letter, all the issues in the
18 warning letter to Lantech.  Again --
19   Q.  (BY MR. HUNCHUCK)  Did you investigate its
20 products from nitrosamines which is in your report?
21        MR. DAVIS:  Is there a question there,
22 Steven?
23   Q.  (BY MR. STOY)  Do you know what was missing
24 from Aurobindo's investigation?
25        MR. DAVIS:  Object to form.  Objection,

21 (Pages 78 - 81)

Page 82

1  asked and answered.
2        THE WITNESS:  So I did not go through all
3  the specifics in terms of the specific investigations.
4  But clearly the fact that all of this occurred at
5  Lantech clearly indicates that they did not have proper
6  investigations and/or proper review of Lantech.
7        Q.  (BY MR. HUNCHUCK)  Aurobindo's route synthesis
8  was for its false API does not create nitrosamine; is
9  that correct?
10       A.  I --
11       MR. DAVIS:  Object to form.  Objection
12  outside the scope.
13       THE WITNESS:  You're hard to hear.
14       Q.  (BY MR. HUNCHUCK)  I can assure you I'm talking
15  very loudly into my computer.
16       Are you aware that AB's route synthesis
17  does not create nitrosamines?
18       MR. DAVIS:  Object to form.  Same
19  objections as before.
20       THE WITNESS:  Again, that's not a topic I
21  particularly reviewed relative to my report.  My report
22  was addressing examples of CGMP deficiencies.
23       Q.  (BY MR. HUNCHUCK)  Okay.  You testified
24  yesterday that a manufacturer is supposed to
25  characterize their impurities and know what they are; is

Page 83

1  that correct?
2        A.  That's correct.
3        Q.  Okay.  If AB's route synthesis -- when I say
4  "AB," I mean Aurobindo -- if AB's route synthesis does
5  not create nitrosamines, how was AB supposed to
6  determine that nitrosamines were present?
7        A.  The --
8        MR. DAVIS:  Object to form.  You can
9  answer.
10       THE WITNESS:  The issue was the fact that
11  these were not being properly investigated.  It doesn't
12  matter what they were.  If they're unidentified peaks,
13  they should be investigated to determine what they are.
14       Q.  (BY MR. HUNCHUCK)  And what steps do you --
15  does -- what steps should Aurobindo have taken to
16  investigate those peaks that you referred to?
17       MR. DAVIS:  Object to form and object,
18  asked and answered already.
19       THE WITNESS:  So clearly, Lantech was out
20  of control.  And the company was using Lantech for
21  recycled solvents, and I mean, that came up I think in
22  the warning letter that was issued to the company and
23  also the warning letter that was issued to Lantech.  Had
24  they done a proper supplier evaluation and monitoring
25  the supplier of recycled solvents, none of this probably

Page 84

1  would have happened.
2        Q.  (BY MR. HUNCHUCK)  Mr. Quick, I haven't gotten
3  to overseeing Lantech.  I'm still on the investigation
4  of the nitrosamine.
5        How was Aurobindo to identify the
6  nitrosamine in a product that does not synthesize
7  nitrosamine?
8        MR. DAVIS:  Object to form.
9        THE WITNESS:  Well, the issue is the fact
10  that the improper investigations is to determine what
11  they were, what the impurities were.
12       Q.  (BY MR. HUNCHUCK)  But you don't know what
13  steps Aurobindo took to investigate; is that correct?
14       A.  All I know is what the FDA stated in the
15  warning letter.
16       Q.  Okay.  Aurobindo did determine the root cause
17  of its nitrosamine impurities; is that correct?
18       A.  I'm not certain.  Again, I'm only -- I have --
19  I have limited documents to look at relative to this
20  particular situation, and I'm relying on the FDA's
21  warning letter and also the warning letter that in
22  circulation to Lantech.
23       Q.  Are you aware that the nitrosamines -- excuse
24  me.  Strike that.
25       Are you aware that the amount of

Page 85

1  nitrosamines varied among the manufacturers' products?
2        MR. DAVIS:  Object to form.
3        THE WITNESS:  There may have been some
4  variability, but that's not at all relevant to my report
5  relevant to the CGMP deficiencies.
6        Q.  (BY MR. HUNCHUCK)  Do you have an understanding
7  as to why there was variability in the nitrosamines?
8        A.  I --
9        MR. DAVIS:  Object to form.  Objection,
10 outside the scope.
11       THE WITNESS:  That's not an area I
12 reviewed.  It was not part of the assignment relative to
13 this report relative to the CGMP deficiencies.  We may
14 get into that later on if we go beyond this report to a
15 merits report.  But that has not been the scope of this
16 report.
17       Q.  (BY MR. HUNCHUCK)  Do you know what
18 manufacturer of valsartan products inspected their
19 products for nitrosamines prior to 2018?
20       MR. DAVIS:  Object -- sorry.  No objection.
21       THE WITNESS:  I missed the first part of
22 that.
23       MR. DAVIS:  Can you repeat the question,
24 Steven?
25       Q.  (BY MR. HUNCHUCK)  Yes.  Do you know which

22 (Pages 82 - 85)

Page 86

1  manufacturer of valsartan inspected products for
2  nitrosamines prior to 2018?
3          MR. DAVIS:  Objection -- object to the form
4  and object to -- as vague and ambiguous as to the
5  question.
6          You can answer.
7          THE WITNESS:  So I'd have to go back and
8  look at documents to see.  I may be aware.  It's not
9  something I reviewed relative to this particular report.
10  Q. (BY MR. HUNCHUCK)  All right.  Please take a
11  look at Paragraph 174 of your report.
12  A. Okay.
13  Q. It says here, the FDA told Aurobindo in a
14  warning letter, et cetera, did you review the FDA's
15  Form 483 from the AB site inspection?
16  A. I may have.  I'm not certain.  If I -- if I
17  did, it would have been in one of the documents in my
18  Exhibit A.
19  Q. Okay.  Do you know whether Aurobindo responded
20  in writing to the 483 before FDA issued its warning
21  letter?
22  A. I'm having a difficult time hearing you.  So I
23  missed the first part of that.
24          MR. HUNCHUCK:  Is there -- is there a way
25  to turn up the volume of my voice in the room or?

Page 87

1          MR. DAVIS:  Yeah, I think it's -- it's as
2  high as it's going to go.
3  Q. (BY MR. HUNCHUCK)  Okay.  Mr. Quick, do you
4  know whether Aurobindo responded in writing to the 483
5  before FDA issued its warning letter?
6  A. I don't know the answer to that question.  My
7  assumption would be that they most likely did, which was
8  what most companies would do, but I don't know.
9  Q. Do you know whether Aurobindo informed FDA of
10  its intent to evaluate the potential for key starting
11  materials, other raw materials and solvents, to result
12  in the presence NDMA and NDEA before the FDA issued its
13  warning letter?
14  A. Again, I'm not sure I had those documents
15  reviewed.  So I'm not -- I don't know.  I may have, but
16  I don't know.
17  Q. Did you ask to see Aurobindo's response to
18  the 483 report?
19  A. I don't believe I did.  But I might have.  But
20  the relevant thing is, as I said before, I'm not looking
21  at all the deficiencies, GMP deficiencies.  I was just
22  looking at examples, and these are the examples that I
23  have for my report that apply to the entire class.
24  Q. And that -- that's exactly why I'm asking you
25  about these examples you cited in your report.

Page 88

1          Do you know whether Aurobindo ever
2  evaluated potential for key starting materials, other
3  raw materials and solvents, to result in the presence of
4  NDMA and NDEA?
5          MR. DAVIS:  Object to form.  Vague and
6  ambiguous.
7          THE WITNESS:  I have no idea whether they
8  evaluated other things.  Now again, my -- my focus was
9  on the CGMP deficiencies.  It wasn't what they may or
10  may not have evaluated.
11  Q. (BY MR. HUNCHUCK)  Do you know if -- strike
12  that.
13          I would like to take a look at
14  Paragraph 175.  You say, (Reading:)  The fact that
15  Aurobindo could not even competently investigate the
16  nitrosamine contamination once it became a focus of the
17  FDA demonstrates that Aurobindo's quality management
18  system had serious flaws and deficiencies.
19          Did I read that correctly?
20          MR. DAVIS:  He's asking if you read
21  Paragraph 175.
22          THE WITNESS:  I did read it.
23  Q. (BY MR. HUNCHUCK)  Okay.  Can you please tell
24  me what the serious flaws were?
25  A. The serious flaws were that the company

Page 89

1  qualified Lantech to recycle solvents without having
2  done a proper investigation, didn't -- didn't understand
3  what they were doing, and had they done that, had the
4  quality management system in place to do that, we
5  probably wouldn't have had this situation.
6  Q. We're going -- we're going to get to Lantech.
7  But I'm asking about Aurobindo's investigation that you
8  cited in Paragraph 175.
9          So what were the serious flaws in
10  Aurobindo's investigation?  You say "serious flaws" and
11  I would like to know what you mean by that.
12          MR. DAVIS:  Object to form.  Objection,
13  mischaracterizing his report and the testimony.
14          You can answer.
15          THE WITNESS:  Okay.  The flaws -- the flaws
16  were that they did not do a proper investigation
17  relative to the issue.  Had they done that, we would not
18  have had the problem with Lantech.  So I -- again,
19  I'm -- I -- I am not going through an exhaustive
20  analysis here.  I'm just citing a couple of examples and
21  this goes back -- I know you don't want to talk about
22  Lantech here.  But this goes back to the issue with
23  Lantech and the recycled solvents.
24  Q. (BY MR. HUNCHUCK)  Do you know how many lots of
25  Aurobindo's products contained NDMA?

23 (Pages 86 - 89)

Page 90

1    A. I may have seen that, but that wasn't relevant
2  to this report.
3    Q. Do you know the level of concentration of NDMA
4  found in any of Aurobindo's lots?
5    A. I may have seen that someplace, but that was
6  not relevant to this report.
7    Q. Would you agree that certain laws of
8  Aurobindo's VCDs had concentrations of NDA below the
9  FDA's acceptable intake level?
10   A. They may have. But again, that's not relevant.
11 The real issue is the control. So if the company did
12 not have adequate control or suppliers did not have
13 adequate control and some lots had acceptable limits,
14 others did not, would indicate there was a lack of
15 control and consistency relative to the product.
16   Q. Mr. Quick, in your view, does the presence of a
17 detectable about of nitrosamine in a VCD always
18 demonstrate a failure to comply with the CGMP?
19   A. I did not opine on that. My point was that
20 there with were deficiencies --
21   Q. I'm asking you -- I'm asking you --
22   MR. DAVIS: Don't cut the witness off,
23 Steven.
24   Q. (BY MR. HUNCHUCK) My apologies. My apologies.
25   A. I did not render an opinion on that.

Page 91

1    Q. As you sit here today, in your view, does the
2  presence of a detectable amount of nitrosamine in a VCD
3  always demonstrate a failure to comply with a CGMP?
4    MR. DAVIS: Object to form. Objection,
5  improper hypothetical.
6    THE WITNESS: Again, like I said, I did not
7  look at that, I did not review that. If we want to do
8  that in some further report, we can go down that report,
9  but I did not go down that path in my report and I have
10 not -- did not review that aspect.
11   Q. (BY MR. HUNCHUCK) Will you please take a look
12 at Paragraph 72 of your report?
13   A. 72?
14   MR. DAVIS: 7-2.
15   Q. (BY MR. HUNCHUCK) 72, yes. It says,
16 (Reading:) FDA expects drug manufacturers to test and
17 compare recovered solvents to an established standard.
18   Did I read that correctly?
19   A. Right, you did.
20   Q. What was the solvent Aurobindo recovered?
21   MR. DAVIS: Object to form and object to
22 the memory test that you're trying to use here.
23   THE WITNESS: So I probably saw that, but I
24 don't recall that and that was not relevant to my
25 report.

Page 92

1    Q. (BY MR. HUNCHUCK) What established standard
2  applied for comparing Aurobindo's recovered solvent?
3    A. Well, it should be the established standard
4  that the company had. My quote here from this -- in 72
5  is from the API process inspection manual.
6    Q. Do you know whether the test Aurobindo used
7  would have detected the presence of nitrosamines?
8    MR. DAVIS: Object to form. Objection,
9  outside the scope. He's not a process chemist.
10   You can try and answer if you -- if you
11 want.
12   THE WITNESS: I don't have an answer for
13 that because that's not an area that I reviewed and was
14 not part of my report.
15   Q. (BY MR. HUNCHUCK) We can go back to the
16 Aurobindo specific section. Please look at
17 Paragraph 168.
18   A. Okay.
19   Q. You say, (Reading:) Lantech had not even been
20 investigated by the FDA prior to 2018.
21   MR. DAVIS: Inspected I believe.
22   Q. (BY MR. HUNCHUCK) I'm sorry. Let me strike
23 that.
24   You say, (Reading:) Lantech had not even
25 been inspected by the FDA prior to 2018.

Page 93

1    Did I read that correctly?
2    A. You did.
3    Q. What is the basis for that opinion?
4    A. The basis is I don't -- I don't believe -- in
5  fact, they had been inspected prior to that date. I
6  believe they came in after this occurred.
7    Q. What is -- what assumption are you making for
8  that belief?
9    MR. DAVIS: Object to form.
10   THE WITNESS: I -- I'm not quite certain
11 where it came from, but I believe it to be factually
12 correct.
13   Q. (BY MR. HUNCHUCK) That's -- that's my
14 question. Where did that come from?
15   A. I don't recall at this point in time where it
16 came from. But, I mean, that's something -- go ahead.
17   Q. Sorry. I didn't mean to interrupt you. Please
18 go ahead.
19   A. So I believe that to be a statement of fact,
20 but I'm not quite sure where that originated.
21   Q. Was Lantech licensed by the FDA?
22   MR. DAVIS: Object -- sorry. Object to
23 form. Objection, vague and ambiguous.
24   You can answer.
25   THE WITNESS: Okay. The FDA does not

24 (Pages 90 - 93)

Page 94

1  license.  The -- the firm has to have a drug
2  establishment.  They register as a drug establishment.
3  The FDA does not license them.
4      Q. (BY MR. HUNCHUCK)  Okay.  In Paragraph -- can
5  you please look at Paragraph 169?
6      A. Okay.
7      Q. You say, (Reading:)  Had Aurobindo been
8  properly overseeing Lantech Pharmaceuticals and
9  conducting its appropriate due diligence, Aurobindo
10  would have observed Lantech appeared to be
11  cross-contaminating Aurobindo's solvents recovery
12  activities with other manufacturers.
13          Did I read that correctly?
14      A. You did.
15      Q. Can you please describe Lantech's process for
16  recovering solvents for Aurobindo?
17          MR. DAVIS:  Objection, asked and answered.
18  Objection, outside the scope.  Objection, he's not a
19  process chemist.  I don't see where you're even trying
20  to go with this, Steven.
21          You can answer if you want.
22          THE WITNESS:  The issue was not how they do
23  it.  The issue was the cross-contamination.
24      Q. (BY MR. HUNCHUCK)  You opined that Aurobindo
25  failed to oversee its -- its solvent recovery vendor,

Page 95

1  and I'm trying to understand what you know about
2  Lantech's solvent recovery methods to determine that
3  Aurobindo failed to oversee it.
4          So my question is, please describe
5  Lantech's process for recovering Aurobindo's solvent.
6          MR. DAVIS:  Same objections.
7          THE WITNESS:  So Lantech's processes are
8  not relevant here.  The fact is that they were not --
9  the proper oversight didn't exist, which appeared in the
10  warning letters.
11      Q. (BY MR. HUNCHUCK)  Where were the nitrosamines
12  found at Lantech?
13      A. I don't recall where they were found.
14          MR. DAVIS:  Object to form to that question
15  also.
16          THE WITNESS:  Again, my -- as I'll say
17  again, my report was covering examples of CGMP
18  deficiencies, and it was clear that the company did not
19  have proper oversight over Lantech.
20      Q. (BY MR. HUNCHUCK)  What is your understanding
21  of what caused nitrosamines to be present on Lantech's
22  equipment?
23      A. I did not get into that level of detail.  The
24  issue was that there was not proper oversight and this
25  did, in fact, occur.

Page 96

1      Q. Looking back at Paragraph 169, you say
2  "properly overseeing."  Can you please tell me the basis
3  for that statement?
4      A. Which -- which paragraph?
5          MR. DAVIS:  Which paragraph, Steven?
6          MR. HUNCHUCK:  169.
7          MR. DAVIS:  169.
8          THE WITNESS:  Okay.  The basis for that is
9  the FDA warning letter and also the deposition that I
10  reference there.
11      Q. (BY MR. HUNCHUCK)  Do you know what steps, if
12  any, were taken to oversee Lantech's solvent recovery
13  process?
14      A. I don't know what specific steps were taken.
15  But whatever they were, they were not adequate.
16      Q. Why do you believe Aurobindo would have
17  observed that Lantech appeared to be
18  cross-contaminating?
19      A. That came out in the -- in the warning letters,
20  and like I said before, if, in fact, the company
21  had --had -- properly had oversight and audited and
22  understood what Lantech was doing, the company should
23  have been aware of what they were doing.
24      Q. Do you know what Lantech's solvent's recovery
25  equipment looks like?

Page 97

1          MR. DAVIS:  Objection to form.  Objection,
2  relevance.
3          THE WITNESS:  I have no idea what their
4  equipment looks like.  I've never been to Lantech, so
5  I've never seen it.
6      Q. (BY MR. HUNCHUCK)  Do you -- in Paragraph 170
7  you say, (Reading:)  Lantech's operations were so
8  deficient that cross-contamination was occurring at
9  least in four different ways.
10          What were the four different ways?
11      A. Well, the four different ways were described in
12  the depositions, which if we want to pull those
13  depositions up, we can look at those.
14      Q. Are you familiar with -- I'm going to butcher
15  this name.  Apologies.  Are you familiar with Tree Can't
16  (phonetic) Road Lines?
17      A. I didn't hear that.
18          MR. DAVIS:  Can you -- can you repeat the
19  question?
20      Q. (BY MR. HUNCHUCK)  Are you familiar with Tree
21  Can't (phonetic) Road Lines, the trucking company, Tree
22  Can't Road Lines?
23      A. Am I familiar with them?  I don't believe so.
24      Q. Are you familiar with Jaganat Road Lines?
25          MR. DAVIS:  Objection, relevance.

25 (Pages 94 - 97)

Page 98

1    You can answer.
2        THE WITNESS: I don't believe I am.
3    Q. (BY MR. HUNCHUCK) Have you ever seen
4  Lantech -- strike that.
5        If we look at Paragraph 171, you say,
6  (Reading:) Aurobindo's chief quality officer,
7  Dr. Ambati Rama Mohana Rao, would agree that Lantech's
8  equipment is being uncleaned.
9        Do you know what equipment Mr. Rao was
10  referring to?
11    A. I don't know specifically what equipment he was
12  referring to. This comes from the deposition.
13    Q. Do you have an understanding as to what he
14  meant by saying "unclean"?
15    A. Well, we'd have to go back to the deposition if
16  we want to do that, and we could discuss that. But I --
17  just looking at this today, I'm not sure. I mean, the
18  fact is it wasn't. So...
19    Q. Why do you say that?
20    A. Because there was cross-contamination.
21    Q. Do you know how many lots of Aurobindo's
22  products were contaminated by unclean equipment?
23        MR. DAVIS: Objection, asked and answered.
24        THE WITNESS: I -- I don't know how many
25  lots were contaminated. Again, that's not relevant to

Page 99

1  the CGMP deficiencies. The CGMP deficiency would --
2  would pertain to whether they had contaminated a product
3  or not. So how many lots would be relevant to this.
4    Q. (BY MR. HUNCHUCK) Are you aware that not all
5  of Aurobindo's lots were recalled?
6    A. I'm not -- I'm not certain how many lots were
7  recalled or whether they weren't recalled. But again,
8  that's not relevant to the CGMP deficiencies that I
9  found. And again, I state those were just examples.
10    Q. Are you aware that certain consumers of
11  Aurobindo's valsartan containing drugs did not consume
12  any nitrosamines?
13        MR. DAVIS: Objection, assumes facts not in
14  evidence.
15        THE WITNESS: Again, I'm not aware of that,
16  and again, it's not relevant to the report that I wrote.
17    Q. (BY MR. HUNCHUCK) Okay. In Paragraph 172 you
18  say, (Reading:) Had Aurobindo done even a minimal
19  amount of due diligence, it could have discovered these
20  deficiencies for itself in any of the years prior
21  to 2019.
22        What was necessary to discover the presence
23  of nitrosamines before 2019?
24    A. So the paragraph talks about the deficiencies.
25  And my point earlier had the company done an adequate

Page 100

1  job of managing and had oversight of Lantech, they would
2  have been there, they would under covered the same kinds
3  of things that the FDA did before the FDA inspected. So
4  they should have been able to have found whatever the
5  FDA found.
6    Q. Do you know whether any BCD manufacturers, API,
7  or API manufacturers were testifying for nitrosamines
8  prior to 2018?
9        MR. DAVIS: Objection, asked and answered.
10  Frank asked that question in exactly the same verbiage.
11        THE WITNESS: So we'd have to go back and
12  review the documents relative to that particular point.
13  And again, that was not relevant to my report.
14        MR. HUNCHUCK: That's all the questions I
15  have, Mr. Quick.
16        THE WITNESS: Thank you.
17        EXAMINATION
18    Q. (BY MR. ABRAHAM) Morning, sir. My name is
19  Eric Abraham. Can you hear me?
20    A. I can hear you, yes.
21    Q. Great. I'm going to be asking you some
22  questions next. I'm at the law firm of Hill Wallack in
23  Princeton, New Jersey, and I represent the Hetero Labs
24  and Hetero Drugs, defendants in this case. All right?
25    A. All right.

Page 101

1    Q. Do you still -- still have your report in front
2  of you?
3    A. I do.
4    Q. Okay. Great.
5        Please tell me your understanding of the
6  role, if any, that Hetero Labs played in the supply of
7  valsartan into the United States.
8        MR. DAVIS: Object to form.
9        THE WITNESS: We'd have to go back -- as we
10  talked about, there's been a number of entities here.
11  We'd have to go back and review those entities. That
12  was not the subject of my report. My subject of my
13  report is what I have on Page 35 of the report.
14    Q. (BY MR. ABRAHAM) Okay. Let me ask it
15  different.
16        Do you know whether Hetero Labs was an API
17  manufacturer or a finish dose manufacturer of valsartan?
18    A. I believe that they're an API manufacturer.
19    Q. And do you think that they were a finished dose
20  manufacturer? Do you know?
21    A. I'm not -- they may be. I'm not sure.
22    Q. Okay.
23    A. I would have to go back -- I would have to go
24  back and review the documents. Again, that's not
25  something I opined in the -- in the -- my document, my

26 (Pages 98 - 101)

Page 102

1  report.
2      Q.  Okay.  And how about Hetero Drugs, was Hetero
3  Drugs an API manufacturer; do you know?
4      A.  I thought I just -- just answered that.
5      Q.  Okay.  Do you know the difference between
6  Hetero Drugs and Hetero Labs as corporate entities?
7      A.  I -- I have not studied the corporate structure
8  of the company.
9      Q.  Okay.  Do you know which one manufactured API
10  or which one manufactured finished dose of valsartan?
11      MR. DAVIS:  Objection, asked and answered.
12  He says he hasn't studied the corporate structure of
13  Hetero.
14      MR. ABRAHAM:  Counsel, please don't answer
15  for the witness.
16      Q.  (BY MR. ABRAHAM)  Can you tell me what the
17  difference is between Hetero Drugs and Hetero Labs with
18  respect to the manufacture of valsartan?
19      A.  No.  I cannot tell you the difference.  If we
20  went back and reviewed some of the documents, maybe I
21  could, but that was not the subject of my report.
22      Q.  Do you know what manufacturing facility, either
23  Hetero Drugs or Hetero Labs, produced the valsartan
24  APIN?
25      A.  Which facility?

Page 103

1      Q.  Yes, sir.
2      A.  I'm not certain.  But that -- I'm sure that was
3  probably on the 43.  I -- that wasn't relevant, this
4  particular document, to put which facility.
5      Q.  Sir, I don't want to hear about your position
6  about what's relevant --
7      MR. DAVIS:  He's entitled -- hang on, Eric,
8  he's entitled to his testimony.
9      MR. ABRAHAM:  Don't interrupt me.  I have
10  very little time.  Don't interrupt me.
11      Q.  (BY MR. ABRAHAM)  My next question, sir:  Do
12  you know what Hetero facility manufactured the valsartan
13  finished dose?
14      A.  I probably do.  Okay.  Well -- the finished
15  dose, I'm not certain.
16      Q.  Okay.  Now, if I look at your report, it looks
17  to me like Paragraphs 176 through 186 are the paragraphs
18  that are specific to Hetero; is that correct?
19      A.  That is correct.
20      Q.  You offered no opinion as to any alleged
21  failure by Hetero to conduct a risk assessment
22  associated with any manufacturing change for valsartan
23  and API, correct?
24      MR. DAVIS:  Object to form.
25      THE WITNESS:  Let me just look back at the

Page 104

1  report.  I don't believe that was one of the issues that
2  I looked at here.  Again, my --
3      Q.  (BY MR. ABRAHAM)  Okay.
4      A.  -- as I said before --
5      MR. DAVIS:  Hey, hey, Eric, let him finish
6  his answer.  Thank you.
7      MR. ABRAHAM:  Answer the question.  Thank
8  you very much.
9      MR. DAVIS:  Hang on.  Before you move on,
10  you've got to let the witness finish his answer.  You
11  cannot cut him off mid sentence.  Thank you.
12      MR. ABRAHAM:  John, please, stop.
13      Q.  (BY MR. ABRAHAM)  Sir, you haven't offered any
14  opinion as to any failure by Hetero to assess deviations
15  or unknown peaks or aberrate, correct?
16      A.  That's correct.  I only offered the opinions
17  that I offered relevant to the specific deficiencies
18  that are in this report.  And again, I cite those as
19  being examples.  There may be others.
20      Q.  And you offered no opinion about any failure by
21  Hetero to adequately validate the valsartan
22  manufacturing process change, correct?
23      A.  Again, as I said, I only offered opinions on
24  specific examples.  It was not an exhaustive analysis of
25  the issues.

