# Exhibit 1

Confidential Information - Subject to Protective Order

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
2                     CAMDEN VICINAGE
3

      *****************************
4    IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
     AND IRBESARTAN PRODUCTS
5    LIABILITY LITIGATION
6    **************************  HON ROBERT B.
     THIS DOCUMENT APPLIES TO ALL  KUGLER
7    CASES
8    **************************
9

              - CONFIDENTIAL INFORMATION -
10            SUBJECT TO PROTECTIVE ORDER
11

12

13            Remote Videotaped Deposition of
14   DAVID L. CHESNEY, commencing at 9:40 a.m., on
15   the 21st of March, 2022, before Maureen
16   O'Connor Pollard, Registered Diplomate
17   Reporter, Realtime Systems Administrator,
18   Certified Shorthand Reporter.
19

20                  - - -
21

          GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23

24
```

Page 2

1
2 REMOTE APPEARANCES:
3 MAZIE SLATER KATZ & FREEMAN, LLC
  BY: ADAM SLATER, ESQ.
  BY: JULIA S. SLATER, ESQ.
4 BY: CHRISTOPHER GEDDIS, ESQ.
5   103 Eisenhower Parkway
    Roseland, New Jersey 07068
    973-228-9898
6   aslater@mazieslater.com
7   cgeddis@mazieslater.com
  Representing the Plaintiffs
8
9 RIVERO MESTRE LLP
  BY: JORGE MESTRE, ESQ.
  BY: ZALMAN KASS, ESQ.
10  2525 Ponce De Leon Boulevard
    Miami, Florida 33134
11  305-445-2500
    Representing the Plaintiffs
12
13 GREENBERG TRAURIG LLP
14 BY: KATE M. WITTLAKE, ESQ.
    4 Embarcadero Center, Suite 3000
15  San Francisco, California 94111
    415-655-1285
16  wittlakek@gtlaw.com
  Representing the Defendants Teva
17  Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
18  and Actavis Pharma, Inc.
19 GREENBERG TRAURIG, LLP
20 BY: STEVEN M. HARKINS, ESQ.
    Terminus 200
21  3333 Piedmont Road NE
    Suite 2500
22  Atlanta, Georgia 30305
    678-553-2100
23  harkinss@gtlaw.com
  Representing the Defendants Teva
24  Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,

Page 3

1 APPEARANCES (Continued):
2 WALSH PIZZI O'REILLY LLP
  BY: CHRISTINE I. GANNON, ESQ.
3 By: LIZA WALSH, ESQ.
    Three Gateway Center
4   100 Mulberry Street, 15th Floor
    Newark, New Jersey 07102
5   973-757-1017
  Representing the Defendants Teva
6   Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
7   and Actavis Pharma, Inc.
8
  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
9 BY: THOMAS E. FOX, ESQ.
10  One Manhattan West
    New York, New York 10001-8602
    212-735-2165
11  thomas.fox@skadden.com
  Representing the Defendants Zhejiang
12  Huahai Pharmaceutical Co., Ltd.,
    Prinston Pharmaceutical Inc., Huahai
13  U.S., Inc., and Solco Healthcare US,
    LLC
14
15 HINSHAW & CULBERTSON, LLP
  BY: GEOFFREY M. COAN, ESEQ.
16  53 State Street
    Boston, Massachusetts 02109
17  617-213-7047
    gcoan@hinshawlaw.com
18  Representing the Defendant SciGen
    Pharmaceuticals
19
20 BARNES & THORNBURG, LLP
  BY: MITCHELL CHARCHALIS, ESQ.
21  2029 Century Park E, Suite 300
    Los Angeles, California 90067
22  310-284-3896
    mcharchalis@btlaw.com
23  Representing the Defendants CVS
    Pharmacy, Inc., and Rite Aid
24  Corporation

Page 4

1
2 APPEARANCES (Continued):
3 FALKENBERG IVES, LLP
  BY: MEGAN A. ZMICK, ESQ.
    230 W. Monroe Street, Suite 2220
4   Chicago, Illinois 60606
    312-566-4808
5   maz@falkenbergives.com
  Representing the Defendant Humana
6
7 BUCHANAN INGERSOLL & ROONEY PC
  BY: ASHLEY D.N. JONES, ESQ.
8 BY: DEBORAH HOPE, ESQ.
    1700 K Street NW, Suite 300
9   Washington, DC 20006-3807
    202-452-7318
10  ashley.jones@bipc.com
  Representing the Defendant Albertsons
11  LLC
12
13 Videographer: David Stone
14
15
16
17
18
19
20
21
22
23
24

Page 5

1        INDEX
2 EXAMINATION              PAGE
3 DAVID L. CHESNEY
4 BY MR. SLATER             10
5 BY MR. FOX               276
6 BY MR. SLATER            311
7 BY MR. FOX               348
8
9
10      E X H I B I T S
11 NO.      DESCRIPTION        PAGE
12 1     Notice to Take
13    Videotaped Deposition.....   13
     2     ZHP Defendants' Response
14    and Objections to Notice
     to Take Videotaped Oral
15    Deposition of David
     Chesney...................   14
16
     3     DL Chesney Consulting,
17    LLC Invoices.............   15
18 4   Expert Report of David
     L. Chesney, MSJ...........   24
19
     5     IARC Monographs on the
20    Evaluation of the
     Carcinogenic Risk of
21    Chemicals to Humans, May
     1978.....................  116
22
     6     Document titled
23    Purification of
     Laboratory Chemicals......  122
24

Page 6

1
2   7        Article in Tetrahedron,
            N,N-Dimethylformamide:
3           Much more than a solvent..   128
4   8        Sun, et al, Theoretical
            Investigation of
5           N-Nitrosodimethylamine
            Formation from
6           Nitrosation of
            Trimethylamine.........   131
7   9        PowerPoint titled
            Advanced analytical
8           Technology Center
            (CEmat) Introduction......   201
9
10  10       E-mail titled Notice on
            the Results of the
11          Report of the
            Preliminary
12          Investigation on the
            Formation of Unknown
13          Impurities Resulting
            from the Sodium Azide
14          Quenching in Crude
            Irbesartan, Bates
15          ZHP00190573 and 574.......   207
16  11       PowerPoint titled
            Quality Management
17          Essentials, Expert
            Advice on Building a
18          Compliant System:.........   233
19  12       Deviation Report Form,
            Bates ZHP00004352
20          through 4471..............   266
21  13       November 29, 2018
            Warning Letter, Bates
22          ZHP01344159 through 4164..   320
23  14       Investigation Report,
            Bates ZHP00662283
24          through 2309..............   336

Page 7

1
2   15       August 26, 2018 Response
            to FDA Inspection on
3           July 23 - August 3,
            2018, Bates ZHP02115600
4           through 5603..............   338
5   16       Establishment Inspection
            Report, Bates
6           PRINSTON00162349 through
            2406..............   344
7   Defendant 1   January 25, 2019 FDA
            Statement on the FDA's
8           ongoing investigation
            into valsartan and ARB
9           class impurities and the
            agency's steps to
10          address the root causes
            of the safety issues......   291
11
12  Defendant 2   August 30, 2018 FDA
            Statement on FDA's
13          ongoing investigation
            into valsartan
14          impurities and recalls
            and an update on FDA's
15          current findings..........   297
16
17
18
19
20
21
22
23
24

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

1
2
3
4   Direction to Witness Not to Answer
    PAGE LINE
    None.
5
6
7
8   Request for Production of Documents
    PAGE LINE
9   None.
10
11
12  Stipulations
    PAGE LINE
    None.
13
14
15  Questions Marked Highly Confidential
    PAGE LINE
16  None.
17
18
19
20
21
22
23
24

Page 9

1   P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  We are now
4   recording and on the record.  My name
5   is David Stone.  I'm a legal video
6   specialist on behalf of Golkow
7   Litigation Services.
8       Today's date is March 21st, and
9   the time is 9:40 a.m.
10      This is the deposition of David
11  Chesney in the matter of In Re:
12  Valsartan, Losartan, and Irbesartan
13  Products Liability Litigation,
14  plaintiffs, versus -- in the United
15  States District Court, District of New
16  Jersey, Case Number, MDL Number 2875.
17      This deposition is being taken
18  via remote recording on behalf of the
19  plaintiffs.
20      The court reporter is Maureen
21  Pollard.
22      Counsel will state their
23  appearances, and the court reporter
24  will administer the oath.

Confidential Information - Subject to Protective Order

Page 10

1      MR. SLATER:  Adam Slater, Chris
2  Gaddis, Julia Slater for plaintiffs.
3      MR. FOX:  Thomas Fox, Skadden,
4  Arps, for the ZHP defendants.
5          ///
6      DAVID L. CHESNEY,
7  having been duly remotely identified and
8  sworn, was examined and testified as follows:
9          EXAMINATION
10 BY MR. SLATER:
11     Q.   Good morning, Mr. Chesney.
12     A.   Good morning.
13     MR. FOX:  Adam, I just want to
14 make clear, this is being taken
15 pursuant to the remote deposition
16 protocol in the case?
17     MR. SLATER:  I think that we
18 have a remote deposition protocol.
19     MR. FOX:  Yes.
20     MR. SLATER:  Why are you asking
21 me that?
22     MR. FOX:  I just wanted to make
23 sure, that's all.
24     MR. SLATER:  I just have never

Page 11

1  been asked that question before in one
2  of depositions we were doing remotely.
3  I thought it was a trick question.  I
4  think so.
5  BY MR. SLATER:
6      Q.   Okay.  Good morning,
7  Mr. Chesney.
8      A.   Good morning.
9      Q.   We're going to take your
10 deposition now.  You understand that, right?
11     A.   I do.
12     Q.   Have you been deposed before?
13     A.   Yes.
14     Q.   How many times?
15     A.   Let's see.  Four or five times,
16 I guess.
17     Q.   You understand you're under
18 oath and must tell the truth, right?
19     A.   Yes.
20     Q.   If I ask you a question that
21 for some reason you don't feel you can answer
22 truthfully and completely, for any reason,
23 just tell me.  It may be that I mispronounce
24 a word, or ask you a question that

Page 12

1  technically doesn't make sense to you because
2  I don't understand something either from a
3  regulatory perspective or legal perspective,
4  whatever it may be, for any reason you're not
5  clear on my question or don't feel like you
6  can answer it, just tell me and we'll try to
7  figure out what I need to clarify, and I'll
8  try to do that.  Okay?
9      A.   Okay.
10     Q.   Counsel may object.  I think it
11 would be unlikely he won't object during the
12 course of the deposition.  That's routine.
13 It's never to signal an answer or how to
14 answer, it's just preserving rights -- or at
15 least it should never be to signal an answer,
16 and I doubt it would be today, and I would
17 expect it wouldn't be.
18     In any event, let your counsel
19 object, and then answer the question, unless
20 he tells you not to.  Okay?
21     A.   Yes, sir.
22     MR. SLATER:  Chris, let's put
23 up the deposition notice as Exhibit 1.
24          ///

Page 13

1      (Whereupon, Chesney Exhibit
2  Number 1 was marked for
3  identification.)
4  BY MR. SLATER:
5      Q.   Mr. Chesney, this is the
6  deposition notice we served for your
7  deposition.
8      Have you seen this document
9  before?
10     A.   Yes.
11     Q.   Did you read it and go through
12 all the requests?
13     A.   Yes.
14     Q.   Did you provide any documents
15 to the lawyers that retained you in this case
16 to be provided to us pursuant to this
17 deposition notice?
18     A.   Before I received the notice I
19 did, yes.
20     Q.   Okay.  Once you got the notice,
21 was there anything else that you identified
22 and provided to counsel?
23     A.   I don't recall that I did, no.
24     Q.   When you say you don't recall,

Confidential Information - Subject to Protective Order

Page 14

1  you don't recall if that happened, or you
2  don't -- I'm unclear on your answer.
3      A.   We had a discussion.  The list
4  of requests was quite broad, and I had
5  difficulty interpreting the scope of some of
6  the requests, and we discussed that.
7          At the end of that discussion,
8  I believe counsel was going to submit a
9  response, and I never heard anything further
10  after that.
11      Q.   At the end of that discussion
12  when counsel worked through what the
13  deposition notice was asking, was there
14  any information or documents that you
15  provided to counsel to be provided to us?
16      A.   No.
17          MR. SLATER:  Okay.  Let's take
18      that document down, and put up as
19      Exhibit 2 the response to the
20      deposition notice, please.
21          (Whereupon, Chesney Exhibit
22      Number 2 was marked for
23      identification.)
24          ///

Page 15

1  BY MR. SLATER:
2      Q.   On the screen as Exhibit 2 is
3  what we were provided as the response to our
4  deposition notice.  Have you seen that
5  document?
6      A.   No.
7      Q.   One of the things we requested
8  from you was the invoices in this matter.
9          MR. SLATER:  And I guess,
10      Chris, let's go to the invoices as
11      Exhibit 3, and then we'll come back to
12      the dep notice after, if that's
13      possible.
14          (Whereupon, Chesney Exhibit
15      Number 3 was marked for
16      identification.)
17          MR. SLATER:  Perfect.  Thank
18      you.
19  BY MR. SLATER:
20      Q.   On the screen as Exhibit 3 are
21  the invoices we were provided, and it shows
22  that you began to work in this matter in June
23  of 2021, is that correct?
24      A.   That's correct.

Page 16

1      Q.   Who contacted you and asked you
2  to get involved in this case?
3      A.   Frederick Ball of Duane Morris.
4      Q.   Did you know Mr. Ball before he
5  contacted you in June of 2021?
6      A.   No.
7      Q.   You'd never met him before?
8      A.   I had not.
9      Q.   Do you know how it was that he
10  came to contact you?  Did he tell you why he
11  contacted you?
12      A.   I don't recall.  He probably
13  told me at the time, but I don't recall now
14  where he got my name.
15      Q.   The response to the deposition
16  notice, which we don't have to pull up, says
17  that the invoices that were provided were in
18  connection with the preparation of your
19  expert report and your related testimony in
20  this litigation.  Is that what these invoices
21  represent?
22      A.   Yes.  The majority of the time
23  was the preparation of the expert report and
24  the work I did researching information in

Page 17

1  that preparation.
2      Q.   Other than writing this report
3  and preparing for this deposition, have you
4  done any other work for ZHP or any of its
5  subsidiaries in connection with the
6  nitrosamine contamination of its valsartan?
7      A.   No.
8      Q.   Have you been asked to consult
9  or provide any opinions with regard to any
10  disputes that ZHP may be having with any of
11  its customers?
12      A.   No.
13      Q.   Okay.  I added up these
14  invoices which are dated between June 2021
15  and January of 2022 at $51,000.
16          Does that sound correct?
17      A.   I think it's a little on the
18  low side.  I had added them up, and I think I
19  came up with around 56.
20      Q.   Okay.  These invoices are up
21  through January of 2022, the last one being
22  $13,000.
23          MR. SLATER:  Maybe we can go to
24      that one, Chris, the last page.

Confidential Information - Subject to Protective Order

Page 18

1    Perfect.
2    Q.    Looking at the last page of
3  this group of invoices, this is from January
4  of 2022, $13,000, correct?
5    A.    Yes.
6    Q.    What amount of time have you
7  spent since January up until today in
8  connection with this matter?
9    A.    I have that information on my
10 time sheet records, but I don't have it with
11 me. It's approximately 25 hours, more or
12 less.
13   Q.    Does that include your
14 preparation right up until the point when we
15 started the deposition?
16   A.    I don't believe it includes the
17 hours I spent this weekend looking over my
18 report, but it's pretty close. It might be
19 between 25 and 30.
20   Q.    So 25 hours approximately
21 before the weekend, and then maybe another
22 five or so hours over the weekend before
23 today's deposition?
24   A.    Approximately, yes.

Page 19

1    Q.    Okay. Thank you.
2        MR. SLATER: All right. Chris,
3    let's go back to the deposition
4    notice, if we could, please. Not the
5    notice, I'm sorry, I meant the
6    response. My bad. Thank you.
7    Q.    I'm not going to go through all
8  these requests, and you haven't read the
9  responses, so I'm not going to go through
10 that with you today in great detail. But
11 what I would like to ask you is --
12       MR. SLATER: Let's go to
13   request number 8. That's the -- go to
14   the responses and objections to the
15   requests, number 8. Perfect. Thanks,
16   Chris.
17   Q.    Looking at number 8, which we
18 asked for any documentation of any research
19 that you had performed with regard to the
20 FDA's regulation of API and finished drug
21 products, FDA inspections, current good
22 manufacturing processes, and the risks and
23 benefits of any angiotensin II receptor
24 blockers or nitrosamines, we were told that

Page 20

1  you had worked at the FDA for 23 years, and
2  have had an FDA-related consulting practice
3  for more than a quarter of a century, and in
4  those roles you'd informally researched
5  countless issues over the course of your
6  career, and that you have already submitted a
7  list of your publications, and not conducted
8  academic research regarding the list of
9  topics. That was the response we were given.
10 You can see that there.
11       Do you see that?
12   A.    Yes.
13   Q.    I just want to know talking to
14 you now, have you in connection with this
15 work -- well, rephrase.
16       Have you ever done any research
17 regarding nitrosamines?
18   A.    No.
19   Q.    And that's true right up until
20 right now?
21   A.    Other than just briefing myself
22 on the general issue and rereading some of
23 the press that was out when it was made
24 public and that sort of thing. No, no

Page 21

1  technical research.
2    Q.    I think I saw in a few places
3  in your report where you said you'd defer to
4  scientific or to others with scientific
5  expertise.
6        Is this one of the areas where
7  you would defer to others with scientific
8  expertise, meaning the nitrosamines and the
9  risks posed by nitrosamines?
10   A.    Yes.
11       MR. FOX: Objection to form.
12       Just make sure you slow down,
13   David, so you give me an opportunity
14   to make an objection on the record.
15 BY MR. SLATER:
16   Q.    I'll just ask it again just
17 because counsel objected, it may be that I
18 talked too much in my question, happens from
19 time to time.
20       Am I correct that you'd defer
21 to other experts regarding the risks posed by
22 nitrosamines as relevant in this case?
23   A.    Yes.
24   Q.    When I asked you if you'd defer

Confidential Information - Subject to Protective Order

Page 22

1  to others, I didn't see you specifically cite
2  any of their expert reports, you're just
3  saying in general you would defer to others
4  who have that expertise, is that correct?
5        MR. FOX:  Objection to the
6  form.
7     A.   Yes.
8  BY MR. SLATER:
9     Q.   Am I correct that in your
10  experience both with the FDA and as a
11  consultant following the time you left the
12  FDA, you've never been involved in a matter
13  that involved potential nitrosamine
14  impurities in either an API or a finished
15  dose product?
16     A.   That's correct.
17     Q.   Is this the first time in your
18  career you've been involved in a matter where
19  nitrosamines were a relevant factor in the
20  analysis you were providing, meaning one of
21  the constituent variables in the case was
22  nitrosamines?
23        MR. FOX:  Objection to form.
24     A.   Yes.

Page 23

1  BY MR. SLATER:
2     Q.   Before you were retained in
3  this case, had you ever heard of NDMA?
4     A.   Yes.
5     Q.   And how did you know what NDMA
6  was?
7     A.   There were press reports
8  involving the occurrence of NDMA in a variety
9  of products, some gastrointestinal products
10  as well as the valsartan-irbesartan family,
11  and I read those press reports in the
12  literature.
13     Q.   Other than seeing press reports
14  regarding the recent discovery of NDMA in
15  various drug products, had you ever had any
16  occasion to know what NDMA was before that?
17     A.   No.
18        MR. FOX:  Objection to form.
19        Slow down, David.
20  BY MR. SLATER:
21     Q.   I didn't see any discussion of
22  NDEA in your report.  Is that something you
23  did not address at all in your report?
24     A.   I did not address it.

Page 24

1     Q.   I also saw no discussion of the
2  TEA process for manufacture of valsartan API
3  at ZHP.  Am I also correct that is not
4  something that you addressed at all in your
5  report?
6     A.   You're correct.
7        MR. SLATER:  Let's take those
8  down and go to Mr. Chesney's report.
9  We'll mark that as Exhibit 3, along
10  with the attached Exhibits A and B.
11        (Whereupon, Chesney Exhibit
12  Number 4 was marked for
13  identification.)
14  BY MR. SLATER:
15     Q.   Mr. Chesney, you have in front
16  of you on the screen your report which we've
17  marked as Exhibit 3.  I understand you're not
18  scrolling right through it, but does that
19  look like the first page of your report?
20     A.   Yes.
21     Q.   And I can tell you --
22        MR. GEDDIS:  Adam, for the
23  record it's Exhibit 4.
24        MR. SLATER:  Did I say 3?  I

Page 25

1  meant 4.  Sorry about that.  Let me
2  rephrase.
3  BY MR. SLATER:
4     Q.   Mr. Chesney, on the screen as
5  Exhibit 4 we have your report.  Does that
6  look like your report right there?
7     A.   Yes.
8     Q.   And I have it as 59 pages, and
9  then there's a digital signature for you on,
10  it looks like, January 12, 2022.  Is that
11  when you put your signature on it and stamped
12  this as a final report?
13     A.   I'm not looking at it, but that
14  sounds right.
15     Q.   Do you have your report there
16  in hard copy?
17     A.   I do.  I was just trying to
18  flip to that page.
19     Q.   Go ahead, take a look, and
20  we'll just make sure we're on the same page
21  of that.
22        MR. SLATER:  You don't have to
23  scroll to that, I don't think, Chris,
24  because he has it.

Page 26

1    A.    Yes, it was digitally signed on
2  January 12th, that's correct.
3    Q.    And that was the day when you
4  finalized and confirmed your opinions in this
5  case?
6    A.    Yes.
7    Q.    Does this report contain each
8  of the opinions you formed in this matter?
9    A.    Yes.
10    Q.    You went through a number of
11  facts and discussed a number of facts in the
12  course of your report.  Were those the facts
13  that you felt were most important to you in
14  supporting or formulating your opinions?
15    A.    Yes.
16        MR. FOX:  Objection to form.
17  BY MR. SLATER:
18    Q.    I'm just going to digress for a
19  second.  We can leave that on the screen.  I
20  just want to ask you a few background
21  questions.
22        Can you tell me how many times
23  you've been retained as an expert witness in
24  civil litigation?

Page 27

1    A.    Four or five times.
2    Q.    What is the bulk of the work
3  you have done as a consultant since you left
4  the FDA?  It sounds like it's not
5  litigation-based, so I'm curious what it is
6  that you generally do.
7    A.    I provide advice to clients on
8  compliance strategy.  I help them respond to
9  FDA findings when they have inspections.  I
10  help them prepare for and manage FDA
11  inspections.  I conduct audits from time to
12  time, some of which are general audits for
13  compliance purposes, others of which are
14  intended as mock FDA inspections to help them
15  prepare for the real event.  Any of a variety
16  of other ad hoc issues that arise with
17  clients that involve FDA compliance matters.
18    Q.    Have you ever done any work in
19  the past for ZHP, Prinston, Solco, or Huahai
20  US?
21    A.    No.
22    Q.    Have you done any work for any
23  of the other manufacturers or parties to this
24  litigation, to your knowledge?

Page 28

1    A.    The only two I recall seeing
2  the names of are Teva and Mylan, and the
3  answer in both cases is no.
4    Q.    How about Aurobindo?
5    A.    No.
6    Q.    Hetero?
7    A.    No.
8    Q.    How about Torrent?
9    A.    No.
10    Q.    When you were an FDA
11  investigator -- rephrase.
12        When you worked at the FDA, did
13  your responsibilities include evaluation of
14  manufacturers to determine whether there were
15  GMP violations in the manufacture of API?
16    A.    Yes.
17    Q.    Same question with regard to
18  manufacture of finished dose products.
19    A.    Yes.
20    Q.    In your work at the FDA, how
21  much of your work was focused on that area,
22  evaluation of potential GMP violations in the
23  manufacture of API or finished dose?
24    A.    I can't quantitate that

Page 29

1  precisely for you.
2    Q.    Can you give me some idea of
3  how many matters you investigated where that
4  was the question?
5        MR. FOX:  Objection to form.
6    A.    Almost impossible, sir.  I
7  began my FDA career in 1972.  Between that
8  and my consulting career, I've spent nearly
9  50 years.  It's very difficult to say how
10  many of these issues I've dealt with over an
11  extensive period of time like that.
12  BY MR. SLATER:
13    Q.    So -- and I'm not going to push
14  it.  If you're not able to estimate the
15  number of times that you addressed that issue
16  at the FDA, I'll let it go if you tell me
17  that.
18    A.    I could not give you an
19  estimate I would be confident about.
20    Q.    Looking at your report, let me
21  just find a good jumping off point.
22        MR. SLATER:  Let's go to
23    page 11, if we could, please, Chris.
24    Q.    I was curious, on page 11 --

Confidential Information Subject to Protective Order

Page 30

1  rephrase.
2        On page 11 there's a heading
3  "FDA Awards and Recognition" --
4        A.   Yes.
5        Q.   -- that says, "In 1990, I
6  received the FDA Award of Merit, the FDA's
7  highest award for individual achievement, for
8  my work coordinating a major investigation
9  involving deliberate contamination of
10 imported produce sent to the United States."
11       When you say "deliberate
12 contamination," what was that referring to?
13 What happened?
14       A.   Injection of grapes from a
15 country of Chile with cyanide residues.
16       Q.   I suppose you would agree with
17 me that the deliberate contamination of a
18 product regulated by the FDA would be a
19 significant violation?
20       MR. FOX:  Objection to form.
21       A.   Yes.
22 BY MR. SLATER:
23       Q.   Would you agree that the
24 deliberate contamination of a product

Page 31

1  regulated by the FDA would be a GMP
2  violation?
3        MR. FOX:  Objection to form.
4        A.   It depends.
5  BY MR. SLATER:
6        Q.   Well, in this case where
7  somebody injected cyanide into grapes, was
8  that a GMP violation?
9        A.   No.
10       Q.   What was it a violation of?
11       A.   Title 18 US Code Section 1365
12 of the Federal Anti-Tampering Act.
13       Q.   If the grapes had been injected
14 by somebody unrelated to the seller who was
15 ultimately the target of your investigation,
16 but the seller knew that they had been
17 injected and still went ahead and shipped the
18 grapes, would that be a violation?
19       MR. FOX:  Objection to the
20 form.
21       A.   Yes, of course.
22 BY MR. SLATER:
23       Q.   What would that be a violation
24 of?

Page 32

1        A.   Well, that could be a violation
2  of the Food, Drug and Cosmetic Act if they
3  knowingly shipped a product that they knew to
4  be contaminated.
5        Q.   If ZHP knowingly sold valsartan
6  and knew that it had NDMA in it, would that
7  be a violation of the -- of any regulations
8  or laws?
9        MR. FOX:  Objection to form.
10 No foundation.
11       A.   That depends.
12 BY MR. SLATER:
13       Q.   If before FDA dis -- rephrase.
14       If before ZHP disclosed to the
15 FDA that there was NDMA in its valsartan, if
16 ZHP had been selling the valsartan for a
17 period of time knowing that anyway and it
18 still sold the product, would that have been
19 a violation?
20       MR. FOX:  Objection to form.
21 No foundation.
22       A.   It depends.
23 BY MR. SLATER:
24       Q.   Depends on what?

Page 33

1        A.   Depends on the levels of NDMA,
2  what was known about it, whether they posed a
3  hazard to people who might ingest the
4  product.  A variety of factors.
5        Q.   So you're not able to form an
6  opinion based on my question?
7        A.   Not based on your question.
8        Q.   Okay.  If we go to page 12 of
9  your report, the last matter listed is
10 October 2021 and continuing, a "Contractual
11 dispute between two pharmaceutical companies
12 over cost recovery from a recall alleged to
13 have been necessitated by GMP deviations at
14 the contractor."
15       Can you tell me the name of
16 that matter?
17       MR. FOX:  It's subject to a
18 confidentiality order.  But, David,
19 you can tell him the name of the
20 matter.
21       THE WITNESS:  Okay.
22       ████████████████████
23 ██  ████████████████████████
24 ██  ████████████████

Confidential Information Subject to Protective Order



Page 34

Page 35

    6    Q.    Good manufacturing practices
 7  requires a manufacturer to recognize
 8  potential creation of impurities so that they
 9  can be assessed, correct?
10          MR. FOX:  Objection to form.
11      A.    If information comes to light
12  that raises that suspicion, GMP would require
13  that it be looked into.
14          MR. SLATER:  Chris, go to
15  Exhibit A of Mr. Chesney's report,
16  please.
17      Q.    Mr. Chesney, Exhibit A to your
18  report is your CV.  Is that your up-to-date
19  CV?
20      A.    It is.
21      Q.    Have you ever given any
22  presentations as a consultant -- rephrase.
23          After you left the FDA, did you
24  ever give any presentations regarding the

Page 36

 1  application of GMP to the manufacture of API
 2  or finished dose?
 3      A.    Not as the sole subject in the
 4  presentation.
 5      Q.    But that's something that's
 6  come up as part of some presentations?
 7      A.    Yes.
 8      Q.    Do you have those presentations
 9  still?
10      A.    Some.
11      Q.    Have you given any
12  presentations -- rephrase.
13          Since the time you left the
14  FDA, have you given any presentations
15  regarding what a GMP-compliant risk
16  assessment for a drug manufacturing process,
17  whether API or finished dose, would involve?
18          MR. FOX:  Objection to form.
19      A.    Not as the sole subject of a
20  presentation.
21  BY MR. SLATER:
22      Q.    But again, something that's
23  come up in the course of some presentations?
24      A.    Yes.

Page 37

 1      Q.    Are those presentations you
 2  still have?
 3      A.    Some.
 4      Q.    When you were at the FDA, did
 5  you give any presentations regarding what GMP
 6  required in terms of a risk assessment in
 7  connection with the manufacturing process for
 8  API or finished drug?
 9      A.    No.
10      Q.    When you were at the FDA, did
11  you ever write any reports or sign off on any
12  reports addressing whether or not there was a
13  GMP violation in connection with the risk
14  assessment for a manufacturing process for
15  either API or finished drug?
16          MR. FOX:  Objection to form.
17      A.    Not specifically, no.
18  BY MR. SLATER:
19      Q.    When you say "not
20  specifically," does that mean -- what does
21  that mean?
22      A.    I reviewed and signed off on
23  many reports involving API manufacturing.
24  But in the era when I was working for the

Page 38

¹ FDA, the requirements and expectations for
² documentation of risk assessment were not as
³ detailed or well understood as they are
⁴ today.
⁵        MR. SLATER:  Let's go, Chris,
⁶ if we could, to Exhibit B, please.
⁷    Q.    And, Mr. Chesney, you're
⁸ welcome to look at your hard copy report as
⁹ well as I ask you questions if it's easier,
¹⁰ whatever you think -- whatever is easiest for
¹¹ you.  Okay?
¹²    A.    Thank you.  I have it open
¹³ here.  I'll try to work off the screen.  If I
¹⁴ need to stop, I'll let you know.
¹⁵    Q.    Fair enough.
¹⁶        Exhibit B is titled
¹⁷ "References," and it's my understanding those
¹⁸ are the materials that -- well, actually let
¹⁹ me rephrase it.
²⁰        Exhibit B is titled
²¹ "References," and there's a list of
²² 129 items.  Did you read all of those items?
²³    A.    I, at minimum, read them
²⁴ cursorily, but I didn't necessarily read

Page 39

¹ every word in every item, no.
²    Q.    With regard to the -- let me
³ start over.
⁴        The first reference is the
⁵ Expert Declaration of John Quick.  Did you
⁶ read that?
⁷    A.    Yes.
⁸    Q.    Number 2 is the Expert
⁹ Declaration of Rena Conti.  Did you read
¹⁰ that?
¹¹    A.    I did.
¹²    Q.    Did you find that to be
¹³ relevant to the work you were doing?
¹⁴        MR. FOX:  Object to form.
¹⁵    A.    Mr. Quick's declaration, yes.
¹⁶        Dr. Conti's was helpful from a
¹⁷ contextual standpoint, but I don't believe I
¹⁸ relied on it to any great extent.
¹⁹ BY MR. SLATER:
²⁰    Q.    She is an economist.  You
²¹ didn't provide any opinions regarding
²² economics or economic damages, right?
²³    A.    No, I did not.
²⁴    Q.    Number 3 is the Plaintiffs'

Page 40

¹ Memorandum of Law in Support of their Motion
² for Class Certification of Consumer Economic
³ Loss Claims.  Did you read that?
⁴    A.    Cursorily.
⁵    Q.    And I didn't see any opinions
⁶ in your report regarding whether or not this
⁷ matter was suitable or not for class
⁸ certification.  Am I correct that's not an
⁹ issue you addressed?
¹⁰    A.    That is not an issue --
¹¹        MR. FOX:  Objection to form.
¹²        David, you have to slow up.
¹³        THE WITNESS:  Sorry.
¹⁴        MR. FOX:  Objection to the
¹⁵ form.
¹⁶        You can answer.
¹⁷    A.    That is not within my area of
¹⁸ expertise, and I did not address it, no.
¹⁹ BY MR. SLATER:
²⁰    Q.    And I -- rephrase.  The second
²¹ -- rephrase.
²²        The next reference is reference
²³ 4, Memorandum of Law in Support of the
²⁴ Medical Monitoring Plaintiffs' Motion for

Page 41

¹ Class Certification.  Did you read that?
²    A.    Again, cursorily.
³    Q.    What, if anything, about your
⁴ cursory reading of those two memorandums of
⁵ law was of any significance or use to you;
⁶ anything?
⁷        MR. FOX:  Objection to the
⁸ form.
⁹    A.    It was of use to me in
¹⁰ understanding the context and the background,
¹¹ but not the details of fulfilling my remit in
¹² this matter.
¹³ BY MR. SLATER:
¹⁴    Q.    Was there anything you read
¹⁵ about in those briefs, those memorandum of
¹⁶ laws -- memorandums of law that you said,
¹⁷ Well, that's interesting, I should probably
¹⁸ look at that, so -- and did you ask the
¹⁹ lawyers, Hey, can you get me this document or
²⁰ that document, or this testimony or that
²¹ testimony that you read about in the briefs?
²² Did that happen at all?
²³    A.    I don't recall it happening.
²⁴ It was months ago.

Confidential Information Subject to Protective Order

Page 42

1    Q.   With regard to the materials
2 here, I can assure you we're not going to go
3 through every single one of them because that
4 would take a while, I want to ask you a few
5 general questions about the references here.
6         Did you ask for any specific
7 materials when you were engaged in this
8 matter where you said, Look, this is what you
9 have to provide me so I can formulate an
10 opinion?
11    A.   I may have asked for one or two
12 items.  I was provided with a great volume of
13 material.  The first thing I did was try to
14 organize it, sort it out, see what was there.
15        And then as I got into the
16 details of some of the items, there were
17 things that I wanted to see that had not been
18 provided.
19    Q.   What, if anything, did you ask
20 for that had not been provided to you in the
21 course of your work in this matter?
22    A.   One I recall was that when ZHP
23 initiated the recall of their product, it is
24 FDA's common practice to send what's called a

Page 43

1 recall classification letter.  It's a
2 template letter that says the agency agrees
3 with the decision, and informs the recalling
4 company of the class FDA has assigned to the
5 recall.
6         I don't believe that was in the
7 initial package, and I did ask for that
8 document.
9    Q.   Anything else that you
10 requested?
11    A.   I remember that one
12 specifically.  There may well have been
13 others.  This was a very voluminous document
14 set, and as I went through it, if I found
15 there was something I either could not find
16 or felt I needed, then I would request it.
17        But I didn't keep a list of
18 what I asked for separately from what was
19 volunteered to me at the outset.
20    Q.   You told me earlier that those
21 facts that you found to be important to you
22 in formulating your opinions were discussed
23 in your report.
24        So can I trust that to the

Page 44

1 extent you read these materials and saw
2 something that you felt to be of significance
3 you related it in your report?
4    A.   Yes.
5    Q.   Item number 5 on the reference
6 list is the Third Party Payors' Brief in
7 Support of Motion to Certify Class.  Did you
8 read that?
9    A.   I glanced at it.
10    Q.   Is there anything of
11 significance about that that you can point to
12 now?
13    A.   No.
14    MR. FOX:  Object to the form.
15 BY MR. SLATER:
16    Q.   Item number 11 is the Prinston
17 Pharmaceuticals Audit Report, dated
18 January 31, 2012, for inspection dates
19 January 31, 2012.  Did you read that?
20    A.   Yes.
21    Q.   I don't think I saw it
22 referenced at all in your report in any
23 specificity, is that correct?
24    A.   I suppose.  I don't recall

Page 45

1 referencing it.  And there are several
2 similar reports.  I -- at this point by
3 memory I can't distinguish one from the
4 other.
5    Q.   Do you know if you read each of
6 the audit reports or not?
7    A.   I looked at all of the listed
8 reports, yes.
9    Q.   And because they were not
10 discussed in any -- at all in the report, can
11 I assume that you didn't find anything to be
12 of any real significance in those reported
13 reports?
14    MR. FOX:  Objection to form.
15    A.   Not for the purpose I was asked
16 to fulfill.
17 BY MR. SLATER:
18    Q.   What did you have an
19 understanding -- rephrase.
20        What was your understanding of
21 your role?  What were you asked to opine on?
22    A.   I was asked to opine on what
23 the documents in this matter caused me to
24 think of the GMP compliance status of ZHP

Page 46

1  facilities.
2      Q.    Am I correct that your opinions
3  regarding GMP were confined to ZHP and its
4  manufacturing of the API?
5      A.    Yes.
6      Q.    I didn't see any discussion or
7  opinions regarding Prinston, Solco, or Huahai
8  US.  Am I correct you gave no opinions
9  regarding their actions or their compliance
10  or noncompliance with GMP?
11      A.    That's correct.
12      Q.    I also saw no discussion of
13  ZHP's manufacturing of the finished dose
14  products.  Am I correct that's not an issue
15  you addressed in your report?
16          MR. FOX:  Objection to form.
17      A.    At least one of the FDA
18  inspections touched on that, and I may have
19  summarized some of the findings from that
20  inspection.  But I did not focus greatly on
21  the finished dose for manufacturing issues.
22  BY MR. SLATER:
23      Q.    I didn't see any opinions
24  regarding ZHP's manufacture of finished dose

Page 47

1  product.  Is that correct, you didn't
2  actually offer any opinions specific to that
3  issue?
4      A.    Not that I can recall.
5          MR. SLATER:  Chris, can you go
6  down to item number 19, please?
7      Q.    Number 19 on this list is ZHP
8  Genotoxicity Statement, dated July 6, 2016,
9  and it has a Torrent Bates number.
10          Do you see that item?
11      A.    I do.
12      Q.    Is that something you read?
13      A.    If it's on the list I did, yes.
14      Q.    And I can tell you, and you can
15  tell me if this comports with your
16  recollection, that the genotoxicity statement
17  is a representation that there were no
18  genotoxic impurities in the valsartan API
19  being sold by ZHP.  Is that your
20  understanding?
21          MR. FOX:  Objection to form.
22      A.    That is my recollection.
23  BY MR. SLATER:
24      Q.    Did cGMP at that time in July

Page 48

1  of 2016 require that such a statement be
2  accurate?
3          MR. FOX:  Objection to form.
4      A.    All GMP statements are required
5  to be accurate.
6  BY MR. SLATER:
7      Q.    And this would be a GMP
8  statement, correct?
9          MR. FOX:  Objection to form.
10      A.    It's a statement as to the
11  presence or absence or impact of it is
12  present of toxic compounds in the product.
13  It's not really a GMP statement per se.
14  BY MR. SLATER:
15      Q.    The genotoxicity statement
16  whereby ZHP represented that no genotoxic
17  impurities are present in the substance was
18  certainly required to be a true statement if
19  that's what they were saying, right?
20          MR. FOX:  Objection to form.
21      A.    Yes, any such statement
22  submitted to the FDA would be required to be
23  true, yes.
24          ///

Page 49

1  BY MR. SLATER:
2      Q.    What would be the regulatory
3  framework within which such a statement would
4  be evaluated, if it turned out it wasn't
5  true?
6          MR. FOX:  Objection to form.
7      A.    I'm not sure I understand your
8  question.
9  BY MR. SLATER:
10      Q.    You said that such a
11  statement -- rephrase.
12          You agree with me that the
13  statement that no genotoxic impurities are
14  present in the substance was required to be
15  true, right?
16      A.    Yes.
17      Q.    If that statement was false,
18  what would be the regulatory or other
19  framework within which that would be
20  evaluated?
21          MR. FOX:  Objection to form.
22      A.    That would depend on the
23  purpose for the submission of the statement.
24          ///

Confidential Information - Subject to Protective Order

Page 50

BY MR. SLATER:

Q.    If the statement was made to allow a downstream purchaser of ZHP's API to be confident that the API did not contain genotoxic impurities, what would be the framework for evaluating that statement?

MR. FOX:  Objection to form.

A.    First of all, whether or not it was true and accurate.  And it would not be a GMP statement per se.  If it were submitted to the FDA directly because the agency requested it or in connection with a pending application or something of that sort, then it would come under the regulations for new drug applications or abbreviated new drug applications.

BY MR. SLATER:

Q.    Any time that ZHP made a representation to the FDA as to whether or not there were genotoxic impurities in the valsartan API, that would come within the ANDA regulations, is that correct?

MR. FOX:  Objection to form.

A.    It depends on the context, but

Page 51

much of the time, yes.

BY MR. SLATER:

Q.    Any statements ZHP made to the FDA about whether or not there were genotoxic impurities in the valsartan API was required to be a true and accurate statement, correct?

A.    Yes.

MR. FOX:  Objection to form.

BY MR. SLATER:

Q.    You told me a few moments ago that your task in this matter was to review the documents provided to you and to evaluate the GMP compliance status of the ZHP manufacturing facility based upon your review of those documents, correct?

