# Exhibit 2

RESTRICTED CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW JERSEY

2      - - - - - - - - - - - - - - - - - x

       IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3      IRBESARTAN PRODUCTS LIABILITY      :

       LITIGATION,                        :

4                                         :

       THIS DOCUMENT RELATES TO           :

5      ALL ACTIONS                        :

       - - - - - - - - - - - - - - - - - x

6

7

8                ***RESTRICTED CONFIDENTIAL***

9

10               Veritext Virtual Zoom Videotaped

11     deposition of RENA M. CONTI, Ph.D., taken on

12     Thursday, February 10, 2022, in Glenside,

13     Pennsylvania, commencing at 10:17 a.m. Eastern

14     Standard Time, before Jamie I. Moskowitz, a

15     Certified Court Reporter and Certified Livenote

16     Reporter.

17

18

19

20

21

22

23

24

25

RESTRICTED CONFIDENTIAL

Page 2

1  A P P E A R A N C E S :
2
   HONIK LLC
3  BY:  RUBEN HONIK, ESQUIRE
   ruben@honiklaw.com
4  1515 Market Street - Suite 1100
   Philadelphia, Pennsylvania 19102
5  267.435.1300
   Counsel for the Witness Rena M. Conti, Ph.D.
6
7  MAZIE SLATER KATZ FREEMAN
   BY:  ADAM M. SLATER, ESQUIRE
8  aslater@mazieslater.com
   103 Eisenhower Parkway
9  Roseland, New Jersey 07068
   973.228.9898
10 Counsel for the Plaintiffs
11
   SLACK DAVIS SANGER LLP
12 BY:  JOHN R. DAVIS, ESQUIRE
   jdavis@slaterdavis.com
13 6001 Bold Ruler Way - Suite 100
   Austin, Texas 78746
14 512.795.8686
   Counsel for the Plaintiffs
15
16 LIEFF CABRASER HYMAN & BERNSTEIN, LLP
   BY:  RACHEL J. GEMAN, ESQUIRE
17 rgeman@lchb.com
   250 Hudson Street
18 New York, New York 10013
   212.355.9500
19 Counsel for the Plaintiffs
20
   KANNER & WHITELEY, L.L.C.
21 BY:  CONLEE S. WHITELEY, ESQUIRE
   c.whiteley@kanner-law.com
22 BY:  DAVID J. STANOCH, ESQUIRE
   d.stanoch@kanner-law.com
23 BY:  LAYNE C. HILTON, ESQUIRE
   l.hilton@kanner-law.com
24 701 Camp Street
   New Orleans, Louisiana 70130
25 504.524.5777
   Counsel for the Plaintiffs

Page 3

1  A P P E A R A N C E S :
2
   DUANE MORRIS LLP
3  BY:  SETH A. GOLDBERG, ESQUIRE
   sagoldberg@duanemorris.com
4  BY:  COLEEN W. HILL, ESQUIRE
   cwhill@duanemorris.com
5  BY:  ALEK W. SMOLIJ, ESQUIRE
   awsmolij@duanemorris.com
6  BY:  DANA B. KLINGES, ESQUIRE
   30 South 17th Street
7  Philadelphia, Pennsylvania 19103
   215.979.1000
8  Counsel for the Defendants Prinston Pharmaceutical
   Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
9  Healthcare U.S., LLC and Huahai U.S., Inc.
10
   DUANE MORRIS LLP
11 BY:  REBECCA E. BAZAN, ESQUIRE
   rebazan@duanemorris.com
12 BY:  DREW T. DORNER, ESQUIRE
   dtdorner@duanemorris.com
13 505 9th Street NW - Suite 1000
   Washington, DC 20004
14 202.776.7800
   Counsel for the Defendants Prinston Pharmaceutical
15 Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
   Healthcare U.S., LLC and Huahai U.S., Inc.
16
17 MORGAN, LEWIS & BOCKIUS LLP
   BY:  JOHN K. GISLESON, ESQUIRE
18 john.gisleson@morganlewis.com
   BY:  STEVEN N. HUNCHUCK, ESQUIRE
19 steven.hunchuck@morganlewis.com
   One Oxford Centre - 32nd Floor
20 Pittsburgh, Pennsylvania 15219
   412.560.3300
21 Counsel for Defendant Aurobindo Pharma Ltd.
22
23
24
25

Page 4

1  A P P E A R A N C E S :
2
   GREENBERG TRAURIG, LLP
3  BY:  TIFFANY M. ANDRAS, ESQUIRE
   andrast@gtlaw.com
4  BY:  GREG E. OSTFELD, ESQUIRE
   osfeldg@gtlaw.com
5  77 West Wacker Drive - Suite 3100
   Chicago, Illinois 60601
6  312.456.1065
   Counsel for Defendant Teva Pharmaceuticals
7  Industries Ltd.
8
   NORTON ROSE FULBRIGHT US LLP
9  BY:  ELLIE NORRIS, ESQUIRE
   ellie.norris@nortonrosefulbright.com
10 BY:  D'LESLI M. DAVIS, ESQUIRE
   dlesli.davis@nortonrosefulbright.com
11 2200 Ross Avenue - Suite 3600
   Dallas, Texas 75201-7932
12 214.855.8221
   Counsel for McKesson Corporation
13
14 HUSCH BLACKWELL
   BY:  MATTHEW D. KNEPPER, ESQUIRE
15 matt.knepper@huschblackwell.com
   190 Carondelet Plaza - Suite 600
16 St. Louis, Missouri 63105
   314.480.1500
17 Counsel for the Defendant Express Scripts
18
   BUCHANAN INGERSOLL & ROONEY PC
19 BY:  JONATHAN D. JANOW, ESQUIRE
   jonathan.janow@bipc.com
20 1700 K Street - Suite 300
   Washington, DC 20006
21 202.452.7900
   Counsel for the Defendant Albertsons LLC
22
23
24
25

Page 5

1  A P P E A R A N C E S :
2
   BUCHANAN INGERSOLL & ROONEY PC
3  BY:  CHRISTOPHER B. HENRY, ESQUIRE
   christopher.henry@bipc.com
4  227 West Trade Street - Suite 600
   Charlotte, North Carolina 28202
5  704.444.3475
   Counsel for the Defendant Albertsons LLC
6
7  BARNES & THORNBURG LLP
   BY:  KARA M. KAPKE, ESQUIRE
8  kara.kapke@btlaw.com
   11 South Meridian Street
9  Indianapolis, Indiana 46204
   317.236.1313
10 Counsel for CVS and Rite Aid
11
   CROWELL & MORING LLP
12 BY:  LUKE J. BRESNAHAN, ESQUIRE
   lbresnahan@crowell.com
13 BY:  DANIEL T. CAMPBELL, ESQUIRE
   dcampbell@crowell.com
14 1001 Pennsylvania Avenue NW
   Washington, DC 20004
15 202.624.2500
   Counsel for the Defendant Cardinal Health Inc.
16
17 HILL WALLACK LLP
   BY:  WILLIAM E. MURTHA, ESQUIRE
18 wmurtha@hillwallack.com
   BY:  ERIC I. ABRAHAM, ESQUIRE
19 eabraham@hillwallack.com
   BY:  CARLO J. DEHART, ESQUIRE
20 cdehart@hillwallack.com
   21 Roszel Road
21 Princeton, New Jersey 08540
   609.924.0808
22 Counsel for the Defendants Hetero Drugs Limited and
   Hetero Labs Limited
23
24
25

2 (Pages 2 - 5)

RESTRICTED CONFIDENTIAL

Page 6

1  A P P E A R A N C E S :
2
   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
3  BY:  FRANK H. STOY, ESQUIRE
   fhs@pietragallo.com
4  38th Floor - One Oxford Centre
   Pittsburgh, Pennsylvania 15219
5  412.263.4397
   Counsel for the Defendants Mylan Laboratories
6  Limited and Mylan Pharmaceuticals Inc.
7
   WALSH PIZZI O'REILLY FALANGA LLP
8  BY:  CHRISTINE I. GANNON, ESQUIRE
   cgannon@walshlaw.com
9  Three Gateway Center
   100 Mulberry Street - 15th Floor
10 Newark, New Jersey 07102
   973. 757.1100
11 Counsel for the Defendant Teva Pharmaceuticals
12
   HINSHAW & CULBERTSON LLP
13 BY:  GEOFFREY M. COAN, ESQUIRE
   gcoan@hinshawlaw.com
14 53 State Street - 27th Floor
   Boston, Massachusetts 02109
15 617.213.7045
   Counsel for the Defendant Sciegen Pharmaceuticals
16
   DORSEY & WHITNEY LLP
17 BY:  SHEVON D. ROCKETT, ESQUIRE
   rockett.shevon@dorsey.com
18 51 West 52nd Street
19 New York, New York 10019-6119
   212.415.9357
20 Counsel for the Defendant OptumRx
21
   FALKENBERG IVES LLP
22 BY:  KIRSTIN B. IVES, ESQUIRE
   kbi@falkenbergives.com
23 BY:  MEGAN A. ZMICK, ESQUIRE
   maz@falkenbergives.com
24 230 West Monroe - Suite 2220
   Chicago, Illinois 60606
25 312.566.4803
   Counsel for the Defendant Humana Pharmacy, Inc.

Page 7

1  A P P E A R A N C E S :
2
   ULMER & BERNE LLP
3  BY:  JEFFREY D. GEOPPINGER, ESQUIRE
   jgeoppinger@ulmer.com
4  312 Walnut Street - Suite 1400
   Cincinnati, Ohio 45202-4029
5  513.698.5000
   Counsel for the Defendant AmerisourceBergen
6
7  ALSO PRESENT:
8  JUSTIN BILY
   Legal Videographer
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1         E X H I B I T S
2
   EXHIBIT NUMBER    DESCRIPTION              PAGE
3
   Conti 1    Retention Agreement         43
4
   Conti 2    Defendant's Notice to       52
5              Videotaped Deposition of
              Dr. Conti
6
   Conti 3    Plaintiffs' Objections and  56
7              Responses to Defendants'
              Notice of Videotaped
8              Deposition of Rena Conti,
              Ph.D.
9
   Conti 4    Greylock McKinnon Invoices  58
10
   Conti 5    Declaration              74
11
   Conti 6    FDA Updates and Press       167
12             Announcements on
              Angiotensin II Receptor
13             Blocker (ARB) Recalls
              (Valsartan, Losartan, and
14             Irbesartan)
15
16
17
18
19
20
21
22
23
24
25

Page 9

1  REQUEST PAGE
2
3  INSTRUCTIONS NOT TO ANSWER:
4  Page Line
5  None
6  REQUEST FOR PRODUCTION OF DOCUMENTS:
7  Page Line          Description
8  None
9  STIPULATIONS:
10 Page Line
11 None
12 QUESTIONS MARKED:
13 Page Line
14
15
16
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

RESTRICTED CONFIDENTIAL

Page 10

1        TABLE OF CONTENTS
2    RENA M. CONTI, Ph.D.
3
     Examination
4
     By Mr. Goldberg......................Page  12
5
     Index of Exhibits....................Page   8
6
7    Reporter Certificate.................Page 242
8    Read and Sign.......................Page 243
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1        THE VIDEOGRAPHER:  We are going on the
2    record at 10:17 on February 10th, 2022.  This
3    is Media Unit Number 1 of the video recorded
4    deposition of Rena Conti regarding the
5    valsartan litigation.
6        My name's Justin Bilely from the firm
7    Veritext, and I'm the videographer.  The court
8    reporter is Jamie Moskowitz from the firm
9    Veritext.
10       All counsel will be noted on the
11   stenographic record.  Will the court reporter
12   please swear in the witness, and then we can
13   begin.
14            *   *   *
15        P R O C E E D I N G S
16       THE COURT REPORTER:  The attorneys
17   participating in this deposition acknowledge
18   that I am not physically present in the
19   deposition room and that I will be reporting
20   this deposition remotely.
21       They further acknowledge that, in lieu
22   of an oath administered in person, the witness
23   will verbally declare his testimony in this
24   matter is under penalty of perjury.
25       The parties and their counsel consent

Page 12

1    to this arrangement and waive any objections to
2    this manner of reporting.  If there are any
3    objections, please state them at this time.
4            *   *   *
5        THE COURT REPORTER:  Hearing no
6    objections, I will swear in the witness.
7            *   *   *
8        RENA CONTI, after having been first
9    duly sworn, was examined and testified as
10   follows:
11           *   *   *
12        THE COURT REPORTER:  Okay, Counsel,
13   please proceed.
14        MR. GOLDBERG:  Thank you.
15   EXAMINATION BY MR. GOLDBERG:
16   Q    Good morning, Dr. Conti.  My name is
17   Seth Goldberg.  I'm with the law firm Duane Morris,
18   and we represent the ZHP parties in this action.
19   I'm going to be asking you questions during the
20   deposition today on behalf of all of the defendants
21   in the case, as well.
22        Can you state your name for the
23   record, and your current address?
24   A    Sure, Rena Conti, 2 Overlea Way,
25   Glenside, PA 19038.

Page 13

1    Q    Okay.  You've been deposed before,
2    Dr. Conti?
3    A    I have.
4    Q    You understand, throughout the day,
5    I'm going to ask you questions.  You're going to
6    provide answers.  And if -- during the day, if we
7    can try not to talk over one another, that would be
8    helpful.
9        Your counsel or plaintiff's counsel
10   may assert objections from time to time.  Unless
11   they instruct you not to answer, you're to answer
12   the question, okay, not withstanding the objection.
13   If you don't understand --
14   A    I understand.
15   Q    If you don't understand a question
16   I've asked, please ask me to clarify it or rephrase
17   it.  If you answer it, we'll assume that you
18   understood it.  Okay?
19   A    I understand.  Thank you.
20   Q    If you need to take a break at any
21   time, no problem.  Just ask.
22   A    Okay.
23   Q    Have you taken any medications this
24   morning that may impair your testimony today?
25   A    I took a couple of Tylenol, but I

4 (Pages 10 - 13)

RESTRICTED CONFIDENTIAL

Page 14

1  don't think that's going to --
2  Q      Hopefully -- okay.
3         Why don't we talk a little bit about
4  your professional background?
5         Can you explain what your current
6  position is at Boston University?
7  A      Sure.
8      I am associate professor in the
9  Department of Markets, Public Policy and Law at the
10 business school at Boston University. It's called
11 Questrom School of Business. In addition, I am
12 co-director of the institute -- of an institute
13 called Technology & Policy research Institute, which
14 is an institute across the business school and the
15 law school that focuses on issues related to
16 technological innovation, its -- and its regulation.
17 Q      Are you -- are you currently teaching
18 any courses?
19 A      Sadly, yes, I am. I am --
20 Q      What courses?
21 A      I am teaching Strategy in the
22 Biopharmaceutical Industry --
23        COURT REPORTER: I'm sorry. You're
24 teaching...
25        THE WITNESS: I teach Strategy in the

Page 15

1      Biopharmaceutical Industry. That is the class
2      that I have taught for the better part of
3      20 years.
4  BY MR. GOLDBERG:
5  Q      What is that course about? Just give
6  me a -- give me a thumbnail sketch of that course.
7  A      Sure.
8         It's about the financing, organization
9  and regulation of the pharmaceutical industry, and
10 how firms in this industry, most notably the -- the
11 pharmaceutical manufacturers themselves, innovate
12 price, get reimbursed and generate revenue.
13 Q      Did you write a textbook for that
14 course?
15 A      I'm in the process of writing a
16 textbook now. Like I said, I have taught this class
17 for the better part of 20 years, at
18 Harvard University, at the University of Chicago and
19 now at Boston University. And I developed many
20 materials, including case studies, that are now the
21 industry standard.
22        I have a number of textbooks --
23 Q      Hang on --
24 A      Wait. Wait. So I was the economist
25 on the National Academy of Science's recent report

Page 16

1  on drug pricing and regulation, and it's that report
2  that the committee developed that is actually the --
3  one of the textbooks that we use in my class.
4  Q      You said something about industry
5  standard. I was trying to ask, industry standard
6  for what? What -- you said something was the
7  industry standard.
8  A      Oh, the materials that -- that I've
9  developed for my course and developed in -- in other
10 contexts during my research, are very widely used to
11 teach about the industry, about the pharmaceutical
12 industry.
13 Q      In terms of your expert consulting,
14 you have an associate position at Greylock McKinnon?
15        COURT REPORTER: Where?
16        MR. GOLDBERG: Greylock McKinnon; is
17 that correct?
18        THE WITNESS: I'm sorry, is that a
19 question?
20 BY MR. GOLDBERG:
21 Q      Yes.
22 A      Okay. Right. So I have worked with
23 Greylock McKinnon and Associates on -- on health
24 litigation matters, again, largely in the
25 pharmaceutical industry -- products, I guess, in the

Page 17

1  pharmaceutical industry, again, for the better part
2  of 20 years.
3  Q      And what do you do at
4  Greylock McKinnon?
5  A      I provide expert services for -- in
6  support of litigation.
7  Q      Do you do any consulting with
8  Greylock McKinnon that is not litigation related?
9  A      No.
10 Q      Are there particular kinds of
11 litigation that you work on for Greylock McKinnon?
12 A      Again, all of it's in -- on the
13 pharmaceutical industry, related to pricing,
14 reimbursement, coverage, competition and regulation.
15 And I have been involved in a variety of antitrust
16 matters, and a variety of -- of other types of legal
17 matters.
18 Q      On a -- on a, you know, given day or
19 given week, how many matters are you handling in
20 your capacity as an -- this academic affiliate at
21 Greylock?
22 A      It really depends on the time period
23 and the year. Right now, I think I have maybe three
24 cases that I'm working on in various forms.
25 Q      Well, are you working as an -- as an

5 (Pages 14 - 17)

RESTRICTED CONFIDENTIAL

Page 18

1  expert in all three of those cases?
2      A    Yes.
3      Q    Okay.  And are those three cases
4  products liability cases?  Are they antitrust cases?
5  What's the subject matter of those cases?
6      A    One of them is a liability case,
7  and -- well, actually -- yeah.  One of them is a
8  liability case, and two others are antitrust cases.
9      Q    Generally, can you -- can you describe
10  the mix on a percentage basis, between antitrust,
11  patent, products liability, that you -- that you
12  generally have?
13      A    So do you mean in relation to the work
14  that I do at -- with Greylock McKinnon --
15      Q    Yes.
16      A    -- or other -- okay.
17      Q    Well, are you doing expert work
18  outside of Greylock McKinnon?
19      A    Yes, I am.
20      Q    Okay.  Is that -- I guess we'll --
21  we'll get to your CV, and maybe you can show me on
22  your CV where that is.
23          But why don't we take it first with
24  Greylock McKinnon, where your -- what the case mix
25  is from antitrust, patents and other subject

Page 19

1  matters?
2      A    I don't quite understand what you mean
3  by "patent."
4      Q    Patent, patent, patent or intellectual
5  property.  Are you doing any expert work in
6  intellectual property matters?
7      A    Not -- so patents are obviously an
8  important part of the industry.  But -- and they are
9  related to the work that I'm doing, but I'm not
10  doing any patent litigation work, if that is what
11  you're asking.
12      Q    Yeah.  So I'm asking, what is the --
13  you know, the -- the makeup of the different subject
14  matters that you're working on as an expert, as a
15  general matter.  You said antitrust.  You said
16  products liability.  Are there other types of
17  matters that you work on?
18      A    Okay.  So at Greylock McKinnon, I'm
19  largely working half and half on product liability
20  and antitrust.  I would say I have increasingly
21  worked on product liability over the past couple of
22  years, and -- but generally, there's a mix of that
23  now.
24      Q    And explain what your expert work is
25  when you're doing it not through Greylock McKinnon.

Page 20

1  Are you -- do you have an independent expert
2  consulting firm that you're just doing
3  independently?
4      A    I am working on a number of matters
5  that Greylock McKinnon has conflicts with, and
6  I'm -- they are largely either business disputes
7  between pharmaceutical firms --
8          COURT REPORTER:  Between what?
9          THE WITNESS:  Between pharmaceutical
10      firms.
11          COURT REPORTER:  Uh-huh.
12          THE WITNESS:  Or matters related to
13      government work that -- where I am serving as
14      an expert and there are government agencies
15      involved.
16  BY MR. GOLDBERG:
17      Q    Can you describe what that -- can you
18  give us a little bit more detail about what those
19  kinds of matters are?
20          MR. HONIK:  Dr. Conti -- Dr. Conti,
21      let me instruct you that while Mr. Goldberg's
22      questions are fine, not to reveal any matters,
23      particularly in the litigation sphere, in which
24      there may not have been a normal date to
25      disclose your involvement.  And so be very

Page 21

1  circumspect about that.  Thank you.
2          THE WITNESS:  Thank you.
3          On the government investigations
4      and -- I am serving as an expert and have
5      served as an expert in the past.  And I can't
6      provide any details.
7  BY MR. GOLDBERG:
8      Q    Are there matters that you worked in
9  terms of government investigations in the past that
10  you can provide details about what the -- what the
11  subject matter is of the investigation?  Are you
12  investigating cGMP practices?  Are you investigating
13  fraud?  Are you investigating, you know, something
14  related to the business?  I'm just trying to get a
15  sense of what you do as an expert in government
16  investigation.
17      A    Sure.  So every single day, all day
18  long, all I do is think about the financing, the
19  organization and the regulation of the
20  pharmaceutical industry.  So you can kind of fairly
21  surmise from that the work that I'm doing,
22  either in business disputes between industry members
23  is related to financing, organization and regulation
24  of these products, and in the government work that I
25  do, again, it's all related to financing,

Page 22

1 organization and regulation.
2        I have been a special consultant to
3 the Office of Generic Drugs for years, and have been
4 involved in the regulation of pharmaceuticals by the
5 Food and Drug Administration for a long time.
6        And so a lot of the -- a lot of the
7 work that I work on for government agencies is
8 related to the regulation of these products.
9    Q    Is there a particular aspect of the
10 regulation of these products that you focus on?  And
11 when you're -- let me qualify that.  Regulation of
12 pharmaceutical products that you focus on?
13   A    So I would say I have two broad
14 expertise.  The first is on pricing of these
15 products; how it is priced by the pharmaceutical
16 industry themselves, what are the factors that lead
17 to prices being high, changing over time, increasing
18 or decreasing with competition, both in the branded
19 and specialty -- or branded and generic market.
20       And then the second broad category of
21 expertise is on competition, and specifically what
22 are the factors that drive pharmaceutical companies
23 to enter specific types of markets, particularly
24 generic markets; what are the conditions upon which
25 they can enter those markets; how does competition

Page 23

1 evolve over time; and to what extent do regulatory
2 agencies support entry and sustained competition
3 over time.
4    Q    I just want to come back -- I'd just
5 like to clarify one thing.
6        Going back to when you were talking
7 about your coursework, and you -- the -- the
8 materials that you said, you know, are used and have
9 become an industry standard, when you -- when you're
10 talking about the industry standard, you're saying
11 the industry standard for teaching this stuff at
12 universities.  Is that -- is that what you mean?
13   A    Well, right.  So many of my articles
14 that I've published on the pricing of these products
15 and the regulation of these products are used by
16 myself to teach, but are also used by many other
17 experts in the field to teach about this industry.
18 And that's actually one of the conditions of tenure,
19 is that there is an industry standard that -- that
20 is met.
21       And then I have developed coursework
22 for materials that are used for teaching, case
23 studies, that type of stuff, that are used by
24 myself, and they are used by Harvard University
25 professors.  And they are used by Wharton professors

Page 24

1 and others.
2    Q    Okay.  Got it.
3        Back to the expert stuff, in terms of
4 working as an expert on behalf of plaintiffs, on
5 behalf of defendants, do you -- do you do more of
6 one or the other?
7    A    So I have worked on the defendant
8 side, largely in business disputes between different
9 firms.  In those cases, matters largely related to
10 production of products and the regulation of those
11 products have been domain.
12       And then I would say -- I mean,
13 obviously, in the government work I've done, it's
14 largely been on the side of the government and
15 taxpayers, consumers, that are insured by the
16 government.
17       And then -- and then I have done
18 plaintiff's work on -- largely on antitrust matters.
19   Q    And in products work, are you on
20 plaintiff's side more than defendant's side?
21   A    I'm sorry.  I didn't hear the first
22 part.
23   Q    In products -- in products liability
24 matters, or consumer class action matters, are you
25 on plaintiff's side more than defendant's side?

Page 25

1    A    I've largely worked on the plaintiff's
2 side on those matters.
3    Q    Have you represented any defendants
4 in -- as an -- as an expert, in a products liability
5 action or consumer class action?
6    A    What do you mean by "consumer class
7 action?" I'm sorry.
8    Q    Like -- like the claims that we're
9 here for today, the economic loss claim.  Consumers
10 are claiming they should get a refund for a product.
11   A    Right.  So I'm only -- I think I have
12 three cases right now, one settled, on products
13 liability.  Each one of those cases, I was working
14 on the plaintiff's side.
15   Q    So in your -- your expert consulting
16 experience, you've done three products liability
17 cases; is that correct?
18   A    Right, that I can talk about.  Right.
19   Q    And of those three, all three were on
20 behalf of plaintiffs?
21   A    Correct.
22   Q    How many other products liability
23 matters have you worked on that you can't talk
24 about?
25   A    At least one that comes to mind.

7 (Pages 22 - 25)

RESTRICTED CONFIDENTIAL

Page 26

1    Q     And in that one, can you tell us
2  whether it's on behalf of plaintiffs or defendants?
3    A     It was for the government.
4    Q     Okay.  In 2021, since we just finished
5  the year, how much of your income was generated from
6  your work as an expert witness versus your income as
7  a professor?
8    A     Somewhere maybe around a quarter.
9    Q     Can you quantify that in dollars, what
10  that expert work looks like on an annual basis?
11    A     Do you mean in 2021?
12    Q     Yes, sure.
13    A     Okay.  So pandemic year, I think I
14  made approximately $100,000, maybe $80,000,
15  somewhere around there, in 2021.  Much of that was
16  for cases that I worked on in previous years, not
17  in -- in 2021.
18    Q     Has the pandemic caused you to have
19  fewer cases or work?
20    A     Sadly, it's the reverse.  All I do is
21  sit in my house and work.  I know you all probably
22  feel the same way.
23    Q     We all share that -- we all share that
24  experience that we're working way more due to the
25  pandemic, especially in litigation.

Page 27

1    A     I'm hoping to not be like that in
2  2022.
3    Q     Yeah.  In terms of the -- the business
4  disputes where you've been an expert, have you
5  represented pharmaceutical companies in those
6  business disputes?
7    A     Yes.  Again, every single day, all I
8  do is think about this industry.  So in those
9  matters, they've been pharmaceutical companies.
10    Q     Are there -- are they generic
11  companies or branded companies?
12    A     Both.
13    Q     Were any of the companies that you've
14  represented in these matters, defendants in this
15  case?
16    A     No.
17    Q     Have you -- let's talk about your
18  retention in this matter.  How did you -- how did
19  you come about being retained in this matter?
20    A     I was contacted by one of the
21  principals at Greylock McKinnon and Associates, and
22  asked if I would be interested in discussing with
23  the attorneys the general outlines of the -- of the
24  matter.
25    Q     When was that first contact at

Page 28

1  Greylock and your first meetings with plaintiffs'
2  counsel?
3    A     I think it was the month, or maybe the
4  month previous, to when the pandemic started.
5    Q     February of '20?
6    A     February or March.  I remember it was
7  a very gray, cold day in Boston.
8    Q     Do you recall who the lawyers were for
9  the plaintiffs that you met with for the first time
10  when you met -- had that first meeting in this
11  matter?
12    A     I think Ruben Honik and
13  Conlee Whiteley and Layne Hilton were on that first
14  call.
15    Q     Have you --
16    A     Maybe misremembering --
17         THE COURT REPORTER:  I'm sorry,
18  Ms. who?
19         THE WITNESS:  Misremembering.
20         THE COURT REPORTER:  Misremembering?
21         THE WITNESS:  Misremembering.  Sorry.
22  My English.
23         MR. HONIK:  It's a thing, not a
24  person.
25         THE WITNESS:  Exactly.

Page 29

1  BY MR. GOLDBERG:
2    Q     Well, whoever those plaintiffs'
3  counsel were, had you known any of them before that
4  first meeting?
5    A     No.
6    Q     Had you worked with any of the
7  plaintiffs' counsel that are on -- on the
8  plaintiffs' executive committee in this case prior
9  to starting work on this matter?
10    A     Not -- not that I can recall.
11    Q     Do you know if Greylock McKinnon had a
12  prior relationship with any of the lawyers that
13  represent the plaintiffs in this matter?
14    A     I don't know.
15    Q     Do you have any matters currently
16  pending with any of the lawyers that represent
17  plaintiffs in this matter, any other matters that
18  you're working on?
19    A     I am sorry.  What do you mean by
20  "currently pending"?
21    Q     Are you an expert in any cases that
22  are currently pending where the lawyers who are
23  plaintiffs in this case are representing parties in
24  that case?
25    A     I'm sorry.  I don't -- I don't know

8 (Pages 26 - 29)

RESTRICTED CONFIDENTIAL

Page 30

1  what you mean by "currently pending".
2      Q     Okay.  Are -- are you doing expert
3  work in any other case where the lawyers who
4  represent the plaintiffs in this case are involved?
5      A     Yes.
6      Q     What case is that?
7           MR. HONIK:  Let me caution you,
8      Dr. Conti, that to the extent that there's no
9      disclosure requirement in those matters, you
10     should not reveal that today.
11          THE WITNESS:  Thank you.  I cannot
12     provide any details.
13  BY MR. GOLDBERG:
14     Q     Which lawyers in plaintiffs' committee
15  are involved in that matter?
16          MR. HONIK:  Let me instruct you not to
17     answer that for the same reason posited
18     previously.  It's effectively the same question
19     and would reveal something -- excuse me -- and
20     would reveal or disclose something that doesn't
21     require to be disclosed at present.  Thank you.
22          THE WITNESS:  I'm sorry.  I cannot
23     provide an answer.
24          MR. GOLDBERG:  Counsel, you can mark
25     this portion of the transcript "highly

Page 31

1  confidential" so that it doesn't have to be
2  disclosed outside of this matter, but I think
3  we're entitled to know if Dr. Conti is working
4  for the lawyers who represent the plaintiffs in
5  this case in another matter.
6           MR. HONIK:  She's already answered
7      affirmatively to that question.  But your
8      pending question, to which I objected and
9      instructed her not to answer, is -- is nearly a
10     backdoor way of disclosing formally her
11     involvement as an expert in cases in which
12     there's not presently a disclosure requirement.
13          Accordingly, I've instructed her, and
14     she's followed this, not to identify the lawyers
15     because that identification effectively reveals
16     the matter in which she's working.  That's the
17     basis.  So please ask another question.
18  BY MR. GOLDBERG:
19     Q     That matter, is that a products
20  liability matter?
21          MR. HONIK:  I instruct you not to
22     answer.
23  BY MR. GOLDBERG:
24     Q     Is it a -- is it an antitrust matter?
25          MR. HONIK:  I instruct you not to

Page 32

1      answer and reveal the type of matter, litigated
2      matter.
3  BY MR. GOLDBERG:
4      Q     In that matter, have you been asked to
5  render an opinion that's similar to the opinion
6  you've been -- provided in this case?
7           MR. HONIK:  Object to the form.
8           THE WITNESS:  Are you asking whether
9      that matter is on the pharmaceutical industry
10     and its regulation and financing?
11  BY MR. GOLDBERG:
12     Q     Sure.  Let's start with that.
13     A     Yes.  Everything --
14          MR. HONIK:  Excuse me.
15          THE WITNESS:  Go ahead.
16          MR. HONIK:  Without waiving the
17     objection, I'll permit you to answer that and
18     only that question.
19          THE WITNESS:  Thank you.
20          Everything I work on in my teaching,
21     in my research and in the expert work that I
22     provide to the government and to other
23     entities, is related to the financing,
24     organization and regulation of the
25     pharmaceutical industry.

Page 33

1           THE COURT REPORTER:  Of the
2      pharmacy -- of the pharmacy...
3           THE WITNESS:  Of the pharmaceutical
4      industry.
5           THE COURT REPORTER:  Thank you.
6           THE WITNESS:  Thank you.
7  BY MR. GOLDBERG:
8      Q     When did you begin to work on that
9  matter?
10     A     I'm sorry, on -- on the industry?
11     Q     No, on the matter that we've been
12  discussing that you're working for plaintiffs'
13  counsel in.
14          MR. HONIK:  I'll instruct you not to
15     answer that question for the same reason.
16          Seth, respectfully, these are just
17     backdoor ways to try to get at your essential
18     question, which is, tell me the other cases
19     that you're involved in.  And I won't allow
20     Dr. Conti to reveal that.
21          MR. GOLDBERG:  Well, I -- I disagree.
22     I don't need to know the name of the case.  I
23     don't need to know the names of the other
24     parties, but I do think we're entitled to know
25     what Dr. Conti is doing for plaintiffs' counsel

9 (Pages 30 - 33)

RESTRICTED CONFIDENTIAL

Page 34

1    in this case in other matters.
2         MR. HONIK: Yeah, I don't agree. And
3    moreover, I don't understand the last part of
4    your observation. I have permitted you to ask
5    her many questions about all of the matters
6    that she's involved with, for whom she's doing
7    these in terms of segments of industry and
8    otherwise.
9         But you know and I know that if you're
10   involved as an expert consultant in a case in
11   which the date for disclosure of experts has
12   not yet arrived, that that is information that
13   can't be revealed. So please move on.
14   BY MR. GOLDBERG:
15   Q    How much money have you made from
16   plaintiffs' counsel in that case?
17        MR. HONIK: Without waiving the
18   objection, you can answer. I think you did,
19   didn't you?
20        THE WITNESS: Thank you. None.
21   BY MR. GOLDBERG:
22   Q    Do you have your retention in that
23   case through Greylock McKinnon?
24   A    Yes.
25   Q    Are you charging in that matter the

Page 35

1    same fee, hourly fee, that you're charging in this
2    matter?
3    A    I don't know.
4    Q    Have you generated an invoice yet in
5    that matter?
6    A    No.
7    Q    Okay. Going back to the beginning of
8    your retention in this case, prior to being retained
9    or at least meeting plaintiffs' counsel in February,
10   March 2020, had you done any research into
11   valsartan?
12   A    Yes.
13   Q    In -- in what capacity did you do
14   research into valsartan prior to that February,
15   March 2020 time period?
16   A    In two separate capacities. The first
17   is that I have a longstanding interest in some types
18   products --
19        COURT REPORTER: In some what?
20        THE WITNESS: In some types of
21   pharmaceutical products, which include drugs
22   that are used to treat heart disease, valsartan
23   being one of them, but there are many others.
24        And then, in the other capacity, I
25   have spent a fair amount of time thinking about

Page 36

1    generic entry in product markets, and have
2    thought a lot about -- I have thought about and
3    also researched the entry of manufacturers in
4    this particular market.
5    BY MR. GOLDBERG:
6    Q    When you say," in this particular
7    market," what were you -- define what you mean by
8    "in this particular market."
9    A    In the valsartan market.
10   Q    When you were studying or researching
11   valsartan in connection with your interest in heart
12   disease, what was the nature of the research?
13   A    Pricing, promotion and --
14        THE COURT REPORTER: And -- and what?
15        THE WITNESS: And access to these
16   products.
17   BY MR. GOLDBERG:
18   Q    What do you mean by "access"?
19   A    Patient use.
20   Q    Were you looking at it from an
21   efficacy standpoint?
22   A    Safety and efficacy are both part -
23   are both determinants of access. So I guess,
24   generally, yes.
25   Q    But at that -- at that time, you

Page 37

1    became generally familiar with the safety and
2    efficacy of valsartan at that time?
3    A    I think I would think -- I think about
4    that differently as an economist. So I am
5    interested, again, in the pricing and the
6    reimbursement and in the utilization of these drugs.
7    Safety and efficacy of products are one of the
8    determinants -- or two of the determinants of people
9    using these products.
10   Q    Okay. So you -- you were kind of
11   thinking about how many people are using it, the
12   number of people who are using it, and that's sort
13   of indicative of its safety and efficacy in some
14   way?
15   A    No.
16   Q    Okay. Do you want to explain?
17   A    Sure.
18        So I was thinking about the pricing of
19   this product market, which included the -- the
20   valsartan products, but not only the valsartan
21   products. I've been thinking about the
22   reimbursement of those products, so who pays what
23   for them. And then I have -- I researched the use
24   of those products, so what determines the use of
25   those products, what are the general patterns of use

10 (Pages 34 - 37)

RESTRICTED CONFIDENTIAL

Page 38

1  in national prescriptions, in dispensing of
2  prescriptions in certain -- by certain --
3       COURT REPORTER:  I'm sorry.  In
4  certain?
5       THE WITNESS:  Sorry.  In certain
6  markets, et cetera.
7  BY MR. GOLDBERG:
8    Q    And by "these products," you're -- you
9  said it's more than valsartan.  Are you talking
10  hypertension products generally, or -- or is it
11  heart disease products generally?
12   A    Correct, drugs that are used to treat
13  heart disease.
14   Q    What was the timeframe of doing this
15  kind of research?
16   A    So I would say it overlapped with
17  my -- the completion of my dissertation.  So I
18  finished my dissertation in 2007.  I was researching
19  the use of these products and their pricing before I
20  finished my dissertation, so probably 2003, 2005.
21  And then it continued on from there.
22       Similarly, I was very -- I've been
23  very interested in competition, so when these
24  products are expected to experience generic entry,
25  undergo patent expiration; what types of product --

Page 39

1  or what types of firms enter into these markets; how
2  much competition is there; to what extent do these
3  prices go down over time; who uses these types of
4  products.  I think I've been thinking about that
5  since at least 2010, 2011.
6    Q    How about nitrosamines?  Are you
7  familiar with nitrosamines?
8    A    Yes.
9    Q    Prior to the February, March 2020
10  timeframe, had you done any work in connection with
11  nitrosamines?
12   A    Yes.  There was -- President Bush had
13  a council on cancer that released a report in 2010
14  about toxins, and specifically chemicals that can
15  cause DNA damage and other types of human health
16  harms that people might be exposed to in the
17  United States.  I read that report when it came out.
18  I have been generally interested in -- in
19  determining -- in chemicals that might impact
20  consumer health.
21       As an expert in pharmaceutical
22  economics and policy, this is kind of part of my --
23  my job, is to understand what these things are.
24   Q    Have you done any -- authored any
25  articles relating to nitrosamines?

Page 40

1    A    No.  This is just part of, again, the
2  work -- this is all part of understanding a little
3  bit more -- understanding this market.  I was a
4  chemistry major when I entered college, so I
5  actually know what they are.  So I -- I am familiar
6  with what they are before I was an economist.
7    Q    And in between 2010 and 2020, did you
8  do any particular research on the occurrence of NDMA
9  or NDEA in pharmaceutical products?
10   A    Okay.  I'm sorry.  Can you restate the
11  question or just -- just ask the question again?
12   Q    Sure.
13       Between 2010, when you said that
14  article -- that article came out, and February 2020,
15  did you do any research in -- in the area of the
16  occurrence of NDMA or NDEA in pharmaceutical
17  products?
18   A    Right.  So there's a various body of
19  literature that was developing since, I think, at
20  least the early 2000s on -- and actually, probably,
21  before then, on -- on chemical contaminates that are
22  harmful to human health.  I did some coursework on
23  that in -- at Harvard when I was finishing my --
24  when I was doing my Ph.D.  And I have been
25  interested in the topic especially since -- since I

Page 41

1  did my dissertation.
2    Q    All right.  I think you said you
3  finished your dissertation before 2010?
4    A    Right.  I finished -- my dissertation
5  was awarded in -- or my Ph.D. was awarded in 2007.
6    Q    All right.  My -- my question was --
7  I'm trying to be little more specific.
8    A    Uh-huh.
9    Q    My question was, since 2010, between
10  2010 and February of 2020, have you done any focused
11  research on the occurrence of NDMA and NDEA, in
12  particular, in pharmaceutical drugs?
13   A    So I don't know what you mean by
14  "focused research."
15   Q    Well, has -- has the particular focus
16  of research that you've done been the occurrence of
17  NDMA or for NDEA in pharmaceutical drugs?
18   A    So -- so again, the occurrence of
19  these products and their threat to human health as
20  part of the pharmaceutical industry is something
21  that I have been aware of for a long time.  And
22  because of product contamination and adulteration in
23  other product categories, not in valsartan, but in
24  other drugs since at least 2007, 2008, that involve
25  products made by Ranbaxy, products made at the Cidra

11 (Pages 38 - 41)

RESTRICTED CONFIDENTIAL

Page 42

1    plant, products made by Mylan, I am aware that there
2    are a variety of chemicals that can contaminate
3    pharmaceuticals and are harmful to human health.
4    And NDMA is one of those products. It's not the
5    only one.
6        Q      And I'm asking about NDMA. Have you
7    studied NDMA prior to February of 2020?
8        A      NDMA and other products that have come
9    up in my work between 2010 and 2020. Just like --
10   so, again, I -- if you are an expert in this
11   industry, you know that there have been some very
12   significant quality manufacturing lapses in
13   pharmaceutical products. That includes contaminated
14   Heparin. It includes the products that were made at
15   Ranbaxy and ultimately at Mylan as well, and the
16   products that were made at the Cidra plant --
17           COURT REPORTER: At the what?
18           THE WITNESS: By Glaxo -- by
19   GlaxoSmithKline.
20           COURT REPORTER: I'm sorry. That were
21   made at the...
22           THE WITNESS: Cidra plant at -- owned
23   by GlaxoSmithKline in Puerto Rico.
24           There have also been other lapses in
25   quality and in manufacturing that have occurred

Page 43

1    particularly around 2010, 2011, 2012. And I
2    have been very interested in what exactly those
3    quality lapses were and -- and what are the
4    nature of the -- what are the harms to human
5    health of those types of lapses.
6        So I am aware of nitrosamines, in
7    addition to many other chemicals, being harmful
8    to human health and have been aware of that
9    during this time period.
10           MR. GOLDBERG: Can we pull up Tab 66?
11   BY MR. GOLDBERG:
12       Q      Dr. Conti, I want to show you your
13   retention agreement in this case. I don't think you
14   need to take the time to go through the binder, but
15   if you want to, I just want to pull this up and mark
16   this as Conti 1.
17           (Whereupon, Exhibit Conti 1 was marked
18       for Identification.)
19   BY MR. GOLDBERG:
20       Q      This is -- can you see that okay? You
21   have it up on the screen?
22       A      Yeah. I'm going to go get my binder.
23       Q      It's going to be Tab 66 in that
24   binder.
25       A      Okay. Great.

Page 44

1        Q      Do you have Tab 66, what we have
2    marked as Conti 1, in front of you?
3        A      I do. If you can just give me a
4    second to read it, please.
5        Q      Okay. This is your retention
6    agreement with plaintiffs' counsel in this case?
7        A      This is GMA's retention agreement with
8    the attorneys on my behalf.
9            THE COURT REPORTER: I'm sorry?
10           THE WITNESS: On my behalf.
11   BY MR. GOLDBERG:
12       Q      And it says that, in the first
13   paragraph, that plaintiffs' executive committee has
14   retained Greylock McKinnon Associates to provide
15   consulting on economic issues and other related
16   services.
17           What -- what are the related services
18   that -- that you're providing?
19       A      I don't know.
20       Q      It goes on to say that you're going
21   to -- you've been retained to provide expert
22   testimony as it relates to issues of the calculation
23   of damages.
24       A      I see that.
25       Q      Are -- are you -- do you understand

Page 45

1    that that -- that to be the scope of your testimony,
2    the calculation of damages?
3            MR. HONIK: Object to the form and to
4        the extent that it calls for a legal expert
5        opinion.
6            You may answer.
7            THE WITNESS: I have produced a report
8        that is calculating damages in this matter.
9    BY MR. GOLDBERG:
10       Q      So the answer is, yes, you understand
11   the scope of your work to be in relation to the
12   calculation of damages?
13           MR. HONIK: Same objection.
14           You may answer.
15           THE WITNESS: Thank you.
16           So up until this period in time, what
17   I have largely worked on in this matter is
18   related to the calculation of damages.
19           MR. GOLDBERG: You can take that down,
20       put that aside.
21   BY MR. GOLDBERG:
22       Q      You generated a report in this matter
23   in November of 2021. Can you describe, generally,
24   what the process was for putting together that
25   report?

12 (Pages 42 - 45)

RESTRICTED CONFIDENTIAL

Page 46

1    A    I reviewed data. We --
2        THE COURT REPORTER: I'm sorry,
3    Doctor. Can you repeat that?
4        THE WITNESS: Sure.
5        I discussed with the attorneys the
6    availability of data to calculate damages in
7    this matter, and also theories of liability
8    that would determine how we calculated
9    damages -- or how I calculated damages. I
10   worked with my staff to -- and with -- and with
11   the attorneys, to cull materials that would be
12   helpful in the calculation of damages. And I
13   also reviewed regulatory documents and other
14   facts that are relevant to the calculation of
15   damages.
16       And there's -- hold on. And there was
17   lots of drafting, analysis, redrafting and
18   finally, the final report.
19   BY MR. GOLDBERG:
20   Q    How long do you think it took to
21   generate the report from when you started to work --
22   work on it?
23       MR. HONIK: Seth, can we agree that
24   when you use the word, "report," you're
25   referring to the expert declaration of

Page 47

1    Dr. Conti --
2        MR. GOLDBERG: Yes.
3        MR. HONIK: -- of November 10th of
4    last year.
5        MR. GOLDBERG: Yes, the expert
6    declaration.
7        MR. HONIK: Thank you.
8        THE WITNESS: I'm sorry. Can you ask
9    me the question --
10       MR. HONIK: How long did it take you?
11   That's what he asked.
12       THE WITNESS: To generate the report,
13   correct?
14   BY MR. GOLDBERG:
15   Q    Yes.
16   A    Okay. Many months.
17   Q    How many months?
18   A    A lot. A lot of time because we were
19   waiting -- we were discussing. We were waiting for
20   data. We were -- and then calculating damages and
21   then writing the report.
22   Q    Many, a lot, do you have -- was it
23   10 months, more than 10 months?
24   A    I would say -- I mean, we -- I was
25   working on this, and staff was working on this

Page 48

1    pretty intently, at least starting over the summer.
2    Q    Over which summer?
3    A    Last summer, 2021.
4    Q    You mentioned the staff. How big was
5    your staff for this matter, and who were they?
6    A    The people that I have worked most
7    closely with are Bennett Erickson and Sarah Stone,
8    both employees at Greylock McKinnon, both people
9    that I work with pretty closely, generally. There
10   might be some other staff that I don't know as well
11   that have worked on this case.
12   Q    Do you have a sense of how much time
13   Bennett put into this matter?
14   A    No. Bennett's worked a lot on this
15   matter. But I -- I don't know. I don't see his
16   billings.
17   Q    Do you see anybody's billings for this
18   matter, or does that all go to Greylock admins?
19   A    I am very grateful for the work that
20   Greylock does, and no, I don't see any of the
21   billings. I don't -- I'm not involved in any of the
22   administration.
23   Q    Do you have a sense of how many hours
24   you put into the declaration?
25   A    Frankly, no.

Page 49

1    Q    Do you expect it to be more than
2    25 hours?
3    A    Yes.
4    Q    More than 50 hours?
5    A    Yes.
6    Q    More than 100 hours?
7    A    I would say close to 100 hours, sounds
8    about right, but I don't --
9        THE COURT REPORTER: I'm sorry. One
10   more time.
11       THE WITNESS: I don't have an exact
12   accounting.
13   BY MR. GOLDBERG:
14   Q    Your -- the retention agreement, which
15   we marked as Conti 1, says your hourly rate is $675.
16   Does that sound right to you?
17   A    Hold on. Let me just look again.
18   Q    Sure.
19   A    So, yeah, it does. I think my hourly
20   rate has gone up a little bit over time, maybe by
21   $100, but I'm not exactly sure.
22   Q    And for -- you would invoice your time
23   to Greylock, as well?
24   A    Yes.
25   Q    What are -- what do Bennett -- what

13 (Pages 46 - 49)

RESTRICTED CONFIDENTIAL

Page 50

1  are Bennett and Sara's backgrounds?  Are they
2  Ph.D.s?  Are they -- what -- what do they do?
3      A      So Bennett and Sarah both have -- are
4  both highly trained quantitative people.  I would
5  say Sarah largely assists me on research through
6  identifying documents and specific facts that might
7  be helpful.  I would say Bennett largely works on
8  data cleaning, manipulation and analysis.  I have
9  not seen either of their CVs, but I have worked very
10  closely with them for a long time.
11      Q      When you think about your expert
12  declaration, it's broken into -- sort of at the
13  beginning -- your calculations of damages kind of
14  appear at the end of the declaration.  Did -- did
15  either Bennett or Sarah do more in terms of the
16  calculations of damages?  How did the work break up
17  in terms of writing, drafting your report?
18      A      Okay.  I think you're
19  mischaracterizing my report, number one.
20          So the estimate of damages is found in
21  the front, and then the discussion of how to
22  calculations -- how to calculate the report is kind
23  of in the middle.  And then the actual -- actual
24  calculations are summarized at the end.  And then
25  there are appendices that provide the details of the

Page 51

1  data and the specific calculations.
2          I wrote my report.
3      Q      What do you mean by that?
4      A      I mean I wrote my report.
5      Q      Okay.  You mentioned that there were
6  lots of drafts and back and forth.  You wrote it,
7  you shared it with your colleagues at
8  Greylock McKinnon to comment on it?
9      A      I think that's a mischaracterization.
10      Q      Did your colleagues at
11  Greylock McKinnon not comment on your draft report?
12      A      Again, I think that's a
13  mischaracterization.
14      Q      Okay.  So just tell me.  This isn't
15  too much of a mystery.  I'm just trying to
16  understand.
17          Did you share your report with your
18  team at Greylock McKinnon so they could provide
19  edits to it and comment to it?
20      A      Okay.  So I wrote my report, and
21  Greylock -- folks who work at Greylock McKinnon
22  helped me fill in citations where I asked them to
23  provide -- to identify full citations for certain
24  types of facts.  They helped me fill in specific
25  numbers.  They helped me construct certain exhibits,

Page 52

1  but I wrote my report.  And they worked at my
2  direction.
3      Q      And then did you provide drafts to
4  plaintiff's counsel to obtain comments from them
5  about your report?
6          MR. HONIK:  I'm sorry.  I didn't hear
7  the question.  May I have it back, Jamie?
8          THE COURT REPORTER:  Sure.
9          (Whereupon, the question was read back
10  as requested.)
11          MR. HONIK:  Thank you.  It's a yes or
12  no.
13          THE WITNESS:  Yes.
14  BY MR. GOLDBERG:
15      Q      Did anyone outside of
16  Greylock McKinnon or plaintiff's counsel provide
17  input to your report?
18      A      No.
19      Q      Did anyone at Boston University help
20  gather information for your report?
21      A      No.
22          MR. GOLDBERG:  Can we pull up Tab 52?
23  I'm gonna mark as Tab 52 Defendant's Amended
24  Notice to Videotaped Deposition of Dr. Conti.
25          (Whereupon, Exhibit Conti 2 was marked

Page 53

1  for Identification.)
2          MR. HONIK:  And we're calling that
3  Conti 2?
4          MR. GOLDBERG:  And this is going to be
5  marked as Conti 2, yes.
6  BY MR. GOLDBERG:
7      Q      Do you recognize this document,
8  Dr. Conti?
9      A      Yes.
10      Q      Did you receive this document?
11      A      Yes.
12      Q      And this document, you understand,
13  made certain document requests of you?
14      A      Yes.  I understand on Exhibit A,
15  Page 3, or actually, Page 2, 3 and 4.
16      Q      What did you do to respond to this set
17  of document requests?
18          MR. HONIK:  Dr. Conti, I have no
19  objection to the question, but don't reveal
20  discussions with counsel.  It's protected by
21  the work product privilege.
22          THE WITNESS:  Thank you.
23          So there were 17 requests.  They
24  included my current up-to-date resume or CV.
25  That, I worked on with Sarah Stone to get it to

14 (Pages 50 - 53)

RESTRICTED CONFIDENTIAL

Page 54

1    be updated, and then it was provided to counsel
2    to provide to you.
3          Number 2 was a list of all articles,
4    abstracts, studies, reports, seminar materials,
5    presentations, publications or other writings
6    authored or co-authored by me from 2022 to the
7    present, that relate to the use of data after
8    team members -- the use of pharmaceutical
9    data --
10   Q     Doctor. Doctor, I don't --
11   A     Hold on.
12   Q     Hang on. Hang on. Hang on.
13         MR. HONIK: Mr. Goldberg, let her
14   finish, and then you can interject whatever --
15         MR. GOLDBERG: Hang on a second. It's
16   not -- the answer is not responsive to the
17   question. And also, we really don't need to
18   waste -- just hang on, Doctor. We don't need
19   to waste the time. I'm not asking you to read
20   the request out loud. I'm not asking you to
21   read it. My question was what did you do to
22   respond?
23         MR. HONIK: Excuse me. Excuse me.
24   Seth, respectfully, she is completely
25   responsive to your question. It's within her

Page 55

1    province to answer it in whatever way she
2    thinks is appropriate. To frame her response,
3    she is going through each request and
4    identifying what she did.
5          Now, I'd like her to complete her
6    response which you cut off. If you'd like to
7    sharpen your question in some way and perhaps
8    give her an instruction, that's fine. I have
9    no objection.
10         MR. GOLDBERG: That's fine.
11         MR. HONIK: But -- but she was in the
12   middle -- she was in the middle of a response,
13   which was highly responsive, even if it didn't
14   satisfy what you wanted.
15         You can continue, Dr. Conti, and then
16   pause.
17         MR. GOLDBERG: Objection. I'm
18   withdrawing -- I'm withdrawing the question, so
19   there's no reason...
20         MR. HONIK: That's fine. Very good.
21   Thank you. Next question.
22   BY MR. GOLDBERG:
23   Q     Did you -- did you collect any
24   documents to respond to this request?
25   A     Yes. That's what I'm trying to answer

Page 56

1    in specifics. So -- so there's a --
2    Q     What did you --
3    A     Hold on, please let me finish.
4          You requested 17 separate items, so in
5    order to answer your question, I am happy to tell
6    you, for each request, how I answered -- how I
7    gathered documents and provided that information.
8    Q     Okay. We don't have to do that.
9    Okay. We'll -- we'll get to it.
10         MR. GOLDBERG: Can we pull up document
11   65, please?
12   BY MR. GOLDBERG:
13   Q     Do you recognize the document that's
14   on the screen?
15   A     No.
16         MR. GOLDBERG: Marking as Conti 3, the
17   document entitled, "Plaintiffs' Objections and
18   Responses to Defendants' Notice of Videotaped
19   Deposition of Rena Conti, Ph.D."
20         (Whereupon, Exhibit Conti 3 was marked
21   for Identification.)
22   BY MR. GOLDBERG:
23   Q     Is this the first time you're seeing
24   this document, Dr. Conti?
25   A     Well, let me look through in detail,

Page 57

1    please. I'm on Page 6. I think there are --
2    Q     Yeah, my question was --
3    A     -- 15 pages. You asked me if I had
4    seen this, and I'm saying I'm going to look through.
5    Q     We can go off the record while you do
6    that.
7          MR. HONIK: Are you nearly done,
8    Dr. Conti?
9          THE WITNESS: I'm on Page 8 now. If
10   you can just give me a little bit more time.
11         MR. GOLDBERG: Let's go off the
12   record.
13         THE VIDEOGRAPHER: The time is 11:29.
14   We're going off the record.
15         (Whereupon, a short break was taken.)
16         THE VIDEOGRAPHER: The time is 11:30.
17   We're back on the record.
18   BY MR. GOLDBERG:
19   Q     Dr. Conti, have you seen this document
20   before, what we've marked as Conti 3?
21   A     No, I have not.
22         MR. GOLDBERG: Can you pull up -- the
23   document -- the document that's Tab -- I
24   believe it's Tab 0. Do you have a copy of your
25   report handy? If not, there's one in the

15 (Pages 54 - 57)

RESTRICTED CONFIDENTIAL

Page 58

1    binder.
2    A      I didn't hear you with it.
3           THE COURT REPORTER:  I didn't hear
4    you.
5    Q      Your report is the first document in
6    Binder 1.  Do you have -- get that unless you have a
7    copy of it handy.
8    A      I have Tab 1 in front of me.
9    Q      Okay.  Actually, before we get to
10   that --
11          MR. GOLDBERG:  And that can come down,
12   sorry about that.
13          Could you please pull up
14   document 70 -- I'm sorry, not 70, document 67.
15          THE VIDEOGRAPHER:  This will be
16   Exhibit 4?
17          MR. GOLDBERG:  This will be, yes.
18          THE WITNESS:  I'm sorry.  Did you say
19   64?
20          MR. HONIK:  67.
21          MR. GOLDBERG:  Document 67, which we
22   are marking as Exhibit Conti 4.
23          (Whereupon, Exhibit Conti 4 was marked
24   for Identification.)
25

Page 59

1    BY MR. GOLDBERG:
2    Q      Do you recognize document -- the
3    document we have marked as Conti 4?
4    A      No.
5    Q      I'll represent to you that these were
6    the invoices of Greylock McKinnon Associates that
7    were provided in response to the document request.
8    Do you have any reason to disagree with that
9    representation?
10   A      No.
11   Q      And you can see that this is -- at
12   least on the first page, you can see it's an invoice
13   submitted to Conlee Whitely and David Stanoch.
14   Okay.  Do you see that?
15   A      Yes.
16   Q      And those are plaintiffs' counsel in
17   this case, right?
18   A      That's my understanding, yes.
19   Q      I just want to ask you about a few of
20   the invoices here, some entries on these, just so we
21   can understand.  It looks like -- looking at the
22   first page, and I do believe these are in
23   chronological order.  It looks like you first
24   started working on this back in January of 2020.  Is
25   that more or less correct?

Page 60

1    A      Right.  I think winter 2020 is when we
2    first started having discussions, like I said,
3    before the pandemic.
4    Q      Yeah.  Okay.  Yeah.  I know earlier
5    you said February, March, but it looks like it was
6    more like January that you got into this matter; is
7    that correct?
8    A      Well, that's what it says here, so
9    must be.
10   Q      And just going through -- at the time,
11   it looks like your hourly rate was $675 an hour if
12   we go to that column.  And you said that your hourly
13   rate is different now?
14   A      Is that a question?
15   Q      Well, I'm trying to -- do you know
16   what your hourly rate is now?  It looks like if you
17   go three or four pages in --
18   A      Yeah.
19   Q      What is your hourly rate now?
20   A      I think it's either 750 or 775.  I
21   think it has changed a little bit over time.
22   Q      Okay.  We'll get there, but it is 775.
23          Let's just go down this -- let's just
24   go through this so we can get some names here.  Who
25   is -- after -- so you have four entries for

Page 61

1    Dr. Conti in 2020.  And who is the next person?
2    A      Mike Augusteijn.
3    Q      What did Mike do?
4    A      It says that he discussed --
5    Q      Okay.  What -- what does -- what did
6    Mike do on the -- not in this particular entry.
7    What did Mike do for the project?
8    A      Mike is also an expert on data and --
9           THE COURT REPORTER:  And what?
10          THE WITNESS:  Data, acquisition in
11   cleaning, in manipulation, in analysis.  And so
12   I would expect that he would have worked on
13   this in that capacity.
14   BY MR. GOLDBERG:
15   Q      Going to the next person,
16   Bennett Erickson?
17   A      Correct.
18   Q      What did Bennett Erickson do,
19   generally, for the project?
20          MR. HONIK:  Objection, asked and
21   answered.
22          THE WITNESS:  Right.  So I've already
23   answered --
24          MR. GOLDBERG:  I'm sorry.
25          THE WITNESS:  So --

16 (Pages 58 - 61)

RESTRICTED CONFIDENTIAL

Page 62

1  BY MR. GOLDBERG:
2      Q    I can withdraw the question. I'm
3  sorry. You did talk about Bennett before.
4          The next person is Brian Hebert. What
5  did Brian do for the project, generally?
6      A    So it looks here that he billed time
7  for import checking of manufacturing data.
8      Q    Do you know what -- what manufacturing
9  data he looked at?
10     A    I don't.
11     Q    Do you know what -- what is meant by
12  the phrase "manufacturing data"?
13     A    I'm assuming it was data that was
14  related to the sale of these products.
15     Q    That's pretty broad. Do you -- is
16  there any particular data that you think he looked
17  at related to the sale of the products?
18     A    I don't know.
19     Q    If you go on into 2021, now you've got
20  Sarah Honan added to the invoices. Who is
21  Sarah Honan? Is that the Sarah we mentioned
22  earlier? No, that was Sarah Stone.
23     A    Right, Sarah Stone. So Sarah Stone
24  and Bennett Erickson are the people that I have been
25  working with at GMA on this matter. There are a

Page 63

1  handful of other people that generally support
2  Bennett and Sarah that I don't know as well. So
3  Sarah Honan is -- is one of those people.
4      Q    Do you know -- can you describe,
5  generally, what she did for the project?
6      A    It says here "Imported IQVIA data."
7      Q    If you -- on the third page of the
8  document, assuming you have double-sided copies,
9  it's -- it's invoice 21158.
10     A    Yes. That's not what's on the screen,
11  but I see -- I am on that.
12     Q    Okay. The first entry for Bennett
13  says, "Work on valsartan cGMP market share
14  analysis."
15          What -- do you know what that means?
16     A    I'm sorry, I'm a little confused,
17  because what's on the screen is not -- I don't think
18  what we're talking about, so can we just make sure
19  we're on the same page?
20          So invoice 21158, is that what we're
21  talking about right now?
22     Q    Right.
23     A    Okay. Good. So --
24     Q    The question is, Bennett says he
25  worked on valsartan cGMP market share analysis.

Page 64

1  What -- what was that?
2      A    I don't know.
3      Q    You don't know what he meant by "cGMP
4  market share analysis"?
5      A    I'm assuming it has something to do
6  with -- there are multiple manufacturers of these
7  products at issue in this matter. But I don't know
8  what he specifically meant on this date.
9      Q    Do you know if Bennett's cGMP market
10  share analyses were produced in this case?
11     A    I'm sorry, what do you mean by
12  "produced"?
13     Q    Provided to plaintiffs' counsel for
14  production in this case.
15     A    You mean did Bennett turn those
16  documents over to you?
17     Q    Well, did Greylock McKinnon or Bennett
18  provide them to plaintiffs' counsel to produce in
19  this case?
20     A    Well, I'm assuming -- so I -- I mean,
21  the short answer is I don't know. The longer answer
22  is by definition, my report contains the sales of
23  these products across different manufacturers over
24  time. And so I'm assuming that it's related to what
25  Bennett states here, and those -- all of that back

Page 65

1  up and -- have been produced. They are part of my
2  report.
3      Q    Did you rely on a market share
4  analysis in reaching your report -- in reaching your
5  opinions?
6      A    Again, by definition, the at-issue
7  products are valsartan drugs made by different
8  manufacturers. My report had to identify those
9  manufacturers in national data and then apportion
10  sales of those products across different
11  manufacturers.
12          If you go further down on the fourth
13  line, Bennett says, "Work on review of repackager
14  NDCs. Create comparison of FDA-recalled" --
15          COURT REPORTER: I'm sorry, Doctor.
16  Bennett says, "Work on review of..."
17          THE WITNESS: "Repackager NDCs.
18  Create comparison of FDA-recalled NDCs to IQVIA
19  NDCs."
20          I think that -- so -- so there is an
21  FDA list of recalled valsartan products, and --
22  that identifies products by NDC code in the
23  IQVIA data. I can identify products by NDC
24  code, but products are very commonly repackaged
25  and relabeled by private label -- by private

17 (Pages 62 - 65)

RESTRICTED CONFIDENTIAL

Page 66

1     label distributers and even retailers such as
2     CVS or Costco.
3          And so in order to go from the NDC
4     list produced by the -- by the FDA to Xponent
5     was actually sold into the U.S. market, there
6     is -- there is a job that needs to get done.
7     Because repackagers or relabelers will change
8     the NDC code by definition.
9          And so there was work that was done to
10    match NDC codes or drugs at issue in this
11    matter with the national sales that we had on
12    these products. All of that was produced in my
13    report.
14    BY MR. GOLDBERG:
15    Q     Let's just start at the beginning of
16    this. And if you go back to the first page of this
17    document, do you see it says, for you, Dr. Conti --
18          THE COURT REPORTER: I'm sorry, Seth.
19    Can you start that again?
20    BY MR. GOLDBERG:
21    Q     It looks like you invoiced two hours,
22    2.6 hours; is that correct?
23    A     Yes, I see that here.
24    Q     And if you go along with me to the
25    next invoice, there's -- there's no entry for

Page 67

1     Dr. Conti; am I correct?
2     A     You mean -- again, I don't know --
3     Q     Invoice --
4          COURT REPORTER: All right. I
5     cannot -- I can't take both of you down at the
6     same time. And you're both interrupting each
7     other, and so you're not giving me a chance to
8     do my job.
9          MR. GOLDBERG: Okay. Let's not worry
10    about the screen since you have the binder in
11    front of you, and that was the purpose of
12    giving you the document in hard copy. So can
13    you -- and the tech can follow along if the
14    tech can follow along.
15    BY MR. GOLDBERG:
16    Q     Right now I'm looking at
17    Invoice 21024, which is in your binder. Do you see
18    that.
19    A     Yes.
20    Q     Okay. And there's not an entry for
21    Dr. Conti in there, correct?
22          MR. HONIK: Seth, I think for the
23    benefit of myself and all other counsel, can
24    the tech bring up the specific document?
25          MR. GOLDBERG: Sure.

Page 68

1          MR. HONIK: Thank you.
2          MR. GOLDBERG: Sure.
3          MR. HONIK: I see it now. Thank you.
4     BY MR. GOLDBERG:
5     Q     And then if we go to --
6     A     It's two pages, actually. It's two
7     pages.
8     Q     Right. And there's no entry for
9     Dr. Conti on that invoice, correct?
10    A     Correct.
11    Q     And then the next invoice is 21158.
12    Do you see that?
13    A     Yes.
14    Q     And there's no invoice for Dr. Conti
15    there? There's no time invoiced for Dr. Conti in
16    that invoice, correct?
17    A     Correct, but there is mention of me
18    participating in calls with the attorney.
19    Q     So you participated in that call on
20    May 24th, 2021, right?
21    A     Yes.
22    Q     Let's turn to the next invoice, which
23    is 21617. There we see Dr. Conti, you billed
24    12.75 hours, right? Correct?
25    A     I'm just -- I didn't -- I didn't

Page 69

1     prepare this invoice, so I'm just looking through --
2     Q     Sure.
3     A     -- what is actually billed. That's
4     correct.
5     Q     And that invoice takes us through
6     12-29-21. It's the last date anyone billed time on
7     that invoice. Do you see that?
8     A     Well, it's the last time that some of
9     the staff billed time on the invoice. I can see
10    that.
11    Q     Based on my review of these invoices,
12    before December 29th, 2021, you billed, in total,
13    approximately 15 hours for your work in this matter;
14    is that a fair representation?
15          MR. HONIK: Object to form.
16          THE WITNESS: Well, again, I didn't
17    produce these documents, so I just simply
18    billed for the time that's listed here. But if
19    there's a different process for what I submit
20    and what GMA does in what is listed here if
21    there is time, I'm happy -- that I billed, I'm
22    happy to total it up. I haven't done that.
23          It looks like, in the first invoice,
24    there's about two-and-a-half hours.
25          COURT REPORTER: There is -- there's

18 (Pages 66 - 69)

RESTRICTED CONFIDENTIAL

Page 70

1    what?
2         THE WITNESS:  About two-and-a-half
3    hours.
4         In the last invoice there's about 12,
5    almost 13 hours.  So I think that's fair.  So
6    there's approximately 15 to 16 hours that I
7    billed for my time on these invoices.
8    BY MR. GOLDBERG:
9    Q    Are there other Greylock McKinnon
10   invoices that haven't been produced?
11   A    So I am woefully behind in my time on
12   this matter.  I have a list of the time that I have
13   worked on this, but it has not been completely
14   submitted to Greylock McKinnon or to the attorneys.
15   Q    But you were asked --
16   Greylock McKinnon was asked to produce your invoices
17   in this case, and you didn't comply with that
18   request?
19        MR. HONIK:  Object to the form.
20        THE WITNESS:  Of course I did.
21   BY MR. GOLDBERG:
22   Q    Well, why don't we have that time and
23   your invoices for that?
24   A    You mean -- you mean all the invoices?
25   Q    Yeah.

Page 71

1    A    Because I'm really busy, frankly.  I'm
2    teaching intensely.  I've been doing a lot of other
3    work to support government activity.  And I have a
4    very sick mother that I am managing her time and
5    also taking care of my kid.  So I've been very, very
6    busy over the past two months and --
7    Q    Well, I'm not -- I'm not --
8         MR. HONIK:  Don't interrupt her,
9    please.
10        THE WITNESS:  So I have been really,
11   really busy, and so my time is not complete.
12   BY MR. GOLDBERG:
13   Q    I'm not concerned about your time in
14   2022.  You --
15   A    I'm saying that my time in 2021, I
16   spent the majority of 2021 dealing with a very sick
17   mother, traveling in three separate cities, and
18   taking care of my child, in addition to myself, in
19   addition to very intense teaching and other
20   activities.  I am behind in my time.
21   Q    Were you able to put your time in for
22   some invoices, but not others; is that what you're
23   saying?
24   A    What I'm saying is my mother became
25   very sick last summer, and so my time -- and I was

Page 72

1    also teaching intensely during that time.  I have
2    actually been teaching intensely since July.  And so
3    I have been actively working on this case, but I
4    have not submitted my time because I frankly did not
5    have the time to do it.
6    Q    Well, let's look at invoice 21617.
7    That's the last invoice in the -- in the packet.
8    That's your 2021 time.  And --
9    A    I'm sorry.  I'm sorry.  I'm not -- I'm
10   not following you.  Where are you?
11   Q    It's up on the screen, invoice 21617.
12   It's the last invoice in the packet.
13   A    I can see that.
14   Q    So you billed an hour in May of 2021,
15   correct?  You billed an hour in September 2021,
16   correct?  And -- am I correct?
17   A    I can see that there.
18   Q    And you billed 10.75 hours in
19   October 2021, correct?
20   A    Correct.
21   Q    How much time do you expect to bill
22   plaintiffs for 2021 in addition to these
23   12.75 hours?
24   A    So I have a preliminary listing of my
25   time, and it amounts to approximately 60 hours.

Page 73

1    Q    And that's for 2021?
2    A    Yes.  Oh, 2021 and 2022.
3    Q    And how much of that time is 2021
4    versus 2022?
5    A    I would say the majority.
6    Q    Is 2021?
7    A    Correct.
8    Q    How much time have you spent on this
9    matter -- excuse me -- in 2022?
10   A    In preparing for the deposition and
11   doing a handful of other things, maybe about
12   20 hours or so.  I don't have a specific accounting
13   yet.  Again, I've been going back and forth between
14   Boston, New York, Philadelphia and Chicago, because
15   my mother is really sick, for every single week
16   since the new year.
17   Q    Do you think you'd be able to provide
18   that preliminary list to your counsel so that we can
19   see it?
20   A    Sure.  I mean, my -- my plan is to --
21   to finish it.  I don't like to submit bills, and I
22   don't -- I don't like to submit bills that I don't
23   feel -- that aren't triple checked, and so I have a
24   process for doing that.
25        MR. GOLDBERG:  Why don't we go off the

19 (Pages 70 - 73)

RESTRICTED CONFIDENTIAL

Page 74

1    record and take a five-minute break just to
2    give everybody a minute?
3            MR. HONIK:  Why don't we call it
4    10 minutes and come back at 10:07.  Okay?
5            MR. GOLDBERG:  Sounds good.
6            THE VIDEOGRAPHER:  The time is 11:57.
7    This ends Media Unit Number 1.
8            (Whereupon, a short break was taken.)
9            THE VIDEOGRAPHER:  The time is 12:11.
10   This begins Media Number 2, and back on the
11   record.
12   BY MR. GOLDBERG:
13   Q       Dr. Conti, if you could pull and put
14   in front of you your report -- or your declaration,
15   which we marked as -- which we are going to mark as
16   Conti 5.
17           (Whereupon, Exhibit Conti 5 was marked
18           for Identification.)
19   BY MR. GOLDBERG:
20   Q       And I'd like to start at the beginning
21   of your report.
22   A       Just give me a second to get it.
23   Q       Okay.  Let's start at the beginning of
24   your report.  I'm going to ask you questions about
25   it in different places, but I'd like to start just

Page 75

1    at Paragraph 1.
2            You said you were retained to provide
3    opinions and calculations regarding the -- the
4    injury and damages incurred by classes of consumers
5    and end-payers in this matter.
6            By "this matter," you're referring to
7    the amended economic class action complaint, which
8    is at Footnote 1, correct?
9    A       Yes.
10   Q       I'm just going to remind you to speak
11   up a little bit, or maybe the microphone needs to be
12   turned up.
13           And by "injury in this matter" -- you
14   use the phrase "injury" -- you're -- you're talking
15   about an economic injury of this matter, correct?
16   A       Correct.
17   Q       And your damages -- you're not
18   providing opinions on liability, you're providing
19   opinions on damages, right?
20           MR. HONIK:  Object to form.
21           THE WITNESS:  I'm providing opinions
22           on economic injury and damages.
23   BY MR. GOLDBERG:
24   Q       You're not -- you're not -- you
25   haven't reached an opinion as to -- well, strike

Page 76

1    that question.
2            Going to the next paragraph, you say,
3    "I have been asked by plaintiffs' counsel to assume
4    that the at-issue valsartan products manufactured
5    and sold by the defendants" -- and I'm gonna go now
6    to the bottom -- "were recalled" -- "that were
7    recalled in 2018 and 2019 were adulterated and
8    misbranded."
9            Do you see that?
10   A       Yes.
11   Q       What do you mean by "at-issue
12   valsartan products"?
13   A       The valsartan products that were
14   listed in Footnote 3 and Footnote 4.
15   Q       When you use the phrase "at-issue
16   valsartan products," are you limiting that to
17   valsartan products that contained NDMA or NDEA?
18   A       No.
19           COURT REPORTER:  I'm sorry?
20           THE WITNESS:  No.
21           MR. GOLDBERG:  Can we go off the
22           record for one second?
23           THE VIDEOGRAPHER:  The time is 12:16.
24   We're going off the record.
25           (Whereupon, a discussion was held off

Page 77

1    the record.)
2            THE VIDEOGRAPHER:  The time is 12:18.
3    We're back on the record.
4    BY MR. GOLDBERG:
5    Q       So when you're using the phrase
6    "at-issue valsartan products" in Paragraph 2 of your
7    declaration, throughout your declaration,
8    you -- you're including valsartan products that
9    may not have contained NDMA or NDEA?
10           MR. HONIK:  Object to form, asked and
11           answered.
12           THE WITNESS:  When I am referring to
13           "at-issue valsartan products," they are the
14           ones listed in Footnote 2 and Footnote -- I'm
15           sorry -- Footnote 3 and Footnote 4 of my
16           report.
17   BY MR. GOLDBERG:
18   Q       Footnote 3 and Footnote 4 refer to
19   recalled valsartan products, correct?
20           MR. HONIK:  Object to form.
21           THE WITNESS:  No, not solely.  That's
22           a mischaracterization.  So Footnote 3 and
23           Footnote 4 define at-issue valsartan products.
24           And they include products manufactured by --
25           I'm going to say this, and it's -- I'm going to

20 (Pages 74 - 77)

RESTRICTED CONFIDENTIAL

Page 78

1    butcher the name -- Zhejiang Huahai, Teva,
2    Hetero, Torrent, Mylan and Aurobindo. And it
3    includes the valsartan products marketed under
4    Diovan name and their generic equivalent and
5    then marketed under the Exforge name and their
6    generic equivalent during the time period
7    2020 -- 2012 through 2018.
8    BY MR. GOLDBERG:
9    Q    So you are including in at-issue
10   valsartan products all valsartan manufactured by
11   those defendants between 2012 and 2018?
12   A    Correct.
13   Q    That paragraph at the end talks
14   about -- it says that you -- you were asked to
15   assume that those products were adulterated and
16   misbranded. On what basis do you --
17   A    I'm sorry. I'm sorry. I don't
18   know -- what -- what do you mean by "at the end"?
19   Q    Okay. If you look at -- if you look
20   at the paragraph, it says, "I have been asked" --
21   A    Paragraph 2, okay.
22   Q    You were asked to assume that those
23   products were adulterated and misbranded, correct?
24   A    Correct.
25   Q    On what basis were you asked to make

Page 79

1    that assumption?
2    A    I'm sorry. I don't understand the
3    question.
4    Q    What were the -- what was the basis
5    for the adulteration that you were asked to assume?
6    A    My understanding is, that basis is
7    outlined in the complaint, which I reference in the
8    first paragraph of my report and also Footnote 1.
9    Q    Was there any particular aspect of
10   these drugs that made them -- that you were asked to
11   assume made them adulterated?
12   A    Again, the basis of adulteration and
13   misbranding is detailed in the complaint. And the
14   definition of "adulterated" and "misbranded" is also
15   outlined in the complaint, and is also outlined in
16   my report in later paragraphs.
17         COURT REPORTER: Is also outlined in
18   my report...
19         MR. HONIK: In later paragraphs, she
20   said.
21         COURT REPORTER: Thank you.
22         MR. GOLDBERG: Counsel, Counsel,
23   there's no need for you to testify.
24         MR. HONIK: I'm not testifying. It's
25   just that I heard her --

Page 80

1         MR. GOLDBERG: What you understand --
2         MR. HONIK: Excuse me. Excuse me.
3         MR. GOLDBERG: Counsel, don't
4    interrupt. Don't interrupt.
5         MR. HONIK: I'm going to protect this
6    record in every single way that I want to. And
7    as a courtesy to Ms. Moskowitz, I simply heard
8    a noncontroversial three words and offered them
9    to her to move things along. Thank you.
10        MR. GOLDBERG: Counsel, what do you
11   understand to be the -- the adulteration that
12   you assumed?
13        MR. HONIK: I'm not -- I'm not here to
14   answer your questions. If it's directed --
15        MR. GOLDBERG: I'm sorry. I'm sorry,
16   Dr. Conti.
17   BY MR. GOLDBERG:
18   Q    I'd like to -- I'd like you to explain
19   what you under- -- what you assumed.
20   A    So, again, the assumption of
21   adulteration and misbranding is detailed in the
22   complaint and cited in my Paragraph 1 and
23   Paragraph 2 in Footnotes 1, 2, 3 and 4.
24   Q    It's fair to say, since you assume
25   those facts that are in that complaint, you didn't

Page 81

1    reach any independent determination about whether
2    there was an adulteration, correct?
3    A    Again, I was asked to assume certain
4    facts about the adulteration and misbranding of
5    valsartan products at issue in this matter.
6    Q    So the answer to my question is yes,
7    you didn't independently conclude that there was an
8    adulterated drug?
9         MR. HONIK: Object to form.
10   BY MR. GOLDBERG:
11   Q    You were asked to make that
12   assumption?
13        MR. HONIK: Object to the form.
14   BY MR. GOLDBERG:
15   Q    Correct?
16   A    I was asked to make that assumption,
17   correct, as outlined in the complaint and in the
18   footnotes listed here.
19   Q    If you go on to Paragraph 4 of your
20   complaint -- of your report, sorry --
21   A    That's okay.
22   Q    The first few lines is where I'm
23   looking. It says, "The adulteration derives from
24   the defendant manufacturers' allowance of chronic
25   and pervasive deficiencies in the manufacturing of

21 (Pages 78 - 81)

RESTRICTED CONFIDENTIAL

Page 82

1   at-issue valsartan products."
2          What did you mean by "chronic and
3   pervasive deficiencies"?
4      A     My understanding is that there were --
5   there are systematic failures of cGMP in the
6   manufacturing of the at-issue valsartan products by
7   the manufacturers.
8      Q     What are those systematic failures
9   that you're referring to?
10         MR. HONIK:  Objection, asked and
11   answered.
12         THE WITNESS:  There -- there is -- my
13   understanding is that there are -- there are
14   many of them, and those are outlined in the
15   complaint and also supporting FDA documents of
16   cGMP violations that the manufacturers were
17   cited for.
18  BY MR. GOLDBERG:
19     Q     You wrote your report, correct?
20     A     I did.
21     Q     Okay.  So when you wrote "chronic and
22   pervasive deficiencies," what were you -- what were
23   you documenting?  What chronic and pervasive --
24         MR. HONIK:  Objection, asked and
25   answered.

Page 83

1   BY MR. GOLDBERG:
2      Q     What chronic and pervasive
3   deficiencies were you referring to?
4          MR. HONIK:  Object to form, asked and
5   answered.
6          THE WITNESS:  The ones that are
7   referred to in the complaint at issue in this
8   matter.
9   BY MR. GOLDBERG:
10     Q     Any others?
11     A     No.
12     Q     Could you -- I -- I should have done
13   this before, but if you could look at Attachment B
14   to your report, which is up on the screen, as well,
15   this -- this -- this attachment says, "Materials
16   relied upon."  Did you prepare this attachment?
17     A     My staff, under my direction, prepared
18   this document.
19     Q     And is it fair to say that these were
20   the materials you relied upon in reaching your
21   opinions?
22     A     In addition to my expertise and my
23   experience in this matter -- or my experience in
24   this industry.
25     Q     So there was a document that you

Page 84

1   looked at and relied upon in reaching your opinions,
2   that's listed here; is that correct?
3      A     I don't think that's accurate, because
4   again, I am in -- as an expert in the regulation of
5   the pharmaceutical industry, and in many other
6   contexts, I have spent a lot of time thinking about
7   the -- the requirements of manufacturers, that they
8   need to meet, in order to meet cGMP, and also
9   violation of cGMP.  I have also spent a lot of time
10   thinking about and thinking on adulteration and
11   misbranding of products, generally, in this
12   industry.
13         So again, it's -- the materials relied
14   upon or the ones listed here are the most germane to
15   this specific matter.  But my experience is also
16   germane.  That's in Attachment A.
17     Q     Okay.  So my question was, the
18   documents that you relied upon to reach your
19   opinions in this matter, leaving aside your
20   experience and your general knowledge, but the
21   specific documents that you relied upon to reach
22   your opinions in this matter, are set forth in
23   Attachment B, correct?
24         MR. HONIK:  Object to the form, asked
25   and answered.

Page 85

1          THE WITNESS:  I don't -- I mean,
2   again, I don't quite understand the distinction
3   you're making.  So again, my expertise and
4   experience in the regulation of this industry
5   informs everything I do, including the opinions
6   that -- and the calculations that I performed
7   in this matter.
8          Attachment A provides my CV, which has
9   an extensive list of things that I have
10   published on this industry.  But Attachment B
11   is enumerating the materials that I
12   specifically relied on in this matter.  But I
13   don't see how I could distinguish between my
14   experience generally in this industry and the
15   materials that I relied on.
16  BY MR. GOLDBERG:
17     Q     Well, you just -- you did, because
18   this document says, "Materials Relied Upon."  So
19   you're making a distinction between your CV and the
20   materials that you relied upon, right?
21     A     No, you are.  No, you are.  What I'm
22   saying is my experience informs the materials that I
23   relied upon, by definition.  I mean, I -- I know a
24   lot about cGMP and the regulation of the
25   products --

22 (Pages 82 - 85)

RESTRICTED CONFIDENTIAL

Page 86

1    Q    Did you --
2    A    Hold on, please, if I can finish.
3        I know a lot about the regulation of
4    these products in the U.S. market.  But it's based
5    upon my experience working on many different aspects
6    of this market.  And it's many different products.
7    That informs the documents that were selected and
8    thought about specifically or cited specifically in
9    my report.
10    Q    Did you review any deposition
11    testimony in reaching your opinions?
12    A    No.
13    Q    Did you --
14    A    As I -- hold on.  As I understand
15    it --
16    Q    No.  No.  No.  You answered the
17    question.
18    A    No.  No.  No.  I didn't answer.
19        MR. HONIK:  She has not finished her
20    response.  Do not interrupt the witness.
21        THE WITNESS:  So, as I understand it,
22    the reports that were produced that mention my
23    report, none of those people had been deposed
24    yet.  So I would have liked to have seen their
25    depositions, because some of it -- what they

Page 87

1    say in the reports is confusing.  But I have
2    not -- my understanding is they have not been
3    deposed yet.
4    BY MR. GOLDBERG:
5    Q    Did you review any depositions of any
6    witnesses in reaching your opinions in this case?
7    A    No.  I mean, some of -- like I said,
8    the ones that I would have liked to have reviewed, I
9    wasn't able to because they haven't been deposed
10    yet.
11    Q    So you haven't read a deposition of a
12    plaintiff in this case?
13    A    No.
14    Q    Or a plaintiff --
15    A    I understand that the depositions
16    haven't been done of the economic experts.
17    Q    I'm asking you about the plaintiffs.
18    I'm not asking you about experts.  You haven't read
19    a deposition of a plaintiff in this case, correct?
20    A    I have not.
21    Q    You haven't read the deposition of a
22    class representative in this case?
23    A    I have not.
24    Q    And you haven't read -- read the
25    deposition of any defendant witnesses or employees

Page 88

1    in this case?
2    A    My understanding, again, of the
3    defendant experts in this case is that they have
4    not -- they've produced reports, but they have not
5    been deposed yet.  So I don't see how I could read a
6    deposition if it hasn't occurred yet.
7    Q    If you go back in your report to
8    Paragraph 4 --
9    A    I'm sorry.  I didn't hear you.  I
10    can't hear you.
11        THE COURT REPORTER:  Seth, I can't
12    hear you either.
13        MR. GOLDBERG:  Sorry about that.
14    BY MR. GOLDBERG:
15    Q    The third line refers to "a failure by
16    the defendant manufacturers to implement quality
17    assurance practices."
18        Do you have any specific understanding
19    of what those quality assurance practices were?
20        MR. HONIK:  Objection, asked and
21    answered.
22        THE WITNESS:  So manufacturers who are
23    legally allowed to supply products to the
24    pharmaceutical U.S. chains are required to
25    attest to a very significant number of quality

Page 89

1    assurance practices, which include but are not
2    limited to the risk, assessment and mitigation
3    of their -- of their product from end to end.
4    And there's also attestation of the practices
5    that the firms are required to provide to
6    the --
7        THE COURT REPORTER:  To the -- I'm
8    sorry.  To the what?
9        THE WITNESS:  Are required to provide
10    to the U.S. Food and Drug Administration, upon
11    their initial application to get a license to
12    sell these products to the U.S. market, but
13    also over time.  Yes, that's what I mean by
14    "quality assurance practices."
15    BY MR. GOLDBERG:
16    Q    Do you have any particular instances
17    of quality assurance practices or the failure to
18    implement quality assurance practices as to any of
19    the defendants in this case?
20        MR. HONIK:  Object to form and asked
21    and answered.
22        THE WITNESS:  Yes.  They are detailed
23    in the complaint, and they are also detailed in
24    the FDA documents that are listed in --
25    detailing for each one of the defendants on the

23 (Pages 86 - 89)

RESTRICTED CONFIDENTIAL

Page 90

1  systematic --
2        THE COURT REPORTER: On the
3  systematic --
4        THE WITNESS: And pervasive quality
5  assurance.
6        COURT REPORTER: Excuse me, Counsel.
7  One second. Let me see if I can turn my volume
8  up.
9        THE VIDEOGRAPHER: Mr. Goldberg, I
10 think the -- the paper shuffling may be
11 distracting a little bit.
12        THE WITNESS: Correct. It's very hard
13 to hear.
14        COURT REPORTER: Okay. I put my
15 volume up.
16 BY MR. GOLDBERG:
17     Q     Did you review any document that --
18 that detailed for a failure to implement quality
19 assurance practices by the defendant manufacturers?
20        MR. HONIK: Object to form, asked and
21 answered.
22        THE WITNESS: Yes. The complaint
23 details systematic and pervasive deficiency
24 in -- in the cGMP. And then there are FDA
25 documents that are supportive of that for each

Page 91

1  of the defendant manufacturers that details
2  many different deficiencies in cGMP.
3  BY MR. GOLDBERG:
4     Q     Which FDA documents --
5     A     Hold on. In the manufacturing of
6  these products.
7     Q     Which FDA documents are you referring
8  to?
9     A     Hold on a second. We were just
10 looking at the materials relied upon. I think it's
11 in Attachment B.
12        So there's the complaint and
13 then -- and -- I don't see it assessed here, but I
14 have a binder of FDA documents that are specific to
15 each one of the manufacturers that I have reviewed
16 that are related to the at-issue products here.
17     Q     What binder are you referring to?
18     A     I'm happy to get it if you can just
19 give me a second.
20        MR. GOLDBERG: Let's go off the
21 record.
22        THE VIDEOGRAPHER: The time is 12:42.
23 We're going off the record.
24        (Whereupon, a discussion was held off
25 the record.)

Page 92

1        THE VIDEOGRAPHER: The time is 12:42.
2  We're back on the record.
3  BY MR. GOLDBERG:
4     Q     I want you to listen to the questions
5  I'm going to ask. I just want to you answer the
6  questions I'm going to ask. Okay?
7        The binder that -- the binder that you
8  have in front of you now --
9     A     Correct.
10     Q     -- you did not provide that binder to
11 your counsel before today, correct?
12        MR. HONIK: Object to the form of the
13 question.
14        THE COURT REPORTER: What was your
15 answer?
16        THE WITNESS: I mean, I did not -- I,
17 me, provide it. It's the complaint and the
18 backup and some of the documents listed in the
19 complaint. The complaint is listed in my
20 Attachment B, and the documents that are
21 related specifically to inspection reports,
22 FDA, failure notices to the -- to each of the
23 manufacturers are just the complaint. They're
24 just the backup to the complaint.
25

Page 93

1  BY MR. GOLDBERG:
2     Q     Okay. I understand.
3        So you're saying you looked at the
4  complaint and the exhibits to the complaint?
5     A     Correct.
6     Q     That's what is in that binder?
7     A     Yes. And specifically, I reviewed
8  the -- the backup material that the complaint
9  references related to the systematic and
10 persuasive [sic] failures of cGMP for each of the
11 defendants.
12        So I'm gonna say this incorrectly
13 again, Zhejiang Huahai --
14     Q     You don't have to -- you don't have to
15 name the defendants. We know who they are.
16     A     Okay. No, I'm just telling you -- I'm
17 saying to you, not the defendants, but for the
18 specific documents related to cGMP violations, the
19 products that I looked -- the manufacturers that I
20 looked at were Zhejiang --
21        MR. HONIK: You can say ZHP. ZHP.
22        THE WITNESS: ZHP. Thank you.
23        ZHP and the FDA warning letters
24 related to that. Mylan, in multiple ways, and
25 Aurobindo, Torrent, Hetero and Lantech.

24 (Pages 90 - 93)

RESTRICTED CONFIDENTIAL

Page 94

1          THE COURT REPORTER:  What was the last
2    one?
3          THE WITNESS:  And Lantech.
4    BY MR. GOLDBERG:
5      Q     Yes or no, the documents that you
6    relied on for the pervasive deficiencies that you
7    referred to, are the complaint and the exhibits
8    attached to the complaint?
9          MR. HONIK:  Object to the form, asked
10    and answered.
11          THE WITNESS:  Okay.  So I have
12    answered your question a bunch of times.  So
13    again, there's --
14          MR. GOLDBERG:  I'm going to strike
15    the -- I'm going to withdraw the question.
16    Counsel, we're going to off the record.
17          THE VIDEOGRAPHER:  The time is 12:46.
18    We are going off the record.
19          (Whereupon, a discussion was held off
20    the record.)
21          MR. HONIK:  Let's proceed on the
22    stenographic record.  Are we off the video
23    record?
24          THE VIDEOGRAPHER:  We are off the
25    video.

Page 95

1          MR. HONIK:  Okay.  Before we go back
2    on the video, is there anything else you need
3    to say, Seth?  I don't want to waste more time.
4          MR. GOLDBERG:  Well, you want me to
5    put it on the record, so I'm going to.
6          MR. HONIK:  That's fine.  Do you want
7    it on the video record?
8          MR. GOLDBERG:  Sure.
9          MR. HONIK:  Okay.  Queue us, please,
10    Justin.
11          THE VIDEOGRAPHER:  The time is 12:48.
12    We're back on the record.
13    BY MR. GOLDBERG:
14      Q     Let's turn to Paragraph 23 of your
15    report.  In this paragraph, you refer --
16      A     Hold on.  I'm not there yet.  Hold on.
17    Paragraph 23 or Page 23?
18      Q     Paragraph 23.
19      A     Great.  Thank you.  Okay.  Just give
20    me one second.
21      Q     In this paragraph --
22      A     Just give me -- just give me one
23    second.  Okay.
24      Q     In this paragraph, you're referring to
25    reasons the FDA deems a drug as misbranded.  Do you

Page 96

1    see that?
2      A     Yes.
3      Q     Were there any particular reasons that
4    you were asked to assume that are listed here?
5          MR. HONIK:  Object to the form of the
6    question.
7          THE WITNESS:  All of them.  So the --
8    my -- I was -- hold on.
9          MR. HONIK:  She's responding to your
10    question.  Please stop interrupting her.
11          THE WITNESS:  So I -- thank you.
12    I was asked to assume these products
13    were misbranded.  This paragraph, Paragraph 23
14    in my report, lists the definition of
15    "misbranding" according to the
16    Food and Drug Administration.  And the
17    definition is inclusive.
18    BY MR. GOLDBERG:
19      Q     So you were asked to assume that all
20    of these particular reasons that a drug can be
21    misbranded applied to the valsartan in this case?
22          MR. HONIK:  Objection to form.
23          THE WITNESS:  That is -- that is a
24    mischaracterization of my testimony.  I was
25    asked to assume that these products at issue

Page 97

1    were misbranded.  And paragraph 23 is providing
2    a definition by the FDA of what "misbranded"
3    means.
4    BY MR. GOLDBERG:
5      Q     And my particular question is, were
6    you asked to assume that any of these particular
7    reasons occurred with respect to the at-issue
8    valsartan products?
9          MR. HONIK:  Object to the form, asked
10    and answered.
11          THE WITNESS:  I was asked to assume
12    that the at-issue valsartan products were
13    misbranded.  "Misbranded" is defined by the
14    U.S. Food and Drug Administration in a very
15    particular way.  And that definition is
16    provided in Paragraph 23 of my report.
17    BY MR. GOLDBERG:
18      Q     Looking at Paragraph 23, which of
19    these specific reasons for misbranding do you
20    believe applied in this -- with respect to the
21    at-issue valsartan products?
22          MR. HONIK:  Object to the form, asked
23    and answered.
24          THE WITNESS:  The complaint uses the
25    term "misbranded."  From the perspective of

25 (Pages 94 - 97)

RESTRICTED CONFIDENTIAL

Page 98

1    regulation of pharmaceutical industry, there is
2    a particular definition of misbranding that the
3    U.S. Food and Drug Administration uses. My
4    understanding, and what I was asked to assume,
5    is that the term "misbranded" is specific to
6    the U.S. Food and Drug Administration's
7    definition. And the definition is listed here
8    and is inclusive.
9    BY MR. GOLDBERG:
10    Q    You -- you understand that a
11    misbranding can occur for any one of these reasons,
12    right?
13    A    Again, I was asked to assume that
14    these products were misbranded.
15        The definition of "misbranding" by the
16    U.S. Food and Drug Administration is provided here,
17    and it's inclusive.
18    Q    So you don't agree with my question?
19    You don't agree that any one of these that are
20    listed in 20 -- in Paragraph 23 could be a reason
21    for misbranding?
22        MR. HONIK: Object to form, asked and
23    answered.
24        THE WITNESS: Okay. The FDA has a
25    very specific definition of "misbranded." It

Page 99

1    is stated here. In my Paragraph 23 of my
2    report, it says, "Reasons that the FDA deems a
3    drug as misbranded include, but are not limited
4    to:" and then it enumerates the specifics. I'd
5    be happy to go on and provide those
6    specifics --
7    BY MR. GOLDBERG:
8    Q    So I'm asking you --
9        MR. HONIK: Don't interrupt the
10    witness. Don't interrupt the witness.
11    BY MR. GOLDBERG:
12    Q    I would like you to --
13        MR. GOLDBERG: I'm not interrupting
14    her.
15        MR. HONIK: Do not interrupt the
16    witness.
17    BY MR. GOLDBERG:
18    Q    I would like to you answer my
19    question.
20        MR. HONIK: If you persist in
21    interrupting the witness in the middle of her
22    responses, we will conclude the deposition.
23    She was in the middle of her response.
24        Ms. Moskowitz, can you please read
25    back the question and the answer?

Page 100

1        MR. GOLDBERG: No. Counsel --
2        MR. HONIK: No.
3        MR. GOLDBERG: Counsel, let me just
4    say that you -- you are interfering with this
5    deposition, and the witness is clearly
6    filibustering. And we will -- we will not
7    continue with this. Judge Vanaskie has been
8    very clear that he will not permit
9    filibustering by witnesses, period. He's
10    actually sanctioned witnesses for it. And if
11    we have to do it, we will get him on the phone
12    for this.
13        I tried to do this with you off the
14    record, but you refused. I tried to do this in
15    a way that would not color the testimony, but
16    you did not want to do that. You wanted it on
17    the record. The reality is, as the last five
18    questions will demonstrate, this witness is
19    filibustering and not answering the questions
20    that are being asked. Period.
21        MR. HONIK: It seems to me with the
22    last five questions --
23        MR. GOLDBERG: If you want to continue
24    in this way, we will conclude the deposition
25    with a call to Judge Vanaskie.

Page 101

1        MR. HONIK: What the last five
2    questions and responses revealed to me is your
3    ignorance in understanding the witness, full
4    stop. We will not proceed until and unless you
5    allow the witness to complete her responses,
6    even if you don't like them.
7        Accordingly, I will ask the reporter
8    to read the pending question and as much as
9    Dr. Conti's response as she has so that she may
10    complete her response. And then you should
11    feel free to ask another question.
12        Ms. Moskowitz?
13        COURT REPORTER: Sure.
14        (Whereupon, the answer was read back
15    as requested.)
16        MR. HONIK: Do you wish to complete
17    your response, Dr. Conti, or have you lost your
18    train of thought?
19        THE WITNESS: I have not lost my train
20    of thought, but I don't have to...
21        So, again, I was asked to assume that
22    these products were misbranded. "Misbranded"
23    from the FDA's perspective has its very
24    specific definition that's enumerated -- that's
25    listed in Paragraph 23. And that -- that

26 (Pages 98 - 101)

RESTRICTED CONFIDENTIAL

Page 102

1    definition of "misbranded" is inclusive.
2    BY MR. GOLDBERG:
3        Q    Let's try it like this:  Which --
4    which of these enumerated factors of misbranding
5    apply to the at-issue products -- the at-issue
6    valsartan products?
7        MR. HONIK:  Objection, asked and
8    answered and outside the scope of her report.
9        You may respond.
10        THE WITNESS:  I was asked to assume
11    these products were misbranded, and -- and
12    again, that the definition of "misbranded" was
13    inclusive of all, but -- but not limited to
14    these factors.
15    BY MR. GOLDBERG:
16        Q    So you weren't asked to assume any
17    particular fact -- any particular reason for
18    misbranding.  You were just asked to assume
19    misbranding based on the definition of
20    "misbranding"?
21        MR. HONIK:  Object to form, asked and
22    answered.
23    BY MR. GOLDBERG:
24        Q    And --
25        COURT REPORTER:  I'm sorry.  I didn't

Page 103

1    hear a response.
2        THE WITNESS:  Correct.
3        COURT REPORTER:  Thank you.
4    BY MR. GOLDBERG:
5        Q    And if you -- if you look at the --
6    the immediately preceding paragraph, Paragraph 22,
7    you provide the reasons the FDA deems a drug
8    adulterated, correct?
9        A    I -- no.  That is not what the
10    paragraph states.  The paragraph states the reasons
11    the FDA deems a drug adulterated to include, but not
12    be limited to factors that are listed here.
13        Q    And is the same true with respect to
14    adulteration, that you were asked to assume the
15    drugs were adulterated based on the definition of
16    "adulterated" as we see it here?
17        MR. HONIK:  Object to form.
18        THE WITNESS:  The FDA has a very
19    specific definition of "adulteration," which is
20    listed here, but again, it's inclusive.  I was
21    asked to assume that adulteration -- that the
22    use of the term "adulteration" in the -- in the
23    complaint is inclusive of these factors and the
24    other factors that the FDA considers a product
25    to be adulterated.

Page 104

1    BY MR. GOLDBERG:
2        Q    So you were asked to assume the drugs
3    were adulterated based on all of the different
4    factors the FDA might consider a drug adulterated?
5        MR. HONIK:  Object to the form.
6    BY MR. GOLDBERG:
7        Q    Those listed -- those listed here and
8    those that are not listed here?
9        MR. HONIK:  Object to the form, asked
10    and answered.
11        THE WITNESS:  Again, I was -- so any
12    one of these factors can make a product
13    adulterated in the view of the FDA, just like
14    any one of these factors could be considered --
15    would make a product misbranded, according to
16    Paragraph 23 and -- and beyond.
17        I was asked to assume that these
18    products are considered to be adulterated and
19    misbranded according to the FDA's definition,
20    which is inclusive of all of the factors
21    listed, both in my report and alluded to -- and
22    alluded to as additional.
23    BY MR. GOLDBERG:
24        Q    Let's turn back to Paragraph 6 of your
25    report.  It's on Page 3 of your report.

Page 105

1        Here you say -- and I'm looking in the
2    middle of the paragraph -- "Prescription drugs that
3    are adulterated and misbranded are neither
4    recognized by the United States government as
5    legitimate products to be sold by manufacturers nor
6    paid for by payors; nor are they considered
7    legitimate products by the pharmaceutical industry."
8        What do you mean by "legitimate
9    products"?
10        A    I mean that a product that does not
11    meet cGMP regulations cannot be entered into the
12    legal class of trade into the United States
13    pharmaceutical trade.  That means that pharmacies
14    can't sell products that don't meet cGMP practices
15    and standards, and nor can -- and nor do payors pay
16    for product --
17        COURT REPORTER:  And nor do payors...
18        THE WITNESS:  Pay for products that do
19    not meet cGMP.
20    BY MR. GOLDBERG:
21        Q    Is it -- is it the fact that there's a
22    cGMP violation that makes the product not
23    legitimate, or is it the fact that, as you put it,
24    pharmacies wouldn't pay for it, that consumers
25    wouldn't pay for it?  What makes the product not

27 (Pages 102 - 105)

RESTRICTED CONFIDENTIAL

Page 106

1  legitimate?
2          MR. HONIK: Object to form, asked an
3  answered.
4          THE WITNESS: Violation of cGMP.
5          Remember -- and -- and also just to
6  make sure that I understand your question,
7  payors pay for products, consumers and
8  insurers, right? Pharmacies may stock products
9  for sale.
10  BY MR. GOLDBERG:
11  Q    Is it your understanding that any cGMP
12  violation would make a product not legitimate?
13          MR. HONIK: Object to form, outside
14  the scope of her report.
15          You may answer.
16          THE WITNESS: Manufacturers must
17  attest to their compliance with cGMP practices
18  in order to enter their products into the U.S.
19  class of trade and then throughout the
20  pharmaceutical supply chain, both as a
21  condition of sale into the U.S. and then
22  yearly.
23  BY MR. GOLDBERG:
24  Q    Okay. Is it -- is it your
25  understanding that any cGMP violation would make the

Page 107

1  product not legitimate?
2          MR. HONIK: Object to form.
3  BY MR. GOLDBERG:
4  Q    In your view?
5          MR. HONIK: Object to form, asked and
6  answered, beyond the scope.
7          THE WITNESS: So, again -- again, my
8  understanding is that pharmaceutical
9  manufacturers that want to sell their product
10  into the closed pharmaceutical chain in the
11  United States must attest that their products
12  meet cGMP. But when they first enter and
13  launch into the market, that's conditional on
14  launch -- that their launch is conditional on
15  that attestation. And then annually
16  thereafter.
17          THE COURT REPORTER: And then
18  annually, they're...
19          THE WITNESS: Thereafter.
20          COURT REPORTER: Okay.
21  BY MR. GOLDBERG:
22  Q    So it's your testimony that any cGMP
23  violation would make a product not legitimate?
24          MR. HONIK: Object to the form, asked
25  and answered.

Page 108

1          THE WITNESS: That is not my
2  testimony, sir.
3  BY MR. GOLDBERG:
4  Q    So a product that has a cGMP violation
5  could be a legitimate product, in your view?
6          MR. HONIK: Object to the form, asked
7  and answered, beyond the scope.
8          THE WITNESS: Again -- thank you.
9          Again, pharmacy manufacturers cannot
10  enter their products into the U.S. -- the
11  closed U.S. chain of pharmaceutical products
12  sold, bought, insured, consumed and -- by
13  pharmacies, et cetera, if they do not meet
14  cGMPs both upon launch -- they can't actually
15  enter the U.S. market, and they can't sell over
16  time unless they make the attestation that
17  their products are cGMP compliant.
18  BY MR. GOLDBERG:
19  Q    Is it your testimony that products
20  produced by a manufacturer where there are cGMP
21  violations cannot be sold in the U.S.?
22          MR. HONIK: Object to the form, asked
23  and answered.
24          THE WITNESS: Okay. Again, a
25  pharmaceutical manufacturer cannot --

Page 109

1  BY MR. GOLDBERG:
2  Q    My question is a yes or no question.
3          MR. HONIK: You're interrupting the
4  witness.
5          MR. GOLDBERG: I am because my
6  question is yes or no question.
7          MR. HONIK: The witness is permitted
8  to answer it in whatever manner she believes is
9  appropriate. You have interrupted her.
10          MR. GOLDBERG: Actually -- actually,
11  that's not what happens under the rules in this
12  case. If it's a yes or no question, the
13  witness should say yes or no and then qualify
14  their answer if need be.
15          MR. HONIK: Yeah. Whatever you
16  believe is -- is fine, Seth. You're not to
17  interrupt her. If you persist in interrupting
18  her, then we'll have to stop the deposition.
19  But as far as I can see, you have asked her the
20  same question a half dozen times. She's --
21  she's being quite level with you in responding.
22  I'm protecting the record.
23          Madam reporter, let's have the
24  question, and we'll have Dr. Conti answer it
25  again.

28 (Pages 106 - 109)

RESTRICTED CONFIDENTIAL

Page 110

1    (Whereupon, the question was read back
2    as requested.)
3        MR. HONIK: And then I've noted my
4    objection.
5        You can respond, Dr. Conti.
6        THE WITNESS: Thank you.
7        Pharmaceutical manufacturers are not
8    allowed to sell their products into the U.S.
9    without meeting cGMP standards both upon their
10   launch and over time. And just to be really
11   clear, it is -- from -- from the
12   U.S. regulator's perspective, it is on the
13   manufacturer to ensure and to attest that they
14   are manufacturing their products to the gold
15   standard of cGMP that is -- as outlined by the
16   U.S. Food and Drug Administration.
17   BY MR. GOLDBERG:
18   Q    Is it -- do you -- is it your view
19   that -- is it your understanding that any cGMP
20   violation would prevent a manufacturer from selling
21   the product in the case -- in the U.S.?
22       MR. HONIK: Object to form, asked and
23   answered and beyond the scope.
24       You may respond.
25       THE WITNESS: Again --

Page 111

1        MR. GOLDBERG: When you say "beyond
2    the scope" -- can I just get a clarification
3    counsel? When you say "beyond the scope," what
4    do you mean?
5        MR. HONIK: Happily. You've
6    established that Dr. Conti was retained to
7    provide opinions and calculations regarding the
8    injury and damages incurred by classes of
9    consumers and end-payors in this matter.
10       To do so, she was assigned -- she must
11   assign an economic value to prescription drugs
12   that were adulterated and misbranded, two terms
13   that she's now defined for you, as outlined in
14   the complaint. As such, she's not our cGMP
15   expert. We have such an expert. He's been
16   deposed. And I'm merely pointing out to you
17   that if you want to drill down on cGPM
18   standards beyond what Dr. Conti, as a health
19   economist, needs to know, I think you're
20   wasting time.
21       But more importantly, it's beyond the
22   scope of her expertise and her report, which
23   you, yourself, established about two hours ago.
24       That's the basis for my objection when
25   I say "beyond the scope." Let's proceed.

Page 112

1        MR. GOLDBERG: Why don't we --
2        THE WITNESS: I think there's a
3    pending question. Would you like me the answer
4    it?
5        MR. GOLDBERG: No, I will withdraw
6    that. I can withdraw that question.
7        THE WITNESS: Okay. May I ask -- I'm
8    not sure what time it is in the real world.
9        MR. HONIK: It's 1:12 p.m. Is this a
10   good time to break for lunch, Dr. Conti?
11       MR. GOLDBERG: Sure.
12       THE WITNESS: That would be great.
13   Thank you.
14       MR. HONIK: And for your comfort, how
15   much time would you like?
16       THE WITNESS: Can we have half an
17   hour, please?
18       MR. HONIK: Yes. So we'll resume at
19   1:45.
20       THE WITNESS: Thank you.
21       THE VIDEOGRAPHER: The time is 1:13.
22   This ends Media Unit Number 2. We're going off
23   the record.
24       (Whereupon, a lunch recess was taken.)
25       THE VIDEOGRAPHER: The time is 1:53.

Page 113

1    This begins Media Unit Number 3. We're back on
2    the record.
3    BY MR. GOLDBERG:
4    Q    Dr. Conti, if you look at Paragraph 6
5    of your report --
6    A    Just one second. Let me get it.
7    Okay.
8    Q    The last sentence in this paragraph,
9    you use the phrase, "non-product status." What do
10   you mean by "non-product status"?
11   A    Only prescription drugs -- only
12   products that have met the evidentiary standard for
13   cGMP, in addition to safety and efficacy, are
14   allowed to be sold into the U.S. market trade.
15       So products that do not meet that
16   standard of being manufactured to good manufacturing
17   practices -- or according to good manufacturing
18   practices, plus are safe and efficacious, are
19   allowed to be sold into the -- into the U.S. product
20   market. Those that do not meet that standard are
21   not -- are not -- according -- according to the
22   U.S. Food and Drug Administration, would be not
23   allowed.
24   Q    When you use the terms "safety" and
25   "efficacy," can you explain what you mean by the

29 (Pages 110 - 113)

RESTRICTED CONFIDENTIAL

Page 114

1    term -- by each of those terms?
2        A    All right.  Again, this is a -- this
3    is one of the most highly regulated consumer product
4    markets, and so the FDA has very specific
5    definitions of "safety" and "efficacy."
6             What I mean here is that the product
7    is judged to be safe and efficacious according to
8    the U.S. Food and Drug Administration's rules.
9        Q    You don't have an independent
10   understanding of safety and efficacy?  It's just
11   based on what the FDA would determine to be safe and
12   effective?
13            MR. HONIK:  Object to the form.
14            THE WITNESS:  For my purposes in this
15   report, correct.  The definitions I'm using of
16   safety and efficacy and meeting cGMP are those
17   that relate to the
18   Food and Drug Administration's definitions.
19   BY MR. GOLDBERG:
20       Q    If you scroll down -- or if you go
21   down to Paragraph 7 -- I know you have a hard copy
22   in front of you.  The last sentence of this
23   paragraph, you say, "Prescription drugs that are
24   adulterated and misbranded have no economic value.
25   They are worthless."

Page 115

1             What do you mean by "worthless"?
2        A    I mean this is in --
3             COURT REPORTER:  You mean this in...
4             THE WITNESS:  Thank you.
5             I mean this in -- in economic sense,
6    that there is no legitimate supply curve of
7    products -- of products that do not meet the
8    standard of cGMP in addition to being --
9             THE COURT REPORTER:  In addition to
10   being...
11            THE WITNESS:  Judged safe and
12   efficacious by the
13   Food and Drug Administration.
14   BY MR. GOLDBERG:
15       Q    Is it -- is it your view that there's
16   no degree of adulteration when it comes to
17   worthlessness and that all adulterated drugs, for
18   any reason, are worthless?
19            MR. HONIK:  Object to form.
20            THE WITNESS:  So my understanding is
21   that in order to be allowed to be sold into the
22   U.S. supply chain of prescription drugs, the
23   manufacturer needs to attest that these
24   products are manufactured according to cGMP, at
25   minimum, and in addition, are safe and

Page 116

1    efficacious as -- as attested to in the drug's
2    manufacturing report to the
3    Food and Drug Administration.
4    BY MR. GOLDBERG:
5        Q    So products that have such an
6    attestation have value, right?
7             MR. HONIK:  Object to form.
8             THE WITNESS:  You mischaracterized my
9    testimony.
10   BY MR. GOLDBERG:
11       Q    I'm asking you a question.  Products
12   that have the attestation you described have value,
13   correct?
14            MR. HONIK:  Object to form.
15            THE WITNESS:  Okay.  Again,
16   prescription -- pharmaceutical manufacturers
17   are not allowed to sell products into the U.S.
18   market that are not produced in a manner of
19   cGMP compliant, plus are safe and efficacious
20   as judged by the Food and Drug Administration.
21            There is a long and very complicated
22   route for a product to be judged, a drug, a
23   prescription drug, that is allowed to be
24   entered into the U.S. class of trade.
25   Manufacturers have to meet all of those

Page 117

1    standards, both in terms of attestation -- in
2    other words, they can say these things, but
3    they -- but they are also judged by the
4    regulator itself about whether or not these
5    things are actually --
6             THE COURT REPORTER:  Are actually...
7             THE WITNESS:  True.
8    BY MR. GOLDBERG:
9        Q    So products that are sold with that
10   attestation have value?
11            MR. HONIK:  Object to form, asked and
12   answered.
13            THE WITNESS:  Okay.  Again, it's not
14   just the attestation that matters.  The U.S.
15   regulator requires that any products that want
16   to be sold into the U.S. market that is going
17   to be considered a prescription drug, must be
18   produced in accordance with cGMP and be safe
19   and efficacious.  And the manufacturer just --
20   can't just say that.  They actually have to
21   prove it to the regulator.
22            It is in that meaning that I mean that
23   those products have value.  In other words,
24   products that -- I can say it in a different
25   way, which is products have value.  There is a

30 (Pages 114 - 117)

RESTRICTED CONFIDENTIAL

Page 118

1 legitimate supply curve if and only if they are
2 produced according to cGMP and are safe and
3 efficacious, both by attestation and by
4 proof -- by empirical proof.
5 BY MR. GOLDBERG:
6 Q    If the FDA is permitting those
7 products to be sold, they have value?
8 A    For prescription drugs, drugs that are
9 actually called "drugs" by the
10 Food and Drug Administration, they -- and are sold
11 at pharmacies, and dispensed to American patients by
12 physicians or by pharmacy chains, those products
13 must meet the evidentiary standard of, they are
14 produced according to cGMP, they are not adulterated
15 or misbranded, and they are safe and efficacious,
16 for the -- for the disease -- specific indication
17 that the Food and Drug Administration approves that
18 product for.
19        COURT REPORTER:  I'm sorry.  The
20 Food and Drug Administration...
21        THE WITNESS:  Approves that product to
22 be sold for or used for.
23 BY MR. GOLDBERG:
24 Q    So if the FDA has permitted --
25 if -- permitted prescription drugs to be sold at

Page 119

1 pharmacies, you would agree that those drugs have a
2 value?
3        MR. HONIK:  Object to form, asked and
4 answered.
5        THE WITNESS:  Well, wait.  So it's not
6 just that.  So again, according to the
7 regulator, a prescription drug is not allowed
8 to enter into the U.S. class of trade, sold to
9 a consumer, covered by a manufacturer -- or by
10 an insurer, unless they meet the evidentiary
11 standard of -- of being produced in accordance
12 with cGMP at a minimum, and meet other
13 requirements, as well.
14 BY MR. GOLDBERG:
15 Q    Are you aware of any instance where a
16 drug was sold, but it did not meet the minimum, as
17 you put it, cGMP requirements?
18 A    Again, drugs cannot enter into the
19 U.S. class of trade without meeting the evidentiary
20 standard.  What I mean by that is the FDA will not
21 approve a drug to enter into the U.S. class of trade
22 without meeting the evidentiary standard and the
23 manufacturer attesting that they are meeting that
24 standard.
25        It is actually on the manufacturer --

Page 120

1 hold on.  It's actually on the manufacturer to
2 ensure that that product is what it says it is on
3 the product's -- on the product's label.
4 BY MR. GOLDBERG:
5 Q    Okay.  So you -- you seem to be
6 emphasizing the word "enter."  Is there some
7 particular emphasis you're putting on that?
8 A    I don't -- I'm not sure what you mean
9 by that question.
10 Q    You keep saying the FDA will not
11 allow -- a manufacturer cannot -- you -- you -- what
12 you said is drugs cannot enter into the U.S. class
13 of trade without meeting the evidentiary standard.
14 What do you mean by "enter into the U.S. class of
15 trade"?
16 A    I mean they are not allowed to be sold
17 into the U.S. market without meeting the evidentiary
18 standard of being produced, at minimum, by cGMP and
19 meeting other evidentiary standards, as well.
20 Q    So what are the evidentiary standards
21 that you're referring to?  You have cGMP violations.
22 A    I'm confused.
23 Q    You used the phrase "evidentiary
24 standard" in the four -- in your last four answers.
25 What are the evidentiary standards you're referring

Page 121

1 to?
2        MR. HONIK:  Object to form, asked and
3 answered and beyond the scope of her report.
4        THE WITNESS:  Okay.  So you can look
5 at Paragraph 6 of my report, "Federal law, as
6 codified by regulations of the
7 Food and Drug Administration, mandates that
8 prescription drugs be produced in accordance
9 with cGMP to ensure that the drugs meet the
10 legal requirements of safety and that they have
11 the quality, purity, identity and strength they
12 are represented to conduct."
13        That's what I mean by the evidentiary
14 standard of being sold into the U.S. or being
15 legitimate products.
16 BY MR. GOLDBERG:
17 Q    Let's take each one of those.  What do
18 you understand the term "quality," as you've used
19 it, to mean?
20 A    Quality is a process, from the
21 U.S. Food and Drug Administration's perspective, so
22 the print is both what it says it is, but it's also
23 manufactured in a process that is a quality
24 manufacturing process that meets cGMP.
25 Q    What do you understand the term

31 (Pages 118 - 121)

RESTRICTED CONFIDENTIAL

Page 122

1  "purity" to mean, as you're using it?
2      A    I mean, again, it's in accordance with
3  the Food and Drug Administration's definition of it.
4  So purity, identity and strength are all the FDA's
5  definition.
6      Q    Okay.  You're -- so you're -- when
7  you're using the term, you're really -- you're just
8  saying based on how the FDA defines these terms?
9      A    Yes.
10     Q    Correct?
11     A    Exactly.  Just like my use of the term
12  "adulterated," my use of the term "misbranded," they
13  are all related to the U.S. government's definition
14  inclusive of how these terms are actually being --
15  being used.
16     Q    How these terms are being written in
17  the regulations, that's what you're referring to?
18     A    Correct.
19     Q    I still want to understand.  If a
20  drug -- if a prescription drug is being sold -- so
21  there's a supply for it.  And people are buying it,
22  so there's a demand for it.  Does it -- is it still
23  worthless if it doesn't meet some of these
24  evidentiary standards?
25         MR. HONIK:  Object to form.

Page 123

1         THE WITNESS:  My statement is one
2  related to the supply curve, not the demand
3  curve.  By definition, there is no supply of
4  drugs -- of product that do not meet the
5  definition of a "drug" according to the
6  Food and Drug Administration.  In order for a
7  manufacturer to sell a product that meets the
8  definition of the term "drug," it must meet the
9  evidentiary standards of meeting and attesting
10  to the cGMP production and be safe and
11  efficacious for the indicated use.
12  BY MR. GOLDBERG:
13     Q    So the demand -- you're -- you're not
14  considering demand in that analysis, you're focusing
15  on --
16         THE COURT REPORTER:  Can you repeat
17  that question, please?
18  BY MR. GOLDBERG:
19     Q    You're not considering demand in your
20  analysis, you're focusing on the supply?
21     A    In my analysis, I don't know what you
22  mean by my -- "in my analysis."
23     Q    You said, "My statement is related to
24  the supply curve, not the demand curve.  By
25  definition, there is no supply of drugs."

Page 124

1         And I am just confirming.  So you're
2  not thinking about it in terms of demand, you're
3  thinking about it in terms of supply?
4      A    What is "it" in your question?
5      Q    The -- the question of whether the
6  drug is -- a drug is worthless?
7      A    So, again, from an economic
8  perspective, there is no legitimate supply curve for
9  a product that is adulterated and misbranded.  That
10  is by statute.  Consumers can demand products that
11  are illegal or illegitimate, but they're -- but a
12  pharmacy can't sell a product that does not -- for
13  which the manufacturer has not met the evidentiary
14  standard and have been approved by the U.S.
15  regulator for use in that -- in that context.
16     Q    Do you have any -- I don't see it
17  here.  Did you cite to any economic treatise for the
18  notion that if there is -- there is no legitimate
19  supply curve for a product that is adulterated and
20  misbranded?
21     A    This is one of the most -- one of the
22  most highly regulated consumer product markets
23  that -- that exists in the United States.  U.S.
24  is -- maintains the gold standard for quality of its
25  prescription drug supply.

Page 125

1         Every pharmaceutical manufacturer that
2  sells products through to pharmacies and ultimately
3  to American consumers, knows what the rules are.
4  The rules are they must meet the evidentiary
5  standard of permitting to quality manufacturing and
6  be safe and efficacious.
7         From an economic standpoint, that --
8  it is meeting those regulations that allow there to
9  be a supply of a product.  I don't need to -- you
10  can't think about the supply curve of prescription
11  drugs without understanding what the regulation is
12  that allows them to be sold to the U.S.  That's
13  your -- that's actually health economics 101.
14     Q    Well, I'm trying to understand which
15  health economics 101 treatise or authority you're
16  citing for the notion that -- because in your view,
17  there's no legitimate supply curve, a drug is
18  worthless?
19         MR. HONIK:  Object to form, asked and
20  answered.
21         I'm sorry.  Please answer, Dr. Conti.
22         THE WITNESS:  Thank you.
23         It's not my view.  This is the U.S.
24  regulator's perspective.  The U.S. regulator
25  does not -- does not view -- does not allow

32 (Pages 122 - 125)

Veritext Legal Solutions
800-227-8440                                          973-410-4040

RESTRICTED CONFIDENTIAL

Page 126

1    drugs to be sold into the U.S. market that do
2    not meet the evidentiary standard.  And it's
3    prescription drug manufacturers themselves that
4    have wanted that standard to be as it is.
5         And so I -- I mean, there's plenty of
6    published literature that talks about this, the
7    importance of the evidentiary standard to the
8    supply of these products, and I cite some of
9    that in my report.  But every pharmaceutical
10   manufacturer that is allowed to sell into the
11   U.S. market knows what the standard is.
12   BY MR. GOLDBERG:
13   Q    You're -- you're not answering my
14   question.  My question is what economic support do
15   you have for the notion that, if there's no supply,
16   the drug is worthless?
17        MR. HONIK:  Object to the form, asked
18   and answered.
19        THE WITNESS:  This is economics 101.
20   If you go -- I'm more than happy to show you
21   the picture.  But there can be no price for a
22   product that does not have a demand curve
23   meeting a supply curve.  There is no economic
24   price if there is no legitimate supply curve.
25        There are plenty of economic textbooks

Page 127

1    that explain that an economic price is related
2    to both demand and supply, and its -- and, you
3    know, its relationship to each other.
4    BY MR. GOLDBERG:
5    Q    Was it -- there was an economic --
6    there was an economic price that was paid for
7    valsartan between 2012 and 2018, right?
8         MR. HONIK:  Object to the form.  Are
9    you asking if consumers paid for it, paid for
10   this drug?
11        THE WITNESS:  I don't understand what
12   you're asking.
13        MR. GOLDBERG:  Counsel --
14   BY MR. GOLDBERG:
15   Q    I'm using your phrase, "economic
16   price."  There was an economic price paid for
17   valsartan between 2012 and 2018, right?
18        MR. HONIK:  Right.  And our lawsuit
19   seeks --
20        MR. GOLDBERG:  Counsel, you're not --
21   counsel, don't testify.  Don't interrupt.  Let
22   the witness answer the question.
23        MR. HONIK:  You have now asked the
24   same question six times.
25        MR. GOLDBERG:  Counsel, don't --

Page 128

1    counsel, don't coach the witness.  Don't
2    interfere.
3         MR. HONIK:  This witness needs to be
4    heard --
5         MR. GOLDBERG:  Counsel, don't say a
6    word.  The question is pending.  Witness will
7    answer without your interruption.  If you want
8    to say objection, you can say objection.
9         MR. HONIK:  I will say as many words
10   as I deem appropriate --
11        MR. GOLDBERG:  If you want to say
12   objection to form, say it, but don't --
13        MR. HONIK:  I will protect the record
14   in the manner in which I see fit.
15        MR. GOLDBERG:  No.  You will interfere
16   with the record.
17        MR. HONIK:  What I'm -- what I'm now
18   trying to do, because I believe you've asked
19   the witness the same exact question 6, 7, maybe
20   10 times, is to clarify.  And if -- and if
21   you're asking a different question, then
22   perhaps she can answer it differently.  I'm
23   simply trying to move things along.
24        Is your question whether or not
25   consumers, during the relevant period that

Page 129

1    you've now raised, actually --
2         MR. GOLDBERG:  I want to ask my
3    question.  Don't ask my question.
4         MR. HONIK:  I know.  I'm not --
5         MR. GOLDBERG:  No, stop.  Ruben, stop.
6    It's improper, and stop.
7         MR. HONIK:  Here is what we're going
8    to do.
9         MR. GOLDBERG:  Stop it.
10        MR. HONIK:  Here's what we're going to
11   do.  Here's what we're going to do.
12        MR. GOLDBERG:  Tell me what we're
13   going to do.
14        MR. HONIK:  If you persist in asking
15   the same question again, then we will have to
16   stop.  I think the witness has responded -- I
17   think the witness has responded completely to
18   your question.  You seem not to understand --
19        MR. GOLDBERG:  The objection is asked
20   and answered.  If that's your objection, say
21   it.
22        MR. HONIK:  Is there a pending
23   question?
24   BY MR. GOLDBERG:
25   Q    Dr. Conti -- Dr. Conti, there was an

33 (Pages 126 - 129)

RESTRICTED CONFIDENTIAL

Page 130

1  economic price that was paid for valsartan between
2  2012 and 2018, correct?
3        MR. HONIK: Object to form, asked and
4  answered.
5        THE WITNESS: Okay. Again, let's
6  start at the beginning. From my perspective,
7  prospectively, there may be a demand curve for
8  products that exist that cannot be met by a
9  legitimate supply curve. In -- you can't get
10  an economic price if there is not both a demand
11  curve and a legitimate supply curve.
12        In this matter, I was asked to assume
13  that these products at issue between 2012 and
14  2018 were adulterated and misbranded according
15  to the Food and Drug Administration's
16  definition.
17        By definition, if they were both
18  adulterated and misbranded, there is no
19  legitimate supply curve. And therefore, demand
20  and supply cannot meet, and there cannot be an
21  economic price.
22  BY MR. GOLDBERG:
23    Q    But demand and supply did meet, and an
24  economic price was paid for valsartan between 2012
25  and 2018, wasn't there?

Page 131

1        MR. HONIK: Object to the form, asked
2  and answered.
3        Go ahead, Dr. Conti. You can explain
4  it again.
5        THE WITNESS: Again, consumers and
6  payors did not know that these products were
7  adulterated and misbranded during the relevant
8  time period. That's because, as I understand
9  it, the manufacturers, who are the defendants
10  in this case, were attesting that these
11  products were meeting the evidentiary standard
12  when they were not.
13        From my perspective in -- in analyzing
14  this market, if I assume that these products
15  are misbranded and adulterated, then there is
16  no legitimate supply curve. And therefore,
17  there is no meeting of demand and supply and no
18  economic price.
19  BY MR. GOLDBERG:
20    Q    There was a supply for these drugs
21  between 2012 and 2018. You don't dispute that, do
22  you?
23        MR. HONIK: Object to the form, asked
24  and answered.
25        Go ahead.

Page 132

1        THE WITNESS: Again, I was asked to
2  assume that that supply was adulterated and
3  misbranded.
4  BY MR. GOLDBERG:
5    Q    So the answer is, yes, there was a
6  supply? Leaving aside your assumptions, you agree
7  there was a supply of valsartan between 2012 and
8  2018?
9        MR. HONIK: Object to the form, asked
10  and answered.
11        THE WITNESS: I think what you're
12  asking is whether Diovan and Exforge, the
13  brand -- the branded products, plus the generic
14  drugs, were available to the U.S. market, were
15  available --
16        THE COURT REPORTER: I'm sorry. You
17  cut out, Doctor.
18        Were available to...
19        THE WITNESS: To be purchased in the
20  U.S. supply chain between 2012 and 2018. If
21  that is your question, then the answer is yes.
22  BY MR. GOLDBERG:
23    Q    Okay. And between 2012 and 2018,
24  valsartan -- that valsartan was purchased by
25  consumers and third-party payors, right?

Page 133

1    A    So consumers purchased Diovan and
2  Exforge and it's generic equivalents during that
3  time period. The at-issue drugs, I was asked to
4  assume were adulterated and misbranded during that
5  time period.
6    Q    Do you have experience assessing the
7  clinical value of drugs?
8    A    As an economist? Yes. As a doctor,
9  sadly, no.
10    Q    Got you.
11        Have you conducted any clinical trials
12  with respect to drug -- to drugs, pharmaceutical
13  drugs?
14    A    Have I conducted any clinical trials?
15  I have been involved in clinical trials that
16  have -- that are conducted --
17        THE COURT REPORTER: That are
18  conducted...
19        THE WITNESS: On prescription drugs.
20  BY MR. GOLDBERG:
21    Q    Have you reviewed the -- the -- strike
22  that.
23        You understand that valsartan is -- an
24  intended use of valsartan is to treat hypertension,
25  right?

34 (Pages 130 - 133)

RESTRICTED CONFIDENTIAL

Page 134

1    A    Yes. I mean, it is a member of a
2  class of drug -- of a therapeutic class of drugs
3  that are all intended to treat hypertension.
4    Q    And another intended use of valsartan
5  is to treat heart failure?
6    A    I don't know that specifically.
7    Q    Are you aware that, if left untreated,
8  high blood pressure can lead to heart attacks?
9        MR. HONIK: Objection, outside the
10    scope.
11        THE WITNESS: I mean, like, as an
12    American citizen who's relatively well
13    informed, yes, I understand that.
14  BY MR. GOLDBERG:
15    Q    Okay. And -- yeah, I'm looking for
16  your understanding as Dr. Conti, whether that's in
17  your individual capacity as an expert. But you
18  understand that high blood pressure, if left
19  untreated, can lead to heart attacks, right?
20    A    Yes. And I understand that there are
21  many, many treatments to prevent heart attacks
22  available.
23    Q    And if left untreated, high blood
24  pressure can lead to strokes?
25        MR. HONIK: Same objection, outside

Page 135

1  the scope of her report.
2        THE WITNESS: Thank you.
3        Again, I understand as, a general
4    matter, that -- that high blood pressure is a
5    risk factor for stroke and that high blood
6    pressure can be treated in many different ways.
7  BY MR. GOLDBERG:
8    Q    And if somebody has a heart attack,
9  that can require hospitalization?
10        MR. HONIK: Same objection.
11        THE WITNESS: Yes. My mother had a
12    heart attack, and she was hospitalized. I am
13    generally aware of the facts.
14  BY MR. GOLDBERG:
15    Q    And if somebody has a stroke, it can
16  require hospitalization?
17        MR. HONIK: Same objection.
18        THE WITNESS: Yes. But again, there
19    are many treatments -- I mean, we are so
20    fortunate in the U.S. that there are so many
21    treatments that prevent heart attack and
22    strokes now from progressing to the point of
23    requiring hospitalization or even, more
24    tragically, death now. Deaths from strokes and
25    heart attacks have dramatically come down over

Page 136

1    the past two decades with the advent of stents,
2    but also the advent of many prescription drugs
3    that support their prevention and treatment.
4  BY MR. GOLDBERG:
5    Q    There would be medical expenses
6  attributable to a heart attack for most consumers,
7  right?
8        MR. HONIK: Same objection.
9        THE WITNESS: Are you saying as a
10    general matter that -- that heart attacks
11    entail costs?
12  BY MR. GOLDBERG:
13    Q    Yes.
14    A    Yes, definitively.
15    Q    And the same -- the same is true for
16  strokes?
17    A    The primary prevention and treatment
18  of strokes costs money.
19        COURT REPORTER: It what?
20        THE WITNESS: In the U.S.
21        COURT REPORTER: I'm sorry. The
22    primary prevention...
23        THE WITNESS: And treatment of strokes
24    in the U.S. costs money.
25        COURT REPORTER: Thank you.

Page 137

1  BY COURT REPORTER:
2    Q    You'd agree that avoiding the
3  complications from untreated hypertension could
4  provide a value to a patient?
5        MR. HONIK: Objection, outside the
6    scope.
7        THE WITNESS: As a general matter?
8  BY MR. GOLDBERG:
9    Q    Yeah.
10    A    I think a lot of Americans would view
11  the primary prevention and treatment of underlying
12  conditions to prevent strokes and heart attacks is
13  of value. I mean, I certainly view that as
14  valuable.
15    Q    So if valsartan were treating
16  someone's hypertension and that person, as a result,
17  was avoiding a heart attack or a stroke because of
18  their valsartan, that would be a value to that
19  consumer?
20        MR. HONIK: Object to form.
21        THE WITNESS: That has therapeutic
22    value. It doesn't have economic value from my
23    reports on that.
24  BY MR. GOLDBERG:
25    Q    So the consumer would get a

35 (Pages 134 - 137)

RESTRICTED CONFIDENTIAL

Page 138

1 therapeutic benefit from the treatment of
2 valsartan -- their treatment with valsartan?
3          MR. HONIK:  Object to the form,
4 outside the scope.
5          THE WITNESS:  Yeah.  I think that's a
6 good question.
7          So, again, from the perspective of my
8 report, I was asked to assume that the
9 valsartan products at issue were adulterated
10 and misbranded, and therefore, they should not
11 have entered into the U.S. class of trade.
12          Whether those products provided
13 therapeutic value is -- is not of -- it's
14 not -- it doesn't matter for the purposes of my
15 calculation.
16 BY MR. GOLDBERG:
17     Q     Well, do you dispute that those
18 products provided therapeutic value?
19          MR. HONIK:  Object to the form, asked
20 and answered, outside the scope.
21          THE WITNESS:  I don't know.  I
22 don't -- I don't have an opinion.  You know, as
23 an economist, I don't have an opinion.
24 BY MR. GOLDBERG:
25     Q     Are you aware of any studies showing

Page 139

1 that between 2012 and 2018, valsartan was not
2 effective in treating hypertension?
3          MR. HONIK:  Object to the form, beyond
4 the scope.
5          THE WITNESS:  No.  But it's -- again,
6 has no moment, in my analysis, because again, I
7 was asked to assume that those products at
8 issue were misbranded and adulterated, and
9 therefore would not have entered into the U.S.
10 class of trade.
11 BY MR. GOLDBERG:
12     Q     Are you aware of any warnings by the
13 FDA between 2012 and 2018 that patients shouldn't
14 take valsartan because it's not effective in
15 treating hypertension?
16          MR. HONIK:  Object to form, outside
17 the scope.
18          THE WITNESS:  So, again, it's of no
19 moment -- moment in my analysis and my
20 assignment in this case.
21          THE COURT REPORTER:  What word are you
22 using?  Moment?
23          THE WITNESS:  It's no moment.
24          MR. HONIK:  It's of no moment, she
25 said.

Page 140

1          COURT REPORTER:  Of no moment.
2 M-o-m-e-n-t?  Moment.
3          THE WITNESS:  Yes.
4          THE COURT REPORTER:  Thank you.  Thank
5 you.
6 BY MR. GOLDBERG:
7     Q     Is it your testimony that positive
8 health outcomes have no economic value to consumers?
9          MR. HONIK:  Object to the form, asked
10 and answered, outside the scope.
11          THE WITNESS:  That is not my
12 testimony, sir.
13 BY MR. GOLDBERG:
14     Q     Do you agree that positive health
15 outcomes can have economic value to consumers?
16          MR. HONIK:  Same objection.
17          THE WITNESS:  That is not my
18 testimony, sir.
19 BY MR. GOLDBERG:
20     Q     Do you agree that positive outcomes,
21 health outcomes, can have economic value to
22 consumers, yes or no?
23          MR. HONIK:  Same objection, asked and
24 answered.
25          THE WITNESS:  Of what, sir?

Page 141

1 BY MR. GOLDBERG:
2     Q     Do you agree that controlled
3 hypertension due to valsartan could have economic
4 value to a consumer?
5     A     Same objection.
6          THE WITNESS:  I think I'm gonna -- I
7 think I'm gonna ask just -- you to clarify.
8          So do you mean that prescription-based
9 control of hypertension could have value to
10 consumers?
11 BY MR. GOLDBERG:
12     Q     Yes.
13     A     There's my -- my -- my point is
14 there's lots of -- I mean, my understanding is
15 there's lots of ways that consumers can control
16 their hypertension that go well beyond the
17 availability of prescription valsartan.
18     Q     But my question dealt with
19 prescription valsartan.
20     A     Okay.
21     Q     Yes or no, if prescription valsartan
22 were controlling a patient's hypertension, could
23 that provide economic value to the patient?
24          MR. HONIK:  Objection to form, asked
25 and answered, outside the scope.

36 (Pages 138 - 141)

Veritext Legal Solutions
800-227-8440                                                              973-410-4040

RESTRICTED CONFIDENTIAL

Page 142

1    THE WITNESS:  What do you mean by
2  "economic value"?
3      (Whereupon, there was a speaking
4  interruption.)
5      THE WITNESS:  I'm sorry --
6      THE COURT REPORTER:  I'm sorry, who's
7  speaking?
8      MR. HONIK:  There was a question and
9  objection and a partial answer from the
10  witness.  Did you get any of that?
11      THE COURT REPORTER:  Yes.
12      MR. HONIK:  Okay.  Great.
13      THE WITNESS:  And there was, like,
14  something -- someone else started speaking.
15      MR. HONIK:  And then someone
16  interjected.
17      THE WITNESS:  Correct.  In the middle
18  of my answer.
19      MR. HONIK:  Okay.  So other than Seth,
20  everyone -- and myself, everyone should be
21  muted.
22  BY MR. GOLDBERG:
23   Q    Let me ask the question again.
24      Yes or no, prescription valsartan,
25  when controlling a patient's hypertension, could

Page 143

1  that provide an economic value to the patient?
2      MR. HONIK:  Object to form, asked and
3  answered, beyond the scope.
4      You can answer.
5      THE WITNESS:  Thank you.  Seth --
6  Mr. Goldberg, what do you mean by "economic
7  value" in that question?
8  BY MR. GOLDBERG:
9   Q    Well, before you had said that that
10  kind of control would provide a therapeutic benefit,
11  not an economic value.  And I'm just asking -- you
12  used the phrase "economic value."  What do you
13  understand it to mean?
14      MR. HONIK:  Object to the form.
15      THE WITNESS:  Okay.  Again, I -- we
16  are talking about my definition of "economic
17  value" in this specific matter based on
18  assumptions that I was asked to make.  You are
19  using "economic value" in a way that is not
20  consistent with how I just defined "economic
21  value" for the purposes of my report.  So in
22  that --
23  BY MR. GOLDBERG:
24   Q    Doctor --
25      THE WITNESS:  Hold on.

Page 144

1      MR. HONIK:  Don't interrupt her.
2      THE WITNESS:  I'm going to ask again.
3  I don't understand how you're using the term
4  "economic value."
5  BY MR. GOLDBERG:
6   Q    If a patient saved money on their
7  health expenses because of their treatment with
8  at-issue valsartan products, would that have
9  provided economic value to the patient?
10      MR. HONIK:  Is there a question?
11      MR. GOLDBERG:  That is the question.
12  Should I ask it again?
13      MR. HONIK:  No, Jamie can read it, and
14  we can all determine if it's a question.  It
15  sounded like a statement.
16      But, Jamie, can you read it back.
17      MR. GOLDBERG:  I'm going to
18  read -- I'm going to read the question.
19  BY MR. GOLDBERG:
20   Q    If a patient saved money on their
21  health expenses because of their treatment with
22  at-issue valsartan products, would that have
23  provided an economic value to the patient?
24      MR. HONIK:  Object to form, beyond the
25  scope, asked and answered.

Page 145

1      You can respond.
2      THE WITNESS:  Thank you.
3      MR. HONIK:  As best you can.
4      THE WITNESS:  Thank you.
5      So for the -- I mean, as a general
6  matter, if people are saving money, then there
7  is some economic -- there might be economic
8  value.  That is not the way in which I am using
9  the term "economic value" or "worth" or
10  "worthlessness" in my report.
11  BY MR. GOLDBERG:
12   Q    If a patient is -- strike that.
13      So if consumers received that economic
14  value that you just described from their treatment
15  of valsartan, is, in your view, the product still
16  worthless?
17      MR. HONIK:  Object to form, asked and
18  answered, beyond the scope.
19      THE WITNESS:  Okay.  So from the
20  Food and Drug Administration's perspective,
21  there are two values associated with a drug --
22  associated with a prescription drug.  One is
23  related to the economic value.  Is this product
24  actually available to be sold into the U.S.
25  market?  Does supply meet demand?

37 (Pages 142 - 145)

RESTRICTED CONFIDENTIAL

Page 146

1    There is a separate value that is
2    related to its therapeutic benefit. Only
3    products that are considered to be legitimate
4    products, they meet the evidentiary standard
5    for sale in the U.S., could have therapeutic
6    value, because you need to meet the evidentiary
7    standard of being actually allowed on the
8    market to be sold before you can have -- be
9    judged to have additional therapeutic --
10   therapeutic value because it only -- the only
11   way that you would know whether that product
12   has benefit is if -- for a given patient, is if
13   the product meets the evidentiary standard.
14       So in my analysis, that -- a product
15   has value, economic value, if it meets the
16   first part, that is there is a legitimate
17   supply curve. Therapeutic value, whether that
18   product is -- provides value or clinical value
19   or maybe does have some economic value to a
20   consumer is all predicated on it meeting --
21       COURT REPORTER: Is all predicated...
22       THE WITNESS: That goes above and
23   beyond the economic value that I have been
24   asked to consider.
25       I'm sorry. Is there a question? I'm

Page 147

1    hearing voices.
2        MR. HONIK: You're hearing background
3    noise.
4        THE WITNESS: Okay. Okay.
5    BY MR. GOLDBERG:
6    Q    Have you reviewed -- strike that.
7        You haven't reviewed any of the
8    deposition testimony of any of the plaintiffs or
9    class representatives in this case, correct?
10       MR. HONIK: Objection, asked and
11   answered.
12       THE WITNESS: I think you asked that
13   question to me this morning, and the answer --
14   my answer remains no.
15   BY MR. GOLDBERG:
16   Q    Okay. So you're not aware of the
17   plaintiffs and class representatives who have
18   testified that they got therapeutic benefits from
19   the at-issue valsartan they took? You're not aware
20   of that testimony, right?
21       MR. HONIK: Object to the form, asked
22   and answered, beyond the scope.
23       THE WITNESS: Again, it's of no moment
24   for my assignment in this case. Therapeutic
25   value associated with a product's benefits and

Page 148

1    potential downside costs are all predicated on
2    the product being a legitimate product allowed
3    for sale --
4    BY MR. GOLDBERG:
5    Q    Of a product --
6    A    Hold on, please, let me finish.
7        Allowed for sale in the U.S. market.
8    I was asked to assume these -- these products were
9    not legitimate products. They were not allowed into
10   the U.S. market -- or they were not -- did not meet
11   the evidentiary standard for sale. And therefore,
12   that clinical value that they may have provided, is
13   a separate matter.
14   Q    That clinical value --
15   A    Hold on. Hold on.
16       And not one that I evaluated. It's
17   outside the scope of my report.
18   Q    That clinical value is meaningless to
19   you?
20       MR. HONIK: Object to the form, asked
21   and answered.
22       THE WITNESS: Okay. Again, as, like,
23   a human being, obviously, pharmaceutical
24   products that are available for sale in the
25   U.S. have -- may have clinical value to

Page 149

1    individual patients.
2        But for the purposes of my report, I'm
3    using the term "economic value" in a very
4    specific way, which is that the products meet
5    the evidence -- either meet the evidentiary
6    standard for being allowed to be sold into the
7    U.S., or they don't.
8        I was asked to assume that they do
9    not. And therefore, all the downstream
10   potential benefits and costs associated with
11   the products are of no moment -- excuse me --
12   are of no moment to me.
13   BY MR. GOLDBERG:
14   Q    Let's look at it just from a human
15   way, the human standpoint.
16       You agree that from a human
17   standpoint, consumers who took valsartan between
18   2012 and 2018 may have had a therapeutic benefit
19   from the drug, right?
20       MR. HONIK: Object to the form.
21   BY MR. GOLDBERG:
22   Q    Human standpoint? Not -- not --
23       MR. HONIK: Object to the form.
24       THE WITNESS: I'm not a doctor, sir.
25   I'm so sorry, Ruben.

38 (Pages 146 - 149)

RESTRICTED CONFIDENTIAL

Page 150

1      MR. HONIK: That's okay. I think
2 Jamie got it.
3      THE COURT REPORTER: I have not heard
4 anything clearly for the last 10 seconds.
5      MR. HONIK: Okay. Do you want to ask
6 that question again?
7      MR. GOLDBERG: We can strike that
8 question.
9      THE COURT REPORTER: I have --
10      MR. HONIK: It's stricken, Jamie.
11      COURT REPORTER: Can we go off the
12 record for a second, please?
13      THE VIDEOGRAPHER: The time is 2:44.
14 We're going off the record.
15      (Whereupon, a short break was taken.)
16      THE VIDEOGRAPHER: The time is 2:55.
17 We're back on the record.
18 BY MR. GOLDBERG:
19   Q   Dr. Conti, you'd agree that the
20 therapeutic benefits that consumers may have gotten
21 from valsartan between 2012 and 2018 would be
22 different from one consumer to the next, right?
23      MR. HONIK: Object to form, outside
24 the scope.
25      You can answer.

Page 151

1      THE WITNESS: Again, it's -- it's no
2 moment to my report -- or to my opinions in
3 this matter.
4 BY MR. GOLDBERG:
5   Q   I -- I understand. I understand your
6 view. But you've talked about the drug as being
7 worthless, and we're talking about the therapeutic
8 benefit of the drug and -- in the context of your
9 opinion related to worthlessness.
10      My question is, you would agree that
11 consumers would experience the therapeutic benefits
12 from the at-issue valsartan products differently
13 from consumer to consumer?
14      COURT REPORTER: Differently from
15 consumers...
16      MR. GOLDBERG: Differently from
17 consumer to consumer.
18      MR. HONIK: Object to form, asked and
19 answered and beyond the scope of her report.
20      THE WITNESS: Okay. So I think that
21 we are misunderstanding. I think you are
22 misunderstanding the way in which I'm using the
23 term "economic value" or "economic worth."
24      And so maybe if you would indulge me,
25 I can just go back to my report. On page -- on

Page 152

1 Paragraph 42, I state, "Federal law establishes
2 that non-safety and quality compliant
3 adulterated and misbranded prescription drugs
4 are not legitimate consumer products and cannot
5 be lawfully or" -- "lawfully sold or
6 distributed for sale."
7      It is in that context that I am
8 discussing the economic worth or value of the
9 at-issue products.
10      Whether or not an individual consumer,
11 or there were consumers that may have --
12      COURT REPORTER: Let me just -- excuse
13 me. Sorry. Let me just mute my microphone.
14      MR. HONIK: Go ahead. Go ahead.
15      THE WITNESS: Thank you. So the
16 economic value that I -- let me just start from
17 the beginning. Sorry, Jamie.
18      From my perspective, the economic
19 value that is at issue in my report, in my
20 opinions in this matter, are related to the
21 product -- to the products being either meeting
22 the evidentiary standard for sale or not.
23      Whether or not individual people --
24 there's a demand curve for these products, and
25 individual people within that demand curve --

Page 153

1 or that make up that demand curve, experience
2 therapeutic benefit or -- benefit or not, is of
3 no moment to my opinion.
4 BY MR. GOLDBERG:
5   Q   Is there -- is there some other
6 economic value that you're excluding from your
7 opinion that may have resulted from consumers taking
8 the at-issue valsartan?
9      MR. HONIK: Object to the form.
10      THE WITNESS: I am using the term
11 "economic value" in my report in the way in
12 which I've justified, multiple times, and in
13 the way that the judge in this case has defined
14 "economic value" and its converse, "economic
15 worthlessness."
16 BY MR. GOLDBERG:
17   Q   How do you understand the judge in
18 this case has defined "economic value"?
19   A   I think it would be easier if I just
20 read from my phone. I have his opinion in front of
21 me. He says --
22      COURT REPORTER: Please just read
23 slowly and clearly.
24      THE WITNESS: "This Court finds that
25 contaminated drugs are economically worthless

39 (Pages 150 - 153)

RESTRICTED CONFIDENTIAL

Page 154

1    at the point of sale by virtue of the
2    dangerousness caused by their contamination,
3    regardless whether the sold VCDs actually
4    achieve the medical purpose of lowering blood
5    pressure." I can go on.
6        "Put differently, contaminated drugs,
7    even if medically efficacious for their
8    purpose, cannot create a benefit of the bargain
9    because the contaminants, and their dangerous
10   effects, were never bargained for.
11       "Further, contaminated drugs do create
12   a present injury because their sale should
13   never have occurred."
14       THE COURT REPORTER:  Doctor, just for
15   my clarification, what were you reading from?
16       THE WITNESS:  I was reading from my
17   cell phone.
18   BY MR. GOLDBERG:
19   Q    And what were you -- what were you
20   reading from?
21   A    I was reading from an opinion of the
22   court.
23   Q    And who sent you that opinion?
24       MR. HONIK:  Without waiving -- excuse
25   me, without waiving the objection, I'll permit

Page 155

1    her to answer.
2        THE WITNESS:  So I have been aware of
3    this opinion for a while, and the opinion was
4    provided to me by counsel.
5    BY MR. GOLDBERG:
6    Q    When was that?
7    A    When did they -- when did I receive
8    this via text on my phone?
9    Q    Yes.
10   A    Five minutes ago.  But I have been
11   aware of this before then.
12   Q    So counsel texted you five minutes ago
13   with the judge's opinion that you just read into the
14   record?
15       MR. HONIK:  Without waiving -- excuse
16   me, without waiving the objection and
17   privilege, I'll permit her to answer.
18       THE WITNESS:  Yes.  It was just texted
19   to me.  But again, I have been aware of this
20   opinion for a while.
21   BY MR. GOLDBERG:
22   Q    And which counsel texted that to you?
23       MR. HONIK:  Without waiving the
24   objection, I'll permit her to answer.
25       THE WITNESS:  John Davis.

Page 156

1    BY MR. GOLDBERG:
2    Q    And did John -- so we talked about the
3    therapeutic benefits that may have -- that -- that
4    consumers who took the at-issue valsartan products
5    may have experienced.  You don't dispute that
6    consumers who took valsartan at-issue products may
7    have experienced therapeutic benefits?
8        MR. HONIK:  Object to the form, asked
9    and answered, beyond the scope.
10       You may answer.
11       THE WITNESS:  Again, the demand curve
12   for these products may exist.  From an economic
13   theory perspective, the demand curve represents
14   individual assessments of benefits and costs of
15   prescription drugs.  I am not disputing that
16   there may have been a demand curve for these
17   products.  That is not my opinion.
18       My opinion is related to the supply
19   curve.  In other words, that products that do
20   not meet the evidentiary standard are not
21   allowed into the U.S. products of trade, they
22   are not viewed as being legitimate products.
23   From my perspective, those products are
24   worthless.
25

Page 157

1    BY MR. GOLDBERG:
2    Q    Yeah.  And the consumers in that
3    demand curve, as you have put it, those -- each
4    consumer has -- has their own individual demand for
5    the drug, right?
6        MR. HONIK:  Object -- object to the
7    form, asked and answered and beyond the scope.
8        You may answer.
9        THE WITNESS:  Yes.
10   BY MR. GOLDBERG:
11   Q    And --
12   A    I mean, predicated, of course, on
13   their doctor being willing to write a prescription
14   and their insurer being willing to -- to insure that
15   prescription, which is also predicated on FDA
16   approval of the product.
17       But -- I mean, consumer demand does
18   not live in a vacuum outside of physician
19   prescribing behavior in this context.
20   Q    And that physician prescribing
21   behavior and the consumer demand for the at-issue
22   valsartan products, that's individual from one
23   consumer to the next.  Why I need the drug is
24   different from why someone else might need the drug,
25   and so on, right?

40 (Pages 154 - 157)

RESTRICTED CONFIDENTIAL

Page 158

1        MR. HONIK:  Object to the form,
2    outside the scope, asked and answered, improper
3    hypothetical.
4        You may answer.
5        THE WITNESS:  I don't know what you
6    mean by the term "need," sir.
7    BY MR. GOLDBERG:
8    Q     Why I might be prescribed valsartan
9    would likely be different than why someone else
10   might be prescribed valsartan, and these are really
11   individualized issues?
12       MR. HONIK:  Same objection as
13   previously stated.
14       THE WITNESS:  I mean, that is not
15   consistent with my understanding of demand for
16   prescription drugs. I'm sorry.
17   BY MR. GOLDBERG:
18   Q     Do you agree that therapeutic benefits
19   that consumers who have taken at-issue valsartan may
20   have been different from consumer to consumer?
21       MR. HONIK:  Object to the form, asked
22   and answered, beyond the scope.
23       THE WITNESS:  Again, demand for
24   prescription drugs is related, generally, to
25   their benefits and their costs, predicated on

Page 159

1    the supply of those products being legitimate.
2    In other words, the manufacturer actually
3    meeting the evidentiary standard.
4    BY MR. GOLDBERG:
5    Q     Yes or no -- yes or no, do you agree
6    the therapeutic benefit --
7    A     Sir --
8    Q     I thought you were finished with your
9    answer.
10       MR. HONIK:  She's not.
11       THE WITNESS:  I'm not.  I'm not.
12   BY MR. GOLDBERG:
13   Q     Why don't you go ahead and finish your
14   answer, and then I'll ask my next question.
15   A     Why don't ask you your question again
16   because you interrupted me in mid-answer.
17   Q     Oh, okay.
18   A     Yeah.
19   Q     Yes or no, do you agree that the
20   therapeutic benefits that consumers who have
21   taken -- let me -- let me rephrase.
22       Yes or no, do you agree -- yes or no,
23   do you agree that the consumers who took at-issue
24   valsartan would have received -- would have received
25   different therapeutic benefits from consumer to

Page 160

1    consumer?
2        MR. HONIK:  Objection, asked and
3    answered, beyond the scope.  I think you've
4    asked her this four times already.
5        THE WITNESS:  They may have received
6    exactly the same therapeutic benefit.
7    BY MR. GOLDBERG:
8    Q     And they may not, right?
9    A     You're -- I'm sorry, sir, but this is
10   impossible.  You just interrupted me again,
11   mid-answer, to the same question.
12   Q     Go ahead.
13   A     No.  Please answer your -- please ask
14   your question again, and then I'll answer it.
15   Q     Yes or no, do you agree that the
16   therapeutic benefits that consumers may have
17   realized from taking the at-issue valsartan products
18   would have differed from consumer to consumer?
19       MR. HONIK:  Same objection.
20       THE WITNESS:  Again, this is not a
21   yes-or-no-type question.  Consumers may have
22   received exactly the same benefit from at-issue
23   valsartan products, or they may have received
24   different experiences of that product.  It is
25   of no moment in my opinions in this matter

Page 161

1    because, again, demand -- their demand is
2    predicated on a legitimate supply curve.  And
3    I've been asked to assume that there was no
4    legitimate supply curve.
5    BY MR. GOLDBERG:
6    Q     You would agree, Dr. Conti, that we
7    all have different risk tolerances for things we're
8    willing to put into our bodies?
9        MR. HONIK:  Same objection as
10   previously, beyond the scope.
11       THE WITNESS:  From the U.S.
12   regulator's perspective, risk tolerance is of
13   no moment.  Again, only products that meet the
14   evidentiary standard are allowed to enter into
15   the prescription class of trade in the
16   United States.
17   BY MR. GOLDBERG:
18   Q     I'm asking you a different question.
19   Answer my question.
20       You'd agree that people have different
21   risk tolerances from what they're willing to put
22   into their bodies from person to person?
23       MR. HONIK:  Same objection as
24   previously.
25       THE WITNESS:  Okay.  I'm going to

41 (Pages 158 - 161)

RESTRICTED CONFIDENTIAL

Page 162

1    answer your question again, which is, it is of
2    no moment whether people want to consume
3    illegitimate products.  If there is no
4    legitimate supply curve, those products cannot
5    enter into the U.S. class of trade.  That
6    is -- that is the position of the U.S.
7    government.  And it's --
8    BY MR. GOLDBERG:
9        Q    Is my answer, no, you --
10       A    Hold on.  Hold on.
11       Q    You're still going?
12       A    I am still going.
13       Q    Okay.  I mean, I would just say,
14   Dr. Conti, I don't mean to be rude.  But what
15   happens is you -- you kind of -- the way you do this
16   is you sort of get to the end of something.  It
17   seems like you're stopping, and then that's why I'm
18   starting.  I'm not trying to interrupt you.  And
19   then you --
20       A    Mr. Goldberg, that is not the case.
21   You just continue to talk over me.  The mansplaining
22   is a little bit challenging, frankly.  But I'll try
23   to do this again.
24       Q    Okay.
25       A    Again, Americans have a variation of

Page 163

1    their risk tolerance.  That is of no moment for the
2    legitimate class of trade for prescription drugs.
3    If the product -- if pharmaceutical companies want
4    to sell their products in the U.S., they must meet
5    the evidentiary standard.  Full stop.
6        Q    You would agree that some consumers
7    would be willing to accept a very low risk of a
8    probable human carcinogen, whereas other consumers
9    might not be willing to accept the risk of a
10   probable human carcinogen?
11       MR. HONIK:  Object to form, outside
12   the scope.
13       THE WITNESS:  It is of no moment in my
14   opinions in this matter.  The bottom line is
15   that these manufacturers attested to that there
16   was no contamination of these products by known
17   human carcinogens.
18   BY MR. GOLDBERG:
19       Q    Is the answer to my question, no, you
20   don't agree?
21       MR. HONIK:  Object to form, asked
22   and answered.
23       THE WITNESS:  I have answered your
24   question, sir, the best way that I know how.
25

Page 164

1    BY MR. GOLDBERG:
2        Q    Your methodology does not take into
3    consideration how consumers might have perceived the
4    value of the at-issue valsartan to them, correct?
5        MR. HONIK:  Object to the form.
6        THE WITNESS:  My analysis presumes
7    there is a demand curve for these products.
8    What my analysis also presumes is that there is
9    no legitimate supply curve for products that do
10   not meet the evidentiary standard of the U.S.
11   BY MR. GOLDBERG:
12       Q    What your analysis does not take into
13   consideration is whether any consumer perceived that
14   they received a therapeutic benefit that provided a
15   value to them, right?
16       MR. HONIK:  Object to the form, asked
17   and answered.
18       You may answer.
19       THE WITNESS:  Again, of course, it
20   does.  There is a demand curve for these
21   products.  That is not -- that is not the issue
22   in this case.  Of course, there's a demand
23   curve, and I -- I describe it in my report.
24   What my report is trying to explain is that
25   there is no legitimate supply curve for

Page 165

1    products that do not meet the evidentiary
2    standard of the U.S. government.
3        I was asked to assume that
4    products -- that these products at issue
5    between 2012 and 2018 did not meet the
6    evidentiary standard.  They were adulterated
7    and misbranded.  Therefore, there was no supply
8    curve, in my analysis.
9    BY MR. GOLDBERG:
10       Q    Are you familiar with what the FDA
11   advised patients to do when the recalls were
12   announced?
13       MR. HONIK:  Object to the form,
14   outside the scope.
15       THE WITNESS:  Specifically, what do
16   you mean?
17   BY MR. GOLDBERG:
18       Q    Are you aware that the FDA advised
19   people that they should not discontinue their use of
20   valsartan until they spoke with their doctor about
21   it?
22       MR. HONIK:  Object to the form, asked
23   and answered, outside the scope.
24       THE WITNESS:  Again, my understanding
25   is that there were multiple FDA communications

42 (Pages 162 - 165)

RESTRICTED CONFIDENTIAL

Page 166

1    when the contamination of these products and
2    their adulteration became known. Is there a
3    specific communication that you are referring
4    to?
5  BY MR. GOLDBERG:
6    Q    Well, I think my first question
7  is -- and you can answer no if it's no.
8        Are you aware of the FDA telling
9  patients they should not discontinue the use of
10 their valsartan when the FDA announced the recalls?
11       MR. HONIK: Same objection as
12   previously stated.
13       THE WITNESS: Okay. The FDA had
14   multiple communications with consumers and
15   other suppliers about these products. I'm
16   asking you to be specific.
17 BY MR. GOLDBERG:
18   Q    Do you want to turn to Tab 2 in your
19 binder?
20   A    Which binder?
21   Q    Tab 2 is binder -- that would be
22 binder, I guess, Volume 1 of 3?
23       THE COURT REPORTER: Will this be a
24   new exhibit?
25       MR. GOLDBERG: Yeah -- we'll mark this

Page 167

1  as Conti 6. This is a --
2        (Whereupon, Exhibit Conti 6 was marked
3    for Identification.)
4  BY MR. GOLDBERG:
5    Q    Dr. Conti, I'm marking as exhibit
6  Conti 6, a document entitled, "FDA Updates and Press
7  Announcements on Angiotensin II Receptor Blocker
8  Recalls." Do you see that?
9        MR. HONIK: Seth, what's Conti 5?
10       MR. GOLDBERG: Her expert report.
11       MR. HONIK: Thank you.
12 BY MR. GOLDBERG:
13   Q    Are you familiar with this document,
14 Dr. Conti?
15   A    I am aware of this document.
16   Q    This is a document that was cited in
17 your report, right?
18   A    There are many documents from the FDA
19 documented -- sorry, cited in my report.
20   Q    And this is one of those documents,
21 right?
22   A    I don't -- I don't recall.
23   Q    If you turn to the very end of this
24 document, it's the July 18th, 2018 statement.
25   A    I don't see that, sir. I'm sorry.

Page 168

1    Q    It's probably --
2        MR. GOLDBERG: For the tech -- it's
3  almost three pages to the end. It's the last
4  three pages-- three pages from the end.
5        THE WITNESS: Do you mean the one that
6  says July 13th, 2018?
7  BY MR. GOLDBERG:
8    Q    No, it's -- it's a page before it.
9  It's the page before that.
10   A    So that's three pages in. So four
11 pages in, on July 18th, 2018, not the other --
12   Q    Right.
13   A    Okay.
14   Q    Okay. And at the top of this page, it
15 says -- where it says, "7-18-2018," do you see that?
16   A    Yes.
17   Q    And this page is referring to the
18 recall of valsartan by ZHP. Do you see that?
19   A    I don't see ZHP here.
20   Q    Yeah. It's right in the second
21 paragraph.
22   A    You mean Zhejiang Huahai
23 Pharmaceuticals?
24   Q    Correct. Correct.
25   A    Okay. So, yes, I see that here.

Page 169

1    Q    Okay. And at the bottom of that page,
2  there are two bullet points at the very bottom. Do
3  you see those? And --
4    A    Is that a question?
5    Q    The first bullet point --
6    A    Is that a question?
7    Q    The first bullet point -- the first
8  bullet point, the FDA is instructing patients taking
9  at-issue valsartan that they should continue taking
10 their current medicine until their doctor or
11 pharmacist provides a replacement or a different
12 treatment option. Did I read that correctly?
13   A    I think you asked me two questions,
14 but I see that you have read that -- that text
15 correctly.
16   Q    Did you consider at all in your
17 assessment the FDA's instructing patients to
18 continue -- to continue taking their medicine until
19 they found an alternative?
20       MR. HONIK: Object to form, asked and
21 answered, beyond the scope.
22       THE WITNESS: Again, from my
23 perspective, there is a demand for these
24 products. In my report, I was asked to assume
25 that these products were contaminated,

43 (Pages 166 - 169)

RESTRICTED CONFIDENTIAL

Page 170

1    adulterated and misbranded. And therefore,
2    there is no --
3           THE COURT REPORTER: I'm sorry. There
4    is no...
5           THE WITNESS: There is no legitimate
6    supply curve. The fact that the FDA reaffirms
7    that there is a demand curve for these products
8    and many other products that might treat
9    someone's hypertension, is in my report. It
10   is, by definition, considered.
11          My report is about the supply of these
12   products.
13   BY MR. GOLDBERG:
14   Q       The FDA is acknowledging that the
15   at-issue valsartan may be providing a therapeutic
16   benefit to the consumers who are taking it, right?
17          MR. HONIK: Object to the form, asked
18   and answered, beyond the scope.
19          THE WITNESS: That's not what it says
20   here on this -- on this document, sir.
21          MR. GOLDBERG: You can take down that
22   document.
23   BY MR. GOLDBERG:
24   Q       You're aware that there have been a
25   number of recalls of valsartan since that one in

Page 171

1    July of 2018 that -- that went through July -- went
2    through 2019, right?
3    A       I am aware, as I stated earlier, that
4    the FDA has had many communications with the
5    manufacturers about these products and also the
6    American public about these products over -- over
7    time.
8    Q       And in each of those recalls, the FDA
9    made the same directive to consumers, that they
10   should not discontinue their use of valsartan until
11   they spoke with their doctor about an alternative?
12          MR. HONIK: Object to form.
13   BY MR. GOLDBERG:
14   Q       Is it your testimony that the FDA saw
15   no therapeutic benefit in the at-issue valsartan?
16          MR. HONIK: Object to form, asked and
17   answered, beyond the scope.
18          THE WITNESS: So there were valsartan
19   products that were not contaminated or
20   adulterated or misbranded that were available
21   during this time period, most notably by the
22   manufacturer --
23          THE COURT REPORTER: I'm sorry. By
24   the manufacturer...
25          THE WITNESS: By the manufacturer

Page 172

1    Novartis.
2           There were also many other treatments
3    available for hypertension. I -- I haven't
4    studied all of these FDA communications
5    regarding all of the valsartan products, but my
6    understanding is that the FDA has said to
7    patients that they should discuss with their
8    doctor continuing on the contaminated products
9    and consider the use of non-contaminated or
10   non-adulterated products for their treatment,
11   which included valsartan, specifically the
12   valsartan that were not contaminated or
13   adulterated, but many other products as well.
14   BY MR. GOLDBERG:
15   Q       And it also included the valsartan at
16   issue, right, that the FDA was saying, don't
17   discontinue your use of at-issue valsartan, to use
18   your phrase "at-issue," until you talked with your
19   doctor, right?
20          MR. HONIK: Object to the form, beyond
21   the scope.
22          THE WITNESS: No. For example, in the
23   document that we were just talking about, the
24   FDA says -- the "FDA reminds consumers to
25   continue taking your current medication until

Page 173

1    you -- until your doctor or pharmacist gives
2    you a replacement or a different treatment
3    option."
4           That is my understanding of what the
5    FDA does, generally, when there are -- there
6    are concerns about the quality of the product,
7    and that is my understanding that that is what
8    happened here.
9    BY MR. GOLDBERG:
10   Q       And the products the FDA is referring
11   to in that sentence are the at-issue valsartan
12   products, right?
13          MR. HONIK: Object to form.
14          THE WITNESS: So, actually this -- the
15   statement I just read, but on 7-24-2018, FDA
16   publishes a list of valsartan-containing
17   products not part of the recall. So it's
18   actually talking about products that were not
19   contaminated, adulterated or misbranded.
20   BY MR. GOLDBERG:
21   Q       Why don't we go back to the statement
22   we were talking about, which was July 18th, 2018?
23   And that sentence appears --
24   A       You told me -- you told me to put that
25   away. I mean, just the one document, right?

44 (Pages 170 - 173)

Page 174

1    So like I said, to begin, when we
2  started this long line of questioning, there were
3  many, many communications the FDA had with American
4  consumers and physicians and pharmacists about
5  valsartan.
6         And so there are many products that
7  are available to treat high blood pressure and
8  hypertension in the U.S. market. We're very
9  fortunate. And the FDA was telling consumers that
10  they should talk to their doctor and talk to their
11  pharmacist about their treatment in the use of both
12  valsartan products, but also many other products
13  that could control their condition as well.
14   Q    The directive about the valsartan
15  recall, by the FDA on July 18, 2018, to consumers
16  about the valsartan recall, where the FDA says,
17  "Continue taking your current medicine until your
18  doctor or pharmacist gives you a replacement or a
19  different treatment option," the FDA is saying if
20  you are taking the at-issue valsartan products, you
21  should continue taking those until you talk to your
22  doctor, right?
23         MR. HONIK: Objection to form, asked
24   and answered, beyond the scope.
25         You may answer.

Page 175

1         THE WITNESS: Thank you.
2         So, again, just going back to your
3  specifically directed text, the FDA states,
4  "Valsartan is used to treat high blood pressure
5  and heart failure. Not all products containing
6  valsartan" -- "valsartan are recalled, and this
7  update will clarify which valsartan-containing
8  products are being recalled."
9         It then goes on to say there are three
10  current voluntary recalls, which involve Teva
11  products, Prinston products and some other.
12  And then they go on to say you should continue
13  taking your current medication until you talk
14  to your doctor about the treatment of your
15  condition, where your doctor can give you a
16  replacement or a different treatment option.
17         And then they go on to say, as you
18  highlighted, "Not all valsartan-containing
19  medications are affected and being recalled."
20  BY MR. GOLDBERG:
21   Q    And the current medicine that they're
22  referring to when they're saying "current medicine,"
23  could have been the at-issue valsartan products that
24  somebody had in a bottle of pills at their house,
25  right? And that the FDA is saying continue taking

Page 176

1  that until you speak with your doctor. Okay?
2         MR. HONIK: Object to form, beyond the
3   scope, asked and answered.
4         You may answer.
5         THE WITNESS: Thank you.
6         So, again, there are many valsartan
7  products, and there are valsartan products that
8  don't contain contamination or adulteration.
9  In fact, FDA says that in this specific wording
10  on July 18, 2018.
11         What it's communicating is, to
12  American consumers and their physicians and
13  pharmacists, is that, for those of you taking
14  valsartan products, go talk to your doctor
15  about continuing taking those products or
16  switching.
17  BY MR. GOLDBERG:
18   Q    Yeah. Okay. And so if those products
19  are some of the products that are at-issue now, you
20  don't deny that the FDA was saying keep taking them?
21         MR. HONIK: Object to the form, asked
22   and answered.
23         THE WITNESS: You mean the
24   non-recalled products?
25

Page 177

1  BY MR. GOLDBERG:
2   Q    No. I mean products that were
3  recalled. But remember, somebody -- okay. On
4  July 2018 -- on July 2018, if somebody had a bottle
5  of valsartan that is part of the at-issue valsartan
6  products that you're talking about, right? They're
7  sitting at home. They've got their bottle of
8  valsartan. It has NDMA in it. Okay? Just assume.
9  Okay? Accept my assumption. It's hypothetical.
10  Okay?
11         Somebody on July 2018, on
12  July 28, 2018, has a bottle of valsartan, that is
13  one of the at-issue products because it has NDMA in
14  it, you would agree that the FDA is instructing that
15  patient to continue to take that drug until they
16  talk to their doctor, right?
17         MR. HONIK: Object to form, object to
18   the hypothetical based upon facts not of
19   evidence, asked and answered.
20         THE WITNESS: So, again, there are
21   many communications the FDA had with American
22   consumers, physicians and pharmacists about
23   these products. In -- in this specific
24   communication, the FDA reminds consumers,
25   pharmacists and physicians, that there are

45 (Pages 174 - 177)

Page 178

1    valsartan products that are being recalled, and
2    there are valsartan products that are not part
3    of the recall. And it recommends to consumers
4    that they -- they continue taking their
5    product -- these products, and go talk to their
6    doctor about it.
7    BY MR. GOLDBERG:
8      Q    And that includes both valsartan that
9    is being recalled and valsartan that may not be
10   recalled, right?
11         MR. HONIK: Object to the form, asked
12   and answered.
13         THE WITNESS: Yes.
14   BY MR. GOLDBERG:
15     Q    Awesome.
16         And did you consider this FDA
17   statement in forming your opinion?
18     A    Again, I -- in my report, I assume
19   that there is a demand curve for -- for these
20   prescription drugs, including the at-issue products.
21     Q    Yes or no, did you consider this
22   specific statement in forming your opinion?
23         MR. HONIK: Objection, asked and
24   answered.
25         THE WITNESS: Sir, I'm sorry.  A

Page 179

1    demand curve, by definition, includes that
2    consumers may -- pharmacists and physicians may
3    want to continue using these at-issue products.
4    The issue --
5    BY MR. GOLDBERG:
6      Q    Is the answer to my question, yes?
7          MR. HONIK: You're interrupting her.
8    You're interrupting the witness.
9    BY MR. GOLDBERG:
10     Q    Is the answer to my question yes?
11         MR. HONIK: Objection, asked and
12   answered. She's answered that question a dozen
13   times already.
14   BY MR. GOLDBERG:
15     Q    Did you consider this statement by the
16   FDA in forming your opinion?
17         MR. HONIK: Objection, asked and
18   answered.
19         THE WITNESS: Thank you.
20         Again, my opinion is that there was a
21   demand curve for valsartan products that
22   included the ones that were -- that are
23   at-issue, that are contaminated or adulterated
24   and misbranded, and others as well that were
25   not.

Page 180

1          All this statement is saying is
2    legitimating my presumption, which is there is
3    a demand curve. And the FDA goes on, in later
4    statements, to American consumers, saying there
5    is a demand curve. All that's supporting my
6    position.
7          MR. GOLDBERG: Why don't we take a
8    two-minute break, if we can. Okay?
9          THE VIDEOGRAPHER: The time is 3:37.
10   This ends Media Unit 3. We're going off the
11   record.
12         (Whereupon, a short break was taken.)
13         THE VIDEOGRAPHER: The time is 4:02.
14   This begins Media Unit Number 4. We're back on
15   the record.
16   BY MR. GOLDBERG:
17     Q    Dr. Conti, have you received any other
18   text messages from plaintiffs' counsel today during
19   the deposition?
20         MR. HONIK: Without waiver of the
21   privilege it attaches to work product, I'll
22   permit her to answer.
23         THE WITNESS: No.
24   BY MR. GOLDBERG:
25     Q    And have any other documents been sent

Page 181

1    to you by email during the day from plaintiffs'
2    counsel?
3          MR. HONIK: Same objection.
4          You may answer.
5          THE WITNESS: I'm a little afraid of
6    my email, but I haven't checked. So I don't
7    know.
8    BY MR. GOLDBERG:
9      Q    Okay. You've -- you've talked about
10   legitimate supply curve, and is -- is it your
11   testimony that no -- that there is no price that
12   could be paid where there's no legitimate supply?
13         MR. HONIK: Object to the form.
14         THE WITNESS: I don't understand your
15   question, sir. I'm sorry.
16   BY MR. GOLDBERG:
17     Q    Well, if -- thinking about your
18   Figure 2 where there's no supply curve --
19     A    Wait a minute. Wait a minute. Hold
20   on. Just let me get my report, so I can reference
21   what you're referring to.
22     Q    So Figure 2 of your -- in your report
23   shows "Demand with no Legitimatized Supply."
24   That's -- that's how you've titled this figure,
25   right?

RESTRICTED CONFIDENTIAL

Page 182

1    A    That's accurate.
2    Q    Is there -- is it -- is it your
3  testimony that there's -- that no price could be
4  paid under a scenario where there's, to use your
5  term, "no legitimate" -- "no legitimate supply"?
6    A    To be honest, it's a matter of
7  economic theory.  In order for there to be a price,
8  there needs to be both demand and supply.  What
9  we've been talking about for the past, at least,
10  hour, seems like more, is that in my model there is
11  demand for these products, although demand falls off
12  quite dramatically for these products when the
13  recalls start.
14        But I have been asked to assume that
15  the products at issue were adulterated and
16  misbranded.  Adulterated and misbranded products are
17  not allowed in the U.S. supply chain, and therefore,
18  there is no supply.  And therefore, there is no
19  meeting of demand and supply to arrive at a price.
20    Q    So there is -- is it your testimony
21  that there is no price that would -- could be paid
22  for a product where there is no legitimate supply?
23        MR. HONIK:  Object to the form, asked
24    and answered.
25        THE WITNESS:  As a matter of economic

Page 183

1    theory, price cannot be arrived at without
2    there being both demand and supply.  I have
3    been asked to assume there is -- these products
4    were adulterated and misbranded, and therefore,
5    there is no supply that is legitimate for these
6    products as -- as a matter of U.S. policy.  And
7    therefore, there can be no price.
8  BY MR. GOLDBERG:
9    Q    Is -- is -- in your opinion, is price
10  the same as value?
11    A    So according to the FDA alone, there
12  is both an economic price and a therapeutic -- well,
13  an economic value and a therapeutic value.  We've
14  also talked about this quite a lot today.
15        There might be therapeutic value, in
16  other words, that is encapsulated in the demand
17  curve.  People -- people trade off the benefits and
18  costs of products.  But there is no supply of
19  illegitimate, adulterated and misbranded products in
20  my -- in my model.  And therefore, there is no
21  price.
22  BY MR. GOLDBERG:
23    Q    You said, "According to the FDA alone,
24  there is both an economic price and a therapeutic
25  value."

Page 184

1    A    I meant economic value.  And I
2  corrected myself and said that there's a -- there's
3  an economic value, and then there's a therapeutic
4  value.
5    Q    What -- is there something in
6  particular that you're thinking about where the FDA
7  has said there is an economic value to a drug?
8        MR. HONIK:  Objection to the form.
9        THE WITNESS:  Sure.  I put it in my --
10    in my report.  Let me get to the right
11    paragraph, and I'll direct you to it.
12        Paragraph 26 of my report, "The FDA
13    explains the rationale for its central focus on
14    protecting consumers from adulterated and
15    misbranded drugs on the web page as follows:
16    At the turn of the 20th century, there were no
17    federal regulations to protect the public from
18    dangerous drugs.  'It was a menacing" --
19    "'menacing marketplace filled with products,
20    such as William Radam's Microbe Killer and
21    Benjamin Bye's'" --
22        COURT REPORTER:  I'm sorry, Doctor.  I
23    just -- I lost you there a little bit.
24        Marketplace filled with products such
25    as William...

Page 185

1        THE WITNESS:  Sure.  I'm sorry.
2        "'It was a menacing market'" -- so,
3    "'It was a menacing marketplace filled with
4    products such as William Radam's Microbe Killer
5    and Benjamin Bye's Soothing Balmy Oils to cure
6    cancer,' said John Swann, Ph.D., a historian at
7    the Food and Drug Administration.  Products
8    like these were, at minimum, remedies that
9    picked the pocket of the user."  That's what I
10    mean by "economic value."
11        "But they could also be downright
12    harmful."  That's what I mean by
13    "therapeutically harmful."
14        "I emphasize the text" -- "the text in
15    italics because the FDA's statement underscores
16    the harms from adulterated and misbranded
17    products as twofold:  First, economic losses
18    from purchasing products that are adulterated
19    and misbranded and second, the possibility of
20    clinical harm from consumption of adulterated
21    and misbranded products."
22        From my perspective, there are two
23    types of value, and therefore, two types of
24    usefulness or worthlessness.  There is the
25    economic value, and then there is a therapeutic

47 (Pages 182 - 185)

RESTRICTED CONFIDENTIAL

Page 186

1    value.  The economic value, products such as
2    these -- and products that are adulterated and
3    misbranded should never have entered into the
4    U.S. class of trades.  That is the position of
5    the U.S. government, that we do not allow
6    products such as these onto the U.S. market.
7  BY MR. GOLDBERG:
8    Q    I -- I thought you said that it was
9  the FDA's view that -- that there was no -- that
10  this term "economic value," you had said, "the FDA
11  alone."  And then in your last answer, you referred
12  to you having two views of value, economic value and
13  therapeutic value.
14        Are you basing -- are you basing your
15  view of economic value on what the FDA says?
16        MR. HONIK:  Object to the form.  You
17  may answer.
18        THE WITNESS:  My view is both a matter
19  of economic theory; there is demand that does
20  not meet supply, and therefore there is no
21  price.  But also, it is predicated, as my
22  understanding of FDA regulation, and also,
23  frankly, regulation that the pharmaceutical
24  industry itself has -- has wanted, which is
25  that there is only the legitimate supply of

Page 187

1    products that are not adulterated and
2    misbranded into the U.S. market, those that are
3    valuable.
4  BY MR. GOLDBERG:
5    Q    Let's talk about the first part --
6    A    Wait.  Wait.  Wait.  Wait.  Wait.
7  Hold on.  Let me just -- let me just finish.
8        So it is the -- it is the position of
9  the pharmaceutical industry in the United States
10  since at least the '60s, that they have wanted them
11  to be very clear guidance about what is a legitimate
12  product, that meets the evidentiary standards, and
13  what is a not legitimate product that does not.
14        It is their position that they do not
15  want products on the market that are misbranded,
16  adulterated or otherwise contaminated.
17    Q    Are you finished?
18    A    I am.  Thank you for asking.
19    Q    So the first part of that question,
20  you said -- or answer, you said, "My view is more
21  the matter of economic theory.  There is demand that
22  does not meet supply, and therefore, there is no
23  price."  And then you went on to talk about the
24  FDA's view?
25    A    Yes.

Page 188

1    Q    Just in terms of the FDA --
2    A    And -- wait, and -- just so that
3  you're not mischaracterizing me.
4        It's also the pharmaceutical
5  industry's view that they want to be known as
6  producing and entering products into the U.S. and
7  selling products into the U.S. that are legitimate,
8  that do meet the evidentiary standard as
9  distinguished from products that do not.
10    Q    Just as you don't want me to interrupt
11  you, I'd appreciate it if you don't interrupt me.
12    A    I was just trying to clarify your
13  mischaracterization of my position.
14    Q    In your answer, going back, you refer
15  to the economic theory of supply and demand.  What
16  economic treatises have you been relying on for the
17  theory that where there's no legitimate supply,
18  there -- there's no possibility for a delivery of
19  price?
20    A    That's Economics 101.
21        MR. HONIK:  Objection, asked and
22  answered.
23        THE WITNESS:  It's Economics 101.
24        MR. HONIK:  I think you got your
25  answer, Seth.

Page 189

1        THE WITNESS:  Thank you.
2        It is Economics 101.  Literally, my
3  high school student was just taught that price
4  is a function of supply and demand.  So that
5  is -- that is a familiar concept to anyone who
6  has taken elementary economics.
7  BY MR. GOLDBERG:
8    Q    What economic theory are you relying
9  on for the point that where there is a cGMP
10  violation in a drug, there is no legitimate supply?
11  Which economic theory are you relying on?
12        MR. HONIK:  Objection,
13  mischaracterizes her previous response.
14        THE WITNESS:  Okay.  Again,
15  Economics 101.  There can be a demand curve for
16  products that have no supply, legitimate
17  supply.  If there is no legitimate supply,
18  there is no economic price.  That -- that is
19  just -- that is just elementary economics.
20  BY MR. GOLDBERG:
21    Q    I'm asking you, what is the economic
22  theory for an adulterated drug equals no legitimate
23  supply?  What's the economic theory for that?
24    A    Sure.
25        So this is the most highly -- one of

48 (Pages 186 - 189)

RESTRICTED CONFIDENTIAL

Page 190

1   the most highly regulated consumer products in
2   the -- in the U.S. marketplace.  And it is the U.S.
3   regulator's perspective that products that do not
4   meet the evidentiary standard of cGMP are not
5   considered prescription drugs.
6           And I can point you to the orange book
7   where the FDA makes that statement.  In other words,
8   in order for a prescription drug to be sold in the
9   U.S., to enter into the commercial class of trade
10  and be sold in a pharmacy, it must be produced in
11  accordance with the cGMP at minimum and attested to
12  by the manufacturer, and in addition, meet other
13  evidentiary standards for safety and efficacy.
14          That is the position of the U.S.
15  government.
16  Q      Would you agree that patients who
17  would not have taken the at-issue valsartan would
18  have -- because it was not supplied, in your view of
19  the world, would not -- would have needed to take
20  another medication to treat their hypertension?
21          MR. HONIK:  Objection, beyond the
22  scope.
23          THE WITNESS:  So are you saying
24  that -- because I think I'm -- I think what
25  you're asking is, would there be demand for

Page 191

1   treatment of hypertension and high blood
2   pressure regardless of whether these products
3   were on the market?  Is that what you're
4   asking?
5   BY MR. GOLDBERG:
6   Q      Sure.
7   A      Okay.  Consumers in America who suffer
8   from high blood pressure or hypertension or other
9   related conditions certainly seek treatment.  They
10  demand treatment for those conditions.
11          My understanding, and as I understand
12  it, your own experts have suggested that there were
13  many treatments available for those conditions,
14  including uncontaminated, unadulterated valsartan
15  manufactured by Novartis, among others.  And
16  other -- many other products and non-pharmaceutical
17  products --
18          THE COURT REPORTER:  I'm sorry,
19  Doctor, can you repeat the end of that?
20          THE WITNESS:  Sure.
21          Where -- so my understanding is that
22  there are many products that are
23  pharmaceutical, in addition to other
24  non-pharmaceutical products, that can treat the
25  underlying conditions to either mitigate the

Page 192

1   hyper -- high blood pressure or hypertension or
2   prevent sequella.
3           THE COURT REPORTER:  Thank you.
4   BY MR. GOLDBERG:
5   Q      Would there have been a cost
6   associated with having to take one of those
7   alternative medications or treatments?
8           MR. HONIK:  Object to the form, beyond
9   the scope.
10          THE WITNESS:  It depends.
11  BY MR. GOLDBERG:
12  Q      If someone had to take a different
13  ARB, they might have had to pay for that ARB, right?
14          MR. HONIK:  Object to the form.
15          THE WITNESS:  They may have.  They may
16  have decided to manage their -- their treatment
17  in many other ways.  Physicians can choose to
18  do many things.  We know that demand for
19  valsartan products that were recalled dropped
20  precipitously, and so those consumers went
21  elsewhere.  Where they went, there are many,
22  many options available to them and their
23  physicians.
24  BY MR. GOLDBERG:
25  Q      Is it -- your analysis doesn't take

Page 193

1   into account the cost that a consumer might have had
2   to pay for a different medication?
3           MR. HONIK:  Object to the form.
4           THE WITNESS:  Or do you mean or other
5   management techniques?  Because there are many
6   management techniques.
7   BY MR. GOLDBERG:
8   Q      Sure.
9   A      Some which would have cost less.
10  Q      Your -- your analysis doesn't take
11  into account any other -- any -- the cost of any
12  alternative treatment of medication, right?
13          MR. HONIK:  Object to the form.
14          THE WITNESS:  That is outside the
15  scope of my report, sir.
16  BY MR. GOLDBERG:
17  Q      Is it possible that if it
18  weren't -- if they hadn't taken the at-issue
19  valsartan products, consumers might have paid more
20  for a hypertension medication?
21          MR. HONIK:  Object to the form.
22          THE WITNESS:  I've learned in this
23  world anything is possible.  I mean, there are
24  many, many ways of controlling high blood
25  pressure and -- and other related conditions

49 (Pages 190 - 193)

RESTRICTED CONFIDENTIAL

Page 194

1    that people may have taken valsartan for during
2    this time period.  I have no opinion whether or
3    not those other therapeutic alternatives,
4    including doing nothing, were lostless or
5    costly.
6    BY MR. GOLDBERG:
7        Q       Why is the cost of an alternative
8    medication not pertinent to your analysis?
9            MR. HONIK:  Object to the form, asked
10   and answered.
11           THE WITNESS:  Because my damages
12   calculation is focused on the injury that
13   occurred to consumers and to end-party payors
14   for contaminated, adulterated and misbranded
15   valsartan products that were recalled during
16   the time period.  Whether or not people went
17   elsewhere, the downstream economic costs to
18   that -- to that contamination are of no moment
19   in my economic calculation.
20           And maybe the way that I like to think
21   of it is this way, which is I was asked to
22   calculate damages associated with this injury,
23   the defendants selling adulterated, misbranded
24   products into the U.S. marketplace that
25   consumers --

Page 195

1            THE COURT REPORTER:  That consumers...
2            THE WITNESS:  And end-payors or
3    insurers didn't know about.
4            Injury occurs -- in other words, if
5    you get hit by a car, injury occurs at the time
6    of the car, being hit.  If people go elsewhere
7    after they hit their -- after their car was
8    hit, maybe they buy a new car or it's more
9    costly, maybe they go without a car all
10   together, that's -- that's not related to my
11   calculation.  It's of no moment.  The
12   economic --
13   BY MR. GOLDBERG:
14       Q       You --
15       A       Hold on.  The economic loss occurs at
16   the time of injury.
17       Q       You said that this drug should not
18   have been sold to those consumers, right?
19       A       That's not what I said, sir.
20       Q       So the drug could have been sold to
21   consumers?
22           MR. HONIK:  Object to form.
23           THE WITNESS:  That's not what I said
24   either, sir.
25

Page 196

1    BY MR. GOLDBERG:
2        Q       Okay.  You said the drug shouldn't be
3    sold, and that it was an illegitimate supply, right?
4            MR. HONIK:  Object to form.
5            THE WITNESS:  They are not the same
6    thing, sir.
7    BY MR. GOLDBERG:
8        Q       Okay.  If consumers would have paid
9    more for a different drug because
10   valsartan -- because the at-issue valsartan were not
11   sold, doesn't -- wouldn't that have mattered to your
12   analysis?
13           MR. HONIK:  Object to the form, asked
14   and answered, improper hypothetical, facts not
15   in evidence.
16           You can answer.
17           THE WITNESS:  Thank you.
18           You have asked this question four
19   times, and I have already answered it.  But I'm
20   happy to answer it again.
21           Again, injury occurs at the time of
22   the accident, at the time of -- at the time of
23   the accident.  Whether consumers would have
24   gone on to buy something else after the injury
25   occurred is of no moment.  There was an

Page 197

1    economic loss.  People bought things that
2    shouldn't -- they -- that under the assumptions
3    that were given to me, Counsel, should not have
4    entered into the legitimate class of trade.
5    BY MR. GOLDBERG:
6        Q       Okay.  So I just asked you, your
7    testimony is that these drugs should not have
8    entered into the class of trade, right?
9        A       No.  What I was asked --
10       Q       And my question is --
11       A       No.  What I was asked to assume is
12   that these products were adulterated and misbranded.
13   If a product is adulterated and misbranded,
14   according to U.S. regulation and pharmaceutical
15   manufacturers, they are not allowed to enter into
16   the U.S. class of trade.  And therefore, there was
17   no supply.
18       Q       Okay.
19       A       Injury occurs because these
20   products -- these contaminated products entered into
21   the U.S. class of trade and people bought them.  And
22   insurers purchased -- insurers paid for them.  The
23   economic loss arising, therefore, from the purchase
24   of products that, under this theory of damages,
25   should not have occurred.

50 (Pages 194 - 197)

RESTRICTED CONFIDENTIAL

Page 198

1    What people would have done after the
2 injury, they switched products to another
3 prescription drug, they managed their hypertension
4 by diet and exercise, they underwent stent therapy,
5 all of those other things are of no moment to my
6 assessment of economic loss.
7 BY MR. GOLDBERG:
8    Q    I'm not talking about after the injury
9 at this point. I'm talking about instead of the
10 injury. Instead of buying the at-issue valsartan
11 because it was not on the market and a consumer
12 bought a different ARB or a different drug and paid
13 more for that, that doesn't matter to your -- would
14 have paid more for that, that doesn't matter to your
15 analysis?
16    MR. HONIK: Objection, asked and
17    answered, improper hypothetical.
18    THE WITNESS: So -- I mean, really the
19    alternative here is not -- is that the
20    manufacturers actually sold unadulterated,
21    properly branded product, not that consumers
22    were forced to go elsewhere, in my economic
23    analysis.
24 BY MR. GOLDBERG:
25    Q    In an economic analysis where a

Page 199

1 consumer would have taken a different drug instead
2 of the at-issue valsartan, and they would have paid
3 the same or more for that different drug, did the
4 consumer have an economic injury?
5    MR. HONIK: Objection, asked and
6    answered, improper hypothetical.
7    THE WITNESS: From my perspective, if
8    the consumer did not buy adulterated or -- and
9    misbranded, illegitimate valsartan products,
10    they are not injured.
11    So all of those people between 2012
12    and 2018 that took Novartis-brand valsartan
13    that was not recalled or contaminated, they are
14    out of my class. They are out of the -- my
15    calculation of damages.
16    All of those people between 2012 and
17    2018 that used other therapeutic modalities to
18    treat their hypertension are of no moment to
19    me, in my economic analysis.
20    My economic analysis is only focused
21    on the people who purchased adulterated and
22    misbranded valsartan products that were
23    ultimately recalled.
24 BY MR. GOLDBERG:
25    Q    And if they didn't make that purchase,

Page 200

1 they would have had to purchase some other drug,
2 right?
3    MR. HONIK: Object to the form. It's
4    been asked and answered, I don't know, 15 times
5    already.
6    THE WITNESS: There are many, many
7    treatments for hypertension and high blood
8    pressure out there. Some of them are
9    pharmaceutical. Some of them are other things.
10    It's immaterial to my perspective. I am simply
11    focused on the people who actually bought or
12    insured the contaminated, misbranded and
13    adulterated products at-issue in this matter.
14 BY MR. GOLDBERG:
15    Q    Do you know the difference between
16 compensatory damages and punitive damages?
17    MR. HONIK: Object to the form,
18    outside the scope, calls for an expert legal
19    opinion.
20    THE WITNESS: No. I'm not a lawyer.
21    Maybe in my future life.
22 BY MR. GOLDBERG:
23    Q    In your view, the damages you
24 calculated, are you -- are you calculating damages
25 to compensate consumers or their loss or deter

Page 201

1 manufacturers from making drugs that have
2 adulterations or misbranding?
3    MR. HONIK: Same objection to the
4    extent it calls for a legal conclusion.
5    You may answer.
6    THE WITNESS: I'm sorry. I -- I
7    didn't quite follow. Can you slow down and ask
8    not a compound question, but in parts?
9 BY MR. GOLDBERG:
10    Q    Turn to Paragraph 45 of your report.
11    A    So we're moving on? You're not going
12 to ask that question?
13    Q    I'm moving on.
14    A    Oh, okay.
15    Q    Do you have Paragraph 45 up?
16    A    Uh-huh.
17    Q    In Paragraph 45, you write, "Assigning
18 a non-zero value to non-safety and quality compliant
19 products is perverse. To do so would be to
20 incentivize and legitimize cheating and
21 noncompliance by manufacturers and other members of
22 the United States pharmaceutical supply chain."
23    Did I read that correctly?
24    A    That's what it says.
25    Q    Is it your opinion that -- that the

51 (Pages 198 - 201)

RESTRICTED CONFIDENTIAL

Page 202

1  damages you calculated are intended to
2  disincentivize manufacturers from cheating and
3  noncompliance?
4      MR. HONIK: Object to the form.
5  BY MR. GOLDBERG:
6      Q      Well, let me put it another way.
7          Are you -- are you suggesting that
8  manufacturers should be deterred from cheating and
9  noncompliance?
10     A      It is the U.S. government's position,
11  evolving over time, and also pharmaceutical
12  manufacturers' position, that the illegitimate,
13  misbranded, adulterated, contaminated, criminal
14  class of trade of prescription drugs should be
15  minimized at, if at all, at all possibilities.
16          There's 100 years of focus on reducing
17  products that pick the pocket of consumers, don't do
18  what they say or could even cause harm. To allow
19  those products onto the market to legitimate this
20  type of cheating, goes against U.S. policy and,
21  frankly, the pharmaceutical industry's position, for
22  the better part of many decades.
23  BY MR. GOLDBERG:
24     Q      So in calculating the damages the way
25  you have, are you taking into account the need to

Page 203

1  deter manufacturers from wrongdoing, as you put it?
2          MR. HONIK: Object to the form, calls
3      for a legal conclusion, beyond the scope of her
4      report.
5          THE WITNESS: I'm sorry. I don't
6      quite understand your question. Can you please
7      repeat it?
8  BY MR. GOLDBERG:
9      Q      In calculating -- in calculating the
10  damages that you've calculated, are you trying to
11  also account for some punishment, if you will, of
12  manufacturers -- of the defendants for manufacturing
13  drugs that had an impurity in it?
14          MR. HONIK: Same objection. She's not
15      a lawyer, beyond the scope.
16          THE WITNESS: I'm sorry. I don't -- I
17      don't quite understand what you mean. Am I
18      trying to punish the manufacturers? Is that
19      what you're asking?
20  BY MR. GOLDBERG:
21     Q      Yes.
22          MR. HONIK: Same objection.
23          THE WITNESS: Again, that's no moment
24      to my -- that has no moment in my opinions in
25      this matter. I was asked to calculate economic

Page 204

1  damages associated with misconduct.
2  BY MR. GOLDBERG:
3      Q      Right. So --
4      A      Myself -- I mean, from, again, an
5  economic perspective, these products are worthless.
6  The court has agreed. Consumers and third-party
7  payors suffered an economic harm. And my analysis
8  calculates that economic harm, which is the full
9  price of the product that they paid at the pharmacy
10  counter.
11     Q      Why do you -- why is it necessary for
12  you to -- to say that a nonzero value is perverse
13  and would incentivize to you? What -- what does
14  that have to do with your economic calculation?
15     A      It goes -- because it goes -- because
16  assigning a nonzero value goes against U.S. policy
17  and the pharmaceutical companies' own position on
18  the matter of illegitimate products for the better
19  part of 50 -- and if you count from 1906, the better
20  part of more than 100 years of U.S. policy. But,
21  again, products that are illegitimate, that do not
22  meet cGMP, that would not be allowed to come into
23  the U.S. market, they have no economic value. And
24  the court agrees with me.
25          THE COURT REPORTER: And the -- I'm

Page 205

1      sorry.
2          THE WITNESS: And the court agrees
3      with me on that point.
4          COURT REPORTER: Thank you.
5          THE WITNESS: Thank you.
6  BY MR. GOLDBERG:
7      Q      I just want to confirm, you have not
8  made any attempt to consider whether a consumer
9  would have paid a different co-payment for a
10  different drug but for their purchase of valsartan?
11          MR. HONIK: Object to the form.
12          THE WITNESS: I already answered this
13      question, sir.
14          But, again, all I considered in my
15      analysis is what consumers actually paid for
16      these at-issue products.
17  BY MR. GOLDBERG:
18     Q      And the same is true for TPPs? All
19  you considered for end-payors or third-party payors
20  is what they actually paid for the product?
21          THE COURT REPORTER: Is what they
22      actually...
23          MR. GOLDBERG: Paid for the product.
24          THE WITNESS: Correct.
25

52 (Pages 202 - 205)

RESTRICTED CONFIDENTIAL

Page 206

BY MR. GOLDBERG:

1  BY MR. GOLDBERG:
2      Q      Just moving on into another area of
3  your report --
4          THE WITNESS:  Excuse me.  If we're
5      moving on, before there's a question pending,
6      do you mind if we take a break, please?
7          MR. GOLDBERG:  No, that's fine.
8          THE VIDEOGRAPHER:  The time is 4:41.
9      We're going off the record.
10          (Whereupon, a short break was taken.)
11          THE VIDEOGRAPHER:  The time is 4:52.
12      This begins Media Unit Number 5.  We're back on
13      the record.
14  BY MR. GOLDBERG:
15      Q      Dr. Conti, can you turn in your report
16  to Paragraph 58?
17      A      I'm there.
18      Q      At the beginning of this paragraph,
19  you say, "Plaintiffs' counsel have asked me to
20  calculate damages for four different theories of
21  liability against the manufacturer defendants and
22  two different theories of liability and one theory
23  of unjust enrichment against the defendant
24  retailers."
25          Do you see that?

Page 207

1      A      Yes.
2      Q      The unjust enrichment damages that you
3  calculated, did you apply the same measure of
4  damages to all of the different theories of
5  liability?
6      A      They differ by the states included in
7  the calculations.
8      Q      To your knowledge, is that the only
9  difference that -- as between these different
10  theories of liability?
11      A      Generally, yes.  And then -- I mean,
12  in terms of the defendants, the terms of the
13  retailers, there's both data and --
14          THE COURT REPORTER:  And what?  And
15      what, Doctor?
16          THE WITNESS:  And states that are
17      different from the retailers.
18  BY MR. GOLDBERG:
19      Q      In terms of the measure of damages for
20  all of the liability, leaving aside unjust
21  enrichment, the measure of damages for all of them
22  is the same, which is a full refund of the price
23  paid at the point of sale?
24          MR. HONIK:  Object to the form.
25          THE WITNESS:  Correct.  Yeah, correct.

Page 208

1      Again, the retailers are different.  But --
2          THE COURT REPORTER:  But from the
3      defendants...
4          MR. HONIK:  I think she said the
5      retailers are different.
6          THE WITNESS:  Right.  For the
7      defendants, the measure of economic liability
8      is the same.  It's the price that was paid.
9      And for the retailers, it's different.
10          THE COURT REPORTER:  Thank you.
11  BY MR. GOLDBERG:
12      Q      And leaving aside unjust enrichment,
13  in what way is -- is it different for the retailers?
14      A      Let's go down and talk about it.
15      So the -- the retailers sold the
16  product to consumers, and they obtained their own
17  benefit from selling these products.  So it's the
18  economic loss or economic gain associated with the
19  retailers' sale that's different than the
20  defendants' sale.
21      Q      Okay.  I'm not going to get into the
22  economic damages for the retailers, at this point.
23  I'm -- I'm going to leave that for somebody else.
24      You have that -- you made that
25  statement.  I just wanted to clarify that one point.

Page 209

1      In terms of the -- the manufacturer
2  damages, you -- you relied -- you're relying on data
3  from IQVIA?  Am I correct?
4      A      Right.  I'm relying on national sales
5  by product, manufacturer, month, state and payment
6  types of who the payor is.  And I'm also relying on
7  national data related to the co-payment amounts, or
8  co-insurance amounts, that consumers paid.  Again,
9  by product, payor, state, month, year.
10      Q      And how did you get the data that you
11  relied upon?
12      A      I instructed my staff to purchase the
13  data on my behalf.
14          THE COURT REPORTER:  To purchase?
15          THE WITNESS:  To purchase, yes.
16  BY MR. GOLDBERG:
17      Q      Did you provide a specific instruction
18  as to what -- what parameters you were looking for
19  for them to purchase?
20      A      I think I just made that clear in my
21  previous answer, sir.
22      I -- I look at IQVIA data every day in
23  my research, and they are known as the gold standard
24  for pharmaceutical sales of legitimate prescription
25  drugs in the U.S. consumer market.

53 (Pages 206 - 209)

RESTRICTED CONFIDENTIAL

Page 210

1    Q    Do you know whether there are any
2  limitations to the IQVIA data you relied upon or
3  purchased?
4    A    Oh, goodness, Mr. Goldberg, there are
5  always limitations, but they are the gold standard.
6  They are used by the pharmaceutical industry
7  themselves for assessing sales of products both in
8  their own market but also in competitor markets.
9  And, you know, I am not aware of a product that is
10  better.
11    Q    Do you know that there are some
12  sources of data that IQVIA is not able to obtain and
13  makes projections in place of the data that they
14  can't obtain?
15    A    So the Xponent data that I used is
16  comprised of approximately 92 percent of total
17  prescription sales for legitimate consumer
18  product -- legitimate pharmaceutical products in the
19  U.S. class of trade. There are some holes in their
20  audit, but with prescription manufacturers and
21  pharmacies. But those are not holes that are
22  particularly relevant to these specific products.
23        What I mean by that is that we know
24  that Xponent data does not have -- does not have
25  good purview into drugs that are sold to some

Page 211

1  hospitals in the U.S. and some specialty pharmacies.
2        But those are not -- these are
3  not -- these products at-issue here are not really
4  those drugs. It's largely drugs that are -- that
5  are used in the inpatient setting to treat very,
6  very sick people in the ICU and -- and otherwise.
7        The retail class of trade from regular
8  pharmacies like CVS and Walgreens are the -- are the
9  products that are at-issue here and that -- in that
10  class of trade.
11        THE COURT REPORTER: That class of --
12  that class of trade...
13        THE WITNESS: That is at-issue in this
14  math certificate.
15        Xponent also doesn't capture all
16  co-insurance and co-payment amounts. It
17  captures approximately 80 percent that are
18  purchased, not all that are purchased or all
19  that are paid in the legitimate consumer --
20        legitimate pharmaceutical market in the U.S.
21  And my methods account for that.
22  BY MR. GOLDBERG:
23    Q    How do your methods account for that?
24  How do you explain that?
25    A    So I explain the limitations of this

Page 212

1  data in -- in my report. I've also written -- I've
2  used Xponent data for my own research in many, many
3  different contexts. And so those limitations for
4  this type of data are very well known. They're well
5  characterized, and I cite those in my report, the
6  fact that Xponent doesn't contain all consumer
7  co-insurance.
8        THE COURT REPORTER: Co-insurance...
9        THE WITNESS: Co-payment amounts that
10  consumers pay -- paid for these products is
11  accounted for in a specific way in this
12  analysis. Specifically, I took average
13  insurance and co-payment amounts by product,
14  month, year, manufacturer and applied that to
15  the analysis --
16        THE COURT REPORTER: The analysis...
17        THE WITNESS: When appropriate.
18        THE COURT REPORTER: One more time.
19        THE WITNESS: When appropriate.
20        COURT REPORTER: I'm sorry. Thank
21  you.
22        THE WITNESS: No problem. It's the
23  end of a day.
24  BY MR. GOLDBERG:
25    Q    From the IQVIA data, the Xponent data,

Page 213

1  you -- that data does not identify the specific
2  patients who purchased valsartan, right?
3    A    It's inclusive of all patients that
4  purchased valsartan or who prescribed and dispensed
5  valsartan by definition.
6    Q    You can't use that data to identify
7  any particular patient, right?
8    A    Correct, it is inclusive of all.
9    Q    And you can't use that data to
10  identify any particular payor for valsartan?
11    A    That is -- that is incorrect.
12    Q    I thought - I thought I just heard you
13  say that, so maybe I misheard you.
14    A    No.
15        MR. HONIK: Wait. Wait. Wait for a
16  question. Wait for a question.
17        MR. GOLDBERG: Okay. I did mishear
18  you. You said prescribe and dispense.
19  BY MR. GOLDBERG:
20    Q    Does the IQVIA -- does the IQVIA data
21  permit you to determine a particular class member's
22  damages in this case?
23    A    The IQVIA data allows me to
24  disaggregate sales of products by product, and by
25  payor type.

54 (Pages 210 - 213)

RESTRICTED CONFIDENTIAL

Page 214

1    Q    So no, you couldn't get to a
2  particular class member's data in this case through
3  the IQVIA data?
4    A    I'm not sure I understand what you
5  mean by "class member." I mean, my -- my -- excuse
6  me. My understanding is that class members are, by
7  definition, defined buy payor type and also by
8  state.
9    Q    Did you look at the IQVIA data and
10 determine what a particular consumer paid for
11 valsartan in cash?
12        MR. HONIK: Objection, asked and
13     answered.
14        THE WITNESS: It is inclusive of all
15     payments made by all consumers who are
16     presumable class members, and it's inclusive of
17     all payors that are inclusive of all payor
18     class members by month, state, year and
19     product.
20 BY MR. GOLDBERG:
21    Q    Right. It doesn't get -- it doesn't
22 allow you to drill down to what a particular
23 consumer paid --
24        MR. HONIK: Do you mean without more?
25     Do you mean without more? Is that what you

Page 215

1  mean, Seth?
2        MR. GOLDBERG: The question is
3     pending. I asked her about the Xponent data.
4        MR. HONIK: The problem is you've
5     asked it six times. I think she's answered it
6     as best she can. It's aggregate data is what
7     she's saying, and if you're asking --
8        MR. GOLDBERG: Are you testifying?
9        MR. HONIK: No. I'm just -- I think
10     you're going round and round.
11        But answer it as best you can.
12        THE WITNESS: Can you restate the
13     question, please?
14 BY MR. GOLDBERG:
15    Q    The IQVIA data doesn't allow you to
16 drill down to what a particular class member paid
17 for at-issue valsartan?
18        MR. HONIK: Object to form, asked and
19     answered.
20        THE WITNESS: So, again, IQVIA's data
21     is specific to the product, month, year, payor
22     and state. And therefore -- and across all the
23     U.S. And therefore, it is -- it is -- it
24     contains in it every single potential class
25     member, whether they be a consumer or a

Page 216

1  specific payor. There are payor variables that
2  are pretty specific in the IQVIA data that
3  would allow me to characterize or identify
4  payors to a pretty specific degree.
5  BY MR. GOLDBERG:
6    Q    What -- what is that specific degree?
7    A    So I know where the payor is located,
8  what the payor's type is, and also what the payor's
9  name is for each individual product, month, year,
10 combination.
11    Q    And by "payor," you're -- when you're
12 talking about -- you're talking about third-party
13 payors? When you're talking about getting to that
14 level of specificity, you're talking about
15 third-party payors or consumers?
16    A    Third-party payors.
17    Q    When you calculated average co-pays,
18 did you exclude co-pays -- 0-dollar co-pays in your
19 averaging?
20        MR. HONIK: Object to form.
21        THE WITNESS: I did not.
22 BY MR. GOLDBERG:
23    Q    Is it the -- you just mentioned the --
24 the specificity with respect to TPPs. Is it your
25 view and understanding that all TPPs are advised in

Page 217

1  the IQVIA data?
2    A    Well, the TPPs that I used for my
3  damage calculations met certain criteria.
4    Q    What were those criteria?
5    A    They're listed in my report.
6    Q    Do you want to point to that?
7    A    Sure, give me a second. Are you with
8  me?
9    Q    Uh-huh.
10    A    Okay, great. Page 29 of my report,
11 Paragraph 75, I define end-payor class damages. And
12 in Paragraph 75, I say, "...my calculation of
13 End-Payor Class damages includes three parts.
14 First, I limit both sets of Xponent data" -- both
15 the total national sales but also co-insurance
16 co-payments, they are actually two separate
17 datasets, "to exclude cash paid claims as well as
18 claims paid by the following state and federal
19 government entities (based on plan categories or
20 plan names in the Xponent data):"
21        "CHIP," Children's Health Insurance
22 Program, "federal assistance programs, Medicare
23 Parts A and B...", Medicare Part A is for hospital
24 plans, we were just talking about that before.
25 We're not talking about that class of trade here.

RESTRICTED CONFIDENTIAL

Page 218

1  And Medicare Part B, which is the insurance that
2  covers drugs that are infused or injected or
3  otherwise given to patients in a medical office.
4          State insurance programs -- assistance
5  programs, to include ADAP. ADAPs are state
6  assistance programs with people with HIV or other
7  infectious disease. Tricare, a military program --
8  a military insurance program, department of Veterans
9  Affairs, another -- another military insurance
10 program, the Indian Health Service, state employee
11 plans, which include city and county plans -- sorry.
12 Not -- I didn't exclude city and county plans. And
13 Workers Compensation plans.
14         And you can see there's a note that
15 follows that. This occurs for 464 distinct
16 combinations of manufacturer, product, state and
17 month out of the 36,000ish -- oh, no, I'm sorry.
18 Right. It includes the valsartan class definitions
19 and exclusions. It's -- it's Footnote 17.
20 Q      Why -- why did you -- what do you
21 understand your reason for excluding the claims paid
22 by those state and federal government entities? Why
23 did you want to exclude those from your
24 calculations?
25 A      That was a --

Page 219

1          THE COURT REPORTER: That was a what?
2          THE WITNESS: A part of the
3  instruction of counsel.
4  BY MR. GOLDBERG:
5  Q      Do you understand that you're --
6  you're excluding them to avoid including claims in
7  your calculation by payors who are excluded from the
8  GPP class definition, such as --
9          THE COURT REPORTER: Such as -- sorry.
10 Hold on. I didn't hear the end of the
11 question.
12         MR. HONIK: She needs you to repeat
13 it, Seth, the last part, the last part. Jamie,
14 read what you have.
15         MR. GOLDBERG: Such as government
16 payors.
17         MR. HONIK: Object to form and object
18 to the extent it calls for a legal conclusion
19 or expertise.
20         You can answer.
21         THE WITNESS: Thank you.
22         Again, the exclusion was based on
23 instruction from counsel.
24 BY MR. GOLDBERG:
25 Q      Do you have any view as to whether

Page 220

1  government payors should be included in your damages
2  calculation?
3          MR. HONIK: Same objection as
4  previously stated.
5          THE WITNESS: It's by instruction of
6  counsel.
7  BY MR. GOLDBERG:
8  Q      Whatever counsel told you to
9  calculate, that's what you calculated?
10         MR. HONIK: Objection to form.
11         THE WITNESS: That is not what I said,
12 sir.
13 BY MR. GOLDBERG:
14 Q      Whatever counsel told you to include
15 is what you included, and what they told you to
16 exclude is what you tried to exclude.
17         MR. HONIK: Object to form. That is
18 not her testimony.
19         THE WITNESS: That is not my
20 testimony, sir.
21 BY MR. GOLDBERG:
22 Q      Going down into this paragraph, you
23 say, "I did not exclude Medicare Part D plan
24 sponsors because they are private entities that
25 offer prescription drug benefits, and I did not

Page 221

1  exclude federal employee plans because they are
2  provided by private insurers."
3  A      There's other things in that sentence
4  as well that you kind of skipped over.
5  Q      Again, just focusing on the first part
6  of the sentence, Medicare -- the Medicare Part D
7  plan, part of that --
8  A      Do you mean the second part of the
9  sentence? Do you mean the second?
10 Q      No.
11 A      I mean, I'm just trying to follow,
12 sir.
13         So the first part of the sentence,
14 which you kind of skipped over half of it, I said,
15 "I also excluded prescriptions for which the
16 consumer is not covered by insurance but uses a
17 coupon that reduces their total costs, including
18 discount cards and vouchers. I did not exclude
19 Medicare Part D plan sponsors because they are
20 private entities that offer prescription drug
21 benefits, and I did not exclude federal employee
22 plans because they are provided by private
23 insurers."
24 Q      I want to focus on the Medicare Part D
25 plan part of that. Okay?

56 (Pages 218 - 221)

RESTRICTED CONFIDENTIAL

Page 222

1    In that part of this paragraph, you're
2 referring to third-party payors who are private
3 insurers that have, as part of their product mix, a
4 Medicare Part D plan; am I correct?
5    A    I don't quite understand your
6 question. I'm sorry.
7    Q    Your sentence says, "I did not exclude
8 Medicare part D plan sponsors because they are
9 private entities that offer prescription drug
10 benefits."
11    My question is, you're referring to
12 third-party payors who have Medicare Part D plans,
13 private entities that have Medicare Part D plans as
14 part of their -- their offerings to consumers,
15 correct?
16    A    No.
17    MR. HONIK: Object to form.
18 BY MR. GOLDBERG:
19    Q    What are you referring to then?
20    A    So there are third-party payors, so,
21 for example, Aetna. Aetna includes sales plans that
22 are to consumers that are -- for people who are
23 employed, for people who are in the individual
24 insurance market, and also sells plans to consumers
25 who may be Medicare eligible.

Page 223

1    A Medicare Part D plan is one that is
2 sold by commercial insurers such as Aetna, United,
3 et cetera, to seniors who are required to have
4 Part D prescription drug benefits.
5    Q    Are you familiar with how
6 Medicare Part D claims are reimbursed?
7    A    I am. But how is that relevant to
8 this case, sir?
9    Q    Do you believe that the TPPs that
10 provide Medicare Part D plans bear 100 percent of
11 the cost of reimbursement for enrollees of those
12 plans?
13    MR. HONIK: Object to the form.
14    THE WITNESS: I think -- okay. So
15 what insurance -- what defines a commercial
16 insurance plan is that consumers, you and me,
17 my mother, who is Medicare eligible, pay
18 premiums to a commercial insurer, as opposed to
19 paying premiums or are otherwise insured by a
20 private -- by a public insurer.
21    Part D plans receive premiums from the
22 people who are insured by them, just like the
23 plans that are sold to non-seniors receive
24 premiums from the people who are insured by
25 them. They're exactly the same.

Page 224

1 BY MR. GOLDBERG:
2    Q    Do you know whether those Part D plan
3 sponsors that are commercial entities receive
4 funding from the federal government?
5    MR. HONIK: Object to form.
6    THE WITNESS: They do under certain
7 circumstances, but that's separate from the
8 premiums that are paid by actual seniors for
9 their insurance coverage.
10 BY MR. GOLDBERG:
11    Q    Did you factor into your calculation
12 any amounts that the federal government might have
13 paid to private commercial third-party payors that
14 offer Medicare Part D plans?
15    MR. HONIK: Object to form, asked and
16 answered.
17    THE WITNESS: Again, consumers who are
18 seniors are required to have -- to purchase
19 prescription drug benefit from these Part D
20 plans. They pay premiums. And then they have
21 an insurance schedule on how much they are
22 required to pay out-of-pocket for each and
23 every prescription drug that is dispensed to
24 them.
25    Since injury occurs at the point of

Page 225

1 sale, it is the insurance price that is paid,
2 both by the payor itself, and by the consumer
3 at the pharmacy counter, than it is at issue in
4 my damage calculation.
5    Whether or not there are side payments
6 or subsidies or anything else that those plans
7 or those consumers may face, is of no moment to
8 my economic analysis.
9    And the way I like to think about it
10 is that if I am injured in a car accident, if I
11 receive side payments from my mother, for
12 example, to pay for my car repair or pay for
13 myself to the -- receive medical treatment,
14 that has nothing to do with the economic loss I
15 suffered from having -- from being injured,
16 from being in a car accident. And therefore,
17 those side payments, even if they exist, are of
18 no moment in my analysis. Injury occurs at the
19 point of sale.
20    COURT REPORTER: I'm sorry?
21    THE WITNESS: Injury occurs at the
22 point of sale.
23 BY MR. GOLDBERG:
24    Q    So did you not factor in that
25 third-party payors who offer Medicare Part D plans

57 (Pages 222 - 225)

RESTRICTED CONFIDENTIAL

Page 226

1  receive respective subsidies from the federal
2  government to cover their beneficiaries'
3  prescription drug purchases?
4        MR. HONIK:  Object to form, asked and
5     answered.
6        THE WITNESS:  Again, they only do so
7     sometimes in a prospective way.  Largely, those
8     payments are made retrospectively and only for
9     certain types of prescription drugs.  I have
10    not seen any evidence to suggest that the
11    valsartan products at issue in this case were
12    ones that were either directly paid by the
13    federal government or were part of those
14    retrospective payments that the government
15    might have made.
16       Usually, those type of direct
17    payments, or retrospective payments, are made
18    for really expensive specialty drugs used in
19    the cancer setting, in the immunology setting,
20    with prices of $10,000 or more for treatment.
21    That's not what we're talking about in this
22    case.
23  BY MR. GOLDBERG:
24    Q     But you haven't considered any amount
25    that the federal government might have paid to any

Page 227

1  TPPs for -- in connection with their Medicare Part D
2  plans, right?
3        MR. HONIK:  Object to the form, asked
4     and answered.
5        THE WITNESS:  Again, I'm not aware of
6     any evidence to suggest that third-party payors
7     receive direct payments from the federal
8     government to underwrite any senior's sale or
9     purchase of valsartan at-issue products in this
10    case.
11       Again, usually those type of payments
12    in the catastrophic limit, for example, of
13    Part D, those are pages that are made either
14    retrospectively after the injury would have
15    occurred, or are for products that are not at
16    issue here.  They're for drugs that are really
17    expensive and for which patients have blown
18    through the donut hole, are in the catastrophic
19    phase of their benefit design.  That's --
20    that's not what we're talking about here.
21       These are generic products that are --
22    I think, you know, the average co-insurance
23    amount that I -- that I calculated was
24    somewhere on the order of $12.  Consumers
25    could, I think -- to get out of the -- into the

Page 228

1  donut hole, they would have to spend something
2  like $400, maybe a little bit more, in order to
3  even get into that phase of the benefit.
4        And I think the limit for catastrophic
5     coverage during this time period is more like
6     $8,000.
7        COURT REPORTER:  Is what?
8        THE WITNESS:  Is more like $8,000.
9  BY MR. GOLDBERG:
10    Q     Yes or no --
11    A     It's not a yes or no question, sir.
12    Q     This -- let me ask the question.
13       Yes or no, did you factor in any
14    payments made by the federal government to
15    third-party payors offering Medicare Part D plans?
16    Yes or no, did you factor that into your
17    calculation?
18       MR. HONIK:  Object to form, asked and
19    answered.  You can't direct the witness to
20    answer it in a manner in which you'd like.  If
21    she tells you she's unable to answer it yes or
22    no, she can provide an answer.
23       Please do so.
24       THE WITNESS:  Thank you.
25       So, again, the vast majority of

Page 229

1  seniors who have prescription drug benefits
2  through Part D -- my mother is one of them.  I
3  might know more about this than I should.  They
4  pay premiums, and they also pay at the pharmacy
5  counter when they get a prescription at a
6  low-cost generic, such as the at-issue
7  valsartan in this case.
8        So that -- whether -- if those TPPs,
9     those third-party payors receive side payments
10    from the federal government, or other types of
11    payments from the federal government, is really
12    not material to this because there's no
13    evidence to suggest that low-cost generics are
14    ever in that phase of the benefit where the
15    third-party payor would actually pay the side
16    payments.
17  BY MR. GOLDBERG:
18    Q     What do you understand the third-party
19    payors' point of sale to be?  You mentioned the
20    consumer paying at the retail pharmacy.  What do you
21    understand the TPPs' point of sale to be?
22    A     When the consumer goes to fill their
23    prescription at the pharmacy counter, the pharmacy
24    runs a check on what insurance that patient has and
25    how much the patient needs to pay out of pocket.

RESTRICTED CONFIDENTIAL

Page 230

1 The point of sale for both, what the pharmacy
2 expects to receive from the consumer and what the
3 pharmacy expects to receive from the insurer is
4 exactly the same.
5             Those transactions occur within
6 seconds, and the pharmacy dispenses the product to a
7 consumer predicated on their existence of insurance
8 and the insurance saying that, yes, they will pay
9 for that product, dispense that beneficiary. It's
10 exactly the same.
11    Q    We were -- you talked a lot about
12 value and therapeutic value of the at-issue
13 valsartan, what the consumers receive. And you
14 explained that there was an illegitimate supply for
15 at-issue valsartan, and therefore, even though there
16 was a demand, the drug was worthless. Is that the
17 same -- that worthless as to consumers, is that the
18 same as to third-party payors?
19             MR. HONIK: Object to the form. It's
20    a little bit --
21             THE COURT REPORTER: I'm sorry. I
22    didn't hear the end of the question.
23             MR. HONIK: Sorry. You trailed off,
24    Seth. Just cover the --
25

Page 231

1 BY MR. GOLDBERG:
2    Q    Is your view that there was an
3 illegitimate supply of valsartan as to consumers the
4 same for TPPs?
5             MR. HONIK: Object to form.
6             THE WITNESS: I don't think that's the
7    question you asked me, sir.
8 BY MR. GOLDBERG:
9    Q    Well, I'm asking you that question.
10    A    Okay. Can you go back and ask that
11 question again because I was focused on trying to
12 get clarity on the previous question that you asked.
13    Q    Is your view that there was an
14 illegitimate supply of at-issue valsartan as to
15 consumers the same for TPPs?
16    A    I was asked to assume that there is no
17 legitimate supply of adulterated and misbranded
18 prescription drugs for the at-issue valsartan
19 products between 2012 and 2018 in order to calculate
20 damages in this matter. For both consumers and
21 end-party payors that are -- that are included in
22 the class.
23             As we have already discussed, my
24 assessment assumes there's a demand curve. What my
25 assessment does not do is assume that there is a

Page 232

1 legitimate supply curve based on the assumptions
2 given to me by counsel.
3    Q    And regardless of any benefit that a
4 TPP might have received, they got from their
5 insured's treatment with the at-issue valsartan,
6 your view is that the drug, as to that TPP, is still
7 worthless?
8             MR. HONIK: Object to form, asked and
9    answered.
10             THE WITNESS: I'm sorry. I didn't --
11    really did not follow your question. There's a
12    lot of compound phrases there. Can you please
13    restate?
14 BY MR. GOLDBERG:
15    Q    Regardless of any benefit that a TPP
16 might have perceived they received from their
17 insured's treatment with the at-issue valsartan, as
18 to that TPP, the drug is still worthless in your
19 view?
20             MR. HONIK: Object to the form, asked
21    and answered.
22             THE WITNESS: I don't understand what
23    you mean by a third-party payor receiving value
24    or benefit. Can you please define?
25

Page 233

1 BY MR. GOLDBERG:
2    Q    Does a third-party payor receive a
3 value when its insureds are effectively treated with
4 a drug?
5             MR. HONIK: Object to the form.
6    They're not consuming -- they're not consuming
7    drugs. I think -- I think that's the problem,
8    Seth.
9             THE WITNESS: I don't follow.
10             MR. HONIK: You're kind of mixing
11    apples and oranges, I think.
12             THE WITNESS: There is no therapeutic
13    value to the third-party payor.
14 BY MR. GOLDBERG:
15    Q    Does a third-party payor --
16    A    I don't even understand that, that
17 context.
18    Q    Does a third-party payor receive an
19 economic value when its insureds are effectively
20 treated with at-issue valsartan?
21             MR. HONIK: Object to the form of the
22    question.
23             THE WITNESS: That's a lot -- again,
24    that's a lot of compound statements and
25    assumptions that you're making.

RESTRICTED CONFIDENTIAL

Page 234

1  BY MR. GOLDBERG:
2      Q      Well, let's just --
3      A      Again, third-party payors are not
4  consumers, so they don't receive any therapeutic
5  benefit from their beneficiaries consuming a
6  product.  And they certainly don't receive any --
7  any benefit from consumers consuming a product that
8  was adulterated and misbranded and may have actually
9  caused clinical harm.
10     Q      Do you have any evidence that there
11 was any clinical harm in this case from 2012 to
12 2018?
13            MR. HONIK:  Object to the form,
14     outside the scope.
15            THE WITNESS:  I don't think that's the
16     issue.  Again, that's why -- that's why I don't
17     understand at all.  I mean --
18 BY MR. GOLDBERG:
19     Q      Just --
20     A      Okay.  I'm sorry, Mr. Goldberg.
21 You've interrupted me over and over again today.
22 There is a word for that, it's mansplaining.  Please
23 let me finish.
24            So, again, I don't understand the idea
25 that third-party payors could benefit from consumers

Page 235

1  taking adulterated prescription drugs.  That should
2  not -- that, I was asked to assume, should not have
3  entered into the U.S. class of trade.  That
4  is -- that is your assumption of your -- underlying
5  your hypothetical question.
6            THE COURT REPORTER:  Seth, when you
7      get to a good point, can we take five minutes,
8      please?
9            MR. GOLDBERG:  Yes, this is a good
10     time.
11            MR. HONIK:  Okay.  Let's take five,
12     and then we will reassess --
13            THE VIDEOGRAPHER:  The time is 5:37.
14     This ends Media Unit Number 5.  We're going off
15     the record.
16            (Whereupon, a short break was taken.)
17            THE VIDEOGRAPHER:  The time is 5:50.
18     This begins Media Unit Number 6.  We're back on
19     the record.
20 BY MR. GOLDBERG:
21     Q      So in your report, you talk about the
22 different levels of the pharmaceutical supply chain?
23     A      Where are you referring, Mr. Goldberg?
24     Q      I'm going to get you there.  It starts
25 at Page 19 and goes through to Page 22.

Page 236

1            And in Paragraph 52, you describe
2  third-party payors.
3      A      Is that a question?
4      Q      Are you aware -- are you familiar with
5  the different contractual arrangements that
6  third-party payors have in terms of sourcing and
7  paying for and being reimbursed for at-issue
8  valsartan?
9      A      I think I'm -- that was a compound
10 question, right?
11            So what do you mean by third-party
12 payors being paid for?
13     Q      Okay.  Are you -- are you familiar
14 with the contractual arrangements that third-party
15 payors have, say, with pharmacy benefit managers?
16     A      Pharmacy benefit managers are a member
17 of the supply chain of prescription drugs in the
18 United States.  And some payors have their own PBM,
19 so there is no contractual relationship.  They all
20 have a PBM, and some third-party payors contract
21 with PBMs to provide fund services to their
22 beneficiaries.
23     Q      These are differences from third-party
24 payor to third-party payor, right?
25     A      I really don't understand that

Page 237

1  question.  I'm sorry.
2      Q      Each third-party payor has its own set
3  of contractual arrangements that control its
4  distribution and -- and insurance of at-issue
5  valsartan?
6            MR. HONIK:  Object to form.
7            THE WITNESS:  That is not my
8      testimony.  Like I just said, the biggest
9      payors in the U.S. are their own PBM.  They own
10     their own PBM, so there is no contractual
11     relationship.  They are the PBM.  There are
12     some payors that contract for external PBM
13     services, and there's some third-party payors
14     that directly go with pharmacies to dispense
15     drugs to their beneficiaries.
16 BY MR. GOLDBERG:
17     Q      Are there other -- are there other
18 arrangements that you can think of that third-party
19 payors have?
20     A      Not -- I mean, that -- those are
21 general buckets that characterize third-party
22 payment for prescription drugs sold in the pharmacy
23 setting.
24     Q      Do third-party payors pay pharmacies
25 directly, to your understanding?

60 (Pages 234 - 237)

RESTRICTED CONFIDENTIAL

Page 238

1    A    They can and do or dispense
2   prescription drugs every day.
3    Q    Are you aware of any contractual
4   arrangements a third-party payor was not able to
5   keep and satisfy as a result of the sale of at-issue
6   valsartan?
7        MR. HONIK:  Object to form, outside
8    the scope.
9        THE WITNESS:  I don't understand your
10   question at all.  I'm sorry, what does "keep"
11   mean here?
12  BY MR. GOLDBERG:
13   Q    Are you aware of any -- any
14  arrangement a third-party payor has that it's not
15  able to satisfy as a result of at-issue valsartan?
16       MR. HONIK:  Same objection.
17       THE WITNESS:  I don't know what you're
18   referring to.  I'm sorry.  I don't follow.
19  BY MR. GOLDBERG:
20   Q    Are you aware of whether any
21  third-party payor did not -- ended up reaching a
22  contract with a pharmacy benefits manager because of
23  their covering at-issue valsartan?
24       MR. HONIK:  Same objection.
25       And to the extent it calls for a legal

Page 239

1   conclusion, you may answer if you understand.
2        THE WITNESS:  I don't understand the
3    question.  I'm sorry.  Like I said before,
4    there are a variety of different types of
5    arrangements.  Many third-party payors -- many
6    insurers pay pharmacies directly for dispensed
7    drugs.  Some third-party payors may contract
8    with pharmacy benefit managers for the coverage
9    of some drugs.
10       I think what you're referring to is
11   the latter category, but I really -- I don't
12   understand your question.  I don't know what
13   you mean by "keep a contract" in this setting.
14  BY MR. GOLDBERG:
15   Q    Does it matter to your analysis that
16  different -- there were different levels of NDMA or
17  NDEA in the manufacturer defendants' valsartan?
18       MR. HONIK:  Object to the form.  Facts
19   not in evidence.
20       You may answer.
21       THE WITNESS:  Thank you.
22       So my understanding is, during the
23   at-issue time period, between January 2012 and
24   2018, the manufacturers attested to the
25   Food and Drug Administration that there were no

Page 240

1   known contaminants of nitrosamines in these
2    products.
3   BY MR. GOLDBERG:
4    Q    Does it matter to your analysis that
5   the specifications for valsartan during that time
6   period did not -- or did not include
7   nitrosamines?
8        MR. HONIK:  Object to the form,
9    hypothetical, inappropriate, facts not in
10   evidence.
11       You can answer.
12       THE WITNESS:  Again, the manufacturers
13   themselves attested on their drug forms to the
14   Food and Drug Administration that there was no
15   contamination.
16  BY MR. GOLDBERG:
17   Q    My question is, does it matter to your
18  analysis that there -- that nitrosamines were not
19  included in the specifications for valsartan from
20  2012 to July 2018?
21       MR. HONIK:  Object to the form,
22   improper hypothetical.  Those are not
23   dispensed.
24       You may answer.
25       THE WITNESS:  Again, my understanding

Page 241

1   is that the manufacturers of the at-issue
2   valsartan products attested to the
3   Food and Drug Administration over and over
4   again that these products were manufactured to
5   be compliant, at minimum, with cGMP.  And they
6   also attested to the fact that there were no
7   contamination of nitrosamines in these at-issue
8   valsartan.
9        MR. GOLDBERG:  I see we're at
10   6 o'clock.
11       MR. HONIK:  Yeah.  Why don't we go off
12   the record, video and steno?
13       THE VIDEOGRAPHER:  The time is
14   6 o'clock.  We're going off the record.
15       (Whereupon, the deposition concluded
16   at 6 o'clock p.m.)
17
18
19
20
21
22
23
24
25

61 (Pages 238 - 241)

RESTRICTED CONFIDENTIAL

Page 242

C E R T I F I C A T E

I, Jamie I. Moskowitz, a Shorthand (Stenotype) Reporter and Notary Public, do hereby certify that the foregoing Deposition, of the witness, RENA M. CONTI, Ph.D., taken at the time and place aforesaid, is a true and correct transcription of my shorthand notes.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the result or outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of February, 2022.

Jamie Ilyse Moskowitz
License No. XI01658

---

Page 243

Ruben Honik, Esq.
ruben@honiklaw.com
        February 16, 2022.
RE: In Re: Valsartan, Losartan, et al.
2/10/22, Rena Conti, PH.D. (#5064909)
The above-referenced transcript is available for review.
Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.
If the witness fails to do so within the time allotted, the transcript may be used as if signed.

        Yours,
        Veritext Legal Solutions

---

Page 244

In Re: Valsartan, Losartan, Et Al
Rena Conti, PH.D (#5064909)
        E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
_____
Rena Conti, PH.D          Date

---

Page 245

In Re: Valsartan, Losartan, et al.
Rena Conti, PH.D (#5064909)
        ACKNOWLEDGMENT OF DEPONENT
I, Rena Conti, PH.D, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____
Rena Conti, PH.D          Date
*If notary is required
        SUBSCRIBED AND SWORN TO BEFORE ME THIS
        _____ DAY OF _____, 20___.

        _____
        NOTARY PUBLIC

62 (Pages 242 - 245)

RESTRICTED CONFIDENTIAL

[& - 23]

Page 1

| & | | 2 |
|---|---|---|

**&**   2:16,20 3:17
  4:18 5:2,7,11 6:2
  6:12,17 7:2 14:13

**0**

**0**  57:24 216:18
**02109**  6:14
**07068**  2:9
**07102**  6:10
**08540**  5:21

**1**

**1**  8:3 11:3 43:16
  43:17 44:2 49:15
  58:6,8 74:7 75:1,8
  79:8 80:22,23
  166:22
**10**  1:12 47:23,23
  74:4 128:20 150:4
**10,000**  226:20
**10.75**  72:18
**100**  2:13 6:9 49:6
  49:7,21 202:16
  204:20 223:10
**100,000**  26:14
**1000**  3:13
**1001**  5:14
**10013**  2:18
**10019-6119**  6:19
**101**  125:13,15
  126:19 188:20,23
  189:2,15
**103**  2:8
**10:07**  74:4
**10:17**  1:13 11:2
**10th**  11:2 47:3
**11**  5:8
**1100**  2:4
**1154**  242:16
**11:29**  57:13

**11:30**  57:16
**11:57**  74:6
**12**  10:4 70:4
  227:24
**12-29-21**  69:6
**12.75**  68:24 72:23
**12:11**  74:9
**12:16**  76:23
**12:18**  77:2
**12:42**  91:22 92:1
**12:46**  94:17
**12:48**  95:11
**13**  70:5
**13th**  168:6
**1400**  7:4
**15**  57:3 69:13 70:6
  200:4
**1515**  2:4
**15219**  3:20 6:4
**15th**  6:9
**16**  70:6 243:3
**167**  8:11
**16th**  242:14
**17**  53:23 56:4
  218:19
**1700**  4:20
**17th**  3:6
**18**  174:15 176:10
**18th**  167:24
  168:11 173:22
**19**  235:25
**190**  4:15
**19038**  12:25
**1906**  204:19
**19102**  2:4
**19103**  3:7
**1:12**  112:9
**1:13**  112:21
**1:45**  112:19
**1:53**  112:25

**2**  8:4 12:24 52:25
  53:3,5,15 54:3
  74:10 77:6,14
  78:21 80:23,23
  112:22 166:18,21
  181:18,22
**2.6**  66:22
**2/10/22**  243:5
**20**  15:3,17 17:2
  28:5 73:12 98:20
  245:15
**20004**  3:13 5:14
**20006**  4:20
**2000s**  40:20
**2003**  38:20
**2005**  38:20
**2007**  38:18 41:5,24
**2008**  41:24
**2010**  39:5,13 40:7
  40:13 41:3,9,10
  42:9 43:1
**2011**  39:5 43:1
**2012**  43:1 78:7,11
  127:7,17 130:2,13
  130:24 131:21
  132:7,20,23 139:1
  139:13 149:18
  150:21 165:5
  199:11,16 231:19
  234:11 239:23
  240:20
**2018**  76:7 78:7,11
  127:7,17 130:2,14
  130:25 131:21
  132:8,20,23 139:1
  139:13 149:18
  150:21 165:5
  167:24 168:6,11
  171:1 173:22
  174:15 176:10

  177:4,4,11,12
  199:12,17 231:19
  234:12 239:24
  240:20
**2019**  76:7 171:2
**202.452.7900**  4:21
**202.624.2500**  5:15
**202.776.7800**  3:14
**2020**  35:10,15 39:9
  40:7,14 41:10
  42:7,9 59:24 60:1
  61:1 78:7
**2021**  26:4,11,15,17
  45:23 48:3 62:19
  68:20 69:12 71:15
  71:16 72:8,14,15
  72:19,22 73:1,2,3
  73:6
**2022**  1:12 11:2
  27:2 54:6 71:14
  73:2,4,9 242:14
  243:3
**20th**  184:16
**21**  5:20
**21024**  67:17
**21158**  63:9,20
  68:11
**212.355.9500**  2:18
**212.415.9357**  6:19
**214.855.8221**  4:12
**215.979.1000**  3:7
**21617**  68:23 72:6
  72:11
**22**  103:6 235:25
**2200**  4:11
**2220**  6:24
**227**  5:4
**23**  95:14,17,17,18
  96:13 97:1,16,18
  98:20 99:1 101:25
  104:16

RESTRICTED CONFIDENTIAL

**[230 - activities]**                                                                  Page 2

| | | | |
|---|---|---|---|
| **230** 6:24 | 80:23 81:19 88:8 | **60** 72:25 | **9th** 3:13 |
| **242** 10:7 | 180:14 | **600** 4:15 5:4 | **a** |
| **243** 10:8 | **400** 228:2 | **6001** 2:13 | **a.m.** 1:13 |
| **24th** 68:20 | **412.263.4397** 6:5 | **60601** 4:5 | **able** 71:21 73:17 |
| **25** 49:2 | **412.560.3300** 3:20 | **60606** 6:24 | 87:9 210:12 238:4 |
| **250** 2:17 | **42** 152:1 | **609.924.0808** 5:21 | 238:15 |
| **26** 184:12 | **43** 8:3 | **60s** 187:10 | **abraham** 5:18 |
| **267.435.1300** 2:5 | **45** 201:10,15,17 | **617.213.7045** 6:15 | **abstracts** 54:4 |
| **27th** 6:14 | **45202-4029** 7:4 | **63105** 4:16 | **academic** 17:20 |
| **28** 177:12 | **46204** 5:9 | **64** 58:19 | **academy** 15:25 |
| **28202** 5:4 | **464** 218:15 | **65** 56:11 | **accept** 163:7,9 |
| **2875** 1:2 | **4:02** 180:13 | **66** 43:10,23 44:1 | 177:9 |
| **29** 217:10 | **4:41** 206:8 | **67** 58:14,20,21 | **access** 36:15,18,23 |
| **29th** 69:12 | **4:52** 206:11 | **675** 49:15 60:11 | **accident** 196:22 |
| **2:44** 150:13 | **5** | **7** | 196:23 225:10,16 |
| **2:55** 150:16 | **5** 8:10 74:16,17 | **7** 114:21 128:19 | **account** 193:1,11 |
| **3** | 167:9 206:12 | **7-18-2018** 168:15 | 202:25 203:11 |
| **3** 8:6 53:15,15 | 235:14 | **7-24-2018** 173:15 | 211:21,23 |
| 56:16,20 57:20 | **50** 49:4 204:19 | **70** 58:14,14 | **accounted** 212:11 |
| 76:14 77:15,18,22 | **504.524.5777** 2:25 | **701** 2:24 | **accounting** 49:12 |
| 80:23 104:25 | **505** 3:13 | **70130** 2:24 | 73:12 |
| 113:1 166:22 | **5064909** 243:5 | **704.444.3475** 5:5 | **accuracy** 243:9 |
| 180:10 | 244:2 245:2 | **74** 8:10 | **accurate** 84:3 |
| **30** 3:6 243:17 | **51** 6:18 | **75** 217:11,12 | 182:1 |
| **300** 4:20 | **512.795.8686** 2:14 | **750** 60:20 | **achieve** 154:4 |
| **3100** 4:5 | **513.698.5000** 7:5 | **75201-7932** 4:11 | **acknowledge** |
| **312** 7:4 | **52** 8:4 52:22,23 | **757.1100** 6:10 | 11:17,21 |
| **312.456.1065** 4:6 | 236:1 | **77** 4:5 | **acknowledgement** |
| **312.566.4803** 6:25 | **52nd** 6:18 | **775** 60:20,22 | 245:3 |
| **314.480.1500** 4:16 | **53** 6:14 | **78746** 2:13 | **acknowledging** |
| **317.236.1313** 5:9 | **56** 8:6 | **8** | 170:14 |
| **32nd** 3:19 | **58** 8:9 206:16 | **8** 10:5 57:9 | **acknowledgment** |
| **36,000ish** 218:17 | **5:37** 235:13 | **8,000** 228:6,8 | 243:12 |
| **3600** 4:11 | **5:50** 235:17 | **80** 211:17 | **acquisition** 61:10 |
| **38th** 6:4 | **6** | **80,000** 26:14 | **action** 12:18 24:24 |
| **3:37** 180:9 | **6** 8:11 57:1 104:24 | **9** | 25:5,5,7 75:7 |
| **4** | 113:4 121:5 | **92** 210:16 | 242:10 |
| **4** 8:9 53:15 58:16 | 128:19 167:1,2,6 | **973** 6:10 | **actions** 1:5 |
| 58:22,23 59:3 | 235:18 241:10,14 | **973.228.9898** 2:9 | **actively** 72:3 |
| 76:14 77:15,18,23 | 241:16 | | **activities** 71:20 |

RESTRICTED CONFIDENTIAL

[activity - andrast]                                                                                     Page 3

activity 71:3
actual 50:23,23
  224:8
adam 2:7
adap 218:5
adaps 218:5
added 62:20
addition 14:11
  43:7 71:18,19
  72:22 83:22
  113:13 115:8,9,25
  190:12 191:23
additional 104:22
  146:9
additions 245:6
address 12:23
administered
  11:22
administration
  22:5 48:22 89:10
  96:16 97:14 98:3
  98:16 110:16
  113:22 115:13
  116:3,20 118:10
  118:17,20 121:7
  123:6 185:7
  239:25 240:14
  241:3
administration's
  98:6 114:8,18
  121:21 122:3
  130:15 145:20
admins 48:18
adulterated 76:7
  78:15,23 79:11,14
  81:8 103:8,11,15
  103:16,25 104:3,4
  104:13,18 105:3
  111:12 114:24
  115:17 118:14
  122:12 124:9,19

130:14,18 131:7
131:15 132:2
133:4 138:9 139:8
152:3 165:6 170:1
171:20 172:10,13
173:19 179:23
182:15,16 183:4
183:19 184:14
185:16,18,20
186:2 187:1,16
189:22 194:14,23
197:12,13 199:8
199:21 200:13
202:13 231:17
234:8 235:1
adulteration 41:22
  79:5,12 80:11,21
  81:2,4,23 84:10
  103:14,19,21,22
  115:16 166:2
  176:8
adulterations
  201:2
advent 136:1,2
advised 165:11,18
  216:25
aetna 222:21,21
  223:2
affairs 218:9
affiliate 17:20
affirmatively 31:7
aforesaid 242:7
afraid 181:5
agencies 20:14
  22:7 23:2
aggregate 215:6
ago 111:23 155:10
  155:12
agree 34:2 46:23
  98:18,19 119:1
  132:6 137:2

140:14,20 141:2
149:16 150:19
151:10 158:18
159:5,19,22,23
160:15 161:6,20
163:6,20 177:14
190:16
agreed 204:6
agreement 8:3
  43:13 44:6,7
  49:14
agrees 204:24
  205:2
ahead 32:15 131:3
  131:25 152:14,14
  159:13 160:12
aid 5:10
al 243:4 244:1
  245:1
albertsons 4:21
  5:5
alek 3:5
alfano 6:2
allotted 243:20
allow 33:19 101:5
  120:11 125:8,25
  186:5 202:18
  214:22 215:15
  216:3
allowance 81:24
allowed 88:23
  110:8 113:14,19
  113:23 115:21
  116:17,23 119:7
  120:16 126:10
  146:7 148:2,7,9
  149:6 156:21
  161:14 182:17
  197:15 204:22
allows 125:12
  213:23

alluded 104:21,22
alternative 169:19
  171:11 192:7
  193:12 194:7
  198:19
alternatives 194:3
amended 52:23
  75:7
america 191:7
american 118:11
  125:3 134:12
  171:6 174:3
  176:12 177:21
  180:4
americans 137:10
  162:25
amerisourceberg...
  7:5
amount 35:25
  226:24 227:23
amounts 72:25
  209:7,8 211:16
  212:9,13 224:12
analyses 64:10
analysis 46:17
  50:8 61:11 63:14
  63:25 64:4 65:4
  123:14,20,21,22
  139:6,19 146:14
  164:6,8,12 165:8
  192:25 193:10
  194:8 196:12
  198:15,23,25
  199:19,20 204:7
  205:15 212:12,15
  212:16 225:8,18
  239:15 240:4,18
analyzing 131:13
andras 4:3
andrast 4:3

RESTRICTED CONFIDENTIAL

[angiotensin - asked]                                                        Page 4

**angiotensin** 8:12
167:7
**announced** 165:12
166:10
**announcements**
8:12 167:7
**annual** 26:10
**annually** 107:15
107:18
**answer** 9:3 13:11
13:11,17 30:17,23
31:9,22 32:1,17
33:15 34:18 45:6
45:10,14 54:16
55:1,25 56:5
64:21,21 80:14
81:6 86:18 92:5
92:15 99:18,25
101:14 106:15
109:8,14,24 112:3
125:21 127:22
128:7,22 132:5,21
142:9,18 143:4
147:13,14 150:25
155:1,17,24
156:10 157:8
158:4 159:9,14,16
160:11,13,14
161:19 162:1,9
163:19 164:18
166:7 174:25
176:4 179:6,10
180:22 181:4
186:11,17 187:20
188:14,25 196:16
196:20 201:5
209:21 215:11
219:20 228:20,21
228:22 239:1,20
240:11,24

**answered** 31:6
56:6 61:21,23
77:11 82:11,25
83:5 84:25 86:16
88:21 89:21 90:21
94:10,12 97:10,23
98:23 102:8,22
104:10 106:3
107:6,25 108:7,23
110:23 117:12
119:4 121:3
125:20 126:18
129:20 130:4
131:2,24 132:10
138:20 140:10,24
141:25 143:3
144:25 145:18
147:11,22 148:21
151:19 156:9
157:7 158:2,22
160:3 163:22,23
164:17 165:23
169:21 170:18
171:17 174:24
176:3,22 177:19
178:12,24 179:12
179:12,18 182:24
188:22 194:10
196:14,19 198:17
199:6 200:4
205:12 214:13
215:5,19 224:16
226:5 227:4
228:19 232:9,21
**answering** 100:19
126:13
**answers** 13:6
120:24
**antitrust** 17:15
18:4,8,10,25 19:15
19:20 24:18 31:24

**anybody's** 48:17
**appear** 50:14
**appears** 173:23
**appended** 245:7
**appendices** 50:25
**apples** 233:11
**applicable** 243:8
**application** 89:11
**applied** 96:21
97:20 212:14
**apply** 102:5 207:3
**apportion** 65:9
**appreciate** 188:11
**appropriate** 55:2
109:9 128:10
212:17,19
**approval** 157:16
**approve** 119:21
**approved** 124:14
**approves** 118:17
118:21
**approximately**
26:14 69:13 70:6
72:25 210:16
211:17
**arb** 8:13 192:13,13
198:12
**area** 40:15 206:2
**arising** 197:23
**arrangement** 12:1
238:14
**arrangements**
236:5,14 237:3,18
238:4 239:5
**arrive** 182:19
**arrived** 34:12
183:1
**article** 40:14,14
**articles** 23:13
39:25 54:3

**aside** 45:20 84:19
132:6 207:20
208:12
**asked** 13:16 27:22
32:4 47:11 51:22
57:3 61:20 70:15
70:16 76:3 77:10
78:14,20,22,25
79:5,10 81:3,11,16
82:10,24 83:4
84:24 88:20 89:20
90:20 94:9 96:4
96:12,19,25 97:6,9
97:11,22 98:4,13
98:22 100:20
101:21 102:7,10
102:16,18,21
103:14,21 104:2,9
104:17 106:2
107:5,24 108:6,22
109:19 110:22
117:11 119:3
121:2 125:19
126:17 127:23
128:18 129:19
130:3,12 131:1,23
132:1,9 133:3
138:8,19 139:7
140:9,23 141:24
143:2,18 144:25
145:17 146:24
147:10,12,21
148:8,20 149:8
151:18 156:8
157:7 158:2,21
160:2,4 161:3
163:21 164:16
165:3,22 169:13
169:20,24 170:17
171:16 174:23
176:3,21 177:19

RESTRICTED CONFIDENTIAL

**[asked - back]**                                                                 Page 5

178:11,23 179:11
179:17 182:14,23
183:3 188:21
194:9,21 196:13
196:18 197:6,9,11
198:16 199:5
200:4 203:25
206:19 214:12
215:3,5,18 224:15
226:4 227:3
228:18 231:7,12
231:16 232:8,20
235:2
**asking** 12:19
19:11,12 32:8
42:6 54:19,20
87:17,18 99:8
116:11 127:9,12
128:21 129:14
132:12 143:11
161:18 166:16
187:18 189:21
190:25 191:4
203:19 215:7
231:9
**aslater** 2:8
**aspect** 22:9 79:9
**aspects** 86:5
**assert** 13:10
**assessed** 91:13
**assessing** 133:6
210:7
**assessment** 89:2
169:17 198:6
231:24,25
**assessments**
156:14
**assign** 111:11
**assigned** 111:10
**assigning** 201:17
204:16

**assignment** 139:20
147:24
**assistance** 217:22
218:4,6
**assists** 50:5
**associate** 14:8
16:14
**associated** 145:21
145:22 147:25
149:10 192:6
194:22 204:1
208:18
**associates** 16:23
27:21 44:14 59:6
**assume** 13:17 76:3
78:15,22 79:5,11
80:24 81:3 96:4
96:12,19,25 97:6
97:11 98:4,13
101:21 102:10,16
102:18 103:14,21
104:2,17 130:12
131:14 132:2
133:4 138:8 139:7
148:8 149:8 161:3
165:3 169:24
177:8 178:18
182:14 183:3
197:11 231:16,25
235:2
**assumed** 80:12,19
**assumes** 231:24
**assuming** 62:13
63:8 64:5,20,24
**assumption** 79:1
80:20 81:12,16
177:9 235:4
**assumptions** 132:6
143:18 197:2
232:1 233:25

**assurance** 88:17
88:19 89:1,14,17
89:18 90:5,19
**attached** 94:8
243:11
**attaches** 180:21
**attachment** 83:13
83:15,16 84:16,23
85:8,10 91:11
92:20
**attack** 135:8,12,21
136:6 137:17
**attacks** 134:8,19
134:21 135:25
136:10 137:12
**attempt** 205:8
**attest** 88:25
106:17 107:11
110:13 115:23
**attestation** 89:4
107:15 108:16
116:6,12 117:1,10
117:14 118:3
**attested** 116:1
163:15 190:11
239:24 240:13
241:2,6
**attesting** 119:23
123:9 131:10
**attorney** 68:18
243:13
**attorneys** 11:16
27:23 44:8 46:5
46:11 70:14
**attributable** 136:6
**audit** 210:20
**augusteijn** 61:2
**aurobindo** 3:21
78:2 93:25
**austin** 2:13

**authored** 39:24
54:6,6
**authority** 125:15
**availability** 46:6
141:17
**available** 132:14
132:15,18 134:22
145:24 148:24
171:20 172:3
174:7 191:13
192:22 243:6
**avenue** 4:11 5:14
**average** 212:12
216:17 227:22
**averaging** 216:19
**avoid** 219:6
**avoiding** 137:2,17
**awarded** 41:5,5
**aware** 41:21 42:1
43:6,8 119:15
134:7 135:13
138:25 139:12
147:16,19 155:2
155:11,19 165:18
166:8 167:15
170:24 171:3
210:9 227:5 236:4
238:3,13,20
**awesome** 178:15
**awsmolij** 3:5

| **b** |

**b** 3:6 5:3 6:22 8:1
83:13 84:23 85:10
91:11 92:20
217:23 218:1
**back** 23:4,6 24:3
35:7 51:6 52:7,9
57:17 59:24 64:25
66:16 73:13 74:4
74:10 77:3 88:7
92:2 95:1,12

RESTRICTED CONFIDENTIAL

**[back - break]**                                                                    Page 6

99:25 101:14
104:24 110:1
113:1 144:16
150:17 151:25
173:21 175:2
180:14 188:14
206:12 231:10
235:18
**backdoor**  31:10
33:17
**background**  14:4
147:2
**backgrounds**  50:1
**backup**  92:18,24
93:8
**balmy**  185:5
**bargain**  154:8
**bargained**  154:10
**barnes**  5:7
**based**  69:11 86:4
102:19 103:15
104:3 114:11
122:8 141:8
143:17 177:18
217:19 219:22
232:1
**basing**  186:14,14
**basis**  18:10 26:10
31:17 78:16,25
79:4,6,12 111:24
**bazan**  3:11
**bear**  223:10
**beginning**  35:7
50:13 66:15 74:20
74:23 130:6
152:17 206:18
**begins**  74:10 113:1
180:14 206:12
235:18
**behalf**  12:20 24:4
24:5 25:20 26:2

44:8,10 209:13
**behavior**  157:19
157:21
**believe**  57:24
59:22 97:20
109:16 128:18
223:9
**believes**  109:8
**beneficiaries**
226:2 234:5
236:22 237:15
**beneficiary**  230:9
**benefit**  67:23
138:1 143:10
146:2,12 149:18
151:8 153:2,2
154:8 159:6 160:6
160:22 164:14
170:16 171:15
208:17 224:19
227:19 228:3
229:14 232:3,15
232:24 234:5,7,25
236:15,16 239:8
**benefits**  147:18,25
149:10 150:20
151:11 156:3,7,14
158:18,25 159:20
159:25 160:16
183:17 220:25
221:21 222:10
223:4 229:1
238:22
**benjamin**  184:21
185:5
**bennett**  48:7,13
49:25 50:1,3,7,15
61:16,18 62:3,24
63:2,12,24 64:15
64:17,25 65:13,16

**bennett's**  48:14
64:9
**berne**  7:2
**bernstein**  2:16
**best**  145:3 163:24
215:6,11
**better**  15:2,17
17:1 202:22
204:18,19 210:10
**beyond**  104:16
107:6 108:7
110:23 111:1,3,18
111:21,25 121:3
139:3 141:16
143:3 144:24
145:18 146:23
147:22 151:19
156:9 157:7
158:22 160:3
161:10 169:21
170:18 171:17
172:20 174:24
176:2 190:21
192:8 203:3,15
**big**  48:4
**biggest**  237:8
**bilely**  11:6
**bill**  72:21
**billed**  62:6 68:23
69:3,6,9,12,18,21
70:7 72:14,15,18
**billings**  48:16,17
48:21
**bills**  73:21,22
**bily**  7:8
**binder**  43:14,22
43:24 58:1,6
67:10,17 91:14,17
92:7,7,10 93:6
166:19,20,21,22

**biopharmaceutical**
14:22 15:1
**bipc.com**  4:19 5:3
**bit**  14:3 20:18 40:3
49:20 57:10 60:21
75:11 90:11
162:22 184:23
228:2 230:20
**blackwell**  4:14
**blocker**  8:13 167:7
**blood**  134:8,18,23
135:4,5 154:4
174:7 175:4 191:1
191:8 192:1
193:24 200:7
**blown**  227:17
**bockius**  3:17
**bodies**  161:8,22
**body**  40:18
**bold**  2:13
**book**  190:6
**bosick**  6:2
**boston**  6:14 14:6
14:10 15:19 28:7
52:19 73:14
**bottle**  175:24
177:4,7,12
**bottom**  76:6
163:14 169:1,2
**bought**  108:12
197:1,21 198:12
200:11
**brand**  132:13
199:12
**branded**  22:18,19
27:11 132:13
198:21
**break**  13:20 50:16
57:15 74:1,8
112:10 150:15
180:8,12 206:6,10

RESTRICTED CONFIDENTIAL

**[break - cgpm]**                                                        Page 7

235:16
**bresnahan** 5:12
**brian** 62:4,5
**bring** 67:24
**broad** 22:13,20
  62:15
**broken** 50:12
**btlaw.com** 5:8
**buchanan** 4:18 5:2
**buckets** 237:21
**bullet** 169:2,5,7,8
**bunch** 94:12
**bush** 39:12
**business** 14:10,11
  14:14 20:6 21:14
  21:22 24:8 27:3,6
**busy** 71:1,6,11
**butcher** 78:1
**buy** 195:8 196:24
  199:8 214:7
**buying** 122:21
  198:10
**bye's** 184:21 185:5

**c**

**c** 2:1,23 3:1 4:1 5:1
  6:1 7:1 11:15
  242:1,1
**c.whiteley** 2:21
**cabraser** 2:16
**calculate** 46:6
  50:22 194:22
  203:25 206:20
  220:9 231:19
**calculated** 46:8,9
  200:24 202:1
  203:10 207:3
  216:17 220:9
  227:23
**calculates** 204:8
**calculating** 45:8
  47:20 200:24

202:24 203:9,9
**calculation** 44:22
  45:2,12,18 46:12
  46:14 138:15
  194:12,19 195:11
  199:15 204:14
  217:12 219:7
  220:2 224:11
  225:4 228:17
**calculations** 50:13
  50:16,22,24 51:1
  75:3 85:6 111:7
  207:7 217:3
  218:24
**call** 28:14 68:19
  74:3 100:25
**called** 14:10,13
  118:9
**calling** 53:2
**calls** 45:4 68:18
  200:18 201:4
  203:2 219:18
  238:25
**camp** 2:24
**campbell** 5:13
**cancer** 39:13
  185:6 226:19
**capacities** 35:16
**capacity** 17:20
  35:13,24 61:13
  134:17
**capture** 211:15
**captures** 211:17
**car** 195:5,6,7,8,9
  225:10,12,16
**carcinogen** 163:8
  163:10
**carcinogens**
  163:17
**cardinal** 5:15

**cards** 221:18
**care** 71:5,18
**carlo** 5:19
**carolina** 5:4
**carondelet** 4:15
**case** 12:21 15:20
  18:6,8,24 23:22
  27:15 29:8,23,24
  30:3,4,6,15 31:5
  32:6 33:22 34:1
  34:10,16,23 35:8
  43:13 44:6 48:11
  59:17 64:10,14,19
  70:17 72:3 87:6
  87:12,19,22 88:1,3
  89:19 96:21
  109:12 110:21
  131:10 139:20
  147:9,24 153:13
  153:18 162:20
  164:22 213:22
  214:2 223:8
  226:11,22 227:10
  229:7 234:11
**cases** 17:24 18:1,3
  18:4,4,5,8 24:9
  25:12,13,17 26:16
  26:19 29:21 31:11
  33:18
**cash** 214:11
  217:17
**catastrophic**
  227:12,18 228:4
**categories** 41:23
  217:19
**category** 22:20
  239:11
**cause** 39:15
  202:18
**caused** 26:18
  154:2 234:9

**caution** 30:7
**cdehart** 5:20
**cell** 154:17
**center** 6:9
**central** 184:13
**centre** 3:19 6:4
**century** 184:16
**certain** 38:2,2,4,5
  51:23,25 53:13
  81:3 217:3 224:6
  226:9
**certainly** 137:13
  191:9 234:6
**certificate** 10:7
  211:14
**certified** 1:15,15
**certify** 242:5,9
**cetera** 38:6 108:13
  223:3
**cgannon** 6:8
**cgmp** 21:12 63:13
  63:25 64:3,9 82:5
  82:16 84:8,9
  85:24 90:24 91:2
  93:10,18 105:11
  105:14,19,22
  106:4,11,17,25
  107:12,22 108:4
  108:17,20 110:9
  110:15,19 111:14
  113:13 114:16
  115:8,24 116:19
  117:18 118:2,14
  119:12,17 120:18
  120:21 121:9,24
  123:10 189:9
  190:4,11 204:22
  241:5
**cgmps** 108:14
**cgpm** 111:17

RESTRICTED CONFIDENTIAL

[chain - competition]                                                                 Page 8

**chain**  106:20
107:10 108:11
115:22 132:20
182:17 201:22
235:22 236:17
**chains**  88:24
118:12
**challenging**
162:22
**chance**  67:7
**change**  66:7 244:4
244:7,10,13,16,19
**changed**  60:21
**changes**  243:10
245:6
**changing**  22:17
**characterize**  216:3
237:21
**characterized**
212:5
**charging**  34:25
35:1
**charlotte**  5:4
**cheating**  201:20
202:2,8,20
**check**  229:24
**checked**  73:23
181:6
**checking**  62:7
**chemical**  40:21
**chemicals**  39:14
39:19 42:2 43:7
**chemistry**  40:4
**chicago**  4:5 6:24
15:18 73:14
**child**  71:18
**children's**  217:21
**chip**  217:21
**choose**  192:17
**christine**  6:8

**christopher**  5:3
**christopher.henry**
5:3
**chronic**  81:24 82:2
82:21,23 83:2
**chronological**
59:23
**cidra**  41:25 42:16
42:22
**cincinnati**  7:4
**circumspect**  21:1
**circumstances**
224:7
**citations**  51:22,23
**cite**  124:17 126:8
212:5
**cited**  80:22 82:17
86:8 167:16,19
**cities**  71:17
**citing**  125:16
**citizen**  134:12
**city**  218:11,12
**claim**  25:9
**claiming**  25:10
**claims**  25:8 217:17
217:18 218:21
219:6 223:6
**clarification**  111:2
154:15
**clarify**  13:16 23:5
128:20 141:7
175:7 188:12
208:25
**clarity**  231:12
**class**  15:1,16 16:3
24:24 25:5,6 75:7
87:22 105:12
106:19 116:24
119:8,19,21
120:12,14 134:2,2
138:11 139:10

147:9,17 161:15
162:5 163:2 186:4
190:9 197:4,8,16
197:21 199:14
202:14 210:19
211:7,10,11,12
213:21 214:2,5,6
214:16,18 215:16
215:24 217:11,13
217:25 218:18
219:8 231:22
235:3
**classes**  75:4 111:8
**cleaning**  50:8
61:11
**clear**  100:8 110:11
187:11 209:20
**clearly**  100:5
150:4 153:23
**clinical**  133:7,11
133:14,15 146:18
148:12,14,18,25
185:20 234:9,11
**close**  49:7
**closed**  107:10
108:11
**closely**  48:7,9
50:10
**coach**  128:1
**coan**  6:13
**code**  65:22,24 66:8
**codes**  66:10
**codified**  121:6
**cold**  28:7
**coleen**  3:4
**colleagues**  51:7,10
**collect**  55:23
**college**  40:4
**color**  100:15
**column**  60:12

**combination**
216:10
**combinations**
218:16
**come**  23:4 27:19
42:8 58:11 74:4
135:25 204:22
**comes**  25:25
115:16
**comfort**  112:14
**commencing**  1:13
**comment**  51:8,11
51:19
**comments**  52:4
**commercial**  190:9
223:2,15,18 224:3
224:13
**committee**  16:2
29:8 30:14 44:13
**commonly**  65:24
**communicating**
176:11
**communication**
166:3 177:24
**communications**
165:25 166:14
171:4 172:4 174:3
177:21
**companies**  22:22
27:5,9,11,11,13
163:3 204:17
**comparison**  65:14
65:18
**compensate**
200:25
**compensation**
218:13
**compensatory**
200:16
**competition**  17:14
22:18,21,25 23:2

RESTRICTED CONFIDENTIAL

**[competition - contaminated]**                                                Page 9

38:23 39:2
**competitor** 210:8
**complaint** 75:7
  79:7,13,15 80:22
  80:25 81:17,20
  82:15 83:7 89:23
  90:22 91:12 92:17
  92:19,19,23,24
  93:4,4,8 94:7,8
  97:24 103:23
  111:14
**complete** 55:5
  71:11 101:5,10,16
  245:8
**completed** 243:17
**completely** 54:24
  70:13 129:17
**completion** 38:17
**compliance**
  106:17
**compliant** 108:17
  116:19 152:2
  201:18 241:5
**complicated**
  116:21
**complications**
  137:3
**comply** 70:17
**compound** 201:8
  232:12 233:24
  236:9
**comprised** 210:16
**concept** 189:5
**concerned** 71:13
**concerns** 173:6
**conclude** 81:7
  99:22 100:24
**concluded** 241:15
**conclusion** 201:4
  203:3 219:18
  239:1

**condition** 106:21
  174:13 175:15
**conditional** 107:13
  107:14
**conditions** 22:24
  23:18 137:12
  191:9,10,13,25
  193:25
**conduct** 121:12
**conducted** 133:11
  133:14,16,18
**confidential** 1:8
  31:1
**confirm** 205:7
**confirming** 124:1
**conflicts** 20:5
**confused** 63:16
  120:22
**confusing** 87:1
**conlee** 2:21 28:13
  59:13
**connection** 36:11
  39:10 227:1
**consent** 11:25
**consider** 104:4
  146:24 169:16
  172:9 178:16,21
  179:15 205:8
**consideration**
  164:3,13
**considered** 104:14
  104:18 105:6
  117:17 146:3
  170:10 190:5
  205:14,19 226:24
**considering**
  123:14,19
**considers** 103:24
**consistent** 143:20
  158:15

**construct** 51:25
**consultant** 22:2
  34:10
**consulting** 16:13
  17:7 20:2 25:15
  44:15
**consume** 162:2
**consumed** 108:12
**consumer** 24:24
  25:5,6 39:20
  114:3 119:9
  124:22 137:19,25
  141:4 146:20
  150:22 151:13,13
  151:17,17 152:4
  152:10 157:4,17
  157:21,23 158:20
  158:20 159:25
  160:1,18,18
  164:13 190:1
  193:1 198:11
  199:1,4,8 205:8
  209:25 210:17
  211:19 212:6
  214:10,23 215:25
  221:16 225:2
  229:20,22 230:2,7
**consumers** 24:15
  25:9 75:4 105:24
  106:7 111:9
  124:10 125:3
  127:9 128:25
  131:5 132:25
  133:1 136:6 140:8
  140:15,22 141:10
  141:15 145:13
  149:17 150:20
  151:11,15 152:11
  153:7 156:4,6
  157:2 158:19
  159:20,23 160:16

160:21 163:6,8
  164:3 166:14
  170:16 171:9
  172:24 174:4,9,15
  176:12 177:22,24
  178:3 179:2 180:4
  184:14 191:7
  192:20 193:19
  194:13,25 195:1
  195:18,21 196:8
  196:23 198:21
  200:25 202:17
  204:6 205:15
  208:16 209:8
  212:10 214:15
  216:15 222:14,22
  222:24 223:16
  224:17 225:7
  227:24 230:13,17
  231:3,15,20 234:4
  234:7,25
**consuming** 233:6
  233:6 234:5,7
**consumption**
  185:20
**contact** 27:25
**contacted** 27:20
**contain** 176:8
  212:6
**contained** 76:17
  77:9
**containing** 173:16
  175:5,7,18
**contains** 64:22
  215:24
**contaminants**
  154:9 240:1
**contaminate** 42:2
**contaminated**
  42:13 153:25
  154:6,11 169:25

**[contaminated - court]**                                                    Page 10

171:19 172:8,9,12
173:19 179:23
187:16 194:14
197:20 199:13
200:12 202:13
**contaminates**
40:21
**contamination**
41:22 154:2
163:16 166:1
176:8 194:18
240:15 241:7
**contents**  10:1
**context**  124:15
151:8 152:7
157:19 233:17
**contexts**  16:10
84:6 212:3
**conti**  1:11 2:5 8:3
8:4,5,6,8,9,10,11
10:2 11:4 12:8,16
12:24 13:2 20:20
20:20 30:8 31:3
33:20,25 43:12,16
43:17 44:2 47:1
49:15 52:24,25
53:3,5,8,18 55:15
56:16,19,20,24
57:8,19,20 58:22
58:23 59:3 61:1
66:17 67:1,21
68:9,14,15,23
74:13,16,17 80:16
101:17 109:24
110:5 111:6,18
112:10 113:4
125:21 129:25,25
131:3 134:16
150:19 161:6
162:14 167:1,2,5,6
167:9,14 180:17

206:15 242:6
243:5 244:2,24
245:2,4,12
**conti's**  101:9
**continue**  55:15
100:7,23 162:21
169:9,18,18
172:25 174:17,21
175:12,25 177:15
178:4 179:3
**continued**  38:21
**continuing**  172:8
176:15
**contract**  236:20
237:12 238:22
239:7,13
**contractual**  236:5
236:14,19 237:3
237:10 238:3
**control**  141:9,15
143:10 174:13
237:3
**controlled**  141:2
**controlling**  141:22
142:25 193:24
**converse**  153:14
**copies**  63:8 243:14
**copy**  57:24 58:7
67:12 114:21
**corporation**  4:12
**correct**  16:17
25:17,21 38:12
47:13 59:25 60:7
61:17 66:22 67:1
67:21 68:9,10,16
68:17,24 69:4
72:15,16,16,19,20
73:7 75:8,15,16
77:19 78:12,23,24
81:2,15,17 82:19
84:2,23 87:19

90:12 92:9,11
93:5 103:2,8
114:15 116:13
122:10,18 130:2
142:17 147:9
164:4 168:24,24
205:24 207:25,25
209:3 213:8 222:4
222:15 242:7
245:8
**corrected**  184:2
**corrections**  245:6
**correctly**  169:12
169:15 201:23
**cost**  192:5 193:1,9
193:11 194:7
223:11 229:6,13
**costco**  66:2
**costly**  194:5 195:9
**costs**  136:11,18,24
148:1 149:10
156:14 158:25
183:18 194:17
221:17
**council**  39:13
**counsel**  2:5,10,14
2:19,25 3:8,14,21
4:6,12,17,21 5:5
5:10,15,22 6:5,11
6:15,20,25 7:5
11:10,25 12:12
13:9,9 28:2 29:3,7
30:24 33:13,25
34:16 35:9 44:6
52:4,16 53:20
54:1 59:16 64:13
64:18 67:23 73:18
76:3 79:22,22
80:3,10 90:6
92:11 94:16 100:1
100:3 111:3

127:13,20,21,25
128:1,5 155:4,12
155:22 180:18
181:2 197:3
206:19 219:3,23
220:6,8,14 232:2
242:10 243:14
**count**  204:19
**counter**  204:10
225:3 229:5,23
**county**  218:11,12
**couple**  13:25
19:21
**coupon**  221:17
**course**  15:5,6,14
16:9 70:20 157:12
164:19,22
**courses**  14:18,20
**coursework**  23:7
23:21 40:22
**court**  1:1,15 11:7
11:11,16 12:5,12
14:23 16:15 20:8
20:11 28:17,20
33:1,5 35:19
36:14 38:3 42:17
42:20 44:9 46:2
49:9 52:8 58:3
61:9 65:15 66:18
67:4 69:25 76:19
79:17,21 88:11
89:7 90:2,6,14
92:14 94:1 101:13
102:25 103:3
105:17 107:17,20
115:3,9 117:6
118:19 123:16
132:16 133:17
136:19,21,25
137:1 139:21
140:1,4 142:6,11

RESTRICTED CONFIDENTIAL

[court - deficiencies]                                                    Page 11

146:21 150:3,9,11
151:14 152:12
153:22,24 154:14
154:22 166:23
170:3 171:23
184:22 191:18
192:3 195:1 204:6
204:24,25 205:2,4
205:21 207:14
208:2,10 209:14
211:11 212:8,16
212:18,20 219:1,9
225:20 228:7
230:21 235:6
**courtesy** 80:7
**cover** 226:2
230:24
**coverage** 17:14
224:9 228:5 239:8
**covered** 119:9
221:16
**covering** 238:23
**covers** 218:2
**create** 65:14,18
154:8,11
**criminal** 202:13
**criteria** 217:3,4
**crowell** 5:11
**crowell.com** 5:12
5:13
**cs** 243:15
**culbertson** 6:12
**cull** 46:11
**cure** 185:5
**current** 12:23 14:5
53:24 169:10
172:25 174:17
175:10,13,21,22
**currently** 14:17
29:15,20,22 30:1

**curve** 115:6 118:1
123:2,3,24,24
124:8,19 125:10
125:17 126:22,23
126:24 130:7,9,11
130:11,19 131:16
146:17 152:24,25
153:1 156:11,13
156:16,19 157:3
161:2,4 162:4
164:7,9,20,23,25
165:8 170:6,7
178:19 179:1,21
180:3,5 181:10,18
183:17 189:15
231:24 232:1
**cut** 55:6 132:17
**cv** 18:21,22 53:24
85:8,19
**cvs** 5:10 50:9 66:2
211:8
**cwhill** 3:4

| **d** |
|---|

**d** 4:14,19 6:17 7:3
11:15 220:23
221:6,19,24 222:4
222:8,12,13 223:1
223:4,6,10,21
224:2,14,19
225:25 227:1,13
228:15 229:2
**d'lesli** 4:10
**d.stanoch** 2:22
**dallas** 4:11
**damage** 39:15
217:3 225:4
**damages** 44:23
45:2,8,12,18 46:6
46:9,9,12,15 47:20
50:13,16,20 75:4
75:17,19,22 111:8

194:11,22 197:24
199:15 200:16,16
200:23,24 202:1
202:24 203:10
204:1 206:20
207:2,4,19,21
208:22 209:2
213:22 217:11,13
220:1 231:20
**dana** 3:6
**dangerous** 154:9
184:18
**dangerousness**
154:2
**daniel** 5:13
**data** 46:1,6 47:20
50:8 51:1 54:7,9
61:8,10 62:7,9,12
62:13,16 63:6
65:9,23 207:13
209:2,7,10,13,22
210:2,12,13,15,24
212:1,2,4,25,25
213:1,6,9,20,23
214:2,3,9 215:3,6
215:15,20 216:2
217:1,14,20
**datasets** 217:17
**date** 20:24 34:11
53:24 64:8 69:6
244:24 245:12
**david** 2:22 59:13
**davis** 2:11,12 4:10
155:25
**day** 13:4,6 17:18
21:17,17 27:7
28:7 181:1 209:22
212:23 238:2
242:14 245:15
**days** 243:17

**dc** 3:13 4:20 5:14
**dcampbell** 5:13
**dealing** 71:16
**dealt** 141:18
**death** 135:24
**deaths** 135:24
**decades** 136:1
202:22
**december** 69:12
**decided** 192:16
**declaration** 8:10
46:25 47:6 48:24
50:12,14 74:14
77:7,7
**declare** 11:23
245:4
**decreasing** 22:18
**deem** 128:10
**deemed** 245:6
**deems** 95:25 99:2
103:7,11
**defendant** 3:21
4:6,17,21 5:5,15
6:11,15,20,25 7:5
24:7 81:24 87:25
88:3,16 90:19
91:1 206:23
**defendant's** 8:4
24:20,25 52:23
**defendants** 3:8,14
5:22 6:5 8:7 12:20
24:5 25:3 26:2
27:14 56:18 76:5
78:11 89:19,25
93:11,15,17 131:9
194:23 203:12
206:21 207:12
208:3,7,20 239:17
**deficiencies** 81:25
82:3,22 83:3 91:2
94:6

RESTRICTED CONFIDENTIAL

**deficiency** 90:23
**define** 36:7 77:23
  217:11 232:24
**defined** 97:13
  111:13 143:20
  153:13,18 214:7
**defines** 122:8
  223:15
**definition** 64:22
  65:6 66:8 79:14
  85:23 96:14,17
  97:2,15 98:2,7,7
  98:15,25 101:24
  102:1,12,19
  103:15,19 104:19
  122:3,5,13 123:3,5
  123:8,25 130:16
  130:17 143:16
  170:10 179:1
  213:5 214:7 219:8
**definitions** 114:5
  114:15,18 218:18
**definitively**
  136:14
**degree** 115:16
  216:4,6
**dehart** 5:19
**delivery** 188:18
**demand** 122:22
  123:2,13,14,19,24
  124:2,10 126:22
  127:2 130:7,10,19
  130:23 131:17
  145:25 152:24,25
  153:1 156:11,13
  156:16 157:3,4,17
  157:21 158:15,23
  161:1,1 164:7,20
  164:22 169:23
  170:7 178:19
  179:1,21 180:3,5

  181:23 182:8,11
  182:11,19 183:2
  183:16 186:19
  187:21 188:15
  189:4,15 190:25
  191:10 192:18
  230:16 231:24
**demonstrate**
  100:18
**deny** 176:20
**department** 14:9
  218:8
**depends** 17:22
  192:10
**deponent** 243:13
  245:3
**deposed** 13:1
  86:23 87:3,9 88:5
  111:16
**deposing** 243:13
**deposition** 1:11
  8:5,8 11:4,17,19
  11:20 12:20 52:24
  56:19 73:10 86:10
  87:11,19,21,25
  88:6 99:22 100:5
  100:24 109:18
  147:8 180:19
  241:15 242:5
**depositions** 86:25
  87:5,15
**derives** 81:23
**describe** 18:9
  20:17 45:23 63:4
  164:23 236:1
**described** 116:12
  145:14
**description** 8:2
  9:7
**design** 227:19

**detail** 20:18 56:25
**detailed** 79:13
  80:21 89:22,23
  90:18
**detailing** 89:25
**details** 21:6,10
  30:12 50:25 90:23
  91:1
**deter** 200:25 203:1
**determinants**
  36:23 37:8,8
**determination**
  81:1
**determine** 46:8
  114:11 144:14
  213:21 214:10
**determines** 37:24
**determining** 39:19
**deterred** 202:8
**developed** 15:19
  16:2,9,9 23:21
**developing** 40:19
**diet** 198:4
**differ** 207:6
**differed** 160:18
**difference** 200:15
  207:9
**differences** 236:23
**different** 19:13
  24:8 60:13 64:23
  65:7,10 69:19
  74:25 86:5,6 91:2
  104:3 117:24
  128:21 135:6
  150:22 157:24
  158:9,20 159:25
  160:24 161:7,18
  161:20 169:11
  173:2 174:19
  175:16 192:12
  193:2 196:9

  198:12,12 199:1,3
  205:9,10 206:20
  206:22 207:4,9,17
  208:1,5,9,13,19
  212:3 235:22
  236:5 239:4,16,16
**differently** 37:4
  128:22 151:12,14
  151:16 154:6
**diovan** 78:4
  132:12 133:1
**direct** 184:11
  226:16 227:7
  228:19
**directed** 80:14
  175:3
**direction** 52:2
  83:17
**directive** 171:9
  174:14
**directly** 226:12
  237:14,25 239:6
**director** 14:12
**disaggregate**
  213:24
**disagree** 33:21
  59:8
**disclose** 20:25
  30:20
**disclosed** 30:21
  31:2
**disclosing** 31:10
**disclosure** 30:9
  31:12 34:11
**discontinue**
  165:19 166:9
  171:10 172:17
**discount** 221:18
**discuss** 172:7
**discussed** 46:5
  61:4 231:23

RESTRICTED CONFIDENTIAL

[discussing - drugs]                                                    Page 13

**discussing** 27:22
33:12 47:19 152:8
**discussion** 50:21
76:25 91:24 94:19
**discussions** 53:20
60:2
**disease** 35:22
36:12 38:11,13
118:16 218:7
**disincentivize**
202:2
**dispense** 213:18
230:9 237:14
238:1
**dispensed** 118:11
213:4 224:23
239:6 240:23
**dispenses** 230:6
**dispensing** 38:1
**dispute** 131:21
138:17 156:5
**disputes** 20:6
21:22 24:8 27:4,6
**disputing** 156:15
**dissertation** 38:17
38:18,20 41:1,3,4
**distinct** 218:15
**distinction** 85:2,19
**distinguish** 85:13
**distinguished**
188:9
**distracting** 90:11
**distributed** 152:6
**distributers** 66:1
**distribution** 237:4
**district** 1:1,1
**dlesli.davis** 4:10
**dna** 39:15
**doctor** 46:3 54:10
54:10,18 65:15
132:17 133:8

143:24 149:24
154:14 157:13
165:20 169:10
171:11 172:8,19
173:1 174:10,18
174:22 175:14,15
176:1,14 177:16
178:6 184:22
191:19 207:15
**document** 1:4 53:7
53:10,12,13,17
56:10,13,17,24
57:19,23,23 58:5
58:14,14,21 59:2,3
59:7 63:8 66:17
67:12,24 83:18,25
85:18 90:17 167:6
167:13,15,16,24
170:20,22 172:23
173:25
**documented**
167:19
**documenting**
82:23
**documents** 9:6
46:13 50:6 55:24
56:7 64:16 69:17
82:15 84:18,21
86:7 89:24 90:25
91:4,7,14 92:18,20
93:18 94:5 167:18
167:20 180:25
**doing** 18:17 19:5,9
19:10,25 20:2
21:21 30:2 33:25
34:6 38:14 40:24
71:2 73:11,24
194:4
**dollar** 216:18
**dollars** 26:9

**domain** 24:11
**donut** 227:18
228:1
**dorner** 3:12
**dorsey** 6:17
**dorsey.com** 6:18
**double** 63:8
**downright** 185:11
**downside** 148:1
**downstream**
149:9 194:17
**dozen** 109:20
179:12
**dr** 8:5 12:16 13:2
20:20,20 30:8
31:3 33:20,25
43:12 47:1 52:24
53:8,18 55:15
56:24 57:8,19
61:1 66:17 67:1
67:21 68:9,14,15
68:23 74:13 80:16
101:9,17 109:24
110:5 111:6,18
112:10 113:4
125:21 129:25,25
131:3 134:16
150:19 161:6
162:14 167:5,14
180:17 206:15
**draft** 51:11
**drafting** 46:17
50:17
**drafts** 51:6 52:3
**dramatically**
135:25 182:12
**drew** 3:12
**drill** 111:17
214:22 215:16
**drive** 4:5 22:22

**dropped** 192:19
**drug** 16:1 22:5
81:8 89:10 95:25
96:16,20 97:14
98:3,6,16 99:3
103:7,11 104:4
110:16 113:22
114:8,18 115:13
116:3,20,22,23
117:17 118:10,17
118:20 119:7,16
119:21 121:7,21
122:3,20,20 123:5
123:6,8 124:6,6,25
125:17 126:3,16
127:10 130:15
133:12 134:2
145:20,21,22
149:19 151:6,8
157:5,23,24
177:15 184:7
185:7 189:10,22
190:8 195:17,20
196:2,9 198:3,12
199:1,3 200:1
205:10 220:25
221:20 222:9
223:4 224:19,23
226:3 229:1
230:16 232:6,18
233:4 239:25
240:13,14 241:3
**drug's** 116:1
**drugs** 5:22 22:3
35:21 37:6 38:12
41:12,17,24 65:7
66:10 79:10
103:15 104:2
105:2 111:11
113:11 114:23
115:17,22 118:8,8

RESTRICTED CONFIDENTIAL

[drugs - enumerating]                                                Page 14

118:9,25 119:1,18
120:12 121:8,9
123:4,25 125:11
126:1 131:20
132:14 133:3,7,12
133:13,19 134:2
136:2 152:3
153:25 154:6,11
156:15 158:16,24
163:2 178:20
184:15,18 190:5
197:7 201:1
202:14 203:13
209:25 210:25
211:4,4 218:2
226:9,18 227:16
231:18 233:7
235:1 236:17
237:15,22 238:2
239:7,9
**dtdorner** 3:12
**duane** 3:2,10
12:17
**duanemorris.com**
3:3,4,5,11,12
**due** 26:24 141:3
**duly** 12:9

**e**

**e** 2:1,1 3:1,1,11 4:1
4:1,4 5:1,1,17 6:1
6:1 7:1,1 8:1
11:15,15 140:2
242:1,1 244:3,3,3
**eabraham** 5:19
**earlier** 60:4 62:22
171:3
**early** 40:20
**easier** 153:19
**eastern** 1:13
**economic** 25:9
44:15 75:7,15,22

87:16 111:11
114:24 115:5
124:7,17 125:7
126:14,23,25
127:1,5,6,15,16
130:1,10,21,24
131:18 137:22
140:8,15,21 141:3
141:23 142:2
143:1,6,11,12,16
143:19,20 144:4,9
144:23 145:7,7,9
145:13,23 146:15
146:19,23 149:3
151:23,23 152:8
152:16,18 153:6
153:11,14,14,18
156:12 182:7,25
183:12,13,24
184:1,3,7 185:10
185:17,25 186:1
186:10,12,15,19
187:21 188:15,16
189:8,11,18,21,23
194:17,19 195:12
195:15 197:1,23
198:6,22,25 199:4
199:19,20 203:25
204:5,7,8,14,23
208:7,18,18,22
225:8,14 233:19
**economically**
153:25
**economics** 39:22
125:13,15 126:19
188:20,23 189:2,6
189:5,19
**economist** 15:24
37:4 40:6 111:19
133:8 138:23

**edits** 51:19
**effective** 114:12
139:2,14
**effectively** 30:18
31:15 233:3,19
**effects** 154:10
**efficacious** 113:18
114:7 115:12
116:1,19 117:19
118:3,15 123:11
125:6 154:7
**efficacy** 36:21,22
37:2,7,13 113:13
113:25 114:5,10
114:16 190:13
**eisenhower** 2:8
**either** 20:6 21:22
50:9,15 60:20
88:12 149:5
152:21 191:25
195:24 226:12
227:13
**elementary** 189:6
189:19
**eligible** 222:25
223:17
**ellie** 4:9
**ellie.norris** 4:9
**email** 181:1,6
**emphasis** 120:7
**emphasize** 185:14
**emphasizing**
120:6
**empirical** 118:4
**employed** 222:23
**employee** 218:10
221:1,21
**employees** 48:8
87:25
**encapsulated**
183:16

**ended** 238:21
**ends** 74:7 112:22
180:10 235:14
**english** 28:22
**enrichment**
206:23 207:2,21
208:12
**enrollees** 223:11
**ensure** 110:13
120:2 121:9
**entail** 136:11
**enter** 22:23,25
39:1 106:18
107:12 108:10,15
119:8,18,21 120:6
120:12,14 161:14
162:5 190:9
197:15
**entered** 40:4
105:11 116:24
138:11 139:9
186:3 197:4,8,20
235:3
**entering** 188:6
**entities** 32:23
217:19 218:22
220:24 221:20
222:9,13 224:3
**entitled** 31:3 33:24
56:17 167:6
**entries** 59:20
60:25
**entry** 23:2 36:1,3
38:24 61:6 63:12
66:25 67:20 68:8
**enumerated**
101:24 102:4
**enumerates** 99:4
**enumerating**
85:11

RESTRICTED CONFIDENTIAL

[equals - fails]                                                Page 15

**equals** 189:22
**equivalent** 78:4,6
**equivalents** 133:2
**eric** 5:18
**erickson** 48:7
61:16,18 62:24
**errata** 243:11,13
243:17
**especially** 26:25
40:25
**esq** 243:1
**esquire** 2:3,7,12
2:16,21,22,23 3:3
3:4,5,6,11,12,17
3:18 4:3,4,9,10,14
4:19 5:3,7,12,13
5:17,18,19 6:3,8
6:13,17,22,23 7:3
**essential** 33:17
**established** 111:6
111:23
**establishes** 152:1
**estimate** 50:20
**et** 38:6 108:13
223:3 243:4 244:1
245:1
**evaluated** 148:16
**everybody** 74:2
**evidence** 149:5
177:19 196:15
226:10 227:6
229:13 234:10
239:19 240:10
**evidentiary**
113:12 118:13
119:10,19,22
120:13,17,19,20
120:23,25 121:13
122:24 123:9
124:13 125:4
126:2,7 131:11

146:4,6,13 148:11
149:5 152:22
156:20 159:3
161:14 163:5
164:10 165:1,6
187:12 188:8
190:4,13
**evolve** 23:1
**evolving** 202:11
**exact** 49:11 128:19
**exactly** 28:25 43:2
49:21 122:11
160:6,22 223:25
230:4,10
**examination** 10:3
12:15
**examined** 12:9
**example** 172:22
222:21 225:12
227:12
**exclude** 216:18
217:17 218:12,23
220:16,16,23
221:1,18,21 222:7
**excluded** 219:7
221:15
**excluding** 153:6
218:21 219:6
**exclusion** 219:22
**exclusions** 218:19
**excuse** 30:19
32:14 54:23,23
73:9 80:2,2 90:6
149:11 152:12
154:24 155:15
206:4 214:5
**executive** 29:8
44:13
**exercise** 198:4
**exforge** 78:5
132:12 133:2

**exhibit** 8:2 43:17
52:25 53:14 56:20
58:16,22,23 74:17
166:24 167:2,5
**exhibits** 10:5
51:25 93:4 94:7
**exist** 130:8 156:12
225:17
**existence** 230:7
**exists** 124:23
**expect** 49:1 61:12
72:21
**expected** 38:24
**expects** 230:2,3
**expenses** 136:5
144:7,21
**expensive** 226:18
227:17
**experience** 25:16
26:24 38:24 83:23
83:23 84:15,20
85:4,14,22 86:5
133:6 151:11
153:1
**experienced** 156:5
156:7
**experiences**
160:24
**expert** 16:13 17:5
18:1,17 19:5,14,24
20:1,14 21:4,5,15
24:3,4 25:4,15
26:6,10 27:4
29:21 30:2 31:11
32:21 34:10 39:21
42:10 44:21 45:4
46:25 47:5 50:11
61:8 84:4 111:15
111:15 134:17
167:10 200:18

**expertise** 22:14,21
83:22 85:3 111:22
219:19
**experts** 23:17
34:11 87:16,18
88:3 191:12
**expiration** 38:25
**explain** 14:5 19:24
37:16 80:18
113:25 127:1
131:3 164:24
211:24,25
**explained** 230:14
**explains** 184:13
**exposed** 39:16
**express** 4:17
**extensive** 85:9
**extent** 23:1 30:8
39:2 45:4 201:4
219:18 238:25
**external** 237:12

**f**

**f** 242:1
**face** 225:7
**fact** 102:17 105:21
105:23 170:6
176:9 212:6 241:6
**factor** 135:5
224:11 225:24
228:13,16
**factors** 22:16,22
102:4,14 103:12
103:23,24 104:4
104:12,14,20
**facts** 46:14 50:6
51:24 80:25 81:4
135:13 177:18
196:14 239:18
240:9
**fails** 243:19

RESTRICTED CONFIDENTIAL

[failure - form]                                                                                      Page 16

failure  88:15
  89:17 90:18 92:22
  134:5 175:5
failures  82:5,8
  93:10
fair  35:25 69:14
  70:5 80:24 83:19
fairly  21:20
falanga  6:7
falkenberg  6:21
falkenbergives.c...
  6:22,23
falls  182:11
familiar  37:1 39:7
  40:5 165:10
  167:13 189:5
  223:5 236:4,13
far  109:19
fda  8:11 65:14,18
  65:21 66:4 82:15
  89:24 90:24 91:4
  91:7,14 92:22
  93:23 95:25 97:2
  98:24 99:2 103:7
  103:11,18,24
  104:4,13 114:4,11
  118:6,24 119:20
  120:10 122:8
  139:13 157:15
  165:10,18,25
  166:8,10,13 167:6
  167:18 169:8
  170:6,14 171:4,8
  171:14 172:4,6,16
  172:24,24 173:5
  173:10,15 174:3,9
  174:15,16,19
  175:3,25 176:9,20
  177:14,21,24
  178:16 179:16
  180:3 183:11,23

184:6,12 186:10
  186:15,22 188:1
  190:7
fda's  101:23
  104:19 122:4
  169:17 185:15
  186:9 187:24
february  1:12
  11:2 28:5,6 35:9
  35:14 39:9 40:14
  41:10 42:7 60:5
  242:14 243:3
federal  121:5
  152:1 184:17
  217:18,22 218:22
  221:1,21 224:4,12
  226:1,13,25 227:7
  228:14 229:10,11
fee  35:1,1
feel  26:22 73:23
  101:11
fewer  26:19
fhs  6:3
field  23:17
figure  181:18,22
  181:24
filibustering  100:6
  100:9,19
fill  51:22,24
  229:22
filled  184:19,24
  185:3
final  46:18
finally  46:18
financing  15:8
  21:18,23,25 32:10
  32:23
finds  153:24
fine  20:22 55:8,10
  55:20 95:6 109:16
  206:7

finish  54:14 56:3
  73:21 86:2 148:6
  159:13 187:7
  234:23
finished  26:4
  38:18,20 41:3,4
  86:19 159:8
  187:17
finishing  40:23
firm  11:6,8 12:17
  20:2
firms  15:10 20:7
  20:10 24:9 39:1
  89:5
first  12:8 18:23
  22:14 24:21 27:25
  28:1,9,10,13 29:4
  35:16 44:12 56:23
  58:5 59:12,22,23
  60:2 63:12 66:16
  69:23 79:8 81:22
  107:12 146:16
  166:6 169:5,7,7
  185:17 187:5,19
  217:14 221:5,13
fit  128:14
five  74:1 100:17
  100:22 101:1
  155:10,12 235:7
  235:11
floor  3:19 6:4,9,14
focus  22:10,12
  41:15 184:13
  202:16 221:24
focused  41:10,14
  194:12 199:20
  200:11 231:11
focuses  14:15
focusing  123:14
  123:20 221:5

folks  51:21
follow  67:13,14
  201:7 221:11
  232:11 233:9
  238:18
followed  31:14
following  72:10
  217:18
follows  12:10
  184:15 218:15
food  22:5 89:10
  96:16 97:14 98:3
  98:6,16 110:16
  113:22 114:8,18
  115:13 116:3,20
  118:10,17,20
  121:7,21 122:3
  123:6 130:15
  145:20 185:7
  239:25 240:14
  241:3
footnote  75:8
  76:14,14 77:14,14
  77:15,15,18,18,22
  77:23 79:8 218:19
footnotes  80:23
  81:18
forced  198:22
foregoing  242:5
  245:5
form  32:7 45:3
  69:15 70:19 75:20
  77:10,20 81:9,13
  83:4 84:24 89:20
  90:20 92:12 94:9
  96:5,22 97:9,22
  98:22 102:21
  103:17 104:5,9
  106:2,13 107:2,5
  107:24 108:6,22
  110:22 114:13

RESTRICTED CONFIDENTIAL

**[form - going]**                                                      Page 17

| | | | |
|---|---|---|---|
| 115:19 116:7,14 | **forms** 17:24 | **gateway** 6:9 | **gives** 173:1 174:18 |
| 117:11 119:3 | 240:13 | **gather** 52:20 | **giving** 67:7,12 |
| 121:2 122:25 | **forth** 51:6 73:13 | **gathered** 56:7 | **glaxo** 42:18 |
| 125:19 126:17 | 84:22 | **gcoan** 6:13 | **glaxosmithkline** |
| 127:8 128:12 | **fortunate** 135:20 | **geman** 2:16 | 42:19,23 |
| 130:3 131:1,23 | 174:9 | **general** 19:15 | **glenside** 1:12 |
| 132:9 137:20 | **found** 50:20 | 27:23 37:25 84:20 | 12:25 |
| 138:3,19 139:3,16 | 169:19 | 135:3 136:10 | **gma** 62:25 69:20 |
| 140:9 141:24 | **four** 60:17,25 | 137:7 145:5 | **gma's** 44:7 |
| 143:2,14 144:24 | 120:24,24 160:4 | 237:21 | **go** 32:15 39:3 |
| 145:17 147:21 | 168:10 196:18 | **generally** 18:9,12 | 43:14,22 48:18 |
| 148:20 149:20,23 | 206:20 | 19:22 36:24 37:1 | 57:5,11 60:12,17 |
| 150:23 151:18 | **fourth** 65:12 | 38:10,11 39:18 | 60:23,24 62:19 |
| 153:9 156:8 157:7 | **frame** 55:2 | 45:23 48:9 61:19 | 65:12 66:3,16,24 |
| 158:1,21 163:11 | **frank** 6:3 | 62:5 63:1,5 84:11 | 68:5 73:25 76:5 |
| 163:21 164:5,16 | **frankly** 48:25 71:1 | 85:14 135:13 | 76:21 81:19 88:7 |
| 165:13,22 169:20 | 72:4 162:22 | 158:24 173:5 | 91:20 95:1 99:5 |
| 170:17 171:12,16 | 186:23 202:21 | 207:11 | 114:20 126:20 |
| 172:20 173:13 | **fraud** 21:13 | **generate** 15:12 | 131:3,25 141:16 |
| 174:23 176:2,21 | **free** 101:11 | 46:21 47:12 | 150:11 151:25 |
| 177:17 178:11 | **freeman** 2:7 | **generated** 26:5 | 152:14,14 154:5 |
| 181:13 182:23 | **front** 44:2 50:21 | 35:4 45:22 | 159:13 160:12 |
| 184:8 186:16 | 58:8 67:11 74:14 | **generic** 22:3,19,24 | 173:21 175:12,17 |
| 192:8,14 193:3,13 | 92:8 114:22 | 27:10 36:1 38:24 | 176:14 178:5 |
| 193:21 194:9 | 153:20 | 78:4,6 132:13 | 195:6,9 198:22 |
| 195:22 196:4,13 | **fulbright** 4:8 | 133:2 227:21 | 208:14 231:10 |
| 200:3,17 202:4 | **full** 51:23 101:3 | 229:6 | 237:14 241:11 |
| 203:2 205:11 | 163:5 204:8 | **generics** 229:13 | **goes** 44:20 146:22 |
| 207:24 215:18 | 207:22 | **geoffrey** 6:13 | 175:9 180:3 |
| 216:20 219:17 | **function** 189:4 | **geoppinger** 7:3 | 202:20 204:15,15 |
| 220:10,17 222:17 | **fund** 236:21 | **germane** 84:14,16 | 204:16 229:22 |
| 223:13 224:5,15 | **funding** 224:4 | **getting** 216:13 | 235:25 |
| 226:4 227:3 | **further** 11:21 | **gisleson** 3:17 | **going** 11:1 12:19 |
| 228:18 230:19 | 65:12 154:11 | **give** 15:5,6 20:18 | 13:5,5 14:1 23:6 |
| 231:5 232:8,20 | 242:9 | 44:3 55:8 57:10 | 35:7 43:22,23 |
| 233:5,21 234:13 | **future** 200:21 | 74:2,22 91:19 | 44:20 53:4 55:3 |
| 237:6 238:7 | **g** | 95:19,22,22 | 57:4,14 60:10 |
| 239:18 240:8,21 | | 175:15 217:7 | 61:15 73:13 74:15 |
| **formally** 31:10 | **g** 11:15 | **given** 17:18,19 | 74:24 75:10 76:2 |
| **forming** 178:17,22 | **gain** 208:18 | 146:12 197:3 | 76:24 77:25,25 |
| 179:16 | **gannon** 6:8 | 218:3 232:2 245:9 | 80:5 91:23 92:5,6 |

Veritext Legal Solutions

800-227-8440                                                      973-410-4040

RESTRICTED CONFIDENTIAL

**[going - guidance]**                                                    Page 18

94:14,15,16,18
95:5 112:22
117:16 129:7,10
129:11,13 144:2
144:17,18 150:14
161:25 162:11,12
175:2 180:10
188:14 201:11
206:9 208:21,23
215:10 220:22
235:14,24 241:14
**gold**   110:14
124:24 209:23
210:5
**goldberg**   3:3 10:4
12:14,15,17 15:4
16:16,20 20:16
21:7 29:1 30:13
30:24 31:18,23
32:3,11 33:7,21
34:14,21 36:5,17
38:7 43:10,11,19
44:11 45:9,19,21
46:19 47:2,5,14
49:13 52:14,22
53:4,6 54:13,15
55:10,17,22 56:10
56:12,16,22 57:11
57:18,22 58:11,17
58:21 59:1 61:14
61:24 62:1 66:14
66:20 67:9,15,25
68:2,4 70:8,21
71:12 73:25 74:5
74:12,19 75:23
76:21 77:4,17
78:8 79:22 80:1,3
80:10,15,17 81:10
81:14 82:18 83:1
83:9 85:16 87:4
88:13,14 89:15

90:9,16 91:3,20
92:3 93:1 94:4,14
95:4,8,13 96:18
97:4,17 98:9 99:7
99:11,13,17 100:1
100:3,23 102:2,15
102:23 103:4
104:1,6,23 105:20
106:10,23 107:3
107:21 108:3,18
109:1,5,10 110:17
111:1 112:1,5,11
113:3 114:19
115:14 116:4,10
117:8 118:5,23
119:14 120:4
121:16 123:12,18
126:12 127:4,13
127:14,20,25
128:5,11,15 129:2
129:5,9,12,19,24
130:22 131:19
132:4,22 133:20
134:14 135:7,14
136:4,12 137:8,24
138:16,24 139:11
140:6,13,19 141:1
141:11 142:22
143:6,8,23 144:5
144:11,17,19
145:11 147:5,15
148:4 149:13,21
150:7,18 151:4,16
153:4,16 154:18
155:5,21 156:1
157:1,10 158:7,17
159:4,12 160:7
161:5,17 162:8,20
163:18 164:1,11
165:9,17 166:5,17
166:25 167:4,10

167:12 168:2,7
170:13,21,23
171:13 172:14
173:9,20 175:20
176:17 177:1
178:7,14 179:5,9
179:14 180:7,16
180:24 181:8,16
183:8,22 186:7
187:4 189:7,20
191:5 192:4,11,24
193:7,16 194:6
195:13 196:1,7
197:5 198:7,24
199:24 200:14,22
201:9 202:5,23
203:8,20 204:2
205:6,17,23 206:1
206:7,14 207:18
208:11 209:16
210:4 211:22
212:24 213:17,19
214:20 215:2,8,14
216:5,22 219:4,15
219:24 220:7,13
220:21 222:18
224:1,10 225:23
226:23 228:9
229:17 231:1,8
232:14 233:1,14
234:1,18,20 235:9
235:20,23 237:16
238:12,19 239:14
240:3,16 241:9
**goldberg's**   20:21
**gonna**   52:23 76:5
93:12 141:6,7
**good**   12:16 55:20
63:23 74:5 112:10
113:16,17 138:6
210:25 235:7,9

**goodness**   210:4
**gordon**   6:2
**gotten**   150:20
**government**   20:13
20:14 21:3,9,15,24
22:7 24:13,14,16
26:3 32:22 71:3
105:4 162:7 165:2
186:5 190:15
217:19 218:22
219:15 220:1
224:4,12 226:2,13
226:14,25 227:8
228:14 229:10,11
**government's**
122:13 202:10
**gpp**   219:8
**grateful**   48:19
**gray**   28:7
**great**   43:25 95:19
112:12 142:12
217:10
**greenberg**   4:2
**greg**   4:4
**greylock**   8:9 16:14
16:16,23 17:4,8,11
17:21 18:14,18,24
19:18,25 20:5
27:21 28:1 29:11
34:23 44:14 48:8
48:18,20 49:23
51:8,11,18,21,21
52:16 59:6 64:17
70:9,14,16
**gtlaw.com**   4:3,4
**guess**   16:25 18:20
36:23 166:22
**guidance**   187:11

800-227-8440                                                    973-410-4040

RESTRICTED CONFIDENTIAL

[h - honik]                                                                    Page 19

| h | | | |
|---|---|---|---|
| **h** 6:3 8:1 244:3 | 90:13 103:1 | **hilton** 2:23 28:13 | 97:9,22 98:22 |
| **half** 19:19,19 | 219:10 230:22 | **hinshaw** 6:12 | 99:9,15,20 100:2 |
| 69:24 70:2 109:20 | **heard** 79:25 80:7 | **hinshawlaw.com** | 100:21 101:1,16 |
| 112:16 221:14 | 128:4 150:3 | 6:13 | 102:7,21 103:17 |
| **hand** 242:14 | 213:12 | **historian** 185:6 | 104:5,9 106:2,13 |
| **handful** 63:1 | **hearing** 12:5 | **hit** 195:5,6,7,8 | 107:2,5,24 108:6 |
| 73:11 | 147:1,2 | **hiv** 218:6 | 108:22 109:3,7,15 |
| **handling** 17:19 | **heart** 35:22 36:11 | **hold** 46:16 49:17 | 110:3,22 111:5 |
| **handy** 57:25 58:7 | 38:11,13 134:5,8 | 54:11 56:3 86:2 | 112:9,14,18 |
| **hang** 15:23 54:12 | 134:19,21 135:8 | 86:14 91:5,9 | 114:13 115:19 |
| 54:12,12,15,18 | 135:12,21,25 | 95:16,16 96:8 | 116:7,14 117:11 |
| **happened** 173:8 | 136:6,10 137:12 | 120:1 143:25 | 119:3 121:2 |
| **happens** 109:11 | 137:17 175:5 | 148:6,15,15 | 122:25 125:19 |
| 162:15 | **hebert** 62:4 | 162:10,10 181:19 | 126:17 127:8,18 |
| **happily** 111:5 | **held** 76:25 91:24 | 187:7 195:15 | 127:23 128:3,9,13 |
| **happy** 56:5 69:21 | 94:19 | 219:10 | 128:17 129:4,7,10 |
| 69:22 91:18 99:5 | **help** 52:19 | **hole** 227:18 228:1 | 129:14,22 130:3 |
| 126:20 196:20 | **helped** 51:22,24 | **holes** 210:19,21 | 131:1,23 132:9 |
| **hard** 67:12 90:12 | 51:25 | **home** 177:7 | 134:9,25 135:10 |
| 114:21 | **helpful** 13:8 46:12 | **honan** 62:20,21 | 135:17 136:8 |
| **harm** 185:20 | 50:7 | 63:3 | 137:5,20 138:3,19 |
| 202:18 204:7,8 | **henry** 5:3 | **honest** 182:6 | 139:3,16,24 140:9 |
| 234:9,11 | **heparin** 42:14 | **honik** 2:2,3 20:20 | 140:16,23 141:24 |
| **harmful** 40:22 | **hereto** 245:7 | 28:12,23 30:7,16 | 142:8,12,15,19 |
| 42:3 43:7 185:12 | **hereunto** 242:13 | 31:6,21,25 32:7,14 | 143:2,14 144:1,10 |
| 185:13 | **hetero** 5:22,22 | 32:16 33:14 34:2 | 144:13,24 145:3 |
| **harms** 39:16 43:4 | 78:2 93:25 | 34:17 45:3,13 | 145:17 147:2,10 |
| 185:16 | **high** 22:17 134:8 | 46:23 47:3,7,10 | 147:21 148:20 |
| **harvard** 15:18 | 134:18,23 135:4,5 | 52:6,11 53:2,18 | 149:20,23 150:1,5 |
| 23:24 40:23 | 174:7 175:4 189:3 | 54:13,23 55:11,20 | 150:10,23 151:18 |
| **health** 5:15 16:23 | 191:1,8 192:1 | 57:7 58:20 61:20 | 152:14 153:9 |
| 39:15,20 40:22 | 193:24 200:7 | 67:22 68:1,3 | 154:24 155:15,23 |
| 41:19 42:3 43:5,8 | **highlighted** | 69:15 70:19 71:8 | 156:8 157:6 158:1 |
| 111:18 125:13,15 | 175:18 | 74:3 75:20 77:10 | 158:12,21 159:10 |
| 140:8,14,21 144:7 | **highly** 30:25 50:4 | 77:20 79:19,24 | 160:2,19 161:9,23 |
| 144:21 217:21 | 55:13 114:3 | 80:2,5,13 81:9,13 | 163:11,21 164:5 |
| 218:10 | 124:22 189:25 | 82:10,24 83:4 | 164:16 165:13,22 |
| **healthcare** 3:9,15 | 190:1 | 84:24 86:19 88:20 | 166:11 167:9,11 |
| **hear** 24:21 52:6 | **hill** 3:4 5:17 | 89:20 90:20 92:12 | 169:20 170:17 |
| 58:2,3 88:9,10,12 | **hillwallack.com** | 93:21 94:9,21 | 171:12,16 172:20 |
| | 5:18,19,20 | 95:1,6,9 96:5,9,22 | 173:13 174:23 |

RESTRICTED CONFIDENTIAL

[honik - incurred]                                                      Page 20

176:2,21 177:17
178:11,23 179:7
179:11,17 180:20
181:3,13 182:23
184:8 186:16
188:21,24 189:12
190:21 192:8,14
193:3,13,21 194:9
195:22 196:4,13
198:16 199:5
200:3,17 201:3
202:4 203:2,14,22
205:11 207:24
208:4 213:15
214:12,24 215:4,9
215:18 216:20
219:12,17 220:3
220:10,17 222:17
223:13 224:5,15
226:4 227:3
228:18 230:19,23
231:5 232:8,20
233:5,10,21
234:13 235:11
237:6 238:7,16,24
239:18 240:8,21
241:11 243:1
**honiklaw.com** 2:3
243:2
**hopefully** 14:2
**hoping** 27:1
**hospital** 217:23
**hospitalization**
135:9,16,23
**hospitalized**
135:12
**hospitals** 211:1
**hour** 60:11 72:14
72:15 112:17
182:10

**hourly** 35:1 49:15
49:19 60:11,12,16
60:19
**hours** 48:23 49:2,4
49:6,7 66:21,22
68:24 69:13,24
70:3,5,6 72:18,23
72:25 73:12
111:23
**house** 26:21
175:24
**huahai** 3:8,9,15,15
78:1 93:13 168:22
**hudson** 2:17
**huh** 20:11 41:8
201:16 217:9
**human** 39:15
40:22 41:19 42:3
43:4,8 148:23
149:14,15,16,22
163:8,10,17
**humana** 6:25
**hunchuck** 3:18
**husch** 4:14
**huschblackwell....**
4:15
**hyman** 2:16
**hyper** 192:1
**hypertension**
38:10 133:24
134:3 137:3,16
139:2,15 141:3,9
141:16,22 142:25
170:9 172:3 174:8
190:20 191:1,8
192:1 193:20
198:3 199:18
200:7
**hypothetical**
158:3 177:9,18
196:14 198:17

199:6 235:5 240:9
240:22

**i**

**icu** 211:6
**idea** 234:24
**identification**
31:15 43:18 53:1
56:21 58:24 74:18
167:3
**identifies** 65:22
**identify** 31:14
51:23 65:8,23
213:1,6,10 216:3
**identifying** 50:6
55:4
**identity** 121:11
122:4
**ignorance** 101:3
**ii** 8:12 167:7
**illegal** 124:11
**illegitimate** 124:11
162:3 183:19
196:3 199:9
202:12 204:18,21
230:14 231:3,14
**illinois** 4:5 6:24
**ilyse** 242:17
**immaterial** 200:10
**immediately** 103:6
**immunology**
226:19
**impact** 39:19
**impair** 13:24
**implement** 88:16
89:18 90:18
**import** 62:7
**importance** 126:7
**important** 19:8
**importantly**
111:21

**imported** 63:6
**impossible** 160:10
**improper** 129:6
158:2 196:14
198:17 199:6
240:22
**impurity** 203:13
**inappropriate**
240:9
**incentivize** 201:20
204:13
**include** 35:21
77:24 89:1 99:3
103:11 218:5,11
220:14 240:6
**included** 37:19
53:24 172:11,15
179:22 207:6
220:1,15 231:21
240:19
**includes** 42:13,14
78:3 178:8 179:1
217:13 218:18
222:21
**including** 15:20
77:8 78:9 85:5
178:20 191:14
194:4 219:6
221:17
**inclusive** 96:17
98:8,17 102:1,13
103:20,23 104:20
122:14 213:3,8
214:14,16,17
**income** 26:5,6
**incorrect** 213:11
**incorrectly** 93:12
**increasing** 22:17
**increasingly** 19:20
**incurred** 75:4
111:8

Veritext Legal Solutions
800-227-8440                                                            973-410-4040

RESTRICTED CONFIDENTIAL

independent 20:1
81:1 114:9
independently
20:3 81:7
index 10:5
indian 218:10
indiana 5:9
indianapolis 5:9
indicated 123:11
indication 118:16
indicative 37:13
individual 134:17
149:1 152:10,23
152:25 156:14
157:4,22 216:9
222:23
individualized
158:11
indulge 151:24
industries 4:7
industry 14:22
15:1,9,10,21 16:4
16:5,7,11,12,25
17:1,13 19:8
21:20,22 22:16
23:9,10,11,17,19
27:8 32:9,25 33:4
33:10 34:7 41:20
42:11 83:24 84:5
84:12 85:4,10,14
98:1 105:7 186:24
187:9 210:6
industry's 188:5
202:21
infectious 218:7
information 34:12
52:20 56:7
informed 134:13
informs 85:5,22
86:7

infused 218:2
ingersoll 4:18 5:2
initial 89:11
injected 218:2
injured 199:10
225:10,15
injury 75:4,13,14
75:15,22 111:8
154:12 194:12,22
195:4,5,16 196:21
196:24 197:19
198:2,8,10 199:4
224:25 225:18,21
227:14
innovate 15:11
innovation 14:16
inpatient 211:5
input 52:17
inspection 92:21
instance 119:15
instances 89:16
institute 14:12,12
14:13,14
instruct 13:11
20:21 30:16 31:21
31:25 33:14
instructed 31:9,13
209:12
instructing 169:8
169:17 177:14
instruction 55:8
209:17 219:3,23
220:5
instructions 9:3
insurance 209:8
211:16 212:7,8,13
217:15,21 218:1,4
218:8,9 221:16
222:24 223:15,16
224:9,21 225:1
227:22 229:24

230:7,8 237:4
insure 157:14
insured 24:15
108:12 200:12
223:19,22,24
insured's 232:5,17
insureds 233:3,19
insurer 119:10
157:14 223:18,20
230:3
insurers 106:8
195:3 197:22,22
221:2,23 222:3
223:2 239:6
intellectual 19:4,6
intended 133:24
134:3,4 202:1
intense 71:19
intensely 71:2
72:1,2
intently 48:1
interest 35:17
36:11
interested 27:22
37:5 38:23 39:18
40:25 43:2 242:11
interfere 128:2,15
interfering 100:4
interject 54:14
interjected 142:16
interrupt 71:8
80:4,4 86:20 99:9
99:10,15 109:17
127:21 144:1
162:18 188:10,11
interrupted 109:9
159:16 160:10
234:21
interrupting 67:6
96:10 99:13,21
109:3,17 179:7,8

interruption 128:7
142:4
investigating
21:12,12,13
investigation
21:11,16
investigations
21:3,9
invoice 35:4 49:22
59:12 63:9,20
66:25 67:3,17
68:9,11,14,16,22
69:1,5,7,9,23 70:4
72:6,7,11,12
invoiced 66:21
68:15
invoices 8:9 59:6
59:20 62:20 69:11
70:7,10,16,23,24
71:22
involve 41:24
175:10
involved 17:15
20:15 22:4 30:4
30:15 33:19 34:6
34:10 48:21
133:15
involvement 20:25
31:11
iqvia 63:6 65:18
65:23 209:3,22
210:2,12 212:25
213:20,20,23
214:3,9 215:15
216:2 217:1
iqvia's 215:20
irbesartan 1:3
8:14
issue 64:7 65:6
66:10 76:4,11,15
77:6,13,23 78:9

RESTRICTED CONFIDENTIAL

[issue - leaving]                                                                    Page 22

81:5 82:1,6 83:7
91:16 96:25 97:7
97:12,21 102:5,5
130:13 133:3
138:9 139:8 144:8
144:22 147:19
151:12 152:9,19
153:8 156:4,6
157:21 158:19
159:23 160:17,22
164:4,21 165:4
169:9 170:15
171:15 172:16,17
172:18 173:11
174:20 175:23
176:19 177:5,13
178:20 179:3,4,23
182:15 190:17
193:18 196:10
198:10 199:2
200:13 205:16
211:3,9,13 215:17
225:3 226:11
227:9,16 229:6
230:12,15 231:14
231:18 232:5,17
233:20 234:16
236:7 237:4 238:5
238:15,23 239:23
241:1,7
**issues**  14:15 44:15
44:22 158:11
**italics**  185:15
**items**  56:4
**ives**  6:21,22

**j**

**j**  2:16,22 5:12,19
**jamie**  1:14 11:8
52:7 144:13,16
150:2,10 152:17
219:13 242:3,17

**janow**  4:19
**january**  59:24
60:6 239:23
**jdavis**  2:12
**jeffrey**  7:3
**jersey**  1:1 2:9 5:21
6:10
**jgeoppinger**  7:3
**job**  39:23 66:6
67:8
**john**  2:12 3:17
155:25 156:2
185:6
**john.gisleson**  3:18
**jonathan**  4:19
**jonathan.janow**
4:19
**judge**  100:7,25
153:13,17
**judge's**  155:13
**judged**  114:7
115:11 116:20,22
117:3 146:9
**july**  72:2 167:24
168:6,11 171:1,1
173:22 174:15
176:10 177:4,4,11
177:12 240:20
**justified**  153:12
**justin**  7:8 11:6
95:10

**k**

**k**  3:17 4:20
**kanner**  2:20,21,22
2:23
**kapke**  5:7
**kara**  5:7
**kara.kapke**  5:8
**katz**  2:7
**kbi**  6:22

**keep**  120:10
176:20 238:5,10
239:13
**kid**  71:5
**killer**  184:20
185:4
**kind**  21:20 37:10
38:15 39:22 50:13
50:22 143:10
162:15 221:4,14
233:10
**kinds**  17:10 20:19
**kirstin**  6:22
**klinges**  3:6
**knepper**  4:14
**know**  17:18 19:13
21:13 23:8 26:21
29:11,14,25 31:3
33:22,23,24 34:9,9
35:3 40:5 41:13
42:11 44:19 48:10
48:15 60:4,15
62:8,11,18 63:2,4
63:15 64:2,3,7,9
64:21 67:2 78:18
85:23 86:3 93:15
111:19 114:21
123:21 127:3
129:4 131:6 134:6
138:21,22 146:11
158:5 163:24
181:7 192:18
195:3 200:4,15
210:1,9,11,23
216:7 224:2
227:22 229:3
238:17 239:12
**knowledge**  84:20
207:8
**known**  29:3
163:16 166:2

188:5 209:23
212:4 240:1
**knows**  125:3
126:11

**l**

**l.l.c.**  2:20
**label**  65:25 66:1
120:3
**laboratories**  6:5
**labs**  5:22
**lantech**  93:25 94:3
**lapses**  42:12,24
43:3,5
**largely**  16:24
19:19 20:6 24:8,9
24:14,18 25:1
45:17 50:5,7
211:4 226:7
**launch**  107:13,14
107:14 108:14
110:10
**law**  12:17 14:9,15
121:5 152:1
**law.com**  2:21,22
2:23
**lawfully**  152:5,5
**lawsuit**  127:18
**lawyer**  200:20
203:15
**lawyers**  28:8
29:12,16,22 30:3
30:14 31:4,14
**layne**  2:23 28:13
**lbresnahan**  5:12
**lchb.com**  2:17
**lead**  22:16 134:8
134:19,24
**learned**  193:22
**leave**  208:23
**leaving**  84:19
132:6 207:20

RESTRICTED CONFIDENTIAL

**[leaving - maintains]**                                    Page 23

208:12
**left** 134:7,18,23
**legal** 7:8 17:16
  45:4 105:12
  121:10 200:18
  201:4 203:3
  219:18 238:25
  243:23
**legally** 88:23
**legitimate** 105:5,7
  105:8,23 106:1,12
  107:1,23 108:5
  115:6 118:1
  121:15 124:8,18
  125:17 126:24
  130:9,11,19
  131:16 146:3,16
  148:2,9 152:4
  156:22 159:1
  161:2,4 162:4
  163:2 164:9,25
  170:5 181:10,12
  182:5,5,22 183:5
  186:25 187:11,13
  188:7,17 189:10
  189:16,17,22
  197:4 202:19
  209:24 210:17,18
  211:19,20 231:17
  232:1
**legitimating** 180:2
**legitimatized**
  181:23
**legitimize** 201:20
**letters** 93:23
**level** 109:21
  216:14
**levels** 235:22
  239:16
**lewis** 3:17

**lhilton** 2:23
**liability** 1:3 18:4,6
  18:8,11 19:16,19
  19:21 24:23 25:4
  25:13,16,22 31:20
  46:7 75:18 206:21
  206:22 207:5,10
  207:20 208:7
**license** 89:11
  242:17
**lieff** 2:16
**lieu** 11:21
**life** 200:21
**liked** 86:24 87:8
**limit** 217:14
  227:12 228:4
**limitations** 210:2
  210:5 211:25
  212:3
**limited** 5:22,22 6:6
  89:2 99:3 102:13
  103:12
**limiting** 76:16
**line** 9:4,7,10,13
  65:13 88:15
  163:14 174:2
  244:4,7,10,13,16
  244:19
**lines** 81:22
**list** 54:3 65:21
  66:4 70:12 73:18
  85:9 173:16
**listed** 69:18,20
  76:14 77:14 81:18
  84:2,14 89:24
  92:18,19 96:4
  98:7,20 101:25
  103:12,20 104:7,7
  104:8,21 217:5
**listen** 92:4

**listing** 72:24
**lists** 96:14
**literally** 189:2
**literature** 40:19
  126:6
**litigated** 32:1
**litigation** 1:3 11:5
  16:24 17:6,8,11
  19:10 20:23 26:25
**little** 14:3 20:18
  40:2 41:7 49:20
  57:10 60:21 63:16
  75:11 90:11
  162:22 181:5
  184:23 228:2
  230:20
**live** 157:18
**livenote** 1:15
**llc** 2:2 3:9,15 4:21
  5:5
**llp** 2:11,16 3:2,10
  3:17 4:2,8 5:7,11
  5:17 6:2,7,12,17
  6:21 7:2
**located** 216:7
**long** 21:18 22:5
  41:21 46:20 47:10
  50:10 116:21
  174:2
**longer** 64:21
**longstanding**
  35:17
**look** 49:17 56:25
  57:4 72:6 78:19
  78:19 83:13 103:5
  113:4 121:4
  149:14 209:22
  214:9
**looked** 62:9,16
  84:1 93:3,19,20

**looking** 36:20
  59:21 67:16 69:1
  81:23 91:10 97:18
  105:1 134:15
  209:18
**looks** 26:10 59:21
  59:23 60:5,11,16
  62:6 66:21 69:23
**losartan** 1:2 8:13
  243:4 244:1 245:1
**loss** 25:9 195:15
  197:1,23 198:6
  200:25 208:18
  225:14
**losses** 185:17
**lost** 101:17,19
  184:23
**lostless** 194:4
**lot** 22:6,6 36:2
  47:18,18,22 48:14
  71:2 84:6,9 85:24
  86:3 137:10
  183:14 230:11
  232:12 233:23,24
**lots** 46:17 51:6
  141:14,15
**loud** 54:20
**louis** 4:16
**louisiana** 2:24
**low** 163:7 229:6
  229:13
**lowering** 154:4
**luke** 5:12
**lunch** 112:10,24

**m**

**m** 1:11 2:5,7 4:3
  4:10 5:7 6:13 10:2
  140:2,2 242:6
**madam** 109:23
**maintains** 124:24

RESTRICTED CONFIDENTIAL

**[major - mckinnon]**                                                    Page 24

| | | | |
|---|---|---|---|
| **major**  40:4 | 64:23 65:8,9,11 | 146:8 148:7,10 | 69:13 70:12 73:9 |
| **majority**  71:16 | 81:24 82:7,16 | 174:8 185:2 186:6 | 75:5,6,13,15 81:5 |
| 73:5 228:25 | 84:7 88:16,22 | 187:2,15 191:3 | 83:8,23 84:15,19 |
| **makeup**  19:13 | 90:19 91:1,15 | 198:11 202:19 | 84:22 85:7,12 |
| **making**  85:3,19 | 92:23 93:19 105:5 | 204:23 209:25 | 111:9 130:12 |
| 201:1 233:25 | 106:16 107:9 | 210:8 211:20 | 135:4 136:10 |
| **manage**  192:16 | 108:9 110:7 | 222:24 | 137:7 138:14 |
| **managed**  198:3 | 116:16,25 126:3 | **marketed**  78:3,5 | 143:17 145:6 |
| **management** | 131:9 163:15 | **marketplace** | 148:13 151:3 |
| 193:5,6 | 171:5 197:15 | 184:19,24 185:3 | 152:20 160:25 |
| **manager**  238:22 | 198:20 201:1,21 | 190:2 194:24 | 163:14 182:6,25 |
| **managers**  236:15 | 202:2,8,12 203:1 | **markets**  14:9 | 183:6 186:18 |
| 236:16 239:8 | 203:12,18 210:20 | 22:23,24,25 36:1 | 187:21 198:13,14 |
| **managing**  71:4 | 239:24 240:12 | 38:6 39:1 114:4 | 200:13 203:25 |
| **mandates**  121:7 | 241:1 | 124:22 210:8 | 204:18 231:20 |
| **manipulation**  50:8 | **manufacturing** | **marking**  56:16 | 239:15 240:4,17 |
| 61:11 | 42:12,25 62:7,8,12 | 58:22 167:5 | **mattered**  196:11 |
| **manner**  12:2 | 81:25 82:6 91:5 | **massachusetts** | **matters**  16:24 |
| 109:8 116:18 | 110:14 113:16,17 | 6:14 | 17:16,17,19 19:1,6 |
| 128:14 228:20 | 116:2 121:24 | **match**  66:10 | 19:14,17 20:4,12 |
| **mansplaining** | 125:5 203:12 | **material**  93:8 | 20:19,22 21:8 |
| 162:21 234:22 | **march**  28:6 35:10 | 229:12 | 24:9,18,24,24 25:2 |
| **manufactured** | 35:15 39:9 60:5 | **materials**  15:20 | 25:23 27:9,14 |
| 76:4 77:24 78:10 | **mark**  30:24 43:15 | 16:8 23:8,22 | 29:15,17 30:9 |
| 113:16 115:24 | 52:23 74:15 | 46:11 54:4 83:15 | 34:1,5 117:14 |
| 121:23 191:15 | 166:25 | 83:20 84:13 85:11 | **matthew**  4:14 |
| 241:4 | **marked**  9:12 | 85:15,18,20,22 | **maz**  6:23 |
| **manufacturer** | 43:17 44:2 49:15 | 91:10 | **mazie**  2:7 |
| 108:20,25 110:13 | 52:25 53:5 56:20 | **math**  211:14 | **mazieslater.com** |
| 110:20 115:23 | 57:20 58:23 59:3 | **matt.knepper** | 2:8 |
| 117:19 119:9,23 | 74:15,17 167:2 | 4:15 | **mckesson**  4:12 |
| 119:25 120:1,11 | **market**  2:4 22:19 | **matter**  11:24 18:5 | **mckinnon**  8:9 |
| 123:7 124:13 | 36:4,7,8,9 37:19 | 19:15 21:11 27:18 | 16:14,16,23 17:4,8 |
| 125:1 126:10 | 40:3 63:13,25 | 27:19,24 28:11 | 17:11 18:14,18,24 |
| 159:2 171:22,24 | 64:4,9 65:3 66:5 | 29:9,13,17 31:2,5 | 19:18,25 20:5 |
| 171:25 190:12 | 86:4,6 89:12 | 31:16,19,20,24 | 27:21 29:11 34:23 |
| 206:21 209:1,5 | 107:13 108:15 | 32:1,2,4,9 33:9,11 | 44:14 48:8 51:8 |
| 212:14 218:16 | 113:14,20 116:18 | 34:25 35:2,5 45:8 | 51:11,18,21 52:16 |
| 239:17 | 117:16 120:17 | 45:17,22 46:7 | 59:6 64:17 70:9 |
| **manufacturers** | 126:1,11 131:14 | 48:5,13,15,18 60:6 | 70:14,16 |
| 15:11 36:3 64:6 | 132:14 145:25 | 62:25 64:7 66:11 | |

RESTRICTED CONFIDENTIAL

[mdl - misbranded]                                                    Page 25

**mdl** 1:2
**mean** 18:13 19:2
  23:12 24:12 25:6
  26:11 29:19 30:1
  36:7,18 41:13
  47:24 51:3,4
  64:11,15,20 67:2
  70:24,24 73:20
  76:11 78:18 82:2
  85:1,23 87:7
  89:13 92:16 105:8
  105:10 111:4
  113:10,25 114:6
  115:1,2,3,5 117:22
  119:20 120:8,14
  120:16 121:13,19
  122:1,2 123:22
  126:5 134:1,11
  135:19 137:13
  141:8,14 142:1
  143:6,13 145:5
  157:12,17 158:6
  158:14 162:13,14
  165:16 168:5,22
  173:25 176:23
  177:2 185:10,12
  193:4,23 198:18
  203:17 204:4
  207:11 210:23
  214:5,5,24,25
  215:1 221:8,9,11
  232:23 234:17
  236:11 237:20
  238:11 239:13
**meaning** 117:22
**meaningless**
  148:18
**means** 63:15 97:3
  105:13
**meant** 62:11 64:3
  64:8 184:1

**measure** 207:3,19
  207:21 208:7
**media** 11:3 74:7
  74:10 112:22
  113:1 180:10,14
  206:12 235:14,18
**medical** 136:5
  154:4 218:3
  225:13
**medically** 154:7
**medicare** 217:22
  217:23 218:1
  220:23 221:6,6,19
  221:24 222:4,8,12
  222:13,25 223:1,6
  223:10,17 224:14
  225:25 227:1
  228:15
**medication** 172:25
  175:13 190:20
  193:2,12,20 194:8
**medications** 13:23
  175:19 192:7
**medicine** 169:10
  169:18 174:17
  175:21,22
**meet** 84:8,8
  105:11,14,19
  107:12 108:13
  113:15,20 115:7
  116:25 118:13
  119:10,12,16
  121:9 122:23
  123:4,8 125:4
  126:2 130:20,23
  145:25 146:4,6
  148:10 149:4,5
  156:20 161:13
  163:4 164:10
  165:1,5 186:20
  187:22 188:8

  190:4,12 204:22
**meeting** 28:10
  29:4 35:9 110:9
  114:16 119:19,22
  119:23 120:13,17
  120:19 123:9
  125:8 126:23
  131:11,17 146:20
  152:21 159:3
  182:19
**meetings** 28:1
**meets** 121:24
  123:7 146:13,15
  187:12
**megan** 6:23
**member** 134:1
  214:5 215:16,25
  236:16
**member's** 213:21
  214:2
**members** 21:22
  54:8 201:21 214:6
  214:16,18
**menacing** 184:18
  184:19 185:2,3
**mention** 68:17
  86:22
**mentioned** 48:4
  51:5 62:21 216:23
  229:19
**merely** 111:16
**meridian** 5:8
**messages** 180:18
**met** 23:20 28:9,10
  113:12 124:13
  130:8 217:3
**methodology**
  164:2
**methods** 211:21
  211:23

**microbe** 184:20
  185:4
**microphone** 75:19
  152:13
**mid** 159:16 160:11
**middle** 50:23
  55:12,12 99:21,23
  105:2 142:17
**mike** 61:2,3,6,7,8
**military** 218:7,8,9
**mind** 25:25 206:6
**minimized** 202:15
**minimum** 115:25
  119:12,16 120:18
  185:8 190:11
  241:5
**minute** 74:1,2
  180:8 181:19,19
**minutes** 74:4
  155:10,12 235:7
**misbranded** 76:8
  78:16,23 79:14
  95:25 96:13,21
  97:1,2,13,13,25
  98:5,14,25 99:3
  101:22,22 102:1
  102:11,12 104:15
  104:19 105:3
  111:12 114:24
  118:15 122:12
  124:9,20 130:14
  130:18 131:7,15
  132:3 133:4
  138:10 139:8
  152:3 165:7 170:1
  171:20 173:19
  179:24 182:16,16
  183:4,19 184:15
  185:16,19,21
  186:3 187:2,15
  194:14,23 197:12

197:13 199:9,22
200:12 202:13
231:17 234:8
**misbranding**
79:13 80:21 81:4
84:11 96:15 97:19
98:2,11,15,21
102:4,18,19,20
201:2
**mischaracterizat...**
51:9,13 77:22
96:24 188:13
**mischaracterized**
116:11
**mischaracterizes**
189:13
**mischaracterizing**
50:19 188:3
**misconduct** 204:1
**mishear** 213:17
**misheard** 213:13
**misremembering**
28:16,19,20,21
**missouri** 4:16
**misunderstanding**
151:21,22
**mitigate** 191:25
**mitigation** 89:2
**mix** 18:10,24
19:22 222:3
**mixing** 233:10
**modalities** 199:17
**model** 182:10
183:20
**moment** 139:6,19
139:19,22,23,24
140:1,2 147:23
149:11,12 151:2
153:3 160:25
161:13 162:2
163:1,13 194:18

195:11 196:25
198:5 199:18
203:23,24 225:7
225:18
**money** 34:15
136:18,24 144:6
144:20 145:6
**monroe** 6:24
**month** 28:3,4
209:5,9 212:14
214:18 215:21
216:9 218:17
**months** 47:16,17
47:23,23 71:6
**morgan** 3:17
**morganlewis.com**
3:18,19
**moring** 5:11
**morning** 12:16
13:24 147:13
**morris** 3:2,10
12:17
**moskowitz** 1:14
11:8 80:7 99:24
101:12 242:3,17
**mother** 71:4,17,24
73:15 135:11
223:17 225:11
229:2
**move** 34:13 80:9
128:23
**moving** 201:11,13
206:2,5
**mulberry** 6:9
**multiple** 64:6
93:24 153:12
165:25 166:14
**murtha** 5:17
**mute** 152:13
**muted** 142:21

**mylan** 6:5,6 42:1
42:15 78:2 93:24
**mystery** 51:15

**n**

**n** 2:1 3:1,18 4:1
5:1 6:1 7:1 11:15
140:2
**name** 12:16,22
33:22 78:1,4,5
93:15 216:9
**name's** 11:6
**names** 33:23 60:24
217:20
**national** 15:25
38:1 65:9 66:11
209:4,7 217:15
**nature** 36:12 43:4
**ndc** 65:22,23 66:3
66:8,10
**ndcs** 65:14,17,18
65:19
**ndea** 40:9,16
41:11,17 76:17
77:9 239:17
**ndma** 40:8,16
41:11,17 42:4,6,7
42:8 76:17 77:9
177:8,13 239:16
**nearly** 31:9 57:7
**necessary** 204:11
245:6
**need** 13:20 33:22
33:23 43:14 54:17
54:18 79:23 84:8
95:2 109:14 125:9
146:6 157:23,24
158:6 202:25
**needed** 190:19
**needs** 66:6 75:11
111:19 115:23
128:3 182:8

219:12 229:25
**neither** 105:3
242:9
**never** 154:10,13
186:3
**new** 1:1 2:9,18,18
2:24 5:21 6:10,19
6:19 73:14,16
166:24 195:8
**newark** 6:10
**nitrosamines** 39:6
39:7,11,25 43:6
240:1,7,18 241:7
**noise** 147:3
**non** 113:9,10
152:2 172:9,10
176:24 191:16,24
201:18,18 223:23
**noncompliance**
201:21 202:3,9
**noncontroversial**
80:8
**nonzero** 204:12,16
**normal** 20:24
**norris** 4:9
**north** 5:4
**norton** 4:8
**nortonrosefulbri...**
4:9,10
**notably** 15:10
171:21
**notary** 242:4
245:13,19
**note** 218:14
243:10
**noted** 11:10 110:3
245:7
**notes** 242:8
**notice** 8:4,7 52:24
56:18

RESTRICTED CONFIDENTIAL

**notices** 92:22
**notion** 124:18
  125:16 126:15
**novartis** 172:1
  191:15 199:12
**november** 45:23
  47:3
**number** 8:2 11:3
  15:22 20:4 37:12
  50:19 54:3 74:7
  74:10 88:25
  112:22 113:1
  170:25 180:14
  206:12 235:14,18
**numbers** 51:25
**nw** 3:13 5:14
**ny** 243:15

**o**

**o** 11:15 140:2
**o'clock** 241:10,14
  241:16
**o'reilly** 6:7
**oath** 11:22
**object** 32:7 45:3
  69:15 70:19 75:20
  77:10,20 81:9,13
  83:4 84:24 89:20
  90:20 92:12 94:9
  96:5 97:9,22
  98:22 102:21
  103:17 104:5,9
  106:2,13 107:2,5
  107:24 108:6,22
  110:22 114:13
  115:19 116:7,14
  117:11 119:3
  121:2 122:25
  125:19 126:17
  127:8 130:3 131:1
  131:23 132:9
  137:20 138:3,19

139:3,16 140:9
143:2,14 144:24
145:17 147:21
148:20 149:20,23
150:23 151:18
153:9 156:8 157:6
157:6 158:1,21
163:11,21 164:5
164:16 165:13,22
169:20 170:17
171:12,16 172:20
173:13 176:2,21
177:17,17 178:11
181:13 182:23
186:16 192:8,14
193:3,13,21 194:9
195:22 196:4,13
200:3,17 202:4
203:2 205:11
207:24 215:18
216:20 219:17,17
220:17 222:17
223:13 224:5,15
226:4 227:3
228:18 230:19
231:5 232:8,20
233:5,21 234:13
237:6 238:7
239:18 240:8,21
**objected** 31:8
**objection** 13:12
  32:17 34:18 45:13
  53:19 55:9,17
  61:20 82:10,24
  88:20 96:22 102:7
  110:4 111:24
  128:8,8,12 129:19
  129:20 134:9,25
  135:10,17 136:8
  137:5 140:16,23
  141:5,24 142:9

147:10 154:25
155:16,24 158:12
160:2,19 161:9,23
166:11 174:23
178:23 179:11,17
181:3 184:8
188:21 189:12
190:21 198:16
199:5 201:3
203:14,22 214:12
220:3,10 238:16
238:24
**objections** 8:6
  12:1,3,6 13:10
  56:17
**observation** 34:4
**obtain** 52:4 210:12
  210:14
**obtained** 208:16
**obviously** 19:7
  24:13 148:23
**occur** 98:11 230:5
**occurred** 42:25
  88:6 97:7 154:13
  194:13 196:25
  197:25 227:15
**occurrence** 40:8
  40:16 41:11,16,18
**occurs** 195:4,5,15
  196:21 197:19
  218:15 224:25
  225:18,21
**october** 72:19
**offer** 220:25
  221:20 222:9
  224:14 225:25
**offered** 80:8
**offering** 228:15
**offerings** 222:14
**office** 22:3 218:3

**oh** 16:8 73:2
  159:17 201:14
  210:4 218:17
**ohio** 7:4
**oils** 185:5
**okay** 12:12 13:1
  13:12,18,22 14:2
  16:22 18:3,16,20
  19:18 24:2 26:4
  26:13 30:2 35:7
  37:10,16 40:10
  43:20,25 44:5
  47:16 50:18 51:5
  51:14,20 56:8,9
  58:9 59:14 60:4
  60:22 61:5 63:12
  63:23 67:9,20
  74:4,23 78:19,21
  81:21 82:21 84:17
  90:14 92:6 93:2
  93:16 94:11 95:1
  95:9,19,23 98:24
  106:24 107:20
  108:24 112:7
  113:7 116:15
  117:13 120:5
  121:4 122:6 130:5
  132:23 134:15
  141:20 142:12,19
  143:15 145:19
  147:4,4,16 148:22
  150:1,5 151:20
  159:17 161:25
  162:13,24 166:13
  168:13,14,25
  169:1 176:1,18
  177:3,8,9,10 180:8
  181:9 189:14
  191:7 196:2,8
  197:6,18 201:14
  208:21 213:17

RESTRICTED CONFIDENTIAL

[okay - parts]                                                          Page 28

217:10 221:25
223:14 231:10
234:20 235:11
236:13
**ones** 77:14 83:6
84:14 87:8 179:22
226:12
**opinion** 32:5,5
45:5 75:25 138:22
138:23 151:9
153:3,7,20 154:21
154:23 155:3,3,13
155:20 156:17,18
178:17,22 179:16
179:20 183:9
194:2 200:19
201:25
**opinions** 65:5 75:3
75:18,19,21 83:21
84:1,19,22 85:5
86:11 87:6 111:7
151:2 152:20
160:25 163:14
203:24
**opposed** 223:18
**option** 169:12
173:3 174:19
175:16
**options** 192:22
**optumrx** 6:20
**orange** 190:6
**oranges** 233:11
**order** 56:5 59:23
66:3 84:8 106:18
115:21 123:6
182:7 190:8
227:24 228:2
231:19
**organization** 15:8
21:19,23 22:1
32:24

**orleans** 2:24
**osfeldg** 4:4
**ostfeld** 4:4
**outcome** 242:11
**outcomes** 140:8,15
140:20,21
**outlined** 79:7,15
79:15,17 81:17
82:14 110:15
111:13
**outlines** 27:23
**outside** 18:18 31:2
52:15 102:8
106:13 134:9,25
137:5 138:4,20
139:16 140:10
141:25 148:17
150:23 157:18
158:2 163:11
165:14,23 193:14
200:18 234:14
238:7
**overlapped** 38:16
**overlea** 12:24
**owned** 42:22
**oxford** 3:19 6:4

**p**

**p** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1 7:1,1
11:15
**p.m.** 112:9 241:16
**pa** 12:25
**packet** 72:7,12
**page** 8:2 9:1,4,7,10
9:13 10:4,5,7,8
53:15,15 57:1,9
59:12,22 63:7,19
66:16 95:17
104:25 151:25
168:8,9,14,17
169:1 184:15

217:10 235:25,25
244:4,7,10,13,16
244:19
**pages** 57:3 60:17
68:6,7 168:3,4,4
168:10,11 227:13
**paid** 105:6 127:6,9
127:9,16 130:1,24
181:12 182:4,21
193:19 196:8
197:22 198:12,14
199:2 204:9 205:9
205:15,20,23
207:23 208:8
209:8 211:19
212:10 214:10,23
215:16 217:17,18
218:21 224:8,13
225:1 226:12,25
236:12
**pandemic** 26:13
26:18,25 28:4
60:3
**paper** 90:10
**paragraph** 44:13
75:1 76:2 77:6
78:13,20,21 79:8
80:22,23 81:19
88:8 95:14,15,17
95:18,21,24 96:13
96:13 97:1,16,18
98:20 99:1 101:25
103:6,6,10,10
104:16,24 105:2
113:4,8 114:21,23
121:5 152:1
168:21 184:11,12
201:10,15,17
206:16,18 217:11
217:12 220:22
222:1 236:1

**paragraphs** 79:16
79:19
**parameters**
209:18
**parkway** 2:8
**part** 15:2,17 17:1
19:8 24:22 34:3
36:22 39:22 40:1
40:2 41:20 65:1
146:16 173:17
177:5 178:2 187:5
187:19 202:22
204:19,20 217:23
218:1 219:2,13,13
220:23 221:5,6,7,8
221:13,19,24,25
222:1,3,4,8,12,13
222:14 223:1,4,6
223:10,21 224:2
224:14,19 225:25
226:13 227:1,13
228:15 229:2
**partial** 142:9
**participated** 68:19
**participating**
11:17 68:18
**particular** 17:10
22:9 36:4,6,8 40:8
41:12,15 61:6
62:16 79:9 89:16
96:3,20 97:5,6,15
98:2 102:17,17
120:7 184:6 213:7
213:10,21 214:2
214:10,22 215:16
**particularly** 20:23
22:23 43:1 210:22
**parties** 11:25
12:18 29:23 33:24
**parts** 201:8 217:13
217:23

RESTRICTED CONFIDENTIAL

**[party - pharma]**                                                                    Page 29

party   132:25
  194:13 204:6
  205:19 216:12,15
  216:16 222:2,12
  222:20 224:13
  225:25 227:6
  228:15 229:9,15
  229:18 230:18
  231:21 232:23
  233:2,13,15,18
  234:3,25 236:2,6
  236:11,14,20,23
  236:24 237:2,13
  237:18,21,24
  238:4,14,21 239:5
  239:7 242:10
patent   18:11 19:3
  19:4,4,4,10 38:25
patents   18:25 19:7
patient   36:19
  137:4 141:23
  143:1 144:6,9,20
  144:23 145:12
  146:12 177:15
  213:7 229:24,25
patient's   141:22
  142:25
patients   118:11
  139:13 149:1
  165:11 166:9
  169:8,17 172:7
  190:16 213:2,3
  218:3 227:17
patterns   37:25
pause   55:16
pay   105:15,18,24
  105:25 106:7
  192:13 193:2
  212:10 223:17
  224:20,22 225:12
  225:12 229:4,4,15

229:25 230:8
  237:24 239:6
payers   75:5
paying   223:19
  229:20 236:7
payment   205:9
  209:5,7 211:16
  212:9,13 237:22
payments   214:15
  217:16 225:5,11
  225:17 226:8,14
  226:17,17 227:7
  227:11 228:14
  229:9,11,16
payor   209:6,9
  213:10,25 214:7
  214:17 215:21
  216:1,1,7,11
  217:11,13 225:2
  229:15 232:23
  233:2,13,15,18
  236:24,24 237:2
  238:4,14,21
payor's   216:8,8
payors   105:6,15
  105:17 106:7
  111:9 131:6
  132:25 194:13
  195:2 204:7
  205:19,19 214:17
  216:4,13,15,16
  219:7,16 220:1
  222:2,12,20
  224:13 225:25
  227:6 228:15
  229:9,19 230:18
  231:21 234:3,25
  236:2,6,12,15,18
  236:20 237:9,12
  237:13,19,24
  239:5,7

pays   37:22 216:17
  216:18,18
pbm   236:18,20
  237:9,10,11,12
pbms   236:21
pc   4:18 5:2
penalty   11:24
pending   29:16,20
  29:22 30:1 31:8
  101:8 112:3 128:6
  129:22 206:5
  215:3
pennsylvania   1:13
  2:4 3:7,20 5:14
  6:4
people   37:8,11,12
  39:16 48:6,8 50:4
  62:24 63:1,3
  86:23 122:21
  145:6 152:23,25
  161:20 162:2
  165:19 183:17,17
  194:1,16 195:6
  197:1,21 198:1
  199:11,16,21
  200:11 211:6
  218:6 222:22,23
  223:22,24
perceived   164:3
  164:13 232:16
percent   210:16
  211:17 223:10
percentage   18:10
performed   85:6
period   17:22
  35:15 43:9 45:16
  78:6 100:9,20
  128:25 131:8
  133:3,5 171:21
  194:2,16 228:5
  239:23 240:6

perjury   11:24
permit   32:17
  100:8 154:25
  155:17,24 180:22
  213:21
permitted   34:4
  109:7 118:24,25
permitting   118:6
  125:5
persist   99:20
  109:17 129:14
person   11:22
  28:24 61:1,15
  62:4 137:16
  161:22,22
perspective   97:25
  101:23 110:12
  121:21 124:8
  125:24 130:6
  131:13 138:7
  145:20 152:18
  156:13,23 161:12
  169:23 185:22
  190:3 199:7
  200:10 204:5
persuasive   93:10
pertinent   194:8
pervasive   81:25
  82:3,22,23 83:2
  90:4,23 94:6
perverse   201:19
  204:12
ph.d   244:2,24
  245:2,4,12
ph.d.   1:11 2:5 8:8
  10:2 40:24 41:5
  56:19 185:6 242:6
  243:5
ph.d.s   50:2
pharma   3:21

RESTRICTED CONFIDENTIAL

[pharmaceutical - practices]                                            Page 30

**pharmaceutical**
3:8,8,14,15 15:9
15:11 16:11,25
17:1,13 20:7,9
21:20 22:12,15,22
27:5,9 32:9,25
33:3 35:21 39:21
40:9,16 41:12,17
41:20 42:13 54:8
84:5 88:24 98:1
105:7,13 106:20
107:8,10 108:11
108:25 110:7
116:16 125:1
126:9 133:12
148:23 163:3
186:23 187:9
188:4 191:16,23
191:24 197:14
200:9 201:22
202:11,21 204:17
209:24 210:6,18
211:20 235:22
**pharmaceuticals**
4:6 6:6,11,15 22:4
42:3 168:23
**pharmacies**
105:13,24 106:8
108:13 118:11
119:1 125:2
210:21 211:1,8
237:14,24 239:6
**pharmacist**
169:11 173:1
174:11,18
**pharmacists** 174:4
176:13 177:22,25
179:2
**pharmacy** 6:25
33:2,2 108:9
118:12 124:12

190:10 204:9
225:3 229:4,20,23
229:23 230:1,3,6
236:15,16 237:22
238:22 239:8
**phase** 227:19
228:3 229:14
**philadelphia** 2:4
3:7 73:14
**phone** 100:11
153:20 154:17
155:8
**phrase** 62:12
75:14 76:15 77:5
113:9 120:23
127:15 143:12
172:18
**phrases** 232:12
**physically** 11:18
**physician** 157:18
157:20
**physicians** 118:12
174:4 176:12
177:22,25 179:2
192:17,23
**pick** 202:17
**picked** 185:9
**picture** 126:21
**pietragallo** 6:2
**pietragallo.com**
6:3
**pills** 175:24
**pittsburgh** 3:20
6:4
**pizzi** 6:7
**place** 210:13 242:7
**places** 74:25
**plaintiff** 87:12,14
87:19
**plaintiff's** 13:9
24:18,20,25 25:1

25:14 52:4,16
**plaintiffs** 2:10,14
2:19,25 8:6 24:4
25:20 26:2 28:1,9
29:2,7,8,13,17,23
30:4,14 31:4
33:12,25 34:16
35:9 44:6,13
56:17 59:16 64:13
64:18 72:22 76:3
87:17 147:8,17
180:18 181:1
206:19
**plan** 73:20 217:19
217:20 220:23
221:7,19,25 222:4
222:8 223:1,16
224:2
**plans** 217:24
218:11,11,12,13
221:1,22 222:12
222:13,21,24
223:10,12,21,23
224:14,20 225:6
225:25 227:2
228:15
**plant** 42:1,16,22
**plaza** 4:15
**please** 11:12 12:3
12:13 13:16 31:17
34:13 44:4 56:3
56:11 57:1 58:13
71:9 86:2 95:9
96:10 99:24
112:17 123:17
125:21 148:6
150:12 153:22
160:13,13 203:6
206:6 215:13
228:23 232:12,24
234:22 235:8

**plenty** 126:5,25
**plus** 113:18
116:19 132:13
**pocket** 185:9
202:17 224:22
229:25
**point** 135:22
141:13 154:1
169:5,7,8 189:9
190:6 198:9 205:3
207:23 208:22,25
217:6 224:25
225:19,22 229:19
229:21 230:1
235:7
**pointing** 111:16
**points** 169:2
**policy** 14:9,13
39:22 183:6
202:20 204:16,20
**portion** 30:25
**posited** 30:17
**position** 14:6
16:14 162:6 180:6
186:4 187:8,14
188:13 190:14
202:10,12,21
204:17
**positive** 140:7,14
140:20
**possibilities**
202:15
**possibility** 185:19
188:18
**possible** 193:17,23
**potential** 148:1
149:10 215:24
**practices** 21:12
88:17,19 89:1,4,14
89:17,18 90:19
105:14 106:17

RESTRICTED CONFIDENTIAL

**[practices - production]**                                                    Page 31

113:17,18
**preceding** 103:6
**precipitously**
192:20
**predicated** 146:20
146:21 148:1
157:12,15 158:25
161:2 186:21
230:7
**preliminary** 72:24
73:18
**premiums** 223:18
223:19,21,24
224:8,20 229:4
**prepare** 69:1
83:16
**prepared** 83:17
**preparing** 73:10
**prescribe** 213:18
**prescribed** 158:8
158:10 213:4
**prescribing**
157:19,20
**prescription** 105:2
111:11 113:11
114:23 115:22
116:16,23 117:17
118:8,25 119:7
121:8 122:20
124:25 125:10
126:3 133:19
136:2 141:8,17,19
141:21 142:24
145:22 152:3
156:15 157:13,15
158:16,24 161:15
163:2 178:20
190:5,8 198:3
202:14 209:24
210:17,20 220:25
221:20 222:9

223:4 224:19,23
226:3,9 229:1,5,23
231:18 235:1
236:17 237:22
238:2
**prescriptions** 38:1
38:2 221:15
**present** 7:7 11:18
30:21 54:7 154:12
**presentations** 54:5
**presently** 31:12
**president** 39:12
**press** 8:11 167:6
**pressure** 134:8,18
134:24 135:4,6
154:5 174:7 175:4
191:2,8 192:1
193:25 200:8
**presumable**
214:16
**presumes** 164:6,8
**presumption**
180:2
**pretty** 48:1,9
62:15 216:2,4
**prevent** 110:20
134:21 135:21
137:12 192:2
**prevention** 136:3
136:17,22 137:11
**previous** 26:16
28:4 189:13
209:21 231:12
**previously** 30:18
158:13 161:10,24
166:12 220:4
**price** 15:12 126:21
126:24 127:1,6,16
127:16 130:1,10
130:21,24 131:18
181:11 182:3,7,19

182:21 183:1,7,9
183:12,21,24
186:21 187:23
188:19 189:3,18
204:9 207:22
208:8 225:1
**priced** 22:15
**prices** 22:17 39:3
226:20
**pricing** 16:1 17:13
22:14 23:14 36:13
37:5,18 38:19
**primary** 136:17
136:22 137:11
**princeton** 5:21
**principals** 27:21
**prinston** 3:8,14
175:11
**print** 121:22
**prior** 29:8,12 35:8
35:14 39:9 42:7
**private** 65:25,25
220:24 221:2,20
221:22 222:2,9,13
223:20 224:13
**privilege** 53:21
155:17 180:21
**probable** 163:8,10
**probably** 26:21
38:20 40:20 168:1
**problem** 13:21
212:22 215:4
233:7
**proceed** 12:13
94:21 101:4
111:25
**process** 15:15
45:24 69:19 73:24
121:20,23,24
**produce** 64:18
69:17 70:16

**produced** 45:7
64:10,12 65:1
66:4,12 70:10
86:22 88:4 108:20
116:18 117:18
118:2,14 119:11
120:18 121:8
190:10
**producing** 188:6
**product** 19:19,21
25:10 36:1 37:19
38:25 41:22,23
53:21 89:3 103:24
104:12,15 105:10
105:16,22,25
106:12 107:1,9,23
108:4,5 110:21
113:9,10,19 114:3
114:6 116:22
118:18,21 120:2
123:4,7 124:9,12
124:19,22 125:9
126:22 145:15,23
146:11,13,14,18
148:2,2,5 152:21
157:16 160:24
163:3 173:6 178:5
180:21 182:22
187:12,13 197:13
198:21 204:9
205:20,23 208:16
209:5,9 210:9,18
212:13 213:24
214:19 215:21
216:9 218:16
222:3 230:6,9
234:6,7
**product's** 120:3,3
147:25
**production** 9:6
24:10 64:14

RESTRICTED CONFIDENTIAL

**[production - purity]**                                                    Page 32

| | | | |
|---|---|---|---|
| 123:10 | 148:8,9,24 149:4 | **professional** 14:4 | 64:13 97:16 98:16 |
| **products** 1:3 | 149:11 151:12 | **professor** 14:8 | 138:12,18 144:9 |
| 16:25 18:4,11 | 152:4,9,21,24 | 26:7 | 144:23 148:12 |
| 19:16 21:24 22:8 | 156:4,6,12,17,19 | **professors** 23:25 | 155:4 164:14 |
| 22:10,12,15 23:14 | 156:21,22,23 | 23:25 | 221:2,22 |
| 23:15 24:10,11,19 | 157:22 159:1 | **program** 217:22 | **provides** 85:8 |
| 24:23,23 25:4,12 | 160:17,23 161:13 | 218:7,8,10 | 146:18 169:11 |
| 25:16,22 31:19 | 162:3,4 163:4,16 | **programs** 217:22 | **providing** 44:18 |
| 35:18,21 36:16 | 164:7,9,21 165:1,4 | 218:4,5,6 | 75:18,18,21 97:1 |
| 37:7,9,20,21,22,24 | 165:4 166:1,15 | **progressing** | 170:15 |
| 37:25 38:8,10,11 | 169:24,25 170:7,8 | 135:22 | **province** 55:1 |
| 38:19,24 39:4 | 170:12 171:5,6,19 | **project** 61:7,19 | **public** 14:9 171:6 |
| 40:9,17 41:19,25 | 172:5,8,10,13 | 62:5 63:5 | 184:17 223:20 |
| 41:25 42:1,4,8,13 | 173:10,12,17,18 | **projections** 210:13 | 242:4 245:19 |
| 42:14,16 62:14,17 | 174:6,12,12,20 | **promotion** 36:13 | **publications** 54:5 |
| 64:7,23 65:7,10,21 | 175:5,8,11,11,23 | **proof** 118:4,4 | **published** 23:14 |
| 65:22,23,24 66:12 | 176:7,7,14,15,18 | **properly** 198:21 | 85:10 126:6 |
| 76:4,12,13,16,17 | 176:19,24 177:2,6 | **property** 19:5,6 | **publishes** 173:16 |
| 77:6,8,13,19,23,24 | 177:13,23 178:1,2 | **prospective** 226:7 | **puerto** 42:23 |
| 78:3,10,15,23 81:5 | 178:5,20 179:3,21 | **prospectively** | **pull** 43:10,15 |
| 82:1,6 84:11 | 182:11,12,15,16 | 130:7 | 52:22 56:10 57:22 |
| 85:25 86:4,6 | 183:3,6,18,19 | **protect** 80:5 | 58:13 74:13 |
| 88:23 89:12 91:6 | 184:19,24 185:4,7 | 128:13 184:17 | **punish** 203:18 |
| 91:16 93:19 96:12 | 185:17,18,21 | **protected** 53:20 | **punishment** |
| 96:25 97:8,12,21 | 186:1,2,6 187:1,15 | **protecting** 109:22 | 203:11 |
| 98:14 101:22 | 188:6,7,9 189:16 | 184:14 | **punitive** 200:16 |
| 102:5,6,11 104:18 | 190:1,3 191:2,16 | **prove** 117:21 | **purchase** 197:23 |
| 105:5,7,9,14,18 | 191:17,22,24 | **provide** 13:6 17:5 | 199:25 200:1 |
| 106:7,8,18 107:11 | 192:19 193:19 | 21:6,10 30:12,23 | 205:10 209:12,14 |
| 108:10,11,17,19 | 194:15,24 197:12 | 32:22 44:14,21 | 209:15,19 224:18 |
| 110:8,14 113:12 | 197:20,20,24 | 50:25 51:18,23 | 227:9 |
| 113:15 115:7,7,24 | 198:2 199:9,22 | 52:3,16 54:2 | **purchased** 132:19 |
| 116:5,11,17 117:9 | 200:13 201:19 | 64:18 73:17 75:2 | 132:24 133:1 |
| 117:15,23,24,25 | 202:17,19 204:5 | 89:5,9 92:10,17 | 197:22 199:21 |
| 118:7,12 121:15 | 204:18,21 205:16 | 99:5 103:7 111:7 | 210:3 211:18,18 |
| 124:10 125:2 | 208:17 210:7,18 | 137:4 141:23 | 213:2,4 |
| 126:8 130:8,13 | 210:22 211:3,9 | 143:1,10 209:17 | **purchases** 226:3 |
| 131:6,11,14 | 212:10 213:24 | 223:10 228:22 | **purchasing** 185:18 |
| 132:13 138:9,12 | 226:11 227:9,15 | 236:21 | **purity** 121:11 |
| 138:18 139:7 | 227:21 231:19 | **provided** 32:6 | 122:1,4 |
| 144:8,22 146:3,4 | 240:2 241:2,4 | 54:1 56:7 59:7 | |

[purpose - receive]                                                          Page 33

**purpose**  67:11
    154:4,8
**purposes**  114:14
    138:14 143:21
    149:2
**purview**  210:25
**put**  45:20 48:13,24
    71:21 74:13 90:14
    95:5 105:23
    119:17 154:6
    157:3 161:8,21
    173:24 184:9
    202:6 203:1
**putting**  45:24
    120:7

**q**

**qualify**  22:11
    109:13
**quality**  42:12,25
    43:3 88:16,19,25
    89:14,17,18 90:4
    90:18 121:11,18
    121:20,23 124:24
    125:5 152:2 173:6
    201:18
**quantify**  26:9
**quantitative**  50:4
**quarter**  26:8
**question**  13:12,15
    16:19 30:18 31:7
    31:8,17 32:18
    33:15,18 40:11,11
    41:6,9 47:9 52:7,9
    53:19 54:17,21,25
    55:7,18,21 56:5
    57:2 60:14 62:2
    63:24 76:1 79:3
    81:6 84:17 86:17
    92:13 94:12,15
    96:6,10 97:5
    98:18 99:19,25

101:8,11 106:6
109:2,2,6,6,12,20
109:24 110:1
112:3,6 116:11
120:9 123:17
124:4,5 126:14,14
127:22,24 128:6
128:19,21,24
129:3,3,15,18,23
132:21 138:6
141:18 142:8,23
143:7 144:10,11
144:14,18 146:25
147:13 150:6,8
151:10 159:14,15
160:11,14,21
161:18,19 162:1
163:19,24 166:6
169:4,6 179:6,10
179:12 181:15
187:19 196:18
197:10 201:8,12
203:6 205:13
206:5 213:16,16
215:2,13 219:11
222:6,11 228:11
228:12 230:22
231:7,9,11,12
232:11 233:22
235:5 236:3,10
237:1 238:10
239:3,12 240:17
**questioning**  174:2
**questions**  9:12
    12:19 13:5 20:22
    34:5 74:24 80:14
    92:4,6 100:18,19
    100:22 101:2
    169:13
**questrom**  14:11

**queue**  95:9
**quite**  19:2 85:2
    109:21 182:12
    183:14 201:7
    203:6,17 222:5

**r**

**r**  2:1,12 3:1 4:1 5:1
    6:1 7:1 11:15
    242:1 244:3,3
**rachel**  2:16
**radam's**  184:20
    185:4
**raised**  129:1
**ranbaxy**  41:25
    42:15
**raspanti**  6:2
**rate**  49:15,20
    60:11,13,16,19
**rationale**  184:13
**reach**  81:1 84:18
    84:21
**reached**  75:25
**reaching**  65:4,4
    83:20 84:1 86:11
    87:6 238:21
**read**  10:8 39:17
    44:4 52:9 54:19
    54:21 87:11,18,21
    87:24,24 88:5
    99:24 101:8,14
    110:1 144:13,16
    144:18,18 153:20
    153:22 155:13
    169:12,14 173:15
    201:23 219:14
    243:9 245:5
**reading**  154:15,16
    154:20,21
**reaffirms**  170:6
**real**  112:8

**reality**  100:17
**realized**  160:17
**really**  17:22 54:17
    71:1,10,11 73:15
    110:10 122:7
    158:10 198:18
    211:3 226:18
    227:16 229:11
    232:11 236:25
    239:11
**reason**  30:17
    33:15 55:19 59:8
    98:20 102:17
    115:18 218:21
    243:11 244:6,9,12
    244:15,18,21
**reasons**  95:25 96:3
    96:20 97:7,19
    98:11 99:2 103:7
    103:10
**reassess**  235:12
**rebazan**  3:11
**rebecca**  3:11
**recall**  28:8 29:10
    167:22 168:18
    173:17 174:15,16
    178:3
**recalled**  65:14,18
    65:21 76:6,7
    77:19 175:6,8,19
    176:24 177:3
    178:1,9,10 192:19
    194:15 199:13,23
**recalls**  8:13
    165:11 166:10
    167:8 170:25
    171:8 175:10
    182:13
**receipt**  243:18
**receive**  53:10
    155:7 223:21,23

RESTRICTED CONFIDENTIAL

**[receive - report]**                                                      Page 34

224:3 225:11,13
226:1 227:7 229:9
230:2,3,13 233:2
233:18 234:4,6
**received** 145:13
159:24,24 160:5
160:22,23 164:14
180:17 232:4,16
**receiving** 232:23
**receptor** 8:12
167:7
**recess** 112:24
**recognize** 53:7
56:13 59:2
**recognized** 105:4
**recommends**
178:3
**record** 11:2,11
12:23 57:5,12,14
57:17 74:1,11
76:22,24 77:1,3
80:6 91:21,23,25
92:2 94:16,18,20
94:22,23 95:5,7,12
100:14,17 109:22
112:23 113:2
128:13,16 150:12
150:14,17 155:14
180:11,15 206:9
206:13 235:15,19
241:12,14
**recorded** 11:3
**redrafting** 46:17
**reduces** 221:17
**reducing** 202:16
**refer** 77:18 95:15
188:14
**reference** 79:7
181:20
**referenced** 243:6

**references** 93:9
**referred** 83:7 94:7
186:11
**referring** 46:25
75:6 77:12 82:9
83:3 91:7,17
95:24 120:21,25
122:17 166:3
168:17 173:10
175:22 181:21
222:2,11,19
235:23 238:18
239:10
**refers** 88:15
**refund** 25:10
207:22
**refused** 100:14
**regarding** 11:4
75:3 111:7 172:5
**regardless** 154:3
191:2 232:3,15
**regular** 211:7
**regulated** 114:3
124:22 190:1
**regulation** 14:16
15:9 16:1 17:14
21:19,23 22:1,4,8
22:10,11 23:15
24:10 32:10,24
84:4 85:4,24 86:3
98:1 125:11
186:22,23 197:14
**regulations** 105:11
121:6 122:17
125:8 184:17
**regulator** 117:4,15
117:21 119:7
124:15 125:24
**regulator's** 110:12
125:24 161:12
190:3

**regulatory** 23:1
46:13
**reimbursed** 15:12
223:6 236:7
**reimbursement**
17:14 37:6,22
223:11
**relabeled** 65:25
**relabelers** 66:7
**relate** 54:7 114:17
**related** 14:15 17:8
17:13 19:9 20:12
21:14,23,25 22:8
24:9 32:23 44:15
44:17 45:18 62:14
62:17 64:24 91:16
92:21 93:9,18,24
122:13 123:2,23
127:1 145:23
146:2 151:9
152:20 156:18
158:24 191:9
193:25 195:10
209:7 242:10
**relates** 1:4 44:22
**relating** 39:25
**relation** 18:13
45:11
**relationship** 29:12
127:3 236:19
237:11
**relatively** 134:12
**released** 39:13
**relevant** 46:14
128:25 131:7
210:22 223:7
**relied** 83:16,20
84:1,13,18,21
85:12,15,18,20,23
91:10 94:6 209:2
209:11 210:2

**rely** 65:3
**relying** 188:16
189:8,11 209:2,4,6
**remains** 147:14
**remedies** 185:8
**remember** 28:6
106:5 177:3
**remind** 75:10
**reminds** 172:24
177:24
**remotely** 11:20
**rena** 1:11 2:5 8:8
10:2 11:4 12:8,24
56:19 242:6 243:5
244:2,24 245:2,4
245:12
**render** 32:5
**repackaged** 65:24
**repackager** 65:13
65:17
**repackagers** 66:7
**repair** 225:12
**repeat** 46:3 123:16
191:19 203:7
219:12
**rephrase** 13:16
159:21
**replacement**
169:11 173:2
174:18 175:16
**report** 15:25 16:1
39:13,17 45:7,22
45:25 46:18,21,24
47:12,21 50:17,19
50:22 51:2,4,11,17
51:20 52:1,5,17,20
57:25 58:5 64:22
65:2,4,8 66:13
74:14,21,24 77:16
79:8,16,18 81:20
82:19 83:14 86:9

RESTRICTED CONFIDENTIAL

**[report - reviewed]**                                                                 Page 35

86:23 88:7 95:15
96:14 97:16 99:2
102:8 104:21,25
104:25 106:14
111:22 113:5
114:15 116:2
121:3,5 126:9
135:1 138:8
143:21 145:10
148:17 149:2
151:2,19,25
152:19 153:11
164:23,24 167:10
167:17,19 169:24
170:9,11 178:18
181:20,22 184:10
184:12 193:15
201:10 203:4
206:3,15 212:1,5
217:5,10 235:21
**reporter** 1:15,16
10:7 11:8,11,16
12:5,12 14:23
16:15 20:8,11
28:17,20 33:1,5
35:19 36:14 38:3
42:17,20 44:9
46:2 49:9 52:8
58:3 61:9 65:15
66:18 67:4 69:25
76:19 79:17,21
88:11 89:7 90:2,6
90:14 92:14 94:1
101:7,13 102:25
103:3 105:17
107:17,20 109:23
115:3,9 117:6
118:19 123:16
132:16 133:17
136:19,21,25
137:1 139:21

140:1,4 142:6,11
146:21 150:3,9,11
151:14 152:12
153:22 154:14
166:23 170:3
171:23 184:22
191:18 192:3
195:1 204:25
205:4,21 207:14
208:2,10 209:14
211:11 212:8,16
212:18,20 219:1,9
225:20 228:7
230:21 235:6
242:4
**reporting** 11:19
12:2
**reports** 54:4 86:22
87:1 88:4 92:21
137:23
**represent** 12:18
29:13,16 30:4
31:4 59:5
**representation**
59:9 69:14
**representative**
87:22
**representatives**
147:9,17
**represented** 25:3
27:5,14 121:12
**representing**
29:23
**represents** 156:13
**request** 9:1,6
54:20 55:3,24
56:6 59:7 70:18
**requested** 52:10
56:4 101:15 110:2
**requests** 53:13,17
53:23

**require** 30:21
135:9,16 240:6
**required** 88:24
89:5,9 223:3
224:18,22 245:13
**requirement** 30:9
31:12
**requirements** 84:7
119:13,17 121:10
**requires** 117:15
**requiring** 135:23
**research** 14:13
16:10 32:21 35:10
35:14 36:12 38:15
40:8,15 41:11,14
41:16 50:5 209:23
212:2
**researched** 36:3
37:23
**researching** 36:10
38:18
**respect** 97:7,20
103:13 133:12
216:24
**respectfully** 33:16
54:24
**respective** 226:1
**respond** 53:16
54:22 55:24 102:9
110:5,24 145:1
**responded** 129:16
129:17
**responding** 96:9
109:21
**response** 55:2,6,12
59:7 86:20 99:23
101:9,10,17 103:1
189:13
**responses** 8:7
56:18 99:22 101:2
101:5

**responsive** 54:16
54:25 55:13
**restate** 40:10
215:12 232:13
**restricted** 1:8
**result** 137:16
238:5,15 242:11
**resulted** 153:7
**resume** 53:24
112:18
**retail** 211:7
229:20
**retailers** 66:1
206:24 207:13,17
208:1,5,9,13,15,19
208:22
**retained** 27:19
35:8 44:14,21
75:2 111:6
**retention** 8:3
27:18 34:22 35:8
43:13 44:5,7
49:14
**retrospective**
226:14,17
**retrospectively**
226:8 227:14
**return** 243:13,17
**reveal** 20:22 30:10
30:19,20 32:1
33:20 53:19
**revealed** 34:13
101:2
**reveals** 31:15
**revenue** 15:12
**reverse** 26:20
**review** 65:13,16
69:11 86:10 87:5
90:17 243:7
**reviewed** 46:1,13
87:8 91:15 93:7

**[reviewed - see]**                                                                 Page 36

133:21 147:6,7
**rgeman** 2:17
**rico** 42:23
**right** 16:22 17:23
23:13 25:11,12,18
25:18 40:18 41:2
41:4,6 49:8,16
59:17 60:1 61:22
62:23 63:21,22
67:4,16 68:8,20,24
75:19 85:20 98:12
106:8 114:2 116:6
127:7,17,18
132:25 133:25
134:19 136:7
147:20 149:19
150:22 157:5,25
160:8 164:15
167:17,21 168:12
168:20 170:16
171:2 172:16,19
173:12,25 174:22
175:25 177:6,16
178:10 181:25
184:10 192:13
193:12 195:18
196:3 197:8 200:2
204:3 208:6 209:4
213:2,7 214:21
218:18 227:2
236:10,24
**risk** 89:2 135:5
161:7,12,21 163:1
163:7,9
**rite** 5:10
**road** 5:20
**rockett** 6:17
**rockett.shevon**
6:18
**room** 11:19

**rooney** 4:18 5:2
**rose** 4:8
**roseland** 2:9
**ross** 4:11
**roszel** 5:20
**round** 215:10,10
**route** 116:22
**ruben** 2:3,3 28:12
129:5 149:25
243:1,2
**rude** 162:14
**ruler** 2:13
**rules** 109:11 114:8
125:3,4
**runs** 229:24

**s**

**s** 2:1,21 3:1 4:1 5:1
6:1 7:1 8:1 11:15
244:3
**sadly** 14:19 26:20
133:9
**safe** 113:18 114:7
114:11 115:11,25
116:19 117:18
118:2,15 123:10
125:6
**safety** 36:22 37:1
37:7,13 113:13,24
114:5,10,16
121:10 152:2
190:13 201:18
**sagoldberg** 3:3
**sale** 62:14,17
106:9,21 146:5
148:3,7,11,24
152:6,22 154:1,12
207:23 208:19,20
225:1,19,22 227:8
229:19,21 230:1
238:5

**sales** 64:22 65:10
66:11 209:4,24
210:7,17 213:24
217:15 222:21
**sanctioned** 100:10
**sanger** 2:11
**sara's** 50:1
**sarah** 48:7 50:3,5
50:15 53:25 62:20
62:21,21,22,23,23
63:2,3
**satisfy** 55:14 238:5
238:15
**saved** 144:6,20
**saving** 145:6
**saw** 171:14
**saying** 23:10 57:4
71:15,23,24 85:22
93:3,17 120:10
122:8 136:9
172:16 174:19
175:22,25 176:20
180:1,4 190:23
215:7 230:8
**says** 44:12 49:15
60:8 61:4 63:6,13
63:24 65:13,16
66:17 78:14,20
81:23 83:15 85:18
99:2 120:2 121:22
153:21 168:6,15
168:15 170:19
172:24 174:16
176:9 186:15
201:24 222:7
**scenario** 182:4
**schedule** 224:21
**school** 14:10,11,14
14:15 189:3
**sciegen** 6:15

**science's** 15:25
**scope** 45:1,11
102:8 106:14
107:6 108:7
110:23 111:2,3,22
111:25 121:3
134:10 135:1
137:6 138:4,20
139:4,17 140:10
141:25 143:3
144:25 145:18
147:22 148:17
150:24 151:19
156:9 157:7 158:2
158:22 160:3
161:10 163:12
165:14,23 169:21
170:18 171:17
172:21 174:24
176:3 190:22
192:9 193:15
200:18 203:3,15
234:14 238:8
**screen** 43:21 56:14
63:10,17 67:10
72:11 83:14
**scripts** 4:17
**scroll** 114:20
**second** 22:20 44:4
54:15 74:22 76:22
90:7 91:9,19
95:20,23 113:6
150:12 168:20
185:19 217:7
221:8,9
**seconds** 150:4
230:6
**see** 43:20 44:24
48:15,17,20 59:11
59:12,14 63:11
66:17,23 67:17

RESTRICTED CONFIDENTIAL

**[see - sorry]**                                                                 Page 37

68:3,12,23 69:7,9
72:13,17 73:19
76:9 85:13 88:5
90:7 91:13 96:1
103:16 109:19
124:16 128:14
167:8,25 168:15
168:18,19,25
169:3,14 206:25
218:14 241:9
**seeing** 56:23
**seek** 191:9
**seeks** 127:19
**seen** 50:9 57:4,19
86:24 226:10
**segments** 34:7
**selected** 86:7
**sell** 89:12 105:14
107:9 108:15
110:8 116:17
123:7 124:12
126:10 163:4
**selling** 110:20
188:7 194:23
208:17
**sells** 125:2 222:24
**seminar** 54:4
**senior's** 227:8
**seniors** 223:3,23
224:8,18 229:1
**sense** 21:15 48:12
48:23 115:5
**sent** 154:23 180:25
243:14
**sentence** 113:8
114:22 173:11,23
221:3,6,9,13 222:7
**separate** 35:16
56:4 71:17 146:1
148:13 217:16
224:7

**september** 72:15
**sequella** 192:2
**served** 21:5
**service** 218:10
**services** 17:5
44:16,17 236:21
237:13
**serving** 20:13 21:4
**set** 53:16 84:22
237:2 242:13
**seth** 3:3 12:17
33:16 46:23 54:24
66:18 67:22 88:11
95:3 109:16
142:19 143:5
167:9 188:25
215:1 219:13
230:24 233:8
235:6
**sets** 217:14
**setting** 211:5
226:19,19 237:23
239:13
**settled** 25:12
**share** 26:23,23
51:17 63:13,25
64:4,10 65:3
**shared** 51:7
**sharpen** 55:7
**sheet** 243:11
**shevon** 6:17
**short** 57:15 64:21
74:8 150:15
180:12 206:10
235:16
**shorthand** 242:3,8
**show** 18:21 43:12
126:20
**showing** 138:25
**shows** 181:23

**shuffling** 90:10
**sic** 93:10
**sick** 71:4,16,25
73:15 211:6
**side** 24:8,14,20,20
24:25,25 25:2,14
225:5,11,17 229:9
229:15
**sided** 63:8
**sign** 10:8 243:12
**signature** 242:16
**signed** 243:20
**significant** 42:12
88:25
**similar** 32:5
**similarly** 38:22
**simply** 69:17 80:7
128:23 200:10
**single** 21:17 27:7
73:15 80:6 215:24
**sir** 108:2 140:12
140:18,25 149:24
158:6 159:7 160:9
163:24 167:25
170:20 178:25
181:15 193:15
195:19,24 196:6
205:13 209:21
220:12,20 221:12
223:8 228:11
231:7
**sit** 26:21
**sitting** 177:7
**six** 127:24 215:5
**sketch** 15:6
**skipped** 221:4,14
**slack** 2:11
**slater** 2:7,7
**slaterdavis.com**
2:12

**slow** 201:7
**slowly** 153:23
**smolij** 3:5
**solco** 3:8,15
**sold** 66:5 76:5
105:5 108:12,21
113:14,19 115:21
117:9,16 118:7,10
118:22,25 119:8
119:16 120:16
121:14 122:20
125:12 126:1
145:24 146:8
149:6 152:5 154:3
190:8,10 195:18
195:20 196:3,11
198:20 208:15
210:25 223:2,23
237:22
**solely** 77:21
**solutions** 243:23
**somebody** 135:8
135:15 175:24
177:3,4,11 208:23
**someone's** 137:16
170:9
**soothing** 185:5
**sorry** 14:23 16:18
24:21 25:7 28:17
28:21 29:19,25
30:22 33:10 38:3
38:5 40:10 42:20
44:9 46:2 47:8
49:9 52:6 58:12
58:14,18 61:24
62:3 63:16 64:11
65:15 66:18 72:9
72:9 76:19 77:15
78:17,17 79:2
80:15,15 81:20
88:9,13 89:8

102:25 118:19
125:21 132:16
136:21 142:5,6
146:25 149:25
152:13,17 158:16
160:9 167:19,25
170:3 171:23
178:25 181:15
184:22 185:1
191:18 201:6
203:5,16 205:1
212:20 218:11,17
219:9 222:6
225:20 230:21,23
232:10 234:20
237:1 238:10,18
239:3
**sort**  37:12 50:12
  162:16
**sound**  49:16
**sounded**  144:15
**sounds**  49:7 74:5
**sources**  210:12
**sourcing**  236:6
**south**  3:6 5:8
**speak**  75:10 176:1
**speaking**  142:3,7
  142:14
**special**  22:2
**specialty**  22:19
  211:1 226:18
**specific**  22:23 41:7
  50:6 51:1,24
  67:24 73:12 84:15
  84:21 88:18 91:14
  93:18 97:19 98:5
  98:25 101:24
  103:19 114:4
  118:16 143:17
  149:4 166:3,16
  176:9 177:23

178:22 209:17
210:22 212:11
213:1 215:21
216:1,2,4,6
**specifically**  22:21
  39:14 64:8 85:12
  86:8,8 92:21 93:7
  134:6 165:15
  172:11 175:3
  212:12
**specifications**
  240:5,19
**specificity**  216:14
  216:24
**specifics**  56:1 99:4
  99:6
**spend**  228:1
**spent**  35:25 71:16
  73:8 84:6,9
**sphere**  20:23
**spoke**  165:20
  171:11
**sponsors**  220:24
  221:19 222:8
  224:3
**st**  4:16
**staff**  46:10 47:25
  48:4,5,10 69:9
  83:17 209:12
**standard**  1:14
  15:21 16:5,5,7
  23:9,10,11,19
  110:15 113:12,16
  113:20 115:8
  118:13 119:11,20
  119:22,24 120:13
  120:18,24 121:14
  124:14,24 125:5
  126:2,4,7,11
  131:11 146:4,7,13
  148:11 149:6

152:22 156:20
159:3 161:14
163:5 164:10
165:2,6 188:8
190:4 209:23
210:5
**standards**  105:15
  110:9 111:18
  117:1 120:19,20
  120:25 122:24
  123:9 187:12
  190:13
**standpoint**  36:21
  125:7 149:15,17
  149:22
**stanoch**  2:22
  59:13
**start**  32:12 66:15
  66:19 74:20,23,25
  130:6 152:16
  182:13
**started**  28:4 46:21
  59:24 60:2 142:14
  174:2
**starting**  29:9 48:1
  162:18
**starts**  235:24
**state**  6:14 12:3,22
  152:1 209:5,9
  214:8,18 215:22
  217:18 218:4,5,10
  218:16,22
**stated**  99:1 158:13
  166:12 171:3
  220:4
**statement**  123:1
  123:23 144:15
  167:24 173:15,21
  178:17,22 179:15
  180:1 185:15
  190:7 208:25

**statements**  180:4
  233:24
**states**  1:1 39:17
  64:25 103:10,10
  105:4,12 107:11
  124:23 161:16
  175:3 187:9
  201:22 207:6,16
  236:18
**status**  113:9,10
**statute**  124:10
**steno**  241:12
**stenographic**
  11:11 94:22
**stenotype**  242:4
**stent**  198:4
**stents**  136:1
**steven**  3:18
**steven.hunchuck**
  3:19
**stipulations**  9:9
**stock**  106:8
**stone**  48:7 53:25
  62:22,23,23
**stop**  96:10 101:4
  109:18 129:5,5,6,9
  129:16 163:5
**stopping**  162:17
**stoy**  6:3
**strategy**  14:21,25
**street**  2:4,17,24
  3:6,13 4:20 5:4,8
  6:9,14,18 7:4
**strength**  121:11
  122:4
**stricken**  150:10
**strike**  75:25 94:14
  133:21 145:12
  147:6 150:7
**stroke**  135:5,15
  137:17

RESTRICTED CONFIDENTIAL

**strokes** 134:24 135:22,24 136:16 136:18,23 137:12
**student** 189:3
**studied** 42:7 172:4
**studies** 15:20 23:23 54:4 138:25
**studying** 36:10
**stuff** 23:11,23 24:3
**subject** 18:5,25 19:13 21:11
**submit** 69:19 73:21,22
**submitted** 59:13 70:14 72:4
**subscribed** 245:14
**subsidies** 225:6 226:1
**suffer** 191:7
**suffered** 204:7 225:15
**suggest** 226:10 227:6 229:13
**suggested** 191:12
**suggesting** 202:7
**suite** 2:4,13 3:13 4:5,11,15,20 5:4 6:24 7:4
**summarized** 50:24
**summer** 48:1,2,3 71:25
**supplied** 190:18
**suppliers** 166:15
**supply** 88:23 106:20 115:6,22 118:1 122:21 123:2,3,20,24,25 124:3,8,19,25 125:9,10,17 126:8 126:15,23,24 127:2 130:9,11,19

130:20,23 131:16 131:17,20 132:2,6 132:7,20 145:25 146:17 156:18 159:1 161:2,4 162:4 164:9,25 165:7 170:6,11 181:10,12,18,23 182:5,8,17,18,19 182:22 183:2,5,18 186:20,25 187:22 188:15,17 189:4 189:10,16,17,17 189:23 196:3 197:17 201:22 230:14 231:3,14 231:17 232:1 235:22 236:17
**support** 17:6 23:2 63:1 71:3 126:14 136:3
**supporting** 82:15 180:5
**supportive** 90:25
**sure** 12:24 14:7 15:7 21:17 26:12 32:12 37:17 40:12 46:4 49:18,21 52:8 63:18 67:25 68:2 69:2 73:20 95:8 101:13 106:6 112:8,11 120:8 184:9 185:1 189:24 191:6,20 193:8 214:4 217:7
**surmise** 21:21
**sustained** 23:2
**swann** 185:6
**swear** 11:12 12:6
**switched** 198:2

**switching** 176:16
**sworn** 12:9 245:14
**systematic** 82:5,8 90:1,3,23 93:9

**t**

**t** 3:12 5:13 8:1 140:2 242:1,1 244:3,3
**tab** 43:10,23 44:1 52:22,23 57:23,24 58:8 166:18,21
**table** 10:1
**take** 13:20 18:23 43:14 45:19 47:10 67:5 74:1 121:17 139:14 164:2,12 170:21 177:15 180:7 190:19 192:6,12,25 193:10 206:6 235:7,11
**taken** 1:11 13:23 57:15 74:8 112:24 150:15 158:19 159:21 180:12 189:6 190:17 193:18 194:1 199:1 206:10 235:16 242:6
**takes** 69:5
**talk** 13:7 14:3 25:18,23 27:17 62:3 162:21 174:10,10,21 175:13 176:14 177:16 178:5 187:5,23 208:14 235:21
**talked** 151:6 156:2 172:18 181:9 183:14 230:11

**talking** 23:6,10 38:9 63:18,21 75:14 143:16 151:7 172:23 173:18,22 177:6 182:9 198:8,9 216:12,13,13,14 217:24,25 226:21 227:20
**talks** 78:13 126:6
**taught** 15:2,16 189:3
**taxpayers** 24:15
**teach** 14:25 16:11 23:16,17
**teaching** 14:17,21 14:24 23:11,22 32:20 71:2,19 72:1,2
**team** 51:18 54:8
**tech** 67:13,14,24 168:2
**techniques** 193:5 193:6
**technological** 14:16
**technology** 14:13
**tell** 26:1 33:18 51:14 56:5 129:12
**telling** 93:16 166:8 174:9
**tells** 228:21
**tenure** 23:18
**term** 97:25 98:5 103:22 114:1 121:18,25 122:7 122:11,12 123:8 144:3 145:9 149:3 151:23 153:10 158:6 182:5 186:10

RESTRICTED CONFIDENTIAL

**[terms - time]**                                                          Page 40

| | | | |
|---|---|---|---|
| **terms** 16:13 21:9 | 68:1,3 79:21 80:9 | **therapeutically** | 84:6,10,10 124:2,3 |
| 24:3 27:3 34:7 | 93:22 95:19 96:11 | 185:13 | 181:17 184:6 |
| 50:15,17 111:12 | 103:3 108:8 110:6 | **therapy** 198:4 | **thinks** 55:2 |
| 113:24 114:1 | 112:13,20 115:4 | **thereof** 242:12 | **third** 63:7 88:15 |
| 117:1 122:8,14,16 | 125:22 135:2 | **thing** 23:5 28:23 | 132:25 204:6 |
| 124:2,3 188:1 | 136:25 140:4,4 | 196:6 | 205:19 216:12,15 |
| 207:12,12,19 | 143:5 145:2,4 | **things** 39:23 73:11 | 216:16 222:2,12 |
| 209:1 236:6 | 152:15 167:11 | 80:9 85:9 117:2,5 | 222:20 224:13 |
| **testified** 12:9 | 175:1 176:5 | 128:23 161:7 | 225:25 227:6 |
| 147:18 | 179:19 187:18 | 192:18 197:1 | 228:15 229:9,15 |
| **testify** 79:23 | 189:1 192:3 | 198:5 200:9 221:3 | 229:18 230:18 |
| 127:21 | 196:17 205:4,5 | **think** 14:1 17:23 | 232:23 233:2,13 |
| **testifying** 79:24 | 208:10 212:20 | 21:18 25:11 26:13 | 233:15,18 234:3 |
| 215:8 | 219:21 228:24 | 27:8 28:3,12 31:2 | 234:25 236:2,6,11 |
| **testimony** 11:23 | 239:21 | 33:24 34:18 37:3 | 236:14,20,23,24 |
| 13:24 44:22 45:1 | **theories** 46:7 | 37:3,3 39:4 40:19 | 237:2,13,18,21,24 |
| 86:11 96:24 | 206:20,22 207:4 | 41:2 43:13 46:20 | 238:4,14,21 239:5 |
| 100:15 107:22 | 207:10 | 49:19 50:11,18 | 239:7 |
| 108:2,19 116:9 | **theory** 156:13 | 51:9,12 57:1 60:1 | **thornburg** 5:7 |
| 140:7,12,18 147:8 | 182:7 183:1 | 60:20,21 62:16 | **thought** 36:2,2 |
| 147:20 171:14 | 186:19 187:21 | 63:17 65:20 67:22 | 86:8 101:18,20 |
| 181:11 182:3,20 | 188:15,17 189:8 | 70:5 73:17 84:3 | 159:8 186:8 |
| 197:7 220:18,20 | 189:11,22,23 | 90:10 91:10 | 213:12,12 |
| 237:8 243:9,18 | 197:24 206:22 | 111:19 112:2 | **threat** 41:19 |
| 245:8 | **therapeutic** 134:2 | 125:10 129:16,17 | **three** 6:9 17:23 |
| **teva** 4:6 6:11 78:1 | 137:21 138:1,13 | 132:11 137:10 | 18:1,3 25:12,16,19 |
| 175:10 | 138:18 143:10 | 138:5 141:6,7 | 25:19 60:17 71:17 |
| **texas** 2:13 4:11 | 146:2,5,9,10,17 | 147:12 150:1 | 80:8 168:3,4,4,10 |
| **text** 155:8 169:14 | 147:18,24 149:18 | 151:20,21 153:19 | 175:9 217:13 |
| 175:3 180:18 | 150:20 151:7,11 | 160:3 166:6 | **thumbnail** 15:6 |
| 185:14,14 | 153:2 156:3,7 | 169:13 188:24 | **thursday** 1:12 |
| **textbook** 15:13,16 | 158:18 159:6,20 | 190:24,24 194:20 | **tiffany** 4:3 |
| **textbooks** 15:22 | 159:25 160:6,16 | 208:4 209:20 | **time** 1:14 12:3 |
| 16:3 126:25 | 164:14 170:15 | 215:5,9 223:14 | 13:10,10,21 17:22 |
| **texted** 155:12,18 | 171:15 183:12,13 | 225:9 227:22,25 | 22:5,17 23:1,3 |
| 155:22 | 183:15,24 184:3 | 228:4 231:6 233:7 | 28:9 35:15,25 |
| **thank** 12:14 13:19 | 185:25 186:13 | 233:7,11 234:15 | 36:25 37:2 39:3 |
| 21:1,2 30:11,21 | 194:3 199:17 | 236:9 237:18 | 41:21 43:9,14 |
| 32:19 33:5,6 | 230:12 233:12 | 239:10 | 45:16 47:18 48:12 |
| 34:20 45:15 47:7 | 234:4 | **thinking** 35:25 | 49:10,20,22 50:10 |
| 52:11 53:22 55:21 | | 37:11,18,21 39:4 | 54:19 56:23 57:10 |

RESTRICTED CONFIDENTIAL

57:13,16 60:10,21
62:6 64:24 67:6
68:15 69:6,8,9,18
69:21 70:7,11,12
70:22 71:4,11,13
71:15,20,21,25
72:1,4,5,8,21,25
73:3,8 74:6,9
76:23 77:2 78:6
84:6,9 89:13
91:22 92:1 94:17
95:3,11 108:16
110:10 111:20
112:8,10,15,21,25
131:8 133:3,5
150:13,16 171:7
171:21 180:9,13
194:2,16 195:5,16
196:21,22,22
202:11 206:8,11
212:18 228:5
235:10,13,17
239:23 240:5
241:13 242:6
243:19
**timeframe** 38:14
  39:10 243:8
**times** 94:12
  109:20 127:24
  128:20 153:12
  160:4 179:13
  196:19 200:4
  215:5
**titled** 181:24
**today** 12:20 13:24
  25:9 30:10 92:11
  180:18 183:14
  234:21
**told** 173:24,24
  220:8,14,15

**tolerance** 161:12
  163:1
**tolerances** 161:7
  161:21
**top** 168:14
**topic** 40:25
**torrent** 78:2 93:25
**total** 69:12,22
  210:16 217:15
  221:17
**toxins** 39:14
**tpp** 232:4,6,15,18
**tpps** 205:18
  216:24,25 217:2
  223:9 227:1 229:8
  229:21 231:4,15
**trade** 5:4 105:12
  105:13 106:19
  113:14 116:24
  119:8,19,21
  120:13,15 138:11
  139:10 156:21
  161:15 162:5
  163:2 183:17
  190:9 197:4,8,16
  197:21 202:14
  210:19 211:7,10
  211:12 217:25
  235:3
**trades** 186:4
**tragically** 135:24
**trailed** 230:23
**train** 101:18,19
**trained** 50:4
**transactions** 230:5
**transcript** 30:25
  243:6,20 245:5,8
**transcription**
  242:7
**traurig** 4:2

**traveling** 71:17
**treat** 35:22 38:12
  133:24 134:3,5
  170:8 174:7 175:4
  190:20 191:24
  199:18 211:5
**treated** 135:6
  233:3,20
**treating** 137:15
  139:2,15
**treatise** 124:17
  125:15
**treatises** 188:16
**treatment** 136:3
  136:17,23 137:11
  138:1,2 144:7,21
  145:14 169:12
  172:10 173:2
  174:11,19 175:14
  175:16 191:1,9,10
  192:16 193:12
  225:13 226:20
  232:5,17
**treatments** 134:21
  135:19,21 172:2
  191:13 192:7
  200:7
**trials** 133:11,14,15
**tricare** 218:7
**tried** 100:13,14
  220:16
**triple** 73:23
**true** 103:13 117:7
  136:15 205:18
  242:7 245:8
**try** 13:7 33:17
  102:3 162:22
**trying** 16:5 21:14
  41:7 51:15 55:25
  60:15 125:14
  128:18,23 162:18

164:24 188:12
  203:10,18 221:11
  231:11
**turn** 64:15 68:22
  90:7 95:14 104:24
  166:18 167:23
  184:16 201:10
  206:15
**turned** 75:12
**two** 18:8 22:13
  35:16 37:8 66:21
  68:6,6 69:24 70:2
  71:6 111:12,23
  136:1 145:21
  169:2,13 180:8
  185:22,23 186:12
  206:22 217:16
**twofold** 185:17
**tylenol** 13:25
**type** 23:23 32:1
  160:21 202:20
  212:4 213:25
  214:7 216:8
  226:16 227:11
**types** 17:16 19:16
  22:23 35:17,20
  38:25 39:1,3,15
  43:5 51:24 185:23
  185:23 209:6
  226:9 229:10
  239:4

| u |
| --- |

**u.s.** 3:9,9,15,15
  66:5 86:4 88:24
  89:10,12 97:14
  98:3,6,16 106:18
  106:21 108:10,11
  108:15,21 110:8
  110:12,16,21
  113:14,19,22
  114:8 115:22

RESTRICTED CONFIDENTIAL

**[u.s. - valsartan]**                                                    Page 42

116:17,24 117:14
117:16 119:8,19
119:21 120:12,14
120:17 121:14,21
122:13 124:14,23
125:12,23,24
126:1,11 132:14
132:20 135:20
136:20,24 138:11
139:9 145:24
146:5 148:7,10,25
149:7 156:21
161:11 162:5,6
163:4 164:10
165:2 174:8
182:17 183:6
186:4,5,6 187:2
188:6,7 190:2,2,9
190:14 194:24
197:14,16,21
202:10,20 204:16
204:20,23 209:25
210:19 211:1,20
215:23 235:3
237:9
**uh** 20:11 41:8
201:16 217:9
**ulmer** 7:2
**ulmer.com** 7:3
**ultimately** 42:15
125:2 199:23
**unable** 228:21
**unadulterated**
191:14 198:20
**uncontaminated**
191:14
**undergo** 38:25
**underlying** 137:11
191:25 235:4
**underscores**
185:15

**understand** 13:4
13:13,14,15,19
19:2 34:3 39:23
44:25 45:10 51:16
53:12,14 59:21
79:2 80:1,11 85:2
86:14,21 87:15
93:2 98:10 106:6
121:18,25 122:19
125:14 127:11
129:18 131:8
133:23 134:13,18
134:20 135:3
143:13 144:3
151:5,5 153:17
181:14 191:11
203:6,17 214:4
218:21 219:5
222:5 229:18,21
232:22 233:16
234:17,24 236:25
238:9 239:1,2,12
**understanding**
40:2,3 59:18 79:6
82:4,13 87:2 88:2
88:18 98:4 101:3
106:11,25 107:8
110:19 114:10
115:20 125:11
134:16 141:14
158:15 165:24
172:6 173:4,7
186:22 191:11,21
214:6 216:25
237:25 239:22
240:25
**understood** 13:18
**underwent** 198:4
**underwrite** 227:8
**unit** 11:3 74:7
112:22 113:1

180:10,14 206:12
235:14,18
**united** 1:1 39:17
105:4,12 107:11
124:23 161:16
187:9 201:22
223:2 236:18
**universities** 23:12
**university** 14:6,10
15:18,18,19 23:24
52:19
**unjust** 206:23
207:2,20 208:12
**untreated** 134:7
134:19,23 137:3
**update** 175:7
**updated** 54:1
**updates** 8:11
167:6
**use** 16:3 36:19
37:23,24,25 38:19
46:24 54:7,8
75:14 76:15
103:22 113:9,24
122:11,12 123:11
124:15 133:24
134:4 165:19
166:9 171:10
172:9,17,17
174:11 182:4
213:6,9
**usefulness** 185:24
**user** 185:9
**uses** 39:3 97:24
98:3 221:16
**usually** 226:16
227:11
**utilization** 37:6

**v**

**vacuum** 157:18
**valsartan** 1:2 8:13
11:5 35:11,14,22
36:9,11 37:2,20,20
38:9 41:23 63:13
63:25 65:7,21
76:4,12,13,16,17
77:6,8,13,19,23
78:3,10,10 81:5
82:1,6 96:21 97:8
97:12,21 102:6
127:7,17 130:1,24
132:7,24,24
133:23,24 134:4
137:15,18 138:2,2
138:9 139:1,14
141:3,17,19,21
142:24 144:8,22
145:15 147:19
149:17 150:21
151:12 153:8
156:4,6 157:22
158:8,10,19
159:24 160:17,23
164:4 165:20
166:10 168:18
169:9 170:15,25
171:10,15,18
172:5,11,12,15,17
173:11,16 174:5
174:12,14,16,20
175:4,6,6,7,18,23
176:6,7,14 177:5,5
177:8,12 178:1,2,8
178:9 179:21
190:17 191:14
192:19 193:19
194:1,15 196:10
196:10 198:10
199:2,9,12,22

RESTRICTED CONFIDENTIAL

[valsartan - went]                                                   Page 43

205:10 213:2,4,5
213:10 214:11
215:17 218:18
226:11 227:9
229:7 230:13,15
231:3,14,18 232:5
232:17 233:20
236:8 237:5 238:6
238:15,23 239:17
240:5,19 241:2,8
243:4 244:1 245:1
**valuable** 137:14
187:3
**value** 111:11
114:24 116:6,12
117:10,23,25
118:7 119:2 133:7
137:4,13,18,22,22
138:13,18 140:8
140:15,21 141:4,9
141:23 142:2
143:1,7,11,12,17
143:19,21 144:4,9
144:23 145:8,9,14
145:23 146:1,6,10
146:15,15,17,18
146:18,19,23
147:25 148:12,14
148:18,25 149:3
151:23 152:8,16
152:19 153:6,11
153:14,18 164:4
164:15 183:10,13
183:13,15,25
184:1,3,4,7 185:10
185:23,25 186:1,1
186:10,12,12,13
186:15 201:18
204:12,16,23
230:12,12 232:23
233:3,13,19

**values** 145:21
**vanaskie** 100:7,25
**variables** 216:1
**variation** 162:25
**variety** 17:15,16
42:2 239:4
**various** 17:24
40:18
**vast** 228:25
**vcds** 154:3
**verbally** 11:23
**verify** 243:9
**veritext** 1:10 11:7
11:9 243:14,23
**veritext.com**
243:15
**versus** 26:6 73:4
**veterans** 218:8
**video** 11:3 94:22
94:25 95:2,7
241:12
**videographer** 7:8
11:1,7 57:13,16
58:15 74:6,9
76:23 77:2 90:9
91:22 92:1 94:17
94:24 95:11
112:21,25 150:13
150:16 180:9,13
206:8,11 235:13
235:17 241:13
**videotaped** 1:10
8:5,7 52:24 56:18
**view** 104:13 107:4
108:5 110:18
115:15 125:16,23
125:25 137:10,13
145:15 151:6
186:9,15,18
187:20,24 188:5
190:18 200:23

216:25 219:25
231:2,13 232:6,19
**viewed** 156:22
**views** 186:12
**violation** 84:9
105:22 106:4,12
106:25 107:23
108:4 110:20
189:10
**violations** 82:16
93:18 108:21
120:21
**virtual** 1:10
**virtue** 154:1
**voices** 147:1
**volume** 90:7,15
166:22
**voluntary** 175:10
**vouchers** 221:18

### w

**w** 3:4,5
**wacker** 4:5
**wait** 15:24,24
119:5 181:19,19
187:6,6,6,6,6
188:2 213:15,15
213:15,16
**waiting** 47:19,19
**waive** 12:1
**waiver** 180:20
**waiving** 32:16
34:17 154:24,25
155:15,16,23
**walgreens** 211:8
**wallack** 5:17
**walnut** 7:4
**walsh** 6:7
**walshlaw.com** 6:8
**want** 23:4 37:16
43:12,15,15 59:19
80:6 92:4,5 95:3,4

95:6 100:16,23
107:9 111:17
117:15 122:19
128:7,11 129:2
150:5 162:2 163:3
166:18 179:3
187:15 188:5,10
205:7 217:6
218:23 221:24
**wanted** 55:14
100:16 126:4
186:24 187:10
208:25
**warning** 93:23
**warnings** 139:12
**washington** 3:13
4:20 5:14
**waste** 54:18,19
95:3
**wasting** 111:20
**way** 2:13 12:24
26:22,24 31:10
37:14 55:1,7 80:6
97:15 100:15,24
117:25 143:19
145:8 146:11
149:4,15 151:22
153:11,13 162:15
163:24 194:20,21
202:6,24 208:13
212:11 225:9
226:7 242:11
**ways** 33:17 93:24
135:6 141:15
192:17 193:24
**we've** 33:11 57:20
182:9 183:13
**web** 184:15
**week** 17:19 73:15
**went** 171:1,1
187:23 192:20,21

RESTRICTED CONFIDENTIAL

**[went - worry]**    Page 44

| | | | |
|---|---|---|---|
| 194:16 | 92:16 93:22 94:3 | 165:15,24 166:13 | 234:22 |
| **west**  4:5 5:4 6:18 | 94:11 96:7,11,23 | 168:5 169:22 | **wording**  176:9 |
| 6:24 | 97:11,24 98:24 | 170:5,19 171:18 | **words**  80:8 117:2 |
| **wharton**  23:25 | 99:10,10,16,21 | 171:25 172:22 | 117:23 128:9 |
| **whereof**  242:13 | 100:5,18 101:3,5 | 173:14 175:1 | 156:19 159:2 |
| **whiteley**  2:20,21 | 101:19 102:10 | 176:5,23 177:20 | 183:16 190:7 |
| 28:13 | 103:2,18 104:11 | 178:13,25 179:8 | 195:4 |
| **whitely**  59:13 | 105:18 106:4,16 | 179:19 180:23 | **work**  17:11 18:13 |
| **whitney**  6:17 | 107:7,19 108:1,8 | 181:5,14 182:25 | 18:17 19:5,9,10,17 |
| **widely**  16:10 | 108:24 109:4,7,13 | 184:9 185:1 | 19:24 20:13 21:21 |
| **william**  5:17 | 110:6,25 112:2,7 | 186:18 188:23 | 21:24 22:7,7 |
| 184:20,25 185:4 | 112:12,16,20 | 189:1,14 190:23 | 24:13,18,19 26:6 |
| **willing**  157:13,14 | 114:14 115:4,11 | 191:20 192:10,15 | 26:10,19,21 29:9 |
| 161:8,21 163:7,9 | 115:20 116:8,15 | 193:4,14,22 | 30:3 32:20,21 |
| **winter**  60:1 | 117:7,13 118:21 | 194:11 195:2,3 | 33:8 39:10 40:2 |
| **wish**  101:16 | 119:5 121:4 123:1 | 196:5,17 198:18 | 42:9 45:11 46:21 |
| **withdraw**  62:2 | 125:22 126:19 | 199:7 200:6,20 | 46:22 48:9,19 |
| 94:15 112:5,6 | 127:11,22 128:1,3 | 201:6 203:5,16,23 | 50:16 51:21 53:21 |
| **withdrawing** | 128:6,19 129:16 | 205:2,5,12,24 | 63:13 65:13,16 |
| 55:18,18 | 129:17 130:5 | 206:4 207:16,25 | 66:9 69:13 71:3 |
| **withstanding** | 131:5 132:1,11,19 | 208:6 209:15 | 180:21 |
| 13:12 | 133:19 134:11 | 211:13 212:9,17 | **worked**  16:22 |
| **witness**  2:5 11:12 | 135:2,11,18 136:9 | 212:19,22 214:14 | 19:21 21:8 24:7 |
| 11:22 12:6 14:25 | 136:20,23 137:7 | 215:12,20 216:21 | 25:1,23 26:16 |
| 16:18 20:9,12 | 137:21 138:5,21 | 219:2,21 220:5,11 | 29:6 45:17 46:10 |
| 21:2 26:6 28:19 | 139:5,18,23 140:3 | 220:19 223:14 | 48:6,11,14 50:9 |
| 28:21,25 30:11,22 | 140:11,17,25 | 224:6,17 225:21 | 52:1 53:25 61:12 |
| 32:8,15,19 33:3,6 | 141:6 142:1,5,10 | 226:6 227:5 228:8 | 63:25 70:13 |
| 34:20 35:20 36:15 | 142:13,17 143:5 | 228:19,24 231:6 | **workers**  218:13 |
| 38:5 42:18,22 | 143:15,25 144:2 | 232:10,22 233:9 | **working**  17:24,25 |
| 44:10 45:7,15 | 145:2,4,19 146:22 | 233:12,23 234:15 | 19:14,19 20:4 |
| 46:4 47:8,12 | 147:4,12,23 | 237:7 238:9,17 | 24:4 25:13 26:24 |
| 49:11 52:13 53:22 | 148:22 149:24 | 239:2,21 240:12 | 29:18 31:3,16 |
| 57:9 58:18 61:10 | 151:1,20 152:15 | 240:25 242:6,13 | 33:12 47:25,25 |
| 61:22,25 65:17 | 153:10,24 154:16 | 243:8,10,12,19 | 59:24 62:25 72:3 |
| 69:16 70:2,20 | 155:2,18,25 | **witnesses**  87:6,25 | 86:5 |
| 71:10 75:21 76:20 | 156:11 157:9 | 100:9,10 | **works**  50:7 |
| 77:12,21 82:12 | 158:5,14,23 | **wmurtha**  5:18 | **world**  112:8 |
| 83:6 85:1 86:20 | 159:11 160:5,20 | **woefully**  70:11 | 190:19 193:23 |
| 86:21 88:22 89:9 | 161:11,25 163:13 | **word**  46:24 120:6 | **worry**  67:9 |
| 89:22 90:4,12,22 | 163:23 164:6,19 | 128:6 139:21 | |

RESTRICTED CONFIDENTIAL

**[worth - zoom]**                                              Page 45

**worth**  145:9
  151:23 152:8
**worthless**  114:25
  115:1,18 122:23
  124:6 125:18
  126:16 145:16
  151:7 153:25
  156:24 204:5
  230:16,17 232:7
  232:18
**worthlessness**
  115:17 145:10
  151:9 153:15
  185:24
**write**  15:13 157:13
  201:17
**writing**  15:15
  47:21 50:17
**writings**  54:5
**written**  122:16
  212:1
**wrongdoing**  203:1
**wrote**  51:2,4,6,20
  52:1 82:19,21

**x**

**x**  1:2,5 8:1
**xi01658**  242:17
**xponent**  66:4
  210:15,24 211:15
  212:2,6,25 215:3
  217:14,20

**y**

**yeah**  18:7 19:12
  27:3 34:2 43:22
  49:19 57:2 60:4,4
  60:18 70:25
  109:15 134:15
  137:9 138:5 157:2
  159:18 166:25
  168:20 176:18

  207:25 241:11
**year**  17:23 26:5,13
  47:4 73:16 209:9
  212:14 214:18
  215:21 216:9
**yearly**  106:22
**years**  15:3,17 17:2
  19:22 22:3 26:16
  202:16 204:20
**york**  2:18,18 6:19
  6:19 73:14

**z**

**zero**  201:18
**zhejiang**  78:1
  93:13,20 168:22
**zhejiant**  3:8,15
**zhp**  12:18 93:21
  93:21,22,23
  168:18,19
**zmick**  6:23
**zoom**  1:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.