# Exhibit 6

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF NEW JERSEY

 3    ******************************

      IN RE: VALSARTAN, LOSARTAN,

 4    AND IRBESARTAN PRODUCTS          MDL No. 2875

      LIABILITY LITIGATION

 5    ******************************

      THIS DOCUMENT APPLIES TO ALL        HON ROBERT B.

 6    CASES                              KUGLER

      ******************************

 7

 8                    MARCH 25, 2022

 9          CONFIDENTIAL INFORMATION - SUBJECT TO

10                  PROTECTIVE ORDER

11        Videotaped Deposition of LAUREN J. STIROH,

12    Ph.D., commencing at 10:13 a.m., at the offices of

13    Duane Morris, LLP, 1540 Broadway, New York, New

14    York, before Jeffrey Benz, a Certified Realtime

15    Reporter, Registered Merit Reporter and Notary

16    Public within and for the State of New York.

17

18

19

20

21

22

23

24
```

Confidential Information - Subject to Protective Order

Page 2

1
  A P P E A R A N C E S :
2
3
4  HONIK LLC
   Attorneys for Plaintiffs
      1515 Market Street, Suite 1100
5      Philadelphia, Pennsylvania  19102
   BY:  RUBEN HONIK, ESQ.  (remote)
6      267-435-1300
      ruben@honiklaw.com
7
8  KANNER & WHITELEY, L.L.C.
   Attorneys for Plaintiffs
9      701 Camp Street
      New Orleans, Louisiana  70130
10  BY:  CONLEE S. WHITELEY, ESQ.  (remote)
      DAVID J. STANOCH, ESQ. (remote)
11      504.524.5777
      c.whiteley@kanner-law.com
12      d.stanoch@kanner-law.com
13
   DUANE MORRIS, LLP
14  Attorneys for Defendants Zhejiang Huahai Pharmaceutical
   Co., Ltd., Prinston Pharmaceutical Co., Ltd., Prinston
15  Pharmaceutical Inc., Huhai U.S., Inc., and Solco
   Healthcare US, LLC
16      30 South 17th Street
      Philadelphia, Pennsylvania  19103-4196
17  BY:  SETH A. GOLDBERG, ESQ.
      DANA B. KLINGES, ESQ. (remote)
18      LAUREN PUGH, ESQ. (remote)
      215.979.1164
19      sagoldberg@duanemorris.com
      dklinges@duanemorris.com
20      lpugh@duanemorris.com
          -and-
21      REBECCA E. BAZAN, ESQ. (remote)
      505 9th Street, N.W.,  Suite 1000
22      Washington, D.C.  20004-2166
      202.776.5253
23      rebazan@duanemorris.com
24

Page 3

1  A P P E A R A N C E S : (Ctd.)
2
3  CROWELL & MORING LLP
   Attorneys for Defendant Cardinal Health, Inc.
4      1001 Pennsylvania Avenue, NW
      Washington, D.C.  20004
5  BY:  DANIEL T. CAMPBELL, ESQ. (remote)
      202.624.2774
6      dcampbell@crowell.com
7
   GREENBERG TRAURIG LLP
8  Attorneys for Defendants Teva Pharmaceutical
   Industries, Ltd., Teva Pharmaceuticals SA, Inc.,
9  Actavis LLC, and Actavis Pharma, Inc.
      77 South Wacker Drive, Suite 3100
10      Chicago, Illinois  60601
   BY:  TIFFANY M. ANDRAS, ESQ. (remote)
11      GREGORY E. OSTFELD, ESQ. (remote)
      312.456.1065
12      andrast@gtlaw.com
      ostfeldg@gtlaw.com
13
14  HUSCH BLACKWELL LLP
   Attorneys for Defendant Express Scripts, Inc.
15      190 Carondelet Plaza
      St. Louis, Missouri  63105
16  BY:  MATTHEW D. KNEPPER, ESQ. (remote)
      314.480.1848
17      matt.knepper@huschblackwell.com
18
   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
19  Attorneys for Defendant Mylan Pharmaceuticals, Inc.
      One Oxford Centre
20      Pittsburgh, Pennsylvania  15219
   BY:  JOHN B. ZAPPONE, ESQ. (remote)
21      412.263.4362
      JBZ@Pietragallo.com
22
23
24

Page 4

1  A P P E A R A N C E S : (Ctd.)
2
3  HINSHAW & CULBERTSON, LLP
   Attorneys for Defendant SciGen Pharmaceuticals
4      53 State Street
      Boston, Massachusetts  02109
5  BY:  KATHLEEN E. KELLY, ESQ. (remote)
      617.213.7000
6      kekelly@hinshawlaw.com
7
   BARNES & THORNBURG, LLP
8  Attorneys for Defendants CVS Pharmacy, Inc., and
   Rite Aid Corporation
9      11 S. Meridian Street
      Indianapolis, Indiana  46204-3535
10  BY:  KARA KAPKE, ESQ. (remote and in-person)
      317.231.6491
11      kara.kapke@btlaw.com
12
   BUCHANAN INGERSOLL & ROONEY PC
13  Attorneys for Defendant Albertsons, LLC
      1700 K Street, N.W.  Suite 300
14      Washington, D.C.  20006-3807
   BY:  ASHLEY D.N. JONES, ESQ. (remote)
15      202.452.7318
      ashley.jones@bipc.com
16
17  HILL WALLACK LLP
   Attorneys for Defendant Hetero Labs Limited
18      2 Bridge Avenue, Suite 211
      Red Bank, New Jersey  07701
19  BY:  JACLYN M. KAVENDEK, ESQ. (remote)
      732.631.8315
20      jkavendek@hillwallack.com
21
22  ALSO PRESENT:
23      DANNY ORTEGA, Videographer
24

Page 5

1          INDEX
2  LAUREN J. STIROH, Ph.D.
3    Examination by:              Page
4      MR. HONIK               7
5      MS. KAPKE               228
6      MR. HONIK               234
7
8          EXHIBITS
9  Number       Description          Page
10  Exhibit 1   Expert report of Lauren J.   9
          Stiroh, Ph.D.
11
   Exhibit 2   MTD Opinion 3: Warranty    124
12          Claims
13  Exhibit 3   Prohibited Acts, 21 USCA,   173
          Section 331
14
   Exhibit 4   Transcript of deposition    188
15          of William J. Lambert
16  Exhibit 5   Invoice from NERA Economic  197
          Consulting
17
   Exhibit 6   Summary of invoices      197
18
   Exhibit 7   Opinion in LaPoint v.      218
19          AmerisourceBergen Corp.
20
21          ***
22  WITNESS DIRECTED NOT TO ANSWER:
23  Page 211
24

Confidential Information - Subject to Protective Order

Page 6

1    THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Danny Ortega, and I am
3  the legal videographer for Golkow
4  Litigation Services.
5    Today's date is March 25, 2022, and
6  the time is 10:13 a.m.
7    This video deposition is being held at
8  1540 Broadway, New York, New York, in the
9  matter of Valsartan, Losartan, and
10  Irbesartan Products Liability Litigation,
11  for the United States District Court,
12  District of New Jersey.
13    The deponent today is Dr. Lauren
14  Stiroh.
15    All counsel will be noted on the
16  stenographic record.
17    The court reporter today is Jeff Benz,
18  who will now swear in the witness.
19  LAUREN J. STIROH, Ph.D.,
20  called as a witness, having been first
21  duly sworn by Jeffrey Benz, a Notary
22  Public within and for the State of New
23  York, was examined and testified as
24  follows:

Page 7

1  EXAMINATION BY MR. HONIK:
2    Q.  Dr. Stiroh, good morning to you once
3  again.
4    A.  Good morning.
5    Q.  As I introduced myself briefly to you
6  earlier, my name is Ruben Honik.  I am one of
7  the plaintiffs' attorneys in this case.  There
8  are, as you might expect, a number of other
9  plaintiffs' lawyers who are observing on Zoom,
10  together with a great many defense attorneys.
11    You're aware of all that?
12    A.  I am, yes.
13    Q.  And I know that you've given testimony
14  under oath before, and I want to take a moment,
15  in a moment, to highlight a couple things.
16    But inasmuch as I'm in Philadelphia
17  and you're in New York, who is in the room with
18  you?
19    A.  The court reporter, the videography,
20  and Seth Goldberg.
21    Q.  Okay.  And I gather you're in the
22  offices of Duane Morris in New York?
23    A.  I am.
24    Q.  I don't know -- I know you've given

Page 8

1  many depositions before.  I don't know how many
2  you've done remotely since the pandemic.  But
3  there are a couple of housekeeping items that I
4  think are worth mentioning so that we can end up
5  with a good transcription and video of your
6  testimony today.
7    First, I'll be the principal
8  questioner today on the plaintiffs' side, and as
9  is always the case, it's my job to make myself
10  clearly understood to you.
11    If you don't understand a question or
12  you haven't heard my question, if there's a
13  technical problem, it's really important that
14  you let me know so that I have an opportunity to
15  restate it or clarify it for your benefit.
16    Can we agree to that?
17    A.  Yes.
18    Q.  I'm sure you're aware that it's
19  important that we not speak over one another,
20  largely because the court reporter needs to be
21  able to take down one speaker at a time.
22    That's sometimes a challenge when it's
23  conducted remote.  I'll do my level best not to
24  ask a new question as you're speaking, and if

Page 9

1  you could, after you give your answer, maybe
2  pause for a second in the event that
3  Mr. Goldberg or one of the other defense lawyers
4  needs to make an objection, that could be noted
5  as well.
6    Can you do that for me?
7    A.  Yes.
8    Q.  I'm going to be marking some exhibits,
9  most if not all of which I hope are in paper
10  form near you.
11    Do you have, for example, your report
12  with you?
13    A.  I do.
14    Q.  Well, for the benefit of the record,
15  when the opportunity arises, we're going to mark
16  that as Exhibit 1, Stiroh 1.
17    (Expert report of Lauren J. Stiroh,
18    Ph.D. was marked Stiroh Exhibit 1 for
19    identification, as of this date.)
20    Q.  Is the copy that you have, does it
21  contain the list of your reliance materials?
22    A.  It does.
23    Q.  And does it contain your CV as well?
24    A.  It does.

Confidential Information - Subject to Protective Order

Page 10

1  Q.  And you're satisfied that the copy
2  that we're going to mark Exhibit 1 is your true
3  and correct report that you issued, or is dated
4  January 12th of this year?
5  A.  Let me just flip through it briefly.
6  THE WITNESS:  I think that's going to
7  be Conti.
8  Can you pass me?
9  (Witness reviewing document.)
10  A.  It is.
11  Q.  Dr. Stiroh, I assume you've had an
12  opportunity to review your report or
13  refamiliarize yourself with it before today?
14  A.  Yes.
15  Q.  You've, doubtless, had time to prepare
16  with defense counsel who engaged you as well?
17  A.  I have.
18  Q.  And you feel ready this morning to
19  discuss the opinions that you express in that
20  report, to me?
21  A.  I do.
22  Q.  And in paragraph 5 of your report,
23  Exhibit 1, you describe your assignment.  If you
24  could turn to that section.

Page 11

1  A.  I have it in front of me.
2  Q.  And -- thank you.
3  And specifically, as I read it, you
4  [indistinct], as well as the things that you did
5  not do; right?
6  A.  I'm sorry.  I lost a little bit of
7  that question.  If you don't mind saying it
8  again.
9  Q.  Not at all.
10  As I read that paragraph entitled
11  Assignment, what I take it you did was to
12  enumerate the things --
13  MR. GOLDBERG:  Hang on a second,
14  Ruben.
15  Q.  -- that you didn't do; right?
16  MR. GOLDBERG:  Ruben, hang on one
17  second.  We're getting a little bit of a
18  delay.
19  MR. HONIK:  Yes.  I'm experiencing a
20  little bit of it here, but it's mostly the
21  image that Dr. Stiroh is a little bit
22  halting.
23  Can we have the videographer address
24  that?

Page 12

1  MR. GOLDBERG:  Let's see if it goes
2  away, because it's a little bit --
3  you're -- you're also sort of coming in and
4  out a little bit.
5  So why don't you go ahead and let's
6  see if it goes away.
7  MR. HONIK:  Seth, I must tell you,
8  you're very crisp, but Dr. Stiroh is a
9  little fuzzy, and there's a bit of a delay.
10  I guess all we can do is just go
11  forward and see how it goes.  Okay?
12  MR. GOLDBERG:  Yeah.
13  Q.  So let me reload the question,
14  Dr. Stiroh.
15  We're looking -- excuse me -- at your
16  paragraph 5 together, which you've headed,
17  Assignment.
18  And I'm simply trying to establish if
19  it isn't so, that in that paragraph, you
20  describe the things -- pardon me -- that you did
21  in discharging the assignment, as well as the
22  things you did not do.
23  Is that fair?
24  MR. GOLDBERG:  Objection to form.

Page 13

1  A.  Generally, yes.  Paragraph 5 of my
2  report describes the assignment, and then also
3  certain assumptions or areas of testimony where
4  I am not offering opinion.
5  Q.  And that's clear to me.
6  If you turn to page 2 of your report,
7  we're still in paragraph 5, and if you were to
8  count down about six lines, do you see the
9  sentence that begins, I do not make an
10  assessment?
11  A.  I see that.
12  Q.  From that line forward, you enumerate
13  certain things that you did not do or assess;
14  correct?
15  A.  I'm not sure what you mean by I
16  enumerate them.
17  I have a sentence that says, I do not
18  make an assessment regarding actual risk of
19  safety issues.
20  And I have a sentence towards the end
21  that says, I also do not opine on the legal
22  issues, and goes on.
23  Those are two areas where I am
24  clarifying that that is not an area for my

Confidential Information - Subject to Protective Order

Page 14

1 testimony.
2    Q.   That's right.  And all I was really
3 getting at is you attempt to list some things
4 that you didn't do; correct?
5    A.   Yes.
6    Q.   I want to spend some time unpacking
7 the language here so I understand the things
8 that you didn't do before we talk about some of
9 the things that you did do.  Okay?
10    A.   Yes.
11    Q.   So the first sentence on page 2,
12 within paragraph 5 that I would like to direct
13 your attention to is the one that begins, I do
14 not make an assessment regarding any actual risk
15 of safety issues with regard to the subject
16 VCDs.
17        Do you see that clause?
18    A.   I do.
19    Q.   Can you tell me what that means?
20    A.   Yes.  I am not a medical expert and I
21 am not intending to offer opinions related to
22 the safety risk, if any, of the products at
23 issue on the patients who consumed them.
24    Q.   And in that regard, the sentence

Page 15

1 continues, And I offer no opinion on whether the
2 presence of NDMA or NDEA impurities rendered any
3 of the at-issue VCDs adulterated or misbranded
4 during the relevant time period.
5        Did I read that correctly?
6    A.   You did.
7    Q.   And does it mean that you have no
8 opinion whether NDMA or NDEA rendered the VCDs
9 in this case adulterated or misbranded?
10    A.   That is correct.  I am not offering
11 opinions on whether the presence, or if there
12 is, of NDMA and NDEA rendered the products at
13 issue misbranded or adulterated.
14        I have reviewed Dr. Conti's report and
15 have opinions with respect to her valuation of
16 the products at issue where she does make those
17 assumptions, and I take her assumptions that she
18 has made and consider them in my opinions.  I do
19 not offer an opinion on adulteration or
20 misbranding.
21    Q.   Let me unpack that a bit.
22        Do you have an opinion whether these
23 contaminants were present at all in these VCDs?
24    A.   That is not a subject of my testimony

Page 16

1 or opinions.
2        I take into account the possibility
3 that the products were -- that the -- the
4 impurities were included in the products at
5 issue and have an understanding from materials
6 that I have read in this case of the impact of
7 that, but I am not offering testimony that the
8 product -- the impurities were included in the
9 products at issue or what implication that has
10 for the risk profile.
11    Q.   Do you have an opinion whether NDMA or
12 NDEA are, in fact, contaminants?
13    A.   I do not.
14    Q.   Do you have an opinion whether NDMA or
15 NDEA are mutagenic?
16    A.   I do not.
17    Q.   Do you have an opinion whether NDMA or
18 NDEA are carcinogenic?
19    A.   I do not.
20    Q.   Do you have an opinion whether NDMA or
21 NDEA are genotoxic?
22    A.   I do not.
23    Q.   Can you explain to me why you read and
24 cited as reliance material the expert report of

Page 17

1 Dr. Ron Najafi?
2    A.   I released certain expert reports of
3 various individuals that offered reports in this
4 case, to gain an understanding of some of the
5 background issues and scope.
6        Some of the materials that I have
7 reviewed were to inform me on the broader
8 background materials and information that is at
9 issue in this case.  It does not mean I am
10 offering opinions on all of the materials that I
11 read.
12        I don't recall offhand if I have cited
13 Dr. Najafi in my report other than in mentioning
14 him in paragraph 6.
15        But if and where I have cited him, it
16 will indicate the reasons for why I have relied
17 on that report.
18    Q.   Well, why don't you turn to Exhibit 2
19 of your report, which we are marking in this
20 deposition as Exhibit 1, which lists the expert
21 reports that you relied upon.
22        Do you see that list?
23    A.   Yes.
24    Q.   I take your point about obtaining some

Confidential Information - Subject to Protective Order

Page 18

1  background information even as to areas that you
2  don't specifically offer an opinion.
3       But as best as you can, what was it
4  about Dr. Najafi's report that caused you to
5  list it as a reliance material?
6       A.  I don't recall if there is specific
7  information from that report that I cite in my
8  background materials or later in my report.  I
9  could page through it and see.
10      But as I sit here, I don't have a
11  specific recollection what caused me to list
12  that one in my materials considered.
13      Q.  Do you recall what kind of expert
14  Dr. Najafi is?
15      A.  No, not by memory.
16      Q.  Can you tell me why you listed as
17  reliance material the expert --
18      MR. GOLDBERG:  Ruben, that question
19  cut out.  You're going to have to ask it
20  again.
21      Q.  Doctor, I'm asking you if you can tell
22  me why you listed reliance upon the report of
23  Dr. Panigraby.
24      A.  I would give you essentially the same

Page 19

1  answer.
2       I don't recall specifically any
3  information from the report of Dr. Panigraby
4  that I rely on for my opinions.
5       If I cite him in the footnotes, then
6  that would indicate the information that I am
7  citing for that report.
8       If I don't and it was simply a report
9  that I reviewed in the context of getting
10 broader information, I don't recall why that one
11 in particular I chose to cite.
12      Q.  Did you prepare this list of reliance
13 material yourself?
14      A.  I have a person on my team that
15 prepares it for me.
16      Q.  Okay.  You mean physically prepares
17 the document?  Is that what you mean?
18      A.  Yes.
19      Q.  Are you the one that's collected the
20 expert reports that you listed as reliance
21 material?
22      A.  Yes.
23      Q.  And so, I take it, since you were the
24 one to list them, that you had a reason for

Page 20

1  doing so; right?
2       A.  For the most part, that is correct.
3       The materials that appear on Exhibit 2
4  are materials that are cited throughout my
5  report.
6       It may be that there are certain
7  expert reports that are cited only in paragraph
8  6 and nowhere else.
9       And the reason they would appear on my
10 Exhibit 2 is that they appear in a footnote,
11 even if the footnote is no more than to identify
12 that report.
13      Q.  Do you know what the subject of
14 Dr. Panigraby's report was?
15      A.  Not by memory, no.
16      Q.  Can you tell me why you listed the
17 report of Dr. Etminan as reliance material for
18 you?
19      A.  The same answer.  I reviewed various
20 expert reports.
21      If they are cited in my footnotes,
22 they are included on Exhibit 2.
23      There are some that may be cited only
24 in connection with paragraph 6 where I have

Page 21

1  listed some of the expert reports.
2       But if it is not cited elsewhere in
3  the report, it is not the basis for any of the
4  information or opinions that I am offering.
5       Q.  Would your answer be the same for
6  Dr. David Chan, who is also listed as a report
7  you relied upon?
8       A.  Yes.
9       Q.  That's a rebuttal report.
10      Do you know what the subject of his
11 report was?
12      A.  Not as I sit here without it in front
13 of me, I don't.
14      Q.  Do you offer any opinions on cGMP?
15      A.  I do not.
16      Q.  Well -- but, Dr. Stiroh, is -- there
17 you go.
18      Dr. Stiroh, can you hear me?
19      A.  Okay.  My computer has a message that
20 says that my Internet connection is unstable.
21      I can hear you now.  I think that cut
22 out in some -- at some point if you were asking
23 a question, and so if you could ask it again.
24      Q.  I will.  Thank you.

Confidential Information - Subject to Protective Order

Page 22

1    I asked you whether you offered any
2  opinions in the area of cGMP and cGMP
3  compliance.
4         MR. GOLDBERG:  Objection to form.
5    A.  I do not.
6    Q.  Can you tell me why you listed the
7  expert report of Dr. -- or Mr. Quick in your
8  reliance material, plaintiffs' cGMP expert?
9    A.  I reviewed the Quick report at the
10 time that I received it, I think in part to see
11 if there were opinions that related to economic
12 losses.
13        I don't recall anything specific in
14 his report that I rely on, unless there might be
15 a definition that I cite to him for.
16   Q.  Was it meaningful for your economic
17 analysis to have an understanding of the
18 allegations regarding the cGMP failures in this
19 case?
20        MR. GOLDBERG:  Objection to form.
21 Vague.
22   A.  I reviewed his report.  I don't recall
23 that there is anything specific that was
24 meaningful for me and my analysis of economic

Page 23

1  loss damages.
2         But I did at the time that I reviewed
3  his report have a -- the understanding from
4  reading it what the subject matter was that he
5  was opining on.
6    Q.  Did you give any weight or
7  consideration whatsoever to any of the opinions
8  of either Mr. Quick or the defense experts in
9  cGMP to your economic analysis?
10        MR. GOLDBERG:  Objection to form.
11 Vague.  Overbroad.
12   A.  I don't recall anything by memory
13 where I am relying on or use as a basis an
14 opinion of any cGMP experts in this case.
15        I reviewed some pieces of information
16 to understand the context of the case, but I
17 don't think there is any of my opinions with
18 respect to economic loss damages that rely on a
19 cGMP expert's opinion.
20   Q.  So would it be fair to say that if
21 there was pervasive cGMP failures on the part of
22 one or more of the defendants in this case, that
23 that did not impact any of your economic
24 analysis?

Page 24

1    A.  I don't think that is fair to say.
2         As a general matter, damages experts
3  will take certain allegations in the complaint
4  at face value and consider, if they are true,
5  what are the economic damages that arise from
6  those actions, and also to consider as
7  appropriate, if some of the allegations are true
8  and others are not, whether damages can be
9  assessed with information common to the class.
10        I have considered the scope of
11 allegations.
12        I have considered how Dr. Conti refers
13 to the alleged wrongdoing and taken that
14 information into account when I formed my
15 opinions.
16   Q.  In what way have you taken into
17 account the allegations in this case as they
18 pertain to cGMP failures?
19   A.  I am going to have to tell you from
20 memory without looking at specific information.
21        To the best of my recollection,
22 Dr. Conti has a section in her report where she
23 either opines or assumes that if there is a cGMP
24 failure, that a drug is then misbranded or

Page 25

1  adulterated, and in her framework, that means
2  that for her, that the drug is economically
3  worthless.
4         I consider that chain of reasoning and
5  respond to it in my report.
6    Q.  What consideration do you give it --
7  the fact in your framework?
8         MR. GOLDBERG:  Can you ask that again,
9  Ruben?  You broke up.
10   Q.  Yeah.  You described understanding
11 that Dr. Conti in her report discusses and gives
12 some specific weight and consideration to the
13 fact of cGMP failures.
14        That's what you've told me; right?
15   A.  I don't think it is what I told you.
16        I am not opining that there is a fact
17 of cGMP failures, and I don't think that
18 Dr. Conti did, unless I have misread her report.
19        I understand that she has taken it as
20 an assumption that there were cGMP failures, and
21 I consider the implication of that assumption
22 for her assessment of economic loss damages and
23 how I think economic loss damages would be
24 properly calculated if there are any in this

Page 26

1 matter.

2     Q. Did you assume that there were cGMP

3 failures for your analysis?

4     A. I don't have a specific assumption

5 that there were cGMP failures.

6      I take under consideration the

7 possibility that the drugs would be considered

8 misbranded or adulterated and consider how that

9 impacts Dr. Conti's opinions.

10      I understand that chain of reasoning

11 in her report starts from an assumption of cGMP

12 failures.

13      I can't think as I sit here whether

14 there are specific aspects of my opinions that

15 depend on me making that assumption.

16     Q. Well, so, before we move on from this

17 idea, I am understanding with some clarity that

18 you understood how Dr. Conti treated that in her

19 framework.

20      I'm simply trying to understand what

21 you did with either the compliance or

22 noncompliance of cGMP.

23      How does that fit into your framework

24 or analysis?

Page 27

1     MR. GOLDBERG: Objection to form.

2 Vague. Compound.

3     A. I do not offer opinions on whether

4 there was compliance or noncompliance with cGMP.

5      I offer opinions with respect to

6 whether damages can be calculated with

7 information common to the class and whether

8 Dr. Conti has put forward a valid economic model

9 to assess damages, if any, with information

10 common to the class.

11     Q. Is the fact of compliance with cGMP

12 relevant to an economic analysis of damages in

13 this case?

14     A. For the analysis itself, whether there

15 is compliance or noncompliance, may not be

16 relevant in the following sense: That if there

17 is ultimately no finding of wrongdoing, my

18 understanding is that there is no damage,

19 regardless of assumptions made by economists.

20      At the stage where I as a damages

21 expert am typically involved in a matter, there

22 has not been a finding of wrongdoing in many

23 cases, and so we would then consider, if there

24 is a finding of wrongdoing, what are the

Page 28

1 economic damages that flow from the conduct that

2 is ultimately deemed to be wrongful.

3     Q. Do you have analysis anywhere in your

4 report that assumes liability and then

5 determines if damages are calculable?

6     MR. GOLDBERG: You're going to have to

7 ask that again, Ruben. You broke up again.

8     MR. HONIK: Did the court reporter get

9 it?

10     THE COURT REPORTER: I did not.

11     Q. Is there any part of your report that

12 assumes liability, as you've just described to

13 me that damages experts sometimes do, in order

14 to address damages?

15      Is that something that you did?

16     A. Yes.

17     Q. And we'll certainly get more deeply

18 into it.

19      But where would I find that in your

20 report, that is, your assumption of liability as

21 a foundation for discussing damages? Where is

22 that?

23     A. There is nowhere in my report where I

24 assume no liability.

Page 29

1      So in that sense, the entirety of my

2 report assumes that liability will be found for

3 some conduct.

4      If liability is found for no conduct,

5 I think my report generally becomes irrelevant.

6     Q. Right. But my question is -- is

7 specific.

8      Can you point to any language in your

9 report that I or any reader could find that says

10 you've assumed liability on any basis in order

11 to discuss or analyze economic damages?

12     MR. GOLDBERG: Objection to form.

13 Asked and answered.

14     A. I don't recall having written that

15 into my report.

16      It is typically a standard

17 going-forward assumption for a damages economist

18 to consider the impact of certain acts where

19 liability for those acts may be determined at a

20 later stage by a court.

21     Q. Okay. And I'm familiar with that

22 construct as well.

23      Is there someplace in your report

24 where I could see your discussion of the basis

Page 30

1 for that liability; in other words, whether the
2 basis lies in warranty or statutory --
3 the -- for economic analysis?
4        Where would I find it in your report?
5        MR. GOLDBERG:  You're going to have to
6 ask that again, Ruben.
7        MR. HONIK:  Jeff, did you hear it?
8        THE COURT REPORTER:  No.  Part of it
9 cut out.
10        MR. HONIK:  Okay.
11    Q.  The question I'm trying to get at,
12 Dr. Stiroh, is this:  Having read the --
13        MR. GOLDBERG:  Ruben, hang on for one
14 second.
15    Q.  -- complaint and other --
16        MR. GOLDBERG:  Can we go off the
17 record for one second?  I do have an idea.
18        MR. HONIK:  Yeah, let's do that.
19        THE VIDEOGRAPHER:  The time right now
20 is 10:42 a.m.  We are off the record.
21        (Discussion off the record.)
22        THE VIDEOGRAPHER:  The time now is
23 11:08 a.m.  We are back on the record.
24    Q.  Dr. Stiroh, thank you for your

Page 31

1 considerable patience.  I am sorry it's taking
2 so long.  And let's see how it goes.  Okay?
3    A.  Yes.
4    Q.  I want to try to pick up where I think
5 we left off, and that is, we were discussing --
6 I was attempting to understand what assumptions
7 you made around the liability questions.
8        You -- you have already described
9 yourself as a damage expert; correct?
10    A.  Yes.
11    Q.  And do you agree generally that the
12 basis for liability impacts damage analysis?
13        MR. GOLDBERG:  Objection to form.
14 Vague.
15    A.  I don't agree generally.
16        As a matter of economics, it may be
17 that it is the fact of liability on a particular
18 claim that then generates damages flowing from
19 that claim.
20        But as a legal basis, the basis for
21 liability I don't think I can tell you matters
22 without some specificity as to what it is that
23 you mean.
24    Q.  So, for example, if you assume

Page 32

1 liability on the basis of a warranty claim, does
2 that impact your analysis differently than
3 assuming, for example, that liability is
4 predicated on negligence?
5        MR. GOLDBERG:  Objection to form.
6 Ambiguous.  Calls for a legal conclusion.
7    A.  It does not affect my analysis in any
8 way as I sit here.
9        To the extent that the legal framework
10 has different ways of considering economic
11 damages, that I would look for guidance from
12 counsel as to whether there are different
13 measures of economic damages depending on the
14 bases for liability, if any, is found.
15    Q.  We'll talk about the basis for
16 measuring or the formulas for measuring.
17        But you agree those are legal
18 determinants; correct?
19        MR. GOLDBERG:  Objection to form.
20 Ambiguous.
21    A.  It is my understanding that it --
22 there would be a legal determination as to
23 whether there is a basis for damages, yes.
24    Q.  And before moving on, in connection

Page 33

1 with your analysis in your report, did you make
2 one or more assumptions about the basis for
3 liability in order to arrive at your economic
4 damages opinions?
5    A.  I don't recall having done so.
6        I have considered the possibility that
7 there would be a finding that the products at
8 issue contain impurities.
9        And I have considered the assumptions
10 that Dr. Conti made and followed with my
11 economic analyses of damages in her framework
12 and the framework I put forward in my report.
13    Q.  In the many cases in which you've been
14 asked to serve as an expert consultant in
15 litigation matters, you frequently need to make
16 assumptions, do you not, in order to answer
17 certain economic questions; correct?
18    A.  I agree.
19    Q.  And so, for example, I know one of
20 your particular -- I'll refer to it as a
21 subspecialty area is evaluating damages in the
22 antitrust context; correct?
23    A.  I'm sorry.  What was the question?
24    Q.  The question is:  You have

Page 34

1 considerable expertise in analyzing economic
2 damages in the antitrust area; correct?
3    A.  Yes.
4    Q.  And I gather one of the things, for
5 example, by way of illustration, that you do
6 there is that you either yourself or you
7 evaluate others' assessments of a but-for world
8 with an actual world in terms of economic
9 consequences; correct?
10       MR. GOLDBERG:  Objection to form.
11    A.  That is a damage model that I am
12 familiar with, yes.
13    Q.  That's right.
14       And in order to actions such models,
15 you have to make certain assumptions in order to
16 arrive at a reasonable understanding of what the
17 models propose; correct?
18    A.  Yes.
19    Q.  So you use things, for example, like
20 regression modeling; correct?
21       MR. GOLDBERG:  Objection to form.
22 Vague.
23    A.  I have used regressions in analyzing
24 things like economic damages or relevant

Page 35

1 markets, as they are relevant to work that I
2 have done.
3    Q.  Have you had occasion to do economic
4 or damage analysis based on assumptions or
5 representations about legal rulings, or based on
6 legal rulings?
7    A.  Yes.
8    Q.  And, in fact, for example, in the
9 antitrust area, have you had occasions where
10 you've been asked to assume or you've been told
11 that courts have determined that there's
12 antitrust culpability and antitrust impact, and
13 then the question becomes how to assess the
14 damages related thereto?  Have you done that?
15    A.  I have not in my experience in
16 antitrust matter.
17       Whether there's antitrust impact is a
18 question for economic testimony, and it's a
19 question on which I have opined.
20       In the antitrust scenario, it would be
21 common for a damage expert to assume the facts
22 in a complaint with respect to conduct are true,
23 but not to assume impact of that conduct without
24 analyzing it in a framework of economics.

Page 36

1    Q.  Understood.  Did you assume any of the
2 facts in the master complaints here?  Did you
3 assume those allegations to be true?
4    A.  I believe where appropriate I have.
5       I have not assumed that facts are not
6 true, as far as I can recall.
7       I have considered the economic
8 implications if there are impurities in the
9 drugs at issue.
10       There may be certain scenarios that I
11 consider that are different from what plaintiff
12 put forward, but that, to my mind, is different
13 from assuming the facts away.
14    Q.  What allegations of plaintiffs'
15 economic loss complaint did you assume to be
16 true?
17    A.  I understand that there is an
18 allegation that NDMA and NDEA impurities were
19 added in the manufacturing process for certain
20 of the Valsartan-containing drugs at issue.
21       I take -- I understand that there is
22 the allegation that then the FDA would not have
23 approved drugs with those impurities in them.
24       I take as given the market facts as I

Page 37

1 understand them that the drugs at issue were
2 withdrawn in 2018 and '19.
3       I take as my understanding that there
4 is a dispute over whether the impurities at
5 issue enhanced any risk that a patient would
6 face, and I consider that aspect of the dispute,
7 taking into account both the possibility that
8 the impurities at issue would have increased
9 risks to patients and the possibility that the
10 impurities at issue would not have increased
11 risk to patients.
12       And I explain in my report how that
13 variation flows through into assessing economic
14 damages.
15    Q.  What do you mean when you say that you
16 assumed the FDA would not have approved the
17 drugs, in your response?
18    A.  I consider the framework that I
19 understand Dr. Conti to have put forward where
20 she says there would not have been a supply of
21 the products at issue.
22       To the best of my recollection, I
23 think that she is assuming that from 2012
24 forward, whereas the market facts as I

Page 38

¹ understand them is that the products at issue
² were not available in 2018 and 2019.
³    Q.  Where in your report would it reveal
⁴ to me or any reader that you assumed the fact
⁵ you just described?
⁶    A.  There is a section in my report where
⁷ I discuss what consumers would have done in the
⁸ absence of the availability of the VCDs at
⁹ issue.
¹⁰       That is consistent with the framework
¹¹ that Dr. Conti has put forward where she assumes
¹² that there would not be supply of the products
¹³ at issue.
¹⁴    Q.  Where is that analysis in your report?
¹⁵    A.  It is included at various places in my
¹⁶ report as appropriate, and specifically in
¹⁷ section Roman Numeral IV of my report, the
¹⁸ discussion begins on paragraph 26.
¹⁹       I have discussed various aspects, I
²⁰ think, that are aligned with that theory, what
²¹ if the drugs were not available at other places
²² as well.  But at least Roman Section IV.
²³    Q.  So I want to make sure that you and I
²⁴ are on the same page.

Page 39

¹       My Roman IV is headed, Plaintiffs'
² payments for VCDs and VCD substitutes would
³ likely have been equal or higher.
⁴       Is that the section you're directing
⁵ me to?
⁶       Because that comports with paragraph
⁷ 50, 5-0, in my report.
⁸    A.  Yes.  Did I say a different number?  I
⁹ meant to say page 26, paragraph 50.
¹⁰    Q.  Got it.
¹¹       Are there any other discrete places in
¹² your report that you believe discusses assuming
¹³ that the FDA would not have approved these
¹⁴ drugs, and, therefore, they wouldn't have been
¹⁵ in the marketplace?
¹⁶       Where else do you discuss it?
¹⁷       MR. GOLDBERG:  Objection to form.
¹⁸    Mischaracterizes the testimony.
¹⁹    A.  I think all of Roman IV, which goes
²⁰ over to a chart that is on page 34.
²¹       But there may be other places,
²² certainly in the summary of opinions that's at
²³ the beginning of my report.
²⁴       And then there may be parts of Roman

Page 40

¹ III where I also consider what patients would
² have done in the absence of available supply for
³ VCDs at issue.
⁴       But the part that I recall discussing
⁵ it more explicitly is Roman IV.
⁶    Q.  Would section Roman IV of your report,
⁷ in addition to the other sections to which
⁸ you've cited me, reflect your analysis of
⁹ potential damages in the absence of a supply
¹⁰ curve for VCDs?
¹¹    A.  My analysis in section IV reflects a
¹² consideration of the financial losses in the
¹³ absence of supply for the VCDs at issue.
¹⁴    Q.  Do you assume in your analysis found
¹⁵ in section IV that there is an absence of a
¹⁶ supply curve for VCDs?
¹⁷    A.  I do not assume an absence of a supply
¹⁸ curve for VCDs.
¹⁹       I understand that one of the
²⁰ alternatives available to consumers in the
²¹ absence of the at-issue VCDs would have been the
²² brand drug and I think some supply available
²³ from other manufacturers that are not
²⁴ defendants.

Page 41

¹    Q.  Is there any part of your analysis in
² which you assume an absence of a supply curve
³ for contaminated VCDs?
⁴    A.  In my section Roman IV, I consider
⁵ what the economic implications are if there had
⁶ not been supply of contaminated VCDs.
⁷    Q.  And was your conclusion in that
⁸ section, generally speaking, that patients would
⁹ go to alternative drug therapy?
¹⁰    A.  Did you ask me if that was my
¹¹ conclusion?
¹²    Q.  Yes.
¹³    A.  It is not a conclusion that I have.
¹⁴ It is a consideration that I have.
¹⁵       My understanding is that patients that
¹⁶ are currently on VCDs or blood pressure
¹⁷ medication, if they could not take their current
¹⁸ medication, would for the most part be required
¹⁹ to switch to something else.
²⁰       I have seen in the data that there are
²¹ some patients that appear to have switched to
²² things like Vitamin C.
²³       So I don't assume that everybody needs
²⁴ to switch, but it is my understanding that the

Page 42

1 majority of consumers would need to take a
2 medication to manage their blood pressure.  It
3 is not necessary to my conclusions that all of
4 them do.
5     Q.   Are you aware that "adulterated" is a
6 term of art with a specific definition under the
7 Federal Food, Drug and Cosmetic Act?
8     A.   My understanding is that it is.
9     Q.   And did you list the relevant section
10 that defines "adulterated" among your reliance
11 materials?
12     A.   I don't think that I did.  I did not
13 rely on an FDA statement of adulteration.  I
14 have considered what Dr. Conti considered in her
15 report, and my report responds to her opinions.
16     Q.   Well, do you acknowledge that
17 Dr. Conti merely applied the definition of
18 "adulterated" as the FDA in the Federal Food,
19 Drug and Cosmetic Act sets it out?
20     A.   As I recall from her report, I believe
21 that is what she sets out to do.
22          I did not go to check whether she had
23 cited it correctly or interpreted it correctly.
24 I take the words in her report as given and

Page 43

1 consider the implications for economic loss
2 damages.
3     Q.   What are the implications, in your
4 judgment, for economic loss damages that we may
5 be dealing with and, in fact, are dealing with
6 adulterated drugs?
7     MR. GOLDBERG:  Objection to form.
8     Assumes facts not in evidence.  Ambiguous.
9     A.   As an economic matter, the economic
10 losses that relate to the difference between the
11 price paid and the value received depend on the
12 impact on the value received by consumers of
13 VCDs from having consumed a product that has an
14 impurity in it that caused it to be deemed
15 adulterated or misbranded.
16          As I explained in my report, as a
17 matter of economics, that diminution of value,
18 if any, depends on what I think I have called
19 the degree of adulteration.  By that, I mean
20 depends on how the risk profile of the product
21 may change for any consumer consuming the
22 product.
23     Q.   And would that be the risk profile as
24 appreciated by that consumer?  Is that what you

Page 44

1 mean?
2     A.   As appreciated by that consumer and/or
3 their doctor.
4     Q.   Okay.  You listed in your reliance
5 material at Exhibit 2, which is now part of your
6 report at Exhibit 1, four court filings.
7          Do you see those?
8     A.   Yes.
9     Q.   There are roughly 2,000 court filings
10 in this MDL.
11          Why did you pick these four?
12     A.   The four that are cited here are the
13 ones that I cited in my report for -- as the
14 basis for certain statements or quotes that I
15 have taken from those court filings.
16     Q.   Yeah.  That strikes me as a tautology.
17 They're there because you cite them in your
18 report.
19          My question is, Why did you select
20 these four?
21          How are they relevant to your analysis
22 and opinions?
23     A.   We can see from where I have cited
24 them how they fit in.

Page 45

1          The definition of the class -- of the
2 purported class, the identities of defendants,
3 the identities of the named plaintiffs all come
4 from the complaint.  And so that is cited.
5          There are certain background facts
6 where I understand there may be a dispute, but
7 from my -- for my purposes, I am using a
8 particular definition, and frequently I will
9 cite a definition that comes from the complaint
10 or the opposing party, if -- if relevant, so
11 that there is not dispute over that fact, and,
12 instead, I focus on the economic analyses.
13     Q.   Were these four court filings provided
14 to you by counsel and suggested as material you
15 should rely on, or did you have a larger pool of
16 documents from which you selected these four on
17 your basis?
18     A.   I have a larger pool of documents and
19 selected these four as having information that I
20 wanted to put either in the background of my
21 report or to define what has been put forward as
22 the class, the dates of the class, the
23 identities of the parties, things like that.
24     Q.   I note that you didn't rely on any

Page 46

¹ opinions or writings of the court to shed light
² on either the theories or the appropriate
³ measure of damages.
⁴        Why didn't you do that?
⁵    A.   I have been asked to assess from the
⁶ standpoint of an economist what -- whether
⁷ economic loss damages in the -- for the class
⁸ members as described in the motion for class
⁹ certification can be assessed with information
¹⁰ methods common to the class.
¹¹        I did that based on my training as an
¹² economist, and have explained at certain places
¹³ in my report where I understand there to be a
¹⁴ correspondence of legal theories and economic
¹⁵ theories.
¹⁶        But for the most part, my report is an
¹⁷ independent economic analysis of economic loss
¹⁸ damages.
¹⁹    Q.   Yeah, I understand all that.
²⁰        But my question was very specific, and
²¹ that was, why didn't you look at any of the
²² writings of the court in the form of opinions to
²³ shed light on any issues that may impact that
²⁴ economic analysis and the ability to certify a

Page 47

¹ class for damages?
²        MR. GOLDBERG:  Objection to form.
³    Asked and answered.
⁴    A.   In the course of my work on this case,
⁵ I have reviewed other legal documents, including
⁶ opinions of the court.  For the purposes of my
⁷ opinions that relate to economic losses, and
⁸ whether there are economic losses that can be
⁹ calculated on a class-wide basis, I rely on my
¹⁰ training and experience as an economist and
¹¹ review the types of information that are
¹² available in this case that economists typically
¹³ rely upon.
¹⁴    Q.   So you did review opinions in the
¹⁵ court, you just didn't list them as reliance
¹⁶ materials; right?
¹⁷    A.   I reviewed opinions of the court.  I
¹⁸ did not rely on an opinion of the court to reach
¹⁹ my independent conclusions as an economist.
²⁰    Q.   When you say "independent," what do
²¹ you mean by that?
²²    A.   I mean that I have not been asked to
²³ assume somebody else's opinion is true.  I have
²⁴ been asked to reach my own opinions.

Page 48

¹    Q.   Were you told not to assume that the
² court's opinions are reliable?
³    A.   I was not.
⁴        MR. GOLDBERG:  Objection.  Note my
⁵    objection to that question as ambiguous.
⁶    Q.   What opinions of the court did you
⁷ read that you failed to list in your reliance
⁸ materials list?
⁹    A.   I did not fail to list any opinions in
¹⁰ my reliance list, because I did not rely on
¹¹ opinions for the court.
¹²        I recall reviewing an opinion of the
¹³ court.  I believe there are more than one.  I
¹⁴ can't recall them for you with certainty as I
¹⁵ sit here without them in front of me.
¹⁶        I think Dr. Conti refers to them
¹⁷ either in her report or in her deposition, and
¹⁸ it would be those ones that are referenced that
¹⁹ I have reviewed.
²⁰    Q.   So these opinions that you did review,
²¹ it sounds like you reviewed them after you wrote
²² your report; correct?
²³    A.   I have reviewed them after I wrote my
²⁴ report.  To the best of my recollection, I have

Page 49

¹ seen the opinions of the court prior to writing
² my report as well.
³    Q.   What opinions of the court did you
⁴ review prior to the preparation and tendering of
⁵ your report that would not be listed in your
⁶ reliance materials list?
⁷    A.   I don't recall by title opinions of
⁸ the court that I reviewed prior to my report.
⁹        There are no opinions of the court
¹⁰ listed in my reliance materials because I did
¹¹ not rely on opinions of the court in reaching my
¹² economic opinions.
¹³    Q.   Right.  I understand that you didn't
¹⁴ rely on anything the court has said.
¹⁵        Now I'm trying to identity what you,
¹⁶ nonetheless, read that the court opined on prior
¹⁷ to January 12th of this year, which is the date
¹⁸ of your report.
¹⁹        If you don't remember the titles or
²⁰ formal names of the opinions, tell me what the
²¹ subjects were.
²²    A.   To the best of my recollection, the
²³ subjects are motions to dismiss documents where
²⁴ the court has written a document that I think

Confidential Information - Subject to Protective Order

Page 50

1  the title has opinion in it.
2      Q.  Okay.  And is it correct that when you
3  read the motions to dismiss, there was nothing
4  in there that the court shed light on which
5  impacted your economic analysis or damage
6  analysis?
7          MR. GOLDBERG: Objection. Ambiguous.
8      A.  I don't recall if there was anything
9  in them that shed light on my economic analysis.
10         To the extent that there was something
11 that is consistent with other documents that I
12 have read that shed light on my economic
13 analysis, I have relied on materials and
14 information that are commonly relied upon by
15 economists in reaching independent economic
16 opinions, and I have not relied on an opinion of
17 the court to reach my own opinion.
18     Q.  So if the court offered an opinion
19 about the viability of a certain cause of action
20 alleged in plaintiffs' complaint and the
21 economic impact of that, you did not place any
22 weight or reliance on such views; correct?
23     A.  I think it is not correct to phrase
24 what I did in that way.

Page 51

1          I reviewed certain court documents.
2  The opinion of the court that I have read does
3  not -- is not something that I relied on in
4  reaching my own opinions with respect to
5  economic loss damages.
6      Q.  Did you read Dr. Conti's deposition
7  testimony in preparation for today?
8      A.  I did.
9      Q.  What opinions were you shown or did
10 you review after the preparation of your written
11 report?
12         You've only authored one written
13 report; correct?
14     A.  In connection with this matter, that
15 is correct.
16     Q.  When you say "in connection with this
17 matter," have you authored any other writings in
18 connection with this MDL which concerns
19 Valsartan, Losartan and Irbesartan?
20     A.  I have not.
21     Q.  So the question is, What opinions of
22 the court did you read and/or consider after the
23 preparation of your one and only written report?
24     A.  To the best of my recollection, I have

Page 52

1  reviewed opinions of the court connected with
2  motions to dismiss.
3          To the best of my recollection, they
4  are the same that I had reviewed earlier in the
5  case.  They are not things that I relied upon to
6  reach my opinions.
7      Q.  Okay.  And so if I've understood you,
8  what you're saying is, you read opinions of the
9  court on motions to dismiss both before and
10 after you wrote your report, and in neither
11 instance do you place reliance on the court's
12 views; correct?
13         MR. GOLDBERG:  Objection.
14 Mischaracterizes the testimony.
15     A.  For purposes of reaching my opinions
16 with respect to the economic loss damages
17 purportedly suffered by the class, I did not
18 rely on a judge's legal opinion.
19         I relied on my own training as an
20 economist and the materials that an economist
21 would typically consider in evaluating whether
22 damages can be assessed with information and
23 methods common to the class.
24     Q.  What do you mean by typically rely

Page 53

1  upon?
2          What do economists typically rely upon
3  that you place reliance on to the exclusion of
4  the court's views?
5      A.  I do not exclude the court's views.  I
6  did not rely on the court's views for purposes
7  of my -- of reaching my opinions.
8          The things that I rely upon, as I
9  mentioned, my training and experience as an
10 economist, that is, the economic -- the
11 application of economic theory and models to
12 business situations to assess whether there is
13 economic loss to individuals in a given set of
14 circumstances.
15     Q.  Does it matter to you to understand
16 what the court's views about what the proper
17 measure of damages is to do the work you were
18 asked to do?
19         MR. GOLDBERG:  Objection to form.
20 Ambiguous.
21     A.  To do the work that I was asked to do
22 is what I have in my report.
23         I was asked to assess whether damages
24 could be determined on a class-wide basis with

Page 54

1 information common to the class where those
2 damages were economic loss damages.
3      I have explained in my report the
4 framework that I am using for economic loss
5 damage.
6      To carry out my assignment in this
7 case, it was not necessary to take an
8 assumption -- sorry -- to take an opinion of the
9 court as an assumption in reaching my economic
10 opinions.
11      Q.  You wrote, and I quote, I also do not
12 opine on the legal issues relating to the proper
13 measure of damages or on which measures should
14 be used.
15      Do you remember writing that?
16      A.  Yes.
17      Q.  Does it matter to you whether the
18 court has a view or opinion on what the proper
19 measure of damages is or which measure should be
20 used?  Is that relevant to you?
21      A.  I would anticipate, in the fullness of
22 time, the court will eventually reach an opinion
23 on the proper measure of damages to be used, and
24 my report is something that I have been asked to

Page 55

1 prepare that reflects my opinions on those
2 topics.
3      Q.  If the fullness of time were to have
4 occurred already and it coincided with today,
5 and if you were told today what the court said
6 is the proper measure of damages, or which
7 measure should be used, would you accept that
8 and rely upon it in forming opinions?
9      A.  I'm sorry.  I need you to say the
10 beginning of that again.  I missed at least one
11 of the words in your question.  Not a technology
12 issue.  I just didn't hear it.
13      MR. HONIK:  Jeff, did you get my
14 question?
15      THE COURT REPORTER:  Yes, I did.
16      MR. HONIK:  Would you be kind enough
17 to read it to Dr. Stiroh.
18      THE COURT REPORTER:  Sure.
19      (The record was read back.)
20      A.  I would not, for the reason that if
21 the court has fully determined what the measure
22 of damages is and does not require, or the
23 parties do not believe, that there is any role
24 for opinion testimony, I would not anticipate

Page 56

1 being asked to give my opinions on economic loss
2 damages.
3      Q.  If you were told to assume VCDs in
4 this case were adulterated under the meaning of
5 the Food, Drug and Cosmetic Act, would that have
6 changed any of your opinions in this case?
7      A.  No.
8      Q.  I'm sorry.  Did you say no?
9      A.  I did say no.
10      Q.  Did you consider in any way in your
11 economic analysis whether if the VCDs in
12 question were adulterated as defined under that
13 act, what impact it would have on your economic
14 analysis and various conclusions?
15      A.  The question was, did I consider that?
16      THE WITNESS:  I'm sorry, Jeff.  If you
17 don't mind reading that one back to me as
18 well.
19      Q.  I'll restate it.
20      Did you consider in any way in your
21 economic analysis whether if the VCDs in
22 question were, in fact, adulterated as defined
23 under the Food, Drug and Cosmetic Act, if that
24 would influence or impact any of your economic

Page 57

1 analysis or conclusions?
2      MR. GOLDBERG:  Objection.  Vague.
3 Overbroad.
4      A.  I have considered that scenario.
5      It does have an impact on my damages
6 assessment.
7      If it is not -- if the products at
8 issue are not found to be adulterated or
9 misbranded, my understanding is there would then
10 be no damages arising from the conduct at issue.
11      If their products at issue are found
12 to be adulterated and misbranded, then, as I
13 explained in my report, to an economist
14 assessing diminution of value that comes from
15 adulteration or misbranding, it matters the
16 degree to which any product consumed by any
17 consumer was adulterated or misbranded, the
18 impact that that adulteration has for the
19 efficacy of the drug for that consumer, whether
20 it still has a therapeutic benefit to the
21 consumer, the amount of the product that they
22 consumed, the change in the risk profile for the
23 consumer, and I understand that some of those
24 factors depend on things individual to the

Confidential Information - Subject to Protective Order

Page 58

1 consumer, such at their weight and health
2 history.
3    Q.  What is the proper measure of damages
4 for a contaminated drug in the U.S. supply
5 chain?
6        MR. GOLDBERG:  Object to form.  Calls
7 for a legal conclusion.
8    A.  I'm not offering an opinion on what
9 the proper measure of damages is.  I'm offering
10 opinions on how to properly use economics to
11 assess damages when those damages come from
12 diminution of loss or differences in financial
13 circumstances of patients.
14    Q.  What is the difference between the
15 phrases you used, "proper measure of damages,"
16 versus "which measure should be used"?
17       Are those terms synonymous or
18 different?
19    A.  They are different.
20    Q.  Can you tell me the difference.
21    A.  Yes.  In my report when I use "proper
22 measure of damages," I am speaking from the
23 standpoint of an economist how to use economics
24 properly in the measure of damages.

Page 59

1        I am not opining to the court on which
2 measure of damages, and in my report, I consider
3 alternative approaches to damage valuation.
4    Q.  Okay.  So what is -- what is "which
5 measure should be used," how is that different?
6    A.  As I hear you say that, I -- I
7 understand that to mean am I telling the court
8 which measure should be used, and that is not
9 what I am intending to do.
10    Q.  Okay.  I think there's some confusion,
11 and I apologize.
12       I am directing your attention to
13 paragraph 5 of your own report, marked as
14 Exhibit 1, in which you write in the penultimate
15 sentence, quote, I also do not opine on the
16 legal issues relating to the proper measure of
17 damages or on which measure should be used.
18       Do you see that clause?
19    A.  I do.
20    Q.  And my question is, are those two
21 different things, the proper measure of damages
22 on the one hand, and which measures should be
23 used on the other?
24       Are they two different concepts or are

Page 60

1 they synonymous as you've used them?
2    A.  They're not synonymous as I have used
3 them.  I think that the explanation that I gave
4 you a minute ago is correct.
5        I don't know with certainty, but it
6 would not surprise me if elsewhere in the report
7 I have used the phrase "to properly calculate
8 economic damages" or "a proper measure of
9 economic damages," or even just "a proper
10 measure of damage" with the word "economic"
11 elsewhere in the sentence.
12       When I use "proper measure of damages"
13 elsewhere in my report, I'm opining on
14 economics.
15       In this sentence that you have quoted
16 that is towards the end of paragraph 5, I am
17 clarifying that if there are legal issues that
18 relate to the proper measure of damages as I
19 would calculate them, I am not opining on the
20 legal issues and I am not opining on which
21 measure should be used.
22    Q.  So do you accept that legal issues can
23 impact the proper measure of damages in a case
24 such as this?

Page 61

1        MR. GOLDBERG:  Objection to form.
2    A.  I don't have an opinion on that.
3    Q.  Listen to my question.
4        Do you accept that legal issues may
5 have an impact on how and what the proper
6 measure of damages is in this case?
7        MR. GOLDBERG:  Objection to form.
8    Vague.
9    A.  I accept that there would be legal
10 issues that could determine which measure of
11 damages would be used.
12       As we've just had in our exchange,
13 when I use "proper measure of damages," I have
14 in that an expectation that it is properly using
15 economics, an economic theory.
16       When you asked the question, it sounds
17 like you maybe have a different measure or
18 definition that is the legal theory.
19       And what I've intended to do in the
20 sentence that you've quoted in paragraph 5 is
21 say specifically, that is not the subject I am
22 opining on.  I am opining on economic damages,
23 and I do have an opinion on how economics would
24 properly be used in determining economic

Confidential Information - Subject to Protective Order

---

Page 62

1 damages.
2    Q.   Right.  And I'm only trying to
3 understand to what extent, if any, you accept or
4 allow that legal principles and legal
5 conclusions in a case like this impact your
6 economic measure of damage analysis.
7    A.   I guess I am not following your
8 question, then, or would need it explained.
9        I have written a report that gives my
10 opinions.  I would expect the court would take
11 into account economic opinions as well as legal
12 information.
13        I do not have an opinion with respect
14 to the legal framework.  I have opinions with
15 respect to the economic framework.
16        If the court takes into account
17 different information, and particularly a legal
18 framework, I think that affects what the court
19 does with my opinion.  It does not affect my
20 opinions, unless you give me an example that
21 then I can consider.
22    Q.   So is it your testimony that the legal
23 framework, to borrow your phrase, doesn't impact
24 your economic analysis?

Page 63

1    A.   It is my understanding that a court
2 may take into account things other than
3 economics in assessing damages.
4        The things that I take into account
5 are economic variables.
6        I have in my report explained why I
7 have an understanding that some of the
8 approaches that I describe may also be of
9 relevance to the court.  I am not telling the
10 court which ones to consider.
11    Q.   Yeah.  Dr. Stiroh, respectfully,
12 you've turned the question on its head.
13        I have a well-developed understanding
14 of what courts consider.
15        What I have asked you is whether, in
16 your economic analysis and your opinions, you
17 considered the legal framework, as you used that
18 term.
19        MR. GOLDBERG:  Objection to form.
20 Argumentative.  Asked and answered.
21    A.   I don't have a basis to incorporate a
22 legal framework into my analysis.
23        I am not a lawyer.  I have worked on
24 matters where, for example, there is a -- a

Page 64

1 statutory prejudgment interest rate, and I have
2 taken those cases -- where appropriate, I have
3 taken the statutory interest rate and used it in
4 analyses.
5        I don't know -- I can't think of an
6 example like that that is relevant here.
7    Q.   Does it matter to you when the point
8 of injury occurred in this case?
9        MR. GOLDBERG:  Objection to form.
10 Vague.
11    A.   It does.
12    Q.   In what way?
13    A.   I understand that the allegations
14 include an allegation that the VCDs at issue
15 increase the risk profile of a potentially
16 adverse health outcome for patients that consume
17 them.
18        I understand that the change in the
19 risk profile depends on factors such as the issue
20 amount of the -- of the products at issue that
21 were consumed, the weight of the person
22 consuming them, and other health factors.  Those
23 can change over time.
24        I have an analysis in my report that

Page 65

1 considers the available information on how long
2 and how many and of what concentrations of the
3 products at issue certain class members took.
4        That timeframe comes into account in
5 assessing whether damages can be determined on a
6 class-wide basis with information common to the
7 class.
8    Q.   Did you give any consideration to when
9 the drugs were purchased in time, to your
10 economic analysis?
11    A.   I --
12        MR. GOLDBERG:  Objection.
13    A.   I think my answer just -- I think my
14 answer answered that question.
15        It -- my understanding is that the
16 class period for the consumers and TPPs starts
17 in 2012 and goes to the recalls.
18        And I consider that patients are
19 differently situated over that timeframe, that
20 there are potentially class members who have
21 taken the products at issue for longer periods
22 than others.  And I describe that in my report.
23    Q.   You listed the plaintiffs' economic
24 loss complaint, as well as our memorandum of law

Page 66

1 supporting class certification, as items that
2 you read and relied upon; correct?
3      A.  Yes.
4      Q.  Did you glean from any of that when
5 the plaintiffs allege that the economic harm
6 occurred?
7          And I don't mean the class period.  I
8 mean, when was economic harm occurring for each
9 class member?  Did you glean that?
10     A.  Are you asking me about the economic
11 loss damages to the purported class of
12 consumers?
13     Q.  Yes.
14        MR. GOLDBERG:  Objection to form.
15     A.  It is my understanding that the harm
16 to consumers is alleged to come from consumption
17 of the products at issue.
18        The products at issue were --
19     Q.  And when you -- I apologize.  I spoke
20 over you.  Go ahead.
21     A.  The product at issue were consumed in
22 different amounts, in different quantities, and
23 over different frame -- timeframes by the class,
24 and I have considered that in my report.

Page 67

1      Q.  When you say "consumption," do you
2 mean ingest?
3      A.  I do.  Sorry about that.  I do.
4      Q.  Did you in any way, shape or form
5 consider that the economic harm is unrelated to
6 consumption, but related to the purchase of the
7 drug?
8      A.  I understand that the allegations of
9 harm to TPPs are not related to their
10 consumption of the drug.
11         I understand that the allegations of
12 harm to consumers comes from the fact that they
13 have consumed a drug that includes impurities.
14         If a consumer did not consume it or
15 purchased it on behalf of somebody else, a -- a
16 parent for a child, for example, I understand
17 that it is considering the harm for -- on the
18 consumers to the person that consumed the drug.
19     Q.  Is it your understanding, therefore,
20 that the economic harm claimed in the economic
21 loss complaint on behalf of the consumer class
22 is unrelated to the purchase of the drug, that
23 is, the transaction at the retail level in which
24 some monies is exchanged between consumer and

Page 68

1 the retailer?
2      A.  It is not my understanding that those
3 are unrelated.
4      Q.  Well, how is that related to your
5 analysis of the economic harm here?
6      A.  My consideration of economic harm
7 includes a consideration of the difference
8 between the price paid, which would be the price
9 that was paid at retail, for example, for the
10 products at issue, and the value received.
11         And the value received would be the
12 value that a patient who consumed the product
13 received from consuming it.
14     Q.  So the definition of value in that
15 sentence and in your analysis is the therapeutic
16 value that was given or provided to the patient;
17 correct?
18     A.  It includes the therapeutic value that
19 was provided to the patient, yes.
20     Q.  What else is included in your
21 definition of value in that construct?
22     A.  The -- other factors that could be
23 considered in value to a patient that consumes
24 it are the either presence or lack of side

Page 69

1 effects from consuming the product at issue, the
2 effectiveness of the drug that they have
3 experienced relative to perhaps taking other
4 blood pressure medications, the ease with which
5 they can take it and remember to take it on a
6 particular daily, weekly, timeframe.
7         Whether they are obtaining it through
8 a mail order and it comes to their house versus
9 they have to drive to get it.
10        There may be other things, but those
11 are the ones that come to mind.
12     Q.  Are you able to assign economic values
13 to the elements that you just laid out for me?
14     A.  Can you say what you mean by "assign
15 economic value"?
16     Q.  Yeah.  Assign a cash value to it, a
17 dollar value to the elements you just described
18 as making up value.
19        MR. GOLDBERG:  Objection to form.
20 Ambiguous.  Overbroad.
21     A.  From the standpoint of economic
22 theory, things that give value to a consumer can
23 be measured in dollar terms.
24     Q.  Okay.  Have you done that in your

Page 70

1  analysis and report?
2      A.  I have not assessed the value of the
3  products received on a
4  class-member-by-class-member basis.
5          My report and opinions of this class
6  certification stage of the case includes the
7  opinion that such an analysis requires
8  individual information and cannot be performed
9  on a class-wide basis.
10     Q.  Is there a reliable methodology of
11  which you're aware that can place a dollar value
12  on any of the elements of value that you've
13  described to me?
14     A.  In a general sense, there are economic
15  methods that have been used to assess changes in
16  consumer welfare that to an economist means all
17  of the aspects of value that a consumer would
18  obtain.
19         To assess damages or loss of consumer
20  welfare in this matter, the diminution of value
21  to a consumer depends on factors that are unique
22  to a consumer and are not market-wide.
23         So information in this matter would
24  be, you would need individual-by-individual

Page 71

1  information to assess the diminution of value,
2  if any.
3      Q.  Yeah.  And assuming all of that to be
4  true, it's correct that you didn't attempt to
5  provide a formula or describe a methodology at
6  which any of those values could be quantified;
7  correct?
8      A.  I do not describe how an economist
9  would consider putting a dollar value on loss of
10  consumer welfare.  It is the concept that is
11  underlying my report.
12         I described the information that would
13  be needed to do so and note that that
14  information is individualized and not
15  class-wide.
16     Q.  So, in other words, if a court and/or
17  jury were to decide that the proper measure of
18  damages in this case is the actual dollars paid
19  by both consumers as well as TPPs, and that
20  number is $4.4 billion, you would have no way to
21  reduce that by ascribing any value or diminution
22  to the value elements that you described for me;
23  correct?
24     A.  I don't think I'm following the

Page 72

1  hypothetical in your question.
2          It had in it at the beginning, as I
3  heard it --
4      Q.  I'll restate it for you.  I'll restate
5  it for you.
6          I want you to assume that a court and
7  a jury has concluded that the damages in this
8  case total $4 billion, which is the actual money
9  paid by consumers and insurers for these
10  contaminated drugs.
11         You with me so far?
12     A.  Yes.
13     Q.  And I want you to further assume that
14  the court will allow some evidence to diminish
15  that number by value that the consumers or the
16  TPPs received.
17         Tell me how you would measure that and
18  offer it as a -- what to deduct the $4 billion
19  number I asked you to assume.
20         MR. GOLDBERG:  Objection to form.
21  Ambiguous.
22     A.  I don't understand your hypothetical.
23         In my experience, if a jury has
24  reached an opinion and conclusion that is after

Page 73

1  I have given my report and testimony, and I --
2  my role has typically ended.
3      Q.  I want you to assume the following,
4  and I want you to listen carefully to me.
5          I want you to assume you haven't
6  testified yet.
7          I want you to assume that the result
8  of a legal proceeding is that gross damages in
9  the amount of $4 billion have been arrived at
10  through testimony other than your own and
11  through legal conclusions that the court made,
12  and that the gross damages in this hypothetical
13  case is $4 billion, which was derived at by
14  simply adding the amount of that consumers paid
15  and insurers paid, and the court is now inviting
16  you as an expert to tell the court how to
17  diminish that sum by the value which you believe
18  the consumers or insurers in this case received.
19         Tell me the method by which you will
20  apprise the court how to diminish the 4 billion
21  sum.
22     A.  In a scenario where the court has
23  determined a sum of money, if -- to me, if they
24  have determined what damages are, then I have

Page 74

1  got to say this is outside of my experience to
2  understand what it is that I'm now being asked
3  to do.
4      If a judge were to tell me, I
5  understand, here is all of the spending on the
6  drugs.  How do I get from this spending to what
7  are economic damages?
8      Depending on the information that I
9  have available to me, if it is the set of
10 information that I have in my report, I would
11 explain to the judge that individual information
12 is required from consumers to assess the
13 diminution of value in the product that they
14 actually experienced.
15     Q.  And you would agree you didn't do that
16 in your report; correct?
17     A.  I don't think that is correct.
18     I think exactly what I have done in my
19 report is to tell the court or the judge that
20 individual information is required to assess
21 diminution of value.
22     Q.  Did you provide a methodology for
23 arriving at a dollar value assigned to the
24 intangible values you've described?

Page 75

1      A.  I have not laid out a framework in my
2  report for assessing the reduction in consumer
3  welfare, if any.
4      I have described that that cannot be
5  done without information that is individualized.
6      Q.  Did you consider whether or not
7  adulterated drugs can be placed into and sold
8  within the U.S. drug supply market, that is,
9  placed into the interstate commerce in the
10 United States?
11     A.  I have considered that -- in my
12 report, I have considered that in the context of
13 evaluating Dr. Conti's opinions.
14     I have an example in my report where
15 it is not reasonable from an economic standpoint
16 to assume that a product loses value because it
17 is not FDA approved in the U.S. where it may be
18 FDA approved elsewhere, and that it is not
19 reasonable to assume from an economic standpoint
20 that because it is not FDA approved, it would
21 have zero value to all potential consumers.
22     MR. GOLDBERG:  Ruben, could we --
23     Q.  Did it matter to you --
24     MR. GOLDBERG:  Can you hear me?

Page 76

1      Can we take a minute off -- can we
2  take a minute off the record?  We've been
3  going -- I know we had a break, but I would
4  like to take a -- a bio break, if we could.
5      MR. HONIK:  Yeah.  Okay.  I'm in the
6  middle of something.  There's one or two
7  questions that would be a more --
8      MR. GOLDBERG:  Okay.  Why don't you go
9  ahead.  That's fine.  Go ahead, Ruben.
10     Q.  Dr. Stiroh, did it matter to you in
11 your analysis and in arriving at your opinions
12 whether it is permissible under U.S. law to sell
13 adulterated or misbranded drugs to U.S.
14 consumers and end payers?
15     A.  It matters to my opinions.
16     I have an opinion that that fact, if
17 or where true, does not mean that the drugs do
18 not have value to consumers.
19     I have opinions in my report that
20 relate to the fact that the drugs at issue were,
21 in fact, sold and consumed by consumers.
22     Q.  If you were told to assume that
23 adulterated drug products cannot be placed into
24 the stream of commerce, would any of your

Page 77

1  opinions have changed?
2      A.  On a going-backward basis for
3  considering the diminution of value, if any, for
4  products that were consumed, that factor does
5  not affect whether consumers obtained value for
6  the product that they consumed, I have
7  considered and described elsewhere in my report
8  a consideration of how to evaluate differences
9  in financial outcomes for consumers if the
10 products had not ever been available in the
11 United States.
12     MR. HONIK:  This is a good time to
13 break.
14     Go off the record.
15     THE VIDEOGRAPHER:  The time now is
16 12:07 p.m.  We are off the record.
17     (A recess was taken from 12:07 to
18 12:15.)
19     THE VIDEOGRAPHER:  The time right now
20 is 12:15 p.m.  We are back on the record.
21     Q.  Dr. Stiroh, are you ready to proceed?
22     A.  I am.  Thank you.
23     Q.  I want to develop just a little kind
24 of -- call it almost a side understanding here

Confidential Information - Subject to Protective Order

Page 78

1 by way of a -- an illustration unrelated to this
2 case specifically, but just to understand how
3 you do certain things as an economist in
4 analyzing litigation issues.
5         If you're working on an antitrust
6 case, for example, involving a claim of generic
7 delay -- an antitrust claim of generic delay,
8 would an economist -- or doesn't an economist
9 typically try to assess what impact to the cost
10 of the drugs during the period of delay may or
11 may not have occurred?
12    A.  In a generic delay case, an economist
13 may consider potentially whether there was a
14 difference in the cost of the drugs, but also
15 the price of the drugs to which they were sold
16 through various channels of distribution.
17    Q.  Right.  And I -- look, I don't want to
18 belabor this.  I just -- I don't need to be
19 provocative.  I just want to get certain
20 understanding about how you go about things as
21 an economist.
22        But the claim in that case is that
23 consumers and/or insurers pay more for the drug
24 than they should have because there was some

Page 79

1 collusion or antitrust behavior that caused the
2 delay for generic entry.
3        That's what those cases are about;
4 right?
5        MR. GOLDBERG:  Objection to form.
6 Ambiguous.
7    A.  There are generic delay cases that I
8 am aware of that have the economic component
9 that I would be familiar with is that the -- the
10 price of the product is higher than it otherwise
11 would be.
12        But for the delay, there could also be
13 a component that the cost is also different.
14    Q.  Where do you turn to to understand
15 what the pricing is or was for the drugs in
16 question in that scenario?  Where do you turn?
17    A.  In cases where I have worked on a
18 generic delay matter, the data that I look at is
19 frequently historic data.
20        Cases that I have been involved in
21 have had a period where there is no generic
22 entry and a period when there is generic entry,
23 and the economic exercise is essentially
24 back-casting from that data to consider what

Page 80

1 outcomes would have been had the point of
2 generic entry occurred earlier.
3    Q.  Right.  When you say "back-casting,"
4 you mean creating a but-for world where there is
5 different points of generic entry; right?
6    A.  Yes.
7    Q.  And all I -- and here is, sort of, the
8 punch line.
9        I just want to understand, where do
10 you collect or get the historic data for
11 pricing?
12    A.  In cases that I have worked on, there
13 have been -- has been available data both for
14 scenarios where there are few generic
15 manufacturers and cases where there then has
16 been later in the timeframe generic entry.
17        And from the actual data on actual
18 transactions for the products at issue, it is
19 possible to construct a model to say what if
20 the -- a generic had entered six months earlier?
21        And we see from the pricing pattern
22 what actually happened to prices when the
23 generic did enter, and we consider can that be
24 moved back six months?  How did economic

Page 81

1 conditions vary in the six-month-earlier period?
2 Are there other factors, such as availability of
3 the active ingredient?  Factors such as that.
4        But it's essentially in matters like
5 that that I have worked on.
6        There are cases where we do have
7 representative data to show what happens when
8 there is generic entry and how prices behaved
9 prior to generic entry.
10    Q.  Yeah.  I understand all that.
11        And do you get the pricing data from
12 IQVIA?
13    A.  I have worked with pricing data from
14 IQVIA for matters like that, yes.
15    Q.  And you find that reliable data?
16        MR. GOLDBERG:  Objection to form.
17 Speculative.  Ambiguous.
18    A.  It matters as to what it is that I am
19 using it for.
20        The IQVIA data are generally used, in
21 my experience in pharmaceutical matters, because
22 they gather data from a variety of different
23 sources.
24        In matters that I have worked on, it

Page 82

1 may be that that -- those data are supplemented
2 by information on sales and prices from the
3 manufacturers.
4        But I have used IQVIA data in other
5 matters.
6    Q.  So if I heard you correctly, there are
7 two sources for what you described as historic
8 data -- or historical data:  Sales and pricing
9 from the actual manufacturer, as well as pricing
10 information from IQVIA; correct?
11    A.  I'm not sure what you're asking me.
12        Are you asking me specifically what I
13 have looked at, or you're asking me to tell you
14 what might be available in a generic delay case?
15    Q.  I'm asking you if as an economist in
16 doing antitrust cases, you routinely rely on
17 both IQVIA sales data, pricing data, as well as,
18 when available, sales and pricing data from the
19 manufacturer of a particular pharmaceutical drug
20 product.  Yes or no?
21        MR. GOLDBERG:  Objection to form.
22    Ambiguous.
23    A.  In matters that I have been involved
24 in that involved pharmaceutical markets, I have

Page 83

1 relied on IQVIA data.
2        I don't know if I can say that I
3 relied on it in every instance, but I have
4 relied on IQVIA data, and I have relied on
5 information available from the manufacturers.
6    Q.  Thank you.
7        Now, before we broke, we spoke a
8 little bit about the impact of the theories of
9 liability in this case to your economic
10 analysis.
11        Do you remember we talked a bit about
12 that?
13    A.  I do.
14    Q.  And I know you discussed and you
15 listed among your -- the reliance materials the
16 complaint in this case which formed the
17 plaintiffs' allegations.
18        You've looked at the briefing on class
19 certification.
20        You've certainly acquainted yourself
21 with the various theories of liability against
22 not only the manufacturers, but all of the
23 defendant entities in this supply chain;
24 correct?

Page 84

1    A.  I don't think that is correct.
2        I have read the complaint.  I have
3 read the information in -- that is listed in my
4 Exhibit 2 to my report.
5        I have reviewed other information on
6 other court filings, but I did not set out to
7 understand all of the theories of harm or
8 liability from a legal standpoint.
9        I have looked at information that is
10 relevant to a consideration of economic loss
11 damages.
12    Q.  Did you consider whether or if
13 warranties were breached in this case?
14    A.  I did not make an assumption one way
15 or another whether or if warranties were
16 breached in this case.
17    Q.  Did you consider what the proper
18 measure of damages would be for a breach of
19 warranty-based claim?
20        MR. GOLDBERG:  Objection to form.
21    Calls for a legal opinion.
22    A.  I'm not opining and not offering an
23 opinion to the court on what the appropriate
24 measure of damages would be for a breach of

Page 85

1 warranty claim.
2        I have considered the economic
3 theories that underlie economic losses and
4 described how I approached that type of
5 analysis.
6        And to the extent that that is
7 relevant to various theories of liability that a
8 court might consider, the court can take my
9 opinion into account.
10        I have not set out to tell the court
11 what theory of damages applies to different
12 theories of harm.
13    Q.  I'm a little confused.
14        What do you mean by "underlying
15 theories" in your answer?
16    A.  I'm not sure how I used it.
17    Q.  Okay.
18        MR. HONIK:  Jeff, can I have the
19    answer read back to me, please.
20        (The record was read back.)
21    Q.  Dr. Stiroh, what did you mean by
22 "considered economic theories" in that response
23 that the court reporter just read back?
24    A.  I had in mind the discussion that is

Page 86

1 in my report that considers diminution of value
2 being the difference between the price paid and
3 the value received.  From an economic
4 standpoint, that is a change in consumer
5 surplus.
6      I have also considered a difference in
7 financial outcomes, and that is the difference
8 in prices paid in a scenario where the products
9 at issue were consumed compared to a scenario
10 where alternative products would have been
11 purchased.
12   Q.  Well, is it fair to say that each of
13 the two models that you just described would be
14 measures of damage?
15      MR. GOLDBERG:  Objection.  Calls for a
16   legal opinion.
17      THE COURT REPORTER:  Counsel, could
18   you repeat that question?  I didn't hear it
19   clearly.  This is Jeff.
20   Q.  Did you hear it, Dr. Stiroh?
21   A.  I believe that I did, yes.
22   Q.  Okay.  For the benefit of the court
23 reporter, let me try to restate or rephrase it.
24      You described, one -- I'll call it a

Page 87

1 model or a measure that you referred to as
2 "diminution of value."
3      Do you remember that?
4   A.  Yes.
5   Q.  And then you described what I
6 understood, and I wrote down in shorthand,
7 another measure or formula that you referred to
8 as "financial outcome."
9      Do you remember that?
10   A.  I do.
11   Q.  The second of those two, the
12 financial -- could we refer to it, just for ease
13 of reference in our talk here, to the second
14 model or measure as financial outcome and the
15 first one diminution?
16      Would that be okay with you?
17   A.  Yes.
18   Q.  So if we focus on financial outcome,
19 if I listen carefully, the formula for
20 determining damages under that approach would be
21 prices paid and compare it to alternative
22 product cost; correct?
23   A.  You are describing for me what I said
24 is a model comparing financial outcomes?

Page 88

1   Q.  Yes, ma'am.
2   A.  I think you use "cost" differently
3 from how I use it, and I'm concerned there could
4 be some confusion.
5      I -- my model, where I would consider
6 differences in financial outcomes from the
7 standpoint of a consumer, I consider the
8 financial outlay, the difference in their
9 financial position purchasing the products at
10 issue and an alternative product.
11      For a -- somebody further upstream,
12 then it may be relevant to consider the
13 difference in both the prices paid and the costs
14 of the -- acquiring the product.
15   Q.  Yeah.  So I completely understand.
16      Let me give you an illustration of
17 what I understand you mean by the measure of
18 damages we're referring to as financial outcome.
19      If someone pays $10 for a drug and you
20 now want to compare the cost of getting an
21 alternative drug, if that alternative drug is
22 $12, there's no economic loss, because the
23 alternative cost exceeds the paid price;
24 correct, in that hypothetical?  Right?

Page 89

1   A.  No.  In that hypothetical, there is no
2 financial loss to the consumers.
3      I have defined economic loss in my
4 report as a difference between the price paid
5 and the value received.
6   Q.  Okay.  But I don't want to leave this
7 area until I've understood the two measures that
8 you've outlined for me.
9      And the one we're going to focus on
10 now is what we referred to -- I referred to, and
11 you agreed to accept -- as financial outcome.
12      Can you give me an example using
13 specific drugs and costs and tell me how
14 financial outcome is a measure?
15   A.  If there were a consumer that was
16 taking Valsartan, and in the absence of supply
17 of the Valsartan that they consumed they would
18 have switched to Irbesartan, the difference in
19 financial outcomes for them depends on whether
20 they are a cash consumer and pay a retail price
21 for two products, because the retail prices are
22 different, or whether they are insured, and then
23 it depends on their insurance plan and what the
24 co-pay or co-insurance amount is for differences

Page 90

1  for the -- the two products.
2      The exercise is to consider what were
3  the financial outlays for the Valsartan that
4  they purchased and what the financial outlays
5  would have been had they consumed a different
6  blood pressure medication.
7      Q.  That's correct.  So if the financial
8  outlay would have been $10 for the Valsartan and
9  the replacement drug is $12, there's no
10  financial outlay or loss to that consumer,
11  right; in the simplest terms; right?
12      A.  If the financial outlay would have
13  been the same, that is correct, there is no
14  difference in the financial outcomes for the
15  consumer.
16      Q.  I actually completely misspoke.  I
17  misspoke.
18      If the replacement drug was actually
19  $12, or $2 more, their loss is $2, in my
20  hypothetical; correct?
21      A.  No.  I think you have assumed that the
22  financial outlay for the replacement drug is
23  higher, which is a reasonable assumption,
24  because I think the replacement drugs often did

Page 91

1  have a higher price.
2      But for that consumer, they did not
3  suffer a financial loss from taking the
4  Valsartan at issue, because their financial
5  outlays would have been higher in the absence of
6  the supply of the Valsartan product that they
7  consumed.
8      Q.  What if the replacement drug was less
9  expensive than the $10 Valsartan cost?
10      A.  In instances for class members who
11  would have switched to a replacement drug and
12  had a lower financial outlay, their financial
13  losses are calculated as the difference in the
14  financial outlay consuming Valsartan and the
15  financial outlay that they would have had with a
16  different medication.
17      Q.  So if in my hypothetical it was $10
18  for the Valsartan and $8 for the replacement or
19  alternative, what's the loss for that consumer
20  in your model?
21      A.  The financial loss to the consumer in
22  that model would be $2.
23      If it is assuming equivalence of the
24  product that they're purchasing, if that is what

Page 92

1  they go for, pay for a month's supply of
2  Valsartan and a month's supply of the
3  replacement product, the financial loss is $2 in
4  your scenario.
5      Q.  And turning to the diminution model,
6  which you said was price minus the value
7  received, if the price of the drug was $10 and
8  the value you're ascribing is control of one's
9  blood pressure, what would the deduction be?
10      A.  The -- sorry.  The scenario here is to
11  consider for a consumer the diminution of value
12  from the Valsartan at issue?
13      Q.  That's right.
14      A.  Yes.  Then the consideration for that
15  consumer is how they value the -- or would price
16  the increased risk of their consumption of
17  Valsartan, if any, because of the presence of
18  alternatives, and whether that has a change to
19  their risk profile of eventually contracting a
20  disease that they wouldn't, in the absence of
21  the impurities at issue.
22      And the diminution of value, their
23  internal intrinsic valuation of the product
24  would depend on things such as how much they had

Page 93

1  to consume, over what timeframe, the degree of
2  impurities, if any, in the product that they
3  consumed, their ability to manage their blood
4  pressure with Valsartan compared to what the
5  alternative products might be, what side effects
6  of alternatives might be that made Valsartan be
7  the product of choice for that consumer, and, my
8  understanding, things like their weight and
9  health history.
10      Q.  Dr. Stiroh, I confess, I'm completely
11  confused by your answer.
12      What I want to understand before
13  moving on is how your diminution model works.
14      And I want you to assume that a
15  particular consumer of a VCD has paid $10 for
16  his or her prescription.
17      And the question in court and for you
18  as an economist is, what, if any, financial loss
19  did that individual suffer by accepting as true
20  that there's some impurity or contamination to
21  that product?
22      What would you look at in the
23  diminution model, assuming the consumer paid
24  $10?

Confidential Information - Subject to Protective Order

Page 94

1    Tell me what you would do step by
2  step.
3        MR. GOLDBERG:  Objection.  Asked and
4    answered.
5    A.  I think in your question you added
6  financial loss into how I would approach the
7  diminution.
8        I have described them in my report as
9  two separate pieces.
10        The financial loss is what comes out
11  of your pocket.
12        The diminution of value starts with an
13  economic framework where the price that a person
14  pays for a product, the fact that they have gone
15  and paid that price indicates to an economist
16  that they value the product at least as much as
17  the price paid.
18        If there is additional information
19  that comes to light that changes their
20  understanding of a product that they received,
21  so that they understand that they received a
22  different product than they believed they were
23  purchasing, it is possible that their value for
24  that product would have been diminished.

Page 95

1        As economists, we think of that as a
2  loss of consumer surplus.  I think I used the
3  phrase "consumer welfare."  I mean them
4  equivalently.
5        The measures of consumer welfare would
6  depend on what the loss of intrinsic value to a
7  customer is based on the new information about
8  the product that they consumed.
9        That diminution is going to depend on
10  factors that are specific to an individual, such
11  as the risk of consuming it, the information
12  that they may receive from their doctor, their
13  health histories, their own aversion to risk, or
14  their willingness to accept risk because of the
15  attributes of the product that they feel they
16  cannot get elsewhere.
17    Q.  That is extremely helpful, because if
18  I've understood you correctly, there are
19  actually two definitions of "value," according
20  to you in your last answer; correct?
21        MR. GOLDBERG:  Objection to form.
22    Ambiguous.  Mischaracterizes the testimony.
23    A.  I don't know what you have in mind as
24  my two definitions of "value."  If you could

Page 96

1  explain them, then I'll consider them.
2    Q.  Yes, I can tell you.
3        I wrote down that you said one way to
4  look at value is, quote, financial loss is what
5  comes out of your pocket.
6        Remember you told me that?
7    A.  I did tell you that.
8        My recollection when I said that was
9  because the question that you had asked me had
10  diminution of value and financial loss.
11        And in the prior questions, we had
12  separated those two topics, and I was clarifying
13  for you the financial loss discussion has to do
14  with the money that comes out of your pocket.
15        The diminution of value discussion has
16  to do with the intrinsic value of a product to a
17  consumer who purchases it.
18    Q.  That's right.  Financial loss is
19  defined by you as what comes out of your pocket,
20  and diminution is what you paid less
21  consumer welfare; right, loss of consumer
22  welfare?
23        Is that what you said?
24    A.  Yes.

Page 97

1    Q.  And so if we focus only on what you've
2  now defined for all of us as financial loss,
3  namely, what comes out of your pocket, that --
4  that's one measure of damage; right?
5        MR. GOLDBERG:  Objection to form.
6    Calls for a legal opinion.
7    A.  Financial losses have been used as a
8  measure of damages in economic matters in which
9  I have been engaged.
10        Diminution of value considers other
11  factors, not just the market prices of products.
12    Q.  Tell me as succinctly as you can how
13  you yourself have used and measured financial
14  loss in matters in which you've been engaged as
15  an expert economist.
16    A.  I have considered -- sorry.  Just to
17  make sure I'm answering it correctly, I'm just
18  going to ask that the question be read back
19  again.
20    Q.  Sure.
21        (The record was read back.)
22    A.  All right.  I have measured financial
23  loss for a class of franchisees who were the --
24  alleged wrongdoing was that they did not have

Page 98

1 available to them multiple source of supply for
2 products that they needed to run their
3 franchises.
4         And I measured that using a regression
5 analysis where I compared the prices for the
6 necessary inputs where there were multiple
7 sources of supply, with necessary inputs where
8 there were few sources of supply to estimate
9 what happens to prices when there are available
10 additional sources of supply.
11        And I used that to estimate what the
12 difference in profits would have been for the
13 franchisees had there been additional sources of
14 supply for a number of necessary products.
15        I have performed --
16    Q.  Let me -- I'm sorry.  I didn't mean to
17 cut you off.  Please continue.
18    A.  I understood that your question to ask
19 me how I have done this, but -- how I have
20 considered financial losses, and I can take you
21 through the ones that I remember.
22    Q.  Let me clarify.
23        As a way of explaining to me and to
24 others listening to you, as an economist, what

Page 99

1 the formula or model is for financial loss.  I
2 understand you've given a very concrete example.
3        Can you give me a somewhat more
4 generic -- generic or general description of how
5 financial loss as an economist is arrived at,
6 that is, how you figure out someone or some
7 entity's loss coming out of their pocket?
8        How do you determine that?
9    A.  I consider --
10    MR. GOLDBERG:  Objection.  Ambiguous.
11    A.  -- the economic circumstances of the
12 entity in the world as it is, and that may
13 include the prices paid, or for an entity
14 further up the distribution chain, the prices
15 paid in the costs -- or the prices received and
16 the costs paid, and I consider the economic
17 variables would be in the absence of some
18 conduct that is challenged as being wrongful.
19        And that analysis depends on what
20 conduct is challenged to be wrongful and the way
21 that that conduct would interact with economic
22 variables.
23        I have worked on matters where the
24 conduct at issue would affect the cost of

Page 100

1 certain inputs, in addition to, or in the
2 alternative, where the conduct at issue affects
3 the prices of products paid, I have worked on
4 matters where the conduct at issue affects the
5 availability of alternative products.
6        Basically, economics has to do with
7 the interaction of various economic variables,
8 and if something changes in the supply chain,
9 there may be other economic implications for
10 other variables.
11        And the economist's role would be to
12 consider those implications and arrive at a
13 comparison of the financial situation as is and
14 the financial situation as it would have been
15 under different circumstances.
16    Q.  I totally understand that answer.
17        What you're conveying is that you
18 start by looking, as you put it, at economic
19 circumstances, which is often the price in
20 question that was paid; right?
21        That's where you started; correct?
22    A.  That is often a starting place,
23 correct.
24    Q.  That's right.  It's often the starting

Page 101

1 place.
2        And then if I've understood you, what
3 you look at is the alleged conduct that alters
4 that construct, the liability, and you look at
5 and consider a but-for world of sorts in which
6 that conduct did not occur, and then you try to
7 figure out that economic variable in its absence
8 what impact to price occurs; right?
9    A.  I don't --
10    MR. GOLDBERG:  Objection.  Ambiguous.
11    THE WITNESS:  Sorry.
12    A.  I don't think so precisely.
13        You put the word "liability," when --
14 in your restatement, and that's not something
15 that I considered.
16        I consider the economic implications
17 of conduct and not liability because -- as I
18 understand it as a legal matter.
19    Q.  I take your point.  And you're right,
20 I speak as a lawyer.
21        And, really, what I meant to say and
22 should have said is "conduct."  That's the word
23 you used to describe the shift or the point of
24 comparison, economically speaking, between the

Confidential Information - Subject to Protective Order

---

Page 102

¹ starting point, which is the price paid, and
² this sort of but-for economic scenario that was
³ caused by some conduct; correct?
⁴       MR. GOLDBERG:  Objection.
⁵   Mischaracterizes.
⁶       A.  I think at a high level, that is
⁷ correct.
⁸       I consider the economic scenario that
⁹ would have unfolded absent some type of conduct
¹⁰ in a consideration of financial loss damages
¹¹ where the financial losses are differences in
¹² economic outcomes.
¹³       Q.  And reasonable economic minds can
¹⁴ disagree about the components of that model or
¹⁵ measure; isn't that true?
¹⁶       MR. GOLDBERG:  Objection to form.
¹⁷   Ambiguous.
¹⁸       A.  I don't know what you have in mind
¹⁹ about what the reasonable minds would disagree
²⁰ on with respect to the components of that
²¹ measure.
²²       I have been involved in matters where
²³ there was disagreement over the appropriate
²⁴ interest rate, what the cost implications of

---

Page 103

¹ certain conduct was, what available alternatives
² might have been.
³       I don't know if I'm agreeing with you
⁴ or disagreeing with you at this point.
⁵       Q.  No.  I -- I kind of get what you're
⁶ doing.
⁷       So reasonable economic minds could
⁸ disagree about the starting pricing, right, that
⁹ you're starting with the -- as you put it,
¹⁰ economic circumstances, you -- one could
¹¹ disagree about what the starting price is;
¹² right?
¹³       A.  I would have to think of a situation,
¹⁴ and I don't -- only because when I said starting
¹⁵ price and agreement with you, I had in mind
¹⁶ actual prices as they are.  Those would be
¹⁷ market facts.  Those -- that would be
¹⁸ information in the record, and I don't see a
¹⁹ dispute over that.
²⁰       Q.  Okay.  So let's start with that.
²¹ That's a good starting place.
²²       There's no dispute in your mind that
²³ the market fact, the market reality, is that
²⁴ consumers and insurers paid what they paid for

---

Page 104

¹ these VCDs during the class period; correct?
²       A.  Did you say there's no ambiguity in my
³ mind?
⁴       Q.  That's right.
⁵       A.  I'm not aware of a dispute on those
⁶ market facts.  If there is one, it's something
⁷ that I'm not aware of.
⁸       I understand that to be in the class,
⁹ a consumer had to have paid some amount for a --
¹⁰ for the Valsartan that they consumed.
¹¹       Q.  That's right.  I mean, the
¹² prescription records are so abundantly detailed,
¹³ that we know exactly what consumers contributed
¹⁴ and we know how much insurers paid.
¹⁵       That's not in dispute in this case;
¹⁶ right?
¹⁷       A.  I disagree with that.
¹⁸       MR. GOLDBERG:  Objection to form.
¹⁹       A.  One of the issues that matters at the
²⁰ class certification stage is whether you can
²¹ tell whether a class member has -- what amount
²² they have paid.  And I think you need to do --
²³ you need individual information from class
²⁴ members on that.

---

Page 105

¹       I think that what you are saying is
² some amount in aggregate.  And even there, there
³ could be dispute over whether that is the amount
⁴ paid or whether it fails to include things like
⁵ discounts or rebates that were given at a time
⁶ and collected in a different database and cannot
⁷ be accurately tied back to the initial purchase.
⁸       Q.  Do you -- do you dispute anywhere in
⁹ your report what the economic circumstances or
¹⁰ prices paid were by the two economic classes?
¹¹       A.  I do not dispute that there were
¹² prices paid by the two purported classes.
¹³       It is my opinion that to assess on a
¹⁴ class-member-by-class-member basis what the
¹⁵ damages incurred by any individual class member,
¹⁶ you would need information on the price that
¹⁷ that actual class member paid.  And that
¹⁸ information is not widely available.  It is --
¹⁹ to my mind, we only --
²⁰       Q.  Weren't you --
²¹       MR. GOLDBERG:  Hang on.  Wait.  Let
²² the witness answer the question.
²³       A.  I understand that there has been some
²⁴ data provided only by three plaintiffs, and one

---

Confidential - Information Subject to Protective Order

---

Page 106

1 plaintiff had, I think, some aggregated data,
2 but I don't think that there exists in this case
3 class-member-by-class-member expenditures on the
4 products at issue.
5    Q.  Class-member-by-class-member
6 expenditures?  Is that what you said?
7    A.  It is.
8    Q.  Is it your opinion that
9 class-member-by-class-member expenditure needs
10 to be demonstrated in order to certify a class?
11 Is that your opinion?
12       MR. GOLDBERG:  Objection to form.
13    Calls for a legal opinion.
14    A.  My understanding as an economist is
15 that one of the things that a court would
16 consider in determining to certify a class is
17 whether the class members have been harmed.
18       And when I use "harm," I use it in an
19 economic sense, by the conduct at issue, where
20 the measure of harm being considered is
21 diminution of value.
22       And that is the difference between the
23 price paid and the value received, you need to
24 have information on the price paid, and then you

---

Page 107

1 also need information that would allow you to
2 assess the value received.
3       Both of those require individual
4 information that has not been provided, or I'm
5 not aware of, on a class-member-by-class-member
6 basis.
7    Q.  Dr. Stiroh, we're not talking about
8 your diminution model; we're talking about your
9 financial outcome or financial loss model.
10       Do you remember that?
11       MR. GOLDBERG:  Objection --
12    Q.  That's what I want to stick with.
13    Can we do that?
14       MR. GOLDBERG:  Objection to form.
15    Mischaracterizes the record.
16    A.  Within the financial model, the
17 information that is not currently available on a
18 class-member-by-class-member basis is still the
19 amount that they actually paid for both models.
20       One of the inputs is the actual
21 expenditures, and we don't have that information
22 on a class-member-by-class-member basis.
23    Q.  Ma'am, I want to direct your attention
24 to one thing and one thing only, and that is the

---

Page 108

1 measure of damages that you described to me,
2 that you and I have been referring to as
3 "financial loss," which begins by looking at
4 actual prices.
5       Isn't that what you told me?
6       MR. GOLDBERG:  Objection to form.
7    Mischaracterizes the record.
8    A.  I'm not sure what you're asking me.
9       I think you're --
10    Q.  I'm asking you if it is true that you
11 told me under oath that in looking at the
12 financial loss model, which is the loss that
13 comes out of your pocket, one begins by looking
14 at, as you put it, economic circumstances, which
15 is usually the actual price paid for something.
16       Isn't that the starting point?
17       MR. GOLDBERG:  Objection to form.
18    Mischaracterizes the testimony.
19    A.  For financial losses, you compare the
20 actual economic circumstances of a class member
21 with the economic circumstances -- the financial
22 economic circumstances they would have
23 experienced under some alternative.
24       And so an input, whether it is the

---

Page 109

1 first one or a different -- or something
2 considered later on is what they actually paid
3 for the product at issue.
4    Q.  That's right.  What they actually paid
5 for the product.  Let's just stop there.
6       The question I next have is:  In
7 calculating the actual price paid, isn't it true
8 that as an economist, you can take an aggregate
9 of the prices paid for the products in question?
10 Yes or no?
11       MR. GOLDBERG:  Objection to form.
12    Ambiguous.
13    A.  It depends on what your purpose is.
14       If your purpose is to assess the
15 aggregate expenditures, you can use an
16 aggregate.
17       If your purpose is to assess whether
18 you can -- whether class members have been
19 financially affected by the conduct under
20 consideration, you need to evaluate the
21 expenditures on a class-member-by-class-member
22 basis.
23    Q.  And then the next step would be, as
24 you described it, to look at the alternative

---

Page 110

1 circumstance and assign a value to that;
2 correct?
3     A.   What do you mean by "assign a value to
4 that"?
5     Q.   Well, you tell me.  We're looking at
6 your financial loss model.  We've now
7 established the pricing and the way that you've
8 described.
9         How would you then arrive at a dollar
10 value for this alternative circumstance in order
11 to determine the loss?
12     A.   In a situation such as this one where
13 class members can choose to take different
14 actions --
15     Q.   I'm not asking you about this one,
16 Doctor, respectfully.  I'm not asking you about
17 VCDs.
18         I'm asking you about this measure,
19 this model that we're talking about generally in
20 economics.
21         You've established there's a financial
22 loss model, which is defined as what comes out
23 of your pocket.  The starting place is actual
24 economic circumstances, typically prices paid.

Page 111

1 You've established that.
2         You've now told me that you -- the
3 next step in this formula that you apply,
4 economically speaking, is to determine the
5 alternative; in other words, the economic
6 variable in the absence of whatever conduct is
7 that changed the world.
8         And I'm asking you, how do you arrive
9 at a dollar value for that to deduct it from the
10 actual price paid?
11     MR. GOLDBERG:  Objection to form.
12 Mischaracterizes the testimony.  Asked and
13 answered.
14     A.   In a general sense, you would consider
15 what the range of alternatives are that are
16 available in the absence of certain conduct,
17 whether there is information that guides which
18 of the alternatives class member might take up,
19 what the costs are of those alternatives,
20 whether there are any relevant market factors to
21 be taken into account, and assess the
22 differences between the financial situation of
23 the -- call it the actual world and the
24 financial situation of a class member under some

Page 112

1 alternative course of conduct.
2     Q.   So the two terms that I wrote down
3 that you employed was "the actual world," and
4 then you compare it to the "alternative course
5 of conduct world."
6         Did I get that right?
7     A.   Yes.
8     Q.   And you used the -- the expression
9 "range of alternative circumstances," I think to
10 imply that there are sometimes multiple ways to
11 look at the alternative course of conduct world;
12 correct?
13     MR. GOLDBERG:  Objection to form.
14 Mischaracterizes testimony.
15     A.   There may be multiple ways to look at
16 the alternative course of conduct world.
17         There may also be alternatives
18 available to purported class members for any
19 particular characterization of the alternative
20 course of conduct world.
21         And in my answer, I may have used the
22 same words to talk about two different things,
23 but there are two points of variation:
24         One, what does the overall alternative

Page 113

1 course of conduct world look like, and then
2 within any one of those, what do consumers do?
3     Q.   What do you mean, "what do consumers
4 do," in that sentence?
5     A.   With respect to this case, one of the
6 things that consumers might do is choose a
7 different medication in consultation with their
8 doctor to manage their blood pressure.
9         And so the economic circumstances,
10 choosing a different medication, depend on the
11 medication that they choose.
12     Q.   And so you would ascribe a cost to
13 that alternative medicine in that scenario and
14 deduct that from the actual cost that you start
15 with; is that right, in that measure?
16     A.   From the standpoint of a consumer, I
17 would consider the price that they paid for the
18 medication that they are on and the price that
19 they would have paid for an alternative
20 medication, and the alternative medication can
21 vary class member by class member.
22     Q.   And to go back to an example that you
23 and I spoke about and you confirmed, if the
24 actual price was 10 and the alternative price

Confidential Information - Subject to Protective Order

---

Page 114

1  was 8, you told me the loss is 2; right?
2       That would be an example of what we
3  just described; right?
4       MR. GOLDBERG:  Objection to form.
5       A.  The financial loss for a class member
6  who paid 8 -- $10 and would have paid a co-pay
7  of $8 would be 2.
8       Q.  And if we had an alternative course
9  of --
10      A.  I'm sorry.  I said that back -- I
11 apologize.  I said that backwards.  And so the
12 answer will not make sense.
13      The other way around.  If they would
14 have paid 8 and would have paid 10 -- no.  I
15 forget now which way you asked me.
16      The difference in financial outlays
17 between what they did pay and what they would
18 have paid is the measure of financial losses.
19      Q.  Dr. Stiroh, here's where I end up.
20      If the alternate course of conduct is
21 subject to various alternative circumstances,
22 aren't you telling me that economically, there
23 are multiple ways in certain circumstances to
24 look at what you're comparing between the actual

---

Page 115

1  and this alternate circumstance world?
2       It can vary; correct?
3       MR. GOLDBERG:  Objection.  Ambiguous.
4       A.  The choices that consumers make can
5  vary consumer by consumer.
6       For an individual --
7       Q.  I haven't asked you that --
8       MR. GOLDBERG:  Counsel, don't
9  interrupt -- Counsel, don't interrupt the
10 witness.
11      A.  My answer was that the choices that
12 consumers make can vary consumer to consumer.
13      Q.  Yeah.  I'm asking a question about
14 economics and about economists and models that
15 they use.
16      And the question I'm posing to you is,
17 when you look at the range of alternative
18 circumstances, figuring out if it's $8 or $9 or
19 $15 to compare to the starting place, which you
20 said is the actual price, I'm just asking, that
21 can vary depending upon how you look at it;
22 correct?
23      MR. GOLDBERG:  Objection.  Ambiguous.
24      Asked and answered.

---

Page 116

1       A.  I'm not sure what you mean by that,
2  and it may be that I am focused more on this
3  case and this framework than in a general sense.
4       In this case, the frame -- the
5  circumstances that we are considering changing
6  is that a consumer chooses a different product.
7       The -- depending on the product chosen
8  and the insurance plan, if any, for the
9  consumer, the amount they pay may differ.  A
10 different consumer for the same product may pay
11 a different price, and a different consumer may
12 choose a different product and also pay a
13 different price, and all of that would have to
14 be considered.
15      Q.  Dr. Stiroh, from an economic
16 standpoint, you acknowledge and understand that
17 what Dr. Conti did was a financial loss
18 analysis; correct?
19      A.  In my view, she has done neither a
20 diminution of value or a financial loss analysis
21 that is consistent with economic principles.
22      Q.  Yeah.  I know that's your conclusion,
23 and I know you disagree with her in every
24 respect.

---

Page 117

1       But based on what you've now told us
2  under oath, she took the actual prices paid by
3  consumers and insurers and compared it or
4  deducted it from the alternative circumstance.
5       And the alternative circumstance in
6  Dr. Conti's economic model is that those drugs
7  should have never been in the supply chain,
8  which means they have a zero value.
9       At the minimum, disagreeing as I know
10 you do, you understand that that's what she did;
11 correct?
12      A.  I understand that she assumed that all
13 of the drugs at issue were worthless, and I
14 disagree with her on that.
15      She did not do a financial loss model
16 because she did not consider in any
17 circumstances the financial circumstances of
18 consumers if they had consumed a different
19 product.
20      Q.  That's right.  Your complaint here is
21 that there isn't an offset for a replacement or
22 an alternative drug; correct?
23      A.  For the financial loss model, there
24 needs to be a consideration of what consumers

---

Page 118

1 would have done in the absence of supply for the
2 Valsartan at issue.
3        Without that consideration there -- it
4 is an incomplete model.  It is not consistent
5 with economic theory.
6    Q.  Understood.  So if we take Dr. Conti's
7 model and fix it in the way you say it needs to
8 be fixed, we'll use this example.
9        The actual price for the drug is $10.
10 She believes the comparative price in the
11 alternative circle is zero.  That means you have
12 net 10.  And you have now told us that you now
13 have to take an alternative cost and factor that
14 in.
15        And so if the alternative cost is 8,
16 the person has a $2 loss; right?
17    A.  I'm not sure what you're asking me to
18 agree with in that sentence.
19        You had statements about what
20 Dr. Conti has done or hasn't done, and then
21 something else that needs to be added.
22        In my view, her approach to financial
23 losses is incomplete, because she does not
24 consider what consumers would have purchased in

Page 119

1 the absence of supply of the
2 Valsartan-containing drugs at issue.
3    Q.  You really have two principal
4 objections to what Dr. Conti has done.
5        Objection Number 1 is that she has
6 ascribed zero value or worthlessness to the
7 contaminated drug, and in the model you and I
8 have now been speaking about for the last
9 half-hour she has failed to factor in the actual
10 cost of an alternative drug; right?
11        MR. GOLDBERG:  What is the question?
12    A.  Those are among the points that I
13 disagree with Dr. Conti's opinion.
14        I disagree that it is appropriate from
15 an economic standpoint to assume the products
16 consumed are worthless.
17        And I disagree that she has put
18 forward a valid damage model because she neither
19 considers the diminution of value to the
20 products -- to the consumers based on the
21 products that they consumed, nor does she
22 consider a financial differences model, which
23 would require considering what patients would
24 have done in the alternative to consuming

Page 120

1 Valsartan-containing drugs.
2    Q.  If you were instructed by the court as
3 a matter of law that these contaminated drugs
4 were legally worthless, would you accept that?
5    A.  I don't know what that means.
6        I have training and experience as an
7 economist.  And as an economist, my opinion is
8 that it is not appropriate to say that they are
9 worthless.
10        If there is a legal opinion and that
11 has legal meaning, then I'm not sure the court
12 needs me.
13        My opinions and my -- the report that
14 I have written give an economic opinion and an
15 economic assessment of the issues involved in
16 assessing class-wide damages from the conduct at
17 issue in this case.
18    Q.  Dr. Stiroh, I'm at a loss to
19 understand why you say the court wouldn't need
20 you if the court determined as a matter of law
21 that these contaminated drugs were worthless.
22        The court would still need an
23 economist like you or Dr. Conti to count up the
24 losses.

Page 121

1        Don't you agree?
2        MR. GOLDBERG:  Objection to form.
3    A.  I guess I don't know what the court
4 needs and don't mean to be opining on what the
5 court needs.
6        I have been asked to give my opinions
7 as an economist on certain topics related to
8 economic loss damages and other models of
9 economic damage assessment, and I have done
10 that, and I don't have an opinion on what the
11 court requires.
12    Q.  I haven't asked you that.
13        What I have done is what I'm permitted
14 to do, and that is to direct you to accept the
15 hypothetical.
16        And the hypothetical I'm asking you to
17 accept for our -- purposes of discussion is that
18 the drugs are economically worthless as a matter
19 of law, and, in turn, economics, law imposing
20 its will on economics.
21        Under that circumstance, could you,
22 number 1, accept that, and then calculate
23 damages?
24        MR. GOLDBERG:  Objection to form.

1  Calls for a legal opinion.  Ambiguous.
2  Speculation.
3      A.  It is outside my experience for how I
4  as an economist have a role in various cases
5  where there are allegations of wrongdoing and an
6  assessment of harm.
7      Where I have participated in cases and
8  assessed damages, I have done my own damage
9  calculation by applying economic principles.
10     There is frequently an economist or an
11 accountant or somebody on the opposing side that
12 may do an alternative or different measure of
13 damages.
14     The -- in my experience, those models
15 are presented to the court and the court reaches
16 opinions.
17     Q.  Well, you're confirming that you would
18 be incapable of accepting as a matter of fact in
19 your analysis that the comparative in the
20 alternative circumstance is zero?
21     You would be unable to accept that and
22 work with that value; correct?
23     MR. GOLDBERG:  Objection to form.
24 Mischaracterize the testimony.

1      A.  In my opinion, that is not a measure
2  of value, and my opinions would be based, as
3  they are in this case, on what an economist
4  considers in assessing value.
5      Q.  Doctor, take the next exhibit in your
6  pile that we sent you there.
7      MR. GOLDBERG:  Ruben --
8      Q.  I believe it's --
9      MR. GOLDBERG:  -- if this is -- you
10 know --
11     MR. HONIK:  Yes.
12     MR. GOLDBERG:  We said we were going
13 to take a lunch break.  We have been back
14 on for about an hour.
15     Is this a good time, or are you still
16 in this line of questioning?
17     MR. HONIK:  No.  I'm still in this
18 line of questioning.
19     Q.  I would like you to take out, at Tab
20 Number 6, that document, please.
21     THE COURT REPORTER:  Counsel, this is
22 the court reporter.  I take it you want me
23 to put exhibit stickers on these as they're
24 produced?

1      MR. HONIK:  That would be great.
2      We're going to call this one Stiroh 2,
3  Exhibit 2.
4      MR. GOLDBERG:  Ruben, do you have a
5  tile for this document?  I just want to
6  make sure I've got the right one.
7      MR. HONIK:  It's Judge Kugler's Motion
8  to Dismiss Opinion 3:  Warranty Claims.
9      MR. GOLDBERG:  Then I don't have the
10 right thing.
11     MR. HONIK:  Should be attached.
12     (MTD Opinion 3: Warranty Claims was
13 marked Stiroh Exhibit 2 for identification,
14 as of this date.)
15     Q.  Do you have it?
16     A.  I have this.
17     Q.  Okay.  I'm not able to see that.
18     Can you verify that you're holding the
19 caption of this case, Judge Kugler's Motion to
20 Dismiss Opinion 3:  Warranty Claims?
21     A.  I do.  I have it.
22     Q.  Okay.  Have you ever seen Exhibit 2
23 before?
24     A.  I believe that I have.

1      Q.  Is it true that you've never seen it
2  before January 12, 2022?
3      MR. GOLDBERG:  Objection to form.
4  Mischaracterizes the testimony.
5      A.  It is not true to the best of my
6  recollection.
7      Q.  Is it true that you didn't list this
8  document in your reliance materials?
9      A.  That is correct.
10     Q.  And you have a specific list of
11 reliance materials called Court Filings;
12 correct?
13     A.  Correct.
14     Q.  And this is not on that list, nor is
15 any other pronouncement of the court; correct?
16     A.  Correct.
17     Q.  I want you to turn with me to page 14
18 of Exhibit 2.
19     Are you there, Dr. Stiroh?
20     A.  Not yet.  If you just give me a
21 minute.
22     I have page 14 in front of me.
23     Q.  If you look at the second line --
24 sentence of that page, of Exhibit 2, the court's

Confidential Information - Subject to Protective Order

Page 126

1 opinion, it says, and I quote, The court finds
2 that for prescription drugs, the mere
3 identifying and marketing a drug as the generic
4 equivalent to a branded pharmaceutical listed in
5 the Orange Book, and then selling that generic
6 equivalent when it contains a contaminant not
7 included in the Orange Book listing, constitutes
8 a breach of express warranty.
9        Did I read that correctly?
10    A. I believe so, yes.
11    Q. Did you consider that finding in your
12 analysis and the opinions in your report?
13    A. To the best of my recollection, I had
14 reviewed this document.
15        It does not have a specific role for
16 my opinions with respect to my economic
17 conclusions regarding economic losses.
18    Q. So whether or not there's a breach of
19 express warranty for the reasons set out by the
20 court did not influence or impact your opinions
21 at all; correct?
22        MR. GOLDBERG: Objection to form.
23    Asked and answered.
24    A. In my opinions evaluating the economic

Page 127

1 loss to consumers, that is correct.
2    Q. Turn to page 20 of Exhibit 2, please.
3        Let me know when you're there.
4    A. I have page 20.
5    Q. You see the second full paragraph that
6 begins with the words, This court finds...?
7    A. I see that.
8    Q. The court wrote as follows, and I
9 quote, This court finds that contaminated drugs
10 are economically worthless at the point of sale
11 by virtue of the dangerousness caused by their
12 contamination, regardless whether the sold VCDs
13 actually achieved the medical purpose of
14 lowering blood pressure.
15        Did I read that correctly?
16    A. I believe so.
17    Q. Did you consider that finding by the
18 court anywhere in your analysis or opinions?
19    A. I reviewed this document. I did not
20 rely on it for reaching my opinions.
21        My opinions are based on my training
22 and experience as an economist, and I have
23 reached independent opinions about the economic
24 value of the products at issue and how to assess

Page 128

1 economic loss damages, if any.
2        I don't know the basis for what the
3 court takes into account. I know the basis for
4 what I take into account in reaching that
5 opinion.
6    Q. Can you explain to me why you read and
7 then ignored the court's finding that these
8 drugs are, as it puts it, economically
9 worthless?
10        Why did you ignore that?
11        MR. GOLDBERG: Objection to form.
12    Mischaracterizes the testimony, and
13    argumentative.
14    A. I don't think it is right to say that
15 I ignored it. I reviewed this document.
16        I was asked to offer my opinion as an
17 economist about whether economic loss damages
18 can be determined with information and methods
19 common to the class.
20        I approached that in an independent
21 manner, considering what I as an economist would
22 review to reach an opinion about economic loss
23 damages, and I have done that.
24    Q. By "independent," do you mean at odds

Page 129

1 with the court?
2    A. I do not mean at odds with the court.
3        MR. GOLDBERG: Note my objection.
4    Q. Do you see the sentence that follows,
5 which reads, Put differently, contaminated
6 drugs, even if medically efficacious for their
7 purpose, cannot create a benefit of the bargain
8 because the contaminants in their dangerous
9 effects were never bargained for?
10        Did I read that correctly?
11    A. I believe that you did.
12    Q. Did you consider that finding by the
13 court in your report or any part of your
14 analysis?
15    A. I reviewed this document for the
16 purposes of my report and my opinions.
17        I consider the -- independently, the
18 economic information that is available and reach
19 an opinion based on my training and experience
20 as an economist.
21    Q. So you disagree when the court writes
22 that the -- that the consumer didn't receive a
23 benefit of his or her bargain?
24        You fundamentally agree with that and

Page 130

¹ believe that there was some benefit; correct?
²        MR. GOLDBERG:  Objection to form.
³        Ambiguous.
⁴    A.  I don't know what the framework is
⁵ that the judge takes into account in reaching a
⁶ legal opinion.
⁷        I do know what the framework is that I
⁸ take into account, and my economic framework
⁹ leads me to the opinion that it is not correct
¹⁰ to assume that the drugs were uniformly
¹¹ worthless to all purported class members.
¹²    Q.  But you understood that, unlike you,
¹³ Dr. Conti took this for what it says, that the
¹⁴ drugs are economically worthless?
¹⁵        You understand that she accepted what
¹⁶ the court found; correct?
¹⁷    A.  I understand that she has assumed the
¹⁸ drugs are economically worthless, and I have
¹⁹ explained in my report why as a matter of
²⁰ economics that is not a valid assumption to
²¹ make.
²²    Q.  But if the court hired you,
²³ Dr. Stiroh, to be the court's expert and
²⁴ directed you that the drugs were worthless, you

Page 131

¹ would then ascribe the value of zero to them in
² your financial loss model that you and I went
³ through earlier, wouldn't you?
⁴        MR. GOLDBERG:  Objection to form.
⁵    Mischaracterize the testimony.
⁶    A.  That is wholly outside my experience
⁷ or any work that I have ever undertaken.
⁸        If I were retained by the court, and I
⁹ have been retained by antitrust authorities, I
¹⁰ still offer an independent economic analysis
¹¹ that may or may not comport with the legal
¹² framework because the legal framework is outside
¹³ of my experience.
¹⁴        What the court does with that would
¹⁵ be, I think, up to the court to decide.
¹⁶        I have never in my experience been
¹⁷ told what opinion to reach and then offered that
¹⁸ opinion.
¹⁹    Q.  Dr. Stiroh, respectfully, if the court
²⁰ instructed you that the drugs in question here,
²¹ the VCDs in this MDL, are economically worthless
²² because of a legal principle, could you not then
²³ ascribe a zero value and compute the loss
²⁴ exactly as Dr. Conti did?

Page 132

¹        MR. GOLDBERG:  Objection to form.
²    Speculation.
³    A.  I will say again that is just so far
⁴ outside my experience, that I cannot imagine
⁵ that scenario happening.
⁶        In my experience, economists are
⁷ brought into legal proceedings to give an
⁸ economist's point of view, and where I have been
⁹ retained, that is what I have done, including in
¹⁰ this matter.
¹¹        I have never been asked to assume a
¹² value and then asked to opine on that value.
¹³        I have been asked to consider whether
¹⁴ economic loss damages can be determined with
¹⁵ information common to the class, and it is my
¹⁶ opinion that economic loss damages, being the
¹⁷ difference between the price paid and the value
¹⁸ received, vary class member by class member and
¹⁹ cannot be determined with information common to
²⁰ the class.
²¹    Q.  Doctor, didn't you tell me earlier
²² today and write in your report that you offer no
²³ legal opinions and don't venture into the legal
²⁴ framework of what the proper measure of damages

Page 133

¹ is?  Didn't you tell me that?
²        MR. GOLDBERG:  Objection to form.
³    Mischaracterizes the testimony.
⁴    A.  I believe that I told you that.  I
⁵ don't think my answer in any way differed from
⁶ that.
⁷        To the extent that there was
⁸ confusion, my opinions are economic opinions,
⁹ and I offer them in the context of economics.
¹⁰        I am not opining for the court on what
¹¹ the appropriate legal context is.
¹²    Q.  Dr. Stiroh, I'm not confused.  I'm
¹³ reading your language.
¹⁴        And it says the following:  I also do
¹⁵ not opine on the legal issues relating to the
¹⁶ proper measure of damages or on which measure
¹⁷ should be used.
¹⁸        Those are your words in paragraph 5 of
¹⁹ your report.
²⁰        And so what I'm positing before we
²¹ break for lunch is, if the court tells you that
²² the proper measure to be used is to take the
²³ actual price paid for the drug, reduce it by its
²⁴ economic worth, which in this case is zero, and

Confidential Information - Subject to Protective Order

Page 134

1 then calculate the loss, is that something you
2 could do?
3        MR. GOLDBERG:  Objection to form.
4        Asked and answered.
5     A.  If I were asked to perform a
6 calculation and told what numbers to sum up, I
7 could do that.
8        If I were told to call that result
9 economic losses, I would not be comfortable
10 offering that opinion because, in my opinion,
11 that summation of numbers is not economic
12 losses.
13        MR. HONIK:  All right.  Good time to
14 break.  Let's go off the record.
15        THE VIDEOGRAPHER:  The time right now
16 is 1:25 p.m.  We are off the record.
17        (Luncheon recess at 1:25)
18
19
20
21
22
23
24

Page 135

1     A F T E R N O O N   S E S S I O N
2     (2:04)
3 LAUREN J. STIROH, Ph.D.,
4     resumed, having been previously duly
5     sworn by a Notary Public, was
6     examined and testified further
7     as follows:
8        THE VIDEOGRAPHER:  Time now is
9     2:04 p.m.  We are back on the record.
10 CONTINUED EXAMINATION BY MR. HONIK:
11    Q.  Dr. Stiroh, a while before we broke
12 for lunch and we spent some time talking about
13 the two different models that you described for
14 me, namely financial loss and diminution of
15 value, I was actually asking you some questions
16 that pertain to some of the specific theories of
17 liability in this case.
18        Do you remember we talked a bit about
19 that?
20    A.  Probably not with sufficient clarity.
21 To continue on that conversation, I would need
22 to hear questions again.
23    Q.  Of course.  And one of the things you
24 told me, or confirmed, is that you didn't

Page 136

1 consider specifically what the proper measure of
2 damages might be, for example, for a warranty
3 base claim, correct?  Do you remember telling me
4 that?
5        MR. GOLDBERG:  Objection to form.
6        Mischaracterizes the testimony.
7     A.  I did not opine on what the
8 appropriate measure of damages would be for a
9 warranty claim.
10        To the extent that the Court finds
11 that the work and the measures of damages that I
12 have considered are relevant, then the work that
13 I have done is relevant to those claims.
14    Q.  I'm sorry, I -- I thought you started
15 out by saying that you didn't offer an opinion
16 about what the measure of damages would be for a
17 warranty claim.  Is that -- that part right?
18    A.  That's not what I said.  I said I
19 didn't offer an opinion on what the correct
20 measure of damages would be for a warranty
21 claim.
22        I do have opinions on the economic
23 considerations and economic loss damages, or
24 damages measured as differences in financial

Page 137

1 outcomes.
2        And to the extent that my opinions and
3 work related to those measures of damages are
4 relevant to what a Court would consider for a
5 warranty claim, then that work would apply.  But
6 I have not been the person that says, This is
7 the damages for a warranty claim.
8        MR. HONIK:  Jeff, can I trouble you to
9     read just the very beginning part of that
10     response?  I tried to get it, but I -- I --
11     I was exasperated and didn't get it down.
12     (The record was read back.)
13        MR. HONIK:  Stop there for a minute.
14    Q.  I don't think that's what you said,
15 Dr. Stiroh, is it?
16    A.  It is not.
17    Q.  You said you did not, that's right.
18 Jeff, she said, I did not.
19        MR. GOLDBERG:  Hang on.
20        MR. HONIK:  Can you read it again
21     slowly starting with, I did not offer.
22     (The record was read back.)
23    Q.  Okay.  Next question, you ready,
24 Dr. Stiroh?

Page 138

1 Did you offer an opinion on what the
2 correct measure of damages are for an unjust
3 enrichment claim in this case?
4 MR. GOLDBERG: Objection to form.
5 Calls for a legal opinion.
6 A. I have an understanding of what the
7 measure of damages for unjust enrichment are,
8 and it is expressed at least under romanette ix,
9 on page 8 in my report.
10 Q. What is that measure or calculation?
11 A. I understand unjust enrichment damages
12 to be the portion of a benefit conferred by a
13 plaintiff on a defendant which it would be
14 unjust for the defendant to retain.
15 Q. Did you actually perform a calculation
16 to determine whether or not unjust enrichment
17 damages exist in this case?
18 A. I have considered what Dr. Conti wrote
19 in her report about the methods that she says
20 she would apply to calculate unjust enrichment
21 damages, and I have considered what she said in
22 her deposition regarding how the variables that
23 she thinks would be relevant, and I have
24 opinions related to the -- what she purports to

Page 139

1 do, that are expressed in my report.
2 Q. Do you have any opinions about the
3 correct measure of unjust enrichment damages,
4 separate and apart from whatever criticism you
5 may have of what Dr. Conti did on unjust
6 enrichment?
7 A. Are you asking me do I have opinions
8 about the quantum of unjust enrichment damages,
9 if any, or the methods?
10 Q. No. I'm asking you how you would
11 measure unjust enrichment.
12 MR. GOLDBERG: Objection to form.
13 Ambiguous.
14 A. In Section Roman V of my report, I
15 have a discussion of the retail pharmacy and
16 wholesaler damages related to plaintiff's theory
17 of liability and unjust enrichment, and in that
18 section, I describe my understanding of unjust
19 enrichment damages and the flaws that I see in
20 Dr. Conti's description of what she would do to
21 assess unjust enrichment damages, and I explain
22 the ways in which what she has set forward are
23 incomplete.
24 Q. What paragraph are you referring to in

Page 140

1 your report?
2 A. In that answer, I was referring to
3 paragraphs 65 through 72. There is also a
4 discussion in my summary of opinions under
5 romanette ix, which is on page 8.
6 Q. Do you agree that if the unjust
7 enrichment formula or calculation used by
8 Dr. Conti reflected profits, that the formula
9 would then be complete according to you?
10 A. No.
11 The formula that Dr. Conti puts in her
12 report, in my view, is a superficial formula of
13 profits. She says little more than profits are
14 revenues minus costs.
15 Calculating unjust enrichment damages,
16 even if starting -- if starting with profits as
17 part of that measure, there needs to be a way of
18 assessing what the relevant revenues are, and
19 assessing what the relevant costs are, and in
20 the pharmaceutical industry, both of those
21 measures can be very complicated.
22 There is a complex supply chain.
23 There are differences in the business structures
24 wholesaler to wholesaler, or retailer to

Page 141

1 retailer, such as the costs and the relevant
2 costs for each entity might differ depending on
3 the defendant, depending on the time period,
4 depending on the product that is being sold, and
5 the channel of distribution through which it
6 reached a wholesaler and then ultimately a
7 retailer.
8 Q. That's your complete answer?
9 A. Yes.
10 Q. Dr. Stiroh, did you arrive at an
11 opinion about the proper measure of damages for
12 Consumer Product Act damages?
13 MR. GOLDBERG: Objection to form.
14 Calls for legal opinion.
15 A. I do not offer an opinion on the
16 correct legal framework for damages for Consumer
17 Product Act damages.
18 Q. Dr. Stiroh, do you offer an opinion
19 anywhere in your report about the proper measure
20 of damages for common law fraud?
21 MR. GOLDBERG: Objection to form.
22 Calls for a legal opinion.
23 A. I do not offer an opinion on the
24 proper legal damages for common law fraud.

Page 142

1    Q.  Is therapeutic benefit synonymous with
2  economic worth, in your opinion?
3    A.  For a pharmaceutical product,
4  therapeutic benefit is a significant component
5  of economic worth.
6    Q.  And how do you go about measuring it?
7        MR. GOLDBERG:  Objection.  Ambiguous.
8    A.  For purposes of an economic analysis
9  that takes therapeutic benefit into account, I
10  would consider the relative therapeutic benefits
11  of one product compared to an alternative, and
12  need information from a consumer, or the doctor
13  of the consumer, that describes the
14  alternatives.
15        A component of damages that considers
16  what a consumer would take in the alternative to
17  Valsartan would have to consider what the
18  therapeutic value of that alternative was and
19  whether it was equivalent to the Valsartan that
20  they took, and differences in the therapeutic
21  value would have to be accounted for.
22        Assessing what those differences are,
23  would require, I think, a medical opinion, not
24  just an economic opinion.

Page 143

1    Q.  And in what way would you be able to
2  translate that economic analysis into dollars
3  and cents?
4        How do you value that in dollars?
5        MR. GOLDBERG:  Objection.  Ambiguous.
6    A.  For -- considering -- I'm sorry, I
7  guess I need you to say what the -- what it is
8  that you want me to value in dollars.
9    Q.  You said that therapeutic benefit,
10  while not synonymous with economic worth, is a
11  significant component.
12        I'm asking you whether and how that
13  translates or could be translated into dollars
14  and cents.
15    A.  We know, from expenditures on the
16  products at issue, that consumers valued the
17  therapeutic benefits of the products at least as
18  much as the price paid for them.
19        The -- if there is a difference in
20  therapeutic benefits measured, for example, by
21  differences in the ability to manage blood
22  pressure, then I could translate that into
23  dollars and cents, with input from a medical
24  expert, by considering what the expenditures

Page 144

1  would need to be to get to the same level of
2  blood pressure management.
3    Q.  Have you seen that input in this case
4  from any medical experts?
5    A.  I have not seen any input in the
6  materials that I have reviewed.
7    Q.  Have you ever had an engagement or
8  consultation in which you had such medical input
9  to arrive at a dollar value for therapeutic
10  value of a prescription drug?
11        MR. GOLDBERG:  Objection.  Vague.
12    A.  I have not worked on a matter that had
13  a sufficiently similar fact profile where the
14  measure of harm includes a potential diminution
15  of value that comes from differences in health
16  outcomes where that would need to be valued, but
17  it is something that would need to be valued in
18  this matter.
19    Q.  Have you ever so much as heard or read
20  about a reported case, in the economic or legal
21  literature, which done -- which has done what
22  you just described, namely, gotten medical input
23  in order to arrive at a dollar value for
24  therapeutic benefit in a prescription drug?

Page 145

1    A.  Yes.  Generally, I am aware of various
2  economic papers that look at the costs of
3  treating certain indications and the costs of
4  managing health outcomes.  It is not a field
5  that I specialize in.
6        I have encountered articles depending
7  on other cases that I have worked on that have
8  overlapped with health sciences, but that
9  economic concept of putting dollar values on
10  either -- certainly on mortality, as I mentioned
11  in my report, but the -- the costs of treating
12  different types of medical conditions, and the
13  costs of treating them under different
14  approaches to controlling that medical
15  condition, is something that I think is fairly
16  common in health economics.
17    Q.  You don't hold yourself out to be a
18  health economist, do you?
19    A.  I don't call myself a health
20  economist.  I am an economist that has expertise
21  working in some industries that relate to health
22  sciences.
23        I would consider this case to be a
24  matter like that, where I bring my experience as

Page 146

¹ an economist to a case that involves health
² outcomes.
³     Q.   You know, of course, that that's all
⁴ Dr. Conti does, she's a health economist, don't
⁵ you?
⁶     A.   I recall her testifying something
⁷ along the lines of that is all she does.
⁸     Q.   And -- and you saw her bibliography in
⁹ which she authored literally hundreds of papers
¹⁰ and other contributions to the literature in
¹¹ health economics.  Right?
¹²     A.   I have read her report.  I have to say
¹³ I'm not sure I paged through her bibliography
¹⁴ ever, but I take your word for it.
¹⁵     Q.   Do you agree that equilibrium price
¹⁶ from a classical economic standpoint is set by
¹⁷ the intersection of supply and demand?
¹⁸     A.   I do.
¹⁹     Q.   And do you agree that according to
²⁰ economic theory, for a consumer product -- and
²¹ we're talking generally -- for a consumer
²² product to have economic value, demand for the
²³ product must exist and supply must be allowed to
²⁴ meet that demand?

Page 147

¹     A.   I disagree.
²     Q.   I didn't see among your reliance
³ materials your having relied upon -- unless I
⁴ missed it -- with the exception, I think, of
⁵ Dr. Chan, you -- you didn't read any of the
⁶ defense class experts in this case.  Have you?
⁷     A.   My team and I have reviewed the expert
⁸ reports that are listed in paragraph 6.  I don't
⁹ recall others and certainly not that I have
¹⁰ reviewed, if there are -- I just don't think
¹¹ that I have, no.
¹²     Q.   Did you review the defense class
¹³ expert report prepared by Dr. Lambert, who is
¹⁴ both a Ph.D. chemist, an expert in the
¹⁵ pharmaceutical supply chain, a cGMP, and CMC
¹⁶ expert?
¹⁷     A.   I don't believe so.
¹⁸     Q.   Do you understand that in this case,
¹⁹ there are any number of pharmacy industry
²⁰ experts with a variety of expertise in how the
²¹ supply chain works, how cGMP compliance occurs,
²² how CMC occurs, how FDA regulations impact this
²³ case?  Are you aware of that generally?
²⁴     A.   I'm aware that there are more experts

Page 148

¹ involved in this case, and my expertise is in
² economics and I have focused my analysis on
³ materials that are relevant to my economic
⁴ analyses.
⁵     Q.   In listing your various reliance
⁶ materials, unless I missed it, I -- I do not
⁷ note your having relied on any of the U.S. Code
⁸ as it pertains to the introduction of drugs into
⁹ the supply chain.  Have you?
¹⁰     A.   I do not rely on any of the U.S. Code
¹¹ as it pertains to the introduction of drugs into
¹² the supply chain for the purposes of my opinions
¹³ that I'm offering in this report.
¹⁴     Q.   Are you -- are you, nonetheless,
¹⁵ familiar with any aspects of federal law as it
¹⁶ concerns the ability for a drug manufacturer to
¹⁷ introduce into the legal class of trade a
¹⁸ prescription drug?
¹⁹     A.   I have some familiarity with the
²⁰ regulations concerning transactions in
²¹ pharmaceuticals, and entry of either new
²² pharmaceutical products or generic
²³ pharmaceutical equivalents to existing
²⁴ pharmaceutical products.

Page 149

¹     I have familiarity based on my prior
² work, but it is not something that I am
³ intending to put forward opinions related to.
⁴     Q.   And certainly in this case, you didn't
⁵ rely upon any of those laws or regulations in
⁶ forming your opinions here, correct?
⁷     A.   That is correct.
⁸     Q.   Do you -- do you disagree that those
⁹ laws have an impact on determining whether
¹⁰ there's a legitimate supply curve for a
¹¹ particular prescription drug?
¹²     MR. GOLDBERG:  Objection to form.
¹³ Ambiguous.
¹⁴     A.   Can you say how you are using the
¹⁵ phrase, "legitimate supply curve"?
¹⁶     Q.   Sure.  Do you think that there are any
¹⁷ laws that impact the ability of a manufacturer
¹⁸ to sell a drug in interstate commerce?
¹⁹     A.   My understanding is that there are.
²⁰     Q.   And what impact, so far as you
²¹ understand, would those laws have on
²² determining, from an economic standpoint, the
²³ legitimacy of producing a supply of a
²⁴ prescription drug and, in turn, having a supply

Confidential - Subject to Protective Order

Page 150

1  curve?
2        MR. GOLDBERG:  Objection to form.
3  Ambiguous.
4    A.  With respect to this case, are you
5  asking me?
6    Q.  No.
7        MR. GOLDBERG:  Same objection.
8    A.  I am aware that there are consumers in
9  the United States who seek to buy prescription
10 drugs outside of the United States for
11 consumption inside the United States.
12       That is a -- from an economic point of
13 view, that is supply of a product that could be
14 taken into account in doing an economic analysis
15 of supply and demand.
16   Q.  Are you familiar with the drug now
17 long banned called fen-phen?
18   A.  I am not.
19   Q.  That was a prescription diet drug that
20 caused a certain type of heart damage, that's
21 been long banned in the United States.
22       Do you have an opinion, as an
23 economist, what the value of that drug is, if
24 I'm not able to get it lawfully here?

Page 151

1    A.  I don't have a fully formed opinion
2  because I have never considered this scenario
3  before.
4        The components of value, though, if it
5  is something that you desire to get,
6  notwithstanding the fact that you can't get it
7  here, that tells me, as an economist, it has
8  value to you as a consumer.
9    Q.  Your -- your economic opinion is that
10 if it's unlawful for me to obtain, and no doctor
11 will give me a prescription, that fen-phen still
12 has some dollar value.  Is that your opinion?
13   A.  My opinion is that if you want it, or
14 a consumer wants it, that product has value to
15 you.
16   Q.  Let me ask the question differently.
17 In my hypothetical for fen-phen, is it lawful
18 for someone to sell it, a manufacturer, and
19 receive money for it?
20   A.  I don't know.  That -- you're asking
21 me now a legal opinion.  And my opinions are
22 rooted in economics, and economic value comes
23 from somebody wanting a product.
24   Q.  Well, respectfully, Dr. Stiroh, you

Page 152

1  don't limit your views in this case to purely
2  economic principles.  Your essential thesis here
3  is that class certification isn't available.
4  That's a legal question, isn't it?
5        MR. GOLDBERG:  Objection to form.
6    A.  Can you say again what my fundamental
7  opinion is?
8    Q.  Sure.  You're familiar with Rule 23 of
9  the Federal Rules of Civil Procedure, aren't
10 you?
11   A.  I am.
12   Q.  You -- you've written on that, haven't
13 you?
14   A.  I have written on the economics of it.
15   Q.  Well, you've written specifically
16 about case law, haven't you?
17   A.  I have written specifically about
18 various cases, but it is -- my writings are
19 related to the economics that were used in the
20 cases and considered by the court.
21   Q.  Dr. Stiroh, your writings relate to
22 the interplay between the class certification
23 rule, Rule 23, and economics, extensively,
24 haven't you?

Page 153

1    A.  I have written on the economics of
2  class certification, and I agree with you that
3  class certification is something that takes
4  place in a legal context.
5    Q.  That's a -- that's a very curious way
6  to put it, because, you know, as I read your
7  opinions, you write for -- just for example,
8  Economic loss damages to members of the consumer
9  or third-party payor classes, if any, cannot be
10 assessed on a class-wide basis using information
11 and methods common to the proposed class.
12       Is that your language?
13   A.  It is.
14   Q.  And I gather you've probably written
15 that sentence numerous times before, right?
16       MR. GOLDBERG:  Objection to form.
17 Ambiguous.
18   A.  I have not.
19   Q.  "Methods common to the proposed
20 class," is that an economic phrase or a legal
21 phrase?
22   A.  It may be a legal phrase.  In my
23 sentence when I said that the class-wide
24 damages, from my perspective, that aspect, is

Confidential Information - Subject to Protective Order

---

Page 154

1 the economic part of it, whether the same words
2 would be used in a legal context or not.
3    Q.  "Cannot be assessed on a class-wide
4 basis," is that a legal phrase or an economics
5 phrase?
6    A.  It is the same answer I just gave you.
7 My assignment, as described in my report, was to
8 consider whether economic damages where I
9 have -- or economic harm, where it is -- I have
10 defined what I understand that to mean, can be
11 assessed on a class-wide basis, and that has
12 meaning to me as an economist, but my answer,
13 then, to the question is rooted in economics,
14 and it is an economic finding, not a legal one.
15    Q.  What does class-wide basis mean?
16    A.  As I use it, it means for the class as
17 a whole.
18    Q.  And how is that different in your
19 mind, as you use it, from individual basis?
20    A.  An individual basis would be to an
21 individual class member, and class-wide basis is
22 to the class as a whole.
23    Q.  Is that the extent of your
24 understanding?

Page 155

1    A.  Sufficient to answer your question,
2 yes.  To the extent that you will expand the
3 context, I may have a different answer, but in
4 the context in which I understood you to ask it,
5 that is the --
6    Q.  Do you understand --
7    A.  If I could just finish the answer so
8 it makes sense.
9       MR. GOLDBERG:  Hang on, Ruben.  She's
10    not finished the answer.
11    Q.  Let me know when you're done.
12       THE WITNESS:  I'm sorry.  If you could
13    just mark that my answer was incomplete,
14    there, that would be good.  I don't -- I've
15    lost my train of thought for it.
16    Q.  Are you addressing what's commonly
17 referred to as the commonality requirement, in
18 the sentence we just went over?
19       MR. GOLDBERG:  Objection to form.
20    Calls for a legal opinion.
21    A.  I have an understanding that when
22 doing work related to the class certification
23 phase of a litigation, that the work that I do
24 is most frequently used by the legal team in the

Page 156

1 context of responding to a commonality argument.
2       The work that I do is based on
3 economics and then is used by a legal team in
4 the legal context in whatever way they feel is
5 most appropriate based on their experience and
6 understanding.
7    Q.  Yeah, that's not really what I'm
8 asking you.  I'm simply asking if we can agree
9 that the shorthand way to refer to your
10 application of economic principles to this
11 aspect of class certification that you've been
12 speaking at length about is referred to as
13 commonality.  That's all I'm asking.
14       MR. GOLDBERG:  Objection --
15    Q.  Do you agree with that?
16       MR. GOLDBERG:  Objection to form,
17    asked and answered.  Calls for a legal
18    opinion.
19    A.  I guess I don't know that to be true
20 in all cases.  Or even in this one.
21       I have an understanding that if the
22 lawyers or the court is considering whether
23 there is a predominance of common issues, that
24 an economist's report and opinions may factor

Page 157

1 into the legal opinions on that subject.
2    Q.  Now you've introduced another legal
3 term, "predominance."  Do you know what that
4 means?
5       MR. GOLDBERG:  Objection to form.
6    Calls for a legal opinion.
7    A.  I understand it is a term that is
8 included in class certification findings, and I
9 have an understanding, from a layperson, of what
10 that means.  I don't -- wouldn't say I have a
11 legal understanding, because I'm not a lawyer.
12    Q.  Well, you do understand, though, don't
13 you, that this issue, or business of
14 commonality, needs to apply, on the one hand, to
15 liability issues, and on the other hand, to
16 damage issues.  Do you understand that much?
17       MR. GOLDBERG:  Objection to form.
18    Calls for a legal opinion.
19    A.  I have an understanding that a court
20 may consider whether the liability theories and
21 defenses are common to the class, and a court
22 may consider whether there are individual issues
23 and potentially weigh the common issues against
24 the individual issues to assess from a legal

Confidential Information - Subject to Protective Order

Page 158

1 perspective which ones dominate.
2    Q.  You do understand that they fall into
3 two buckets, right?  That you have to
4 demonstrate this commonality concept on
5 liability, and separately for damages.  Do you
6 get that?
7       MR. GOLDBERG:  Objection.  Calls for a
8    legal opinion.
9    A.  I don't -- I don't get that from an
10 economic perspective.  I work on class
11 certification matters where I have an assignment
12 that I carry out, and then whether that is used
13 by the legal term to assess common issues on
14 liability or common issues with respect to
15 damages, that is up to the legal team.
16    Q.  Do you agree that whether the
17 manufacturers in this case who have produced the
18 VCDs adhere to cGMP in making them is a --
19 presents a common question of fact or law?
20       MR. GOLDBERG:  Objection to form.
21    Calls for a legal opinion.
22    A.  I don't have an opinion on that.
23    Q.  Do you have an opinion whether
24 nitrosamines, a probable human carcinogen, can

Page 159

1 present a common question of fact or law?
2       MR. GOLDBERG:  Objection to form.
3    Calls for a legal opinion.
4    A.  I don't have an opinion on that.
5    Q.  Do you have an opinion whether it's a
6 common question of fact or law whether the VCDs
7 in this case were contaminated with NDMA or
8 NDEA?
9       MR. GOLDBERG:  Objection to form.
10    Calls for a legal opinion.
11    A.  I don't have an opinion on that.  I
12 consider in my report the possibility that not
13 all products included the impurities NDMA and
14 NDEA in quantities that have been alleged to
15 cause an increase in the risk of cancer, and I
16 have opinions that stem from the -- or that --
17 that talk about how that interplays with the
18 economic outcomes.
19    Q.  Do you agree that it's a common
20 question of fact or law whether the defendant
21 manufacturers in this case were aware, or should
22 have been aware, of the potential for
23 nitrosamine formation prior to 2018?
24       MR. GOLDBERG:  Objection.  Objection

Page 160

1 to form.  Calls for a legal opinion.
2    A.  I don't have an opinion on that.
3    Q.  Do you -- do you know whether it's a
4 common question of fact or law whether the VCDs
5 were adulterated within the meaning of the
6 Federal Food, Drug, and Cosmetic Act?
7       MR. GOLDBERG:  Objection to form.
8    Calls for a legal opinion.
9    A.  I don't have an opinion on that.  I
10 have an understanding that not all of the drugs
11 at issue or all of the lots of the drugs at
12 issue may have contained any of the impurities
13 at issue, and I have a discussion of what that
14 means for Dr. Conti's opinions.  I don't have an
15 opinion as to the facts surrounding that issue.
16    Q.  Do you disagree that it's a common
17 question of fact or law to determine whether the
18 VCDs in question were misbranded?
19       MR. GOLDBERG:  Objection to form.
20    Calls for a legal opinion.
21       THE WITNESS:  Did he ask me do I have
22    an opinion or understanding?  Can you
23    repeat.  Or sorry.
24    Q.  I asked you if you agree --

Page 161

1    A.  Oh.
2    Q.  -- that whether or not the VCDs in
3 question here are misbranded is a common
4 question of law or fact.
5       MR. GOLDBERG:  Again, object to form.
6    Calls for a legal opinion.
7    A.  I don't think I even understand how
8 your question is constructed.  Whether --
9 whether I'm being asked to agree with the
10 statement, or being asked to agree that the
11 issue is a common issue.
12       I don't have an opinion, I think, on
13 either.  But I will say I don't think I
14 understood the question.
15    Q.  Dr. Stiroh, the fact is, you don't
16 question that there are common questions of fact
17 and law that would support certifying a class on
18 liability grounds.  Correct?
19       MR. GOLDBERG:  Objection to form.
20    Calls for a legal opinion.
21    A.  I don't offer opinions on that.  I
22 have opinions in my report related to the
23 assignment I was asked to undertake.
24       And the assignment was to consider

Confidential Information - Subject to Protective Order

Page 162

¹ whether damages from economic losses or
² differences in financial outcomes can be
³ determined with information common to the class,
⁴ and it is my opinion that they cannot be
⁵ determined with information common to the class,
⁶ and you would need individualized information
⁷ for -- from purported class members.
⁸     Q.  Right.  You said that multiple times.
⁹ And the reason for that is because according to
¹⁰ you, you'd have to value the therapeutic benefit
¹¹ on the one hand, and the various risk factors
¹² that can only be viewed through the individual
¹³ consumer.  Right?
¹⁴     MR. GOLDBERG:  Objection to form.
¹⁵ Mischaracterizes the testimony.
¹⁶     A.  That is one of the reasons why you
¹⁷ need individual information.
¹⁸     Q.  I'm sorry, you're saying I'm correct?
¹⁹     A.  Your full statement was not correct,
²⁰ but I do agree with you that you have stated
²¹ some of the reasons why you would need
²² individual information to properly assess
²³ damages in this matter from an economic
²⁴ standpoint.

Page 163

¹     Q.  Yeah.  Before we broke for lunch, and
² you and I looked together at what Judge Kugler
³ wrote about the economic worthlessness of the
⁴ drug and the concept that the drugs were worth
⁵ zero because of the failure of the benefit of
⁶ the bargain, you don't disagree that if that
⁷ ends up being the measure of damages, that that
⁸ subject is subject to common proof, do you?
⁹     MR. GOLDBERG:  Objection to form.
¹⁰ Mischaracterizes the testimony.  Calls for
¹¹ a legal opinion.
¹²     A.  Can you say it again, or may I ask the
¹³ court reporter to repeat that question.
¹⁴     Q.  Sure.  Judge Kugler is correct that
¹⁵ the drugs are economically worthless for the
¹⁶ reasons you and I looked at together and,
¹⁷ therefore, have a value of zero that, arising in
¹⁸ class damages, is a simple matter of common
¹⁹ proof.  Correct?
²⁰     A.  I don't agree with you.
²¹     MR. GOLDBERG:  And note my objection
²² as calling for a legal opinion.
²³     Q.  Well, I know that you don't agree with
²⁴ the premise and the foundation for that, for all

Page 164

¹ the reasons you've written and we've talked
² about, but if it turns out that the measure of
³ damages is financial loss, in the way you've
⁴ outlined to me, and you assume or accept that
⁵ the value of these drugs is zero, then one
⁶ could, quite readily, with common evidence,
⁷ proof, arrive at damages.  Correct?
⁸     A.  I disagree.  If the measure of damages
⁹ is determined to be financial loss, and thus, as
¹⁰ we discussed this morning, you compare the
¹¹ financial position of class members as they were
¹² and the financial positions as they would have
¹³ been had they not consumed the at-issue VCDs,
¹⁴ you have to consider, Are there other variables
¹⁵ that change.
¹⁶     The other variable that would change
¹⁷ is what product would they consume instead of
¹⁸ the VCD to manage their blood pressure.  That is
¹⁹ what is missing from what Dr. Conti did.
²⁰     If you assume away or say that there
²¹ would not be any management of blood pressure,
²² then the comparison of situations at -- as they
²³ are, and the situations as they would be, would
²⁴ have to consider what happens to patients if

Page 165

¹ they stop taking blood pressure medication, and
² do they have adverse health outcomes that then
³ would also have different financial outlays than
⁴ they currently did when their blood pressure was
⁵ managed.
⁶     Q.  Dr. Stiroh, are you aware that in the
⁷ marketplace when these contaminated drugs were
⁸ sold, and afterwards, that there were
⁹ uncontaminated generic forms of Valsartan
¹⁰ available?  Are you aware of that?
¹¹     A.  I am aware that there are other forms
¹² of Valsartan that are not alleged to have the
¹³ impurities, yes.
¹⁴     Q.  And you are aware that in addition to
¹⁵ these uncontaminated generic forms of Valsartan,
¹⁶ there were a whole host of other ARBs, drugs of
¹⁷ this class, that control blood pressure,
¹⁸ correct --
¹⁹     A.  I'm aware of that --
²⁰     Q.  -- available to consumers?
²¹     And you are aware that there were also
²² branded or innovator drug -- drugs available to
²³ treat these conditions as well, correct?
²⁴     A.  I am aware of the presence of other

1 ARBs and the presence of a branded Valsartan
2 product.
3      Q.   Do you agree with the statement that
4 when these drugs were sold between 2012 and
5 their removal from the market in 2018, the
6 contaminated forms of it, that no consumer was
7 aware if the drugs were contaminated?
8      A.   Did you ask me if I am aware of that
9 or I agree with that?
10     Q.   Is there a difference for you?
11     A.   I think if you asked me if I'm aware,
12 you are stating a fact that I'm -- I don't know
13 to be true.
14          And if you're asking me if I am
15 aware -- if -- well, either way, I just don't know
16 that it is true about what consumers understood
17 to be included in their Valsartan-containing
18 drugs as I sit here today.
19     Q.   Do you have any facts or evidence to
20 share with us under oath that any consumer,
21 between 2012 and 2018, had any basis to
22 understand that their Valsartan contained
23 nitrosamines?
24     A.   That is not a subject on which I am

1 offering testimony.  I don't have information to
2 share with you as I sit here today on that
3 subject.
4      Q.   Do you think for a split second that a
5 single consumer knew about it and none of the
6 manufacturers did?  Because that's what they
7 claim, you know.
8          MR. GOLDBERG:  Object- --
9      Q.   You know that, right?
10         MR. GOLDBERG:  Objection to form.
11 Foundation.  Argumentative.
12     A.   Are you asking do I know what is
13 claimed by manufacturers?
14     Q.   Are you aware that the manufacturers,
15 uniformly in this case, claim that they didn't
16 know and couldn't know of the presence of
17 nitrosamines in their own products during the
18 relevant class period?  Are you aware of that?
19     A.   I don't think --
20         MR. GOLDBERG:  Objection to form.
21     A.   -- I have reviewed information that --
22 or at least that I recall as I sit here, on what
23 the defendant manufacturers are stating.  It is
24 not something that I recall reviewing for

1 purposes of my report.
2      Q.   Well, I want you to assume in a
3 hypothetical that that is what they claim.
4          And I want to then ask you, on the
5 basis of that assumed fact, if it's conceivable
6 to you that the manufacturers didn't know there
7 were nitrosamines in their Valsartan pills, but
8 you believe that consumers might have known that
9 fact.  Is that your statement?
10         MR. GOLDBERG:  Objection to form.
11 Argumentative.
12     A.   That is not my statement.
13     Q.   Okay.  Let me ask you a different
14 question.
15          Can you -- do you believe, as a matter
16 of economics, that if there's a binary choice
17 given to a consumer to buy, in this case, with
18 knowledge, a VCD that's contaminated with a
19 carcinogen and the exact same VCD that is
20 uncontaminated with any carcinogen, that there's
21 any consumer who would rationally select the
22 contaminated one?
23     A.   I could envision a scenario in which
24 that happens, yes.

1      Q.   Okay.  Can you tell us, under oath, in
2 what scenario would a rational person pick the
3 contaminated VCD.
4      A.   A scenario in which that may happen is
5 if the VCD that contains impurities is priced
6 lower than the VCD with -- without impurities,
7 and a consumer, in consultation with their
8 doctor, is informed that the level of impurities
9 is not likely to change their health comes --
10 health outcomes in any meaningful way, that a
11 consumer may decide to save money by choosing a
12 product that has impurities in it.
13     Q.   Do you know facts that support that
14 having occurred here ever?
15     A.   I have examples in my report where I
16 talk about similar types of comparisons where
17 consumers choose between organic products and
18 products that contain pesticides, where
19 pesticides may include elements that could have
20 risks for human health outcomes.
21          And consumers make different choices
22 in different scenarios, but we can observe
23 market differences in prices.  We observe
24 organic vegetables being sold, and we observe

Page 170

1 vegetables that have been exposed to pesticides
2 being sold.
3         I have an example where economists
4 have measured differences in housing prices,
5 where houses are located in an area where there
6 is a higher incidence of leukemia than other
7 areas, and economists can observe and measure
8 the differences in prices that would be
9 attributable to the added risk in one geographic
10 area to another geographic area.
11        The section in my report that
12 describes other examples of where economists
13 have measured and priced risk I have in my
14 report as an indication that economists do look
15 at these types of things.
16        The presence of risk doesn't render a
17 product worthless. The presence of risk has
18 been measured by economists in other factors.
19 It's not appropriate to make the assumption that
20 Dr. Conti did. It's not appropriate to assume
21 worthlessness because of the presence of a risk.
22    Q.  In order to price the presence of a
23 risk, doesn't a consumer need to know that the
24 risk exists?

Page 171

1    A.  In the examples that I gave you, I was
2 envisioning that the economist prices the risk.
3        The -- whether the consumer prices the
4 risks, there are examples where the consumer
5 could know about a risk, and in those scenarios,
6 we can see a divergence in price and consumption
7 patterns of products that are deemed more or
8 less risky.
9    Q.  Dr. Stiroh, respectfully, you didn't
10 answer my question. In order for either a
11 consumer or an economist, on an assumption, to
12 price or place a value on risk, to exercise that
13 choice, you have to have knowledge of the risk,
14 do you not?
15    MR. GOLDBERG: Objection to form.
16 Ambiguous.
17    A.  To price the risk, an economist would
18 have an understanding or an assumption regarding
19 the risk profile, yes.
20    Q.  That's right. In order to
21 affirmatively choose to live in an area with
22 high leukemia because of environmental factors,
23 you'd have to know about that risk in order to
24 take it or assume it or exercise a choice around

Page 172

1 it, correct?
2    A.  To do an economic study and draw the
3 conclusion that a price differential is due to
4 risk, you would have built into that some
5 expectation regarding information that is known
6 about the risks.
7    Q.  Have you seen a single shred of
8 evidence in this case that any consumer, during
9 the relevant class period, proposed class
10 period, was aware of the presence of
11 nitrosamines in these Valsartan-containing
12 drugs?
13    A.  I am not aware of any information that
14 indicates that.
15    Q.  Let's bring up -- go into your
16 document if you would, and pull up -- just find
17 it -- bear with me. It's a -- it should be a
18 Tab 3. And it's a section of the United States
19 Code.
20    MR. GOLDBERG: Is this 331 or 351?
21    MR. HONIK: 331.
22    MR. GOLDBERG: Okay.
23    (Prohibited Acts, 21 USCA, Section
24    331, was marked Stiroh Exhibit 3 for

Page 173

1    identification, as of this date.)
2    Q.  Dr. Stiroh, do you have what's been
3 marked as Exhibit 3?
4        Dr. Stiroh, have you ever laid eyes on
5 21 United States Code Annotated Section 331?
6    A.  I don't have a particular recollection
7 of it. I may have seen it before.
8    Q.  Do you see at the top, it's part of
9 the Federal Food, Drug, and Cosmetic Act?
10        Do you see that?
11    A.  I see a heading, Chapter 9, Federal
12 Food, Drug, and Cosmetic Act, is that what
13 you're referring me to?
14    Q.  Yes, ma'am. And underneath it, it
15 should say Subchapter 3, Prohibited Acts and
16 Penalties.
17        Do you see that?
18    A.  I do.
19    Q.  And the construct for this, as a
20 prohibited act piece of litigation, is to set
21 out what's prohibited.
22        You see where it says, The following
23 acts and the causing thereof are prohibited,
24 colon?

Confidential Information Subject to Protective Order

---

Page 174

1    You see that?
2    A.  I do.
3    Q.  And the very first prohibited act
4  that's listed is as follows:  The introduction
5  or delivery for introduction into interstate
6  commerce, of any food, drug, device, tobacco
7  product or cosmetic that is adulterated or
8  misbranded.
9    Did I read that correctly?
10   A.  I believe you did.
11   Q.  Have you ever seen this statement
12 in -- in the -- in federal law?
13   A.  I don't think I have set out to read
14 federal law.  The statement sounds familiar from
15 Dr. Conti's materials.  I may have seen it in
16 this context as well, but I don't have a
17 recollection of having reviewed this document.
18   Q.  Suffice to say you didn't give any
19 weight or consideration to this prohibited act
20 as set out in 21 USCA Section 331?
21   A.  I don't think that is accurate to say
22 that I didn't give it weight.  I didn't -- don't
23 recall having reviewed this particular document.
24   To the extent that it is something

---

Page 175

1  that factors into Dr. Conti's opinions, I --
2  that is something that I consider explicitly in
3  my report.
4    Q.  This prohibits legally introducing,
5  into the legal class of trade, an adulterated or
6  misbranded product.  Correct?
7    MR. GOLDBERG:  Objection.  Calls for a
8    legal opinion.
9    A.  I can see what the words are.  I can't
10 give you an opinion on what this prohibits or
11 doesn't prohibit.  I'm not a lawyer.
12   Q.  Doctor, you have a Ph.D. from Harvard
13 in economics.  Can you apply a plain meaning to
14 what we read together sufficient to understand
15 and agree that it prohibits introducing
16 adulterated drugs in interstate commerce in the
17 United States?
18   MR. GOLDBERG:  Same --
19   Q.  Can you draw that meaning from it?
20   MR. GOLDBERG:  Same objection.
21   A.  I can draw the plain English meaning
22 from the words.  I cannot give you a legal
23 opinion related to it.
24   Q.  Would you agree that because an

---

Page 176

1  adulterated drug can't be introduced into
2  interstate commerce in the U.S., that that means
3  such a drug, namely an adulterated drug, cannot
4  have a legitimate supply curve in our market?
5    MR. GOLDBERG:  Objection to form,
6    ambiguous.
7    A.  I have an understanding of what
8  Dr. Conti was seeking to do when she removed the
9  supply curve and called that legitimate supply.
10 I have a discussion in my report about economic
11 loss damages and that her analysis does not
12 establish worthlessness.
13   Whether there is a supply of product
14 that the U.S. court allows, that is not the same
15 as measuring the worth or value of drugs.  The
16 worth or value of drugs to consumers depends on
17 their valuation of the products, not the supply
18 of the products.
19   I disagree with Dr. Conti on that
20 point.
21   Q.  Did you hear me invoke Dr. Conti's
22 name or any of her findings in my question,
23 Dr. Stiroh?
24   A.  I don't recall if you said it.  It is

---

Page 177

1  relevant to my answer because my assignment in
2  this case was to consider her opinions.
3    Q.  I'm not talking about your assignment
4  now.  I've asked you a profoundly simple
5  question.
6    And that is, as an economic principle,
7  how can you have a legitimate supply curve of a
8  product that is, by law, prohibited from
9  entering interstate commerce?
10   MR. GOLDBERG:  Objection to form.
11   Ambiguous.
12   A.  As a matter of economics, you could
13 have a supply curve if there is supply of the
14 product.  What I take you to mean by "legitimate
15 supply" is supply of a product that meets
16 certain requirements.
17   My understanding is that there was
18 supply of VCDs that met those requirements, and
19 the question is whether there -- the absence of
20 supply from defendants causes products to be
21 worthless.
22   Q.  You agree, if we were constructing,
23 economically speaking, as you do all the time,
24 and appropriately so, a but-for world in which

---

Confidential Information Subject to Protective Order

---

Page 178

1 there's compliance with the law, and
2 specifically this prohibition of introducing
3 into interstate commerce adulterated drugs, that
4 in that but-for world, there is no legitimate
5 supply curve, correct?
6    A.  I don't think that's correct.  I think
7 you -- if you assume that the drugs that are
8 alleged to have impurities are not part of the
9 market, if you assume them away, there is still
10 supply of other Valsartan-containing drugs.
11    Q.  You agree that if all of VHP's drug
12 products were adulterated, that none of them
13 could lawfully be in the U.S. legal class of
14 trade.  Correct?
15       MR. GOLDBERG:  Objection to form.
16    Calls for a legal opinion.
17    A.  I don't know if I agree with that or
18 not.  The facts that I take into account for my
19 report is that there were supply of drugs, there
20 were purchases of drugs, and I consider the
21 value of those drugs and how the value might be
22 diminished if consumers knew that there were
23 impurities in them.
24       It's a framework that I have worked

---

Page 179

1 with in my report.  The concept of legitimate
2 supply being necessary for value is something I
3 reject.
4    Q.  Do you see, in Exhibit 3, that the
5 third prohibited act under C reads, The receipt
6 in interstate commerce of any food, drug,
7 device, tobacco product or cosmetic that is
8 adulterated or misbranded, and the delivery or
9 proper delivery thereof, for pay or otherwise,
10 is yet another prohibited act.
11       Do you see that?
12    A.  I see where you are reading from the
13 document.
14    Q.  And where it says, And the delivery or
15 proffered delivery thereof for pay, do you
16 understand that the prohibition against, in this
17 case, a drug manufacturer being paid for an
18 adulterated drug?
19       MR. GOLDBERG:  Objection to form.
20    Calls for a legal opinion.
21    A.  I guess I don't have an opinion on
22 what this means or a clear understanding of what
23 number C means.
24    Q.  You don't have an understanding that

---

Page 180

1 the totality of these two statements means that
2 you can't introduce adulterated drugs into the
3 U.S. interstate commerce and you can't get paid
4 for it?  You don't understand that construct?
5       MR. GOLDBERG:  Objection to form.
6    Calls for a legal opinion.
7    A.  I guess as the plain English, if I
8 look at C, it seems to be illegal or prohibited
9 to receive it.  Does that mean to you that it is
10 prohibited for a consumer to receive a drug?
11       I don't think that's what would be
12 intended.  But if I, as an economist and not a
13 lawyer read it, that's what the words say.
14    Q.  Suffice to say you didn't consider
15 21 USCA 331 A or C in your own analysis, right?
16       MR. GOLDBERG:  Objection to form.
17    Asked and answered.
18    A.  I did not rely on this document to
19 reach my opinions.  My recollection is that
20 these statements are included in the materials
21 used by Dr. Conti, and so I consider her
22 materials and the opinions that she draws, in my
23 report, responding to those opinions.
24    Q.  Can you show me or tell me where in

---

Page 181

1 your report you discuss these prohibited acts
2 and their impact on your economic analysis?
3       MR. GOLDBERG:  Ruben, while Dr. Stiroh
4    is looking at that, when you get a chance,
5    could we take a break for a minute or two?
6       MR. HONIK:  At a -- at an appropriate
7    place to stop, which is soon, I think.
8       MR. GOLDBERG:  Thanks.
9    A.  In my report, I have a section
10 Roman II, "Background," that starts on page 9,
11 with paragraph 9.
12       Paragraph 10 has my understanding of
13 some of the facts at issue in this case,
14 including whether there are amounts of NDMA in
15 the VCDs at issue.
16    Q.  Dr. Stiroh, I'm looking at
17 paragraphs 9 and 10, and this entire
18 "Background" section.  I don't see a blessed
19 thing about the law prohibiting the introduction
20 of adulterated drugs in interstate commerce.
21 Where is -- where is it that you say it's in
22 there?
23       MR. GOLDBERG:  Objection.
24    Argumentative.

---

Page 182

1    A.   I don't believe I used that phrase
2  anywhere in my report.
3    Q.   Do you -- are you aware that
4  defendants' own expert on the pharmaceutical
5  supply chain, cGMP chemistry, agrees that this
6  construct in Exhibit 3 that we've been looking
7  at means that there could be no legitimate
8  supply curve?  Are you aware of that?
9    A.   I am not.
10   Q.   Have you read or been informed
11 about -- by the defense, about the testimony of
12 Dr. Lambert in this case?
13   A.   I'm not familiar with the testimony of
14 Dr. Lambert.
15   Q.   And I don't -- I don't think you so
16 much as refer to him in your reliance materials,
17 correct?
18   A.   I don't believe I refer to him in my
19 reliance materials.  I don't recall having
20 relied on anything that he wrote.
21   Q.   Would it surprise you, then, that he
22 agrees that if the FDA considers a drug to be
23 adulterated or misbranded, as set out here, and
24 the fact that it can't be lawfully introduced

Page 183

1  into interstate commerce, and the manufacturer
2  or supplier of that lawfully receives money,
3  that that means under that construct, it can't
4  be a legitimate supply curve?
5      MR. GOLDBERG:  Objection --
6    Q.   Do you deny that?
7      MR. GOLDBERG:  Objection to form.
8  Foundation.
9    A.   Are you asking me if I deny what
10 somebody else said in testimony I haven't read?
11   Q.   Yes.  Do you have any basis to
12 disagree with what Dr. Lambert, on behalf of
13 defendants, told us under oath?
14     MR. GOLDBERG:  Objection to form.
15 Assumes facts not in evidence.
16   A.   I have a basis to disagree with
17 certain statements that you have made on the
18 grounds of them not being economic principles.
19     Whether they are legal principles, I
20 don't have a basis to agree with you or disagree
21 about whether somebody else in this case said
22 something or agreed to something when I have not
23 read their testimony.
24   Q.   Well, let me read it to you, and if

Page 184

1  you'd like, I can put it up on a share screen or
2  direct your attention to a paper exhibit, but
3  let me first begin by reading it.
4      And for the record, this is the
5  deposition -- sworn deposition testimony of
6  Dr. Lambert.  It appears at page 104, beginning
7  at line 21, and the question was as follows:
8      And so does that not mean,
9  Dr. Lambert, that there can be no legitimate
10 supply curve, that is, an adulterated drug
11 cannot be legally introduced into the legal
12 class of trade in the United States?
13     And the witness, Dr. Lambert, for the
14 defense, said, So if it's determined by the FDA
15 that it is indeed adulterated, then I would
16 agree.
17     And so my question to you is, are you
18 in disagreement with Dr. Lambert that there can
19 be no legitimate supply curve by the application
20 of this law, and if so, if you do disagree, can
21 you tell us under oath why?
22     MR. GOLDBERG:  Objection.  Calls for a
23 legal opinion.
24   A.   In my opinion as an economist, there

Page 185

1  is a supply curve if there is supply of
2  products, and -- or willingness to supply
3  products at different price points.  That's what
4  a representation of a supply curve would be.
5      My understanding is that not all of
6  the VCDs at issue contained the NDMA and NDEA
7  impurities, and it is also my opinion, as an
8  economist, that whether there is supply of the
9  Valsartan-containing drugs at issue or not,
10 there is value that was received for the
11 products that were purchased and consumed.
12   Q.   Dr. Stiroh, if Dr. Lambert is right
13 and you're wrong, that there is an illegitimate
14 supply curve, you'd agree that no equilibrium
15 price could be set, because you've already
16 confirmed that it requires the intersection of a
17 supply-and-demand curve.  Right?
18   A.   I would agree that an equilibrium
19 price is the intersection of a supply-and-demand
20 curve.  I have disagreed with you about whether
21 there is still a supply curve for
22 Valsartan-containing drugs, and I disagree with
23 Dr. Conti that the absence of supply of certain
24 Valsartan-containing drugs implies that the

Page 186

1  value of those products that were consumed by
2  consumers is zero.
3      Q.  Dr. Stiroh, inasmuch as you're not a
4  cGMP expert, would you disagree with the idea,
5  in good manufacturing practices and by the
6  application of FDA regulations, that if you
7  can't guarantee the integrity, purity, safety
8  and efficacy of one lot or batch of drugs that
9  fail to meet cGMP, that that implicates and
10  causes all of the pills to be adulterated?
11      MR. GOLDBERG:  Objection to form.
12      Ambiguous.  Calls for a legal opinion.
13      A.  The part of that that I agree with is
14  that I am not a cGMP expert.
15      I don't think I even followed the rest
16  of the question.
17      And -- I guess not sure why you would
18  ask my opinion with -- starting it out by saying
19  that you agree that I am not a cGMP expert.  I
20  don't have opinions on that topic.
21      Actually, if we could take a break.
22      MR. GOLDBERG:  Okay.  The witness has
23      just asked to take a break, and I had asked
24      about ten minutes ago.

Page 187

1      MR. HONIK:  I just have some quick
2      follow-up to that, and then we can break.
3      Q.  The reason I've asked you, Doctor, is
4  that you keep repeating that some but not all of
5  the drugs, as to some of the manufacturers, was
6  contaminated, and I'm merely asking if you have
7  any awareness of the rules and regulations of
8  current manufacturing practices which renders
9  all drugs from a facility as adulterated if you
10  can't guarantee the safety of each and every
11  product coming out of that facility.
12      You either are or are not aware of
13  that.  That's what I've asked.
14      MR. GOLDBERG:  Objection to form.
15      Calls for a legal opinion.
16      Q.  Are you?
17      A.  I am not aware of that, and I am not
18  offering opinions on that.
19      Q.  Thank you.
20      MR. HONIK:  How much time of a break
21      would you like, Seth?
22      MR. GOLDBERG:  Why don't we take
23      ten minutes.
24      THE VIDEOGRAPHER:  The time right

Page 188

1  now --
2      MR. HONIK:  Thank you.
3      THE VIDEOGRAPHER:  The time right now
4  is 3:11 p.m.  We are off the record.
5      (A recess was taken from 3:11 to
6  3:28.)
7      THE VIDEOGRAPHER:  Time right now is
8  3:28 p.m.  We are back on the record.
9      MR. HONIK:  Jeff, for the benefit of
10  the record, I've had Dr. Stiroh pull a
11  transcription about which I questioned her
12  earlier, and we're going to be marking this
13  Exhibit 4.
14      (Transcript of deposition of William
15  J. Lambert was marked Stiroh Exhibit 4 for
16  identification, as of this date.)
17      THE COURT REPORTER:  It's now marked.
18      Q.  Dr. Stiroh, we had been talking a bit
19  about this idea of equally -- equilibrium
20  pricing and the intersection of
21  supply-and-demand curves.
22      As an economist -- I don't want to
23  oversimplify it, but the way one would graph a
24  supply curve or put that on the graph, you'd be

Page 189

1  able to see, in the case of a consumer product,
2  the actual movement of a line representing sales
3  in the marketplace.  Correct?
4      A.  No.  I think you are -- either I am
5  confused from your question or you're confusing
6  concepts in your question.
7      A demand curve and a supply curve that
8  intersects at a point that we call the
9  equilibrium price does not show movement along a
10  line.
11      You can imagine it as the amounts that
12  would be consumed at different price points from
13  the standpoint of consumers, or would be
14  supplied at different price points from the
15  standpoint of suppliers.  What we observe in
16  data is what happens at the intersection.
17      Q.  That's right.  And you got me on the
18  words.  All I meant to ask you, in -- however
19  inartfully, and we can go around on this if
20  you'd like, but all I want to understand is, if
21  it isn't -- if you aren't able, as an economist,
22  to plot on a graph a supply curve.
23      A.  I'm sorry.  You're asking me if it is
24  possible to plot on a graph a supply curve?

Page 190

1    Q.   Yeah.
2    A.   Yes.
3    Q.   And when you do so, if the value of a
4  particular point on that graph is zero, is at
5  zero, is -- does that mean that there's no
6  supply of that item or product?
7    A.   No.  There may be a point where
8  quantity demanded is zero and the price could be
9  quite high.  And you would expect that there
10 would be many suppliers that would be willing to
11 supply the product at that high price, but there
12 would be no consumer demand for it.
13   Q.   Did you hear me ask you anything about
14 pricing?
15      MR. GOLDBERG:  Objection to form.
16 Argumentative.
17   A.   I -- then I should have asked for
18 clarification, what are you envisioning on the
19 axes for a supply curve or a demand curve that
20 would intersect.
21      I imagined that they were intersecting
22 at a point that gives you coordinates for price
23 and quantity.
24   Q.   Okay.  So let's try it again.  I'm not

Page 191

1  talking about a demand curve, and I'm not
2  talking about equilibrium pricing.  I'm merely
3  asking you if, as an economist, when you plot a
4  supply curve on a graph, if -- if it's at zero
5  on the horizontal axis and zero at the vertical
6  axis, if that means there's no supply.
7    A.   Yes.
8      MR. GOLDBERG:  Objection.
9    Q.   Okay.
10      Have you seen the sales of any of the
11 at-issue VCDs after recall?
12   A.   Yes.
13   Q.   And do you agree that those sales are
14 at zero in the case of the recalled manufacturer
15 products?
16   A.   I have seen, in the IQVIA data, that
17 there continue to be records of sales of the
18 recalled products after the dates of recalls.
19   Q.   You don't agree that there was no
20 supply, legitimate supply curve for ZHP VCDs
21 after the recall?
22      MR. GOLDBERG:  Objection to form.
23 Ambiguous.
24   A.   I think the term, "legitimate supply,"

Page 192

1  is something that Dr. Conti has created for this
2  report.  I don't understand it outside of the
3  context of her report.  And I hear you use it,
4  and before, you objected to me saying her name.
5      I have seen IQVIA data, and after the
6  dates of recalls, it is apparent in the IQVIA
7  data that it looks like there are sales of the
8  products at issue.  Whether that's a flaw in the
9  data source or an actual fact, I cannot tell you
10 as I sit here.
11      You asked me if I have seen the data.
12 I have seen it, and that is what I have
13 observed.
14   Q.   Let -- let me ask the question this
15 way.  What's your definition of no supply curve?
16   A.   I don't have a definition of no supply
17 curve.  I have a definition of no supply.  Which
18 I think that you asked me earlier, and I agreed,
19 that if supply is zero, that is no supply.  That
20 is not the same as there being no supply curve.
21      A supply curve is a construct of the
22 consideration of how much would be supplied by
23 suppliers at different price points.
24      Would be willing to be supplied.

Page 193

1    Q.   Do you agree that one of the ways to
2  think about this case is to create a but-for
3  world prior to the recall starting in 2018,
4  going back to the beginning of manufacturing in
5  2012, in which there's zero supply?
6      MR. GOLDBERG:  Objection to form.
7  Ambiguous.
8    A.   I have considered that if the but-for
9  world has zero supply of certain Valsartan
10 products between 2012 and 2018, what
11 implications that has for consumer expenditures.
12   Q.   Yeah, that's not really what I asked
13 you.
14      Could you, at my direction, supply a
15 but-for or develop a but-for model in which
16 there's zero supply, between 2012 and 2018, of
17 Valsartan-containing drugs, yes or no?  And then
18 I have a follow-up question.
19   A.   I could construct a model, considering
20 the scenario where there is zero supply of
21 certain Valsartan-containing drug products, and
22 consider the economic implications of that model
23 for financial outcomes for consumers.
24   Q.   I don't know what the second part of

Confidential Information - Subject to Protective Order

Page 194

1 it is, but I take it you can -- you can create a
2 but-for world with zero VCD supplies. That much
3 you said you could do. Right?
4     A.  I can do that.
5     Q.  In that but-for world, is not the --
6 the cost of that drug zero?
7         Isn't the -- excuse me, I misspoke.
8 Isn't the price of that drug zero?
9     A.  No.
10        As an economic matter, the price for a
11 product that has been taken out of the market no
12 longer exists.
13        For a but-for world to be complete and
14 meaningful in a damages context, then you would
15 need to consider what consumers would purchase
16 instead of the product that they did purchase.
17        I can construct a damages model where
18 this but-for scenario is that there is no supply
19 of the Valsartan-containing drugs at issue.
20        For that to be a complete damage
21 model, I need to consider what do patients do to
22 manage their blood pressure in the absence of
23 the products that they actually did consume.
24     Q.  Dr. Stiroh, you didn't even come close

Page 195

1 to answering my question.
2         What I asked you to assume is not all
3 the things you ingrafted upon my hypothetical.
4 It's true, because you've already told me there
5 could be no equilibrium price where there's no
6 intersection of supply and demand, and having
7 informed me that you can create a but-for world
8 with zero supply, which means it will never meet
9 a demand curve, there can be no equilibrium
10 price.  Correct?
11        MR. GOLDBERG:  Objection to form.
12 Argumentative.  Asked and answered.
13        Ambiguous.
14     A.  No.
15        Acknowledging it's getting a little
16 late in the afternoon, that question was
17 absolutely meaningless from a standpoint of
18 economics.
19        I can create a but-for world --
20     Q.  I guess --
21     A.  Let me finish my answer, please.
22        MR. GOLDBERG:  Hang on, Ruben. Hang
23 on, Ruben.  The witness is talking.
24     A.  I can create a but-for world and

Page 196

1 estimate damages under a scenario where we
2 imagine removing the supply of
3 Valsartan-containing drugs.
4         To make that an economically valid
5 damage assessment, I would need to consider what
6 do consumers who purchase those drugs do in the
7 alternative.  I would consider the prices they
8 would pay for alternative drugs, whether they
9 alternative -- they are alternative ARBs or
10 different VCDs other than the contaminated ones.
11        It is not true to say the price is
12 zero if there is no supply.  There is -- price
13 does not exist in that case.  That is
14 meaningless, to say that the price is zero.
15 Price is zero is a free good; price nonexistent
16 is for a product that doesn't exist.
17     Q.  I understand your -- your answer.  And
18 I think anyone listening to this will understand
19 it as well.
20        Why don't you pull up from your pile
21 of exhibits there, both Tabs 18 and 19, which
22 would be your invoicing in this case.
23        We're going to mark your exhibits --
24 excuse me, your invoices as Exhibit --

Page 197

1 Exhibit 5, and the summary that we prepared as
2 Exhibit 6.
3         Would you give that to our reporter,
4 please.
5         (Invoice from NERA Economic Consulting
6     was marked Stiroh Exhibit 5 for
7     identification, as of this date.)
8         (Summary of invoices was marked Stiroh
9     Exhibit 6 for identification, as of this
10    date.)
11     Q.  Do you have Exhibits 5 and 6 in front
12 of you?
13        MR. GOLDBERG:  Not yet, not yet.  Hang
14 on.  Wait one second, please.
15        Okay, go ahead.
16     Q.  Do you have Exhibit 5, the collection
17 of invoices that were turned over to us?
18     A.  I do.
19     Q.  You're familiar with your own
20 invoicing for the work that you and your
21 associates at your firm did in this case?
22     A.  I am.
23     Q.  You reviewed them before today's
24 deposition?

Page 198

1    A.   I did.
2    Q.   The earliest of the activity on
3  invoicing that I have relates to October of
4  2020.  Is that correct?
5    A.   The -- the first page of the project
6  diaries that I have has an entry from me from
7  September 15, 2020.
8    Q.   Does that correspond to the earliest
9  point at which you did work on this matter?
10   A.   I expect I would have read the
11 complaint prior to that date, but it is the --
12 the first date that I recall once I had
13 received -- been retained and received an
14 assignment.
15   Q.   And the work that you did in this
16 matter, Dr. Stiroh, you did perhaps hired by one
17 counsel but you did it on behalf of all the
18 defendants.  Didn't you?
19   A.   Yes, that is correct.
20   Q.   And that's specifically set out in
21 your report, is it not?
22   A.   Yes.  My report, under "Assignment,"
23 says, I've been asked for counsel for all
24 defendants, and goes on from there.

Page 199

1    Q.   Do you know of any other economist
2  that was engaged to do any work similar to your
3  own by the defendants in this case?
4    A.   I'm not sure what you mean by that.
5    Q.   Are you the sole economist engaged by
6  the defendants to prepare a report on whether or
7  not damages can be ascertained on a class-wide
8  basis?
9    A.   I am the only -- I'm the only one that
10 I'm aware of, but I -- I don't know if they've
11 engaged others.
12   Q.   And from my review of your own
13 invoicing, the last of the invoices covers the
14 period December ending last year, 2021.  Is that
15 correct?
16   A.   Yes.
17   Q.   Would you put Exhibit 6 in front of
18 you.
19   A.   I have it.
20   Q.   This is a summary that we put together
21 that's a simple computation or addition of the
22 various invoice amounts from October of 2020
23 through the end of December 2021.
24        Do you see that?

Page 200

1    A.   I do.
2    Q.   Do you have any reason to dispute the
3  amounts that are indicated or enumerated in
4  Exhibit 6?
5    A.   I haven't gone through it and matched
6  them up, but I don't have a reason to dispute
7  them.
8    Q.   So, if the total of the invoice
9  amounts for your work and that of your firm was
10 $1,369,114 through the end of calendar year
11 2021, you would agree with that.  Right?
12   A.   Yes.
13   Q.   How -- with what frequency did your
14 firm issue invoicing for work done by NERA, your
15 firm in this case?
16      MR. GOLDBERG:  Ruben, are you able to
17   put the summary document up on the screen.
18   I'm getting that request from people who
19   are watching in on Zoom.
20      MR. HONIK:  Yeah, I'd be delighted to.
21   Dave, are you able to do that?
22      MR. STANOCH:  It's in the public
23   exhibit folder at Exhibit 6, but --
24      MR. HONIK:  Do you know how to pull it

Page 201

1  up as a screen share?
2      MR. STANOCH:  Stand by.
3    Q.   There we go.  Is -- is what you see on
4  the screen, Dr. Stiroh, the summary that we
5  marked Exhibit 6?
6    A.   It is what you marked as Exhibit 6.
7  Looking at it now, I -- I'm not sure -- I see
8  for January dash 21, 301,262.50.  And if I look
9  at an invoice that I think is intended to cover
10 that period, I see 30,162.50.
11   Q.   Okay.  If there's a computational
12 error, then we'll correct it.
13   A.   If I can, then I think I need to
14 correct my last answer.  I did not dispute that
15 these were accurate, and now I do.
16   Q.   The -- the question that I -- that I
17 posed to you, which I don't think you answered
18 as yet, is, with what frequency has NERA, on
19 your behalf and on behalf of your associates,
20 billed the defendants for your time?  Has it
21 been on a monthly basis?
22   A.   Generally, the invoices reflect a
23 month's work.  The frequency with which we get
24 them out the door is not quite monthly, but

Confidential Information — Subject to Protective Order

Page 202

1 the -- the -- the period of coverage is
2 typically a month.
3    Q.  Have you seen any invoicing for the
4 work of yourself and your team for any part of
5 2022?
6    A.  Yes.
7    Q.  When did you see such invoicing?
8    A.  We are in the process of reviewing
9 those currently.  I have not yet completed my
10 review of them.  I have seen that they're in the
11 process of being prepared.
12    Q.  And is that true for January 2022,
13 that is, you haven't billed for January 2022?
14    A.  That is correct.
15    Q.  Are you able to -- since you've seen
16 the invoicing, and you're auditing it, can you
17 tell me the number of additional hours that
18 reflect work of yourself and others at NERA in
19 2022?
20    A.  Not by memory.  There would be hours
21 associated with completing my report.  But I
22 don't recall specifically what the hours were.
23    Q.  Right.  And all I'm asking you is to
24 estimate for me, if you can, how many total

Page 203

1 hours NERA is likely to bill from January 1,
2 2022, to the present, which would include the
3 finalization of your report, subsequent review,
4 any testimony of experts in this case,
5 preparation for today, anything else that you
6 might have done in -- in connection with your
7 engagement.
8       MR. GOLDBERG:  Objection.
9    Q.  How many hours would that total?
10       MR. GOLDBERG:  Objection.
11 Speculation.
12    A.  I think the total would be around,
13 say, 3,500 hours for all of NERA's work in this
14 matter.  And so whatever is totaled up in the
15 invoices through December 2021 would be
16 subtracted off of that with the understanding
17 that that is sort of a ballpark guess.
18    Q.  Understood.
19       Turn with me, in Exhibit 5, which is
20 the -- which are the invoices themselves, and I
21 just want to go through some of them to get a
22 flavor for what I'm looking at here.
23       There's something called "Project
24 Diary," dated November 24, 2020, and there's an

Page 204

1 invoice number US 48601P005.
2       Do you see that page, for example?
3    A.  I might need you to say it again a
4 little bit slower.  What is the invoice date
5 that you want me to look at?
6    Q.  Let's try to do it this way.  I think
7 it's the second page of Exhibit 5.
8    A.  I have the second page --
9    Q.  Let's do that.
10    A.  I have the second page of Exhibit 5 in
11 front of me.
12    Q.  In the right-hand upper corner, does
13 it say November 24, 2020?
14    A.  It does.
15    Q.  And do you see under your own name as
16 managing director, there's an entry, it says
17 December 15, 2020?
18    A.  Yes.
19    Q.  And the description of services
20 rendered is redacted, with the exception of the
21 word "discussion," with S.LI.
22       Do you see that?
23    A.  Yes.
24    Q.  Did you cause that redaction?

Page 205

1    A.  I did not.
2    Q.  Do you know why it was redacted?
3       MR. GOLDBERG:  Objection.  I mean,
4 that -- that calls for a legal conclusion.
5       And this is information that has been
6 marked confidential by counsel.
7       MR. HONIK:  Nothing's been marked
8 confidential.  I just have black lines.  Do
9 you want to convey why this has been
10 redacted?
11       MR. GOLDBERG:  You can ask the witness
12 the questions.  I'm not here to testify.
13       MR. HONIK:  I have asked her.
14    A.  All right.  But I thought you were
15 asking Mr. Goldberg.  Sorry.
16    Q.  Well, he -- he interrupted.
17       The question I asked was, why was this
18 redacted and what's in there?  What -- what
19 service did you render on September 15, 2020?
20       MR. GOLDBERG:  Let me object to the
21 extent you are being asked to provide
22 information not in a testifying capacity.
23       THE WITNESS:  Now I answer?
24       MR. GOLDBERG:  Yes.

Page 206

1 A. My team and I spent time on this case
2 in a consulting capacity separate from the
3 assignment that I have described in my report.
4 It's my understanding that --
5 Q. I don't -- I'm sorry, I don't
6 understand the distinction you're making.
7 MR. GOLDBERG: Well, counsel, that's
8 not really for Dr. Stiroh. We can talk
9 about this among lawyers. But -- but I'll
10 leave it at that.
11 If you'd like to go off the record,
12 I'm happy to do that, and we can talk about
13 it.
14 MR. HONIK: Well, I -- no, I'd like to
15 stay on the record. I think it's
16 permissible for me to ask about her work in
17 this case.
18 It's -- you've been billed for it.
19 It's in the invoice that's been produced to
20 us. I'd like to know what the work was
21 that relates to this case.
22 Q. Do you -- do you -- first of all, do
23 you know the answer to my question?
24 A. I have a general recollection of some

Page 207

1 of the work that was done that is not connected
2 with my assignment with respect to class
3 certification issues.
4 Q. So, are you saying that you had
5 multiple assignments from these same defendants?
6 MR. GOLDBERG: Counsel, I don't want
7 to belabor the point here. Just as you
8 have done with your experts, to the extent
9 Dr. Stiroh provided services for defendants
10 that were not related to the opinions in
11 her report, that information is redacted.
12 MR. HONIK: Is that the reason they
13 were redacted?
14 MR. GOLDBERG: I just represented that
15 to you.
16 Q. Dr. Stiroh, can you turn deeper into
17 the pile of invoices -- let me try to shorthand
18 way to -- shorthand way.
19 Can you go to project diaries dated
20 December 8, 2021. It's in- -- Invoice
21 Number US 53163P005. And I would estimate it's
22 about eight or ten pages from the back.
23 A. I have in front me a page with project
24 diaries with my time that encompasses

Page 208

1 December 2021.
2 Q. Well, do you see, for example, the
3 time entries for an associate analyst by the
4 name of Nathan Evans? Do you see that?
5 MR. GOLDBERG: We're not on the same
6 page, Ruben. So -- are you talking about
7 the invoice dated December 8, 2021, or the
8 time --
9 MR. HONIK: No, I'm talking about a
10 page called "Project Diaries."
11 A. I have a page called "Project Diaries"
12 that reflects time for Nathan Evans for
13 December 2021.
14 Q. Okay. But do you see the entries for
15 October 14 through October 20 are completely
16 redacted?
17 A. I'm sorry. I was looking at the wrong
18 one. I think -- let me catch up with you. If
19 you give me the dates for the entries, I think I
20 can find the page. The person and the dates for
21 the entries.
22 Q. October -- October 14 through
23 October 20, 2021.
24 A. I believe I have the correct page in

Page 209

1 front of me.
2 Q. Do you see how all of Mr. Evans' time
3 for those dates are redacted?
4 A. I do.
5 Q. What does this work relate to that
6 caused it to be redacted, if not support for
7 this report?
8 MR. GOLDBERG: Again, counsel, that
9 information has been redacted because it
10 is -- does not pertain to Dr. Stiroh's
11 opinions and work in developing her
12 opinions and the report, and therefore,
13 it's been redacted. And -- it --
14 Q. Let me ask a different question.
15 Doctor -- Dr. Stiroh, are you able,
16 you yourself, able to go through all of these
17 invoices and project diaries and, on your own,
18 separate out what was supporting, allegedly,
19 your report in this case that you proffered to
20 this point, and other work? Can you discern the
21 difference?
22 A. I could potentially do that, yes.
23 Q. What -- what criteria would you use to
24 distinguish work done in support of this report,

Confidential Information - Subject to Protective Order

Page 210

1 dated January 12 of this year, and any other
2 assignments that you may have received?
3      A.  Work that I asked to be done for
4 purposes -- from -- to my staff for reviewing
5 information or data, or doing data analyses
6 related to my report, would be things that I
7 would consider in support of my work.
8          If there are tasks that counsel asked
9 of any of my team that was not coming at my
10 direction and not for purposes of my report,
11 that would be -- not be something I would
12 consider to be work for my report.
13     Q.  Are you -- are you preparing another
14 report in this case?
15     A.  I am not preparing another report in
16 this case.
17     Q.  Have you, nonetheless, been asked to
18 undertake a different assignment in this case as
19 it relates to VCDs in this MDL?
20         MR. GOLDBERG:  Objection to form.  To
21     the extent that there's information or
22     services that Dr. Stiroh is providing that
23     are not pertaining to her opinions as a
24     testifying expert, that information is off

Page 211

1 limits.
2          MR. HONIK:  It's just a yes or no.
3     I'm not going to ask her what it is.
4          MR. GOLDBERG:  And that's the answer.
5     I just gave you answer, which is the
6     question is not a proper question.
7          MR. HONIK:  You don't get to decide
8     what's a proper question or not.
9          I'd like Jeff to read it -- excuse me,
10     I'd like Jeff to read it back, please.
11         (The record was read back.)
12         MR. HONIK:  It's MDL.
13         MR. GOLDBERG:  Same.
14     Q.  Without revealing what the nature or
15 name of that assignment is, are you able to
16 answer the question simply yes or no?
17     A.  I have not been given an additional
18 assignment in this case.
19 DIR Q.  Is that true from the beginning of your
20 engagement to the present?
21         MR. GOLDBERG:  I'm -- I'm going to
22     instruct the witness not to answer, because
23     you're taking her down a road that is
24     misleading.

Page 212

1          I've given you the explanation for why
2     the information has been redacted.  And
3     that's because it doesn't pertain to the
4     services Dr. Stiroh is providing for us in
5     the capacity as a testifying expert.
6          I will instruct the witness not to
7     answer --
8          MR. HONIK:  She just testified --
9          MR. GOLDBERG:  -- because you're just
10     going to -- you're just going to create a
11     record that is confused and misleading.
12         MR. HONIK:  She's just testified under
13     oath that she's had no other assignment.
14         MR. GOLDBERG:  Then that's -- that's
15     my point.  That's my point.
16         MR. HONIK:  That she had a single
17     assignment.
18         MR. GOLDBERG:  That's my point.
19         So you could move on, because I've
20     instructed her not to answer.
21         MR. HONIK:  I -- I take that.
22     Q.  Doctor, you apparently, some years
23 ago, were involved in a case called LaPoint
24 versus AmerisourceBergen Corp.

Page 213

1          Do you remember that case?
2     A.  I do.
3     Q.  And apparently in that case you were
4 hired by the plaintiff.  The legal dispute
5 concerned a would-be merger between
6 two companies, plaintiff having a product called
7 a bedside point-of-care, a bar code product of
8 some sort, that was supposed to have been merged
9 or acquired by AmerisourceBergen.
10         Did I get that about right?
11     A.  I don't remember those details.  I
12 remember that there was a point-of-care bar code
13 product that was involved.  I don't recall
14 the -- the aspects of the merger.
15     Q.  That's right.  And your -- your job as
16 an economist was to determine and -- and provide
17 economic support for the contention that but for
18 the merger, that -- that the company who made
19 this product, which was called Bridge, was
20 destined to remain a dominant force in that
21 particular market, and you were going to do some
22 economic calculations based on that premise.
23 Correct?
24     A.  I -- I can't agree with you, just

Confidential Information - Subject to Protective Order

Page 214

1 the -- with respect to I don't have the memory
2 of that.  It -- every word you're saying brings
3 back more memories of it, but I don't -- it's a
4 while ago and I don't remember the specifics of
5 the case.
6     Q.  Uh-huh.  Why don't we -- have you seen
7 the -- the decision by the Court of Chancery of
8 Delaware in this case?
9         Ever?
10    A.  I have.  Some time ago.  But I have.
11    Q.  Right.  And do you remember what
12 happened to your testimony and your work in that
13 case?  Your report?
14    A.  I do.
15    Q.  Can you tell me what you remember
16 happening to it?
17    A.  Yes.  I had written a report.  I can't
18 recall if it -- I think it might have had
19 damages in it.  But it had an economic analysis,
20 in which I relied on the report of another
21 expert to supply certain inputs from my report,
22 particularly market share.
23        In discussions with the other expert,
24 I had -- was given an understanding of the

Page 215

1 methodologies that he used to assess market
2 shares.
3        On the eve of trial, it became
4 apparent that what I had been given to
5 understand about his methodologies was not, in
6 fact, true, and his report was withdrawn.
7        Because his report was withdrawn and I
8 did not have confidence in the method by which
9 the data were collected, I did not feel I could
10 testify to the numbers in my report, and
11 together with counsel, we withdrew my report
12 from the case.
13    Q.  So according to you, there was some
14 unreliable data that was used in your report,
15 and you -- you were pulled as an expert; is that
16 what you're saying?
17        MR. GOLDBERG:  Objection to form.
18    Mischaracterizes the testimony.
19    A.  That's not what I'm saying.  The -- in
20 the course of vetting the data that I used in my
21 report, I was given to understand a set of
22 circumstances that I later understood to be
23 incorrect.
24        I, with -- together with the counsel

Page 216

1 that I was working with, decided not to put my
2 report into evidence, and I did not testify to
3 it.
4     Q.  But was it clearly known that this
5 reliance upon data was not data collected or
6 compiled by you but, in fact, by some other
7 expert?  Was that well known and clear?
8     A.  I don't know what you mean by "well
9 known."  But certainly in my report, it was
10 referenced to the other expert, and the other
11 expert, I think, also had a report or opinion or
12 materials that were not included --
13    Q.  And --
14    A.  -- in the court materials.
15    Q.  -- did you say that that other
16 expert's report was likewise pulled?
17        MR. GOLDBERG:  Objection to form.
18    Mischaracterizes the testimony.
19    A.  I don't recall what happened with the
20 other expert and his report.  To the best of my
21 recollection, the information and circumstances
22 became apparent during his deposition, which
23 suggests that maybe he did have a report, but I
24 don't recall with certainty.

Page 217

1     Q.  Well, I thought you had testified a
2 moment ago under oath that his report was pulled
3 just like yours.  Is that incorrect
4 understanding?
5        MR. GOLDBERG:  Objection.
6    Mischaracterizes the testimony.
7     A.  That is an incorrect understanding.
8 What I have indicated to you with respect to
9 this case, it was some time ago and my memory
10 isn't perfect.
11        My recollection is that for my report,
12 I, in consultation with the counsel that I was
13 working with, elected not to testify to it,
14 because I did not have faith in the numbers that
15 were drawn from a different expert's report.
16        I'm not telling you for a point of
17 fact what happened to that other expert's
18 report.
19    Q.  I see.  Well, why don't you actually
20 pull the -- the decision of the court out of the
21 pile of records there.  It's Tab 11.  And the
22 name of the case, again, is LaPoint versus
23 AmerisourceBergen.
24        And we'll get go ahead and mark that

Confidential Information - Subject to Protective Order

Page 218

1 as Exhibit 7.
2       Do you now have the exhibit,
3 Dr. Stiroh?
4    A.  Not just yet.
5       MR. GOLDBERG:  Ruben, it looks like
6 you did not provide that document to us.
7       MR. HONIK:  Okay.  Then why don't we
8 go ahead and screen share it.
9       Dave, do you have it?
10       MR. STANOCH:  Stand by.
11       MR. HONIK:  Thank you.
12       Okay.  Here's the opinion.  We'll
13 separately send it to -- to Jeff, and he'll
14 mark it as Exhibit 7.  This is next in
15 order.
16       As I mentioned earlier, it's from the
17 Court of Chancery of Delaware.  It's called
18 LaPoint versus AmerisourceBergen Corp.
19    Q.  Do you see that, Dr. Stiroh?
20       (Opinion in LaPoint v.
21 AmerisourceBergen Corp. was marked Stiroh
22 Exhibit 7 for identification, as of this
23 date.)
24    A.  Yes, I do.

Page 219

1    Q.  And you see the opinions authored by
2 Judge Chandler?  Do you remember Judge Chandler
3 in the case?
4    A.  I don't think I had occasion to meet
5 him.
6    Q.  That's right.  That makes sense.
7       MR. HONIK:  Turn to page 5, please,
8 Dave.
9       MR. GOLDBERG:  You going to let the
10 witness review the document?
11       MR. HONIK:  If she would like, sure.
12       MR. GOLDBERG:  Why don't you give her
13 a second and let her take a look at page 1
14 and page 2 so that she has a chance to look
15 at it.
16    Q.  Is that what you'd like to do,
17 Dr. Stiroh?  Do you want to review this opinion?
18 Or it sounds like you may have remembered it
19 fairly well, based on what you told me thus far.
20    A.  I don't remember the details of the
21 case very well.  I'll have to say I do remember,
22 obviously, the circumstances, because it was
23 unique in my history.
24       If -- if you could just go back to

Page 220

1 page 1 and so I can refresh my recollection of
2 the summary of details of the case perhaps.
3    Q.  We can do that if you'd like.
4       (Witness reviewing document.)
5       MR. GOLDBERG:  You want to scroll down
6 a little bit, to the -- the -- that
7 paragraph under Statement of Facts?
8       MR. HONIK:  Well, respectfully, this
9 isn't your deposition.  If --
10       MR. GOLDBERG:  Yeah, but as counsel,
11 I'm allowed to -- as counsel, I'm allowed
12 to review the documents that you're going
13 to ask questions about.  And since you
14 didn't provide the document, I also need to
15 see it.
16       MR. HONIK:  Okay.  Well, we can email
17 it to you right now.  I mean, it's only
18 about six or seven pages, and, Seth, you
19 can take as much time as you'd like to
20 review it.  Is that what you want?
21       MR. GOLDBERG:  You can do that.  I
22 don't want you to ask questions until I've
23 been able to review it.
24       MR. HONIK:  I think it's a colossal

Page 221

1 waste of time and a stalling tactic, but if
2 you want to read it, I really don't care
3 very much.  I'm trying to wrap up
4 Dr. Stiroh's deposition and get her out of
5 there.  We're nearly done.
6       MR. GOLDBERG:  Ruben, all we're --
7       MR. HONIK:  She's demonstrated to
8 me --
9       MR. GOLDBERG:  Ruben, all we're doing
10 is --
11       MR. HONIK:  Excuse me.  She's --
12 excuse me.  She's demonstrated to me a
13 rather keen recollection of this case.  I'm
14 not going to quiz her on the case.  I'm
15 going to focus on what she did and what
16 she's already told us happened, which is
17 that there was some data problem and she
18 got pulled.
19       And all I'm going to do is direct her
20 to that part of the opinion that addresses
21 it.  It's a very narrow section.
22       But if you want to read the entire
23 report -- or, excuse me, opinion, we'll
24 send it to you.

Page 222

1    MR. GOLDBERG: Yeah, I -- I --

2    MR. HONIK: You can take as much time

3  as you like.

4    MR. GOLDBERG: I think all we wanted

5  to do is just take a quick scan of the

6  first page to get familiar with what the

7  case is.

8    And Mr. Stanoch had not shown us that

9  first paragraph.

10    MR. HONIK: There's no "we"; she

11  remembers it, you don't. If you want to

12  read it, read it.

13    MR. GOLDBERG: Like I said, I just

14  wanted to get familiar with the first page

15  here. I wanted Dr. Stiroh to familiarize

16  herself with it.

17    A.  I have looked at the paragraphs that

18  are before me on this screen. Until looking at

19  this, I had not actually recalled that the

20  entire dispute came from a -- an acquisition.

21    I remembered the details about my

22  report and decision not to testify. And if you

23  ask me the question related to what is in this

24  decision, I can see if it -- I feel like I need

Page 223

1  to have more information about the background of

2  the case itself.

3    Q.  Let's go to page 5, and we'll see if

4  you need more review.

5    And if you do, you'll tell me.

6    All right.

7    So -- hold on.

8    Yeah, go up a little bit. Sorry.

9    See where it says, B, Questions of

10  material fact relating to causation and damages?

11    A.  I do.

12    Q.  That's yes?

13    A.  Yes.

14    Q.  So you were -- you were a damage

15  expert on -- as to causation; do you remember

16  that?

17    A.  I don't have an independent memory of

18  it. I'll have to say I -- I -- if you ask the

19  next question or see if there's something -- I

20  don't actually remember my specific assignment

21  without looking back at what the assignment was

22  that I had been given.

23    Q.  Yeah. So, it says in the -- in the

24  second full paragraph, in the right-hand column,

Page 224

1  you see it's highlighted, it says, Plaintiff's

2  causation arguments are not helped by the

3  withdrawal of their key expert witness,

4  Dr. Lauren J. Stiroh, whose report was meant to

5  provide support for the contention that but for

6  a merger with ABC, Bridge was destined to remain

7  the dominant force in the BPOC market.

8    Do you see that?

9    A.  I see where you are reading.

10    Q.  Does that refresh your recollection

11  about what you were doing in the case?

12    A.  It doesn't. I don't -- I don't have

13  any reason to disagree with what's written

14  there, but I don't have a recollection of the

15  work that I did, other than the ultimate

16  outcome.

17    Q.  Yeah. So, the ultimate outcome is

18  that, as the judge wrote, virtually on the eve

19  of trial and after this motion had -- had been

20  filed, had been fully briefed, Plaintiffs

21  discovered that the data on which Dr. Stiroh

22  relied may not have been credibly gathered.

23  Plaintiffs no longer rely upon the conclusions

24  in this report.

Page 225

1    Did I read that correctly?

2    A.  You did.

3    Q.  Is there any mention about your

4  reliance upon data or conclusions or anything

5  from another expert in that paragraph?

6    A.  In that paragraph, it mentions the

7  data on which I had relied. The data on which I

8  relied came from another expert.

9    Q.  Okay. But you agree that the court

10  doesn't note that it came from another expert.

11  It only notes that it came from your report.

12  Right?

13    A.  I don't think it does note that it

14  came from my report. It notes the data on which

15  I relied, and I am telling you, and I believe

16  the court knew, that it came from another expert

17  who might be referenced somewhere else in this

18  document. I don't know that as I sit here. But

19  the data on which I relied came from another

20  expert.

21    Q.  Okay. You see where it says,

22  Plaintiffs no longer rely upon the conclusions

23  in this report?

24    That refers to your report, right?

Confidential Information - Subject to Protective Order

---

Page 226

1    A.  It does.

2    Q.  So the data that the judge is writing

3  about that -- that was not credibly gathered was

4  in your report.  Correct?

5    A.  I can tell you that the data upon

6  which I relied was gathered by another expert.

7  It was the method by -- by which he had gathered

8  data that I found to be unreliable, and so I did

9  not testify to my report.

10    Q.  Well, I'm now confused.  Was the

11  method for gathering it unreliable, or was the

12  data itself unreliable, or both?

13    A.  To the best of my recollection, the

14  method for gathering it was unreliable, and that

15  led me to conclude that the data itself would

16  not be a reliable input into a damages estimate.

17    Q.  And you only discovered that after you

18  employed the data using the methodology which

19  you knew to be unreliable.  Right?

20    A.  No.

21    I did not -- when I used the data, I

22  did not know them to be unreliable.  I was -- I

23  had vetted the data and the process.

24    What I was told about the process of

---

Page 227

1  data gathering turned out not to be the process

2  that had been employed.  When I learned that a

3  different process that I felt was unreliable had

4  been employed, it was my opinion that the --

5  because the data gathering process was not

6  reliable, I could not rely upon the data and was

7  not willing to testify as to the damages that

8  used those data as an input.

9    MR. HONIK:  Those are all the

10  questions I have of this witness.  We're

11  going to keep the deposition open, hope

12  never have -- to have to revisit it, but

13  inasmuch as you withheld invoicing

14  information which needs to be supplemented,

15  we'll keep the record open.

16    You want to take a break and determine

17  if you have any questions?

18    MR. GOLDBERG:  Yeah.  Why don't we do

19  that.  Why don't we come back in

20  ten minutes.

21    THE VIDEOGRAPHER:  Time right now is

22  4:16 p.m.  We are off the record.

23    (A recess was taken from 4:16 to

24  4:31.)

---

Page 228

1    THE VIDEOGRAPHER:  Time right now is

2  4:31 p.m.  We are back on the record.

3  EXAMINATION BY MS. KAPKE:

4    Q.  Good afternoon, Dr. Stiroh.  My name's

5  Kara Kapke.  I'm counsel for CVS and Rite Aid,

6  and I have a few questions for you about your

7  opinions regarding Dr. Conti's unjust enrichment

8  opinions with respect to retail pharmacies and

9  wholesalers.

10    Where does therapeutic value fit into

11  the unjust enrichment analysis?

12    A.  My understanding of unjust enrichment

13  damages, as described in my report, are the

14  portion of a benefit conferred by a plaintiff on

15  a defendant which would be unjust for the

16  defendant to maintain.

17    The portion, then, that would be -- my

18  understanding of just for the plaintiff -- for

19  the defendant to retain would be the benefit

20  that the plaintiffs received from the

21  therapeutic benefits of the drugs.

22    Q.  I want to ask you specifically now

23  about Dr. Conti's unjust enrichment calculations

24  with respect just to pharmacies.

---

Page 229

1    Do you recall having opinions about

2  those calculations?

3    A.  I do.

4    Q.  And after you wrote those opinions,

5  did you have a chance to read Dr. Conti's

6  deposition transcript where she was asked

7  questions about her unjust enrichment opinions

8  with respect to pharmacies?

9    A.  I did.

10    Q.  After reading her report and

11  deposition transcript, what's your understanding

12  of how Dr. Conti calculated unjust enrichment

13  damages with respect to pharmacies from a

14  mechanical perspective?

15    A.  I understand that she summed up

16  certain revenues received by pharmacies, from

17  her report, which reads as if she had intended

18  then to subtract relevant costs.

19    From her deposition, it seems to me

20  from reading that she does not think there are

21  relevant costs, and so she -- my understanding

22  of her opinion is that it is simply revenues

23  received without subtracting costs and without

24  any apportionment with respect to what part

---

Page 230

1 might be just or any consideration of a
2 therapeutic benefit that patients received.
3     Q.  From -- after reading her report and
4 deposition transcript, what's your primary
5 criticism for how Dr. Conti describes her
6 methodology for calculating profits for the
7 pharmacies?
8     A.  I would say it is too simplistic and
9 incomplete.  It was not apparent, from reading
10 her report, that her opinion was that it was
11 essentially revenues that she thought were
12 unjust enrichment.
13         From reading her deposition, it is
14 apparent that she thinks that there are certain
15 costs that she thinks are not relevant, that I
16 think would be relevant for calculating profits
17 even before any apportionment.
18     Q.  Not asking you to give an exhaustive
19 list, but what are some of those costs that you,
20 as an economist, would consider in a profits
21 calculation?
22     A.  I think often and first and foremost
23 it would be the cost of goods sold, is quite
24 often the biggest component of costs.

Page 231

1         There are typically other types of
2 costs that are associated with delivering a
3 product to consumers.  They could be cost of
4 storing the product, delivering the product,
5 operating the facility, but I think there are a
6 wide variety of categories.  None of the
7 categories are included in Dr. Conti's
8 calculation.
9     Q.  For purposes about thinking about the
10 cost of goods sold, does it matter if a pharmacy
11 acquired and paid for the product the day it
12 sold it to the customer, a month before, or a
13 year before?
14     A.  Not from a standpoint of economics,
15 no.
16     Q.  Why not?
17     A.  The profits that are received are the
18 part of the revenue that the retailer gets to
19 hold on to, putting aside the question of
20 apportionment.  The retailer does not benefit
21 from the entirety of revenue.  They have to then
22 use that revenue to pay out their costs, and
23 there would not be the entirety of revenue as a
24 profit calculation.

Page 232

1     Q.  As an economist, have you ever seen
2 profits calculated without including the cost of
3 ingredients?
4     A.  Not profits for a pharmaceutical
5 product, no.
6     Q.  Have you ever seen an economics
7 textbook or scholarly piece of literature, or
8 anything like that, where someone measures
9 profits from an economics perspective without
10 considering the cost of ingredients?
11     A.  No.  For the highest level with no
12 detail, to say that profits are revenue minus
13 cost, it still has cost.
14         As part of that definition, from an
15 accounting point of view, which when we are then
16 applying economic theory to an actual case, we
17 typically would look at accounting data, and
18 that would start with a cost of goods sold and
19 other costs of delivering the product to
20 consumers.
21         MS. KAPKE:  Thank you so much,
22 Dr. Stiroh.  I don't have any further
23 questions.
24         THE WITNESS:  Thank you.

Page 233

1         MR. HONIK:  Any questions from anyone
2 else?
3         MR. GOLDBERG:  I may have a question
4 or two, but I do need to take just a
5 two-minute break.  Sorry.  If we can go off
6 the record for two minutes.
7         THE VIDEOGRAPHER:  The time right now
8 is 4:35 p.m.  We are off the record.
9         (A recess was taken from 4:35 to
10 4:39.)
11         THE VIDEOGRAPHER:  Time right now is
12 4:39 p.m.  We are back on the record.
13         MR. HONIK:  So Ms. Kapke is done
14 questioning.  Are there any other questions
15 from defense counsel?
16         Seth?
17         MR. GOLDBERG:  No.  There are no other
18 questions from defense counsel.
19         MR. HONIK:  Was that Leslie in the
20 room?
21         MR. GOLDBERG:  No one else is in the
22 room at this time.  Just myself, Kara --
23         MR. HONIK:  When we were off the
24 record, was there someone else in the room?

Page 234

1  MR. GOLDBERG:  Leslie was in the room.
2  MS. KAPKE:  She came in to talk to me.
3  MR. HONIK:  Oh.
4  Okay.
5  EXAMINATION BY MR. HONIK:
6  Q.  Dr. Stiroh, you were asked some
7  questions by Ms. Kapke, who represents CVS,
8  about the way in which profits were calculated
9  in an unjust enrichment model.
10  Are you aware that plaintiff sought
11  from the retailers the very costs that you
12  referred to, cost of goods, delivery cost,
13  storage, all the other items that you believe
14  might be incorporated in such a model, and --
15  and we were not provided that?
16  In fact, the court, to this point in
17  the litigation, has not directed the retailers
18  to provide that.  Were you aware of that?
19  MS. KAPKE:  Object to form.  I think
20  that misstates the record.
21  But go ahead and answer.
22  A.  I'm not aware of what costs were
23  requested.  I have considered what Dr. Conti
24  said, and it was my understanding from reading

Page 235

1  her deposition that she had opined that
2  additional costs would not be relevant to the
3  calculation, and in my opinion, additional costs
4  would be relevant to the calculation.
5  Q.  And if -- if those costs were
6  identified and produced in -- in the model that
7  you're talking about, you could subtract those
8  and arrive at your own calculation for profits.
9  Couldn't you?
10  A.  Not for the purposes of assessing
11  damages that accrue from individual plaintiffs
12  and any benefit that they im- -- brought to an
13  individual defendant, the portion of which would
14  be unjust for that defendant to keep.
15  I think tracing the costs through the
16  complex supply chain would be something that
17  could not be done with broad accounting level
18  data.
19  I have not seen what model Dr. Conti
20  purports to put forward to assess profits and
21  how to trace payments through from the --
22  through the entire chain to assess what the
23  unjust portion of profits are for any part of
24  the chain or how they relate to specific

Page 236

1  benefits that come from specific plaintiffs.
2  But at a minimum, my understanding of
3  what she had set forward, the simplistic thing
4  that she put in her report, is not even what I
5  think she said in her deposition from what she
6  intended to do.
7  Q.  Have you done an unjust enrichment
8  calculation for retailers?
9  A.  I have not.
10  Q.  So, you've done little more than
11  criticize what Dr. Conti did, but you've not
12  offered any other opinion about how to go about
13  it the right way, have you?
14  MS. KAPKE:  Object to form.
15  Argumentative.
16  A.  I have the critique in my report that
17  is summarized under Roman IX, and a section that
18  expands on that.  I have not done a
19  quantification of unjust enrichment.
20  I have explained where I think there
21  are flaws in the overarching premise that
22  Dr. Conti puts forward, and the part that is
23  missing in my report is what she had said in her
24  deposition, where it seems that she thinks that

Page 237

1  there are not relevant costs that would need to
2  be considered.
3  I think there are relevant costs that
4  would need to be considered, and it would be
5  very complex to be able to take them into
6  account appropriately to assess unjust
7  enrichment in the manner in which I understand
8  unjust enrichment damages need to be assessed.
9  Q.  So you've assessed unjust enrichment
10  damages in the past.  Have you not?
11  MS. KAPKE:  Object to form.  Vague.
12  Ambiguous.
13  A.  I have worked on matters involving
14  unjust enrichment damages.  I don't recall in a
15  class action setting having done so.
16  Q.  Such models exist, don't they, in the
17  economic world?
18  A.  Unjust enrichment damages models exist
19  in the economic world, yes.
20  MR. HONIK:  Thank you.  Those are all
21  the questions I have.
22  MS. KAPKE:  I don't have redirect.
23  MR. HONIK:  All right.  That concludes
24  the deposition.  Thank you, Dr. Stiroh.

Confidential Information - Subject to Protective Order

Page 238

1      THE WITNESS:  Thank you.

2      THE VIDEOGRAPHER:  The time right now

3   is 4:44 p.m.  We are off the record.

4      (Time noted: 4:44 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 240

1          C E R T I F I C A T E

2

3   STATE OF NEW YORK   )

            ) Ss.:

4   COUNTY OF NEW YORK   )

5

6      I JEFFREY BENZ, a Certified Realtime

7   Reporter, Registered Merit Reporter and Notary

8   Public within and for the State of New York, do

9   hereby certify:

10     That the witness whose examination is

11  hereinbefore set forth was duly sworn by me and

12  that this transcript of such examination is a true

13  record of the testimony given by such witness.

14     I further certify that I am not related to

15  any of the parties to this action by blood or

16  marriage and that I am in no way interested in the

17  outcome of this matter.

18     IN WITNESS WHEREOF, I have hereunto set my

19  hand this _____ of _____, 2022.

20

21  _____

22  JEFFREY BENZ, CRR, RMR

23

24

Page 239

1

2       A C K N O W L E D G E M E N T

3   STATE OF NEW YORK   )

            ) ss.:

4   COUNTY OF NEW YORK   )

5

6      I, LAUREN J. STIROH, Ph.D., hereby certify, I

7   have read the transcript of my testimony taken

8   under oath in my deposition of March 25, 2022;

9   that the transcript is a true, complete and

10  correct record of what was asked, answered and

11  said during this deposition, and that the answers

12  on the record as given by me are true and correct.

13

14

_____

15  LAUREN J. STIROH, Ph.D.

16  Subscribed and sworn to

17  before me on this _____ day

18  of _____, 2022

19

20  _____

21        NOTARY PUBLIC

22

23

24

## WORD INDEX

**< $ >**
**$1,369,114** 200:*10*
**$10** 88:*19* 90:*8* 91:*9, 17* 92:7 93:*15, 24* 114:6 118:9
**$12** 88:*22* 90:*9, 19*
**$15** 115:*19*
**$2** 90:*19* 91:22 92:*3* 118:*16*
**$4** 72:*8, 18* 73:*9, 13*
**$4.4** 71:*20*
**$8** 91:*18* 114:*7* 115:*18*
**$9** 115:*18*

**< 0 >**
**02109** 4:*4*
**07701** 4:*18*

**< 1 >**
**1** 5:*10* 9:*16, 18* 10:2, *23* 17:*20* 44:6 59:*14* 119:*5* 121:22 203:*1* 219:*13* 220:*1*
**1:25** 134:*16, 17*
**10** 113:*24* 114:*14* 118:*12* 181:*12, 17*
**10:13** 1:*12* 6:6
**10:42** 30:*20*
**1000** 2:*21*
**1001** 3:*4*
**104** 184:6
**11** 4:9 217:*21*
**11:08** 30:*23*
**1100** 2:*4*

**12** 125:2 210:*1*
**12:07** 77:*16, 17*
**12:15** 77:*18, 20*
**124** 5:*10*
**12th** 10:*4* 49:*17*
**14** 125:*17, 22* 208:*15, 22*
**15** 198:7 204:*17* 205:*19*
**1515** 2:*4*
**15219** 3:*20*
**1540** 1:*13* 6:*8*
**1700** 4:*13*
**173** 5:*13*
**17th** 2:*16*
**18** 196:*21*
**188** 5:*13*
**19** 37:2 196:*21*
**190** 3:*15*
**19102** 2:*5*
**19103-4196** 2:*16*
**197** 5:*16*

**< 2 >**
**2** 4:*18* 5:*10* 13:6 14:*11* 17:*18* 20:*3, 10*, 22 44:*5* 84:*4* 114:*1, 7* 124:2, *3, 13,* 22 125:*18, 24* 127:2 219:*14*
**2,000** 44:9
**2:04** 135:2, *9*
**20** 127:2, *4* 208:*15, 23*
**20004** 3:*4*
**20004-2166** 2:*22*
**20006-3807** 4:*14*
**2012** 37:*23* 65:*17* 166:*4, 21* 193:*5, 10, 16*

**2018** 37:2 38:2 159:*23* 166:*5, 21* 193:*3, 10, 16*
**2019** 38:2
**202.452.7318** 4:*15*
**202.624.2774** 3:*5*
**202.776.5253** 2:*22*
**2020** 198:*4, 7* 199:22 203:*24* 204:*13, 17* 205:*19*
**2021** 199:*14, 23* 200:*11* 203:*15* 207:*20* 208:*1, 7, 13, 23*
**2022** 1:*8* 6:*5* 125:2 202:*5, 12, 13, 19* 203:2 239:*8, 18* 240:*19*
**21** 5:*13* 172:*23* 173:*5* 174:*20* 180:*15* 184:7 201:*8*
**211** 4:*18* 5:*23*
**215.979.1164** 2:*18*
**218** 5:*16*
**228** 5:*5*
**23** 152:*8, 23*
**234** 5:*6*
**24** 203:*24* 204:*13*
**25** 1:*8* 6:*5* 239:*8*
**26** 38:*18* 39:*9*
**267-435-1300** 2:*6*
**2875** 1:*4*

**< 3 >**
**3** 5:*10, 13* 124:*8, 12, 20* 172:*18, 24*

173:*3, 15* 179:*4* 182:*6*
**3,500** 203:*13*
**3:11** 188:*4, 5*
**3:28** 188:*6, 8*
**30** 2:*16*
**30,162.50** 201:*10*
**300** 4:*13*
**301,262.50** 201:*8*
**3100** 3:9
**312.456.1065** 3:*11*
**314.480.1848** 3:*16*
**317.231.6491** 4:*10*
**331** 5:*13* 172:*20, 21, 24* 173:*5* 174:*20* 180:*15*
**34** 39:*20*
**351** 172:*20*

**< 4 >**
**4** 5:*13* 73:*20* 188:*13, 15*
**4:16** 227:*22, 23*
**4:31** 227:*24* 228:2
**4:35** 233:*8, 9*
**4:39** 233:*10, 12*
**4:44** 238:*3, 4*
**412.263.4362** 3:*21*
**46204-3535** 4:9
**48601P005** 204:*1*

**< 5 >**
**5** 5:*16* 10:22 12:*16* 13:*1, 7* 14:*12* 59:*13* 60:*16* 61:*20* 133:*18* 197:*1, 6, 11, 16* 203:*19* 204:*7,*

**10** 219:7 223:*3*
**50** 39:*7, 9*
**5-0** 39:*7*
**504.524.5777** 2:*11*
**505** 2:*21*
**53** 4:*4*
**53163P005** 207:*21*

**< 6 >**
**6** 5:*16* 17:*14* 20:*8, 24* 123:*20* 147:*8* 197:*2, 9, 11* 199:*17* 200:*4, 23* 201:*5, 6*
**60601** 3:*10*
**617.213.7000** 4:*5*
**63105** 3:*15*
**65** 140:*3*

**< 7 >**
**7** 5:*4, 16* 218:*1, 14, 22*
**701** 2:*9*
**70130** 2:*9*
**72** 140:*3*
**732.631.8315** 4:*19*
**77** 3:*9*

**< 8 >**
**8** 114:*1, 6, 14* 118:*15* 138:*9* 140:*5* 207:*20* 208:*7*

**< 9 >**
**9** 5:*10* 173:*11* 181:*10, 11, 17*
**9th** 2:*21*

**< A >**
**a.m** 1:*12* 6:*6* 30:*20, 23*
**ABC** 224:*6*

Confidential Information - Subject to Protective Order

**ability** 46:24
93:3 143:21
148:16 149:17
**able** 8:21
69:12 124:17
143:1 150:24
189:1, 21
200:16, 21
202:15
209:15, 16
211:15
220:23 237:5
**absence** 38:8
40:2, 9, 13, 15,
17, 21 41:2
89:16 91:5
92:20 99:17
101:7 111:6,
16 118:1
119:1 177:19
185:23 194:22
**absent** 102:9
**absolutely**
195:17
**abundantly**
104:12
**accept** 55:7
60:22 61:4, 9
62:3 89:11
95:14 120:4
121:14, 17, 22
122:21 164:4
**accepted**
130:15
**accepting**
93:19 122:18
**account** 16:2
24:14, 17
37:7 62:11,
16 63:2, 4
65:4 85:9
111:21 128:3,
4 130:5, 8
142:9 150:14
178:18 237:6
**accountant**
122:11
**accounted**
142:21

**accounting**
232:15, 17
235:17
**accrue** 235:11
**accurate**
174:21 201:15
**accurately**
105:7
**achieved**
127:13
**acknowledge**
42:16 116:16

**Acknowledging**
195:15
**acquainted**
83:20
**acquired**
213:9 231:11
**acquiring**
88:14
**acquisition**
222:20
**Act** 42:7, 19
56:5, 13, 23
141:12, 17
160:6 173:9,
12, 20 174:3,
19 179:5, 10
**Actavis** 3:9
**action** 50:19
237:15 240:15
**actions** 24:6
34:14 110:14
**active** 81:3
**activity** 198:2
**Acts** 5:13
29:18, 19
172:23
173:15, 23
181:1
**actual** 13:18
14:14 34:8
71:18 72:8
80:17 82:9
103:16
105:17
107:20 108:4,
15, 20 109:7
110:23
111:10, 23

112:3 113:14,
24 114:24
115:20 117:2
118:9 119:9
133:23 189:2
192:9 232:16
**added** 36:19
94:5 118:21
170:9
**adding** 73:14
**addition** 40:7
100:1 165:14
199:21
**additional**
94:18 98:10,
13 202:17
211:17 235:2,
3
**address** 11:23
28:14
**addresses**
221:20
**addressing**
155:16
**adhere** 158:18
**adulterated**
15:3, 9, 13
25:1 26:8
42:5, 10, 18
43:6, 15 56:4,
12, 22 57:8,
12, 17 75:7
76:13, 23
160:5 174:7
175:5, 16
176:1, 3
178:3, 12
179:8, 18
180:2 181:20
182:23
184:10, 15
186:10 187:9
**adulteration**
15:19 42:13
43:19 57:15,
18
**adverse** 64:16
165:2
**affect** 32:7
62:19 77:5
99:24

**affirmatively**
171:21
**afternoon**
195:16 228:4
**aggregate**
105:2 109:8,
15, 16
**aggregated**
106:1
**ago** 60:4
186:24
212:23 214:4,
10 217:2, 9
**agree** 8:16
31:11, 15
32:17 33:18
74:15 118:18
121:1 129:24
140:6 146:15,
19 153:2
156:8, 15
158:16
159:19
160:24 161:9,
10 162:20
163:20, 23
166:3, 9
175:15, 24
177:22
178:11, 17
183:20
184:16
185:14, 18
186:13, 19
191:13, 19
193:1 200:11
213:24 225:9
**agreed** 89:11
183:22 192:18
**agreeing** 103:3
**agreement**
103:15
**agrees** 182:5,
22
**ahead** 12:5
66:20 76:9
197:15
217:24 218:8
234:21
**Aid** 4:8 228:5

**Albertsons**
4:13
**ALFANO** 3:17
**aligned** 38:20
**allegation**
36:18, 22
64:14
**allegations**
22:18 24:3, 7,
11, 17 36:3,
14 64:13
67:8, 11
83:17 122:5
**allege** 66:5
**alleged** 24:13
50:20 66:16
97:24 101:3
159:14
165:12 178:8
**allegedly**
209:18
**allow** 62:4
72:14 107:1
**allowed**
146:23 220:11
**allows** 176:14
**alternate**
114:20 115:1
**alternative**
41:9 59:3
86:10 87:21
88:10, 21, 23
91:19 93:5
100:2, 5
108:23
109:24
110:10 111:5
112:1, 4, 9, 11,
16, 19, 24
113:13, 19, 20,
24 114:8, 21
115:17 117:4,
5, 22 118:11,
13, 15 119:10,
24 122:12, 20
142:11, 16, 18
196:7, 8, 9
**alternatives**
40:20 92:18
93:6 103:1

Case 1:19-md-02875-RMB-SAK   Document 2040-8   Filed 05/03/22   Page 65 of 99
PageID: 68829
confidential information subject to protective order

111:*15, 18, 19*
112:*17* 142:*14*
**alters** 101:*3*
**ambiguity**
104:*2*
**Ambiguous**
32:*6, 20* 43:*8*
48:*5* 50:*7*
53:*20* 69:*20*
72:*21* 79:*6*
81:*17* 82:*22*
95:*22* 99:*10*
101:*10*
102:*17*
109:*12* 115:*3,
23* 122:*1*
130:*3* 139:*13*
142:*7* 143:*5*
149:*13* 150:*3*
153:*17*
171:*16* 176:*6*
177:*11*
186:*12*
191:*23* 193:*7*
195:*13* 237:*12*
**AmerisourceBe**
**rgen** 5:*19*
212:*24* 213:*9*
217:*23*
218:*18, 21*
**amount** 57:*21*
64:*20* 73:*9,
14* 89:*24*
104:*9, 21*
105:*2, 3*
107:*19* 116:*9*
**amounts**
66:*22* 181:*14*
189:*11*
199:*22* 200:*3,
9*
**analyses**
33:*11* 45:*12*
64:*4* 148:*4*
210:*5*
**analysis** 22:*17,
24* 23:*9, 24*
26:*3, 24*
27:*12, 14*
28:*3* 30:*3*
31:*12* 32:*2, 7*

33:*1* 35:*4*
38:*14* 40:*8,
11, 14* 41:*1*
44:*21* 46:*17,
24* 50:*5, 6, 9,
13* 56:*11, 14,
21* 57:*1* 62:*6,
24* 63:*16, 22*
64:*24* 65:*10*
68:*5, 15* 70:*1,
7* 76:*11*
83:*10* 85:*5*
98:*5* 99:*19*
116:*18, 20*
122:*19*
126:*12*
127:*18*
129:*14*
131:*10* 142:*8*
143:*2* 148:*2*
150:*14*
176:*11*
180:*15* 181:*2*
214:*19* 228:*11*
**analyst** 208:*3*
**analyze** 29:*11*
**analyzing**
34:*1, 23*
35:*24* 78:*4*
**and/or** 44:*2*
51:*22* 71:*16*
78:*23*
**ANDRAS** 3:*10*
andrast@gtlaw
.com 3:*12*
**Annotated**
173:*5*
**ANSWER**
5:*22* 9:*1*
19:*1* 20:*19*
21:*5* 33:*16*
65:*13, 14*
85:*15, 19*
93:*11* 95:*20*
100:*16*
105:*22*
112:*21*
114:*12*
115:*11* 133:*5*
140:*2* 141:*8*
154:*6, 12*

155:*1, 3, 7, 10,
13* 171:*10*
177:*1* 195:*21*
196:*17*
201:*14*
205:*23*
206:*23* 211:*4,
5, 16, 22*
212:*7, 20*
234:*21*
**answered**
29:*13* 47:*3*
63:*20* 65:*14*
94:*4* 111:*13*
115:*24*
126:*23* 134:*4*
156:*17*
180:*17*
195:*12*
201:*17* 239:*10*
**answering**
97:*17* 195:*1*
**answers**
239:*11*
**anticipate**
54:*21* 55:*24*
**antitrust**
33:*22* 34:*2*
35:*9, 12, 16,
17, 20* 78:*5, 7*
79:*1* 82:*16*
131:*9*
**apart** 139:*4*
**apologize**
59:*11* 66:*19*
114:*11*
**apparent**
192:*6* 215:*4*
216:*22* 230:*9,
14*
**apparently**
212:*22* 213:*3*
**appear** 20:*3,
9, 10* 41:*21*
**appears** 184:*6*
**application**
53:*11* 156:*10*
184:*19* 186:*6*
**applied** 42:*17*
**APPLIES** 1:*5*
85:*11*

**apply** 111:*3*
137:*5* 138:*20*
157:*14* 175:*13*
**applying**
122:*9* 232:*16*
**apportionment**
229:*24*
230:*17* 231:*20*
**appreciated**
43:*24* 44:*2*
**apprise** 73:*20*
**approach**
87:*20* 94:*6*
118:*22*
**approached**
85:*4* 128:*20*
**approaches**
59:*3* 63:*8*
145:*14*
**appropriate**
24:*7* 36:*4*
38:*16* 46:*2*
64:*2* 84:*23*
102:*23*
119:*14* 120:*8*
133:*11* 136:*8*
156:*5* 170:*19,
20* 181:*6*
**appropriately**
177:*24* 237:*6*
**approved**
36:*23* 37:*16*
39:*13* 75:*17,
18, 20*
**ARBs** 165:*16*
166:*1* 196:*9*
**area** 13:*24*
22:*2* 33:*21*
34:*2* 35:*9*
89:*7* 170:*5,
10* 171:*21*
**areas** 13:*3, 23*
18:*1* 170:*7*
**argument**
156:*1*
**Argumentative**
63:*20* 128:*13*
167:*11*
168:*11*
181:*24*

190:*16*
195:*12* 236:*15*
**arguments**
224:*2*
**arises** 9:*15*
**arising** 57:*10*
163:*17*
**arrive** 33:*3*
34:*16* 100:*12*
110:*9* 111:*8*
141:*10* 144:*9,
23* 164:*7*
235:*8*
**arrived** 73:*9*
99:*5*
**arriving**
74:*23* 76:*11*
**art** 42:*6*
**articles** 145:*6*
**ascertained**
199:*7*
**ascribe**
113:*12* 131:*1,
23*
**ascribed** 119:*6*
**ascribing**
71:*21* 92:*8*
**ASHLEY** 4:*14*
ashley.jones@b
ipc.com 4:*15*
**aside** 231:*19*
**asked** 22:*1*
29:*13* 33:*14*
35:*10* 46:*5*
47:*3, 22, 24*
53:*18, 21, 23*
54:*24* 56:*1*
61:*16* 63:*15,
20* 72:*19*
74:*2* 94:*3*
96:*9* 111:*12*
114:*15* 115:*7,
24* 121:*6, 12*
126:*23*
128:*16*
132:*11, 12, 13*
134:*4, 5*
156:*17*
160:*24* 161:*9,
10, 23* 166:*11*
177:*4* 180:*17*

Confidential Information - Subject to Protective Order

186:*23* 187:*3, 13* 190:*17* 192:*11, 18* 193:*12* 195:*2, 12* 198:*23* 205:*13, 17, 21* 210:*3, 8, 17* 229:*6* 234:*6* 239:*10*

**asking** 18:*21* 21:*22* 66:*10* 82:*11, 12, 13, 15* 108:*8, 10* 110:*15, 16, 18* 111:*8* 115:*13, 20* 118:*17* 121:*16* 135:*15* 139:*7, 10* 143:*12* 150:*5* 151:*20* 156:*8, 13* 166:*14* 167:*12* 183:*9* 187:*6* 189:*23* 191:*3* 202:*23* 205:*15* 230:*18*

**aspect** 37:*6* 153:*24* 156:*11*

**aspects** 26:*14* 38:*19* 70:*17* 148:*15* 213:*14*

**assess** 13:*13* 27:*9* 35:*13* 46:*5* 53:*12, 23* 58:*11* 70:*15, 19* 71:*1* 74:*12, 20* 78:*9* 105:*13* 107:*2* 109:*14, 17* 111:*21* 127:*24* 139:*21* 157:*24* 158:*13* 162:*22* 215:*1* 235:*20, 22* 237:*6*

**assessed** 24:*9* 46:*9* 52:*22* 70:*2* 122:*8*

153:*10* 154:*3, 11* 237:*8, 9*

**assessing** 37:*13* 57:*14* 63:*3* 65:*5* 75:*2* 120:*16* 123:*4* 140:*18, 19* 142:*22* 235:*10*

**assessment** 13:*10, 18* 14:*14* 25:*22* 57:*6* 120:*15* 121:*9* 122:*6* 196:*5*

**assessments** 34:*7*

**assign** 69:*12, 14, 16* 110:*1, 3*

**assigned** 74:*23*

**assignment** 10:*23* 11:*11* 12:*17, 21* 13:*2* 54:*6* 154:*7* 158:*11* 161:*23, 24* 177:*1, 3* 198:*14, 22* 206:*3* 207:*2* 210:*18* 211:*15, 18* 212:*13, 17* 223:*20, 21*

**assignments** 207:*5* 210:*2*

**associate** 208:*3*

**associated** 202:*21* 231:*2*

**associates** 197:*21* 201:*19*

**assume** 10:*11* 26:*2* 28:*24* 31:*24* 35:*10, 21, 23* 36:*1, 3, 15* 40:*14, 17* 41:*2, 23* 47:*23* 48:*1* 56:*3* 72:*6, 13, 19* 73:*3, 5, 7* 75:*16, 19*

76:*22* 93:*14* 119:*15* 130:*10* 132:*11* 164:*4, 20* 168:*2* 170:*20* 171:*24* 178:*7, 9* 195:*2*

**assumed** 29:*10* 36:*5* 37:*16* 38:*4* 90:*21* 117:*12* 130:*17* 168:*5*

**assumes** 24:*23* 28:*4, 12* 29:*2* 38:*11* 43:*8* 183:*15*

**assuming** 32:*3* 36:*13* 37:*23* 39:*12* 71:*3* 91:*23* 93:*23*

**assumption** 25:*20, 21* 26:*4, 11, 15* 28:*20* 29:*17* 54:*8, 9* 84:*14* 90:*23* 130:*20* 170:*19* 171:*11, 18*

**assumptions** 13:*3* 15:*17* 27:*19* 31:*6* 33:*2, 9, 16* 34:*15* 35:*4*

**at-issue** 15:*3* 40:*21* 164:*13* 191:*11*

**attached** 124:*11*

**attempt** 14:*3* 71:*4*

**attempting** 31:*6*

**attention** 14:*13* 59:*12* 107:*23* 184:*2*

**Attorneys** 2:*4, 8, 14* 3:*3, 8,*

*14, 19* 4:*3, 8, 13, 17* 7:*7, 10*

**attributable** 170:*9*

**attributes** 95:*15*

**auditing** 202:*16*

**authored** 51:*12, 17* 146:*9* 219:*1*

**authorities** 131:*9*

**availability** 38:*8* 81:*2* 100:*5*

**available** 38:*2, 21* 40:*2, 20, 22* 47:*12* 65:*1* 74:*9* 77:*10* 80:*13* 82:*14, 18* 83:*5* 98:*1, 9* 103:*1* 105:*18* 107:*17* 111:*16* 112:*18* 129:*18* 152:*3* 165:*10, 20, 22*

**Avenue** 3:*4* 4:*18*

**aversion** 95:*13*

**aware** 7:*11* 8:*18* 42:*5* 70:*11* 79:*8* 104:*5, 7* 107:*5* 145:*1* 147:*23, 24* 150:*8* 159:*21, 22* 165:*6, 10, 11, 14, 19, 21, 24* 166:*7, 8, 11, 15* 167:*14, 18* 172:*10, 13* 182:*3, 8* 187:*12, 17* 199:*10* 234:*10, 18, 22*

**awareness** 187:*7*

**axes** 190:*19*

**axis** 191:*5, 6*

**< B >**

**back** 30:*23* 55:*19* 56:*17* 77:*20* 80:*24* 85:*19, 20, 23* 97:*18, 21* 105:*7* 113:*22* 114:*10* 123:*13* 135:*9* 137:*12, 22* 188:*8* 193:*4* 207:*22* 211:*10, 11* 214:*3* 219:*24* 223:*21* 227:*19* 228:*2* 233:*12*

**back-casting** 79:*24* 80:*3*

**background** 17:*5, 8* 18:*1, 8* 45:*5, 20* 181:*10, 11* 223:*1*

**backwards** 114:*11*

**ballpark** 203:*17*

**Bank** 4:*18*

**banned** 150:*17, 21*

**bar** 213:*7, 12*

**bargain** 129:*7, 23* 163:*6*

**bargained** 129:*9*

**BARNES** 4:*6*

**base** 136:*3*

**based** 35:*4, 5* 46:*11* 95:*7* 117:*1* 119:*20* 123:*2* 127:*21* 129:*19* 149:*1* 156:*2, 5* 213:*22* 219:*19*

**bases** 32:*14*

**Basically** 100:*6*

basis 21:*3*
23:*13* 29:*10,*
*24* 30:2
31:*12, 20*
32:*1, 15, 23*
33:2 44:*14*
45:*17* 47:9
53:*24* 63:*21*
65:6 70:*4, 9*
77:2 105:*14*
107:6, *18, 22*
109:22 128:2,
*3* 153:*10*
154:*4, 11, 15,*
*19, 20, 21*
166:*21* 168:*5*
183:*11, 16, 20*
199:*8* 201:*21*
batch 186:8
BAZAN 2:*21*
bear 172:*17*
bedside 213:7
beginning
39:*23* 55:*10*
72:2 137:9
184:*6* 193:*4*
211:*19*
begins 13:9
14:*13* 38:*18*
108:*3, 13*
127:6
behalf 67:*15,*
*21* 183:*12*
198:*17* 201:*19*
behaved 81:8
behavior 79:*1*
belabor 78:*18*
207:7
believe 36:*4*
39:*12* 42:20
48:*13* 55:23
73:*17* 86:*21*
123:8 124:*24*
126:*10*
127:16
129:*11* 130:*1*
133:*4* 147:*17*
168:8, *15*
174:*10* 182:*1,*
*18* 208:*24*

225:*15* 234:*13*
believed 94:22
believes
118:*10*
benefit 8:*15*
9:*14* 57:20
86:22 129:7,
*23* 130:*1*
138:*12* 142:*1,*
*4, 9* 143:9
144:*24*
162:*10* 163:*5*
188:9 228:*14,*
*19* 230:2
231:*20* 235:*12*
benefits
142:*10*
143:*17, 20*
228:*21* 236:*1*
Benz 1:*14*
6:*17, 21*
240:6, 22
best 8:*23*
18:*3* 24:*21*
37:22 48:*24*
49:22 51:*24*
52:*3* 125:5
126:*13*
216:20 226:*13*
bibliography
146:8, *13*
biggest 230:*24*
bill 203:*1*
billed 201:*20*
202:*13* 206:*18*
billion 71:*20*
72:8, *18* 73:9,
*13, 20*
binary 168:*16*
bio 76:*4*
bit 11:6, *17,*
*20, 21* 12:2, *4,*
*9* 15:*21* 83:8,
*11* 135:*18*
188:*18* 204:*4*
220:6 223:8
black 205:8

BLACKWELL
3:*14*
blessed 181:*18*

blood 41:*16*
42:2 69:*4*
90:6 92:9
93:*3* 113:8
127:*14*
143:*21* 144:2
164:*18, 21*
165:*1, 4, 17*
194:22 240:*15*
Book 126:5, 7
borrow 62:*23*
BOSICK 3:*17*
Boston 4:*4*
BPOC 224:7
brand 40:22
branded
126:*4* 165:22
166:*1*
breach 84:*18,*
*24* 126:8, *18*
breached
84:*13, 16*
break 76:*3, 4*
77:*13* 123:*13*
133:*21*
134:*14* 181:*5*
186:*21, 23*
187:2, 20
227:*16* 233:*5*
Bridge 4:*18*
213:*19* 224:6
briefed 224:*20*
briefing 83:*18*
briefly 7:*5*
10:*5*
bring 145:*24*
172:*15*
brings 214:2
broad 235:*17*
broader 17:7
19:*10*
Broadway
1:*13* 6:8
broke 25:9
28:7 83:7
135:*11* 163:*1*
brought 132:7
235:*12*
BUCHANAN
4:*11*

buckets 158:*3*
built 172:*4*
business
53:*12* 140:*23*
157:*13*
but-for 34:7
80:*4* 101:*5*
102:2 177:24
178:*4* 193:2,
*8, 15* 194:2, *5,*
*13, 18* 195:7,
*19, 24*
buy 150:*9*
168:*17*

< C >
c.whiteley@ka
nner-law.com
2:*11*
calculable
28:*5*
calculate 60:7,
*19* 121:22
134:*1* 138:*20*
calculated
25:24 27:6
47:9 91:*13*
229:*12* 232:2
234:8
calculating
109:7 140:*15*
230:6, *16*
calculation
122:9 134:6
138:*10, 15*
140:7 230:*21*
231:8, *24*
235:*3, 4, 8*
236:8
calculations
213:22
228:23 229:2
calendar
200:*10*
call 77:24
86:24 111:*23*
124:2 134:8
145:*19* 189:8
called 6:*20*
43:*18* 125:*11*
150:*17* 176:9

203:*23*
208:*10, 11*
212:*23* 213:*6,*
*19* 218:*17*
calling 163:22
Calls 32:6
58:6 84:*21*
86:*15* 97:6
106:*13* 122:*1*
138:*5* 141:*14,*
*22* 155:*20*
156:*17* 157:*6,*
*18* 158:7, *21*
159:*3, 10*
160:*1, 8, 20*
161:6, *20*
163:*10* 175:7
178:*16*
179:*20* 180:6
184:22
186:*12*
187:*15* 205:*4*
Camp 2:9
CAMPBELL
3:*5*
cancer 159:*15*
capacity
205:22 206:2
212:*5*
caption 124:*19*
carcinogen
158:24
168:*19, 20*
carcinogenic
16:*18*
Cardinal 3:*3*
care 221:2
carefully 73:*4*
87:*19*
Carondelet
3:*15*
carry 54:*6*
158:*12*
case 7:7 8:*9*
15:9 16:6
17:*4, 9* 22:*19*
23:*14, 16, 22*
24:*17* 27:*13*
47:*4, 12* 52:5
54:7 56:*4, 6*
60:23 61:6

62:5  64:8
70:6  71:18
72:8  73:13,
18  78:2, 6, 12,
22  82:14
83:9, 16
84:13, 16
104:15  106:2
113:5  116:3,
4  120:17
123:3  124:19
133:24
135:17  138:3,
17  144:3, 20
145:23  146:1
147:6, 18, 23
148:1  149:4
150:4  152:1,
16  158:17
159:7, 21
167:15
168:17  172:8
177:2  179:17
181:13
182:12
183:21  189:1
191:14  193:2
196:13, 22
197:21  199:3
200:15  203:4
206:1, 17, 21
209:19
210:14, 16, 18
211:18
212:23  213:1,
3  214:5, 8, 13
215:12  217:9,
22  219:3, 21
220:2  221:13,
14  222:7
223:2  224:11
232:16
CASES  1:6
27:23  33:13
64:2  79:3, 7,
17, 20  80:12,
15  81:6
82:16  122:4,
7  145:7
152:18, 20
156:20

cash  69:16
89:20
catch  208:18
categories
231:6, 7
causation
223:10, 15
224:2
cause  50:19
159:15  204:24
caused  18:4,
11  43:14
79:1  102:3
127:11
150:20  209:6
186:10
causes  177:20
causing  173:23
Centre  3:19
cents  143:3,
14, 23
certain  13:3,
13  17:2  20:6
24:3  29:18
33:17  34:15
36:10, 19
44:14  45:5
46:12  50:19
51:1  65:3
78:3, 19
100:1  103:1
111:16
114:23  121:7
145:3  150:20
177:16
183:17
185:23  193:9,
21  214:21
229:16  230:14
certainly
28:17  39:22
83:20  145:10
147:9  149:4
216:9
certainty
48:14  60:5
216:24
certification
46:9  66:1
70:6  83:19
104:20  152:3,

22  153:2, 3
155:22
156:11  157:8
158:11  207:3
Certified  1:14
240:6
certify  46:24
106:10, 16
239:6  240:9,
14
certifying
161:17
cGMP  21:14
22:2, 8, 18
23:9, 14, 19,
21  24:18, 23
25:13, 17, 20
26:2, 5, 11, 22
27:4, 11
147:15, 21
158:18  182:5
186:4, 9, 14, 19
chain  25:4
26:10  58:5
83:23  99:14
100:8  117:7
140:22
147:15, 21
148:9, 12
182:5  235:16,
22, 24
challenge  8:22
challenged
99:18, 20
Chan  21:6
147:5
chance  181:4
219:14  229:5
Chancery
214:7  218:17
Chandler
219:2
change  43:21
57:22  64:18,
23  86:4
92:18  164:15,
16  169:9
changed  56:6
77:1  111:7
changes  70:15
94:19  100:8

changing
116:5
channel  141:5
channels  78:16
Chapter
173:11
characterizatio
n  112:19
chart  39:20
check  42:22
chemist
147:14
chemistry
182:5
Chicago  3:10
child  67:16
choice  93:7
168:16
171:13, 24
choices  115:4,
11  169:21
choose  110:13
113:6, 11
116:12
169:17  171:21
chooses  116:6
choosing
113:10  169:11
chose  19:11
chosen  116:7
circle  118:11
circumstance
110:1, 10
115:1  117:4,
5  121:21
122:20
circumstances
53:14  58:13
99:11  100:15,
19  103:10
105:9  108:14,
20, 21, 22
110:24  112:9
113:9  114:21,
23  115:18
116:5  117:17
215:22
216:21  219:22
cite  18:7
19:5, 11

22:15  44:17
45:9
cited  16:24
17:12, 15
20:4, 7, 21, 23
21:2  40:8
42:23  44:12,
13, 23  45:4
citing  19:7
Civil  152:9
claim  31:18,
19  32:1  78:6,
7, 22  84:19
85:1  136:3, 9,
17, 21  137:5,
7  138:3
167:7, 15
168:3
claimed  67:20
167:13
Claims  5:12
124:8, 12, 20
136:13
clarification
190:18
clarify  8:15
98:22
clarifying
13:24  60:17
96:12
clarity  26:17
135:20
class  24:9
27:7, 10  45:1,
2, 22  46:7, 8,
10  47:1
52:17, 23
54:1  65:3, 7,
16, 20  66:1, 7,
9, 11, 23
67:21  70:5
83:18  91:10
97:23  104:1,
8, 20, 21, 23
105:15, 17
106:10, 16, 17
108:20
109:18
110:13
111:18, 24
112:18

113:*21* 114:*5*
128:*19*
130:*11*
132:*15, 18, 20*
147:*6, 12*
148:*17* 152:*3,
22* 153:2, *3,
11, 20* 154:*16,
21, 22* 155:22
156:*11* 157:*8,
21* 158:*10*
161:*17* 162:*3,
5, 7* 163:*18*
164:*11*
165:*17*
167:*18* 172:*9*
175:*5* 178:*13*
184:*12* 207:2
237:*15*
**classes** 105:*10,
12* 153:*9*
**classical**
146:*16*
**class-member-
by-class-
member** 70:*4*
105:*14* 106:*3,
5, 9* 107:*5, 18,
22* 109:*21*
**class-wide**
47:*9* 53:*24*
65:6 70:*9*
71:*15* 120:*16*
153:*10, 23*
154:*3, 11, 15,
21* 199:*7*
**clause** 14:*17*
59:*18*
**clear** 13:5
179:*22* 216:*7*
**clearly** 8:*10*
86:*19* 216:*4*
**close** 194:*24*
**CMC** 147:*15,
22*
**Code** 148:*7,
10* 172:*19*
173:*5* 213:*7,
12*
**coincided** 55:*4*

**co-insurance**
89:*24*
**collect** 80:*10*
**collected**
19:*19* 105:6
215:*9* 216:*5*
**collection**
197:*16*
**collusion** 79:*1*
**colon** 173:*24*
**colossal**
220:*24*
**column** 223:*24*
**come** 45:*3*
58:*11* 66:*16*
69:*11* 194:*24*
227:*19* 236:*1*
**comes** 45:*9*
57:*14* 65:*4*
67:*12* 69:*8*
94:*10, 19*
96:*5, 14, 19*
97:*3* 108:*13*
110:22
144:*15*
151:22 169:*9*
**comfortable**
134:*9*
**coming** 12:*3*
99:*7* 187:*11*
210:*9*
**commencing**
1:*12*
**commerce**
75:*9* 76:*24*
149:*18* 174:*6*
175:*16* 176:*2*
177:*9* 178:*3*
179:*6* 180:*3*
181:*20* 183:*1*
**common** 24:*9*
27:*7, 10*
35:*21* 46:*10*
52:*23* 54:*1*
65:6 128:*19*
132:*15, 19*
141:*20, 24*
145:*16*
153:*11, 19*
156:*23*
157:*21, 23*

158:*13, 14, 19*
159:*1, 6, 19*
160:*4, 16*
161:*3, 11, 16*
162:*3, 5*
163:*8, 18*
164:*6*
**commonality**
155:*17* 156:*1,
13* 157:*14*
158:*4*
**commonly**
50:*14* 155:*16*
**companies**
213:*6*
**company**
213:*18*
**comparative**
118:*10* 122:*19*
**compare**
87:*21* 88:*20*
108:*19* 112:*4*
115:*19* 164:*10*
**compared**
86:*9* 93:*4*
98:*5* 117:*3*
142:*11*
**comparing**
87:*24* 114:*24*
**comparison**
100:*13*
101:*24* 164:22
**comparisons**
169:*16*
**compiled**
216:*6*
**complaint**
24:*3* 30:*15*
35:*22* 36:*15*
45:4, *9* 50:*20*
65:*24* 67:*21*
83:*16* 84:2
117:*20* 198:*11*
**complaints**
36:*2*
**complete**
140:*9* 141:*8*
194:*13, 20*
239:*9*
**completed**
202:*9*

**completely**
88:*15* 90:*16*
93:*10* 208:*15*
**completing**
202:*21*
**complex**
140:22
235:*16* 237:*5*
**compliance**
22:*3* 26:*21*
27:*4, 11, 15*
147:*21* 178:*1*
**complicated**
140:*21*
**component**
79:*8, 13*
142:*4, 15*
143:*11* 230:*24*
**components**
102:*14, 20*
151:*4*
**comport**
131:*11*
**comports** 39:*6*
**Compound**
27:*2*
**computation**
199:*21*
**computational**
201:*11*
**compute**
131:*23*
**computer**
21:*19*
**conceivable**
168:*5*
**concentrations**
65:*2*
**concept** 71:*10*
145:*9* 158:*4*
163:*4* 179:*1*
**concepts**
59:*24* 189:*6*
**concerned**
88:*3* 213:*5*
**concerning**
148:*20*
**concerns**
51:*18* 148:*16*
**conclude**
226:*15*

**concluded**
72:*7*
**concludes**
237:*23*
**conclusion**
32:*6* 41:*7, 11,
13* 58:*7*
72:*24* 116:22
172:*3* 205:*4*
**conclusions**
42:*3* 47:*19*
56:*14* 57:*1*
62:*5* 73:*11*
126:*17*
224:*23* 225:*4,
22*
**concrete** 99:*2*
**condition**
145:*15*
**conditions**
81:*1* 145:*12*
165:*23*
**conduct** 28:*1*
29:*3, 4* 35:22,
*23* 57:*10*
99:*18, 20, 21,
24* 100:2, *4*
101:*3, 6, 17,
22* 102:*3, 9*
103:*1* 106:*19*
109:*19* 111:*6,
16* 112:*1, 5,
11, 16, 20*
113:*1* 114:*20*
120:*16*
**conducted**
8:*23*
**conferred**
138:*12* 228:*14*
**confess** 93:*10*
**confidence**
215:*8*
**CONFIDENTI
AL** 1:*9* 205:*6,
8*
**confirmed**
113:*23*
135:*24* 185:*16*
**confirming**
122:*17*

Confidential Information Subject to Protective Order

confused
85:13  93:11
133:12  189:5
212:11  226:10
confusing
189:5
confusion
59:10  88:4
133:8
CONLEE  2:10
connected
52:1  207:1
connection
20:24  21:20
32:24  51:14,
16, 18  203:6
consequences
34:9
consider
15:18  24:4, 6
25:4, 21  26:8
27:23  29:18
36:11  37:6,
18  40:1  41:4
43:1  51:22
52:21  56:10,
15, 20  59:2
62:21  63:10,
14  65:18
67:5  71:9
75:6  78:13
79:24  80:23
84:12, 17
85:8  88:5, 7,
12  90:2
92:11  96:1
99:9, 16
100:12  101:5,
16  102:8
106:16
111:14
113:17
117:16
118:24
119:22
126:11
127:17
129:12, 17
132:13  136:1
137:4  142:10,
17  145:23

154:8  157:20,
22  159:12
161:24
164:14, 24
175:2  177:2
178:20
180:14, 21
193:22
194:15, 21
196:5, 7
210:7, 12
230:20
considerable
31:1  34:1
consideration
23:7  25:6, 12
26:6  40:12
41:14  65:8
68:6, 7  77:8
84:10  92:14
102:10
109:20
117:24  118:3
174:19
192:22  230:1
considerations
136:23
considered
18:12  24:10,
12  26:7  33:6,
9  36:7  42:14
57:4  63:17
66:24  68:23
75:11, 12
77:7  85:2, 22
86:6  97:16
98:20  101:15
106:20  109:2
116:14
136:12
138:18, 21
151:2  152:20
193:8  234:23
237:2, 4
considering
32:10  67:17
77:3  116:5
119:23
128:21  143:6,
24  156:22
193:19  232:10

considers
65:1  86:1
97:10  119:19
123:4  142:15
182:22
consistent
38:10  50:11
116:21  118:4
constitutes
126:7
construct
29:22  68:21
80:19  101:4
173:19  180:4
182:6  183:3
192:21
193:19  194:17
constructed
161:8
constructing
177:22
consultant
33:14
consultation
113:7  144:8
169:7  217:12
Consulting
5:16  197:5
206:2
consume
64:16  67:14
93:1  164:17
194:23
consumed
14:23  43:13
57:16, 22
64:21  66:21
67:13, 18
68:12  76:21
77:4, 6  86:9
89:17  90:5
91:7  93:3
95:8  104:10
117:18
119:16, 21
164:13
185:11  186:1
189:12
consumer
43:21, 24
44:2  57:17,

19, 21, 23
58:1  67:14,
21, 24  69:22
70:16, 17, 19,
21, 22  71:10
75:2  86:4
88:7  89:15,
20  90:10, 15
91:2, 19, 21
92:11, 15
93:7, 15, 23
95:2, 3, 5
96:17, 21
104:9  113:16
115:5, 12
116:6, 9, 10,
11  129:22
141:12, 16
142:12, 13, 16
146:20, 21
151:8, 14
153:8  162:13
166:6, 20
167:5  168:17,
21  169:7, 11
170:23  171:3,
4, 11  172:8
180:10  189:1
190:12  193:11
consumers
38:7  40:20
42:1  43:12
65:16  66:12,
16  67:12, 18
71:19  72:9,
15  73:14, 18
74:12  75:21
76:14, 18, 21
77:5, 9  78:23
89:2  103:24
104:13  113:2,
3, 6  115:4, 12
117:3, 18, 24
118:24
119:20  127:1
143:16  150:8
165:20
166:16  168:8
169:17, 21
176:16
178:22  186:2

189:13
193:23
194:15  196:6
231:3  232:20
consumes
68:23
consuming
43:21  64:22
68:13  69:1
91:14  95:11
119:24
consumption
66:16  67:1, 6,
10  92:16
150:11  171:6
contain  9:21,
23  33:8
169:18
contained
160:12
166:22  185:6
contains
126:6  169:5
contaminant
126:6
contaminants
15:23  16:12
129:8
contaminated
41:3, 6  58:4
72:10  119:7
120:3, 21
127:9  129:5
159:7  165:7
166:6, 7
168:18, 22
169:3  187:6
196:10
contamination
93:20  127:12
contention
213:17  224:5
context  19:9
23:16  33:22
75:12  133:9,
11  153:4
154:2  155:3,
4  156:1, 4
174:16  192:3
194:14

Confidential Information - Subject to Protective Order

**Conti** 10:7
24:12, 22
25:11, 18
26:18  27:8
33:10  37:19
38:11  42:14,
17  48:16
116:17
118:20  119:4
120:23
130:13
131:24
138:18  139:5
140:8, 11
146:4  164:19
170:20  176:8,
19  180:21
185:23  192:1
229:12  230:5
234:23
235:19
236:11, 22
**continue**
98:17  135:21
191:17
**CONTINUED**
135:10
**continues** 15:1
**Conti's** 15:14
26:9  51:6
75:13  117:6
118:6  119:13
139:20
160:14
174:15  175:1
176:21  228:7,
23  229:5
231:7
**contracting**
92:19
**contributed**
104:13
**contributions**
146:10
**control** 92:8
165:17
**controlling**
145:14
**conversation**
135:21
**convey** 205:9

**conveying**
100:17
**coordinates**
190:22
**co-pay** 89:24
114:6
**copy** 9:20
10:1
**corner** 204:12
**Corp** 5:19
212:24
218:18, 21
**Corporation**
4:8
**correct** 10:3
13:14  14:4
15:10  20:2
31:9  32:18
33:17, 22
34:2, 9, 17, 20
48:22  50:2,
22, 23  51:13,
15  52:12
60:4  66:2
68:17  71:4, 7,
23  74:16, 17
82:10  83:24
84:1  87:22
88:24  90:7,
13, 20  95:20
100:21, 23
102:3, 7
104:1  110:2
112:12  115:2,
22  116:18
117:11, 22
122:22  125:9,
12, 13, 15, 16
126:21  127:1
130:1, 9, 16
136:3, 19
138:2  139:3
141:16  149:6,
7  161:18
162:18, 19
163:14, 19
164:7  165:18,
23  172:1
175:6  178:5,
6, 14  182:17
189:3  195:10

198:4, 19
199:15
201:12, 14
202:14
208:24
213:23  226:4
239:10, 12
**correctly** 15:5
42:23  82:6
95:18  97:17
126:9  127:15
129:10  174:9
225:1
**correspond**
198:8

**correspondence**
46:14
**Cosmetic** 42:7,
19  56:5, 23
160:6  173:9,
12  174:7
179:7
**cost** 78:9, 14
79:13  87:22
88:2, 20, 23
91:9  99:24
102:24
113:12, 14
118:13, 15
119:10  194:6
230:23  231:3,
10  232:2, 10,
13, 18  234:12
**costs** 88:13
89:13  99:15,
16  111:19
140:14, 19
141:1, 2
145:2, 3, 11,
13  229:18, 21,
23  230:15, 19,
24  231:2, 22
232:19
234:11, 22
235:2, 3, 5, 15
237:1, 3
**counsel** 6:15
10:16  32:12
45:14  86:17
115:8, 9

123:21
198:17, 23
205:6  206:7
207:6  209:8
210:8  215:11,
24  217:12
220:10, 11
228:5  233:15,
18
**count** 13:8
120:23
**COUNTY**
239:4  240:4
**couple** 7:15
8:3
**course** 47:4
112:1, 4, 11,
16, 20  113:1
114:8, 20
135:23  146:3
215:20
**COURT** 1:1
6:11, 17  7:19
8:20  28:8, 10
29:20  30:8
44:6, 9, 15
45:13  46:1,
22  47:6, 15,
17, 18  48:6,
11, 13  49:1, 3,
8, 9, 11, 14, 16,
24  50:4, 17,
18  51:1, 2, 22
52:1, 9  54:9,
18, 22  55:5,
15, 18, 21
59:1, 7  62:10,
16, 18  63:1, 9,
10  71:16
72:6, 14
73:11, 15, 16,
20, 22  74:19
84:6, 23  85:8,
10, 23  86:17,
22  93:17
106:15  120:2,
11, 19, 20, 22
121:3, 5, 11
122:15
123:21, 22
125:11, 15

126:1, 20
127:6, 8, 9, 18
128:3  129:1,
2, 13, 21
130:16, 22
131:8, 14, 15,
19  133:10, 21
136:10  137:4
152:20
156:22
157:19, 21
163:13
176:14
188:17  214:7
216:14
217:20
218:17  225:9,
16  234:16
**courts** 35:11
63:14
**court's** 48:2
52:11  53:4, 5,
6, 16  125:24
128:7  130:23
**cover** 201:9
**coverage**
202:1
**covers** 199:13
**create** 129:7
193:2  194:1
195:7, 19, 24
212:10
**created** 192:1
**creating** 80:4
**credibly**
224:22  226:3
**crisp** 12:8
**criteria** 209:23
**criticism**
139:4  230:5
**criticize**
236:11
**critique**
236:16
**CROWELL**
3:3
**CRR** 240:22
**Ctd** 3:1  4:1
**CULBERTSO
N** 4:3

culpability
35:12
curious  153:5
current  41:17
187:8
currently
41:16  107:17
165:4  202:9
curve  40:10,
16, 18  41:2
149:10, 15
150:1  176:4,
9  177:7, 13
178:5  182:8
183:4  184:10,
19  185:1, 4,
14, 17, 20, 21
188:24  189:7,
22, 24  190:19
191:1, 4, 20
192:15, 17, 20,
21  195:9
curves  188:21
customer  95:7
231:12
cut  18:19
21:21  30:9
98:17
CV  9:23
CVS  4:8
228:5  234:7

< D >
D.C  2:22  3:4
4:14
D.N  4:14
d.stanoch@kan
ner-law.com
2:12
daily  69:6
damage  27:18
31:9, 12
34:11  35:4,
21  50:5  54:5
59:3  60:10
62:6  86:14
97:4  119:18
121:9  122:8
150:20
157:16

194:20  196:5
223:14
damages  23:1,
18  24:2, 5, 8
25:22, 23
27:6, 9, 12, 20
28:1, 5, 13, 14,
21  29:11, 17
31:18  32:11,
13, 23  33:4,
11, 21  34:2,
24  35:14
37:14  40:9
43:2, 4  46:3,
7, 18  47:1
51:5  52:16,
22  53:17, 23
54:2, 13, 19,
23  55:6, 22
56:2  57:5, 10
58:3, 9, 11, 15,
22, 24  59:2,
17, 21  60:8, 9,
12, 18, 23
61:6, 11, 13,
22  62:1  63:3
65:5  66:11
70:19  71:18
72:7  73:8, 12,
24  74:7
84:11, 18, 24
85:11  87:20
88:18  97:8
102:10
105:15  108:1
120:16  121:8,
23  122:8, 13
128:1, 17, 23
132:14, 16, 24
133:16  136:2,
8, 11, 16, 20, 23,
24  137:3, 7
138:2, 7, 11,
17, 21  139:3,
8, 16, 19, 21
140:15
141:11, 12, 16,
17, 20, 24
142:15  153:8,
24  154:8
158:5, 15

162:1, 23
163:7, 18
164:3, 7, 8
176:11
194:14, 17
196:1  199:7
214:19
223:10
226:16  227:7
228:13
229:13
235:11  237:8,
10, 14, 18
DANA  2:17
dangerous
129:8
dangerousness
127:11
DANIEL  3:5
DANNY  4:23
6:2
dash  201:8
data  41:20
79:18, 19, 24
80:10, 13, 17
81:7, 11, 13,
15, 20, 22
82:1, 4, 8, 17,
18  83:1, 4
105:24  106:1
189:16
191:16  192:5,
7, 9, 11  210:5
215:9, 14, 20
216:5  221:17
224:21  225:4,
7, 14, 19
226:2, 5, 8, 12,
15, 18, 21, 23
227:1, 5, 6, 8
232:17  235:18
database
105:6
date  6:5  9:19
49:17  124:14
173:1  188:16
197:7, 10
198:11, 12
204:4  218:23
dated  10:3
203:24

207:19  208:7
210:1
dates  45:22
191:18  192:6
208:19, 20
209:3
Dave  200:21
218:9  219:8
DAVID  2:10
21:6
day  231:11
239:17
dcampbell@cro
well.com  3:6
dealing  43:5
December
199:14, 23
203:15
204:17
207:20  208:1,
7, 13
decide  71:17
131:15
169:11  211:7
decided  216:1
decision  214:7
217:20
222:22, 24
deduct  72:18
111:9  113:14
deducted
117:4
deduction  92:9
deemed  28:2
43:14  171:7
deeper  207:16
deeply  28:17
Defendant  3:3,
14, 19  4:3, 13,
17  83:23
138:13, 14
141:3  159:20
167:23
228:15, 16, 19
235:13, 14
Defendants
2:14  3:8  4:8
23:22  40:24
45:2  177:20
182:4  183:13
198:18, 24

199:3, 6
201:20  207:5,
9
defense  7:10
9:3  10:16
23:8  147:6,
12  182:11
184:14
233:15, 18
defenses
157:21
define  45:21
defined  56:12,
22  89:3
96:19  97:2
110:22  154:10
defines  42:10
definition
22:15  42:6,
17  45:1, 8, 9
61:18  68:14,
21  192:15, 16,
17  232:14
definitions
95:19, 24
degree  43:19
57:16  93:1
Delaware
214:8  218:17
delay  11:18
12:9  78:7, 10,
12  79:2, 7, 12,
18  82:14
delighted
200:20
delivering
231:2, 4
232:19
delivery  174:5
179:8, 9, 14,
15  234:12
demand
146:17, 22, 24
150:15  189:7
190:12, 19
191:1  195:6, 9
demanded
190:8
demonstrate
158:4

Confidential Information - Subject to Protective Order

**demonstrated**
106:*10* 221:7,
*12*
**deny** 183:6, *9*
**depend** 26:*15*
43:*11* 57:24
92:24 95:6, *9*
113:*10*
**depending**
32:*13* 74:8
115:*21* 116:7
141:2, *3, 4*
145:6
**depends**
43:*18, 20*
64:*19* 70:*21*
89:*19, 23*
99:*19* 109:*13*
176:*16*
**deponent** 6:*13*
**Deposition**
1:*11* 5:*13*
6:7 17:*20*
48:*17* 51:6
138:22 184:5
188:*14*
197:24
216:22 220:9
221:4 227:*11*
229:6, *11, 19*
230:4, *13*
235:*1* 236:5,
*24* 237:24
239:8, *11*
**depositions**
8:*1*
**derived** 73:*13*
**describe**
10:*23* 12:*20*
63:8 65:22
71:5, 8
101:*23* 139:*18*
**described**
25:*10* 28:*12*
31:8 38:5
46:8 69:*17*
70:*13* 71:*12,
22* 74:24
75:4 77:7
82:7 85:4
86:*13, 24*

87:5 94:8
108:*1* 109:24
110:8 114:*3*
135:*13*
144:22 154:7
206:*3* 228:*13*
**describes** 13:2
142:*13*
170:*12* 230:5
**describing**
87:23
**Description**
5:9 99:4
139:*20* 204:*19*
**desire** 151:5
**destined**
213:*20* 224:6
**detail** 232:*12*
**detailed**
104:*12*
**details** 213:*11*
219:*20* 220:2
222:*21*
**determinants**
32:*18*
**determination**
32:22
**determine**
61:*10* 99:8
110:*11* 111:*4*
138:*16*
160:*17*
213:*16* 227:*16*
**determined**
29:*19* 35:*11*
53:24 55:*21*
65:5 73:*23,
24* 120:*20*
128:*18*
132:*14, 19*
162:*3, 5*
164:9 184:*14*
**determines**
28:5
**determining**
61:*24* 87:*20*
106:*16* 149:*9,
22*
**develop** 77:*23*
193:*15*

**developing**
209:*11*
**device** 174:6
179:7
**diaries** 198:6
207:*19, 24*
208:*10, 11*
209:*17*
**Diary** 203:*24*
**diet** 150:*19*
**differ** 116:9
141:2
**differed** 133:5
**difference**
43:*10* 58:*14,
20* 68:7
78:*14* 86:2, *6,
7* 88:*8, 13*
89:*4, 18*
90:*14* 91:*13*
98:*12* 106:22
114:*16*
132:*17*
143:*19*
166:*10* 209:*21*
**differences**
58:*12* 77:8
88:6 89:*24*
102:*11*
111:22
119:22
136:24
140:*23*
142:*20, 22*
143:*21*
144:*15* 162:2
169:*23* 170:*4,
8*
**different**
32:*10, 12*
36:*11, 12*
39:8 58:*18,
19* 59:5, *21,
24* 61:*17*
62:*17* 66:22,
*23* 79:*13*
80:5 81:22
85:*11* 89:22
90:5 91:*16*
94:22 100:*15*
105:6 109:*1*

110:*13*
112:22 113:7,
*10* 116:6, *10,
11, 12, 13*
117:*18*
122:*12*
135:*13*
145:*12, 13*
154:*18* 155:*3*
165:*3* 168:*13*
169:*21, 22*
185:*3* 189:*12,
14* 192:23
196:*10*
209:*14*
210:*18*
217:*15* 227:*3*
**differential**
172:*3*
**differently**
32:2 65:*19*
88:2 129:5
151:*16*
**diminish**
72:*14* 73:*17,
20*
**diminished**
94:24 178:22
**diminution**
43:*17* 57:*14*
58:*12* 70:*20*
71:*1, 21*
74:*13, 21*
77:3 86:*1*
87:2, *15* 92:5,
*11, 22* 93:*13,
23* 94:7, *12*
95:9 96:*10,
15, 20* 97:*10*
106:*21* 107:8
116:*20*
119:*19*
135:*14* 144:*14*
**DIR** 211:*19*
**direct** 14:*12*
107:23
121:*14* 184:2
221:*19*
**DIRECTED**
5:22 130:*24*
234:*17*

**directing** 39:*4*
59:*12*
**direction**
193:*14* 210:*10*
**director**
204:*16*
**disagree**
102:*14, 19*
103:*8, 11*
104:*17*
116:23
117:*14*
119:*13, 14, 17*
129:*21* 147:*1*
149:8 160:*16*
163:6 164:8
176:*19*
183:*12, 16, 20*
184:*20*
185:22 186:*4*
224:*13*
**disagreed**
185:*20*
**disagreeing**
103:*4* 117:*9*
**disagreement**
102:*23* 184:*18*
**discern** 209:*20*
**discharging**
12:*21*
**discounts**
105:5
**discovered**
224:*21* 226:*17*
**discrete** 39:*11*
**discuss** 10:*19*
29:*11* 38:7
39:*16* 181:*1*
**discussed**
38:*19* 83:*14*
164:*10*
**discusses**
25:*11* 39:*12*
**discussing**
28:*21* 31:5
40:*4*
**discussion**
29:24 30:*21*
38:*18* 85:24
96:*13, 15*
121:*17*

Confidential - Information Subject to Protective Order

139:*15*  140:*4*
160:*13*
176:*10*  204:*21*
**discussions**
214:*23*
**disease**  92:*20*
**dismiss**  49:*23*
50:*3*  52:*2, 9*
124:*8, 20*
**dispute**  37:*4,*
*6*  45:*6, 11*
103:*19, 22*
104:*5, 15*
105:*3, 8, 11*
200:*2, 6*
201:*14*  213:*4*
222:*20*
**distinction**
206:*6*
**distinguish**
209:*24*
**distribution**
78:*16*  99:*14*
141:*5*
**DISTRICT**
1:*1, 2*  6:*11, 12*
**divergence**
171:*6*
**dklinges@duan**
**emorris.com**
2:*19*
**Doctor**  18:*21*
44:*3*  95:*12*
110:*16*  113:*8*
123:*5*  132:*21*
142:*12*
151:*10*  169:*8*
175:*12*  187:*3*
209:*15*  212:22
**DOCUMENT**
1:*5*  10:*9*
19:*17*  49:*24*
123:*20*  124:*5*
125:*8*  126:*14*
127:*19*
128:*15*
129:*15*
172:*16*
174:*17, 23*
179:*13*
180:*18*

200:*17*  218:*6*
219:*10*  220:*4,*
*14*  225:*18*
**documents**
45:*16, 18*
47:*5*  49:*23*
50:*11*  51:*1*
220:*12*
**doing**  20:*1*
82:*16*  103:*6*
150:*14*
155:*22*  210:*5*
221:*9*  224:*11*
**dollar**  69:*17,*
*23*  70:*11*
71:*9*  74:*23*
110:*9*  111:*9*
144:*9, 23*
145:*9*  151:*12*
**dollars**  71:*18*
143:*2, 4, 8, 13,*
*23*
**dominant**
213:*20*  224:*7*
**dominate**
158:*1*
**door**  201:*24*
**doubtless**
10:*15*
**Dr**  6:*13*  7:*2*
10:*11*  11:*21*
12:*8, 14*
15:*14*  17:*1,*
*13*  18:*4, 14,*
*23*  19:*3*
20:*14, 17*
21:*6, 16, 18*
22:*7*  24:*12,*
*22*  25:*11, 18*
26:*9, 18*  27:*8*
30:*12, 24*
33:*10*  37:*19*
38:*11*  42:*14,*
*17*  48:*16*
51:*6*  55:*17*
63:*11*  75:*13*
76:*10*  77:*21*
85:*21*  86:*20*
93:*10*  107:*7*
114:*19*
116:*15, 17*

117:*6*  118:*6,*
*20*  119:*4, 13*
120:*18, 23*
125:*19*
130:*13, 23*
131:*19, 24*
133:*12*
135:*11*
137:*15, 24*
138:*18*  139:*5,*
*20*  140:*8, 11*
141:*10, 18*
146:*4*  147:*5,*
*13*  151:*24*
152:*21*
160:*14*
161:*15*
164:*19*  165:*6*
170:*20*  171:*9*
173:*2, 4*
174:*15*  175:*1*
176:*8, 19, 21,*
*23*  180:*21*
181:*3, 16*
182:*12, 14*
183:*12*  184:*6,*
*9, 13, 18*
185:*12, 23*
186:*3*  188:*10,*
*18*  192:*1*
194:*24*
198:*16*  201:*4*
206:*8*  207:*9,*
*16*  209:*10, 15*
210:*22*  212:*4*
218:*3, 19*
219:*17*  221:*4*
222:*15*  224:*4,*
*21*  228:*4, 7,*
*23*  229:*5, 12*
230:*5*  231:*7*
232:*22*  234:*6,*
*23*  235:*19*
236:*11, 22*
237:*24*
**draw**  172:*2*
175:*19, 21*
**drawn**  217:*15*
**draws**  180:*22*
**Drive**  3:*9*
69:*9*

**drug**  24:*24*
25:*2*  40:*22*
41:*9*  42:*7, 19*
56:*5, 23*
57:*19*  58:*4*
67:*7, 10, 13,*
*18, 22*  69:*2*
75:*8*  76:*23*
78:*23*  82:*19*
88:*19, 21*
90:*9, 18, 22*
91:*8, 11*  92:*7*
117:*22*  118:*9*
119:*7, 10*
126:*3*  133:*23*
144:*10, 24*
148:*16, 18*
149:*11, 18, 24*
150:*16, 19, 23*
160:*6*  163:*4*
165:*22*  173:*9,*
*12*  174:*6*
176:*1, 3*
178:*11*  179:*6,*
*17, 18*  180:*10*
182:*22*
184:*10*
193:*21*  194:*6,*
*8*
**drugs**  26:*7*
36:*9, 20, 23*
37:*1, 17*
38:*21*  39:*14*
43:*6*  65:*9*
72:*10*  74:*6*
75:*7*  76:*13,*
*17, 20*  78:*10,*
*14, 15*  79:*15*
89:*13*  90:*24*
117:*6, 13*
119:*2*  120:*1,*
*3, 21*  121:*18*
126:*2*  127:*9*
128:*8*  129:*6*
130:*10, 14, 18,*
*24*  131:*20*
148:*8, 11*
150:*10*
160:*10, 11*
163:*4, 15*
164:*5*  165:*7,*

16, 22  166:*4,*
*7, 18*  172:*12*
175:*16*
176:*15, 16*
178:*3, 7, 10,*
*19, 20, 21*
180:*2*  181:*20*
185:*9, 22, 24*
186:*8*  187:*5,*
*9*  193:*17*
194:*19*  196:*3,*
*6, 8*  228:*21*
**Duane**  1:*13*
2:*12*  7:*22*
**due**  172:*3*
**duly**  6:*21*
135:*4*  240:*11*

**< E >**
**earlier**  7:*6*
52:*4*  80:*2, 20*
131:*3*  132:*21*
188:*12*
192:*18*  218:*16*
**earliest**  198:*2,*
*8*
**ease**  69:*4*
87:*12*
**Economic**
5:*16*  22:*11,*
*16, 24*  23:*9,*
*18, 23*  24:*5*
25:22, 23
27:*8, 12*  28:*1*
29:*11*  30:*3*
32:*10, 13*
33:*3, 11, 17*
34:*1, 8, 24*
35:*3, 18*  36:*7,*
*15*  37:*13*
41:*5*  43:*1, 4,*
*9*  45:*12*  46:*7,*
*14, 17, 24*
47:*7, 8*  49:*12*
50:*5, 9, 12, 15,*
*21*  51:*5*
52:*16*  53:*10,*
*11, 13*  54:*2, 4,*
*9*  56:*1, 11, 13,*
*21, 24*  60:*8, 9,*
*10*  61:*15, 22,*

Confidential Information - Subject to Protective Order

24 62:6, 11, 15, 24 63:5, 16 65:10, 23 66:5, 8, 10 67:5, 20 68:5, 6 69:12, 15, 21 70:14 74:7 75:15, 19 79:8, 23 80:24 83:9 84:10 85:2, 3, 22 86:3 88:22 89:3 94:13 97:8 99:11, 16, 21 100:7, 9, 18 101:7, 16 102:2, 8, 12, 13 103:7, 10 105:9, 10 106:19 108:14, 20, 21, 22 110:24 111:5 113:9 116:15, 21 117:6 118:5 119:15 120:14, 15 121:8, 9 122:9 126:16, 17, 24 127:23 128:1, 17, 22 129:18 130:8 131:10 132:14, 16 133:8, 24 134:9, 11 136:22, 23 142:2, 5, 8, 24 143:2, 10 144:20 145:2, 9 146:16, 20, 22 148:3 149:22 150:12, 14 151:9, 22 152:2 153:8, 20 154:1, 8, 9, 14 156:10 158:10 159:18 162:1,

23 163:3 172:2 176:10 177:6 181:2 183:18 193:22 194:10 197:5 213:17, 22 214:19 232:16 237:17, 19
**economically** 25:2 101:24 111:4 114:22 121:18 127:10 128:8 130:14, 18 131:21 163:15 177:23 196:4
**economics** 31:16 35:24 43:17 58:10, 23 60:14 61:15, 23 63:3 100:6 110:20 115:14 121:19, 20 130:20 133:9 145:16 146:11 148:2 151:22 152:14, 19, 23 153:1 154:4, 13 156:3 168:16 175:13 177:12 195:18 231:14 232:6, 9
**economist** 29:17 46:6, 12 47:10, 19 52:20 53:10 57:13 58:23 70:16 71:8 78:3, 8, 12, 21 82:15 93:18 94:15 97:15 98:24 99:5

106:14 109:8 120:7, 23 121:7 122:4, 10 123:3 127:22 128:17, 21 129:20 145:18, 20 146:1, 4 150:23 151:7 154:12 171:2, 11, 17 180:12 184:24 185:8 188:22 189:21 191:3 199:1, 5 213:16 230:20 232:1
**economists** 27:19 47:12 50:15 53:2 95:1 115:14 132:6 170:3, 7, 12, 14, 18
**economist's** 100:11 132:8 156:24
**effectiveness** 69:2
**effects** 69:1 93:5 129:9
**efficacious** 129:6
**efficacy** 57:19 186:8
**eight** 207:22
**either** 23:8 24:23 26:21 34:6 45:20 46:2 48:17 68:24 145:10 148:21 161:13 166:15 171:10 187:12 189:4
**elected** 217:13
**elements** 69:13, 17 70:12 71:22

169:19
**else's** 47:23
**email** 220:16
**employed** 112:3 226:18 227:2, 4
**encompasses** 207:24
**encountered** 145:6
**ended** 73:2
**ends** 163:7
**engaged** 10:16 97:9, 14 199:2, 5, 11
**engagement** 144:7 203:7 211:20
**English** 175:21 180:7
**enhanced** 37:5
**enrichment** 138:3, 7, 11, 16, 20 139:3, 6, 8, 11, 17, 19, 21 140:7, 15 228:7, 11, 12, 23 229:7, 12 230:12 234:9 236:7, 19 237:7, 8, 9, 14, 18
**enter** 80:23
**entered** 80:20
**entering** 177:9
**entire** 181:17 221:22 222:20 235:22
**entirety** 29:1 231:21, 23
**entities** 83:23
**entitled** 11:10
**entity** 99:12, 13 141:2
**entity's** 99:7
**entries** 208:3, 14, 19, 21
**entry** 79:2, 22 80:2, 5, 16 81:8, 9

148:21 198:6 204:16
**enumerate** 11:12 13:12, 16
**enumerated** 200:3
**environmental** 171:22
**envision** 168:23
**envisioning** 171:2 190:18
**equal** 39:3
**equally** 188:19
**equilibrium** 146:15 185:14, 18 188:19 189:9 191:2 195:5, 9
**equivalence** 91:23
**equivalent** 126:4, 6 142:19
**equivalently** 95:4
**equivalents** 148:23
**error** 201:12
**ESQ** 2:5, 10, 17, 18, 21 3:5, 10, 11, 16, 20 4:5, 10, 14, 19
**essential** 152:2
**essentially** 18:24 79:23 81:4 230:11
**establish** 12:18 176:12
**established** 110:7, 21 111:1
**estimate** 98:8, 11 196:1 202:24 207:21 226:16
**Etminan** 20:17
**evaluate** 34:7 77:8 109:20

Confidential Information - Subject to Protective Order

evaluating 33:21 52:21 75:13 126:24
Evans 208:4, 12 209:2
eve 215:3 224:18
event 9:2
eventually 54:22 92:19
everybody 41:23
evidence 43:8 72:14 164:6 166:19 172:8 183:15 216:2
exact 168:19
exactly 74:18 104:13 131:24
Examination 5:3 7:1 135:10 228:3 234:5 240:10, 12
examined 6:23 135:6
example 9:11 31:24 32:3 33:19 34:5, 19 35:8 62:20 63:24 64:6 67:16 68:9 75:14 78:6 89:12 99:2 113:22 114:2 118:8 136:2 143:20 153:7 170:3 204:2 208:2
examples 169:15 170:12 171:1, 4
exasperated 137:11
exceeds 88:23
exception 147:4 204:20
exchange 61:12

exchanged 67:24
exclude 53:5
exclusion 53:3
excuse 12:15 194:7 196:24 211:9 221:11, 12, 23
exercise 79:23 90:2 171:12, 24
exhaustive 230:18
Exhibit 5:10, 13, 16 9:16, 18 10:2, 23 17:18, 20 20:3, 10, 22 44:5, 6 59:14 84:4 123:5, 23 124:3, 13, 22 125:18, 24 127:2 172:24 173:3 179:4 182:6 184:2 188:13, 15 196:24 197:1, 2, 6, 9, 16 199:17 200:4, 23 201:5, 6 203:19 204:7, 10 218:1, 2, 14, 22
EXHIBITS 5:8 9:8 196:21, 23 197:11
exist 138:17 146:23 196:13, 16 237:16, 18
existing 148:23
exists 106:2 170:24 194:12
expand 155:2
expands 236:18
expect 7:8 62:10 190:9 198:10

expectation 61:14 172:5
expenditure 106:9
expenditures 106:3, 6 107:21 109:15, 21 143:15, 24 193:11
expensive 91:9
experience 35:15 47:10 53:9 72:23 74:1 81:21 120:6 122:3, 14 127:22 129:19 131:6, 13, 16 132:4, 6 145:24 156:5
experienced 69:3 74:14 108:23
experiencing 11:19
Expert 5:10 9:17 14:20 16:24 17:2, 20 18:13, 17 19:20 20:7, 20 21:1 22:7, 8 27:21 31:9 33:14 35:21 73:16 97:15 130:23 143:24 147:7, 13, 14, 16 182:4 186:4, 14, 19 210:24 212:5 214:21, 23 215:15 216:7, 10, 11, 20 223:15 224:3 225:5, 8, 10, 16, 20 226:6
expertise 34:1 145:20 147:20 148:1

experts 23:8, 14 24:2 28:13 144:4 147:6, 20, 24 203:4 207:8
expert's 23:19 216:16 217:15, 17
explain 16:23 37:12 74:11 96:1 128:6 139:21
explained 43:16 46:12 54:3 57:13 62:8 63:6 130:19 236:20
explaining 98:23
explanation 60:3 212:1
explicitly 40:5 175:2
exposed 170:1
Express 3:14 10:19 126:8, 19
expressed 138:8 139:1
expression 112:8
extensively 152:23
extent 32:9 50:10 62:3 85:6 133:7 136:10 137:2 154:23 155:2 174:24 205:21 207:8 210:21
extremely 95:17
eyes 173:4

< F >
face 24:4 37:6
facility 187:9, 11 231:5

fact 16:12 25:7, 13, 16 27:11 31:17 35:8 38:4 43:5 45:11 56:22 67:12 76:16, 20, 21 94:14 103:23 122:18 144:13 151:6 158:19 159:1, 6, 20 160:4, 17 161:4, 15, 16 166:12 168:5, 9 182:24 192:9 215:6 216:6 217:17 223:10 234:16
factor 77:4 118:13 119:9 156:24
factors 57:24 64:19, 22 68:22 70:21 81:2, 3 95:10 97:11 111:20 162:11 170:18 171:22 175:1
facts 35:21 36:2, 5, 13, 24 37:24 43:8 45:5 103:17 104:6 160:15 166:19 169:13 178:18 181:13 183:15 220:7
fail 48:9 186:9
failed 48:7 119:9
fails 105:4
failure 24:24 163:5
failures 22:18 23:21 24:18 25:13, 17, 20 26:3, 5, 12

Confidential Information - Subject to Protective Order

**fair** 12:*23*
23:*20* 24:*1*
86:*12*
**fairly** 145:*15*
219:*19*
**faith** 217:*14*
**fall** 158:2
**familiar** 29:*21*
34:*12* 79:9
148:*15*
150:*16* 152:8
174:*14*
182:*13*
197:*19* 222:6,
*14*
**familiarity**
148:*19* 149:*1*
**familiarize**
222:*15*
**far** 36:6
72:*11* 132:*3*
149:*20* 219:*19*
**FDA** 36:22
37:*16* 39:*13*
42:*13*, *18*
75:*17*, *18*, *20*
147:22
182:22
184:*14* 186:6
**Federal** 42:7,
*18* 148:*15*
152:9 160:6
173:9, *11*
174:*12*, *14*
**feel** 10:*18*
95:*15* 156:*4*
215:9 222:*24*
**felt** 227:*3*
**fen-phen**
150:*17*
151:*11*, *17*
**field** 145:*4*
**figure** 99:6
101:7
**figuring**
115:*18*
**filed** 224:*20*
**filings** 44:6, 9,
*15* 45:*13*
84:6 125:*11*

**finalization**
203:*3*
**financial**
40:*12* 58:*12*
77:9 86:7
87:*8*, *12*, *14*,
*18*, *24* 88:*6*, *8*,
*9*, *18* 89:*2*, *11*,
*14*, *19* 90:*3*, *4*,
*7*, *10*, *12*, *14*, 22
91:*3*, *4*, *12*, *14*,
*15*, *21* 92:*3*
93:*18* 94:*6*,
*10* 96:*4*, *10*,
*13*, *18* 97:*2*, 7,
*13*, 22 98:*20*
99:*1*, 5
100:*13*, *14*
102:*10*, *11*
107:9, *16*
108:*3*, *12*, *19*,
*21* 110:6, *21*
111:22, *24*
114:*5*, *16*, *18*
116:*17*, *20*
117:*15*, *17*, *23*
118:22
119:22 131:2
135:*14*
136:*24* 162:2
164:*3*, *9*, *11*,
*12* 165:*3*
193:*23*
**financially**
109:*19*
**find** 28:*19*
29:9 30:*4*
81:*15* 172:*16*
208:*20*
**finding** 27:*17*,
*22*, *24* 33:7
126:*11*
127:*17* 128:7
129:*12* 154:*14*
**findings** 157:*8*
176:22
**finds** 126:*1*
127:6, 9
136:*10*
**fine** 76:9

**finish** 155:7
195:*21*
**finished**
155:*10*
**firm** 197:*21*
200:9, *14*, *15*
**first** 6:*20* 8:7
14:*11* 87:*15*
109:*1* 174:*3*
184:*3* 198:*5*,
*12* 206:22
222:*6*, 9, *14*
230:22
**fit** 26:*23*
44:*24* 228:*10*
**fix** 118:7
**fixed** 118:*8*
**flavor** 203:22
**flaw** 192:*8*
**flaws** 139:*19*
236:*21*
**flip** 10:5
**flow** 28:*1*
**flowing** 31:*18*
**flows** 37:*13*
**focus** 45:*12*
87:*18* 89:9
97:*1* 221:*15*
**focused** 116:2
148:2
**folder** 200:*23*
**followed**
33:*10* 186:*15*
**following**
27:*16* 62:7
71:*24* 73:*3*
133:*14* 173:22
**follows** 6:*24*
127:*8* 129:*4*
135:7 174:*4*
184:7
**follow-up**
187:2 193:*18*
**Food** 42:7, *18*
56:*5*, *23*
160:6 173:9,
*12* 174:6
179:6
**footnote**
20:*10*, *11*

**footnotes** 19:5
20:*21*
**force** 213:*20*
224:7
**foremost**
230:22
**forget** 114:*15*
**form** 9:*10*
12:*24* 22:*4*,
*20* 23:*10*
27:*1* 29:*12*
31:*13* 32:5,
*19* 34:*10*, *21*
39:*17* 43:7
46:22 47:*2*
53:*19* 58:6
61:*1*, 7 63:*19*
64:9 66:*14*
67:*4* 69:*19*
72:*20* 79:5
81:*16* 82:*21*
84:*20* 95:*21*
97:5 102:*16*
104:*18*
106:*12*
107:*14* 108:*6*,
*17* 109:*11*
111:*11*
112:*13* 114:*4*
121:*2*, *24*
122:*23* 125:*3*
126:22
128:*11* 130:2
131:*4* 132:*1*
133:*2* 134:*3*
136:*5* 138:*4*
139:*12*
141:*13*, *21*
149:*12* 150:2
152:5 153:*16*
155:*19*
156:*16* 157:*5*,
*17* 158:*20*
159:*2*, 9
160:*1*, 7, *19*
161:*5*, *19*
162:*14* 163:9
167:*10*, *20*
168:*10*
171:*15* 176:5
177:*10*

178:*15*
179:*19* 180:*5*,
*16* 183:*7*, *14*
186:*11*
187:*14*
190:*15*
191:22 193:6
195:*11*
210:*20*
215:*17*
216:*17*
234:*19*
236:*14* 237:*11*
**formal** 49:*20*
**formation**
159:*23*
**formed** 24:*14*
83:*16* 151:*1*
**forming** 55:*8*
149:6
**forms** 165:*9*,
*11*, *15* 166:6
**formula** 71:5
87:*7*, *19* 99:*1*
111:*3* 140:*7*,
*8*, *11*, *12*
**formulas**
32:*16*
**forth** 240:*11*
**forward**
12:*11* 13:*12*
27:*8* 33:*12*
36:*12* 37:*19*,
*24* 38:*11*
45:*21* 119:*18*
139:22 149:*3*
235:*20* 236:*3*,
22
**found** 29:*2*, *4*
32:*14* 40:*14*
57:*8*, *11*
130:*16* 226:*8*
**foundation**
28:*21* 163:*24*
167:*11* 183:*8*
**four** 44:6, *11*,
*12*, *20* 45:*13*,
*16*, *19*
**frame** 66:*23*
116:*4*

Confidential Information - Subject to Protective Order

framework
25:1, 7  26:19,
23  32:9
33:11, 12
35:24  37:18
38:10  54:4
62:14, 15, 18,
23  63:17, 22
75:1  94:13
116:3  130:4,
7, 8  131:12
132:24
141:16  178:24
franchisees
97:23  98:13
franchises
98:3
fraud  141:20,
24
free  196:15
frequency
200:13
201:18, 23
frequently
33:15  45:8
79:19  122:10
155:24
front  11:1
21:12  48:15
125:22
197:11
199:17
204:11
207:23  209:1
full  127:5
162:19  223:24
fullness  54:21
55:3
fully  55:21
151:1  224:20
fundamental
152:6
fundamentally
129:24
further  72:13
88:11  99:14
135:6  232:22
240:14
fuzzy  12:9

< G >
gain  17:4
gather  7:21
34:4  81:22
153:14
gathered
224:22  226:3,
6, 7
gathering
226:11, 14
227:1, 5
general  24:2
70:14  99:4
111:14  116:3
206:24
Generally
13:1  29:5
31:11, 15
41:8  81:20
110:19  145:1
146:21
147:23  201:22
generates
31:18
generic  78:6,
7, 12  79:2, 7,
18, 21, 22
80:2, 5, 14, 16,
20, 23  81:8, 9
82:14  99:4
126:3, 5
148:22  165:9,
15
genotoxic
16:21
geographic
170:9, 10
getting  11:17
14:3  19:9
88:20  195:15
200:18
give  9:1
18:24  23:6
25:6  56:1
62:20  65:8
69:22  88:16
89:12  99:3
120:14  121:6
125:20  132:7
151:11
174:18, 22

175:10, 22
197:3  208:19
219:12  230:18
given  7:13, 24
36:24  42:24
53:13  68:16
73:1  99:2
105:5  168:17
211:17  212:1
214:24  215:4,
21  223:22
239:12  240:13
gives  25:11
62:9  190:22
glean  66:4, 9
go  12:5, 10
21:17  30:16
41:9  42:22
66:20  76:8, 9
77:14  78:20
92:1  113:22
134:14  142:6
172:15
189:19
197:15  201:3
203:21
206:11
207:19
209:16
217:24  218:8
219:24  223:3,
8  233:5
234:21  236:12
goes  12:1, 6,
11  13:22
31:2  39:19
65:17  198:24
going  9:8, 15
10:2, 6  18:19
24:19  28:6
30:5  76:3
89:9  95:9
97:18  123:12
124:2  188:12
193:4  196:23
211:3, 21
212:10
213:21  219:9
220:12
221:14, 15, 19
227:11

going-
backward
77:2
going-forward
29:17
GOLDBERG
2:17  7:20
9:3  11:13, 16
12:1, 12, 24
18:18  22:4,
20  23:10
25:8  27:1
28:6  29:12
30:5, 13, 16
31:13  32:5,
19  34:10, 21
39:17  43:7
47:2  48:4
50:7  52:13
53:19  57:2
58:6  61:1, 7
63:19  64:9
65:12  66:14
69:19  72:20
75:22, 24
76:8  79:5
81:16  82:21
84:20  86:15
94:3  95:21
97:5  99:10
101:10  102:4,
16  104:18
105:21
106:12
107:11, 14
108:6, 17
109:11
111:11
112:13  114:4
115:3, 8, 23
119:11  121:2,
24  122:23
123:7, 9, 12
124:4, 9
125:3  126:22
128:11  129:3
130:2  131:4
132:1  133:2
134:3  136:5
137:19  138:4
139:12

141:13, 21
142:7  143:5
144:11
149:12  150:2,
7  152:5
153:16  155:9,
19  156:14, 16
157:5, 17
158:7, 20
159:2, 9, 24
160:7, 19
161:5, 19
162:14  163:9,
21  167:8, 10,
20  168:10
171:15
172:20, 22
175:7, 18, 20
176:5  177:10
178:15
179:19  180:5,
16  181:3, 8,
23  183:5, 7,
14  184:22
186:11, 22
187:14, 22
190:15  191:8,
22  193:6
195:11, 22
197:13
200:16  203:8,
10  205:3, 11,
15, 20, 24
206:7  207:6,
14  208:5
209:8  210:20
211:4, 13, 21
212:9, 14, 18
215:17
216:17  217:5
218:5  219:9,
12  220:5, 10,
21  221:6, 9
222:1, 4, 13
227:18  233:3,
17, 21  234:1
Golkow  6:3
good  7:2, 4
8:5  77:12
103:21
123:15

Confidential Information - Subject to Protective Order

134:*13*
155:*14*  186:*5*
196:*15*  228:*4*
**goods**  230:*23*
231:*10*
232:*18*  234:*12*
**GORDON**
3:*17*
**gotten**  144:*22*
**graph**  188:*23*,
*24*  189:*22, 24*
190:*4*  191:*4*
**great**  7:*10*
124:*1*
**GREENBERG**
3:*6*
**GREGORY**
3:*11*
**gross**  73:*8, 12*
**grounds**
161:*18*  183:*18*
**guarantee**
186:*7*  187:*10*
**guess**  12:*10*
62:*7*  121:*3*
143:*7*  156:*19*
179:*21*  180:*7*
186:*17*
195:*20*  203:*17*
**guidance**
32:*11*
**guides**  111:*17*

**< H >**
**half-hour**
119:*9*
**halting**  11:*22*
**hand**  59:*22*
157:*14, 15*
162:*11*  240:*19*
**Hang**  11:*13,
16*  30:*13*
105:*21*
137:*19*  155:*9*
195:*22*  197:*13*
**happen**  169:*4*
**happened**
80:*22*  214:*12*
216:*19*
217:*17*  221:*16*

**happening**
132:*5*  214:*16*
**happens**  81:*7*
98:*9*  164:*24*
168:*24*  189:*16*
**happy**  206:*12*
**harm**  66:*5, 8,
15*  67:*5, 9, 12,
17, 20*  68:*5, 6*
84:*7*  85:*12*
106:*18, 20*
122:*6*  144:*14*
154:*9*
**harmed**
106:*17*
**Harvard**
175:*12*
**head**  63:*12*
**headed**  12:*16*
39:*1*
**heading**
173:*11*
**Health**  3:*3*
58:*1*  64:*16,
22*  93:*9*
95:*13*  144:*15*
145:*4, 8, 16,
18, 19, 21*
146:*1, 4, 11*
165:*2*  169:*9,
10, 20*
**Healthcare**
2:*15*
**hear**  21:*18, 21*
30:*7*  55:*12*
59:*6*  75:*24*
86:*18, 20*
135:*22*
176:*21*
190:*13*  192:*3*
**heard**  8:*12*
72:*3*  82:*6*
144:*19*
**heart**  150:*20*
**held**  6:*7*
**he'll**  218:*13*
**helped**  224:*2*
**helpful**  95:*17*
**hereinbefore**
240:*11*

**hereunto**
240:*18*
**Hetero**  4:*17*
**high**  102:*6*
171:*22*  190:*9,
11*
**higher**  39:*3*
79:*10*  90:*23*
91:*1, 5*  170:*6*
**highest**  232:*11*
**highlight**  7:*15*
**highlighted**
224:*1*
**HILL**  4:*17*
**HINSHAW**
4:*3*
**hired**  130:*22*
198:*16*  213:*4*
**historic**  79:*19*
80:*10*  82:*7*
**historical**  82:*8*
**histories**  95:*13*
**history**  58:*2*
93:*9*  219:*23*
**hold**  145:*17*
223:*7*  231:*19*
**holding**  124:*18*
**HON**  1:*5*
**HONIK**  2:*1, 5*
5:*4, 6*  7:*1, 6*
11:*19*  12:*7*
28:*8*  30:*7, 10,
18*  55:*13, 16*
76:*5*  77:*12*
85:*18*  123:*11,
17*  124:*1, 7,
11*  134:*13*
135:*10*  137:*8,
13, 20*  172:*21*
181:*6*  187:*1,
20*  188:*2, 9*
200:*20, 24*
205:*7, 13*
206:*14*
207:*12*  208:*9*
211:*2, 7, 12*
212:*8, 12, 16,
21*  218:*7, 11*
219:*7, 11*
220:*8, 16, 24*
221:*7, 11*

**hereunto**
222:*2, 10*
227:*9*  233:*1,
13, 19, 23*
234:*3, 5*
237:*20, 23*
**hope**  9:*9*
227:*11*
**horizontal**
191:*5*
**host**  165:*16*
**hour**  123:*14*
**hours**  202:*17,
20, 22*  203:*1,
9, 13*
**house**  69:*8*
**housekeeping**
8:*3*
**houses**  170:*5*
**housing**  170:*4*
**Huahai**  2:*14*
**Huhai**  2:*15*
**human**
158:*24*  169:*20*
**hundreds**
146:*9*
**HUSCH**  3:*14*
**hypothetical**
72:*1, 22*
73:*12*  88:*24*
89:*1*  90:*20*
91:*17*  121:*15,
16*  151:*17*
168:*3*  195:*3*

**< I >**
**idea**  26:*17*
30:*17*  186:*4*
188:*19*
**identification**
9:*19*  124:*13*
173:*1*  188:*16*
197:*7, 9*
218:*22*
**identified**
235:*6*
**identify**  20:*11*
**identifying**
126:*3*
**identities**  45:*2,
3, 23*

**identity**  49:*15*
**ignore**  128:*10*
**ignored**  128:*7,
15*
**II**  181:*10*
**III**  40:*1*
**illegal**  180:*8*
**illegitimate**
185:*13*
**Illinois**  3:*10*
**illustration**
34:*5*  78:*1*
88:*16*
**im**  235:*12*
**image**  11:*21*
**imagine**  132:*4*
189:*11*  196:*2*
**imagined**
190:*21*
**impact**  16:*6*
23:*23*  29:*18*
32:*2*  35:*12,
17, 23*  43:*12*
46:*23*  50:*21*
56:*13, 24*
57:*5, 18*
60:*23*  61:*5*
62:*5, 23*  78:*9*
83:*8*  101:*8*
126:*20*
147:*22*  149:*9,
17, 20*  181:*2*
**impacted**  50:*5*
**impacts**  26:*9*
31:*12*
**implicates**
186:*9*
**implication**
16:*9*  25:*21*
**implications**
36:*8*  41:*5*
43:*1, 3*  100:*9,
12*  101:*16*
102:*24*
193:*11, 22*
**implies**  185:*24*
**imply**  112:*10*
**important**
8:*13, 19*
**imposing**
121:*19*

Confidential Information - Subject to Protective Order

impurities
15:2  16:4, 8
33:8  36:8, 18,
23  37:4, 8, 10
67:13  92:21
93:2  159:13
160:12
165:13  169:5,
6, 8, 12  178:8,
23  185:7
impurity
43:14  93:20
inartfully
189:19
inasmuch
7:16  186:3
227:13
incapable
122:18
incidence
170:6
include  64:14
99:13  105:4
169:19  203:2
included  16:4,
8  20:22
38:15  68:20
126:7  157:8
159:13
166:17
180:20
216:12  231:7
includes
67:13  68:7,
18  70:6
144:14
including
47:5  132:9
181:14  232:2
incomplete
118:4, 23
139:23
155:13  230:9
incorporate
63:21
incorporated
234:14
incorrect
215:23  217:3,
7

increase
64:15  159:15
increased
37:8, 10  92:16
incurred
105:15
independent
46:17  47:19,
20  50:15
127:23
128:20, 24
131:10  223:17
independently
129:17
INDEX  5:1
Indiana  4:9
Indianapolis
4:9
indicate  17:16
19:6
indicated
200:3  217:8
indicates
94:15  172:14
indication
170:14
indications
145:3
indistinct  11:4
individual
57:24  70:8
74:11, 20
93:19  95:10
104:23
105:15  107:3
115:6  154:19,
20, 21  157:22,
24  162:12, 17,
22  235:11, 13
individual-by-
individual
70:24
individualized
71:14  75:5
162:6
individuals
17:3  53:13
Industries  3:8
145:21
industry
140:20  147:19

influence
56:24  126:20
inform  17:7
INFORMATIO
N  1:9  17:8
18:1, 7  19:3,
6, 10  21:4
23:15  24:9,
14, 20  27:7, 9
45:19  46:9
47:11  50:14
52:22  54:1
62:12, 17
65:1, 6  70:8,
23  71:1, 12,
14  74:8, 10,
11, 20  75:5
82:2, 10  83:5
84:3, 5, 9
94:18  95:7,
11  103:18
104:23
105:16, 18
106:24  107:1,
4, 17, 21
111:17
128:18
129:18
132:15, 19
142:12
153:10  162:3,
5, 6, 17, 22
167:1, 21
172:5, 13
205:5, 22
207:11  209:9
210:5, 21, 24
212:2  216:21
223:1  227:14
informed
169:8  182:10
195:7
INGERSOLL
4:11
ingest  67:2
ingrafted
195:3
ingredient
81:3
ingredients

232:3, 10
initial  105:7
injury  64:8
innovator
165:22
in-person  4:10
input  108:24
143:23  144:3,
5, 8, 22
226:16  227:8
inputs  98:6, 7
100:1  107:20
214:21
inside  150:11
instance
52:11  83:3
instances
91:10
instruct
211:22  212:6
instructed
120:2  131:20
212:20
insurance
89:23  116:8
insured  89:22
insurers  72:9
73:15, 18
78:23  103:24
104:14  117:3
intangible
74:24
integrity  186:7
intended
61:19  180:12
201:9  229:17
236:6
intending
14:21  59:9
149:3
interact  99:21
interaction
100:7
interest  64:1,
3  102:24
interested
240:16
internal  92:23
Internet  21:20
interplay
152:22

interplays
159:17
interpreted
42:23
interrupt
115:9
interrupted
205:16
intersect
190:20
intersecting
190:21
intersection
146:17
185:16, 19
188:20
189:16  195:6
intersects
189:8
interstate
75:9  149:18
174:5  175:16
176:2  177:9
178:3  179:6
180:3  181:20
183:1
intrinsic
92:23  95:6
96:16
introduce
148:17  180:2
introduced
7:5  157:2
176:1  182:24
184:11
introducing
175:4, 15
178:2
introduction
148:8, 11
174:4, 5
181:19
inviting  73:15
Invoice  5:16
197:5  199:22
200:8  201:9
204:1, 4
206:19
207:20  208:7
invoices  5:16
196:24  197:8,

17  199:13
201:22
203:15, 20
207:17  209:17
**invoicing**
196:22
197:20  198:3
199:13
200:14  202:3,
7, 16  227:13
**invoke**  176:21
**involved**
27:21  79:20
82:23, 24
102:22
120:15  148:1
212:23  213:13
**involves**  146:1
**involving**  78:6
237:13
**IQVIA**  81:12,
14, 20  82:4,
10, 17  83:1, 4
191:16  192:5,
6

**IRBESARTAN**
1:4  6:10
51:19  89:18
**irrelevant**  29:5
**issue**  14:23
15:13, 16
16:5, 9  17:9
33:8  36:9, 20
37:1, 5, 8, 10,
21  38:1, 9, 13
40:3, 13
55:12  57:8,
10, 11  64:14,
20  65:3, 21
66:17, 18, 21
68:10  69:1
76:20  80:18
86:9  88:10
91:4  92:12,
21  99:24
100:2, 4
106:4, 19
109:3  117:13
118:2  119:2
120:17

127:24
143:16
157:13
160:11, 12, 13,
15  161:11
181:13, 15
185:6, 9
192:8  194:19
200:14
**issued**  10:3
**issues**  13:19,
22  14:15
17:5  46:23
54:12  59:16
60:17, 20, 22
61:4, 10  78:4
104:19
120:15
133:15
156:23
157:15, 16, 22,
23, 24  158:13,
14  207:3
**item**  190:6
**items**  8:3
66:1  234:13
**its**  63:12
101:7  121:20
133:23
**IV**  38:17, 22
39:1, 19  40:5,
6, 11, 15  41:4
**ix**  138:8
140:5  236:17

**< J >**
**JACLYN**  4:19
**January**  10:4
49:17  125:2
201:8  202:12,
13  203:1
210:1
**JBZ@Pietragal
lo.com**  3:21
**Jeff**  6:17
30:7  55:13
56:16  85:18
86:19  137:8,
18  188:9
211:9, 10
218:13

**Jeffrey**  1:14
6:21  240:6, 22
**JERSEY**  1:2
4:18  6:12
**jkavendek@hill
wallack.com**
4:20
**job**  8:9
213:15
**JOHN**  3:20
**JONES**  4:14
**judge**  74:4, 11,
19  124:7, 19
130:5  163:2,
14  219:2
224:18  226:2
**judge's**  52:18
**judgment**  43:4
**jury**  71:17
72:7, 23

**< K >**
**KANNER**  2:8
**KAPKE**  4:10
5:5  228:3, 5
232:21
233:13  234:2,
7, 19  236:14
237:11, 22
**KARA**  4:10
228:5  233:22
**kara.kapke@bt
law.com**  4:11
**KATHLEEN**
4:5
**KAVENDEK**
4:19
**keen**  221:13
**keep**  187:4
227:11, 15
235:14
**kekelly@hinsh
awlaw.com**
4:6
**KELLY**  4:5
**key**  224:3
**kind**  18:13
55:16  77:23
103:5
**KLINGES**
2:17

**KNEPPER**
3:16
**knew**  167:5
178:22
225:16  226:19
**know**  7:13, 24
8:1, 14  20:13
21:10  33:19
60:5  64:5
76:3  83:2, 14
95:23  102:18
103:3  104:13,
14  116:22, 23
117:9  120:5
121:3  123:10
127:3  128:2,
3  130:4, 7
143:15  146:3
151:20  153:6
155:11
156:19  157:3
160:3  163:23
166:12, 15
167:7, 9, 12,
16  168:6
169:13
170:23  171:5,
23  178:17
193:24  199:1,
10  200:24
205:2  206:20,
23  216:8
225:18  226:22
**knowledge**
168:18  171:13
**known**  168:8
172:5  216:4,
7, 9
**KUGLER**  1:6
163:2, 14
**Kugler's**
124:7, 19

**< L >**
**L.L.C**  2:8
**Labs**  4:17
**lack**  68:24
**laid**  69:13
75:1  173:4
**Lambert**  5:15
147:13

182:12, 14
183:12  184:6,
9, 13, 18
185:12  188:15
**language**  14:7
29:8  133:13
153:12
**LaPoint**  5:16
212:23
217:22
218:18, 20
**largely**  8:20
**larger**  45:15,
18
**late**  195:16
**LAUREN**
1:11  2:18
5:2, 10  6:13,
19  9:17
135:3  224:4
239:6, 15
**law**  65:24
76:12  120:3,
20  121:19
141:20, 24
148:15
152:16
158:19  159:1,
6, 20  160:4,
17  161:4, 17
174:12, 14
177:8  178:1
181:19  184:20
**lawful**  151:17
**lawfully**
150:24
178:13
182:24  183:2
**laws**  149:5, 9,
17, 21
**lawyer**  63:23
101:20
157:11
175:11  180:13
**lawyers**  7:9
9:3  156:22
206:9
**layperson**
157:9
**leads**  130:9
**learned**  227:2

**leave** 89:*6*
206:*10*
**led** 226:*15*
**left** 31:*5*
**legal** 6:*3*
13:*21* 31:*20*
32:6, *9, 17, 22*
35:*5, 6* 46:*14*
47:*5* 52:*18*
54:*12* 58:*7*
59:*16* 60:*17,*
*20, 22* 61:4, *9,*
*18* 62:4, *11,*
*14, 17, 22*
63:*17, 22*
73:*8, 11* 84:*8,*
*21* 86:*16*
97:*6* 101:*18*
106:*13*
120:*10, 11*
122:*1* 130:*6*
131:*11, 12, 22*
132:*7, 23*
133:*11, 15*
138:*5* 141:*14,*
*16, 22, 24*
144:*20*
148:*17*
151:*21* 152:*4*
153:*4, 20, 22*
154:2, *4, 14*
155:*20, 24*
156:*3, 4, 17*
157:*1, 2, 6, 11,*
*18, 24* 158:*8,*
*13, 15, 21*
159:*3, 10*
160:*1, 8, 20*
161:*6, 20*
163:*11, 22*
175:*5, 8, 22*
178:*13, 16*
179:*20* 180:*6*
183:*19*
184:*11, 23*
186:*12*
187:*15* 205:*4*
213:*4*
**legally** 120:*4*
175:*4* 184:*11*

**legitimacy**
149:*23*
**legitimate**
149:*10, 15*
176:*4, 9*
177:*7, 14*
178:*4* 179:*1*
182:*7* 183:*4*
184:*9, 19*
191:*20, 24*
**length** 156:*12*
**Leslie** 233:*19*
234:*1*
**leukemia**
170:*6* 171:*22*
**level** 8:*23*
67:*23* 102:*6*
144:*1* 169:*8*
232:*11* 235:*17*
**LIABILITY**
1:*4* 6:*10*
28:*4, 12, 20,*
*24* 29:2, *4, 10,*
*19* 30:*1* 31:*7,*
*12, 17, 21*
32:*1, 3, 14*
33:*3* 83:9, *21*
84:*8* 85:*7*
101:*4, 13, 17*
135:*17*
139:*17*
157:*15, 20*
158:*5, 14*
161:*18*
**lies** 30:*2*
**light** 46:*1, 23*
50:*4, 9, 12*
94:*19*
**likewise**
216:*16*
**limit** 152:*1*
**Limited** 4:*17*
**limits** 211:*1*
**line** 13:*12*
80:*8* 123:*16,*
*18* 125:*23*
184:*7* 189:*2,*
*10*
**lines** 13:*8*
146:*7* 205:*8*

**list** 9:*21* 14:*3*
17:*22* 18:*5,*
*11* 19:*12, 24*
42:*9* 47:*15*
48:*7, 8, 9, 10*
49:*6* 125:*7,*
*10, 14* 230:*19*
**listed** 18:*16,*
*22* 19:*20*
20:*16* 21:*1, 6*
22:*6* 44:*4*
49:*5, 10*
65:*23* 83:*15*
84:*3* 126:*4*
147:*8* 174:*4*
**Listen** 61:*3*
73:*4* 87:*19*
**listening**
98:*24* 196:*18*
**listing** 126:*7*
148:*5*
**lists** 17:*20*
**literally** 146:*9*
**literature**
144:*21*
146:*10* 232:*7*
**LITIGATION**
1:*4* 6:*4, 10*
33:*15* 78:*4*
155:*23*
173:*20* 234:*17*
**little** 11:*6, 17,*
*20, 21* 12:2, *4,*
*9* 77:*23* 83:*8*
85:*13* 140:*13*
195:*15* 204:*4*
220:*6* 223:*8*
236:*10*
**live** 171:*21*
**LLC** 2:*1, 15*
3:*9* 4:*13*
**LLP** 1:*13*
2:*12* 3:*3, 6,*
*14, 17* 4:*3, 6,*
*17*
**located** 170:*5*
**long** 31:*2*
65:*1* 150:*17,*
*21*

**longer** 65:*21*
194:*12*
224:*23* 225:*22*
**look** 32:*11*
46:*21* 78:*17*
79:*18* 93:*22*
96:*4* 101:*3, 4*
109:*24*
112:*11, 15*
113:*1* 114:*24*
115:*17, 21*
125:*23* 145:*2*
170:*14* 180:*8*
201:*8* 204:*5*
219:*13, 14*
232:*17*
**looked** 82:*13*
83:*18* 84:*9*
163:2, *16*
222:*17*
**looking** 12:*15*
24:*20* 100:*18*
108:*3, 11, 13*
110:*5* 181:*4,*
*16* 182:*6*
201:*7* 203:*22*
208:*17*
222:*18* 223:*21*
**looks** 192:*7*
218:*5*
**LOSARTAN**
1:*3* 6:*9* 51:*19*
**loses** 75:*16*
**loss** 23:*1, 18*
25:*22, 23*
36:*15* 43:*1, 4*
46:*7, 17* 51:*5*
52:*16* 53:*13*
54:*2, 4* 56:*1*
58:*12* 65:*24*
66:*11* 67:*21*
70:*19* 71:*9*
84:*10* 88:*22*
89:*2, 3* 90:*10,*
*19* 91:*3, 19,*
*21* 92:*3*
93:*18* 94:*6,*
*10* 95:*2, 6*
96:*4, 10, 13,*
*18, 21* 97:*2,*
*14, 23* 99:*1, 5,*

*7* 102:*10*
107:*9* 108:*3,*
*12* 110:*6, 11,*
*22* 114:*1, 5*
116:*17, 20*
117:*15, 23*
118:*16*
120:*18* 121:*8*
127:*1* 128:*1,*
*17, 22* 131:*2,*
*23* 132:*14, 16*
134:*1* 135:*14*
136:*23* 153:*8*
164:*3, 9*
176:*11*
**losses** 22:*12*
40:*12* 43:*10*
47:*7, 8* 85:*3*
91:*13* 97:*7*
98:*20* 102:*11*
108:*19*
114:*18*
118:*23*
120:*24*
126:*17* 134:*9,*
*12* 162:*1*
**lost** 11:*6*
155:*15*
**lot** 186:*8*
**lots** 160:*11*
**Louis** 3:*15*
**Louisiana** 2:*9*
**lower** 91:*12*
169:*6*
**lowering**
127:*14*
**lpugh@duane**
**morris.com**
2:*20*
**lunch** 123:*13*
133:*21*
135:*12* 163:*1*
**Luncheon**
134:*17*

**< M >**
**ma'am** 88:*1*
107:*23* 173:*14*
**mail** 69:*8*
**maintain**

Confidential Information - Subject to Protective Order

228:*16*
**majority** 42:*1*
**making** 26:*15*
69:*18* 158:*18*
206:*6*
**manage** 42:*2*
93:*3* 113:*8*
143:*21*
164:*18* 194:*22*
**managed**
165:*5*
**management**
144:*2* 164:*21*
**managing**
145:*4* 204:*16*
**manner**
128:*21* 237:*7*
**manufacturer**
82:*9, 19*
148:*16*
149:*17*
151:*18*
179:*17* 183:*1*
191:*14*
**manufacturers**
40:*23* 80:*15*
82:*3* 83:*5, 22*
158:*17*
159:*21* 167:*6,*
*13, 14, 23*
168:*6* 187:*5*
**manufacturing**
36:*19* 186:*5*
187:*8* 193:*4*
**MARCH** 1:*8*
6:*5* 239:*8*
**mark** 9:*15*
10:*2* 155:*13*
196:*23*
217:*24* 218:*14*
**marked** 9:*18*
59:*13* 124:*13*
172:*24* 173:*3*
188:*15, 17*
197:*6, 8*
201:*5, 6*
205:*6, 7*
218:*21*
**Market** 2:*4*
36:*24* 37:*24*
75:*8* 97:*11*

103:*17, 23*
104:*6* 111:*20*
166:*5* 169:*23*
176:*4* 178:*9*
194:*11*
213:*21*
214:*22* 215:*1*
224:*7*
**marketing**
126:*3*
**marketplace**
39:*15* 165:*7*
189:*3*
**markets** 35:*1*
82:*24*
**market-wide**
70:*22*
**marking** 9:*8*
17:*19* 188:*12*
**marriage**
240:*16*
**Massachusetts**
4:*4*
**master** 36:*2*
**matched** 200:*5*
**material**
16:*24* 18:*5,*
*17* 19:*13, 21*
20:*17* 22:*8*
44:*5* 45:*14*
223:*10*
**materials**
9:*21* 16:*5*
17:*6, 8, 10*
18:*8, 12* 20:*3,*
*4* 42:*11*
47:*16* 48:*8*
49:*6, 10*
50:*13* 52:*20*
83:*15* 125:*8,*
*11* 144:*6*
147:*3* 148:*3,*
*6* 174:*15*
180:*20, 22*
182:*16, 19*
216:*12, 14*
**matt.knepper@**
**huschblackwell**
**.com** 3:*17*
**matter** 6:*9*
23:*4* 24:*2*

26:*1* 27:*21*
31:*16* 35:*16*
43:*9, 17*
51:*14, 17*
53:*15* 54:*17*
64:*7* 70:*20,*
*23* 75:*23*
76:*10* 79:*18*
101:*18* 120:*3,*
*20* 121:*18*
122:*18*
130:*19*
132:*10*
144:*12, 18*
145:*24*
162:*23*
163:*18*
168:*15*
177:*12*
194:*10* 198:*9,*
*16* 203:*14*
231:*10* 240:*17*
**matters** 31:*21*
33:*15* 57:*15*
63:*24* 76:*15*
81:*4, 14, 18,*
*21, 24* 82:*5,*
*23* 97:*8, 14*
99:*23* 100:*4*
102:*22*
104:*19*
158:*11* 237:*13*
**MATTHEW**
3:*16*
**MDL** 1:*4*
44:*10* 51:*18*
131:*21*
210:*19* 211:*12*
**mean** 13:*15*
15:*7* 17:*9*
19:*16, 17*
31:*23* 37:*15*
43:*19* 44:*1*
47:*21, 22*
52:*24* 59:*7*
66:*7, 8* 67:*2*
69:*14* 76:*17*
80:*4* 85:*14,*
*21* 88:*17*
95:*3* 98:*16*
104:*11* 110:*3*

113:*3* 116:*1*
121:*4* 128:*24*
129:*2* 154:*10,*
*15* 177:*14*
180:*9* 184:*8*
190:*5* 199:*4*
205:*3* 216:*8*
220:*17*
**meaning** 56:*4*
120:*11*
154:*12* 160:*5*
175:*13, 19, 21*
**meaningful**
22:*16, 24*
169:*10* 194:*14*
**meaningless**
195:*17* 196:*14*
**means** 14:*19*
25:*1* 70:*16*
117:*8* 118:*11*
120:*5* 154:*16*
157:*4, 10*
160:*14* 176:*2*
179:*22, 23*
180:*1* 182:*7*
183:*3* 191:*6*
195:*8*
**meant** 39:*9*
101:*21*
189:*18* 224:*4*
**measure** 46:*3*
53:*17* 54:*13,*
*19, 23* 55:*6, 7,*
*21* 58:*3, 9, 15,*
*16, 22, 24*
59:*2, 5, 8, 16,*
*17, 21* 60:*8,*
*10, 12, 18, 21,*
*23* 61:*6, 10,*
*13, 17* 62:*6*
71:*17* 72:*17*
84:*18, 24*
87:*1, 7, 14*
88:*17* 89:*14*
97:*4, 8*
102:*15, 21*
106:*20* 108:*1*
110:*18*
113:*15*
114:*18*
122:*12* 123:*1*

132:*24*
133:*16, 22*
136:*1, 8, 16,*
*20* 138:*2, 7,*
*10* 139:*3, 11*
140:*17*
141:*11, 19*
144:*14* 163:*7*
164:*2, 8* 170:*7*
**measured**
69:*23* 97:*13,*
*22* 98:*4*
136:*24*
143:*20* 170:*4,*
*13, 18*
**measures**
32:*13* 54:*13*
59:*22* 86:*14*
89:*7* 95:*5*
136:*11* 137:*3*
140:*21* 232:*8*
**measuring**
32:*16* 142:*6*
176:*15*
**mechanical**
229:*14*
**medical** 14:*20*
127:*13*
142:*23*
143:*23* 144:*4,*
*8, 22* 145:*12,*
*14*
**medically**
129:*6*
**medication**
41:*17, 18*
42:*2* 90:*6*
91:*16* 113:*7,*
*10, 11, 18, 20*
165:*1*
**medications**
69:*4*
**medicine**
113:*13*
**meet** 146:*24*
186:*9* 195:*8*
219:*4*
**meets** 177:*15*
**member** 66:*9*
104:*21*
105:*15, 17*

Confidential Information - Subject to Protective Order

108:*20*
111:*18*, *24*
113:*21* 114:*5*
132:*18* 154:*21*
**members** 46:*8*
65:*3*, *20*
91:*10* 104:*24*
106:*17*
109:*18*
110:*13*
112:*18*
130:*11* 153:*8*
162:*7* 164:*11*
**memorandum**
65:*24*
**memories**
214:*3*
**memory**
18:*15* 20:*15*
23:*12* 24:*20*
202:*20* 214:*1*
217:*9* 223:*17*
**mention** 225:*3*
**mentioned**
53:*9* 145:*10*
218:*16*
**mentioning**
8:*4* 17:*13*
**mentions**
225:*6*
**mere** 126:*2*
**merely** 42:*17*
187:*6* 191:*2*
**merged** 213:*8*
**merger** 213:*5*,
*14*, *18* 224:*6*
**Meridian** 4:*9*
**Merit** 1:*15*
240:*7*
**message** 21:*19*
**met** 177:*18*
**method** 73:*19*
215:*8* 226:*7*,
*11*, *14*
**methodologies**
215:*1*, *5*
**methodology**
70:*10* 71:*5*
74:*22* 226:*18*
230:*6*

**methods**
46:*10* 52:*23*
70:*15* 128:*18*
138:*19* 139:*9*
153:*11*, *19*
**middle** 76:*6*
**mind** 11:*7*
36:*12* 56:*17*
69:*11* 85:*24*
95:*23* 102:*18*
103:*15*, *22*
104:*3* 105:*19*
154:*19*
**minds** 102:*13*,
*19* 103:*7*
**minimum**
117:*9* 236:*2*
**minus** 92:*6*
140:*14* 232:*12*
**minute** 60:*4*
76:*1*, *2*
125:*21*
137:*13* 181:*5*
**minutes**
186:*24*
187:*23*
227:*20* 233:*6*
**misbranded**
15:*3*, *9*, *13*
24:*24* 26:*8*
43:*15* 57:*9*,
*12*, *17* 76:*13*
160:*18* 161:*3*
174:*8* 175:*6*
179:*8* 182:*23*
**misbranding**
15:*20* 57:*15*
**Mischaracteriz**
**e** 122:*24*
131:*5*
**Mischaracteriz**
**es** 39:*18*
52:*14* 95:*22*
102:*5* 107:*15*
108:*7*, *18*
111:*12*
112:*14* 125:*4*
128:*12* 133:*3*
136:*6* 162:*15*
163:*10*

215:*18*
216:*18* 217:*6*
**misleading**
211:*24* 212:*11*
**misread** 25:*18*
**missed** 55:*10*
147:*4* 148:*6*
**missing**
164:*19* 236:*23*
**Missouri** 3:*15*
**misspoke**
90:*16*, *17*
194:*7*
**misstates**
234:*20*
**model** 27:*8*
34:*11* 80:*19*
87:*1*, *14*, *24*
88:*5* 91:*20*,
*22* 92:*5*
93:*13*, *23*
99:*1* 102:*14*
107:*8*, *9*, *16*
108:*12* 110:*6*,
*19*, *22* 117:*6*,
*15*, *23* 118:*4*,
*7* 119:*7*, *18*,
*22* 131:*2*
193:*15*, *19*, *22*
194:*17*, *21*
234:*9*, *14*
235:*6*, *19*
**modeling**
34:*20*
**models** 34:*14*,
*17* 53:*11*
86:*13* 107:*19*
115:*14* 121:*8*
122:*14*
135:*13*
237:*16*, *18*
**moment** 7:*14*,
*15* 217:*2*
**money** 72:*8*
73:*23* 96:*14*
151:*19*
169:*11* 183:*2*
**monies** 67:*24*
**month** 202:*2*
231:*12*

**monthly**
201:*21*, *24*
**months** 80:*20*,
*24*
**month's** 92:*1*,
*2* 201:*23*
**MORING** 3:*3*
**morning** 7:*2*,
*4* 10:*18*
164:*10*
**Morris** 1:*13*
2:*12* 7:*22*
**mortality**
145:*10*
**motion** 46:*8*
124:*7*, *19*
224:*19*
**motions** 49:*23*
50:*3* 52:*2*, *9*
**move** 26:*16*
212:*19*
**moved** 80:*24*
**movement**
189:*2*, *9*
**moving** 32:*24*
93:*13*
**MTD** 5:*10*
124:*12*
**multiple** 98:*1*,
*6* 112:*10*, *15*
114:*23* 162:*8*
207:*5*
**mutagenic**
16:*15*
**Mylan** 3:*19*

**< N >**
**N.W** 2:*21*
4:*13*
**Najafi** 17:*1*,
*13* 18:*14*
**Najafi's** 18:*4*
**name** 6:*2* 7:*6*
176:*22* 192:*4*
204:*15* 208:*4*
211:*15* 217:*22*
**named** 45:*3*
**names** 49:*20*
**name's** 228:*4*
**narrow** 221:*21*

**Nathan** 208:*4*,
*12*
**nature** 211:*14*
**NDEA** 15:*2*, *8*,
*12* 16:*12*, *15*,
*18*, *21* 36:*18*
159:*8*, *14*
185:*6*
**NDMA** 15:*2*,
*8*, *12* 16:*11*,
*14*, *17*, *20*
36:*18* 159:*7*,
*13* 181:*14*
185:*6*
**near** 9:*10*
**nearly** 221:*5*
**necessary**
42:*3* 54:*7*
98:*6*, *7*, *14*
179:*2*
**need** 33:*15*
42:*1* 55:*9*
62:*8* 70:*24*
78:*18* 104:*22*,
*23* 105:*16*
106:*23* 107:*1*
109:*20*
120:*19*, *22*
135:*21*
142:*12* 143:*7*
144:*1*, *16*, *17*
162:*6*, *17*, *21*
170:*23*
194:*15*, *21*
196:*5* 201:*13*
204:*3* 220:*14*
222:*24* 223:*4*
233:*4* 237:*1*,
*4*, *8*
**needed** 71:*13*
98:*2*
**needs** 8:*20*
9:*4* 41:*23*
106:*9* 117:*24*
118:*7*, *21*
120:*12* 121:*4*,
*5* 140:*17*
157:*14* 227:*14*
**negligence**
32:*4*

Confidential Information - Subject to Protective Order

neither 52:*10*
116:*19* 119:*18*
**NERA** 5:*16*
197:5 200:*14*
201:*18*
202:*18* 203:*1*
**NERA's**
203:*13*
**net** 118:*12*
**never** 117:7
125:*1* 129:9
131:*16*
132:*11* 151:2
195:8 227:*12*
**NEW** 1:2, *13*,
*16* 2:9 4:*18*
6:*8*, *12*, *22*
7:*17*, 22 8:*24*
95:7 148:*21*
239:*3*, *4*
240:*3*, *4*, 8
**nitrosamine**
159:*23*
**nitrosamines**
158:*24*
166:*23*
167:*17* 168:7
172:*11*
**noncompliance**
26:22 27:*4*, *15*
**nonexistent**
196:*15*
**Notary** 1:*15*
6:*21* 135:5
239:*21* 240:7
**note** 45:*24*
48:4 71:*13*
129:*3* 148:7
163:*21*
225:*10*, *13*
**noted** 6:*15*
9:4 238:*4*
**notes** 225:*11*,
*14*
**Nothing's**
205:7
**notwithstandin**
**g** 151:*6*
**November**
203:*24* 204:*13*

**Number** 5:*9*
7:*8* 39:*8*
71:*20* 72:*15*,
*19* 98:*14*
119:5 121:22
123:*20*
147:*19*
179:*23*
202:*17* 204:*1*
207:*21*
**numbers**
134:*6*, *11*
215:*10* 217:*14*
**Numeral**
38:*17*
**numerous**
153:*15*
**NW** 3:*4*

**< O >**
**oath** 7:*14*
108:*11* 117:2
166:*20* 169:*1*
183:*13*
184:*21*
212:*13* 217:2
239:*8*
**Object** 58:*6*
161:5 167:*8*
205:*20*
234:*19*
236:*14* 237:*11*
**objected** 192:*4*
**objection** 9:*4*
12:*24* 22:*4*,
*20* 23:*10*
27:*1* 29:*12*
31:*13* 32:*5*,
*19* 34:*10*, *21*
39:*17* 43:7
47:2 48:*4*, *5*
50:7 52:*13*
53:*19* 57:2
61:*1*, 7 63:*19*
64:9 65:*12*
66:*14* 69:*19*
72:*20* 79:*5*
81:*16* 82:*21*
84:*20* 86:*15*
94:*3* 95:*21*
97:5 99:*10*

101:*10* 102:*4*,
*16* 104:*18*
106:*12*
107:*11*, *14*
108:*6*, *17*
109:*11*
111:*11*
112:*13* 114:*4*
115:*3*, *23*
119:5 121:2,
*24* 122:23
125:*3* 126:22
128:*11* 129:*3*
130:2 131:*4*
132:*1* 133:2
134:*3* 136:5
138:*4* 139:*12*
141:*13*, *21*
142:7 143:5
144:*11*
149:*12* 150:2,
7 152:5
153:*16*
155:*19*
156:*14*, *16*
157:5, *17*
158:7, *20*
159:2, *9*, *24*
160:7, *19*
161:*19*
162:*14* 163:*9*,
*21* 167:*10*, *20*
168:*10*
171:*15* 175:7,
*20* 176:5
177:*10*
178:*15*
179:*19* 180:5,
*16* 181:*23*
183:5, *7*, *14*
184:22
186:*11*
187:*14*
190:*15* 191:*8*,
*22* 193:*6*
195:*11* 203:*8*,
*10* 205:*3*
210:*20*
215:*17*
216:*17* 217:5

**objections**
119:*4*
**observe**
169:22, *23*, *24*
170:7 189:*15*
**observed**
192:*13*
**observing** 7:*9*
**obtain** 70:*18*
151:*10*
**obtained** 77:5
**obtaining**
17:*24* 69:7
**obviously**
219:22
**occasion** 35:*3*
219:*4*
**occasions** 35:*9*
**occur** 101:*6*
**occurred** 55:*4*
64:*8* 66:*6*
78:*11* 80:2
169:*14*
**occurring** 66:*8*
**occurs** 101:*8*
147:*21*, 22
**October**
198:*3* 199:22
208:*15*, 22, 23
**odds** 128:*24*
129:2
**offer** 14:*21*
15:*1*, *19* 18:2
21:*14* 27:*3*, 5
72:*18* 128:*16*
131:*10*
132:22 133:*9*
136:*15*, *19*
137:*21* 138:*1*
141:*15*, *18*, *23*
161:*21*
**offered** 17:*3*
22:*1* 50:*18*
131:*17* 236:*12*
**offering** 13:*4*
15:*10* 16:7
17:*10* 21:*4*
58:*8*, *9* 84:22
134:*10*
148:*13* 167:*1*

187:*18*
**offhand** 17:*12*
**offices** 1:*12*
7:22
**offset** 117:*21*
**Oh** 161:*1*
234:*3*
**Okay** 7:*21*
12:*11* 14:*9*
19:*16* 21:*19*
29:*21* 30:*10*
31:*2* 44:*4*
50:2 52:7
59:*4*, *10*
69:*24* 76:5, *8*
85:*17* 86:22
87:*16* 89:*6*
103:*20*
124:*17*, 22
137:*23*
168:*13* 169:*1*
172:22
186:22
190:*24* 191:*9*
197:*15*
201:*11*
208:*14* 218:7,
*12* 220:*16*
225:*9*, *21*
234:*4*
**once** 7:2
198:*12*
**ones** 44:*13*
48:*18* 63:*10*
69:*11* 98:*21*
158:*1* 196:*10*
**one's** 92:*8*
**open** 227:*11*,
*15*
**operating**
231:5
**opine** 13:*21*
54:*12* 59:*15*
132:*12*
133:*15* 136:7
**opined** 35:*19*
49:*16* 235:*1*
**opines** 24:*23*
**opining** 23:5
25:*16* 59:*1*
60:*13*, *19*, *20*

61:22 84:22
121:4 133:10
**Opinion** 5:10,
16 13:4 15:1,
8, 19, 22
16:11, 14, 17,
20 18:2
23:14, 19
47:18, 23
48:12 50:1,
16, 17, 18
51:2 52:18
54:8, 18, 22
55:24 58:8
61:2, 23
62:13, 19
70:7 72:24
76:16 84:21,
23 85:9
86:16 97:6
105:13 106:8,
11, 13 119:13
120:7, 10, 14
121:10 122:1
123:1 124:8,
12, 20 126:1
128:5, 16, 22
129:19 130:6,
9 131:17, 18
132:16
134:10
136:15, 19
138:1, 5
141:11, 14, 15,
18, 22, 23
142:2, 23, 24
150:22 151:1,
9, 12, 13, 21
152:7 155:20
156:18 157:6,
18 158:8, 21,
22, 23 159:3,
4, 5, 10, 11
160:1, 2, 8, 9,
15, 20, 22
161:6, 12, 20
162:4 163:11,
22 175:8, 10,
23 178:16
179:20, 21
180:6 184:23,

24 185:7
186:12, 18
187:15
216:11
218:12, 20
219:17
221:20, 23
227:4 229:22
230:10 235:3
236:12
**opinions**
10:19 14:21
15:11, 15, 18
16:1 17:10
19:4 21:4, 14
22:2, 11 23:7,
17 24:15
26:9, 14 27:3,
5 33:4 39:22
42:15 44:22
46:1, 22 47:6,
7, 14, 17, 24
48:2, 6, 9, 11,
20 49:1, 3, 7,
9, 11, 12, 20
50:16 51:4, 9,
21 52:1, 6, 8,
15 53:7
54:10 55:1, 8
56:1, 6 58:10
62:10, 11, 14,
20 63:16
70:5 75:13
76:11, 15, 19
77:1 120:13
121:6 122:16
123:2 126:12,
16, 20, 24
127:18, 20, 21,
23 129:16
132:23 133:8
136:22 137:2
138:24 139:2,
7 140:4
148:12 149:3,
6 151:21
153:7 156:24
157:1 159:16
160:14
161:21, 22
175:1 177:2

180:19, 22, 23
186:20
187:18
207:10
209:11, 12
210:23 219:1
228:7, 8
229:1, 4, 7
**opportunity**
8:14 9:15
10:12
**opposing**
45:10 122:11
**Orange** 126:5,
7
**ORDER** 1:10
28:13 29:10
33:3, 16
34:14, 15
69:8 106:10
110:10
144:23
170:22
171:10, 20, 23
218:15
**organic**
169:17, 24
**Orleans** 2:9
**ORTEGA**
4:23 6:2
**OSTFELD**
3:11
**ostfeldg@gtlaw
.com** 3:12
**outcome**
64:16 87:8,
14, 18 88:18
89:11, 14
107:9 224:16,
17 240:17
**outcomes**
77:9 80:1
86:7 87:24
88:6 89:19
90:14 102:12
137:1 144:16
145:4 146:2
159:18 162:2
165:2 169:10,
20 193:23

**outlay** 88:8
90:8, 10, 12,
22 91:12, 14,
15
**outlays** 90:3,
4 91:5
114:16 165:3
**outlined** 89:8
164:4
**outside** 74:1
122:3 131:6,
12 132:4
150:10 192:2
**overall** 112:24
**overarching**
236:21
**Overbroad**
23:11 57:3
69:20
**overlapped**
145:8
**oversimplify**
188:23
**Oxford** 3:19

**< P >**
**p.m** 77:16, 20
134:16 135:9
188:4, 8
227:22 228:2
233:8, 12
238:3, 4
**Page** 5:3, 9,
23 13:6
14:11 18:9
38:24 39:9,
20 125:17, 22,
24 127:2, 4
138:9 140:5
181:10 184:6
198:5 204:2,
7, 8, 10
207:23 208:6,
10, 11, 20, 24
219:7, 13, 14
220:1 222:6,
14 223:3
**paged** 146:13
**pages** 207:22
220:18

**paid** 43:11
68:8, 9 71:18
72:9 73:14,
15 86:2, 8
87:21 88:13,
23 89:4
93:15, 23
94:15, 17
96:20 99:13,
15, 16 100:3,
20 102:1
103:24 104:9,
14, 22 105:4,
10, 12, 17
106:23, 24
107:19
108:15 109:2,
4, 7, 9 110:24
111:10
113:17, 19
114:6, 14, 18
117:2 132:17
133:23
143:18
179:17 180:3
231:11
**pandemic** 8:2
**Panigraby**
18:23 19:3
**Panigraby's**
20:14
**paper** 9:9
184:2
**papers** 145:2
146:9
**paragraph**
10:22 11:10
12:16, 19
13:1, 7 14:12
17:14 20:7,
24 38:18
39:6, 9 59:13
60:16 61:20
127:5 133:18
139:24 147:8
181:11, 12
220:7 222:9
223:24 225:5,
6

Confidential Information - Subject to Protective Order

**paragraphs** 140:*3* 181:*17* 222:*17*
**pardon** 12:*20*
**parent** 67:*16*
**part** 20:*2* 22:*10* 23:*21* 28:*11* 30:*8* 40:*4* 41:*1, 18* 44:*5* 46:*16* 129:*13* 136:*17* 137:*9* 140:*17* 154:*1* 173:*8* 178:*8* 186:*13* 193:*24* 202:*4* 221:*20* 229:*24* 231:*18* 232:*14* 235:*23* 236:*22*
**participated** 122:*7*
**particular** 19:*11* 31:*17* 33:*20* 45:*8* 69:*6* 82:*19* 93:*15* 112:*19* 149:*11* 173:*6* 174:*23* 190:*4* 213:*21*
**particularly** 62:*17* 214:*22*
**parties** 45:*23* 55:*23* 240:*15*
**parts** 39:*24*
**party** 45:*10*
**pass** 10:*8*
**patience** 31:*1*
**patient** 37:*5* 68:*12, 16, 19, 23*
**patients** 14:*23* 37:*9, 11* 40:*1* 41:*8, 15, 21* 58:*13* 64:*16* 65:*18* 119:*23* 164:*24* 194:*21* 230:*2*
**pattern** 80:*21*

**patterns** 171:*7*
**pause** 9:*2*
**pay** 78:*23* 89:*20* 92:*1* 114:*17* 116:*9, 10, 12* 179:*9, 15* 196:*8* 231:*22*
**payers** 76:*14*
**payments** 39:*2* 235:*21*
**payor** 153:*9*
**pays** 88:*19* 94:*14*
**PC** 4:*11*
**Penalties** 173:*16*
**Pennsylvania** 2:*5, 16* 3:*4, 20*
**penultimate** 59:*14*
**people** 200:*18*
**perfect** 217:*10*
**perform** 134:*5* 138:*15*
**performed** 70:*8* 98:*15*
**period** 15:*4* 65:*16* 66:*7* 78:*10* 79:*21, 22* 81:*1* 104:*1* 141:*3* 167:*18* 172:*9, 10* 199:*14* 201:*10* 202:*1*
**periods** 65:*21*
**permissible** 76:*12* 206:*16*
**permitted** 121:*13*
**person** 19:*14* 64:*21* 67:*18* 94:*13* 118:*16* 137:*6* 169:*2* 208:*20*
**perspective** 153:*24* 158:*1, 10* 229:*14* 232:*9*

**pertain** 24:*18* 135:*16* 209:*10* 212:*3*
**pertaining** 210:*23*
**pertains** 148:*8, 11*
**pervasive** 23:*21*
**pesticides** 169:*18, 19* 170:*1*
**Ph.D** 1:*12* 5:*2, 10* 6:*19* 9:*18* 135:*3* 147:*14* 175:*12* 239:*6, 15*
**Pharma** 3:*9*
**Pharmaceutical** 2:*14, 15* 3:*8* 81:*21* 82:*19, 24* 126:*4* 140:*20* 142:*3* 147:*15* 148:*22, 23, 24* 182:*4* 232:*4*
**Pharmaceuticals** 3:*8, 19* 4:*3* 148:*21*
**pharmacies** 228:*8, 24* 229:*8, 13, 16* 230:*7*
**Pharmacy** 4:*8* 139:*15* 147:*19* 231:*10*
**phase** 155:*23*
**Philadelphia** 2:*5, 16* 7:*16*
**phrase** 50:*23* 60:*7* 62:*23* 95:*3* 149:*15* 153:*20, 21, 22* 154:*4, 5* 182:*1*
**phrases** 58:*15*
**physically** 19:*16*
**pick** 31:*4* 44:*11* 169:*2*

**piece** 173:*20* 232:*7*
**pieces** 23:*15* 94:*9*
**PIETRAGALLO** 3:*17*
**pile** 123:*6* 196:*20* 207:*17* 217:*21*
**pills** 168:*7* 186:*10*
**Pittsburgh** 3:*20*
**place** 50:*21* 52:*11* 53:*3* 70:*11* 100:*22* 101:*1* 103:*21* 110:*23* 115:*19* 153:*4* 171:*12* 181:*7*
**placed** 75:*7, 9* 76:*23*
**places** 38:*15, 21* 39:*11, 21* 46:*12*
**plain** 175:*13, 21* 180:*7*
**plaintiff** 36:*11* 106:*1* 138:*13* 213:*4, 6* 228:*14, 18* 234:*10*
**Plaintiffs** 2:*4, 8* 7:*7, 9* 8:*8* 22:*8* 36:*14* 39:*1* 45:*3* 50:*20* 65:*23* 66:*5* 83:*17* 105:*24* 224:*20, 23* 225:*22* 228:*20* 235:*11* 236:*1*
**plaintiff's** 139:*16* 224:*1*
**plan** 89:*23* 116:*8*
**Plaza** 3:*15*
**please** 85:*19* 98:*17* 123:*20* 127:*2* 195:*21*

197:*4, 14* 211:*10* 219:*7*
**plot** 189:*22, 24* 191:*3*
**pocket** 94:*11* 96:*5, 14, 19* 97:*3* 99:*7* 108:*13* 110:*23*
**point** 17:*24* 21:*22* 29:*8* 64:*7* 80:*1* 101:*19, 23* 102:*1* 103:*4* 108:*16* 127:*10* 132:*8* 150:*12* 176:*20* 189:*8* 190:*4, 7, 22* 198:*9* 207:*7* 209:*20* 212:*15, 18* 217:*16* 232:*15* 234:*16*
**point-of-care** 213:*7, 12*
**points** 80:*5* 112:*23* 119:*12* 185:*3* 189:*12, 14* 192:*23*
**pool** 45:*15, 18*
**portion** 138:*12* 228:*14, 17* 235:*13, 23*
**posed** 201:*17*
**posing** 115:*16*
**positing** 133:*20*
**position** 88:*9* 164:*11*
**positions** 164:*12*
**possibility** 16:*2* 26:*7* 33:*6* 37:*7, 9* 159:*12*
**possible** 80:*19* 94:*23* 189:*24*

Confidential Information - Subject to Protective Order

potential 40:9
75:21 144:14
159:22
potentially
64:15 65:20
78:13 157:23
209:22
practices
186:5 187:8
precisely
101:12
predicated
32:4
predominance
156:23 157:3
prejudgment
64:1
premise
163:24
213:22 236:21
preparation
49:4 51:7, 10,
23 203:5
prepare 10:15
19:12 55:1
199:6
prepared
147:13 197:1
202:11
prepares
19:15, 16
preparing
210:13, 15
prescription
93:16 104:12
126:2 144:10,
24 148:18
149:11, 24
150:9, 19
151:11
presence 15:2,
11 68:24
92:17 165:24
166:1 167:16
170:16, 17, 21,
22 172:10
PRESENT
4:22 15:23
159:1 203:2
211:20

presented
122:15
presents
158:19
pressure
41:16 42:2
69:4 90:6
92:9 93:4
113:8 127:14
143:22 144:2
164:18, 21
165:1, 4, 17
194:22
previously
135:4
price 43:11
68:8 78:15
79:10 86:2
88:23 89:4,
20 91:1 92:6,
7, 15 94:13,
15, 17 100:19
101:8 102:1
103:11, 15
105:16
106:23, 24
108:15 109:7
111:10
113:17, 18, 24
115:20
116:11, 13
118:9, 10
132:17
133:23
143:18
146:15
170:22 171:6,
12, 17 172:3
185:3, 15, 19
189:9, 12, 14
190:8, 11, 22
192:23 194:8,
10 195:5, 10
196:11, 12, 14,
15
priced 169:5
170:13
prices 80:22
81:8 82:2
86:8 87:21
88:13 89:21

97:11 98:5, 9
99:13, 14, 15
100:3 103:16
105:10, 12
108:4 109:9
110:24 117:2
169:23 170:4,
8 171:2, 3
196:7
pricing 79:15
80:11, 21
81:11, 13
82:8, 9, 17, 18
103:8 110:7
188:20
190:14 191:2
primary 230:4
principal 8:7
119:3
principle
131:22 177:6
principles
62:4 116:21
122:9 152:2
156:10
183:18, 19
Prinston 2:14
prior 49:1, 4,
8, 16 81:9
96:11 149:1
159:23 193:3
198:11
probable
158:24
Probably
135:20 153:14
problem 8:13
221:17
Procedure
152:9
proceed 77:21
proceeding
73:8
proceedings
132:7
process 36:19
202:8, 11
226:23, 24
227:1, 3, 5
produced
123:24

158:17
206:19 235:6
producing
149:23
product 16:8
43:13, 20, 22
57:16, 21
66:21 68:12
69:1 74:13
75:16 77:6
79:10 82:20
87:22 88:10,
14 91:6, 24
92:3, 23 93:2,
7, 21 94:14,
16, 20, 22, 24
95:8, 15
96:16 109:3,
5 116:6, 7, 10,
12 117:19
141:4, 12, 17
142:3, 11
146:20, 22, 23
150:13
151:14, 23
164:17 166:2
169:12
170:17 174:7
175:6 176:13
177:8, 14, 15
179:7 187:11
189:1 190:6,
11 194:11, 16
196:16 213:6,
7, 13, 19
231:3, 4, 11
232:5, 19
PRODUCTS
1:4 6:10
14:22 15:12,
16 16:3, 4, 9
33:7 37:21
38:1, 12 57:7,
11 64:20
65:3, 21
66:17, 18
68:10 70:3
76:23 77:4,
10 80:18
86:8, 10 88:9
89:21 90:1

93:5 97:11
98:2, 14
100:3, 5
106:4 109:9
119:15, 20, 21
127:24
143:16, 17
148:22, 24
159:13
167:17
169:17, 18
171:7 176:17,
18 177:20
178:12 185:2,
3, 11 186:1
191:15, 18
192:8 193:10,
21 194:23
proffered
179:15 209:19
profile 16:10
43:20, 23
57:22 64:15,
19 92:19
144:13 171:19
profit 231:24
profits 98:12
140:8, 13, 16
230:6, 16, 20
231:17 232:2,
4, 9, 12 234:8
235:8, 20, 23
profoundly
177:4
prohibit
175:11
Prohibited
5:13 172:23
173:15, 20, 21,
23 174:3, 19
177:8 179:5,
10 180:8, 10
181:1
prohibiting
181:19
prohibition
178:2 179:16
prohibits
175:4, 10, 15
project 198:5
203:23

207:*19*, *23*
208:*10*, *11*
209:*17*

**pronouncement**
125:*15*
**proof** 163:*8*,
*19* 164:*7*
**proper** 53:*16*
54:*12*, *18*, *23*
55:6 58:*3*, *9*,
*15*, *21* 59:*16*,
*21* 60:*8*, *9*, *12*,
*18*, *23* 61:*5*,
*13* 71:*17*
84:*17* 132:*24*
133:*16*, *22*
136:*1* 141:*11*,
*19*, *24* 179:*9*
211:*6*, *8*
**properly**
25:*24* 58:*10*,
*24* 60:*7*
61:*14*, *24*
162:*22*
**propose** 34:*17*
**proposed**
153:*11*, *19*
172:*9*

**PROTECTIVE**
1:*10*
**provide** 71:*5*
74:*22* 205:*21*
213:*16* 218:*6*
220:*14* 224:*5*
234:*18*
**provided**
45:*13* 68:*16*,
*19* 105:*24*
107:*4* 207:*9*
234:*15*
**providing**
210:*22* 212:*4*
**provocative**
78:*19*
**Public** 1:*16*
6:*22* 135:*5*
200:*22*
239:*21* 240:*8*
**PUGH** 2:*18*

**pull** 172:*16*
188:*10*
196:*20*
200:*24* 217:*20*
**pulled** 215:*15*
216:*16* 217:*2*
221:*18*
**punch** 80:*8*
**purchase** 67:*6*,
*22* 105:*7*
194:*15*, *16*
196:*6*
**purchased**
65:*9* 67:*15*
86:*11* 90:*4*
118:*24* 185:*11*
**purchases**
96:*17* 178:*20*
**purchasing**
88:*9* 91:*24*
94:*23*
**purely** 152:*1*
**purity** 186:*7*
**purported**
45:*2* 66:*11*
105:*12*
112:*18*
130:*11* 162:*7*
**purportedly**
52:*17*
**purports**
138:*24* 235:*20*
**purpose**
109:*13*, *14*, *17*
127:*13* 129:*7*
**purposes** 45:*7*
47:*6* 52:*15*
53:*6* 121:*17*
129:*16* 142:*8*
148:*12* 168:*1*
210:*4*, *10*
231:*9* 235:*10*
**put** 27:*8*
33:*12* 36:*12*
37:*19* 38:*11*
45:*20*, *21*
100:*18*
101:*13* 103:*9*
108:*14*
119:*17*
123:*23* 129:*5*

149:*3* 153:*6*
184:*1* 188:*24*
199:*17*, *20*
200:*17* 216:*1*
235:*20* 236:*4*
**puts** 128:*8*
140:*11* 236:*22*
**putting** 71:*9*
145:*9* 231:*19*

< Q >
**quantification**
236:*19*
**quantified**
71:*6*
**quantities**
66:*22* 159:*14*
**quantity**
190:*8*, *23*
**quantum**
139:*8*
**question** 8:*11*,
*12*, *24* 11:*7*
12:*13* 18:*18*
21:*23* 29:*6*
30:*11* 33:*23*,
*24* 35:*13*, *18*,
*19* 44:*19*
46:*20* 48:*5*
51:*21* 55:*11*,
*14* 56:*12*, *15*,
*22* 59:*20*
61:*3*, *16* 62:*8*
63:*12* 65:*14*
72:*1* 79:*16*
86:*18* 93:*17*
94:*5* 96:*9*
97:*18* 98:*18*
100:*20*
105:*22* 109:*6*,
*9* 115:*13*, *16*
119:*11*
131:*20*
137:*23*
151:*16* 152:*4*
154:*13* 155:*1*
158:*19* 159:*1*,
*6*, *20* 160:*4*,
*17*, *18* 161:*3*,
*4*, *8*, *14*, *16*
163:*13*

168:*14*
171:*10*
176:*22* 177:*5*,
*19* 184:*7*, *17*
186:*16* 189:*5*,
*6* 192:*14*
193:*18* 195:*1*,
*16* 201:*16*
205:*17*
206:*23*
209:*14* 211:*6*,
*8*, *16* 222:*23*
223:*19*
231:*19* 233:*3*
**questioned**
188:*11*
**questioner** 8:*8*
**questioning**
123:*16*, *18*
233:*14*
**questions**
31:*7* 33:*17*
76:*7* 96:*11*
135:*15*, *22*
161:*16*
205:*12*
220:*13*, *22*
223:*9* 227:*10*,
*17* 228:*6*
229:*7* 232:*23*
233:*1*, *14*, *18*
234:*7* 237:*21*
**Quick** 22:*7*, *9*
23:*8* 187:*1*
222:*5*
**quite** 164:*6*
190:*9* 201:*24*
230:*23*
**quiz** 221:*14*
**quote** 54:*11*
59:*15* 96:*4*
126:*1* 127:*9*
**quoted** 60:*15*
61:*20*
**quotes** 44:*14*

< R >
**range** 111:*15*
112:*9* 115:*17*
**RASPANTI**
3:*17*

**rate** 64:*1*, *3*
102:*24*
**rational** 169:*2*
**rationally**
168:*21*
**reach** 47:*18*,
*24* 50:*17*
52:*6* 54:*22*
128:*22*
129:*18*
131:*17* 180:*19*
**reached** 72:*24*
127:*23* 141:*6*
**reaches** 122:*15*
**reaching**
49:*11* 50:*15*
51:*4* 52:*15*
53:*7* 54:*9*
127:*20* 128:*4*
130:*5*
**read** 11:*3*, *10*
15:*5* 16:*6*, *23*
17:*11* 30:*12*
48:*7* 49:*16*
50:*3*, *12* 51:*2*,
*6*, *22* 52:*8*
55:*17*, *19*
66:*2* 84:*2*, *3*
85:*19*, *20*, *23*
97:*18*, *21*
126:*9* 127:*15*
128:*6* 129:*10*
137:*9*, *12*, *20*,
*22* 144:*19*
146:*12* 147:*5*
153:*6* 174:*9*,
*13* 175:*14*
180:*13*
182:*10*
183:*10*, *23*, *24*
198:*10* 211:*9*,
*10*, *11* 221:*2*,
*22* 222:*12*
225:*1* 229:*5*
239:*7*
**reader** 29:*9*
38:*4*
**readily** 164:*6*
**reading** 23:*4*
56:*17* 133:*13*
179:*12* 184:*3*

224:9  229:10,
20  230:3, 9,
13  234:24
**reads**  129:5
179:5  229:17
**ready**  10:18
77:21  137:23
**reality**  103:23
**really**  8:13
14:2  101:21
119:3  156:7
193:12  206:8
221:2
**Realtime**  1:14
240:6
**reason**  19:24
20:9  55:20
162:9  187:3
200:2, 6
207:12  224:13
**reasonable**
34:16  75:15,
19  90:23
102:13, 19
103:7
**reasoning**
25:4  26:10
**reasons**  17:16
126:19
162:16, 21
163:16  164:1
**rebates**  105:5
**rebazan@duan**
**emorris.com**
2:23
**REBECCA**
2:21
**rebuttal**  21:9
**recall**  17:12
18:6, 13  19:2,
10  22:13, 22
23:12  29:14
33:5  36:6
40:4  42:20
48:12, 14
49:7  50:8
146:6  147:9
167:22, 24
174:23
176:24
182:19

191:11, 21
193:3  198:12
202:22
213:13
214:18
216:19, 24
229:1  237:14
**recalled**
191:14, 18
222:19
**recalls**  65:17
191:18  192:6
**receipt**  179:5
**receive**  95:12
129:22
151:19  180:9,
10
**received**
22:10  43:11,
12  68:10, 11,
13  70:3
72:16  73:18
86:3  89:5
92:7  94:20,
21  99:15
106:23  107:2
132:18
185:10
198:13  210:2
228:20
229:16, 23
230:2  231:17
**receives**  183:2
**recess**  77:17
134:17  188:5
227:23  233:9
**recollection**
18:11  24:21
37:12  48:24
49:22  51:24
52:3  96:8
125:6  126:13
173:6  174:17
180:19
206:24
216:21
217:11  220:1
221:13
224:10, 14
226:13

**record**  6:2, 16
9:14  30:17,
20, 21, 23
55:19  76:2
77:14, 16, 20
85:20  97:21
103:18
107:15  108:7
134:14, 16
135:9  137:12,
22  184:4
188:4, 8, 10
206:11, 15
211:11
212:11
227:15, 22
228:2  233:6,
8, 12, 24
234:20  238:3
239:10, 12
240:13
**records**
104:12
191:17  217:21
**Red**  4:18
**redacted**
204:20  205:2,
10, 18  207:11,
13  208:16
209:3, 6, 9, 13
212:2
**redaction**
204:24
**redirect**
237:22
**reduce**  71:21
133:23
**reduction**  75:2
**refamiliarize**
10:13
**refer**  33:20
87:12  156:9
182:16, 18
**reference**
87:13
**referenced**
48:18  216:10
225:17
**referred**  87:1,
7  89:10

155:17
156:12  234:12
**referring**
88:18  108:2
139:24  140:2
173:13
**refers**  24:12
48:16  225:24
**reflect**  40:8
201:22  202:18
**reflected**  140:8
**reflects**  40:11
55:1  208:12
**refresh**  220:1
224:10
**regard**  14:15,
24
**regarding**
13:18  14:14
22:18  126:17
138:22
171:18  172:5
228:7
**regardless**
27:19  127:12
**Registered**
1:15  240:7
**regression**
34:20  98:4
**regressions**
34:23
**regulations**
147:22
148:20  149:5
186:6  187:7
**reject**  179:3
**relate**  43:10
47:7  60:18
76:20  145:21
152:21  209:5
235:24
**related**  14:21
22:11  35:14
67:6, 9  68:4
121:7  137:3
138:24
139:16  149:3
152:19
155:22
161:22
175:23

207:10  210:6
222:23  240:14
**relates**  198:3
206:21  210:19
**relating**  54:12
59:16  133:15
223:10
**relative**  69:3
142:10
**released**  17:2
**relevance**  63:9
**relevant**  15:4
27:12, 16
34:24  35:1
42:9  44:21
45:10  54:20
64:6  84:10
85:7  88:12
111:20
136:12, 13
137:4  138:23
140:18, 19
141:1  148:3
167:18  172:9
177:1  229:18,
21  230:15, 16
235:2, 4
237:1, 3
**reliable**  48:2
70:10  81:15
226:16  227:6
**reliance**  9:21
16:24  18:5,
17, 22  19:12,
20  20:17
22:8  42:10
44:4  47:15
48:7, 10  49:6,
10  50:22
52:11  53:3
83:15  125:8,
11  147:2
148:5  182:16,
19  216:5
225:4
**relied**  17:16,
21  21:7
50:13, 14, 16
51:3  52:5, 19
66:2  83:1, 3,
4  147:3

Confidential - Information Subject to Protective Order

148:7  182:20
214:20
224:22  225:7,
8, 15, 19  226:6
**reload**  12:13
**rely**  19:4
22:14  23:18
42:13  45:15,
24  47:9, 13,
18  48:10
49:11, 14
52:18, 24
53:2, 6, 8
55:8  82:16
127:20
148:10  149:5
180:18
224:23
225:22  227:6
**relying**  23:13
**remain**
213:20  224:6
**remember**
49:19  54:15
69:5  83:11
87:3, 9  96:6
98:21  107:10
135:18  136:3
213:1, 11, 12
214:4, 11, 15
219:2, 20, 21
223:15, 20
**remembered**
219:18  222:21
**remembers**
222:11
**remote**  2:5,
10, 17, 18, 21
3:5, 10, 11, 16,
20  4:5, 10, 14,
19  8:23
**remotely**  8:2
**removal**  166:5
**removed**  176:8
**removing**
196:2
**render**  170:16
205:19
**rendered**  15:2,
8, 12  204:20
**renders**  187:8

**repeat**  86:18
160:23  163:13
**repeating**
187:4
**rephrase**
86:23
**replacement**
90:9, 18, 22,
24  91:8, 11,
18  92:3
117:21
**report**  5:10
9:11, 17  10:3,
12, 20, 22
13:2, 6  15:14
16:24  17:13,
17, 19  18:4, 7,
8, 22  19:3, 7,
8  20:5, 12, 14,
17  21:3, 6, 9,
11  22:7, 9, 14,
22  23:3
24:22  25:5,
11, 18  26:11
28:4, 11, 20,
23  29:2, 5, 9,
15, 23  30:4
33:1, 12
37:12  38:3, 6,
14, 16, 17
39:7, 12, 23
40:6  42:15,
20, 24  43:16
44:6, 13, 18
45:21  46:13,
16  48:17, 22,
24  49:2, 5, 8,
18  51:11, 13,
23  52:10
53:22  54:3,
24  57:13
58:21  59:2,
13  60:6, 13
62:9  63:6
64:24  65:22
66:24  70:1, 5
71:11  73:1
74:10, 16, 19
75:2, 12, 14
76:19  77:7
84:4  86:1

89:4  94:8
105:9  120:13
126:12
129:13, 16
130:19
132:22
133:19  138:9,
19  139:1, 14
140:1, 12
141:19
145:11
146:12
147:13
148:13  154:7
156:24
159:12
161:22  168:1
169:15
170:11, 14
175:3  176:10
178:19  179:1
180:23  181:1,
9  182:2
192:2, 3
198:21, 22
199:6  202:21
203:3  206:3
207:11  209:7,
12, 19, 24
210:6, 10, 12,
14, 15  214:13,
17, 20, 21
215:6, 7, 10,
11, 14, 21
216:2, 9, 11,
16, 20, 23
217:2, 11, 15,
18  221:23
222:22  224:4,
24  225:11, 14,
23, 24  226:4,
9  228:13
229:10, 17
230:3, 10
236:4, 16, 23
**reported**
144:20
**Reporter**  1:15
6:17  7:19
8:20  28:8, 10
30:8  55:15,

18  85:23
86:17, 23
123:21, 22
163:13
188:17  197:3
240:7
**reports**  17:2,
3, 21  19:20
20:7, 20  21:1
147:8
**representation**
185:4

**representations**
35:5
**representative**
81:7
**represented**
207:14
**representing**
189:2
**represents**
234:7
**request**  200:18
**requested**
234:23
**require**  55:22
107:3  119:23
142:23
**required**
41:18  74:12,
20
**requirement**
155:17
**requirements**
177:16, 18
**requires**  70:7
121:11  185:16
**respect**  15:15
23:18  27:5
35:22  51:4
52:16  62:13,
15  102:20
113:5  116:24
126:16  150:4
158:14  207:2
214:1  217:8
228:8, 24
229:8, 13, 24
**respectfully**
63:11  110:16

131:19
151:24  171:9
220:8
**respond**  25:5
**responding**
156:1  180:23
**responds**
42:15
**response**
37:17  85:22
137:10
**rest**  186:15
**restate**  8:15
56:19  72:4
86:23
**restatement**
101:14
**result**  73:7
134:8
**resumed**  135:4
**retail**  67:23
68:9  89:20,
21  139:15
228:8
**retailer**  68:1
140:24  141:1,
7  231:18, 20
**retailers**
234:11, 17
236:8
**retain**  138:14
228:19
**retained**
131:8, 9
132:9  198:13
**reveal**  38:3
**revealing**
211:14
**revenue**
231:18, 21, 22,
23  232:12
**revenues**
140:14, 18
229:16, 22
230:11
**review**  10:12
47:11, 14
48:20  49:4
51:10  128:22
147:12
199:12

202:*10*  203:*3*
219:*10*, *17*
220:*12*, *20*, *23*
223:*4*
**reviewed**
  15:*14*  17:*7*
  19:*9*  20:*19*
  22:*9*, *22*  23:2,
  *15*  47:*5*, *17*
  48:*19*, *21*, *23*
  49:*8*  51:*1*
  52:*1*, *4*  84:*5*
  126:*14*
  127:*19*
  128:*15*
  129:*15*  144:*6*
  147:*7*, *10*
  167:*21*
  174:*17*, *23*
  197:*23*
**reviewing**
  10:*9*  48:*12*
  167:*24*  202:*8*
  210:*4*  220:*4*
**revisit**  227:*12*
**right**  11:*5*, *15*
  14:*2*  20:*1*
  25:*14*  29:*6*
  30:*19*  34:*13*
  47:*16*  49:*13*
  62:*2*  77:*19*
  78:*17*  79:*4*
  80:*3*, *5*  88:*24*
  90:*11*  92:*13*
  96:*18*, *21*
  97:*4*, *22*
  100:*20*, *24*
  101:*8*, *19*
  103:*8*, *12*
  104:*4*, *11*, *16*
  109:*4*  112:*6*
  113:*15*  114:*1*,
  *3*  117:*20*
  118:*16*
  119:*10*  124:*6*,
  *10*  128:*14*
  134:*13*, *15*
  136:*17*
  137:*17*
  146:*11*
  153:*15*  158:*3*

162:*8*, *13*
167:*9*  171:*20*
180:*15*
185:*12*, *17*
187:*24*  188:*3*,
*7*  189:*17*
194:*3*  200:*11*
202:*23*
205:*14*
213:*10*, *15*
214:*11*  219:*6*
220:*17*  223:*6*
225:*12*, *24*
226:*19*
227:*21*  228:*1*
233:*7*, *11*
236:*13*
237:*23*  238:*2*
**right-hand**
  204:*12*  223:*24*
**risk**  13:*18*
  14:*14*, *22*
  16:*10*  37:*5*,
  *11*  43:*20*, *23*
  57:*22*  64:*15*,
  *19*  92:*16*, *19*
  95:*11*, *13*, *14*
  159:*15*
  162:*11*  170:*9*,
  *13*, *16*, *17*, *21*,
  *23*, *24*  171:*2*,
  *5*, *12*, *13*, *17*, *19*,
  *23*  172:*4*
**risks**  37:*9*
  169:*20*  171:*4*
  172:*6*
**risky**  171:*8*
**Rite**  4:*8*
  228:*5*
**RMR**  240:*22*
**road**  211:*23*
**ROBERT**  1:*5*
**role**  55:*23*
  73:*2*  100:*11*
  122:*4*  126:*15*
**Roman**  38:*17*,
  *22*  39:*1*, *19*,
  *24*  40:*5*, *6*
  41:*4*  139:*14*
  181:*10*  236:*17*

**romanette**
  138:*8*  140:*5*
**Ron**  17:*1*
**room**  7:*17*
  233:*20*, *22*, *24*
  234:*1*
**ROONEY**
  4:*11*
**rooted**  151:*22*
  154:*13*
**roughly**  44:*9*
**routinely**
  82:*16*
**RUBEN**  2:*5*
  7:*6*  11:*14*, *16*
  18:*18*  25:*9*
  28:*7*  30:*6*, *13*
  75:*22*  76:*9*
  123:*7*  124:*4*
  155:*9*  181:*3*
  195:*22*, *23*
  200:*16*  208:*6*
  218:*5*  221:*6*, *9*
**ruben@honikla**
**w.com**  2:*6*
**Rule**  152:*8*, *23*
**Rules**  152:*9*
  187:*7*
**rulings**  35:*5*, *6*
**run**  98:*2*

**< S >**
**S.LI**  204:*21*
**SA**  3:*8*
**safety**  13:*19*
  14:*15*, *22*
  186:*7*  187:*10*
**sagoldberg@du**
**anemorris.com**
  2:*19*
**sale**  127:*10*
**sales**  82:*2*, *8*,
  *17*, *18*  189:*2*
  191:*10*, *13*, *17*
  192:*7*
**satisfied**  10:*1*
**save**  169:*11*
**saw**  146:*8*
**saying**  11:*7*
  52:*8*  105:*1*
  136:*15*

162:*18*
186:*18*  192:*4*
207:*4*  214:*2*
215:*16*, *19*
**says**  13:*17*, *21*
  21:*20*  29:*9*
  37:*20*  126:*1*
  130:*13*
  133:*14*  137:*6*
  138:*19*
  140:*13*
  173:*22*
  179:*14*
  198:*23*
  204:*16*  223:*9*,
  *23*  224:*1*
  225:*21*
**scan**  222:*5*
**scenario**
  35:*20*  57:*4*
  73:*22*  79:*16*
  86:*8*, *9*  92:*4*,
  *10*  102:*2*, *8*
  113:*13*  132:*5*
  151:*2*  168:*23*
  169:*2*, *4*
  193:*20*
  194:*18*  196:*1*
**scenarios**
  36:*10*  80:*14*
  169:*22*  171:*5*
**scholarly**
  232:*7*
**sciences**  145:*8*,
  *22*
**SciGen**  4:*3*
**scope**  17:*5*
  24:*10*
**screen**  184:*1*
  200:*17*  201:*1*,
  *4*  218:*8*
  222:*18*
**Scripts**  3:*14*
**scroll**  220:*5*
**second**  9:*2*
  11:*13*, *17*
  30:*14*, *17*
  87:*11*, *13*
  125:*23*  127:*5*
  167:*4*  193:*24*
  197:*14*  204:*7*,

*8*, *10*  219:*13*
223:*24*
**Section**  5:*13*
  10:*24*  24:*22*
  38:*6*, *17*, *22*
  39:*4*  40:*6*, *11*,
  *15*  41:*4*, *8*
  42:*9*  139:*14*,
  *18*  170:*11*
  172:*18*, *23*
  173:*5*  174:*20*
  181:*9*, *18*
  221:*21*  236:*17*
**sections**  40:*7*
**see**  12:*1*, *6*, *11*
  13:*8*, *11*
  14:*17*  17:*22*
  18:*9*  22:*10*
  29:*24*  31:*2*
  44:*7*, *23*
  59:*18*  80:*21*
  103:*18*
  124:*17*  127:*5*,
  *7*  129:*4*
  139:*19*  147:*2*
  171:*6*  173:*8*,
  *10*, *11*, *17*, *22*
  174:*1*  175:*9*
  179:*4*, *11*, *12*
  181:*18*  189:*1*
  199:*24*  201:*3*,
  *7*, *10*  202:*7*
  204:*2*, *15*, *22*
  208:*2*, *4*, *14*
  209:*2*  217:*19*
  218:*19*  219:*1*
  220:*15*
  222:*24*  223:*3*,
  *9*, *19*  224:*1*, *8*,
  *9*  225:*21*
**seek**  150:*9*
**seeking**  176:*8*
**seen**  41:*20*
  49:*1*  124:*22*
  125:*1*  144:*3*,
  *5*  172:*7*
  173:*7*  174:*11*,
  *15*  191:*10*, *16*
  192:*5*, *11*, *12*
  202:*3*, *10*, *15*

Confidential Information - Subject to Protective Order

214:6 232:1,
6 235:19
select 44:19
168:21
selected 45:16,
19
sell 76:12
149:18 151:18
selling 126:5
send 218:13
221:24
sense 27:16
29:1 70:14
106:19
111:14
114:12 116:3
155:8 219:6
sent 123:6
sentence 13:9,
17, 20 14:11,
24 59:15
60:11, 15
61:20 68:15
113:4 118:18
125:24 129:4
153:15, 23
155:18
separate 94:9
139:4 206:2
209:18
separated
96:12
separately
158:5 218:13
September
198:7 205:19
serve 33:14
service 205:19
Services 6:4
204:19 207:9
210:22 212:4
set 53:13
74:9 84:6
85:10 126:19
139:22
146:16
173:20
174:13, 20
182:23
185:15
198:20

215:21 236:3
240:11, 18
SETH 2:17
7:20 12:7
187:21
220:18 233:16
sets 42:19, 21
setting 237:15
seven 220:18
shape 67:4
share 166:20
167:2 184:1
201:1 214:22
218:8
shares 215:2
shed 46:1, 23
50:4, 9, 12
shift 101:23
shorthand
87:6 156:9
207:17, 18
show 81:7
180:24 189:9
shown 51:9
222:8
shred 172:7
side 8:8
68:24 77:24
93:5 122:11
significant
142:4 143:11
similar
144:13
169:16 199:2
simple 163:18
177:4 199:21
simplest 90:11
simplistic
230:8 236:3
simply 12:18
19:8 26:20
73:14 156:8
211:16 229:22
single 167:5
172:7 212:16
sit 18:10
21:12 26:13
32:8 48:15
166:18 167:2,
22 192:10

225:18
situated 65:19
situation
100:13, 14
103:13
110:12
111:22, 24
situations
53:12 164:22,
23
six 13:8
80:20, 24
220:18
six-month-
earlier 81:1
slower 204:4
slowly 137:21
Solco 2:15
sold 75:7
76:21 78:15
127:12 141:4
165:8 166:4
169:24 170:2
230:23
231:10, 12
232:18
sole 199:5
somebody
47:23 67:15
88:11 122:11
151:23
183:10, 21
someplace
29:23
somewhat
99:3
soon 181:7
sorry 11:6
31:1 33:23
54:8 55:9
56:8, 16 67:3
92:10 97:16
98:16 101:11
114:10
136:14 143:6
155:12
160:23
162:18
189:23
205:15 206:5

208:17 223:8
233:5
sort 12:3
80:7 102:2
203:17 213:8
sorts 101:5
sought 234:10
sounds 48:21
61:16 174:14
219:18
source 98:1
192:9
sources 81:23
82:7 98:7, 8,
10, 13
South 2:16
3:9
speak 8:19
101:20
speaker 8:21
speaking 8:24
41:8 58:22
101:24 111:4
119:8 156:12
177:23
specialize
145:5
specific 18:6,
11 22:13, 23
24:20 25:12
26:4, 14 29:7
42:6 46:20
89:13 95:10
125:10
126:15
135:16
223:20
235:24 236:1
specifically
11:3 18:2
19:2 38:16
61:21 78:2
82:12 136:1
152:15, 17
178:2 198:20
202:22 228:22
specificity
31:22
specifics 214:4

Speculation
122:2 132:2
203:11
Speculative
81:17
spend 14:6
spending 74:5,
6
spent 135:12
206:1
split 167:4
spoke 66:19
83:7 113:23
ss 239:3
240:3
St 3:15
staff 210:4
stage 27:20
29:20 70:6
104:20
stalling 221:1
Stand 201:2
218:10
standard
29:16
standpoint
46:6 58:23
69:21 75:15,
19 84:8 86:4
88:7 113:16
116:16
119:15
146:16
149:22
162:24
189:13, 15
195:17 231:14
STANOCH
2:10 200:22
201:2 218:10
222:8
start 100:18
103:20
113:14 232:18
started
100:21 136:14
starting
100:22, 24
102:1 103:8,
9, 11, 14, 21
108:16

110:*23*
115:*19*
137:*21*
140:*16*
186:*18* 193:*3*
**starts** 26:*11*
65:*16* 94:*12*
181:*10*
**State** 1:*16*
4:*4* 6:*22*
239:*3* 240:*3, 8*
**stated** 162:*20*
**statement**
42:*13* 161:*10*
162:*19* 166:*3*
168:*9, 12*
174:*11, 14*
220:*7*
**statements**
44:*14* 118:*19*
180:*1, 20*
183:*17*
**STATES** 1:*1*
6:*11* 75:*10*
77:*11* 150:*9,*
*10, 11, 21*
172:*18* 173:*5*
175:*17* 184:*12*
**stating** 166:*12*
167:*23*
**statutory** 30:*2*
64:*1, 3*
**stay** 206:*15*
**stem** 159:*16*
**stenographic**
6:*16*
**step** 94:*1, 2*
109:*23* 111:*3*
**stick** 107:*12*
**stickers**
123:*23*
**STIROH** 1:*11*
5:*2, 10* 6:*14,*
*19* 7:*2* 9:*16,*
*17, 18* 10:*11*
11:*21* 12:*8,*
*14* 21:*16, 18*
30:*12, 24*
55:*17* 63:*11*
76:*10* 77:*21*
85:*21* 86:*20*

93:*10* 107:*7*
114:*19*
116:*15*
120:*18* 124:*2,*
*13* 125:*19*
130:*23*
131:*19*
133:*12* 135:*3,*
*11* 137:*15, 24*
141:*10, 18*
151:*24*
152:*21*
161:*15* 165:*6*
171:*9* 172:*24*
173:*2, 4*
176:*23* 181:*3,*
*16* 185:*12*
186:*3* 188:*10,*
*15, 18* 194:*24*
197:*6, 8*
198:*16* 201:*4*
206:*8* 207:*9,*
*16* 209:*15*
210:*22* 212:*4*
218:*3, 19, 21*
219:*17*
222:*15* 224:*4,*
*21* 228:*4*
232:*22* 234:*6*
237:*24* 239:*6,*
*15*
**Stiroh's**
209:*10* 221:*4*
**stop** 109:*5*
137:*13* 165:*1*
181:*7*
**storage** 234:*13*
**storing** 231:*4*
**stream** 76:*24*
**Street** 2:*4, 9,*
*16, 21* 4:*4, 9,*
*13*
**strikes** 44:*16*
**structures**
140:*23*
**study** 172:*2*
**Subchapter**
173:*15*
**SUBJECT**
1:*9* 14:*15*
15:*24* 20:*13*

21:*10* 23:*4*
61:*21* 114:*21*
157:*1* 163:*8*
166:*24* 167:*3*
**subjects** 49:*21,*
*23*
**Subscribed**
239:*16*
**subsequent**
203:*3*
**subspecialty**
33:*21*
**substitutes**
39:*2*
**subtract**
229:*18* 235:*7*
**subtracted**
203:*16*
**subtracting**
229:*23*
**succinctly**
97:*12*
**suffer** 91:*3*
93:*19*
**suffered** 52:*17*
**Suffice** 174:*18*
180:*14*
**sufficient**
135:*20* 155:*1*
175:*14*
**sufficiently**
144:*13*
**suggested**
45:*14*
**suggests**
216:*23*
**Suite** 2:*4, 21*
3:*9* 4:*13, 18*
**sum** 73:*17, 21,*
*23* 134:*6*
**summarized**
236:*17*
**Summary**
5:*16* 39:*22*
140:*4* 197:*1,*
*8* 199:*20*
200:*17* 201:*4*
220:*2*
**summation**
134:*11*

**summed**
229:*15*
**superficial**
140:*12*
**supplemented**
82:*1* 227:*14*
**supplied**
189:*14*
192:*22, 24*
**supplier** 183:*2*
**suppliers**
189:*15*
190:*10* 192:*23*
**supplies** 194:*2*
**supply** 37:*20*
38:*12* 40:*2, 9,*
*13, 16, 17, 22*
41:*2, 6* 58:*4*
75:*8* 83:*23*
89:*16* 91:*6*
92:*1, 2* 98:*1,*
*7, 8, 10, 14*
100:*8* 117:*7*
118:*1* 119:*1*
140:*22*
146:*17, 23*
147:*15, 21*
148:*9, 12*
149:*10, 15, 23,*
*24* 150:*13, 15*
176:*4, 9, 13,*
*17* 177:*7, 13,*
*15, 18, 20*
178:*5, 10, 19*
179:*2* 182:*5,*
*8* 183:*4*
184:*10, 19*
185:*1, 2, 4, 8,*
*14, 21, 23*
188:*24* 189:*7,*
*22, 24* 190:*6,*
*11, 19* 191:*4,*
*6, 20, 24*
192:*15, 16, 17,*
*19, 20, 21*
193:*5, 9, 14,*
*16, 20* 194:*18*
195:*6, 8*
196:*2, 12*
214:*21* 235:*16*

**supply-and-**
**demand**
185:*17, 19*
188:*21*
**support**
161:*17*
169:*13* 209:*6,*
*24* 210:*7*
213:*17* 224:*5*
**supporting**
66:*1* 209:*18*
**supposed**
213:*8*
**sure** 8:*18*
13:*15* 38:*23*
55:*18* 82:*11*
85:*16* 97:*17,*
*20* 108:*8*
116:*1* 118:*17*
120:*11* 124:*6*
146:*13*
149:*16* 152:*8*
163:*14*
186:*17* 199:*4*
201:*7* 219:*11*
**surplus** 86:*5*
95:*2*
**surprise** 60:*6*
182:*21*
**surrounding**
160:*15*
**swear** 6:*18*
**switch** 41:*19,*
*24*
**switched**
41:*21* 89:*18*
91:*11*
**sworn** 6:*21*
135:*5* 184:*5*
239:*16* 240:*11*
**synonymous**
58:*17* 60:*1, 2*
142:*1* 143:*10*

**< T >**
**Tab** 123:*19*
172:*18* 217:*21*
**Tabs** 196:*21*
**tactic** 221:*1*
**take** 7:*14*
8:*21* 11:*11*

Confidential Information - Subject to Protective Order

15:17  16:2
17:24  19:23
24:3  26:6
36:21, 24
37:3  41:17
42:1, 24  54:7,
8  62:10  63:2,
4  69:5  76:1,
2, 4  85:8
98:20  101:19
109:8  110:13
111:18  118:6,
13  123:5, 13,
19, 22  128:4
130:8  133:22
142:16
146:14
171:24
177:14
178:18  181:5
186:21, 23
187:22  194:1
212:21
219:13
220:19  222:2,
5  227:16
233:4  237:5
**taken**  24:13,
16  25:19
44:15  64:2, 3
65:21  77:17
111:21
150:14  188:5
194:11
227:23  233:9
239:7
**takes**  62:16
128:3  130:5
142:9  153:3
**talk**  14:8
32:15  87:13
112:22
159:17
169:16  206:8,
12  234:2
**talked**  83:11
135:18  164:1
**talking**  107:7,
8  110:19
135:12
146:21  177:3

188:18  191:1,
2  195:23
208:6, 9  235:7
**tasks**  210:8
**tautology**
44:16
**team**  19:14
147:7  155:24
156:3  158:15
202:4  206:1
210:9
**technical**  8:13
**technology**
55:11
**tell**  12:7
14:19  18:16,
21  20:16
22:6  24:19
31:21  49:20
58:20  72:17
73:16, 19
74:4, 19
82:13  85:10
89:13  94:1
96:2, 7  97:12
104:21  110:5
132:21  133:1
169:1  180:24
184:21  192:9
202:17
214:15  223:5
226:5
**telling**  59:7
63:9  114:22
136:3  217:16
225:15
**tells**  133:21
151:7
**ten**  186:24
187:23
207:22  227:20
**tendering**  49:4
**term**  42:6
63:18  157:3,
7  158:13
191:24
**terms**  34:8
58:17  69:23
90:11  112:2
**testified**  6:23
73:6  135:6

212:8, 12
217:1
**testify**  205:12
215:10  216:2
217:13
222:22  226:9
227:7
**testifying**
146:6  205:22
210:24  212:5
**testimony**
7:13  8:6
13:3  14:1
15:24  16:7
35:18  39:18
51:7  52:14
55:24  62:22
73:1, 10
95:22  108:18
111:12
112:14
122:24  125:4
128:12  131:5
133:3  136:6
162:15
163:10  167:1
182:11, 13
183:10, 23
184:5  203:4
214:12
215:18
216:18  217:6
239:7  240:13
**Teva**  3:8
**textbook**  232:7
**thank**  11:2
21:24  30:24
77:22  83:6
187:19  188:2
218:11
232:21, 24
237:20, 24
238:1
**Thanks**  181:8
**theories**  46:2,
14, 15  83:8,
21  84:7  85:3,
7, 12, 15, 22
135:16  157:20
**theory**  38:20
53:11  61:15,

18  69:22
85:11  118:5
139:16
146:20  232:16
**therapeutic**
57:20  68:15,
18  142:1, 4, 9,
10, 18, 20
143:9, 17, 20
144:9, 24
162:10
228:10, 21
230:2
**therapy**  41:9
**thereof**
173:23  179:9,
15
**thereto**  35:14
**thesis**  152:2
**thing**  107:24
124:10
181:19  236:3
**things**  7:15
11:4, 12
12:20, 22
13:13  14:3, 7,
9  34:4, 19, 24
41:22  45:23
52:5  53:8
57:24  59:21
63:2, 4  69:10,
22  78:3, 20
92:24  93:8
105:4  106:15
112:22  113:6
135:23
170:15  195:3
210:6
**think**  8:4
10:6  21:21
22:10  23:17
24:1  25:15,
17, 23  26:13
29:5  31:4, 21
37:23  38:20
39:19  40:22
42:12  43:18
48:16  49:24
50:23  59:10
60:3  62:18
64:5  65:13

71:24  74:17,
18  84:1  88:2
90:21, 24
94:5  95:1, 2
101:12  102:6
103:13
104:22  105:1
106:1, 2
108:9  112:9
128:14
131:15  133:5
137:14
142:23
145:15  147:4,
10  149:16
161:7, 12, 13
166:11  167:4,
19  174:13, 21
178:6  180:11
181:7  182:15
186:15  189:4
191:24
192:18  193:2
196:18  201:9,
13, 17  203:12
204:6  206:15
208:18, 19
214:18
216:11  219:4
220:24  222:4
225:13
229:20
230:16, 22
231:5  234:19
235:15  236:5,
20  237:3
**thinking**  231:9
**thinks**  138:23
230:14, 15
236:24
**third**  179:5
**third-party**
153:9

**THORNBURG**
4:6
**thought**
136:14
155:15
205:14  217:1

Confidential Information - Subject to Protective Order

230:*11*
**three** 105:*24*
**tied** 105:*7*
**TIFFANY**
3:*10*
**tile** 124:*5*
**time** 6:6 8:*21*
10:*15* 14:6
15:*4* 22:*10*
23:2 30:*19,*
*22* 54:22
55:3 64:*23*
65:9 77:*12,*
*15, 19* 105:5
123:*15*
134:*13, 15*
135:*8, 12*
141:*3* 177:*23*
187:*20, 24*
188:*3, 7*
201:*20* 206:*1*
207:*24* 208:*3,*
*8, 12* 209:2
214:*10* 217:9
220:*19* 221:*1*
222:2 227:*21*
228:*1* 233:7,
*11, 22* 238:2, *4*
**timeframe**
65:*4, 19* 69:6
80:*16* 93:*1*
**timeframes**
66:*23*
**times** 153:*15*
162:8
**title** 49:7 50:*1*
**titles** 49:*19*
**tobacco** 174:6
179:7
**today** 6:*13, 17*
8:6, *8* 10:*13*
51:7 55:*4, 5*
132:22
166:*18* 167:2
203:5
**Today's** 6:5
197:*23*
**told** 25:*14, 15*
35:*10* 48:*1*
55:5 56:*3*
76:22 96:6

108:*5, 11*
111:2 114:*1*
117:*1* 118:*12*
131:*17* 133:*4*
134:6, *8*
135:*24*
183:*13* 195:*4*
219:*19*
221:*16* 226:*24*
**top** 173:*8*
**topic** 186:*20*
**topics** 55:2
96:*12* 121:7
**total** 72:*8*
200:*8* 202:*24*
203:9, *12*
**totaled** 203:*14*
**totality** 180:*1*
**totally** 100:*16*
**TPPs** 65:*16*
67:9 71:*19*
72:*16*
**trace** 235:*21*
**tracing** 235:*15*
**trade** 148:*17*
175:5 178:*14*
184:*12*
**train** 155:*15*
**training** 46:*11*
47:*10* 52:*19*
53:9 120:6
127:*21* 129:*19*
**transaction**
67:*23*
**transactions**
80:*18* 148:*20*
**Transcript**
5:*13* 188:*14*
229:6, *11*
230:*4* 239:7,
*9* 240:*12*
**transcription**
8:*5* 188:*11*
**translate**
143:2, *22*
**translated**
143:*13*
**translates**
143:*13*
**TRAURIG** 3:6

**treat** 165:*23*
**treated** 26:*18*
**treating** 145:*3,*
*11, 13*
**trial** 215:*3*
224:*19*
**tried** 137:*10*
**trouble** 137:*8*
**true** 10:2
24:*4, 7* 35:22
36:*3, 6, 16*
47:*23* 71:*4*
76:*17* 93:*19*
102:*15*
108:*10* 109:7
125:*1, 5, 7*
156:*19*
166:*13, 16*
195:*4* 196:*11*
202:*12*
211:*19* 215:6
239:*9, 12*
240:*12*
**try** 31:*4* 78:*9*
86:*23* 101:6
190:*24* 204:6
207:*17*
**trying** 12:*18*
26:*20* 30:*11*
49:*15* 62:*2*
221:*3*
**turn** 10:*24*
13:6 17:*18*
79:*14, 16*
121:*19*
125:*17* 127:2
149:*24*
203:*19*
207:*16* 219:7
**turned** 63:*12*
197:*17* 227:*1*
**turning** 92:*5*
**turns** 164:*2*
**two** 13:*23*
59:*20, 24*
76:6 82:*7*
86:*13* 87:*11*
89:*7, 21* 90:*1*
94:9 95:*19,*
*24* 96:*12*
105:*10, 12*

112:2, *22, 23*
119:*3* 135:*13*
158:*3* 180:*1*
181:5 213:6
233:*4, 6*
**two-minute**
233:5
**type** 85:*4*
102:9 150:*20*
**types** 47:*11*
145:*12*
169:*16*
170:*15* 231:*1*
**typically**
27:*21* 29:*16*
47:*12* 52:*21,*
*24* 53:2 73:2
78:9 110:*24*
202:2 231:*1*
232:*17*

< U >
**U.S** 2:*15*
58:*4* 75:*8, 17*
76:*12, 13*
148:7, *10*
176:2, *14*
178:*13* 180:*3*
**Uh-huh** 214:6
**ultimate**
224:*15, 17*
**ultimately**
27:*17* 28:2
141:6
**unable** 122:*21*
**uncontaminate**
**d** 165:*9, 15*
168:*20*
**underlie** 85:*3*
**underlying**
71:*11* 85:*14*
**underneath**
173:*14*
**understand**
8:*11* 14:7
23:*16* 25:*19*
26:*10, 20*
31:6 36:*17,*
*21* 37:*1, 19*
38:*1* 40:*19*
45:6 46:*13,*

19 49:*13*
53:*15* 57:*23*
59:7 62:*3*
64:*13, 18*
67:*8, 11, 16*
72:22 74:2, *5*
78:2 79:*14*
80:9 81:*10*
84:7 88:*15,*
*17* 93:*12*
94:*21* 99:2
100:*16*
101:*18* 104:*8*
105:*23*
116:*16*
117:*10, 12*
120:*19*
130:*15, 17*
138:*11*
147:*18*
149:*21*
154:*10* 155:6
157:*7, 12, 16*
158:2 161:7
166:22
175:*14*
179:*16* 180:*4*
189:*20* 192:2
196:*17, 18*
206:6 215:*5,*
*21* 229:*15*
237:7
**understanding**
16:5 17:*4*
22:*17* 23:*3*
25:*10* 26:*17*
27:*18* 32:*21*
34:*16* 37:*3*
41:*15, 24*
42:*8* 57:*9*
63:*1, 7, 13*
65:*15* 66:*15*
67:*19* 68:2
77:*24* 78:*20*
93:*8* 94:*20*
106:*14* 138:6
139:*18*
149:*19*
154:*24*
155:*21* 156:*6,*
*21* 157:*9, 11,*

Confidential Information - Subject to Protective Order

19  160:*10, 22*
171:*18*  176:*7*
177:*17*
179:*22, 24*
181:*12*  185:*5*
203:*16*  206:*4*
214:*24*  217:*4,
7*  228:*12, 18*
229:*11, 21*
234:*24*  236:2

**understood**
8:*10*  26:*18*
36:*1*  52:*7*
87:*6*  89:*7*
95:*18*  98:*18*
101:*2*  118:*6*
130:*12*  155:*4*
161:*14*
166:*16*
203:*18*  215:22

**undertake**
161:*23*  210:*18*

**undertaken**
131:*7*

**unfolded**
102:*9*

**uniformly**
130:*10*  167:*15*

**unique**  70:*21*
219:*23*

**UNITED**  1:*1*
6:*11*  75:*10*
77:*11*  150:*9,
10, 11, 21*
172:*18*  173:*5*
175:*17*  184:*12*

**unjust**  138:*2,
7, 11, 14, 16, 20*
139:*3, 5, 8, 11,
17, 18, 21*
140:*6, 15*
228:*7, 11, 12,
15, 23*  229:*7,
12*  230:*12*
234:*9*  235:*14,
23*  236:*7, 19*
237:*6, 8, 9, 14,
18*

**unlawful**
151:*10*

**unpack**  15:*21*

**unpacking**
14:*6*

**unrelated**
67:*5, 22*  68:*3*
78:*1*

**unreliable**
215:*14*  226:*8,
11, 12, 14, 19,
22*  227:*3*

**unstable**  21:*20*

**upper**  204:*12*

**upstream**
88:*11*

**USCA**  5:*13*
172:*23*
174:*20*  180:*15*

**use**  23:*13*
34:*19*  58:*10,
21, 23*  60:*12*
61:*13*  88:*2, 3*
106:*18*
109:*15*
115:*15*  118:*8*
154:*16, 19*
192:*3*  209:*23*
231:*22*

**usually**  108:*15*

**< V >**

**Vague**  22:*21*
23:*11*  27:*2*
31:*14*  34:*22*
57:*2*  61:*8*
64:*10*  144:*11*
237:*11*

**valid**  27:*8*
119:*18*
130:*20*  196:*4*

**VALSARTAN**
1:*3*  6:*9*
51:*19*  89:*16,
17*  90:*3, 8*
91:*4, 6, 9, 14,
18*  92:*2, 12,
17*  93:*4, 6*
104:*10*  118:*2*
142:*17, 19*
165:*9, 12, 15*
166:*1, 22*
168:*7*  193:*9*

**Valsartan-
containing**
36:*20*  119:*2*
120:*1*  166:*17*
172:*11*
178:*10*  185:*9,
22, 24*  193:*17,
21*  194:*19*
196:*3*

**valuation**
15:*15*  59:*3*
92:*23*  176:*17*

**value**  24:*4*
43:*11, 12, 17*
57:*14*  68:*10,
11, 12, 14, 16,
18, 21, 23*
69:*15, 16, 17,
18, 22*  70:*2,
11, 12, 17, 20*
71:*1, 9, 21, 22*
72:*15*  73:*17*
74:*13, 21, 23*
75:*16, 21*
76:*18*  77:*3, 5*
86:*1, 3*  87:*2*
89:*5*  92:*6, 8,
11, 15, 22*
94:*12, 16, 23*
95:*6, 19, 24*
96:*4, 10, 15,
16, 20*  97:*10*
106:*21, 23*
107:*2*  110:*1,
3, 10*  111:*9*
116:*20*  117:*8*
119:*6, 19*
122:*22*  123:*2,
4*  127:*24*
131:*1, 23*
132:*12, 17*
135:*15*
142:*18, 21*
143:*4, 8*
144:*9, 10, 15,
23*  146:*22*
150:*23*  151:*4,
8, 12, 14, 22*
162:*10*
163:*17*  164:*5*
171:*12*

176:*15, 16*
178:*21*  179:*2*
185:*10*  186:*1*
190:*3*  228:*10*

**valued**  143:*16*
144:*16, 17*

**values**  69:*12*
71:*6*  74:*24*
145:*9*

**variable**
101:*7*  111:*6*
164:*16*

**variables**  63:*5*
99:*17, 22*
100:*7, 10*
138:*22*  164:*14*

**variation**
37:*13*  112:*23*

**variety**  81:*22*
147:*20*  231:*6*

**various**  17:*3*
20:*19*  38:*15,
19*  56:*14*
78:*16*  83:*21*
85:*7*  100:*7*
114:*21*  122:*4*
145:*1*  148:*5*
152:*18*
162:*11*  199:22

**vary**  81:*1*
113:*21*  115:*2,
5, 12, 21*
132:*18*

**VCD**  39:*2*
93:*15*  164:*18*
168:*18, 19*
169:*3, 5, 6*
194:2

**VCDs**  14:*16*
15:*3, 8, 23*
38:*8*  39:*2*
40:*3, 10, 13,
16, 18, 21*
41:*3, 6, 16*
43:*13*  56:*3,
11, 21*  64:*14*
104:*1*  110:*17*
127:*12*
131:*21*
158:*18*  159:*6*
160:*4, 18*

161:*2*  164:*13*
177:*18*
181:*15*  185:*6*
191:*11, 20*
196:*10*  210:*19*

**vegetables**
169:*24*  170:*1*

**venture**
132:*23*

**verify**  124:*18*

**versus**  58:*16*
69:*8*  212:*24*
217:*22*  218:*18*

**vertical**  191:*5*

**vetted**  226:*23*

**vetting**  215:*20*

**VHP's**  178:*11*

**viability**  50:*19*

**video**  6:*7*  8:*5*

**Videographer**
4:*23*  6:*1, 3*
11:*23*  30:*19,
22*  77:*15, 19*
134:*15*  135:*8*
187:*24*  188:*3,
7*  227:*21*
228:*1*  233:*7,
11*  238:*2*

**videography**
7:*19*

**Videotaped**
1:*11*

**view**  54:*18*
116:*19*
118:*22*  132:*8*
140:*12*
150:*13*  232:*15*

**viewed**  162:*12*

**views**  50:*22*
52:*12*  53:*4, 5,
6, 16*  152:*1*

**virtually**
224:*18*

**virtue**  127:*11*

**Vitamin**  41:*22*

**< W >**

**Wacker**  3:*9*

**Wait**  105:*21*
197:*14*

Confidential Information - Subject to Protective Order

**WALLACK** 4:*17*
**want** 7:*14*
14:6 31:*4*
38:*23* 72:6,
*13* 73:*3, 4, 5,
7* 77:*23*
78:*17, 19*
80:*9* 88:*20*
89:*6* 93:*12,
14* 107:*12, 23*
123:*22* 124:*5*
125:*17* 143:*8*
151:*13* 168:*2,
4* 188:*22*
189:*20*
203:*21* 204:*5*
205:*9* 207:*6*
219:*17* 220:*5,
20, 22* 221:*2,
22* 222:*11*
227:*16* 228:*22*
**wanted** 45:*20*
222:*4, 14, 15*
**wanting**
151:*23*
**wants** 151:*14*
**warranties**
84:*13, 15*
**Warranty**
5:*10* 30:*2*
32:*1* 85:*1*
124:*8, 12, 20*
126:*8, 19*
136:*2, 9, 17,
20* 137:*5, 7*
**warranty-**
**based** 84:*19*
**Washington**
2:*22* 3:*4* 4:*14*
**waste** 221:*1*
**watching**
200:*19*
**way** 24:*16*
32:*8* 34:*5*
50:*24* 56:*10,
20* 64:*12*
67:*4* 71:*20*
78:*1* 84:*14*
96:*3* 98:*23*
99:*20* 110:*7*

114:*13, 15*
118:*7* 133:*5*
140:*17* 143:*1*
153:*5* 156:*4,
9* 164:*3*
166:*15*
169:*10*
188:*23*
192:*15* 204:*6*
207:*18* 234:*8*
236:*13* 240:*16*
**ways** 32:*10*
112:*10, 15*
114:*23*
139:*22* 193:*1*
**weekly** 69:*6*
**weigh** 157:*23*
**weight** 23:*6*
25:*12* 50:*22*
58:*1* 64:*21*
93:*8* 174:*19,
22*
**welfare** 70:*16,
20* 71:*10*
75:*3* 95:*3, 5*
96:*21, 22*
**well** 9:*5, 14,
23* 10:*16*
11:*4* 12:*21*
17:*18* 21:*16*
26:*16* 29:*22*
38:*22* 42:*16*
49:*2* 56:*18*
62:*11* 65:*24*
68:*4* 71:*19*
82:*9, 17*
86:*12* 110:*5*
122:*17*
151:*24*
152:*15*
157:*12*
163:*23*
165:*23*
166:*15* 168:*2*
174:*16*
183:*24*
196:*19*
205:*16* 206:*7,
14* 208:*2*
216:*7, 8*
217:*1, 19*

219:*19, 21*
220:*8, 16*
226:*10*
**well-developed**
63:*13*
**went** 131:*2*
155:*18*
**we're** 9:*15*
10:*2* 11:*17*
12:*15* 13:*7*
88:*18* 89:*9*
107:*7, 8*
110:*5, 19*
124:*2* 146:*21*
188:*12*
196:*23* 208:*5*
221:*5, 6, 9*
227:*10*
**we've** 61:*12*
76:*2* 110:*6*
164:*1* 182:*6*
**whatsoever**
23:*7*
**WHEREOF**
240:*18*
**WHITELEY**
2:*8, 10*
**wholesaler**
139:*16*
140:*24* 141:*6*
**wholesalers**
228:*9*
**wholly** 131:*6*
**wide** 231:*6*
**widely** 105:*18*
**William** 5:*15*
188:*14*
**willing** 190:*10*
192:*24* 227:*7*
**willingness**
95:*14* 185:*2*
**withdrawal**
224:*3*
**withdrawn**
37:*2* 215:*6, 7*
**withdrew**
215:*11*
**withheld**
227:*13*
**WITNESS**
5:*22* 6:*18, 20*

10:6, *9* 56:*16*
101:*11*
105:*22*
115:*10*
155:*12*
160:*21*
184:*13*
186:*22*
195:*23*
205:*11, 23*
211:*22* 212:*6*
219:*10* 220:*4*
224:*3* 227:*10*
232:*24* 238:*1*
240:*10, 13, 18*
**word** 60:*10*
101:*13, 22*
146:*14*
204:*21* 214:*2*
**words** 30:*1*
42:*24* 55:*11*
71:*16* 111:*5*
112:*22* 127:*6*
133:*18* 154:*1*
175:*9, 22*
180:*13* 189:*18*
**work** 35:*1*
47:*4* 53:*17,
21* 122:*22*
131:*7* 136:*11,
12* 137:*3, 5*
149:*2* 155:*22,
23* 156:*2*
158:*10*
197:*20* 198:*9,
15* 199:*2*
200:*9, 14*
201:*23* 202:*4,
18* 203:*13*
206:*16, 20*
207:*1* 209:*5,
11, 20, 24*
210:*3, 7, 12*
214:*12* 224:*15*
**worked** 63:*23*
79:*17* 80:*12*
81:*5, 13, 24*
99:*23* 100:*3*
144:*12* 145:*7*
178:*24* 237:*13*

**working** 78:*5*
145:*21* 216:*1*
217:*13*
**works** 93:*13*
147:*21*
**world** 34:*7, 8*
80:*4* 99:*12*
101:*5* 111:*7,
23* 112:*3, 5,
11, 16, 20*
113:*1* 115:*1*
177:*24* 178:*4*
193:*3, 9*
194:*2, 5, 13*
195:*7, 19, 24*
237:*17, 19*
**worth** 8:*4*
133:*24* 142:*2,
5* 143:*10*
163:*4* 176:*15,
16*
**worthless**
25:*3* 117:*13*
119:*16* 120:*4,
9, 21* 121:*18*
127:*10* 128:*9*
130:*11, 14, 18,
24* 131:*21*
163:*15*
170:*17* 177:*21*
**worthlessness**
119:*6* 163:*3*
170:*21* 176:*12*
**would-be**
213:*5*
**wrap** 221:*3*
**write** 59:*14*
132:*22* 153:*7*
**writes** 129:*21*
**writing** 49:*1*
54:*15* 226:*2*
**writings** 46:*1,
22* 51:*17*
152:*18, 21*
**written** 29:*14*
49:*24* 51:*10,
12, 23* 62:*9*
120:*14*
152:*12, 14, 15,
17* 153:*1, 14*

Confidential Information - Subject to Protective Order

164:*1*  214:*17*
224:*13*
**wrong**  185:*13*
208:*17*
**wrongdoing**
24:*13*  27:*17*,
*22, 24*  97:*24*
122:*5*
**wrongful**  28:*2*
99:*18, 20*
**wrote**  48:*21*,
*23*  52:*10*
54:*11*  87:*6*
96:*3*  112:*2*
127:*8*  138:*18*
163:*3*  182:*20*
224:*18*  229:*4*

**< Y >**
**Yeah**  12:*12*
25:*10*  30:*18*
44:*16*  46:*19*
63:*11*  69:*16*
71:*3*  76:*5*
81:*10*  88:*15*
115:*13*
116:*22*  156:*7*
163:*1*  190:*1*
193:*12*
200:*20*
220:*10*  222:*1*
223:*8, 23*
224:*17*  227:*18*
**year**  10:*4*
49:*17*  199:*14*
200:*10*  210:*1*
231:*13*
**years**  212:*22*
**York**  1:*13, 14*,
*16*  6:*8, 23*
7:*17, 22*
239:*3, 4*
240:*3, 4, 8*

**< Z >**
**ZAPPONE**
3:*20*
**zero**  75:*21*
117:*8*  118:*11*
119:*6*  122:*20*
131:*1, 23*

133:*24*  163:*5,
17*  164:*5*
186:*2*  190:*4,
5, 8*  191:*4, 5,
14*  192:*19*
193:*5, 9, 16,
20*  194:*2, 6, 8*
195:*8*  196:*12,
14, 15*
**Zhejiang**  2:*14*
**ZHP**  191:*20*
**Zoom**  7:*9*
200:*19*