# Exhibit 9

REDACTED

RESTRICTED CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

IN RE: VALSARTAN, LOSARTAN, AND
IRBESARTAN PRODUCTS LIABILITY
LITIGATION

Civil Action No. 1:19-md-2875-RBK

# EXPERT REPORT OF LAUREN J. STIROH, PH.D.

## January 12, 2022

RESTRICTED CONFIDENTIAL

# Table of Contents

I.   **Introduction** .......................................................................................................... 1

    *A.*  *Qualifications* ................................................................................................ *1*

    *B.*  *Assignment* ..................................................................................................... *1*

    *C.*  *Materials Relied Upon* .................................................................................. *2*

    *D.*  *Summary of Opinions* ................................................................................... *3*

II.  **Background** ............................................................................................................. 9

    *A.*  *Products at Issue* .......................................................................................... *9*

    *B.*  *Overview of Dr. Conti's Class Certification Opinions* ..................... *11*

III. **Economic Value of At-Issue VCDs Cannot Be Assessed on A Classwide Basis** ........ 13

    *A.*  *Dr. Conti Ignores the Therapeutic Value of Affected VCDs* ................. *15*

    *B.*  *The FDA's Assessment of the Risks of At-Issue VCDs Would Likely Have Been Perceived Differently from Consumer to Consumer* ............................................ *17*

    *C.*  *The Presence of Health Risks Does Not Render a Product Worthless* ................. *18*

    *D.*  *Health Risks to Class Members Likely Varied by Consumer and Cannot be Reliably Quantified with Information Common to the Class* ........................................ *21*

    *E.*  *Economic Value Received from At-Issue VCDs Differ from Consumer to Consumer* ......... *24*

IV.  **Plaintiffs' Payments for VCDs and VCD Substitutes Would Likely Have Been Equal or Higher If Defendants' VCDs Were Unavailable or If Plaintiffs Had Purchased Different Medication** ............................................................................................ 26

    *A.*  *Market Prices Likely Would Have Been Higher with Fewer Generic Suppliers* ............. *26*

    *B.*  *Payments Would Likely Have Been the Same Had Consumers Purchased Unaffected VCDs* *30*

    *C.*  *Before Recalls, Affected VCDs Were among the Lowest Cost Options for Hypertension Medication* .............................................................................................. *30*

    *D.*  *TPPs Face No Identifiable Economic Losses and Available Data Indicate that TPPs Spent More on Replacement Hypertension Medication after the Recalls than on At-Issue VCDs before the Recalls* .................................................................................... *33*

V.   **Retail Pharmacy and Wholesaler Damages Related to Plaintiffs' Theories of Liability and Unjust Enrichment** .......................................................................................... 34

VI.  **Conclusion** ............................................................................................................ 37

RESTRICTED CONFIDENTIAL

# I.    Introduction

## A.  Qualifications

1.  My name is Lauren J. Stiroh.  I am an economist and Managing Director of NERA Economic Consulting.  NERA was founded in 1961 and provides research and analysis in the field of applied microeconomics, including the economics of competition, regulation, and finance.  A substantial portion of my work, as well as NERA's consulting work, includes the calculation of economic damages and analysis of class certification issues.

2.  I have experience analyzing a variety of business practices in a litigation setting, including cases involving allegations of breach of contract, commercial disputes, business interference, conspiracy, monopolization, vertical restraints, price predation, tie-ins, and patent infringement.  I have provided economic consulting services and testimony in connection with liability, damages, and class certification issues, and have testified at both deposition and trial.  I have extensive experience with economic damages and class certification issues in a range of industries, including pharmaceuticals, medical devices, biotechnology, labor, automotive services, agricultural products, industrial chemicals, consumer products, insurance, real estate, sports, advertising and promotion, and semiconductors.

3.  I have worked on a number of cases involving various aspects of the pharmaceutical, medical, and health sciences industries.  I have assessed the pricing implications of regulation and of patent infringement settlements in pharmaceuticals, analyzed the economics of contractual tying in medical devices, and evaluated market power associated with innovations in medical technologies, among others.  As part of my work, I have studied the economics and competitive dynamics of pharmaceuticals, dental and medical supplies, eyeglasses, medical device sterilization services, hip and knee replacements, pulse oximeters, and catheters.

4.  I received my Ph.D. in economics from Harvard University in 1996.  Prior to that, I completed my B.A. in economics from the University of Western Ontario in 1990, and my M.A. from the University of British Columbia in 1991.  My curriculum vitae, which includes a list of my prior expert testimony, is appended to this report as **Exhibit 1**.  NERA is being compensated for my time at a rate of $1,050 per hour.  Neither NERA's compensation, nor my compensation, depends on the outcome of this litigation.

## B.  Assignment

5.  I have been asked by counsel for all Defendants to opine on whether (and to what extent) the economic evidence and analysis that would be used to assess damages resulting from the allegations set out in the Third Amended Consolidated Economic Loss Class Action Complaint are common to the proposed class versus affecting only individual putative

class members.[1]  I have also been asked to evaluate and comment on the opinions and calculations presented in the declaration of Dr. Rena Conti, submitted on November 10, 2021, as they pertain to the appropriateness of class certification, the estimation of economic loss damages, if any, in this matter, and the use of an aggregate classwide damages model based on the assertion that the valsartan-containing drugs ("VCDs") purchased by the putative class members are "worthless."[2]  I do not make an assessment regarding any actual risk of safety issues with regard to the subject VCDs, and I offer no opinion on whether the presence of N-nitrosodimethylamine ("NDMA") or N-nitrosodiethylamine ("NDEA") impurities rendered any of the at-issue VCDs adulterated or misbranded during the relevant time period.  It is my understanding that these are disputed issues.  Instead, my opinions assume the possibility of risk and the considerations required to assess how the economic value of those VCDs would change even if there were a health risk related to the impurities at issue.  I also do not opine on the legal issues relating to the proper measure of damages or on which measure should be used; instead, I have analyzed the economic issues that arise with respect to multiple possible measures.

## C.  Materials Relied Upon

6.  In preparing this report, I, and economists working under my direction, have reviewed the Conti Report, the Craft Report,[3] the Quick Report,[4] the Najafi Report,[5] the Panigrahy Report,[6] the Kosty Report,[7] the Etminan Report,[8] the Chan Report,[9] and the documents referenced therein; data, documents, deposition testimony, and other materials produced

---

[1]   Third Amended Consolidated Economic Loss Class Action Complaint, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 1, 2021 ("Complaint").  While a class has not been certified, for ease of reference, I use the term "class member" in this report to refer to putative class members.

[2]   Expert Declaration of Rena Conti, Ph.D., *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 10, 2021 ("Conti Report").

[3]   Expert Declaration of Laura R. Craft, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 10, 2021 ("Craft Report").

[4]   Expert Declaration of John L. Quick, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 7, 2021 ("Quick Report").

[5]   Expert Declaration of Ron Najafi, Ph.D., *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 4, 2021 ("Najafi Report").

[6]   Rule 26 Expert Report of Dipak Panigrahy, MD, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, July 6, 2021 ("Panigrahy Report").

[7]   Expert Report of Timothy E. Kosty, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, January 12, 2022 ("Kosty Report").

[8]   Expert Report of Dr. Mahyar Etminan PharmD, MSc, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, July 4, 2021 ("Etminan Report").

[9]   Expert Rebuttal Report of Dr. David Chan, MD, PhD, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, January 12, 2022 ("Chan Report").

RESTRICTED CONFIDENTIAL

by the parties in this case; and publicly available materials. The opinions expressed in this report are based on my review of this information, my training and experience as an economist, and the application of economic analysis to the information that I have reviewed. A list of the sources of information and materials I relied upon in forming my opinions is presented in **Exhibit 2**.

### D. Summary of Opinions

7. Based on my analysis to date, I have reached the following opinions:

   i.   Economic loss damages to members of consumer or third-party payor ("TPP") classes, if any, cannot be assessed on a classwide basis using information and methods common to the proposed class.

   ii.  Plaintiffs assert that economic losses depend on the difference between the prices paid (either by consumers or TPPs) for the VCDs produced by Defendant Manufacturers before product recalls ("at-issue VCDs") and the value received from those VCDs, and further assert the putative class members received no value and that the at-issue VCDs were "worthless." Plaintiffs' assertion of worthlessness is based on the assumption that the presence, or potential presence, of nitrosamine impurities in VCDs rendered the products adulterated or misbranded. However, Plaintiffs' and Dr. Conti's approach to damages assessment does not accurately use or apply reliable economic valuation principles. From an economic perspective, it is not accurate to state that the value of a prescription drug product that has already been sold and used is retroactively reduced to zero because later production of the same product was subsequently recalled. As set forth in greater detail below, the economic value of a prescription drug depends on numerous factors requiring individualized analysis, including but not limited to the therapeutic value of the product's indicated use, the personal benefits to the consumer (patient) from the therapeutic value of the product, and the known or perceived risks. In fact, when the recalls were announced, the U.S. Food & Drug Administration ("FDA") advised patients to continue taking recalled VCDs until they obtained a replacement medication, indicating that the FDA considered that the product retained therapeutic value even after the discovery of the impurities, and that the therapeutic value of the prescription drug outweighed its risks after the recall—and patients themselves have attested that they received some therapeutic value from the VCDs they consumed— circumstances that Dr. Conti has not reconciled with her premise that the drugs were automatically rendered "worthless" going backwards in time for years.

   iii. The economic value of the drug would not necessarily be eliminated, or even diminished, by the presence of a previously unknown impurity if the impurity did not affect the therapeutic effectiveness of the drug, did not reduce the personal benefit to the consumer (patient) from the therapeutic value of the

RESTRICTED CONFIDENTIAL

drug, was not of sufficient magnitude to concern the prescribing doctor, and/or did not impact the individual patient's risk-benefit assessment. These are value determinations that vary on an individual basis depending on each consumer's individual circumstances and are potentially informed by that consumer's physician's opinions. Even for those consumers for whom the presence of an impurity might diminish their perceived value of a drug they already purchased and used, the amount of any such diminution in value would be a function of the therapeutic effectiveness of the drug for each consumer. I understand that the degree of risks posed by impurities to each specific consumer which, to the extent the impurities pose any risk, necessarily depends on the amount of the impurity in specific prescriptions as well as other issues specific to that individual (such as weight, genetic background, or other factors), and each consumer's aversion to those risks, which may be affected by consultation with his or her physician. That information varies class member to class member—indeed, prescription to prescription—and cannot be assessed with information common to the class.

iv.   Economic research indicates that individuals are willing to face and able to value risks. The presence of risk does not automatically render a product worthless. To the contrary, every prescription drug purchase represents a valuation of therapeutic benefit versus risk, as every prescription drug has therapeutic benefits and carries known and perceived risks. The addition of a new known or perceived risk to the list of already known and perceived risks about a prescription drug thus does not automatically reduce its value from something to nothing, but simply adds a new item of information for the consumer to assess in valuing the risk of the prescription drug. The inclusion of a modest new known or perceived risk associated with a therapeutically important drug that reduces an existing risk of much greater personal importance to the consumer, thus may have little or no impact on the consumer's individual valuation assessment. Economic research and marketplace examples illustrate how risk has been incorporated into product valuations and further show that perceptions of and aversions to risk vary across individuals. Consumer decisions in the marketplace show that individuals' perceptions of value are not exclusively contingent on FDA approval. Specifically, with regard to nitrosamines, marketplace examples demonstrate that consumers continue to purchase products, such as bacon and processed meats, that are known to contain nitrosamines, indicating that the presence of nitrosamines does not render a product "worthless" to consumers.

v.   There is no common method or data to determine the value each consumer received from their purchases of affected VCDs, or the retroactive impact, if any, on the value of at-issue VCDs already purchased and used by each consumer prior to discovery of impurities. Based on testimony from Plaintiffs' and Defendants' experts and statements from the FDA, evaluating the degree of known, potential, or perceived risk to each patient, if any,

4

RESTRICTED CONFIDENTIAL

requires information that is not available classwide.  Quantifying how each consumer valued the potential risks would require information about how each consumer perceived the risk after discovery of the impurity, and what each consumer would have been willing to pay in retrospect to avoid it.  Dr. Conti provides no analysis of either actual risk to class members or their aversion to such risk and provides no classwide basis on which to measure the perceived diminished value, if any, of the products at issue.

a.  Even Plaintiffs' scientific experts in this matter concede that the amount of consumption is relevant to the degree of actual health risks, if any, from NDMA and NDEA exposure, which means that the amount of consumption is also relevant to any diminution of economic value to consumers attributable to potential health risks.  I understand this to be consistent with Plaintiffs' own definition of the purported Medical Monitoring class in this litigation, which excludes VCD consumers based on the duration of their consumption and differentiates between manufacturers because the levels of impurities varied by manufacturer.  I understand that Defendants' scientific experts contend that the degree of health risks, if any, would also depend upon an individual consumer's risk profile, including factors such as weight, genetic background, or other factors.  However, there is no reliable way to quantify consumption or risk classwide.  Doing so requires information about the level of impurities in each affected VCD prescription filled by each consumer, each individual's prescription histories, and each individual's personal risk profile.  This information is not available classwide, if at all.

b.  Dr. Conti has not shown that the degree of known or perceived risk to which each consumer was exposed, if any, would have been sufficient to erase any, much less all, of the value provided by those VCDs.  Moreover, any economic analysis of diminution of value would need to assess known and perceived risk and benefits at the individual level, which Dr. Conti does not consider.

c.  My analysis of information produced in this case indicates that known and perceived risks and benefits of at-issue VCDs would vary across class members.  For example, deposition testimony of multiple named Plaintiffs demonstrates that some class members continued to take recalled VCDs despite knowing about the potential presence of impurities in their medication.  This contradicts Dr. Conti's claim that the at-issue VCDs were uniformly worthless.  Moreover, my understanding is that some at-issue VCDs contained no impurities.  In such circumstances, where Defendants' VCDs that contained no impurities were purchased by consumers, those consumers received the exact product that they thought they were purchasing and could not have been subjected to any alleged

RESTRICTED CONFIDENTIAL

safety and quality issues that, according to Dr. Conti's model, would diminish the value of the drug that they purchased.

vi.  Dr. Conti's opinion that "adulterated" and "misbranded" pharmaceutical products are worthless is not based on sound economic reasoning and is instead a punitive legal policy prescription masquerading as economic testimony. Her opinion on worthlessness is indifferent to the degree of known or perceived health risks, if any, faced by class members. The opinion that value would not be dependent on the degree of risk of exposure to adverse health outcomes is contrary to basic economic theories of risk-based pricing, the basic economic realities of the prescription drug market, which is by its nature a valuation of known or perceived benefits against risks, and even lay common sense. While Dr. Conti acknowledges that one aim of FDA regulations is to promote effective drugs rather than "useless remedies," she fails to account in any way for the therapeutic value at-issue VCDs did provide and class members' and their physicians' recognition of those therapeutic benefits. I understand that Plaintiffs do not allege that the presence of the impurities had any negative impact on therapeutic efficacy of at-issue VCDs. Dr. Conti cannot assess economic losses without considering the medical benefits of affected VCDs, the likelihood of any risks, or consumers' aversion to risks.

