# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CASES | MDL No. 2875<br><br>HON. ROBERT B. KUGLER<br>CIVIL NO. 19-2875 (RBK)(KMW) |

## PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PUNAM KELLER, PH.D.

SLACK DAVIS SANGER, LLP
6001 Bold Ruler Way, Suite 100
Austin, TX 78746
Tel.: 512-795-8686
Fax: 512-795-8787
jdavis@slackdavis.com

HONIK LLC,
1515 Market St., Suite 1100
Philadelphia, PA 19102
Tel.: 267-435-1300
ruben@honiklaw.com

On the Brief:
John R. Davis, Esq.
Ruben Honik, Esq.

# Table of Contents

I.   INTRODUCTION ...................................................................................................................1

II.   APPLICABLE LAW ............................................................................................................1

   A.  *Daubert* Standard................................................................................................... 1

III.   ARGUMENT.........................................................................................................................2

   A.  Dr. Keller's Expert Opinions are Grounded on Assumptions Lacking any Factual Foundation and Unsupported Speculation ........................................................................................ 2

     1.  Dr. Keller Incorrectly Assumes that Consumers (and Reimbursing TPPs) Were Able to Weigh the Fact of Contamination with NDMA/NDEA at the Time of Purchase.................................................................................2

     2.  The "Choice" as Presented by Dr. Keller as Between Contaminated VCDs or No VCDs At All Was Never the Reality Faced by Consumers...................................................................................................5

     3.  Dr. Keller Incorrectly Assumes that Consumers Could Have Chosen to Purchase Defendants' Adulterated and Misbranded VCDs in a Hypothetical World Where that Information Was Disclosed...............7

   B.  Dr. Keller's "Real World Evidence" that VCDs Held "Value" Is Unreliable and Ignores the Best Evidence............................................................................................................... 9

     1.  Dr. Keller Did No Empirical Study – Which She Has Said in Other Litigation is "Always Required" .........10

     2.  Dr. Keller's "Real-World Evidence" is Unreliable and the Conclusions She Draws Are Based on Non-Sequiturs..........................................................................................................................................10

     3.  Dr. Keller Did Not Examine How the Market Actually Responded to the Information Regarding the Adulteration of Defendants' VCDs.........................................................................................................13

   C.  Dr. Keller Admitted that Her Critique of Dr. Conti Was Factually Baseless and Actually Affirmed Dr. Conti's Zero Value Calculation...............................................................................................15

**IV.     CONCLUSION........................................................................................................*16*

**I.     INTRODUCTION**

Dr. Punam Keller is a Professor of Marketing at Dartmouth College. Dr. Keller submitted an Expert Report that discusses consumer choice from a marketing and behavioral science perspective, including in the pharmaceutical context and relating to VCDs. Dr. Keller also opines that the contaminated adulterated at issue VCDs had "value" and offers a critique of Dr. Rena Conti's Declaration submitted by Plaintiffs in support of class certification.

As impressive as Dr. Keller's CV is regarding *marketing*, she is simply not qualified to critique the *economics* theory underpinning Dr. Conti's analysis. Perhaps in recognition, Dr. Keller admitted that she essentially grafted her own marketing views/understanding onto Dr. Conti's report, though without being able to identify any acceptable methodology within which this was done. In addition, much of Dr. Keller's analysis relies on improper factual assumptions regarding facts that are not even (nor could be) contested by the Defendants in this litigation. Dr. Keller did not offer any reliable methodology to support her irrelevant off-point opinion that VCDs hold "value" even if it not "economic value." Finally, Dr. Keller admitted at her deposition that her critique of Dr. Conti's Declaration was without factual basis.

**II.     APPLICABLE LAW**

**A.  *Daubert* Standard**

The admissibility of expert testimony is determined pursuant to Federal Rule of Evidence 702. The party offering the proposed expert testimony bears the burden of establishing the admissibility of the testimony by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 417-18 (3d Cir. 1999).

