# EXHIBIT 2

Confidential Information - Subject to Protective Order

```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2

 3

     *****************************
 4   IN RE:  VALSARTAN, LOSARTAN,
     AND IRBESARTAN PRODUCTS       MDL No. 2875
 5   LIABILITY LITIGATION
 6   ***************************
     THIS DOCUMENT APPLIES TO ALL  HON ROBERT B.
 7   CASES                         KUGLER
 8   *****************************
 9              - CONFIDENTIAL INFORMATION -
              SUBJECT TO PROTECTIVE ORDER
10

11           Videotaped Deposition of PUNAM
12   ANAND KELLER, Ph.D., commencing at 9:19 a.m.
13   Eastern, on the 10th of March, 2022, at the
14   offices of Duane Morris, 100 High Street,
15   Boston, Massachusetts, before Maureen
16   O'Connor Pollard, Registered Diplomate
17   Reporter, Realtime Systems Administrator,
18   Certified Shorthand Reporter.
19

20                   - - -

21

          GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23

24
```

Confidential Information - Subject to Protective Order

```
 1    APPEARANCES:
 2

      GOLOMB & HONIK PC
 3    BY:    RUBEN HONIK, ESQ.
             1835 Market Street, Suite 2900
 4           Philadelphia, Pennsylvania 19102
             215-327-9166
 5           ruben@honiklaw.com
             Representing the Plaintiffs
 6
 7    SLACK DAVIS SANGER, LLP
      BY:    JOHN R. DAVIS, ESQ.
 8    BY:    BETH QUESTAD, Paralegal (remotely)
             6001 Bold Ruler Way, Suite 100
 9           Austin, Texas 78746
             512-795-8686
10           jdavis@slackdavis.com
             Representing the Plaintiffs
11
12    KANNER & WHITELEY, LLC
      BY:    CONLEE WHITELEY, ESQ. (Remotely)
13           701 Camp Street
             New Orleans, Louisiana 70130
14           504-524-5777
             c.whiteley@kanner-law.com
15           Representing the Plaintiffs
16
      DUANE MORRIS, LLP
17    BY:    SETH A. GOLDBERG, ESQ.
      BY:    ALEKSANDER SMOLIJ, ESQ.
18    BY:    DANA B. KLINGES, ESQ. (Remote)
             30 South 17th Street
19           Philadelphia, Pennsylvania 19103
             215-979-1164
20           sgoldberg@duanemorris.com
             dklinges@duanemorris.com
21           Representing the Defendants Zhejiang
             Huahai Pharmaceutical Co., Ltd.,
22           Prinston Pharmaceutical Inc., Huahai
             U.S., Inc., and Solco Healthcare US,
23           LLC
24
```

Confidential Information - Subject to Protective Order

```
 1   APPEARANCES (Continued):
 2
     DUANE MORRIS LLP
 3   BY:   REBECCA BAZAN, ESQ. (Remote)
           505 9th Street, N.W., Suite 1000
 4         Washington, DC 20004-2166
           202-776-5253
 5         rebazan@duanemorris.com
           Representing the Defendants Zhejiang
 6         Huahai Pharmaceutical Co., Ltd.,
           Prinston Pharmaceutical Inc., Huahai
 7         U.S., Inc., and Solco Healthcare US,
           LLC
 8
 9   CROWELL & MORING LLP
     BY:   DANIEL T. CAMPBELL, ESQ. (Remote)
10         1001 Pennsylvania Avenue, NW
           Washington, DC 20004
11         202-624-2774
           dcampbell@crowell.com
12         Representing the Defendant Cardinal
           Health, Inc.
13
14   GREENBERG TRAURIG LLP
     BY:   TIFFANY M. ANDRAS, ESQ.
15         77 West Wacker Drive, Suite 3100
           Chicago, Illinois 60601
16         312-456-1065
           andrast@gtlaw.com
17         Representing the Defendants Teva
           Pharmaceutical Industries, Ltd., Teva
18         Pharmaceuticals SA, Inc., Actavis LLC,
           and Actavis Pharma, Inc.
19
20   HUSCH BLACKWELL LLP
     BY:   SARAH ZIMMERMAN, ESQ. (Remote)
21         190 Carondelet Plaza
           St. Louis, Missouri 63105
22         314-345-6664
           sarah.zimmerman@huschblackwell.com
23         Representing the Defendant Express
           Scripts, Inc.
24
```

```
 1   APPEARANCES (Continued):
 2

     GREENBERG TRAURIG, LLP
 3   BY:   DOUGLAS JOHNSON, ESQ. (Remote)
           Terminus 200
 4         3333 Piedmont Road NE
           Suite 2500
 5         Atlanta, Georgia 30305
           678-553-2100
 6         johnsondo@gtlaw.com
           Representing the Defendants Teva
 7         Pharmaceutical Industries, Ltd., Teva
           Pharmaceuticals SA, Inc., Actavis LLC,
 8         and Actavis Pharma, Inc.
 9

     WALSH PIZZI O'REILLY
10   BY:   CHRISTINE I. GANNON, ESQ. (Remote)
           Three Gateway Center
11         100 Mulberry Street, 15th Floor
           Newark, New Jersey 07102
12         973-757-1017
           Representing the Defendants Teva
13         Pharmaceutical Industries, Ltd., Teva
           Pharmaceuticals SA, Inc., Actavis LLC,
14         and Actavis Pharma, Inc.
15

     PIETRAGALLO GORDON ALFANO BOSICK &
16   RASPANTI, LLP
     BY:   FRANK H. STOY, ESQ. (Remote)
17         One Oxford Centre
           Pittsburgh, Pennsylvania 15219
18         412-263-1840
           fhs@pietragallo.com
19         Representing the Defendant, Mylan
           Pharmaceuticals, Inc.
20
21
22
23
24
```

Confidential Information - Subject to Protective Order

```
 1   APPEARANCES (Continued):
 2
     NORTON ROSE FULBRIGHT US LLP
 3   BY:   D'LESLI M. DAVIS, ESQ. (Remote)
           2200 Ross Avenue, Suite 3600
 4         Dallas, Texas 75201
           214-855-8000
 5         dlesli.davis@nortonrosefulbright.com
           Representing the Defendant McKesson
 6         Corporation
 7
     HINSHAW & CULBERTSON, LLP
 8   BY:   GEOFFREY M. COAN, ESQ. (Remote)
           53 State Street
 9         Boston, Massachusetts 02109
           617-213-7047
10         gcoan@hinshawlaw.com
           Representing the Defendant SciGen
11         Pharmaceuticals
12
     BARNES & THORNBURG, LLP
13   BY:   KARA KAPKE, ESQ. (Remote)
           11 S. Meridian Street
14         Indianapolis, Indiana 46204
           317-231-6491
15         kara.kapke@btlaw.com
           Representing the Defendants CVS
16         Pharmacy, Inc., and Rite Aid
           Corporation
17
18   FALKENBERG IVES, LLP
     BY:   MEGAN A. ZMICK, ESQ. (Remote)
19         230 W. Monroe Street, Suite 2220
           Chicago, Illinois 60606
20         312-566-4808
           maz@falkenbergives.com
21         Representing the Defendant Humana
22
23
24
```

```
 1    APPEARANCES (Continued):

 2

      BUCHANAN INGERSOLL & ROONEY PC

 3    BY:    ASHLEY D.N. JONES, ESQ. (Remote)

             1700 K Street, N.W., Suite 300

 4           Washington, DC 20006-3807

             202-452-7318

 5           ashley.jones@bipc.com

             Representing the Defendant,

 6           Albertsons, LLC

 7

 8    Videographer:   Alex Jandrow

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential Information - Subject to Protective Order

