# EXHIBIT 12

Case 1:19-md-02875-RMB-SAK   Document 2045-14   Filed 05/03/22   Page 2 of 10
PageID: 69347

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

2015 WL 4887446
United States District Court,
S.D. New York.

The BANK OF NEW YORK MELLON,
solely as Trustee for GE–WMC Mortgage
Securities Trust 2006–1, Plaintiff,
v.
WMC Mortgage, LLC, and GE
Mortgage Holding, L.L.C., Defendants.

No. 12cv7096 (DLC).
|
Signed Aug. 17, 2015.

**Attorneys and Law Firms**

William S. Ohlemeyer, Robin A. Henry, Motty Shulman, Ian M. Dumain, Nathan A. Holcomb, Boies, Schiller & Flexner LLP, New York, NY, for Plaintiff Bank of New York Mellon.

Stephen L. Ascher, Jenner & Block LLP, New York, NY, Paul M. Smith, Matthew S. Hellman, Jenner & Block LLP, Washington, DC, Barbara S. Steiner, Megan B. Poetzel, Jenner & Block LLP, Chicago, IL, for Defendant WMC Mortgage, LLC.

William Christopher Carmody, Shawn J. Rabin, Stephen Shackleford, Jr., Susman Godfrey L.L.P., New York, NY, Greg A. Danilow, Stacy Nettleton, Weil, Gotshal & Manges LLP, New York, NY, for Defendant GE Mortgage Holding, LLC.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Defendants WMC Mortgage, LLC ("WMC") and GE Mortgage Holding, L.C.C. ("GEMH"; collectively "defendants") have moved under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude testimony by Ira Holt ("Holt"), a reunderwriting expert retained by plaintiff Bank of New York Mellon ("BoNY," or "plaintiff"), concerning 1,511 mortgage loans. The reunderwriting of these loans was performed by Digital Risk, LLC ("Digital Risk"), a nonparty engaged by BoNY's directing certificate-holder to perform the reunderwriting prior to this litigation.

Defendants have also moved *in limine* to exclude the testimony of Kristina Cmorey ("Cmorey"), the Federal Rule of Civil Procedure 30(b)(6) witness for Digital Risk.

Holt provides opinions regarding material defects in the origination of a total of 2,274 mortgage loans. While Holt supervised the reunderwriting of 763 of these loans, he relied on the results of the Digital Risk reunderwriting project as the basis for his opinions regarding 1,511 loans. Because the defendants were denied the opportunity to take discovery of Digital Risk regarding its reunderwriting of the 1,511 loans, and with one exception, Holt has not identified an alternative basis to conclude that he was entitled to rely on the Digital Risk reunderwriting, his opinion regarding all but 256 of those 1,511 loans will be excluded. Since Holt's own team reunderwrote 256 of the Digital Risk loans, the defendants' motion will be denied as to those loans. The parties will be given a further opportunity to address the effect of this ruling on the motion addressed to Cmorey.

**BACKGROUND**

I. History

This action involves a breach of contract claim brought by BoNY as the trustee ("Trustee") of a residential mortgage backed securities ("RMBS") trust. Defendant WMC, the sponsor of the securitization, sold the loans at issue to co-defendant GEMH. GEMH then sold the loans to the depositor, GE–WMC Mortgage Securities, L.L.C. ("GE Securities"), who placed the loans into the trust. As part of the transfer of loans to the trust, the defendants made a number of contractual representations and warranties ("R & Ws") regarding the underlying mortgage loans.

The trust, GE–WMC Mortgage Securities Trust 2006–I ("Trust"), contains residential mortgage loans originated or acquired by WMC.[1] As discussed below, these mortgage loans were to be originated in accordance with WMC's Underwriting Guidelines ("Guidelines"), which assisted in determining both a borrower's ability and willingness to make timely payments and the value of the underlying property. For example, at origination of the mortgage loan, underwriters are required to follow prescribed parameters for acceptable LTV/CLTV[2] and debt-to-income ("DTI") ratios, to examine a borrower's employment status and credit history, and to ensure that certain crucial documents were present. Applications are to be reviewed "with a level-of-risk approach based on facts derived from credit reports

Case 1:19-md-02875-RMB-SAK   Document 2045-14   Filed 05/03/22   Page 3 of 10
                              PageID: 69348
Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

and the assessment of multiple risk factors." The Guidelines also permitted underwriters to grant exceptions to specific requirements in the presence of "compensating factors" such as a "potentially liquid asset base" and "potential for increased earnings."

