## APPENDIX OF UNPUBLISHED AUTHORITIES

**Tab**

*Andren v. Alere, Inc.*,
    2018 WL 1920179 (S.D. Cal. Apr. 24, 2018)...................................................... 1

*Blue Cross Blue Shield Association v. GlaxoSmithKline LLC*,
    2019 WL 4751883 (E.D. Pa. Sept. 30, 2019) ...................................................... 2

*Cats v. Monaco RV, LLC*,
    2016 WL 5253204 (W.D. Wash. Sept. 22, 2016)................................................ 3

*Gilberto v. Walgreen Co.*,
    2020 WL 1890538 (D. Or. Apr. 16, 2020) .......................................................... 4

*Haley v. Bayer Healthcare Pharms. Inc.*,
    2016 WL 10966426 (C.D. Cal. June 9, 2016) ..................................................... 5

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
    2021 WL 1041017 (N.D. Fla. Feb. 10, 2021) ..................................................... 6

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*,
    2010 WL 2813788 (D.N.J. July 9, 2010)............................................................ 7

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
    2010 WL 2839480 (S.D. Cal. July 20, 2010) ..................................................... 8

*In re Seroquel Prods. Liab. Litig.*,
    2006 WL 3929707 (S.D. Fla. Dec. 22, 2006) ..................................................... 9

*In re Thalomid & Revlimid Antitrust Litig.*,
    2018 WL 6573118 (D.N.J. Oct. 30, 2018).......................................................... 10

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
    2017 WL 1902160 (D.N.J. May 8, 2017) ........................................................... 11

*Karhu v. Vital Pharm., Inc.*,
    2013 WL 4047016 (S.D. Fla. Aug. 9, 2013)....................................................... 12

*Korolshteyn v. Costco Wholesale Corp.*,
    2017 WL 1020391 (S.D. Cal. Mar. 16, 2017) .................................................... 13

*Krueger v. Wyeth, Inc.*,
    2011 WL 8971449 (S.D. Cal. Mar. 30, 2011) .................................................... 14

*McDermott v. Cummins, Inc.*,
    2016 WL 3287335 (D.N.J. June 7, 2016) ........................................................... 15

*Muehlbauer v. Gen. Motors Corp.*,
    2008 WL 4542650 (N.D. Ill. July 22, 2008)....................................................... 16

1

**APPENDIX OF UNPUBLISHED AUTHORITIES**

**Tab**

*PB Prop. Mgmt., Inc. v. Goodman Mfg. Co.*,
  2014 WL 12640371 (M.D. Fla. Aug. 14, 2014) ................................................. 17

*Riaubia v. Hyundai Motor Am.*,
  2019 WL 3714497 (E.D. Pa. Aug. 7, 2019) ..................................................... 18

*Sharma v. Gupta*,
  2022 WL 970544 (D.N.J. Mar. 31, 2022) ......................................................... 19

*Suchanek v. Sturm Foods*, Inc.,
  2018 WL 6617106 (S.D. Ill. July 3, 2018) ...................................................... 20

# Tab 1

Andren v. Alere, Inc., Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 4 of 260
PageID: 69668

2018 WL 1920179
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Dina ANDREN, Sidney Bludman, Virginia
Cioffi, Bernard Falk, Jeanette Kerzner-
Green, Carol Montalbano, and Donald Rigot,
individually, and on behalf of other members of
the general public similarly situated, Plaintiff,
v.
ALERE, INC., a Delaware corporation, Alere Home
Monitoring, Inc., a Delaware corporation, Alere San
Diego, Inca., a Delaware corporation,, Defendant.

Case No.: 16cv1255-GPC(AGS)
|
Signed 04/24/2018

**Attorneys and Law Firms**

Mark P. Pifko, Roland K. Tellis, Peter B. Klausner, Baron
& Budd, PC, Encino, CA, Thomas Joseph O'Reardon, II,
Timothy G. Blood, Blood Hurst & O'Reardon, LLP, San
Diego, CA, for Plaintiff.

Andrew A. Kassof, Brenton Adam Rogers, Kirkland & Ellis
LLP, Anthony John Anscombe, Steptoe & Johnson, Darlene
K. Alt, Mary E. Buckley, Sedgwick LLP, Chicago, IL, Dennis
Francis Murphy, Sedgwick LLP, Stephanie A. Sheridan,
Steptoe & Johnson LLP, San Francisco, CA, Ragan Naresh,
Kirkland & Ellis LLP, New York, NY, Sierra Elizabeth,
Kirkland and Ellis LLP, Los Angeles, CA, for Defendant.

## ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION

### [Dkt. No. 151.]

Hon. Gonzalo P. Curiel, United States District Judge

**\*1** Before the Court is Plaintiffs' motion for reconsideration
of the Court's order denying class certification filed on
December, 2017, Dkt. No. 140. (Dkt. No. 151.) Defendants
filed an opposition. (Dkt. Nos. 179.) Plaintiffs filed a
reply. (Dkt. No. 183.) After a review of briefs, supporting
documentation and applicable law, the Court DENIES
Plaintiffs' motion for reconsideration.

**Background**

The original complaint was filed on May 26, 2016. (Dkt.
No. 1.) After the Court granted Defendants' motion to
dismiss with leave to amend, (Dkt. No. 19), on October 3,
2016, Plaintiffs Dina Andren ("Andren"), Sidney Bludman
("Bludman"), Virginia Cioffi ("Cioffi"), Bernard Falk
("Falk"), Jeanette Kerzner-Green ("Kerzner-Green"), Carol
Montalbano ("Montalbano") and Donald Rigot ("Rigot")
(collectively "Plaintiffs") filed the operative purported first
amended class action complaint ("FAC") against Defendants
Alere, Inc., Alere Home Monitoring, Inc., ("AHM"),
and Alere San Diego, Inc. ("Alere SD") (collectively
"Defendants" or "Alere") for unlawfully, deceptively and
misleadingly engaging in the advertising, marketing and sale
of the INRatio products which include "INRatio PT/INR
Monitors," "INRatio PT/INR Test Strips," "INRatio2 PT/INR
Monitors" and "INRatio2 PT/INR Test Strips" (collectively,
"INRatio Products"). (Dkt. No. 21, FAC.) The FAC alleges
sixteen causes of action for violations of (1) California's
Consumer Legal Remedies Act, ("CLRA"), Cal. Civil Code
§§ 1750 et seq.; (2) California's Unfair Competition Law,
("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (3) fraud;
(4) unjust enrichment; (5) Colorado Consumer Protection
Act, Colo. Rev. Stat. §§ 6-1-101 et seq.; (6) breach of
the implied warranty of merchantability, Colo. Rev. Stat. §
4-2-314; (7) Florida Deceptive and Unfair Trade Practices
Act, Fla. Stat. § 501.201, et seq.; (8) breach of the implied
warranty of merchantability, Fla. Stat. §§ 672.314, et seq.;
(9) Georgia Fair Business Practices Act, Ga. Code Ann. §§
10-1-390, et seq.; (10) Georgia Uniform Deceptive Trade
Practices Act, Ga. Code Ann. §§ 10-1-370, et seq.; (11)
Maryland Consumer Protection Act, Md. Code Com. Law
§§ 13-101, et seq.; (12) breach of the implied warranty of
merchantability under Md. Code Com. Law § 2-314; (13)
New York General Business Law, N.Y. Gen. Bus. Law § 349;
(14) New York General Business Law, N.Y. Gen. Bus. Law §
350; (15) Pennsylvania Unfair Trade Practices and Consumer
Protection Law, Pa. Stat. Ann. §§ 201-1, et seq.; and (16)
breach of the implied warranty of merchantability, 13 Pa. Stat.
Ann. § 2314. [1] (Id.)

Plaintiffs filed a motion for class certification on June 21,
2017. (Dkt. No. 75.) After the motion was fully briefed,
including a sur-reply, the Court held a hearing on September
22, 2017 and then ordered supplemental briefing on the issue
of claim splitting. (Dkt. Nos. 122, 125.) The parties filed

supplemental briefing on October 13, 2017 and October 20, 2017. (Dkt. Nos. 128, 129.) On December 20, 2017, the Court denied Plaintiffs' motion for class certification. (Dkt. No. 140.)

**\*2**  On January 31, 2018, Plaintiffs filed a motion for reconsideration of the class certification order. (Dkt. No. 151.) Defendants filed an opposition on March 16, 2018. (Dkt. No. 179.) Plaintiffs filed their reply on March 30, 2018. (Dkt. No. 183.) With leave of Court, Defendants filed a sur-reply on April 18, 2018. (Dkt. No. 203.)

### Discussion

### A. Legal Standard

Plaintiffs move for reconsideration under Federal Rule of Civil Procedure ("Rule") 60(b). Sch. Dist. No. 1J, Multnomah County, Or. v. AcandS, Inc., 5 F.3d 1255, 1262 (9th Cir. 1993). [2]  Defendants oppose arguing that Rule 60(b) does not apply and Plaintiffs' motion is untimely under these standards.

While the motion is labeled a motion for reconsideration, the Court recognizes that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C); Rodriguez v. West Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009) ("A district court may decertify a class at any time.") "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982). Because the Court has discretion to modify an order on class certification prior to judgment, the Court considers Plaintiffs' motion under Rule 23 and not under the parameters of a motion for reconsideration.

In the Court's order, it denied certification of a nationwide class and also of the six sub-class states. (Dkt. No. 140 at 11.) In their motion, Plaintiffs seek the Court's reconsideration of the class certification denial of the six sub-class states. In the FAC, Plaintiffs seek to certify six sub-classes States represented by them: a Colorado, Florida, Georgia, Maryland, New York and Pennsylvania Sub-Class to include, "All residents of [each Plaintiffs' respective home State] who, during the period January 1, 2009 through the present, purchased, rented or otherwise paid for the use of the INRatio products manufactured, marketed, sold or distributed by Defendants." (See Dkt. No. 21, FAC ¶ 148.) They argue that newly discovered facts not available at the time of

class certification demonstrate that predominance has been satisfied as to the individual state sub-classes on the learned intermediary doctrine, statute of limitations and damages. [3]

### B. Predominance

**\*3**  Rule 23(b)(3) requires a court to find that "the question of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Plaintiff "must affirmatively demonstrate compliance" with Rule 23 and must satisfy Rule 23(b)(3) with "evidentiary proof." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (Rule 23(b)(3)'s predominance standard is even more demanding than Rule 23(a) ). The Court is required to perform a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." Dukes, 564 U.S. 338, 350-51 (2011) " '[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with class certification issues; rather, a district court must consider the merits if they overlap with Rule 23(a) requirements." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011).

The central Rule 23(b)(3) inquiry is whether "the proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 594 (1997). If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998). " '[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.' " Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1778, at 535–39 (1986) ).

### i. Learned Intermediary Doctrine

In the Court's prior order, it concluded that Plaintiffs had not demonstrated predominance under Rule 23(b)(3) because Plaintiffs failed to demonstrate that the defense of learned intermediary was amenable to class wide treatment as it applies to Plaintiffs' home states' consumer protection laws.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 6 of 260
PageID: 69670

Andren v. Alere, Inc., Not Reported in Fed. Supp. (2018)

(Dkt. No. 140 at 42-43. [4] ) While Plaintiffs alleged in the FAC and at oral argument that Alere never warned any healthcare provider about the alleged defect, they failed to directly address the issue with legal or factual analysis during briefing on class certification.

In their instant motion, Plaintiffs argue that common issues predominate on the learned intermediary doctrine because Alere failed to warn any physicians, and therefore the issue is subject to common proof. [5] Plaintiffs assert for the first time that the learned intermediary doctrine is recognized in the six sub-class states. Responding, Defendants argue Plaintiffs fail to address the full scope of a learned intermediary analysis which not only requires a showing that the warnings were inadequate but also to demonstrate the inadequate or lack of warnings were the proximate cause of Plaintiffs' injuries. Demonstrating proximate causation requires an array of individual inquiries about Plaintiffs' prescribing physicians. In reply, for the first time, Plaintiffs argue that the learned intermediary doctrine does not apply because their case concerns a design defect that prevented the product from working as intended and not a failure to warn. Next, they argue that because Plaintiffs do not allege physical injuries and only suffered economic injuries, the doctrine has no application where the alleged injuries are solely economic based on the purchase price of the device. Lastly, they argue that because the INRatio monitor is a user-operated diagnostic monitor that does not directly affect the patient's physiology, the doctrine does not apply to medical devices which requires the patient to use the devices themselves.

**\*4** Restatement (Third) of Torts concerning Liability of Commercial Seller or Distributor for Harm Caused by Defective Prescription Drugs and Medical Devices provides,

> (d) A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to:
>
> (1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings;....

Restatement (Third) Torts, Prod. Liab. § 6(d)(1) (1998).

It is now not disputed that the learned intermediary doctrine applies to the six subclass states based on a failure to warn. [6] See Beale v. Biomet, Inc., 492 F. Supp. 2d 1360 (S.D. Fla.

2007); Porter v. Eli Lilly and Co., No. 16cv1297-JOF, 2008 WL 544739, at \*6 (N.D. Ga. Feb. 25, 2008) (noting that the doctrine is well established in state tort law as it applies in forty-four jurisdictions, including Georgia.); Martin v. Hacker, 185 A.D. 2d 553, 554–55 (N.Y. App. Div. 1992); Doe v. American Nat'l Red Cross, 866 F. Supp. 242, 248 (D. Md. 1994); Taurino v. Ellen, 579 A.2d 925, 927 (Pa. Super. Ct. 1990); Caveny v. CIBA–GEIGY Corp., 818 F. Supp. 1404, 1406 (D. Colo. 1992) ("It is the responsibility of the physician as a learned intermediary to assess the risks and benefits of a particular course of treatment.").

As described by one district court concerning the rationale behind the doctrine, "[a]s a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative." Porter, 2008 WL 544739, at \*6 (citation omitted) (applying Georgia law); O'Connell v. Biomet, Inc., 250 P.3d 1278, 1281-81 (Colo. Ct. Appeal. 2010) ("we are persuaded that the learned intermediary doctrine should apply to failure to warn claims in the context of a medical device installed operatively when it is available only to physicians and obtained by prescription, and the doctor is in a position to reduce the risks of harm in accordance with the instructions or warnings.").

To prevail on a cause of action based on a failure to warn a learned intermediary, a plaintiff must prove that the warning to the physician was inadequate, the inadequate warning caused his or her injury and he or she suffered an injury from the device. See Hoffmann-La Roche Inc., 27 So. 3d 75, 77 (Fla. Ct. App. 2009) (appellee failed to show that the inadequate warning was the proximate cause of his injury because physician testified that even if the warning label contained all the warnings, he still would have prescribed the medication for appellee); Demmler v. SmithKline Beecham Corp., 671 A. 2d 1151, 1155 (Pa. Super. Ct. Feb. 14, 1996) (noting that even if plaintiff has established a failure to warn, a plaintiff must also demonstrate proximate cause by "showing that had defendant issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided.") (citation omitted); Porter, 2008 WL 544739, at \*9-11 (N.D. Ga. 2008); Ames v. Apothecon, Inc., 431 F. Supp. 2d 566, (D. Md. 2006) (plaintiff must show that the inadequate warning caused the injury stating "a product defect claim based on

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 7 of 260
PageID: 69671

Andren v. Alere, Inc., Not Reported in Fed. Supp. (2018)

insufficient warnings cannot survive summary judgment if stronger warnings would not have altered the conduct of the prescribing physician."); Wollam v. Wright Medical Grp., Inc., No. 10cv3104-DME-BNB, 2012 WL 4510695, at *6 (D. Colo. Sept. 30, 2012) ("Plaintiffs have not submitted any evidence suggesting that any failure to warn or inadequacy of the warnings [the defendant] gave was the proximate cause of [the plaintiff's] harm" because doctor testified that he never read the instructions); Mulhall v. Hannafin, 45 A.D. 3d 282, 287 (N.Y. App. Div. 2007) ("Under well settled law, to prove proximate cause, a plaintiff has the obligation to adduce proof that had a warning been provided, she would have read the warning and heeded it."). "In the event that a warning is inadequate, proximate cause is not presumed." Demmler, 671 A.2d at 1155. Here, Plaintiffs do not dispute that individual inquiries will be necessary to determine proximate cause. Instead, they change position in their reply and now argue that the learned intermediary doctrine does not even apply in their case.

**\*5** In each sub-class state, a learned intermediary doctrine analysis requires more than just demonstrating that warnings to healthcare providers were inadequate or that there was a failure to make any warnings, it also requires demonstrating proximate cause. The cases above reveal that a proximate cause determination will ultimately lead to individual inquiries into each doctor's experience with the product. Saavedra, a Central District of California case, relied on by Plaintiffs, stated that even if the warnings were inadequate, plaintiffs would still be required to prove the inadequate warning caused their injuries. Saavedra v. Eli Lilly & Co., No. 12cv9366-SVW-MAN, 2013 WL 3148923, at *4 (C.D. Cal. June 13, 2013). The court stated that such a question will require that fact-finder to engage in a series of individualized assessments such as "1) if the individual plaintiff had known about the severity, duration, and extent of [the prescription drug's] withdrawal, would she or he still have taken the medication?; 2) if the individual plaintiff's physician had known about the relevant side-effects, would the physician still have recommended and prescribed [the prescription drug]?; 3) did the individual plaintiff's physician know of the side effects from a source other than the warning label, and prescribe [the prescription drug] even with this knowledge?" Id. at *4. The court concluded, "[a]lthough the question of whether or not the warnings given to doctors, and consumers, were inadequate or misleading may be capable of resolution on a class-wide basis, the question of whether or not, had the warnings been adequate, each plaintiff would not have taken [the prescription drug] are not." Id.

It is not disputed that the failure to give any warnings to the health care providers can be demonstrated by common proof; however, Plaintiffs have fail to demonstrate that the issue of whether the INRatio Products proximately caused Plaintiffs' injuries is subject to common proof. Plaintiffs have also not provided a case where class certification was granted involving the learned intermediary doctrine.

In reply, for the first time, Plaintiffs raise new arguments asserting that a full learned intermediary analysis is not required because the doctrine does not apply to a design defect case, does not apply to plaintiffs seeking economic injuries, and does not apply to a product that is user-operated.

First, as to the claim that their case involves a design defect, the Court notes that there are no allegations of a design defect in the FAC. (See Dkt. No. 21, FAC.) In fact, the Court characterized Plaintiffs' misrepresentations and omissions claims as based on a failure to warn. (Dkt. No. 19 at 17.) Moreover, Plaintiffs do not cite any cases from Plaintiffs' home states that hold that the learned intermediary doctrine does not apply to a design defect claim. The Court does not find Plaintiffs' argument supported. Next, Plaintiffs fail to present any legal authority that the learned intermediary doctrine only applies to physical injuries, not economic injuries. Defendants respond by citing to Saavedra, where the court applied the learned intermediary doctrine to four states' consumer protection law, including New York even though putative class members did not seek damages for personal injuries. See Saavedra, Eli Lilly & Co., No. 12cv9366-SVW(MANX), 2014 WL 7338930, at *3 (C.D. Cal. Dec. 18, 2014) ("At the heart of Plaintiffs' case lies their novel theory of damages. Plaintiffs do not seek damages for personal injuries."). Lastly, Plaintiffs argue that because the INRatio is a user-operated device, the doctrine does not apply. Plaintiffs cite to a general proposition from a district court case in the Western District of Pennsylvania that the failure to warn applies to the "intended user" and a California appellate case. In sur-reply, Defendants argue that Plaintiffs fail to present any authority for the argument and cites to two cases applying Georgia law that applied the doctrine to user-operated devices. Ellis v. C.R. Bard, Inc., 311 F.3d 1272, 1280-81 (11th Cir. 2002) (applying learned intermediary doctrine to pain control pump prescribed by physician but operated by patient); Edwards-Astin v. Medtronic Minimed, Inc., Civil No. 08cv103-CAP, 2008 WL 11319723, at *1 (N.D. Ga. June 3, 2008) (same). The Court does not find that Plaintiffs' new alternative theory that the learned intermediary

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 8 of 260
PageID: 69672
Andren v. Alere, Inc., Not Reported in Fed. Supp. (2018)

doctrine does not apply in this case is supported or is persuasive.

Accordingly, the Court concludes Plaintiffs have not satisfied their burden to affirmatively demonstrate predominance as to the learned intermediary doctrine. See Comcast, 569 U.S. at 33. The Court DENIES Plaintiffs' motion for reconsideration on this issue.

### ii. Comcast Damages

**\*6** In the Court's order, it also concluded that Plaintiffs had not demonstrated that their damages model satisfies Comcast to satisfy predominance. (Dkt. No. 140 at 47.) Both parties improperly relied on California law to address Plaintiffs' full refund damages model theory and failed to address whether the full refund model is consistent with their theories of liability under Colorado, Florida, Georgia, Maryland, New York and Pennsylvania law.

Plaintiffs must present a damages model that is consistent with their liability case, and the court "must conduct a rigorous analysis to determine whether that is so." Comcast Corp., 133 S. Ct. at 1433 (2013) (internal quotation marks omitted). Plaintiffs "must be able to show that their damages stemmed from the defendant's actions that created the legal liability." Leyva v. Medline Industries, Inc., 716 F.3d 510, 514 (9th Cir. 2013). While a plaintiff must present the likely method for determining class damages, "it is not necessary to show that [this] method will work with certainty at this time." Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010).

Plaintiffs argue that their theory of liability is simple, "Alere engaged in a pattern and practice of deceptive and dishonest marketing, causing consumers to pay money for worthless products that were ultimately recalled. Because Plaintiffs allege the products provided no value, a full refund is consistent with Plaintiffs' theory." (Dkt. No. 151-1 at 18.) They also argue that Comcast "simply requires" that they connect their damages to their theories of liability without having to address the issue on a state by state basis and cite to cases. (Id.) Plaintiffs claim that the cases they cite to support a full refund model in a class action "decline to analyze the plaintiff's damages models, and their adherence to the standard defined in Comcast, on a state-by-state basis." (Dkt. No. 151-1 at 18.)

Defendants argue that Plaintiffs fail to demonstrate that a full refund is recoverable but only cite to cases applying California law. They further contend that Plaintiffs have failed to provide any evidence that the INRatio product was entirely worthless to every class member and only rely on their expert's declaration that no consumer would have purchased the product had they known about the potential for discrepant results and therefore, the product had no value to them.[7]

The Court disagrees with Plaintiffs' contention that a state by state analysis is not necessary and conclude that their cited cases are also not supportive. For example, in Rikos v. Procter & Gamble Co., 799 F.3d 497, 512-17 (6th Cir. 2015), the court conducted an analysis of the different states' consumer protection statutes prior to determining whether Comcast was met. Likewise the Court in Makaeff v. Trump Univ., 309 F.R.D. 631 (2015) conducted an analysis of California's three consumer protection statutes, California Unfair Competition Law ("UCL"), California False Advertising Law ("FAL"), and California Consumer Legal Remedies Act ("CLRA") noting that these statutes provide for restitution which seeks to put the plaintiff back to the status quo prior to the misrepresentation. Id. at 636. The Court then turned to Florida and New York law, noting that the three statutes at issue, the Florida Misleading Advertising Law, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and the New York deceptive practices statute, N.Y. Gen. Bus. Law § 349, provide for recovery of actual damages, not restitution damages. Id. at 641-42. After conducting an analysis of these state laws and the available damage provided by the statutes, the Court concluded that the plaintiffs' damages model was aligned with the theory of liability under California, New York and Florida law. Id. at 640, 642.

**\*7** Plaintiffs also cite to Lambert v. Nutraceutical Corp., 870 F.3d 1170, 1182 (9th Cir. 2017) where the Ninth Circuit reversed the district court's decertification order. The Ninth Circuit analyzed California's damages calculations under the theories of liability alleged, the UCL, FAL, and CLRA, to determine class wide damages calculations noting that damages calculation under these statutes were forgiving. Id. at 1183. In concluding that the full refund model applied, it concluded that plaintiff had presented evidence that the product was valueless and was amenable to full refund treatment and conclude that the full refund model is consistent with plaintiff's theory of liability. Id. at 1183-84.

In another case, Williams v. Jet One Jets, Inc., 755 F. Supp. 2d 1281, 1289 (N.D. Ga. 2010), not a class action case, Plaintiffs cite the language, "measure of damages to be applied for an FBPA violation is that of actual injury suffered." However,

the next sentence states, "Actual damages' for purposes of the FBPA, means relief other than the refund of the purchase price and restitution." Id. (citation omitted). Plaintiffs provide no analysis as to whether actual damages under Georgia's FBPA allow for a full refund recovery of the purchase price.

Finally, in Chapman v. Tristar Prod., Inc., No. 16cv1114, 2017 WL 1433259 (N.D. Ohio Apr. 24, 2017), the plaintiffs sought a breach of implied warranty class consisting of thirty states. Id. at 9. However, the court only certified a Colorado class for implied warranty of merchantability because the other states' laws would not satisfy predominance. Id. Interestingly, the court declined to certify a Pennsylvania implied warranty of merchantabilty class. Id. at 10. The court noted that each state defines "merchantability" under UCC § 2-314 differently and "whether an alleged defect meets that threshold." Id. at 9 ("§ 2-314's application differs across states because fifty state legislatures and judiciaries have differently enacted and interpreted the provision.") Moreover, while some states define implied warranty as a contract, other states recognize it as a tort and this affects whether a plaintiff is entitled to economic losses. Id. The court also denied certification of a Pennsylvania UTPCPL class. Id. at 13. This case highlights the distinctions between each state law.

Similarly, Plaintiffs seek an implied warranty of merchantability class under Colorado, Florida, Maryland and Pennsylvania statutes because they all adopted § 2-314 of the UCC implying that these states apply the same standard. (Dkt. No. 111 at 29 (under SEAL).) However, as noted in Chapman, each state interprets § 2-314 differently. Plaintiffs have failed to specifically explain how each of these states' interpretation of the § 2-314 are consistent or how they differ.

Here, Plaintiffs summarily conclude that because there are cases that have held that the full-refund damages model satisfies Comcast under certain of their states' consumer protection law,[8] then Comcast is necessarily met. However, Comcast demands a "rigorous analysis" and is not satisfied by merely arguing that courts in some of the six states allow for a full refund model. Plaintiffs have failed to specifically demonstrate that each of the six sub-class states' consumer protection statute and claims for implied breach of warranty in four sub-class states are connected to their theory of damages or that these state law causes of action damages provide for a full refund recovery. Thus, the Court DENIES Plaintiffs' motion for reconsideration on the issue of Comcast damages.

### iii. Statute of Limitations

**\*8** In denying class certification, the Court concluded that the predominance factor had not been met as it concerned the statute of limitations in Colorado, Florida, Georgia, Maryland, New York and Pennsylvania because both parties failed to adequately address the issue and cited only to California law. (Dkt. No. 140 at 45-46.)

In the motion for reconsideration, Plaintiffs argue that the class claims are not barred by the statute of limitations as Plaintiffs' home states recognize equitable tolling of the statute of limitations. Moreover they contend that the discovery rule is recognized in Colorado, Florida, Maryland and Pennsylvania and Georgia codified its own discovery rule under Ga. Code. Ann. § 10-1-401. Plaintiffs argue that it was not until July 11, 2016, when they received the recall notices, when they discovered that the INRatio Products could not be safely used. Therefore, their claims are not barred by the statute of limitations. Defendants respond that individual questions as to the applicability of the statute of limitations prevent certification.

As with the learned intermediary and Comcast damages issues, Plaintiffs fail to sufficiently demonstrate that common issues of law or fact will predominate over individual inquiries on the statute of limitations. In their moving brief, Plaintiffs summarily cite to cases in Plaintiffs' home states where the Court recognized the equitable and/or the discovery rule, yet none are class action cases where the courts in the home states address the statute of limitations in connection with the predominance issue. Plaintiffs simply argue that because equitable and/or the discovery rule is recognized in the six sub-class states, then necessarily common proof will prevail over individual questions since Plaintiffs did not know until July 11, 2016, when they received the recall notices, that the INRatio Product provided erroneous readings.

Notably, Defendants first question whether the newly discovered evidence provided in the moving papers from March 2012 would toll the statute of limitations from January 2009, the date asserted in the class definition. Because certain consumer protection statutes have a two year statute of limitation for breach of implied warranty such as in Georgia, Ga. Code Ann. § 10-1-401, or three year statute of limitations for certain New York claims, N.Y. C.P.L.R. 214(2), and three years under Colorado, Colo. Rev. Stat. 13-80-101, those claims would be barred by the statute of limitations. Plaintiffs do not respond to this argument.

Andren v. Alere, Inc., Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 10 of 260
PageID: 69674

Moreover, an analysis of equitable tolling and the discovery rule considers whether the plaintiff acted with reasonable diligence. See e.g., Gerald v. Doran, 169 Ga. App. 22 (1983) ("[t]he statute of limitation is tolled until the actual fraud is discovered or by reasonable diligence should have been discovered. Mere ignorance of facts constituting a cause of action does not prevent the running of a statute of limitations."); Dean Witter Reynolds, Inc. v. Hartman, 911 P.2d 1094, 1096 (Colo. 1996) (the statute of limitations may be equitably tolled where the defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely manner); Thomas v. Lopez, 982 So.2d 64, 67 (Fla. Dist. Ct. App. 2008) (the discovery rule in Florida establishes both a subjective component, what the plaintiff actually knew, and an objective component, what an objectively reasonable plaintiff should have discovered with the exercise of due diligence).

**\*9** The FAC alleges, for example, that Plaintiff Bludman suffered a TIA while riding the subway in February 2016 after he had lowered his warfarin dosage to offset his high INR reading. (Dkt. No. 21, FAC ¶¶ 105-06.) After returning home from the hospital, Bludman began monitoring his INR with his INRatio2 testing kit and comparing those results with the results of blood tests conducted by a laboratory at his hospital. (Id. ¶ 107.) He found that his INR, using the INRatio2 testing kit, was consistently .4-.6 higher than his INR, as indicated by the results of the lab tests. (Id.) This should have provided Bludman with notice that there was an issue with his testing kit. Plaintiffs do not address

how the equitable tolling/discovery rule applies to Bludman's situation.

While Plaintiffs may be entitled to tolling of the statute of limitations under equitable tolling and/or the discovery rule, they have not sufficiently demonstrated its application to the six sub-class states and whether these exceptions would allow the statute of limitations to toll from July 2016 as to all potential class members. The Court DENIES Plaintiffs' motion for reconsideration on the statute of limitations issue.

In sum, Plaintiffs have not carried their burden to satisfy Rule 23(b)(3)'s requirement that the questions of law or fact common to the numbers of the class predominate over any questions affecting only individual member on the learned intermediary doctrine, Comcast damages and the statute of limitations.

## Conclusion

Based on the above, the Court DENIES Plaintiffs' motion for reconsideration of the order denying class certification. The hearing set for April 27, 2018 shall be **vacated**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1920179

## Footnotes

1    On January 17, 2017, the Court granted Defendants' motion to strike paragraph 74 of the FAC and denied Defendants' request to strike the remaining paragraphs of 75-80. (Dkt. No. 41.)

2    A motion for reconsideration is "appropriate if the district court (1) is presented with newly discovered evidence; (2) clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." Sch. Dist. No. 1J, Multnomah County, Or., 5 F.3d at 1263.

3    The alleged new facts concern newly produced internal documents by Alere that allegedly show that it was discussing defects or errors with a software algorithm since March 2012. Based on these documents, Plaintiffs claim that Alere fraudulently concealed the products' defect and it was not until July 11, 2016 when the recall was issued that they discovered the devices could not be safely used. (Dkt. No. 193-1 at 9 (UNDER SEAL).) In response, Alere disputes Plaintiffs' interpretation of these documents explaining that an algorithm error avoids the possibility of a discrepant result by reporting an error code instead of a potentially erroneous INR. (Dkt. No. 179 at 21 n.8.) The documents submitted by Plaintiffs to support their legal theory is not easily

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 11 of 260
PageID: 69675
Andren v. Alere, Inc., Not Reported in Fed. Supp. (2018)

understandable to a layperson and they fail to provide sufficient explanation that the software algorithm, which appears to be raised for the first time with the Court, is the alleged defect in the INRatio Products.

4  Page numbers are based on the CM/ECF pagination.

5  The parties dispute who has the burden to prove the application or non-application of the learned intermediary doctrine. Plaintiffs, relying on Saavedra v. Eli Lily & Co., No. 12cv9366-SVW-MAN, 2013WL 6345442, at *3 (C.D. Cal. Feb. 26, 2013), a case from the District Court for the Central District of California stated that the manufacturer must demonstrate that the prescribing physicians were adequately warned. Defendants argue that Plaintiffs bear the burden that Alere's warnings were inadequate citing Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 8 (11th Cir. 2010) (applying Georgia law stating that plaintiff has the burden to show that the defendant had a duty to warn). (Dkt. No. 179 at 26.) Notwithstanding who has the initial burden, ultimately, Plaintiffs have the burden to prove that common questions of law or fact will predominate over any individual inquiries on the learned intermediary doctrine. See Fed. R. Civ. P. 23(b)(3).

6  It does not appear that the parties dispute that the learned intermediary doctrine applies to medical device cases in failure to warn cases. See Ellis v. C.R. Bard, Inc., 311 F.3d 1272, 1280 (11th Cir. 2002) (applying Georgia law); O'Connell v. Biomet, Inc., 250 P.3d 1278, 1281-82 (Colo. Ct. Appeal 2010) (learned intermediary doctrine applies to failure to warn claims for a medical device); Beale v. Biomet, Inc., 492 F.Supp.2d 1360, 1367–68 (S.D. Fla. 2007) (collecting cases) (applying Florida law); Pumphrey v. C.R. Bard, Inc., 906 F. Supp. 334, 337 (N.D.W. Va. 1995) ("the learned intermediary doctrine[ ] is nearly universal").

7  Defendants also argue that initially Plaintiffs sought a refund of the customer's purchase price but now seeks a damages model based on Alere's sales revenue. In reply, Plaintiff disagrees and argue that they still seek damages based on the customer's purchase price. They explain that their expert factored in Alere's revenues into his damages model explaining that damage calculations need not be exact.

8  Plaintiffs provide cases that have applied the full refund recovery damages under Florida's FDUTPA, New York's General Business Law § 349, and Colorado's implied breach of warranty but have not provided cases that have applied full refund recovery on all their causes of action in all of their home states

---

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

# Tab 2

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....
Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 13 of 260
PageID: 69677

2019 WL 4751883
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

BLUE CROSS BLUE SHIELD ASSOCIATION, et al.

v.

GLAXOSMITHKLINE LLC

CIVIL ACTION No. 13-4663
|
Filed 09/30/2019

**Attorneys and Law Firms**

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, for Blue Cross Blue Shield Association, Aetna, Inc., Amerigroup/HMS, Avmed Health Plans, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Montana, Inc., Blue Cross and Blue Shield of North Carolina, Blue Cross & Blue Shield of Rhode Island, Blue Cross and Blue Shield of South Carolina, Bluecross Blueshield of Tennessee, Carefirst of Maryland, Inc., Connecticut General Life Insurance Company, Emblem Health, Government Employees Health Association, Group Health Cooperative, Group Hospitalization and Medical Services, Inc., Health Net, Inc., Healthnow New York, Highmark Inc., Highmark West Virginia Inc., HMO Partners, Inc., Kps Health Plans, Medical Mutual of Ohio, Noridian, Premera Blue Cross, Priority Health, The Regence Group, Usable Mutual Insurance Company, Wellcare Health Plans, Inc., Wellcare Health Plan of Iowa, Inc., Wellmark, Inc., Wellpoint, Inc.

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, John Gregory Murphy, Baton Rouge, LA, for Louisiana Health Service Indemnity Company.

David H. Pittinsky, Edward D. Rogers, Stephen J. Kastenberg, William B. Igoe, Leslie E. John, Barbara A. Schwartz, Daniel Mullin, Elizabeth P. Weissert, JoAnna Rebecca Hess Kunz, Juliana Carter, Thomas J. Gallagher, IV, Ballard Spahr Andrews & Ingersoll LLP, Ricky Mario Guerra, Blank Rome LLP, Philadelphia, PA, Joseph E. O'Neil, John J. O'Donnell, Campbell Conroy & O'Neil, P.C., Berwyn, PA, Mark H. Lynch, Covington & Burling, Matthew F. Dunn, Matthew J. O'Connor, Michael M. Maya, Jason C. Raofield, Covington & Burling LLP, Washington, DC, William Mark LaNier, Houston, TX, for GlaxoSmithKline LLC.

## MEMORANDUM

Juan R. Sánchez, C.J.

**\*1** Plaintiffs, 38 private health insurance companies that purchased billions of dollars' worth of adulterated pharmaceutical drugs from Defendant GlaxoSmithKline LLC (GSK), bring the instant action, alleging they purchased the drugs at issue based on GSK's misrepresentations that the drugs were manufactured in accordance with the Food and Drug Administration's "current Good Manufacturing Practices." [1] Plaintiffs claim the adulterated drugs were worthless and had they known of the adulteration they would not have included the drugs in their formularies. GSK has moved to exclude Plaintiffs' five expert witnesses pursuant to Federal Rule of Evidence 702—Phillip Russ; David A. Kessler, M.D.; Matthew Perri III, B.S. Pharm, PhD, RPh; Stephen W. Schondelmeyer, PhD; and Rena Conti, PhD. GSK's motion will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the Motion will be denied.

## BACKGROUND

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....
Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 14 of 260
PageID: 69678

This case arises out of Plaintiffs' providing prescription drug coverage for seventeen drugs—Albenza, Avandia, Avandamet, Bactroban, Compazine, Coreg, Denavir, Dibenzyline, Dyazide, Dyrenium, Factive, Horowitz, Kytril, Paxil IR, Paxil OS, Stelazine, and Thorazine (collectively, the At-Issue Drugs). The drugs were manufactured by GSK's corporate affiliate, SB Pharmco Puerto Rico Inc. (SB Pharmco), at a pharmaceutical manufacturing plant in Cidra, Puerto Rico (the Cidra Plant). From 2000 to 2005 (the Relevant Period), Plaintiffs assert SB Pharmco's poor manufacturing process and quality control system at the Cidra Plant were non-compliant with the Food and Drug Administration's (FDA) "current Good Manufacturing Practices" (cGMP). According to Plaintiffs, the drugs were therefore "adulterated" under the Food, Drug & Cosmetic Act (FDCA). *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). Plaintiffs allege GSK fraudulently misrepresented that the At-Issue Drugs manufactured at the Cidra Plant were cGMP compliant, resulting in Plaintiffs providing coverage for adulterated drugs they claim were worthless.[2] In support of their case, Plaintiffs have retained the five expert witnesses.

Plaintiffs retained Philip Russ to analyze the nature and extent of the cGMP violations at the Cidra Plant during the Relevant Period. *See* Pls.' Resp. in Opp'n to Def.'s *Daubert* Mot. (Pls.' Opp'n) 2. Russ is the owner and president of Innovative Consultants GXP, which "provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device, and biologics industry." GSK's Mot. to Exclude Expert Test. of Phillip Russ, Drs. David Kessler, Matthew Perri, Stephen Schondelmeyer, and Rena Conti (GSK Mot.) Ex. 3, at 4. Russ has twenty-three years of experience in the pharmaceutical, medical device, and biologics industry, focusing on the regulatory compliance aspects of developing and managing quality management systems and cGMP compliance. *See id.* Russ's report evaluates "the extent to which manufacturing at the [Cidra Plant] was in material violation of 21 U.S.C. § 351." *Id.* at 3. Russ's report is based upon a review of (1) cGMP records of compliance activities; (2) FDA inspection results; (3) GSK's internal audits; (4) internal GSK emails and other correspondence and memoranda related to the Quality Management System (QMS) at the Cidra Plant; and (5) the observations of Quantic Regulatory Services, the third-party expert engaged by GSK to evaluate cGMP compliance at the Cidra Plant as a result of a Consent Decree entered into between GSK and the FDA. *Id.* at 3-4. After review of these documents, Russ concluded "all products manufactured at the Cidra Plant between 2000 and 2005 were materially

non-compliant with cGMPs and lacked the assurance of conformance to their represented properties." *Id.* at 105.

**\*2** Plaintiffs retained David A. Kessler, M.D., as an expert on cGMP regulations and cGMP compliance. Dr. Kessler was FDA Commissioner from 1990 until 1997. *See id.* Ex. 7, at ¶ 2 As the FDA Commissioner, Dr. Kessler oversaw the FDA's promulgation and implementation of proposed and finalized regulations concerning cGMPs for pharmaceuticals. *See id.* at ¶ 5-7. Dr. Kessler's expert report opines on four central questions: (1) "[w]hy is compliance with cGMPs important?"; (2) "[w]hy are a drug manufacturer's responsibilities with regard to cGMP compliance?"; (3) "[f]rom a regulatory point of view, what types of cGMP violations can have a 'material impact' on a drug?"; (4) "[i]f specific drugs are recalled from the market or seized from a plant because they violate cGMPs, what conclusions can be drawn as to whether other drugs at the same plant are cGMP compliant?" *id.* at ¶ 11(a)-(d). Dr. Kessler opines that (A) cGMP compliance is important "because it assures that what a drug manufacturer says is in a drug is actually in the drug;" *id.* at ¶ 12, (B) drug manufacturers "[can]not sell products that fall below the represented standards," *id.* at ¶ 28, and must "investigate, understand, and correct quality deviations," *id.* at ¶ 30, (C) there "are three categories of cGMP violations that can have a 'material impact' on a drug," *id.* at ¶ 35, and (D) "[t]he fact that specific drug products are recalled from the market or seized from a plant because they violate cGMPs does not mean that other drugs are cGMP-compliant," *id.* at ¶ 43.

Matthew Perri III, B.S. Pharm, PhD, RPh, is offered as an expert in pharmaceutical marketing and his expert report assesses "the nature and significance of the marketing activities of [GSK] related to ongoing problems at [the Cidra Plant]." *Id.* Ex. 8, at 3. Dr. Perri is a Professor at the University of Georgia, teaching undergraduate and graduate courses in healthcare and pharmaceutical marketing and other related areas. *See id.* at ¶ 1-3. Dr. Perri offers seven opinions including, inter alia, (1) it is the pharmaceutical manufacturer's job to ensure its drug products are manufactured in compliance with all FDA regulations; (2) patients, pharmacists, prescribers, and third-party payers rely on the assurance that a drug is what the manufacturer represents it to be; (3) major pharmaceutical manufacturers control the information their personnel disseminate into the market place; and (4) it is not feasible, or expected, for third-party payers to monitor FDA enforcement actions, given the number of drugs listed on third-party payers' formularies.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 15 of 260
PageID: 69679

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

*See id.* at 3. In reaching his conclusions, Dr. Perri asserts his opinions are based on "universally accepted principles of marketing." *Id.* at ¶ 11.

Next, Plaintiffs offer Stephen Schondelmeyer, PhD, as a causation expert to demonstrate that, had Plaintiffs known about the cGMP violations at the Cidra Plant, they would have removed the At-Issue Drugs from their formularies and that non-cGMP compliant drugs have no economic value to third-party payors. Dr. Schondelmeyer is a Professor of Pharmaceutical Management and Economics at the University of Minnesota. *See id.* Ex. 11, at ¶¶ 1, 4. Dr. Schondelmeyer has more than 40 years of experience related to pharmaceutical economics and public policy research. *See id.* at ¶ 4. In his six-page opinion, Dr. Schondelmeyer concludes, based on his experience, "no payer in the United States would knowingly and willingly pay for such material non-compliant drugs [and] [s]uch drug products for all practical purposes have no value in the U.S. market and would be considered non-salable." *Id.* at ¶ 19.

Finally, Plaintiffs offer Rena Conti, PhD, as an expert on damages. Dr. Conti is an Associate Professor at Boston University's Questrom School of Business and an economist for the FDA's Center for Drug Evaluation and Research. *See id.* Ex. 15, at ¶ 8. She focuses her research on the market for prescription drugs and the pricing of pharmaceutical products in the United States market. *See id.* at ¶ 10. Dr. Conti concludes only prescription drugs "manufactured in compliance with [cGMPs] may be assigned a non-zero value by patients and third-party payers, and drugs which fail to meet those standards have no economic value." *Id.* at ¶ 4. Applying the economic principle of supply and demand, Dr. Conti concluded there can be no legitimate supply curve to establish an economic value because the FDCA prohibits the sale of adulterated drugs. *See id.* at ¶¶ 37-40. Dr. Conti further determined that, "[b]ecause GSK produced and sold non-compliant drugs, plaintiffs paid for illegitimate products that have no economic value." *Id.* at ¶ 5. As a result, Dr. Conti calculated the aggregate damages for all Plaintiffs as $2.82 billion, and individual damages for each Plaintiff as ranging between $3.3 million to $483.7 million. *See id.* at ¶ 52.

## DISCUSSION

**\*3** Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) that testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

The United States Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* that Rule 702 creates a "a gatekeeping role for the [trial] judge." 509 U.S. 579, 597 (1993). However, "the court's role as a gatekeeper is not intended to serve as a replacement for the adversary system," because, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Crowley v. Chait,* 322 F. Supp. 2d 530, 536 (D. Del. 2004) (internal quotation marks and alterations omitted).

Following *Daubert,* the Third Circuit Court of Appeals has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir. 1999). Rule 702 envisions a "liberal policy of admissibility." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir. 1997)). GSK does not seek to exclude Plaintiffs' experts based on their qualifications and this requirement will therefore not be further discussed.

To meet the "reliability" requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable ... [but] the evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda,* 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.' " *In re TMI Litig.,* 193 F.3d 613, 664 (3d Cir. 1999) (citation omitted). The Court

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 16 of 260
PageID: 69680
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

must focus on the expert's methodology—not his or her conclusions. *In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions.")

When evaluating the reliability of a witness's methodology, the Court is guided by several factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

**\*4** *id.* at 742 n.8. The Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

To meet the "fit" requirement "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. Like a typical relevance inquiry, the standard for analyzing the fit of an expert's analysis is "not that high." *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir. 2007). Nevertheless, expert testimony can be powerful and misleading, and the Third Circuit has cautioned district courts to "tread carefully when evaluating proffered expert testimony." *Id.* at 219 n.6. With these standards in mind, the Court turns to GSK's motion to exclude.

GSK first moves to exclude Russ's testimony arguing it does not fit the question before the Court. GSK contends the question before the Court is whether Plaintiffs can prove that GSK's cGMP violations had a "material impact" on the drugs for which they paid. GSK asserts Russ proposes to testify only

that GSK could not assure that the At-Issue Drugs were not impacted by the cGMP violations at the plant. GSK claims such testimony would confuse the jury and is irrelevant. GSK's argument is unpersuasive.

In denying GSK's motion to dismiss, this Court previously held "Plaintiffs [were] entitled prove that the nature of GSK's [cGMP] violations had a material impact on the drugs for which they paid." *See* Mem. 11, Nov. 9, 2016, ECF No. 105. Russ's report finds the Cidra Plant had significant fundamental failures in all six essential quality systems—which relate to a manufacturer's ability to certify a drug's purity, uniformity, quality, and manufacturing. The report concludes that, due to these chronic failures, GSK could not assure the At-Issue Drugs "conformed to their represented properties of safety, identity, strength, purity, and quality." GSK Mot. Ex. 4, at 9. This testimony fits the question in this case and is relevant because a reasonable jury could find GSK's cGMP violations had a material impact on the value of the At-Issue Drugs as GSK could not assure their conformance to their representative properties—i.e., their quality was not as labeled and advertised.

GSK also argues Russ's opinion fails the reliability test because (1) his opinion applies to every product made at the Cidra plant during the relevant time period, not just the At-Issue Drugs; (2) he has never used the phrase "material violation" before this litigation and it does not have the same meaning as "material impact"; and (3) he could not answer why the FDA chose to seize a certain drug manufactured at the Cidra Plant but concurrently stated consumers could continue to take another drug manufactured at the Cidra Plant with confidence. These arguments, however, go to the weight and credibility of Russ's testimony and can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Crowley*, 322 F. Supp. 2d at 536. Therefore, GSK's motion to exclude Russ's testimony will be denied.

**\*5** GSK next moves to exclude Dr. Kessler's expert opinion asserting it draws an impermissible legal conclusion. GSK contends Dr. Kessler's opinion is merely a legal conclusion because he seeks to interpret the "material impact" language from the Court's November 9, 2016, Memorandum. GSK argues this is a legal term the Court must instruct the jury on, and therefore, Dr. Kessler may not opine on it.

GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 17 of 260
PageID: 69681

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

"materiality" or referring to certain cGMP violations as having a "material impact." Quoting the Court's November 9, 2016, Memorandum, Dr. Kessler seeks to opine on "what types of cGMP violations have a 'material impact' on a drug" and interpret the language in the Court's Memorandum. *See* GSK Mot. Ex. 8, at 2 ("The Court in this case cited the FDA's statement, then noted that Plaintiffs are entitled to show a "material impact" on drugs for which they paid. From a regulatory point of view, what types of cGMP violations can have a "material impact" on a drug?"). Allowing Dr. Kessler to opine on what constitutes a material impact on the case would run afoul of *Daubert* as it would allow Dr. Kessler to directly opine on the legal issue in this case. *See Whitmill v. City of Philadelphia*, 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998)("As a general rule an expert's testimony on issues of law is inadmissible.")(quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also In re Wellbutrin SR Antitrust Lit.*, Nos. 04-5525, 05-5898, 05-396, 2010 WL 8425189, at *3-5 (E.D. Pa. Mar. 31, 2010) (collecting cases and finding the experts in the instant case could testify about the background of patent law and procedure but could not testify about whether a previous patent lawsuit was objectively baseless—a legal issue in the case). Therefore, Dr. Kessler will be precluded from defining "material impact." However, Dr. Kessler will be permitted to testify about FDA regulations generally and how cGMP violations occur on a spectrum, including how violations range in severity and provide examples of how cGMP violations fall on that spectrum.[3] Therefore, GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact" during his testimony at trial.[4]

**\*6** Next, GSK moves to exclude Dr. Perri's testimony based on reliability.[5] GSK argues Dr. Perri's opinion must be excluded because he fails to explain or define the reliable methodology he used to come to his opinion. Specifically, GSK asserts Dr. Perri explains he applied "universally accepted principles of marketing," *see* GSK Mot. Ex. 8, at ¶ 11, but never defined the principles, applied specific principles, or explained why these principles would assist the jury in determining whether Plaintiffs would have removed the At-Issue Drugs from its formularies.

GSK's arguments are unpersuasive. While GSK focuses on the phrase "universal principles of marketing" to argue Dr. Perri's analysis is unreliable, Dr. Perri applies the case study method—an objective methodology—and consults additional academic sources regarding the pharmaceutical industry, to apply his own pharmaceutical and healthcare marketing experience to the facts of the instant case and draw his conclusions. *See generally id.* ¶ 13-75. As other courts have held, this is sufficient to meet the reliability prong under *Daubert*. *See Wolfe v. McNeil–PPC, Inc.*, No. 07–348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011) (finding three doctor's testimony sufficiently reliable where the doctors used the case study method and "extensive[ly] review[ed] of plaintiff's medical records and deposition testimony of plaintiff's treating physicians" and determined "the three doctors' use of case studies in reaching their conclusion affects only the weight to be given their testimony, not its admissibility...."); *Acosta v. WPN Corp.*, No. 14-1494, 2018 WL 3707418, at *6 (W.D. Pa. Aug. 3, 2018) (admitting expert testimony where the expert used "her experience and specialized knowledge" to discern a standard of fiduciary care and apply it to the facts of the case). In any event, the issues GSK takes with Dr. Perri's analysis pertain to the credibility and weight of Dr. Perri's testimony, which GSK may test through cross-examination and the presentation of contrary evidence. *See Crowley*, 322 F. Supp. 2d at 536.

GSK further asserts Dr. Perri's expert opinion should be excluded because it is similar to the excluded opinion he offered in *United States v. AseraCare, Inc.*, No 12-0245, 2014 WL 6879254, at *1 (N.D. Ala. Dec. 4, 2014). In *AseraCare*, the Government sought to offer Dr. Perri as a "marketing expert" to support its theory that an operator of hospice facilities knew it had submitted false Medicare claims. *Id.* at *11. To support his opinion, Dr. Perri relied on "universal principles of marketing." *Id.* at *12. The court ultimately excluded Dr. Perri's opinion, stating "Dr. Perri has no experience in the hospice industry, did not study any other hospice companies, and did not review any of the guidance from [the Centers for Medicare and Medicaid Services] regarding many of the topics on which he opined." *Id.* at *11. GSK contends *AseraCare* is nearly identical to this case, and the Court should therefore exclude Dr. Perri's testimony on the same grounds.

GSK's reliance in *AseraCare* is misplaced. Dr. Perri's opinion in *AseraCare* was excluded because he did not have *any* experience in the hospice industry and failed to explain why his universal principles of marketing methodology had any bearing in the hospice industry. *Id.* at *12. Unlike *AseraCare*, in the instant case, Dr. Perri has significant experience in the pharmaceutical marketing industry—a point which GSK does not dispute. *See* GSK Mot. Ex. 7, at ¶ 1-11 (discussing

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 18 of 260
PageID: 69682

Dr. Perri's qualifications). Further, unlike *AseraCare*, Dr. Perri has connected his "universally accepted principles of marketing" to the pharmaceutical industry. *See id.* at ¶ 13-17 (describing marketing principles generally and how they apply in the pharmaceutical market). Therefore, the reasons for excluding Dr. Perri's testimony in *AseraCare* do not apply and GSK's motion to exclude Dr. Perri's testimony will be denied.

**\*7** Turning Dr. Schondelmeyer, GSK argues Dr. Schondelmeyer's testimony should be excluded because it is unreliable. GSK asserts Dr. Schondelmeyer's report states he provided his opinion as an "expert on economic and public policy issues," GSK Mot. Ex. 11, at ¶ 1, but when deposed he stated his opinion was "not really" economic in nature, *id.* Ex. 12, at 176:18-20. GSK further contends Dr. Schondelmeyer failed to tie his expert opinion to the facts of the case by failing to cite any source for his key opinions. The Court agrees with GSK and finds Dr. Schondelmeyer has failed to offer a reliable methodology as the basis for his opinion.

Initially, the type of expert analysis Dr. Schondelmeyer purports to provide is unclear. In his report, Dr. Schondelmeyer states he provides his opinion as an "independent expert on economic and public policy issues." GSK Mot. Ex. 11, at ¶ 1. However, in his deposition, he stated his opinion provides no economic analysis. *See id.* Ex. 12, at 176:18-20. Yet, in his reply report, Dr. Schondelmeyer states his opinion is that non-cGMP-compliant drugs have "no economic value," *id.* Ex. 13, at ¶ 5 ("Under federal law, materially non-compliant drugs cannot be lawfully distributed and sold. For payers acting within the law, therefore, such drugs have no economic value." (footnote omitted)). Adding further confusion is Plaintiffs' presentation of Dr. Schondelmeyer as a "healthcare insurance expert." *See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 17 ("Dr. Stephen Schondelmeyer (Plaintiffs' healthcare insurance expert)."). The Court is hard pressed to find an acceptable basis on which to allow Dr. Schondelmeyer to testify about non-cGMP-compliant drugs having "no economic value" while claiming he is not providing an economic analysis and being offered as a healthcare expert.

In any event, Dr. Schondelmeyer provides no reliable basis for his opinions. In two brief paragraphs of his short six-page report, Dr. Schondelmeyer concludes that, based on his experience, insurers rely on a drug manufacturer's assurances regarding cGMP compliance and no insurer or third-party payer would pay for drugs with material

cGMP violations. *See* GSK Mot. Ex. 11, at ¶ 18-19. Dr. Schondelmeyer's opinion, however, provides no more than a paradigm example of "say-so" expert testimony. While the Court does not doubt his qualifications and experience in the pharmaceutical industry, Dr. Schondelmeyer has failed to demonstrate or explain how his experience is reliably applied to the facts of this case. *See id.* ("My experience includes consulting for payers that provide drug benefits to insured individuals or beneficiaries, including, but not limited to, self-insured employers ... In my experience, no payer in the United States would knowingly and willingly pay for such materially non-compliant drug products."). Unlike Dr. Perri, whose experience-based testimony was applied to the instant case through the objective case study methodology and supplemented with additional academic sources, Dr. Schondelmeyer's experience-based testimony is *entirely subjective* and premised solely on his say-so, which cannot be adequately tested through cross-examination. *In re TMI Lit.*, 193 F.3d at 703 n.144 ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology."). The Court will therefore grant GSK's motion to exclude Dr. Schondelmeyer's testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."); *see also Player v. Motiva Enters., LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) (stating the "District Court certainly had the discretion to exclude opinion evidence that is connected to existing data only by the ipse dixit [or say-so] of the expert." (internal citations omitted)).

**\*8** Finally, GSK moves to exclude Dr. Conti's expert testimony on four grounds: (1) she impermissibly bases her opinion on a legal interpretation of the FDCA; (2) she provides no reliable economic methodology for her opinion; (3) she improperly regurgitates Plaintiffs' allegations; and (4) she fails to account for the rebates Plaintiffs received for purchasing the At-Issue Drugs and fails to consider the cost of alternative treatment options. GSK's arguments to exclude Dr. Conti's testimony are unavailing.

First, Dr. Conti's testimony does not render an impermissible legal conclusion. Dr. Conti's expert report states the FDCA prevents companies from introducing adulterated drugs into the market place. *See* 21 U.S.C. § 331(a) ("The following acts

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 19 of 260
PageID: 69683
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."). According to Dr. Conti, based on this prohibition, economic principles state there is no legitimate supply curve for these drugs. *See, e.g.*, GSK Mot. Ex. 15, at ¶¶ 4, 38, 39. Because Dr. Conti is explaining the FDCA's prohibition on adulterated drugs—based on her own previous experience and discussions with pharmaceutical companies—and not providing a legal conclusion, she is not rendering an impermissible legal opinion. *See Hartle v. FirstEnergy Gen. Corp.*, Nos. 08–1019, 08–1025, 08–1030, 2014 WL 5089725, at *1-2 (W.D. Pa. Oct. 9, 2014) (permitting an expert to explain regulations but not offer an opinion on whether the defendant violated the provisions at issue).

Second, GSK's argument that Dr. Conti's expert opinion is not based on a reliable economic methodology is similarly without merit. As her expert report demonstrates, Dr. Conti relied on peer-reviewed journal articles, textbooks, studies regarding the economic value of drugs, *see id.* Ex. 17, at ¶ 9 n.15-16, conversations with providers and insurers, *see id.* Ex. 16, at 83:23-84:7, and the generally accepted economic principles of supply and demand in support of her opinion, *see id.* Ex. 15, at ¶ 38 ("There is no equilibrium between the demand for compliant prescription drugs and the supply of non-compliant drugs."). Dr. Conti has therefore provided a sufficient reliable basis and methodology for her expert opinion. *In re Paoli*, 35 F.3d at 744 ("[Proponents of expert testimony] do not have to demonstrate to the judge ... that the assessments of their experts are correct, they only have to demonstrate ... that their opinions are reliable."). To the extent GSK argues Dr. Conti's analysis is superficial and conclusory, this argument goes to the credibility of Dr. Conti's testimony and may be elicited through cross-examination. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("[T]he burden of exploring the facts and assumptions underlying the testimony of an expert witness [is placed] on opposing counsel during cross-examination.").

Third, GSK's argument that Dr. Conti merely parrots Plaintiffs' allegations because she lacks real-world experience as a third-party payor is not a reason to exclude Dr. Conti's testimony. GSK points to two lines in Dr. Conti's deposition where she said she is not a third-party payer and has never worked for one. *See* GSK Mot. Ex. 16, at 153:6-8 ("I'm not a third-party payer. I've never worked in a third-party payer"). And GSK argues Dr. Conti has no basis to opine

on the value insurers assign to non-complaint drugs. GSK's argument again goes to the credibility and weight of Dr. Conti's testimony, not the admissibility of her opinion. *See Stecyk*, 295 F.3d at 414.

**\*9** Finally, Dr. Conti's damages calculation is not flawed for not factoring in any rebates Plaintiffs may have received for the At-Issue Drugs or any therapeutic alternatives they may have had to cover as a result of discontinuing coverage for the At-Issue Drugs. GSK's argument that Dr. Conti should have reduced her damages amount—as suggested by GSK's expert Dr. Mohan Rao—is not a basis to exclude Dr. Conti's analysis. Rather, it demonstrates a fact question the jury must resolve because it requires a credibility determination and comparison of each expert's methodology. *Compare* GSK Mot. Ex. 15, at ¶ 43 ("Based on my assessment that spending on prescription drugs cannot be separated from the quality manufacturing assured by the manufacturer and overseen by government regulators, non-compliant prescription drugs have no economic value. Therefore, the appropriate measure of damages in this matter is the total amount paid....") *with* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. 222, at ¶ 48 ("Dr. Conti fails to account for rebates received by Plaintiffs after the initial reimbursement of a claim, causing her to overstate Plaintiffs' purchases by approximately 8 percent. She also fails to deduct payments on claims where Plaintiffs served in an administrative role only...."). Accordingly, GSK's motion to exclude Dr. Conti's testimony will be denied. *See In re Asbestos Prods. Liab. Lit. (No. VI)*, 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010) ("[I]t is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.").

**CONCLUSION**

In sum, GSK's motion to exclude will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the motion will be denied.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4751883

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 20 of 260
PageID: 69684
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

## Footnotes

1      At the time of filing, 41 private health insurance companies were named as plaintiffs in this action. Since filing,
       three plaintiffs—Blue Cross of Idaho Health Service, Inc., Health Care Services Corporation, and Horizon
       Blue Cross Blue Shield of New Jersey—have settled with GSK.

2      In light of the Court having provided a detailed recitation of the facts of this case in its September 30, 2019,
       Memorandum granting in part and denying in part GSK's Motion for Summary Judgment, the Court will not
       further discuss the factual background of this case.

3      GSK also moves to exclude Dr. Kessler's opinion on what constitutes a "material impact" because there is
       no FDA practice or policy grounding his opinion. However, because the Court will prevent Dr. Kessler from
       defining "material impact," GSK's argument is moot.

4      GSK directs the Court to a handful of cases, which it asserts demonstrate that Dr. Kessler's testimony has
       regularly been excluded. However, in the majority of the cases GSK relies on, Dr. Kessler's testimony was not
       excluded but merely narrowed. *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-02641, 2017 WL 6523833,
       at *9 (D. Ariz. Dec. 21, 2017) ("Dr. Kessler is qualified to opine on FDA regulatory issues that relate to Bard
       filters, and his testimony in this regard would prove helpful to the jury. But no expert, including Dr. Kessler,
       will be permitted to give ultimate legal opinions on state law claims, improperly narrate or regurgitate facts,
       or speculate about motives or intent."); Order, *Bartolini v. Abbott Labs., Inc.*, No. 15-702 (S.D. Ill. May 23,
       2017), ECF No. 277 (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *In re
       Prograf Antitrust Litig.*, No. 11-2242, 2014 WL 7641156, at *2-3 (D. Mass. Dec. 23, 2014) (granting in part
       and denying in part motion to exclude Dr. Kessler's testimony); *Drake v. Allergan, Inc.*, No. 13-234, 2014 WL
       5392995, at *5-6 (D. Vt. Oct. 23, 2014) ("Allergan's Motion [to exclude Dr. Kessler's testimony] is granted to
       the extent it sought the general guidance given above and denied to the extent that some objections will have
       to be raised at trial"); *Allen v. Takeda Pharm. N.A., Inc.*, Nos. 11-2299, 12-64, 2014 WL 120973, at *4-19
       (W.D. La. Jan. 10, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony);
       *Wells v. Allergan*, No. 12-973, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (allowing defendants to
       object at trial if Dr. Kessler speculates or regurgitates facts).

5      GSK's motion to exclude also states GSK seeks to exclude Dr. Perri's testimony on the basis of fit. *See* GSK
       Mot. 1. GSK's arguments, however, all pertain to the reliability of Dr. Perri's opinion.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 3

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 22 of 260
PageID: 69686
Cats v. Monaco RV, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 5253204
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Ronald H. CATS and Shannon N. Cats, Plaintiffs,
v.
MONACO RV, LLC, a Delaware Corporation; Navistar,
Inc., a Delaware Corporation; Does 1–10, Defendants.

CASE NO. C15-1585-JCC
|
Signed 09/22/2016

**Attorneys and Law Firms**

Trent M. Latta, Shannon L. McDougald, McDougald &
Cohen PS, Seattle, WA, for Plaintiffs.

Whitney Smith, Wilson Smith Cochran & Dickerson, Andrew
C. Gauen, Rossi F. Maddalena, Merrick Hofstedt & Lindsey,
Seattle, WA, for Defendants.

ORDER

John C. Coughenour, UNITED STATES DISTRICT JUDGE

*1  This matter comes before the Court on Defendant
Navistar's motion for summary judgment (Dkt. No. 22);
Plaintiffs Ronald and Shannon Cats' motion to amend
complaint (Dkt. No. 25); Plaintiffs' motion to compel Navistar
to comply with discovery (Dkt. No. 27); Plaintiffs' motion
to compel Fed. R. Civ. P. 30(b)(6) depositions (Dkt. No.
29); Navistar's motion for a protective order (Dkt. No.
32); and Plaintiffs' motion to strike Docket Number 61
(Declaration of Patrick Nolan) and Docket Number 62
(Declaration of Andrew Gauen) (Dkt. No. 66). Having
thoroughly considered the parties' briefing and the relevant
record, the Court finds oral argument unnecessary and, for
the reasons explained herein, GRANTS in part and DENIES
in part Navistar's motion for summary judgment (Dkt. No.
22); GRANTS in part and DENIES in part Plaintiffs' motion
to amend complaint (Dkt. No. 25); GRANTS Plaintiffs'
motion to compel discovery (Dkt. No. 27); GRANTS in part
and DENIES in part Plaintiffs' motion to compel 30(b)(6)
depositions (Dkt. No. 29); GRANTS in part and DENIES in
part Navistar's motion for protective order (Dkt. No. 32); and
DENIES Plaintiffs' motion to strike (Dkt. No. 66).

**I. BACKGROUND**

This case arises out of the purchase of a Monaco Diplomat
Recreational Vehicle ("Diplomat") by Plaintiffs Ronald and
Shannon Cats from McMahon's RV in California on October
26, 2013. (Dkt. No. 42 at 2.) Plaintiffs are residents of Texas
and Washington. (*Id.* at 6, 15.) McMahon's RV delivered the
Diplomat to Plaintiffs in Arizona, and Plaintiffs drove it to
their Texas home. (*Id.* at 6.) Defendant Monaco manufactured
the Diplomat, using a MaxxForce engine manufactured by
Defendant Navistar. (Dkt. No. 16 at 1.)

Less than a week after purchase, on October 31, 2013, the
"Stop Engine" light illuminated and Plaintiffs had to admit
the Diplomat for repairs caused by overheating. (*Id.* at 3.) The
Diplomat was out of service until November 26, 2013. (*Id.* at
4.) Not long after, the Diplomat began leaking fluid from the
engine compartment. (*Id.*) The Diplomat was in the shop for
repairs from February 18, 2014 to March 7, 2014. (*Id.*) Again,
overheating was the cause. (*Id.*) The Diplomat broke down
once more on July 8, 2014 and was sent to a Navistar repair
shop. (*Id.*; Dkt. No. 47-2 at 12.) It remained in the shop until
August 15, 2014. [1] (Dkt. No. 16 at 4.)

In July 2015, the engine once again failed and Plaintiffs
admitted the Diplomat for repairs at a Navistar MaxxForce
engine repair shop in Everett, Washington on July 15,
2015. (Dkt. No. 42 at 7; Dkt. No. 47-1 at 93–95.) This
repair replaced the advanced exhaust gas recirculation valve
("EGR") that was stuck open and causing the overheating
issues (*Id.*), and was completed under Navistar's limited
warranty. (Dkt. No. 22 at 3.) Following this repair, Plaintiffs
stopped using the Diplomat and sought compensation from
Defendants. (Dkt. No. 42 at 8.) Plaintiffs filed suit in King
County Superior Court in August 2015. (Dkt. No. 1 at 1.)
Defendants removed in October 2015. (*Id.*)

*2  Navistar now moves for summary judgment on all claims
asserted against it. (Dkt. No. 22.) Plaintiffs filed motions to
amend their complaint (Dkt. No. 25), compel discovery (Dkt.
No. 27), compel a Fed. R. Civ. P. 30(b)(6) deposition(s) (Dkt.
No. 29), and strike two declarations in support of Navistar's
summary judgment motion (Dkt. No. 66). Navistar also filed a
motion for a protective order in response to Plaintiffs' motion
to compel a 30(b)(6) deposition. (Dkt. No. 32.) Because
the motions are interrelated, the Court will consider them
together.

## II. DISCUSSION

### A. Plaintiffs' Motion to Amend the Complaint

Plaintiffs seek leave to amend their complaint to clarify prior facts and allegations and to add causes of action against both defendants. (Dkt. Nos. 25 and 26.) Both Monaco and Navistar oppose the amendments. (Dkt. Nos. 39 and 43.) Plaintiffs filed the motion to amend on August 4, 2016, more than one month before the close of discovery (Dkt. No. 14), and before expert discovery and the depositions of Monaco and Navistar's corporate witnesses. (Dkt. No. 53 at 1.) However, the motion also comes nearly one year after the filing of Plaintiffs' initial complaint. (Dkt. No. 1 at 1.)

The district court is afforded discretion to grant leave to amend and "[t]he court should freely give leave when justice so requires." *Fed. R. Civ. P. 15(a)(2)*. The generosity in granting leave to amend is "to be applied with extreme liberality" as there is a strong presumption in favor of granting leave to amend a complaint. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–52 (9th Cir. 2003). Courts are to consider five factors in granting leave to amend a complaint: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether the complaint has previously been amended. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011).

As will be discussed, Navistar has been less than forthcoming with its discovery responses, and therefore the Court finds no such factor discouraging amendment of Plaintiff's complaint to clarify factual allegations contained in Plaintiffs' proposed amended complaint (Dkt. No. 26 at 6–12). However, Plaintiffs' basis for adding seven causes of action, including state law claims from California, Texas, and Arizona (*Id.* at 15–23) stems from their own deposition testimony. (Dkt. No. 25 at 3–4.) While this may not rise to the level of bad faith, the fact that the Plaintiffs had the factual bases for additional causes of action in their possession certainly constitutes undue delay.

Additionally, many of the new causes of action are futile or based on speculation. "Where the legal basis for a cause of action is tenuous, futility supports the refusal to grant leave to amend." *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir. 1999). Plaintiffs first allege two California lemon law claims based on the Song-Beverly Consumer Warranty Act, *Cal. Civ. Code § 1790 et seq.* (Dkt. No. 26 at 15–18.) These claims cannot be sustained because the Act is limited expressly to goods sold in California. *Gusse*

*v. Damon Corp.*, 470 F. Supp. 2d 1110, 1112 (C.D. Cal. 2007) (citing *Cal. Civ. Code §§ 1792, 1792.1-3*, 1792.6). Although Plaintiffs purchased the Diplomat from an RV dealer in California, the sale and delivery were completed in Arizona. (Dkt. No. 26 at 9, ¶ 4.2.) Under a virtually identical set of facts, the California Court of Appeals held that the Song-Beverly Act did not apply because the RV was delivered, and the sale consummated, in Nevada. *Davis v. Newmar Corp.*, 38 Cal. Rptr. 3d 690, 691 (Cal. Ct. App. 2006).

**\*3** Plaintiffs also claim violations of Texas and Arizona lemon laws. (Dkt. No. 26 at 20–22.) The lemon law claims under Tex. Occ. Code § 2301 fail because Plaintiffs have not presented any evidence of written notice by mail to either defendant of the alleged defects, as required by *Tex. Occ. Code § 2301.606(c)(1)*. The Arizona lemon laws do not apply to vehicles with a gross weight over 10,000 pounds. *Ariz. Rev. Stat. § 44-1261(C)*. The Diplomat weighs nearly 35,000 pounds. (Dkt. No. 39 at 10.)

Finally, Plaintiffs' proposed new claims for misrepresentation and vicarious liability of McMahon's RV are based on speculation and devoid of specific factual allegations. (Dkt. No. 26 at 22–23.) The only remaining claim by Plaintiffs is for violation of California's Unfair Competition Law. (*Id.* at 18.) It is possible this claim is not futile, however, as previously stated, this claim is the result of undue delay.

Accordingly, the Court GRANTS in part and DENIES in part Plaintiffs' motion for leave to amend the complaint. The Court ORDERS that Plaintiffs are granted leave to amend the complaint only insofar as it pertains to clarifying factual allegations. Plaintiffs may not add additional causes of action.

### B. Navistar's Motion for Summary Judgment

Navistar asks the Court to dismiss all claims against it, which include: (1) breach of warranty claims under the Uniform Commercial Code ("UCC"), (2) Magnuson-Moss Warranty Act ("MMWA") claims, (3) Washington state lemon law claims, (4) Washington state Consumer Protection Act ("CPA") claims, and (5) negligence claims. (Dkt. No. 22 at 7–20.)

The Court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*. In making such a determination, the Court views the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving

party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

Navistar's overarching argument is that none of Plaintiffs' claims against it may be sustained because it provided only one warranty repair to the MaxxForce engine in Plaintiffs' Diplomat and privity is lacking between Plaintiffs and Navistar. Navistar argues that all of Plaintiffs' claims fail as a matter of law.

As a preliminary matter, Plaintiffs move to strike docket numbers sixty-one and sixty-two, which are declarations in support of Navistar's motion for summary judgment. The decision to strike material from the pleadings is within the discretion of the trial court. *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). Plaintiffs maintain that because the declarations contained information previously sought by them, it may not be used to supply evidence in a motion. (Dkt. No. 66 at 1); Fed. R. Civ. P. 37(c)(1). Plaintiffs' argument has some merit. However, because the declarations were not relevant to this Court's decision regarding the motion for summary judgment, and because the Court orders Navistar to comply with Plaintiffs' discovery requests, the failure is harmless. *Id.* The Court DENIES Plaintiffs' motion to strike declarations sixty-one and sixty-two. (Dkt. No. 66.)

### a. Plaintiffs' Breach of Warranty Claims under the UCC

**\*4** Navistar first argues that in order to state a claim for breach of an express or implied warranty under Washington's adoption of the Uniform Commercial Code ("UCC") the goods must have either been purchased in Washington or bear an "appropriate relationship" to Washington. (Dkt. No. 22 at 15, citing Wash. Rev. Code § 62A.1-301.) Navistar treats as determinative that the Diplomat was not purchased in Washington. However § 62A.1-301 deals with the parties' ability to choose applicable law, not a prerequisite to bring suit. If the transaction bears an appropriate relationship to Washington, Washington's adoption of the UCC may apply. Although the Diplomat was not purchased in Washington, the fact that Plaintiffs drove the Diplomat to Washington and that Navistar's engine was repaired by a Navistar mechanic in Washington constitutes an appropriate relationship to Washington State. Navistar's first argument fails.

Navistar next argues that Plaintiffs were required to file pre-suit notice. (*Id.*) Navistar cites to Wash. Rev. Code § 62A.2-607(3)(a), which states that "[t]he buyer must within a reasonable amount of time after he or she discovers or should have discovered any breach notify the seller or be barred from any remedy." (*Id.*) However, this section pertains to a buyer's (here, Monaco's) knowledge of a defect prior to acceptance, and does not apply to downstream purchasers such as Plaintiffs. *See* Rev. Code. Wash. § 62A.2-607, Washington Comments (2); UCC Comments 5 (stating that Plaintiffs need only "notify the seller than an injury has occurred"); *see also La Hue v. Coca Cola Bottling Co.*, 314 P.2d 421, 422 (1957) ("The ultimate consumer may, because of the breach of warranty, recover against the manufacturer...despite the lack of privity, without complying with the provisions of the uniform sales act relative to notice."). Regardless, viewed in the light most favorable to Plaintiffs, a jury could find that a Navistar mechanic twice performing work on their Diplomat satisfies the notice requirement.

Navistar next argues that Plaintiffs' breach of implied warranty claims under Wash. Rev. Code § 62A.2-314 fail due to a lack of privity between Navistar and Plaintiffs. [2] According to Navistar, Plaintiffs must have purchased the engine directly from Navistar in order for privity to lie. Navistar conflates horizontal privity, which is privity between the seller and immediate purchaser (applicable only to Wash. Rev. Code 62A.2-318), and vertical privity. *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*, 831 P.2d 724, 729 (Wash. 1992). Vertical privity is "privity between a manufacturer and end users down the distribution chain," *id.*, and "controls warranty issues [ ] between a remote manufacturer and ultimate purchaser." *Id.* at 730; *see also Kadiak Fisheries Co. v. Murphy Diesel Co.*, 422 P.2d 496 (Wash. 1967). Because Plaintiffs are the ultimate purchasers of Navistar's engine, there is vertical privity between the two.

Finally, Navistar argues that Plaintiffs did not meet their burden in presenting evidence demonstrating an express warranty made by Navistar to Plaintiffs either in writing, orally, or through advertising. (Dkt. No. 22 at 17.) This Court agrees. Plaintiffs' contention that the declaration of one of Navistar's engineers in support of its motion for summary judgment (Dkt. No. 24 at ¶ 3), stating "Navistar designed, built and manufactured a MaxxForce 10 DT-570 405 horsepower engine for specific use in Monaco RVs," constituted an express warranty made to Plaintiffs prior to their purchase is absurd. (Dkt. No. 42 at 19.) The Court hereby DENIES Navistar's motion as to the implied warranty claims

under the UCC, and GRANTS Navistar's motion as to the express warranty claims under the UCC.

### b. Plaintiffs' Claims under the MMWA

**\*5** Navistar next asks this Court to dismiss Plaintiffs' claims under the Magnusson-Moss Warranty Act ("MMWA") because (1) no implied warranties flow from Navistar to Plaintiffs due to a lack of privity; (2) there is no evidence of a breach of a warranty; (3) there are no current defects with the Diplomat; and (4) Plaintiffs did not give Navistar enough opportunities to repair any alleged defect. (Dkt. No. 22 at 8.) First, as to privity, the MMWA defines a supplier as "any person engaged in the business of making a consumer product directly or indirectly available to consumers." 15 U.S.C. § 2301(4). And as previously discussed, under Washington law, [3] there is privity between Navistar and Plaintiffs.

Second, Navistar maintains there is no evidence of a breach of warranty. At the very least, the MaxxForce engine manufactured by Navistar comes with an implied warranty of fitness for use in a vehicle. Wash. Rev. Code § 62A.2-314. Under this implied warranty, the Diplomat must be "fit for the ordinary purposes for which such goods are used." Wash. Rev. Code § 62A.2-314(2)(c). For a recreational vehicle, this would include driving it on the highway. Plaintiffs submitted evidence that the Diplomat was admitted to a repair shop at least four times and was out of service for a minimum of three months within the first 10,000 miles of ownership. There is sufficient evidence that Navistar breached its implied warranty of fitness.

Third, Navistar argues that Plaintiffs may not maintain their claim because it repaired the engine and the Diplomat is currently in working order, and that this satisfies Navistar's duty to cure the failure under 15 U.S.C. § 2310(e). Considering the mechanical troubles repeatedly encountered by Plaintiffs with their Diplomat—including troubles that did not necessarily result in shop-time—it is understandable that Plaintiffs would be reticent to continue driving the Diplomat, lest it break down a fifth time. Based on the facts already alleged, a jury could conclude that the MaxxForce engine is defective and that Navistar has sufficient opportunities to cure the defect, and this Court will not force Plaintiffs to drive their motor home until it breaks down again in order to survive summary judgment.

Finally, as to Navistar's argument that Plaintiffs did not give Navistar enough attempts to repair the defect, Navistar-sanctioned mechanics twice worked on the Diplomat. Although a single attempt does not meet the statutory threshold, a jury could conclude that two attempts was sufficient. *See* 15 U.S.C. § 2304(a)(4) (using plural "attempts"); *Temple v. Fleetwood Enterprises, Inc.*, 133 Fed. Appx. 254, 368 (6th Cir. 2005) ("In determining whether or not a seller is given a reasonable amount of time or a reasonable number of attempts to cure a defect, the Magnuson-Moss Act contemplates that a seller will be given at least two chances to remedy an alleged defect.").

The Court hereby DENIES Navistar's motion as to the MMWA claims.

### c. Plaintiffs' Claims under Washington's Lemon Laws

Navistar argues that Plaintiffs' claims under Washington's lemon laws, Wash. Rev. Code ch. 19.118, should be dismissed because Plaintiffs did not purchase the Diplomat in Washington state. (Dkt. No. 22 at 9.) The Court agrees. Under Wash. Rev. Code §§ 19.118.005, .010, and .021(12), the vehicle in question must have been purchased in this state. Because Plaintiffs purchased their Diplomat in California and delivered in Arizona, they have no basis for a claim under Washington's lemon laws.

The Court hereby GRANTS Navistar's motion to dismiss Plaintiffs' claim under Washington's lemon laws.

### d. Violations of Washington's Consumer Protection Act

**\*6** Next, Navistar argues that Plaintiffs failed to state a prima facie claim under Washington's CPA. (Dkt. No. 22 at 12.) Under the CPA, a plaintiff must establish five elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). Navistar contends that Plaintiffs failed to meet the first, third, and fourth elements. (Dkt. No. 22 at 12.)

Starting with an unfair act or deceptive practice, Plaintiffs allege that the MaxxForce engine was defective and if Navistar knew about it, that would constitute a deceptive

Cats v. Monaco RV, LLC, Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 26 of 260
PageID: 69690

practice. (Dkt. No. 26 at 8–9.) Navistar maintains that Plaintiffs have not come forward with any evidence to show that Navistar engaged in any sort of unfair or deceptive conduct. (*Id.*) However, this is more a result of Navistar's failure to comply with discovery requests than any shortfall of Plaintiffs. Navistar is correct that "an isolated breach of contract, warranty, or act of negligence does not ordinarily create a right of action under the CPA without more." [4] (Dkt. No. 22 at 13.) However, a defendant cannot refuse to provide discovery which may reveal an unfair or deceptive practice and then point to the plaintiff's lack of evidence on a motion for summary judgment. Here, if Navistar knowingly installed defective engines in Monaco RVs, especially when Navistar was the parent company of Monaco at the time it manufactured Plaintiffs' Diplomat, a jury could find that constitutes a deceptive practice.

As to the third element, the public has a strong interest in preventing manufacturers from knowingly installing defective products. Therefore, Navistar's argument that this does not affect the public interest also fails.

Finally, Navistar claims that Plaintiffs have not demonstrated any injury. Spending roughly $250,000 on a vehicle that immediately and repeatedly broke down—sometimes on the freeway—and spent at least three months in the repair shop during the first 10,000 miles of use constitutes a real and articulated injury. This is especially true if it is the result of Navistar knowingly installing a defective engine. Navistar's objections to Plaintiffs' CPA claim fail.

The Court DENIES Navistar's motion to dismiss Plaintiffs' CPA claims.

### e. Plaintiffs' Negligence Claims

Finally, Navistar maintains that Plaintiffs' negligence claims cannot proceed because they have not identified a duty owed or a breach. (Dkt. No. 22 at 19.) In order to prevail on a negligence claim, a plaintiff must demonstrate (1) that a duty was owed to the plaintiff; (2) there was a breach of that duty; (3) that plaintiff was harmed by the breach; and (4) that the breach was the proximate cause of the harm. *Jackson v. City of Seattle*, 244 P.3d 425, 428 (Wash. Ct. App. 2010).

Navistar frames Plaintiffs' formulation of the duty as providing a product that would never need adjustment or repair. (*Id.*) Navistar is correct that it would not have such

a duty, however it does have a duty not to knowingly install defective engines in vehicles. If Navistar knowingly installed the defective engines in Monaco RVs, then duty, breach, causation, and harm would all be met. [5] Had Navistar fully complied with discovery obligations, the Court would have a better idea as to whether, viewed in the light most favorable to the plaintiffs, a jury could conclude that Navistar knowingly manufactured and sold defective engines. Because it did not, the Court finds Navistar's argument that Plaintiffs failed to produce any evidence on this unavailing.

**\*7** The Court hereby DENIES Navistar's motion to dismiss Plaintiffs' negligence claim.

### C. Discovery Motions

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* The Court "may order discovery of any matter relevant to the subject matter involved." *Id.*

Discovery has been highly contested between the parties. Plaintiffs filed a motion to compel Navistar to comply with its discovery obligations (Dkt. No. 27) and a motion to compel Navistar to provide 30(b)(6) witnesses for deposition (Dkt. No. 29). In response to Plaintiffs' motion to compel 30(b)(6) witnesses, Navistar filed a motion for a protective order, requesting that (1) the Court stay corporate depositions until after its summary judgment motion is decided; (2) any depositions that are ordered take place at its headquarters in Chicago, Illinois; and (3) the Court limit the scope of the twenty-two topics included in Plaintiffs' notice. (Dkt. No. 32 at 1–2.)

Turning first to Plaintiffs' motions to compel discovery, Plaintiffs request that this Court order Navistar to respond to multiple requests for production, specifically requests numbered 3, 4, 8–10, 12, 18–21, 23, 27, and 28. (Dkt. No. 27 at 5–9.) Navistar maintains that what it has already produced and its objections justifying a lack of production are sufficient to satisfy its discovery obligations. However, Navistar has not given this Court a solid foundation to trust that it is faithfully complying with its discovery obligations. For example, in Plaintiffs' request for production No. 10, they asked for documents relating to "any complaints made by any owner of a MaxxForce engine of the kind used on the Diplomat

Cats v. Monaco RV, LLC, Not Reported in Fed. Supp. (2018)
Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 27 of 260
PageID: 69691

during the years 2010 to the present." (Dkt. No. 28 at 23.) Navistar at first objected and later complied by providing one Florida case. (*Id.* at 33; Dkt. No. 27 at 7.) Two more cases were produced in response more than eight months later. (Dkt. No. 56 at 3.) However, in its own reply in support of summary judgment, Navistar cites *Ross Neely Systems, Inc. v. Navistar, Inc., et al.*, 2015 WL 1565702 (N.D. Texas). (Dkt. No. 60 at 6.) The cite in the briefing was to a specific docket number from that case, which leads the Court to believe that Navistar and its counsel are well aware of, and have ready access to, all litigation matters relating to Navistar and its MaxxForce engines. A quick search of orders in *Ross Neely* led this Court to the multidistrict litigation case, *In re: Navistar Maxxforce Engines Marketing, Sales Practices and Products Liability Litigation*, 67 F. Supp. 3d 1382 (J.P.M.L. 2014), consisting of fourteen actions in eight districts involving "claims that the Advanced Exhaust Gas Recirculation (EGR) emission control system developed by Navistar for its MaxxForce truck engines is defective, resulting in repeated engine failures and frequent repairs." *Id.* at 1383. That is virtually the same claim alleged by Plaintiffs.

**\*8** Additionally, Navistar maintains that only one Navistar-sanctioned mechanic worked on Plaintiffs' Diplomat, and counsel for Navistar represented that "Navistar has no record of any SanTex work, if it is an authorized service representative, on the engine." (Dkt. Nos. 42 at 12 and 47-2 at 102.) To the contrary, a copy—provided by Monaco—of the SanTex repair invoice shows on the first page in large, bold letters "Repair Management by Navistar." (Dkt. 47-2 at 12.)

As to its objection to Plaintiffs' proposed 30(b)(6) topics, Navistar claimed "there have been no operational employees at Navistar with RV knowledge since May 15, 2013," (Dkt. No. 36-1 at 18), yet submitted a declaration in support of summary judgment from Patrick Nolan, a senior engineer at Navistar, who made numerous statements based on information Navistar claimed was unavailable. (Dkt. No. 61 at 2–6.) Navistar also claimed that it had no documents relating to its decision to discontinue its MaxxForce 10 engine, however Mr. Nolan stated that it was "discontinued for business reasons." (*Id.* at 4.) This Court finds it difficult to believe that a corporation's decision to terminate production of the engine would be made devoid of any documentation and only exist in the memory of a few employees.

Accordingly, the Court GRANTS Plaintiffs' motion to compel discovery (Dkt. No. 27) in its entirety. To the extent the requests have not already been complied with since the filing

of the motion, the Court ORDERS Navistar to comply with the requests for production within 14 days from the date of this order. The Court also GRANTS in part Plaintiffs' motion to compel a 30(b)(6) deposition(s) (Dkt. No. 29) and ORDERS Navistar to produce a witness or witnesses capable of answering questions on topics 7, 8, 10, and 12–21. (Dkt. No. 29 at 6–7.) The Court GRANTS in part Navistar's motion for a protective order (Dkt. No. 32) as to the questions that pertain to speculative or conspiratorial allegations relating to McMahon's RV, or other irrelevant topics, specifically topics 1–6, 9, and 11. (Dkt. No. 29 at 6–7.) The Court further ORDERS that the depositions shall take place at Navistar's headquarters in Chicago, Illinois. Navistar's request that this Court stay the depositions until it decides the summary judgment motion is DISMISSED as moot.

## III. CONCLUSION

For the foregoing reasons, Defendant Navistar's motion for summary judgment (Dkt. No. 22) is DENIED IN PART and GRANTED IN PART. It is DENIED as to (1) breach of warranty under the Uniform Commercial Code; (2) claims under the Magnuson-Moss Warranty Act; (3) claims under the Washington Consumer Protection Act; and (4) Plaintiffs' negligence claim, and GRANTED as to Plaintiffs' Washington lemon law claim under Wash. Rev. Code. ch. 19.118.

Plaintiffs' motion to amend (Dkt. No. 25) is GRANTED as to clarifying factual allegations, and DENIED as to adding additional claims.

Plaintiffs' motion to compel Navistar to comply with discovery obligations (Dkt. No. 27) is GRANTED. The Court ORDERS Navistar to comply with the requests for production within 14 days from the date of this order.

Plaintiffs' motion to compel a 30(b)(6) deposition(s) (Dkt. No. 29) is GRANTED IN PART. The Court ORDERS Navistar to produce a witness or witnesses capable of answering questions on topics 7, 8, 10, and 12–21. (Dkt. No. 29 at 6–7.)

Navistar's motion for a protective order (Dkt. No. 32) is GRANTED IN PART as to the topics that pertain to speculative or conspiratorial allegations concerning McMahon's RV, or other irrelevant topics, namely topics 1–6, 9, and 11. (Dkt. No. 29 at 6–7.) The Court further ORDERS that the depositions shall take place at Navistar's headquarters in Chicago, Illinois.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 28 of 260
PageID: 69692

Cats v. Monaco RV, LLC, Not Reported in Fed. Supp. (2016)

**\*9**  Plaintiffs' motion to strike Docket Number 61 and Docket Number 62 (Dkt. No. 66) is DENIED.

DATED this 22nd day of September 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5253204

## Footnotes

1    Plaintiffs provided different dates regarding the time the Diplomat spent in the shop and it is possible the Diplomat remained in the shop as late as November 13, 2014. (Dkt. No. 47-2 at 61.) Absent clarification from Plaintiffs, the Court will assume the Diplomat was out of service until August 15, 2014.

2    Navistar appears to argue in its subheading that privity is required—and also lacking—between Navistar and McMahon's RV. (Dkt. No. 22 at 16.) However, no argument is set forth beyond the heading and the Court will not consider it.

3    15 U.S.C. § 2301(7) defines an "implied warranty" as one "arising under State law."

4    Navistar cites to *Henery v. Robinson*, 834 P.2d 1091 (Wash. Ct. App. 1992) for the proposition that a single misrepresentation by a mobile home salesman did not constitute a deceptive act. (Dkt. No. 22 at 14.) That case is inapplicable here. Had Navistar complied with discovery requests regarding defects in it engine, the Court would be better suited to determine whether a jury could find Navistar acted unfairly or deceptively.

5    Navistar argues in its reply supporting summary judgment that Plaintiffs' expert and his declaration should be excluded because it is based on assumptions and without factual support. (Dkt. No. 60 at 4–7.) Although the Court believes Mr. Merrion should be more specific as to what, exactly, he reviewed in coming to his conclusions, it also notes that various requests for production pertaining to the design and manufacture of Navistar's MaxxForce engine were not provided to Plaintiffs. Navistar cannot refuse to provide discovery on which Plaintiffs' expert may need to rely and then claim he has insufficient facts on which to base his opinion.

---

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

# Tab 4

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 30 of 260
PageID: 69694
Gilberto v. Walgreen Co., Not Reported in Fed. Supp. (2020)

2020 WL 1890538
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

Heather GILBERTO, individually and
on behalf of other customers, Plaintiff,

v.

WALGREEN CO., Defendant.

No. 3:18-cv-01003-AC
|
Signed 04/16/2020

**Attorneys and Law Firms**

Michael R. Fuller, OlsenDaines, Kelly D. Jones, Kelly D. Jones, Attorney at Law, Portland, OR, Young W. Walgenkim, Hanson & Walgenkim, LLC, Salem, OR, for Plaintiff.

Timothy W. Snider, Stephen H. Galloway, Stoel Rives LLP, Portland, OR, for Defendant.

ORDER

HERNÁNDEZ, District Judge:

**\*1** Magistrate Judge Acosta issued a Findings and Recommendation [30] on November 20, 2019, in which he recommends that this Court grant Defendant's Motion to Dismiss [13] and give Plaintiff leave to amend. The matter is now before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

Plaintiff and Defendant both filed timely objections to the Magistrate Judge's Findings & Recommendation. Pl. Obj., ECF 33; Def. Obj., ECF 32. When any party objects to any portion of the Magistrate Judge's Findings & Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Together, Plaintiff and Defendant object to each of the Magistrate Judge's findings. The Magistrate Judge found that Plaintiff had not alleged actionable violations of Oregon's Unlawful Trade Practices Act (UTPA) under Or. Rev. Stat. § ("O.R.S.") 646.608(1)(b), (e), (i), (t), and (j). F&R at 18–30.

He concluded, however, that Plaintiff sufficiently pleaded a violation of ORS 646.608(1)(s). *Id.* at 26–27. The Magistrate Judge also found that Plaintiff has failed to allege that she and the putative class members suffered an ascertainable loss and that Defendant acted knowingly or recklessly as required to maintain a class action under the UTPA. *Id.* at 30–37.

The Court adopts these findings in part. The Court agrees with the Magistrate Judge that Plaintiff: (1) failed to allege violations of ORS 646.608(1)(b), (t), and (j); (2) sufficiently stated a claim for a violation of ORS 646.608(1)(s); and (3) failed to allege that she and the putative class members suffered an ascertainable loss. The Court, however, declines to adopt the Magistrate Judge's findings that Plaintiff has failed to adequately allege claims for violations of ORS 646.608(1)(e) and (i) and knowing or reckless conduct by Defendant.

Plaintiff has adequately stated claims for violations of ORS 646.608(1)(e) and (i). Subsection (e) makes it unlawful to "represent[ ] that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have[.]" O.R.S. 646.608(1)(e). The Court cannot conclude at this stage in the proceedings that, as a matter of law, redeemability of the drink boxes is not a "characteristic" or "quality" of the good under Oregon law. Even assuming that, as the Magistrate Judge concluded, the statute "is concerned with misrepresentations as to the inherent characteristics or qualities of a good," *see* F&R 22 (citing *Caldwell v. Pop's Homes, Inc.*, 54 Or. App. 104 (1981) and *Feitler v. Animation Celection, Inc.*, 170 Or. App. 702 (2000)), whether the redeemability of the packaging is a distinguishing attribute of a good, increases the value of a good, or might induce a reasonable consumer to purchase one good over another is a question more appropriate for summary judgment.

**\*2** Subsection (i) makes it unlawful to "[a]dvertise[ ] real estate, goods or services with intent not to provide the real estate, goods or services as advertised[.]" O.R.S. 646.608(1)(i). In this case, Plaintiff alleges that Defendant "advertis[ed] on the price tags on its shelves that the exempt beverage containers would be redeemable in the amount of the 10-cent bottle deposit charge" even though it did not intend that the containers would be redeemable. Am. Compl. ¶ 17. The Court agrees with the Magistrate Judge that such a representation constitutes advertising as to a good. *See* F&R at 24. But it disagrees that Plaintiff has not adequately alleged intent.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 31 of 260 PageID: 69695

Although Plaintiff does not allege that she sought to return the containers and Defendant denied the redemption, she does allege that she complained to Defendant about the 10-cent charge and that Defendant refused to refund the money:

> When Ms. Gilberto learned that the boxes she purchased from Walgreens were not eligible for a 10-cent deposit refund under Oregon law, she complained to Walgreens management and to corporate, but Walgreens refused to give her a cash refund of the 10-cent overcharges it assessed against her for its exempt beverages. Corporate said they would call Ms. Gilberto back but never did.

Am Compl. ¶ 10. From this, it is plausible that Defendant did not intend to provide the goods as advertised. Accordingly, the Court declines to adopt the Magistrate Judge's findings that Plaintiff cannot bring claims under O.R.S. 646.606(1)(e) and (i).

The Court also finds that Plaintiff has plausibly alleged that Defendant was reckless as required to maintain a class action under Oregon's UTPA. *See* O.R.S. 646.638(8)(a) (requiring Plaintiff to establish that Defendant's unlawful act was reckless or knowing). Again, in the Amended Complaint, Plaintiff alleges that she complained to corporate management and corporate counsel after learning that the drink boxes were not redeemable, and Defendant refused

to give her a refund for the overcharges. Am. Compl. ¶ 10. Plaintiff also alleges that even after she complained, Defendant "recklessly continued to violate Oregon's [UTPA] by charging 10-cent deposits on exempt beverages[.]" Am. Compl. ¶ 21. Viewing these facts in the light most favorable to Plaintiff, the Court can reasonably infer that Defendant acted recklessly: Plaintiff complained about the 10-cent deposit to Defendant, Defendant was put on notice of its potential UTPA violation, and Defendant continued to apply the 10-cent deposit to exempt beverage containers. Accordingly, the Court declines to adopt the Magistrate Judge's finding that Plaintiff has not adequately alleged recklessness.

The Court has carefully considered the remainder of Plaintiff's and Defendant's objections, has reviewed the pertinent portions of the record *de novo*, and finds no other error in the Magistrate Judge's Findings & Recommendation.

## CONCLUSION

The Court ADOPTS in part Magistrate Judge Acosta's Findings and Recommendation [30]. Defendant's Motion to Dismiss [13] is GRANTED in part and DENIED in part. Plaintiff shall file an amended complaint within 30 days of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1890538

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 5

2016 WL 10966426
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Churee HALEY et al.

v.

BAYER HEALTHCARE
PHARMACEUTICALS INC. et al.

Case No. SACV 16–546–JLS (Ex)
|
Filed 06/09/2016

**Attorneys and Law Firms**

Marc S. Strecker, Strecker Law Offices, Irvine, CA, for
Churee Haley et al.

Brian Patrick Ziska, Darolyn Y. Hamada, Frank C. Rothrock,
Shook Hardy and Bacon LLP, Irvine, CA, for Bayer
Healthcare Pharmaceuticals Inc. et al.

**PROCEEDINGS: (IN CHAMBERS) ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS (Doc. 21)**

JOSEPHINE L. STATON, UNITED STATES DISTRICT
JUDGE

**\*1** Before the Court is Defendant Pfizer Inc.'s Motion to
Dismiss or, in the Alternative, to Strike. (Mot., Doc. 21.)
Plaintiffs Churee Haley and Rojelio Serrano opposed, and
Defendant replied. (Opp., Doc. 26; Reply, Doc. 27.) The
Court finds this matter appropriate for decision without oral
argument. Fed. R. Civ. P. 78; C.D. Cal. R. 7–15. Accordingly,
the hearing set for June 10, 2016, at 2:30 p.m., is VACATED.
Having read and considered the parties' briefs, the Court
GRANTS IN PART and DENIES IN PART the Motion to
Dismiss.

**I. BACKGROUND**
The Complaint alleges the following facts:

In 2007, Plaintiff Churee Haley was pregnant with her third
child, Hayden Serrano. (Compl. ¶¶ 1, 13, Doc. 1.) Haley
and Plaintiff Rojelio Serrano are the parents and legal heirs of
Hayden. (Id. ¶ 1.) On September 28, 2007, Haley was in pre-
term labor and was admitted to Kaiser Permanente Medical
Center in Anaheim, California. (Id. ¶ 13.) Upon admission,
Haley was noted to have a history of hyperthyroidism, and
she had lower than average blood pressure. (Id.) Healthcare
providers prescribed and administered Nifedipine to Haley
to halt the pre-term labor. (Id.) Under the influence of
Nifedipine, Haley's blood pressure dropped. (Id.)

On September 30, 2007, Haley was discharged from the
hospital and was prescribed a course of oral Nifedipine.
(Id. ¶ 14.) When at home, Haley took the oral Nifedipine
according to the schedule prescribed by her doctor. (Id. ¶
15.) On October 2, 2007, Haley was again admitted to the
hospital. (Id. ¶ 16.) The doctor ordered aggressive intravenous
hydration due to her low blood pressure, and the doctor also
proceeded with immediate delivery due to the persistent fetal
tachycardia and late decelerations. (Id.)

On October 2, 2007, Haley delivered Hayden. (Id. ¶¶ 1, 17.)
Plaintiffs allege that the Nifedipine lowered Haley's maternal
blood pressure such that there was a decreased perfusion
of blood through the placenta. (Id. ¶ 17.) Hayden allegedly
suffered a "severe hypoxicischemic injury" and "profound
neurological deficits" as a result of the drug, including severe
cerebral palsy, severe breathing problems, and the inability to
properly regulate his own body temperature. (Id.) Haley had
previously given birth to two children with no complications
or birth defects. (Id. ¶ 13.) Plaintiffs allege that the above
injuries were the proximate cause of Hayden's death on
February 23, 2014. (Id. ¶ 17.)

Plaintiffs allege that Defendants Bayer Healthcare
Pharmaceuticals, Inc. and Pfizer, Inc. manufactured,
distributed, and sold Nifedipine but failed to (1) adequately
warn prescribing physicians of the drug's potential risks and
side effects, (2) adequately instruct prescribing physicians on
the proper use of Nifedipine, and (3) adequately label the
drug. (Id. ¶¶ 2, 4.) On February 22, 2016, Plaintiffs filed a
Complaint in state court alleging the following claims against
Defendants: (1) strict product liability, (2) negligence, (3)
breach of implied warranty of merchantability, and (4) breach
of implied warranty of fitness for a particular purpose. (Id.
¶¶ 21–47.) On March 24, 2016, Bayer Healthcare removed
the action to this Court. (Notice of Removal, Doc. 1.) On
April 5, 2016, Plaintiffs dismissed Bayer Healthcare without
prejudice for 90 days and, in the event Plaintiffs do not file
an amended complaint renaming Bayer by July 5, 2016, with
prejudice thereafter. (Doc. 20.)

**\*2** Pfizer now moves to dismiss the claim for strict product liability based on a design defect or, in the alternative, to strike certain language from paragraphs 22 and 23 of the Complaint. Pfizer also moves to dismiss the claims for breach of implied warranties of merchantability and fitness.

## II. LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party. *See Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). And while judicial review is generally limited to the face of a complaint, courts may properly consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Harris v. Amgen, Inc.*, 738 F.3d 1026, 1035 (9th Cir. 2013) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level ...." *Twombly*, 550 U.S. at 555. Thus, a complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively[,]" and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## III. DISCUSSION

### A. Claim for Strict Liability Based on a Design Defect

We first address Plaintiffs' product liability claim. Here, Plaintiffs allege that Pfizer is strictly liable for "defects in the design, development, marketing, manufacture, distribution[,]

and sale of Nifedipine." (Compl. ¶ 22.) Pfizer argues that because there is no cognizable claim for design defect-based strict liability in an action against the manufacturer of a prescription drug, the Court should dismiss the claim to the extent it relies on allegations of a design defect.

In California, "[s]trict liability has been imposed for three types of products defects: manufacturing defects, design defects, and 'warning defects.' " *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 347 (2012). However, in *Brown v. Superior Court*, 44 Cal. 3d 1049 (1988), the California Supreme Court "established an exception to general products strict liability rules for prescription drugs." *Artiglio v. Superior Court*, 22 Cal. App. 4th 1388, 1392 (1994). "It was held, for policy reasons set forth at length in the opinion, that drug manufacturers could not be held strictly liable for design defects in prescription drugs." *Id.* at 1392–93 (citing *Brown*, 44 Cal. 3d at 1069). Plaintiffs do not dispute that *Brown* remains binding authority. Rather, they argue the Motion should be denied because their strict liability claim also contains viable allegations of manufacturing defects and failure to warn. (Opp. at 2, 4–5.) We find this argument unavailing.

**\*3** Notably, Pfizer seeks to dismiss the claim for strict liability *only to the extent it is based on a design defect*. Plaintiffs regularly bring separate claims for strict liability based on different theories of manufacturing, design, and warning defects. *See, e.g.*, *Waldo v. Eli Lilly & Co.*, No CIV. S–13–0789 LKK EFB, 2013 WL 5554623, at \*2–6 (E.D. Cal. Oct. 8, 2013) (separately addressing plaintiff's claims for strict liability under theories of design defect, manufacturing defect, and failure to warn and dismissing the design defect claim with prejudice). When plaintiffs do raise multiple claims in a single cause of action for strict liability, courts continue to separately address these theories at the pleading stage. *See Schwartz v. Wright Med. Tech., Inc.*, No. EDCV 14–1615 JGB (SPx), 2014 WL 11320637, at \*3–4 (C.D. Cal. Sept. 11, 2014) (separately addressing the plaintiff's theories for strict liability based on design defects and manufacturing defects when both theories were raised under a single cause of action, and dismissing the design defect claim with prejudice).

Accordingly, having found that a strict liability claim against a prescription drug manufacturer based on design defect is precluded as a matter of law, the Motion is GRANTED as to this claim. Plaintiffs' claim for strict products liability based on a design defect is DISMISSED WITH PREJUDICE. In

Haley v. Bayer Healthcare Pharmaceuticals Inc., Not Reported in Fed. Supp. (2016)

light of this dismissal, we need not address Pfizer's alternative request to strike the underlying allegations.

**B. Implied Warranties of Merchantability and Fitness**

We then turn to Plaintiffs' claims for breach of implied warranties of merchantability and fitness. Pfizer argues that dismissal of both claims is proper because Plaintiffs fail to allege privity. (Mem. at 5–6.) Plaintiffs assert privity is not required in the context of claims involving prescription drugs. (Opp. at 6–9.)

Under California law, privity between parties is generally required for claims of breach of an implied warranty. *Clemens v. Daimler Chrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir. 2008). However, "[a]n exception to the general rule has been recognized in the case of foodstuffs, and has been extended to drugs, on the basis that a drug is intended for human consumption quite as much as is food." *Arnold v. Dow Chem. Co.,* 91 Cal. App. 4th 698, 720 (2001) (citing *Gottsdanker v. Cutter Laboratories,* 182 Cal. App. 2d 602, 607 (1960)). Pfizer points to more recent California Court of Appeal decisions in which privity has been required to assert implied warranty claims in the context of implanted medical devices. (*See* Mem. at 5 (citing *Blanco v. Baxter Healthcare Corp.,* 158 Cal. App. 4th 1039, 1058 (2008) (privity required to pursue breach of implied warranty claims against manufacturer of a prosthetic heart valve); *Evraets v. Intermedics Intraocular, Inc.,* 29 Cal. App. 4th 779, 788 (1994) (same against manufacturer of an intraocular lens) ). Pfizer asserts that for both prescription drugs and implanted medical devices, patients rely on a physician's skill and judgment to receive the drug or device. (Mem. at 5–6.) Pfizer then characterizes California's intermediate appellate courts as "in conflict" and, in light of the above similarity, urges the Court to require privity in the context of prescription drugs. (*Id.*) For the following reasons, we decline to do so.

The Ninth Circuit has recognized that "California courts have painstakingly established the scope of the privity requirement ... and a federal court sitting in diversity is not free to create new exceptions to it." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1024 (9th Cir. 2008). *See also Day & Zimmerman, Inc. v. Challoner,* 423 U.S. 3, 4 (1975) ("A federal court in a diversity case is

not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits."). Notably, Pfizer fails to identify *any* case where a court required privity for an implied warranty claim involving prescription drugs. Following *Evraets* and *Blanco,* California appellate courts have continued to acknowledge the privity exception for breach of implied warranty claims involving prescription drugs. *See, e.g., Jones v. ConocoPhillips,* 198 Cal. App. 4th 1187, 1201 (2011) ("There are, of course, multiple court-created exceptions to the general rule of privity ... in cases involving foodstuffs, drugs, and pesticides[.]"); *Chavez v. Glock, Inc.,* 207 Cal. App. 4th 1283, 1315 (2012) (same). District courts in this circuit have also continued to acknowledge a difference in the privity requirement for prescription drugs and implanted medical devices. *Stanley v. Novartis Pharm. Corp.,* 11 F. Supp. 3d 987, 1005 (C.D. Cal. 2014) (acknowledging a difference in the privity requirement for drugs and implanted medical devices and "find[ing] that a lack of privity is not a bar to Plaintiff's breach of implied warranty claim" involving prescription drugs); *Quetala v. Stryker Corp.,* 820 F. Supp. 2d 1045, 1047 (N.D. Cal. 2010) (acknowledging the food and drug exception to privity but declining to apply the exception to an implanted medical device); *Tapia v. Davol, Inc.,* 116 F. Supp. 3d 1149, 1159–60 (S.D. Cal. 2015) (same).

**\*4** In light of the above considerations, we find that the lack of privity does not bar Plaintiffs' breach of implied warranty claims as a matter of law. The Motion is therefore DENIED as to these claims.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Motion to Dismiss. Plaintiffs' claim for strict products liability based on a design defect is precluded as a matter of law and is thereby DISMISSED WITH PREJUDICE. The Motion is DENIED as to the remaining claims.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 10966426

---

End of Document      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 6

2021 WL 1041017
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
PENSACOLA DIVISION.

IN RE: ABILIFY (ARIPIPRAZOLE)
PRODUCTS LIABILITY LITIGATION,
This Document Relates to: Scott Findeisen

Case No. 3:16-md-2734, Case No. 3:19-cv-22
|
Signed 02/10/2021

**REPORT AND RECOMMENDATION**

GARY R. JONES, United States Magistrate Judge

*1 Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 29. Plaintiff has filed a response in opposition, ECF No. 34, and Defendants filed a reply in support of their motion, ECF No. 36. The district court referred the instant motion to the undersigned for further proceedings and the preparation of a report and recommendation. ECF No. 38. The motion is, therefore, ripe for consideration. For the reasons discussed below, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment should be **GRANTED IN PART and DENIED IN PART**.

**I. BACKGROUND**

This is a products liability action against Defendants Bristol-Myers Squibb Co., Otsuka America Pharmaceutical, Inc., and Otsuka Pharmaceutical Co., Ltd., concerning Plaintiff's use of the atypical antipsychotic drug Aripiprazole, commonly known by its trade name "Abilify." ECF No. 1. Dr. Thomas Scaramella prescribed Abilify to Plaintiff to treat his major depressive disorder and anxiety. ECF No. 29-1 at 52. Plaintiff took Abilify (and a generic version of Aripiprazole) as prescribed until June 2013, and then again between November 2013 and August 2016. ECF No. 29-2; ECF No. 29-3 at 34–36. During this time—as described in the parties' filings —Plaintiff engaged in compulsive gambling, experienced hypersexuality, and struggled with substance abuse. ECF No. 29 at 14–16; ECF No. 34 at 11–12.

In May 2016, the Food and Drug Administration ("FDA") issued a drug safety communication regarding Abilify, stating:

> The US Food and Drug Administration is warning that compulsive or uncontrollable urges to gamble, binge eat, shop, and have sex have been reported with the use of the antipsychotic drug aripiprazole. These uncontrollable urges were reported to have stopped when the medicine was discontinued or dose was reduced. These impulse control problems are rare, but they may result in the harm to the patients and others if not recognized

ECF No. 29-1 at 73. In August 2016, the Abilify label was modified to reflect a similar warning concerning impulse control. ECF No. 34 at 10.

Plaintiff has pleaded claims against Defendants for strict products liability (design defect, manufacturing defect, and failure to warn), breach of express warranty, breach of implied warranty, negligence, negligence per se, negligent misrepresentation, violation of Rhode Island consumer protection laws, and fraudulent concealment. ECF No. 1 at 4. This case was consolidated in multidistrict litigation for the coordination of pretrial proceedings. 28 U.S.C. § 1407. Plaintiff was eligible to participate in the MDL settlement program established by the parties, but he elected to continue litigating his claims on an individual basis. ECF No. 5.

**II. LEGAL STANDARD**

The entry of summary judgment is appropriate when the Court is satisfied "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). "The nonmovant need not be given the benefit of every

inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

**\*2** As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the movant bears the initial burden of establishing the nonexistence of a triable issue of fact. This, however, does not require the movant to disprove matters on which the non-moving party bears the burden of proof at trial. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994); *see also United States v. Four Parcels of Real Property in Green and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991) ("[T]he moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." (alterations adopted)).

If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

### III. DISCUSSION

Defendants have denied any wrongdoing, ECF Nos. 10, 11, 12, and now move for summary judgment, ECF No. 29. The substantive law of Rhode Island governs as to the merits of Plaintiff's claims, ECF No. 29 at 20 n.3, but this Court, as the MDL transferee court, applies the law of the circuit in which it sits (the Eleventh Circuit) to matters of federal law or procedure, *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996); *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175–76 (D.C. Cir. 1987).

Plaintiff concedes summary judgment is proper for his claims premised on negligence per se and the Rhode Island Deceptive Trade Practices Act. ECF No. 34 at 9, 25.

Additionally, Plaintiff fails to address Defendants' arguments as to a manufacturing defect claim, and, therefore, it is deemed abandoned. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

As to the remaining claims, which are discussed below, the Court concludes as follows. Defendants are entitled to summary judgment on Plaintiff's claims of design defect, negligent misrepresentation, fraudulent concealment, breach of express warranty, and breach of implied warranty because Plaintiff fails to present sufficient evidence of the essential elements he must prove. Plaintiff's failure to warn claim survives because there is a genuine issue of material fact as to whether the learned intermediary rule precludes a finding of proximate causation.

*Failure to Warn*. In Rhode Island, a manufacturer or marketer of a prescription drug may be held liable for breaching the duty to warn of the drug's dangerous propensities. *Thomas v. Amway Corp.*, 488 A.2d 716, 722 (R.I. 1985). This "failure to warn" claim may arise under strict liability or negligence. *Id.*; *see also Raimbeault v. Takeuchi Mfg. (U.S.), Ltd.*, 772 A.2d 1056, 1063–64 (R.I. 2001). Under either theory, however, the plaintiff must prove proximate causation—the link "between the conduct and the resulting injury," *Hall v. City of Newport*, 138 A.3d 814, 819 (R.I. 2016), that is "natural, unbroken, and continuous[,]" *Gray v. Derderian*, 365 F. Supp. 2d 218, 230 (D.R.I. 2005). *See Hodges v. Brannon*, 707 A.2d 1225, 1227 (R.I. 1998) ("[T]he jury's finding of no proximate cause torpedoed all these failure-to-disclose theories of liability.").

**\*3** Inextricably intertwined with the proximate cause analysis is the so-called "learned intermediary doctrine," which "imposes on prescription drug manufacturers a duty to adequately warn physicians, rather than patients, of the risks their products pose." *Hubbard v. Bayer Healthcare Pharm. Inc.*, 983 F.3d 1223, 1225 (11th Cir. 2020). Although the Rhode Island Supreme Court has not expressly adopted the learned intermediary doctrine, it has referred to the rule when describing the proximate cause element of a failure to warn claim. *See Hodges*, 707 A.2d at 1227–28 ("For if, as the jury determined, [the drug] did not proximately cause [the decedent's] death, then [the manufacturer's] alleged failure to warn [the prescriber] about all the potential dangers in

prescribing [the drug] could not possibly have played any role in bringing about [the decedent's] demise."). Consequently, at least one federal court has predicted it is "highly likely" that the Rhode Island Supreme Court would apply the learned intermediary doctrine if given the chance because it has been adopted by "almost every state." *In re Zyprexa Prods. Liab. Litig.*, 277 F.R.D. 243, 250 (E.D.N.Y. 2011), *aff'd sub nom, Greaves v. Eli Lilly and Co.*, 503 F. App'x 70, 71–72 (2d Cir. 2012).

Some states have applied the learned intermediary doctrine to bar claims based on allegedly inadequate instructions or warnings accompanying a drug when there is no evidence that the prescriber read or relied on the drug's label or instructions. *See In re Wright Med. Tech. Inc., Conservative Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1359 (N.D. Ga. 2015) (collecting cases). In the same vein, "in cases where a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, courts typically conclude that the causal link is broken and the plaintiff cannot recover." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 816 (11th Cir. 2010) (applying Georgia law); *see also* ECF No. 29 at 25 (collecting cases).

Defendants argue they are entitled to summary judgment on Plaintiff's failure to warn claim because there is "no evidence that Dr. Scaramella would have done anything differently even had the Abilify label included a warning about compulsive behaviors." ECF No. 29 at 24. Defendants cite Dr. Scaramella's deposition testimony that "he has never discussed impulsivity with any of his patients, even after reports of impulsivity were added to the Abilify warning label" and that "despite the change in the warning label, he cannot say ... he would have changed the way he treated" Plaintiff. *Id.* at 23–24.

This argument fails for two reasons. First, courts routinely reject Defendants' suggestion that a failure to warn claim may be defeated as a matter of law by a prescriber's hindsight opinion that he would not have treated a patient differently if she received an adequate warning. *See Garside v. Osco Drug, Inc.*, 976 F.2d 77, 83 n.9 (1st Cir. 1992) (applying Massachusetts law) ("[T]he Massachusetts Supreme Judicial Court would likely be reluctant to allow a physician's pre-trial testimony about what s/he would have done had s/he been warned to insulate a defendant manufacturer from liability."); *Doe v. Miles Labs., Inc.*, 927 F.2d 187, 195 n. 32 (4th Cir. 1991) (applying Maryland law) ("Although [the prescriber] testified that she would have administered the drug regardless of the AIDS risk, her hindsight opinion is not conclusive of what she would have done had she been invested with all pertinent facts regarding [the drug]."); *Williams v. Lederle Labs.*, 591 F. Supp. 381, 387 (S.D. Ohio 1984) (applying Ohio law) ("What [the prescriber] might or might not have done involves to some degree his credibility. Thus, we conclude that it is for the jury to determine whether the presence of an adequate warning would have made no difference in [the prescriber's] decision.").

**\*4** Second, Dr. Scaramella's deposition testimony about his supposed course of treatment is equivocal at best. Dr. Scaramella stated he relied on the product labeling to form his understanding of the risks and benefits of Abilify, which impacts the way he prescribes a medication. ECF No. 29-1 at 78. He stated further that he would have heeded the FDA's instruction to prescribers to ask patients or their caregivers about "the development of new or intense gambling urges, compulsive sexual urges, compulsive shopping, binge or compulsive eating, or other urges while being treated with" Abilify. *Id.* When Dr. Scaramella was asked the ultimate question—whether he would have "done anything differently in terms of the medications [he] prescribed to [Plaintiff]"— he said he was "not sure" and could not say. *Id.* at 73.

In view of this record, there is a triable issue as to whether Defendants' failure to warn was the proximate cause of Plaintiff's injuries. *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514, 518 (R.I. 1977) ("The true rule is that what is proximate cause of an injury is ordinarily a question for the jury. It is only when the facts are undisputed and are susceptible of but one inference, that the question is one of law for the court."). Therefore, Defendants are not entitled to summary judgment on this claim.

*Design Defect*. To prevail on a strict liability claim based on a design defect, the plaintiff must prove: "(1) a defect; (2) the defect existed at the time the product left defendants' hands; (3) the defect rendered the product unreasonably dangerous; (4) the product was being used as intended at the time of the accident; and (5) the defect was the proximate cause of plaintiffs' injuries." *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 276 (1st Cir. 2002) (citing *Raimbeault*, 772 A.2d at 1063). Rhode Island courts determine if a product is defective using the "consumer-expectation test," which "seeks to protect the consumer or user who was unaware of the danger involved in using a product in a way that it was

intended to be used." *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 779 (R.I. 1988). A product is "unreasonably dangerous" if the "defect in the product establishes a strong likelihood of injury to the user or consumer thereof." *Id.*

Defendants argue that summary judgment is appropriate on Plaintiff's design defect claim because there is no evidence (from an expert witness or otherwise) of a defect in Abilify, that Abilify was (or is) unreasonably dangerous, or that any defect proximately caused Plaintiff's injuries. ECF No. 29 at 27. Plaintiff avers he has "clearly demonstrated" a defect in Abilify that rendered the drug unreasonably dangerous and caused his injuries. ECF No. 34 at 21. Plaintiff suggests the "defect" in Abilify is that the drug causes "an impulsivity disorder," ECF No. 34 at 19, but he fails to cite any evidence that this side effect rendered Abilify unreasonably dangerous because it presents a "strong likelihood" of injury. Defendant relies instead on his conclusory statements and attorney argument, which (obviously) do not carry any weight in the Court's examination of the record. *Leigh*, 212 F.3d at 1217; *see also Sartori v. Schrodt*, 424 F. Supp. 3d 1121, 1123 (N.D. Fla. 2019) ("It follows that attorney arguments alone cannot preclude summary judgment." (citing *Rich v. Dollar*, 841 F.2d 1558, 1565 n.5 (11th Cir. 1988))). There is, thus, no genuine issue of material fact and Defendants are entitled to summary judgment on this claim.

*Negligent Misrepresentation*. In Rhode Island, a claim of negligent misrepresentation has four elements: "(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he or she ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Cruz v. DaimlerChrysler Motors Corp.*, 66 A.3d 446, 453 (R.I. 2013). Typically, such a claim may not be based on a party's non-disclosure. *Marchakov v. Chaampagne*, No. 00-1861, 2004 WL 1542227, at *4 (R.I. Super. Ct. July 8, 2004); *see also Travelers Indem. Co. v. Children's Friend and Serv., Inc.*, No. PC98-2187, 2005 WL 3276224, at *8 (R.I. Super Ct. Dec. 1, 2005) (the claim of negligent misrepresentation "involves" the "intentional act" of "speech").

**\*5** Defendants argue they are entitled to summary judgment on this claim because Plaintiff fails to show any misrepresentations by Defendants or evidence of

his own reliance. ECF No. 29 at 29. Plaintiff asserts there is "[s]ufficient evidence" that Defendants made a misrepresentation by promoting Abilify as a "safe medication" while "failing to warn of its impulsive behavior side effects." ECF No. 34 at 21. As discussed above, Plaintiff does not point to any evidence in the record to demonstrate Abilify was (or is) not "safe"—indeed it is undisputed that Abilify is still on the market—and it is clear that Defendants' supposed failure to warn is an omission, not a misrepresentation. What's more, Plaintiff admitted in his deposition that he did not rely on Defendants' statements regarding Abilify because he did not read the label or research the drug on his own. ECF No. 29-3 at 7, 11. Therefore, summary judgment on this claim is warranted.

*Fraudulent Concealment*. To prove fraudulent concealment, a plaintiff must prove "(1) that the defendant made an actual misrepresentation of fact; and (2) that, in making such misrepresentation, the defendant fraudulently concealed the existence of plaintiff's causes of action." *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 182 (R.I. 2008). "Mere silence or inaction on the part of the defendant does not constitute actual misrepresentation in this context." *Id.* There must be an "express representation" or "other affirmative conduct." *Caianiello v. Shatkin*, 82 A.2d 826, 829 (R.I. 1951).

This claim fares no better for Plaintiff. Defendants are entitled to summary judgment because their supposed failure to warn is an omission that is not actionable as fraudulent concealment, and, again, Plaintiff does not point to any record evidence to support the naked assertion that Defendants' marketing of Abilify "as safe and fit for consumers," ECF No. 34 at 22, is an actual misrepresentation. Therefore, Defendants are entitled to summary judgment on this claim.

*Breach of Warranties*. "A claim for breach of implied warranty of merchantability requires a plaintiff to prove that the product is defective, that it was in a defective condition at the time it left the hands of the seller, and that said defect is the proximate cause of the injury." *Dent v. PRRC, Inc.*, 184 A.3d 649, 656 (R.I. 2018). Additionally, a "plaintiff who claims breach of express warranty has the burden of proving that the statements or representations made by the seller induced her to purchase that product and that she relied upon such statements or representations." *Thomas*, 488 A.2d at 720. Rhode Island has adopted the Uniform Commercial Code provision barring a buyer from recovery for a breach of warranty unless the buyer notified the seller of

the breach within a reasonable time after the buyer discovers (or should have discovered) it. R.I. Gen. Laws § 6A-2-607(3) (a); *DiPetrillo v. Dow Chem. Co.*, 729 A.2d 677, 682 (R.I. 1999).

Defendants argue that Plaintiff is barred from recovery for breach of an implied or express warranty because he failed to provide them pre-suit notice of the breach and, alternatively, that the claims fail on the merits in view of the summary judgment record. ECF No. 29 at 34–36. Courts are deeply divided as to whether a buyer may satisfy the UCC "reasonable notice" provision by initiating a lawsuit. *See Langner v. Boston Sci. Corp.*, –F. Supp. 3d–, No. 8:20-cv-349, 2020 WL 6940131, at *5 (D. Neb. Oct. 1, 2020) ("jurisdictions are split on the issue" of whether UCC § 2-607(3)(a) requires pre-suit notification); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001) ("[S]ome courts have held, with varying degrees of analysis, that the filing of a lawsuit can, at least in some instances, satisfy the notice of breach requirement. Other courts have reached the opposite conclusion."). As Plaintiff mentions, ECF No. 34 at 23, the Supreme Court of Rhode Island previously held—based on unique facts—that "the filing of the complaint constituted sufficient notice of the breach of the implied warranty." *DiPetrillo*, 729 A.2d at 683. Moreover, "the sufficiency and reasonableness of time of [a] plaintiff's notice ordinarily are questions of fact for the jury." *Lariviere v. Dayton Safety Ladder Co.*, 525 A.2d 892, 898 (R.I. 1987).

**\*6** Nevertheless, the Court need not pass on the question of whether Plaintiff provided Defendants sufficient notice within a reasonable time because summary judgment is otherwise warranted as to Plaintiff's breach of warranty claims. As explained above, Plaintiff fails to cite any evidence that a reasonable jury may rely on to conclude that Abilify is defective (to establish a breach of an implied warranty) or that Defendants made statements or representations on which Plaintiff relied (to establish a breach of an express warranty). *See Lariviere*, 525 A.2d at 896 (there is a triable issue of fact as to a claim for breach of the implied warranty of merchantability only when there is "evidence from which a jury could find that [the product] at issue was not fit for ordinary purposes"); *Thomas*, 488 A.2d at 720 (affirming the trial court's entry of a directed verdict on a plaintiff's claim for breach of express warranty because the "defendant had not

printed on the bottle that the product would not produce a rash, thus plaintiff had no representation to rely upon"). Therefore, Defendants are entitled to summary judgment on Plaintiff's breach of warranty claims.

### IV. CONCLUSION

Accordingly, it is respectfully **RECOMMENDED** that Defendants' Motion for Summary Judgment, ECF No. 29, should be **GRANTED IN PART and DENIED IN PART** as follows:

(a) The motion is due to be **GRANTED** with respect to Plaintiff's claims for design defect, manufacturing defect, breach of express warranty, breach of implied warranty, negligence per se, negligent misrepresentation, and fraudulent concealment, as well as his claim under the Rhode Island Deceptive Trade Practices Act.

(b) The motion is due to be **DENIED** with respect to Plaintiff's claim for "failure to warn" (under either a strict liability or negligence theory).

**IN CHAMBERS** this 10th day of February 2021.

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.

**All Citations**

Slip Copy, 2021 WL 1041017

---

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 7

2010 WL 2813788
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re FORD MOTOR CO. E–350 VAN
PRODUCTS LIABILITY LITIGATION (NO. II).

Civil Action No. 03–4558 (GEB).
|
MDL No. 1687.
|
July 9, 2010.

**Attorneys and Law Firms**

Keven Hal Friedman, Kevin Peter Roddy, Daniel R. Lapinski, Wilentz Goldman & Spitzer, Woodbridge, NJ, Lawrence Jay Sass, West Orange, NJ, Randall K. Berger, Kirby McInerney LLP, New York, NY, for Plaintiff.

C. Scott Toomey, Campbell, Campbell, Edwards & Conroy, PC, Wayne, PA, James Demosthenes Smith, Lawrence G. Scarborough, Meridyth M. Andresen, Bryan Cave LLP, Phoenix, AZ, Stephen Bradley Perkins, O'Melveny & Myers, LLP, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

BROWN, Chief Judge.

### *TABLE OF CONTENTS*

| | | | |
|---|---|---|---|
| Background ........................ | | | 4 |
| Analysis ........................ | | | 7 |
| I. | California ........................ | | 9 |
| | A. | Material Facts ..................... ........................ | 9 |
| | | 1. Greater All Nation................................................... | 9 |
| | | 2. First United............................................................. | 11 |
| | B. | Express Warranty ..................... ........................ | 12 |
| | | 1. Plaintiffs' Express Warranty Theory.................................... | 12 |
| | | 2. California Plaintiffs' Express Warranty Claims......................... | 16 |
| | C. | Implied Warranty ..................... ........................ | 20 |
| | | 1. Plaintiffs' Implied Warranty Theory..................................... | 20 |
| | | 2. Privity................................................................... | 21 |
| | D. | California Statutory Consumer Fraud Claims .......... ........................ | 25 |
| | E. | Unjust Enrichment .................... ........................ | 32 |
| | | 1. Plaintiffs' Unjust Enrichment Theory.................................... | 32 |
| | | 2. California Plaintiffs' Restitution Claims................................ | 33 |
| | F. | Summary ..................... ........................ | 35 |
| II. | Illinois ..................... | | 36 |

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 44 of 260
PageID: 69708
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

|       |      | A. | Material Facts ....................... |                       | ....................... 36 |
|       |      | B. | ICFA ....................... |                       | ....................... 38 |
|       |      |    | 1. | Statute of Limitations.................................................. | 38 |
|       |      |    | 2. | Actual Deception....................................................... | 43 |
|       |      | C. | Unjust Enrichment ....................... |                       | ....................... 45 |
|       |      | D. | Summary ....................... |                       | ....................... 48 |
| III.  | New Jersey ....................... |  |  |  | 48 |
|       |      | A. | Material Facts ....................... |                       | ....................... 49 |
|       |      |    | 1. | Macedonia................................................................. | 49 |
|       |      |    | 2. | Faith Tabernacle....................................................... | 49 |
|       |      |    | 3. | Social Clubhouse...................................................... | 50 |
|       |      |    | 4. | Bethany Baptist........................................................ | 51 |
|       |      | B. | NJCFA ....................... |                       | ....................... 52 |
|       |      |    | 1. | Motion for Summary Judgment.............................. | 52 |
|       |      |    | 2. | Motion to Strike....................................................... | 54 |
|       |      | C. | Express Warranty .................... |                       | ....................... 58 |
|       |      | D. | Implied Warranty .................... |                       | ....................... 60 |
|       |      | E. | Unjust Enrichment .................... |                       | ....................... 61 |
|       |      | F. | Summary ......................... |                       | ....................... 63 |
| IV.   | Georgia ......................... |  |  |  | 64 |
|       |      | A. | Material Facts ....................... |                       | ....................... 64 |
|       |      | B. | Express and Implied Warranty .................... |                       | ....................... 64 |
|       |      | C. | Georgia FBPA ....................... |                       | ....................... 67 |
|       |      | D. | Unjust Enrichment ....................... |                       | ....................... 70 |
|       |      | E. | Summary ......................... |                       | ....................... 72 |
| V.    | Pennsylvania ......................... |  |  |  | 72 |
|       |      | A. | Material Facts ......................... |                       | ....................... 73 |
|       |      |    | 1. | Bethel....................................................................... | 73 |
|       |      |    | 2. | Hickman Temple...................................................... | 74 |

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 45 of 260
PageID: 69709
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

|   |   | 3. | Mt. Airy.......................................................................... | 74 |
|   | B. |   | Express Warranty and Implied Warranty: Notice ............... | ....................... 74 |
|   | C. |   | Express Warranty ................... | ....................... 77 |
|   | D. |   | Implied Warranty ................... | ....................... 78 |
|   | E. |   | Pennsylvania UTPCPL ................... | ....................... 81 |
|   | F. |   | Unjust Enrichment ................... | ....................... 83 |
|   | G. |   | Summary ....................... | ....................... 86 |
| VI. |   |   | Florida ........................ | 87 |
|   | A. |   | Material Facts ................... | ....................... 87 |
|   |   | 1. | Blandon........................................................................ | 87 |
|   |   | 2. | Diaz.............................................................................. | 88 |
|   |   | 3. | Mestre.......................................................................... | 89 |
|   | B. |   | *Kia Motors* ..................... | ....................... 90 |
|   | C. |   | Express Warranty ................... | ....................... 91 |
|   | D. |   | Implied Warranty ................... | ....................... 92 |
|   | E. |   | FDUTPA ....................... | ....................... 93 |
|   | F. |   | Unjust Enrichment ....................... | ....................... 97 |
|   | G. |   | Summary ........................ | ....................... 98 |
| VII. |   |   | Texas ........................ | 99 |
|   | A. |   | Material Facts ....................... | ....................... 99 |
|   | B. |   | *Inman* ........................ | ....................... 99 |
|   | C. |   | Express and Implied Warranty ........................ | ................... 10 2 |
|   | D. |   | DTPA ....................... | ................... 103 |
|   | E. |   | Unjust Enrichment ........................ | ................... 107 |
|   | F. |   | Summary ........................ | ................... 108 |
| VIII. |   |   | Missouri ........................ | 108 |
|   | A. |   | Material Facts ....................... | ................... 109 |
|   | B. |   | *Briehl* and *O'Neil* ....................... | ................... 110 |
|   | C. |   | Express and Implied Warranty ................... | ................... 11 5 |

Case 1:19-md-02875-BMB-SAK   Document 2057-2   Filed 05/10/22   Page 46 of 260
In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...
PageID: 69710

| | D. | MMPA ......................... | ...................... 116 |
|---|---|---|---|
| | E. | Unjust Enrichment ...................... | ...................... 117 |
| | F. | Summary ......................... | ...................... 118 |
| IX. | | Michigan ......................... | 119 |
| | A. | Material Facts ....................... | ...................... 119 |
| | B. | *Hendricks* and *Henry* ...................... | ...................... 121 |
| | C. | Express Warranty ....................... | ...................... 123 |
| | D. | Implied Warranty ....................... | ...................... 125 |
| | E. | MCPA ...................... | ...................... 127 |
| | F. | Unjust Enrichment ....................... | ...................... 130 |
| | G. | Summary ......................... | ...................... 132 |
| X. | | New York ......................... | 132 |
| | A. | Material Facts ...................... | ...................... 132 |
| | | 1. | Bishop Anderson............................................ | 132 |
| | | 2. | Barrett............................................ | 133 |
| | B. | *Frank* as Applied to Bishop Anderson ................... | ...................... 136 |
| | C. | *Frank* as Applied to Barrett ...................... | ...................... 139 |
| | D. | Bishop Anderson's Express and Implied Warranty Claims: Notice .......... | ...................... 141 |
| | E. | Bishop Anderson's Express Warranty Claim ................... | ...................... 142 |
| | F. | Bishop Anderson's Implied Warranty Claim ................... | ...................... 143 |
| | G. | Bishop Anderson's GBL Claims ...................... | ...................... 14 5 |
| | H. | Bishop Anderson's Unjust Enrichment Claim ................... | ...................... 146 |
| | I. | Summary ......................... | ...................... 147 |
| XI. | | Massachusetts ......................... | 147 |
| | A. | Material Facts ....................... | ...................... 147 |
| | B. | *Iannacchino* ...................... | ...................... 149 |
| | C. | Express Warranty ...................... | ...................... 153 |
| | | 1. | Notice............................................ | 153 |
| | | 2. | No Express Warranty............................................ | 155 |

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 47 of 260
PageID: 69711

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

D.    Unjust Enrichment ........................    .................... 156

E.    Summary .........................    .................... 157

Conclusion .........................    157

**\*1** This matter comes before the Court on the motions for summary judgment filed by Defendant Ford Motor Company ("Ford") in this multidistrict litigation. Ford has filed a total of 21 summary judgment motions in this putative class action. This Court previously granted two of these motions. In the remaining 19 motions, Ford requests that summary judgment be granted in its favor with respect to all 20 remaining named Plaintiffs, pursuant to the laws of the 11 states wherein Plaintiffs reside. This Opinion will address all of Ford's remaining summary judgment motions, with respect to Plaintiffs from California (Doc. No. 188), Illinois (Doc. No. 226), New Jersey (Doc. Nos. 210, 212, 214, and 216), Georgia (Doc. No. 221), Pennsylvania (Doc. Nos. 228, 230, and 232), Florida (Docs. No. 190, 194, and 197), Texas (Doc. No. 219), Missouri (Doc. No. 202), Michigan (Doc. No. 223), New York (Docs. No. 204 and 206), and Massachusetts (Doc. No. 208). In this Opinion, this Court will also decide Ford's motion to strike Plaintiffs' August 7, 2009 letter and affidavit (Doc. No. 272).

For the following reasons, Ford's remaining motions for summary judgment will be granted in part, granted without prejudice in part, and denied in part. Ford's motion to strike the August 7, 2009 letter and affidavit will be granted.

### *Background*

On June 16, 2005, the Judicial Panel on Multidistrict Litigation transferred five actions[1] to this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re Ford Motor Co. E–350 Van Prods. Liab. Litig. (No. II),* 374 F.Supp.2d 1353 (J.P.M.L.2005). Following the transfer to this Court, Plaintiffs filed a Consolidated Amended Class Action Complaint ("Complaint"). In the Complaint, Plaintiffs allege that their Ford E–350 "15–passenger" vans were defectively designed due to a high center of gravity that leads to an unusually high rollover rate and, consequently, an increased risk of death or injury. No Plaintiffs or members of the proposed class have actually suffered a rollover. Plaintiffs claim economic harm because the alleged defect purportedly makes the E–350 vans unsuitable and unfit for transporting 15 passengers. The Complaint asserts claims on behalf of Plaintiffs and a putative nationwide class that includes: "all persons and entities who purchased or otherwise lawfully acquired E350 '15–passenger' vans (a/k/a E350 Super Club Wagons, Econoline '15–passenger' vans, or E350 Super Duty Extended Length passenger vans) manufactured by Defendant Ford Motor Company ... model years 1991–2005, and who reside in the fifty states and/or the District of Columbia." (Compl.¶ 1.) This class includes persons or entities who purchased new or used model years 1991–2005 Ford E–350 vehicles between January 1, 1991 and the date of the filing of the Complaint, inclusive. The proposed class, however, specifically excludes those who claim damages for personal injury as a result of purchasing or leasing a Ford E–350 van. (Compl.¶ 63.)

**\*2** Each named Plaintiff asserts four causes of action: (1) breach of express warranty; (2) breach of implied warranty; (3) unjust enrichment; and (4) violation of the state consumer fraud statutes applicable to each Plaintiff. Specifically, Plaintiffs seek damages for the alleged diminution in value of their vehicles as a result of the vehicles' alleged defects; the cost of purchasing or leasing additional vehicles and of training drivers; equitable relief requiring Ford to correct the alleged defect and enjoining Ford from distributing any E–350 van until the alleged defect is corrected; restitution; disgorgement of revenues; and applicable statutory damages.

The Complaint initially asserted claims on behalf of various named Plaintiffs from five states: Alabama, Arkansas, California, Illinois, and New Jersey. Ford moved to dismiss the entire Complaint. In an Opinion and Order dated September 2, 2008, Senior United States District Judge Harold A. Ackerman granted in part and denied in part Ford's motion.[2] *In re Ford Motor Co. E–350 Van Prods. Litig. (No. II),* No. 03–4558, MDL No. 1687, 2008 WL 4126264, at \*29 (D.N.J. Sept.2, 2008) (hereinafter "MTD Opinion").[3] Judge Ackerman applied the law of the Plaintiffs' home states to their respective claims, except where no material difference existed between the various states' laws. *Id.* at \*3. The court granted Ford's motion to the extent that Judge Ackerman: 1) dismissed the Alabama, Arkansas, and Illinois

Plaintiffs' express warranty claims; 2) dismissed the Alabama, Arkansas, and Illinois Plaintiffs' implied warranty claims; 3) dismissed the Alabama and Arkansas Plaintiffs' respective state consumer fraud statutory claims; and 4) dismissed one of the three state consumer fraud statutory claims advanced by the California Plaintiff. *Id.* at \*29–30. Judge Ackerman denied the remainder of Ford's motion. In the previous summary judgment opinion, this Court granted summary judgment in Ford's favor on the sole remaining claim of unjust enrichment asserted by the Alabama and Arkansas Plaintiffs (Doc. No. 286). Therefore, the following claims brought by the initially named Plaintiffs in the Complaint remain pending: 1) the California and New Jersey Plaintiffs' express warranty claims; 2) the California and New Jersey Plaintiffs' implied warranty claims; 3) the California, New Jersey, and Illinois Plaintiffs' unjust enrichment claims; 4) the Illinois and New Jersey Plaintiffs' respective state consumer fraud statutory claims; and 5) two of the California Plaintiff's state consumer fraud statutory claims. *Id.*

After Judge Ackerman resolved Ford's motion to dismiss, the parties in November 2008 agreed to the joinder of newly named Plaintiffs from many new jurisdictions. (Doc. No. 150.) Following extensive discovery, Ford filed 21 separate motions for summary judgment, seeking judgment against all named Plaintiffs on all claims. This Court previously granted two of Ford's motions. At present, this case includes 20 named Plaintiffs from 11 states. These states include the three remaining initial states—California, Illinois, and New Jersey —and eight additional states: Georgia, Pennsylvania, Florida, Texas, Missouri, Michigan, New York, and Massachusetts. [4]

### *Analysis*

**\*3** A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). An

issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The substantive law will identify which facts are "material." *Anderson,* 477 U.S. at 247–48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Peters v. Del. River Port Auth. of Pa. & N.J.,* 16 F.3d 1346, 1349 (3d Cir.1994). It is inappropriate for a district court to resolve factual disputes or make credibility determinations at the summary judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc. .,* 974 F.2d 1358, 1363 (3d Cir.1992).

This does not mean, however, that a district court may ignore the weight of the evidence. *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. AT & T,* No. 99–4982, 2004 WL 190295, at \*3 (D.N.J. Jan.9, 2004) (quoting *Anderson,* 477 U.S. at 249). To raise a genuine issue of material fact, the summary judgment opponent " 'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir.1993); *see also Anderson,* 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

As Judge Ackerman did in the MTD Opinion, this Court will apply the law of each Plaintiff's home state to that Plaintiff's claims. MTD Opinion at \*3.

### I. California

This Court will first address Ford's motion for summary judgment as to the two California Plaintiffs in this action, Greater All Nation Pentecost Church of Jesus Christ ("Greater All Nation") and First United Methodist Church of Santa Barbara ("First United"). In the MTD Opinion, the Court dismissed Greater All Nation's claim under California's Consumers Legal Remedies Act for lack of standing, but

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 49 of 260 PageID: 69713

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

allowed the remainder of Greater All Nation's claims—express warranty, implied warranty, unjust enrichment, and claims under two other California consumer fraud statutes—to proceed. The parties added California Plaintiff First United to this case after the Court's resolution of the motion to dismiss, and therefore the Court has not yet addressed any of the claims asserted by First United. For the following reasons, this Court will grant Ford's motion in its entirety as to Greater All Nation. Ford's motion as to First United will be granted with regard to the warranty claims and granted without prejudice with regard to the statutory and unjust enrichment claims.

### A. Material Facts

#### 1. Greater All Nation

**\*4** James P. Jennings, Jr., a deacon at Greater All Nation, testified at deposition on behalf of Greater All Nation that he personally purchased a used 1996 model E–350 van with his own funds in 1999, with the intention to donate the van to the church. (Jennings Dep. at 41:13, 53:2–23.) [5] The church did not ask Deacon Jennings to donate the van, and while Jennings consulted with officials at Greater All Nation (*id.* at 53:10–25), those officials offered no guidance "because it wasn't their money" (*id.* at 57:10). Deacon Jennings purchased the vehicle from Fox Leasing for $11,687.15, which included an optional $1,100 extended service agreement. (*Id.* at 82:12–83:8.) At the time of purchase by Deacon Jennings, the Greater All Nation vehicle had traveled 154,486 miles. (*Id.* at 81:9–14.)

Deacon Jennings testified that in buying a van to donate to the church, he "was looking to fill like 15 people in a van that we can go around [and] just pick up." (*Id.* at 54:25–55:1.) When he purchased the E–350 van from Fox Leasing, he asked for a 15–passenger van, and the salesperson represented to Deacon Jennings that the E–350 was a 15–passenger van. (*Id.* at 117:17–22.) Aside from this representation, however, no one at Fox Leasing or the other dealerships Deacon Jennings visited made any statements about steering, handling, or stability, and no one presented Deacon Jennings with any materials or brochures issued by Ford or anyone else. (*Id.* at 58:22–25; 60:7–13.) Deacon Jennings also had not viewed any Ford or government websites regarding 15–passenger vans, seen any press releases, advertisements, or media coverage regarding E–350 vans, or had any discussions with Ford officials. (*Id.* at 63:9–64:6.) Deacon Jennings purchased the E–350 based on price, stating that he got "the best deal." (*Id.* at 56:17.)

Greater All Nation's E–350 has traveled approximately 20,000 miles over an eight-year period, transporting members to and from church. (*Id.* at 105:15–106:5.) Deacon Jennings testified that the church has never carried more than 12 passengers in the van because the seats are too small for more than 12 people. (*Id.* at 45:14–22; 110:24–111:12.) He further testified that on two occasions, while he was driving the van, he felt the van might roll over, but he maintained control and did not actually roll over. (*Id.* at 69:7–72–17.) Deacon Jennings stated at deposition that he had some difficulty obtaining automobile insurance on Greater All Nation's behalf for the E–350, but he ultimately secured insurance connected to his personal insurance policy. (*Id.* at 77:17–80:22 .) Deacon Jennings conceded that the church can presently fit as many people into the van as it could when he first purchased it (*id.* at 110:4–6), and that the church has not sought to sell the van (*id.* at 110:7–8). When asked why Greater All Nation has not sold the van, he explained, "It's serving the purpose of—I won't say it's serving the purpose but it's doing the job that we need [it] to do. It's transporting people." (*Id.* at 110:10–12.)

#### 2. First United

**\*5** Sue Zilotto, chair of First United's Board of Trustees, testified at deposition on behalf of First United. Ford alleges that Boy Scout Troop 1 (the "Troop") purchased a new 1995 model E–350 in 1995 for approximately $26,000 from the Mel Clayton Ford dealership, and that the Troop sold the van to the church for $1.00 with the understanding that the Troop could use the van as needed. (Ford's Statement of Undisputed Material Facts ("SUMF") No. 2 at ¶¶ 23, 29.) Zilotto conceded these facts as stated in Plaintiffs' Responses to Interrogatories. (Zilotto Dep. at 28:3–29:14.) However, Plaintiffs now contend that First United purchased the van directly from the Ford dealership, as supported in the record by the Retail Buyers Order for the church's E–350. (Lapinski Certif., Ex. 34 at FUM000004.) Zilotto agreed at deposition that First United purchased the van, after previously stating that the Troop did.

Zilotto asserted that the church believed, based on the van's window sticker, that the van was safe for carrying 15 passengers, but was unsure whether church officials had viewed other materials regarding the van. Zilotto further stated that the church acted based on advertisements that Ford sent directly to many churches. (Zilotto Dep. at 33:1–35:17; 111:3–5.) Zilotto claimed that the church purchased the van because it was safe to carry 15 passengers. (*Id.*

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 50 of 260 PageID: 69714

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

at 33:1–5.) The church used the van to transport up to 15 passengers at a time from 1995 until approximately January 2003, when the church, after learning through the news media of rollover issues, followed the advice of its automobile insurer to remove the last row of seats from the van. (Pls.' Supp. Statement of Disputed Material Facts ("Pls.' Supp. Statement") at ¶¶ 445–451; Ford's SUMF No. 2 at ¶¶ 31–35.) First United's insurer did not *require* this change as a condition of continued coverage. (Zilotto Dep. at 61:4–20.) First United also adopted other recommendations made by its insurer, including that the van not be driven in excess of 60 miles per hour, that only trained, Class 2–licensed drivers be used, and that heavy baggage not be piled in the back area of the van. (*Id.* at 24:15–21.) Zilotto testified that the removal of the back row of seating limited First United's use of the van by restricting the number of people it could transport to retreats or out-of-town meetings. (*Id.* at 26:17–22.)

### B. Express Warranty

#### 1. Plaintiffs' Express Warranty Theory

As do the other Plaintiffs, Greater All Nation and First United (collectively the "California Plaintiffs") allege in their First Causes of Action a breach of express warranty by Ford under Section 2–313 of the Uniform Commercial Code ("UCC"), as codified under California law by Cal. Com.Code § 2313. In the Complaint, Plaintiffs assert that Ford "expressly warranted by its representations, advertisements and statements, including Ford's labeling the E350 as a '15–passenger' van, that the E350 van was fit to safely accommodate and transport '15 passengers,' and that the E350 could legally and practically be used for that purpose." (Compl.¶ 78.) Ford allegedly breached this express warranty by distributing a "defective vehicle which could not be safely, legally, or practically used to accommodate and safely transport 15 passengers." (*Id.* ¶ 79.) Before addressing the express warranty claims of the individual Plaintiffs, this Court will first consider the general express warranty theory asserted by all Plaintiffs.

**\*6** As discussed in the MTD Opinion, UCC § 2–313 recognizes that a seller may create an express warranty by three general classes of statements or representations:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See, e.g.,* Cal. Com.Code § 2313(1); 810 Ill. Comp. Stat. § 5/2–313(1); N.J.S.A. § 12A:2–313(1). The UCC stipulates that, to create an express warranty, a seller need not "use formal words such as 'warrant' or 'guarantee' " or "have a specific intention to make a warranty." Cal. Com.Code § 2313(2); *see also, e.g.,* 810 Ill. Comp. Stat. § 5/2–313(2); N.J.S.A. § 12A:2–313(2). However, "affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Cal. Com.Code § 2313(2); *see also, e.g.,* 810 Ill. Comp. Stat. § 5/2–313(2); N.J.S.A. § 12A:2–313(2).

Judge Ackerman held in the MTD Opinion that at that stage of this litigation, all Plaintiffs sufficiently alleged the existence of an express warranty, and breach thereof, in claiming Ford's "core description" of the E–350 van as a 15–passenger van constituted an express warranty.[6] MTD Opinion at \*4. The Court reasoned that "accepting Plaintiffs' allegations as true, Ford's representation that the E–350 van was capable of transporting 15 people was not a subjective statement relating to the good's value, but rather an objective representation warranting the van's design and safety." *Id.* The court ultimately determined that several factual issues precluded a ruling as a matter of law on the merits of all Plaintiffs' express warranty claims at the motion to dismiss stage, including "whether Ford's description of the E350 van as a '15–passenger' van or Ford's outfitting the vans with seats for 15 passengers independently supports an express warranty; if so, whether any such warranty was the basis of the bargain between Plaintiffs and Ford; and whether Ford breached any such warranty." *Id.* at \*5.

In opposing Ford's motions for summary judgment, Plaintiffs evince significant confusion regarding the basis for their express warranty claims. In one passage in their brief, Plaintiffs appear to disclaim any reliance on an *express* warranty of safety:

> Although Ford attempts to paint Plaintiffs' express warranty claims

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 51 of 260
PageID: 69715

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

as grounded in representations of 'safety,' Plaintiffs do not claim that Ford *expressly* represented that its vehicles were safe. Instead, Plaintiffs allege, and Ford cannot deny, that Ford affirmatively represented and described the vehicle as being able to transport 15–passengers. While Ford expressly warranted the vehicle as being capable of transporting 15 passengers, it is *implied* in Ford's representation that the vehicle is able to do so safely.

**\*7** (Pls.' Omnibus Br. at 50 (emphases added).) The Court construed Plaintiffs' express warranty claim in the MTD Opinion as alleging that Ford made an "objective representation warranting the van's design and safety" in describing the E–350 van in its advertisements and on its labels as a "15–passenger van." MTD Opinion at \*4. Yet in the above-quoted argument, Plaintiffs now appear to discard this theory that Ford *expressly* warranted the safety of the E–350 van in carrying 15 passengers, and instead assert that Ford only expressly warranted the E–350 van as being *capable* of transporting 15 passengers, and that any representation of safety in that capability is merely implied. As Ford contends, Plaintiffs appear to argue that Ford breached an "implied express" warranty of safety. By legal definition, an express warranty must be express; an implied warranty might give rise to a claim for breach of implied warranty, a claim which each Plaintiff also pursues. Therefore, based on this rendition of Plaintiffs' argument, this Court would be inclined to conclude that all of Plaintiffs' express warranty claims fail as a matter of law.

The Court cannot rely entirely on Plaintiffs' apparent concession, however, due to Plaintiffs' shifting descriptions of its express warranty theory. In the paragraph immediately preceding the above-quoted language, Plaintiffs state that "[i]t is obvious from the evidence presented to this Court that Plaintiffs were induced to purchase E–350 vans based upon the *express* warranty that the vehicles were capable of *safely* transporting 15 passengers." (Pls.' Omnibus Br. at 49 (emphases added).) Thus, in one breath Plaintiffs contend that Ford *expressly* warranted safety in the carrying of 15 passengers, but in the next breath Plaintiffs argue that such safety was only *implied* by Ford. Because on these motions, this Court must view the underlying facts and

draw all reasonable inferences in the light most favorable to Plaintiffs as the non-moving parties, *see Matushita,* 475 U.S. at 587, this Court will not summarily conclude that Plaintiffs have foresworn an actionable express warranty theory. This Court must examine the record relevant to each Plaintiff and consider the law regarding express warranty in each relevant jurisdiction, beginning with the California Plaintiffs. For the following reasons, this Court will grant Ford's motion for summary judgment as to the California Plaintiffs' express warranty claims.

*2. California Plaintiffs' Express Warranty Claims*

Determining whether a statement by a seller constitutes an express warranty under California law involves three inquiries:

First, the court must determine whether the seller's statement constitutes an "affirmation of fact or promise" or "description of the goods" under [§ 2313(1)(a) or (b) ], or whether it is rather "merely the seller's opinion or commendation of the goods" under [§ 2313(2) ]. Second, assuming the court finds the language used susceptible to creation of a warranty, it must then be determined whether the statement was "part of the basis of the bargain." Third, the court must determine whether the warranty was breached.

**\*8** *Keith v. Buchanan,* 173 Cal.App.3d 13, 220 Cal.Rptr. 392, 395 (Cal.Ct.App.1985).

Under California law, an express warranty arises only from "specific and unequivocal" statements or "explicit guarantees." *See Maneely v. General Motors Corp.,* 108 F.3d 1176, 1181 (9th Cir.1997) (citing *Hauter v. Zogarts,* 14 Cal.3d 104, 120 Cal.Rptr. 681, 534 P.2d 377, 379 (Cal.1975); *Keith,* 220 Cal.Rptr. at 396–97). For example, in *Hauter,* the Supreme Court of California construed a label on a golf training device "COMPLETELY SAFE BALL WILL NOT HIT PLAYER" as a statement of fact creating an express warranty of complete safety from the ball hitting the user. 120 Cal.Rptr. 681, 534 P.2d at 380–383 & n. 10. Similarly, in *Keith,* the descriptions of a sailboat in sales brochures as "a picture of sure-footed seaworthiness" and "a carefully well-equipped and very seaworthy vessel" constituted an express warranty of seaworthiness. 220 Cal.Rptr. at 396–97. The Ninth Circuit in *Maneely,* applying California law, concluded that a visual depiction of people sitting in the cargo bed of pickup trucks did not create an express warranty because "no reasonable jury could find that GMC promised that riding

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 52 of 260 PageID: 69716

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

in the back of a moving truck was safe simply by depicting people in the beds of pickup trucks." 108 F.3d at 1181.

Here, Ford's description of the E–350 van as a "15–passenger van" goes beyond the mere visual depictions at issue in *Maneely,* but does not rise to the level of an express warranty of safety as found in *Hauter* and *Keith.* As Plaintiffs ultimately appear to recognize, the statement that the E–350 is a "15–passenger van" does not explicitly, specifically, and unequivocally include a representation of safety. California law does not allow for an express warranty claim in the absence of such a specific "affirmation or promise made by the seller to the buyer which ... becomes part of the basis of the bargain." Cal. Com.Code § 2313(1)(a); *see Pisano v. Am. Leasing,* 146 Cal.App.3d 194, 194 Cal.Rptr. 77, 79–80 (Ct.App.1983). It is undisputed that no Ford representative, let alone any other person involved in the sale of the vehicles to the California Plaintiffs, made an express representation of *safety* with regard to the transport of 15 passengers. While the precise understandings of the sellers and exactly what the California Plaintiffs knew about the safety risks of the E–350 van remain in dispute, Ford has established that no one *explicitly* represented to the California Plaintiffs that the E–350 van was safe for carrying 15–passengers. After extensive discovery, Plaintiffs point to no evidence to the contrary, nor do they identify any specific, unequivocal statement made to the California Plaintiffs, or those affiliated with them, regarding safety. Plaintiffs allege in their Complaint that in promotional materials and press releases, Ford made certain representations regarding safety, such as that the E–350 van was "very safe" or "America's Most Trustworthy." (Compl.¶¶ 48–55.) However, as the Court ruled in the MTD Opinion, these statements and similar allegations in the Complaint are non-actionable opinion, or puffery, and cannot constitute an express warranty. MTD Opinion at *4. Plaintiffs do not pursue any such theory in opposing Ford's motion for summary judgment, and instead rely on Ford's "core description" that lacks any specific, explicit reference to safety.

**\*9** A description of goods that becomes part of the basis of the bargain "creates an express warranty that the goods shall conform to the description," Cal. Com.Code § 2313(1)(b), but the only description alleged and supported in the record here is that the E–350 van is a "15–passenger van." This bare description, while it certainly can be interpreted to *imply* that the van can safely carry 15 passengers, does not contain the explicit guarantee found in cases such as *Hauter* and *Keith.* Plaintiffs argue that an "express warranty by description not only promises that the product is that it is

described to be, but also that the product works as described." (Pls.' Omnibus Br. at 49.) However, the cases Plaintiffs cite in support of this proposition involve clear statements that make their promises explicit, and are dissimilar to the purported express warranty here. For example, one case cited by Plaintiffs involved a defendant's description of a camera as an "electronic color camera." *See Metowski v. Traid Corp.,* 28 Cal.App.3d 332, 104 Cal.Rptr. 599, 600–01 (Ct.App.1972) (reversing trial court's dismissal of express warranty claim). The court in *Metowski* reversed the trial court's dismissal of the express warranty claim without analysis of the content of the express warranty, and instead based its holding on its finding that plaintiff had provided timely notice of its claim. *Id.* at 602–04. In any event, the description amounting to an express warranty in *Metowski* stipulated only that the camera took color pictures, and did not warrant anything further. Similarly, another case cited by Plaintiffs concerned a seller's description of a gear as a "36–tooth gear." *See Square Deal Mach. Co. v. Garrett Corp.,* 128 Cal.App.2d 286, 275 P.2d 46, 49 (Cal.Ct.App.1954). That case, however, involved a claim for *implied* warranty, not express warranty. *Id.* at 51. Even accepting Plaintiffs' description of that case that a " '36–tooth gear' promises gear with 36 teeth,' " such a warranty says nothing affirmatively about safety or any other characteristic.

Just as defendant only expressly promised a 36–tooth gear in *Square Deal,* Ford here explicitly promised only a 15–passenger van. Plaintiffs do not dispute that the E–350 van can hold 15 passengers, and based upon this undisputed record, Ford has not breached any warranty that the vehicle can transport 15–passengers.[7] Plaintiffs instead contend that the E–350 van cannot transport 15–passengers safely, and is not fit for such a purpose. On these facts, such a contention might lie in implied warranty, but not in express warranty. As Plaintiffs ultimately concede, "Ford expressly warranted the vehicle as being capable of transporting 15 passengers," and it is only "implied in Ford's representation that the vehicle is able to do so safely." (Pls.' Omnibus Br. at 50.) Based on the undisputed record and pursuant to California law, Ford's statement that the E–350 van is a "15–passenger van" does not create an express warranty of the safety of the vehicle in transporting 15 passengers. This Court will grant summary judgment in favor of Ford on the California Plaintiffs' claims for breach of express warranty.

*C. Implied Warranty*
**\*10** Ford moves for summary judgment on the California Plaintiffs' Second Causes of Action, breach of implied

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 53 of 260
PageID: 69717

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

warranty, on two grounds. First, Ford contends that California law requires that a plaintiff asserting a breach of implied warranty must stand in privity with the defendant, and that here the California Plaintiffs are not in privity with Ford. Second, Ford renews the argument first made on its motion to dismiss that the California Plaintiffs have not shown actual injury sufficient to maintain an implied warranty claim. This Court agrees with Ford's privity argument and will grant Ford's motion for summary judgment as to the California Plaintiffs' implied warranty claims.

### 1. Plaintiffs' Implied Warranty Theory

As do the other Plaintiffs, the California Plaintiffs in their Second Causes of Action assert that Ford breached the implied warranty of merchantability pursuant to UCC § 2–314, as codified under California law by Cal. Com.Code § 2314. Before addressing the implied warranty claims of the individual Plaintiffs, this Court will first consider the general implied warranty theory asserted by all Plaintiffs. Plaintiffs allege that Ford impliedly warranted "that the E350 vans were merchantable and was [*sic* ] fit for the ordinary purposes for which a 15–passenger van is used." (Compl.¶ 83.) Plaintiffs contend that Ford breached this implied warranty because the vehicles were "totally unfit to accommodate and safely transport 15 passengers." (Compl.¶ 84.)

Section 2–314 of the UCC provides generally that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *See, e.g.,* Cal. Com.Code § 2314; 810 Ill. Comp. Stat. § 5/2–314; N.J.S.A. § 12A:2–314. To be merchantable, goods must, among other things, be "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label if any." Cal. Com.Code § 2314(2)(c), (f); *see also, e.g.,* 810 Ill. Comp. Code. § 5–214(2)(c), (f).

### 2. Privity

With regard to the California Plaintiffs, Ford first argues that these Plaintiffs cannot maintain an implied warranty claim against Ford because discovery has established that they do not stand in vertical contractual privity with Ford. Unlike courts in some other jurisdictions, California courts have retained the traditional privity requirement. *See, e.g.,* Cardinal Health 301, Inc. v. Tyco Elecs. Corp., 169 Cal.App.4th 116, 87 Cal.Rptr.3d 5, 23 (Cal.Ct.App.2008) ("Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied warranty of fitness, unless

an exception applies."); *see also* Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1023–24 (9th Cir.2008) (applying California law). "Vertical privity means that the buyer and seller were parties to the sales contract." Cardinal Health, 87 Cal.Rptr.3d at 23. To stand in privity, a buyer and seller must be "in adjoining links of the distribution chain." Clemens, 534 F.3d at 1023; *see also* Osborne v. Suburu of Am., Inc., 198 Cal.App.3d 646, 243 Cal.Rptr. 815, 820 n. 6 (Cal.Ct.App.1988) (quoting Clark and Smith, The Law of Product Warranties (1984) ¶ 10.01[1], p. 10–3). Therefore, an "end consumer ... who buys from a retailer is not in privity with a manufacturer." Clemens, 534 F.3d at 1023.

**\*11** Here, Deacon Jennings purchased a used E–350 van with his own funds from Fox Leasing, and Deacon Jennings donated the van to Greater All Nation. Disputed facts exist regarding from whom First United acquired its vehicle. At one point during her deposition, in accordance with Plaintiff's Responses to Interrogatories, Zilotto testified that Troop 1 purchased the van from the Mel Clayton Ford dealership and sold the vehicle to First United for $1.00. Later in her deposition, Zilotto asserted, based on the Retail Buyers Order for the van, that First United purchased the van directly from Mel Clayton Ford. In the cases of both California Plaintiffs, however, it undisputed that neither church, let alone a church member or other affiliated group, acquired its vehicle directly from the manufacturer, Ford. The vans were purchased from an independent leasing company and a retail Ford dealership, respectively. Because the California Plaintiffs are separated from Ford by at least one link in the chain of distribution, they are not in privity with Ford. *See, e.g.,* Osborne, 243 Cal.Rptr. at 820 n. 6 ("For example, the distributor is normally in vertical privity with the manufacturer, and the ultimate retail buyer is normally in vertical privity with the dealer. But if the retail buyer seeks warranty recovery against a manufacturer with whom he has no direct contractual nexus, the manufacturer would seek insulation via the vertical privity defense." (quoting Clark and Smith, The Law of Product Warranties (1984) ¶ 10.01[1], p. 10–3)). Therefore, unless an exception to the privity requirement applies, the California Plaintiffs cannot establish implied warranty claims against Ford because they do not stand in the requisite privity with Ford.

The California Plaintiffs do not contest that they fail to meet the strict requirements of vertical privity. Instead, they argue that the privity requirement does not apply to their implied warranty claims. The California Plaintiffs point to an exception referenced by the Ninth Circuit in *Clemens,* namely

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 54 of 260
PageID: 69718

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

"when the plaintiff relies on written labels or advertisements of a manufacturer." *Clemens,* 534 F.3d at 1023 (citing *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 268 P.2d 1041, 1048–49 (Cal.1954)). Here, the California Plaintiffs contend that they relied on the van's window sticker and other written labels identifying the E–350 van as a "15–passenger van." However, the California Plaintiffs ignore *Burr,* the Supreme Court of California case cited by the Ninth Circuit in *Clemens. Burr* makes clear that this exception only excuses the privity requirement for *express* warranty claims. *Burr,* 268 P.2d at 1048–49. This Court has already concluded that Ford is entitled to summary judgment on the California Plaintiffs' express warranty claims, therefore this exception to the privity requirement does not save their implied warranty claims. Other exceptions to the privity requirement, such as where the case involves "foodstuffs, pesticides, and pharmaceuticals," or "where the end user is an employee of the purchaser" also do not apply. *Clemens,* 534 F.3d at 1023 (collecting cases).

**\*12** The California Plaintiffs further contend that the privity requirement does not apply to their implied warranty claims based on *Atkinson v. Elk Corp. of Texas,* 142 Cal.App.4th 212, 48 Cal.Rptr.3d 247, 257–58 (Cal.Ct.App.2006). In *Atkinson,* the court acknowledged that generally, privity must be established to maintain an implied warranty claim, but commented that the privity rule "should be relaxed" based in the case before it. *Id.* at 257. The implied warranty of quality at issue in *Atkinson* derived from a express warranty with specific terms of guarantee and duration contained in the defendant manufacturer's brochure for the goods. *Id.* at 258. The *Atkinson* court concluded that the defendant "brought itself into privity of contract with the ultimate consumer, [plaintiff], by extending this express warranty." *Id.; see also id.* ("It would be inconsistent to recognize privity existing for breach of express quality warranties under Magnuson–Moss and to reach the opposite conclusion in the same transaction for breach of the implied warranty of merchantability.").

*Atkinson* has no applicability here for several reasons. First, as discussed above, no express warranty may be found here, and therefore any rationale for relaxing the privity requirement in *Atkinson* is wholly absent here. *See Zabit v. Ferretti Group, USA,* No. 06–1252, 2006 WL 3020855, at \*6 (N.D.Cal. Oct.23, 2006) (distinguishing *Atkinson* in case where defendant did not issue written express warranty because "[t]he *Atkinson* court's holding was based upon the fact that the manufacturer had issued a written warranty on the product in question ... and based upon the fact that the plaintiff

relied on that warranty"). More broadly, several courts have deemed the *Atkinson* court's discussion of privity to be *dicta* both because the court ultimately dismissed the implied warranty claim as time-barred, and because those claims arose under the federal Magnuson–Moss act and did not directly involve state implied warranty law. *See Hartless v. Clorox Co.,* No. 06–2705, 2007 WL 3245260, at \*2 (S.D.Cal. Nov.2, 2007) ("The *Atkinson* case provides no support for plaintiff's contention because the court merely indicated, in *dicta,* that the privity requirement might be relaxed if the dismissed implied warranty claim were brought alongside a related express warranty claim."); *see also Ward v. IPEX, Inc.,* No. 08–6370, 2009 WL 2634842, at \*4 (C.D.Cal. Feb.4, 2009). Courts have consistently rejected *Atkinson*-based challenges to California's privity requirement for implied warranty claims and, without fail, have recognized the continued viability of the privity requirement as established in Burr. *See, e.g., Wolph v. Acer Am. Corp.,* No. 09–1314, 2009 WL 2969467, at \*3 (N.D.Cal. Sept.14, 2009). "*Atkinson* appears to be an anomaly in that it contravenes the well-established principle under California law that privity is required in cases alleging breach of an implied warranty." *Postier v. Louisiana–Pacific Corp.,* No. 09–3290, 2009 WL 3320470, at \*6 (N.D.Cal. Oct.13, 2009) (citing *Burr,* 268 P.2d at 1048; *Blanco v. Baxter Healthcare Corp.,* 158 Cal.App.4th 1039, 70 Cal.Rptr.3d 566, 582 (Cal.Ct.App.2008)).

**\*13** While the Ninth Circuit observed in *Clemens* that other states have discarded the privity requirement for implied warranty claims, and that the requirement "may be an archaism in the modern consumer marketplace," the court concluded that "California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314, and a federal court sitting in diversity is not free to create new exceptions to it." *Clemens,* 534 F.3d at 1024 (citations omitted). This Court agrees. Because the undisputed facts demonstrate that the California Plaintiffs do not stand in privity with Ford, this Court must grant summary judgment in Ford's favor on the California Plaintiffs' breach of implied warranty claims.

Because the lack of privity requires this Court to rule in favor of Ford on the California Plaintiffs' implied warranty claims, this Court need not address Ford's contention that the undisputed facts show that the California Plaintiffs have not suffered sufficient actual injury to prove a breach of any implied warranty.

*D. California Statutory Consumer Fraud Claims*

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 55 of 260
PageID: 69719

In the Complaint, Greater All Nation asserts in its Fourth Cause of Action [8] claims under three California consumer fraud statutes: the California Unfair Competition Law ("California UCL"), Cal. Bus. & Prof.Code § 17200, et seq.; the California False Advertising Law ("California FAL"), Cal. Bus. & Prof.Code § 17500, et seq.; and the California Consumers Legal Remedies Act ("California CLRA"), Cal. Civ.Code § 1750, et seq. In the MTD Opinion, the Court dismissed Greater All Nation's California CLRA claim, but denied Ford's motion to dismiss as to the California UCL and the California FAL. Ford now moves for summary judgment on all California state consumer fraud statute claims brought by both California Plaintiffs.

At the outset, this Court will grant summary judgment in favor of Ford on First United's California CLRA claim for the same reasons that it dismissed Greater All Nation's CLRA claim. The Court has not formally addressed First United's California CLRA claim because First United was added to this matter after the MTD Opinion. As Judge Ackerman held in the MTD Opinion, the California CLRA applies only to individuals who seek or acquire goods or services for personal, family, or household purposes; commercial entities and nonprofit organizations do not qualify as "consumers" with standing to sue under the California CLRA. MTD Opinion at *26 (citing Cal. Civ.Code §§ 1770(a), 1761(d)). Like Greater All Nation, First United is a nonprofit church organization and, therefore, lacks standing to assert a California CLRA claim.

Ford advances two theories as to why the California Plaintiffs' California UCL and FAL claims fail, but both rely on the same underlying assertion: that the California Plaintiffs did not suffer any injury or lose any money or property because they did not pay (or only paid nominally) for their E-350 vans. In their first argument, Ford contends that although the California Plaintiffs state that they seek restitution as their remedy for the statutory violations, they actually seek a form of legal damages because Ford took no money or property from the California Plaintiffs. Because the California UCL and FAL only allow for equitable relief, Ford concludes that the California Plaintiffs cannot recover such legal damages under these statutes. Ford additionally argues that the California Plaintiffs lack standing to assert these statutory claims because they have not suffered injury-in-fact or lost money or property due to any proscribed unfair competition. As support, Ford again relies upon the assertion that neither Greater All Nation nor First United paid any substantial value for their vans and, therefore, cannot be deemed to have lost any money due to Ford's alleged conduct.

**\*14** Ford correctly states that the California UCL and FAL do not allow for recovery of legal damages. Both the California UCL and FAL authorize injunctive relief, along with "such orders or judgments" that "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of" the statutory violation. Cal. Bus. & Prof.Code §§ 17203(UCL); 17535(FAL). California courts have held that legal damages may not be awarded under the California UCL. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003); Cortez v. Purolator Air Filtration Prods. Co., 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 999 P.2d 706, 712 (Cal.2000); see also, e.g., Stearns v. Select Comfort Retail Corp., No. 08–2746, 2009 WL 1635931, at *17 (N.D.Cal. June 5, 2009). "A plaintiff may not recover non-restitutionary disgorgement of profits under the UCL." Trew v. Volvo Cars of N. Am., LLC, No. 05–1379, 2006 WL 306904, at *2 (E.D.Cal. Feb.8, 2006). Similarly, the California FAL only allows for equitable relief, i.e. injunction and restitution. See Buckland v. Threshold Enterps., Ltd., 155 Cal.App.4th 798, 66 Cal.Rptr.3d 543, 558 (Cal.Ct.App.2007).

Assuming that the California Plaintiffs may prove a violation of the California UCL and/or FAL, they cannot recover if the damages they seek are purely legal in nature. Ford concedes that the California Plaintiffs nominally seek restitution, but Ford argues that such restitution in this case would be compensatory and therefore legal, not equitable. The object of equitable restitution is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." Korea Supply, 29 Cal.4th at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937. If the plaintiff "does not have an ownership interest in the money it seeks to recover from [a] defendant[ ]," the remedy that plaintiff seeks is not restitutionary under the California consumer fraud statutes. Id. In the alternative, restitution encompasses the recovery of money or property in which the plaintiff has a "vested interest." Id. To qualify as equitable restitution under this theory, the money sought by the plaintiff must be "identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession." Id. at 1150, 131 Cal.Rptr.2d 29, 63 P.3d 937 (quoting Great–West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)).

Case 1:19-md-02875-BMB-SAK   Document 2057-2   Filed 05/10/22   Page 56 of 260
PageID: 69720

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

In contending that the restitution the California Plaintiffs seek as remedies for the alleged California UCL and FAL violations amounts to disgorgement of profits and not equitable restitution, Ford seizes upon the Supreme Court of California's reasoning in *Korea Supply* that "[a]ny award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took *directly* from plaintiff." *Korea Supply,* 29 Cal.4th at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (emphasis added). Subsequent courts have construed *Korea Supply* to permit restitutionary recovery by a plaintiff who paid a defendant only indirectly, as "it was clear in Korea Supply that the plaintiff did not pay any money, even indirectly, to the defendant." *In re Ditropan XL Antitrust Litig.,* 529 F.Supp.2d 1098, 1103 (N.D.Cal.2007). Thus, *Korea Supply* may be read to preclude recovery under the California UCL and FAL if the plaintiff did not pay any money, directly or indirectly, to the defendant.

 **\*15** The undisputed record shows that Greater All Nation did not pay any money to Ford. Deacon Jennings donated a used E–350 van to Greater All Nation. Deacon Jennings purchased that van with his own money from Fox Leasing. Thus, Greater All Nation had no ownership interest in any money Ford might have made by its allegedly unfair business practices in selling the E–350 vans. The California Plaintiffs argue that restitution under the California UCL includes an order compelling a defendant to return money to those persons "who had an ownership interest in the property *or those claiming through that person." Kraus v. Trinity Mgmt. Servs., Inc.,* 23 Cal.4th 116, 96 Cal.Rptr.2d 485, 999 P.2d 718, 725 (Cal.2000) (emphasis added). The California Plaintiffs thus seem to contend that Greater All Nation claims restitution through Deacon Jennings, even though the undisputed record shows that Greater All Nation paid no money directly or indirectly to Ford. (Pls.' Omnibus Br. at 13.) However, the California Plaintiffs undermine any such theory one page later, where they simply assert that they need not trace their funds to Ford and that they "have a vested or ownership interest in the restitutionary relief sought." (*Id.* at 14, 96 Cal.Rptr.2d 485, 999 P.2d 718.) Neither in their Complaint nor elsewhere do Plaintiffs seek to recover restitution on behalf of another (as opposed to other prospective class members similarly situated).

Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant. *See, e.g., Ditropan,* 529 F.Supp.2d at 1105 (concluding that "as long as Indirect Purchaser Plaintiffs are ultimately able to prove traceability, California law authorizes this Court to award them restitution under the UCL"). Here, Greater All Nation cannot do so, as Deacon Jennings donated the van to the church, and no funds of Greater All Nation were paid directly or through intermediaries to Ford. The California Plaintiffs concede that the Supreme Court of California held in *Korea Supply* that plaintiff in that case could not recover because it never had any possession or ownership interest in the money sought to be restored, regardless of to whom the money was paid. (Pls.' Omnibus Br. at 14 n. 9.) Here too, Greater All Nation paid no money to Ford or an intermediary, and has no vested interest or prior ownership interest in any funds Ford might have ultimately obtained from the purchase of the van by Deacon Jennings. Furthermore, Greater All Nation has not alleged or presented any evidence to support the implication that Fox Leasing was an agent of Ford, and Greater All Nation has not otherwise shown that Ford received money from anyone with regard to the purchase of the Greater All Nation vehicle. Even if Greater All Nation had bought the vehicle itself, the undisputed record lacks any evidence that Ford received any funds from the Greater All Nation vehicle transaction. Greater All Nation's damages claims under the California UCL and FAL, therefore, depend upon precluded legal damages, rather than equitable restitution. For these reasons, this Court will grant Ford summary judgment on Greater All Nation's California UCL and FAL claims.

 **\*16** First United stands in a different position than Greater All Nation. It is *not* undisputed that First Nation paid no money directly or indirectly to Ford for its vehicle. The record contains evidence supporting either that Troop 1 purchased the van from the Mel Clayton Ford dealership and sold the vehicle to First United for $1.00, or that First United purchased the van directly from Mel Clayton Ford. If First United can prove the latter theory, it could show that Ford, through the intermediary dealership, ultimately took money at least indirectly from First United. However, First United points to no evidence in the record showing that even if First United purchased the vehicle, that the money it paid to Mel Clayton Ford ultimately made its way to Defendant Ford. While "[g]enerally, the existence of an agency relationship and the extent of the authority of an agent are questions of fact," the party asserting an agency relationship bears "the burden of proving agency." *Inglewood Teachers Ass'n v. Public Employment Relations Bd.,* 227 Cal.App.3d 767, 278 Cal.Rptr. 228, 234 (Cal.Ct.App.1991).

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 57 of 260
PageID: 69721

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

In their Complaint, Plaintiffs state that Ford "manufactures and sells motor vehicles, including cars, vans and trucks, through retail dealers throughout North America" and appear to allege that the dealers are agents of Ford. (Compl.¶ 13.) Plaintiffs—the California Plaintiffs and all other individual Plaintiffs—bear the burden of producing some evidence sufficient to at least create a dispute of material fact in opposing Ford's motion for summary judgment. In its brief, Plaintiffs contend that the Ford dealerships are agents of Ford as a matter of law, but do not support their assertion with any evidence. Plaintiffs observe in their brief that Ford generally "does not sell its vehicles directly to the general public," "relies exclusively upon its dealer network to sell vehicles," "distributes its literature relating to E–350 vehicles through its dealerships," and "advertises its vehicles with the intent that sales will occur through the dealerships." (Pls.' Omnibus Br. at 61.) These assertions in their argument are not supported by any evidence in the record. Plaintiffs argue that if their "inability to prove a transfer of money from Ford dealerships to Ford, alone, were sufficient to dismiss a claim against Ford, the extension of this doctrine would prevent any actions against manufacturers who sell their products primarily through retail outlets or other such agents; such an outcome is anathematic to both statutory and common law principles." (*Id.* at 62, 278 Cal.Rptr. 228.)

Even if this may be true, those statutory and common law principles still require some proof of the relationship between the dealers and Ford beyond mere assertion in their brief. Without some evidence of the relationship between the dealer and Ford, this Court declines to take judicial notice of the relationship such that it will assume that Ford benefits every time one of its dealers sells a new or used vehicle. Furthermore, many courts have strongly suggested that "automobile dealerships generally are not agents of automobile manufacturers regarding the selling of vehicles." *Zeno v. Ford Motor Co., Inc.,* 480 F.Supp.2d 825, 845 (W.D.Pa.2007) (collecting cases). Although a plaintiff seeking to show such an agency relationship faces an "uphill battle," the inquiry is fact-specific and no per se rule bars such a finding on an appropriate factual basis. *Id.* at 846. Here, Plaintiffs have presented no such factual basis whatsoever.

**\*17** Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant. *See, e.g., Ditropan,* 529 F.Supp.2d at 1105. First United does not do so here, either with regard to the money it might have paid or more generally with regard to the financial relationship between the dealers and Ford.

This Court will grant Ford's motion for summary judgment without prejudice on First United's California UCL and FAL claims. First United shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the California UCL and FAL claims. Ford shall have until September 13, 2010 to file a response to First United's submission.

### *E. Unjust Enrichment*

Finally, Ford next seeks summary judgment on the California Plaintiffs' unjust enrichment claims. Ford contends that the California Plaintiffs cannot show either that Ford received a benefit from them or that any benefit Ford received was unjust or at the expense of the California Plaintiffs.

#### *1. Plaintiffs' Unjust Enrichment Theory*

Plaintiffs allege generally in their Third Causes of Action that Ford "extracted significant payments" from individual Plaintiffs "who would not have purchased the E350 vans or who would only have agreed to purchase the E350 vans at greatly reduced prices" if they knew of the potential rollover problems. (Compl.¶ 88.) Essentially, all Plaintiffs contend that their vans suffered diminution in value relative to their purchase prices due to the alleged defect and Ford's conduct. Plaintiffs further assert that Ford secured additional payment for necessary repairs to E–350 vans after the expiration of the "90–day 'Limited Warranty.' " (Compl.¶ 89.) Thus, all Plaintiffs claim that "Ford has been unjustly enriched, having retained the benefits of its sales of defective E350 vans and payment for repair services," and all Plaintiffs seek restitution and disgorgement of "all sums by which Ford has been unjustly enriched." (Compl.¶¶ 90, 91.)

#### *2. California Plaintiffs' Restitution Claims*

In the MTD Opinion, the Court acknowledged the uncertainty that exists regarding whether California law recognizes an independent claim for unjust enrichment. MTD Opinion at \*21 (citing *Nordberg v. Trilegiant Corp.,* 445 F.Supp.2d 1082, 1100 (N.D.Cal.2006)). The Court agreed with the district court in *Nordberg* that a claim for unjust enrichment under California law may be understood as a claim for restitution. *Id.* As the court in *Nordberg* concluded, it is clear that California Plaintiffs seek restitution. (Compl. ¶ 91 (seeking remedies of "rescission, *restitution,* and disgorgement of all sums by which Ford has been unjustly enriched").) The semantic difference between "unjust enrichment" and

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

"restitution" does not foreclose California Plaintiffs' claim as a matter of law. *See Nordberg,* 445 F.Supp.2d at 1100; *RaceRedi Motorsports, LLC v. Dart Machinery, Ltd.,* 640 F.Supp.2d 660, 667 (D.Md.2009) ( "Generally, a party asserting a claim of unjust enrichment is simply seeking the remedy of restitution, and that is certainly the case here."); *see also Lauriedale Assocs., Ltd. v. Wilson,* 7 Cal.App.4th 1439, 9 Cal.Rptr.2d 774, 780 (Cal.Ct.App.1992) ("The phrase' Unjust Enrichment' does not describe a theory of recovery .... What appellants actually seek is restitution." (citations omitted)).

 **\*18**  "Generally, to claim unjust enrichment, a plaintiff must allege that' (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it.' " MTD Opinion at *21 (quoting *In re K–Dur Antitrust Litig.,* 338 F.Supp.2d 517, 544 (D.N.J.2004)). The elements for showing unjust enrichment under California law mirror this general standard. *See Ghirardo v. Antonioli,* 14 Cal.4th 39, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1003 (Cal.1996); *County of Solano v. Vallejo Redevelopment Agency,* 75 Cal.App.4th 1262, 90 Cal.Rptr.2d 41, 52 (Cal.Ct.App.1999). The benefit received by the defendant may be "any form of advantage." *County of Solano,* 90 Cal.Rptr.2d at 52 (quoting Restatement of Restitution § 1 cmt. (b), p. 12)). While "[f]or a benefit to be conferred, it is not essential that money be paid directly to the recipient by the party seeking restitution," the benefit must nonetheless be received at the expense of the plaintiff. *California Fed. Bank v. Matreyek,* 8 Cal.App.4th 125, 10 Cal.Rptr.2d 58, 62 (Cal.Ct.App.1992).

This Court will grant summary judgment in Ford's favor on Greater All Nation's restitution claim. Greater All Nation points to no evidence whatsoever in the record that Ford received any benefit at their expense. Rather, the California Plaintiffs contend that their *"predecessors in interest* were parted with their money due to Ford's conduct and Ford was unjustly enriched as a result." (Pls.' Omnibus Br. at 64 (emphasis added).) As support for this theory, the California Plaintiffs only state that "[i]t is *axiomatic* that Ford ultimately received the victims' money for the unsafe E–350 vans which Ford illegally marketed in California." (*Id.* (emphasis added).) This purported "axiom" is mere assertion, not evidence. Furthermore, if the "victims" from whom Ford allegedly received an unjust benefit were the California Plaintiffs' predecessors in interest, then any restitution claim belongs to those parties, not the California Plaintiffs. Money need not be paid directly to a defendant by a plaintiff seeking restitution, but that money must still have been received by a defendant at a plaintiff's expense. The record is devoid of any evidence that Ford derived any benefit from the Greater All Nation vehicle that was purchased used from Fox Leasing, and it is undisputed that Greater All Nation did not pay any money for the vehicle because the vehicle was donated to the church by Deacon Jennings. In opposing summary judgment, an unsupported "axiom" does not exceed the mere scintilla standard. The record also contains no evidence that Greater All Nation made any other payments to Ford, such as payment for repair services.

With regard to First United, while a factual dispute exists regarding who purchased the First United vehicle, there is no evidence in the record that if First United indeed purchased the vehicle, Ford ultimately received First United's payment. As with First United's statutory claims, this Court declines to take judicial notice of any "axiomatic" agency or other relationship between Mel Clayton Ford and Ford in the absence of even a mere scintilla of evidence produced by Plaintiffs to show that the Ford ultimately benefitted from the purchase of the van from the Ford dealership. This Court will grant Ford's motion for summary judgment without prejudice on First United's unjust enrichment claim. First United shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to First United's submission.

*F. Summary*

 **\*19**  For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all claims brought by Greater All Nation. This Court will grant Ford's motion for summary judgment on the express and implied warranty claims and California CLRA claims asserted by First United, and grant the motion without prejudice with regard to First United's California UCL, California FAL, and unjust enrichment claims. First United shall have until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Mel Clayton Ford and Ford and demonstrate that summary judgment should not be granted in Ford's favor on the California UCL, California FAL, and unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to First United's submission.

**II. Illinois**

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 59 of 260
PageID: 69723

In re Ford Motor Co. E-350 van Products Liability..., Not Reported in...

In the MTD Opinion, the Court dismissed the express and implied warranty claims brought by Illinois Plaintiff Pentecostal Temple Church of God in Christ ("Pentecostal Temple"). The Court denied Ford's motion to dismiss as to Pentecostal Temple's statutory consumer fraud claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505/1, *et seq.*, and Pentecostal Temple's unjust enrichment claim. Ford now moves for summary judgment on these remaining claims. For the following reasons, the Court will grant Ford's motion.

### A. Material Facts

Pastor Samuel Edwards gave deposition testimony on behalf of Pentecostal Temple. The Illinois Plaintiff purchased two Ford E–350 vans and, therefore, asserts an ICFA and unjust enrichment claim on each of its vehicles. Pentecostal Temple first purchased a new 1994 model vehicle sometime in 1993 or 1994 from Currie Motors, a Ford dealership. (Edwards Dep. at 55:7–24.) Pastor Edwards could not recall how much Pentecostal Temple paid for the 1994 van. (*Id.* at 60:21–24, 10 Cal.Rptr.2d 58.) Pentecostal Temple sold the 1994 van in or about 1998 due to mechanical difficulties with the engine and other issues not involving the handling-related claims in this litigation. (*Id.* at 57:20–58:5, 10 Cal.Rptr.2d 58.) Pastor Edwards also had no recollection regarding how much Pentecostal Temple received when it sold the 1994 van, although he did state that "we ended up just kind of almost giving it away" due to the mechanical problems unrelated to this litigation. (*Id.* at 28:21–22, 10 Cal.Rptr.2d 58.) Pastor Edwards expressed no concerns regarding the handling of the 1994 van. (*Id.* at 80:24–81:3, 10 Cal.Rptr.2d 58.) On April 10, 1999, Pentecostal Temple purchased its second E–350 van, a used 1998 model, for $24,227. (Andresen Certif. No. 3, Ex. 1 at 1.) It continues to use this vehicle.

Prior to purchasing both vehicles, Pentecostal Temple did not receive any representations from Ford regarding the vehicle as a 15–passenger van, either by way of Ford brochures, salesperson statements, advertisements, media reports, or other written or verbal information. (Edwards Dep. at 79:4–11; 93:2–9; 95:20–97:1; 98:16–99:6.) As Ford stresses, Pastor Edwards conceded that Pentecostal Temple did not observe that the vans purported to be 15–passenger vehicles. (*Id.* at 95:5–8, 10 Cal.Rptr.2d 58.) According to Pastor Edwards, when purchasing the vehicles, Pentecostal Temple was looking for "something that would take more than four or five members at a time" and that would have ease of access for seniors and young people. (*Id.* at 56:16–17, 10 Cal.Rptr.2d 58; 57:1–19.)

**\*20** Pentecostal Temple contests Ford's reading of Pastor Edwards's testimony, and contends that it purchased the vehicles "in reliance on Ford's representations concerning the safety and 15–passenger capacity of the E350." (*See, e.g.,* Pls.' Supp. Statement ¶ 333.) However, the deposition excerpts upon which the Illinois Plaintiff relies simply do not support its reading of the undisputed facts in the record. None of the excerpts referenced by Pentecostal Temple, or any other portion of the transcript provided to the Court, discusses any purported misrepresentation that Pentecostal Temple received from Ford, or any recognition by Pentecostal Temple that Ford advertised or represented the vehicles to be 15–passenger vans. Pastor Edwards stated that the church sought to transport "10 to 15" people in the vans, but knew the vehicle would be too crowded to fit 15 full-size adults. (Edwards Dep. at 59:20–60:10.) Pentecostal Temple first noticed difficulties with the handling of the 1998 vehicle in 1999 or 2000 (*id.* at 85:10–21, 10 Cal.Rptr.2d 58), and those issues caused it to decrease the number of trips it made with the van and forced its drivers to operate the vehicles more carefully (*id.* at 84:4–87:11, 10 Cal.Rptr.2d 58). No one observed any handling problems with the 1994 van that Pentecostal Temple sold sometime in 1998. (*Id.* at 85:22–24, 10 Cal.Rptr.2d 58.) According to Pastor Edwards, Pentecostal Temple's automobile insurance carrier indicated that it would no longer provide insurance for E–350 vans after the policy in effect at the time of the deposition expired in January 2007. (*Id.* at 23:14–24:7, 10 Cal.Rptr.2d 58.) Pastor Edwards testified that Pentecostal Temple was encountering difficulties in securing insurance on the van from another company. (*Id.* at 26:4–14, 10 Cal.Rptr.2d 58.)

### B. ICFA

Pentecostal Temple asserts two ICFA claims arising from its two purchases of E–350 vans. The ICFA provides protection against deceptive acts or practices in the conduct of trade or commerce, including the use of any "misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 Ill. Comp. Stat. § 505/2.

### 1. Statute of Limitations

Ford first contends that this Court should grant summary judgment in its favor on Pentecostal Temple's ICFA claims because they run afoul of the ICFA's statute of limitations. An action under the ICFA must be brought within three years after

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 60 of 260
PageID: 69724

the cause of action accrues. 815 Ill. Comp. Stat. § 505/10a(e). Ford asserts that a cause of action "generally" accrues when the plaintiff suffers injury, and assumes without providing authority that Pentecostal Temple's claims accrued here at the time of purchase of each van. (Ford Br. No. 3 at 3–4.) If true, Pentecostal Temple's claims would be untimely. Pentecostal Temple filed its initial class action complaint in this matter in state court on January 27, 2005. It purchased its first vehicle sometime in 1993 or 1994, and its second vehicle in 1999. Both purchases lie well outside the ICFA's three-year limitations period.

**\*21** However, Illinois state and federal courts have consistently applied a version of the discovery rule to ICFA claims. An ICFA claim accrues "when the plaintiff' knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused.' " *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 441 (7th Cir.1994) (quoting *Knox College v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976, 980 (Ill.1982)); *see also, e.g., Kopley Group V., L.P. v. Sheridan Edgewater Props., Ltd.,* 376 Ill.App.3d 1006, 315 Ill.Dec. 218, 876 N.E.2d 218, 231 (Ill.App.Ct.2007); *Bradley v. Alpine Constr. Co.,* 224 Ill.App.3d 432, 166 Ill.Dec. 695, 586 N.E.2d 653, 655 (Ill.App.Ct.1991) (collecting cases). [9]

Instead of discussing when Pentecostal Temple's causes of action accrued under the discovery rule, the parties focus primarily on whether Ford fraudulently concealed Pentecostal Temple's causes of action such that the statute of limitations should be tolled. Pentecostal Temple insists that the Court already rejected Ford's statute of limitations defense in the MTD Opinion, where, in a footnote, the Court stated that Ford's limitations argument "lack[s] merit" because Plaintiffs alleged a viable theory of fraudulent concealment. MTD Opinion at \*26 n. 14. However, that ruling arose in the context of a Rule 12(b)(6) motion on which the Court assumed the truth of Pentecostal Temple's allegations. Indeed, the Court denied Ford's motion with regard to the statute of limitations "because 7Fthe bar is not apparent on the face of the [C]omplaint.' " MTD Opinion at \*19 (quoting *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002)). At this summary judgment stage, where the Court assesses undisputed facts based on the extensive record developed during discovery, the Court's prior ruling on a motion to dismiss that Pentecostal Temple sufficiently *alleged* fraudulent concealment to defeat Ford's limitations defense does not automatically preclude a conclusion, based on the undisputed record, that Pentecostal Temple's ICFA claims are time-barred.

Pursuant to 735 Ill. Comp. Stat. § 5/13–215, if a defendant fraudulently conceals a cause of action from the plaintiff, the statute of limitations is tolled until the plaintiff "discovers that he or she has such cause of action" and runs for five years from that discovery. To constitute fraudulent concealment under § 5/13–215, a defendant's conduct must consist of "affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim. Mere silence on the part of the defendant is insufficient." *Orlak v. Loyola Univ. Health Sys.,* 228 Ill.2d 1, 319 Ill.Dec. 319, 885 N.E.2d 999, 1009 (Ill.2007). Here, a finding of fraudulent concealment would extend the statute of limitations under the ICFA from three years to five years, but determination of whether Pentecostal Temple timely filed its claims still depends upon when it discovered or reasonably should have discovered that it had causes of action, i.e. that it was injured and that such injury was wrongfully caused. Pentecostal Temple's ICFA claims did not necessarily accrue when its alleged injuries actually occurred—the date of purchase of the vehicles—but when Pentecostal Temple knew or reasonably should have known of the injuries and that they were wrongfully caused by Ford's allegedly deceptive practices.

**\*22** In a footnote, Ford argues that even if the discovery rule applies, Pentecostal Temple knew or reasonably should have known of its alleged injury before January 27, 2002, three years before it filed its claim. Ford lists various events recited in the Complaint that occurred prior to January 2002 and that should had given Pentecostal Temple actual or constructive knowledge of its cause of action, including government agency reports and media reports regarding the dangers of E–350 vans. (Ford Br. No. 3 at 4 n. 3.) Pentecostal Temple labels Ford's chosen " 'should have known' date" as "fictional" and "untenable." (Pls.' Omnibus Br. at 21 n. 12.) Yet Pentecostal Temple fails to respond substantively to the notion that before January 27, 2002, it knew that its 1998 van had handling difficulties, and had adjusted its usage accordingly.

Pastor Edwards testified at deposition that he and others at Pentecostal Temple first recognized issues with the handling of its 1998 van when filled to capacity in 1999 or 2000. No one noticed any rollover-related difficulties with regard to the 1994 vehicle. Pentecostal Temple's ICFA claims arise from Ford's alleged misrepresentations and omissions that "deceive[d] consumers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 61 of 260
PageID: 69725

passengers." (Compl. ¶ 93.) Its cause of action accrued with regard to the 1998 van when it first discovered, after purchasing the vehicle, problems regarding its ability to transport 15 passengers. Viewing the undisputed facts in the light most favorable to Pentecostal Temple, this discovery date occurred by December 31, 2000, at the latest, because Pastor Edwards testified that the handling issue was first brought to his attention in "'99, [or] 2000." (Edwards Dep. at 85:18.) Pentecostal Temple filed its initial complaint in this matter in January 2005, more than three years past this latest discovery date. With regard to the claim based on the purchase of the 1994 vehicle, Pentecostal Temple sold that van in 1998 due to mechanical problems unrelated to the rollover-related concerns at issue in this matter (*id.* at 57:20–58:5, 319 Ill.Dec. 319, 885 N.E.2d 999), and Pastor Edwards testified that no one at the church had observed any problems regarding driving the 1994 fully loaded with passengers (*id.* at 85:22–24, 319 Ill.Dec. 319, 885 N.E.2d 999). If Pentecostal Temple suffered any injury arising from its purchase of the 1994 van, it reasonably should have discovered that injury at the latest when it sold the vehicle in 1998. Therefore, both of Pentecostal Temple's ICFA claims are time-barred as they accrued under the discovery rule more than three years prior to its filing of the initial complaint.

Furthermore, Pentecostal Temple cannot establish fraudulent concealment sufficient to toll or extend the statute of limitations. To constitute fraudulent concealment, Ford's conduct must have consisted of affirmative acts or representations that caused Pentecostal Temple to delay filing its claims or prevent it from discovering its claims; mere silence or omissions are not enough. *Orlak,* 319 Ill.Dec. 319, 885 N.E.2d at 1009. Furthermore, "fraudulent misrepresentations which form the basis of the cause of action do not constitute fraudulent concealment under section 13–215 in the absence of a showing that the misrepresentations tended to conceal the cause of action." *Foster v. Plaut,* 252 Ill.App.3d 692, 192 Ill.Dec. 238, 625 N.E.2d 198, 203 (Ill.App.Ct.1993). To do so, Pentecostal Temple must show that Ford's misrepresentations were made with the intent to deceive Pentecostal Temple and, crucially, that Pentecostal Temple detrimentally relied upon such misrepresentations. *Id.* at 203. Here, Pastor Edwards testified that before, during, and after the church purchased the vehicles, no one at Pentecostal Temple received any representations from Ford, saw any Ford marketing materials or media reports, or even observed that the E–350 purported to be a 15–passenger van. (Edwards Dep. at 79:4–11; 93:2–9; 95:5–8; 95:20–97:1; 98:16–99:6.) Even if Ford made the misrepresentations Plaintiffs allege, the undisputed record establishes that Pentecostal Temple did not detrimentally rely on any of these representations.

**\*23** While Pentecostal Temple satisfactorily alleged fraudulent concealment sufficient to withstand a motion to dismiss, there is no genuine dispute of material fact at this stage, based on the full record, regarding the lack of detrimental reliance by Pentecostal Temple. Nor does equitable estoppel aid Pentecostal Temple. Equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450–51 (7th Cir.1990). Pentecostal Temple presents no evidence of any actions taken by Ford specifically to prevent Pentecostal Temple from filing a timely claim; indeed, Pentecostal Temple received no representations from Ford and did not rely on any statements or conduct of Ford. For these reasons, Pentecostal Temple cannot avail itself of the tolling afforded by fraudulent concealment or equitable estoppel, and its ICFA claims are barred by that statute's three-year statute of limitations.

### 2. Actual Deception

Even if Pentecostal Temple's ICFA claims were timely filed, they fail on the merits because Pentecostal Temple cannot show that it was actually deceived by Ford's conduct. Under the ICFA, a plaintiff must establish "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (Ill.2005); *see also First Midwest Bank, N.A. v. Sparks,* 289 Ill.App.3d 252, 257, 224 Ill.Dec. 812, 682 N.E.2d 373 (Ill.App.Ct.1997) ("Concealment is actionable where it is employed as a device to mislead and the concealed fact must be such that had the other party been aware of it, he would have acted differently."). Reliance is not an element of an ICFA claim, because "the Act is intended to provide broader consumer protection than the common law action of fraud." *Harkala v. Wildwood Realty, Inc.,* 200 Ill.App.3d 447, 146 Ill.Dec. 232, 558 N.E.2d 195, 199 (Ill.App.Ct.1990). Still, "a valid claim must show that the consumer fraud proximately caused plaintiff's injury." *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (Ill.1996). The Supreme Court of Illinois has held that "to maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 62 of 260 PageID: 69726

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *De Bouse v. Bayer,* 235 Ill.2d 544, 337 Ill.Dec. 186, 922 N.E.2d 309, 316 (Ill.2009); *see also Avery,* 296 Ill.Dec. 448, 835 N.E.2d at 861.

As discussed above, the undisputed record shows that Pentecostal Temple never received or observed any misrepresentations by Ford. "If plaintiff never saw the alleged misrepresentations, he cannot have been deceived by them and any misrepresentation cannot have proximately caused him injury." *Gredell v. Wyeth Labs., Inc.,* 367 Ill.App.3d 287, 305 Ill.Dec. 160, 854 N.E.2d 752, 757 (Ill.App.Ct.2006). Thus, any Ford misrepresentations cannot form the basis for Pentecostal Temple's ICFA claims. The same principle applies to Ford's alleged omissions. With regard to Ford's omissions regarding the safety of E–350 vehicles when fully loaded with 15 passengers, Pentecostal Temple could not have been deceived by such omissions because it did not observe the vans to be 15–passenger vehicles. At most, Pastor Edwards acknowledged that Pentecostal Temple sought to transport "10 to 15" people in the vans (Edwards Dep. at 59:20–22), but did not state that Pentecostal Temple purchased the vans because they were advertised or represented to be capable of carrying 15 passengers. As the Supreme Court of Illinois has observed, "in a consumer fraud action, the plaintiff must actually be deceived by a statement or omission. If there has been no communication with the plaintiff, there have been no statements and no omissions. In such a situation, a plaintiff cannot prove proximate cause." *De Bouse,* 337 Ill.Dec. 186, 922 N.E.2d at 316. Even if Pentecostal Temple's ICFA claims were timely filed, there is no genuine issue of material fact with regard to actual deception and proximate cause, and Ford is entitled to judgment as a matter of law on those claims. This Court will grant Ford's motion for summary judgment with regard to Pentecostal Temple's ICFA claims.

### C. Unjust Enrichment

**\*24**  Under Illinois law, to state a claim of unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Where a plaintiff did not give money directly to a defendant, but that benefit was transferred by plaintiff to defendant by a third-party, retention of the benefit would be unjust if

"(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.* at 161–62, 137 Ill.Dec. 19, 545 N.E.2d 672 (internal citations omitted); *see also Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.,* 577 F.Supp.2d 1023, 1047–48 (N.D.Ill.2008).

Here, Pentecostal Temple purchased its two E–350 vans from Currie Motors, a Ford dealership. Just as California Plaintiff First United presented no evidence regarding the relationship between the dealer-seller and Ford, here Pentecostal Temple can point to no evidence in the record even suggesting that the money it paid to Currie Motors ultimately made its way to Ford. Even if it could be described as "axiomatic" that Ford would receive money paid to a dealer for the purchase of a new Ford vehicle, this does not satisfy a party's evidentiary burden. Nor has Pentecostal Temple shown any agency relationship between Ford and Currie Motors, thus establishing some relationship whereby benefits conferred upon Currie Motors may be considered to be conferred upon Ford. As discussed with regard to the California Plaintiffs, Pentecostal Temple has not pointed to any evidence in the record whatsoever that would permit this Court to find any kind of agency relationship. Ford contends that Pentecostal Temple has not shown the essential element of Ford's retention of a benefit to Plaintiff's detriment, and Pentecostal Temple has not met its burden to produce evidence in support of its position.

Furthermore, even if Pentecostal Temple could raise a genuine issue of material fact as to whether Ford has retained a benefit to Pentecostal Temple's detriment, its unjust enrichment claim fails for the same substantive flaw that dooms its ICFA claim: it cannot show deception or other wrongful conduct directed at Pentecostal Temple. Of the three types of indirect unjust enrichment discussed above, only the second—"the defendant procured the benefit from the third party through some type of wrongful conduct"— applies here. Under Illinois law, unjust enrichment of this type "is not descriptive of conduct that, standing alone, will justify an action for recovery. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct." *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.,* 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 63 of 260
PageID: 69727

N.E.2d 971, 977 (Ill.Ct.App.1995) (quoting *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.,* 137 Ill.App.3d 84, 91 Ill.Dec. 790, 484 N.E.2d 349, 354 (Ill.App.Ct.1985)). "It is not enough to show that the defendant, at some point in time, behaved 'wrongfully'; rather, the plaintiff must show that the defendant procured the benefit ... through some type of wrongful conduct.' " *Indep. Trust Corp.,* 577 F.Supp.2d at 1051 (quoting *HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 679). Pentecostal Temple's unjust enrichment claim cannot stand where it depends upon improper conduct but cannot show such conduct.

**\*25** It is undisputed, based on Pastor Edwards's deposition testimony, that no one at Pentecostal Temple received any representations from Ford, saw any Ford marketing materials, or even observed that the E–350 purported to be a 15–passenger van. Pentecostal Temple sold its first E–350 van for reasons unrelated to the handling issues giving rise to this litigation, and it purchased the 1998 van based on the desire for "something that would take more than four or five members at a time" and that would have ease of access for seniors and young people. (Edwards Dep. at 56:16–17; 57:1–19.) While other Plaintiffs in this action might have acquired their E–350 vans based on Ford's representations or labeling of the vehicles as 15–passenger vans, the undisputed record shows that Pentecostal Temple did not. Pentecostal Temple cannot show the required "causal link between the wrongful conduct and the acquisition by the defendant of the benefit." *Indep. Trust Corp.,* 577 F.Supp.2d at 1051.

Pentecostal Temple attempts to distinguish *HPI and Independent Trust Corp.* by observing that "each of those cases concern the transfer of money by a third party to the defendant, not payments by Plaintiffs that benefit the third-party (Ford dealers) and Defendant Ford." (Pls.' Omnibus Br. at 63.) However, this is a distinction without a difference. The additional element of wrongful conduct required under these circumstances applies where "someone other than the plaintiff transfers the benefit to the defendant." *Independent Trust Corp.,* 577 F.Supp.2d at 1047 (citing *HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 679). Pentecostal Temple recognizes that Currie Motors is a "third-party," and contends that this third-party transferred the payments by Pentecostal Temple to Ford. On these undisputed facts, the wrongful conduct requirement outlined in *Independent Trust* and *HPI* applies. "[I]n the absence of any deception on the part of the defendant[ ], the requisite violation of 'fundamental principles of justice, equity, and good conscience' is not present." *Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 943 (7th Cir.2001) (dismissing

unjust enrichment claim because plaintiff did not state a claim under ICFA or other cause of action) (citing *Alliance Acceptance Co.,* 208 Ill.Dec. 49, 648 N.E.2d at 976–77). Because there is no genuine issue of material fact with regard to any deception of Pentecostal Temple by Ford, this Court will grant Ford's motion for summary judgment on Pentecostal Temple's unjust enrichment claim.

### *D. Summary*

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on the ICFA and unjust enrichment claims brought by Pentecostal Temple. None of Pentecostal Temple's claims remain in this matter. Therefore, this Court will dismiss Pentecostal Temple as a party in this case.

### III. New Jersey

In the MTD Opinion, the Court denied Ford's motion to dismiss the claims brought by New Jersey Plaintiffs Macedonia Free Will Baptist Church ("Macedonia"), Faith Tabernacle Church ("Faith Tabernacle"), and Social Clubhouse, Inc ("Social Clubhouse"). New Jersey Plaintiff Bethany Baptist Church ("Bethany Baptist") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of the New Jersey Plaintiffs' claims: violation of the New Jersey Consumer Fraud Act ("NJCFA"), *N.J. Stat. Ann. § 56:8–1 et seq.,* breach of express warranty, breach of implied warranty, and unjust enrichment. Ford also moves to strike a letter and affidavit filed by Plaintiffs on August 7, 2009.

### *A. Material Facts*

### *1. Macedonia*

**\*26** Macedonia purchased two new 2002 E–350 vans from Dayton Ford in Dayton, New Jersey on February 18, 2002, for $21,878.30 each. (Andresen Certif. No. 4, Ex. 1 at 10; Phillips Dep. (3/27/07) at 36:2–7.) Roy Phillips, a deacon at Macedonia, was responsible for purchasing the 2002 vans. (Phillips Dep. (3/27/07) at 32:16–24.) Phillips recalled seeing brochures for the E–350 van that stated that the E–350 van was a 15–passenger van with an 8–cylinder engine. (*Id.* at 30:8–16, 208 Ill.Dec. 49, 648 N.E.2d 971.) Phillips did not recall looking at any other materials from Ford regarding the vans. (*Id.* at 36:21–25, 208 Ill.Dec. 49, 648 N.E.2d 971.) Phillips stated that the salespeople at Dayton Ford told him the vans were "good for what [he] need[ed] it for" and that "a lot of people [were] buying them for church." (*Id.* at 34:6–13,

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 64 of 260
PageID: 69728

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

208 Ill.Dec. 49, 648 N.E.2d 971.) Phillips could not remember anything else about the conversations with the salespeople at Dayton Ford. (*Id.* at 34:14–16, 208 Ill.Dec. 49, 648 N.E.2d 971.) Macedonia continues to use both 2002 vans (Ford's SUMF No. 4 at ¶ 2); however, Phillips stated that he "tr[ies] not to put more than ten" in the vans because he "just feel[s] less people it's safer" (Phillips Dep. (3/27/07) at 73:24–74:5).

### 2. Faith Tabernacle

Faith Tabernacle purchased a used 2000 E–350 van on August 30, 2001, from Giant Liccardi Auto Group in Green Brook, New Jersey for $23,521. (Andresen Certif. No. 5, Ex. 1 at 9; Bright Dep. at 17:23–18:23.) Bishop Herbert Bright testified that Faith Tabernacle was specifically seeking a vehicle that could carry 15 passengers. (Bright Dep. at 20:10–12.) Bright did not recall hearing any statements from Ford regarding the safety of the E–350 vans (*id.* at 95:14–24, 208 Ill.Dec. 49, 648 N.E.2d 971), and testified that Faith Tabernacle "ha[d] no direct contact with Ford regarding th[e] vehicle" (*id.* at 103:4– 12, 208 Ill.Dec. 49, 648 N.E.2d 971). Faith Tabernacle ceased using the van to transport members because members began using alternative methods of transportation and because of increases in the cost of gasoline. (*Id.* at 63:3–17, 208 Ill.Dec. 49, 648 N.E.2d 971.) After learning of the alleged safety concerns, the church continued to use the van "without filling it to capacity." (*Id.* at 58:20–22, 208 Ill.Dec. 49, 648 N.E.2d 971.) Faith Tabernacle continues to use the van to "pick up the food from the food bank. And once, maybe, per month may use it to take the kids out." (*Id.* at 60:24–61:2, 208 Ill.Dec. 49, 648 N.E.2d 971.)

### 3. Social Clubhouse

Social Clubhouse purchased a total of five used E–350 vans from 1995 through 2003, which were all subsequently sold in 2003. (Ford's SUMF No. 6 at ¶ 1; Andresen Certif. No. 6, Ex. 1 at 8–9.) Prior to August 1999, Social Clubhouse purchased a used 1993 E–350 van and a used 1994 E–350 van, which were both later sold by Social Clubhouse in 2003. (Andresen Certif. No. 6, Ex. 1 at 8.) Social Clubhouse has not identified where the 1993 and 1994 vans were purchased or to whom they were sold. (*Id.*) In November 2001, Social Clubhouse purchased a used 1997 E–350 van from Craig Auto Sales in Brooklyn, New York, and in June 2002, Social Clubhouse purchased a second used 1997 E–350 van from an unidentified used auto dealer in Philadelphia, Pennsylvania. (*Id.* at 9.) In 2003, Social Clubhouse sold both of the 1997 E–350 vans to M & R Auto Sales in Plainfield, New Jersey. (*Id.*) In April 2003, Social Clubhouse purchased a used 2002

E–350 van from Autoland in Springfield, New Jersey. (*Id.* at 8.) Social Clubhouse sold the 2002 Van four months later to Williamsburg Leasing of Brooklyn, New York. (*Id.* at 8–9.) Michael Samet, a vice-president of Social Clubhouse, did not recall reading any brochures or viewing any advertisements prior to purchasing any of the vans, nor did he recall any representations made by salespersons relating to van characteristics other than that they were 15–passenger vans that held 15 people. (Samet Dep. at 20:12–14; 64:6–66:10; 75:8–76:2.) Samet testified that, when purchasing the vans, he only knew that a 15–passenger van "was the largest vehicle that [Social Clubhouse] could purchase to carry the most amount of people without having a CDL license." (*Id.* at 69:8–19.) Social Clubhouse used the vans to "provide door to door transportation to its facilities and transportation for social/recreational services including bi-weekly outings and trips." (Andresen Certif. No. 6, Ex. 1 at 13.)

### 4. Bethany Baptist

**\*27** Bethany Baptist purchased a new 2001 van in 2001 from Holman Ford in Stratford, New Jersey for approximately $28,000. (Andresen Certif. No. 11, Ex. 1 at 2; Ford's SUMF No. 11 at ¶ 1.) Bethany Baptist purchased a new 2003 van in 2003 from Princeton Ford in New Jersey for approximately $28,000. (Andresen Certif. No. 11, Ex. 1 at 2; Ford's SUMF No. 11 at ¶ 1.) Bethany Baptist also owns a 1993 van and a 1994 van, but it has not provided any information regarding the purchases of those vehicles. (Congleton Dep. at 16:3–19; 49:17–50:9; Ford's SUMF No. 11 at ¶ 1.) Bethany Baptist does not know if anyone at the Ford dealerships made any statements concerning the vans at the time of purchase and does not know if it looked at any advertising material. (Congleton Dep. at 32:21–33:2, 35:14–17, 59:4–9.) James Congleton, the director of the transportation ministry at Bethany Baptist, testified that around 2006 he began limiting the number of passengers in the vans to ten or eleven people "[b]ecause [the church] heard that they became unsafe for carrying more people or a lot of cargo, that they were top heavy." (*Id.* at 18:14–19:6.) Prior to that time, the church typically carried the full capacity on Sundays, but did not do so for services during the week. (*Id.* at 45:8–23.)

### B. NJCFA

#### 1. Motion for Summary Judgment

Ford contends that this Court should grant summary judgment with respect to the New Jersey Plaintiffs' NJCFA claims because the New Jersey Plaintiffs have failed to establish an

"ascertainable loss" as required by N.J. Stat. Ann. § 56:8–19. This Court agrees and will grant summary judgment with respect to those claims. The NJCFA provides that

> [a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.

N.J. Stat. Ann. § 56:8–19. The New Jersey Supreme Court has held that to give effect to the "ascertainable loss" requirement of the NJCFA, "a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss." *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 248, 872 A.2d 783 (2005). "To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory," and in order to avoid summary judgment, the evidence "must be presented with some certainty demonstrating that it is capable of calculation." *Id.* "The certainty implicit in the concept of an 'ascertainable' loss is that it is quantifiable or measurable." *Id.; see also* Arcand v. Brother Int'l Corp., 673 F.Supp.2d 282, 300 (D.N.J.2009) (stating that plaintiff must, "[a]t the very least, ... be able to quantify or measure what loss he has suffered or will suffer"). Furthermore, "by the time of a summary judgment motion, it is the plaintiff's obligation to be able to make such a demonstration or risk dismissal of the cause." *Thiedemann,* 183 N.J. at 249, 872 A.2d 783.

**\*28** The Court in *Thiedemann* recognized that "[t]he ascertainable loss requirement operates as an integral check upon the balance struck by the NJCFA between the consuming public and sellers of goods." *Id.* at 251, 872 A.2d 783. The Court acknowledged the importance of that balance by noting that "[d]efects can, and do, arise," and that "[t]he mere fact that [a] ... defect arises does not establish, in and of itself, an actual and ascertainable loss to the ... purchaser." *Id.; see also* Solo v. Bed Bath & Beyond, Inc ., Civ. No. 06–1908, 2007 WL 1237825, at \*3 (D.N.J. Apr. 26, 2007) (holding that plaintiff, alleging that a sheet set purchased from defendant contained a thread count less than half of what was advertised, nonetheless failed to set forth a measurable loss sufficient to satisfy the ascertainable loss requirement). Thus, even though a product may be defective, a subjective assertion of a diminution in value or loss of a benefit-of-the-bargain will be insufficient to support a quantifiable loss; rather, the plaintiff must produce specific proofs. *Thiedemann,* 183 N.J. at 252, 872 A.2d 783; *see also* Parker v. Howmedica Osteonics Corp., Civ. No. 07–02400, 2008 WL 141628, at \*4 (D.N.J. Jan.14, 2008) ("When a plaintiff fails to give particulars regarding their ascertainable loss, and when they offer broad and conclusory allegations, the ascertainable loss requirement has not been met.").

In this case, the New Jersey Plaintiffs have failed to establish an ascertainable loss. The New Jersey Plaintiffs repeatedly assert that they have suffered various losses, but fail to establish any of those losses with any degree of certainty. The allegations set forth by the New Jersey Plaintiffs are replete with generalized statements concerning loss; however, the evidence submitted by the New Jersey Plaintiffs contains no specific proofs such that the losses could be quantified or measured. It was the New Jersey Plaintiffs' obligation to show an ascertainable loss in opposition to Ford's motion for summary judgment, and because the New Jersey Plaintiffs have failed to provide particularized evidence of such calculable losses, this Court will grant Ford's motions for summary judgment with respect to the New Jersey Plaintiffs' NJCFA claims.

### 2. Motion to Strike

Ford filed its motions for summary judgment on March 24, 2009. The New Jersey Plaintiffs filed their opposition brief on May 22, 2009, and Ford filed its reply brief on July 10, 2009. Nearly one month later, on August 7, 2009, Plaintiffs submitted a letter to the court expressing several additional arguments in opposition to Ford's summary judgment motion with respect to the New Jersey Plaintiffs, along with an affidavit pursuant to Federal Rule of Civil Procedure 56(f) requesting additional time for discovery. On August 21, 2009, Ford filed a motion to strike Plaintiffs' August 7 letter and affidavit as improper sur-replies and as insufficient to comply with Rule 56(f). For the following reasons, this Court will grant Ford's motion to strike.

**\*29** Local Rule 7.1(d)(6) provides that "[n]o sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned." A court may strike a party's sur-reply if filed without permission from the court. *See, e.g.,* Hailstalk v. Antique Auto Classic Car Storage, LLC,

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 66 of 260
PageID: 69730

Civ. No. 07–5195, 2008 WL 4192275, at *8 (D.N.J. Sept.9, 2008); *Niyogi v. Intersil Corp.,* Civ. No. 05–4685, 2006 WL 1128725, at *3 (D.N.J. Apr.27, 2006). This Court finds that Plaintiffs' letter and affidavit, filed without permission from the Court, constitute improper sur-replies. *See Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F.Supp.2d 732, 741–42 (D.N.J.2001) (concluding that letter submitted by plaintiff after conclusion of summary judgment briefing constituted improper sur-reply). Therefore, this Court will grant Ford's motion to strike Plaintiffs' August 7 letter and affidavit.

Even if the Court were to consider the arguments raised in Plaintiffs' letter and accompanying affidavit, Plaintiffs' arguments are nonetheless unavailing. As discussed above, Ford argued, and this Court agrees, that the New Jersey Plaintiffs have failed to submit any evidence, such as expert testimony, that would establish an ascertainable loss with regard to the New Jersey Plaintiffs' NJCFA claims. In their August 7 letter, Plaintiffs contend that the Court should deny Ford's summary judgment motion because Plaintiffs are not yet required to submit such expert testimony. Plaintiffs base their argument on the contention that the Fifth Amended Pretrial Scheduling Order, filed on April 19, 2007, did not require the parties to disclose experts until 45 days after the Court issued a ruling on class certification. Plaintiffs' argument is without merit. The Fifth Amended Pretrial Scheduling Order has been inconsistent with subsequent scheduling orders since October 18, 2008, when the Eighth Amended Pretrial Scheduling Order was adopted. That Order provided a January 12, 2009 deadline for Ford's summary judgment motions and a March 13, 2009 deadline for Plaintiffs ' motion for class certification. The deadlines regarding depositions of experts in that Order relate to the experts Plaintiffs would rely on for their class certification motion.

Plaintiffs contend, however, that the Eighth Amended Pretrial Scheduling Order contemplates that experts would be disclosed, and expert testimony taken, after a decision on Plaintiffs' motion for class certification, which was after the deadline set for Ford's summary judgment motions. Plaintiffs rely on a clause in the fourth paragraph of the Eighth Amended Pretrial Scheduling Order that provides that "[p]laintiffs will not waive any arguments that expert discovery is required precluding summary judgment." Plaintiffs, however, fail to quote the entire sentence, which provides more context to the clause. The sentence in its entirety reads: "Plaintiffs will not waive any arguments that expert discovery is required precluding summary judgment,

but plaintiffs will continue bearing the burden under *Federal Rule of Civil Procedure 56(f)* in this regard." (emphasis added). Thus, the Eighth Amended Pretrial Scheduling Order explicitly provides that although Plaintiffs did not waive their arguments regarding expert discovery, the Plaintiffs were still required to comply with the requirements of Rule 56(f) with regard to Ford's motions for summary judgment.

**\*30** Pursuant to Rule 56(f), if a party cannot at the time of a summary judgment motion present facts essential to justify its opposition to the summary judgment motion, and the party believes that additional time for discovery is needed, that party must file an affidavit setting forth why the additional time is needed and what information is sought. *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 510–11 (3d Cir.1994). The Third Circuit has made clear that "in all but the most exceptional cases, failure to comply with Rule 56(f) is fatal to a claim of insufficient discovery." *Bradley v. United States,* 299 F.3d 197, 207 (3d Cir.2002). [10]

It is undisputed that Plaintiffs did not file a Rule 56(f) affidavit in response to Ford's motions for summary judgment. Plaintiffs, however, contend that their brief in opposition to Ford's summary judgment motions is sufficient to meet the affidavit requirement of Rule 56(f). The Third Circuit has expressly rejected that argument. In *Pastore,* the Third Circuit held that

> Rule 56(f) clearly requires that an affidavit be filed. The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit.

24 F.3d at 511 (citation omitted). Thus, this Court will not accept Plaintiffs' brief in opposition to the summary judgment motions as a replacement for Rule 56(f)'s affidavit requirement. Moreover, Plaintiffs' failure to submit a Rule 56(f) affidavit is fatal to the arguments in their August 7 letter that they should be allowed additional time to submit expert testimony to oppose Ford's summary judgment motions.

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 67 of 260
PageID: 69731
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

In an attempt to remedy their failure to submit a timely Rule 56(f) affidavit, Plaintiffs included a Rule 56(f) affidavit with their August 7 letter to the Court. This affidavit, like the letter, constitutes an improper sur-reply. Even if the Court were to consider the Rule 56(f) affidavit, it fails to meet the substantive content requirements of Rule 56(f). In order for an affidavit to comply with requirements of Rule 56(f), the affidavit must "identify[ ] 'with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.' " *Bradley,* 299 F.3d at 206–07 (quoting *St. Surin v. V.I. Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir.1994)). A court need not grant a Rule 56(f) request "when the party opposing the [summary judgment] motion simply relies on vague assertions that additional discovery will produce needed, but unspecified facts, particularly when 'ample time and opportunities for discovery have already lapsed." *SEC v. Chester Holdings, Ltd.,* 41 F.Supp.2d 505, 517 (D.N.J.1999) (citation omitted).

Plaintiffs' August 7 affidavit simply contains a portion of the procedural history of the case and then states that "[b]ecause Plaintiffs are not scheduled to disclose experts to be relied upon until forty-five (45) days after the Court's ruling on Plaintiffs' Motion for Class Certification, Plaintiffs cannot present expert facts essential to justify its Opposition to Ford's Motions for Summary Judgment." Plaintiffs' affidavit does not specify what information the Plaintiffs are seeking or how that information, if uncovered, would preclude summary judgment. Thus, not only have Plaintiffs failed to timely file a Rule 56(f) affidavit, but the untimely affidavit, filed as an improper sur-reply, does not even meet the requirements that would allow the Court to grant a Rule 56(f) request.

**\*31** In summary, this Court will grant Ford's motion to strike Plaintiffs' August 7 letter and affidavit. These documents constitute improper sur-replies, and moreover, the arguments presented in the letter and affidavit are without merit and are insufficient to satisfy the requirements of Rule 56(f).

### *C. Express Warranty*

Ford also contends that this Court should grant its summary judgment motions with respect to the New Jersey Plaintiffs' express warranty claims. Under New Jersey law, an express warranty can be created by the following:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J. Stat. Ann. § 12A:2–313. Thus, "an express warranty is created when a promise is made by a seller to a buyer which relates to a good and becomes the basis of the bargain." *Liberty Lincoln–Mercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 824 (3d Cir.1999).

In *Simmons v. Stryker Corp.,* the defendants were manufacturers of a device referred to as a "pain pump" that delivered infusions of anesthetics to surgical patients. Civ. No. 08–3451, 2008 WL 4936982, at \*1 (D.N.J. Nov. 17, 2008). The plaintiff alleged that the manufacturer expressly warranted that the pain pump was fit and safe for the purpose for which it was to be used. *Id.* The plaintiff argued that the manufacturer breached the express warranty because the pain pump was not safe and caused injuries to users. *Id.* The court concluded that the plaintiff's breach of warranty claim was "devoid of any 'factual matter' to support the existence of an express warranty," and the court dismissed the plaintiff's claims because the plaintiff "identifie[d] no source whatsoever of any alleged warranty." *Id .* at \*2.

In this case, the New Jersey Plaintiffs have failed to identify a source for the alleged warranty regarding the safety level of transporting 15 passengers in the E–350 van. Although the van was marketed as a "15–passenger" van, New Jersey Plaintiffs have not submitted any evidence that Ford or any Ford representatives made any representations concerning the "safety" of transporting 15 passengers. Ford's advertisements and brochures described the E–350 van as a "15–passenger van." Although that description could be interpreted to *imply* a certain level of safety with regard to carrying 15 passengers, the description alone does not form the basis for an express warranty. Thus, the New Jersey Plaintiffs have failed to establish that Ford made an express representation regarding the safety of the E–350 vans and, therefore, this Court will grant Ford's motions for summary judgment with respect to the New Jersey Plaintiffs' express warranty claims.

Case 1:19-md-02875-BMB-SAK   Document 2057-2   Filed 05/10/22   Page 68 of 260 PageID: 69732

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

### D. Implied Warranty

**\*32** Ford also seeks summary judgment on the New Jersey Plaintiffs' implied warranty claims, arguing that summary judgment is required because the New Jersey Plaintiffs cannot show an actual injury or ascertainable loss. Ford's argument is based on the assertion that the New Jersey Supreme Court's decision in *Thiedemann,* discussed above with regard to the New Jersey Plaintiffs' NJCFA claims, also applies to warranty claims. Ford repeatedly asserts simply that Thiedemann requires summary judgment on the New Jersey Plaintiffs' "CFA and warranty claims," but Ford fails to offer any explanation as to how Thiedemann applies to warranty claims. In Thiedemann, the Court focused only on the plaintiffs' claims brought under the NJCFA. The Court expressly noted that the "appeal focus[ed] on the [NJCFA's] enigmatic requirement of an 'ascertainable loss,' " and that certification was granted "to review whether plaintiffs had made out a case that could withstand defendant's motion for summary judgment in respect of the issue of ascertainable loss." *Thiedemann,* 183 N.J. at 238, 240, 872 A.2d 783. Ford has not cited any authority to support its contention that the NJCFA's "ascertainable loss" requirements apply equally to claims involving breaches of an implied warranty, and this Court is unaware of any case that extends the Court's holding in *Thiedemann* to such claims. Absent any other argument from Ford to support its motions for summary judgment on this issue, this Court will deny Ford's motions with respect to the New Jersey Plaintiffs' implied warranty claims.

### E. Unjust Enrichment

In New Jersey, "[t]o establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.' " *Iliadis v. Wal–Mart Stores, Inc.,* 191 N.J. 88, 110, 922 A.2d 710 (2007) (quoting *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.' " *Id.* (quoting *VRG Corp.,* 135 N.J. at 554, 641 A.2d 519). Moreover, "[a] claim of unjust enrichment also requires that the plaintiff allege a sufficiently direct relationship with the defendant to support the claim." *Nelson v. Xacta 3000 Inc.,* Civ. No. 08–5426, 2009 WL 4119176, at \*7 (D.N.J. Nov.24, 2009) (citing *Maniscalco v. Brother Int'l Corp.,* 627 F.Supp.2d 494, 505–06 (D.N.J.2009). Furthermore, "it is the plaintiff's (as opposed

to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." *Eli Lilly and Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 496 (D.N.J.1998). For example, in *Cooper v. Samsung Electronics America, Inc.,* the plaintiff filed a claim for unjust enrichment against Samsung Electronics after purchasing an allegedly defective Samsung television from a retailer, Ultimate Electronics. Civ. No. 07–3853, 2008 WL 4513924, at \*10 (D.N.J. Sept. 30, 2008). The court concluded that despite the fact that the television was manufactured by Samsung, there was no relationship conferring any direct benefit on Samsung through the plaintiff's purchase from the retailer, and that therefore plaintiff failed to establish unjust enrichment. *Id.*

**\*33** Here, several of the New Jersey Plaintiffs purchased used vehicles. Faith Tabernacle purchased its used 2000 van from Giant Liccardi Auto Group. Social Clubhouse purchased a used 2002 van from Autoland, a used 1997 van from Craig Auto Sales, a used 1997 van from an unidentified used car dealer in Philadelphia, Pennsylvania, and failed to identify where the 1993 and 1994 used vans were purchased. Bethany Baptist has not identified from whom it purchased its 1993 and 1994 Ford vans. With respect to the sale of these eight vans, the New Jersey Plaintiffs have failed to establish any relationship between these dealers and Ford. They point to no evidence that Ford received any benefit from the sales at the New Jersey Plaintiffs' expense. Therefore, this Court will grant Ford's motions for summary judgment with respect to the unjust enrichment claims of Faith Tabernacle and Social Clubhouse, and with respect to the unjust enrichment claims of Bethany Baptist that are based on the 1993 and 1994 Ford vans.

The remaining unjust enrichment claims are based on new van purchases from Ford dealerships. Macedonia purchased two new 2002 vans from Dayton Ford, and Bethany Baptist purchased a new 2001 van from Holman Ford and a new 2003 van from Princeton Ford. Like other Plaintiffs in this matter, these New Jersey Plaintiffs point to no evidence in the record regarding the relationship between these dealerships and Ford and whether money paid to these dealerships was ultimately conferred upon Ford. This Court will not take judicial notice of an agency relationship based solely upon conclusory assertions that such a relationship is "axiomatic." *See Westerdale v. Kaiser–Frazer Corp.,* 6 N.J. 571, 574, 80 A.2d 91 (1951) ("While courts will take judicial notice of facts of common knowledge relating to business and occupations, such as the general course of business and the usual method of transacting it, we are unable to agree ... that

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 69 of 260
PageID: 69733

it is common knowledge that a manufacturer of automobiles supervises and controls its dealers ...."). These New Jersey Plaintiffs, by failing to present any evidence of a sufficiently direct relationship between Ford and the dealerships such that Ford received a benefit from these New Jersey Plaintiffs' purchases, have failed to satisfy their evidentiary burden. This Court will grant Ford's motions for summary judgment, without prejudice, with respect to the unjust enrichment claims of Macedonia and those of Bethany Baptist that are based on the vans purchased from the Ford dealerships. Macedonia and Bethany Baptist shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on these unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to Macedonia's and Bethany Baptist's submissions.

### F. Summary

For the foregoing reasons, this Court will grant Ford's motions for summary judgment with regard to the New Jersey Plaintiffs' NJCFA and express warranty claims and deny Ford's motions for summary judgment with regard to the implied warranty claims. The Court will grant Ford's motion for summary judgment with respect to the unjust enrichment claims of Faith Tabernacle and Social Clubhouse, and with respect to the unjust enrichment claims of Bethany Baptist that are based on the 1993 and 1994 vans. The Court will grant Ford's motions for summary judgment without prejudice with respect to the unjust enrichment claims of Macedonia and those of Bethany Baptist that are based on the 2001 and 2003 vans purchased from the Ford dealerships. Macedonia and Bethany Baptist shall have until August 13, 2010 to show cause to cure the evidentiary deficiency identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor on the implicated unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to Macedonia's and Bethany Baptist's submissions. Finally, this Court will grant Ford's motion to strike the New Jersey Plaintiffs' August 7 letter and affidavit.

### IV. Georgia

**\*34** Georgia Plaintiff Allen Temple AME Church ("Allen Temple") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of Allen Temple's claims: breach of express warranty; breach of implied warranty; violation of the Georgia Fair Business Practices Act ("Georgia FBPA"), Ga.Code Ann. § 10–1–392 *et seq.;* and unjust enrichment.

### A. Material Facts

Allen Temple purchased two Ford E–350 vans. It purchased a new 2001 vehicle in June 2001 for $27,834.25 from Beaudry Ford. (Andresen Certif. No. 8, Ex. 3 at ATA0003.) In July 2002, Allen Temple bought a new 2002 E–350 from Lou Sobh Ford for $27,771 through a no-interest financing agreement with Ford Motor Credit. (*Id.* at ATA0005–06.) At deposition, Henry Adams testified on behalf of Allen Temple and responded in the affirmative to the question "Is it your understanding that Ford represented to you that this was a safe 15–passenger vehicle?" (Adams Dep. at 124:12–15.) Yet, Adams earlier testified that Allen Temple had no communication with Ford prior to its purchases (*id.* at 29:16–20, 80 A.2d 91; 43:17–19) and saw no advertisements by Ford "that had to deal with the reliability and safety of the vehicle" (*id.* at 96:21–24, 80 A.2d 91). Allen Temple continues to use the vehicles, but has elected to not carry more than 12 persons at one time in each vehicle since 2002 or 2003, after it purchased the second van, based on media reports about the van's rollover propensity. (*Id.* at 26:7–23, 80 A.2d 91.)

### B. Express and Implied Warranty

Ford argues that this Court should grant summary judgment in its favor on Allen Temple's warranty claims because Allen Temple did not give notice of its claims as required by UCC § 2–607(3)(a). As codified under Georgia law, as a prerequisite to an express or implied warranty claim, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Ga.Code Ann. § 11–2–607(3)(a). Allen Temple contends that notice need not be given prior to filing suit, but only must be given "at some point in time." (Pls.' Omnibus Br. at 45.) Therefore, Allen Temple asserts that filing suit—here, by joining this litigation after resolution of the motion to dismiss—satisfied the notice requirement. While notice is a condition precedent to recovery for breach of warranty, Georgia courts have concluded that under appropriate circumstances, "[s]ervice of the original suit" can be reasonable notice. *See Hudson v. Gaines,* 199 Ga.App. 70, 403 S.E.2d 852, 854 (Ga.Ct.App.1991). However, in *Hudson* the court emphasized that the plaintiff filed suit eight months after the event giving rise to the warranty claims. *Id.* Here, Allen Temple joined this litigation in November 2008, more than six years after Allen Temple's purchases of its E–350 vehicles and approximately five years after Allen Temple discovered potential handling problems with the vehicles. Ford argues that this lengthy delay was unreasonable as a

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 70 of 260
PageID: 69734

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

matter of law and therefore insufficient under § 11–2–607(3)(a).

**\*35** In determining whether notice is reasonable, courts look to the purpose of the rule: facilitation of settlement negotiations and minimization of prejudice by allowing the seller the early opportunity to cure the defect or reduce damages. *See, e.g., Great Western Press, Inc. v. Atlanta Film Converting Co.,* 223 Ga.App. 861, 479 S.E.2d 143, 145 (Ga.Ct.App.1996). "Generally, whether notice has been reasonably given presents a question of fact, but summary adjudication is appropriate if the uncontroverted facts establish that notice was unreasonable as a matter of law." *Wal–Mart Stores, Inc. v. Wheeler,* 262 Ga.App. 607, 586 S.E.2d 83, 85 (Ga.Ct.App.2003). Here, this Court cannot resolve the reasonableness question because, as the Georgia Court of Appeals held in *Wal–Mart,* for a consumer or retail breach of warranty claim, "delay alone without prejudice caused by such delay is insufficient to bar relief to the plaintiff under § 11–2–607(3)(a)." *Id.* at 86.[11] Even if Ford could establish based on undisputed facts that Allen Temple's delay in providing notice was unreasonable under the circumstances, this Court cannot preclude Allen Temple's warranty claims absent any evidence of prejudice to Ford from the delay. In *Wal–Mart,* the Georgia Court of Appeals affirmed the trial court's denial of defendant's motion for summary judgment because defendant did not present any evidence of prejudice to the trial court. *Id.* at 87. Ford likewise fails to present any evidence of prejudice. It fails even to mention the prejudice requirement and points to no evidence whatsoever in the record regarding any prejudice it might have suffered from Allen Temple's delay. Therefore, this Court cannot grant summary judgment in Ford's favor on Allen Temple's warranty claims on the basis of lack of notice.

While in many of its other summary judgment motions, Ford presents various other meritorious arguments against Plaintiffs' warranty claims, it relies solely on the notice theory in moving for summary judgment against Allen Temple. Absent any other argument from Ford to support its motion for summary judgment on Allen Temple's warranty claims, this Court will deny Ford's motion with regard to these claims.

*C. Georgia FBPA*

The Georgia FBPA bars "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." Ga.Code Ann. § 10–1–393(a). The FBPA defines "consumer acts or practices" as "acts or practices intended to encourage consumer transactions," Ga.Code Ann. § 10–1–392(a)(7), and defines "consumer transactions" as "the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes," Ga.Code Ann. § 10–1–392(a)(10). Any "person" who suffers injury or damage from violation of the Georgia FBPA may bring a claim under the statute. Ga.Code Ann. § 10–1–399(a). Allen Temple asserts FBPA claims with regard to the two E–350 vehicles it purchased.

**\*36** Ford argues that Allen Temple lacks standing to assert a claim under the Georgia FBPA because it is not a "natural person" and it did not purchase the vans "primarily for personal, family, or household purposes." In the MTD Opinion, Judge Ackerman dismissed other state consumer fraud statute claims because the churches were not natural persons and did not purchase the vehicles for these consumer purposes. Allen Temple argues that the purchases took place "in the conduct of consumer acts or practices" and that a business may assert a Georgia FBPA claim if it acted as a consumer. (Pls.' Omnibus Br. at 19.) Ford responds that Allen Temple did not act as a consumer here because it did not purchase its vehicles for personal, family, or household purposes.

Both parties fail to cite the statutory definition of "person." The statute defines "person" as "a natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity." Ga.Code Ann. § 10–1–392(a)(24). As opposed to other states' consumer fraud statutes (such as California), the Georgia FBPA extends standing to corporations and does not limit standing to natural persons. Ga.Code Ann. § 10–1–399(a) ("Any person who suffers injury or damage as a result of a violation ... may bring an action."). Therefore, Allen Temple has standing to bring its Georgia FBPA claim as long as it complains of deceptive business practices "intended to encourage consumer transactions."

Allen Temple contends that Ford's selling of the E–350 vans to the public and its advertising representations were intended to encourage consumer transactions. Ford argues that Allen Temple produced no evidence that the alleged injury suffered by Allen Temple stemmed from activity intended to encourage transactions for personal, family, or household purposes in that Ford marketed the vans to churches and other community groups. The Court of Appeals of Georgia has held that in determining whether

a defendant's actions took place within the context of the consumer marketplace under the Georgia FBPA, "two factors are determinative: (a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact." *State ex rel. Myles v. Meredith Chevrolet, Inc.,* 145 Ga.App. 8, 244 S.E.2d 15, 18 (Ga.Ct.App.1978). Deceptive advertisements to the general public triggers the protections of the Georgia FBPA, while those "even though in a public medium, addressed to the nonconsuming public are not in contravention of the Act if such advertisements cannot be said to reasonably tend to encourage consumer transactions." *Id.* (stating that such advertisements "would not be violative if the medium chosen reasonably restricted the audience (i.e., market) to nonconsumers, even though the product so advertised were eventually to reach the hands of consumers").

Caselaw applying these standards is scarce. In *Meredith Chevrolet,* defendant allegedly rolled back the odometers on vehicles sold at a *private* auction to retail car dealers. The court concluded that while the deceptive act itself "can reasonably be said to tend to encourage a consumer transaction (thus supplying the market impact factor), the medium chosen to introduce that act into the stream of commerce, i.e., a private sale limited to nonconsumers, is outside the context of consumer commerce." *Id.* at 19. Non-consumers also may not bring suit under the Georgia FBPA for misrepresentations made by their competitors to the general consuming public. *Friedlander v. PDK Labs, Inc.,* 266 Ga. 180, 465 S.E.2d 670, 671 (Ga.1996).

**\*37** Here, although Ford allegedly made misrepresentations to the public, Allen Temple cannot maintain suit because Ford's purported conduct with regard to Allen Temple did not occur in a consumer context. Allen Temple did not purchase the vans primarily for personal, family, or household use. The court in *Meredith Chevrolet* stated that "[o]ffering a product for sale by opening one's doors to the general public would trigger the prohibitions of the Act if some deceptive act or practice were involved." 244 S.E.2d at 18–19. This principle would seem to apply here, as Ford did not limit sales of the E-350 vans to "private offers for sale, communicated between merchants." *Id.* However, *Friedlander* instructs that the identity and nature of the plaintiff also matters. The competitor-plaintiff in *Friedlander* was not a consumer, and neither is Allen Temple here under the statutory definition of "consumer transaction." While a "person" with standing under the statute includes an unincorporated association,

such a plaintiff still must bring a claim alleging injury to itself based on consumer acts or transactions, and Allen Temple cannot do so here. All Plaintiffs allege that Ford marketed the E-350 to church groups and other organizations (Compl.¶ 16), and there is no evidence in the record that Ford engaged in similar campaigns promoting the E-350 for "personal, family, or household use." Thus, the deceptive acts in which Allen Temple alleges Ford engaged did not involve consumer transactions as defined by the Georgia FBPA or promote such transactions. It is undisputed that Allen Temple did not purchase the vans for any particular parishioner's or employee's personal, family, or household use. Rather, it bought the vans for use in the course of church business, even though that business might have additionally benefitted individual members personally. Therefore, Allen Temple lacks standing to assert its Georgia FBPA claims.

For these reasons, this Court will grant Ford's motion for summary judgment as to Allen Temple's FBPA claims.

### D. Unjust Enrichment

Under Georgia law, an unjust enrichment claim may lie in the absence of a contract "when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Wachovia Ins. Servs., Inc. v. Fallon,* 299 Ga.App. 440, 682 S.E.2d 657, 665 (Ga.Ct.App.2009) (citations and quotations omitted). "Inherent in the theory of unjust enrichment is the requirement that the receiving party knew of the value being bestowed upon him by another and failed to stop the act or to reject the benefit prior to its conferment." *Hollifield v. Monte Vista Biblical Gardens, Inc.,* 251 Ga.App. 124, 553 S.E.2d 662, 670 (Ga.Ct.App.2001).

Allen Temple purchased its vehicles from Ford dealers, but just as other Plaintiffs have failed to produce evidence regarding the relationship between the dealer and Ford, Allen Temple presents no evidence to establish any such relationship by which Ford could have been unjustly enriched by Allen Temple's purchases. However, Ford does not raise this issue as a basis for awarding it summary judgment, although it argues for summary judgment on unjust enrichment claims brought by other Plaintiffs on this rationale. Ford also fails to assert that Allen Temple cannot recover under an unjust enrichment theory because it had contractual relationships with the Ford dealers. Instead, Ford only contends that Allen Temple cannot show that it purchased its vans at higher than actual, fair market value,

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 72 of 260
PageID: 69736

In re Ford Motor Co. E-350 van Products Liability... Not Reported in...

and therefore could not have conferred an undue benefit on Ford. (Ford Reply Br. at 52 ("Allen Temple purchased its two vans new from Ford dealers. Ford's only argument as to Allen Temple's unjust enrichment claim was that Allen Temple could not prove that Ford was unjustly enriched at Ford's expense because it could not prove that it purchased its van at an artificially inflated price.").) Ford argues that Allen Temple cannot show that it paid more than the fair market value for its vehicles and therefore cannot show that it conferred a benefit on Ford. In the Complaint, Plaintiffs allege that various events occurring before June 2001 led to a "diminution in the value" of E–350 vans. (Compl.¶ 61.) Ford alleges that Allen Temple purchased its first van after these events and therefore cannot prove that its sale price did not already reflect the actual value of the van. Additional events between June 2001 and July 2002 also allegedly diminished the vans' value, and Ford claims that Allen Temple's unjust enrichment claim as to its second van suffers from the same infirmity. Plaintiffs' Response Brief does not specifically address Allen Temple's unjust enrichment claim. Still, this Court cannot resolve Allen Temple's unjust enrichment claim as a matter of law because disputed facts exist regarding the actual market value of the vehicles. While some of the events listed in the Complaint might have occurred before Allen Temple purchased either its first or second vehicle, there are disputes regarding when Allen Temple learned of the problems with the vehicles and what, if any, representations Allen Temple received from Ford. Under the equitable theory of unjust enrichment, this Court cannot conclude based on speculation that because certain facts regarding the vehicles might have been made public prior to Allen Temple's purchases, the price paid by Allen Temple necessarily reflected fair market value and no unjust enrichment. [12] This Court will deny Ford's motion with regard to the unjust enrichment claim.

### E. Summary

**\*38** For the foregoing reasons, this Court will deny Ford's motion for summary judgment with respect to Allen Temple's breach of express warranty, breach of implied warranty, and unjust enrichment claims. This Court will grant Ford's motion for summary judgment as to Allen Temple's Georgia FBPA claims.

## V. Pennsylvania

Pennsylvania Plaintiffs Bethel AME Church ("Bethel"), Hickman Temple AME Church ("Hickman Temple"), and Mount Airy Baptist Church ("Mt.Airy") were added to this litigation after Judge Ackerman decided Ford's motion

to dismiss. Ford now moves for summary judgment as to all of the Pennsylvania Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL"), 73 Pa. Cons.Stat. § 201–1 *et seq.;* and unjust enrichment.

### A. Material Facts

#### 1. Bethel
Bethel owns two E–350 vans. Its first vehicle, a new 2000 model, was purchased from Parkway East Ford by Amoore Health Systems, Inc. ("Amoore") in June 2000 for $30,800. Bethel effectively purchased the vehicle from Amoore by paying the salaries of handicapped drivers provided by Amoore. The salaries "were equivalent to what it would have been to make a monthly payment." (Miott Dep. at 33:12–14.) Thus, Bethel "financed [the vehicle] through Amoore ... [a]nd it was a criteria that after we reached the amount paid for the van, that the van would become Bethel's." (*Id.* at 32:14–19, 553 S.E.2d 662.) While Amoore negotiated the purchase price of the van, representatives of Bethel were present and consulted on the purchase. (*Id.* at 37:3–9, 553 S.E.2d 662.) Bethel representatives indicated at deposition that Ford salespeople discussed the features of the E–350 van, but could not recall precisely what Bethel might have been told about its 15–passenger capacity. (Ford SUMF No. 12 ¶¶ 4–10; Pls .' Responsive Statement of Material Facts for Bethel ¶¶ 4–10.)

Bethel purchased its second E–350 van, a new 2001 model, directly from Parkway East Ford in November 2001 for $29,530. [13] Bethel has never instructed its drivers to not fill the vehicles to capacity, and Bethel sometimes uses the vans filled to capacity (Ingram Dep. at 110:14–24), but it has also experienced some difficulties in handling when driven with capacity seating (*see, e .g.,* Miott Dep. at 97:7–98:23; 101:19–102:4; 105:24–106:23). Bethel has had no difficulties procuring insurance for its vehicles. Bethel has not sold the vehicles and has no intention of doing so.

#### 2. Hickman Temple
Hickman Temple purchased a used 2001 E–350 van from Springfield Ford in 2003 for $17,133.87. Hickman Temple does not recall viewing any Ford advertisements or other materials (Feaster Dep. at 32:5–14), but does recall that the salesman at the Ford dealership discussed the safety of the vehicle. According to Johnnie W. Feaster, who testified on

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 73 of 260
PageID: 69737

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

behalf of Hickman Temple, the salesman at Springfield Ford "talked about how safety was, that this would be the vehicle that you want to do the job because it was safe and it would deliver." (*Id.* at 31:4–7, 553 S.E.2d 662). Hickman Temple still uses the vehicle for transporting members, and does not limit the capacity of its vehicle and often drives it with 15 passengers. (*Id.* at 59:14–19, 553 S.E.2d 662; 40:14–44:18.)

*3. Mt. Airy*

**\*39** Mt. Airy purchased a used 2004 E–350 van from Chapman Ford Sales for $19,998 in August 2005. Mt. Airy does not recall if it viewed any Ford materials or relied on any Ford representations when buying the vehicle. (W. Brown Dep. at 29:22–30:3; 56:5–11.) The church requires qualified drivers to operate the vehicle and, based on requirements by its insurance company, requires that drivers take defensive driving courses. (*Id.* at 51:21–52:1, 553 S.E.2d 662; 48:15–19.) It has placed no limits on capacity, and it operates the vehicles fully-loaded on occasion. (*Id.* at 38:17–19; 39:6–12, 553 S.E.2d 662; 42:11–14.) It has experienced some stability and handling problems when operating the vehicle filled to capacity. (*Id.* at 11:1–13, 553 S.E.2d 662.)

*B. Express Warranty and Implied Warranty: Notice*

Ford contends that the Pennsylvania Plaintiffs' express and implied warranty claims are barred by those Plaintiffs' failure to give notice within a reasonable time. UCC § 2–607, as codified in Pennsylvania, provides that, to assert a warranty claim post-tender, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." 13 Pa. Cons.Stat. § 2607(c)(1). The Pennsylvania Plaintiffs argue that filing suit—here, by joining this litigation after resolution of the motion to dismiss—satisfied the notice requirement. The Pennsylvania Supreme Court has not definitively addressed whether the filing of a complaint constitutes sufficient notice under § 2607. However, a court in the Middle District of Pennsylvania has held that "nothing in section 1201 or 2607 ... specifically prohibits a civil complaint from serving as notice of a breach of warranty." *Bednarski v. Hideout Homes & Realty, Inc.,* 709 F.Supp. 90, 93 (M.D.Pa.1988). The court in *Bednarski* relied upon a prior ruling by the Pennsylvania Superior Court that the filing of a complaint was sufficient for notice of rejection of goods, and reasoned that there was no indication that the Pennsylvania Supreme Court would rule otherwise with regard to notice of breach of warranty. *Id.* at 93–94 (discussing *Yates v. Clifford*

*Motors, Inc.,* 283 Pa.Super. 293, 423 A.2d 1262, 1269–70 (Pa.Super.Ct.1980)).

Ford attempts to distinguish *Bednarski* by pointing to the Illinois Supreme Court's treatment of that case in applying Pennsylvania law. In *Connick v. Suzuki Motor Co.,* the Illinois Supreme Court reasoned that Pennsylvania law allows the filing of a complaint to satisfy the notice requirement only where the plaintiff suffered personal injuries. 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 590–91 (Ill.1996). The *Connick* court distinguished *Bednarski* because *Bednarski* involved a plaintiff who suffered personal injuries, and Ford here similarly argues that, because the Pennsylvania Plaintiffs did not suffer any personal injury, the Pennsylvania Supreme Court would hold that the filing of the complaint fails to fulfill the notice requirement. While Ford's interpretation of *Bednarksi* holds some appeal, two cases from the Pennsylvania Court of Common Pleas expressly reject Ford's theory. In *Solarz v. DaimlerChrysler Corp.,* the court followed *Bednarski* and found defendant's reliance on *Connick* to distinguish *Bednarski* to be "misplaced." No.2033, 2002 WL 452218, at *12 (Pa.Com.Pl. Mar.13, 2002). The court in *Solarz* stated that "[n]owhere in the *Bednarski* opinion does the court expressly carve out an exception to the notice requirement for 'consumer buyers who suffer personal injury.' In fact, the holding in Bednarski, based on Pennsylvania law, is quite clear and unambiguous." *Id.* Several months later, another opinion from the Court of Common Pleas similarly held, relying on *Bednarski,* that "[t]he filing of a complaint has been held to satisfy the notice requirement for a breach of warranty claim." *Precision Towers, Inc. v. Nat–Com, Inc.,* No. 2143, 2002 WL 31247992, at *5 (Pa.Com.Pl. Sept.23, 2002).

**\*40** In the absence of any contrary authority from the Pennsylvania Supreme Court, and in light of the approval of the federal court's holding by lower Pennsylvania courts, this Court will follow *Bednarski.* The addition of the Pennsylvania Plaintiffs' to this litigation by joining the Complaint constitutes sufficient notice under Pennsylvania law for breach of warranty claims. The reasonableness of the time within which the Pennsylvania Plaintiffs gave notice, on this disputed record, is a question of fact and cannot be resolved on this motion. *Rad Servs., Inc. v. Am. Refining Group, Inc.,* 330 Pa.Super. 308, 479 A.2d 565 (Pa.Super.Ct.1984) ("Whether a buyer discovers a breach and gives notice of it within a reasonable time is normally a jury question. Only under the situation where the facts are undisputed and the buyer clearly ought to have known

Case 1:19-md-02875-BMB-SAK   Document 2057-2   Filed 05/10/22   Page 74 of 260
PageID: 69738

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

of the alleged defect does the question of reasonableness become one for the court." (citations omitted)); *see also Bednarski,* 709 F.Supp. at 94. Therefore, this Court will not grant summary judgment in Ford's favor on the Pennsylvania Plaintiffs' warranty claims for lack of notice.

### C. Express Warranty

For the same reasons discussed previously with regard to other Plaintiffs, Ford's statement that the E–350 van is a "15–passenger van" does not create an express warranty of the safety of the vehicle in transporting 15 passengers. According to Pennsylvania law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 13 Pa. Cons.Stat. § 2313(a) (1). "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." 13 Pa. Cons.Stat. § 2313(a) (2). The Pennsylvania Plaintiffs assert that Ford made an express warranty of safety, but Ford's core description of the vehicle "contain[s] no language of promise, description, or affirmation of fact that conceivably could constitute an express warranty as to product safety." *Kenepp v. Am. Edwards Labs.,* 859 F.Supp. 809, 817 (E.D.Pa.1994). It is undisputed that no Ford representative, let alone any other person involved in the sale of the vehicles to the Pennsylvania Plaintiffs, made an express representation of *safety* with regard to the transport of 15 passengers to the Pennsylvania Plaintiffs. After extensive discovery, Plaintiffs point to no evidence to the contrary, and do not identify any specific, unequivocal statement made to these Plaintiffs, or those affiliated with them, regarding safety in the transport of 15 passengers.

With regard to the testimony of Hickman Temple's representative that the Springfield Ford salesman stated generally that the van was "the vehicle that you want to do the job because it was safe and it would deliver" (Feaster Dep. at 31:6–7), Hickman Temple has not met its burden to show that the salesman acted as Ford's agent such that his statements could be attributable to Ford. Even if this Court could find that these statements could be attributed to Ford, the statements amount at most to non-actionable puffery. 13 Pa. Cons.Stat. § 2313(b) ("[A] statement purporting to be merely the opinion of the seller or commendation of the goods does not create a warranty."); *County of Mercer v. UniLect Corp.,* 612 F.Supp.2d 638, 650 (W.D.Pa.2009) ("Opinion statements do not create express warranties."). In other contexts, courts

in Pennsylvania have concluded that non-specific statements regarding the general safety of a product were mere puffing. *See Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 903 (Pa.1975) (in misrepresentation tort action, finding that statements in brochure that "you are assured of a safe, dependable helicopter" was non-actionable puffing); *see also Hoffman v. A.B. Chance Co.,* 339 F.Supp. 1385, 1388 (M.D.Pa.1972) (in misrepresentation tort action, concluding that "[t]he general representation that a product 'offered unprecedented safety' is a statement of opinion and is in the nature of seller's 'puffing' "). As a matter of law, the Pennsylvania Plaintiffs' express warranty claims must fail.

**\*41** Accordingly, this Court will grant Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' express warranty claims.

### D. Implied Warranty

Pennsylvania courts have not directly addressed whether a plaintiff can recover under a UCC implied warranty theory for an allegedly defective product that has not actually malfunctioned or caused personal injury. Ford asks this Court to predict that Pennsylvania courts would apply the rule followed by other states that a plaintiff cannot recover under such circumstances. Ford contends that under UCC § 2–314, codified in Pennsylvania at 13 Pa. Cons.Stat. § 2314, the Pennsylvania Plaintiffs' vehicles are "merchantable" because they are fit for their ordinary purpose, and further argues that Plaintiffs' description of the vehicle as defective is not based on an objective, legally recognizable standard.

Pennsylvania law imposes an implied warranty of merchantability on all contracts for the sale of goods if the seller is a merchant. 13 Pa. Cons.Stat. § 2314(a). To be merchantable, the UCC as codified in Pennsylvania provides that the goods, in relevant part, must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used." 13 Pa. Cons.Stat. § 2314(b). The Pennsylvania Supreme Court has held that "[t]he concept of merchantability does not require that the goods be the best quality or the best obtainable but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used." *Gall v. Allegheny Cty. Health Dep't,* 521 Pa. 68, 555 A.2d 786, 789–90 (Pa.1989) (internal citations omitted).

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 75 of 260
PageID: 69739

Ford devotes much of its argument with regard to the Pennsylvania Plaintiffs' implied warranty claims to an extended discussion of the potential policy repercussions of allowing Plaintiffs to proceed with their claims for purely economic injury while lacking a consistently expressed, internally consistent theory of the "defect" of the E–350 van. Ford bemoans the possibility that "defect" could mean different things to different juries in different cases in different states. (*See* Ford Br. No. 19 at 14 ("And it also follows that a product is not unmerchantable simply because that plaintiff's lawyer, on a particular day before a particular jury opposed by particular defense lawyer, can actually prevail on such a claim, because on another day before another jury opposed by a different defense lawyer he or she could also lose.").) Because no governmental entity has declared the vehicles to be defective, Ford contends that no objective standard for defect exists. Ford urges this Court to conclude that Pennsylvania courts would follow the reasoning of the Supreme Judicial Court of Massachusetts in *Iannacchino v. Ford Motor Co.* that an implied warranty claim grounded solely on economic injury based on overpayment, not personal injury, cannot lie under such circumstances. *See Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 888 N.E.2d 879, 888 (Mass.2008) ("When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.").

**\*42** While the Pennsylvania Supreme Court might adopt *Iannacchino* in the future, it has not yet done so, and Ford points to no caselaw from lower courts in Pennsylvania suggesting any trend in that direction.[14] Rather, Ford's emphasis on the contingent nature of the Pennsylvania Plaintiffs' claims only highlights that many disputed issues of fact exist that prevent this Court from being able to decide these Plaintiffs' implied warranty claims as a matter of law. Ford notes that the risk-utility approach often applied by Pennsylvania courts requires balancing of many factors that "cannot be known with precision," and "in the typical case, reasonable people can and do disagree about whether a design related risk of harm renders a product defective." (Ford Br. No. 19 at 13.) Ford later reiterates that "[n]othing in plaintiffs' complaint suggests that this is anything other than a typical case where the issue of 'defect' is reasonably debatable. *i.e.,* where reasonable people can reach different conclusions on the issue." (*Id.* at 14, 888 N.E.2d 879.) This Court agrees, and absent definitive guidance from any Pennsylvania court that

plaintiffs asserting economic harm and not personal injury must allege a defect based on a governmentally-required standard, the question of defect is reserved for the jury.

Ford raises no other alternative arguments against the Pennsylvania Plaintiffs' implied warranty claims. This Court will deny Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' implied warranty claims.

*E. Pennsylvania UTPCPL*

The Pennsylvania UTPCPL grants standing to sue to "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful." 73 Pa. Cons.Stat. § 201–9.2(a). Ford contends that the Pennsylvania Plaintiffs lack standing to bring its Pennsylvania UTPCPL claim here because they purchased their vehicles for church purposes, not for personal, family, or household use. Plaintiffs rely upon *Valley Forge Towers South Condominium v. Ron–Ike Foam Insulators, Inc.,* in which the Superior Court held that a non-profit association had standing to sue on behalf of its member condominium residents in a representative capacity with regard to the roof of the condominium building. 393 Pa.Super. 339, 574 A.2d 641, 645 (Pa.Super.Ct.1990). The court in *Valley Forge* focused on the Pennsylvania UTPCPL's statutory definition of "person," which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 Pa. Cons.Stat. § 201–2(2). The Pennsylvania Plaintiffs, presumably as unincorporated associations, and the incorporated association plaintiff in *Valley Forge* all qualify as a person under the statute.

However, the condominium association in *Valley Forge* was empowered by separate, specific statutory authority to act in a representative capacity on behalf of its members to sue, enter into contracts, and regulate the maintenance of common elements of its members' condominium homes. *Valley Forge,* 574 A.2d at 645. The court recognized that even in the absence of statutory authority, before Pennsylvania law clarified the representative standing of condominium associations, such condominium associations had such standing. *Id.* (citing *1000 Grandview Ass'n, Inc. v. Mt. Washington Assocs.,* 290 Pa.Super. 365, 434 A.2d 796, 797–98 (Pa.Super.Ct.1981)). However, these cases deal with the unique context of residential condominium associations suing on behalf of their members with regard to purchases related to

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 76 of 260
PageID: 69740

In re Ford Motor Co. E–350 Van Products Liability... Not Reported in...

common areas of its members homes, and thus the purchases undoubtedly were for "personal, family, or household use." *See In re TFT–LCD (Flat Panel) Antitrust Litig.,* 586 F.Supp.2d 1109, 1128–29 (N.D.Cal.2008) (recognizing "the unusual facts of *Valley Forge,"* and "not[ing] that it would be the rare exception that a business entity would have standing under the Pennsylvania statute"). Here, the Pennsylvania Plaintiffs have no recognized statutory or other authority to sue on behalf of its members, and did not purchase the van for the personal, family, or household use of any of its members . [15] The Pennsylvania Plaintiffs lack standing to assert Pennsylvania UTPCPL claims. This Court will grant Ford's motion for summary judgment as to these claims.

### F. Unjust Enrichment

**\*43** To assert a claim of unjust enrichment under Pennsylvania law, a plaintiff must show that "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Williams Twp. Bd. of Supervisors v. Williams Twp. Emerg. Co.,* 986 A.2d 914, 923–24 (Pa.Commw.Ct.2009) (citations omitted). Ford points out that none of the Pennsylvania Plaintiffs have produced any evidence that they conferred a benefit on Ford. All of the vehicles at issue were purchased from Ford dealerships. As discussed previously in this Opinion, Plaintiffs have presented no evidence regarding the relationships between Ford and any of the Ford dealers at issue and whether money paid to a dealership was ultimately conferred upon Ford. "The burden of establishing an agency relationship rests with the party asserting the relationship." *Basile v. H & R Block, Inc.,* 563 Pa. 359, 761 A.2d 1115, 1120 (Pa.2000). Pennsylvania courts (as well as those in many other states) have strongly suggested that automobile dealerships are generally not agents of automobile manufacturers in the selling of vehicles, and that the inquiry is a fact-specific one that must be supported by sufficient evidence in the record. *See, e.g., Zeno,* 480 F.Supp.2d at 845–46. The Pennsylvania Plaintiffs, like other Plaintiffs in this matter, have failed to satisfy their evidentiary burden. Ford contends that the Pennsylvania Plaintiffs have not shown the essential elements of a benefit conferred upon and retained by Ford, and the Pennsylvania Plaintiffs have not met their burden to produce evidence in support of their position.

Bethel claims unjust enrichment based on its two E–350 vans. With respect to its second vehicle, the 2001 model, this Court will grant Ford's motion for summary judgment on the unjust enrichment claim without prejudice and allow Bethel until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Parkway East Ford and Ford and demonstrate that summary judgment should not be granted in Ford's favor on this unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to Bethel's submission. However, Bethel's first vehicle, the new 2000 model, was not purchased by Bethel, but rather by Amoore. The van was purchased for Bethel's benefit essentially under a financing arrangement whereby Bethel would pay for the van over a period of time by paying the salaries of handicapped drivers provided by Amoore. Still, Amoore purchased the vehicle, and Bethel did not confer any benefit upon Ford or even a Ford dealership in the acquisition of the 2000 van. Therefore, this Court will grant Ford's motion with regard to Bethel's unjust enrichment claim on the 2000 van.

Hickman Temple purchased a *used* E–350 van from Springfield Ford. This Court has already declined to take judicial notice of any benefit conferred upon Ford by the purchase of a new vehicle from a Ford dealership. Even if this Court could somehow conclude that Ford necessarily derives some benefit from the sale of new cars by its dealers, the record is devoid of any evidence that used car sales benefit Ford. This Court will grant Ford's motion for summary judgment on Hickman Temple's unjust enrichment claim without prejudice and allow Hickman Temple until August 13, 2010 to show cause to cure the evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to Hickman Temple's submission.

**\*44** Finally, Mt. Airy's unjust enrichment claim fails not only due to the lack of evidence regarding conferral of a benefit on Ford from a purchase from Chapman Ford Sales, a Ford dealership, but due to Plaintiffs' admissions regarding the allegedly inflated value of E–350 vans. Plaintiffs assert unjust enrichment based on 1) Ford's extraction of payments from Plaintiffs who would not have purchased the vehicles, or would have done so at reduced prices; and 2) Ford's revenues on repairs outside Ford's 90–day limited warranty. (Compl.¶¶ 88–89.) Mt. Airy has pointed to no evidence of money paid to Ford for repairs, and therefore its unjust enrichment claim rests upon the inflated value Ford allegedly

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...
Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 77 of 260
PageID: 69741

received from Mt. Airy for the allegedly defective vehicle. Even if Mt. Airy could show a sufficient agency relationship between Chapman Ford Sales and Ford, or produce other evidence showing that Mt. Airy conferred a benefit upon Ford, all Plaintiffs admitted in their Responses and Objections to Ford's Second Set of Written Interrogatories that "[t]he artificial demand for the E–350 15 passenger vans, as referred to in the Complaint, is believed to have eroded fully by April, 2004, when the [National Highway Traffic Safety Administration] reissued a safety warning concerning 15–passenger vans." (Andresen Certif No. 19, Ex. 5 at 22; *see also, e.g.,* Pls.' Responsive Statement of Material Facts for Blandon ¶ 24.) Although the Complaint references this claimed artificial demand in its pleadings regarding Plaintiffs' statutory consumer fraud claims (Compl.¶ 98), the same theory underlies Plaintiffs' unjust enrichment claims: Ford received an unjust benefit in excess of the value of the "defective" vehicle received by Plaintiffs. Mt. Airy purchased its used van in August 2005, well after Plaintiffs believed the claimed "artificial demand" leading to artificially inflated prices "eroded fully." To determine whether a defendant in an unjust enrichment claim "enjoyed an appreciation of the benefits which were conferred ... the issue is whether the value of the benefit conferred exceeds the value of the consideration he paid for the benefits." *Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 3006831, at \*12 (W.D.Pa. Nov.9, 2005). Here, if the claimed "artificial demand" for the vehicles fully eroded by April 2004, the market value of the vans similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Mt. Airy purchased its vehicle in August 2005, and therefore, on Plaintiffs' own admission, could not have paid an inflated, unjust value for its van. Therefore, this Court will grant Ford's motion for summary judgment as to Mt. Airy's unjust enrichment claim.

### G. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' express warranty and Pennsylvania UTPCPL claims. This Court will deny Ford's motion with respect to the Pennsylvania Plaintiffs' implied warranty claims. With regard to the Pennsylvania Plaintiffs' unjust enrichment claims, this Court will: 1) grant Ford's motion as to Bethel's claim based on its 2000 vehicle, and grant Ford's motion without prejudice as to Bethel's claim based on its 2001 van; 2) grant Ford's motion without prejudice as to Hickman Temple's claim; and 3) grant Ford's motion as to Mt. Airy's claim. For Bethel's unjust enrichment claim based on its 2001 van and Hickman

Temple's unjust enrichment claim, these Plaintiffs shall have until August 13, 2010 to show cause to cure the evidentiary deficiencies identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response to Bethel's and Hickman Temple's submissions.

### VI. Florida

**\*45** Florida Plaintiffs Martha Blandon, Tania Diaz, and Jose Mestre were added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of the Florida Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq.;* and unjust enrichment.

### A. Material Facts

#### 1. Blandon

Blandon worked for Maya's Carpool from 2004 to 2006, transporting students to and from school in Ford E–350 vans. During that time, Blandon and her co-workers discussed the stability problems they experienced with driving Ford E–350 vans, and Blandon herself lost control of a Ford E–350 vehicle on one occasion. (*See* Ford's SUMF No. 13 at ¶ 3.) At deposition, Blandon acknowledged that she knew that the vehicles were unstable, but she stated that she "did not know that it was a factory defect that they had." (Blandon Dep. at 31:23–24.) In 2006, Blandon stopped working at Maya's Carpool and opened her own business transporting students. It is undisputed that in connection with this business, in June 2006, Blandon purchased a used, gold-colored 2000 Ford E–350 van (the "Gold Van") "from a dealership not affiliated with Ford." (*Id.* at 6:19–7:5; Pls.' Responsive Statement of Material Facts for Blandon ¶ 4.) She paid $8,500 for the Gold Van. Blandon did not view any Ford advertising material or talk to any Ford representatives before purchasing the Gold Van. (Blandon Dep. at 17:6–24.) Blandon purchased an E–350 because she wanted a van for 15 passengers, and she asserted that she knew Ford E–350 vehicles from her time with Maya's Carpool. Blandon encountered some handling problems with the Gold Van, and restricted the capacity of the van to 13 passengers by limiting usage of the last row of seats. (*Id.* at 29:15–24.)

After experiencing engine problems with the Gold Van, Blandon sold it in 2008 for $3,800; she had hoped to sell it

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 78 of 260
PageID: 69742

for as much as $6,000, but thought that the engine problems limited her ability to sell at that price. (*Id.* at 36:6–38:3.) In August 2008, Blandon bought a used, blue-colored 2000 Ford E–350 van (the "Blue Van"). She bought the Blue Van for $3,000 from a private individual. (*Id.* at 56:2–13.) At deposition, Blandon stated that she bought a second E–350 van despite the problems she encountered with her first vehicle because "it was good, and [she] liked the comfort that they offer." (*Id.* at 42:17–18.) She removed the back seat from the Blue Van to address disciplinary problems resulting from many students wanting to sit in the back seat, but also testified that she would not reinstall the back seat due to the risk of "accident or tip over." (*Id.* at 65:5–66:3.)

### 2. Diaz

Until approximately 2005, Diaz worked for a company that used Ford E–350 vans to transport children to and from school. Diaz and her coworkers discussed handling problems with the vehicles (Diaz Dep. at 6:9–11:3), but according to Diaz, no one told her that Ford vans were dangerous (*id.* at 11:4–6.) Diaz started her own school transportation business in 2005, and purchased for use in this business a used 1993 Ford E–350 van for $2,000. Diaz purchased her 1993 vehicle from a private individual named "Manolo" or "Manuel." (*Id.* at 13:16–22.) Diaz could not remember the individual's last name. Diaz did not view any Ford advertising material or talk to any Ford representatives before purchasing the 1993 vehicle. (*Id.* at 27:3–13.) Diaz limited the capacity of her 1993 van to 13 passengers, but she would have filled it to capacity if she had enough paying customers to do so. (*Id.* at 26:17–22.) Diaz subsequently sold the 1993 van for $1,000 in 2006. In March 2007, Diaz purchased a used 2003 Ford E–350 van from Maroone Chevrolet, a Chevrolet dealer. (*Id.* at 37:8.) Again, Diaz viewed no Ford advertising material and did not talk to any Ford representatives before making this purchase. (*Id.* at 39:3–12.) Diaz does not operate this vehicle at capacity because she does not have sufficient paying customers to do so, although she testified that she has noticed some handling issues when the van is close to full and obtained insurance coverage at rates perceived to be high. (*Id.* at 52:14–53:5.)

### 3. Mestre

**\*46** For a commercial business transporting students to and from school, Mestre purchased a used 2000 Ford E–350 van in 2004. He purchased this vehicle for $9,115 from Bonanza Auto Sales, a used car dealership not affiliated with Ford. (Mestre Dep. at 55:22–23.) Mestre did not speak to any Ford representatives or view any Ford advertising

before the purchase. (*Id.* at 55:25–56:5.) Before purchasing the 2000 van, Mestre spoke to a potential customer for his driving services who told Mestre that 15–passenger vans were dangerous if they lacked additional stabilizers. (*Id.* at 31:20–34:12.) Mestre operates the 2000 vehicle filled to capacity, although he has encountered some handling and stability problems, including one occasion where the wheels came off the ground when turning. (*Id.* at 35:4–9.) Mestre purchased a second E–350 vehicle to be used by three other drivers working for him. Mestre bought the second vehicle, a used 2001 van, in approximately 2006 from the Belen School, for whom Mestre worked, for $10,500. Again, Mestre did not speak to any Ford representatives or view any Ford promotional materials before buying the 2001 van. (*Id.* at 34:13–18.) The drivers filled the 2001 van to capacity almost every day during the school year. Mestre sold the 2001 van in approximately 2007 or 2008 for $7,000.

### B. Kia Motors

As a general matter, the Florida District Court of Appeal has disapproved of claims involving alleged defects that have not yet manifested and caused personal injury, and where plaintiffs seek damages in the form of "risk of failure" and diminished resale value. *See Kia Motors Am. Corp. v. Butler,* 985 So.2d 1133, 1139 (Fla.Dist.Ct.App.2008) (denying class certification in case asserting claims for breach of express and implied warranty claims and for violation of FDUTPA). The court stated that it aligned itself with the "majority jurisprudence" on this issue. *Id.* Ford relies upon *Kia Motors* to contend that because none of the Florida Plaintiffs experienced a rollover, they may not recover on any of their claims in this action.

However, the court in *Kia Motors* rejected class certification primarily because of factual differences in the performance of the vehicles at issue that precluded the finding of a faulty common design and prevented proof of a defect on a class-wide basis. *Id.* at 1138. The court relied upon the inclusion in the class of those whose vehicles had performed satisfactorily and thus caused no injury as one of two "additional, readily apparent reasons" to deny class certification. *Id.* No court has applied the reasoning of the appellate court in *Kia Motors* to flatly preclude recovery for diminished resale value and other economic damages where personal injury has not occurred. However, this Court need not apply *Kia Motors* as a blanket prohibition against the maintenance of any of the Florida Plaintiffs' claims, because each of their claims all fail under established Florida law governing those claims.

In re Ford Motor Co. E-350 Van Products Liability... Not Reported...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 79 of 260
PageID: 69743

### C. Express Warranty

**\*47** Ford contends that this Court should grant it summary judgment on the Florida Plaintiffs' express warranty claims because the Florida Plaintiffs did not provide requisite notice to Ford pursuant to Fla. Stat. § 672.607(3)(a), and because they did not engage in any justifiable reliance upon Ford's affirmations or representations. With regard to the notice argument, Fla. Stat. § 672.607(3)(a) indeed codifies the UCC's requirement of notice by the buyer to the seller to maintain a breach of warranty claim. It is undisputed that none of the Florida Plaintiffs gave actual notice to Ford prior to joining this litigation. However, Florida law appears silent on whether the filing of a complaint satisfies the notice requirement, and the parties do not address this issue in their briefing on any of the Florida Plaintiffs. This Court need not explore this issue, as the Florida Plaintiffs express warranty claims fail for other reasons.

"Under Florida law, an express warranty may arise only where justifiable reliance upon assertions or affirmations is part of the basis of the bargain." *Hobco, Inc. v. Tallahassee Assocs.,* 807 F.2d 1529, 1533 (11th Cir.1987). None of the Florida Plaintiffs purchased their vehicles from Ford or even from those affiliated with Ford, and they had no interaction with any Ford representatives and viewed no Ford materials. Therefore, no express statements by Ford to these Plaintiffs formed the basis of the bargain between the Florida Plaintiffs and their sellers. Furthermore, under Florida law, "an express warranty is generally considered to arise only where the seller asserts a fact of which the buyer is ignorant prior to the beginning of the transaction, and on which the buyer justifiably relies as part of the 'basis of the bargain.' " *Thursby v. Reynolds Metals Co.,* 466 So.2d 245, 250 (Fla.Dist.Ct.App.1984) (internal citations omitted). In *Thursby,* the court held that plaintiff did not rely on any affirmation of particular fact because defendant "refus[ed] to make any specific factual guarantee regarding the [product]'s performance." *Id.* Similarly here, Ford made no explicit factual representation regarding the E–350 van's performance; as discussed above with regard to other Plaintiffs, any representation of safety was implied in Ford's description of the E–350 as a 15–passenger van. In addition, all of the Florida Plaintiffs testified that they were familiar with the Ford E–350 van and its potential problems, either from prior work experience (Blandon and Diaz) or a conversation with a potential customer (Mestre). These Plaintiffs nonetheless purchased the vehicles, and cannot be said to have relied upon an assertion of fact by Ford of which they were ignorant prior to the transaction. For these reasons,

this Court will grant Ford's motion for summary judgment as to the Florida Plaintiffs' express warranty claims.

### D. Implied Warranty

"Under Florida law, privity of contract is required to maintain an action for breach of an implied warranty." *Ocana v. Ford Motor Co.,* 992 So.2d 319, 325 (Fla.Dist.Ct.App.2008). None of the Florida Plaintiffs purchased their vehicles from Ford or even any dealer arguably affiliated with Ford: Blandon purchased used vehicles from a non-Ford dealership and a private individual; Diaz purchased used vans from a private individual and a Chevrolet dealer; and Mestre bought used E–350 vans from a non-Ford dealership and a school. Because none of the Plaintiffs are in privity with Ford, their implied warranty claims must all fail.

**\*48** The Florida Plaintiffs contend that an older ruling by the Florida Supreme Court abolished the privity requirement for implied warranty claims. *See Manheim v. Ford Motor Co.,* 201 So.2d 440, 441–42 (Fla.1967). However, the Florida Supreme Court later held that "the doctrine of strict liability in tort supplants all no-privity, breach of implied warranty cases." *Kramer v. Piper Aircraft Corp.,* 520 So.2d 37, 39 (Fla.1988). In the absence of privity, Florida law no longer recognizes a breach of implied warranty claim. *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc. .,* 891 So.2d 532, 539 (Fla.2004). A federal court in Florida observed that "[u]nder Florida law, to recover for breach of implied warranty, the plaintiff must be in privity of contract with the defendant" and rejected any reliance on *Manheim* because *Manheim* only applies to cases involving a disclaimer in a contract between a manufacturer and a dealer. *Powers v. Lazy Days RV Ctr., Inc.,* No. 8:05–cv–1542T17EAJ, 2006 WL 373011, at *2 (M.D.Fla. Feb.16, 2006) (describing "limited scope" of *Manheim* ). Because none of the Florida Plaintiffs have privity with Ford, this Court will grant Ford's motions for summary judgment as to the Florida Plaintiffs' claims for breach of implied warranty.

### E. FDUTPA

The elements of a claim for damages under the FDUTPA are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors,* 985 So.2d at 1140. Ford contends that the Florida Plaintiffs have suffered no damages because they have not experienced a rollover and the FDUTPA does not allow for recovery of "consequential damages, such as repair damages or resale damages." *Id.* However, Ford misconstrues the meaning of "actual

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 80 of 260
PageID: 69744

damages" under the FDUTPA, Fla. Stat. § 501.211. Under this section, a consumer plaintiff may recover damages "attributable to the diminished value of the goods or services received, but does not authorize recovery of consequential damages to other property attributable to the consumer's use of such goods or services." *Schauer v. Morse Operations, Inc.,* 5 So.3d 2, 7 (Fla.Dist.Ct.App.2009) (quotations and citations omitted); *see also Rollins, Inc. v. Heller,* 454 So.2d 580, 585 (Fla.Dist.Ct.App.1984) ("[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."). While the Florida Plaintiffs cannot recover damages associated with repair costs, if they can show diminution in value due to deception or fraud, they may recover. The defect need not have actually manifested itself in the form of a rollover; indeed, the FDUTPA does not apply to personal injury claims. *Schauer,* 5 So.3d at 6.

Ford further argues that the Florida Plaintiffs cannot prove that they suffered any losses "as a result of" any allegedly deceptive Ford practice or act. Central to an FDUTPA action in this context is whether the purchaser "had knowledge of the alleged [ ] defect and purchased the vehicle despite such knowledge." *Kia Motors,* 985 So.2d at 1140 (denying class certification in part because common question of law did not predominate). If the purchaser did so, she could not show she was actually deceived, or that any actual deception caused her damages. *See Pop's Pancakes, Inc. v. NuCO2, Inc.,* 251 F.R.D. 677, 685 (S.D.Fla.2008) (rejecting class certification on FDUTPA claim because some class members who knew of the allegedly deceptive inclusion of an administrative fee in invoices for property taxes could not reasonably assert that they were likely to be deceived by the invoice).

**\*49** The Florida Plaintiffs argue that even if they knew of the rollover risk of the vehicles, such knowledge is only relevant when obtained from the defendant, and their knowledge here was not derived from Ford. The Florida Plaintiffs rely on *Pop's Pancakes* for this proposition, noting that the court in *Pop's Pancakes* stated that consumers could not assert they were deceived by the inclusion of an administrative charge in an invoice where they were told about it by a defendant's representative or by reading the invoice itself. 251 F.R.D. at 685. However, the court in *Pop's Pancakes* did not limit its holding that certain class members could assert an FDUTPA claim to where those members learned of the fee from defendant; rather, the factual context of that case dictated

that such knowledge could only come from the defendant. Here, the Florida Plaintiffs had experience with Ford E–350 vans not limited to interactions with Ford itself, a scenario unavailable in *Pop's Pancakes.* In any event, the court in *Pop's Pancakes* explicitly stated that the deceptiveness of the invoice "depends, in part, on the knowledge and/or understanding of each [defendant] customer." *Id.* at 686. Limiting the relevance of knowledge to that derived from the defendant would obviate the causation element for an FDUTPA claim; a defendant's deceptive practice must cause a plaintiff's injury, and if a plaintiff knew of the safety issues that Ford's allegedly deceptive sales practices attempted to conceal, her injuries could not have been caused by those practices.

Blandon and Diaz both drove Ford E–350 vehicles before starting their own transportation businesses and purchasing Ford E–350 vans themselves. They asserted that they knew of the alleged handling problems with the vehicles and admitted experiencing those problems themselves. They nonetheless purchased the vans, and never viewed any Ford promotional materials or had any discussions with Ford representatives. Under these circumstances, Ford argues that any loss they have suffered, as a matter of law, could not have been the result of an allegedly deceptive Ford act. With regard to Blandon, this Court agrees. Blandon testified that while working at Maya's Carpool, the drivers discussed the propensity of Ford vans to rollover "everyday" and that they warned each other to "be careful that you will—not to tip over because these vans are not stable." (Blandon Dep. at 14:19–15:9.) Blandon's supervisor at Maya's Carpool, after Blandon reported her loss of control of an E–350 van, told her to be careful "because these vans were not safe ." (*Id.* at 14:4–5.) Thus, Blandon asserts that she knew not only that the vehicles could potentially have handling problems, but that they were not safe. With regard to Blandon, Plaintiffs appear to contend that while she knew of the problems with some Ford vans, she did not know that the problems stemmed from an alleged "factory defect." (Blandon Dep. at 31:23–24.) This attempt to create a dispute of material fact does not negate the undisputed fact that Blandon assertedly knew that the vehicles were unsafe but nonetheless purchased two vehicles. This Court will grant summary judgment in Ford's favor on Blandon's FDUTPA claims.

**\*50** With regard to Diaz and Mestre, the record is not as clear. Diaz drove Ford E–350 vans before purchasing his own vehicles, and discussed the vans' handling problems with his coworkers, but testified that no one ever told him that the vans

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

were dangerous. She did not explicitly acknowledge that she knew that the vehicles were unsafe. Mestre did not operate any Ford vehicles before he purchased his first van, the 2000 van. Mestre testified that he knew of some "swaying" problems with the vehicles before buying his second van, but bought the second van anyway because he "like[d] the vehicle." (Mestre Dep. at 27:18–22.) On the record before the Court, the degree of Mestre's knowledge regarding the safety of the vehicles is disputed and his feelings about the vans does not exclude the possibility that Ford's alleged omissions could have caused his injury. [16] Because the nature and extent of Diaz's and Mestre's knowledge is disputed, this Court will deny Ford's motion for summary judgment on their FDUTPA claims.

### F. Unjust Enrichment

This Court will grant summary judgment in Ford's favor on the Florida Plaintiffs' claims for unjust enrichment because none of the Florida Plaintiffs purchased their vehicles from Ford or any entity arguably affiliated with Ford. Under Florida law, "[t]he essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Rollins, Inc. v. Butland,* 951 So.2d 860, 876 (Fla.Dist.Ct.App.2006) (quoting *Swindell v. Crowson,* 712 So.2d 1162, 1163 (Fla.Dist.Ct.App.1998)). The Florida Plaintiffs have not met their burden to produce evidence showing that the Florida Plaintiffs conferred any benefit upon Ford. Rather, it is undisputed that none of the Florida Plaintiffs conferred a benefit upon Ford.

Furthermore, as discussed above, a defendant enjoys the appreciation of the benefits which were conferred if the value of that benefit exceeds the value of the consideration given for that benefit. The Florida Plaintiffs point to no evidence of money paid to Ford for relevant repairs, and therefore their unjust enrichment claims rest upon the inflated value Ford allegedly received from them for the allegedly defective vehicles. As Plaintiffs concede, the claimed "artificial demand" for Ford E–350 vehicles fully eroded by April 2004, the market value of these post-April 2004 vans similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Here, even if the Florida Plaintiffs had conferred a benefit upon Ford—which, based on the undisputed record, they did not—they cannot maintain

most of their unjust enrichment claims because they stem from purchases made after April 2004, when the claimed artificial demand had eroded and the prices they therefore paid were not unjustly inflated. Blandon and Diaz purchased their vehicles after April 2004, and Mestre purchased his 2001 van in 2006. Therefore, unjust enrichment claims based on these vehicles fail. While Mestre purchased his 2000 van in 2004, it is unclear when in 2004 he made that purchase. In any event, even if he purchased the 2000 van prior to the full erosion of the purported artificial demand, this Court must enter summary judgment in Ford's favor on the unjust enrichment claim based on that purchase due to the fundamental evidentiary deficiency: that Mestre did not confer any benefit upon Ford in purchasing the 2000 van from a used car dealership not affiliated with Ford. For these reasons, this Court will grant Ford's motions for summary judgment on the Florida Plaintiffs' unjust enrichment claims.

### G. Summary

**\*51** For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to the Florida Plaintiffs's claims for breach of express warranty, breach of implied warranty, and unjust enrichment, and with respect to Florida Plaintiff Blandon's FDUTPA claim. The Court will deny Ford's motion with regard to the FDUTPA claims of Florida Plaintiffs Diaz and Mestre. Florida Plaintiff Blandon shall be dismissed from this matter.

## VII. Texas

Texas Plaintiff St. Luke's Community United Methodist Church ("St.Luke's") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of St. Luke's claims: breach of express warranty; breach of implied warranty; violation of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), *Tex. Bus. & Com.Code § 2.313 et seq.;* and unjust enrichment.

### A. Material Facts

St. Luke's purchased two new model year 2001 Ford E–350 vans on April 28, 2001 from Village Ford, a Ford dealership, for $25,000 each. St. Luke's testifying representative, Evelyn Kelly, was unaware whether St. Luke's viewed any Ford promotional materials or statements prior to the purchase, but thought that Ford promised a 15–passenger van based on the van's name and product specification. (Kelly Dep. at 124:13–124:5.) In approximately 2004, the church started limiting the

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 82 of 260
PageID: 69746

capacity of its vans to 12 passengers by removing the back seat. (Kelly Dep. at 34:10–35:19.) The church has had no reports of actual handling or stability problems, and it asserts that it has avoided those problems by not overloading its vans, although St. Luke's representative also did not remember any incidents during the period prior to when the church began limiting the number of passengers in the vans. (*Id.* at 64:13–65:19.) It is undisputed that St. Luke's encountered no difficulties in obtaining insurance on the vans. (Ford SUMF No. 21 ¶ 14; Pls.' Responsive Statement of Material Facts for St. Luke's ¶ 14.)

*B. Inman*

Ford argues that the decision of the Supreme Court of Texas in *DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299 (Tex.2008) dictates that St. Luke's lacks standing to bring its claims under Texas law and therefore this Court should grant summary judgment in Ford's favor. Plaintiffs in *Inman* asserted, in a purported class action, that certain vehicles manufactured by defendant and employing a particular model of seatbelt buckle were defective because the buckles were "dangerously subject to accidental release ." *Id.* at 302. None of the named plaintiffs had suffered personal injury from accidental buckle unlatching; two had never experienced any problem related to the buckle, and a third could not be sure. Just as Plaintiffs do in the instant case, plaintiffs in *Inman* asserted claims of breach of express and implied warranty, and violations of the DTPA, among other claims. The lower court in Texas certified the purported class. As Plaintiffs here concede, the Supreme Court of Texas reversed and "dismissed plaintiffs['] claims for lack of standing because the plaintiffs themselves could not prove that they had ever experienced buckle unlatching, but had only offered evidence documenting instances in which other people experienced unlatching." (Pls.' Omnibus Br. at 43 (citing *Inman,* 252 S.W.3d at 302).) The court concluded that the plaintiffs could not show "more than the merest possibility of injury to themselves," and that to find that they had standing "would drain virtually all meaning from the requirements that a plaintiff must be 'personally aggrieved' and that his injury must be 'concrete' and 'actual or imminent'." *Inman,* 252 S.W.3d at 307. The court did not exclude the possibility that some owners of the vehicles with the allegedly defective seatbelt buckle could assert concrete injury, but found that the plaintiffs at issue could not. *Id.*

**\*52** Ford argues that the facts here are virtually identical to *Inman,* and therefore this Court should find that St. Luke's lacks standing. If the Court did find a want of standing, it could not render judgment in Ford's favor, but could only

dismiss St. Luke's claims. *Inman,* 252 S.W.3d at 307–08. St. Luke's responds that unlike the *Inman* plaintiffs, it has asserted evidence of actual injury in that it removed the back seats of its vans and had to rent additional vehicles due to the capacity limitations. (Pls.' Omnibus Br. at 43.) With regard to the latter contention, examination of the deposition testimony of St. Luke's representative reveals that St. Luke's occasionally rented additional vehicles to transport additional passengers to confirmation class. However, St. Luke's in those instances sought to transport somewhere between 40 to 60 people at a time. (Kelly Dep. at 70:8–17.) If St. Luke's imposed no limitations on the capacity of its Ford E–350 vans, it could only carry 30 total passengers in the two vans, so additional vehicles would have been necessary nonetheless. Still, St. Luke's points to evidence of some injury from its removal of the back seat.

Ford contends that Judge Ackerman, in applying Arkansas law, rejected "loss of use" and diminution in value as cognizable actual damage under Arkansas's consumer fraud statute, and contends that the same interpretation should apply here. (MTD Opinion at \*23 (citing *Wallis v. Ford Motor Co.,* 362 Ark. 317, 208 S.W.3d 153 (Ark.2005).) Judge Ackerman's rejection of the Arkansas consumer fraud statute claim pursuant to *Wallis* does not directly control here, and *Inman* did not explicitly hold, as did the court in *Wallis,* that "actual damage or injury is sustained when the product has actually malfunctioned or the defect has manifested itself." *Wallis,* 208 S.W.3d at 161. Indeed, the *Inman* court stated that "[w]e do not decide the degree to which a defect must manifest itself in a product before a warranty is breached," and based its holding solely on standing, concluding that plaintiffs' asserted injury was "extremely remote." *Inman,* 252 S.W.3d at 307.

Plaintiffs in *Inman* presented no plausible theory of actual injury at all. As the Supreme Court of Texas noted, the *Inman* plaintiffs did *not* contend that the allegedly defective "buckles made their vehicles worth less than they paid for them." *Inman,* 252 S.W.3d at 302. Rather, they only sought damages for repair costs. *Id.* Here, St. Luke's seeks damages based on diminution in value and loss of use, and the *Inman* court did not have this kind of potential injury before it. Ford asserts that "[n]othing in *Inman* suggests that the Court would have found standing had the plaintiffs alleged that their 'fear of possible injury' led them to limit the use of their vehicles." (Ford Reply Br. at 77.) This might be true, and the Supreme Court of Texas could so rule in a subsequent case, but nothing in *Inman* expressly suggests that the Court would

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 83 of 260
PageID#: 69747

not have found standing under a different theory of injury and damages. This Court will decline to conclude that St. Luke's lacks standing.

### C. Express and Implied Warranty

**\*53** Ford argues that St. Luke's express and implied warranty claims are barred for its failure to give notice within a reasonable time. UCC § 2–607, as codified in Texas, provides that, to assert a warranty claim post-tender, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Tex. Bus. & Com.Code § 2.607(c)(1). St. Luke's concedes that it did not provide any pre-litigation notice, but contends that filing suit by joining this litigation satisfied the notice requirement. However, under Texas law the filing of a complaint does not constitute sufficient notice; notice must be given pre-suit. See, e.g., Martin v. Home Depot U.S.A., Inc., 369 F.Supp.2d 887, 893 (W.D.Tex.2005) (granting summary judgment in favor of defendant because plaintiff did not provide "pre-suit notice as required by Texas law"); U.S. Tire–Tech, Inc. v. Boeran, B.V., 110 S.W.3d 194, 202 (Tex.App.2003) ( "Neither did the commencement of litigation satisfy this notice requirement."). St. Luke's failure to provide pre-suit notice is fatal both to its express and implied warranty claims. U.S. Tire–Tech, 110 S.W.3d at 201 ("The notice requirement for both breach of implied warranty and breach of express warranty springs from the same source—section 2.607(c)(1) of the Texas Business and Commerce Code."). Any generic notice Ford might have had regarding problems with E–350 vans generally does not suffice under Texas law. "The manufacturer must be made aware of a problem with a particular product purchased by a particular buyer." Id. at 202. This Court will grant Ford's motion for summary judgment as to St. Luke's express and implied warranty claims based on lack of notice.

### D. DTPA

The DTPA bars "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com.Code § 17.46(a), and provides a "laundry list" of examples of such acts or practices, Tex. Bus. & Com.Code § 17.46(b). St. Luke's claims that Ford misrepresented or concealed certain facts regarding the safety of Ford E–350 vans potentially falls under several provisions of the laundry list. See, e.g., Tex. Bus. & Com.Code § 17.46(b)(5), (7), and (9) (misrepresentations in advertising), and (24) (omissions leading consumer to enter into transaction she would not have

entered into had the information been disclosed). Reliance is an essential element of a DTPA claim under any of these theories. Tex. Bus. & Com.Code § 17.50(a)(1)(B); see Morgan Bldgs. and Spas, Inc. v. Humane Society of S.E. Texas, 249 S.W.3d 480, 490 (Tex.App.2008) (citing Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 693 (Tex.2002)). Ford contends that St. Luke's could not have relied upon any Ford misrepresentation or omission to its detriment, as its only testifying representative did not recall whether anyone at St. Luke's viewed any advertisements or other materials issued by Ford. St. Luke's, based on Kelly's testimony, argues that St. Luke's observed the "packaging" of the Ford E–350 van as a 15–passenger van and perceived those specifications as a promise of a safe 15–passenger van, one upon which St. Luke's relied by purchasing the vehicles.

**\*54** Whether Ford's representation of the vehicle as a 15–passenger van constitutes a deceptive trade practice under the DTPA requires consideration of whether the representation was mere puffing or too vague to be actionable. In Chandler v. Gene Messer Ford, Inc., 81 S.W.3d 493 (Tex.App.2002), plaintiff asserted a violation of § 17.46(b)(5) of the DTPA, which defines a deceptive trade practice as "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," Tex. Bus. & Com.Code § 17.46(b)(5). Plaintiffs in Chandler asserted that Ford's advertisements represented that air bags improve overall vehicle safety, and that a salesperson with the defendant Ford dealership told plaintiff that the Ford car they ultimately purchased was safer than a competitor's because it had dual air bags. After plaintiffs' child was injured while riding in the front seat, plaintiffs sought recovery under the DTPA based on these representations. The court in Chandler held that the salesperson's statements were mere puffery and therefore not actionable under the DTPA, and the advertisements were "too vague to support [plaintiffs'] claim of a misrepresentation under the DTPA." 81 S.W.3d at 501.

Here, Ford's description of the vehicles as 15–passenger vans, as previously discussed, does not include an express representation of safety. Even the misrepresentations at issue in Chandler and found insufficient to serve as the basis for a DTPA violation expressly included representations of safety. Nonetheless, the Texas court found them wanting for vagueness. "Although general or indefinite statements may support recovery under the DTPA, they must be examined in light of the particular facts of the case." Humble Nat'l Bank v. DCV, Inc., 933 S.W.2d 224, 230 (Tex.App.1996). An imprecise or vague representation amounts to mere opinion or

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 84 of 260
PageID: 69748

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

puffing. *Id.* Here, under the particular undisputed facts of this case, Ford's description of the E–350 van as a 15–passenger van did not include any representation of safety, and does not rise to the level required for a violation of § 17.46(b)(5).

St. Luke's also asserts violations of §§ 17.46(b)(7) and (9). Section 17.46(b)(7) bars the representation "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and § 17.46(b)(9) covers "advertising goods or services with intent not to sell them as advertised." Ford limits its argument on St. Luke's DTPA misrepresentation theory to § 17.46(b)(5) and *Chandler,* which only involved § 17.46(b)(5). However, the principles applied in *Chandler* apply equally to the other implicated misrepresentation provisions, and Texas courts often discuss these provisions together. *See, e.g., Douglas v. Delp,* 987 S.W.2d 879, 886 (Tex.1999) (analyzing §§ 17.46(b) (5) and (7) together); *Humble,* 933 S.W.2d at 229–30 (same). This Court will grant summary judgment in Ford's favor on St. Luke's DTPA claims to the extent that the claims are based on misrepresentations by Ford in its description of the E–350 van.

**\*55** Section § 17.46(b)(24) of the DTPA prohibits the failure "to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." A claim for failure to disclose under the DTPA requires that a plaintiff show that "(1) the defendant knew information regarding the goods or services, (2) the information was not disclosed, (3) there was an intent to induce the consumer to enter into the transaction through the failure to disclose, and (4) the consumer would not have entered into the transaction had the information been disclosed." *Patterson v. McMickle,* 191 S.W.3d 819, 827 (Tex.App.2006). St. Luke's presents claims under this section based on Ford's alleged omission of information regarding the stability of the vehicles. Ford argues that because St. Luke's presented no evidence that it ever viewed any Ford promotional materials or other communications, it also cannot prove that it would have seen any disclosure Ford would have made, and therefore "it has no evidence that it would have relied upon any such unseen disclosure." (Ford Br. No. 21 at 8.)

However, the deposition testimony of St. Luke's representative only demonstrates that she was not aware whether St. Luke's had seen any Ford materials prior to its

purchases, and cannot be read to establish, as a matter of law, that St. Luke's would not have seen a disclosure regarding safety. The elements of a non-disclosure claim under pursuant to § 17.46(b)(24) do not require St. Luke's essentially to prove a negative by showing that it would have seen a disclosure that never happened. Rather, to satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to induce a transaction through failure to disclose, and that plaintiff would not have entered into the transaction if the information had been disclosed. The record is not undisputed on these questions, and Ford has not conclusively shown, based on undisputed facts, that St. Luke's would have purchased the vehicles regardless of any disclosure Ford might have made. This Court will deny Ford's motion with regard to St. Luke's DPTA claims to the extent they assert a violation based on non-disclosure.

### E. Unjust Enrichment

In Texas "[u]njust enrichment, itself, is not an independent cause of action but rather 'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay.' " *R.M. Dudley Constr. Co. v. Dawson,* 258 S.W.3d 694, 703 (Tex.App.2008) (quoting *Friberg–Cooper Water Supply Corp. v. Elledge,* 197 S.W.3d 826, 832 (Tex.App.2006)). To recover under a theory of unjust enrichment in Texas, a party must prove that "one person has obtained a benefit from another by fraud, duress, or the other taking of an undue advantage." *City of The Colony v. N. Tx. Mun. Water Dist.,* 272 S.W.3d 699, 731 (Tex.App.2008).

**\*56** Just as other Plaintiffs in this matter who purchased vehicles from a Ford dealership failed to present evidence that their purchase benefitted Ford, St. Luke's points to no evidence that Ford benefitted from the purchases from Village Ford. "Under Texas law, an agency relationship must be affirmatively established, it may not be presumed." *Coffey v. Fort Wayne Pools, Inc.,* 24 F.Supp.2d 671, 677 (N.D.Tex.1998) (citing *Karl Rove & Co. v. Thornburgh,* 39 F.3d 1273, 1296 (5th Cir.1994)). Moreover, "[i]n Texas, the general rule is that a retailer or wholesaler is not an agent of a manufacturer." *Coffey,* 24 F.Supp.2d at 678. St. Luke's, in response to Ford's motion for summary judgment, has failed to meet its burden to come forward with facts supporting its agency theory, and St. Luke's "burden is not satisfied by assertions unsupported by facts or a scintilla of evidence." *Id.* at 679 (footnotes omitted). Therefore, this Court will grant Ford's motion for summary judgment on St. Luke's unjust

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 85 of 260
PageID: 69749

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

enrichment claims without prejudice and allow St. Luke's until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Village Ford and Ford and demonstrate why summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response to St. Luke's submission.

### F. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment as to St. Luke's claims for breach of express warranty and implied warranty, and for violation of the DTPA under a misrepresentation theory. This Court will deny Ford's motion with respect to St. Luke's DTPA claims to the extent that they are based upon non-disclosure. This Court will grant Ford's motion without prejudice with regard to St. Luke's unjust enrichment claim. [17] St. Luke's shall have until August 13, 2010 to show cause to cure the evidentiary deficiency identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claims. Ford shall have until September 13, 2010 to file a response to St. Luke's submission.

## VIII. Missouri

Missouri Plaintiff St. James United Methodist Church ("St.James") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of St. James's claims: breach of express warranty; breach of implied warranty; violation of the Missouri Merchandising Practices Act ("MMPA"), Mo.Rev.Stat. § 407.010 et seq.; and unjust enrichment.

### A. Material Facts

Randy Hall, Chairman of St. James's Board of Trustees, purchased a used 1997 Ford E–350 van on behalf of St. James in February 1998. Hall purchased the used 1997 vehicle from South Town Ford, a Ford dealership. (Andresen Certif. No. 20, Ex. 2 at 2.) In August 2001, St. James purchased another Ford E–350 van, a used 2000 model, for approximately $23,000. Hall, who testified at deposition on St. James's behalf, could not remember from whom St. James purchased the 2000 van. (Hall Dep. at 96:17–97:2.) St. James purchased both vehicles because they could carry 15 passengers, and James testified with regard to the 2000 van that the church viewed Ford brochures that stated that the van could carry 15 passengers. (Id. at 79:4–80:4.) The church purchased the vehicles to transport church members to and from services and events, and in connection with

other church functions and programs. St. James continues to use both vans. At one time, St. James operated the vans with 15 passengers, but now limits capacity to 12 by not using the back row of seats. (Id. at 66:15–67:18.) St. James has driven each van approximately 13,000 miles per year. (Id. at 97:17–98:9.) While St. James has heard reports about the handling problems with the Ford E–350 van, Hall testified that St. James's drivers had only reported brake issues and other minor problems. (Id. at 138:11–17.) James did not testify that any drivers reported any handling problems. (Id.) Hall testified that he believed that St. James's insurance carrier alerted it to the reported handling problems with Ford E–350 vans and recommended that St. James use drivers with commercial drivers' licences for the vehicles. (Hall Dep. at 34:17–35:10; 101:2–12.) However, St. James never encountered any difficulty procuring insurance for the vehicles, and it reduced its rates when it switched carriers in approximately 2008. (Id. at 35:23–37:23.) St. James intends to sell the vehicles, but has made no plans and conducted no research into a potential future sale. (Id. at 113:22–114:25.)

### B. Briehl and O'Neil

**\*57** Ford primarily contends that the decision of the Eighth Circuit in Briehl v. General Motors Corp., 172 F.3d 623 (8th Cir.1999), dictates that under Missouri law, St. James's claims must be dismissed for failure to adequately plead damages because the alleged defect in its vans has not manifested itself. In Briehl, the Eighth Circuit affirmed the dismissal by a district court in Missouri of a purported class's claims in multidistrict litigation for breach of implied and express warranties and various state consumer fraud statutes. Plaintiffs in Briehl asserted that the anti-locking brake system in their vehicles were defective and that the defect resulted in diminution in value and lower resale value. Just as here, the Briehl plaintiffs did not seek recovery for any personal injury or property damage. Briehl, 172 F.3d at 626. The Eighth Circuit agreed with the district court in Eastern District of Missouri that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." Id. at 628. Because plaintiffs "failed to allege any manifest defect and their vehicles perform in a satisfactory manner," the Eighth Circuit affirmed the dismissal of all of plaintiffs' claims. Id. The court in Briehl did not limit its holding to Missouri law, and cited cases from several jurisdictions holding that a plaintiff in product liability cases cannot sufficiently plead damages if the alleged defect did not manifest itself. Id. at 627–28 (collecting cases). Ford concedes that the Missouri state courts have not spoken on this issue with regard to the types of claims asserted by St.

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 86 of 260
PageID: 69750

James, although it points to a Missouri Court of Appeals decision that dismissed claims for strict liability and negligent failure to warn on similar reasoning that the product did not actually malfunction or fail. *See Spuhl v. Spiley, Inc.,* 795 S.W.2d 573, 580–81 (Mo.Ct.App.1990).

Curiously, St. James ignores *Briehl* in responding to Ford's motion. Plaintiffs argue generally that they have suffered "actual injury due to a present inability to use the E–350 for its ordinary purpose," and contend that other cases similar to *Briehl* that required manifestation of the defect are distinguishable because in those cases, the products served their ordinary purposes. (Pls.' Omnibus Br. at 9.) To show actual injury, Plaintiffs rely generally on various Plaintiffs' limitations on use and capacity of their vans and evidence that some Plaintiffs have incurred out-of-pocket costs associated with responding to handling problems, such as repair and insurance costs. (*Id.* at 6–7.)

In *Briehl,* the plaintiffs did not assert such limitations on use or other out-of-pocket damages, and instead only sought damages for "(1) lost resale value and (2) overpayment for the vehicles at the time of purchase." *Briehl,* 172 F.3d at 626. With regard to the *Briehl* plaintiffs' claim for reduced resale value, the court commented that no plaintiff or purported class member actually sold their vehicle at a reduced value. *Id.* at 628–29. Here, St. James has not sold its vehicles, has no specific plan to do so, and has not identified any reduced resale value. More fundamentally, St. James of course has not suffered a rollover, and did not produce evidence even of any significant handling complaints. It is not clear how the *Briehl* court would have approached the plaintiffs' claims if plaintiffs also sought economic damages based on limitations on use, but the court's firm rejection of any claimed damages as too speculative absent manifestation of defect strongly suggests that an alternate theory would not have made a difference.

**\*58** Subsequent application of *Briehl* confirms that the limitation-on-use theory does not provide the basis for a no-injury case to proceed. In *O'Neil v. Simplicity, Inc.,* plaintiffs alleged that "they paid for a drop-side crib and now they do not use the crib because the drop-side is not safe .... Thus, they contend that they have suffered an economic injury, and they seek to recover the difference in price between a crib with a functional drop-side and a crib without." 574 F.3d 501, 502 (8th Cir.2009). The Eighth Circuit affirmed the dismissal of plaintiffs' claims by a district court in Minnesota because plaintiffs' cribs had "not exhibited the alleged defect," and

therefore "they have necessarily received the benefit of their bargain." *Id.*

Plaintiffs in *O'Neil* limited their use of the crib, but the alleged defect never manifested itself and did not result in personal injury or other injury. The Eighth Circuit affirmed the dismissal of all their claims, which included all the claims asserted by St. James here: breach of express and implied warranty, violation of the relevant state's consumer fraud statute, and unjust enrichment. [18] While *O'Neil* concerned Minnesota law, it relied upon general principles propounded by the Eighth Circuit and did not refer to any doctrine specific to Minnesota law. The reasoning of *Briehl* and *O'Neil* applies equally here. St. James has elected to limit its use of its vehicles by limiting capacity, but the defect has not manifested itself and therefore they have received the benefit of their bargain. As in *O'Neil,* the manifestation of the alleged defect in vehicles purchased by others does not translate into a cognizable injury for a plaintiff whose product did not malfunction. *See O'Neil,* 574 F.3d at 504 ("[Plaintiffs] purchased a crib with a functioning drop-side and that crib continues to have a functioning drop-side. Their bargain with [defendants] did not contemplate the performance of cribs purchased by other consumers.").

A district court in Missouri recently distinguished *Briehl* and *O'Neil* and declined to dismiss certain claims brought by plaintiffs who purchased baby products and later learned that they contained Bisphenol–A (BPA), a chemical which has potentially negative health effects, and either still retained the goods or replaced or disposed of them. *In re Bisphenol–A (BPA) Polycarbonate Plastic Prods. Liab. Litig.,* 687 F.Supp.2d 897 (W.D.Mo.2009). The district court concluded that unlike in *Briehl* and *O'Neil,* where only a "potential defect" existed and had not yet manifested itself, the products at issue in *BPA* definitely contained BPA. Thus, the key for the *BPA* court was "not that someone was injured, but that consumers were not told of BPA's presence and the corresponding health risks. Perhaps no physical injuries resulted—but a fraud claim does not depend on a showing of physical injury." *Id.* at 911. The court concluded that for the plaintiffs whose claims survived, those claims "do not depend on proving the products are defective," and thus the no-injury line of products liability cases do not apply. *Id.* at 912. The court accepted these plaintiffs' benefit-of-the-bargain argument, reasoning that they "purchased a product they allege they would not have purchased had they known the true facts. Now that they know the true facts, they are unwilling to risk allowing their children to use the product.

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 87 of 260
PageID: 69751

They cannot obtain the intended bargain or benefit from the goods, so they incurred damages." *Id* . In a subsequent opinion, the court clarified that "[a] person who buys a product and is later told there is a substance in the product that might cause personal injury has a claim for breach of implied warranty of merchantability; the consumer need not suffer personal injury in order to assert a breach of contract/ warranty claim." *In re Bisphenol–A (BPA) Polycarbonate Plastic Prods. Liab. Litig.,* No. 08–1967, 2010 WL 286428, at *1 (W.D.Mo. Jan.19, 2010). By the same token, "a person who buys a product and is not told that the product contains a substance that might cause personal injury when the product is used has a claim for fraud by omission; a personal injury is not required." *Id.*

 **\*59** This Court concludes that the instant case bears closer resemblance to *Briehl* and *O'Neil* than *BPA*. Whereas the products in *BPA* undisputedly contained the chemical which could cause negative health effects, the vans at issue here, like the anti-lock braking system in *Briehl* and the cribs in *O'Neil,* only contain a potential defect in handling. Just like plaintiffs in *O'Neil,* St. James here no longer uses the vehicle to carry 15 passengers and thus claims that it did not receive the benefit of its bargain. However, absent manifestation of the defect, the vehicles "perform[ ] just as [they were] intended, and thus there is no injury and no basis for relief." *O'Neil,* 574 F.3d at 505.

The court in *BPA* relied upon *Coghlan v. Wellcraft Marine Corp.,* in which plaintiffs were promised an all-fiberglass boat but received a boat made of fiberglass and plywood, as an example of a case alleging loss of benefit-of-the-bargain that did not depend on manifestation of actual injury because the injury was the misrepresentations made to the buyer. 240 F.3d 449, 455 n. 4 (5th Cir.2001). Because the claims in *Coghlan* were "rooted in basic contract law rather than the law of product liability" and the damages sought were "not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain," the *Goghlan* court allowed the claims to proceed, and the *BPA* court used *Coghlan* to distinguish *O'Neil*. However, as the *BPA* court recognized, *O'Neil* cited *Coghlan* approvingly, and acknowledged the difference between a no-injury suit and benefit-of-the-bargain suit. *O'Neil,* 574 F.3d at 504–05. The Eighth Circuit in *O'Neil* concluded that the plaintiffs before it "attempted to refashion what is at its core a no-injury products liability suit into a suit based in contract" but could not succeed because defendants "ha[d] not failed to deliver what was promised." *Id.* at 504. Plaintiffs in *O'Neil* paid for

a drop-side crib and limited their use of the crib because the drop-side was not safe; St. James here paid for 15–passenger vans and limited their use of the vehicles because use at full capacity allegedly is not safe. While St. James's claims do not depend on products liability law, they still depend upon a showing that its vans did not perform as promised, and like the plaintiffs in *Briehl* and *O'Neil,* it cannot do so. In the absence of definitive guidance from the Missouri state courts, this Court will follow the guidance of the Eighth Circuit's rulings under Missouri and other states' laws. This Court will grant summary judgment in Ford's favor on all of St. James's claims because it has suffered no injury and no damages.

### C. Express and Implied Warranty

While summary judgment is warranted for the reasons discussed above, Ford is entitled to summary judgment on some of St. James's claims for additional reasons. Ford contends that St. James's warranty claims as to its 1997 vehicle, purchased in 1998, are barred by Missouri's four-year statute of limitations for breach of contract actions. Mo.Rev.Stat. § 400.2–725(1). A cause of action under this statute accrues when the breach occurs; a breach of warranty generally occurs when tender of delivery is made. Mo.Rev.Stat. § 400.2–725(2). [19] Plaintiffs filed this action in 2003, and St. James joined this action in 2008. Even based on the initial filing of this action in 2003, St. James's claims are time-barred because they are outside the four-year limitations period, unless the doctrine of fraudulent concealment applies to toll the statute.

 **\*60** "To constitute concealment of a cause of action within the general rule tolling the statute of limitations on that ground the concealment must be fraudulent or intentional and, ... there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." *Owen v. General Motors Corp.,* 533 F.3d 913, 919–20 (8th Cir.2008) (quoting *Hasenyager v. Bd. of Police Comm'rs of Kansas City,* 606 S.W.2d 468, 471 (Mo.Ct.App.1980) (internal marks omitted)). The fraudulent concealment must involve "more than mere silence on defendant's part" and usually requires the use of "some means or device to prevent discovery." *Owen,* 533 F.3d at 920 (quoting *Gilliam v. Gohn,* 303 S.W.2d 101, 107 (Mo.1957)). Although Illinois Plaintiff Pentecostal Temple contends that the statute of limitations here was tolled by the doctrine of fraudulent concealment, St. James does not present any such argument, or oppose Ford's motion with regard to the timeliness of the 1997 vehicle warranty claims in any way. Under Missouri law, the burden

Case 1:19-md-02875-BMB-SAK   Document 2057-2   Filed 05/10/22   Page 88 of 260
PageID: 69752

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

of proving fraudulent concealment rests with the plaintiff. *See Tayborn v. Burstein,* 748 S.W.2d 824, 826 (Mo.Ct.App.1988); *see also Nitro Distributing, Inc. v. Alticor, Inc.,* 565 F.3d 417, 427 (8th Cir.2009); *Hasenyager,* 606 S.W.2d at 471–72. St. James has failed to meet its burden here; indeed, it has failed even to raise an argument as to why the warranty claims for the 1997 van should not be time-barred.

### D. MMPA

As it has with regard to other Plaintiffs' state consumer fraud statute claims, Ford contends that St. James may not assert a claim under Missouri's consumer fraud statute, the MMPA, because it did not purchase its vans for personal, family, or household use. The MMPA allows "any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss" as a result of an unlawful sales practice to bring suit. Mo.Rev.Stat. § 407.025(1). While St. James qualifies as a "person" under the statutory definition, *see* Mo.Rev.Stat. § 407.010(5), it purchased the vehicles for church purposes and not primarily for personal, family, and household use. As this Court previously held with regard to Georgia Plaintiff Allen Temple, St. James did not purchase the vans for any particular parishioner's or employee's personal, family, or household use. Rather, it bought the vans for use in the course of church business, even though that business might have additionally benefitted individual members personally. *See Se.* Mo. Hosp. v. C.R. Bard, Inc., No. 07–31, 2008 WL 199567, at *9 (E.D.Mo.2008) (dismissing MMPA claim for purchases of catheters by hospital); *Saey v. CompUSA, Inc.,* 174 F.R.D. 448, 450 (E.D.Mo.1997) (holding that plaintiff who purchased computer for business lacked standing under MMPA). In addition to its failure to assert cognizable injury under *Briehl* and *O'Neil,* St. James lacks standing to assert its MMPA claims.

### E. Unjust Enrichment

**\*61**  Under Missouri law, a plaintiff asserting a claim for unjust enrichment must show "(1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; [and] (3) that it would be unjust to allow the defendant to retain the benefit." *Beeler v. Martin,* 306 S.W.3d 108, 112 (Mo.Ct.App.2010) (quoting Miller v. Horn, 254 S.W.3d 920, 924 (Mo.Ct.App.2008)). To establish unjust enrichment, a plaintiff must show the "conferral of a benefit on the defendant by the plaintiff." *McCormick v. Cupp,* 106 S.W.3d 563, 568 (Mo.Ct.App.2003).

Here, St. James purchased its first vehicle used from a Ford dealership, and cannot recall from whom it purchased its second vehicle. With regard to the first vehicle, for the same reasons as discussed above with regard to other Plaintiffs who purchased used vehicles from a Ford dealership, the record is devoid of any evidence that used car sales benefit Ford, and St. James does not point to any evidence whatsoever suggesting that Ford received any benefit from the sale of the used car by a Ford dealer to St. James. Under Missouri law, a party relying on an agency relationship bears the burden of proof, *Elam v. Dawson,* 216 S.W.3d 251, 254 (Mo.Ct.App.2007), and as discussed previously with regard to other Plaintiffs, St. James has utterly failed to meet its burden to show an agency relationship here. With regard to the second vehicle, in opposing summary judgment St. James has not pointed to any evidence regarding from whom it purchased the vehicle, and therefore has not met its burden to produce more than a mere scintilla of evidence to support a finding that St. James conferred a benefit upon Ford. Therefore, in addition to the reasons stated above, Ford is entitled to summary judgment in its favor on St. James's unjust enrichment claims. In light of this Court's conclusion that St. James cannot maintain its action pursuant to *Briehl* and *O'Neil,* this Court sees no cause for St. James to be granted leave to cure its evidentiary deficiency regarding the 1997 van.

### F. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all of St. James's claims. St. James shall be dismissed from this matter.

## IX. Michigan

Michigan Plaintiff Conant Avenue United Methodist Church ("Conant Avenue") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of Conant Avenue's claims: breach of express warranty; breach of implied warranty; violation of the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901 *et seq.;* and unjust enrichment.

### A. Material Facts

Elaine Hopkins, a Conant Avenue member and chairperson of the church's Administrative Board, was employed by Ford in its Fleet Services Department and held the responsibility to provide transportation to those doing business with Ford.

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 89 of 260
PageID: 69753

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Hopkins learned that Ford Fleet Services was selling a used 2000 Ford E–350 van, looked at the van, and told Conant Avenue about it. (Totty Dep. at 18:12–25.) The church purchased the vehicle in February 2001 for $21,404.58. (*Id.* at 24:6–25; Andresen Certif. No. 15, Ex. 3 at CAUM 003.) As a Ford representative, Hopkins told Conant Avenue that it was the largest capacity van and would hold 15 passengers. (Totty Dep. at 21:3–7.) Conant Avenue believed that Ford promised that the vehicle "would carry 15 passengers," (*id.* at 119:20) based on Hopkins's statements (*id.* at 19:13–23) and the VIN number indicating that it was a 15–passenger van (*id.* at 119:24–120:1). However, Pastor Darryl Eugene Totty also testified on behalf of Conant Avenue that he was not aware of any Ford marketing or other printed materials, other than that which might have been provided by Hopkins. (*Id.* at 108:21–109:11.) The church purchased the vehicle to transport members to and from church events, and bought the van because it needed to carry a large number of people and the E–350 was "the maximum size van that they could get at the time." (*Id.* at 18:4–8.) Totty stated that in selling the van, Ford falsely represented that the van could carry 15 people safely. (*Id.* at 115:2–4.) Yet Totty also testified that Ford did not have the "intent at that time ... to mislead or defraud the church in any way" (*id.* at 115:5–6), and that Ford did not conceal any information from the church when it sold the church the van (*id.* at 115:10–13).

 **\*62**  The Retail Installment Contract for the vehicle lists Riverside Ford Sales, Inc. ("Riverside Ford"), a Ford dealership, as the seller. (Andresen Certif. No. 15, Ex. 3 at CAUM 003.) However, according to Totty, Riverside Ford was just a "pickup location," because one could not purchase the van "directly from the corporation," and Ford's policies dictated that "it had to go through a dealer." (Totty Dep. at 38:25–39:3.) Conant Avenue negotiated price and other terms of the contract with Ford Fleet Services, and the vehicle was delivered via Riverside Ford. (*Id.* at 39:5–15.) At deposition, Totty acknowledged that Conant Avenue had a direct contract with Ford for the purchase of its van. (*Id.* at 119:2–9.)

Conant Avenue still owns its used 2000 Ford E–350 van. Until October 2008, Conant Avenue often filled the vehicle to capacity with 15 passengers. (Totty Dep. at 115:7–9.) In October 2008, after reading the government report regarding the safety of the Ford E–350, the church removed the last row of seats to limit capacity to 12 passengers. (*Id.* at 44:3–17.) Conant Avenue never experienced a rollover (*id.* at 115:14–17), but Totty and others reported some swaying when the van was filled to capacity (*id.* at 52:22–53:16; 56:3–19).

Sometime in 2008, after a driver reported to the church that she had some concerns about the stability of the vehicle, Conant Avenue took its van to Jorgensen Ford to "check the tires and to check the vehicle out and just to make sure that it was safe." (*Id.* at 56:23–24.) The Ford dealership found no problems with the vehicle, and merely rotated the tires and gave the van an oil change. (*Id.* at 57:1–2.) Conant Avenue has driven its vehicle over 57,000 miles. (Andresen Certif. No. 15, Ex. 1 at 2 .)

### B. Hendricks and Henry

Ford first asks this Court to predict that the Supreme Court of Michigan would follow the rulings of other state courts in holding that a plaintiff cannot recover under breach of warranty or the MCPA where its claim is based upon an alleged product defect that has not manifested itself in personal injury or property damage. A court in the Western District of Michigan has stated that it was "aware of no Michigan authority which recognizes, as injury in an action under the MCPA, recovery for a potential future loss which has not actually occurred." *Hendricks v. DSW Shoe Warehouse, Inc.,* 444 F.Supp.2d 775, 782 (W.D.Mich.2006). In *Hendricks,* plaintiff claimed that she suffered identity and data theft at the hands of the defendant, and only sought damages for "expenses which she has made to purchase a credit monitoring product, which she alleges will prevent future unauthorized use of her personal data." *Id.* at 779. The court in Hendricks rejected plaintiff's claims, holding that "[t]here is no existing Michigan statutory or case law authority to support plaintiff's position that the purchase of credit monitoring constitutes either actual damages or a cognizable loss." *Id.* at 783. Ford asks this Court to grant summary judgment in Ford's favor on all of Conant Avenue's claims based on the same reasoning.

 **\*63**  Ford concedes that Michigan state courts have not yet directly addressed this issue, and relies also upon a decision of the Supreme Court of Michigan in a negligence case that refused to allow liability for potential future injury. *Henry v. Dow Chemical Co.,* 473 Mich. 63, 701 N.W.2d 684, 688–89 (Mich.2005). The court in *Henry* rejected tort liability where plaintiffs suffered no present physical injury from a chemical allegedly released by the defendant, but where plaintiffs sought damages for economic losses they had suffered and would continue to suffer by monitoring their health condition for symptoms based on exposure to defendant's chemical. *Id.* at 77. Ford concedes that "*Henry* involved a claim based on negligence, and the holding of the supreme court is by its terms limited to tort cases" (Ford. Br. No. 15 at 6) and thus

Case 1:19-md-02875-RBK-SAK    Document 2057-2    Filed 05/10/22    Page 90 of 260
PageID: 69754

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

not controlling here. However, Ford argues that extending this rationale would best serve the underlying policy concerns that guided the *Henry* court. The federal court in *Hendricks* relied upon *Henry* in dismissing contract and MPCA claims, reasoning that "there is reason to believe that Michigan's highest court would reject a novel legal theory of damages which is based on a risk of injury at some indefinite time in the future." *Hendricks,* 444 F.Supp.2d at 783 (citing *Henry,* 701 N.W.2d at 692). Conant Avenue argues that this Court should distinguish *Hendricks* because Conant Avenue does not seek recovery "for the cost of protecting [itself] against future injury," but asks for damages based on "the current loss of full use of [its] vehicle[ ]," acknowledging that "reduced likelihood of future injury resulting from a rollover" would be a 'secondary benefit." (Pls.' Omnibus Br. at 10–11.) In *Henry,* the Supreme Court of Michigan held with regard to plaintiffs' tort claims that their asserted economic losses for medical monitoring "are wholly derivative of a possible, future injury rather than an *actual, present* injury." *Henry,* 701 N.W.2d at 691 (emphasis in original). Still, Ford itself concedes that *Henry* is limited to tort claims, and this Court declines to extend *Henry* to the contract and MPCA claims at issue here. The court's reasoning in *Henry* does not allow this Court to conclusively predict that the Supreme Court of Michigan would categorically rule that a plaintiff in a non-tort case involving economic injury arising from loss of full use such as that asserted by Conant Avenue here could not recover.

### C. Express Warranty

In addition to its broad argument that *Henry* should be extended to preclude Conant Avenue's claims, Ford asserts that it should win summary judgment on Conant Avenue's claims for breach of express warranty because Ford's description of the E–350 van does not amount to an actionable express warranty of safety in transporting 15 passengers. Michigan has adopted the UCC's express warranty provisions. "An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Mich. Comp. Laws § 440.2313(1)(a). In addition, "[a] description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Mich. Comp. Laws § 440.2313(1)(b). This Court concludes, for the same reasons as discussed earlier with regard to other Plaintiffs, that Ford's statement that the E–350 van is a 15–passenger van does not create an express warranty of the safety of the van in carrying 15 passengers. Similarly, Hopkins's statements on behalf of Ford that the van

could carry 15 passengers and was the largest van they could get did not amount to an express warranty of safety.

**\*64** Michigan courts have required that an express warranty include a specific promise or description with the intention that the goods conform to that specific promise. For example, in *Guaranteed Constr. Co. v. Gold Bond Prods.,* the defendant represented a product as "corner bead," and plaintiff sued for breach of express warranty when this product suffered corrosion. 153 Mich.App. 385, 395 N.W.2d 332, 334–35 (Mich.Ct.App.1986). The Court of Appeals of Michigan concluded that the defendant had supplied "corner bead" as promised, and that plaintiff had not pointed to any express representation by the seller that the corner bead would not rust. *Id.* at 335. The court noted that if defendant's packaging had stated "noncorrosive corner bead," then plaintiff might have had a valid breach of express warranty claim. *Id.* Similarly here, Ford described the vehicle as a 15–passenger van, and Plaintiffs do not dispute that the E–350 van can transport 15 passengers; therefore, as a matter of law Ford has not breached any express warranty. Any representation of safety in carrying 15 passengers, if actionable, is only an implied warranty and not an express warranty based on the undisputed record. Indeed, the court in *Guaranteed Construction* observed that under plaintiff's theory of the case, to recover under warranty the plaintiff had to rely upon implied warranty. *Id.* Another court in Michigan found that a label on a water heater stating "SET DIAL D TO DESIRED TEMPERATURE" did not constitute an express warranty that dial could be *safely* set at the maximum temperature. *Ledesma ex rel. Hoffman v. Rheem Mfg. Co.,* No. 175457, 1997 WL 33354494, at *1 (Mich.Ct.App. Jan.21, 1997). The court concluded that defendant's "instruction to set the dial to the desired temperature cannot be read as a warranty that any temperature setting would be safe for bathing." *Id.* The same reasoning applies here: Ford's description of the vehicle as a 15–passenger van and Hopkins's comments about the van's large capacity cannot be read to create an express warranty of safety.

An action for express warranty must rely upon express representations or statements made by defendant, and not on any understandings on plaintiff's part or mere implications. *Latimer v. William Mueller & Son, Inc.,* 149 Mich.App. 620, 386 N.W.2d 618, 622 (Mich.Ct.App.1986); *see also Heritage Resources, Inc. v. Caterpillar Financial Servs. Corp.,* 284 Mich.App. 617, 774 N.W.2d 332, 342 n. 11 (Mich.Ct.App.2009) (citing *Latimer,* 386 N.W.2d at 622). Because Conant Avenue does not point to any express,

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 91 of 260
PageID: 69755

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

actionable representations of safety in transporting 15 passengers made by Ford, this Court will grant summary judgment in Ford's favor on Conant Avenue's claim for breach of express warranty.

### D. Implied Warranty

Beyond its general arguments pursuant to *Henry* and *Hendricks,* Ford moves for summary judgment on Conant Avenue's breach of implied warranty claim only based on lack of sufficient notice. Ford does not present any other argument on the merits of Conant Avenue's implied warranty claim. Michigan has adopted the UCC's notice standard: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mich. Comp. Laws § 440.2607(3) (a). As do the other Plaintiffs, Conant Avenue argues that its joining of this lawsuit constitutes sufficient notice. Michigan law is silent on the precise question of whether the filing of a complaint satisfies the requirements of § 440.2607(3)(a). *See, e.g., In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,* 155 F.Supp.2d 1069, 1110 (S.D.Ind.2001) (noting that no Michigan court has addressed whether filing suit, at least in some instances, could satisfy the notice requirement). In a case involving a commercial transaction, the Court of Appeals of Michigan concluded, based upon an extensive examination of undisputed facts and consideration of the purposes for the UCC's notice requirement, [20] that a merchant plaintiff failed to provide sufficient notice where plaintiff notified defendants of a problem but never notified defendants that they were in breach until it filed suit. *American Bumper & Mfg. Co. v. Transtechnology Corp.,* 252 Mich.App. 340, 652 N.W.2d 252, 256 (Mich.Ct.App.2002). However, the court's reasoning in *American Bumper* depended upon a commercial standard of reasonableness and involved consideration of plaintiff's subsequent investigation of the problem that exonerated defendant. *Id.* The court declined to resolve whether Michigan applies a "strict" or "lenient" standard with regard to the adequacy of notice, but determined under either approach, plaintiff's purported notice did not serve the purposes of the notice requirement. *Id.* at 255–56.

**\*65** What constitutes reasonable notice and reasonable time for such notice "is to be determined under the facts of each case." *Eaton Corp. v. Magnavox Co.,* 581 F.Supp. 1514, 1531 (E.D.Mich.1984); Mich. Comp. Laws § 440.1204(2). Michigan courts have only required that notice of breach "inform the seller that there are outstanding problems with the transaction" and that the transaction must be watched.

*See Mich. Sugar Co. v. Jebavy Sorenson Orchard Co.,* 66 Mich.App. 642, 239 N.W.2d 693, 696 (Mich.Ct.App.1976); *see also Natron Corp. v. Hamilton/Avnet Elecs. of Ariz., Inc.,* No. 5:90–CV–60, 1991 WL 303604, at \*2 (W.D.Mich. Nov.1, 1991). One federal court concluded that nothing in Michigan law suggests that the Supreme Court of Michigan would hold that "the filing of a lawsuit can never satisfy the notice of breach requirement." *In re Bridgestone/Firestone,* 155 F.Supp.2d at 1110. That court further reasoned that the policies underlying the UCC notice requirement—those policies analyzed by the Michigan state court in *American Bumper*—are not necessarily frustrated by if notice is given by filing suit. *Id.* at 1110–11 (stating that notice by filing suit promotes the protection of defendants from stale claims and does not impede settlement negotiations because the prospect of going to trial presents a powerful incentive, and considering factor that defendants had ample actual notice of breach well before lawsuit was filed). This Court agrees, and concludes that the Supreme Court of Michigan would not hold that notice by filing or joining suit does not constitute notice at all. Disputed facts exist regarding such issues as Ford's actual notice, both of the potential handling problem with Ford E–350 vans generally and difficulties with Conant Avenue's vehicle specifically based on Conant Avenue's bringing of the vehicle to a Ford dealer for service. Whether Conant Avenue gave notice by joining suit within a reasonable time is also a question of fact. Because Ford presents no additional argument for granting summary judgment on Conant Avenue's implied warranty claim, this Court will deny Ford's motion with regard to that claim.

### E. MCPA

The MCPA makes various "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" unlawful. Mich. Comp. Laws § 445.903(1). The act defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes." Mich. Comp. Laws § 445.902(g). Michigan state courts and most Michigan federal courts have held that under this statutory definition, "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection." *Slobin v. Henry Ford Health Care,* 469 Mich. 211, 666 N.W.2d 632, 634–35 (Mich.2003); *Zine v. Chrysler Corp.,* 236 Mich.App. 261, 600 N.W.2d 384, 393 (Mich.Ct.App.1999); *see also Robertson v. State Farm Fire & Cas. Co.,* 890 F.Supp. 671, 680–81 (E.D.Mich.1995). The Court of Appeals in Michigan in *Zine* agreed with the federal court in *Robertson* that "the proper focus was on the use to

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 92 of 260
PageID: 69756

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

which the goods or services were put by the plaintiffs." *Zine,* 600 N.W.2d at 393 (citing *Robertson,* 890 F.Supp. at 680).

**\*66** Here, Conant Avenue used its vehicle for church purposes, and not for personal, family, or household use, as this Court has held with regard to other church Plaintiffs in this action. Conant Avenue seizes upon the MCPA's definition of a "person" who can bring suit as including a corporation or unincorporated association. Mich. Comp. Laws § 445.902(d). Thus, according to Conant Avenue, the statute contemplates a suit by a church organization. While this statutory definition indeed does not bar an association from bringing a claim under the MCPA, that claim must still meet the standing requirement that purchase be for a personal purpose. As the court in *Robertson* observed, and as quoted with approval by the Court of Appeals of Michigan in *Zine,*

> "Person" is used in the MCPA in reference to those bringing actions (i.e., plaintiffs) and to those against whom actions will be brought (i.e., defendants). Since defendant sellers will often be businesses and corporations, the Act would have to include such entities in its definition of "person" as long as the Act continued to refer to potential defendants as "persons." Accordingly, inclusion of corporations and other business entities in the definition of "person" serves a broader purpose and does not really aid the definition of "personal."

*Robertson,* 890 F.Supp. at 679–680; *see also Zine,* 600 N.W.2d at 392.

Conant Avenue notes that the court in *Robertson* conceded that "[t]he only scenario the court can envision is one where a corporation would buy its employees products as a holiday bonus, e.g ., televisions, stereos, etc., which will be used by the employees in their respective homes. In such a scenario, it is arguable that the corporation is buying goods for personal, family, or household purposes." *Robertson,* 890 F.Supp. at 679. Here, however, the church did not purchase the vehicle for personal use by its members, but to be used by the church for church business: to transport its members to and from church functions. Such use is not actionable under the MCPA. *See German Free State of Bavaria v. Toyobo Co.,* 480 F.Supp.2d 958, 969 (W.D.Mich.2007) (holding that purchase by German states of bulletproof vests to be worn personally by police officers was a purchase for public police business, not personal, family, or household purposes). The inclusion of corporations and other associations in the statutory definition of "person" allows suit if the purchase is primarily intended for personal purposes

Some federal courts have rejected *Robertson* and held that, particularly in a false advertising case, a plaintiff need not have purchased the product primarily for personal, family, or household purposes as long as defendant generally was engaging in trade or commerce when it made the representations at issue. *Florists' Transworld Delivery, Inc. v. Fleurop–Interflora,* 261 F.Supp.2d 837, 848–850 (E.D.Mich.2003); *Action Auto Glass v. Auto Glass Specialists,* 134 F.Supp.2d 897, 899–901 (W.D.Mich.2001). However, these cases did not cite *Zine,* which reflects the opinion of the Michigan courts on this question under Michigan law, and Michigan courts have reaffirmed *Zine* on many occasions and have held that the MCPA does not apply to transactions intended primarily for business or commercial, rather than personal, purposes. *See, e.g., Slobin,* 666 N.W.2d at 634–35; *Computer Network, Inc. v. AM General Corp.,* 265 Mich.App. 309, 696 N.W.2d 49, 59–60 (Mich.Ct.App.2005); *Jackson Cty. Hog Producers v. Consumers Power Co.,* 234 Mich.App. 72, 592 N.W.2d 112, 117–118 (Mich.Ct.App.1999). Federal courts have also followed the approach of *Zine* and *Robertson. See, e.g., German Free State of Bavaria,* 480 F.Supp.2d at 968–69; *Watkins & Son Pet Supplies v. Iams Co.,* 107 F.Supp.2d 883, 892–93 (S.D.Ohio 1999); *Cosmetic Dermatology & Vein Centers of Downriver, P.C. v. New Faces Skin Care Ctrs., Ltd.,* 91 F.Supp.2d 1045, 1060 (E.D.Mich.2000); *see also, e.g., McKay v. Thane Int'l, Inc.,* No. 06–11209, 2007 WL 4287552, at \*2–\*3 (E.D.Mich. Dec.5, 2007).

**\*67** This Court will adhere to the rulings of the Michigan state courts and the majority interpretation of the Michigan federal courts. Because Conant Avenue did not purchase the vehicle primarily for personal, family, or household purposes, it lacks standing to bring its MCPA claim. This Court will therefore grant summary judgment in Ford's favor on Conant Avenue's MCPA claim.

*F. Unjust Enrichment*

In Michigan, "[t]he elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the

plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. In such instances, the law operates to imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter." *Barber v. SMH (US), Inc.,* 202 Mich.App. 366, 509 N.W.2d 791, 796 (Mich.Ct.App.1993). Ford argues that although the Retail Installment Contract for Conant Avenue's vehicle lists Riverside Ford as the seller, Conant Avenue concedes that it formed a direct contract with Ford through Ford Fleet Services, and that Riverside was only listed as the pickup location. Therefore, because Conant Avenue formed an express contract with Ford by its own admission pertaining to the purchase of the vehicle, it cannot maintain an action for unjust enrichment. [21] This Court agrees. Conant Avenue's claim for unjust enrichment arises from its purchase of its Ford E–350 van, and the sales contract governed this purchase and covers the same subject matter as Conant Avenue's unjust enrichment claim. Therefore, this Court may not imply a contract to prevent any unjust enrichment. [22]

Conant Avenue dismisses Ford's argument based on a direct contract as "disingenuous" because with regard to many other Plaintiffs who purchased their vehicles through Ford dealers, Ford asks this Court to grant summary judgment on unjust enrichment and other claims for lack of privity, and cannot now be heard to argue the opposite—a contractual relationship—for the same result. (Pls .' Omnibus Br. at 61 n. 26.) Yet Conant Avenue ignores the crucial difference between it and the other Plaintiffs: Conant Avenue concedes that although its sales contract lists a Ford dealer, it entered into a direct contract with Ford, not a dealer. Other Plaintiffs have not met their burden to point to evidence in the record establishing that Ford benefitted from the sales by dealers. Here, Plaintiffs have met their evidentiary burden but face a bar to recovery for unjust enrichment by virtue of their contractual relationship. These alternative results are not mutually exclusive.

### G. Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to Conant Avenue's claims for breach of express warranty, violation of the MCPA, and unjust enrichment. This Court will deny Ford's motion as to Conant Avenue's claim for breach of implied warranty.

### X. New York

**\*68** New York Plaintiffs Bishop Winston R. Anderson and Gladstone Barrett were added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of the New York Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of New York General Business Law ("GBL") §§ 349 and 350; and unjust enrichment.

### A. Material Facts

#### 1. Bishop Anderson

Bishop Anderson purchased a used 1999 Ford E–350 van in the summer of 2002. He bought the vehicle from a motor vehicle dealership located on Flatbush Avenue in Brooklyn, New York. At deposition, Anderson recalled that the dealership sold new and used cars, including Ford cars, but could not remember the name of the dealership, and could not recall whether it was a Ford dealership. (Anderson Dep. at 58:17–59:8.) Anderson also could not remember how much he paid for the vehicle. (*Id.* at 62:2–3, 509 N.W.2d 791.) Anderson stated that his records relating to the vehicle's purchase and subsequent service were lost in a fire in the van. (*Id.* at 27:3–5, 509 N.W.2d 791.) Anderson told the salesperson at the dealership on Flatbush Avenue that he was looking for a van that carried 15 passengers (*id.* at 59:13–16, 509 N.W.2d 791), and the salesperson told him that the Ford E–350 was a 15–passenger van (*id.* at 62:4–7, 509 N.W.2d 791). Anderson purchased the vehicle to transport members of his congregation to other churches. (*Id.* at 63:6–25, 509 N.W.2d 791.)

After a deacon in Bishop Anderson's church who drove the van reported in 2004 that the vehicle "swayed" to the right when fully loaded with 15 passengers, and Bishop Anderson later experienced this "swaying," Bishop Anderson took the van to Gordon Auto Service ("Gordon Auto") to address what Bishop Anderson thought was a mechanical problem. Gordon Auto worked on the vehicle for two days, replaced some parts, and worked on the vehicle's "front end." (*Id.* at 25:10–21, 509 N.W.2d 791.) The mechanic at Gordon Auto advised Bishop Anderson that the van had a problem with swaying in the front end that he could not fix. (*Id.* at 76:12–77:14, 509 N.W.2d 791.) At deposition, Bishop Anderson agreed with the proposition that a mechanic at Gordon Auto advised him that driving with 15 passengers would "cause problems on the highway." (*Id.* at 75:12–17, 509 N.W.2d 791.) Bishop Anderson never raised these concerns with the dealer on Flatbush Avenue from whom he purchased the vehicle (*id.* at 122:6–8, 509 N.W.2d 791), or with Ford or any Ford dealer

Case 1:19-md-02875-RBK-SAK   Document 2057-2   Filed 05/10/22   Page 94 of 260 PageID: 69758

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

prior to this litigation (*id.* at 56:9–10, 509 N.W.2d 791; 99:13–18). After the service on the front end proved unsuccessful, Bishop Anderson decided to drive the vehicle with less than 15 passengers. (*Id.* at 79:7–8, 509 N.W.2d 791; 81:1–17.) Bishop Anderson now drives the vehicle with less than 15 passengers, and "trie[s] to leave the back seat empty" so that only the van only contains 12 passengers (*id.* at 81:9–14, 509 N.W.2d 791), and stated that the church sometimes rents an additional van when it needs to transport more than 12 people (*id.* at 82:8–20, 509 N.W.2d 791). However, Bishop Anderson sometimes carries more than 12 but less than 15 passengers on shorter trips. (*Id.* at 117:6–25, 509 N.W.2d 791.)

### 2. Barrett

**\*69** Gladstone Barrett owns and operates Yours and Mine Transportation Service, Inc., a company that provides transportation services to the subways in Queens, New York. He has owned this business for over 10 years, and has utilized Ford E–350 vans for this business the entire time. From 1995 to 1998, he used a 1995 Ford E–350 van leased by his wife, and he gave the van to a junk yard after the lease expired. He does not seek recovery based on this 1995 van. In 1998, Barrett purchased a used 1997 Ford E–350 from Park Inn Ford for $18,000, negotiated down from the asking price of $20,000. The salesperson at Park Inn Ford assured Barrett that the 1997 vehicle could be used to transport 15 people safely. (Barrett Dep. at 106:16–23.) Barrett himself expressly told the salesman that these vehicles should not be driven by an inexperienced driver, and stated that a friend of his had a roll over with a Ford van. (*Id.* at 48:11–49:13, 509 N.W.2d 791.) Barrett testified that after the salesman assured him, he told the salesman that "I said I had experience with the Ford van and it's not a problem to me in driving it but I would not purchase it and give to the next man to drive unless they have the experience that I have." (*Id.* at 49:9–13, 509 N.W.2d 791.)

After driving the 1997 van, Barrett felt that he did not pay a fair price for the vehicle because of problems with the transmission and "a lot of noise in the rear end section." (*Id.* at 44:19–45:5, 509 N.W.2d 791.) He used the 1997 van until 2006 when he gave the vehicle to another driver. In October 2006, Barrett purchased a used 2001 Ford E–350 van for $5,500 from Start Up Management Solutions, a rental car business. (*Id.* at 17:1–22, 509 N.W.2d 791.) Start Up Management Solutions offered this 2001 van, which had 167,000 miles on it at the time of Barrett's purchase, for $8,500 and Barrett decided to buy it when the price dropped to $5,500. Barrett saw no Ford advertisements and received no representations from Ford in connection with the purchase of

the 2001 vehicle. (*Id.* at 25:9–26:6; 107:22–25, 509 N.W.2d 791; 127:24–128:25.) According to Barrett, at the time of the purchase of the 2001 vehicle, he had heard news of other accidents with Ford E–350 vans, but not about the "tendency to rollover." (*Id.* at 33:14–34:4, 509 N.W.2d 791.) He stated at deposition that he learned of the alleged defect in Ford E–350 vans just a few months before his deposition. (*Id.* at 110:10–25, 509 N.W.2d 791.)

Barrett still owns and uses the 2001 Ford E–350 vehicle, has no plans to sell it, and continues to fill it to capacity when he has enough passengers to do so. (*Id.* at 59:2–19; 84:19–25, 509 N.W.2d 791; 126:7–11 .) Barrett asserts losses from repairs to his vans for issues unrelated to this litigation, and also asserts that, based on conversations with his insurance broker, he paid higher insurance rates on his Ford E–350 vehicles. (Pls.' Responsive Statement of Material Facts for Barrett ¶ 32; Ford SUMF No. 10 ¶ 32.) Barrett never suffered a rollover in his vehicles and has never been unable to transport his passengers safely to their destination when the vans were filled to capacity. (Barrett Dep. at 80:4–10.)

**\*70** At deposition, Barrett testified that if he had heard the news reports regarding the Ford E–350 van's tendency to rollover before he purchased the used 2001 van in October 2006, he still would have bought the van because he and his customers like Ford vehicles and he trusted his driving abilities. (*Id.* at 26:10–19; 35:2–14, 509 N.W.2d 791; 127:19–23.) Barrett stated that "the public tend to like Ford vans. Even with the risk I would go ahead and purchase the van because I would feel comfortable purchasing the van because I am the person driving the van." (*Id.* at 35:18–22, 509 N.W.2d 791; *see also id.* at 120:6–11, 509 N.W.2d 791 ("I have some fantasy about the vans but regardless of the problem, I still would purchase the van because I alone drive the van. I take extra caution in driving it. I am aware of the problem and I didn't let it trouble me."); *id.* at 58:10–15, 509 N.W.2d 791 ("I didn't let that worry me. Let the problem of the van be front worry. I didn't worry about that. I just like the van and I was assured that they can carry fifteen passengers safely."). Despite his testimony that he would have bought the vehicle even if he had full information about the rollover potential, Barrett also stated that "I put my [faith] in the van and what the dealer said to me about the van. I put me faith there." (*Id.* at 59:10–12, 509 N.W.2d 791.) Barrett said that the Ford van "is the van that I like. All I like to see is improvement. If Ford can improve on them to make them safer and make more comfortable as being a Ford addict to Ford van. I will

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 95 of 260
PageID: 69759

be more comfortable. Tomorrow morning I would still by the next Ford van." (*Id.* at 105:9–14, 509 N.W.2d 791.)

*B. Frank as Applied to Bishop Anderson*

In *Frank v. Daimler Chrysler Corp.,* the Supreme Court of New York, Appellate Division, affirmed the dismissal of proposed class plaintiffs' claims based upon an alleged defect in certain vehicles' front seat backrests that were "susceptible to rearward collapse in the event of a rear-end collision." 292 A.D.2d 118, 741 N.Y.S.2d 9, 11 (App.Div.2002). Like the New York Plaintiffs here, Plaintiffs in *Frank* did not suffer any rearward collapse or other personal injury from the alleged defect. Two of plaintiffs' claims in *Frank* are asserted here: breach of implied warranty and violation of N.Y. GBL §§ 349 and 350. The *Frank* plaintiffs also brought claims for negligence, strict liability, negligent concealment and misrepresentation, and fraud. The court concluded:

> In sum, plaintiffs have not been involved in any accidents and have not suffered any personal injuries or property damage. Moreover, plaintiffs do not allege that any seat has failed, been retrofitted or repaired, nor have plaintiffs attempted to sell, or sold an automobile at a financial loss because of the alleged defect. We find, therefore, that the motion court properly dismissed the first through sixth causes of action as the result of plaintiffs' failure to plead any actual injury.

*Id.* at 17.

Ford argues that *Frank* dictates that this Court should grant summary judgment in its favor on the New York Plaintiffs' implied warranty and statutory consumer fraud claims. The New York Plaintiffs seek to distinguish *Frank* by arguing generally that Plaintiffs have limited their use of their vehicles due to the handling problems and have incurred expenses in renting additional vehicles and other out-of-pocket costs. Bishop Anderson testified that he brought his vehicle to Gordon Auto to attempt to fix the "swaying" problem, that after the problem was not resolved by the service, he decided to limit his use of the van by carrying less than 15 passengers,

and that on occasion, his church rents an additional van when it needs to carry more than 12 passengers. These asserted injuries suffice to remove Bishop Anderson's claims from the scope of *Frank.* With regard to his alleged out-of-pocket repair costs, Ford contends that he presents no evidence whatsoever that he paid for these repairs, or how much he might have paid. Yet for a claim under GBL § 349, any injured person may bring an action "to recover his actual damages or fifty dollars, whichever is greater." GBL § 349(h). GBL § 350 similarly allows any person injured by false advertising to bring "an action to recover his or her actual damages or five hundred dollars, whichever is greater." GBL § 350–e(3). Thus, a plaintiff asserting a claim for deceptive business practices under GBL §§ 349 and 350 may recover without proving a specific amount of damages. *See McDonald v. North Shore Yacht Sales, Inc.,* 134 Misc.2d 910, 513 N.Y.S.2d 590, 593 (N.Y.Sup.Ct.1987) (stating that under § 350, "[t]he dollar amount of injury involved in such a claim is not relevant"). Ford next argues that Bishop Anderson has not shown that the "swaying" issue that was the subject of the repairs was related to the alleged rollover propensity that forms the basis of this litigation because Gordon Auto replaced the "front end" of the vehicle, while Plaintiffs generally allege that the handling problems stem from issues with the "rear axle" of the vans. (Pls.' Omnibus Br. at 2, 4 n. 4.) While Gordon Auto might not have focused on the area of the van Plaintiffs later identified as the location of the alleged problem, this Court rejects Ford's attempt to parse the difference between "swaying" and "unsafe tendency to rollover." A genuine dispute exists regarding the nature of the repairs and whether the issues addressed by Gordon Auto were related to the handling issues in this litigation.

**\*71** In *Frank,* the court listed repair costs as one form of actual injury that plaintiffs did not allege. 741 N.Y.S.2d at 17. Here, Bishop Anderson has asserted cognizable injury based on his attempt to repair. Similarly, Bishop Anderson's claim that he rents additional vehicles, while not supported by an actual dollar amount, presents a disputed issue of fact sufficient to withstand summary judgment and avoid the actual injury bar of *Frank.* Ford contends that Bishop Anderson's claim of injury based on limitation of use does not suffice based on Judge Ackerman's reliance on the decision of the Arkansas Supreme Court in *Wallis* that actual injury for a consumer fraud statute claim may be found only where the alleged defect has manifested itself. (MTD Opinion at \*23 (citing *Wallis v. Ford Motor Co.,* 362 Ark. 317, 208 S.W.3d 153 (Ark.2005).) As this Court has stated above, however, Judge Ackerman's rejection of the Arkansas consumer fraud

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 96 of 260
PageID: 69760

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

statute claim pursuant to *Wallis* does not directly control here, even though *Wallis* relied upon *Frank* in reaching its conclusion. *Wallis* not only concerns only Arkansas law, but expands upon *Frank* to require manifestation of the alleged defect. The court in *Frank* did not limit actual injury to personal injury or property damage from malfunction or manifestation of defect, but expressly stated that plaintiffs in *Frank* also failed to allege any repair or sale at diminished value. *Frank,* 741 N.Y.S.2d at 17. Thus, the court in *Frank* contemplated that actual injury could be asserted under circumstances where the alleged defect might not have manifested itself to cause injury. For these reasons, this Court concludes that *Frank* does not operate to preclude Bishop Anderson's claims for lack of actual injury.

### C. Frank as Applied to Barrett

While Bishop Anderson asserts limitation of use and repair costs as actual injury, New York Plaintiff Barrett 1) did not allege any out-of-pocket repair or rental costs; 2) fills his vehicle to capacity when he has sufficient passengers; and 3) stated that he has no plans to sell his van. The only cognizable actual injury pursuant to *Frank* that this Court can locate stems from Barrett's assertion that his insurance carrier told him that his premiums were higher for the Ford E–350 than for other vans. However, closer examination of Barrett's deposition testimony reveals that any higher rates, even if true, did not constitute actual injury. Barrett stated that he never had any problem obtaining insurance coverage. (Barrett Dep. at 96:6–8.) He testified that his broker at Lincoln General Insurance Company told him that he paid higher insurance premiums on his Ford van than did those who own GMC or other vans. (*Id.* at 97:15–98:2, 741 N.Y.S.2d 9.) Yet Barrett stated that this statement by his broker came in the context of Barrett telling the broker that "I [was] never interested in the GMC" (*id.* at 97:24–25, 741 N.Y.S.2d 9), and when asked at deposition whether he ever contemplated buying other vans such as GMC, he responded "I don't like them. I never think about it" (*id.* at 26:16–19, 741 N.Y.S.2d 9). Furthermore, at deposition Barrett never linked the purported higher premiums with the rollover issues with Ford E–350 vans. Indeed, Plaintiffs base their case on studies and reports that claim Ford E–350 vans and other 15–passenger vans have an increased tendency to rollover. (*See, e.g.,* Pls.' Supp. Statement at ¶¶ 17–37; 41–47.) Barrett has not presented evidence that his broker's statements regarding increased premium costs stemmed from the alleged higher rollover potential of Ford E–350 vans. The court in *Frank* also did not explicitly recognize increased insurance premiums as a form of actual injury sufficient to allege a breach of

implied warranty or consumer fraud statute claim. This Court concludes that Barrett has not presented evidence of an actual injury under *Frank* and therefore cannot state a claim for breach of implied warranty or violation of GBL §§ 349 and 350. This Court will grant summary judgment in Ford's favor on these claims brought by Barrett.

**\*72** Ford asks this court to extend the reasoning of *Frank* to bar the New York Plaintiffs' express warranty and unjust enrichment claims even though those claims were not presented in *Frank*. According to Ford, the court in *Frank* 1) affirmed the dismissal of all of plaintiffs' claims for lack of actual injury without distinction or separate analysis of each individual claim, and 2) relied on cases, such as the Eighth Circuit's decision in *Briehl,* that used the same reasoning to dismiss express warranty and other claims. The court in *Frank* did not assess each claim separately, but the court began its analysis by stating that "plaintiffs must plead actual injuries or damages, resulting from defendants' conduct, as an essential element of each of the first six causes of action" and cited cases supporting an actual injury requirement for each of the claims. *Id.* at 12–13. Barrett's claim for breach of express warranty requires proof of actual injuries or damages. *See Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 642 (S.D.N.Y.1999) (citing *CBS, Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997, 1000–01 (N.Y.1990); *Ainger v. Michigan Gen. Corp.,* 476 F.Supp. 1209, 1220–21 (S.D.N.Y.1979)); *Gusmao v. GMT Group, Inc.,* No. 06–5113, 2008 WL 2980039, at \*4 (S.D.N.Y. Aug.1, 2008). "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citing *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983)). As one court has held, to prevail on an unjust enrichment claim, a plaintiff must establish that the benefit received was less than what that purchaser bargained for. *In re Canon Cameras,* 237 F.R.D. 357, 359–60 (S.D.N.Y.2006) (quotations and citations omitted). Where a plaintiff purchases a product that "never malfunctions over its ordinary period of use," that plaintiff "cannot be said to have received less than what he bargained for when he made the purchase." *Id.* at 360. This reasoning reflects the analysis in *Frank* where, after reviewing cases that rejected claims regarding products that never manifested an alleged defect, the court concluded a plaintiff has not pled actual injury where the product never failed or no personal injury or property damage has been alleged. *Frank,* 741 N.Y.S.2d at 13–17. This Court concludes that the actual

Case 1:19-md-02875-BMB-SAK    Document 2057-2    Filed 05/10/22    Page 97 of 260 PageID: 69761

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

injury requirement as articulated in Frank applies to Barrett's claims for breach of express warranty and unjust enrichment. Because Barrett has not presented evidence of cognizable actual injury, this Court will grant summary judgment in Ford's favor on all of Barrett's claims. [23]

### D. Bishop Anderson's Express and Implied Warranty Claims: Notice

In addition to arguing that *Frank* dictates that all of Bishop Anderson's claims must fail, Ford presents several additional grounds for why summary judgment should be granted in its favor on these claims. Ford contends that Bishop Anderson's express and implied warranty claims must fail for lack of notice, based on New York's codification of the familiar UCC standard for notice: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.Y. UCC 2–607(3)(a). Bishop Anderson contends that the notice requirement may be satisfied by the filing of a complaint or, as here, the joining of litigation. This Court agrees that under New York law, the filing of a complaint could constitute sufficient notice. *See Panda Capital Corp. v. Kopo Int'l, Inc.,* 242 A.D.2d 690, 662 N.Y.S.2d 584, 586 (App.Div.1997) ("This argument overlooks the fact that the complaint and subsequent amended complaint in this action themselves constituted such notice ...."); *Silverstein v. R.H. Macy & Co.,* 266 A.D. 5, 40 N.Y.S.2d 916, 920 (App.Div.1943) ("[T]he commencement of this action would seem to afford sufficient notice of breach of warranty."). Whether notice was given within a reasonable time constitutes a question of fact. *Panda Capital,* 662 N.Y.S.2d at 587. This Court rejects Ford's lack of notice argument with regard to Bishop Anderson's warranty claims.

### E. Bishop Anderson's Express Warranty Claim

**\*73** For the same reasons the Court expressed with regard to the express warranty claims presented by other Plaintiffs, this Court concludes that Bishop Anderson's claim for breach of express warranty must fail because Ford's description of the vehicle as a 15–passenger van does not constitute an express warranty of safety. Anderson did not view any other representations or materials issued by Ford; indeed, he testified at deposition that he could not remember whether the dealership from which he purchased his vehicle was even a Ford dealership at all. (Anderson Dep. at 58:17–59:8.) Under New York's version of the UCC, "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.Y. U.C.C. § 2–313(2). The description of the vehicle as a 15–passenger van, while a description of a particular characteristic, makes no reference to safety or quality. *See Hubbard v. General Motors Corp.,* No. 95–4362, 1996 WL 274018, at \*7 (S.D.N.Y. May 22, 1996) (dismissing express warranty claim because purported warranty statements "ma[de] no reference whatsoever to the type or quality of the vehicles' braking system"); *cf. Anderson v. Bungee Int'l Mfg. Corp.,* 44 F.Supp.2d 534, 541 (S.D.N.Y.1999) (granting summary judgment to defendants on express warranty claim because purported warranty statements were "generalized statements of salesmanship" and not "descriptions of particular characteristics of the goods"). Under New York law, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." N.Y. U.C.C. § 2–313(1)(b). Here, Ford expressly described the vehicle as a 15–passenger van, but made no explicit representation regarding safety in carrying 15 passengers that rose above the level of mere puffery. This Court will grant Ford's motion for summary judgment as to Barrett's claim for breach of express warranty.

### F. Bishop Anderson's Implied Warranty Claim

Ford asserts that Bishop Anderson cannot maintain his claim for breach of implied warranty because he lacks contractual privity with Ford. Based on his deposition testimony, it is undisputed that Bishop Anderson did not purchase his used vehicle from Ford, and it is not clear whether he even purchased it from a Ford dealer. Under New York law, "[i]t is now settled that no implied warranty will extend from a manufacturer to a remote purchaser not in privity with the manufacturer where only economic loss and not personal injury is alleged." *Lexow & Jenkins, P.C. v. Hertz Commercial Leasing Corp. .,* 122 A.D.2d 25, 504 N.Y.S.2d 192, 193–94 (App.Div.1986). However, an exception to the privity requirement for economic loss exists under New York law where the product is a "thing of danger." As one federal court in New York explained,

> "However, New York recognizes an exception to this principle where the product in question is a 'thing of danger.' " *Hubbard v. Gen. Motors Corp.,* 95–CV–4362, 1996 WL 274018, at \*5 (S.D.N.Y. May 22, 1996); *Goldberg v. Kollsman Instr. Corp.,* 12 N.Y.2d 432, 436,

240 N.Y.S.2d 592, 191 N.E.2d 81 (N.Y.1963). More specifically, "where an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, the manufacturer as well as the vendor is liable, for breach of law-implied warranties, to the persons whose use is contemplated." *Hubbard,* 1996 WL 274018, at *5 (quoting *Goldberg,* 12 N.Y.2d at 436, 240 N.Y.S.2d 592, 191 N.E.2d 81) (other citation omitted).

**\*74** *Wade v. Tiffin Motorhomes, Inc.,* 686 F.Supp.2d 174, 191 (N.D.N.Y.2009). Distinguishing other cases involving transportation vehicles where implied warranty claims were dismissed for lack of privity, the court in *Hubbard* concluded that "plaintiff's claim alleging a defective braking system is qualitatively different from claims against an automobile manufacturer alleging the use of inferior transmissions or the design of defective air conditioners, in that a vehicle with defective brakes is a thing of danger." 1996 WL 274018, at *5 n. 7. Here, a vehicle with an alleged increased propensity to rollover is likely to be a thing of danger to foreseeable drivers and passengers. *See Wade,* 686 F.Supp.2d at 191. Ford points out that some courts have not always invoked this exception even where arguably applicable. *See, e.g., Fanok v. Carver Boat Corp.,* 576 F.Supp.2d 404, 413 (E.D.N.Y.2008) (alleged defect in yacht where yacht caught fire). However, under the facts of this case, this Court concludes that the exception to the privity requirement applies, and this Court will not grant summary judgment on Bishop Anderson's implied warranty claim for lack of privity. Because Ford presents no additional arguments with regard to Barrett's implied warranty claim, this Court will deny Ford's motion for summary judgment as to Barrett's claim for breach of implied warranty.

### G. Bishop Anderson's GBL Claims

With regard to Bishop Anderson's New York consumer fraud statute claims, Ford contends that these claims must fail because Bishop Anderson did not prove that he suffered actual injury based on out-of-pocket loss. Ford relies upon an Appellate Division decision stating that "[i]n order to state a cause of action pursuant to General Business Law §§ 349 and 350, the plaintiffs were required to plead and prove that

the deceptive act caused actual injury." *Canario v. Gunn,* 300 A.D.2d 332, 751 N.Y.S.2d 310, 312 (App.Div.2002) (citing *Hazelhurst v. Brita Prods. Co.,* 295 A.D.2d 240, 744 N.Y.S.2d 31, 33 (App.Div.2002); *Frank,* 741 N.Y.S.2d at 12–13). In *Canario,* plaintiffs sought damages based on allegedly false advertising by real estate agents regarding property purchased by plaintiffs. Plaintiffs alleged that their downpayment on the property was the proper measure of damages, but the court concluded that because the property was worth "many times that amount" and plaintiffs retained the property, plaintiffs' "claim of actual harm is without merit on its face." *Canario,* 751 N.Y.S.2d at 312. Here, Ford observes that Bishop Anderson cannot even establish his original purchase price for the van, let alone any injury, and therefore cannot show that the van is now worth less than what he paid for it. However, the court's reasoning regarding the nature of actual injury in *Canario* appears to have been dicta, as the court first held that plaintiffs could not maintain their GBL claims because they were private transactions regarding a unique piece of property and without impact on consumers or the public at large. *Id.* at 311–12. Moreover, *Canario* is distinguishable, because plaintiffs' sole measure of damages for their injury in that case was their downpayment. Here, Bishop Anderson alleges out-of-pocket costs based on his limitation on use of the vehicle and alleged repair costs. These asserted injuries suffice to remove his claims from the ambit of *Frank,* and *Canario* similarly does not preclude his GBL claims. Ford presents no other argument against Bishop Anderson's statutory claims. Therefore, this Court will deny Ford's motion for summary judgment as to Bishop Anderson's GBL claims.

### H. Bishop Anderson's Unjust Enrichment Claim

**\*75** To prove an unjust enrichment claim under New York law, a plaintiff must show "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye,* 202 F.3d at 616 (2d Cir.2000) (citing *Dolmetta,* 712 F.2d at 20. Here, Bishop Anderson purchased a used van from an unknown dealer. He has not presented any evidence that Ford benefitted at his expense from the purchase of the vehicle; he cannot even recall whether the unknown dealer was a Ford dealer. In any event, even if he could do so, he could not recover for unjust enrichment based on the diminution in value of his vehicle because, as discussed above with regard to *Frank,* he would have to show that any benefit he received was less than that for which he bargained. Because his vehicle did not malfunction, he "cannot be said to have received less than what he bargained for when he made the purchase." *In re Canon,* 237

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Case 1:19-md-02875-BMB-SAK   Document 2057-2   Filed 05/10/22   Page 99 of 260
PageID: 69763

F.R.D. at 360. Bishop Anderson cannot show what he paid for the vehicle, let alone that he received less value than what he paid. Bishop Anderson also cannot maintain an unjust enrichment action based on his asserted out-of-pocket costs. He brought his vehicle to a private mechanic at Gordon Auto for service; no evidence in the record suggests any affiliation or connection between Gordon Auto and Ford. This Court will grant Ford's motion for summary judgment on Bishop Anderson's claim for unjust enrichment.

*I. Summary*

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to all of Barrett's claims. With regard to Bishop Anderson, this Court will grant Ford's motion for summary judgment as to his claims for breach of express warranty and for unjust enrichment. This Court will deny Ford's motion with regard to Bishop Anderson's claims for breach of implied warranty and for violation of GBL §§ 349 and 350.

**XI. Massachusetts**

Massachusetts Plaintiff Charles St. AME Church ("Charles St. AME") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss. Ford now moves for summary judgment as to all of Charles St. AME's claims: breach of express warranty; breach of implied warranty; violation of Massachusetts's consumer protection act, Mass. Gen. Laws ch. 93A, § 9 *et seq.;* and unjust enrichment.

*A. Material Facts*

In 2005, Charles St. AME entered into a contract with Salem Ford Hyundai to purchase a new 2005 Ford E–350 van for approximately $28,000. Charles St. AME still owns the vehicle, has not attempted to sell the vehicle, and according to its representative at deposition, church trustee Albert Kinnitt, Jr., has no intention to sell the van. (Kinnitt Dep. at 132:15–17; 152:8–11.) While no one at Charles St. AME viewed any Ford advertisements prior to purchasing the van (*id.* at 139:6–8; 144:24–145:10), Kinnitt testified that he specifically asked the salesman at Salem Ford Hyundai for a 15–passenger van and told him about the church's need for a vehicle to transport seniors and youth for church purposes (*id.* at 48:14–17; 50:22–53:4). Kinnitt, who had responsibility for purchasing the van and supervising its drivers, stated that the salesman told him that the van was "capable of servicing 15 passengers in it." (*Id.* at 51:3–13.) According to Kinnitt, the salesman told him that the vehicle was a 15–passenger van, but when

asked at deposition whether the salesman told him that the van "was safe to carry 15 passengers," Kinnitt responded, "He say it was a 15–passenger van." (*Id.* at 176:15–22.) Earlier at deposition, Kinnitt stated that when the church purchased the vehicle, he thought that Ford represented that it would be safe because Ford repeatedly stated that the van was "the best vehicle going." (*Id.* at 135:1–23.)

**\*76** According to Kinnitt, Charles St. AME decided to limit the capacity of its van to approximately 9 passengers for out-of-state trips after learning from articles about the van's rollover propensity. (*Id.* at 31:2–24; 114:3–23; 117:20–118:24.) Such long trips occur approximately once per year. (*Id.* at 101:13–17.) Kinnitt testified that the church has had to make double trips for these long journeys to make up for the limited capacity or ask members to use their own vehicles (*id.* at 122:1–22; 147:20–24), and he mentioned at deposition, without elaboration, that "[w]e had to rent buses" (*id.* at 34:20–21). For trips within the Boston area, however, the church still fills the vehicle to capacity with 15 passengers (*id.* at 31:11–19), and the church has continued to make such trips on a weekly basis since the church learned of the van's rollover propensity (*id.* at 101:4–102:15; 104:6–13). The van has never suffered a rollover, and has been involved in only two minor accidents, neither of which involved handling or stability issues. Various drivers, including Kinnitt, reported some issues with swaying and shifting. (*Id.* at 25:13–27:21.) Charles St. AME does not seek damages related to its procurement of insurance for the van. (Kinnitt at 153:2–10.)

*B. Iannacchino*

Ford argues that the decision of the Supreme Judicial Court in *Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 888 N.E.2d 879 (Mass.2008), compels that summary judgment be granted in Ford's favor on Charles St. AME's claims for breach of implied warranty and violation of ch. 93A, § 9, and further contends that the rationale of *Iannacchino* should apply to Charles St. AME's express warranty and unjust enrichment claims as well. This Court agrees that under *Iannacchino,* Charles St. AME's implied warranty and ch. 93A claims must fail. The Court need not decide whether the Massachusetts courts would extend *Iannacchino* to encompass Charles St. AME's express warranty and unjust enrichment claims because those claims fail for independent reasons.

Plaintiffs in *Iannacchino* brought a purported class action in which they alleged that certain Ford vehicles had outside door handle systems that did not comply with federal safety standards and were defective and unsafe. Plaintiffs alleged

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 100 of 260
PageID: 69764

In re Ford Motor Co. E-350 Van Products Liability... — Not Reported in...

that due to noncompliance and defect, the doors on the vehicles could open accidentally in certain kinds of collisions, putting the occupants at risk of serious injury or death. *Id.* at 883. At issue in the appeal in *Iannacchino* were plaintiffs' claims for breach of implied warranty and violation of ch. 93A, § 9, and "whether the plaintiffs ... have adequately alleged an 'injury' or 'loss' for purposes of stating a claim under § 9." *Id.* at 885. As here, the class in *Iannacchino* did not include those who had suffered personal injury, but only encompassed those who suffered economic loss by owning vehicles worth less than a vehicle that complied with all relevant safety standards. Plaintiffs alleged that Ford knew the outside door latches were defective because they failed to comply with Federal Motor Vehicle Safety Standard 206 ("FMVSS 206"), a standard promulgated by the National Highway Traffic Safety Administration (NHTSA), and Ford's internal safety guidelines. The Supreme Judicial Court of Massachusetts concluded that plaintiff's theory of regulatory noncompliance failed because they conceded that the door latches complied with NHTSA standards. *Iannacchino*, 888 N.E.2d at 887. The court therefore affirmed the dismissal of plaintiff's ch. 93A claims for failure to plead adequate "injury" or "loss" under ch. 93A, § 9. [24] With regard to the implied warranty claim, the court observed that such a claim requires the same showing of injury as does a ch. 93A claim, and stated that "[a]n implied warranty claim and a c. 93A claim are based on the same economic theory of injury and the same set of alleged facts, they should survive or fail under the same analysis." *Id.* at 889. Because the two claims were "interconnected ... the reasons that call for the dismissal of the c. 93A claim also warrant dismissal of the breach of implied warranty claim." *Id.*

**\*77** Charles St. AME here seeks to limit *Iannacchino* to this context of allegations of non-compliance with federal standards, and claims that the court in *Iannacchino* recognized that a ch. 93A claim could lie where not premised on noncompliance with government standards. Indeed, the court did not erect a total bar on claims asserting economic loss from an allegedly defective product; the court stated at the outset that it did "not consider the lack of accident-related injury or manifested defect a bar to recovery under G.L. c. 93A, § 9, in this case." *Id.* at 882. [25] Charles St. AME points out that no explicit federal safety standard applied to Ford E–350 vans. Despite citing many NHTSA reports, Plaintiffs have not alleged that the NHTSA made an explicit determination that the vans fail to comply with a federal standard or that they contain a defect. Instead, Charles St. AME appears to argue that Ford represented the vans to meet

the unspecified standard of transporting 15 passengers safely, all the while knowing that the vehicles did not comply with that standard. (Pls.' Omnibus Br. at 26.)

However, the court in *Iannacchino* also addressed plaintiffs' claims to the extent they did not rely on regulatory noncompliance, and imposed a requirement of some allegation of violation of a legally required standard for diminution in value claims. The court stated:

> But to the extent the plaintiffs have attempted to allege that the door handles are defective independently of any issue with FMVSS 206, we add the following.

> Because the term "defect" is conclusory and can be subjective as well, a bare assertion that a defendant, while representing the opposite, has knowingly manufactured and sold a product that is "defective," or suffers from "safety-related defects," does not suffice to state a viable claim. *Where, as in this case, there is no allegation that the plaintiffs—or indeed anyone else—have suffered personal injury or property damage, the complaint must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not.* When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.

*Iannacchino*, 888 N.E.2d at 888 (footnote and citations omitted) (emphasis added).

*Iannacchino* requires that where no personal injury has been alleged, a claim for economic loss based on diminution in value must depend upon noncompliance with some legally required standard. The court further rejected injury based on noncompliance with nonspecific internal safety standards akin to the vague "standard" of safety alleged by Charles St. AME: "In any event, in the absence of any allegation of personal injury or even injury to property, we decline to adopt a rule that would expose a company to liability for failing to meet self-imposed standards that may in fact be aspirational goals conducive to the development and implementation of improved safety measures that exceed regulatory requirements." *Id.* at 888.

**\*78** Charles St. AME cites pages 886–887 of *Iannacchino* as "contemplat[ing] that a plaintiff *may* maintain a cause of action under Ch. 93 § 9, independent of government

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 101 of 260
PageID: 69765

In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

standards, despite the fact that its plaintiffs had not." (Pls.' Omnibus Br. at 26 (citing *Iannacchino*, 888 N.E.2d at 886–87 & n. 13).) Yet as Ford emphasizes, these very pages of the decision in *Iannacchino* reject any claim for purely economic injury independent of a violation of some governmental, legally required standard. Under Massachusetts law as propounded in *Iannacchino*, mere allegations of a "defect" unmoored to a violation of a legally required standard does not suffice to state a claim for injury based on purely economic loss under ch. 93A, § 9. Here, *Iannacchino* compels this Court to conclude that Charles St. AME's implied warranty and Massachusetts state consumer fraud statute claims must fail for failure to show cognizable injury. [26] Therefore, this Court will grant summary judgment in Ford's favor on these claims.

The *Iannacchino* court did not expressly address the viability of claims for breach of express warranty and unjust enrichment under the court's analysis of cognizable injury. Plaintiffs in *Iannacchino* had initially brought claims for breach of express warranty and unjust enrichment. The court noted that the trial judge "dismissed the plaintiffs' breach of express warranty claim, finding that they had not alleged that they had seen or relied on the labels certifying compliance with Federal safety regulations, as well as their unjust enrichment claim, concluding that '[t]he alleged facts in this case do not lend themselves to such a cause of action.' " *Id.* at 885. Plaintiffs did not challenge the dismissal of these counts on appeal to the Supreme Judicial Court. *Id.* at 885 n. 11. To this Court's knowledge, no court has extended the principles of *Iannacchino* regarding injury to claims for breach of express warranty or unjust enrichment. But this Court need not predict whether the Supreme Judicial Court would extend *Iannacchino* beyond ch. 93A and implied warranty claims because Charles St. AME's express warranty and unjust enrichment claims fail for reasons independent of the rationale of *Iannacchino*.

## C. Express Warranty

### 1. Notice

Ford additionally contends that Charles St. AME's express warranty claim is barred because it did not give sufficient notice under Massachusetts's version of U.C.C. § 2–607(3)(a), which states that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Mass. Gen. Laws. ch. 106, § 2–607(3)(a). Charles St. AME did not provide any pre-litigation notice to Ford, and Plaintiffs

generally contend that by joining this litigation, it provided sufficient notice.

To the court's knowledge, no Massachusetts court has explicitly held that notice by way of filing a complaint or joining litigation is insufficient. Courts have focused on the purposes behind the notice requirement and reasoned that notice would be sufficient if it allows for settlement through negotiation and "allows the seller to infer that the buyer is asserting its legal rights." *Delano Growers' Co-op. Winery v. Supreme Wine Co.,* 393 Mass. 666, 473 N.E.2d 1066, 1072 (Mass.1985). Regardless of whether notice by litigation could or could not constitute adequate notice under this standard, Massachusetts law dictates that "[f]ailure to give notice shall not bar recovery under this section unless the defendant proves that he was prejudiced thereby." Mass. Gen. Laws ch. 106, § 2–318; *see also Swartz v. General Motors Corp.,* 375 Mass. 628, 378 N.E.2d 61, 63 (Mass.1978) (stating that under Massachusetts law, "the defense of failure to give notice [has been] limited to cases where the defendant proved prejudice"). One court in Massachusetts implicitly recognized that notice by commencement of an action might not suffice but any lack of notice would not bar recovery unless the defendant proves prejudice: "General Laws c. 106, § 2–318, is explicit that the burden is on the defendant to prove prejudice in cases such as the present, in which there was no notice of any breach of warranty prior to the commencement of the action." *Henrick v. Coats Co.,* 17 Mass.App.Ct. 976, 458 N.E.2d 773, 775 (Mass.App.Ct.1984) (citing *Swartz,* 378 N.E.2d at 63). In most cases, prejudice arises where "evidence which may reasonably have been developed by prompt investigation has been lost." *Castro v. Stanley Works,* 864 F.2d 961, 964 (1st Cir.1989) (quotation and citations omitted). Massachusetts law treats the defense of lack of notice as a jury issue, *Sacramona v. Bridgestone/Firestone, Inc.,* 106 F.3d 444, 449 (1st Cir.1997), and summary judgment may only be appropriate on the issue if "a reasonable jury would ... have been compelled to find prejudice," *Smith v. Robertshaw Controls Co.,* 410 F.3d 29, 36 (1st Cir.2005) (quoting *Sacramona,* 106 F.3d at 449).

**\*79** Ford has not met its burden to prove prejudice based on undisputed facts such that a reasonable jury would have been compelled to find prejudice. It notes that Charles St. AME's failure to give pre-litigation notice deprived Ford of the chance to negotiate settlement (Ford Reply Br. at 37), but does not address the form of evidence-based prejudice discussed in the Massachusetts caselaw. This Court rejects

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 102 of 260
PageID: 69766

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

Ford's lack of notice argument with regard to Charles St. AME's breach of express warranty claim.

### 2. No Express Warranty

Under Massachusetts's version of the UCC, an express warranty may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." Mass. Gen. Laws ch. 106, § 2–313(1)(a), (b). Puffing or other sales talk does not create an express warranty. Mass. Gen. Laws ch. 106, § 2–313(2); Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 434 N.E.2d 611, 617 (Mass.1982). To maintain a breach of express warranty claim, "the plaintiff must demonstrate that the defendant promised a specific result." Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 396 Mass. 818, 489 N.E.2d 172, 175 (Mass.1986). Under the UCC's general principles of express warranty discussed previously, and under Massachusetts law, Ford's description of the E–350 as a 15–passenger van does not constitute an express warranty of safety in transporting 15–passengers. The description does not promise a specific result of safety, and any warranty of safety is merely implied. Cf. Roth v. Ray–Stel's Hair Stylists, Inc., 18 Mass.App.Ct. 975, 470 N.E.2d 137, 138 (Mass.App.Ct.1984) (affirming jury's verdict of breach of express warranty where hair bleach package stated "Doesn't creep or swell," plaintiff relied on representation, and product "swell[ed] rapidly"). The statement of the Salem Ford Hyundai salesman to Kinnitt that the van was the "best vehicle going" was puffery that does not create an express warranty. Mass. Gen. Laws ch. 106, § 2–313(2). This Court will grant Ford's motion for summary judgment on Charles St. AME's claim for breach of express warranty.

### D. Unjust Enrichment

As in many other states, to prove a claim for unjust enrichment under Massachusetts law, "a plaintiff must prove (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable." Stevens v. Thacker, 550 F.Supp.2d 161, 165 (D.Mass.2008); see also Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st. Cir.2009).

Plaintiffs assert unjust enrichment based on 1) Ford's extraction of payments from Plaintiffs who would not have purchased the vehicles, or would have done so at reduced prices; and 2) Ford's revenues on repairs outside Ford's 90–day limited warranty. (Compl.¶¶ 88–89.) Charles St. AME does not allege that it paid any money to Ford for repairs, and its unjust enrichment claim depends solely upon the inflated value Ford allegedly received for Charles St. AME's vehicle. Setting aside the evidentiary problems common to many Plaintiffs in this action regarding purchases from a Ford dealer (here, Salem Ford Hyundai), Charles St. AME cannot maintain its unjust enrichment claim because it purchased its vehicle in 2005, after the April 2004 period in which Plaintiffs concede that the claimed artificial demand for Ford E–350 vans fully eroded. (Andresen Certif No. 14, Ex. 3 at 22; Pls.' Responsive Statement of Material Facts for Charles St. AME ¶ 25.) As discussed previously, a defendant enjoys the appreciation of the benefits conferred upon it if the value of that benefit exceeds the value of the consideration given for that benefit. As Plaintiffs concede, the purported "artificial demand" for Ford E–350 vehicles fully eroded by April 2004, the market value of van purchased after April 2004 similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Here, even if Charles St. AME could show that it has conferred a benefit upon Ford, its unjust enrichment claim fails for the same reason that claims of certain Pennsylvania and Florida Plaintiffs failed: it did not pay an unjustly inflated price for the vehicle because it purchased the vehicle after the claimed artificial demand had eroded. Therefore, this Court will grant Ford's motion for summary judgment as to Charles St. AME's unjust enrichment claim.

### E. Summary

**\*80** For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all of Charles St. AME's claims. Charles St. AME shall be dismissed from this matter.

### Conclusion

For the foregoing reasons, this Court will grant Ford's motions for summary judgment in part, grant them without prejudice in part, and deny them in part, as follows:

| State Plaintiff | Doc. No. | Express Warranty | Implied Warranty | Consumer Fraud Statute(s) | Unjust Enrichment |
|---|---|---|---|---|---|

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 103 of 260
PageID: 69767
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in...

|    |                           |     |                         |                         |                                                          |                                                                        |
|----|---------------------------|-----|-------------------------|-------------------------|----------------------------------------------------------|------------------------------------------------------------------------|
|    | Greater All Nation        | 188 | Grant.                  | Grant.                  | Grant.                                                   | Grant.                                                                 |
| CA | First United              | 188 | Grant.                  | Grant.                  | California CLRA: Grant. California UCL and California FAL: Grant without prejudice. | Grant without prejudice.                                               |
| IL | Pentecostal Temple        | 226 | Previously dismissed.   | Previously dismissed.   | Grant.                                                   | Grant.                                                                 |
|    | Macedonia                 | 214 | Grant.                  | Deny.                   | Grant.                                                   | Grant without prejudice.                                              |
|    | Faith Tabernacle          | 210 | Grant.                  | Deny.                   | Grant.                                                   | Grant.                                                                 |
| NJ | Social Clubhouse          | 216 | Grant.                  | Deny.                   | Grant.                                                   | Grant.                                                                 |
|    | Bethany Baptist           | 212 | Grant.                  | Deny.                   | Grant.                                                   | Grant as to 1993 and 1994 vans. Grant without prejudice as to 2001 and 2003 vans. |
| GA | Allen Temple              | 221 | Deny.                   | Deny.                   | Grant.                                                   | Deny.                                                                  |
|    | Bethel                    | 230 | Grant.                  | Deny.                   | Grant.                                                   | Grant as to 2000 van.                                                 |
| PA |                           |     |                         |                         |                                                          | Grant without prejudice                                               |

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 104 of 260
PageID: 69768
In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

| State | Name | # | | | | |
|---|---|---|---|---|---|---|
| | | | | | | as to 2001 van. |
| | Hickman Temple | 228 | Grant. | Deny. | Grant. | Grant without prejudice. |
| | Mt. Airy | 232 | Grant. | Deny. | Grant. | Grant. |
| | Blandon | 190 | Grant. | Grant. | Grant. | Grant. |
| FL | Diaz | 194 | Grant. | Grant. | Deny. | Grant. |
| | Mestre | 197 | Grant. | Grant. | Deny. | Grant. |
| TX | St. Luke's | 219 | Grant. | Grant. | Grant as to misrepresentation theory. Deny as to nondisclosure theory. | Grant without prejudice. |
| MO | St. James | 202 | Grant. | Grant. | Grant. | Grant. |
| MI | Conant Avenue | 223 | Grant. | Deny. | Grant. | Grant. |
| NY | Bishop Anderson | 204 | Grant. | Deny. | Deny. | Grant. |
| | Barrett | 206 | Grant. | Grant. | Grant. | Grant. |
| MA | Charles St. AME | 208 | Grant. | Grant. | Grant. | Grant. |

For the claims on which summary judgment will be granted without prejudice, Plaintiffs shall have until August 13, 2010 to show cause to cure the evidentiary deficiencies identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response.

This Court will also grant Ford's motion (Doc. No. 172) to strike Plaintiffs' August 7, 2009 letter and affidavit. Appropriate forms of order accompany this Memorandum Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2813788

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 105 of 260
PageID: 69769

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

## Footnotes

1  *New Bethlehem Baptist Church v. Ford Motor Co.,* No. 2:05–519 (N.D.Ala.); *Eleventh Street Baptist Church v. Ford Motor Co.,* No. 4:05–4020 (W.D.Ark.); *Greater All Nation Pentecost Church of Jesus Christ v. Ford Motor Co.,* No. 2:05–1765 (C.D.Cal.); *Pentecostal Temple Church of God in Christ v. Ford Motor Co. .,* No. 1:05–1340 (N.D.Ill.); *Social Clubhouse, Inc. v. Ford Motor Co.,* No. 2:03–4558 (D.N.J.).

2  In August 2009, this matter was reassigned to the undersigned.

3  Judge Ackerman issued an Amended Opinion and Order on September 3, 2008 (Doc. No. 142) that made no substantive revisions to the initial Opinion and Order issued one day earlier.

4  On April 8, 2010, Ford filed a Notice of Supplemental Authority Regarding Summary Judgment Motions. Plaintiffs ask this Court to strike this filing, or allow them to file a response. Plaintiffs note that several of the cases cited by Ford in this filing were decided prior to the filing of Ford's reply brief. While the Court takes note in its own research and analysis of any relevant cases recently decided, it has not relied upon Ford's Notice of Supplemental Authorities, and will not allow Plaintiffs to file any response to that Notice.

5  Differing portions of Deacon Jennings's deposition transcript are attached as exhibits to Ford's Certification of Meridyth M. Andresen No. 2 (Ex. 1) and Plaintiffs' Certification of Daniel R. Lapinski (Ex. 35). For simplicity, the Court will cite to the deposition transcript without reference to which party's exhibit contains the specific lines discussed. The Court will adhere to the same practice with regard to other depositions referenced in this Opinion.

6  The Court dismissed the Alabama, Arkansas, and Illinois Plaintiffs' express warranty claims not because Plaintiffs failed to allege the existence of an express warranty sufficiently, but for lack of pre-litigation notice under the laws of those jurisdictions.

7  First United used its vehicle to transport up to 15 passengers from 1995 to January 2003, and Zilotto agreed at deposition that the van could accommodate 15 passengers based on its seating capacity. (Ford's SUMF No. 2 at ¶¶ 31–35; Pls.' Supp. Statement at ¶¶ 445–451; Zilotto Dep. at 103:19–23.) Greater All Nation never used its van to carry more than 12 passengers because the seats were too small (Jennings Dep. at 45:14–22; 110:24–111:12), but Plaintiffs do not allege breach of an express warranty of comfort or seat size based on the description of the vehicle as a "15-passenger van."

8  Although Plaintiffs style their state consumer fraud claims as the "Fourth Cause of Action," the parties address these claims third in their respective briefs. This Court will follow the parties' example.

9  In *Hermitage Corp. v. Contractors Adjustment Co.,* the Supreme Court of Illinois recognized that for most tort claims, the cause of action accrues when the plaintiff suffers injury. 166 Ill.2d 72, 209 Ill.Dec. 684, 651 N.E.2d 1132, 1135 (Ill.1995). Ford cites *Hermitage Corp.* as its sole authority for the notion that this general rule applies to ICFA claims. However, the *Hermitage* court ultimately rejected the general rule for the claims before it, and instead applied the discovery rule. *Id.* at 1135–1140.

10 An example of an exceptional case can be found in *Miller v. Beneficial Management Corp.,* 977 F.2d 834, 846 (3d Cir.1992), where the magistrate judge issued an order that a formal Rule 56(f) affidavit would not be required. Thus, in that case, the failure to file a Rule 56(f) affidavit was not fatal to plaintiff's claim of insufficient discovery. This case presents no similar exceptional circumstances to warrant relaxing the Rule 56(f) requirements.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 106 of 260
In re Ford Motor Co. E-350 Van Products Liability... Not Reported in
                                        PageID: 69770

11    In so concluding, the court in *Wal–Mart* "disapproved" of a prior ruling that suggested that "a delay of two
      years, without more, is unreasonable as a matter of law." *Wal–Mart,* 586 S.E.2d at 86 (citing *Buford v. Toys
      R' Us, Inc.,* 217 Ga.App. 565, 458 S.E.2d 373, 375 (Ga.Ct.App.1995)).

12    In their Responses and Objections to Ford's Second Set of Written Interrogatories, Plaintiffs stated that the
      purported "artificial demand" for E–350 vans that led to artificially inflated prices being paid by Plaintiffs
      "is believed to have fully eroded by April, 2004, when the [National Highway Traffic Safety Administration]
      reissued a safety warning concerning 15–passenger vans." (*See, e.g.,* Andresen Certif No. 19, Ex. 5 at 22.)
      Allen Temple purchased its vehicles before this date, and not after the time Plaintiffs concede that the claimed
      artificial demand eroded such that Ford could not have been unjustly enriched by artificially high sales prices
      for E–350 vans.

13    Bethel has also contended that it purchased a new 2005 vehicle, but now does not dispute that this third
      vehicle is not owned by Bethel but by an independent, non-profit organization.

14    Similarly, Ford contends that Pennsylvania courts would follow the decision of the Supreme Court of New
      Jersey in *Thiedemann* and conclude that the Pennsylvania Plaintiffs have presented no cognizable proof of
      their damages. However, this Court has already held that *Thiedemann* does not apply to implied warranty
      claims, and Ford similarly fails to point to any Pennsylvania caselaw suggesting that Pennsylvania courts
      would adopt *Theidemann* even if applicable.

15    For example, in an internal document describing the purpose of the church's Ford vans, Bethel stated *"Church
      vans will not be used for PERSONAL use!!!!!!!"* (Andresen Certif. No. 12, Ex. 4 at BAME0011.)

16    Ford does not move for summary judgment on the grounds of lack of actual reliance, and while reliance
      does not appear to be an express element of an FDUTPA claim, *see Cold Stone Creamery, Inc. v. Lenora
      Foods I, LLC,* 332 F. App'x 565, 567 (11th Cir.2009), Florida courts have not spoken clearly on the topic and
      particularly regarding whether the causation requirement incorporates some notion of reliance, *Fitzpatrick v.
      General Mills, Inc.,* 263 F.R.D. 687, 694–95 (S.D.Fla.2010). Generally, "to satisfy the FDUTPA's causation
      requirement, each plaintiff is required to prove only that the deceptive practice would—in theory—deceive
      an objective reasonable consumer." *Fitzpatrick,* 263 F.R.D. at 695. Ford does not frame its argument for
      summary judgment based on the knowledge of the Florida Plaintiffs in these terms, and the Florida Plaintiffs
      do not oppose Ford's motion by arguing that their subjective knowledge is irrelevant; rather, they advance
      that the *source* of the knowledge makes the difference. This Court will decide Ford's motion on the arguments
      advanced by the parties.

17    Ford also asks for summary judgment in its favor on any claims by St. Luke's with regard to two additional
      Ford E–350 vans it purchased, a 1990 model year and a 1991 model year. St. Luke's has excluded these
      vehicles from this suit, and indeed the 1990 van is outside Plaintiffs' purported class definition. Therefore,
      St. Luke's does not present any claims on the 1990 or 1991 vehicles, and only asserts claims based on the
      two 2001 vans in this litigation.

18    In the opinion of the district court affirmed by the Eighth Circuit in *O'Neil,* the court concluded "[i]t is simply
      not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of that same
      product unsafe; the plaintiff must instead allege an actual manifestation of the defect that results in some
      injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment."
      *O'Neill v. Simplicity, Inc.,* 553 F.Supp.2d 1110, 1115 (D.Minn.2008).

19    Section 400.2–725(2) provides for an exception to the rule that a breach of warranty occurs upon tender
      where the warranty expressly extends to future performance, a situation not present here.

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 107 of 260
PageID: 69771

In re Ford Motor Co. E-350 Van Products Liability..., Not Reported in...

20    These purposes include: "(1) to prevent surprise and allow the seller the opportunity to make recommendations how to cure the nonconformance, (2) to allow the seller the fair opportunity to investigate and prepare for litigation, (3) to open the way for settlement of claims through negotiation, and (4) to protect the seller from stale claims and provide certainty in contractual arrangements." *American Bumper & Mfg. Co. v. Transtechnology Corp.,* 252 Mich.App. 340, 652 N.W.2d 252, 256 (Mich.Ct.App.2002).

21    In its Responsive Statement of Material Facts, in one paragraph Conant Avenue disputes Ford's contentions that Conant Avenue had a direct contract with Ford, claiming that Conant Avenue purchased its vehicle from Riverside Ford. (Pls.' Responsive Statement of Material Facts for Conant Avenue ¶ 2.) However, in the very next paragraph, Conant Avenue responds "Undisputed" to Ford's statement that "Conant Avenue admits that the purchase agreement was a direct contract with Ford." (*Id.* ¶ 3, 652 N.W.2d 252.) This Court concludes that no genuine issue of material fact exists, as Conant Avenue conceded that it had a direct contract with Ford. Conant Avenue's dispute with itself as to the nature of its contract does not create a disputed fact; Totty clearly testified at deposition that the church had a direct contract with Ford for the purchase of the van (Totty Dep. at 119:2–9), and Conant Avenue does not dispute that this testimony amounts to an admission that its contract was with Ford directly.

22    Indeed, while Conant Avenue may not maintain its breach of express warranty claim because Ford did not expressly warrant the safety of the vehicle, this Court will deny summary judgment to Ford as to Conant Avenue's breach of implied warranty claim. Therefore, Conant Avenue may effectively proceed with its claim of breach of an implied contract term, but not under the guise of unjust enrichment.

23    With regard to unjust enrichment, even if Barrett has sufficient cognizable actual injury, this Court would grant Ford's motion for summary judgment as to that claim without prejudice. As with other Plaintiffs who purchased their vehicles from Ford dealers, Barrett has not met his evidentiary burden to establish that Ford benefitted from his purchase of the used van.

24    Ch. 93A, § 9 requires that a consumer "must have 'been injured by another person's use or employment of' an unfair or deceptive act or practice." *Iannacchino,* 888 N.E.2d at 885 (quoting Mass. Gen. Laws Ch. 93A, § 9).

25    Rather, according to the court, if plaintiffs had adequately pled noncompliance with a federal standard, and that after learning of the noncompliance, defendant failed to initiate a recall and pay for remediation, "the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received. Such an overpayment would represent an economic loss—measurable by the cost to bring the vehicles into compliance—for which the plaintiffs could seek redress under G.L. c. 93A, § 9." *Iannacchino,* 888 N.E.2d at 886–87.

26    *Iannacchino* arose in the context of a motion to dismiss, and the court in *Iannacchino* allowed plaintiffs to amend their complaint to cure their pleading defects on the nature of their injury. 888 N.E.2d at 889. Here, after extensive discovery, Charles St. AME has not identified any cognizable, legally required standard that Ford represented its E–350 vans as meeting but knew that they did not. Therefore, *Iannacchino* applies with equal force at the summary judgment stage.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   65

# Tab 8

72 UCC Rep.Serv.2d 816

2010 WL 2839480

United States District Court,
S.D. California.

In re HYDROXYCUT MARKETING
AND SALES PRACTICES LITIGATION.

Coretta T. Brown, Plaintiff,

v.

Kerr Investment Holding Corp.; Iovate Health
Sciences, Inc.; Iovate Health Sciences U.S.A., Inc.; and
Muscletech Research and Development, Inc., Defendants.

No. 09MD2087–BTM (AJB).
|
S.D. Cal. No. 10CV0237.
|
July 20, 2010.

West KeySummary

1    Sales 🔑 Parties entitled to notice

Sales 🔑 Particular actions and claims

Consumer sufficiently stated her breach of
implied warranty claim against weight loss
supplement manufacturer. Consumer alleged
that she suffered a heart attack, stroke, and
renal failure after ingesting manufacturer's
weight loss supplement. Consumer alleged
that manufacturer impliedly warranted that the
product was safe for its intended purpose as
a weight loss supplement. Manufacturer argued
that consumer's claim was barred due to a failure
to notify them of the alleged breach. However,
since the supplement was intended for human
consumption, no such notice was required as the
defect would not be disclosed upon inspection.
McKinney's Uniform Commercial Code § 2–
607(3)(a).

3 Cases that cite this headnote

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S

MOTION TO DISMISS COUNTS IV, V, VI,
AND VIII OF PLAINTIFF'S COMPLAINT

BARRY TED MOSKOWITZ, District Judge.

*1    Defendants Iovate Health Sciences, Inc., Iovate
Health Sciences USA, Inc., and Muscletech Research and
Development, Inc. ("Defendants") have filed a motion
to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b)
("Motion"). The Motion seeks dismissal of Count IV (breach
of express warranty), Count V (breach of implied warranty),
Count VI (common law fraud), and Count VIII (violation of
New York General Business Law § 349) of the complaint
filed by Coretta T. Brown ("Complaint"). For the reasons set
forth below, Defendants' Motion is **GRANTED in part** and
**DENIED in part.** The Court denies the Motion as to Count
V. The Motion is granted as to Counts IV, VI, and VIII.

## I. BACKGROUND

On December 16, 2009, Plaintiff filed a complaint in
the District Court for the Southern District of New York
(S.D.N.Y. Civil Action No. 09cv10231). On January 29,
2010, the case was transferred by the Panel on Multidistrict
Litigation ("MDL") to the Southern District of California.
Upon transfer, the case became part of the pending MDL
entitled In re Hydroxycut Marketing and Sales Practice
Litigation (09md2087), and was assigned a separate civil case
number in the Southern District of California (10cv0237).
On February 2, 2010, in the above-entitled MDL action
(09md2087), Defendants filed a Motion to Dismiss Counts
IV, V, VI and VIII of Plaintiff's Complaint.

## II. STANDARDS

### A. Fed.R.Civ.P. 12(b)(6)

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the
formal sufficiency of the plaintiff's statement of the claim
for relief. The Court's inquiry is whether the allegations state
a sufficient claim under Fed.R.Civ.P. 8, which sets forth
the requirements for pleading. Under Fed.R.Civ.P. 8(a)(2),
a pleading must contain a "short and plain statement of the
claim showing that the pleader is entitled to relief." In the
adjudication of a motion to dismiss under 12(b)(6), plaintiff's
allegations must be accepted as true, drawing all inferences
from the pleaded facts in plaintiff's favor. *Pension Comm.
of Univ. of Montreal Pension Plan v. Banc of America Sec.*

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 110 of 260
PageID: 69774

In re Hydroxycut Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...

72 UCC Rep.Serv.2d 816

*LLC,* 568 F.3d 374, 377 (2d Cir.2009). To survive a motion to dismiss, the complaint must allege facts that, if true, would create a judicially cognizable cause of action. *South Road Assoc. v. Int'l Bus. Machines Corp.,* 216 F.3d 251, 253 (2d Cir.2000). Only factual allegations need be accepted as true— not legal conclusions. *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Although detailed factual allegations are not required, the factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**B. Fed.R.Civ.P. 9(b)**

Rule 9(b) requires that a plaintiff state a claim for fraud with particularity as follows:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

**\*2** Fed.R.Civ.P. 9(b). A court may dismiss a claim of fraud when its allegations fail to satisfy Rule 9(b)'s heightened pleading requirements. *Vess v. Ciba–Geigy Corp. U.S.A.,* 317 F.3d 1097, 1107 (9th Cir.2003).

### III. DISCUSSION

Plaintiff, Coretta T. Brown, alleges that she suffered personal injuries, namely, a heart attack, a stroke, and renal failure, after ingesting a dietary supplement manufactured and sold by defendants, namely, Hydroxycut Regular Rapid Release Caplets. (Compl.¶¶ 51–53.) Plaintiff's Complaint contains eight claims for relief: negligence, strict liability —failure to warn, strict liability—defective design, breach of express warranty, breach of implied warranty, common law fraud, punitive damages, and violation of New York General Business Law § 349. "Count IV" and "Count V" of the Complaint allege breach of express and implied warranties. (Compl.¶¶ 82–96.) Specifically, Plaintiff alleges that defendants expressly and impliedly warranted that

Hydroxycut products were safe for their intended purpose as a dietary supplement for weight loss. (Compl.¶¶ 83, 92.) According to Plaintiff, Hyrdroxycut products were unfit and unsafe for those purposes. (Compl.¶¶ 86, 93.) "Count VI" of the Complaint alleges common law fraud. (Compl.¶¶ 97– 104.) Specifically, Plaintiff alleges defendants fraudulently represented that Hydroxycut Regular Rapid Release Caplets were safe, Plaintiff relied on the representations and as a result, incurred serious injuries. (Compl.¶¶ 98, 103–104.) "Count VIII" of the Complaint alleges a violation of the New York General Business Law § 349. (Compl.¶¶ 110– 115.) Specifically, Plaintiff alleges defendants engaged in fraudulent and deceptive acts by failing to disclose material facts about Hydroxycut Regular Rapid Release Caplets. (Compl.¶ 111.)

**A. Breach of Express Warranty Claim—Count IV**

To plead a cause of action for breach of express warranty, Plaintiff must allege: (1) the exact terms of the warranty; (2) that the warranty formed part of the basis of the bargain; (3) the warranty was breached and (4) the breach caused injury to the plaintiff. *See Horowitz v. Stryker Corp.,* 613 F.Supp.2d 271, 286 (E.D.N.Y.2009); *Fagan v. AmerisourceBergen Corp.,* 356 F.Supp.2d 198, 217 (E.D.N.Y.2004). Defendants contend that Plaintiff's breach of express warranty claim fails because Plaintiff has not alleged facts that demonstrate the formation of an express warranty and Plaintiff has not pled "notice" as required by New York warranty law. The Court agrees that Plaintiff has not alleged sufficient facts that provide the basis for an express warranty. Though Plaintiff quotes specific language from Hydroxycut's website and Hydroxycut product labels that assure the products' safety, nowhere does Plaintiff allege that she read that language or that it was part of the reason she bought the product. Plaintiff does allege that "but for and as a direct result of Defendants' negligent and deceptive conduct, Plaintiff would not have purchased products which carried such significant safety risks when used as directed" (Compl.¶ 8) and "[b]ased upon Defendants' marketing, labeling, distribution and sale of Hydroxycut products, including the Hydroxycut Regular Rapid Release Caplets, it was and is reasonable for Plaintiff to rely on Defendants' representations in purchasing and taking the Hydroxycut products" (Compl.¶ 36), but fails to include any specific allegations about which information she read and relied on before purchasing the caplets. In order to have a cause of action for breach of express warranty, Plaintiff must allege that the warranty formed part of the basis of the bargain.

In re Hydroxycut Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...

72 UCC Rep.Serv.2d 816

**\*3** Since Plaintiff has not pled the necessary elements for the formation of an express warranty, her claim fails. Defendants' further contention that Plaintiff failed to properly plead "notice" as required is discussed in Part B below. Defendants' Motion to Dismiss Count IV for breach of express warranty is granted without prejudice. The Court, however, grants Plaintiff leave to amend her breach of express warranty claim.

### B. Breach of Implied Warranty Claim—Count V

Defendants contend Plaintiff's breach of implied warranty claim fails because Plaintiff has not plead notice. Specifically, Defendants argue that in order to properly plead a warranty claim under the New York Uniform Commercial Code ("N.Y.-U.C.C."), a buyer must plead factual allegations that he gave the seller prior notice of such claim. *See* N.Y.-U.C.C. § 2–607(3)(a). Section 2–607(3) of the New York Uniform Commercial Code provides:

> Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

Plaintiff contends that the notice requirement in N.Y.-U.C.C. § 2–607 is inapplicable to a product, such as Hydroxycut Regular Rapid Release Caplets, which is intended for human ingestion. In support of her contention, Plaintiff cites *Fischer v. Mead Johnson Laboratories,* 41 A.D.2d 737, 341 N.Y.S.2d 257 (N.Y.App.Div.1973). *Fischer* involved breach of warranty claims against the manufacturer of an oral contraceptive. The court noted that the notice provision contained in N.Y–U.C.C. § 2–607(3)(a) is inapplicable in cases involving goods sold for human consumption. *Id.* The court in *Fischer* looked to *Kennedy v. Woolworth Co.,* 205 A.D. 648, 200 N.Y.S. 121 (N.Y.App.Div.1923), a case involving injuries caused by a child's consumption of candy sold by the defendant. In *Kennedy,* the plaintiff brought breach of warranty claims and, based on a similar provision of the statutory predecessor to section 2–607, the court recognized:

> The reason for the rule has no relevant application to the circumstances of such a case. That section apparently

has to do with the sales of goods whose inspection or use discloses a defect of quality, lack of conformance to sample, failure to comply with description, or other cognate circumstances, which causes money damage to the vendee. To require a complaint which, whatever its nomenclature of form, is really grounded on tortious elements, to indicate a notice of rejection or claim of damage within a reasonable time on account of defect of edible goods in a retail transaction, would strain the rule beyond a breaking point of sense or proportion to its intended object.

*Id.* at 649–50, 200 N.Y.S. 121.

Defendants cite *Neri v. R.J. Reynolds Tobacco Co.,* No. 98–CV–371, 2000 WL 33911224 (N.D.N.Y. Sept.28, 2000), in support of New York's notice requirement, noting that the court granted summary judgment for the defendant on plaintiffs' breach of warranty claim. While the court in *Neri* did grant summary judgment, it was not based on the issue of notice. The court granted summary judgment on the breach of express warranty claim because the plaintiff had not shown that the cigarette advertisements created warranties that suggested cigarettes were safe. *Neri,* 2000 WL 33911224, at \*20–21. Thus, *Neri* does not stand for the proposition that notice is required for ingested products. In fact, the court's reference to *Fischer* suggests that *Fischer* remains good law in New York. *Id.* at \*20, 341 N.Y.S.2d 257. No contrary New York authority appears to exist. Indeed, the latest version of New York Pattern Jury Instructions, presumably applicable when this case goes to trial, recognizes the exception to the N.Y.-U.C.C. notice provision that is carved out in *Fischer. See e.g.,* N.Y. P.J.I. 2:140, Comments, (fourth paragraph from end).

**\*4** While Defendants cite to *Reyes v. McDonald's Corp.* 2006 WL 3253579 (N.D.Ill.2006), an unreported case from the Northern District of Illinois involving McDonald's French fries, for the proposition that some courts require notice even in the context of goods for human consumption, it appears that another court, in a reported opinion the following year from that same district, has reached the opposite result where the case involves, as here, personal injuries. *See, In*

72 UCC Rep.Serv.2d 816

*re McDonald's French Fries Litigation,* 503 F.Supp.2d 953, 956–57 (N.D.Ill.2007) (holding that because the plaintiffs alleged personal injuries, pre-suit notice was not required for their warranty claim).

Defendants also rely on *Hubbard v. General Motors Corp.,* No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996), to support their position that Plaintiff must plead that notice was given as a prerequisite to her breach of warranty claims. In *Hubbard,* a class brought claims again General Motors based, in part, on warranty theories for defects in the braking system in the Chevrolet Suburban. That case is distinguishable because the court's entire analysis of § 2–607 involved a distinctly different question than that presented here. In *Hubbard,* the issue was whether § 2–607(3)(a) requires a buyer to give notice only to his or her immediate seller, not a remote manufacturer. Moreover, the *Hubbard* case is distinguishable because of the particular product involved, which, as in the other cases cited by Defendants, did not involve goods intended for human consumption.

Defendants also contend that notice is required for breach of warranty claims under North Carolina law. However, under North Carolina law,

> [w]hen the plaintiff is a lay consumer and notification is given to the defendant by the filing of an action within the period of the statute of limitations, and when the applicable policies behind the notice requirement have been fulfilled ... the plaintiff is entitled to go to the jury on the issue of seasonable notice.

*Maybank v. S.S. Kresge Co.,* 302 N.C. 129, 273 S.E.2d 681, 685 (N.C.1981). This has been followed in numerous North Carolina cases, as in *Horne v. Novartis Pharmaceuticals Corp.,* 541 F.Supp.2d 768 (W.D.N.C.2008), in which the plaintiff alleged that the medicine the defendant manufactured caused birth defects in her son. The defendant moved to dismiss the breach of warranty claims because notice had not been given. Relying on *Maybank,* the court denied the motion and ruled that since the plaintiff filed a complaint within the applicable statute of limitations period, the plaintiff was entitled to go to the jury on the issue of seasonable notice. *Horne,* 541 F.Supp.2d at 786.

Thus, under both North Carolina and New York law, Plaintiff has satisfied her pleading requirements with respect to notice on her breach of warranty claims. Accordingly, the Court holds Plaintiff has, at least at the pleading stage, sufficiently stated her breach of implied warranty claim. Defendants' Motion to Dismiss Count V, therefore, is denied.

### C. Common Law Fraud Claim—Count VI

**\*5** To state a claim for common law fraud a plaintiff must plead: (1) a material, false representation or omission; (2) an intent to defraud thereby; and (3) reasonable reliance on the representation, causing damage to the plaintiff. *See e.g., City of New York v. Cyco.Net, Inc.,* 383 F.Supp.2d 526, 564 (S.D.N.Y.2005); *Liner v. DiCresce,* 905 F.Supp. 280, 288 (M.D.N.C.1994). Federal Rule of Civil Procedure 9(b) requires that each of these elements be pled with particularity. The Ninth Circuit has "interpreted Rule 9(b) to mean that the pleader must state the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392–93 (9th Cir.1988).[1] As Defendants point out, averments of fraud must be accompanied by the "who, what, when, where, and how" of the misconduct charged. *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997).

Defendants correctly analogize the present case to *Kearns v. Ford Motor Co.,* 567 F.3d 1120 (9th Cir.2009), in which the plaintiff alleged he relied on fraudulent representations about Ford's Certified Pre–Owned Vehicle Program (CPO) when he made a decision to purchase a CPO vehicle. *Id.* at 1125. In *Kearns,* the court dismissed the fraud claim for lack of specificity because the plaintiff did not specify what the television and sales material specifically stated, when he was exposed to them and which sales material he relied upon in making his decision. *Id.* at 1125–26. Though Plaintiff here has quoted the Hydroxycut website and product packaging (Compl.¶ 29–33), she fails to specify that she was exposed to these statements, when she was exposed to them, and which material (if any) she relied upon in making her decision to purchase the Hydroxycut Regular Rapid Release Caplets.

The Court, therefore, grants Defendants' Motion to Dismiss Plaintiff's claim of common law fraud as set forth in Count VIII of the Complaint. The Motion is granted without prejudice and Plaintiff is granted leave to amend.

In re Hydroxycut Marketing and Sales Practices Litigation, Not Reported in F.Supp.2d...

72 UCC Rep.Serv.2d 816

### D. New York General Business Law § 349 Claim— Count VIII

To state a claim for violation of New York General Business Law § 349, the plaintiff must show that the defendant's material deceptive act caused the injury. *Gale v. Int'l Bus. Machines Corp.,* 9 A.D.3d 446, 781 N.Y.S.2d 45, 46 (N.Y.App.Div.2004). In *Gale,* the court dismissed a § 349 claim because the plaintiff never alleged he saw any of the allegedly deceptive statements before he purchased his computer hard drive. The Court agrees with Defendants' contention that Plaintiff's complaint fails because she never alleged that she actually saw or read any of the deceptive statements regarding Hydroxycut Regular Rapid Release Caplets prior to purchasing them.

The Court further agrees with Defendants that Plaintiff's New York General Business Law § 349 claim fails because she has not alleged the transaction in which she was allegedly deceived took place in the state of New York. In order to state a claim under § 349, Plaintiff must allege deceptive acts or practices that occurred in the state of New York. *Goshen v. Mut. Life Ins. Co. of N.Y.,* 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (N.Y.2002) ( "As both the text of the statute and history suggest, the intent is to protect consumers in their transactions that take place in New York State.").

**\*6**  Plaintiff cites *Leider v. Ralfe,* 387 F.Supp.2d (S.D.N.Y.2005), for the proposition that while the transaction in which the customer is deceived must occur in New York, the entirety of the conduct does not need to occur in New York. Plaintiff then alleges that because Iovate Health Sciences, USA, Inc. and MuscleTech Research and Development, Inc. both have their principal place of business in New York, "it is a reasonable inference that at least part of

the deceptive conduct required for the GBL claim occurred in New York." (Opp'n, p. 7.) It is irrelevant whether part of the deceptive conduct took place in New York because it is the transaction at issue that must have occurred in New York. *See In re Hydroxycut Marketing and Sales Practices Litigation,* 2010 WL 1734948, at \*4–\*5 (S.D.Cal. April 26, 2010). While Plaintiff acknowledges this essential element of the claim, she fails to allege any facts to show that she bought Hydroxycut Regular Rapid Release Caplets in New York.

Accordingly, since Plaintiff has not alleged that she read or saw any of the allegedly deceptive statements before buying Hydroxycut Regular Rapid Release Caplets or that the transaction occurred in the state of New York, Defendants' Motion to Dismiss Count VIII for violation of New York General Business Law § 349 is granted. The Motion is granted, however, without prejudice and the Court grants Plaintiff leave to amend if she is able to do so.

### III. CONCLUSION

Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part** as stated above. Counts IV, VI, and VIII are dismissed without prejudice. The motion to dismiss Count V is **DENIED.** Plaintiff has leave to file an amended complaint within 21 days of the entry of this order.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2839480, 72 UCC Rep.Serv.2d 816

---

### Footnotes

1  The Second Circuit has similarly interpreted Rule 9(b). See *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) ("To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.").

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 9

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 115 of 260
PageID: 69779
In re Seroquel Products Liability Litigation, Not Reported in F.Supp.2d (2006)

2006 WL 3929707
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

In re SEROQUEL PRODUCTS
LIABILITY LITIGATION.

No. 6:06–md–1769–Orl–22DAB.
|
Dec. 22, 2006.

**Attorneys and Law Firms**

K. Camp Bailey, Bailey, Perrin & Bailey, LLP, Houston, TX, Larry M. Roth, Law Offices of Larry M. Roth, PA, Orlando, FL, Paul J. Pennock, Weitz & Luxenberg, P.C., New York, NY, for Seroquel Products Liability Litigation.

**REPORT AND RECOMMENDATION**

DAVID A. BAKER, United States Magistrate Judge.

**\*1 TO THE UNITED STATES DISTRICT COURT**
This cause came on for consideration with oral argument on various matters including the following motions filed herein:

> **MOTION: MDL PLAINTIFFS AND DEFENDANTS' JOINT MOTION REQUESTING THE COURT TO ADOPT AND ENTER PROPOSED CASE MANAGEMENT ORDERS (Doc. No. 110)**

> **FILED: December 20, 2006**

> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED in part and DENIED in part and MODIFIED** as set forth herein.

> **MOTION: MDL PLAINTIFFS AND DEFENDANTS' JOINT MOTION FOR STATUS CONFERENCE, AND/OR ORAL ARGUMENT [FOR ONE HOUR] (Doc. No. 111)**

> **FILED: December 20, 2006**

> **THEREON** it is **RECOMMENDED** that a ruling on the motion be deferred to the District Judge for consideration in connection with review of this Report and Recommendation.

In this multi-district litigation, Plaintiffs have sued Defendants for claims arising for alleged injuries from ingesting AstraZeneca's Seroquel, an atypical antipsychotic medication that allegedly can cause diabetes and related disorders. Doc. No. 1. On July 10, 2006, the original litigation consisted of 114 actions pending in six districts across the United States. Doc. No. 1. Many other Conditional Transfer Orders have transferred cases since the Initial Transfer Order. *See* Doc. Nos. 2, 3, 13, 21, 22, 25, 33, 34, 36, 40, 43, 46, 47, 57, 65, 78, 90. Many more are expected to be transferred to this Court.

*Severance*
The Court held a status conference on December 11, 2006. At that time, Defendants made a presentation that based on their research, there were 7,297 plaintiffs in Seroquel cases pending throughout the United States, with 6,561 plaintiffs (or 94% of the total plaintiffs) represented by one firm, Bailey Perrin Bailey, with cases filed in Massachusetts. The claims of the 6,561 plaintiffs in the Massachusetts cases are consolidated into approximately 106 cases and the 6,561 plaintiffs are from forty-seven of the fifty United States.

Following Defendants' description of the status of the national cases filed, and without any correction from Camp Bailey, Esq. (nominated to serve as Co–Lead Counsel from the firm of Bailey Perrin Bailey), the Court raised the issue *sua sponte*[1] of whether Plaintiffs in the 100 or so cases with 6,500 plaintiffs had been improperly joined and should be severed pursuant to Federal Rule of Civil Procedure 21. Mr. Bailey, at the hearing, could not satisfactorily articulate the "same transaction or occurrence" required to support permissive joinder under Rule 20(a), but explained that these plaintiffs were bundled in the cases to ease the multi-district aspect of the cases anticipated once the multi-district litigation had been established.

At least one appellate court has affirmed the appropriateness of the district court's use of a case management tool requiring the filing of severed claims, rendering dismissals with prejudice for those plaintiffs who fail to timely file severed complaints.

**\*2** [I]n the context of multi-district litigation ... while the rules are the same as for ordinary litigation on an ordinary docket—that is, ... the district court must weigh the public's interest in expeditious resolution of litigation; the court's need to manage its docket; the risk of prejudice to the defendants; the public policy favoring the disposition of

cases on their merits; and the availability of less drastic sanctions-multidistrict litigation is different because of the large number of cases that must be coordinated, its greater complexity, and the court's statutory charge to promote the just and efficient conduct of the actions. 28 U.S.C. § 1407. As a result, the considerations that inform the exercise of discretion in multidistrict litigation may be somewhat different, and may tip the balance somewhat differently, from ordinary litigation on an ordinary docket.

* * *

The goal of the multidistrict litigation process is to "promote the just and efficient conduct" of "civil actions involving one or more common questions of fact" that are pending in different districts. 28 U.S.C. § 1407(a). If realized, hundreds or-as here, thousands-of cases, coordinated, will proceed toward resolution on the merits with less burden and expense overall than were each litigated through pretrial individually.

Section 1407 arose out of the federal courts' experience with a massive prosecution of electrical equipment manufacturers for antitrust violations, which had been rendered manageable only by conducting joint pretrial proceedings.... Congress saw a need to create a mandatory version of that procedure to govern cases such as "civil antitrust actions ..., common disaster (air crash) actions, patent and trademark suits, products liability actions and securities law violation actions, among [and] created the Judicial Panel on Multidistrict Litigation and conferred on the Panel the power to consolidate pretrial proceedings for such cases and to assign them to a single judge who would coordinate them.

It was thought that consolidation and central coordination would avoid these dangers and would yield significant benefits of economy and speed.... Transfer proceedings may be commenced either on the Panel's own initiative ... or by motion of any party. A transfer is effective when the order of transfer is "filed in the office of the clerk of the district court of the transferee district ." When the transfer becomes effective, "the jurisdiction of the transferor court ceases and the transferee court has exclusive jurisdiction." A transferee judge exercises all the powers of a district judge in the transferee district under the Federal Rules of Civil Procedure and "may make any pretrial order that the transferor court might have made in the absence of a transfer." This includes authority to decide all pretrial motions, including dispositive motions such as motions

to dismiss, motions for summary judgment, motions for involuntary dismissal under Rule 41(b), motions to strike an affirmative defense, and motions for judgment pursuant to a settlement.... Once pretrial proceedings are completed in the MDL, the Panel remands individual cases to the district court in which the action was originally filed for trial ...

**\*3** A district judge charged with the responsibility of "just and efficient conduct" of the multiplicity of actions in an MDL proceeding must have discretion to manage them that is commensurate with the task. The task is enormous, for the court must figure out a way to move thousands of cases toward resolution on the merits while at the same time respecting their individuality. The court is also confronted with substantial legal questions, such as, [in the drug case on appeal], FDA issues, *Daubert* motions, questions of joinder and federal jurisdiction, class certification, timeliness of claims, and causation. For it all to work, multidistrict litigation assumes cooperation by counsel and macro-, rather than micro-, judicial management because otherwise, it would be an impossible task for a single district judge to accomplish. Coordination of so many parties and claims requires that a district court be given broad discretion to structure a procedural framework for moving the cases as a whole as well as individually, more so than in an action involving only a few parties and a handful of claims. As the Court of Appeals for the First Circuit put it, a district court must be able to "uncomplicate matters" and counsel must, for their part, "collaborate with the trial judge from the outset in fashioning workable programmatic procedures, and thereafter alert the court in a timely manner as operating experience points up infirmities warranting further judicial attention."

Pretrial plans will necessarily vary with the circumstances of the particular MDL. However, the district judge must establish schedules with firm cutoff dates if the coordinated cases are to move in a diligent fashion toward resolution by motion, settlement, or trial. As happened in MDL 1407, the multidistrict process contemplates involvement of representative counsel in formulating workable plans. Once established in consultation with counsel, time limits and other requirements must be met and, "when necessary, appropriate sanctions are imposed ... for derelictions and dilatory tactics." Manual For Complex Litigation § 10.13 at 13. "Close judicial oversight and a clear, specific, and reasonable management program, developed with the participation of counsel, will reduce the potential for sanctionable conduct because the parties will know what

the judge expects of them.... Although sanctions should not generally be a management tool, a willingness to resort to sanctions, *sua sponte* if necessary, may ensure compliance with the management program." *Id.* at § 10.151 at 15.

In sum, multidistrict litigation is a special breed of complex litigation where the whole is bigger than the sum of its parts. The district court needs to have broad discretion to administer the proceeding as a whole, which necessarily includes keeping the parts in line. Case management orders are the engine that drives disposition on the merits.

*In re Phenylpropanolamine (PPA) Products Liability Litigation,* 460 F.3d 1217, 1222 & 1229–32 (9th Cir. Aug.29, 2006) (internal citations and quotations omitted) (holding that the district court did not abuse its discretion in dismissing cases for failure to timely file severed cases between five and twelve weeks late).

**\*4** Permissive joinder is governed by Federal Rules of Civil Procedure 20 and 21, which provide that multiple plaintiffs may "assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Fed. R. Civ. P 20(a). Because these multiple plaintiff cases do not appear to seek relief arising from the same transaction or occurrence, severance of the individual plaintiffs is proper. Pursuant to Rule 21, the court may sever any claim against a party, which will proceed separately. Fed.R.Civ.P. 21.

It is respectfully **RECOMMENDED** that all of the plaintiffs' claims (except for consortium claims) be severed. If this Report and Recommendation is adopted, the Clerk should be directed to open new separate files [2] for each named plaintiff (with the consortium exception noted above). Concurrent with the service of each Plaintiff Fact Sheet [PFS] (as set forth below), a new individual complaint for that Plaintiff should be filed in the corresponding case docket along with payment of the required filing fee (or application to proceed *in forma pauperis).* Cases abandoned or dismissed prior to service of the PFS would not be required to comply. Any cases transferred to this Court after entry of any Order regarding severance would be subject to this requirement. The disaggregated cases, though filed here, would retain their status as transfer cases, subject to remand upon completion of the multidistrict proceedings.

*Other Case Management Issues*

After protracted argument concerning many discovery and scheduling issues that the parties had not resolved among themselves *prior* to the December 11, 2006 status conference, and following a strenuous admonishment by the Court, counsel were ordered to meet and confer at length until the issues were more fully resolved. Doc. No. 102. The status conference was recessed until the following morning at 11:00 a.m. on December 12, 2006. Doc. No. 104. Counsel were able to agree to several discovery compromises, now memorialized in the two Proposed Case Management Orders filed on December 20, 2006.[3] As the Court told counsel at the December 12 status conference, the undersigned is flabbergasted as to how unprepared the parties are and the case appears to be in worse condition than at the September 2006 Preliminary Pretrial Conference. While counsel appears to have approached negotiating discovery in a more professional manner, they have not set deadlines that as a practical matter, will move this litigation at the pace at which both the undersigned and Judge Conway have repeatedly stated the litigation must proceed to keep the pretrial proceedings on track.

Having said that, the parties filed a proposed case management order that describe (in CMO No. 1): responsibilities of lead and liaison counsel; the frequency of status conferences; service of complaints and amendments; filing of motions; and service of documents. Doc. No. 110–2. The second proposed case management order (CMO No. 2) proposes deadlines for service of Plaintiff Fact Sheets, to the effect that at least 500 be filed by January 31, 2007 or stipulated to dismissal, with 500 more per month filed each month thereafter; all PFS from plaintiffs whose cases were filed before September 11, 2006 be served by September 30, 2007; all PFS from plaintiffs whose cases are docketed in the MDL before March 31, 2007 be served by December 31, 2007; and all PFS from plaintiffs whose cases are docketed in the MDL after March 31, 2007 be served within 90 days after docketing; and sets forth notification and cure procedures for absent or deficient PFS. Doc. No. 110–3. CMO No. 2 also sets forth deadlines for AstraZeneca's production of organizational charts for its corporate structure, the Seroquel team, and the drug safety team for the past ten years; listings of (eighty) custodians from whom it is collecting documents; listing of databases concerning document production and preservation; timing for interviews of knowledgeable AstraZeneca IT persons; and withdrawal of all currently pending discovery to AstraZeneca.

Doc. No. 110–3. The parties also set forth the format of the production of custodial files, agreements on the preservation of documents, notably with the parties agreed language regarding "spoliation" of evidence. Doc. No. 110–3.

 **\*5**  The Court is satisfied with neither the pace nor the mechanics of the parties' proposal, especially with respect to the PFSs. The specific format and content of the agreed PFS has been known since October 2006, and counsel have known since prior to the original filing of these actions that such information would be required from each plaintiff. Particularly in recognition of the difficulties that many of the plaintiffs face in assembling the required information, the lack of anticipation and preparation for the plaintiffs to meet the requirements is inexplicable and disappointing. Likewise, the failure of the Defendant to investigate and understand its own records and documents and to prepare them for production has not met the expectations of the Court as discussed at the September 2006 Conference.

With those observations as background, the Court turns to the specifics of the proposed CMOs (Doc. Nos. 110–2 and 110–3). In general proposed CMO 1 appears helpful in moving the cases forward, subject to the following observations. In ¶ II.A.3. the words "or magistrate" should be deleted as superfluous. Objections by non lead counsel should be filed within five days. All matters presented to the Court must comply with the Local Rules, especially Local Rule 3.01(g). ¶ II.A.4. requires additional explanation from Plaintiffs as to what is contemplated.

In ¶ IV.4. the parties should be aware that the Court may rule on motions without hearing. Motions may be filed up to 20 days prior to the hearing, and responses should be filed within 11 days of service of the motion. Replies are not permitted absent leave of Court.

In ¶ V.A. counsel wishing to be removed from the electronic service list should simply notify the Clerk.

With respect to proposed CMO 2, the Court does not find that the suggested schedule will permit timely consideration of the cases, and their proposal is unclear how cases would be identified for dismissal if plaintiffs fail to meet the schedule. It appears that the Bailey law firm has by far the greatest number of plaintiffs and the greatest problem with timely completion of the PFSs. For other plaintiffs' counsel no showing has been made of inability to get the required information served more quickly. As to the Bailey firm clients, the Court

remains unpersuaded that good cause exists for stringing out production to September and December 2007. It is recommended that the schedule proposed be modified to provide that, for cases now pending here, the Bailey clients serve completed PFSs and associated documents (or notices of dismissal) as follows: one-sixth by January 31, 2007 and one-sixth more by the end of each succeeding month ending June 30, 2007. For the non Bailey plaintiffs, one-third would be due January 31 and so on each month until March 31, 2007. By January 31, 2007, plaintiffs' counsel would be required to serve a designation of the month each client's completed form is due. For plaintiffs whose cases arrive after entry of any scheduling order, PFSs would be due within 45 days after docketing in this Court. Plaintiffs who do not meet the designated deadlines would be subject to possible sanctions, including dismissal of the cases following the procedure outlined in the proposed order.

 **\*6**  Plaintiffs' counsel are admonished not to delay production of PFSs during the pendency of the motions and while awaiting the District Judge's disposition of this Report. Whatever schedule is finally imposed will not include any additional period to cover the time these matters are under consideration.

The balance of proposed CMO 2 regarding production and preservation of Defendant's documents still seems unduly cumbersome. Nonetheless, if the parties are confident that their agreement will allow them to present issues to the Court for appropriate consideration and disposition without delays engendered by claims of non production of information, the proposal can be approved.

Notably, the parties did not address the previously discussed issue of bellwether cases, and the Court assumes that there is lingering disagreement about the need for and mechanics of using such cases. As noted at the December 2006 hearing, the grounds argued by Defendant, for the most part, would not benefit from consideration in individual cases. It is recommended that the parties be required to state in writing their respective positions on these issues prior to any future hearing in the case.

At the December 2006 hearing, the Court indicated that the next conference would be January 25, 2007 before the undersigned. In light of the parties request at Doc. No. 111, that **conference is cancelled** (subject to reinstatement) pending the District Judge's decision whether to schedule her

In re Seroquel Products Liability Litigation, Not Reported in F.Supp.2d (2006)

own hearing. The discovery motions (Doc. Nos. 92 and 100) are **DENIED as moot.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days

from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3929707

## Footnotes

1    In response to the Court's query, Defendants indicated that they were planning to file a motion seeking severance. However, in the interest of moving the matter forward, the Court addresses the issue *sua sponte*. Plaintiffs by responding to this Report and Recommendation will have an appropriate opportunity to make their views known.

2    The precise mechanics and timing for this task may require further specification to reduce the work burden on the Clerk of the Court.

3    Although the Court ordered counsel to file their proposals by 12:00 p.m. on December 20, given the proximity of the Christmas holiday, counsel did not file the documents until 4:48 p.m.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 10

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

2018 WL 6573118

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

IN RE THALOMID AND REVLIMID

ANTITRUST LITIGATION

Civil Action No. 14-6997

|

Filed 10/30/2018

**OPINION**

Madeline Cox Arleo, United States District Judge

**\*1  THIS MATTER** is before the Court by way of Class
Plaintiffs International Union of Bricklayers and Allied Craft
Workers Local Health Fund ("IUB"), International Union of
Operating Engineers Local 39 Health and Welfare Trust Fund
("Local 39"), The Detectives' Endowment Association, Inc.
("DEA"), David Mitchell ("Mitchell"), City of Providence,
and New England Carpenters Health Benefits Fund's ("NEC"
and, collectively, "Plaintiffs") Motion for Class Certification
and Appointment of Class Counsel. ECF No. 149. Defendant
Celgene Corporation ("Defendant" or "Celgene") opposes the
motion. ECF No. 182.

To summarize, this motion seeks to certify a class of
consumers and third parties that were allegedly overcharged
because Defendant delayed entry of generic versions of its
branded drugs onto the market. The crux of Defendant's
argument against certification is that the complicated
purchasing relationships in the pharmaceutical industry
render it impossible to either ascertain membership in the
proposed classes or prove that common issues predominate.
Plaintiffs contend that the obstacles to certification raised
by Defendant are speculative and hypothetical and that
there is abundant proof of class membership and common
injury. Nevertheless, the Court agrees with Defendant that
Plaintiffs have not, at this point, carried their burden with
regard to certification. The Court does not find that the
concerns raised by Defendant are so pervasive as to render
certification impossible, assuming Plaintiffs can address the
issues discussed herein. Consequently, the Court will **DENY**
the motion without prejudice to renew with appropriate
supplementation.

## I. BACKGROUND

The Court discussed in detail the extensive factual allegations
involved in this case when it denied Defendant's motion to
dismiss. ECF Nos. 67, 68. In brief, this case involves claims
that Celgene delayed the entry of generic versions of the drugs
Thalomid and Revlimid—the generic names are thalidomide
and lenalidomide, respectively—by listing and suing to
enforce invalid patents, refusing to sell samples necessary
to develop generics, and encouraging the FDA to reject
generic applications based on sham safety concerns. Plaintiffs
contend that these anticompetitve actions allowed Celgene
to successfully monopolize the market for thalidomide
based drugs for seven years, charge supracompetitive prices, and
prevent the entry of generic manufacturers into the market.
Plaintiffs further contend that these actions unjustly enriched
Celgene by $5.8 billion in profits.

As a result of Celgene's alleged behavior, Plaintiffs seek
certification of three classes: (1) the "Antitrust/Consumer
Protection Damages Class" under Federal Rule of Civil
Procedure 23(b)(3), (2) the "Unjust Enrichment Damages
Class" under Rule 23(b)(3), and (3) the "Injunction Class"
under Rule 23(b)(2). Defendants oppose certification of
all three classes, contending that (1) neither of the
damages classes are ascertainable, that (2) Plaintiffs cannot
demonstrate predominance, that (3) Plaintiff Mitchell does
not satisfy the adequacy or typicality requirements of Rule
23(A), and (4) that the injunction class cannot be certified
because the relief sought is primarily monetary.

### A. Class Definition
**\*2**  Plaintiffs seek certification of the following Classes:

The "Antitrust/Consumer Protection Damages Class" (under
Rule 23(b)(3) ):

> All persons or entities who purchased
> and/or paid for some or all of the
> purchase price for thalidomide in
> any form after November 6, 2010
> or lenalidomide in any form after
> December 28, 2012, in California, the
> District of Columbia, Florida, Kansas,
> Maine, Massachusetts, Michigan,
> Nebraska, New York, North Carolina,
> Oregon, Pennsylvania, Rhode Island,
> or Tennessee, for consumption

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 122 of 260
PageID: 69786

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

by themselves, their families, or their members, employees, insureds, participants, or beneficiaries.

The "Unjust Enrichment Damages Class" (under Rule 23(b)(3) ):

All persons or entities who purchased and/or paid for some or all of the purchase price for thalidomide in any form after November 6, 2010 or lenalidomide in any form after December 28, 2012, in California, the District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, Nebraska, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, or Tennessee, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Unjust Enrichment Damages Class").

The "Injunction Class" (under Rule 23(b)(2) ):

All persons or entities who purchased and/or paid for some or all of the purchase price for thalidomide in any form after November 6, 2010 or lenalidomide in any form after December 28, 2012, in the United States or its territories for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Injunction Class").

Pl. Reply Br. in Support of Certification, ECF No. 210.

Excluded from the class are the following persons or entities:

a. Defendant and their officers, directors, management, employees, subsidiaries, or affiliates;

b. Government entities, except for government-funded employee benefit plans;

c. All persons or entities who purchased Revlimid or Thalomid for purposes of resale or directly from Defendant or their affiliates;

d. Fully insured health plans (i.e., Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members);

e. "Single flat co-pay" consumers who purchased Revlimid or Thalomid only via a fixed dollar co-payment that does not vary on the basis of the purchased drug's status as branded or generic (e.g., $20 for both branded and generic drugs);

f. Pharmacy benefit managers;

g. Stop-loss insurers; [1]

h. The judges in this case and any members of their immediate families. Id.

**B. Expert Reports**

**1. Luis Molina**

Plaintiffs submitted the expert report of Luis Molina, a professional in the pharmaceutical injury with experience in product launches of brand and generic drugs. Molina opined on whether Celgene prevented or delayed the entry of generic drugs that would have competed with Thalomid and Revlimid and on the timeframe in which generic equivalents to the drugs would have become available to classmembers. Report of Luis A. Molina ("Molina Rep.") ¶11, ECF No. 150.16. He concluded that Celgene's action prevented generic equivalents from entering the market, that, absent Celgene's actions, a generic version of Thalomid would have been available beginning in November 2010, and that, absent Celgene's conduct, a generic version of Revlimid would have been available by January 2011. Molina Rep. ¶ 12. Molina subsequently provided a Supplement to his report, wherein he predicted that generic Revlimid would have been available December 2012, rather than January 2011. ECF No. 169.

**2. Dr. Leitzinger**

 **\*3** Plaintiffs also submitted the expert report of Dr. Jeffery J. Leitzinger in support of their motion for class certification. Expert Report of Jeffery J. Leitzinger ("Leitzinger Rep."),

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 123 of 260
PageID: 69787

2018-2 Trade Cases P 80,574

ECF No. 150.17. Plaintiffs posit that Dr. Leitzinger's methodology for measuring antitrust impact and aggregate damages demonstrate that the elements of Plaintiffs' claims can be satisfied through proof at trial that is common to the class.

Dr. Leitzinger first opines that class members suffered common antitrust impact. He asserts that "the price benefits associated with ... generic competition are predictable, substantial, and market-wide" and "[c]onduct that illegally delays, limits or altogether blocks that competition therefore would cause average prices paid by end-payors (members of the proposed Classes in this case) for Thalomid and Revlimid to be much higher than otherwise." Id. ¶ 10. Dr. Leitzinger asserts that evidence common to the members of the Class shows that the "absence of generic alternatives ... has likely caused 90 percent (or more) of the proposed Class members, collectively accounting for over 99 percent of the payments for these drugs within each Class, to incur at least some overcharge." Id. The common evidence is comprised of "i) literature and prior studies ...; ii) forecasts prepared by Celgene, Mylan, and Watson ...; and iii) the actual experience of other orally administered cancer drugs and REMS drugs once generics entered the market." Id. ¶ 16.

Dr. Leitzinger next opines that the classwide damages sought by Plaintiffs are "readily susceptible to formulaic calculation and do not require individualized analysis of Class members." Id. ¶ 62. Dr. Leitzinger's methodology for determining classwide damages involves analyzing the amounts charged to Plaintiffs for Revlimid and Thalomid and comparing it to the amounts Plaintiffs would have been charged in the but-for world—that is, the world absent the allegedly anticompetitive conduct in which there is generic competition. Id. ¶¶ 44-45. Dr. Leitzinger also considers the profits gained by Defendant during the period of delayed entry and compares them to the profits Defendant would have realized in the but-for world. Id. ¶ 58. The difference between these two figures is Dr. Leitzinger's measurement of Defendants' unjust enrichment. Id. ¶ 61.

To arrive at his calculation of classwide damages, Dr. Leitzinger considered estimates of "[a]ctual sales and prices for Thalomid and Revlimid," "[g]eneric penetration rates that would have occurred absent the exclusion," "[g]eneric price discounts that would have resulted from generic entry and competition," and "[i]ncremental profit rates on sales of the two brand drugs protected by the generic exclusion." Id. ¶ 62. Dr. Leitzinger contends that these estimates can

be determined without individualized inquiry. Id. Actual sales and prices "can be estimated from pharmacy-level electronic data and Celgene's electronic transaction data." Id. ¶ 63. Generic penetration rates can be derived, in part, from the "market outcomes associated with other orally administered cancer drugs that faced generic competition." Id. Revenues and incremental profit margins can be estimated from Celgene's financial records. And, finally, the overall calculation of damages "under both theories" is performed "through a set of computer programs and instructions applied to the data jointly and formulaically as to all Class members." Id.

### 3. Dr. Hughes

*4 Defendants retained their own expert, Dr. James Hughes, who submitted an expert report regarding the obstacles to class-wide resolution. Expert Report of James W. Hughes ("Hughes Rep."), ECF No. 182.4, Ex. 1. In sum, Dr. Hughes concludes that substantial individualized inquiry is necessary because of the significant variations throughout the pharmaceutical industry.

Dr. Hughes opines that "putative class membership, incidence of injury, and damages cannot be reliably determined on a class-wide basis using common proof." Id. ¶ 46. He reasons that "for any given Thalomid® or Revlimid® transaction, there are a number of different individuals and entities involved who may have made a payment and may potentially claim putative Class membership because of that payment"; yet, "determining the actual size of the payment made by each putative Class members and what the size of the payment would have been in Plaintiffs' but-for world with generic versions on the market is a complicated task." Id. In his view, it is complicated because it "requires disentangling a series of complex, changing, and idiosyncratic relationships between putative Class members and non-Class members." Id. Consequently, "detailed individualized inquiry is the only way to determine reliably putative Class membership, incidence of injury, and damages." Id.

To explain why the relationships among Class members and non-Class members are complicated, Dr. Hughes identifies the various entities involved in prescription drug markets. These include consumers, pharmacy benefits managers ("PBM"), insurers, and health and welfare plans. Dr. Hughes also describes the "payment flows" for prescription drugs, which includes uninsured and insured individuals as well as third party payors. Individuals who purchase drugs without health insurance pay for the entire cost of the drug, either directly to

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)
2018-2 Trade Cases P 80,574

Case 1:19-md-02875-RMB-SAK     Document 2057-2     Filed 05/10/22     Page 124 of 260 PageID: 69788

the manufacturer or indirectly through a wholesaler. Id. ¶ 15. Insured individuals, however, are part of a complex structure of payments. Third party payors ("TPPs") will pay a portion of the price, typically leaving the insured with a co-pay. Id. ¶ 16. Dr. Hughes contends that determining who paid a portion of the price is varied and requires consideration of each individual contract between the TPPs. Id. ¶ 18. He provides the following chart to demonstrate the flow of payment.



Hughes Rep., Ex. 1. Dr. Hughes goes on to discuss each of the entities described in the chart and their potential payments in detail.

A plan sponsor is an employer, a union, or another type of employee organization that makes health benefits available to its employees or members and their families. Hughes Rep. ¶ 19. Plan sponsors either enter into a fully insured contract or a self-insured contract, or a hybrid of the two. Id. ¶ 20. Under a fully insured contract, the sponsor pays premiums to a health insurer, which in turn covers certain health expenditures of the sponsor's insured members during the contract period. Id. ¶ 20. Plan sponsors with fully insured contract are excluded from the putative Classes because the plan sponsor does not directly bear any of the costs of drug prices. Id. Self-insured plans, on the other hand, involve a commercial insurer or a PBM administering the claims between a plan sponsor and a PBM or insurer at a contractually agreed price. Id. ¶ 21. When plan sponsors contract with health insurers or PBMs to manage their pharmacy benefit, the health insurer or PBM reimburses pharmacies at negotiated prices. Id. The health insurer or PBM then may bill the plan sponsor for the prescription. Id. A plan sponsor may also use a hybrid of these two options. Id.

**\*5** Plan sponsors can also contract with a stop-loss insurer to protect themselves against high healthcare expenditures of their members. Id. ¶ 22. Once an individual member's healthcare expenditures, or once all members' healthcare expenditures, exceed the aggregate stop-loss deductible, the plan sponsor notifies the stop-loss insurer who then starts

reimbursing the plan sponsor for any covered healthcare expenditure in excess of the deductible. Id.

Health insurers themselves may also serve as TPPs in the prescription market. When a plan sponsor chooses to self-insure, it usually hires a health insurer to administer its health plan in an administrative services only ("ASO") capacity. Id. ¶ 30. The health insurer may bundle stop-loss insurance with its ASO contract. Id. The health insurer is paid an agreed price for each prescription or paid a flat rate. Id. When a plan sponsor chooses to have a fully insured contract with a health insurer, then the health insurer is responsible for all the covered healthcare expenditures, including drug expenditures, of the plan sponsor's insured members. Id. ¶ 31. The plan sponsor pays premiums, but it does not pay any specific medical or drug claim. Id. Many health insurers operate under an ASO contract in some instances and under a fully insured contract in other instances. Id. ¶ 32. Even when operating under a fully insured contract, health insurers may not be fully responsible for the pharmacy benefit, as they may also contract with a PBM and have a cost-sharing relationship with the PBM. Id. Finally, health insurers may also be involved in government-funded plans, such as Medicare Part D drug plans, and serve as plan sponsors. Id. ¶ 33.

Dr. Hughes also discusses PBMs at potential TPPs in the drug purchasing market. PBMs will often negotiate prices with retail pharmacies, charging insurers or plans more than they paid for the drug to obtain profit. Id. ¶ 35. PBMs also negotiate rebates with manufacturers and will then pass some of that rebate on to insurers or plans. Id. Dr. Hughes opines that PBMs use a "variety of cost-sharing arrangements with health insurers and plan sponsors such as minimum discount guarantees, minimum rebate guarantees, and sharing of savings or costs relative to a specific target." Id. ¶ 37. Consequently, "if the discounts and rebates [a PBM] receives from pharmacies and drug manufacturers are lower than the discounts and rebates it guaranteed to the plan sponsor or health insurer," then "the PBM may share some of the drug cost." Id. Additionally, "the PBM may also share some of the drug cost under a contract with a set target cost per insured member per month," because, "if the cost per insured member is higher than expected, the PBM and the plan sponsor or health insurer split the excess payments." Id. Finally, Dr. Hughes contends that, under a "capitation arrangement," the PBM could bear the entire cost of a drug. Id.

Finally, consumers without prescription drug coverage "pay a price set by the entity dispensing the drug" and consumers

2018-2 Trade Cases P 80,574

with prescription drug coverage pay out-of-pocket up to the amount of their deductible and then pay either a fixed dollar amount, such as a co-pay, or a percentage of the total cost of the drug depending on their plan. Id. ¶ 39-40. These payments are affected by deductibles, annual benefit maximums, and out-of-pocket ("OOP") maximums—a limit on the maximum amount that a consumer has to pay for prescription drugs during a benefit year. Id. ¶ 41. Consumer spending may also be affected by whether the consumer is a Medicare Part D beneficiary. Id. ¶ 42.

 **\*6** Out of these entities, Dr. Hughes opines that individualized inquiry is necessary to identify injured consumers and TPPs. First, with regard to consumers, Dr. Hughes asserts that there is no common method for identifying brand loyalists—those individuals who would have continued to use Thalomid or Revlimid even if generics were available. Id. ¶ 52 He also asserts that certain consumers' annual drug expenditures would have remained the same, even if generics were available, if (1) the consumer would have reached his or OOP maximums even when purchasing a generic, if (2) generics were placed on the same formulary tier on the prescription drug plan resulting in equivalent payments, or if (3) a customer was eligible for Celgene's commercial copayment program, which reduced the amounts for Thalomid and Revlimid. Id. ¶¶ 53-58. Thus, with regard to consumers, Dr. Hughes concludes "[i]ndividualized inquiry is required to determine how many brand loyal customers there are and their identities" and to determine "how many additional consumers there are who may not be brand loyal and yet would still be uninjured." Hughes Rep. ¶ 58.

Dr. Hughes contends that similar individualized inquiry is necessary to determine whether TPPs suffered the alleged injury. First, he contends that plan sponsors with stop-loss insurance may not have suffered any injury so long as they would have exceeded their stop-loss deductible even in the but-for world. Id. ¶¶ 60-64. If they exceeded their deductible with or without generics, then the insurer would reimburse them for any amounts in excess of that deductible. Id. Dr. Hughes also contends that individualized inquiry is necessary to determine whether contractual rebates or formulary tiers eliminated injury to plan sponsors. Id. ¶¶ 65-69. Next, Dr. Hughes opines that individualized inquiry is necessary to determine whether PBMs were injured, and such inquiry requires consideration of myriad contracts between PBMs and other entities. Id. ¶¶ 70-74. Dr. Hughes reaches the same conclusion with regard to stop-loss insurers. Id. ¶¶ 75-77.

Turning to Dr. Leitzinger's classwide analysis of damages, Dr. Hughes opines that the Dr. Leitzinger's method is flawed because he cannot identify which individuals or entities made purchases in the damages jurisdictions and, therefore, cannot calculate the prescriptions that should be included in his damages estimate. Id. ¶ 90. Additionally, to the extent that Dr. Leitzinger excluded PBMs from the Damages Classes, Dr. Hughes contends the damages estimates are inflated for the TPPs that remain in the putative Classes. Id. ¶ 97. This is because the excluded PBMs "may bear some or even the entire alleged overcharge" for Thalomid and Revlimid, and these damages are included in Dr. Leitzinger's estimate despite the exclusion of the PBMs. Id. Finally, Dr. Hughes opines that Dr. Leitzinger has failed to accurately or reliably calculate federal reimbursement for Medicare on a classwide basis. Id. ¶¶ 102-107. Specifically, Dr. Hughes asserts that Dr. Leitzinger's methodology is unreliable as to Medicare payments because it relies on incomplete third-party pharmacy data, because identifying whether Low Income Subsidy ("LIS") Medicare payments requires individualized inquiry into the status of the covered consumers and their level of coverage, and because it fails to account for risk-sharing mechanisms provided by the federal government. Id.

### 4. Dr. Leitzinger's Rebuttal
Plaintiffs provided Dr. Leitzinger's rebuttal declaration in response to Dr. Hughes' claims. Rebuttal Expert Report of Jeffery J. Leitzinger ("Leitzinger Reb."), ECF No. 210.3. In his rebuttal, Dr. Leitzinger considers Dr. Hughes' criticisms of his aggregate damages estimates and Dr. Hughes' contentions regarding potentially uninjured class members.

First, Dr. Leitzinger addresses the contentions regarding the methodology for excluding federal Medicare reimbursements. Id. ¶¶ 7-19. Dr. Leitzinger contends that various payments and subsidies provided by the federal government are not directly related to purchases of Thalomid or Revlimid and do not constitute direct payments for either drug. Id. ¶¶ 10, 12. Next, Dr. Leitzinger opines that Dr. Hughes' concerns regarding Low Income Subsidy Medicare payments are either irrelevant or already accounted for in his damages estimate. Id. ¶¶ 13-15. Finally, Dr. Leitzinger argues that the pharmacy data he relied on in making his determinations regarding Medicare payments is representative of the overall experience for the two drugs and that Dr. Hughes has failed to provide any specific challenge to Dr. Leitzinger's list of Medicare plan names and types developed from the pharmacy data. Id. ¶ 19.

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

**\*7** Next, Dr. Leitzinger considers the challenges to his methodology's ability to identify which entities and consumers purchased Thalomid or Revlimid in the damages jurisdictions and the contentions regarding PBMs. First, Dr. Leitzinger contends that his methodology results in reasonable estimates of overall Thalomid and Revlimid prescription volumes and that these estimates are borne out by other sources of information. Id. ¶¶ 20-28. Second, with regard to PBMs, Dr. Leitzinger asserts that PBMs do not cover any of the purchase price of Thalomid or Revlimid. Id. ¶¶ 29-33.

Turning to the question of uninjured class members, Dr. Leitzinger contends that Dr. Hughes' examples are either hypothetical and speculative, not included in the classes, very small in number, or previously identified in Dr. Leitzinger's report. Id. ¶ 36. In sum, he contends that none of the group resulted in overcharge estimates that are inflated. Id.

### 5. W. Paul DeBree

Finally, Plaintiffs submitted the expert declaration of W. Paul DeBree, an individual who has been involved in the PBM industry for more than twenty years and has expertise in "PBM contracting, payment flows, rebates, rebate contract billing, plan design, pharmacy network development and management, recordkeeping, and other services that PBMs perform for their customers." Expert Declaration of W. Paul DeBree ("DeBree Decl."), ECF No. 210.4. DeBree opined that the "identities of those who paid or reimbursed Thalomid and Revlimid are readily available and identifiable using existing prescription claim data" and that "PBMs do not pay some or all of the purchase for Thalomid and Revlimid – third partypayors and consumers do." Id. ¶ 6. With regard to the identifes of class members, DeBree asserts that "patient/prescription electronic claim record sources," "[p]harmacy records," and "[c]laim processing records" will allow identification. Id. ¶ 35. And, with regard to payments to PBMs, DeBree contends that "[t]he retail price for Thalomid and Revlimid is paid solely by the TPP and its beneficiary," that PBMs using an ASO model "are not themselves paying for drugs," and that "Dr. Hughes's statement [that PBMs pay for prescription drugs] is unsupported conjecture, and wrong." Id. ¶ 40.

## II. LEGAL STANDARD

Every putative class action must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy. City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 438 (3d Cir. 2017) (citations omitted). In addition to the Rule 23(a) requirements, a class action must be one of the types recognized by Rule 23(b). Boyle v. Progressive Specialty Ins. Co., No. 09-5515, 2018 WL 2770166, at \*4 (E.D. Pa. June 7, 2018). Here, Plaintiff has moved for certification under subsections (b)(2) and (b)(3).

**\*8** The Rule 23 requirements are "not mere pleading standards;" rather, "[p]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316, 321 (3d Cir.2008). A district court must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." Id. at 320. Additionally, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits ... [and] [f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." Id. at 307, 320. "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." Id. at 323.

## III. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Hayes v. Wal–Mart Stores, Inc., 725 F.3d 349, 354, 356 (3d Cir. 2013) (quoting Fed. R. Civ. P. 23(a)(1) ). Although numerosity is determined on a case-by-case basis, the Third Circuit has determined that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 595 (3d Cir. 2012) (quoting Stewart v. Abraham, 275 F.3d 220, 226-227 (3d Cir. 2001) ). Numerosity is not an issue here. The proposed class consists of at least hundreds of persons and entities that paid for some or all the purchase price of Thalomid and Revlimid, as demonstrated by data obtained from subpoenas served on pharmacies. Leitzinger Rep. ¶ 46.

#### 2. Commonality

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 127 of 260
PageID: 69791

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

Per Rule 23(a)(2)'s commonality requirement, the plaintiff must share a question of law or fact with the prospective class members. Commonality means "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (emphasis in original) (citation omitted). "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least on question of fact or law with the grievances of the prospective class." In re Comty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 408-09 (3d Cir. 2015) (internal citation omitted). "Because the requirement may be satisfied by a single common issue, it is easily met." Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).

"As in other similar antitrust cases, '[e]ach class member's claims depend on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors,' which will require evidence common to the class." Vista Healthplan, Inc. v. Cephalon, Inc., No. 06-1833, 2015 WL 3623005, at *14 (E.D. Pa. June 10, 2015) (quoting In re Wellbutrin XL Antitrust Litigation, 282 F.R.D. 126 (E.D.Pa.2011) (citations omitted) ). The commonality requirement is not disputed here, and it has been satisfied.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57 (citations omitted). Typicality exists "[i]f the representative's claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories ... regardless of factual differences underlying the individual claims." In re Wellbutrin XL, 282 F.R.D. at 138 (citing Baby Neal, 43 F.3d at 57-58).

 **\*9**  The court must consider "whether the named plaintiff's circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Hassine v. Jeffes, 846 F.3d 169, 177 (3d Cir. 1998) (quotation marks and citations omitted). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with

those of the absentees." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631 (3d Cir. 1996) (citations omitted).

Defendant alleges that one of the six named Plaintiffs—David Mitchell—fails to satisfy the typicality requirement because he lacks standing to pursue either the damages claim or the claim for injunctive relief asserted in this action. Specifically, Defendant argues that Mitchell did not purchase Revlimid in a Damages Jurisdiction and that Mitchell has no likelihood of future injury that would give him standing to pursue injunctive relief. The Court disagrees.

With regard to the damages claim, "[c]ase law supports the position that [p]laintiffs suffered injury and have standing in states where they purchased a drug or reimbursed their members for purchase of a drug." In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) (citations omitted) (listing cases). Defendants contend that Mitchell lacks standing because he neither resided in D.C. nor purchased Revlimid at pharmacies located in D.C. Plaintiffs respond that Mitchell ordered Revlimid and provided his payment information from his office in D.C., thereby giving him standing.

It is not disputed that Mitchell ordered Revlimid over the phone in D.C. and paid for it using his credit or debit cards. Although the credit card bills were sent to his home in Maryland, the Court is satisfied that he nonetheless "purchased" the drug in D.C. See, e.g., Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V., 817 F. 3d 241, 248 (5th Cir. 2016) (" 'Purchase' means [t]he acquisition of an interest in real or personal property by sale...' And a 'sale' may occur based on either an actual payment or a mere promise to make payment.' ") (quoting Black's Law Dictionary (10th Ed. 2014); Bourgeois v. Live Nation Entm't, Inc., 3 F. Supp. 3d 423, 448 (D. Md. 2014) as corrected (Mar. 20, 2014) ("location" of online concert tick sales "may depend, inter alia, on the mechanics of the purchase process on the Ticketmaster website ... the location from which the purchaser accessed the Ticketmaster website; the location at which the purchaser's electronic funds were received; the location from which Ticketmaster and/or the [theater] sent the tickets to the purchaser; the location at which the purchaser received the tickets; and, perhaps, the location of the event for which the ticket grants entry."). As for the debit card purchases, Mitchell's debit card was linked to a Flexible Spending Account provided by his employer in D.C. Given these facts, the Court is satisfied that Mitchell's purchases

---

2018-2 Trade Cases P 80,574

of Revlimid give rise to standing to pursue damages claims under D.C. law.

Defendant also challenges Mitchell's standing to pursue injunctive relief, contending that Mitchell has not demonstrated a likelihood of future injury because he no longer takes Thalomid or Revlimid. Again, the Court disagrees. To have standing to seek injunctive relief, a plaintiff must show: (1) that he is under imminent threat of suffering injury in fact " 'that is concrete and particularized' "; (2) "a causal connection between the injury and the conduct complained of"; and (3) "a likelihood that a favorable judicial decision will prevent or redress the injury." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 301 (3d Cir. 2012) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) ). The Third Circuit has repeatedly held that a plaintiff seeking an injunction must show that he is "likely to suffer future injury"; a mere "possibility" of future injury is insufficient. Id. (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) ).

 **\*10**  Defendant asserts that Mitchell has never taken Thalomid and has not taken Revlimid since April 2016. ECF No. 182, Ex. 5. Consequently, Defendant contends that there is no likelihood of future injury. Plaintiffs respond with a declaration from Mitchell's prescribing doctor, wherein he states "it is likely that we will treat Mr. Mitchell with Revlimid again in the future." See Declaration of Kenneth Anderson, MD, Ex. 126, ECF No. 210.2. Given the fact that Mitchell has multiple myeloma, an uncurable blood cancer that he will battle for the rest of his life, Plaintiffs have shown that Mitchell is likely to suffer future injury as a result of Defendant's alleged conduct. Consequently, Mitchell has standing to pursue the claims for injunctive relief.

### 4. Adequacy

Rule 23(a)(4) dictates that representative plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625. The adequacy determination "depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class. In re Flonase, 284 F.R.D. at 218 (quoting New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007).

Rule 23(g) governs the analysis as to Plaintiffs' attorneys' qualifications, experience, and ability to handle the proposed litigation. It provides that in appointing class counsel, the court must consider four factors:

> (i) the work counsel has done in identifying or investigating potential claims in the action;

> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

> (iii) counsel's knowledge of the applicable law; and

> (iv) the resources that counsel will commit to representing the class.

Cmty. Bank of N. Va., 622 F.3d at 292 (quoting Fed. R. Civ. P. 23(g)(1)(A) ). Here, the Court is satisfied that Interim Co-Lead Counsel—the firms of Hausfeld LLP, Block & Leviton LLP, and Hach Rose Schirripa & Cheverie LLP, are qualified, experienced, and familiar with antitrust class action litigation. They have spent considerable time and resources on this litigation, including engaging in discovery and working with experts, and they have knowledge of substantive and class action law, as well as complex litigation rules, practice, and procedure.

With regard to the second factor, the Court is satisfied that all Plaintiffs share an interest in establishing Celgene's liability and in obtaining the largest monetary recovery possible. The basis of each class member's claim against Celgene is the alleged anticompetitive behavior resulting in higher payments for Thalomid and Revlimid than if Celgene had not blocked generic competition. The only argument raised by Defendants under this factor is that Plaintiff Mitchell lacks standing and therefore cannot serve as an adequate representative. The Court has already rejected this position. Given that the interests of the class members are aligned, the named Plaintiffs have satisfied the second part of the adequacy requirement.

### B. Rule 23(b)(3) Damages Classes

Under Rule 23(b)(3), certification is appropriate when: (i) common questions of law or fact predominate over questions affecting the individual class members only; and (ii) class treatment is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3); Boyle v. Progressive Specialty Ins. Co., No. 09-5515, 2018 WL 2770166, at *4 (E.D. Pa. June 7, 2018). These requirements are called

predominance and superiority. In addition to satisfying the predominance and superiority prongs, a "Rule 23(b)(3) class must ... be 'currently and readily ascertainable based on objective criteria.' " City Select, 867 F.3d at 439 (quoting Marcus v. BMW of N. Am. LLC, 687 F.3d 583, 593 (3d Cir. 2012) ).

### 1. Predominance

 **\*11**  "In a class action brought under Rule 23(b)(3), common questions of law or fact must predominate over questions affecting only individual members and must be a significant part of the individual cases." Boyle, 2018 WL 2770166, at \*8. The predominance inquiry assesses whether the elements of the claims of the class can be proven at trial with "common, as opposed to individualized, evidence." Taha v. County of Bucks, 862 F.3d 292, 308 (3d Cir. 2017) (quoting Hayes, 725 F.3d at 359). "Class certification is not appropriate if proof of the essential elements of the cause of action requires individual fact finding or application of different legal principles. Boyle, 2018 WL 2770166, at \*8 (citations omitted). "The evidence needed to prove each element of the plaintiff's legal claim must be capable of common proof rather than individualized proof." Id. (citing Marcus, 687 F.3d at 600). "To assess predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3). Marcus, 687 F. 3d at 600 (quoting In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir.2011) ). A court's task is to predict how specific issues will play out at trial "in order to determine whether common or individual issues predominate in a given case." Malack v. BDO Seidman, LLP, 617 F.3d 743, 746 (3d Cir. 2010) (quoting Hydrogen Peroxide, 552 F.3d at 311) ).

A plaintiff need not provide his claims for purposes of the predominance inquiry; rather, he "need only show that he can establish the elements of his claim at trial by common, not individualized proof." Boyle, 2018 WL 2770166, at \*8 (citing Sullivan v. DB Invs., Inc, 667 F.3d 273, 305 (3d. Cir. 2011). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen, 568 U.S. at 459 (emphases omitted). "The merits underlying the cause of action need by considered only to the extent that they are 'enmeshed' with the certification inquiry." Boyle, 2018 WL 2770166 (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013) (citations omitted) ).

Defendant asserts that Plaintiffs have failed to satisfy their burden to show predominance for three reason: (i) Plaintiffs cannot prove injury on a class-wide basis because the class includes large numbers of uninjured person and entities; (ii) Plaintiffs' proposed class-wide damages analysis inflates damages and cannot be corrected without individualized analysis; and (iii) significant variations in the state laws governing Plaintiffs' unjust enrichment and consumer protection claims would render any class-wide trial impractical.

### i. Plaintiffs' Proof of Antitrust Impact

Injury is an essential element of an antitrust claim. See, e.g., In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class, 868 F.3d 132, 164 (3d Cir. 2017) ("[t]o establish antitrust standing, a plaintiff must show that it has suffered an antitrust injury"). To certify a class, "the putative class must first demonstrate economic loss—that is, the fact of damage—on a common basis." Harnish v. Widener Univ. Sch. Of Law, 833 F.3d 298, 305-06 (3d Cir. 2016) (internal quotation marks omitted); see also In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244, 252 (D.C. Cir. 2013) ("plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured"). The same is true for Plaintiffs' state law unfair competition and unjust enrichment claims. See Gonzalez v. Corning, 317 F.R.D. 443, 517 (W.D. Pa. 2016) (denying certification of, inter alia, unjust enrichment claims where "plaintiffs failed to meet their burden to establish that injury can be proven by evidence that is common to the proposed [ ] class").

Defendants contend that the predominance requirement is not satisfied here because there are large categories of uninjured class members that Plaintiffs have not identified and cannot identify without individualized inquiry. See, e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 190 (3d Cir. 2001) (affirming decision not to certify where "ascertaining which class members have sustained injury means individual issues predominate over common ones"). Plaintiffs respond that substantially all class members were injured. The Court agrees with Defendant.

 **\*12**  Defendant relies on the report of Dr. Hughes, who described several categories of allegedly uninjured consumers, including: (1) brand loyal customers who would have bought branded Revlimid or Thalomid even if a generic had been available, (2) consumers who purchased Revlimid or Thalomid after meeting an annual out-of-pocket maximum or deductible, (3) consumers who pay the same for a generic and a brand drug, and (4) consumers who obtain patient assistance. Dr. Hughes also identified categories of TPPs

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 130 of 260
PageID: 69794

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)
2018-2 Trade Cases P 80,574

that would otherwise fall within the class definition but who were not injured such as, (1) plan sponsors with stop-loss insurance, (2) plan sponsors and PBMs who pay the same or less for a brand than a generic, and (3) plan sponsors with maximum plan limits.

The first category of allegedly uninjured class members is made up of brand loyalists—consumers that would purchase a brand product even if a generic alternative was available. Dr. Leitzinger asserted that up to 10 percent of consumer class members would purchase a brand product even if a generic were available, and he confirmed that he had not "done anything to try to identify which individual consumers members of these classes are in fact brand loyalists." Leitzinger Dep. at 78:22-79:10; 79:12-79:25, ECF No. 182.4, Ex. 3. According to Defendant, the presence of brand loyalists is a significant barrier to class certification: "[W]hen every class member has the potential to be a brand loyalist, a person with a flat copay or a consumer who never paid out-of-pocket for their prescriptions, and the only way to identify persons who fall within those groups is individualized inquiry, individualized inquiries would predominate." Vista Healthplan, Inc. v. Cephalon, Inc., No. 06-1833, 2015 WL 3623005, at *19 (E.D. Pa. June 10, 2015). In the absence of a method for identifying which consumers would continue to take brand Thalomid or Revlimid and which would not, Defendant contends that certification is inappropriate.

Plaintiffs respond, first, that Dr. Leitzinger, while not individually identifying brand loyalists, already took them into consideration in determining that at least 90% of consumers were impacted by Celgene's conduct, accounting for 99% of class period prescriptions. Leitzinger Rep. ¶¶ 36-37. Second, Plaintiffs argue that identification of individual brand loyalists is a question of damages allocation that is inappropriate for class certification. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977) ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate") (abrogated on other grounds). Plaintiffs cite to out-of-circuit cases for the proposition that consumers can, at the damages stage, "establish [their] injury through testimony ... that, given the choice, he or she would have purchased the generic." In re Nexium Antitrust Litig., 777 F.3d 9, 20 (1st Cir. 2015); In re Lidoderm Antitrust Litig., No. 14-2521, 2017 WL 679367, at *17 (N.D. Cal. Feb. 21, 2017) (same); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-2503,

2017 WL 4621777, at *16 n.16 (D. Mass. Oct. 16, 2017) (same).

None of the cases cited by Plaintiffs applied Third Circuit standards for class certification. As explained in Solodyn, "In Nexium III, the First Circuit explained that the putative class need not propose the specific mechanism to exclude uninjured consumers at the time of class certification, as long as a court is confident that such a mechanism does exist...."[2] 2017 WL 4621777, at *16. However, "[i]n Vista, the court specifically rejected the standards outlined in Nexium III, explaining that the Third Circuit imposes greater standards of proof at the time of class certification than does the First Circuit...." Id. Both Solodyn and Lidoderm followed the approach articulated in Nexium. This Court, however, is required to apply the "greater standards of proof" discussed in Vista Healthplan and, consequently, Plaintiffs' inability to identify a non-individualized means of identifying brand loyalists weighs against certification. See, e.g., Vista Healthplan, 2015 WL 3623005, at *19; Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, No. CIV.A. 04-5898, 2010 WL 3855552, at *25 (E.D. Pa. Sept. 30, 2010) (rejecting certification of end payor class in part because plaintiffs did not provide "a method for identifying which individual purchasers would remain brand loyal through analysis of common information" and therefore failed to demonstrate that common proof is available to show that supra-competitive prices passed through to purchasers of both branded and generic purchasers).

*13  Furthermore, the First Circuit subsequently limited the reach of Nexium, bringing it into closer consistency with the Third Circuit's standards for certification and undermining Plaintiffs' reliance on it. In re Asacol Antitrust Litigation involved allegations that defendant delayed generic entry resulting in higher prices paid by some members of the putative class. The district court found that at least 10% of putative class members because they would have continued taking the brand drug even if a generic had been available earlier. ECF No. 247, Ex. A at 9. The district court certified the class, finding that the ten percent of brand loyalists was a de minimis number of uninjured members. Id. The district court further found sufficient a proposal by plaintiffs that class members be allowed to submit a claims form, along with data and documentation, to substantiate their membership in the class, which a claims administrator would review to determine class membership. Id. The First Circuit reversed, finding that a " 'claims administrator's' review of contested forms completed by consumers concerning an element of

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 131 of 260
PageID: 69795
In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

their claims would fail to be 'protective of defendants' Seventh Amendment and due process rights.' " Id. at 24-25 (quoting Nexium, 777 F.3d at 19). Because plaintiffs had not provided an appropriate common method for proving injury-in-fact, the First Circuit concluded that certification was inappropriate, as individual inquiries regarding this issue would overwhelm common issues at trial.[3] Similarly, here, Plaintiff have not provided an appropriate common method of proving injury-in-fact given the presence of brand loyalists. Any renewed motion must enable this Court to offer a "reasonable and workable plan for how [the opportunity to press at trial genuine challenges to allegations of injury-in-fact] will be provided in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues." Id. at 36.

Next, Defendants contend that consumers—and plans—who would have hit their out of pocket maximums even with a generic alternative are not injured. Defendants reason that Thalomid and Revlimid are expensive, that generic prices would not have been substantially lower, and that cancer patients, who likely have other high medical costs, are likely to reach their maximums regardless of the availability of generics given these expenses. Plaintiffs respond that if a consumer or a TPP paid more for brand Thalomid or Revlimid than it would have for their generic counterparts even one time, then it suffered antitrust injury. See Castro v. Sanofi Pasteur Inc., 134 F. Supp. 3d 820, 847 (D.N.J. 2015). Thus, it is "irrelevant to antitrust injury if that class member subsequently limited the damage it suffered from Celgene's overcharge with contractual maximums." Pl. Reply Br. at p. 18, ECF No. 210. Moreover, "even if the consumer would be uninjured [due to a plan maximum], the third-party insurer who actually paid the costs would have been overcharged, and the aggregate damages award would remain the same, so there is no prejudice to Defendants at this time." In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-02503, 2017 WL 4621777, at *16 (D. Mass. Oct. 16, 2017).

The Court agrees with Plaintiffs that antitrust injury occurs on the first overcharge. While Plaintiffs expert acknowledged that six percent of consumers reached their out of pocket maximum on the first purchase, see Leitzinger Reb. ¶ 41, some patients within this group may not have reached their out of pocket limit if generics were available or may have reached their OOP limit as a result of other medical expenses after incurring the full overcharge for Thalomid and Revlimid, and thereby suffered injury. The Court finds that,

at most, a de minimis number of consumers escaped injury as a result of out of pocket maximums.

**\*14**  Defendant also asserts that certain class members pay the same for a generic and a brand drug and, thus, suffered no injury. This situation would arise if a health plan included certain generic medication on the brand tier, meaning that consumers would have the same copayment for the generic version of those drugs as for the branded versions. Plaintiffs respond that such a situation is unlikely to occur and that it is purely hypothetical. Plaintiffs further respond that health plans generally benefit when consumers take generic drugs, so they create incentives to encourage consumer members to choose generics—including generic versions of cancer drugs—by placing them on less expensive tiers than brands. See, e.g., Ex. 121, 122, 123, ECF No. 150. Finally, Plaintiffs argue that, if a particular formulary required a consumer to pay a percentage of every drug's price and capped the expenditure at a certain dollar amount, and that dollar amount was the same for both a generic and brand drug, then that consumer would fall under the flat co-pay exclusion. The Court rejects Defendants' unfounded hypothetical and agrees with Plaintiffs.

Next, Defendant argues that Celgene offers patient assistance programs that reduce the amount that insured and uninsured patients are charged for Thalomid and Revlimid. The patient assistance "can cause consumers to pay less for the brand medication than they would have paid for the generic alternative," so consumers receiving assistance "are not injured." Def. Br. at 33, ECF No. 182; see also Ex. 11 (Plaintiff DEA explaining that it actively encourages its members to seek patient assistance); Ex. 33 (PBM confirming that "patient assistance will be pursued" for DEA members taking Revlimid). Plaintiffs contend that only a small number of overall consumers participated in the assistance program. See Leitzinger Reb. ¶ 46 ("With regard to Celgene's copay assistance program more generally, only 9% of the Thalomid/Revlimid consumers receive some assistance from Celgene's copay assistance program"). Moreover, participating consumers would still be injured, according to Dr. Leitzinger, if any of the following is true: (1) their co-pay for generics was less than $100 before 2013; or (2) their co-pay for generics was less than $25 during or after 2013; or (3) they received the maximum of $10,000 in co-pay assistance before their last prescription was filled;[4] or (4) they otherwise did not qualify for or apply for the assistance program for any one prescription of Thalomid or Revlimid. As was the case with out of pocket maximums, the Court finds

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 132 of 260
PageID: 69796

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

that, at most, a de minimis number of consumers escaped injury as a result of Celgene's assistance program.

Turning to TPPs, Defendant argues that Plan Sponsors who pay the same or less for a brand than a generic as a result of the discount or rebate structures in their contracts with PBMs would not be injured. Defendant also argues that Plan Sponsors with stop-loss insurance, who would have hit their stop-loss deductibles even with a generic alternative, are not injured because they would have paid the same deductible amount. However, as Plaintiffs correctly argue, any amounts that such Plan Sponsors received in coverage or in the form of rebates is irrelevant to the question of impact. See Nexium, 777 F.3d at 28 (rejecting defendants' argument that some class members were not injured because they "benefitted from rebates that reduced the actual class period price for branded Nexium"); In re Solodyn, 2017 WL 4621777, at *18 (same). Thus, Plan Sponsors with stop-loss insurance or with a favorable discount or rebate structure suffered antitrust injury at the time they first paid for Thalomid or Revlimid, regardless of whether they eventually recouped all or part of their losses.

Ultimately, the Court finds that there are potentially uninjured class members remaining in the class—specifically, brand loyalists—and that identifying these members would require extensive individualized inquiry. Consequently, the Court will deny certification. See, e.g., Vista Healthplan, 2015 WL 3623005, at *21. The Court will allow Plaintiffs another opportunity to address this issue and to propose a method of identifying potential brand loyalists without resorting to individualized inquiry.

### ii. Plaintiffs' Proposed Class-wide Damages Calculation

**\*15** Defendant argues that Dr. Leitzinger's model is fundamentally unreliable and does not accurately reflect the transactions that are attributable to Plaintiffs' theory of class injury in three respects: (1) the model does not identify those purchases of Thalomid and Revlimid that occurred in the fourteen Damages Jurisdictions; (2) the model does not account for the role of PBMs; and (3) the model does not reliably estimate the amount of Medicare reimbursements. Plaintiffs respond that Dr. Leitzinger has adequately demonstrated that damages can be calculated on a class-wide basis.

"At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures

for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." In re Processed Egg Products, 312 F.R.D. 171, 202 (E.D. Pa. 2015). A class-wide damages model is invalid if it "identifies damages that are not the result of the wrong." Comcast, 569 U.S. at 37; see also Franco v. Conn. Gen. Life Ins., 299 F.R.D. 417, 430 (D.N.J. 2014) (court must ensure that "proffered model measures only those damages attributable to the plaintiff's theory of liability"), aff'd, 647 F. App'x 76 (3d Cir. 2016).

Defendant asserts that Dr. Leitzinger's model is fundamentally unreliable, criticizing its reliance on averages and its failure to analyze or incorporate individualized differences. See Sheet Metal Workers, 2010 WL 3855552, at *30 (finding certification unwarranted where the proposed model used averaged prices, thereby "glid[ing] over what may be important differences" in the "actual price paid by each purported class member.") (internal quotation marks omitted). The Court disagrees. Dr. Leitzinger opined that his aggregate damages model, which is based on both extensive literature as well as Celgene's own forecasts as described in the background of this opinion, illustrates that the price benefits associated with generic entry into the market "would have been shared broadly across patients (both with and without insurance) and third-party payors (including insurance plans, state and local government entities, and self-insured employers)." Leitzinger Rep. ¶¶ 34-36. The aggregate class-wide damages estimates have readily been accepted in other similar cases. See, e.g., In re Flonase Antitrust Litig., 284 F.R.D. 207, 226 (E.D. Pa. 2012); In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 351 (E.D. Mich. 2001).

Defendant goes on to specifically challenge several aspects of the classwide damages model. First, Defendant contends that the data relied on by Dr. Leitzinger does not reflect the states in which the relevant purchasers were made, given that many patients using Thalomid and Revlimid travel great distances to receive their cancer treatment and many receive their prescriptions from out-of-state pharmacies. See Hughes Rep. ¶¶ 94-95. Dr. Hughes noted that, in the Revlimid claims data produced by Plaintiff DEA, "19 percent of the prescriptions were dispensed to consumers whose primary address was in a different state from the mailing address of their prescribing physician." Id. ¶ 94. Based on these assertions, Defendant contends that the model does not reliably identify the purchases in the Damages Jurisdictions.

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)
2018-2 Trade Cases P 80,574

Plaintiffs provide Dr. Leitzinger's rebuttal declaration, in which he contends that the relevant question is not "whether the ... data allows [him] to properly determine patient locations for each prescription," but rather "whether [the] data applied in the aggregate (that is, across all the health care plans in all of the Class states) results in reasonable estimates of overall Thalomid and Revlimid prescription volumes for the Classes." Leitzinger Reb. ¶ 23. Dr. Leitzinger opines that the pharmacy data produced in this case—accounting for several hundred thousand prescriptions that have both patient and prescriber addresses—"show that the volume of Thalomid and Revlimid prescriptions used in the Class states during the damages period is within two-tenths of a percentage point of the volume prescribed in those states." Id. ¶ 24. Dr. Leitzinger also performed robustness check on his estimates by "reviewing CDC data on diagnoses by state for myeloma and Non-Hodgkin Lymphoma (which are treated with Thalomid and Revlimid), and using census data based on age of population ... and found his state-by-state damage estimates were robust." Pl. Reply at 22; Leitzinger Reb. ¶¶ 26-28. Finally, Dr. Leitzinger used Celgene's REMS database, which shows the number of Thalomid and Revlimid capsules purchased by each customer and each customer's state of residence, to corroborate his estimates, finding that the Thalomid estimate essentially matched the REMS data percent and that the Revlimid estimate was within five percentage points of the REMS data percent. Leitzinger Reb. ¶ 28. The Court finds that the damages model sufficiently estimates damages in the Damages Jurisdictions.

**\*16** Defendant's second argument is that Dr. Leitzinger's model does not account for the role of PBMs, who Defendant alleges may bear part or all of the alleged overcharge. "To the extent Plaintiffs take the position that PBMs are not part of the Damages Classes, Dr. Leitzinger fails to identify and subtract costs borne by PBMs, which inflates his damages estimate for those payors who *are* class members." Def. Br. at 38 (emphasis in original). As discussed more fully elsewhere in this opinion, Defendant's underlying contention that PBMs may bear the price of Thalomid and Revlimid is unsupported and, therefore, the Court rejects this challenge to Dr. Leitzinger's model.

Finally, Defendant argues that Dr. Leitzinger uses unreliable data to exclude the federal government's Medicare payments and uses an unreliable method to ascertain Low Income Subsidy beneficiaries and to determine whether LIS beneficiaries are in the catastrophic coverage statute, two factors which allegedly impact the amount of the government's payments. Hughes Rep. ¶¶ 46, 104-05. "Dr. Leitzinger's failure to identify and exclude these non-class member payments weighs heavily against the reliability of his model to measure damages to purported class members." Def. Br. at 39. Having reviewed both Dr. Leitzinger's initial report and rebuttal declaration, the Court finds that his model adequately accounts for Medicare payments. See Leitzinger Reb. ¶¶ 7-19. The Court credits Dr. Leitzinger's analysis that any potential LIS issues on the overcharge analysis are de minimis and that the pharmacy data he relied on is representative of the overall experience for Thalomid and Revlimid. Id.

### iii. Variations in State Law

Plaintiffs' proposed classes include claimants under the laws of all fourteen Damages Jurisdictions, based on state antitrust and consumer protection statutes and common law unjust enrichment. Defendant contends that there are significant differences among state laws that have led other courts to deny certification of similar proposed classes.

"In a motion for class certification, plaintiff bears the burden of providing an extensive analysis of state law variations to determine whether there are insuperable obstacles to class certification." Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 219 (E.D. Pa. 2000) (internal quotations marks omitted).

### a. Unjust Enrichment

Defendant contends that there are significant variations in state unjust enrichment laws that preclude a finding of predominance. Defendant points to six differences regarding: (1) whether and how states recognize unjust enrichment as an independent cause of action, as opposed to requiring a separate underlying cause of action; (2) what conduct is required to prove a claim, including whether a plaintiff must prove inducement, solicitation, fraud, or inadequate consideration or compensation; (3) whether a relationship between the parties or a direct conferral of benefit is required; (4) whether a plaintiff must prove a defendant's culpable state of mind; (5) the length of the statute of limitations period, and when the limitations period begins to run; and (6) whether an adequate remedy at law precludes an unjust enrichment claim. See App. A., ECF No. 182. Plaintiffs respond that all states' unjust enrichment laws are virtually identical and that the differences identified by Defendant are either contradicted by superior precedent or overblown.

2018-2 Trade Cases P 80,574

Plaintiffs assert the standard elements of unjust enrichment are: (1) benefit conferred by a plaintiff upon defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by defendant under circumstances where it would be unjust to do so without payment. See, e.g., In re Liquid Aluminum Sulfate Antitrust Litig., No. 16-2687, 2017 WL 3131977, at *29 (D.N.J. July 20, 2017). With respect to the conduct required for proof of the claim, Plaintiffs contend that "[u]njust enrichment is an equitable remedy, and thus by its very nature is a flexible doctrine." In re. TFT-LCD (Flat Panel) Antitrust Litig., 2017 WL 4501223, at *7 (N.D. Cal. Sept. 28, 2011) ("As a cause of action based in equity, 'the requirements of proof of unjust enrichment are neither technical nor complicated.' ") (citing Restatement (Third), Restitution, § 1, cmt. a (noting the "inherent flexibility of the concept of unjust enrichment") ). Plaintiffs also contend that their unjust enrichment claims here are well-suited for class treatment because the claims depend on common evidence of Defendant's allegedly illegal behavior and the profits derived therefrom. Additionally, Plaintiffs provide a detailed overview of the various states' unjust enrichment laws, including citations to relevant precedent.

 *17  After careful consideration, the Court is not convinced that any of the potential variations described by Defendant are so material as to prevent certification. As other courts have recognized, state claims of unjust enrichment "are universally recognized causes of action that are materially the same throughout the United States." In re Terazosin Hydrochloride, 220 F.R.D. 672, 697 (S.D. Fla. 2004); see also Singer v. AT & T Corp., 185 F.R.D. 681, 692 (S.D.Fla.1998) (citing Sollenberger v. Mountain States Tel. & Tel. Co., 121 F.R.D. 417, 428 (D.N.M.1988) ). To the extent the variations identified by Defendant exist, they "do not significantly alter the central issue or the manner of proof." In re Abbott Labs. Norvir Anti-Tr. Litig., No. 04-1511, 2007 WL 1689899, at *9 (N.D. Cal. June 11, 2007). "Common to all class members ... is whether Defendant unjustly acquired additional revenue or profits by virtue or an anti-competitive premium on the price of [the drug at issue]." Id. "The 'idiosyncratic differences' between state unjust enrichment laws 'are not sufficiently substantive to predominate over the shared claims.' " Id. (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir.1998) ). Based on Plaintiffs analysis of the states' various unjust enrichment laws, their use in indirect purchaser actions, and the similarity between unjust enrichment causes of action, the Court is satisfied that common questions predominate. Unlike the cases cited by Defendant where courts reached an opposite conclusion, the Court does not find

that there is a need for inquiry into the equities of individual Plaintiffs. Moreover, to the extent there are variations in statutes of limitation or the preclusive effect of an adequate remedy at law, the Court finds that such differences can be accommodated without overcoming the efficacy of the class action.

### b. Unfair and Deceptive Trade Practices

Defendant raises similar challenges to Plaintiffs' unfair and deceptive trade practices claims, contending that there are extensive variations among the relevant state laws that make them unsuitable for class treatment. Specifically, Defendant claims that jurisdictions vary regarding: (1) whether the law requires a showing of false of deceptive acts; (2) whether the conduct must be directed at consumers; (3) whether the defendant must act willfully or with intent to deceive; (4) whether the conduct must occur locally; (5) whether corporations, business entities, or third parties not directly involved in the alleged deceptive transaction can bring claims; (6) whether and to what extent a plaintiff must prove reliance on the alleged deceptive conduct; (7) the types of damages available; and (8) the length of the statute of limitations period and when it begins to run. See App. B., EXC No. 182.

Plaintiffs respond that common issues predominate and that any material variations can be handled via a special verdict form or by separating the purported differences into groups, both of which Plaintiffs allege are more efficient options than individual or state-wide class lawsuits. Further, to the extent there are variations among the relevant state laws, Plaintiffs contend that they do not predominate over the core elements of Plaintiffs' claims: "whether Celgene engaged in anticompetitive conduct; whether that conduct resulted in artificially inflated prices for Thalomid and Revlimid; and the aggregate damages suffered by the Classes." Pl. Reply at 29. The Court disagrees.

Defendant has identified substantial variations among the state laws. For example, Defendant identifies various definitions of protected consumers—a variation that is not accounted for in Plaintiffs' analysis. See Def. App., ECF No. 182.2; see also In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 194 F.R.D. 484, 489 (D.N.J. 2000) (finding that there was not predominance of common legal issues because, in part, "some states have different definitions of the word 'consumers'."). Similarly, Defendant identifies differences related to standards for scienter and reliance under various states' statutes. See Def. App., ECF No. 182.2; see also Mazza v. Am. Honda Motor Co., 666 F.3d 581, 591

(9th Cir. 2012) (finding material variations due to differing scienter and reliance requirements under consumer protection laws); see also Lyon, 194 F.R.D. at 219 (finding that "[s]tate consumer protection acts vary on a range of fundamental issues," including on conduct that is actionable and level of scienter"). Additionally, Defendant demonstrates variations in the substantive preconditions to bringing a suit under various state consumer protection laws, which have likewise been found to defeat predominance. See S. States Police Benev. Ass'n v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 93 (D. Mass. 2007). More generally, the Court is mindful of the fact that "[c]onsumer protection laws are a creature of the state in which they are fashioned. They may impose or not impose liability depending on policy choices made by state legislatures or, if legislators left a gap or ambiguity, by state supreme courts." Id.

*18 In sum, the Court finds that there are significant differences between the states' consumer protection statutes and Plaintiffs' causes of action. These distinctions "lessen the predominance of common legal issues" and "would demand significant attention from this Court, not the least of which would be instructing the jury or juries consistent with the law of each relevant states." In re Ford Motor Co. Ignition Switch Prod. Liab. Litig., 194 F.R.D. at 490. Plaintiffs fail to account for these variations in their analysis and, to the extent they seek to renew this motion, Plaintiffs must provide a more extensive analysis of the various consumer protection laws indicating that the variations described by Defendant would not raise an insuperable obstacle to certification.

## 2. Superiority

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy" and provides a "non-exhaustive" list of factors to consider in determining superiority. Fed. R. Civ. P. 23(b)(3). These factors include the class members' interest in individually controlling the prosecution of separate actions, the extent and nature of any similar litigation already commenced by class members, the desirability of concentrating the litigation in a particular forum, and the difficulties likely to be encountered in management of a class action. Fed. R. Civ. P. 23(b)(3); Cmty. Bank of N. Va., 795 F.3d at 409. "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." Cmty. Bank of N. Va., 795 F.3d at 409 (quotations omitted). "[S]imilar to the predominance requirement, the requirement of superiority ensures that

resolution by class action will 'achieve economies of time, effort, and expense, and promote ... uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results.' " Flonase, 294 F.R.D. at 234 (quoting Amchem, 521 U.S. at 615).

The superiority requirement is fulfilled here. In end payor class actions alleging generic entry, the "vast majority of district courts" have held that class action treatment is superior to other available methods of adjudication." Flonase, 284 F.R.D. at 234; see also In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 351 (E.D. Mich. 2001) ("Multiple lawsuits by the large number of class members allegedly injured by Defendants' antitrust violations would be costly and inefficient.") (citations omitted).

## 3. Ascertainability

"A plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015). To demonstrate ascertainability, a plaintiff must show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is a 'reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' " Id. (quoting Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013) ). Ascertainability should not be conflated with the predominance requirement. "Predominance focuses on whether the essential elements of the class claims can be proven at trial by 'common, as opposed to individualized, evidence.' " Boyle v. Progressive Specialty Ins. Co., No. 09-5515, 2018 WL 2770166, at *10 (E.D. Pa. June 7, 2018) (quoting Byrd, 784 F.3d at 164). Ascertainability, on the other hand, "focuses on whether the class members can be identified without resorting to 'individualized fact finding.' " Id. (quoting Byrd, 784 F.3d at 163, 164). "In other words, predominance considers the evidence necessary to establish the claims while ascertainability considers the criteria and means necessary to identify class members." Id. Ascertainability does not, however, require plaintiff to identify all class members at class certification; rather, "plaintiff need only show that 'class members can be identified.' " Byrd, 784 F.3d at 163 (quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013) ) (emphasis in Byrd); see also City Select, 867 F.3d at 439. "[A] party cannot merely provide assurances to the district court that it will later meet Rule 23's requirements." Byrd, 784 F. 3d at 164. "Nor may a party 'merely propose a method of ascertaining a class without any evidentiary support that the

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 136 of 260 PageID: 69800

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

method will be successful.' " Id. (quoting Carrera, 727 F.3d at 306-07, 311).

**\*19** The Third Circuit provides "three principal rationales for the ascertainability requirement." In re Tropicana Orange Juice Mktg. & Sales Practices Litig., No. 11-07382, 2018 WL 497071, at \*8 (D.N.J. Jan. 22, 2018), reconsideration denied, No. 11-07382, 2018 WL 2357749 (D.N.J. May 24, 2018). "First, 'ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of the class.' " City Select, 867 F.3d at 439 (quoting Carrera, 727 F.3d at 306 (3d Cir. 2013) ). "Second, it ensures that a defendant's rights are protected by the class action mechanism,' [ ] and that 'those persons who will be bound by the final judgment are clearly identifiable." Id. (quoting Carrera, 727 F.3d at 306; Marcus, 687 F.3d at 593). "Finally, 'it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action.' " Id. (quoting Carrera, 727 F.3d at 307).

### a. Third Circuit Ascertainability Precedent

"An examination of the various factual circumstances in which [the Third Circuit has] analyzed the ascertainability standards help to demonstrates its contours." City Select, 867 F.3d at 439. In Marcus, "plaintiff proposed a class of New Jersey purchasers of BMW vehicles equipped with 'run-flat tires' that had 'gone flat and been replaced' during the class period." Id. (quoting Marcus, 687 F.3d at 592). However, the defendant "did not have access to the records of which vehicles were equipped with the defective tires," the plaintiff "did not present a method of obtaining records from individual dealerships" to demonstrate whether the defective tires were replaced with regular tires, and plaintiff did not propose a method for ascertaining which purchasers' tires had gone flat and been replaced, as required by the class definition. Id. (citations omitted). "Because plaintiff merely left the answer to each of these questions to 'potential class members' say so,' " the Third Circuit remanded for consideration of "the critical issue of whether defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative." Id. at 439-40 (quoting Marcus, 687 F.3d at 594).

In Hayes v. Wal-Mart Stores, Inc., the Third Circuit "considered claims brought by a putative class of New Jersey retail discount club customers who purchased goods with extended warranties." Id. at 440 (citing Hayes, 725 F.3d

at 352). "Plaintiff's proposed class definition included all customers who purchased a 'Service Plan to cover as-is products' but excluded any customers whose 'as-is product was covered by a full manufacturer's warranty, was a last-one item, customers who obtained service on their product, and consumers who have previously been reimbursed for the cost of the Service Plan.' " Id. (quoting Hayes, 725 F.3d at 353). The Third Circuit determined that the class definition "required a number of separate factual inquiries to determine class membership: '(1) whether a Sam's Club members purchased a Service Plan for an as-is item, (2) whether the as-is item was a "last one" item or otherwise came with a full manufacturer's warranty, and (3) whether the member nonetheless received service on the as-is item or a refund of the cost of the Service Plan.' " Id. (quoting Hayes, 725 F.3d at 356). It remanded "so that plaintiff could propose reliable and administratively feasible methods of answering these questions without requiring 'extensive and individualized fact-finding.' " Id. (quoting Hayes, 725 F.3d at 356).

Next, in Carrera, the "District Court certified a class composed of all purchasers of a particular over-the-counter diet supplement over several years in the state of Florida." Id. (citing Carrera, 727 F.3d at 304). "Defendants in that case were the drug manufacturers, and thus did not have access to any retailers records that could have established which customers purchased the drug during the requisite time period." Id. (citations omitted). "Plaintiff proposed using 'retailer records of online sales and sales made with store loyalty or rewards cards' combined with affidavits from potential class members.' " Id. (quoting Carrera, 727 F.3d at 304). "But plaintiff had not sought, nor obtained, the proposed records during class discovery." Id. (citations omitted). The Third Circuit determined that further inquiry into the nature and extent of the available records was necessary and remanded. It "also noted that, even if the proposed records did exist, there was no evidence that a 'single purchaser,' let alone the whole class, could be identified using them.' " Id. (quoting Carrera, 727 F.3d at 309).

**\*20** Then, in Byrd, the Third Circuit "considered claims brought by people who leased computers with spyware that was installed and activated without their consent." Id. (citing Byrd, 784 F.3d at 160). "This class definition included both the lessees and their household members." Id. (citations omitted). "Defendants kept detailed records enabling identification of the lessees"—the lessees and owners amounted to 895 in total. Id. (citations omitted). The

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 137 of 260
PageID: 69801

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)

2018-2 Trade Cases P 80,574

Third Circuit concluded that "identification of the household members was unlikely to pose 'serious administrative burdens that are incongruous with the efficiencies expected in a class action.' " Id. (quoting Byrd, 784 F.3d at 170). The Third Circuit reasoned that "[a]ny forms used to indicate a household member's status in the putative class must be reconciled with the 895 known class members or some additional public records." Byrd, 784 F.3d at 171.

Finally, in City Select, plaintiffs "brought claims under the Telephone Consumer Protection Act against BMW who they alleged sent them unsolicited faxes through a database called 'Creditsmarts.' " In re Domestic Drywall Antitrust Litig., No. 13 -2437, 2017 WL 3700999, at *8 (E.D. Pa. Aug. 24, 2017). Plaintiff "sought to certify a class of 'all auto dealerships that were included in the Creditsmarts database on or before December 27, 2012, with fax numbers identified in the database who were sent one or more telephone facsimile messages between November 20, 2012 and January 1, 2013, that advertised the commercial availability of property, goods or services offered by BMW Bank of North America." Id. (quoting City Select, 867 F.3d at 437). The District Court denied certification, concluding that "even though [p]laintiff may be able to identify the potential universe of fax recipients, there is no objective way of determining which customers were actually sent the BMW fax." City Select, 867 F.3d at 437. The Third Circuit remanded "because the court determined that the use of the Creditsmarts database, which included the entire potential universe of class members because it was part of the class definition, in addition to affidavits, could have been a reliable and administratively feasible method of determining class membership." In re Domestic Drywall, 2017 WL 3700999, at *8. The Third Circuit "emphasized that in that case, due to the limited universe of potential plaintiffs, two policy considerations that underpin the administrative feasibility requirements were not concerns: facilitating opt-outs and identifying persons bound by the final judgment." Id.

### b. Is the class defined with reference to objective criteria?

Plaintiffs contend that the proposed Classes are defined with reference to objective criteria. Any person or entity that paid some or all of the purchase price of thalidomide in any form after November 6, 2010 or lenalidomide in any form after January 29, 2011 for their personal consumption or the consumption of their members or subscribers is a member

of the Classes (unless they fall within one of the named exclusions). See Lidoderm, 2017 WL 679367, at *25 (similar class definition found to be based on sufficiently objective criteria. The Court agrees. Moreover, Defendant does not provide any specific challenge under this first prong of the ascertainability analysis.

### c. Is there an administratively feasible method for determining class membership?

Defendant, does, however, contend that Plaintiffs have failed demonstrate a reliable and administratively feasible method for determining class membership. Specifically, Defendants contend that Plaintiffs have failed to provide sufficient information to identify (a) what entities or consumers are members of the class; (b) the flat copay consumers and fully insured health plans that are excluded; or (c) which entities or consumers have claims in the fourteen Damages Jurisdictions. Defendants also contend that Plaintiffs entirely ignore the role of PBMs and stop-loss insurers. Plaintiffs, relying heavily on City Select, respond that individual consumers may be identified using pre-existing documentation in combination with Defendant's REMS database. As for third-party payors, Plaintiffs contend that they possess substantial transaction data from pharmacies and that third-party payors can submit their own transaction data, in conjunction with documents showing that they are not fully insured. Finally, Plaintiffs argue that PBMs and stop-loss insurers are not part of the Damages Classes and, consequently, need not be identified for purposes of the ascertainability analysis.

### 1. Individual Consumers

**\*21** Plaintiffs propose four methods for identifying consumer class members: (1) purchase receipts; (2) pharma prescription records; (3) insurer prescription records; and (4) Celgene's REMS database. Defendants argue that these methods are insufficient.

Celgene's REMS database contains the last name, date of birth, partial social security number, prescribing physician, and dispensing pharmacy for each patient, and the name and address of every pharmacy dispensing either drugs. Thus, this case resembles Byrd and City Select, insofar as all potential individual consumers are listed in Defendant's own database. See In re Domestic Drywall, 2017 WL 3700999, at *10 (noting that, in both Byrd and City Select, the "possible

2018-2 Trade Cases P 80,574

universe of plaintiffs was defined with reference to a single database, and defendants claimed that there was difficulty ascertaining who among those listed in the database qualified for class membership"). However, the inquiry as to the ascertainability of consumer class members does not rest merely by noting the existence of the database. Plaintiffs must also demonstrate an administratively feasible method for excluding the single flat copay consumers, as required by the class definition.

Plaintiffs contend that application of the single flat copay exclusion can be determined through comparing consumer's purchase receipts or prescription history with the description of the prescription drug benefits provided by a health benefit plan or insurer. To demonstrate that this method is administratively feasible, Plaintiffs rely on David Mitchell's documentation. Defendant argues that this proposed method necessitates individualized inquiry, thereby rendering it infeasible on its face. Defendant further contends that, even if such an individualized inquiry is not per se infeasible, it is infeasible here because of the complicated nature of the analysis. The Court agrees.

According to Plaintiffs, identifying individuals with a flat copay is as simple as comparing the amount and date of a drug purchase on a purchase receipt or prescription history with the description of the prescription drug benefit provided by the individual's health benefit plan or insurer. Indeed, federal law requires non-governmental employee benefit plans to give participants and their beneficiaries a "Summary Plan Description" ("SPD"). See 29 U.S.C. § 1022. Plaintiffs contend that every third party payor class representative provided its participants and beneficiaries with a summary document stating in plain English that brand and generic drugs are subject to different co-pay amounts. In support of this proposition, Plaintiffs provide a 2016 receipt for a drug purchase by David Mitchell and a copy of his SPD from 2016. See Ex. 97-99, ECF No. 150.

Defendant identifies several problems with the proposed methodology. First, Defendant provides evidence that the SPDs and plan benefit statements are often inaccurate or unavailable. For example, Defendant points to Plaintiff IUB, whose health plan is an SPD that has not been updated since it was issued in 1999. ECF No. 182, Ex. 6 at 114:25-115:24. Instead, notices about benefit changes have been sent to plan members over the last two decades. To identify what any particular benefit was in any particular year, one "would need to look at th[e] 1999 Summary

Plan Description and also look at all of the subsequent notices" because there is "[n]o official document ... that would summarize it all nice and neat." Id. at 121:13-25. Defendant identifies similar issues with respect to Plaintiff NEC's SPD. See Werner Dep. at 97:23-98:11, ECF No. 182.4, Ex. 2 (NEC has an SPD from 2005 that it did not update until 2016). Second, Defendant asserts that—even assuming accuracy and availability—the documents do not necessarily indicate whether consumers are excluded as uninjured flat copay consumers.

**\*22** Plaintiffs do not directly rebut any of these assertions, citing to the documentation of David Mitchell for their assertion that excluded consumers are identifiable. However, Defendant contends that even Mitchell's information is problematic. Specifically, Defendant argues that the information provided by Mitchell—a 2016 receipt and a 2016 brochure—fails to account for the entire period in which Mitchell took Revlimid, which began in 2010. Moreover, Mitchell testified that the 2016 enrollment brochure did not accurately reflect his copayment for Revlimid and that he needed to call the specialty pharmacy to determine his copay for any particular prescription. ECF No. 182, Ex. 5 at 80:23-81:3, 85:7-13; 102:10-104:7). In sum, Plaintiffs ask the Court to rely on the incomplete records of one consumer to find there is a feasible, reliable method for ascertaining the excluded members of the consumer class. However, Plaintiffs fail to rebut or account for the deficiencies in their proposed methodology, and the Court is not satisfied, at this juncture, that the proposed methodology will prove effective. Consequently, the Court agrees with Defendant that Plaintiffs have failed to present evidence of a reliable "mechanism for determining whether putative class members fall within the class definition," insofar as it relates to individual consumers. Byrd, 784 F.3d at 163. On any renewed motion, Plaintiffs are directed to demonstrate that the excluded, flat co-pay members of the class can be identified using the proposed records. See Carrera, 727 F.3d at 309.

### 2. Third Party Payors

Turning to TPPS, Plaintiffs contend that they have substantial transaction data from pharmacies that dispensed Thalomid and Revlimid during the class period—accounting for about half of all prescriptions—in which third-party payor purchasers are identified. Plaintiffs also argue that third-party payors can submit their own transaction data as proof of purchases, in conjunction with documents showing they

2018-2 Trade Cases P 80,574

are not fully insured. Defendant responds that the pharmacy data is incomplete and unavailable. The Court finds that the proposed method of identifying third party payors is administratively reliable and feasible.

Plaintiffs assert—without dispute—that every named Plaintiff maintains records of claims for its drug purchases, and insurance companies maintain claim records in the ordinary course of business. See, e.g., Ex. 90, 91, 92, ECF No. 150. In addition, Plaintiffs also have transaction data from 24 pharmacies that dispensed Thalomid and Revlimid during the Class Period, constituting about half of the total volume shipped by Celgene. Leitzinger Rep. ¶ 46. Plaintiffs contend that "[t]hese data usually contain a field identifying the TPP, which can be used to confirm a TPP's purchase." See, e.g., Ex. 93, 94, ECF No. 150.

Defendant highlights the fact that Plaintiffs have been able to gather only half of the transaction data from the pharmacies dispensing Thalomid and Revlimid, despite issuing subpoenas over a year ago. Defendant contends that Plaintiffs' failure to obtain all relevant records "heightens the ... concern that pharmaceutical records may not be obtainable for use in the ascertainability inquiry." Wellbutrin, 308 F.R.D. at 150 (discussing plaintiffs' failure to obtain records despite service of subpoenas during discovery); accord Carrera, 727 F.3d at 308–09 (class unascertainable in part because plaintiffs had not obtained during class discovery the retail records that they proposed to use to show diet supplement purchases). Moreover, Defendant analogizes to Vista Healthplan, where the court determined that the class was unascertainable. There, plaintiffs provided the customer history of one named consumer plaintiff, which they had obtained from that consumer's pharmacy, and a "chart of claims data that ... lists patients by number and identifies ... the submitted cost of the prescription and the copayment paid by the consumer." 2015 WL 3623005, at *9. The court determined that "[p]laintiffs have failed to present any evidence that they have developed a methodology for ascertaining the identities of class members, aside from simply assuring the court that records of ... prescriptions exist. Nor have [p]laintiffs presented any evidence to demonstrate that it is possible to ascertain class members in an administratively feasible manner without highly individualized inquiry." Id. at *13.

Vista Healthplan is not analogous here, with respect to TPP purchases. Unlike the plaintiffs there, Plaintiffs here provided evidence demonstrating that TPPs' own transaction data is

useable as proof of purchases. Defendant does not rebut this showing. Consequently, the Court does not find that ascertaining the membership of TPPs is problematic for certification, even if Plaintiffs are unable to procure all of the relevant pharmacy records.

### 3. PBMs

 *23  Defendant contends that PBMs are potential class members because they may have paid a portion of the price of Thalomid and Revlimid as a result of spread pricing arrangements or price discount guarantees. Defendant further asserts that Plaintiff has not proposed any method, let alone an administratively feasible one, for ascertaining which PBMs bore a portion of the payments. Plaintiffs argue that PBMs do not pay any portion of the payments and, thus, are not class members, thus obviating the need for an ascertainability analysis. The Court agrees with Plaintiffs.

Defendant relies extensively on the court's decision in Wellbutrin to support their position that PBMS are both potential members of the class and that their potential membership is not readily ascertainable. 308 F.R.D. 134. In Wellbutrin, like here, plaintiffs "argue[d] that PBMs are not potential class members," and thus did "not need to show that [they] can ascertain which PBMs are class members and which are not." Id. at 148. The court disagreed, finding "PBMs are potential class members because they may have paid a portion of the retail purchase price ... via so-called 'spread pricing arrangements' or 'price discount guarantees.' " Defendant contends that the same reasoning is fatal to the instant motion.

Defendant reasons that most sponsors, and all named Plaintiffs who are sponsors, use PBMs. Hughes Rep. ¶¶ 21, 48. Accordingly, each Thalomid and Revlimid claim paid by such a sponsor was paid to the pharmacy in the first instance by the PBM, which later would have sought reimbursement from the sponsor for the purchase price pursuant to the parties' contract. Defendant argues that, if the PBM paid more to the pharmacy than it received in reimbursement from the sponsor, it would be a class member, as it would have paid a portion of the price after accounting for payments by other entities. Defendant rightly contends that Plaintiffs have not identified which PBMs bore a portion of the payments for Thalomid and Revlimid. The same failing led the Wellbutrin court to find that "[t]here are thousands of PBMs and retail pharmacies; the [plaintiff] has not produced any evidence

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 140 of 260
PageID: 69804
In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)
2018-2 Trade Cases P 80,574

showing that it could synthesize records from these disparate entities and use them to ascertain PBMs ... in a reliable and administratively feasible manner." 308 F.R.D. at 150.

To remove any question of PBMs class membership, Plaintiffs propose excluding them from the class. While this solution would remove any potential ascertainability issues, it would potentially raise other concerns to the extent that PBMs do, in fact, bear responsibility for some or all of the purchase price of Thalomid and Revlimid. See In re Skelaxin, 299 F.R.D. at 575 (finding, in a similar delayed entry case, that excluding PBMs—or finding them excluded under the class definition—would create issues with plaintiffs' impact and damages model because the model would "incorporate damages suffered by TPPs who are ostensibly excluded from the class" and that "such a model could be problematic" because the it would not measures those damages "attributable only to End Payors' theory") (emphasis in original). Thus, if the Court finds that PBMs potentially bear part or all of the cost of Thalomid and Revlimid, it would create issues either with ascertainability or, if PBMs are excluded, with the classwide damages model.

However, neither of these potential issues are relevant here, as the Court is not convinced that PBMs potentially bear any or part of the cost of Thalomid and Revlimid. First, Dr. Hughes has provided no evidence to support his opinion that PBMs may have paid pharmacies more for a drug than they received from the third-party payor. See Ex. 112, Hughes Dep. 246:22-247:15 (admitting that he had no citation to support his opinion). Dr. Hughes could not name an example of this happening. Id. at 81:23-83:17. The court in Lidoderm considered Dr. Hughes opinion that PBMs could potentially pay part of the price of a drug and concluded that, "[a]s with spread pricing, defendants identify a general, theoretical risk without substantiating the true impact (if any) of that risk." 2017 WL 679367. Ultimately, the Lidoderm court found that "defendants criticize [plaintiff's] model for its failure to exclude damages born by the PBMs that resulted from the speculated failure of the PBMs to effectively negotiate rebates and set spread prices. However, ... there is no evidence either of these scenarios actually occurred to PBMs" with respect to the product at issue. Id. at 25 (emphasis in original). There, as here, "[d]efendants' speculation cannot defeat certification."[5] Id.

### 4. Purchases Falling Within the
### Relevant Jurisdictions' Laws

**\*24** Defendant contends that, because the proposed Damages Classes are limited to persons or entities that purchased or paid for Thalomid or Revlimid in the fourteen Damages Jurisdictions, it is fundamental that Plaintiffs articulate a method to identify the purchases of Thalomid and Revlimid covered by the Damages jurisdictions while excluding other purchases. Defendant further contends that Plaintiffs have not, in fact, offered a method for determining which purchases fall within the jurisdictions at issue and, to make matters worse, they argue that Plaintiffs fail to apply a consistent criterion for deciding which state's laws apply to a given purchase. Plaintiffs reply that the method for ascertaining whether a purchase was made in a Damages Jurisdiction is simple: did the purchaser pay for some or all the purchase price of Thalomid or Revlimid in a Damages Classes state? For consumers, Plaintiffs contend "a purchase occurs during the transaction with the pharmacy, which for Thalomid or Revlimid typically takes place over the telephone. So if consumers were in a Damages Class state when they made the purchase, then (as long as they do not pay a flat co-pay for all prescriptions) they are members of the Damages Classes." Pl. Reply at 8; see In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) (plaintiffs may sue under laws of states in which they reside or in which they purchased drug). Health plans "can also be members of the Damages Classes if they themselves are located in one of the Damages Class states, as these health plans are paying for some or all ... of the purchase price of Thalomid or Revlimid from the state in which they are located." Pl. Reply at 9; see In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) (finding plaintiff health and welfare plans had "standing to bring a claim under the laws of the states where they are located, and where they purchased Flonase or reimbursed their members for Flonase purchases").

In sum, while the Court disagrees with most of Defendant's contention regarding ascertainability, it nonetheless finds that Plaintiffs have failed to provide an administratively feasible method of determining class membership. In any renewed motion, Plaintiff must demonstrate that excluding flat co-pay consumers will not require extensive individualized inquiry and mini-trials.

### C. Rule 23(b)(2) Injunction Class

2018-2 Trade Cases P 80,574

In addition to the Damages Classes, Plaintiffs also seek to certify an Injunction Class under Rule 23(b)(2). A class action is "maintainable under Rule 23(b)(2) when 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Barnes v. Am. Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998) (quoting Fed. R. Civ. P. 23(b)(2) ). "Subsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.' " Id. (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note) ).

Defendant raises one primary argument against certifying the Rule 23(b)(2) class—the relief sought by Plaintiffs is primarily monetary. See, e.g., In re Arthur Treacher's Franchise Litig., 93 F.R.D. 590, 594 (E.D. Pa. 1982) (denying class certification because "the relief sought is predominantly money damages"); Hall v. Burger King Corp., No. 89-0260, 1992 WL 372354, at *11 (S.D. Fla. Oct. 26, 1992) (finding that, "where antitrust plaintiffs seek treble damages, certification under Rule 23(b)(2) is improper even if injunctive relief is sought as well"). Defendant notes several cases where Courts refused to certify 23(b)(2) classes "even where injunctive classes have been proposed alongside separate damages classes if the 'primary intent' driving the action 'is to recovery damages for past purchases.' " Def. Br. at 50 (quoting In re Flash Memory Antitrust Litig., No. C 07-0086, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010); see also In re Processed Egg Prods. Antitrust Litig., 321 F.R.D. 555, 558 (E.D. Pa. 2017) (stating that "[a]ntitrust cases ... at their core, revolve around money" and, consequently, "the very nature of antitrust claims does provide good cause for a court to examine a request for (b)(2) certification with some good faith skepticism").

Plaintiffs contend that the relief sought is not primarily monetary here because a large portion of the proposed Injunction Class—namely, the members that are not in the Damages Jurisdictions—is not seeking money damages. See, e.g., In re OSB Antitrust Litigation, 2007 WL 2253425, at *18 ("Although the classes are represented by the same named [p]laintiffs, they are not identical. The nationwide class potentially includes many members from states that do not permit damages actions. Thus, a significant portion of the nationwide class seeks injunctive relief only. In these circumstances, it is appropriate to certify two separate classes under Rule 23(b)(2) and 23(b)(3)"); Cohen v. Chicago Title Ins. Co., 242 F.R.D. 295, 301 (E.D. Pa. 2007) (rejecting argument that plaintiff sought primarily monetary damages and certifying Rule 23(b)(2) and (b)(3) classes, as "[a]ny remedy could include both money damages and enjoining the conduct"); Wilson v. County of Gloucester, 256 F.R.D. 479, 491–92 (D.N.J. 2009) ("certifying the equitable portion of this suit under (b)(2), and the damages portion under (b)(3), allows for the best of both worlds").

*25 The Court will not apply a brightline rule, as suggested by Defendant. Rather, the Court finds "that when a Rule 23(b)(2) class is proposed alongside Rule 23(b)(3) classes, the correct approach is to rigorously analyze whether the proposed class is appropriate." In re Processed Egg Products, 312 F.R.D. at 166. The Court finds that Plaintiffs "have not met their burden of demonstrating that certification of the Rule 23(b)(2) class is appropriate." Id. at 170. Plaintiffs have devoted only a fraction of their analysis to discussing the legal requirements of Rule 23(b)(2). One specific issue that must addressed in any renewed motion is "the preclusive effect of an injunction-only class action on class members' ability to bring subsequent damages claims." See In re Skelaxin, 299 F.R.D. 555 ("Many courts have acknowledged the claim preclusive difficulties associated with injunction-only class actions"); see also In re Processed Egg Prod. Antitrust Litig., 312 F.R.D. 124, 171 (E.D. Pa. 2015). Because Plaintiffs have not sufficiently met their burden on this point, the Court will deny the motion in its entirety.

### III. Conclusion

Based on the foregoing, the Motion for Class Certification and Appointment of Class Counsel, ECF No. 149, is **DENIED** without prejudice. The parties are directed to meet with the Magistrate Judge regarding a renewed motion schedule.

### All Citations

Not Reported in Fed. Supp., 2018 WL 6573118, 2018-2 Trade Cases P 80,574

### Footnotes

In re Thalomid and Revlimid Antitrust Litigation, Not Reported in Fed. Supp. (2018)
2018-2 Trade Cases P 80,574

1     The exclusion for stop-loss insurers, along with pharmacy benefit managers, was not included in Plaintiffs' original class definition; rather, it was proposed in Plaintiffs' reply brief in support of their motion for class certification.

2     Both Solodyn and Lidoderm relied on the First Circuit's holdings in Nexium, which—as discussed above—run contrary to the Third Circuit's standards of proof at the time of class certification.

3     In reaching this conclusion, the First Circuit rejected argument that class certification was appropriate, regardless of whether a method for excluding brand loyalists was sufficient, because defendant "would only be found liable and forced to pay damages if the jury found that [its] actions unlawfully raised the price paid by consumers by a specified amount, and if the jury also determine the percentage of sales for which that price surcharge would not have been paid but for the illegal conduct." Id. at 29. In other words, the "total aggregate damages award would therefore in theory net out all purchases by brand loyal consumers as a group." Id. In rejecting this argument, the First Circuit explained that certifying a class containing a large percentage of uninjured members so long as the aggregate damages were reduced proportionally "would fly in the face of the core principle that class actions are the aggregation of individual claims, and do not create a class entity or re-apportion substantive claims." Id. Plaintiffs here advance a similar argument, contending that question of brand loyalists is a question for damages allocation. For the same reasons articulated in Alcasol, the Court rejects this argument.

4     Dr. Hughes agreed that a consumer would still suffer an injury after reaching the copay assistance maximum. Hughes Dep. at 180:21-181:15.

5     Defendant provides a declaration from the CEO of IUB's PBM, which states that the PBM may pay the pharmacy either more, less, or the same amount that it receives from the Sponsor. Again, the Court does not disagree that it is theoretically possible that a PBM end up paying part of the price of a prescription. Rather, the Court finds that this theoretical, unsubstantiated risk is not borne out by any evidence in the record.

---

**End of Document**                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 11

2017 WL 1902160
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE VOLKSWAGEN TIMING CHAIN
PRODUCT LIABILITY LITIGATION

Civil Action No.: 16-2765 (JLL)
|
Signed 05/08/2017

**OPINION**

JOSE L. LINARES, UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court by way of Defendant Volkswagen Group of America, Inc.'s Motion to Dismiss Plaintiffs First Amended Complaint (ECF No. 6 ("Compl.")) and Compel Arbitration pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 36). Plaintiffs have collectively submitted an opposition (ECF No. 40), which Defendant has replied to (ECF No. 42). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants in part and denies in part Defendant's Motion to Dismiss.

## I. BACKGROUND [1]

### A. The Parties

Plaintiff David Zimand is a citizen and resident of the State of New Jersey, who leased and later purchased a 2009 Volksagen ("VW") Jetta Wolfsburg Edition equipped with a 2.0L TSI [2] engine from a VW and Audi authorized dealer, Jack Daniels Motors Inc., in Fairlawn, New Jersey. (Compl. ¶ 18). Additionally, Plaintiff Chris Drake, who is also a citizen and resident of New Jersey, purchased a 2010 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 26).

Also, Plaintiff Jay Melman, who is a citizen and resident of the State of New York, purchased a 2010 VW Tiguan equipped with a 2.0L TSI engine in New York. (Compl. ¶ 24). Additionally, Plaintiff Hamza Deib, another citizen and resident of New York, purchased a 2010 Audi A4 equipped with a 2.0L TFSI [3] engine. (Compl. ¶ 46). Plaintiff Rosario

Panepinto, who is also a New York citizen and resident, purchased a 2009 VW Jetta equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 48).

Next, Plaintiff Anoushirvan Nadiri is a citizen and resident of the State of California, who purchased a new 2011 VW GTI equipped with 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 27). Additionally, Plaintiffs Jennifer Piumarta and William R. Swihart, who are also California citizens and residents, purchased a certified pre-owned 2010 Audi A3 equipped with a 2.0L TFSI engine and a 2009 Audi A4 Avant equipped with a 2.0L TSI engine, respectively, from authorized Audi dealers. (Compl. ¶¶ 28, 29). Furthermore, California citizen and resident Plaintiff Umar Ellahie "entered into a contract for a 2010 Volkswagen CC from Sunnyvale Volkswagen in Sunnyvale, California." (Compl. ¶ 62).

Furthermore, Plaintiff Dawn Stanton Blanchard, who is a Florida citizen and resident, leased a 2011 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer, South Motors Volkswagen, in Miami, Florida. (Compl. ¶ 32). In addition, Plaintiffs Luis F. Lopez and Shimelesse Mekbeb, who are also citizens and residents of Florida, purchased a 2009 A4 Quattro equipped with a 2.0L TFSI engine and a 2009 VW Jetta equipped with a 2.0L TSI engine, respectively. (Compl. ¶¶ 36, 37). Also, Florida citizens and residents Plaintiffs Allison Fleck and William Fleck leased and then purchased a 2012 Volkswagen EOS from Volkswagen of Freehold in Freehold, New Jersey. (Compl. ¶ 65).

**\*2** Further, Plaintiff Rafael Serbia, a citizen and resident of the State of Connecticut, purchased a new 2011 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 31). Another citizen and resident of Connecticut, Plaintiff Karl Molwitz purchased a pre-owned 2009 Volkswagen Tiguan from Danbury Volkswagen in Danbury, Connecticut. (Compl. ¶ 56). Moreover, Plaintiff Allan Gaudet, who is also a citizen and resident of Connecticut, "entered into a contract for a 2011 Volkswagen GTI from Crowley Volkswagen in Plainville, Connecticut." (Compl. ¶ 59).

Illinois citizen and resident Plaintiff Erika Sennsnovispurchased a certified pre-owned 2011 Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 39). Plaintiff Katrina Calihan, also a citizen and resident of Illinois, purchased a certified pre-owned 2010 Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 40).

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

Next, Plaintiff John Schaffranek, a citizen and resident of the Commonwealth of Pennsylvania, purchased a 2010 VW CC. (Compl. ¶ 53). Also a citizen and resident of Pennsylvania, Plaintiff Jeffery Pipe purchased a new 2009 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 51).

Moreover, Plaintiff Dena Stockalper is a citizen and resident of the State of Arkansas, who purchased a 2012 VW EOS Lux equipped with a 2.0L TSI EA888 engine in Springdale, Arkansas. (Compl. ¶ 22). Next, Plaintiff Hannah LeMoine, who is a citizen and resident of the State of Colorado, purchased a 2010 Audi A3 equipped with a 2.0L TSI engine. (Compl. ¶ 30). Plaintiff Robby Smith, a citizen and resident of the State of Georgia, purchased a certified pre-owned 2010 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 38). Additionally, Plaintiff Garrett Johnson, who is a citizen and resident of Indiana, purchased a 2009 Audi A4 equipped with a 2.0L TFSI engine. (Compl. ¶ 41).

Furthermore, citizen and resident of the State of Kansas, Plaintiff Neel Mody purchased a new 2012 VW Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 42). Plaintiff Debra Ann Haggerty, who is a citizen and resident of the State of Michigan, purchased a new 2012 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 43). In addition, Plaintiff David Zhao, a citizen and resident of the State of Minnesota, purchased a new 2012 Audi Q5 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 44). Additionally, Plaintiff Suzanne Noyes, a citizen and resident of the State of New Hampshire, purchased a 2012 VW Tiguan equipped with a 2.0L TSI engine. (Compl. ¶ 45).

Next, Plaintiff Jason Hosier is a citizen and resident of the State of Maryland, who purchased a 2010 VW Tiguan equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 47). Additionally, citizen and resident of the State of North Carolina, Plaintiff Debra J. Oles purchased a 2008 VW Passat equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 49). Plaintiff James I. Scott, IV, a citizen and resident of the State of Ohio, purchased a 2011 VW GTI equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 50). Additionally, Plaintiff Michael A. Borchino, who is a citizen and resident of the State of South Carolina, purchased a new 2012 VW CC equipped with a 2.0L TSI engine from an authorized VW dealer. (Compl. ¶ 52).

Moreover, Plaintiff Pamela K. Kane, a citizen and resident of the State of Texas, purchased a new 2010 Audi A4 equipped with a 2.0L TFSI engine from an authorized Audi dealer. (Compl. ¶ 54). Additionally, citizen and resident of the State of Washington, Plaintiff Zachariah Gossman purchased a 2009 Audi A4 equipped with a 2.0L TFSI engine. (Compl. ¶ 55). Next, Plaintiff Bartosz Zielezinski, who is a citizen and resident of the State of Nevada, purchased a 2012 Audi A5 from AutoNation Volkswagen in Las Vegas, Nevada. (Compl. ¶ 67).

**\*3** Finally, Defendant Volkswagen Aktiengesellschaft ("VWAG") is a German corporation that designs, develops, manufactures, and sells automobiles. (Compl. ¶ 73). VWAG is the parent corporation of Defendants Volkswagen Group of America, Inc. ("VW America") and Audi Aktiengesellschaft ("Audi AG"). (Compl. ¶ 73). Defendant VW America is a New Jersey corporation that acts in the furtherance of the interests of VWAG, which includes the advertising, marketing, and sale of VWAG and VW America (collectively referred to as "VW") automobiles nationwide. (Compl. ¶ 74). Defendant Audi AG is a German corporation that designs, develops, manufactures, and sells luxury automobiles under the Audi brand name. (Compl. ¶ 75). Audi AG is the parent corporation of Audi of America, Inc. ("Audi America"), which is a Delaware corporation that, *inter alia*, advertises, markets, and sells Audi AG and Audi America (collectively referred to as "Audi") automobiles nationwide. (Compl. ¶ 76).

**B. Procedural History**

Plaintiff initially brought this putative class action on May 16, 2016. (ECF No. 1). Thereafter, Plaintiffs filed their "First Consolidated Class Action Complaint" on August 22, 2016, (ECF No. 6), which, as noted above, is currently the operative complaint. Plaintiffs bring this class action against Defendants individually, and on behalf of all persons similarly situated in the United States who purchased, own, owned, lease, or leased a 2008 through 2013 model year 2.0L TSI or 2.0L TFSI VW or Audi vehicle containing the allegedly defective Timing Chain System [4] (the "Class Vehicles"). (*See generally* Compl.). On December 12, 2016, Defendant VW America filed the instant motion to dismiss and compel arbitration of the claims. (ECF No. 36).

**C. Timing Chain Systems**

92 UCC Rep.Serv.2d 754

Each Plaintiff either leased or purchased a Class Vehicle manufactured and/or sold by Defendants. (Compl. ¶¶ 79, 80). The Class Vehicles are equipped with 2.0L TSI or 2.0L TFSI EA888 four-cylinder turbocharged gasoline engines, which contain the allegedly defective Timing Chain System. (Compl. ¶ 81, 89).

### a. Engine Mechanics and Components

A "combustion" is required in order for a conventional four-stroke internal combustion engine to function. (Compl. ¶ 87). First, the engine's intake valves open in order to allow fuel and air to enter into the piston combustion chamber. (Compl. ¶¶ 88, 91). The valves then close so that the "rising piston can compress the air and fuel right below the spark plug," which then results in a combustion that drives the piston down. (Compl. ¶ 91). This combustion produces byproducts that must be removed in order for further combustion to occur. (Compl. ¶ 87). Thus, the exhaust valves open so that the "rising piston can expel the combusted air and fuel mixture" resulting from the combustion. (Compl. ¶ 91).

Crucial to the proper operation of the engine is the synchronization of the piston movements with the opening and closing of the intake and exhaust valves. (Compl. ¶¶ 87, 92). Therefore, a timing chain is added to physically connect the crankshaft, which is connected to the pistons, to the camshaft, which opens and closes the valves. (Compl. ¶ 88). If the timing chain system fails, then "synchronization is lost and the four-stroke cycle will be disrupted," which may result in power loss or engine failure. (Compl. ¶ 92).

### b. The Class Vehicles

Here, the 2.0L TSI and 2.0L TFSI both use a double overhead camshaft ("DOHC") configuration with two camshafts connected to the crankshaft by a timing chain. (Compl. ¶ 89). This engine is specifically an interference engine, such that the intake or exhaust valves, when fully open, extend into the area in which the piston travels. (Compl. ¶ 89). Therefore, a stretched, broken, or dislocated timing chain could severely distort the camshaft timing, which could cause the pistons to collide into the valves, leading to damaged pistons and/or valves. (Compl. ¶ 89). This could cause substantial engine failure, which is expensive to repair or replace. (Compl. ¶ 89).

### D. The Defective Timing Chain System

### a. The Chain Tensioner

**\*4** Plaintiffs claim that the source of the defect in the Timing Chain System is the Hydraulic Tensioner, Camshaft Chain Drive (the "Chain Tensioner"), which keeps the timing chain in proper tension—which is crucial in preventing "jumps"—through oil pressure. (Compl. ¶¶ 96, 97). Since oil pressure is only available when the vehicle is turned on with the engine running, there is little to no oil pressure when the vehicle is turned off or is starting up. (Compl. ¶ 97). Thus, the Chain Tensioner uses a mechanical mechanism during the latter in order to keep the chain tight. (Compl. ¶ 97). This mechanism requires several key components: a steel retainer clip, a piston retainer pin, a ratchet pawl, and piston teeth. (Compl. ¶ 98). According to Plaintiffs, the failure of the ratchet pawl caused the loss of tension on the timing chain, which then allowed the timing chain to "jump a tooth" during start up, causing the bending of intake valves and subsequent engine failure. (Compl. ¶ 99).

Ordinarily, when the engine is running, there is an internal spring that augments oil pressure in order to push a piston against a timing chain tensioning rail, which presses against the timing chain and maintains its tension. (Compl. ¶ 97). When the engine is off and there is no oil pressure to push the piston out, a ratchet pawl is used to prevent the piston from collapsing inward. (Compl. ¶ 100). The piston incorporates ratchet teeth and a retaining clip in order to hold a detached pawl above the piston. (Compl. ¶ 100). If the pawl teeth are broken or worn, or if the retaining clip fails to hold the pawl in position, then the piston will not hold the proper tension on the chain when oil pressure is low. (Compl. ¶ 100). This low tension can cause the chain to "jump a tooth," which may subsequently cause the camshaft to be out of sync with the crankshaft and pistons. (Compl. ¶ 100).

### E. Defendants' Knowledge and Omissions

Plaintiffs claim Defendants knew or should have known of the defect in the Timing Chain Systems and "fraudulently, intentionally, negligently and/or recklessly concealed [the defect] from Plaintiffs and members of the Classes...." (Compl. ¶ 106).

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

### a. Knowledge

First, Defendants released several technical service bulletins ("TSB") from 2010 to 2012 regarding the timing chain issues with the Class Vehicles. (Compl. ¶¶ 111–122). They specifically described noise coming from the timing chains, difficulty starting engines, and possible damage to the camshaft. (Compl. ¶¶ 112–119). In 2012, a TSB stated that the "[t]iming chain tension may be incorrect due to [the] tensioner," causing skips in the timing chain. (Compl. ¶ 116). At this time, dealers were instructed to repair the Timing Chain System when customers complained of rattling noises after the engine started, issues with the engine not starting, or the "check engine" light being on. (Compl. ¶ 117). Such TSBs were not available publicly and were not disclosed to owners or lessees. (Compl. ¶ 121).

Second, consumer complaints were made to the National Highway Traffic Safety Administration ("NHTSA") regarding failures of the Chain Tensioner that were causing problems with the Timing Chain System. (Compl. ¶¶ 123–125). Several of the consumers experienced sudden and complete engine failure. (Compl. ¶ 125). Plaintiffs assert that Defendants have a duty to identify potential defects in their vehicles, and that the monitoring of NHTSA complaints falls within this duty. (Compl. ¶ 123).

Third, Defendants significantly redesigned the Chain Tensioner in 2012. (Compl. ¶¶ 126–127). Specifically, the ratchet pawl of the earlier Chain Tensioner was accessible from outside the part, and needed an external steel retainer clip to keep its position. (Compl. ¶ 127). The "Redesigned Tensioner" no longer needed the external retainer clip because the grooved tensioner piston and internal clip were placed inside the structure. (Compl. ¶ 127). This change is significant because the earlier Chain Tensioner utilized a sintered metal (type of metal forged by being heated beyond its melting point such that its particles formed a molecular bond), which is weaker than other forged metal. (Compl. ¶¶ 128–129). The sintered metal pawl could no longer function properly after approximately 50,000 miles because its teeth would significantly erode. (Compl. ¶ 129).

**\*5** Additionally, Defendants redesigned the timing chain incorporated by the Timing Chain System. (Compl. ¶ 130). Specifically, the earlier timing chain had "alternating rows of link plate thickness," which may have allowed the chain

to stretch, subsequently affecting the Timing Chain System. (Compl. ¶ 130).

Plaintiffs further assert that even if Defendants did not have actual knowledge, they should have at least been put on notice of the Timing Chain System defects following the number of replacement components and revisions. (Compl. ¶ 153). Additionally, Plaintiffs allege that predecessor models of the Class Vehicles used identical Timing Chain System components that were also experiencing premature failure. (Compl. ¶ 153).

### b. Omissions

Not only do Plaintiffs assert that Defendants had knowledge of the Timing Chain System defect, but they also assert that Defendants intentionally concealed this defect from Plaintiffs and other Class Vehicle purchasers and/or lessees. (Compl. ¶ 151).

First, Plaintiffs' omission claims are based on Defendants' representations in the USA Warranty and Maintenance schedules provided with the Class Vehicles that the Timing Chain System is "intended and reasonably expected to last for the useful life of the engine and at least 120,000 miles without the need for repair or replacement." (Compl. ¶ 94). Specifically, several of Defendants' maintenance schedules do not require maintenance of the Timing Chain System within 120,000 to 135,000 miles. (Compl. ¶ 94; *see* Compl. at Exhibits A, B, E, G). Thus, Plaintiffs allege that Defendants set forth incorrect maintenance recommendations in its Class Vehicle owner manuals and concealed these inaccuracies from Class Vehicle owners and/or lessees. (Compl. ¶¶ 143, 158–161, 181).

Next, Plaintiffs allege that Defendants deceived Plaintiffs and other Class Vehicle purchasers and/or lessees by failing to disclose material information regarding the Timing Chain System defects and the impact this would have on future repairs, costs, and reliability. (Compl. ¶ 189). Further, Plaintiffs allege that Defendants concealed their knowledge during the express warranty period in order to shift the costs of repair and replacement to Plaintiffs once the period expired. (Compl. ¶ 151): Even when several of Plaintiffs' Class Vehicles showed signs of premature failure—that only Defendants could identify or know of—within the express warranty period, Defendants did not disclose the existence of the defect. (Compl.¶¶ 139, 141). The express warranty

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

included "bumper to bumper coverage for 3 years or 36,000 miles, whichever occur[red] first," and "a Powertrain Limited Warranty for '5 years or 60,000 miles whichever occur[red] first.' " (Compl. ¶ 9). Moreover, Plaintiffs allege Defendants continued to sell the Class Vehicles containing the defect and refused to fully compensate Plaintiffs who experienced Timing Chain System failures after the expiration of the express warranty. (Compl. ¶ 138). Thus, Plaintiffs assert that they were deprived of the "right to have such defective part replaced for free under the warranty." (Compl. ¶ 189).

Plaintiffs further allege that these material omissions concerning the defective Timing Chain System protected Defendants' corporate profits since Plaintiffs and other members of the putative class would not have purchased the vehicles or would have purchased them at a lower price had they been aware of the defects. (Compl. ¶¶ 192, 193).

## II. LEGAL STANDARD

**\*6** To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. ANALYSIS

Based on the aforementioned allegations, Plaintiffs brought the within suit seeking to recover damages for the following causes of action, individually and on behalf of the putative class: Count I—Fraud; Count II—Breach of Contract; [5] Count III—Negligent Misrepresentation; Count IV—Breach of Express Warranty; Count V—Breach of Implied Warranty; Count VI—Violation of the Magnuson-Moss Warranty Act; Count VII—Unjust Enrichment. (*See* Compl. at 74–91).

Additionally, each group of Plaintiffs from the various different States have brought putative sub-class actions asserting the following violations of State consumer fraud and/or consumer protection laws: Count VIII—Violation of the New Jersey Consumer Fraud Act; Count IX—Violation of the Arkansas Deceptive Trade Practice Act; Count X—Violation of California's Unfair Competition Law; Count XI—Violation of the California Consumer Legal Remedies Act; Count XII—Violation of the Colorado Consumer Protection Act; Count XIII—Violation of the Connecticut Unfair Trade Practices Act; Count XIV—Violation of the Connecticut Product Liability Act; Count XV—Violation of the Florida Deceptive and Unfair Trade Practices Act; Count XVI—Violation of the Georgia Uniform Deceptive Trade Practices Act; Count XVII—Violation of the Georgia Fair Business Practices Act of 1975; Count XVIII—Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; Count XIX—Violation of the Indiana Deceptive Consumer Sales Act; Count XX—Violation of the Kansas Consumer Protection Act; Count XXI—Violation of the Maryland Consumer Protection Act; Count XXII—Violations of the Michigan Consumer Protection Act; Count XXIII—Violation of the Minnesota Prevention of Consumer Fraud Act; Count XXIV—Violation of the Minnesota Uniform Deceptive Trade Practices Act; Count XXV—Violation of Minnesota's "Private Attorney General Statute"; Count XXVI—Violation of the Nevada Deceptive Trade Practices Act; Count XXVII—Violation of the New Hampshire Consumer Protection Act; Count XXVIII—Violations of the New York Consumer Protection Act; Count XXIX—Violation of the North Carolina Unfair and Deceptive Trade Practices Act; Count XXX—Violation of the Ohio Consumer Sales Practices Act; Count XXXI—Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; Count XXXII—Violation of the South Carolina Consumer Unfair Trade Practices Act; Count XXXIII—Violation of the Texas

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

92 UCC Rep.Serv.2d 754

Deceptive Trade Practices-Consumer Protection Act; Count XXXIV—Violation of the Washington Consumer Protection Act. (*See* Compl. at 92–198). The Court discusses each claim separately.

### A. Breach of Contract

**\*7** As noted above (*see* n.5, *supra*), Plaintiffs have collectively abandoned their breach of contract claim. (Pl. Opp. Br. at 41). Accordingly, this claim is hereby dismissed.

### B. Motion to Dismiss and Compel Arbitration

Generally, an agreement to arbitrate a dispute "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *E.M. Diagnostic Sys., Inc. v. Local 169, Intl Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 812 F.2d 91, 94 (3d Cir. 1987)(quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). The Federal Arbitration Act ("FAA"), applies to arbitration clauses contained in contracts involving matters of interstate commerce. *See* 9 U.S.C. § 2; *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When a party, whose claims are subject to the FAA, refuses to arbitrate same the district court must decipher whether the claims are arbitrable. *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001)(citing *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)). "In the absence of any express provision excluding a particular grievance from arbitration, ... only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Technologies*, 475 U.S. at 654 (quotations omitted); *see Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.").

"Federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic*, 247 F.3d at 55 (citing *Moses H. Cone*, 460 U.S. at 24-25); *Zimmerman*, 783 F. Supp. at 868. The presumption in favor of arbitration guides district courts to refrain from denying a motion to compel arbitration absent certainty that the claims do not fall within the scope of an arbitration clause. *See Medtronic*, 247 F.3d at 55; *Mutual Ben. Life Ins., Co., v. Zimmerman*, 783 F. Supp. 853, 869 (D.N.J. 1992)("There is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance

should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.")(internal citations and quotations omitted). However, "[i]f there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury." *Par-Knit*, 636 F.2d at 54. In considering a motion to compel arbitration, a court must engage in a two-step analysis: *it must determine first whether there is a valid agreement to arbitrate* and, if so, *whether the specific dispute falls within the scope of said agreement. See Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009)(emphasis added); *Salvadori v. Option One Mtg. Corp.*, 420 F. Supp. 2d 349, 356 (D.N.J. 2006).

**\*8** The Court here finds that, contrary to Defendant VW America's assertion, no agreement to arbitrate exists between the parties. Defendant argues that arbitration must be compelled because the various Plaintiffs entered into purchase and/or lease agreements contained an arbitration clause. (ECF No. 36-1 ("Def. Mov. Br.") at 7-11). Those purchase and/or lease agreements contained the following language:

> **"ARBITRATION PROVISION**
>
> **"PLEASE REVIEW—IMPORTANT-AFFECTS YOUR LEGAL RIGHTS**
>
> **"1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**
>
> **"2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS...."**

((Def. Mov. Br. at 7)(quotations and bold in original); *see also* Exhibits A-I annexed to Def. Mov. Br.) This clause, according to Defendant, requires the Court to dismiss the action and compel arbitration consistent with the above law.

However, as Plaintiffs have explained, and as Defendant concedes, Defendant VW America was not a party to these purchase and/or lease agreements. (*See* ECF No. 40 ("Pl.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 150 of 260
PageID: 69814
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

Opp. Br.") at 8-11; ECF No. 42 ("Def. Rep. Br.") at 1-3). Rather, those agreements were entered into by Plaintiffs and the various dealerships from which they purchased and/or leased their vehicles from. (Def. Mov. Br. at 7). Accordingly, Defendant VW America never entered into any agreement with Plaintiffs to arbitrate.

Basic contract law requires parties to be in privity with each other in order for them to enforce the terms of a contract. *See Black's Law Dictionary* (10th ed. 2014), *available at* Westlaw BLACKS (defining privity of contract as "The relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so."). Since the parties never personally entered into an agreement with each other, no privity of contract between Plaintiffs and Defendant can be established. The parties concede this point. (*See* Def. Mov. Br. at 10, 31, 37; Pl. Opp. Br. at 9). Hence, without privity of contract between the parties, Defendant VW America cannot enforce the arbitration clause contained within the purchase and/or lease agreements signed by Plaintiffs and the various dealerships. Thus, in accordance with *Century Indem. Co., supra*, there is no valid agreement between the parties that this Court can enforce, and the Motion to Compel Arbitration must be denied.

Defendant VW America also attempts to rely on the doctrine of equitable estoppel in support of its Motion to Compel Arbitration. (*See* Def. Mov. Br. at 12). "[I]n certain situations, a non-signatory to an arbitration agreement may compel a signatory to arbitrate." *EPIX Holdings Corp. v. Marsh & McLennan Cos.*, 410 N.J. Super. 453, 982 A.2d 1194, 1200 (N.J. Super. Ct. App. Div. 2009); *see also E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001) (noting situations in which non-signatories may be bound by an arbitration clause). The *EPIX* Court noted that "the combination of the requisite nexus of the claim to the contract *together with the integral relationship* between the non-signatory and the other contracting party [is] ... a sufficient basis to invoke estoppel." *982 A.2d at 1202* (emphasis in original).

**\*9** Courts have permitted "non-signatory third party beneficiaries to compel arbitration against signatories of arbitration agreements." *E.I. DuPont, supra* at 195 (citation omitted). For example, the Third Circuit has "bound a signatory to arbitrate with a non-signatory at the non[-]signatory's insistence *because of the close relationship between the entities involved, as well as the relationship*

*of the alleged wrongs to the non[-]signatory's obligations and duties in the contract* ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont*, 269 F.3d at 199-200 (internal quotations omitted; alteration in original) (emphasis added). "The distinction between signatories and non-signatories is important to ensure that short of piercing the corporate veil, a court does not ignore the corporate form of a non-signatory based solely on the interrelatedness of the claims alleged." *Id.* at 202.

Here, the doctrine of equitable estoppel does not assist Defendant VW America's assertions that arbitration must be compelled. This is because Defendant VW America can point to no allegations that there was a "close relationship" between the parties. Rather, the allegations in the Complaint indicate the complete opposite. Plaintiffs each purchased and/or leased their vehicle from an authorized car dealership. At the time Plaintiffs acquired their vehicles, they entered into a purchase and/or lease agreement between themselves *and the dealership*. A member of each dealership presented this document. The agreements only contained the dealership's name and the various Plaintiffs' names. Accordingly, there was no relationship, let alone a close one, that supports the application of equitable estoppel in this action. Thus, the Motion to Compel Arbitration must be denied.

### C. Plaintiffs' Complaint Does Not Need to be Dismissed for "Lumping"

Defendant also briefly argues that Plaintiffs' entire complaint should be dismissed for "combin[ing] separate named defendant entities under the name 'Defendants[.]' " (Def. Mov. Br. at 17). Accordingly, Defendant VW America believes the Complaint should be dismissed for failing to meet the pleading standards set forth under Rules 8 and 9(b) of the Federal Rules of Civil Procedure. (Id.). However, this argument is not persuasive. While Plaintiffs do use the term "Defendants" throughout the Complaint, they also make particularized allegations against each Defendant, including Defendant VW America, separately.

Specifically, as to Defendant VW America, Plaintiffs allege that it is headquartered in the United States and "engages in ... the advertising, marketing and sale of VW automobiles nationwide." (Compl. ¶ 74). Plaintiffs clearly distinguish Defendant VW America form Defendant Audi America by stating that Defendant Audi America is also headquartered in the United States and engages is nearly identical activities that Defendant VW America engages in. (Compl. ¶ 76). The

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

Complaint also explains that both Defendants VW America and Audi America are authorized agents, representatives, servants, employees and/or alter egos of the German parent companies. (Compl. ¶ 77).

The allegations against each entity are clear, and, as Plaintiffs explain, "to the extent Plaintiffs assert common allegations as to [Defendants collectively]," it is because the entities are intertwined through a complex corporate structure. (Pl. Opp. Br. at 18). Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery. *See Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 708 (D.N.J. 2013)(holding that Courts should employ a relaxed pleading standard when "specific information is in the exclusive control of the defendant") (citing *Craftmatic Sec. Litig v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)).

*10 Moreover, this Court is satisfied that, with the limited information in Plaintiffs' possession, Plaintiffs have made specific allegations as to Defendant VW America. For example, Plaintiff Molowitz asserts his vehicle was impacted by the timing chain issue, that he contacted Defendant VW America regarding same, and that Defendant VW America denied his request for repairs. (Compl. ¶ 58). Plaintiffs also allege that Defendant VW America "acted as [an] authorized agent[ ], representative[ ], servant[ ], [and/or] employee[ ]" of its German parent company, and that Defendant VW America performed activities of "advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of [its] vehicles." (Compl. ¶ 77). Additionally, Plaintiffs make specific allegations regarding Defendant VW America's knowledge of the supposedly faulty timing chain because Defendant "VW America was monitoring warranty claims and Class Vehicle performance in the United States." (Compl. ¶ 136). Moreover, "[c]ertain Plaintiffs were informed by representatives of [Defendant] VW America that" it would not repair the faulty timing chain system because the "failure occurred outside of the express warranty period." (Compl. ¶ 137). Plaintiffs further allege that "Defendants' [collective] knowledge of Class Vehicle defects was derived from warranty claims, claims supervisors, customer complaints *and monitoring ofperformance of Class Vehicles by [Defendant] VW America quality assurance employees.*" (Compl. ¶ 153)(emphasis added). Finally, Plaintiffs have alleged that "Defendant (*and particularly the sales and marketing executives at [Defendant] VW America*) advertised and otherwise created

the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that Class Vehicles would last over 120,000 miles or ten years before experiencing Timing Chain System failure." (Compl. ¶ 157)(emphasis added).

The Court finds that these allegations are specific to, and targeted at, Defendant VW America. Thus, while Plaintiffs use the generic term of "Defendants" in their Complaint, they also make particularized allegations regarding Defendant VW America's conduct sufficient to satisfy Rules 8 and 9(b) of the Federal Rules of Civil Procedure. Hence, Defendant VW America's Motion to Dismiss based on "lumping" is hereby denied.

### D. Dismissal for Failure to "Plead Which State's Law Applies" as to Plaintiff's Common Law Counts is Unwarranted

Defendant avers that Plaintiffs' common law claims for fraud, breach of contract, [6] negligent misrepresentation, and unjust enrichment must be dismissed since Plaintiffs have not identified the applicable law for each claim, thereby rendering them "vague." (Def. Mov. Br at 15). Defendant also argues that each Plaintiffs home state has the "most significant relationship," and, according to New Jersey law, each state's laws governing common law claims must be applied to each group of Plaintiffs, based on the state where they reside. (Def. Mov. Br. at 16-17). Indeed, New Jersey's choice of law principles are applicable to this matter since federal courts with diversity jurisdiction must apply the choice of law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). However, the Court need not address the choice of law arguments at this juncture.

As Plaintiff correctly notes, the choice of law analysis has routinely been found to be premature at the motion to dismiss phase of a class action law suit, especially when certain discovery is needed to further develop the facts that will be used in the choice of law analysis. *See, e.g., Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-cv-6590, 2013 WL 1431680, at *5 (D.N.J. Apr. 9, 2013) (choice of law analysis at motion to dismiss premature); *In re Samsung DLP Television Class Action Litig.*, No. 07-cv-2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009) (same); *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 55 (D.N.J. 2009) (same); *see also Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 295 (D.N.J. 2009) (finding that New Jersey's most significant relationship test" requires a fact-sensitive analysis

that cannot be performed on a record that consists solely of a complaint and motion to dismiss); *In re K-Dur Antitrust Litig.,* 338 F. Supp. 2d 517, 541 (D.N.J. 2004) (finding that a choice of law analysis is premature at the motion to dismiss phase).

Further, Defendant has failed to explain how Plaintiffs' common law claims conflict among their home states. Rather, Defendant simply concludes that a conflict exists and therefore the Complaint must be dismissed. Yet, as discussed, the most significant relationship test is a fact-sensitive inquiry. Accordingly, the Court declines to engage in a choice of law analysis at this juncture and Defendant VW America's Motion to Dismiss based on same is hereby denied.

### E. Plaintiffs Have Sufficiently Pled *prima facie* Claims for Breach of Express Warranty

**\*11** Defendant VW America advances five separate arguments as to why Plaintiffs' breach of express warranty claims must be dismissed. First, Defendant VW America argues that no claim can lie for repairs to, or failures of, the Timing Chain System beyond the express warranty period contained in Defendant's New Vehicle Limited Warranty ("NVLW"). (Def. Mov. Br. at 18). Second, Defendant asserts that both the time and mileage terms of the NVLWs were not unconscionable. (Def. Mov. Br. at 19). Third, Defendant avers that the NLVWs do not cover design defects, which, it claims, is the gravamen of Plaintiffs' claims. (Def. Mov. Br. at 22). Fourth, Defendant claims that Plaintiffs have not pled sufficient facts showing they complied with the NLVWs' notice requirements. (Def. Mov. Br. at 23). Finally, Defendant asserts that four Plaintiffs' express warranty claims are barred by the statute of limitations; specifically those Plaintiffs from Connecticut, New York, Ohio, and Texas. (Def. Mov. Br. at 27). For the following reasons, the Court is unpersuaded by any of these arguments and concludes that Plaintiffs have included sufficient allegations to withstand a motion to dismiss.

First, the Court is satisfied that Plaintiffs have pled sufficient facts to allege that the NVLWs were unconscionable, and therefore the time and mileage limitations argument advanced by Defendant is premature. Indeed, as Plaintiffs note, "[o]ne way Plaintiffs may avoid [the] durational limits of Defendant's warranty is by alleging facts sufficient to show that the warranty is unconscionable." (Pl. Opp. Br. at 21) (citing *Skeen v. BMW of N. Am., LLC,* 2014 WL 283618 \*12 (D.N.J. Jan 24, 2014))(compiling cases). The *Skeen* matter is quite similar to this action. There, the Plaintiffs brought a putative class action against BMW asserting that certain MINI Cooper vehicles suffered from "a latent defect in a part of the engine known as the 'timing chain tensioner' which causes the part to fail prematurely." *Skeen, supra* at 1. Those vehicles were subject to "an express warranty of 48 months or 50,000 miles, whichever came first." *Id.* at 1. Plaintiffs there alleged that the warranty period was "not fatal to their warranty claims because Defendants [therein] knew the defects would manifest and manipulated the warranty term to make sure it did not happen until after the warranty term expired." *Id.* at 1.

BMW moved to dismiss the various claims, including the breach of warranty claim asserting that the malfunction occurred after the warranty period expired, and therefore no claim could stand. *Id.* at 1, 4. The Court denied the motion regarding the warranty claim. *Id.* at 4, 15-16. According to the Court, Plaintiffs had sufficiently pled both substantive and procedural unconscionability. *Id.* Specifically, the Court noted that Plaintiffs were in a significantly weaker bargaining position than the manufacturer because the "preprinted" warranty left the purchasers with no meaningful choice in setting the terms of said warranty," and therefore satisfied the procedural unconscionability requirement. *Id.* at 43 (citing *Delta Funding Corp. v. Harris,* 189 N.J. 28, 55 (N.J. Sup. Ct. 2006)(Zazzali, J., concurring in part and dissenting in part)). Moreover, the Court concluded that substantive unconscionability was also sufficiently pled because plaintiffs alleged that defendant knew the timing chain tensioner would fail and the warranty was manipulated in such a manner so that defendant could avoid paying for it. *Id.* at 41-42. Thus, the Court was satisfied that plaintiffs met the unconscionability pleading standard.

This Court is also satisfied that Plaintiffs have pled both substantive and procedural unconscionability. Substantive unconscionability occurs when "the term is 'excessively disproportionate,' involving an exchange of obligations so one-sided as to shock the court's conscience." *Skeen, supra* at 12. "[P]rocedural unconscionability focuses on the circumstances of the negotiation that produced the contested term," and typically is present when a party has "no meaningful choice" in negotiating the term due to "a gross disparity in bargaining power." *Id.* (quoting *Henderson v. Volvo Cars of North America, LLC,* 2010 WL 2925913, \*9 n.6 (D.N.J. Jul. 21, 2010)).

**\*12** Here, both forms of unconscionability have been pled. Just as in *Skeen,* Plaintiffs have pled that Defendant was well aware of the defect in their vehicles' Timing Chain Systems. (Compl. ¶¶ 2, 5, 11, 110, 256). Plaintiffs further

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    9

pled that said defect manifests during and/or shortly after the warranty period, but prior to the end of the Class vehicles' useful lives. (Compl. ¶¶ 5, 33, 94, 110, 139-41, 144, 150, 248). Moreover, Plaintiffs allege that Defendant had superior knowledge regarding said defect. (Compl. ¶¶ 11, 107, 110, 122). Additionally, Plaintiffs have pled that they had no meaningful choice in determining the temporal and/or mileage limits of the NLVWs. (Compl. ¶ 162). Finally, Plaintiffs allege that the NLVWs were drafted by Defendant, without any input, let alone meaningful input, from Plaintiffs, that there was a gross disparity in bargaining power in favor of Defendant, the terms of the NLVWs unreasonably favored Defendant, and Defendant was aware of the defect at the time of sale. (Compl. ¶¶ 162-, 165-72, 256).

Based on the above, Plaintiffs have sufficiently pled that the express warranties were unconscionable. It is important to note that this Court is not declaring the NLVWs unconscionable at this time. Rather, at the Motion to Dismiss stage, the Court is merely satisfied that Plaintiffs have alleged sufficient facts to support the assertion that the NLVWs are unconscionable. Should Plaintiffs be able to, through discovery, elicit sufficient evidence to support the allegations the NLVWs' limitations may not be applicable, and Defendant's defense of this claim based on said limitations would not be viable. Accordingly, and since this is a fact sensitive inquiry, dismissal at this time is inappropriate.

Defendant's next argument in support of dismissal of the express warranty claims is that the NLVWs "cover only repairs to correct 'a manufacturer's defect in material and workmanship.'" (Def. Mov. Br. at 22). In essence, Defendant asserts that the Timing Chain System defect is a "design defect" and therefore is not covered by the NLVWs. (Id.). For this reason, Defendant argues that the express warranty claims must be dismissed.

The Court is not persuaded by this argument either. Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleadings stage of litigation. *See Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010)(Hayden, J.)(holding that "where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives."); *see also Cox v. Chrysler Grp., LLC*, 2015 WL 5771400, at *6 (D.N.J. Sept. 30, 2015)(same). This Court

agrees with the *Alin* and *Cox* opinions. Indeed, Plaintiffs' Complaint contains sufficient factual allegations to assert a breach of the warranty, regardless of whether the defect is in design or in manufacturing and workmanship. (Compl. ¶¶ 94-100, 108, 126-29, 201, 251-53).

Moreover, even if the NLVWs only cover design defects, Plaintiffs' allegations specifically point to defects in the materials and/or the workmanship. The Complaint describes how various materials within the Timing Chain System break and/or fail, and how that failure leads to the motor failing in general. (Compl. ¶¶ 94-100). Plaintiffs also make allegations regarding how the material used in the ratchet pawl sintered metal is defective and fails over time. (Compl. ¶¶ 126-29). These allegations were designed to point to specific materials and/or workmanship that contained defects known to Defendant, which by its own admissions and arguments, would be covered by the NLVWs. Accordingly, the Court is satisfied that Plaintiffs have sufficiently pled claims for breach of the NLVWs.

Additionally, Defendant argues that Plaintiffs failed to comply with the notice requirements of the NLVWs, warranting dismissal of their express warranty claims. (Def. Mov. Br. at 23). Defendant asserts that the States of Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, South Carolina, Texas, and Washington, and the Commonwealth of Pennsylvania, all have pre-suit notice requirements for breach of warranty claims. (Id.). Defendant avers that not a single Plaintiff has complied with said pre-suit notice requirements, and therefore the claims must be dismissed. (Id. at 23-24).

**\*13**  However, this argument also fails. Defendant's reliance on the Uniform Commercial Code ("UCC") § 2-607 is misplaced. That provision requires a buyer of a product that allegedly breaches an express warranty to provide the *seller* of a product with notice within a reasonable time after the breach is discovered or when the buyer should have discovered said breach. *See* UCC § 2-607(3)(a). However, Defendant here is not the direct seller of the vehicles, but rather the remote manufacturer and/or seller.

Pre-suit notice is not required when the action is brought against a remote manufacturer and/or seller. *See Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005). There, the Court explained that it "has

Case 1:19-md-02875-RMB-SAK Document 2057-2 Filed 05/10/22 Page 154 of 260 PageID: 69818

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

92 UCC Rep.Serv.2d 754

previously predicted that the New Jersey Supreme Court would not require notice under section 2-607(3)(a) in a case against a *remote manufacturer who was not the immediate seller of a defective product.*" *Strzakowlski, supra* at *3 (emphasis added). The Court further held that even if notice was required, notice would be satisfied merely by filing the Complaint. *Id.* at *3. Additionally, Plaintiffs need not give a remote manufacturer and/or seller pre-suit notice in California, Florida, Georgia, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Washington. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010)(under California law, pre-suit notice excused with respect to remote manufacturer with whom consumer did not deal); *Strzakowlski v. Gen. Motors Corp.*, 2005 WL 2001912, *3 (D.N.J. Aug. 16, 2005)(New Jersey does not require notice to remote manufacturer and, if it did, filing complaint would satisfy notice); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 975-979 (N.D. Cal 2014)(surveying states: in Florida, notice not required to manufacturer; in Ohio and Pennsylvania, the filing of a complaint satisfies notice); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1109-1110 (S.D. Ind. 2001)(surveying cases: in Pennsylvania, Michigan, New York, and Georgia, the filing of a complaint satisfies notice requirement); *Cats v. Monaco RV, LLC*, 2016 WL 5253204, at *4 (W.D. Wash. Sept. 22, 2016)(the State of Washington does not require notice to remote sellers, and, if required, taking vehicle to dealer for repair satisfied notice). As for Illinois, Indiana, and Minnesota, the notice requirement is satisfied when, as alleged here, the manufacturer is aware of the defect with the goods. *See In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 799-800 (N.D. Ill. 2016) (Ill. law); *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781-82 (7th Cir. 2011) (Ind. law); *Church of the Nativity of Our Lord v. Watpro, Inc.*, 491 N.W.2d 1, 5 (Minn. 1992). Accordingly, the Court concludes that Plaintiffs, in certain circumstances, were not required to provide Defendant with any pre-suit notice, and, in cases where pre-suit notice was required, Plaintiffs satisfied said requirement by simply filing their Complaint. Hence, dismissal on this ground is also unwarranted.

Finally, Defendant argues that a four-year statute of limitations bars any express warranty claims by Plaintiffs from Connecticut, New York, Ohio, and Texas. (Def. Mov. Br. at 27; Def. Rep. Br. at 28-29). Defendant cites to Conn. Gen. Stat. § 42a-2-725(1)-(2); N.Y. U.C.C. Law § 2-725; Ohio Rev. Code § 1302.98; Tex. Bus & Com. Code Ann. § 2.725

in support of this contention. (Def. Mov. Br. at 27). Those statutes impose a four-year statute of limitations for repair and replace warranties, such as the NLVWs. None of these statutes of limitations have a discovery rule. *See* Conn. Gen. Stat. § 42a-2-725(1)-(2); N.Y. U.C.C. Law § 2-725; Ohio Rev. Code § 1302.98; Tex. Bus & Com. Code Ann. § 2.725.

**\*14** Resolving this argument would require the Court to engage in a choice of law analysis. However, as noted above, this Court will not engage in a choice of law analysis at this juncture. Yet, this does not preclude the Court from rendering a determination, since Plaintiffs have properly alleged grounds for equitable tolling of the statute of limitations. *See In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2008 WL 4126264, at *17 (D.N.J. Sept. 2, 2008); *Simpson v. Widger*, 311 N.J. Super. 379, 391 (N.J. Super. Ct. App. Div. 1998)("[T]he presence of fraud may toll the running of the statute" for breach of warranty claims).

For fraudulent concealment to toll the statute of limitations a plaintiff must plead "(1) wrongful concealment by the party raising the statute of limitations defense, resulting in (2) plaintiffs failure to discover the operative facts forming the basis of his cause of action during the limitations period (3) despite the exercise of due diligence." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 523 (D.N.J. 2008).

The Court is satisfied that Plaintiffs have met all three elements of the above standard. Specifically, Plaintiffs allege that "Defendant[ ] wrongfully and intentionally concealed a defect in the [Timing Chain System] of the Class Vehicles, which can fail at any time." (Compl. ¶ 2). Plaintiffs further allege that Defendant had knowledge of this defect, and, despite this knowledge, Defendant has "never disclosed to Plaintiffs and members of the Classes that the defect exists or that drivers and/or occupants of the Class Vehicles [were] at risk." (Compl. ¶ 5). Additionally, Plaintiffs assert that the Timing Chain System failed far before its useful life expired. (Id.) Accordingly, Plaintiffs allege that Defendant has "wrongfully and intentionally transferred the cost of repair or replacement of the Timing Chain System to Plaintiffs and members of the Classes by fraudulently concealing the existence of the defect, which Defendant [knew would] typically occur after the expiration of the [NLVWs]." (Id.). Moreover, Plaintiffs assert and allege that despite their due diligence, they were incapable of ascertaining the defect, partly due to Defendant's alleged fraudulent concealment. (Compl. ¶¶ 10-12, 14, 106-10, 144-60, 195-202).

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 155 of 260
PageID: 69819
In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

While this Court is not concluding that Defendant did in fact fraudulently conceal the defect in the Timing Chain System, it is satisfied that Plaintiffs have sufficiently pled same. Since Plaintiffs have successfully pled fraudulent concealment, the statute of limitations may be equitably tolled. Accordingly, the Court finds that it is inappropriate to dismiss the express warranty claims at this juncture. Defendant may renew this argument at a later point, should discovery tend to indicate that no fraudulent concealment occurred.

### F. Plaintiffs Have Successfully Pled a *prima facie* Cause of Action for a Breach of the Implied Warranty of Merchantability

Similarly, Defendant argues that Plaintiffs' claims for breach of the implied warranty of merchantability must be dismissed for the following reasons: 1) the implied warranties expired prior to the manifestation of the defect and the Class Vehicles are merchantable; 2) "[m]any of Plaintiffs [i]mplied [w]arranty [c]laims [m]ust [b]e [d]ismissed [b]ecause [p]laintiffs [a]re [n]ot in [p]rivity with Defendant[ ];" 3) Plaintiffs did not comply with the pre-suit notice requirements; and 4) certain Plaintiffs are barred by the statute of limitations. (Def. Mov. Br. at 29-36). For the reasons below, the Court disagrees with said arguments and denies Defendant's Motion to Dismiss Plaintiffs' breach of the implied warranty of merchantability claims.

**\*15** Summarily, the Court disposes of arguments three and four, regarding the pre-suit notice and statute of limitations, relatively. This is because the arguments advanced in support of both the pre-suit notice requirements and the statute of limitations is identical to those advanced by Defendant in support of dismissal of the express warranty claims. (Def. Mov. Br. at 34-35, *cf.* Def. Mov. Br. 23-25, 27-29). Accordingly, the above analysis, *supra* at 26-30, is applicable to these arguments. Hence, these arguments are not persuasive and no further analysis is necessary herein.

The implied warranty of merchantability is designed "to protect buyers from loss where the goods purchased are below commercial standards." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992)(citing *Vlases v. Montgomery Ward & Co.*, 377 F.2d 846, 849 (3d Cir. 1967)). "In order to be merchantable, goods must be 'fit for the ordinary purposes for which such goods are used.' " *Id.* (citation omitted). "[T]o establish a breach of this warranty, a plaintiff must show, among other things, that the product at issue was defective." *Am. Atelier, Inc. v. Materials, Inc.*, 2017 U.S. App. LEXIS 851, \*3, 2017 WL 203371 (3d Cir. Jan. 18,

2017)(citing *Altronics, supra* at 1105). "In the context of a car, this warranty is satisfied when the vehicle provides safe and reliable transportation." *Greene v. BMW of North Am.*, 2013 WL 5287314, \*2 (D.N.J. Sept. 17, 2013).

Here, despite Defendant's assertion that the Class Vehicles were merchantable, Plaintiffs have successfully pled a *prima facie* claim for breach of the implied warranty of merchantability. The Complaint contains more than sufficient factual allegations regarding the failure of the Timing Chain System, which led to failure of the vehicle in general. For example, Plaintiffs allege that when the Timing Chain System's tensioner failed the timing of the motor's valves was no longer in sync causing various internal components to bend and/or break. (Compl.¶¶ 3, 4, 34, 92). The bending and/or breaking of said components causes the motor to cease operation. (Id.). When the motor ceased working, the vehicle no longer performed its ordinary commercial purpose of driving. (Id.). Hence, Plaintiffs have sufficiently pled that the vehicles were not merchantable.

Moreover, the latency in manifestation is insufficient to support dismissal at this juncture of this litigation. It is true that implied warranties do not extend beyond the time, or other limitations, of a good's express warranty. *See, e.g.*, *Glass v. BMW of N. Am.*, 2011 U.S. Dist. LEXIS 149199, \*49, 2011 WL 6887721 (D.N.J. Dec. 29, 2011); *Suddreth v. Mercedes-Benz, LLC*, 2011 U.S. Dist. LEXIS 126237, \*12-13, 2011 WL 5240965 (D.N.J. Oct. 31, 2011). According to Defendant, the breach of the implied warranty of merchantability claim must be dismissed because the defect manifested itself after the NLVWs expired. However, as this Court explained above, Plaintiffs have sufficiently pled unconscionability of the NLVWs, which may result in the inapplicability of the NLVWs' time and mileage limitations. If said limitations are inapplicable, the express warranty claims may still be viable. If the express warranty claims are viable due to the unconscionability of the limitation terms, then the implied warranty claims would remain viable as well, since the prior limitations relied on by Defendant no longer bind Plaintiffs. Accordingly, dismissal of the implied warranty claims pursuant to this argument is also inappropriate.

Finally, Defendant argues that Plaintiffs from California, Connecticut, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and Washington cannot maintain an implied warranty claim because they are not in "vertical privity" with Defendant. (Def. Mov. Br. at 31-34). Indeed, those states require the parties to be in vertical privity with each other

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 156 of 260
PageID: 69820

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

92 UCC Rep.Serv.2d 754

in order for a breach of implied warranty claim to lie. *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008); *TD Props., LLC, v. VP Bldgs., Inc.*, 602 F. Supp. 2d 351, 362 (D. Conn. 2009); *Speier-Roche v. Volkswagen Grp. of Am., Inc.*, 2014 U.S. Dist. LEXIS 59991, *21-22, 2014 WL 1745050 (S.D. Fla. Apr. 30, 2014); *Monticello v. Winnebago Indus.*, 369 F. Supp. 2d 1350, 1361 (N.D. Ga. 2005); *Ibarolla v. Nutrex Research, Inc.*, 2012 U.S. Dist. LEXIS 155721, *22, 2012 WL 5381236 (N.D. Ill. Oct. 31, 2012); *In re Scotts EZ Seed Litig.*, 2013 U.S. Dist. LEXIS 73808, *24-25, 2013 WL 2303727 (S.D.N.Y. May 22, 2013); *Kelly v. Ga.-Pac. LLC*, 671 F. Supp. 2d 785, 769 (E.D.N.C. 2009); *Curl v. Volkswagen of Am., Inc.*, 114 Ohio St. 3d 266, 269 (Ohio 2007); *Baughn v. Honda Motor Co.*, 107 Wash.2d 127, 151 (Wash. 1986). [7]

**\*16** However, each of these states provides various exceptions to the vertical privity requirement; the so-called third-party beneficiary exception. [8] California, North Carolina, Florida and Washington all have exceptions to the vertical privity requirement when, as is the case here, the consumer, rather than the dealer, is the ultimate user. *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983-85 (N.D. Cal. 2014)(acknowledging the third-party beneficiary exception under California and North Carolina law); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 947-48 (C.D. Cal. 2012)(stating that in California the purchaser of a vehicle may maintain implied warranty claim against manufacturer when vehicle is purchased from authorized dealership); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233-34 (S.D. Fla. 2014)(acknowledging the third-party beneficiary exception under Florida law); *In re MyFord Touch Consumer Litig.*, 2015 WL 5118308, *7 (N.D. Cal. Aug. 31, 2015)(acknowledging the third-party beneficiary exception under Washington law). In Georgia, the vertical privity requirement is satisfied when the manufacturer provides an express warranty, as is the case with Defendant's NLVWs. *See Lee v. Mylan, Inc.*, 806 F. Supp. 2d 1320, 1326 (M.D. Ga. 2011). Finally, and similar to Georgia, Illinois' vertical privity requirement is satisfied if the manufacturer provides a written warranty that satisfies the Magnuson-Moss Warranty Act, as, once again, is the case with Defendant's NLVWs. *See Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1030-31 (Ill. 1988); *Szajna v. Gen. Motors Corp.*, 503 N.E.2d 760, 770 (Ill. 1986).

Accordingly, while a party may generally be required to be in vertical privity with its adversary to assert a breach of implied warranty claim in California, Connecticut, Florida, Georgia, Illinois, New York, North Carolina, Ohio, and Washington, Plaintiffs herein are not required to meet said requirement. This is because Plaintiffs from California, North Carolina, Florida and Washington are exempt from said requirement as they were the true consumers of the product, not the dealer. Moreover, those Plaintiffs from Georgia and Illinois are also exempt from the vertical privity requirement since Defendant provided express warranties to Plaintiffs hailing from these states, which absolves Plaintiffs from the vertical privity requirement in those states. Therefore, dismissal of the breach of the implied warranty of merchantability is inappropriate.

### G. Plaintiffs Have Pled a Claim Under the Magnuson-Moss Warranty Act

Defendant does not attack the sufficiency of Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claim. Rather, Defendant's sole argument in support of dismiss of Plaintiffs' MMWA is premised on its anticipated dismissal of Plaintiffs' express and implied warranty claims. (Def. Mov. Br. at 36). Indeed, a prerequisite to a MMWA claim is adequately pleading a breach of warranty claim. *See Cooper v. Samsung Elecs. Am., Inc.*, 2008 U.S. Dist. LEXIS 75810, *18-19, 2008 WL 4513924 (D.N.J. Sep. 30, 2008). Here, since the Court has determined that Plaintiffs have asserted viable breach of warranty claims, both express and implied, Plaintiffs satisfy the pleading requirement to assert an MMWA claim. Accordingly, the Court will not dismiss Plaintiffs' MMWA claims.

### H. Plaintiffs Have Article III Standing to Bring Common Law Fraud, Statutory Fraud, and Negligent Misrepresentation Claims

According to Defendant, Plaintiffs lack Article III standing to assert claims for common law fraud, statutory fraud, and negligent misrepresentation. (Def. Mov. Br. at 39). Article III standing requires Plaintiffs to allege: 1) an injury in fact; 2) causation; and 3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendant does not challenge that Plaintiffs have pled both an injury in fact and redressability with regards to these claims, nor does it assert that Plaintiffs have insufficiently pled any of the three claims. (*See* Def. Mov. Br. at 39-41). Rather, Defendant focuses its argument strictly on causation and asserts that these causes of action must be dismissed because Plaintiffs' alleged injuries cannot be "traced" to Defendant. (Id.)(citing *Toll Bros., Inc. v. Twsp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009)).

**\*17** The Court is satisfied that Plaintiffs have more than sufficiently pled causation. Plaintiffs point to Defendant's knowledge of the defects in the Timing Chain System

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 157 of 260
PageID: 69821

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

92 UCC Rep.Serv.2d 754

and allege that it concealed same. (*See, e.g.*, Compl. ¶¶ 2, 5, 11). As a matter of fact, Plaintiffs allege Defendant acknowledged the issue in their TSBs. (*See, e.g.*, Compl. ¶¶ 2, 111-25). The concealment of this information, Plaintiffs assert, was fraudulent, negligent and the sole reason they suffered damages in the form of a malfunctioning vehicle and the costs associated with repairing same, as well as higher operation costs due to the inefficiency of the motor. (*See, e.g.*, Compl. ¶¶ 105, 108, 145, 149, 150-58). Hence, the Complaint contains ample allegations of the injury Plaintiffs suffered, and, more importantly, Defendant's role in causing said injury. Therefore, the Court holds that Plaintiffs have Article III standing to bring this action.

### I. Plaintiffs Have Pled Their Common Law Fraud Claims with Particularity

Next, Defendant asserts that, while the 22 different states laws implicated in this action all have different common law fraud pleading standards, they all require that fraud be pled with particularity, and argues that Plaintiffs have failed to meet this heightened pleading standard. (Def. Mov. Br. at 41-42). In making this argument, Defendants advance the following sub-arguments: 1) Plaintiffs failed to plead an actionable misrepresentation; 2) Plaintiffs failed to plead any omission Defendant was under a duty to disclose (based on varying state laws); 3) Plaintiffs cannot maintain a fraud claim because their vehicles outlasted the time and mileage durations in the NLVWs; and 4) certain claims by Plaintiffs are barred by the economic loss doctrine. (Def. Mov. Br at 42-59). For the reasons below, the Court is not persuaded by any of these arguments.

First, the Court disposes of arguments three and four above. Argument three relies on the expiration of the NLVWs. (Def. Mov. Br. at 57). For that argument to succeed, this Court would need to conclude that the time and mileage limitations set forth in the NLVWs are applicable to these Plaintiffs. This is because of the fact that, generally speaking, permitting common law fraud claims beyond the scope of the express warranty would effectively extend the express warranty. *See, e.g.*, *Duffy v. Samsung Elecs. Am., Inc.*, 2007 U.S. Dist. LEXIS 14792, *22-23, 2007 WL 703197 (D.N.J. Mar. 2, 2007)*; *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333, 337-38 (D.N.J. 2010)*; *Nobile v. Ford Motor Co.*, 2011 U.S. Dist. LEXIS 26766, *15-16, 2011 WL 900119 (D.N.J. Mar. 14, 2011)*. However, while the Court has not reached the complete opposite conclusion (*i.e.* that the limitations are not applicable to Plaintiffs), this Court has concluded that Plaintiffs have sufficiently pled that said limitations are

potentially unconscionable. Since the Court has reached such a conclusion, the applicability of the NLVWs' limitations remains unknown.

As noted above, should Plaintiffs succeed at proving the alleged unconscionability of the NLVWs' limitations, the warranty period may not be applicable to Plaintiffs. If the limitations are not applicable to Plaintiffs, then their common law fraud claims would no longer be bound to the time and mileage limitations contained therein. Accordingly, the Court will not dismiss said claims based on the time and mileage limitations contained in the NLVWs.

Additionally, the Court will not dismiss the claims pursuant to the economic loss doctrine. Under that doctrine, a plaintiff who is dissatisfied with a product must bring a breach of contract or warranty claim. *See* *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871-72 (1986). Florida, Michigan, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, and South Carolina all extend the economic loss doctrine to fraud based claims, such as those advanced by Plaintiffs here. *See* *Burns v. Winnebago Indus., Inc.*, 2013 U.S. Dist. LEXIS 116377, *9, 2013 WL 4437246 (M.D. Fla. Aug. 16, 2013)*; *Murphy v. P&G*, 695 F. Supp. 2d 600, 602 (E.D. Mich. 2010)*; *In re Elk Cross Timbers Decking Mktg., Sales Practices & Prods. Liab. Litig.*, 2015 U.S. Dist. LEXIS 144790, *73-74, 2015 WL 6467730 (D.N.J. Oct. 26, 2015)* (Linares, J.)(applying New Hampshire law)*; *Park v. Inovio Pharms., Inc.*, 2016 U.S. Dist. LEXIS 24993, *4-6, 2016 WL 796890 (D.N.J. Mar. 1, 2016)*; *Orlando v. Novurania of Am., Inc.*, 162 F. Supp. 2d 220, 225-26 (S.D.N.Y. 2001)*; *Malone v. Tamko Roofing Prods.*, 2013 U.S. Dist. LEXIS 145530, *6, 2013 WL 5561628 (W.D.N.C. Oct. 8, 2013)*; *Galoski v. Stanley Black & Decker, Inc.*, 2015 U.S. Dist. LEXIS 114663, *19-21, 2015 WL 5093443 (N.D. Ohio Aug. 28, 2015)*; *Sabol v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 92341, *17, 2015 WL 4378504 (E.D. Pa. July 16, 2015)*; *Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 49 (S.C. 2009)*.

 **\*18**  However, each of these states also have exceptions to the general rule that permit all of Plaintiffs' claims to proceed. New York law does not apply the economic loss doctrine to "claims of misrepresentation and fraud." *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, *35 (D.N.J. Jul. 29, 2015)*(citing *Weisblum v. Prophase Labs, Inc.*, 2015 WL 738112, *12 (S.D.N.Y. Feb. 20, 2015)*). New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina law also do not apply the economic loss doctrine to fraud

92 UCC Rep.Serv.2d 754

based claims when a plaintiff alleges fraudulent inducement or that the defendant violated an extrinsic duty. *See Smith v. Citimortgage, Inc.*, 2015 WL 12734793, \*7 (D.N.J. Dec. 22, 2015)(Linares, J.)(under New Jersey law, "fraud [based] claims that are extrinsic to the underlying contract, such as for fraudulent inducement, are not" barred by economic loss doctrine); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 965-67 (N.D. Cal. 2014)(holding that the economic loss doctrine does not bar fraudulent inducement claims under Florida or North Carolina law); *Stein v. Fenestra Am., L.L.C.*, 2010 WL 816346, \*4 (E.D. Pa. Mar. 9, 2010)(finding that the economic loss doctrine does not apply under Pennsylvania law where the fraud is "extraneous to the contract"); *Wyle v. Lees*, 162 N.H. 406, 411 (N.H. 2011)(holding that the economic loss doctrine does not apply to fraudulent inducement); *Simons v. Wal-Mart Stores E., L.P.*, 2013 WL 393998, \*5 (D.S.C. Jan. 31, 2013)("The economic loss rule does not bar tort claims where a defendant voluntarily assumes a duty to use due care over and above the duty required by the contract."). Similarly, Michigan and Ohio's economic loss doctrine does not bar fraud claims by consumers who are not in contractual privity with the defendant. *See Republic Ins. Co. v. Broan Mfg. Co., Inc.*, 960 F. Supp. 1247, 1249 (E.D. Mich. 1997) (Michigan's economic loss doctrine "has no application outside the commercial realm."); *Blackward v. Simplex Prods. Div.*, 2001 WL 1255924, \*3 (Mich. Ct. App. Oct. 19, 2001) ("The economic loss doctrine as adopted in Michigan clearly distinguishes between transactions involving the sale of goods for commercial purposes, where there are economic expectations attached to the purchases, and those involving the sale of defective products which result in losses traditionally remedied by resort to tort law."); *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 706 (D.N.J. 2013)(find that the economic loss doctrine does not bar negligence claims under Ohio law for claims brought by consumer not in privity with manufacturer); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d. 936, 968 (N.D. Cal. 2014) (same).

Here, Plaintiffs' common law fraud claims fall into each their home state's exception to the economic loss doctrine. Plaintiffs' fraud claims are simply exempt from New York's economic loss doctrine. As for the Ohio and Michigan Plaintiffs, their claims also survive since, as established above, the parties were never in privity with each other. Finally, the New Jersey, Florida, North Carolina, Pennsylvania, New Hampshire, and South Carolina Plaintiffs'

fraud claims also survive because they have adequately pled fraud claims based on fraudulent inducement.

Additionally, Plaintiffs have pled actionable misrepresentation. Defendant asserts that "Plaintiffs never allege that Defendants actually made any affirmative misrepresentations that Plaintiffs relied upon regarding the timing chain system or the useful life of the vehicles in the Warranty Manuals or elsewhere." (Def. Mov. Br. at 43). This is simply not true, as Plaintiffs have done exactly that. Specifically, Plaintiffs allege that Defendant's sale and marketing departments advertised and otherwise misrepresented to Plaintiffs that the Class Vehicles would last over 120,000 miles or ten years without needing to service the Timing Chain System. (Compl. ¶¶ 8, 142-43, 156-57). These misrepresentations were made in the NLVWs and Maintenance schedules. (Compl. ¶¶ 83, 94). Plaintiffs further allege that Defendant misrepresented that the NLVWs would cover all defects occurring within the mileage limitations despite the fact that they knew it intended to deny coverage for anything that it deemed a "design defect," without actually ever defining that term. (Compl. ¶¶ 9-10). Additionally, Plaintiffs assert that Defendants misrepresented that the NLVWs would cover all engine parts while knowing that the Timing Chain System would likely fail outside the warranty period and refused to cover same during the warranty period. (Comp. ¶¶ 135-37). Finally, Plaintiffs allege "Defendants misrepresented the that the Timing Chain System failures were the result of other conditions not covered under [the NLVWs]." (Pl. Opp. Br. at 52)(citing Compl. ¶ 149).

These alleged misrepresentations, which, at this point in the litigation the Court must accept as true, were not simply puffery, but actual misstatements of fact. *See Castol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993). Accordingly, Plaintiffs have successfully pled actionable misrepresentations to support their common law fraud claims.

**\*19** Lastly, Defendant asserts Plaintiffs have failed to plead any omission of information that it had a duty to disclose. (Def. Mov. Br. at 46). According to Defendant, New Jersey, Georgia, Illinois, and South Carolina laws create a duty to disclose only if there is a fiduciary or other special relationship between the parties. (Id.)(citing *N. J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 319 N.J. Super. 435, 446 (N.J. Super. Ct. App. Div. 1998); *Lilliston v. Regions Bank*, 653 S.E.2d 306, 309 (Ga. Ct. App. 2007); *Greenberger v. GEICO General Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011) (applying Illinois law); *Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 159 of 260
PageID: 69823

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....

92 UCC Rep.Serv.2d 754

502, 510 (S.C. Ct. App. 2002)). Defendant further argues that in Arkansas, "plaintiffs and defendants must be in either a fiduciary relationship or in contractual privity for a duty to disclose to attach." (Id.)(citing *Perez v. Volkswagen Grp. of Am.*, 2013 U.S. Dist. LEXIS 54845, *29-30, 2013 WL 1661434 (W.D. Ark. Apr. 17, 2013)). Ohio and Texas laws are similar and also only impose a duty to disclose when there is a fiduciary or special relationship, or when a defendant makes a misleading partial disclosure. *See Gator Dev. Corp. v. VHH, Ltd.*, 2009-Ohio-1802, ¶ 28 (Ohio Ct. App. Apr. 17, 2009); *Yoon v. Yoo*, 2016 U.S. Dist. LEXIS 129268, *8, 2016 WL 4801314 (N.D. Tex. Feb. 24, 2016). Defendant further asserts that arm's-length transactions between a manufacturer and consumer does not give rise to such a relationship and therefore no duty to disclose existed here. (Def. Mov. Br. at 47)(citing *Stevenson v. Mazda Motor of Am., Inc.*, 2015 U.S. Dist. LEXIS 70945, *27, 2015 WL 3487756 (D.N.J. June 2, 2015); *Coba v. Ford Motor Co.*, 2013 U.S. Dist. LEXIS 8366, *37, 2013 WL 244687 (D.N.J. Jan. 22, 2013)). Hence, Defendant concludes that since there is no fiduciary or other special relationship, and, with regards to the Ohio and Texas Plaintiffs, no partial disclosures were made, it had no duty to disclose and the common law fraud claims must be dismissed. (Def. Mov. Br. at 47-49).

However, as Defendant acknowledges (*see* Def. Mov. Br. at 49-55), "the laws of the majority of [Plaintiffs'] home states recognize a duty to disclose where the defendant possesses exclusive or superior knowledge or actively conceals the omitted information."[9] (Pl. Mov. Br. at 46-47 (citing Def. Mov. Br. at 49)); *see also Song Fi, Inc. v. Google, Inc.*, 2016 U.S. Dist. LEXIS 45547, *22, 2016 WL 1298999 (N.D. Cal. Apr. 4, 2016); *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998); *Bac Home Loans Serv. v. Farina*, 2010 Conn. Super. LEXIS 4929, *1-2 (Conn. Super. Ct. June 2, 2010); *Mukamal v. GE Capital Corp. (In re Palm Beach Fin. Partners, L.P.)*, 517 B.R. 310, 335 (Bankr. S.D. Fla. 2013); *Fifth Third Bank v. Double Tree Lake Estates, LLC*, 2013 U.S. Dist. LEXIS 20234, *21-22 (N.D. Ind. Feb. 12, 2013); *Kestrel Holdings I, L.L.C. v. Learjet Inc.*, 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004); *Dean v. Beckley*, 2010 U.S. Dist. LEXIS 105007, *16, 2010 WL 3928650 (D. Md. Oct. 1, 2010); *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 551, 553 (W.D. Mich. 1998); *Graphic Commc'ns. Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014); *Heldenbrand v. Multipoint Wireless, LLC*, 2012 U.S. Dist. LEXIS 150634, *13-14, 2012 WL 5198479 (D. Nev. Oct. 18, 2012); *King v. Philip Morris, Inc.*, 2000 N.H. Super. LEXIS 5, *26, 2000 WL 34016322

(N.H. Super. Ct. 2000); *Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, N.V., 68 F.3d 1478, 1483-84 (2d Cir. 1995) (applying New York law); *McKee v. James, 2013 NCBC 38*, ¶ 51 (N.C. Super. Ct. 2013); *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 586 (W.D. Pa. 2004); *White v. Zhou Pei*, 452 S.W.3d 527, 537-38 (Tex. App. 2014); *Lovell v. P.F. Chang's China Bistro, Inc.*, 2015 U.S. Dist. LEXIS 112101, *17-18, 2015 WL 4940371 (W.D. Wash. Mar. 27, 2015) (citation omitted).

Here, Plaintiffs from New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada have all sufficiently pled Defendant's superior knowledge with regards to the defect in the Timing Chain System. Specifically, Plaintiffs point to various pre-production testing, design failure mode analysis, early consumer complaints, warranty data gathered from the various dealerships, consumer complaints to the NHTSA, and Defendant's testing performed in response to consumer complaints in support of the fact that Defendant had superior, and potentially exclusive, knowledge regarding the defect. (Compl. ¶ 107). Plaintiffs have also alleged the presence of various TSBs and Defendant's decision to redesign the Timing Chain System as further proof of its superior knowledge. (Compl. ¶¶ 112-30). Plaintiffs further contend that Defendant took steps in order to conceal the defect in order to shift the cost of repair to Plaintiffs. (Compl. ¶¶ 2, 5, 10, 11-12, 14, 106-07, 110, 121, 144, 146, 149, 151-52, 156-57, 160-61, 189, 191, 193). Indeed, these allegations are sufficient to impose a duty to disclose on Defendant. *See, e.g., Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626, *17 (D.N.J. Oct. 9, 2013); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014); *Feldman v. Mercedes-Benz USA, LLC*, 2012 WL 6596830, *11 (D.N.J. Dec. 18, 2012). Accordingly, the Court concludes that the New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada Plaintiffs have sufficiently pled a duty to disclose and the Court will not dismiss their common law fraud claims.

**\*20** The Court comes to the same conclusion as to the Georgia, Illinois, Ohio, South Carolina, and Texas Plaintiffs. In those jurisdictions, Defendant owed a duty to disclose safety defects. *See, e.g., McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1368-70 (N.D. Ga. 2013)(imposing a duty to disclose where "safety defects with gasoline tanks ... could not have been discovered through the exercise of ordinary prudence and caution [by plaintiffs]" and allowing the fraud

by omission claims under Georgia and Texas law to proceed); *In re Takata Airbags Prods. Liability Litig.*, No. 15-md-2599, slip op. at 13-14 (S.D. Fla. Sept. 21, 2016)("South Carolina law does not always require a fiduciary relationship for a duty to disclose to exist")(citing *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 823 (D.S.C. 2011)); *In re Takata Airbags Prods. Liability Litig.*, No. 15-md-2599, slip op. at 11, 15, 21-22 & 31 (S.D. Fla. Oct. 14, 2016)(permitting fraudulent concealment claims to proceed under Ohio, Georgia and Illinois law based on duty to disclose safety defects). Plaintiffs here have specifically pled that the defect in the Timing Chain System created safety concerns, and, despite Defendant's knowledge of the defect and the safety concerns associated with same, Defendant chose not to disclose the defect to Plaintiffs. (Compl. ¶¶ 4, 10). Hence, Defendant had a duty to disclose the safety defect under Georgia, Illinois, Ohio, South Carolina, and Texas law and Plaintiffs claims pursuant to this theory of liability will not be dismissed.

Finally, New Jersey law imposes a duty to disclose when a defendant has made a partial disclosure. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993) ("where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true"). Here, Plaintiffs have made allegations with respect to Defendant's partial disclosures regarding the Class Vehicles. Plaintiffs rely on the maintenance schedules which, *inter alia*, identify engine parts and components that require routine maintenance and/or replacement at certain points throughout the lifespan of the vehicle. (Compl. at Exs. A, B). According to Plaintiffs' Complaint, "Defendant represents in the maintenance schedules that the timing belt, which performs the same function as the Timing Chain System, will need service after a certain time but makes no representation that the Timing Chain System will need maintenance." (Pl. Opp. Br. at 51 (citing Compl. ¶ 83)). Accordingly, Plaintiffs have pled that Defendant made partial disclosure regarding the Class Vehicles. Since Defendant allegedly made said partial disclosures, it had a duty to fully disclose any and all information regarding the Timing Chain System to Plaintiffs under New Jersey law. Hence, Plaintiffs have pled a viable claim for common law fraud based on Defendant's duty to disclose under New Jersey law, and dismissal would be inappropriate.

### J. Plaintiffs Have Successfully Pled Claims for Negligent Misrepresentation

First, the parties agree the Arkansas does not recognize negligent misrepresentation claims. (Def. Mov. Br. at 59; Pl. Opp. Br. at n.41). Accordingly, Plaintiffs claim for negligent misrepresentation under Arkansas is hereby dismissed.

Defendant argues that the rest of the negligent misrepresentation claims must be dismissed for three reasons: 1) certain states do not permit a negligent misrepresentation claim to lie absent an express, false statement, and therefore cannot be based on an omission; 2) certain states permit omission claims, but only when there is a special relationship; [10] and 3) aside from Kansas and Texas, the economic loss doctrine bars suit for economic damages based on tort theories. These arguments are unconvincing.

First, negligent misrepresentation may be actionable in New York and Michigan even when the claim is based on an omission. *See Williams v. Polgar*, 215 N.W.2d 149 (Mich. 1974)(permitting a negligent misrepresentation claim against an abstracter when he or she omits a recorded deed in a title abstract after failing to conduct a reasonable investigation); *Gomez-Jimenez v. N.Y. Law Sch.*, 103 A.D.3d 13, 17-18 (N.Y. App. Div. 2012)("To state a cause of action for fraudulent misrepresentation, a plaintiff must allege a misrepresentation or a material omission of fact"). Hence, the New York and Michigan Plaintiffs may have an actionable claim under the relevant laws of their forum states and dismissing the claim, at this juncture, would not be proper.

**\*21** Defendant's argument that the negligent misrepresentation claims must be dismissed because there is no special relationship between the parties is equally unpersuasive. This is because, as discussed above, claims based on affirmative misrepresentations and omissions by a vehicle manufacturer may lie when the manufacturer has exclusive or superior knowledge regarding the defect or if the defect relates to a safety concern. The Court has already concluded that, for purposes of this motion, Defendant, at the very least, had superior knowledge regarding the defect and that the defect here potentially implicates safety concerns. Accordingly, at this point in the litigation, Plaintiffs' claims for negligent misrepresentation by Defendant is sufficient as no special relationship is necessary.

Finally, the economic loss doctrine does not bar Plaintiffs' negligent misrepresentation claims. First, as Plaintiffs note, Defendant concedes that this argument is inapplicable to the Kansas and Texas Plaintiffs, and therefore dismissal of those claims pursuant to this argument is not warranted. [11]

Moreover, the remainder of the jurisdictions all have exceptions to the economic loss doctrine. Specifically, those states allow claims to proceed when the tort claim is based on conduct that is either independent of a contract or where there is a risk of personal injury. *See, e.g., United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000) (discussing Colorado law and the applicability of the economic loss doctrine); *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *Ulbrich v. Groth*, 310 Conn. 375, 406 (Conn. 2013); *U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 746 (Ind. 2010); *Holloman v. D.R. Horton, Inc.*, 241 Ga. App. 141, 147-48 (Ga. Ct. App. 1999); *In re Chi. Flood Litig.*, 680 N.E.2d 265, 274-75 (Ill. 1997); *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 265-66 (Md. Ct. App. 2007); *80 S. Eighth St. Ltd. P'ship v. Carey-Canada, Inc.*, 486 N.W.2d 393, 399 (Minn. 1992); *Phillips v. Dignified Transition Sols.*, 2014 WL 4294972, *7 (D. Nev. Aug. 28, 2014); *Johnson v. Capital Offset Co.*, 2013 WL 5406613, *3 (D.N.H. Sept. 25, 2013); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 1134453, *6, n.7 (E.D.N.C. Jan. 25, 2011); *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prods. Inc.*, 2007 WL 894833, *6 (S.D. Ohio Mar. 22, 2007); *Brand Mktg. Grp. LLC v. Intertek Testing Servs.*, N.A., Inc., 801 F.3d 347, 354 (3d Cir. 2015) (applying Pennsylvania economic loss doctrine); *Jackson v. City of Seattle*, 244 P.3d 425, 431 (Wash. Ct. App. 2010); *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 273 (Cal. 2004). Plaintiffs' negligent misrepresentation claim is independent of any contractual claim. (Compl. ¶ 4; *see also* n.5 *supra*). Plaintiffs have also alleged that potential for personal injury in connection with the allegedly defective Timing Chain System. (Compl. ¶ 4). For these reasons, as well as those set forth in Subsection I *supra*, the Court will not dismiss Plaintiffs' negligent misrepresentations claims as being barred by the economic loss doctrine.

### K. Plaintiffs' Have Sufficiently Pled Claims for Unjust Enrichment

Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed because they have an adequate remedy at law. (Def. Mov. Br. at 61)(citing *In re Ford Tailgate Litig*, 2014 U.S. Dist. LEXIS 119769, *12–17, n.3, 2014 WL 3899545 (N.D. Cal. Aug. 8, 2014)). Essentially, Defendant asks this Court to dismiss the unjust enrichment claims because Plaintiffs have asserted other viable, legal remedies. (Def. Mov. Br. at 62)(citing *Ebner v. Fresh, Inc.*, 2016 U.S. App. LEXIS 4875, *17-18, 2016 WL 1056088 (9th Cir. Mar.

17, 2016))(additional citations omitted). This argument is meritless.

**\*22** To assert a *prima facie* cause of action for unjust enrichment a plaintiff must allege that: "(1) at plaintiffs expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying for it." *In re K-Dur*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004)(citing Restatement of Restitution § 1 (1937)); *see also VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (N.J. Sup. Ct. 1994)(stating that a plaintiff seeking to assert a claim for unjust enrichment must establish that "defendant received a benefit[,] and that retention of that benefit without payment would be unjust[,] ... [and plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."). [12]

Plaintiffs here have sufficiently pled claims for unjust enrichment. Indeed, they claim that Defendant received a benefit at Plaintiffs' expense. Specifically, they allege that Defendant benefited, at Plaintiffs' expense, when they sold Plaintiffs a vehicle that would not operate properly until the end its purported usual lifespan. (Compl. ¶¶ 1, 2, 5, 9-10). Said differently, Plaintiffs allege that they received a vehicle that was inferior to the vehicle they thought they were purchasing, yet the price they paid was the price for a supposedly better functioning vehicle they thought they were purchasing. Hence, Plaintiffs have pled that Defendant has been unjustly enriched at their expense.

This claim is pled in the alternate to the other claims in the Complaint. (Pl. Opp. Br. at 63). Pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2); *see also Verizon N.J., Inc. v. Ntegrity Telecontent Servs., inc.*, 219 F. Supp. 2d 616, 635 (D.N.J. 2002). Therefore, Defendant's argument that Plaintiffs' unjust enrichment claims are duplicative fails. For these reasons, the Court concludes that Plaintiffs have pled an alternate *prima facie* causes of action for unjust enrichment, and therefore does not dismiss said claims.

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

### L. Plaintiffs' Have Sufficient Pled Their Statutory Consumer Fraud Claims

As noted above, Plaintiffs have all brought consumer protection claims pursuant to each Plaintiff's local state laws. According to Defendant, the state law consumer protection claims must be dismissed for the following reasons: 1) all of the claims fail to satisfy Fed. R. Civ. P. 9(b) as they lack particularity; 2) eighteen of the state law claims must be dismissed because they fail to allege practices that are likely to deceive ordinary customers; 3) the Arkansas and New York claims must be dismissed because they fail to plead any injury other than diminution of the value of the vehicles; 4) the Georgia and Indiana claims must be dismissed because those states do not recognize omission based claims; 5) Colorado, Georgia, and South Carolina laws do not recognize classwide claims for damages under their consumer protection statutes; 6) Georgia, California and Minnesota's consumer protection statutes do not allow for monetary damages, only equitable relief; 7) the economic loss doctrine bars the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' claims; 8) the Connecticut claims must be dismissed because Connecticut's Products Liability Act subsumes all other claims; 9) the New Jersey and California claims must be dismissed because those states will not permit a claim when a component has outlasted its warranty period; 10) the Ohio claim must be dismissed because Defendant was not placed on sufficient notice that its conduct was deceptive or unconscionable; and 11) the Connecticut and New York claims are time barred. (Def. Mov. Br. at 64-79). The Court disagrees with each of these arguments, except for the argument addressing the Ohio claims.

 **\*23** First, with regards to the Ohio Consumer Sales Protection Act, Defendant argues that the claim must be dismissed as it was not sufficiently on notice that its conducts was deceptive or otherwise unconscionable as defined by the Act. *See* Ohio Rev. Code § 1345.09(B). Plaintiffs bringing claims under this act "must demonstrate that either (1) the alleged violation is an act or practice that are declares to be deceptive or unconscionable by a rule adopted by the Attorney General before the consumer transaction on which the action is based, or (2) the alleged violation is an act or practice that was determined by a court to violate the [Act] and the court's decision was available for inspection before the transaction took place." *In Re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*, 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012). The Ohio Plaintiffs seemingly concede that they failed to sufficiently plead their claim under the Ohio Consumer Sales Protection Act, and offer to re-plead same. (Pl. Opp. Br. at 72, n.55). Accordingly, the Court dismisses the Ohio Plaintiffs' claims under the Ohio Consumer Sales Protection Act, without prejudice, and with leave to file an amended claim.

Additionally, the Court finds that Defendant is correct that each and every one of the various Plaintiffs' statutory fraud and/or violations of consumer protection laws all sound in fraud and therefore are subject to the heightened pleading standards of Fed. R. Civ. P. 9(b). The Court further finds that Plaintiffs have pled *prima facie* claims of statutory fraud and/or violations of consumer protection laws in accordance with each of their home state laws sufficient to satisfy Rule 9(b). Defendant's entire argument relies on its assertion that Plaintiffs' have supposedly failed to plead a misrepresentation by Defendant or that Plaintiffs did not plead facts to support a duty to disclose. The Court disagrees with both of these notions.

As to the duty to disclose, the Court has addressed this argument, *supra*, and has concluded that Plaintiffs' complaint contains sufficient factual allegations to support a duty to disclose claim. Accordingly, the Court adopts the above logic and conclusion. As to the particularity, the Court has discussed, in great detail, how Plaintiffs' Complaint is replete with allegations of both overt misrepresentations and active concealment with respect to the alleged defect in the Timing Chain System. Indeed, Plaintiffs make very specific allegations about how they were supposedly misled about the defective Timing Chain System, along with misrepresentations by Defendant regarding the warranties, the useful life of the vehicle and its engine components, as well as the necessary maintenance and repairs associated with the Class Vehicles. (Compl. ¶¶ 8, 9-10, 94, 135-37, 143, 149, 157, 189-94). These allegations sufficiently place Defendant on notice regarding the specific misconduct that Plaintiffs' assert was fraudulent and deceptive in connection with the statutory fraud and/or violation of consumer protection laws. *See Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 1574301, \*15-18 (D.N.J. May 3, 2012)(Linares, J.), *aff'd*, 525 Fed.Appx. 94 (3d Cir. 2013)(recognizing that the purpose of the heightened Rule 9(b) pleading standards in connection with fraud based claims is to assure a defendant is provided with notice of the "precise misconduct with which [it is] charged."). Here, the Court is satisfied that the Complaint contains sufficient allegations regarding the statutory fraud and/or consumer protection claims and meets the heightened pleading standard under Rule 9(b).

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

Additionally, as noted above, the economic loss doctrine does not bar Plaintiffs' fraud based claims. Those exceptions to the doctrine's applicability extend to statutory fraud and/or consumer protection claims as well. *See, e.g., In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2008 WL 4126264, *29 (D.N.J. Sept. 2, 2008)(compiling cases that refused to dismiss New Jersey Consumer Fraud Act claims pursuant to the economic loss doctrine); *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421, 429 (E.D. Pa. 2015)(holding that the economic loss rule does not bar a Pennsylvania consumer fraud claim); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014)(applying North Carolina law and holding that "the consumer protection statute here gives rise to a duty independent of the contract and therefore should not be barred by the economic loss rule"); *Safeco Ins. Co. of Am. v. CPI Plastics Grp., Ltd.*, 625 F. Supp. 2d 508, 520 (E.D. Mich. 2008)(finding that Michigan's economic loss doctrine does not apply to consumer transactions). Accordingly, based on this Court's analysis above, as well as the relevant case law, the Court concludes that the economic loss doctrine does not bar the Michigan, New Jersey, North Carolina, and Pennsylvania Plaintiffs' statutory fraud and/or violation of consumer protection law claims.

**\*24** Defendant's argument that the Colorado, Georgia, and South Carolina Plaintiffs' claims must be dismissed because those states do not recognize classwide claims for damages is unpersuasive for two reasons. First, as the parties are aware, the application before the Court is to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defendant does not attack the sufficiency of the class allegations in the Complaint, but rather directs its argument as to whether the action could proceed as a class action in general. Hence, Defendant does not address the sufficiency or insufficiency of the claims it seeks to dismiss.

Moreover, the Supreme Court has addressed this issue and has held that matters may proceed as putative class actions, regardless of whether state statutes prohibit such claims, so long as the application of Fed. R. Civ. P. 23 does not "abridge, enlarge or modify any substantive right." *Shady Grove Othopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010)(quoting 28 U.S.C. § 2072(b)). Circuit Courts applying *Shady Grove* have also held that class actions may proceed despite state statutes prohibiting such actions. *See, e.g., In re Hydroxycut Marketing and Sales Practices Litig.*, 299 F.R.D. 648 (S.D. Cal. 2014)(permitting claims under

Georgia, South Carolina and other state consumer protection statutes to proceed as class action under Rule 23 where state statutes do not allow class actions); *see also Lisk v. Lumber One Wood Preserving, LLC*, 792 1331 (11th Cir. 2015)(same application for Alabama consumer protection statutes). Hence, the claim may proceed as a class action and any attacks as to whether class certification is appropriate can be raised at the class certification phase.

Defendant also argues that Plaintiffs from Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas and Washington cannot maintain their claims under the relevant state statutes, because all of those statutes either require a plaintiff to plead subjective reasonable reliance on the alleged deceptive acts or "determine whether a particular practice is deceptive according to its objective tendency to deceive reasonable, ordinary, or average customers." (Def. Mov. Br. at 68)(quotations omitted). Plaintiffs do not disagree with this standard. In support of this argument, Defendant relies on its prior arguments that "Plaintiffs have failed adequately to [*sic*] the existence of, let alone reliance on, misrepresentations, omissions or other deceptive acts by" Defendant. (Def. Mov. Br. at 69).

However, as the Court explained above, Plaintiffs Complaint sufficiently pleads reliance on Defendant's alleged misrepresentations and/or omissions. This is apparent based on Defendant's alleged superior and/or exclusive knowledge of the defective Timing Chain System as well as the allegations that Defendant actively concealed same from Plaintiffs, and those similarly situated. (Compl. ¶¶ 11, 106-07, 110, 122, 143, 151, 158-61, 181). Plaintiffs further contend that these alleged misrepresentations and/or omissions would mislead purchasers, including Plaintiffs, regarding the useful life of the vehicle, the anticipated cost of repair, and the overall value and quality of the Class Vehicles. (Compl. ¶¶ 156-57, 168-, 193). Thus, for these reasons, as well as those detailed above, the Court is satisfied that Plaintiffs have sufficiently pled that they reasonably relied on Defendant's alleged misrepresentations and/or omissions, and therefore their claims will not be dismissed for this reason.

**\*25** As to the Arkansas and New York Plaintiffs, Defendant avers that these claims must be dismissed because those Plaintiffs fail to plead any damages other than a diminution of the value of their vehicles. (Def. Mov. Br. at 70). The Court disagrees. Defendant cites to case law from both jurisdictions,

92 UCC Rep.Serv.2d 754

yet said law does not support its contention. While the Court in *Wallis v. Ford Motor Company*, 208 S.W.3d 153, 161 (Ark. 2005) did dismiss the claim there, the dismissal was because Plaintiff did not plead any "actual damage or injury," and simply pled an abstract diminution in value. The Arkansas Court noted that "actual damage or injury is sustained when the product has *actually malfunctioned or the defect has manifested itself.*" *Id.* Here, Plaintiffs from Arkansas, as well as the rest of Plaintiffs, have sufficiently pled that the malfunction has already either manifested itself in their vehicles and/or that the vehicles have already malfunctioned. (Compl. ¶ 248). Thus, the Court concludes that the Arkansas Plaintiffs have sufficiently pled their claims under the Arkansas Deceptive Trade Practices Act and the Court declines to dismiss same at this juncture.

Similarly, New York's consumer protection laws are implicated when a "plaintiff [alleges] that a deceptive practice caused him to pay more than the good or service he actually received was worth." *Servedio v. State Farms Ins. Co.*, 889 F. Supp. 2d 450, 453 (E.D.N.Y. 2012), *aff'd*, 531 Fed.Appx. 110 (2d Cir. 2013). The *Servedio* Court held that such allegations "maybe able to satisfy the injury requirement" under New York law. *Id.* New York Courts have also explained that where a consumer pays an inflated price due to deceptive conduct on behalf of a defendant that "plaintiff might have a claim for the higher price the consumer paid for the product as a result of the misrepresentation." *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 n.5 (1999). Here, the New York Plaintiffs have sufficiently pled that, based on Defendant's alleged misrepresentations and/or omissions, they were caused to overpay for the supposedly defective Class Vehicles which are purportedly worth less than a defect-free vehicle. (Compl. ¶¶ 15, 183-84, 192-93). Thus, the Court will not dismiss the Arkansas and New York claims based on this argument.

Defendant argues that the Georgia and Indiana claims must be dismissed because those jurisdictions do not recognize omission based claims. (Def. Mov. Br. at 71). This assertion is correct, to the degree that both jurisdictions do not permit statutory consumer fraud claims to proceed merely on allegations of omissions. *See Energy Four, Inc. v. Dornier Med. Systems, Inc.*, 765 F. Supp. 724, 731 (N.D. Ga. 1991)(absent an affirmative representation that is "misleading, partially incorrect, or untrue," the "mere failure to disclose is not actionable."); *Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. Ct. App. 2009)("Indiana Code section 24-5-0.5-3(a) ... does not apply to nondisclosures."). The Georgia and Indiana Plaintiffs

concede the assertion that omission based claims cannot lie in these jurisdictions, but note that they have made allegations of affirmative misrepresentations, which satisfy the pleading requirements of both jurisdictions. (Pl. Opp. Br. at 71-72). Indeed, as detailed above, Plaintiffs' Complaint contains numerous allegations of affirmative misrepresentations. (Compl. ¶¶ 9, 10, 12, 135-37, 143, 149, 156, 157, 362). Those allegations, for example, include affirmative misrepresentations regarding the coverage afforded by the NLVWs, and the useful life of the vehicle. (Compl. ¶¶ 94, 135-37). Thus, the Court is satisfied that the Georgia and Indiana Plaintiffs have pled *prima facie* claims under each their forum state's consumer protection laws.

Defendant further asserts that the California, Georgia, and Minnesota Plaintiffs' consumer fraud claims must be dismissed because those statutes allow for injunctive relief, and those Plaintiffs cannot seek injunctive relief when they have an adequate remedy at law. (Def. Mov. Br. at 72). This argument fails for numerous reasons. First, the Court has explained that Plaintiffs may plead causes of actions in the alternate under Rule 8(d)(2) of the Federal Rules of Civil Procedure. Accordingly, at the very least, these Plaintiffs may sustain these claims in the alternate. Moreover, while these Plaintiffs may ultimately be foreclosed from recovering under these statutes due to the injunctive nature of the relief, that does not necessarily preclude an award of injunctive relief for currently unascertained members of the putative class who may later be identified through discovery. For these reasons, the Court declines to dismiss the California, Georgia, and Minnesota Plaintiffs' statutory consumer fraud claims at this juncture.

**\*26** As to the Connecticut Plaintiffs, Defendant argues that Connecticut's Products Liability Act subsumes any and all other claims stemming from the allegedly defective product. (Def. Mov. Br. at 75)(citing Conn. Gen. Stat. § 52-572m-q). Yet, despite Defendant's assertion that this provision forecloses *all* claims stemming from a defective product, the Connecticut Supreme Court has created exceptions to said blanket rule. *See Gerrity v. R.J. Reynolds Tobacco Co.*, 818 A.2d 769 (Conn. 2003). In *Gerrity*, the Connecticut Supreme Court found that a plaintiff may sustain both a Connecticut Products Liability Act claim along with a Connecticut Unfair Trade Practices Act claim if the Unfair Trade Practices Claim is based on financial injury caused by the allegedly defective product. *Gerrity*, 818 A.2d at 775-76. Here, Plaintiffs have pled financial injury in the form of exacerbated costs of maintenance and repair, as well as increased ownership

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

costs due to inefficiency. (Compl. ¶¶ 151, 189). The Court is satisfied that, at this juncture, Plaintiffs have pled a financial injury and therefore may maintain both a Products Liability claim, as well an Unfair Trade Practices Act, under Connecticut law.

Finally, the Court disagrees with Defendant's assertion that the New York, Connecticut, and Ohio statutory consumer fraud claims are time barred. (Def. Mov. Br. at 78-79). The statute of limitations under both New York and Connecticut law for consumer fraud claims is three years. *See Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184-85 (N.Y. 2013); Conn. Gen. Stat. § 42-110g. In Ohio, the statute of limitations for such claims is two years. *See Ohio Re. Code. Ann.* § 1345.10(c). All three of these statutes of limitations begin running when the "violation" first occurs. *See Indep. Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F. Supp. 2d 183, 190 (D. Conn. 2007)(the "limitation period for [Connecticut Unfair Trade Practices Act] is triggered upon the occurrence of the alleged violation"); *Ohio Rev. Code Ann.* § 1345.10 (an action may not be brought "more than two years after the occurrence of the violation"); *Corsello v. Verizon N.Y.*, Inc., 967 N.E.2d 1177, 1184 (N.Y. 2012) (there must be "successful deception of plaintiffs within three years of the time the action was brought"). Defendant contends that the statute of limitations began each of the Plaintiffs from these forum states purchased their vehicles.

However, as Plaintiffs correctly note, post-sale deceptive conduct is actionable in all three of the venues. *See Marshall v. Hyundai Motor America*, 51 F. Supp. 3d 451 (S.D.N.Y. 2014)(finding that the plaintiff's consumer fraud claims under New York's General Business Law was not time barred due to "post-sale" fraud, specifically, defendant's "fail[ure] to disclose information about the defects in the brake system through adequate warnings or adequate recall notices"); *CSL Silicones Inc. v. Midsun Grp. Inc.*, 170 F. Supp. 3d 304, 312 (D. Conn. 2016) (findind that a "[Connecticut Unfair Trade Practices Act] claim can accrue separately for each discrete illegal act that forms the basis of a [Connecticut Unfair Trade Practices Act] claim"). Here, Plaintiffs Complaint contains sufficient factual allegations regarding Defendant's supposed ongoing deception and failure to disclose the defect despite having knowledge of same. (Compl. ¶¶ 136, 168-69, 181). Dismissal, without affording Plaintiffs the opportunity to conduct discovery regarding this issue, would be inappropriate. Thus, the Court concludes that Plaintiffs have sufficiently pled these claims at this juncture and declines to dismiss them.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint is hereby granted in part and denied in part. The Court hereby dismisses Count II (Breach of Contract),[13] Count III (Negligent Misrepresentation) *only as to the Arkansas Plaintiffs*,[14] and Count XXX (Violation of the Ohio Sales Practices Act) as to the Ohio Sub-Class.[15] The remainder of Defendant's Motion to Dismiss is hereby denied.

### All Citations

Not Reported in Fed. Supp., 2017 WL 1902160, 92 UCC Rep.Serv.2d 754

## Footnotes

1    This background is derived from Plaintiffs' First Consolidated Amended Class Action Complaint (ECF No. 6 ("Compl.")), which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

2    A full description of the TSI engine is contained herein, *infra*.

3    A full description of the TFSI engine is contained herein, *infra*.

4    A full discussion regarding timing chains and the alleged defect that is the subject matter of this action is contained herein, *infra*.

In re Volkswagen Timing Chain Product Liability Litigation, Not Reported in Fed. Supp....
92 UCC Rep.Serv.2d 754

5    Plaintiffs have since abandoned their Breach of Contract Claim. (Pl. Opp. Br. at 41).

6    As discussed in n. 5, *supra*, this claim has been abandoned by Plaintiffs.

7    The Court notes that Defendant is incorrect in its assertion that both Michigan and Nevada law require vertical privity for breach of implied warranty claims. *See Montgomery v. Kraft Foods Glob., Inc.*, 822 F.3d 304, 309 (6th Cir. 2016)(Mich. law); *Pack v. Damon Corp.*, 434 F.3d 810, 818-20 (6th Cir. 2006)(Mich. law); *Hiles Co. v. Johnston Pump of Pasadena, Cal.*, 560 P.2d 154, 157 (Nev. 1977)("[W]e believe that lack of privity between the buyer and manufacturer does not preclude an action against the manufacturer for the recovery of economic losses caused by breach of warranties.").

8    The Court notes that Defendant did not address Plaintiffs' exception arguments in its reply brief. (*See generally* Def. Rep. Br.).

9    Specifically, this is applicable to Plaintiffs from New York, California, Colorado, Connecticut, Florida, Indiana, Kansas, Michigan, Minnesota, New Hampshire, Maryland, North Carolina, Pennsylvania, Washington and Nevada.

10   Defendant relies on its pervious arguments regarding the lack of a special relationship.

11   The Court notes that Defendant did not advance any argument with regards to Colorado's application of the economic loss doctrine to these claims.

12   The Court notes that there are no material differences between jurisdictions regarding the law of unjust enrichment. Accordingly, the Court analysis same under New Jersey law. *See Tele Aid*, 257 F.R.D. at 58 ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict.").

13   This Count was voluntarily withdrawn by Plaintiffs.

14   Dismissal of the negligent misrepresentation claims by the Arkansas Plaintiffs was conceded to.

15   The Ohio Plaintiffs shall be permitted to submit an amended pleading addressing the deficiencies set forth herein.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 12

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 168 of 260
PageID: 69832
Karhu v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2013)

2013 WL 4047016
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

Adam KARHU, on behalf of himself and
all others similarly situated, Plaintiff,
v.
VITAL PHARMACEUTICALS,
INC., d/b/a Vpx Sports, Defendant.

No. 13–60768–CIV.
|
Aug. 9, 2013.

**Attorneys and Law Firms**

Daniel R. Lever, Barry L. Davis, Thornton Davis & Fein, Miami, FL, Scott A. Bursor, Bursor & Fisher, P.A., New York, NY, for Plaintiff.

Victoria Nicole Godwin, Vital Pharmaceuticals, Inc., Weston, FL, for Defendant.

### *ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT*

JAMES I. COHN, District Judge.

**\*1 THIS CAUSE** is before the Court upon Defendant's Motion to Dismiss First Amended Complaint for Failure to State a Claim [DE 21]. The Court has considered the motion, Plaintiff's response [DE 28], Defendant's reply [DE 29], the record in this case, and is otherwise fully advised in the premises.

### I. BACKGROUND

According to the First Amended Complaint ("FAC") [DE 15], which is the operative pleading in this action, Defendant Vital Pharmaceuticals, Inc., d/b/a VPX Sports, is a Florida corporation with its principal place of business in Davie, Florida. DE 15 ¶ 7. Defendant manufactures and markets a dietary supplement called VPX Meltdown Fat Incinerator ("Meltdown"), which is advertised as a product that "burns fat" for six hours, helping the consumer lose weight. *See id.* ¶¶ 1, 15, 44. Meltdown's packaging asserts that its

fat-burning claims are "backed by 5 university studies." *Id.* ¶ 15. On January 16, 2013, Plaintiff Adam Karhu purchased one bottle of Meltdown capsules from a website, www.bodybuilding.com. *Id.* ¶ 25. Plaintiff alleges that the claims made by Defendant in its packaging and on its website are false and misleading, and that Meltdown has "never been clinically proven to be effective for fat loss." *Id.* ¶ 1.

In support, the FAC cites to an October 28, 2010 report about Meltdown issued by the National Advertising Division of the Council of Better Business Bureaus ("NAD"), an investigative unit of the advertising industry's self-regulatory body. In the report, the NAD allegedly demanded that Defendant:

- Stop making the false claim that Meltdown is a "Fat Burner," since the product does not burn fat.

- Stop making the false claims that Meltdown capsules "Burn Fat for 6+ hours" and "Increase Fat Utilization by 56%."

- Stop making any claims that compare Meltdown to ephedrine and epinephrine, including that it is "273% more potent that ephedrinecaffeine" and "972% more powerful than epinephrine," since no reliable basis for comparison exists.

- Stop making any claim about the long-term effects of Meltdown, including "before and after" photographic comparisons, since there is no evidence to support any such claims [ ... ].

*Id.* ¶¶ 14, 16 (collectively referred to as Defendant's "Express Misrepresentations").

Moreover, Plaintiff alleges that Defendant knew that its ingredients were ineffective. One of the ingredients listed on Meltdown's packaging is "Synephrine HCl." *Id.* ¶¶ 18–19. However, according to the FAC, Defendant's own scientist warned as follows:

> **Caution: *Synephrine DOES NOT WORK!*** I hate to burst your bubble by Synephrine and Synephrine HCl are as ***useless as a screen door on a submarine."***

*Id.* ¶ 20. Plaintiff further alleges that Meltdown contains an ingredient called "Hordenine HCl," even though Defendant had experimented with this ingredient and come away "highly disappointed with [its] lack of MAO inhibiting capacity...." *Id.* ¶ 21. Additionally, Defendant allegedly advertises

that Meltdown "provides a thermogenic increase," despite Defendant's own experiments with the product's ingredients which found that "thermogenesis was not induced." *Id.* ¶ 22.

**\*2** On April 3, 2013, Plaintiff Adam Karhu filed this class-action suit against Defendant, on behalf of all purchasers of Meltdown in the United States, as well as a subclass who purchased the product in New York. *See id.* ¶ 28. On May 7, 2013, Defendant filed a Motion to Dismiss for Failure to State a Claim [DE 7] ("First Motion to Dismiss"). On May 28, 2013, Plaintiff filed the FAC, and the Court subsequently denied as moot the First Motion to Dismiss. *See* DE 16. In the FAC, Plaintiff brings the following six claims for relief: (i) violation of the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.;* (ii) breach of express warranty; (iii) breach of implied warranty of merchantability; (iv) unjust enrichment; (v) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statutes § 501.201, *et seq.;* and (vi) violation of New York General Business Law § 349. In the instant motion, Defendant seeks dismissal of all counts of the FAC. Plaintiff opposes the motion.

## II. MOTION TO DISMISS STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss lies for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In order to state a claim, Federal Rule of Civil Procedure 8(a)(2) requires " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Fed.R.Civ.P. 8(a)(2); and *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

At this stage in the litigation, the Court must consider the factual allegations in the complaint as true, and accept all reasonable inferences therefrom. *Jackson v. Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1534 (11th Cir.1994). Nevertheless, the Court may grant a motion to dismiss when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993).

## III. ANALYSIS

In the present motion, Defendant argues that the entire FAC should be dismissed for four reasons: (1) the FAC is a "shotgun pleading"; (2) the FAC is "false on its face;" (3) the FAC relies exclusively on documents from NAD, and thus fails to assert any factual allegations; and (4) that this Court's resolution of the claims would invade the primary jurisdiction of the United States Food and Drug Administration ("FDA") and Federal Trade Commission ("FTC"). Defendant further argues that each of Plaintiff's claims should be dismissed for failure to state the necessary elements for relief. The Court will address each of these arguments in turn.

### A. Shotgun Pleading

**\*3** Defendant asserts that the FAC is a shotgun pleading because it does not indicate which facts apply to which causes of action. The Court agrees. A shotgun pleading is one which "fails to adequately link a cause of action to its factual predicates." *Lampkin–Asam v. Volusia Cnty. Sch. Bd.,* 261 F. App'x 274, 277 (11th Cir.2008). "The Eleventh Circuit has had much to say about shotgun pleadings, none of which is favorable." *Jovine v. Abbott Labs., Inc.,* 795 F.Supp.2d 1331, 1336–37 (S.D.Fla.2011) (citing *Davis v. Coca–Cola Bottling Co.,* 516 F.3d 955, 979 n. 54 (11th Cir.2008) ("[S]ince 1985 we have explicitly condemned shotgun pleadings upward of fifty times."); *see also Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.,* 305 F.3d 1293, 1295 n. 9 (11th Cir.2002) ("This court has addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."). Typically, such a pleading fails to comply with Rule 8(a)(2), requiring that the complaint contain a "short and plain statement of the claim," as well as Rule 8(d), which states that "[e]ach allegation [in a pleading] must be simple, concise, and direct." *Burch v. Baker,* No. CV–11–S–3770–NW, 2013 U.S. Dist. LEXIS 354, at \*8–9, 2013 WL 24017 (N.D.Ala. Jan.2, 2013) (citing Fed.R.Civ.P. 8(a)(2), 8(d)). Here, the FAC is clearly

a shotgun pleading. While it contains a section titled "Facts Common to All Causes of Action," and goes on to generally describe the six causes of action, it does not plead the specific factual predicate for each claim, or link particular facts to the individual causes of action. *See* DE 15 ¶¶ 12–27. Consequently, the Court will dismiss the FAC in its entirety for this reason. Nonetheless, the Court will address the parties' remaining arguments to guide the parties' preparation of prospective pleadings.

### B. Alleged Falsity of the Pleadings

Defendant next claims that Plaintiff's allegations are false and unsupportable. Defendant purports to attach five university studies which substantiate claims made in the advertising of Meltdown. However, at the motion to dismiss stage, the Court accepts Plaintiff's well-pleaded allegations as true. Thus, the Court finds this argument to be without merit.

### C. Reliance on the Findings of NAD

Defendant contends that the FAC does not contain sufficient factual content to support any of the claims because it relies exclusively on the findings of the NAD and its appellate body. This argument is unavailing, as the FAC does not rely solely on the NAD's findings. To the contrary, from paragraphs 20 through 24, Plaintiff cites to Defendant's own studies which allegedly state that Meltdown's formula was ineffective at facilitating weight loss. DE 15 ¶¶ 20– 24. Moreover, Defendant provides no reason why Plaintiff cannot use the NAD's findings as part of the factual basis for its claims. Indeed, Plaintiff may reference them as evidence that an industry group found Defendant's advertising to be misleading. Accordingly, the Court will not dismiss the FAC for lack of factual basis.

### D. Primary Jurisdiction

**\*4** Defendant asserts that this action should be dismissed because the Court's resolution of this case would invade the primary jurisdiction of the United States Food and Drug Administration ("FDA") and Federal Trade Commission ("FTC"). The primary jurisdiction doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."

*Axiom Worldwide, Inc. v. Becerra,* No. 8:08–cv–1918–T– 27–TBM, 2009 U.S. Dist. LEXIS 40214, at \*15, 2009 WL 1347398 (M.D.Fla. May 13, 2009) (quoting *Alpharma, Inc. v. Pennfield Oil Co.,* 411 F.3d 934, 938 (8th Cir.2005)). Invoking the doctrine allows a court to benefit from an agency's experience and expertise, and promotes the uniform administration of the regulatory scheme administered by the agency. *Flo–Sun, Inc. v. Kirk,* 783 So.2d 1029, 1037 (Fla.2001) (citing *Key Haven Associated Enters. v. Bd. of Trustees of the Internal Improvement Trust Fund,* 427 So.2d 153, 157 (Fla.1982)). Generally, the doctrine will apply where there is "(1) a need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Clark v. Time Warner Cable,* 523 F.3d 1110, 1115 (9th Cir.2008) (internal quotations and citations omitted). However, the application of the doctrine "is a matter of deference, policy and comity, not subject matter jurisdiction." *Id.* at 1037–38.

Defendant asserts that Plaintiff is essentially asking the Court to regulate the formulation, labeling, and advertisement of a dietary supplement. Defendant argues that those are functions that Congress has specifically assigned to the FDA and FTC, and that substantial technical expertise is required to administer these tasks. Plaintiff responds that his claims pertain to misrepresentations in labeling, and are brought pursuant to state and federal consumer protection laws which are within the Court's competency to enforce.

The Court recently handled a similar issue in *In re Horizon Organic Milk Plus DHA Omega–3 Marketing and Sales Practice Litigation,* No. 12–md–02324–JAL, 2013 U.S. Dist. LEXIS 105830, 2013 WL 3830124 (S.D .Fla. July 24, 2013). In *Horizon,* the defendants' product label stated that the product was fortified with DHA Omega–3, and that "DHA Omega–3 Supports Brain Health." 2013 U.S. Dist. LEXIS 105830 at \*7, 2013 WL 3830124. The plaintiffs brought claims for consumer fraud, unjust enrichment, and breach of warranty, asserting that the label's claims were false and misleading. The defendants argued that whether and to what extent their claims regarding DHA Omega–3 were substantiated was within the primary jurisdiction of the FDA. Judge Lenard rejected this argument, finding that

> Plaintiffs' claims rest on the determination of whether WhiteWave's brain health representations on its products' labeling, in its advertisements, and on its website

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 171 of 260
PageID: 69835
Karnu v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2013)

are false and/or misleading and whether customers purchased WhiteWave's products in reliance on these representations. ... " '[T]his is not a tehcnical area in which the FDA has greater technical expertise than the courts—[as] every day courts decide whether conduct is misleading.' " *Rikos v. Procter & Gamble Co.,* 782 F.Supp.2d 522, 530 (S.D.Ohio 2011) (quoting *Lockwood v. Conagra Foods, Inc.,* 597 F.Supp.2d 1028, 1035 (N.D.Cal.2009).

**\*5** *Id.* at \*95–96. Judge Lenard further noted that the primary jurisdiction doctrine is generally not applied unless the party seeking agency referral provides evidence that the agency has taken an interest in investigating the claims at issue. *Id.* at 103–04 (citing *Rikos,* 782 F.Supp.2d at 530).

The Court finds Judge Lenard's reasoning to be applicable in the instant action. Here, Plaintiff's claims depend primarily on whether Defendant's fat-burning representations on their packaging and website are false or misleading, and whether customers relied on these representations in purchasing the product. Determining whether a manufacturer has misled consumers is squarely within the judicial function, and does not require the special expertise of the FDA or the FTC. Moreover, while Defendant demonstrates that Plaintiff could bring Meltdown to the FDA or FTC's attention, Defendant does not make a showing that either agency has actually taken an interest in investigating the product. Accordingly, the Court finds that its ruling on Plaintiff's claims would not interfere with the FDA or FTC's regulatory scheme, and the application of the primary jurisdiction doctrine would be inappropriate in this case.

### E. Failure to State a Claim

As noted above, Defendant moves to dismiss each count of the FAC for failure to state a claim upon which relief may be granted. The Court will proceed to address the motion as it pertains to each count.

### 1. Counts I and II

In Count I, Plaintiff alleges that Defendant violated the MMWA by making false and misleading written representations about Meltdown. In Count II, Plaintiff brings a claim for breach of express warranty based on the same facts. Defendant asserts that the MMWA incorporates

state law causes of action regarding express warranties, and that Florida law requires privity of contract in order to bring a breach of express warranty claim. Plaintiff alleges that he purchased Meltdown from the website, www.bodybuilding.com, rather than from Defendant directly. *See* DE 15 ¶ 25. Therefore, because Plaintiff does not allege privity of contract, Defendant argues that both Counts I and II must be dismissed.

Some courts have held that the MMWA incorporates state law causes of action as to both express and implied warranties, *see, e.g., Hill v. Hoover,* 899 F.Supp.2d 1259, 1266 (N.D.Fla.2012), while others have found that it only incorporates state law with regard to implied and oral warranties, but creates an independent cause of action for express written warranties, *see, e.g., Rentas v. DaimlerChysler Corp.,* 936 So.2d 747, 750–51 (Fla. 4th DCA 2006). Courts that have found that the MMWA creates an independent cause of action for express written warranties have consistently found that such an action can be brought notwithstanding a lack of transactional privity. *See Borchardt v. Mako Marine Int'l, Inc.,* No. 08–61199–CIV–MARRA, 2011 U.S. Dist. LEXIS 55150, at \*15, 2011 WL 2084177 (S.D.Fla. May 24, 2011); *Fed. Ins. Co. v. Lazzara Yachts of N. Am., Inc.,* No. 8:09–CV–T–27MAP, 2010 U.S. Dist. LEXIS 28865, at \*17, 2010 WL 1223126 (M.D.Fla. Mar. 25, 2010) (citing *Yvon v. Baja Marine Corp.,* 495 F.Supp.2d 1179, 1183 n. 4 (N.D.Fla.2007)); *Rentas,* 936 So.2d at 751.

**\*6** However, even if the MMWA incorporates Florida law with regard to all breach of warranty claims, privity of contract would not be required to sustain Plaintiff's claim. While privity is generally necessary for breach of express warranty claims, see, e.g., *Weiss v. Johansen,* 898 So.2d 1009, 1011 (Fla. 4th DCA 2005), courts have relaxed this requirement where the express warranty was clearly intended to cover subsequent purchasers. See *Fed. Ins. Co.,* 2010 U.S. Dist. LEXIS 28865 at \*18–20; 2010 WL 1223126 *see also, Mardegan v. Mylan,* No. 10–14285–CIV–MARTINEZ–LYNCH, 2011 U.S. Dist. LEXIS 89787, at \*16–19 & n. 4, 2011 WL 3583743 (S.D.Fla. Aug. 12, 2011) (noting that "courts applying Florida law have found exceptions allowing express warranty claims to proceed even absent privity," and that a claim's success depends on the particular facts of the case).

The Court addressed a factual situation similar to the present one in *Smith v. WM. Wrigley Jr. Co.,* 663 F.Supp.2d 1336, 1341–43 (S.D.Fla.2009). In Wrigley, the plaintiff brought an

*Karhu v. Vital Pharmaceuticals, Inc.,* Not Reported in F.Supp.2d (2013)

MMWA claim for breach of express warranty for misleading statements made on the packaging of Defendant's chewing gum. *663 F.Supp.2d at 1337.* The defendant, relying on *T.W.M. v. American Medical Systems,* 886 F.Supp. 842, 844 (N.D.Fla.1995), argued that the claim must fail because the parties are not in privity of contract. The Court rejected this argument, noting that, while Florida courts had not expressly ruled on whether privity is required for an express warranty claim, "several Florida courts discussing warranty claims under the [MMWA] have dismissed implied warranty claims against a manufacturer for lack of privity while allowing express warranty claims to go forward." *Id.* at 1342 (citing, *e.g., Mesa v. BMW of N. Am.,* 904 So.2d 450, 458 (Fla. 3d DCA 2005); *David v. Am. Suzuki Motor Corp.,* 629 F.Supp.2d 1309 (S.D.Fla.2009)). In analyzing whether privity was required in that case, the Court found two factors to be particularly important. First, the Court distinguished the case from *T.W.M.,* which involved a defective surgical implant, because the plaintiff in *T.W.M.* could reasonably rely on a learned intermediary—his doctor—to give him relevant information regarding the product and its warranties. *Id* . at 1343. With chewing gum, on the other hand, the end-purchaser could look to the retailer of the product—i.e., the cashier at a convenience store—for such information. Second, the warranty at issue was contained on the product's packaging, and therefore was clearly meant to be relied upon by the consumer. *See id.* Based on these facts, the Court held that the plaintiff stated a valid claim under the MMWA, despite the lack of privity. *Id.*

Defendant in this case also relies on *T.W.M.* for the proposition that privity is required in express warranty cases. For the reasons stated in *Wrigley,* such reliance is misplaced. Here, the product in question is a dietary supplement sold online. There are no facts in the pleadings that indicate that Plaintiff could expect to receive relevant scientific information about Meltdown's ingredients from the retailer. Moreover, like the warranty in *Wrigley,* the express warranties in this case were contained on the packaging and in the advertisements, both clearly directed toward the end-purchaser. Accordingly, based on the particular facts of this case, privity is not required to state a claim for breach of express warranty, and Plaintiff will be permitted to replead Counts I and II to conform with Rule 8.

*2. Count III*

**\*7** In Count III, Plaintiff alleges that Defendant breached an implied warranty of merchantability because the goods were not of average quality, and the goods were unfit for their intended and ordinary purpose. As with Counts I and II, Defendant contends that Count III must be dismissed for lack of privity between the parties. Here, Defendant's argument has greater merit. Indeed, under Florida law, it is wellestablished that "a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity." *Mesa,* 904 So.2d at 458 (citing, e.g., *Kramer v. Piper Aircraft Corp.,* 520 So.2d 37 (Fla.1988)); *see also Mardegan,* 2011 U.S. Dist. LEXIS 89787 at \*15–16, 2011 WL 3583743 (dismissing a breach of implied warrant claim for a failure to allege privity).

Plaintiff responds that, contrary to Defendant's assertion, the parties are in privity. Plaintiff argues that courts have found privity, even when the plaintiff did not buy directly from the defendant, "where the [defendant's] representative had direct contacts with the purchaser." *Carnival Corp. v. Rolls–Royce PLC,* No. 08–23318–CIV–SEITZ, 2009 U.S. Dist. LEXIS 107261, at \*9–10, 2009 WL 3861482 (S.D.Fla. Nov. 17, 2009) (citing *Cedars of Lebanon Hosp. Corp. v. European X–Ray Distribs. of Am., Inc.,* 444 So.2d 1068, 1072 (Fla. 3d DCA 1984)). Plaintiff claims that Defendant made direct representations to Plaintiff through Meltdown's label, thereby placing the parties in privity. This argument is unavailing. In *Carnival Corp.* and *Cedars of Lebanon,* the manufacturer-defendant or his representative was significantly and directly involved in the sale to the plaintiff. *See Carnival Corp .,* 2009 U.S. Dist. LEXIS 107261 at \*4–6, 2009 WL 3861482 (defendants met with plaintiffs and made specific representations about the merchantability of the goods in question); *Cedars of Lebanon,* 444 So.2d at 1072 (defendant's sales representatives called the plaintiff and made direct representations about the quality of the goods). Here, while Defendant's labeling was aimed at consumers, it does not amount to the type of substantial and direct contacts that created privity in the aforementioned cases. *See Cedars of Lebanon,* 444 So.2d at 1072 n. 4 (emphasizing that it was the direct contacts between the manufacturer and consumer that permitted a finding of privity).

In the alternative, Plaintiff alleges that the retailer, bodybuilding.com, was an agent of Defendant. Plaintiff argues that its privity with Defendant's agent is sufficient to establish privity with Defendant. This argument is unpersuasive. Florida courts have generally found that a

*Karhu v. Vital Pharmaceuticals, Inc., Not Reported in F.Supp.2d (2015)*

plaintiff's privity with a defendant's agent, by itself, is not enough to create privity with the defendant. Rather, it is necessary to look at the relationship between the plaintiff and defendant themselves to determine the existence of privity. For instance, in *Bland v. Freightliner, LLC,* 206 F.Supp.2d 1202, 1206–07 (M.D.Fla.2002), cited by Plaintiff, the plaintiff bought a truck from a dealer, but sued the manufacturer. The court found privity between the plaintiff and manufacturer because, in the plaintiff's contract with the dealer, the names of the dealer and manufacturer were "used almost interchangeably." 206 F.Supp.2d at 1207. The contract identified the manufacturer when waiving the dealer's liability, and permitted the plaintiff to return the vehicle to any of manufacturer's dealers for repair. *Id.* Based on these facts, the Court found that there was a sufficiently direct relationship between the parties to support a finding of privity. *Id.; see also Foote v. Green Tree Acceptance, Inc.,* 597 So.2d 803, 804–05 (Fla. 1st DCA 1991) (finding privity between vehicle purchaser and manufacturer when the warranty agreement required the purchaser to contact the manufacturer for repairs if the dealer failed to repair the vehicle). By contrast, courts have repeatedly found that merely purchasing a product from an authorized dealer does not establish privity with the manufacturer. *See Rentas,* 936 So.2d at 751; *Mesa,* 904 So.2d at 458; *Cesarani v. Am. Honda Motor Co.,* 916 So.2d 843, 847 (Fla. 2d DCA 2005).

**\*8** Here, the FAC alleges only that Plaintiff "understood that in making the sale, www.bodybuilding.com was acting with the knowledge and approval of Defendant and/or as the agent of Defendant." DE 15 ¶ 27. This allegation, by itself, is insufficient to support a finding of privity with Defendant. Accordingly, Count III will be dismissed with prejudice.

### 3. Count IV

In Count IV, Plaintiff alleges that Defendant was "unjustly enriched in retaining the revenues from Plaintiff and Class members' purchases of Meltdown." DE 15 ¶ 61. Defendant moves to dismiss Count IV on two grounds. First, Defendant claims that Plaintiff has failed to plead sufficient facts to establish an unjust enrichment claim. To state a claim for unjust enrichment, a party must plead that:

> 1) the plaintiff has conferred a benefit on the defendant; 2) the defendant has knowledge of the benefit; 3) the

> defendant has accepted or retained the benefit conferred; and 4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value.

*Della Ratta v. Della Ratta,* 927 So.2d 1055, 1059 (Fla. 4th DCA 2006) (citations omitted). Defendant argues that Plaintiff has not alleged that Defendant had knowledge of a benefit that was inequitable, and therefore the claim is inadequately pleaded. This assertion is without merit. The FAC alleges that:

> 59. Plaintiff and Class members conferred benefits on Defendant by purchasing Meltdown.

> 60. Defendant has knowledge of such benefits.

> 61. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchase of Meltdown. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that Meltdown was a safe and effective treatment for fat loss when in fact it was ineffective and worthless, which caused injuries to Plaintiff and Class members because they would not have purchased Meltdown if the true facts had been known.

DE 15 ¶¶ 59–61. There is no additional requirement that Defendant be aware that retention of the benefit would be inequitable.

Defendant further contends that Count IV should be dismissed because unjust enrichment is an equitable claim, and Plaintiff has an adequate remedy at law. The Eleventh Circuit recently addressed this issue in *State Farm Mutual Automobile Insurance Company v. Physicians Injury Care Center, Inc.,* stating that:

> It is generally true that equitable remedies are not available under Florida law when adequate legal remedies exist. *Williams v. Bear Stearns & Co.,* 725 So.2d 397, 400 (Fla. 5th DCA 1998). However, that rule does not apply to unjust enrichment claims. *Id.* "It is only upon a showing that an express contract exists [between the parties] that the unjust enrichment ... count fails ." *Id.* Thus, to the extent that [the plaintiff] did have adequate legal remedies, those remedies did not bar its unjust enrichment claim.

**\*9** 427 F. App'x 714, 722 (11th Cir.2011). Therefore, until an express contract is proved, Defendant's motion to dismiss Count IV with prejudice is premature. Moreover, as Plaintiff points out, the Federal Rules permit a party to plead alternative legal and equitable theories for recovery. *See* Fed.R.Civ.P. 8(a)(3). Thus, "while a plaintiff may not recover under both legal and equitable theories, there is no basis for dispensing with Plaintiff's unjust enrichment claim at the motion to dismiss stage." *Muzuco v. Re SubmitIt, LLC,* No. 11–62628–CIV–SCOLA, 2012 U.S. Dist. LEXIS 110373, at \*22, 2012 WL 3242013 (S.D.Fla. Aug. 7, 2012). Therefore, Count IV will be dismissed without prejudice.

### *4. Count V*

Count V of the FAC alleges that Defendant's labeling and advertising of Meltdown as a fat-burning product amounted to an unfair and deceptive practice injurious to consumers, in violation of FDUTPA. Defendant moves to dismiss Count V on the ground that FDUTPA only protects in-state consumers, or out-of-state consumers where the offending conduct occurred entirely within the State of Florida. Plaintiff responds that there are no geographical limitations within the language of the statute, and that it is applicable to non-residents even when the fraudulent conduct occurred outside the state. The parties also disagree as to which state the fraudulent conduct took place in.

#### *a. FDUTPA applies to fraudulent conduct taking place in Florida.*

On a few occasions, Florida courts have held that FDUTPA is applicable only to claims brought by in-state consumers. *See Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.,* 760 So.2d 1037, 1042 (Fla. 2d DCA 2000) (declining to certify a nationwide class-action FDUTPA claim, and holding that "only in-state consumers can pursue a valid claim under [FDUTPA]."); *Coastal Physician Servs. of Broward Cnty. v. Ortiz,* 764 So.2d 7 (Fla. 4th DCA 1999) (concluding that FDUTPA was enacted to protect in-state consumers). More recently, however, courts have expanded coverage to claims of outof-state consumers if the offending conduct occurred predominantly or exclusively in Florida. *See Millennium Communs. & Fulfillment, Inc. v. Office of the AG, Dep't of Legal Affairs,* 761 So.2d 1256, 1261–62 (Fla. 3d DCA 2000) (holding that FDUTPA applies to claims brought by any consumer where the allegations show "that the offending conduct occurred entirely within this state");

*Barnext Offshore, Ltd. v. Ferretti Group USA, Inc.,* No. 10–23869–CIV–ALTONAGA/SIMONTON, 2012 U.S. Dist. LEXIS 61710, at \*16–20, 2012 WL 1570057 (S.D.Fla. May 2, 2012) (finding that FDUTPA was applicable to claims of an out-of-state consumer, even though certain relevant events took place outside Florida); *2P Commercial Agency S.R.O. v. Familiant,* No. 2:11–cv–FtM–29SPC, 2012 U.S. Dist. LEXIS 179628, at \*10–12 (citing *Millennium* and *Barnext,* and finding that FDUTPA applies to claims involving fraudulent conduct that occurred exclusively in Florida).

**\*10** The Court finds that the reasoning in *Millennium* and its progeny provides the fairest reading of FDUTPA's text and stated purpose. Nothing in the language of the statute suggests that it is limited to transactions involving Florida consumers. *See* Fla. Stat. §§ 501.202–501.204; *see also Millennium,* 761 So.2d at 1262 (noting that, while other states' consumer statutes contain geographic or residential restrictions, FDUTPA does not). Moreover, "one of the three enumerated purposes of FDUTPA is '[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.' " *2P Commercial Agency,* 2012 U.S. Dist. LEXIS 179628 at \*12 (quoting Fla. Stat. § 501.202(2)). FDUTPA does not limit the term "consuming public" to Florida residents. *Id.* Thus, the Court concludes that FDUTPA applies to non-Florida residents if the offending conduct took place predominantly or entirely in Florida.

#### *b. Defendant's alleged fraudulent conduct took place in Florida.*

Defendant argues that, because Plaintiff purchased and consumed the product in New York, there is not a sufficient nexus between the alleged tort and the State of Florida. The Court disagrees. Plaintiff alleges that Defendant is a Florida corporation, and that its principal place of business is located in Davie, Florida. *See* DE 15 ¶ 7. The claims in this action are based on Defendant's alleged misrepresentations that it made on its own website and on the label of its product. Thus, it is reasonable to infer that all of Defendant's alleged misconduct took place in Florida. While Plaintiff is a New York resident and may have been injured in New York, "the place of injury is less significant in the case of fraudulent misrepresentations." *Cohen v. Implant Innovations, Inc.,* 259 F.R.D. 617, 635 (S.D.Fla.2008) (quoting *Restatement (Second) of Conflict of Laws* § 145 cmt. e (1971)). Moreover, in "[a]n action based upon deceptive representations made on a centralized website ... [the Court] should give greater weight to the

Defendant['s] location as opposed to the place fo injury." *Costa v. Kerzner Int'l Resorts,* Inc., No. 11–60663–CV–COHN, 2011 U.S. Dist. LEXIS 66921, at *13, 2011 WL 2519244 (S.D. Fla. June 23, 2011). Accordingly, because Defendant's alleged fraudulent activities took place in Florida, Plaintiff will be dismissed without prejudice, and Plaintiff may replead Count V to comply with Rule 8.

### 5. Count VI

In Count VI, Plaintiff brings a claim under New York General Business Law § 349 for unfair and deceptive trade practices related to the packaging and advertising of Meltdown. Defendant moves to dismiss Count VI on four grounds, each of which is unavailing. First, Defendant asserts that, under *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), "the district court has a powerful reason to choose not to continue to exercise jurisdiction" over a state-law claim. DE 21 at 17. *Cohill* concerned a district court's discretion in exercising pendent jurisdiction over state-law claims. The instant claim is brought pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), conferring original federal jurisdiction over class actions so long as there is minimal diversity, at least 100 class members, and more than $5,000,000 in controversy. *See* DE 15 ¶ 9; 28 U.S.C. § 1332(d). These jurisdictional facts are alleged and, to this point, undisputed by Defendant. *See* DE 15 ¶ 9. Accordingly, the Court finds that the exercise of jurisdiction over this claim is appropriate.

**\*11** Second, Defendant argues that Plaintiff has failed to plead sufficient damages to recover under § 349. Defendant contends that Plaintiff only alleges $35.97 in damages, and that the statute has a $50.00 threshold for recovery. This argument is inconsistent with the plain language of the provision. Section 349(h) provides a private right of action allowing a party "to recover his actual damages or fifty dollars, whichever is greater." N.Y. Gen. Bus. Law § 349(h). Thus, if a plaintiff claims less than $50.00 in damages, he can nonetheless recover up to $50.00 if he prevails in his claim. The Court fails to discern any minimum threshold amount to bring a claim under the statute.

Third, Defendant asserts that Plaintiff cannot show "actual damages" because he has only pled monetary harm, rather than physical harm. However, as Plaintiff notes, New York courts have routinely held that monetary harm is sufficient to bring a claim under § 349. *See Ackerman v. Coca–Cola*

*Co.,* No. CV–09–0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *88, 2010 WL 2925955 (E.D.N.Y. July 21, 2010) ("Injury is adequately alleged under [§ 349] ... by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations.") (citing *Jenrow v. Wendy's Int'l., Inc.,* No. 07 Civ. 3971(LTS) (THK), 2007 U.S. Dist. LEXIS 85104, at *8–9, 2007 WL 4116241 (S.D.N.Y. Nov. 15, 2007)).

Fourth, Defendant claims that § 349(d) specifically allows for the defense of primary jurisdiction. This is incorrect. Subsection (d) provides as follows:

> In any such action [brought under the statute] it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to **and complies with** the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statute are interpreted by the federal trade commission or such department, division, commission or agency of the federal courts.

N.Y. Gen. Bus. Law § 349(d) (emphasis added). Defendant has not provided any evidence that it has complied with applicable federal regulations. Thus, Count VI will be dismissed without prejudice.

### IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss First Amended Complaint for Failure to State a Claim [DE 21] is **GRANTED;**

2. Counts I, II, IV, V, and VI are **DISMISSED without prejudice;**

3. Count III is **DISMISSED with prejudice;** and

4. Plaintiff shall file a Second Amended Complaint by no later than **August 19, 2013.**

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4047016

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 13

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 178 of 260
PageID: 69842

Korolshteyn v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1020391
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Tatiana KOROLSHTEYN, on behalf of herself
and all others similarly situated, Plaintiff,

v.

COSTCO WHOLESALE CORPORATION
and NBTY, Inc., Defendants.

Case No.: 3:15-cv-709-CAB-RBB
|
Signed 03/16/2017

**Attorneys and Law Firms**

Max A. Stein, Boodell & Domanskis, LLC, Stewart Weltman, Siprut PC, Chicago, IL, Patricia N. Syverson, Bonnett, Fairbourn, Friedman & Balint, PC, San Diego, CA, Elaine A. Ryan, Bonnett, Fairbourn, Friedman & Balint, PC, Phoenix, AZ, for Plaintiff.

Eileen M. Ahern, Megan O'Neill, Nicole Diaz, William Alexander Delgado, Willenken Wilson Loh & Delgado LLP, Los Angeles, CA, for Defendants.

**ORDER GRANTING MOTION
FOR CLASS CERTIFICATION**

Hon. Cathy Ann Bencivengo, United States District Judge

\*1  This matter is before the Court on Plaintiff's motion for class certification. The motion has been fully briefed, and the Court deems it suitable for submission without oral argument. As discussed below, the motion is granted.

**I. Background**

This case arises out of Defendants' alleged false statements about the health benefits of TruNature Gingko Biloba with Vinpocetine ("TruNature Gingko"), which is manufactured by Defendant NBTY, Inc. ("NBTY") and sold at the stores of Defendant Costco Wholesale Corporation ("Costco"). The labels of TruNature Gingko represent that the product "supports alertness & memory," that "Gingko biloba can help with mental clarity and memory," and that "[i]t also helps maintain healthy blood flow to the brain to assist mental clarity and memory, especially occasional mild memory

problems associated with aging." [Doc. No. 100 at ¶ 1.] According to the TAC, these representations are false because studies show that gingko biloba and vinpocetine do not provide any mental clarity, memory or mental alertness benefits. [*Id.* at ¶ 2.] Plaintiff Tatiana Korolshteyn alleges she bought a bottle of TruNature Gingko based on the allegedly false representations on the product label and filed this lawsuit on behalf of herself and a putative class of consumers who purchased TruNature Gingko in California. The TAC asserts two claims: (1) violation of California's unfair competition law (the "UCL"), California Business & Professions Code § 17200 *et seq.*; and (2) violation of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.* The prayer for relief asks for restitution and disgorgement of Defendants' revenues, actual, statutory and punitive damages, and attorneys' fees and costs. [*Id.* at p. 15.] She now moves to certify a class.

**II. Legal Standard for Class Certification**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted). "Parties seeking class certification must satisfy each of the four requirements of [Federal Rule of Civil Procedure] 23(a) ... and at least one of the requirements of Rule 23(b)." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). "Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class). *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (internal quotation marks, brackets, and ellipses omitted).

Plaintiff here contends that in addition to satisfying these four Rule 23(a) requirements, class certification is warranted under Rule 23(b)(3). Rule 23(b)(3) "requires that common questions of law or fact found under Rule 23(a)(2) 'predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016).

\*2  In considering class certification, district courts must engage in "a rigorous analysis" to determine whether "the

prerequisites of Rule 23(a) have been satisfied." *Dukes,* 564 U.S. at 350-51 (citing *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161 (1982)). "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 981 (9th Cir. 2011). Thus, "a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (*emphasis* in original). At the same time, courts "consider merits questions at the class certification stage *only* to the extent they are relevant to whether Rule 23 requirements have been met." *Torres,* 835 F.3d at 1133 (*emphasis* added). "While some evaluation of the merits frequently cannot be helped in evaluating commonality, that likelihood of overlap with the merits is no license to engage in free-ranging merits inquiries at the certification stage." *Stockwell v. City & Cty. of San Francisco,* 749 F.3d 1107, 1111 (9th Cir. 2014) (internal quotation marks and citation omitted). "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not turn class certification into a mini-trial on the merits." *Edwards v. First Am. Corp.,* 798 F.3d 1172, 1178 (9th Cir. 2015).

### III. Motions to Exclude or Strike Declarations and Expert Reports

"On a motion for class certification, the Court makes no findings of fact and announces no ultimate conclusions on Plaintiffs' claims." *Keilholtz v. Lennox Hearth Prod. Inc.,* 268 F.R.D. 330, 337 (N.D. Cal. 2010). Thus, at the certification stage, "the Court may consider evidence that may not be admissible at trial." *Aguirre v. Genesis Logistics,* No. SACV1200687JVSANX, 2016 WL 6573986, at *2 (C.D. Cal. July 20, 2016). One court even noted that a "district court may certify a class without supporting evidence." *Dominguez v. Schwarzenegger,* 270 F.R.D. 477, 483 n.5 (N.D. Cal. 2010) (citing *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir. 1992)). "Accordingly, the court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the motion for class certification." *Aguirre,* 2016 WL 6573986, at *2 (internal quotation marks and brackets omitted).

Here, in conjunction with the motion, the parties have combined to submit numerous declarations and expert reports and dozens of exhibits that they claim support their arguments for or against class certification. Perhaps unsurprisingly, these voluminous evidentiary submissions have yielded three separate motions to exclude the reports or declarations of four different experts or witnesses purportedly offering expert testimony. That the evidence does or does not support the putative class' claims is a separate question from whether a plaintiff may assert those claims on behalf of a class. The parties may disagree about the admissibility various expert reports and other declarations, but the admissibility of this testimony is largely inconsequential to the Court's current task of determining whether Plaintiff's claims are appropriate for determination on a classwide basis. Accordingly, the motions to exclude or strike the declarations, testimony or reports of Richard Bazinet, Beth Snitz, Susan Mitmesser, and Edward Rosick are all denied without prejudice. The parties are welcome to re-file these motions in connection with summary judgment motions or as motions in limine consistent with the deadlines set by the applicable case management orders and local rules.

### IV. Discussion

#### A. The Proposed Class(es)

Plaintiff seeks certification of a California-only UCL Class and a California-only CLRA Class, but the classes are identical: "All California consumers who, within the applicable statute of limitations, purchased TruNature Gingko Biloba with Vinpocetine until the date notice is disseminated." [Doc. No. 107 at 20.] "For purposes of class certification, the UCL ... and CLRA are materially indistinguishable." *Forcellati v. Hyland's, Inc.,* No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014). "[C]lass certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue." *Berger v. Home Depot USA, Inc.,* 741 F.3d 1061, 1068 (9th Cir. 2014).

**\*3** "To state a claim under the UCL ... 'based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.' " *Pulaski & Middleman, LLC v. Google, Inc.,* 802 F.3d 979, 985 (9th Cir. 2015) (quoting *In re Tobacco II Cases,* 46 Cal. 4th 298, 312 (2009)). "This inquiry does not require 'individualized proof of deception, reliance and injury.' " *Id.* (quoting *In re Tobacco II Cases,* 46 Cal. 4th at 320). "Thus, a court need not make individual determinations regarding entitlement to restitution. Instead, restitution is available on a classwide basis once the class representative makes the threshold showing of liability under the UCL." *Id.* at 986.

Korolshteyn v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 180 of 260
PageID: 69844

Meanwhile, "[u]nlike the UCL, the CLRA demands that each potential class member have both an actual injury and show that the injury was caused by the challenged practice. However, if a material misrepresentation has been made to the entire class, an inference of reliance arises as to the class." *Berger*, 741 F.3d at 1069-70 (internal citation and quotation marks omitted). "As a general rule, materiality may be established by common proof '[b]ecause materiality is judged according to an objective standard,' and so '[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.' " *Mullins v. Premier Nutrition Corp.*, No. 13-cv-1271-RS, 2016 WL 1535057, at *5 (N.D. Cal. Apr. 15, 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013)); *see also McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB OP, 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) ("[T]he determination of materiality, and thus reliance, is determined using objective criteria that apply to the entire class and do not require individualized determination."); *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (Cal. Ct. App. 2010) ("Materiality of the alleged misrepresentation generally is judged by a 'reasonable man' standard.").

Here, the only alleged misrepresentations in question appeared on the labels of the products purchased by class members. Whether these representations were material to a reasonable person can be determined on a classwide basis. Therefore, the different requirements for UCL and CLRA claims do not warrant different outcomes in the class certification analysis. For this reason, and because neither party makes arguments unique to either proposed class, the Court does not separately analyze whether the two proposed classes satisfy the requirements of Rule 23(a) and (b)(3).

## B. Numerosity

The "numerosity" requirement is satisfied if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendants do not dispute that this requirement is satisfied, and in light of evidence that Costco sold over 1 million units of TruNature Gingko to thousands of consumers during the class period, the putative class easily meets this requirement for class certification.

## C. Typicality

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis*, 657 F.3d at 984; *see also* Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[W]hen determining typicality, the Court focuses on the defendant's conduct and the plaintiff's legal theory, not the specific facts from which the claim arises." *Allen v. Similasan Corp.*, 306 F.R.D. 635, 645 (S.D. Cal. 2015) (citing *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Torres*, 835 F.3d at 1141 (quoting *Hanon*, 976 F.2d at 508).

*4 Here, Plaintiff's theory is that the statements on the labels of TruNature Gingko are false because it provides no health benefits. Every class member was exposed to these statements on the labels of the TruNature Gingko they purchased. According to Plaintiff, anyone who purchased TruNature Gingko suffered the same harm because they would not have purchased TruNature Gingko but for these false statements and as a result paid money for a worthless product. The wrongful conduct (the allegedly false statements) and the resulting harm (the amount paid to purchase TruNature Gingko) are the same. In other words, none of Defendants' allegedly wrongful conduct is unique to the named plaintiff or any member of the proposed class. Therefore, the typicality requirement is satisfied.

## D. Adequacy

The "adequacy" requirement is satisfied if the class representative and the attorneys she hired "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *Hanlon*, 150 F.3d at 1020. Defendants do not contest that Plaintiff's counsel can adequately represent the class, but they argue that Korolshteyn is not an adequate named plaintiff because of what they deem to be credibility issues. The Court is not persuaded.

Defendants rely on a conversation on Facebook between Korolshteyn and her friend Peter Crane, who is an attorney. The transcript of this Facebook conversation indicates that Crane first advised her of the alleged worthlessness of Gingko

biloba after she had purchased TruNature Gingko but before she had used it. Defendants then point to Korolshteyn's deposition testimony that she took the product within a day or two of purchasing it, which would mean that she took it before her Facebook conversation with Crane. [Doc. No. 112-26 at 18-20.] [1] However, the Facebook conversation transcript also makes clear that Korolshteyn had purchased TruNature Gingko before the Facebook conversation with Crane, and that she did so based on a hope that "it would help with sleepy mommy brain." [Doc. No. 112-27 at 3.] Moreover, at her deposition Korolshteyn testified that she read and relied on the label of the bottle before purchasing it. [Doc. No. 112-26 at 14.]

Ultimately, the evidence on which Defendants' rely does not necessarily undermine Korolshteyn's credibility or make her an inadequate representative plaintiff. The Facebook conversation and deposition transcript demonstrate that Korolshteyn's experience in purchasing TruNature Gingko is consistent with the plaintiff class' theory that the statements about health benefits on the TruNature Gingko packaging are material to the average consumer and that consumers rely on the statements when purchasing the product. For all of the reasons discussed below, when Korolshteyn took TruNature Gingko, or even if she took it at all, is irrelevant to the claims for which she seeks to represent the class. Accordingly, the adequacy requirement for class certification is satisfied.

### E. Commonality and Predominance

To satisfy the commonality requirement, a plaintiff must establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Ninth Circuit recently explained:

Although Rule 23(a)(2) refers to common "questions of law or fact" in the plural, even a single common question will do. Wal–Mart, 131 S.Ct. at 2556. But because " '[a]ny competently crafted class complaint literally raises common questions,' " id. at 2551 (alteration in original) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–32 (2009)), courts should look for a "common contention" in determining whether putative class members' claims can be litigated together. Id. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." Id. Thus, it is not just the common contention, but the answer to that contention, that is important: "What matters to class certification ... is not the raising of common 'questions'—even in droves —but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (alterations in original) (quoting Nagareda, supra, at 132)."

**\*5** Alcantar v. Hobart Serv., 800 F.3d 1047, 1052 (9th Cir. 2015).

"There is substantial overlap between the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance tests, but the Rule 23(b)(3) test is 'far more demanding.' " Allen v. Hyland's Inc., 300 F.R.D. 643, 666 (C.D. Cal. 2014) (quoting Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010)); see also Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen, 133 S. Ct. at 1191 (emphasis in original). To satisfy Rule 23(b) (3), "the common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." Berger, 741 F.3d at 1068 (internal quotation marks and ellipses omitted).

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones. For purposes of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Torres, 835 F.3d at 1134 (citing Tyson Foods v. Bouaphakeo, 136 S.Ct. 1036, 1045 (2016)) (internal quotation marks and brackets omitted).

Plaintiff argues that the common questions that predominate here include whether the statements on the product label are false, and whether those statements are material and likely to deceive a reasonable consumer. [Doc. No. 107 at 22.] "By definition, class members were exposed to these labeling claims, creating a 'common core of salient facts.' " McCrary, 2014 WL 1779243, at \*10 (quoting Hanlon, 150 F.3d at 1019-20). Courts routinely certify consumer classes where the claims concerned false statements about the

*Koroshteyri v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)*

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 182 of 260
PageID: 69846

efficacy of nutritional supplements or homeopathic remedies in part because the plaintiffs' argument is that the product is worthless because the advertised benefits are not true. *See, e.g., Allen v. Similasan Corp.,* 306 F.R.D. 635, 651 (S.D. Cal. 2015) (certifying class concerning claims of false statements of effectiveness of homeopathic ear, nose, and eye remedies); *Allen v. Hyland's Inc.,* 300 F.R.D. 643, 672 (C.D. Cal. 2014) (certifying class for claims of false statements of effectiveness of various homeopathic remedies); *Forcellati,* 2014 WL 1410264, at *12 (certifying class for claims of false statements of effectiveness of various homeopathic cold and flu remedies); *cf. Ries v. Arizona Bev. USA LLC,* 287 F.R.D. 523, 537 (N.D. Cal. 2012) (finding commonality requirement satisfied as to questions of "whether the use of the terms 'All Natural' or '100% Natural' to advertise beverages that contain HFCS or citric acid violates the UCL, FAL, or CLRA").

 **\*6** Here, Plaintiff's entire lawsuit rides on her claim that TruNature Gingko provides no benefits and that the statements on the product labels are false. The answer to these questions will be the same for the entire class. Likewise, the determination of whether the statements on the label are material and likely to deceive a reasonable consumer will be the same for the entire class. The answers to these questions will resolve issues that are central to the validity of each class members' claims in one stroke. *Alcantar,* 800 F.3d at 1052. These common questions are not only more significant than other questions at issue in this suit, they are the most significant questions in this lawsuit. Therefore, these questions predominate over any individual questions that may arise.

Defendants argue that common questions do not predominate because some customers may have received a benefit from TruNature Gingko and thus are not entitled to damages. However, "[t]hat some people believe [Gingko biloba] provides benefits as advertised is beside the point. [Plaintiff's] 'claims do not rise or fall on whether individual consumers experienced health benefits, due to the placebo effect or otherwise. They rise or fall on whether [Defendant's] representations were deceptive." *Mullins v. Premier Nutrition Corp.,* 2016 WL 1535057, at *3 (quoting *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 673 (7th Cir. 2015)). "It stands to reason that a product that, in effect, has tricked people into thinking that they received a benefit should not be given credit for actually conferring a benefit." *Allen v. Hyland's Inc.,* 300 F.R.D. at 671 n.26. Moreover, "if Plaintiffs' theory is correct, the belief of some users that the products are effective

would necessarily be attributable to the placebo effect. Thus, each of Defendants' arguments goes to the merits of Plaintiffs' case, but they fail to demonstrate that Plaintiffs' claims are not subject to common proof." *Id.* at 661; *Forcellati,* 2014 WL 1410264, at *9 (holding that if the plaintiff could prove allegations that the products' effectiveness is solely a placebo effect, "Defendants' representations about the products' effectiveness would constitute false advertising 'even though some consumers may experience positive results' ") (citing *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1100 (9th Cir. 1994)); *see also Torres,* 835 F.3d at 1137 ("[F]ortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition."). [2] Ultimately, if Plaintiff can prove that the class would not have purchased TruNature Gingko but for the alleged false statements on the label, class members are entitled to full restitution of the purchase price regardless of any benefit received after the purchase. *See Pulaski & Middleman, LLC,* 802 F.3d at 989 (holding that the restitution calculation under the UCL "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase," meaning "the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information.").

 **\*7** Defendants also speculate that class members may have purchased TruNature Gingko based on Defendants' competitors' advertising about the benefits of Gingko biloba or based on the instructions of doctors or others who recommended Gingko biloba. That class members may have learned about Gingko biloba or TruNature Gingko from other sources does not absolve Defendants from liability for false statements that appeared on the labels of the products purchased by the class members. *Mullins v. Premier Nutrition Corp.,* 2016 WL 1535057, at *3 ("How consumers first learned about Joint Juice—from a doctor, parent, Joe Montana, or the packaging—does not matter if 'they nonetheless decided to purchase the product only for its purported health benefits.' ") (quoting *Rikos v. Proctor & Gamble Co.,* 799 F.3d 497, 512 (6th Cir. 2015)); *see also Ries,* 287 F.R.D. at 537 ("[V]ariation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality.").

Defendants also argue that Plaintiff does not have a workable damages model. This argument reflects a misunderstanding of Plaintiff's claims. The TAC alleges, and Plaintiff argues, that TruNature Gingko has no value whatsoever and that any perceived benefits by consumers are merely the result of a placebo effect. If Plaintiff can prove that TruNature Gingko does not have any impact on brain health or memory and therefore does not perform as advertised on the labels and is worthless, the putative class will be entitled to restitution of the full amount they paid for the product. This full refund damages model, particularly considering Costco's records of purchases of TruNature Gingko, is entirely workable.

The cases on which Defendants' rely are distinguishable because they involve products that could provide some value to their purchasers even if they did not perform as advertised and for which it strains credulity to argue that no consumers would have purchased them if not for the allegedly false statement. This is the case with many food products, because if nothing else, they provide calories, hydration or good taste to the consumer. See *In re Pom Wonderful LLC*, No. ML 10-2199 DDP (RZx), 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (holding that the plaintiffs could not "plausibly contend that they did not receive any value at all from Defendant's' juice products."). It is also true for a product like a television where consumers value a variety of factors when choosing which television to buy. See *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. CV 14-7242-DMG (KSx), 2016 WL 5920345, at *7 (C.D. Cal. Jun. 23, 2016). Unlike these other products, it is plausible to contend that no one would have purchased TruNature Gingko if not for the representations on the label, and that if the representations on the label are false, consumers who purchased TruNature Gingko did not receive any value and are entitled to a full refund of their purchase price. In this regard, supplements like Gingko biloba are entirely distinct from food or televisions because consumers know generally the purpose of food and the function of a TV without reading a description on the label. Consumers do not necessarily know what benefit a supplement like Gingko biloba provides without reading the label. Accordingly, any damages calculation issues are not an obstacle to class certification.

In sum, "[t]he Court finds that Plaintiff's full refund damages model matches h[er] theories of liability. Plaintiff claims that [Gingko biloba] is valueless, and Plaintiff has produced evidence that supports h[er] claim. If the finder of fact finds that [Gingko biloba] is in fact valueless then that justifies

fully refunding the class for their purchases." *Lambert v. Nutraceutical Corp.*, No. CV 13-05942-AB (Ex), 2015 WL 12655388, at *4 (C.D. Cal. Feb. 20, 2015).

**\*8** Because common questions that are subject to resolution using classwide proof predominate, the commonality and predominance requirements are met.

### F. Superiority

"Rule 23(b)(3) requires that a class action be 'superior to other available methods for fairly and efficiently adjudicating the controversy,' and it specifically mandates that courts consider 'the likely difficulties in managing a class action.' " *Briseno*, 844 F.3d at 1128 (quoting Fed. R. Civ. P. 23(b)(3)(D)). Defendants argue that a class action is not superior because Costco offers refunds without a receipt and that it would be easier to simply allow dissatisfied class members to obtain refunds from Costco. However, as Plaintiff points out in her reply, allowing class members to obtain a refund is not an alternative to "adjudicating" whether Defendants are liable for material misrepresentations on the labels of their products. If it were, then Costco (and any retail store) could freely misrepresent the benefits of their products secure in the knowledge that their return policy effectively immunizes them from any suit seeking restitution. Moreover, to require each absent class member to drive to a Costco store, wait in line, deal with an employee and ask for a relatively small refund is not superior to obtaining relief as a class. Accordingly, the superiority requirement is satisfied.

### V. Conclusion

For the foregoing reasons, the Court finds that: (a) the class is sufficiently numerous; (b) named plaintiff Tatiana Korolshteyn's claims are typical of the class and that she and her counsel will adequately represent the class; (c) common questions subject to classwide proof predominate; and (d) a class action is superior to other methods of adjudicating this controversy and will not be difficult to manage. Accordingly, it is hereby **ORDERED** as follows:

1. Plaintiff's motion for class certification [Doc. No. 105] is **GRANTED**.

2. The following class is certified:

   All California consumers who, within the applicable statute of limitations, purchased TruNature Gingko

Biloba with Vinpocetine until the date notice is disseminated. [3]

3. Plaintiff Tatiana Korolshteyn is appointed as class representative.

4. Plaintiff's counsel of record Bonnett, Fairbourn, Friedman, & Balint, P.C. and Boodell & Domanskis, LLC are appointed as class counsel.

5. Defendants' motion to exclude Plaintiffs' expert testimony [Doc. No. 113] is **DENIED** without prejudice.

6. Plaintiff's motion to strike the declaration of Dr. Susan Mitmesser [Doc. No. 122] is **DENIED** without prejudice.

7. Plaintiff's motion to strike the declaration and revised report of Dr. Edward Rosick [Doc. No. 125] is **DENIED** without prejudice.

8. On or before **March 31, 2017**, class counsel shall meet and confer with defense counsel regarding the proposed method and form of class notice. Any agreed-upon notice shall be presented to the Court for approval no later than **April 7, 2017**. In the event the Parties cannot agree upon the form of the notice, each side shall file its proposal on **April 7, 2017**.

It is **SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1020391

## Footnotes

1    The deposition testimony is hardly clear in this regard. Plaintiff purchased the product on October 29, 2014, and her conversation with Crane began several days later on November 3, 2014. When asked at her deposition eighteen months later about when she first took TruNature Gingko, she estimated that she took it only once or twice either the day that she brought it home or the day after, but also stated that she couldn't recall exactly. [Doc. No. 105-26 at 21-22.]

2    Defendants argue throughout their opposition that, contrary to Plaintiff's allegations and evidence, Gingko biloba helps some consumers with memory problems. This dispute over whether Gingko biloba, and more specifically TruNature Gingko, performs as advertised on the label goes to the heart of Plaintiff's case. If Plaintiff cannot prove that the statements on the labels were false and that Gingko biloba has no benefit to memory or otherwise, the class claims will fail. That the class may include non-injured individuals "merely highlights the possibility that an injurious course of conduct may sometimes fail to cause injury to certain class members. However, it fails to reveal a flaw that may defeat predominance, such as the existence of large numbers of class members who were never exposed to the challenged conduct to begin with." *Torres, 835 F.3d at 1136*. "When, as here, the concern about the proposed class is ... an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Id.* at 1140 (quoting *Tyson Foods,* 136 S.Ct. at 1047).

3    The motion seeks certification of two classes, but they are defined identically. The motion does not explain why a separate class for each claim is needed and the opposition does not distinguish between the two classes when arguing why the motion should be denied. Presumably, the only reason for seeking certification of two identically defined classes is a difference in the statute of limitations between the two claims. However, because the relief sought for each claim is identical, the Court is unclear why this distinction is needed. In any event, this distinction is something that can be addressed, if needed, on any notice to the class.

Korolshteyn v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 14

2011 WL 8971449
Only the Westlaw citation is currently available.
United States District Court,
S.D. California.

April KRUEGER, Plaintiff,
v.
WYETH, INC., et al, Defendants.

Civil No. 03CV2496 JAH (AJB).
|
March 30, 2011.

**Attorneys and Law Firms**

Anthony D. Birchfield, Jr., P. Leigh O'Dell, Beasley, Allen,
Crow, Methvin, Portis & Miles, PC, David B. Byrne, III,
Montgomery, AL, Breean Walas, Littlepage Booth, Houston,
TX, Eileen L. McGeever, Rushall and McGeever, Carlsbad,
CA, William Gary Holt, Gary Holt & Associates PA, Little
Rock, AR, for Plaintiff.

Bert L. Slonim, Kaye Scholer LLP, Bert L. Wolff, Hayden A.
Coleman, Skadden Arps Slate Meagher & Flom LLP, New
York, NY, Beth A. Wilkinson, Katherine Halpin Moor, Paul,
Weiss, Rifkind, Wharton & Garrison LLP, Frank Lane Heard,
III, Wiliams & Connolly LLP, Washington, DC, Christopher
Munro Young, DLA Piper US, San Diego, CA, David C.
Bonnin, DLA Piper LLP, Houston, TX, Elliott M. Davis,
Skadden Arps Slate Meagher & Flom LLP, Boston, MA,
Grace Lee, Shook Hardy & Bacon LLP, Irvine, CA, Jessica
D. Miller, John H. Beisner, Nina Ramos Rose, Skadden Arps
Slate Meagher & Flom LLP, Nathan E. Hoffman, Winston and
Strawn, LLP, Chicago, IL, Fletcher C. Alford, Ryan B. Polk,
Gordon & Rees LLP, San Francisco, CA, Pamela Joan Yates,
Kaye Scholer LLP, Los Angeles, CA, for Defendants.

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

JOHN A. HOUSTON, District Judge.

**INTRODUCTION**

*\*1* The underlying complaint was filed in this district on
December 12, 2003. On March 20, 2004, the Judicial Panel
on Multidistrict Litigation transferred this case to the Eastern

District of Arkansas for coordinated pretrial proceedings.
After that court declined to certify a multi-state class of
consumers alleging consumer fraud and seeking medical
monitoring for any future injuries that arise from their use of
Prempro, it remanded plaintiff's case to this district.

Plaintiff previously filed a motion for class certification in this
district on May 14, 2007. In that motion, plaintiff sought to
certify a class defined as:

> All California consumers who
> purchased Wyeth's Hormone
> Replacement Therapy products,
> Premarin, Prempro, and/or Premphase,
> between January 1995 and January
> 2003.

The Honorable Janis L. Sammartino found the class definition
included consumers who suffered personal injuries. Because
plaintiff has not suffered personal injuries and does not
seek to pursue personal injuries damages claims, the Court
found plaintiff could not satisfy the adequacy requirement of
F.R.C.P. 23(a)(4). Doc. 44 at 5–6. However, the Court stated
in a footnote that "plaintiff may be able to satisfy the adequacy
requirement by redefining the class." *Id.* at 6, fn3.

Plaintiff filed the instant motion for class certification on
January 7, 2010. In the current motion, plaintiff requests
certification of a damages class under F.R.C.P. 23(b)(3)
defined as:

> All California consumers who
> purchased Wyeth's Hormone
> Replacement Therapy products,
> Premarin, Prempro, and/or Premphase,
> for personal consumption between
> January 1995 and January 2003, and
> who do not seek personal injury
> damages resulting therefrom.

Plaintiff seeks class certification for two separate claims
under California law, one arising under the Consumer Legal
Remedies Act ["CLRA"] and the other under the Unfair

Krueger v. Wyeth, Inc., Not Reported in F.Supp.2d (2011)

Competition Law ["UCL"]. Defendants filed an opposition and plaintiff filed a reply. [1]

For the reasons that follow, plaintiff's Motion for Class Certification is GRANTED IN PART with respect to both claims.

### FACTUAL BACKGROUND

The following contentions are taken from plaintiff's complaint, plaintiff's motion for class certification, and defendant's opposition.

Defendant, Wyeth, Inc. ("Wyeth"), currently manufactures hormone replacement therapy drugs. In 1994, Wyeth received FDA approval for Prempro for "limited use as a continuous, short-term regimen by post-menopausal women for the treatment of moderate to sever vasomotor symptoms associated with menopause (hot flashes, night sweats), vulvar and vaginal atrophy, and the prevention of osteoporosis." SSCF ¶ 1. At that time, the FDA refused Wyeth's request to market Prempro for cardiovascular benefits. Id. ¶ 2. Premarin is a FDA approved conjugated estrogen prescription drug for the treatment of moderate to severe vasomotor symptoms associated with menopause, prevention of postmenopausal osteoporosis, and treatment of vulvar and vaginal atrophy. Doc. 85 at 10. Premphase is "an alternative form of [hormone therapy] that consists of two separate tablets given on a 28–day cycle." Id. at 11.

 *2  Wyeth used branded and unbranded campaigns to market its hormone therapy drugs to all women over forty five years old, and physicians, for on and off-label uses, including the prevention of cardiovascular disease, dementia and Alzheimer's disease. Id. ¶ 22,24. Branded campaigns marketed the drug for FDA approved uses and unbranded campaigns marketed the drug for non-approved, off-label uses. Wyeth used the unbranded campaign to educate women that estrogen loss increased cardiovascular, dementia and Alzheimers risk and that hormone replacement therapy reduced the risk of contracting those ailments. Id. ¶ 47. Wyeth then used its branded campaign ads to inform consumers about which hormone therapy drug provided the benefits touted during the unbranded campaign ads. Id. ¶ 53. During this campaign, defendant also informed consumers and physicians that HRT did not cause breast cancer. Id . ¶ 28–29.

In 2002, the Women's Health Initiative ("WHI"), sponsored by the National Institutes of Health, released a report indicating Prempro increased risk for strokes, heart attacks, cardiovascular disease, breast cancer, Alzheimers disease, and dementia. Id.¶ 9. After the study, Wyeth warned that its HRT drugs should not be used to prevent coronary heart disease. Id. ¶ 15. Wyeth also warned its hormone therapy drugs should be "prescribed selectively, appropriately, with clearly defined treatment goals, and for the shortest duration possible." Id.¶ 18. The FDA placed a warning label on Wyeth's HRT drugs listing its risks in 2003.

In this litigation, plaintiff alleges Wyeth advertising campaign misrepresented the benefits and failed to disclose the risks of its HRT drugs during the class period.

### DISCUSSION

#### 1. STANDARD

Plaintiff seeks two forms of relief for the putative class members: 1) "damages, statutory damages, punitive damages, and/or refund of purchase monies paid by class members due to Wyeth's conduct in violation of the CLRA; and 2) "a refund of all monies spent by Class Members, as well as a disgorgement of profits Wyeth earned from its HRT sales to Class Members, as a result of its unlawful, unfair, and fraudulent business practices under the UCL." Doc. 61 at 2. Plaintiff asserts her claims under the CLRA and UCL meet the requirements under F.R.C.P. Rule 23(a) and Rule 23(b)(3) for class certification.

F.R.C.P. 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

  (1) the class is so numerous that joinder of all members is impracticable;

  (2) there are questions of law or fact common to the class;

  (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

  (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to meeting the aforementioned requirements, a party seeking class certification must also satisfy one of the

*Krueger v. Wyeth, Inc.,* Not Reported in F.Supp.2d (2011)

requirements in Rule 23(b). Plaintiff seeks certification under Rule 23(b)(3) which requires a court finding:

> **\*3** that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. F.R.C.P. 23(b) (3).

The requirements of Rule 23(a) are commonly referred to as: numerosity, commonality, typicality, and adequacy. The only Rule 23(a) issues in dispute here are typicality and adequacy [2].

The Ninth Circuit recently clarified the standard for granting class certification. *In Dukes v. Walmart,* the court states:

> A district court must sometimes resolve factual issues related to the merits to properly satisfy itself that Rule 23's requirements are met, but the purpose of the district court's inquiry at this stage remains focused on, for example, common questions of law or fact under Rule 23(a)(2), or predominance under Rule 23(b)(3), not the proof of answers to those questions or the likelihood of success on the merits. 603 F.3d 571, 590 (9th Cir.2010).

The *Dukes* court further iterates that:

> district courts ... must perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often, though not always, require looking behind the pleadings to issues overlapping with the merits of the

underlying claims. It is important to note that the district court is not bound by these determinations as the litigation progresses ... [but] district courts may not analyze any portion of the merits of a claim that do not overlap with the Rule 23 requirements. *Id.* at 595.

Using the above standard, this Court examines the pertinent Rule 23 requirements.

### A. Rule 23(b)(3)

#### 1. Predominance

The critical inquiry for courts assessing predominance is whether common issues will predominate throughout the entire litigation. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This standard is "far more demanding" than the commonality requirement of Rule 23(a). *Id.* at 623–24. Predominance "focuses on the relationship between the common and individual issues. 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir.1998) (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 1776 (2d ed.1986)). Although there are multiple issues in this case, predominance does not depend on whether there are numerically more issues subject to common proof rather than individualized proof. Predominance can be found even where there is only one issue subject to common proof, if that is the primary issue in the action. On the other hand, it is possible that the predominance requirement is not met where only one issue is subject to individualized proof. Wyeth contends individualized issues of reliance predominate over any common issues for plaintiff's CLRA claim. Wyeth further contends individualized issues concerning whether a putative class member was actually exposed to Wyeth's alleged misrepresentations, and the proper amount of restitution for each putative class member, predominate over common issues for plaintiff's UCL claim. The Court will discuss each of these arguments in turn.

### a. CLRA

**\*4** The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale ... of goods or services to any consumer." Cal Civ.Code § 1770. The CLRA only allows recovery when a consumer is damaged as a result of the unlawful practice. Thus, to prevail on a CLRA claim, a plaintiff must show defendant's conduct was deceptive and the deception caused them harm. In re *Vioxx Class Cases,* 180 Cal.App.4th 116, 128, 103 Cal.Rptr.3d 83 (2009); see also *Steroid Hormone Product Cases,* 181 Cal.App.4th 145, 156, 104 Cal.Rptr.3d 329 (2010) ("to obtain relief under the CLRA, both the named plaintiff and unnamed class members must have suffered some damage caused by a practice deemed unlawful under Civil Code section 1770."). "The 'damage' that a plaintiff in a CLRA action must show 'may encompass harms other than pecuniary damages.' " *Steroid Hormone Product Cases,* 181 Cal.App.4th at 156, 104 Cal.Rptr.3d 329.

Plaintiff's CLRA claim is based upon the premise that Wyeth's misrepresentation of the benefits of the HRT drugs, while failing to disclose the known risks, caused the class members to purchase the HRT drugs. Doc. 88 at 15, fn2. Plaintiff claims this conduct violated three provisions of the CLRA:

1. Misrepresenting the source, sponsorship, approval, or certification of goods or services.

2. Misrepresenting the affiliation, connection, or association with, or certification by, another.

3. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have....

Cal Civ.Code § 1770(a)(2)(3)(5).

Additionally, Plaintiff claims reliance does not require an individualized inquiry and can be proven on a classwide basis. Under California law, a classwide inference of reliance is permitted when the deceptive conduct alleged is a material misrepresentation. *Steroid Hormone Product Cases,* 181 Cal.App.4th at 157, 104 Cal.Rptr.3d 329. This is true notwithstanding a showing by defendant that some class members would have bought the product with knowledge of the representation's falsity. *Id.* "[A] misrepresentation is deemed material if a reasonable man would attach importance to its existence or nonexistence in determining his choice

of action in the transaction in question ... materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Id.* (internal citations omitted). Under the facts of this case the question is: would a reasonable person contemplating purchase of Wyeth's hormone therapy drugs attach importance to the nondisclosed fact that the drug increases the risk for breast cancer, heart disease, Alzheimers disease, and dementia in light of Wyeth's representations that the drug reduces menopausal symptoms while simultaneously lowering the risk for heart disease, Alzheimers disease and dementia, without increasing breast cancer risk.

**\*5** In its opposition brief, Wyeth's contention against predominance for the CLRA claim is that reliance must be proved on an individualized basis and that individualized inquiry predominates over any common issues. Wyeth presents three assertions on this point: 1) "an inference of reliance is improper because Plaintiff cannot show that all the proposed class members and their doctors were exposed to the same representations" [Doc. 85 at 21]; 2) "a presumption of reliance would [ ] be inappropriate because the physicians and proposed class members who were allegedly exposed to representations by Wyeth reacted differently to the information they received" [Doc. 85 at 23]; and 3) "any inference of classwide reliance is [ ] inappropriate because many HT users-including Ms. Kruegercontinued taking HT drugs after they became aware of the alleged risks." Doc. 85 at 24.

Wyeth's second and third assertions stem from the same suppositionbecause the physician's decision about whether to prescribe, and the patient's decision to use, HRT is based on factors unique to each patient, and some patients currently take HRT with knowledge of the risks involved, the materiality of Wyeth's misrepresentations is not an issue subject to common proof. In support, Wyeth repeatedly cites *In re Vioxx Class Cases,* 180 Cal.App.4th 116, 103 Cal.Rptr.3d 83 (2009). In *Vioxx,* the drug at issue, Vioxx, was marketed as a pain relief drug with no gastrointestinal side effects. Because the other generic drugs available in its class all had gastrointestinal side effects, the manufacturers of Vioxx charged a higher price for its product. However, the defendant manufacturers concealed the fact that taking Vioxx, unlike taking the generic pain reliever, increased cardiovascular risks. Importantly, Vioxx had the benefit claimed but with an undisclosed side effect. The plaintiff in that action claimed the risks involved with taking Vioxx made it no more effective and less safe than the generic pain

reliever. On that basis, the plaintiff sought to recover the difference in purchase price between Vioxx and the generic drug. To support their motion for class certification, the plaintiff alleged the defendant had a "common campaign of hiding the cardiovascular risks of Vioxx" and the "common representations support a common inference of reliance." *Id.* at 133, 103 Cal.Rptr.3d 83. According to the plaintiff in that case "there can be nothing more material than an increased risk of death." *Id.*

However, the evidence in *Vioxx* demonstrated that certain members of the putative class suffered from gastrointestinal issues and thus would not have been able to take the generic drug. For those class members restitution could not be calculated as the difference between the Vioxx purchase price and the generic purchase price since those class members could not take the generic drug. The Court also surmised that certain class members may have deemed pain relief worth the increased cardiovascular risk. In addition, the Court found the drug only had an increased risk of death for certain class members while for other class members the risk was lower than for similar drugs. Finally, the Court concluded that because doctors prescribe drugs for many patient-specific reasons the "materiality of any statements made by Merck to any particular prescribing decision cannot be presumed." Based on the above reasoning the trial court determined, and the Court of Appeals agreed, plaintiff's overall theory of the case, to wit, Vioxx was no more effective and less safe than the generic pain reliever, could not be determined on a classwide basis. *Id.* at 126, 103 Cal.Rptr.3d 83. However, the trial court acknowledged that the "issue of Merck's alleged misrepresentations and omissions was subject to common proof." *Id.*

**\*6** Although *Vioxx* also involved a prescription drug, the facts of the instant case are readily distinguishable. First, plaintiff does not claim the risks of Wyeth's HRT drugs made it less effective than another hormone therapy drug. Nor does plaintiff contend that absent Wyeth's deceptions she would have purchased another, less riskier product. Because there was no similar hormone therapy drug on the market during the class period, the choice offered to plaintiff and the putative class members was to purchase Wyeth's HRT drugs or buy nothing. Second, plaintiff does not seek the difference in price between Wyeth's drugs and a drug issued by another manufacturer. Rather, plaintiff seeks a refund of the entire purchase price. As a result, there will be no need for an individualized assessment of the drug's value to each class member nor an individualized assessment of the proper comparator drug for each class member.

Notwithstanding the aforementioned differences between this case and *Vioxx,* Wyeth argues that a physician's consideration of multiple patient-specific factors before prescribing a drug may negate the materiality of any particular misrepresentation it made. It is important to note that at this stage in the litigation, the issue is not whether the alleged misrepresentations were in fact material. The proper inquiry for class certification purposes is whether plaintiff can use common proof to prove whether a misrepresentation or nondisclosure is material. The seminal California case on this issue is *Massachusetts Mutual Life Ins. Co. v. Superior Court.* 97 Cal.App.4th 1282, 119 Cal.Rptr.2d 190.

In *Massachusetts Mutual* the plaintiffs claimed they, and the rest of the proposed class, purchased a specific type of life insurance that had a guaranteed return on an accumulated premium and permitted plaintiffs to share in dividends the company declared on a discretionary basis. Massachusetts Mutual represented that over time, the dividend would pay for the accumulated premium. Plaintiffs claimed at the time they purchased the policies, Massachusetts Mutual paid a discretionary dividend rate that it planned to lower. Plaintiffs argued the failure of Massachusetts Mutual to disclose its plans to lower the dividend would have been material to any reasonable person contemplating a purchase of that type of policy. Although the thousands of putative class members obtained their policies from various agents who utilized various sales tactics, the Court stated:

> "We recognize that in determining whether the inference of reliance arises, the trial court will have to consider whether other information which Mass Mutual disclosed about its dividend rate provided buyers with the material information they needed in making a decision to purchase Mass Mutual's product. However, the information Mass Mutual provided to prospective purchasers appears to have been broadly disseminated. Given that dissemination, the trial court could have reasonably concluded that the ultimate question of whether the undisclosed information was material

was a common question of fact suitable for treatment in a class action. 97 Cal.App.4th at 1294, 119 Cal.Rptr.2d 190.

**\*7** In the footnote appended to the above statement, the Court also stated:

> Plainly, should it develop that class members were provided such a variety of information that a single determination as to materiality is not possible, the trial court has the flexibility to order creation of subclasses or to decertify the class altogether. At this point, however, the record fully supports the trial court's determination [sic] Mass Mutual's failure to disclose its own conclusion presents an issue common to class members. Id. at 129, 119 Cal.Rptr.2d 190, fn5.

The California Court of Appeals relied upon the reasoning of *Massachusetts Mutual* to certify a class of consumers who purchased roof tiles that were represented to (1) last for 50 years, (2) permanently retain their color, and (3) be maintenance free. *McAdams v. Monier,* 182 Cal.App.4th 174, 105 Cal.Rptr.3d 704 (2010). In *McAdams,* the plaintiff alleged those representations were misleading because the manufacturer failed to disclose the tiles were inherently defective and would lose their color well before the end of their represented 50 year life span. The trial court denied certification in part due to its finding that each class member would have to prove the representation they relied on and the resulting damage. On appeal, the court found that the misrepresentations alleged by plaintiff actually constituted one material nondisclosure. Based on that finding the Court stated:

> The record here permits an inference of common reliance among the CLRA class. Plaintiff alleges that Monier made a single, material

misrepresentation to class members that consisted of a failure to disclose a particular fact regarding its roof tiles. Plaintiff has tendered evidence that Monier knew but failed to disclose to class members that the color composition of its roof tiles would erode to bare concrete well before the end of the tiles' represented 50–year life; and that this failure to disclose would have been material to any reasonable person who purchased tiles in light of the 50–year/lifetime representation, or the permanent color representation, or the maintenance-free representation. If plaintiff is successful in proving these facts, the purchases common to each class memberthat is, purchases pursuant to this alleged failure to disclose in light of the 50–year life, permanent color, or maintenance-free representations-would be sufficient to permit an inference of common reliance among the class on the material misrepresentation comprising the alleged failure to disclose. Id. at 184, 105 Cal.Rptr.3d 704.

Because of this reasoning, the Court in *McAdams* limited the class to individuals who "prior to purchasing or obtaining their Monier roof tile product ... [were] exposed to a statement along the lines that the roof tile would last 50 years, **or** would have permanent color, **or** would be maintenance free." Id. at 179, 105 Cal.Rptr.3d 704 (emphasis added). Of importance is the fact that members of the class did not have to hear the representation from Monier. The court included consumers as class members who heard one of the aforementioned representations from Monier, or an independent distributor who had Monier literature, home builders, or individuals selling their homes. Id. at 186, 105 Cal.Rptr.3d 704. Additionally, a class representative who purchased the roof tile product after exposure to the representations from any of these sources would have a claim typical of other class members who purchased from any other source because the claim is based on a "single, specific failure to disclose." Id.

**\*8**  The allegations here are analogous to those in *Massachusetts Mutual* and *McAdams*. Through its extensive advertising campaign, Wyeth broadly disseminated representations about the benefits of its HRT drugs. Plaintiff has tendered evidence to show Wyeth failed to disclose to both physicians and consumers the material fact that its HRT drugs posed an increased risk of heart disease, Alzheimers, dementia, and breast cancer. As a result, neither physicians nor consumers had the necessary information upon which to accurately determine whether HRT was an appropriate drug to prescribe or use.

The tendered evidence also indicates that prior to Wyeth's campaign many physicians and consumers did not consider HRT a viable therapy for menopause because the increased risk of breast cancer caused by HRT outweighed the benefit of reduced menopausal symptoms. According to plaintiff, against this backdrop of fear that HRT increased breast cancer while only providing the benefit of menopausal relief, Wyeth began a massive advertising campaign to convince consumers and physicians that HRT had more benefits, including reducing the risk of heart disease, Alzheimers and dementia. Wyeth further claimed HRT did not increase breast cancer. Wyeth's campaign was so broad so as to include providing literature to health care plans for distribution to patients regarding HRT's benefits and affixing the health care plan's brand, mark or name on the literature to suggest the health care provider, not Wyeth, was the source of the information. Doc. 95 at 8.

According to the proffered evidence, Wyeth conducted a systematic, standardized, and broadly disseminated advertising campaign misrepresenting the benefits of HRT drugs for the class period to induce California consumers to purchase HRT while failing to disclose the known fact that the drug actually increased, rather than reduced, the risks. This campaign altered physician and consumer perception of HRT. Thus, instead of evaluating HRT to determine whether relief of menopausal symptoms was worth the increased breast cancer risk, physicians and consumers were evaluating HRT to determine whether the drug would be a benefit because it decreased menopausal symptoms along with a reduction in risk of heart disease, dementia, and Alzheimers. While informing physicians and consumers of the multiple additional benefits of HRT, Wyeth allegedly failed to disclose that those additional benefits were false. That in and of itself would be an egregious omission. However, Wyeth also allegedly failed to disclose that HRT had the opposite effects of those advertised and actually increased the risk of heart disease, dementia and Alzheimers. This allegation is another key distinguishing factor between the instant case and *Vioxx*. In *Vioxx* the drug at issue was advertised as a pain reliever **without** gastrointestinal side effects. As such, the drug in *Vioxx* ultimately performed as advertised, but with an undisclosed side effect. In this case, HRT did not perform as advertised. Thus, for the facts of *Vioxx* to be analogous to those here, the *Vioxx* drug would have to perform as a pain reliever **with** gastrointestinal side effects, in addition to the undisclosed risk factor. In addition, Wyeth's campaign also encouraged long term use of HRT to prevent the onset of identified diseases and to reduce menopausal symptoms despite the fact that HRT was approved by the FDA for short term alleviation of menopausal symptoms only. It is within this context that materiality must be assessed.

**\*9**  Wyeth contends, nonetheless, that because physicians still prescribe, and consumers continue to use, HRT with the same dosage as the drug advertised during the class period, physicians and consumers perceived the importance of Wyeth's misrepresentations differently. The Court recognizes that the drug in its original dosage remains approved by the FDA to treat certain symptoms associated with menopause. However, the evidence in the record demonstrates that usage of HRT greatly increased during Wyeth's advertising campaign and decreased dramatically when that campaign ended and the risk factors about HRT became public. [3]  The massive decrease in HRT usage in the aftermath of the WHI study gives credence to plaintiff's theory that many physicians would not have prescribed, and many consumers would not have used, HRT with knowledge of the risks involved. [4]

The Court further recognizes that some physicians and consumers currently believe that the benefits of HRT outweigh the risks in certain circumstances. This recognition is somewhat aligned with Wyeth's argument that physicians consider multiple patient-specific factors when deciding which drug to prescribe. Yet, regardless of those patient-specific factors, it cannot be seriously contended that the drug manufacturer's knowledge that a drug has the opposite effect of its advertised benefits would not play an important role in the physician's decision to prescribe.

Additionally, a material misrepresentation or omission is one that a "reasonable [person] would attach importance to its existence or nonexistence in determining [her] **choice of action.**" *Steroid Hormone Product Cases,* 181 Cal.App.4th at 157, 104 Cal.Rptr.3d 329. Thus, materiality is not decided by determining whether the misrepresentation or omission

was the sole reason behind a particular action.[5] Rather, materiality is found where the omitted or misrepresented information would have been important to the decision-making process. This principle is espoused in *Steroid Hormone Product Cases.* In that litigation, the plaintiff sought to certify a class of consumers who purchased supplements that contained androstenediol from GNC. Although those supplements were purported to be legal, over the counter products, it was illegal under California law to possess and use androstenediol products without a prescription. Plaintiff claimed he was damaged by purchasing a product he would not have purchased had he known it was illegal. Plaintiff further claimed class certification was appropriate because GNC's representation that the products were legal over the counter supplements was material. Despite defendant's argument that the illegality of the supplements would not have been important to the bodybuilders who purchased those products, the California Court of Appeals agreed with plaintiff and stated "we assume that a reasonable person would not knowingly commit a criminal act." *Id.* at 157, 104 Cal.Rptr.3d 329. In addition, that Court found "even if there may be some people who bought androstenediol products from GNC with the knowledge that the products were unlawful to sell or possess in California without a prescription ... their existence would not defeat class certification." *Id.* at 157, 104 Cal.Rptr.3d 329. Similarly, here, the fact that some class members may have purchased HRT despite Wyeth's misrepresentations would not defeat class certification. "[P]laintiff[ ] satisf[ies][her] burden of showing causation as to each class member by showing materiality as to all." *Steroid Hormone Product Cases,* 181 Cal.App.4th at 157, 104 Cal.Rptr.3d 329 (citing *Massachusetts Mutual,* 97 Cal.App.4th at 1292, 119 Cal.Rptr.2d 190).

**\*10** In sum, to meet the requirements for class certification plaintiff is not required to prove the information Wyeth failed to disclose was material. Plaintiff must only demonstrate at this stage of the litigation that common proof can be used to show that failure to disclose was material to the putative class members. The final determination of materiality is a question of fact for the jury, not this court. However, for the purpose of this motion the Court finds that a reasonable consumer contemplating purchase of a prescription drug would attach importance to the fact that the drug does not provide most of its advertised benefits but rather has the opposite effect of its advertised benefits and increases the risk of contracting several life threatening diseases. In this case the advertised benefits of HRT were the same for all class members. Additionally, Wyeth's failure to disclose both

the nonexistence of those benefits and the drug's risk factors were the same for all class members. Thus, the question of materiality is subject to common proof.[6]

If the plaintiff is successful in proving these facts, the purchases common to each class member-to wit, those who were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that Wyeth's HRT lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk-would be sufficient to permit an inference of common reliance among the class on the material misrepresentation comprising the failure to disclose. *McAdams,* 182 Cal.App.4th at 174, 105 Cal.Rptr.3d 704.[7] This Court finds that limiting the class as defined in this paragraph is consistent with and based upon the rationale in *McAdams* and makes this class sufficiently cohesive to warrant adjudication by representation. *Amchem Products, Inc.,* 521 U.S. at 623. Based upon the tendered evidence, the Court finds that common issues predominate for this claim.[8]

**b. UCL**

California's UCL defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law §§ 17500 et seq.) ]." *McAdams v. Monier, Inc. .,* 182 Cal.App.4th 174, 187, 105 Cal.Rptr.3d 704 (Cal.Ct.App.2010). In 2004, California enacted Proposition 64 which limited standing under the UCL "to a 'person who has suffered injury in fact and has lost money or property as a result of the unfair competition.' " *Id.* at 188, 105 Cal.Rptr.3d 704. However, in the class action context the injury in fact requirement is limited to the named representative, not the putative class as a whole. *Id.* at 189, 105 Cal.Rptr.3d 704 (citing *In re Tobacco II* Cases, 46 Cal.4th 298, 315–16, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009)).

Although a plaintiff is only required to prove a business act is either unlawful, unfair or fraudulent, plaintiff asserts Wyeth's conduct satisfies all three criteria. Plaintiff states Wyeth acted unlawfully by violating the CLRA and reasonable basis doctrine, fraudulently because "members of the public are likely to be deceived" by the defendant's conduct, and unfairly because defendant's conduct was unlawful and fraudulent. (Doc. 61 at 17–21). The injury claimed by plaintiff is the monetary loss incurred from purchasing defendant's product.

**\*11** Initially, the Court finds that plaintiff's allegations meet the standing requirements to bring a cause of action under the UCL. Plaintiff's purchase of Wyeth's HRT drugs constitutes an injury in fact under the UCL. *Morgan v. AT & T Wireless Servs., Inc.,* 177 Cal.App.4th 1235, 1249, 99 Cal.Rptr.3d 768 (2009). To bring a claim under the UCL's fraud prong, plaintiff must show actual reliance, or, in other words, that "the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury producing conduct." *Tobacco II,* 46 Cal.4th at 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (internal citations omitted). As discussed in this Court's analysis of plaintiff's CLRA claim, an inference of reliance is allowed when the misrepresentation is material. *Id.* at 327, 93 Cal.Rptr.3d 559, 207 P.3d 20. The evidence demonstrating Wyeth consistently made the same material misrepresentations during a strategically orchestrated widespread multi-year advertising campaign entitles plaintiff to an inference of reliance. *See id.* at 327–328, 93 Cal.Rptr.3d 559, 207 P.3d 20; *Morgan,* 177 Cal.App.4th at 1258, 99 Cal.Rptr.3d 768. Plaintiff's allegations also state a claim under either the unlawful or unfair prong of the UCL. Plaintiff alleges defendant's conduct violated the CLRA, which satisfies the unlawful prong of the UCL. Additionally, conduct alleged to be fraudulent is by definition unfair. *See Blakemore v. Superior Court,* 129 Cal.App.4th 36, 49, 27 Cal.Rptr.3d 877 (2005) ("Because the allegations are sufficient to state a UCL claim based upon deception, the same allegations necessarily suffice to state a claim under the unfairness prong of the UCL. A practice which is deceptive is necessarily unfair.").

Turning to the merits of this motion, Wyeth first asserts that certification is inappropriate in that "different [hormone therapy] users (and their doctors) received different information about [hormone therapy] from Wyeth at different times—and some received no information from Wyeth at all." Doc. 85 at 29. According to defendant, "as in *Kaldenbach* and *Pfizer,* there is no way for Plaintiff to provein one trial, with common evidence-that each proposed class member was exposed to an unfair marketing practice by Wyeth." *Id.* A review of *Kaldenbach v. Mutual of Omaha Life Ins. Co.,* 178 Cal.App.4th 830, 100 Cal.Rptr.3d 637 (Cal.Ct.App.2009) and *Pfizer v. Superior Court,* 182 Cal.App.4th 622, 105 Cal.Rptr.3d 795 (Cal.Ct.App.2010) reveals the error in Wyeth's contention.

In *Kaldenbach,* the plaintiff sought to represent a class of individuals who purchased vanishing premium policies issued by the defendant insurance company. 178 Cal.App.4th at 830. Plaintiff claimed the defendant's representations about the overall cost of the policy were misleading and violated the UCL. Although the putative class members bought their policies from various agents who worked as independent contractors, plaintiff claimed the alleged misrepresentations were part of marketing material sent by defendant to each of its agents. Plaintiff further claimed the agents underwent standard training programs conducted by defendant. Because defendant sent the same material to each agent and used the same information in its training programs, plaintiff asserted the claim could be resolved on a classwide basis. However, defendant submitted evidence showing that agent sales presentations varied from one another and agents were not required to utilize the marketing materials from defendant. Furthermore, agents were not required to attend the training programs. Because of the various sales presentations each putative class member received, the appellate court found the trial court "could properly conclude there was no showing of uniform conduct likely to mislead the entire class, and the viability of a UCL claim would turn on an inquiry into the practices employed by any given independent agent." 178 Cal.App.4th at 850, 100 Cal.Rptr.3d 637. Thus, the question of "whether there was in fact an unfair business practice by [the defendant]" would require an individualized inquiry. *Id.*

**\*12** Wyeth also cites *Pfizer* for the proposition that individuals seeking restitution under the UCL must establish that the money lost was acquired by defendant because of the alleged unfair competition. 182 Cal.App.4th at 622. In that case, plaintiff alleged Pfizer ran a six month marketing campaign where it misrepresented that its Listerine mouthwash was "as effective as floss." Plaintiff sought to certify a class of consumers under the UCL who purchased Listerine during that six month period. However, because of the short-term nature of the campaign, the fact that not every bottle of Listerine sold during that period contained the misrepresentation, and the undisputed evidence showing many, if not most, class members had never seen the "as effective as floss" representation, the Court of Appeals reversed the trial court's certification and concluded the class was overbroad. The *Pfizer* court distinguished *In re Tobacco II Cases,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20 (Cal.2009), on the grounds that "cigarettes were marketed as part of a massive, sustained, decades-long fraudulent advertising campaign" and consequently defendants "may have .. acquired" the purchase price as a result of such a pervasive campaign. [9]

*Krueger v. Wyeth, Inc.*, Not Reported in F.Supp.2d (2011)

This Court's decision to restrict the class for the CLRA claim to those consumers who actually heard or read one of Wyeth's alleged misrepresentations applies to the UCL claim as well. This limitation resolves the issue of ensuring all class members were actually exposed to an unfair practice by Wyeth. This limitation also distinguishes the instant case from *Kaldenbach.* This Court notes that in *Kaldenbach,* the claim was based on representations from various agents about the advantages of a particular type of life insurance. Because the representations did not follow a standard format, there was no way to determine on a classwide basis whether an agent's sales presentations consisted of misleading representations. As stated, plaintiff's claim is based on uniform material misrepresentations that were part of a pervasive, strategically orchestrated, widespread, multi-year advertising campaign. As a result, common evidence can be used to establish the elements of this claim.

This Court also finds the reasoning in *Pfizer* does not apply here. In *Pfizer* the allegedly deceptive advertising campaign ran for only six months. During that time multiple advertisements aired that did not contain the misrepresentation that formed the basis of plaintiff's lawsuit. However, in this case, the same alleged misrepresentations were featured in Wyeth's advertising campaign in a massive, well organized and sustained manner throughout the eight year class period. Additionally, the breadth and length of defendant's fraudulent advertising campaign is more analogous to *Tobacco* II than *Pfizer.*

Wyeth next claims certification is inappropriate for this claim because "of the need for individualized evidence that the defendant's allegedly wrongful conduct caused each proposed class member to pay more for [hormone therapy] than it was worth to her." Doc. 85 at 29. Wyeth refutes plaintiff's contention that hormone therapy drugs have "no health-related quality of life benefit" and thus the class should simply be refunded the full purchase price. According to Wyeth, class certification is only appropriate if plaintiff can prove at trial that "no doctor would have prescribed [hormone therapy] in the face of more risk information—and no woman would have taken it." Doc. 85 at 30. Wyeth claims plaintiff cannot make this showing because many doctors continue to prescribe hormone therapy medication, notwithstanding the risk, and plaintiff herself continued taking hormone therapy medication for more than six months after becoming aware of the risks. *Id.* at 31. This argument is unpersuasive as California law allows recovery, including restitution, under the UCL "without individualized proof of

deception, reliance and injury." *McAdams,* 182 Cal.App.4th at 192, 105 Cal.Rptr.3d 704 (internal citations omitted). [10] As a result, the fact that damages may require an individualized inquiry does not prevent this claim from proceeding as a class action by way of the UCL cause of action. [11] *Id.*

 **\*13** Because the primary issue of plaintiff's UCL claim is whether Wyeth's representations about the benefits of its HRT drugs and concomitant failure to disclose the risks were unlawful, fraudulent or unfair, is subject to common proof, the Court finds common issues predominate over individualized issues for this claim. [12]

### 2. Superiority

The factors pertinent to assess superiority include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." F.R.C.P. 23(b)(3)(A–D).

"The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy" *Wolin v. Jaguar Land Rover North America, LLC,* 617 F.3d 1168, 2010 WL 3222091, at *6 (9 th Cir.2010) (citing 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 1779 at 174 (3 d ed.2005). "Where recovery on an individual basis would be dwarfed by the cost of litigation on an individual basis, this factor weighs in favor of class certification ... Rule 23(b)(3)'s superiority test requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Id.*

Here, the minimal recovery that each class member might obtain pales in comparison to the substantial legal costs involved in litigating this type of action on an individual basis. Thus, if this case does not proceed as a class action thousands, if not millions, of potentially injured parties may not have the opportunity to obtain recovery. Additionally, in a case such as this where the majority of pertinent issues are subject to common proof, judicial economy weighs in favor of allowing this case to proceed as a class action rather than a host of individual ones. The Court thus finds the superiority requirement is met here.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 197 of 260
PageID: 69861
Krueger v. Wyeth, Inc., Not Reported in F.Supp.2d (2011)

**B. Rule 23(a)**

Having found the requirements of Rule 23(b)(3) satisfied, the Court will now examine the remaining issues under Rule 23(a).

*Typicality*

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interest of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotation marks omitted).

Wyeth claims plaintiff is not typical of the class she wishes to represent because she continued taking HRT for more than six months after becoming aware of the risk. According to Wyeth this renders plaintiff's claims "atypical of any proposed class members who stopped taking HT as soon as they learned about its alleged risks." Doc. 85 at 34. Additionally, plaintiff's physician testified that for some women the benefits of HRT outweigh the risks. Wyeth argues plaintiff would not be typical of other class members whose physicians disagree and no longer prescribe HT at all. *Id.*

**\*14** Plaintiff claims she is typical of the proposed class because her claim, like the other putative class members, arises from the same advertising scheme conducted by Wyeth and alleges the same injury as the other class members.

This Court agrees with plaintiff. Typicality does not require that the factual circumstances surrounding plaintiff's claim be completely identical to the other class members. The relevant inquiry is whether the claims asserted by plaintiff are based on the same conduct that gives rise to the claims of the other class members and whether plaintiff and the other class members have been injured in a similar manner. Plaintiff claims Wyeth uniformly failed to disclose the risks associated with its HRT drugs and that conduct was deceptive in light of the representations Wyeth made about the drugs' benefits. Plaintiff further claims that deception caused her to purchase the product. Finally, plaintiff seeks a refund of the entire purchase price for all HRT drugs bought from Wyeth during the class period. Because there was no competing product in the marketplace, plaintiff had the option to buy Wyeth's HRT drugs or buy no drug at all. That claim is typical of the

proposed class. The Court thus finds that typicality has been satisfied here.

*Adequacy*

To ensure due process requirements are met, "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9 th Cir.1998). There are two criteria used to evaluate whether this requirement is met: 1) does the named class representative and their counsel have any conflicts of interest with other class members; and 2) will the named representative and her counsel prosecute the action vigorously on behalf of the class. *Id.* In this case, the named representative and class counsel have been actively pursuing this litigation since 2003, first in this court, then in the multi-district litigation, and back in this court again. This Court has no difficulty finding that both the named representative and class counsel will continue their vigorous prosecution of this action.

With respect to the first requirement, however, Wyeth contends that named representative April Krueger's employment relationship with class counsel "gives her an incentive to advocate in the interests of counsel, rather than the interests of class members." Doc.85 at 36. According to Ms. Krueger's declaration, she has worked on a part-time basis for class counsel's law firm since 2004 as an independent contractor. Doc. 88–2 ¶ 2. During this time period, Ms. Krueger also had other employment and did "not rely on the law firm for [her] livelihood." *Id.* Ms Krueger also states she has "no personal financial stake in this litigation, nor any personal participation or interest in what the law firm might recover, if anything." *Id.* ¶ 3. Finally, there is no proffer or argument that Ms. Krueger began taking Wyeth's HRT drugs, or initiated litigation against Wyeth, at the request of class counsel.

**\*15** Unlike the cases cited by Wyeth where the class representative's livelihood depended on her employment with class counsel, *see Miller v. Mercedes–Benz USA LLC,* 2009 WL 1393488 (C.D.Cal.2009), or class counsel was the primary employer of the named representative, *see Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371 (11th Cir.1984), the named representative here is not dependent on class counsel for her economic well-being. Thus, the concern that the named representative will put counsel's interest above that of her fellow class members does not appear applicable at this time.

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 198 of 260
PageID: 69862
Krueger v. Wyeth, Inc., Not Reported in F.Supp.2d (2011)

This Court does acknowledge its duty to "undertake a stringent and continuing examination of the adequacy of representation by the named class representative [ ] at all stages of the litigation where absent members will be bound by the court's judgment." *Susman v. Lincoln American Corp.,* 561 F.2d 86 (7th Cir.1977). If the court is later made aware of facts tending to show the named representative's interest conflicts with those of the other class members, the Court will revisit this issue. *See, e.g., Barboza v. West Coast Digital GSM, Inc.,* 179 Cal.App.4th 540, 547, 102 Cal.Rptr.3d 295 (Cal.Ct.App.2009) ("it is the duty of the trial court to ensure at every stage of the proceeding that counsel is adequately representing [absent class members'] interests").

### CONCLUSION AND ORDER

Based on the foregoing, the Court finds plaintiff has satisfied all of the requirements for class certification under Rule 23(a) and Rule 23(b)(3). The Court further finds it appropriate to modify the class definition to incorporate the limitation on the class discussed *supra* in the Court's analysis of plaintiff's CLRA claim. Accordingly, this Court GRANTS plaintiff's motion IN PART and certifies a class of:

> All California consumers who purchased Wyeth's Hormone

Replacement Therapy products, Premarin, Prempro, and/or Premphase, for personal consumption between January 1995 and January 2003, and were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that Premarin, Prempro, and/or Premphase lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk, and do not seek personal injury damages resulting therefrom.

Plaintiff's Motion for Class Certification is **DENIED** insofar as it is based on the class definition set forth in the motion.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 8971449

## Footnotes

1   After oral argument on this motion, the parties submitted supplemental briefing to address the impact of the Ninth Circuit's decision in *Dukes v. Walmart,* 603 F.3d 571, 590 (9th Cir.2010), on the instant motion.

2   According to plaintiff, Wyeth sold more than 53 million prescriptions of its hormone therapy drugs to California consumers between 1997 and 2002, which more than satisfies the numerosity requirement. Doc. 61 at 7. The commonality requirement has been construed permissively, such that the "existence of shared legal issues" and "a common core of salient facts are sufficient." *Hanlon v. Chrylser Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). Here, the claims asserted by the class members are all premised upon the same two legal theories: whether Wyeth's conduct violated the CLRA and UCL. Additionally, the claims are based upon the same set of facts, specifically the nature of Wyeth's marketing of its HRT drugs between 1995 and 2003. This satisfies the commonality requirement.

3   *See* Def. Ex. D [Doc. 85–2 at 50] *Physicians' and Women's Views on Hormone Therapy and Breast Cancer Risk After the WHI: A Qualitative Study* ("The use of menopausal hormone therapy (HT) has significantly declined since the release of the Women's Health Initiative findings....")

*Krueger v. Wyeth, Inc.,* Not Reported in F.Supp.2d (2011)

4  Def. Ex. D at 59 ("Our qualitative study conducted more than three years after the release of the WHI findings suggested that, for both physicians and women, concern about breast cancer risk was a key factor in the **decision making process** to initiate and continue HT.") (emphasis added). *But see id.* at 51 ("For women, control of menopausal symptoms was important and possibly outweighed their concerns about the potential risks of breast cancer .")

5  *See* footnote 4, *supra.*

6  This Court is mindful of the court's monition in the MDL opinion, *In re Prempro,* that "[p]laintiffs' causes of action 'raise a host of individual issues. For example, the consumer fraud claim 'require[s] individualized proof concerning reliance and causation.' Whether a plaintiff saw an advertisement; whether the particular advertisement was fraudulent; whether that plaintiff relied on the advertisements; and whether the plaintiff was damaged as a result of the advertisement are all individual questions of fact." 230 F.R.D. 555, 567 (E.D.Ark.2005). However, that action involved varying consumer fraud laws from more than 20 states. Additionally, that court was not bound by California law which, unlike most states, allows an inference of reliance where the alleged misrepresentations are material.

7  This limitation also resolves the issue raised in Wyeth's first argument, *supra* p. 7, and ensures all class members were exposed to the same representation.

8  *See, e.g.,* McAdams, 182 Cal.App.4th 174, 105 Cal.Rptr.3d 704 (finding class action of CLRA claim appropriate where the issues of liability and causation were subject to common proof). The Court also notes that while there have been multiple litigations nationwide with respect to Wyeth's conduct in the marketing of Prempro, discovery has not commenced in this litigation. Accordingly, if it subsequently becomes clear that the class members were inundated with such a variety of information about HRT that it is impossible to assess materiality on a classwide basis, the Court will entertain a motion to redefine or decertify the class.

9  In *Tobacco II,* the California Supreme Court reversed the trial court's decertification of a UCL class defined as "those people who are residents of California and who, while residents of California, smoked one or more cigarettes during the applicable class period." 46 Cal.4th at 308–09, 93 Cal.Rptr.3d 559, 207 P.3d 20. The Court found this class consists of "members of the public who were exposed to defendants' allegedly deceptive advertisements and misrepresentations and who were also consumers of defendants' products during a specific period of time." *Id.* at 324, 93 Cal.Rptr.3d 559, 207 P.3d 20. The Court surmised such a class could be appropriate for a UCL class action due to the tobacco industry defendants' "long-term campaign of deceptive advertising and misrepresentations to the consumers of its products regarding the health risks of those products. *Id.* at 325, 93 Cal.Rptr.3d 559, 207 P.3d 20. In so doing, the Court rejected the defendants' arguments that class certification was inappropriate because each putative class member would have to individually show they read or heard a misrepresentation made by defendants and were misled or deceived about the health risks of smoking. *Id.* at 309, 93 Cal.Rptr.3d 559, 207 P.3d 20.

10  Defendant's argument that nonrestitutionary disgorgement is not an available remedy under the UCL is correct. *Tobacco II,* 46 Cal.4th at 320 n. 14, 93 Cal.Rptr.3d 559, 207 P.3d 20. However, restitutionary disgorgement is allowed under the UCL and that is the remedy sought by plaintiff here. *See Feitelberg v. Credit Suisse First Boston, LLC,* 134 Cal.App.4th 997, 1013, 36 Cal.Rptr.3d 592 (2005).

11  *See also* McAdams, 182 Cal.App.4th at 186, 105 Cal.Rptr.3d 704 ("A class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or damages, so long as each class member would not be required to litigate substantial and numerous factually unique questions to determine his or her individual right to recover."). Where the claims of all class members stem from the same source, and it does not involve substantial and numerous factually unique

questions, a class action may be appropriate even though a class member will have to show the specific misrepresentation made and the amount of their damages. *Id.*

12    Wyeth also contends that predominance should not be found because different statute of limitations apply to each class member. However, a statute of limitations defense can be separated out and determined on an individualized basis once the class trial is over. *Cartwright v. Viking Industries, Inc.,* 2009 WL 2982887, at *7 (E.D.Cal.2009) (citing *Arthur Young & Co. v. U.S. Dist. Court,* 549 F.2d 686, 696 (9th Cir.1977).

---

**End of Document**                                            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 15

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 202 of 260
PageID: 69866

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 3287335
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

T.J. MCDERMOTT Transportation Co., Inc., DeMase
Warehouse Systems, Inc., Heavy Weight Enterprises,
Inc., P&P Enterprises Co., LLC, Young's Auto Transport,
Inc., Allen Hardwick, and Jose Vega, Plaintiffs,
v.
CUMMINS, INC., Cummins Emission Systems, Inc., and
Paccar, Inc. d/b/a Peterbilt Motor Company, Defendants.

Civ. No. 14-4209 (WHW) (CLW)
|
Signed 06/07/2016

**Attorneys and Law Firms**

James E. Cecchi, Lindsey H. Taylor, Carella Byrne Cecchi
Olstein Brody & Agnello, P.C., Roseland, NJ, James Michael
Mulvaney, Jennifer Marie Bennett, McElroy, Deutsch,
Mulvaney & Carpenter, LLP, Morristown, NJ, Ryan P.
Mulvaney, McElroy, Deutsch, Mulvaney & Carpenter, LLP,
Newark, NJ, James C. Shah, Natalie Finkelman Bennett,
Shepherd, Finkelman, Miller & Shah, LLP, Collingswood,
NJ, Eileen T. Burns, Kohn Swift & Graf PC, Philadelphia, PA,
for Plaintiffs.

Craig R. Tractenberg, Nicole F. Mastropieri, Nixon Peabody,
LLP, New York, NY, Anthony M. Pisciotti, Danny Charles
Lallis, Pisciotti Malsch & Buckley PC, Florham Park, NJ, for
Defendants.

**OPINION**

Walls, Senior District Judge

*1 Plaintiff T.J. McDermott Transportation Co. filed this
action on July 2, 2014, invoking this Court's diversity
jurisdiction and alleging that tractors it purchased from
Defendants had defective engines. T.J. McDermott filed
an amended complaint on September 2, 2014. ECF No.
17. Defendants moved to dismiss that complaint, and this
Court partially granted and partially denied that motion
on March 11, 2014. ECF Nos. 37, 38. On December
29, 2015, Magistrate Judge Waldor granted Plaintiff leave
to file a Second Amended Complaint, ECF No. 69, and

Plaintiff did so on January 8, 2016. The Second Amended
Complaint added Plaintiffs DeMase Warehouse Systems,
Heavy Weight Enterprises, Inc., P&P Enterprises, Co.,
Young's Auto Transport, Inc., Allen Hardwick, and Jose Vega.
*Id.* They seek to certify classes on behalf of purchasers
in New Jersey, California, Florida, Georgia, Michigan, and
Connecticut. Defendant PACCAR now moves to partially
dismiss that complaint. Decided without oral argument under
Fed. R. Civ. Pr. 78, the motion is granted in part and denied
in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the Second Amended
Complaint ("SAC"), ECF No. 69, unless otherwise noted.
Plaintiffs allege that Defendants PACCAR and Cummins
formed a partnership in 2001 for the "development, design,
manufacture, assembly, marketing and sale of" tractors that
used Cummins's ISX15 engine. *Id.* ¶ 14. According to
Plaintiffs, PACCAR's vehicles equipped with the ISX15
engine from model years 2007 through 2009 experienced
failures due to various problems relating to "exhaust gas
recirculation ('EGR'), the EGR valves, diesel particulate filter
('DPF') systems and other sensors, and other piping and
containment components for the Aftertreatment System." *Id.*
¶ 24. Plaintiffs assert that Defendants were aware of these
failures in part because the vehicles' onboard diagnostics
systems "store trouble or fault codes and provide data
to Defendants' and/or their authorized service providers'
diagnostic computers." *Id.* ¶ 19.

Despite these problems with earlier ISX15 models, Cummins
"designed, manufactured, marketed, assembled and sold"
a 2010 ISX15 model (the "subject engines"). *Id.* ¶ 16.
Plaintiffs allege that Cummins designed these engines without
"correcting the known problems with the 2007 through 2009
model year ... engines." *Id.* ¶ 25. PACCAR then designed and
marketed tractors equipped with the 2010 ISX15 engine (the
"subject vehicles"). *Id.* ¶ 18. Plaintiffs assert that Cummins
"warranted to Plaintiffs that the 2010 ISX15 engines would
be free from defects in material and workmanship and that
in the event a defect manifested, Cummins was obligated to
correct the defect." *Id.* ¶ 26.

According to the complaint, Defendants "intentionally
concealed" defects with the subject vehicles, including
persistent problems with (1) the engines' gas recirculation
system, (2) the aftertreatment system's diesel particulate

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 203 of 260
PageID: 69867
McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

filters, (3) the aftertreatment system's hydrocarbon doser, (4) several of the engines' sensors, and (5) other components in the aftertreatment system's piping and containment system. *Id.* ¶ 27. Owners of the subject vehicles experienced various problems "often before the 200,000 mile interval, at a high rate." *Id.* ¶ 28. Their tractors "repeatedly and frequently broke down, failed to function properly, and failed to function reliably and dependently." *Id.* ¶ 32. Cummins issued seventeen technical service bulletins listing problems with the subject engines from 2011 through 2014. *Id.* ¶ 29. Plaintiffs allege that these defects were known to Defendants at the time of sale and that Defendants failed to disclose them. *Id.* ¶¶ 30-34.

**\*2** Plaintiffs are companies and individuals that purchased the subject vehicles. Plaintiff T.J. McDermott, a New Jersey corporation, purchased five subject vehicles between 2010 and 2011. *Id.* ¶¶ 1, 36. Plaintiff DeMase, also a New Jersey corporation, purchased four subject vehicles in 2011. *Id.* ¶¶ 2, 37. Plaintiff Heavy Weight Enterprises, a Michigan corporation, bought one subject vehicle in 2010. *Id.* ¶¶ 3, 38. Plaintiff P&P, a Connecticut corporation, also bought one subject vehicle in 2010. *Id.* ¶¶ 4, 39. Plaintiff Young's Transport, a Florida corporation, bought two subject vehicles in 2012. *Id.* ¶¶ 5, 40. Plaintiff Hardwick, a Georgia resident, purchased a subject vehicle in 2010. *Id.* ¶¶ 6, 41. Plaintiff Vega, a California resident, purchased a subject vehicle in 2013. *Id.* ¶¶ 7, 42. These Plaintiffs experienced problems with the subject engines that they claim resulted in "out-of-pocket costs of repair, towing and lodging costs, rental costs of replacement vehicles, diminished value of Subject Vehicles, lost revenue, lost profit, and goodwill" as well as "substantially diminished resale value and intrinsic value." *Id.* ¶¶ 47, 48.

Plaintiffs also seek to certify several classes and sub-classes. They propose a New Jersey class consisting of all persons and entities in New Jersey who are "users, purchasers, subsequent purchasers, owners, subsequent owners, and lessors" of a vehicle powered by a 2010 ISX15 engine, with a New Jersey subclass specifically relating to those whose vehicle was made by PACCAR. *Id.* ¶ 50. They also seek to certify identical classes and subclasses for persons and entities in the states of California and Florida. *Id.* Finally, Plaintiffs propose classes of 2010 ISX15 engine owners, without related subclasses for the states of Georgia, Michigan, and Connecticut. *Id.*

On behalf of themselves and the putative classes, Plaintiffs assert (1) one count under the New Jersey Consumer Fraud

Act, N.J.S.A. 56:8-1, against Cummins on behalf of the New Jersey Class and against PACCAR on behalf of the New Jersey sub-class, *id.* ¶¶ 62-71, (2) one count of breach of express warranty under New Jersey law against Cummins on behalf of the New Jersey Class, *id.* ¶¶ 72-86, (3) one count of breach of express warranty under California law against Cummins on behalf of the California Class, *id.* ¶¶ 87-100, (4) one count for violation of the California Unfair Competition Law, Cal. Business and Professions Code § 17200, against Cummins on behalf of the California Class and against Cummins and PACCAR on behalf of the California sub-class, *id.* ¶¶ 101-109, (5) one count of breach of express warranty under Florida law against Cummins on behalf of the Florida Class, *id.* ¶¶ 110-124, (6) one count for violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201, Florida Statutes, against Cummins on behalf of the Florida Class and against PACCAR on behalf of the Florida sub-class, *id.* ¶¶ 125-132, (7) one count for breach of express warranty under Georgia law against Cummins on behalf of the Georgia class, *id.* ¶¶ 133-147, (8) one count for breach of express warranty under Michigan law against Cummins on behalf of the Michigan class, *id.* ¶ 148-162, (9) and finally one count of breach of express warranty under Connecticut law against Cummins on behalf of the Connecticut Class, *id.* ¶¶ 163-177. On March 9, 2016, the parties stipulated to a dismissal without prejudice of the claims against Cummins, subject to Cummins's agreement to discovery and toll the statute of limitations for claims asserted against it in the Second Amended Complaint. *See* ECF No. 91.

PACCAR moves to dismiss (1) DeMase's claim under the New Jersey Consumer Fraud Act, (2) Vega's claim under the California Unfair Competition Law, (3) Young's Transport's claim under the Florida Deceptive and Unfair Trade Practices Act, and (4) all claims for consequential and incidental damages under these laws. Mot. to Dismiss, ECF No. 77 at 8-13.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2018)

offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations and alterations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Id.* at 679.

**\*3** Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The purpose of the heightened pleading standard is to require the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). "To satisfy this heightened standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200. Normally, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations ... with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (citations and quotation marks omitted). "Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (citation omitted).

## DISCUSSION

In its March 11, 2015 opinion addressing Defendants' original motion to dismiss, the Court held that choice of law analysis would be premature, noting that "the present factual record is insufficient for choice of law analysis." *See T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209, 2015 WL 1119475 at *4 (D.N.J. Mar. 11, 2015). This remains true, and the Court will analyze each of Plaintiffs' state law claims under the laws of that state for this motion. *See id.*

**1. DeMase has adequately pled a claim under the NJCFA.**

To state a claim under New Jersey's Consumer Fraud Act, a plaintiff must allege (1) a defendant's unlawful conduct, (2) an ascertainable loss by the plaintiff, and (3) a causal connection between the two. *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 389 (N.J. 2007). The NJCFA is to be "liberally construed in favor of protecting consumers." *Barry v. Arrow Pontiac, Inc.*, 100 N.J. 57, 69 (N.J. 1985). In light of this, motions to dismiss NJCFA claims are to be "approached with hesitation." *N.J. Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 13 (N.J. Ct. App. 2003). Fed. R. Civ. Pr. 9(b)'s heightened pleading standard applies to fraud claims under the NJCFA. *Frederico v. Home Depot, 507* F.3d 188, 200 (3d Cir. 2007).

PACCAR argues that DeMase has not pled facts with sufficient particularity to show an ascertainable loss. Mot. to Dismiss at 11. This Court previously analyzed Plaintiff T.J. McDermott's claims and found that it "alleged[d] ascertainable loss by stating that it incurred over $80,000 in post-warranty repair costs." *T.J. McDermott*, 2015 WL 1119475 at *7. Defendant argues that "no such similar facts have been provided" by DeMase. Mot. to Dismiss at 12. Plaintiffs first respond that DeMase is not obligated to independently plead ascertainable losses because "McDermott's allegations already establish that losses from purchasing the Subject Vehicles are ascertainable." Opposition Brief ("Opp. Br."), ECF No. 82 at 16-17. They also argue that DeMase has independently established that its losses are ascertainable, because it has alleged that it would not have purchased the subject vehicles if it had been aware of the defects. Opp. Br. at 16-17.

The "viability of a CFA claim ... 'often turns on the question of whether a plaintiff is able to provide sufficient evidence of an ascertainable loss.'" *Mickens v. Ford Motor Co.*, No. l0-cv-5842, 2015 WL 5310755 at *6 (D.N.J. Sept. 10, 2015) (quoting *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 105 (N.J. Ct. App. 2006)). The requirement that a plaintiff prove an ascertainable loss "has been broadly defined as embracing more than a monetary loss." *Union Ink Co. v. AT&T Corp.*, 352 N.J. Super. 617, 646 (N.J. Ct. App. 2002). An ascertainable loss occurs "when a consumer receives less than what was promised." *Id.*

**\*4** The Second Amended Complaint alleges that the subject vehicles' "problems and defects resulted in warnings, deratings, and shutdowns, requiring expensive repairs in an effort to remediate the faults and frequent and excessive down times ...." SAC ¶ 32. It also specifically alleges that

T.J. McDermott's "out-of-pocket expenses for post-limited warranty repairs" exceeded $80,000. *Id.* ¶ 71. Although there is no equivalent allegation specifying DeMase's losses in a dollar amount, the defects in DeMase's tractors allegedly caused engine shutdowns and required expensive repairs. This adequately alleges an ascertainable loss. "[B]y the time of a summary judgment motion," DeMase will be obligated to provide an estimate of damages and show that its losses were "quantifiable or measurable," but it is entitled to discovery in order to make that showing. *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 249 (N.J. 2005); *see also Mickens*, 2015 WL 5310755 at *6.

### 2. Vega had adequately pled a California UCL claim.

#### a. Unfair Competition Law Claims

The California Unfair Competition Law prohibits business practices that are "unlawful, unfair, or fraudulent." *Cal. Bus. & Prof. Code § 17200.* Plaintiff Vega alleges that PACCAR's conduct violated all types. SAC ¶¶ 102-105. Unlawful practices are those that violate another law; "the UCL 'borrows' violations of other laws and treats them as unlawful practices independently actionable under the UCL." *Saldate v. Wilshire Credit Corp.*, 268 F.R.D. 87, 102 (E.D. Cal. 2010) (citing *Farmers Ins. Exchange v. Superior Court*, 2 Cal 4th 377, 383 (1992)). A practice is unfair if "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (Cal. Ct. App. 2006). To state a claim under the UCL, a plaintiff must plead that "(1) defendant engaged in one of the practices prohibited by the statue; and (2) plaintiff suffered actual injury in fact as a result of defendant's actions." *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1003 (N.D. Cal. 2009). The UCL allows a plaintiff to recover injunctive relief and restitution, but not damages. *E.g. Asghari v. Volkswagen Group of America, Inc.*, 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013).

#### b. Vega has not adequately alleged unlawful conduct.

PACCAR first argues that Plaintiffs have failed to plead unlawful business practices because they have not identified which statute, regulation, or ordinance was violated by their conduct. Mot. to Dismiss at 9. Count Four alleges violations

of each prohibition of the UCL. With respect to the unlawful assertion, it states that "Defendants have violated the unlawful prong of § 17200 by its violations as set forth below," SAC ¶ 103, but does not identify any specific law that PACCAR is alleged to have violated. A "violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Graham v. Bank of America, N.A.*, 172 Cal. Rptr. 3d 218, 231 (Cal App. Div. 2014) (quotations omitted). In their opposition to the motion to dismiss, Plaintiffs state that "PACCAR's argument overlooks the breach of warranty count in the SAC. Such an allegation would satisfy [the unlawful] prong." Opp. Br. at 23, fn. 8. But the breach of warranty claim brought by Vega on behalf of the proposed California class is brought only against Cummins, while the UCL violation is brought against PACCAR. SAC ¶¶ 87-100. And even if Cummins's alleged breach of expressed warranty could support a UCL claim against PACCAR, the breach of warranty claim was dismissed by the Court according to the parties' March 9 stipulation. Stipulation, ECF No. 91. Finally, Plaintiffs' other claims against PACCAR that are brought under the laws of other states cannot be used to support a claim under California's UCL. *See Hilton v. Apple Inc.*, No. 13-7674, 2014 WL 10435005 at *3-*4 (C.D. Cal. April 18, 2014). PACCAR is correct that Vega has failed to state a UCL violation under the unlawful prong.

#### c. Vega adequately alleges a violation based on PACCAR's omission.

**\*5** PACCAR next argues that Vega's UCL claim does not meet the requirements for pleading a violation based on an omission. Mot. to Dismiss at 9. Under California law, an omission is actionable if it is "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty*, 144 Cal. App. 4th at 835-36; *see also Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012). PACCAR argues that Vega has failed to show that it was obligated to disclose the alleged defects and so its failure to disclose any such defects is not an actionable omission in the absence of a contrary representation. Mot. to Dismiss at 9.

Relying on *Ostreicher v. Alienware Corp.*, PACCAR argues that a manufacturer is only obligated to disclose a defect if there has been "an affirmative misrepresentation or a safety issue." 322 Fed.Appx. 489, 493 (9th Cir. 2009). *Ostreicher* relied on *Daugherty*, a decision of the California Court of Appeals for the Second District, which held that the

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 206 of 260
PageID: 69870

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2019)

defendants had no duty to disclose an alleged defect because the plaintiff's complaint "is devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect." 144 Cal. App. 4th at 836. Plaintiffs respond that "[s]uch a limited duty to disclose only arises when the defect manifests after the warranty period expired, as was the case in *Ostreicher.*" Opp. Br. at 24 fn 11. They point to *Decker v. Mazda Motor of America, Inc.*, where the Central District of California held that a "proper reading of *Daugherty* reveals a two-step duty to disclose analysis" under which a manufacturer has a duty to disclose (1) any defects that would have "caused the consumer not to purchase the [product] if they had been disclosed" during the warranty period and (2) defects relating to safety after the end of the warranty period. No. 11-873, 2011 WL 5101705 at *4 (C.D. Cal. Oct. 24, 2011). The year after *Decker* was decided, the Ninth Circuit stated that "California federal courts have generally interpreted *Daugherty* as holding that '[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue,' " without citing *Decker. Wilson,* 668 F.3d at 1141.

This Court need not decide between these two conflicting interpretations of *Daugherty,* because the complaint's allegations raise a safety issue, which explicitly gives rise to a duty to disclose under California law. *Daugherty,* 144 Cal. App. 4th at 836

The Second Amended Complaint asserts that the Subject Vehicles' onboard diagnostic systems "monitor and control all aspects of safety, emissions and performance" of the Subject Engines. SAC ¶¶ 19, 69. The complaint alleges that, when "there are problems with the Subject Engine or Aftertreatment Systems that require the Subject Vehicle be brought to one of Defendants' authorized service providers," warning lights would be illuminated and "after a short de-rated operating time, the Subject Engine is shut down by the on-board diagnostic system." *Id.* ¶ 20. The complaint also alleges that these "on-board diagnostic systems had problems." *Id.* ¶ 70. These assertions, along with the allegation that the subject engines experienced "clogging" and "plugging" and would cause the tractors to shut down during use, *id.* ¶¶ 20, 29, raise the issue of safety. The existence of a defect that caused a safety risk would trigger a duty to disclose and allow Vega to plead a UCL violation based on an omission. *Compare Marsikian v. Mercedes Benz USA, LLC*, No. 8-4876, 2009 WL 8379784, at *6-7 (C.D. Cal. May 4, 2009) (safety issue adequately alleged because "it is not implausible that [air

intake clogging] would cause 'catastrophic engine ... failure' while the car is on the road") *and Wilson*, 668 F.3d at 1144 (no safety issue alleged where "it is difficult to conceive (and the complaint does not explain) how [laptops sold by defendant] could ignite if [the alleged defect renders them] 'unable to receive an electrical charge.' ").

#### d. Vega adequately alleges reliance.

**\*6** PACCAR further argues that Vega fails to allege reliance, noting that he "fails to state that he viewed any promotional materials or advertisements from PACCAR prior to his purchase." Mot. to Dismiss at 10. A claim for fraud under the UCL requires a showing of actual reliance. *In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (Cal. 2009). Reliance may be established by showing that, in the "absence [of a defendant's misrepresentation] the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Id.* at 327 (internal citation omitted). A plaintiff need not show "individualized reliance on specific misrepresentations," and the misrepresentation need not be "the sole or even the predominant or decisive factor" in influencing a plaintiff's conduct. *Id.* at 326-27. A "presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material," and "materiality is generally a question of fact." *Id.* "Alleged defects that create 'unreasonable safety risks' are considered material." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

Plaintiffs argue that reliance has been adequately pled because Vega alleges that he "would not have purchased the Subject Vehicle ... or not have paid as much for the Subject Vehicle" if "defendants [had] disclosed the defect with the Subject Engine." SAC ¶ 107. Plaintiffs also argue that the alleged defects should be considered material because they created unreasonable safety risks. In its reply, PACCAR contends that the complaint fails to plead any facts "related to Vega's transaction and/or experiences" or any unreasonable safety risk. Reply Br., ECF No. 85 at 7-9.

Materiality of a misrepresentation is "a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *In re Tobacco II Cases,* 46 Cal. 4th at 327 (internal quotations omitted). The alleged defects led to repeated engine shutdowns that rendered the tractors unusable until they were repaired at a service provider. A defect that repeatedly renders a product unusable is unlikely

to be "obviously unimportant" to the consumer. Materiality can also be inferred here because, as discussed, the Second Amended Complaint raises a safety issue. The facts alleged in the Second Amended Complaint, taken as true for the purpose of a motion, raise a question of fact as to materiality and an inference of materiality based on the issue of safety. *Cf.* *McVicar v. Goodman Global, Inc.*, No. 13-1223, 2015 WL 4945730 at *11 (C.D. Cal. Aug. 20, 2015)* (In "some cases, for example, those involving automobile safety, it is fair to assume that *all* of the purchasers of automobiles read some marketing materials regarding the product."). PACCAR's motion to dismiss Vega's UCL claim based on failure to plead reliance is denied.

### e. Vega's claim for restitution has been adequately pled.

Finally, PACCAR argues that Plaintiffs fail to make a valid claim for restitution because Vega does not allege that he bought his vehicle directly from Defendant. PACCAR relies on *Asghari v. Volkswagen Group of America, Inc.*, where the Central District of California dismissed a UCL claim for restitution because the plaintiff had bought an allegedly defective vehicle from a third party and could not show that defendants obtained her money or property. 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013). *Asghari* is distinguishable because the plaintiffs in that case purchased their vehicles used, *id.* at 1318, while Vega alleges that he purchased his tractor new. SAC ¶ 42. To recover on a claim for restitution, Vega will have to produce "evidence that supports the amount of restitution necessary to restore to the plaintiff any money ... which may have been acquired by means of ... unfair competition." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 697 (Cal. Ct. App. 2006). The allegation that Vega purchased a new, rather than a used, tractor is sufficient to entitle him to discovery in order to locate evidence that PACCAR is in possession of money acquired by means of unfair competition.

### 3. Young's Transport fails to allege conduct in the state of Florida.

**\*7** The Florida Unfair and Deceptive Trade Practices Act prohibits "unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of [Florida]." *Millennium Commc'n & Fulfillment, Inc. v. Office of Attorney Gen.*, 761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000); *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012). A "consumer claim for

damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). PACCAR argues that Plaintiff's claim fails because it has not shown that it suffered actual damages and it has not specified that the alleged purchase took place in Florida. Mot. to Dismiss at 12-13. Young's Transport has alleged that its vehicles suffered a "diminution in value" and stated that it is a Florida corporation with its principal place of business in Fort Myers, Florida. SAC ¶¶ 5, 132.

Young's Transport has adequately alleged actual damages. The FDUTPA "allows for recovery of the difference between the value of the defective ... goods provided and the value of non-defective ... goods...." *Orkin Exterminating Co. v. DelGuidice*, 790 So. 2d 1158, 1162 (Fla Dist. Ct. App. 2001). Young's Transport alleges that the subject vehicles had defective engines, identifies specific mechanical defects in the engines, and claims that these defects diminished the value of the subject vehicles. SAC ¶¶ 27,131-132. In short, it alleges that the value of its defective tractors was less than the value of non-defective tractors would have been. The allegation of these specific defects contain sufficient factual content to withstand a motion to dismiss.

Next, PACCAR argues that Plaintiffs fail to allege sufficient activity within the state of Florida to proceed under the FDUTPA. Plaintiffs assert that the claim is sufficiently pled because the Second Amended Complaint "provides that Plaintiff Young's Transport is a Florida corporation ... and that Defendants knowingly and intentionally concealed their knowledge of the problems and defects when the trucks were placed into the stream of commerce." Opp. Br. at 18. They argue that "it is reasonable to infer that Defendants' misconduct reached Florida because any decision to purchase the trucks and subsequent injury occurred in Florida, which would not have occurred had Defendants not concealed the material information in their marketing campaign." *Id.*

Plaintiffs cite four cases where courts have declined to dismiss FDUTPA claims on the ground that injuries took place outside of Florida, *id.*, but in each of these cases the plaintiffs alleged that at least some of defendants' activities occurred within the state. *Solyom v. World Wide Child Care Corp.*, 14-80241-CIV, 2015 WL 6167411 at *2-*3 (S.D. Fla. Oct 15, 2015) (Defendants' principal place of business was in Florida, and they were alleged to have hired "unlicensed sales people" who made material misrepresentations while selling securities.); *In re Flonase Antitrust Litig.*, 692 F. Supp.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 208 of 260
PageID: 69872
McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

2d 524, 538 (E.D. Pa. 2010) (Plaintiffs alleged that "their purchases and/or reimbursements of" defendants' medicine took place in Florida.); *Carnival Corp. v. Rolls-Royce PLC*, No. 8-23318-CIV, 2009 WL 3861450 at *6 (S.D. Fla. Nov. 17, 2009) ("Plaintiffs' Amended Complaint has alleged numerous actions that occurred in Florida ..."); *Millennium Commc'n*, 761 So. 2d at 1262 ("the allegations in this case reflect that the offending conduct occurred entirely within this state"). The mere assertion that Young's Transport is a Florida company that purchased Defendant's tractors is insufficient to allege that the "unfair, deceptive and/or unconscionable practices ... transpired within the territorial boundaries" of Florida. *Millennium Commc'n*, 761 So. 2d at 1262. As the Southern District of Florida has explained, "pertinent question ... is not the citizenship of the [p]laintiff, but rather the connection of the [d]efendants' alleged activities with Florida." *Solyom*, 14-80241-CIV, 2015 WL 6167411 at *2-*3. Alleging that Plaintiff, rather than Defendant, is a Florida company, on its own, does not establish a connection between a defendant's activities and that state. And alleging that Young's Transport's principal place of business is in Florida is not equivalent to alleging that the decision to purchase PACCAR tractors, or the purchase itself, took place in Florida.

**\*8** Where FDUTPA complaints have failed to specify which actions occurred in Florida, courts have granted motions to dismiss "with leave to re-plead to specify the location of the conduct to make certain it occurred within the territorial boundaries of Florida." *Five for Entm't S.A.*, 877 F. Supp. 2d at 1331. Because Plaintiffs have not pled that any of the subject vehicles were purchased by Young's Transport in Florida, Young's Transport's FDUTPA claim is dismissed without prejudice. Plaintiffs are granted leave to file an amended complaint that pleads the specific location of the conduct alleged in Young's Transport's FDUTPA claim within 90 days of the date of this order.

### 4. Plaintiffs' claims for consequential and incidental damages are partially dismissed.

Defendant argues that all claims for consequential damages against PACCAR should be dismissed because (1) PACCAR's warranties included a damages limitation that is valid under New Jersey law and (2) consequential damages are not available under either the UCL or FDUTPA. Mot. to Dismiss at 13.

Under New Jersey law, consequential damages may be limited by a disclaimer, and PACCAR disclaimed consequential damages in its express warranties. *See Chatlos*

*Sys., Inc. v. Nat'l Cash Register Corp.*, 635 F.2d 1081, 1083 (3d Cir. 1980); *see also Kearney & Trecker Corp. v. Master Engraving Co., Inc.*, 107 N.J. 584, 600 (NJ. 1987); Warranty, ECF No. 15-3. A disclaimer of consequential and incidental damages may be invalidated "when the circumstances of the transaction, including the seller's breach [of warranty], cause the consequential damage exclusion to be inconsistent with the intent and reasonable commercial expectations of the parties ...." *Kearney*, 107 N.J. at 600. Previously, the Court found that this issue was prematurely raised because it could not rule on whether PACCAR's disclaimer was invalidated without deciding the merits of T.J. McDermott's claim for breach of express warranty. *T.J. McDermott*, 2015 WL 1119475 at *15. Defendant now claims that, because there is no longer any "breach of warranty cause of action alleged against PACCAR," the "damages limitation should be enforced, and all claims for consequential damages against PACCAR should be dismissed." Reply Br. at 11.

This issue remains premature. Although Plaintiffs no longer bring a claim against PACCAR for breach of express warranty, the Court cannot make a determination as to the "circumstances of the transaction," including the "seller's breach" and the "intent ... of the parties." *Kearney*, 107 N.J. at 600. These are disputed questions of fact that cannot be decided on a motion to dismiss.

PACCAR is correct that consequential damages are not available under the FDUTPA or the UCL. "Florida courts specifically reject the recovery of consequential damages under FDUTPA." *Eclipse Medical, Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999) (citing *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451, 454 (Fla. Dist. Ct. App. 1985)). Similarly, "[r]elief under the UCL is limited to injunction and restitution." *Marolda*, 672 F. Supp. 2d at 1004; *see Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (Cal. 2003) (quotations and alternations omitted). Plaintiffs' claims for consequential damages under the FDUTPA and UCL are dismissed. Defendant's motion to dismiss Plaintiffs' claims for consequential damages under the NJCFA is denied.

### CONCLUSION

Defendant PACCAR's motions to dismiss are granted in part and denied in part. Plaintiff Vega's claim under the UCL, brought in Count Four, is dismissed only to the extent that it relies on the "unlawful" prong of that statute. Plaintiff

McDermott v. Cummins, Inc., Not Reported in Fed. Supp. (2016)

Young's Transport's claim under FDUTPA, brought in Count Six, is dismissed without prejudice, and Plaintiffs are granted leave to amend their complaint to specify the location of the activity alleged in that Count within 90 days of the date of this order. Plaintiffs' claims for consequential damages

under the FDUTPA and UCL are dismissed. The remainder of Defendant's motion is denied. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3287335

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 16

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 211 of 260
PageID: 69875
Muehlbauer v. General Motors Corp., Not Reported in F.Supp.2d (2008)

2008 WL 4542650
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Wayne MUEHLBAUER, et al., Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.

No. 05 C 2676.
|
July 22, 2008.

**Attorneys and Law Firms**

Peter Todd Berk, McDonald Hopkins LLC, Chicago, IL, for Plaintiff.

James Andrew Langan, Brian Patrick Kavanaugh, John Benjamin Rottenborn, Kirkland & Ellis LLP, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

JAMES B. MORAN, Senior District Judge.

 **\*1** Plaintiffs bring this proposed class action against defendant General Motors Corporation. Plaintiffs allege that GM-designed components for braking systems of vehicles they purchased or leased were defective and that GM failed to disclose the defect. That failure, they allege, unjustly enriched GM and breached implied warranties of merchantability. Defendant moves for summary judgment on the claim for breach of implied warranties of merchantability (Count IV). For the reasons stated below, we grant the motion.

*BACKGROUND*

There are currently three named plaintiffs in this action [1], but only one, Corey Bisson, argues breach of the implied warranty of merchantability. In November 2004, Bisson purchased a used 2002 Chevrolet Silverado from Darling's Select, an auto dealership in Waterville, Maine (Bisson 6/6/07 dep., 45:7-13). At the time of the purchase Bisson was aware that the original manufacturer's limited written warranty had expired (*id.* at 93:5-9), and he refused to purchase the extended warranty (*id*

at 66:11-22; 90:14-22). He understood that by refusing the written warranty he was purchasing the vehicle "as is" (*id* at 91:23-92:2).

In June 2005, Bisson was driving the Silverado in his driveway and traveling at a speed of approximately four to five miles per hour, when the anti-lock brake system activated (*id.* at 30:10-21; 120:10:21). This unwanted activation resulted in an increased stopping distance and caused the vehicle to run into a building on his property (*id.* at 30:15-21). Bisson contends that the unwanted ABS activation on the Silverado is due to a defectively designed ABS, and as a result the Silverado was not merchantable at the time it was sold (2d am.cplt.¶¶ 131-140).

Further, Bisson alleges that the defectively designed ABS was installed in other select GMT800 series platform vehicles from 1999 through 2002. He purports to bring Count IV individually and on behalf of similarly situated residents in 22 states, and purchasers of new vehicles in Texas. Under the relevant state statutes, Bisson alleges that the defective ABS made the vehicles unfit for their ordinary purposes of use and violated the implied warranty of merchantability.

*DISCUSSION*

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett.* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When reviewing the facts, we may not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts. *Celotex.* at 255. Instead, we draw all inferences and view all admissible evidence in the light most favorable to the non-moving party. *Id*

1. *Whether a Warranty Exists*
Before we analyze whether Bisson's claim satisfies the elements of breach of warranty, we must first determine whether any warranty attached at the time Darling's sold the Silverado to Bisson. Bisson, recognizing that he disclaimed any express warranties when he refused to extend the expired manufacturer's warranty, instead argues that the purchase was subject to the implied warranty of merchantability. Whether the implied warranty of merchantability attached at the time of the sale to Bisson is a point of dispute between the parties.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 212 of 260
PageID: 69876
*Muehlbauer v. General Motors Corp., Not Reported in F.Supp.2d (2008)*

**\*2** Bisson brings his claim under Maine law. The State of Maine has adopted Article 2 of the Uniform Commercial Code. *See* Me.Rev.Stat. Ann. Tit 11, §§ 2-102 *et seq.* As adopted, the Maine UCC requires that"[u]nless excluded or modified ..., a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Id.* § 2-314(1). But Maine does not extend implied warranties to goods that are purchased "as is." *Id.* § 2-316(3)(a). Bisson's testimony that he understood that by refusing the written warranty he was purchasing the vehicle "as is" would appear to end the dispute, but he correctly notes that Maine law contains an exception that prohibits sellers from disclaiming implied warranties on consumer goods. *Id.* § 2-316(5). Consumer goods are those goods "that are used or bought primarily for personal, family or household purposes." *Id.* Bisson contends that his vehicle, primarily used for personal purposes, qualifies as a consumer good and, therefore, the implied warranty of merchantability cannot be waived.

GM, in turn, draws our attention to an exception to the consumer goods exception. Under Maine's Used Car Information Act, as codified at Me.Rev.Stat. Ann. Tit 10, §§ 1471-78, the exemption for consumer goods does not apply to used cars sold "as is." *See id.* § 1473 ("The provisions of this chapter shall not be construed to limit or restrict in any way the rights or warranties provided to persons under any other Maine law, except that Title 11, section 2-316, subsection 5 shall not apply to transactions under this chapter.").

Bisson argues that Maine has expressly rejected such disclaimers in the sale of used cars. As support, he relies on *Maybury v. Quality Motors. Inc.,* No. CV 78-60,1980 Me.Super. LEXIS 101 (Feb. 12, 1980). But *Maybury* does not stand for Bisson's proposition. In *Maybury,* the defendant argued that the UCIA was plaintiff's sole remedy for breach of warranty because for used car transactions the UCIA wholly displaced the implied warranties found in the Maine UCC. The court rejected this argument and specifically noted that the legislature did not intend the UCIA to supplant the warranties found in the Maine UCC. Moreover, the sale in *Maybury* was not "as is," and so the implied warranty of merchantability had not in any way been disclaimed.

We find more instructive a different Maine Superior Court case, *Cole v. Farnham's Auto Sales.* No. CV 90-79,1990 Me.Super. LEXIS 140 (June 25, 1990). Although the judge in *Cole* found that an implied warranty of merchantability attached to the sale at issue, he also noted that it was possible to disclaim implied warranties. This possibility existed because § 1473 "circuitously preserved" a dealer's ability to disclaim implied warranties with regard to used car sales. We also note that the Maine Attorney General interprets the UCIA as allowing the disclaimer of implied warranties. *See* State of Maine, Office of the Attorney General, Consumer Law Guide, Chapter 4: Consumer Goods and Maine Express and Implied Warranty Laws, § 4.2, at http:// www.maine.gov/tools/whatsnew/attach.php?id=27922an=l (last revised 04/07/08) ("The only exception to [the implied warranty of merchantability] is that used car dealers can disclaim your implied warranties when they sell you a used car "as is", without any express warranty.").

**\*3** Bisson also argues that even if dealers may disclaim implied warranties on used car sales, GM may not because it is a manufacturer and not a dealer. GM concedes that under the UCIA it is a manufacturer, rather than a dealer. Neither party presents us with any authority that conclusively determines whether, under Maine law, manufacturers may disclaim implied warranties, and our independent review did not locate any. So, instead, we turn to the language of the statute.

The UCIA specifically defines the term "dealer." Me. Rev. Stat Ann. Tit. 10, § 1471(2). Manufacturers are defined under the UCIA as a separate class called "sellers." *Id.* § 1471(6-B). All of the substantive provisions of the act either mandate or prohibit specific conduct on the part of dealers when selling used cars to the public. *See generally id.* §§ 1474-78. [2] Based on the plain language of the UCIA, we find that the intent of the legislature was only to govern the actions of used car dealers. Although the specific language of § 1473 does not limit the ability to disclaim implied warranties to dealers, it follows from the entirety of the Act that such a limitation exists. This interpretation is consistent with the Maine Supreme Court's instruction that "[t]he UCIA will be interpreted liberally to carry out the legislature's beneficent purpose of protecting purchasers of used cars." *Tanguay v. Seacoast Tractor Sales. Inc.,* 494 A.2d 1364, 1367 (Me.1985) (citations omitted). Moreover, we note that this holding is consistent with the interpretation of the Attorney General of Maine. *See* Consumer Law Guide, Chapter 9: Consumer Rights When You Buy A Used Vehicle, § 9.8, at http:// www.maine.gov/tools/whatsnew/attach.php?id=27927an=l (last revised 05/27/08) ("While state law allows used car dealers to disclaim implied warranties, manufacturers cannot") (citing Me.Rev.Stat. Ann. Tit. 10, § 1473). As such, the implied warranty of merchantability

passes to Bisson because he is "a person whom the manufacturer ... might reasonably have expected to use, consume or be affected by the goods." *Id.* Tit.ll, § 2-318. *See also Koken v. Black & Veatch Constr., Inc.,* 426 F.3 39, 51 (1st Cir.2005) (holding that breach of the implied warranty of merchantability does not require privity of contract under Maine law).

### 2. *Notice of Breach*

Under *Me. Rev. Stat Ann. Tit 11, § 2-314*(2)(c), a good product must be fit for its ordinary purpose. *Koken,* 426 F.3d at 51. Customarily, a buyer who accepts tender of goods "must notify the seller of any breach within a reasonable time after he or she discovered or should have discovered any breach or be barred from any remedy." *Sullivan v. Young Bros. & Co., Inc.,* 91 F.3d 242, 250 (1st Cir.1996); Me.Rev.Stat. Ann. Tit 11, § 2-607(3)(a). Notice to the seller is required in order "to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." *Id.* § 2-607 cmt. 4. Benefits of notifying the seller of the breach include preventing stale claims, allowing the seller to investigate the claims, providing the seller with an opportunity to cure, and encouraging negotiation and settlement between the parties. *M.K. Assoc. v. Stowell Prod., Inc.,* 697 F.Supp. 20, 21 (D.Me.1988). GM argues that because Bisson did not give notice of the ABS malfunction to either Darling's or GM, he has failed to provide notice as required for recovery under the implied warranty of merchantability.

**\*4** In response, Bisson first argues that this court, in its May 15, 2006, order denying GM's motion to dismiss, conclusively determined that Bisson met the notice requirement, and that GM should be barred from relitigating the issue. Bisson mischaracterizes our earlier order. When we denied GM's motion to dismiss, we held only "that plaintiffs have at least stated a claim that, through a number of consumer complaints and official investigations, defendant had 'early warning' of the breach. Whether or not notice is sufficient to satisfy section 2607 is an issue of fact." *Muehlbauer v. General Motors Corp.,* 431 F.Supp.2d 847, 860 (N.D.Ill.2006) (citations omitted). GM is now free to argue that Bisson has failed to raise a genuine issue of material fact that the notice was sufficient under Maine law.

For the most part, GM's notice argument attempts to convince the court that the Maine UCC's notice provision is a condition precedent to any warranty claim, rather than an affirmative defense. As support, GM cites a series of cases in which Maine courts or courts applying Maine law found pre-suit notice sufficient to meet the notice requirement. *See, e.g., Crescent Lumber Co. v. Maine Packaging Equip., Inc.,* No. CV-95-212, 1995 Me.Super. LEXIS 449 (Dec. 20, 1995); *Pease v. Dead River L.P. Gas Co.,* No. CV-74-20, 1979 Me.Super. LEXIS 141 (Sept. 24, 1979). But this approach focuses on too narrow a reading of our earlier order. In the May 16, 2006, order we noted that § 2-607(3)(a) has not been subject to extensive analysis by the Maine courts, and that it was possible that Maine courts would treat the notice requirement as an affirmative defense. What GM ignores is that we held, alternatively, that "the complaint does allege that the defendant was on notice of the alleged defect, and that a specific pre-suit complaint by Bisson to defendant is not required." *Muehlbauer,* 431 F.Supp.2d at 857.

To the extent that GM argues that the Maine UCC requires individual notice from each potential plaintiff, one of the cases cited by GM, *Sullivan v. Young Bros. & Co.,* 91 F.3d 242, 250-51 (1st Cir.1996), undermines its argument. In *Sullivan,* the court, applying Maine law, looked at the totality of information presented to the defendant, and concluded that the defendant had constructive knowledge of a product defect. As we stated in our earlier opinion, "[u]nder this approach the lack of a specific complaint from a particular customer should not eclipse the defendant's actual knowledge of a problem." *Muehlbauer,* 431 F.Supp.2d at 857. *See also Sullivan v. Young Bros. & Co.,* 893 F.Supp. 1148, 1159 (D.Me.1995). Such an interpretation is consistent with Maine law, where notice need "merely be sufficient to let the seller know that the transaction is still troublesome and must be watched," and the notice requirement is not meant and should not function to deprive a consumer of a remedy. Me.Rev.Stat. Ann Tit 11, § 2-607 cmt. 4. GM has provided us no authority to challenge this interpretation of the notice requirement.

**\*5** Bisson concedes that he did not notify Darling's or GM of the unwanted ABS activation and that he refused to partake in GM's recall remedy when GM notified him of it. But Bisson has provided an e-mail from Randy Leek, an engineer at GM, that acknowledges the ABS defect and notes that it "is responsible for a significant amount of warranty costs" (Tufaro Aff. Ex. 1).[3] Viewing the facts in the light most favorable to Bisson, as we must, it is possible that the trier of fact could find that GM was afforded sufficient notice that transactions involving vehicles with the faulty ABS were "still troublesome" and should "be watched."

### 3. *Damages*

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 214 of 260
PageID: 69878
Muehlbauer v. General Motors Corp., Not Reported in F.Supp.2d (2008)

The parties agree that an essential element of Bisson's action for breach of the implied warranty of merchantability under Maine law is that he prove that he suffered injury or damage that was proximately caused by the ABS defect (def's mo. at 17; plf's resp. at 7). *See also* Me.Rev.Stat. Ann. Tit. 11, § 2-714 (discussing damages for breach of accepted goods). GM argues that summary judgment is appropriate because Bisson cannot show economic damages that were caused as a result of the defect.

Bisson purchased the Silverado in November 2004 for $13,950 (Bisson 6/6/07 dep., 45:7-18). At the time, the vehicle's odometer had 57,952 miles on it (*id.* at 46:5-8). Approximately one year later, after driving the vehicle over 11,600 miles, he sold it to Darling's for a trade-in allowance of $11,000 (*id.* at 46:11-16; 73:2-8). Based on these facts, we cannot say Bisson suffered economic damage.

Further, at the time of the sale to Darling's, the Silverado was subject to a voluntary recall. Bisson could have opted for the recall remedy free of charge before the sale, and Darling's had the same option after the sale. Bisson informed the Darling's sales representative of the voluntary recall at the time of sale, but the sales representative gave no indication that the recall would affect the value of the trade-in allowance (Bisson 6/6/07 dep., 19:24-21:12). In fact, at the time of the trade-in, Bisson did not believe that the ABS defect affected the value of the trade-in allowance (*id.* at 21:8-16).

Bisson argues that later, at his deposition, he testified that he now assumes that he was given a lower trade-in allowance because the people in the industry knew that GM vehicles were affected by the design defect (*id.* at 21:21-22:3). But that is supposition, not evidence. *See* In re Cohen. 507 F.3d 610, 614 (7th Cir.2007) (speculation is not evidence). Similarly, Bisson's testimony that "the price may not have been as high" when he originally purchased the vehicle (*id.* at 189:5-11) is a mere assumption, with no evidence to back it up.

Bisson notes that he is not a damages expert and that any statements he made concerning damages are of limited value. This may be true, but it does not excuse his complete failure to provide any evidence of economic damages proximately caused by the ABS defect. Even if Bisson could not identify evidence of damages at his deposition, now is the time for him to do so. Summary judgment is the "put up or shut up" moment in an action where a party must identify the evidence it has that would convince a trier of fact. *See Harney v. Speedway Super America, LLC.,* 526 F.3d 1099, 1104 (7th Cir.2008) (citations omitted). Bisson has "put up" nothing and therefore summary judgment for defendant GM is appropriate on the breach of implied warranty claim.

*CONCLUSION*

**\*6** For the forgoing reasons, GM's motion for summary judgment on Count IV is granted.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4542650

---

### Footnotes

1    When this action originated there were five named plaintiffs. We dismissed Norman Soohoo and Wayne Meuhlbauer under Federal Rule of Civil Procedure 41(a)(l)(ii). *See* docket entries 99 and 126. Currently before the court is a motion by Patrick Duffy for leave to intervene as plaintiff. The court has not yet ruled on that motion. However, Duffy seeks permission to intervene only as to the unjust enrichment counts (Counts I and H). Therefore, the outcome of that motion has no effect on the disposition of defendant's motion for summary judgment on Count IV.

2    The UCIA does impose one affirmative duty on manufacturers. Section 1475(4)(B) provides that when a manufacturer sells a vehicle to a dealer, it must disclose whether it has repurchased that car under the "lemon law" of any state. This provision, however, does not regulate the conduct of a manufacturer with the public. Rather, it is a mechanism to provide the dealer with all the information it needs to make the required disclosures to the ultimate vehicle purchaser.

**Muehlbauer v. General Motors Corp., Not Reported in F.Supp.2d (2008)**

3    In a footnote in its reply brief, GM argues that Bisson's assertion in his statement of undisputed material facts that GM had actual notice of the design defect is improper because Bisson does not support the assertion with evidence and instead simply repeats the allegations of the complaint. We disagree. Bisson's Fact No. 10 cites to the Leek e-mail that is attached to the Tufaro affidavit as Exhibit 1. To the extent that GM disagrees with the assertion, that is an argument more appropriately made to a trier of fact.

---

**End of Document**                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.    

# Tab 17

2014 WL 12640371
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Jacksonville Division.

PB PROPERTY MANAGEMENT, INC., Janet
Helm, Jimmy Jewell, Deborah L. Wagner,
and Stanley H. Wagner, individually and on
behalf of all others similarly situated, Plaintiffs,
v.
GOODMAN MANUFACTURING
COMPANY, L.P., Goodman Global, Inc.,
and Goodman Company, L.P., Defendants.

Case No. 3:12–cv–1366–HES–JBT
|
Signed 08/13/2014
|
Filed 08/14/2014

**Attorneys and Law Firms**

April Goodwin, Law Offices of April S. Goodwin, P.A., Largo, FL, Christopher Craig Casper, James, Hoyer, Newcomer & Smiljanich, PA, Tampa, FL, Elizabeth Lin, Pro Hac Vice, The Lin Law Firm, PLC, Brea, CA, Jay P. Dinan, Parker Waichman, LLP, Bonita Springs, FL, Jordan L. Chaikin, Chaikin Law Firm PLLC, Fort Myers, FL, Kevin F. Ruf, Pro Hac Vice, Marc L. Godino, Pro Hac Vice, Lionel Z. Glancy, Pro Hac Vice, Glancy, Binkow & Goldberg, LLP, Los Angeles, CA, William M. Audet, Audet & Partners, LLP, San Francisco, CA, for Plaintiffs.

Charles M. Trippe, Jr., David Clifford Reeves, Jeffrey Alan Yarbrough, Robert B. Parrish, Moseley, Prichard, Parrish, Knight & Jones, Jacksonville, FL, Dana Baiocco, Pro Hac Vice, Boston, MA, Elizabeth G. Myers, Pro Hac Vice, Houston, TX, Louis A. Chaiten, Pro Hac Vice, Richard J. Bedell, Jr., Pro Hac Vice, Cleveland, OH, Sharyl A. Reisman, Pro Hac Vice, Theodore M. Grossman, Pro Hac Vice, New York, NY, for Defendants.

## ORDER

HARVEY E. SCHLESINGER, UNITED STATES DISTRICT JUDGE

**\*1** Before this Court is Plaintiffs' "First Consolidated Class Action Complaint" (Dkt. 48, filed Feb. 28, 2014); Defendants' "Motion to Dismiss and Accompanying Memorandum of Law" (Dkt. 53, filed Mar. 31, 2014); and Plaintiffs' "Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss the First Consolidated Class Action Complaint" (Dkt. 57, filed Apr. 30, 2014). This Court held a hearing on Defendants' motion on August 6, 2014 (Dkt. 58, filed July 10, 2014). Defendants move to have the Complaint dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 53 at 1. Having considered both parties' filings and the arguments made at the hearing, this Court determines the following.

## I. BACKGROUND

On December 19, 2012, Plaintiff PB Property Management filed its original Complaint, a putative class action diversity lawsuit alleging breach of express warranty, breach of implied warranty of merchantability, violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 et seq., and unjust enrichment. Dkt. 1. Defendants filed their "Motion to Dismiss" the original Complaint on April 12, 2013. Dkt. 18. Plaintiff then filed its response in opposition thereto on May 23, 2013. Dkt. 26. On August 28, 2013, this Court entered an order granting in part and denying in part Defendant's motion. Dkt. 30.

In this Court's previous order, this Court denied Defendants' motion as to Plaintiff's express warranty claim under a theory of unconscionability, but granted Defendants' motion as to Plaintiff's express warranty claim under a theory of failure of essential purpose. Dkt. 30 at 7–10. This Court also granted Defendant's motion as to Plaintiff's FDUTPA claim, dismissing said claim without prejudice to allow Plaintiff to plead the claim with particularity, as it is grounded in fraud. *Id.* at 11–14. Lastly, this Court granted Defendants' motion as to Plaintiff's implied warranty and unjust enrichment claims, both of which were dismissed with prejudice. *Id.* at 11, 14–16.

Plaintiff PB Property Management filed its "First Amended Class Action Complaint" on September 11, 2013, and Defendants filed their "Motion to Dismiss" on September 30, 2013. Dkts. 31 and 32. Then, on October 21, 2013, the parties filed a "Joint Motion to Stay Proceedings Pending JPML Ruling on Request for Transfer of Actions for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407" (Dkt. 35), which this Court granted on October 23, 2013, thus staying the case until the Judicial Panel on Multidistrict Litigation made its decision. Dkt. 36. On

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 218 of 260
PageID: 69882

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

December 13, 2013, the JPML denied Plaintiff's motion to transfer, and this Court lifted the stay shortly thereafter. Dkt. 37. On January 14, 2014, Plaintiff filed a "Consent Motion Re: Consolidation of Related Cases, Filing a Consolidated Amended Class Action Complaint, and Responses Thereto," with no objection from Defendants. Dkt. 40. This Court granted the motion on January 30, 2014 (Dkt. 43), and this case became consolidated with another case originally filed in the Middle District of Florida, Tampa Division. Plaintiffs then filed their "First Consolidated Class Action Complaint" ("FCCAC") on February 28, 2014 (Dkt. 48), Defendants subsequently filed their "Motion to Dismiss" on March 31, 2014, and Plaintiffs filed their response in opposition thereto on April 30, 2014.

 **\*2** The basic facts alleged in the FCCAC are similar to those alleged in Plaintiff PB Property Management's original complaint and recited in this Court's previous order. Defendants "are in the business of engineering, manufacturing, distributing and marketing heating, ventilation and air conditioning ("HVAC") products for residential and light commercial use" under the Goodman or Amana brand names. Dkt. 48 ¶¶ 1–2. Plaintiffs in this consolidated case all purchased Goodman or Amana air conditioning units between 2007 and 2009. *Id.* ¶¶ 56, 61, 67, 74, 81. Each Plaintiff subsequently spent hundreds or thousands of dollars in detection and repairs due to allegedly defective copper evaporator coils (an important part of the air conditioning unit) manufactured by Defendants. *Id.* ¶¶ 55–89.

Plaintiffs allege that Defendants had knowledge that the copper evaporator coils in their air conditioning units were defective either in manufacturing or design due to the fact that they eroded quickly and required repeated repair, yet Defendants knowingly advertised these air conditioning units' high quality, performance, and reliability and sold these units to consumers. *Id.* ¶¶ 33–43. Plaintiffs assert that the defects were latent, widespread, and known by Defendants at the time of sale. *Id.* ¶¶ 109–11, 117–18. The air conditioning units manufactured by Defendants came with a limited warranty, which stated that Defendants would pay for the price of any replacement parts, but would not pay for the costs of shipping, labor associated with detection and repairs, or the cost of replacing refrigerant that had leaked. *Id.* ¶¶ 48–49. Therefore, based on Defendants' alleged knowledge of the manufacturing or design defect and subsequent sale of these air conditioning units with a limited warranty, Plaintiffs argue that this renders the limited warranty unconscionable and that the warranty failed in its essential purpose. *Id.* ¶¶ 50, 106–13.

Plaintiffs also allege that Defendants' "express affirmations, statements, assertions, and representations concerning the Products' quality and durability in their marketing and advertising materials ... constitute express warranties" in addition to the limited warranty. *Id.* ¶ 107.

Further, Plaintiffs allege that Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* Plaintiffs must plead a violation of the FDUTPA with particularity, as it is "grounded in fraud." *See, e.g., D.H.G. Props., LLC v. Ginn Cos., LLC*, No. 3:09–cv–735–J–34JRK, 2010 WL 5584464, at \*5 & n.9 (M.D. Fla. Sept. 28, 2010) ("The Court need not determine the extent to which FDUTPA claims in other contexts may or may not be subject to the heightened pleading requirements of Rule 9(b); it suffices to recognize that the allegations of misrepresentation comprising Plaintiff's FDUTPA claim in this action are grounded in fraud and, thus, required to be plead with particularity."). Plaintiffs have attempted to plead their FDUTPA claim with particularity in the FCCAC by pleading additional, more specific facts regarding Defendants' alleged fraudulent misrepresentations about the quality of the product. Dkt. 48 ¶¶ 115–25.

Plaintiff PB Property Management proposed July 1, 2006, as the date from which the proposed class should begin (Dkt. 1 ¶ 16), and Plaintiffs propose the same date in their FCCAC. Dkt.48 ¶ 21. As in Defendants' original Motion to Dismiss, Defendants again argue that Plaintiffs' have failed to state a claim upon which relief may be granted. Dkt. 53 at 1–2. Specifically, Defendants argue that Plaintiffs have alleged no plausible breach of the limited warranty under either theory put forth by Plaintiffs–unconscionability or failure of essential purpose-because, most importantly, Plaintiffs have not sufficiently alleged facts that demonstrate Defendants' knowledge of the alleged defect beginning on July 1, 2006. *Id.* Defendants also allege that any statements made in their marketing or advertising materials do not constitute additional express warranties, and in any event, that all other warranties are disclaimed in the limited warranty. *Id.* at 1. Furthermore, Defendants argue that Plaintiffs have failed to state a claim under the FDUTPA with the requisite level of specificity as required by Federal Rule of Civil Procedure 9(b). *Id.* at 2.

## II. STANDARD OF REVIEW

 **\*3** In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the District Court is required to construe the complaint broadly, *Levine v. World Fin. Network*

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 219 of 260
PageID: 69883

*Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint must be viewed in the light most favorable to the plaintiff. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). However, as the Supreme Court has ruled, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although Rule 12(b)(6) allows "a well-pleaded complaint [to] proceed even if it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555, 556.

The Supreme Court teaches in *Twombly* that a complaint must contain "enough factual matter (taken as true) to suggest" the required element. *Twombly*, 550 U.S. at 556. The rule "does not impose a probability requirement at the pleading stage," but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* It is adequate if the complaint succeeds in "identifying facts that are suggestive enough to render [the element] plausible." *Id.*

## III. DISCUSSION

Defendants advance various reasons to dismiss Plaintiff's first and second claims for relief. This Court will address these arguments in turn.

### A. Breach of Express Warranty

Count I of Plaintiffs' FCCAC alleges breach of express warranty. Plaintiffs argue three theories of recovery under breach of express warranty: 1) unconscionability; 2) failure of the limited warranty's essential purpose; and 3) expansion of the scope of the warranty. In this Court's previous order (before this case was consolidated), this Court held that Plaintiff PB Property Management alleged facts sufficient to state a claim for unconscionability, but that Plaintiff did not plead facts sufficient to support a claim of failure of essential purpose. Dkt. 30 at 7–11. The third theory of recovery was not alleged in Plaintiff PB Property Management's original complaint. In Defendants' current Motion to Dismiss, Defendants argue that Plaintiffs have not sufficiently alleged facts to support each theory. Dkt. 53 at 8–15. In Plaintiffs' response to Defendants' motion, Plaintiffs argue that this Court already held that Plaintiffs sufficiently stated a claim based on unconscionability, and that new facts alleged in the FCCAC state a claim for failure of essential purpose. Dkt. 57 at 6–11.

### 1. Unconscionability

A plaintiff must demonstrate both substantive and procedural unconscionability when bringing a claim for breach of warranty based on the theory of unconscionability. *See Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1134 (11th Cir. 2010). Additionally, in order to maintain a claim for breach of warranty, each plaintiff must have satisfied the notice requirement as set forth in the Florida Statutes. Defendants argue that Plaintiffs have failed to demonstrate both substantive and procedural unconscionability, and that three of the five Plaintiffs did not satisfy the notice requirement. Dkt. 53 at 13–17.

#### a. *Notice*

As a condition precedent to recovery for breach of warranty, "[t]he buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach." Fla. Stat. § 672.607(3)(a). Defendants' argue in their Motion to Dismiss that only two of the Plaintiffs notified Defendants of the problem (PB Property Management and Mr. Jewell) and that Ms. Helm and Mr. and Mrs. Wagner did not properly notify Defendants. [1] Dkt. 53 at 16–17. Plaintiffs' response explains that "the provision only require[s] notice to the 'seller' " and that Ms. Helm and Mr. and Mrs. Wagner did so by notifying the respective third-party sellers of the problem. Dkt. 57 at 11–14.

**\*4** Plaintiffs are correct in their assertion that notice is required to be given to the *seller*, not the manufacturer, under Florida law. In *Federal Insurance Co. V. Lazzara Yachts of North America, Inc.*, No. 8:09–cv–607–T–27MAP, 2010 WL 1223126 (M.D. Fla. Mar. 25, 2010), the court noted that the Florida Statutes define "seller" as "a person who sells or contracts to sells goods" and held that "the plain language of the statute therefore does not require notice to a manufacturer, such as [Defendants]." *Id.* at \*5 (quoting Fla. Stat. § 672.103(1)(d)). *Lazzara* describes further the difference between a "remote manufacturer" and a "manufacturer [that] was not remote but was 'in effect a direct seller to the plaintiffs,' " explaining that notice has been required to be given to the latter. *Id.* (quoting *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 742 (Colo. 1991)) (construing an identical provision in Colorado's Uniform Commercial Code). Here, Defendants have not argued that they were in effect the "direct seller" to Ms. Helm or Mr. and

Mrs. Wagner, and Plaintiffs' FCCAC alleges that Ms. Helm and Mr. and Mrs. Wagner contacted the third-party sellers from whom they purchased their respective air conditioning units upon failure of the units. Therefore, for purposes of the motion to dismiss stage, each Plaintiff has satisfied the notice requirement.

### b. *Procedural Unconscionability*

Defendants argue in their Motion to Dismiss that Plaintiffs have failed to demonstrate procedural unconscionability. Dkt. 53 at 15–16. In this Court's previous order, this Court explained that under Florida law, "[a] central question to which courts turn when examining procedural unconscionability is whether the consumer had a 'meaningful choice in whether to accept the contract terms.' " Dkt. 30 at 10 (quoting *Pendergast*, 592 F.3d at 1135). Further, courts consider:

> (1) the manner in which the contract was entered into; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into; (3) whether the terms were merely presented on a "take-it-or-leave-it" basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract.

*Pendergast*, 592 F.3d at 1135 (citing *Powertel, Inc. v. Bexley*, 743 So.2d 570, 574 (Fla. 1st DCA 1999); *Murphy v. Courtesy Ford, L.L.C.*, 944 So.2d 1131, 1134 (Fla. 3d DCA 2006)). The above are all factors a court may consider in determining procedural unconscionability; they are not required elements. At the motion to dismiss stage, Plaintiffs' "[f]actual allegations" of procedural unconscionability "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And as *Pendergast* notes, "Each [decision discussing procedural unconscionability] depends highly on the particular facts of the case." *Pendergast*, 592 F.3d at 1137.

This Court previously found Plaintiffs' allegations of procedural unconscionability sufficiently plausible to overcome Defendants' motion, and this Court finds as such again. While Defendants are correct in pointing out that Plaintiffs have made no allegations that they did not understand the terms of the limited warranty or that the limited warranty was unclear, and while this factor is important in determining procedural unconscionability or lack thereof, Defendants focus too narrowly on this factor as being dispositive. Dkt. 53 at 16. Here, the relative bargaining power of the parties and whether Plaintiffs had a meaningful choice on whether to accept the warranty limitation are also important factors. Plaintiffs almost certainly had no ability to negotiate around or waive the provisions of the limited warranty, and the terms were presented on a "take-it-or-leave-it" basis. Thus, Plaintiffs have satisfactorily alleged procedural unconscionability at this stage in the proceedings.

### c. *Substantive Unconscionability*

To prevail over Defendants' Motion to Dismiss, Plaintiffs must sufficiently "identify[ ] facts that are suggestive enough to render [the element] plausible." *Twombly*, 550 U.S. at 556. As applied to this case, Plaintiffs must plausibly allege substantive unconscionability, which means that Plaintiffs must sufficiently demonstrate that Defendants had knowledge of the manufacturing or design defect at the time each Plaintiff purchased their respective air conditioning units. Furthermore, Plaintiffs' proposed class consists of:

> **\*5** All persons and/or entities in Florida who purchased air conditioners, air handlers and heat pumps (collectively, the "Goodman Products") under the Goodman or Amana brand names since July 1, 2006, or who own a home or other structure in which the Goodman Products are installed since July 1, 2006, and who incurred damages as a result of having to repair and/or replace their Goodman Products due to leakage of refrigerant.

Dkt. 48 ¶ 21. Therefore, Plaintiffs' FCCAC must allege facts that render Defendants' knowledge of the alleged defect since July 1, 2006 plausible in order for this Court to certify Plaintiffs' proposed class.

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 221 of 260
PageID: 69885

As this Court previously noted, "[u]nder Florida law, a warranty limitation may be unconscionable when a defect is latent and the manufacturer knows that the product's effectiveness is questionable." Dkt. 30 at 10 (citing *Monsanto Agric. Prods. Co. V. Edenfield*, 426 So.2d 574, 579 (Fla. 1st DCA 1982); *see also Barnext Offshore, Ltd. V. FerrettiGrp. USA, Inc.*, No. 10–23869–CIV, 2012 WL 1570057, at *10 (S.D. Fla. May 2, 2012)). After reviewing the original pleadings, this Court previously held that Plaintiff PB Property Management sufficiently alleged that Defendants knew of the defective copper evaporator coils at the time of sale. Dkt. 30 at 9–10.

This time around, Defendants argue that Plaintiffs' FCCAC is wholly insufficient in regards to Plaintiffs' allegations of Defendants knowledge or lack thereof beginning on July 1, 2006. Defendants highlight that the FCCAC is scarce in facts that support Plaintiffs' theory that Defendant had knowledge beginning on July 1, 2006. Dkt. 53 at 14–15. Specifically, Defendants allege that "almost all of the complaints and statements that Plaintiffs point to occurred after Plaintiffs purchased and installed their units. Each of the Plaintiffs purchased their units in 2009 or before." *Id.* at 14. According to Defendants, the vast majority of the statements to which Plaintiffs' cite in support of their claim occurred in 2010 or later. *See id.* Further, Defendants note that the only fact alleged by Plaintiffs that dates back to July 1, 2006, is that of a newspaper article published on July 1, 2009, which describes a petition drive that was started by residents in one subdivision who had purchased Goodman air conditioning units in 2003 and 2004 and had complained about defective evaporator coils since 2003. Dkt. 48 ¶ 94; Dkt. 53 at 15.

Defendants are correct that Plaintiffs have not alleged much to support their claim that Defendants had knowledge of the alleged defect beginning July 1, 2006. However, the pleading standard is low at this stage in the proceedings. As the Supreme Court explained in *Twombly*, "Asking for plausible grounds to infer [a fact] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [said fact]." *Twombly*, 550 U.S. at 556. This Court finds the quoted passage helpful in articulating the proper standard to apply in this case; Plaintiffs' FCCAC is replete with facts that plausibly demonstrate that Defendants had knowledge of the alleged defect at some point. The question is when, precisely, did Defendants obtain knowledge of the alleged defect such that continued use of the limited

warranty could be considered unconscionable? It is true that most of Plaintiffs' factual allegations relating to Defendants' alleged knowledge are dated 2009 or later. Dkt. 48 ¶¶ 91, 95–98. However, as previously mentioned, Plaintiffs do cite one article that would suggest knowledge on Defendants' part by July 1, 2006. *Id.* ¶ 94.

**\*6** Having considered the parties' pleadings, this Court still maintains that Plaintiffs have made sufficient factual allegations as to Defendants' knowledge of the alleged defect to surmount the procedural hurdle of Rule 12(b)(6). Nevertheless, this Court declines to certify Plaintiffs' proposed class at this time. The parties shall engage in discovery to more precisely discern a proper date from which the proposed class should begin, and at that time, this Court will consider class certification. In addition, if discovery leads to the conclusion that any of the individual named Plaintiffs in this case do not fit within the proposed class, this Court will address the matter at that time as well.

## 2. Failure of Essential Purpose

In this Court's previous order, this Court held that Plaintiffs failed to demonstrate failure of the limited warranty's essential purpose. Dkt. 30 at 7–9. Nevertheless, Plaintiffs bring this claim again in their FCCAC. Dkt. 48 at 110. Specifically, Plaintiffs state that "[t]he defects in the Goodman Products are latent and not discoverable on reasonable inspection. As such, Goodman's express warranty fails in its essential purpose." *Id.* As previously explained, Florida courts do not support this theory of failure of essential purpose. Dkt. 30 at 9 ("This Court can find no Florida court opinions supporting the contention that a repair and replacement limited warranty fails of its essential purpose merely because a defect is latent, and this Court declines to make such a pronouncement of law in the absence of such authority."). An alternative theory of failure of essential purpose, which Florida courts do recognize, "typically has been limited to circumstances involving repeated (unsuccessful) efforts to repair a product that completely fails in its intended use." *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1319 n.11 (S.D. Fla. 2009); *Parsons v. Motor Homes of Am., Inc.*, 465 So.2d 1285, 1292 (Fla. 1st DCA 1985).

This Court held that Plaintiff PB Property Management failed in its original complaint to "allege a single failed effort, let alone a series of repeated failed efforts, by Defendants to

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 222 of 260
PageID: 69886

remedy any alleged coil leakage by providing a replacement coil." Dkt. 30 at 8. Likewise, there do not exist facts to support this theory as to PB Property Management in Plaintiffs' FCCAC. Furthermore, Plaintiffs Ms. Helm, Mr. Jewell, and Mr. and Mrs. Wagner also do not allege a series of repeated failed efforts by Defendants to remedy any alleged coil defect by providing a replacement evaporator coil. *See* Dkt. 48 ¶¶ 55–89. It is true that Plaintiffs quote many consumer complaints in the FCCAC, some of which may plausibly support a claim for failure of essential purpose due to repeated failure of Defendants to remedy these particular consumers' problems with allegedly defective evaporator coils and leaking refrigerant. *See id.* ¶ 91. However, the individual Plaintiffs who seek to represent the class cannot sufficiently plead this claim, and this theory is too individualized for it to be part of a class action. Therefore, this Court again grants Defendants' motion as to the theory of failure of essential purpose.

### 3. Expansion of Scope of Express Warranty

Plaintiffs argue in their FCCAC that "Defendants' made the previously described express affirmations, statements, assertions, and representations concerning the Products' quality and durability in their marketing and advertising materials. Such affirmations constitute express warranties." Dkt. 48 ¶ 107. Essentially, Plaintiffs argue that Defendants' statements on their website and in other advertising material expanded the scope of the warranty, but Defendants argue that these "extra-contractual statements" do not constitute express warranties. Dkt. 53 at 10–12. Defendants also note that the limited warranty "explicitly disclaims 'all other express warranties,' including any that might have been displayed on websites." *Id.* at 11. Defendants correctly point out that " 'Florida law authorizes sellers to exclude warranties, both express and implied, in the sale of goods.' " *Id.* (quoting *Drew v. Boaters Landing Inc. of Fort Myers*, No. 2:07–cv–252–FtM–29DNF, 2007 WL 2700987, at \*2 (M.D. Fla. Sept. 13, 2007)). In addition, the Florida Statutes allow the exclusion or modification of express or implied warranties. *See* Fla. Stat. § 672.316. In *Drew*, the court found that the section in the sales contract regarding exclusion of warranties was "conspicuous," and thus held that the defendant "effectively disclaimed any express or implied warranties" located therein. *Drew*, 2007 WL 2700987, at \*3. In this case, the provision disclaiming all other express warranties in the limited warranty is set off as its own paragraph and is written in plain language. This limitation

is thus "conspicuous." Therefore, this Court holds that Defendants' marketing and advertising statements-whether or not they are considered additional express warranties-are properly disclaimed in the limited warranty, and Defendants' motion as to this theory of breach of warranty is granted.

### B. Florida Deceptive and Unfair Trade Practices Act

**\*7** Count II of Plaintiffs' FCCAC alleges a violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§ 501.201 *et seq.* The claim is "grounded in fraud" and thus must be described with particularity in the complaint. *See, e.g., D.H.G. Props., LLC*, 2010 WL 5584464, at \*5 & n.9. To satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b), "the complaint [must] allege facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (internal quotations marks omitted). This Court previously dismissed without prejudice Plaintiff PB Property Management's FDUTPA claim, as it had not alleged facts to support it with the requisite particularity. Dkt. 30 at 11–14. In Plaintiffs' FCCAC, they have alleged additional and more specific facts in regards to their FDUTPA claim in an attempt to cure this jurisdictional defect.

To state a claim for damages under the FDUTPA, a plaintiff must describe "(1) a deceptive or unfair practice; (2) causation; and (3) actual damages." *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009). Further, "[t]he conduct considered to be deceptive or unfair for the purposes of an FDUTPA claim may be defined by 'any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices.' " *Id.* (quoting Fla. Stat. § 501.203(3)(c)). The FDUTPA does not define "a deceptive or unfair practice," and courts have held that this term should be broadly construed. *See, e.g., Citibank (S.D.) N.A. v. Nat'l Arbitration Council, Inc.*, No. 3:04–cv–1076–J–32MCR, 2006 WL 2691528, at \*3 (M.D. Fla. Sept. 19, 2006). An act is "unfair" under the FDUTPA if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Suris v. Gilmore Liquidating, Inc.*, 651 So.2d 1282, 1283 (Fla. 3d DCA 1995)). Further, an act or practice is "deceptive" if it is "likely to mislead consumers." *Davis v. Powertel*, 776 So.2d 971, 974 (Fla. 1st DCA 2000) (internal quotation marks omitted).

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 223 of 260
PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....
PageID: 69887

With these standards in mind, this Court turns to the pleadings before it in this case. There are two issues that need to be addressed regarding this claim: 1) whether Plaintiffs have sufficiently alleged knowledge by Defendants since July 1, 2006, such that it is plausible that Defendants knew they were deceptively misrepresenting the quality of their product on the website and in other advertising materials, and 2) whether the factual allegations in the FCCAC are pled with sufficient particularity to overcome the procedural hurdle of Rule 9(b). The first issue is similar to the issue discussed above in relation to Plaintiffs' breach of warranty claim. The FCCAC contains specific facts that plausibly demonstrate Defendants' alleged knowledge at some point in time; the question is precisely when did Defendants obtain this knowledge?

First, this Court previously noted that Plaintiff PB Property Management's original complaint "failed to allege with specificity the time at which [Defendants' alleged misrepresentations] occurred." Dkt. 30 at 13. Now, this Court finds that Plaintiffs have alleged with particularity "details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Medco Health Solutions, Inc.*, 671 F.3d at 1222. For example, the FCCAC details when a number of the alleged misrepresentations occurred in the form of statements made on Defendants' website, and the FCCAC includes quotes of statements made on the website and the dates by which these statements were present. Dkt. 48 ¶¶ 41–44 (listing specific statements and dates). Some of the Plaintiffs also allege that they relied on representations made by third-party sellers and Defendants' advertising materials as to the superior quality of Defendants' product. *Id.* ¶¶ 67, 75, 81. Defendants also claim that Plaintiffs failed to identify with specificity the identity of consumers who may have viewed the website and made a decision to buy Defendants' products based thereon. Dkt. 53 at 19 n.6. However, the relevant test is not whether a particular plaintiff actually relied on statements made, but whether a reasonable consumer would have been deceived under the circumstances. *Davis*, 776 So.2d at 974. Therefore, individual identities of consumers who did, in fact, rely on Defendants' alleged misrepresentations are not necessary to maintain a claim under the FDUTPA.

**\*8** In addition, Defendants argue that Plaintiffs' have not sufficiently demonstrated a causal link between Defendants' statements and Plaintiffs' reliance or lack thereof. Dkt. 53 at 18–19. However, Plaintiffs "need not plead actual reliance on the alleged deceptive trade practice, but merely must allege that the practice 'was likely to deceive a consumer acting reasonably in the same circumstances.' " Dkt. 30

at 12 (quoting *Davis*, 776 So.2d at 974). The FCCAC is replete with statements that Plaintiffs relied to their detriment on Defendants' alleged misrepresentations, and at the least, that the practice was likely to deceive a consumer acting reasonably in the same circumstances. *See* Dkt. 48 ¶¶ 45, 53, 66, 73, 80, 89, 123. Therefore, Plaintiffs have sufficiently demonstrated a causal link.

Lastly, Defendants argue that "Plaintiffs have failed to plausibly allege that any unfair act or deceptive practice caused them damage." Dkt. 53 at 18–19 (citing cases). To the contrary, Plaintiffs allege that they "would not have purchased the Goodman Products, or at least would have paid less for them, had they known of the defects in the Goodman Products." Dkt 48 ¶ 53; *see also id* ¶¶ 45, 66, 73, 80, 89, 123. Plaintiffs thus allege damages in the purchase or purchase price of Defendants' product, as well as the expenses associated with diagnosing and repairing the problem.

Thus, having considered the parties' pleadings, this Court holds that Plaintiffs have cured the jurisdictional defects previously noted and have made sufficiently specific factual allegations as to the time, place, and substance of Defendants' alleged misrepresentations and to Defendants' alleged knowledge of the alleged defect to surmount the procedural hurdles of Rule 12(b)(6) and 9(b). However, as with the breach of warranty claim, this Court declines to certify Plaintiffs' proposed class at this time. The parties shall engage in discovery to more precisely discern a proper date from which the proposed class should begin, and at that time, this Court will consider class certification. In addition, if discovery leads to the conclusion that any of the individual named Plaintiffs in this case do not fit within the proposed class, this Court will address the matter at that time as well.

### IV. CONCLUSION
In light of the foregoing discussion, it is **ORDERED AND ADJUDGED:**

1. Defendants' "Motion to Dismiss and Accompanying Memorandum of Law" (Dkt. 53, filed Mar. 31, 2014) is **GRANTED IN PART AND DENIED IN PART**, as follows:

2. The Motion is **DENIED** as to Plaintiffs' express warranty claim under the theory of unconscionability;

3. The Motion is **GRANTED** as to Plaintiffs' express warranty claim under the theories of failure of essential purpose and expansion of the scope of the warranty;

PB Property Management, Inc. v. Goodman Manufacturing..., Not Reported in Fed....

4. The Motion is **DENIED** as to Plaintiffs' Florida Deceptive and Unfair Trade Practices Act claim; and

5. With regard to the issue of class certification, the Court is going to allow the parties to conduct discovery on that issue. The issue may be more properly resolved in a motion for summary judgment than on a motion to dismiss. The Court **DENIES without prejudice** Defendants' motion and will not rule on Defendants' request at this juncture concerning the class action date.

**DONE AND ORDERED** at Jacksonville, Florida, this <u>13th</u> day of August, 2014.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 12640371

## Footnotes

1    Defendants also challenge the sufficiency of Plaintiff PB Property Management and Mr. Jewell's notification to Defendants, but they concede that this Court already ruled that sufficiency of notice is a question of fact and is not to be determined at the motion to dismiss stage. Dkt. 53 at 17 n.5.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   8

# Tab 18

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 226 of 260
PageID: 69890
Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

2019 WL 3714497
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Joshua RIAUBIA, individually and on behalf
of all others similarly situated, Plaintiff,

v.

HYUNDAI MOTOR AMERICA, Defendant.

CIVIL ACTION No. 16-5150
|
Signed 08/06/2019
|
Filed 08/07/2019

**Attorneys and Law Firms**

Noah I. Axler, Marc A. Goldich, Axler Goldich LLC,
Philadelphia, PA, James C. Shah, Natalie Finkelman Bennett,
Shepherd Finkelman Miller & Shah LLC, Media, PA, for
Plaintiff.

Christopher J. Dalton, Buchanan Ingersoll & Rooney,
Newark, NJ, Jacqueline M. Weyand, Buchanan Ingersoll &
Rooney, PC, New York, NY, Kenneth L. Racowski, Buchanan
Ingersoll & Rooney, Philadelphia, PA, for Defendant.

## MEMORANDUM

SITARSKI, M.J.

**\*1** Pending before the Court is Plaintiff's Unopposed
Motion for Certification of Settlement Class, Preliminary
Approval of Settlement, Appointment of Class Counsel, and
Approval of Class Notice (ECF No. 42). [1] Plaintiff Joshua
Riaubia ("Plaintiff") and Defendant Hyundai Motor America
("Defendant") have agreed to a class action settlement that
will resolve the instant matter, in which Plaintiff alleges
that Defendant's 2015, 2016, and 2017 Hyundai Sonata U.S.
specification vehicles equipped with the Smart Trunk feature
were defective, as their hands-free, proximity-activated
trunks did not fully open. For the following reasons, Plaintiff's
Motion will be GRANTED.

## I. BACKGROUND

### A. Factual Background and Procedural History

In August of 2014, Plaintiff purchased a 2015 Hyundai Sonata
Limited equipped with the Smart Trunk Feature. (Complaint
¶ 9, ECF No. 1). The Smart Trunk allowed consumers to
open their vehicles' trunks "hands-free" by standing directly
behind the vehicle while holding a key fob. (*Id.* ¶¶ 14, 17).
Plaintiff's Smart Trunk opened only a few inches. (*Id.* ¶ 76).
Plaintiff consulted with counsel, who discovered dozens of
similar complaints from owners of Hyundai Sonatas. Thus, on
September 28, 2016, Plaintiff filed the instant class action on
behalf of himself and others similarly situated. (Pl.'s Br. 2). In
response, on December 23, 2016, Defendant filed a Motion
to Dismiss, (ECF No. 2), which Judge Jones denied in full
on August 22, 2017. (ECF No. 22). Thereafter, on October 6,
2017, Defendant filed its Answer. (ECF No. 29).

The parties then began discussing the possibility of mediation,
and filed a joint stipulation requesting to stay the litigation
proceedings pending mediation. (Stipulation, ECF No.
31). During their initial mediation session before David
Geronemus of JAMS, held in New York City on January
9, 2018, the parties made some progress towards reaching a
resolution. (Pl.'s Br. 5). On May 15, 2018, a second mediation
session was held, and the parties executed a term sheet
wherein they set forth the majority of terms that would be
agreed to in the eventual settlement. (*Id.*) On February 15,
2019, Plaintiff filed the instant unopposed Motion. By Order
dated July 3, 2019, Judge Jones referred the Motion to me for
disposition. (Order, ECF No. 45).

### B. The Proposed Class Action Settlement

The terms of the proposed class action settlement are set
forth in the Settlement Agreement, (Declaration of Natalie
Finkelman Bennett Ex. 1, ECF No. 42-3), and are outlined
below.

#### 1. The Proposed Settlement Class

The Settlement Agreement provides for a Settlement Class
defined as follows:

> All persons or entities in the fifty
> United States and the District of
> Columbia who currently own or lease,
> or previously owned or leased, a model
> year 2015 to 2017 U.S. specification
> Hyundai Sonata vehicle equipped with

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 227 of 260
PageID: 69891
Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

the Smart Trunk feature purchased in the fifty United States and the District of Columbia.

**\*2** (Pl.'s Br. 5-6). Excluded from the Settlement Class are:

> Defendant, as well as Defendant's affiliates, employees, suppliers, officers, and directors, attorneys, agents, insurers, and dealers; third-party providers of extended warranty/ service contracts; independent repair/ service facilities; the attorneys representing Defendant in this case; the judges and mediator to whom this case is assigned and their immediate family members; all persons and entities who request exclusion from (opt-out of) the Settlement; all persons and entities who previously released any claims encompassed in this Settlement or whose vehicle was permanently transported outside the United States; and all persons or entities claiming personal injury or property damage other than to a Class Vehicle or claiming subrogation of such claims.

(*Id.* at 6).

### 2. The Proposed Settlement Terms

In exchange for a release of Settlement Class members' claims against Defendant, the Settlement Agreement states that Defendant will provide Settlement Class members with: (1) a cash payment in the form of a $50 debit card or $100 dealer credit; (2) replacement of the defective parts of Class vehicle trunks, followed by a second replacement if necessary; (3) a warranty extension; and (4) reimbursement of any previous repair costs they incurred in their efforts to fix the Smart Trunk feature of the Class vehicle. (Pl.'s Br. 6).

Defendant will be responsible for bearing the cost of providing Class members with notice of the Settlement

Agreement. Defendant's Consumer Affairs Division, serving as the Settlement Administrator, will be responsible for providing Class members with notice, as well as appropriate state and federal officials, in accordance with the Class Action Fairness Act, 28 U.S.C. § 1715. (*Id.* at 9). The Administrator will send Class members notice via first class mail, and will resend any returned notices that contain an address correction or forwarding address. (*Id.* at 10). The Administrator will also maintain a website where Class members can get more information about the Settlement Agreement, and where they can submit claims either online or via email. (*Id.*).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval. Fed. R. Civ. P. 23(e) (2). "Thus, when a district court is presented with a class settlement agreement, the court must first determine that the requirements for class certification under Rule 23(a) and (b) are met, and must separately determine that the settlement is fair to the class under [Rule] 23(e)." *In re Nat'l Football League Players Concussion Injury Litig.,* 775 F.3d 570, 581 (3d Cir. 2014) (citations and internal quotation marks omitted). These procedures aim to provide "transparency for class members and authority to the district court to act as a fiduciary for putative class members by 'guarding the claims and rights of absent class members.' " *Id.* (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010)).

Review of a proposed class action settlement generally occurs in two stages. At this preliminary stage, counsel submits the proposed settlement terms to the Court, and the Court then makes a "preliminary fairness evaluation." *In re Nat'l Football League Players' Concussion Injury Litig.*, at 582 (quoting *Manual for Complex Litigation* § 21.632). "If the proposed settlement is preliminarily acceptable, the court then directs that notice be provided to all class members who would be bound by the proposed settlement to afford them an opportunity to be heard, opt out of the class, or object to the settlement." *Silvis v. Ambit Energy L.P.*, No. 14-5005 2018 WL 1010812 at \*3 (E.D. Pa. Feb. 22, 2018) (citing Fed. R. Civ. P. 23(c)(3), (e)(1), (e)(5); *Manual for Complex Litigation* § 21.633). Once notification has occurred, the Court then conducts the formal "fairness hearing" provided for in Rule 23(e)(2). *Id.* (citing *Manual for Complex Litigation* § 21.633). After the Court determines that the settlement is "fair, reasonable, and adequate," it gives the settlement its final approval. Fed. R. Civ. P. 23(e)(2).

**\*3** Courts sitting in this procedural posture:

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 228 of 260
PageID: 69892
Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

should make clear that they are
making a 'preliminary determination'
on class-action certification for the
purpose of issuing notice of settlement,
and that they are reserving the
issuance of a certification order
until after a fairness hearing. The
certification order ultimately issued
must necessarily be entered before
the district court approves the class
settlement but need not occur before
providing notice under Rule 23(e)(1).
Permitting a district court to manage
a settlement class in this manner
provides the flexibility needed to
protect absent class members' interests
and efficiently evaluate the issues of
class certification and approval of a
settlement agreement.

*In re Nat'l Football League Players Concussion Injury Litig.*,
775 F.3d at 586 (internal citations omitted).

## III. DISCUSSION

In the instant Motion, Plaintiff seeks preliminary approval of
the Class Settlement. For the following reasons, the Court
will grant Plaintiff's Motion for Preliminary Approval of the
Settlement Agreement.

### A. Whether Class Certification is Proper

During its preliminary fairness evaluation, this Court must
first preliminarily determine whether class action certification
is proper under Rule 23. "Although the [C]ourt will undertake
a rigorous 'analysis' as to whether class certification is
appropriate at the later fairness hearing, compliance with
Rule 23(a) and (b) must still be analyzed at this juncture."
*Silvis*, 2018 WL 1010812 at *3 (citing *In re Nat'l Football
League Players Concussion Injury Litig.*, 775 F.3d at 582-83).
First, under Rule 23(a), Plaintiff must demonstrate that: "(1)
the class is so numerous that joinder of all members is
impracticable; (2) there are questions of law or fact common
to the class; (3) the claims or defenses of the representative
parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect

the interests of the class." These requirements are generally
termed numerosity, commonality, typicality, and adequacy of
representation.

Next, Rule 23(b)(3), under which Plaintiff now seeks class
certification, requires that Plaintiff show that "questions of
law or fact common to class members predominate over any
questions affecting only individual members, and that a class
action is superior to other available methods for fairly and
efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)
(3).

Lastly, after conducting the Rule 23(a) and (b)(3) analysis,
the Court then determines whether the class is readily and
currently ascertainable. *Marcus v. BMW of North America,
LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012).

### 1. Rule 23(a) Factors

#### a. Numerosity

The proposed Settlement Class satisfies Rule 23(a)'s
numerosity requirement. "No minimum number of plaintiffs
is required to maintain a suit as a class action, but generally
if the named plaintiff demonstrates that the potential number
of plaintiffs exceeds 40, the first prong of Rule 23(a) has
been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d
Cir. 2001). Rule 23(a)(1) requires only that a Plaintiff provide
the Court with enough information so that it may determine
whether the numerosity prong is satisfied. *Marcus*, 687
F.3d at 596 ("a plaintiff must show sufficient circumstantial
evidence ... to allow a district court to make a factual
finding.")

**\*4** Here, records show that Defendant sold approximately
30,000 Class vehicles within the United States, so it is
estimated that there are about that many potential Class
members. (Pl.'s Br. 11). Accordingly, although the Class
excludes certain individuals affiliated with Defendant, the
Court finds that the numerosity requirement is satisfied,
and that joinder of all members is impracticable. (Pl.'s Br.
6 (noting that the Class excludes, *inter alia*, Defendant's
affiliates, employees, suppliers, officers, directors, attorneys,
agents, insurers, and dealers, as well as all persons
who previously released any claims encompassed in the
Settlement.)).

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 229 of 260
PageID: 69893
Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

### b. Commonality

The proposed Settlement Class satisfies Rule 23(a)'s commonality requirement. Rule 23(a)(2) requires that Plaintiff demonstrate the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Thus, class "claims must depend upon a common contention ... of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). If Plaintiff shares a single common question of law or fact with the prospective class, this will satisfy the requirement of Rule 23(a)(2). *See id.* at 359.

In the context of an allegedly defective automobile, courts in the Third Circuit routinely find the commonality element to be satisfied when a plaintiff asserts that a defendant's vehicle has a defective part. *See, e.g.*, *Marcus*, 687 F.3d at 597 (finding the commonality requirement satisfied where a plaintiff sought "to offer evidence about, among other things, whether Bridgestone RFTs are 'defective,' whether the defendants had a duty to disclose those defects, and whether the defendants did in fact fail to disclose those defects.... These issues of fact and law (or some subset of them) apply to each of [Plaintiff's] causes of actions ... and are issues common to all class members."); *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 267 (E.D. Pa. 2013) ("Proving the Benteler Axle was defective is a factual question central to each of Plaintiff's claims—breach of express and implied warranty, consumer protection violations, and unjust enrichment.").

Here, Plaintiff maintains that there are several questions of law and fact common to Plaintiff and prospective Class members. The Court agrees. Plaintiff alleges that the Smart Trunk feature of Class vehicles is defective because the trunk does not open fully when the "hands-free" feature is used. (Pl.'s Br. 13). Specifically, Plaintiff asserts that Class vehicles have a defect in their torsion bars which cause the trunk to fail to fully open, and that repairs performed on these vehicles have not fixed the problem. (*Id.*). Plaintiff further asserts that the Class vehicles are all subject to the same express warranty. (*Id.*). Because the issues of whether the Smart Trunk feature is defective and breaches Defendant's express warranty are common to both Plaintiff and prospective Class members, the Court finds that Rule 23(a)(2)'s commonality requirement is satisfied.

### c. Typicality

Plaintiff's claims satisfy Rule 23(a)'s typicality requirement. Rule 23(a)(3) requires that Plaintiff's claims be "typical" of the claims of the class. Fed. R. Civ. P. 23(a)(3). The Court's typicality inquiry is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). The typicality prong is satisfied where the representative plaintiff's claims arise from the same alleged wrongful conduct of the defendant as do those of other class members. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

**\*5** When conducting the typicality analysis, the Third Circuit instructs that district courts must "consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." *Marcus*, 687 F.3d at 598. Specifically, they must focus on the factual and legal similarities between the claims of the class representative and those of the class and whether the interests and incentives of the representative are sufficiently aligned with those of the class. *Id.*

Here, Plaintiff asserts that his claims satisfy the typicality prong because both he and prospective Class members experienced the same defect of the Smart Trunk feature, and their vehicles were all subject to the same warranties. (Pl.'s Br. 14). Because each prospective Class member was allegedly harmed by a common course of conduct, Plaintiff's claims are both factually and legally similar to those of the Class, and the typicality prong is therefore satisfied.

### d. Adequacy of Representation

Plaintiff satisfies Rule 23(a)'s requirement that the named plaintiff adequately represent the interests of the Class. Rule 23(a)(4) requires that Plaintiff "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement helps to ensure that the named plaintiff and the class he seeks to represent do not have any conflicts of interest. *Amchem Products v. Windsor*, 521 U.S.591, 625 (1997). The Court first determines whether Plaintiff's counsel is appropriately qualified to represent the class, and next assesses whether any conflicts of interest exist. *In re*

Case 1:19-md-02875-RMB-SAK   Document 2057-2   Filed 05/10/22   Page 230 of 260
PageID: 69894
Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

*Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 312 (3d Cir. 1998).

Here, Plaintiff maintains that the adequacy requirement is satisfied. First, he asserts that his counsel "are highly qualified and experienced class action litigators familiar with the factual and legal issues involved [in the case]." (Pl.'s Br. 14). The Court agrees. Proposed Class counsel, James C. Shah and Natalie Finkelman Bennet of Shepherd, Finkelman, Miller & Shah, LLP; Noah Axler and Marc A. Goldrich of Axler Goldrich LLC; and Robert P. Cocco of Robert Cocco, P.C., have submitted resumes to the Court which show that counsel have extensive experience handling multiple class actions and other complex civil matters. *See generally* (Declaration of Natalie Finkelman Bennett Exs. 2-4, ECF Nos. 42-4, 42-5, 42-6). In addition, counsel took part in extensive negotiations through a neutral mediator which resulted in the proposed settlement. The Court therefore concludes that Plaintiff's counsel is well qualified to represent the Class.

Next, Plaintiff alleges that his interests are aligned with those of other class members, as both he "and the Class he seeks to represent share common interests with respect to seeking compensation for the alleged defects with the Class vehicles[,]" and that by proving his own claims, Plaintiff will help to prove the claims of other Class members. (*Id.*). The Court similarly believes that Plaintiff's interests are aligned with those of the of other Class members. Both Plaintiff and the absent Class members have an equal interest in the relief offered by the Settlement Agreement. In addition, the claims of Plaintiff and other Class members all arise from the same conduct, and they seek the same remedies. [2] The Court therefore finds that there are no conflicts of interest between the Plaintiff and the Class that warrant a denial of class certification.

**\*6** Accordingly, the Court finds Plaintiff has satisfied the Rule 23(a) factors for preliminary class certification.

## 2. Rule 23(b)(3) Factors

In addition to meeting the requirements of Rule 23(a), a class representative must show that his claim falls into at least one of the categories found in Rule 23(b). Here, Plaintiff brings his claim under Rule 23(b)(3), which requires that "the court finds questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### a. Predominance

The predominance inquiry focuses "on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011); *see also Amchem*, 521 U.S. at 624 (stating that the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."). The Rule 23(b)(3) predominance requirement incorporates Rule 23(a)'s commonality requirement, and the Court "analyze[s] the two factors together, with particular focus on the predominance requirement." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 528 (citations omitted). Where the Court finds that liability depends on the conduct of the defendant, and not on that of individual class members, Rule 23(b)(3)'s predominance requirement is satisfied. *Id.* at 528-29 (finding the predominance requirement satisfied where "liability depends on the conduct of DuPont, and ... does not depend on the conduct of individual class members.... DuPont's alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability.").

Plaintiff asserts that Defendant's conduct was common to all Class members, as Class vehicles have similarly defective trunks, Defendant issued the same warranties on these vehicles, and Class members were similarly harmed by Defendant's conduct. (Pl.'s Br. 15). The Court agrees that Plaintiff satisfies the predominance requirement. The conduct at issue here is that of Defendant, and not that of individual Class members. Therefore, there are questions of law and fact common to the settlement Class, and these questions predominate over individual ones with respect to Defendant's liability. As a result, the Court finds that a class action is the most efficient manner to adjudicate Class members' claims.

### b. Superiority

The superiority inquiry "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication[,]" such

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 231 of 260
PageID: 69895
Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

as joinder or individual trials. *Id.* at 533-34 (internal citations and quotation marks omitted). When assessing superiority in the context of a "settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 624 (internal citation omitted). If "each consumer has a very small claim in relation to the cost of prosecuting a lawsuit ... a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes[,]" which favors a finding of superiority. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 534.

**\*7** Plaintiff asserts that class adjudication of his claims is "superior to individual trials, and joinder of all Class members is impracticable." (Pl.'s Br. 15). He further argues that without class certification, members of the proposed settlement Class "would go uncompensated because they would lack adequate monetary incentives to pursue their claims individually[,]" and that individual lawsuits would impose a heavy burden on the courts. (*Id.* at 16). The Court agrees that resolution of these claims as a class action is superior to individual lawsuits because it promotes efficiency. Similarly, because the individual claims are small in relation to the costs of litigating them, without the class action mechanism, individual plaintiffs would likely lack an incentive to pursue their claims. In addition, because this is a nationwide Class, there is a risk of inconsistent findings of liability were the claims to be litigated in multiple forums. The Court therefore finds that Plaintiff has satisfied the requirements of Rule 23(b)(3).

### 3. Ascertainability

The Court finds that the proposed Class is ascertainable. "A plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The ascertainability inquiry requires a plaintiff to show both that: "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* (internal quotation marks and citations omitted). It requires only that the plaintiff "show that class members *can be* identified"; it does not ask that the plaintiff affirmatively identify them. *Id.* at 165.

Here, the class is defined with reference to objective criteria. Based on documents produced during discovery, Defendant sold approximately 30,000 Class vehicles within the United States. (Pl.'s Br. 11). Therefore, the Court finds that the putative class is ascertainable because current owners of Class vehicles can be readily identified using Vehicle Identification Numbers.

Accordingly, for the above reasons, I conclude the settlement Class preliminarily satisfies Rules 23(a) and (b)(3). Thus, preliminary certification is proper.

### B. Whether the Proposed Settlement is Fair

The Court next determines whether the settlement is "fair, reasonable, and adequate." *In Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d at 316-17; *see also* Fed. R. Civ. P. 23(e)(2). "In deciding whether to grant preliminary approval of a proposed class action settlement, the court is required to determine only whether 'the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval.' " *Silvis*, 2018 WL 1010812, at \*6 (quoting *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014)); *see also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (citation omitted) (stating that an initial presumption of fairness is established "when the [C]ourt finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; [and] (3) the proponents of the settlement are experienced in similar litigation[.]").

If there is a conceivable basis for presuming that the standard applied for final approval under Rule 23 will be satisfied, a settlement is deemed to fall within the range of possible approval. *Silvis*, 2018 WL 1010812 at \*6; *see also Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.") "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).

**\*8** The Court concludes that the proposed Settlement is fair, reasonable, and adequate. First, the parties' negotiations occurred at arm's length and followed two mediation sessions.

(Pl.'s Br. 5). Second, the parties have engaged in sufficient discovery. Plaintiff's counsel investigated the facts underlying his claims prior to the filing of his complaint. (*Id.* at 19). After Defendant's Motion to Dismiss was denied, experts were retained and the parties began to engage in discovery, and confirmatory discovery commenced once the parties were in the process of negotiating settlement. (*Id.*). Third, proposed Class counsel have extensive experience handling similar class action litigation, and they therefore appreciate the potential risks and benefits that settlement presents. *See generally* (Declaration of Natalie Finkelman Bennett Exs. 2-4). The Court finds that, on its face, the Settlement Agreement does not disclose grounds to doubt its fairness, and that it therefore appears proper under Rule 23(e)(2), as it is fair, reasonable, and adequate.

### C. The Propriety of the Notices

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard and the opportunity to exclude themselves from the class." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985). Rule 23(c)(2)(B) provides that class members must receive the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts." Fed. R. Civ. P. 23(c)(2)(B). The Rule dictates that such notice must clearly state: (1) the nature of the action; (2) the definition of the certified class; (3) the class claims, issues, or defenses; (4) that a class member has the right to enter an appearance through an attorney; (5) that class members have the right to be excluded from the class; (6) the terms for requesting exclusion; and (7) the binding effect of a class judgment on members. *Id.*

Rule 23(e) similarly requires that all members of the class be notified of the terms of a proposed settlement. Fed. R. Civ. P. 23(e)(1). "The Rule 23(e) notice is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d at 327. (internal quotation marks and citation omitted). "The combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class satisfy the due process requirements of the Fifth Amendment." *Id.* at 306.

The Court finds that both the proposed methods for providing notice, as well as the content of said notices, meet the requirements for approval. The parties propose that Defendant's Consumer Affairs Division serves as Settlement Administrator, and in this role, be tasked with mailing individual direct notice to each Class member. (Pl.'s Br. 24). In addition, the Settlement Administrator will publish notice on a dedicated website. (*Id.*). These methods are more than sufficient and satisfy the requirements of Rule 23(c)(2)(B). *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d at 327 (stating that "[p]roviding individual notice to ... class members is a daunting task, and no doubt an expensive one ... [and that] the combination of individual and publication notice ... greatly increase[s] the possibility that Prudential will ultimately compensate a greater number of injured policyholders than would otherwise have been possible."); *see also* Fed. R. Civ. P. 23(c)(2)(B) (expressing a preference for individual notice when possible).

The proposed content of the notices similarly meets the requirements of Rule 23 and due process. Plaintiff summarizes the content of the notice:

> The proposed Long Form Notice is written in plain English and describes: (1) the nature of the claims in the case; (2) a description of the Settlement Class; (3) a description of the Settlement and the relief to be provided; (4) the consequences of opting out or remaining in the Class; and (5) how to get more information from this Court about the Settlement, the parties involved and the procedures to follow to object or opt out. The Notice also includes the deadline to object to or opt out of the Settlement, and the date of the Final Approval Hearing. The Notice also states that Class members can enter an appearance through counsel if desired. Finally, the Notice states how to get information about making a claim and the applicable deadlines for submitting a claim. Accordingly, the contents of the Notice meet all requirements and

Riaubia v. Hyundai Motor America, Not Reported in Fed. Supp. (2019)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 233 of 260
PageID: 69897

fully apprises Class members of their
options.

**\*9**  (Pl.'s Br. 25 (internal citations omitted)). Plaintiff further
explains that Defendant will bear the cost of providing notice.
(*Id.*). The Court has reviewed the notice and concludes that
it plainly explains the Settlement and the procedures for
opting out. (Notices, Ex. B. to Ex. 1 of Declaration of Natalie
Finkelman Bennet, ECF No. 42-3).

Accordingly, the Court finds that the proposed notice program
satisfies Rule 23(c)(2)(B) and (e)(1), as well as due process
requirements.

### D. Appointment of Counsel

Rule 23(c)(1)(B) states that an order certifying a class action
must also "appoint class counsel under Rule 23(g)." Rule
23(g) provides that "a court that certifies a class must appoint
class counsel." Fed. R. Civ. P. 23(g)(1). "Thus, under the plain
language of the rule, a district court's decision to certify a class
must *precede* the appointment of class counsel." *Sheinberg
v. Sorenson*, 606 F.3d 130, 132 (3d Cir. 2010) (emphasis in
original). In appointing class counsel, the Court considers
counsels': (1) efforts to identify or investigate potential claims
in the action; (2) experience in handling class actions, other
complex litigation, and the types of claims asserted in the
action; (3) knowledge of the applicable law; and (4) ability
to commit the necessary resources to representing the class.
Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). A court must also ensure
that class counsel will "fairly and adequately represent the
interests of the class." Fed. R. Civ. P. 23(g)(4).

After reviewing the Motion and attachments, the Court
concludes that counsels' work on the case thus far provides
a substantial basis for finding that they satisfy the criteria of
Rule 23(g), and are therefore well-qualified to serve as Class
counsel. Counsel has spent significant time investigating
Class members' claims. (Pl.'s Br. 19). Likewise, they are
experienced and knowledgeable, and have the resources
necessary to represent the class. *See generally* (Declaration
of Natalie Finkelman Bennett Exs. 2-4). Therefore, the Court
finds that James C. Shah and Natalie Finkelman Bennet of
Shepherd, Finkelman, Miller & Shah, LLP; Noah Axler and
Marc A. Goldrich of Axler Goldrich LLC; and Robert P.
Cocco of Robert Cocco, P.C. should be appointed as Class
counsel.

### IV. CONCLUSION

The Court finds that the requirements of Rules 23(a) and (b)
(3) have been met. It further finds that the ascertainability
requirement is met, and that preliminary certification of the
Settlement Class appears proper. Moreover, the terms in the
Settlement Agreement, as well as the forms of notice, appear
fair, reasonable and adequate. As a result, the Court will grant
Plaintiff's Motion for preliminary approval of the Settlement
Agreement, and appoint Class counsel.

An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2019 WL 3714497

---

## Footnotes

1  The Honorable C. Darnell Jones, II referred the matter to me for disposition pursuant to 28 U.S.C. § 636(b)
(1)(A). (Order, ECF No. 45).

2  While Class members who had a documented complaint about the Smart Trunk prior to the Settlement
Agreement are eligible for compensation that is not available to all Class members, the Court does not find
this creates a "fundamental" intra-class conflict between those who have already lodged a complaint and
those who have not. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (citing *Valley
Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("Significantly, the existence of
minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental'

one going to the specific issues in controversy.")). It is not clear from Plaintiff's Brief that he has already lodged a complaint with Defendant. If he has, however, the Court does not find that this fact renders him an inadequate Class representative.

"An intra-class conflict will not necessarily prevent certification if the settlement agreement contains sufficient structural protections to ensure that the interests of the class will be adequately represented despite the conflict." *Amchem*, 521 U.S. at 627. Here, any class member who has already lodged a complaint and can be thought of as a "past" claimant maintains an interest in the relief granted to "future" claimants, as it is that relief which will ultimately address the issue with the Smart Trunk (the repair of a defective torsion bar), and for which the "past" claimant is similarly eligible. *See Dewey*, 681 F.3d at 185-86 (finding that the alignment of interests of car owners with leaky sunroofs was not problematic because a "class member who has already suffered leakage, and is thus a 'past' claimant, can continue to suffer leakage into the future to the same extent as a future claimant, and can continue to make future claims. As such, past claimants also have an incentive to protect the ability of class members to make claims for future damage.").

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 19

2022 WL 970544
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Salil SHARMA, individually and on behalf
of Sage Group Consulting, Inc., Plaintiff,

v.

Vijay GUPTA et al., Defendants.

Civil Action No. 20-3446 (MAS) (DEA)
|
Filed 03/31/2022

**Attorneys and Law Firms**

Maryam Hadden, Timothy Charles Parlatore, Parlatore Law
Group LLP, New York, NY, for Plaintiff.

Louis D. Tambaro, Offit Kurman, Iselin, NJ, Umar A. Sheikh,
Offit Kurman, New York, NY, for Defendants Vijay Gupta,
Rajeev Gupta, Jyoti Gupta, Brian Mead, Exceleo Business
Consulting, Inc., Exceleo Group, Inc.

Daniel John Sheridan, Lawrenceville, NJ, Susan Verda
Metcalfe, Potomac Law Group, Washington, DC, for
Defendant ProSoft Technology Group, Inc.

**MEMORANDUM OPINION**

SHIPP, District Judge

**\*1**  This matter comes before the Court on separate motions
to dismiss Plaintiff Salil Sharma's ("Sharma") Amended
Complaint. The first is from Defendant ProSoft Technology
Group, Inc. ("ProSoft") to dismiss for failure to state a claim.
(ECF No. 8.) The second is from Defendants Vijay Gupta
("Vijay"), Rajeev Gupta ("Rajeev"), Jyoti Gupta, Brian Mead
("Mead"), Exceleo Business Consulting, Inc., and Exceleo
Group, Inc. (collectively, the "Gupta Defendants," and
together with ProSoft, "Defendants") to compel arbitration
and dismiss Sharma's Amended Complaint. (ECF No. 33.)
Sharma opposed ProSoft's motion (ECF No. 12), and ProSoft
replied (ECF No. 14). Sharma and ProSoft separately opposed
the Gupta Defendants' motion (ECF Nos. 45, 46), and the
Gupta Defendants replied (ECF No. 49). The Court has
carefully considered the parties' submissions and decides
the motions without oral argument under Local Civil Rule

78.1. For the reasons below, the Court denies the Gupta
Defendants' motion and grants ProSoft's motion.

**I. BACKGROUND**

This case arises out of a business breakdown between two
shareholders. Back in 2004, Sharma and others established
two corporate entities. The first was Sage Group Consulting,
Inc. ("Sage"), a New Jersey-based S corporation that had two
shareholders, Sharma and Vijay. (Am. Compl. ¶¶ 6, 16, ECF
No. 5.) The second was Sage Group, a New Jersey-based
partnership that initially had four partners including Sharma
and Vijay. (*Id.* ¶ 17.) The partners abandoned the partnership
in July 2005. (*Id.* ¶ 18.)

Regarding Sage, the Amended Complaint alleges that the
Gupta Defendants devised a scheme to deprive Sage of one
of its core assets. It alleges that Vijay lied to Sharma about
the profitability of one of Sage's divisions, thereby causing
Sharma to consent to the sale of that division (the "Division")
to Caldwell Investment LLC ("Caldwell"). (*Id.* ¶¶ 35-36.)
Unbeknownst to Sharma, however, Vijay caused Caldwell
to then sell the Division to ProSoft, an entity controlled by
Vijay's brother Rajeev and Mead. (*Id.* ¶¶ 37-38.) According
to the Amended Complaint, the Division was valuable to
Sage because it owned several licenses and employed key
personnel. (*Id.* ¶ 38.) Eventually, another company, Kellton
Tech Solutions Inc. ("Kellton"), acquired ProSoft for $14
million. (*Id.*) Nevertheless, the Amended Complaint alleges
that no sale proceeds of the Division ever accrued to Sage.
(*Id.* ¶ 40.)

Part of this dispute turns on where these events unfolded.
Sharma is based in New Jersey, Vijay and Rajeev in
Illinois, and Mead in Connecticut. (*Id.* ¶¶ 7-10.) Sage is
headquartered in New Jersey and has operations in both
New Jersey and Illinois. (*Id.* ¶¶ 6, 25.) The Division
comprised part of Sage's Illinois operations, and ProSoft was
an Illinois-based company. (*Id.* ¶¶ 15, 34.) Regarding where
the misrepresentation about the Division's profitability took
place, exhibits attached to the Amended Complaint reveal
that it occurred during a 2009 board meeting in New Jersey.
(*See* Am. Compl., Ex. C (Sage Corporate Documents) *36-37,
ECF No. 5-3.) [1] The Amended Complaint does not allege
where Kellton is headquartered.

**\*2**  In any event, on behalf of Sage, Sharma sued
the Gupta Defendants and ProSoft, alleging, as relevant
here, three causes of action and two remedies: unjust

enrichment, conversion and misappropriation, aiding and abetting breach of fiduciary duty, declaratory relief, and imposition of a constructive trust. (*See generally* Am. Compl.) ProSoft moved to dismiss all five, arguing that under either Illinois or New Jersey law, the Amended Complaint insufficiently pled the causes of action and remedies. (*See generally* ProSoft's Mot. to Dismiss Moving Br., ECF No. 8-1.) Following briefing on ProSoft's motion, the Gupta Defendants additionally moved to compel arbitration and dismiss the Amended Complaint. In their brief, the Gupta Defendants urge that Sage Group's Partnership Agreement (*see* Am. Compl., Ex. B (Partnership Agreement)) governs the Amended Complaint's causes of action (*see* Gupta Defs.' Mot. to Compel Moving Br. 10, ECF No. 33-1.) Because the Partnership Agreement contains an arbitration clause, according to the Gupta Defendants, the Court must compel arbitration and dismiss this case. (Gupta Defs.' Mot. to Compel Moving Br. 7, 10.) These motions are now ripe for resolution.

## II. LEGAL STANDARD

### A. Motion to Compel Arbitration

"Because arbitration is a matter of contract, before compelling arbitration pursuant to the Federal Arbitration Act [('FAA')], a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of the agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citations omitted). "[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "By contrast,' [i]f a party has not agreed to arbitrate, the courts have no authority to mandate that [that party] do so.' " *Hejamadi v. Midland Funding, LLC*, No. 18-13203, 2019 WL 4855624, at *2 (D.N.J. Oct. 2, 2019) (first alteration in original) (quoting *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999)).

"It is well established that the [FAA] reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.' " *Kirleis*, 560 F.3d at 160 (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). "But this presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Id.* (citation and internal quotation marks omitted).

### B. Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2)[2] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' " *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III. DISCUSSION

**\*3** Before the Court are two motions to dismiss—ProSoft's for failure to state a claim and the Gupta Defendants' to compel arbitration. As the Gupta Defendants' motion asserts a jurisdictional challenge, the Court begins its analysis there.

### A. The Court Denies the Gupta Defendants' Motion to Compel Arbitration.

The Gupta Defendants move to dismiss this case, asserting that the Court lacks jurisdiction because the parties' Partnership Agreement contains an arbitration clause.[3] According to the Gupta Defendants, the claims here "squarely

fall within the scope of the Partnership Agreement," and "the parties must be compelled to resolve their respective matters through Arbitration." (Gupta Defs.' Mot. to Compel Moving Br. 7, 10.) Sharma resists this claim, arguing that the partnership dissolved in July 2005. (Sharma's Opp'n Br. to Gupta Defs.' Mot. to Compel 7-8, ECF No. 45.) ProSoft adds that arbitration is unnecessary because the Amended Complaint and its exhibits show no arbitrable causes of action. (ProSoft's Opp'n Br. to Gupta Defs.' Mot. to Compel 12, ECF No. 46.)

The Court agrees that arbitration is improper here. As an initial matter, the Court must determine the appropriate standard of review for motions to compel arbitration. Two options exist: review akin to a motion to dismiss for failure to state a claim under Rule 12(b)(6), or review for summary judgment under Rule 56. In deciding which standard applies, the Court considers whether "the face of a complaint, and documents relied upon in the complaint" establishes that "certain of a party's claims 'are subject to an enforceable arbitration clause.' " *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). If the issue of arbitrability is clear on the face of the complaint and its exhibits, a motion-to-dismiss standard applies. *Id.* Here, no question exists that the Amended Complaint and the attached documents establish arbitrability—the Amended Complaint attaches the Partnership Agreement containing the arbitration clause. (Partnership Agreement ¶ 20.) The Court thus proceeds under a Rule 12(b)(6) analysis.

Taking all allegations in the Amended Complaint as true and all inferences in favor of Sharma, the Court concludes that the Amended Complaint's causes of action are not arbitrable. To establish arbitrability, the Court assesses "whether there is a valid agreement to arbitrate" and "whether that agreement encompasses the dispute at issue." *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020) (citing *Jaludi v. Citigroup*, 933 F.3d 246, 254 (3d Cir. 2019)). The Gupta Defendants fail the second test. The arbitration provision of the Partnership Agreement (Sage Group) applies to "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach hereof." (Partnership Agreement ¶ 20.) Yet, the Amended Complaint plainly asserts claims on behalf of Sage Group Consulting, Inc., not the partnership Sage Group. (Am. Compl. 1.) Indeed, all the conduct at issue in the Amended Complaint relates to Sage as a corporation not Sage as a partnership. (*See, e.g., id.* ¶ 35 ("At a point

in time following the establishment of the Solution Division [in 2008–2009], Vijay engaged in a secret scheme to divest, and did divest, this said Solution Division of Sage to Prosoft without board or shareholder knowledge or approval."); ¶ 41 ("Vijay has operated many companies with similar names as Sage for the sole purpose of hiding Sage funds to avoid reporting revenue to Sage and its other shareholders."); ¶ 55 ("Vijay has not disclosed any accounting transaction for the year 2019 and revenue in corporate books since year 2018.").)

**\*4** Tellingly, the Amended Complaint's causes of action also arise from conduct occurring well after 2005. That's significant because the Gupta Defendants have a temporal problem: the Amended Complaint alleges that the partners abandoned the partnership in July 2005. (Am. Compl. ¶ 18 ("In or about July[ ] 2005 the original parties to the Partnership Agreement abandoned the partnership, distributed shares of stock in Sage and from that point forward held their meetings as Shareholder meetings.").) Sharma reinforces that allegation by attaching to the Amended Complaint several corporate governance documents for Sage, buttressing that the partnership wound up some time ago and is not relevant to this dispute. (*See generally* Am. Compl. Ex. C.) The Gupta Defendants attempt to answer this temporal problem by contending that the Partnership Agreement also applied to Sage as a corporation. But that argument founders because a partnership is a different corporate form from a corporation and because the Court accepts Sharma's pleadings as true at this stage. *See* 1 NJ Corporations and Other Business Entities § 1.03 (2021) (describing differences between partnerships and corporations).[4] The Court accordingly denies the Gupta Defendants' motion to compel arbitration.

### B. The Court Grants ProSoft's Motion to Dismiss.

Next up is ProSoft's motion to dismiss. ProSoft argues that none of the Amended Complaint's causes of action apply to it. ProSoft also asserts that substantive Illinois law applies to these causes of action. The Court thus first analyzes the choice-of-law issue and then considers the Amended Complaint's causes of action against ProSoft.

#### 1. New Jersey and Illinois Law Apply.

The Court applies a familiar analysis to determine which law applies. Courts sitting in diversity apply the choice-of-law test of the forum state. *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec.*

*Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey applies the most-significant-relationship test, which comprises two questions: whether an actual conflict exists, and (if so) which state has the most significant relationship to the controversy. *See Caspersen ex rel. Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 36 (D.N.J. 2020) (quoting, among others, *P. V. ex rel. T. V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008)). If no actual conflict exists or if New Jersey has the most significant relationship to the causes of action here, New Jersey law applies. *See id.*

Both parties mix and match their application of New Jersey and Illinois law. (*E.g.*, ProSoft's Mot. to Dismiss Moving Br. 11 ("Where there is no apparent conflict, however, ProSoft cites herein to New Jersey and/or Illinois law interchangeably.").) Neither squarely addresses whether an actual conflict exists. The Court's own review of the Amended Complaint's causes of action reveals differences in the underlying law. *See Camp Jaycee*, 962 A.2d at 460 (describing that actual-conflict analysis "is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them" (internal quotation marks and citations omitted)). The Court thus considers each cause of action in turn to determine whether Illinois or New Jersey law applies. [5]

### *a. Unjust Enrichment*

**\*5**  To start, ProSoft relies on Illinois and New Jersey law in moving to dismiss the Amended Complaint's causes of action for unjust enrichment. Each state defines the elements of unjust enrichment slightly differently. *Compare, e.g.*, *EnviroFinance Grp., LLC v. Env't Barrier Co.*, 113 A.3d 775, 790 (N.J. Super. Ct. App. Div. 2015) ("To demonstrate unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust' and that the plaintiff 'expected remuneration' and the failure to give remuneration unjustly enriched the defendant." (quoting *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 554 (1994)), *with Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1043 (Ill. App. Ct. 2015) ("To prevail on a claim for unjust enrichment, a plaintiff must prove that the defendant 'retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience.' " (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (1989))). Notably however, this Court is not the first to search for

conflicts in unjust enrichment claims between New Jersey and Illinois. In one case in the Eastern District of Pennsylvania, for example, the court conducted a fifty-state survey for unjust enrichment claims and found that both New Jersey and Illinois "require[ ] proof of essentially the same three elements: (1) a benefit is conferred upon the defendant; (2) at the plaintiff's expense; (3) under circumstances that would make defendant's retention unjust." *Powers v. Lycoming Engines*, 245 F.R.D. 226, 230-31 (E.D. Pa. 2007), *vacated on other grounds*, 328 F. App'x 121 (3d Cir. 2009); *see also Avram v. Samsung Elecs. Am., Inc.*, Nos. 11-6973, 12-976, 2013 WL 3654090, at *20 (D.N.J. July 11, 2013) (listing cases) ("For unjust enrichment claims, many courts have found that there is no actual conflict between different states' laws."). Tellingly, the court found that, "[a]lthough there are numerous permutations of the elements of the cause of action in the various states, there are few real differences." *Powers*, 245 F.R.D. at 231; *see also In re Mercedes-Benz Tele Aid Cont. Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material and do not create an actual conflict." (citation omitted)), *abrogated on other grounds by Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 210 (3d Cir. 2013).

Considering these authorities, the Court is satisfied that no real conflict exists. "In other words, regardless of which state's unjust enrichment elements are applied, the result is the same." *Powers*, 245 F.R.D. at 231. Accordingly, as this Court sits in New Jersey, it will apply New Jersey law to the Amended Complaint's unjust enrichment claim.

### *b. Conversion and Misappropriation*

The Court next considers the conversion and misappropriation claim, which it presumes to be a cause of action for conversion. *See* 18A Am. Jur. 2d Corporations § 623 (Feb. 2022) ("Even in the case of a closely held corporation, shareholders generally have no independent cause of action and cannot recover personally for misappropriation of corporate assets."). Relative to New Jersey, Illinois appears to have additional elements for conversion. *Compare Mareskas-Palcek v. Schwartz, Wolf& Bernstein, LLP*, 90 N.E.3d 463, 467 (Ill. App. Ct. 2017) ("The four elements of conversion are: (1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession

of the property, absolutely and unconditionally; and (4) a demand for possession of the property." (citations omitted)), with *Latef v. Cicenia*, No. A-5747-13T2, 2015 WL 10458543, at *5 (N.J. Super. Ct. App. Div. Mar. 14, 2016) ("The elements of conversion are: (1) 'the property and right to immediate possession thereof belong to the plaintiff and (2) 'the wrongful act of interference with that right by the defendant.' " (citation omitted)). Because the elements are not the same, an actual conflict exists and the Court proceeds to determine which state bears the most significant relationship to this claim.

Section 145 of the Restatement (Second) of Conflict of Laws governs conversion claims. *See Pet Gifts USA, LLC v. Imagine This Co.*, No. 14-3884, 2015 WL 570264, at *3 n.7 (D.N.J. Feb. 11, 2015). That section provides four factors that the Court must evaluate "according to their relative importance with respect to the particular issue":

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

**\*6** (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (Am. L. Inst. 1971) (last updated Mar. 2022). Here, the Court finds the first two factors dispositive of this choice-of-law issue. According to the Amended Complaint, Sage sold the Illinois-based Division ultimately to another Illinois-based Defendant, ProSoft. (Am. Compl. ¶¶ 15, 37.) The focus of the conversion is thus Illinois, and the Court will apply Illinois law to the Amended Complaint's conversion claim.

### c. Aiding and Abetting Breach of Fiduciary Duty

The Court finally considers the Amended Complaint's claim for aiding and abetting a breach of fiduciary duty. Here, the elements appear to be the same between Illinois and New Jersey. *Compare Vasiljevich v. Levit*, No. 1-10-1329, 2011 WL 10068639, at *7 (Ill. App. Ct. Oct. 31, 2011) (noting that aiding-and-abetting claim requires "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that

he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation" (quoting *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003))), with *Armada v. Kuzovkin*, No. A-1893-19, 2021 WL 4026177, at *8 (N.J. Super. Ct. App. Div. Sept. 3, 2021) (noting that aiding-and-abetting claim requires "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation" (ultimately quoting *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004))). Because no conflict appears to exist, the Court will apply New Jersey law to this claim.

### 2. The Court Dismisses the Unjust Enrichment Claim.

With the applicable law set, the Court now assesses the adequacy of the Amended Complaint's pleadings. Starting with the unjust enrichment claim, under New Jersey law, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust and that the plaintiff expected remuneration and the failure to give remuneration unjustly enriched the defendant." *EnviroFinance Grp., LLC*, 113 A.3d at 790 (internal quotation marks and citation omitted). On its face, the unjust enrichment claim must fail because Sage did not expect remuneration from ProSoft. The Amended Complaint alleges that Sage sold the Division to Caldwell, not ProSoft. Indeed, at the time Sage parted with the Division, neither it nor Sharma could have known that the Division would ultimately end up with ProSoft. *See Nelson v. Xacta 3000 Inc.*, No. 08-5426, 2009 WL 4119176, at *7 (D.N.J. Nov. 24, 2009) (dismissing unjust enrichment claim where complaint did not allege expectation of remuneration "at the time" the benefit was conferred).

**\*7** Other problems plague the unjust enrichment claim. For one, numerous courts have concluded that New Jersey requires some relationship between the parties when alleging unjust enrichment. *See Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 506 (D.N.J. 2009) (listing cases) ("New Jersey law requires a direct relationship between the parties."). The Amended Complaint alleges no such relationship—contractual or otherwise. *See Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, No. 14-4657, 2015 WL 1969380, at *9 (D.N.J. Apr. 29, 2015) ("[The] [p]laintiff may be injured here, but there is no doubt that, as pled, [p]laintiff does not confer any benefit on [d]efendant").

Relatedly, New Jersey recognizes unjust enrichment as a quasi-contractual claim only—not as an independent tort claim. *See Cafaro v. HMC*, No. 07-2793, 2008 WL 4224801, at *12 (D.N.J. Sept. 8, 2008). Indeed, "the role of unjust enrichment in the law of torts is limited for the most part to its use as a justification for other torts such as fraud or conversion." *Castro v. NYT Television*, 851 A.2d 88, 98 (N.J. Super. Ct. App. Div. 2004) (citation omitted). That is precisely what's at issue here. The Amended Complaint alleges that ProSoft unjustly enriched itself by converting Sage's corporate assets. Thus, conversion is the proper tort cause of action; unjust enrichment is the means to get there. *See Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, No. 08-5380, 2009 WL 4730187, at *7 (D.N.J. Dec. 3, 2009) (listing cases dismissing with prejudice unjust enrichment claims brought as independent torts).[6]

### 3. The Court Dismisses the Conversion Claim.

Under Illinois law, conversion claims require: "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." *Mareskas-Palcek*, 90 N.E.3d at 467. This claim fails on straightforward pleading grounds. Simply put, the Amended Complaint does not allege what was wrongful about ProSoft's acquisition of the Division from Caldwell, and ultimately from Sage. Rather, it alleges some sort of scheme between Vijay, Rajeev, and Mead to ultimately vest ProSoft with control of the Division. (*See* Am. Compl. ¶ 35 ("Vijay engaged in a secret scheme to divest, and did divest, this said Solution Division of Sage to Prosoft without board or shareholder knowledge or approval."). The Court notes that these allegations are undercut by other allegations showing that Sage approved the sale of the Division to Caldwell. (*See id.* ¶ 36 ("The Solutions Division transfer to Caldwell was consented to in a Board of Director's meeting....").) Further, the speculative allegations of Defendants' scheme are unadorned with any facts to buttress them. For example, the Amended Complaint does not allege facts showing how the scheme worked, how ProSoft was involved in it, how Caldwell was involved in it, and how Sharma came to learn

about it. Without these critical supporting allegations, the Court cannot assess how ProSoft's acquisition of the Division was unauthorized or wrongful.

### 4. The Court Dismisses the Aiding-and-Abetting Claim.

The Amended Complaint's aiding-and-abetting claim suffers from the same flaw. To state a claim for aiding and abetting, Sharma must allege three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Armada v. Kuzovkin*, No. A-1893-19, 2021 WL 4026177, at *8 (N.J. Super. Ct. App. Div. Sept. 3, 2021) (quoting *N.J. Dep't of Treasury ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 784 (N.J. Super. Ct. App. Div. 2013)). The Amended Complaint fails to allege the second and third elements. It alleges nothing about ProSoft's knowledge of the sale of the Division to Caldwell, nor its knowledge of a broader conspiracy to defraud Sage. Said another way, as alleged, ProSoft's role in the scheme is too attenuated for the Court to assess whether it could have aided and abetted a breach of fiduciary duty. *See Cevdet Aksüt Oğullari Koll. Sti. V. Cavusoglu*, No. 14-3362, 2018 WL 585542, at *4 (D.N.J. Jan. 29, 2018) (dismissing with prejudice aiding-and-abetting claim where "there is no evidence in the record" that alleged participant "had any knowledge" of scheme); *McCormac*, 904 A.2d at 783 ("However, the mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution." (internal quotation marks and citation omitted)).

### IV. CONCLUSION

**\*8** For the reasons above, the Court denies the Gupta Defendants' motion and grants ProSoft's motion. It will issue an order consistent with this Memorandum Opinion.

### All Citations

Slip Copy, 2022 WL 970544

## Footnotes

1    Pin-cites preceded by asterisks refer to the pagination atop the CM/ECF header.

2    All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

3    Although docketed as a motion to dismiss, the Court construes the Gupta Defendants' motion as one to compel arbitration. *See Turner v. Evers*, 726 F.2d 112, 114 (3d Cir. 1984).

4    The Gupta Defendants make much over Sharma's prior complaint, which asserted a breach-of-contract claim based on the Partnership Agreement. (*See* Compl. ¶¶ 55-58, ECF No. 1.) But the Amended Complaint dropped that claim, and Sharma "cannot be bound by allegations in a prior complaint." *Danon v. Vanguard Grp., Inc.*, No. 15-6864, 2018 WL 5785342, at *4 (E.D. Pa. Nov. 2, 2018) (quoting *West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013)); *see also* 6 Wright & Miller, Federal Practice and Procedure § 1474 (3d ed. 2021) ("Perhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading.").

5    It notes, however, that these choice-of-law rulings are preliminary—especially considering the lack of proper briefing on the issue. *See Krys v. Aaron*, 106 F. Supp. 3d 472, 481 (D.N.J. 2015) ("[T]he factual inquiry necessary for a choice-of-law analysis often proves inappropriate or impossible at the motion to dismiss stage when little or no discovery has taken place." (internal quotation marks omitted) (quoting *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 700-01 (D.N.J. 2011))).

6    Because the Court dismisses the Amended Complaint's unjust enrichment claim, it also dismisses the remedies of constructive trust and declaratory relief derived therefrom. *See Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 771-72 (D.N.J. 2013) (noting that unjust enrichment is element of constructive trust).

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 20

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 244 of 260
PageID: 69908
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 6617106
Only the Westlaw citation is currently available.
United States District Court, S.D. Illinois.

Linda SUCHANEK, Richard McManus,
Carol Carr, Paula Gladstone, Edna Avakian,
Charles Cardillo, Ben Capps, Deborah
DiBenedetto, and Carol Ritchie, Plaintiffs,

v.

STURM FOODS, INC., and
Treehouse Foods, Inc., Defendants.

Case No. 11-CV-565-NJR-RJD
|
Signed 07/03/2018

**Attorneys and Law Firms**

Randy L. Gori, Chelsea Lauren Fischer, D. Todd
Mathews, Megan Myers Arvola, Gori Julian and Associates
P.C., Edwardsville, IL, David Michael Rosenberg-Wohl,
Hershenson Rosenberg-Wohl, a Professional Corporation,
San Francisco, CA, Peter H. Burke, W. Todd Harvey, Burke
Harvey LLC, Joseph Allen Schreiber, Schreiber Law Firm
PC, Birmingham, AL, Michael H. Maizes, Maizes & Maizes
LLP, Bronx, NY, for Plaintiffs.

John F. Zabriskie, Pro Hac Vice, Craig S. Fochler, Pro Hac
Vice, Jaclyne D. Wallace, Richard Spencer Montei, Pro Hac
Vice, Foley & Lardner, Aaron J. Weinzierl, United Airlines,
Inc., Jonathan W. Garlough, Pro Hac Vice, Foley & Lardner,
LLP, Chicago, IL, Patrick G. Walker, Farris Bobango Branan,
PLC, Memphis, TN, for Defendants.

## MEMORANDUM AND ORDER

NANCY J. ROSENSTENGEL, United States District Judge

 **\*1** Plaintiffs filed this class action in 2011, alleging
Sturm Foods, Inc. and Treehouse Foods, Inc. ("Defendants")
violated a multitude of state consumer protection laws by
deceptively packaging instant[1] coffee in individual coffee
pods that are popularly used in Keurig coffeemakers.[2] (Doc.
2). Per the Court's order, the parties submitted a joint trial
plan, along with a memorandum identifying the elements
Plaintiffs must prove under each state's consumer fraud statute
and whether those elements are amenable to class-wide proof

(Doc. 47). After a review of the submissions and the relevant
case law, the Court makes the following findings.

## FACTUAL & PROCEDURAL BACKGROUND

Keurig Machines are popular coffeemakers that can brew a
single cup of fresh coffee through small pods ("K-Cups") that
contain individual filters. *Suchanek v. Sturm Foods, Inc.*, 764
F.3d 750, 752 (7th Cir. 2014). Until 2012, Keurig held a patent
over the K-Cup filter technology. *Id.* Defendants hoped to
break into the Keurig market before the patent expired. *Id.* To
do so, they formulated Grove Square Coffee ("GSC"), which
was made up of over 95% instant coffee and a small amount
of microground coffee. *Id.* at 753. The product was essentially
chunks of freeze-dried brewed coffee that dissolved and was
reconstituted in hot water, thus eliminating the need for a
filter. *Id.*

To target Keurig owners, Defendants sold GSC in a filter-less
K-Cup style pod that was compatible with Keurig Machines.
*Id.* at 752. GSC's packaging, though, did not state that the
product was instant coffee. *Id.* at 753. Sturm's consultants
cautioned that the "use of the word 'instant' is a real nono."
*Id.* Rather, in small font on the package, Defendants described
GSC as "naturally roasted soluble and microground Arabic
coffee." *Id.* Defendants also included images of K-Cups with
coffee beans and a statement that the product was intended
"[f]or use by owners of Keurig© coffee makers." *Id.* A
Sturm executive admitted that Defendants "rearrange[d] the
packaging operation to put [GSC] into a display like Keurig
had on the shelf." *Id.* The package also contained a warning
not to remove the foil seal on the K-Cup because "the cup will
not work properly in the coffee maker and could result in hot
water burns." *Id.* "Except as a measure designed to ensure that
the user did not view the true contents of the pod, this makes
no sense: the presence or absence of a foil seal on top would
have no effect on the risk of burns or the use of the cup." *Id.*

 **\*2** GSC did not yield the success Defendants hoped for,
*See Id.* at 754, and, instead, returned scathing reviews
from disappointed customers (*See* Docs. 220-21). Take the
following, for example:

> I purchased your 'Grove Square'
> coffee product from Wal-Mart and
> will be taking it back for refund,
> or throwing it away in their trash

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 245 of 260
PageID: 69909

*Suchanek v. Sturm Foods, Inc.*, Not Reported in Fed. Supp. (2018)

can if they refuse. (1) Your product packaging does not identify your product is low quality dehydrated instant coffee. (2) It is the worse [sic] coffee I have ever tried to drink. (Both my wife and I poured it down the drain.) (3) Total crap!

(Doc. 221, p. 5). The record is riddled with complaints of similar sentiments. (*See* Docs. 220-21 & 248, pp. 3-20). Customers reported Sturm to the Better Business Bureau (Doc. 248, pp. 7-8, 10), and retailers informed Sturm that GSC was doing poorly (Doc. 248, pp. 16-20). One retailer, in particular, reported that GSC was the worst performing introductory product it sold in its twelve-year history. *Suchanek*, 764 F.3d at 754. Defendants eventually altered GSC's packaging to include the word "instant" sometime in 2011, but it is unclear how many Plaintiffs were exposed to the new packaging (Doc. 24). Nonetheless, Plaintiffs set forth evidence that the modified package was still insufficient to prevent a customer from being misled, and customers still continued to complain about GSC despite the new packaging (Doc. 101-8, p. 5; Doc. 100-12; Doc. 101-9).

These events culminated in the present action, in which Plaintiffs bring claims under consumer fraud statutes from Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee (Doc. 248). Plaintiffs allege that due to Defendants' false representation of GSC's quality and nature, they were misled into purchasing an over-priced product they believed was ground coffee (*Id.* at p. 7). This Court initially denied Plaintiffs' motion for class certification (Doc. 138) and granted summary judgment in Defendants' favor (Doc. 161). The Seventh Circuit vacated those decisions, reversed the grants of summary judgment, and remanded the case for further proceedings. *See Suchanek*, 764 F.3d 750. On remand, the Court certified a class as to liability only (Doc. 247).

The litigation has now reached a stage of development that demands a detailed and refined trial plan. Accordingly, the Court ordered the parties to submit a joint trial plan and a memorandum addressing several unresolved questions, including: the elements of each cause of action; the elements that remain to be proven if the factfinder determines Defendants committed a deceptive act or omission; whether those remaining elements can be established using common

proof; and how the elements should be bifurcated for trial (Doc. 328).

## ANALYSIS

### I. Redefinition of the Plaintiff Class
The Court previously defined the class as:

All persons or consumers that during the Class Period, from September of 2010, up through the date the case is certified and notice is disseminated, who purchased Defendants' Grove Square Coffee ("GSC") products in Alabama, California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee.

Excluded from the Class are: (a) Defendants' Board members or executive-level officers, including its attorneys; (b) persons or entities who purchased the GSC primarily for resale; (c) retailers or re-sellers of the GSC; (d) governmental entities, including this Court; (e) any consumer that already received a refund from Defendants; and (f) any consumer who purchased GSC online.

**\*3** (Doc. 247, pp. 50-51). Plaintiffs propose a shortened Class Period that would cover September 2010 through September 30, 2014, when sales of GSC were discontinued, (Doc. 328, pp. 2). Defendants raise no objection to this proposal.

Federal Rule of Civil Procedure 23(c)(1) permits the Court to alter or amend a class at any time before final judgment. Final judgment has not been entered in this case, and the proposed amendment does not alter the class certification analysis. Thus, the Class Period is amended to encompass September 2010 through September 30, 2014.

### II. Reoccurring Arguments
Defendants repeatedly raise certain arguments throughout the memorandum and tailor them to each state's law. For purposes of economy, the Court will expeditiously address them at once.

#### a. Preemption
The Court first turns to Defendants' preemption argument, which they waited seven years to raise. Defendants posit that the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, preempts Plaintiffs' arguments that

(1) Defendants had to label GSC either "not all ground" or "instant and microground" and (2) Defendants should have cited the percentages of soluble or instant coffee on GSC's package.

To start, the Court, in no vague terms, set forth exactly what the parties were to include in their joint brief. Those instructions did not permit a preemption argument that would be appropriately raised in a motion for summary judgment (Doc. 324, pp. 45-48).

Moreover, FDCA preemption is a complex issue that encompasses matters of legislative intent and complicated regulatory schemes. *See generally Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 338-39 (3d Cir. 2009). Defendants, however, devote two sentences to their argument and re-assert it eight times throughout the brief. Again, the Court denounces "kitchen-sink collection[s] of arguments that are not clearly delineated" and "poorly organized" (Doc. 324, p. 3).

Untimely, inappropriate, and poorly-articulated arguments will continue to thwart judicial economy and stall the resolution of this litigation. Accordingly, the Court will not entertain Defendants' preemption argument.

### b. Candace Preston's Damages Models

Defendants also continue to attack the admissibility, relevance, and sufficiency of Candace Preston's testimony, which Plaintiffs purport to use to establish damages. The Court already has held that Ms. Preston's testimony is admissible, and the alleged deficiencies in her damages models go to the credibility of her analyses (*See* Doc. 324). It is up to a jury, and not the Court, to determine what weight her opinions should carry. The Court will not address Defendants' arguments for a second time.

### c. Class Certification Cases

Defendants also repeatedly argue that case law addressing class certification is not persuasive in determining whether certain issues may be resolved through class-wide evidence. Defendants assert that those cases address certification, rather than the evidence that is suitable for trial. This distinction is illusory.

Before a district court can certify a class under Federal Rule of Civil Procedure 23(b), it must find that "questions of law or fact common to class members predominate over

any questions affecting only individual members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). The predominance inquiry focuses on "common question that *can be proved* through evidence common to the class." *In re Whirlpool Front-Loading Washer Products Liability Litig.*, 722 F.3d 838, 858 (6th Cir. 2013) (citing *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455 (2013) ); *See also Tyson Foods*, 136 S. Ct. 1036 at 1045 ("This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case ... [A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible of generalized, class-wide proof." (alterations in original) ). Thus, contrary to Defendants' argument, the cited case law is relevant to determining which elements are susceptible of class-wide proof.

### d. Law of the Case

**\*4** On multiple occasions, Defendants quote the Seventh Circuit's opinion that reversed the denial of class certification and grants of summary judgment in this case. Specifically, the Seventh Circuit noted that "[e]very consumer fraud case involves individual elements of reliance or causation." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014). Defendants use this quote to argue that Plaintiffs cannot use class-wide proof to establish reliance and causation under any circumstances due to the law of the case doctrine.

"Under the law of the case doctrine, a court generally should not reopen issues decided in earlier stages of the same litigation." *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008). The doctrine, though, has no relevancy here because it "creates a presumption against a court's reexamining *its own* rulings" and "has no application to the review of rulings by a higher court." *Marseilles Hydro Power LLC v. Marseilles Land & Water Co.*, 481 F.3d 1002, 1004 (7th Cir. 2007). Defendants' arguments actually rests on the doctrine of *stare decisis*, which provides that "decisions of a superior court in a unitary system bind the inferior courts." *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987). Nonetheless, there are, undeniably, statutes at issue in this case that either provide for a presumption of reliance and/or causation or permit class-wide proof in certain instances. The Seventh Circuit's quote more appropriately stands for the proposition that consumer fraud actions all require a showing of causation and/or reliance. These elements often demand individual inquires, but as discussed in more detail below, there are exceptions to this rule.

Defendants raise another law of the case argument in regards to this Court's statement that "individualized proof from each class member may be required on the issues of proximate causation and reliance ..." (Doc. 247, p. 39). This statement is plainly speculative, however, and the Court certainly did not hold that individualized proof is, in fact, required. Defendants' argument is simply not persuasive.

### III. Elements of the Causes of Action

The parties generally agree on the elements of the cause(s) of action under the laws of California, Illinois, New Jersey, New York, North Carolina, South Carolina, and Tennessee. Although there is no real dispute under these states' laws, their elements will be laid out below for clarity's sake and for purposes of defining subclasses. The parties disagree about whether causation and/or justifiable reliance is an element of Alabama's consumer fraud statute.

#### a. Alabama

The Alabama Deceptive Trade Practice Act ("ADTPA") delineates as unlawful specific deceptive acts or practices in trade or commerce. ALA. CODE § 8-19-5. Alabama Plaintiffs bring their claims under the statute's catch-all provision, which prohibits "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." *Id.* § 5(27).

The parties agree that to recover under the ADTPA, Plaintiffs must show (1) Defendants engaged in consumer-oriented conduct; (2) the conduct was materially deceptive; (3) Defendants intended for Plaintiffs to rely on the deception, if the deception was an omission; and (4) Plaintiffs suffered injuries in fact (Doc. 328, pp. 49-54).

Moreover, the ADTPA provides for actual damages, or the sum of $100, whichever is greater, and treble damages in consideration of the amount of actual damages, the frequency of the unlawful acts, the number of persons adversely affected, and whether the acts were intentional. ALA. CODE § 8-19-10.

\*5 The parties disagree as to whether causation and justifiable reliance are elements of a cause of action under the ADTPA and, if so, whether those elements are amenable to class-wide proof.

The ADTPA provides that "[a]ny person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damages to a consumer ... shall be liable to each consumer ..." *Id.*

"[T]he primary goal of statutory construction is to ascertain and effectuate the legislature's intent." *Matter of Barker*, 768 F.2d 191, 194 (7th Cir. 1985). When a statute's language is clear, the court should look only to the statute's language without resorting to extrinsic aids for construction. *Id.* When a statute is unclear, however, the court should look to sources such as "the statute's legislative history, the reason for the statute's enactment, the circumstances that led to its adoption, and the ends that the legislature wished to achieve. *Id.*

The plain language of the ADTPA establishes that Plaintiffs must prove causation under the act; a deceptive act or practice is not actionable unless the defendant's conduct "*causes* monetary damage to a consumer....*" Id.* (emphasis added); *see also Billings v. White and Stafford Furniture Co., Inc.*, 528 So.2d 878, 890 (Ala. Civ. App. 1988)* ("There has been no showing by [plaintiff] that he suffered any monetary damages *as a result of* [defendant's conduct]. That is the test for a private right of action under the statute." (emphasis added) ). There is otherwise an underwhelming amount of information about the remaining elements Plaintiffs must establish under the ADTPA.

The Alabama Legislature enacted the ADTPA because "[t]he public health, welfare and interest require a strong and effective consumer protection program to protect the interest of both the consuming public and the legitimate businessperson." ALA. CODE §§ 8-19-2. The ADTPA derives from the Federal Trade Commission Act ("FTCA"), [3] which also prohibits "deceptive acts or practices" in business. [4] Following the FTCA's enactment, several states adopted statutes modeled after the FTCA, which are commonly referred to as "Little FTC Acts." Bailey & Pertschuk, *supra*, at 862 n.63. "In 1981 Alabama became the 50th state to enact a 'Little FTC Act' " when it passed the ADTPA. *Id.* at n.64. The Alabama legislature expressly instructs courts to construe the ADTPA in harmony with the FTCA when determining what constitutes an "unlawful" act:

> It is the intent of the Legislature that in construing Section 8-19-5, due consideration and great weight shall be given where applicable to

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 248 of 260
PageID: 69912

Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Federal Trade Commission Act ...

ALA. CODE § 8-19-6. [5] Although the ADPTA does not instruct courts to interpret its elements in accordance with the FTCA, doing so is appropriate, here, due to the lack of any other guiding authority.

**\*6** The FTCA, itself, does not provide for a private cause of action, [6] but the FTC can enforce the FTCA's provisions where it shows "that a corporation made material representations likely to mislead a reasonable consumer." [7] The FTC must show the consumer reasonably and detrimentally relied on the defendant's deceptive act or omission. *See FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir. 1988) ("[T]he FTC must establish that the representations, omissions, or practices likely to mislead consumers, acting reasonably, to their detriment"). However, once the FTC establishes (1) that a reasonable consumer would rely on the deception, (2) that the defendant widely disseminated the deception, and (3) that the consumer purchased the product, "[t]he burden then shifts to the defendants to prove that the representations were not relied upon by the consumers." *Id.*

Defendants argue that the Court should not adopt a presumption of reliance under the ADTPA because the act is rooted in common law fraud, which requires individual showings of reliance. The ADTPA clearly has its beginnings in the FTCA, however, and it was intended to *replace* common law and statutory actions for fraud, [8] to provide a "strong and effective" scheme for protecting consumers and legitimate business. [9] Permitting a presumption of reliance would keep in spirit with the ADPTA's purpose of providing a broad remedy for consumers.

Defendants further argue that an individual showing of justifiable reliance is consistent with the Alabama Legislature's intent to limit class actions under the ADTPA. Section 8-19-10 of the ADTPA provides, "[a] consumer or other person bringing an action under this chapter may not bring an action on behalf of a class." ALA. CODE § 8-19-10. The Eleventh Circuit, however, has held that this provision is not applicable in federal courts, where Rule 23 controls. *Lisk v. Lumber One Wood Preserving, LLC,* 792 F.3d 1331,

1335-36 (11th Cir. 2015). Also, the Alabama Legislature did not intend to prohibit all class actions; the ADTPA "allows class actions so long as they are brought by the Attorney General or a district attorney." *Id.* at 1336. As such, the Court will not require an individual showing of reliance simply because Plaintiffs bring an action under the ADTPA as a class.

In sum, causation and reliance are elements of the ADTPA, but Plaintiffs are entitled to a rebuttable presumption of reliance if they show Defendants made a uniform and material misrepresentation to the class. Moreover, causation and reliance are "twin" concepts that are often intertwined in the context of fraud. *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 30 (N.Y. 2000); *see also* Seth William Goren, *A Pothole on the Road to Recovery: Reliance and Private Class Actions Under Pennsylvania's Unfair Trade Practices & Consumer Protection Law,* 107 DICK. L. REV. 1, 11 (Summer 2002). Thus, the inquiry into causation will most likely require similar evidence and findings as the inquiry into reliance, so it follows that Plaintiffs also are entitled to a presumption of causation if they establish the elements necessary for a presumption of reliance.

### b. California

Plaintiffs bring claims under California Civil Code § 1750 (California's Consumers Legal Remedies Act ("CLRA") ), California Business and Professional Code § 17200 (California's Unfair Competition Law ("UCL") ), and California Business and Professional Code § 17500 (California's False Advertising Law ("FAL") ).

### i. CLRA

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that result in the sale or lease of goods or service to any consumer." CAL. CIV. CODE § 1770(a).

**\*7** To recover under the CLRA, Plaintiffs must establish: (1) a deceptive act or omission by Defendants; [10] (2) materiality of the act or omission; [11] (3) Plaintiffs' reliance on the act or omission; [12] (4) Plaintiffs suffered economic injuries; [13] and (5) Defendants' deception caused Plaintiffs' injuries. [14]

Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

The CLRA permits actual damages (at least $1,000), an injunction, restitution, punitive damages, and "any other relief that the court deems proper," including attorney's fees. CAL. CIV. CODE § 1780. "[T]he Court has 'very broad' discretion to determine an appropriate remedy award as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired." *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 670 (C.D. Cal. Jan. 30, 2009).

### ii. UCL / FAL

Plaintiffs also bring claims under California's UCL and FAL, which are "equitable in nature ..." *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). The UCL prohibits "any unlawful, unfair or fraudulent business act or practice ..." CAL. CIV. CODE § 17200. Each one of these prongs operates independently, and they consist of different elements. *Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1199 (N.D. Cal. July 14, 2016). "The UCL incorporates the FAL's prohibition on unfair advertising as one form of unfair competition," *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (7th Cir. 2013), and the parties agree that their elements are therefore the same. "[T]o state a claim under either the UCL or the [FAL], based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *In re Sony PS3 Other OS Litig.*, 551 F. App'x 916, 921-22 (9th Cir. 2014).

The remedies available in a UCL/FAL action are limited to injunctive relief and restitution. *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 95 (Cal. Ct. App. 2009).

### c. Illinois

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices ... in the conduct of any trade or commerce ..." 815 ILCS 505/2.

To recover under the ICFA, Plaintiffs must show: (1) Defendants committed an unfair or deceptive act; [15] (2) the act was material; [16] (3) the act occurred in the course of trade or commerce; [17] (4) Defendants intended for Plaintiffs to rely on the act; [18] (5) Plaintiffs suffered actual pecuniary losses; [19] and (6) the act proximately caused Plaintiffs' losses. [20]

**\*8** Plaintiffs may recover "actual economic damages or any other relief which the court deems proper," including injunctive relief and attorney's fees. 815 ILCS 505/10a. Additionally, "[p]unitive damages, while disfavored, also are recoverable where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1337 (Ill. App. Ct. 1995).

### d. New Jersey

New Jersey's Consumer Fraud Act ("NJCFA") was enacted to prevent "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566, 568-69 (N.J. 1978). The NJCFA requires Plaintiffs to establish: "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). Unlawful conduct encompasses both affirmative acts and knowing omissions. N.J. STAT. ANN. § 56:8-2. Where a plaintiff's claims are based on a knowing omission, he or she must also establish intent. *Bosland*, 964 A.2d 741 at 749.

Plaintiffs may recover "appropriate legal or equitable relief," along with "threefold the damages sustained by any person in interest" and "attorney's fee, filing fees and reasonable costs of suit." N.J. STAT. ANN. § 56:8-19.

### e. New York

Plaintiffs also bring claims under New York General Business Law §§ 349 and 350. Section 349 prohibits "deceptive acts or practices" in business and § 350 prohibits false advertising. *Braynina v. TJX Companies, Inc.*, 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016). "[C]ourts have found that the scope of § 350 is as broad as that of § 349 and that its essential elements are the same." *Id.*

Thus, to recover under either section, Plaintiffs must establish: (1) Defendants engaged in consumer-oriented conduct; [21] (2) the conduct was materially misleading; [22] (3) Plaintiffs suffered injuries; [23] and (4) Defendants' materially misleading conduct caused Plaintiffs' injuries. [24]

Plaintiffs who establish the above may seek an injunction and/or "actual damages or fifty dollars, whichever is greater" under § 349. N.Y. GEN. BUS. LAW § 349(h). "The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated the section. The court may award reasonable attorney's fees to a prevailing plaintiff." N.Y. GEN. BUS. LAW § 349(h).

Under § 350, Plaintiffs may be entitled to injunctive relief, and actual damages or five hundred dollars, whichever is greater. N.Y. GEN. BUS. LAW § 350-e. Courts may treble the actual damages up to ten thousand dollars if the defendant's conduct was willful or knowing. *Id.*

### f. North Carolina

North Carolina's Unfair Trade Practices Act ("NCUTPA") provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. GEN. STAT. § 75-1.1(a). Plaintiffs must prove the following to recover under the NCUTPA: (1) Defendants committed an unfair or deceptive act; [25] (2) the act was in or affected commerce; [26] (3) Plaintiffs suffered actual injuries; [27] and (4) Defendants' deceptive act proximately caused Plaintiffs' injuries. [28] "[I]t is a question for the jury as to whether [a party] committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice." *Richardson v. Bank of America, N.A.*, 643 S.E.2d 410, 416 (N.C. Ct. App. 2007).

**\*9** "Treble damages are assessed automatically upon a violation of [North Carolina's UDTPA] ... Section 75-16 only refers to 'any person' being 'injured' and does not provide the appropriate method of measuring damages. The North Carolina courts have explained that 'the measure of damages used should further the purpose of awarding damages, which is to restore the victim to his original condition, to give back to him that which was lost as far as it may be done by compensation in money.' " *Belk, Inc. v. Meyer Corp. U.S.*, 679 F.3d 146, 165 (4th Cir. 2012).

### g. South Carolina

South Carolina's Uniform Trade Practices Act (SCUTPA) provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C. CODE ANN. § 39-5-20.

To recover under the SCUTPA, Plaintiffs must show: (1) Defendants committed an unfair or deceptive act; [29] (2) the act was in the course of trade or commerce; [30] (3) the act affected public interest; [31] (4) Plaintiffs suffered ascertainable losses of money or property; [32] and (5) Defendants' deceptive act proximately caused the ascertainable losses. [33]

Plaintiffs may recover actual damages, which include special or consequential damages that are a natural and proximate cause of the deceptive conduct, [34] and attorneys' fees and costs. [35] Plaintiffs are also entitled to treble damages if the court finds that Defendants knowingly or willfully violated the SCUTPA. S.C. CODE ANN. § 39-5-140.

### h. Tennessee

Tennessee Code § 47-18-104 (the Tennessee Consumer Protection Act ("TCPA") ), provides that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices and are Class B misdemeanors." Plaintiffs must establish the following to recover under the TCPA: (1) Defendants engaged in an unfair or deceptive act; [36] (2) Plaintiffs suffered ascertainable losses; [37] and (3) Defendants' unfair or deceptive act proximately caused Plaintiffs' losses. [38]

"Once an ascertainable loss has been established, the TCPA allows consumers to recover actual damages but does not define that term." *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012). The TCPA also provides for attorney's fees and costs and treble damages when the violation was knowing or willful. *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998).

### IV. Causation/Reliance

The parties' primary dispute is whether Plaintiffs may use common proof to establish causation and/or reliance under each statute. The parties concur that individual proof is needed to show causation under the statutes of Tennessee and South Carolina. They disagree, however, on

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 251 of 260
PageID: 69915
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

whether causation is amenable to class-wide proof under the remaining states' laws.

### a. Alabama

As held above, the ADTPA permits a rebuttable presumption of causation and reliance once Plaintiffs show (1) Defendants engaged in deceptive conduct; (2) a reasonable consumer would rely on the deception; (3) Plaintiffs purchased Defendants' product; and (4) Defendants widely disseminated the deception. Here, the class includes only consumers who purchased GSC (Doc. 247, pp. 50-52). Thus, all of the remaining prerequisites for the presumption can be resolved on a class-wide basis and do not demand individual proof.

### b. California

**\*10** Under the CLRA, Plaintiffs must prove they relied on Defendants' deceptive or unfair conduct. *Noel v. Thrifty Payless, Inc.*, 226 Cal. Rptr. 3d 465, 479 (Cal. Ct. App. 2017). "When the consumer shows the complained-of misrepresentation would have been material to any reasonable person, he or she has carried the burden of showing actual reliance and causation of injury for each member of the class. As some courts have put it, the plaintiff may establish causation as to each by showing materiality as to all." *Id.*

However, "such an inference will not arise where the record will not permit it." *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1294 (Cal. Ct. App. 2002). For instance, in *Caro v. Procter & Gamble Co.*, consumers alleged that the defendant deceptively mislabeled orange juice as "fresh" with "no additives." 22 Cal. Rptr. 2d 419, 433 (Cal. Ct. App. 1993). A named plaintiff, however, testified that he did not actually expect the orange juice to be fresh when he made his purchase. *Id.* at 430. In addition, he stated at his deposition that "if he had read the bottom part of the three sides of the carton saying, 'from concentrate,' he would have concluded it did not contain 'premium juice.'" *Id.* at 432. Consequently, the California District Court held that the plaintiffs would need to introduce individual evidence of reliance, since the record suggested some plaintiffs may not have relied on the misrepresentations. *Id.* at 433. Similarly, courts also have refused to infer reliance where it was "likely that many class members were never exposed to the allegedly misleading advertisement," [39] and where "there [was] no evidence that the allegedly false representations were uniformly made to all members of the proposed class." [40]

In sum, an inference of causation, reliance, and injury arises under the CLRA where plaintiffs can establish that the defendants made a uniform and material misrepresentation or omission to the entire class, and the record does not suggest that members were never exposed to or did not rely on the deception. Defendants, though, are entitled to rebut any inference with individualized proof of the contrary. *Vasquez v. Superior Court*, 484 P.2d 964, 973 (Cal. 1971).

The UCL is much more straightforward: Courts have "repeatedly and consistently" held that "relief under the UCL is available without individualized proof of deception, reliance and injury." *In re Tobacco II Cases*, 207 P.3d 20, 35 (Cal. 2009).

### c. Illinois

"[A] damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the deception." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-14 (7th Cir. 2006). Accordingly, courts commonly find that ICFA claims require individual inquiries into proximate causation. *Clark v. Experian Information Solutions, Inc.*, 256 F. App'x 818, 822 (7th Cir. 2007) ("Illinois law requires a finding of proximate causation under ICFA, and does not provide for such causation to be inferred"); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935-36 (7th Cir. 2010) ("[A]bsent proof as to why a particular plaintiff purchased a particular gasoline, [plaintiff] cannot establish that the defendants' conduct caused him or her to make that purchase"). However, "where the representation being challenged was made to all putative class members, Illinois courts have concluded that causation is susceptible of classwide proof ..." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 997 (N.D. Cal. Feb. 23, 2015). The Western District of Wisconsin has explained:

**\*11** [C]ourts sometimes will presume causation where the defendant makes a uniform misrepresentation to all class members, but this is in situations where there is no other logical explanation for the class members' behavior in response to the representation. For example, in *Peterson v. H&R B[l]ock Tax Services, Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997) ... the court found that reliance by all class members on H&R Block's allegedly deceptive Fact Sheet describing its Rapid Refund service was 'apparent' where they paid a fee for the service, not realizing that they were ineligible for it because they were claiming an Earned Income Tax Credit (EITC). The court explained that because it was 'inconceivable that the class members

would rationally choose to pay a fee for a service they knew was unavailable ... [t]he only logical explanation for such behavior is that the class members relied on the RAL Fact Sheet's representation that they could take advantage of RAL by paying the requisite fee. Similarly, in *Garner v. Healy*, 184 F.R.D. 598 (N.D. Ill. 1999), the district court certified a class of consumers who purchased a substance represented as 'car wax' that allegedly contained no wax, finding that 'if Plaintiffs paid money for a 'wax,' but instead received a worthless 'non-wax' product, then issues of proximate cause would be relatively simple to resolve on a classwide basis.' These cases ... simply reflect the commonsensical notion that people generally won't pay something for nothing.

*Boulet v. National Presto Industries, Inc.*, 2012 WL 12996298, at *10 (W.D. Wis. Dec. 21, 2012).

Thus, Plaintiffs can use class-wide evidence to establish proximate causation under the ICFA if they establish Defendants made a uniform misrepresentation or omission to the class, and the only logical reason for Plaintiffs' behavior is that they purchased GSC as a result of the deception.

### d. New Jersey

Courts have applied a presumption of causation under New Jersey's consumer fraud statute where a misrepresentation was material, in writing, and uniformly made to each plaintiff,[41] and where "all the representations about the product [were] baseless."[42]

When determining whether a presumption of causation is appropriate under the NJCFA, "a court must consider not only the defendants' course of conduct, but also that of the plaintiffs." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 610 (3d Cir. 2012). Specifically, the court must determine whether plaintiffs could have known the truth behind the alleged fraud and whether plaintiffs reacted to information about the product in a similar manner. *Id.*

In sum, New Jersey Plaintiffs may establish causation on a class-wide basis if they show Defendants made a uniform and material misrepresentation or omission to the entire class. The Court also must consider Plaintiffs' response to learning the truth about GSC and whether Plaintiffs could have known the truth about the product.

### e. New York

A plaintiff bringing a claim under §§ 349 or 350 does not need to "show reliance on the misleading act or practice. In demonstrating that she sustained injury as a result of defendant's action, the plaintiff must merely show that she suffered a loss because of the defendant's deceptive act." *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 63 (S.D.N.Y. Aug. 6, 2015).

Courts have found that class-wide proof is appropriate to establish causation under §§ 349 and 350 where the misrepresentation or omission was uniformly made to the entire class, crucial to the purchasing decision, and misrepresented the product's very essence. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409-10 (S.D.N.Y. Jan. 26, 2015); *Ebin v. Food Inc.*, 297 F.R.D. 561, 564 (S.D.N.Y. 2014). For instance, district courts in New York have held causation could be evidenced by common proof where a grass seed package asserted it grew grass "50% thicker with half the water" compared to "ordinary seed," but allegedly did not grow grass at all,[43] and where olive-pomace oil was incorrectly labeled "100% Pure Olive Oil."[44] Alternatively, courts have concluded individual proof is necessary where the product had "a number of characteristics that customers might value." *Ackerman v. Coca-Cola*, 2013 WL 7044866, at *20 n.30 (E.D.N.Y. July 18, 2013); *see also Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *2 (S.D.N.Y. Aug. 5, 2010) (where the plaintiffs disclosed a myriad of reasons for purchasing Snapple instead of its competitors' beverage, including "Snapple's humorous promotions, flavor offerings, and because Snapple beverages were refreshing and thirst-quenching").

**\*12** Thus, the Court will permit Plaintiffs to use class-wide evidence to show causation under New York's statutes if the deception was made in a uniform manner, after consideration of whether Plaintiffs may have purchased GSC for a variety of reasons and whether the deception was crucial to the purchasing decision.

### f. North Carolina

The NCUTPA requires a showing of proximate causation, which demands Plaintiffs to demonstrate reliance on Defendants' misrepresentation. *Bumpers v. Community Bank of Northern Virginia*, 747 S.E.2d 220, 226 (N.C. 2013). This inquiry involves examining the mental state of the plaintiff for actual and reasonable reliance. *Id.* at 227. While this inquiry may be difficult to conduct on a class-wide basis, the Supreme Court of North Carolina has held that circumstantial evidence

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 253 of 260
PageID: 69917
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

may be sufficient for a factfinder to infer reliance. *Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 661 (N.C. 1992).

The Sixth Circuit permitted class-wide evidence of causation under the NCUTPA where "the alleged misrepresentation [was] material and was made in a generally uniform manner to all class members." *Rikos v. Proctor & Gamble*, 799 F.3d 497, 518 (6th Cir. 2015). In *Rikos*, the defendant allegedly manufactured an ineffective probiotic supplement, Align. *Id.* at 503. The court recognized that "Plaintiffs all purchased Align because it allegedly promoted digestive health. That is the only reason to buy Align." *Id.* at 511. Essentially, the product was "entirely ineffective." *Id.*

Similarly, in *In re TD Bank*, the District Court of South Carolina found that causation could be established on a class-wide basis under the NCUTPA. 2018 WL 1003548, at *20 (D.S.C. Feb. 22, 2018). There, bank customers challenged their bank's overdraft policies, which "were implemented uniformly across all branches and in each state where [the bank] had a presence." *Id.* at *3. The court found "sufficient evidence of the uniformity and materiality of the putative misrepresentations and omissions" to presume class-wide reliance under the NCUTPA. *Id.* at *20.

Thus, North Carolina Plaintiffs may use class-wide evidence to show causation if the deception was uniformly made to the class. The Court also must consider whether Plaintiffs could have purchased GSC for a number of reasons and whether the deception was sufficiently material to the purchasing decision.

### g. Analysis

With the exception of Tennessee and South Carolina, Plaintiffs can prove causation and/or reliance on a class-wide basis, provided they first show Defendants made a uniform and material misrepresentation or omission to the entire class.

Defendants targeted a very specific group of consumers– Keurig owners–who faced a "more-or-less one-dimensional decision making process" when they purchased Defendants' product. *Sergeants Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015). That is, they hoped to buy single-servings of premium, ground coffee they could brew in their Keurig machines. There is no other logical explanation as to why consumers would purchase instant coffee, at a premium price, in a K-Cup, that they had to brew. As one of Plaintiffs' experts opined, GSC

was "three to four times more expensive than the typical instant coffee," and "only a very price 'insensitive' consumer, or one who was misled, would use a $100 brewer [the Keurig machine] to heat water to make instant coffee." *Suchanek*, 764 F.3d at 754. This is simply not a case where the plaintiffs had a number of reasons for purchasing GSC. For instance, GSC is unlike overpriced gasoline that Plaintiffs might have purchased because of "price, location, quality of gasoline, convenience, and environmental concerns." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010); *see also Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452 (S.D. N.Y. Aug. 5, 2010) (where the plaintiffs identified several motives for purchasing Snapple, including the taste, glass bottle, and brand).

*\*13* Moreover, Plaintiffs allege Defendants entirely misrepresented what GSC was; Defendants disguised instant coffee as premium, ground coffee. This deception was obviously crucial to Plaintiffs' purchasing decisions as Keurig owners. There also is no evidence that Plaintiffs would have purchased GSC even if they "knew the truth" about the product. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (Ill. 2002). Similarly, "there is no evidence any significant part of the class had access to all the information [they] believed they needed before purchasing [GSC]." *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1295 (Cal. Ct. App. 2002). In contrast, the Seventh Circuit upheld a denial of class certification in *Clark v. Experian Information Solutions, Inc.* because "[a]lthough not prominently displayed, the [allegedly deceptive] website did contain notice of the need to cancel, which individuals could have seen." 256 F. App'x 818, 822 (7th Cir. 2007). Here, numerous experts conducted surveys and concluded that few consumers understood that GSC contained instant coffee at all based upon either the initial or modified packaging. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 753-54 (7th Cir. 2014). Even if some consumers did understand GSC consisted of instant coffee, they had no way of knowing GSC was actually more than 95% instant coffee. *Id.* at 754.

The record also demonstrates that Plaintiffs reacted in a virtually identical manner after learning the truth behind GSC; there was a uniform outpouring of dissatisfaction with the product. One retailer told Sturm that GSC was the poorest performing introductory product in its twelve-year history, *Suchanek*, 764 F.3d at 754; many consumers complained to the Better Business Bureau (Doc. 248, pp. 7-8, 10); and even more purchasers complained directly to Sturm (*See* Docs.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 254 of 260
PageID: 69918
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

220-21 & 248, pp. 3-20). Essentially, Plaintiffs received a useless product.

In sum, the record strongly suggests that Plaintiffs purchased GSC for one reason—they wanted premium, ground coffee in pods that were compatible with their Keurig machines. Additionally, nothing on the packages could have adequately informed Plaintiffs that GSC was over 95% instant coffee; thus, there is no risk that some Plaintiffs bought GSC despite knowing the true nature of the product. Finally, Plaintiffs' uniform rejection of GSC indicates the product was essentially worthless to consumers.

Although a jury must ultimately determine whether GSC's packaging was deceptive and whether it proximately caused Plaintiffs' injuries, the jury may do so on a class-wide basis, without delving into individual inquiries.

### V. Injury / Ascertainable Loss

The parties agree that Plaintiffs from Tennessee and South Carolina must use individual proof to show ascertainable loss under those states' laws. The parties disagree, though, on whether Plaintiffs can use class-wide proof to show ascertainable loss under New Jersey and injury under Alabama, California, Illinois, New York, and North Carolina.

#### a. Alabama

Plaintiffs are entitled to relief under the ADTPA if they suffered any monetary damages. *Billions v. White and Stafford Furniture Co., Inc.*, 528 So. 2d 878, 890 (Ala. Civ. App. 1988). There is no applicable case law addressing whether plaintiffs may establish injury on a class-wide basis under the ADTPA.

#### b. California

As set forth above, under California's CLRA, Plaintiffs are entitled to a presumption of injury if they show Defendants made a uniform and material misrepresentation to Plaintiff. *In re Steroid Hormone Product Cases*, 104 Cal. Rptr. 3d 329, 338 (Cal. Ct. App. 2010) (where "material misrepresentations were made to the class members, at least an inference of reliance [i.e., causation/injury] would arise as to the entire class") (alterations in original). Also, the UCL/FAL does not demand individual inquiries into injury. *In re Tobacco II Cases*, 207 P.3d 20, 35 (Cal. 2009).

#### c. Illinois

Plaintiffs can recover for "purely economic injury" under the ICFA,[45] where they show they purchased a product that did not live up to their expectations.[46]

**\*14** Calculating a pecuniary loss under the ICFA is as straight forward as "identifying a comparable product (or products) and calculating the pertinent price difference between this comparable product and the class products. Such a measure implements the theory that a class member's damages are 'the difference between the actual value of the package she purchased' and 'the inflated price she paid' thinking the product was as advertised." *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 156 (N.D. Ill. Mar. 16, 2017).

#### d. New Jersey

The NJCFA requires Plaintiffs to show they suffered an ascertainable loss, but does not define the term. The Third Circuit has stated that "an ascertainable loss is either an out-of-pocket loss or a demonstration of loss in value that is quantifiable or measurable." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 606 (3d Cir. 2012). This encompasses circumstances where the product was "ultimately worth less to the consumer than the product he was promised." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99 (D. N.J. Mar. 23, 2011). New Jersey Courts require that the loss is quantifiable; it must be "supported by sufficient evidence to get to the factfinder," and that evidence cannot be "hypothetical or illusory." *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 792-93 (N.J. 2005).

In *Harnish v. Widener University School of Law*, the Third Circuit opined that the plaintiffs could establish a loss under the NJCFA with class-wide proof, based on an out-of-pocket theory. 833 F.3d 298, 306-07 (3d Cir. 2016). The plaintiffs sought to recover the difference between the law school tuition they actually paid and what they would have paid in the absence of the school's misleading marketing related to employment statistics. *Id.* at 307. The court stated,

> Neither the 'price paid' nor the 'actual value' depends on class members' own individual employment outcomes. For the price paid, that is self-evident. For the actual value, it is less obvious. Actual value in a fraud case

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 255 of 260
PageID: 69919
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

is generally determined as of the time of the transaction ... It is the time-of-enrollment probability of full-time legal employment (which the then-available aggregate employment statistics help to predict), rather than an individual student's own future employment outcome, that affects the true/actual market value of [the] education.

*Id.* (internal quotations and citations omitted).

### e. New York

The parties disagree on what constitutes an injury under the New York laws and whether the injury is amenable to common proof. Defendants contend that Plaintiffs can recover only if they demonstrate they paid a premium for GSC because of Defendants' allegedly deceptive act. This is otherwise referred to as a "price-premium" model. *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015). Plaintiffs, on the other hand, assert they only need to allege they suffered a loss because of the deceptive act.

Both parties are correct in some sense. "[T]here is no such rigid 'price premium' doctrine under New York law." *Orlander*, 802 F.3d at 302. Plaintiffs can proceed under a theory that "on account of a materially misleading practice, [they] purchased a product and did not receive the full value of [their] purchase." *Id.* New York courts have repeatedly rejected claims under §§ 349 and 350 where plaintiffs fail to allege an economic injury and merely allege they would not have purchased the product in absence of the deceptive act. *Goldemberg v. Johnson & Johnson*, 8 F. Supp. 3d 467, 481 (S.D.N.Y. Mar. 27, 2014); *Braynina v. TJX Companies, Inc.*, 2016 WL 5374134, at *10 (S.D.N.Y. Sept. 26, 2016) (and cases cited therein). In these cases, the plaintiffs were essentially alleging deception as the injury. This is not the same as alleging an economic injury by virtue of buying a product that was worthless. Thus, to establish an injury under §§ 349 and 350, Plaintiffs must show they paid a premium for the product or did not receive the full value of their purchase. *Orlander*, 802 F.3d at 302.

**\*15** The parties also disagree on whether injury is susceptible of class-wide proof. Courts interpreting New York's consumer fraud statutes have held that common

evidence can establish injury where plaintiffs assert they paid a premium for the defective product. *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 62 (E.D.N.Y. Oct. 5, 2015). Liability under the statute does not "depend on whether the product met [the plaintiffs'] personal, subjective expectations. Rather, the injury is the purchase price ... It is not necessary for all of the plaintiffs to have had a uniform experience with respect to the product. The purpose of [the statute] is to punish companies that sell products using advertising that misleads the reasonable consumer." *Id.* (internal quotations and citations omitted).

To illustrate, in *Ebin v. Kangadis Food Inc.*, the Southern District of New York held that the plaintiffs' injuries did not vary significantly from plaintiff to plaintiff because they all bought an overpriced product alleging to be olive oil that was actually pomace oil. 297 F.R.D. 561, 568-69 (S.D.N.Y. 2014). The Court explained, "even if a class member actively wanted to buy pomace instead of 100% pure olive oil, they nevertheless paid too much for it." *Id.* "[T]he common actual injury consisted of the payment of the price of olive oil for a product that was pomace oil and the associated receipt of an inferior product different from that which the consumers purchased." *Id.*

### f. North Carolina

Under the NCGSA, plaintiffs must prove they suffered an "actual injury as a proximate result of defendants' misrepresentations." *Bailey v. LeBeau*, 339 S.E.2d 460, 464 (N.C. Ct. App. 1986). "Actual injury may include the loss of the use of specific and unique property, the loss of any appreciated value of the property, and such other elements of damages as may be shown by the evidence." *Coley v. Champion Home Builders Co.*, 590 S.E.2d 20, 22 (N.C. Ct. App. 2004). The parties do not point to, and the Court has not found, any case specifically addressing whether class-wide evidence is appropriate to show injury under the NCGSA.

### g. Analysis

Plaintiffs may use class-wide evidence to establish injury under the laws of Alabama, California, Illinois, New Jersey, New York, and North Carolina.

The Court already has held that Plaintiffs are entitled to a presumption of injury under the CLRA, provided they show Defendants committed a materially deceptive act, and that UCL/FAL claims do not require individual proof of injury. There is no valid dispute to the contrary.

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 256 of 260
PageID: 69920
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

For the remaining states that do not provide for statutory damages (Illinois, New Jersey, and North Carolina), Plaintiffs will establish injury at the time they establish damages, if at all. These states require Plaintiffs to show an "economic injury," [47] an "out-of-pocket loss," [48] and an "actual injury," [49] respectively. Ms. Preston has set forth two damages models that will suffice under any of these statutes: the Retail Damages model, which provides class members with a full refund of the purchase price, reflecting Plaintiffs' theory that GSC had no value to consumers (Doc. 101-12); and a Price Premium Model that provides class members with a partial refund, reflecting Plaintiffs' theory that the consumers paid an inflated price for GSC (Doc. 268-1). The Court has determined that Plaintiffs can establish damages on a class-wide basis with these models (Doc. 324, p. 30). Accordingly, this same class-wide evidence can show injury under the laws of Illinois, New Jersey, and North Carolina.

**\*16** Plaintiffs also may use Ms. Preston's damages model to establish injury on a class-wide basis for the states that do provide for statutory damages (Alabama and New York). Alabama Plaintiffs must show they suffered "any monetary damages," [50] while New York Plaintiffs must show they received a product that was worth less to them than what was promised. [51] As stated in *Ebin*, this does not require individual assessments of the product's worth because Plaintiffs all purchased an overpriced product alleging to be premium, ground coffee that was actually instant coffee. 297 F.R.D. 561, 568-69 (S.D.N.Y. 2014). Ms. Prestons' damages models are adequate to show that GSC was worth objectively less than what Plaintiffs paid.

In sum, Plaintiffs' injuries do not differ from person to person, and they intend to show they all bought an overpriced product that claimed to be something it was not. Thus, the factfinder does not need to evaluate each class member's experience with the product because "the focus is on what the defendants said on their packages and whether the product is different from what was promised." *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 249 (D.N.J. June 30, 2008). Class-wide evidence is appropriate in this scenario to show injury.

## VI. Summary
The following chart summarizes the above findings:

| Statute | Elements to be Decided by the Court | Elements Susceptible of Class—Wide Proof | Elements Requiring Individual Proof |
|---|---|---|---|
| ALA. CODE § 8-19-5 | N/A | • Consumer-oriented Conduct<br>• The Conduct was Materially Deceptive<br>• Defendants Intended for Plaintiffs to Rely on the Deception, if it was an Omission<br>• Plaintiffs suffered an Injury in Fact<br>• Defendants' Conduct Caused Plaintiffs' Injuries<br>• Plaintiffs Relied on Defendants' Conduct<br>• Statutory Damages | N/A |

| Statute | Elements to be Decided by the Court | Elements Susceptible of Class—Wide Proof | Elements Requiring Individual Proof |
|---|---|---|---|
| CAL. CIV. CODE § 1770 | N/A | • Defendants Committed a Materially Deceptive Act or Omission<br>• Plaintiffs Relied on the Act or Omission<br>• Plaintiffs Suffered an Economic Injury<br>• Defendants' Deception Caused Plaintiffs' Injuries<br>• Damages | N/A |
| CAL. CIV. CODE § 17200 | | • Defendants' Conduct was Likely to Deceive Members of the Public<br>• Injunctive Relief or Restitution | |
| 815 ILCS 505/2 | N/A | • Defendants Committed a Materially Unfair or Deceptive Act<br>• The Act Occurred in the Course of Trade or Commerce<br>• Defendants Intended for Plaintiffs to Rely on the Act<br>• Plaintiffs Suffered an Actual Pecuniary Loss<br>• Defendants' Act Proximately Caused Plaintiffs' losses<br>• Damages | N/A |

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 257 of 260
PageID: 69921
Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

| Statute | Elements to be Decided by the Court | Elements Susceptible of Class—Wide Proof | Elements Requiring Individual Proof |
|---|---|---|---|
| N.J. STAT. ANN. § 56:8-19 | N/A | • Defendants Engaged in Unlawful Conduct<br>• Plaintiffs Suffered an Ascertainable Loss<br>• There is a Causal Relationship Between the Unlawful Conduct and the Ascertainable Loss<br>• Damages | |
| N.Y. GEN. BUS. LAW §§ 349 & 350 | N/A | • Defendants Engaged in Consumer-Oriented Conduct<br>• Defendants' Conduct was Materially Misleading<br>• Plaintiffs Suffered Injuries<br>• Defendants' Conduct Caused Plaintiffs' Injuries<br>• Statutory Damages | N/A |
| N.C. GEN. STAT. § 75-1.1 | • Defendants Committed an Unfair or Deceptive Act | • Defendants' Act was in or Affected Commerce<br>• Plaintiffs Suffered Actual Injuries<br>• Defendants' Act Proximately Caused Plaintiffs' Injuries<br>• Damages | N/A |

| Statute | Elements to be Decided by the Court | Elements Susceptible of Class—Wide Proof | Elements Requiring Individual Proof |
|---|---|---|---|
| S.C. CODE ANN. § 39-5-20 | N/A | • Defendants Committed an Unfair or Deceptive Act<br>• The Act Occurred in the Course of Trade or Commerce<br>• The Act Affected Public Interest | • Plaintiffs Suffered Ascertainable Losses<br>• Defendants' Act Proximately Caused the Ascertainable Losses |
| TENN. CODE ANN. § 47-18-104 | N/A | • Defendants engaged in an Unfair or Deceptive Act<br>• Damages | • Plaintiffs Suffered Ascertainable Losses<br>• Defendants' Act Proximately Caused Plaintiffs' Losses |

## VII. Trial Plan

The Court envisions certifying several subclasses after first dividing Plaintiffs into two groups. Group 1 will consist of consumers who purchased the initial package of GSC, and Group 2 will consist of consumers who purchased the modified package of GSC. Each Group will then be divided into the following subclasses:

• Plaintiffs bringing claims under the ADTPA (Alabama), CLRA (California), ICFA (Illinois), NJCFA (New Jersey), and GBL §§ 349 and 350 (New York) ("Subclass A");

• Plaintiffs bringing claims under the TCPA (Tennessee) ("Subclass B");

• Plaintiffs bringing claims under the SCUTPA (South Carolina) ("Subclass C");

• Plaintiffs bringing claims under the NCUTPA (North Carolina) ("Subclass D"); and

• Plaintiffs bringing claims under the UCL/FAL (California) ("Subclass E").

The Court will conduct two jury trials, and the first trial will be bifurcated in two phases. Each trial will address the claims from the Subclasses in both Group 1 and 2. During the first trial, the parties will put on evidence of whether Defendants committed a deceptive act or omission that would be materially misleading to a reasonable consumer. The parties will then rest for the jury to determine whether Defendants committed the alleged acts for purposes of Subclass D. *Richardson v. Bank of America, N.A.*, 643 S.E.2d 410, 416 (N.C. Ct. App. 2007) (Under the NCUTPA, "it is a question for the jury as to whether [a party] committed the alleged acts ..."). Based on this finding, the Court will decide whether those acts were materially deceptive for Subclasses D and E. *Id.* (Under the NCUTPA, "it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice"); *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009) (UCL and FAL claims are equitable in nature). The jury will then answer the same question for the remaining Subclasses. If the jury answers the question in the affirmative, the parties will put on evidence of the following:

• Whether Defendants' conduct occurred in the course of trade or commerce.

• Whether Defendants' conduct was consumer-oriented.

• Whether Defendants' conduct affected the public's interest.

  *17 • Whether Plaintiffs in Subclasses A and D suffered injuries/damages/ascertainable losses in reliance on, or as a proximate cause of, Defendants' deception.

• Whether Defendants intended for Plaintiffs in Subclasses A and D to rely on the deceptive act or omission.

A second jury trial will then determine the remaining elements of ascertainable loss, proximate cause, and damages for Subclasses B and C.

Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 2057-2    Filed 05/10/22    Page 258 of 260
PageID: 69922

The Court invites the parties to respond, on or before **July 24, 2018**, to the trial plan in Section VII (**not to its rulings regarding the issues amenable to common proof**) with any objections as to why this plan cannot be executed as described. The parties shall also advise the Court of **mutually acceptable dates** to begin trial, along with their best estimate on how many trial days are needed for each phase, anticipating approximately 7 hours of trial per day, excluding breaks.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6617106

## Footnotes

1    The coffee at issue was over 95% instant coffee with only a small amount of microground coffee mixed in. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 753 (7th Cir. 2014). For brevity's sake, this Order will simply refer to the coffee as "instant."

2    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to the Class Action Fairness Act, 28 U.S.C.A. § 1332(d), because the class consists of at least 100 members, the amount in controversy exceeds $5,000,000, and minimal diversity exists. *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013).

3    Patricia P. Bailey & Michael Pertschuk, *The Law of Deception: The Past as Prologue*, 33 AM. U. L. REV. 849, 862 n.64 (1984).

4    15 U.S.C. § 45(a)(1).

5    Over twenty states have adopted Little FTC Acts that contain similar provisions directing courts to defer to the FTCA when determining whether acts are deceptive. Jack E. Karns, *State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?*, 94 DICK. L. REV. 373, 378-79 n.24 (Winter 1990). These statutes, however, have various standards of causation and/or reliance and thus do not aid in determining the ADTPA's elements. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). (requiring proximate causation under Illinois' statute); *Koch v. Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1380 (S.D. Fla. Mar. 21, 2012) (a party asserting a deceptive trade practice claim under Florida's statute need not show actual reliance); *Jenkins v. BAC Home Loan Servicing, LP*, 822 F. Supp. 2d 1369, 1375 (M.D. Ga. Sept. 29, 2011) ("courts have implied a reliance component into the causation element of the prima facie case under [Georgia's statute]").

6    *Copeland v. Newfield National Bank*, 2017 WL 6638202, at *3 (D.N.J. Dec. 29, 2017).

7    *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005).

8    *Sam v. Beaird*, 685 So. 2d 742, 744 (Ala. Civ. App. 1996).

9    ALA. CODE § 8-19-2.

10    *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 94 (Cal. Ct. App. 2009) (plaintiffs must show "that a defendant's conduct was deceptive"); *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 3d 588, 593 (Cal. Ct. App. 2011) (the deceptive acts proscribed by the CLRA "include the concealment or suppression of material facts").

11    *See Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1111-12 (N.D. Cal. Feb. 3, 2016).

12    *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 591 (9th Cir. 2012).

13    "A plaintiff may bring a claim under the CLRA so long as she suffer[ed] any damage as a result of a proscribed practice under the CLRA. This means that to adequately plead a CLRA claim, a plaintiff must allege that she relied on the defendant's alleged misrepresentation and that she suffered economic injury as a result." *Doe v. Successfulmatch.com*, 2014 WL 1494347, at *4 (N.D. Cal. Apr. 16, 2014).

14    *Id.*

15    *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014).

16    815 ILCS 505/2.

17    *Camasta*, 761 F.3d at 739.

18    *Id.*

19    *Id.*

20    *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010).

21    *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (N.Y. Ct. App. 1995).

22    *Id.*

23    *Id.*

24    *Id.*

25    *Gray v. North Carolina Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000).

26    *Id.*

27    *Id.*

28    *Id.*

29    *Health Promotion Specialists, LLC v. South Carolina Bd. of Dentistry*, 743 S.E.2d 808, 816 (S.C. 2013).

30    *Id.*

31    *Id.*

32    *Id.*

33    *Id.*

34    *Collins Holding Corp v. Defibaugh*, 646 S.E.2d 147, 149 (S.C. Ct. App. 2007).

35    S.C. CODE ANN. § 39-5-140.

36    *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. 2005).

37    *Id.*

Suchanek v. Sturm Foods, Inc., Not Reported in Fed. Supp. (2018)

38    *Id.*

39    *Sandoval v. Pharmacare U.S., Inc.*, 2016 WL 3554919, at * 4 (S.D. Cal. June 10, 2016).

40    *Davis-Miller v. Automobile Club of Southern California*, 134 Cal. Rptr. 3d 551, 565 (Cal. Ct. App. 2011).

41    *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 248-49 (D.N.J. June 30, 2008).

42    *Lee v. Carter–Reed Company, L.L.C.*, 4 A.3d 562, 580 (N.J. 2010); *see also Varacallo v. Massachusetts Mut. Life Ins. Co.*, 752 A.2d 807, 817-18 (N.J. Super. Ct. App. Div. 2000).

43    *EZ Seed Litig.*, 304 F.R.D. at 409-10.

44    *Ebin*, 297 F.R.D. at 564; *see also In re Avon Anti-Aging Skincare Creams and Products Marketing and Sales Practices Litig.*, 2015 WL 5730022, at *5 (S.D.N.Y. Sept. 30, 2015) (denying class certification, noting, "This is not a case where the false statements were present in all cases and crucial to the purchase decision").

45    *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 550 (Ill. App. Ct. 2006).

46    *Spector v. Mondelez International, Inc.*, 178 F. Supp. 3d 657, 673 (N.D. Ill. Mar. 31, 2016) ("Under the ICFA, a plaintiff who alleges deceptive advertising about the effectiveness of a product has not suffered an injury if she believed the product was effective ..."); *Phillips v. DePaul University*, 19 N.E.3d 1019, 1034 (Ill. App. Ct. 2014) ("plaintiff received exactly what they paid for ... and, thus, have failed to show any actual damages").

47    *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 550 (Ill. App. Ct. 2006).

48    *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 606 (3d Cir. 2012).

49    *Coley v. Champion Home Builders Co.*, 590 S.E.2d 20, 22 (N.C. Ct. App. 2004).

50    *Billions v. White and Stafford Furniture Co., Inc.*, 528 So. 2d 878, 890 (Ala. Civ. App. 1988).

51    *Orlander*, 802 F.3d at 302.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.