# Exhibit 201

*FEDERAL JUDICIAL CENTER*
*POCKET GUIDE SERIES*

# Managing Related Proposed Class Actions in Multidistrict Litigation

Catherine R. Borden

Federal Judicial Center

2018

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to conduct and stimulate research and development for the improvement of judicial administration. While the Center regards the content as responsible and valuable, this guide does not reflect policy or recommendations of the Board of the Federal Judicial Center.

# Contents

Preface,  v

Introduction,  1

Early Steps,  1

Organizing Cases in a Multiclass MDL Proceeding,  2

    Case Categorization,  3

    Grouping for Motions Practice and Discovery,  5

    Grouping for Trial,  5

    Docket Organization,  6

Organizing Attorneys,  6

Sequencing and Motions Practice,  8

    Consolidated Complaints and Motions Sequencing,  8

    Case Management After a Decision on Class Certification,  9

    Other Management Techniques,  10

Judicial Adjuncts and Court Staffing,  10

Discovery,  11

Resolution: Mediation, Settlement, and Attorneys' Fees,  12

    Trials and Mediation,  12

    Impact of Class Certification Motions Practice on Resolution,  13

    Settlement and Attorneys' Fees,  14

Conclusion,  15

For Further Reference,  17

# Preface

This pocket guide was created to help transferee judges handle multidistrict litigation (MDL) that involves overlapping or conflicting putative classes. Congress created the United States Judicial Panel on Multidistrict Litigation (JPML) under 28 U.S.C. § 1407 and gave it authority to transfer "civil actions involving one or more common questions of fact" from multiple districts to any single district for coordinated or consolidated pretrial proceedings. The JPML centralizes cases in order to promote the convenient, just and efficient conduct of the actions. After the JPML transfers cases, it exercises virtually no further control over them. Section 1407 empowers a transferee judge to exercise all the powers of the transferor court, with the exception of actually conducting the trial (other than in cases originally filed in the transferee district or cases in which the parties have waived venue objections).

Federal Rule of Civil Procedure 23 requires transferee judges to safeguard the interests of class members. The Class Action Fairness Act of 2005 (CAFA) increased the number of class actions filed in or removed to federal court; the legislation expressed congressional confidence in the ability of federal judges to ensure "fair and prompt recoveries for class members with legitimate claims." CAFA also calls on the judiciary to develop and implement best practices for achieving the goals of ensuring that settlements are fair to class members and that class members are the primary beneficiaries of any settlement. This guide is part of the continuing efforts of the JPML and the Federal Judicial Center to assist transferee judges in achieving those objectives while simultaneously pursuing the Section 1407 goal of promoting the just and efficient conduct of MDL proceedings.

A highly useful resource for every transferee judge managing related alleged class actions is the *Manual for Complex Litigation*. You will find references to the manual throughout this guide. Management of class action issues is also addressed in *Managing Class Action Litigation: A Pocket Guide for Judges*. These and additional resources are listed at the end of this guide. A database of sample orders issued in both past and ongoing MDL proceedings can be found on the JPML's site on the federal judiciary's intranet.

# Introduction

Multidistrict litigation can be complex. When the litigation includes actions alleging multiple overlapping or conflicting class actions, the complexity—and the judge's responsibilities—only increase. Different potential classes may have different interests, which may actually or potentially conflict. Even absent conflicts of interest, different classes may require nonduplicative discovery, motions practice, and legal rulings.

This guide focuses on MDLs that include multiple overlapping or conflicting related class actions. The term *related class actions* in this guide refers to situations in which there are multiple class actions based on differences among the class members and does not require that any class actually be certified as a class, only that class allegations are included in a complaint. Nor does the term require that every action, or even the majority of actions, in an MDL proceeding include class allegations. This guide is designed to assist transferee judges from the beginning of MDL proceedings, before they determine whether the main focus of the litigation will be on class-related issues. Even if no class is ultimately certified, this guide can be useful in organizing the litigation and setting it on a smooth course.

Overlapping classes are most likely to be alleged in antitrust, consumer privacy, data breach, products liability, and sales practices proceedings but may be found in any type of MDL.

This guide identifies case management strategies that MDL transferee judges use successfully in managing related class actions. Judges handle the increased complexity and potential for conflicts of interest between members of related classes using numerous tools, from organizing counsel and cases to sequencing motions practice and other key events.

# Early Steps

In MDL proceedings involving multiple proposed classes, as with all complex litigation, fair and efficient resolution requires the court to exercise early and effective supervision and control. The heaviest lifting for transferee judges is at the beginning and end of the litigation. Exercising control early sets the tone. And when MDL proceedings end in settlement—either class or nonclass aggregate settlement—the court must be vigilant to protect the interests of class members. Some nonclass aggregate settlement contracts depend on judicial evaluation as well.

Active management as soon as the litigation is centralized is critical. As one transferee judge put it, "It's all about managing the first conference." Remember that your new cases already may have experienced some delay while the JPML considered and resolved the issue of centralization. It is important to get these cases moving again. Schedule a prompt organizational conference, and use it to set the tone for the litigation. This sends the message that the transferee judge is serious about organizing and moving the MDL proceeding forward.

Set a firm but reasonable schedule, and ensure that the lead attorneys understand your expectations regarding the litigation's course. Determine if there are potentially dispositive issues that you can decide early or on an expedited basis. Make clear that you expect the litigation to be conducted expeditiously, while also respecting the difficulties that counsel may confront in dealing with complex litigation that involves numerous proposed classes. Brisk progress in the litigation is likely to minimize or eliminate petty and time-consuming incidental disputes

1

among counsel and help bring the proceeding to a fair and prompt conclusion. As discussed in more detail later, consider whether organizing cases into groups would streamline management. Groups need not correspond precisely to the proposed classes. Interim class counsel or nonclass lead attorneys are necessary in most proceedings. Once a litigation plan is in place, a lighter judicial hand may be considered.