Page 105

1      Q.  So your expert report focused on two Form 483s
2  that were issued to Hetero, correct?
3      A.  I believe that to be the case.  But we'd have
4  to go back and --
5      Q.  Those are the only things that you footnoted --
6      MR. DAVIS:  Eric, let him finish his answer
7  before moving onto your next question.
8      THE WITNESS:  I believe that to be the
9  case.  The documents that I referenced are the ones in
10  the footnotes at the bottom of the page.
11      Q.  (BY MR. ABRAHAM)  Right.  And those -- the only
12  footnotes are to the two Form 483s, right?
13      A.  I believe that to be the case.
14      Q.  Okay.  I have emailed to your counsel,
15  Ms. Hilton, copies of those two Form 483s.  So if I
16  could ask her to please hand those to you so that way if
17  we need to refer to them during the questioning, you'll
18  have them.  Okay?
19      MR. DAVIS:  Sure.  I am handing them to the
20  court reporter to be marked as exhibits.
21      MR. ABRAHAM:  Great.  And if the court
22  reporter could just mark the March 2018 Form 483 and the
23  September 28 Form 483 and just let me know what numbers
24  you affix to those.
25      MR. DAVIS:  Okay.  The March one will

27 (Pages 102 - 105)

Page 106

1  first.
2      (Exhibits No. 30 and 31 were marked.)
3      MR. DAVIS:  For the record, the witness has
4  the March 483 as Exhibit 30 and the September as
5  Exhibit 31.
6  Q.  (BY MR. ABRAHAM)  Great.  Sir, if you could
7  just confirm for me, do you see Bates numbers on the
8  bottom of Exhibit 30?  It should say Hetero USA with
9  some numbers?
10  A.  I do.
11  Q.  Okay.  It's Hetero USA151204 on the first page?
12  A.  I do.
13  Q.  Okay.  And it goes through -- the last number
14  ends with the Bates number 7, correct?
15  A.  Yes, that's correct.
16  Q.  Okay.  And then for Exhibit 31 it's got the
17  Bates number HLL446173 on the bottom right corner,
18  right?
19  A.  That's correct.
20  Q.  Okay.  And the very last page, it ends
21  with 446176, correct?
22  A.  179?
23  Q.  Oh, it goes through 179?  Okay.
24  A.  Yes.
25  Q.  Thank you.

Page 107

1      These Form 483s were issued by the FDA at
2  Hetero in conclusion of facility inspections that are
3  referenced in the upper right-hand corner of Form 483,
4  right?
5  A.  I missed the last part of that.
6  Q.  The dates of inspection for each Form 483 are
7  notated in the upper right-hand corner, correct?
8  A.  That's correct.
9  Q.  So those inspections occurred in late February
10  and early March of 2018 and then a second series of
11  inspections in September of 2018; is that correct?
12  A.  That's correct.
13  Q.  Other than these two Form 483s, did you rely on
14  anything else to reach your conclusions that you reached
15  as against Hetero in your declaration that's marked as
16  Exhibit 6?
17  A.  Again, I'd have to go back and look at all
18  these footnotes to make sure that these footnotes that I
19  reference here didn't include any other documents.  But
20  I'm not certain because we haven't -- I haven't pulled
21  those up.
22  Q.  Okay.  Did you review any of the FDA's
23  establishment inspection reports for the Hetero
24  manufacturing facility that's the subject of Exhibit 30,
25  the Form 483 from -- from March 2018?

Page 108

1  A.  I don't believe that I had those.
2  Q.  Of the -- the February and March of 2018
3  inspection, that occurred a few months before the
4  manufacture of the valsartan by Hetero that allegedly
5  contained the NDMA impurity; is that correct?
6  A.  If you're asking did this occur before the ZHP
7  in the situation of June of 2018, is that what you're
8  asking?
9  Q.  No, my question was specifically to Hetero.
10  Not ZHP, sir.
11  A.  Okay.
12      MR. DAVIS:  Perhaps you can repeat the
13  question.
14  Q.  (BY MR. ABRAHAM)  My question is whether this
15  inspection that's referenced in Exhibit 30 took place
16  before the manufacture of allegedly impure valsartan by
17  Hetero.
18      MR. DAVIS:  Object to form.
19  Q.  (BY MR. ABRAHAM)  Do you know?
20  A.  I'm not certain I really understand what you're
21  asking.
22  Q.  Okay.  If you don't understand my question, say
23  so.
24      Do you know when it is that Hetero is
25  alleged to have manufactured valsartan with an NDMA

Page 109

1  impurity present?
2  A.  I'm not certain.  There may have been
3  documents, but I'm just not certain here today.
4  Q.  Okay.  Did you evaluate or consider whether FDA
5  had determined that the Hetero manufacturing facility
6  was in an acceptable state of compliance with CGMP as of
7  February and March of 2018?
8  A.  As you indicated, the documents that I reviewed
9  were the FDA 483 reports.
10  Q.  I understand that.  But I want to know whether
11  you did anything to determine whether FDA had determined
12  that the facility was in an acceptable state of
13  compliance with CGMP as of the February and March 2018
14  timeframe?
15  A.  I'm not sure there are any other documents to
16  review.  Had I -- if the documents were there, I'd be
17  glad to review them.
18  Q.  I'm not asking you to do something now.  I'm
19  wondering what you did to form your opinion.  In other
20  words, did you or did you not determine whether FDA had
21  reached the conclusion about whether the facility
22  subject to Exhibit 30 was in compliance with CGMP as of
23  February and March 2018?  If you did, you did.  If you
24  didn't, you didn't.  Just tell me.
25  A.  So in order to do that, we probably would have

Page 110

1 had to seen the EIRs from prior inspections where they
2 probably would state that. I have not seen those.
3    Q. Okay. So you didn't look at the EIRs either
4 before or after March 2018 for Hetero, is that fair?
5    A. Well, it's fair, but I don't think they were
6 provided. Had they been provided, I would have reviewed
7 them.
8    Q. Okay. But they weren't provided by the lawyers
9 who retained you, right?
10    A. Again, I'm not certain. If they have them,
11 they may have been provided, but I just don't recall
12 reviewing those.
13    Q. Okay. So in other words, the lawyers that
14 retained you may have made a choice not to share those
15 documents?
16        MR. DAVIS: Objection, that
17 mischaracterizes his testimony.
18        THE WITNESS: That's not what I said.
19    Q. (BY MR. ABRAHAM) Okay. You told me that you
20 hadn't been provided with those documents, correct?
21    A. I'm not even sure that I asked for them. So...
22    Q. Okay.
23    A. The bottom line is I have -- I have not seen
24 those. To answer your question whether it'd been in
25 compliance, I don't know because I haven't seen the

Page 111

1 document that would say one way or the other.
2    Q. And you didn't ask for them, correct?
3    A. Well, I don't -- I don't know. I would have to
4 go back and see what it asked for originally.
5    Q. Okay. And you weren't provided them. We can
6 agree on that?
7    A. Well, I don't know. I am not sure what was
8 provide and what wasn't. I'd have to go back and check.
9    Q. Okay. They're not listed on your exhibit to
10 your expert report as materials that you reviewed in
11 connection with the report, correct?
12    A. If they're not there, then I did not review
13 them.
14    Q. Okay. Did you determine the existence of any
15 inspectional classification for the Hetero unit that
16 manufactured valsartan API in 2018 such as a no action
17 indicated or a voluntary action indicated as of February
18 or March of 2018?
19    A. I did not review that. But if I were to pursue
20 this beyond this, I -- that's one of the things that I
21 would do. Again, as I said, my list of examples were
22 only examples. They're not exhaustive in terms of the
23 situation.
24    Q. Okay. And did you review any correspondence to
25 Hetero from FDA that followed the February or March 2018

Page 112

1 inspection?
2    A. I don't believe I've seen that.
3    Q. Isn't the normal process for the recipient of a
4 Form 483 to respond?
5    A. It is.
6    Q. Do you know whether Hetero responded to
7 the Form 483s that were issued in March and September
8 of 2018?
9    A. I don't know, but I assume they probably did.
10 Most companies would respond.
11    Q. So in issuing your declaration, you didn't
12 review any responses that Hetero may have made to those
13 Form 483s, right?
14    A. Had I seen those, I would have reviewed them.
15    Q. Right. Did you ask for them?
16    A. I don't recall whether I asked for them or not.
17    Q. Wasn't it important to you to consider the
18 responses of Hetero to the Form 483s issued in March and
19 September of 2018 before you issued your declaration?
20    A. No. As I said before, my examples are only
21 examples. It's not exhaustive. If this were a merits
22 report, that's one thing I would absolutely do. But
23 this is not a merits report. These are examples of CGMP
24 deficiencies.
25    Q. Okay. But the Form 483s, they are not final

Page 113

1 agency action, right?
2    A. That is correct.
3    Q. Okay. So by forming your opinions based just
4 upon the Form 483, isn't that sort of like only looking
5 at one side of the equation and not the other in
6 reaching your conclusion?
7        MR. DAVIS: Object to form. Object to the
8 analogy.
9        THE WITNESS: I'm looking at what the FDA
10 saw when they inspected the facility and what they had
11 as observations. Again, I would review the other
12 documents that you've referred to if this were to
13 continue to a merits report, and I agree that those
14 documents would be documents that I would review in that
15 situation.
16    Q. (BY MR. ABRAHAM) Okay. And you offered your
17 declaration without even reading the transcript of a
18 single Hetero witness, correct?
19    A. I don't believe so.
20    Q. You don't believe so meaning you didn't review
21 any Hetero Labs depositions, correct?
22    A. I don't believe that I did. I reviewed a
23 number of documents. If they're not in my Exhibit A,
24 then I did not review those.
25    Q. Okay. Let's talk about the Form 483s that you

29 (Pages 110 - 113)

Page 114

1  did cite in the report. And I'd like you to start with
2  the March 2, 2018 Form 483 which we've marked as
3  Exhibit 30. Do you have that in front of you?
4      A. I do.
5      Q. Great. Did you review any communication
6  between Hetero and FDA regarding the manufacturing
7  changes that allegedly gave rise to the NDMA purity of
8  valsartan API?
9      A. I don't believe so. And if it's not referenced
10  in my Exhibit A, then I probably did not review those.
11      Q. Okay. The March 2018 Form 483 identified five
12  observations, correct?
13      A. Yes, there are five observations.
14      Q. And the Form 483 doesn't indicate that any of
15  those five observations actually caused the NDMA
16  impurity to arise in Hetero's valsartan API, correct?
17      A. Correct, but I wouldn't expect to see that
18  anyway.
19      Q. You don't offer the opinion that any
20  observations contained in the March 2018 Form 483
21  actually caused the alleged NDMA impurity to arise in
22  Hetero's valsartan API, correct?
23          MR. DAVIS: Let me object just to -- in the
24  sense that this document is heavily redacted.
25          But you can answer.

Page 115

1          THE WITNESS: Right. That was the point I
2  was going to make as well. Most -- most of the
3  observations are redacted to the point it's not clear.
4  So I would assume the FDA did not make that connection,
5  but it's not clear because of the redactions.
6      Q. (BY MR. ABRAHAM) Right. But you don't offer
7  any opinion on the ultimate question of whether the
8  observations contained in the Form 483 from March 2018
9  actually gave rise to the NDMA impurity in Hetero's
10  valsartan, right?
11      A. That's correct. What I was offering opinions
12  on was the CGMP compliance.
13      Q. Okay. So in other words, but -- but you don't
14  connect the dots; in other words, you don't offer the
15  opinion that any CGMP compliance issues that you
16  identified for Hetero actually gave rise to the NDMA
17  impurity allegedly found in Hetero valsartan, right?
18      A. Right. And that was outside the scope of the
19  report. The report was identified examples of CGMP
20  issues that might pertain to the class.
21      Q. Okay. As of March of 2018, there was no
22  specification for NDMA levels in valsartan APIs; is that
23  correct?
24          MR. DAVIS: Can you repeat that, Eric? I
25  think we both missed that question.

Page 116

1      Q. (BY MR. ABRAHAM) Do you need it repeated, sir?
2      A. No. I heard the question. But my -- my -- my
3  point was, what I was going to say is I'm not aware of
4  specific dates relative to specifications or standards
5  or whatever as it relates to this. I'd have to go back
6  and -- I'd have to go back and review what those are.
7  But again, that was not relevant to my report.
8      Q. As far as you know today, was there a USP
9  monograph that required testing for NDMA as of
10  March 2018?
11          MR. DAVIS: Object to form.
12          THE WITNESS: See, again, no. But again, I
13  may have seen those documents but I -- those were not
14  relevant to my report.
15      Q. (BY MR. ABRAHAM) Okay. Again, I'd like to
16  look at the specifics briefly.
17          The first observation in the Exhibit 30
18  Form 483 relates to a thorough review of an unexplained
19  discrepancy between a batch and some specs, correct?
20      A. Well, it's very heavily redacted. I mean, I
21  can read what the unredacted part is.
22      Q. Right. And that's what the unredacted part
23  says, right, the observation relates to an unexplained
24  discrepancy, correct?
25      A. That's what -- that's what the -- that's what

Page 117

1  the top part of it says, and they go into the example,
2  yes.
3      Q. Okay. And you don't offer the opinion that
4  that discrepancy is what gave rise to the NDMA impurity
5  alleged in the --
6      A. No.
7      Q. -- valsartan from Hetero, correct?
8          MR. DAVIS: Object to form.
9          THE WITNESS: No. And I stated this
10  before, that was not --
11      Q. (BY MR. ABRAHAM) You've answered the question,
12  sir. Thank you.
13          MR. DAVIS: Hey, Eric as a professional --
14  as a professional courtesy, you need to let the witness
15  answer -- finish his answer.
16          MR. ABRAHAM: John, I have a very short
17  amount of time.
18          MR. DAVIS: That does not -- that does not
19  obviate --
20          MR. ABRAHAM: Don't interrupt me, John.
21  Don't interrupt me. He answers the question --
22          MR. DAVIS: You need to not interrupt the
23  witness, Eric.
24      Q. (BY MR. ABRAHAM) Sir, I would like to draw
25  your attention to observation No. 2. Observation No. 2

30 (Pages 114 - 117)

Page 118

1  relates to responsibilities and procedures applicable
2  for the quality control unit not being followed. Do you
3  see that?
4      A. I see that.
5      Q. And you don't offer the opinion that that's
6  what caused the NDMA to arise in Hetero's valsartan,
7  right?
8      A. No, it goes back to the questions I answered
9  previously --
10     Q. Okay. Thank you.
11         MR. DAVIS: Let me just -- I'm going to
12  place a formal running objection on the record to the
13  continued interrupting of the witness before he finishes
14  his answers.
15         MR. ABRAHAM: And I'm going to place an
16  objection to the witness's having to answer the
17  questions by giving a speech. So please just confine
18  yourself to answering my question. You can talk to your
19  lawyer afterwards and tell him whatever else you want to
20  tell him.
21     Q. (BY MR. ABRAHAM) I would like to draw your
22  attention, please, to the third observation. This
23  relates to some allegations regarding the lack of
24  training and experience for some employees involved in
25  the processing holding and testing the drug problem,

Page 119

1  correct?
2      A. Correct.
3      Q. So this has to do with some interviews that
4  were conducted by QC personnel within the manufacturing
5  unit by FDA's inspector, right?
6      A. It appears to be the case.
7      Q. And you don't offer the opinion that that's
8  what caused the NDMA to arise allegedly, right?
9      A. Same answer as I have given before. I don't
10  offer that for any of these.
11     Q. Thank you. Observation No. 4 has to do with
12  the equipment used in the production about being
13  maintained in proper conditions. Do you see that?
14     A. I do see that.
15     Q. Okay. And same answer as before, in other
16  words, you didn't offer any opinion that this is what
17  caused the NDMA to arise, correct?
18     A. That is correct.
19     Q. Okay. And the last observation has to do with
20  storage of glassware in a storage area, right?
21     A. Right.
22     Q. Okay. And same answer, that's not what gave
23  rise -- or you don't offer the opinion that that's what
24  gave rise to the NDMA --
25         MR. DAVIS: Before the witness answers, let

Page 120

1  me just place an objection. This is outside the scope.
2  He's not offering any opinion about how nitrosamine is
3  actually formed in these products.
4         You can answer.
5         THE WITNESS: Again, same answer as before.
6      Q. (BY MR. ABRAHAM) Thank you. Now I would like
7  to turn your attention, please, to Exhibit 31. That's
8  the September 2018 Form 483. Do you have that in front
9  of you, sir?
10     A. I do.
11     Q. Okay. Do you understand that this Form 483
12  occurred in the month or so after FDA's recall of
13  Hetero's valsartan?
14     A. So I see it's September. Relative to that
15  sequence of timing, I'm not certain.
16     Q. So you don't know the dates when Hetero's
17  valsartan was recalled; is that correct?
18     A. Well, I probably do. I probably looked at it.
19  But I don't recall those dates in conjunction with this
20  particular inspection. So I don't want to give an
21  answer without going back and checking the exact dates.
22     Q. Okay. What would you go back and check?
23     A. Well, the dates that -- you asked the timing
24  relative to the recall, I'd have to go back and
25  determine when the recall was, and then I could answer

Page 121

1  your question about whether it was before or after.
2      Q. Well, I want to know is that something that you
3  think you already know the answer to and you just forgot
4  it or that's an answer you would have to go learn?
5      A. It wasn't relevant to my report in terms of
6  CGMP deficiencies. So if you're asking me that
7  question, I need go back and determine when the recall
8  was, and I could determine whether this was before or
9  after. That's the question you're asking me.
10     Q. Okay. Let's look at Exhibit 31. This offers
11  four observations relative to the inspection that was
12  conducted September 17the through the 28th, correct?
13     A. Yes, sir, four observations.
14     Q. Okay. And the Form 483 that's marked as
15  Exhibit 31 that doesn't indicate that any of those four
16  observations actually caused the NDMA impurity to arise
17  in Hetero's valsartan API, correct?
18         MR. DAVIS: Do you need a few moments to
19  review the document?
20         THE WITNESS: I probably need to read this
21  if you want me the answer that.
22     Q. (BY MR. ABRAHAM) Well, you read it before you
23  offered your opinion, right?
24     A. That's been some time ago.
25     Q. But you did read it, right?

31 (Pages 118 - 121)

Page 122

1    A. I did.
2    Q. Okay. And in your expert report you wrote that
3 none of the observations -- well, you didn't offer the
4 opinion that any of the observations contained in the
5 September 28th Form 483 actually caused the alleged NDMA
6 impurity to arise, correct?
7    A. That's correct. And that was not within the
8 scope of my report.
9    Q. Okay. So you stand by that opinion, correct?
10    A. I do.
11    Q. Okay. Let's look at the specific observations.
12 Observation No. 1 relates to the quality control unit
13 failed to perform a thorough investigation. Do you see
14 that?
15    A. I do.
16    Q. That's an observation that relates to the
17 investigation performed by Hetero after the impurity was
18 discovered allegedly in Hetero's product, correct?
19    MR. DAVIS: Do you want -- you're asking,
20 Eric, about two-and-a-half pages of single space type.
21 I think the witness --
22    MR. ABRAHAM: John, if you want to make an
23 objection, make it. Okay. He just told me he reviewed
24 this document in preparation for his deposition. I
25 would just like to confirm his understanding.

Page 123

1    MR. DAVIS: Do you need a few moments
2 to read Observation 1?
3    (Cross-talk.)
4    THE WITNESS: If you want me to answer that
5 question, I need to review this today because you're
6 asking me a question specifically about the 483.
7    Q. (BY MR. ABRAHAM) Okay. Great. Go ahead. And
8 let me know when you're done.
9    A. Okay.
10    MR. GOLDBERG: May I suggest that we go off
11 the record because --
12    MR. ABRAHAM: No, Seth, you may not suggest
13 that because y'all pitched a fit about that when your
14 witnesses were spending 20 minutes reading a document.
15 So we will not go off the record.
16    Q. (BY MR. ABRAHAM) You know what? I'll ask
17 another question because I don't want to waste the time
18 it will take you to refresh you -- yourself on what the
19 contents of that document are.
20    Are you familiar with what FDA action
21 resulted from the March 2018 or the September 2018 483's
22 issue to Hetero?
23    A. I've not seen the actions. If there were any
24 actions, I've not seen those.
25    Q. So you don't if there was an NAI issue or a VAI

Page 124

1 or an OAI?
2    A. I'm not certain. I've not reviewed those.
3    Q. Okay. Are you aware of any official action
4 that was taken by FDA as a result of the Form 483s that
5 you relied on in this report?
6    A. Again, I did not review those.
7    Q. So you don't know if there's a warning letter?
8    MR. DAVIS: Eric, the -- Eric, the
9 videographer has indicated that he needs to go off the
10 record to change the tape.
11    MR. ABRAHAM: Okay. We can go off the
12 record and do that. Thank you.
13    VIDEOGRAPHER: Off the record 11:20 a m.
14    (Off the record.)
15    VIDEOGRAPHER: We are back on the
16 record 11:24 a m.
17    MR. DAVIS: For the record, there is 54
18 minutes remaining.
19    MR. ABRAHAM: Thank you. Just to the
20 videographer, our witness is very blurry. Okay. There
21 you go. Thank you.
22    Q. (BY MR. ABRAHAM) Sir, I just have a few more
23 questions, and I appreciate your patience.
24    Are you aware of any warning letter or
25 import ban that was issued by FDA to Hetero as a result

Page 125

1 of the Form 483s that we've been reviewing this morning?
2    A. I'm not aware of any.
3    Q. Any seizure or regulatory meeting or
4 recommendations to cease manufacturing?
5    A. I'm not aware of any.
6    Q. Okay. Are you aware of any corrective and
7 preventive actions or cappas (phonetic) relating to the
8 observations of the two Form 483s that we've been
9 discussing?
10    A. I'm not aware of any because I have not seen
11 what the company may have done relative to the 483.
12    Q. Okay. So did you review any cappas that were
13 initiated in connection with the Form 483s that we've
14 been discussing?
15    A. I would -- if I had seen them, I would review
16 them.
17    Q. Did you ask to review them?
18    A. I didn't ask to review them because I didn't
19 know any had been generated.
20    MR. ABRAHAM: Okay. Okay. I am concluded
21 with my questions. I appreciate your patience, sir.
22    THE WITNESS: Thank you.
23    MR. ABRAHAM: What I would like to do is
24 ask that we take a very short break so that I can confer
25 with my co-counsel. I think we have one questioning

32 (Pages 122 - 125)

Page 126

1 lawyer left to go.
2          John, can we take a very short break?
3      MR. DAVIS: Okay. All right.
4      VIDEOGRAPHER: Off the record 11:25 a.m.
5      (Brief recess.)
6      VIDEOGRAPHER: Back on the record. The
7  time is 11:34 a.m.
8          EXAMINATION
9      Q. (BY MS. NAGLE) Hi, Mr. Quick. My name is
10 Brittney Nagle, and I represent Torrent Pharmaceuticals,
11 Ltd. and Torrent Pharma, Inc.
12         Have you ever heard -- and I may refer to
13 them together as Torrent. Is that fair?
14     A. You're asking if I've heard of Torrent?
15     Q. I was asking for clarification. When I refer
16 to Torrent, I'm referring to those two entities. Okay?
17     A. What were the two entities again?
18     Q. Torrent Pharmaceuticals, Ltd. and Torrent
19 Pharma, Inc.
20     A. I would generally just refer to the one.
21     Q. By "the one" do you mean Torrent
22 Pharmaceuticals, Ltd.?
23     A. I would not have made a distinction is what I'm
24 saying.
25     Q. Okay. Well, you understand there's two

Page 127

1  different entities?
2      A. Okay.
3      Q. All right. Do you have any understanding about
4  the difference between the two entities?
5      MR. DAVIS: Object to form.
6      THE WITNESS: I may, but that was not part
7  of my review.
8      Q. (BY MS. NAGLE) Okay. Had you -- have ever
9  heard of Torrent prior to being engaged in this matter?
10     A. I'm sure I have.
11     Q. Have you ever done any work for Torrent?
12     A. No, I have not.
13     Q. So safe to say you've never physically been to
14 a Torrent facility?
15     A. I don't believe so unless there was some sort
16 of an acquisition that Torrent had and I might have been
17 in a facility where they acquired. But I'm not aware of
18 that.
19     Q. Are you aware of any instances where you've
20 been adverse to Torrent in another engagement?
21     MR. DAVIS: Object to form.
22         You can answer.
23     THE WITNESS: No. I'm sorry. No.
24     Q. (BY MS. NAGLE) So prior to your engagement,
25 did you have any understanding about the types of

Page 128

1  products that Torrent manufactures?
2      A. Prior to the engagement? I may have, but it's
3  not something I had particularly understood or had an
4  interest to understand.
5      Q. Okay. So when you say you may have, do you
6  mean just in your familiarity with the pharmaceutical
7  industry?
8      A. Well, what I'm saying is you asked the question
9  about Torrent's products prior to this engagement. It's
10 very possible that I may have. I don't recall.
11     Q. Okay. So sitting here today, you don't recall
12 knowing anything about what kind of products Torrent
13 manufactures prior to being engaged in this matter?
14     A. That's not exactly what I said. I may have,
15 but I'm not aware that I was.
16     Q. Okay. And prior to this engagement, you didn't
17 have any understanding of the relationship between
18 Torrent and any of its suppliers, correct?
19     MR. DAVIS: Object to form.
20     THE WITNESS: I don't believe so.
21     Q. (BY MS. NAGLE) Okay. Prior to your
22 engagement, you hadn't done any analysis of Torrent's
23 quality assurance program, correct?
24     A. I don't believe so unless it was in connection
25 with something else unrelated to this. But I don't

Page 129

1  believe so.
2      Q. Okay. So there's a possibility, but sitting
3  here today, you can't think of specifically any
4  engagement that would have required you to -- to know
5  anything about Torrent's quality assurance program?
6      A. I don't believe so, as I said.
7      Q. Okay. So -- so as far as you know, as far as
8  you can remember, the totality of your understanding of
9  Torrent's quality assurance process is based on
10 documents that you've reviewed in connection with this
11 engagement, correct?
12     MR. DAVIS: Object to form.
13     THE WITNESS: I believe so.
14     Q. (BY MS. NAGLE) Okay. And your understanding
15 of the relationship between Torrent and ZHP is based
16 entirely on the documents you reviewed in connection
17 with this engagement, correct?
18     A. That is correct.
19     Q. So in your report, looking specifically at
20 Paragraph 157, you reached the conclusion that Torrent
21 failed to diligently inspect the manufacturing process
22 prior to retaining ZHP as its API manufacturer, right?
23     A. Right.
24     Q. What do you mean comprehensive chemical
25 analysis?