A.    Yes.

MR. FOX:  Objection to form.

BY MR. SLATER:

Q.    Did you rely on the attorneys who provided those documents to you to make sure that you had all of the documents relevant to forming such an opinion?

A.    Between the initial information they provided and responding to subsequent

Page 52

requests that I may have made, yes.

Q.    You would agree with me that if there were material documents, meaning material -- rephrase.

You would agree with me that to the extent there were documents that would be material to your formation of that opinion that were not provided to you, that could potentially be problematic, correct?

MR. FOX:  Objection to form.  Calls for speculation.

A.    I'm not aware that there were any such documents.  And if I felt something was needed and I didn't have it, I requested it.

BY MR. SLATER:

Q.    You told me about the one document you requested regarding the recall.  Is there any other document you can recall that you asked for?

MR. FOX:  Objection.  Asked and answered.

A.    I did a little independent research as well, looking at publicly

Page 53

available data on the FDA's website regarding the compliance history of ZHP.  That was not supplied by the attorneys.

BY MR. SLATER:

Q.    Ultimately your opinion is dependent on the materials you reviewed, correct?

MR. FOX:  Objection to form.

A.    Yes.

BY MR. SLATER:

Q.    If I were to be able to show you documents during the course of this deposition where you would say, You know, that's a document that would have been material to me so I would have to look at that document and reevaluate my opinion, that would -- if that were to happen, that would place your opinion in question until you'd have the chance to review that document and determine whether it affected your opinion, right?

MR. FOX:  Objection.  Calls for speculation.

A.    I have no way of knowing that

Confidential Information Subject to Protective Order

---

Page 54

1  without seeing the specifics.
2  BY MR. SLATER:
3      Q.   Let me talk to you -- and let
4  me be specific in what I'm asking you.
5           In terms of your approach to
6  this case, your methodology, you've already
7  told me that you relied on the documents that
8  you reviewed to form your opinion.  We've
9  already gone over that.
10          What I'm getting at is, if I
11 were to show you a document or ask you about
12 a type of document and you said, Well, I
13 didn't see that, and if that existed that
14 would be important to me, something I would
15 have needed to take into account in order to
16 form my opinion in this case, if that were to
17 happen, would you agree with me that you
18 would then want to review that document and
19 then offer an opinion based on everything you
20 had seen inclusive of that document?
21          MR. FOX:  Objection to form.
22     A.   It would depend on the
23 specifics.
24          ///

---

Page 55

1  BY MR. SLATER:
2      Q.   One of the things that you
3  talked about in your report were internal
4  standard operating procedures which you
5  mention can go by various nomenclatures;
6  standard operating procedures, standard
7  management procedures, they can have various
8  titles, but you talked about that concept in
9  your report, right?
10     A.   Yes.
11     Q.   And I think -- you can correct
12 me if I'm wrong, I think what you said was
13 those internal -- and I'm going to call them
14 generically standard operating procedures or
15 SOPs, okay?
16     A.   That's fine.
17     Q.   I think you said in your report
18 that to the extent a company actually adopts
19 such SOPs as part of their GMP processes,
20 they're required to comply with those SOPs.
21          Did I understand that
22 correctly?
23     A.   Yes.
24     Q.   So if ZHP had internal SOPs

---

Page 56

1  relevant to the issues that you looked at,
2  you would have expected to be provided those
3  so you could take those into account in
4  forming your opinion, correct?
5          MR. FOX:  Objection to form.
6     A.   Yes.
7  BY MR. SLATER:
8     Q.   So for example, with regard
9  to -- well, withdraw that.
10          If, in fact, there were
11 internal SOPs from ZHP that you were not
12 provided that relate, for example, to the
13 change control process or the change control
14 that was -- rephrase.
15          If there was a -- rephrase.
16          If there was an internal
17 standard operating procedure from ZHP
18 addressing the change in manufacturing
19 process, you would have wanted to see that,
20 right?
21          MR. FOX:  Objection to form.
22     A.   I did see one related to that.
23 BY MR. SLATER:
24     Q.   Is it listed on your list of

---

Page 57

1  references?
2     A.   No.
3     Q.   Is it listed in your report in
4  a footnote?
5     A.   Yes.
6     Q.   Is that 18.01?
7     A.   That's a typographical error.
8  I've discovered it should be 18.08.
9          The reason it may not be listed
10 in the references is it was an attachment to
11 the warning letter response that ZHP sent in,
12 so it was included in another item that is
13 referenced.
14     Q.   Why are you saying that 18.08
15 should have been listed as opposed to 18.01?
16     A.   Because I looked at it over the
17 weekend and double-checked it against the
18 footnote in my report, and found the report
19 has a typo in that number.
20     Q.   So the S -- it's actually an
21 SMP.
22     A.   Yes.
23     Q.   Okay.  So the SMP that you saw
24 was 18.08?

---

Confidential - Information Subject to Protective Order

Page 58

1    A.    Yes.
2    Q.    You did not see any of the
3  other iterations of SMP 18, correct?
4    A.    I did not, but the .08 version
5  has a complete revision history, so I was
6  able to tell from that what changes had been
7  made over time.
8    Q.    As you sit here now, do you
9  know what the form of that SMP was when the
10  manufacturing change process was being
11  evaluated by ZHP?
12        MR. FOX:  Objection to form.
13    A.    I'm sorry, you said the form?
14  I don't follow your question.
15  BY MR. SLATER:
16    Q.    Let me ask you this.  Did you
17  ask to be shown the SMP that was actually in
18  effect when ZHP was going through the change
19  control process?
20    A.    By retrospectively looking at
21  the revision history, I believe it was
22  version 5 or version 6, I don't recall as I
23  sit here.  But I was able to see what changes
24  had been made since then in '08, and use that

Page 59

1  to determine what would have been there in
2  that earlier iteration.
3    Q.    Did you discuss that at all in
4  your report?
5    A.    No.
6    Q.    Is this just an issue that you
7  became aware of this weekend, as you said?
8    A.    Oh, just the incorrect citation
9  of the number I became aware of, yes.
10    Q.    The wording of the SMP that
11  governed the change control for the
12  manufacturing process is an important
13  document in this case, correct?
14        MR. FOX:  Objection to form.
15    A.    It's an important document,
16  yes.
17  BY MR. SLATER:
18    Q.    And the version that would be
19  most significant would be the version that
20  was in effect in 2011 when the manufacturing
21  process change was being evaluated at ZHP,
22  correct?
23        MR. FOX:  Objection to form.
24    A.    Yes, that would be important.

Page 60

1  Whether it would be most important or not is
2  -- I'm not prepared to say, but it certainly
3  would be important.
4  BY MR. SLATER:
5    Q.    Well, in terms of whether or
6  not ZHP complied with the SMP governing
7  change control, the version that was in
8  effect when ZHP conducted that change control
9  review would be the one that you would want
10  to look to to determine whether or not it was
11  complied with, right?
12        MR. FOX:  Objection to form.
13    A.    I was able to use the revision
14  history to see what changes had been made
15  since that time, and as I sit here now, I
16  can't explain that in detail because I don't
17  have the document in front of me.  But I
18  concluded I had enough information there to
19  establish that they did have a procedure for
20  that.
21  BY MR. SLATER:
22    Q.    Is the answer to my question
23  yes, that the version that was in effect when
24  the change was being evaluated, that would be

Page 61

1  the one that would be most significant
2  because that would have been the one in
3  effect at the time?
4        MR. FOX:  Objection to form.
5    A.    That would have been the one in
6  effect at the time, and that would be the one
7  that GMP would require them to follow, yes.
8  BY MR. SLATER:
9    Q.    And you testified that you
10  believed that version 5 or 6 would be the one
11  that was in effect at the time of the change,
12  and that's the one that would be most
13  significant, that's your understanding?
14        MR. FOX:  Objection to form.
15    A.    I can't be positive without
16  looking at the version history in the actual
17  attachment that's referenced here, but from
18  memory, I think it was in that vicinity.  It
19  was either 5 or 6.  I'd have to look again to
20  be sure.
21  BY MR. SLATER:
22    Q.    If ZHP failed to comply with
23  the SMP 18 version that was in effect when it
24  did its change control review, then it

Page 62

1  violated GMP, correct?
2        MR. FOX:  Objection.  Form.
3     A.    That would be a deviation from
4  GMP, yes.
5  BY MR. SLATER:
6     Q.    I'm not going to pull them out
7  right now, but there were also some ICH
8  documents that you referenced in your report
9  as well, correct?
10    A.    Yes.
11    Q.    For example, ICH Q7A and Q7,
12 that's the good manufacturing practice
13 guidance for active pharmaceutical
14 ingredients, that's an important document in
15 this case, right?
16       MR. FOX:  Objection to form.
17    A.    The correct nomenclature is Q7.
18 They dropped the A off of it a few years ago.
19 BY MR. SLATER:
20    Q.    In the 2001 version it said
21 Q7A, and then in 2016 they dropped the A.
22       Does that sound right?
23    A.    Yes.
24    Q.    So for our discussion today, we

Page 63

1  can just call it the Q7?
2     A.    Yes.
3     Q.    Was ZHP required to comply with
4  Q7 at the time that it was evaluating the
5  change in the manufacturing process as a
6  matter of GMP?
7        MR. FOX:  Objection to form.
8     A.    In the US regulatory hierarchy,
9  Q7 stands as nonbinding guidance, not as a
10 regulation.
11 BY MR. SLATER:
12    Q.    Well, if it's a nonbinding
13 guidance, why does anybody look at it if it
14 has no impact on anything that anyone is
15 actually going to have to do?
16    A.    Because there is no binding
17 regulation for GMP for API, only a broad
18 statutory requirement.
19    Q.    In terms of how the broad
20 statutory requirement to comply with GMP is
21 interpreted, Q7 is actually a significant
22 source, correct?
23    A.    Yes.
24       MR. FOX:  Objection to form.

Page 64

1  BY MR. SLATER:
2     Q.    And in your industry, it's
3  accepted that a violation -- rephrase.
4        And in your industry, it's
5  accepted that a failure to comply with Q7
6  would amount to a GMP violation, correct?
7        MR. FOX:  Objection to form.
8     A.    Not exactly.
9  BY MR. SLATER:
10    Q.    Are there circumstances where
11 the failure to comply with Q7 constitutes a
12 violation of GMP?
13    A.    Are there circumstances --
14 pardon me.  Say again?  Are there
15 circumstances when it does?
16    Q.    Yes.
17       MR. FOX:  Objection to form.
18    A.    Yes.
19 BY MR. SLATER:
20    Q.    I'm saying in and of itself
21 where somebody would say, Well, because you
22 didn't comply with this aspect of Q7, that
23 constitutes a violation of GMP.
24       MR. FOX:  Objection to form.

Page 65

1        Incomplete hypothetical.
2     A.    That involves the application
3  of judgment.  It is not a linear correlation.
4  If you deviate from a guideline, you're
5  expected to have a justified reason why what
6  you are going to comply is as good as or
7  better than what the guideline prescribes.
8        So there may be times you don't
9  meet the guideline literally, but what you're
10 doing is perfectly adequate.
11 BY MR. SLATER:
12    Q.    I think what you're saying is
13 if you're going to deviate from the Q7
14 guideline, you need to be able to explain why
15 the alternative approach you took was
16 acceptable?
17    A.    That's correct.
18    Q.    And acceptable would mean that
19 it -- well, let me rephrase.
20       And acceptable would mean that
21 your own process or your own approach
22 accomplished the same thing that Q7 sought to
23 approach, correct?
24       MR. FOX:  Objection to form.

Confidential Information - Subject to Protective Order

Page 66

1    A.    Yes.
2    BY MR. SLATER:
3        Q.    So, for example, if the issue
4    was a -- the Q7 requirement that a thorough
5    scientifically based risk assessment be
6    performed in order to identify potential
7    genotoxic impurities that may result from a
8    change in manufacturing process, if ZHP
9    failed to actually identify that potential
10   impurity, ZHP would need to show why its
11   approach either -- it would need to show why
12   its approach which deviated from Q7 -- let me
13   rephrase, because I think that I actually
14   answered my own question.
15           MR. FOX:  I'm going to object
16   to it anyway, Adam.
17           MR. SLATER:  I took it back.
18   You can't object to the take-back.
19   BY MR. SLATER:
20       Q.    If ZHP did not apply Q7 to its
21   risk assessment for the manufacturing change
22   to the zinc chloride process, ZHP would need
23   to justify why it took an alternative
24   approach, correct?

Page 67

1            MR. FOX:  Objection to form.
2        A.    Mr. Slater, your question
3    assumes that that level of detail is in Q7,
4    which it is not.  If memory serves,
5    Section 2.22 of Q7, line item 4 is one
6    sentence that simply says that when
7    deviations occur they must be investigated.
8    It doesn't mention genotoxic impurities or
9    anywhere near the level of specificity that
10   was embodied in your question.
11   BY MR. SLATER:
12       Q.    Can we agree when ZHP performed
13   its risk assessment in connection with the
14   manufacturing process change to the zinc
15   chloride process that ZHP was required to
16   apply current scientific knowledge?
17           MR. FOX:  Objection to form.
18       A.    Yes.
19   BY MR. SLATER:
20       Q.    You said something earlier
21   about from what you saw there was a process
22   that ZHP had, and that's part of GMP, is that
23   you have to have a process to follow, right?
24       A.    Yes.

Page 68

1        Q.    GMP also requires that the
2    process be followed thoroughly and correctly,
3    right?
4            MR. FOX:  Objection to form.
5        A.    Yes.
6    BY MR. SLATER:
7        Q.    So going through the motions
8    and saying, Well, we checked the boxes and we
9    technically did a risk assessment, that's not
10   enough; you have to actually actively perform
11   the risk assessment and apply the available
12   scientific knowledge in evaluating that
13   process, right?
14           MR. FOX:  Objection to form.
15       A.    I don't -- I fail to understand
16   the difference between saying you did a risk
17   assessment and doing a risk assessment, which
18   is what your question implied to me, sir.
19   BY MR. SLATER:
20       Q.    Well, what I'm saying is, is it
21   enough to just go through the motions and not
22   apply the scientific knowledge that's
23   available and just check the boxes and then
24   you're okay?

Page 69

1            MR. FOX:  Objection to form.
2        A.    I fail to understand the thrust
3    of your question.  I really don't follow you.
4    BY MR. SLATER:
5        Q.    Okay.  I understand that you
6    have told us you don't have the scientific
7    expertise to determine whether or not --
8    well, rephrase.  Let me ask you this, if I'm
9    right.
10           Am I correct that you have told
11   us in your report you do not have the
12   scientific expertise to evaluate whether or
13   not ZHP adequately took into account the
14   scientific knowledge at the time of the
15   manufacturing process change such that you
16   can't offer an opinion as to whether or not
17   ZHP met or did not meet current good
18   manufacturing practices?
19           MR. FOX:  Objection to form.
20       A.    I am not a subject matter
21   expert in process chemistry or pharmaceutical
22   chemistry, nor was I when I was at the FDA.
23           The way things were done there
24   and the way I do them in my consulting

Confidential Information - Subject to Protective Order

1  practice is in a multidisciplinary
2  collaborative sense where I call on the
3  knowledge and expertise of other subject
4  matter experts to assist in areas where I
5  don't feel I have all the knowledge and
6  experience necessary.
7         That's the way these things are
8  worked out both in the agency and in the
9  consulting work that I do.
10  BY MR. SLATER:
11     Q.   In response to my question, "am
12  I correct," is the answer yes?
13         MR. FOX:  Objection to form.
14     A.   I don't -- I am not a subject
15  matter expert in process chemistry or
16  pharmaceutical chemistry, so there are
17  limitations for how far I could take that
18  analysis, yes.
19  BY MR. SLATER:
20     Q.   And am I correct that because
21  you do not offer any opinions regarding the
22  scientific adequacy of the risk assessment,
23  you're not offering an opinion at this time
24  as to whether or not ZHP met its GMP

1  obligations?
2         MR. FOX:  Objection to the
3      form.  Misstates testimony.
4  BY MR. SLATER:
5      Q.   Am I correct?
6      A.   In my report I indicate those
7  areas where I must defer to appropriate --
8  people with appropriate scientific expertise.
9      Q.   And that's one of those areas,
10  right?
11         MR. FOX:  Objection to form.
12     A.   It may be.  As I recall it is,
13  but I'm not looking at that part of the
14  report at the moment.
15  BY MR. SLATER:
16     Q.   Well, I'm asking you as you sit
17  here right now, am I correct that because
18  you're not able to offer an opinion as to
19  whether or not ZHP's risk assessment was
20  adequate from a scientific perspective,
21  you're not in a position to offer an opinion
22  as to whether ZHP's risk assessment was
23  adequate from a GMP perspective --
24         MR. FOX:  Objection to the

1      form.
2         Sorry, Adam.
3  BY MR. SLATER:
4      Q.   -- am I correct that you cannot
5  do so because of your lack of scientific
6  expertise?
7         MR. FOX:  Objection to the
8      form.  Misstates testimony, no
9      foundation.
10     A.   I would require the assistance
11  of scientific subject matter experts to have
12  a fully formed opinion of that, that's
13  correct.
14  BY MR. SLATER:
15     Q.   Well, when you say to have a
16  fully formed opinion, I just want to make
17  sure before we get off this point that we're
18  both clear.
19         You don't have an opinion as
20  you sit here right now as to whether ZHP
21  satisfied good manufacturing practices when
22  it made the manufacturing process change
23  because you're not able to evaluate the
24  scientific adequacy of that risk assessment,

1  is that correct?
2         MR. FOX:  Objection to form.
3      A.   I'm not able to determine
4  independently whether it was feasible for
5  them to have brought the scientific
6  principles to bear beyond what they did,
7  because I am not a pharmaceutical chemist or
8  a process scientist, and not aware of what
9  the state of the art may have been at that
10  point in time.  That's what I would need help
11  on.  I can't evaluate other aspects of the
12  risk assessment.
13         And assuming the science is
14  sound, I can then offer an opinion that if
15  that is true, then the effort complies with
16  GMP.  But it's subject to validation by
17  appropriate scientific expertise.
18  BY MR. SLATER:
19     Q.   At this point you don't have an
20  opinion as to whether ZHP met or did not meet
21  GMP because you do not at this time have a
22  basis to evaluate the scientific adequacy of
23  the risk assessment.  Is that a correct
24  statement?

Confidential Information - Subject to Protective Order

---

Page 74

1      MR. FOX: Objection to form.
2   Misstates testimony and his report.
3      A.    Assuming the science is
4   supportable I can form an opinion, but I
5   would need additional input in order to be
6   confident.
7   BY MR. SLATER:
8      Q.    I understand what you could do
9   if certain information were provided at a
10  later date.
11         But as you sit here now, you're
12  not able to form that opinion because you
13  don't have that information one way or the
14  other, correct?
15     A.    That's correct.
16        MR. FOX: Objection to form.
17  BY MR. SLATER:
18     Q.    I'm sorry, over the objection
19  you said "that's correct," right?
20     A.    Yes.
21     Q.    You said that -- I think you
22  used words to the effect of -- rephrase.
23         When you were talking a few
24  moments ago you referred to the feasibility

---

Page 75

1   of having certain scientific knowledge, or
2   something to that effect.  I know I'm not
3   directly quoting you.  But I think you said
4   something to that effect.
5         Did I hear you right?
6      A.    Yes.
7         MR. FOX: Objection to form.
8   BY MR. SLATER:
9      Q.    If it was feasible for ZHP to
10  be aware of the scientific processes that led
11  to the creation of the NDMA impurity at the
12  time it did its risk assessment, then it
13  violated GMP by failing to identify that
14  potential impurity, correct?
15        MR. FOX: Objection to the
16     form.  Misstates testimony, no
17     foundation.
18     A.    If it was feasible for them to
19  apply appropriate science at that point in
20  time and they failed to do so, it would raise
21  certain questions and would require further
22  study on my part and collaboration with the
23  appropriate scientific experts so that I
24  could fully understand the details before I

---

Page 76

1   would be able to reach a conclusion I would
2   be confident in.  It would require study and
3   discussion.
4   BY MR. SLATER:
5      Q.    Well, I would like you to
6   assume that it was feasible for ZHP to know
7   at the time that it was performing its risk
8   assessment on the zinc chloride process that
9   under those manufacturing conditions DMF
10  could degrade and create dimethylamine, and
11  that it was also feasible to know that under
12  those manufacturing conditions that
13  dimethylamine could react with the nitrous
14  acid that resulted from the sodium nitrate at
15  the quenching stage, and that that reaction
16  could form NDMA or other nitrosamines, I'd
17  like you to assume that that was feasible for
18  them to know at the time, and they did not --
19  as we know, they did not identify that
20  potential impurity and that potential
21  reaction, we know that.
22         So if my hypothetical is
23  correct, ZHP violated GMP in its risk
24  assessment, correct?

---

Page 77

1         MR. SLATER: Objection to form.
2     Incomplete hypothetical.
3      A.    Part of a proper vetting of
4   that position would require understanding
5   whether analytical methodology existed that
6   could detect NDMA at whatever level it might
7   or might not be present, and how much
8   reliability could be placed in that
9   analytical methodology.
10         So that's another example of
11  the sort of thing I would need the help of
12  pharmaceutical chemistry expertise to better
13  understand.
14  BY MR. SLATER:
15     Q.    The analytical methodology
16  would be GC-MS, gas chromatography-mass
17  spectrometry, right?
18        MR. FOX: Objection to form.
19     A.    That's one of, I believe, three
20  methods that are out there now that were not
21  at the time in question.
22  BY MR. SLATER:
23     Q.    I'd like to expand my
24  hypothetical to address the comment you just

---

Page 78

1  made, and I'd like you to assume that it was
2  feasible based on technology available in
3  2011 for ZHP to have identified the NDMA if
4  they were looking for it as a potential
5  impurity. I'd like you to assume that
6  technology was available.
7        Having expanded my hypothetical
8  accordingly, you would agree that under those
9  circumstances ZHP would have violated GMP in
10  its risk assessment, correct?
11        MR. FOX: Objection to form.
12     A.   Well, you're asking me to make
13  a lot of assumptions, which I do not know
14  whether they're true or not, and I frankly
15  struggle with that. I'm not sure I can agree
16  to that hypothetical.
17  BY MR. SLATER:
18     Q.   We'll come back to it.
19        You said you normally work with
20  a multidisciplinary team to form your GMP
21  opinions in this type of a context?
22     A.   I said that I did that when I
23  was at the FDA, and that in consulting I
24  still do that to this day.

Page 79

1     Q.   That did not occur here, right?
2     A.   It did not, because my
3  retention was under a particular agreement,
4  and I didn't have the benefit of being able
5  to call upon colleagues and share details
6  with them due to confidentiality.
7     Q.   You did not rely on the
8  opinions of any subject matter experts
9  regarding the scientific questions here in
10  forming your opinions. That has not
11  occurred, right?
12        MR. FOX: Objection to the
13     form. Misstates his report and
14     references.
15  BY MR. SLATER:
16     Q.   I'm correct, right?
17     A.   I took what was available from
18  the FDA communications and the record that I
19  had in front of me and based my opinion on
20  that.
21     Q.   I didn't see any discussion in
22  your report of you relying on any particular
23  subject matter experts regarding the science
24  to form your opinions. That's not something

Page 80

1  you did in your report, right?
2     A.   That's right.
3        MR. FOX: Objection to form.
4     Misstates testimony.
5     A.   What I did was I mentioned
6  specifically in the report the areas where I
7  was unable to carry my opinion beyond the
8  point it's at because I would need to defer
9  to others with appropriate scientific
10  expertise. Those areas are highlighted.
11  BY MR. SLATER:
12     Q.   I want to come back now to my
13  hypothetical. And it's no secret I'm asking
14  you these questions as a hypothetical because
15  I think I can prove every single aspect of it
16  very easily. So this is not some -- I'm just
17  telling you this is no farfetched
18  hypothetical. So let me -- having said that,
19  let me rephrase.
20        Were you provided the report of
21  Dr. Steven Hecht?
22     A.   No.
23     Q.   Do you know who he is?
24     A.   No.

Page 81

1     Q.   Were you -- rephrase.
2        Were you provided, other than
3  Mr. Quick's declaration and Ms. Conti's
4  declaration, any other plaintiff expert
5  reports or declarations?
6     A.   No.
7     Q.   I'm going to try this one more
8  time, but I'm going to try to do it more
9  coherently.
10        Let me ask you this before I go
11  on. Actually let me do this, actually, the
12  way that I want to.
13        All right. I'm going to try to
14  ask you the hypothetical in a little more
15  condensed fashion now also addressing the
16  analytical methodology issue that you
17  questioned me on so I can put it all together
18  in one question, and then we'll see if, maybe
19  by me doing that, if you'll be able to answer
20  that question, okay?
21     A.   Sure.
22     Q.   I'd like you to assume that at
23  the time -- rephrase.
24        I would like you to assume that

Page 82

1 at the time ZHP was performing its risk
2 assessment on the zinc chloride manufacturing
3 process that it was scientifically feasible
4 for ZHP to know that, under the manufacturing
5 process conditions that were proposed, that
6 the DMF that they had added to the process
7 could degrade, and that one of the degradings
8 from that could be dimethylamine, and that
9 under the proposed manufacturing conditions
10 that dimethylamine could react with the
11 nitrous acid that would be present during the
12 quenching phase due to the presence of sodium
13 nitrate, and that that reaction could yield
14 NDMA.
15         I'd like you also to assume
16 that at the time it would have been
17 scientifically feasible to apply testing to
18 see if there was NDMA there if one were
19 looking for it. I'd like you to assume those
20 facts.
21         If those facts are true, you
22 would agree with me that ZHP's failure to
23 take into consideration what I just asked you
24 about would have violated current good

Page 83

1 manufacturing practices at the time?
2         MR. FOX: Objection to the
3     form. Incomplete hypothetical, calls
4     for speculation.
5     A.    If I understand your question
6 correctly, Mr. Slater, if all those things
7 were feasible and were known to ZHP, they
8 should have taken them into consideration.
9 BY MR. SLATER:
10     Q.    We know they did not, because
11 you've seen their documentation, so we know
12 ZHP never took into account the potential
13 chemical reactions I went through with you,
14 correct?
15         MR. FOX: Objection to form.
16     A.    I can't reach that conclusion.
17 ZHP submitted a tremendous amount of very
18 detailed scientific analysis, a lot of
19 structural chemistry diagrams and other
20 things, and this is where my expertise drops
21 off, and I would need others to look at that
22 and determine whether they, in fact,
23 understood the principles you've just
24 outlined or not. I cannot reach that

Page 84

1 conclusion by reviewing the information they
2 submitted.
3 BY MR. SLATER:
4     Q.    If ZHP did not take into
5 account the chemical reactions that I just
6 described to you in my hypothetical, then
7 they violated good manufacturing practices,
8 correct?
9         MR. FOX: Objection to the
10     form. Misstates testimony, calls for
11     speculation.
12     A.    What I -- I'm sorry? I heard
13 an echo there, I guess. I thought someone
14 was asking another question.
15 BY MR. SLATER:
16     Q.    No, no one said anything. But
17 let me just be clear on my question before
18 you answer.
19         I'm going back to my original
20 question, which is, assuming the accuracy of
21 that hypothetical, assuming that it was
22 scientifically feasible for ZHP to know those
23 things, and assuming they did not take them
24 into account, they violated good

Page 85

1 manufacturing practices in that risk
2 assessment, correct?
3         MR. FOX: Objection to form.
4     No foundation, misstates testimony,
5     and calls for speculation.
6     A.    The GMP requirement is very
7 high level, it's for a thorough
8 investigation. Nowhere does it specify what
9 the elements of a thorough investigation are;
10 it leaves that up to judgment.
11         And certainly if there is
12 material information that was either not
13 considered, omitted, whatever, then that risk
14 assessment would be less than it should be
15 based upon those facts.
16 BY MR. SLATER:
17     Q.    When you say "less than it
18 should be," that would mean not compliant
19 with GMP, correct?
20         MR. FOX: Objection to form.
21     A.    That calls for a conclusion
22 that I'm not prepared to reach. It would be
23 less than I would hope to see certainly.
24         But it's difficult sometimes to

Page 86

¹ discern when you're talking about something
² would simply improve an otherwise compliant
³ practice or make the difference between
⁴ compliance and noncompliance.
⁵ BY MR. SLATER:
⁶     Q.    Are you aware that there was --
⁷ well, let's jump forward a little bit,
⁸ actually, since we're cruising along here.
⁹ Just find a paperclip.  We'll come back to
¹⁰ this a little bit.
¹¹         Let me ask you this:  On your
¹² Exhibit B, did you actually review the change
¹³ request form which laid out the evaluation
¹⁴ that ZHP did of its change in manufacturing
¹⁵ process to the zinc chloride process?
¹⁶ Because I didn't see that referenced on your
¹⁷ reliance list -- reference list, I should
¹⁸ say.
¹⁹     A.    I think it was incorporated in
²⁰ another document that is on that list, but it
²¹ would take me some time to check back and
²² find it.  I do recall seeing that form, but I
²³ don't remember much about it as I sit here.
²⁴     Q.    I didn't see the change request

Page 87

¹ form referenced anywhere in your report.  Did
² I miss that, or am I correct that it's not
³ referenced?
⁴         MR. FOX:  Objection.  Asked and
⁵     answered.
⁶     A.    It may not have been referenced
⁷ by that name.  I think it was a part of
⁸ another document set that I reviewed and
⁹ relied upon.  And if memory serves, I believe
¹⁰ it was the response to the warning letter,
¹¹ but I would have to go back and check through
¹² these references to determine that for
¹³ certain.
¹⁴ BY MR. SLATER:
¹⁵     Q.    The documentation of the risk
¹⁶ assessment for the change in manufacturing
¹⁷ process, that documentation would have been
¹⁸ very important to you in forming your opinion
¹⁹ here, correct?
²⁰         MR. FOX:  Objection to form.
²¹     A.    Yes.
²² BY MR. SLATER:
²³     Q.    Yet there's no place in your
²⁴ report where you actually discuss that

Page 88

¹ document at all, correct?
²     A.    What do you mean by "that
³ document"?  Which document are you referring
⁴ to?
⁵ ███████████████████████
  ██████████████████████████
  ██████████████████████
⁹ anywhere in your report or discussed at all
¹⁰ in your report.  Am I correct?
¹¹     A.    I don't recall specifically
¹² citing it.  I do recall seeing it.
¹³     Q.    The change request form
¹⁴ documenting what was done and what was
¹⁵ considered would be a critical document to
¹⁶ you in forming an opinion as to whether or
¹⁷ not ZHP met its GMP obligations, right?
¹⁸         MR. FOX:  Objection to form.
¹⁹     Argumentative, and misstates prior
²⁰     testimony.  Asked and answered.
²¹     A.    Subject to input regarding the
²² rigor of the science, yes.
²³         MR. SLATER:  Counsel, you keep
²⁴     saying that I'm misstating testimony.

Page 89

¹ I don't understand why you keep saying
² that.  I'm not stating his testimony.
³         I mean, I think we have to at
⁴ some point -- I would ask you politely
⁵ if we can just limit the objections to
⁶ legitimate objections, please.
⁷         MR. FOX:  It was a legitimate
⁸ objection, Adam.  You previously asked
⁹ him whether it was important, now
¹⁰ you're asking him whether it's
¹¹ critical.  You were changing the
¹² question on him, and you had already
¹³ asked about that.
¹⁴ BY MR. SLATER:




Page 90

Page 91

1    Q.    As a matter of ICH guidance, if
2 something is deemed a critical change, it
3 requires a higher degree of scientific rigor
4 in performing the risk assessment, right?
5         MR. FOX:  Objection to form.
6    A.    Generally speaking, yes.
7 BY MR. SLATER:
8    Q.    Do you know whether or not --
9 well, rephrase.
10        You said you think that you saw
11 the change request form as an attachment to
12 another document.  Did you ever ask counsel,
13 Is this the complete change request form with
14 all attachments?
15   A.    I don't recall ever asking that
16 question, no.
17   Q.    Do you have any knowledge as to
18 whether or not the change request form that
19 you think you saw attached to another
20 document was the complete change request form
21 with all attachments?  As you sit here now,
22 do you have any idea?
23   A.    I do not as I sit here now.
24   Q.    And without seeing the complete

Page 92

1 document and comparing it to what you did
2 have, you don't know whether there's material
3 information that you didn't have available to
4 you, right, by definition?
5    A.    I'm not sure I understand your
6 question, sir.
7    Q.    Well, you don't know what you
8 don't know, and since you don't know if you
9 saw the complete document you don't know if
10 you were missing material information from
11 the change request form and its attachments,
12 right?
13        MR. FOX:  Objection to form.
14   A.    If there was material
15 information that was not made available to
16 me, I'm not aware of that, and yes, it would
17 be of concern.
18 BY MR. SLATER:
19 
23   A.    I don't recall.
24   Q.    Would that be an important

Page 93

1 consideration in forming an opinion as to
2 whether ZHP complied with GMP?
3        MR. FOX:  Objection to form.
4    A.    That's another example of
5 something that I would ask for help from a
6 pharmaceutical chemistry expert to evaluate,
7 but yes, the outcome of that discussion would
8 be important.
9 BY MR. SLATER:
10   Q.    Were you curious when you were
11 writing your report as to what impurities ZHP
12 considered -- let me rephrase.
13        When you were writing your
14 report, were you curious as to what potential
15 impurities ZHP considered as part of its risk
16 assessment for the zinc chloride process?
17 Were you curious as to what they looked at?
18   A.    I'm not sure I understand what
19 you mean by was I curious.  I reviewed the
20 record, I saw what they did consider, I saw
21 how they documented it, I stated, I think
22 fairly clearly, where my limitations were in
23 my ability to evaluate the science.
24        Was I curious as to whether

Page 94

1 they looked for certain other things that
2 they might have had no reason to believe
3 there? No. GMP does not require that you
4 look for things you have no basis to believe
5 are present.
6 ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮
13 BY MR. SLATER:
14    Q.    As you sit here now, did you
15 say anything about that in your report?
16    A.    Again, I'd have to go through
17 the report to be certain.
18 ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
21 Are you saying it might be in the report and
22 you'd need to check your report to see if
23 that's in there?
24    A.    I don't recall that it's there,

Page 95

1 but I wouldn't be prepared to say that
2 definitively without going through the
3 report.
4    Q.    And as you sit here now, are
5 you able to tell me one way or another
6 whether or not -- well, let me ask you this.
7        As you sit here now, do you
8 have an assumption as to whether or not ZHP
9 considered the potential formation of NDMA or
10 any other nitrosamines as part of the zinc
11 chloride manufacturing process when it
12 performed its risk assessment? Do you have
13 an assumption one way or the other as to
14 whether that was considered?
15    A.    My assumption would be that
16 they did, absent information to the contrary.
17 But I don't recall what those documents said
18 without going back and looking at them again.
19 This was an incredibly voluminous data set,
20 and I don't carry it all around in my head.
21    Q.    What's the basis for that
22 assumption that they did consider the
23 potential formation of NDMA or other
24 nitrosamines as part of the risk assessment?

Page 96

1    A.    It's the impression I got of
2 the thoroughness and completeness of the
3 documents that I reviewed from ZHP, the
4 interactions between them and the FDA staff,
5 the FDA questions that came back to them, the
6 entire dialogue that took place there.
7        Ultimately they did, of course,
8 find those residues in certain batches, and
9 they did the responsible thing and conducted
10 a recall, so at some point in time they did
11 make that identification. I believe that was
12 in 2018.
13    Q.    When you say "they did the
14 responsible thing," do you mean telling their
15 customers and the FDA that there was NDMA in
16 the valsartan?
17    A.    Once they knew that, yes.
18    Q.    When you say that's the
19 responsible thing, it's not only the
20 responsible thing, it was the legally
21 required thing to do, right?
22    A.    Yes.
23        MR. FOX: Objection to form.
24        ///

Page 97

1 BY MR. SLATER:
2    Q.    As soon as ZHP knew that there
3 was NDMA in its valsartan, it was legally
4 obligated to inform all of its customers and
5 the FDA, correct?
6        MR. FOX: Objection to form.
7        Calls for a legal conclusion.
8    A.    The regulatory requirement is
9 for them to report that to the FDA in the
10 form of a report called a field alert report.
11 BY MR. SLATER:
12    Q.    And it's your testimony based
13 on the materials you saw that you understand
14 that ZHP complied with that field alert
15 report regulation in June of 2018?
16    A.    They notified the FDA.
17    Q.    It's your understanding that
18 ZHP notified its customers and the FDA
19 immediately upon learning that there was NDMA
20 in its valsartan? Is that your understanding
21 from what you reviewed?
22        MR. FOX: Objection to form.
23    A.    The word "immediately" is one I
24 have difficulty with. They did it very soon

Page 98

1 thereafter.  I don't know what you mean by
2 "immediate," but it was in very close
3 proximity time-wise to that, yes.
4 BY MR. SLATER:
5     Q.    The field alert report
6 regulation provides three business days to
7 provide that information to the FDA, right?
8     A.    Yes.
9     Q.    Is it your understanding that
10 ZHP reported that there was NDMA in its
11 valsartan within three days -- business days
12 of learning of that?
13         MR. FOX:  Objection to form.
14     A.    The difficulty with that is
15 it's very difficult to determine in many
16 cases when the clock starts.
17         I believe they did the
18 responsible thing by reporting it.  Once they
19 had certainty as to that information they
20 told the FDA about it, and they did conduct a
21 recall on a voluntary basis.
22 BY MR. SLATER:
23     Q.    Was the notification of the
24 presence of NDMA in the valsartan to

Page 99

1 customers and the FDA required by good
2 manufacturing practices?
3     A.    No.
4         MR. FOX:  Objection to form.
5 BY MR. SLATER:
6     Q.    Did good manufacturing
7 practices require that -- well, rephrase.
8 I'll get back to it.
9         Coming back to what ZHP did as
10 part of its risk assessment -- well,
11 rephrase.
12         I was asking you before about
13 whether ZHP considered the potential
14 formation of nitrosamine impurities including
15 NDMA, and you said your assumption was that
16 they did consider that, right?
17         MR. FOX:  Can you repeat that,
18     Adam?  I missed that.
19         MR. SLATER:  Sure.
20 BY MR. SLATER:
21     Q.    You told me a moment ago that
22 you assumed that ZHP did as part of its risk
23 assessment take into account the potential
24 formation of nitrosamines as part of the zinc

Page 100

1 chloride process during its risk assessment.
2 You told me that you assumed they took that
3 into account, right?
4     A.    It would appear that they did
5 from the depth of the scientific information
6 they submitted.  But again, that's one of
7 those areas where I would turn to the subject
8 matter expertise -- or a person with
9 appropriate subject matter expertise to help
10 me understand how far they carried things and
11 whether that was sufficient to achieve those
12 ends.  I didn't --
13     Q.    Go ahead, I'm sorry.
14     A.    I was going to say I made no
15 attempt to evaluate the science
16 independently.