vii.  Dr. Conti additionally fails to identify any economic loss for which TPPs must be made whole. She has not shown that the value of the at-issue VCDs was diminished at all with respect to TPPs – much less diminished by 100 percent – given that, regardless of at-issue VCD risk, they inherently face no health risk and face no financial loss: the TPPs were not required to somehow replace past VCD purchases their members had already used prior to the recall. Moreover, the at-issue VCDs provided value to TPPs because the at-issue VCDs continued to offer therapeutic value, and, as I understand, allowed the TPPs to provide the prescription coverage for their members that they were contractually required to provide. As such, Dr. Conti's proposed classwide damages, which include full refunds to TPPs, would result in large windfall payments for all TPP class members, without any economic justification. Putting aside the fact that there is no tangible economic loss to any TPP bringing suit, even if the at-issue VCDs had never been on the market, TPPs would likely have paid at least as much for alternative hypertension medication—and in all events would have paid *something* for alternative hypertension medication. Determining what amounts TPPs would have spent on alternative treatments would require information not only about what medication patients would have switched to but also about the costs to TPPs for those medications. Identifying the alternatives and determining how the costs of those alternatives would have compared to the amounts actually paid by the TPPs would be an individual and fact-intensive inquiry.

viii.   Dr. Conti's model also does not account for the market-specific features of pricing and value in the regulated prescription drug market.  If the relevant measure of economic loss to class members is the difference between their actual financial positions and what their financial positions would have been if Defendants had never sold the at-issue VCDs in the U.S., then neither consumer nor TPP class members suffered economic loss to the extent they would have paid similar or higher amounts for alternative products.  Many of the putative class representatives who have been deposed admitted at their depositions that medication is necessary for controlling their hypertension, so that if they were not taking Defendants' VCDs, they would have had to purchase some other product.

a.   Economic analysis indicates that, had Defendants' VCD products not been available, most class members would have paid at least as much for their medications because of lower overall market supply of VCDs and potentially more expensive replacement options.  Dr. Conti's damages model essentially rests on the economically unsupported premise that consumer class members should have received full therapeutic benefits without any financial costs.

b.   Many consumer class members on insurance plans with copays would likely have paid the same copay amounts absent Defendants' conduct at issue.  This would happen when, within each insurance plan, copays for generics of the same drug are the same across all manufacturers.  Similarly, in cases where patients would have switched to non-affected generic VCDs absent Defendants' conduct at issue, TPP class members would likely have paid at least as much as they did for at-issue VCDs because TPP reimbursements are usually based on the Maximum Allowable Cost ("MAC") set by the TPP's Pharmacy Benefit Manager ("PBM"), which does not differ for the same generic drug from different manufacturers.

c.   Failing to account for the real-world economic difference (or lack of difference) between what consumers and TPPs actually paid for the at-issue VCDs versus what they would have paid in the prescription drug market absent the at-issue VCDs again means Dr. Conti's model awards a windfall by giving consumers and TPPs the benefit of the full therapeutic value of their VCDs at no cost, without accounting for the equivalent costs required to obtain the same therapeutic benefit from a different prescription drug.  Dr. Conti's model offers no method to account for these offsetting costs on a classwide basis, nor can it, as the cost of an alternative hypertension drug may vary from class member to class member based on prescription drug benefits, pricing, payment structure, and similar patient-specific and plan-specific features.

7

RESTRICTED CONFIDENTIAL

ix.  Dr. Conti also purports to calculate unjust enrichment damages, which I understand to be the portion of a benefit conferred by a plaintiff on a defendant which it would be unjust for the defendant to retain.  Dr. Conti's claim that she can calculate unjust enrichment damages is incomplete and unreliable.

    a.  While Dr. Conti assumes that profits at the point of sale are the appropriate measure of the unjustly conferred benefit, she does not actually account for the costs necessary to calculate profits, nor has she shown that she can.  Furthermore, Dr. Conti merely claims in a footnote that she "can calculate…if needed" total damages that do not double count across different theories of liability or different entities along the supply chain.

    b.  Dr. Conti provides no analysis to identify benefits specific plaintiffs conferred on specific defendants.  I understand that such an assessment is a legal requirement for assessing unjust enrichment damages.  Such an exercise likely requires reconciling datapoints representing millions of purchases of VCDs, which are contained in imperfect datasets recorded by independent entities at different levels of the supply chain.

    c.  Correctly accounting for the portion of payments from Plaintiffs that were ultimately received and then unjustly retained by each Manufacturer, Wholesaler, and Retail Pharmacy Defendant would likely require individualized inquiry given the complex variation across contracts in the pharmaceutical supply chain.  Dr. Conti does nothing on this front as to Wholesalers, and, while Dr. Conti's report presents tables of numbers that purport to reflect Retailer Pharmacy damages, these tables only reflect her ability to striate and tabulate claims within independent datasets, which has no bearing on the general feasibility of tracking dollars spent at each level of the supply chain for the relevant subset and combinations of pills, patients, and entities, not to mention any other factors that the Court may find relevant.

    d.  Even the tabulations Dr. Conti does present are unreliable as she has not accurately identified the relevant subset of purchases in the datasets provided to her.  Finally, apart from failing to determine portions of benefit plaintiffs bestowed on particular Defendants, Dr. Conti does not provide any analysis to assess what portion of that benefit was "unjustly" retained – an analysis that would likely require individualized inquiry.

8.  These opinions are based on my review and analyses of documents and information made available to me to date.  I reserve the right to update my opinions should additional information be provided to me or should Dr. Conti alter her analyses or opinions.

RESTRICTED CONFIDENTIAL

## II. Background

### A. Products at Issue

9. Valsartan is the active pharmaceutical ingredient ("API") in multiple hypertension medications indicated for the treatment of high blood pressure and heart failure.[10] It has been available in the U.S. since 2002 under the brand name Diovan.[11] Valsartan is available in products that either have valsartan as the sole API, or in combination with hydrochlorothiazide ("HCT") and/or amlodipine (*i.e.,* valsartan-HCT, amlodipine-valsartan, and amlodipine-valsartan-HCT).[12] Generic manufacturers began marketing valsartan-HCT in 2012 when the patent for the brand version, Diovan HCT, expired.[13] Although the patent for Diovan also expired in 2012, generic valsartan did not receive FDA approval until 2014.[14] Generic amlodipine-valsartan and amlodipine-valsartan-HCT were first introduced to the U.S. market in 2014 after the patent for the branded Exforge and Exforge HCT expired.[15] VCDs belong to a class of hypertension medications called angiotensin receptor blockers ("ARB's") which treat high blood pressure by relaxing the blood vessels.[16]

10. I understand that in 2018 and 2019 some valsartan products were voluntarily recalled after it was discovered that those products may contain trace amounts of NDMA or NDEA impurities, which, based on the classification given to them by the International Agency for Research on Cancer, the FDA has identified as substances that potentially increase the risk of cancer.[17] On July 13, 2018, the FDA announced voluntary recalls of select lots of VCDs due to the detection of trace amounts of NDMA.[18] Patients taking recalled products were instructed by the FDA to "continue taking their medicine until they have a replacement product … [b]ecause valsartan is used in medicines to treat serious medical conditions" and "the risk of harm to a patient's health may be higher if

---

[10] Robert D. Hill and Prabhakar N. Vaidya, "Angiotensin II Receptor Blockers (ARB)," *National Center for Biotechnology Information*, April 14, 2021.

[11] Diovan (Valsartan) Drug Approval Package, *FDA Website*, February 3, 2003.

[12] Robert D. Hill and Prabhakar N. Vaidya, "Angiotensin II Receptor Blockers (ARB)," *National Center for Biotechnology Information,* April 14, 2021. Hydrochlorothiazide is sometimes abbreviated as HCTZ. *See e.g.,* "FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018.

[13] "Mylan Launches First Generic Version of Diovan HCT Tablets," *Mylan*, September 21, 2012; Larry Husten, "Diovan Patent Expires But Generic Valsartan Is MIA," *Forbes,* September 25, 2012.

[14] Toni Clarke and Zeba Siddiqui, "Ranbaxy Gets FDA Approval for Novartis's Diovan Generic," *Reuters*, June 27, 2014.

[15] IQVIA NSP Data for VCDs, December 2014 to November 2020; IQVIA NSP Data for VCDs, January 2012 to December 2014.

[16] Other ARBs include azilsartan, candesartan, eprosartan, irbesartan, losartan, olmesartan, and telmisartan. *See,* "Angiotensin II Receptor Blockers (ARB)," *National Center for Biotechnology Information,* April 14, 2021.

[17] "FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018; "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)," *FDA*, March 22, 2019 Update.

[18] "FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018.

**RESTRICTED CONFIDENTIAL**

the treatment is stopped immediately without any alternative treatment."[19]  The final voluntary recalls announced by the FDA were in March 2019.[20]

11. At the end of 2018, the FDA established intake limits for NDMA and NDEA and recommended recalls of valsartan products if they contained impurities in excess of those limits.[21]  I understand that those levels were estimates of daily exposure to impurities that would result in an estimated 1 in 100,000 risk of cancer if consumed every day for 70 years for a 50kg[22] human.[23]  The FDA described this degree of risk resulting from lifetime daily consumption as "reasonably safe."[24]  These limits were 96 ng/day for NDMA and 26.5 ng/day for NDEA.[25]  These limits correspond to concentrations of 0.3 ppm for NDMA and 0.083 ppm for NDEA for products containing 320mg of valsartan, which is the maximum available dose.[26]  In an August 2019 press release, the FDA noted that their risk estimates applied to a "worst-case scenario" where patients took the highest dosage (320mg) for four years, but "the actual risk to patients is likely much lower than [their] estimates."[27]

12. I understand that some Defendant Manufacturers produced some batches of API and VCDs that contained no NDMA or NDEA.  For example, in Mylan's manufacturing process, I understand that impurities accumulated in reused solvents and that, consequently, batches of API produced with fresh solvent contained no accumulated impurities.[28]  ███████████████████████████████ [29]

[19]  "FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018; "Teva Pharmaceuticals USA Issues Voluntary Nationwide Recall of Valsartan and Valsartan Hydrochlorothiazide Tablets," *FDA*, July 17, 2018.

[20]  "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)," *FDA*, March 22, 2019 Update.

[21]  "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)," *FDA*, December 19, 2018 Update.

[22]  50 kg is roughly equivalent to 110 lbs.

[23]  "FDA Updates and Press Announcements on Angiotensin II Receptor (ARB) Blocker Recalls (Valsartan, Losartan, and Irbesartan)," *FDA*, December 19, 2018 Update.  *See also,* Panigrahy Report, pp. 10-12.

[24]  "Laboratory Analysis of Valsartan Products," *FDA Website,* May 2, 2019.

[25]  Panigrahy Report, p. 11; "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)," *FDA,* July 27, 2018 Update.

[26]  Panigrahy Report, p. 10.

[27]  "Statement on the agency's ongoing efforts to resolve safety issue with ARB medications," *FDA,* August 28, 2019.

[28]  Sample Analysis Details of Valsartan (Manufacturing Processes Filed in US), 2018, MYLAN-MDL 2875-00591174.

[29]  APL Research Centre-II Analysis Report, April 2, 2019, Auro-MDL 2875-0020760-761; Department of Health and Human Services Food and Drug Administration NDA/ANDA Field Alert, December 20, 2018, Auro-MDL 2875-0020766-769 at 769; Evaluation of N-nitrosodimethylamine (NDMA) and N-nitrosodimethylamine (NDEA) impurities in Valsartan USP (Process II) manufactured by Aurobindo Pharma Limited., December 20, 2018, Auro-MDL 2875-0020775-776 at 775-776; Department of Health and Human Services Food and Drug Administration NDA/ANDA Field Alert, December 26, 2018, Auro-MDL 2875-0020785-804 at 797-804; Department of Health and Human Services Food and Drug Administration

10

13. Plaintiffs allege that consumers and TPPs sustained economic injury by paying for affected VCDs, and seek damages for the economic losses they purportedly suffered from purchases of VCDs from 2012 until the VCD recalls that took place from July 2018 to March 2019.[30] The purported Economic Loss Class alleged in the Complaint in this matter includes "[a]ll individuals and entities in the United States and its territories and possessions who, since at least January 1, 2012 to the present, paid any amount of money for a valsartan-containing drug (intended for personal or household use) that was manufactured, distributed, or sold by any defendant."[31] The Complaint divides this nationwide class into two subclasses: one purporting to represent consumers and another purporting to represent TPPs.[32] Exhibits A and B to Plaintiffs' Motion for Class Certification of Consumer, Third Party Payor, and Medical Monitoring Claims further defines 93 consumer economic loss subclasses, and 19 TPP economic loss subclasses.[33]

14. Plaintiffs also seek damages based on unjust enrichment, stating that it would be "inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation obtained from Plaintiffs and other Class Members as a result of their wrongful conduct alleged in this Complaint."[34] In their brief in support of their Motion for Class Certification of Consumer Economic Loss Claims, Plaintiffs appear to limit their unjust enrichment claims to the Wholesaler and Retail Pharmacy Defendants, and Dr. Conti discusses unjust enrichment only in the context of those Defendants.[35]

## B. Overview of Dr. Conti's Class Certification Opinions

15. Plaintiffs retained Dr. Conti to "provide opinions and calculations regarding the injury and damages incurred by the Classes of consumers and end-payors in this matter."[36] Dr.

NDA/ANDA Field Alert, April 26, 2019, Auro-MDL 2875-0020811-813 at 813; Aurobindo Toxicology Health Hazard Assessment, January 2019, Auro-MDL 2875-0020989-1000 at 996-1000; APL Research Centre-II Analysis Report, May 2, 2019, Auro-MDL 2875-0021259-260 at 259-260; APL Research Centre-II Analysis Report, December 27, 2018, Auro-MDL 2875-0021287; APL Research Centre-II Analysis Report, April 2, 2019, Auro-MDL 2875-0021288-289 at 288-289; APL Research Centre-II Analysis Report, February 2, 2019, Auro-MDL 2875-0021290-291 at 290-291; APL Research Centre-II Analysis Report, January 19, 2019, Auro-MDL 2875-0021292-294 at 292-294;

APL-MDL 2875-0139456.

[30] Complaint, ¶¶ 632, 651, 669, 687, 738, 759, 779; "FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018; "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)," *FDA*, March 22, 2019 Update.

[31] Complaint, ¶ 603.

[32] Complaint, ¶ 604.

[33] Plaintiffs' Motion for Class Certification of Consumer, Third Party Payor, and Medical Monitoring Claims, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 10, 2021.

[34] Complaint, ¶ 785.

[35] Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification of Consumer Economic Loss Claims, *In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation,* Case No. 1:19-md-2875-RBK, United States District Court for the District of New Jersey, November 10. 2021, pp. 2-3; Conti Report, Section V and VI.

[36] Conti Report, ¶ 1. End-payors is another name for TPPs.