First, Rule 702 "requires the witness to have 'specialized knowledge' regarding the area of testimony" proffered by the witness. *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir 1998).

Once qualified, an "expert's opinions must be based on the methods and procedures of

science, rather than on subjective belief or unsupported speculation." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994) (citations and internal quotations omitted). Thus, "the expert must have 'good grounds' for his or her belief." *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993)). These good grounds must support each step of the analysis and, "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 745. Judges within this Circuit also consider how and when the methodology is used outside of litigation. *Paoli*, 35 F.3d at 742 (discussing reliability factors under *Daubert* and Third Circuit case law).

Importantly, the Third Circuit has held that "[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Steyck v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (citing *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 & n.13 (3d Cir. 2000)).

Furthermore, "*Daubert*'s gatekeeping requirement .... make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 594 (D.N.J.2002*), aff'd,* 68 Fed. Appx. 356 (3d Cir. 2003).

### III.   ARGUMENT

**A. Dr. Keller's Expert Opinions are Grounded on Assumptions Lacking any Factual Foundation and Unsupported Speculation**

   *1. Dr. Keller Incorrectly Assumes that Consumers (and Reimbursing TPPs) Were Able to Weigh the Fact of Contamination with NDMA/NDEA at the Time of Purchase*

The thrust of Dr. Keller's Expert Report is that there is "wide variation" among consumers about how they choose to purchase consumer products, including pharmaceutical prescription

2

drugs. (Keller Report, at ¶ 18 (**Ex. 1**).) Specifically, Dr. Keller discusses the concept of trade-offs (or in her words, decision rules), suggesting that consumers most often weigh competing product features with some consumers placing higher and lower values on various features.

As support for her assertions in the pharmaceutical context, Dr. Keller uses the example of Accutane to demonstrate that "consumers value prescription drugs even when those drugs can have negative side effects." (Keller Report, at ¶ 37.) Dr. Keller then cites a number of Accutane's <u>disclosed</u> side effects that she testified she pulled from the FDA-approved label. (Keller Dep. 139:5-141:12 (**Ex. 2**).) She then applies that reasoning to NDMA/NDEA contaminated and adulterated VCDs, and opines that "the fact that different consumers have different drug features to consider, and each place different weights on different drug features, means that overall consumer evaluation of the at-issue VCDs cannot be assumed to be zero …." (Keller Report, at ¶ 28.)

There is a glaring omission in Dr. Keller's analysis, however. While, as in the case of Accutane, consumers were and are able to weigh potential side effect information that is known to and considered by the FDA in approving the drug and its labeling, that is <u>disclosed</u> to patients, here, there is not a single consumer (or reimbursing TPP) who could have weighed the fact of adulteration or NDMA/NDEA contamination in their decision to purchase Defendants' VCDs. That is because the information was not disclosed to Plaintiffs and Class Members (nor even the FDA) and they were in no position to discover it. This fact is undisputed in this litigation.[1]

---

[1] Defendants themselves have claimed early and often in this litigation that the presence of NDMA/NDEA in their VCDs was not known and could not have been known to them. While Plaintiffs take issue with these assertions when they come from sophisticated pharmaceutical manufacturers who had detailed knowledge of their process chemistry and manufacturing operations, and will prove constructive and/or actual knowledge at a merits stage of this case, Defendants cannot credibly claim that consumers (and reimbursing TPPs) would be in a better position to acquire knowledge than Defendants themselves in light of these assertions.

Indeed, Dr. Keller's choice of Accutane as her demonstrative example in her Report (Keller Report, ¶¶ 38-39) proves fortuitous in elucidating how she rests her analysis on this outright false factual assumption that consumers were somehow able to weigh NDMA/NDEA contamination at the time they purchased their VCDs.