```
 1                        INDEX
 2     EXAMINATION                             PAGE
 3     PUNAM ANAND KELLER, Ph.D.
 4     BY MR. DAVIS                            11
 5
 6
 7                   E X H I B I T S
 8     NO.         DESCRIPTION               PAGE
 9   1     Punam Anand Keller's bio from
           Analysis Group website...........   19
10
     2     January 12, 2022 Expert
11         Declaration of Professor Punam
           A. Keller, PhD...................   37
12
     3     Report to GTMRx National Task
13         Force: Building Vaccine
           Confidence in the Medical
14         Neighborhood.  Background and
           Resources to Build Vaccine
15         Confidence in the Health
           Neighborhood, March 2001.........   60
16
     4     Document titled Generic Drugs:
17         Questions & Answers..............   79
18   5     Accutane label..................   138
19   6     May 13, 2013 Department of
           Justice press release, Generic
20         Drub Manufacturer Ranbaxy Pleads
           Guilty and Agrees to Pay $500
21         Million to Resolve False Claims
           Allegations, cGMP Violations and
22         False Statements to the FDA.......  142
23   7     Copy of 21 U.S. Code Section 331
           - Prohibited Acts................   172
24
```

Confidential Information - Subject to Protective Order

1

8      Three graphs, Monthly ZHP Rxs by

2      Valsartan Product.................  181

3  9   Diovan (valsartan) Tablets,
       Highlights of Prescribing

4      Information......................  199

5  10  Excerpts of the Samuel Cisneros
       December 3, 2021 deposition

6      transcript.......................  210

7  11  MTD Opinion 3: Warranty Claim.....  225

8  12  2/3/22 invoice from Analysis
       Group............................  234

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential Information - Subject to Protective Order

```
 1                        -   -   -

                 DEPOSITION SUPPORT INDEX
 2                        -   -   -

 3

    Direction to Witness Not to Answer
 4  PAGE  LINE
    None.
 5

 6

 7

 8  Request for Production of Documents
    PAGE  LINE
 9
    245        15
10

11  Stipulations
    PAGE  LINE
12  None.

13

14  Questions Marked Highly Confidential
    PAGE  LINE
15  None.

16

17

18

19

20

21

22

23

24
```

Confidential Information - Subject to Protective Order

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now

 4      on the record.  My name is Alex

 5      Jandrow, I'm a videographer for Golkow

 6      Litigation Services.

 7              Today's date is March 10, 2022,

 8      and the time is 9:19 a.m.

 9              This video deposition is being

10      held in Duane Morris LLP of Boston

11      Massachusetts in the matter of

12      Valsartan, Losartan, and Irbesartan

13      Products Liability Litigation, MDL

14      Number 2875, for the United States

15      District Court, District of New

16      Jersey.

17              The deponent is Punam Keller,

18      MD.

19              And the court reporter is

20      Maureen O'Connor Pollard.

21              Counsel will now introduce

22      themselves for the record.

23              MR. DAVIS:  John Davis and

24      Ruben Honik for the plaintiffs.
```

confidential information subject to protective order

1              MR. GOLDBERG:  Seth Goldberg on

2       behalf of the ZHP defendants and

3       defendants.

4              MR. SMOLIJ:  Alek Smolij on

5       behalf of the ZHP defendants.

6              MS. ANDRAS:  Tiffany Andras on

7       behalf of Teva and Actavis

8       Pharmaceuticals.

9              MR. DAVIS:  Good morning,

10      Dr. Keller.  How are you today?

11                   ///

12           PUNAM ANAND KELLER, Ph.D.,

13   having been duly identified and sworn, was

14   examined and testified as follows:

15                   ///

16              THE WITNESS:  And the first

17      thing I want to do is, it's not MD,

18      it's Ph.D.

19                EXAMINATION

20   BY MR. DAVIS:

21      Q.     Okay.  Let me try that again.

22             Good morning, Dr. Keller.  How

23   are you this morning?

24      A.     Good.  How are you?

confidential information - subject to protective order

1    opinions and the basis and reasons for them?

2        A.    Yes.

3        Q.    Okay.  You didn't do any kind

4    of survey or empirical study as part of your

5    assignment in this case, did you?

6        A.    No, because I felt that there

7    was evidence from consumers as well as

8    literature from consumers that were

9    sufficient to support my opinions.

10       Q.    We'll get into that a little

11   bit later.

12             But your answer is no, you did

13   not do a survey or any kind of empirical

14   study as part of your assignment in this

15   case?

16       A.    Yes.

17       Q.    Okay.  Have you been asked to

18   at some point in the future?

19       A.    No.

20       Q.    I think you said earlier that

21   you've done some consumer messaging in the

22   field of healthcare, is that correct?

23       A.    Yes.

24       Q.    Okay.  Can you describe that

Confidential Information - Subject to Protective Order

1    have an opinion.

2         Q.      Well, the question is do you

3    know.

4         A.      No.

5         Q.      Are you familiar with the fact

6    that generic pharmaceutical manufacturers do

7    not routinely engage in promotional

8    activities for their drugs?

9         A.      I do not know.

10        Q.      When I refer to FDA-approved

11   labeling, do you know what that means?

12        A.      Could you be more specific?

13        Q.      Sure.

14                Do you know what an

15   FDA-approved label is?

16        A.      No.

17        Q.      Have you looked at any

18   FDA-approved labeling for any of the generic

19   valsartan products at issue in this case?

20        A.      I have looked at some labels of

21   valsartan.  I do not know if they are

22   FDA-approved or not.

23        Q.      In general terms, the labels

24   that you looked at, what kind of information

Confidential Information - Subject to Protective Order

1    decision rule, do you not?

2         A.     I do not say that.

3         Q.     Take a look at paragraph 9 of

4    your report, first bullet point.  You say in

5    the middle of that bullet point, "In doing

6    so, Dr. Conti's analysis implicitly relies on

7    a uniform noncompensatory decision-rule for

8    calculating damages."

9              Do you see that?

10        A.     Yes.

11        Q.     So you are saying that she's

12   applying a uniform noncompensatory decision

13   rule, do you not?

14        A.     You forgot a critical word.

15   No, I did not say that, I said she is

16   implicitly applying.

17        Q.     How is that different from her

18   applying, which is my question?