**\*2** The securitization of the loans placed into the Trust was accomplished through the execution of three documents in August 2006. First, WMC, the sponsor of the securitization, sold these loans to GEMH on August 10, pursuant to a Mortgage Loan Purchase Agreement ("MLPA"). GEMH then transferred the mortgage loans to GE Securities, the depositor, pursuant to a second contract, also dated August 10. The depositor conveyed the mortgage loans to the Trust, with BoNY as the Trustee, pursuant to a Pooling and Servicing Agreement ("PSA") dated as of August 1. The closing date for the PSA was August 21, 2006.

The PSA and MLPA grant the right to enforce the R & Ws in the event the R & Ws are materially breached. Upon discovery or receipt of notice of a breach of the R & Ws, the PSA requires the Trustee to notify WMC, who must then cure the breach, "substitute for" the defective loan, or repurchase the defective loan from the Trust within 90 days of receiving the notice. This remedy constitutes the "sole remedy ... available to the Trustee." The MLPA also requires WMC to cure, repurchase, or substitute for a defective loan if it discovers a breach of the R & Ws.

BoNY commenced this suit on August 21, 2012 in state court, alleging, among other things, numerous breaches of the R & Ws and seeking to enforce the remedies it asserts it is owed under the MLPA. WMC removed the case to federal court on September 20, 2012, and BoNY amended its complaint on May 29, 2013. Fact discovery closed on January 30, 2015, and expert discovery closed on June 23. The parties filed a joint pretrial order on July 31st, along with the instant motions. A bench trial is scheduled for September 21.

II. Representations and Warranties
Section 6(a) of the MLPA contains more than 80 R & Ws concerning the mortgage loans in the Trust. The R & Ws are express assurances regarding various loan characteristics, including loan quality, insurance, compliance with relevant law and industry standards, and repayment schedules. In this litigation, BoNY relies on six R & Ws allegedly breached by WMC. They are:

- § 6(a)(1). The information set forth in the related Mortgage Loan Schedule ["MLS"] is complete, true and correct.

- § 6(a)(21). The origination and collection practices used with respect to each Mortgage Note and Mortgage have been in all respects legal, proper, prudent and customary in the mortgage origination industry....

- § 6(a)(24). The Mortgage Loan was underwritten in accordance with the [WMC] Underwriting Guidelines; and the Mortgage Note and Mortgage are on forms acceptable to prudent mortgage lenders in the secondary mortgage market.

- § 6(a)(31). No Mortgage Loan had an LTV or CLTV at origination in excess of 100% ....

- § 6(a)(33). No misrepresentation, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage or in the application of any insurance in relation to such Mortgage Loan.

**\*3** • § 6(a)(44). The debt-to-income ratio of the related Mortgagor was not greater than the limits set forth in the Underwriting Guidelines (including the Seller's standard exception practices).

In addition, § 6(a)(53) states that "[t]he Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001...."[3]

Section 6(a)(1) refers to the MLS. The MLS is a comprehensive document containing key information about each loan in a securitized loan pool, including LTV/CLTV ratios, DTI ratio, and the value of the underlying property.

III. Holt's Expert Report
Defendants challenge Holt's proposed testimony contained in his amended expert report[4] dated February 25, 2015.[5] BoNY retained Holt to opine on whether 2,274 mortgage loans underlying the Certificate "have material defects" in violation of the six contractual R & Ws that WMC made to the Trust. Material defects, Holt explains, are those that

Case 1:19-md-02875-RMB-SAK    Document 2045-14    Filed 05/03/22    Page 4 of 10
                                     PageID: 69349

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

"increase[ ] the risk of loss" or have a "material impact on the risk associated with the loan."