Require the parties to identify related litigation and proceedings as a part of early case management. Arbitration, litigation in other courts, and investigations by government agencies can affect an MDL proceeding in sometimes surprising ways. For example, in litigation over customer data security breaches, potential plaintiffs can include consumers, credit card companies and banks, but some of these may be in your court while others are in arbitration. The amount of money at issue may be even greater in the arbitration than the litigation, and the parties may allocate their efforts accordingly. Avoid a situation where, for instance, you could suddenly be confronted with a motion to enjoin a settlement in litigation you did not even know had commenced.

Related criminal proceedings or governmental agency investigations also can greatly affect an MDL proceeding. In antitrust MDL proceedings, a related Department of Justice investigation that leads to Fifth Amendment invocations by potential witnesses may delay progress in MDL proceedings by halting discovery, at least on certain aspects of the litigation, for months or even years.

Knowing what is going on in the entire litigation—both inside and outside the MDL proceeding—also protects a judge from issuing rulings that inadvertently provide one set of attorneys with a strategic advantage. The key to preventing this kind of gamesmanship is not to manage one's own cases in the dark.

Where appropriate, particularly with related state-court litigation, active coordination with your fellow jurists is preferable to mere awareness. The JPML and the Center offer guidance on coordinating with judges handling related litigation.[1] When appropriate, coordinating schedules and discovery among multiple jurisdictions may create efficiencies, allow for a more rational allocation of judicial resources, and eliminate unnecessary duplication.

# Organizing Cases in a Multiclass MDL Proceeding

Transferee judges can simplify the management of MDL proceedings and manage potential conflicts of interest by organizing groups of similar cases. But multidistrict litigation combined with multiple proposed classes creates a challenge that neither one presents on its own: a wide variety of possible dimensions along which to categorize the cases. The multidistrict aspect suggests at the very least geographic variation, as well as potential variation among defendants,

---

1. Coordinating Multijurisdiction Litigation: A Pocket Guide for Judges (Federal Judicial Center, National Center for State Courts & Judicial Panel on Multidistrict Litigation 2013), and related resources at https://multijurisdictionlitigation.wordpress.com. *See also* Barbara J. Rothstein & Catherine R. Borden, Managing Multidistrict Litigation in Products Liability Cases: A Pocket Guide for Transferee Judges (Federal Judicial Center & Judicial Panel on Multidistrict Litigation 2011).

*Managing Related Proposed Class Actions in Multidistrict Litigation*

while the different proposed classes typically reflect another set of dimensions, such as plaintiff type or injury. Different approaches to categorization are discussed in the next section.

Once you have determined the best way to categorize the cases, a group may then be put on a separate schedule, or may file motions applicable only to it. In addition, in order to avoid potential or actual conflicts of interest, different groups may need to be represented by separate attorneys. Federal Rule of Civil Procedure 23(g)(1)(B) requires the judge, in appointing class counsel, to consider any factors affecting counsel's "ability to fairly and adequately represent the interests of the class." And Rule 23(a)(4) requires the judge to ensure that "the representative parties will fairly and adequately protect the interests of the class." When parties' interests conflict—or simply differ—fair and adequate representation generally requires that separate counsel be appointed for different groups of parties. See *Organizing Attorneys*, *infra* page 6, regarding attorney representation.

We use the term *group* because the categories judges use do not always correspond precisely with the alleged classes or subclasses. While groups can be classes or subclasses, they can also be categories within or across alleged classes. One example is issues-based grouping. When the claims in an MDL proceeding are largely based on state law, it is often possible to group cases from states with similar laws. Motions practice can also be streamlined this way.

Groups offer more flexibility than classes and may change throughout the course of the litigation. You may need to organize cases for motions practice differently than you organize cases for settlement negotiations or trial. Even where subclasses are not certifiable as litigation classes, judges can still organize cases into groups along those lines. Settlement classes differ from litigation classes, and judges have certified classes for settlement that they previously rejected as litigation classes. Differences in state law become less important when the purpose of class certification is settlement alone.[2]

Grouping can facilitate management, but the number of groups and their relationships to subclasses must be carefully considered. Make clear to the parties that grouping for management purposes does not prejudge the certifiability of any classes or subclasses. Dividing the litigation into too many subclasses can defeat the aggregating purpose of multidistrict litigation. Where appropriate, defer consideration of subclasses until the outline of the litigation is clear. Early rulings on key issues and/or settlement negotiations may be fruitful. After that, if the litigation is not proceeding appreciably toward settlement or another resolution, consider reopening the doors to subclasses.

Below is a summary of the types of groupings that may facilitate litigation management.

## Case Categorization

Cases may be grouped along many dimensions and, in some proceedings, along more than one dimension. At the most basic level, a proceeding may involve different **types of parties**.

---

2. Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . ."); Sullivan v. DB Investments, Inc., 667 F.3d 273, 297 (3d Cir. 2011) ("[C]oncerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class.").

*Organizing Cases in a Multiclass MDL Proceeding*

In a data-breach proceeding, for example, there will be individual claimants whose data were breached, but there may also be financial institutions (banks and credit card companies) affected by the breach of their customers' data. In such a case, there may even be a shareholder suit against the defendant. The legal theories and arguments of individual claimants will differ from those of the financial institutions, and the legal theories and arguments of the shareholders will differ from both of the others. Moreover, a defendant's defenses will likely differ based on the nature of the claimant. The classic example of grouping by party type may be direct and indirect purchasers in a price-fixing proceeding. These groups' legal theories are based on different sources of law. In many proceedings, there are governmental entities—either as plaintiffs or defendants—as well as private parties. Governmental parties have very different claims and defenses in most situations than private parties do. In any proceeding involving claimants that are not all the same type of entity, the transferee judge should be aware of how those differences affect the claims, defenses, and legal theories at play. Defendants also may be different types of parties. In some proceedings, organizing the defense side of the case may be as complex and time-consuming as organizing the plaintiff side. There are too many variations on this theme to list, but it is something to which the court should be attuned.