33 (Pages 126 - 129)

Page 130

1    MR. DAVIS: Where are you referring to,
2  Brittney?
3    THE WITNESS: Can you refer me to the
4  paragraph you're talking from?
5    Q. (BY MS. NAGLE) Oh, sorry. I -- I misquoted
6  part of your report. I apologize.
7    In Paragraph 159, that's -- that's where
8  I'm reading that from. I apologize.
9    So in Paragraph 159 you wrote, (Reading:)
10  Torrent also made no inquiries into the manufacturing
11  process uses -- I think that should be used by ZHP and
12  failed to conduct a comprehensive chemical analysis.
13    Do you see that?
14    A. I do see that.
15    Q. Can you tell me what you meant by
16  "comprehensive chemical analysis"?
17    A. Well, it goes to some of the other aspects of
18  this section on Torrent, and it relates to the
19  depositions that I reviewed.
20    Q. Okay. What would you require for a
21  comprehensive chemical analysis?
22    A. I wouldn't require anything. I'm just saying I
23  don't believe that they did.
24    Q. What is the basis for that?
25    A. I'm just saying based on the depositions that I

Page 131

1  reference in this report, I don't believe that they did
2  an adequate chemical analysis.
3    Q. Okay. And so I'm asking, well, if you believe
4  it was inadequate, what would you have wanted them to
5  do?
6    A. Okay. As we -- if we can look at
7  Paragraph 161, Torrent, as indicated, had they known of
8  the chemicals used in the manufacturing process, the
9  chemical analysis revealed what I said in there, had
10  they done that, they would have been able to determine
11  this. So they should -- they should have known what
12  these chemicals were that were being used in the ZHP
13  process.
14    Q. So, Mr. Quick, you're aware that Torrent is a
15  finish dose manufacturer, correct?
16    A. Correct.
17    Q. And as a finish dose manufacturer, you're aware
18  that Torrent does not get full access to the DMF for
19  valsartan API, correct?
20    MR. DAVIS: Object to form. Object to
21  mischaracterization of -- of the -- well, just object to
22  form.
23    You can answer.
24    THE WITNESS: So the point would be that I
25  believe Torrent should thoroughly understand the process

Page 132

1  that ZHP used to make the product that they are
2  requiring from ZHP, however they do it, whether it's DMF
3  or on-site visits looking at the documents, whatever.
4    Q. (BY MS. NAGLE) Well, Mr. Quick, you understand
5  that -- that the process API -- the process ZHP uses to
6  manufacture its API contains proprietary information,
7  correct?
8    A. I hear what you said. But my point is that the
9  drug manufacturer such as Torrent should have audited.
10  They should have gotten complete information relative to
11  how the product -- how the API is made.
12    Q. So it's your position that a finish dose
13  manufacturer is entitled to all proprietary information
14  for APIs that it sources?
15    MR. DAVIS: Object to form. Object to
16  mischaracterizes his testimony.
17    You can answer.
18    THE WITNESS: So that's not what I said.
19    Q. (BY MS. NAGLE) But, Mr. Quick, you realize
20  that Torrent isn't -- like, is not able to access all of
21  the information regarding API that it sources?
22    MR. DAVIS: Object to form. Objection,
23  asked and answered.
24    THE WITNESS: No, I'm not. But my point is
25  that Torrent should have been able to understand exactly

Page 133

1  how to process was, and they should have asked for a
2  number of documents to be able to understand the
3  situation. So when you say they're not able to, I think
4  they should have been able to.
5    Q. (BY MS. NAGLE) And how would you reconcile
6  being able to do that if the information is proprietary
7  information?
8    A. Well, you ask -- you ask ZHP for it and you say
9  we need this to do a thorough evaluation of ZHP as part
10  of a supplier audit, supplier qualification. And I'm
11  sure there were confidentiality agreements between
12  Torrent and ZHP such as ZHP could have provided the
13  information that Torrent would ask for.
14    Q. Mr. Quick, you recognize that there's different
15  testing done for API and for finish dose, correct?
16    A. Yes.
17    Q. And so a chemist trained to do testing for
18  finish dose wouldn't necessarily know how to do testing
19  for API, correct?
20    MR. DAVIS: Object -- object to the form.
21  Calls for speculation. Incomplete hypothetical.
22    You can answer it.
23    THE WITNESS: I'm not even sure what you're
24  trying to ask because it's not relevant. Maybe you can
25  explain why you're asking that.

34 (Pages 130 - 133)

Page 134

1    Q. (BY MS. NAGLE) Okay. Mr. Quick, I want to
2  talk a little bit about your materials relied upon.
3          So looking in Appendix A to your report, it
4  looks like there are eight documents we see from Torrent
5  and two deposition transcripts of Torrent employees. Do
6  you see that?
7    A. I see that.
8    Q. And is this the totality of documents by
9  Torrent you used in forming your opinions in your
10 report?
11   A. The documents that I used were the documents I
12 reference in Exhibit A.
13   Q. Okay. Any other documents?
14   A. Not that I'm aware of.
15   Q. In your report you also state that, (Reading:)
16 The FDA also observed issues with Torrent's quality
17 management activities related to the investigation of
18 out-of-specification test results for their products and
19 note that Torrent engaged Meridan consultants to assist,
20 correct?
21       MR. DAVIS: Can you refer to the paragraph,
22 Brittany?
23   Q. (BY MS. NAGLE) Sure. And that -- that's in
24 Paragraph 163 to 166, the section I'm going to be
25 talking about.

Page 135

1    A. So is the question I'm aware? Yes, I am aware.
2    Q. Okay. And you note that Meridan found that 89
3  of 157 out-of-specification investigations were
4  non-compliant, right?
5    A. That's correct.
6    Q. Are you aware that none of those related to
7  valsartan?
8    A. I'm not sure what they were related to, but
9  it's not relevant to the report. The issue was whether
10 they were CGMP compliance.
11   Q. Okay. So I guess taking a step back, the FDA
12 warning letter that you're referring to is from
13 October 2019, correct?
14   A. That's correct.
15   Q. So after the date of the recall?
16   A. I'm assuming it's after the date of the recall.
17   Q. Okay. Mr. Quick, are you offering any opinions
18 about Torrent at this point outside of what's contained
19 in your report?
20       MR. DAVIS: Object -- object to form, vague
21 and ambiguous.
22       You can answer.
23       THE WITNESS: Okay. The only opinions I'm
24 offering at this time relative to this declaration are
25 the opinions that I express in this report. Those are

Page 136

1  the only opinions. Were this to proceed to a merits
2  report sometime in the future, I might offer different
3  opinions. And if additional information became
4  available, the opinions might differ. But again, it
5  would apply to all users and all pills that were
6  produced by the facility.
7    Q. (BY MS. NAGLE) Okay. So as of right now
8  understanding those caveats, the only opinions you're
9  offering with respect to Torrent are the ones listed
10 here in your report, Paragraphs 157 to 166 there?
11   A. And again, that's -- that's true. And again,
12 these were just examples.
13   Q. Okay. So Mr. Quick, yesterday you were shown
14 your notice of deposition that included some document
15 requests. Do you remember that?
16   A. I do.
17   Q. And I don't think we entered these. But do
18 you -- do you recall that your counsel served responses
19 and objections in response to those document requests?
20   A. I'm not -- I'm not certain what you're
21 referring to.
22   Q. Okay.
23   A. We could pull that document up, if you'd like.
24       MS. NAGLE: Sure. So can someone please
25 pass the witness what's marked Tab 2 -- or Tab 1, I

Page 137

1  apologize, that I uploaded it on Exhibit Share.
2        MR. DAVIS: Okay. Is this the -- the
3  responses and objections that we served?
4        MS. NAGLE: Yeah, that's correct.
5        MR. DAVIS: Okay. I handing the --
6        MR. MILLER: Brittney, this is Bill Miller,
7  the tech. Do you need me to mark that in Exhibit Share?
8        MS. NAGLE: Yes. Can you mark it? I
9  believe we're up to 32, please.
10       MR. MILLER: 32, yes. Do you need it up on
11 the screen or just a paper copy?
12       MS. NAGLE: I mean, paper copy is fine
13 unless people on Zoom want to see it.
14       (Exhibit No. 32 was marked.)
15       MR. DAVIS: Do you -- do you want a few
16 minutes to review it?
17       THE WITNESS: Sure. I -- I'm not certain
18 if I have seen this or not. I can review it if you'd
19 like?
20       MR. DAVIS: But there is no question
21 pending.
22       He's ready for your question, Brittney.
23   Q. (BY MS. NAGLE) Okay. Mr. Quick, have you ever
24 seen this document?
25   A. I'm not certain whether I have or not. I've

35 (Pages 134 - 137)

Page 138

1  seen a lot of documents. It's possible I may have seen
2  it. I don't believe so, but I could have.
3      Q. Okay. I'm going to represent to you that this
4  is the -- the formal response that your counsel made to
5  our -- to those document requests that you saw yesterday
6  and the notice of the deposition. Does that make sense?
7      A. That makes sense.
8      Q. Okay. And I want to direct your attention
9  to -- I think it's page 5 of the document. It's Request
10  No. 6 and the response to Request No. 6.
11     A. Okay.
12     Q. And Request No. 6 basically asks for the -- you
13  know, your complete and entire file for this case. And
14  it lays out some subcategories of documents. Do you see
15  that?
16     A. I see it.
17     Q. Okay. And in the response, it goes on to the
18  next page, your counsel says that they will produce a
19  list of documents that were provided to you in your
20  file.
21     MR. DAVIS: Is there a question?
22     Q. (BY MS. NAGLE) Do you see that?
23     A. Well, yeah, I can see that, yes.
24     Q. Okay. So can we look at Tab 2?
25     A. Tab 2.

Page 139

1      MS. NAGLE: And can that be marked, please,
2  as Exhibit 33 or 34.
3      MR. DAVIS: Brittney, is this the list of
4  documents?
5      MS. NAGLE: Yeah.
6      MR. DAVIS: Okay. I'm handing it to the
7  court reporter.
8      (Exhibit No. 33 was marked.)
9      MR. DAVIS: The witness has the document,
10  Brittney.
11     Q. (BY MS. NAGLE) Okay. Mr. Quick, do you
12  recognize this document?
13     A. I'm not certain whether I've seen this document
14  or not before.
15     Q. Okay. So I'm going to represent to you that
16  this is the list of documents that your counsel provided
17  in response to Request No. 6 --
18     A. Okay.
19     Q. -- about the complete file. Do you understand?
20     A. I understand.
21     Q. Okay. So I'm going to represent to you that if
22  you compare this list against the list in Exhibit A of
23  your report, the materials relied upon, there are 36
24  documents on that list you have that's marked, I
25  believe, Exhibit 33 that do not appear in Exhibit A of

Page 140

1  your report. Do you understand?
2      A. I understand what you're saying.
3      Q. Okay. And 34 of 36 of those exhibits are
4  Torrent exhibits. Okay?
5      A. Okay.
6      Q. So you were sent more materials related to
7  Torrent than you ultimately relied upon, right?
8      MR. DAVIS: Object to -- object to form.
9  And object to failure to lay a proper predicate to the
10  question.
11     You can answer, though.
12     THE WITNESS: Yes, there are more documents
13  here.
14     Q. (BY MS. NAGLE) Okay. Do you know why these
15  additional documents were pro -- provided to you?
16     MR. DAVIS: I'm going to object. I'm going
17  to counsel the witness not to disclose attorney work
18  product and --
19     But you can answer with that cautionary
20  instruction.
21     THE WITNESS: So I'd have to go back and
22  review each and every one of these to understand. So
23  I'm not certain just by looking at this list.
24     Q. (BY MS. NAGLE) Okay. So do you have any
25  reason why you chose not to rely on these documents that

Page 141

1  were provided?
2      MR. DAVIS: Object to form. Same
3  instruction.
4      THE WITNESS: Well, my --
5      MR. DAVIS: You can answer.
6      THE WITNESS: Okay. So I -- the documents
7  that I relied on for my report are the documents that I
8  reviewed and are Exhibit A. That's -- those are the
9  documents I relied on for my report. So there may have
10  been other documents that I didn't rely on these for my
11  report.
12     Q. (BY MS. NAGLE) Okay. And I'm just trying to
13  understand why -- why you excluded these 34 documents is
14  all.
15     A. Well, okay. So I cannot answer that question
16  without actually looking at those documents. But I'll
17  go back to the comments I made before. My report only
18  list examples. So there may be other documents that
19  would be in these documents which might be in a report
20  later, a merits report or something beyond that. But
21  the documents that I relied on for my report are the
22  documents that are in Exhibit A. So I'm not sure
23  specifically why these additional documents were not
24  relied on other than the fact I didn't need them
25  relative to providing the examples that I have in my

36 (Pages 138 - 141)

Page 142

1  report.
2       Q.  Okay.  So the additional documents found on --
3  on this Exhibit 33 do not serve as a basis for any of
4  the opinions contained in your report, correct?
5            MR. DAVIS:  Object to form.
6            THE WITNESS:  What I -- what I said was is
7  that the documents that I relied on for my report are
8  the ones that are Exhibit A.
9       Q.  (BY MS. NAGLE)  Okay.  So you're not relying on
10  any of these additional documents found in this exhibit?
11      A.  If they're not in that Exhibit A, the answer is
12  no.
13           MS. NAGLE:  Okay.  I have no further
14  questions for you, Mr. Quick.  Thank you.  I think one
15  of my colleagues has some clean-up questions, but
16  appreciate your time today.  Thank you.
17           THE WITNESS:  All right.  Thank you.
18           MS. ISIDRO:  I have just a few questions
19  briefly.
20           MR. DAVIS:  Are you going to retread any
21  ground or -- I don't think our protocol --
22           MS. ISIDRO:  It's just -- just some
23  follow-up based on the question today.
24           MR. DAVIS:  I don't think our protocol is
25  to have another bite at the apple here.

Page 143

1            MS. ISIDRO:  It's just some brief follow-up
2  based on the questions today.
3            MR. DAVIS:  You passed the witness
4  yesterday.  I -- I am going to place an objection to
5  this.
6            FURTHER EXAMINATION
7       Q.  (BY MS. ISIDRO)  Mr. Quick, do you recall being
8  asked some questions this morning regarding a warning
9  letter that you had received at -- during your time at
10  Baxter, warning letter received by Baxter during your
11  time there?
12      A.  I do.
13           MR. DAVIS:  I'm objecting to this.  You
14  covered this yesterday.  You don't get another bite at
15  the apple.  I'm sorry.
16           MS. ISIDRO:  We've noted your objection.
17  Moving on.
18      Q.  (BY MS. ISIDRO)  And in addition to the warning
19  letter that was discussed, during your time at Baxter,
20  there were other inspections by FDA which led to
21  observations about the inspected facilities; is that
22  right?
23      A.  Of the inspected facilities?
24      Q.  Yes.
25      A.  That's true, yes.

Page 144

1       Q.  And some of those observations over the years
2  related to issues about CGMP compliance?
3       A.  They did.
4       Q.  You testified that Baxter took the warning
5  letter it received very seriously.
6       A.  Yes.
7            MR. DAVIS:  Asked and answered.  Objection.
8  This is covered in almost identically.  You're just
9  recovering the questions you asked yesterday.
10      Q.  (BY MS. ISIDRO)  You, likewise, took any
11  additional CGMP observations that were received over the
12  years seriously?
13      A.  Yes.
14           MR. DAVIS:  Same objection.  This is an
15  utter waste of time.  It's running the clock.
16      Q.  (BY MS. ISIDRO)  And you took appropriate
17  corrective action?
18      A.  Yes.
19      Q.  In general, when Baxter received observations
20  from the FDA related to CGMP issues, Baxter did not
21  recall all product manufactured at the impact --
22  impacted facilities, correct?
23           MR. DAVIS:  Object to form.  Object to the
24  extent it mischaracterizes his testimony from yesterday
25  on which you asked these very questions.  Objection,

Page 145

1  asked and answered.
2            THE WITNESS:  So Baxter recalled the
3  products from the -- appropriately should have been
4  recalled.
5       Q.  (BY MS. ISIDRO)  But it did not recall every
6  product from a particular facility every time that
7  facility received a CGMP observation, correct?
8       A.  No.  That's correct.
9            MR. DAVIS:  Same objection.  I'm going to
10  place a continuing objection to this.  And this needs to
11  be brief.  This is -- you're recovering exactly what you
12  covered yesterday.  This is -- this is not proper.
13      Q.  (BY MS. ISIDRO)  In general, when Baxter
14  received observations from the FDA related to CGMP
15  issues, Baxter did not stop releasing all product from
16  that impacted facility to the market, correct?
17           MR. DAVIS:  Same objections.
18           THE WITNESS:  Well, it depends.  In some
19  cases that might have occurred.
20      Q.  (BY MS. ISIDRO)  But it did not stop releasing
21  all product from a particular facility every time that
22  facility received any CGMP observation.
23      A.  Well, there are some cases where it might have.
24      Q.  But certainly not in every instance.
25      A.  Of course not.

37 (Pages 142 - 145)

Page 146

1    MS. ISIDRO: I don't have any further
2 questions at this time.
3    MR. DAVIS: Okay.
4    MS. ISIDRO: Oh, and just briefly, I'd like
5 to mark for the record Exhibit -- I believe we're up
6 to 34. It is a thumb drive containing all of the
7 documents that were listed on Exhibit A to -- to
8 Mr. Quick's report as well as the written responses and
9 documents received in response to the notice of
10 deposition.
11    MR. DAVIS: That's two separate things. Is
12 that somehow -- I haven't seen how that's set forth on
13 the jump drive.
14    MS. ISIDRO: It's not separated, but we can
15 do that quickly and then mark it if that's -- if
16 that's -- we discussed it yesterday and you didn't
17 specify that, but I'm happy to do that now.
18    MR. DAVIS: I think maybe just for clarity
19 sake let's do it.
20    MS. ISIDRO: Separate it?
21    MR. DAVIS: Yeah.
22    MS. ISIDRO: Sure, no problem.
23    (Exhibit No. 34 was marked.)
24    MS. ISIDRO: And it will be Exhibit 34,
25 correct?

Page 147

1    MR. DAVIS: Yeah, 34 and then 30 --
2 yeah, 34. I mean, yeah, it can all be on that same jump
3 drive, yeah.
4    MS. ISIDRO: We'll put it in two separate
5 folders.
6    MR. DAVIS: Folders, yeah. Okay. No
7 objection.
8    MR. KERNER: Anybody else on the Zoom have
9 any questions?
10    MR. DAVIS: Okay. Not hearing anything,
11 why don't we take like a one-minute break just to see
12 how much time is left.
13    VIDEOGRAPHER: Off the record. The time
14 is 12:01 p.m.
15    (Brief recess.)
16    VIDEOGRAPHER: Back on the record. The
17 time is 12:03 p.m.
18    EXAMINATION
19    Q. (BY MR. DAVIS) Mr. Quick, the defendants have
20 passed the witness after all questioning you for some
21 amount of time. I just have a few redirect questions on
22 my end.
23    So over the course of the past two days,
24 you were shown a number of documents, correct?
25    A. Correct.

Page 148

1    Q. Some of those documents are listed in Exhibit A
2 to your report or -- or in plaintiff's responses to the
3 Request No. 6 that Ms. Nagle mentioned a few minutes
4 ago, correct?
5    A. Correct.
6    Q. And then there's some amount of documents that
7 were also shown you over the past couple of days that
8 are not referenced in your report or in those responses,
9 correct?
10    A. That's correct.
11    Q. Okay. Based on your review of those documents,
12 is there anything in them that changes your core opinion
13 in this declaration that appears at Paragraph 191 of
14 your declaration?
15    MS. NAGLE: Object to form.
16    THE WITNESS: There is nothing in those
17 documents that would change my opinion in 191.
18    Q. (BY MR. DAVIS) Okay. And what is that opinion
19 in Paragraph 191?
20    A. I'll read it. It says, (Reading:) I do
21 conclude that because of the nature of these
22 deficiencies being high level corporate QA failings, the
23 corporate quality assurance deficiencies described
24 herein are the type of quality assurance activities that
25 would have impacted each of the manufactures defendants'

Page 149

1 valsartan products equally and in the same manner.
2    Q. Okay. Thank you. Are you -- you're familiar
3 that this litigation that you're testifying in today is
4 part of what's called a multi-district litigation
5 involving all these manufacture defendants whose
6 attorneys questioned you today?
7    A. I am.
8    Q. Okay.
9    MR. ABRAHAM: John, this is Eric. I'm just
10 going to place an objection on the record to the leading
11 nature of your questions. It's improper.
12    MR. DAVIS: Thank you for the speaking
13 objection, Eric and I'm allowed to do this for the
14 introduction matters.
15    MR. ABRAHAM: Right. That's why I let it
16 go for the first couple of questions. Your last
17 question was improper.
18    MR. DAVIS: This is an introductory matter,
19 Eric. Thank you.
20    MR. ABRAHAM: I move to strike the last
21 answer and the last question.
22    MR. DAVIS: The judge has told us, the
23 parties, numerous times, Eric, that he will not tolerate
24 motions to strike as part of these depositions. So
25 that's -- that's not proper. Okay.