17     Q.    Whether or not ZHP considered
18 the potential formation of nitrosamines as
19 part of the zinc chloride process is an
20 important fact you would want to know, right?
21         MR. FOX:  Objection to form.
22     A.    Along with whether or not it
23 was even reasonable for them to consider that
24 at that point in time.  I think that's the

Page 101

1 other aspect of this.  There's nothing in GMP
2 that requires you to look for things you
3 would have no basis to believe were there.
4 And that's why the state of the art of the
5 science at that moment in time is important
6 for me to understand in tandem with the other
7 information.
8 BY MR. SLATER:
9     Q.    Well, my first question is
10 this.  One important fact for you to consider
11 in this matter would be whether or not ZHP
12 considered the potential formation of
13 nitrosamine impurities as part of the
14 proposed zinc chloride process when it
15 performed its risk assessment.
16         Would you agree with that
17 statement?
18     A.    It would be helpful to
19 understand that, yes.
20     Q.    Did you ask the lawyers who
21 retained you if there's any information
22 available to answer that question one way or
23 another?
24     A.    I don't recall asking that

Confidential Information - Subject to Protective Order



Page 102

1  question.
2      Q.    That's my question.  I want to
3  know if you asked them for that.  Okay.
4      A.    No.
5

[text redacted]

Page 103

1  [text redacted]

15          MR. FOX:  Is this a good time
16      for a break, Adam?
17          MR. SLATER:  I need a couple
18      more minutes.  I'd like to continue.
19      I don't want to just arbitrarily take
20      a break now.
21  BY MR. SLATER:
22      Q.    If there was deposition
23  testimony from corporate representatives of
24  ZHP that definitively answered that question,

Page 104

1  would you like to have been provided that
2  deposition testimony?
3      A.    Yes.
4      Q.    If such testimony exists one
5  way or another, you would actually expect
6  that that would have been provided to you so
7  that you could perform your function here,
8  right?
9      A.    It would have been helpful.
10     Q.    Can you think of any legitimate
11 reason why the lawyers who hired you would
12 not have provided you that deposition
13 testimony if, in fact, it exists?
14         MR. FOX:  Objection.
15     Argumentative.
16     A.    I don't know what the basis was
17 for the document set that I was provided.  I
18 can't speculate about what might have been in
19 their minds as to what I would need or what I
20 wouldn't.
21 BY MR. SLATER:
22     Q.    If there was a feasible
23 scientific basis for ZHP to know that
24 nitrosamines could potentially be formed by

Page 105

1  the zinc chloride manufacturing process that
2  was being proposed, if that was feasible to
3  know, and if the technology existed for ZHP
4  to feasibly test to see if a nitrosamine was
5  being created by this new manufacturing
6  process, then ZHP would have been required to
7  carry out such testing to see if nitrosamines
8  were being created as part of its risk
9  assessment, correct?
10         MR. FOX:  Objection to form.
11     A.    That would have been the right
12 thing for them to do.  The requirements don't
13 speak to that level of detail, but that would
14 have been a reasonable thing for them to do,
15 yes.
16 BY MR. SLATER:
17 [text redacted]

Confidential Information - Subject to Protective Order

---

Page 106

1  ████████████████████████████
2
3  ████████████████████████████
4  ██
5  ████████████████████████████████
6  BY MR. SLATER:
7      Q.    But you, as somebody who holds
8  themself out as an expert on GMP, would look
9  at what the company actually put in force in
10  its own internal SOPs to address its own
11  business, and based on what you've seen you
12  would agree GMP as applied by ZHP would have
13  required that to be done, right?
14          MR. FOX:  Objection to form.
15      A.    If their procedure called for
16  identification or quantitation of known
17  potential impurity risk and they failed to do
18  so, then yes, that would be a failure to
19  follow their own procedure, which by
20  extension is a failure to follow GMP.
21  BY MR. SLATER:
22      Q.    And you would certainly expect
23  that ZHP or any similar manufacturer would
24  have an internal SOP that would require it to

Page 107

1  identify new impurity risks if they were
2  going to change a manufacturing process,
3  right?
4      A.    That's something they should be
5  considering, yes.
6      Q.    That would be required by GMP
7  under those circumstances, right?
8          MR. FOX:  Objection to form.
9      A.    Broadly, yes, but not
10  specifically.
11  BY MR. SLATER:
12      Q.    Well, if you were brought in by
13  ZHP or a similar company and asked, We're
14  changing our manufacturing process for this
15  API, would GMP require that that evaluation
16  that we're going to perform evaluate whether
17  any new impurities are being formed, you
18  would say yes, right?
19      A.    Yes.
20      Q.    If you want to take a break --
21  I'm happy to keep going, Mr. Chesney, your
22  counsel asked if we need a break, I don't
23  need one.  I'm happy to keep going because
24  I'm hoping to get done in the afternoon, but

Page 108

1  it's completely up to you.  If you want to
2  keep going, I'll keep going.
3          MR. FOX:  We've been --
4          THE WITNESS:  Go ahead, Tom.
5          MR. FOX:  What did you say,
6  David?
7          THE WITNESS:  I was just going
8  to say I could use about ten minutes
9  at this point.
10          MR. SLATER:  All right.  Let's
11  take ten minutes.
12          THE VIDEOGRAPHER:  The time is
13  11:25 a.m.  We are off the record.
14          (Whereupon, a recess was
15  taken.)
16          THE VIDEOGRAPHER:  The time is
17  11:36 a.m.  We are back on the record.
18  BY MR. SLATER:
19      Q.    I want to talk a little bit
20  about the significance of the risk assessment
21  for a couple minutes with you.
22          The risk assessment
23  performed -- rephrase.
24          The risk assessment that was

Page 109

1  required to be performed by ZHP has
2  significance for process validation in the
3  sense that you have to identify potential
4  impurities so that you know to test for them.
5          Is that a true statement?
6      A.    Generally speaking, yes.
7      Q.    So identification of the
8  potential impurities from a new manufacturing
9  process is really a very important threshold
10  step pursuant to GMP, correct?
11          MR. FOX:  Objection to form.
12      A.    To the extent that it's
13  feasible to do so and you know what to
14  expect, yes.
15  BY MR. SLATER:
16      Q.    When you say you know what to
17  expect, meaning you know that this is a
18  potential impurity so you know that you need
19  to test for it?
20      A.    Yes.  You don't need to conjure
21  up things that there's no rational basis to
22  believe what happened.
23      Q.    And this risk assessment is not
24  supposed to be based on guesswork, it's

Confidential - Subject to Protective Order

Page 110

1  supposed to be based on scientific analysis,
2  right?
3       A.    Yes.
4            MR. FOX:  Objection to form.
5  BY MR. SLATER:
6       Q.    For example, in a situation
7  like this, a company like ZHP would be
8  expected by GMP to have process chemists
9  evaluating the proposed chemical reactions,
10 and to bring their scientific knowledge to
11 bear to identify the potential impurities
12 that could result, right?
13      A.    Yes.
14      Q.    And they would -- rephrase.
15           And these process chemists
16 would be expected to not only bring to bear
17 their own knowledge that's in their mind, but
18 also to, to the extent they don't know the
19 answer, to research available medical
20 literature, right?
21           Let me rephrase because I went
22 all over the place.  I meant to say
23 scientific.
24           And those process chemists

Page 111

1  would be expected to not only employ their
2  own personal knowledge, but also to research
3  scientific literature as well to the extent
4  that it existed, right?
5            MR. FOX:  Objection to form.
6       A.    Any literature reports they're
7  aware of, they should be taken into
8  consideration if they're relevant.
9  BY MR. SLATER:
10      Q.    And this should be an active
11 process of research and evaluation, right?
12 They should be actively looking to make sure
13 that they turn over the stones that can be
14 turned so they don't miss something, right?
15           MR. FOX:  Objection to form.
16      A.    Well, yes.  Within reasonable
17 limits.  You don't have to stay in search
18 mode forever.  There comes a point in time
19 when you've consulted appropriate reference
20 materials and feel that you have enough to go
21 on.  That's a matter of judgment.
22 BY MR. SLATER:
23      Q.    One of the other important
24 reasons why potential impurities need to be

Page 112

1  identified during the risk assessment is so
2  that not only the process validation can be
3  thorough, but also so that ultimately the
4  specifications for what needs to be tested
5  and what the levels that should be tested for
6  so that those can be set as well, right?
7       A.    Yes.
8       Q.    And I guess the specifications
9  is sort of the other side of the coin from
10 the process validation.  Is that a fair
11 assumption?  The process validation is
12 when -- it actually doesn't make sense.  You
13 don't have to answer that.  You roll your
14 eyes, I know I move on.
15           If there was a GMP violation in
16 the risk assessment, as I have proposed to
17 you through my hypothetical, and ultimately
18 ZHP should have but failed to evaluate the
19 potential nitrosamine impurities that could
20 have resulted from the zinc chloride process,
21 if that's so, and then they went ahead and
22 used that manufacturing process, that process
23 would not be cGMP compliant based on the GMP
24 violation in the risk assessment, correct?

Page 113

1            MR. FOX:  Objection to form.
2       A.    That would require me to accept
3  a lot of the assumptions that you're building
4  into your hypothesis.
5  BY MR. SLATER:
6       Q.    I'm asking you to accept those
7  assumptions.
8            If those assumptions are -- if
9  the answer is yes, if you accept them, am I
10 correct that the manufacturing process itself
11 would not be GMP compliant?
12           MR. FOX:  Objection to form.
13      Incomplete hypothetical.
14      A.    Well, that's not the way I
15 would put it, Mr. Slater, that the GMP -- or
16 that the manufacturing process would not be
17 GMP compliant.  I would simply say there was
18 material information about the risks inherent
19 in that process that had not been identified.
20           The point in time when this
21 took place, if I remember correctly, was
22 2011, 2012, something like that.  Again,
23 without referring to the references, I can't
24 be sure.  But I think the FDA in their public

Page 114

1  statements later on indicated the general
2  awareness of these risks wasn't really known
3  in the industry or even to the regulators
4  until much later.  So that's why I'm a little
5  concerned about the validity of some of these
6  assumptions.
7  BY MR. SLATER:
8      Q.    And I'm going to go through
9  that with you a little more.  But let me ask
10 you this.  I want to go back to what I was
11 asking.
12         If you make the assumptions
13 that I've asked you to make as to the
14 inadequacy of the risk assessment, and if you
15 make those assumptions, which you can assume
16 those things are hypothetical as an expert as
17 you know, and the risk assessment violated
18 GMP, would it also be a violation of GMP to
19 then manufacture with that manufacturing
20 process which is creating NDMA?
21         MR. FOX:  Objection to form.
22      A.    Well, if we can be clear that
23 I'm not accepting the assumptions, just
24 viewing them purely as hypotheticals, then my

Page 115

1  answer would be yes.  But I'm really not
2  clear that the underlying assumptions are
3  accurate at this point.
4  BY MR. SLATER:
5      Q.    At the time ZHP developed the
6  zinc chloride process, to your knowledge was
7  any other API manufacturer for valsartan, or
8  any other sartan for that matter, using the
9  zinc chloride process in the world?
10     A.    I don't know.
11     Q.    Are you aware of whether or not
12 there was any potential risk of the creation
13 of nitrosamines with the original
14 manufacturing process for valsartan, for the
15 branded form of the drug, did you ever look
16 to see whether or not that manufacturing
17 process had a similar risk?
18     A.    I did not because that would
19 get into process chemistry, which is outside
20 my area of expertise.
21     Q.    Give me one second.
22         Sorry, I'm just digging through
23 a pile because my goal in life is to not make
24 the deposition last longer than necessary.

Page 116

1  Okay.
2      A.    That's appreciated, sir.
3      Q.    There's no reason to go longer
4  than necessary.
5         MR. SLATER:  Okay.  Let's go,
6  Chris, if you can do this, I want to
7  go to what I think was marked
8  Exhibit 209 previously, the IARC
9  monograph from May of 1978.
10        (Whereupon, Chesney Exhibit
11        Number 5 was marked for
12        identification.)
13 BY MR. SLATER:
14     Q.    It's probably going to take a
15 moment because I just pulled something out of
16 order.  Look at that.
17        Okay.  Mr. Chesney, have you
18 ever seen -- and Chris could scroll up for
19 you to show you what this is.
20        MR. SLATER:  Maybe you could
21        scroll up a little bit, show the
22        bottom half also, or maybe make it fit
23        the screen a little better.  There we
24        go.

Page 117

1      Q.    And we can blow it up as you
2  need, Mr. Chesney, whatever you need.
3         My first question is, have you
4  seen this document, the IARC Monographs on
5  the Evaluation of the Carcinogenic Risk of
6  Chemicals to Humans, Some N-Nitroso
7  Compounds, Volume 17, dated in May of 1978?
8  That's the date in the bottom left.  Is this
9  something you've seen?
10     A.    No.
11     Q.    And you can see it's marked
12 with an exhibit sticker, Peng Dong ZHP 209.
13        Do you know who Peng Dong is?
14     A.    The name is vaguely familiar,
15 but I don't recall.
16     Q.    Okay.  I assume you're familiar
17 with IARC?
18     A.    I've heard of them.  I'm not
19 terribly familiar with them.
20     Q.    The International Agency for
21 Research on Cancer.  That doesn't -- you're
22 just generally familiar that they exist?
23     A.    That's about it.  I haven't had
24 much to do with that agency over the years.

Page 118

1    Q.   You see that this is a
2  component of -- at the top you can see the
3  "World Health Organization."  I assume you've
4  heard of the World Health Organization?
5    A.   Oh, of course, yes.
6    Q.   And what I'm going to do, if we
7  could, is go to page 36.
8        MR. SLATER:  And let's blow up
9    the third full paragraph.  Good job.
10   Thank you.  Maybe a little smaller.
11   Perfect.
12   Q.   Can you see that okay,
13 Mr. Chesney?
14   A.   Yes, sir, that's fine.
15   Q.   Okay.  We're looking here on
16 page 36 of this IARC monograph, the third
17 full paragraph, it says, "It has been known
18 since 1865 that the reaction of dimethylamine
19 hydrochloride with sodium nitrate at an
20 acidic pH yields N-nitrosodimethylamine,"
21 which is NDMA.
22       Do you see that?
23   A.   Yes.
24   Q.   Is this the type of feasible

Page 119

1  scientific information you're talking about
2  in terms of the ability of ZHP to have known
3  that this reaction between the DMA that would
4  be a degradant product of the DMF could react
5  with the nitrous acid from the sodium nitrate
6  and form NDMA?  Is this the type of feasible
7  scientific information you're talking about?
8        MR. FOX:  Objection to the
9    form.  Beyond the scope of his report
10   and the scope of his expertise, as
11   he's testified to.
12   A.   It's the sort of thing I would
13 expect scientific experts with whom I would
14 collaborate to take into consideration.  By
15 itself it is what it is, but it doesn't -- it
16 doesn't go beyond what it says on its face.
17 This tendency was identified a long time ago.
18       But it says nothing with
19 respect to the process itself.  I'd have to
20 have somebody make that connection for me.
21 BY MR. SLATER:
22   Q.   I understand.  And I have a few
23 different pieces to the puzzle that I'm
24 planning to probably show you over the next

Page 120

1  few minutes.
2        As far as what I just showed
3  you, this shows that IARC, an arm of the
4  World Health Organization, published as of
5  1978 that it's been known since 1865 that the
6  reaction that ultimately created the NDMA has
7  been known to scientists.  That's what this
8  shows, right?
9        MR. FOX:  Objection to form.
10   Calls for speculation.
11   A.   That's what the sentence says.
12       MR. SLATER:  Okay.  Let's go
13   now, if we could, to page 40.  And
14   we'll blow up that last paragraph.
15   Perfect.
16 BY MR. SLATER:
17   Q.   This says in part, "Most of the
18 chemical and physical properties of the
19 nitrosamines described in these monographs
20 were taken from Druckrey et al," and cites to
21 a 1967 publication.  Then it says, and this
22 is the part I wanted to really focus on with
23 you, "The principal techniques employed for
24 the analysis of volatile N-nitrosamines have

Page 121

1  been described in a recent publication
2  (Preussmann et al, 1978).  The relative
3  merits of high- and low-resolution mass
4  spectrometry are discussed, since use of mass
5  spectrometry as a confirmatory technique is
6  particularly important."
7        Do you see what I just read?
8    A.   Yes.
9    Q.   So again, this is addressing
10 the issue of whether or not analytical
11 methods were available to actually detect the
12 NDMA in 2011, 2012, and this is showing that
13 as of 1978, it was being discussed in the
14 World Health Organization publication that
15 mass spectrometry was one available method.
16       Do you see that?
17       MR. FOX:  Objection to the
18   form, and incomplete recitation of the
19   document.
20 BY MR. SLATER:
21   Q.   Okay.  You see that, right,
22 Mr. Chesney?
23   A.   I do.
24   Q.   Okay.  And again, this is the

Page 122

1  type of feasibly available scientific
2  information that you were talking about
3  earlier that you would expect ZHP's
4  scientists to be aware of when they were
5  doing their risk assessment, right?
6         MR. FOX:  Objection to form.
7         A.    It could constitute an
8  informative data point, but it's by no means
9  the entire picture.
10        MR. SLATER:  Okay.  Take that
11        document down.  Let's go now, Chris,
12        if we could, to Exhibit 311, which is
13        the publication Purification of
14        Laboratory Chemicals.
15            Let me see if this has page
16        numbers.
17            (Whereupon, Chesney Exhibit
18        Number 6 was marked for
19        identification.)
20  BY MR. SLATER:
21        Q.    Okay.  I've put on the screen a
22  document titled Purification of Laboratory
23  Chemicals, and you can see that it was marked
24  as Exhibit 311 during the deposition of Min

Page 123

1  Li.
2         Do you see that on the screen?
3         A.    I do.
4         Q.    Do you know who Min Li is?
5         A.    The name is familiar from ZHP
6  documents, but I couldn't tell you what
7  position she has, so that she --
8         Q.    Or he?
9         A.    -- as the case may be, occupies
10 in the company.
11        Q.    Okay.  And just to be clear,
12 you weren't provided the depositions of Peng
13 Dong or Min Li as part of the materials you
14 were provided, right?
15        A.    I don't recall either of those,
16 sir, no.
17        Q.    Okay.  And, for example, the
18 IARC monograph I just showed you, that's not
19 something you were provided, correct?
20        A.    I was not.
21        Q.    And this publication, the
22 Purification of Laboratory Chemicals, which
23 was used as a deposition exhibit with Min Li,
24 that's not something you were provided

Page 124

1  either, correct?
2         A.    I have not seen this document.
3         MR. SLATER:  Chris, let's go to
4  page 192 of this -- actually, stop
5  don't go there yet.  Let's go to the
6  second page which has the publication
7  dates.  I just want to establish that.
8         Q.    We can see that this has a
9  first publication date of 1996 and reprinted
10 in 1998, '99, and 2000.
11        Do you see that?
12        A.    I do.
13        MR. SLATER:  Let's go now to
14 page 192.  Perfect.  There you go.
15 You've got it, Chris.  If you can blow
16 up that bottom paragraph, and just
17 read the first beginning.  Just a tiny
18 bit less because we're cutting off --
19 my picture cuts off.  All right.
20 Perfect.  Thank you.
21        Q.    You see that this references
22 N-N-dimethylformamide, which is DMF.
23        Do you see that?
24        A.    Yes.

Page 125

1         Q.    And you understand that one of
2  the changes to the manufacturing process when
3  the zinc chloride process was created was to
4  begin to utilize DMF.  You're aware of that,
5  right?
6         A.    Yes.
7         Q.    And this scientific
8  publication, which we know was originally
9  published in 1996 and reprinted up
10 through 2000 on this copy that I am showing
11 you, states that DMF "decomposes slightly at
12 its normal boiling point to give small
13 amounts of dimethylamine and carbon
14 monoxide."
15        Do you see that?
16        A.    Yes.
17        Q.    And again, this would be the
18 type of feasibly available scientific
19 information you would expect the people at
20 ZHP to have been aware of when they were
21 performing the risk assessment with regard to
22 their decision to add DMF to the
23 manufacturing process, correct?
24        MR. FOX:  Objection to form.

Page 126

1    A.    It would be another data point
2  that would have to be evaluated for its
3  significance and context and understood
4  fully, yes.
5  BY MR. SLATER:
6    Q.    The fact that it was known in
7  the scientific community that DMF could
8  decompose to give off small amounts of
9  dimethylamine is certainly something you
10  would have expected the people at ZHP to be
11  aware of when they were formulating and then
12  performing a risk assessment on the zinc
13  chloride process.  You could agree with that,
14  correct?
15        MR. FOX:  Objection to form.
16    Beyond the scope.
17    A.    I would have no ability to form
18  an independent expectation of that.  That's
19  the kind of thing I would ask the scientific
20  expert, Is this something they ought to have
21  known about, is this peer-reviewed research,
22  was it -- did it have credibility, was it
23  widely circulated.  Those are all things that
24  I would want to take into account to decide

Page 127

1  whether it's something that the ZHP folks
2  ought to have known about.
3        It stands here as a single
4  reference in an otherwise very lengthy
5  document.  I don't know who prominence it had
6  in the industry at that time.
7        MR. SLATER:  Okay.  Chris,
8    let's go to Exhibit 197, please.
9        MR. GEDDIS:  Is there another
10    exhibit number for that that you had
11    too?
12        MR. SLATER:  Possibly 14, it's
13    the "N-N-dimethylformamide: much more
14    than a solvent" in Tetrahedron.
15        MR. FOX:  You're going to a
16    different exhibit, Adam?
17        MR. SLATER:  I am.  The problem
18    is Chris moved so quickly before, that
19    now when he doesn't do something
20    instantaneously we all say, What's
21    going on?
22        MR. GEDDIS:  What was it you
23    said, 214?
24        MR. SLATER:  14, 1-4.  It was

Page 128

1  definitely Exhibit 197 marked during
2  Min Li's deposition.
3        MR. GEDDIS:  197.  Found it.
4        (Whereupon, Chesney Exhibit
5    Number 7 was marked for
6    identification.)
7  BY MR. SLATER:
8    Q.    On the screen we have an
9  exhibit that was marked Exhibit 197 actually
10  in the deposition of Peng Dong originally, I
11  can tell you we also showed it to Min Li, and
12  it's published in the medical journal
13  Tetrahedron, or scientific journal I should
14  say, and the title of this article is
15  "N-N-Dimethylformamide: much more than a
16  solvent?
17        Do you see that?
18    A.    Yes.
19    Q.    And this is dated in 2009.  You
20  can see it at the very top.  Even though it's
21  very small letters, it says "Tetrahedron,"
22  and the year is 2009.
23    A.    Yes, I can see it.
24    Q.    Great.

Page 129

1        MR. SLATER:  Let's go now to
2    the third page of this article, which
3    is page 8315, please.
4    Q.    It says in part, paragraph
5  number 3, "Source of carbon monoxide.  DMF
6  decomposes slightly at its boiling point to
7  afford dimethylamine and carbon monoxide,
8  this reaction occurring even at room
9  temperature in the presence of some acidic or
10  basic materials.  This observation has led to
11  the use of DMF as a carbonylating agent."
12        Do you see that?
13    A.    I do.
14    Q.    Taken together with the
15  textbook I showed you, and now I'm showing
16  you a medical -- in a scientific journal, can
17  you agree that, based on what I've shown you,
18  it was at least scientifically feasible
19  for -- and expected for ZHP to know that DMF
20  could decompose or degrade and give off
21  dimethylamine as part of this manufacturing
22  process, that they at least had to take into
23  account the possibility that that would
24  occur?

Confidential Information - Subject to Protective Order

---

Page 130

1    MR. FOX: Objection to the
2  form. Argumentative, incomplete
3  hypothetical.
4    A.   I can agree that, from what
5  you've shown me, that there are references in
6  the scientific literature that are
7  potentially useful data points that should be
8  taken into account and considered in the
9  overall scheme of things. But I'm not
10  capable of judging them on the merits
11  independently, so I don't know what relevance
12  they really have.
13  BY MR. SLATER:
14    Q.   What I'm just asking is, we can
15  agree that the potential decomposition of DMF
16  to give off dimethylamine, based on what I'm
17  showing you, was something that you would
18  expect ZHP to have at least been aware of as
19  a potential chemical reaction as part of the
20  zinc chloride process and take into account
21  however they chose to?
22    MR. FOX: Objection to form.
23    MR. SLATER: Let me rephrase.
24  I lost, because I was trying to finish

---

Page 131

1  the question and you objected. I'm
2  not criticizing because I paused, but
3  let me just ask again.
4  BY MR. SLATER:
5    Q.   You would agree with me that
6  you would expect that ZHP would have at least
7  been aware of the potential degradation or
8  decomposition of the DMF to give off
9  dimethylamine, and to take that into account
10  as something that could potentially occur
11  during the zinc chloride process. Just
12  limiting it to that, would you agree with me?
13    MR. FOX: Objection to the
14  form. Asked and answered.
15    A.   It's information that's out
16  there in the scientific literature. It would
17  have been appropriate for them to take a look
18  at it and give it consideration.
19    MR. SLATER: Let's take that
20  down now and go to Exhibit 211.
21    (Whereupon, Chesney Exhibit
22  Number 8 was marked for
23  identification.)
24    ///

---

Page 132

1  BY MR. SLATER:
2    Q.   Okay. We have on the screen an
3  article titled Theoretical Investigation of
4  N-Nitrosodimethylamine Formation from
5  Nitrosation of Trimethylamine.
6    Do you see that?
7    A.   Yes.
8    Q.   And at the bottom of the first
9  page of the article there's an exhibit
10  sticker, Peng Dong ZHP 211. Again, I'm
11  representing to you this was utilized in Peng
12  Dong's deposition as well as Min Li's
13  deposition, which we've already established
14  you have not seen those transcripts, correct?
15    A.   Correct.
16    Q.   And the articles that I've
17  shown you, these scientific articles that
18  were used in those depositions, you haven't
19  seen any of these, right?
20    A.   No.
21    Q.   Okay. Meaning I'm correct?
22    A.   Yes.
23    Q.   I wasn't trying to be picky,
24  it's just sometimes the negatives on the

---

Page 133

1  double negatives won't be clear.
2    A.   No, I have not seen this
3  article before.
4    MR. SLATER: Okay. Let's,
5  Chris, if you could just blow up the
6  Introduction, that left column, that
7  would be great.
8    Q.   Okay. And let's just start out
9  at the beginning. It says, "It is well known
10  that N-nitrosamines are a class of undesired
11  industrial and environmental pollutants, many
12  of which are carcinogenic, mutagenic, and
13  teratogenic. In particular,
14  N-nitrosodimethylamine (NDMA), which is the
15  simplest dialkylnitrosamine, has been
16  demonstrated to be a potent carcinogen to
17  various organs in animals, including liver,
18  lung, and kidney." And I just want to stop
19  there.
20    Does this comport with at least
21  what you've learned about NDMA since you were
22  retained in this matter, or from the
23  literature, from the media reports you had
24  seen before? I'm just curious if you're

---

Confidential Information Subject to Protective Order

Page 134

1  familiar with at least these types of
2  information about NDMA.
3      A.    The carcinogenic potential,
4  yes.  The detail involving the specific organ
5  systems that might be at risk, no, I haven't
6  seen much in the way of specific reference to
7  that before.
8      Q.    And I neglected to ask about
9  this, but maybe I can do it real quick.
10     The importance of detecting
11  genotoxic impurities as potential
12  manufacturing process impurities, that was
13  not a novel concept in 2011, ZHP would have
14  known at that point that that was something
15  they had to be on the lookout for, right?
16     MR. FOX:  Objection to form.
17     A.    Be on the lookout for what?
18  BY MR. SLATER:
19     Q.    For genotoxic process
20  impurities as a part of any manufacturing
21  process?
22     A.    There's long been a general
23  awareness that unidentified impurities need
24  to be characterized so you know what you're

Page 135

1  dealing with, and then back up and look and
2  see what the implications are of those
3  materials present in your product as a result
4  of your process, and to the extent feasible
5  to quantitate them.
6      Q.    And with regard to genotoxic
7  impurities which could potentially lead to
8  cancer, it's been understood that those need
9  to be focused on and they need to be
10  identified and addressed, correct?
11     MR. FOX:  Objection to form.
12     A.    Well, if you identify either
13  the potential or the actual occurrence of
14  this type of impurity, then certainly it's
15  important to understand it.
16  BY MR. SLATER:
17     Q.    Looking now at the second
18  paragraph under the Introduction, it says,
19  "because dialkylnitrosamines are of great
20  interest in carcinogenesis, much attention
21  have been focused on their formation
22  mechanism, especially from secondary amines.
23  Consequently, NDMA is generally believed to
24  be formed from the reactions of dimethylamine

Page 136

1  (DMA) and nitrosating agents, such as N2O3,
2  N2O4 and ONCl."
3      And I can represent to you that
4  N2O3 would be nitrous acid, I believe.
5  Actually I just screwed up the whole question
6  so I've got to ask it again.
7      This says, "Because
8  dialkylnitrosamines are of great interest in
9  carcinogenesis, much attention has been
10  focused on their formation mechanism,
11  especially from secondary amines.
12  Consequently, NDMA is generally believed to
13  be formed from the reactions of dimethylamine
14  (DMA) and nitrosating agents, such as N2O3,
15  N2O4, and ONCl."
16     Do you see what I just read?
17     A.    Yes.
18     MR. SLATER:  And let's just
19  scroll up a little bit just to the
20  authors of the article again.  I want
21  to just show -- there we go.
22     Q.    This article was published by
23  three authors at the College of Life Science
24  & Bioengineering at Beijing University of

Page 137

1  Technology in Beijing, China, and it shows
2  that it was -- in 2009 it was received, and
3  published in 2010.
4      Do you see that?
5      A.    Yes.  Okay.  I was just looking
6  for publication date.  Yes, I see that.
7      Q.    Would you agree with me that
8  this demonstrates that it was certainly
9  feasible and expected for ZHP to be aware
10  that the potential DMA that could be produced
11  during the manufacturing process could react
12  with the nitrous acid to form NDMA?  Would
13  you agree that this demonstrates that it's
14  certainly something that they needed to be
15  aware of and take into account in their risk
16  assessment?
17     MR. FOX:  Objection to the
18  form.  It's beyond the scope of his
19  expertise, as he has testified
20  repeatedly that he's not a scientific
21  expert.
22     MR. SLATER:  Counsel, do you
23  want to testify?
24     MR. FOX:  If you'd like me.

Page 138

1    MR. SLATER:  We'll do that
2  later.  We do the lawyer testimony
3  later.
4    A.    This is another example of the
5  kind of information I would need input from
6  somebody with the appropriate expertise to
7  fully take into consideration.  I can only
8  judge this on the merits.
9  BY MR. SLATER:
10

21    MR. FOX:  Objection to the
22  form.
23    MR. SLATER:  Okay.  I think we
24  can take that one down.

Page 139

1  BY MR. SLATER:
2    Q.    I'd like to ask you to assume
3  that ZHP's corporate representative witnesses
4  testified that they did not take into
5  consideration the potential degradation or
6  decomposition of DMF to yield DMA, nor did
7  they take into consideration the potential
8  reaction between DMA and nitrous acid, that
9  they didn't even take that into consideration
10  at all, they didn't think about it, they
11  didn't look at the issue, they completely
12  didn't think about that.
13    If my hypothetical is true,
14  would you agree with me that that
15  demonstrates a lack of rigor in violation of
16  GMP based on them not even taking it into
17  consideration and thinking about it?
18    MR. FOX:  Objection to form.
19    A.    I would not go that far until I
20  had the opportunity to ask them a simple
21  question, Why did you not, and hear what
22  their justification is.
23  BY MR. SLATER:
24    Q.    What if their justification was

Page 140

1  nobody knew -- rephrase.
2    What if their justification
3  was, Nobody could have known that these
4  chemical reactions could have occurred?  In
5  the face of what I've just shown you, would
6  you agree that that would show that their
7  evaluation fell below good manufacturing
8  practices?
9    MR. FOX:  Object to the form.
10  Incomplete hypothetical.
11    A.    I would then ask them why they
12  took that position and what there is that's
13  different about the chemistry of their
14  process that leads them to conclude that.
15  BY MR. SLATER:
16    Q.    What if they -- well, are you
17  saying you would ask them why is it that
18  you're concluding that nobody could have
19  known about these potential chemical
20  reactions in the face of publicly available
21  scientific literature, including from
22  scientists in Beijing, that you would not
23  have known what other people had readily
24  available to them?

Page 141

1    MR. FOX:  Objection to the
2  form.
3  BY MR. SLATER:
4    Q.    I don't understand -- I'm just
5  trying to understand why you would ask them
6  that question in the face of what I've shown
7  you.
8    A.    I would -- no, I would expect
9  them to know that that information was out
10  there.  But why they excluded it from
11  consideration in their particular product
12  would be what I'd like to hear their
13  explanation of.  I don't know if they would
14  have such an explanation or not, but I would
15  certainly ask them, Is there anything about
16  your particular process that led you to
17  believe that information such as this would
18  not be relevant.
19    But a lack of awareness that it
20  exists or even to rule it out as important,
21  no, I would expect them to go that far at
22  least.
23    Q.    As a matter of GMP, right?
24    MR. FOX:  Objection to form.

Page 142

1    A.    Yes.
2   BY MR. SLATER:
3    Q.    What if their answer to your
4   question was, We didn't exclude it, we never
5   even thought about it --
6        MR. FOX:  Objection to form.
7   BY MR. SLATER:
8    Q.    -- would that fall below GMP
9   then?
10       MR. FOX:  Objection to form.
11       Misstates -- or incomplete
12       hypothetical.
13   A.    They certainly should be
14  looking at the relevant literature to see if
15  there's anything about what they're proposing
16  to do in their process that poses a potential
17  risk.  So yeah, I would expect them to at
18  least be aware of the existence of this
19  information.
20  BY MR. SLATER:
21   Q.    And if their -- rephrase.
22       If their response to your
23  question, which I think you said your
24  question would be, Well, why did you exclude

Page 143

1   this information from consideration, if their
2   response was, We didn't even actively exclude
3   it and say we're not going to consider it, we
4   didn't even know it, because we didn't even
5   do a research, a literature -- rephrase.  Let
6   me try to ask it clean.
7        If you were to ask them, Why
8   did you decide this information didn't need
9   to be taken into account, and they said, We
10  didn't even make a decision about whether to
11  take it into account, we just never even
12  knew --
13       MR. FOX:  Is that a question?
14  BY MR. SLATER:
15   Q.    -- would I be correct that you
16  would say, Well, your risk assessment fell
17  below GMP because you at least should have
18  known this information was available and made
19  a reasoned decision as to how you were going
20  to take it into account?
21       MR. FOX:  Objection.  Misstates
22       testimony.  It's also beyond the scope
23       of his expertise, given that he's not
24       a scientific expert.

Page 144

1   BY MR. SLATER:
2    Q.    You can answer.
3    A.    It's a concern I would have,
4   but I would ask that the scientific experts I
5   was working with resolve it on a peer-to-peer
6   basis and give me their insight and their
7   opinion.
8    Q.    Well, coming back to my
9   question, though, since you've already agreed
10  with me that they were required to at least
11  know about these potential chemical reactions
12  that could occur during the process, if you
13  then asked them, Well, why did you not
14  perform an actual risk assessment on whether
15  or not these reactions were going to occur or
16  were occurring, and they said, We never even
17  took it into account, we didn't even think
18  about this, we never even thought about these
19  potential reactions, if that were to be their
20  response, would you agree that that would
21  show that their -- the fundamental parts of
22  their risk assessment fell below GMP because
23  they never even made themselves aware of
24  these potential reactions to begin with?

Page 145

1        MR. FOX:  Objection.  Beyond
2        the scope, incomplete hypothetical,
3        and misstates his prior testimony.
4    A.    I'm sorry, I lost -- in all of
5   that I lost the thread of the question.  Can
6   you restate it?  I had to ask you to restate
7   it, but please do.
8        MR. SLATER:  Just so that I
9        don't misstate it a little differently
10       and get another objection that might
11       distract you, Maureen, could you read
12       that question back, please?
13       I'll ask the court reporter to
14  read it back, and if I need to reask
15  it I will again, but maybe this will
16  be the quicker way to go.
17       (Whereupon, the reporter read
18  back the following:
19       QUESTION:  Well, coming back to
20  my question, though, since you've
21  already agreed with me that they were
22  required to at least know about these
23  potential chemical reactions that
24  could occur during the process, if you

Confidential - Information Subject to Protective Order

1 then asked them, Well, why did you not
2 perform an actual risk assessment on
3 whether or not these reactions were
4 going to occur or were occurring, and
5 they said, We never even took it into
6 account, we didn't even think about
7 this, we never even thought about
8 these potential reactions, if that
9 were to be their response, would you
10 agree that that would show that
11 their -- the fundamental parts of
12 their risk assessment fell below GMP
13 because they never even made
14 themselves aware of these potential
15 reactions to begin with.)
16       MR. FOX:  Same objection.
17    A.    I would agree that the risk
18 assessment would have been better had they
19 taken that into account for sure.
20 BY MR. SLATER:
21    Q.    Well, if they told you they
22 never took it into account, that would
23 violate GMP.  You've already told me they
24 were required to know about this scientific

1 information, so if they didn't even consider
2 it that would violate GMP, right?
3       MR. FOX:  Objection to form.
4    Misstates testimony.
5    A.    I think that's taking the
6 concept a bit far.  But they certainly -- the
7 risk assessment would certainly be improved
8 by a thorough literature search, and if they
9 missed something like this that was publicly
10 available and directly involved the type of
11 reaction that was involved in their process,
12 then yes, it should have been taken into
13 account.  And if it wasn't, that would be a
14 gap in the overall risk assessment.
15 BY MR. SLATER:
16    Q.    It would be a gap in violation
17 of GMP, correct?
18       MR. FOX:  Objection to form.
19    A.    Whether or not it's a violation
20 of GMP I'm not been prepared to say without a
21 more rigorous understanding of the scientific
22 considerations here.
23       When you look at information
24 like this in the literature, it may not have

1 been created in an environment that
2 duplicates adequately the environment that
3 exists with respect to the process chemistry
4 that you're dealing with, and there could be
5 mitigating factors or things that would
6 influence the production of NDMA in some way
7 as to negate the risk.  All that has to be
8 taken into consideration before you can
9 conclude what the impact of the lack of that
10 information really was.
11 BY MR. SLATER:
12    Q.    And what you just went through
13 in terms of the types of questions that you
14 might ask, you would expect that pursuant to
15 GMP that people at ZHP would have asked
16 themselves the same questions back at the
17 time in 2011, right?
18    A.    Yes.
19       MR. FOX:  Objection to form.
20    A.    That I can agree to.  The
21 question is whether in 2011 the technology
22 was adequate to make that identification, and
23 whether there was reasonable probability that
24 they would even find anything if they looked.