11

RESTRICTED CONFIDENTIAL

Conti opines that "prescription drugs that are adulterated and misbranded have no economic value" and that "the appropriate measure of damages in this matter is the total amount paid by each plaintiff for the at-issue Valsartan products."[37] Dr. Conti assumes that all VCDs produced by Defendant Manufacturers were adulterated and misbranded.[38]

16. Dr. Conti opines that the "assurance of safety and quality by the manufacturers of prescription drugs is foundational to third-party payers' decision making" and that, consequently, "[t]here is no insurer demand for non-safety and quality compliant, adulterated, and misbranded drugs."[39] She further opines that "[a]ccording to economic theory, for a consumer product to have economic value, demand for the product must exist and supply must be allowed to meet demand."[40] Dr. Conti concludes that because "there is no legitimate supply curve for [adulterated and misbranded] drugs … there is no economically determinable price for non-compliant drugs."[41] Moreover, Dr. Conti opines that the at-issue VCDs must be deemed worthless because "assigning a non-zero value to non-safety and quality compliant products… would be to incentivize and legitimize cheating and non-compliance by manufacturers."[42]

17. Dr. Conti purports to estimate Economic Loss damages as all spending on at-issue VCDs by consumers and TPPs. Dr. Conti's method would provide a refund to plaintiffs of all amounts spent on VCDs produced by Defendant Manufacturers and sold before recalls, regardless of whether that product's lot was recalled, whether the recalled lots had detectable levels of NDMA or NDEA, or whether any levels of NDMA or NDEA detected exceeded the levels identified by FDA in December 2018.[43] Dr. Conti does not account for any refunds already dispensed to consumers for returned products.[44] Her assessment of harm does not allow for or consider any diminution of value less than 100 percent.

18. 

---

[37] Conti Report, ¶¶ 7-8.

[38] Conti Report, ¶ 2.

[39] Conti Report, ¶ 40.

[40] Conti Report, ¶ 43.

[41] Conti Report, ¶ 44.

[42] Conti Report, ¶ 45.

[43] Conti Report, ¶¶ 2, 60; Conti Reliance Materials.

[44] Conti Reliance Materials, "05_Damages_Analysis.sas."

[45] Conti Report, ¶ 78.

RESTRICTED CONFIDENTIAL

███████████████████████[46]  Dr. Conti states that she does not "consider any offsets such as rebates when calculating damages again[st] the Manufacturer and Retail [Pharmacy] Defendants since these do not occur at the point of sale."[47]

19. Dr. Conti proposes to use a similar method to estimate Defendant Wholesaler unjust enrichment damages, as represented by wholesaler profits, once the "appropriate input data" are available.[48]  As a result, Dr. Conti in essence makes no meaningful calculation of Wholesaler damages.

20. The purported damages calculated by Dr. Conti are not Economic Loss damages and are based on unsound economic reasoning.  Her measure of value fails to perform an appropriate comparison of costs and benefits not only because she disregards the beneficial therapeutic effects of the at-issue VCDs, but also because her proposed damages methodology assumes worthlessness regardless of the degree of known or perceived health risks, if any, due to impurities.  There is no basis, as a matter of economics, to assume that the value of a product is unrelated to the magnitude of its known or perceived risks and benefits, or that pills that pose a minimal risk to consumers/TPPs would have the same "assigned" value as pills that posed significant risks.  Finally, the unrealistic simplicity of her calculations belies the complexities of the drug supply chain and fails to demonstrate her ability to reliably perform the appropriate computations.  Thus, Dr. Conti's opinion that all at-issue VCDs are retrospectively worthless due to the subsequent discovery of an unexpected impurity is merely a baseless assertion with no grounding in economics.

## III. Economic Value of At-Issue VCDs Cannot Be Assessed on A Classwide Basis

21. I understand that Plaintiffs seek compensatory damages for certain of their causes of action.  I further understand that the basic goal of compensatory damages is to make the plaintiff whole.  In other words, the damage calculation should aim to return each class member to the economic position she or he would have been in absent the Defendants' alleged misconduct—that is, to restore each class member to the economic position she or he would have been in had she or he purchased a drug delivering the value anticipated rather than the at-issue VCDs.  This "make-whole" approach to economic damages requires assessing what class members' economic positions would have been absent the allegedly wrongful conduct and comparing that to their actual economic positions.[49]

---

[46] Conti Report, ¶ 78.

[47] Conti Report, footnote 52.

[48] Conti Report, ¶¶ 84-86.

[49] *See, e.g.,* "Make One Whole," *Legal Information Institute* ("Make one whole is a theory of remedying a breach of contract or other legal obligation. The idea is that someone should be awarded damages to put that person in the same position they

13

Case: 19-1940 Document: 1-1 Page: 17 Page ID: 9003
Case 1:19-md-02875-RMB-SAK Document 2009-1 Filed 03/03/22 Page 17 of 67 PageID: 68259

RESTRICTED CONFIDENTIAL

22. The computation of what amount would make a plaintiff whole can be accomplished using several different measures.[50]  One measure of damages—sometimes called diminution in value—is the difference between the amount paid by a consumer or TPP for the products at issue and the value received.[51]  By refunding this difference, a plaintiff can be made whole.

23. Plaintiffs' expert claims that the value of the products received is zero and that damages are therefore the entirety of the amounts paid by class members.  I disagree.  As a matter of economics, value must reflect the benefits received, including therapeutic benefits, and accordingly, products that provide effective therapeutic benefits but that also may confer risk on the user can still have economic value.  However, the value perceived by consumers would vary from consumer to consumer, and therefore economic damages cannot be assessed with information common to the class.

24. Dr. Conti's proposed damages calculation is indifferent to the magnitude of known or perceived health risks and benefits, and as such, fails to measure economic losses that stem from value diminution, if any, due to the alleged health risks of the NDMA and NDEA impurities.  As a matter of economics, any diminution in value, including the 100 percent diminution that Dr. Conti proposes, would depend on the nature of the impurity, its impact on the safety and efficacy profile of the product in question, and individual characteristics of the consumer.  In terms of assessing economic value, impurities that pose no risk to a consumer would not have the same effect as impurities that generated significant risk to a consumer, regardless of whether such impurities constitute adulteration or misbranding, as Dr. Conti assumes.  Dr. Conti provides no analysis to demonstrate that the degree of known or perceived risk inherent in affected VCDs was so uniformly great as to erase any positive value for all consumers, nor has she accounted for the positive therapeutic value of the VCDs to any of them.

---

would have been if the obligation was not broken").  *See also*, the Reference Manual on Scientific Evidence, in the chapter discussing "The Standard General Approach to Quantification of Damages":

> The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.  In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position. … The characterization of the harmful event begins with a clear statement of what occurred.  The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario).  Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario.  Economic damages are the difference between that value and the actual value that the plaintiff achieved.

Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition) (Washington, DC: National Academies Press, 2011), p. 432.

[50]  As noted above, I am not offering an opinion on which measure of damages is most appropriate as a legal matter.

[51]  I understand that this measure of damages would be consistent with how economic damages for breach of warranty claims are defined in the Uniform Commercial Code and applied in some states, including New Jersey, namely: "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted … ."  *See*, Uniform Commercial Code, §2-714.  I offer no opinion on whether this measure of damages applies to all Plaintiffs' claims in all states.

14

RESTRICTED CONFIDENTIAL

25. Thus, Dr. Conti's opinion on worthlessness is predicated solely on her view that value only exists when supply meets demand to form an equilibrium price, coupled with her reasoning that the existence of an impurity that is assumed to constitute adulteration or misbranding erases the supply curve and thereby makes the determination of an equilibrium price impossible. Dr. Conti's claims are not supported by sound economic reasoning.

26. Dr. Conti provides no means to assess diminution in value other than her blanket assertion that all at-issue VCDs were worthless to all who paid for them. Her proposed measure of classwide damages therefore assumes uniformity in impact to class members when there is none. Whether consumers believed they received value from consuming the at-issue VCDs notwithstanding the impurities, as opposed to deeming them entirely worthless, is an individualized question that differs from consumer to consumer based on trade-offs each consumer would have considered, such as efficacy and health risk.

27. Instead of relying on economic theory and analysis, Dr. Conti appears to have derived her opinion that the VCDs at issue are worthless from her opinion that "assigning a non-zero value to non-safety and quality compliant products ... would ... incentivize and legitimize cheating and non-compliance by manufacturers and other members of the United States pharmaceutical supply chain."[52] This concept of determining the magnitude of damages based on whether such damages would provide a deterrent to the underlying conduct at issue has no bearing on whether class members suffered actual economic losses. To the contrary, what Dr. Conti calculates appears to be a punitive (rather than compensatory) measure of damages designed to deter manufacturers from using unsafe methods of manufacturing rather than an economic measure of damages designed to restore to plaintiffs the value they would have received absent Defendants' alleged wrongdoing.

### A. Dr. Conti Ignores the Therapeutic Value of Affected VCDs

28. Dr. Conti offers no analysis or discussion of whether at-issue VCDs provided the claimed therapeutic value or whether the impurities at issue were uniformly harmful to all class members. Her report wholly fails to consider how therapeutic value factors into the overall economic value of affected VCDs. A meaningful economic analysis must account for the benefits of a product, and Dr. Conti's opinion on economic value is incomplete without consideration of therapeutic value.

29. The FDA, scientific experts, and Plaintiffs all agree that VCDs produced by Defendant Manufacturers had functional, therapeutic value, contradicting Dr. Conti's claim that affected VCDs had "no economic value."[53] That affected VCDs provided therapeutic value is supported by the FDA, which recommended at the time of the recalls that

---

[52]   Conti Report, ¶ 45.

[53]   Conti Report, ¶ 44.

RESTRICTED CONFIDENTIAL

patients continue taking their VCDs until they could receive a replacement product.[54] This is also consistent with testimony from scientific experts: for example, Dr. Bottorff testified in deposition that VCDs would still be able to treat heart failure and hypertension despite any presence of NDMA or NDEA.[55] To my knowledge, no scientific expert has contested the fact that affected VCDs had therapeutic value because they contained the desired pharmaceutical ingredient. Twenty-one named Plaintiffs in the Economic Loss Class also acknowledged at their depositions that the at-issue VCDs were effective at managing their hypertension during the class period.[56] Many class representatives were initially prescribed other medications for treatment of their hypertension, but were later switched to VCDs by their healthcare providers precisely because their prior medications had not been effective at treating their hypertension while VCDs, including Defendants' at-issue VCDs, did offer effective treatment.[57] That class representatives received therapeutic value from Defendants' at-issue VCDs is evidenced by class representatives' continued use of those products, including those who made multiple purchases of Defendants' at-issue VCDs.[58] Thus the consumers of the affected VCDs did receive the anticipated therapeutic benefit of their purchase, which was the effective treatment of their hypertension. Yet, Dr. Conti does not acknowledge this intended effect and erroneously claims that VCDs were worthless.

---

[54] "FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018.

[55] Deposition of Michael B. Bottorff, Pharm.D., September 16, 2021, 14:3-15:5.

[56] *See, e.g.,*



**B. The FDA's Assessment of the Risks of At-Issue VCDs Would Likely Have Been Perceived Differently from Consumer to Consumer**

30. Even if some consumers rely on the advice of the FDA when making product decisions, there is no reason to believe that every member of the purported class would only value a product if it is approved for sale by the FDA. Rather, real world examples show that consumers form their own views of risks, considering not only the risk posed by treatments but also the risks posed by the treated conditions.

31. Compound drugs are examples of medications that are not FDA approved, but nonetheless provide economic value to consumers. The FDA describes compounding as "the process of combining, mixing, or altering ingredients to create a medication tailored to the needs of an individual patient," and states that compounded drugs are not FDA approved and that the "FDA does not verify their safety, effectiveness, or quality before they are marketed."[59] Nonetheless, the FDA recognizes that "[c]ompounded drugs can serve an important medical need for patients," and a recent medical study found that there is growing demand for compounded drugs, as reflected in their use in the fields of allergy, dermatology, immunology, otolaryngology, oncology, ophthalmology, neurology, and rheumatology.[60] The demand for compounded drugs shows that, contrary to Dr. Conti's assertions, the lack of FDA verification of quality and safety for a medication does not automatically render that medication worthless. Rather, proper assessment of a medication's value to each class member requires consideration of its therapeutic benefits in combination with any potential risks, an exercise that would require individual inquiry.

32. Another example of such individualized variation in consumers' sensitivities to and perceptions of risks are peoples' reactions to COVID-19 vaccines. When the FDA first issued Emergency Use Authorization for COVID-19 vaccines, many embraced them despite the lack of full approval, but a large portion of the population was also wary of potential risks from the new vaccines.[61] By August 2021, before the FDA approved the use of additional vaccine doses to boost immunity to COVID-19, more than one million people had already received at least one additional, unauthorized vaccine dose on top of their first vaccinations.[62] As of December 2021, more than three months after the FDA's full approval of the first COVID-19 vaccine, 16 percent of the U.S. adult population has not received any COVID-19 vaccine doses, in part due to concerns regarding vaccine side

---

[59] "Compounding and the FDA: Questions and Answers," *FDA*, June 21, 2018.

[60] "Compounding and the FDA: Questions and Answers," *FDA*, June 21, 2018; Donald R. Mattison, *et al.*, "The Clinical Utility of Compounded Bioidentical Hormone Therapy: A Review of Safety, Effectiveness, and Use," *National Academies of Sciences, Engineering, and Medicine* (Washington, DC: The National Academies Press, 2020), p. 36.

[61] *See, e.g.*, Julie Bosman, "They Waited, They Worried, They Stalled. This Week, They Got the Shot," *The New York Times*, July 26, 2021.

[62] "Coronavirus (COVID-19) Update: FDA Authorizes Additional Vaccine Dose for Certain Immunocompromised Individuals," *FDA*, August 12, 2021; Dr. Kathleen Dooling, MD, MPH, "Evidence to Recommendation Framework: An Additional Dose of mRNA COVID-19 Vaccine Following a Primary Series in Immunocompromised People," *Centers for Disease Control and Prevention: Advisory Committee on Immunization Practices*, August 13, 2021.

17

effects.[63] The range of consumers' attitudes towards the COVID-19 vaccines indicates that sensitivities to and perceptions of risks from medical treatments are not uniform and do not necessarily conform to FDA approval status. Nevertheless, Dr. Conti assumes that "prescription drugs that do not meet the foundational [federal] standard of safety and quality manufacturing have no economic value" to all consumers.[64] Dr. Conti's opinions regarding classwide economic damages are thus contrary to economic reality because she ignores real world variation in consumers' sensitivities to and perceptions of health risks and FDA approval.

## C. The Presence of Health Risks Does Not Render a Product Worthless

33. Dr. Conti has failed to show that members of the purported class would uniformly assign zero value to the at-issue VCDs based on the FDA's assessments of health risks, and she has further failed to show that the presence of perceived health risks renders products worthless to all consumers. To the contrary, information in the record and economic research indicate that consumers value products that may pose health risks, that they hold differing views towards such health risks, and that the benefits they receive from products must be factored into value.