Going deeper into Dr. Keller's false analogy, Ranbaxy was a generic manufacturer of Accutane (isotretinoin), and entered into a guilty plea and settlement agreement with the United States Department of Justice ("DOJ") wherein "Ranbaxy USA admitted to introduced into interstate commerce certain batches of adulterated drugs … in 2005 and [2006], including Sotret … Ranbaxy's branded generic form of isotretinoin[.]" (Keller Dep. 143:17-144:10.) When asked specifically how purchasers of adulterated Ranbaxy's generic Accutane could have possibly weighed that information (*i.e.*, the fact of adulteration) when it was never disclosed to anyone outside Ranbaxy itself, Dr. Keller admitted consumers simply could not engage in the very choice exercise on which she bases the majority of her opinions. (Keller Dep. 148:18-153:11 ("They could not have weighed the specific information[.]").)

The same holds true for the fact of NDMA/NDEA contamination and adulteration of Defendants' At-Issue VCDs at the point of sale.[2] Plaintiffs and Class Members in this case – in Dr. Keller's own words – "could not have weighed the specific information" regarding NDMA/NDEA contamination and adulteration. As a result of this uncontested fact, the entire choice exercise Dr. Keller describes in her Report is completely undermined because not a single consumer (or reimburser) could have considered information not disclosed to them.

---

[2] The Court has previously ruled, consistent with Dr. Conti's economic damages analysis, that the point of sale is the appropriate moment to measure economic damages. (Dkt. No. 775, at 20 ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless of whether the sold VCDs actually achieved the medical purpose of lowering blood pressure.").)

4

Perhaps by design, Dr. Keller blinded herself to basic salient facts she should have considered, but never learned, before submitting her Report to the Court. For example, Dr. Keller testified that she had no idea whether NDMA/NDEA were supposed to be in VCDs. (Keller Dep. 178:7-179:12.) Dr. Keller never examined at issue VCDs FDA-approved labeling (as she did for Accutane) to see whether NDMA/NDEA (and potential side effects from ingesting them) were disclosed. (Keller Dep. 199:6-201:4.) In fact, Dr. Keller did not even understand what an FDA-approved label was. (Keller Dep. 73:14-16.)

Because Dr. Keller herself agreed that consumers simply could not engage in the very choice exercise that forms the majority of the discussion in her Expert Report, her opinions rest on a demonstrably false factual assumption without any basis in the record, which renders her opinions fatally unreliable. *Steyck v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record.").)

> **2. The "Choice" as Presented by Dr. Keller as Between Contaminated VCDs or No VCDs At All Was Never the Reality Faced by Consumers**

Dr. Keller makes another egregiously incorrect factual assumption that lacks any factual foundation in the record. Specifically, Dr. Keller assumes that had consumers somehow been disclosed the facts (i.e., the contamination and adulteration of their VCDs), the resultant choice they faced was either (1) purchasing those contaminated and adulterated VCDs, or (2) not purchasing VCDs at all.

This was not at all the reality that Plaintiffs and Class Members faced. At all material times, there were non-contaminated and non-adulterated VCDs on the market. Neither brand DIOVAN (and DIOVAN HCT) nor brand EXFORGE (and EXFORGE HCT) was ever recalled, and world health authority testing has never found any NDMA/NDEA in any of these brand name products.

5

In addition, there are and have been at material times non-contaminated non-adulterated generic VCDs on the market with therapeutic equivalence.[3]

Dr. Keller had no idea there were non-contaminated options. (Keller Dep. 177:16-178:6.) In fact, Dr. Keller had no idea that generic drugs are supposed to be fully substitutable to each other and to the brand reference listed drug. (Keller Dep. 155:22-157:10.) For an expert purporting to opine on consumer choice, Dr. Keller completely failed to understand the basic context that shapes what choices are available and how those choices are made.

Dr. Keller and Defendants may counter that it is "likely"[4] some consumers "may"[5] or "might"[6] somehow prefer the contaminated and adulterated VCDs, but "unsupported speculation" is not sufficient to get past the Court's gatekeeping function. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (stating that expert testimony must not be based on "subjective belief or unsupported speculation; the expert must have 'good grounds'").