19        A.     The different between an

20   explicit and an implicit application.  She

21   does not mention a noncompensatory decision

22   rule, but her assertions are consistent with

23   a noncompensatory decision rule, which is why

24   I said she implicitly applies a

Confidential Information - Subject to Protective Order

1    noncompensatory decision rule.

2         Q.     Okay.  Thank you for that.

3    That was going to be my next question, is

4    Dr. Conti never uses that term in her report,

5    does she?

6         A.     No.

7         Q.     Thank you.

8                That's a term -- compensatory

9    decision rules, noncompensatory decision

10   rules, those are terms that are borne out of

11   the field of sort of behavioral science,

12   right?  Consumer behavior, consumer

13   psychology, your field of expertise, correct?

14        A.     As I mentioned in my testimony

15   earlier, the foundation for some of this work

16   on compensatory/noncompensatory decision

17   rules came from economists, and I mentioned

18   several, Simon, Tversky, Kahneman, amongst

19   others.

20               Simon actually was the first

21   one that came up, from what I know, or is at

22   least given credit for the first

23   noncompensatory rule satisfying.  This is

24   Herbert Simon, he's an economist.

Confidential Information - Subject to Protective Order

1          Q.      This is behavioral economics,

2     correct?

3          A.      At that time it was not defined

4     as such, but he's an economist, and now it is

5     commonly adopted in behavioral economics as

6     well.

7          Q.      Let's go to paragraphs 21

8     through 28 of your report.  And this is where

9     you set forth some discussion and definitions

10    of what you mean by compensatory decision

11    rules and noncompensatory decision rules, is

12    that correct?

13         A.      Yes.

14         Q.      For example, in paragraph 22

15    you state that "The compensatory

16    decision-rule involves physicians and

17    consumers placing a higher value of one drug

18    feature to compensate for a lesser value of

19    another feature," correct?

20         A.      Yes.

21         Q.      There's an assumption there, is

22    there not, that the information regarding

23    those features is available for them to

24    actually weigh, correct?

Confidential Information - Subject to Protective Order

```
 1         A.     No.
 2                MR. GOLDBERG:  Objection.
 3         Asked and answered.
 4    BY MR. DAVIS:
 5         Q.     In your report on paragraph 38
 6    you mention that Accutane "has a number of
 7    potentially serious side effects, including:
 8    eye irritation; skin infection; bone
 9    tenderness; vision loss; birth defects (in
10    pregnant women); skin inflammation."
11                Do you see that?
12         A.     Yes.
13         Q.     Where did you get that
14    information from?
15         A.     Footnote 62, and it's in
16    Appendix B of my report.
17         Q.     Okay.  So that is -- that
18    appears to be the label, so you did --
19         A.     I didn't know that's what the
20    label was.  Thank you.
21         Q.     Yes.  So this is the label.  So
22    you have looked at this?
23         A.     Yes.
24         Q.     And that's how you pulled out
```

Confidential Information - Subject to Protective Order

1   for example, these potential side effects,

2   was from looking at what's been marked as

3   Exhibit 5, correct?

4        A.      Sorry, can you repeat the

5   question?  What has been -- sorry, can you

6   ask the question again?

7        Q.      Sure.

8                The way you came to understand

9   that Accutane carries the risk of these side

10  effects that you discuss in paragraph 38 is

11  because, as you cite in footnote 62, you

12  actually went and looked at the label for the

13  drug, correct?

14       A.      That's right.

15       Q.      Okay.  And that's where those

16  side effects were disclosed?

17       A.      I'm sure -- there may be more,

18  but that's where the ones I've listed were

19  disclosed, yes.

20       Q.      So essentially what happened

21  here is the FDA approved Accutane, correct?

22  The FDA granted approval for Accutane to be

23  marketed to Roche, which was the brand

24  company as you see there.

Confidential Information - Subject to Protective Order

```
 1                      Do you understand that?

 2          A.       I take your word for it.

 3          Q.       And they approved Accutane

 4    despite the drug carrying these disclosed

 5    side effects, correct?

 6          A.       I'll take your word for it.

 7          Q.       And left it up to physicians

 8    and consumers to weigh the costs and benefits

 9    of taking the medicine with those -- with the

10    knowledge of those disclosed side effects in

11    the label, right?

12          A.       Yes.

13          Q.       Okay.  Let me ask you, how do

14    you think users of --

15          A.       Should I put this away?

16          Q.       Sure, if you want to.

17                   How do you think users of

18    generic Accutane manufactured by Ranbaxy

19    weighed the fact that that generic Accutane

20    was contaminated?

21          A.       Could you please repeat the

22    question?

23          Q.       Sure.

24                   Are you familiar with a company
```

Confidential Information - Subject to Protective Order

1    called Ranbaxy?

2         A.    No.

3         Q.    Okay.  Let me mark something

4    else for you.

5              MR. DAVIS:  I'm handing

6         Exhibit 6 to the reporter to be

7         marked.

8              (Whereupon, Keller Exhibit

9         Number 6 was marked for

10        identification.)

11   BY MR. DAVIS:

12        Q.    Okay.  I'm handing you a --

13   Exhibit 6, for the record, is a US Department

14   of Justice press release titled "Generic Drug

15   Manufacturer Ranbaxy Pleads Guilty and Agrees

16   to Pay $500 Million to Resolve False Claims

17   Allegations, cGMP Violations and False

18   Statements to the FDA."

19             Do you see that?

20        A.    I see it.

21        Q.    That's dated May 13, 2013?

22        A.    I see.

23        Q.    Okay.  So, in fact, if you --

24   just to orient you, if you go back to

confidential information - subject to protective order

1    Exhibit 5 just for a moment, which is the

2    Roche label for Accutane, do you see what the

3    generic name for that drug is?

4         A.     Exhibit -- where?  It's a big

5    document.

6         Q.     Well, actually it's in your

7    report at paragraph 38, "As an example,

8    Accutane, or isotretinoin."

9         A.     Yes.

10        Q.     Do you know that Accutane's

11   generic name is isotretinoin?

12        A.     Yes.

13        Q.     Okay.  I'm going to direct your

14   attention to page 2 of Exhibit 6, which is

15   this DOJ announcement.

16        A.     Okay.

17        Q.     And you'll see in the second

18   paragraph on that page, "Ranbaxy USA admitted

19   to introducing into interstate commerce

20   certain batches of adulterated drugs that

21   were produced at Paonta Sahib in 2005 and '6,

22   including Sotret, gabapentin, and

23   ciprofloxacin."

24             And then it says, "Sotret is

Confidential Information - Subject to Protective Order

1    Ranbaxy's branded generic form of

2    isotretinoin," which is Accutane, correct?

3        A.    Is the generic form.

4        Q.    Right.

5        A.    Yes.

6        Q.    So do you see there that

7    Ranbaxy admitted that in 2005 and '6 that

8    they distributed adulterated isotretinoin?

9        A.    According to this statement,

10   yes.

11       Q.    Okay.  So my question is, how

12   do you think consumers of Ranbaxy's Sotret or

13   isotretinoin manufactured by them who got

14   that drug in 2005 and 2006 were able to weigh

15   at the moment they went to the pharmacy and

16   got it the fact that it was adulterated?