Holt's report purports to describe in detail the criteria he used, and sources he consulted, in evaluating each loan's compliance with WMC's guidelines and in determining whether the loan was tainted by fraud or misrepresentation. He explains that the reunderwriting looked to key borrower characteristics—income, employment, debt, DTI ratio, credit history, and assets-as well as key property characteristics such as LTV/CLTV ratio, property type, whether the property was insured, occupancy of the property, and the borrower's purpose in obtaining the loan. These characteristics were then compared to the requirements set forth in WMC's Guidelines and, to assess the accuracy of the information, the reunderwriting consulted a limited variety of information not contained in the loan file, including subsequent bankruptcy filings and income data from the Bureau of Labor Statistics ("BLS") and commercial salary databases. In addition, the reunderwriting looked for missing key documents or other "red flags" in the loan file, and considered whether any compensating factors might counterweigh the risks presented by the defects, whether those compensating factors were recorded in the loan file or not. According to Holt, for those loans that did not comply with the WMC Guidelines, he personally reviewed the loan file to determine whether there were any compensating factors that would offset the risk created by the guideline violation, even though, in these instances, the original underwriter did not identify any. He explained, that if "I could identify such factors, I did not consider there to be a Material Defect." He also noted "red flags" in the loan file that should have, in his view, alerted the original underwriter of the loan to the potential risk of borrower fraud.

According to Holt, based on this extensive and personal review, he concluded that 2,274 loans were materially defective. His conclusions about those loans are set forth in two large appendices to his report, which he states contain "my analysis" and "were prepared at my direction or adopted by me based on my review and analysis of the quality and integrity of the reunderwriting analysis performed by others." In a footnote following this latter statement, Holt explains that he supervised a team "of over twenty reunderwriters," each of whom had "at least six years of underwriting experience."

*4 Holt's report, which is forty-four pages, does not explain that the detailed and careful process he describes in it, including his personal review of loan files, only applied to 763 of the 2,274 loans for which he purports to find a material defect in the origination process. At no point does the report mention Digital Risk, much less Digital's Risk standards and procedures for reunderwriting or the qualifications of Digital Risk's underwriting personnel. Digital Risk is mentioned, however, in an exhibit to the report and in Appendix 2 to the report. The exhibit lists, among the materials Holt considered in rendering his report, "Digital Risk breach data and other information relating to the loans listed in Appendix 2." Appendix 2 follows Appendix 1.

Appendix 1 contains the conclusions reached by Holt about 763 loans after his team re-underwrote 1,022 loans in accordance with the procedures outlined in the report. [6] Appendix 1 is a lengthy spreadsheet that lists each loan, a tally of which, if any, of the six R & Ws it was found to breach, and a description of the breaches Holt's team identified. Appendix 1 represents that all of the loans contain one or more breaches and material defects. [7]

An example of Appendix 1's findings for a single loan is below. (The example has been separated into two lines for ease of presentation.)

| Loan No. | Originator MLPA §6(a)(1) | Originator MLPA §6(a)(21) | Originator MLPA §6(a)(24) | Originator MLPA §6(a)(31) | Originator MLPA §6(a)(33) | Originator MLPA §6(a)(44) |
|---|---|---|---|---|---|---|
| # | 1 | 1 | 1 | 0 | 0 | 1 |

| Narrative Description |
|---|
| Lender required survey and well inspection. Those documents are not in the file. The final title policy did not contain an ALTA 9 (or its equivalent) to clear the survey requirement. There was no well inspection or waiver in the file.  2004 W2 forms were omitted from the file. Lender required evidence of sufficient funds to close the loan.  Verified funds were short.  There was no evidence that $1,000 in earnest money had cleared the bank. Earnest money was deducted from the available funds as well as funds due at closing. Lender approved 5% DTI exception. The compensating factors are insufficient to overcome the defect. CBR Red Flag - borrower's correct employment is not reflected. Appraisal Red Flag - suburban property with only one of three comps within three miles of the subject property. |