A second dimension is **geography**. Somewhat obviously, in diversity cases, differences in state laws can affect claimants' rights. Indeed, the laws of some states may not even recognize claimants' right to any relief in a proceeding. For example, not all states recognize the right of indirect purchasers to seek relief in a price-fixing case. Similarly, a defendant's defenses also will be affected by state law. A defendant may have a meritorious defense in one state that is unavailable in other states. Dispositive motion sequencing must therefore take into account variations in state law. Organizing the cases by state law allows the court to resolve dispositive motions relevant to claimants from each state separately. Of course, grouping does not have to be by individual state. Often multiple states have similar enough laws that only three or four groups are needed. In some proceedings, international parties or international transactions may require further geographical grouping.

A third dimension is **time**. The term of art here is *class period*. Claimants' rights may have arisen at different times, and in many cases, this may affect the nature of their claims. In a securities-fraud proceeding, for example, there may be more than one potentially fraudulent statement. Purchasers of the security at issue may have bought the security before the first statement, or after the first but before the second, or after the second, and so on. Each of these groups will have different rights and be subject to different defenses. In some cases, a change in federal regulations may affect a group's claims. In other cases, a defendant may have altered the terms in its customer agreement at some point, which may affect groups' claims in a contracts proceeding. Time also may be an issue procedurally—in some proceedings, one group of cases may be far ahead of others at the time of centralization. This may complicate the organization of the proceeding, if, for example, a litigation class has already been certified in one group but not in others.

A fourth dimension is **type of injury**. A prototypical example is in the area of products liability, in which the severity of injury suffered can range from actual death to only the possibility of future injury (e.g., a medical monitoring claim). But in many types of proceedings,

*Managing Related Proposed Class Actions in Multidistrict Litigation*

claimants may have different types of injuries. What is important to remember here is that even claimants of the same type may have different injuries. The interests of these groups will often be in conflict, especially if the settlement is reached in terms of a single dollar amount. The strongest claims (the most severe injuries) should not be given short shrift in a settlement that also includes weaker claims (less severe injuries). It should go without saying that it is the attorneys' and court's duty to ensure that the claimants are treated fairly in any settlement.[3]

A fifth dimension is that different claimants, of whatever type, may be seeking different **types of relief**, as opposed to different amounts of relief or damages. In some proceedings, there may be motions for certification of a Rule 23(b)(2) class seeking injunctive relief and for certification of a Rule 23(b)(3) damages class.

## Grouping for Motions Practice and Discovery

Except in rare circumstances, no more than two or three groups are likely to be needed. Grouping is often necessary in antitrust MDL proceedings, where direct and indirect purchasers are treated separately as a general rule. Groups also are frequently created in products-liability proceedings, often based on substantive state-law differences or geographic markets. In data-breach litigation, transferee judges often separate consumer and bank plaintiffs.

An example of grouping that illustrates both the complexity of the task and how grouping can facilitate litigation management is in the *Blue Cross Blue Shield Antitrust Litigation*.[4] There are two tracks—subscribers and providers, which are roughly analogous to indirect and direct purchasers—and within each track are multiple alleged classes, divided by regional market. The grouping only partially corresponds to the proposed classes.

Typically, cases are split up by plaintiff type, but judges' creativity in meeting the challenges presented by multiclass MDL proceedings is unlimited. Cases may be split up by the nature of the claims brought (e.g., securities actions and commodities actions) or by time of filing. Plaintiffs may be grouped based on whether they have opted out of arbitration or not. In antitrust proceedings, cases may be grouped based on which subset of defendants is being sued.

## Grouping for Trial

Prioritized or bellwether trials may be useful in a variety of circumstances. If multiple classes have been certified, it may make sense to prioritize certain trials (for example, direct purchaser class before indirect purchaser class in antitrust litigation). If class certification has been denied and plaintiffs pursue individual actions, conducting bellwether or test-case trials may help advance the litigation toward resolution.[5] If an MDL proceeding includes both class and nonclass actions, it may make sense to group certain actions together in trial preparation. The poten-

---

3. *See, e.g., In re:* Nat'l Football League Players' Concussion Litig., 821 F.3d 410 (3d Cir. 2016).
4. MDL No. 2406, N.D. Alabama, C.A. No. 2:13-cv-2000.
5. In the *Vioxx Products Liability Litigation*, several bellwether trials were conducted after nationwide class certification was denied. 239 F.R.D. 450, 452–54 (E.D. La. 2006). *See also* Fallon, Grabill & Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2335 (2008) (describing the bellwether trials).

*Organizing Attorneys*

tial variations are many; your careful evaluation of the needs of the litigation will determine whether grouping for trial purposes would be useful.

Groupings for the purposes of trial may differ from groupings for motions practice. For example, in antitrust proceedings, for prioritized or bellwether trial management, it may make sense to separately consider cases arising in a variety of markets, where the defendant has a high, medium, or low percent of market share. This division differs from the indirect/direct purchaser and geographic groupings that may have been created for motions practice or discovery. For example, in the *Blue Cross Blue Shield Antitrust Litigation* mentioned earlier, the primary division is between cases brought by medical service providers and by subscribers. In prioritizing cases for trial, however, an additional dimension has been the defendants' level of market share. The first cases that have been prioritized for trial are from Alabama, where the defendants have a strong market presence. The judge noted the desirability of trying cases from states where the defendants have a less predominant market share but recognized that pursuant to *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*[6] he cannot try cases transferred from another district by the JPML.