38 (Pages 146 - 149)

Page 150

1    MR. ABRAHAM: Right. He's also said no
2 leading questions of your own witness. So you follow
3 the rule, I'll follow the rule.
4    MR. DAVIS: Thank you.
5    Q. (BY MR. DAVIS) So Mr. Quick, what's your
6 understanding of why these manufacture defendants are a
7 part of this litigation?
8    MS. ISIDRO: Objection.
9    MR. ABRAHAM: Objection, form. No
10 foundation.
11    MR. DAVIS: Let's not have multiple
12 attorneys objecting. I think -- I think Nilda has it
13 covered. She's present.
14    Q. (BY MR. DAVIS) okay. So what's your
15 understanding, sir, of why these defendants are
16 defendants in this litigation?
17    A. Because of the presence of nitrosamines in the
18 finished drug products.
19    Q. Okay. And does the -- does the presence of
20 those contaminants, nitrosamines as you said, is that
21 one component of your opinion in Paragraph 28 of your
22 declaration --
23    MS. ISIDRO: Objection, form.
24    Q. (BY MR. DAVIS) -- that the finished drug
25 products involved in this litigation manufactured by the

Page 151

1 defendants are adulterated?
2    A. Yes.
3    Q. Okay. Okay. Your -- your report has a number
4 of exemplary sort of what you describe as examples of
5 corporate level CGMP failures, in your words, that you
6 provide as to each of the manufacture defendants; is
7 that right?
8    A. That's right.
9    Q. Okay. How long have you been in the
10 pharmaceutical and -- and general sort of FDA medical
11 device industry, sir?
12    MS. ISIDRO: Objection.
13    THE WITNESS: Over 55 years.
14    Q. (BY MR. DAVIS) Okay. And your -- your
15 observations in this declaration, are they based only on
16 the documents and other materials or are they also based
17 on those 55 years of experience that you have?
18    MS. ISIDRO: Objection, form.
19    THE WITNESS: They are based on my
20 experience in addition to the documents.
21    MR. DAVIS: Thank you. No further
22 questions.
23    Okay. Hearing nothing else, I think we can
24 wrap it up and go off the record.
25    VIDEOGRAPHER: Okay. This concludes the

Page 152

1 deposition of John Quick. Off the record at 12:08 p.m.
2    (Proceedings concluded at 12:09 p m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 153

1    REPORTER'S CERTIFICATION
     DEPOSITION OF JOHN QUICK
2         VOLUME 2 OF 2
      TAKEN JANUARY 28, 2022
3
4    I, Janalyn Elkins, Certified Shorthand
5 Reporter in and for the State of Texas, hereby certify
6 to the following:
7    That the witness, JOHN QUICK, was duly sworn
8 by the officer and that the transcript of the oral
9 deposition is a true record of the testimony given by
10 the witness;
11    That the original deposition was delivered to
12 MS. NILDA ISIDRO;
13    That a copy of this certificate was served on
14 all parties and/or the witness shown herein on
15 _____.
16    I further certify that pursuant to FRCP No.
17 30(f)(i) that the signature of the deponent was
18 requested by the deponent or a party before the
19 completion of the deposition and that the signature is
20 to be returned within 30 days from date of receipt of
21 the transcript. If returned, the attached Changes and
22 Signature Page contains any changes and the reasons
23 therefor.
24    I further certify that I am neither counsel
25 for, related to, nor employed by any of the parties in

39 (Pages 150 - 153)

Page 154

1 the action in which this proceeding was taken, and
2 further that I am not financially or otherwise
3 interested in the outcome of the action.
4        Certified to me this 6th day of February
5 2022.
6
7
        JANALYN ELKINS
8        Texas CSR 3631
         Expiration Date 1/31/2023
9        Veritext Legal Solutions
         300 Throckmorton Street, Suite 1600
10       Fort Worth, Texas 76102
         Firm Registration No. 571
11       PH: (817) 336-3042
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 155

1 John R. Davis
2 jdavis@slackdavis.com
3        February 7, 2022
4 RE:  In re: Valsartan, Losartan, Et Al v.
5    1/28/2022, John Quick (#5063421)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 156

1 In Re: Valsartan, Losartan, Et Al v.
2 John Quick (#5063421)
3        E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____    _____
24 John Quick                Date
25

Page 157

1 In Re: Valsartan, Losartan, Et Al v.
2 John Quick (#5063421)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, John Quick, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____    _____
12 John Quick                Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

40 (Pages 154 - 157)

[& - 212-801-9200]                                                      Page 1

**&**

**&**   2:9 3:22 4:12
  5:10,15,16,19 6:12
  6:14,19 7:4,11,16
  7:20,21 8:4,10

**0**

**02109**   7:17
**07102**   7:7
**07701**   6:5
**07932**   3:10
**08540**   6:9

**1**

**1**   36:2 122:12
  123:2 136:25
**1/28/2022**   155:5
**1/31/2023**   154:8
**10**   9:3 78:9
**100**   1:17 2:4 7:6
  9:5
**1000**   2:19
**1001**   5:11
**10017**   3:6
**10019**   7:22
**10022**   5:17
**104**   13:10 14:1
  15:7,15 17:6
**105**   14:14
**106**   9:15,16
**107**   26:6
**108**   17:6
**109**   13:10 14:1
  15:7,15
**10:00**   78:3
**10:18**   78:6
**10:21**   80:11
**10:26**   80:14
**11**   7:12
**110**   17:13
**1100**   2:14

**111**   25:23
**112**   17:13
**114**   32:13 35:8,10
**116**   18:16,18 36:3
  36:4 37:12 38:9
  38:21 40:3,17
**117**   40:24
**118**   41:1,5,11,17
**119**   42:22
**11:20**   124:13
**11:24**   124:16
**11:25**   126:4
**11:34**   126:7
**12212**   3:23
**126**   9:5 40:24
**12798**   154:7
**129**   58:2,13
**12:01**   147:14
**12:03**   147:17
**12:08**   152:1
**12:09**   1:14 152:2
**130**   57:18
**131**   57:23 59:3
  61:10
**132**   60:20 61:9
**133**   58:2,14
**136**   63:2 70:1
**137**   9:18
**139**   9:20
**1400**   6:19
**143**   9:6
**146**   9:21
**147**   9:6
**15141**   3:22
**1515**   2:14
**15219**   4:20 8:11
**157**   129:20 135:3
  136:10
**159**   130:7,9
**15th**   7:6

**1600**   154:9
**161**   131:7
**163**   134:24
**166**   134:24 136:10
**168**   92:17
**169**   33:8 35:11
  94:5 96:1,6,7
**170**   33:8 35:11
  97:6
**171**   98:5
**1717**   3:13
**172**   99:17
**173**   78:18,20 79:5
  80:16
**174**   86:11
**175**   88:14,21 89:8
**176**   103:17
**179**   106:22,23
**17th**   4:5,9
**17the**   121:12
**1800law1010.com**
  3:24
**186**   103:17
**190**   5:21
**19087**   6:15
**191**   44:24 148:13
  148:17,19
**19102**   2:15
**19103**   3:13 4:5,9

**2**

**2**   6:5 9:2 32:5
  114:2 117:25,25
  136:25 138:24,25
  153:2,2
**20**   10:15 13:10
  22:21 25:6 54:1
  78:10 123:14
  157:15
**200**   3:17
**2000**   73:11

**20004**   5:11
**2010**   40:25 41:19
  42:7,10,12,13,18
  43:7,23
**2011**   45:12,19
  52:18
**2012**   52:19
**2013**   52:19
**2014**   42:23 43:4,7
  47:18,24 58:9
**2015**   43:23
**2018**   12:3 42:10
  48:1,9 49:8 50:15
  52:15 85:19 86:2
  92:20,25 100:8
  105:22 107:10,11
  107:25 108:2,7
  109:7,13,23 110:4
  111:16,18,25
  112:8,19 114:2,11
  114:20 115:8,21
  116:10 120:8
  123:21,21
**2019**   99:21,23
  135:13
**202-624-2500**   5:12
**2020**   63:5 66:22,23
  67:16,17
**2022**   1:8,13 10:4
  153:2 154:5 155:3
**207**   39:8,15
**208**   39:8,15,19
**209**   39:8,15,20,20
  40:2
**21**   6:9 12:10 13:11
**210**   39:8,15
**211**   6:5
**212-390-4210**   5:17
**212-415-9357**   7:23
**212-801-9200**   3:6

[214-855-8000 - 78746]                                    Page 2

| **214-855-8000** 5:6 | **3** | **4** | **52nd** 7:22 |
|---|---|---|---|
| **215-977-4093** 6:15 | **3** 31:25 | **4** 14:17 40:23 | **53** 7:17 |
| **215-979-1164** 4:10 | **30** 4:5,9 9:15 | 41:15 119:11 | **54** 124:17 |
| **215-979-1175** 4:6 | 14:19 106:2,4,8 | **40** 14:20,21 71:2 | **55** 151:13,17 |
| **215-988-7864** 3:14 | 107:24 108:15 | **400** 3:9,13 | **550** 6:14 |
| **22** 15:1 74:15 75:7 | 109:22 114:3 | **41** 14:20 15:1,8 | **571** 154:10 |
| 75:24 76:8 | 116:17 147:1 | **412-263-4397** 8:12 | **5th** 39:4 |
| **2200** 5:5 | 153:17,20 155:17 | **412-560-3300** 4:20 | **6** |
| **2220** 4:14 | **300** 154:9 | **43** 103:3 | **6** 9:20 23:21 24:6 |
| **227** 8:5 | **301** 8:11 | **44** 9:4 18:5 | 107:16 138:10,10 |
| **23** 12:22 13:2,11 | **30305** 3:18 | **446176** 106:21 | 138:12 139:17 |
| 14:22 18:9 36:2 | **305-445-2500** 2:20 | **45** 16:6 18:6 | 148:3 |
| **230** 4:14 | **31** 9:16 37:13 | **45202** 6:20 | **600** 5:21 8:5 52:16 |
| **231** 38:8 | 106:2,5,16 120:7 | **46** 32:22,23 | **6001** 1:16 2:4 |
| **232** 37:19,25 38:1 | 121:10,15 | **46204** 7:12 | **601** 5:16 |
| 38:6 | **312** 6:19 | **483** 86:15,20 87:4 | **60606** 4:14 |
| **24** 16:4 | **312-566-4808** 4:15 | 87:18 105:22,23 | **609-734-6358** 6:10 |
| **25** 9:11 10:15 | **314-480-1500** 5:22 | 106:4 107:3,6,25 | **617-213-7000** 7:18 |
| 22:22 23:6,15 | **317-231-6491** 7:13 | 109:9 112:4 113:4 | **63105** 5:22 |
| 25:6,13 | **32** 9:12,17 38:25 | 114:2,11,14,20 | **678-553-2100** 3:19 |
| **2500** 3:18 | 137:9,10,14 | 115:8 116:18 | **68** 62:21 |
| **2525** 2:19 | **32nd** 4:19 | 120:8,11 121:14 | **69** 62:21 |
| **26** 9:11 25:7,8,17 | **33** 9:19 139:2,8,25 | 122:5 123:6 | **6th** 154:4 |
| 25:19 59:3 | 142:3 | 125:11 | **7** |
| **267-435-1300** 2:15 | **33134** 2:20 | **483's** 123:21 | **7** 63:5 66:21 68:2 |
| **27** 9:12 31:17 32:8 | **3333** 3:18 | **483s** 105:1,12,15 | 69:20 106:14 |
| 32:9 63:2 | **336-3042** 154:11 | 107:1,13 112:7,13 | 155:3 |
| **270** 6:14 | **34** 9:21 139:2 | 112:18,25 113:25 | **7-2** 91:14 |
| **276** 23:20 | 140:3 141:13 | 124:4 125:1,8,13 | **70** 62:21 |
| **27th** 7:17 | 146:6,23,24 147:1 | **5** | **701** 2:9 |
| **28** 1:8,13 9:13 | 147:2 | **5** 23:21 24:6 138:9 | **70130** 2:10 |
| 10:4 31:17 37:14 | **35** 12:3 14:9 | **500** 3:9 | **704-444-3475** 8:6 |
| 37:15 63:5 105:23 | 101:13 | **504-524-5777** 2:10 | **72** 91:12,13,15 |
| 150:21 153:2 | **36** 14:13,14 44:23 | **5063421** 155:5 | 92:4 |
| **28202** 8:5 | 139:23 140:3 | 156:2 157:2 | **732-924-8171** 6:6 |
| **2875** 1:3 | **3600** 5:5 | **51** 7:22 | **75201** 5:5 |
| **28th** 37:17 121:12 | **3631** 154:8 | **512-795-8686** 2:5 | **76102** 154:10 |
| 122:5 | **37** 9:13 14:17 | **513-698-5038** 6:20 | **78** 9:4 |
| **29** 9:14 39:1,2 | **38th** 8:11 | **518-724-2207** 3:23 | **78746** 2:5 |
| **29th** 31:24 | **39** 9:14 14:18,19 | | |

[7917 - answer]                                                                          Page 3

| | | | |
|---|---|---|---|
| **7917**  14:10 | 125:20,23 149:9 | **addressing** 82:22 | **allegedly** 108:4,16 |
| **8** | 149:15,20 150:1,9 | **adequate** 80:22,22 | 114:7 115:17 |
| | **absolutely** 112:22 | 80:25 90:12,13 | 119:8 122:18 |
| **817**  154:11 | **accept** 15:3 | 96:15 99:25 131:2 | **allotted** 155:20 |
| **89**  135:2 | **acceptable** 90:9,13 | **adequately** 18:10 | **allow** 72:20 |
| **896**  15:10 | 109:6,12 | 41:2,21 78:22 | **allowable** 50:20 |
| **8:00**  1:13 | **access** 131:18 | 79:7,10 104:21 | 51:7,9 52:10 |
| **8:12**  10:4 | 132:20 | **adulterated** 51:4 | 53:16 |
| **9** | **accomplish** 35:24 | 68:8 72:21 74:1,9 | **allowed** 67:17 |
| | **accuracy** 155:9 | 74:20 75:4,19 | 149:13 |
| **950**  15:9 | **accurate** 14:25 | 76:10 151:1 | **ambati** 98:7 |
| **973-443-3269**  3:10 | **acknowledge** | **adverse** 127:20 | **ambiguous** 70:9 |
| **973-757-1100**  7:7 | 34:14 | **affect** 53:13 | 70:20 74:12 75:21 |
| **9:09**  44:9 | **acknowledgement** | **affix** 105:24 | 86:4 88:6 93:23 |
| **9:18**  44:12 | 157:3 | **agency** 66:7 113:1 | 135:21 |
| **a** | **acknowledgment** | **ago** 15:18 55:16 | **amerisourceberg...** |
| | 155:12 | 74:15 75:7,24 | 6:18 |
| **a.m.**  1:13 10:4 | **acquired** 127:17 | 76:8 121:24 148:4 | **amount** 84:25 |
| 44:9,12 78:3,6,9 | **acquisition** 127:16 | **agree** 14:23 17:6 | 91:2 99:19 117:17 |
| 80:11,14 124:13 | **actavis** 3:3,3 | 28:2 30:19,21,23 | 147:21 148:6 |
| 124:16 126:4,7 | **action** 111:16,17 | 38:13 64:12 66:22 | **analogizing** 34:21 |
| **ab**  83:4,5 86:15 | 113:1 123:20 | 77:16,18 90:7 | 34:22 35:13 |
| **ab's**  82:16 83:3,4 | 124:3 144:17 | 98:7 111:6 113:13 | **analogy** 34:12,14 |
| **aberrate**  104:15 | 154:1,3 | **agreed** 11:15 | 34:15,16,18,19 |
| **aberrations**  32:17 | **actions** 66:19 | 77:18 | 113:8 |
| 33:14 34:3 35:17 | 123:23,24 125:7 | **agreements** | **analysis** 47:13 |
| **able**  63:21 70:24 | **active** 25:3 | 133:11 | 49:9 59:16 63:9 |
| 100:4 131:10 | **activities** 45:4 | **ahead** 60:3 93:16 | 63:22 89:20 |
| 132:20,25 133:2,3 | 94:12 134:17 | 93:18 123:7 | 104:24 128:22 |
| 133:4,6 | 148:24 | **airlines** 32:18 | 129:25 130:12,16 |
| **abraham**  6:8 9:5 | **actual** 14:5 | 33:15,17 34:4,6 | 130:21 131:2,9 |
| 100:18,19 101:14 | **addition** 17:25 | 35:14 | **analyze** 60:13 |
| 102:14,16 103:9 | 143:18 151:20 | **al**  155:4 156:1 | **answer** 11:14 12:6 |
| 103:11 104:3,7,12 | **additional** 69:14 | 157:1 | 13:15 16:16 17:24 |
| 104:13 105:11,21 | 136:3 140:15 | **albany** 3:23 | 20:2,19 21:3,14,25 |
| 106:6 108:14,19 | 141:23 142:2,10 | **albertsons** 8:3 | 22:12,16 24:11,17 |
| 110:19 113:16 | 144:11 | **alfano** 8:10 | 24:20 26:9 27:3 |
| 115:6 116:1,15 | **additions** 157:6 | **allegations** 118:23 | 27:12,15,25 28:7 |
| 117:11,16,20,24 | **addressed** 64:16 | **alleged** 103:20 | 29:11,15,25 30:2,4 |
| 118:15,21 120:6 | 64:17 | 108:25 114:21 | 30:14,17 31:9 |
| 121:22 122:22 | | 117:5 122:5 | 33:23 35:22 38:6 |
| 123:7,12,16 | | | |
| 124:11,19,22 | | | |

41:24 43:11,15
47:1 48:14 49:4
53:5,19 55:10
61:20 63:12 64:24
66:2 67:6 68:13
70:10,22 74:13
75:22 76:12 77:14
79:16 83:9 86:6
87:6 89:14 92:10
92:12 93:24 94:21
98:1 102:14 104:6
104:7,10 105:6
110:24 114:25
117:15,19 118:16
119:9,15,22 120:4
120:5,21,25 121:3
121:4,21 123:4
127:22 131:23
132:17 133:22
135:22 140:11,19
141:5,15 142:11
149:21
**answered** 19:18
29:16,20,24 30:12
35:21 46:19 82:1
83:18 94:17 98:23
100:9 102:4,11
117:11 118:8
132:23 144:7
145:1
**answering** 118:18
**answers** 12:19
117:21 118:14
119:25
**anybody** 77:22
147:8
**anybody's** 37:1
**anyway** 114:18
**api** 45:17,24 46:3
47:10 49:16 50:20
52:9 53:8,15

54:10 64:10,13
72:12 82:8 92:5
100:6,7 101:16,18
102:3,9 103:23
111:16 114:8,16
114:22 121:17
129:22 131:19
132:5,6,11,21
133:15,19
**apin** 102:24
**apis** 115:22 132:14
**apologies** 90:24,24
97:15
**apologize** 73:13
130:6,8 137:1
**apology** 38:14
**apparent** 17:16
**appear** 14:20
45:18 56:20 64:2
139:25
**appearances** 9:2
**appeared** 94:10
95:9 96:17
**appears** 14:14
119:6 148:13
**appended** 157:7
**appendix** 134:3
**apple** 142:25
143:15
**applicable** 118:1
155:8
**applied** 17:4 43:14
50:12 92:2
**apply** 46:16 48:7
51:1 68:9,11,17,25
87:23 136:5
**appreciate** 124:23
125:21 142:16
**appropriate** 34:12
66:18 75:10 94:9
144:16

**appropriately**
145:3
**approval** 70:19
71:6 72:13
**approve** 71:12
**april** 31:24
**arch** 3:13
**area** 17:14,15
47:11 85:11 92:13
119:20
**areas** 10:15,22,25
10:25 22:15
**asked** 19:15,17
20:11,20 22:3
26:6 27:17 29:20
29:24 30:12,23
33:4 35:21 40:2
46:19 56:5,15
82:1 83:18 94:17
98:23 100:9,10
102:11 110:21
111:4 112:16
120:23 128:8
132:23 133:1
143:8 144:7,9,25
145:1
**asking** 13:9 24:16
28:2 30:15,21,23
34:25 39:11 46:24
51:12,13 56:11
71:1 74:14 75:13
76:13 77:24 87:24
88:20 89:7 90:21
90:21 100:21
108:6,8,21 109:18
121:6,9 122:19
123:6 126:14,15
131:3 133:25
**asks** 138:12
**aspect** 70:11 91:10

**aspects** 47:8 56:17
130:17
**assess** 104:14
**assessment** 12:2
12:16 17:17 23:23
23:25 24:1,7,24
25:3 29:3 30:11
32:15 47:16,17,25
48:9 57:19 58:9
103:21
**assessments** 27:2
58:17
**assignment** 85:12
**assist** 134:19
**associated** 103:22
**assume** 112:9
115:4
**assumes** 53:18
99:13
**assuming** 47:23
135:16
**assumption** 87:7
93:7
**assurance** 34:2
35:15 41:2,21
45:3,4 128:23
129:5,9 148:23,24
**assure** 82:14
**atlanta** 3:18
**aton** 7:4
**attached** 153:21
155:11
**attachment** 13:19
13:23,24
**attempt** 69:16
**attempted** 46:10
**attention** 24:3
25:1 41:9 44:22
117:25 118:22
120:7 138:8

[attorney - brittney]                                              Page 5

**attorney**  140:17
  155:13
**attorney's**  77:23
**attorneys**  22:4,7
  75:11 149:6
  150:12
**audio**  79:25 80:5
**audit**  133:10
**audited**  96:21
  132:9
**august**  12:3
**aurobindo**  4:17
  78:15,20 79:6,22
  80:16 81:2 83:4
  83:15 84:5,13,16
  86:13,19 87:4,9
  88:1,15 91:20
  92:6,16 94:7,9,16
  94:24 95:3 96:16
  99:18
**aurobindo's**  81:13
  81:24 82:7 87:17
  88:17 89:7,10,25
  90:4,8 92:2 94:11
  95:5 98:6,21 99:5
  99:11
**austin**  1:17 2:5
**available**  136:4
  155:6
**avenue**  3:5 5:5,11
  5:16 6:5
**avkare**  6:13
**aware**  43:21 45:23
  47:9 50:19 51:6
  51:13,15 52:19
  54:1 64:9 67:1,7
  72:11,15 82:16
  84:23,25 86:8
  96:23 99:4,10,15
  116:3 124:3,24
  125:2,5,6,10

127:17,19 128:15
131:14,17 134:14
135:1,1,6

**b**

**b**  1:4 8:3
**back**  14:2,18,24
  15:4 24:17 28:3
  38:7 39:24 42:19
  43:4 44:11 45:1
  45:25 47:19 48:3
  52:14,18 55:16
  62:17 64:21 66:8
  66:21 67:2,12,22
  67:23,24 71:5,13
  71:19 72:1,3
  75:24,24 76:1,5
  78:5,6,10 80:4,13
  80:15 86:7 89:21
  89:22 92:15 96:1
  98:15 100:11
  101:9,11,23,24
  102:20 103:25
  105:4 107:17
  111:4,8 116:5,6
  118:8 120:21,22
  120:24 121:7
  124:15 126:6
  135:11 140:21
  141:17 147:16
**ban**  124:25
**bank**  6:5
**barnes**  7:11
**based**  11:23 12:2,7
  29:12 40:8 55:4
  71:2 73:24 113:3
  129:9,15 130:25
  142:23 143:2
  148:11 151:15,16
  151:19
**basically**  37:9
  61:22 138:12

**basing**  81:7,9
**basis**  11:22 13:5
  55:3 79:9 93:3,4
  96:2,8 130:24
  142:3
**batch**  54:9,21
  116:19
**batches**  53:14
**bates**  106:7,14,17
**bausch**  7:4
**baxter**  66:9,12,12
  73:10,15,18 75:4
  75:18 76:2,5 77:8
  143:10,10,19
  144:4,19,20 145:2
  145:13,15
**baxter's**  73:16
  74:9,20
**bcd**  100:6
**beginning**  55:14
**begins**  10:2
**belief**  45:16 93:8
**believe**  24:2,22,25
  26:25 35:12,13
  42:18 47:18 63:24
  66:7 70:3,5 72:9
  73:23,24 74:3,8,19
  75:1,16 76:24
  77:3 78:1 80:3
  87:19 92:21 93:4
  93:6,11,19 96:16
  97:23 98:2 101:18
  104:1 105:3,8,13
  108:1 112:2
  113:19,20,22
  114:9 127:15
  128:20,24 129:1,6
  129:13 130:23
  131:1,3,25 137:9
  138:2 139:25
  146:5

**berne**  6:19
**better**  26:1,11,19
  28:12,17,20 29:7
  30:10,19,25 31:4
  31:13
**beyond**  48:20
  62:15 85:14
  111:20 141:20
**bill**  137:6
**bipc.com**  8:6
**bisgaard**  6:14
**bit**  17:14 55:2 74:7
  134:2
**bite**  142:25 143:14
**blackwell**  5:21
**blurry**  124:20
**bogdan**  3:21
**bold**  1:17 2:4
**bosick**  8:10
**boston**  7:17
**bottom**  105:10
  106:8,17 110:23
**boulevard**  2:19
**box**  3:22
**break**  44:3,4,5,7
  78:8 80:4 125:24
  126:2 147:11
**bresnahan**  5:9
**brian**  3:12
**bridge**  6:5
**brief**  44:10 126:5
  143:1 145:11
  147:15
**briefly**  116:16
  142:19 146:4
**brisbois**  6:14
**brittany**  134:22
**brittney**  5:15
  126:10 130:2
  137:6,22 139:3,10

| | | | |
|---|---|---|---|
| **brittney.nagle** 5:18 | **caveats** 136:8 | 135:10 144:2,11 | **chief** 98:6 |

brittney.nagle
5:18
btlaw.com 7:13
buchanan 8:4
butcher 97:14

**c**

c 2:1 3:1 4:1 5:1
6:1 7:1 8:1
c.whiteley 2:11
call 26:7
called 59:17 149:4
calls 133:21
camber 6:12
camden 1:2
camp 2:9
campbell 5:10
campus 3:9
cappas 125:7,12
carillon 8:4
carolina 8:5
carondelet 5:21
case 13:4 22:17
45:18 58:16 71:9
79:20 100:24
105:3,9,13 119:6
138:13
cases 20:9 71:12
71:13 145:19,23
category 55:19
cause 1:13 33:16
33:18 34:5,7,21,23
35:18 38:3,16
47:13,25 48:8
49:9 78:22 79:8
80:17 84:16
caused 95:21
114:15,21 118:6
119:8,17 121:16
122:5
cautionary 140:19

caveats 136:8
cease 125:4
center 7:6
centre 4:19 8:10
certain 46:6,10
47:21 51:15 55:5
61:11 72:9 84:18
86:16 90:7 93:10
99:6,10 103:2,15
107:20 108:20
109:2,3 110:10
120:15 124:2
136:20 137:17,25
139:13 140:23
certainly 54:15
145:24
certificate 153:13
certification 153:1
certified 153:4
154:4
certify 153:5,16
153:24
cetera 51:10 86:14
cgannon 7:8
cgmb 11:9
cgmp 43:5,8,10,13
43:22 46:11,23
47:7,8 48:6 49:19
49:25 50:12,24,25
51:3 52:6 54:7,23
54:24 57:4 64:17
64:18 65:4,6,7,14
66:6 67:10,14,25
68:15,16 69:4,13
69:17 71:17 72:5
72:17 82:22 85:5
85:13 88:9 90:18
91:3 95:17 99:1,1
99:8 109:6,13,22
112:23 115:12,15
115:19 121:6

135:10 144:2,11
144:20 145:7,14
145:22 151:5
cgmp's 10:16 11:1
68:5
chains 53:11
chance 63:3
change 12:22 15:2
15:23 16:9 17:8
18:11 36:7 37:10
40:9,12 45:12,16
45:20,21 103:22
104:22 124:10
148:17 156:4,7,10
156:13,16,19
changes 45:19
47:7 114:7 148:12
153:21,22 155:10
157:6
changing 19:21,25
20:4,6,14,17
characterization
21:24 26:23 27:24
55:9
characterize 35:10
45:21 82:25
charlie 2:18
charlotte 8:5
check 15:4 111:8
120:22
checking 120:21
chemical 129:24
130:12,16,21
131:2,9
chemicals 131:8
131:12
chemist 46:20
92:9 94:19 133:17
chemistry 47:5
chicago 4:14

chief 98:6
chinese 41:6
choice 110:14
chose 140:25
christine 7:5
christopher 8:3
christopher.henry
8:6
chromatogram
62:11
chromatograms
59:13,15 60:9
chromatography
59:8,12
cigna 5:19
cincinnati 6:20
circulation 84:22
circumstance
76:15
circumstances
73:7 75:5
cite 14:9,12 16:5
16:21 17:20 18:4
18:5,7 32:21 40:3
42:22 62:19
104:18 114:1
cited 14:14 17:7
18:1 87:25 89:8
citing 12:11 15:7
18:12 67:16 89:20
civil 1:18
claiming 10:25
claims 2:18
clarification 27:17
126:15
clarify 58:21
77:13,15
clarity 146:18
class 17:4 43:14
46:12 48:7 50:12
52:7 57:5 58:22

[class - control]