1 Those are the two basic questions that I
2 would need the scientific support to answer.
3 BY MR. SLATER:
4    Q.    Assuming the answer to both of
5 those assumptions is yes, as I've asked you
6 to assume in the hypothetical, if they didn't
7 ask themselves those questions that you just
8 recited for me about how you would take into
9 account -- how to take this into account in
10 their risk assessment, they didn't even go
11 through that exercise, that would fall below
12 GMP, right?
13       MR. FOX:  Objection to form.
14    Misstates testimony.
15    A.    That would be a flaw in the
16 overall risk assessment for sure, yes.
17 BY MR. SLATER:
18    Q.    In violation of GMP, right?
19       MR. FOX:  Objection to form.
20    A.    I'm not prepared to go that
21 far.  That requires a multifaceted
22 consideration really as to what the risk is
23 that's presented.
24       If I may, GMP conceptually does

Page 150

1  not expect everything to be done perfectly.
2  In fact, the regulations, the finished dose
3  form regulations actually anticipate that
4  imperfections will occur, and what it calls
5  for is a thorough investigation when those
6  imperfections do occur, not that everything
7  be absolutely perfect every time.
8       If that were the case, no
9  pharmaceutical products would be produced
10 because nobody is ever 100 percent perfect.
11 That's been my experience.
12      So the question really is not
13 whether or not the risk assessment could have
14 been better, the question is was it
15 sufficiently flawed to violate GMP.  And it's
16 difficult for me to take it to that level.
17      I can certainly agree that this
18 information you've highlighted would have
19 been helpful, even should have been taken
20 into consideration.  But whether the fact
21 that it was not, if the testimony indeed
22 states that, constitutes a violation of GMP
23 as a further analysis, that I would not be
24 prepared to make based on this level of

Page 151

1  information.
2  BY MR. SLATER:
3       Q.    If you were to assume that
4  considering that information could have
5  feasibly led to testing to see if
6  nitrosamines were being formed, if you assume
7  that, and that that testing would have shown
8  NDMA was being formed, then the failure to
9  take this into consideration in 2011 would be
10 a GMP violation, correct?
11      MR. FOX:  Objection to form.
12      A.    If all that was true, yes.  The
13 problem is I've seen other information that
14 suggests that, at least from the FDA's public
15 statements, that suggests that that
16 information was not -- or that technology was
17 not up to speed until much later.  Neither
18 the regulators nor the industry at large
19 really had that awareness.
20      So I question whether it was
21 feasible in 2011.  I don't know, and I would
22 require the help of someone with the right
23 scientific expertise to convince me of that.
24      If I could be convinced of that

Page 152

1  then, sure, I could get to the point of
2  agreeing it was a violation of GMP, but not
3  based upon bits and pieces of the total
4  story.
5  BY MR. SLATER:
6       Q.    When you were reading the
7  information from the FDA, were you aware that
8  the reason why nobody had been looking for
9  NDMA before was because the manufacturing
10 processes for valsartan hadn't created NDMA
11 to the FDA's knowledge before the zinc
12 chloride process was put into effect, and
13 that that's how this issue came to the FDA's
14 attention?
15      MR. FOX:  Objection to form.
16 BY MR. SLATER:
17      Q.    Were you aware of that?
18      A.    Public statements allude to the
19 timeline on this, and the reasons why it
20 eventually did come to light.
21      What I remember from that as I
22 sit here now is that full awareness and
23 understanding didn't really occur until
24 sometime in the middle of 2018.  So I

Page 153

1  question whether it would have been something
2  the company could have anticipated or known
3  about in 2011.
4       Q.    I read something in your report
5  which indicated along the lines of what
6  you've been telling me, that the FDA doesn't
7  prescribe a one size fits all GMP approach to
8  the manufacture of each product.  I think
9  you've been telling me that, right?
10      A.    Yes, that's true.
11      Q.    And I read a couple of things
12 in your report, and I'm just going to run
13 through them.  One of the things you said is
14 that the cGMP regulations describe what is to
15 be accomplished, not necessarily how.
16      I think that's the same point,
17 right?
18      A.    Yes.
19      Q.    And another thing you said is
20 any reasonable format that achieves the
21 desired results.
22      Again, that's another way of
23 saying the same thing, right?
24      A.    Yes.

Page 154

1    Q.    And I think another place you
2  said -- rephrasing.
3          Another part of your report on
4  page 51 you said, As long as the approach
5  ensures that the API meets its purported or
6  represented purity and quality.  That was
7  another way of you saying you have to come up
8  with an approach, it might not be the same
9  approach someone else will have, but that's
10  the outcome that you need to achieve, right?
11      MR. FOX:  Objection to form.
12    A.    Yes, I think in that -- sorry,
13  Tom.
14      MR. FOX:  Go ahead.
15    A.    I believe in that case I was
16  actually quoting an FDA compliance program to
17  illustrate that point.
18  BY MR. SLATER:
19    Q.    And that point would apply to
20  what ZHP was doing in 2011 as part of its
21  risk assessment, that its approach was
22  required to ensure that the API met the
23  purported or represented purity and quality
24  of the API, correct?

Page 155

1    A.    Yes.
2    Q.    We know in retrospect that the
3  risk assessment failed to do so, and that the
4  API did not satisfy the represented purity
5  and quality because it was -- it contained
6  NDMA, correct?
7      MR. FOX:  Objection to form.
8  Calls for speculation.
9    A.    I don't believe there was any
10  specification established for NDMA at that
11  point in time because there was no
12  anticipation that it would be there.
13  BY MR. SLATER:
14    Q.    That was due to the failure of
15  the risk assessment to identify the potential
16  creation of nitrosamines, correct?
17      MR. FOX:  Objection to form.
18    A.    In part.
19  BY MR. SLATER:
20    Q.    When the valsartan was sold by
21  ZHP, it was representing that it had a
22  certain level of quality and purity, and
23  listed what the ingredients and components
24  were that were in those pills, right?

Page 156

1    A.    I've never seen the labeling
2  for how it was sold, nor any representations
3  that were made to purchasers, but implicitly
4  it would be required to comply with the law,
5  certainly.
6    Q.    Have you looked at the USP
7  entries for the valsartan?
8    A.    The monographs and the USP?
9    Q.    Yes.
10    A.    I don't recall that I looked at
11  the monographs.  I do have one USP citation
12  in my list of references, but I don't think
13  that was the valsartan monograph.
14    Q.    You mentioned specifications
15  before, and I think we can agree that,
16  because we talked about it earlier, that one
17  of the important parts of the risk assessment
18  is to identify what are the impurities that
19  need to be specified so that you can test to
20  make sure they're below certain levels,
21  right?
22    A.    Yes.
23    Q.    So if the risk assessment
24  failed -- well, rephrase.

Page 157

1          We know the risk assessment
2  failed to identify the potential NDMA
3  impurity, we know that, that's why it was
4  never part of the process validation testing,
5  and that's why there was never any even
6  attempt to set a specification for NDMA,
7  right?
8      MR. FOX:  Objection to form.
9    A.    I think -- my understanding is
10  that that's not the only reason.
11          The other reason is there were
12  not available analytical methods that were
13  sensitive enough at the levels that
14  apparently this material was occurring to
15  enable detection at that point.
16  BY MR. SLATER:
17    Q.    And I think you said earlier
18  you haven't seen Dr. Hecht's report, so
19  you're not aware of the fact that one of the
20  world's foremost experts regarding
21  nitrosamines and the use of mass spectrometry
22  has written in his report that the technical
23  ability to identify the NDMA was absolutely
24  available in 2011, that's not something that

Confidential Information - Subject to Protective Order

Page 158

1  you're aware of, right?
2          MR. FOX:  Objection to form.
3      Lacks foundation, argumentative.
4      A.   I'm not aware of it, no.
5  BY MR. SLATER:
6      Q.   If I am correct that it was
7  technically feasible for ZHP to have employed
8  technology to test for NDMA and identify the
9  NDMA in 2011, you would agree with me based
10 on all the information I've shown you that
11 they should have performed that test and they
12 should have detected the NDMA before ever
13 marketing this product, right?
14         MR. FOX:  Objection to form.
15     Asked and answered, misstates
16     testimony.
17     A.   That would require a series of
18 steps; that the risk analysis would recognize
19 that as a potential problem, that they had
20 the available technology or acquired it or
21 found someone to contract with to do the
22 testing, did the testing, and identified the
23 NDMA at the levels in which it was occurring.
24         And even then, you would have

Page 159

1  to take that quantitative information and
2  determine whether or not that was a health
3  risk, and if so, how severe, and to whom, and
4  all the rest of it.
5  BY MR. SLATER:
6      Q.   Well, we know what happened
7  when the world found out there was NDMA in
8  the valsartan, we found out that the levels
9  that ZHP had created in its valsartan were so
10 high that the pills couldn't be sold any
11 longer, right?
12         MR. FOX:  Objection to the
13     form.
14     A.   The levels were such that the
15 FDA classified the recall as Class 2, which
16 is minimal risk to health, and actually
17 issued public advice to patients taking those
18 tablets or capsules to continue to take the
19 medication until they either had an
20 alternative available, or their physician had
21 switched their medication.
22         So the FDA's official advice on
23 this was keep taking your medication until
24 you have an alternative.

Page 160

1  BY MR. SLATER:
2      Q.   Are you aware that the reason
3  the FDA said that is because they figured
4  it's better not to have a heart attack or
5  stroke in the next couple weeks while you go
6  to your doctor and get a new drug rather than
7  stopping the pill?
8          MR. FOX:  Objection to form.
9  BY MR. SLATER:
10     Q.   Let me reask.
11         Are you aware that the reason
12 the FDA said that people should keep taking
13 the pills until they can meet with their
14 doctor is because there was a concern that
15 people could suffer strokes or cardiovascular
16 episodes and die, or have massive medical
17 harm, and that they weighed that against the
18 risk of taking the pills for another couple
19 weeks while they get new medication?
20         You understand that's why the
21 FDA said that, right?
22         MR. FOX:  Objection to form.
23     A.   A couple weeks or however long
24 it takes.

Page 161

1  BY MR. SLATER:
2      Q.   Well, I mean, the FDA was
3  making a decision, We don't want a bunch of
4  people having strokes and dropping dead all
5  over the place because they stopped taking
6  their blood pressure medications while we get
7  them onto other medications, and then the FDA
8  -- shortly after that, this stuff was
9  completely off the market, right?
10         MR. FOX:  Objection to form.
11     A.   It was off the market after the
12 recall was conducted, yes.
13 BY MR. SLATER:
14     Q.   Certainly the FDA telling
15 people to keep taking the pills until they
16 get an alternative blood pressure medication
17 was not an endorsement of the safety of the
18 valsartan, was it?
19         MR. FOX:  Objection to form.
20     A.   Safety is a relative concept in
21 pharmacology.  So it was a statement by the
22 FDA that the greater good was served by
23 patients continuing it until they could get
24 an alternative medication.

Confidential - Information Subject to Protective Order

Page 162

BY MR. SLATER:

Q.    Was the FDA also concerned that because ZHP had such a massive part in the market that there could be a bunch of people left with no blood pressure drugs if they stopped taking it, and there could be a lot of people getting very, very sick and dying if they all stopped taking it right away?

MR. FOX:  Objection to form.

BY MR. SLATER:

Q.    Just asking if you know.

A.    I don't know if they raised supply chain concerns or created a potential shortage.

Q.    Let me go back to a question about the testing that you've talked about, of whether it was feasible to test.

If ZHP had actually taken into consideration the potential chemical reactions and realized that the creation of nitrosamines including NDMA was possible, and if it wasn't feasible to test for the NDMA or other nitrosamines back in 2011, wouldn't the proper thing to do at that point be to say,

Page 163

We can't move forward until we can test and confirm that these genotoxic impurities are not in this pill?  Wouldn't that be what would be required if the testing didn't exist at the time?

MR. FOX:  Objection to form. Argumentative, beyond the scope.

A.    If there was a concern about a substantial risk that they didn't have the feasibility to address through analytical procedures due to a lack of equipment or knowledge of the method or whatever, the usual approach is to try to find someone who can assist with that line of inquiry.

BY MR. SLATER:

Q.    And I'm just going to play out what you've questioned me about to the end.

Let's assume that they -- there was no technology available to test for NDMA or other nitrosamines at that point, even though they knew this manufacturing process very well could be creating these genotoxic impurities, if that were the case -- I'm taking your hypothetical -- if that were the

Page 164

case, then they would not be able to manufacture by that process, they would have to come up with a different way to manufacture it where there wouldn't be the potential creation of a genotoxic impurity that you couldn't test for, correct?

MR. FOX:  Objection to form.

A.    That's a possible outcome.

BY MR. SLATER:

Q.    That would be the -- I'm sorry, I missed your answer because I think you might have broken up.

A.    I'm sorry, just waiting for Tom.

That -- yes, that would be a possible outcome.  They could elect to hold off on the process change until that question could be answered, yes.

Q.    I mean, that would be -- rephrase.  That would be required -- rephrase.

At the very least, they couldn't go forward and institute that manufacturing process until they could answer

Page 165

the question of whether or not this genotoxic impurity was in the pill, right?

MR. FOX:  Objection to form. Incomplete hypothetical.

A.    They should have taken that into consideration, and that's a decision that would have to be made in light of all the facts, and with the appropriate scientific expertise coming to bear.

But yes, that's a possible decision that they could have taken at that time, to not go forward.

BY MR. SLATER:

Q.    It would not have been -- rephrase.

Taking your hypothetical that there was no test in existence that could have told you whether or not this genotoxic impurity was there or not, if that was the fact, it would not have been acceptable to go forward with the manufacturing process while not knowing if there was going to be this genotoxic impurity.  That would not have been permitted, correct?

Page 166

1      MR. FOX:  Objection to form.
2   Beyond the expertise, incomplete
3   hypothetical.
4      A.    Again, I would agree if and
5   only if the weight of the science argued that
6   there was a significant risk of formation of
7   NDMA.  There are literature references which
8   you've shown me that showed in a laboratory
9   setting people that identified this as a
10  potential risk that's of concern, they should
11  consider that.
12         But it would take a more
13  wholistic assessment to understand whether
14  that was a real risk, and decide accordingly
15  whether to proceed with that process change
16  at that time.
17  BY MR. SLATER:
18      Q.    In retrospect you would agree
19  with me it was a real risk because it
20  happened, right?
21      MR. FOX:  Objection to form.
22  Argumentative.
23      A.    Well, I agree with you that it
24  happened.

Page 167

1   BY MR. SLATER:
2      Q.    Okay.  I wanted to just
3   establish that.  If we -- if you'll assume
4   for the moment that a reasonable scientific
5   expert in this field would say, Yes, this
6   would be considered a real risk that this
7   manufacturing process could create NDMA or
8   other genotoxic impurities, if that were the
9   fact, and if your hypothetical was correct
10  that no test existed that could have measured
11  whether or not this genotoxic impurity was
12  actually being created, under those
13  circumstances you could not go forward and
14  manufacture with this process, you'd have to
15  come up with a different way to do it, right?
16      MR. FOX:  Objection to form.
17      A.    You should not go forward
18  unless there's a persuasive reason to believe
19  that the formation of these impurities would
20  be at such a low level that it would not
21  present a risk to human health.
22      MR. FOX:  Break, Adam?
23      MR. SLATER:  Sure.  I was
24  losing track of the time.  It's fine.

Page 168

1   BY MR. SLATER:
2      Q.    Do you want to -- I don't know
3   what you want to do, Mr. Chesney, if you want
4   to take a little longer, you want to eat
5   because it's almost 1:00 o'clock, whatever
6   you want?
7      A.    Well, maybe a little bit longer
8   and just grab something quick.  I'm certainly
9   not one who takes a big lunch anyway.
10      Q.    All right.  Well, you tell me,
11  how long would you like?  I'm just on my
12  second bite of my apple so far, so I'm going
13  to eat an entire apple for the next eight
14  hours.
15      A.    Okay.  Well, it's about
16  20 minutes of 1:00, why don't we say, I don't
17  know --
18      Q.    I'm not trying to rush you.
19  Make sure you give yourself a comfortable
20  amount of time.
21      A.    Ten minutes past 1:00 sound
22  okay to you?
23      Q.    That sounds really good.  We'll
24  shoot for that.

Page 169

1      A.    All right.  Fine.
2         THE VIDEOGRAPHER:  The time is
3   12:38 p.m.  We are off the record.
4         (Whereupon, a luncheon recess
5   was taken.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 170

AFTERNOON SESSION

THE VIDEOGRAPHER: The time is 1:24 p.m. We are back on the record.
BY MR. SLATER:
Q. Okay. We are ready to resume, Mr. Chesney.
Question, I read your discussion of adulteration in your report, which I hope not to have a long, drawn-out discussion about it, I think I understand your points, but we may have to come back to it a little bit. But let me ask you one question maybe to help to avoid a lot of that. So here's the question.
If the zinc chloride process violated cGMP as we've discussed, if that's the case, then the valsartan API manufactured with that process would be adulterated, correct?
MR. FOX: Objection to form.
A. If it is determined that there is a GMP violation that is sufficient to establish adulteration under the FDCA.

Page 171

That's a big if.
BY MR. SLATER:
Q. I understand. Nobody is saying that you've agreed to all aspects of the hypothetical I gave you, but I just wanted to understand if that's the case what the consequences were, or what the implications were.
And sort of -- okay. What I'm doing is looking at my outline to see if I can cut through a few things. Okay.
We talked a little bit about earlier about what ZHP did when they learned about the NDMA in the valsartan. I want to talk a little more about that with you, okay?
A. Okay.
Q. Let me just find in your report.
One of the things that you said in your report is the actions taken -- well, let me start over.
With regard to what ZHP did when it learned that there was NDMA in the valsartan, you say -- this is on page 40 of

Page 172

your report, "The actions taken are, in my opinion, responsible steps that the FDA would expect of any company who had discovered and self-disclosed an issue with a distributed product."
I want to ask you a couple questions about that statement, okay?
A. Sure. That's on page 40. Can you tell me, I've got page 40 open on my hard copy, whereabouts are you in that?
Q. The third line from the top.
A. Oh, okay. All right. I see it, yes.
Q. When you say that those were responsible steps that the FDA would expect of any company in that situation, those steps were legally required of ZHP, correct?
MR. FOX: Objection to form. Calls for a legal conclusion.
BY MR. SLATER:
Q. I'll ask the question differently.
Based on your understanding of the applicable FDA regulations and statutes,

Page 173

is it your opinion that those steps that ZHP took in June of 2018 were legally required of ZHP?
MR. FOX: Same objection.
A. No. These are not things that are covered by any specific FDA regulation or statutory requirement; they're just reasonable and proper things to do when a company has information of this sort.
But there's nothing that I'm aware of that's an affirmative duty for ZHP to have done any of these based on a specific FDA regulation or statutory requirement.
BY MR. SLATER:
Q. One of the things you told me, and it's stated in your report, is that pursuant to 21 CFR 314.81(b)(1), ZHP was required to submit a field alert report within three business days to the FDA once it had learned that there was NDMA in the valsartan, correct?
A. But that's not one of the five elements that I cite here. It begins on page 39 at the bottom.

Confidential Information - Subject to Protective Order

Page 174

1    Q.   Okay.  So let's go through the
2   five elements.  Well, going back to -- I'll
3   ask you a different question and then we'll
4   come back to where you were.
5        ZHP was legally required
6   pursuant to 21 CFR 314.81(b)(1) to submit a
7   field alert report to the FDA within three
8   business days of learning there was NDMA in
9   its valsartan, correct?
10       A.   Yes, with one slight
11  modification, and that being that because
12  this is under an abbreviated new drug
13  application, the regulation that directly
14  covers it is 314.98, but it reflects back to
15  314.81 for the content.  So in effect, yes.
16       Q.   Bottom line was ZHP was
17  required to notify the FDA that there was
18  NDMA in its valsartan within three business
19  days of learning that, correct?
20       A.   Yes.
21       Q.   Once ZHP knew that the zinc
22  chloride manufacturing process was creating
23  NDMA as an impurity, was ZHP required to stop
24  using that manufacturing process as a matter

Page 175

1   of GMP pending further evaluation?
2        MR. FOX:  Objection to form.
3        A.   Once again, no specific
4   requirement for that, but that would be the
5   reasonable thing to do.
6   BY MR. SLATER:
7        Q.   Well, it's my understanding
8   that at all times that ZHP was manufacturing
9   valsartan with the zinc chloride process,
10  that if it knew that NDMA was an impurity in
11  that valsartan API, that ZHP would have had
12  to address that situation pursuant to GMP,
13  correct?
14       MR. FOX:  Objection to form.
15  BY MR. SLATER:
16       Q.   Starting broad right now.
17       A.   What do you mean by "address
18  that situation"?
19       Q.   Well, let me ask you this
20  question.
21       When ZHP first learned that
22  there was NDMA in its valsartan API and that
23  it was a process impurity, did GMP require
24  that ZHP take any steps?

Page 176

1        MR. FOX:  Objection to form.
2   No foundation.
3        A.   It would require that they
4   conduct a thorough investigation to determine
5   where that was coming from, and how to
6   control it going forward, and what to do
7   about it in the interim.
8   BY MR. SLATER:
9        Q.   When you say how to control it
10  in the interim, what do you mean by that?
11       A.   Well, the steps that they took,
12  for example, placing existing inventory on
13  hold until the investigation was complete and
14  the decision could be made as to what to do.
15  Ultimately, of course, they conducted a
16  recall, notifying customers to place a hold
17  on valsartan API, those kinds of interim
18  controls, while the investigation is ongoing
19  and coming to its ultimate conclusion.  Those
20  are reasonable things to do.
21       None of those are prescribed
22  specifically by GMP, but they certainly are
23  the kinds of things that responsible
24  companies do when in this situation.

Page 177

1        Q.   Well, what I'm trying to
2   understand is what GMP required based on the
3   documents you reviewed, based on -- to the
4   extent you have any knowledge of any internal
5   SOPs, I'm trying to get a idea of what GMP
6   required when ZHP first learned that there
7   was NDMA in its valsartan API.
8        I think the first thing you
9   said is it needed to do a thorough
10  investigation to figure out why, where it's
11  coming from, correct?
12       A.   And also the risk.  And then --
13       Q.   I'm sorry, I wanted to go one
14  step at a time just because --
15       A.   Sure.
16       Q.   I'll start over.  We'll do it
17  in small steps.
18       A.   Okay.
19       Q.   When ZHP first learned that
20  there was NDMA in its valsartan API, GMP
21  would have required ZHP to do an
22  investigation to determine why is it there,
23  where is it coming from, correct?
24       A.   Yes, and the associated risk.

Page 178

1    Q.    And to evaluate the associated
2  risk?
3    A.    Yes.
4    Q.    Once ZHP understood that this
5  was coming from the process, the
6  manufacturing process itself, and understood
7  that this was a genotoxic impurity that was
8  considered to be a probable human carcinogen,
9  what did GMP require ZHP to do once it knew
10  that information?
11        MR. FOX:  Objection to form.
12    A.    If feasible, quantify the
13  levels of the compound that were present as a
14  result of its formation during the process,
15  and include a health hazard assessment as to
16  what the implications are of that level of
17  material, once they had a clear understanding
18  of what the levels were that were occurring,
19  whether they were just trace levels that
20  would perhaps have a negligible or no effect,
21  or whether they were at levels of concern.
22  That would be the next step.
23  BY MR. SLATER:
24    Q.    You would agree with me that

Page 179

1  knowing what you know now, the levels were at
2  levels that would be of concern, correct?
3    A.    Right.  And they agreed as
4  well, that's why they conducted the recall.
5    Q.    And again, I'm sticking with
6  GMP right now, so I want to just make sure
7  we're on the same page that once ZHP
8  understood there was NDMA in the valsartan
9  API, it needed to do a thorough
10  investigation, determine what was the root
11  cause, also to evaluate the potential health
12  hazard, quantify the levels.
13        And then what else would have
14  been required by GMP?
15        MR. FOX:  Objection to form.
16    A.    Exactly what they did here,
17  which is for the quality unit to take
18  appropriate action with respect to the
19  material in their possession, and would have
20  to evaluate whether a recall was necessary,
21  which they did.  And they placed the material
22  on hold and notified their customers.  They
23  also notified the FDA.
24        ///

Page 180

1  BY MR. SLATER:
2    Q.    Would that also have required
3  that they stop manufacturing for the time
4  being?
5    A.    It wouldn't have required that.
6  Some companies in a situation like this where
7  information is still developing and they're
8  not sure where it's going to come out, if
9  there's sufficient demand they may continue
10  to manufacture at risk, but put any new lots
11  manufactured also on hold.
12        Other companies will look at
13  that and say no, the risk is too high, we
14  don't want to make that investment in the
15  cost of goods, and they'll simply cease
16  manufacturing until they sort the matter out.
17        So if they continue to
18  manufacture, they should certainly -- they
19  would certainly not be wise to distribute any
20  additional product made, but rather to put
21  that on hold with the rest of it.
22    Q.    Would there have been anything
23  else that GMP would have required of ZHP?
24        MR. FOX:  Objection to form.

Page 181

1    A.    Once a final conclusion is made
2  that the product is not in a saleable
3  condition, then the final thing would be for
4  the quality unit to reject the material that
5  they still had control over and any returns
6  they get back as a result of the recall.
7        Some companies in a recall
8  situation will authorize the destruction by
9  their consignees rather than have it all
10  returned.
11  BY MR. SLATER:
12    Q.    And your understanding is that
13  from all the things you've seen, that ZHP
14  first learned that there was NDMA in its
15  valsartan in June of 2018, is that correct?
16    A.    That's when the investigation
17  was in its final or latter stages, and they
18  had done some quantification, yes.
19    Q.    Did you come to an
20  understanding of how -- well, rephrase.  Did
21  you have an -- rephrase.
22        Did you review materials having
23  to do with the interactions between Novartis
24  and ZHP regarding the NDMA impurity in the



Page 182

1  valsartan which led to the disclosure?
2      MR. FOX:  Objection to form.
3      A.    I do recall reviewing some of
4  the original reports, or an original report
5  from Novartis that they had detected an
6  unidentified impurity.
7  BY MR. SLATER:
8      Q.    Did you notice that it was
9  Novartis and a third party lab that Novartis
10  retained that identified the NDMA before ZHP
11  did?
12     A.    I don't recall specific
13  details.  It's possible that I did, yes.
14

Page 183

1
in

Page 184

1  your report.  That was not something you
2  actually addressed in your report, correct?
3      A.    I don't recall addressing it.
4      Q.    Do you have any opinions as to
5  whether -- rephrase.
6          I didn't see any opinions in
7
8
9
10
11  opined on, correct?
12     A.    I don't believe I dealt with
13  that specifically in my report.
14     Q.    You would agree that when ZHP
15  was receiving complaints from its customers
16  of unknown peaks on chromatography that ZHP
17  had certain GMP obligations in response to
18  those complaints?  We'll get to what those
19  responsibilities were, but you would agree
20  that that would trigger certain GMP
21  responsibilities, correct?
22         MR. FOX:  Objection to form.
23  Foundation.
24     A.    Yes, they should investigate

Page 185

1  those complaints for sure.
2  BY MR. SLATER:
3      Q.    They would have been required
4  by GMP to conduct a risk assessment with
5  regard to those peaks in an effort to --
6  well, let me ask it differently.  Maybe I
7  won't use the word risk assessment, and
8  you'll tell me, it could be something else
9  closely akin.
10         When ZHP was -- rephrase.
11         When ZHP received the customer
12  complaints of these unknown peaks in the
13  valsartan API, GMP required ZHP to analyze
14  and try to determine what those unknown peaks
15  represented, correct?
16         MR. FOX:  Objection to form.
17     A.    When you use the word "analyze"
18  there, can you be more specific?
19  BY MR. SLATER:
20     Q.    Well, sure.
21         ZHP would have been required to
22  try to learn the reason why those unknown
23  peaks were appearing, correct?
24     A.    Yes.  And that could be through

Page 186

1  dialogue with the complainant, review of
2  information submitted by the complainant,
3  review of production records, a variety of
4  ways, sometimes including laboratory analysis
5  of retained samples if that's appropriate.
6  All of that has to be taken into
7  consideration based on the details of the
8  complaint.
9      Q.   One of the things ZHP would
10  have been expected to do would have been to
11  evaluate the manufacturing process to
12  determine whether there was the potential
13  creation of impurities that could explain
14  those unknown peaks, correct?
15      MR. FOX:  Objection to form.
16  Calls for speculation.
17      A.   Once the manufacturing process
18  is established and being followed, there's no
19  requirement that they go back and reconsider
20  something like that.
21      What they would need to do
22  instead is to make sure the batch records
23  reflect that the manufacturing process that
24  was used for the batch that was the subject

Page 187

1  of the complaint was followed as required by
2  the master form of the record.
3  BY MR. SLATER:
4      Q.   In terms of deciding what
5  testing to -- rephrase.
6      One of the things ZHP had to do
7  was determine what type of testing to perform
8  to try to determine the explanation for those
9  unknown peaks; that would have been part of
10  what they should have done, correct?
11      MR. FOX:  Objection to form.
12      A.   They should have determined
13  whether testing was even feasible or
14  necessary, because sometimes the information
15  that comes in from the complainant is not
16  that you don't really need to go to testing,
17  other times it's helpful.  So it depends on
18  the details.
19  BY MR. SLATER:
20      Q.   Well, in retrospect we know
21  that there were unknown peaks attributable to
22  NDMA, and that certain testing would have
23  disclosed the presence of NDMA.  We know that
24  in retrospect, right?

Page 188

1      MR. FOX:  Objection to form.
2      A.   I'm not sure that I know that
3  at all.  First of all --
4  BY MR. SLATER:
5      Q.   Was it in the materials you
6  reviewed?
7      A.   From the public statements by
8  the FDA, those analytical procedures were not
9  fully robust until a later date for one
10  thing, you know.  So I don't know what was
11  available at the time.  We've talked about
12  these literature references and so on.
13      But again, this is something I
14  would ask a subject matter expert, Was there
15  analytical technology available that should
16  have been used, could have been used under
17  these circumstances to shed some light on
18  this.
19      But the ordinary approach with
20  unknown peaks is to attempt to identify them
21  qualitatively, and then once you know that,
22  quantitate them if that's possible with
23  existing technology.
24      Q.   When you say "qualitatively,"

Page 189

1  you're talking about figuring out what they
2  are?
3      A.   Yeah, what is it.  And then
4  quantitatively is okay, how much is it, how
5  much is there present, what level is it at.
6      Q.   Well, one of the things that
7  ZHP would have had to question was, Is there
8  a test we can perform to identify the source
9  of those unknown peaks.  They would at least
10  have been expected by GMP to ask themselves
11  that question, right?
12      MR. FOX:  Objection to form.
13      A.   What I have seen the scientists
14  do is look at the unknown peaks, look where
15  they're alluding, evaluate the size and
16  occurrence of them, and attempt to infer from
17  that what might be going on.
18      If additional testing is
19  necessary, then they do that, but I'm not the
20  one to make that call.
21  BY MR. SLATER:
22      Q.   I read somewhere, and I don't
23  remember if it was in your report or in some
24  of the ICH documents, that risk assessment is

Page 190

1  not a static process, it's a process that
2  continues through the lifecycle of the drug's
3  production and manufacture, is that correct?
4      A.    I would agree with that
5  statement, yes.
6      Q.    So when the unknown peaks were
7  brought to the attention of ZHP, one of the
8  things that would have been prudent for them
9  to do would have been to go back to their
10  risk assessment to determine whether it was
11  adequate to make sure they hadn't missed
12  something that could explain those unknown
13  peaks.  That would have been a prudent step,
14  right?
15          MR. FOX:  Objection to form.
16      Calls for speculation.
17      A.    I don't know if they did that
18  or not, but they certainly could have.
19  BY MR. SLATER:
20      Q.    It would have been prudent for
21  them to do so, correct?
22          MR. FOX:  Objection to form.
23      A.    Yes.
24          ///

Page 191

1  BY MR. SLATER:
2      Q.    And if it was scientifically
3  feasible for ZHP to have evaluated the
4  manufacturing process, gone through the
5  chemical reactions that could have been
6  occurring, and identify that potentially
7  nitrosamines were being created, and if it
8  was technically feasible to perform a test
9  like mass spectrometry to determine whether
10  these were nitrosamines causing these unknown
11  peaks, if both of those ifs -- if the answer
12  is yes to both of those, then that would have
13  been expected by ZHP, that would have been
14  expected by GMP, correct?
15          MR. FOX:  Objection to form.
16      Incomplete hypothetical.
17      A.    That's the sort of question I
18  would turn to a subject matter expert to help
19  formulate.
20  BY MR. SLATER:
21      Q.    I'm asking you to assume the
22  answer is yes, it would have been
23  scientifically feasible to figure out that
24  these reactions could have led to the

Page 192

1  creation of nitrosamines, and I'm asking you
2  to assume that testing, including mass
3  spectrometry, was available to test to see if
4  this was a nitrosamine peak, if the answer to
5  both of those is yes, then GMP would have
6  required ZHP to do so when those unknown
7  peaks were reported, correct?
8          MR. FOX:  Objection to form.
9      A.    There's a lot of ifs in that
10  hypothetical.
11  BY MR. SLATER:
12      Q.    Is the answer yes?
13      A.    The answer would be yes, if the
14  answer to all the ifs you just posed was also
15  yes.
16      Q.    So again, this comes back to
17  the importance of identification of the
18  potential impurity being the trigger to many
19  of these cGMP functions, correct?
20          MR. FOX:  Objection to form.
21      A.    Yes.
22  BY MR. SLATER:
23      Q.    Would you agree that as soon as
24  ZHP had internally determined that those

Page 193

1  unknown peaks could be due to the formation
2  of a nitrosamine as a result of the
3  manufacturing process, that ZHP was obligated
4  to tell the complaining customers that based
5  on their analysis of the manufacturing
6  process, one explanation could be
7  nitrosamines?
8          MR. FOX:  Objection to form.
9      Calls for speculation, incomplete
10      hypothetical.
11      A.    There's no requirement for them
12  to notify the complainant at that stage of
13  the game.  They're in the middle of an
14  investigation.  They have a hypothesis
15  formed, as you've described it, they're
16  putting a hypothesis to the test, so their
17  main investigation, that would probably be a
18  premature point at the time.
19  BY MR. SLATER:
20      Q.    Once ZHP actually tested its
21  hypothesis and confirmed that there was NDMA
22  forming in the valsartan as a result of the
23  manufacturing process, at that point was ZHP
24  required to notify its customers?

Page 194

1    MR. FOX:  Objection to form.
2    A.    Required, no.  Prudent, yes.
3  BY MR. SLATER:
4    Q.    How about a customer that had
5  complained and said, Please tell us what
6  these unknown peaks represent, was ZHP
7  required to tell those complaining customers
8  once ZHP knew it was NDMA, that yes, those
9  peaks were due to NDMA?
10    MR. FOX:  Objection to form.
11    No foundation.
12    A.    Not required by GMP, but again,
13  the sort of thing that prudent companies do,
14  and in fact ZHP did in June of 2018.
15  BY MR. SLATER:
16    Q.    If ZHP knew that there was NDMA
17  in its valsartan API and continued to sell
18  the API and didn't tell any of its customers
19  and didn't tell the FDA, that would be
20  inexcusable, correct?
21    MR. FOX:  Objection to form.
22    No foundation, argumentative, beyond
23    the scope.
24    A.    Use of the word "inexcusable"

Page 195

1  is a little inflammatory.  I think if they
2  had knowledge that a product posed a danger
3  to health and didn't do anything about it,
4  that would certainly be inappropriate, and
5  they could potentially be in violation of the
6  Act for other reasons other than GMP as well.
7  BY MR. SLATER:
8    Q.    What could they potentially be
9  in violation of under the Act, aside from
10  GMP?
11    A.    If --
12    MR. FOX:  Objection to the
13    form.  Calls for a legal conclusion.
14  BY MR. SLATER:
15    Q.    You can answer.
16    A.    Okay.  If they are aware that a
17  product contains a contaminant that poses an
18  actual or potential danger to health, and
19  tell no one and continue to ship it anyway,
20  that could be construed later, after
21  evaluation of all the facts, as having
22  shipped a contaminated and, therefore,
23  adulterated product in interstate commerce.
24    Q.    What are the consequences for

Page 196

1  that?
2    MR. FOX:  Objection to form.
3    Calls for speculation.
4    A.    Well, any of a number of
5  consequences.  It would depend on a variety
6  of factors.
7    A product can be seized.  If
8  it's domestic US channels of distribution,
9  FDA can move for that.
10    FDA can seek an injunction to
11  cause a company to cease and desist violative
12  conduct.
13    They can deal with it as they
14  did in this case with a warning letter, which
15  is a lesser way of handling it.
16    There are a number of other
17  possibilities, depending on the
18  circumstances.  And whether it's in domestic
19  commerce or coming in from abroad would
20  change the equation as well.
21  BY MR. SLATER:
22    Q.    Well, here we're talking about
23  API that was coming in from China.
24    A.    Right.

Page 197

1    Q.    If it turned out that ZHP knew
2  that its zinc chloride manufacturing process
3  was creating NDMA in the API, and ZHP despite
4  that knowledge continued to sell the API and
5  not inform any of its customers or any
6  regulatory authorities and kept that
7  knowledge secret and did so for months, that
8  would be a violation, I would assume, of the
9  Food, Drug, Cosmetic Act, correct?
10    MR. FOX:  Objection.
11    Hypothetical, no foundation.
12    MR. SLATER:  You know what,
13    Counsel, you can have your -- you have
14    your standing objection, because you
15    give it to every question, I'm not
16    going to make you keep saying it.  I
17    want to just get through this.
18    MR. FOX:  It's beyond the scope
19    of his opinion.
20    MR. SLATER:  I'm not so sure it
21    is.
22    A.    Okay.  Once again let's be
23  clear on what the question is, Mr. Slater.
24    MR. SLATER:  I'm going to ask

Page 198