34. For example, named Plaintiff Mr. Nelson admitted in deposition that



[65] The decisions by other named Plaintiffs to continue consuming recalled VCDs even after recalls underscores the point that at least some Plaintiffs saw value in at-issue VCDs regardless of impurities. For example,

[66]

Similarly,

[67] For other named Plaintiffs

[68]

---

63   "FDA Approves First COVID-19 Vaccine," *FDA*, August 23, 2021; "COVID-19 Vaccinations in the United States," *Centers for Disease Control and Prevention*, December 8, 2021; Alistair MacDonald, "For Big Miners, U.S. Workers Are Most Reluctant to Get Vaccinated," *The Wall Street Journal*, December 1, 2021 (reporting that concerns regarding side effects as a chief reason why some U.S. workers were hesitant to get vaccinated).

64   Conti Report, ¶ 42.

65   Nelson Deposition, 177:14-23.



RESTRICTED CONFIDENTIAL

The fact that some class members continued to take recalled VCDs despite knowing about the potential presence of impurities in their medication shows that not all purported class members considered recalled VCDs to be worthless, and therefore Dr. Conti's opinion of worthlessness does not apply on a classwide basis.

35. Economic studies and real-world examples also demonstrate that consumers are willing to pay for risk-bearing products. One marketplace example is certain food products that contain NDMA and NDEA but are nonetheless purchased and consumed by consumers. In a press release providing updates on drug recalls, the FDA cited studies that found that food products such as smoked meat could result in exposure to more than 1,000 ng of NDMA and that a pound of bacon may contain more than 300 ng.[69] While the FDA recommended recalls of at-issue VCDs based on an intake limit of 96 ng of NDMA per day, more than 18 million Americans consumed more than 5 pounds of bacon in 2018, according to available statistics.[70] Named Plaintiff Mr. Erwin indicated that he ate bacon up to once a week.[71] The fact that people are willing to consume products that contain NDMA demonstrates that the presence of such impurities does not automatically render a product worthless and that consumers continue to place value on those products.

36. Other examples are products sold in California with labels that warn of potential carcinogenic effects. Since the enactment of Proposition 65 in 1986, California has compiled a list of over 800 chemicals suspected of causing toxic effects, and warning labels must be affixed to products that are believed to contain chemicals in amounts that exceed certain limits.[72] Since introducing the proposition, the State of California has caused warning labels to be affixed to a range of products from soap to tea to bathing suits, and more than 100,000 products have been accused of violating Proposition 65.[73] Continued sales of these products indicate that such products still have value to consumers despite the risks they may pose. I note, though, that warning labels are not required for products if the levels of potentially carcinogenic chemicals are believed to pose "no significant risk," which California defined along lines similar to those used by the FDA to recall VCDs. Specifically, California deems the risk of exposure to some chemicals as not significant if it "would result in not more than one excess case of cancer in 100,000 individuals exposed to the chemical over a 70-year lifetime," the same

---

[69] "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker Recalls," *FDA*, August 20, 2018 Update.

[70] "U.S. population: Amount of bacon consumed from 2011 to 2020," *Statista*, July 2, 2021.

[71] Erwin Deposition, 133:7-12.

[72] "Proposition 65 in Plain Language," *California Office of Environmental Health Hazard Assessment*, August 1, 2017.

[73] Geoffrey Mohan, "You see the warnings everywhere. But does Prop. 65 really protect you?" *Los Angeles Times*, July 23, 2020.

probability threshold used by the FDA to calculate the acceptable daily intake level for NDMA and NDEA.[74]

37. Another example of consumer valuations of potential risk exposure comes from organic foods, which have fewer pesticides than non-organic equivalents. Consumers who are wary of potential risks associated with non-organic foods are willing to pay more for the organic equivalents. Consequently, organic foods are typically sold at a higher price point than non-organic alternatives. Analyzing premiums for several foods, the U.S. Department of Agriculture found that consumers who chose to buy products meeting the definition of "organic" were willing to pay at least 20 percent more for almost every product compared to the non-organic equivalent.[75] In other words, while some consumers may prefer the perceived safety of organic foods and are willing to pay a premium for those foods, other consumers are still willing to buy non-organic foods at a lower price, showing that the presence of perceived risks does not render a product worthless.

38. Another example that demonstrates varying reactions to potential (or perceived) risks is genetically modified (GM) foods, where a food's DNA has been altered during the production process. In 2016, Congress passed a law requiring labeling of some foods as "bioengineered," as some consumers prefer to avoid GM foods.[76] Various economic studies have measured consumers' willingness to pay to avoid GM foods. One meta-analysis of 25 such studies found that consumers were willing to pay a premium of 23 to 42 percent for non-GM food.[77] The study found that these premiums varied depending on where consumers were from and the food at issue.[78] This demonstrates that while perceptions of potential risks may affect the economic value of a product, the economic value assigned to such risks is not uniform across consumers. Accordingly, there is no reason to believe Dr. Conti's suggestion that the (lack of) value of at-issue VCDs would be uniform to members of the purported economic loss classes when the risks, if any, would vary with the level of impurities in each pill, according to the FDA and Plaintiffs' own experts, and would vary based other individualized factors, as well, according to Defendants' scientific experts.[79]

39. One example in the economic literature is studies of housing prices in geographic areas that are perceived to pose a risk of cancer, such as properties near hazardous waste sites. These studies find that while the amount that homebuyers are willing to pay for houses in

---

[74] "Proposition 65 in Plain Language," *California Office of Environmental Health Hazard Assessment*, August 1, 2017. *See also,* "FDA Updates and Press Announcements on Angiotensin II Receptor Blocker Recalls," February 28, 2019 Update.

[75] Andrea Carlson, "Investigating Retail Price Premiums for Organic Foods," *U.S. Department of Agriculture Economic Research Service*, May 24, 2016.

[76] Associated Press, "Congress Passes GMO Food Labeling Bill," *NBC News*, July 14, 2016.

[77] Jayson L. Lusk, *et al.*, "A Meta-Analysis of Genetically Modified Food Valuation Studies," *Journal of Agricultural and Resource Economics* 30:1 (2005), 28-44 ("Lusk, *et al.*, 2005"), p. 40.

[78] Lusk, *et al.*, 2005, p. 40.

[79] *See*, Panigrahy Report, pp. 10-12; "Environmental Carcinogens and Cancer Risk," *National Cancer Institute*, June 26, 2019; Chan Report, ¶ 84.

these areas is lower than in comparable areas without the identified cancer risk, homebuyers are still willing to buy such houses at some price.[80] While these studies evaluate the price reduction that consumers would require to take on risk, other economic studies evaluate the price premia that consumers would pay to avoid risk. One approach used to value mortality risks is the application of econometric methods to labor market data: the statistical relationship between compensation and occupational hazards represents a measurement, in dollar terms, of the value of mortality risk.[81] These examples illustrate that markets are able to price health risks and establish that there is no economic support for assuming that the presence of a health risk uniformly renders a product worthless to all consumers.

### D. Health Risks to Class Members Likely Varied by Consumer and Cannot be Reliably Quantified with Information Common to the Class

40. While economic research shows that the presence of risks does not immediately render a product worthless, Dr. Conti has not shown that the health risks, if any, posed by the at-issue VCDs were so uniformly great to erase their entire value to all consumers. Moreover, Plaintiffs in the related Medical Monitoring claims appear to acknowledge that low levels of consumption of at-issue VCDs result in less risk, as the definition of the Medical Monitoring Class excludes anyone who consumed less than three months of at-issue VCDs at the highest strength and excludes patients who consumed greater numbers of pills depending on strength and manufacturer.[82] However, there is no way to quantify individual patients' potential health risks due to consumption of at-issue VCDs with information common to the class because doing so would require details on each patient's personal prescription histories, including manufacturer, strength, and duration of consumption, as well as details regarding their personal characteristics such as weight, genetic background, or other factors.[83] Thus, to the extent that the economic value of the at-issue VCDs is a function of their health risks, the value of at-issue VCDs cannot be assessed on a classwide basis.

41. While classwide data are not available to assess health risks, if any, due to the consumption of impurities on an individual basis, claims data produced in this matter [redacted]

---

80 *See, e.g.,* Lucas W. Davis, "The Effect of Health Risk on Housing Values: Evidence from a Cancer Cluster," *The American Economic Review* 94:5 (December 2004), 1,693-1,704, pp. 1,693-1,694, 1,699. *See also,* Ted Gayer, *et al*., "The Market Value of Reducing Cancer Risk: Hedonic Housing Prices with Changing Information," *Southern Economic Journal* 69:2 (October 2002), 266-289, pp. 266-268, 287; David A. Besanko and Ronald R. Braeutigam, *Microeconomics* (4th Edition) (Hoboken, NJ: John Wiley & Sons, Inc., 2011) ("Besanko and Braeutigam (2011)"), p. 154 ("The Demand Curve Is Also a 'Willingness to Pay' Curve").

81 *See, e.g.,* W. Kip Viscusi and Joseph E. Aldy, "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," *The Journal of Risk and Uncertainty* 27:1 (2003), 5-76, pp. 5-6.

82 Third Amended Medical Monitoring Complaint, ¶¶ 540-541.

83 *See*, Panigrahy Report, pp. 10-12; "Environmental Carcinogens and Cancer Risk," *National Cancer Institute*, June 26, 2019; Chan Report, ¶ 84.

RESTRICTED CONFIDENTIAL



[84]

42. One reason why diminution of value cannot be reliably quantified using classwide data is that lot-level tracking is not available classwide, and the level of impurities varied between lots. The "lot" of a given drug represents a more granular level of identification than the National Drug Code (NDC), which identifies drugs by the manufacturer, strength, form, and package.[85] However, throughout the class period, there was no regulatory requirement to track prescriptions at the lot level.[86] As a result, prescription data produced in this matter, such as the claims from TPPs or the pharmacy dispensing records produced by the Retail Pharmacy Defendants in this case, only identify the drugs by NDC but not by lot.[87] A reliable quantification of damages to a given class member requires not only the NDC but also the lot of a given prescription, as testing results varied widely between different lots of the same NDC.

43. Testing results from the FDA also show potential variation among lots, as summarized in **Table 1** below. The tested level of NDMA can vary across different lots of the same NDC by more than 8 micrograms per pill, and for some lots, the level of contamination, if any, is below the level of detection. The tested level of NDEA can vary by as much as 0.8 micrograms per pill, and for some lots, was below the level of detection. This demonstrates that, without lot level tracking, there is no way to reliably estimate classwide risk.

---

[84]  *See,* MSP Replacement Claims Data, July 13, 2018 - July 31, 2019, MSP0001625; MSP VCD Claims Data, January 1, 2012 - March 31, 2020, MSP_0001655; SummaCare non-Medicare VCD Claims Data, January 1, 2012 – November 29, 2021; SummaCare non-Medicare Blood Pressure Claims Data, July 1, 2018 – October 31, 2018; Emblem and ConnectiCare Non-Medicare VCD Claims Data, October 11, 2012 – November 8, 2021, Emblem-Connect-MSP_003116; "Search List of Recalled Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan," *FDA Website*, October 20, 2021.

[85]  *See,* "National Drug Code Database Background Information," *FDA*, March 20, 2017.

[86]  Kosty Report, Section IV.C.

[87]  *See,* MSP VCD Claims Data, January 1, 2012 - March 31, 2020, MSP_0001655; SummaCare non-Medicare VCD Claims Data, January 1, 2012 – November 29, 2021; Emblem and ConnectiCare Non-Medicare VCD Claims Data, October 11, 2012 – November 8, 2021, Emblem-Connect-MSP_003116.

RESTRICTED CONFIDENTIAL

**Table 1: Variation in NDMA and NDEA Levels Across Lots[88]**
**FDA Laboratory Analysis as of May 2, 2019**

| Manufacturer | Product | Testing Level (ug/pill) | |
| | | NDMA | NDEA |
| (a) | (b) | (c) | (d) |
| --- | --- | --- | --- |
| Aurobindo | Amlo. 10mg/Val. 320 mg | Below LOD | 0.02-0.09 |
| Aurobindo | Val. 320mg | Below LOD | 0-0.05 |
| Aurobindo | Val. 320mg/HCT 25mg | Below LOD | 0.02-0.19 |
| Hetero | Val. 320mg | 0.33-0.44 | Below LOD |
| Mylan | Amlo. 10mg/Val. 320 mg | Below LOD | 0.04-0.11 |
| Mylan | Amlo. 10mg/Val. 320 mg/HCT 25mg | Below LOD | 0.05 |
| Mylan | Val. 320mg | Below LOD | 0.07-0.16 |
| Mylan | Val. 320mg/HCT 25mg | Below LOD | 0.20-0.38 |
| Solco | Val. 320mg | 15.18-16.30 | Below LOD |
| Solco | Val. 320mg/HCTZ 25mg | 13.18-20.19 | Below LOD |
| Teva | Amlo. 10mg/Val. 320 mg | Below LOD | 0-0.03 |
| Teva | Amlo. 10mg/Val. 320 mg/HCT 25mg | Below LOD | 0-0.03 |
| Teva | Val. 320mg | 7.92-16.55 | Below LOD |
| Teva | Val. 320mg/HCTZ 25mg | 6.94-10.35 | 0-0.77 |
| Torrent | Amlo. 10mg/Val. 320 mg/HCTZ 25mg | 10.24-11.53 | Below LOD |
| Torrent | Val. 320mg | 0.56-0.62 | 1.12-1.22 |
| Torrent | Val. 160mg | 0.45 | 1.31 |

44. Even if consumption data and impurity levels could be determined on a classwide basis, it is my understanding that the risk faced by consumers, if any, also depends upon factors unique to each individual that cannot be analyzed on a classwide basis. For example, the risk to an individual may depend on body weight. I understand that the FDA set the daily acceptable intake limit by assuming that risk varies linearly with weight and by assuming a body weight of 50 kilograms per person. Under these assumptions, a person weighing 100 kilograms would face half the risk of a person weighting 50 kilograms, all else equal. This is significant because the average weight for Americans is higher than the FDA's assumption: On average, adult men weigh 91 kilograms, and adult women weigh 78 kilograms.[89] As a result, using the FDA's assumption of a proportional relationship, the average American adult male could consume about 80 percent more NDMA or NDEA each day than the limit set by the FDA and still face the same risk as a hypothetical

---

[88] LOD – the Limit of Detection – is the lowest concentration reliably detected. *See,* David A Armbruster and Terry Pry, "Limit of Blank, Limit of Detection and Limit of Quantification," *National Center for Biotechnology Information,* ("LoD is the lowest analyte concentration likely to be reliably distinguished from the LoB and at which detection is feasible. Limit of Blank (LoB) … is the highest *apparent* analyte concentration expected to be found when replicates of a blank sample containing no analyte are tested." In this case, the analyte is either NDEA or NDMA.); "Analyte," *Merriam Webster Website*; "Laboratory Analysis of Valsartan Products," *FDA*, May 2, 2019.

[89] U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, and National Center for Health Statistics, "Anthropometric Reference Data for Children and Adults: United States, 2015–2018," *National Center for Health Statistics: Vital and Health Statistics* 3:46 (January 2021), pp. 6,9.

RESTRICTED CONFIDENTIAL

person weighing 50 kilograms.  Accordingly, it follows that any economic losses predicated on health risks from any alleged impurities cannot be determined without individualized inquiry into each consumer's body weight.  Likewise, to the extent that risk depends on factors such as diet or medical history, those factors cannot be determined on a classwide basis.