And the known facts (and also common sense) show that not a single consumer who purchased a VCD would choose the contaminated one over the non-contaminated one. As Dr. Keller herself recognized at her deposition, every single Plaintiff and Class Member *did make a decision and did act on that decision*: they all went to the pharmacy with the intent to purchase an FDA-approved generic VCD fully substitutable to the brand. (Keller Dep. 157:12-160:17.) This choice was consistent with what the Manufacturer Defendants themselves were saying about their VCDs. (Hai Wang 3/10/21 Dep. Tr. 85:5-10 (ZHP Defendants "

---

[3] The FDA Drugs website lists no less than twenty-three (23) therapeutic equivalents for DIOVAN and DIOVAN HCT, and no less than nine (9) for EXFORGE and EXFORGE HCT (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm ).
[4] The word "likely" appears in Dr. Keller's Expert Report twenty-two (22) times.
[5] The word "may" appears in Dr. Keller's Expert Report fifty five (55) times.
[6] The word "might" appears in Dr. Keller's Expert Report twelve (12) times.

██████████████████████████████████

██████████ (**Ex. 10**)).)

Despite her entire report being dedicated to consumer choices and actions in response to those choices, *Dr. Keller ignores her own basic tenet that consumer actions reflect choices they make*: she effectively pretends that Plaintiffs and Class Members sleep-walked to the pharmacy when they purchased their at issue VCDs with zero intention whatsoever. The reality is that by simply purchasing their *prescription* VCDs named "valsartan" or "valsartan-containing", every consumer chose an FDA-approved therapeutic equivalent to DIOVAN and EXFORGE branded products. *Schneider*, 320 F.3d at 404 (3d Cir. 2003); *accord* Dkt. No. 775, at 14, 20 (consumers "had no choice" but to rely on Defendants' representations that their VCDs were FDA-approved therapeutic equivalents and that the contamination and adulteration of the VCDs they received "were never bargained for").

### 3. Dr. Keller Incorrectly Assumes that Consumers Could Have Chosen to Purchase Defendants' Adulterated and Misbranded VCDs in a Hypothetical World Where that Information Was Disclosed

As set forth above, Dr. Keller speculates that had the information regarding the adulteration and misbranding of Defendants' VCDs been known, some consumers may still have wanted to purchase them, as opposed to other non-adulterated therapeutic equivalents. This proposition is so factually absurd (*i.e.*, that any consumer would want to unnecessarily ingest carcinogens) that not even Defendants themselves asserted it. For example, Hai Wang of the ZHP Defendants put it rather simply: "███████████████████████." (Hai Wang 3/10/21 Dep. 325:18-326:1 (**Ex. 10**).)

Regardless, Dr. Keller simply ignores both the law and fact that adulterated and/or misbranded drugs cannot be lawfully sold in the first place. Dr. Keller admits that she did not investigate how the fact of adulteration may affect the ability of a manufacturer to sell those drugs in the United States. (Keller Dep. 170:16-171:21.) Dr. Keller further testified she had no idea what

7

the U.S. Code was generally; that she was specifically unaware that it was illegal under federal law to distribute adulterated and/or misbranded drugs; and that she did not investigate whether the Defendants' VCDs were in fact adulterated or misbranded. (Keller Dep. 172:17-175:19.)

The reason for the swift cratering to zero sales of Defendants' VCDs upon disclosure of NDMA/NDEA, as discussed in further detail below, is the federal law prohibition on the sale of adulterated and misbranded drugs. *See* 21 U.S.C. § 331(a) ("The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any … drug … that is adulterated or misbranded."). Numerous witnesses testifying on behalf of the Retail Pharmacy Defendants as corporate designees repeatedly admitted that they cannot and do not sell adulterated drugs.[7] In addition to not reviewing the law, or the fact of adulteration of



7

8

Defendants' VCDs, Dr. Keller also did not review these admissions. Her opinions are classic net opinions. *May v. Atlantic City Hilton*, 128 F. Supp. 195, 198 (D.N.J. 2000) ("The net opinion rule is that an expert's bare conclusions, unsupported by factual evidence, are inadmissible.").