17           MR. GOLDBERG:  Objection to

18       form.

19           I think it would be fair to

20       allow the witness to review the

21       document, given the question.

22   BY MR. DAVIS:

23       Q.    You don't need to review the

24   document to answer the question.  I'm asking

Confidential Information - Subject to Protective Order

```
 1            it's going to take longer we'll go off

 2            the record.  But we don't go off the

 3            record automatically just because a

 4            document is presented.  That's how it

 5            goes.

 6     BY MR. DAVIS:

 7            Q.    Feel free to give the document

 8     a cursory review.

 9            A.    I'm sorry, I'm going to

10     undertake my task so that I can answer your

11     question to the best of my ability.

12            Q.    Sure.  Okay.

13            A.    Thank you.

14            Q.    Review the document.

15            A.    Thank you.

16                  (Witness reviewing document.)

17            A.    Thank you.

18            Q.    Sure.  So let's start with the

19     portion of the document that I called out to

20     you.

21                  You agree that Ranbaxy admitted

22     to distributing in 2005 and 2006 certain

23     batches of adulterated isotretinoin, which is

24     generic Accutane, correct?
```

Confidential Information - Subject to Protective Order

1      A.      Yes.

2      Q.      Okay.  So my question is, how
3    can consumers who purchased those drugs in
4    2005 and '6 have weighed the fact that they
5    were adulterated at the time that they
6    purchased them?

7      A.      You are making an assumption
8    that consumers uniformly would have wanted to
9    weigh that fact.

10     Q.      No, that's not my question, and
11   you're not answering my question.

12             My question is, how could they
13   have weighed that information when it wasn't
14   disclosed to them?

15     A.      But the assumption is that they
16   would even want to.  So if I don't want to,
17   the issue of how I could is irrelevant.

18     Q.      Well, you're taking it --
19   you're taking my question and you're
20   answering a different question.

21     A.      I see.

22     Q.      My question is, how can
23   consumers who purchased adulterated Ranbaxy
24   isotretinoin in 2005 and 2006 that was

Confidential Information - Subject to Protective Order

1    adulterated, how could they have weighed the

2    fact that it was adulterated?  If they wanted

3    to weigh that fact, how could they have

4    weighed that fact that it was adulterated?

5    They couldn't, right?

6         A.     Again, I'll explain why I'm

7    having a hard time answering that question

8    directly.

9              Based on my understanding of

10   consumer behavior, there are consumers who

11   think drugs are adulterated when they're not

12   and consider that.  And the example that I

13   give in my report was on -- because we were

14   talking about COVID vaccine earlier, about

15   bleach, and I cited a supporting document,

16   you know, something from the CDC on the

17   percentage of people that were using bleach

18   because they thought that was more

19   efficacious for them or safer or whatever set

20   of reasons they had that I'm unsure of than

21   the COVID-19 vaccine.

22              So I don't -- I said this

23   earlier, I don't think that consumers need to

24   get specific information in order for them to

Confidential Information - Subject to Protective Order

1    include features, whether they're benefits or

2    costs or both in some cases, in order to make

3    a determination of how they impact the value

4    that they are assessing.

5        Q.    You don't think consumers are

6    entitled -- you don't think these Ranbaxy

7    isotretinoin consumers were entitled to know

8    that the drug they got was adulterated?  Is

9    that what you're saying?

10       A.    No, I did not say that.  I

11   actually don't know what you mean by

12   "entitled."

13       Q.    You don't think it would have

14   been right for them to know that the drug

15   they were getting was adulterated?

16       A.    There are some consumers who

17   would say, It is my right to know, and there

18   are others who would say, I don't care.

19            There is a range of consumer

20   behavior, and I don't think that you can

21   uniformly assume any consumer would be

22   exactly the same in this context of they

23   would feel that they have the right to know.

24       Q.    But you're not answering my

confidential information - subject to protective order

1    question.  You're answering a different

2    question, which is how they might have

3    weighed that information or not have weighed

4    that information.

5              My question is, it wasn't

6    disclosed to them, so even if they wanted to

7    weigh it they couldn't have, right?  Even if

8    they would have considered that in their

9    decision-making, they couldn't have, right,

10   because it wasn't disclosed to them.  Would

11   you agree with that?

12        A.    So you're saying make the

13   assumption that people -- that there were

14   people who wanted to know, and then -- you're

15   asking me to make a lot of assumptions.

16        Q.    Well, I don't think it's a big

17   assumption to assume that people would want

18   to know that their drug was contaminated.

19        A.    Some will and some will not,

20   and that's what I said.

21        Q.    Assume it for me, Dr. Keller,

22   assume that there were patients of Ranbaxy's

23   Sotret who would have wanted to know that

24   information.

Confidential Information - Subject to Protective Order

```
 1         A.      Okay.

 2         Q.      But they didn't know that

 3   information at the time they purchased the

 4   drug, right?

 5         A.      Correct.

 6         Q.      Okay.  How could they have

 7   weighed that information when it wasn't

 8   disclosed to them?  They couldn't have,

 9   right?  They could not have weighed that

10   information, correct?

11         A.      They could not have weighed the

12   specific information, but they could have

13   weighed related information.

14         Q.      What do you mean by "related

15   information"?

16         A.      You know, there are consumers

17   out there who believe that pure drugs is an

18   oxymoron, and that -- you know, and as I

19   state in my report in Section IV, I think it

20   was IV.B, which is what we were referring to

21   earlier, there are some consumers who learn

22   over time that things that they thought were

23   safe were not safe, and things that they

24   thought may have not been safe have reentered
```

Confidential Information - Subject to Protective Order

1    don't think consumers of pharmaceuticals

2    dispensed in the US should be entitled to a

3    belief or an expectation that those drugs are

4    dispensed to them as described and approved

5    by the FDA?

6         A.    Again, I don't believe that is

7    the case for all consumers.  I think many

8    consumers don't think about whether the drug

9    is approved or not approved, or who approves

10   it or doesn't approve it.

11             And I'm going to break one of

12   my own rules and give you an example where if

13   I was taking a drug, and it could be this one

14   that you have as an example, and I thought it

15   was working brilliantly for me, I might not

16   want to know that the drug -- I mean, sorry,

17   I can say drug, yeah -- that the drug was

18   adulterated because I would like to continue

19   taking the drug without any trepidation.

20        Q.    You might not want to know?

21        A.    I might not want to know.

22        Q.    Well, what if -- I mean, we're

23   talking about just one manufacturer's version

24   of generic Accutane, you wouldn't want to

Confidential Information - Subject to Protective Order

1    know that so you could just take another

2    manufacturer's version of generic Accutane

3    that wasn't adulterated?