Appendix 2, by contrast, contains conclusions reached by the third-party underwriter, Digital Risk, based on its own reunderwriting and analysis in 2012 of the remainder of the 2,274 defective loans, that is, 1,511 loans. In addition to the six R & Ws on which Holt and his team focused, Digital Risk also analyzed a number of other loan characteristics for guideline compliance and fraud. These included, *inter alia,* breaches of § 5 of the MLPA, which contains general R & Ws about WMC and its obligations; the presence of "payment shock," which refers to the degree to which a borrower's monthly housing payments will increase with a new loan; and each loan's compliance with § 6(a)(53), which states that WMC complied with the anti-money laundering provisions

Case 1:19-md-02875-RMB-SAK    Document 2045-14    Filed 05/03/22    Page 5 of 10
                                   PageID: 69350

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

of the Patriot Act. Appendix 2 is also a lengthy spreadsheet, but has a different layout and structure than Appendix 1. It contains almost 13,000 descriptions of defects reflecting Digital Risk's conclusions about each loan's compliance with Holt's six R & Ws and the additional characteristics Digital Risk examined.

An example of a defect finding from Appendix 2 is below. (Again, it has been split into two for ease of presentation.) As noted, in his report, Holt represents that the information contained in Appendix 2 represents his analysis.



As has since become apparent, Digital Risk's reunderwriting methodology differed from Holt's. In addition to Digital Risk's review of other R & Ws and potential breaches than the six Holt examined, Digital Risk used third-party documentation to a greater extent than Holt's team and did not search for compensating factors; it only considered those compensating factors that were explicitly noted in a loan file. Accordingly, Digital Risk's reunderwriting was less conservative than Holt's.

 **\*5**  It is undisputed that the version of Appendix 2 dated February 25, 2015, adopted by Holt and attached to his report, contains a number of errors. Appendix 2 initially reported over 1,000 breaches of § 6(a)(1) on the ground that loan information in the MLS did not match the information in the corresponding loan files. Digital Risk had, in fact, been referring to an MLS with "bad data." When BoNY sent defendants information about the MLS used by Digital Risk, it was apparent that the MLS used by Digital Risk had identified the loans as associated with Washington Mutual Bank, not WMC. Holt's understanding is that Digital Risk was provided this incorrect MLS by its client for the 2012 reunderwriting, the directing certificateholder here. [8]

And, at least one loan in Appendix 2 was identified as having the following fill-in-the-blank MLS defect:

> [T]he Mortgage Loan Schedule failed to disclose the correct (state and zip code of the subject) (occupancy) (property type) (maturity date) (LTV) (CLTV) (payment) (principal loan amount) (loan purpose) (appraised value) (purchase price) (credit score) (prepayment terms) (loan type-balloon I ARM etc.) (rate) (ARM terms). The Mortgage Loan Schedule indicates a( ) of ( ) however, a review of the loan file reveals the actual ( ) is ( ).

In addition, according to the rebuttal report of defendants' expert David E. Abshire, a number of Digital Risk's findings regarding missing documents were wrong. Upon Abshier's review of the identical loan files, the documents reported missing were in fact present in the file.

On June 9, after defendants mentioned these and other errors at Digital Risk's 30(b)(6) deposition, BoNY provided defendants with a revised Appendix 2, withdrawing 1,071 MLS defect claims and six loans in their entirety because of a "data error in the MLS used by the underwriters in reunderwriting the mortgage loans."

Although he does not describe this process in the report, Holt represented at deposition and in his trial Declaration ("Declaration") that he and his team validated the information in Appendix 2 before "adopting" its findings in toto. First, Holt explains that he reviewed the "data points" and read the "narrative" supplied by Digital Risk for each of the 1,511 loans analyzed. The data points and narrative refer to Digital Risk's detailed descriptions of defects as provided in Appendix 2 and any numerical figures in those narratives. Holt states that this review coupled with his general knowledge of Digital Risk's methods made him "extremely familiar" and "comfortable" with its conclusions.