One or more groups created for trial purposes may encounter novel difficulties. There are a number of reasons this may occur—gamesmanship by the attorneys being only one possibility. Several plaintiffs in a row may dismiss complaints late in the game. Remember that the individual plaintiffs in an MDL proceeding are not always the sophisticated entities that the defendants or plaintiff attorneys are. Because of time constraints, the difficulty of taking time off for travel, or sometimes a degree of discomfort with the legal system, some groups of plaintiffs may not be eager to go to court. This could lead to a situation where multiple plaintiffs selected for bellwether or prioritized trials withdraw. If this pattern emerges, the judge should consider whether it is the result of gamesmanship or has other, perhaps legitimate, causes. If it is gamesmanship, the judge must take appropriate measures.

## Docket Organization

Regardless of grouping for various purposes, the transferee court clerk's office typically creates one master docket to represent activity in the centralized litigation. This docket is referred to as the lead, coordinated, master, or main case. Most courts use the case type *md* and the case number used by the JPML.[7] The case name should also match that assigned by the JPML.

# Organizing Attorneys

Closely related to organizing cases is organizing attorneys. A useful tool in managing complex proceedings is the appointment of plaintiff-side attorney leadership. The *Manual for Complex Litigation* recommends appointing interim class counsel when there are "a number of overlapping, duplicative, or competing suits"[8] and offers guidance to judges in selecting from

---

6. 523 U.S. 26, 40 (1998).

7. For example, in the Northern District of California, *In re: Yahoo! Inc. Customer Data Security Breach Litigation,* MDL No. 2752, has the case number 5:16-md-2752.

8. Manual for Complex Litigation, Fourth § 21.11 (2004) [hereinafter MCL 4th].

*Managing Related Proposed Class Actions in Multidistrict Litigation*

competing class counsel.[9] Transferee judges appoint attorney leadership in the vast majority of proceedings. Interim class counsel is appointed most often. Nonclass lead counsel is appointed in some multiclass MDL proceedings, particularly in products-liability litigation. In some litigations involving both putative class actions and individual actions, a court may appoint both interim class counsel and lead counsel, such as was done in the *Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*.[10] Where the interests of putative classes actually conflict, of course, separate counsel is needed.

Determining how to categorize cases for management efficiency and prevention of conflicts is the first step in determining how many attorney teams you need. There are typically fewer attorney teams than case categories. The number and complexity of interests represented will guide the number of attorney teams appointed and the duties assigned. Be careful to exercise your own judgment rather than let the attorneys decide how many classes or subclasses are appropriate. Counsel sometimes propose multiple classes and subclasses primarily to gain appointment to positions of leadership in the litigation. The court should attempt to distinguish such proposals from proposed classes that reflect more substantive differences. Special circumstances, such as the bankruptcy of a defendant or other issues pointing to the likelihood of a limited fund if plaintiffs prevail, may necessitate appointing counsel for subclasses because they inherently will be in conflict over allocation of the limited fund. If it is possible to avoid a limited-fund situation, the putative classes may benefit because fewer attorneys may need to be appointed, keeping fees lower.

It is worth noting that cases, classes, and counsel may all be organized differently. For example, in the multifaceted *Automotive Parts Antitrust Litigation*,[11] the cases are divided by the auto part at issue and the type of plaintiff (direct or end purchaser), but counsel are divided only by plaintiff type. In other words, one lead counsel team handles all the auto parts for direct purchasers, and another lead counsel team handles all the auto parts for end purchasers.

While keeping in mind the legal obligations that conflicts create, you should focus on appointing the number of attorneys that will be effective. Often only one team of attorneys is necessary, even when the cases have been separated into groups, but potential conflicts or the magnitude of the litigation may require the appointment of two or three (or even more) teams of attorneys. The guiding principle is always the benefit to the class or classes, but this can play out in complicated ways. Appointing an excessive number of attorneys will cost the class in attorneys' fees, but skimping on quality counsel will not serve the class either. Appointing a sufficient, but not greater than necessary, number of counsel to avoid fights and keep the attorneys working well together will best serve the class.

While the appointment of attorney leadership must always be done carefully, the presence of multiple proposed classes intensifies both the importance and the difficulty of the task. Approach the complex task of selecting attorney leadership with care, and with an eye to ensuring that the leadership appropriately reflects the differing backgrounds, viewpoints, and skill sets of all lawyers involved in the litigation. In a large-scale proceeding where a complex committee

---

9. MCL 4th § 21.27.
10. MDL No. 2738, D. New Jersey, 3:16-md-2738.
11. MDL No. 2311, E.D. Michigan, C.A. No. 2:12-md-2311.

structure is appropriate, consider the "advise and consent" approach. After class or lead counsel are appointed, those counsel propose steering committee and subcommittee members, and the judge then approves or disapproves the selection. Instruct the attorney leadership to, where appropriate, be inclusive of and listen to attorneys who were not appointed and who may offer unique and valuable suggestions regarding litigation strategy and other matters. Keeping them informed and addressing their concerns are important to the success of the litigation. Ignoring these attorneys may derail a settlement down the line. Their perspective is valuable in making sure their clients are well served by that settlement.

Be open to revisiting your appointments; you are not stuck with attorneys who have not proved effective. Some transferee judges require lead attorneys to seek reappointment on a regular basis (e.g., annually).

# Sequencing and Motions Practice

Sequencing the discovery and briefing necessary to resolve class certification and dispositive motions is one of a transferee judge's most vital early tasks. With multiple potential classes in addition to the volume added by the multidistrict character of the litigation, the number of motions has the potential to become overwhelming. Judges approach this challenge with a variety of tools.