68:17 87:23 115:20

**classification** 111:15

**classified** 57:20

**clean** 142:15

**clear** 21:19,22 26:12 69:18 80:25 95:18 115:3,5

**clearly** 82:4,5 83:19

**client** 45:10,24

**clock** 144:15

**closer** 78:25

**cmp** 41:9

**coan** 7:16

**coates** 3:8

**coatesg** 3:11

**coleen** 4:8

**colleagues** 142:15

**combination** 79:3

**come** 11:5 93:14

**comes** 66:22 98:12

**commenced** 78:8

**comment** 45:18 60:2,4

**comments** 68:15 141:17

**communication** 114:5

**communications** 11:16

**companies** 8:3 65:15 87:8 112:10

**company** 5:19 29:1 62:3,12 65:8 65:9,10 71:4,5 73:10 79:20 80:20 80:25 81:12 83:20 83:22 88:25 90:11 92:4 95:18 96:20

96:22 97:21 99:25 102:8 125:11

**compare** 91:17 139:22

**comparing** 92:2

**competent** 78:21 79:6

**competently** 88:15

**complete** 22:8 56:2 132:10 138:13 139:19 157:8

**completed** 155:17

**completely** 24:13

**completion** 153:19

**compliance** 109:6 109:13,22 110:25 115:12,15 135:10 144:2

**compliant** 55:1 65:6 135:4

**comply** 90:18 91:3

**component** 150:21

**comprehensive** 129:24 130:12,16 130:21

**computer** 82:15

**computerized** 1:15

**concentration** 90:3

**concentrations** 90:8

**conclude** 44:2 148:21

**concluded** 125:20 152:2

**concludes** 151:25

**conclusion** 18:17 35:5 107:2 109:21 113:6 129:20

**conclusions** 14:1 107:14

**conditions** 43:23 119:13

**conduct** 12:2,16 103:21 130:12

**conducted** 47:16 48:9 49:9 119:4 121:12

**conducting** 27:2 29:2 94:9

**confer** 125:24

**confidentiality** 133:11

**confine** 118:17

**confirm** 11:22 106:7 122:25

**confusion** 17:15 17:16 24:22 26:25 29:1,6,13

**conjunction** 120:19

**conlee** 2:8

**connect** 115:14

**connection** 15:15 111:11 115:4 125:13 128:24 129:10,16

**conor** 6:13

**conor.donze** 6:16

**consecutive** 14:21

**consider** 50:2 52:11 109:4 112:17

**considered** 34:11 50:9 68:7 70:13 73:25

**consistency** 90:15

**consistent** 54:17

**consultants** 134:19

**consume** 99:11

**consumers** 99:10

**contain** 56:14

**contained** 50:20 51:2 52:9 53:15 89:25 108:5 114:20 115:8 122:4 135:18 142:4

**containing** 50:14 99:11 146:6

**contains** 132:6 153:22

**contaminant** 52:17 54:25

**contaminants** 51:2 150:20

**contaminated** 98:22,25 99:2

**contaminating** 94:11 96:18

**contamination** 88:16 94:23 97:8 98:20

**content** 54:10

**contents** 123:19

**context** 26:19

**continuation** 10:2

**continue** 113:13

**continued** 3:1 4:1 5:1 6:1 7:1 8:1 72:12 118:13

**continuing** 75:9 145:10

**contradicted** 20:25 21:9

**contrary** 71:8

**control** 15:3,23 16:9 42:6 54:16 83:20 90:11,12,13 90:15 118:2

[control - davis]                                                    Page 8

122:12
**conversion** 36:8
**copied** 73:20
**copies** 105:15
155:14
**copy** 137:11,12
153:13
**core** 148:12
**corner** 106:17
107:3,7
**corporate** 45:2
65:2 102:6,7,12
148:22,23 151:5
**corporation** 5:3
5:19 6:18
**correct** 10:16 15:5
26:7,9 27:4,22
29:8 34:19 36:14
36:15 41:3 45:13
45:14 46:17 47:6
47:18,20,23 48:1,2
48:11 50:3,4,11
51:20 53:9,12
55:7,25 56:21,22
56:23 58:7,11,12
58:15 59:9,18
60:1,18 62:25
63:7,22 66:24
72:8 73:24 81:8
82:9 83:1,2 84:13
84:17 93:12
103:18,19,23
104:15,16,22
105:2 106:14,15
106:19,21 107:7,8
107:11,12 108:5
110:20 111:2,11
113:2,18,21
114:12,16,17,22
115:11,23 116:19
116:24 117:7

119:1,2,17,18
120:17 121:12,17
122:6,7,9,18
128:18,23 129:11
129:17,18 131:15
131:16,19 132:7
133:15,19 134:20
135:5,13,14 137:4
142:4 144:22
145:7,8,16 146:25
147:24,25 148:4,5
148:9,10 157:8
**corrected** 67:15
69:8
**corrections** 157:6
**corrective** 66:19
125:6 144:17
**correctly** 42:1
45:7 88:19 91:18
93:1 94:13
**correspondence**
111:24
**cost** 38:2,15
**counsel** 10:11
11:10,13 19:6
20:25 21:10,21
24:12,12 29:19,19
33:1 38:8 55:7,12
56:16 77:24 78:1
79:24 102:14
105:14 125:25
136:18 138:4,18
139:16 140:17
153:24 155:14
**counsel's** 29:9
31:8
**count** 10:18
**couple** 39:5 89:20
148:7 149:16
**course** 145:25
147:23

**court** 1:1,5 32:7
37:21 39:4 105:20
105:21 139:7
**courtesy** 117:14
**covered** 75:9
100:2 143:14
144:8 145:12
150:13
**covering** 95:17
**create** 82:8,17
83:5
**creating** 26:8
**critical** 36:7 45:20
**cross** 94:11,23
96:18 97:8 98:20
123:3
**crowell** 5:10
**crowell.com** 5:12
5:13
**cs** 155:15
**csr** 1:14 154:8
**culbertson** 7:16
**cut** 71:22 90:22
104:11
**cvs** 7:10
**cwhill** 4:10
**cwhorton** 2:21

**d**

**d** 5:20 6:18
**d'lesli** 5:4
**d.b.** 7:21
**d.c.** 5:11
**d.stanoch** 2:12
**dallas** 5:5
**daniel** 5:10
**date** 10:3 47:20,20
47:21 93:5 135:15
135:16 153:20
154:8 156:24
157:12

**dates** 43:7 107:6
116:4 120:16,19
120:21,23
**david** 2:8
**davis** 1:16 2:3,4
3:16 5:4 9:6 11:14
12:5,12 13:13
15:16,24 16:13
17:18,22 19:9,20
19:24 20:16 21:2
21:12,23 22:11,23
23:4,8,13,16 24:8
24:19 25:9,12,15
25:18 26:14,22
27:7,13,17,23 28:6
28:15,21 29:9,16
29:20,24 30:4,12
31:6,8,18,21 32:6
33:2,19 34:9,24
35:6,20 37:16,21
39:3,10,13,16 41:4
41:22 42:15 43:2
43:16 44:4,6
46:18 48:13 49:2
50:22 51:21,24
53:17 54:4,12
55:8 58:19 60:3
60:15 61:3,7,18
62:5,8 63:11 64:4
64:15,20 65:11,25
67:4,19 68:12,19
69:2,22 70:8,20
71:7,21 72:23
74:11 75:8,20
76:23 77:22 78:7
79:1,14,16 81:15
81:21,25 82:11,18
83:8,17 84:8 85:2
85:9,20,23 86:3
87:1 88:5,20
89:12 90:22 91:4

[davis - directed]                                                    Page 9

91:14,21 92:8,21
93:9,22 94:17
95:6,14 96:5,7
97:1,18,25 98:23
99:13 100:9 101:8
102:11 103:7,24
104:5,9 105:6,19
105:25 106:3
108:12,18 110:16
113:7 114:23
115:24 116:11
117:8,13,18,22
118:11 119:25
121:18 122:19
123:1 124:8,17
126:3 127:5,21
128:19 129:12
130:1 131:20
132:15,22 133:20
134:21 135:20
137:2,5,15,20
138:21 139:3,6,9
140:8,16 141:2,5
142:5,20,24 143:3
143:13 144:7,14
144:23 145:9,17
146:3,11,18,21
147:1,6,10,19
148:18 149:12,18
149:22 150:4,5,11
150:14,24 151:14
151:21 155:1
**day** 154:4 157:15
**days** 76:6 147:23
148:7 153:20
155:17
**dcampbell** 5:13
**de** 2:19
**december** 50:15
**declaration**
107:15 112:11,19

113:17 135:24
148:13,14 150:22
151:15
**declare** 157:4
**deemed** 157:6
**defendant** 58:15
**defendant's** 78:9
**defendants** 1:11
44:17 45:5 78:15
100:24 147:19
148:25 149:5
150:6,15,16 151:1
151:6
**deficiencies** 11:2,3
11:9 17:1 43:13
45:3 46:11,24
48:6 49:19,25
50:12,24,25 51:3
52:7 53:22 54:7
54:23,24 57:4
64:17,18 66:3,6,17
66:19 67:11,14,25
68:5,15,16,22 69:8
69:13,17 70:13
71:17 72:5,17
82:22 85:5,13
87:21,21 88:9,18
90:20 95:18 99:1
99:8,20,24 104:17
112:24 121:6
148:22,23
**deficiency** 65:14
68:18,21 69:4
99:1
**deficient** 10:16
11:1 97:8
**delay** 80:1
**delayed** 79:25
**delivered** 153:11
**demonstrate**
46:11 90:18 91:3

**demonstrates**
88:17
**denies** 38:20
**department** 24:3
25:1,24
**department's**
23:22 34:2 35:15
**depend** 72:24
**depends** 71:14
145:18
**deponent** 153:17
153:18 155:13
157:3
**deposed** 18:20
**deposing** 155:13
**deposition** 1:7,10
9:11,12,13,14,18
9:19 10:3 18:25
19:17 20:7,7,8
22:5,19 23:17
24:10 35:25 37:18
39:4,6 45:11 55:5
55:23 56:9,12,24
57:15 61:24 68:4
96:9 98:12,15
122:24 134:5
136:14 138:6
146:10 152:1
153:1,9,11,19
**depositions** 18:20
19:3,4,12,19 20:14
21:5,19 22:2,3,14
22:15,19 56:4
60:18 61:22 97:12
97:13 113:21
130:19,25 149:24
**depth** 22:18
**describe** 94:15
95:4 151:4
**described** 45:3
97:11 148:23

**describing** 21:7
**description** 9:10
**detail** 69:12 95:23
**detectable** 90:17
91:2
**detected** 47:10
48:1 54:2,3 92:7
**determine** 20:23
39:24 56:13 62:13
76:7 83:6,13
84:10,16 95:2
109:11,20 111:14
120:25 121:7,8
131:10
**determined** 72:25
109:5,11
**determining** 57:15
**deviations** 32:17
33:13 34:3 35:16
104:14
**device** 151:11
**differ** 136:4
**difference** 54:2
102:5,17,19 127:4
**different** 26:15
31:14,23 45:23
46:8,8 47:5 53:8
53:11 54:20 71:11
73:6,7 75:13
76:15 97:9,10,11
101:15 127:1
133:14 136:2
**differently** 36:12
**difficult** 86:22
**diligence** 94:9
99:19
**diligently** 129:21
**direct** 33:4 39:8
44:22 138:8
**directed** 20:21
21:17 22:4,15

[directed - entire]                                                    Page 10

27:5,5 33:6 56:18
**disagree**  77:12
**disagreed**  77:8
**disclose**  140:17
**disclosure**  11:17
**discover**  99:22
**discovered**  99:19
  122:18
**discrepancy**
  116:19,24 117:4
**discuss**  11:12
  15:13 16:1 26:1
  28:17 31:13 98:16
**discussed**  11:18,19
  17:9,14 143:19
  146:16
**discussing**  10:10
  72:14 125:9,14
**discussion**  78:4
**discussions**  77:17
**display**  24:9
**distinction**  126:23
**distributed**  59:1
**district**  1:1,1,5
  149:4
**dlesli.davis**  5:7
**dmf**  131:18 132:2
**document**  12:17
  12:18,18,20 14:9
  14:10,12,15 15:8,9
  16:1,3 23:9 25:20
  31:17 32:11 37:13
  38:25 43:12 47:18
  47:22,24,24 52:13
  52:14,22,23,24
  57:19,21,21 58:11
  60:22 62:20,21,24
  63:10 69:19,21
  70:15 73:21
  101:25 103:4
  111:1 114:24

121:19 122:24
123:14,19 136:14
136:19,23 137:24
138:5,9 139:9,12
139:13
**documents**  9:19
  10:11,12,13 11:6
  11:24 12:8,10,14
  13:5,7,18,22,23,25
  14:3 15:6,18,20
  16:7,14,18,23 17:2
  17:7,8,10 18:1,23
  22:23 29:12 43:8
  43:24 45:25 46:4
  46:5,7,23 48:4,5
  48:15,17 49:5,6,23
  50:2 51:8,16 52:3
  55:5,11,14,17,18
  55:19,24 56:25
  57:2,6,9,11 62:16
  64:6 84:19 86:8
  86:17 87:14
  100:12 101:11,24
  102:20 105:9
  107:19 109:3,8,15
  109:16 110:15,20
  113:12,14,14,23
  116:13 129:10,16
  132:3 133:2 134:4
  134:8,11,11,13
  138:1,14,19 139:4
  139:16,24 140:12
  140:15,25 141:6,7
  141:9,10,13,16,19
  141:21,22,23
  142:2,7,10 146:7,9
  147:24 148:1,6,11
  148:17 151:16,20
**doing**  24:23 25:22
  89:3 96:22,23

**dominant**  38:3,16
**donze**  6:13
**dorsey**  7:21
**dorsey.com**  7:23
**dose**  49:22 101:17
  101:19 102:10
  103:13,15 131:15
  131:17 132:12
  133:15,18
**dots**  115:14
**dr**  31:12 98:7
**draw**  117:24
  118:21
**drawing**  16:12
**drive**  3:9 9:21
  146:6,13 147:3
**drug**  68:6 72:12
  72:20 91:16 94:1
  94:2 118:25 132:9
  150:18,24
**drugs**  99:11
  100:24 102:2,3,6
  102:17,23
**du**  9:13 36:14
  37:17 38:1,9,12,19
  40:7,16
**du's**  36:16,20
**duane**  4:4,8
**duanemorris.com**
  4:6,10
**due**  94:9 99:19
**duly**  1:12 153:7

|          e           |
| e  2:1,1 3:1,1 4:1,1 |

e  2:1,1 3:1,1 4:1,1
  5:1,1 6:1,1,14 7:1
  7:1 8:1,1 156:3,3
  156:3
**eabraham**  6:10
**earlier**  10:12
  16:25 45:11 55:23
  99:25

**early**  107:10
**eight**  134:4
**eir**  12:3,11,15,21
  13:11 14:18 16:9
  17:8 18:1,12,14
  36:10,11,13 37:2
  40:3 66:22 69:20
**eirs**  76:20,25 77:5
  110:1,3
**either**  61:2 79:2
  102:22 110:3
**elkins**  1:14 153:4
  154:7
**ellie**  5:3
**ellie.norris**  5:6
**ellis**  5:16
**email**  15:13,21
  16:5 40:25 41:19
  42:2,7,9
**emailed**  105:14
**emails**  16:10,20
  18:5
**employed**  153:25
**employees**  17:17
  60:19 118:24
  134:5
**ended**  23:2
**ends**  15:9 16:4
  106:14,20
**engaged**  127:9
  128:13 134:19
**engagement**
  127:20,24 128:2,9
  128:16,22 129:4
  129:11,17
**ensure**  65:16
  66:17,18 69:7
**ensuring**  65:5
**entered**  136:17
**entire**  17:4 19:17
  19:19 20:7,8 22:5

22:19 57:18,21,21
72:13 87:23
138:13
**entirely**  129:16
**entirety**  55:25
**entities**  101:10
102:6 126:16,17
127:1,4
**entitled**  41:1 103:7
103:8 132:13
**equally**  45:6 149:1
**equation**  113:5
**equipment**  95:22
96:25 97:4 98:8,9
98:11,22 119:12
**eric**  6:8 100:19
103:7 104:5 105:6
115:24 117:13,23
122:20 124:8,8
149:9,13,19,23
**errata**  155:11,13
155:17
**erratas**  155:15
**established**  63:15
91:17 92:1,3
**establishment**
63:6 94:2,2
107:23
**et**  51:10 86:14
155:4 156:1 157:1
**evaluate**  87:10
109:4
**evaluated**  88:2,8
88:10
**evaluation**  83:24
133:9
**eventually**  57:20
67:15
**evidence**  53:18
99:14

**exact**  38:9 75:5
120:21
**exactly**  27:10 37:7
75:25 87:24
100:10 128:14
132:25 145:11
**examination**  9:3,4
9:4,5,5,6,6 10:5
44:2,13 78:12
100:17 126:8
143:6 147:18
**examine**  66:17
**example**  57:17
66:4 71:10 117:1
**examples**  11:2,4,5
11:7,8,8 16:25
17:1,4 43:10,10,13
46:10 47:3 48:6
48:17,18 49:19
50:12 52:5,6 57:4
57:7 64:8 67:10
69:12,16 70:16
72:17 82:22 87:22
87:22,25 89:20
95:17 99:9 104:19
104:24 111:21,22
112:20,21,23
115:19 136:12
141:18,18,25
151:4
**excerpt**  23:17
31:23
**excerpts**  19:16
20:12 62:24
**excluded**  141:13
**excuse**  84:23
**executive**  36:14
**executives**  41:6
**exemplary**  151:4
**exhaustive**  18:23
43:11 47:2 48:5

48:19,20 52:5
89:19 104:24
111:22 112:21
**exhibit**  9:11,12,13
9:14,15,16,17,19
9:21 12:22,24
13:2,11,25 14:6,10
14:15,21,22 15:1,8
15:9 16:4 22:21
23:1,2,6,12,15
25:7,8,17,19 31:16
31:17 32:8,9
37:14,15 39:1,2
48:10,25 49:7,9
55:21 64:6 86:18
106:4,5,8,16
107:16,24 108:15
109:22 111:9
113:23 114:3,10
116:17 120:7
121:10,15 134:12
137:1,7,14 139:2,8
139:22,25,25
141:8,22 142:3,8
142:10,11 146:5,7
146:23,24 148:1
**exhibits**  9:9
105:20 106:2
140:3,4
**exist**  95:9
**existed**  67:11
70:13
**existence**  111:14
**expect**  66:8 114:17
**expectation**  66:7
**expected**  25:2
**expects**  91:16
**experience**  71:3
77:4,6 118:24
151:17,20

**expert**  105:1
111:10 122:2
**experts**  11:16
**expiration**  154:8
**explain**  68:25 76:9
79:9 133:25
**explaining**  33:15
**express**  5:19,19
135:25
**extensive**  56:4
**extensively**  68:4
76:17
**extent**  53:18 54:13
144:24

**f**

**f**  153:17
**face**  37:17 39:4
**facilities**  64:10
65:5,16,17,19,23
66:6,14,18 72:11
73:16 75:4 143:21
143:23 144:22
**facility**  63:19
64:13 65:3,4,8,9
66:4,11,16 68:6,7
68:9,9,10,22,23
69:1,5,6 70:5 74:1
74:23,24 75:19
102:22,25 103:4
103:12 107:2,24
109:5,12,21
113:10 127:14,17
136:6 145:6,7,16
145:21,22
**fact**  13:19 21:16
31:4 41:6 42:17
43:3 51:3 61:14
66:5 67:1,23 76:7
80:20,21 81:11
82:4 83:10 84:9
88:14 93:5,19

[fact - form]                                                                                    Page 12

95:8,25 96:20
98:18 141:24
**facts** 53:18 67:5,20
71:8 99:13
**factually** 93:11
**failed** 12:16 94:25
95:3 122:13
129:21 130:12
**failings** 148:22
**fails** 155:19
**failure** 12:1 18:10
41:2,20 62:2
90:18 91:3 103:21
104:14,20 140:9
**failures** 151:5
**fair** 48:8 110:4,5
126:13
**fairly** 35:10
**falanga** 7:5
**falkenberg** 4:13
**falkenbergives.c...**
4:15
**fall** 55:19
**false** 82:8
**familiar** 97:14,15
97:20,23,24
123:20 149:2
**familiarity** 128:6
**far** 116:8 129:7,7
**fda** 9:15,16 12:3
36:19 37:9 40:7
43:8,22 45:21,22
51:6,9 52:15 60:6
60:11,21 62:20
63:5,13,17,18,19
63:22,24 64:12
65:20 66:10 67:17
70:4,15 71:12
72:7,13,20,25 73:1
73:1,6,6,8,10,15
76:10,14,14,16,17

76:19 77:4,9,12,16
77:17,18 79:11,19
80:21 81:7 84:14
86:13,20 87:5,9,12
88:17 91:16 92:20
92:25 93:21,25
94:3 96:9 100:3,3
100:5 107:1 109:4
109:9,11,20
111:25 113:9
114:6 115:4
123:20 124:4,25
134:16 135:11
143:20 144:20
145:14 151:10
**fda's** 49:20 50:20
52:10 53:15 70:19
71:6 84:20 86:14
90:9 107:22 119:5
120:12
**fdca** 76:11
**february** 63:5
107:9 108:2 109:7
109:13,23 111:17
111:25 154:4
155:3
**federal** 1:18
**feel** 35:9
**fhs** 8:12
**file** 138:13,20
139:19
**files** 75:25
**final** 112:25
**financially** 154:2
**find** 33:18 34:7
35:19 43:22
**fine** 137:12
**finish** 101:17
104:5,10 105:6
117:15 131:15,17
132:12 133:15,18

**finished** 49:22
101:19 102:10
103:13,14 150:18
150:24
**finishes** 118:13
**firm** 20:13,22 94:1
100:22 154:10
**first** 12:1 14:8,9
19:16 38:19,22
40:15,19 44:23
58:1 85:21 86:23
106:1,11 116:17
149:16
**fit** 123:13
**five** 10:15,17,18
10:18,21,21,24,24
10:25 11:12 44:7
52:15 114:11,13
114:15
**fix** 80:7,10
**flash** 9:21
**flaws** 88:18,24,25
89:9,10,15,15
**floor** 4:19 7:6,17
8:11
**florham** 3:10
**florida** 2:20
**focus** 48:5 71:16
88:8,16
**focused** 105:1
**focusing** 50:11
**fold** 54:1
**folders** 147:5,6
**follow** 14:8 142:23
143:1 150:2,3
**followed** 111:25
118:2
**following** 41:7
62:6 153:6
**footnote** 12:3 14:9
14:13,14 16:6,23

18:5 32:23 62:21
**footnoted** 17:11
105:5
**footnotes** 13:17,21
13:22 14:17 18:7
18:13 105:10,12
107:18,18
**foregoing** 157:5
**forgot** 121:3
**form** 12:5,12,22
13:5,13 15:16,24
16:13 17:22 19:9
19:24 20:16 21:2
21:12,23 22:11
24:8,14 26:14,22
27:23 28:15,21
29:10 30:13 31:6
33:2,19 34:9,24
35:6,20 41:4,22
42:15 43:2 48:13
49:2 50:22 51:21
51:25 53:17 54:4
54:12 55:3,8 60:3
60:15 61:18 62:8
63:11 64:4,15
65:11,25 67:4,19
69:2,20,22 70:8
71:7 72:23 74:11
75:20 76:23 81:15
81:25 82:11,18
83:8,17 84:8 85:2
85:9 86:3,15 88:5
89:12 91:4,21
92:8 93:9,23
95:14 97:1 101:8
103:24 105:1,12
105:15,22,23
107:1,3,6,13,25
108:18 109:19
112:4,7,13,18,25
113:4,7,25 114:2

[form - great]                                                      Page 13

114:11,14,20
115:8 116:11,18
117:8 120:8,11
121:14 122:5
124:4 125:1,8,13
127:5,21 128:19
129:12 131:20,22
132:15,22 133:20
135:20 140:8
141:2 142:5
144:23 148:15
150:9,23 151:18
**formal** 118:12
138:4
**formed** 47:10
120:3
**forming** 113:3
134:9
**fort** 154:10
**forth** 146:12
**found** 42:18 43:8
43:11 63:14 66:3
90:4 95:12,13
99:9 100:4,5
115:17 135:2
142:2,10
**foundation** 150:10
**four** 18:5 97:9,10
97:11 121:11,13
121:15
**frank** 8:9 44:16
51:22 61:3 71:21
75:8 100:10
**frcp** 153:16
**front** 32:11 101:1
114:3 120:8
**fulbright** 5:4
**full** 18:19,25 19:12
22:2,5,14 24:3
25:1 57:9 131:18

**function** 25:2
**further** 9:6 48:20
77:19 91:8 142:13
143:6 146:1
151:21 153:16,24
154:2
**future** 67:12 136:2

**g**

**galleria** 6:4
**gannon** 7:5
**gateway** 7:6
**gcoan** 7:18
**ge** 9:12 23:7 25:25
31:20
**ge's** 23:17
**general** 10:22 71:2
144:19 145:13
151:10
**generally** 33:16
50:13 126:20
**generated** 125:19
**geoffrey** 7:16
**geoppinger** 6:18
**georgia** 3:18
**gergis** 40:25 42:1
42:22
**getting** 80:1
**gi** 24:6 25:13
26:10,12,20 27:5
27:20 28:12,16,19
29:7 30:9,19,24
31:4,12,25 32:2,5
32:14 33:12
**gi's** 35:10
**gisleson** 4:18
**give** 74:14 77:25
120:20
**given** 119:9 153:9
157:9
**giving** 71:11
118:17

**glad** 109:17
**glassware** 119:20
**glenn** 3:4
**global** 65:8,10
**gmp** 26:9,10,13,21
27:6,21 28:12,20
29:8 30:9,18,24
31:5 41:7 47:6
53:22 66:16 70:13
87:21
**gmps** 65:21
**go** 11:21 14:2,18
14:24 15:4 17:5
17:12,12 18:4
31:16 36:10 38:6
39:20,24 40:23
45:25 46:5 47:19
48:3 52:14 57:1
57:15,17 60:3
65:15 66:5,21
75:24 78:2 80:9
81:16 82:2 85:14
86:7 87:2 91:8,9
92:15 93:16,18
94:20 98:15
100:11 101:9,11
101:23,23 105:4
107:17 111:4,8
116:5,6 117:1
120:22,24 121:4,7
123:7,10,15 124:9
124:11,21 126:1
140:21 141:17
149:16 151:24
**goes** 55:16 65:20
89:21,22 106:13
106:23 118:8
130:17 138:17
**going** 10:8 11:14
24:14 39:14,16
44:1,8,17 58:19