```
 1   Maureen, if you could read it back.
 2   It worked well the first time, so try
 3   the second time.
 4        (Whereupon, the reporter read
 5   back the following:
 6        QUESTION:  If it turned out
 7   that ZHP knew that its zinc chloride
 8   manufacturing process was creating
 9   NDMA in the API, and ZHP despite that
10   knowledge continued to sell the API
11   and not inform any of its customers or
12   any regulatory authorities and kept
13   that knowledge secret and did so for
14   months, that would be a violation, I
15   would assume, of the Food, Drug,
16   Cosmetic Act, correct.)
17   A.    One thing that's missing from
18   the fact set that you put forth is how much
19   of the NDMA is present, whether it's at
20   miniscule trace amounts or amounts that could
21   potentially pose a hazard to health, and that
22   would be necessary for me to give an opinion.
23        I would also need to know once
24   the amounts were quantified what the medical
```

Page 199

```
 1   opinion is in terms of the health hazard that
 2   would be necessary.  Because if something is
 3   present at very minuscule trace amounts that
 4   pose no risk whatsoever, then that could
 5   result in a different answer.
 6   BY MR. SLATER:
 7   Q.    Do you know the amounts that
 8   were found in ZHP's API?  Did you have a
 9   chance to see that?
10   A.    I have.
11   Q.    Those amounts.
12        MR. FOX:  Object to form.
13   A.    Yeah, those amounts are
14   concerning.  And again, there are a lot -- a
15   string of ifs in a row here.  If this was
16   going on, if they were fully aware of it, if
17   they didn't notify the FDA, if they didn't
18   notify their customers, if they continued to
19   sell it, and so on, then yes, that could be
20   construed as a violation of the Food, Drug &
21   Cosmetic Act.  I don't want to give a legal
22   opinion here.
23        The fact is, as my report
24   relates, that's not what they did in 2018.
```

Page 200