### E.  Economic Value Received from At-Issue VCDs Differ from Consumer to Consumer

45. Dr. Conti's proposed measure of classwide damages further does not make economic sense because the basis of her claim—that products are worthless unless supply meets demand at an equilibrium price—is not grounded in economic theory.  Dr. Conti seems to conflate prices and value, which are related in economics but are not equivalent.  Specifically, prices are considered an indication of value because the decision to buy a good implies that the good is worth at least as much to the consumer as the price paid.[90]  However, the fact that prices imply value does not mean that a market price is a precondition for economic value.

46. One of Dr. Conti's own charts illustrates a scenario where value exists despite the absence of a market price: the scenario when there is demand but not supply.[91]  Dr. Conti illustrates in Figure 2 of her report that that there may be demand even if there is no market supply.  She claims that the at-issue VCDs are worthless because "there is no legitimate supply curve for such drugs … [and] [a]s a result, there is no economically determinable price."[92]  However, she fails to acknowledge that the existence of demand is an indication of economic value.  The downward sloping demand line that Dr. Conti draws in her Figure 2 represents consumers' willingness to pay for the product that is the subject of the illustration.[93]  By illustrating a demand curve for at-issue VCDs, Dr. Conti is illustrating the fact that consumers would still be willing to pay for the product at issue and thus its value is, by definition, not zero.

47. Moreover, the downward slope of the line illustrates the economic concept that, as the price of a product decreases, more people are willing to buy (*i.e.*, demand) that product.  More people buy at lower prices because there are more people who value a product at least as much as the lower price.  This reflects the commonsense fact that different people assign different values to a product.  Dr. Conti's own illustration thus demonstrates the

---

[90] *See, e.g.*, Besanko and Braeutigam (2011), pp. 194-195 ("Consumer surplus is the difference between what a consumer is willing to pay for a good and what he must pay for it. … On a graph the consumer surplus will be the area under an ordinary demand curve and above the price of the good," indicating that consumers' valuations based on willingness to pay are higher that the product price)*;* Evan Blecher, *et al.*, *Economics* (2nd edition) (Cape Town, South Africa: Oxford University Press, 2009), Chapter 8 (Discussing an example where "the total value … is significantly higher than the… price" because the willingness to pay for the product is more than the market equilibrium price.);" Martin Kolmar, *Principles of Microeconomics: An Integrative Approach* (Cham, Switzerland: Springer International Publishing, 2017), p. 89 ("The consumer surplus is the aggregate difference between the customers willingness to pay and their actual payment.")

[91] *See,* Conti Report, Figure 2.

[92] Conti Report, ¶ 44.

[93] Besanko and Braeutigam (2011), p. 154 ("The Demand Curve Is Also a 'Willingness to Pay' Curve").

RESTRICTED CONFIDENTIAL

concept that there is willingness to pay even when supply is not present, and also that willingness to pay for products generally varies across individuals. The fact that Dr. Conti recognizes that willingness to pay varies across consumers directly contradicts her claim that all consumers uniformly saw zero value in the at-issue VCDs.

48. Another example that undercuts Dr. Conti's claim that products without FDA-approved supply are worthless is Kinder Surprise Eggs, which are small chocolate eggs enclosing a small toy.[94] I understand that, because the enclosed toy presents a choking hazard, the FDA deemed Kinder Surprise Eggs "adulterated" and stated that they "may pose a public health risk."[95] In 1997, Kinder Surprise Eggs were recalled by the United States Consumer Products Safety Commission, which has worked with the FDA regarding Kinder Surprise products.[96] While these chocolate eggs are permitted in Canada, U.S. regulators have taken a stricter view and have seized the candies when found in the possession of a person entering from Canada.[97] This example illustrates why Dr. Conti's reasoning of worthlessness makes no economic sense. Dr. Conti suggests that a product that clearly has value to a consumer that chose to purchase it loses all value to that consumer simply because he or she crossed a border.

49. Similarly, U.S. consumers' demand for imported medication from other countries such as Canada and Mexico also illustrates the fallacy in Dr. Conti's claim that products without FDA-approved supply are worthless. A survey conducted by the Kaiser Family Foundation found that eight percent of U.S. adults self-reported that they or another family member in their household purchased prescription medication from sources outside the United States to save money.[98] However, the FDA states that "[i]n most circumstances, it is illegal for individuals to import drugs into the United States for personal use … because drugs from other countries that are available for purchase by individuals often have not been approved by FDA for use and sale in the United States."[99] The fact that U.S. consumers are willing to import and consume these drugs undercuts Dr. Conti's claim that economic value of a drug automatically drops to zero without FDA approval.

---

[94] "Kinder Surprise egg seized at U.S. border," *Canadian Broadcast Corporation*, January 10, 2011.

[95] Import Alert 34-02, *FDA*, December 10, 2020.

[96] "CPSC Warns of Banned 'Kinder Chocolate Eggs' Containing Toys Which Can Pose Choking, Aspiration Hazards to Young Children," *United State Consumer Product Safety Commission*, April 13, 2006. *See also*, Import Alert 34-02, *FDA*, December 10, 2020.

[97] "Kinder Surprise egg seized at U.S. border," *Canadian Broadcast Corporation*, January 10, 2011.

[98] Rachel Bluth, "Faced With Unaffordable Drug Prices, Tens Of Millions Buy Medicine Outside U.S.," *Kaiser Health News*, December 20, 2016; "Kaiser Health Tracking Poll: November 2016," *Kaiser Family Foundation*, November 2016. *See also,* John P. Calvillo and Lincy Lal, "Pilot study of a survey of US residents purchasing medications in Mexico: demographics, reasons, and types of medications purchased," *Clinical Therapeutics* 25:2 (2003), 561-577, pp. 561-562; Grace C. de Guzman, *et al.*, "A Survey of the Use of Foreign-Purchased Medications in a Border Community Emergency Department Patient Population," *Public Health in Emergency Medicine* 33:2 (2007), 213-221, p. 213.

[99] "Is it legal for me to personally import drugs?," *FDA*.

RESTRICTED CONFIDENTIAL

## IV. Plaintiffs' Payments for VCDs and VCD Substitutes Would Likely Have Been Equal or Higher If Defendants' VCDs Were Unavailable or If Plaintiffs Had Purchased Different Medication

50. An alternative way to make the plaintiffs whole is to consider how plaintiffs' financial positions would have differed had Plaintiffs purchased unaffected VCDs or alternative hypertension treatments. Dr. Conti provides no analysis of this issue. She opines that there should not have been a legitimate supply for Defendants' at-issue VCDs, but she does not analyze what Plaintiffs would have done if Defendants' VCDs were not available.[100] Or, expressed in terms of value, Dr. Conti considers only the cost of the at-issue VCDs, which delivered the anticipated therapeutic benefit but contained an impurity, while giving no consideration to the substitute cost of an unaffected VCD or alternative hypertension treatment necessary to deliver the same anticipated therapeutic benefit without the impurity.

51. As I understand it, most class members did not have the option to stop treatment entirely. Thus, if the at-issue VCDs had not been sold, class members would have had to purchase unaffected VCDs or alternative hypertension medication. In either scenario most class members would have paid at least as much for their medication because of more expensive replacement options or lower overall market supply. In this respect, class members suffered no economic loss with respect to the financial position that they would have been in absent the sales of the products at issue and the financial position they are actually in.

### A. Market Prices Likely Would Have Been Higher with Fewer Generic Suppliers

52. There are many factors that impact generic pharmaceutical pricing, including but not limited to the number of suppliers in each market. Class members would likely have spent more in a market without Defendant Manufacturers' supply of VCDs because reduced competition and lower supply typically result in higher prices, per economic theory and market research. Indeed, prior to the recalls, VCDs became less expensive as Defendant Manufacturers entered the market and increased their production volumes. Thus, prices for VCDs – and payments by consumers and insurers – would likely have been higher if Defendant Manufacturers' VCDs had been absent from the marketplace.

53. In the economic literature, it has been recognized that the introduction of generic drugs and an increase in the number of generic manufacturers lower prices for consumers and insurers. One FDA study examining price movements after generic drug entry from 2015 to 2017 found that when there is only one generic producer, the generic price was 39

---

[100] Conti Report, ¶ 44.

percent lower than the brand price before generic competition on average.[101]  With four generic producers, the generic is 79 percent less expensive than the brand product on average, and with six or more competitors, the generic is more than 95 percent less expensive on average.[102]  Other studies also support the conclusion that the number of generic manufacturers in competition can decrease drug costs.[103]

54. This relationship between the number of generic manufacturers and the prices of generic drugs can be seen in the case of generic valsartan prices.  As shown in **Figure 1** below,



Had Defendant Manufacturers never come to market with their VCDs, it is likely that prices for VCDs would have been higher due to diminished competition for generic VCD sales.

---

[101]  Ryan Conrad and Randall Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," *FDA*, December 13, 2019.

[102]  Ryan Conrad and Randall Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," *FDA*, December 13, 2019.

[103]  *See, e.g.,* Chintan Dave, *et al.*, "Prices of Generic Drugs Associated with Numbers of Manufacturers," *New England Journal of Medicine* 377:2597-2598 (December 2017) (For a drug with one manufacturer, generic and brand-name prices were similar; for a drug with three manufacturers, the generic price was 60% of the brand-name price.); Nguyen Xuan Nguyen, *et al.*, "Medicare Part D: Competition and Prices in Generic Drug Markets 2007-2018," *U.S. Department of Health and Human Services*, January 19, 2021, Exhibit 3 (showing negative coefficients for the effect of the number of suppliers on drug price in all models, significant at the 1% confidence level.)

**Figure 1: Price of Generic Valsartan Relative to Brand Price[104]**
**IQVIA NSP Data**
**July 2014 – December 2015**

[redacted]

55. Not only did market prices decline as the number of generic competitors increased, prices also fell as Defendant Manufacturers took a greater share of valsartan sales. As shown in **Figure 2**, [redacted]

104 [redacted] Complaint, ¶¶ 159, 161; "We are the Leading Manufacturer of Serialized, Barcoded Unit-Dose Products," *American Health Packaging Website*; "Welcome to A-S Medication Solutions, LLC," *A-S Medication Solutions Website*.

**Figure 2: Valsartan Defendant Sales Share vs Generic Price**[105]
**IQVIA NSP Data**
**January 2015 – June 2018**

[redacted]

56. Similar trends are seen for generics of valsartan-HCT and amlodipine-valsartan as shown in **Exhibit 3**.[106] As shown in **Exhibit 3.A**, [redacted] Similarly, **Exhibit 3.B** shows [redacted]

57. In a scenario where Defendant Manufacturers' VCDs would have been absent from the marketplace, the downward pressure that Defendant Manufacturers had exerted on generic VCD prices would have also been absent. Market research into generic drug pricing, the actual history of generic VCD prices, and the economic principles of supply

---

105 [redacted] *See*, IQVIA NSP Data for VCDs, December 2014 to November 2020.

106 [redacted] *See*, **Exhibit 3.C.**

RESTRICTED CONFIDENTIAL

and demand all indicate that generic VCD prices would have likely been higher in such a scenario.

## B. Payments Would Likely Have Been the Same Had Consumers Purchased Unaffected VCDs

58. A complete assessment of how much class members would have spent absent Defendants' conduct at issue should also consider the way payments interact with the structure of prescription insurance. Many consumers would likely have paid the same amounts for unaffected VCDs or alternative hypertension medications as they did for at-issue VCDs. In other words, many consumers face no economic losses because their financial situations were not affected by Defendants' conduct at issue. While it is likely that most consumers' payments would have been the same, whether each consumer would have paid the same or different amounts for alternatives would only be determinable after an individualized inquiry into the consumer's prescription coverage and unique details of his or her health insurance.

59. Consumers on prescription insurance plans with tiered cost-sharing formularies, which accounted for 88 to 92 percent of the U.S. insured population between 2012 and 2018, would likely have paid exactly the same or very similar copay amounts had they purchased unaffected VCDs instead of affected VCDs.[107] This is because a customer would pay the same copay for a generic of the same drug regardless of the manufacturer. For example, as illustrated in the [redacted].[108]

## C. Before Recalls, Affected VCDs Were among the Lowest Cost Options for Hypertension Medication

60. Before the recalls at issue, the prices of affected generic VCDs were generally lower than the prices of potential alternative unaffected medications, such as other ARBs, which were the most common type of replacement medication for class representatives.[109]

---

[107] For an additional 7 to 12 percent of the insured population (a total of 99 percent in all years), the copay amounts would also have been the same or very similar had they purchased other VCDs because they have a plan where either (a) the copayment is the same regardless of the drug or (b) where there is there no cost sharing after a deductible is met. *See,* "Employer Health Benefits 2016 Annual Survey," *Kaiser Family Foundation and Health Research & Educational Trust,* 2016, pp. 173-174; "Employer Health Benefits 2017 Annual Survey," *Kaiser Family Foundation and Health Research & Educational Trust,* 2017, pp. 148-149; "Employer Health Benefits 2018 Annual Survey," *Kaiser Family Foundation,* 2018, pp. 153-154.

[108] [redacted], MSP-EMBLEM-000001-108 at 008 – 009, 048.

[109] For reference, claims data [redacted] reflected claims for alternative hypertension treatments. [redacted]; "Search List of Recalled Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan," *FDA Website,* October 20, 2021.

RESTRICTED CONFIDENTIAL

**Figure 3** depicts the average wholesale price throughout the class period for ARBs that I understand may be comparable to valsartan and valsartan-HCT.[110]  Prices for



[11]

---

[110]  Valsartan is one of 7 generic ARBs currently available.  Other generic ARB's include candesartan, eprosartan, irbesartan, losartan, olmesartan, and telmisartan.  Medical experts identified these medication as effective alternatives to recalled valsartan.  *See,* Robert D. Hill and Prabhakar N. Vaidya, "Angiotensin II Receptor Blockers (ARB)," *National Center for Biotechnology Information,* April 14, 2021*;* Randall M. Zusman, MD, "Recall of Valsartan-Containing Products: Clarion Call to Prepare Systematic Response," *Cardiology Magazine,* November 16, 2018.

[111]  "Search List of Recalled Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan," *FDA Website*, October 20, 2021.

RESTRICTED CONFIDENTIAL

**Figure 3: VCD vs ARB Prices[112]**
**IQVIA NSP Data**
**January 2015 – June 2018**



61. Patients who would have taken other ARB alternatives to amlodipine-valsartan and amlodipine-valsartan-HCT also would have paid more for their hypertension medication than they paid for the products at issue, as shown in **Exhibit 4**.



---

[112] VCDs are those produced by Defendant Manufacturers. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See,* IQVIA NSP Data for VCDs, December 2014 to November 2020; IQVIA NSP Data for Alternative ARBs, January 2015 to December 2020; Randall M. Zusman, MD, "Recall of Valsartan-Containing Products: Clarion Call to Prepare Systematic Response," *Cardiology Magazine*, November 16, 2018.