Expert testimony that is contrary to law or fact, or that seeks to misstate the applicable law to the jury, is unhelpful. *See, e.g.*, *SEC v. Ambassador Advisors, LLC*, -- F. Supp. 3d –, *5 (E.D. Pa. Dec. 21, 2021) (**Ex. 7**). Expert analysis also must have sufficient support in facts or data for the conclusions reached. *See, e.g.*, *Mondis Tech. Ltd. v. LG Elecs., Inc.*, No. 15-4431, 2021 WL 4077563, at *3 (D.N.J. Sept. 8, 2021) (**Ex. 8**). An expert's damages opinion is inadmissible if it "is both contrary to the record…[and] is contrary to the law." *See, e.g.*, *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 236 (E.D. Pa. 2017). Opinions that rest on "assumptions and conclusions that are not supported by the factual record" have been excluded on the basis that it would not "aid the jury in resolving a factual dispute" because it does not "fit under the facts of the case." *Meadows*, 306 F. App'x at 790 (citing *Stecyk*, 295 F.3d at 414, and quoting *Lauria*, 145 F.3d at 599).

### B. Dr. Keller's "Real World Evidence" that VCDs Held "Value" Is Unreliable and Ignores the Best Evidence

Dr. Keller asserts in her Report that she has "real world" evidence to support her opinion that the NDMA/NDEA contaminated and adulterated VCDs held "value." (Keller Report, at ¶¶ 46-64.) However, she broke her own previously-stated rule that "empirical testing is always required" for evaluating consumer sentiment. In addition, her real-world evidence is admittedly unreliable. Finally, Dr. Keller completely neglected the most salient real-world evidence of all: Defendants' VCDs were recalled and made unavailable in the market.

9

### 1. Dr. Keller Did No Empirical Study – Which She Has Said in Other Litigation is "Always Required"

As an initial matter, Dr. Keller failed to follow the methodology she has recognized for her work in this area: she did no empirical study of her own. (Keller Dep. 42:3-16.) That is despite Dr. Keller being on record in another litigation stating to that court that "empirical testing is always required" (usually in the form of a conjoint survey or other empirical study) for measuring consumer sentiments or reactions to marketing or trade offs. *California v. Johnson & Johnson*, No. 47-2016-17229-CU-MC-CTL, 2020 WL 603964, at *21 & n.26 (Cal. Sup. Ct. – San Diego January 30, 2020) (attached hereto as **Ex. 3**). Dr. Keller is not displaying the "same level of intellectual rigor that characterizes the practice of an expert" in the field of marketing science. *Elcock*, 233 F.3d at 746.

### 2. Dr. Keller's "Real-World Evidence" is Unreliable and the Conclusions She Draws Are Based on Non-Sequiturs

Dr. Keller's real-world evidence consists of: (1) selective review of a couple of the class representative depositions; and (2) instructions from physicians/regulatory authorities that consumers should continue taking their VCDs until they received a replacement medicine; and (3) the FDA's setting of acceptable intake limits for NDMA/NDEA. (Keller Dep. 205:10-208:15.)

#### i. The Very Class Representatives Cited by Dr. Keller All Testified They Never Would Have Purchased the At Issue VCDs Had They Known of their Contamination and Adulteration

Dr. Keller admits that her primary "real-world" evidence, the testimony of the class representatives themselves, is unreliable. She explicitly conceded in her Expert Report that "[t]he statements of consumers, particularly those involved in litigation, regarding their retrospective valuation of at-issue VCDs *may not be reliable measures* of even individual value assessments, much less population-wide value assessments." (Ex. 1, at ¶ 52 (emphasis added).) And yet, that is precisely what Dr. Keller relies on.