4         A.    It's a hypothetical, so I'm

5    giving you a hypothetical back, and that is,

6    if I like this one that I'm taking and it's

7    worked for me -- and back to my framework

8    that I talk about in the model, and I'll use

9    MICI this time, which is, depending on the

10   message that I got -- and I can give you

11   examples, depending on -- I'm focusing on the

12   individual differences, that if I've tried

13   other acne medicines and they haven't worked

14   for me, and then I find one that I really

15   like and it seems to work for me, and then

16   there is this information out there, I'm

17   saying that there are some consumers in those

18   situations that might not want to know or not

19   care about this information about the

20   adulteration from this specific batch because

21   they don't want to switch, they don't want to

22   consider any alternative products.

23        Q.    Do you understand that the

24   point of our generic drug system is that all

Confidential Information - Subject to Protective Order

1    the generics are supposed to work in the same

2    way to each other and to the brand?

3                    MR. GOLDBERG:  Objection.

4    BY MR. DAVIS:

5        Q.    Do you understand that?

6                    MR. GOLDBERG:  Objection to

7        form.  Asked and answered.

8        A.    I am not an expert on how

9    generics are supposed to work, and I will not

10   give you an opinion on that.

11   BY MR. DAVIS:

12       Q.    Let's back up for a second.

13             You talk a lot about this

14   choice exercise that consumers make in the

15   healthcare context, right?

16       A.    Which context are you speaking?

17   We were talking about how a consumer might

18   value the drug that they have, so when you

19   say "choice exercise," I'm trying to

20   understand the context.

21       Q.    Sure.

22             Your whole report is about

23   healthcare decision-making, right?  And that

24   involves a choice, right?

Confidential Information - Subject to Protective Order

1     A.     I would say that that's a bit

2  of a mischaracterization.  The bulk of my

3  report is focused on how consumers would

4  assess the value or worth of a drug to them.

5     Q.     Okay.  And once they make that

6  assessment, at what point is the decision

7  finalized for them?

8     A.     Lots of cases, never.  In some

9  cases, they try one, they never switch.  That

10 varies by consumer.

11    Q.     Well, the choice is culminated

12 when they go buy the drug, right?  They're

13 acting, would you agree --

14    A.     No, no.

15    Q.     Would you agree that a

16 consumer, when they go fill a prescription,

17 they're acting on a choice that they've made,

18 correct?  They may -- I hear what you're

19 saying, they may reevaluate that choice in

20 the future, but they're acting on a choice

21 that they made prior to that, because they

22 had to -- I mean, it's just common sense, you

23 go fill a prescription, you're doing an act,

24 right?

Confidential Information - Subject to Protective Order

1          A.      As I mentioned to you earlier,

2     the consumer value is defined as a comparison

3     of benefits and costs, and the price they pay

4     or the act of actually exchanging a product

5     for money is only one aspect of the cost.

6          Q.      It's an action, though, that a

7     consumer is taking, correct?

8          A.      It's one of several.

9          Q.      As a result of the decision and

10     choice analysis that they went through prior

11     to engaging in that act, right?

12          A.      I take objection to that.  As I

13     explain in my report, and this is in Section

14     IV.B of my report, consumers use a variety of

15     different methods to make those choices.

16     Some of them are noncompensatory or

17     reflexive, they haven't thought about

18     anything, they've just gone and done it

19     spontaneous, others -- there's a range --

20     others will spend a lot of time and think

21     about the plusses and minuses.  There's a

22     range.

23          Q.      I'm not going into the

24     qualitative aspect of that choice.  All I'm

Confidential Information - Subject to Protective Order

1    saying is that in order to act, which is to

2    go fill the prescription at the pharmacy,

3    some level of choice had to be made to go do

4    that.  We're not talking about zombies here

5    who are just like, you know, going to the

6    pharmacy, this is a choice that humans make

7    to go fill a prescription, is it not?

8        A.    I would say some will go fill

9    and some will not.  And again, as is

10   explained in my report, many consumers do not

11   fill their prescriptions, and many consumers

12   who fill their prescriptions do not take

13   their drugs.  So those are also actions.

14       Q.    So with this Sotret example,

15   which consumers affirmatively made the choice

16   to go get adulterated Sotret from Ranbaxy?

17       A.    I have no idea.

18       Q.    None, right?

19       A.    Well, no, that is -- I have no

20   information on that.  I can't tell you that.

21       Q.    If you don't know -- if they

22   didn't know about it, how could they

23   affirmatively go choose that at the time?

24   They can't, right?

Confidential Information - Subject to Protective Order

1    Q.    No, I was resetting our --

2    A.    I'm sorry.  Okay.

3    Q.    -- context here.

4          Have you examined in any detail

5    how the fact of adulteration in this case,

6    for example, affects a company's ability to

7    supply their drugs into the US?

8    A.    I need a clarification.

9    Q.    Sure.

10   A.    In this case are we talking

11   about the Ranbaxy case, or are we talking

12   about the VCD case, or some other case?

13   Q.    I'm just talking generally

14   about pharmaceutical prescription drugs.

15   A.    Okay.

16   Q.    Did you as part of this

17   assignment, or not as part of this

18   assignment, just generally, have you ever

19   studied how the fact of a prescription drug's

20   adulteration affects its ability to be

21   distributed, marketed, sold, dispensed in the

22   United States?

23         MR. GOLDBERG:  Objection.

24   Ambiguous and compound.

confidential information - subject to Protective Order

1          A.      I am not an expert on many of

2    the things that were raised, and I'm not

3    going to give an opinion.

4    BY MR. DAVIS:

5          Q.      So you haven't looked into how

6    the fact of adulteration might affect the

7    supply of a drug in the US?

8          A.      Not prior to this case.

9          Q.      Did you in this case?

10         A.      I reviewed Dr. Conti's report,

11   so yes.

12         Q.      Okay.  I'm asking not did you

13   review Dr. Conti's report.  I'm asking if you

14   did any independent analysis of your own how

15   the fact of adulteration under the law might

16   affect the supply or the ability of a

17   manufacturer to supply its drug product in

18   the United States market?

19         A.      No.  I am a consumer behavior

20   expert.  I have no opinion on drug supply for

21   the example you've given.

22              MR. DAVIS:  I'm going to mark

23         Exhibit 7.

24              ///

Confidential Information - Subject to Protective Order

```
 1                (Whereupon, Keller Exhibit

 2          Number 7 was marked for

 3          identification.)

 4   BY MR. DAVIS:

 5        Q.    I understand you're not a

 6   lawyer, Dr. Keller.  What I'm showing --

 7                MS. ANDRAS:  Can you please

 8          identify it with specificity on the

 9          record?

10                MR. DAVIS:  Sure.  For the

11          record, this is Exhibit 7, which is 21

12          USC 331, part of the US Code entitled

13          "Prohibited Acts."

14   BY MR. DAVIS:

15        Q.    Do you see that?

16        A.    Yes.

17        Q.    Do you have familiarity with

18   what the US Code is?

19        A.    No.

20        Q.    Do you understand that that's

21   federal law enacted by congress, signed by

22   the President?

23                MR. GOLDBERG:  Objection to

24          form.  Foundation.
```

Confidential Information - Subject to Protective Order

1          A.     I did not know that.  I'm not

2     an expert on the law.