Case 1:19-md-02875-RMB-SAK    Document 2045-14    Filed 05/03/22    Page 6 of 10
                                     PageID: 69351

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

Second, Holt's team performed a "spot check" of Digital Risk's analysis and conclusions by independently reunderwriting 256 of the 1,511 loans that Digital Risk previously re-underwrote, without reference to Digital Risk's conclusions. [9] Holt's team confined its review of the 256 loans to breaches of the six R & Ws Holt identified. Neither Holt nor his team ever checked the substantive accuracy of Digital Risk's analysis as to the other R & Ws and factors Digital Risk examined. For example, Holt's team did not independently assess whether Digital Risk's findings of defects based on "payment shock," compliance with § 5 of the MPLP, and Patriot Act violations were correct. Accordingly, Holt never checked the accuracy of those defects either. Holt explained that his team was "not looking at what was done prior to" the spot check because Digital Risk's was "not a comparable analysis." The spot check therefore only determined whether the spot-checked loans from Appendix 2 were materially defective according to Holt's methodology and criteria.

 *6  Holt states that his team followed similar quality control procedures for the 256 Digital Risk loans as for those that they underwrote. For both groups of loans, Holt's reunderwriters first reunderwrote the loans from scratch, after which a senior underwriter and then an assistant director reviewed the accuracy of the initial reunderwriting. [10] These findings were ultimately reviewed by Holt himself. In the case of the 256 Digital Risk loans, Holt compared his team's factual findings to Digital Risk's factual findings and concluded they "were consistent."

In its review, Holt's reunderwriting team identified as non-defective over 50 of the 256 loans that Digital Risk found defective. Holt explained that his team "focused on guidelines compliance only, while [Digital Risk] analyzed breaches of multiple [R & Ws] with more third-party data at hand." Despite the disagreement in standards, methodology and conclusions, Holt has adopted Digital Risk's findings in full. His trial Declaration continues to opine that those 50–plus loans are materially defective.

Holt testified at deposition that he is unfamiliar with the specific reunderwriting methodology used by Digital Risk. Before beginning his reunderwriting, he participated in a brief telephone call with Digital Risk during which he got "a broad summary of what they typically do" but he does not know the identities or experience of the individuals who conducted the analyses, the process they used, the degree of care they took, or how they actually used information not contained in the loan file.

IV. Testimony of Kristina Cmorey
In addition to Holt's report, BoNY seeks to introduce testimony by Kristina Cmorey, the Federal Rule of Civil Procedure 30(b)(6) designee for Digital Risk. BoNY seeks to introduce Cmorey's deposition testimony relating to Digital Risk's general reunderwriting practices. [11]

Cmorey stated at her deposition that she had no personal involvement in Digital Risk's reunderwriting of the loans at issue here. And while she answered detailed questions about Digital Risk's general practices, she declined to answer similar or identical questions regarding the reunderwriting process for the specific loans at issue here, including whether underwriters were instructed to focus on certain issues; whether they applied "industry standard guidelines"; whether they used information outside the loan file or publicly available information, and if so, how; whether they analyzed the reasonableness of borrowers' stated incomes; and whether they considered compensating factors. Each time such questions were asked, counsel asserted attorney-client privilege. [12] Accordingly, Cmorey's deposition testimony does not specifically address the practices and procedures used during Digital Risk's reunderwriting of the loans at issue here.

## DISCUSSION

Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, provided that (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702; *Daubert,* 509 U.S. at 592. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams,* 506 F.3d 151, 160 (2d Cir.2007). The district court performs the role of gatekeeper-ensuring that the proponent has made the necessary showing and that the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597.

Case 1:19-md-02875-RMB-SAK   Document 2045-14   Filed 05/03/22   Page 7 of 10
PageID: 69352

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

**\*7** In all events, an expert must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. "This condition goes primarily to relevance," because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citation omitted); see id. at 587 (quoting Fed.R.Evid. 402) ("Relevant evidence is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence.' "). Testimony that "will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," however, must be excluded. United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir.1999) (citation omitted). "The role of an expert is not to displace the [trier of fact] but rather to provide the groundwork to enable the [trier of fact] to make its own informed determination." In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig., 725 F.3d 65, 114 (2d Cir.2013) (citation omitted), cert. denied sub nom. Exxon Mobil Corp. v. City of New York, N.Y., 134 S.Ct. 1877 (2014).