## *Consolidated Complaints and Motions Sequencing*

Consolidated complaints feature prominently in MDL proceedings. The *Manual for Complex Litigation* recommends "consolidated pleadings and motions to decide how to resolve competing claims for certification, of class counsel, and appointment of lead class counsel."[12] Even if motions are not formally consolidated, transferee judges can avoid duplicative filings.

A consolidated complaint can streamline the litigation, since it often results in the plaintiffs' counsel forgoing dubious claims. It also facilitates efficient motions practice.[13] However, it must be remembered that the plaintiff is the master of the complaint. The judge can direct leadership on the plaintiff side to file anew, but short of Rule 12, he or she cannot direct the contents of the complaint.

Judges differ on whether to address class certification motions before or after dispositive motions. Most judges prefer to handle motions to dismiss before motions for class certification. Ruling early on motions to dismiss can narrow the litigation to a more manageable set of claims. But some judges prefer to address class certification first because, as a practical matter, plaintiffs are less likely to pursue the litigation if class certification is denied, and therefore an early class certification ruling may eliminate unnecessary pretrial practice and expense. Sometimes certifiability of a class is the key legal issue that will best advance the litigation. An

---

12. MCL 4th § 21.25.

13. Where a consolidated complaint is used, it is critical that the parties and the court make clear whether the pleading is intended to be merely an administrative summary of plaintiffs' claims or a legally operative pleading that supersedes any prior individual pleadings. *See In re:* Refrigerant Compressors Antitrust Litig., 731 F.3d 586, 590–91 (6th Cir. 2013).

*Managing Related Proposed Class Actions in Multidistrict Litigation*

early assessment of the litigation by the judge will guide which approach is best in a particular proceeding. Regardless of the timing of class certification motions practice, a probing analysis is required.[14]

Most often, motions to dismiss precede class certification motions, and motions for summary judgment are scheduled after or concurrently with class certification motions. A typical sequence is as follows: first conference, first scheduling order, counsel appointed, consolidated complaint, motion to dismiss, class certification motion, motions for summary judgment. The timing of *Daubert* motions, if needed, may vary depending on the significance of expert opinion to issues of summary judgment. In the *Mirena IUD Products Liability Litigation*,[15] for example, a *Daubert* decision that excluded all of plaintiffs' experts on general causation was crucial to a later decision granting summary judgment to the defendants.[16]

## Case Management After a Decision on Class Certification

After class certification is addressed, the litigation may take various paths. If one or more classes are certified, the MDL proceeding may quickly enter settlement mode. Otherwise, proceedings can move on to class notice and preparation for trial of one or more of the class actions. Whether or not any class is certified, there may still be a large number of individual actions, and even after a class settlement, opt-out actions may be filed, as occurred in the *Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act (TCPA) Litigation*.[17] If the MDL proceeding includes many individual actions in addition to the proposed class actions, you will likely need to decide which actions to prioritize for trial preparation. See *Trials and Mediation*, *infra* page 12, discussing prioritized trials.

If class certification is denied, plaintiffs may file follow-up motions seeking certification of smaller, more focused classes (e.g., statewide classes rather than a nationwide class), or plaintiffs may proceed with individual claims. You may elect to handle the new class certification motions or individual cases within the context of the MDL proceeding, or you may decide that the remaining issues in the litigation are so individualized that they are better resolved by the transferor courts.[18] In that event, you may suggest that the JPML remand the remaining actions to the transferor courts.[19] Alternatively, you also are free to request that the JMPL discontinue transferring new tag-along actions to the MDL proceeding so that you can devote your attention to resolving the remaining issues in the previously transferred actions that are already before you.

---

14. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351–52 (2011).

15. MDL No. 2434, S.D. New York, 7:13-md-2434, 202 F. Supp. 3d 304, 308–309, 312 (2016).

16. 202 F. Supp. 3d 304, 308-309, 312 (2016).

17. MDL No. 2295, S.D. California, C.A. No. 3:11-md-2295.

18. A version of this occurred in the *Light Cigarettes Marketing and Sales Practices Litigation*, where Judge John A. Woodcock, Jr., denied certification of four "exemplar" statewide classes and then ordered plaintiffs in the other actions to notify him whether they objected to the extension of his rulings to their cases. Certain plaintiffs did object and requested that the judge suggest a § 1407 remand of their actions to the transferor courts. The judge granted the request, and the JPML remanded the actions. *See In re:* Light Cigarettes Mktg. & Sales Practices Litig., MDL No. 2068, 856 F. Supp. 2d 1330, 1331 (J.P.M.L. 2012).

19. *See* JPML Rule 10.2(a).

*Other Management Techniques*

The usual techniques to focus litigation apply in proceedings with related proposed classes. To reduce unnecessary summary-judgment motions practice, an effective approach is to require parties to exchange outlines of motions and drafts of statements of undisputed material facts (which is a requirement in some districts) before a motion can be filed. The parties should be urged to negotiate a single undisputed set of facts to whatever extent possible.

Where claims are based on state law, a crucial task will be streamlining Rule 12 motions while still giving all parties an appropriate opportunity to be heard. In the *Automotive Parts Antitrust Litigation*, which involves multiple plaintiff types, multiple defendants, and multiple states' laws, Judge Marianne O. Battani has encouraged joint motions to dismiss and instructed defendants to clarify in their motions how authority in subsequent motions differed from that in already-filed motions. In the *Target Corporation Customer Data Security Breach Litigation*,[20] Judge Paul A. Magnuson dealt with Rule 12 motions covering the laws of all fifty states and Washington, D.C. Motions practice was made manageable by addressing the issue in groups based on the similarity of state laws. The majority of motions fell into one category, while a small number fell into a few other categories. Another streamlining approach was equally successful in the *Motor Fuel Temperature Sales Practices Litigation*,[21] which was an industry-wide, multidefendant MDL proceeding involving proposed classes in twenty-six states. Plaintiffs from the various states separately moved for class certification. After briefing was completed, Judge Kathryn H. Vratil administratively terminated all the motions except for the motion in the two direct-filed Kansas cases.