66:8 71:13 72:16
73:1,6,7 75:23
76:12,15 78:14
80:15 87:2 89:6,6
89:19 97:14
100:21 115:2
116:3 118:11,15
120:21 134:24
138:3 139:15,21
140:16,16 142:20
143:4 145:9
149:10
**goldberg** 4:4 9:3
10:6 11:21 12:9
12:14 13:16 15:21
16:3,19 17:19
18:3 19:14,21
20:4,23 21:8,20
22:6,21,25 23:6,11
23:14,19 24:12
25:5,10,14,16,22
26:18 27:3,8,15,19
28:3,11,18 29:4,15
29:19,21,25 30:2,8
30:18 31:7,16,19
32:1,3,10 33:7,23
34:13 35:3,9 36:1
37:19 38:1,24
39:7,14,19 41:12
42:3,21 43:6,21
44:1 79:24 80:3
123:10
**good** 10:6,7 34:16
34:18,19 44:15
80:6
**gordon** 8:10
**gotten** 45:22 84:2
132:10
**grant** 8:11
**great** 100:21 101:4
105:21 106:6

114:5 123:7
**greenberg** 3:5,9
  3:12,17
**gregory** 3:8
**ground** 75:11
  142:21
**groups** 24:23 29:1
**gtlaw.com** 3:7,7
  3:11,14,19,20
**guess** 10:25 58:21
  135:11

**h**

**h** 7:15 8:9 156:3
**half** 122:20
**hand** 23:8 64:11
  65:19 105:16
  107:3,7
**handed** 25:19,19
  37:22
**handing** 32:6,7
  37:16 39:3 105:19
  137:5 139:6
**hang** 103:7 104:9
**happened** 67:13
  74:15 75:7 76:8
  84:1
**happy** 146:17
**hard** 79:23 82:13
**harding** 3:22
**harkins** 3:16 7:15
**harkinss** 3:19
**head** 25:24 40:1
**heading** 18:10
  41:15,15
**headings** 10:20,21
**health** 7:10
**healthcare** 4:3
**hear** 53:4 61:1,5
  79:13,14,23 82:13
  97:17 100:19,20
  103:5 132:8

**heard** 45:11 48:24
  116:2 126:12,14
  127:9
**hearing** 79:2
  86:22 147:10
  151:23
**heavily** 114:24
  116:20
**henry** 8:3
**hereto** 157:7
**hetero** 6:3 100:23
  100:24 101:6,16
  102:2,2,6,6,13,17
  102:17,23,23
  103:12,18,21
  104:14,21 105:2
  106:8,11 107:2,15
  107:23 108:4,9,17
  108:24 109:5
  110:4 111:15,25
  112:6,12,18
  113:18,21 114:6
  115:16,17 117:7
  122:17 123:22
  124:25
**hetero's** 114:16,22
  115:9 118:6
  120:13,16 121:17
  122:18
**hey** 79:1 104:5,5
  117:13
**hi** 126:9
**high** 87:2 148:22
**highest** 54:3
**highlighted** 21:10
  33:1
**hill** 4:8 6:4,8
  100:22
**hillwallack.com**
  6:6,10

**hilton** 2:7 105:15
**hinshaw** 7:16
**hinshawlaw.com**
  7:18
**hll446173** 106:17
**hold** 25:21 68:18
**holding** 5:19
  118:25
**honik** 2:13,14
**honiklaw.co** 2:16
**honorable** 1:4
**hour** 44:8
**huahai** 4:3
**humana** 4:12,12
**hunchuck** 4:18 9:4
  78:13,14 79:4,5,15
  79:21 80:1,9,15
  81:19 82:7,14,23
  83:14 84:2,12
  85:6,17,25 86:10
  86:24 87:3 88:11
  88:23 89:24 90:24
  91:11,15 92:1,15
  92:22 93:13 94:4
  94:24 95:11,20
  96:6,11 97:6,20
  98:3 99:4,17
  100:14
**hundreds** 20:9
  57:11
**husch** 5:21
**huschblackwell....**
  5:23,23
**hypothetical** 66:1
  71:8,11 91:5
  133:21

**i**

**idea** 33:20 34:11
  35:24 37:6 80:6
  88:7 97:3

**identically** 144:8
**identified** 10:15
  27:5,20 28:19
  30:8 31:4 69:12
  70:12 72:17
  114:11 115:16,19
**identify** 11:10
  16:7 19:15 20:11
  28:14 43:6 46:10
  47:3 49:19 53:22
  69:16 84:5
**identifying** 26:20
  29:6 54:7,23
**ididro** 9:6
**illinois** 4:14
**impact** 47:7
  144:21
**impacted** 45:4
  144:22 145:16
  148:25
**implementation**
  41:10
**import** 72:7
  124:25
**important** 112:17
**improper** 71:8
  84:10 91:5 149:11
  149:17
**impure** 108:16
**impurities** 24:1
  49:15,21 78:23
  79:8 80:18 81:3
  82:25 84:11,17
**impurity** 23:25
  40:10,10 45:17
  47:9,14 48:1
  108:5 109:1
  114:16,21 115:9
  115:17 117:4
  121:16 122:6,17

**inadequate** 81:6
  131:4
**inappropriate**
  24:13
**incident** 34:5
**include** 13:20 64:6
  107:19
**included** 13:21
  49:6 57:7,10
  63:14 136:14
**inclusion** 57:2
**incomplete** 66:1
  133:21
**incorporated** 7:4
**incorrect** 63:25
  77:1,7
**increasing** 36:8
**independent** 63:21
**index** 9:1
**indiana** 7:12
**indianapolis** 7:12
**indicate** 47:15
  51:3 54:16 59:20
  90:14 114:14
  121:15
**indicated** 15:17
  16:24,25 21:5
  24:21 34:10 37:6
  44:7 45:20 57:3
  59:22 67:14 109:8
  111:17,17 124:9
  131:7
**indicates** 31:11
  82:5
**indicative** 65:2
**individuals** 18:20
  19:13 27:1 39:23
  39:25
**industries** 3:3
**industry** 71:3
  128:7 151:11

**inference** 53:2,6
**information** 56:14
  69:14,15 132:6,10
  132:13,21 133:6,7
  133:13 136:3
**informed** 87:9
**ingersoll** 8:4
**initial** 40:11
**initially** 55:13
**initiate** 65:22
  66:13
**initiated** 125:13
**inquiries** 130:10
**inspect** 129:21
**inspected** 85:18
  86:1 92:21,25
  93:5 100:3 113:10
  143:21,23
**inspection** 42:22
  42:25 43:4 62:20
  63:6,14,15 66:22
  66:23 67:2,17
  86:15 92:5 107:6
  107:23 108:3,15
  112:1 120:20
  121:11
**inspectional**
  111:15
**inspections** 43:19
  107:2,9,11 110:1
  143:20
**inspector** 119:5
**instance** 1:11 43:7
  145:24
**instances** 127:19
**instruction** 140:20
  141:3
**intake** 50:21 51:7
  52:10 53:16 90:9
**intended** 48:19

**intent** 37:10 87:10
**interest** 128:4
**interested** 154:3
**interfering** 29:21
  29:22
**internal** 49:15
  58:7,8,10
**international** 7:3
**interrupt** 93:17
  103:9,10 117:20
  117:21,22
**interrupting**
  118:13
**interviews** 119:3
**introduced** 14:22
  15:1
**introduction**
  149:14
**introductory**
  149:18
**investigate** 62:3
  62:12 65:16 66:5
  78:22 79:8 80:17
  81:3,19 83:16
  84:13 88:15
**investigated** 59:20
  59:22,25 60:5
  61:15,17 62:15
  79:10 83:11,13
  92:20
**investigating** 60:7
  61:13
**investigation**
  33:16,17 34:5,22
  34:23 35:14,17,18
  79:22 81:14,24
  84:3 89:2,7,10,16
  122:13,17 134:17
**investigations**
  65:23 66:13 82:3
  82:6 84:10 135:3

**investigator** 36:19
  37:10
**investigator's**
  76:19
**involved** 118:24
  150:25
**involving** 34:6
  149:5
**irbesartan** 1:4
**irrelevant** 67:24
**isidro** 3:4 142:18
  142:22 143:1,7,16
  143:18 144:10,16
  145:5,13,20 146:1
  146:4,14,20,22,24
  147:4 150:8,23
  151:12,18 153:12
**isidron** 3:7
**isomer** 36:7 40:11
**issue** 34:1 45:20
  59:2 60:8 68:8
  70:12 80:8 83:10
  84:9 89:17,22
  90:11 94:22,23
  95:24 123:22,25
  135:9
**issued** 51:19 63:19
  70:4 73:10,15
  79:12,19 83:22,23
  86:20 87:5,12
  105:2 107:1 112:7
  112:18,19 124:25
**issues** 43:5,8 47:6
  65:7 79:20 81:11
  81:17,17 104:1,25
  115:15,20 134:16
  144:2,20 145:15
**issuing** 112:11
**it'd** 110:24
**ives** 4:13

## j

**j**  2:8 7:15
**jaganat**  97:24
**janalyn**  1:14 153:4
  154:7
**january**  1:8,13
  10:4 153:2
**jason**  8:15
**jdavis**  2:6 155:2
**jeffrey**  6:18
**jersey**  1:1 3:10 6:5
  6:9 7:7 100:23
**jgeoppinger**  6:21
**job**  80:25 100:1
**john**  1:7,10 2:3
  4:18 10:3 31:20
  75:14 104:12
  117:16,20 122:22
  126:2 149:9 152:1
  153:1,7 155:1,5
  156:2,24 157:2,4
  157:12
**john.gisleson**  4:21
**jr**  6:3
**jucai**  9:12 23:7,17
  25:12 31:20,25
  32:2,5
**judge**  1:5 149:22
**jump**  146:13
  147:2
**jun**  9:13 36:14
  37:17
**june**  108:7

## k

**k**  23:25
**kanner**  2:9,11,11
  2:12
**kapke**  7:11
**kara**  7:11

**kara.kapke**  7:13
**karwacki**  8:16
**kerner**  3:4 147:8
**kernerg**  3:7
**key**  61:12 87:10
  88:2
**kind**  69:11 128:12
**kinds**  100:2
**kirkland**  5:16
**kirkland.com**  5:18
**knepper**  5:20
**know**  11:19 21:11
  24:9,9 26:10 30:5
  31:25 33:22 35:2
  35:3 39:21,21
  43:9 44:24 46:14
  47:1 48:2,3 50:16
  51:18 58:4 60:24
  61:8,16,23 62:14
  63:3 67:21 68:1
  70:23,24 71:2,18
  71:25 72:4 75:6
  76:2,6,13 79:21,24
  79:25 80:5 81:13
  81:23 82:25 84:12
  84:14 85:17,25
  86:19 87:4,6,8,9
  87:15,16 88:1,11
  89:11,21,24 90:3
  92:6 95:1 96:11
  96:14,24 98:9,11
  98:21,24 100:6
  101:16,20 102:3,5
  102:9,22 103:12
  105:23 108:19,24
  109:10 110:25
  111:3,7 112:6,9
  116:8 120:16
  121:2,3 123:8,16
  124:7 125:19
  129:4,7 133:18

138:13 140:14
**knowing**  128:12
**knowledge**  40:9
**known**  81:12
  131:7,11
**kroger**  6:12
**kugler**  1:5

## l

**l**  5:20
**l.hilton**  2:11
**l.l.c.**  2:9
**laboratories**  8:8
**labs**  6:3 100:23
  101:6,16 102:6,17
  102:23 113:21
**lack**  90:14 118:23
**lacked**  78:21 79:6
**language**  38:9
**lantech**  80:24 81:1
  81:10,11,18 82:5,6
  83:19,20,23 84:3
  84:22 89:1,6,18,22
  89:23 92:19,24
  93:21 94:8,10
  95:12,19 96:17,22
  97:4 98:4 100:1
**lantech's**  94:15
  95:2,5,7,21 96:12
  96:24 97:7 98:7
**late**  107:9
**law**  20:13,22
  100:22
**law.com**  2:11,11
  2:12
**laws**  90:7
**lawyer**  118:19
  126:1
**lawyers**  110:8,13
**lay**  140:9
**layne**  2:7

**lays**  138:14
**lbresnahan**  5:12
**lead**  45:16
**leading**  149:10
  150:2
**learn**  121:4
**learned**  53:14
**leave**  80:7
**leaves**  31:3
**led**  143:20
**left**  126:1 147:12
**legal**  154:9 155:23
**length**  75:10
**lengthy**  22:20
**leon**  2:19
**letter**  70:4 72:7
  73:10,15,17,19,25
  74:2,8,19 75:2,3,6
  75:16,18 76:4
  79:12,19 80:21,24
  81:8,9,17,18 83:22
  83:23 84:15,21,21
  86:14,21 87:5,13
  96:9 124:7,24
  135:12 143:9,10
  143:19 144:5
**letters**  95:10 96:19
**level**  54:2,3 90:3,9
  95:23 148:22
  151:5
**levels**  52:9,16,18
  53:15 54:15,20
  115:22
**lewis**  4:19 6:14
**lewisbrisbois.com**
  6:16
**lexington**  5:16
**li**  9:11 25:11,17,24
  26:6,12,20 27:5,20
  28:19 29:6 30:8
  30:18 31:4,12

[li's - march]                                                                    Page 17

li's  26:9 30:9,24
liability  1:5
license  94:1,3
licensed  93:21
life  66:9
light  69:15
likened  32:14
  33:12
likening  33:25
  34:1
likewise  144:10
limited  84:19
limits  50:21 51:7,9
  51:15 52:10 53:16
  90:13
lin  9:14 39:5,20,21
  40:1,16
linda  9:14 39:5,21
line  23:21 110:23
  156:4,7,10,13,16
  156:19
lines  16:12 24:6
  97:16,21,22,24
list  16:4 37:13
  52:5 55:14 111:21
  138:19 139:3,16
  139:22,22,24
  140:23 141:18
listed  36:20,23
  48:9 52:16 55:20
  64:6 111:9 136:9
  146:7 148:1
listing  52:15
litigation  1:5
  44:17 149:3,4
  150:7,16,25
little  17:14 55:2
  73:12 74:7 103:10
  134:2
liza  7:4

llc  2:14,18 3:3 4:3
  8:3
llp  1:16 2:4,19 3:5
  3:9,12,17,22 4:4,8
  4:13 5:16 6:4,8,14
  6:19 7:5,11,16,21
  8:10
lockard  3:16
lockardv  3:20
logged  80:4,4
lomb  7:4
long  151:9
look  10:12,20 12:1
  13:9 14:3,6 15:7
  16:2 18:15 21:6
  24:6 25:23 26:5
  26:16 33:11 36:16
  37:19 39:7,11
  42:21 46:5 48:3,6
  57:23 59:3 62:19
  63:2 84:19 86:8
  86:11 88:13 91:7
  91:11 92:16 94:5
  97:13 98:5 103:16
  103:25 107:17
  110:3 116:16
  121:10 122:11
  131:6 138:24
looked  12:4,23
  13:7 15:18 43:12
  43:12 47:1,11
  59:21 104:2
  120:18
looking  12:10
  18:16 28:8,22
  36:3 37:24 41:18
  47:4,6,8,22 56:7
  71:15,16 79:5
  87:20,22 96:1
  98:17 113:4,9
  129:19 132:3

134:3 140:23
  141:16
looks  12:3 14:7
  55:4 96:25 97:4
  103:16 134:4
losartan  1:4 155:4
  156:1 157:1
lost  68:19
lot  46:4 138:1
lots  52:16 89:24
  90:4,13 98:21,25
  99:3,5,6
loud  59:4
loudly  82:15
louis  5:22
louisiana  2:10
low  57:20 79:3
lowest  54:2
luke  5:9
luxury  41:7
lwalsh  7:8

### m

m  3:16 5:4 7:4,16
machine  1:16
madam  64:21
maintained
  119:13
major  5:9
making  27:11 36:6
  37:10 38:20 61:15
  93:7
malaysian  32:18
  33:15,17 34:4,6
  35:14
management
  78:21 79:7 88:17
  89:4 134:17
managing  81:1
  100:1
manner  45:6 55:1
  149:1

manual  92:5
manufacture
  45:24 46:3 64:10
  64:13 102:18
  108:4,16 132:6
  149:5 150:6 151:6
manufactured
  68:2 69:1 70:5
  72:12 74:1 75:18
  102:9,10 103:12
  108:25 111:16
  144:21 150:25
manufacturer
  45:5 69:7 72:21
  82:24 85:18 86:1
  101:17,17,18,20
  102:3 129:22
  131:15,17 132:9
  132:13
manufacturer's
  47:5
manufacturers
  46:8 50:17 53:9
  85:1 91:16 94:12
  100:6,7
manufactures
  128:1,13 148:25
manufacturing
  32:17 33:14 34:3
  35:16 46:16 66:14
  102:22 103:22
  104:22 107:24
  109:5 114:6 119:4
  125:4 129:21
  130:10 131:8
march  105:22,25
  106:4 107:10,25
  108:2 109:7,13,23
  110:4 111:18,25
  112:7,18 114:2,11
  114:20 115:8,21

116:10 123:21
**mark** 25:6,21
  31:17 37:14 38:25
  105:22 137:7,8
  146:5,15
**marked** 23:11,12
  23:14 25:8 31:22
  31:22 32:8,9
  37:15,22 39:2,4
  105:20 106:2
  107:15 114:2
  121:14 136:25
  137:14 139:1,8,24
  146:23
**market** 2:14 38:3
  38:16 67:3,18,23
  70:19,21 71:5,6,13
  71:19 72:1,4 76:3
  145:16
**marketplace**
  67:12
**marking** 23:10
**martin** 3:22
**massachusetts**
  7:17
**materials** 14:7
  36:21 87:11,11
  88:2,3 111:10
  134:2 139:23
  140:6 151:16
**matt.knepper**
  5:23
**matter** 51:2 62:1
  68:5 83:12 127:9
  128:13 149:18
**matters** 149:14
**matthew** 5:20
**maz** 4:15
**mazzotti** 3:22
**mckesson** 5:3

**mdl** 1:3
**mean** 58:24 71:22
  75:21 83:4,21
  89:11 93:16,17
  98:17 116:20
  126:21 128:6
  129:24 137:12
  147:2
**meaning** 113:20
**means** 49:10
**meant** 98:14
  130:15
**medical** 151:10
**medications** 50:14
  51:19
**meeting** 125:3
**megan** 4:13
**memory** 91:22
**mentioned** 52:22
  148:3
**meridan** 134:19
  135:2
**meridian** 7:12
**merits** 48:21 69:15
  85:15 112:21,23
  113:13 136:1
  141:20
**mestre** 2:19
**methods** 95:2
**miami** 2:20
**mic** 78:25
**microphone** 68:20
**mid** 104:11
**miller** 137:6,6,10
**min** 9:11 25:10,17
  25:24 26:6
**minimal** 99:18
**minor** 45:21
**minute** 15:17 33:9
  44:7 78:2 147:11

**minutes** 78:10
  123:14 124:18
  137:16 148:3
**misbranded** 72:21
**mischaracterizat...**
  17:23 19:10,25
  20:17 42:16 43:17
  60:16 61:19 62:9
  65:12 67:5,20
  131:21
**mischaracterizes**
  13:14 41:23 54:13
  110:17 132:16
  144:24
**mischaracterizing**
  49:3 89:13
**misquoted** 130:5
**missed** 34:17
  85:21 86:23 107:5
  115:25
**missing** 81:13,23
**missouri** 5:22
**misstate** 73:23
**misstated** 77:1
**mistype** 32:4
**mohana** 98:7
**moment** 37:23
**moments** 39:10
  121:18 123:1
**money** 36:9 37:11
**monitoring** 83:24
**monograph** 116:9
**monroe** 4:14
**month** 120:12
**months** 108:3
**morgan** 4:19
**morganlewis.com**
  4:21,21
**moring** 5:10
**morning** 10:6,7,12
  23:18 44:14,15,18

46:6 74:18 100:18
  125:1 143:8
**morris** 4:4,8
**motions** 149:24
**move** 104:9
  149:20
**moving** 105:7
  143:17
**msp** 2:18
**muffled** 79:2,3
**mulberry** 7:6
**multi** 149:4
**multiple** 39:11
  75:11 150:11
**murtha** 6:3
**mylan** 8:8,8 44:17
  44:19 45:24 46:2
  46:16 47:16 48:9
  49:9 50:14 51:19
  53:1,8 55:3 56:12
  58:10,15,17,22,23
  59:1,19,21,25
  60:18 61:12,21
  62:17 64:3,9 65:4
  65:22 66:5 67:11
  67:18 70:4,18
  71:19 72:1,7
**mylan's** 47:10,13
  47:24 49:14,22
  50:5,19 52:9
  53:14,25 54:10
  58:7 67:2,22
  70:21

|  **n**  |
| --- |

**n** 2:1 3:1 4:1,18
  5:1 6:1 7:1 8:1
**nagle** 5:15 9:5
  126:9,10 127:8,24
  128:21 129:14
  130:5 132:4,19
  133:5 134:1,23

[nagle - objection]

136:7,24 137:4,8
137:12,23 138:22
139:1,5,11 140:14
140:24 141:12
142:9,13 148:3,15
**nai** 123:25
**name** 32:4 42:1
44:16 78:13 97:15
100:18 126:9
**nature** 148:21
149:11
**nda** 90:8
**ndea** 51:7,22 52:9
53:15,25 54:2,3,10
87:12 88:4
**ndma** 50:20 51:7
51:20,22,23 87:12
88:4 89:25 90:3
108:5,25 114:7,15
114:21 115:9,16
115:22 116:9
117:4 118:6 119:8
119:17,24 121:16
122:5
**ne** 3:18
**necessarily** 11:3,7
16:22 17:3 19:2
21:6 48:16 51:1
52:21 56:3,8 57:5
68:15 133:18
**necessary** 45:22
99:22 157:6
**need** 16:1 24:15
25:21 105:17
116:1 117:14,22
121:7,18,20 123:1
123:5 133:9 137:7
137:10 141:24
**needs** 124:9
145:10

**neither** 153:24
**never** 59:20 72:7
77:6,8 97:4,5
127:13
**new** 1:1 2:10 3:6,6
3:10,23 5:17,17
6:5,9 7:7,22,22
100:23
**newark** 7:7
**nilda** 3:4 150:12
153:12
**nitrate** 26:2,8
**nitrosamine** 45:17
47:9,14,25 49:15
49:21 78:22 79:8
80:17 81:3 82:8
84:4,6,7,17 88:16
90:17 91:2 120:2
**nitrosamines** 26:2
26:8 81:20 82:17
83:5,6 84:23 85:1
85:7,19 86:2 92:7
95:11,21 99:12,23
100:7 150:17,20
**non** 135:4
**noncompliance**
65:2
**normal** 112:3
**normally** 25:2
**norris** 5:3
**north** 8:5
**norton** 5:4
**nortonrosefulbri...**
5:6,7
**notary** 157:13,19
**notated** 107:7
**note** 134:19 135:2
155:10
**noted** 75:14
143:16 157:7

**notice** 9:18 136:14
138:6 146:9
**notices** 50:6
**notion** 40:16
**novak** 8:15
**november** 50:15
**number** 10:19
13:6,18 14:5
16:17 37:4,4
39:23,25 43:9
50:17,17 51:8
101:10 106:13,14
106:17 113:23
133:2 147:24
151:3
**numbered** 1:13
**numbers** 105:23
106:7,9
**numerous** 149:23
**nw** 5:11

---

**o**

---

**o'clock** 78:9
**o'reilly** 7:5
**oai** 124:1
**object** 12:12 13:13
15:16,24 16:13,13
17:18,22,22 19:9,9
19:24,24 20:16,16
20:17 21:2,12,12
21:23,23 22:11
24:8,8 26:14,22,22
27:23,23 28:15,21
29:9,10 30:13
31:6,8 33:2,19
34:9,24 35:6,20
41:4,22 42:15,15
43:2,16 48:13
49:2,2 50:22
51:21,24 53:17,17
54:4,12,12 55:8,8
60:3,15 62:8

63:11 64:4,15
65:11,25 67:4,19
69:2,22 70:8,20
71:7,21 72:23
74:11 75:20 76:23
81:15,25 82:11,18
83:8,17,17 84:8
85:2,9,20 86:3,4
88:5 89:12 91:4
91:21,21 92:8
93:9,22,22 95:14
101:8 103:24
108:18 113:7,7
114:23 116:11
117:8 127:5,21
128:19 129:12
131:20,20,21
132:15,15,22
133:20,20 135:20
135:20 140:8,8,9
140:16 141:2
142:5 144:23,23
148:15
**objecting** 143:13
150:12
**objection** 12:5
24:13,14 29:20,23
29:24 30:12 35:20
46:18 58:20 60:15
61:18,18 62:5,8
65:11,25 67:4,20
68:12 70:8 71:7
75:9,14 81:25
82:11 85:9,20
86:3 89:12 91:4
92:8 93:23 94:17
94:18,18 97:1,1,25
98:23 99:13 100:9
102:11 110:16
118:12,16 120:1
122:23 132:22

143:4,16 144:7,14
144:25 145:9,10
147:7 149:10,13
150:8,9,23 151:12
151:18
**objectionable**
43:22
**objections**  9:17
24:19 27:7 28:6
82:19 95:6 136:19
137:3 145:17
**observation**  9:15
9:16 116:17,23
117:25,25 118:22
119:11,19 122:12
122:16 123:2
145:7,22
**observations**
46:15 58:13 60:21
64:12 65:21 66:11
113:11 114:12,13
114:15,20 115:3,8
121:11,13,16
122:3,4,11 125:8
143:21 144:1,11
144:19 145:14
151:15
**observed**  43:5
53:23 64:19 94:10
96:17 134:16
**obviate**  117:19
**obviously**  34:15
81:10
**occasions**  77:13
**occur**  65:3,8,9
66:8,25 95:25
108:6
**occurred**  66:23
67:17 81:10 82:4
93:6 107:9 108:3
120:12 145:19