```
 1   BY MR. SLATER:
 2   Q.    When you say that could be a
 3   violation of the Food, Drug, Cosmetic Act,
 4   could that be something that could rise to
 5   the level of being criminal?
 6        MR. FOX:  Objection to the
 7   form.  You're asking him for a legal
 8   opinion.
 9        MR. SLATER:  He's your expert
10   who cited to regulations all over the
11   report.  I think he's competent to
12   talk about the legal implications of
13   the conduct of your client.
14        MR. FOX:  And I think he did
15   that in the report.  You have my
16   objection.
17        MR. SLATER:  I appreciate it.
18   BY MR. SLATER:
19   Q.    You can answer.
20   A.    Any decision to go forward with
21   a criminal prosecution would go even beyond
22   the scientific multidisciplinary process that
23   I mentioned.  This is hence my reluctance.
24
```

Page 201

Confidential Information Subject to Protective Order



Page 202

Page 203

Page 204

8    Q.    Okay.
9         MR. SLATER:  Let's go to the
next page, please, Chris.
10        MR. FOX:  Is there a date on
11   this, Adam?
12        MR. SLATER:  Is there a date on
13   this.  I believe I can get that for
14   you.  I don't remember that off the
15   top of my head.
16        MR. FOX:  Okay.
17        MR. SLATER:  But we can get
18   that and we'll certainly make a record
19   of it.  It was used in a prior
20   deposition, so it's certainly been
21   identified in the metadata.
22
23   BY MR. SLATER:

Page 205

Confidential Information Subject to Protective Order

Page 206

[redacted]

Page 208

[redacted]

9    A.    From my experience when you go
10   from Chinese to English, sometimes things
11   don't come across quite the same way.
12   Q.    Fair enough.
13   A.    I've dealt with Chinese
14   companies in the past, and sometimes things
15   are a little hard to follow in the translated
16   version.
17   Q.    No problem.
18        Let's go back to Exhibit 296
19   now.
20        Now, I'm showing you an e-mail
21   marked as ZHP 296 which was sent by Jinsheng
22   Lin, Ph.D who we just read about in that
23   CEMAT PowerPoint.  And do you see his name
24   there at the top?

Page 207

1   [redacted]
2   [redacted]
3   [redacted]
4   another exhibit which will be, I believe,
5   296.
6        (Whereupon, Chesney Exhibit
7        Number 10 was marked for
8        identification.)
9        MR. SLATER:  Chris, I want the
10   translated version of this, not the
11   Chinese version of the e-mail.
12   A.    Can we pause on that PowerPoint
13   for just a moment?
14   BY MR. SLATER:
15   Q.    Sure, we can go back to it.
16   A.    I just have a question.
17   [redacted]

Page 209

1   A.    Yes.
2   Q.    And it was sent to a number of
3   people, Jucai Ge, Tianpei Huang, Wangwei
4   Chen, Wenquan Zhu, Wenbin Chen, Mr. Li, Peng
5   Dong, Lihong Lin, Yanfeng Liu, Peng Wang, and
6   Wenling Zhang.
7        Do you see that?
8   A.    I do.
9   Q.    And the date of this e-mail is
10   July 27, 2017.  Do you see that towards the
11   top of the e-mail?
12   A.    Yes.
13   Q.    And what I want to do is go
14   through first, this is -- the first person
15   it's sent -- rephrase.
16        It's addressed to Ms. Ge.  As
17   you can see, it says, "Ms. Ge:  According to
18   the results of our telephone communication
19   with the Technology Department at Chuannan
20   Plant today," and then it talks about "the
21   incomplete quenching of sodium azide caused
22   by the separate treatment of irbesartan
23   sodium azide wastewater," and it goes into
24   that area, it discusses that.



Page 210

1    Do you see that?
2    A.    Yes.
3    Q.    Okay.  What I would like now to
4 do is go to -- now, looking at the bottom of
5 that paragraph, Dr. Lin points out, "However,
6 after the improvement, there is an unknown
7 impurity of about 0.544 percent at 26 minutes
8 in the crude irbesartan, and it is the
9 largest impurity in the irbesartan crude
10 product."
11    Do you see that?
12    A.    Yes.
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22    MR. SLATER:  Let's go now to
23 the next page, please, Chris, the top
24 of the second page.

Page 211

1    Q.    At the top of the next page
2 Dr. Lin states, "Through the secondary mass
3 spectrometry analysis, it can be inferred
4 that the extra NO substituent is in the
5 cyclic compound fragment, and it is very
6 likely that it is an N-NO" -- which would be
7 an N-nitroso -- "compound; it is similar to
8 the N-nitrosodimethylamine that occurs in
9 valsartan when quenched with sodium nitrite,
10 and its structure is very toxic."  Then it
11 says, "Its possible formation route is shown
12 as follows:"
13    Do you see what I just read?
14    A.    Yes.
15    Q.    Were you aware before right now
16 that at least as of July 27, 2017, ZHP knew
17 internally that there was NDMA in valsartan,
18 and that the mechanism that was creating it
19 occurred when the valsartan was quenched with
20 sodium nitrite during the manufacturing
21 process?
22    MR. FOX:  Objection to the
23 form.  Misstates the document.
24    A.    I can't conclude that based on

Page 212

1 what you've read up to this point in time.
2 BY MR. SLATER:
3    Q.    Okay.  This e-mail is dated
4 July 27, 2017.
5    A.    No, the date is not in
6 question.  But I can't conclude from what
7 I've heard so far that this suggests that
8 this material is actually in finished
9 valsartan.
10    It talks about being in crude
11 irbesartan, and at some stage of production
12 in valsartan.  I have no idea how much more
13 synthesis or purification either of those
14 compounds are supposed to go through as
15 they're being manufactured and whether that
16 would remediate this or not.
17    That's exactly the kind of
18 scientific analysis that I would defer to
19 others and would require collaboration on.
20    Q.    Okay.  I hadn't asked a
21 question at that point, but I appreciate you
22 telling me where you wanted to take this.
23 But let me go back now to what I want to ask
24 you.

Page 213

1    This e-mail is dated July 27,
2 2017.  It's written by Jinsheng Lin, who we
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8 We went through that just a few moments ago,
9 correct?
10    A.    Yes.
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 214

12  Q.   What I'm asking you is -- so
13  we've established that.  Now let's go to my
14  next question.
15        In this e-mail Dr. Lin, whose
16  responsible was to understand and discover
17  such root causes, states that what was being
18  seen in the irbesartan "is similar to the
19  NDMA that occurs in valsartan when it's
20  quenched with sodium nitrite."
21        Do you see that?  Just asking
22  if you see those words.
23  A.   I do.
24

Page 215

12  Q.   And in this e-mail, Dr. Lin
13  compares what is being seen in this
14  irbesartan that they're experimenting with
15  and says that what they're seeing is similar
16  to the NDMA that occurs in valsartan when
17  quenched with sodium nitrite.  He's stating a
18  comparison to what -- according to the words
19  on this page -- what he knows to occur in the
20  valsartan when it's quenched with sodium
21  nitrite, which you'll agree with me is a true
22  statement because that was the ultimate root
23  cause ultimately disclosed to the world,
24  correct?

Page 216

1        MR. FOX:  Objection to form.
2  The document speaks for itself.
3  A.   I'm still not certain about the
4  timeline here, but I mean, it says what it
5  says.  So certainly I'm not quarreling with
6  the fact they the words are there.
7        But whether that aligns to what
8  the other documents I reviewed say in terms
9  of when that determination was made, my
10  memory is the final determination that they
11  based the recall on was not made until 2018,
12  which would have been approximately a year
13  more or less after this was done.
14        So I'm not sure when the
15  gentleman makes this statement whether he's
16  basing that on a final conclusion, a
17  speculation, a work in progress, or what that
18  is.  It says what it says.
19        But beyond that, I don't know.
20  BY MR. SLATER:
21  Q.   Well, you know from the
22  materials you were provided that what he says
23  here is the root cause for the creation of
24  NDMA.

Page 217

1  A.   Was eventually determined to
2  be.
3  Q.   Okay.  And he was speaking to
4  the root cause in July of 2017.  That's what
5  it says right here, right?
6        MR. FOX:  Objection to form.
7  The document speaks for itself.  Stop
8  trying to put words in his mouth.
9  BY MR. SLATER:
10  Q.   That's correct, right,
11  Mr. Chesney?
12  A.   It says what it says.
13  Q.   You were not shown this
14  document or told about this e-mail by the
15  people who retained you, is that correct?
16  A.   This is the first time I've
17  seen it.
18  Q.   And you saw the list of people
19  on the first page that this was sent to.  So
20  this was not one person hoarding this
21  information; it was shared with multiple
22  people within the company.  I showed you
23  that, correct?
24  A.   You showed me the list that it

Page 218

was supposedly sent to, yes.

Q.    If ZHP knew, as reflected in
this document, that there was NDMA in
valsartan as of July 2017, all the things
that you said that ZHP was required to do in
June of 2018, you would say all those things
were required to be done as of July 2017 when
ZHP knew this, correct?

MR. FOX:  Objection to the
form.  Calls for speculation.

A.    What we have in this document
is a side statement in one sentence to this
information.  I don't know what's behind
that, what the writer meant, particularly in
Chinese -- I assume this was originally
written in Chinese -- when he crafted this
statement, what -- how deep his knowledge or
understanding of that was or whether that was
a speculative or off-the-cuff remark.

It's really very difficult to
make any definitive conclusion from this
about what the company actually knew and how
many people knew it in 2017.

He's making an -- I guess you'd

Page 219

call it at minimum an allegation, or a
suggestion maybe is a better way to put it,
that this is the case.  What the facts are
behind that and how well-known they are, I
have no idea.

BY MR. SLATER:

Q.    With all due respect, that's
not what I asked you, to give me every reason
that you could come up with why someone might
want to try to undercut the statement.
That's not what I asked you.  So let's go
back to my question.

If, as stated in this document,
ZHP knew that there was NDMA in the valsartan
and it was a process impurity that was being
created when the sodium nitrite quenching
step occurred as part of the zinc chloride
process, then everything you said ZHP was
required to do in June of 2018 would be
transferred back to July of 2017, or whenever
earlier date they knew this, and all those
things would have been required at that time,
correct?

MR. FOX:  Objection to the

Page 220

form.  Lack of foundation, incomplete
hypothetical, calls for speculation.

A.    If they knew it, yes.

BY MR. SLATER:

Q.    If they knew as of at least
July 27th -- rephrase.

If ZHP knew at least as of July
27, 2017 that there was NDMA in the
valsartan, and kept that secret and didn't
tell any customers or any regulators until
Novartis came to them and forced them to
disclose this information in June of 2018,
that would be a violation of the Food, Drug
and Cosmetic Act, correct?

MR. FOX:  Objection to form.

A.    It would if it was offered for
importation into the United States, yes.

BY MR. SLATER:

Q.    We know that ZHP was selling
its valsartan with NDMA in it right through
until the recall occurred in June or July of
2018, right?

MR. FOX:  Objection to the
form.

Page 221

A.    I haven't looked at their sales
and distribution records.  I know only that
they had product on the market when they
conducted the recall, or there wouldn't have
been anything to recall.

MR. FOX:  Adam, is there a
reason why you're not appearing on any
of these screens?

MR. SLATER:  Is there a reason
I'm not appearing?  I'm looking right
at myself.

MR. FOX:  Okay.

MR. SLATER:  I'm right below
Mr. Chesney, where I belong.

THE WITNESS:  I can see him.

MR. SLATER:  He's sitting right
on my -- he's got his feet right on my
shoulders right now.

A.    Actually you're at the bottom
on my list, but I can see you.

MR. SLATER:  I'm in here.

MR. FOX:  Okay.  I found you.

BY MR. SLATER:

Q.    Okay.  If, in fact, ZHP knew at

Page 222

1 least as of July 27, 2017 that there was NDMA
2 in the valsartan and didn't tell its
3 customers and didn't tell any regulatory
4 authorities and just continued to sell the
5 product, that would be a very serious
6 violation of the Food, Drug and Cosmetic Act,
7 correct?
8        MR. FOX:  Objection to form.
9    Argumentative, lacks foundation.
10        A.   It would be of great concern if
11 indeed that's true, but I don't know that it
12 is.
13 BY MR. SLATER:
14        Q.   In terms of your ability to
15 form an opinion in this case, this is the
16 type of information you would have expected
17 to have been provided when you were provided
18 materials by counsel, correct?
19        MR. FOX:  Objection to the
20    form.
21        A.   If I had been provided this
22 information, it would have raised certain
23 questions in my mind.  I would have referred
24 those to scientific subject matter experts,

Page 223

1 but I would have taken note of it.
2 BY MR. SLATER:
3        Q.   Let's go down a little further
4 in this e-mail.
5             After the pictures of the
6 potential formation route of the nitrosamine
7 impurity in the irbesartan, the second
8 paragraph under that says, "If it is
9 confirmed as the above speculated structure,
10 then its toxicity will be very strong, and
11 there will be an extremely high GMP risk.
12 This is a common problem in the production
13 and synthesis of sartan APIs.  It is
14 recommended to improve other quenching
15 processes (such as NaClO) along with the
16 optimization of the valsartan sodium azide
17 quenching process."
18             Do you see that?
19        A.   I do.
20        Q.   So this provides further
21 information about the depth of understanding
22 by ZHP as of July 2017, because this shows
23 that they knew that this is a common problem
24 in the production and synthesis of sartan

Page 224

1 APIs.  That's additional important
2 information, right?
3        MR. FOX:  Objection to the
4    form.
5        A.   It also characterizes the
6 findings up above as not confirmed and
7 speculative.
8 BY MR. SLATER:
9        Q.   The speculated structure is
10 talking about what was being seen in the
11 irbesartan, which was something they were
12 working on to try to work on that process to
13 manufacture it.  They're not speculating
14 about there being NDMA in valsartan; that's
15 not stated as speculative at all, correct?
16        MR. FOX:  Objection to form.
17    The document speaks for itself.
18        MR. SLATER:  Counsel, you have
19    to stop, with all due respect, making
20    a document speaks for itself
21    objection.  I would appreciate it if
22    it would stop.  I know you're new to
23    this litigation, but the Special
24    Master has instructed that that

Page 225

1 objection should not be made.
2             You don't have to take my word
3    for it, I'm just trying to help.
4 BY MR. SLATER:
5        Q.   Can you answer the question,
6 please?
7        A.   I'm just taking a minute to
8 read it here.
9             (Witness reviewing document.)
10        A.   I'm having trouble from these
11 isolated paragraphs here making a link back
12 to valsartan, frankly.  I hear what you're
13 saying, but I'm not able to get there based
14 on what it says right here.
15        Q.   I'll ask you a different
16 question then.
17             You see the sentence that says,
18 "This is a common problem in the production
19 and synthesis of sartan APIs"?  Do you see
20 that sentence?
21        A.   I do.
22        Q.   That's not phrased as something
23 he's speculating about; that's being stated
24 as fact in this e-mail.  That's how it reads,

Confidential Information - Subject to Protective Order

Page 226

1  right?
2      A.   Yes.
3          MR. FOX:  Objection to the
4  form.
5  BY MR. SLATER:
6      Q.   Did you say yes?
7      A.   Yes.
8      Q.   And we know in retrospect that
9  this was a common problem in the production
10  and synthesis of sartan APIs, which is why
11  ultimately it turned out that other
12  manufacturing processes were implicated in
13  irbesartan and losartan, that there were
14  recalls of those drugs as well.  That was
15  ultimately learned, correct?
16         MR. FOX:  Objection to form.
17     A.   Yes.
18  BY MR. SLATER:
19     Q.   And in fact, Dr. Lin makes the
20  responsible recommendation to improve the
21  other quenching processes along with the
22  optimization of the valsartan sodium azide
23  quenching process.  That's the responsible
24  thing to say when you realize that your

Page 227

1  manufacturing process is creating a genotoxic
2  impurity, in this case NDMA, correct?
3          MR. FOX:  Objection to the
4  form.
5      A.   You're talking about the last
6  paragraph here.
7          Okay.  I'm sorry, but I was
8  catching up with you by reading this in a
9  little more depth, could you either repeat
10  the question or have it read back to me,
11  please?
12  BY MR. SLATER:
13     Q.   Sure.
14         It was responsible for Dr. Lin
15  to state, as he did, that he was recommending
16  that they improve the other quenching
17  processes such as NaClO, along with the
18  optimization of the valsartan sodium azide
19  quenching process, because of the fact that,
20  as he stated, this is a common problem in the
21  production and synthesis of sartan APIs.
22  That's a responsible recommendation, right?
23     A.   Yes, it is.
24     Q.   In the last paragraph he

Page 228

1  states, "I've also attached a patent of a
2  2013 sodium azide NaClO quenching method by
3  Zhejiang Second Pharma Co., Limited.  They
4  proposed that the use of NaNO2 quenching will
5  result in the formation of N-NO impurities,"
6  which is N-nitroso impurities.  "At the same
7  time, they used ZHP's crude Valsartan in
8  their LC-MS test" -- that would be liquid
9  chromatography-mass spectrometry -- "and
10  detected this impurity.  This indicates that
11  other companies have paid attention to the
12  quality problem very early on.  So leaders
13  please pay attention to this issue."
14         Do you see that paragraph I
15  just read?
16     A.   Yes.
17     Q.   Dr. Lin's statement to these
18  other executives -- rephrase.
19         Dr. Lin's statement that other
20  companies are aware of this quality problem,
21  and giving an example going back to 2013,
22  that's significant, isn't it?
23         MR. FOX:  Objection to form.
24     A.   It's my understanding that at

Page 229

1  that point in time other companies had not
2  conducted recalls or taken any market action
3  with respect to the issue, so it sounds to me
4  like it was something the industry was in the
5  process of coming to an understanding of at
6  that time.
7  BY MR. SLATER:
8      Q.   Most important -- rephrase.
9          At the very end he says, "So
10  leaders please pay attention to this issue."
11  That is a very responsible thing to say in
12  this e-mail, alerting the others that receive
13  this e-mail of this situation with the
14  creation of NDMA and the fact that it's a
15  common problem in the production and
16  synthesis of sartan APIs.  It's responsible
17  for him to tell the leaders in his company to
18  take note of this situation, right?
19     A.   Yes.
20         MR. FOX:  Objection to form.
21  BY MR. SLATER:
22     Q.   And in fact, the leaders of the
23  company, right up to the highest executive,
24  would have the ultimate responsibility for

Page 230

1  this quality problem, right?
2        MR. FOX:  Objection to form.
3      A.    Yes.
4  BY MR. SLATER:
5      Q.    And you've actually written on
6  that subject and published on that subject,
7  correct?
8      A.    Yes.
9      Q.    You would agree with me as a
10  matter of GMP that the information in this
11  e-mail could not be ignored; it needed to be
12  aggressively evaluated by the so-called,
13  quote-unquote, leaders as soon as it was
14  brought to their attention, right?
15        MR. FOX:  Objection to form.
16      A.    Yes.
17  BY MR. SLATER:
18      Q.    And we know in retrospect that
19  what Dr. Lin said about the valsartan
20  quenching creating the NDMA and this being a
21  common problem in the production and
22  synthesis of sartan APIs, we know in
23  retrospect he was 100 percent correct about
24  those statements.  You've seen that in the

Page 231

1  materials you've reviewed for this case,
2  right?
3        MR. FOX:  Objection to form.
4      Argumentative.
5      A.    Ultimately that information was
6  developed, yes.
7  BY MR. SLATER:
8      Q.    Are you stunned to see this
9  e-mail, and to see that this information was
10  being circulated within ZHP as of July 2017?
11  Because you said it's the first time you've
12  become aware of that.
13        MR. FOX:  Objection to form.
14  BY MR. SLATER:
15      Q.    Are you stunned, shocked,
16  surprised?  What word would you put on it?
17      A.    I wouldn't say stunned.  It
18  sounds to me like an appropriate notification
19  based on some information that is outlined in
20  the e-mail.
21        It's a few months before --
22  actually about -- let's see here, about 10 or
23  11 months before the recall, and these things
24  are -- complex scientific issues like this

Page 232

1  don't get resolved overnight.
2        I don't know what was done
3  about this, whether this was a triggering
4  point for further work that culminated in the
5  notification to FDA and the recall, or what.
6        But it certainly is responsible
7  for Dr. Lin to have made this notification,
8  and it looks like he made it to the right
9  people.
10      Q.    We know, again in retrospect,
11  that what Dr. Lin said is accurate, and we
12  know that he must have had a way to know it
13  because -- well, rephrase.
14        You're certainly not taking the
15  position that he just came up with this out
16  ███████████████████████████████
17  ███████████████████████████
18  █████████████████████████████
19  ████████████████████████████████
20  ██████████████████████████████████
21  ███████████████████████████
22  ██  ████  ████
23        MR. FOX:  Objection.
24        MR. SLATER:  Chris, let's go to

Page 233

1  the article in the Quality Management
2  Essentials publication that I just
3  mentioned a moment ago indirectly,
4  please.
5        And I'm not sure what exhibit
6  number would this be for the record,
7  if anybody knows.
8        MR. GEDDIS:  That would be
9  Exhibit 5.
10        (Whereupon, Chesney Exhibit
11  Number 11 was marked for
12  identification.)
13        MR. FOX:  Which exhibit is this
14  on the screen?
15        MR. SLATER:  I think I was just
16  told Exhibit 5.
17        MR. FOX:  So this has not been
18  used before.
19        MR. SLATER:  This has not been
20  used before.
21  BY MR. SLATER:
22      Q.    And you recognize this
23  publication, Quality Management Essentials,
24  Expert Advice on Building a Compliant System?

Page 234

1  You recognize this publication from 2018,
2  correct?
3      A.    I don't recognize the artwork,
4  but I recognize the title, yes.
5      Q.    And if we go to the third page,
6  the Table of Contents, we can see that you
7  actually wrote an article that was included
8  in this publication titled Executive
9  Responsibility for Quality, correct?
10     A.    Yes, that's correct.
11     Q.    Let's go to your article which
12  comes right after that.  And this is
13  titled -- rephrase.
14          Your article is titled
15  Executive Responsibility for Quality, and I
16  want to go to the section titled Importance
17  of Quality just below that.
18          MR. SLATER:  Chris, could you
19      make it a little bigger, please?
20      Perfect.
21     A.    That's fine.
22     Q.    This says, "Importance of
23  Quality.
24          "Executive commitment to

Page 235

1  quality in the pharmaceutical industry is
2  critical, not only to ensure continuing
3  profitability of the company, but also for
4  the safety and well-being of patients and to
5  meet the needs of healthcare providers who
6  prescribe and use pharmaceutical products
7  every day."
8          That's what you wrote, correct?
9      A.    Yes.
10     Q.    The primary concern has to
11  always be the safety and well-being of
12  patients, right?
13     A.    Yes.
14     Q.    It would never be acceptable
15  for ZHP or any other company to place profits
16  over safety, right?
17          MR. FOX:  Objection to form.
18     A.    I agree with that.
19  BY MR. SLATER:
20     Q.    For example, if it turned out
21  that ZHP was making so much money with the
22  zinc chloride process to manufacture
23  valsartan API that they chose to keep secret
24  from its customers and the regulatory

Page 236

1  authorities that they knew there was NDMA in
2  the valsartan because they were so enamored
3  with the profits they were making and put
4  that ahead of the safety of people using
5  those pills, that would be reprehensible,
6  right?
7          MR. FOX:  Objection to the
8      form.  Argumentative, no foundation,
9      beyond the scope of his expertise.
10     A.    It would be of great concern,
11  yes.
12  BY MR. SLATER:
13     Q.    It would be reprehensible,
14  right?
15          MR. FOX:  Objection.  Same
16      objection.
17     A.    That's a value judgment word.
18  I prefer more precise terminology.  But it
19  would not be a good thing.
20  BY MR. SLATER:
21     Q.    Going down a little further to
22  the fourth full paragraph under Importance of
23  Quality, there's a paragraph that says, "For
24  these reasons, quality assurance (QA) and GMP

Page 237

1  compliance may be viewed differently in the
2  pharmaceutical industry than in those
3  industries where a reputation for high
4  quality drives sales.  Quality assurance may
5  be viewed as a 'cost of doing business' or an
6  internal 'police department' issuing
7  directives that delay or prevent product
8  release.  That viewpoint can result in a low
9  priority being assigned to quality operations
10  and resourcing, which can lead in turn to
11  quality problems, regulatory difficulties,
12  unnecessary expense, adverse publicity,
13  lawsuits and investor disappointment.  All
14  these consequences are preventable if
15  executive managers understand the importance
16  of the quality assurance function and treat
17  it as a critical business operation just like
18  other critical areas, such as strategic
19  planning, financial management and others."
20          That's what you wrote because
21  you believed it to be true, correct?
22     A.    Yes, sir.
23     Q.    Let's go now to the next page.
24  There's a heading that says Regulatory

Page 238

1 Considerations. And you wrote, "In addition
2 to the business benefits, health regulatory
3 agencies around the world both require and
4 expect top management to support a strong
5 quality assurance function for their
6 companies."
7         Top management would include,
8 for example, the chairman of ZHP, Mr. Baohua
9 Chen; he would fall within the context of top
10 management, right?
11     A.    Yes.
12         MR. FOX: Objection.
13         I'm sorry, Adam, I didn't hear
14     the name that you mentioned.
15         MR. SLATER: I said Baohua
16     Chen. Mr. Baohua Chen.
17 BY MR. SLATER:
18     Q.    You then go through, after
19 introducing this section, a couple of cases
20 from the US Supreme Court that addressed the
21 executive responsibility for certain
22 regulatory violations, correct?
23     A.    Yes.
24     Q.    The first case you talk about

Page 239

1 is US versus Dotterweich where you say that
2 "Mr. Dotterweich's company, Buffalo
3 Pharmacal, was inspected by the FDA,
4 resulting in direct adulteration and
5 misbranding findings. The FDA criminally
6 prosecuted Mr. Dotterweich and the company,
7 charging that as president, he was ultimately
8 responsible for the company's actions and
9 therefore should be found guilty of violating
10 the law."
11         And you put that in the article
12 because you found that to be a significant
13 case and a significant cautionary tale,
14 correct?
15     A.    Yes.
16     Q.    You said, "Following a District
17 Court case and subsequent appeal, the Supreme
18 Court ruled on his case and concluded that as
19 president, he could be held responsible for
20 the acts of the corporation even though he
21 did not know of the violations and did not
22 intend for them to occur. This has become
23 known in the US as the Doctrine of Strict
24 Liability, or 'Responsible Corporate Officer'

Page 240

1 doctrine. It applies to those who, in the
2 words of the Court, '...stand in a
3 responsible relationship to the acts of the
4 corporation.'"
5         And again, you stated this
6 because you're cautioning the executives in
7 pharmaceutical companies to take their
8 quality obligations very seriously, right?
9     A.    Yes.
10     Q.    You then talk about the Park
11 case, US v. Park, and you say in part, "Like
12 Mr. Dotterweich, Mr. Park defended himself by
13 claiming that he was not involved in the
14 conduct that violated the law and that he had
15 delegated authority to 'dependable
16 subordinates' he trusted to do the right
17 thing."
18         And a little further down you
19 actually quote from the majority opinion from
20 the Supreme Court stating, "The Act imposes
21 not only a positive duty to seek out and
22 remedy violations when they occur but also,
23 and primarily, a duty to implement measures
24 that will ensure that violations will not

Page 241

1 occur.
2         "The requirements of foresight
3 and vigilance imposed on responsible
4 corporate agents are beyond question
5 demanding and even onerous, but they are no
6 more stringent than the public has the right
7 to expect. We are satisfied that the Act
8 imposes the highest standard of care and
9 permits conviction of responsible corporate
10 officials, who in light of this standard of
11 care, have the power to prevent or correct
12 violations."
13         And you quoted that language
14 because you felt it to be, again, not only a
15 cautionary tale, but right on point to get
16 the attention of executives, correct?
17     A.    That's right.
18     Q.    When you talk about demanding
19 and even onerous obligations and the highest
20 standard of care, those statements would
21 apply to ZHP, too, right, and their
22 executives, correct?
23         MR. FOX: Objection to form.
24     Calls for conclusion.

Page 242

1    A.   In my opinion they apply to
2  anyone in the FDA-regulated industries.
3  BY MR. SLATER:
4    Q.   Looking now on page 5, if you
5  could.  Towards the bottom, you provide at
6  the bottom, you say, "some general
7  suggestions that apply to all companies in
8  this industry, regardless of size or
9  complexity."
10    And number 1, you say,
11  "Executive managers must recognize the
12  criticality of a strong quality assurance
13  organization and quality system to patient
14  safety and to the company's business
15  success."
16    And that's an important
17  foundational point, right, that QA has to be
18  prioritized?  Right?
19    A.   Yes.
20    Q.   Looking at number 2, "Quality
21  management must be seen as similar to other
22  critical business management activities
23  executives participate in, such as strategic
24  planning, budget management, succession

Page 243

1  planning and other areas."
2    And then number 3, you say,
3  "Executive management teams must support
4  their QA organization with authority and
5  resources that are equal to the
6  responsibility they have."
7    And then you say a little
8  further down that the structures within the
9  company "must assure that the quality unit
10  can make decisions without undue influence
11  from other organizational components and
12  avoid conflict of interest."
13    Again, these are all what you
14  believe to be very important points for any
15  responsible company to follow, correct?
16    A.   Yes, that's correct.
17    Q.   Number 4, you wrote, "Executive
18  management must establish a strong quality
19  policy that makes it clear the company is
20  committed to consistently producing
21  high-quality products that perform clinically
22  as intended.  Day-to-day statements and
23  actions of top level executives must
24  demonstrate that this commitment is real, not

Page 244

1  just words on paper."
2    I wanted to ask you about the
3  "words on paper" part, because that jumped
4  out at me when I read this.
5    That's an important point to
6  you, that it's not enough just to put these
7  policies in writing, but you actually have to
8  be committed to following through with them
9  and taking these obligations seriously,
10  right?
11    MR. FOX:  Objection to form.
12    A.   Yes.
13  BY MR. SLATER:
14    Q.   Number 5, you say, "As with
15  other management responsibilities, executive
16  teams must be kept aware of the performance
17  of the quality system and of any emerging
18  problems that are being dealt with."
19    MR. FOX:  Is that a question?
20  BY MR. SLATER:
21    Q.   That's another important point
22  that you felt needed to be communicated to
23  executive management in pharmaceutical
24  companies, correct?

Page 245

1    A.   Yes.
2    Q.   And I think overall what I'm
3  hearing here is that the top level management
4  has to essentially make very clear to
5  everyone in the company that quality is very
6  important, safety is very important, and it
7  should never be minimized and never be put
8  aside for considerations of profit, correct?
9    MR. FOX:  Objection to form.
10    A.   Yes, correct.
11  BY MR. SLATER:
12    Q.   Did you read in the FDA
13  documents where Jung Du told the FDA
14  investigator that the zinc chloride process
15  allowed them to increase their yield and
16  lower their cost, and to thus dominate the
17  world market for valsartan?
18    Did you see that statement?
19    A.   Yes, I did.
20    Q.   That's a concerning statement
21  to you, isn't it?
22    MR. FOX:  Objection to form.
23  Calls for speculation.
24    A.   Well, it's a statement that's

Page 246

1 not unreasonable to make if there are
2 benefits to -- you know, enhancing the
3 process for those reasons, that's fine, as
4 long as these other principles we've been
5 discussing are given proper consideration.
6 There's nothing wrong with improving a
7 process, there's nothing wrong with being
8 profitable for that matter, provided that
9 these other principles are respected.
10 BY MR. SLATER:
11     Q.    With regard to the e-mail I
12 showed you from July of 2017, matched up
13 against what Jung Du told the FDA
14 investigator, does that cause you some
15 concern about whether or not ZHP kept secret
16 its knowledge that there was NDMA in their
17 valsartan because they were making so much
18 money?
19         MR. FOX:  Objection.  Calls for
20 speculation.
21     A.    I don't see any connection on
22 the surface of it.  I think that e-mail by
23 itself certainly is the type of upward
24 communication that I'm talking about here

Page 247

1 that should be made on a regular basis.  But
2 there are many questions about what was then
3 done about it, how complete and accurate its
4 foundation was and all that.
5         But that's exactly the sort of
6 thing that should be -- questions that should
7 be asked when someone like Dr. Lin raises
8 that kind of an issue to upper management.
9 BY MR. SLATER:
10     Q.    If a decision was made not to
11 investigate in any detail this issue and not
12 to disclose it in any reports or to anybody
13 because of the profits that were being made
14 with this valsartan API, that would be a
15 very, very serious problem, right?
16         MR. FOX:  Objection to form.
17 Calls for speculation, argumentative.
18     A.    I've certainly seen no evidence
19 that that was the case.  But if it was the
20 case, then yes, it would be of concern.
21 BY MR. SLATER:
22     Q.    Going now to the Summary at
23 the -- one second actually.
24         Looking at the next section, it

Page 248

1 says, "Common Mistakes Executive Teams Make,"
2 number 3 you wrote, "Emphasizing production
3 quotas and market demands to the extent that
4 quality problems are overlooked or regarded
5 as unimportant - worst case, deliberate
6 coverup of known quality problems through
7 falsification of records."  I'm going to stop
8 there.
9         When you say, "worst case,
10 deliberate coverup of known quality problems
11 through falsification of records," you're
12 saying that would be as bad as it gets pretty
13 much, right?
14     A.    Yes.
15     Q.    Are you aware that -- well,
16 rephrase.
17         To the extent that ZHP knew
18 there was NDMA in its valsartan as of July
19 2017 or earlier, yet continued to represent
20 to customers and regulators and the world
21 that what they were selling was valsartan of
22 the expected quality and the expected purity
23 and didn't disclose the NDMA deliberately,
24 that would be as bad as it gets, right?

Page 249

1         MR. FOX:  Objection to form.
2 BY MR. SLATER:
3     Q.    If that happened, that's as bad
4 as it gets, right?
5         MR. FOX:  Objection to form.
6 Lacks foundation, calls for
7 speculation.
8     A.    I don't see enough in the
9 July 2017 e-mail to enable me to conclude
10 with finality that the premise of your
11 question is accurate.
12         There certainly are some
13 concerns expressed there that are appropriate
14 to express, they're being expressed to the
15 right people.  But full background and all
16 the facts would have to be delved into with
17 considerable effort in order to reach a
18 conclusion that would have that much impact.
19 BY MR. SLATER:
20     Q.    If the conclusion that I
21 postulated were the facts, you would agree
22 that that would be about as bad as it gets,
23 right?
24         MR. FOX:  Objection to the

Page 250

1    form.  Calls for -- it's
2    argumentative.
3        A.    Once again, if after a complete
4    investigation considered all the facts, if it
5    was established and proven based on objective
6    evidence that information existed that was
7    known was deliberately covered up or anything
8    was falsified, then that would be a very
9    serious violation, yes.
10   BY MR. SLATER:
11       Q.    Looking now at the Summary, you
12   talked about the fact that there is a
13   "growing consensus about the most critical
14   quality management concepts."  And you say,
15   "First among those is that executive
16   management teams are the key to a company's
17   ability to successfully meet quality
18   standards on a consistent basis.  Doing so is
19   critical to proper clinical performance of
20   the products of this industry and therefore,
21   ultimately, to global public health."
22           And you would apply those --
23   that point to ZHP?  Those points would apply
24   to ZHP, right?

Page 251

1        A.    I'm sorry, Adam, can you just
2    have that repeated?  It got garbled.
3        Q.    This would apply to ZHP,
4    correct?
5            MR. FOX:  I'll object to the
6        form because I didn't hear it.
7    BY MR. SLATER:
8        Q.    I read the -- I'll do it again.
9            You say in the Summary that
10   certain -- rephrase.
11           You say in the Summary that
12   there's a "growing consensus about the most
13   critical quality management concepts.  First
14   among those is that executive management
15   teams are the key to a company's ability to
16   successfully meet quality standards on a
17   consistent basis.  Doing so is critical to
18   proper clinical performance of the products
19   of this industry and therefore, ultimately,
20   to global public health."
21           And you would agree that within
22   ZHP, the ultimate responsibility lies with
23   the executive management team, correct?
24           MR. FOX:  Objection to form.

Page 252

1        A.    Yes, I would agree it applies
2    to ZHP and everybody else in the industry.
3    BY MR. SLATER:
4        Q.    Let's go to the last page,
5    please.  It's there already, sorry.
6            The last paragraph of this
7    article says, "Prudent management teams
8    recognize this and support their quality
9    units both philosophically and materially,
10   with strong policies backed up by consistent
11   actions, authority and resources.  Failure to
12   do so may have both serious business
13   consequences for the company and potentially
14   even personal consequences for individual
15   executives."
16           Again, that's a statement that
17   you believe would hold true for ZHP and any
18   company in this industry, right?
19       A.    Yes, any company in this
20   industry.
21       Q.    Going back to the events of
22   2017, if ZHP knew that there was NDMA in its
23   valsartan as of at least July 2017, yet
24   continued to manufacture that valsartan with

Page 253

1    the zinc chloride process, didn't change
2    anything, didn't tell anybody, every pill
3    manufactured with that process would be
4    adulterated, right?
5            MR. FOX:  Objection to form.
6        A.    I'm sorry, I'm giving some
7    thought to the way you phrased that, not the
8    concept, but just the phraseology.
9            If there was proven evidence
10   that the process was contributing NDMA at
11   harmful levels, and they allowed that to
12   continue and continued to sell the product,
13   and particularly if there was any deliberate
14   effort to conceal that, then yes, that would
15   be very serious.
16           MR. SLATER:  If you guys need a
17       break, this would be a good point
18       because I'm going to shift to
19       something else.  But if you don't need
20       a break, I can do it.
21           MR. FOX:  Let's take a break,
22       Adam, because I have to take care of
23       something else for a few minutes, too.
24       A.    I need a couple minutes.

Page 254

1    How much time do you want to
2  take here?
3          MR. FOX:  About 3:15?
4          THE WITNESS:  Okay.  What time
5  is it now?
6          MR. SLATER:  That's fine.
7          THE WITNESS:  Okay.  3:15 is
8  good.
9          MR. SLATER:  Thank you.
10         THE VIDEOGRAPHER:  The time is
11  2:54 p.m.  We are off the record.
12         (Whereupon, a recess was
13  taken.)
14         THE VIDEOGRAPHER:  The time is
15  3:23 p.m.  We are back on the record.
16  BY MR. SLATER:
17     Q.    Mr. Chesney, have you seen any
18  indication in anything you've seen that ZHP
19  has ever notified the FDA about the contents
20  of the July 2017 e-mail we discussed earlier?
21         MR. FOX:  Objection to form.
22     A.    The existence of the e-mail
23  itself?
24         ///

Page 255

1  BY MR. SLATER:
2     Q.    Well, the contents we've been
3  talking about, including that there was NDMA
4  in valsartan --
5     A.    Well, the --
6     Q.    -- how it was being created at
7  the quenching of the sodium azide, the sodium
8  nitrite, and that it was a common problem
9  with sartan APIs?
10         MR. FOX:  Objection to form.
11         Argumentative, lacks foundation.
12     A.    There was extensive back and
13  forth with the FDA.  ZHP submitted a
14  tremendous amount of scientific data.  FDA
15  asked questions, ZHP responded.  I've seen a
16  lot of that.  Some of it may have contained
17  information that was foundational to that
18  July of '17 e-mail or may not.
19         But the existence of the e-mail
20  itself, I haven't seen reference.  It's just
21  the information that it refers to may have
22  been wrapped up and included in some other
23  discussions that were held with the FDA.
24         ///

Page 256

1  BY MR. SLATER:
2     Q.    I understand you're saying
3  maybe it was, but nothing you can recall
4  seeing as you sit here now, right?
5     A.    No, and nothing specific about
6  that particular e-mail.
7     Q.    Did you see any indication in
8  anything you reviewed where ZHP suggested to
9  the FDA or anybody else that it was known
10  internally that there was NDMA in valsartan,
11  and that this was caused by the quenching of
12  the sodium azide with the sodium nitrite,
13  that that was known before June of 2018?
14  Have you seen anything indicating they ever
15  told that to anybody?
16         MR. FOX:  Objection to form.
17         Lacks foundation, argumentative.
18     A.    Again, I would have to look at
19  the correspondence back and forth to refresh
20  my memory as to what happened when and what
21  they told the FDA about the timeline.  But as
22  I sit here, I can't recall anything.
23  BY MR. SLATER:
24     Q.    I'm going to jump through a

Page 257

1  couple of things with you.
2         One of the things I noticed in
3  your report was that you said that the time
4  period that you focused on was August 2013 to
5  October 2019, other than, I think, one
6  complaint from 2010 that you found on the FDA
7  website.
8         Do I understand that correctly?
9     A.    Not exactly.  That wasn't a
10  complaint on the FDA website.  It was a
11  record of a prior inspection.  And there
12  was -- you know, that was not within that
13  bracketed time period.
14         But the majority of the
15  documents I reviewed were within that
16  bracketed time period.
17     Q.    Do you have any
18  understanding -- rephrase.
19         Why would the time period you
20  were looking at beginning 2013 when the
21  manufacturing process change was vetted and
22  evaluated in 2011?
23     A.    Well, the primary remit I was
24  given was to opine on what the record showed



Page 258

1  for ZHP's GMP compliance status, and most of
2  the records that I was supplied, the vast
3  majority of them, began in 2013 and ran up
4  until that latter date.
5          I was able to extract from the
6  FDA website a couple earlier references, and
7  at least one later one when the warning
8  letter was closed out formally by the agency.
9  But most of it was in that time period.
10

Page 260

23  BY MR. SLATER:
24      Q.    You talked a lot about the

Page 259

Page 261

1  events after the 483s, the warning letter,
2  and the establishment inspection report.  You
3  talked a lot about what happened after that,
4  and talked about the fact that, well,
5  eventually they got a closeout letter, and
6  eventually they got the import alert over
7  three years later.  You talked about that in
8  your report, right?
9      A.    Yes.
10      Q.    The point is that there were
11  violations the FDA found, and then those
12  violations had to be remedied on a going
13  forward basis.  And that's what you're
14  talking about would happen on a going forward
15  basis; you're not saying that these
16  violations didn't exist before, right?
17          MR. FOX:  Objection to the
18      form.  Assumes facts not established.
19      A.    One of the contributing factors
20  I'm sure in that three-year delay you alluded
21  to was the COVID pandemic.  FDA's action in
22  closing out the warning letter probably could
23  have been done much more promptly had it not
24  been for that.  That slowed down a lot of

Page 262

1 things at the FDA. In fact, they're still
2 dealing with the backlog caused by that, so
3 that may have been one contributing factor.
4        You know, that whole process of
5 bringing the warning letter to the fore,
6 issuing that, taking the import alert action
7 and clearing all those things up, those
8 things happen very slowly in normal times,
9 and with the intervention of the pandemic,
10 I'm sure it slowed it even further.
11 BY MR. SLATER:
12     Q.    Aside from the timing of how
13 long it took, the fact of the matter is that
14 the FDA found some violations, and then ZHP
15 had to take steps to remedy those situations
16 before it could get a closeout letter and get
17 off the import alert, correct?
18     A.    With respect to the warning
19 letter, the FDA's formal position is that
20 that's an advisory action, not a final agency
21 determination of noncompliance.
22        And what they characterized
23 those items in the warning letter as
24 internally is observations of regulatory

Page 263

1 significance. They don't term them to be
2 violations because they've not truly been
3 adjudicated at that point in time.
4     Q.    I did some reading, and my
5 understanding is that the warning letter is
6 actually a very serious document because the
7 assumption is it's going to get the attention
8 of the company and get the company to fix the
9 situation so that the FDA doesn't have to
10 escalate to direct legal action in court.
11     A.    That's correct. I didn't say
12 it wasn't a serious event. It is a serious
13 event. It's just that the agency's official
14 position is that it is an advisory
15 notification intended to stimulate, bring
16 about voluntary corrective action, and also
17 to serve as prior notice in the event they do
18 have to escalate, then they can make showing
19 that they gave the company the opportunity to
20 correct things voluntarily.
21     Q.    For the companies, for example,
22 that you consult on -- rephrase.
23        For the companies you consult
24 with, when they get a warning letter, you

Page 264

1 take that very seriously and you make it
2 clear to those companies to take them very
3 seriously, right?
4     A.    Without question, yes.
5     Q.    I mean, a warning letter is not
6 something that happens every day, and it's a
7 big event in a company's lifecycle that they
8 have to really focus on and deal with very,
9 very seriously, right?
10     A.    A warning letter is not
11 something that happens every day to a
12 company, but it's something that happens
13 every day at the FDA. They're not uncommon
14 events.
15     Q.    I guess really, I think we've
16 talked about through, but I got the sense
17 that maybe there was a suggestion that a
18 warning letter, because it's not a binding
19 legal action, that it somehow has some kind
20 of minimal significance. That's not what
21 you're saying?
22     A.    Oh, no, not at all. I'm sorry
23 if I conveyed that impression. That was not
24 what I intended.

Page 265

1     Q.    We're going to digress into
2 something really random right now, which is
3 to clear something up actually.
4        MR. SLATER:  Chris, do you have
5     the Exhibit B addendum to the reliance
6     list?  I just realized I never marked
7     it as an exhibit.  The addendum we got
8     the other day.
9        MR. FOX:  What is this?
10        MR. SLATER:  I'm sorry, what?
11        MR. FOX:  Okay.
12        MR. SLATER:  I think, Chris,
13     this is Exhibit 12 now, right?
14        MR. GEDDIS:  Yes.
15        MR. SLATER:  Okay.  Just for
16     everybody to know, we had talked about
17     what exhibit numbers there were.  The
18     exhibits have been getting marked
19     sequentially in the deposition.  Even
20     though a lot of them had numbers from
21     prior depositions, we've marked them
22     for purposes of this deposition as
23     well so that we know which ones were
24     actually used here, so they're marked

Confidential Information Subject to Protective Order

Page 266

1    specific to this deposition as well.
2    So this is Exhibit 12.
3         (Whereupon, Chesney Exhibit
4    Number 12 was marked for
5    identification.)
6    BY MR. SLATER:
7    Q.    Mr. Chesney, we were provided
8    this the other day, a list of additional
9    references as an addendum to Exhibit B.
10        Are these materials that you
11   have read?
12   A.    Not in their entirety.  At the
13   onset of this engagement I accessed a number
14   of things that were publicly available just
15   to get some context and bring myself a little
16   bit more up to speed on what was going on
17   with the nitrosamine issue.
18        So these are things that I've
19   pulled from various sources, took a look at,
20   took what I could get from them, more for
21   orientation and contextual purposes and not
22   for specific reliance during the formation of
23   the opinion I submitted in this matter.
24   Q.    Were these materials that you

Page 267

1    had available -- rephrase.
2         Are these materials that you
3    had at least looked at before you signed your
4    report --
5    A.    Yes.
6    Q.    -- or things you looked at
7    after?
8    A.    Yes.  I looked at them, most of
9    them, at the very beginning of this
10   engagement back, whatever it was, in June of
11   2021 when I first started doing the work,
12   just to get a sense of the issues and what
13   some of the guidance documents were that FDA
14   and others have come out with on this topic.
15   Q.    Okay.  In terms of the
16   methodology that you followed here -- well,
17   rephrase.
18        In terms of your normal
19   methodology, if I understood before, normally
20   what you would do when you're evaluating the
21   GMP compliance status for a particular
22   manufacturer would be to evaluate the
23   relevant documents that are available, the
24   internal standard operating procedures that

Page 268

1    would apply, and I think also you said you
2    would do this in a multidisciplinary way
3    where you would rely on subject matter
4    experts with regard to the scientific
5    questions to give input that you could then
6    rely on to give an opinion.
7         I don't mean to oversimplify,
8    so if you want to tell me a little more you
9    can, but that was generally my understanding
10   of your methodology for evaluating GMP
11   compliance status.
12   A.    Well, let me expand that
13   thought a little bit, if you may.
14        If I'm doing this for a client
15   in the sense of either an audit or any other
16   type of consultative activity, then my
17   approach would be more or less the way I
18   mentioned, looking at standard operating
19   procedures perhaps, looking at the actual
20   facility, watching operations, looking at
21   investigations they've done, and things of
22   that sort.
23        For this engagement what I was
24   provided was a lot of FDA documentation,

Page 269

1    communication from the company and so on.
2         So the way I approached it was
3    first to try to get myself a little bit of a
4    briefing on the general issues.  I had read,
5    as I mentioned before, about the NDMA issues,
6    I thought it would help if I understood a
7    little more depth about what was going on
8    here, so I accessed some of these documents
9    for that purpose.  It was just for
10   orientation.
11        Then when I got into the
12   documents themselves, I looked at them
13   through the same eyes I would have looked at
14   when I was reviewing identical kinds of
15   documents at the FDA, which I did for many,
16   many years.  And I relied to a large extent
17   on FDA's published methodology for doing the
18   same thing, which appears for the most part
19   in their compliance program guidance manual
20   which gives -- all of those programs in part
21   Roman Numeral V, gives instructions to
22   reviewers for what kinds of observations
23   should be considered significant and what
24   regulatory pathways are appropriate in

Confidential Information - Subject to Protective Order

Page 270

1  different fact situations.
2       So I apply the FDA's own
3  published methodology to determine whether
4  the establishment inspection reports were
5  appropriately classified by the agency based
6  on their own criteria.
7       I also read the establishment
8  inspection reports to determine if the
9  investigators followed the compliance program
10 requirements, collected the correct
11 information, whether their statements are
12 objective or conclusory, whether they're
13 substantiated with appended evidence.  I have
14 a number of factors that I apply that are
15 really the same that I applied when I was
16 reviewing those reports for many years in the
17 FDA.
18     Q.    So ultimately, if I understand
19 correctly, when you were evaluating the GMP
20 compliance status, you were doing it through
21 the prism of the back and forth with the FDA
22 and the FDA documents for the most part?
23     A.    Largely, yes.
24     Q.    And I think that with regard to

Page 271

1  the -- rephrase.
2       We've talked quite a bit about
3  this, so I'm not going to go back into it in
4  any detail, but with regard to scientific
5  issues, that's an area where you've told us
6  you would defer.  And since you don't have
7  that at this point you didn't offer opinions
8  in your report as to whether or not there
9  were GMP violations because you would need
10 that input before you could form that
11 opinion, correct?
12     A.    Yes, that's correct.  And
13 furthermore, the law firm I started working
14 with on this matter, we discussed that angle,
15 and I told him what my limitations were.
16 When we entered into my retention in this
17 matter, I told him there were certain
18 scientific issues that were going to come up
19 that I would not be the best expert to
20 address.
21     And they understood that, said
22 that they had other people that they were
23 working with that could provide that
24 perspective, and not for me to be concerned

Page 272

1  about that, but just to indicate in my report
2  any areas where I was, in fact, deferring to
3  others.  And I attempted to do that as I
4  wrote the report.  I think you've seen that.
5     Q.    Got it.
6     A.    Some other documents I relied
7  upon that are referenced in part in the
8  report include the FDA regulatory procedures
9  manual, and certain other publicly available
10 guidance documents that the agency has out
11 there.
12     Q.    And at this point we've also
13 talked about some documents and some
14 information you hadn't seen yet.  Ultimately
15 if you were to form an opinion, you would
16 want to be able to be assured that you had
17 the relevant documents in doing so, right?
18     A.    Well, yes.  But I believed I
19 had sufficient information there to make
20 general conclusions and form an opinion as to
21 what the overall compliance status of the
22 facility was.
23     Q.    The overall compliance status
24 as we talked about from 2013 to 2019,

Page 273

1  correct?
2     A.    That was the major focus, yes,
3  with some excursion back to as early as 2010.
4     Q.    That excursion was to one
5  investigation, or one inspection?
6     A.    Yes, that's right.  I think
7  there was also -- well, no, I guess that
8  would be within the time frame that I
9  bracketed.
10     I think there was another
11 inspection that -- in one of the
12 establishment inspection reports, the FDA
13 person made a statement that the prior
14 inspection was of a certain date, and when I
15 looked at the record, the public record on
16 the FDA data dashboard, there was an
17 inspection that they weren't aware of that
18 they omitted from their text.
19     So there were a few little gaps
20 like that.
21     Q.    And overall, for you to be able
22 to form an opinion as to whether GMP was met
23 or not, if you were to do your full-blown
24 methodology, you would want to -- you would

Page 274