RESTRICTED CONFIDENTIAL

**D. TPPs Face No Identifiable Economic Losses and Available Data Indicate that TPPs Spent More on Replacement Hypertension Medication after the Recalls than on At-Issue VCDs before the Recalls**

62. TPPs face no identifiable financial losses as a result of covering prescriptions that were fulfilled with at-issue VCDs. Dr. Conti has presented no basis for concluding that the at-issue VCDs held zero value to TPPs. As explained by Mr. Kosty, the at-issue VCDs provided value to TPPs because they "allowed proposed TPP and consumer class members to mitigate adverse health outcomes, as well as the associated and higher costs of those outcomes, such as surgeries and emergency room visits."[113] I also understand that, as a matter of law, the at-issue VCDs allowed TPPs to fulfill their contractual obligations to cover prescription drugs for their members. Moreover, TPPs clearly could not have experienced health risks, as they did not consume VCDs. Thus, while Dr. Conti asserts that insurers suffered over $3.6 billion in economic losses,[114] she offers no method by which to determine how insurers would have valued the at-issue VCDs.

63. Even if TPPs claim now that they would never have reimbursed claims for at-issue VCDs—that is, that the at-issue VCDs had no value whatsoever—TPPs would still have been obligated to cover claims for unaffected VCDs or alternative hypertension medications. From the TPPs' perspectives, reimbursements for VCDs are often based on MACs, which are set by PBMs at the drug level and are the same for all generics of the same drug, regardless of the manufacturer.[115] Therefore, in cases where patients would have switched to unaffected generic VCDs, TPP class members would likely have paid the same amounts as they did for the affected VCDs because they would be reimbursing based on the same MAC.

64. 
These results suggest that class members' total spend would have been at least as high had Defendants not sold the products at issue. The exact amounts of that spend, however, would have to be analyzed on an individual basis.

---

[113] Kosty Report, Section III.A.

[114] Conti Report, ¶ 9.

[115] I understand that MAC prices may vary from health plan to health plan and that PBMs often change MAC prices throughout the year. Kosty Report, Section III.A.

RESTRICTED CONFIDENTIAL

**Figure 4: Comparison of Daily TPP Spend Amounts**[116]
**Daily Spend on At-Issue VCDs Before Recalls vs. Daily Spend on Replacements Post Recalls**



## V. Retail Pharmacy and Wholesaler Damages Related to Plaintiffs' Theories of Liability and Unjust Enrichment

65. Dr. Conti presents damages purportedly associated with Defendant retail pharmacy liability and unjust enrichment.[117] Dr. Conti writes that she can also calculate unjust enrichment damages for wholesalers if provided with the relevant data.[118] Dr. Conti purports to calculate unjust enrichment damages as the entirety of Retail Pharmacy and Wholesaler Defendants' profits. This method fails to account for any portion of profits that may be determined to have been justly earned. Moreover, Dr. Conti's measures of

---

[116] _See,_ MSP Replacement Claims Data, July 13, 2018 – July 31, 2019, MSP0001625; MSP VCD Claims Data, January 1, 2012 – March 31, 2020, MSP–0001655; SummaCare non-Medicare VCD Claims Data, January 1, 2012 – November 29, 2021; SummaCare non-Medicare Blood Pressure Claims Data, July 1, 2018 – October 31, 2018; "Search List of Recalled Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan and Irbesartan," _FDA Website_, October 20, 2021.

[117] Conti Report, Section V. For retailers, Dr. Conti calculated damages for "Implied Warranty Theory of Liability," "Consumer Protection Act Claims Theory of Liability," as well as "Theory of Unjust Enrichment."

[118] Conti Report, Section VI.

RESTRICTED CONFIDENTIAL

retail pharmacy and wholesaler damages overlap with her measure of manufacturer damages, resulting in double counting. In addition, Dr. Conti's analysis of the retail pharmacy sales data is unreliable, and her analysis of unjust enrichment damages does not properly account for costs, and thus does not correspond to Defendants' profits.

66. Further, I understand that unjust enrichment damages in this case, if any, should correspond to benefits conferred by a plaintiff on a defendant that were unjustly retained by that Defendant – namely, a portion attributable to a particular defendant after distribution of class member dollars across different entities (PBMs, claims administrators, manufacturers, retail pharmacies, wholesalers) in the supply chain, and determination of a possible apportionment thereof, but not necessarily the entirety of their payments, if it is determined that the products at issue had some value to consumers. As I demonstrated above, as a matter of economics the VCDs at issue were not uniformly worthless. Moreover, the value received by class members for the VCDs at issue necessarily varied by class member. Thus, unjust enrichment damages cannot be assessed on a classwide basis using information and methods common to the class.

67. Individual assessment of supply chain contracts would likely be required to determine which entities received what amounts given the complexities of the pharmaceutical supply chain. As explained by Mr. Kosty:[119]

> Each contract in the pharmacy benefit flow is negotiated individually among the relevant parties, and, and these contracts collectively impact (1) the payments wholesalers make to manufacturers for generic drugs; (2) the prices paid by pharmacies to wholesalers and/or manufacturers for their stock of generic drugs; (3) the total payments that pharmacies receive for a prescription; and (4) the share of that prescription cost that will be paid by consumers, and the amount paid by a TPP. The characteristics of each individual contract along the pharmacy benefit payment flow are unique to the parties in the contract, which results in significant variation in prices paid by TPPs and consumers for the same medications. Moreover, in many cases, the prices paid for prescriptions can be retroactively adjusted, which further complicates the determination of the actual costs that were borne by the various parties to a transaction. In short, accurately determining the price paid for a VCD prescription and the parties sharing the cost of a VCD prescription requires individualized inquiry into the business relationships among the multiple parties involved in the purchase and distribution of generic drugs. This analysis cannot be done in the aggregate, without review of the unique circumstances governing each individual transaction.

Dr. Conti provides no method to account for the numerous sources of contract-level variation to apportion amounts paid by consumer and TPP class members to individual Defendant manufacturers and retail pharmacies.

---

[119]  Kosty Report, Section III.A

68. Dr. Conti appears to recognize this.  She acknowledges the overlap between her damages figures by stating that her damages figures for Manufacturer and Retail Pharmacy Defendants are "not intended to be summed."[120]  But she provides no methodology to trace those amounts back to the defendant receiving benefit, or to apportion the amount of benefit unjustly retained.  With respect to the different theories of manufacturer and retail pharmacy liability and unjust enrichment, she notes that some claims "fall into multiple categories of the different theories of liability and unjust enrichment" and that she "can calculate" those amounts "if needed."[121]  But Dr. Conti provides no description of how she would actually calculate the relevant measure or apportionment of damages found by the Court or any analysis to show that such apportionment would be feasible on a classwide basis at the different individual defendant or even supply chain level.

69. With regard to retail pharmacies, Dr. Conti fails to provide reliable data analysis to support her economic claims.  But Dr. Conti's limited analysis of retail pharmacy data is illustrative of the types of complexities that stand in the way of reliable assessments of the relevant sales or profits, as she has not accurately identified the set of relevant purchases in the datasets provided to her.  For example, Dr. Conti's retail pharmacy damages for CVS are based, in part, on data from CVS Caremark.  ███████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████  As such, Dr. Conti not only overstates retail pharmacy damages but also undermines her own claim that she can reliably deduplicate claims.[122]  The difficulty in deduplicating claims and apportioning dollars spent would only multiply if Dr. Conti were to attempt such an exercise across the different combinations of PBMs, retail pharmacies, wholesalers, and manufacturers.

70. Dr. Conti's calculation of retail pharmacy unjust enrichment damages is also unreliable because she does not account for all costs.  While she claims that she can calculate unjust enrichment damages by accounting for costs, she does not actually subtract any costs to arrive at profits.[123] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[120]  Conti Report, ¶ 79.

[121]  Conti Report, Footnote 62.

[122]  Conti Report, Footnote 62.

[123]  Conti Report, ¶ 67. *See also,* Conti Reliance Materials, "05_Damages_Analysis.sas."

RESTRICTED CONFIDENTIAL

[124]

71. Similarly, Dr. Conti claims that she "can calculate unjust enrichment damages for each Defendant Wholesaler" but has not performed such a calculation, shown how it can be done on a classwide basis, or attempted to apportion the amounts involved.[125]

72. For these reasons Dr. Conti's retail pharmacy and wholesaler damages are unreliable and incomplete. I reserve the right to address other deficiencies in Dr. Conti's calculations if she updates her calculations.

## VI.   Conclusion

73. Dr. Conti has opined that consumers and insurers should receive full refunds for every dollar spent on at-issue VCDs based on the assertion that every such VCD had zero value. Rather than making any attempt to measure the value of the VCDs using established economic methods, Dr. Conti simply asserts an unsupported theory with no basis in economics: that any adulterated or misbranded drugs are worthless. Without presenting any analysis or research to show that every consumer's view of value is conditioned on FDA standards, Dr. Conti's proposed measure of damages is inaccurate and cannot be used to assess economic losses on a classwide basis.

74. Dr. Conti's method for calculating economic losses does not capture any losses in terms of financial positions. She does not consider any scenario where patients would have purchased alternative medications or the costs to consumers and insurers in such a scenario. Absent Defendant's conduct at issue, class members would not have received the therapeutic benefits of the VCDs for zero financial cost. Rather, Plaintiffs would likely have spent at least as much on hypertension treatment had the at-issue VCDs never been sold, or had patients purchased other treatments.

75. Finally, Dr. Conti presents flawed methods for assessing damages for Retail Pharmacies and Wholesalers. For unjust enrichment damages, Dr. Conti has done little beyond presenting a definition of profits. She ignores the complexities of the pharmaceutical supply chain, contracting, and payment flows that would require individual inquiry to trace revenues and profits from sales to class members to each Defendant and an analysis of the benefit conferred by a plaintiff to a particular defendant that would be unjust for the defendant to retain. While she claims that she can calculate profits if provided with the relevant data, she has not shown the feasibility of acquiring such data.

---

[124] Conti Report, ¶¶ 65, 78, 85.

[125] Conti Report, ¶ 85.

**RESTRICTED CONFIDENTIAL**

Signed this 12th day of January, 2022:

_(signature: Lauren Stiroh)_

_____

Lauren J. Stiroh



**Lauren J. Stiroh**
Managing Director

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: +1 914 448 4143  Fax: +1 914 448 4040
lauren.stiroh@nera.com
www.nera.com

# LAUREN J. STIROH
## Managing Director

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy*, *Litigation and Management*, published in 2005.

Much of Dr. Stiroh's work and research focuses on the intersection of antitrust and intellectual property litigation. She has written articles and given speeches on this subject for the American Bar Association, Law Seminars International, the Practicing Law Institute, and the 2002 US Department of Justice and Federal Trade Commission joint hearings on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy." She has analyzed market power in technology markets and evaluated the competitive implications of licensing arrangements, including tying and patent pooling provisions.  In 2010, she participated in the ABA Stanford Law School Symposium on Antitrust and Innovation.

Dr. Stiroh has presented her research before the FTC, the DOJ, the Canadian Competition Bureau, and in expert testimony.  In 2010, she was inducted into the YWCA-NYC Academy of Women Leaders.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia, and a B.A. in Economics from the University of Western Ontario.

**Lauren J. Stiroh**

## Education

**Harvard University**
Ph.D., Economics, August 1996

**University of British Columbia**
M.A., Economics, November 1991

**University of Western Ontario**
B.A., Economics, June 1990

## Professional Experience

**NERA Economic Consulting**
| | |
|---|---|
| 2021- | *Managing Director* |
| 2016-2021 | *Chair, Global Antitrust and Competition Practice* |
| 2005-2016 | *Managing Director/Senior Vice President* |
| 2002-2005 | *Vice President* |
| 1999-2002 | *Senior Consultant* |
| 1996-1999 | *Senior Analyst* |

**Unidad de Desarrollo Social**
March 1994 - August 1994  *Consultant.*  Prepared two studies for the National Planning Department concerning the effect of the trade liberalization in Colombia on the distribution of income.

**Harvard University**
1994-1996  *Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts.

**Harvard University**
1993-1996  *Teaching Fellow in Economics.*  Taught principles of economics, the introductory and core course in economics at Harvard College.

## Honors and Professional Activities

Member, American Bar Association.

Member, American Economic Association.

Adjunct member, NY City Bar Association, Antitrust and Trade Regulation Committee, September 2016 to 2018.

YWCA-NYC Academy of Women Leaders, Class of 2010.

2

**Lauren J. Stiroh**

Derek Bok Teaching Award, 1996.

Harvard University Scholarship 1991-1994.

Social Sciences and Humanities Research Council of Canada Fellowship 1991-1994.

University Graduate Fellowship (University of British Columbia) 1990-1991.

Huron College Corporation Scholarship (University of Western Ontario) 1987-1989.

# Expert Testimony and Reports (2017-2021)

### *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company*

Deposition testimony, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 22, 2021.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Gettys Bryant Millwood, et al., v. State Farm Life Insurance Company,* December 3, 2021.

### *John E. Jaunich, et al., v. State Farm Life Insurance Company*

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* December 13, 2021.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *John E. Jaunich, et al., v. State Farm Life Insurance Company,* August 5, 2021.

### *Earl L. McClure, et al., v. State Farm Life Insurance Company*

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Earl L. McClure, et al., v. State Farm Life Insurance Company,* December 9, 2021.

3

**Lauren J. Stiroh**

***Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc.***

Expert Report, on behalf of Defendants, The National Association of Realtors, et al., in connection with *Scott and Rhonda Burnett, et al., v. The National Association of Realtors, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max, LLC, and Keller Williams Realty, Inc*., November 12, 2021.

***Elizabeth A. Bally, et al., v. State Farm Life Insurance Company***

Supplemental Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* September 23, 2021.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* December 21, 2020.

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Elizabeth A. Bally, et al., v. State Farm Life Insurance Company,* February 3, 2020.

***Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC***

Deposition testimony, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC,* August 9, 2021.

Expert Report, on behalf of Defendants, SAP SE, SAP America, Inc., and SAP Labs, LLC in connection with *Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC,* June 2, 2021.

***Anna Gonzalez and Ronald K Page, et al., v. State Farm Life Insurance Company***

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *Anna Gonzalez and Ronald K. Page, et al., v. State Farm Life Insurance Company,* August 9, 2021.

***William T. Whitman, et al., v. State Farm Life Insurance Company***

Declaration and Expert Report, on behalf of Defendant, State Farm Life Insurance Company in connection with *William T. Whitman, et al., v. State Farm Life Insurance Company,* March 29, 2021.

Lauren J. Stiroh

*In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*

Deposition testimony, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* March 25, 2021.

Expert Reply Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* February 1, 2021.

Expert Report, on behalf of Plaintiff, TreeHouse Foods, Inc., in connection with *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* August 28, 2020.

*Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.*

Deposition testimony, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* March 2, 2021.

Expert Report, on behalf of Defendant, QVC, Inc., in connection with *Suzanne Somers, and SLC Sweet, Inc., v. QVC, Inc.,* January 25, 2021.

*Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited*

Deposition testimony, on behalf of Defendant, Ford Motor Company of Canada, Limited, in connection with *Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* October 14, 2020.

Expert Reply Report, on behalf of Defendant, Ford Motor Company of Canada, Limited, in connection with *Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* September 30, 2020.

Expert Report, on behalf of Defendant, Ford Motor Company of Canada, Limited, in connection with *Barry Rebuck v. Ford Motor Company and Ford Motor Company of Canada, Limited and Yonge-Steeles Ford Lincoln Sales Limited,* June 30, 2020.