10

The danger of selecting a few out-of-context quotes from a deposition by a cross-examining attorney is also highlighted by the specific class representatives selected by Dr. Keller for support, where she inappropriately conflates concessions of the drugs' efficacy to economic value. Numerous of these very class representatives cited by Dr. Keller for her "value proposition" explicitly stated that they would not have paid any amount of money for Defendants' VCDs. Plaintiffs attach for the Court's review deposition excerpts from those very class representatives where they state as much. (**Ex. 9** (Compiled Deposition Excerpts of Cisneros, Cooper, Duffy, Erwin, Kaplan, Roberts, Semmel).) And Dr. Keller did not rely on anything to fill this methodological failing.

### ii. FDA and Physician Guidance Regarding Choosing the Lesser of Two Evils Does Not Confer Economic Value

As to the FDA/physician statements to continue taking the At Issue VCDs for a short period of time (usually a matter of a few days), it is simply a factually unsupported *non-sequitur* for Dr. Keller to draw any kind of finding of economic value. The clear import of these messages from the FDA and physician groups was that, from a medical care standpoint, the acute risk of a heart attack outweighed the incrementally increased risk of a future cancer diagnosis from a few extra days' of exposure. It is patently absurd to draw from this a message that the FDA and physician community assigned "economic value" to these drugs (especially when the FDA itself ordered the recalls, declared products adulterated, and in at least one case placed the defendant on import alert). As Defendants' own hypertension treating physician expert John Flack testified, getting patients on alternative therapies was accomplished easily and swiftly for each patient. (*See* Dkt. Nos. 1706, 1858.)

### iii. The FDA's Setting of Acceptable Intakes Does Not Mean that Defendants Adulterated VCDs Had Economic Value

Finally, Dr. Keller's derivation of "value" from the FDA's setting of Acceptable Intakes ("AI") ignores a crucial point. As set forth in Plaintiffs' Class Certification Motion, common and irrefutable evidence will establish in this litigation that Defendants were not in compliance with current good manufacturing practices ("cGMPs") which directly resulted in the undetected but preventable contamination of their VCDs with quite high levels of NDMA/NDEA. Literally all of the VCDs manufactured by the ZHP, Teva, Torrent, Hetero, and Mylan Defendants during their respective class periods contained NDMA and/or NDEA. (*See* Mot. for Class Cert., at 5-30.) Even as to the valsartan that was contaminated due to improper cleaning practices (as opposed to manufacturing processes), those Defendants could not "assure" their products that they did not test were not contaminated with NDMA/NDEA and that fact rendered all of them adulterated, as set forth by Congress:

> A drug or device shall be deemed adulterated … (B) if it is a drug and the methods used in, or facilities used for, its manufacture … do not conform to or are not operated or administered in conformity with current good manufacturing practice to ***assure*** that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess[.]"

21 U.S.C. § 351(a)(2)(B).

To retroactively derive "economic value" from the FDA's setting of AIs and apply it to manufacturing operations that were out of cGMP control is inappropriate and ignorant of the law and facts of this case. Moreover, Dr. Keller is simply not qualified to opine on the interpretation of FDA regulatory actions, further cutting out her opinions at their foundation.

### 3. Dr. Keller Did Not Examine How the Market Actually Responded to the Information Regarding the Adulteration of Defendants' VCDs

Finally, Dr. Keller admitted she did not even examine the most salient information that would be indicative of economic value as derived from consumer choice: information regarding how the marketplace reacted to the information regarding the adulteration of Defendants' VCDs once that information was disclosed. (Keller Dep. 180:22-181:7 (testifying that she did not look at sales data of VCDs after the recalls were announced).)

Had Dr. Keller examined sales data (e.g., IQVIA data), as Dr. Conti did, she would have observed for every single manufacturer that their monthly VCDs prescriptions cratered to zero shortly after recall. Dr. Keller had no good explanation for how she could find some hypothetical consumer demand for contaminated and adulterated VCDs in light of what naturally occurred in the marketplace post-disclosure. For example, Plaintiffs presented Dr. Keller with the following chart (based on IQVIA sales data relied upon by Dr. Conti) reflecting monthly ZHP VCD sales and attached hereto as **Exhibit 11**:



Dr. Keller had no explanation for the market reaction (because she was similarly unaware of the federal law prohibition on selling adulterated drugs), and the fact that not a single consumer purchased ZHP VCDs upon disclosure of NDMA/NDEA contamination. Dr. Keller was surprised to learn that ZHP was placed on FDA import alert meaning that the sale of its products in the U.S. was illegal. (Keller Dep. 184:5-186:5.)