3     BY MR. DAVIS:

4          Q.     Okay.  I'm granting you that.

5                 It says there that, "The

6     following acts and the causing thereof are

7     prohibited."  And then it says, "(a) The

8     introduction or delivery" into -- sorry.

9     "The introduction or delivery for

10    introduction into interstate commerce of

11    any," and it lists several things, including

12    drugs, that are adulterated or misbranded.

13                Do you see that?

14         A.     Yes.

15         Q.     Okay.  And then (c) says, "The

16    receipt in interstate commerce of any" of the

17    same categories, including drugs, that are

18    adulterated or misbranded, and the delivery

19    or preferred delivery thereof for pay or

20    otherwise.

21                Do you see that?

22         A.     I do.

23         Q.     Okay.  Were you aware -- your

24    testimony is you're not aware of these

Confidential Information - Subject to Protective Order

```
 1    prohibitions under federal law, are you?

 2         A.     Correct.

 3         Q.     Okay.  Thank you.

 4                MR. GOLDBERG:  Are you done

 5         with this one?

 6                MR. DAVIS:  For the moment,

 7         yes.

 8    BY MR. DAVIS:

 9         Q.     Do you have any opinion about,

10    or -- let me rephrase it.

11                Do you have any understanding

12    about whether the at-issue VCDs in this case

13    were deemed to be adulterated or misbranded

14    under the law?

15         A.     I don't have an opinion.

16         Q.     Okay.  You don't have any

17    understanding, correct?

18         A.     That's not what you asked.  You

19    asked if I had an opinion.  So could you

20    reask the question?

21         Q.     Sure.

22                MR. HONIK:  I'd like Maureen to

23         read it exactly as John posed.

24                THE WITNESS:  Thank you.
```

Confidential Information - Subject to Protective Order

1             (Whereupon, the reporter read

2        back the question:

3             QUESTION:  Do you have any

4        understanding about whether the

5        at-issue VCDs in this case were deemed

6        to be adulterated or misbranded under

7        the law?)

8             MR. HONIK:  Not opinion.

9        A.     I apologize.

10            Could you read that again?

11            (Whereupon, the reporter read

12       back the question:

13            QUESTION:  Do you have any

14       understanding about whether the

15       at-issue VCDs in this case were deemed

16       to be adulterated or misbranded under

17       the law?)

18       A.    I am not a lawyer.  I do not --

19   I am not going to offer any opinion on that.

20   BY MR. DAVIS:

21       Q.    Okay.  And the question was,

22   you don't have any understanding of whether

23   they were or not, correct?

24       A.    Please explain what you mean by

confidential information subject to protective order

1    "understanding."

2        Q.      So my question was, do you have

3    any understanding of whether the at-issue

4    VCDs in this case were deemed to be

5    adulterated or misbranded under the law?

6        A.      I will answer to the best of my

7    ability.  I have read the -- as you can see

8    in Appendix B of my report, I have read a

9    couple of legal documents that explain that

10   some of the at-issue VCDs were found to be

11   adulterated and unbranded under the law.

12       Q.      Okay.  But you're not sure how

13   many, right?  You said "some."  You're not

14   sure whether it's some or all of them, are

15   you?

16       A.      I am -- my understanding, which

17   is what you asked, is that of the VCDs that

18   were voluntarily recalled by the

19   manufacturers, some of them, not all of them,

20   were adulterated or unbranded.

21       Q.      You're not sure how many that

22   is, though?

23       A.      No.

24       Q.      Okay.  And you didn't do any

confidential information subject to protective order

1    independent analysis of whether that's true

2    or not true, right?

3         A.    Correct.

4         Q.    Okay.  Do you have any

5    understanding of whether there are

6    valsartan-containing drugs out there that

7    don't have and never had NDMA and NDEA in

8    them?

9         A.    I am not an expert.  I will

10   qualify that some of the material that I have

11   in my supporting documents suggested --

12   indicated to me that there were levels of

13   these two impurities that you just mentioned,

14   but I am assuming they were acceptable

15   levels.

16        Q.    So my -- that's not my

17   question, though.  My question -- and I'll

18   reask it just to make sure we're clear, my

19   question is, do you have any understanding of

20   whether there were not at-issue VCDs

21   manufactured by entities other than the

22   defendants in this case that did not have any

23   NDEA or NDMA in them?

24        A.    I have no information on them.

Confidential Information - Subject to Protective Order

1    Q.    You have no information on

2    that.

3          Didn't look at it?

4    A.    No.

5    Q.    Didn't investigate it?

6    A.    No.  Not part of my task.

7    Q.    Do you have any understanding

8    of whether NDMA or NDEA are supposed to be in

9    valsartan drugs?

10   A.    I'm not an expert on the

11   formulation of these drugs.  I have no

12   opinion.

13   Q.    Okay.  So you don't know

14   whether these two substances are supposed to

15   or not supposed to be in valsartan drugs?

16   A.    I am not an expert.  I cannot

17   comment as to the presence, absence, or

18   extent to which these are or are not

19   necessary for these drugs.

20   Q.    Well, the drugs were recalled,

21   as you said, right?

22   A.    (Nodding in the affirmative).

23   Q.    Doesn't that indicate to you

24   that they weren't supposed to be in there?

confidential information subject to protective order

1          A.      My caveat is when you say

2     they're not supposed to be there, my

3     understanding is that they are there, it's

4     just not they're not supposed to be there

5     above certain levels, and that's what I'm

6     qualifying.

7          Q.      But you don't know whether

8     they're supposed to be there at all or not,

9     correct?

10               MR. GOLDBERG:   Objection to

11          form.   Foundation.

12          A.      No.

13     BY MR. DAVIS:

14          Q.      Did you look at a valsartan

15     label like you looked at the Accutane label?

16          A.      I already testified that I

17     looked at valsartan product labels.

18          Q.      Can you point me -- it may be

19     in there, I just want you to point me to

20     where in your materials considered that would

21     be.

22          A.      I can show you from my report,

23     but I don't have the binder of all the -- and

24     actually there's maybe six on a page, they're

Confidential Information - Subject to Protective Order

1    visuals, in case you have those materials and

2    you're trying to look for them, but I can

3    help.

4                (Witness reviewing document.)

5         A.    I'm -- I wish I had my

6    materials in front of me, but I'm going to --

7    I don't want to guess.  It could be in the

8    drugs.com or the MedlinePlus.  I'm picturing

9    the page in front of me, and they're pictures

10   of multiple labels with on the left side the

11   name, and on the right side the drug

12   manufacturer and the place of manufacture.

13   That's what I'm picturing.

14        Q.    Okay.  You say -- flip to

15   page 30 of your report, if you don't mind,

16   Exhibit 1.

17        A.    Of course.

18        Q.    The title of that section is

19   "Real-world Evidence Indicates that the

20   At-Issue VCDs Held Value," correct?

21        A.    Yes.

22        Q.    Okay.  Did you look at any

23   sales data of -- sorry.

24                Did you look at any sales data

Confidential Information - Subject to Protective Order

1    of the actual sales of these drugs after the

2    recalls were announced?