In order to be admissible, a relevant expert opinion "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir.2006), aff'd on other grounds, 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). An explanation is necessary because "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Ruggiero v. Warner–Lambert Co., 424 F.3d 249, 255 (2d Cir.2005) (citation omitted).

Experts may rely upon otherwise inadmissible facts or data in reaching conclusions "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed.R.Evid. 703. Where inadmissible evidence is relied upon by an expert, however, that expert must still "form his *own* opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." United States v. Mejia, 545 F.3d 179, 197 (2d Cir.2008) (citation omitted) (emphasis added). "[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir.2013) (citation omitted), cert. dismissed, ––– U.S. ––––, 135 S.Ct. 42, 189 L.Ed.2d 893 (2014).

Defendants have moved to exclude Holt's testimony to the extent he purports to incorporate the results of Digital Risk's analysis of 1,511 loans. They argue that Holt's testimony in this regard, and the related testimony of Cmorey, should be excluded for essentially two reasons: that Holt has adopted conclusions about the loans in Appendix 2 that do not represent his own opinion and that he lacks the knowledge to offer opinions regarding the loans underwritten by Digital Risk.

**\*8** In opposition to this motion, BoNY does not contend that Holt is entitled to rely on the analysis or conclusions reached by Digital Risk regarding an underwriting defect. It asserts, however, that Holt was entitled to rely on the "factual summaries" in Appendix 2. These factual findings contained in the Digital Risk narratives, BoNY contends, allowed Holt to draw his own conclusions about the extent to which the loan conformed to WMC's Guidelines or contained some other defect.

Holt's trial Declaration, which was submitted with BoNY's opposition to this motion, contains a description of the Digital Risk work that did not appear in his expert report. Holt describes Digital Risk's reputation and success in providing reunderwriting services. Holt acknowledges that aspects of its reunderwriting process differ from the processes employed in this case by Holt and his team. Holt acknowledges that Digital Risk reunderwrote the loans with the benefit of information it acquired from third-parties and did not do an independent search for undocumented compensating factors. Holt asserts that both approaches are standard and that his own team's work was highly conservative and will only serve to benefit the defendants. Holt explains that he is only relying on Appendix 2 as a compilation of "factual summaries" prepared by Digital Risk and that he "dr[ew] his own breach conclusions" on the basis of those facts.

With the exception of the 256 loans that Holt's team reunderwrote, BoNY has not shown that it is entitled to offer Holt's opinions regarding the loans reunderwritten by Digital Risk. BoNY has not carried its burden of showing that the Digital Risk fact gathering is sufficiently reliable to permit a reunderwriting expert to use it in rendering opinions about material defects.

Case 1:19-md-02875-RMB-SAK   Document 2045-14   Filed 05/03/22   Page 8 of 10
PageID: 69353

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

Experts are, of course, permitted to rely upon facts and data prepared or obtained by others and that would not be otherwise admissible if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed.R.Evid. 703. BoNY does not suggest, however, that it is either reasonable or customary for an expert in the field of mortgage loan reunderwriting to rely upon data gathered by reunderwriters whose methodology the expert did not design, whom he did not directly or indirectly supervise, and over whom he did not impose quality control. Holt's report emphasized the experience in mortgage underwriting that each member of his own team possessed, and the work he personally performed by reviewing loan files and other documents to insure that the fact finding and judgment employed in connection with the 763 loans identified in Appendix 1 met his own high standards. His trial Declaration elaborates on his extensive use of quality control to ensure reliability. Holt cannot make such representations regarding the Digital Risk workers or their work. He does not know the experience of any of Digital Risk reunderwriters who worked on this project, he is unaware of the instructions they were given or the extent to which their work was subject to quality control. As he admitted in his deposition, his familiarity with the Digital Risk work on this project was confined to a single brief telephone conversation that was a "meet-and-greet" during which he learned no details about Digital Risk's methodology. [13] He maintains, however, that Digital Risk's practices are "industry standard."