# Judicial Adjuncts and Court Staffing

Chambers staffing, court clerk staffing, and, if needed, the assistance of magistrate judges and/or special masters, must all be optimized when handling a complex MDL proceeding.

In chambers staffing, remember that MDL proceedings can be lengthy. It may therefore be preferable to assign a career law clerk to a complex MDL proceeding, if possible, rather than a term clerk. A term clerk's tenure may not last the whole proceeding, and the learning curve can be steep.

The transferee court clerk's office should assign responsibility for all aspects of MDL case management to an experienced docket clerk. This MDL docket clerk should serve as the main contact person for counsel, the JPML, chambers, and other court employees on matters relating to the clerk's office's handling of the proceeding. The court clerk should assign employees to assist the MDL docket clerk as needed.

Transferee judges frequently utilize judicial adjuncts, such as magistrate judges and special masters, to help manage the complexity of multidistrict litigation involving related proposed classes. Magistrate judges in most districts are available to assist in these complex proceedings. Federal Rule of Civil Procedure 53(a)(1)(C) authorizes judges to appoint special masters to aid

---

20. MDL No. 2522, D. Minnesota, C.A. No. 0:14-md-2522.
21. MDL No. 1840, D. Kansas, C.A. No. 2:07-md-1840.

*Managing Related Proposed Class Actions in Multidistrict Litigation*

in handling pretrial or posttrial matters "that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."

A special master's interpersonal skills may be as important to consider as other qualifications. An effective special master is not concerned about credit. Many judges find that a helpful approach for an adjunct to take is "I take the blame when something goes wrong, but the lawyers get credit when it goes well."

Transferee judges enlist the assistance of magistrate judges in many proceedings involving overlapping proposed classes. Special masters, while still somewhat rare, are employed much more often in MDL proceedings than in federal litigation in general. You may enlist a magistrate judge to assist you whether or not you appoint a special master, and vice versa.

Magistrate judges can be particularly helpful in managing discovery. Sometimes magistrate judges are given other duties in multiclass MDL proceedings, such as assisting in settlement negotiations. Magistrate judges have tackled a wide variety of other tasks as well, such as pro hac vice motions, scheduling, and motions to seal.

Special masters are most often assigned duties related to settlement. This may be mediation to help reach settlements, or responsibilities after settlement is reached, such as implementing the settlement. Special masters can also handle discovery or other assignments.

Whether to engage a special master or delegate tasks to a magistrate judge does not depend on the number of cases in your MDL proceeding and may turn on your preferences, as well as the customs of your particular district. A small proceeding may make good use of adjuncts, and even the largest MDL proceedings sometimes do not use magistrate judges or special masters.

It bears emphasizing that the JPML assigns an MDL proceeding to a district judge, not an adjunct. The district judge's hands-on management of the litigation is crucial to achieving its just and expeditious resolution.

## Discovery

Different judges have different practices when handling discovery matters. Some judges assign a magistrate judge to monitor all discovery issues. Others have found it beneficial to handle discovery disputes themselves; these judges have found that the more contact they have with the lawyers, the more familiar the judges are with the litigation and the more they can control its pace and influence its progress.

Regardless of preference, there are naturally limits to a judge's ability to primarily handle discovery. When managing discovery in the proceeding becomes effectively a full-time job, a full-time adjunct must be appointed to manage discovery.

To set the tone for the litigation, many judges handle more manageable levels of discovery themselves. This allows the judge to set the expectation that abusive or delaying tactics or other misconduct will not be tolerated. Occasionally, counsel on one or both sides may start off being difficult. But once the judge lets them know that their behavior is unacceptable, it should tail off quickly.

When there are numerous disputes over discovery, a transferee judge who handles discovery can direct the parties to brief the most contentious five, and then rule on those. With the

guidance from a few rulings, the parties should get a good sense of how the judge would rule on the rest, and they can usually resolve the remaining disputes themselves.

# Resolution: Mediation, Settlement, and Attorneys' Fees

In guiding the litigation toward resolution, trials, mediation, and key legal rulings can all help. Although trials themselves are relatively rare in MDL proceedings, trial preparation is often key to advancing the litigation. As a practical matter, settlement is a frequent outcome in MDL proceedings. Multiple proposed classes introduce additional complexity to MDL proceedings in several ways. Even though the complaints include proposed classes, settlements may be class or nonclass based. Particularly in proceedings with multiple proposed classes, a settlement may resolve only part of the litigation, shifting the playing field in the remaining cases. A related challenge of these complex proceedings is that one or more parties may be unable or unwilling to settle with one class or subclass in the litigation unless other classes' or subclasses' claims are resolved. Yet in other situations, settling or trying one part of the litigation helps the remaining parties to resolve their claims. Indeed, the value of multidistrict transfer, in addition to judicial efficiency, is that it brings most or all parties before the same court.

## Trials and Mediation

Prioritized trials can advance resolution, particularly where class certification has already been decided. For example, in the *Motor Fuel Temperature Sales Practices Litigation* mentioned earlier, Judge Vratil considered and granted class certification in the two cases directly filed in the District of Kansas. She then conducted a trial. Before the trial (and after she had denied defendants' motions for summary judgment), plaintiffs negotiated settlements with ten of the defendants. Ultimately, after she suggested remand of plaintiffs' claims against nonsettling defendants in the twenty-six cases remaining in the MDL proceeding, the parties reached an additional eighteen settlements.