**occurring**  66:6
97:8
**occurs**  65:3,14,14
**october**  135:13
**offer**  114:19 115:6
115:14 117:3
118:5 119:7,10,16
119:23 122:3
136:2
**offered**  103:20
104:13,16,17,20
104:23 113:16
121:23
**offering**  59:24
60:8 115:11 120:2
135:17,24 136:9
**offers**  121:10
**officer**  98:6 153:8
**offices**  1:16
**official**  124:3
**oh**  23:4 31:22,25
32:6 41:16 73:13
106:23 130:5
146:4
**ohio**  6:20
**okay**  10:14,23
11:5,21 12:9,21
13:3,17 14:6,12,17
14:21 15:1,6,12,14
16:8 17:12 18:9
19:5 23:4,13,13
24:5,15 25:5,15,18
26:5 27:12 29:4
30:15 31:25 32:10
32:13 33:7,10,11
34:13,16,20 35:3
36:1,5,16 37:24
38:6,12,24 39:13
39:16,18,19 40:21
41:16,16 42:13,25
44:1,22 45:1,9,10

50:1,9 51:24 58:3
58:6 59:6,7 63:4
67:16 68:24 74:6
74:17 77:12,19
78:19,20 82:23
83:3 84:16 86:12
86:19 87:3 88:23
89:15 92:18 93:25
94:4,6 96:8 99:17
101:4,14,22 102:2
102:5,9 103:14,16
104:3 105:14,18
105:25 106:11,13
106:16,20,23
107:22 108:11,22
109:4 110:3,8,13
110:19,22 111:5,9
111:14,24 112:25
113:3,16,25
114:11 115:13,21
116:15 117:3
118:10 119:15,19
119:22 120:11,22
121:10,14 122:2,9
122:11,23 123:7,9
124:3,11,20 125:6
125:12,20,20
126:3,16,25 127:2
127:8 128:5,11,16
128:21 129:2,7,14
130:20 131:3,6
134:1,13 135:2,11
135:17,23 136:7
136:13,22 137:2,5
137:23 138:3,8,11
138:17,24 139:6
139:11,15,18,21
140:3,4,5,14,24
141:6,12,15 142:2
142:9,13 146:3
147:6,10 148:11

148:18 149:2,8,25
150:14,19 151:3,3
151:9,14,23,25
**once**  88:16
**ones**  11:20 13:8
14:4 55:20 61:10
105:9 136:9 142:8
**operation**  42:5
65:15 69:5
**operational**  32:16
33:13 34:2 35:15
**operations**  42:10
58:7,8 69:8,9 97:7
**opine**  90:19
**opined**  94:24
101:25
**opinion**  10:16 13:5
16:18 24:5 33:12
42:9,13 59:24
60:8 73:3 74:15
74:18 81:7 90:25
93:3 103:20
104:14,20 109:19
114:19 115:7,15
117:3 118:5 119:7
119:16,23 120:2
121:23 122:4,9
148:12,17,18
150:21
**opinions**  14:8
15:15,19,23 21:11
44:19 53:13 55:3
64:2 69:20 78:15
104:16,23 113:3
115:11 134:9
135:17,23,25
136:1,3,4,8 142:4
**optum**  7:20
**optumrx**  7:20
**oral**  1:7,10 153:8

**order** 14:8,21
69:20 109:25
**original** 153:11
**originally** 111:4
**originated** 93:20
**orleans** 2:10
**ortho** 59:8
**outcome** 154:3
**outside** 46:18
82:12 85:10 92:9
94:18 115:18
120:1 135:18
**overall** 46:11
55:15
**oversee** 94:25 95:3
96:12
**overseeing** 84:3
94:8 96:2
**oversight** 95:9,19
95:24 96:21 100:1
**oxford** 4:19 8:10

**p**

**p** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1,3 7:1,1
8:1,1
**p.m.** 1:14 147:14
147:17 152:1,2
**p.o.** 3:22
**page** 9:1,10 12:10
18:9 23:20 25:20
26:6 36:2,2 37:17
37:17,19 38:6,9
39:5,19 40:2
44:23 59:3 62:19
63:2 64:2 69:19
101:13 105:10
106:11,20 138:9
138:18 153:22
156:4,7,10,13,16
156:19

**pages** 10:15 13:10
20:9 24:9 33:8
39:5,8,11,17 40:23
57:12 122:20
**paid** 24:3 25:1
**paper** 137:11,12
**paragraph** 14:14
18:16,18 19:3
25:23 32:13 36:3
36:4 41:1 42:22
44:24 45:1 57:18
57:23,25 59:3
60:20 61:9,10
63:2,6 78:18 79:5
80:16 86:11 88:14
88:21 89:8 91:12
92:17 94:4,5 96:1
96:4,5 97:6 98:5
99:17,24 129:20
130:4,7,9 131:7
134:21,24 148:13
148:19 150:21
**paragraphs** 13:10
14:1 17:7,13
18:11 40:24 58:2
103:17,17 136:10
**park** 3:10
**part** 45:1 51:17
55:15 68:8,22,23
69:5 70:25 85:12
85:21 86:23 92:14
107:5 116:21,22
117:1 127:6 130:6
133:9 149:4,24
150:7
**particular** 11:8
20:13 21:6 22:5
28:9 30:16 37:1,2
49:24 51:5,11
56:16 72:25 84:20
86:9 100:12 103:4

120:20 145:6,21
**particularly** 21:16
49:24 61:11 70:16
72:15 74:4 82:21
128:3
**parties** 11:16
29:14 149:23
153:14,25
**parts** 68:9
**party** 153:18
**pass** 136:25
**passed** 143:3
147:20
**path** 91:9
**patience** 124:23
125:21
**pay** 41:9
**pc** 8:4
**peak** 16:10,20
62:3
**peaks** 15:13,22
16:5 18:4 59:17
59:21,23 60:1,5,7
60:22,24 61:9,13
61:24 62:11,13
83:12,16 104:15
**pending** 137:21
**pennsylvania** 2:15
3:13 4:5,9,20 5:11
6:15 8:11
**people** 137:13
**perform** 122:13
**performed** 63:9
122:17
**period** 43:19
72:14
**permit** 76:10
**person** 26:13,20
27:6,20 28:19
29:7

**personally** 59:11
**personnel** 41:21
119:4
**pertain** 44:19 64:2
99:2 115:20
**pertained** 46:12
**pertains** 45:10
**pertinent** 20:10
50:8 56:10,14
58:14
**pfizer** 7:3
**ph** 154:11
**pharma** 3:3 4:17
5:15 7:4 126:11
126:19
**pharmaceutical**
3:3 4:3,3 65:15
69:7 128:6 151:10
**pharmaceuticals**
3:3 5:9,15 6:12
7:3 8:8 94:8
126:10,18,22
**pharmacy** 4:12
**philadelphia** 2:15
3:13 4:5,9
**phonetic** 97:16,21
125:7
**phrase** 26:19
**physically** 127:13
**pick** 10:8 11:7
**picked** 11:6
**picture** 22:8
**piedmont** 3:18
**pietragallo** 8:10
**pietragallo.com**
8:12
**pills** 59:1 136:5
**pitched** 123:13
**pittsburgh** 4:20
8:11

**pizzi** 7:5
**place** 58:19 66:19
  75:8 78:8,21 79:7
  89:4 108:15
  118:12,15 120:1
  143:4 145:10
  149:10
**placed** 72:7 80:23
**plaintiff** 2:3,18
**plaintiff's** 10:11
  11:10,12 19:6
  20:25 21:10,21
  22:7 38:8 55:6,12
  148:2
**played** 101:6
**plaza** 5:21
**please** 38:25 64:21
  78:17 79:9,15
  86:10 88:23 91:11
  92:16 93:17 94:5
  94:15 95:4 96:2
  101:5 102:14
  104:12 105:16
  118:17,22 120:7
  136:24 137:9
  139:1
**plus** 71:2
**point** 12:15 27:11
  28:24,25 29:3,4,22
  37:8,11 46:6
  61:15 67:12 68:3
  68:17 69:12,14
  90:19 93:15 99:25
  100:12 115:1,3
  116:3 131:24
  132:8,24 135:18
**points** 16:25 20:10
  56:10 64:17
**ponce** 2:19
**portion** 10:9 37:2
  40:3 44:18

**portions** 17:20
  19:6 20:24 21:1,9
  21:21 22:3,10
  32:25 39:9 56:13
**position** 26:1,11
  26:19 28:12,17,20
  29:7 30:10,19,25
  31:5,13 65:22
  103:5 132:12
**possibility** 129:2
**possible** 43:12
  128:10 138:1
**potential** 87:10
  88:2
**potentially** 21:18
**predicate** 140:9
**premise** 21:13
**preparation**
  122:24
**preparing** 48:11
  50:3,10
**presence** 45:16
  87:12 88:3 90:16
  91:2 92:7 99:22
  150:17,19
**present** 8:14 83:6
  95:21 109:1
  150:13
**president** 36:14
**pretty** 21:19,22
  26:12
**preventive** 125:7
**previously** 10:1
  31:21,22 118:9
**primary** 40:9
**princeton** 6:9
  18:21 100:23
**prinston** 4:3
**printed** 31:24
**prior** 66:9 85:19
  86:2 92:20,25

93:5 99:20 100:8
  110:1 127:9,24
  128:2,9,13,16,21
  129:22
**pro** 140:15
**probably** 10:17,18
  21:17 22:18 47:21
  48:21,25 49:10
  52:13 58:16 65:3
  75:2 80:23 83:25
  89:5 91:23 103:3
  103:14 109:25
  110:2 112:9
  114:10 120:18,18
  121:20
**problem** 26:1,9
  28:17 31:3,13
  33:18 34:7 35:19
  89:18 118:25
  146:22
**procedure** 1:18
**procedures** 118:1
**proceed** 22:18
  136:1
**proceeding** 154:1
**proceedings** 152:2
**process** 17:8 18:11
  34:23 45:12,16,23
  46:3,16,19 47:5,7
  54:17 55:13,16
  92:5,9 94:15,19
  95:5 96:13 104:22
  112:3 129:9,21
  130:11 131:8,13
  131:25 132:5,5
  133:1
**processes** 46:8
  95:7
**processing** 118:25
**produce** 138:18

**produced** 1:11
  68:7 102:23 136:6
**product** 67:22
  71:4,5,13 84:6
  90:15 99:2 122:18
  132:1,11 140:18
  144:21 145:6,15
  145:21
**production** 9:19
  119:12
**products** 1:4 24:2
  45:5 51:1,4 58:23
  58:25 68:6 72:13
  72:21 73:25 74:9
  74:20 75:4,18
  76:3,10 81:20
  85:1,18,19 86:1
  89:25 98:22 120:3
  128:1,9,12 134:18
  145:3 149:1
  150:18,25
**professional**
  117:13,14
**program** 128:23
  129:5
**pronouncing** 42:1
**proper** 82:5,6
  83:24 89:2,16
  95:9,19,24 119:13
  140:9 145:12
  149:25
**properly** 60:6
  61:15,17 83:11
  94:8 96:2,21
**proprietary** 132:6
  132:13 133:6
**prospectively**
  75:19,21
**protocol** 142:21
  142:24

[provide - real]                                                        Page 23

**provide** 22:8
23:23,24 24:7
111:8 151:6
**provided** 18:19
19:6,12 20:12,25
21:21 22:2,4,14
24:1 37:5 40:20
55:6,12 56:2,5
73:17 110:6,6,8,11
110:20 111:5
133:12 138:19
139:16 140:15
141:1
**providing** 22:9
141:25
**provisions** 1:18
**public** 157:19
**published** 49:21
51:9
**puerto** 65:20,20
66:4
**pull** 14:2 16:1
22:21 25:6 36:3
37:13 38:24 57:3
78:17 97:12
136:23
**pulled** 107:20
**purity** 114:7
**purpose** 40:9,11
42:4 49:17,18
53:21,21
**purposes** 49:13
54:21
**pursuant** 1:17
153:16
**pursue** 111:19
**put** 16:22 17:16
38:20 46:23 63:23
66:19 70:15 71:5
77:5,9 103:4
147:4

**putting** 56:24 72:6

**q**

**qa** 148:22
**qc** 119:4
**qualification**
133:10
**qualified** 89:1
**quality** 25:2 34:1
35:15 41:2,21
45:2,4 78:21 79:7
80:22,22 88:17
89:4 98:6 118:2
122:12 128:23
129:5,9 134:16
148:23,24
**quenching** 26:2,8
**question** 11:15
12:13 13:16 19:20
21:13,24 22:16
24:16,17,18 27:4
27:12,14,16 28:4,5
29:5,15,16 30:1,3
30:5,7 31:9 33:24
36:12 43:15 46:25
57:14 58:20 61:4
64:20,22,25 67:6
71:2 77:11 79:17
81:21 85:23 86:5
87:6 93:14 95:4
95:14 97:19
100:10 103:11
104:7 105:7 108:9
108:13,14,22
110:24 115:7,25
116:2 117:11,21
118:18 121:1,7,9
123:5,6,17 128:8
135:1 137:20,22
138:21 140:10
141:15 142:23
149:17,21

**questioned** 149:6
**questioning** 10:8
105:17 125:25
147:20
**questions** 40:22
44:18 75:14 77:20
77:24 78:14
100:14,22 118:8
118:17 124:23
125:21 142:14,15
142:18 143:2,8
144:9,25 146:2
147:9,21 149:11
149:16 150:2
151:22
**quick** 1:7,10 10:3
10:6 19:14 44:14
77:20 78:13 79:13
80:15 84:2 87:3
90:16 100:15
126:9 131:14
132:4,19 133:14
134:1 135:17
136:13 137:23
139:11 142:14
143:7 147:19
150:5 152:1 153:1
153:7 155:5 156:2
156:24 157:2,4,12
**quick's** 146:8
**quickly** 146:15
**quite** 52:19 93:10
93:20
**quote** 26:1 36:10
36:11,13 38:9
62:24 92:4
**quoted** 40:17
76:17,19
**quotes** 36:11,13
77:5

**quoting** 63:5,16,18
69:23

**r**

**r** 2:1,3 3:1 4:1 5:1
6:1 7:1 8:1 155:1
156:3,3
**rama** 98:7
**ramirez** 8:15
**rao** 98:7,9
**raspanti** 8:10
**raw** 87:11 88:3
**reach** 35:4 107:14
**reached** 107:14
109:21 129:20
**reaching** 21:11
113:6
**read** 18:25 19:17
19:19 20:6,8
23:21 24:16,18
28:3,5 29:13 33:7
33:25 39:17 40:2
40:19 45:7 56:3
57:9 59:4,6 62:15
63:3 64:20,22
88:19,20,22 91:18
93:1 94:13 116:21
121:20,22,25
123:2 148:20
155:9 157:5
**reading** 23:22
26:6,10 36:6 38:2
38:8,12 40:6 41:8
45:2 78:20 88:14
91:16 92:19,24
94:7 97:7 98:6
99:18 113:17
123:14 130:8,9
134:15 148:20
**ready** 137:22
**real** 36:6 37:10
61:12 90:11

[realize - relevant]    Page 24

**realize**  132:19
**really**  15:25 31:10
  33:23 69:10 71:14
  108:20
**reason**  24:2,25
  36:6 63:24 76:24
  77:3 79:11,18
  80:19,19,19
  140:25 155:11
  156:6,9,12,15,18
  156:21
**reasons**  153:22
**recall**  12:18 18:16
  36:25 40:7,8 50:5
  51:19 53:25 64:11
  66:24 74:16 75:5
  75:23,25 76:5,8
  91:24 93:15 95:13
  110:11 112:16
  120:12,19,24,25
  121:7 128:10,11
  135:15,16 136:18
  143:7 144:21
  145:5
**recalled**  50:14
  99:5,7,7 120:17
  145:2,4
**recalls**  50:17
  66:25
**receipt**  153:20
  155:18
**receive**  73:18
**received**  80:20,23
  143:9,10 144:5,11
  144:19 145:7,14
  145:22 146:9
**recess**  44:10 126:5
  147:15
**recipient**  112:3
**recognize**  133:14
  139:12

**recollection**  40:6
**recommendations**
  125:4
**reconcile**  133:5
**record**  1:19 10:4
  23:16 25:12,18
  37:16 39:3 44:9
  44:11 78:2,3,4,5,6
  78:8,10 80:10,11
  80:12,13 106:3
  118:12 123:11,15
  124:10,12,13,14
  124:16,17 126:4,6
  146:5 147:13,16
  149:10 151:24
  152:1 153:9
**recover**  75:11
**recovered**  91:17
  91:20 92:2
**recovering**  94:16
  95:5 144:9 145:11
**recovery**  2:18
  94:11,25 95:2
  96:12,24
**recycle**  89:1
**recycled**  83:21,25
  89:23
**red**  6:5
**redacted**  114:24
  115:3 116:20
**redactions**  115:5
**redirect**  147:21
**reduce**  40:10
**reducing**  36:7
**reduction**  38:2,15
**refer**  105:17
  126:12,15,20
  130:3 134:21
**reference**  14:4
  18:13 41:10 43:18
  47:17 58:9 59:7

  60:25 61:9 70:14
  70:16 96:10
  107:19 131:1
  134:12
**referenced**  18:17
  57:1,13 60:21
  61:10 76:20 105:9
  107:3 108:15
  114:9 148:8 155:6
**references**  56:6
**referencing**  36:18
  63:13 69:25 70:2
**referred**  13:1
  83:16 113:12
**referring**  41:17
  61:24 62:17 70:1
  98:10,12 126:16
  130:1 135:12
  136:21
**refers**  41:5
**reflect**  46:7
**refresh**  123:18
**refutes**  40:16
**regard**  47:25
  57:18 60:11
**regarding**  10:9
  23:25 46:15 54:10
  55:3 78:15 79:6
  114:6 118:23
  132:21 143:8
**register**  94:2
**registration**
  154:10
**regulatory**  40:1
  125:3
**rejoin**  80:7
**relate**  56:16 57:4
  58:25
**related**  14:7 15:2
  15:22 16:5,20
  18:15 42:9 47:14

  51:20 52:6,7 57:5
  58:22 63:9 68:15
  68:16,16 70:4
  134:17 135:6,8
  140:6 144:2,20
  145:14 153:25
**relates**  15:13
  52:20 62:4 116:5
  116:18,23 118:1
  118:23 122:12,16
  130:18
**relating**  33:17
  125:7
**relation**  18:17
**relationship**
  128:17 129:15
**relative**  24:23 37:8
  42:11 43:13,24
  45:19 47:12 49:25
  51:9,10 52:3,12
  54:18,24 56:10
  59:1 60:19 64:17
  67:25 70:14 71:16
  71:17 73:7 79:20
  82:21 84:19 85:12
  85:13 86:9 89:17
  90:15 100:12
  116:4 120:14,24
  121:11 125:11
  132:10 135:24
  141:25
**releasing**  145:15
  145:20
**relevance**  97:2,25
**relevant**  21:16
  22:3,10 33:5
  49:24 51:5,12
  52:21 54:6,8,20,25
  57:7,13,16,22
  58:22 59:14 61:12
  61:14,25 64:14,18

65:1 67:7,8,13,23
70:6,16 71:15
72:5,10,16,18,19
73:5 74:4 85:4,5
87:20 90:1,6,10
91:24 95:8 98:25
99:3,8,16 100:13
103:3,6 104:17
116:7,14 121:5
133:24 135:9
**relied**   15:20 16:7,9
16:10,14,17,19
20:12 59:19 124:5
134:2 139:23
140:7 141:7,9,21
141:24 142:7
**rely**   15:14,19
40:25 42:25
107:13 140:25
141:10
**relying**   12:15
13:11 17:19 41:19
41:25 42:3,11,17
43:3 69:19 84:20
142:9
**remaining**   124:18
**remember**   49:1
50:16 79:17 129:8
136:15
**remonda**   40:25
**render**   64:1 75:18
90:25
**rendered**   74:9,19
75:3
**repeat**   61:4 71:22
85:23 97:18
108:12 115:24
**repeated**   116:1
**repeating**   63:23
**report**   10:9,14
11:19 12:11 13:14

15:14 16:6,8,11
17:1,3 18:7 23:23
23:25 24:7,21
25:4,23 26:3,4,17
26:18,23 27:4,8,16
27:19 28:14,18,25
30:22 31:1,2,3,11
31:14,15 32:13
35:4 36:2 38:10
40:18,22,24 41:19
41:23 43:10,20,25
44:19,23 46:9,9
47:2,12,15,18
48:10,11,18,19,20
48:21 49:6,13,18
49:18,24 50:3,8,10
51:5,11,13,17 52:2
52:3,4,13 53:3,7
53:21,22 54:18,22
55:4,20 56:10,20
57:2,8,10,22,24
58:2 59:14 63:6
63:15,20,23 64:3
64:14,16 66:21
67:7,9,10,13,16,24
69:11,12,16,20
70:6,12,17,25
71:16 72:6,10,18
74:5 76:18 77:9
78:17 81:20 82:21
82:21 85:4,13,14
85:15,16 86:9,11
87:18,23,25 89:13
90:2,6 91:8,8,9,12
91:25 92:14 95:17
99:16 100:13
101:1,12,13,13
102:1,21 103:16
104:1,18 105:1
111:10,11 112:22
112:23 113:13

114:1 115:19,19
116:7,14 121:5
122:2,8 124:5
129:19 130:6
131:1 134:3,10,15
135:9,19,25 136:2
136:10 139:23
140:1 141:7,9,11
141:17,19,20,21
142:1,4,7 146:8
148:2,8 151:3
**reported**   1:15
**reporter**   25:21
32:2,7 37:21 39:4
61:1 64:21 78:24
80:3 105:20,22
139:7 153:5
**reporter's**   153:1
**reporting**   37:2
**reports**   24:1 77:15
107:23 109:9
**represent**   15:12
44:16 62:13
100:23 126:10
138:3 139:15,21
**representation**
15:3
**request**   9:20 78:9
138:9,10,12
139:17 148:3
**requested**   24:18
28:5 55:17 64:22
153:18
**requests**   136:15
136:19 138:5
**require**   130:20,22
**required**   116:9
129:4 157:13
**requiring**   132:2
**reread**   30:6

**research**   76:7
**resolving**   32:16
33:13 34:2 35:16
**respect**   15:23
26:13,21 27:6,21
29:8 30:10 36:17
55:23 56:11,24,25
102:18 136:9
**respond**   77:17
112:4,10
**responded**   86:19
87:4 112:6
**response**   87:17
136:19 138:4,10
138:17 139:17
146:9
**responses**   9:17
112:12,18 136:18
137:3 146:8 148:2
148:8
**responsibilities**
118:1
**responsibility**
23:23 62:12 69:6
**responsible**   24:24
27:1 29:2 65:5
**responsive**   9:20
**restate**   28:6
**restated**   74:18
**restating**   60:10
**result**   74:2 76:3
87:11 88:3 124:4
124:25
**resulted**   123:21
**resulting**   26:2
**results**   49:14,21
134:18
**retained**   110:9,14
**retaining**   129:22
**retread**   142:20

**retrospectively**
74:10,12 75:17
**return** 67:18
70:21 155:13,17
**returned** 70:18
153:20,21
**revealed** 131:9
**review** 12:8 13:19
18:21 19:2 21:18
22:19 36:21,24,25
37:6,23 39:11
43:24 45:22,25
47:13,15 48:10,16
49:11,12 52:3
55:15,24 56:8,9,17
57:6,21 59:11,13
59:14,15 64:3
69:14 81:4 82:6
86:14 91:7,10
100:12 101:11,24
107:22 109:16,17
111:12,19,24
112:12 113:11,14
113:20,24 114:5
114:10 116:6,18
121:19 123:5
124:6 125:12,15
125:17,18 127:7
137:16,18 140:22
148:11 155:7
**reviewed** 11:24
13:23 16:23 19:2
36:21 37:7,8 46:4
46:7,12,23 48:16
48:17,25 49:6,14
49:20 50:5,24,24
51:17 54:6,18
55:19 57:6,12,12
57:18 60:18 64:5
70:25 72:19 80:24
82:21 85:12 86:9

87:15 92:13
102:20 109:8
110:6 111:10
112:14 113:22
122:23 124:2
129:10,16 130:19
141:8
**reviewing** 11:6
17:2 37:1 53:25
72:6 110:12 125:1
**rican** 66:4
**rico** 65:20,21
**riddell** 3:21
**right** 11:24,25
12:4,23 13:5,12
14:7,18,22 17:21
18:6,12 19:7 23:5
26:3,3,13 27:6
28:14,20 30:11,20
32:4 34:14,16,18
34:23 35:5 36:23
41:21 42:7,14,23
47:4 49:8,11
50:10 52:23,24
53:1,8,10,11 54:3
55:22 58:10 60:10
60:14,22 62:16,20
62:22,23 63:16,17
67:18 68:2,11
69:21,24 73:11,16
73:20,21 74:24,25
75:1 76:18,22
77:2,3 86:10
91:19 100:24,25
105:11,12 106:17
106:18 107:3,4,7
110:9 112:13,15
113:1 115:1,6,10
115:17,18 116:22
116:23 118:7
119:5,8,20,21

121:23,25 126:3
127:3 129:22,23
135:4 136:7 140:7
142:17 143:22
149:15 150:1
151:7,8
**rise** 114:7 115:9
115:16 117:4
119:23,24
**risk** 12:2,16 17:17
23:23,24 24:1,7,23
25:3 27:2 29:2
30:10 32:14 47:16
47:17 57:19,20
58:9,17 103:21
**rivero** 2:19
**riveromestre.com**
2:21
**road** 3:18 6:9,14
97:16,21,22,24
**robert** 1:4
**rockett** 7:21
**rockett.shevon**
7:23
**role** 25:3 39:21,24
101:6
**room** 86:25
**rooney** 8:4
**root** 33:15,18 34:5
34:21,23 35:18
47:13,25 48:8
49:9 78:22 79:8
84:16
**rose** 5:4
**rosemarie** 3:21
**rosemarie.bogdan**
3:24
**ross** 5:5
**roszel** 6:9
**route** 80:17 82:7
82:16 83:3,4