```
1  need to have the full relevant documents.
2  And as you've seen today, you didn't
3  necessarily have all those, the necessary
4  testimony to be able to understand what would
5  actually happen, you would need all that in
6  order to form such an opinion, correct?
7          MR. FOX:  Object to the form.
8      A.    If there are material
9  omissions, or if there were material
10 omissions in what I was given to review, I
11 was certainly unaware of that at the time.
12         And, you know, of course, if
13 things like that come to light, I become
14 aware of them, it's something I would want to
15 see.
16 BY MR. SLATER:
17     Q.    And you would need to see to be
18 able to form an opinion ultimately if it
19 exists, right?
20         MR. FOX:  Objection to form.
21     A.    Yes.  But I don't generally
22 speculate that there's something that is not
23 being provided to me.  Unless I'm trying to
24 reach a conclusion and don't have adequate
```

Page 275

```
1  information, I would not presume to ask a
2  question such as, Is there anything you're
3  deliberately withholding from me for any
4  reason, because I wouldn't assume that to be
5  the case.
6  BY MR. SLATER:
7      Q.    You assumed you were provided
8  all of the relevant documents, correct?
9          MR. FOX:  Objection to form.
10     A.    I did.  And that assumption was
11 bolstered to some extent by my comfort that I
12 had quite a bit of information from which to
13 draw an appropriate conclusion.
14         MR. SLATER:  Why don't we go
15 off the record for five minutes.  I
16 may be done, I just want to
17 double-check my notes and then we
18 can -- then I can hand it off to
19 Mr. Fox if he has questions too.
20         THE VIDEOGRAPHER:  The time is
21 3:44 p.m.  We are off the record.
22         (Whereupon, a recess was
23 taken.)
24         THE VIDEOGRAPHER:  The time is
```

Page 276

```
1  3:47 p.m.  We are back on the record.
2          MR. SLATER:  Mr. Chesney, thank
3  you.  I don't have any other questions
4  for you, unless counsel questions you,
5  in which case I may follow up on his
6  questioning.
7          MR. FOX:  I have a few
8  questions, Mr. Chesney.
9          EXAMINATION
10 BY MR. FOX:
11     Q.    Do you recall that counsel
12 showed you an e-mail from July 27, 2017,
13 ZHP 296?
14     A.    Yes.
15     Q.    And does that e-mail involve
16 scientific information of the type that
17 you're not an expert to decipher?
18     A.    Yes.
19          MR. SLATER:  Objection.
20          You can answer.
21 BY MR. FOX:
22     Q.    I'm sorry, did you answer?
23     A.    Yes, it does.
24     Q.    Now, according to --
```

Page 277