*In Re: Zetia (Ezetimibe) Antitrust Litigation*

Deposition testimony, on behalf of Defendants, Merck & Co., Inc., and Glenmark Pharmaceuticals, Ltd., in connection with *In Re: Zetia (Ezetimibe) Antitrust Litigation,* March 10, 2020.

Expert Report, on behalf of Defendants, Merck & Co., Inc., and Glenmark Pharmaceuticals, Ltd., in connection with *In Re: Zetia (Ezetimibe) Antitrust Litigation,* February 28, 2020.

**Lauren J. Stiroh**

*X One, Inc. v. Uber Technologies, Inc.*

Deposition testimony, on behalf of Plaintiff, X One, Inc., in connection with *X One, Inc. v. Uber Technologies, Inc.,* September 20, 2019.

Expert Report, on behalf of Plaintiff, X One, Inc., in connection with *X One, Inc. v. Uber Technologies, Inc.,* August 2, 2019.

*The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, d/b/a Nashville General Hospital, et al., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.*

Deposition testimony, on behalf of Defendant, Sandoz, Inc., in connection with *The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, d/b/a Nashville General Hospital, et al., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.,* August 6, 2019.

Expert Report, on behalf of Defendant, Sandoz, Inc., in connection with *The Hospital Authority of Metropolitan Government of Nashville and Davidson County Tennessee, d/b/a Nashville General Hospital, et al., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.,* July 5, 2019.

*In Re Capacitors Antitrust Litigation*

Deposition testimony, on behalf of Defendants, KEMET Corporation, and KEMET Electronics Corporation, in connection with *In Re Capacitors Antitrust Litigation,* May 30, 2019.

Expert Report, on behalf of Defendants, KEMET Corporation, and KEMET Electronics Corporation, in connection with *In Re Capacitors Antitrust Litigation,* February 22, 2019.

*Amphastar Pharmaceuticals, Inc., and International Medication Systems, Ltd., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.*

Deposition testimony, on behalf of Defendant, Sandoz, Inc., in connection with *Amphastar Pharmaceuticals, Inc., and International Medication Systems, Ltd., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.,* April 5, 2019.

Expert Report, on behalf of Defendant, Sandoz, Inc., in connection with *Amphastar Pharmaceuticals, Inc., and International Medication Systems, Ltd., v. Momenta Pharmaceuticals, Inc., and Sandoz, Inc.* February 15, 2019.

6

Exhibit 1

**Lauren J. Stiroh**

***Christopher Dicesare, James Little, and Diana Stone et al., v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System***

Deposition testimony, on behalf of Defendant, Atrium Health, Inc., in connection with *Christopher Dicesare, James Little, and Diana Stone et al., v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System,* March 13, 2019.

Expert Report, on behalf of Defendant, Atrium Health, Inc., in connection with *Christopher Dicesare, James Little, and Diana Stone et al., v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System,* December 7, 2018.

***Crest Foods, Inc., v. Nestlé USA, Inc.***

Deposition testimony, on behalf of Defendant, Nestlé USA, Inc., in connection with *Crest Foods, Inc., v. Nestlé USA, Inc.,* January 31, 2019.

Expert Report, on behalf of Defendant, Nestlé USA, Inc., in connection with *Crest Foods, Inc., v. Nestlé USA, Inc.,* January 7, 2019.

***James Pudlowski, et al., v. The St. Louis Rams, LLC, et al.***

Affidavit, on behalf of Defendants, The St. Louis Rams, LLC, et al., in connection with *James Pudlowski, et al, v. The St. Louis Rams, LLC, et al.,* January 24, 2019.

Affidavit, on behalf of Defendants, The St. Louis Rams, LLC, et al., in connection with *James Pudlowski, et al, v. The St. Louis Rams, LLC, et al.,* January 10, 2019.

***Oxbow Carbon & Minerals, LLC, et al., v. Union Pacific Railroad Company, et al.***

Deposition testimony, on behalf of Defendants, Union Pacific Railroad Company, et al., in connection with *Oxbow Carbon & Minerals, LLC, et al., v. Union Pacific Railroad Company, et al.,* November 9, 2018.

Expert Report, on behalf of Defendants, Union Pacific Railroad Company, et al., in connection with *Oxbow Carbon & Minerals, LLC, et al., v. Union Pacific Railroad Company, et al.,* September 10, 2018.

***Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.***

Testimony, on behalf of Defendants, FedEx Corporation, et al., in the United States District Court for the Eastern District of Texas, Marshall Division, in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.*, May 17, 2018.

Supplemental Expert Rebuttal Report, on behalf of Defendants, FedEx Corporation, et al., in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.*, February 12, 2018.

7

Deposition testimony, on behalf of Defendants, FedEx Corporation, et al., in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.*, January 26, 2018.

Expert Report, on behalf of Defendants, FedEx Corporation, et al., in connection with *Intellectual Ventures II, L.L.C. v. FedEx Corporation, et al.*, January 11, 2018.

### *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.*

Deposition testimony, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* March 16, 2018.

Expert Reply Report, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* February 26, 2018.

Deposition testimony, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* January 30, 2018.

Expert Report, on behalf of Plaintiffs, U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc. in connection with *U.S. Futures Exchange, L.L.C. and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, Inc. and Chicago Mercantile Exchange, Inc.,* January 8, 2018.

### *Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al.; Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.*

Expert Report, on behalf of Defendants, Progressive Casualty Insurance Company, et al., in connection with *Blue Ash Auto Body, Inc., et al., v. Progressive Casualty Insurance Company, et al.; Russell Westfall, et al., v. Progressive Casualty Insurance Company, et al.,* March 15, 2018.

### *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.*

Deposition testimony, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* March 14, 2018.

Expert Rebuttal Report, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* October 30, 2017.

Expert Report, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* July 31, 2017.

Deposition testimony, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* April 6, 2017.

Expert Rebuttal Report, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* February 3, 2017.

Expert Report, on behalf of Defendants, Interexchange, Inc., et al., in connection with *Johana Paola Beltran, et al., v. Interexchange, Inc., et al.,* January 13, 2017.

### *In Re Dental Supplies Antitrust Litigation*

Deposition testimony, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *In Re Dental Supplies Antitrust Litigation,* January 5, 2018.

Expert Report, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *In Re Dental Supplies Antitrust Litigation,* November 20, 2017.

### *Mark Hale, et al., v. State Farm Mutual Automobile Insurance Company, et al.*

Deposition testimony, on behalf of Defendants, State Farm Mutual Automobile Insurance Company, et al., in connection with *Mark Hale, et al., v. State Farm Mutual Automobile Insurance Company, et al.,* November 17, 2017.

Expert Report, on behalf of Defendants, State Farm Mutual Automobile Insurance Company, et al., in connection with *Mark Hale, et al., v. State Farm Mutual Automobile Insurance Company, et al.,* October 30, 2017.

### *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.*

Declaration, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* October 16, 2017.

Declaration, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* October 3, 2017.

Affidavit, on behalf of Defendants, Acciona Solar Energy, LLC, et al., in connection with *Solargenix Energy, LLC v. Acciona Solar Energy, LLC, et al.,* September 7, 2017.

**Lauren J. Stiroh**

***SourceOne Dental, Inc., v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company***

> Deposition testimony, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *SourceOne Dental, Inc., v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company,* July 21, 2017.

> Expert Rebuttal Report, on behalf of Defendants, Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company, in connection with *SourceOne Dental, Inc., v. Patterson Companies, Inc., Henry Schein, Inc., and Benco Dental Supply Company,* April 28, 2017.

***Dino Rikos, et al., v. The Procter & Gamble Company***

> Expert Reply Report, on behalf of Defendant, The Procter & Gamble Company, in connection with *Dino Rikos, et al., v. The Procter & Gamble Company,* February 17, 2017.

***Insight Equity A.P.X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.***

> Expert Reply Report, on behalf of Defendant, Transitions Optical, Inc., in connection with *Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*, February 1, 2017.

## Presentations (2011-2021)

> Panelist, "Proving Market Power in Unilateral Conduct Cases," presented by the *ABA Section of Antitrust Law, Unilateral Conduct Committee*, June 30, 2020.

> Panelist, "A View of Class Actions from Both Sides of the Atlantic," presented by *Monckton Chambers and NERA Economic Consulting Summer Webinar Series: Competition Law in the UK and EU*, June 25, 2020.

> Panelist, "Honest Broker or Advocate: Effective Expert Testimony," presented by the *Antitrust Magazine and Economics Committee*, *Our Curious Amalgam Podcast Release,* April 29, 2020.

> Panelist, "Algrithms, Textual Analysis, and Collusion," presented at New York University, School of Law, New York, New York, January 31, 2020.

> Panelist, "Wage the Battle to Win the War: Expert Challenges at Class Certification," presented at McDermott, Will & Emery*,* Chicago, Illinois, September 24, 2019.

Lauren J. Stiroh

Panelist, "College Sports – Beyond Pay," presented by *The Trade, Sports, and Professional Associations Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 11, 2018.

Panelist, "The Nexus between Competition and Innovation," presented by *GCR Live: Women in Antitrust*, Washington, DC, November 9, 2017.

Panelist, "2015 Canadian Bar Association Roundtable: IP and Competition Law," presented by *The Economics and Law Committee of the CBA National Competition Law Section, Borden Ladner Gervais, LLP*, Toronto, ON, June 22, 2015.

Panelist and Expert Economist for Plaintiff at "Mock Trial," presented by *The Antitrust Law and Economics Institute*, Co-sponsored by American Bar Association Section on Antitrust, George Mason School of Law, Arlington, VA, October 9, 2013.

Panelist, "Fundamentals-Antitrust Economics," presented by *The Economics Committee of the American Bar Association's Section of Antitrust Law,* American Bar Association Spring Meeting, Washington, DC, April 10, 2013.

Panelist, "Presenting an Effective Damages Case in Light of Recent Federal Circuit Precedent," sponsored by *The Licensing Executives Society (U.S.A. and Canada), Inc. (LES Workshop),* San Diego, CA, October 19, 2011.

Panelist, "The Fundamentals of Working with Economic Experts Committee Program," co-sponsored by *The ABA Section of Antitrust Law,* Teleconference, April 29, 2011.

## Publications (2011-2021)

"Checking in on *PeaceHealth*: Providing Some Clearer Guidance to Bundling Sellers," co-authored with David Reichenberg, Cozen O'Connor, *The Antitrust Source,* American Bar Association, Volume 19, Issue 2, October 2019.

"Sports, Student-Athletes, and Antitrust," *Ass'n: The Newsletter of the Trade, Sports, & Professional Associations Committee*, American Bar Association, Section of Antitrust Law, Summer 2018.

"Demonstrating Faulty Predictions in Class Certification Analysis," co-authored with Christine Siegwarth Meyer and Claire (Chunying) Xie, NERA Economic Consulting, American Bar Association, Section of Antitrust Law, *Antitrust Magazine*, Vol. 30, No. 2, Spring 2016.

Exhibit 1

**Lauren J. Stiroh**

Chapter 6: "Interpreting Regression Results," co-authored with G. Steven Olley, Adjunct Assistant Professor of Economics at Columbia University in <u>Econometrics: Legal, Practical and Technical Issues, Second Edition,</u> American Bar Association Section of Antitrust Law, 2014.

"Considerations in Defining the Relevant Product Market for Antitrust Analysis," published as part of the course materials in connection with the 61st Spring Meeting of the Section of Antitrust Law, American Bar Association, *Fundamentals-Antitrust Economics*, April 10, 2013.

December 2021

**Exhibit 2**                                          RESTRICTED CONFIDENTIAL

## Materials Relied Upon by Lauren J. Stiroh, Ph.D.

**Court Filings**

*In re: Valsartan, Losartan, and Irbesartan Products Liability Litigation*, United States District Court for the District of New Jersey, Case No. 1:19-md-2875-RBK:

Third Amended Consolidated Economic Loss Class Action Complaint, November 1, 2021

Third Amended Medical Monitoring Class Action Complaint, November 1, 2021

Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification of Consumer Economic Loss Claims, November 10, 2021

Plaintiffs' Motion for Class Certification of Consumer, Third Party Payor, and Medical Monitoring Claims, November 10, 2021

**Expert Reports**

Expert Rebuttal Report of Dr. David Chan, MD, PhD, January 12, 2022

Expert Declaration of Rena Conti, Ph.D., November 10, 2021, and accompanying backup

Expert Declaration of Laura R. Craft, November 10, 2021

Expert Report of Dr. Mahyar Etminan PharmD, MSc, July 4, 2021

Expert Report of Timothy E. Kosty, January 12, 2022

Expert Declaration of Ron Najafi, Ph.D., November 4, 2021

Rule 26 Expert Report of Dipak Panigrahy, MD, July 6, 2021

Expert Declaration of John L. Quick, November 7, 2021

**Depositions**



**Exhibit 2**                                              RESTRICTED CONFIDENTIAL



**Bates Stamped Documents**

APL-MDL 2875-0139456                    Auro-MDL 2875-0020775 – 776

Auro-MDL 2875-0020760 – 761             Auro-MDL 2875-0020785 – 804

Auro-MDL 2875-0020766 – 769             Auro-MDL 2875-0020811 – 813

**Exhibit 2**                                    RESTRICTED CONFIDENTIAL

| | |
|---|---|
| Auro-MDL 2875-0020989 – 1000 | MSP-EMBLEM-000001-108 |
| Auro-MDL 2875-0021259 – 260 | MSP_0001625 |
| Auro-MDL 2875-0021287 | MSP_0001655 |
| Auro-MDL 2875-0021288 – 289 | MYLAN-MDL 2875-00591174 |
| Auro-MDL 2875-0021290 – 291 | RiteAid_MDL2875_ DFS_BORKA_0000000001 |
| Auro-MDL 2875-0021292 – 294 | |
| Emblem-Connect-MSP_003116 | |

**Data**

IQVIA NSP Data for VCDs, January 2012 to December 2014

IQVIA NSP Data for VCDs, December 2014 to November 2020

IQVIA NSP Data for Alternative ARBs, January 2015 to December 2020

SummaCare Non-Medicare Blood Pressure Claims Data, July 1, 2018 – October 31, 2018

SummaCare Non-Medicare VCD Claims Data, January 1, 2012 – November 29, 2021

**Books**

Allen, Mark A., Robert E. Hall, and Victoria A. Lazear., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence* (3rd Edition). Washington, DC: The National Academies Press, 2011.

Besanko, David and Ronald R. Braeutigam Microeconomics (4th edition). Hoboken, NJ: John Wiley & Sons, Inc., 2011.

Blecher, Evan, *et al*. Economics (2nd edition). Cape Town, South Africa: Oxford University Press, 2009.

Martin Kolmar. Principles of Microeconomic: An Integrative Approach. Cham, Switzerland: Springer International Publishing, 2017.

Mattison, Donald R., *et al.*, "The Clinical Utility of Compounded Bioidentical Hormone Therapy: A Review of Safety, Effectiveness, and Use," in *National Academies of Sciences, Engineering, and Medicine*. Washington, DC: The National Academies Press, 2020.