Put simply, Dr. Keller's assumption of residual market demand (and, therefore, "value") even for NDMA/NDEA contaminated VCDs flies in the face of the undisputed facts of this case. The Court should exclude her opinions that are so untethered from the realities of the case. *Steyck*, 295 F.3d at 414.

14

### C. Dr. Keller Admitted that Her Critique of Dr. Conti Was Factually Baseless and Actually Affirmed Dr. Conti's Zero Value Calculation

Despite her lack of qualifications to critique an economic damages expert's analysis, at Paragraphs 65-75 of her Expert Report, Dr. Keller asserts that Dr. Conti "incorrectly assesses" damages for the consumer class.

First, Dr. Keller demonstrates her lack of qualifications by grafting her own marketing and behavioral science concepts onto Dr. Conti's economic theory-based analysis. She presents no methodological basis for doing this. She accuses Dr. Conti of "rel[ying] on a non-compensatory decision-rule for calculating damages." (Ex. 1, at ¶ 65.) However, at her deposition, she admitted that Dr. Conti never used such a term, which is borne out of marketing/behavioral science and not economics theory. (Keller Dep. 125:3-127:6.) Dr. Keller simply does not understand the economic theory behind Dr. Conti's calculation of zero damages, which occurs when there is no intersection of the supply and demand curves resulting in no economically determinable price (i.e., $0).

Dr. Keller's primary critique of Dr. Conti's Expert Report is her supposedly improper "removing [of] the supply curve." (Ex. 1, at ¶¶ 66, 72.) She states that it is "more appropriate to envision how each consumer's demand would shift due to knowledge of the presence (or potential presence) of impurities" and then provides a "hypothetical" supply-demand curve with an unaffected supply line along with multiple modeled demand lines. (Ex. 1, at ¶¶ 71-72; Keller Dep. 186:24-189:1.)

At her deposition, however, Dr. Keller admitted that her own supply-demand curve was uninformed by the facts of the case, and actually affirmed Dr. Conti's zero value analysis. When pressed, she admitted that if there was no supply, then all consumers (even the hypothetical consumer who wanted contaminated VCDs) would end up "*paying no money for [Defendants' VCDs]*" and that there would be "*no intersection of supply and demand*" exactly in the way Dr.

15

Conti describes and models in her Report. (Keller Dep. 197:22-198:19 (emphasis added).) Once again, Dr. Keller's analysis is based on demonstrably false facts that Defendants simply wish were not so, and a fundamental lack of understanding of the economic theory as applied by Dr. Conti. The Court should strike Dr. Keller's critique of Dr. Conti's Report, which she admitted was without basis in the record and then actually agreed with Dr. Conti's analysis.

## IV.  CONCLUSION

For the foregoing reasons, Dr. Keller should be excluded from offering her opinions related to class certification.

Dated: May 3, 2022                                                                 Respectfully submitted,


/s/ John R. Davis
SLACK DAVIS SANGER, LLP
6001 Bold Ruler Way, Suite 100
Austin, TX 78746
Tel.: 512-795-8686
Fax: 512-795-8787
jdavis@slackdavis.com

/s/ Ruben Honik                .
HONIK LLC,
1515 Market St., Suite 1100
Philadelphia, PA 19102
Tel.: 267-435-1300
ruben@honiklaw.com

MDL PEC AND/OR CO-LEAD
COUNSEL FOR THE PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2022, a true and correct redacted copy of the foregoing was filed and served via the Court's CM/ECF system, and an undredacted version was served on the court and the Defense Executive Committee via email.

/s/ David J. Stanoch
David J. Stanoch