3           A.    Only information that was part

4    of Dr. Conti's report, not otherwise.

5           Q.    So do you know what happened to

6    sales of these products after the recalls?

7           A.    I don't recall.

8           Q.    Sorry, give me a few moments

9    here.  I should have two copies of all this

10   somewhere, but I don't.  I'm just going to

11   mark one, it's big enough for, I think, you

12   to see it.

13              MR. DAVIS:  This is being

14         marked as Exhibit 8, let's start with

15         that.

16              (Whereupon, Keller Exhibit

17         Number 8 was marked for

18         identification.)

19   BY MR. DAVIS:

20          Q.    Let me represent to you that

21   what I'm showing you there is the monthly

22   prescription data for --

23          A.    Should I put the -- my report

24   away?

confidential Information subject to Protective Order

```
1          A.     Okay.  Then yes.

2                 MR. GOLDBERG:  Objection to

3          form.

4     BY MR. DAVIS:

5          Q.     Do you understand why for ZHP

6     the monthly sales dropped to zero?

7          A.     I don't have that information.

8          Q.     Did you come to any

9     understanding or investigate whether similar

10    to Ranbaxy, ZHP was barred from importing

11    prescription drug products to the US?

12         A.     I just want to make sure,

13    exporting, that ZHP was barred from -- we

14    barred them from imports of their product,

15    right?

16         Q.     Yes.  ZHP products were made

17    illegal to sell in the US, correct?

18         A.     Yes.

19                MR. GOLDBERG:  Objection to

20         form.

21    BY MR. DAVIS:

22         Q.     And subject to seizure by

23    federal agents if they were imported or

24    attempted to be distributed?
```

Confidential Information - Subject to Protective Order

1          A.     I am not an expert on this

2     process.  I cannot form an opinion.

3          Q.     Well, you sort of do form an

4     opinion, though.  If you look at paragraph 71

5     of your report, you have a hypothetical

6     supply-demand curve, do you not?

7          A.     Excuse me, I need to get there.

8                 Could you ask that question

9     again?

10         Q.     Sure.

11                You said you don't have an

12    opinion one way or the other on whether ZHP

13    was barred from importing or selling its

14    products in the US.  Am I right about that?

15         A.     I'm not sure, that may have

16    been before your last question, I don't

17    recall that as your last question, so I'm

18    trying to be accurate.

19                MR. DAVIS:  Could you read that

20         last question?  Sorry.

21                (Whereupon, the reporter read

22         back the following:

23                QUESTION:  And subject to

24         seizure by federal agents if they were

1          imported or attempted to be

2          distributed?

3                    THE WITNESS:  I am not an

4          expert on this process.  I cannot form

5          an opinion.

6                    QUESTION:  Well, you sort of do

7          form an opinion, though.  If you look

8          at paragraph 71 of your report, you

9          have a hypothetical supply-demand

10         curve, do you not.

11                   THE WITNESS:  Excuse me, I need

12         to get there.

13                   Could you ask that question

14         again?

15                   QUESTION:  Sure.

16                   You said you don't have an

17         opinion one way or the other on

18         whether ZHP was barred from importing

19         or selling its products in the US.  Am

20         I right about that?)

21    BY MR. DAVIS:

22         Q.    So let me -- I'll withdraw the

23    last question.

24                   You do at paragraph 71 on

confidential information subject to protective order

```
1    page 43, the next page over, supply a

2    hypothetical supply-demand curve, do you not?

3           A.      Several.

4           Q.      Well --

5           A.      Several demand curves, and

6    therefore --

7           Q.      You have several demand curves,

8    but you have one supply, correct?

9           A.      Yes, so a combination would be

10   several supply-demand curves.

11          Q.      Right.  But with one supply

12   line, correct?

13          A.      Yes.

14          Q.      And this is hypothetical,

15   right?  This is a hypothetical supply-demand

16   curve, is it not?

17          A.      Well, it is a figure, and the

18   changes or the alternatives of the demand

19   curve that I'm sharing with you here reflect

20   my argument that consumers would have

21   different assessments of what the drug would

22   be -- what the at-issue VCD would be to them,

23   and based on the compensatory/noncompensatory

24   decision rules and MICI.
```

Confidential Information - Subject to Protective Order

```
 1              And some consumers would say, I
 2      don't want any of this product, it is not
 3      worth anything to me, all the way to the
 4      other end of the continuum where you have
 5      some consumers who would say, I'm consuming
 6      these impurities in multiple forms and it's
 7      of no consequence to me, and everything in
 8      between.
 9              That's what these alternative
10      demand curves, or multiple demand curves are
11      meant to represent.
12              So when you ask the question,
13      you know, are they hypothetical demand
14      curves, yes, they are, as that they're not
15      based on data, nor is the supply curve, by
16      the way, based on data, they're just
17      representing how my frameworks and opinions
18      would translate into alternative demand
19      curves.
20          Q.     Okay.  And that was -- I think
21      you've answered my next question, which is,
22      this is not informed by any look at data, is
23      it?  These are hypothetical scenarios you're
24      putting forward, right?
```

confidential information - subject to protective order

1    A.    Yes.

2    Q.    And in fact, your supply curve

3    is just inconsistent with the facts if you

4    accept, for example, the ZHP graph as

5    actually representing the sales situation,

6    correct?

7    A.    It is incorrect, because the

8    example that I'm giving you in my report is

9    that one can retrospectively go to those

10   consumers -- because there was supply, they

11   were supplied the product.  I mean, I'm not a

12   lawyer, but how do you have a recall if

13   there's -- no product was given?  How do you

14   make, what, ZHP or any manufacturer say they

15   committed fraud because they sold something

16   if they didn't sell anything.  So if there's

17   no supply, how is it possible if someone

18   sells something that there's no supply.

19         So I'm just saying that this to

20   me is not relevant -- sorry, your -- what

21   exhibit is this?

22   Q.    This is Exhibit 8.

23   A.    Sorry.  Oh, I see that.

24         Exhibit 8 does not help inform

Confidential Information - Subject to Protective Order

1   I'm relying on my frameworks, depending on

2   how that message was communicated, if you say

3   carcinogen-laced the way you said it versus a

4   valsartan that may contain impurities, the

5   individual's -- I'm using MICI factors -- the

6   individual's status, so if they were happy

7   with their valsartan and had -- as I shared

8   in my report in Section IV.E, they were happy

9   with their valsartan, they had serious health

10  issues, they may have even tried alternative

11  medications and felt that the valsartan was

12  the best at controlling their hypertension,

13  and contextual factors, how much their

14  relationship with their doctor and their

15  ability or inability to have a healthy

16  lifestyle, all of those factors would have an

17  impact on what they thought the drug was

18  worth.

19  BY MR. DAVIS:

20       Q.    Okay.  But you're not answering

21  my question.