**\*9** Nor has BoNY shown that the Digital Risk data is sufficiently reliable to permit an expert who did not participate in its creation to rely upon it. Of course, careful and thorough inquiry into the process or procedures used to obtain the data upon which the expert relies may suffice to establish that the data was gathered through "a reliable methodology." *Mejia,* 545 F.3d at 197 (citation omitted). But, BoNY or its directing certificateholder blocked all attempts to obtain information about the individual Digital Risk underwriters, the specific reunderwriting methodology that Digital Risk used to gather the facts that appear in Appendix 2, the circumstances under which that reunderwriting took place, and the sources consulted by reunderwriters during that reunderwriting.

BoNY has offered the Rule 30(b)(6) deposition testimony of Cmorey in an attempt to show that Digital Risk's methodology and practices are reliable in general. This, however, does not show what is required to render sufficiently reliable the facts and data in Appendix 2–that the Digital Risk methodology and practices were faithfully and consistently applied here, for the purposes of collecting the specific data upon which Holt has relied.

BoNY principally rests on the spot checking done by Holt's team of 256 loans to support Holt's reliance on the Digital Risk data gathering for the 1,511 loans. But, BoNY's showing here is inadequate as well.

BoNY has not shown that the sample was drawn in a way that permits an extrapolation of its results to the entire data set. Holt did not know how the sample was chosen and BoNY has offered no other evidence in that regard. Accordingly, there can be no extrapolation of accuracy from the examination of the 256 loans to the remaining 1,255. [14]

It bears noting that Holt's own team concluded that roughly one-fifth of the Digital Risk conclusions were erroneous. Applying Holt's own reunderwriting standards, his team concluded that over 50 of the 256 loans were not materially defective. Holt has ignored his team's analysis, and chosen instead to apply a different standard for the Digital Risk loans. Any other approach would have required Holt's team to reunderwrite all of the 1,511 loans, but this tension underscores how divorced the two underwriting projects were from each other.

Because BoNY has failed to show that Holt has an adequate basis to rely on the fact-finding done by Digital Risk, the defendants' motion to exclude is granted in part. Holt's opinions regarding the loans reunderwritten solely by Digital Risk are excluded. Pursuant to Rule 703 and the principles described above, Holt's conclusions about the loans described in Appendix 2 are inadmissible, except with respect to the 256 loans his team re-underwrote and that he reviewed. Only these can be said to rest upon "data [and] a methodology ... [ ]adequate to support the conclusions reached." *Ruggiero,* 424 F.3d at 249. [15]

Defendants have raised a number of other arguments regarding the nature of the review Holt performed. These arguments go to the weight, not the admissibility, of Holt's testimony and are properly raised on cross-examination. *See, e.g., Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 214 (2d Cir.2009); *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002).

Case 1:19-md-02875-RMB-SAK   Document 2045-14   Filed 05/03/22   Page 9 of 10
                                        PageID: 69354

Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)
98 Fed. R. Evid. Serv. 243

## CONCLUSION

**\*10** Defendants' July 31, 2015 motion to limit the testimony of Ira Holt is granted in part. Holt's testimony regarding 1,255 loans is stricken. The parties shall confer regarding the effect of this ruling on the defendants' motion *in limine* to exclude the testimony of Kristina Cmorey. In addition, any opinions by defendants' expert David Abshire in connection with the opinions stricken here are excluded as irrelevant. [16]

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4887446, 98 Fed. R. Evid. Serv. 243

### Footnotes

1     The loans were divided into two Groups: Group 1, which contained 1,609 loans, and Group 2, which contained 3,045 loans. Only a subset of loans from Group 2 remain at issue in this litigation.

2     LTV (loan-to-value) ratios represent the amount of a loan against the value of its collateral. CLTV (combined loan-to-value) ratios are used when the same collateral is used to support more than one loan

3     The specific provision referred to is 31 U.S.C. § 5318(l), which prescribes minimum procedures for verifying and maintaining records of a borrower's identity.

4     Holt produced an initial expert report dated December 23, 2014; he produced an amended report on February 25, 2015, replacing the initial report in its entirety. References herein to the "report" refer to this amended report.