Similarly, in the *Pharmaceutical Industry Average Wholesale Price Litigation*,[22] another industry-wide MDL proceeding with certified classes, Judge Patti B. Saris created two tracks—Track 1, a fast track involving five defendants, and Track 2, a regular track involving ten defendants and 200 drugs. Judge Saris conducted a bench trial in the cases of the Track 1 defendants and issued substantial findings of fact and conclusions of law. With the guidance on the legal issues that the bench trial provided, the parties in Track 2 negotiated settlements.

Bellwether trials may be helpful after class certification has been denied. In the *Genetically Modified Rice Litigation*,[23] after Judge Catherine D. Perry denied class certification, she held several bellwether trials. In connection with the first bellwether, she issued a detailed memorandum opinion on summary judgment and *Daubert* motions, and then was largely able to apply that order in subsequent cases. For a good overview on how to maximize the value of bellwether trials, see Fallon, Grabill, and Wynne's *Bellwether Trials in Multidistrict Litigation*.[24]

---

22. MDL No. 1456, D. Massachusetts, C.A. No. 1:01-cv-12257.
23. MDL No. 1811, E.D. Missouri, C.A. No. 4:06-md-1811.
24. *Supra* note 5.

*Managing Related Proposed Class Actions in Multidistrict Litigation*

A different approach, referred to as *bellwether mediation*, is too new to have much of a track record but has proven valuable in at least one MDL proceeding. Under this approach, multiple individual settlement negotiations are undertaken in order to provide the parties with information to more accurately value a global settlement. Bellwether mediations are most likely to be effective where some basic degree of liability is not in dispute and the product is no longer on the market. The approach was employed successfully in the *Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation*[25] by working in concert with state judges with related litigation.[26] In an MDL proceeding with both class and nonclass actions, depending where the "center of gravity" of the litigation lies, bellwether mediations could advance resolution of the nonclass actions and, as a side benefit, give the class-action parties information on valuing their claims.

## Impact of Class Certification Motions Practice on Resolution

As every judge knows, keeping litigation moving is the surest path to resolution. In simpler litigation, settling on the eve of a trial is common enough to be a cliché. In MDL proceedings with multiple proposed classes, however, it is class certification motions practice that frequently can spur settlement. The parties may ask you to extend the motion deadline or even defer ruling on a filed motion because, they aver, settlement is imminent. Give the parties leeway, but do not acquiesce in an endless series of delays. If there is related litigation or arbitration, keeping abreast of the progress of those related cases will enable you to better evaluate requests for extensions or postponements.

While settlements may be prompted by many factors, not all of which are apparent to outside observers, the pattern of reaching settlements as class-certification briefing deadlines approach is common enough to be suggestive. For example, in the *Ford Motor Co. Spark Plug and 3-Valve Engine Products Liability Litigation*,[27] in December 2014, Judge Benita Y. Pearson issued a schedule for class-certification discovery and briefing. Six months later, plaintiffs filed a motion for preliminary approval of a class-action settlement.

Class certification is often the issue that, once resolved, gives the parties enough information to value a settlement. In the *Optical Disk Drive Antitrust Litigation*,[28] direct purchasers settled their claims against all defendants after the initial denial of class certification. In addition, after Judge Richard Seeborg granted the indirect purchasers' renewed motion for class certification, several actions by indirect purchasers settled. In the *Celexa & Lexapro Marketing and Sales Practices Litigation*,[29] Judge Nathaniel M. Gorton certified a proposed Missouri consumer class in January 2014 (but denied certification of two other statewide classes). Just two months later, Judge Gorton preliminarily approved a settlement reached in that action. In the

---

25. MDL No. 2441, D. Minnesota, C.A. No. 0:13-md-2441.
26. For an in-depth exploration, see Adam Zimmerman, *The Bellwether Settlement*, 85 Fordham L. Rev., no. 5, April 2017, at 2275–2298.
27. MDL No. 2316, N.D. Ohio, C.A. No. 1:12-md-2316.
28. MDL No. 2143, N.D. California, C.A. No. 3:1-md-2143.
29. MDL No. 2067, D. Massachusetts, C.A. No. 1:09-md-2067.

*Resolution: Mediation, Settlement, and Attorneys' Fees*

*Chase Bank Check Loan Contract Litigation*,[30] Judge Maxine M. Chesney certified a class in May 2011. While a motion to decertify was pending, a motion for preliminary approval of a class settlement was filed in July 2012.

This is not to suggest that class certification is the only key legal ruling that advances resolution. In other cases, it is a transferee judge's decision on a significant motion to dismiss that may aid in resolving the litigation. For example, in the *Herbal Supplements Marketing and Sales Practices Litigation*,[31] which involved multiple proposed classes of consumers, Judge Amy J. St. Eve issued a detailed ruling on defendants' motions to dismiss and motions to strike class allegations in May 2017. Just three months following that ruling, the parties reported that they had reached a settlement. In the *Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation*,[32] Judge Jerome B. Simandle granted in part and denied in part Caterpillar's motion to dismiss in late July 2015. Not long after, the judge granted the parties' request for a temporary stay so that they could engage in settlement negotiations. Those negotiations proved fruitful, as plaintiffs filed a motion for preliminary approval of a class settlement in April 2016.