**ruben** 2:13,16
**rubenstein** 3:12
**rubensteinb** 3:14
**rule** 150:3,3
**ruler** 1:17 2:4
**rules** 1:18
**running** 118:12
144:15

---
**s**
---

**s** 2:1,3,8 3:1 4:1
5:1 6:1 7:1,12 8:1
156:3
**safe** 127:13
**sagoldberg** 4:6
**sake** 146:19
**sanger** 1:16 2:4
**sarah** 5:20
**sarah.zimmerman**
5:23
**save** 36:9 37:11
**saw** 11:9 42:12
91:23 113:10
138:5
**saying** 13:21 34:4
35:5,17 40:7 69:3
98:14 126:24
128:8 130:22,25
140:2
**says** 26:3,4,19
27:22 30:9,18,24
36:11 38:1,12
40:6 41:15 63:17
63:18 67:15 78:20
86:13 91:15
102:12 116:23
117:1 138:18
148:20
**scope** 46:19 82:12
85:10,15 92:9
94:18 115:18
120:1 122:8

screen  137:11
scripts  5:19,19
search  48:5 52:5
second  14:15 23:8
  40:8 59:4 68:18
  78:1 107:10
section  13:10 16:8
  16:10,24 28:9
  32:22 37:12 38:21
  40:17,23 41:1,11
  41:17,18 70:1
  92:16 130:18
  134:24
sections  13:18
  15:20 18:22 20:13
  20:21,21 22:5
  33:4,5 56:16,18,19
  56:20 57:12,13,16
see  12:17 14:10,15
  14:16 15:10 32:6
  32:19,20,22 38:4,5
  38:10,11,17,18
  39:20 40:3,5,13,14
  41:11 45:1 49:8
  86:8 87:17 94:19
  106:7 111:4
  114:17 116:12
  118:3,4 119:13,14
  120:14 122:13
  130:13,14 134:4,6
  134:7 137:13
  138:14,16,22,23
  147:11
seen  10:13 17:2
  38:19,22 40:15
  46:24,25 49:23
  50:1,7 52:1 72:3
  77:6 90:1,5 97:5
  98:3 110:1,2,23,25
  112:2,14 116:13
  123:23,24 125:10

125:15 137:18,24
  138:1,1 139:13
  146:12
seizure  125:3
selecting  57:1
selective  24:9
sell  72:21
sense  34:6 114:24
  138:6,7
sent  10:11,11
  23:17 52:14 140:6
  155:14
sentence  30:16
  56:4,9 104:11
separate  146:11
  146:20 147:4
separated  146:14
september  105:23
  106:4 107:11
  112:7,19 120:8,14
  121:12 122:5
  123:21
sequence  79:25
  120:15
series  2:18 107:10
serious  26:9 41:9
  88:18,24,25 89:9
  89:10
seriously  70:13
  144:5,12
serve  142:3
served  136:18
  137:3 153:13
set  51:7,15 146:12
seth  4:4 22:24 23:8
  27:18 29:17 31:22
  37:21 123:12
shane  8:15
share  38:3,16
  110:14 137:1,7

sheet  155:11
shevon  7:21
short  117:16
  125:24 126:2
shorthand  153:4
show  42:5
showed  12:25
  73:18,18
shown  49:7 136:13
  147:24 148:7
  153:14
side  56:25 113:5
sign  155:12
signature  153:17
  153:19,22 154:7
signed  155:20
significant  52:17
similar  32:18
  42:20 43:5 65:17
  66:5,18
single  19:2 113:18
  122:20
sir  25:23 29:15
  31:3 32:11 37:19
  39:7 48:8 50:19
  62:7 100:18 103:1
  103:5,11 104:13
  106:6 108:10
  116:1 117:12,24
  120:9 121:13
  124:22 125:21
  150:15 151:11
sit  46:2,14 91:1
site  86:15 132:3
sitting  128:11
  129:2
situation  21:6 37:8
  54:6 60:19 65:17
  66:16 71:12 72:25
  76:1 84:20 89:5
  108:7 111:23

113:15 133:3
situations  42:20
  65:18 66:20
skimmed  19:3
  20:7,9 21:5 22:14
  56:2,5
slack  1:16 2:4
slackdavis.com
  2:6 155:2
smith  6:14
smps  15:2
sodium  26:2,8
solco  4:3
sold  76:10
solutions  154:9
  155:23
solvent  59:8 91:20
  92:2 94:25 95:2,5
  96:12
solvent's  96:24
solvents  83:21,25
  87:11 88:3 89:1
  89:23 91:17 94:11
  94:16
someplace  90:5
sorry  18:24 32:15
  34:17 36:2,11
  53:4 60:2 61:3
  68:19 71:21,24
  73:13,13 74:24
  77:14 79:4 85:20
  92:22 93:17,22
  127:23 130:5
  143:15
sort  14:8 113:4
  127:15 151:4,10
sounds  14:24 15:4
source  35:19
sources  132:14,21
south  4:5,9

space 122:20
speak 73:1,6,8
  75:6 76:14,14,16
  76:21 78:24
speaker 77:23,25
speaking 24:13
  50:13 149:12
specific 11:19
  19:15 20:11,20
  22:15 39:8,24
  43:13 46:10,25
  48:6 56:6 59:2,13
  59:15 60:8 66:11
  74:23,24 77:5
  82:3 92:16 96:14
  103:18 104:17,24
  116:4 122:11
specifically 44:23
  50:16 57:23 59:3
  98:11 108:9 123:6
  129:3,19 141:23
specification
  115:22 134:18
  135:3
specifications
  116:4
specifics 82:3
  116:16
specify 146:17
specs 116:19
speculation
  133:21
speech 118:17
speeches 24:16
spending 123:14
st 5:22
stand 25:4 26:24
  122:9
standard 91:17
  92:1,3

standards 116:4
standpoint 65:4
stanoch 2:8
start 24:15 78:7,11
  114:1
started 10:10
  55:13
starting 87:10
  88:2
state 1:15 7:17
  29:22 38:2,15
  52:4 60:21 99:9
  109:6,12 110:2
  134:15 153:5
stated 1:19 21:19
  21:20 22:13 36:8
  42:2 61:22 84:14
  117:9
statement 35:25
  36:13,17 37:9
  38:13,20,23 45:9
  72:18 79:10,19
  80:20 93:19 96:3
statements 25:4
  26:25 33:21 42:19
  58:6 76:20,22,25
  77:7
states 1:1 72:22
  76:11 101:7
stating 28:23
stenotype 1:15
step 135:11
steps 79:21 80:16
  81:2,4 83:14,15
  84:13 96:11,14
steve 78:7
steven 3:16 4:18
  78:13 79:1,14
  81:22 85:24 90:23
  94:20 96:5

steven.hunchuck
  4:21
stop 104:12
  145:15,20
storage 119:20,20
stoy 8:9 9:4 44:14
  44:16 47:4 49:8
  49:20 51:6,23
  53:24 54:8,19
  55:22 58:24 60:10
  60:20 61:5,8,23
  62:6,14 63:16
  64:9,24 65:19
  66:10 67:8 68:1
  68:24 69:18,23
  70:18 71:1,18,24
  73:3 74:17 75:13
  75:15 76:2 77:2
  77:19 81:23
street 2:9,14 3:13
  4:5,9 6:19 7:6,12
  7:17,22 8:5,11
  154:9
strike 84:24 88:11
  92:22 98:4 149:20
  149:24
strongly 41:9
structure 102:7,12
studied 102:7,12
styled 1:12
subcategories
  138:14
subject 11:17 52:2
  69:11 101:12,12
  102:21 107:24
  109:22
subscribed 157:14
success 32:16
  33:13 34:1,2,21
  35:15

successful 41:8
suggest 32:14
  123:10,12
suite 1:17 2:4,14
  2:19 3:9,13,18
  4:14 5:5,21 6:5,14
  6:19 8:5 154:9
supplier 83:24,25
  133:10,10
suppliers 90:12
  128:18
supply 53:11
  72:12 101:6
support 13:25
  17:7
supposed 82:24
  83:5
sure 10:17 12:24
  13:7 14:4 26:15
  27:10 28:1,24
  31:10,14 37:24
  41:10 46:1 47:19
  47:20 48:23 51:12
  52:19,22 55:18
  56:7 58:18 61:5
  68:10 69:18 75:17
  76:6,6 87:14
  93:20 98:17
  101:21 103:2
  105:19 107:18
  109:15 110:21
  111:7 127:10
  133:11,23 134:23
  135:8 136:24
  137:17 141:22
  146:22
swedesford 6:14
sworn 1:12 10:1
  153:7 157:14
synthesis 82:7,16
  83:3,4

**synthesize** 84:6
**system** 11:7 78:21
   79:7 80:22,22
   88:18 89:4

**t**

**t** 5:10 156:3,3
**tab** 25:6,6 136:25
   136:25 138:24,25
**take** 16:1 33:9
   37:23 44:3,4,5,7
   59:4 62:19 63:2
   80:16 81:2,5
   86:10 88:13 91:11
   123:18 125:24
   126:2 147:11
**taken** 1:12 83:15
   96:12,14 124:4
   153:2 154:1
**takes** 26:18 71:4
**talk** 26:21 27:6,21
   55:2 89:21 113:25
   118:18 123:3
   134:2
**talked** 101:10
**talking** 17:15 18:9
   20:8 41:20 43:20
   74:23 82:14 130:4
   134:25
**talks** 99:24
**tape** 124:10
**tech** 8:15,16 137:7
**technology** 23:22
   24:3 25:1,24
**tell** 63:9 88:23
   96:2 101:5 102:16
   102:19 109:24
   118:19,20 130:15
**telling** 13:1 37:9
**term** 16:14
**terminus** 3:17

**terms** 26:10 28:11
   28:20 30:9,18,24
   31:5 82:3 111:22
   121:5
**test** 91:16,22 92:6
   134:18
**testified** 19:5
   55:23 73:9,14,23
   73:24 82:23 144:4
**testify** 25:25 31:12
   45:12 48:24
**testifying** 29:9
   31:8 49:1 100:7
   149:3
**testimony** 16:20
   17:20,20,23 18:15
   18:16,24 19:6,10
   19:16,22,25 20:5
   20:15,18,24 21:1,8
   21:9,21,22 22:8
   23:7,20 25:10,16
   26:5 27:22 29:6
   29:22 30:9,24
   31:19,20 32:22,25
   33:8,11 35:10
   36:4,16,20,22 37:1
   37:18,20 39:6
   40:15 46:1 48:23
   49:3 54:11,13
   55:6,24 57:15
   59:19 60:16 61:19
   61:24 62:2,7,9
   65:7,12 66:12
   70:7 71:20 74:2
   89:13 103:8
   110:17 132:16
   144:24 153:9
   155:9,18 157:8
**testing** 49:15,21
   53:25 59:8,12
   116:9 118:25

133:15,17,18
**teva** 3:3,3
**texas** 1:15,17 2:5
   5:5 153:5 154:8
   154:10
**text** 56:22
**thank** 51:24 77:20
   77:21 100:16
   104:6,7,11 106:25
   117:12 118:10
   119:11 120:6
   124:12,19,21
   125:22 142:14,16
   142:17 149:2,12
   149:19 150:4
   151:21
**thanks** 78:11
**therefor** 153:23
**thing** 32:5 48:22
   69:3 87:20 112:22
**things** 16:15 56:6
   64:7 73:6 88:8
   100:3 105:5
   111:20 146:11
**think** 11:15 12:20
   13:24 21:15,19
   22:6,7,9,16 29:13
   42:19 50:25 52:15
   54:8,19 55:22
   60:11 62:20 66:4
   72:20 73:11,20
   75:10 83:21 87:1
   101:19 110:5
   115:25 121:3
   122:21 125:25
   129:3 130:11
   133:3 136:17
   138:9 142:14,21
   142:24 146:18
   150:12,12 151:23

**thinking** 33:21
   34:11 35:1
**third** 118:22
**thornburg** 7:11
**thorough** 116:18
   122:13 133:9
**thoroughly** 131:25
**thought** 31:21
   41:17 55:14 102:4
**three** 7:6
**throckmorton**
   154:9
**thumb** 146:6
**time** 21:16 24:2,25
   30:5 38:19,22
   40:15,19 43:19
   55:16 67:1,14
   72:13 86:22 93:15
   103:10 117:17
   121:24 123:17
   126:7 135:24
   142:16 143:9,11
   143:19 144:15
   145:6,21 146:2
   147:12,13,17,21
   155:19
**timeframe** 50:18
   109:14 155:8
**times** 43:9 51:16
   149:23
**timing** 67:21 70:3
   70:6,11,14 120:15
   120:23
**today** 18:24 46:2,6
   46:14 91:1 98:17
   109:3 116:8 123:5
   128:11 129:3
   142:16,23 143:2
   149:3,6
**today's** 10:3

**told**  36:19 86:13
  110:19 122:23
  149:22
**tolerate**  149:23
**tom**  8:16
**top**  41:16 117:1
**topic**  70:25 71:16
  82:20
**torrent**  5:15,15
  126:10,11,13,14
  126:16,18,18,21
  127:9,11,14,16,20
  128:1,12,18
  129:15,20 130:10
  130:18 131:7,14
  131:18,25 132:9
  132:20,25 133:12
  133:13 134:4,5,9
  134:19 135:18
  136:9 140:4,7
**torrent's**  128:9,22
  129:5,9 134:16
**totality**  15:18
  129:8 134:8
**totally**  67:24
**tower**  8:4
**tracking**  14:13
**trade**  8:5
**tragedy**  32:18
  33:14 34:4
**train**  41:2,21
**trained**  133:17
**training**  41:10
  118:24
**transcript**  24:10
  28:9,23,23 30:16
  113:17 153:8,21
  155:6,20 157:5,8
**transcripts**  9:19
  18:25 19:18 37:5
  56:2,3,12,13,25

134:5
**traurig**  3:5,9,12
  3:17
**tree**  97:15,20,21
**trial**  8:15,16
**tried**  57:3
**trouble**  79:2
**trucking**  97:21
**true**  136:11
  143:25 153:9
  157:8
**truth**  76:21
**try**  20:23 34:25
  46:21 53:2,6
  79:15,16 80:6
  92:10
**trying**  16:7,11
  28:24 31:11 33:18
  34:7,15 35:19,24
  56:17 91:22 94:19
  95:1 133:24
  141:12
**turn**  23:19 25:5
  26:13 36:1 78:18
  86:25 120:7
**two**  13:4 15:18
  17:8 24:9,23
  25:20 29:1 39:5
  42:20 105:1,12,15
  107:13 122:20
  125:8 126:16,17
  126:25 127:4
  134:5 146:11
  147:4,23
**type**  45:3 48:21
  122:20 148:24
**types**  127:25
**typically**  77:4
**typo**  32:4

**u**

**u.s.**  4:3
**ulmer**  6:19
**ulmer.com**  6:21
**ultimate**  115:7
**ultimately**  56:20
  57:20 140:7
**un**  15:22
**unclean**  98:14,22
**uncleaned**  98:8
**unclear**  24:6
**underlying**  21:24
**understand**  16:11
  27:10 35:1 38:14
  44:20 48:23 50:13
  56:8 75:15,22
  89:2 95:1 108:20
  108:22 109:10
  120:11 126:25
  128:4 131:25
  132:4,25 133:2
  139:19,20 140:1,2
  140:22 141:13
**understanding**
  45:15 52:8 85:6
  95:20 98:13 101:5
  122:25 127:3,25
  128:17 129:8,14
  136:8 150:6,15
**understood**  96:22
  128:3
**undertake**  59:16
**unexplained**
  116:18,23
**unidentified**  77:23
  77:25 83:12
**unit**  63:5 66:21
  68:2 69:20 111:15
  118:2 119:5
  122:12

**united**  1:1 72:22
  76:11 101:7
**unknown**  15:13,22
  16:5,10,19 18:4,5
  59:17,20,23 60:7
  60:22,24 61:8,13
  62:3,11,13 104:15
**unpack**  74:6
**unredacted**
  116:21,22
**unrelated**  128:25
**update**  21:18
**uploaded**  137:1
**upper**  107:3,7
**urge**  41:9
**usa**  3:3 106:8
**usa151204**  106:11
**use**  16:14 91:22
**useful**  55:15
**users**  136:5
**uses**  130:11 132:5
**usp**  116:8
**utter**  144:15

**v**

**v**  155:4 156:1
  157:1
**vague**  16:14 24:15
  63:11 70:9,20
  74:11 75:20 86:4
  88:5 93:23 135:20
**vai**  123:25
**valeant**  7:3
**validate**  18:10
  104:21
**valsartan**  1:3
  18:11 24:1 40:10
  40:11 45:5,24
  46:3 47:10 49:15
  50:5,14,20 52:9
  53:15 62:4 64:10
  64:13 66:24 67:2

[valsartan - witness]    Page 31

67:18,22 68:2,11
68:11,16,25 70:5
70:19,21 71:20
72:2,12 85:18
86:1 99:11 101:7
101:17 102:10,18
102:23 103:12,22
104:21 108:4,16
108:25 111:16
114:8,16,22
115:10,17,22
117:7 118:6
120:13,17 121:17
131:19 135:7
149:1 155:4 156:1
157:1
**valsartan's** 49:22
**vanderbilt** 3:5
**variability** 85:4,7
**variance** 54:9
**varied** 85:1
**various** 46:23
51:16
**varying** 54:15
**vcd** 90:17 91:2
**vcds** 90:8
**vendor** 94:25
**verbiage** 100:10
**verify** 14:24 63:22
155:9
**veritext** 154:9
155:14,23
**veritext.com**
155:15
**versus** 76:19
**vice** 36:14
**vicinage** 1:2
**victoria** 3:16
**videographer** 8:15
10:2 44:9,11 78:3
78:5 80:11,13

124:9,13,15,20
126:4,6 147:13,16
151:25
**videotaped** 1:7,10
**view** 41:20 90:16
91:1
**visits** 132:3
**voice** 86:25
**volume** 31:25 32:5
79:3 86:25 153:2
**voluntary** 111:17

**w**

**w** 4:8,14
**wait** 61:1
**wallack** 6:4,8
100:22
**walnut** 6:19
**walsh** 7:4,5
**walsh.com** 7:8
**walsh.law** 7:8
**want** 10:14 11:22
11:22 15:25 26:7
27:12,15 29:25
30:6 35:4 37:23
39:10 40:21 41:7
44:4,22 45:9 52:4
54:17 55:2 56:7
58:1 71:12,22
74:6 75:6,15
77:13 78:8 80:9
89:21 91:7 92:11
94:21 97:12 98:16
103:5 109:10
118:19 120:20
121:2,21 122:19
122:22 123:4,17
134:1 137:13,15
138:8
**wanted** 21:11 46:5
56:9 76:6 131:4

**wants** 44:7
**warned** 41:6
**warning** 70:4
73:10,15,17,19,25
74:2,8,19 75:1,3
75:16,18 76:3
79:11,19 80:21,23
81:8,9,17,18 83:22
83:23 84:15,21,21
86:14,20 87:5,13
95:10 96:9,19
124:7,24 135:12
143:8,10,18 144:4
**washington** 5:11
**waste** 123:17
144:15
**way** 1:17 2:4
51:18 52:18 53:13
54:1 68:1 71:25
73:4 76:22 77:3
86:24 105:16
111:1
**wayne** 6:15
**ways** 44:8 97:9,10
97:11
**we've** 11:15,18
44:7 72:14 114:2
125:1,8,13 143:16
**went** 41:8 52:18
55:5 68:4 71:19
72:1,3 81:10
102:20
**west** 7:22 8:5
**whiteley** 2:8,9
**whitney** 7:21
**whorton** 2:18
**william** 6:3
**witness** 1:11 10:1
11:18 12:7 15:17
15:25 16:17 17:25
19:11 20:3,20

21:4,15 22:1,13
23:9,16 24:21
25:19 26:15,24
28:1,8,16,22 29:12
29:18 30:6,15
31:10 32:7 33:3
33:20 34:10,25
35:7,23 37:17,22
37:24 39:12,16,18
41:5,25 42:17
43:3,18 44:3,5,6
46:22 48:15 49:5
50:23 52:1 53:20
54:5,14 55:11
58:21 60:4,17
61:2,21 62:10
63:13 64:5,16,23
65:13 66:3 67:6
67:21 68:14,19,21
69:3 70:11,23
71:10 72:24 74:14
75:23 76:24 77:21
79:18 81:16 82:2
82:13,20 83:10,19
84:9 85:3,11,21
86:7 88:7,22
89:15 90:22 91:6
91:23 92:12 93:10
93:25 94:22 95:7
95:16 96:8 97:3
98:2,24 99:15
100:11,16 101:9
102:15 103:25
104:10 105:8
106:3 110:18
113:9,18 115:1
116:12 117:9,14
117:23 118:13
119:25 120:5
121:20 122:21
123:4 124:20

[witness - zoom]                                                                                  Page 32

125:22 127:6,23
128:20 129:13
130:3 131:24
132:18,24 133:23
135:23 136:25
137:17 139:9
140:12,17,21
141:4,6 142:6,17
143:3 145:2,18
147:20 148:16
150:2 151:13,19
153:7,10,14 155:8
155:10,12,19
**witness's** 118:16
**witnesses** 19:18
123:14
**wmurtha** 6:6
**wondering** 109:19
**words** 32:16 35:14
41:13 109:20
110:13 115:13,14
119:16 151:5
**work** 48:20 127:11
140:17
**world** 38:16 65:24
**worth** 154:10
**wrap** 151:24
**writing** 86:20 87:4
**written** 38:15
146:8
**wrote** 99:16 122:2
130:9

**x**

**xylene** 59:8

**y**

**y'all** 123:13
**yeah** 14:20 32:3,4
44:6 79:18 87:1
137:4 138:23
139:5 146:21

147:1,2,2,3,6
**year** 42:20
**years** 66:23 71:3
74:15 75:7,24
76:8 77:6 99:20
144:1,12 151:13
151:17
**yesterday** 10:10
12:4,20,23 13:1
14:22 15:2 17:14
17:23 19:5,10,15
23:2,3,12,15 48:24
50:25 51:4 55:12
68:4 73:9,14,17
74:4 75:10 82:24
136:13 138:5
143:4,14 144:9,24
145:12 146:16
**yield** 36:8
**york** 3:6,6,23 5:17
5:17 7:22,22

**z**

**zh** 42:5
**zhejiang** 4:3
**zhp** 10:9 12:15
13:6,18,23 14:5,7
14:9 15:18 17:2
18:21 36:14 39:22
40:2 41:9 42:5,13
43:8,23 45:12,19
45:23 46:2 52:14
52:23,24 53:8
108:6,10 129:15
129:22 130:11
131:12 132:1,2,5
133:8,9,12,12
**zhp's** 10:16 11:1
15:2 18:10 32:14
32:15 33:12 34:21
41:1,20,20 42:10
45:17 46:15

**zimmerman** 5:20
**zmick** 4:13
**zoom** 137:13
147:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 278

1    In Re: Valsartan, Losartan, Et Al

2    John Quick (#5025079)

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, John Quick, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____          2/18/22

12    John Quick                               Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15              18  DAY OF February        , 20 22.

16

17

18

19              NOTARY PUBLIC

OFFICIAL SEAL
CHRISTY MONTEMAYOR
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 5/21/2025

20

21

22

23

24

25

Page 277

1    In Re: Valsartan, Losartan, Et Al

2    John Quick (#5025079)

3                    E R R A T A   S H E E T

4    PAGE _17_ LINE _7_ CHANGE _EMPLOYEE SHOULD BE_

5    _____EMPLOYER_____

6    REASON _____CORRECTION_____

7    PAGE _17_ LINE _9_ CHANGE _"IN AN EMPLOY" SHOULD_

8    _____BE "AN EMPLOYEE"_____

9    REASON _____CORRECTION_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   John Quick                          Date

25

Page 157

1    In Re: Valsartan, Losartan, Et Al v.

2    John Quick (#5063421)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, John Quick, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____          2/18/22

12   John Quick                               Date

13   *If notary is required

14                          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                          18 DAY OF February, 20 22.

16

17

18                                    OFFICIAL SEAL
                                      CHRISTY MONTEMAYOR
19        NOTARY PUBLIC       NOTARY PUBLIC, STATE OF ILLINOIS
                              MY COMMISSION EXPIRES: 5/21/2025

20

21

22

23

24

25

Page 156

1    In Re: Valsartan, Losartan, Et Al v.

2    John Quick (#5063421)

3                    E R R A T A   S H E E T

4    PAGE _63_ LINE _15_ CHANGE _ESTASLISHOO_

5    _SHOULD BE ESTASLISHMENT_

6    REASON _COURT REPORTER MISSED THIS_

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   John Quick                              Date

25

```
                                          Page 277

 1    In Re: Valsartan, Losartan, Et Al

 2    John Quick (#5025079)

 3              E R R A T A  S H E E T

 4    PAGE__11___  LINE__N/A___  CHANGE Exhibit #18 in the

 5    glossary should be the Deposition of Pan Lin as

 6    ___correctly noted at 225:4 and on the exhibit

 7                          itself.

 8    _____

 9    REASON_____

10    PAGE_____  LINE_____  CHANGE_____

11    _____

12    REASON_____

13    PAGE_____  LINE_____  CHANGE_____

14    _____

15    REASON_____

16    PAGE_____  LINE_____  CHANGE_____

17    _____

18    REASON_____

19    PAGE_____  LINE_____  CHANGE_____

20    _____

21    REASON_____

22    PAGE_____  LINE_____  CHANGE_____

23    _____

24    REASON_____ Date_____
      /s/ Nilda Isidro                        3/10/22
25
```