```
1  plaintiffs' counsel indicated that there had
2  been testimony taken on that document.  Are
3  you aware that there will be additional
4  testimony about that document?
5          MR. SLATER:  Objection.
6          You can answer.
7      A.    No, I wasn't aware of that.
8  BY MR. FOX:
9      Q.    Have you spoken to the author
10 of that document?
11     A.    No, I have not.
12     Q.    From the substance of the
13 document that was shown to you and that you
14 read, can you determine definitively what was
15 going on in that document?
16          MR. SLATER:  Objection.
17          You can answer.
18     A.    No.  As I said when Mr. Slater
19 asked the question earlier, there are some
20 issues there that are being brought to the
21 attention of upper management, and that
22 seemed to me an appropriate thing to do.  But
23 I cannot independently judge fully the
24 significance of the issues.
```

Page 278

BY MR. FOX:

Q. Based on your review, did that document indicate that NDMA was in valsartan API?

A. It alludes to that at one point. But there's -- you know, again, I can't determine how reliable that statement is or how well substantiated it is. Those are the kinds of questions the leadership team should be asking, and others. Once they get that notification, they should ask for a more complete briefing.

Q. Is it your normal practice to opine on company documents?

A. I'm sorry, Mr. Fox?

Q. Is it your normal practice to offer opinions on company documents?

A. Yes, some. If a client asks me to and it's within my expertise, yes.

Q. Okay. Was the document dated July 27, 2017 within your expertise?

A. No.

MR. SLATER: Objection.

You can answer.

Page 279

BY MR. FOX:

Q. You were asked questions earlier by plaintiffs' counsel about unknown peaks, correct?

A. Yes.

Q. Do you remember that testimony?

A. I remember the topic, yes.

Q. And did that topic come up in connection with an FDA inspection in May 15th to May 19th of 2017 --

MR. SLATER: Objection.

BY MR. FOX:

Q. -- at the Chuannan plant?

MR. SLATER: Objection. Lack of foundation.

A. I would have to either look at the inspection report or my report to see if there's any mention of that. My recollection is not precise on that.

BY MR. FOX:

Q. Okay. I'm going to ask you to turn to page 35 of your report.

A. Okay. Got it.

MR. SLATER: I'm sorry, what

Page 280

page did you say in the report?

MR. FOX: 35.

MR. SLATER: Give me one second. Okay.

BY MR. FOX:

Q. Do you see at the bottom of the paragraph it discusses an analysis of peaks?

A. Sorry, the bottom of the third paragraph, or...

Q. The bottom -- at the bottom of the page, the last six lines of the page.

A. Bottom of the page.

Yes, uh-huh, I have that.

Q. So is the issue of peaks a part of that inspection?

A. Apparently was, yes.

Q. And did ZHP respond to the issue raised with regard to the peaks?

A. Yes, they did.

Q. How did they respond to it?

A. Well, in at least one instance they said -- they characterized it as a, quote-unquote, "ghost peak with no product quality impact."

Page 281

Q. Do you understand why they referred to it as a ghost peak?

A. I have a general understanding. Again, I'm not an analytical chemist, I don't do these tests myself, but I have heard that reference made many, many times by pharmaceutical analysts, including those that were in my line of command at the FDA. So I have a general understanding of what it means.

Q. And you reported -- you stated in here that there was a report that in the entire year of 2016, there were nine occurrences out of nearly 95,000 batches.

Do you see that?

A. Yes.

Q. In looking at peaks, is the first step to analyze whether they're real or not?

A. Yes, usually it is.

Q. And is it a possibility that there could be aberrations in the test results?

MR. SLATER: Objection.

Confidential Information Subject to Protective Order

Page 282

1    You can answer.
2    A.    It certainly is.  That can come
3  from a number of different sources, including
4  dirty glassware, contaminated solutions,
5  laboratory error.  There a whole host of
6  possible ways that these kinds of ghost peaks
7  can appear, and that needs to be investigated
8  and resolved as one of the possible sources.
9  BY MR. FOX:
10    Q.    Did the FDA accept that nine
11  occurrences out of nearly 95,000 batches was
12  an aberration?
13        MR. SLATER:  Objection.
14        You can answer.
15    A.    I don't know what the FDA's
16  opinion about that was.
17  BY MR. FOX:
18    Q.    Well, does your report indicate
19  that the FDA's action was consistent with the
20  view that the agency accepted the scientific
21  rationale offered by ZHP?
22        MR. SLATER:  Objection.
23        You can answer.
24    A.    Let me look and see what --

Page 283

1  just let me back up for a moment here,
2  Mr. Fox.
3        Yes, this -- the classification
4  of this inspection reflects that the FDA
5  would have deemed the compliance status of
6  the facility minimally acceptable.  That's
7  their official term for that.  That generally
8  means there are a few observations, they are
9  minor and not of regulatory significance.
10        So yes, that's a fair
11  conclusion that they concurred that this did
12  not indicate anything serious.
13  BY MR. FOX:
14    Q.    And did it indicate, in your
15  opinion, that the facility at that time was
16  operating in compliance with GMP?
17        MR. SLATER:  Objection.
18        You can answer.
19    A.    Well, I base my opinion on more
20  than just this, but certainly this didn't
21  cause me to hold an opinion that they were
22  not in compliance with GMP.
23  BY MR. FOX:
24    Q.    I believe your testimony is

Page 284

1  that you don't have the scientific background
2  to make an independent judgment with regard
3  to the scientific chemistry issues raised,
4  but you're capable of understanding what the
5  FDA's perception of that scientific evidence
6  was?
7    A.    Yes.  My capabilities are
8  sufficient that if a subject matter expert
9  offers me a technical explanation, I can
10  usually follow most of it.
11        And if I have questions of
12  areas that I don't understand, then I ask
13  further followup questions.  Usually we can
14  reach accord to where they can explain it
15  adequately to my satisfaction, and I can
16  understand what they're telling me.
17        So in other words, I have a
18  modicum of understanding of these things, but
19  I am not an independent subject matter
20  expert.
21    Q.    The fact that a company
22  experiences ghost peaks that are viewed to be
23  an aberration, can a company still be
24  compliant with GMP?

Page 285

1        MR. SLATER:  Objection.
2        You can answer.
3    A.    Yes, they can.  In fact, in my
4  personal experience, this happens frequently
5  in pharmaceutical testing laboratories.
6        And my last job in the FDA when
7  I was district director for San Francisco, I
8  had a staff of approximately 50 analysts, of
9  whom 10 or 15 were pharmaceutical chemists.
10  And I know that even in the lab that was in
11  my line of command and control, this issue
12  was not infrequent.
13        So the FDA itself runs into
14  ghost peaks, they resolve them ad hoc as they
15  come up.
16  BY MR. FOX:
17    Q.    And during your -- counsel's
18  questioning of you, he showed you a couple
19  sentences here and there in a couple of
20  scientific publications, correct?
21    A.    Yes.
22        MR. SLATER:  Objection.
23        You can answer.
24        ///

Page 286

BY MR. FOX:

Q.    Is it outside of your scientific expertise, or lack thereof, to be able to make judgments concerning what was known in the scientific literature and the quality of that knowledge, given the sentences that plaintiffs' counsel showed you today?

MR. SLATER:  Objection for multiple reasons, including it's argumentative.

You can answer.

A.    I can't evaluate the technical sufficiency of those articles.  There are some portions of it that I frankly don't even independently understand, although I might understand a good deal of it.

BY MR. FOX:

Q.    Given the fact that you told counsel who retained you of your limited expertise when it comes to scientific issues, does it surprise you that you would not be provided all of the scientific data that may be involved in this case?

Page 287

MR. SLATER:  Objection.

You can answer.

A.    No, it doesn't surprise me, because one of the things -- this was one of the concerns I expressed is, Please don't expect me to be able to opine on the scientific questions.  When they come up, I will have to say that I need to defer to people with appropriate expertise, and I was informed that those people would be retained separately and would take those issues up as they arose.

BY MR. FOX:

Q.    In connection with the e-mail of July 27, 2017 that were shown you, ZHP 296, would you defer to other people for the correct interpretation of that document?

A.    Yes, I would.

MR. SLATER:  Objection.

You can answer.

A.    Yes, I would.

BY MR. FOX:

Q.    Earlier in the day plaintiffs' counsel asked you about the 2011 risk

Page 288

assessment.

A.    Yes.

Q.    And that was conducted in connection with the change in the manufacturing process?

A.    Yes.

Q.    Am I correct that you testified that you assumed that nitrosamines was a part of that risk assessment in 2011?

A.    I don't think I understood the question if I said that.  I was -- what I had in mind was the risk assessment that was done in four stages in 2018 and reported out in the response to the warning letter.  That's really what I thought we were talking about, and I may have become a little confused as to the timing.

Q.    Okay.  So you never -- you never made the assumption that nitrosamines was part of 2011 risk assessment, did you?

MR. SLATER:  Objection.

You can answer.

A.    No, I did not.

///

Page 289

BY MR. FOX:

Q.    Is there any reason why you would not make that assumption with regard to the 2011 risk assessment?

MR. SLATER:  Objection.

You can answer.

A.    The totality of the information that I had before me suggested that the industry at large was not really aware of this problem, nor had they developed robust tests to look for it until much later than that.

This appeared in the two public communications on that topic from the FDA; one I believe in the latter part of 2018, and one in January, I think it was, of 2019 where they repeatedly stated that there was not an awareness of this problem in the industry nor by regulators on a worldwide basis.

So based upon that, I would not have assumed that there was knowledge at ZHP or anywhere else in 2011.

Q.    So you're aware of statements by the FDA that indicated that it was not

Page 290

1 part of GMP to look for nitrosamines in this
2 process in 2018?
3          MR. SLATER:  Objection.
4     A.    Yes, I'm aware of those
5 statements.  And in those statements, the FDA
6 said it really wasn't feasible for them to
7 even look for that or evaluate it during
8 inspections because there wouldn't be any
9 records that they would be able to review
10 that would reflect that type of analysis had
11 taken place.
12 BY MR. FOX:
13     Q.    Are you aware of the FDA ever
14 stating that they were still not sure of the
15 root cause of the NDMA impurity in the
16 valsartan API?
17          MR. SLATER:  Objection.
18          You can answer.
19     A.    There's a statement that's
20 still being worked on, I believe, in the 2019
21 pronouncement.  The specifics escape me.  I'm
22 not looking at it right at the moment.  But
23 they did make a statement to that effect.  I
24 believe it was 2019 January statement.

Page 291

1          MR. FOX:  Why don't we put up
2 the -- why don't I put up a document
3 here.  Can we go off the record for a
4 second until I get the technology
5 down?
6          THE VIDEOGRAPHER:  The time is
7 4:02 p.m.  We are off the record.
8      (Off the record.)
9          THE VIDEOGRAPHER:  The time is
10 4:04 p.m.  We are back on the record.
11      (Whereupon, Chesney Exhibit
12      Number Defendant 1, was marked for
13      identification.)
14 BY MR. FOX:
15     Q.    Mr. Chesney, I'm showing you a
16 document of an FDA public statement made on
17 January 25, 2019.
18          Do you see that?
19     A.    Yes.
20     Q.    And this is reference 91 in
21 your report?
22     A.    I'm not looking at the
23 reference numbering list, but give me a
24 moment, I will.

Page 292

1          Yes, that's it.
2     Q.    And if I bring you down to the
3 last paragraph of this page, and I'll just
4 read it to you, it says, "Today, we want to
5 provide an update on this ongoing
6 investigation and outline the steps we've
7 taken to identify the root causes of the
8 nitrosamine impurities and to prevent a
9 recurrence of this episode in the future."
10          Do you see that sentence?
11     A.    I'm sorry, no, I don't.  What
12 I'm looking at starts "last summer."
13          Oh, there.  Okay.  "Today, we
14 want to provide an update."  Now I see it,
15 yes.
16     Q.    And so this was an update of an
17 earlier statement that the FDA made in August
18 of 2018?
19     A.    Yes.
20     Q.    And does this indicate to you
21 that they're still identifying -- trying to
22 identify the root causes of the nitrosamine
23 impurities of valsartan?
24          MR. SLATER:  Objection.

Page 293

1     A.    Yes, it says it "continues to
2 be an exhaustive effort led my a
3 multidisciplinary team," which is the point
4 I've been trying to make here today, that
5 that's typically the way things are done at
6 FDA.  So I'm not surprised by that.  A number
7 of people in collaboration with global
8 regulators.
9          And they go on to say, "While
10 we're still investigating the root causes of
11 the impurities, our ongoing effort has
12 determined that the impurities may be
13 generated when specific chemicals and
14 reaction conditions are present."
15          So they're saying the
16 investigation is ongoing, they have what
17 sounds like a hypothesis in their sights, but
18 it appears to be not yet concluded.
19 BY MR. FOX:
20     Q.    If we go to the next page, do
21 you see where it says in the beginning of the
22 page, "To implement a risk assessment for any
23 genotoxic impurity"?
24     A.    I haven't found it yet.  Sorry.

Page 294

1  Oh, there, "To implement a risk assessment."
2  All right.  I've got it.
3      Q.   And doesn't that last sentence
4  of the paragraph indicate that the FDA had
5  now just uncovered the risk of nitrosamine
6  impurities in the manufacturing steps
7  involved in ARBs?
8          MR. SLATER:  Objection.
9          You can answer.
10     A.   I'm sorry, I was still reading
11 the sentence, Mr. Fox.  Could you repeat the
12 question for me?
13 BY MR. FOX:
14     Q.   Doesn't the FDA state in
15 January 2019, quote, "Now that we've
16 uncovered the risk of nitrosamine impurities
17 in the manufacturing steps involved in ARBs,
18 we'll incorporate the findings into ongoing
19 policy development"?
20     A.   Yes, they say exactly that.
21     Q.   It says here -- do you see the
22 sentence where it says, "Tests are selected
23 based on assessments of what impurities may
24 develop as a result of the manufacturing

Page 295

1  process.  In other words, it generally needs
2  to be recognized that there's a risk of an
3  impurity occurring as a result of a
4  manufacturing process to know the impurity
5  should be tested for."
6          Do you see that?
7      A.   Yes, I do.
8      Q.   Can you read the next sentence
9  into the record, "Our investigation"?
10     A.   "Our investigation to ZHP's
11 process identified that a change made to the
12 manufacturing process likely led to this
13 impurity, and that the impurity went
14 undetected by global regulators, including
15 the FDA, for a period of time."
16     Q.   Can you read the next sentence?
17     A.   Yes.  Do you want me to read
18 the whole paragraph?
19     Q.   Sure, that would be fine.
20     A.   "Before we undertook this
21 analysis, neither regulators nor industry
22 fully understood how NDMA or NDEA could form
23 during this particular manufacturing process.
24 This is troubling to us and we know it's

Page 296

1  troubling to the public.  This concern is
2  appropriate.  Among other steps, we need to
3  take actions that would prevent a similar
4  situation from occurring.  We are making
5  important strides at understanding how these
6  impurities occurred, mitigating the risk to
7  patients and learning what steps need to be
8  taken to prevent this from occurring again in
9  the future."
10     Q.   Does this indicate -- have
11 implications for when GMP would have been
12 implicated in connection with nitrosamines?
13         MR. SLATER:  Objection.
14         You can answer.
15     A.   I'm sorry?  Was someone going
16 to interject there?
17         MR. SLATER:  I just objected to
18 the form.  You can answer.
19         THE WITNESS:  Okay.
20         Yes, it indicates to me that
21 certainly prior -- or as of the time
22 of this transmittal to the public,
23 there was enough understanding that
24 companies should be pretty well aware.

Page 297

1          Prior to that time, the
2  statement seems to say that there was
3  not general recognition that this was
4  a risk, and that, therefore, GMP would
5  not require testing for something that
6  no one had awareness could constitute
7  a risk.
8  BY MR. FOX:
9      Q.   If we go to the next page, can
10 you read the first line of the paragraph
11 beginning "During this time"?
12     A.   Sure.  "During this time, our
13 scientists have developed and refined novel
14 and sophisticated testing methods
15 specifically designed to detect and quantify
16 the NDMA and NDEA in all ARB medicines."
17     Q.   And this is something that
18 occurred between 2018 and 2019?
19     A.   Yes, because this was not the
20 case in the earlier 2018 public statement,
21 but here we have it showing us January 25,
22 2019.
23         (Whereupon, Chesney Exhibit
24 Number Defendant 2 was marked for

Confidential Information - Subject to Protective Order

Page 298

1    identification.)
2  BY MR. FOX:
3    Q.   I'm showing you now the earlier
4  statement of the FDA that was referred to.
5  Can you see that?  Do I need to lower it?
6    A.   You're going to need to shrink
7  it a little bit, because the panel with all
8  our pictures is overlapping.
9        There, now I've got it.  That's
10 fine right there.
11   Q.   This is the FDA statement of
12 August 30, 2018.
13        Do you see that?
14   A.   Yes.
15   Q.   And this describes the FDA's
16 actions after learning about the impurity in
17 the valsartan, correct?
18   A.   Yes.
19   Q.   If we go to the second page of
20 it, maybe the third page, do you see the
21 paragraph that says, "Based on information"?
22   A.   Yes.
23   Q.   Can you read that into the
24 record, please?

Page 299

1    A.   The whole paragraph?
2    Q.   Yes, please.
3    A.   Sure.  "Based on information
4  provided regarding ZHP's manufacturing
5  processes, we believed (but did not have
6  proof) that the impurity resulted from
7  changes that ZHP made to the manufacturing
8  process for its API.  We needed to identify
9  the root cause of the problem and evaluate
10 ZHP's explanation.  After assessing
11 information about ZHP's manufacturing
12 processes and the changes ZHP made over time,
13 we identified how its processes could have
14 led to the presence of NDMA in their API."
15   Q.   Can you continue with the next
16 paragraph?
17   A.   "Specifically, a combination of
18 conditions, which include certain chemicals,
19 processing conditions and production steps,
20 could lead to formation of the NDMA impurity.
21 We believe that these risks are introduced
22 through a specific sequence of steps in the
23 manufacturing process, where certain chemical
24 reactions are needed to form the active

Page 300

1  ingredient.  Before we undertook this
2  analysis, neither regulators nor industry
3  fully understood how NDMA could form during
4  this process."
5    Q.   Let me just stop you there for
6  a second.
7    A.   Okay.
8    Q.   Is that an important fact in
9  connection with judging cGMP with regard to
10 nitrosamines?
11       MR. SLATER:  Objection.
12       You can answer.
13   A.   Yes, it is, because it speaks
14 to the feasibility of doing this and the
15 general awareness in the industry of it.
16 BY MR. FOX:
17   Q.   Given this extensive -- you
18 would say the FDA's investigation was
19 extensive, correct?
20       MR. SLATER:  Objection.
21       You can answer.
22   A.   I've only reviewed the records
23 on ZHP, but their track record is pretty
24 extensive there.  I'm not sure what they did

Page 301

1  with the other manufacturers.
2  BY MR. FOX:
3    Q.   Okay.  But certainly this
4  public statement is reflecting an extensive
5  investigation that the FDA undertook of this
6  matter?
7    A.   Yes, it --
8        MR. SLATER:  Objection.  Form.
9    A.   It infers that.  It doesn't
10 describe the full scope of the investigation
11 with specifics, but it's implicit, yes.
12 BY MR. FOX:
13   Q.   Now, if you continue with the
14 paragraph that says "We are still."
15   A.   "We are still not 100 percent
16 sure that this is the root cause of the
17 problem.  Full understanding will require
18 correlation of multiple test results from
19 valsartan APIs made by different processes
20 with the various process steps used by
21 different manufacturers or at different
22 times.  We need to determine how NDMA can be
23 formed and why it is not separated from the
24 API during purification."

Page 302

1    Q.    Those statements by the FDA, is
2  that important information for you in
3  rendering an opinion with regard to
4  compliance with cGMP by ZHP?
5    A.    Yes, it is.
6    Q.    Can you read the next
7  paragraph, please?
8    A.    "Once we understand the way or
9  ways that the NDMA impurity can occur as a
10  by-product of the manufacturing process, we
11  will make sure" that these -- "make sure
12  these conditions are evaluated in API
13  synthetic processes so that, in the future,
14  testing for this impurity would be required
15  if there was a risk of NDMA formation."
16    Q.    And again, is that an important
17  factor in rendering an opinion with regard to
18  ZHP's compliance with cGMP with regard to
19  nitrosamines?
20        MR. SLATER:  Objection.
21        You can answer.
22    A.    Yes, because it lays out a
23  two-pronged test to determine if something --
24  if this is GMP or not.  One is, is there a

Page 303

1  risk of NDMA formation; and two, if so, what
2  is does the testing show.
3  BY MR. FOX:
4    Q.    Okay.  If you go down a little
5  bit further, do you see the sentence that
6  begins "We employ"?
7    A.    Yes.
8    Q.    Can you read that into the
9  record, please?
10    A.    "We employ robust teams of
11  organic chemists, as part of our newly
12  established Office of Pharmaceutical Quality,
13  to review applications and referenced
14  information to look for steps - and
15  manufacturing changes - where these risks
16  could be introduced."
17    Q.    And if you look at the last
18  sentence on the page, can you read that into
19  the record?
20    A.    "In other words, it needs to be
21  recognized that the risk of an impurity can
22  occur in order to know that it should be
23  tested for."
24    Q.    Is it fair to say that prior to

Page 304

1  this date, the FDA did not understand there
2  to be a risk of an impurity in this
3  manufacturing process?
4        MR. SLATER:  Objection.
5        You can answer.
6    A.    It is.  That's what the agency
7  states in this public statement.
8  BY MR. FOX:
9    Q.    Let's see.  I lost my place.
10        Okay.  If we go to the next
11  page here, do you see -- can you read into
12  the record the sentence beginning with the
13  word "Because" in this top paragraph?
14    A.    Yes.  Do you want me to read
15  that?
16    Q.    Please.
17    A.    Okay.  "Because it was not
18  anticipated that NDMA would occur at these
19  levels in the manufacturing of the valsartan
20  API, manufacturers would not have been
21  testing for it.  They would not have records
22  that help identify this issue during an
23  inspection.  So this particular risk would
24  not have been identified on an inspection.

Page 305

1  As we develop a better understanding of the
2  root cause of NDMA formation, and develop a
3  way to detect NDMA in valsartan or other
4  ARBs, we can ensure that appropriate testing
5  is performed in the future."
6    Q.    Again, is this an important
7  fact in determining whether or not GMP was
8  compliant in connection with nitrosamines in
9  2018?
10    A.    Yes.
11        MR. SLATER:  Objection.
12        You can answer.
13    A.    Yes.
14  BY MR. FOX:
15    Q.    And before 2018, correct?
16    A.    Yes.
17    Q.    And is it true that the FDA is
18  again stating that they're still seeking to
19  better understand the root cause of the
20  formation of this impurity?  Is that right?
21        MR. SLATER:  Objection.
22        You can answer.
23    A.    Yes.
24        ///

Page 306

BY MR. FOX:

Q.    And it's also saying in August
of 2018 that they need to find better ways to
detect it.

        MR. SLATER:  Objection.

        You can answer.

    A.    Yes.

BY MR. FOX:

Q.    Is it your testimony that the
compliance record of ZHP was in accord with
or even better than much of the industry
during the period that you reviewed?

        MR. SLATER:  Objection.

        You can answer.

    A.    Yes.  But they had many
inspections that led to no observations at
all, and most others, while they might have
had a small number of observations, they were
classified by the agency as voluntary action
indicated, which is a mid-level
classification that does not reflect a
serious state of noncompliance.

BY MR. FOX:

Q.    Did the FDA ever determine that

Page 307

the nitrosamine or NDMA present in the
valsartan was the result of a violation of
GMP?

        MR. SLATER:  Objection.

        You can answer.

    A.    I don't -- I've never seen them
make that specific correlation.  In the
warning letter they raised certain concerns,
but I don't believe they ever came right out
and made that connection.

BY MR. FOX:

Q.    So as far as you understand,
the FDA never made a determination that the
impurity existed in the valsartan as a result
of a failure to comply with GMP?

        MR. SLATER:  Objection.

        You can answer.

    A.    I never saw anything that
connected those two issues directly.

Q.    Are you aware of any GMP
violation that would render all of the
products of ZHP adulterated?

        MR. SLATER:  Objection.

Page 308

        You can answer.

    A.    Well, hypothetically I suppose
you could use your imagination and come up
with something that would be so global in
scope that it would cause that.

        But usually when that is the
case, and all the products at a given
facility come under that kind of cloud, it's
not just because of any one GMP deviation,
it's because there are multiple ones of a
systemic and repeated nature across all of
what FDA calls product classes in that
particular -- profile classes, pardon me, in
that particular facility.

BY MR. FOX:

Q.    And you have not seen that in
connection with ZHP here, have you?

    A.    No.

        MR. SLATER:  Objection.

        You can answer.

    A.    No, I haven't.

BY MR. FOX:

Q.    And did the FDA ever make a
final determination of a GMP violation by

Page 309

ZHP?

        MR. SLATER:  Objection.

        You can answer.

    A.    I believe the import alert that
they were placed on, along with many, many,
many other companies, was primarily
predicated upon GMP issues.  But again, there
was no specific linkage to the occurrence of
NDMA.

BY MR. FOX:

Q.    So was the alert due to the
potential of an impurity being in the drug?

        MR. SLATER:  Objection.

        You can answer.

    A.    The alert is very nonspecific.
It gives a general statement with respect to
GMP compliance, I believe it's one sentence,
and then there's a list of dozens and dozens
and dozens of companies that follow that are
on the import alert for that reason.  So it's
very hard to tell anything specific from the
import alert.

BY MR. FOX:

Q.    And the language that you're

Page 310

1  referring to, that's template language at the
2  top of the document?
3      A.    It is.
4          MR. SLATER:  Objection.
5          You can answer.
6      A.    It is.
7          And I might add that the
8  standard that FDA applies by statute to bring
9  an import alert action is one of an
10  appearance of a violation, not even a
11  preponderance of the evidence, let alone
12  beyond a reasonable doubt.  The standard is
13  very, very low.
14          And I'm getting that directly
15  out of the Food, Drug and Cosmetic Act
16  Section 801.  If it appears to be in
17  violation, that's sufficient to take an
18  import alert action.  It's a very low
19  standard.
20  BY MR. FOX:
21      Q.    Did the FDA ever make a finding
22  that the NDMA contamination was due to a cGMP
23  violation?
24      A.    I've never seen them connect --

Page 311

1          MR. SLATER:  Objection.
2          You can answer.
3      A.    I've never seen them connect
4  those two issues directly in anything they've
5  said in writing.
6  BY MR. FOX:
7      Q.    With regard to ZHP?
8      A.    With regard to ZHP.
9          MR. FOX:  I think that's it for
10  me, Adam.
11          MR. SLATER:  I'm going to
12  continue now, Mr. Chesney.
13          FURTHER EXAMINATION
14  BY MR. SLATER:
15      Q.    Did you read the deviation
16  investigation reports that ZHP created and
17  submitted to the FDA?
18      A.    You know, I read an awful lot
19  of information.  And to answer your question
20  whether I did or did not look at those, I
21  would have to go back and look at them again
22  just to be sure.  But I believe that I did.
23      Q.    I didn't see any discussion of
24  them in your report.

Page 312

1      A.    I read a lot of their
2  investigation information, particularly what
3  was in the response to the 483 of the 2018
4  inspection which raised most of these issues,
5  and also the warning letter that followed.
6  There was a tremendous amount of highly
7  detailed information.  One of those
8  transmittals alone was 230 pages.
9          So to the extent that
10  constituted in whole or in part the deviation
11  investigations, I can't say from memory.  It
12  was very extensive.
13      Q.    All right.  Well, I didn't ask
14  you about all that stuff.
15          I asked you if you saw the
16  deviation investigation reports, and did you
17  talk about them in your report.  I don't see
18  any discussion of them at all in your report.
19  Is there something in the report I've
20  overlooked?
21      A.    Well, I doubt that there's
22  anything in the report you've overlooked.
23          What I'm saying is what
24  constituted a deviation investigation report

Page 313

1  may well have been the information in the
2  warning letter response and other documents
3  that I reviewed.  They also included a number
4  of attachments.
5      Q.    Are you just speculating as you
6  go right now?
7      A.    No.  I'm trying to say that I
8  can't answer your question with definity
9  because I don't know what you mean when you
10  say "a deviation investigation," and I'm not
11  sure whether it was included or not included
12  in any of the materials that I did review.
13          MR. SLATER:  Okay.  Chris,
14      let's go to exhibit -- let's take down
15      whatever this is, if you could, Tom.
16          MR. FOX:  Sorry.
17          MR. SLATER:  That's okay.
18          Chris, this might take a
19      second, but could you put up
20      Exhibit 204, please, the deviation
21      investigation report prepared July 20,
22      2018?  That's 20 -- oh, you know what,
23      you have the -- that's what I want.
24          ///

Confidential Information Subject to Protective Order



Page 314

1  BY MR. SLATER:
2      Q.    Does this document look
3  familiar to you?  It's Exhibit 204 from a
4  prior deposition.
5      A.    I don't recognize it
6  immediately.
7      Q.    All right.  Because you were
8  saying something about some generic deviation
9  investigation report, and you said you didn't
10 know what it was.  I'm showing you, that's
11 the actual title of a document.
12     A.    I understand that.
13     Q.    It's very simple.  Hang on.
14     A.    No, it's not that simple.  I
15 reviewed other documents that contained
16 attachments such as standard management
17 procedures and things like that.
18           And when you asked me the
19 question before, I didn't know whether this
20 was one that might have been included in one
21 of those other packages, or I may have seen
22 it but just not as a standalone document.
23     Q.    I saw no discussion of this
24 document at all in your report.  Is there

Page 315

1  something in there that I may have
2  overlooked, or am I correct that you didn't
3  discuss this document at all?
4      A.    Not as a standalone document,
5  no.  And the data --
6      Q.    That's all I asked you, though,
7  so I don't need an explanation beyond that,
8  okay?
9      A.    Okay.
10           MR. SLATER:  Let's go to ZHP,
11 the last four digits are 4386, Chris.
12 It's 22 of 33.
13     A.    Is this the same report, or is
14 this something different?
15     Q.    It's the same report.
16           MR. SLATER:  Can you blow up
17 the bottom part, Chris, under
18 Section 3.8 with that heading?
19 Perfect.
20

Page 316

1

Page 317

1

Page 318

BY MR. SLATER:

Q.    Now, you were asked some questions about ghost peaks. Do you know what a ghost peak is? Do you know how that's defined?

A.    I know that they occur frequently. And as I said before, this is not something I do for a living. I've just heard the term used very often to describe unidentified peaks, they're usually not very large in terms of quantity that may arise from any of a number of different factors and require some investigation to resolve.

Q.    Do you know the difference between a ghost peak and an aberrant peak?

A.    No.

Q.    Do you know if all unknown peaks are ghost peaks?

A.    No, I think when -- you call something a ghost peak when it's not possible to define with specificity what's causing it, and there are a number of different possible contributing factors that requires an

Page 319

investigation to try to iron that out.

Q.    You're guessing at the definition when you just said that, right? You don't know if you're right?

A.    I'm telling you what my understanding is. If my understanding is incorrect, then so be it. But that term has been used to me for a number of years, and the context has usually been that.

Q.    I'm not going to go through those FDA statements that counsel had you read, but I want to ask you a question.

There was a point where the FDA was explaining why they didn't find the problem with the NDMA in the valsartan on their inspections.

Do you remember you were reading that part?

A.    Yes.

Q.    You understand we're not suing the FDA here; we're suing ZHP, right?

A.    Of course.

Q.    Okay. And if -- rephrase. And if the manufacturer -- rephrase.

Page 320

You said in your report that the FDA primarily relies upon drug manufacturers to voluntarily follow the law, right?

A.    Yes.

Q.    That's how the system works, is the companies are supposed to follow the regulations and follow their SOPs so that things like this don't happen, right?

MR. FOX: Object to the form. Argumentative.

A.    Yes.

MR. SLATER:  Chris, let's go, if we could, to the Warning Letter, ZHP 213, the November 29, 2018 Warning Letter. Thank you.

(Whereupon, Chesney Exhibit Number 13 was marked for identification.)

BY MR. SLATER:

Q.    You've seen this document, correct?

A.    I have.

Q.    And right there on the first

Page 321

page in the second sentence it says, "This warning letter summarizes significant deviations from current good manufacturing practice (CGMP) for active pharmaceutical ingredients (API)," right?

A.    Yes.

Q.    And then the next paragraph says, "Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, your API are adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug and Cosmetic Act, 21 USC 351(a)(2)(B)," right?

A.    Yes.

Q.    And then the FDA says that they reviewed the August 26, 2018 response from ZHP to the 483s, and acknowledged receipt of your subsequent correspondence, right?

A.    That's right.

Q.    Let's go through number 1 a little bit. "Failure of your quality unit to ensure that quality-related complaints are investigated and resolved." It says,

Confidential Information — Subject to Protective Order

Page 322

"Valsartan API."

You've read this paragraph, right?

A.   I have.  And I've also read ZHP's response to all this to get some balance to the situation.

Q.   Did I ask you about ZHP's response?

A.   No, you didn't.

Q.   Okay.  By the way, to the extent that ZHP withheld information from the FDA as part of its investigation, that would be unlawful, correct, if that information was material to the investigation?

MR. FOX:  Objection to the form.  Calls for a legal conclusion.

A.   That's not an area that I get myself into as a rule.  Whether there's been a material misrepresentation or not is -- that's usually a legal conclusion.

BY MR. SLATER:

Q.   Okay.  This says under number 1, "Your firm received a complaint from a customer on June 6, 2018, after an unknown

Page 323

peak was detected during residual solvents testing for valsartan API manufactured at your facility.  The unknown peak was identified as the probable human carcinogen N-nitrosodimethylamine (NDMA).  Your investigation (DCE-18001)" -- and I'll tell you for the record that's the deviation investigation report I just showed you.  If you need me to show it to you again I'll show you and show you the number matches up.

A.   No, that's all right.  I take your word for it.

Q.   -- "determined that the presence of NDMA was caused by the convergence of three process-related factors, one factor being the use of the solvent dimethylformamide (DMF).  Your investigation concluded that only one valsartan manufacturing process (referred to as the zinc chloride process in your investigation) was impacted by the presence of NDMA.

"However, FDA analyses of samples of your API, and finished drug product manufactured with your API,

Page 324

identified NDMA in multiple batches manufactured with a different process, namely the trimethylamine process, which did not use the solvent DMF.  These data demonstrate that your investigation was inadequate and failed to resolve the control and presence of NDMA in valsartan API distributed to customers."

Do you see what I just read?

A.   Yes.

Q.   You've told me you didn't evaluate the TEA process, the triethylamine process, and you didn't talk about it in your report at all, right?

A.   That's correct.



not something you addressed at all in your report, right?

A.   That was something that falls in the area of process chemistry, and I again would defer to people with the appropriate

Page 325

expertise to evaluate that.



MR. FOX:  Objection to form.

BY MR. SLATER:

Q.   Wondering if you know that.

A.   No, I haven't seen that information.

Q.   Going back to the document now, the warning letter, it says, "Your investigation also failed:", the first bullet point, "To include other factors that may have contributed to the presence of NDMA."

Second bullet point, "To assess factors that could put your API at risk for NDMA cross-contamination.

And then the third bullet point, "To evaluate the potential for other mutagenic impurities to form in your products."

Do you see that?

Confidential Information - Subject to Protective Order

Page 326

1    A.    Yes, I do.

2    Q.    Then the next paragraph, "Our

3  investigation also noted other examples of

4  your firm's inadequate investigation of

5  unknown peaks observed in chromatograms."

6        Do you see that?

7    A.    Yes.

8    Q.    If you go to the next

9  paragraph, it says, "Your response states

10 that NDMA was difficult to detect.  However,

11 if you had investigated further, you may have

12 found indicators in your residual solvent

13 chromatograms alerting you to the presence of

14 NDMA.  For example, you told our

15 investigators you were aware of a peak that

16 eluted after the toluene peak in valsartan

17 API residual solvent chromatograms where the

18 presence of NDMA was expected to elute.  At

19 the time of testing, you considered this

20 unidentified peak to be noise and

21 investigated no further."

22        And then it goes through the

23 API validation batches, and they indicate

24 that these "show at least one unidentified

Page 327

1  peak eluting after the toluene peak in the

2  area where the presence of NDMA was suspected

3  to elute."

4        So I read that as a preview to

5  this question, which is the FDA didn't

6  think -- you would agree with me the FDA

7  didn't think that ZHP did a good job in

8  evaluating unknown peaks, right?

9        MR. FOX:  Objection to form.

10   A.    That's what the warning letter

11 alleges, yes.

12 BY MR. SLATER:

13   Q.    And then if you go to the next

14 paragraph at the bottom of this page, page 2

15 of this warning letter, in the middle of it,

16 it says, "FDA has grave concerns about the

17 potential presence of mutagenic impurities in

18 all intermediates and API manufactured at

19 your facility, both because of the data

20 indicating the presence of impurities in API

21 manufactured by multiple processes, and

22 because of the significant inadequacies in

23 your investigation."

24        So again, there's some what the

Page 328

1  FDA termed grave concerns about what was

2  going on in ZHP's facilities, right?

3    A.    That's correct.

4        MR. SLATER:  Now let's go to

5    the page number 4, please, Chris.

6    Q.    Heading number 2, "Failure to

7  evaluate the potential effect that changes in

8  the manufacturing process may have on the

9  quality of your API."

10       That's relating to the risk

11 assessment, correct?

12   A.    Yes.

13   Q.    It says, "In November 2011 you

14 approved a valsartan API process change that

15 included the use of the solvent DMF.  Your

16 intention was to improve the manufacturing

17 process, increase product yield, and lower

18 production costs.  However, you failed to

19 adequately assess the potential formation of

20 mutagenic impurities when you implemented the

21 new process.  Specifically, you did not

22 consider the potential for mutagenic or other

23 toxic impurities to form from DMF degradants,

24 including the primary DMF degradant,

Page 329

1  dimethylamine.  According to your ongoing

2  investigation, dimethylamine is required for

3  the probable human carcinogen NDMA to form

4  during the valsartan API manufacturing

5  process.  NDMA was identified in valsartan

6  API manufactured at your facility."

7        Do you see what I just read?

8    A.    Yes.

9    Q.    The failure to adequately

10 assess the potential formation of mutagenic

11 impurities when ZHP implemented the new

12 process, that would be a cGMP violation,

13 correct?

14       MR. FOX:  Objection to form.

15   A.    I think you used the word

16 "potential."  That's not what it says, but...

17 BY MR. SLATER:

18   Q.    It says "potential formation."

19 It says, "However, you failed to adequately

20 assess the potential formation of mutagenic

21 impurities when you implemented the new

22 process."

23       And my question to you is, the

24 failure to adequately assess the potential

Confidential Information Subject to Protective Order

Page 330

1 formation of the mutagenic impurities, that's
2 a violation of cGMP, right?
3          MR. FOX:  Objection to form.
4 BY MR. SLATER:
5      Q.    If that's what happened, it's a
6 violation, correct?
7          MR. FOX:  Objection to form.
8      A.    I'm sorry, I lost you as you
9 were reading.  You must have skipped ahead
10 somewhere and I was reading the wrong
11 sentence.
12          Can you direct me where you're
13 reading?
14 BY MR. SLATER:
15      Q.    I'm in the first paragraph
16 under number 2, the third line.
17      A.    Oh, okay.
18      Q.    It says, "However, you failed
19 to adequately assess" --
20      A.    Okay.  I'm sorry.  I skipped
21 ahead to far.
22      Q.    No problem.
23          You see it says, "However, you
24 failed to adequately assess the potential

Page 331

1 formation of mutagenic impurities when you
2 implemented the new process"?
3      A.    Yes.
4      Q.    That would be a cGMP violation,
5 right?
6          MR. FOX:  Objection to form.
7          THE WITNESS:  I'm sorry, what
8 did you say?
9          MR. FOX:  I objected to the
10 form.
11          What was the answer?
12          MR. SLATER:  You talked over
13 it, that's why I'm asking him.
14 BY MR. SLATER:
15      Q.    Is that correct?
16      A.    Yes, that's correct.
17      Q.    Going now to the second
18 paragraph under section -- the heading
19 section 2, "You also failed to evaluate the
20 need for additional analytical methods to
21 ensure that unanticipated impurities were
22 appropriately detected and controlled in your
23 valsartan API before you approved the process
24 change."

Page 332

1          Stopping right there, that's a
2 cGMP violation, correct?
3          MR. FOX:  Objection to the
4 form.
5      A.    That should be done, yes.
6 BY MR. SLATER:
7      Q.    It says further, I'm going to
8 continue to read, "You are responsible for
9 developing and using suitable methods to
10 detect impurities when developing, and making
11 changes to, your manufacturing processes.  If
12 new or higher levels of impurities are
13 detected, you should fully evaluate the
14 impurities and take action to ensure the drug
15 is safe for patients."
16          You agree with that statement,
17 that was an obligation of ZHP, right?
18          MR. FOX:  Objection to the
19 form.
20      A.    I agree that's a correct
21 statement.
22 BY MR. SLATER:
23      Q.    Go to the next paragraph.
24          It says, "Your response" -- now

Page 333

1 they're talking about that response that you
2 were telling me about before, that you got
3 that long response from ZHP and you read it.
4 Remember you told me that?
5      A.    Wait.  There are two responses.
6 The one they're referring to here is a
7 response to the 483.
8          There's also a response to this
9 warning letter where they take issue with a
10 number of these points, provide additional
11 data, and a considerable level of detail.
12          So this letter by itself makes
13 certain assertions, but it's not the complete
14 story.
15      Q.    Looking now at the third
16 paragraph, the FDA says, "Your response
17 states that predicting NDMA formation during
18 the valsartan manufacturing process required
19 an extra dimension over current industry
20 practice, and that your process development
21 study was adequate.  We disagree."
22          MR. FOX:  Adam, let me object.
23          Where are you, Adam?
24          MR. SLATER:  Third paragraph

Confidential Information - Subject to Protective Order

---

Page 334

1  under number 2.  I wasn't planning to
2  do any of this, you brought it up, so
3  I'm just going to hammer the nail.
4  BY MR. SLATER:
5  Q.    Third paragraph under number 2,
6  I'll go back to it again.  "Your response" --
7  rephrase.
8        The third paragraph under
9  number 2 says, "Your response states that
10 predicting NDMA formation during the
11 valsartan manufacturing process required an
12 extra dimension over current industry
13 practice, and that your process development
14 study was adequate.  We disagree."
15       Do you see that?
16 A.    I do.
17 Q.    So the FDA felt that the
18 process development study was inadequate and
19 there was a violation of cGMP, correct?
20       MR. FOX:  Objection to form.
21 A.    They -- I don't agree with your
22 statement there, and it's inconsistent with
23 their public statements both before and after
24 this warning letter.  But that's what they

---

Page 335

1  say.
2  BY MR. SLATER:
3  Q.    Coming back to my question, the
4  FDA disagreed with ZHP that they couldn't
5  have known about the potential formation of
6  the NDMA, right?
7        MR. FOX:  Objection to form.
8  A.    They disagreed that it required
9  an extra dimension over current industry
10 practice.  That's what the reference is to.
11 BY MR. SLATER:
12 Q.    The next sentence says, "We
13 remind you that common industry practice may
14 not always be consistent with CGMP
15 requirements and that you are responsible for
16 the quality of drugs you produce."
17       You agree with that statement,
18 right?
19 A.    I do.
20 Q.    So when ZHP decided to develop
21 this zinc chloride process that had not been
22 used before, they were responsible for the
23 quality of the drugs that would be
24 manufactured with that new process, right?

---

Page 336

1        MR. FOX:  Objection to form.
2  A.    Yes, they were responsible.
3  BY MR. SLATER:
4  Q.    And the fact that nobody else
5  had been manufacturing by that process
6  previously doesn't change the fact or excuse
7  the fact that they failed to evaluate fully
8  the risks from that new process?
9        MR. FOX:  Objection to form.
10 A.    The fact that nobody else was
11 using the process does not relieve them of
12 the necessity to evaluate it fully.
13       MR. SLATER:  Okay.  Let's take
14 that down.  Let's go, Chris, if we
15 could, to Exhibit 212.
16       (Whereupon, Chesney Exhibit
17 Number 14 was marked for
18 identification.)
19 BY MR. SLATER:
20 Q.    This was previously marked as
21 Exhibit 212 at a deposition of Peng Dong.  I
22 assume you haven't seen this.  It's a draft
23 of a deviation investigation report.
24 A.    From the cover page I couldn't

---

Page 337

1  tell you.
2        And could you make it a little
3  bit larger?  It's a little small on my
4  screen.
5  Q.    No problem.
6  A.    The cover page I don't
7  recognize, but I don't know.
8  Q.    Well, I'm going to represent to
9  ███████████████████████
10 ███████████████████████████
11 ███████████
12 ████████████████████
13 ██████████████████████████
14 ██████████████████████████
15 ████████████
16 ████████████████████████████
17 ██████████████████████
18 ████████████████████████████
19 ██████████████████████████████
20 ███████████████████████████
21 █████████████████████████████
22 ██████████████████████████
23 █████████████████████████
24       Do you see what I just read?

---

Page 338

1    A.    Yes.

2    Q.    And if that's what happened,
3  that was a violation of cGMP, as we've gone
4  through earlier, correct?

5         MR. FOX:  Objection to form.

6    A.    Again, I can't characterize an
7  individual occurrence like that as a
8  violation or not a violation.  That requires
9  a lot more consideration.

10        But it's concerning and
11 certainly worthy of everyone's attention,
12 including those at the company that received
13 this report.

14        MR. SLATER:  Take that down.
15 The next thing I'd like to go
16 to, if we could, is -- I believe it
17 was Exhibit 430.  It's the August 26,
18 2018 response to the 483 letter.

19        (Whereupon, Chesney Exhibit
20 Number 15 was marked for
21 identification.)

22        MR. SLATER:  Signed by Jun Du.

23        MR. GEDDIS:  Give me a second.

24        THE VIDEOGRAPHER:  Excuse me,

Page 339

1  Attorney Slater?

2         MR. SLATER:  Yes.

3         THE VIDEOGRAPHER:  May we go
4  off the record for a moment?  I have
5  approximately ten minutes left on this
6  backup media recording.

7         MR. SLATER:  No, I want to
8  continue.  We'll be done in ten
9  minutes.  I'm also through.

10        THE VIDEOGRAPHER:  Okay, sir.

11        MR. SLATER:  Don't worry about
12 it.  If I start to run into it and get
13 to two minute, let me know.

14        THE VIDEOGRAPHER:  The Zoom is
15 going, just the backup.

16        MR. SLATER:  Are we okay?

17        THE VIDEOGRAPHER:  The Zoom is
18 recording, yes.  The backup media had
19 approximately ten minutes left.

20        MR. SLATER:  Okay.  Just let me
21 know if we get to two minutes.

22        THE VIDEOGRAPHER:  Okay, sir.

23        MR. SLATER:  While Chris is
24 looking for that, you might as well --

Page 340

1  okay.  He got it.

2  BY MR. SLATER:

3    Q.    Okay.  This is the August 26,
4  2018 letter from Jun Du of ZHP to the FDA.

5         You've seen this, correct?

6    A.    Yes, I have.

7    Q.    Let's go to page 3 of 4,
8  please.

9         MR. SLATER:  And let's blow up
10 that middle paragraph, if we could,
11 just so we can all see it.  Okay.
12 Perfect.

23        MR. FOX:  Objection to the
24 form.

Page 341

1    A.    You showed me a document that
2  had a suggestion of that.  But as I
3  indicated, it's got some technical aspects
4  that I'm not comfortable evaluating, and
5  would trigger a lot more questions in my mind
6  before I would be prepared to make a
7  definitive statement about it.

8  BY MR. SLATER:

9    Q.    The July 2017 e-mail doesn't
10 make any suggestion, it states definitively
11 that there's NDMA in valsartan, the root
12 cause is the quenching of the sodium azide in
13 the presence of sodium nitrite, and says it's
14 a problem with all the sartans, across
15 sartans.  That's what it says.  It doesn't
16 speculate about it; it makes those factual
17 statements, right?

18        MR. FOX:  Objection.  Object to
19 the form.  Argumentative.

20    A.    It presents the information in
21 that way, yes.

22 BY MR. SLATER:

23    Q.    All of which you can tell me
24 sitting right now is accurate because we know

Page 342

1  historically that was all proven true, those
2  factual statements, right?
3          MR. FOX:  Objection to the
4  fact -- objection to the form.
5      A.    Most of that proved to be
6  correct.  But again, putting myself in the
7  position of having received that at that
8  point in time, I would have had a host of
9  more questions.
10 BY MR. SLATER:
11     Q.    It's not some of it has been
12 proven correct, all of those three things
13 have been proven correct, right?
14         MR. FOX:  Objection to the
15 form.  Argumentative.
16     A.    I, at this point, am not sure
17 specifically what we're talking about in
18 terms of all of them.
19 BY MR. SLATER:
20     Q.    There's NDMA in valsartan, it's
21 caused when they quench the sodium azide with
22 sodium nitrite, and it's a problem with
23 multiple sartans.  That's been proven true,
24 right?

Page 343

1          MR. FOX:  Objection to the
2  form.
3      A.    Yes.  At a high level, yes,
4  that's true.
5  BY MR. SLATER:
6      Q.    And just to be clear, Jun Du
7  represented that this wasn't learned until
8  June of 2018.  That's what he represented to
9  the FDA, right?
10         MR. FOX:  Objection to form.
11 Argumentative, document speaks for
12 itself.
13         MR. SLATER:  All right.  Look,
14 I'll ask it again.
15 BY MR. SLATER:
16     Q.    It's a fact that ZHP has always
17 represented to the FDA that those facts
18 weren't learned until June 2018, right?
19         MR. FOX:  Well, ask the
20 question.
21 BY MR. SLATER:
22     Q.    Can you answer that?  That's
23 correct, right?
24     A.    I'm sorry, I heard two people

Page 344

1  talking there.  I wasn't sure where we were
2  with this.
3          Could you restate the question,
4  because I heard multiple people.
5      Q.    Sure.
6          ZHP has always told the FDA it
7  did not learn of what we just talked about
8  until June of 2018 at the earliest, right?
9      A.    That's when they reached the
10 final conclusion, yes.  That's what they told
11 the FDA.
12     Q.    Well, they claimed that they
13 didn't even know there was NDMA in the
14 valsartan until June of 2018, right?
15         MR. FOX:  Objection to form.
16     A.    That they -- they wouldn't have
17 said they knew it until they were sure of it.
18         MR. SLATER:  Let's take that
19 down and go to Exhibit 312, the
20 establishment inspection report.
21         (Whereupon, Chesney Exhibit
22 Number 16 was marked for
23 identification.)
24         MR. SLATER:  Do we have at

Page 345

1  least another five minutes left on
2  that backup?  Okay.
3  BY MR. SLATER:
4      Q.    Here on the screen we have the
5  Establishment Inspection Report, Exhibit 312.
6          Do you see that?
7      A.    Yes.
8      Q.    And I just want to go to
9  page 20 of 58.  Looking at the paragraph that
10 says, "During the opening presentation."
11         MR. SLATER:  Let's blow that up
12 a little bit.  Perfect.
13     Q.    This states, "During the
14 opening presentation on July 23, 2018, Mr. Du
15 explained how the firm came to know Valsartan
16 manufactured by the firm could contain the
17 genotoxic impurity NDMA.  Mr. Du stated
18 Novartis placed an order with the firm for
19 45 Metric Tons of valsartan."  And then he
20 goes through it and talks about how it was
21 Novartis that told ZHP of this issue, right?
22     A.    Let me read the paragraph here.
23         (Witness reviewing document.)
24     A.    Okay.  So okay, I've read the

Page 346

1  paragraph.  Now, what was the question again?
2      Q.    This is reciting what Jun Du
3  told the FDA at the time of the inspection of
4  July 23, 2018, right?
5      A.    Yes.
6      Q.    Based on the content of the
7  e-mail from July of 2017 showing that ZHP
8  already knew there was NDMA in the valsartan
9  and why it was occurring, when Mr. Du spoke
10  to the FDA that day, he lied to the FDA,
11  correct?
12          MR. FOX:  Objection.  Calls for
13      conclusion, speculation.
14      A.    I can't conclude that based on
15  what I see here.
16  BY MR. SLATER:
17      Q.    What Jun Du told the FDA was
18  untrue in comparison to what that July 2017
19  e-mail shows, correct?
20          MR. FOX:  Objection to form.
21      Beyond his expert report, calls for a
22      legal conclusion.
23      A.    Again, I am still not confident
24  of the state of the firm's awareness,

Page 347

1  notwithstanding Dr. Lin's statement in his
2  July 17th e-mail.  For me to accept that as
3  fact, I would need to see considerably more
4  backup information that that statement is
5  based upon and have it evaluated by
6  scientific experts to be sure it's right.
7          Because an allegation such as
8  that that he was not being truthful is very
9  serious and needs to be vetted in
10  considerable detail, and I think FDA would
11  approach it the same way.
12  BY MR. SLATER:
13      Q.    If ZHP wasn't truthful with the
14  FDA as to when they learned there was NDMA in
15  the valsartan and how it was occurring, if
16  that occurred, that's a very, very serious
17  violation, right?
18          MR. FOX:  Objection.  Asked and
19      answered.
20      A.    Yes, that would be a
21  significant violation, yes.
22          MR. SLATER:  I don't have any
23      other questions unless your counsel
24      wants to ask you more.

Page 348

1          FURTHER EXAMINATION
2  BY MR. FOX:
3      Q.    Mr. Chesney, can something that
4  occurred in this instance with impurity found
5  in valsartan, could that have occurred even
6  though everyone followed the law?
7          MR. SLATER:  Objection.
8      A.    Yes.
9  BY MR. FOX:
10      Q.    In regard to GMP and cGMP, what
11  does the "C" stand for?
12      A.    Current.
13      Q.    Does cGMP change over time?
14      A.    Yes.
15      Q.    Did cGMP change with regard to
16  nitrosamines in the 2019 time frame as far as
17  the FDA is concerned?
18          MR. SLATER:  Objection.
19      A.    I would draw that conclusion
20  from the public statements that we looked at
21  earlier, 2018 and 2019, that as information
22  was developed and better understood, the
23  expectations rose and were still, in fact,
24  rising at the time of the January 25, 2019

Page 349

1  statement.
2  BY MR. FOX:
3      Q.    And when cGMP changes, does the
4  FDA typically apply it retroactively to the
5  industry?
6          MR. SLATER:  Objection.
7      You can answer.
8      A.    No.
9  BY MR. FOX:
10      Q.    That would be unfair, wouldn't
11  it?
12          MR. SLATER:  Objection.
13      You can answer.
14      A.    Yes, it would be unfair, and
15  that has not been the practice, to my
16  knowledge.
17          MR. FOX:  No further questions.
18          MR. SLATER:  I don't have any
19      other questions.
20          MR. FOX:  Thank you,
21      Mr. Chesney.
22          Thank you, Adam.
23          MR. SLATER:  Thank you very
24      much.

Confidential Information Subject to Protective Order

---

Page 350

```
 1        THE WITNESS:  Thank you,
 2  Mr. Slater.
 3        MR. SLATER:  It was nice to
 4  meet you.  I hope everybody has a nice
 5  evening.
 6        THE WITNESS:  Thank you.  Same
 7  to you, sir.
 8        THE VIDEOGRAPHER:  The time is
 9  5:03 p.m.  We're off the record.  This
10  concludes today's deposition.
11        (Whereupon, the deposition was
12  concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 352

```
 1        INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition over
 4  carefully and make any necessary corrections.
 5  You should state the reason in the
 6  appropriate space on the errata sheet for any
 7  corrections that are made.
 8        After doing so, please sign the
 9  errata sheet and date it.  It will be
10  attached to your deposition.
11        It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24
```

Page 351

```
 1             CERTIFICATE
 2        I, MAUREEN O'CONNOR
 3  POLLARD, Registered Diplomate
    Reporter, Realtime Systems
 4  Administrator, and Certified Shorthand
    Reporter, do hereby certify that prior
 5  to the commencement of the
    examination, DAVID L. CHESNEY, was
 6  remotely duly identified and sworn by
    me to testify to the truth, the whole
 7  truth, and nothing but the truth.
 8        I DO FURTHER CERTIFY that
    the foregoing is a verbatim transcript
 9  of the testimony as taken
    stenographically by and before me at
10  the time, place, and on the date
    hereinbefore set forth, to the best of
11  my ability.
12        I DO FURTHER CERTIFY that
    I am neither a relative nor employee
13  nor attorney nor counsel of any of the
    parties to this action, and that I am
14  neither a relative nor employee of
    such attorney or counsel, and that I
15  am not financially interested in the
    action.
16
17
18  _____
19  MAUREEN O'CONNOR POLLARD
    NCRA Registered Diplomate Reporter
20  Realtime Systems Administrator
    Certified Shorthand Reporter
21  Notary Public

22  Dated:  March 24, 2022
23
24
```

Page 353

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3  PAGE LINE CHANGE
 4  ___ ___ _____
 5    REASON: _____
 6  ___ ___ _____
 7    REASON: _____
 8  ___ ___ _____
 9    REASON: _____
10  ___ ___ _____
11    REASON: _____
12  ___ ___ _____
13    REASON: _____
14  ___ ___ _____
15    REASON: _____
16  ___ ___ _____
17    REASON: _____
18  ___ ___ _____
19    REASON: _____
20  ___ ___ _____
21    REASON: _____
22  ___ ___ _____
23
24
```

Confidential Information Subject to Protective Order

Page 354

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4       I, _____, do
        Hereby certify that I have read the foregoing
5       pages, and that the same is a correct
        transcription of the answers given by me to
6       the questions therein propounded, except for
        the corrections or changes in form or
7       substance, if any, noted in the attached
        Errata Sheet.
8
9

        _____
10      DAVID L. CHESNEY          DATE
11
12
13
14
15
16

        Subscribed and sworn
17      To before me this
        _____ day of _____, 20_____.
18
        My commission expires: _____
19
20      _____
        Notary Public
21
22
23
24

Page 355

1       LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____