## Journals

Calvillo, John P. and Lincy Lal, "Pilot Study of a Survey of US Residents Purchasing Medications in Mexico: Demographics, Reasons, and Types of Medications Purchased," *Clinical Therapeutics* 25:2 (2003), 561-577

Dave, Chintan, *et al*., "Prices of Generic Drugs Associated with Numbers of Manufacturers," *New England Journal of Medicine* 377:26 (2017), 2597-2598

De Guzman, Grace C., *et al*., "A Survey of the Use of Foreign-Purchased Medications in a Border Community Emergency Department Patient Population," *Public Health in Emergency Medicine* 33:2 (2007), 213-221

Lusk, Jayson L., *et al*., "A Meta-Analysis of Genetically Modified Food Valuation Studies," *Journal of Agricultural and Resource Economics* 30:1 (2005), 28-44


## Publicly Available Information

"AAC Costs," *NY Department of Health*, available at https://www.health.ny.gov/health_care/medicaid/program/aac_cod/nyaac_20140131_draft.xls, accessed January 12, 2022

"Ambulatory Care Measures Using Clinically Enriched Administrative Data," *Qualityforum,* available at http://www.qualityforum.org/Projects/a-b/Ambulatory_Care_Measures_Using_Clinically_Enriched_Administrative_Data/Commenting/Coding/EC-231-08.aspx, accessed January 12, 2022

"Analyte," *Merriam Webster Website*, available at https://www.merriam-webster.com/dictionary/analyte, accessed January 10, 2022

Armbruster, David A and Terry Pry, "Limit of Blank, Limit of Detection and Limit of Quantification," *National Center for Biotechnology Information*, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2556583/, accessed January 10, 2022

Associated Press, "Congress Passes GMO Food Labeling Bill," *NBC News*, July 14, 2016, available at https://www.nbcnews.com/health/health-news/congress-passes-gmo-food-labeling-bill-n609571, accessed Jan 11, 2022

Bluth, Rachel, "Faced With Unaffordable Drug Prices, Tens Of Millions Buy Medicine Outside U.S.," *Kaiser Health News*, December 20, 2016, available at https://khn.org/news/faced-with-unaffordable-drug-prices-tens-of-millions-buy-medicine-outside-u-s/, accessed January 12, 2022

Exhibit 2                                    RESTRICTED CONFIDENTIAL

Bosman, Julie, "They Waited, They Worried, They Stalled. This Week, They Got the Shot," *The New York Times*, July 26, 2021, available at https://www.nytimes.com/2021/07/24/us/covid-vaccine-hesitant.html, accessed January 10, 2022

Carlson, Andrea, "Investigating Retail Price Premiums for Organic Foods," *U.S. Department of Agriculture Economic Research Service*, May 24, 2016, available at https://www.ers.usda.gov/amber-waves/2016/may/investigating-retail-price-premiums-for-organic-foods/, accessed January 10, 2022

Clarke, Toni and Siddiqui, Zeba, "Ranbaxy Gets FDA Approval for Novartis's Diovan Generic," *Reuters*, June 27, 2014, available at https://www.reuters.com/article/ranbaxy-lab-fda-idUSL2N0P804120140627, accessed January 10, 2022

"Compounding and the FDA: Questions and Answers," *FDA*, June 21, 2018, available at https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers, accessed January 10, 2022

Conrad, Ryan and Randall Lutter, "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," *FDA*, December 2019, available at https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/generic-competition-and-drug-prices, accessed January 10, 2022

"Coronavirus (COVID-19) Update: FDA Authorizes Additional Vaccine Dose for Certain Immunocompromised Individuals," *FDA*, August 12, 2021, available at https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-additional-vaccine-dose-certain-immunocompromised, accessed January 10, 2022

"COVID-19 Vaccinations in the United States," *Centers for Disease Control and Prevention*, available at https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total, accessed December 8, 2021

"CPSC Warns of Banned 'Kinder Chocolate Eggs' Containing Toys Which Can Pose Choking, Aspiration Hazards to Young Children," *United State Consumer Product Safety Commission*, April 13, 2006, available at https://www.cpsc.gov/Newsroom/News-Releases/2006/CPSC-Warns-of-Banned-Kinder-Chocolate-Eggs-Containing-Toys-Which-Can-Pose-Choking-Aspiration-Hazards-to-Young-Children, accessed January 12, 2022

Davis, Lucas W., "The Effect of Health Risk on Housing Values: Evidence from a Cancer Cluster," *The American Economic Review*, 94:5 (December 2004), 1,693-1,704, available at https://pubs.aeaweb.org/doi/pdfplus/10.1257/0002828043052358, accessed January 10, 2022Dooling, Kathleen, "Evidence to Recommendation Framework: An Additional Dose of mRNA COVID-19 Vaccine Following a Primary Series in Immunocompromised People," *Centers for Disease Control and Prevention: Advisory Committee on Immunization Practices*, August 13, 2021, available at https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-08-13/02-COVID-Dooling-508.pdf, accessed January 10, 2022

Exhibit 2                                          RESTRICTED CONFIDENTIAL

"Diovan (Valsartan) Drug Approval Package," *FDA*, February 3, 2003, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2002/21-283s001_Diovan.cfm, accessed January 6, 2022

"Employer Health Benefits 2016 Annual Survey," *Kaiser Family Foundation and Health Research & Educational Trust*, 2016, available at https://files.kff.org/attachment/Report-Employer-Health-Benefits-2016-Annual-Survey, accessed January 10, 2022

"Employer Health Benefits 2017 Annual Survey," *Kaiser Family Foundation and Health Research & Educational Trust*, 2017, available at https://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017, accessed January 10, 2022

"Employer Health Benefits 2018 Annual Survey," *Kaiser Family Foundation*, 2018, available at https://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018, accessed January 10, 2022

"Environmental Carcinogens and Cancer Risk," *National Cancer Institute*, June 26, 2019, available at https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/carcinogens, accessed January 12, 2022

"FDA Announces Voluntary Recall of Several Medicines Containing Valsartan Following Detection of an Impurity," *FDA*, July 13, 2018, available at https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity, accessed January 6, 2022

"FDA Approves First COVID-19 Vaccine," *FDA*, August 23, 2021, available at https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine, accessed January 10, 2022

"FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)," *FDA*, November 13, 2019, available at https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan, accessed January 10, 2022

Fryar, Cheryl D., *et al*., "Anthropometric Reference Data for Children and Adults: United States, 2015–2018," *National Center for Health Statistics: Vital and Health* Statistics, 3:46 (January 2021), available at https://stacks.cdc.gov/view/cdc/100478, accessed January 12, 2022

Gayer, Ted, *et al*., "The Market Value of Reducing Cancer Risk: Hedonic Housing Prices with Changing Information," *Southern Economic Journal*, 69:2 (October 2002), 266-289, available at https://ir.vanderbilt.edu/bitstream/handle/1803/6837/Market%20Value%20of%20Reducing.pdf?sequence=1, accessed January 10, 2022

Hill, Robert D. and Vaidya, Prabhakar N., "Angiotensin II Receptor Blockers (ARB)," *National Center for Biotechnology Information*, April 14, 2021, available at https://www.ncbi.nlm.nih.gov/books/NBK537027/, accessed January 6, 2022

Exhibit 2                                                            RESTRICTED CONFIDENTIAL

Husten, Larry, "Diovan Patent Expires But Generic Valsartan Is MIA," *Forbes*, September 25, 2012, available at https://www.forbes.com/sites/larryhusten/2012/09/25/another-one-bites-the-dust-diovan-patent-expires-but-generic-valsartan-is-mia/?sh=27c68322833c, accessed January 6, 2022

"Import Alert 34-02," *FDA*, December 10, 2020, available at https://www.accessdata.fda.gov/cms_ia/importalert_107.html, accessed January 12, 2022

"Is it legal for me to personally import drugs?," *FDA*, January 26, 2021, available at https://www.fda.gov/about-fda/fda-basics/it-legal-me-personally-import-drugs#:~:text=In%20most%20circumstances%2C%20it%20is,sale%20in%20the%20United%20States., accessed January 12, 2022

"Kaiser Health Tracking Poll: November 2016," *Kaiser Family Foundation*, November 2016, available at https://files.kff.org/attachment/Kaiser-Health-Tracking-Poll-November-2016-Topline, accessed January 12, 2022

"Kinder Surprise egg seized at U.S. border," *Canadian Broadcast Corporation*, January 10, 2011, available at https://www.cbc.ca/news/canada/manitoba/kinder-surprise-egg-seized-at-u-s-border-1.1023347, accessed January 12, 2022

"Laboratory Analysis of Valsartan Products," *FDA*, May 2, 2019, available at https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products, accessed January 10, 2022

MacDonald, Alistair, "For Big Miners, U.S. Workers Are Most Reluctant to Get Vaccinated," *The Wall Street Journal*, December 1, 2021, available at https://www.wsj.com/articles/for-big-miners-u-s-workers-are-most-reluctant-to-get-vaccinated-11638363600, accessed January 10, 2022

"Make One Whole," *Legal Information Institute*, available at https://www.law.cornell.edu/wex/make_one_whole, accessed on January 6, 2022

Mohan, Geoffrey, "You see the warnings everywhere. But does Prop. 65 really protect you?" *Los Angeles Times*, July 23, 2020, available at https://www.latimes.com/business/story/2020-07-23/prop-65-product-warnings, accessed January 10, 2022

"Mortality Risk Valuation," *EPA*, available at https://www.epa.gov/environmental-economics/mortality-risk-valuation, accessed January 10, 2022

"Mylan Launches First Generic Version of Diovan HCT® Tablets," *Mylan*, September 21, 2012, available at https://investor.mylan.com/news-releases/news-release-details/mylan-launches-first-generic-version-diovan-hctr-tablets, accessed on January 6, 2022

"National Drug Code Database Background Information," *FDA*, March 20, 2017, available at https://www.fda.gov/drugs/development-approval-process-drugs/national-drug-code-database-background-information, accessed January 10, 2022

Exhibit 2                                          RESTRICTED CONFIDENTIAL

Nguyen, Nguyen Xuan, *et al.*, "Medicare Part D: Competition and Prices in Generic Drug
Markets 2007-2018," *U.S. Department of Health and Human Services*, January 19, 2021,
available at https://aspe.hhs.gov/sites/default/files/private/pdf/265016/medicare-part-d-generic-
comp.pdf#:~:text=Medicare%20Part%20D%3A%20Competition%20and%20Generic%20Dru
g%20Prices%2C,initially%20competitive%20tend%20to%20remain%20so%20over%20time,
accessed January 10, 2022

"Proposition 65 in Plain Language," *California Office of Environmental Health Hazard
Assessment*, August 1, 2017, available at https://oehha.ca.gov/proposition-65/general-
info/proposition-65-plain-language, accessed January 10, 2022

"Search List of Recalled Angiotensin II Receptor Blockers (ARBs) including Valsartan, Losartan
and Irbesartan," *FDA*, October 20, 2021, available at https://www.fda.gov/drugs/drug-safety-
and-availability/search-list-recalled-angiotensin-ii-receptor-blockers-arbs-including-valsartan-
losartan-and, accessed December 9, 2021

"Statement on the Agency's Ongoing Efforts to Resolve Safety Issue with ARB Medications,"
*FDA*, August 28, 2019, available at https://www.fda.gov/news-events/press-
announcements/statement-agencys-ongoing-efforts-resolve-safety-issue-arb-medications,
accessed January 10, 2022

"Teva Pharmaceuticals USA Issues Voluntary Nationwide Recall of Valsartan and Valsartan
Hydrochlorothiazide Tablets," *FDA*, July 17, 2018, available at
https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/teva-pharmaceuticals-usa-
issues-voluntary-nationwide-recall-valsartan-and-valsartan, accessed January 10, 2022

"Rebatable Drug List for Maine Medicaid," *Maine Medicaid,* available at
http://www.mainecarepdl.org/sites/default/files/ghs-files/general-pharmacy-info/2013-04-
18/mecmsrebatable20124.pdf, accessed January 12, 2022

Uniform Commercial Code, §2-714, available at https://www.law.cornell.edu/ucc/2/2-714,
accessed January 12, 2022

"U.S. population: Amount of bacon consumed from 2011 to 2020," *Statista*, July 2, 2021,
available at https://lb-aps-frontend.statista.com/statistics/282269/us-households-amounts-of-
bacon-consumed-trend/, accessed January 10, 2022

Viscusi, W. Kip and Joseph E. Aldy, "The Value of a Statistical Life: A Critical Review of
Market Estimates Throughout the World," *The Journal of Risk and Uncertainty*, 27:1 (2003),
5-76, available at http://camra.msu.edu/documents/ViscusiandAldy2003.pdf, accessed January
10, 2022

"We are the Leading Manufacturer of Serialized, Barcoded Unit-Dose Products," *American
Health Packaging Website*, available at https://www.americanhealthpackaging.com/, accessed
January 10, 2022

"Welcome to A-S Medication Solutions, LLC," *A-S Medication Solutions Website*, available at
https://www.a-smeds.com/?page_id=8, accessed January 12, 2022

Exhibit 2                                                      **RESTRICTED CONFIDENTIAL**

Zusman, Randall M., "Recall of Valsartan-Containing Products: Clarion Call to Prepare Systematic Response," *Cardiology Magazine*, 2018, available at https://www.acc.org/latest-in-cardiology/articles/2018/11/06/12/42/perspective-recall-of-valsartan-containing-products-clarion-call-to-prepare-systematic-response, accessed January 10, 2022

Restricted Confidential

**Exhibit 3.A: Valsartan-HCT Defendant Sales Share vs Generic Price**
**IQVIA NSP Data**



Source: IQVIA NSP Data for VCDs, December 2014 to November 2020.

NERA Economic Consulting

Restricted Confidential

**Exhibit 3.B: Amlodipine-Valsartan Defendant Sales Share vs Generic Price**
**IQVIA NSP Data**



Source:  IQVIA NSP Data for VCDs, December 2014 to November 2020.

Restricted Confidential

**Exhibit 3.C: Amlodipine-Valsartan-HCT Defendant Sales Share vs Generic Price**
**IQVIA NSP Data**



Source:  IQVIA NSP Data for VCDs, December 2014 to November 2020.

Restricted Confidential

**Exhibit 4.A: Amlodipine-Valsartan Price vs Alternative ARBs
IQVIA NSP Data**



Source: IQVIA NSP Data for VCDs, December 2014 to November 2020; IQVIA NSP Data for Alternative ARBs, January 2015 to December 2020;
Randall M. Zusman, MD, "Recall of Valsartan-Containing Products: Clarion Call to Prepare Systematic Response," Cardiology Magazine (2018).

Restricted Confidential

**Exhibit 4.B: Amlodipine-Valsartan-HCT Price vs Alternative ARBs**
**IQVIA NSP Data**



Source:   IQVIA NSP Data for VCDs, December 2014 to November 2020; IQVIA NSP Data for Alternative ARBs, January 2015 to December 2020;
Randall M. Zusman, MD, "Recall of Valsartan-Containing Products: Clarion Call to Prepare Systematic Response," Cardiology Magazine (2018).