22            My question is, if there's no

23  supply after the recall, as you can see from

24  the sales data, even if a consumer -- like

Confidential Information - Subject to Protective Order

```
1    let's just assume that there is a consumer

2    who does want ZHP valsartan after the recall

3    and wants to go get a new prescription of it

4    from their doctor, the result is just like it

5    was with Fen-Phen, they can't get it, right?

6            A.    I'm assuming that is the case,

7    yes.

8            Q.    And they would end up,

9    therefore, paying no money for it, correct?

10           A.    Yes.

11           Q.    Okay.  Thank you.

12                 And there would be no

13   intersection of -- sorry, showing you my

14   screen, you've got it right there.

15           A.    Yes.

16           Q.    There would be no intersection

17   of supply and demand in that very specific

18   situation I just asked you about, correct?

19           A.    Correct.

20           Q.    Okay.  Thank you.

21           A.    Should I put these away?

22           Q.    Sure.

23           A.    Okay.

24                 MR. DAVIS:  I'm marking
```

Confidential Information - Subject to Protective Order

1          Exhibit 9.

2                   (Whereupon, Keller Exhibit

3          Number 9 was marked for

4          identification.)

5   BY MR. DAVIS:

6          Q.     This is a -- can you identify

7   this document for me?

8          A.     No.

9          Q.     I'll represent to you that it's

10  a valsartan -- I'll represent to you that

11  it's a valsartan label, which may or may

12  not -- I think, we looked at your materials

13  considered.

14                  Is this a document you recall

15  seeing ever?

16          A.     No.

17          Q.     Okay.  I'll represent to you --

18  but, you know, you're free to look, but I'll

19  represent to you that there's no mention of

20  nitrosamines, NDMA, NDEA, anywhere in this

21  label.

22                  Are you willing to accept that,

23  or do you want to take a look?

24          A.     I actually don't have any idea

Confidential Information - Subject to Protective Order

1  what is in this label period, so I don't know

2  how to understand the absence of the two

3  impurities you just mentioned.

4       Q.    Well, I'm not asking you yet to

5  understand the absence of them.  I'm just

6  asking you if you see any reference to them

7  in that document.

8       A.    I cannot do that.  You're

9  asking if there's any reference, and I don't

10 know if there's any reference without having

11 a chance to review the document.

12      Q.    Okay.  So you're not willing to

13 take my word for it that they're not in

14 there?  You're willing to look.  Why don't

15 you take a look, that's fine.

16            Do you want to look at -- and I

17 can direct your attention, for example, to

18 make this go a little faster, okay, if you

19 don't mind, go to the very last page.

20            Do you see that last question

21 there, "What are the ingredients in Diovan?"

22      A.    I do.

23      Q.    Okay.  Do you see any reference

24 to NDEA, NDMA?

Confidential Information - Subject to Protective Order

1      A.      I am not a chemist.  I don't

2    know the different forms and labels.  Those

3    drugs may be represented some other way.  I

4    cannot answer the question.

5      Q.      Would you agree with me --

6    let's start with just a very general

7    proposition.

8              Would you agree with me that a

9    manufacturer of valsartan when they

10   distribute it into the US market, by calling

11   it valsartan and by distributing this label

12   with it, they're conveying some kind of

13   message to the people that will interact with

14   it, namely physicians and consumers, correct?

15            MR. GOLDBERG:  Objection to

16        form.  Foundation.

17      A.      Please be more specific.

18   BY MR. DAVIS:

19      Q.      Do you think that by -- when a

20   manufacturer of valsartan distributes

21   valsartan in the US market, by calling it

22   valsartan, are they conveying a message that

23   it's valsartan?  It's a pretty general

24   proposition, right?

Confidential Information - Subject to Protective Order

1    multiple messages?  It's a pretty simple

2    question.

3          A.     I cannot answer that question.

4    I mean, if you're just saying is there

5    communication about valsartan in here?  I

6    would say yes.  For me, a message has a

7    different meaning, and I would need to read

8    the document to understand what the

9    message -- multiple messages might be.

10         Q.     Okay.  Let's go back to your

11   report for a moment, and again that section E

12   that's titled Real-world evidence indicates

13   that the at-issue VCDs held value.

14         A.     Yes.

15         Q.     And I understand you have --

16   you know, and I'm going to try and

17   short-circuit a long back and forth here by

18   stating that I understand that you have quite

19   a few sources of general applicability here

20   to support what you're saying amounts to

21   real-world evidence of value.

22                My question very specifically

23   here is, what evidence from this fact

24   situation and case specifically, what

1    valsartan-specific evidence do you have that

2    is real-world evidence that indicates that

3    the VCDs at issue had value?

4        A.    I have evidence from the

5    individual depositions from the plaintiffs,

6    and I have quoted some of them, who said that

7    the at-issue VCDs provided them with

8    therapeutic benefit.

9            I want to qualify, this is a

10   small subset of depositions.  I know that

11   there were probably thousands if not tens of

12   thousands consumers who took valsartan and

13   this is a small group.  But this is one

14   source of evidence that consumers who took

15   the at-issue valsartan said that -- some of

16   them, not all of them -- that it helped them

17   with controlling their blood pressure, that

18   they had fewer side effects such as

19   light-headedness and dizziness and nausea,

20   and that they did not suffer any extreme

21   emotional consequences to the point of

22   actually seeking professional help.  So those

23   are just some examples of value from the

24   real-world evidence.

Confidential Information - Subject to Protective Order

1          I also -- the other sources of

2    value also come from information in the

3    public press as well as in some of the

4    depositions, in the individual plaintiff

5    depositions, where physicians are either

6    publicly recommended, for example, I believe

7    Dr. Neeson, to AARP group members that, you

8    know, they should not stop taking the

9    at-issue VCDs on their own without talking to

10   their physicians because it is more important

11   to control their blood pressure, and they

12   could face very serious consequences, health

13   consequences if they stopped, and that it

14   would be -- the trade-off would be -- even if

15   there were any problems in the short or the

16   long-term with regard to any of the potential

17   cancers, which again would vary across

18   individuals, that the immediate serious

19   health consequence of stopping their at-issue

20   VCDs would be serious.

21          So the sources, just to sum,

22   are the plaintiff depositions as well as --

23   as well as physicians.  This includes

24   cardiologists who shared that the at-issue

confidential information - subject to protective order

1    VCDs held value.

2          Q.     Anything else, or those two?

3          A.     I will also add -- thank you

4    for asking -- the FDA also mentioned that

5    consumers or patients who were taking the

6    at-issue VCDs should not stop taking the

7    VCDs, thereby indicating that they held

8    value, unless, you know, an alternative was

9    available to them.  So that is also a source.

10              So I appreciate your giving me

11   a chance.

12         Q.     Sure.

13              So you've identified those

14   three things.  Is that everything?

15         A.     To the best of my recall.

16         Q.     Sure.  Okay.  Well, let's, I

17   guess, take them somewhat in order.

18              You concede, you know, for the

19   first point, which is the plaintiff

20   depositions, you do concede at paragraph 52

21   that in your view "The statements of

22   consumers, particularly those...in

23   litigation, regarding their retrospective

24   valuation of at-issue VCDs may not be