5     The defendants also challenged Holt's proposed testimony contained in a document dated January 30, 2015, that has been re-designated a "supplemental report." In response to this motion, BoNY has withdrawn that proposed testimony.

6     BoNY withdrew its claims as to three loans in early 2015, and Holt later revised Appendix 1 to eliminate several loans whose defect findings were erroneous. The final tally of materially defective loans in Holt's revised Appendix 1 is 751.

7     Appendix 3 contains these findings, but also records findings for the loans Holt re-underwrote that were not found materially defective.

8     At the time of his deposition, Holt did not know whether Digital Risk was provided the wrong MLS or whether it obtained the irrelevant MLS itself. He states his new understanding in his Declaration. error in the MLS used by the underwriters in reunderwriting the mortgage loans."

9     The sample was selected by "a colleague of [Holt's] at Analytic Focus," his firm, but Holt does not know what, if any, methodology the colleague used to select the sample.

10    Holt's teams followed an additional step for the non-Digital Risk loans: a "double-blind" review whereby a new underwriter reunderwrote a loan from scratch to compare the findings to the initial reunderwriter's.

11    BoNY initially indicated that it might call Cmorey as a live witness, but has withdrawn that proposal.

12    The privilege asserted is that between Digital Risk and Glenview Master Fund II, L.L.C., the Trust's directing certificateholder. Privilege was also asserted as to thousands of documents relating to the re-underwriting of these loans.

13    In a footnote to his Declaration, Holt attempts to address this gap in his understanding by referring to a recent visit that he made to Digital Risk in connection with another matter. He asserts that that meeting confirmed his understanding that Digital Risk applies industry standard methodology and procedures "including with respect to their work on this case". It is unclear what, if anything, Holt recently learned about the Digital Risk work on the 1,511 loans, but as of the time he rendered his expert report and submitted to a deposition on

Case 1:19-md-02875-RMB-SAK   Document 2045-14   Filed 05/03/22   Page 10 of 10
                                   PageID: 69355

**Bank of New York Mellon v. WMC Mortg., LLC, Not Reported in F.Supp.3d (2015)**
98 Fed. R. Evid. Serv. 243

| | |
|---|---|
| 14 | that report he had no knowledge of the qualifications of the personnel or procedures actually employed by Digital Risk on the project for the instant case. |
| 14 | BoNY also argues that the findings of defendants' underwriting expert, David Abshire, confirm that Digital Risk's reunderwriting was "more accurate" than the reunderwriting performed by Holt's team. BoNY makes this curious observation based on the fact that Abshire contests 82.1% of the loans Holt reunderwrote as compared to only 71% of the loans Digital Risk reunderwrote. Tellingly, Holt himself never suggests that this is significant. BoNY's argument reflects a fundamental fallacy. The comparison of "accuracy rates" is not meaningful because there has been no showing that the Digital Risk loan population and Holt's loan population are comparable, such that a comparison between rates of agreement with Abshire could signify anything about the relative accuracy of Digital Risk's and Holt's work product. In any event, BoNY cannot rely upon conclusions of the defendants' expert to patch the holes in its own expert's work. |
| 15 | The Second Circuit cases BoNY has cited in support of its position are inapposite. The circuit decisions arise in the context of environmental damage and either involve experts who used abstract theories on groundwater flow to explain contamination data collected by a CERCLA defendant and a government agency, *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94 (2d Cir.2000), or who opined about the effects of hazardous substances in municipalities using "methodology and data typically used and accepted in these sorts of cases." B.F. *Goodrich v. Betkoski,* 99 F.3d 505, 525 (2d Cir.1996). The other cases cited involve third parties whom the court found "gathered data and provided research under [the expert's] supervision," *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank,* N.A., No. 09cv3020 (SAS), 2011 WL 6288415, at *10 (S.D .N.Y. Dec. 15, 2011), or obtained "reliable results from tests ... observed by representatives of numerous interested parties." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,* 769 F.Supp.2d 269, 285 (S.D.N.Y.2011). These circumstances are not present in this case. |
| 16 | The defendants shall provide a revised trial declaration of Abshire to BoNY and the Court within seven days that accounts for the elimination of the 1,255 loans. |

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.