## Settlement and Attorneys' Fees

As with the initial organization of the litigation, settlement is a stage that demands the transferee judge's utmost attention. The earlier in the litigation that settlement is reached, the more information you may need to acquire to determine fairness and adequacy because the information has not been acquired in the process of litigation.[33] You may have to probe to uncover the strengths and weaknesses of the parties' claims and defenses as well as the circumstances of their negotiations. Settlements that do not resolve the entire litigation, a situation which is very likely where multiple alleged classes are involved, may require extra scrutiny.[34]

The *Manual for Complex Litigation* discusses factors to consider in determining whether a class settlement meets Rule 23(e)(1)(C) standards for fairness, reasonableness, and adequacy.[35] Multiclass MDL proceedings are particularly likely to implicate factors 8 and 9—"the effect of the settlement on other pending actions" and "similar claims by other classes and subclasses and their probable outcome . . . ." See the manual for a more complete discussion of issues concerning partial settlements.[36]

Objectors to a class settlement may play a beneficial role in improving the value of the settlement for class members. Some objections, however, are made for improper purposes, such as those made by "professional objectors" seeking side payments. Your challenge is to distinguish between meritorious objections and those advanced for improper purposes.[37] While objectors

---

30. MDL No. 2032, N.D. California, C.A. No. 3:09-md-2032.
31. MDL No. 2619, N.D. Illinois, C.A. No. 1:15-cv-5070.
32. MDL No. 2540, D. New Jersey, C.A. No. 1:14-03722.
33. *See* MCL 4th § 13.14.
34. *See id.* § 21.651.
35. *See id.* § 21.62.
36. *See id.* § 21.651.
37. *See id.* § 21.643.

*Managing Related Proposed Class Actions in Multidistrict Litigation*

have become nearly a routine part of class settlements, a large number of objecting class members may indicate a serious problem with the settlement.[38]

If you do approve a settlement, it is likely that you will need to rule on attorneys' fees. Typically, the request will be made under the authority of Rule 23, although common benefit fund fees may be requested in nonclass aggregate settlements. Rarely, attorneys' fees are awarded under other authority, such as the Fair Labor Standards Act or in connection with accepting offers of judgment.

For extremely large, complex cases, it can be difficult to determine how much to award in attorneys' fees. The two standard approaches for simpler cases, awarding a percentage of recovery or using the lodestar method to calculate reasonable attorneys' fees, both present challenges. With the lodestar approach it is very difficult to carefully review a huge number of hours for potential padding. With the percentage approach, it is difficult to know what is fair when, in a very large settlement, a typical percentage (such as one-third) is an enormous sum of money. Circuits differ, but typically a percentage-of-fund approach is used, often with a lodestar cross-check or other factors that can raise or lower the fee award. Another type of cross-check involves examining the defendants' attorney fee records as a measure of what might be a reasonable number of hours or a total payment. In some larger MDL proceedings, such as the *Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico Litigation*,[39] judges have appointed a special master or CPA to assist them with this process.

## Conclusion

Managing multidistrict litigation with related overlapping or conflicting putative classes is challenging. Transferee judges must bring all of their skills, talents, and experience to managing this complex litigation.

Specific methods include appointing attorney leadership in most proceedings and organizing the cases into manageable groups, which may or may not correspond precisely to the proposed classes or subclasses. In addition, judges frequently use adjuncts (such as special masters and magistrates) to assist them in their work. Motions practice is sequenced according to the needs of the case and the judge's preferences. Proceedings often lead to a settlement, where judges must evaluate the fairness of the settlement and consider attorneys' fees.

---

38. *See, e.g.*, *In re:* American Express Anti-Steering Rules Antitrust Litigation, E.D. New York, C.A. No. 1:11-md-2221, Dkt 658, at 10. After class members accounting for 20% of charge volume filed objections, settlement approval was denied.

39. MDL No. 2179, E.D. Louisiana, C.A. No. 2:10-md-2179.

# For Further Reference

Coordinating Multijurisdiction Litigation: A Pocket Guide for Judges (Federal Judicial Center, National Center for State Courts & Judicial Panel on Multidistrict Litigation 2013); *see also* https://multijurisdictionlitigation.wordpress.com.

Managing Class Action Litigation: A Pocket Guide for Judges (Federal Judicial Center, 3d ed. 2010).

Managing Multidistrict Litigation in Products Liability Cases: A Pocket Guide for Transferee Judges (Federal Judicial Center & Judicial Panel on Multidistrict Litigation 2011).

Manual for Complex Litigation, Fourth (2004).

Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Judges (Judicial Panel on Multidistrict Litigation & Federal Judicial Center, 2d ed. 2014).

**The Federal Judicial Center**

**Board**
The Chief Justice of the United States, Chair
Magistrate Judge Tim A. Baker, U.S. District Court for the Southern District of Indiana
Judge Duane Benton, U.S. Court of Appeals for the Eighth Circuit
Judge Curtis L. Collier, U.S. District Court for the Eastern District of Tennessee
Chief Judge Barbara J. Houser, U.S. Bankruptcy Court for the Northern District of Texas
Judge Kimberly J. Mueller, U.S. District Court for the Eastern District of California
Judge George Z. Singal, U.S. District Court for the District of Maine
Judge David S. Tatel, U.S. Court of Appeals for the District of Columbia Circuit
James C. Duff, Director of the Administrative Office of the U.S. Courts

**Director**
Judge Jeremy D. Fogel

**Deputy Director**
John S. Cooke

**About the Federal Judicial Center**
The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The organization of the Center reflects its primary statutory mandates. The Education Division plans and produces education and training for judges and court staff, including in-person programs, video programs, publications, curriculum packages for in-district training, and Web-based programs and resources. The Research Division examines and evaluates current and alternative federal court practices and policies. This research assists Judicial Conference committees, who request most Center research, in developing policy recommendations. The Center's research also contributes substantially to its educational programs. The Federal Judicial History Office helps courts and others study and preserve federal judicial history. The International Judicial Relations Office provides information to judicial and legal officials from foreign countries and informs federal judicial personnel of developments in international law and other court systems that may affect their work. Two units of the Director's Office—the Information Technology Office and the Editorial & Information Services Office—support Center missions through technology, editorial and design assistance, and organization and dissemination of Center resources.