1

2016 WL 226639
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Anthony Francis MARTINEZ, on behalf of
himself and all others similarly situated, Plaintiff,

v.

EQUIFAX INC. et al., Defendants.

Civil Action No. 15-2100 (SRC)
|
Signed 01/19/2016

**Attorneys and Law Firms**

Donald A. Ecklund, James E. Cecchi, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., Roseland, NJ, for Plaintiff.

Debra Marie Albanese, Traflet & Fabian, Esqs., Morristown, NJ, Joann Needleman, Clark Hill PLC, Philadelphia, PA, for Defendants.

**OPINION & ORDER**

Chesler, U.S.D.J.

**\*1** This matter comes before the Court on the motion to dismiss the Complaint and to strike the class action allegations, pursuant to Federal Rule of Civil Procedure 12(b)(6), by Defendants Equifax Inc. and Equifax Information Services LLC (collectively, "Equifax"). For the reasons stated below, the motion to dismiss will be granted in part and denied in part.

This case arises from a dispute between a consumer, Plaintiff Anthony Francis Martinez, and a credit reporting agency, Equifax, under the Fair Credit Reporting Act ("FCRA"). In brief, the Complaint alleges that Equifax issued a credit report with incorrect and damaging information about Plaintiff, and refused to correct it. The Complaint asserts four claims for FCRA violations: 1) failure to implement reasonable procedures; 2) failure to conduct a reasonable investigation; 3) failure to provide notice of dispute; and 4) failure to consider all relevant information. The Complaint asserts these claims for Plaintiff, as well as on behalf of a putative class.

The class allegations in the Complaint begin by defining the class: the class action "is brought of behalf of all persons who disputed an Equifax credit report and where Equifax failed to apply the proper and appropriate FCRA procedures." (Compl. ¶ 35.) The Complaint also states that questions of law or fact common to the class predominate over any questions affecting only individual members, and then cites seven issues concerning violations of the FCRA.

Defendants first move to dismiss the Complaint against Defendant Equifax Inc., arguing that Equifax Inc. is not a consumer reporting agency, as defined by the FCRA. Plaintiff, in response, does not oppose this. The motion to dismiss the Complaint against Defendant Equifax Inc. will be granted, and, as to Defendant Equifax Inc. only, the Complaint will be dismissed with prejudice.

Defendants next move to dismiss Counts III and IV, contending that the Complaint does not plead sufficient facts to make these claims plausible under the pleading standards of Iqbal and Twombly. As to Count III, violation of the FCRA through failure to provide notice of the dispute, Defendants correctly assert that the Complaint pleads insufficient facts in support: the Complaint has no information about even what entity provided the allegedly incorrect information to Equifax, much less anything about what transpired between Equifax and that unidentified entity. As to Count III, the motion to dismiss will be granted, and the claim will be dismissed without prejudice.

As to Count IV, for violation of the FCRA through failure to consider all relevant information provided by the consumer, the Complaint pleads sufficient facts to make plausible a claim that Defendant violated the FCRA by failing to consider all relevant information provided by the consumer. Taking the factual allegations as true, such a violation appears plausible. [1] As to Count IV, the motion to dismiss will be denied.

**\*2** Defendants next move to strike the class allegations from the Complaint, arguing that the putative class, as defined, cannot be certified as a matter of law. Defendants argue that where, as here, it is clear from the face of the Complaint that the requirements for maintaining a class action cannot be met, it is appropriate to strike the class allegations at this early point in the litigation.

Defendants contend that the proposed class, as currently defined, does not and cannot meet the requirements of

Martinez v. Equifax Inc., Not Reported in Fed. Supp. (2019)

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 3 of 172
PageID: 70546

Federal Rule of Civil Procedure 23. The Third Circuit has held:

> The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3). To satisfy Rule 23(a), (1) the class must be 'so numerous that joinder of all members is impracticable' (numerosity); (2) there must be 'questions of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties' must be 'typical of the claims or defenses of the class' (typicality); and (4) the named plaintiffs must 'fairly and adequately protect the interests of the class' (adequacy of representation, or simply adequacy). Rule 23(b)(3), the basis for certification here, 'requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority).'

Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590-591 (3d Cir. 2012) (citations omitted).

The Complaint paraphrases the language of Rule 23(b)(3), asserting that "[t]here are questions of law or fact common to the Class that predominate over any questions affecting only individual members." (Compl. ¶ 38(B).) To be certified, the proposed class must therefore meet the requirements for classes pursuant to Rule 23(a) and Rule 23(b)(3).

In addition, the Third Circuit requires that a Rule 23(b)(3) class be ascertainable: Many courts and commentators have recognized that an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria. If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate. Some courts have held that where nothing in company databases shows or could show whether individuals should be included in the proposed class, the class definition fails.

Marcus, 687 F.3d at 592-593 (citations omitted). Recently, the Third Circuit provided additional guidance on the ascertainability requirement:

> The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' The ascertainability requirement consists of nothing more than these two inquiries. And it does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'

Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015).

Defendants argue, and this Court agrees, that the class definition in the Complaint fails to meet the ascertainability requirement. First and foremost, the putative class is not defined with reference to objective criteria. The Complaint states that the class action "is brought of behalf of all persons who disputed an Equifax credit report and where Equifax failed to apply the proper and appropriate FCRA procedures." (Compl. ¶ 35.) This definition has two components: 1) the set of all persons who disputed an Equifax credit report; and 2) "where Equifax failed to apply the proper and appropriate FCRA procedures." The first component of the class definition is easily ascertained by reference to objective criteria, such as a list of all people who disputed an Equifax credit report, which clearly and crisply identifies all potential class members.

 **\*3** The second component of the definition, however, is not sufficiently ascertainable. It meets neither part of the Byrd ascertainability requirements. First, it lacks any reference to objective criteria. It leaves unanswered a host of crucial questions: what specific procedures are proper and appropriate? How is the determination of the proper and appropriate procedure made? Procedures for doing what? This Court does not see how this subset of report-disputing consumers – the ones subjected to procedural failures by

Martinez v. Equifax Inc., Not Reported in Fed. Supp. (2016)

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 4 of 172
PageID: 70547

Equifax – can be determined by reference to any objective criteria.

Second, there appears to be no reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. This is both because the class definition is unworkably vague, and also because it necessitates individualized fishing expeditions to search for unspecified violations of FCRA. This sounds very much like what the Third Circuit had in mind when it stated: "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." 📄 Marcus, 687 F.3d at 593. This Court does not see how it would be possible to ascertain the members of this subset without resort to individualized, open-ended fishing for FCRA violations.

In opposition, Plaintiff cites cases in which, he contends, other courts have certified similarly-defined classes. These cases are worth discussing, because they highlight the defects in Plaintiff's class definition. Plaintiff first cites 📄 Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 194-195 (E.D. Va. 2015), an Equifax FCRA case in which the Court certified a class defined as follows:

> All natural persons who meet every one of the following definitional requirements:
>
> 1. the computer database of the Executive Secretary of the Supreme Court of Virginia shows that the person was the defendant in a Virginia General District Court civil action or judgment;
>
> 2. the computer database of the Executive Secretary of the Supreme Court of Virginia shows that as of the date 20 days after the Court's certification of this class, the civil action or judgment was dismissed, satisfied, appealed, or vacated on or before April 1, 2009 ("the disposition date");
>
> 3. Equifax's records note receipt of a communication or dispute from that person about the accuracy of Equifax's reporting of that civil action or judgment status; and
>
> 4. Equifax's records note that a credit report regarding the person was furnished to a third party who requested the credit report, other than for an employment purpose: (1.) no earlier than February 17, 2008, (2.) no later than February 21, 2013, (3.) after the date that Equifax's records note its receipt of the consumer dispute regarding the judgment status, and (4.) at least thirty (30) days after the disposition

date but before the judgment notation was corrected by Equifax to report that it was satisfied, appealed or vacated.

This definition identifies the proposed class clearly and crisply, defining it by reference to clear objective criteria, and the administrative process for determining whether putative class members fall within the class definition is easy to envision. Unlike the class definition in the instant case, the Soutter class definition did not necessitate mini-trials.

Plaintiff next cites 📄 Summerfield v. Equifax Info. Servs. LLC, 264 F.R.D. 133, 144 (D.N.J. 2009), an Equifax FCRA case in which the Court certified a class defined as follows:

> All consumers in the State of New Jersey to whom, beginning two years prior to the filing of this Complaint and continuing through resolution of this action, in response to a dispute about the accuracy of a public record that Defendant reported (including, but not limited to bankruptcies, liens, or judgments), Defendant sent a letter substantially similar to the Letter attached to the Complaint as Exhibit A.

**\*4** As with the definition in Soutter, and unlike that in the instant case, this defines the class by reference to clear objective criteria, the administrative process for determining whether putative class members fall within the class definition is easy to envision, and that process does not necessitate mini-trials.

Plaintiff next cites 📄 Clark v. Experian Info. Sols., Inc., 2002 WL 2005709 (D.S.C. June 26, 2002), a case in which the cited decision does not quote the class definition. It does, however, give a good sense of it, offering this summary:

> In their initial complaints, named Plaintiffs Franklin E. Clark and Latanjala Denise Miller allege that Defendants Experian Information Solutions, Inc., Equifax, Inc., Equifax Credit Information Services, Inc., Trans Union Corp., and Trans Union

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 5 of 172
PageID: 70548
Martinez v. Equifax Inc., Not Reported in Fed. Supp. (2016)

L.L.C. willfully failed to set up or maintain reasonable procedures to assure the maximum possible accuracy of information contained in their consumer credit reports. Plaintiffs further alleged that, for at least the past two years, Defendants have produced consumer credit reports regarding Plaintiffs, and the putative class, which indicate that Plaintiffs have been involved in bankruptcy proceedings. Plaintiffs contended, however, that neither they nor those similarly situated ever have filed bankruptcy, or at least have not filed within the ten year period immediately preceding the inclusion of the alleged inaccurate information in the credit reports.

Id. at *1. This suggests that the amended complaint proposed the easily ascertainable class of persons whose credit report incorrectly said that they had filed for bankruptcy. As with the definitions in Clark and Soutter, and unlike that in the instant case, this defines the class by reference to clear objective criteria, the administrative process for determining whether putative class members fall within the class definition is easy to envision, and that process does not necessitate mini-trials.

Plaintiff correctly contends that these three cases are on point, but they do not support Plaintiff's position. Instead, they highlight the defects in Plaintiff's proposed class definition. Plaintiff's proposed class definition fails to meet the ascertainability requirement. It is clear at this early stage of the litigation, as a matter of law, that this Court would never grant a motion for class certification involving this class definition. The class action allegations in the Complaint will be struck. Should Plaintiff wish to amend the Complaint to redefine the class, he must seek this Court's leave to do so.

The motion to dismiss the Complaint and to strike the class allegations will be granted in part and denied in part. As to Defendant Equifax Inc. only, the motion to dismiss will be granted, and the Complaint will be dismissed with prejudice. As to Count III, the motion to dismiss will be granted, and the claim will be dismissed without prejudice. As to Count IV, the motion to dismiss will be denied. The motion to strike the class allegations in the Complaint will be granted.

For these reasons,

**IT IS** on this 19th day of January, 2016,

**ORDERED** that Defendants' motion to dismiss the Complaint and to strike the class action allegations (Docket Entry No. 9), pursuant to Federal Rule of Civil Procedure 12(b)(6), is **GRANTED** in part and **DENIED** in part; and it is further

**\*5 ORDERED** that, as to Defendant Equifax Inc. only, the motion to dismiss is **GRANTED**, and the Complaint is hereby **DISMISSED** with prejudice; and it is further

**ORDERED** that, as to Count III, the motion to dismiss is **GRANTED**, and Count III is hereby **DISMISSED** without prejudice; and it is further

**ORDERED** that, as to Count IV, the motion to dismiss is **DENIED**; and it is further

**ORDERED** that the motion to strike the class allegations is **GRANTED**, and the class allegations in the Complaint are hereby **STRUCK**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 226639

---

### Footnotes

1    Defendants argue that there "are any number of reasons why an investigation that included a review of Mr. Martinez's submissions" could have resulted in rejecting his dispute. That is absolutely true. Iqbal, however, does not require that a complaint's factual allegations must make a claim more likely true than not, but only

that the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 🟨 Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The facts alleged make it plausible that Equifax failed to consider all relevant information provided by Plaintiff.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2

2015-1 Trade Cases P 79,203

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by    In re Lidoderm Antitrust Litigation,    N.D.Cal.,
February 21, 2017

2015 WL 3623005

United States District Court,
E.D. Pennsylvania.

VISTA HEALTHPLAN, INC., et al., Plaintiffs,

v.

CEPHALON, INC., et al., Defendants.

No. 2:06–cv–1833.
|
Signed June 10, 2015.

**Attorneys and Law Firms**

Joseph H. Meltzer, Terence S. Ziegler, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Lawrence Kendall Satterfield, Michael McLellan, Finkelstein Thompson LLP, Washington, DC, Theodore M. Lieverman, John A. Macoretta, Jeffrey L. Kodroff, Mary Ann Geppert, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, William Richard Restis, Finkelstein and Krinsk, San Diego, CA, for Plaintiffs.

Gregory P. Teran, Peter J. Kolovos, Emily R. Whelan, James C. Burling, Mark A. Ford, Michelle D. Miller, Peter A. Spaeth, Yin Zhou, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, Robert J. Gunther, Jr., Wilmer Cutler Pickering Hale Dorr LLP, New York, NY, Frank R. Emmerich, Jr., John A. Guernsey, Nancy J. Gellman, Conrad O'Brien, Philadelphia, PA, Gregory L. Skidmore, John C. O'Quinn, Karen N. Walker, Kirkland Ellis LLP, Washington, DC, Jay P. Lefkowitz, Kirkland & Ellis, New York, NY, Lathrop B. Nelson, III, Richard L. Scheff, Montgomery McCracken Walker and Rhoads, L.L.P., Philadelphia, PA, C. Fairley Spillman, Catherine E. Creely, Paul B. Hewitt, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, David L. Comerford, Jeffery A. Dailey, Katherine M. Katchen, Paul T. McGurkin, Jr., Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA, David R. Marriott, Evan R. Chesler, Rowan D. Wilson, Cravath Swaine & Moore LLP, New York, NY, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, Jeffrey B. Korn, William H. Rooney, Willkie Farr Gallagher LLP, New York, NY, Joseph E.

Wolfson, Stevens & Lee, King Of Prussia, PA, Danielle R. Foley, J. Douglas Baldridge, Lisa Jose Fales, Vincent E. Verrocchio, Molly Geissenhainer, Catherine E. Creely, Venable LLP, Washington, DC, Anthony S. Volpe, John J. O'Malley, Volpe & Koenig PC, Philadelphia, PA, Monica L. Rebuck, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, PA, Steve D. Shadowen, Hilliard & Shadowen LLC, Mechanicsburg, PA, for Defendants.

*MEMORANDUM OPINION*

GOLDBERG, District Judge.

**\*1**  Presently before me is the End Payor Class Plaintiffs' motion for class certification filed in the consolidated antitrust lawsuit known as the *In re Modafinil Litigation.*[1] The prospective class of End Payor Plaintiffs includes consumers and Third–Party Payors ("TPPs"), such as health insurance plans, which purchased the brand-name pharmaceutical, Provigil, or its generic equivalent for either their own use, their families' use, or their beneficiaries' use between June 1, 2006 and September 30, 2013.

Plaintiffs have brought this antitrust lawsuit against the manufacturer of Provigil, Cephalon, Inc., as well as four generic pharmaceutical companies: Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. ("Teva"); Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy"); Mylan Pharmaceuticals, Inc. and Mylan Laboratories, Inc. ("Mylan"),[2] and Barr Laboratories, Inc. ("Barr") (collectively "Generic Defendants"). At the center of this case are four Hatch–Waxman reverse-payment settlements, executed in 2005 and 2006 between Cephalon and each of the Generic Defendants, which are alleged to be anticompetitive for delaying the market entry of generic Provigil. Cephalon is also accused of maintaining an illegal monopoly by enforcing its patent on Provigil, which was allegedly obtained by committing fraud on the Patent and Trademark Office ("PTO").

Plaintiffs seek certification of two classes: (1) a class of End Payors bringing claims under the state antitrust and consumer protection laws of twenty-three states and the District of Columbia; and (2) an unjust enrichment class, bringing claims under the laws of twenty-five states and the District of Columbia. Plaintiffs have also articulated numerous class member exclusions. Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(3), and assert that

2015-1 Trade Cases P 79,203

all of the requirements of 🔖 Rule 23 have been satisfied. Defendants vigorously oppose certification and urge that Plaintiffs have failed to demonstrate the requirements of ascertainability, predominance and superiority.

For the reasons that follow, I find that certification of the End Payor class is not appropriate because Plaintiffs have failed to satisfy the 🔖 Rule 23 requirements of ascertainability, predominance and superiority by a preponderance of the evidence. Accordingly, Plaintiffs' motion is denied.

### I. *FACTUAL AND PROCEDURAL HISTORY*

#### A. *Overview of the In re Modafinil Litigation*
In April 1997, the PTO issued U.S. Patent No. 5,618,845 ("the ′845 patent") to Cephalon, which patented a specific formulation of modafinil known as Provigil, a wakefulness-promoting drug. In 2002, Cephalon was granted a reissue patent on Provigil, 🚩 U.S. Patent No. RE 37,516 ("the RE ′516 patent"), which was scheduled to expire October 6, 2014. However, as a result of studying the drug's effects on children, Cephalon also received an additional six months of pediatric exclusivity on Provigil, extending Cephalon's exclusivity period through April 6, 2015.

 **\*2** On December 24, 2002, all four Generic Defendants filed Abbreviated New Drug Applications ("ANDAs") for generic Provigil, each certifying that Cephalon's patent was either invalid or would not be infringed by their generic modafinil product. As first-filers, all of the Generic Defendants were entitled to share in 180 days of exclusive marketing upon FDA approval, a characteristic of the Hatch–Waxman Act, Pub.L. No. 98–417. As a result of the Generic Defendants' ANDA filings, Cephalon sued the Generic Defendants for patent infringement on March 28, 2003.

All of the litigation between Cephalon and the Generic Defendants was settled between December 2005 and February 2006, while motions for summary judgment were pending. The settlements each permitted the Generic Defendants to launch their generic Provigil product on a "date certain" prior to the expiration of the RE ′ 🚩 516 patent—April 6, 2012. The agreements further contained "contingent-launch provisions," which permitted each Generic Defendant to market generic Provigil prior to the date certain if any other company marketed generic Provigil, whether through a license or at-risk,[3] or if the RE ′ 🚩 516 patent was

declared invalid, unenforceable, or not infringed by generic Provigil. Each of these settlement agreements contained provisions for and/or were signed alongside licenses for intellectual property, active pharmaceutical ingredient supply agreements, and pharmaceutical development agreements. Cephalon agreed to pay a total of approximately $300 million to the Generic Defendants as a result of these agreements.[4] Plaintiffs allege that but-for these payments the Generic Defendants would have launched generic Provigil at risk, and thus lower-cost generic competition would have been brought to the prospective class members by June 2006.

Each of these settlement transactions have been characterized by Plaintiffs as anticompetitive reverse-payment settlement agreements that violate the antitrust laws. *See* 🔖 *Federal Trade Commission v. Actavis, Inc.,* ——U.S. ——, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013). Furthermore, Cephalon is alleged to have violated the antitrust laws by procuring its Provigil patent by fraud on the PTO, and then enforcing said patent to keep competitors off of the market. *See* *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

#### B. *Facts Pertinent to Class Certification*
In support of class certification, Plaintiffs presented the expert testimony of Dr. Raymond S. Hartman.[5] Plaintiffs posit that Dr. Hartman's methodology of measuring antitrust impact and aggregate damages demonstrates that the elements of Plaintiffs' claims can be satisfied through proof at trial that is common to the class. Dr. Hartman's methodology will be explored in greater detail herein, but to summarize, his methodology considered the amounts charged to Plaintiffs for branded and generic Provigil in the real world, and compared it to the amounts Plaintiffs would have been charged in the but-for world—that is, the world absent the allegedly anticompetitive conduct. Dr. Hartman opined that but-for the settlement agreements, the Generic Defendants would have launched their generic Provigil products at-risk in June 2006, which would have brought significant savings to TPPs and consumers. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶¶ 25–26.) According to Dr. Hartman, these overcharges constitute the relevant anticompetitive harm. (*Id.* at ¶¶ 42–44.) Dr. Hartman also considered the profits gained by Defendants during this time period, and compared them to the profits Defendants would have realized in the but-for world. According to Dr. Hartman, the difference between these two

2015-1 Trade Cases P 79,203

figures is an accurate measurement of Defendants' unjust enrichment. (*Id.* at ¶¶ 47–48.)

**\*3** To arrive at these figures, Dr. Hartman used yardsticks —data compiled from the generic launches of similar drugs —to calculate the rates of generic substitution and pricing of generic Provigil in the but-for world, and to demonstrate that consumers and TPPs would have paid less for their prescriptions if generic Provigil had entered the market.[6] (Hrg.Tr., Mar. 24, 2015, pp. 76–87.) Dr. Hartman also considered data derived from the real-world launch of generic Provigil, which occurred in April 2012, to support and update his calculations. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 6–7.)

Defendants presented competing testimony from Dr. James W. Hughes, who opined that significant variations throughout the pharmaceutical industry prevent Plaintiffs from being able to identify class members or prove antitrust impact and damages without substantial individualized inquiry. (Hughes Exp. Rep., June 10, 2011, ¶ 3.) Regarding TPPs, Dr. Hughes stated that establishing injury and the amount of damages will depend upon the particular contractual relationships each TPP has with its insureds, pharmacies, drug manufacturers, and pharmacy benefit managers ("PBMs"),[7] all of which may vary over time. (*Id.* at ¶ 8.) Dr. Hughes also identified several categories of potentially uninjured persons who might otherwise fall within the class definition: (1) brand loyalists, or persons who choose to purchase the brand despite the availability of a generic; (2) consumers with the same copay for branded and generic drugs; (3) consumers who have not paid out-of-pocket for their prescriptions due to meeting an out-of-pocket maximum or an employer-funded health reimbursement account; (4) patients who would not have been prescribed Provigil in the but-for world due to decreased promotion; and (5) consumers whose insurers would place generic Provigil on a non-preferred tier. (*Id.* at ¶¶ 15–19.) As will be explored below, while some of these categories of uninjured persons have been excluded from the class, some remain.

During the class certification hearing, Dr. Hughes explained that simply excluding uninjured persons from the class definition would not prevent numerous individualized inquiries that would make class treatment inappropriate:

> You're not going to be able to determine on any sort of average

basis who the consumers are with flat copays. It's in the contract. You have to go to the contract to see. Certain brand loyal consumers get the question of ... had the generic been available, who would have purchased the brand, who would have purchased the generic? Again, you have to look individually to see what individual consumers would have done.

(Hrg.Tr., Mar. 25, 2015, pp. 38–39.) Dr. Hughes further opined that, without a means of identifying class members, and particularly uninjured persons within the class, Plaintiffs were unable to satisfy the ascertainability and predominance requirements under Rule 23. (*Id.* at pp. 43–44.)

### C. *Proposed Class Definitions*

**\*4** Plaintiffs seek certification of two groups of End Payors: (1) a class of End Payors asserting claims under state antitrust and consumer protection laws; and (2) a class of End Payors asserting claims for unjust enrichment under state law. The proposed class definitions are as follows:

**State Antitrust/Consumer Protection Class**[8]

> All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds from June 1, 2006 through September 30, 2013.

**State Unjust Enrichment Class**

> All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Kentucky[9], Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or

2015-1 Trade Cases P 79,203

their members, employees, plan participants, beneficiaries or insureds from June 1, 2006 through September 30, 2013. The class definitions exclude the following persons and/or entities: (1) Defendants and their respective subsidiaries, affiliates and employees; (2) all governmental entities (except for government funded employee benefit plans); (3) all persons or entities who purchased modafinil, including Provigil, for purposes of resale or directly from Defendants to the extent and solely to the extent of such purpose for resale or as a direct purchaser; (4) insured individuals covered by plans imposing a flat dollar copay that was the same dollar amount for generic as for brand purchases; (5) individuals who bought only branded Provigil after generic modafinil became available ("brand loyalists"); (6) insured individuals who purchased only generic modafinil (not branded Provigil) pursuant to a fixed copay applicable to generic drugs; (7) fully insured health plans, *i.e.,* plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members; and (8) all PBMs without capitation agreements. (Pls.' Br., pp. 12–13.)

## II. *STANDARD OF REVIEW*

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores v. Dukes,* ––– U.S. –––, –––, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)) (quotation marks omitted). In order to certify a class action, the plaintiffs bear the burden of proving by a preponderance of the evidence that the putative class satisfies all of the prerequisites identified in Federal Rule of Civil Procedure 23(a) and one of the subcategories of Rule 23(b). Fed.R.Civ.P. 23; *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir.2008). "[P]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties." *Hydrogen Peroxide,* 552 F.3d at 321. "[T]he court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.* at 307. "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." *Id.* at 323 (citations omitted).

**\*5** Subsection (a) of Rule 23 contains four prerequisites for any class action:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

For certification under Rule 23(b)(3), the movant must also demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These requirements are known as predominance and superiority. *In re Flonase Antitrust Litig.,* 284 F.R.D. 207, 215 (E.D.Pa.2012).

In addition to these requirements, there are two "essential prerequisite[s]" to class certification under Rule 23(b)(3): (1) a "clearly defined class and set of claims, issues, or defenses to be given class treatment"; and (2) "the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 59293 (3d Cir.2012) (citations omitted).

## III. *CLASS DEFINITION AND ASCERTAINABILITY*

### A. *Clearly–Defined Class*

"An order that certifies a class action must define the class and the class claims, issues, or defenses." Fed.R.Civ.P. 23(c)(1)(B). "[T]he text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis." *Marcus,* 687 F.3d at 591 (quoting *Wachtel v. Guardian Life Ins. Co.,* 453 F.3d 179, 187 (3d Cir.2006)). Clearly defining the contours of the class ensures that parties

2015-1 Trade Cases P 79,203

have clarity, and that class members understand their rights and make informed opt-out decisions. *Id.* at 591–92.

The parties have not raised any concerns about the class definitions, and my own review reveals that the classes are clearly defined. Plaintiffs have consistently alleged that, with limited exceptions, every person who purchased Provigil or its generic equivalent during the relevant time period and in the relevant jurisdictions suffered an overcharge, in violation of the state antitrust and consumer protection laws, and are due compensation based upon Defendants' unjust enrichment. As noted above, Plaintiffs have also excluded numerous categories of uninjured class members. Because the class definitions clearly identify the claims at issue, I find that the proposed class definitions satisfy the requirements of Rule 23(c)(1)(B).

**B. Ascertainability**

The United States Court of Appeals for the Third Circuit has recently identified ascertainability as an important prerequisite for class treatment. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' " *Byrd v. Aaron's Inc.,* 784 F.3d 154, 163 (3d Cir.2015) (quoting *Hayes v. Wal–Mart Stores, Inc.,* 725 F.3d 349, 355 (3d Cir.2013)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus,* 687 F.3d at 593. Ascertainability serves several goals: "it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members"; (2) "it protects absent class members by facilitating the best notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action"; and (3) "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Id.* (citations and quotation marks omitted).

**\*6** The same rigorous analysis that a district court is required to undertake for Rule 23 requirements must be conducted with respect to ascertainability, and the plaintiff bears the burden of proving this element by a preponderance of the evidence. *Carrera v. Bayer Corp. .,* 727 F.3d 300, 306 (3d Cir.2013) (quoting *Marcus,* 687 F.3d at 593). "A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful[,]" and a party's assurance that it will be able to establish ascertainability at some point in the future is insufficient. *Id.* at 306; *see also Shelton v. Bledsoe,* 775 F.3d 554, 559 (3d Cir.2015) (class members must be "identifiable at the moment of certification").

The plaintiffs' method for identifying class members must be "administratively feasible," meaning "that identifying class members is a manageable process that does not require much, if any individual factual inquiry." *Id.* at 307–08 (citations omitted). "Ascertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership." *Id.* at 307. It is insufficient to rely solely on a potential class members' "say so" that they belong within the class through affidavits or declarations. *Marcus,* 687 F.3d at 594.

The Third Circuit has recently issued several opinions on the ascertainability requirement, and last year a district court in Tennessee was confronted with class certification issues in a Hatch–Waxman reverse-payment settlement case very similar to the case before me. An examination of this precedent is instructive to analyzing the complex class certification concerns at issue here.

**1. Recent Precedent–Ascertainability**

The Third Circuit first provided a detailed analysis of the ascertainability requirement in *Marcus v. BMW of North America, LLC,* 687 F.3d 583 (3d Cir.2012), wherein the named plaintiff had brought fraud, breach of warranty, and breach of contract claims against a tire manufacturer and a car company. The plaintiff alleged that the manufacturer's run-flat tires ("RFTs") that had been placed on his leased BMW were defective because the tires were highly susceptible to flats, were unable to be repaired, and were exorbitantly priced. *Id.* at 588. The plaintiff sought to certify a class under Rule 23(b)(3) on behalf of all purchasers and lessees of certain model-year BMWs equipped with the RFTs sold or leased in New Jersey with tires that had gone flat or been replaced. *Id.*

The Third Circuit determined that the plaintiff had failed to demonstrate that the proposed class was ascertainable because there was no database or manifest indicating which BMWs had been sold and driven off of the lot with RFT tires. *Id.* at 593–94. In denying the certification motion the Court found that, even if the cars with the tires at issue could be identified, an individualized inquiry would need to be undertaken to determine whether that consumer's RFTs had gone flat and been replaced, as was required by the class definition. *Id.* at 594. The court further found that simply submitting affidavits from potential class members stating that they belong within the class was not a sufficiently reliable methodology. *Id.*

**\*7** The Third Circuit expanded upon the ascertainability requirement in *Carrera v. Bayer Corp.,* 727 F.3d 300 (2013). There, an indirect purchaser of Bayer's One–A–Day WeightSmart product brought claims against Bayer under the Florida Deceptive and Unfair Trade Practices Act and sought class certification on behalf of all persons who purchased WeightSmart in Florida. Bayer argued that it did not maintain a list of class members because the class consisted of indirect purchasers, and potential class members were unlikely to have documentary proof of their purchase. *Id.* at 304. The plaintiff responded that he could identify class members through retailer records of online sales and sales made with store loyalty/rewards cards, or through class member affidavits. *Id.* The Third Circuit rejected this proposal and determined that class certification was inappropriate for lack of ascertainability because the plaintiff had failed to present evidence that the retailers had records of WeightSmart purchases during the relevant period, or that those records would be able to identify purchasers of WeightSmart. *Id.* at 308–09. The *Carrera* court reaffirmed its pronouncement in *Marcus* that affidavits from potential class members were insufficient. *Id.* at 309.

Most recently, in *Byrd v. Aaron's Inc.,* 784 F.3d 154 (3d Cir.2015), the Third Circuit sought to clarify the ascertainability requirement, citing some confusion among district courts and litigants. In *Byrd,* the plaintiffs, lessees of a laptop computer from the defendant, Aaron's Inc., alleged that spyware had been placed on their computer and that the defendants had activated that spyware to obtain pictures from the laptop's camera, as well as screenshots, without the plaintiffs' knowledge or consent. Citing violations of the Electronic Communications Privacy Act, 18 U.S.C.

§ 2511, the plaintiffs sought to certify a class containing all persons who leased or purchased a computer from the defendant, as well as their household members, where the computer contained spyware that was activated without the person's consent. *Id.* at 159–60. The district court denied certification for lack of ascertainability, finding that the class was underinclusive, overly broad, and did not adequately define "household member." *Id.* at 160–61.

The Third Circuit reversed, holding that the plaintiffs had met their burden through defendant's records, which provided the identities and addresses of 895 class members. The court clarified that a plaintiff does not need to actually identify all class members at the time of class certification to demonstrate ascertainability, "a plaintiff need only show that 'class members *can* be identified.' " *Id.* at 163, 166–67 (quoting *Carrera,* 727 F.3d at 308 n. 2) (emphasis in original). "Accordingly, there is no records requirement," although a plaintiff must still provide *evidentiary support* that the proposed method of ascertaining the identities of class members will be successful and administratively feasible. *Id.* at 164.

**\*8** The *Byrd* opinion also found that the district court's concern with underinclusiveness was not an appropriate ascertainability inquiry, and that the class potentially being overbroad was more appropriately considered as a predominance issue. *Id.* at 166–69. Further, the court disagreed with the district court's determination that the "household members" included in the class were not ascertainable, noting that the plaintiffs had presented government documents that could be used to identify those individuals. *Id.* at 169–70. The court remarked that:

> [t]here will always be some level of inquiry required to verify that a person is a member of the class; for example, a person's statement that she owned or leased an Aspen Way computer would eventually require anyone charged with administering the fund resulting from a successful class action to ensure that person is actually among the 895 customers identified by the Byrds. Such a process of identification does not require a "mini-trial," nor does it amount to "individualized fact-finding." ... "[T]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification."

2015-1 Trade Cases P 79,203

*Id.* at 170–71 (quoting *Carrera, 727 F.3d at 307; Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 539–40 (6th Cir.2012)).

*In re Skelaxin (Metaxalone) Antitrust Litigation,* 299 F.R.D. 555 (E.D.Tenn.2014), closely resembles the facts before me, as it involved antitrust allegations brought by a number of end payors who purchased a branded drug and alleged that the brand manufacturer illegally delayed market entry of the generic drug. Relying in part on the Third Circuit precedent discussed above, the district court noted that "[i]f class members are impossible to identify without extensive and individualized fact-finding or mini-trials then a class action is inappropriate." *Id.* at 567 (quoting *Marcus,* 687 F.3d at 593).[10] The court found that "[g]iven the discrepancy between End Payors' expert's testimony and the class definition, the Court cannot determine which entities or individuals are members of the class and which are not." *Id.* at 560. To make this determination, the court found, would require a transaction-by-transaction inquiry that was incompatible with a Rule 23(b)(3) class action. *Id.*

In reaching these conclusions, the district court noted the various links in the pharmaceutical supply chain, and that numerous entities could contribute all or part of the cost of any particular prescription. Thus, the court found it impossible to determine whether an end payor belonged within the class without considering "the individual contractual relationships underlying each transaction." *Id.* at 569. Indeed, much like the record before me, the plaintiffs' expert in *Skelaxin* had opined that identifying who was injured in any particular transaction was a claims administration issue. The district court rejected this testimony, finding that "the issue with End Payors' class is not whether a purchaser was damaged in each individual transaction; the issue is whether a purchaser constitutes a class member." *Id.* at 570. "Until proceeding through each transaction and resolving factual disputes about who 'bears the burden' of the price in that transaction, the Court [could not] say who [was] a member of the class." *Id.* at 571. In short, the district court concluded that ascertaining class members would entail "individual inquiry into contracts covering millions of purchases." *Id.* at 570.

### 2. *Ascertainability of the End Payor Class*

**\*9** As set forth previously, the proposed class definition essentially includes persons from numerous states who purchased *Provigil* (or its generic equivalent) from June 1, 2006 through September 30, 2013. Eight categories of persons and entities are specifically excluded from the proposed class.

Defendants raise two primary arguments in support of their position that the proposed class is not ascertainable.[11] The first argument is that Plaintiffs have failed to present any databases or other records that would identify who belongs within the class, let alone who is excluded. Defendants point out that they do not have such records, as the class is comprised of persons who purchased *Provigil* from other entities in the distribution chain, such as retailers. Defendants stress that Plaintiffs' class certification expert, Dr. Hartman, has clearly acknowledged that he has no methodology for identifying class members. Defendants also assert that even if Plaintiffs had presented a methodology of identifying class members, that process would be overwhelmed by individualized inquiries and would not be administratively feasible.

According to Defendants, the difficulties in identifying class members are further amplified by the multiple entities that may be involved in each pharmaceutical transaction who may have paid for all or a portion of the drug. These possible End Payors could include TPPs, health plan sponsors, PBMs, and the consumers themselves. Defendants stress that many End Payors, particularly consumers, will not have receipts or other ways of proving a purchase of *Provigil* during the relevant time period.

Plaintiffs respond that they have demonstrated ascertainability by proffering "a well-defined class with certain clearly articulated exclusions." (Pls.' Reply, p. 6.) They maintain that other courts within this district have certified classes of end payors without expressing concerns about ascertainability, and the result here should be the same. Plaintiffs attempt to distinguish *Marcus* and *Carrera* by pointing out that those cases arose in the "products liability context" where a complete lack of reliable and objective records existed to identify class members. According to Plaintiffs, that is not the case here, where "comprehensive records documenting any purchase of *Provigil* can be easily obtained from any number of reliable, objective sources" such as "IMS–NPA data, insurance companies, healthcare plans,

health and welfare funds, pharmacies, as well as consumers." (Pls.' Reply, p. 7, n. 18.)

Despite Plaintiffs' assurances, a careful review of the record before me demonstrates that Plaintiffs have not met their burden of demonstrating ascertainability.

a. *Reliable Methodology for Identifying Class Members*

In support of their position that records are readily available, Plaintiffs point to the customer history of named Plaintiff Shirley Panebianco, which was obtained from Bridge Pharmacy. This document lists the various prescriptions that Panebianco had filled during the relevant time period, as well as the amount paid out of pocket and the amount covered by her health insurance plan. (*See* Pls.' Reply, Meltzer Decl., Ex. 27.) Plaintiffs also point to a short chart of claims data that was attached to their reply brief. This document does not identify any individuals, but rather lists patients by number and identifies the state, pharmacy, and/or city in which the prescription was filled, the submitted cost of the prescription and the copayment paid by the consumer. [12] (*See id.* at Ex. 28.)

**\*10** Aside from these two exhibits—one which lists the prescriptions of one consumer, and the other, which identifies consumers by number as opposed to including their identities —Plaintiffs have not presented any *evidence* that these records can be utilized to identify class members. While one consumer's prescription history dating back to 2006 has been presented, the record before me contains no evidence as to whether other pharmacies kept reliable records of this same type of patient data over that time period. Plaintiffs' counsel assures the Court that such records were available. *Carrera* mandates, however, that it is insufficient to simply make assurances that records are readily available without providing evidence that "retailer records in this case can be used to identify class members." *Carrera,* 727 F.3d at 308. And the record before me is certainly different from *Byrd,* where the defendant maintained a list of the 895 persons that belonged within the class.

Dr. Hartman does not cure these deficiencies, and indeed seemed to dispute Plaintiffs' counsel's assurance that readily available records could be used to ascertain the identities of the class members. When asked if a database or other collection of records existed from which the identities of class members could be derived, Dr. Hartman testified that "[w]ithout them coming forward on their own[,]" he was

unaware of any such records. (Hrg.Tr., Mar. 24, 2015, p. 182.) [13] Dr. Hartman stated numerous times that "at this stage of [his] analysis, [he] ha[d]n't been asked to" identify the class members and that he could simply verify that they belonged in the class "when class members come forward with their claims." (*See id.* at pp. 149–51; *see also id.* at p. 162 ("The Court: Do you have a methodology to ascertain the members of the class presently? ... [Dr. Hartman]: No, I haven't been asked to do that yet").)

Although Plaintiffs continue to stress that they need not present a methodology at this time, and that such an analysis would be more appropriate during a damages allocation, this argument is contradicted by clear pronouncements from the Third Circuit. Plaintiffs must, *at the time of class certification,* present a methodology to identify class members, and prove by a preponderance of the evidence that such methodology will be effective and will not require extensive individualized inquiry and mini-trials. *See Carrera,* 727 F.3d at 306 (the class must be *"currently* and readily ascertainable based on objective criteria") (emphasis added). Plaintiffs' argument that other courts within this district and elsewhere have certified similar classes of End Payors without being concerned with ascertainability is diminished by the fact that these cases were decided before *Marcus, Carrera* and *Byrd.* Indeed, the two cases cited by Plaintiffs, *In re Flonase Antitrust Litigation,* 284 F.R.D. 207 (E.D.Pa.2012) and *In re Wellbutrin XL Antitrust Litigation,* 282 F.R.D. 126 (E.D.Pa.2011), never even addressed the issue of ascertainability.

**\*11** Plaintiffs' reliance on *In re Nexium Antitrust Litigation,* 777 F.3d 9 (1st Cir.2015), does not assist their position. It is accurate that the United States Court of Appeals for the First Circuit held that the plaintiffs' failure to identify a methodology for distinguishing between injured and uninjured class members did not preclude class certification. However, in reaching this conclusion, the court found that "[w]hile it is true that a proper mechanism for exclusion of [uninjured] consumers has not yet been proposed, plaintiffs' expert made no concession that such a mechanism could not be developed." *Id.* at 20.

My understanding of Third Circuit precedent, particularly *Hydrogen Peroxide,* and subsequently *Carrera,* is that much more is needed in this Circuit than an expert who did not concede that an ascertainability mechanism could not

2015-1 Trade Cases P 79,203

be developed. *See* 🔖 *Hydrogen Peroxide,* 552 F.3d at 318 (Rigorous analysis required, and assurances that a Plaintiff "intends or plans to meet the requirements is insufficient");

🔖 *Carrera,* 727 F.3d at 306 (same). Put another way, plans to create a methodology at a later date do not satisfy the rigorous analysis insisted upon by the Third Circuit and I do not read *Byrd* to alter these requirements. Moreover, the First Circuit in *In re Nexium* was satisfied that class member testimony in the form of an affidavit or declaration would meet the ascertainability requirement. As noted above, this method has been squarely rejected in this Circuit. *Compare*

🔖 *In re Nexium,* 777 F.3d at 20 (categorizing affidavits and declarations as an acceptable means of identification), *with*

🔖 *Marcus,* 687 F.3d at 594 ("Forcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications").

For all of the above reasons, I agree with Defendants that Plaintiffs have failed to present evidence of a reliable "mechanism for determining whether putative class members fall within the class definition." 🔖 *Byrd,* 784 F.3d at 163.

### b. *Administratively Feasible Methodology for Identifying Class Members*

Plaintiffs have also not met their burden of establishing that any methodology for identifying class members would be administratively feasible. Dr. Hughes credibly testified that he was unaware of any administratively feasible approach that would allow Plaintiffs to distinguish class members from persons that fell within an exclusion, and that Dr. Hartman's yardstick methodology did not address this concern. (Hrg.Tr., Mar. 25, 2015, pp. 43–46, 80–81.) I find Dr. Hughes' analysis on this issue convincing. [14]

At oral argument, Plaintiffs' counsel acknowledged that, in the absence of a database or comprehensive list of class members, sending notice to potential consumer class members would necessitate numerous steps. According to Plaintiffs' counsel, this process would first require a plan to be developed by a consulting company, wherein notices would be sent to TPPs. While Plaintiffs' counsel assured me that a list of TPP class members had been compiled, this list was not offered into evidence and thus its reliability could not be challenged by Defendants or examined by the Court. Plaintiffs' counsel next described setting up a website which

would allow the consumer class members to make themselves known to Plaintiffs' counsel. Thereafter, individual records would need to be compiled to determine whether that person actually belongs within the class, or if they fall within an exclusion. (Oral Arg. Tr., May 6, 2015, pp. 7–12.) Dr. Hartman acknowledged that in order to identify consumers and TPPs that fell within the class, he would need to conduct a detailed analysis of the contracts between various entities and also examine the purchasing history of the individual. (*See* Hrg. Tr., Mar. 24, 2015, pp. 175–76, 195–96.)

**\*12** To the extent that this multi-step notice process acts as a means of identifying class members, it entails "extensive and individualized fact-finding or 'mini-trials' " that *Byrd* stated would make class certification inappropriate.

🔖 *Byrd,* 784 F.3d at 163 (citation omitted). Indeed, Plaintiffs' ascertainability problems are compounded by the complex nature of the pharmaceutical and insurance industries. Many individualized questions must be answered in order to determine whether an individual falls within the class definition, such as: Was the individual a brand loyalist?; What was the individual's copay for branded as opposed to generic Provigil?; Was the individual a member of a group plan that provided full or partial reimbursement?; What, if any, rebates factored into the consumer payment?

These very same hurdles also caused concern to the district court in *In re Skelaxin*. Under very similar circumstances, the court denied class certification, as it required "consideration of the individual contractual relationships underlying each transaction." 🔖 *In re Skelaxin,* 299 F.R.D. at 569. I share those concerns and agree with Judge Collier when he stated:

> [U]ntil proceeding through each transaction and resolving factual disputes about who "bears the burden" of the price in that transaction, the Court cannot say who is a member of the class, that is, who has paid or reimbursed a portion of the purchase price. Although the class is circumscribed to only those entities who paid for their own consumption or the consumption of their constituents, End Payors' expert testified that, depending on the circumstances of each transaction, an end payor may

be one or more entities or individuals sharing the burden.

*Id.* at 571.

Plaintiffs argue that Defendants are confusing claims administration with ascertainability, and insist that the court in *In re Skelaxin* made this same error. They point to an antitrust case involving allegations of delayed generic entry where class counsel successfully provided settlement checks to 816,000 consumers and 2,500 TPPs during the claims administration of a settlement class. That claims administration was conducted by gathering and analyzing records from insurers and pharmacies to determine who was owed a portion of the settlement. *See In re Tricor Indirect Purchaser Antitrust Litig.,* C.A. No. 05–360 (D.Del.). However, this procedure was used in the context of a settlement, which raises different certification issues. *See Carrera,* 727 F.3d at 308 n. 4 (questioning whether methods used to identify purchasers in a settlement class would be relevant to resolving ascertainability in a litigation class); *see also In re Skelaxin,* 299 F.R.D. at 571–72 ("The proposed 'claims administration' procedure is wholly post-hoc whittling of the class in the context of *settlement.* This methodology does nothing for the individual fact-finding required if this case were put to a jury") (emphasis in original).

*\*13* I also recognize and have considered *Byrd'* s conclusion that verification of a person's membership in the class for purposes of fund administration does not require a "mini-trial." *See Byrd,* 784 F.3d at 170. But again, fund administration and the rigorous analysis required by the Third Circuit for establishing ascertainability are separate and distinct. My concerns about ascertainability focus on whether Plaintiffs can reliably identify class members at the outset. By contrast, the fund administration process would occur at the conclusion of litigation, and simply verify that any particular consumer or TPP is indeed one of the previously-identified members of the class. *See id.* (a person's statement that she belongs within the class would need to be verified at the conclusion of successful litigation to ensure she is actually among the previously-identified class members).

In summary, Plaintiffs have failed to present any evidence that they have developed a methodology for ascertaining the identities of class members, aside from simply assuring the

court that records of *Provigil* prescriptions exist. Nor have Plaintiffs presented any evidence to demonstrate that it is possible to ascertain class members in an administratively feasible manner without highly individualized inquiry. Accordingly, Plaintiffs have failed to meet their burden of satisfying the ascertainability requirement.

## IV. *RULE 23(A) REQUIREMENTS*

### A. *Rule 23(a)(1)-Numerosity*

Defendants do not dispute Plaintiffs' ability to meet their burden as to the numerosity requirement, where Plaintiffs must establish that "the class is so numerous that joinder of all members is impracticable." *Fed.R.Civ.P.* 23(a)(1). Whether joinder is impracticable requires consideration of the number of class members, expediency, and the inconvenience of trying individual cases. *Jackson v. Se. Pa. Transp. Auth.,* 260 F.R.D. 168, 186 (E.D.Pa.2009) (citations omitted). While there is no precise number that will meet this requirement, classes in excess of forty members tend to satisfy numerosity. *Id.* Dr. Hartman has identified in excess of five million total *Provigil* prescriptions filled in the relevant jurisdictions from 2006 through January 2011. (Hartman Damages Exp. Rep., Apr. 26, 2011, Attachment E.1.e.) Therefore, I find that Plaintiffs have satisfied the numerosity requirement.

*See In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 685 n. 21 (S.D.Fla.2004) ("once the good faith estimate of the class size reaches the thousands, the joinder impracticability test is satisfied").

### B. *Rule 23(a)(2)-Commonality*

The commonality requirement is met where the members of the class's claims "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. "Because the requirement may be satisfied by a single common issue, it is easily met." *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994).

*\*14* As in other similar antitrust cases, "[e]ach class member's claims depend on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors," which will require evidence

2015-1 Trade Cases P 79,203

common to the class." *In re Wellbutrin XL,* 282 F.R.D. at 137 (citing *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 528 (3d Cir.2004)). Defendants do not dispute Plaintiffs' ability to establish commonality, and I find that it has been satisfied.

**C.** *Rule 23(a)(3)—Typicality*

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57 (citations omitted). Typicality exists "[i]f the representative's claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories ... regardless of factual differences underlying the individual claims." *In re Wellbutrin XL,* 282 F.R.D. at 138 (citing *Baby Neal,* 43 F.3d at 57–58). The court must consider "whether the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1998) (quotation marks and citations omitted). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 631 (3d Cir.1996) (citations omitted).

Plaintiffs argue that typicality has been established because both the named and absent class members maintain the same claims and legal theories—that the allegedly anticompetitive conduct of Cephalon and the Generic Defendants constituted a violation of state antitrust, consumer protection and unjust enrichment laws. Plaintiffs allege that the Defendants' conduct injured both the class representatives and the absent class members through overcharges and unjust enrichment. Defendants respond that a conflict of interest exists between class members that may share an overcharge, and that this conflict defeats typicality. I do not agree. *See In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 337 (E.D.Mich.2001) (quoting *In re S. Cent. States Bakery Prods. Antitrust Litig.,* 86 F.R.D. 407, 418 (M.D.La.1980)) ("A naked allegation of antagonism cannot defeat class

certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit"); (*see also* Section IV. D. *infra*).[15] Plaintiffs' and the absent class members' claims are based on largely identical legal theories and focus heavily on Defendants' course of conduct. *See In re Flonase,* 284 F.R.D. at 218 (finding typicality had been established where the indirect purchasers all alleged "that the same unlawful conduct injured both the class representatives and the absent class members"). Therefore, I find that Plaintiffs have satisfied the typicality requirement.

**D.** *Rule 23(a)(4)-Adequacy of Representation*

**\*15** Adequacy of representation has two prongs: (1) "the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation"; and (2) "the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975) (citation omitted). The adequacy requirement necessitates that the court consider whether conflicts of interest exist between named parties and those they represent. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Defendants do not challenge the adequacy of Plaintiffs' counsel, all of whom have extensive experience handling complex class action litigation, including cases in the antitrust context. (*See* Pls.' Mot., Meltzer Decl., Exs. 15–17.) Defendants do, however, argue that conflicts exist between and among the named Plaintiffs and absent class members that defeat adequacy of representation. First, Defendants argue that conflicts exist between certain class members who actually benefitted from the absence of generic Provigil and those who were allegedly harmed by the absence of generic Provigil. For instance, Dr. Hughes opined that brand loyalists often benefit from a delay in generic entry because their copayment may increase when a generic product becomes available. (Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 10, 49–51.) Plaintiffs respond, and I agree, that brand loyalists have been excluded from the class definition, and therefore no such conflict exists.

Next, Defendants argue that conflicts exist between the various End Payors who may bear the cost of any particular Provigil prescription through cost-sharing. For example, a consumer may pay a portion of the cost of Provigil through a copay, while his insurer, a TPP, would pay the

2015-1 Trade Cases P 79,203

remainder. Defendants assert that this framework, where alleged overcharges are split among class members, would result in class members battling against each other for recoveries, resulting in a conflict of interest. Plaintiffs respond that shared portions of an overcharge does not constitute a conflict, but is instead an integral part of the damages allocation process.

The court in *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 326 (E.D.Mich.2001), considered a similar argument, and found that a hypothetical conflict regarding apportionment of damages was insufficient to defeat certification. "Each class member has the same interest in maximizing the aggregate amount of classwide damages." *Id.* at 337 (quoting *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 512 (S.D.N.Y.1996)) (quotation marks omitted). "A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit." *Id.* (quoting *In re S. Cent. States Bakery Prods. Antitrust Litig.,* 86 F.R.D. 407, 418 (M.D.La.1980)); *see also* *Kohen v. Pacific Inv. Mgmt. Co. LLC,* 571 F.3d 672, 680 (7th Cir.2009) ("To deny class certification now, because of a potential conflict of interest that may not become actual, would be premature").

**\*16** Defendants have not presented evidence to establish a real probability of a conflict of interest among class members. All class members have a common interest in maximizing aggregate classwide damages. As in *In re Cardizem,* I find that the risk of conflicts during a damages allocation is speculative, and in any event, if conflicts were to arise at that stage of the litigation, those conflicts could be alleviated through the creation of subclasses of consumers and insurers. Therefore, I find that Plaintiffs have met the adequacy of representation requirement.

## V. *ANTITRUST CLAIMS–PREDOMINANCE*
The predominance requirement considers "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. In order to certify a class under Rule 23(b)(3), "questions of law or fact common to class members [must] predominate over any questions affecting only individual class members." Fed.R.Civ.P. 23(b)(3). While commonality and predominance present similar

considerations, the predominance standard is "far more demanding." *Hydrogen Peroxide,* 552 F.3d at 311 (citations omitted).

"Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* ——U.S. ——, ——, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013) (emphasis in original). Individual questions need not be absent, so long as common questions predominate. *Id.* at 1196.

When conducting a predominance inquiry, the court must consider the elements of the underlying cause of action. *In re Flonase,* 284 F.R.D. at 219 (quoting *John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011)). In order to prevail on their state law antitrust claims, [16] Plaintiffs must prove: (1) a violation of the state antitrust laws; (2) individual injury resulting from the violation, also known as antitrust impact; and (3) measurable damages. *See* *Hydrogen Peroxide,* 552 F.3d at 311.

Defendants largely do not dispute that the evidence Plaintiffs would present at trial to establish a violation of the state antitrust laws would be common to the class. [17] Instead, Defendants argue that Plaintiffs are not able to demonstrate antitrust impact or damages using class-wide evidence because determining whether a particular purchaser was harmed and the extent of that harm will necessitate individualized inquiries.

### A. *Antitrust Impact*
"In antitrust cases, impact often is critically important for the purposes of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *Id.* (citations omitted). "[T]he task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 31112. To resolve this issue, the court must conduct a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.* at 312 (citations omitted).

**\*17** Plaintiffs largely rely upon the reports and testimony of Dr. Hartman in demonstrating that antitrust impact can be established using proof common to the class. Plaintiffs argue that Defendants' actions in unlawfully keeping generic Provigil off of the market caused universal injury to the class in several ways. First, by entering into the reverse-payment settlement agreements, Defendants allegedly kept generic Provigil off of the market through 2012, when Plaintiffs argue it would have otherwise entered the market, bringing lower prices to the class members, in 2006. (Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶¶ 128–29.) Thereafter, when generic Provigil did enter the market in 2012, Plaintiffs allege that those who switched to the generic paid more for generic Provigil than they would have paid in the but-for world—that is, if the generic had come onto the market in 2006. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 7, Attach. E.3.a, b.) Plaintiffs argue that common proof of these overcharges can establish antitrust impact for the class as a whole.

Defendants respond that significant variations within the class and large groups of uninjured class members prevent Plaintiffs from proving antitrust impact on a class-wide basis. I will first address Plaintiffs' evidence of class-wide antitrust impact, and then address Defendants' arguments that individualized evidence of impact would overwhelm common evidence.

### 1. *Plaintiffs' Class–Wide Evidence of Antitrust Impact*

To meet their burden of demonstrating impact to the class, Plaintiffs must demonstrate that branded and generic Provigil prices would have been lower absent Defendants' conduct, which resulted in overcharges to the class members, and must be able to do so through common evidence. *See In re Flonase,* 284 F.R.D. at 221. Plaintiffs rely on the testimony of Dr. Hartman to meet these standards.

Dr. Hartman reports that by virtue of entering into the settlement agreements with the Generic Defendants, Cephalon was able to maintain a monopoly on the Provigil market and generate monopoly profits for an extended period of time. (Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶¶ 28, 129–30.) Dr. Hartman opined that absent the agreements, all of the Generic Defendants would have launched their generic Provigil products at-risk in 2006. (*Id.* at ¶¶ 35, 129–30.) He further explained that generic pharmaceuticals, including generic Provigil, have a lower cost to consumers and TPPs than their brand-name counterparts. (*Id.* at ¶¶ 62–66.) Dr. Hartman reasoned that this is why the Hatch–Waxman Act was implemented—to increase the availability and procompetitive effects of generic pharmaceuticals. (*Id.* at ¶¶ 55–61.)

Dr. Hartman's reports detail the significant cost savings to end payors when generic pharmaceuticals enter the market, and how those savings increase with each additional generic competitor. (*Id.* at ¶¶ 131–34.) He also examined the real-world effects of generic competition on the Provigil market by reviewing data derived from generic Provigil's market entry in 2012. His evaluation of the data suggests that 99% of consumers switched to the generic version of Provigil, and that they have experienced savings as a result.

**\*18** According to Dr. Hartman, but-for the settlement agreements by and among Defendants, the savings to consumers who switched to generic Provigil would have been greater. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 7, Attach. E.3.a, b.) This is because the price charged for a generic upon release is impacted by the price of the brand-name drug. As the price of branded Provigil increased from 2006 through 2012, the amount charged by generic manufacturers in 2012 also increased to a higher level than it would have been in 2006. Therefore, according to Dr. Hartman, even those consumers who were able to purchase generic Provigil in 2012 suffered overcharges. (Hrg.Tr., Mar. 24, 2015, pp. 66–68, 87–91.) To demonstrate the difference between the but-for cost of Provigil and the prices paid by consumers for branded and generic Provigil in the actual world, Dr. Hartman used the yardstick method described above, which has been utilized in other antitrust cases. *See In re Linerboard Antitrust Litig.,* 305 F.3d 145, 153–55 (3d Cir.2002) (accepting the use of the yardstick method for antitrust impact and damages on a class-wide basis); *In re Flonase,* 284 F.R.D. at 220 (same); *In re Wellbutrin XL,* 282 F.R.D. at 140–41 (same).

Plaintiffs assert that these facts are common to all class members and are sufficient to establish antitrust impact on a class-wide basis. (Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶ 135.)

### 2. *Defendants' Challenges to Class–Wide Evidence of Antitrust Impact*

Defendants argue that individualized evidence regarding antitrust impact overwhelms common evidence because the class includes numerous categories of purchasers that suffered no injury, and that there is no class-wide methodology

for identifying or distinguishing between those persons and otherwise injured class members.

Dr. Hughes described several categories of uninjured consumers, which include: (1) consumers who purchased Provigil after meeting an annual out-of-pocket maximum or deductible; (2) consumers whose insurer placed generic modafinil on the same formulary tier as Provigil, and thus would have the same copay for generic and branded Provigil; and (3) brand loyal consumers who would have bought branded Provigil even if a generic had been available. (*See* Hughes Exp. Rep., June 10, 2011, ¶¶ 90–110, 105–110, 126–27; Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 10, 11.) Dr. Hughes further identified categories of institutional payors that would otherwise fall within the class definition but who were not injured, such as: (1) institutional payors that shared risk with pharmacies through capitation agreements; and (2) institutional payors that paid more for generic Provigil due to aggressive promotion of generic substitution through their copayment structure. (Hughes Exp. Rep., June 10, 2011, ¶¶ 70, 75.) Due to these categories of uninjured class members, Dr. Hughes opined that determining whether individuals would have suffered harm, or would instead fall into one of these no-injury categories, would require individualized inquiry into the contracts that govern the relationships between entities and consumers, as well as the consumer's purchasing history. (*Id.* at ¶¶ 70, 75, 98, 110, 126.)

**\*19**  Based upon Dr. Hughes' experience and training and the reliable data he reviewed, I credit his testimony regarding the numerous categories of uninjured consumers and the extensive individualized inquiries that would follow.[18] I thus conclude that a significant number of uninjured class members remain within the class definition, and that Plaintiffs have not identified a methodology that would identify and remove those persons on a class-wide basis. This conclusion is supported by Plaintiffs' own expert Dr. Hartman, who acknowledged that in order to identify uninjured persons or entities, whether they fall within an exclusion or not, would require a fact-intensive, individualized analysis of the contracts between various entities and the consumer, as well as the purchasing history of a particular consumer. (Hrg.Tr., Mar. 24, 2015, pp. 183–87.) While Dr. Hartman indicated that "[y]ou have to look at individualized records in that case for a few number—for a number of consumers" (*id.* at 186), there is no escaping that every potential class member would need to be subject to individualized inquiries. Indeed, when every class member has the potential to be a brand loyalist, a person with a flat copay or a consumer who never paid out-

of-pocket for their prescriptions, and the only way to identify persons who fall within those groups is individualized inquiry, individualized inquiries would predominate.

Additionally, despite Dr. Hartman's assurances that only a de minimis number of class members are uninjured, and that by excluding certain categories of uninjured class members, impact is capable of class-wide proof, the exclusions proposed by Plaintiffs do not resolve the predominance issue. In fact, the many exclusions proposed by Plaintiffs appear to be part of the problem.

As described above, Dr. Hughes established that Plaintiffs have not offered a class-wide methodology for identifying those persons who purchased Provigil or its generic equivalent, but who fall within an exclusion, such as brand loyalists and persons with flat copays. When the identification and exclusion of these consumers cannot be managed without considering the highly individualized purchasing history of individuals and their specific insurance plans, simply stating that they are excluded from the class definition is not sufficient to show that common issues will predominate.

Further, I find that unrebutted testimony from Dr. Hughes credibly demonstrates that more than a de minimis number of uninjured persons remain within the class, despite Plaintiffs' assurances to the contrary. Dr. Hughes has identified several categories of consumers and TPPs that have not been excluded from the class definition, but would be uninjured. One such category of institutional payors includes TPPs that are uninjured due to capitation agreements between TPPs and pharmacies. For example, TPPs may have agreements with pharmacies whereby the TPP would reimburse the pharmacy a set fee for a certain therapeutic class of drug, whether the drug was brand or generic. Therefore, pharmacies can insulate TPPs from injury. (Hughes Exp. Rep., June 10, 2011, ¶ 70.)

**\*20**  Another possible category of uninjured parties includes TPPs that pay more for the generic than branded Provigil because they aggressively promote generic substitution through their copayment structure. For example, when a generic is priced slightly, but not substantially, below the price of the branded drug, and the TPP requires a much higher copay for the brand-name drug than the generic, the TPP may actually pay more for the generic because they are receiving a much lesser copay contribution from the consumer. This category of TPPs could also be uninjured. (*Id.* at ¶ 75.)

2015-1 Trade Cases P 79,203

Consumers with no out-of-pocket payment are another category of persons who could be uninjured, but have not been excluded from the class definition. Plaintiffs have not disputed Dr. Hughes' finding that, based upon employer claims data, five percent of all consumers prescribed Provigil never paid out-of-pocket for the drug from January 2005 through March 2010. (*Id.* at ¶ 106, Ex. 6.) According to Dr. Hughes, this result is derived from two groups of people: (1) consumers who have reached their annual out-of-pocket maximum for prescriptions prior to purchasing Provigil; and (2) consumers that are covered by an exclusively employer-funded health reimbursement arrangement or health savings account. If these consumers never paid out-of-pocket for their branded or generic Provigil prescription, they are uninjured by any delay in generic entry. (*Id.* at ¶¶ 105–10.)

Dr. Hughes also described consumers who received no cost-benefit from switching to the generic. For example, some health plans place non-preferred brands of generics in the highest copayment tier. If a consumer's TPP lists generic Provigil in the same or a higher copayment tier than that of branded Provigil, that consumer would not pay any less for generic Provigil, and thus would not be injured by delayed generic entry. (*Id.* at ¶¶ 126–27.) In fact, Dr. Hughes' supplemental expert report, which was completed following generic entry, actually demonstrates that some of the plans associated with named Plaintiff Vista Healthplan covered both branded and generic Provigil on tier three. (Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 57–58.) Dr. Hughes further noted that, of the plans he reviewed, nine percent of three-tier non-Medicare plans, eighteen percent of four-tier Medicare plans, and thirty-five percent of five-tier Medicare plans placed generic Provigil on a non-preferred tier, which can result in no injury to consumers. (*Id.* at ¶ 59, Ex. 4.) [19]

While Dr. Hughes could not quantify the prevalence of many of these groups of uninjured class members among purchasers of Provigil, he testified that in his experience, these categories of TPPs and consumers exist within the pharmaceutical market place, a point not disputed by Plaintiffs. Dr. Hughes reliably and credibly stated that at least five percent of consumers had no out-of-pocket payment, and thus were uninjured, from 2005 to 2010. I find that this five percent, combined with the substantial likelihood that some of the other categories mentioned above of uninjured class members identified by Dr. Hughes would be within the proposed class, indicates that the prevalence of uninjured class members is more than de minimis.

**\*21**  This case is similar to *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 2010 WL 3855552 (E.D.Pa. Sept.30, 2010), where Judge Lawrence Stengel of this district denied class certification for a group of end payors in a case involving delayed generic entry. There, Judge Stengel found that the class contained several categories of uninjured class members, such as brand loyalists and those whose insurance plan terms insulated them from overcharges. *Id.* at *26. Judge Stengel commented that "I cannot fathom, and the plaintiffs have not put forth, a method for identifying which individual purchasers would [be uninjured] through analysis of common information." *Id.* at *25. The plaintiffs' evidence did "not show that *all* class members paid supra-competitive prices for generic or branded [Wellbutrin SR], or that this determination c[ould] be made with common proof." *Id.* at *27. Accordingly, the plaintiffs were unable to meet the predominance standard in light of *Hydrogen Peroxide 's* rigorous analysis requirement. I reach the same conclusion here. Without a means of identifying these uninjured persons using common evidence, every class member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' alleged anticompetitive actions.

In summary, Plaintiffs have not sufficiently proven that they are able to demonstrate antitrust impact on a class-wide basis. This is due to various groups of uninjured persons that remain within the class, and because identifying and removing these uninjured class members would require extensive individualized inquiry.

### B. *Damages*

Plaintiffs argue that they have demonstrated predominance with respect to antitrust damages through Dr. Hartman's yardstick methodology. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶ 42.) For overcharge damages, Dr. Hartman subtracts the but-for price of generic Provigil from the prices of branded and generic Provigil in the actual world during the relevant time period. He then multiplies that price difference by the number of prescriptions written. (*Id.* at ¶¶ 43–44.) The aggregate amount of overcharges to the Class, as calculated by Dr. Hartman, is $2.449 billion. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 4.) In calculating unjust enrichment damages, Dr. Hartman subtracts the profits that Defendants would have realized in the but-for world from the amount of profits Defendants realized in the actual world during the relevant time period. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶¶ 47–48; Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 12.) Dr.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)

2015-1 Trade Cases P 79,203

Hartman opined that the amount of unjust enrichment owed to the class, in the aggregate, is $2.507 billion. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 11.)

Defendants argue that Plaintiffs are unable to demonstrate predominance as to damages for several reasons. First, citing *Comcast Corp. v. Behrend,* ——U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), Defendants argue that "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." (Defs.' Resp., p. 24.) Second, in supplemental briefing, Defendants assert that Plaintiffs' damages calculation did not match their theory of antitrust impact. For the reasons that follow on this point, I disagree with Defendants' arguments.

**\*22** "At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." *In re Wellbutrin XL,* 282 F.R.D. at 144 (citing *In re Neurontin Antitrust Litig.,* 2011 WL 286118, at \*9 (D.N.J. Jan.25, 2011)). Courts have held that proof of aggregate damages is appropriate in class actions. *In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d 156, 197 (1st Cir.2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself").

"Some variation of damages among class members does not defeat certification," *In re Flonase,* 284 F.R.D. at 232 (quoting *Behrend v. Comcast Corp.,* 655 F.3d 182, 204 (3d Cir.2011)), and damages "calculations need not be exact." *Comcast,* 133 S.Ct. at 1433 (citing *Story Parchment Co. v. Paterson Parchment Paper Co. .,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). Once injury has been established, "the jury is permitted to calculate the actual damages suffered using a reasonable estimation, as long as the jury verdict is not the product of speculation or guess work." *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 484 (3d Cir.1998) (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1176 (3d Cir.1993)) (quotation marks omitted).

In *Comcast,* the Supreme Court addressed the issue of predominance as it relates to antitrust damages. The district court had certified the class, but had only accepted one out of four of the plaintiffs' theories of antitrust impact as capable of class-wide proof—"the theory that Comcast engaged in anticompetitive clustering conduct, the effect of which was to deter the entry of overbuilders" in the Philadelphia area. *Comcast,* 133 S.Ct. at 1431. However, the damages model the plaintiffs' expert had used to calculate damages for the class included damages from all of the various theories of antitrust impact, including the ones not certified for class treatment. *Id.* The Supreme Court reversed class certification, finding that plaintiffs had not shown that damages were capable of measurement on a class-wide basis, as required to establish predominance. *Id.* at 1433. The primary takeaway from *Comcast* has been that a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Id.*

In the wake of *Comcast,* some defendants, including those here, argue that plaintiffs cannot have variations in damages calculations, and that diverse individual damages calculations prohibit class treatment. This is because in *Comcast,* the district court held (without a challenge on appeal) that in order to meet the predominance requirement, plaintiffs had to show "that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.' " *Id.* at 1430. Furthermore, the Supreme Court stated that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.*

**\*23** Circuit courts have largely rejected the interpretation urged by Defendants—that variations in damages calculations between and among class members defeat predominance. *See Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir.2013) ("It would drive a stake through the heart of the class action device, in cases in which damages were sought ... to require that every member of the class have identical damages"); *see also In re Nexium Antitrust Litig.,* 777 F.3d 9, 18–19 (1st Cir.2015) (limiting its interpretation of *Comcast* to the principle that the plaintiff's theory of impact must match his damages model); *In re Deepwater Horizon,* 739 F.3d 790, 817 (5th Cir.2014) (same); *In re Whirlpool Corp. Front Loading Washer Prods. Liab. Litig.,* 722 F.3d 838, 860 (6th Cir.2013) (same); *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir.2013) (same). Indeed, "[i]f the issues

2015-1 Trade Cases P 79,203

of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."

*Butler*, 727 F.3d at 801. Accordingly, *Comcast* has largely been limited to its unique set of facts, and interpreted as precluding class treatment where the class-wide measure of damages does not match the theory of antitrust impact.

In response to Defendants' argument that variations in damages calculations overwhelm questions common to the class, Dr. Hartman demonstrated that his aggregate damages model is able to account for the variations between and among class members. To establish this point, Dr. Hartman compiled a list of individuals with copays for branded and generic Provigil ranging from $0 to $180. Some members of the sample had a flat copay, and some experienced significant savings from purchasing generic Provigil. Dr. Hartman added up the total injury to this small sample individual-by-individual—that is, he computed the overcharge experienced by each individual, and added those numbers together to find a total overcharge for the sample. He then used his averages formula to calculate the average overcharge to the sample, and multiplied that figure by the number of persons in the sample. Whether Dr. Hartman added up the overcharges individual-by-individual or took the average overcharge and multiplied it by the total number of class members, Dr. Hartman reached the same exact amount of total damages to the sample. Through this demonstration, Plaintiffs have satisfied me that their damages were derived using a reliable method that took individual variations among class members into consideration.[20] (Hrg.Tr., Mar. 24, 2015, pp. 95–103.) Therefore, I do not find that individual variations in Plaintiffs' damages calculations prevent a finding of predominance.

Defendants separately urge that when this Court granted Defendants' motions for summary judgment on Plaintiffs' overall conspiracy claims, Dr. Hartman's damages model suffered the same defect that the Court addressed in *Comcast,* in that his damages model no longer fit Plaintiffs' theory of liability and antitrust impact.

**\*24** In a prior Opinion, I considered whether Plaintiffs had provided sufficient evidence to survive summary judgment on a claim for one overall antitrust conspiracy among all Defendants. *King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* 2014 WL 2813312 (E.D.Pa. June 23, 2014). In their

complaint, Plaintiffs had alleged that Cephalon and the Generic Defendants had all conspired together to keep generic Provigil off the market and to share in the generated monopoly profits. *Id.* at \*4. In support of their claim for overall conspiracy, Plaintiffs pointed to the 180–day period of exclusivity shared by the Generic Defendants, as well as the substantially identical contingent launch provisions found within each of the settlement agreements. *Id.* Defendants had argued that each Generic had an individual incentive to demand a contingent launch provision, and that Plaintiffs' circumstantial evidence was insufficient to establish an overarching conspiracy as a matter of law. *Id.* I agreed with Defendants, holding that the Private Plaintiffs had not provided direct evidence of an overall agreement encompassing Cephalon and all of the Generic Defendants, nor had they presented circumstantial evidence that supported "an inference of concerted, as opposed to independent, action." *Id.* at \*14. Accordingly, summary judgment was granted in favor of the Defendants as to the Private Plaintiffs' claims of overall conspiracy. *Id.*

As a result of this decision, which was issued after briefing had been completed on the instant motion for class certification, Defendants submitted a supplemental argument under *Comcast* urging that Plaintiffs' damages model did not match their remaining theories of liability. Defendants argue that Dr. Hartman's damages model presents aggregate damages to the entire market, which he attributes collectively to all Defendants. To match Plaintiffs' remaining theories of liability, Defendants posit that Dr. Hartman needed to analyze the potential damages attributable to each of the separate agreements between Cephalon and a Generic Defendant standing on its own. Such an analysis would allow a jury to determine, if only one or two Defendants were ultimately found liable, the amount of damages attributable to those specific parties' conduct. (Doc. No. 425, pp. 4–5.)

Plaintiffs respond that their damages calculation does not run afoul of *Comcast* because their "damage analysis is exactly the same whether there is one conspiracy or four." (Doc. No. 429, pp. 1–2.) This is due to the contingent launch provisions in each settlement agreement, urge Plaintiffs, which allowed the Generic Defendant bound by that settlement agreement to enter the market earlier than 2012 if any other generic Provigil product entered the market. Therefore, "[i]f any one of the Generic Defendants had not accepted a payment from Cephalon to stay off the market then that company would have launched a generic, all other Generic Defendants would have entered and prices would fall for the entire class." (*Id.* at p. 2.)

**\*25** I agree with Plaintiffs and find that Dr. Hartman's damages model comports with the remaining theories of liability. Dr. Hartman opines that but for the settlement agreements, the following would have occurred: (1) the four Generic Defendants would have launched on June 24, 2006; (2) Apotex would have launched a generic Provigil product on December 24, 2006; and (3) Cephalon would have launched its own authorized Generic on June 24, 2006, which would lead to six generic Provigil products on the market. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶ 26.)

According to Dr. Hartman:

> But-for the settlement agreements between Cephalon and *each* Defendant, generic launch would have occurred as posed above.... If Cephalon had settled with only a subset of the Generic Defendants, those settling [G]eneric Defendants would likely have launched by triggering the clause that allowed each settling Generic Defendant to launch if another generic launched.

(*Id.* at ¶ 27 (emphasis in original).) Dr. Hartman then measures the difference between what the price would have been with six generic entrants in 2006 and the price actually paid by consumers and TPPs in the actual world.[21] (*Id.* at ¶¶ 42–46.) A hypothetical provided by Plaintiffs helps to illustrate this issue:

> If End–Payors prove at trial that Ranbaxy accepted a payment from Cephalon for the purpose of staying off the market in violation of the various state antitrust[,] consumer protection and unjust enrichment laws, End–Payors' damage model assumes that, but for the illegal agreement, Ranbaxy would have entered the market in 2006. The damage model also assumes that other generic competitors would have followed Ranbaxy's entry shortly thereafter.

(Doc. No. 429, p. 3.) Therefore, I do not agree with Defendants' *Comcast* argument, and I find that Plaintiffs' damages model matches their remaining theories of liability and impact. Accordingly, although I find that

Plaintiffs have not been able to establish predominance as to antitrust impact, I disagree with Defendants' arguments regarding Plaintiffs' damages calculations.[22]

## VI. *UNJUST ENRICHMENT CLAIMS— PREDOMINANCE & SUPERIORITY*

### A. *Choice of Law*

I must first determine which laws apply to the unjust enrichment claims of the proposed class. "A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply." *Powers v. Lycoming Engines,* 328 Fed. Appx. 121, 124 (3d Cir.2009). A court "must apply an individualized choice of law analysis to each plaintiff's claims" raised by a proposed class action. *Georgine,* 83 F.3d at 627 (citing *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 823, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)).

Despite being a necessary prerequisite to the Rule 23 inquiry, Plaintiffs failed to brief the relevant choice-of-law analysis with respect to which laws should govern the state antitrust, consumer protection and unjust enrichment claims of the proposed classes. As such, Plaintiffs failed to meet their burden of showing that common questions of law predominate. *See Spence v. Glock, Ges.m.b.H.,* 227 F.3d 308, 313 (5th Cir.2000) ("The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate").

**\*26** I will nonetheless undertake a choice of law analysis because it is a prerequisite to an evaluation of the Rule 23(b)(3) factors. *See In re LifeUSA Holding Inc.,* 242 F.3d 136, 147 (3d Cir.2001) (finding error where the "District Court failed to consider how individualized choice of law analysis of the forty-eight different jurisdictions would impact Rule 23's predominance requirement").

When a federal court is sitting in diversity, the court must apply the choice of law rules of the forum state to determine what substantive state law will govern. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This action was commenced in the United States District Court for the Eastern District of Pennsylvania. As such, I will apply Pennsylvania's choice of law rules.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)
2015-1 Trade Cases P 79,203

Under Pennsylvania's choice of law rules, the first step is to determine whether there is an actual or true conflict between the potentially applicable laws. 🔖 *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 229–30 (3d Cir.2007). If there are no relevant differences or the laws would produce the same result, the court need not engage in a choice of law analysis and may refer to the laws "interchangeably." 🔖 *Id.* at 229.

However, if there are relevant differences, then the court must examine the governmental policies which underlie the laws. 🔖 *Id.* at 230. Based on the result of that analysis, the court then characterizes the case as a "true conflict, false conflict, or unprovided-for case." *Id.* (citations omitted). If the relevant policy interests of both jurisdictions would be impaired by application of the other jurisdiction's law, there is a true conflict. *Id.* Where there is a true conflict, the court must then determine which state has the "greater interest in the application of its law." 🔖 *Id.* at 230–31.

Pennsylvania requires that courts making such a determination use a "combination of the approaches of both [the] Restatement II (contacts establishing significant relationships) and interests analysis (qualitative appraisal of the relevant States' policies with respect to the controversy)." 🔖 *Id.* at 231 (citing 🔖 *Melville v. Am. Home Assur. Co.,* 584 F.2d 1306, 1311 (3d Cir.1978) (quotation marks omitted)). The interest analysis requires a weighing of "the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue." 🔖 *Id.* at 231 (citing *Shields v. Consol. Rail Corp.,* 810 F.2d 397, 400 (3d Cir.1987) (alterations in original)).

A false conflict exists when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." 🔖 *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991). If there is a false conflict, the court applies the law of the only interested jurisdiction. *Id.* Finally, a case is unprovided-for where neither jurisdiction's interests would be impaired if its laws are not applied. 🔖 *Garcia v. Plaza Oldsmobile Ltd.,* 421 F.3d 216, 220 (3d Cir.2005). In unprovided-for cases, "the principle of lex loci delicti, the law of the place of the wrong, supplies the substantive law to be applied." *Id.*

**\*27** Applying the above choice of law framework, I must first determine whether there is a true conflict between the twenty-six unjust enrichment laws under which Plaintiffs seek certification as well as any other potentially applicable unjust enrichment laws. Several courts in this circuit that have been confronted with the issue have determined that no material differences distinguish the various states' unjust enrichment laws and, therefore, no conflict exists. *See* 🔖 *Pennsylvania Employee, Benefit Trust Fund v. Zeneca, Inc.,* 710 F.Supp.2d 458, 477 (D.Del.2010) (concluding that the "basic elements" required under various unjust enrichment laws do not create an actual conflict); 🚩 *Agostino v. Quest Diagnostics Inc.,* 256 F.R.D. 437, 464 (D.N.J.2009) ("the Court concludes that there are no actual conflicts among the laws of unjust enrichment"); 🚩 *Powers v. Lycoming Engines,* 245 F.R.D. 226, 231 (E.D.Pa.2007), rev'd on other grounds, 328 Fed. Appx. 121 (3d Cir.2009) ("there are few real differences amongst the unjust enrichment cause of action in the various states and no conflict exists").

However, other courts in this circuit have reached the opposite conclusion and determined that the elements necessary to establish an unjust enrichment cause of action in various jurisdictions differ in material ways and, therefore, give rise to a conflict. *See In re Actiq Sales & Mktg. Practices Litig.,* 2015 WL 1312015, at \*11–12 (E.D.Pa. Mar.23, 2015) (concluding that a true conflict exists as the variances in the states' unjust enrichment law could lead to differential treatment of the claims of the proposed nationwide class).

The conclusion that a conflict exists finds support in courts outside of this circuit. *See, e.g.,* 🚩 *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 591 (9th Cir.2012) ("[t]he elements necessary to establish a claim for unjust enrichment also vary materially from state to state"); *Thompson v. Bayer Corp.,* 2009 WL 362982, at \*4 (E.D.Ark. Feb.12, 2009) ("[a]fter an extensive review of the law, the Court finds that the states' different approaches to, or elements of, unjust enrichment are significant"); 🔖 *In re Aqua Dots Products Liab. Litig.,* 270 F.R.D. 377, 386 (N.D.Ill.2010) (the law of unjust enrichment "varies too much" from state to state and poses "insurmountable choice-of-law problems"); 🔖 *Clay v. Am. Tobacco Co.,* 188 F.R.D. 483, 501 (S.D.Ill.1999) ("variances exist in state common laws of unjust enrichment"); *Thompson v. Jiffy Lube Intern., Inc.,* 250 F.R.D. 607, 627 (D.Kan.2008) (finding a conflict between state unjust enrichment laws).

In considering a proposed nationwide unjust enrichment class, the *In re Actiq* opinion catalogues some of the many material ways in which unjust enrichment laws vary. First, states apply statutes of limitations of varying lengths to unjust enrichment claims. 2015 WL 1312015, at \*11. Second, states have different rules as to when and how the statute of limitations accrues. *Id.* Third, some states do not recognize unjust enrichment as an independent cause of action. *Id.* at \*12. Fourth, some but not all states require a plaintiff to demonstrate that they lack an adequate remedy at law. *Id.* Fifth, some states require that a plaintiff establish that the benefit was directly conferred on the defendant. *Id.* Sixth, the states also vary as to the level of misconduct, if any, a plaintiff must prove. *Id.* Lastly, the states follow different rules as to the availability of defenses, including laches and unclean hands. *Id.*

**\*28** According to Plaintiffs, the "basic elements" common to the relevant unjust enrichment laws are as follows: "(1) Plaintiff confers benefit on defendant; (2) defendant accepts/retains benefit; (3) circumstances make it unjust for defendant to do so." (Pls.' Mot., Meltzer Decl., Ex. 25.) However, although Plaintiffs do not seek certification of a nationwide class, several of the differences catalogued in *In re Actiq* distinguish the unjust enrichment laws relevant to Plaintiffs' class proposal. In fact, the state law chart submitted by Plaintiffs in support of their motion for class certification demonstrates the presence of three such material jurisdictional differences. (*See id.*)

First, according to Plaintiffs' chart, Arizona, Louisiana, Massachusetts, New York, North Carolina, North Dakota, Tennessee and Utah require that a plaintiff demonstrate that there is not an adequate remedy at law in addition to the "basic elements" which compromise an unjust enrichment claim. (*Id.*)

My review of the case law confirms that these states do indeed recognize this requirement. *Trustmark Ins. Co. v. Bank One, Ariz., NA,* 202 Ariz. 535, 48 P.3d 485, 491 (Ariz.Ct.App.2002) (to establish unjust enrichment a party must show "the absence of a legal remedy"); La. Civ.Code Ann. art. 2298 (unjust enrichment "shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule"); *Santagate v. Tower,* 64 Mass.App.Ct. 324, 833 N.E.2d 171, 176 (Mass.App.Ct.2005) ("equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law"); *Samiento v. World*

*Yacht Inc.,* 10 N.Y.3d 70, 854 N.Y.S.2d 83, 883 N.E.2d 990, 996 (N.Y.2008) (cause of action for unjust enrichment "does not lie as plaintiffs have an adequate remedy"); *Jones Cooling & Heating, Inc. v. Booth,* 99 N.C.App. 757, 394 S.E.2d 292, 294 (N.C.App.1990) (plaintiff may not recover under a theory of unjust enrichment where an adequate remedy at law exists); *Lochthowe v. C.F. Peterson Estate,* 692 N.W.2d 120, 124 (N.D.2005) (to establish unjust enrichment a party must demonstrate "an absence of a remedy provided by law"); *Thorpe v. Washington City,* 243 P.3d 500, 507 (Utah App.2010) (plaintiff must show absence of an adequate remedy at law); *Freeman Industries, LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 525 (Tenn.2005) (a plaintiff must demonstrate the absence of a legal remedy).

Additionally, although not mentioned in Plaintiffs' chart, a review of the case law also discloses that Hawaii and Minnesota recognize the same no adequate remedy requirement. *Porter v. Hu,* 116 Hawai'i 42, 169 P.3d 994, 1007–08 (Haw.Ct.App.2007) (unjust enrichment is only appropriate in the absence of an adequate remedy at law); *Caldas v. Affordable Granite & Stone, Inc.,* 820 N.W.2d 826, 842 (Minn.2012) (citing *Service Master of St. Cloud v. GAB Bus. Servs. ., Inc.,* 544 N.W.2d 302, 305 (Minn.1996) ("A party may not have equitable relief where there is an adequate remedy at law available")). Pennsylvania does as well. *Meehan v. Cheltenham Twp.,* 410 Pa. 446, 189 A.2d 593, 595 (1963) (holding that unjust enrichment is not available where an adequate remedy at law exists).

**\*29** Second, according to Plaintiffs' chart, in addition to the "basic elements," California, Florida, Kansas, Maine, Massachusetts, Nevada, New Mexico, North Carolina, South Dakota, Tennessee, Utah and Wisconsin require that a plaintiff establish that the defendant appreciates or has knowledge of the benefit conferred. (Pls.' Mot., Meltzer Decl., Ex. 25.)

My review of the case law confirms Plaintiffs' assertion regarding the foregoing jurisdictions. *See Ghirardo v. Antonioli,* 14 Cal.4th 39, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1003 (Cal.1996) (plaintiff must demonstrate that the defendant knew of the benefit); *Hillman Const. Corp. v. Wainer,* 636 So.2d 576, 577 (Fla. 4th Dist.App.1994) (must establish that the "plaintiff has conferred a benefit on the defendant, who has knowledge thereof"); *J.W. Thompson*

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 28 of 172
PageID: 70571
Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)
2015-1 Trade Cases P 79,203

*Co. v. Welles Products Corp.,* 243 Kan. 503, 758 P.2d 738, 745 (Kan.1988) (plaintiff must establish "an appreciation or knowledge of the benefit by the defendant"); *In re Est. of Anderson,* 988 A.2d 977, 980 (Me.2010) (plaintiff must establish that receiving party "had appreciation or knowledge of the benefit"); *Stevens v. Thacker,* 550 F.Supp.2d 161, 165 (D.Mass.2008) (plaintiff must establish "appreciation or knowledge of the benefit by the defendant"); *Certified Fire Prot. Inc. v. Precision Constr.,* 283 P.3d 250, 257 (Nev.2012) (plaintiff must establish that the defendant "appreciates" the benefit); *Ontiveros Insulation Co., Inc. v. Sanchez,* 129 N.M. 200, 3 P.3d 695, 698 (N.M.App.2000) (plaintiff must establish that "another has been knowingly benefitted at one's expense"); *D.W.H. Painting Co., Inc. v. D.W. Ward Const. Co., Inc .,* 174 N.C.App. 327, 620 S.E.2d 887, 893 (N.C.App.2005) (the defendant must have "consciously" accept the benefit); *Action Mech., Inc. v. Deadwood Historic Preservation Commn.,* 652 N.W.2d 742, 750 (S.D.2002) (defendant must be "aware" that he is receiving a benefit); *Freeman Industries, LLC,* 172 S.W.3d at 525 (plaintiff must establish "appreciation by the defendant of such benefit"); *Rawlings v. Rawlings,* 240 P.3d 754, 763 (Utah 2010) (plaintiff must establish "an appreciation or knowledge by the conferee of the benefit"); *Puttkammer v. Minth,* 83 Wis.2d 686, 266 N.W.2d 361, 363 (Wis.1978) (plaintiff must establish "an appreciation or knowledge by the defendant of the benefit"). Pennsylvania does as well. *Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super.1999) (appreciation of the benefit by defendant is a necessary element of unjust enrichment).

Third, Plaintiffs' chart notes that Minnesota requires a showing of defendant's wrongful conduct in addition to the "basic elements." *See* *Service Master,* 544 N.W.2d at 306 ("it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.")

Plaintiffs' chart stops short of offering a full analysis of all the ways that the various unjust enrichment laws vary. For example, Plaintiffs fail to note that New York requires a plaintiff to demonstrate a "relationship or connection between the parties that is not too attenuated," *Georgia Malone & Co., Inc. v. Rieder,* 19 N.Y.3d 511, 950 N.Y.S.2d 333, 973 N.E.2d 743, 746 (N.Y.2012), or that North Dakota, Arizona and Louisiana have a similar yet distinct requirement

that a plaintiff must demonstrate a "connection between the enrichment and the impoverishment." *Zuger v. N. Dakota Ins. Guar. Ass'n,* 494 N.W.2d 135, 138 (N.D.1992); *City of Sierra Vista v. Cochise Enter. ., Inc.,* 144 Ariz. 375, 697 P.2d 1125, 1131 (Ariz.Ct.App.1984); *USA Disaster Recovery, Inc. v. St. Tammany Parish Govt.,* 145 So.3d 235, 236 n. 1 (La.2013). Plaintiffs' failure to account for these additional variations underscores the divergent nature of the body of relevant state law.

**\*30** The foregoing variances are significant as some, if not all, could result in differential treatment of Plaintiffs' claims. *See* *In re Actiq,* 2015 WL 1312015, at *12. The resulting differential treatment is not accidental—the unique tailoring of the unjust enrichment laws reflects the policy choices of the state as to when the equitable remedy should be made available. As such, imposition of another state's more permissive law could impair the interests of a state with a more stringent law. In light of these material differences which implicate the states' interests in providing a forum for redress, I conclude that a true conflict exists amongst the relevant unjust enrichment laws.

Having found that a true conflict exists, I must determine which state or states have a greater interest in application of its unjust enrichment law. Pursuant to Pennsylvania's choice of law rules, the first step is to consider the relevant Restatement factors.

The Restatement instructs that the following contacts are to be considered when assessing which jurisdiction has the most significant relationship to the occurrence giving rise to an unjust enrichment cause of action:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

2015-1 Trade Cases P 79,203

Restatement (Second) of Conflict of Laws § 221(2) (1971); *Powers,* 328 Fed. Appx. at 126 (applying § 221(2) to an unjust enrichment claim under Pennsylvania's choice of law rules).

Regarding the first factor, the relationship between the parties was centered in the state in which Plaintiffs purchased, paid and/or reimbursed for Provigil or its generic equivalent. The class members allegedly conferred the benefit on Defendants in the state where the purchase was made. Since unjust conferral of a benefit is the gravamen of the unjust enrichment cause of action, the first factor weighs strongly in favor of applying the unjust enrichment law of the purchase state to each claim raised. Additionally, this factor is generally "given the greatest weight in determining the state of the applicable law." Restatement (Second) of Conflict of Laws § 221 cmt. d.

Regarding the second factor, where the benefit was received, Cephalon and Teva's principal places of business are located in Pennsylvania, Barr's principal place of business is located in New York, and Ranbaxy's principal place of business is located in Florida. (*See* Answers, Doc. Nos. 118, 129, 131 and 134). Therefore, Defendants likely received the alleged overpayments in Pennsylvania, New York and Florida. As such, the second factor weighs in favor of applying Pennsylvania law to the unjust enrichment claims against Cephalon and Teva, New York law to the unjust enrichment claims against Barr and Florida law to the unjust enrichment claims against Ranbaxy.

 **\*31**  However, the third factor militates in favor of application of the law of the purchase state because the "act bestowing the enrichment" is payment and/or reimbursement of Provigil or its general equivalent. As noted above, this act occurred in the state in which Plaintiffs made the relevant purchases.

The fourth factor also weighs in favor of application of the law of purchase states. Although Defendants' principal places of business are Pennsylvania, Florida and New York, purchases were allegedly made in all jurisdictions in which Plaintiffs seek certification. As such, no single state has a greater connection to the case than any other state.

Lastly, the fifth factor weighs in favor of applying the law of the purchase states as well because that is where the Provigil or its generic equivalent—the "physical thing" substantially related to the enrichment—was located at the time of the alleged unjust enrichment.

In sum, four out of five of the relevant Restatement factors, including the first factor which is often the most significant, *see* § 221 cmt. d, demonstrate that the state in which the particular purchase was made has the most significant connection to the related claim. As such, I find that the Restatement factors weigh in favor of applying the laws of the purchase states.

Pursuant to Pennsylvania's choice of law rules, I must also consider the relevant state policies at issue to determine which state has the greatest interest in application of its law. This "qualitative appraisal" also suggests that application of the laws of the purchase states is appropriate. Regarding the relevant state policies at issue, Pennsylvania, Florida and New York have a clear interest in regulating the conduct of corporations transacting business within their borders. However, the states in which the purchases were made "also have an interest in ensuring that corporations conducting business within their borders are doing so fairly." *In re Actiq,* 2015 WL 1312015, at \*13.

In addition to these interests in regulating business, the purchase states have a strong interest in providing a forum for redress to their citizens. Furthermore, "those states with more protective unjust-enrichment laws have an interest in ensuring that their citizens have full recourse to those laws."

*Rapp v. Green Tree Servicing, LLC,* 302 F.R.D. 505, 518 (D.Minn.2014).

I agree with other courts which have concluded that a state's interest in providing its citizens with the level and type of redress set forth in its unique unjust enrichment law "outweigh a state's interest in regulating a resident corporation." *In re Actiq,* 2015 WL 1312015, at \*13 (citing *Rapp,* 302 F.R.D. at 518) (finding "no reason to believe that the unjust-enrichment laws of [the non-forum state] could not equally or more effectively hold corporations accountable")). As such, I find that the relevant policy concerns at issue weigh in favor of applying the unjust enrichment laws of the purchase states.

 **\*32**  In light of the preceding choice of law analysis, I conclude that the laws of the purchase states govern the proposed class' unjust enrichment claims. Having identified the law applicable to the claims of the proposed class, I now turn to whether Plaintiffs have satisfied the predominance and superiority requirements of Rule 23(b)(3).

2015-1 Trade Cases P 79,203

## B. *Predominance*

Despite Plaintiffs' attempt to characterize the variances between the various unjust enrichment laws of the purchase states as "minor," the laws are distinguished by the substantive and nuanced differences discussed above. Plaintiffs respond that these differences can be "easily addressed through a limited number of jury instructions."

Plaintiffs urge that this conclusion finds support in *In re Flonase Antitrust Litig.,* 284 F.R.D. 207 (E.D.Pa.2012), *In re Wellbutrin XL Antitrust Litig.,* 282 F.R.D. 126 (E.D.Pa.2011) and *Sullivan v. DB Investments, Inc.,* 667 F.3d 273 (3d Cir.2011). Plaintiffs contend that these cases demonstrate a willingness of courts in this circuit to certify "indirect purchaser classes under multiple state laws."

The proposed classes at issue in *In re Flonase, In re Wellbutrin XL* and *Sullivan* are distinguishable from the proposed classes before me. *In re Flonase* involved a proposed class of indirect purchasers pursuing claims under seven different state laws (antitrust, consumer protection, and unjust enrichment of four states). 284 F.R.D. at 210–11. In granting certification, the court held that the predominance requirement had been met because the evidence would be the same with regard to each of the plaintiffs' state law claims. *Id.* at 219–20. However, in reaching this conclusion, the court noted and relied upon the fact that the defendants had conceded that the plaintiffs' claims were subject to common proof. *Id.* That is not the case here.

Likewise, *In re Wellbutrin XL* involved a proposed class of indirect purchasers pursuing claims under seven different antitrust and consumer protection laws of six states. 282 F.R.D. at 131. The court found that the predominance requirement had been met because "[t]he issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members." *Id.* at 140.

*Sullivan,* on the other hand, involved proposed certification of a nationwide settlement class. The Third Circuit stated:

Because we are presented with a settlement class certification, we are not as concerned with formulating some prediction as to how [variances in state law] would play out at trial, for the proposal is that there be no trial. As such, we simply need not inquire whether the varying state treatments of indirect purchaser damage claims at issue would present the type of "insuperable obstacles" or "intractable management problems" pertinent to certification of a litigation class.... The proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and the difference is key.

**\*33** *Sullivan,* 667 F.3d at 303–04 (internal citations omitted).

The cases relied on by Plaintiffs are distinguishable from the instant case on multiple grounds. Both *In re Flonase* and *In re Wellbutrin* involved significantly fewer state laws than are at issue in Plaintiffs' proposed classes. Additionally, neither certification decision involved a substantive analysis of the variances in the elements of the relevant state laws. And, unlike *In re Flonase,* Defendants here dispute Plaintiffs' ability to demonstrate that common issues of fact or law predominate.

*Sullivan* also involved a settlement class and is of limited relevance to certification of a litigation class. *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 529 (3d Cir.2004) (variations in state law are "irrelevant to certification of a settlement class"); *Amchem,* 521 U.S. at 620 (in a settlement-only class certification, "a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial").

Moreover, nothing in *In re Flonase, In re Wellbutrin* or *Sullivan* relieves Plaintiffs of their burden of demonstrating that common questions of law or fact predominate. This

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 31 of 172
PageID: 70574
Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)
2015-1 Trade Cases P 79,203

burden includes providing the Court with an extensive analysis which demonstrates that the variations in the applicable state laws do not defeat predominance. *See In re Sch. Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986).

I recognize that the existence of variations in state law does not automatically foreclose Plaintiffs' ability to satisfy the predominance requirement. The Third Circuit has "endorsed the general procedure of grouping multiple state laws into a few categories for the purposes of class litigation." *Grandalski v. Quest Diagnostics Inc.,* 767 F.3d 175, 183 (3d Cir.2014). Grouping is permissible where differences in state law fall "into a limited number of predictable patterns, and any deviations could be overcome at trial by grouping similar state laws together and applying them as a unit." *Id.* However, when taking such an approach, "plaintiffs face a significant burden to demonstrate that grouping is a workable solution." *Id.*

After careful consideration, I conclude that Plaintiffs' unjust enrichment claims under the laws of the purchase states are not amenable to concise explanation. *See In re Actiq,* 2015 WL 1312015, at *14 ("[t]he elements of Plaintiffs' unjust enrichment claim cannot be succinctly identified because ... the law of each [plaintiffs'] home state will govern"). Some states require that a plaintiff satisfy five elements to prevail on a claim of unjust enrichment. *See, e.g., Freeman v. Sorchych,* 226 Ariz. 242, 245 P.3d 927, 936 (Ariz.App. 1st Div.2011) (a plaintiff must demonstrate "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law"). Other states require a plaintiff to satisfy three or four elements. *See, e.g., Stevens,* 550 F.Supp.2d at 165 ("a plaintiff must prove (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable"); *Com. Partn. 8098 Ltd. Partn. v. Eq. Contracting Co., Inc.,* 695 So.2d 383, 386 (Fla. 4th Dist.App.1997) (a plaintiff must prove "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it").

**\*34** In an attempt to reconcile these variations, Plaintiffs' proposed jury instructions organize the state laws into a limited number of permutations. (*See* Pls.' Reply, Meltzer Decl., Ex. 35.) However, as noted above, Plaintiffs' accounting of the state variations is not comprehensive and glosses over important differences. As such, Plaintiffs have not met their burden of demonstrating that grouping is a feasible method for addressing the variations amongst the purchase states' unjust enrichment laws. Consequently, I conclude that Plaintiffs have failed to meet their burden of demonstrating that common questions of law predominate.

Notwithstanding the variances in the applicable state law, the equitable nature of the unjust enrichment remedy also compounds the predominance issues with Plaintiffs' proposed unjust enrichment class. When considering an unjust enrichment claim, "a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1274 (11th Cir.2009); *Grandalski,* 767 F.3d at 185 ("individual inquiries would be required to determine whether an alleged overbilling constituted unjust enrichment for each class member"); *Hernandez v. Ashley Furniture Indus., Inc.,* 2013 WL 2245894, at *9 (E.D.Pa. May 22, 2013) (unjust enrichment claim demands inquiry into the unique factual circumstances of each case to determine whether inequity would result). "Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts ... have found unjust enrichment claims inappropriate for class action treatment." *Vega,* 564 F.3d at 1274.

In light of this necessary inquiry, the Eleventh Circuit concluded "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Id.* Other courts have reached similar conclusions. *See Grandalski,* 767 F.3d at 185 ("District Court properly found that individual inquiries would be required to determine whether an alleged overbilling constituted unjust enrichment for each class member"); *In re Actiq Sales,* 2015 WL 1312015, at *17; *Hernandez,* 2013 WL 2245894, at *9.

Nonetheless, Plaintiffs urge that common questions of fact predominate because Defendants' alleged common course of misconduct lies at the heart of the proposed class' unjust enrichment claims. Although Plaintiffs' claims do rely on some common proof, the existence of some common evidence

2015-1 Trade Cases P 79,203

as to Defendants' conduct does not dispose of the need for individualized inquiry into the equities surrounding the claims of individual Plaintiffs. *See Commander Properties Corp. v. Beech Aircraft Corp.,* 164 F.R.D. 529, 540 (D.Kan.1995) ( "Even if it could be said that [the] general theory of liability for unjust enrichment ... is uniform among class members, individual questions remain about whether" any plaintiff actually conferred a benefit).

**\*35** As such, even if Plaintiffs had offered a sufficient analysis accounting for the variations in state law, I find that common factual issues do not predominate as to Plaintiffs' proposed unjust enrichment class.

### C. *Superiority*

The second inquiry under Rule 23(b)(3) is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) enumerates the following factors for assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

In establishing superiority, a plaintiff must demonstrate that resolution by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615. The court must "balance in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *In re Flonase,* 284 F.R.D. at 234 (quoting *Georgine.,* 83 F.3d at 632).

Where there are numerous state law causes of action at play, I must consider "whether variations in state laws present the types of insuperable obstacles which render class litigation

unmanageable." *In re Warfarin Sodium,* 391 F.3d at 529. However, the superiority requirement may be satisfied where "varying state laws can be grouped by shared elements and applied as a unit in such a way that the litigation class is manageable." *Id.*

Plaintiffs argue that class litigation is superior to individual litigation because absent a class action, the same facts pertaining to Defendants' alleged course of conduct would have to be proven repeatedly in numerous cases. Plaintiffs urge that individual litigation would, therefore, waste resources and potentially cause inconsistent results.

Plaintiffs' concerns are not immaterial. However, for the reasons discussed above in the context of the predominance analysis, I find that the variations in state law also render class litigation unmanageable. Other courts have reached similar conclusions regarding the manageability of proposed multi-state unjust enrichment classes. *See, e.g., Lilly v. Ford Motor Co.,* 2002 WL 507126, at \*2 (N.D.Ill. Apr.3, 2002) ("variations in state common laws of unjust enrichment demonstrate that class certification of such a claim would be unmanageable").

As noted above, Plaintiffs' proposed jury instructions do not address all of the variations which distinguish the unjust enrichment laws of the purchase states, nor do Plaintiffs' proposed jury instructions adequately account for the nuanced ways in which different states explain even seemingly similar elements. Therefore, Plaintiffs have failed to satisfy Rule 23(b)(3)'s superiority requirement as to their unjust enrichment claims.

### VII. *CONSUMER PROTECTION CLAIMS— PREDOMINANCE & SUPERIORITY*

#### A. *Choice of Law*

**\*36** Applying Pennsylvania's choice of law framework, I must first consider whether there is a true conflict between the relevant consumer protection laws. I begin by noting that other courts in this circuit confronted with proposed multi-state consumer protection classes have concluded that the laws vary in significant ways. *See, e.g., Karnuth v. Rodale, Inc.,* 2005 WL 1683605, at \*4 (E.D.Pa. July 18, 2005) ("[t]he consumer fraud statutes of the various states are not uniform"); *Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 219 (E.D.Pa.2000) ("consumer protection acts vary on a range of fundamental issues"). Similarly, the Supreme Court has

remarked that "no one doubts that a state may protect its citizens by prohibiting deceptive trade practices.... But the states need not, and in fact do not, provide such protection in a uniform manner." 🔖 *BMW of N. Am., Inc., v. Gore,* 517 U.S. 559, 568–69, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Plaintiffs assert that the consumer protection laws share a few common "basic elements," which are as follows: "it is unlawful for a person to commit a deceptive or unfair act or practice, misrepresentation, false statement, or make an omission or material fact in connection with the sale or advertisement of merchandise." (Pls.' Mot, Meltzer Dec., Ex. 25.) Despite the foregoing characterization, the state consumer protection laws under which the proposed class pursues claims vary in material ways.

Some consumer protection laws require that a plaintiff prove that the defendant undertook the prohibited act with some level of intention. Where such a requirement is recognized, the states articulate the intent element in a variety of ways.

For example, Arizona, Minnesota and North Dakota require a plaintiff to establish that the defendant undertook the unfair conduct or deceptive practice with the intent that persons would rely on the prohibited act. 🔖 Ariz.Rev.Stat. Ann. § 44–1522 (prohibited act must be done "with intent that others rely"); 🔖 Minn.Stat. Ann. § 325F.69 (prohibited act must be done "with the intent that others rely thereon"); N.D. Cent.Code Ann. § 51–15–02 (prohibited act must be done "with the intent that others rely thereon"). Utah requires that the prohibited act be done knowingly or intentionally. 🔖 Utah Code Ann. § 13–11–4 (prohibited act must be done knowingly or intentionally). New Mexico and South Dakota require that the prohibited act be done knowingly. 🔖 *Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 811 P.2d 1308, 1311 (N.M.1991) (prohibited act must be done knowingly); S.D. Codified Laws § 37–24–6 (prohibited act must be done knowingly). Kansas requires that the prohibited act be done "knowingly or with reason to know." 🔖 Kan. Stat. Ann. § 50–626. Lastly, Vermont requires that the act be done intentionally. *Winton v. Johnson & Dix Fuel Corp.,* 147 Vt. 236, 515 A.2d 371, 376 (Vt.1986).

Massachusetts and Hawaii require plaintiffs to prove that the alleged unfair or deceptive act or practice was "immoral, unethical, oppressive, unscrupulous or substantially injurious

to consumers." 🔖 *Balthazar v. Verizon Haw., Inc.,* 109 Hawai'i 69, 123 P.3d 194, 202 (Haw.2005); 🔖 *Renovor's Supply, Inc. v. Sovereign Bank,* 72 Mass.App.Ct. 419, 892 N.E.2d 777, 786–87 (Mass.App.2008) (conduct is unfair if it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness; ... it is immoral, unethical, oppressive, or unscrupulous; [and] ... whether it causes substantial injury to consumers, competitors, or other business") (alterations in original). Defendants also state that Florida recognizes this requirement but that contention appears to be in dispute. *See* 🔖 *Porsche Cars N.A., Inc. v. Diamond,* 140 So.3d 1090, 1098 (Fla.3d Dist.App.2014) review denied, 157 So.3d 1042 (Fla.2014) (holding that this requirement no longer defines the term "unfair" as used in Florida's consumer protection law).

**\*37** Additionally, Nebraska and Florida require a plaintiff to prove that the unfair act or deceptive practice affected public policy or the public interest. 🔖 *Nelson v. Lusterstone Surfacing Co.,* 258 Neb. 678, 605 N.W.2d 136, 142 (Neb.2000) (to be actionable "the unfair or deceptive act or practice must have an impact upon the public interest"); 🔖 *PNR, Inc. v. Beacon Prop. Mgt., Inc.,* 842 So.2d 773, 777 (Fla.2003) (prohibited act must offend "established public policy"). [23]

Further complicating matters, Florida, Maine and Vermont require an additional showing that the unfair act or deceptive practice was likely to mislead consumers. *State v. Beach Blvd Automotive Inc.,* 139 So.3d 380, 387 (Fla. 1st Dist.App.2014), reh'g denied (June 12, 2014) ("Deception occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances"); 🔖 *State v. Weinschenk,* 868 A.2d 200, 206 (Me.2005) (an act is deceptive if it is "likely to mislead consumers acting reasonably under the circumstances"); 🔖 *Greene v. Stevens Gas Serv.,* 177 Vt. 90, 858 A.2d 238, 244 (Vt.2004) (act must be "likely to mislead the consumer").

Wisconsin also mandates that a plaintiff prove that the unfair act or practice was made to the public. 🔖 *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.,* 301 Wis.2d 109, 732 N.W.2d 792, 798–99 (Wis.2007).

States further vary as to whether a plaintiff must prove that they relied on the defendant's prohibited act. Pennsylvania

2015-1 Trade Cases P 79,203

requires a plaintiff to demonstrate that he relied on the defendant's act and that the reliance was justified. *Kern v. Lehigh Valley Hosp., Inc.,* 108 A.3d 1281, 1289 (Pa.Super.2015). Arizona also requires reliance but, unlike Pennsylvania, the reliance need not be reasonable, let alone justified. *Correa v. Pecos Valley Dev. Corp.,* 126 Ariz. 601, 617 P.2d 767, 771 (Ariz.App.2d Div.1980). In Michigan, class litigants "need not individually prove reliance on the alleged misrepresentations," as it is sufficient if the class can establish that "a reasonable person would have relied on the representations." *Dix v. Am. Bankers Life Assur. Co. of Florida,* 429 Mich. 410, 415 N.W.2d 206, 209 (Mich.1987). Other states, such as Florida, do not require any showing of reliance. *Davis v. Powertel, Inc.,* 776 So.2d 971, 974 (Fla. 1st Dist.App.2000).

Although not exhaustive, the foregoing list illustrates the many varying elements and nuanced articulations that distinguish the state consumer protection laws. Contrary to Plaintiffs' characterization, these laws cannot be neatly distilled into a core set of elements with only minor distinctions.

Furthermore, these differences are of such a nature that a state's interests would be impaired by application of another state's law. For example, some consumer protection laws require proof of the defendant's intent and others do not. The states without an intent requirement or even those states with a less searching intent requirement create a lower evidentiary hurdle for the plaintiffs than states with a strict intent requirement. The particular formulation of these variables reflects a state's policy decisions regarding how and when redress should be available to consumers. As such, I find that a conflict exists between the relevant state consumer protection laws.

**\*38** Other courts have reached similar conclusions. *See In re Actiq Sales and Mktg. Practices Litig.,* 790 F.Supp.2d 313, 321 (E.D.Pa.2011) (finding a true conflict between the consumer protection laws of Indiana and Pennsylvania in light of differences in the range of prohibited acts and intent requirements); *Zeneca,* 710 F.Supp.2d at 471 (finding "an actual conflict exists between the laws of Delaware and Pennsylvania on the issue of whether reliance is a necessary element under the respective consumer fraud statutes").

Having found that a true conflict exists, I must determine which state or states have a greater interest in application of its consumer protection laws. Pursuant to Pennsylvania's choice of law rules, the first step is to consider the relevant Restatement factors.

The Restatement (Second) of Conflict of Laws § 148 sets forth contacts that are to be considered when assessing which jurisdiction has the most significant relationship to the occurrence giving rise to a fraud or misrepresentation claim. *See Lyon,* 194 F.R.D. at 214 (applying § 148 to a consumer protection claim under Pennsylvania's choice of law rules).

Section 148 provides that "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," courts should weigh the following factors:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

Factors (a) and (b) weigh in favor of applying the laws of the purchase states. Plaintiffs received and acted in reliance on Defendants' representations in the state in which Plaintiffs purchased, paid and/or reimbursed for Provigil or its generic equivalent.

Regarding factor (c), a representation is "made" in the "location from which the representation emanated." *Maniscalco v. Bro. Intern. (USA) Corp.,* 709 F.3d 202, 208 (3d Cir.2013). Defendants likely made the representations from their principal places of business, Pennsylvania, Florida

2015-1 Trade Cases P 79,203

and New York. As such, this factor weighs against application of the consumer protection laws of the purchase states.

Regarding factor (d), Defendants' principal places of business are located in Pennsylvania, Florida and New York. On the other hand, Plaintiffs likely reside or conduct business in all states in which Plaintiffs pursue claims. At first glance, factor (d) appears neutral However, the Restatement notes that "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant." Restatement (Second) of Conflict of Laws § 148 cmt. 2(i). As such, factor (d) also weighs in favor of applying the consumer protection of laws of the purchase states.

 **\*39** The relative importance of the foregoing factors should be further assessed in light of the following principles set forth in Section 6 of the Restatement: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Restatement (Second) of Conflict of Laws § 6 cmt 2(e).

Regarding the second and third principles, the basic policies underlying the particular field of law are those of "consumer protection, suggesting that any balancing of the parties' contacts or expectations should be weighted toward those of consumers." In re Relafen Antitrust Litig., 221 F.R.D. 260, 277–78 (D.Mass.2004). As such, the location of consumers' purchases assumes "special significance." Id. Regarding the first and fifth factors, "[s]tates have a strong interest in protecting consumers with respect to sales within their borders ... but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states." Id.

As such, the Restatement factors viewed through the prism of the Section 6 principles weigh in favor of applying the law of the purchase state. However, under Pennsylvania's choice of law rules, I must also examine the relevant state policies at issue to determine which state has the greatest interest in application of its law.

A "qualitative appraisal" of the relevant states' policies at issue also suggests that application of the law of the purchase states is appropriate. Consumer protection laws "are intended to protect consumers from being overcharged." In re Flonase, 815 F.Supp.2d at 883. Therefore, "the purchase states have a serious interest in applying their law to allow consumers ... to

recover the money that they were overcharged in a transaction occurring in their states." Id.

However, states also clearly have "an independent interest in preventing deceptive or fraudulent practices by companies operating within their borders." Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 946–47 (6th Cir.2011). Nonetheless, the "primary aim of antitrust and consumer protection laws generally—and those of indirect purchaser states particularly—is compensating consumers, not policing corporate conduct." In re Relafen, 221 F.R.D. at 277.

I agree, that given that the primary policy interest is consumer protection, the state with the strongest interest in regulating such conduct is the state "where the consumers—the residents protected by its consumer-protection laws—are harmed by it." Pilgrim, 660 F.3d at 946–47 (emphasis in original). As such, I find that the purchase states' interest in application of their own consumer protection law to be the greatest.

### B. Predominance

For reasons similar to those discussed in the context of Plaintiffs' unjust enrichment claims, Plaintiffs have not demonstrated that common questions of law predominate as to their consumer protection claims. Again, Plaintiffs failed to provide the extensive analysis of the variations in the consumer protection laws necessary for determining whether there are insuperable obstacles to class certification.

 **\*40** Rather, Plaintiffs attempt to meet their burden by distilling a common core of "basic elements" from the various consumer protection laws. Plaintiffs then annotate these purported "basic elements" with additional elements where recognized by a particular state.

However, Plaintiffs' state law charts and proposed jury instructions gloss over material differences. For example, one of Plaintiffs' proposed jury instructions states:

> The consumer protection laws of Arizona, Maine, Minnesota, New Mexico, North Dakota, South Dakota, Utah and Vermont additionally require that the defendant know or intend that the unfair deceptive act, practice or omission was likely to mislead

2015-1 Trade Cases P 79,203

others, or that others would rely on,
or be deceived by, said act, practice or
omission.

(Pls.' Reply, Meltzer Dec., Ex. 35.)

As noted above, the states vary considerably in their formulation of the intent a plaintiff must prove. The jury instruction proposed by Plaintiffs fails to distinguish which state requires which particular intent formulation and disregards important differences amongst those formulations. The proposed jury instruction also fails to explain how each state defines operative terms. Plaintiffs' effort to explain away these differences through a generalized explanation is overly simplistic. Therefore, I find that Plaintiffs failed to provide a basis for concluding that common legal questions will predominate as to their consumer protection claims.

Other courts have reached similar conclusions regarding proposed multi-state or nationwide consumer protection classes. *See Pilgrim,* 660 F.3d at 946–48 ("the consumer-protection laws of the affected States vary in material ways, no common legal issues favor a class-action approach to resolving this dispute"); *Karnuth,* 2005 WL 1683605, at *5 (declining to certify a nationwide consumer protection class in light of the variations in state law); *Lyon,* 194 F.R.D. at 220 (denying certification under forty-one state consumer protection laws in light of variations in the applicable law).

### C. *Superiority*
As discussed above, Plaintiffs failed to offer the requisite extensive analysis of how the differences in the state consumer protection laws would be overcome. Relevant to the

manageability inquiry, Plaintiffs have failed to demonstrate how the jury could be instructed in a manageable and accurate fashion. *See Powers,* 328 Fed. Appx. at 127 ("[a]ttempting to apply the law of a multiplicity of jurisdictions can present problems of manageability for class certification under Rule 23(b)(3)").

Plaintiffs state that a jury could be instructed as to each state's relevant laws individually or as to the laws of grouped states. Plaintiffs contend that "[r]egardless of which of these two approaches the Court adopts, the instruction process is manageable, and the jury is not likely to be confused." (Pls.' Mot ., Meltzer Dec., Ex. 24, p. 7.) However, Plaintiffs have not offered a plan of how that grouping may be accomplished in a manner that does not gloss over important substantive differences between the laws. Plaintiffs' assurance that such an instruction process is manageable and not likely to confuse the jury is insufficient. As such, I find that Plaintiffs have also failed to demonstrate that a class action is a fair and efficient method for adjudicating the consumer protection law claims of the proposed class.

### VIII. *CONCLUSION*
**\*41** For the reasons stated above, I find that certification of the End Payor class is not appropriate because Plaintiffs have failed to establish the Rule 23 requirements of ascertainability, predominance and superiority by a preponderance of the evidence. Accordingly, Plaintiffs' motion for class certification is denied. (*See* Doc. No. 433.)

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3623005, 2015-1 Trade Cases P 79,203

### Footnotes

1   The other cases consolidated within the *In re Modafinil Litigation* are: *King Drug Co. of Florence, Inc. v. Cephalon, Inc* . (Dkt. No. 06–1797); *Apotex, Inc. v. Cephalon, Inc.* (Dkt. No. 062768); and *Federal Trade Commission v. Cephalon, Inc.* (Dkt. No. 08–2141) (settlement agreement reached, pending court approval). Only the End Payors' case is implicated by the instant motion for class certification. Therefore, I will refer to End Payors as Plaintiffs.

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 37 of 172
                                                                      PageID: 70580
Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)

2015-1 Trade Cases P 79,203

2    The End Payor Plaintiffs and Mylan have reached an agreement in principle for settlement.

3    Launching "at risk" means that a company has chosen to market its generic product, despite the fact that it
     is actively being accused of patent infringement and the court has not yet determined whether the patent is
     valid or has been infringed. Under the Hatch–Waxman Act, when a patent holder files an infringement lawsuit
     within forty-five days of an ANDA containing a certification that the patent is invalid or not infringed, the FDA
     may not approve the ANDA for thirty months. If the case is resolved during the thirty-month stay, the FDA will
     take action on the ANDA consistent with the court's judgment. However, if the case is still ongoing at the end
     of the thirty-month stay, the FDA may approve the ANDA, at which point the generic company may choose
     to launch at risk. If the infringement lawsuit is eventually resolved in favor of the patent holder, the generic
     company may owe damages for its at-risk launch. *King Drug Co. of Florence, Inc.,* 2015 WL 356913, at
     *2 (citing 21 U.S.C. § 355(j)(5)(B)(iii); *Federal Trade Commission v. Actavis, Inc.,* ——U.S. ——, ——,
     133 S.Ct. 2223, 2228, 186 L.Ed.2d 343 (2013)).

4    Additional details regarding these settlement agreements and the Hatch–Waxman administrative framework
     may be found at this Court's Memorandum Opinion addressing Defendants' motions for summary judgment
     on Plaintiffs' *Actavis* claims. *See King Drug Co. of Florence, Inc.,* 2015 WL 356913, at *1–5.

5    At the class certification hearing, the parties jointly agreed that, although various aspects of both Dr. Hartman's
     and Defendants' expert, Dr. Hughes' testimony were challenged by way of *Daubert* motions, those challenges
     would not be pressed for purposes of class certification. (Hrg.Tr., Mar. 24, 2015, pp. 5–9.)

6    Dr. Hartman explained that the use of yardsticks "is accepted everywhere in the industry, government
     research, academic research and litigation." (Hrg.Tr., Mar. 24, 2015, p. 77.) In fact, many of the yardstick
     drugs examined by Dr. Hartman were actually used by Cephalon to predict the impact of generic launch at
     or around the time of the settlement agreements. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶¶ 36–38.)
     Defendants do not challenge the use of yardsticks as a general matter.

7    Dr. Hartman described PBMs as entities that largely act as middlemen in managing pharmacy benefits. PBMs
     "organize, negotiate, manage contracts, [and] govern reimbursement" between and among TPPs and retail
     pharmacies. They may also, in rare instances, act as an insurer through a subsidiary. Where a PBM acts
     as a TPP, Dr. Hartman opined it would fall within the class definition. (Hrg.Tr., Mar. 24, 2015, pp. 72–75.)

8    In their reply memorandum in support of their motion for class certification, Plaintiffs withdrew their claim
     under the Tennessee Consumer Protection Act and the Wisconsin Deceptive Trade Practices Act. (Pls.' Rep.,
     p. 17 n. 48.) Additionally, Plaintiffs state that they are not presenting consumer protection claims in the District
     of Columbia, Iowa, or Mississippi or antitrust claims in Florida, Massachusetts or Nebraska. (Pls.' Mot. for
     Class Cert., p. 12 n. 25.)

9    Plaintiffs do not include Kentucky's unjust enrichment law in their proposed jury instructions or state law
     charts. However, Plaintiffs do not state that they are abandoning their unjust enrichment claims under
     Kentucky law. Therefore, it appears that the omission is an oversight and I will include Kentucky's unjust
     enrichment law in my consideration.

10   The court described the "end payor" class as persons who purchased the brand drug "for consumption and
     other than for resale ." In other words, end payors were persons or entities who purchased the brand drug
     "for their own use and by logical extension were the final consumers who absorbed the overcharge[.]" *Id.*
     at 562.

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 38 of 172
PageID: 70581
Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)
2015-1 Trade Cases P 79,203

11    Defendants note that Plaintiffs failed to address the prerequisite of ascertainability in their opening brief in support of class certification, and urge that this should amount to a waiver. (Defs.' Br., p. 13 n. 3.) While I agree with Defendants that Plaintiffs did not sufficiently address ascertainability in their opening brief, I will not resolve this motion on the basis of a waiver and will carefully consider the arguments Plaintiffs raise in their reply brief, supplemental briefing, and at oral argument.

12    This chart was also submitted to rebut Defendants' assertion that Plaintiffs only have standing to sue in New York and Pennsylvania. However, Plaintiffs only provided evidence of standing through purchases and reimbursements in fourteen out of the twenty-six states, which may raise some standing concerns. In any event, because I find that class certification should be denied for a variety of other reasons, I need not address this issue further.

13    Dr. Hartman's testimony on this issue was as follows:

Q. Sir, are you aware of any records from which the identity of the members of the class can be derived?

A. Without them coming forward on their own?

Q. Without them coming forward on their own.

A. I would have to investigate that. None that could be easily linked to mine.

Q. So the IMS system doesn't—

A. The IMS system does not—it does it by type of payer. I can break out copay, co-insurance, but individual plans, it does not identify those that I know of. There may be product lines that have that, but I have not used them.

Q. As you sit here now, you're not aware of those records?

A. As I sit here now, they may exist. IMS is always improving its product lines. But I've never used them if they do exist.

(Hrg.Tr., Mar. 24, 2015, p. 182.)

14    I have carefully considered the guidance provided in *Byrd* that overbreadth of a class raises questions of predominance as opposed to ascertainability. *Byrd,* 784 F.3d at 168; *see also Grandalski v. Quest Diagnostics Inc.,* 767 F.3d 175, 184–85 (3d Cir.2014) (by focusing on the individualized inquiry required to establish harm in its ascertainability analysis, the district court conflated predominance with ascertainability). However, by choosing to define its class with eight specific exclusions, Plaintiffs have created the need for a structured, multi-stepped, individualized fact-finding process in order to determine which individuals would fall within the class definition and which would fall within one of the eight exclusions. *See In re Skelaxin,* 299 F.R.D. at 570 (similar considerations raised questions about "whether a purchaser *constitutes a class member*" ) (emphasis in original).

15    Conflicts of interest between and among class members are often addressed in the context of adequacy of representation. *See Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 183–84 (3d Cir.2012) ("Certain intra-class conflicts may cause the interests of the representative plaintiffs to diverge from those of the unnamed class members. The adequacy requirement is designed to ferret out such conflicts of interest.") (citation and quotation marks omitted). Accordingly, I will address Defendants' conflict arguments in more detail in section IV. D. *infra.*

Case 1:19-md-02875-RMB-SAK   Document 2058-1   Filed 05/10/22   Page 39 of 172
PageID: 70582
Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)
2015-1 Trade Cases P 79,203

16   As noted below, Plaintiffs failed to address the question of which states' antitrust laws should govern. However, under any potentially applicable law, Plaintiffs must demonstrate antitrust impact. *See* 📖 *Hydrogen Peroxide,* 552 F.3d at 311. As I have concluded that Plaintiffs have not demonstrated that antitrust impact is capable of proof through common, class-wide evidence, I need not reach the choice of law question.

17   I agree with Plaintiffs that evidence of Defendants' alleged violations of the state antitrust laws would be common to the class. *See* 📖 *In re Wellbutrin XL,* 282 F.R.D. at 140 ("If each class member pursued its claims individually, the class member would have to prove the same antitrust and consumer protection violations using the same documents, witnesses, and other evidence").

18   In reaching his opinions, Dr. Hughes stated that nearly seventeen percent of consumers and nearly half of the employer groups paid the same or more for generic modafinil than they had paid for branded Provigil prior to generic entry, and therefore were not injured. (Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 45, 69.) This figure was vigorously challenged by Plaintiffs. After considering this testimony, I find that Dr. Hartman convincingly refuted Dr. Hughes' seventeen percent non-impact number. Dr. Hughes obtained these percentages by comparing the amount paid for Provigil by consumers and TPPs in the year prior to generic entry—2011—to the amount paid by class members for generic Provigil in the year following generic entry—2013. (*See id.*) Dr. Hartman explained that in order to accurately determine whether there was an overcharge, one should take the but-for price of generic Provigil and compare it to either the price of branded Provigil, or, after generic entry, the actual price of generic Provigil, *during the same time period.* (Hrg.Tr., Mar. 24, 2015, pp. 136–44.) According to Dr. Hartman, when comparing the prices of these products during the same quarter, the data reflects an overcharge to virtually all class members. (*Id.;* Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶¶ 128–35.) Based upon this analysis, I do not accept that the number of uninjured consumer class members reaches seventeen percent, as Dr. Hughes suggested.

19   Dr. Hughes also opined that ten percent of three-tier non-Medicare plans, nineteen percent of Medicare four-tier plans, and forty-seven percent of Medicare five-tier plans placed generic modafinil on the same or higher formulary tier after generic entry than Provigil had occupied *prior to generic entry.* (*Id.* at ¶ 60, Ex. 5.) I reject Dr. Hughes' opinion that these consumers are all uninjured for the same reason I rejected Dr. Hughes' opinion that seventeen percent of the class is uninjured. Dr. Hughes appears to have improperly compared data from the year prior to generic entry to data derived from the year after generic entry, as opposed to data from the same quarter.

20   In fact, Defendants do not seem to dispute that the use of yardsticks and averages to compile aggregate damages numbers is a reliable method. During the hearing, defense counsel sought to stipulate that "one and one equals two" and stated that he was "not going to be attacking the individual calculation to get to the total number." (Hrg.Tr., Mar. 24, 2015, p. 99.)

21   Defendants do not squarely attack Dr. Hartman's calculations for unjust enrichment damages; however, similar logic would apply. According to Dr. Hartman's analysis, Defendants' profits would have dropped by the same amount in the but-for world, whether one or all of the settlement agreements were anticompetitive, due to the contingent launch provisions. (*See id.* at ¶¶ 47–48.)

22   Because I find that numerous individualized inquiries prevent Plaintiffs from establishing predominance for the element of antitrust impact, I also find that superiority has not been established as to the state antitrust claims. A class action would not be superior to other available methods for trying these claims because the prevalence of individualized inquiries would make the case unmanageable on a collective basis. *See* 📖 Fed.R.Civ.P. 23(b)(3). Further, conflicts between the various states' consumer protection laws, which will be discussed *infra,* defeat superiority for the antitrust/consumer protection law class.

Vista Healthplan, Inc. v. Cephalon, Inc., Not Reported in F.Supp.3d (2015)

2015-1 Trade Cases P 79,203

23    Defendants assert that Hawaii also recognizes this requirement. However, the Hawaii law expressly provides "[n]o showing that the proceeding or suit would be in the public interest ... is necessary in any action brought under this section." Haw.Rev.Stat. § 480–2.

---

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

3

MAO-MSO Recovery II, LLC v. State Farm Mutual... Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 42 of 172
PageID: 70585

2018 WL 6634324
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois,
Springfield Division.

MAO-MSO RECOVERY II, LLC, a Delaware
Entity; MSP Recovery, LLC, a Florida Entity; MSPA
Claims 1, LLC, a Florida Entity; and MSP Recovery
Claims, Series LLC, a Delaware Entity, Plaintiffs,
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, an
Illinois Company, Defendant.

No. 17-cv-1537
|
Signed 12/19/2018

**Attorneys and Law Firms**

Christopher L. Coffin, Pendley Baudin & Coffin LLP,
Plaquemine, LA, Robert Brent Wisner, Adam M. Foster,
Michael L. Baum, Pedram Esfandiary, Baum, Hedlund,
Aristei & Goldman, PC, Los Angeles, CA, Courtney L.
Stidham, Nicholas R. Rockforte, Pendley, Baudin & Coffin,
L.L.P., New Orleans, LA, David M. Hundley, Hundley Law
Group, P.C., Chicago, IL, for Plaintiffs.

David Matthew Allen, Carlton Fields Jorden Burt P.A.,
Tampa, FL, Joseph Anthony Cancila, Jr., James P. Gaughan,
Riley Safer Holmes & Cancila LLP, Chicago, IL, Patrick
D. Cloud, Heyl Royster Voelker & Allen, Edwardsville, IL,
Benjamine Reid, Carlton Fields Jorden Burt P.A., Miami, FL,
Brian Joseph Neff, Riley Safer Holmes & Cancila LLP, New
York, NY, for Defendant.

**OPINION**

TOM    SCHANZLE-HASKINS,    UNITED    STATES
MAGISTRATE JUDGE

 *1  This matter comes before the Court on Plaintiffs' Motion
to Quash or Modify Third Party Subpoenas (d/e 95) (Motion
95) and Defendant State Farm's Motion to Compel Responses
to Discovery Request (d/e 97) (Motion 97). For the reasons
set forth below, Motion 95 is ALLOWED in part and Motion
97 is ALLOWED.

BACKGROUND

Plaintiffs MAO-MSO Recovery II, LLC; MSP Recovery,
LLC; MSPA Claims 1, LLC; and MSP Recovery Claims,
Series LLC are assignees of claims for reimbursement from
"Medicare Advantage Organizations ("MAOs"), first-tier
entities, and downstream entities (the "Assignors") that offer
or manage Medicare Advantage ("MA") plans for Part C
Medicare Beneficiaries." Second Amended Complaint (d/
e 63) ¶ 1. Defendant State Farm Automobile Insurance
Company (State Farm) is an insurance company that
provides no-fault casualty insurance to its insureds (Casualty
Insurer). Casualty Policies sometimes include coverage for
medical expenses incurred as a result of a covered loss
(Casualty Insurance Medical Coverage). Pursuant to federal
law, Casualty Insurance Medical Coverage is primarily
liable for covered medical expenses and Medicare coverage
is secondary, including coverage by Medicare Advantage
Organizations. See ⚑ 42 U.S.C. § 1395y(b)(2).

Medicare and Medicare Advantage Organizations may make
conditional payments to cover medical expenses, but the
Casualty Insurer, such as State Farm, must reimburse the
conditional payments pursuant to the terms set forth in the
applicable statutes and regulations. See ⚑ Fanning v. United
States, 346 F.3d 386, 389 (3rd Cir. 2003). See Second
Amended Complaint ¶¶ 1-9, 92-93.

Plaintiffs allege "first-tier entities" and "downstream entities"
may bring actions to recover reimbursements for conditional
payments. A "first-tier entity" is an organization that
contracts directly with a Medicare Advantage Organization to
administer Medical Advantage Plans. A "downstream entity"
is a subcontractor or similar-type entity that participates
in the administration of Medicare Advantage Plans but
does not contract directly with the Medicare Advantage
Organization. First-tier entities and downstream entities
include Management Service Organizations (sometimes
called "MSOs"), and Independent Physician Associations
(sometimes called "IPAs"). The Plaintiffs allege that they are
Medicare Service Organizations Second Amended Complaint
¶¶ 90-93.

The Plaintiffs, as assignees of Medical Advantage
Organization claims for reimbursement of conditional
payments (either directly and through first-tier or downstream
entities), seek to bring a nationwide class action against

MAO-MSO Recovery II, LLC v. State Farm Mutual... Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 43 of 172
PageID: 70586

State Farm for unpaid reimbursements due for conditional payments of all Medicare Advantage Organizations, first-tier entities, and their assignees. The Plaintiffs seek to be the class representative of this nationwide class action. See Second Amended Complaint ¶¶ 10-12. The alleged class is:

All Medicare Advantage Organizations, First Tier Entities, or their assignees, that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare beneficiary's medical items and services within the last six years from the filing of the complaint where Defendant:

**\*2** (1) is the primary payer by virtue of having a contractual obligation to pay for the items and services that are required to be covered by the policy of insurance of the same Medicare Beneficiaries that are also covered by an MA plan;

(2) failed to pay for the items and services or otherwise failed to reimburse Medicare Advantage Organizations, First Tier Entities, or their assignees for the items and services that were provided for medical items and services related to the claims on behalf of the Medicare Beneficiaries;

This class definition excludes (a) Defendant, their officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

Second Amended Complaint ¶ 94. The example assignment documents attached to the Second Amended Complaint state that the Assignors will receive 50% of the net proceeds that the Plaintiffs recover. See e.g., Second Amended Complaint, Exhibit I, Recovery Agreement between SummaCare and Plaintiffs dated May 12, 2017, § 2.2.

The Plaintiffs allege two individuals as exemplar claims for reimbursement. Both exemplar claims involved injuries to a State Farm insured with Casualty Insurance Medical Coverage. The two individuals are identified as O.D. and C.S. O.D. was enrolled in a Medicare Advantage Program managed by Florida Healthcare Plus, Inc. O.D. was injured in an automobile accident covered by the State Farm's Casualty Insurance Medical Coverage. Florida Healthcare Plus, Inc., paid O.D.'s medical expenses of $11,060.58 for treatment of his injuries from the accident. Florida Healthcare Plus, Inc. assigned its claims for reimbursement of conditional payments to Plaintiff MSPA Claims 1, LLC. Plaintiffs allege that State Farm under its Casualty Policy "is required to pay

Plaintiff up to the limits of its policy times two as double damages the maximum policy limits to cover all or as much of the $11,060.58 amount for all accident-related expenses." Second Amended Complaint, ¶ 20.

Similarly, C.S. was injured in an automobile accident. Plaintiffs allege C.S. was covered by State Farm Casualty Policy Medical Coverage. C.S. was also enrolled in Medicare Advantage coverage managed by SummaCare Inc. (SummaCare). SummaCare conditionally paid $13,046.03 of C.S.'s medical expenses. SummaCare assigned its claims for reimbursement of conditional payments to Plaintiffs. Plaintiffs allege that, "Defendant is required to pay Plaintiff up to the limits of its policy times two as double damages the maximum policy limits for all or as much of the $13,046.03 amount for all accident-related expenses." Second Amended Complaint ¶ 32.

The parties are currently conducting discovery on the issue of class certification. See Minute Entry entered August 31, 2018 (d/e 91) (adopting Defendant's proposed Discovery Plan (d/e 90). [1]

On September 14, 2018, State Farm served Plaintiffs with interrogatories and requests for production of documents. On October 16, 2018, counsel for State Farm contacted Plaintiffs' counsel by email because Plaintiffs had not responded to State Farm's discovery requests. Counsel for Plaintiffs responded by email stating that he thought State Farm's discovery requests were premature and asking for an additional 21 days. State Farm's counsel responded by asking why Plaintiffs' counsel believed the discovery requests were premature. Plaintiffs' counsel did not respond. See Motion 97, at 2-3 and Exhibit C, Email string between attorneys for the Parties.

**\*3** On October 29, 2018, State Farm issued four Subpoenas (Subpoenas) that are the subject of this Motion. Plaintiffs' Memorandum of Law in Support of their Motion to Quash or Modify Third Party Subpoenas (d/e 96) (Plaintiffs' Memorandum), Exhibit A, Notice of Intent to Serve Subpoenas and copies of the Subpoenas. State Farm issued a Subpoena to the Florida Department of Financial Services, as the receiver for Florida Healthcare Plus, Inc (Receiver). The Subpoena seeks production of 27 categories of documents related to the following topics: (1) Florida Healthcare Plus, Inc.'s relationship with: Centers for Medicare and Medicaid Services; the Plaintiffs; O.D., including all payments and related documents for claims for O.D. from 2013 through 2015, inclusive; first-tier and downstream entities; (2) Florida

MAO-MSO Recovery II, LLC v. State Farm Mutual..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 44 of 172
PageID: 70587

Healthcare Plus, Inc.'s internal procedures for evaluating and paying claims; (3) documents related to claims for reimbursements from insurers or others that may be liable to reimburse conditional payments; and (4) documents related to any audit of the systems and methodologies of the Plaintiffs, including but not limited to the audit referenced in the order approving a Settlement Agreement (Settlement Agreement) between the Receiver and La Ley Recovery Systems, Inc. in In re: The Receivership of Florida Healthcare Plus, Inc., Leon County, Florida Circuit Court Case No. 2014 CA 2762 entered June 14, 2016, and attached as an exhibit to the Second Amended Complaint. State Farm issued a Subpoena to SummaCare, Inc. This Subpoena seeks 26 categories of documents similar to the Subpoena issued to Florida Department of Financial Services, except that certain requests related to C.S. rather than O.D., and this Subpoena did not refer to the Settlement Agreement.

State Farm issued a Subpoena to RD Legal Finance, LLC (RD). RD is one of two members of Plaintiff MAO-MSO Recovery II, LLC. This Subpoena seeks production of documents related to RD's relationship with the Plaintiffs, including documentation of ownership or other interest, communications, and documents exchanged with the Plaintiffs. The Subpoena also seeks governing documents of RD and the identity of the members of RD and the percentage ownership interest of each member. State Farm issued a Subpoena to VSP MSP Recovery Partners, LLC (VSP). VSP is the sole member of Plaintiff MSP Recovery Claims, Series LLC. This Subpoena seeks documents similar to the documents sought from RD.

On November 7, 2018, State Farm's counsel again emailed Plaintiffs' counsel to ask for Plaintiffs' discovery response. Plaintiffs had not yet responded to State Farm's discovery requests. State Farm's counsel stated that he sent this email as a good faith effort to meet and confer to resolve this dispute. Plaintiffs' counsel did not respond. See Motion 97, at 2-3, and Exhibit C, Email string between attorneys for the Parties.

On November 13, 2018, Plaintiffs filed Motion 95. Plaintiffs ask the Court to quash all four Subpoenas described above. State Farm opposes this Motion.

On November 15, 2018, State Farm filed Motion 97. Plaintiffs oppose this motion. Plaintiffs' counsel states that Plaintiffs have now provided written responses to State Farm's interrogatories and have begun a rolling document production. Plaintiffs state that they await the Court's entry

of an ESI protocol order. Plaintiff's Response in Opposition to Defendant's Motion to Compel Responses to Discovery Requests (d/e 102), at 5.

## ANALYSIS

### MOTION 95 TO QUASH SUBPOENAS

As an initial matter, State Farm challenges whether Plaintiffs have standing to challenge the Subpoenas. Normally, a party lacks standing to move to quash a subpoena directed at third parties unless the party had a claim of privilege attached to the information sought or unless the production implicates a party's privacy interests. Jump v. Montgomery Cty, 2015 WL 4530522, at *1 (C.D. Ill. July 27, 2015). The Subpoenas may raise concerns about privilege because State Farm defines the term "MSP Entities" to include Plaintiffs and their attorneys. It is possible, given that definition, the Subpoenas may seek documents over which Plaintiffs may claim an attorney client or attorney work product privilege. This is particularly true in the case of RD and VSP. They are owners of a Plaintiff and so could easily have possession of privileged documents. In light of that possibility, the Court concludes that Plaintiffs have standing to move to quash the Subpoenas.

**\*4** This Court must quash or modify a subpoena if the subpoena subjects a person to an undue burden. Fed. R. Civ. P. 45(c)(3)(A)(iv). Plaintiffs have the burden to show that the subpoenas would subject the recipients of the subpoenas to an undue burden. Pacific Century Intern., Ltd. v. Does 1-37, 282 F.R.D. 189, 193 (N.D. Ill. 2012). The Plaintiffs must show that the burden caused by producing the subpoenaed documents will exceed the benefit from the production of that information. Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923, 927 (7th Cir. 2004).

The parties are currently conducting discovery on Plaintiffs' claims that the Court should certify a nationwide class of all Medicare Advantage Organizations and all first-tier entities and downstream entities that have claims against State Farm for reimbursement for conditional payments arising from State Farm's obligations under Casualty Insurance Medical Coverage and should appoint the Plaintiffs as the class representatives. The Plaintiffs may pursue a class action on behalf of the proposed class only if the class meets the requirements of Rule 23(a) and (b)(3). Fed. R. Civ. P. 23(a) and (b). Rule 23(a) requires that:

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 45 of 172
PageID: 70588

MAO-MSO Recovery II, LLC v. State Farm Mutual..., Not Reported in Fed....

**(1)** the class is so numerous that joinder of all members is impracticable [referred to as the numerosity requirement];

**(2)** there are questions of law or fact common to the class [referred to as the commonality requirement];

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class [referred to as the typicality requirement]; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) requires that :

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

State Farm, therefore, can discover information relevant to all these requirements to certify a class. Fed. R. Civ. P. 26(b)(1) ( Rule 23 Class Issues). State Farm can use Subpoenas to secure documents relevant to these issues. See Fed. R. Civ. P. 26(b)(1), 34(c), 45(a)(1)(D), (d)(2), and (d)(3).

The four Subpoenas seek documents relevant to the Rule 23 Class Issues. The Subpoenas directed to Florida Healthcare Plus, Inc., and SummaCare, Inc., seek information relevant to the commonality of the claims under Rule 23(a)(2), and the typicality of the claims under Rule 23(a)(3). The

documents sought also relate to all of the requirements of Rule 23(b)(3) (B), (C), and (D). The documents sought from RD and VSP are relevant to the question of the adequacy of the Plaintiffs as class representatives under Rule 23(a) (4), and to the question of the class members' interest in controlling the litigation under Rule 23(b)(3)(A). The documents sought by the Subpoenas are relevant.

**\*5** The Subpoenas impose a burden on the recipients. The Plaintiffs ask the Court to treat the Subpoena recipients as part of the Plaintiffs. See Plaintiffs' Memorandum ¶ 4 ("[E]ach of the four respondents are essentially one of the party Plaintiffs in this matter, either by way of a closely held corporate relationship or an assignment of rights."). The Court agrees that the Subpoena respondents each have an interest in the outcome of this action. The Receiver and SummaCare, Inc. are entitled to receive a percentage of the net proceeds that the Plaintiffs recover from State Farm. RD and VSP are members, or equity owners of one of the Plaintiffs. They also clearly have an interest in securing a return on their investments in the respective Plaintiff. Normally, the Court gives special weight to the burden imposed on non-parties by Subpoenas. See e.g., Uppal v. Rosalind Franklin University of Medicine and Science, 124 F.Supp.3d 811, 813 (N.D. Ill. 2015). In this case, however, the Subpoena respondents have clear interests in the outcome of this case. The Court agrees with Plaintiffs that the Subpoena respondents are aligned with the Plaintiffs and will not give significantly more consideration to the burden imposed on them by the Subpoenas.

The Plaintiffs have the burden to show that the Subpoenas impose an undue burden on the Subpoena respondents. Pacific Century Intern., Ltd., 282 F.R.D. at 193. The Plaintiffs fail to meet this burden. The Plaintiffs argue first that the Subpoenas seek privileged information. The Court disagrees. The instructions with the Subpoenas direct the recipients to withhold responsive privileged documents and provide a privilege log in accordance with Rule 26(b)(5)(A).

The Plaintiffs argue that the Subpoenas require the recipients to produce electronically stored information (ESI). A party may subpoena ESI documents. Fed. R. Civ. P. 45(e)(1). The respondent of a subpoena must comply or file a motion and show that the ESI documents sought are not reasonably accessible because of undue burden or cost. Fed. R. Civ. P. 45(e)(1)(D). The Plaintiffs have presented no proof that

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 46 of 172
PageID: 70589

MAO-MSO Recovery II, LLC v. State Farm Mutual..., Not Reported in Fed....

any responsive ESI document is not reasonably accessible because of undue burden or cost. The Plaintiffs have not met their burden on this point.

The Plaintiffs argue that the requests for documents related to O.D. and C.S. (collectively the "Individuals") are overly broad. The Court disagrees. State Farm seeks documents related to the nature of the Individuals' Medicare Advantage coverage and to their covered medical expenses from 2013-2015 for O.D., and from 2014 -2016 for C.S. These documents are relevant to class certification. Plaintiffs must show, among other things, that the common questions of law or fact predominate over any questions affecting individual members of the class. 📑 Fed. R. Civ. P. 23(b)(3). State Farm is entitled to discover the nature of the Medicare Advantage coverage for the Individuals to test whether common factual or legal issues predominate. State Farm is entitled to discover information about each Individual's medical condition generally to test whether the common facts predominate or whether the particularized facts about each injured person's medical condition of at the time of each accident predominates. The request also does not impose an undue burden on the Individuals because the parties have a HIPAA-qualified protective order in place (d/e 56) to protect the documents from improper disclosure.

Plaintiffs argue that documents related to notice to State Farm is irrelevant. Plaintiffs argue that no notice is required. This legal question has not been resolved by the District Court. State Farm is entitled to discover matters related to their theory of the case. At this juncture, the discovery of documents related to notice is relevant to the question of whether the various claims meet the commonality and typicality requirements for class certification and whether common issue of law or fact predominate under 📑 Rule 23(a) (2)and(3), and 23(b)(3). The requests are not overly broad.

Plaintiffs argue that the requests for all communications between SummaCare and Florida Healthcare Plus and Plaintiffs is overly broad. The Court again disagrees. The Plaintiffs allege that they are appropriate class representatives for all Medicare Advantage Organizations and all first-tier and downstream entities in the United States. The relationship of Plaintiffs to these entities is directly relevant to whether they are appropriate class representatives. Based on the material filed in this case, the Plaintiffs do not appear to administer Medicare Advantage Plans in a traditional sense. The Plaintiffs do not appear to process medical claims,

pay claims, or perform other administrative duties. The Plaintiffs appear to exist solely to collect reimbursements from Casualty Insurers such as State Farm. As such, the adequacy of the Plaintiffs as a class representative may be a significant issue at the class certification hearing. The Plaintiffs will need to demonstrate that they can fairly and adequately represent the interests of the other class members. The Plaintiffs' relationship with the members of the class identified in the Second Amended Complaint seems directly relevant to this issue. The documents requests are not overly broad.

**\*6** Plaintiffs complain that the information sought by the Subpoenas is duplicative of the information State Farms seeks to secure directly from Plaintiffs in State Farm's interrogatories and requests to produce. State Farm responds that Plaintiffs have not produced anything yet. The fact discovery on class certification issues was scheduled to close on November 30, 2018, although State Farm has asked for an extension. See State Farm's Motion for Extension of Time (d/e 100). State Farm is entitled to pursue discovery in any manner allowed by the Rules. Given the short timeframe and the lack of documents production by Plaintiffs, the Subpoenas are a reasonable option to secure relevant information before the end of fact discovery on this phase. If Plaintiffs can demonstrate to the Court that they have produced responsive documents that are also documents sought by the Subpoenas, the Court will consider relieving the Subpoena respondents from producing a second copy of the specific documents. Otherwise, the Court will not bar State Farm from using available discovery methods to secure relevant non-privileged information.

Lastly, Plaintiffs ask for additional time to respond to the Subpoenas. The Court agrees that fifteen days is not enough time to produce the documents. The Court will give the Subpoena respondents until December 31, 2018 to produce the responsive documents.

MOTION 97 TO COMPEL DISCOVERY

As an initial matter, Plaintiffs complain that State Farm failed to certify that it met and conferred with Plaintiffs to attempt to resolve this discovery dispute without court action. See Fed. R. Civ. P. 37(a)(1). The Court finds that in this particular case State Farm adequately demonstrated and certified that it attempted to resolve the matter without court action. The emails exchanged by the parties, as set forth in the Defendant's Motion (d/e 97, p. 21), are sufficient to comply with Rule 37. The cases cited in Plaintiffs' Response (d/e 102, p. 2-3) are

MAO-MSO Recovery II, LLC v. State Farm Mutual..., Not Reported in Fed....

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 47 of 172
PageID: 70590

factually distinguishable. The Court will not deny Motion 97 on these grounds.

Plaintiffs state that they have responded in writing to State Farm's interrogatories. Plaintiffs also state that they are producing documents on a rolling basis. Plaintiffs additionally state that they await the entry of an order approving a protocol for ESI production. Rule 34 does not authorize rolling document production. All documents are to be produced within 30 days. Fed. R. Civ. P. 34(a)(2)(A). Rule 34 also does not require an order approving a protocol for ESI production. Rather, Rule 26 imposes on the Plaintiffs the burden of showing that producing requested ESI is not reasonably accessible because of undue burden or cost. Fed. R. Civ. P. 26(b)(2)(B). If Plaintiffs could not comply with the 30-day production requirement of Rule 34, or if they wanted to establish a protocol for ESI production, they should have contacted State Farm to work out these issues or filed a motion for a protective order. They did not. The Court, therefore, orders Plaintiffs to produce the responsive documents by January 15, 2019. Plaintiffs are also ordered to produce by January 15, 2019, a privilege log that meets the requirements of Federal Rule of Civil Procedure 26(b)(5)(A) identifying any documents withheld on claims of privilege.

ATTORNEY FEES

This Court has allowed Motion 97. Rule 37 states that this Court, "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A) (emphasis added). This Rule requiring the award of fees and expenses is mandatory, unless the statutory exceptions apply. The exceptions are:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

*7 Fed. R. Civ. P. 37(a)(5)(A)(i)-(iii). None of these exceptions apply here. State Farm attempted to resolve the discovery dispute. The Plaintiffs were not substantially justified in failing to comply with the discovery requests, and no other circumstances exist that would make an award unjust.

The Court, therefore, directs State Farm to file by January 15, 2019, a statement of fees and expenses incurred in connection with filing Motion 97 along with any supporting evidence. The Plaintiffs are directed to file by February 7, 2019, any objections to State Farm's statement of expenses and attorney fees along with any supporting evidence. The Court will then rule on an award of expenses and fees.

THEREFORE, IT IS ORDERED that Plaintiffs' Motion to Quash or Modify Third Party Subpoenas (d/e 95) is ALLOWED in part. The Court modifies the Subpoenas to give the Subpoena respondents until January 15, 2019, to produce the requested documents. Defendant State Farm's Motion to Compel Responses to Discovery Requests (d/e 97) is ALLOWED. Plaintiffs are ordered to produce the responsive non-privileged documents by January 15, 2019. Plaintiffs and Subpoena respondents are also required to produce by January 15, 2019, a privilege log that meets the requirements of Federal Rule of Civil Procedure 26(b)(5)(A) identifying any documents withheld on claims of privilege.

All Citations

Not Reported in Fed. Supp., 2018 WL 6634324

## Footnotes

1    State Farm has moved to extend fact discovery on class certification issues. State Farm's Motion for Extension of Time (d/e 100). That motion is pending.

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 48 of 172
PageID: 70591

MAO-MSO Recovery II, LLC v. State Farm Mutual..., Not Reported in Fed....

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

4

2021-1 Trade Cases P 81,783

2021 WL 3704727
United States District Court, E.D. Virginia,
Norfolk Division.

IN RE: ZETIA (EZETIMIBE)
ANTITRUST LITIGATION

MDL No. 2:18md2836
|
Signed 08/20/2021

**MEMORANDUM ORDER**

Rebecca Beach Smith, Senior United States District Judge

 **\*1** This matter comes before the court on the End-Payor Plaintiffs' ("EPPs' ") Motion for Class Certification and Appointment of Class Representatives and Class Counsel, ECF No. 729, and EPPs' Motion for Leave to Modify and Limit Their Class Definition, ECF No. 809.

## I. Background

EPPs [1] filed the Motion for Class Certification on November 18, 2019, and the Motion to Modify the Class Definition on January 15, 2020. ECF Nos. 729, 809. On January 20, 2020, the Glenmark and Merck Defendants [2] filed an Opposition to the Motion for Class Certification, ECF Nos. 829, 833, and EPPs filed a reply on February 20, 2020, ECF Nos. 885, 886. On February 4, 2020, the Glenmark and Merck Defendants filed an Opposition to the Motion to Modify the Class Definition, ECF Nos. 854, 857, and EPPs filed a reply on February 20, 2020, ECF Nos. 884, 887.

On February 25, 2020, the Motion for Class Certification was referred to United States Magistrate Judge Douglas E. Miller pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72 (b), to conduct necessary hearings and to submit to the undersigned district judge proposed findings of fact, if applicable, and recommendations for the disposition of the motion. ECF No. 888. The Motion to Modify the Class Definition was separately referred on February 21, 2020. The Magistrate Judge held hearings on the motions on May 1, 2020, and July 7, 2020. ECF Nos. 931, 1014. EPPs filed a Supplemental Brief in Support of their Motion for Class Certification and Motion to Modify the

Class Definition on May 15, 2020, ECF Nos. 945, 949, and Defendants filed a Supplemental Brief in Opposition on May 22, 2020, ECF Nos. 954, 956.

On August 14, 2020, the Magistrate Judge submitted a Report and Recommendation ("R&R"). ECF No. 1094. The R&R recommends that the court grant EPPs' Motion for Class Certification, ECF No. 729, and grant EPPs' Motion for Leave to Modify Their Class Definition, ECF No. 809. R&R at 83-84.

The R&R advised Defendants of their right to file written objections to the findings and recommendations made by the Magistrate Judge within fourteen (14) days from the date of service of the R&R on the objecting party. Id. at 84. Defendants filed Objections to the R&R on August 28, 2020, arguing that EPPs cannot satisfy the predominance and ascertainability requirements of Federal Rule of Civil Procedure 23 even with EPPs' modified class definition. ECF No. 1103. EPPs filed a response on September 11, 2020. ECF No. 1129. On April 23, 2021, the court allowed Defendants to file a supplemental brief in further support of their Objections to the R&R. See ECF Nos. 1258-1261, 1271-1272.

 **\*2** These matters are now ripe for review. Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the court, having reviewed the record in its entirety, hereby makes a de novo determination of those portions of the R&R to which Defendants have specifically objected. See Fed. R. Civ. P. 72(b). The court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to him with instructions. 28 U.S.C. § 636 (b) (1).

## II. Analysis

Defendants make two overarching objections to the R&R. [3] First, they argue that the class should not be certified because EPPs have not shown by a preponderance of the evidence that issues that are common to the class will predominate over individual ones. Second, they argue that EPPs have not provided a reliable and administratively feasible method for ascertaining class membership. For the reasons below, the court rejects the Defendants' objections and affirms the R&R.

2021-1 Trade Cases P 81,783

## A. Predominance

For the proposed class to be certified, EPPs must prove by a preponderance of the evidence that questions "of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b) (3). To satisfy this requirement, EPPs must specifically demonstrate that they can prove violation of antitrust laws, injury, and measurable damages through common proof on a classwide basis. See In re Restasis Antitrust Litig., 335 F.R.D. 1, 14 (E.D.N.Y. 2020). However, "individual questions need not be absent in order to certify a class," In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 204 (S.D.N.Y. 2018), as long as "common questions "predominate over any questions affecting only individual [class] members," Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013) (alteration in original).

Defendants argue that the proposed class does not satisfy the predominance requirement as to classwide proof of injury because the class includes "thousands of uninjured class members" for which EPPs "offer no mechanism of identifying ... without ... individual inquiries." Defs.' Objs. at 7. They argue that the R&R mistakenly arrived at the opposite conclusion by (1) applying the wrong legal standard to assess injury and (2) erroneously using anecdotes and averages to mask large numbers of uninjured members.

### 1. Nexium Standard

Defendants first argue that in determining whether class members suffered injury, the R&R "wrongly relied on the Nexium single overcharge standard." Defs.' Objs. at 7. Under that standard, "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." In re Nexium, 777 F.3d 9, 27 (1st Cir. 2015). Defendants argue that the court should instead assess injury on a net basis. See Defs.' Objs. at 11.

After reviewing the record and case law, the court concludes that the Magistrate Judge properly rejected the Defendant's argument. See R&R at 47 (noting that "[t]he overwhelming weight of authority rejects Defendants' position"). Defendants mistakenly assert that "if an EPP was no worse off because of the alleged conduct (or in fact benefitted from it, on net) then it has not been injured by that conduct." Defs.' Objs. at 8.

However, in the antitrust context, injury occurs at the moment a single overcharge occurs due to the alleged anticompetitive conduct. Nexium, 777 F.3d at 27; see also Mayor of Baltimore v. Actelion Pharms. Ltd., 995 F.3d 123, 131 (4th Cir. 2021) (asserting that "each time [pharmaceutical company] sold [branded drug] at a supracompetitive price ..., it illegally exercised monopoly power ... thus committing an overt act that caused injury and violated the antitrust laws"); R&R at 47-48 (collecting cases). When assessing injury, "no attempt is made to ask whether the injury is outweighed by benefits." Alig v. Quicken Loans Inc., 990 F.3d 782, 792 (4th Cir. 2021) (affirming class certification and holding that an instance of financial harm, even if subsequently offset, constituted injury). Offsets are relevant to the issue of damages,[4] not injury. Id.

**\*3** The court is not convinced otherwise by Defendants' reliance on vague statements in Windham v. American Brands, Inc., 565 F.2d 59, 66-67 (4th Cir. 1977), a case that was based on patently different facts than this case, and involved an "unmanageable" variety of antitrust claims "arising out of ... several violations," and focused primarily on the unfeasible and individualized calculation of damages. See Defs.' Objs. at 10. Relatedly, the court rejects Defendants assertion that the Nexium standard is irrelevant to "many of the transactions" in this case because "[u]ndisputed evidence showed that some rebates are paid 'at the time of purchase,' and not as a later offset." Defs.' Objs. at 10 (quoting Hughes Decl., ECF No. 836, ¶ 50). However, Dr. Hughes failed to persuasively support that assertion, which is in fact disputed, with evidence related to Zetia during the applicable class period. Cf. Dietz Decl., ECF No. 835, ¶ 27,; May Hr'g Tr., ECF No. 931, at 99:15-100:23, 114:6-10.

### 2. Uninjured Class Members

Next, Defendants argue that the R&R underestimated the number of uninjured class members because the use of "averages and anecdotes offered by EPPs' expert" to support classwide injury "mask a large number of uninjured TPPs in the putative class." Defs.' Objs. at 12. Therefore, according to Defendants, the individualized inquiry necessary to identify uninjured members will predominate over common questions. Defendants rely on the case In re Lamictal Direct Purchaser Antitrust Litig., 957 F.3d 184 (3d Cir. 2020), and argue that the use of averages is only "acceptable where they do not mask individualized injury." Defs.' Objs. at 12

(quoting Lamictal, 957 F.3d at 194). However, Lamictal involved evidence of "nuance[s]" in that particular market that were ignored by the district judge and may have defeated a predominance finding. 957 F.3d at 194. Here, Defendants do not attempt to analogize the salient facts at issue in Lamictal, and therefore fail to provide persuasive evidence that the use of averages is inappropriate here. See In re Zetia (Ezetimibe) Antitrust Litig., No. 20-2184, 2021 WL 3379035, at *6 (4th Cir. Aug. 4, 2021) ("But we find no issue with the practice of proving injury by classwide averages, which the district court correctly characterized as 'common.' ")

Additionally, the Magistrate Judge completed an extensive and rigorous analysis to find that EPPs presented sufficient evidence to show that the amended class does not include so many uninjured class members as to bar class certification. See R&R at 40-66. By limiting the class definition, EPPs have excluded certain government-subsidized plans and plans with high manufacturer rebates on branded Zetia, which likely included members with no injury or damages. See R&R at 58. Defendants contend that even the proposed class as amended should not be certified because too many uninjured members remain, particularly due to the inclusion of Medicare Part D Plans and TPPs that placed branded Zetia on Tier 4 of their formularies, among others. See Defs.' Objs. at 11-20. However, the court has reviewed Defendants' objection, and the court agrees with the Magistrate Judge's findings and the ultimate conclusion that the proposed members in the modified class definition do not include so many uninjured members that this class should not be certified. See R&R at 60-66.

**3. Summary**

EPPs have shown by a preponderance of the evidence antitrust impact/injury as to all, or substantially all, members of the class through common evidence, and that individual issues regarding net damages do not so overwhelm common issues as to defeat predominance. See R&R at 50-70; see also In re Zetia (Ezetimibe) Antitrust Litig., 2021 WL 3379035, at *6 ("[E]ven if some individualized-injury inquiry is ultimately required at trial for some defendants, common issues will still predominate."). The court has reviewed the record of this case de novo, and the court now **AFFIRMS** the Magistrate Judge's factual findings and conclusions with respect to the predominance requirement under Rule 23.

**B. Ascertainability**

**\*4** Under Rule 23's implicit "ascertainability" requirement, a class should not be certified unless proposed class members are "readily identif[iable] in reference to objective criteria." Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 655 (4th Cir. 2019) (quoting EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014)). The class must be defined "in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." Id. at 658 (quoting EQT Prod. Co., 764 F.3d at 358). A class should not be certified "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.' " EQT Prod. Co., 764 F.3d at 358 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012)).

The R&R aptly describes EPPs' proposed methodology for identifying proposed class members through data maintained by pharmacy benefit managers ("PBMs"). See R&R at 20-25. The Magistrate Judge concluded that "EPPs have adequately shown that PBM data can be procured and standardized to identify class members" and that EPPs have provided "an administratively feasible method for ascertaining class members." Id. at 26, 37.

On this issue, Defendants make numerous objections to the Magistrate Judge's factual findings and recommendations, many of which were considered and appropriately rejected in the R&R itself. Defendants argue that PBM data is not sufficient to identify class members; EPPs have not demonstrated they can feasibly obtain that data even if it exists; the proposed methodology is inadequate given the multiple class exclusions; EPPs have not met their burden of showing that the methodology is not prohibitively expensive; and the Magistrate Judge's attempt to distinguish In re Niaspan Antitrust Litig., 2020 WL 2933824, at *15 (E.D. Pa. June 2, 2020), was erroneous. See Defs.' Objs. at 20-30. In their Objections and a later-filed supplemental brief, Defendants also suggests that EPPs do not intend to utilize their proposed ascertainably methodology for class notice purposes, which, in their view, further undermines the conclusion that the proposed methodology is feasible or

proper for class certification. See ECF Nos. 1103 at 22, 1272 at 5.

After voluminous briefing and an extensive evidentiary hearing regarding the feasibility of identifying class members using EPPs' proposed methodology, the Magistrate Judge found EPPs expert, Laura Craft, reliable, credible, and persuasive. This court agrees. [5] After reviewing Defendants' objections on discrete factual issues, and a de novo review of the record, this court agrees with the R&R's underlying findings and concludes that EPPs have sufficiently demonstrated by a preponderance of the evidence an administratively feasible method for identifying class members.

The court reiterates that "[t]he plaintiffs need not be able to identify every class member at the time of certification," EQT Prod. Co., 764 F.3d at 358, so long as class members can be determined "at some point," Krakauer, 925 F.3d at 658. [6] Ms. Craft provided extensive and detailed testimony, which the court finds credible, regarding her ability to obtain relevant PBM data, standardize it, then identify class members and exclude non-members--all without the type of individualized inquiry that would make any proposed methodology unfeasible.

*5 Moreover, Ms. Craft's proposed methodology was found administratively feasible in another end-payor action, see In re Loestrin 24 FE Antitrust Litig., 410 F. Supp. 3d 352, 397 (D.R.I. 2019), and the R&R correctly distinguishes a decision to the contrary in In re Niaspan Antitrust Litig., No. 13-md-2460, 2020 WL 2933824 (E.D. Pa. June 2, 2020). See R&R at 28-31. Unlike Niaspan, the proposed class in this matter importantly does not involve potentially uninjured consumers, the inclusion of which would likely prove difficult to efficiently identify and exclude in an administratively feasible manner. See R&R at 28-29. Moreover, in this case, Ms. Craft "squarely addressed the ... points of concern in Niaspan," and provided extensive and detailed testimony on the feasibility of identifying class members, in contrast to the lack of evidence provided on problematic issues in Niaspan. R&R at 31. After a de novo review, the court AFFIRMS the R&R's findings and recommendations as to Rule 23's ascertainability requirement.

### III. Conclusion

The court, having reviewed the record in its entirety, having examined the Objections to the R&R, and having made de novo findings with respect thereto, hereby OVERRULES Defendants' Objections, ECF No. 1103. The court ADOPTS AND APPROVES IN FULL the findings and recommendations set forth in the Magistrate Judge's thorough and well-reasoned R&R, ECF No. 1094. Accordingly, the court GRANTS EPPs' Motion for Class Certification, ECF No. 729, and GRANTS EPPs' Motion for Leave to Modify and Limit their Class Definition, ECF No. 809, and certifies the class of third-party payors as proposed and modified by EPPs, and as delineated in the R&R. See R&R at 4-5.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3704727, 2021-1 Trade Cases P 81,783

### Footnotes

1    The named End-Payor Plaintiffs consist of the City of Providence, Rhode Island; International Union of Operating Engineers Local 49 Health and Welfare Fund; Painters District Council No. 30 Health & Welfare Fund; Philadelphia Federation of Teachers Health & Welfare Fund; Sergeants Benevolent Association Health & Welfare Fund; The Uniformed Firefighters' Association of Greater New York Security Benefit Fund; The Retired Firefighters' Security Benefit Fund of the Uniformed Firefighters' Association; and United Food and Commercial Workers Local 1500 Welfare Fund.

2    The Glenmark Defendants consist of Glenmark Pharmaceuticals, Ltd. and Glenmark Pharmaceuticals Inc., USA, the latter incorrectly identified as Glenmark Generics Inc., USA. The Merck Defendants consist of Merck

& Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC.

3    After reviewing the R&R, the court agrees with and adopts the Magistrate Judge's factual findings, reasoning and conclusions with respect to all issues for which there were no objections, including the required numerosity, typicality, commonality, and adequacy findings under 🟨 Federal Rule of Civil Procedure 23(a). See R&R at 9-18.

4    The R&R correctly recognizes that "the predominance requirement applies to damages as well," such that "EPPs must still define class membership so as to limit the number of indirect purchases that experienced no net injury," and also present an administratively feasible method of identifying class members who suffered no net damages. R&R at 48-49. The court agrees with the R&R that EPPs have sufficiently done so, and that "[t]he individual net damages issues remaining after the [class definition] amendment do not present any individualized issues that would overwhelm common issues and defeat predominance." R&R at 66.

5    Although courts in the Second Circuit are not required to determine whether a proposed ascertainability methodology is administratively feasible, see 🟨 In re Petrobras Sec., 862 F.3d 250, 264 (2d Cir. 2017), the court notes that since the R&R was issued, the Southern District of New York found that Ms. Craft's methodology was "sufficiently reliable" in a similar pay-for-delay antitrust action, see In re Namenda Indirect Purchaser Antitrust Litig., No. 115CV6549CMRWL, 2021 WL 100489, at *1 (S.D.N.Y. Jan. 12, 2021).

6    Defendants' arguments concerning the related, but distinct, issue of class notice do not change the court's analysis. See ECF No. 1260 at 4 ("EPPs have never contended that their ascertainability methodology," particularly the potential need to subpoena PBMs, "was necessary to implement class notice here.").

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

5

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by  In re Niaspan Antitrust Litigation,  E.D.Pa.,
August 17, 2021

2020 WL 5778756
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Norfolk Division.

IN RE ZETIA (EZETIMIBE)
ANTITRUST LITIGATION
This Document Relates to: All End-Payor Actions

MDL No. 2:18-md-2836
|
Signed 08/13/2020
|
Filed 08/14/2020

**REPORT AND RECOMMENDATION**

DOUGLAS E. MILLER, UNITED STATES MAGISTRATE
JUDGE

**Table of Contents**

I. Statement of the Case...——

II. Analysis...——
A. Rule 23 (a)...——

  1. Numerosity...——

  2. Commonality...——

  3. Typicality...——

  4. Adequacy...——

  5. Ascertainability...——

B. Rule 23 (b)...——

C. Rule 23 (g)...——

  1. Predominance...——

    a. Uninjured Class Members...——

    i. Injury and Damages: Separate
Considerations...——

    ii. TPPs that "Ceased Operations" Before May
2015...——

    iii. Brand Loyalists...——

    iv. Increased Premiums...——

    V. Copayments, Rebates, and Formulary
Placement...——

    1. TPPs Covering Zetia on Tier 3...——

    2. TPPs Covering Zetia on Tier 4 or Higher...——

    3. Medicare Part D Plans...——

    b. Measurable Damages...——

    c. State Law Variations...——

  2. Superiority...——

III. Conclusion and Recommendation...——

IV. Review Procedure...——

**\*1** Before the court are End-Payor Plaintiffs' ("EPPs")[1]
Motion for Class Certification and Appointment of Class
Representatives and Class Counsel, ECF No. 729, and Motion
for Leave to Modify and Limit their Class Definition, ECF
No. 809. Defendants Glenmark[2] and Merck[3] oppose the
Motions. For the reasons explained in greater detail below, I
recommend that the court GRANT both Motions.

**I. Statement of the Case**

The allegations underlying this multidistrict litigation have
been set forth in great detail by this court in previous
opinions.[4] I therefore provide only a brief summary here.
EPPs allege that Merck and Glenmark entered into an
unlawful reverse payment settlement agreement,[5] which
resulted in artificially inflated prices for the brand drug
Zetia (ezetimibe) and its generic equivalents. EPPs' Am.
Consolidated Class Action Compl. ("EPPs' Am. Compl.")
¶¶ 1-7, 184-222 (ECF No. 130). Specifically, Glenmark, a
generic drug manufacturer, agreed to refrain from launching
the market's first generic version of Zetia - a blockbuster

cholesterol-controlling drug manufactured by Merck - for a period of roughly five years, providing Merck between $5.7 and $8.3 billion in additional Zetia sales. Id. ¶¶ 4, 193, 197, 210-16. In exchange, Merck agreed to drop patent infringement claims against Glenmark and to abstain from introducing its own generic version of Zetia (an "authorized generic") during the initial 180-day exclusivity period following Glenmark's generic entry, ensuring Glenmark's sole-generic-provider status. Id. ¶¶ 4-5, 193, 196, 217-22. This type of agreement is referred to as a "no-authorized-generic" or "No-AG" agreement. Id. ¶¶ 4, 84. And in this case, according to EPPs, Defendants' No-AG agreement resulted in an $800 million payment to Glenmark and supracompetitive purchase prices for both brand and generic Zetia. Id. ¶¶ 4, 6-7, 221, 267, 273-74. Defendants vehemently dispute this characterization of the settlement.

**\*2** Here, EPPs, one of three sets of plaintiffs, seek to certify a proposed class of third-party payors ("TPPs") consisting of selfinsured health and welfare plans or insurers that indirectly purchased and/or provided reimbursement for their members' purchases of Zetia and its generic equivalents. The proposed class encompasses claims under the antitrust, consumer protection, and/or unjust enrichment laws of twenty-eight states, the District of Columbia, and Puerto Rico. [6]

After filing their Motion for Class Certification, EPPs sought leave to modify their class definition. The initial definition provides as follows:

> All Third-Party Payor entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Zetia or its AB-rated generic equivalents in any form, that was sold through a retail pharmacy, including mail-order pharmacies and long-term care pharmacies, in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota,

Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia[,] West Virginia and Wisconsin from July 1, 2012 through November 18, 2019.

The following entities are excluded from the Class:

a. Defendants and their subsidiaries and affiliates;

b. All federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

c. All entities who purchased Zetia or generic Zetia for purposes of resale or directly from Defendants or their affiliates;

d. Fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); and

e. Pharmacy benefit managers.

EPPs' Mot. Class Certification 1-2; EPPs' Mem. Supp. Mot. Class Certification ("EPPs' Mem. Supp. Mot. Certify") 8 (ECF Nos. 730 (public), 734 (sealed)).

EPPs now propose the following modified class definition:

> All Third-Party Payor entities ("TPPs") within the Brand Subclass or the Generic Subclass defined herein that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Zetia or its AB-rated generic equivalents in any form, that was sold through a retail pharmacy, including mail-order pharmacies and long-term care pharmacies, in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia[,] West Virginia and Wisconsin from November 15, 2014 (the "but-for generic entry date") through November 18, 2019.

Brand Subclass: TPPs that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of brand Zetia purchased between the but-for generic entry date and December 11, 2016, inclusive. Excluded from the Brand Subclass are Optum Health Part D Plans, Silverscript Part D Plans, Emblem Health Part D, Humana Part D Plans, Optum Health Managed Care Plans, and any TPPs that used one of these plans or OptumRx as its pharmacy benefits manager ("PBM") during this subclass period.

**\*3** Generic Subclass: TPPs that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic ezetimibe purchased between the generic entry date (December 12, 2016) and November 18, 2019, inclusive.

General Exclusions: The following entities are excluded from both subclasses:

a. Defendants and their subsidiaries and affiliates;

b. All federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans;

c. All entities who purchased Zetia or generic Zetia for purposes of resale or directly from Defendants or their affiliates;

d. Fully-insured health plans (i.e., health plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members); and

e. Pharmacy benefit managers.

EPPs' Mot. Modify Class Definition 2-3 ("EPPs' Mot. Modify"); EPPs' Mem. Supp. Mot. Modify Class Definition ("EPPs' Mem. Supp. Mot. Modify") 2-3 (ECF No. 810). This new proposed class definition shortens the class period by two years and reduces the number of class members by excluding (1) certain entities and brand purchases before generic entry and (2) all brand purchases after generic entry. Id. at 3. In addition, EPPs' economic expert estimates that the modified definition would reduce EPPs' claimed damages by approximately 50 percent. Id.

Defendants oppose class certification, primarily arguing that EPPs cannot satisfy the ascertainability and predominance

requirements of Federal Rule of Civil Procedure 23. Defs.' Mem. Opp'n to EPPs" Mot. Class Certification ("Defs.' Opp'n Mot. Certify") 11-12 (ECF Nos. 829 (public), 833 (sealed)). Additionally, Defendants argue that EPPs' proposal to modify the class definition is futile because it fails to cure the defects noted by Defendants in their opposition to EPPs' Motion for Class Certification. Defs.' Mem. Opp'n to EPPs' Mot. Modify Class Definition ("Defs.' Opp'n Mot. Modify") 3 (ECF Nos. 854 (public), 857 (sealed)). The court heard expert witness testimony on May 1, 2020 ("May Hr'g"), ECF Nos. 931 (sealed), 987 (public), and oral argument on July 7, 2020 ("July Hr'g"), ECF No. 1014.

After reviewing the parties' extensive briefing, expert evidence, and arguments on the Motions, I conclude that EPPs and their modified proposed class definition satisfy the

requirements of Rule 23. Thus, this report recommends that the court certify a class of end payors pursuant to EPPs' modified class definition.

## II. Analysis

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)). A party seeking to invoke this exception must "affirmatively demonstrate [its] compliance" with the requirements of Federal Rule of Civil Procedure 23. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); see also Brown v. Transurban USA, Inc., 318 F.R.D. 560, 566 (E.D. Va. 2016) (stating that the party seeking class certification must prove each Rule 23 requirement by a preponderance of the evidence).

At the same time, "the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." EQT Prod. Co. v. Adair, 764 F.3d 347, 358 (4th Cir. 2014) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350-51). This analysis may require "the court to probe behind the pleadings before coming to rest on the certification question." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982). And it often "overlap[s] with the merits of the plaintiff's underlying

claim." Comcast Corp., 569 U.S. at 33-34 (quoting Wal-Mart Stores, Inc., 564 U.S. at 351). To the extent the court must resolve disputes between the parties' experts in order to determine whether a particular class certification requirement has been satisfied, see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 324 (3d Cir. 2008) (noting that such resolution, when necessary, is reserved for the court), any "determination that an expert's opinion is persuasive or unpersuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case," id. ("Rigorous analysis need not be hampered by a concern for avoiding credibility issues; as noted, findings with respect to class certification do not bind the ultimate fact-finder on the merits.").

**\*4** Here, EPPs seek leave to modify their class definition, which Defendants oppose as futile because, in their view, the modified class definition suffers the same deficiencies as the original. Although Rule 23(c) (1) (C) permits courts to alter or amend a prior order that granted or denied class certification before final judgment is entered, Fed. R. Civ. P. 23(c) (1) (C); accord Henderson v. CoreLogic Nat'l Background Data, LLC, No. 3:12-cv-97, 2016 WL 4611571, at \*4 (E.D. Va. Sept. 2016); Milbourne v. JRK Residential Am., LLC, No. 3:12-cv-861, 2016 WL 1071571, at \*3-4, \*8 (E.D. Va. Mar. 15, 2016), this court has not yet ruled on class certification.

Nevertheless, in that same spirit, the court may permit a party to amend its class definition prior to a class certification ruling, just as the court itself may modify the definition upon consideration of a motion for class certification, when the result is a better-pled class definition. See Weisfeld v. Sun Chem. Corp., 84 F. App'x. 257, 259 (3d Cir 2004) ("Despite failing to revise his complaint, Weisfeld sought to narrow the definition of the class in his motion for class certification.... The District Court considered this revised class definition in its analysis, and we will do the same." (citing Robidoux v. Celani, 987 F. 2d 931, 937 (2d Cir. 1993))); Abdeljalil v. Gen. Elec. Capital Corp., 306 F.R.D. 303, 306 (S.D. Cal. 2015) (permitting the plaintiff to narrow the class definition on a motion for class certification); Charron v. Pinnacle Grp. N.Y. LLC, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("A district court is not bound by the class definition proposed in

the complaint, and is empowered to carve out an appropriate class." (internal quotation marks omitted)).

Here, Defendants do not raise any procedural defenses to modification - they only assert that modification is futile because it fails to remedy the inadequacies in the original class definition. Thus, in order to resolve EPPs' Motion to Modify, this report's analysis focuses on EPPs' modified class definition to determine whether it meets the requirements for certification under Rule 23. [7]

### A. Rule 23 (a)

Rule 23 (a) spells out four prerequisites to class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Furthermore, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.' " EQT Prod. Co., 764 F.3d at 358 (quoting Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972)). Courts often refer to this implicit requirement as "ascertainability." Id.; see, e.g., Soutter v. Equifax Info. Servs., LLC, 307 F.R.D 183, 196 (E.D. Va. 2015).

1. Numerosity

The numerosity prong requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a) (1). The Fourth Circuit has held that " [n]o specified number is needed to maintain a class action." Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir. 1984). Generally, classes consisting of forty or more members are considered sufficiently large that joinder is presumed to be impracticable. Am. Sales Co., LLC v. Pfizer, Inc., No. 2:14-cv-361, 2017 WL 3669604, at \*6 (E.D. Va. July 28, 2017), R. & R. adopted, 2017 WL 3669097 (E.D. Va. Aug. 24, 2017); In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 337 (D. Md. 2012).

**\*5** To establish numerosity, EPPs cite their expert reports, which state that "Class members purchased, paid, and/or

provided reimbursement for millions" of brand and generic Zetia prescriptions, EPPs' Mem. Supp. Mot. Certify 9 (citing Buchman Decl. Ex. 2 ("Lamb Decl."), ¶ 25 n.54 (ECF Nos. 730-3 (public), 734-2 (sealed)) (stating that between July 2012 and March 2019, "there were approximately 33.26 million branded Zetia prescriptions and 12.66 million generic ezetimibe prescriptions prescribed to insured patients in the retail channel" and that TPP class members "would have purchased, paid, and/or provided reimbursement for some or all of the cost of these prescriptions")), and that "in 2016 alone, there were over 27,000 employer-sponsored health plans in the United States that were not fully insured," id. (citing Buchman Decl. Ex. 13 ("Craft Decl."), ¶ 11 (ECF No. 730-14)). EPPs thus assert that "common sense dictates that the number of Class members far exceeds forty TPPs." Id. (citing In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998)).

Given EPPs' uncontested evidence, I am satisfied that the class is sufficiently numerous as to render joinder impracticable. See In re Loestrin 24 FE Antitrust Litig., 410 F. Supp. 3d 352, 397 (D.R.I. 2019) (numerosity satisfied when plaintiffs proffered that TPP class included at least forty members "in light of the fact that there were approximately 24,534 employer-sponsored health plans in the United States in 2012").

### 2. Commonality

Rule 23(a)(2) requires that questions of law or fact be common to the class. "A common question is one that can be resolved for each class member in a single hearing" and does not "turn[ ] on a consideration of the individual circumstances of each class member." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006). In other words, the named plaintiffs must "demonstrate that the class members 'have suffered the same injury' " and that their claims "depend upon a common contention." Wal-Mart Stores, Inc., 564 U.S. at 349-50 (quoting Falcon, 457 U.S. at 157). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350. So long as EPPs make this showing, factual differences among the class members' claims are generally of no concern. Stanley v. Cent. Garden & Pet. Corp., 891 F. Supp. 2d 757, 770 (D. Md. 2012) ("Factual differences among

class members will not necessarily preclude certification 'if the class members share the same legal theory.' " (citing Mitchell-Tracey v. United Gen. Title Ins. Co., 237 F.R.D. 551, 557 (D. Md. 2006))); see also Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982) ("[E]very member of the class need not be in a situation identical to that of the named plaintiff [to establish commonality].").

In the antitrust context, commonality is readily satisfied because allegations of conspiracy or monopolization normally constitute a "central or single overriding issue ... sufficient to establish a common question." Brown v. Cameron-Brown Co., 92 F.R.D. 32, 38 (E.D. Va. 1981) (internal quotation marks omitted) (citing 4 Herbert B. Newberg, Newberg on Class Actions § 7514 (1977)); see also Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 246 F.R.D. 293, 300 (D.D.C. 2007) ("[N]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).").

In this case, commonality, which Defendants do not contest, is easily satisfied. Here, EPPs allege that they were injured as a result of Defendants' unlawful conspiracy to delay the entry of generic Zetia. EPPs' Am. Compl. ¶¶ 1-7, 184-222. To prove their claims, EPPs identify several sources of evidence common to the class. Evidence related to the alleged conspiracy itself comes from Merck and Glenmark documents and witnesses involved with the underlying patent litigation and subsequent settlement. This evidence bears on common questions related to the motivations for settlement and its effect on the market for ezetimibe. With respect to damages, EPPs' common evidence consists of (1) actual experience of brand and generic Zetia following generic entry, which, according to EPPs, shows that brand sales "quickly converted" to generic sales and thus demonstrates that earlier generic entry would have led to significantly lower prices; (2) academic literature and studies analyzing the effects of generic competition in pharmaceutical markets, which consistently show that generic drugs enter the market at a lower price than the brand (and further decrease in price as additional generic manufacturers enter the market) and quickly capture more than 50 percent of the market share; and (3) Defendants' internal documents and forecasts, which establish that Defendants expected generic Zetia entry to likewise enter at a discount on the brand price and quickly

capture a large portion of the brand base. Lamb Decl. ¶¶ 36-62.

**\*6** Several courts in similar delayed generic entry class actions have found that such allegations and evidence involve common questions of law and fact in accordance with Rule 23 (a) (2). See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., No. 18-md-2819, 2020 WL 2555556, at \*5-6 (E.D.N.Y. May 5, 2020); Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms., Inc., 333 F.R.D. 390, 403-04, 409-12 (M.D. Tenn. 2019); In re Flonase Antitrust Litig., 284 F.R.D. 207, 217, 221 (E.D. Penn. 2012). I too find that the claims of the putative class, which are based on Defendants' alleged anticompetitive conduct regarding the market for ezetimibe, "present important common questions sufficient to satisfy the commonality requirement of Rule 23 (a) (2)." Meijer, Inc., 246 F.R.D. at 300.

3. Typicality

The typicality prong requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a) (3). The typicality and commonality requirements are similar, as "[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected." Falcon, 457 U.S. at 157 n.13. But the typicality requirement specifically ensures that named class representatives are appropriately part of the class and "possess the same interest and suffer the same injury as the class members." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 338 (4th Cir. 1998); see also Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006) ("The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so goes the claims of the class.' " (quoting Broussard, 155 F.3d at 340)). Typicality therefore requires the named plaintiffs to demonstrate " (1) that their interests are squarely aligned with the interests of the class members and (2) that their claims arise from the same events and are premised on the same legal theories as the claims of the class members." Jeffreys v. Commc'ns Workers of Am., 212 F.R.D. 320, 322 (E.D. Va. 2003).

In antitrust cases, the typicality requirement is "particularly likely" to be satisfied. 6 William B. Rubenstein, Newberg on Class Actions § 20:40 (5th ed. Dec. 2019 update). Indeed, in such cases, "all of the plaintiffs' claims will arise out of the same course of conduct (the alleged conspiracy) and be based on the same legal theory (an unlawful restraint of trade resulting in supracompetitive prices)." Id. Consequently, "the proposed class representative's claims will be typical of those of the rest of the class." Id.; see also Playmobil, 35 F. Supp. 2d at 241 ("[T]ypicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants.").

In support of this requirement, the named class representatives argue that their claims and the proposed TPP class members' claims "arise from the same course of conduct, namely, Defendants' anticompetitive scheme to delay the availability of generic Zetia," which caused the named and absent TPP class members "to suffer the same injury - paying supra-competitive prices for Zetia and its AB-rated generic equivalent." EPPs' Mem. Supp. Mot. Certify 13. As a result, "[t]he claims are based upon common legal theories: conspiracy in restraint of trade and monopolization." Id.

**\*7** EPPs satisfy typicality for the same reasons they satisfy commonality. That is to say that by executing the alleged reverse payment settlement agreement, Defendants unlawfully caused EPPs and absent TPP class members to pay overcharges for ezetimibe. Thus, the named and absent class members' claims "are based largely on identical legal theories and focus heavily on Defendants' course of conduct." Vista Healthplan, Inc. v. Cephalon, Inc., No. 2:06-cv-1833, 2015 WL 3623005, at \*14 (E.D. Penn. June 10, 2015); accord Flonase, 284 F.R.D. at 218; In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 138 (E.D. Penn. 2011).

4. Adequacy

Rule 23(a) requires that the parties representing the proposed class be able to "fairly and adequately ... protect the interests" of all members of the class. Fed. R. Civ. P. 23(a) (4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prod., Inc., v. Windsor, 521 U.S. 591, 625 (1997) (citing Falcon, 457 U.S. at 157 n.13). In order for a conflict to defeat class certification, "that conflict must be fundamental." Gunnells v. Healthplan Servs., Inc., 348

F.3d 417, 430 (4th Cir. 2003). In other words, the conflict "must be more than merely speculative or hypothetical," but rather must "go to the heart of the litigation." Id. at 430-31.

EPPs have likewise satisfied the adequacy requirement. Here, EPPs' interests are aligned with the putative TPP class members because all their claims depend on the same alleged anticompetitive conduct by Defendants, resulting in the same injury - paying overcharges for ezetimibe. Naturally, "they have the same interest in establishing [Defendants'] liability." Gunnells, 348 F.3d at 431; see also Momenta Pharms., Inc., 333 F.R.D. at 405 (holding that named end-payor plaintiffs' "interests are aligned with the putative class members because they all possess the same interests and have suffered the same alleged injury i.e., they have each allegedly paid more for generic enoxaparin than they would have paid absent the alleged conspiracy"); Flonase, 284 F.R.D. at 207 ("Each class member purchased and/or reimbursed for fluticasone propionate at some point during the Class Period at a supracompetitive price. Each class members holds a strong common interest in establishing [the defendant's] liability for these alleged overcharges.").

I cannot identify, and Defendants do not assert, any fundamental conflicts rendering any of the named class representatives inadequate. Accordingly, I find that EPPs have met the Rule 23(a) (4) adequacy requirement.[8]

### 5. Ascertainability

**\*8** In addition to the express requirements of Rule 23, EPPs must also prove that the proposed class members are "readily identifiable," or "ascertainable," "in reference to objective criteria." EQT Prod. Co., 764 F.3d at 358. To satisfy this requirement, "[t]he plaintiffs need not be able to identify every class member at the time of certification. But '[i]f class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate.' " Id. (second alteration in original) (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012)). Put differently, the named plaintiffs must "define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." Krakauer v. Dish Network,

L.L.C., 925 F.3d 643, 658 (4th Cir. 2019) (alteration in original) (quoting EQT Prod. Co., 764 F.3d at 358).

Here, EPPs assert that under their modified proposed class definition, class members can be identified in reference to objective criteria: (1) TPP purchases of brand and/or generic Zetia (2) within applicable states (3) during discrete time periods. EPPs' Reply Mem. Supp. Mot. Modify Class Definition ("EPPs' Reply Supp. Mot. Modify") 10 (ECF Nos. 884 (sealed), 887 (public)); see also EPPs' Mem. Supp. Mot. Certify 15. They argue the same with respect to the class exclusions. EPPs' Reply Supp. Mot. Modify 10. Defendants do not appear to contest those assertions, but they contend that EPPs are unable to demonstrate an administratively feasible method of identifying class members. Defs.' Opp'n Mot. Certify 28-29; Defs.' Opp'n Mot. Modify 24-29.

On this point, EPPs rely on the declarations and testimony of Laura Craft. Craft is the president of OnPoint Analytics, Inc., "an economical, statistical, and financial consulting firm specializing in data analytics for complex litigation," including pharmaceutical antitrust litigation. Craft Decl. ¶ 2. According to Craft, both class members and those excluded from the class are easily ascertainable through data maintained by pharmacy benefit managers ("PBMs").[9] Id. ¶¶ 5, 29. TPPs "often contract with PBMs who negotiate purchases and process prescriptions on their behalf" and "employ mechanisms to promote generic substitution." Lamb Decl. ¶ 18. Consequently, PBMs "maintain detailed purchase data on prescription drug claims, including payment amounts, coverage and plan characteristics." EPPs' Mem. Supp. Mot. Certify 16 (citing Craft Decl. ¶¶ 17-21). EPPs have submitted declarations from a handful of the largest PBMs, most of which were filed in connection with other end-payor antitrust litigation, confirming that such data exist.[10] See Buchman Decl. Exs. 15, 16, 17, 18, 19, 20 (ECF No. 730-16, -17, -18, -19, -20, -21); EPPs' Notice of Filing Ex. 5 ("Schaper Decl.") (ECF No. 939-5); see also Craft Decl. ¶ 23 (identifying various data retention incentives).

**\*9** Although there are more than forty PBMs, only about half handle claims adjudication. Craft Rebuttal Decl. ¶ 8; accord May Hr'g Tr. 132:7-133:6. Moreover, of those PBMs that perform claim adjudication, the seven largest PBMs process the vast majority of prescriptions. See Craft Decl. ¶¶ 17-20 (explaining that of all U.S. retail prescriptions, the top seven PBMs processed 78 percent in 2011, 89 percent in 2015, 92 percent in 2016, and 96 percent in 2017). Thus, according to

Craft, nearly all of the relevant data is in the hands of a small number of entities.

EPPs propose obtaining the relevant data from PBMs through subpoenas, if necessary, noting this practice in similar end-payor actions. See EPPs' Reply Mem. Supp. Mot. Class Certification ("EPPs' Reply Supp. Mot. Certify") 19 & n.32 (ECF Nos. 885 (sealed), 886 (public)); see also May Hr'g Tr. 134:13-137:23. Because the data would come from multiple sources, Craft explains that OnPoint must first standardize the relevant data fields to employ consistent terminology. Craft Decl. ¶¶ 6-7; Craft Rebuttal Decl. ¶¶ 15-16; May Hr'g Tr. 91:4-14. Craft says that this process is "particularly easy in the pharmaceutical industry because the specific types of data reported are already standard and the field and variable names, although they may differ from one data set to another, usually have an obvious interpretation." [11] Craft Decl. ¶ 7; Craft Rebuttal Decl. ¶ 15; see also Craft Rebuttal Decl. ¶¶ 21-22 (noting the ease of standardizing named EPPs' data and that doing so with PBM data "would likely be even easier"); May Hr'g Tr. 91:15-23 ("I want to make clear here that this data is very easy to work with ... and I can assure you that the field names remain standardized, simple to understand."). This high degree of standardization, Craft says, is due in large part to the Health Insurance Portability and Privacy Act's ("HIPPA") required use of the National Council for Prescription Drug Programs ("NCPDP") Telecommunication Standards for the electronic submission and processing of prescription drug transactions since 2003. Craft Decl. ¶ 26; see id. ¶ 27 (describing identifying data collected pursuant to NCPDP standards). These standards, which ensure secure and uniform information exchange and are employed by the entire retail pharmaceutical sector, require the use of certain data fields, which enable EPPs to identify each class member and "link individual transactions to them." Craft Decl. ¶¶ 25-28; see also Schaper Decl. ¶ 6 ("Caremark maintains records by which Clients and a Client's members can be identified for purchases of Zetia or its generic equivalents that Caremark adjudicates on behalf of its Clients."); ¶ 9 (confirming that Caremark's "data is generally maintained in an industry standard format created by the [NCPDP]" and listing the various data fields). Although there have been several updates to these standards since 2003, "not all of which may have been implemented by every PBM and pharmacy," Craft avers that such "updates have nothing to do with the core data elements relevant to this case" and thus "have no impact on the identification, injury or damage assessment for proposed Class Members." Craft Rebuttal Decl. ¶ 17; see id. Ex. B (clarifying standards updates).

*10 Additionally, each drug product in the United States is identified by a unique ten-digit code, known as the National Drug Code ("NDC"), which is "universally used by pharmacies and insurers in the United States to communicate with each other about exactly what drug product is being dispensed to a patient." Craft Decl. ¶ 24. The NDC "embeds details about the specific product including the identity of the manufacturer (or labeler)"; and because brand and generic drugs have different NDCs, a data query can easily distinguish brand and generic purchases. Id.; see also May Hr'g Tr. 88:16-89:14.

After standardizing the data fields, OnPoint would then merge the datasets, eliminate any duplicates and data errors, and compile a list of class members and the corresponding purchase amounts. Craft Decl. ¶ 6; Craft Rebuttal Decl. ¶ 16; May Hr'g Tr. 91:24-92:19. And even under EPPs' modified class definition, Craft states that she can straightforwardly exclude non-class members using the same PBM data in combination with Defendants' own sales data. Craft Decl. ¶ 29; Craft Rebuttal Decl. ¶ 27, May Hr'g Tr. 107:25-108:11. Craft notes that the "process is manageable and can be carried out programmatically," Craft Decl. ¶ 6.

Defendants and their expert, Donald Dietz, take several issues with Craft's methodology and the ease with which she claims she can employ it. For example, Defendants point to Craft's own statements that she has never "compile[d] every PBM data source into a single master database," May Hr'g Tr. 112:8-14; see also id. at 112:18-24 (Craft testifying that she has "never been involved in a case where all seven [major] PBMs have all produced their transactional data"). Additionally, Dietz asserts that attempting to collect the data in the first instance would be extremely difficult given the number of entities in possession of the data as well as such entities' respective data retention policies and potential unwillingness to produce the data. Dietz Decl. ¶¶ 30-42 (ECF Nos. 831 (public), 835 (sealed)). And even if Craft could obtain all the relevant data, Defendants assert, efforts to standardize the data, identify class members, and exclude non-members - particularly, fully-insured health plans, federal and state government entities, and certain Medicare Part D plans - as Craft posits would likewise prove difficult, if not prohibitive, as discussed more fully below. Id. ¶¶ 43-78. Finally, Defendants argue that due to the presence of several exclusions in the modified class definition, EPPs cannot identify such exclusions programmatically but would have to engage in individualized inquiries to ascertain class

membership. Defs.' Opp'n Mot. Modify 25-26 (citing 📄 Vista Healthplan, Inc., 2015 WL 3623005).

As an initial matter, it is not necessary that a plaintiff demonstrate the proposed methodology has previously been employed; indeed, the methodology for ascertaining class members in any given case is arguably unique and has never previously been employed. Rather, the test is whether the proposed methodology is "administratively feasible." 📄 Krakauer, 925 F.3d at 658; see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 421 F. Supp. 3d 12, 72 (E.D. Penn. 2019) ("The proposed method for identifying class members must be 'administratively feasible,' meaning that 'identifying class members is a manageable process that does not require much, if any individual factual inquiry.' " (quoting 📄 Carrera v. Bayer Corp., 727 F.3d 300, 307-08 (3d Cir. 2013))). Moreover, EPPs have adequately shown that the PBM data can be procured and standardized to identify class members. As Craft explains, and Dietz concedes, only half of the approximately forty PBMs performs claim adjudication and thus possesses the relevant data. Craft Rebuttal Decl. ¶ 8; May Hr'g Tr. 132:7-133:6. Despite Dietz's various claims to the contrary, see Dietz Decl. ¶¶ 30, 32-33, this data could be obtained through subpoenas in the event PBMs resisted sharing it voluntarily. [12] Indeed, similar subpoenas have issued in other end-payor actions, [13] a fact unknown to Dietz at the time he prepared his expert report, May Hr'g Tr. 134:25-137:23.

**\*11** Moreover, in addition to her declarations, Craft repeatedly and credibly testified that she has extensive experience - sixteen years' worth - working with PBM data and health insurance data generally, and that she commonly performs the type of data analysis she proposes in the course of her work at OnPoint. [14] May Hr'g Tr. 85:24-86:1, 91:15-23, 112:8-17; see July Hr'g Tr. 32:11-17, 127:18-128:6; see also Craft Decl. ¶¶ 2, 4, 7; Craft Rebuttal Decl. ¶¶ 15, 21-23. In fact, her purported methodology was recently deemed adequate to satisfy ascertainability in another pharmaceutical antitrust end-payor action. See 📄 Loestrin 24 FE, 410 F. Supp. 3d at 399-400.

Defendants, however, point to a contrary decision by a Pennsylvania district court, 📄 In re Niaspan Antitrust Litigation, No. 13-md-2460, 2020 WL 2933824 (E.D. Pa.

June 2, 2020). Defs.' Notice Suppl. Authority (ECF No. 965); July Hr'g Tr. 99:19-102:6. In Niaspan, Craft's methodology was deemed insufficient to establish ascertainability primarily with respect to various class exclusions. 📄 2020 WL 2933824, at \*16-19. But there are several important differences between Niaspan and this case. Most importantly, the proposed class in Niaspan included TPPs and consumers. And the court's ascertainability determination hinged, in large part, on its finding that the plaintiffs had failed to provide sufficient evidence that they could identify and exclude from the consumer subclass certain uninjured consumers, namely, "flat co-payors" and brand loyalists. 📄 Id. at \*19, \*26. Here, however, EPPs' proposed class definition does not include consumers. Thus, the complications identified by the Niaspan court with respect to identifying and excluding those categories of unharmed class members are not present in this case.

The court in Niaspan also expressed doubt as to whether the plaintiffs could identify and exclude federal and state governmental entities with self-funded plans and fully-insured plans. 📄 Id. at \*18. But the circumstances giving rise to that doubt are likewise absent in this case. For example, with respect to identifying federal and state entities, the end payors in Niaspan merely argued that the "federal and government agencies are facially obvious" from their name; but the court credited the defendants' evidence that "such plans are not necessarily facially obvious." 📄 Id. at \*18. Without more, the court concluded that the end payors had failed to set forth a suitable methodology for identifying those entities. Id. In so doing, the court distinguished Loestrin 24 FE, where the end-payor plaintiffs "made specific assurances that self-funded government plans would be removed from the data by PBMs rather than merely identified by name."

Id.; see 📄 Loestrin 24 FE, 410 F. Supp. 3d at 401 ("With respect to state and federal governmental entities, the EPPs will request that the PBMs remove federal and state plans from their dataset and, in addition, OnPoint will be able to identify them by name."). Although Craft reasserts in this case that one can typically determine whether an entity is a governmental entity by the name alone, Craft Decl. ¶ 31; Craft Rebuttal Decl. ¶ 30, she also proposes that the PBMs themselves identify such entities rather than OnPoint, Craft Decl. ¶ 31 ("In the course of requesting data from the PBMs, these plans could be specifically flagged."). Craft persuasively testified that PBMs "absolutely know" which of its clients are federal or state entities and thus would be able to

point them out to EPPs. May Hr'g Tr. 105:17-106:1; see also Craft Decl. ¶ 31 ("PBMs are fully aware of which plans are government funded."); Craft Rebuttal Decl. ¶ 30 ("[I]t would be foolish to suggest that PBMs do not know whether they are contracting with the U.S. government or a state, as opposed to a private entity."). Whether PBMs actually remove such entities from the datasets produced to EPPs or simply "flag" those entities during data production, EPPs have proffered an administratively feasible method of identifying and excluding such plans.

**\*12** I am also satisfied that Craft's methodology can identify and exclude fully-insured plans. [15] In Niaspan, the end payors proposed identifying fully-insured plans by using Form 5500s, 2020 WL 2933824, at \*18, which health benefit plans submit to the IRS each year and which "require [ ] the plan to identify each source of funding it uses to pay benefits," Craft Decl. ¶ 34. Here, however, Craft has consistently represented that, while data from Form 5500s "can serve as a cross-check," Craft Decl. ¶ 34, the PBM data alone can readily identify fully-insured plans, Craft Decl. ¶ 33; Craft Rebuttal Decl. ¶ 34; May Hr'g Tr. 104:8-11. To elaborate, recall that in the context of fully-insured plans, the insurer acts as the TPP, not the plan sponsor. Craft Decl. ¶ 33. Craft explains,

> Since the insurance carrier ... is responsible for administering the claims, the PBM it contracts with would maintain complete data on all of the plan members' pharmaceutical transactions. The PBMs' data identifies both the insurance carrier and the plan sponsor, which are identified by the Plan ID and Group ID, respectively. Therefore, for every fully insured plan, the PBM could simply list the insurance carrier (which is a class member) and not the fully insured plan sponsor (which is not a class member).

Craft Decl. ¶ 33; accord Craft Rebuttal Decl. ¶¶ 31-33; May Hr'g Tr. 102:14-103:6.

Because EPPs' proposed class does not include consumers and EPPs have squarely addressed the other points of concern

in Niaspan, that case is distinguishable and does not warrant a finding against ascertainability here. [16]

Defendants also raise the issue of "mixed-funded" plans, plans that "provide some health benefits using its own selffunding, while providing other health benefits using an insurance company as an underwriter (fully insured)," Dietz Decl. ¶ 58, and claim that such plans, if they fall within the class definition at all, cannot be identified programmatically. See Defs.' Opp'n Mot. Certify 29; Dietz Decl. ¶¶ 59, 61. Dietz points out that according to the 2016 Form 5500 data, the Department of Labor characterized roughly 4,100 plans as being mixed-funded plans. Dietz Decl. ¶ 60.

Craft concedes that mixed-funded plans "may add some complexity to interpretation of IRS Form 5500 data," but, as discussed above, Craft does not intend to use Form 5500 data to identify fully-insured plans. Craft Rebuttal Decl. ¶ 34. Instead, she intends to rely on the PBM data, which will clearly indicate whether a particular plan is fully-insured or self-insured. Id. ("[A] plan sponsor that purchases health (medical claims) insurance for its employees, but self-insures its prescription drug benefits will have two entirely distinct plans in the PBM data.").

**\*13** Finally, in the amended class definition, EPPs delineate two subclasses, a brand subclass and a generic subclass. EPPs' Mot. Modify 2. EPPs expressly exclude from the brand subclass "Optum Health Part D Plans, Silverscript Part D Plans, Emblem Health Part D, Humana Part D Plans, Optum Health Managed Care Plans, and any TPPs that used one of these plans or OptumRx as its [PBM] during this subclass period." Id.

As to these exclusions, Defendants make specific arguments only as to two (any TPPs that used OptumRx as its PBM and Emblem Health Part D plans) and a more general argument that the "laundry list" of exclusions defeats ascertainability. Defs.' Opp'n Mot. Modify 3, 25-29. To support these arguments, Defendants rely on the supplemental report of their economic expert, Dr. James Hughes. First, Dr. Hughes concludes that the exclusion of TPPs that used OptumRx as their PBM during the subclass period "cannot be accomplished without individualized inquiry." Hughes Suppl. Decl. ¶ 20 (ECF Nos. 856 (public), 859 (sealed)). Underlying this conclusion is the fact that "OptumRx has merged with and acquired a number of entities over time, including during the proposed subclass period." Id. Consequently, questions arise as to whether certain TPPs should be excluded from the class

if they used a PBM that was later acquired by OptumRx and as to whether EPPs can identify and exclude those transactions involving TPPs that "relied on OptumRx as their PBM for only a portion of the class period." Defs.' Opp'n Mot. Modify 27; see also Hughes Suppl. Decl. ¶ 21.

Dr. Hughes notes a similar issue with respect to the exclusion of Emblem Health Part D plans. Hughes Suppl. Decl. ¶ 22. According to him, Emblem Health and the City of New York entered into a partnership in February 2016 whereby Emblem Health offered coverage to city and union employees. Id. Assuming this partnership results in the exclusion of New York City plans, "it would create an additional layer of complex individualized inquiry that requires looking into which time periods the various transactions occurred and assessing whether they indeed resulted in any injury arising out of the alleged delay in generic entry." Defs.' Opp'n Mot. Modify 28 (citing Hughes Suppl. Decl. ¶ 22).

Craft persuasively rebuts these contentions. First, she states that notwithstanding the numerous PBMs that OptumRx has acquired, "[t]he identifier of the PBM by whom the claim was processed is an indelible field in the data and can be sorted programmatically in a single search." Craft Rebuttal Decl. ¶ 38. Moreover, Craft has reliably explained that identifying and excluding Emblem Health Part D plans, and Part D plans generally, is a process made possible through analyzing and manipulating data from the Center for Medicare and Medicaid Services ("CMS"). Craft Rebuttal Decl. ¶¶ 27, 39; May Hr'g 101:11-25. Craft reports that CMS publishes monthly enrollment reports for Medicare plans, which can be used to identify any Part D plans. Craft Rebuttal Decl. ¶ 27; May Hr'g Tr. 101:17-25; see also Craft Rebuttal Decl. ¶ 39 (describing the process as "a straightforward data query" requiring no "individual inquiry") & Exs. E, F, G (screenshots of 2016 Medicare enrollment report data for Silverscript, Emblem, and Humana). And as to Emblem Health specifically, Craft makes clear that nothing about Emblem Health's partnership with New York City would prohibit or complicate the process of identifying and excluding Emblem Health Part D plans. See Craft Rebuttal Decl. ¶ 39.

**\*14** Defendants make a broader argument that the sheer number of exclusions in the amended class definition "ha[s] only ratcheted up the complexity of the individualized inquiries that will be necessary to ascertain class membership." Defs.' Opp'n Mot. Modify 26. On this point, Defendants rely on Vista Healthplan, Inc., 2015 WL 3623005. There, another Pennsylvania district court

declined to certify a class of end payors with a class definition containing eight specific exclusions, [17] in part, because the plaintiffs failed to satisfy the ascertainability requirement. Id. at \*9-13. Defendants portray the ruling as hinging on the plaintiffs' "need for structured, multi-stepped, individualized fact-finding process" to identify class members. Defs.' Opp'n Mot. Modify 25-26 (citing Vista Healthplan, Inc., 2015 WL 3623005, at \*11 n.14). A closer review of that decision, however, reveals that it was much more encompassing and stemmed from the named plaintiffs' utter lack of demonstrated ability to identify class members. According to the opinion, the plaintiffs had produced next to no evidence that they could locate, obtain, and utilize identifying data, and their own expert readily admitted that he had no methodology to ascertain class members. Vista Healthplan, Inc., 2015 WL 3623005, at \*10 & n.13. The court rejected the plaintiffs' argument that they were not required at the class certification stage to make such showings. Id. at \*10. As discussed above, however, through Craft's testimony, EPPs have not only established the existence and location of the identifying data, but they have also put forth a detailed approach to utilizing that data to ascertain class members. In my view, the efficacy of that methodology is not diminished by the exclusions in the modified class definition. While it is true that such exclusions may warrant additional analysis, "[t]he number of 'steps' in the process and the time and effort required have no bearing" on whether the class is ascertainable. Soutter, 307 F.R.D. at 197 (citing Dunnigan v. Metro Life. Ins. Co., 214 F.R.D. 125, 136 (S.D.N.Y. 2003)). What matters is that the named plaintiffs offer an administratively feasible method for identifying class members in reference to objective criteria. Id. ("The individualized factfinding giving rise to mini-trials that defeat ascertainability are those requiring determinations on the merits - not an administrative review to determine whether an objective element of a class definition is met."). EPPs have done that here. [18]

For the foregoing reasons, EPPs' amended class definition is based on objective criteria, and EPPs have set forth an administratively feasible method for ascertaining class members.

**B. Rule 23(b)**

In addition to the Rule 23 (a) requirements, EPPs must demonstrate that the class action fits within one of the provisions of Rule 23 (b). Here, EPPs proceed under Rule 23 (b) (3), which requires findings that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b) (3).

### 1. Predominance

Under Rule 23(b) (3), common questions of law or fact "must predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b) (3). This is a separate and "more stringent" requirement than Rule 23(a)'s commonality requirement. Thorn, 445 F.3d at 319 (quoting Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 n.4 (4th Cir. 2001)); cf. Fed. R. Civ. P. 23(a) (2) (requiring only the presence of common questions of law or fact). Predominance of common questions over individual issues ensures that the "proposed class[ ] [is] sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc., 521 U.S. at 623.

To be clear, the predominance inquiry "is not simply a matter of counting common versus noncommon questions and checking the final tally." Soutter, 307 F.R.D. at 214. Rather, the court "compares the quality of the common questions to those of the noncommon questions." Id. (emphasis added); see also Stillmock v. Weis Mkts., Inc., 385 F. App'x 267, 273 (4th Cir. 2010) (describing the predominance test as "qualitative rather than quantitative" (citing Gunnells, 348 F.3d at 429)). Accordingly, EPPs are not required to prove that each element of their claims is susceptible to classwide proof, but only that "common questions predominate over any questions affecting only individual [class] members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013) (alteration in original) (quoting Fed. R. Civ. P. 23(b) (3)); see also Namenda, 331 F. Supp. 3d at 204 (" ' [I]ndividual questions need not be absent' in order to certify a class

under Rule 23 (b) (3); the text of Rule 23 (b) (3) itself contemplates that such questions will be present." (quoting Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 81 (2d Cir. 2015))).

*15 As previously mentioned, EPPs assert claims under various antitrust, consumer protection, and unjust enrichment statutes. The parties agree that central to these claims are proving a violation of the antitrust laws, injury (or impact), and measurable damages. See EPPs' Mem. Supp. Mot. Certify 21; EPPs' Reply Supp. Mot. Certify 16; Defs.' Opp'n Mot. Certify 13. Accordingly, to satisfy the predominance requirement, EPPs must demonstrate that these elements can be proven on a classwide basis. See Restasis, 2020 WL 2555556, at *8; Momenta Pharms., Inc., 333 F.R.D. at 406; Wellbutrin XL, 282 F.R.D. at 139. Here, Defendants do not contest EPPs' ability to satisfy the predominance requirement with respect to proving antitrust violations. Indeed, allegations of antitrust-violative conduct tend to focus on the defendants' conduct rather than evidence specific to individual class members and thus can be proven using evidence common to the class. Restasis, 2020 WL 2555556, at *8; Momenta Pharms., Inc., 333 F.R.D. at 407. Defendants' predominance challenges instead relate to the presence of uninjured class members, measuring damages on a classwide basis, and variations among state laws.

### a. Uninjured Class Members

Defendants argue that EPPs' evidence of classwide impact is insufficient to meet their predominance burden because the class definition includes many uninjured class members, and the individualized inquiry necessary to identify and eliminate those uninjured members will predominate over common questions. Defs.' Opp'n Mot. Certify 13-15 (citing In re Asacol Antitrust Litig., 907 F.3d 47 (1st Cir. 2018); In re Rail Freight Fuel Surcharge Antitrust Litig., 934 F.3d 619 (D.C. Cir. 2013)). Such challenges are commonly addressed "through the lens of predominance, asking whether the differences among the class members are so great that individual adjudication subsumes the class-wide issues." Krakauer, 925 F.3d at 658.

The Fourth Circuit has not yet defined a precise standard for determining what number or proportion of uninjured

class members would defeat certification. See id. at 659. In Asacol, the First Circuit reviewed the various circuit precedents on this issue, which "strikes at the heart of the competing considerations raised by some class actions." 907 F.3d at 51. In that case, the court reversed certification of a class of end-payor antitrust plaintiffs where the district court concluded that approximately 10 percent of the class was uninjured by the defendants' conduct, and where the plaintiffs" proposed mechanism for identifying those uninjured members was fraught with individualized considerations and would deny the defendants their Seventh Amendment and due process rights. Id. at 51-58. The D.C. Circuit reached a similar result in Rail Freight, 934 F.3d at 623-27 (rejecting a class containing approximately 2,000 uninjured class members (about 13 percent of the class) where plaintiffs could not identify a mechanism for "segregat[ing] the uninjured from the truly injured"). In both cases, certification failed because a subset of class members was not harmed by the antitrust conduct alleged. In the case of Asacol, that subset was made up of consumers of the drug who, according to the evidence, would have remained loyal to the brand and thus were not harmed by delayed generic entry. 907 F.3d at 46-47, 54.

Defendants argue that the Fourth Circuit has "endorsed" both Asacol and Rail Freight, relying on a collegial reference in Krakauer to "well-reasoned opinions from our sister circuits," 925 F.3d at 659. Defs.' Opp'n Mot. Certify 2, 14-15. But as Defendants also acknowledge, the facts of Krakauer gave no occasion to opine on "[t]he question of how best to handle uninjured class members." 925 F.3d at 659; see Defs.' Opp'n Mot. Certify 15 n.10. And the "well-reasoned opinions" endorsed by the panel in Krakauer also included the Seventh Circuit's decision in Kleen Products v. International Paper Co., 831 F.3d 919 (7th Cir. 2016), which reached a somewhat different, though equally well-reasoned result. Krakauer, 925 F.3d at 658; see Kleen Prods. 831 F.3d at 927 ("While we have no quarrel with the proposition that each and every class member would need to [prove at least some impact] in order ... to recover, we have not insisted on this level of proof at the class certification stage."); see also Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1137 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.").

Indeed, as the panel itself wrote in Krakauer, "The entire notion of predominance implies that the plaintiffs' claims need not be identical." 925 F.3d at 658. A class can meet the predominance requirement "even though other important matters will have to be tried separately." Id. (quoting Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016));

see also Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification.").

**\*16**  Although the Fourth Circuit has left for another day the precise contours of the inquiry necessary to address uninjured class members at class certification, the parties agree that a class should not be certified "if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant," Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 677 (7th Cir. 2009). See EPPs' Mem. Supp. Mot. Certify 26; Defs.' Opp'n Mot. Certify 15 n.11. Defendants prefer to phrase the burden more stringently, limiting class certification to those cases where common proof demonstrates that all or substantially all class members suffered injury. Defs.' Opp'n Mot. Certify 15 & n.11 (citing Asacol, 907 F.3d at 56-57; Rail Freight, 725 F.3d at 252; Denny v. Deutsche Bank AG, 443 F.3d 253, 264 (2nd Cir. 2006)). Under either of these measures, the purpose of the predominance inquiry into uninjured class members is the same. The First Circuit in Asacol put it well:

> The aim of the predominance inquiry is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not inefficient or unfair. Inefficiency can be pictured as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues. Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise individual challenges on those issues.

907 F.3d at 51-52 (citation and internal quotation marks omitted). When large numbers of class members can only establish injury through individual proof, the resulting inefficiency defeats predominance. And it is no answer to inefficiency to presume injury without reliable classwide evidence and thus deny the defendants the right to raise potentially meritorious defenses.

EPPs have presented evidence that the alleged antitrust conduct caused the members of the putative class to suffer antitrust injury, and that injury can be measured by classwide evidence of the aggregate damages suffered by the class. Defendants' expert, Dr. Hughes, attempts to show that even under the amended class definition, the putative class still fails this predominance inquiry because "a great many" class members, are uninjured by the alleged antitrust conduct. His supplemental report and hearing presentation identified six categories of allegedly uninjured class members and suggests that separating the uninjured from the injured cannot be accomplished without extensive (and inefficient) individualized evidence. Hughes Suppl. Decl. ¶¶ 26-48; see also Hughes Mot. Certify Hr'g Presentation ("Hughes Presentation") 6 (ECF Nos. 928-2 (sealed), 940-3 (public)). And to permit such a class to go forward, according to Defendants, would deprive them of their right to "challeng[e] the claims of individual, uninjured class members." Defs.' Opp'n Mot. Certify 14; July Hr'g Tr. 61:16-63:3, 91:21-92:3.

EPPs, through their own expert, Dr. Russell Lamb, dispute Dr. Hughes' evidence on all six categories of allegedly uninjured members. Dr. Lamb argues that Dr. Hughes' opinions inflate the number of allegedly uninjured class members by confusing individual health plans with TPPs; focusing on individual prescription transactions in a narrow window of the class period; and ignoring valid assumptions underlying EPPs' classwide model of damages in the but-for world. See generally Buchman Reply Decl. Ex. 1 ("Lamb Reply Decl.") (ECF Nos. 885-1 (sealed), 886-2 (public)); EPPs' Suppl. Mem. Supp. Mot. Certify Ex. A ("Lamb Suppl. Decl.") (ECF Nos. 945-1 (sealed), 949-1 (public)). By accounting for these flawed assumptions, Dr. Lamb claims that EPPs can demonstrate through classwide evidence that all or substantially all class members suffered an antitrust injury.

i. Injury and Damages: Separate Considerations

*17 Before addressing the parties' arguments on each of these categories of allegedly uninjured class members, however, I must first address the parties' disagreement over the proof necessary to demonstrate that class members suffered an antitrust injury. EPPs argue that an antitrust injury is shown by payment of a single overcharge, regardless of whether that overcharge is later offset. EPPs' Reply Supp. Mot. Certify 6, 10 (citing In re Nexium Antitrust Litig., 777 F.3d 9, 27, 28 n.23 (1st Cir. 2015) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show - as a legal and factual matter - impact or fact of damage.")).

Several pharmaceutical antitrust cases have followed the First Circuit's reasoning in Nexium to reach the same conclusion. See, e.g., Niaspan, 2020 WL 2933824, at *22-23; Loestrin 24 FE, 410 F. Supp. 3d at 404-05; In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-md-2503, 2017 WL 4621777, at *17-18 (D. Mass. Oct. 16, 2017). But as Defendants note, these cases applied a long-established tenet of federal antitrust law. Defendants argue this federal precedent is bound up in the Supreme Court's decision in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 491-94 (1968), which prevented antitrust defendants from raising the defense that plaintiffs were unharmed because they passed on the overcharge to end purchasers, and its corollary case, Illinois Brick v. Illinois, 431 U.S. 720, 732-47 (1977), which restricted federal antitrust claims exclusively to direct purchasers. Because EPPs' class is made up of indirect purchasers raising antitrust claims under state law, where such claims are expressly permitted, Defendants contend that antitrust injury under these state laws must be shown by each class member's net damages rather than evidence of a single overcharge. Defs.' Suppl. Mem. Opp'n to Mot. Class Certification ("Defs.' Suppl. Opp'n Mot. Certify") 8-9 (ECF Nos. 954 (public), 956 (sealed)); see also July Hr'g Tr. 51:7-55:22; Defs.' Mot. Certify Hr'g Presentation 16-17 (ECF Nos. 940-5 (public), 944-1 (sealed)).

The overwhelming weight of authority rejects Defendants' position. See, e.g., In re Thalomid & Revlimid Antitrust Litig., No. 14-6997, 2018 WL 6573118, at *14 (D.N.J. Oct. 30, 2018) (holding later recovered damages are "irrelevant to the question of impact"); Solodyn, 2017 WL 4621777, at *15 (observing that class members reimbursed for a portion of the overcharge "still experienced antitrust injury in the

form of an overcharge, although the amount of damages may require adjustment"); In re Lidoderm Antitrust Litig., No. 14-md-2521, 2017 WL 679367, at *21-23 (N.D. Cal. Feb. 21, 2017) (finding that class members "injured as of the date they paid the overcharges"). Defendants complain that these cases all followed the First Circuit's Nexium decision, which they argue "is based on a flawed analysis of injury and inapplicable federal precedent." Defs.' Suppl. Opp'n Mot. Certify 8. But, as the Eastern District of Pennsylvania recently observed, "the purpose of the antitrust injury requirement is to prove that the theory of unlawful conduct, i.e. the theory of liability, was in fact responsible for causing harm to plaintiffs." In re Niaspan Antitrust Litig., 397 F. Supp. 3d 668, 689 (E.D. Pa. 2019). This is an element of the claim, necessary to confer Article III standing. At class certification, EPPs must be able to demonstrate that all or substantially all members of the putative class suffered some injury fairly traceable to the conduct of the defendants. See Denney, 443 F.3d at 264-65 (finding each member of the class suffered injury-in-fact thus satisfying Article III standing). That being said, offsets that have the effect of mitigating the injury do bear on the calculation of damages. Nexium, 777 F.3d at 27; Lidoderm, 2017 WL 679367, at *21 ("That is not to say that the rebates are irrelevant; they are relevant to damages and, if large enough, to class membership."). And because damages is also a component of the antitrust claims, and some end purchasers may suffer no damage when downstream offsets are considered, EPPs must still define class membership so as to limit the number indirect purchasers that experienced no net injury.

**\*18** I follow this line of cases reasoning that antitrust injury occurs at the moment the overcharge is incurred. A single overcharge establishes that any particular TPP rightfully claims injury from the alleged anticompetitive conduct. Niaspan, 2020 WL 2933824, at *22. But the "predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations ... overwhelm questions common to the class.'" In re Modafinil Antitrust Litig., 837 F.3d 238, 260 (3d Cir. 2016) (alterations in original) (quoting Comcast, 569 U.S. at 34). The determination as to whether class members suffered net damages may depend in part on individualized proof as long as EPPs identify an administratively feasible method of identifying such members, which is "protective

of [ D]efendants' Seventh Amendment and due process rights." Asacol, 907 F.3d at 52. But at the class certification stage, even substantial variation in damages rarely defeats predominance. Nexium, 777 F.3d at 21. EPPs must produce reliable classwide proof to demonstrate the fact of injury for each class member as well as a reliable method for excluding on a classwide basis transactions that produced no overcharge on the antitrust theory alleged. See Lidoderm, 2017 WL 679367, at *24-25 ("[I]n estimating aggregate damages plaintiffs have shown how purchases attributable to class members who were not damaged can be excluded on a classwide basis." (emphasis omitted)). If they do so, questions regarding the apportionment of those damages ordinarily will not defeat predominance. See id. at *25 (noting post-judgment claims procedures allow the defendants to "test a class member's purported entitlement to damages and to apportion damages appropriately between class members"). With both these standards in mind, I consider Defendants' various theories of "uninjured" class members.

### ii. TPPs that "Ceased Operations" Before May 2015

Dr. Hughes' supplemental report contends that approximately 100,000 class members were uninjured because they ceased doing business by May 2015, which, according to Dr. Hughes' calculations, was before generic prices would have dropped enough in the but-for world to give rise to damages. Hughes Presentation 6 (citing Hughes Suppl. Decl. ¶¶ 26-27 & Ex. 7); see also May Hr'g Tr. 56:15-57:15. This opinion relies on the Form 5500 data reported by the Department of Labor. The Form 5500 data, however, is ordinarily reported by health plans, not TPPs. According to Dr. Lamb, 90 percent of small employers offer fully-insured prescription drug plans, meaning they utilize an insurance company or other TPP to administer the plan and pay benefits. Lamb Suppl. Decl. ¶¶ 6-7. Any fully-insured plan is, by definition, not a class member. While some self-insured health plans may be TPPs, Dr. Hughes' data on this point is not confined to self-insured plans. And even if it were, it would still overstate the number of affected class members because a single self-insured employer might offer its members several different health plans. By treating health plans as synonymous with TPPs, Dr. Hughes vastly overstates the potential size of the class. Correspondingly, his estimate of uninjured class members under this theory is also vastly overstated. The same error renders his statement about the number of health plans that

ceased operation before May 2015 irrelevant for purposes of determining antitrust impact. TPPs, which are included in the amended class definition, frequently sponsor multiple plans, and the fact that any particular plan stopped filing reports after May 2015 does not demonstrate that the TPP sponsor of that plan did not continue in business beyond that date. [19] Lamb Suppl. Decl. ¶ 7.

In addition, Dr. Hughes' calculations regarding uninjured plans are premised on a contested but-for generic price. His report states that his spreadsheet prices are based on "Dr. Lamb's calculation of Zetia and but-for generic ezetimibe prices, simply adjusted in order to correct for three errors made by Dr. Lamb." Hughes Suppl. Decl. ¶ 26. But these alleged "errors" that Dr. Hughes "corrected" are in reality only Dr. Hughes' contrary opinions on various disputed issues, including the expected levels of cost-sharing with individual consumers and government payors and the but-for generic price as it approached the marginal cost of production. See Lamb Reply Decl. ¶¶ 82-86. The admissibility of Dr. Lamb's testimony has not been challenged at the certification stage, and his opinions on these issues are adequate to rebut Dr. Hughes' assertion that the class includes large numbers of uninjured TPPs in this category.

### iii. Brand Loyalists

**\*19** Dr. Hughes also opines that certain class members could be uninjured because they would have continued to buy only brand Zetia even after generic entry. Hughes Decl. ¶¶ 79-85 (ECF Nos. 832 (public), 836 (sealed)). Brand-loyal consumers have been an obstacle to certification in other putative end-payor classes. See, e.g., Niaspan, 2020 WL 2933824, at *16-28; Vista Healthplan, Inc., 2015 WL 3623005, at *21. Those cases determined that in some instances of delayed generic entry, there is a significant percentage of individual consumers who would remain loyal to the brand even after generic entry. If consumers never intended to buy the generic, they suffer no antitrust injury by delayed generic competition. This presents a predominance problem because although it is clear that certain consumers are brand loyal, they are difficult, if not impossible, to identify without individualized inquiry. Asacol, 907 F.3d at 51-54.

As previously discussed, however, the EPP class in this case does not include consumers. And courts facing the issue of brand-loyal TPPs have universally concluded that it is "highly

unlikely" that "institutional payors were uninjured even if some of their members are brand-loyal." Loestrin 24 FE, 410 F. Supp. 3d at 402 (quoting Solodyn, 2017 WL 4621777, at *18). [20]

Dr. Hughes' attempts to overcome this obvious issue by focusing on the possibility that very small health plans might have only a single brand-loyal plan member taking Zetia. But his calculations are not persuasive. As with his argument related to health plans ceasing operation prior to May 2015, he has conflated data regarding health plans with TPPs. Because these very small health plans would likely have only one or two members in the plan taking brand Zetia, Dr. Hughes opines that such small plans should be assumed to be brand loyalists to the same extent as individual consumers. Hughes Decl. ¶ 84. But many TPPs sponsor multiple plans. As a result, Dr. Hughes' estimate of the number of very small plans significantly overstates the number of very small TPPs and, therefore, the potential number of affected uninjured class members. In addition, the plan data Dr. Hughes relies upon includes all health plans (e.g., dental and vision plans), not just those providing prescription drug benefits. Lamb Suppl. Decl. ¶ 6.

Accounting for these critical facts reveals that the number of TPPs that would be expected to serve only brand-loyal Zetia users is likely extremely small or nonexistent. Moreover, evidence that certain purchasers within any TPP would have remained loyal to the brand may be addressed during trial without resorting to individualized inquiry or overwhelming common issues. See Restasis, 2020 WL 2555556, at *18; Lidoderm, 2017 WL 679367, *19. Dr. Lamb provided such an alternate damages calculation, concluding that it would lower classwide damages by only 0.2 percent. Lamb Reply Decl. ¶ 102.

### iv. Increased Premiums

**\*20** In both his original and supplemental declarations, Dr. Hughes asserts that large numbers of TPP class members could have avoided injury by passing on the increased costs of prescription Zetia through increased premiums charged to their members. Hughes Decl. ¶¶ 86-91; Hughes Suppl. Decl. ¶¶ 46-48. He points to general data suggesting that health insurers pass on the higher cost of benefits in the form of higher premiums. Hughes Decl. ¶ 90 & Ex. 14 (chart demonstrating correlation between rising medical benefit

expenses and insurance premiums). But this data - derived from only four large insurers - says nothing about the cost of prescription drugs generally, much less the cost of any single drug such as Zetia. Dr. Lamb points to internal Merck documents suggesting that prescription drug costs as a whole account for approximately 10 percent of the total healthcare costs that drive premium increases. Lamb Reply Decl. ¶ 39. Moreover, as these premiums are set in advance based on aggregate expected increases, there is no way to trace any premium increase to the alleged overcharge paid for brand or generic Zetia during the class period. Id. Thus, Defendants have not demonstrated that EPPs' proposed class includes any uninjured class members under this theory.

### v. Copayments, Rebates, and Formulary Placement

The last three overlapping categories of allegedly uninjured class members identified by Dr. Hughes all relate to the complex nature of the pharmaceutical distribution chain. Because class members' eventual cost of prescription drugs is offset by consumer copayments, manufacturer rebates, and government support under Medicare Part D, Dr. Hughes argues that many class members would have paid more for generic Zetia despite the price decreases generally expected from generic competition. Hughes Decl. ¶¶ 42-78. Even after the amended class definition, Dr. Hughes contends many members are uninjured as a result of these contributions absorbing a larger portion of cost of the brand drug after generic entry. Hughes Suppl. Decl. ¶¶ 26-42.

Analyzing these arguments requires a general understanding of the pharmaceutical distribution chain and the role played by TPPs, PBMs, consumers, and the government. Experts for both sides described the complex market for prescription drugs and the interplay among these various contributors to the overall cost of pharmaceuticals. Hughes Decl. ¶¶ 21-40; Lamb Decl. ¶¶ 17-19. The proposed class here includes only TPPs, which consist of commercial insurers, self-funded employers, and union health and welfare plans. Hughes Decl. ¶ 31; Lamb Decl. ¶ 18. These TPPs generally work with PBMs to manage pharmacy benefits for their members. Hughes Decl. ¶ 33; Lamb Decl. ¶ 18. While there are thousands of TPPs, there are just over forty PBMs and the vast majority of claims are managed by just seven. Craft Decl. ¶¶ 17-20; Craft Rebuttal Decl. ¶ 8; May Hr'g Tr. 132:7-133:2. Among the functions served by PBMs is formulary design, under which PBMs advise TPPs on the placement of prescription drugs into various preferred or non-preferred tiers. Hughes

Decl. ¶¶ 33-34; Lamb Decl. ¶ 18. Tier placement affects the allocation of the eventual cost of prescription drugs in several ways. Preferred, or lower tier placement (i.e., Tier 1 or Tier 2), results in lower consumer copayments and thus higher sales volume. In order to obtain favorable formulary placement, brand drug manufacturers commonly offer PBMs and TPPs rebates, which reduce the effective costs that TPPs pay for brand prescription drugs. Hughes Decl. ¶ 37; Lamb Decl. ¶ 54. In addition to this pricing structure, certain government-subsidized plans, namely Medicare Part D plans, subsidize the cost of prescription drugs at varying rates, depending on the amount of prescription drugs purchased by individual consumers insured under each plan. See Hughes Decl. ¶¶ 68-72.

The remaining three categories of allegedly uninjured class members advanced by Dr. Hughes involved calculations that he claims demonstrate that certain tier placement and rebate payments would render the cost of brand Zetia less than the cost of generic for significant portions of the class period. As a result, Dr. Hughes opines that many TPPs that placed Zetia on higher tiers in their formulary would have been uninjured during significant portions of the class period because higher consumer copayments and manufacturer rebates would more than offset the lower but-for generic price.

**\*21** With respect to these overlapping claims, EPPs' proposed amended class definition implicitly concedes Defendants' primary argument - at least as it relates to damages. By amending the definition to exclude certain Medicare Part D plans, as well as TPPs utilizing particular PBMs that pay high rebates, EPPs acknowledge that large rebates on the brand drug, and small consumer copayments for the generic drug, blunt the price effect of delayed generic entry and may result in zero damages for certain government-subsidized plans and plans receiving high manufacturer rebates on the brand drug. But after accounting for those plans in the amended class definition (and correspondingly reducing their damages estimate), Dr. Lamb states that all or substantially all of the remaining class members suffered the same antitrust impact and sustained net positive damages as a result of Defendants' conduct. Lamb Reply Decl. ¶¶ 40-58; Lamb Suppl. Decl. ¶¶ 8-22. He faults Dr. Hughes' continued attack as focused too narrowly on individual transactions in a small window of the class period and argues that even though some individual transactions might not result in an overcharge, all or substantially all TPP class members under the modified class definition suffered net injury after considering all the relevant transactions during the class

period. Lamb Reply Decl. ¶¶ 61-68. With this background in mind, I address each of these remaining uninjured class member disputes in turn.

### 1. TPPs Covering Zetia on Tier 3

Dr. Hughes contends that many TPPs covering Zetia on formulary Tier 3 or higher would suffer no net injury absent Dr. Lamb's assumption that Merck would have launched an authorized generic in the but-for world. That is, absent generic competition (from an AG or other generic manufacturer), the price for the generic would have remained sufficiently high to leave large numbers of TPPs uninjured by delayed generic competition. Hughes Decl. ¶¶ 60, 105, 148(c); Hughes Suppl. Decl. ¶¶ 34-36 & Ex. 15. And according to Dr. Hughes, Dr. Lamb's assumption that Merck would have launched an AG in the but-for world is "speculative." Hughes Suppl. Decl. ¶ 33.

But this assumption, which supports Dr. Lamb's calculation of the generic price in the but-for world, is no more or less speculative than EPPs' allegations of antitrust liability in general. The core issue for trial in this case is EPPs' claim that Defendants' settlement of patent litigation in 2010 effected an unlawful reverse payment. The terms of that alleged reverse payment included Merck's promise not to launch an AG. It will, of course, be EPPs' burden to prove these allegations. But that is a merits inquiry that does not bear directly on the predominance question presented by this particular claim of uninjured class members. There is no dispute that all of the plaintiff groups will attempt to prove the terms of the No-AG agreement by evidence that is common to all plaintiffs - not just the proposed EPP class. At this stage, it is sufficient to note that Plaintiffs have pled sufficient facts to plausibly allege a No-AG agreement and that those facts are common to the class and present no issues of individualized proof. Accordingly, Dr. Hughes' opinion that Zetia's placement on Tier 3 or higher would produce large numbers of uninjured class members is based on an assumption not warranted by the record. At the class certification stage, EPPs are entitled to calculate the but-for price based on the theory of the case they intend to prove. See Suboxone 421 F. Supp. 3d at 63-65 (finding Dr. Lamb's damages model "reliable" and satisfactory under the predominance requirement).

### 2. TPPs Covering Zetia on Tier 4 or Higher

With respect to a narrower subset of TPPs that placed Zetia on formulary Tier 4 or higher, Dr. Hughes opines that manufacturer rebates and other cost sharing would leave them uninjured during large portions of the class period. Hughes Suppl. Decl. ¶¶ 28-31 & Ex. 9. As with Dr. Hughes' other calculations, however, Dr. Lamb has pointed to assumptions underlying Dr. Hughes' interpretations of the data that undermine his opinions on this group of allegedly uninjured TPPs. Most importantly, the estimated rebates used in Dr. Hughes' calculations are average rebates based on Merck's data for rebates paid to TPPs for Zetia in 2015. Hughes Suppl. Decl. ¶ 29 & Ex. 9 (estimating average rebates between 14 percent and 30 percent during the 26-month brand/generic class period). But actual rebate amounts vary depending in part upon formulary placement, with the higher rebates paid to secure a lower tier placement. Lamb Suppl. Decl. ¶¶ 19-20 (isolating Dr. Hughes' hearing presentation examples to show that rebates paid by Merck on those transactions varied between 5 percent and 7 percent when Zetia was on non-preferred tiers). Dr. Lamb also cites Merck's sales material indicating that rebates were intended for TPPs and PBMs that placed Zetia on preferred tiers and opines that TPPs with Zetia on Tier 4 likely received minimal or no rebates. Lamb Suppl. Decl. ¶¶ 20-22. Dr. Hughes acknowledged as much in his original report. Hughes Decl. ¶ 37 n.50 ("[I]t is common for manufacturers of branded drugs to offer rebates in exchange for better formulary placement."). Yet in his opinion on this category of allegedly uninjured TPPs, Dr. Hughes assumes that TPPs' the cost of brand Zetia would be reduced by both higher rebates and higher copayments. By assuming higher consumer copayments associated with the non-preferred Tier 4 and average rebates (inflated by the larger rebates paid to TPPs offering a lower tier placement), Dr. Hughes understates the degree of antitrust injury sustained by TPPs with Zetia on Tier 4.

**\*22** Moreover, even applying the rebates and copayments from Dr. Hughes' estimates, his calculations purporting to define large numbers of uninjured class members are limited to a portion of the class period ending prior to the actual date of generic entry. The price differential increased significantly during the later months of this period as generic competition increased. The result of this increased competition is that TPPs making consistent purchases throughout the period would still suffer net harm even using Dr. Hughes' rebate data. To the extent Dr. Hughes argues that certain plans may have ceased operation before damages accrued, his analysis is based on the same methodology of counting health plans, which says nothing about TPPs that make up the class.

### 3. Medicare Part D Plans

The amended class definition includes significant changes to address Dr. Hughes' argument that many Medicare Part D plans would suffer no net damages. Cost sharing under Medicare Part D plans varies according to how much any particular consumer pays for all of their prescription medications. Hughes Decl. ¶ 68. Part D plans typically consist of four phases. Id.; May Hr'g Tr. 47:16-25. In the first phase, called the deductible phase, consumers pay for all costs of the drug until they reach the annual deductible fixed by the plan. Hughes Decl. ¶ 69. Both Dr. Lamb and Dr. Hughes agree that during this deductible phase, individual transactions do not produce any overcharge to the TPP. Id. ¶ 76(i); Lamb Suppl. Decl. ¶ 11. As a result, Dr. Lamb's damages model excludes such purchases from the calculation of classwide damages. Lamb Decl. ¶ 11.

After the deductible phase, consumers enter the initial coverage phase where the TPPs share the cost of prescription medicine with consumer copayments and a government subsidy. Hughes Decl. ¶ 70; May Hr'g Tr. 47:19-22, 48:1-8. Once the total prescription costs for an individual reach the liability limit for the year, consumers enter the coverage gap phase, also known as the "doughnut hole." Hughes Decl. ¶ 71; May Hr'g Tr. 47:19-24. During this phase of coverage, costs are divided primarily between the consumer and the TPP, with certain manufacturer discounts usually paid in the form of rebates. Hughes Decl. ¶ 71. Finally, if an individual consumer's costs proceed beyond the next defined threshold, consumers enter the catastrophic phase where government subsidies again defray a large portion of the costs. Id.; May Hr'g Tr. 74:19-25.

Although Dr. Lamb disagrees with Dr. Hughes' calculations on specific class member transactions, the changes made in EPPs' amended class definition effectively concede that Dr. Hughes' methodology uncovered a genuine concern regarding Part D plans that sustained no net damages. The amendment removed from the class those Part D plans using one of the major PBMs to negotiate formulary placement and rebates. In doing so, Dr. Lamb states that Part D plans remaining in the class are those whose manufacturer rebates in the initial coverage phase are 20 percent or less.[21] Lamb Suppl. Decl. ¶ 4 (citing Hughes Presentation 5). By so limiting the class, the amendment ensures that these remaining members can

demonstrate not only impact, but also that they suffered net positive damages.

Notwithstanding the amendment, Defendants claim that many Part D plans suffered no net damages. Defs.' Opp'n Mot. Modify 19-21. However, Dr. Hughes' attempts to demonstrate how any individual Part D plan would be uninjured rely on assumptions related to patient copayments for the brand and generic in the initial coverage phase that Dr. Lamb has shown are not consistent with the record evidence. For example, Dr. Hughes' calculation of injury in the initial coverage period depends upon the member copayment being only $1.00, which was derived from the median copayment for all generic drugs on the preferred generic tier. Hughes Suppl. Decl. ¶¶ 39-40; Lamb Suppl. Decl. ¶¶ 12-14. But as Dr. Lamb notes, certain generics are placed on higher tiers and this was the case for generic ezetimibe when it entered the market. Lamb Suppl. Decl. ¶ 14. The median copayment from consumers on these higher tiers, namely, Tier 3 and Tier 4, was $38.00 and $80.00, respectively. Id. Dr. Lamb calculated a weighted average copayment based upon the number of covered lives included in the Part D plans with ezetimibe on higher tiers. Id. His calculations show that the weighted average consumer copay was equal to approximately 22 percent of the total generic cost, whereas Dr. Hughes' estimated $1.00 copay equaled less than one percent of the generic cost. Id. I am persuaded by Dr. Lamb's analysis that consumer copayments in the initial coverage phase would have been significantly higher than Dr. Hughes' estimates and that his opinions regarding large numbers of uninjured class members based on the unreasonably low copayment is therefore not reliable.

**\*23** With respect to transactions during the coverage gap, or doughnut hole, Dr. Lamb agrees with Dr. Hughes that TPPs reimbursing Zetia purchases during this phase would not result in an overcharge. Dr. Lamb addressed these offsets in his calculation of classwide damages. Lamb Suppl. Decl. ¶ 15. But the fact that certain transactions during the coverage gap did not produce an overcharge does not mean that TPPs reimbursing or paying these claims suffered no net damages. At the rebate levels expected to be paid to TPPs in the amended class definition, Dr. Lamb's analysis credibly demonstrates that the substantial damages in the initial coverage phase more than offset any negative damages resulting during the coverage gap.

Finally, with respect to the catastrophic phase, Dr. Lamb disputes Dr. Hughes' calculation of rebates, citing industry literature that establishes that the government reimburses

TPPs for 80 percent of the net cost of prescriptions during this phase. Id. ¶ 16. That net cost is calculated after application of rebates and other discounts from the manufacturer. Id.

Importantly, even accepting Dr. Hughes' calculations regarding all the various individual transactions affected by tier placement and rebates, he has not identified any putative class member that suffered no net damage on all transactions. Dr. Lamb demonstrated that the individual transactions that Dr. Hughes selected for criticism were atypical, and that examining all the transactions in the same or neighboring months proved net positive damages among the named class members addressed in the examples. Lamb Reply Decl. ¶¶ 62-63; Lamb Suppl. Dec. ¶¶ 19-20. And it is undisputed that TPPs within the amended class definition all allege the same antitrust injury alleged in the consolidated complaint. EPPs have thus met their burden to show antitrust impact as to all or substantially all members of the class through common evidence. The individual net damages issues remaining after the amendment do not present any individualized issues that would overwhelm common issues and defeat predominance - a result similar to that reached in numerous other end-payor actions brought on behalf of TPPs.

See, e.g., Restasis, 2020 WL 2555556, at *24-26; Solodyn, 2017 WL 4621777, at *18; Lidoderm, 2017 WL 679367, at *23.

### b. Measurable Damages

EPPs must also demonstrate that "damages can be reliably measured on a class-wide basis." Am. Sales Co., 2017 WL 3669604, at *15 (citing Comcast Corp., 569 U.S. at 35). To be clear, EPPs are "not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." Wellbutrin XL, 282 F.R.D. at 144. And that methodology must be consistent with the purported theory of liability. See Comcast Corp., 569 U.S. at 35. Assuming an appropriate model is put forth, "the need for some individualized determinations" is not fatal to class certification. Nexium, 777 F.3d at 21.

To demonstrate measurable damages, EPPs propose Dr. Lamb's "benchmark" methodology, which "compar[es] the

price that arose as a result of the alleged misconduct with the price for that product during some other period of time in which pricing was not affected by the alleged anticompetitive conduct." Lamb Decl. ¶ 63; accord May Hr'g Tr. 24:19-25:2. To accomplish this, Dr. Lamb uses data on retail prescriptions compiled by the IQVIA National Prescription Audit database as well as Merck's transaction-level and rebate data. Lamb Decl. ¶¶ 9 & n.5, 64-66. With this data, Dr. Lamb calculates the but-for generic price (which, when compared with the actual brand and generic prices, determines the amount of the overcharge) and generic penetration rate (which is based in part on the actual generic penetration rate and penetration rates of similar drugs facing loss of exclusivity). Id. ¶¶ 71-72, 74-76. Next, Dr. Lamb determines (1) the but-for generic volume by multiplying the but-for generic penetration rate by the actual total volume of ezetimibe (brand plus generic), and (2) the but-for brand volume by multiplying the difference between 100 percent and the generic penetration rate (1 - generic penetration rate) by the actual total volume. Id. ¶ 77. After accounting for some adjustments, id. ¶¶ 78-79, Dr. Lamb then computes classwide damages suffered by (1) class members that purchased brand Zetia in the actual world but would have purchased a lower-priced generic had it been available ("brand-generic" or "B-G" damages) by multiplying the overcharge by the difference of actual brand volume and but-for brand volume; and (2) class members that purchased generic Zetia in the actual world but would have paid less had generic entry occurred sooner ("generic-generic" or "G-G" damages) by multiplying the overcharge by the actual generic volume. Id. ¶¶ 70-71, 76-77; May Hr'g Tr. 25:3-26:9.

**\*24** To calculate unjust enrichment damages, Dr. Lamb simply takes the difference of Merck's profits in the actual world and what Merck's profits would have been in the but-for world, the latter taking into account but-for brand sales and but-for authorized generic sales. Lamb Decl. ¶ 82; May Hr'g Tr. 26:10-16. Similar to the classwide antitrust damages discussed above, Dr. Lamb utilizes IQVIA National Prescription Audit and National Sales Perspectives data as well as Merck's own sales data to estimate Merck's but-for Zetia and authorized generic profits. Lamb Decl. ¶¶ 83-90; May Hr'g Tr. 26:17-20. After making some adjustments, Dr. Lamb is then able to calculate the amount by which Merck was allegedly unjustly enriched. Lamb Decl. ¶ 91; May Hr'g Tr. 26:22-27:6.

Defendants argue that Dr. Lamb's damages methodology offers only "generalized" classwide proof because it

calculates damages in the aggregate, which ignores the need to "trac[e] payments through complex, multilevel distribution chains." Defs.' Opp'n Mot. Certify 24-25. Thus, Defendants argue, Dr. Lamb does not explain how damages would be allocated to class members - an exercise that would "require extensive individualized inquiries. Id. at 25.

Despite Defendants' arguments, I am satisfied that EPPs have demonstrated a reliable method of calculating damages on a classwide basis. To begin with, "[a]ntitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate." In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 348 (E.D. Mich. 2001). They need only "show that a reliable method is available to prove damages on a class-wide basis." Wellbutrin XL, 282 F.R.D. at 144. And the damages methodology proposed by Dr. Lamb has been deemed sufficiently reliable to meet that classification in other pharmaceutical antitrust end-payor class actions. See, e.g., Restasis, 2020 WL 2555556, at *26-28; Loestrin 24 FE, 410 F. Supp. at 389-95; Flonase, 284 F.R.D. at 232-34; Cardizem CD, 200 F.R.D. at 347-51. Furthermore,

> while the claims administration process will include individualized damages calculations, many of the questions relevant to the damages distribution will be answered through common proof. The entire process depends on the extensive and particularized data created in the pharmaceutical industry that reveals number of prescriptions purchased by each consumer and how much each end-payor paid for each prescription. These common components will significantly narrow the scope of individualized damages calculations, which will likely involve simple arithmetic.

Restasis, 2020 WL 2555556, at *26; see also Flonase, 284 F.R.D. at 233. Accordingly, common issues predominate with respect to classwide damages calculations.

c. State Law Variations

Defendants also argue that EPPs "have failed to show that the individualized nature of the variations among the state laws under which they purport to proceed will not predominate." Defs.' Opp'n Mot. Certify 26. Because the class encompasses claims relating to purchases of the drug in twenty-eight states, the District of Columbia, and Puerto Rico, the court must determine which states' laws apply to these purchases. Although not extensively briefed, this inquiry is necessary at the class certification stage because EPPs bear the burden of showing that common issues would predominate over any variations among the applicable state laws. See Restasis, 2020 WL 2555556, at *28; Vista Healthplan, Inc., 2015 WL 3623005, at *33. EPPs contend that the state in which the purchase occurred supplies the applicable law. I agree.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). "Where a transferee court presides over several diversity actions consolidated by the multidistrict litigation panel, the choice of law rules applied are that of each jurisdiction in which the transferred actions were originally filed." In re Section 1031 Exchange Litig., 716 F. Supp. 2d 415, 421 (D.S.C. 2010); accord In re Panacryl Sutures Prods. Liab. Cases, 263 F.R.D. 312, 318 (E.D.N.C. 2009). The present proceedings involve end-payor actions originally filed in California, Massachusetts, New York, and Virginia. Thus, for each action, the court must apply the corresponding state's choice-of-law rules. For California, New York, and Massachusetts, it is well established that the law of the state in which the drug was purchased applies to EPPs' claims. A review of Virginia's choice-of-law rules reveals the same.

**\*25** "California and New York courts employ variations o[f] the same choice-of-law analysis - the 'government interest test.' " Restasis, 2020 WL 2555556, at *29 (citing Mazza v. Am. Honda Motor Co., 666 F.3d 581, 594 (9th Cir. 2012); In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 147, 150 (S.D.N.Y. 2008)). Under that test, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its

borders."[22] Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 72, 612 N.E.2d 277, 280 (1993); accord McCann v. Foster Wheeler LLC, 48 Cal. 4th 68, 87-88, 225 P.3d 516, 527 (2010). The Eastern District of New York recently performed a detailed choice-of-law analysis of the government interest test pursuant to New York and California law in Restasis - multidistrict litigation also involving pharmaceutical antitrust allegations by end payors - and concluded that "the state of purchase provides the appropriate substantive law for ... class members' claims." 2020 WL 2555556, at *29 (citing Mazza, 666 F.3d at 594; Grand Theft Auto, 251 F.R.D. at 147, 150). I see no reason to depart from that court's well-reasoned analysis.

Massachusetts follows "a flexible or 'functional choice of law approach,' under which courts consider 'the interests of the parties, the States involved, and the interstate system as a whole.' " Relafen, 221 F.R.D. at 277 (quoting Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985)). As the Massachusetts Supreme Court has acknowledged, this test is similar to the significant relationship test of the Restatement (Second) of Conflict of Laws § 6(2) (1971). See generally Bushkin Assocs., Inc., 393 Mass. at 631-39, 473 N.E.2d at 668-72; see also Watkins v. Omni Life Sci., Inc., 692 F. Supp. 2d 170, 174 (D. Mass. 2010) ("Under Massachusetts choice-of-law rules, tort claims are governed by the law of the state in which the injury occurred, unless another state has a more significant relationship to the underlying cause of action."). In Relafen, another end-payor action alleging unlawful generic suppression, the District of Massachusetts analyzed this functional approach and found that Massachusetts law "would select the various states in which [the] purchases were made." 221 F.R.D. at 277-78; see also Restasis, 2020 WL 2555556, at *30 (analyzing the significant relationship test under Texas law and concluding that "consideration of the factors as a whole and in the context of this case indicates that [the] place of purchase - that is, where he or she was injured by overpaying - has the most significant contacts or relationships with the particular issue"). This report follows Relafen's analysis.

Unlike the other three states, I am not aware of any case where a court has analyzed and applied Virginia's choice-of-law rules in a pharmaceutical antitrust class action like this one. "Virginia applies the lex loci delicti, the law of the place

of the wrong, to tort actions." Milton v. IIT Research Inst., 138 F. 3d 519, 521 (4th Cir. 1998) (citing Jones v. R.S. Jones & Assocs., Inc., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993); Buchanan v. Doe, 246 Va. 67, 70-71, 431 S.E.2d 289, 291 (1993)). The place of the wrong is considered "the place where the last event necessary to make an actor liable for an alleged tort takes place, even if the actor has no control over the location of that last event." Insteel Indus., Inc. v. Costanza Contracting Co., 276 F. Supp. 2d 479, 486 (E.D. Va. 2003) (citing Quillen v. Int'l Playtex, Inc., 789 F.2d 1041, 1044 (4th Cir. 1986)). Here, the last event necessary to establish liability was the purchase of the drug, when the alleged injury occurred. Accordingly, Virginia would likewise apply the substantive law of the states in which the purchases occurred. Cf. id. at 488 (applying North Carolina law to claim for unfair and deceptive trade practices because last events necessary for liability - paying invoice containing misrepresentations - occurred in North Carolina).[23]

**\*26** In light of the foregoing, EPPs' various state law claims are thus governed by the laws of the thirty jurisdictions identified in their modified class definition. After extensively litigated motions practice, the court dismissed a number of state claims. See Zetia, 2019 WL 1397228, at *39 (Exs. A, B). The dismissed claims had been attacked individually for lack of support in the facts pled or a failure by EPPs to meet elements of recovery required on the theories asserted. See generally id. at *22-39. EPPs' remaining claims arise under the antitrust laws of twenty-four states, the District of Columbia, and Puerto Rico; the consumer protection laws of twelve states; and the unjust enrichment laws of twenty-five states and the District of Columbia. Id. at *39 (Exs. A, B).

As a general matter, "[t]he need to apply multiple states' laws ... does not necessarily defeat class certification." Solodyn, 2017 WL 4621777, at *19. Indeed, courts commonly certify end-payor classes seeking to recover for delayed generic competition under the laws of multiple states. See, e.g., Restasis, 2020 WL 2555556, at *28-34 (certifying end-payor class asserting claims under thirty-one jurisdictions); Solodyn, 2017 WL 4621777, at *19-20 (forty jurisdictions); In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 168, 175-76 (twenty-six jurisdictions). In such cases, the plaintiffs demonstrated not that the various laws were identical in every respect, but that the variations among them could be dealt with in a manageable way

that does not overwhelm issues common to the class. See Solodyn, 2017 WL 4621777, at *20 ("EPPs have provided a compilation of state laws at issue here and highlighted the substantial similarities in the language among states and between state and federal antitrust provisions." (citation omitted)); Lidoderm, 2017 WL 679367, at *27 (noting that any significant differences "can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one"); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998) (observing that "relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit").

Here, EPPs argue that any variations among the relevant state laws are minor and do not defeat predominance. Specifically, EPPs claim

> each of the applicable state antitrust statutes mirrors the federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law. The consumer protection statutes, modeled from Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), have been interpreted to permit recovery for anticompetitive, unfair or unconscionable conduct, and Plaintiffs' claims under these statutes are premised on the same unlawful conduct as their antitrust claims.[24] Further, Plaintiffs' unjust enrichment claims are premised on the same alleged facts and will be proven using the same evidence as their antitrust and consumer protection claims.

EPPs' Mem. Supp. Mot. Certify 21 (citations omitted); see also EPPs' Reply Supp. Mot. Certify 14-15. EPPs have submitted a compilation of the relevant state antitrust and consumer protection statutes as well as interpretative case law, which emphasizes the significant similarities among themselves and in relation to their federal counterparts.[25]

EPPs' Mem. Supp. Mot. Certify Ex. 14 (ECF No. 730-15); see Gariety v. Grant Thornton, LLP, 368 F.3d 356, 370 (4th Cir. 2004). They have also proposed a trial plan that not only groups common elements but also calls for the use of a special verdict form for any state-specific issues. See EPPs' Mem. Supp. Mot. Certify Ex. 21 (ECF No. 730-22).

**\*27** Defendants assert that "there are meaningful differences among the various state laws that EPPs rely upon," but they point to only three states of the remaining claims that allegedly require some comparatively heightened showing. Defs' Opp'n Mot. Certify 27. According to Defendants, " 'the indirect purchaser statutes of ... Michigan[ ] and Minnesota require a somewhat stronger and more precise showing of individual impact' than other state statutes." Id. (alterations in original) (quoting In re Dig. Music Antitrust Litig., 321 F.R.D. 64, 99 (S.D.N.Y. 2017)). They also claim that Michigan and Arizona "provide for treble damages only upon a showing that a defendant's violation was 'flagrant.' " Id. (quoting Dig. Music, 321 F.R.D. at 99); see Ariz. Rev. Stat. § 44-1408(B); Mich. Comp. Laws § 445.778(2). As an obstacle to a finding of predominating common issues, these arguments are unconvincing. First, the court in Restasis, after careful analysis, rejected the precise argument Defendants make here (including the supporting case law) with respect to showing individual impact under the laws of Michigan and Minnesota, "discern[ing] no heightened standard, explicit or implicit." 2020 WL 2555556, at *31-32. After reviewing the relevant state laws, I find Restasis' reasoning on this issue persuasive and also conclude that Michigan and Minnesota do not present individualized considerations with respect to impact.

Second, assuming arguendo that the three states identified by Defendants impose some additional burden of proof with respect to liability and/or damages and thus present individualized issues, such variations are immaterial and pose no risk of overtaking the overwhelming common evidence expected to be presented in this case. They are easily addressed through the use of a special verdict form, see Lidoderm, 2017 WL 679367, at *27, which EPPs' trial plan specifically anticipates, see EPPs' Mem. Supp. Mot. Certify Ex. 21.

Defendants also make a general averment that EPPs have not demonstrated that common issues will predominate over variations among the applicable unjust enrichment laws. See

Defs.' Opp'n Mot. Certify 22-23. While it is true that the compilation of state laws that EPPs provide does not examine unjust enrichment statutes, the court has already conducted a detailed review of EPPs' unjust enrichment claims (as well as the other state claims) and disposed of several. See generally 🔖 Zetia, 2019 WL 1397228, at *22-39. For the remaining claims, the court has already determined that the allegations supporting the antitrust and consumer protection claims are also sufficient to establish unjust enrichment. [26] And Defendants have not raised any issues with respect to the laws governing the remaining unjust enrichment claims that would defeat predominance. [27] Cf. 🔖 Zetia, 400 F. Supp. 3d at 441 ("Defendants do not point to any specific material differences in jurisdictions' requirements for unjust enrichment claims that warrant consideration, other than those already raised before the Magistrate Judge.").

**\*28** Defendants may, of course, raise such issues on summary judgment and attempt to dispose of additional claims. But at present, EPPs have demonstrated that common issues predominate over any variations among the various antitrust, consumer protection, and unjust enrichment state laws.

Having shown that evidence common to the class predominates over individualized issues with respect to uninjured class members, classwide damages, and state law variations, EPPs have satisfied the predominance requirement.

### 2. Superiority

Finally, EPPs must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." 🔖 Fed. R. Civ. P. 23(b) (3). This "superiority" requirement ensures that proceeding by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." 🔖 Amchem Prods., Inc., 521 U.S. at 615. To determine whether EPPs have satisfied this requirement, the court "must compare the possible alternatives to determine whether 🔖 Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." 🔖 Stillmock, 385 F. App'x

at 274 (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2005)).

To help guide the court's analysis, 🔖 Rule 23 provides a list of four, non-exhaustive factors: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." 🔖 Fed. R. Civ. P. 23(b) (3); see also 🔖 Fed. R. Civ. P. 23(b) (3) advisory committee's note to 1966 amendment (stating that the four factors are non-exhaustive).

Defendants do not appear to contest superiority requirement; nonetheless, I find that it is met here. Indeed, given the need to prove essentially identical facts, proceeding in a class action here is significantly more efficient than proceeding individually, which "would waste judicial resources and leave all parties vulnerable to unfair inconsistences." 🔖 Flonase, 284 F.R.D. at 234; see also 🔖 Wellbutrin XL, 282 F.R.D. at 145 (finding class resolution of EPP claims was superior to individual actions, which "would require duplicative, expensive litigation ... at enormous expense to the parties and judicial economy"). Additionally, as stated above, potential variations among state laws will not render the case unmanageable. Thus, as courts consistently find in such cases, EPPs have satisfied the superiority requirement. See 🔖 Flonase, 284 F.R.D. at 234 (agreeing with "the vast majority of district courts" in delayed generic entry cases that "class action treatment is superior to other available methods of adjudication"); see also Momenta Pharms., Inc., 333 F.R.D. at 414.

### C. 🔖 Rule 23 (g)

**\*29** Lastly, EPPs seek to confirm Motley Rice LLC and Miller Law LLC as co-lead class counsel, and Furniss, Davis, Rashkind and Saunders, PC as liaison counsel for the class. EPPs' Mot. Class Certification 2; EPPs' Mem. Supp. Mot. Certify 29. Pursuant to 🔖 Rule 23 (g), the court previously appointed Motley Rice LLC and Miller Law LLC as co-lead counsel and interim co-class counsel for the proposed EPP class, emphasizing their "years of experience litigating similar cases across the country and extensive knowledge of

the applicable law from that experience." Pretrial Order No. 3, at 1-2, 5-10 (ECF No. 105). The court also appointed Alan B. Rashkind and James A. Cales, III, of Furniss, Davis, Rashkind and Saunders, PC as local counsel for the EPP class. Id. at 9. Given the court's previous finding that these law firms and attorneys have the "necessary expertise, resources, and experience to represent" the EPP class, id. at 2, as well as counsel's consistent performance in litigating the case thus far, I recommend that the court confirm Motley Rice LLC and Miller Law LLC as co–lead class counsel and Furniss, Davis, Rashkind and Saunders, PC as local counsel for the EPP class, in accordance with Rule 23(g).

### III. Conclusion and Recommendation

For the foregoing reasons, I recommend that the court GRANT EPPs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, ECF No. 729, and GRANT EPPs' Motion for Leave to Modify and Limit their Class Definition, ECF No. 809, and certify the class as set forth therein.

### IV. Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b) (1) (C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b) (1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72 (b) (2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

Slip Copy, 2020 WL 5778756

## Footnotes

1  The named EPPs seeking class certification are the City of Providence, Rhode Island; International Union of Operating Engineers Local 49 Health and Welfare Fund; Painters District Council No. 30 Health & Welfare Fund; Philadelphia Federation of Teachers Health & Welfare Fund; Sergeants Benevolent Association Health & Welfare Fund; The Uniformed Firefighters' Association of Greater New York Security Benefit Fund; The Retired Firefighters' Security Benefit Fund of the Uniformed Firefighters' Association; and United Food and Commercial Workers Local 1500 Welfare Fund.

2  "Glenmark" consists of Glenmark Pharmaceuticals Limited and Glenmark Pharmaceuticals Inc., USA, the latter incorrectly identified as Glenmark Generics Inc., USA.

3  "Merck" consists of Merck & Co., Inc.; Merck Sharp & Dohme Corp.; Schering-Plough Corp.; Schering Corp.; and MSP Singapore Co. LLC.

4    In re Zetia (Ezetimibe) Antitrust Litig., No. 2:18-md-2836, 2019 WL 6122017, at *1-3 (E.D. Va. Oct. 15, 2019),
     R. & R. adopted as modified, 2019 WL 6977405 (E.D. Va. Dec. 20, 2019); In re Zetia (Ezetimibe) Antitrust
     Litig., No. 2:18-md-2836, 2019 WL 1397228, at *1-10 (E.D. Va. Feb. 6, 2019), R. & R. adopted as modified,
     400 F. Supp. 3d 418 (E.D. Va. 2019).

5    See FTC v. Actavis, Inc., 570 U.S. 136, 140-41 (2013) (describing reverse payment settlements).

6    See Zetia, 2019 WL 1397228, at *39 (Exs. A, B).

7    This fact does not require amendment of the consolidated complaint. See Henderson, 2016 WL 4611571,
     at *4.

8    Although Rule 23(a) (4) by its express terms deals only with the adequacy of the "representative parties,"
     Fed. R. Civ. P. 23(a) (4) (emphasis added), the Supreme Court noted in Amchem Products, Inc. that
     the adequacy requirement "also factors in competency and conflicts of class counsel," 521 U.S. at 626
     n.20 (emphasis added). Accordingly, several courts have addressed the adequacy of class representatives
     and class counsel in tandem. See, e.g., London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1253 (11th
     Cir. 2003) (noting that the Rule 23(a) (4) adequacy requirement "applies to both the named plaintiff and
     counsel" (quoting Amchem Prods., Inc., 521 U.S. at 626 n.20)). In 2003, however, Congress enacted
     Rule 23(g), which outlines factors for courts to consider in assessing the adequacy of class counsel. See
     Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment ("Until now, courts have scrutinized
     proposed class counsel as well as the class representative under Rule 23(a)(4).)."); accord Bell v. Brockett,
     922 F.3d 502, 510 (4th Cir. 2019). Accordingly, I will address separately the adequacy of class counsel
     pursuant to Rule 23 (g) below.

9    Although Craft notes that the same data can be obtained from pharmacies and TPPs, id. ¶¶ 5, 15, her
     methodology relies on PBM data as the primary data source, see id. ¶ 21; Buchman Reply Decl. Ex. 3 ("Craft
     Rebuttal Decl."), ¶ 10 (ECF Nos. 886-4 (public), 885-3 (sealed)) ("There is no need to rely on pharmacy data
     in this case given the proposed Class consists solely of TPPs who themselves have records of their Zetia/
     ezetimibe purchases and who hire PBMs as their claims adjudication agents who retain detailed, accurate,
     and comprehensive data.").

10   According to Defendants, the court cannot take judicial notice of the declarations filed in other cases. Defs.'
     Mot. Certify Hr'g Ascertainability Presentation ("Defs.' Ascertainability Presentation") 15 (ECF Nos. 1020
     (sealed), 1021-2 (public)) (citing Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001)). As a
     preliminary matter, the language that Defendants quote from Lee - "With respect to Plaintiff's citation to a
     declaration in another case, documents filed in other cases are of no assistance to Plaintiff, as the Court
     cannot take judicial notice of the truth of facts set forth in filings in other cases" - does not appear anywhere
     in that opinion. Moreover, in Lee, a case with no binding effect on this court, the Ninth Circuit found that
     a district court erred in taking judicial notice of disputed facts on a motion to dismiss. See 250 F.3d at
     688-89. Here, Defendants do not dispute the factual assertions in the PBM declarations; rather, they argue
     that those assertions do not lend support to EPPs' ascertainability arguments. See Defs.' Ascertainability
     Presentation 15. Accordingly, Lee is inapposite. In any event, Defendants do not dispute that the court may
     properly consider the declaration of Steven Schaper, Caremark L.L.C.'s senior vice president of employer

sales, submitted specifically for the present litigation, ECF No. 939-5, which largely mirrors the other PBM declarations.

11    To the extent any data field or variable name is ambiguous, however, "a simple 'data dictionary' (a record maintained by virtually all companies deploying large data-intensive technology systems) provides clarification and allows the data to be standardized." Craft Decl. ¶ 7.

12    EPPs note that the proposed class members are PBM clients and that there is no reason to suspect that PBMs would be hostile to their efforts to obtain a recovery, see July Hr'g Tr. 130:9-22, particularly since the sought data relates only to TPPs and thus does not implicate personal identifying information of consumers, see Craft Rebuttal Decl. ¶ 11.

13    See, e.g., Mahoney v. Endo Health Sols., Inc., No. 15-cv-9841 (S.D.N.Y Nov. 21, 2016), ECF No. 97, at 3; In re Relafen Antitrust Litig., No. 01-cv-12239, 2004 U.S. Dist. LEXIS 29834, at *17-19 (D. Mass. Nov. 24, 2004).

14    By contrast, Dietz testified that he lacks expertise in computer hardware, computer software, storage systems, and data aggregation. May Hr'g Tr. 131:18-132:6.

15    Fully-insured plans are those plans that purchase a group health insurance policy from a third-party insurer that "assumes financial responsibility for the covered health benefit claims of the plan's participants and the associated administrative costs." Craft Decl. ¶ 33. In such circumstances, the insurer, rather than the plan sponsor, is considered the TPP for purposes of the class exclusion. Id.; accord May Hr'g Tr. 102:1-13.

16    Two other points also bear mention here. First, the Niaspan court noted its concern that the methodology proposed by Craft "would be prohibitively expensive," citing evidence from another pay-for-delay case out of

Massachusetts that obtaining the relevant pharmaceutical records would cost $18 million. See ⬜ 2020 WL 2933824, at *19. In this case, however, there has been no showing regarding the cost of obtaining PBM data; therefore, that factor does not inform this report's analysis. Second, the court in Niaspan, according to EPPs' counsel, did not hear live testimony from Craft but instead relied, in part, on a four-and-a-half-page report authored by Craft. July Hr'g Tr. 124:4-23. In this case, Craft prepared exhaustive and detailed reports totaling nearly sixty pages. And her live testimony demonstrated not only her extensive knowledge and experience regarding PBM data, but also that she has the analytical tools to carry out, in an administratively feasible way, what she proposes.

17    Of the eight exclusions, three involved consumers. Id. at *4. The other five resemble exclusions in EPPs' amended class definition. See id. (defendants, certain government entities, entities that purchased the drug directly from defendants or for purposes of resale, fully-insured plans, and certain PBMs).

18    Defendants do not contest EPPs' ability to identify entities encompassed by the other exclusions, namely (1) PBMs, which are easily identifiable, and, according to Craft, do not fall within the class definition to begin with; (2) Defendants and their affiliates, which can be identified by Defendants; and (3) entities that made direct purchases or purchased ezetimibe for purposes of resale, which can be identified using Defendants' own data. See Craft Decl. ¶¶ 30, 35-38.

19    Dr. Hughes' calculation of 100,000 uninjured class members in this category is confounding in other respects. He appears to have derived this estimate by multiplying the percentage of plans that stopped filing Form 5500s after May 2015 (approximately 5 percent) by the total number of Form 5500s filed during the entire class period (about 2.2 million). See Hughes Presentation 7. Because plans filed multiple Form 5500s during the class period, this calculation is meaningless and thus irrelevant to the question of uninjured class members.

20    The issue of brand-loyal consumers neatly illustrates the difference between injury-in-fact and damages. A brand-loyal consumer never sustains antitrust injury because they would not have bought generic no matter

when it entered the market. See Asacol, 907 F.3d at 53-54; Niaspan, 2020 WL 2020 WL 2 933824, at *26. In those cases that rejected certification on this ground, it was not sufficient for the end payors to simply produce classwide proof that permitted them to accurately estimate brand retention and then remove such purchases from their aggregate damages model. Absent classwide proof of which consumers were brand loyalists, those classes potentially included large numbers of claimants who suffered no antitrust injury at all and thus could not demonstrate impact. By contrast, institutional payors like those in the EPP class in this case can easily show impact given their volume of affected transactions.

21  Dr. Lamb's estimate of the rebate percentage was based on Merck's data relating to rebates that it actually paid. Lamb Suppl. Decl. ¶ 4 (citing Hughes Presentation 5); July Hr'g Tr. 13:10-24.

22  Because EPPs' claims sound in tort rather than breach of contract, I look to the applicable choice-of-law rules governing tort claims. See Restasis, 2020 WL 2555556, at *30 (considering similar state claims in pharmaceutical antitrust end-payor action as tort claims for choice-of-law analysis); In re Relafen Antitrust Litig., 221 F.R.D. 260, 277-79 (D. Mass. 2004) (same); Buchanan v. Doe, 246 Va. 67, 71, 431 S.E.2d 289, 291 (1993) (defining "tort" in Virginia as "any civil wrong or injury; a wrongful act"); see also Wellbutrin XL, 282 F.R.D. at 135 ("[A] ntitrust violations are essentially tortious acts." (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 547 (1983) (Marshall, J., dissenting))).

23  Although it is not addressed by either side, this report also follows Restasis' reasonable approach to mail-order prescriptions and "treat[s] the place of receipt of mailed drugs as the place of purchase." 2020 WL 2555556, at *31.

24  See also FTC v. Cement Inst., 333 U.S. 683, 694 (1948) (observing that "all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act").

25  Indeed, courts often remark about such similarities. See, e.g., Restasis, 2020 WL 2555556, at *8 n.8; Relafen, 221 F.R.D. at 275, 278.

26  Furthermore, courts have recognized the extensive similarities among various state unjust enrichment laws. See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 64 F. Supp. 3d 665, 703 (E.D. Pa. 2014) ("While it is true that the elements of unjust enrichment vary state by state, 'almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit.' " (quoting In re Flonase, 692 F. Supp. 2d 524, 541 (E.D. Pa. 2010))); see also Flonase, 284 F.R.D. at 219 & n.11 (noting similarities of unjust enrichment laws and observing that the plaintiffs "will utilize the same operative evidence to establish" liability despite minor differences).

27  EPPs assert unjust enrichment claims under the laws of twenty-six jurisdictions. Of those jurisdictions, there are only two - Alabama and Vermont - whose laws do not also provide the basis for antitrust or consumer protection claims. See Zetia, 2019 WL 1397228, at *39 (Exs. A, B). Defendants have not pointed to anything in the unjust enrichment laws of Alabama or Vermont that would defeat predominance as to class members seeking to recover for purchases in those two states.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

6

Case 1:19-md-02875-RMB-SAK     Document 2058-1     Filed 05/10/22     Page 86 of 172
PageID: 70629
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

2019 WL 4751883
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

BLUE CROSS BLUE SHIELD ASSOCIATION, et al.

v.

GLAXOSMITHKLINE LLC

CIVIL ACTION No. 13-4663
|
Filed 09/30/2019

**Attorneys and Law Firms**

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, for Blue Cross Blue Shield Association, Aetna, Inc., Amerigroup/HMS, Avmed Health Plans, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Montana, Inc., Blue Cross and Blue Shield of North Carolina, Blue Cross & Blue Shield of Rhode Island, Blue Cross and Blue Shield of South Carolina, Bluecross Blueshield of Tennessee, Carefirst of Maryland, Inc., Connecticut General Life Insurance Company, Emblem Health, Government Employees Health Association, Group Health Cooperative, Group Hospitalization and Medical Services, Inc., Health Net, Inc., Healthnow New York, Highmark Inc., Highmark West Virginia Inc., HMO Partners, Inc., Kps Health Plans, Medical Mutual of Ohio, Noridian, Premera Blue Cross, Priority Health, The Regence Group, Usable Mutual Insurance Company, Wellcare Health Plans, Inc., Wellcare Health Plan of Iowa, Inc., Wellmark, Inc., Wellpoint, Inc.

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, John Gregory Murphy, Baton Rouge, LA, for Louisiana Health Service Indemnity Company.

David H. Pittinsky, Edward D. Rogers, Stephen J. Kastenberg, William B. Igoe, Leslie E. John, Barbara A. Schwartz, Daniel Mullin, Elizabeth P. Weissert, JoAnna Rebecca Hess Kunz, Juliana Carter, Thomas J. Gallagher, IV, Ballard Spahr Andrews & Ingersoll LLP, Ricky Mario Guerra, Blank Rome LLP, Philadelphia, PA, Joseph E. O'Neil, John J. O'Donnell, Campbell Conroy & O'Neil, P.C., Berwyn, PA, Mark H. Lynch, Covington & Burling, Matthew F. Dunn, Matthew J. O'Connor, Michael M. Maya, Jason C. Raofield, Covington & Burling LLP, Washington, DC, William Mark LaNier, Houston, TX, for GlaxoSmithKline LLC.

## MEMORANDUM

Juan R. Sánchez, C.J.

**\*1** Plaintiffs, 38 private health insurance companies that purchased billions of dollars' worth of adulterated pharmaceutical drugs from Defendant GlaxoSmithKline LLC (GSK), bring the instant action, alleging they purchased the drugs at issue based on GSK's misrepresentations that the drugs were manufactured in accordance with the Food and Drug Administration's "current Good Manufacturing Practices." [1] Plaintiffs claim the adulterated drugs were worthless and had they known of the adulteration they would not have included the drugs in their formularies. GSK has moved to exclude Plaintiffs' five expert witnesses pursuant to Federal Rule of Evidence 702—Phillip Russ; David A. Kessler, M.D.; Matthew Perri III, B.S. Pharm, PhD, RPh; Stephen W. Schondelmeyer, PhD; and Rena Conti, PhD. GSK's motion will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the Motion will be denied.

## BACKGROUND

This case arises out of Plaintiffs' providing prescription drug coverage for seventeen drugs—Albenza, Avandia, Avandamet, Bactroban, Compazine, Coreg, Denavir, Dibenzyline, Dyazide, Dyrenium, Factive, Horowitz, Kytril, Paxil IR, Paxil OS, Stelazine, and Thorazine (collectively, the At-Issue Drugs). The drugs were manufactured by GSK's corporate affiliate, SB Pharmco Puerto Rico Inc. (SB Pharmco), at a pharmaceutical manufacturing plant in Cidra, Puerto Rico (the Cidra Plant). From 2000 to 2005 (the Relevant Period), Plaintiffs assert SB Pharmco's poor manufacturing process and quality control system at the Cidra Plant were non-compliant with the Food and Drug Administration's (FDA) "current Good Manufacturing Practices" (cGMP). According to Plaintiffs, the drugs were therefore "adulterated" under the Food, Drug & Cosmetic Act (FDCA). *See* 🔖 21 U.S.C. §§ 331(a), 🔖 351(a)(2)(B). Plaintiffs allege GSK fraudulently misrepresented that the At-Issue Drugs manufactured at the Cidra Plant were cGMP compliant, resulting in Plaintiffs providing coverage for adulterated drugs they claim were worthless.[2] In support of their case, Plaintiffs have retained the five expert witnesses.

Plaintiffs retained Philip Russ to analyze the nature and extent of the cGMP violations at the Cidra Plant during the Relevant Period. *See* Pls.' Resp. in Opp'n to Def.'s *Daubert* Mot. (Pls.' Opp'n) 2. Russ is the owner and president of Innovative Consultants GXP, which "provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device, and biologics industry." GSK's Mot. to Exclude Expert Test. of Phillip Russ, Drs. David Kessler, Matthew Perri, Stephen Schondelmeyer, and Rena Conti (GSK Mot.) Ex. 3, at 4. Russ has twenty-three years of experience in the pharmaceutical, medical device, and biologics industry, focusing on the regulatory compliance aspects of developing and managing quality management systems and cGMP compliance. *See id.* Russ's report evaluates "the extent to which manufacturing at the [Cidra Plant] was in material violation of 🔖 21 U.S.C. § 351." *Id.* at 3. Russ's report is based upon a review of (1) cGMP records of compliance activities; (2) FDA inspection results; (3) GSK's internal audits; (4) internal GSK emails and other correspondence and memoranda related to the Quality Management System (QMS) at the Cidra Plant; and (5) the observations of Quantic Regulatory Services, the third-party expert engaged by GSK to evaluate cGMP compliance at the Cidra Plant as a result of a Consent Decree entered into between GSK and the FDA. *Id.* at 3-4. After review of these documents, Russ concluded "all products manufactured

at the Cidra Plant between 2000 and 2005 were materially non-compliant with cGMPs and lacked the assurance of conformance to their represented properties." *Id.* at 105.

**\*2** Plaintiffs retained David A. Kessler, M.D., as an expert on cGMP regulations and cGMP compliance. Dr. Kessler was FDA Commissioner from 1990 until 1997. *See id.* Ex. 7, at ¶ 2 As the FDA Commissioner, Dr. Kessler oversaw the FDA's promulgation and implementation of proposed and finalized regulations concerning cGMPs for pharmaceuticals. *See id.* at ¶ 5-7. Dr. Kessler's expert report opines on four central questions: (1) "[w]hy is compliance with cGMPs important?"; (2) "[w]hy are a drug manufacturer's responsibilities with regard to cGMP compliance?"; (3) "[f]rom a regulatory point of view, what types of cGMP violations can have a 'material impact' on a drug?"; (4) "[i]f specific drugs are recalled from the market or seized from a plant because they violate cGMPs, what conclusions can be drawn as to whether other drugs at the same plant are cGMP compliant?" *id.* at ¶ 11(a)-(d). Dr. Kessler opines that (A) cGMP compliance is important "because it assures that what a drug manufacturer says is in a drug is actually in the drug;" *id.* at ¶ 12, (B) drug manufacturers "[can]not sell products that fall below the represented standards," *id.* at ¶ 28, and must "investigate, understand, and correct quality deviations," *id.* at ¶ 30, (C) there "are three categories of cGMP violations that can have a 'material impact' on a drug," *id.* at ¶ 35, and (D) "[t]he fact that specific drug products are recalled from the market or seized from a plant because they violate cGMPs does not mean that other drugs are cGMP-compliant," *id.* at ¶ 43.

Matthew Perri III, B.S. Pharm, PhD, RPh, is offered as an expert in pharmaceutical marketing and his expert report assesses "the nature and significance of the marketing activities of [GSK] related to ongoing problems at [the Cidra Plant]." *Id.* Ex. 8, at 3. Dr. Perri is a Professor at the University of Georgia, teaching undergraduate and graduate courses in healthcare and pharmaceutical marketing and other related areas. *See id.* at ¶ 1-3. Dr. Perri offers seven opinions including, inter alia, (1) it is the pharmaceutical manufacturer's job to ensure its drug products are manufactured in compliance with all FDA regulations; (2) patients, pharmacists, prescribers, and third-party payers rely on the assurance that a drug is what the manufacturer represents it to be; (3) major pharmaceutical manufacturers control the information their personnel disseminate into the market place; and (4) it is not feasible, or expected, for third-party payers to monitor FDA enforcement actions, given the

number of drugs listed on third-party payers' formularies. *See id.* at 3. In reaching his conclusions, Dr. Perri asserts his opinions are based on "universally accepted principles of marketing." *Id.* at ¶ 11.

Next, Plaintiffs offer Stephen Schondelmeyer, PhD, as a causation expert to demonstrate that, had Plaintiffs known about the cGMP violations at the Cidra Plant, they would have removed the At-Issue Drugs from their formularies and that non-cGMP compliant drugs have no economic value to third-party payors. Dr. Schondelmeyer is a Professor of Pharmaceutical Management and Economics at the University of Minnesota. *See id.* Ex. 11, at ¶¶ 1, 4. Dr. Schondelmeyer has more than 40 years of experience related to pharmaceutical economics and public policy research. *See id.* at ¶ 4. In his six-page opinion, Dr. Schondelmeyer concludes, based on his experience, "no payer in the United States would knowingly and willingly pay for such material non-compliant drugs [and] [s]uch drug products for all practical purposes have no value in the U.S. market and would be considered non-salable." *Id.* at ¶ 19.

Finally, Plaintiffs offer Rena Conti, PhD, as an expert on damages. Dr. Conti is an Associate Professor at Boston University's Questrom School of Business and an economist for the FDA's Center for Drug Evaluation and Research. *See id.* Ex. 15, at ¶ 8. She focuses her research on the market for prescription drugs and the pricing of pharmaceutical products in the United States market. *See id.* at ¶ 10. Dr. Conti concludes only prescription drugs "manufactured in compliance with [cGMPs] may be assigned a non-zero value by patients and third-party payers, and drugs which fail to meet those standards have no economic value." *Id.* at ¶ 4. Applying the economic principle of supply and demand, Dr. Conti concluded there can be no legitimate supply curve to establish an economic value because the FDCA prohibits the sale of adulterated drugs. *See id.* at ¶¶ 37-40. Dr. Conti further determined that, "[b]ecause GSK produced and sold non-compliant drugs, plaintiffs paid for illegitimate products that have no economic value." *Id.* at ¶ 5. As a result, Dr. Conti calculated the aggregate damages for all Plaintiffs as $2.82 billion, and individual damages for each Plaintiff as ranging between $3.3 million to $483.7 million. *See id.* at ¶ 52.

## DISCUSSION

**\*3** Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) that testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The United States Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* that Rule 702 creates a "a gatekeeping role for the [trial] judge." 509 U.S. 579, 597 (1993). However, "the court's role as a gatekeeper is not intended to serve as a replacement for the adversary system," because, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Crowley v. Chait,* 322 F. Supp. 2d 530, 536 (D. Del. 2004) (internal quotation marks and alterations omitted).

Following *Daubert,* the Third Circuit Court of Appeals has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir. 1999). Rule 702 envisions a "liberal policy of admissibility." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir. 1997)). GSK does not seek to exclude Plaintiffs' experts based on their qualifications and this requirement will therefore not be further discussed.

To meet the "reliability" requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable ... [but] the evidentiary requirement of reliability is lower than the merits standard of correctness."

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 89 of 172
PageID: 70632

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

*Pineda*, 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.' " *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (citation omitted). The Court must focus on the expert's methodology—not his or her conclusions. *In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions.")

When evaluating the reliability of a witness's methodology, the Court is guided by several factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

**\*4** *id.* at 742 n.8. The Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

To meet the "fit" requirement "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. Like a typical relevance inquiry, the standard for analyzing the fit of an expert's analysis is "not that high." *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir. 2007). Nevertheless, expert testimony can be powerful and misleading, and the Third Circuit has cautioned district courts to "tread carefully when evaluating proffered expert testimony." *Id.* at 219 n.6. With these standards in mind, the Court turns to GSK's motion to exclude.

GSK first moves to exclude Russ's testimony arguing it does not fit the question before the Court. GSK contends the question before the Court is whether Plaintiffs can prove that GSK's cGMP violations had a "material impact" on the drugs for which they paid. GSK asserts Russ proposes to testify only that GSK could not assure that the At-Issue Drugs were not impacted by the cGMP violations at the plant. GSK claims such testimony would confuse the jury and is irrelevant. GSK's argument is unpersuasive.

In denying GSK's motion to dismiss, this Court previously held "Plaintiffs [were] entitled prove that the nature of GSK's [cGMP] violations had a material impact on the drugs for which they paid." *See* Mem. 11, Nov. 9, 2016, ECF No. 105. Russ's report finds the Cidra Plant had significant fundamental failures in all six essential quality systems—which relate to a manufacturer's ability to certify a drug's purity, uniformity, quality, and manufacturing. The report concludes that, due to these chronic failures, GSK could not assure the At-Issue Drugs "conformed to their represented properties of safety, identity, strength, purity, and quality." GSK Mot. Ex. 4, at 9. This testimony fits the question in this case and is relevant because a reasonable jury could find GSK's cGMP violations had a material impact on the value of the At-Issue Drugs as GSK could not assure their conformance to their representative properties—i.e., their quality was not as labeled and advertised.

GSK also argues Russ's opinion fails the reliability test because (1) his opinion applies to every product made at the Cidra plant during the relevant time period, not just the At-Issue Drugs; (2) he has never used the phrase "material violation" before this litigation and it does not have the same meaning as "material impact"; and (3) he could not answer why the FDA chose to seize a certain drug manufactured at the Cidra Plant but concurrently stated consumers could continue to take another drug manufactured at the Cidra Plant with confidence. These arguments, however, go to the weight and credibility of Russ's testimony and can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Crowley*, 322 F. Supp. 2d at 536. Therefore, GSK's motion to exclude Russ's testimony will be denied.

**\*5** GSK next moves to exclude Dr. Kessler's expert opinion asserting it draws an impermissible legal conclusion. GSK contends Dr. Kessler's opinion is merely a legal conclusion because he seeks to interpret the "material impact" language

from the Court's November 9, 2016, Memorandum. GSK argues this is a legal term the Court must instruct the jury on, and therefore, Dr. Kessler may not opine on it.

GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact." Quoting the Court's November 9, 2016, Memorandum, Dr. Kessler seeks to opine on "what types of cGMP violations have a 'material impact' on a drug" and interpret the language in the Court's Memorandum. *See* GSK Mot. Ex. 8, at 2 ("The Court in this case cited the FDA's statement, then noted that Plaintiffs are entitled to show a "material impact" on drugs for which they paid. From a regulatory point of view, what types of cGMP violations can have a "material impact" on a drug?"). Allowing Dr. Kessler to opine on what constitutes a material impact on the case would run afoul of *Daubert* as it would allow Dr. Kessler to directly opine on the legal issue in this case. *See Whitmill v. City of Philadelphia*, 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998)("As a general rule an expert's testimony on issues of law is inadmissible.")(quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also In re Wellbutrin SR Antitrust Lit.*, Nos. 04-5525, 05-5898, 05-396, 2010 WL 8425189, at *3-5 (E.D. Pa. Mar. 31, 2010) (collecting cases and finding the experts in the instant case could testify about the background of patent law and procedure but could not testify about whether a previous patent lawsuit was objectively baseless—a legal issue in the case). Therefore, Dr. Kessler will be precluded from defining "material impact." However, Dr. Kessler will be permitted to testify about FDA regulations generally and how cGMP violations occur on a spectrum, including how violations range in severity and provide examples of how cGMP violations fall on that spectrum.[3] Therefore, GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact" during his testimony at trial.[4]

**\*6** Next, GSK moves to exclude Dr. Perri's testimony based on reliability.[5] GSK argues Dr. Perri's opinion must be excluded because he fails to explain or define the reliable methodology he used to come to his opinion. Specifically, GSK asserts Dr. Perri explains he applied "universally accepted principles of marketing," *see* GSK Mot. Ex. 8, at ¶ 11, but never defined the principles, applied specific principles, or explained why these principles would assist the jury in determining whether Plaintiffs would have removed the At-Issue Drugs from its formularies.

GSK's arguments are unpersuasive. While GSK focuses on the phrase "universal principles of marketing" to argue Dr. Perri's analysis is unreliable, Dr. Perri applies the case study method—an objective methodology—and consults additional academic sources regarding the pharmaceutical industry, to apply his own pharmaceutical and healthcare marketing experience to the facts of the instant case and draw his conclusions. *See generally id.* ¶ 13-75. As other courts have held, this is sufficient to meet the reliability prong under *Daubert*. *See Wolfe v. McNeil–PPC, Inc.*, No. 07–348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011) (finding three doctor's testimony sufficiently reliable where the doctors used the case study method and "extensive[ly] review[ed] of plaintiff's medical records and deposition testimony of plaintiff's treating physicians" and determined "the three doctors' use of case studies in reaching their conclusion affects only the weight to be given their testimony, not its admissibility...."); *Acosta v. WPN Corp.*, No. 14-1494, 2018 WL 3707418, at *6 (W.D. Pa. Aug. 3, 2018) (admitting expert testimony where the expert used "her experience and specialized knowledge" to discern a standard of fiduciary care and apply it to the facts of the case). In any event, the issues GSK takes with Dr. Perri's analysis pertain to the credibility and weight of Dr. Perri's testimony, which GSK may test through cross-examination and the presentation of contrary evidence. *See Crowley*, 322 F. Supp. 2d at 536.

GSK further asserts Dr. Perri's expert opinion should be excluded because it is similar to the excluded opinion he offered in *United States v. AseraCare, Inc.*, No 12-0245, 2014 WL 6879254, at *1 (N.D. Ala. Dec. 4, 2014). In *AseraCare*, the Government sought to offer Dr. Perri as a "marketing expert" to support its theory that an operator of hospice facilities knew it had submitted false Medicare claims. *Id.* at *11. To support his opinion, Dr. Perri relied on "universal principles of marketing." *Id.* at *12. The court ultimately excluded Dr. Perri's opinion, stating "Dr. Perri has no experience in the hospice industry, did not study any other hospice companies, and did not review any of the guidance from [the Centers for Medicare and Medicaid Services] regarding many of the topics on which he opined." *Id.* at *11. GSK contends *AseraCare* is nearly identical to this case, and the Court should therefore exclude Dr. Perri's testimony on the same grounds.

GSK's reliance in *AseraCare* is misplaced. Dr. Perri's opinion in *AseraCare* was excluded because he did not have *any* experience in the hospice industry and failed to explain why his universal principles of marketing methodology had any bearing in the hospice industry. *Id.* at *12. Unlike *AseraCare*, in the instant case, Dr. Perri has significant experience in the pharmaceutical marketing industry—a point which GSK does not dispute. *See* GSK Mot. Ex. 7, at ¶ 1-11 (discussing Dr. Perri's qualifications). Further, unlike *AseraCare*, Dr. Perri has connected his "universally accepted principles of marketing" to the pharmaceutical industry. *See id.* at ¶ 13-17 (describing marketing principles generally and how they apply in the pharmaceutical market). Therefore, the reasons for excluding Dr. Perri's testimony in *AseraCare* do not apply and GSK's motion to exclude Dr. Perri's testimony will be denied.

**\*7** Turning Dr. Schondelmeyer, GSK argues Dr. Schondelmeyer's testimony should be excluded because it is unreliable. GSK asserts Dr. Schondelmeyer's report states he provided his opinion as an "expert on economic and public policy issues," GSK Mot. Ex. 11, at ¶ 1, but when deposed he stated his opinion was "not really" economic in nature, *id.* Ex. 12, at 176:18-20. GSK further contends Dr. Schondelmeyer failed to tie his expert opinion to the facts of the case by failing to cite any source for his key opinions. The Court agrees with GSK and finds Dr. Schondelmeyer has failed to offer a reliable methodology as the basis for his opinion.

Initially, the type of expert analysis Dr. Schondelmeyer purports to provide is unclear. In his report, Dr. Schondelmeyer states he provides his opinion as an "independent expert on economic and public policy issues." GSK Mot. Ex. 11, at ¶ 1. However, in his deposition, he stated his opinion provides no economic analysis. *See id.* Ex. 12, at 176:18-20. Yet, in his reply report, Dr. Schondelmeyer states his opinion is that non-cGMP-compliant drugs have "no economic value," *id.* Ex. 13, at ¶ 5 ("Under federal law, materially non-compliant drugs cannot be lawfully distributed and sold. For payers acting within the law, therefore, such drugs have no economic value." (footnote omitted)). Adding further confusion is Plaintiffs' presentation of Dr. Schondelmeyer as a "healthcare insurance expert." *See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 17 ("Dr. Stephen Schondelmeyer (Plaintiffs' healthcare insurance expert)."). The Court is hard pressed to find an acceptable basis on which to allow Dr. Schondelmeyer to testify about non-cGMP-compliant drugs having "no economic value"

while claiming he is not providing an economic analysis and being offered as a healthcare expert.

In any event, Dr. Schondelmeyer provides no reliable basis for his opinions. In two brief paragraphs of his short six-page report, Dr. Schondelmeyer concludes that, based on his experience, insurers rely on a drug manufacturer's assurances regarding cGMP compliance and no insurer or third-party payer would pay for drugs with material cGMP violations. *See* GSK Mot. Ex. 11, at ¶ 18-19. Dr. Schondelmeyer's opinion, however, provides no more than a paradigm example of "say-so" expert testimony. While the Court does not doubt his qualifications and experience in the pharmaceutical industry, Dr. Schondelmeyer has failed to demonstrate or explain how his experience is reliably applied to the facts of this case. *See id.* ("My experience includes consulting for payers that provide drug benefits to insured individuals or beneficiaries, including, but not limited to, self-insured employers ... In my experience, no payer in the United States would knowingly and willingly pay for such materially non-compliant drug products."). Unlike Dr. Perri, whose experience-based testimony was applied to the instant case through the objective case study methodology and supplemented with additional academic sources, Dr. Schondelmeyer's experience-based testimony is *entirely subjective* and premised solely on his say-so, which cannot be adequately tested through cross-examination. *In re TMI Lit.*, 193 F.3d at 703 n.144 ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology."). The Court will therefore grant GSK's motion to exclude Dr. Schondelmeyer's testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."); *see also Player v. Motiva Enters., LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) (stating the "District Court certainly had the discretion to exclude opinion evidence that is connected to existing data only by the ipse dixit [or say-so] of the expert." (internal citations omitted)).

**\*8** Finally, GSK moves to exclude Dr. Conti's expert testimony on four grounds: (1) she impermissibly bases her opinion on a legal interpretation of the FDCA; (2) she provides no reliable economic methodology for her opinion;

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 92 of 172
PageID: 70635
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

(3) she improperly regurgitates Plaintiffs' allegations; and (4) she fails to account for the rebates Plaintiffs received for purchasing the At-Issue Drugs and fails to consider the cost of alternative treatment options. GSK's arguments to exclude Dr. Conti's testimony are unavailing.

First, Dr. Conti's testimony does not render an impermissible legal conclusion. Dr. Conti's expert report states the FDCA prevents companies from introducing adulterated drugs into the market place. *See* 21 U.S.C. § 331(a) ("The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."). According to Dr. Conti, based on this prohibition, economic principles state there is no legitimate supply curve for these drugs. *See, e.g.*, GSK Mot. Ex. 15, at ¶¶ 4, 38, 39. Because GSK Mot. Ex. 15, at ¶¶ 4, 38, 39. Because Dr. Conti is explaining the FDCA's prohibition on adulterated drugs —based on her own previous experience and discussions with pharmaceutical companies—and not providing a legal conclusion, she is not rendering an impermissible legal opinion. *See Hartle v. FirstEnergy Gen. Corp.*, Nos. 08–1019, 08–1025, 08–1030, 2014 WL 5089725, at *1-2 (W.D. Pa. Oct. 9, 2014) (permitting an expert to explain regulations but not offer an opinion on whether the defendant violated the provisions at issue).

Second, GSK's argument that Dr. Conti's expert opinion is not based on a reliable economic methodology is similarly without merit. As her expert report demonstrates, Dr. Conti relied on peer-reviewed journal articles, textbooks, studies regarding the economic value of drugs, *see id.* Ex. 17, at ¶ 9 n.15-16, conversations with providers and insurers, *see id.* Ex. 16, at 83:23-84:7, and the generally accepted economic principles of supply and demand in support of her opinion, *see id.* Ex. 15, at ¶ 38 ("There is no equilibrium between the demand for compliant prescription drugs and the supply of non-compliant drugs."). Dr. Conti has therefore provided a sufficient reliable basis and methodology for her expert opinion. *In re Paoli*, 35 F.3d at 744 ("[Proponents of expert testimony] do not have to demonstrate to the judge ... that the assessments of their experts are correct, they only have to demonstrate ... that their opinions are reliable."). To the extent GSK argues Dr. Conti's analysis is superficial and conclusory, this argument goes to the credibility of Dr. Conti's testimony and may be elicited through cross-examination. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("[T]he burden of exploring the facts and assumptions underlying the testimony of an expert witness [is placed] on opposing counsel during cross-examination.").

Third, GSK's argument that Dr. Conti merely parrots Plaintiffs' allegations because she lacks real-world experience as a third-party payor is not a reason to exclude Dr. Conti's testimony. GSK points to two lines in Dr. Conti's deposition where she said she is not a third-party payer and has never worked for one. *See* GSK Mot. Ex. 16, at 153:6-8 ("I'm not a third-party payer. I've never worked in a third-party payer"). And GSK argues Dr. Conti has no basis to opine on the value insurers assign to non-complaint drugs. GSK's argument again goes to the credibility and weight of Dr. Conti's testimony, not the admissibility of her opinion. *See Stecyk*, 295 F.3d at 414.

**\*9** Finally, Dr. Conti's damages calculation is not flawed for not factoring in any rebates Plaintiffs may have received for the At-Issue Drugs or any therapeutic alternatives they may have had to cover as a result of discontinuing coverage for the At-Issue Drugs. GSK's argument that Dr. Conti should have reduced her damages amount—as suggested by GSK's expert Dr. Mohan Rao—is not a basis to exclude Dr. Conti's analysis. Rather, it demonstrates a fact question the jury must resolve because it requires a credibility determination and comparison of each expert's methodology. *Compare* GSK Mot. Ex. 15, at ¶ 43 ("Based on my assessment that spending on prescription drugs cannot be separated from the quality manufacturing assured by the manufacturer and overseen by government regulators, non-compliant prescription drugs have no economic value. Therefore, the appropriate measure of damages in this matter is the total amount paid....") *with* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. 222, at ¶ 48 ("Dr. Conti fails to account for rebates received by Plaintiffs after the initial reimbursement of a claim, causing her to overstate Plaintiffs' purchases by approximately 8 percent. She also fails to deduct payments on claims where Plaintiffs served in an administrative role only...."). Accordingly, GSK's motion to exclude Dr. Conti's testimony will be denied. *See In re Asbestos Prods. Liab. Lit. (No. VI)*, 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010) ("[I]t is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.").

**CONCLUSION**

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

In sum, GSK's motion to exclude will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the motion will be denied.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4751883

# Footnotes

1    At the time of filing, 41 private health insurance companies were named as plaintiffs in this action. Since filing, three plaintiffs—Blue Cross of Idaho Health Service, Inc., Health Care Services Corporation, and Horizon Blue Cross Blue Shield of New Jersey—have settled with GSK.

2    In light of the Court having provided a detailed recitation of the facts of this case in its September 30, 2019, Memorandum granting in part and denying in part GSK's Motion for Summary Judgment, the Court will not further discuss the factual background of this case.

3    GSK also moves to exclude Dr. Kessler's opinion on what constitutes a "material impact" because there is no FDA practice or policy grounding his opinion. However, because the Court will prevent Dr. Kessler from defining "material impact," GSK's argument is moot.

4    GSK directs the Court to a handful of cases, which it asserts demonstrate that Dr. Kessler's testimony has regularly been excluded. However, in the majority of the cases GSK relies on, Dr. Kessler's testimony was not excluded but merely narrowed. *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-02641, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Dr. Kessler is qualified to opine on FDA regulatory issues that relate to Bard filters, and his testimony in this regard would prove helpful to the jury. But no expert, including Dr. Kessler, will be permitted to give ultimate legal opinions on state law claims, improperly narrate or regurgitate facts, or speculate about motives or intent."); Order, *Bartolini v. Abbott Labs., Inc.*, No. 15-702 (S.D. Ill. May 23, 2017), ECF No. 277 (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *In re Prograf Antitrust Litig.*, No. 11-2242, 2014 WL 7641156, at *2-3 (D. Mass. Dec. 23, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *Drake v. Allergan, Inc.*, No. 13-234, 2014 WL 5392995, at *5-6 (D. Vt. Oct. 23, 2014) ("Allergan's Motion [to exclude Dr. Kessler's testimony] is granted to the extent it sought the general guidance given above and denied to the extent that some objections will have to be raised at trial"); *Allen v. Takeda Pharm. N.A., Inc.*, Nos. 11-2299, 12-64, 2014 WL 120973, at *4-19 (W.D. La. Jan. 10, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *Wells v. Allergan*, No. 12-973, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (allowing defendants to object at trial if Dr. Kessler speculates or regurgitates facts).

5    GSK's motion to exclude also states GSK seeks to exclude Dr. Perri's testimony on the basis of fit. *See* GSK Mot. 1. GSK's arguments, however, all pertain to the reliability of Dr. Perri's opinion.

---

**End of Document**                                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

7

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 95 of 172
PageID: 70638
Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re LIBOR-Based Financial Instruments Antitrust Litigation, S.D.N.Y., February 28, 2018

2013 WL 5658790
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

GE DANDONG et al., Plaintiffs,

v.

PINNACLE PERFORMANCE LTD. et al., Defendants.

No. 10 Civ. 8086(JMF).
|
Oct. 17, 2013.

*OPINION AND ORDER*

JESSE M. FURMAN, District Judge.

**\*1** In this action, a group of Singapore investors assert various claims against Morgan Stanley & Co. and certain of its affiliates related to a series of credit–linked notes (the "Pinnacle Notes" or "Notes") issued by Defendant Pinnacle Performance Limited. Before the Court are two motions. First, named Plaintiffs—Ge Dandong, Loh Tuck Woh Peter, the Singapore Government Staff Credit Cooperative Society, Ltd. ("SGSCCS"), Ni Yan Amy, Ang Soo Cheng, Choh Gek Hong Johnson, Ng Shook Phin Susan, and Zhao Yuzheng

—move, pursuant to 🚩 Rule 23 of the Federal Rules of Civil Procedure, for certification of a proposed class. Second, Defendants move, pursuant to Rule 702 of the Federal Rules of Evidence, to exclude the declarations of Plaintiffs' proffered experts Ilya Eric Kolchinsky and Craig A. Wolson. For the reasons that follow, Plaintiffs' motion to certify the class is GRANTED, and Defendants' motion to exclude the expert declarations is DENIED in part as moot and in part on the merits.

**BACKGROUND**

The background of this action is complex and summarized in greater detail in prior opinions of this Court and the Court of Appeals, familiarity with which is assumed. *See, e.g., Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong I* ), No.

10 Civ. 8086(LBS), 🚩 2011 WL 5170293 (S.D.N.Y. Oct.31, 2011); *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong II* ), No. 10 Civ. 8086(LBS), 🚩 2011 WL 6156743 (S.D.N.Y. Dec.12, 2011), *aff'd sub nom. Lam Yeen Leng v. Pinnacle Performance Ltd.,* 474 F. App'x 810, 814 (2d Cir.2012) (summary order); *Ge Dandong v. Pinnacle Performance Ltd.* (*Dandong III* ), ——F.Supp.2d. ——, 2013 WL 4482509, at *13 (S.D.N.Y. Aug.22, 2013).

Plaintiffs are retail investors who purchased the Notes from various distributor banks based in Asia between August 2006 and December 2007. The Notes are a type of credit derivative known as a credit-linked note ("CLN"), which Defendants structured and issued in seven series during 2006 and 2007. (*See* McNeela Decl. (Docket No. 143) Ex. 3 at ii; *id.* Ex. 4 at ii; *id.* Ex. 5 at ii; *id* . Ex. 6 at SING0003533; *id.* Ex. 7 at SING0000964). Credit-linked notes shift the credit risk associated with certain Reference Entities ("REs") from a "protection buyer" (typically the bank arranging the CLNs) to a "protection seller" (the CLN investors). As Judge Sand—to whom this case was previously assigned—explained in his October 31, 2011 opinion, CLNs are typically created as follows:

> First, the bank arranging the CLNs creates a Special Purpose Vehicle ("SPV") to issue the CLNs. The SPV is generally ... an orphan company owned by a trustee that will not appear on the balance sheet of any party to the transaction. The bank then buys protection from the SPV in the amount of the CLNs that will be issued to investors insuring it against the possibility that the REs would experience a credit event, such as a default. The name given to this particular transaction is a credit default swap, and this is, in effect, a derivative contract that functions like a form of insurance. Second, the SPV sells the CLNs to investors and uses the principal it receives therefrom to purchase highly-rated securities, or underlying assets, which serve as collateral in the event the REs default.... Third, in return for assuming

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 96 of 172
PageID: 70639
Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

the risk, investors receive interest in the form of (i) credit protection payments from the sponsoring bank and (ii) any interest generated by the underlying assets. Assuming that no credit event occurs, investors will receive the redemption value of the Note.

**\*2** *Dandong I,* 2011 WL 5170293, at \*1 (internal quotation marks and citations omitted).

As Judge Sand also explained, "[g]enerally ... from the perspective of the investor, the single most important risk exposure in a CLN is the credit risk associated with the reference entities." *Id.* at \*2 (internal quotation marks and alterations omitted). Yet, Plaintiffs contend, "[r]ather than invest [their] principal in low-risk underlying assets, [Defendants] invested in high-risk synthetic collateralized debt obligations," *id.,* that they themselves issued (the "ACES CDOs"). Even worse, Plaintiffs argue, Defendants "shorted"—that is, bet against—the ACES CDOs that were to serve as the underlying assets for the Notes (Compl. ¶ 77 (Docket No. 1)), creating a situation in which Defendant "MS Capital stood to profit in the event that the pool of assets performed poorly, while the investors suffered losses." *Dandong I,* 2011 WL 5170293, at \*2.

Plaintiffs commenced this action on October 25, 2010. (Compl. (Docket No. 1)). At bottom, they allege that each series of Pinnacle Notes was sold pursuant to a set of documents (the "Offering Documents") that failed to reveal the true nature of the financial arrangement. The Offering Documents for each series comprised (1) a Base Prospectus common to all the Pinnacle Notes; (2) a Pricing Statement specific to the series; and (3) a two-page Brochure purporting to provide a "Summary of Terms" with respect to the series. (Compl.¶ ¶ 247–51). According to the Complaint, these documents were materially false and misleading in various ways, including "by portraying the synthetic CDOs as one choice ... for the Underlying Asset," when "in truth investment in the Synthetic CDOs was certain" (Compl.¶ 254), and by failing to disclose that Defendant "Morgan Stanley created the synthetic CDOs to be used as Underlying Assets and ... possessed opposed interests ... to those of Plaintiffs." (Compl. ¶ 266).

Defendants filed a motion to dismiss the Complaint and, in October 2011, Judge Sand granted in part and denied in part their motion. The Court allowed the Plaintiffs' claims for, *inter alia,* fraud, fraudulent inducement, and breach of the implied covenant of good faith and fair dealing to proceed. *See* *Dandong I,* 2011 WL 5170293, at \*16. Defendants subsequently sought an anti-suit injunction from the High Court of the Republic of Singapore; in response, Judge Sand issued an anti-anti-suit injunction, preventing Defendants from further prosecuting their injunction application in Singapore, *see* *Dandong II,* 2011 WL 6156743, at \*1. Judge Sand's injunction was affirmed by the Second Circuit on interlocutory review, but the Court of Appeals nonetheless remanded the case because it found that Judge Sand had erred in not addressing whether there was personal jurisdiction over Defendant Pinnacle Performance Limited. *See Lam Yeen Leng,* 474 F. App'x 810. The Circuit did not address whether Judge Sand had properly ruled on Defendants' motion to dismiss. *See id.*

**\*3** On remand, Plaintiffs filed an Amended Complaint (Docket No. 109), which Defendants again moved to dismiss. This time, Defendant Morgan Stanley moved to dismiss on the grounds, among others, that "subsequent developments render[ed] the Amended Complaint's core fraud allegation implausible as a matter of law" and that the "Plaintiff[s] ... testified that they did not read or could not remember reading the Pinnacle Notes offering documents that the Amended Complaint alleges Plaintiffs relied on." (Morgan Stanley Mem. in Supp. Mot. To Dismiss 1 (Docket No. 122)). The Court granted Morgan Stanley's motion to dismiss with respect to Plaintiffs' claim of aiding and abetting breach of the implied covenant of good faith and fair dealing, but otherwise denied the motion. *See Dandong III,* 2013 WL 4482509, at \*13. That is, Plaintiffs' claims for fraud, aiding and abetting fraud, fraudulent inducement, aiding and abetting fraudulent inducement, and breach of the covenant of good faith and fair dealing all survived. (Am.Compl.¶¶ 289–330).

As noted, there are now two motions pending before this Court. First, Plaintiffs move pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify the following class:

All persons who purchased Pinnacle Notes Series 1, 2, 3, 6, 7, 9, and 10 or their successors in interest and

thereby suffered damages, excluding: the Defendants named herein; any of Defendants' Officers or Directors or their immediate family members; or any firm trust, partnership, corporation, or entity in which a Defendant or its Officers or Directors or their immediate family members, has a controlling interest.

(Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification ("Pls.' Cert. Mem.") 1 (Docket No. 142)). Plaintiffs also seek the appointment of the named Plaintiffs as class representatives, as well as the appointment of Kirby McInerney LLP as lead class counsel. (*Id.*) Second, Defendants move pursuant to Rule 702 of the Federal Rules of Evidence to exclude two expert declarations filed by Plaintiffs in support of their motion for class certification, namely the declarations of Craig A. Wolson (Docket No. 146), and Ilya Eric Kolchinsky (Docket No. 147). (*See* Memorandum of Law in Support of Defendants' Motion to Exclude the Declarations of Plaintiffs' Experts Ilya Eric Kolchinsky and Craig A. Wolson ("Defs.' Exclusion Mem.") (Docket No. 155)). The Court will address the two motions in turn.

### DISCUSSION

**A. Class Certification**

Rule 23 governs class certification. A party seeking class certification must first meet the requirements of Rule 23(a), namely: numerosity, commonality, typicality, and adequacy of representation. *See* Fed.R.Civ.P. 23(a). If those threshold requirements are met, the proposed class must also fit within one of the subdivisions of Rule 23(b). *See* Fed.R.Civ.P. 23(b); *see also, e.g.,* *Brown v. Kelly,* 609 F.3d 467, 475–76 (2d Cir.2010). Here, Plaintiffs propose a Rule 23(b)(3) damages class (Pls .' Cert. Mem. 16), which means that it must meet Rule 23(b)(3)'s requirements that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

**\*4** In evaluating a motion for class certification, a district court is required to evaluate compliance with each of Rule 23's requirements, even if that requires considerations of merits issues. *See, e. g., Levitt v. J.P. Morgan Sec.,* 710 F.3d 454, 465 (2d Cir.2013). In making such determinations, however, a district judge "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 40 (2d Cir.2006); *see also* *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, —— – ——, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent— but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). "The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification. *Levitt,* 710 F.3d at 465, and Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend,* —— U.S. ——, ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (internal quotation marks omitted). Instead, the party seeking certification must "satisfy through evidentiary proof" compliance with the Rule. *Id.* In evaluating whether the moving party has done so, the Court must engage in a "rigorous analysis" in which it is permitted to "probe behind the pleadings before coming to rest on the certification question." *Id.* (internal quotation marks omitted). The party seeking certification meets its burden by establishing that the requirements have been met by a preponderance of the evidence. *See* *Levitt,* 710 F.3d at 465.

**1. The Rule 23(a) Prerequisites**

**i. Numerosity**

The first requirement for class certification is that the class "is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). The Second Circuit has held that "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). Plaintiffs' counsel has been retained by more than 200 Notes investors (McNeela Decl. ¶ 2), and Defendants do not contest the numerosity requirement.

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 98 of 172
PageID: 70641
*Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)*

(Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Defs.' Cert. Mem.") (Docket No. 152) 27 n. 22). The Court thus concludes that the class meets the numerosity requirement of Rule 23(a)(1).

### ii. Commonality

The second requirement for class certification is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Members of the class must have claims that "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). The test for commonality, however, "is not demanding and is met so long as there is at least one issue common to the class." *Linsley v. FMS Inv. Corp.,* 288 F.R.D. 11, 15 (D.Conn.2013) (internal quotation marks omitted).

**\*5** Plaintiffs have met this burden. They have put forth numerous issues that are common to the class including, *inter alia,* "[w]ether Defendants withheld information regarding the Pinnacle Notes' Underlying Assets ... from the investors" (Pls.' Cert. Mem. 19); "whether Defendants acted with scienter when they omitted material facts" (*id.*); and whether Defendants engaged in behavior that they argue constitutes bad faith. (Pls.' Mem. 20). *See also Dandong I,* 2011 WL 5170293 at \*10–16. These issues, which can be resolved on a class-wide basis, are indeed central to the validity of the claims in this litigation. Defendants do not contest the commonality requirement except "to the extent it affects whether Plaintiffs satisfy Rule 23(b)(3)'s predominance requirement" (Defs.' Cert. Mem. 27 n. 22), an issue addressed separately below. The commonality requirement has thus been met.

### iii. Typicality

The third Rule 23(a) requirement is that "the claims or defenses of the representative parties are typical of [those of] the class." Fed.R.Civ.P. 23(a)(3). The Supreme Court has observed that "the commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d

740 (1982). More specifically, typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Sykes v. Mel Harris & Assocs., LLC,* 285 F.R.D. 279, 287 (S.D.N.Y.2012) (quoting *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001)).

Here, Plaintiffs argue that typicality is satisfied because the named Plaintiffs, "like all Class members, purchased the Notes pursuant to a uniform application procedure and allege that they were defrauded and suffered damages due to Defendants' undisclosed self-dealing." (Pls.' Cert. Mem. 20–21). Defendants counter that the named Plaintiffs are not typical because they are exposed to "unique defenses." (Defs.' Cert. Mem. 27). In particular, Defendants claim that the named Plaintiffs are exposed to unique defenses because (1) they "did not read (or could not recall reading) the Pinnacle Notes Offering Documents" (Defs.' Cert. Mem. 28); and (2) of the named Plaintiffs' "individual experiences when investing in" the Notes. (*Id.*). These arguments do not survive scrutiny.

Reformulated, Defendants' first challenge to the typicality requirement is that because the named Plaintiffs did not read the Offering Documents, their claims are subject to the unique defense that they cannot establish the reliance element required for a common law fraud claim. *See, e.g., Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir.2001) (noting that a common law fraud claim requires, *inter alia,* "a misrepresentation or omission of material fact ... upon which the plaintiff reasonably relied"). Defendants point out that none of the named Plaintiffs could recall reading the Base Prospectus or the Pricing Statements (Defs.' Cert. Mem 5–6) and argue that "if putative class members had—unlike the [named Plaintiffs]—actually *read* the Pinnacle Notes Offering Documents," the named Plaintiffs would be subject to unique defenses. (*Id.* 28).

**\*6** Ultimately, this argument fails. First, although it is true that each of the named Plaintiffs appears to have admitted failing to review both the Base Prospectus and the Pricing Statements,[1] Defendants have not established that this failure is unique to the named Plaintiffs. That is, it may well be that *none* of the class members— be they class representatives or not—reviewed the Base Prospectus and the Pricing Statements. Second, it appears that Plaintiffs can establish reliance on another document: the Brochures. Each named Plaintiff appears to have

reviewed the Brochures, [2] and the Brochures all contained one of the allegedly misleading statements, namely that "[t]he Notes will be secured by, *amongst other assets,* (i) *Underlying Assets which may include* AA-rated or higher rated U.S. Dollar denominated portfolio credit-linked securities (i.e. Synthetic CDO securities), and (ii) the Swap Arrangements)." (Am.Compl.¶ 154) (emphasis in Am. Compl.); *see also* McNeela Decl. Ex. 3 at iii; *id.* Ex. 4 at iii; *id.* Ex. 5 at iii; *id.* Ex. 6 at SING0003534; *id.* Ex. 7 at SING0000965).

Defendants counter that, as a matter of law, Plaintiffs cannot establish reasonable reliance on sales brochures (Defs.' Cert. Mem. 19), but this argument is unavailing, at least at this stage of the litigation. Defendants point to three cases to support their position: *Hunt v. Alliance North American Government Income Trust,* 159 F.3d 723 (2d Cir.1998), *McCoy v. Goldberg,* 883 F.Supp. 927 (S.D.N.Y.1995), and *Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.,* 919 F.Supp. 149 (S.D.N.Y.1996). Yet these cases merely stand for the proposition that when an investor relies on misrepresentations in a sales brochure but could have discovered the true nature of the product being advertised by looking at other documents, reliance on the sales brochure is unreasonable. *See Hunt,* 159 F.3d at 730 ("Minimal diligence in this case would have included consulting the prospectuses, ... which contained disclosures broad enough to cover [the alleged omissions from the sales brochures.]"); *McCoy,* 883 F.Supp. at 935 ("[A]n investor [can]not justifiably rely on optimistic statements concerning the risk and profitability of an investment, whether made in a summary brochure or orally, when the total mix of information adequately disclosed the investment's riskiness." (internal quotation marks omitted)). [3] Here, as Judge Sand found, "[d]efendants have proffered nothing to suggest that investors ... were 'practically faced with the facts,' or that they had 'access to truth-revealing information." *Dandong I,* 2011 WL 5170293, at *14; *see also Dandong III,* 2013 WL 4482509, at *12. The named Plaintiffs, in other words, could not have discovered the nature of the alleged fraud by consulting other documents. At this class certification stage, Defendants have submitted no additional information to call this finding into question. The named Plaintiffs can, therefore, establish reliance by virtue of their review of the Brochures.

*7 Defendants' second challenge to the typicality requirement also falls short. Without specifying what, exactly, the defenses are, Defendants claim that "several [named Plaintiffs] are exposed to different unique defenses based on their individual experiences when investing in Pinnacle Notes." (Defs.' Mem. 28). For example, Defendants contend that (1) Plaintiff Ang Soo Cheng is subject to unique defenses based on his prior investment experience; (2) Plaintiff Ge Dandong tried, but was ultimately unable, to cancel her investment before the offer period for Series 1 had closed; and (3) Plaintiff Ng Shook Phin Susan was coached by her financial advisor on what to say to receive compensation. (*Id.*) But while such experiences may ultimately subject these three named Plaintiffs to defenses not available against other class members, unique defenses defeat the typicality requirement only when they "threaten to become the focus of the litigation." *In re Livent, Inc. Noteholders Sec. Litig.,* 211 F.R.D. 219, 224 (S.D.N.Y.2002) (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)). These defenses are far too idiosyncratic to meet that standard. Because "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability," *Sykes,* 285 F.R.D. at 287, the Court finds the typicality requirement satisfied.

### iv. Adequacy of Representation

Finally, Rule 23(a)(4) requires a certifying court to determine that the class representatives will "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). In particular, the Court must inquire as to whether "(1) the plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir.2007).

Plaintiffs satisfy both conditions. Although Defendants contend that Plaintiffs fail the first inquiry because the named Plaintiffs "are not involved in this case" (Defs.' Mem. 29), the extent of the named Plaintiffs' involvement is sufficient here, particularly given the nature of the case. *See, e.g., In re Omnicom Grp., Inc. Sec. Litig.,* 02 Civ. 4483(RCC), 2007 WL 1280640, at *6 (S.D.N.Y. Apr. 30, 2007) ("[I] n 'complex securities litigation, named plaintiffs are not expected to possess expert knowledge of the details of the case and must

be expected to rely on expert counsel.' " (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 61 (2d Cir.2000))). The named Plaintiffs have demonstrated a basic understanding of the nature of their claims (*see, e.g.,* McNeela Decl. Ex. 52 at 188:25–189:6; Ex. 53 at 169:14–24), the case's procedural posture (*see, e.g., id.* Ex. 52 at 228:10–17; Ex. 56 at 195:3–12), their duties as class representatives (*see, e.g., id.* Ex. 52 at 210:11–23; Ex. 54 at 185:10–15; Ex. 55 at 161:11–20), and they have remained at least somewhat active in monitoring the litigation (*see, e.g., id.* Ex. 52 at 206:24–207:8; Ex. 54 at 176:9–19). The fact that some of them exhibited confusion about the case (*see, e.g.,* Cattell Decl. Ex. 10 at 205:25–206:7; Ex. 12 at 182:16–24) and admitted to relying on their lawyers (*see, e.g., id.* Ex. 9 at 168:11–13; Ex. 11 at 121:11–122:8) does not render them so ignorant as to be "unable or unwilling to protect the interests of the class." *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76, 88 (S.D.N.Y.2007) (quoting *Baffa,* 222 F.3d at 61).

**\*8** As to the second inquiry, there is no question that counsel is qualified to conduct the litigation. Defendants do not challenge Kirby McInerney's competence, and the firm has a demonstrated history of success in commercial class litigation. (*See* McNeela Decl. Ex. 51 at 27–32). Accordingly, Plaintiffs have met their burden under Rule 23(a)(4).

### 2. The Rule 23(b) Requirements

As noted above, a class action must not only meet the four prerequisites of Rule 23(a); it must also satisfy the requirements of Rule 23(b). Here, as noted also, Plaintiffs proceed under Rule 23(b)(3), which requires a showing that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court will address each requirement in turn.

### i. Predominance

The requirement that common questions predominate over individual ones is similar to, but more demanding than, the commonality prerequisite of Rule 23(a). *See, e.g., Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and it is satisfied if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues," *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 2013 WL 4609219, at \*7 (2d Cir. Aug.30, 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 131 (2d Cir.2010)). For common questions to predominate over individual ones, it is not necessary for "each element of plaintiff['s'] claims [to be] susceptible to classwide proof," but only for "common questions [to] predominate over any questions affecting only individual class members." *Amgen,* 133 S.Ct. at 1210 (internal quotation marks and alterations omitted).

As discussed in the context of the commonality requirement, Plaintiffs posit a number of common questions that could be resolved if these case proceeded on a class-wide basis. Some of these questions relate to Plaintiffs' fraud and fraudulent inducement claims, while others relate to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. Accordingly, the Court evaluates the predominance requirement in two parts: first, with respect to the fraudbased claims, and second, with respect to the implied covenant claims.

#### a. Fraud and Fraudulent Inducement

To state a claim for common law fraud or fraudulent inducement under New York law, a plaintiff must demonstrate: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn,* 273 F.3d at 156 (citing *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)); *see State v. Indus. Site Servs., Inc.,* 52 A.D.3d 1153, 862 N.Y.S.2d 118, 121–22 (3d Dep't 2008) (reciting these same elements for a fraudulent inducement claim); *Petrello v. White,* 412 F.Supp.2d 215, 226–27 (E.D.N.Y.2006) (same); *see also Twin Holdings of Del. LLC v. CW Capital, LLC,* No. 005193/09, 2010 WL 309022, at \*9 (N.Y.Sup.Ct. Jan.19,

2010) (stating that the elements for fraudulent inducement are the same as those required for fraud). Plaintiffs put forth three common questions relevant to their fraud-based claims: (1) "[w]hether Defendants withheld information regarding the Pinnacle Notes' Underlying Assets, including conflicts of interest, from the investors" (Pls.' Cert. Mem. 19); (2) "[w]hether the omitted information was material and whether Defendants acted with scienter when they omitted material facts" (*id*); and (3) "[w]hether Defendants' misconduct injured Plaintiffs." (*Id.*). Noting that reliance cannot be presumed in this case, however, Defendants contend that these questions are overwhelmed by individual questions of reliance—in other words, that these questions do not predominate with respect to Plaintiffs' fraud-based claims. (Defs.' Cert. Mem. 13–14).

**\*9** Defendants are certainly correct that reliance cannot be presumed here. The fraud-on-the-market presumption of reliance that applies in federal securities claims under Rule 10b–5 does not apply to a common law fraud action. *See, e.g., Secs. Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 72 (2d Cir.2000). Likewise, courts in this district have refused to import the so-called *Affiliated Ute* presumption—a presumption of reliance for misleading omissions—into common law fraud claims. *Int'l Fund Mgmt. S.A. v. Citigroup, Inc.,* 822 F.Supp.2d 368, 387 (S.D.N.Y.2011) (collecting cases discussing *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). Instead, "the requisite reliance is actual reliance." *Id.* And in order to prove such reliance, each individual Plaintiff must demonstrate that the misrepresentation or omission was a "substantial factor in inducing [him or her] to act the way that [he or she] did." *Curiale v. Peat, Matwick, Mitchell & Co.,* 214 A.D.2d 16, 27, 630 N.Y.S.2d 996 (1st Dep't 1995); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,* 269 F.R.D. 252, 261 (S.D.N.Y.2010).

It does not follow, however, that individual issues "predominate as a matter of law," as Defendants argue. (Defs.' Mem. 15). To be sure, "[c]ertification is inappropriate where 'reliance is too individualized to admit of common proof.' " *In re U.S. Foodservice Pricing Litig.,* 729 F.3d 108, 2013 WL 4609219, at \*8 (quoting *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 224–25 (2d Cir.2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.,*

553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008)). But the obverse of that statement is also true. That is, the Second Circuit has made clear that "fraud-based claims" are not "entirely beyond the reach of Rule 23," and that where each plaintiff can prove reliance " 'through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue),' " certification may well be appropriate. *Id.* (quoting *Klay v. Humana, Inc.,* 382 F.3d 1241, 1259 (11th Cir.2004), *abrogated on other grounds by Bridge,* 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012). As that Court put it in *McLaughlin,* "proof of reliance by circumstantial evidence may be sufficient under certain conditions." 522 F.3d at 225. For example, in the context of a financial transaction—which "does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase"—payment alone "may constitute circumstantial proof of reliance upon a financial representation." *Id.* at 225 n. 7.

In light of this case law, many courts in this Circuit and beyond have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product. *See, e.g., Seekamp v. It's Huge,* 09 Civ. 00018 (LEK/DRH), 2012 WL 860364, at \*10 (N.D.N.Y. Mar. 13, 2012) (reliance could be proved through purchase of product where "every plaintiff would have relied on the [allegedly misleading] ... representation of the [product's] legality and beneficialness in deciding whether to purchase it"); *Spencer v. Hartford,* 256 F.R.D. 284, 301–303 (D.Conn.2009) (reliance could be proved through plaintiffs' acceptance of structured settlements where quotation documents were alleged to be misleading); *Klay v. Humana, Inc.,* 382 F.3d 1241, 1259 (5th Cir.2004) (reliance could be proved through doctors' entrance into HMO contracts when defendant HMOs allegedly misrepresented that they would reimburse doctors for medically necessary services provided to insureds).

**\*10** Defendants argue that these cases are "no longer good law" in light of the Supreme Court's decision last February in *Amgen.* (Defs.' Cert. Mem. 20). The *Amgen* Court did observe that, in a suit not subject to the fraud-on-the-market presumption, "[i]ndividualized reliance issues would predominate" and "[t]he litigation, therefore, could

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 102 of 172
PageID: 70645
Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

not be certified under Rule 23(b)(3) as a class action." 133 S.Ct. at 1199. But that observation was *dictum* and, read in context, is little more than an acknowledgement of the uncontroversial proposition that, absent a fraud-on-the-market presumption, individual reliance issues often preclude class certification in fraud cases. *See also* id. at 1193 ("Absent the fraud-on-the-market theory, the requirement that [securities fraud] plaintiffs establish reliance would *ordinarily* preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." (emphasis added)). There is thus no basis to read the passing remark as abrogating widespread circuit court precedent. And were there any doubt on that score, it would be resolved by the Second Circuit's more recent decision in *In re U.S. Foodservice Pricing Litigation,* which expressly reaffirmed that the mere fact that class members have to show causation "by establishing reliance on a defendant's misrepresentations ... does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate." 729 F.3d 108, 2013 WL 4609219, at *8 (citing *McLaughlin,* 522 F.3d at 224–25).

The question, then, is whether Plaintiffs in this case can prove reliance on a class-wide basis through common, circumstantial evidence. For purposes of class certification, the Court concludes that they can. Like the misrepresentations in *Seekamp, Spencer,* and *Klay,* the alleged misrepresentations and omissions here were so fundamental to the value of the Notes that it is hard to imagine a reasonable investor purchasing them if the Offering Documents had revealed their true nature. If Plaintiffs had known that Morgan Stanley would select the ACES CDOs—a risky asset whose depreciation would *benefit* a Morgan Stanley affiliate—as the source of funds that Plaintiffs would receive in the absence of a Reference Entity credit event, it stands to reason that Plaintiffs would not have purchased the Notes in the first place. (*See* Wolson Decl. ¶¶ 2.07, 5.01, 5.02). The Notes were not the type of product that individuals purchase for "any number of reasons," *McLaughlin,* 522 F.3d at 225; they were financial investments that Plaintiffs made in hopes that they would prove profitable. Further, the Brochures, which failed to disclose Defendants' conflict of interest and included an allegedly misleading description of the Underlying Assets, contained the same allegedly misleading language across all

seven series, (McNeela Decl. Ex. 3 at iii; *id.* Ex. 4 at iii; *id.* Ex. 5 at iii; *id.* Ex. 6 at SING0003534; *id.* Ex. 7 at SING0000965), were provided to all class members, (McNeela Decl. Ex. 13 ¶¶ 1–3), and were reviewed by each of the Plaintiffs making their purchasing decisions (see *supra* n. 2).

**\*11** This is not, as Defendants contend, "just a version of the fraud created the market presumption." (Defs.' Cert. Mem. 24). The Court cannot—and does not—presume, as a matter of *law,* that the element of reliance is satisfied for each putative class member. Instead, the Court concludes, based on the evidence in the record at this stage of the proceedings, that "a reasonable factfinder [could] conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' [uniform] representations." *Klay,* 382 F.3d at 1259. That is, "while each plaintiff must prove reliance, he or she may do so"—in *this* case—"through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)." *In re U.S. Foodservice Pricing Litig.,* 729 F.3d 108, 2013 WL 4609219, at *8 (quoting *Klay,* 382 F.3d at 1259).

*Abu Dhabi Commercial Bank,* upon which Defendants rely (Defs.' Cert. Mem. 17–18, 22), is therefore distinguishable. In that case, the Court refused to certify a common law fraud class action on behalf of three institutional investors who had acquired certain notes issued by a structured investment vehicle. *See* 269 F.R.D. at 253–54. But there, unlike here, "the record evidence reveal[ed] material differences among investors with regard to their decision making processes, investment guidelines, due diligence inquiries, and communications with those involved in selling the Rated Notes." *Id.* at 261. Indeed, there was concrete evidence that some investors "chose not to rely—or relied only minimally—on the [alleged misrepresentations in] credit ratings prior to investing in the Rated Notes." *Id.* at 265; *see also* id. at 262. In fact, some investors made their investment decisions *"before* the ratings were issued ..., rendering it unlikely that any rating played a substantial role in those investors' decisions to invest." *Id.* at 261 (emphasis in original). Additionally, the "information memoranda and marketing materials" that were the source of the misrepresentations in *Abu Dhabi* varied between the different notes, and they were modified over time. *See id.* at 263. Furthermore, Defendants "prepared no less than fifty-six individualized memoranda to

potential ... investors answering questions and due diligence inquiries by these investors." *Id.* In short, individualized reliance issues plainly predominated in that case given the facts. Not so here.

Finally, while Defendants point to some "non-uniform" conversations putative class members had about the Notes with the Distributors (*see* Defs.' Mem. 7–9; 17) and with the putative class members' own personal financial advisors (*see* Defs.' Mem. 9–10; 17), none of these conversations—either alone or taken together—demonstrates that Plaintiffs cannot establish reliance through common, circumstantial evidence. New York law does not require Defendants' misrepresentations and omissions to have been the only considerations that Plaintiffs relied upon in deciding to purchase the Notes. *See, e.g., Phillips v. Better Homes Depot, Inc.,* No. 02–CV–1168 (ERK), 2003 WL 25867736, at *12 (E.D.N.Y. Nov.12, 2003) (" 'In fraud actions, the fraudulent representations complained of need not be the sole consideration or inducement moving a plaintiff ....' " (alteration omitted) (quoting 37 Am.Jur.2d Fraud and Deceit § 245)). Instead, the misrepresentation or omission need only have been a "substantial factor in inducing [Plaintiffs] to act the way that [they] did." *Curiale v. Peat, Matwick, Mitchell & Co.,* 214 A.D.2d 16, 27, 630 N.Y.S.2d 996 (1st Dep't 1995). At most, the conversations Defendants point to demonstrate that some putative class members had more than one reason for purchasing the Notes; they do not, however, contradict the notion that putative class members relied on Defendants' alleged misrepresentations and omissions as well. *See Seekamp,* 2012 WL 860364, at *10 (finding predominance met in fraud action even where "each proposed class member may have opted to purchase the [product in question] for different reasons"); *Spencer,* 256 F.R.D. at 303 (finding predominance met fraud action notwithstanding that "each plaintiff may have accepted his or her [allegedly fraudulent] settlement for somewhat different reasons"). Accordingly, the Court finds that common questions of law and fact with respect to Plaintiffs' fraud and fraudulent inducement claims will predominate over any individual issues of reliance that may exist.

### b. Implied Covenant of Good Faith and Fair Dealing

**\*12** New York law implies a covenant of good faith and fair dealing in all contracts, which "embraces a pledge that neither party shall do anything which shall have the effect of destroying or injuring the right of the other party

to receive the fruits of the contract." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 169 (2d Cir.2004) (citation omitted). In the Amended Complaint, Plaintiffs alleged that all Defendants other than Morgan Stanley & Co. violated the covenant in various ways (Am.Compl.¶¶ 105, 325–330), and they now posit at least four common questions relevant to alleged violations of the implied covenant, namely: (1) "[w]hether Defendants utilized their unilateral authority over the Underlying Assets to select CDOs that they created and shorted," (Pls.Cert.Mem.20); (2) "[w]hether Defendants utilized their unilateral control over the Underlying Assets to select REs highly susceptible to a downturn in the housing and financial markets" (*Id.*); (3) "[w]hether Defendants played ratings arbitrage and selected Fitch to create the riskiest possible Underlying Collateral still capable of garnering an AA rating" (*Id.*); and (4)[w]hether Defendants lowered their internal underwriting criteria in order to approve riskier Underlying Assets," (*Id.*)

Defendants object to certification of implied covenant claim on two grounds. First, they claim that Plaintiffs' attempt to certify an implied covenant class is an impermissible attempt to "re-package a defective common law securities fraud class" as an implied covenant class. (Defs.Cert.Mem.26). But the cases upon which Defendants rely concern the "re-packaging" of *defective* fraud claims. *See, e.g., Permasteelisa S.p.A. v. Lincolnshire Mgmt. Inc.,* 16 A.D.3d 352, 793 N.Y.S.2d 16, 17 (1 st Dep't 2005) ("The claim for breach of the implied covenant of good faith ... merely duplicated the insufficient contract claim," which itself "was essentially duplicative of the insufficient fraud claim."); *Sutton Assocs. v. Lexis–Nexis,* 196 Misc.2d 30, 761 N.Y.S.2d 800, 804 (N.Y.Sup.Ct. Apr.29, 2003) (holding that the implied covenant claim "[was] duplicative of and merely recast[ed] [plaintiff's] unavailing fraud theory"). Here, Plaintiffs have stated a *valid* fraud claim, as Judge Sand and this Court previously determined. *See Dandong I,* 2011 WL 5170293, at *14; *Dandong III,* 2013 WL 4482509, at *11. Accordingly, Defendants' argument is without merit.

Second, Defendants argue that Plaintiffs cannot satisfy the predominance requirement with respect to the implied covenant claim because they rely on a "common course of conduct" theory that was rejected by the Second Circuit in *Moore v. PaineWebber,* 306 F.3d 1247 (2d Cir.2002). (Defs.Cert.Mem.26). But the holding in *Moore* was simply that, in the context of a fraudulent misrepresentation

claim, proving a common course of conduct could not, by itself, establish predominance because "each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss." *Moore,* 306 F.3d at 1255. That principle is irrelevant to Plaintiffs' implied covenant claims, as liability for an implied covenant claim does not require reliance on any sort of misrepresentation. *See, e.g., ABN AMRO Bank, N.V. v. MBIA Inc.,* 17 N.Y.3d 208, 228–29, 928 N.Y.S.2d 647, 952 N.E.2d 463 (2011) (holding that insureds stated a claim against insurer for breach of the implied covenant when insurer allegedly transferred assets to its parent company for no consideration); *Forman v. Guardian Life Ins. Co. of Am.,* 76 A.D.3d 886, 908 N.Y.S.2d 27, 30 (1st Dep't 2010) (holding that insurance auditor adequately stated a claim for breach of the implied covenant against insurer where insurer allegedly provided auditor with claims to audit but entered into agreement that prevented auditor from recovering funds on those claims), Accordingly, common issues predominate with respect to Plaintiffs' implied covenant claims as well.

*See, e.g., In re Checking Account Overdraft Litig.,* 281 F.R.D. 667, 681 (S.D.Fla.2012) ("[B]reach of the duty [of] good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct ."); *Nat'l Seating & Mobility, Inc. v. Parry,* No. 10 Civ. 2782(JSW), 2012 WL 2911923, at *1, *10 (N.D.Cal. July 16, 2012) (certifying implied covenant class based on employer's allegedly inaccurate calculation of employees' compensation); *Denney v. Jenkens & Gilchrist,* 230 F.R.D. 317, 321 (S.D.N.Y.2005) (certifying class and approving settlement predicated on breach of, *inter alia,* duty of good faith and fair dealing), *aff'd in part, vacated in part,* 443 F.3d 253 (2d Cir.2006).

#### ii. Superiority

**\*13** In addition to mandating the predominance of common factual and legal issues, Rule 23(b)(3) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Four factors are "pertinent" to this inquiry:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* Courts have held that class actions are particularly appropriate in federal securities actions, *see, e.g., Green v. Wolf Corp.,* 406 F.2d 291, 296 (2d Cir.1968) ("[A] class action in a federal securities action may well be the appropriate means for expeditious litigation of issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf."); *see also In re Vivendi Universal, S.A.,* 242 F.R.D. at 91 (collecting cases), and these considerations apply with equal force here. Further, Plaintiffs have put forth evidence that a class action judgment would likely be enforced in a Singapore court (*see* Furmston Decl. (Docket No. 144) ¶¶ 11–12), and Defendants do not appear to contest the superiority requirement. Accordingly, the Court finds that it is satisfied, and Plaintiffs' motion to certify the class is therefore GRANTED. Additionally, the Court appoints Kirby McInerney LLP as class counsel, and approves the named Plaintiffs as class representatives.

#### B. The Admissibility of Expert Reports

The second motion before the Court is one brought by Defendants to exclude the declarations of Plaintiffs' experts Craig A. Wolson (the "Wolson Declaration") and Ilya Eric Kolchinsky (the "Kolchinsky Declaration"), pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* requires that an expert's testimony "both rest[ ] on a reliable foundation and [be] relevant to the task at hand." *Id.* at 597. When a motion to exclude expert testimony is made at the class certification

stage, the *Daubert* standard applies, but the inquiry is "limited to whether or not the [expert reports] are admissible to establish the requirements of Rule 23." *In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55, 66 (S.D.N.Y.2009). In other words, "[t]he question is not ... whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to liability, but rather whether [the Court] may utilize it in deciding whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68, 77 (S.D.N.Y.2000). Defendants challenge the Declarations as both irrelevant and unreliable.

**\*14** Defendants' arguments with respect to the Kolchinsky Declaration have some force, but they are moot because the Court did not consider the Kolchinsky Declaration in reaching its decision on Plaintiffs' motion to certify. Defendants' arguments with respect to the Wolson Declaration, on the other hand, fail to persuade. First, as the discussion above makes clear, the Wolson Declaration is plainly relevant insofar as it has a "valid connection to the pertinent inquiry." *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 540 (S.D.N.Y.2009). That is, the Wolson Declaration is relevant to the predominance inquiry under Rule 23(b)(3) because it speaks to whether and how investors would have reacted differently if Defendants had provided the omitted information or had they not made the allegedly misleading statements on the documents provided to Plaintiffs. (Wolson Decl. ¶¶ 5.01, 5.02).

The fact that the Wolson Declaration refers to the omitted information as "material" does not render it an inadmissible legal opinion. The Court does not understand any of Mr. Wolson's statements—particularly that the "offering materials omitted information that would have been material to any reasonable investor" (Wolson Decl. ¶ 5)—as "encompass[ing] an ultimate legal conclusion." *United States v. Jacques Dessange, Inc.,* No. S2 99 Cr. 1182(DLC), 2000 WL 294849, at \*2 (S.D.N.Y. Mar. 21, 2000). Whether the omitted information and misrepresentations were material is an issue for the factfinder at trial, and is not before the Court at this stage of the litigation. The question presently before the Court is simply whether common questions predominate—or, alternatively, whether individual questions of reliance overwhelm them—and the importance of the omitted information and allegedly misleading statements has some bearing on that question. Of course, if Wolson were to testify regarding materiality at trial, the Court might well

instruct him to "recast his testimony by using terminology that does not express legal conclusions." *Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Bos. Corp.,* Nos. 12 Civ. 5803(JLG) et al., 2013 WL 978980, at \*8 (S.D.N.Y. Mar.12, 2013). The risk of jury confusion inherent in a witness's use of a legal term is not relevant at this stage, however.

Defendants' reliability objections to the Wolson Declaration are also unconvincing. *See* Fed.R.Evid. 702 (providing that expert testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and that "the expert reliably applied the principles and methods to the facts of the case"); *see also Daubert,* 509 U.S. at 593–94 (listing factors to use in assessing the reliability of expert testimony). Defendants' principal objection appears to be that Wolson failed to account for the geographical location of Plaintiffs. In particular, they assert that Wolson "has no understanding of either the Singapore securities marketplace or Singapore investors" and that he did not conduct any investigation about the Singapore financial markets. (Defs.' Exclusion Mem. 6–7, 14–15). But Defendants fail to identify any reason that information would be relevant to investors in United States markets—markets with which Wolson is indisputably familiar (*see* Wolson Decl. ¶¶ 1.04, 1.05; Cattell Decl. (Docket No. 156) Ex. 2 136:24–137:9)—but not to investors in the Singapore marketplace. Defendants also contend that the Wolson Declaration represents nothing more than Wolson's subjective opinion, unmoored from any verifiable methodology. (Defs.' Exclusion Mem. 15–16). But Wolson's opinion regarding the importance of the omitted or allegedly misleading information is based on his experience in the structured finance industry, and experts are permitted to provide such experiential testimony so long as they "explain how [their] experience leads to the conclusion reached and how [their] experience is reliably applied to the facts." *Israel v. Spring Indus., Inc.,* 2006 WL 3196956, at \*2 (E.D.N.Y. Nov.3, 2006); *see also Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,* 2011 WL 6288415, at \*4 (S.D.N.Y. Dec.15, 2011). Wolson has done so here. (Wolson Decl. ¶ 1.07).

**\*15** Ultimately, Defendants' objections to the Wolson Declaration go more to weight than to admissibility. *See, e.g., Bacardi & Co. v. N.Y. Lighter Co.,* No. 97–CV–7140 JS VVP, 2000 WL 298915, at \*2 (E.D.N.Y. Mar.15, 2000) ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so

Case 1:19-md-02875-RMB-SAK    Document 2058-1    Filed 05/10/22    Page 106 of 172
PageID: 70649
Ge Dandong v. Pinnacle Performance Ltd., Not Reported in F.Supp.2d (2013)

unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (quoting 🔖 *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996)); *see also* 🔖 *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002) (describing the "liberal admissibility standards of the federal rules" and explaining that "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible"); 🔖 *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony."). Accordingly, Defendants' motion is DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED. Defendants' motion to exclude the declarations of Plaintiffs' experts is DENIED as moot with respect to the Kolchinsky Declaration and DENIED on the merits with respect to the Wolson Declaration. The Clerk of the Court is directed to terminate Docket Numbers 141 and 154.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5658790

## Footnotes

1    See Cattell Decl. (Docket No. 153) Ex. 11 [Ge Dandong] 39:5–7, 78:14–16; Ex. 7 [Loh Tuck Woh Peter] 40:14–17, 39:19–22; Ex. 12 [Singapore Government Staff Credit Cooperative Society, Ltd. ("SGSCCS") ] 87:21–24, 88:9–12; Ex. 13 [Ni Yan Amy] 92:8–12, 145:11–14; Ex. 8 [Ang Soon Cheng] 46:7–11; 77:18–20; Ex. 9 [Choh Gek Hong Johnson] 185:21–23, 185:24–186:2; Ex. 14 [Ng Shook Phin Susan] 49:3–5, 49:6–8; Ex. 10 [Zhao Yuzheng] 51:17–20; 52:8–11.

2    See Cattell Decl. Ex. 11 [Ge Dandong] 35:14–23; Ex. 7 [Loh Tuck Woh Peter] 44:12–45:50; Ex. 12 [SGSCCS] 59:17–20; Ex. 13 [Ni Yan Amy] 65:19–22, 68:19–69:19–25; Ex. 8 [Ang Soon Cheng] 18:7–9; Ex. 9 [Choh Gek Hong Johnson] 41:18–24; Ex. 14 [Ng Shook Phin Susan] 44:15–22; Ex. 10 [Zhao Yuzheng] 31:9–22.

3    *Foresters* did not explicitly condition its holding on the fact that offering materials contained the undisclosed information. See 🔖 *Foresters,* 919 F.Supp. at 155 ("A sales brochure, in and of itself, in a highly regulated industry where voluminous contracts detailing the securities at issue are created and filed with governmental agencies, such as the SEC, is not a document, on which someone trading securities worth millions of dollars, would reasonably rely."). But the Court specifically noted that the plaintiff challenged only the sales brochures, not the actual contracts or offering circulars, 🔖 *id.* at 151–52, and none of the cases cited by the *Foresters* court supports the proposition that reliance on sales brochures is unjustifiable in all circumstances, *see, e.g.,* 🔖 *Cong. Fin. Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 471 (S.D.N.Y.1992) ("Where sophisticated businessmen engaged in major transactions *enjoy access to critical information but fail to take advantage of that access,* New York courts are particularly disinclined to entertain claims of justifiable reliance ." (emphasis added and internal quotation marks omitted)).

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

8

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

KeyCite Yellow Flag - Negative Treatment
Disagreed With by    Counts v. General Motors, LLC,    E.D.Mich.,
February 14, 2017

2013 WL 4517994
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re GERBER PROBIOTIC SALES
PRACTICES LITIGATION.

Civil Action No. 12–835 (JLL).
|
Aug. 23, 2013.

**Attorneys and Law Firms**

James E. Cecchi, Lindsey H. Taylor, Donald A. Ecklund,
Carella Byrne Cecchi Olstein Brody & Agnello, P.C.,
Roseland, NJ, Richard Daniel Devita, Devita & Associates,
Hoboken, NJ, Antonio Vozzolo, Courtney E. Maccarone,
Faruqi & Faruqi, LLP, Yitzchak Kopel, Bursor & Fisher PA,
New York, NY, Ro nald A. Marron, San Diego, CA, for
Plaintiffs.

Scott A. Ohnegian, Riker, Danzig, Scherer, Hyland & Perretti,
LLP, Morristown, NJ, for Defendants.

**OPINION**

LINARES, District Judge.

**\*1** This matter comes before the Court by way of a motion
to dismiss the Second Consolidated Amended Complaint
("SAC") (CM/ECF No. 48) pursuant to Federal Rule of Civil
Procedure 12(b)(6) (CM/ECF No. 53) by Gerber Products
Company (hereafter "Defendant" or "Gerber"). No oral
argument was heard pursuant to Rule 78 of the Federal Rules
of Civil Procedure. After considering the submissions of the
parties in support of and in opposition to the instant motions,
Defendant's motion to dismiss is granted.

*I. BACKGROUND*

The instant putative consumer-protection class action arises
out of the alleged deceptive, false, and misleading marketing
of three Gerber products (collectively the "Products"): Good
Start Protect Infant Formula and Good Start Protect Formula

for 9 through 24 months ("Good Start"), and DHA &
Probiotic Cereal—Single Grain Oatmeal and Rice varieties.
(SAC ¶ 2). Plaintiffs [1] allege that the marketing and labeling
of those products are deceptive in two primary ways: despite
representations to the contrary, the Products (1) do not provide
immune system benefits; and (2) are not are not near equal to
breast milk.

Plaintiffs first assert that the Products' marketing and
labeling contain false and misleading representations based
on the immune system effect of probiotic bacteria, "Bifidus
BL." (SAC ¶ 1). The allegation is essentially that despite
Defendant's representations regarding the Products' immune
system benefits, "numerous studies show that the Products
do not and cannot provide the immune-related health benefits
Defendant claims." (SAC ¶ 3). Specifically, Plaintiffs allege:

> Gerber's representations are designed
> to induce the consumer, who is
> unaware that healthy babies' bodies
> already maintain the proper balance of
> intestinal bacteria, to buy the Products.
> Gerber advertises the Products as
> the only formulas and cereals
> that include probiotics that will
> strengthen and support the immune
> systems of young children. However,
> Defendant's marketing message is
> false and deceptive, as the "probiotic"
> bacteria in the Products do not
> perform as advertised, and scientific
> studies ... demonstrate that probiotic
> supplementation in infant formula
> does not support infant immunity
> or provide the advertised health
> benefits including because such
> supplementation does not (a) decrease
> the levels of harmful pathogens
> in babies' intestinal microflora, (b)
> increase the levels of good bacteria
> in babies' intestinal micro-flora, or (c)
> reduce infections

(SAC ¶ 7, see also ¶¶ 16, 17).

With regard to the Good Start products, Plaintiffs maintain
that the Gerber marketing strategy deliberately includes

"IMMUNIPROTECT," which contains the trademarked Bifidus BL probiotic bacteria, as a "deceptive marketing hook." (SAC ¶ 5). Plaintiffs also maintain that to further reinforce the allegedly deceptive message, Gerber represents that the Products' "advanced" immune system benefits result from the use of Bifidus BL, which is found in breast milk. (SAC ¶ 6).

**\*2** Second, Plaintiffs allege that despite the fact that "experts unanimously agree that breast milk is best for infants," Gerber also adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk." (SAC ¶ 11, *see also* ¶¶ 12, 14). However, scientific evidence allegedly demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide." (SAC ¶ 14).

Plaintiffs assert that even though the Products' marketing implies that there is a proven scientific basis for the immune system benefits, by representing that the health-related claims are based on "studies" and "research," "the body of scientific evidence on probiotic supplementation in infant formula shows that the probiotic ingredient in the Products *does not* support the infant immune system and *does not* otherwise provide the advertised health benefits." (SAC ¶ 18, *see e.g.* ¶ 37, 39) (emphasis in original). Similarly, "scientific evidence proves that, contrary to Defendant's advertising, formula supplemented with probiotics does not provide breast milk-quality nutrition." (SAC ¶ 19).

In support of their position that the findings of numerous studies contradict Defendant's representations regarding the Products, Plaintiffs point to a number of scientific studies and reports. (SAC ¶¶ 70–86). In addition, Plaintiffs allege that Defendants cite no studies that effectively support certain of its claims and, in fact, the studies cited by Defendants actually demonstrate the falsity of Defendant's advertising and otherwise do not support its immunity strengthening claims. (SAC ¶¶ 87–91, 93–102). Therefore, Plaintiffs allege that "[n]one of these studies, even if they could be characterized as clinical—which they cannot—supports the conclusion that Gerber Products in fact strengthen and support a baby and toddler's immune system as labeled and advertised." (SAC ¶ 92).

Accordingly, Plaintiffs allege that the "labeling and advertising claims are false and deceptive because they imply

that the Products provide more health benefits than other, less costly predecessor and regular formulas that do not contain probiotics, Bifidus BL, or "IMMUNIPROTECT." (SAC ¶ 65). Therefore, Plaintiffs allege that Defendant's representations regarding the Products are likely to mislead consumers, acting reasonably under the circumstances, into believing that the Products are superior to other products because they are the near-equivalent of breast milk and that they provide immune system benefits. (SAC ¶ 66). They also maintain that a reasonable consumer would not have purchased the Products but for the alleged misrepresentations and that Plaintiffs have paid a premium for doing so. (SAC ¶ 104).

Plaintiffs assert that despite rebranding the Products in February 2010 and re-naming them in early 2011, Defendant has manufactured, marketed, and sold the Products since at least September 27, 2009 with false and misleading representations on the packaging, labeling, and online advertising. (SAC ¶¶ 3, 33). Defendants allegedly advertise and promote the Products primarily through "the front-of-pack and back-of-pack" labeling claims. (SAC ¶ 47). In addition, Defendants allegedly use online advertising, its website, and other media, including television commercials. (SAC ¶¶ 48, 63). Gerber allegedly sells the Products at a premium over predecessor and regular formula products without probiotics. (SAC ¶ 21).

**\*3** Plaintiffs assert the following causes of action in the SAC [2] : (1) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8–2 *et seq.* ("NJCFA") on behalf of Plaintiffs Dourdoulakis and Jose and the putative Class or New Jersey Subclass; (2) violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.,* on behalf of Plaintiffs Alvarez, Ginger, Hawkins, and Thomas and the putative California Subclass; (3) unlawful business acts and practices in violation of California Business & Professions Code Section 17200, *et seq.,* on behalf of Plaintiffs Alvarez, Ginger, Hawkins and Thomas and the putative California Subclass; (4) violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.,* on behalf of Plaintiff Rudich and the putative Illinois Subclass; (5) violation of the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349, *et seq.,* on behalf of Plaintiff Siddiqi and the putative New York Subclass; (6) violation of the Washington Deceptive Trade Practices Law, Wash. Rev.Code. §§ 19.86.020, *et seq.* on behalf of Plaintiff Burns

and the putative Washington Subclass. In addition, without specifying under which state's law they are brought, the SAC also contains a number of state law claims on behalf of all Plaintiffs and the putative class: (1) breach of express warranty (Count VII); (2) breach of implied warranty of merchantability (Count VIII); and (3) unjust enrichment (Count IX).

## II. JURISDICTION and LEGAL STANDARD

Jurisdiction is premised upon 28 U.S.C. § 1332(d)(2), as Plaintiffs allege that the matter in controversy, exclusive of interest and cost, exceeds the value of $5 million and is a class action in which at least one class member is a citizen of a different state from Defendant.

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The plaintiff's short and plain statement of the claim must "give the defendants fair notice of what the ... claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 545 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. County of Alleg hen y,* 515 F.3d 224, 234 (3d Cir.2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555 (2007). Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555, 557 (2007)). However, this " 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal

evidence of the necessary element." *West Perm Alleg hen y Health Sys. Inc. v. UPMC,* 627 F.3d 85, 98 (3d Cir.2010) (quoting *Phillips v. County of Alleg hen y,* 515 F.3d 224, 234 (3d Cir.2008)).

## IV. DISCUSSION

**\*4** Defendant argues that dismissal is warranted on several grounds: (1) the SAC does not allege a plausible false advertising claim; (2) Plaintiffs have not adequately plead their fraud claims with the requisite level of particularity under Federal Rule of Civil Procedure 9(b); (3) Plaintiffs lack constitutional standing to bring their claims; (4) Plaintiffs lack standing to seek injunctive relief; (5) Plaintiffs fail to satisfy the essential elements of the applicable state consumer fraud and false advertising statutes; (6) Plaintiffs fail to allege a breach of warranty; and (7) Plaintiff's unjust enrichment claim is improper.

Plaintiffs' standing to assert claims under Article III of the Constitution is a threshold jurisdictional question. *See e.g. O' Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Accordingly, the Court begins its analysis there. The Court concludes for the reasons set forth below that Plaintiffs only have standing to assert claims premised on the alleged misrepresentations on the Products' labeling. In addition, Plaintiffs do not have standing to seek injunctive relief. The Court has considered the parties' arguments based on the Product labeling and determines, again for the reasons set forth below, that as Plaintiffs' claims are based on Defendant's overall marketing in connection with the Products, the SAC does not sufficiently allege false advertising claim based on the labeling alone. Accordingly, the Court dismisses the SAC without prejudice.

## A. Standing

Defendant argues that Plaintiffs' allegations are insufficient to demonstrate that they have constitutional standing in two regards: (1) they do not sufficiently plead an injury for purposes of Article III; and (2) they do not adequately plead causation. In addition, Gerber submits that Plaintiffs do not have standing to seek injunctive relief because they do not plead a threat of future injury, as required to maintain a claim for injunctive relief.

Gerber asserts that "Plaintiffs have not adequately pled injury in fact and causation, which are necessary elements

to establish Article III standing." (Def.'s Mot. 4). The requirements of Article III constitutional standing are as follows:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Darners Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 290–91 (3d Cir.2005); *Society Hill Towers Owners' Ass'n v. Rendell,* 210 F.3d 168, 175–76 (3d Cir.2000).

**\*5** "In the class action context, however, traditional notions of standing are not completely informative of what claims may be asserted." *In re Franklin Mut Funds Litig.,* F.Supp.2d at 461. However, "if none of the named plaintiffs purporting to represent a class establishes the requisite case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Hayes v. Wal–Mart Stores, Inc.,* —— F.3d ——, 2013 WL 3957757, at \*9 (3d Cir.2013) (quoting *O' Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). At the pleading stage, "[a]lthough general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III." *Reilly v. Ceridian Corp.,* 664 F.3d 38, 41 (3d Cir.2011) (quoting *Lujan,* 504 U.S. at 561; *Whitmore v. Arkansas,* 485 U.S. 149, 155 (1990)).

*1. Injury In Fact*

With regard to the injury in fact requirement, Defendant asserts that "not one plaintiff alleges (even in conclusory terms) that he did not receive the health benefits from the products as advertised. This is a fatal flaw." (Def.'s Mot. 4; *see also* Def.'s Mot. 24–25). [3] In arguing that Plaintiffs did not suffer an injury-in-fact, Defendant relies on a number of consumer protection cases where the products at issue contained potentially dangerous substances, but the plaintiffs suffered no ill effects. (Def.'s Mot. 25) (citing *In re Fruit Juice Products Mktg. & Sales Practices Litig.,* 831 F.Supp.2d 507 (D.Mass.2011) (plaintiffs suffered no injury-in-fact where they alleged that fruit juice contained trace amounts of lead); (Def.'s Reply 14–15) (citing *Koronthaly v. L' Oreal USA, Inc.,* 2008 WL 2938045, at \*4–5 (D.N.J. Jul.29, 2008) (plaintiff did not have standing where she alleged she was denied the benefit of the bargain when she purchased lipstick containing lead). However, as discussed above, that is not the substance of Plaintiffs' claim. Throughout the SAC and their Opposition, Plaintiffs claim that they paid a premium for the Products at issue based on false, deceptive, and misleading representations. Plaintiffs correctly argue that "[m]onetary harm is a classic form of injury in fact. Indeed it is often assumed without discussion." (Pl.'s Opp'n. 22) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d at 293) (internal citation omitted). Accordingly, at this stage of the litigation, Plaintiffs sufficiently allege an actual injury which is concrete and particularized. *See Wang v. OCZ Tech. Grp., Inc.,* 276 F.R.D. 618, 625 (N.D.Cal.2011). [4]

*2. Causation*

As to causation, Defendant submits that "plaintiffs fail to specify which allegedly false or misleading advertisement was reviewed prior to purchasing the product(s) and how that statement influenced the purchasing decision." (Def.'s Mot. 4). However, Defendant does not point to a requirement that such specificity is required to demonstrate constitutional standing generally. Rather, Gerber points to a number of cases which analyzed the standing requirements for certain specific state consumer protection statutes, which the parties do not dispute are analyzed under the lens of Rule 9(b)'s heightened pleading requirement. [5] (Def.'s Mot. 25) (citing *In Re Toshiba Am. HD DVD Mktg. & Sales Practices Litig.,* 2009 WL 2940081, at \*13 (D.N.J. Sept.11, 2009) (considering claims asserted under New Jersey's Consumer

Fraud Act)[6]; *Delacruz v. Cytosport, Inc.,* 2012 WL 1215243, at *8 (N.D.Cal. Apr.11, 2012) (discussing the reliance requirement under California's Unfair Competition Law, False Advertising Law and Consumer Legal Remedies Act); *Wang v. OCX Tech. Grp., Inc.,* 276 F.R.D. 618, 628 (N.D.Cal.2011) (considering whether allegations satisfy the heightened pleading requirements of Rule 9(b)); *Johns v. Bayer Corp.,* 2010 WL 476688, at *5 (S.D.Cal. Feb.9, 2010) (discussing statutory standing requirements of California's Unfair Competition Law and Consumer Legal Remedies Act)). In their Opposition, Plaintiffs argue that "[t]here is a causal connection between the Plaintiffs' injury and Defendant's conduct. Plaintiffs thought they were purchasing, and paying for, products with the immune benefits Gerber stated they had, but Plaintiffs did not receive what they paid for because [ ] Gerber misrepresented the qualities of its products." (Pls.' Opp'n. 23).

**\*6** A number of Plaintiffs allege that they relied on alleged misrepresentations contained only on the Products' labeling. Plaintiffs Rudich, Siddiqi, and Lhomas all identify the Products they purchased and allege that they "viewed and specifically relied upon Defendant's claims by reading the representations made on the product label concerning the probiotic benefit of the Products, purchased Gerber Products in reliance on these claims, and sustained injury in fact and lost money as a result of the wrongful conduct described herein." (SAC ¶¶ 29–31). On the other hand, a number of Plaintiffs state in a conclusory fashion that they relied on Defendant's "advertisements and labeling." Plaintiffs Burns, Dourdoulakis, Ginger, Hawkins, and Jose all allege that they purchased certain of the Products based on "Gerber's misleading claims in its advertisements and labeling that the Products contained probiotic bacteria strains that provide immunity-related health benefits and are near-equivalents to breastmilk." (SAC ¶¶ 24–28). In addition, one Plaintiff merely alleges that she would not have purchased the Products but for Gerber's "misrepresentations." (SAC ¶ 23). Plaintiff Alvarez alleges that she "would not have purchased and paid a premium for the Gerber products but for Gerber's misrepresentations, and she suffered injury in fact and lost money as a result of Gerber's deceptive, unfair, and fraudulent practices described herein." (SAC ¶ 23).

Separate and apart from the product labeling, the SAC references a number of different types of representative "advertisements," including television commercials, press releases, and excerpts from Gerber's website. Indeed, as discussed in greater detail below, Plaintiffs premise their claims on Gerber's overall marketing campaign in connection with the Products. However, no Plaintiff provides facts sufficient to allege causation in connection with those aspects of Defendant's marketing campaign. For example, other than the Products' label, no Plaintiff alleges even the general type or medium of "advertising" to which they were allegedly exposed. Nor do Plaintiffs otherwise allege facts as to how misrepresentations in the "advertising" caused their injuries. Therefore, the SAC does not contain sufficient facts to allege that the injuries which resulted to Plaintiffs were fairly traceable to any of Gerber's representations other than those on the Products' labeling. *See Hein v. Freedom From Religion Foundation, Inc.,* 551 U.S. 587, 599, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."))

### 3. *Injunctive Relief*

Next, Defendant argues that Plaintiffs lack standing to seek injunctive relief because they have not alleged a threat of a future injury, which is required to obtain prospective relief. (Def.'s Mot. 4, 26–27). On the other hand, Plaintiffs argue that it is premature to decide whether they have standing to seek injunctive relief. (Pls.' Opp'n. 23). Plaintiffs further argue that "[i]n the instant case, Plaintiffs' ability to seek injunctive relief on behalf of other class members to prevent Gerber from continuing to falsely tout the qualities of its Products arises only because of the class-action context of this case. As a result, Plaintiffs' standing to seek injunctive relief should be determined after class certification, in relation to whether the class as a whole would have standing to seek injunctive relief, not just the named Plaintiffs." (Pls.' Opp'n. 25). Plaintiffs also point to a number of cases from the district courts of California to argue that standing should not be so narrowly construed. (Pls.' Opp'n. 23–24).

**\*7** "An injury-in-fact 'must be concrete in both a qualitative and temporal sense.' " *Reilly v. Ceridian Corp.,* 664 F.3d at 42. As explained by the Third Circuit, where a plaintiff seeks prospective relief, "the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp., Inc.,* 672 F.3d 213, 223 (3d Cir.2012) (quoting *City of Los Angeles v. Lyons,* 461

U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). "The threat of injury must be sufficiently real and immediate, and, as a result of the immediacy requirement, past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. if unaccompanied by any continuing, present, adverse effects." *Id.* (internal citations and quotations marks omitted). The Court agrees with Defendant that in this instance, no Plaintiff alleges that he or she is likely to "suffer future injury from the defendant's conduct [and in] the class action context, that requirement must be satisfied by at least one named plaintiff."

*Id.; see also* Dicuio v. Brother Intern. Corp., Civ. No. 2012 WL 3278917, at * 15 (D.N.J. Aug. 9, 2012) ("[I]t is not enough that other, non-named members of the class may intend to purchase [the product] in the future."). Therefore, the Court dismisses without prejudice Plaintiffs' claim for injunctive relief. Dicuio, 2012 WL 3278917, at * 14–16; Robinson v. Hornell Brewing Co., Civ. No. 11–2183, 2012 WL 1232188, at *3–7 (D .N.J. Apr. 11, 2012).

**B. False or Misleading Advertising**
In essence, Gerber maintains that the Products' marketing is not deceptive or misleading as a matter of law. Defendant submits that the law of New Jersey, California, New York, and Washington requires that allegedly false advertisements must have the capacity to mislead the average consumer. (Def.'s Mot. 6–7). Similarly, Defendant contends that the law of Illinois requires a plaintiff to allege that he was deceived and that deception caused him damages." (Def.'s Mot. 7). Accordingly, Gerber argues that Plaintiffs' false advertising claim is deficient due to the following: (1) Gerber's Good Start Formula Products are not marketed as an equivalent of breast milk; (2) Plaintiffs' lack of substantiation allegations are not viable; and (3) the cited studies are either irrelevant or confirm the advertised healthy immune system benefits.

Defendants argue that private individuals may not bring an action demanding substantiation for advertising claims. (Def.'s Mot. 9). In Opposition to this instant motion, Plaintiff asserts that: "Gerber casts Plaintiffs' case as something it is not-a 'lack of substantiation case'-and then contends the re-defined case must be dismissed." (Pls.' Opp'n. 1). Rather, Plaintiffs clarify that their claim is based on Defendant's alleged false and deceptive marketing regarding "probiotic" bacteria which is alleged to not perform as advertised. (Pl's Opp'n. 1) (citing SAC ¶¶ 64–65, 67–69, 78, 93). Plaintiffs distinguish a lack of substantiation argument-where a plaintiff

argues that there is no competent evidence to support a claim made in defendant's advertising or labeling-from their claim which they maintain is premised upon allegations that competent scientific evidence demonstrates that claims made by a defendant are objectively false. (PL's Opp'n. 9). Accordingly, they argue that the scientific evidence to which they point supports their allegations of false advertising. (PL's Opp'n. 8–9). They concede, however, that their claims are not viable to the extent that it is premised upon a lack of substantiation theory. Therefore, to the extent Plaintiffs' claims are based on a lack of substantiation theory, they are dismissed with prejudice. Franulovic v. Coca–Cola Co., 390 F. App'x. 125, 128 (3d Cir.2010); *Scheuerman v. Nestle Healthcare Nutrition, Inc.,* Nos. 10–3684, 10–5628, 2012 WL 2916827, at *6–7 (D.N.J. Jul.17, 2012).

**\*8** Gerber additionally argues that Plaintiffs may not rely on a lack of substantiation theory to "so easily sidestep their obligation to allege *facts* demonstrating falsity in order to survive a motion to dismiss." (Def.'s Mot. 2). However, as discussed above, Plaintiffs do cite a number of studies and reports and allege in detail that those relied upon by Defendant in its marketing are false or misleading. (Pl's Opp'n. 6–8). Thus, Plaintiffs do not merely assert that no credible science supports Defendant's claims; rather, they allege that the representations regarding the Products are affirmatively false. Hughes v. Ester C Co., —— F.Supp.2d ——, 2013 WL 1080533, at *13 (E.D.N.Y. Mar.15, 2013).

Notwithstanding, Gerber argues that "Plaintiffs' reliance on these studies is misplaced: the studies either confirm the immunity benefits of Gerber's probiotic formula and cereal products ... or are entirely irrelevant. Merely citing a gaggle of studies might create the appearance of factual issues, but in this case the tactic does not withstand even minimal scrutiny-it was rejected in a very recent decision and should likewise be rejected again here." (Def.'s Mot. 3) (citing Route, 2013 WL 658251, at *5). The Court concludes that *Route* is distinguishable from this case. In *Route,* the court characterized plaintiff's allegations of falsity as based on allegations that: "(1) one paper discusses both the evidence supporting the advertisement's claim and the evidence that doesn't support it, (2) unidentified experts and studies have shown that the advertisement's claims are false, and (3) [p]laintiff subjectively believes that the advertisement's claims are false." Route, 2013 WL 658251 at *5. In this case, however, Plaintiffs point to a number of studies, which they contend have "demonstrated that the

bacteria in the Products do not provide any clinically relevant immunity benefits. This means that it does not provide these benefits, rendering the advertising false or misleading." (PL's Opp'n. 12) (internal citations omitted). The parties dispute the reliability and findings of certain studies, as well as the applicability of same to infants and children who consume the Products at issue. In this regard, however, the Court agrees with Plaintiffs that it is not appropriate to consider the content of the studies and resolve the factual issues at this stage of the litigation. Indeed, in arguing that other courts have rejected similar claims, Defendant relies on two cases that involved motions for summary judgment. (Def.'s Mot. 17–18) (citing *Scheuerman v. Nestle Healthcare Nutrition, Inc.,* Nos. 10–3684 and 10–8258, 2012 WL 2916827, at \* 7 (D.N.J. Jul.17, 2012)[7]; *Stanley v. Bayer Healthcare, LLC,* No. 11–862, 2012 WL 1132920, at \* 5 (S.D.Cal. April 3, 2012). Therefore, the Court declines to hold that Gerber's representations regarding purported immune system benefits are neither false, deceptive, nor misleading.

### a. *Equivalence of Breast Milk*

**\*9** The Court now turns to whether a reasonable consumer could find Gerber's representations regarding the products misleading. Gerber maintains that it "endorses breast milk in the clearest of terms on its products and its website as the ideal source of nutrition for babies." (Def.'s Mot. 7, *see also* 8). Further, Defendant asserts: "Remarkably, Gerber's statements-which eviscerate plaintiffs' breast milk equivalence claim-are carefully edited out of the SAC." (Def.'s Mot. 8).[8] Specifically, Defendant points to the use of ellipses in place of the word "ideal" throughout the SAC and writes: "Is this really how lawyers should state a claim? Alleging a fraud only by deleting the truth? The Court should not approve such tactics." (Def.'s Mot. 9) (citing *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.,* 653 F.3d 241, 253 (3d Cir.2011); *Freeman v. Time, Inc.,* 68 F.3d 285, 290 (9th Cir.1995)); *see also Route v. Mead Johnson Nutrition Co.,* 2013 WL 658251. Defendant argues that it clearly and unmistakably endorses breast milk as the ideal nutrition for babies.[9] However, the parties do not dispute that the appropriate inquiry is whether a reasonable person would be misled by the overall advertising. (Pls.' Opp'n. 3, n. 2.; Def.'s Reply 3).

In their Opposition, Plaintiffs write: "With overblown and false indignation, Gerber accuses Plaintiffs of 'the

consummate blue smoke and mirrors' by 'repeatedly replac[ing] Gerber's statements promoting breast milk as the 'ideal' source of nutrition for babies with 'dot-dot-dot. Gerber should focus on being more accurate and less accusatory.'" (Pls.' Opp'n. 4) (internal citations omitted, alteration in original). Plaintiffs quote allegations in the SAC at length and clarify that the substance of their claim is that: despite touting the benefits of probiotic cultures in Good Start which are "like those naturally promoted by breast milk to support an infant's healthy immune system," those claims are allegedly contrary to scientific evidence which demonstrates that "formula supplemented with probiotics does not provide breast milk-quality nutrition." (PL's Opp'n. 2, 4–5). Therefore, Plaintiffs explain that they "never allege that Gerber advertises that Good Start is *better* than breast milk. Instead, Plaintiffs allege that Gerber falsely or deceptively *equates* Good Start to breast milk." (PL's Opp'n. 3). Stated another way, Plaintiffs allege that "Gerber clearly holds out breastfeeding as the gold standard, and then (falsely) equates Good Start to that gold standard." (PL's Opp'n. 4). Accordingly, Plaintiffs argue "that this is not the 'rare' case where an advertisement can be declared not deceptive as a matter of law." (PL's Opp'n. 5) (citing *Williams v. Gerber Prods. Co.,* 552 F.3d 934, 938 (9th Cir.2008)).

The Court notes that whether a practice is deceptive or misleading is generally a question of fact. *See e.g. Williams,* 552 F.3d at 938–39 ("whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' " and usually cannot be resolved through a motion to dismiss); *Union Ink Co. v. AT & T Corp.,* 352 N.J.Super. 617, 645, 801 A.2d 361 (App.Div.2002) ("Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact."). Here, Plaintiffs allege that in light of the fact that "experts unanimously agree that breast milk is best for infants," Gerber adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk," despite the fact that scientific evidence demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide." (SAC ¶ 11,14).

**\*10** Notwithstanding, as discussed above, Plaintiffs only establish standing to assert claims based on the alleged

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

misrepresentations on the Products' labeling. However, the allegedly deceptive or misleading practice on which Plaintiffs base their claims is the overall marketing of the Products, which includes both the labeling as well as many other aspects of Gerber's marketing/advertising. Stated another way, Plaintiffs do not assert independent claims based on the Product's labeling alone.

In addition, both parties rely on representations of Defendant's overall marketing message in both the advertising as well as the labeling of the Products in support of their arguments. For example, throughout Plaintiffs' brief, they point to concrete examples of misleading statements from press releases and the website in the SAC. Plaintiffs also refer to Defendant's "misrepresentations" without specifying the source. (*See e.g.* SAC ¶ 66). Also, they allege that a reasonable consumer would not have purchased the Products but for the alleged misrepresentations and that Plaintiffs have paid a premium for doing so. (SAC ¶ 104). Further, in responding to Defendant's argument that Plaintiffs have not alleged that a reasonable consumer is "likely to be deceived" under California law, Plaintiffs point to the following which exemplifies the issue:

> Gerber expressly advertises that Good Start contains probiotics, which makes Good Start a near-equivalent to breast milk. For example, in one press release, Defendant stated "Nestle believes that GOOD START formula provides mothers, who cannot or who choose not to breastfeed, a healthy breast milk alternative." SAC ¶ 44; *see also* ¶ 12 (Good Start contains probiotics "like those promoted by breast milk"), ¶ 40 (same), ¶ 41 ("This breakthrough product is the first and only older-baby formula in the U.S. with the probiotic, BIFIDUS BL-beneficial cultures like those found in breast milk that help support babies' immune system."), ¶ 57 and ¶ 59 (product packaging and labeling), ¶¶ 60–62 (Gerber website, including a FAQ "How does GOOD START Protect compare with breast milk?"), ¶ 63 (tv ad).

(Pls.' Opp'n. 29). To be sure, the Court does not suggest that Plaintiffs may never refer to Defendant's collective misrepresentations in the SAC. However, as determined above, Plaintiffs only have standing to assert claims based on the labeling of the Products. In light of the fact that Plaintiffs' claims are premised on Gerber's overall marketing campaign, the Court cannot determine whether Plaintiffs state a plausible right to relief based on the representations contained on the Products' labels alone. Accordingly, the Court dismisses the SAC without prejudice.

### IV. CONCLUSION

For the reasons set forth above, Defendant's motion is GRANTED. The SAC only establishes standing to sue for injuries caused by the alleged misrepresentations on the Products' labels. However, as Plaintiffs premise their claims on Defendant's overall marketing message and assert no independent claims based on the labeling of the Products alone, they do not clearly allege a plausible right to relief. In addition, Plaintiffs do not allege a plausible future injury which could suffice as a basis for injunctive relief in the Third Circuit. Accordingly, the Court dismisses the SAC without prejudice. However, the Court dismisses with prejudice Plaintiffs' claims to the extent that they are premised upon a lack of substantiation theory.

**\*11** If Plaintiffs choose to amend, the Court advises the parties of the following in light of the Court's inherent authority to manage its cases and docket. Plaintiffs assert claims for breach of express warranty, breach of implied warranty, and unjust enrichment without specifying which state or states' laws they seek to invoke. As a general matter, absent a conflict, a court sitting in diversity applies the law of the forum state. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir.2006). Choice of law analysis must also be applied in the class action context. *Phillips Petroleum v. Shutts, All* U .S. 797 (1985). Accordingly, the parties should make clear which law they contend applies, to the extent possible given the posture of the litigation, for purposes of determining plausibility and otherwise.

In addition, Plaintiffs assert causes of action under the consumer fraud and false advertising statutes of a number of States. To the extent that any of the parties make general arguments regarding those claims, they should exercise caution to ensure that those arguments are indeed applicable to all claims and make clear where they are not. For example, Defendant argues that dismissal is warranted because "not one of the nine named plaintiffs identifies the advertisements on which he relied or how that advertisement influenced the purchasing decision." (Def.'s Mot. 3–4; *see also* 19–20). However, the Court notes that while almost all of the relevant statutes require a plaintiff to satisfy the heightened pleading standards of 9(b), Defendants do not address which of the state consumer protection statutes at issue require individual

*In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)*

reliance.[10] Defendant also argues that Plaintiffs fail to satisfy Rule 9(b) because they do not allege the "premium" they allegedly paid. However, Defendants do not explain why this is fatal to state claims in light of the essential elements of each. For example, Defendants address the "ascertainable loss" requirement in the New Jersey Consumer Fraud Act[11] at length but make no similar arguments regarding the laws of other states. Therefore, as the essential elements of the relevant consumer fraud and false advertising statutes vary, the parties should organize their briefs in a manner which makes clear to which elements Rule 9(b) applies and which of their arguments are generally applicable.

An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4517994

---

## Footnotes

1    The following plaintiffs assert claims in the SAC: Maria Alvarez, Ryan Burns, Irene Dourdoulakis, Chad Ginger, Shavonda Hawkins, Joven Jose, Andrew Rudich, Saba Siddiqi and Janna Thomas. (SAC ¶¶ 23–31) (collectively "Plaintiffs").

2    Defendant explains:

This case began when ten separate nationwide class actions were filed in six different District Courts between February and April 2012. On June 7, 2012, the five then-pending New Jersey cases were consolidated and a single consolidated complaint was filed. Dkt. No. 28. On October 16, 2012, the Judicial Panel on Multidistrict Litigation denied consolidation of all pending cases in the District of Washington. *In re Gerber Probiotic Prods. Mktg and Sales Practices Litig.,* —— F.Supp.2d ——, 2012 WL 495523 (J.P.M.L. Oct. 16, 2012). Following that ruling, the California plaintiffs consolidated their actions, and Gerber moved to transfer the two remaining non-New Jersey actions to this Court pursuant to 28 U.S.C. § 1404(a). Both courts determined that the paramount 1404 factors (avoiding duplication, fostering judicial economy and conserving limited judicial resources) weighed in favor of transfer. *Burns v. Gerber Prods. Co.,* 922 F.Supp.2d 1168, 2013 WL 518664 (E.D.Wash. Feb.12, 2013); *Hawkins v. Gerber Prods. Co.,* 924 F.Supp.2d 1208, 2013 WL 627066 (S.D.Cal. Feb.20, 2013). The Second Amended Consolidated Complaint (Dkt.48) was filed on April 10, 2013.

(Def.'s Mot. 1 n. 1).

3    The Court agrees with Plaintiffs that this argument goes to the merits of the claim. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal citations and quotations omitted). To the extent that a state consumer statute or other cause of action requires a showing of same, it would be more appropriate to address Defendant's arguments within the context of that discussion. The Court notes, however, that it does not reach Defendant's argument that Plaintiff fails to plead certain essential elements of their consumer fraud claims.

4    Even under the more exacting standard of Rule 9(b), courts in this District have held that an exact dollar amount is not required to plead an ascertainable loss under the New Jersey Consumer Fraud Act. *Nelson*

*v. XACTA 3000 Inc.,* No. 08–5426, 2010 WL 1931251, at *7 n. 3 (D.N.J. May 12, 2010); *Torres–Hernandez v. CVT Prepaid Solutions, Inc.,* No. 08–1057, 2008 WL 5381227, at *7 n. 3 (D.N.J. Dec.17, 2008)

5    The parties do not dispute that most of Plaintiffs' false advertising claims asserted under state statutes, including New Jersey, Illinois, California, and Washington, must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). (Def.'s Mot. 3; Def.'s Reply 9).

6    For the sake of completeness, it is worth noting that in *In re Toshiba* the court concluded that the plaintiff's allegations regarding ascertainable loss and causation under the NJFCA satisfied neither Rule 8(a) or 9(b). 2009 WL 2940081, at *13.

7    The Court notes for the sake of completeness that *Scheuerman* disposed of both a motion to dismiss and a motion for summary judgment. 2012 WL 2916827, at *7. However, in concluding that the plaintiffs' claims premised upon false or misleading statements were insufficient, the court considered evidence adduced throughout discovery as well as opinions of experts. *Id.* at 7–9.

8    The parties do not dispute that the Court may properly consider the contents of the advertisings upon which Plaintiffs base their claims in deciding the instant motion to dismiss. (Def.'s Mot. 8) (citing *Am. Cyanamid Co. v. S.C Johnson & Son, Inc.,* 729 F.Supp. 1018, 1021–22 (D.N.J.1989)).

9    In its Reply, Defendant further argues that Plaintiffs fail to distinguish *Route v. Mead Johnson Nutrition Co.,* 2013 WL 658251. (Def.'s Reply 5). That case also involved allegedly misleading representations made in connection with the marketing of baby formula. Defendants point to the following language from a footnote in that case: "[I]t appears that Plaintiff would have this Court find that anytime baby formula is advertised as providing health benefits *analogous* to those found in breast milk, the advertisement is misleading. This surely cannot be." (Def.'s Reply 5) (quoting *Route,* 2013 WL 658251, at *5 n. 6) (emphasis added by Defendant). Notably, the decisions of other district courts are not binding on this court. In any event, here Plaintiffs allege that in light of the fact that "experts unanimously agree that breast milk is best for infants," Gerber adds ingredients to the Products in order to "claim through its marketing and advertising campaign and package labeling that the Products possess nutritional qualities that are nearly equivalent to those of breast milk," despite the fact that scientific evidence demonstrates that "breast milk provides unique nutritional benefits that Defendant's Products do not provide" (SAC ¶ 11, 14).

10   Defendant cites this Court's Opinion in another case for the proposition that " 'general exposure to, and reliance upon, some advertisements, is insufficient to survive [the] heightened scrutiny' of Rule 9(b)." (Def.'s Br. 20) (quoting *Gray v. Bayer Corp.,* No. 08–4716, 2009 WL 1617930, at *3 (D.N.J. June 9, 2009) (Linares, J.) (no alteration supplied). The Court notes, however, that the excerpt to which Defendant points related to the Court's discussion of Rule 9(b) with regard to negligent and intentional misrepresentation, which require a plaintiff to allege and prove reliance upon a defendant's misrepresentations. 2009 WL 1617930, at *3.

11   *See e.g. Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* 192 N.J. 372, 929 A.3d 1076, 1086 (N.J.2007). (In order to state a claim under the NJCFA, a plaintiff must allege the following: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.)

In re Gerber Probiotic Sales Practices Litigation, Not Reported in F.Supp.2d (2013)

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

9

2014 WL 6461355
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Western Division.

In re POLYURETHANE FOAM
ANTITRUST LITIGATION.
This document relates to: All Cases.

No. 1:10 MD 2196.
|
Signed April 9, 2014.
|
Filed Nov. 17, 2014.

*CLASS CERTIFICATION
MEMORANDUM OPINION AND ORDER*

JACK ZOUHARY, District Judge.

**\*1** On April 9, 2014, this Court filed a sealed Opinion granting class certification. Much of the record, cited extensively throughout the sealed Opinion, was itself sealed. In late April, Defendants asked the Sixth Circuit for leave to appeal the sealed Opinion pursuant to Federal Civil Rule 23(f). On September 29, 2014, the Sixth Circuit denied the appeal. In early November, several Defendants moved to reopen the appeal in order to file an emergency motion to stay issuance of class notice. On November 13, 2014, the Sixth Circuit denied the motions. What follows is a redacted Opinion which preserves almost all of the discussion in the sealed Opinion, omitting most of the record citations and associated parentheticals, and correcting any misspellings or citation form errors.

\* \* \*

## INTRODUCTION

In these consolidated proceedings, two putative classes allege that dominant firms in the flexible polyurethane foam market engaged in a decade-long conspiracy to fix, raise, and maintain the price of foam products. Pending before this Court are Motions for Class Certification by two groups

of plaintiffs: Direct Purchasers and Indirect Purchasers. Defendants opposed the Motions, and Plaintiffs replied. The parties papered the docket with numerous expert reports. (Other parties in this case, Direct Action Plaintiffs, proceed separately from the putative classes.)

This Court then held oral argument on both Motions, and heard testimony from several experts-Leitzinger, Lamb, Ordover, and Burtis. There is more. The parties engaged in a parade of filings with post-hearing supplemental authorities and other materials covering a range of topics. After an exhaustive review of the record, this Court grants both Motions for the reasons that follow.

## BACKGROUND

### The Parties and Products

*Polyurethane Foam Market*
The polyurethane foam ("foam") market consists of several types of products. Foam products are created from a mixture of toluene diisocyanate ("TDI") and polypropylene glycol ("polyol"). Pricing for each chemical is influenced by petroleum prices. The principal chemical manufacturing plants for TDI and polyol, run by industry-dominant firms like Lyondell Chemical Company (now LyondellBasell Industries), Huntsman, Dow, and BASF, are or were located in the Gulf Coast region. Together, these two chemicals account for roughly ninety percent (90%) of foam production costs.

Water also figures in the foam blend, serving as a "blowing agent" that produces an exothermic reaction in the foam blend causing it to expand. Product-specific additives, discussed below, are important in determining foam type. But, like water content, the cost of these additives does not cause large variations in the cost of producing foam products of comparable foam volume-TDIs and polyols are dominant throughout.

From here, production processes and alterations to the general foam blend effectively split the generic foam market into "sub-markets." Some foam, termed "rigid," is used for building or automotive insulation. "Molded" foam, primarily found in automobile cushions, is formed after the foam blend is "poured into custom tooled molds the shape of the desired product." Foam is near ubiquitous, appearing in a vast array of product uses. "Packing peanuts," for example, derive from

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

the same general foam blend. Flexible foam alone amounts to 1.2 billion pounds per year in domestic consumption.

**\*2** But the present Motions, while broad in scope, do not encompass the entire foam industry. Rather, only two foam sub-markets, distinguished from other sub-markets by their production processes and end uses, are relevant: slabstock and underlay.

### Slabstock

As noted above, the foam blend undergoes an exothermic reaction with the addition of a blowing agent, typically water; that reaction generates a release of heat, forming bubbles within the foam blend. "The bubbles in the foam produce 'cells' containing air." For slabstock, the expansion process occurs as foam is continuously "poured" onto a moving conveyor belt. That conveyor belt is equipped with "sides from [three to four feet] high", with length and width dimensions that vary depending on intended uses. Cured slabstock, which resembles a loaf of bread, is also referred to as a "bun."

But not all slabstock is created equal. Foam manufacturers regularly vary foam blends to produce varying characteristics or "grades." Slabstock can vary by density, with more dense foam typically providing better support and comfort. Slabstock can also be more or less firm, measured according to an industry-standard Indentation Force Deflection calculation. "Support factor," a measure of "deep down support," can also be adjusted in the production process, as can resilience or springiness, a quality measured by dropping a steel ball onto foam and measuring the ball's rebound height as a percentage of the drop height. The parties identify other ways slabstock can vary. These characteristics "are determined by the specific formulation of chemicals that are combined to produce [the foam], and are largely independent of each other," such that high resilience foam can be more or less dense.

Slabstock with a given set of characteristics may vary by form. A bun can be sold in the same form in which it leaves the conveyor belt. Or, extending the industry's apparent penchant for baking metaphors, a bun can become a "roll" by slicing the bun lengthwise and then winding the resulting foam sheets into a roll. Or a bun can be otherwise fabricated, either by the bun manufacturer itself or by another firm, through various post-pouring technologies "involv [ing] combining foam with another material, such as a nonwoven substrate or fiber," or joining foam types together.

### Underlay

Underlay, or carpet cushion, is produced in two primary forms. Most commonly, underlay is composed of "rebond." Rebond joins together slabstock "scrap" or "trim" generated during the fabrication process-for example, the waste material created in the course of cutting a bun to some desired shape. The scrap is shredded further, and then combined in a mold with a binding agent. Heat and pressure are applied, forming a rebond bun or log. A rebond bun can then be sliced lengthwise to produce underlay. A rebond log is "rotated against a knife blade to peel the log into a long sheet of rebond foam padding." In both cases, a backing material of some type is applied to the rebond sheets. Two-thirds of rebond production costs are attributable to the price of scrap. Another 20 percent of costs can be traced to the binding agent. Not all the rebond-producing Defendants internally source the scrap used to produce rebond. For example, Mohawk "has always fulfilled all of its scrap foam needs on the open market."

**\*3** In recent years, domestic scrap's place in the rebond "mix" has declined, due in part to the rising price of domestic slabstock. Between 2000 and 2008, underlay producers substantially increased the use of "take up" in producing rebond; "take up" is underlay removed from a prior use in residential or commercial buildings. Similarly, over the same period, scrap imports increased. Rebond demand has declined since 2004, owing to shifts in consumer preferences for wood or tile flooring products.

Carpet cushion also can contain "prime underlay." Prime underlay is not formed from the waste of fabrication operations or post-consumer recycled materials; instead, prime underlay is poured in the same manner as slabstock, for the immediate purpose of serving as foam for underlay Prime underlay is a very small portion of the underlay market, amounting to "less than one percent" of underlay sales in 2009.

Finally, like slabstock, underlay of a particular type can vary according to product attributes. For instance, underlay can include noise dampening qualities and antimicrobial coatings. And, like slabstock, its density can vary. These varying attributes affect underlay prices.

### Plaintiffs and the Proposed Classes

The pending Motions seek certification of classes that include most of Defendants' immediate customers, as well as all end-

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

use purchasers, for certain foam products. Seven Plaintiffs seek certification of a Direct Purchaser class, defined to include:

> All persons or entities that purchased flexible polyurethane foam (but excluding molded foam) directly from Defendants and/or their co-conspirators from January 1, 1999 to July 31, 2010 for purchase from or delivery into the United States. Excluded from the Class are governmental entities, Defendants, their co-conspirators, and their officers, employees, agents, representatives, parents, subsidiaries and affiliates.

Indirect Purchasers,[1] individual consumers and "authorized managing agents" for hotels and other entities operating in various states, seek certification of a class consisting of:

> All persons or entities in Alabama, Arizona, California, Colorado, [the] District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who purchased products containing flexible polyurethane foam ["product" here defined to include only carpet underlay, bedding, and upholstered furniture products], not for resale, which were manufactured, produced or supplied by Defendants or their unnamed co-conspirators from January 1, 1999 to the present. Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

### Defendants

As a group, Defendants dominate the domestic market for the manufacture and sale of flexible polyurethane foam ("flexible foam"). Defendants' internal records trace a gradual increase in Defendants' combined control of the "North American flexible slab production" market over the course of the Class Period-from 80 percent in 1999 to 96 percent of "total U.S.

production" in 2010.[2] A similar upward trend is reflected in Defendants' share of the underlay market, from 91 percent in 2001 to 94 percent in 2009. Individual Defendants during the Class Period have engaged in these two general markets, among others, to greater or lesser degrees.

**\*4** Carpenter manufactures polyurethane foam products, polyols, polyester fibers, and expanded polystyrene products. Carpenter had $269 million in 2009 foam sales.

FXI produces foam for the home, healthcare, electronics, industrial, personal care, and transportation markets. FXI's products include finished goods, sub-assemblies, services, and raw material for OEMs, fabricators, and retailers. FXI had $247 million in 2009 foam sales. In June 2009, FXI purchased assets of the former Foamex International Inc. ("Foamex") at a bankruptcy sale. Defendants represent FXI as "a distinct company [from Foamex] with different ownership that did not exist before 2009." (Defendants claim certain Plaintiffs' experts omit the FXI/Foamex distinction in their references to FXI.)

Future Foam manufactures polyurethane foam for the furniture industry. Future Foam also operates carpet cushion plants and fabricates foam. Future Foam had $221 million in 2009 sales.

Flexible Foam manufactures carpet cushion and flexible foam for bedding, furniture, and specialty applications. Flexible Foam had sales of $269 million in 2009.

Woodbridge primarily manufactures molded foam products for the automotive and transportation industries, and also manufactures rigid foam insulation products, technical foams, and unfabricated and fabricated products. Woodbridge had foam sales of $52 million in 2009.

Leggett & Platt manufactures products for the residential, automotive, and transportation markets. Rebond underlay accounts for the overwhelming majority of Leggett & Platt's sales to direct purchasers. Leggett & Platt sold its slabstock production and sales operations in March 2007, and now only produces underlay using purchased scrap. Leggett & Platt had $185 million in 2009 underlay sales.

Hickory Springs similarly manufactures flexible foam products for the furniture and bedding industries, totaling $180 million in 2009 sales.

Mohawk produces carpet cushion products made from recycled flexible polyurethane foam, latex rubber, and other fibers. Mohawk's relevant sales were limited to carpet underlay during the Class Period, with only a "small fraction," $92 million out of $5 billion, in 2009 total revenues from such underlay sales.

Vitafoam sold its American polyurethane foam manufacturing operations in 2005–06, and differs from other Defendants in two respects: Vitafoam has settled with Direct Purchasers; and Vitafoam is a Department of Justice ("DOJ") corporate leniency applicant-a decision on that application in still pending. Vitafoam also cooperates with Plaintiffs in hopes of securing damages limitations under the Antitrust Criminal Penalties Enhancement and Reform Act of 2004 ("ACPERA"), in the event judgment is entered against Vitafoam.

### Distribution Chains

Earlier discussion identified links in the foam distribution chain. Chemical manufacturers, like BASF, sell TDIs and polyols to slabstock manufacturers, or "foamers," like Flexible Foam. Flexible Foam might then sell unfabricated foam buns or partially fabricated foam rolls to foam fabricators. Further foam fabrication may be followed by sale of the resulting fabricated foam product to an original equipment manufacturer ("OEM"), like a mattress producer. Or the fabricated foam can be sold directly to a retailer or distributor, without further finishing. In either case, after purchasing flexible foam from a Defendant, an OEM, retailer, or distributor eventually sells a product incorporating flexible foam to an end-use consumer.

 *5  The underlay distribution chain is similar to the slabstock and fabricated foam distribution chains. Again, chemical manufacturers sell inputs to foamers who then pour slabstock. Foamers sell unfabricated slabstock to foam fabricators, who in turn sell trim generated during fabrication of slabstock to rebond producers. Alternatively, rebond manufacturers can purchase take-up from vendors of that input, or imported scrap from brokers, or rely on internal scrap. Rebond is then produced from these primary inputs. The same firm, or a different firm, then fashions underlay from the rebond bun or log. Underlay is then sold to retailers, distributors, and buying co-ops. Builders, or homeowners directly, then purchase the underlay for end-use in commercial and residential buildings.

Defendants fill a number of these roles in the supply chain. Carpenter, a producer of polyols, is both a chemical manufacturer and a foamer, while Mohawk is not a foamer, and instead manufactures only underlay using purchased scrap. The fact that not all Defendants engage in the slabstock and underlay markets to the same extent means that situations like the following hypothetical can arise: Flexible Foam might sell slabstock to Fabricator A. Fabricator A could then sell scrap to Mohawk. Or Flexible Foam could sell its internal scrap to Mohawk, directly or through a scrap broker. It may even be that a Defendant firm could sell an unfabricated bun to a fabricator, and then purchase, from the same fabricator, scrap cast off from the earlier-sold bun for use in rebond production.

Eventually a product reaches its "end-use." Indirect Purchasers describe three relevant end-use categories: (1) carpet underlay; (2) "bedding (*i.e.,* mattresses, pillows, and toppers)" and; (3) "upholstered furniture products, including upholstered sofas and chairs." These three categories account for three-fourths of all domestic foam consumer uses. In consumption terms, underlay is the largest of these end-use markets, followed by bedding and then furniture. Defendants' flexible foam products appear in each of the end-use markets to varying degrees.

### The Alleged Conspiracy

Plaintiffs allege Defendants joined in a conspiracy to fix and raise the price of flexible polyurethane foam, and to allocate customers in that market. The Direct Purchaser Class Period spans more than eleven years, from January 1, 1999 through July 31, 2010. The Indirect Purchaser Class Period shares the same start date, but runs through the present.

Plaintiffs allege that law enforcement first learned of the conspiracy when, in February 2010, Vitafoam sought admission to the DOJ corporate leniency program. DOJ issued Vitafoam a "conditional leniency letter ..., which means that Vitafoam has admitted to its participation in a conspiracy to violate the U.S. antitrust laws ." Further, in connection with Vitafoam's participation in that program, and in cooperation with Canadian antitrust authorities, Vitafoam employees "revealed the mechanisms, participants, duration, and impact of the conspiracy."

 *6  According to these Vitafoam employees, the conspiracy worked as follows: chemical manufacturers would announce a price increase for TDIs or polyols, providing Defendants the "pretext" for a collusive price increase. Defendants would then resort to an "established practice" to "reach an agreement or understanding" on the amount and timing

of price increases for their foam products, by phone or in person. Face-to-face talks were typically held two to three times per year and often coincided with foam industry trade shows. Price increase letters also played an important role in reaching and enforcing the conspiratorial agreement. Prior to sending customers formal notice, the exchange of draft price increase letters provided a basis for discussing the level and timing of increases. After publishing price increase letters, exchange of the letters helped Defendants police co-conspirator's compliance with the agreed-on pricing policy.

Plaintiffs then detail the participation of four Vitafoam employees in the conspiracy, discussing their use of these same coordination practices to agree on anticompetitive pricing and naming other Defendants' employees who joined in these discussions. These Vitafoam employees include: a former Vitafoam President; the then-current Vitafoam President; a former Vitafoam Vice President of Sales; and a succeeding Vice President of Sales. This last Vitafoam employee also appears as "Witness A" in a Canadian sworn information in support of a search warrant, identifying foam industry employees involved in the conspiracy.

Plaintiffs allege that *every* flexible foam price increase letter issued during the Class Period was "the result of conspiratorial discussions among Defendants on pricing."

## CLASS CERTIFICATION STANDARD

Direct Purchasers seek certification of a nationwide class, comprised of individuals who directly purchased products containing slabstock and underlay from Defendants or their coconspirators. Indirect Purchasers seek certification of a class that includes residents of twenty-nine (29) states and the District of Columbia who purchased items falling within three end-use products—underlay, bedding, and furniture products-and containing slabstock or underlay manufactured by Defendants or their co-conspirators. Both Motions seek certification of classes under Federal Civil Rule 23(a) and (b) (3).

To be certified under Rule 23, a putative class action first must satisfy Rule 23(a), which provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

**\*7** Second, the putative class action must satisfy one of three sets of conditions under subsection (b) of the same Rule. Relevant here, Rule 23(b)(3) requires this Court to determine if:

[Q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Plaintiffs bear the burden of showing the relevant components of the rule are met. *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). Rule 23(a) and (b)(3) require Plaintiffs to establish six requisites before a class may be certified: numerosity, commonality, typicality, adequacy, predominance, and superiority.

Some courts note a seventh "implied" requirement of "ascertainability." *See, e.g., In re High–Tech Employee Antitrust Litig.,* 289 F.R.D. 555, 563 (N.D.Cal.2013). Both proposed class definitions meet that requirement. For a class to be ascertainable, the proposed definition "must be precise, objective, and presently ascertainable." It must not rely on "subjective" factors like a class member's state of mind. "For example, the class may consist of those persons and companies that purchased specified products ... from the

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

defendants during a specified period...." ANN. MANUAL ON COMPLEX LIT. § 21.222 (4th ed.).

At the class certification stage, Plaintiffs must show that there are "*in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation" under 🔖 Rule 23(a), and must further "satisfy through evidentiary proof at least one of the provisions of 🔖 Rule 23(b)." *Comcast Corp. v. Behrend,* 133 S.Ct. 1432, 1436 (2013) (internal quotation mark omitted) (emphasis in original). The Sixth Circuit recently declined to adopt a standard, embraced in other circuits, that would require "a district court, when deciding whether to certify a class [to] resolve factual disputes by a preponderance of the evidence." *Gooch v. Life Investors Ins. Co. of Am.,* 672 F.3d 402, 418 n. 8 (6th Cir.2012) (internal quotation marks omitted). The court concluded there was "no reason to superimpose [on the Circuit's longstanding "rigorous analysis" standard] a more specific standard"-specifically, a preponderance standard-"than the Supreme Court" did in 🔖 *Wal-mart Stores, Inc. v. Dukes,* 564 U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). *Id.* But the court also concluded that "the result [in *Gooch* ] would not differ [if a preponderance standard had been adopted] ... because factual issues [were] not in play." *Id.*

**\*8** The "rigorous analysis" in which this Court must engage may "overlap with the merits of the plaintiff's underlying claim." 🔖 *Comcast Corp.,* 133 S.Ct. at 1436. *See* 🔖 *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 168 (3d Cir.2001) ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."). But at the same time, this Court has no "license to engage in free-ranging merits inquiries" at this stage of the proceedings. It may consider "[m]erits questions ... to the extent-but only to the extent-that they are relevant to determining whether 🔖 Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Con.* 🔖 *Retirement Plans and Trust Funds,* 568 U.S. ——, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013). *See also* 🔖 *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012) (noting a district court's class certification inquiry is not "a dress rehearsal for the trial on the merits"); 🔖 *Szabo v. Bridgeport Machines,* Inc., 249 F.3d 672, 677 (7th

Cir.2001) ("A court may not say something like ... 'I'm not going to certify a class unless I think that the plaintiffs will prevail' "). Where this Court must probe merits questions, it must resolve any material evidentiary disputes. 🔖 *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 324 (3d Cir.2008) (the task of "[r]esolving expert disputes in order to determine whether a class certification requirement has been met is always a task for" a district court). *See also* 🔖 *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir.2011) (noting a district court erred when "[i]nstead of judging the persuasiveness of the evidence presented, the district court seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible").

This Court's 🔖 Rule 23 inquiry requires it to "sift[ ] the [parties'] evidence through the sieve of the legal claims." 🔖 *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.,* 722 F.3d 838, 852 (6th Cir.2013) ( "*In re Whirlpool Corp.*"), *cert. denied, Whirlpool Corp. v. Glazer,* ——U.S. ——, 134 S.Ct. 1277, 188 L.Ed.2d 298 (Feb. 24, 2014). Plaintiffs must prove: "(1) Defendants violated [the Sherman Act or, in Indirect Purchasers' case, state-law analogues]; (2) Defendants' violation caused Plaintiffs to suffer some injury to their business or property (injury-in-fact or impact); and (3) the extent of this injury can be quantified with requisite precision." 🔖 *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 331 (E.D.Mich.2001). Thus, 🔖 Rule 23 proof is framed in terms of liability, impact, and damages. In addition, because each putative class seeks damages for purchases made during the entire Class period, they must show fraudulent concealment is susceptible of proof on a classwide basis. *See* 🔖 *Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 446 (6th Cir.2012) (listing the three elements of fraudulent concealment, proof of which is necessary to toll applicable statutes of limitations). "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." 🔖 *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005).

**\*9** Should this Court conclude that either Motion should be granted, this Court must then appoint class counsel, considering under 🔖 Rule 23(g)(1)(A):

(i) the work counsel has done in identifying or investigating potential claims in th[is] action;

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in th[is] action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

This Court may also consider other relevant factors outlined in Rule 23(g)(1)(B)-(D). Appointed class counsel must "fairly and adequately represent the interests of the class." Federal Civil Rule 23(g)(4).

### Plaintiffs Satisfy Rule 23(a)

Each putative class satisfies the numerosity requirement of Rule 23(a)(1), a point Defendants do not dispute. "[W]hile there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.,* 458 F.3d 549, 552 (6th Cir.2006). As noted below in this Court's predominance discussion, expert analysis shows each proposed class contains (at minimum) thousands of members.

Nor do Defendants seriously dispute that each putative class has identified "questions of law or fact common to the class." Rule 23(a)(2). Plaintiffs need identify only one common question of law or fact for purposes of "commonality." *See Wal-mart Stores, Inc. .,* 131 S.Ct. at 2556. *See also Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998). The resolution of a common question must "drive the resolution of the litigation." *Wal-mart Stores, Inc.,* 131 S.Ct. at 2551. *See also In re Deepwater Horizon,* 739 F.3d 790, 811 (5th Cir.2014) (characterizing a plaintiff's commonality burden as requiring "evidence to demonstrate that a particular contention is common, but not that it is correct" or true). Plaintiffs' identified common questions do just that-they are common and critical, in that resolution of all putative class members' claims depend on a single answer provided by a factfinder (*see* Doc. 584–1 at 35 (noting common questions to include the existence of the alleged price-fixing and customer allocation conspiracy, antitrust injury, and aggregate damages calculations); Doc. 578 at 23–24 (same)).

Rule 23(a)(3) demands that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." This element of the Rule serves to "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of the Nw., Inc. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.,* 75 F.3d at 1082.

Defendants argue in passing that the claims of certain Indirect Purchasers are atypical of the class claims. Defendants note that two Indirect Purchasers–Kathleen Nolan and Kirsten Luenz—received rebates or other discounts when purchasing the products on which their claims are predicated- in Nolan's case, a pillow, and in Luenz's case, mattresses. But Defendants do not, and cannot, dispute that Nolan and Luenz assert claims based on a legal theory, which, if proven, would also entitle those less thrifty class members to recover. *See Sprague,* 133 F.3d at 399 (noting typicality does not exist if "a named plaintiff who proved his own claim [does] not necessarily prove[ ] anybody else's claim."). *See also In re Cardizem CD Antitrust Litig.,* 200 F.R.D. at 304 ("[C]laims in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s typicality requirement, even if members purchase different quantities and pay different prices"). If Nolan and Luenz secure damages in this case, they would do so only because a factfinder has accepted Indirect Purchasers' proof establishing the alleged conspiracy and found credible and persuasive expert analysis of impact and damages. So too for the other class members' claims.

**\*10** Defendants' standing-based challenges to Nolan and the Parker entities fare no better. (*See* Doc. 742 at 79–80 (Nolan testimony establishing Nolan and her spouse jointly purchased the pillow on which Nolan's claim depends); *id.* at 82, 84, 86, 88 (assigning to Parker claims of the Parker-related entities)). Similarly, Defendants argue that "the entities on whose behalf Driftwood is suing specifically *disclaim* any legal agency relationship between Driftwood and them." That assertion is based on the deposition testimony of a Driftwood corporate deponent who does not offer any legal conclusion as to whether an agency relationship exists between Driftwood and the various hotels on whose behalf Driftwood sues. Nor do the management agreements preclude Driftwood

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

from suing on a managed hotel's behalf-in fact, each of the management agreements obligates Driftwood to act in that capacity. For five hotels, the management agreements specifically identify Driftwood as an "agent" of the hotel it manages and, further, obliges Driftwood to sue on the hotels' behalf. For three other hotels, Driftwood is not described as an "agent," but is nonetheless required to sue on the managed hotel's behalf. Thus, typicality exists with respect to the claims of the putative classes' representatives.

Finally, Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." This component of Rule 23 focuses this Court's attention on the qualities of both the class representatives and proposed class counsel. "The representative must have common interests with unnamed members of the class, and [ ] it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Vassalle v. Midland Funding LLC,* 708 F.3d 747, 757 (6th Cir.2013) (alterations omitted) (quoting *In re Am. Med. Sys., Inc.,* 75 F.3d at 1088). But "[b]ecause few people are ever identically situated, it is easy to paint an image of the class representative's interests as peripherally antagonistic to the class. That depiction does not make [a] plaintiff an inadequate representative." *Gooch,* 672 F.3d at 429. *See also* *Matamoros v. Starbucks Corp.,* 699 F.3d 129, 138 (1st Cir.2012) ("Put another way, to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole."). A supposed conflict should doom class certification only if that conflict is "fundamental." *Ward v. Dixie Nat. Life Ins. Co.,* 595 F.3d 164, 180 (4th Cir.2010).

Plaintiffs identify the proposed class representatives' "common interests" to establish the existence of the alleged price-fixing conspiracy and to recover damages. Each touts the skills of proposed class counsel, and argue the time and resources invested by proposed class counsel to date show proposed class counsel will vigorously litigate the class claims.

**\*11** Defendants do not dispute either group of proposed class counsel are "qualified counsel" for the purposes of Rule 23. This Court agrees. Instead, Defendants point to characteristics of specific class representatives,

and argue these characteristics create conflicts between class representatives, as well as with the class. With respect to Direct Purchasers, Defendants note the breadth of the proposed class-encompassing slabstock, underlay, and fabricated foam-and then emphasize two facts: five of seven class representatives produced and sold fabricated foam "in direct horizontal competition with Defendants" and so made sales of fabricated foam that "benefitted" from the inflated pricing environment created by the alleged conspiracy; and two of seven class representatives sourced large portions of their flexible foam purchases from firms who are not defendants, and so are "hardly representative of purchases by the class Plaintiffs seek to create." Direct Purchasers counter that in earlier downstream discovery orders, this Court rejected the premise of Defendants' conflicts argument.

This Court concludes Direct Purchasers satisfy the adequacy requirement. That two of the seven class representatives purchased large amounts of flexible foam products from non-defendant firms does not change the fact that the same class representatives also seek recovery of alleged antitrust overcharges on purchases from Defendants. *See* *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 532 (3d Cir.2004). This is hardly a "fundamental conflict" (if a conflict at all). *See* *Schlaud v. Snyder,* 717 F.3d 451, 458 (6th Cir.2013) (noting a "clear conflict" between named representatives, all of who opposed union representation "in any form," and members of the class, many who approved the collective bargaining agreement and its challenged mandatory dues provision). Nor is Defendants' conflicts argument, touching on the competitor foam fabricator class representatives, a basis for denying certification of a Direct Purchaser class. This Court's prior downstream discovery orders do not resolve this issue, but they come close.

Specifically, Defendants' conflicts argument necessarily would require the competitor foam fabricators who wish to serve as class representatives to not only show they have individual standing to bring an antitrust claim, but to also show lost profits (or lower profit margins) during the Class Period in the relevant areas of competition. After all, how else could these competitors avoid Defendants' painting them as "benefitting" from the alleged conspiratorial pricing? But the *Hanover Shoe* line of cases, embraced by this Court in its downstream discovery orders, deem an antitrust plaintiff's lost profits irrelevant for purposes of impact and damages:

It is also clear that if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

**\*12** *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). *See also* *Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

This Court joins those courts that have found the logic of *Hanover Shoe* extends to also reject conflicts arguments based on the fact that a representative plaintiff may have "benefitted" from the anticompetitive conduct they challenge. *Teva Pharm. USA, Inc. v. Abbott Labs.,* 252 F.R.D. 213, 227 (D.Del.2008); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* 246 F.R.D. 293, 304 (D.D.C.2007) (holding "Defendants' arguments that the [representative parties] actually benefitted from the delayed entry of [a generic drug] into the market due to the generic bypass phenomenon are irrelevant as a matter of law, and cannot serve to demonstrate that a conflict exists between Plaintiffs' interests and those of the ["benefitting" parties] with respect to this litigation"). Defendants' conflicts arguments, based on the fact of foam fabricator competition, are speculative and are leveled in the face of a proposed damages methodology that would first calculate classwide damages, and then award each representative party and class member the full amount of damages to which the Sherman Act entitles them, based on transaction-level data. *See* NEWBERG ON CLASS ACTIONS § 3:64 (5th ed.) (noting "this form of

conflict should not preclude a finding of adequacy on merely speculative terms as, for example, it will almost always be the case that some member in a large class prefers the status quo for some reasons"). And in any event, were these hypothetical conflicts to become conflicts in fact (*e.g.,* in the context of a class settlement), mechanisms exist for addressing this issue.

*See* *Kohen v. Pacific Inv. Mgmt. Co. LLC,* 571 F.3d 672, 680 (7th Cir.2009).

### *Plaintiffs Satisfy Rule 23(b)(3)*

In recognition of the fact that Rule 23's predominance requirement is "more stringent" than other elements of the Rule, *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 609, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the overwhelming focus of the briefing discusses whether Direct or Indirect Purchasers can show that common questions of fact or law predominate over those questions "affecting only individual members." To carry their Rule 23(b)(3) burden, Direct and Indirect Purchasers offer documentary evidence, deposition testimony, and the expert reports of Leitzinger, Krieger, Gordon (for Direct Purchasers), and Lamb (for Indirect Purchasers). Defendants reply in kind, offering contrary expert reports of Ordover, Burtis (for Mohawk and Leggett & Platt), the Sentinel Group, and Maness (for Vitafoam).[3]

At this stage of the litigation, Plaintiffs' burden as it relates to predominance is "not to prove [ (for example) ] the element of antitrust impact." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d at 311. Plaintiffs must instead show that the essential elements of their claims are "*capable* of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311–12 (emphasis added). This inquiry necessarily requires this Court to form "some prediction as to how specific issues will play out" in terms of trial proof, particularly when a class certification decision is made on the basis of an incomplete discovery record. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 522 F.3d 6, 20, 27 (1st Cir.2008). The predominance inquiry gauges whether a proposed class is cohesive enough to "warrant adjudication by representation." *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 564 (6th Cir.2007) (internal quotation marks omitted) (quoting *Amchem Prod., Inc.,* 521 U.S. at 632).

**\*13** The Sixth Circuit has expanded on this predominance burden at some length, in the course of examining recent Supreme Court class action jurisprudence. *See* 🔖 *In re Whirlpool Corp.,* 722 F.3d at 858–61. In this Circuit's view, *Amgen* instructs that a plaintiff need not "prove that each element of a claim can be established by classwide proof: 'What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members.' " 🔖 *Id.* at 858 (emphasis and alterations original) (internal quotation mark omitted) (quoting 🔖 *Amgen Inc.,* 133 S.Ct. at 1196). *Comcast* did not alter that burden: it merely "reaffirms the settled rule that liability issues relating to injury must be susceptible of proof on a classwide basis to meet the predominance standard." 🔖 *Id.* at 860. *See also id* . (concluding *Amgen* and *Comcast* "are premised on existing class-action jurisprudence"). *But see* 🔖 *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 725 F.3d 244, 255 (D.C.Cir.2013). All that is needed is "common evidence and methodology," not "also common results for members of the class." 🔖 *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir.2013), *cert. denied,* 143 S.Ct. 1277 (Feb. 24, 2014). *See also* 🔖 *Amgen Inc.,* 133 S.Ct. at 1196 (noting putative class representatives "need not, at th[e clas certification] threshold, prove that the predominating question will be answered in their favor").

Defendants attempt to distinguish *In re Whirlpool Corp.,* noting the case involved products liability claims with impact occurring at the point of sale. But while that case's discussion of the predominance standard occurred in a specific factual context-as all 🔖 Rule 23 cases do-there is no reason to conclude *In re Whirlpool Corp.'s* instructive analysis is limited to products liability class action litigation. After all, *In re Whirlpool Corp.* expounds *Comcast* and *Amgen,* which undoubtedly control this Court's analysis. *See Merenda v. VHS of Mich., Inc.,* 296 F.R.D. 528, 548 (E.D.Mich.2013) (citing *In re Whirlpool Corp.* for its predominance analysis in the course of certifying a plaintiff class asserting federal antitrust claims). *See also Cason–Merenda v. VHS of Mich., Inc.,* 2014 WL 905828 (E.D.Mich.2014) ("reinstating in full" the district court's prior opinion and order, following an order from the Sixth Circuit directing the district court to reconsider its prior decision in light of *Comcast* ). [4]

Analysis of whether Plaintiffs satisfy 🔖 Rule 23's predominance requirement "begins, of course, with the elements of the underlying cause of action." 🔖 *Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011). Therefore, this Court wades through the parties' proof by examining liability, impact, damages, and, finally, fraudulent concealment. This Court conducts a "rigorous" analysis of Direct Purchasers' predominance showing, followed by a similar analysis of Indirect Purchasers' attempt to satisfy the same requirement.

\* \* \*

## Direct Purchasers' Liability Proof

**\*14** Direct Purchasers allege that the conspiracy centered on the issuance of price increase letters "close in time and for the same or similar amounts and effective dates" throughout the Class Period. Direct Purchasers submit examples of these price increase letters. Similarly, Leitzinger prepared a chart, listing for each quarter the Defendants who issued price increase letters; the percentage price increase reflected in the letter; and the foam products to which the letter applied. The price increase letters typically attribute increased foam prices to increases in raw materials prices. Or more specifically, the price increase letters claim that "[s]uppliers of polyol and TDI have substantially increased their prices to the urethane industry" or that the cost of trim had risen. These price increase letters typically applied to broad product segments, and provided the starting point for price negotiations with customers.

Direct Purchasers offer witness declarations that throughout the Class Period there were communications between foam industry competitors "to coordinate the percentage amount and timing of price increases for foam" so that individual Defendants could enter account negotiations "knowing that [ ] competitors had also issued the same or a nearly identical increase," limiting a customer's ability to "play [competitors] against [ ] competitors and either negotiate a much lower increase or no increase at all." *See also* Doc. 584–9 at 8 (describing Defendants' discussions about, and the exchange of, price increase letters as aimed at helping "push through price increases" for foam products); Doc. 584–15 at 39; *id.* at 10–11 (noting that "purchasing agents" for customers are "paid to tell stories" about a Defendant's competitors' pricing decisions).

Direct Purchasers argue that five categories of documentary or deposition evidence establish the patterns in price increase letters resulted from the price-fixing conspiracy. First, Direct Purchasers offer "direct evidence" of communications between Defendants about foam pricing (*see, e.g.,* Doc. 584–3 at 2 (Leggett & Platt email noting Carpenter, Foamex, and Future Foam price increases and Leggett & Platt's intention to "have our letters ready to mail to selected accounts"); Doc. 584–4 at 11; *id.* at 59 (Leggett & Platt email recounting sender's price discussions with Vitafoam and Hickory Springs, and noting "Carpenter wants Foamex to lead")). This "direct evidence" includes materials that Direct Purchasers claim show "advance knowledge" of a competitor's impending price increases (*see, e.g.,* Doc. 584–5 at 91 (Leggett & Platt employee e-mailing to Flexible Foam employee an "initial draft" price increase letter, expected to be mailed to customers one or two business days later); *id.* at 82 (draft Foamex letter with "tracked changes," notifying customers of Foamex plans to "allocate products to [Foamex] customers," produced in discovery in this matter by Carpenter)). Direct Purchasers also offer documents in which the employees of Carpenter and Woodbridge make none-too-subtle allusions to price-fixing (*see, e.g., id.* at 124 (email of Woodbridge employee, concluding with the observation that "I think we should go strong and tr[y] to keep Vita and [Foamex] on board. Forget [market] share for now—fix pricing." (line break omitted))

 **\*15** Direct Purchasers also collect a series of faxed price increase letters, in which the letter's header shows the transmitting Defendant, while the Bates stamp shows the Defendant that (directly or indirectly) received the letter and later produced the document in discovery. For instance, Vitafoam produced a March 2000 Foamex price increase letter, while Hickory Springs produced a June 2004 Future Foam price increase letter. Direct Purchasers offer a second compilation of price increase letters, sent by fax or e-mail, except this collection shows one Defendant transmitting to another Defendant the price increase letters of a third Defendant or group of Defendants. Defendants also exchanged price increase letters in face-to-face meetings.

Second, Direct Purchasers point to "indirect communications" between Defendants. Specifically, Direct Purchasers offer evidence that Defendants communicated about price coordination through third-parties. *See, e.g.,* Doc. 584–8 at 38 (scrap broker sending Carpenter a Leggett & Platt price increase letter); *id.* at 42–44 (scrap broker sending Carpenter the price increase letters of Hickory

Springs, Scottdel, and Flexible Foam); Doc. 584–8 at 71–72; Doc. 584–9 at 139 (email from Woodbridge employee to Woodbridge–Hickory Springs joint venture employee, asking for, and later receiving, price increase information on "what Hickory is doing").

Third, Direct Purchasers offer evidence that, during periods in which price increase letters were issued, Defendants refused new customers because a new "customer would only come[ ] to [a Defendant] in an attempt to beat the price increase" and the price increase was "more important to [a Defendant] than a little additional business."

Fourth, Direct Purchasers emphasize the "admissions" of Vitafoam, made during Vitafoam's 30(b)(6) deposition in related litigation. Specifically, Vitafoam's corporate witness agreed that the Vitafoam Defendants–Vitafoam Canada and Vitafoam, Inc.-had "communicated and reached understandings on the percentage amount and timing of price increases and market allocation in the sale of polyurethane foam." Vitafoam's witness specifically identified FXI, Woodbridge, Carpenter, Hickory Springs, and Future Foam as the Vitafoam partners in these "understandings."

Finally, Direct Purchasers note that twenty employees of four Defendants have invoked their Fifth Amendment privileges against self-incrimination in the course of depositions in this matter.

Direct Purchasers argue all of this evidence-the price increase letters themselves and patterns among Defendants in issuing price increase letters, direct and indirect communications between Defendants about pricing, certain Defendants' stated refusal to pursue new customers through price competition during a period in which a price increase letter was in effect, the Vitafoam "admissions," and deponents' Fifth Amendment invocations-establish that Direct Purchasers "will seek to show through common proof at trial that Defendants coordinated the substance and timing of price increase letters on a national level to all customers for all flexible polyurethane foam products each defendant sold." Direct Purchasers will use the same proof to answer for each class member questions like "did the conspiracy exist" and "for how long did it exist?" [5]

 **\*16** Defendants counter with two related arguments. First, Defendants argue the price-fixing conspiracy alleged in the Complaint did not exist, a fact borne out by the failure of discovery to "yield[ ] evidence of any agreement among

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

foam manufacturers in the [United States] to fix the timing or content of price increase" letters. Defendants characterize the declarations of the Domfoam and Valle Foam witnesses as expressly disclaiming "that they ... ever entered into an agreement with any Defendant to fix prices or allocate customers" (*id.*). *See also* Doc. 682–6 at 68 ("Q: So ... [was] your decision to pass on a price increase [letter] ... the result of an agreement with another company ... ? [objection omitted] A: No, [it was not result of an agreement] with anybody"); Doc. 682–7 at 4 (same); Doc. 682–8 at 3 (same)). *But see* Doc. 744–2 at 17 (testifying that in the aftermath of chemical price increases "[m]eetings weren't held by all the foamers saying, 'Okay. Now it is time. We've got to put letters out.' But on an informal basis, 'I'm raising prices, and its going to be on this date and this percent. And here's evidence of what I'm going to do [in the form of exchanged price increase letters]'.... So that's as sophisticated as we got in assuring that everybody was on the same page in terms of getting prices up when there was a chemical price increase.") (paragraph break omitted)).

Defendants cast Vitafoam's corporate depositions, taken in related litigation, in the same light. *But see* Doc. 584–10 at 13 (relating testimony of Vitafoam's corporate witness that she was "struggling with, ... the word 'agreement,' " but agreeing that Vitafoam reached "understandings" with other Defendants as to the "percentage amount and timing of price increases"). In the absence of specific evidence of express agreements to fix prices, Defendants argue that Direct Purchasers merely attempt-unsuccessfully-to transform "field chatter and attempts to gather competitive intelligence into" the conspiracy.

Second, and similarly, Defendants argue market reality, consistent with legal and economic theory predictions of behavior in concentrated markets, shows only independent behavior by firms faced with the same supply and demand conditions. Defendants argue these independent decisions are bare conscious parallelism, or "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

It would, of course, be inappropriate for this Court to decide, on the basis of an incomplete discovery record and in the context of a motion for class certification, that Defendants are

correct in arguing the conspiracy did not in fact exist. This Court's inquiry focuses instead on whether, on the basis of this record, the element of antitrust liability is susceptible of proof through evidence common to the class. Defendants may be correct in the significance they attach to Direct Purchasers' liability evidence. But if so, that fact simply would mean summary judgment would be appropriate as to the Direct Purchaser class, or that a trier of fact should reject Direct Purchasers' liability arguments. Defendants do not succeed in showing liability questions-however answered-cannot be answered through common proof. Like the defendant in *In re Whirlpool Corp.,* Defendants simply point to "a fatal similarity [,] an alleged failure of proof as to an element of the [Direct Purchasers'] cause of action," that this Court may not yet resolve. *In re Whirlpool Corp.,* 722 F.3d at 859. This Court concludes that, considered as a whole, the Direct Purchaser class certification evidentiary record does support such a finding.

### Direct Purchasers' Impact Proof

**\*17** "[T]he task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d at 311–12. Direct Purchasers need only produce a method of proof capable of showing "some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and *not the fact* of damage. It is enough that the illegality is shown to be a material cause of the injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (emphasis added). Direct Purchasers must show "that the class members paid a higher price for [foam products] purchased from Defendants than they would have absent the existence of a conspiracy." *In re Titanium Dioxide Antitrust Litig.,* 284 F.R.D. 328, 340 (D.Md.2012) *amended,* 86 Fed. R. Serv.3d 674 (D.Md.2013). To show impact is susceptible of proof on a classwide basis, Direct Purchasers must show "widespread impact," or that all or nearly all class members suffered injury:

> What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification, despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct. Those cases focus on the class definition; if the definition is so broad that it sweeps within it persons who *could not have been injured* by the defendant's conduct, it is too broad.

*Kohen,* 571 F.3d at 677 (emphasis added) (citations omitted).

Direct Purchasers' proposed proof on impact comes in four forms. First, Direct Purchasers refer back to evidence, discussed above in the context of antitrust liability, purporting to show Defendants "systematically and collusively coordinated ... nearly-simultaneous price increase" letters that applied to all of a Defendant's flexible foam products, or to all products in a foam sub-market. Second, Direct Purchasers state the price increase letters did not just announce price increases, but paved the way for actual price increases after individual negotiations with customers. Third, Direct Purchasers point to foam's commodity nature, which dictates that competition occur primarily on the basis of price. And finally, Direct Purchasers offer Dr. Leitzinger's analysis of market structures and his impact models. Defendants vigorously dispute that any of these facts can support classwide proof of impact, relying heavily on dueling expert reports, which are examined next. *See In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 42 (2d Cir.2006) *decision clarified on denial of reh'g.,* 483 F.3d 70 (2d Cir.2007).* Leitzinger's assertion that there is evidence "common to members of the proposed class ... which leads to the conclusion that all or virtually all members of the proposed class have been impacted by the alleged conspiracy" rests on three analytical components, summarized in turn below: (1) inferences drawn from market structure; (2) Defendants' pricing behavior; and (3) statistical evidence of impact.

*Market Structure*

 **\*18**  Leitzinger's review of the discovery to date leads him to conclude that there are five characteristics of the flexible foam market that make this case susceptible to a showing that all or nearly all direct purchasers suffered antitrust injury. First, throughout the Class Period Defendants controlled the vast majority of the slabstock and underlay markets. Defendants' own internal estimates of concentration in the relevant sub-markets bear this out. A series of Foamex and FXI estimates show Defendants, as a group, gradually increasing their control of the slabstock market until achieving almost total control of that market: in 2000, Defendants controlled 85 percent of the slabstock market; that number rose to 89 percent in 2003; and to 96 percent in 2010. Market concentration is actually more pronounced, because Foamex estimated in 2009 that just four Defendants accounted for 87 percent of domestic slabstock production. Leggett & Platt estimated in 2001 that 91 percent of the underlay market rested in the hands of Defendants, while a 2009 FXI document estimated Defendants held 94 percent market share in that industry.

The upshot of all these concentration figures is straightforward. With such a large portion of the relevant sub-markets controlled by Defendants, it is unlikely that a substantial number of direct purchasers would have avoided the alleged conspiracy's price effects. And, high market concentration, particularly with certain Defendants' focus in one sub-market, reduces coordination costs, increases the likelihood that a price-fixing conspiracy would have been successful, and increases the scope of the conspiracy's likely price effects.

Second, several barriers to entry substantially impede firms from entering the slabstock or underlay markets. A Foamex investment analysis concludes barriers to entry are "relatively high" in the industry, specifically observing that to be competitive with existing market participants, new entrants must: be able to purchase foam inputs on a large scale to take advantage of purchasing economies; make substantial capital investments before beginning foam production; possess certain expertise in large-scale foam production processes; and gain access to large foam direct purchasers, like Wal–Mart. Moreover, foam inputs, including TDI, are heavily-regulated hazardous materials, the proper handling of which may be cost-prohibitive for smaller firms looking to penetrate the foam market. Producing foam itself subjects a firm to still

more regulatory requirements, such as federal and state clean air standards.

Even if a firm could overcome these initial barriers with respect to either slabstock or underlay, Defendants' substantial excess capacity in each sub-market would allow Defendants to flood either market with increased production, causing slabstock or underlay prices to plummet, thus preventing the new entrant from recouping on the investment needed to enter the market. These various barriers block a non-conspirator firm from newly entering the slabstock or underlay markets in hopes of undercutting the alleged cartel's supracompetitive pricing decisions, and support a finding that common evidence exists to show that all or nearly all direct purchasers suffered antitrust injury.

**\*19**  Third, demand for flexible foam products is inelastic. For the effect of a price conspiracy to be widespread, a price-increase driven decline in sales volume must "not outweigh the benefit of higher prices." Put differently, collusion is more likely to occur, and its effects are more likely to be widespread, when conspirators can profit more from selling less of a product at a higher, supracompetitive price than by selling more of a product at a lower, competitive price. A cartel's chance of fixing a supracompetitive price that pulls off that balancing act increases in tandem with the inelasticity of the product's demand. And that inelasticity depends, in part, on the existence (or not) of acceptable substitutes for the product, or the product's share of end-use product costs.

Leitzinger bases his conclusions that demand for flexible foam is inelastic on discovery materials that describe flexible foam gradually supplanting alternative cushioning materials, like polyester fibers, natural latex, and resinated cotton. A 1996 "Economic Impact Analysis," authored by the U.S. Environmental Protection Agency, compares flexible foam to its "primary substitute for slabstock in cushioning applications," polyester fiber, noting flexible foam's superior product qualities. Leitzinger offers similar observations with respect to bedding applications and underlay. Because slabstock, as an intermediate material, comprises a relatively small share of end-use product costs, furniture and bedding manufacturers are relatively insensitive to flexible foam price increases.

Fourth, there exists evidence establishing that slabstock and underlay are "commodities," as economic literature defines that term. The more closely flexible foam products resemble a prototypical commodity, like gasoline of a given grade,

the more cohesive an industry cartel will be and the more widespread the price effects. This is so because cartel members would need to reach agreement, and then police that agreement, only with respect to one product characteristic: price. Though Defendants produce a wide range of slabstock grades, varying according to product characteristics like foam density or IFD, discovery materials show Defendants and their customers could identify and compare each Defendant's version of a given slabstock grade. An FXI employee testified that foam fabricators would buy buns "from anyone who had the lowest price that day." Similar evidence is offered with respect to underlay, which Hickory Springs, Leggett & Platt, Foamex, and Carpenter all described as commodity-like products, with Mohawk making similar statements. Here, too, variability exists among underlay grades, but again Defendants and their customers were able to compare these various grades on a price basis.

Fifth, because TDIs and polyols comprise such a large portion of flexible foam's input costs, and because chemical manufacturers noticed similar price increases for these key inputs at similar times, there exists further evidence that the cartel's price effects likely were widespread. All Defendants faced similar price increases from the chemical manufacturers. Therefore, Defendants had "ready focal point[s]" to use "as triggers for jointly established announcements regarding slabstock price increases," further reducing the difficulties the alleged cartel would have faced in its efforts to agree on pricing.

**\*20**  In sum, then, Leitzinger draws inferences from the flexible foam industry's market structure to paint that industry as one in which a few dominant firms, protected from outside competition by high barriers to market entry and using common foam input price announcements, succeeded in fixing the price of a commodity with an inelastic demand function. All those qualities provide common evidence that all or nearly all direct purchasers would have been impacted by the alleged cartel.

### Pricing Behavior

Leitzinger further supports his common impact conclusion by pointing to the manner in which prices are set in the foam industry. Three aspects of Defendants' pricing behavior would allow the conspiratorial conduct-fixing prices-to impact all or virtually all direct purchasers. First, price increase letters were not tailored to any particular customer or to any particular subset of foam products. In Carpenter's case, central management drafted slabstock and underlay price increase

letters. Once drafted, letter copies would be sent to local sales staff, who would add a customer's contact information and the local salesman's signature. Each such letter contained some version of the salutation "Dear Customer." Moreover, with few exceptions, the percentage price increase reflected in each letter was uniform across Defendants' foam product lines.

Second, Defendants typically (though not always) were able to transform these generally-applicable price increase *announcements* into *effective* price increases. One indicator of this success, according to Leitzinger, is the repeated insistence of pricing executives that *no* customer be excepted from the price increase percentage reflected in a given price increase letter. When exceptions were permitted-typically following negotiations that used the announced price increase percentage as the jumping-off point for discussions-a price increase letter could still be "partially successful" by leading to a percentage price increase, even if the effective price increase was less than the amount reflected in the price increase letter or had a later effective date than was announced in a price increase letter. Slabstock and underlay price indexes, constructed using Defendants' transactional data, show Defendants' effective price increases generally closely track one another.

Third, Defendants set prices in such a way as to limit customer-specific deviations from generally-enforced profit margins. This aspect of Defendants' pricing behavior reflects institutional pricing controls, and differs from the "no-exceptions" instructions, noted above, that pricing executives sent along with price increase letters. For example, Carpenter uses a "centrally administered minimum pricing system" for underlay, tied to profit margins over costs, which was aimed at "removing most of the [sales force's] pricing flexibility" through a tiered system that accorded less price discretion to less senior sales officials. Likewise, Carpenter used "branch prices" for slabstock price quotes that could be tailored to specific grades, while Foamex used a system for slabstock pricing similar to Carpenter's tiered limits on minimum margins for underlay.

**\*21** Leitzinger thus paints a pricing system among Defendants that results in all or nearly all direct purchasers suffering antitrust impact. That process began with the publication of price increase letters that, with few exceptions, purported to apply to *all* customers and to *all* foam products. Price increase letter publication would then trigger negotiations with customers, who would attempt to drive down the quoted foam price. Based on Defendants'

pricing behavior, those attempts would have generally been unsuccessful as customers (1) would have to negotiate with a Defendant salesperson who was limited, by various minimum price or margin systems, in his or her ability to accept a lower sales price, or (2) would see similar benchmarks offered by all Defendants, owing to the coordination of price increase levels. "Given these [pricing] mechanisms," Leitzinger concludes, "I find it implausible that customers in any significant number would have escaped the effects of repeated price increase announcements over a period of more than ten years."

### Statistical Evidence of Impact

Finally, Leitzinger presents the results of a regression analysis that isolates from other factors and then measures the impact of Defendants' price increase letters on actual prices. He describes this mode of statistical inquiry as "particularly useful in separating the impact of an alleged anticompetitive act on market outcomes (such as pricing) from the impact of other influences" (*id.* at 61 n. 334 (quoting ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES 125–26 (2010)). For each Defendant, Leitzinger creates three separate models for each category of slabstock-buns, rolls, and fabricated products-and for each grade-conventional, viscoelastic, and high resilience. He also estimates models for prime, standard, and premium underlay products. All told, he runs 73 regression models.

Leitzinger inputs several data sources into these models. First, he uses Defendants' transactional data, which contain more than 50 million "transaction records" (excluding Woodbridge and Mohawk) consisting of some or all of the following information fields: product ID; foam grade; sales volume for a given transaction; price; rebates; "other price adjustments"; billing ID; and transaction date. A billing ID is essentially an account number. Leitzinger synthesizes certain parts of this transactional data-billing ID, customer name, and location-to create a "master billing ID," reflecting the purchases of "the same physical purchasing facility," which may be represented in the transactional data by one or more product IDs.

Second, Leitzinger assembles a group of explanatory variables or regressors. Leitzinger's first set of regressors represent those he seeks to isolate from his measurement of the effect on price of Defendants' price increase letters. He compiles one regressor from a U.S. Bureau of Labor Statistics ("BLS") producer price index ("PPI") reflecting quarterly prices of TDI and polyols. Another regressor incorporates a "durable goods index," a measure of demand for durable

goods like furniture; demand for slabstock is tied to demand for durable goods. A third regressor measures housing starts, described as a "driver of sales for both slabstock and carpet cushion" in light of the demand new housing creates for furniture and carpeting. Finally, Leitzinger includes regressors representing imports of foam-containing products, like furniture and mattresses, and imports of underlay.

**\*22**  Together, these various regressors create a "regression model [that] provides a series of rolling quarterly benchmarks for prices changes[ ] based on normal market effects on prices." Then, Leitzinger adds a third data source, also as a regressor: Defendants' allegedly conspiratorial price increase letters. He claims that these models make it "possible to see statistically the extent to which those [price increase letters] caused prices paid under a given Master Billing ID for a particular product type to increase more than otherwise would have been the case." *See also* ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES 125–26 (2010) ("An explanatory variable's partial effect is the change in the dependent variable that would result from a change in the explanatory variable, holding all of the other explanatory variables constant"). The price increase letter variable is used to determine whether "price increase [letters] independently dr[o]ve prices higher" than the models would predict using only supply and demand variables. [6]

Leitzinger's models report a supracompetitive premium for a given transaction whenever it returns a positive coefficient between a price increase letter and actual prices. A positive coefficient associated with a price increase letter for a given transaction means "it is more likely that the true effects of a price increase [letter] were positive than ... zero or negative." The magnitude of that coefficient represents the "average percentage of the Defendant's price announcements that Dr. Leitzinger interprets as anticompetitive." For instance, a coefficient estimate of 0.1657 indicates that roughly 17 percent of the price increase announced in a price increase letter is attributable to anticompetitive effects, according to a formula for converting the coefficient estimate into a percentage. In the context of a specific price increase letter, the .1657 impact coefficient means that if a Defendant announced a 10 percent price increase, 1.7 percent of that increase would represent antitrust impact. All told, Leitzinger's framework yields over "32,000 separate Defendant, product[,] and customer-specific estimates" of the anticompetitive impact of the price increase letters, if any, before incorporating Mohawk data.

Leitzinger finds antitrust impact with respect to a given master billing ID whenever his models estimates for at least one of that master billing ID's purchases a positive coefficient for a price increase letter. Leitzinger claims to be able to do so for more than 14,000 master billing IDs that "*collectively accounted* for roughly $18.1 billion of the $18.3 billion" of foam product purchases recorded in Defendants' transactional data (emphasis added). In percentage terms, Leitzinger's models find antitrust impact for customers who account for 99 percent of "purchases for which [he] could identify product form, foam type, and transactional details from Defendants' produced data." Leitzinger also reports results showing the probability of his models' generating a random effect for a given sales volume. With respect to 82 percent of the sales volume reflected in Defendants' transactional data, Leitzinger finds a less than five percent likelihood that his models produced a spurious impact finding.

**\*23**  Leitzinger's models can be adjusted so that if a particular set of price increase letters were deemed not the product of a conspiracy, those letters could be removed from the models, and thus "remove any potential effect of those announcements in terms of [generating] impact estimates." Leitzinger concludes his impact regression analysis by effectively "double-checking" his models' results, using three alternative sets of assumptions to conduct sensitivity analyses. All three alternative sets of assumptions confirm his base models' finding of antitrust impact for the overwhelming majority of revenues grouped by master billing IDs (*see id.* at 65–66 (using Carpenter's price increase letters as an indicator of Defendants' conspiratorial activity because Carpenter often led price increases, assuming the conspiracy ended slightly earlier than alleged, and gauging impact only with respect to large buyers)).

### Ordover Challenges Leitzinger's Analysis

Ordover and Burtis respond to Leitzinger's proposed common-impact method of proof, with the latter expert focusing her efforts on the Direct Purchasers' burden as it relates to the underlay market. Leitzinger then responds to both experts' critiques. This Court turns first to the Ordover–Leitzinger disputes, and then to the Burtis–Leitzinger disputes.

As an initial matter, this Court finds portions of Ordover's Report proceed along a line of reasoning that is inappropriate at this stage of the proceedings, in view of his claim to only testify as to impact and damages issues. Ordover contests the notion that Leitzinger's inferences from market structure

can be used as common evidence to support a claim that all or nearly all direct purchasers suffered antitrust impact. Some of Ordover's justifications for that line of argument, discussed below, are properly addressed now. But at other times, Ordover bolsters his conclusions about the lack of common evidence demonstrating impact by pointing to the *lack of evidence that collusion actually took place*. Of course, if Direct Purchasers cannot prove an antitrust conspiracy existed, it follows that they cannot prove Direct Purchasers suffered common antitrust impact. But proof of a conspiracy is not required at this stage of the litigation. Therefore, this Court does not address merits-based arguments, like these, unrelated to the 🔖 Rule 23 requirements.

### Product Variability

Ordover begins his substantive critique of Leitzinger's methods with a series of arguments focusing on the degree of product heterogeneity in the flexible foam industry. First, Ordover argues that Leitzinger errs in failing to recognize "undisputed heterogeneity of [flexible foam] products." These products vary according to the particular product being manufactured, that product's specific attributes (*e.g.,* the product's IFD) and end uses. As a result, transaction prices vary across the product range that, Defendants argue, Direct Purchasers inappropriately lump together.

 **\*24** Ordover claims that product heterogeneity has a few consequences for the Direct Purchasers' case. First, this heterogeneity contradicts the notion that an agreement to fix and raise prices in the flexible foam industry could have existed at all, or, if it did exist, would have been successful. Defendants would have had to agree on prices for a range of products "subject to different demand conditions, different competitive condition, and different costs," rendering the fact of agreement implausible. Further, even if an agreement had been reached with respect to products that varied to this extent, the agreement would have had "variegated effects on prices and price changes across different products and customers."

Ordover claims to demonstrate a wide range of price variance by producing dispersion charts reflecting actual prices charged by each Defendant over the Class Period. Ordover uses the same foam product and grade classifications that Leitzinger uses to estimate his models (*i.e.,* conventional slabstock, rebond underlay, *etc.*). For Ordover, these price dispersion charts show not just the infeasibility of a

price-fixing conspiracy existing, but further question "how common impact is possible in light of the market facts."

Leitzinger successfully refutes this aspect of Ordover's analysis. Specifically, Leitzinger explains that Ordover's price dispersion charts do not control for the various attributes that account for two foam products of the same category and type-for instance, conventional slabstock-selling at different prices for the same board feet of foam (or other relevant unit of measure). By way of example, Leitzinger observes that "one would expect that the observed price of a product with twice the density of another product"-meaning the product contains "twice as much foam per board feet" as the less dense product-"would be (all else equal) twice the price of the less dense product." Selecting specific plot points from Ordover's graphs, Leitzinger shows that product characteristics, like density, account for that price variance.

Leitzinger also performed a "hedonic analysis," a standard statistical analysis for analyzing whether differences in product characteristics can explain price variance. That analysis constructs a regression model with price as a dependent variable, and the various product characteristics as independent variables. Using Carpenter data, Leitzinger's model finds that product characteristics account for 90 percent of the variance in slabstock pricing, and 80 percent of the variance in underlay pricing. Ordover disputes this tight correlation, but when shown one of Ordover's controlled price dispersions, Leitzinger explained one cannot tie that analysis, controlling for three (albeit important) factors, to the output of his original analysis. Leitzinger's more comprehensive analysis is persuasive.

Moreover, Defendants knew their product pricing would vary in this way and could easily (and in fact *did* ) compare the prices of foam with varying characteristics. Additionally, Ordover's claim that "[a]ny attempt to analyze impact on prices paid by the putative class members from the alleged cartel must account for this product heterogeneity" is true enough, but Leitzinger's proposed models attempt to do just that (*see* Doc. 584–14 at 61 (noting that Leitzinger's models employ a transactional dataset that includes product IDs and foam grades, among other datapoints)).

 **\*25** Ordover similarly argues that by including in one proposed class the purchasers of slabstock and underlay, Direct Purchasers have made it impossible to demonstrate "the alleged price fixing conspiracy could ... have had a common impact on prices between these two product groups."

This is so, Ordover argues, because the two product categories bear different costs and demonstrate variances in price that do not track one another. He demonstrates that point by producing two line graphs, one for slabstock and one for underlay, that plot each Defendant's average price for that product. These charts show Defendants' average prices varied with respect to other Defendants' prices for the same foam product group over the course of the Class Period (though not by much). Ordover argues this variance refutes the notion that the alleged conspiracy would have resulted "in antitrust injury to all or virtually [all] members of the proposed class that could be established using evidence that is common across poured foam and rebond carpet cushion products."

Defendants misunderstand the type of "impact" that must be capable of proof using evidence common to the class. Ordover's discussion of variance in average price between the relevant sub-markets would only be relevant if that difference in price were relevant to the concept of "impact." But it is not. Direct Purchaser's ⚖ Rule 23 burden with respect to impact does not require proof of "identical damages" or "common results." ⚖ *Butler,* 727 F.3d at 801. *See also In re Electronic Books Antitrust Litig.,* 11–md–02293–DLC, at *74 (S.D.N.Y Mar. 28, 2014) ("[T]he relevant question is not whether the model can explain variances within the pricing data for a given [product], but rather whether the model can reliably explain the differences between collusive [product] prices and competitive prices so that it can disentangle the effects of collusion.") (footnote omitted); 🚩 *In re Blood Reagents Antitrust Litig.,* 283 F.R.D. 222, 239 (E.D.Pa.2012) (rejecting the proposition that "it is not enough for plaintiffs to show that a customer paid more than the but-for price for at least one item in at least one transaction").

Rather, the impact burden requires a method of proof, using evidence common to the class, that can establish all or nearly all class members incurred an antitrust overcharge of some amount. *See* ⚖ *Hanover Shoe, Inc.,* 392 U.S. at 491. Leitzinger explains that is precisely what his models would prove-the fact of an overcharge with respect to all or virtually all class members, not identical overcharges. His regression models measure overcharges with respect to specific master billing IDs which, again, are the closest identifiers for discrete customers that can be culled from Defendants' transactional data. And so what matters is "whether the pattern of price changes for given [master billing ID] changed in connection with the price increase announcements"-that is, whether the price increase letters led to a specific master billing ID paying more for a given product than market forces, represented in Leitzinger's models by his supply and demand regressors, would have demanded-"not whether the pattern of price changes *across* [master billing IDs] or products was the same over a given interval of time."

### Market Composition

 **\*26**  Ordover next turns his focus to the manner in which Leitzinger describes the relevant flexible foam markets. First, Ordover disputes that Defendants control the overwhelming majority of the slabstock and underlay markets, pointing to a January 2010 IBISWorld survey of the "Urethane Foam Product Manufacturing" market, which claims that the "variety of foam products produced in this industry as well as the diverse downstream markets makes it difficult for individual firms to grab a large portion of industry market share." But as Lamb explains, that market survey "accounts for a broader market"-specifically, one that includes rigid and molded foam products, neither of which are included in either proposed class definition-"with more firms than the [flexible foam] market, thus artificially reducing the level of market concentration applied to the [flexible foam] market." As previously explained, Leitzinger bases his market concentration calculations on Defendants' *own* calculations for those figures. Those documents do not include market share calculations for the broader swath of urethane foam products included in the IBISWorld Report. This Court credits Defendants' own contemporaneous calculations of market concentration.

Second, Ordover claims there exist other firms "in *this* industry"-an ambiguous phrase, which may refer to other overbroad IBISWorld definition discussed in the same paragraph-that "serve as potential entrants into the manufacturing of polyurethane products relevant to this litigation." This argument is underwhelming. In effect, Ordover merely names a handful of firms who produce urethane foam products of some sort, and concludes (without further grappling with how these various firms would confront and overcome the industry barriers to entry and the threat posed by Defendants' excess capacity) that these firms could enter, or expand their presence in, the relevant foam markets in some unspecified period of time. His deposition testimony demonstrates a lack of any particular understanding of these other non-defendant firms' production capabilities, further undercutting his claim that they serve as ready entrants to the relevant flexible foam markets. Of course, Defendants bear no particular burden of proof on this (or any) point, but to effectively counter Plaintiffs' substantial proof, Defendants

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

must do more than merely point to a list of possible market entrants assembled from a survey of websites or 10–K filings.

Third, Ordover searches Defendants' transactional data, using the terms "foam" and "fabricators" to identify a set of firms he believes to be foam fabricators who purchase buns and rolls from Defendants. He posits these non-defendant firms would serve as a further competitive constraint on Defendants with respect to those customers who might purchase fabricated foam products from Defendants. These top–25 non-defendant foam fabricators "have the ability to absorb some portion of the anticompetitive effect from the alleged price fixing conspiracy" and provide possible cover for Defendant firms cheating on price with respect to fabricated foam, all necessitating "individualized inquiries to determine the extent to which these foam fabricators provide competitive alternatives" to Defendants. But Ordover fails to examine any particular non-defendant fabricator's sales behavior to show they have in fact undercut Defendants by accepting lower margins on their sale of fabricated foam products.

 **\*27** Leitzinger concludes that scenario "makes no economic sense," unless Defendants also have monopoly power with respect to fabricated foam-a claim no party to this litigation or party expert has explored. Even assuming these non-defendant foam fabricators have some potential to serve as competitive checks on Defendant firms, that fact alone does not occlude the analysis with respect to whether Direct Purchasers have demonstrated common issues with respect to impact which predominate over individualized inquiry.

Fourth, Ordover identifies Defendants' largest customers, and argues that two features of Defendants' relationships with these large customers undercut Direct Purchasers' ability to demonstrate through common proof that all or nearly all direct purchasers suffered antitrust injury. Ordover identifies the fifty largest customers during the latter half of the Class Period; these large customers account for $6.044 billion in Defendant sales, or 46.7 percent of total Defendant sales from 2005 through 2010; fourteen of those large firms account for just over 30 percent of total Defendant sales during the same period. In addition, Ordover displays, for each Defendant, the percentage of Defendant's 2005–10 sales that were claimed by that Defendant's top 50 customers. Only Leggett & Platt sells more than 50 percent of its slabstock and underlay products to non-top 50 customers.

Ordover concludes that such large buyers likely would have wielded negotiating power of varying degrees. Also, these large purchasers obtained product from Defendants "under long term contracts or other agreements that place limits on price changes." As a result, "the effect on prices from the alleged price fixing conspiracy would have been different for these [large] customers than for other customers." Individualized inquiry would be required to gauge impact, if any, on these large customers. For his part, Leitzinger conducts a sensitivity analysis, limiting a data sample to only *large* buyers, and finds impact at conventional significance levels for customers who account for over 95 percent of purchase activity.

This Court reserves for discussion below Ordover's reference to the effect of purchasing contracts on Direct Purchaser's impact burden, for that argument is more fully-developed by the experts in the course of discussing Leitzinger's observations regarding the existence and functioning of pricing structures in the flexible foam industry. However, this Court concludes the possibility that large purchasers generally exercise bargaining power in the flexible foam markets does not preclude Direct Purchasers from establishing impact using a common proof. Assuming Leitzinger's regression models properly function as Leitzinger describes them-an assumption critically examined below—the models necessarily would take into account these large buyers' negotiating power, if any. After all, the models contain price as the dependent variable. Ordover's line of argument is that negotiating power would permit these large buyers to avoid any price increase attributable to the price fixing conspiracy. If that is so, Leitzinger's regression models should estimate a negative coefficient with respect to a given transaction and master billing ID, indicating the lack of antitrust impact (*see* Doc. 744–26 at 2) ("[Ordover:].... But ultimately, to the extent that such contracts exist and that they affect prices, it's going to be picked up in Leitzinger's regression"). If the bargaining power only allows some, but not all, of the supracompetitive premium to be avoided, the regression models should estimate a positive, but relatively low, coefficient with respect to a given transaction and master billing ID, indicating that the price increase letter explains a smaller portion of actual price increases.

 **\*28** Fifth, Ordover notes that foam has a high volume-to-weight ratio, making it expensive to transport long distances. Therefore, Defendants sell foam products into local geographic markets where prices are not always the same. For instance, Carpenter plants located in California

and Texas charged different prices for rebond underlay of the same thickness and density. In Ordover's view, these local geographic markets mean antitrust injury cannot be examined using proof common to the class, but instead can be gauged only through individualized analysis that accounts for these differences in geography. It is difficult to understand why this is so, in light of the manner in which Leitzinger constructed his models. Again, those models' dependent variable are prices charged with respect to a specific master billing ID. A master billing ID represents Leitzinger's efforts at identifying a single *physical purchasing location.* Just as Defendants sell only to purchasers located within some given distance from a plant, a single physical purchasing location would likely only purchase product sold by plants in that local market. If a master billing ID purchased foam from a plant in another geographic region, that difference in price as compared to products sold by a nearer plant would be reflected in Defendants' transactional data and Leitzinger's models (*see* Doc. 744–49 at 26) ("[I]f [master billing] IDs and markets are localized-precisely what Dr. Ordover points to as problematic here-then the regression results for each [master billing] ID will reflect those localized competitive circumstances."). Moreover, as noted above, Defendants themselves did not distinguish between local markets when announcing price increases.

Sixth, Ordover identifies instances of apparent competition between Defendants, asserting that this competition is "contrary to [Direct Purchasers'] allegations of price fixing" and is "consistent with a diversity of competitive conditions faced by individual" direct purchasers. Ordover points to Defendant documents that show Defendants discussing accounts lost to, or gained from, other Defendants, as well as examples from Defendants' transactional data that show certain of Defendants' customers shifting their buying habits over the course of the Class Period.

But Direct Purchasers' theory is not inconsistent with these instances of competition Ordover intimates that Direct Purchasers charge Defendants with conspiring to *eliminate* competition within the cartel. That is not so. Direct Purchasers allege that price increase letters were a part of the conspiracy (Doc. 46 at ¶ 94). But price increase letters were not issued quarterly-instead, some Defendants issued price increase letters, on average, once every three quarters. Moreover, these very competitive conditions served as the impetus for the alleged price fixing arrangement in this case, according to a Defendant's senior executive: "I cannot think of a single account at Domfoam and Valle Foam where we

felt confident that there was no way we could lose [the account] to a competitor. In fact, it was for this reason that we were agreeable to coordinating price increases with our competitors. Coordination benefitted everyone because it minimized the degree to which we undercut each other on common accounts and gave confidence that all foamers would raise prices at about the same time."

**\*29** Finally, Ordover argues that conditions in the flexible foam industry are such that Defendants would not have been able to monitor and compare actual prices charged for their products, citing the testimony of a Leggett & Platt underlay employee who asserted that "it would have been totally impossible" to collect information on prices charged, given the wide dispersion in underlay prices. From that assertion about price visibility, Ordover argues that "the inability of the Defendants to monitor each other's prices indicates that the alleged price fixing conspiracy would likely not have resulted in antitrust harm to all or virtually all members of the proposed class." "[M]onitoring prices is important to the success of the alleged conspiracy," he earlier explains, "[but] it is difficult to accomplish."

This argument must be rejected for three reasons. First, to the extent Ordover again strays into opining on merits questions not bound up with the requirements of Rule 23, his argument is improper. Of course, if the antitrust conspiracy alleged in this case failed owing to the inability to monitor pricing, then necessarily there would be fewer impacted Direct Purchasers as compared to a better coordinated price fixing conspiracy. But Direct Purchasers need only demonstrate at this stage of the proceedings that they offer a method that is capable of establishing antitrust impact using common evidence, assuming the conspiracy existed.

Second, and again setting aside critiques of Leitzinger's model design for present purposes, the number of positive coefficients his models are capable of producing would be a reflection on the alleged conspiracy's success which, as Ordover notes, is partly dependent on price transparency. If, as Ordover contends, Defendants were substantially unable to monitor the prices they actually charged, then Leitzinger's models would be unable to predict impact to any significant degree. That is, Defendants could have agreed to issue coordinated price increase letters containing prices set at a supracompetitive level. When it came to actually concluding deals with respect to specific customers, individual Defendants would then cheat on the price fixing agreement in hopes of undercutting coconspirators. And all

throughout, Ordover's description of price opaqueness would conceal this cheating, presenting Defendants with strong incentives to cheat on the agreement, lest they become the *only* party *not* to cheat. As a result, no antitrust impact would be demonstrable under Leitzinger's models. But in fact, Leitzinger finds impact with respect to accounts who account for the overwhelming majority of Class Period revenues, and of master billing IDs in their own right. That result contradicts the notion that widespread cheating, borne of price opaqueness, led to Defendants paying lip service to agreed prices.

Finally, Direct Purchasers offer what is comparatively a much weightier body of pre-litigation evidence suggesting that in fact Defendants could, and did, compare actual prices charged, and with great granularity to boot (Doc. 744–49 at 20–22) (noting, for instance, that employees of Defendant Vitafoam were able to compare its prices to Carpenter pricing on the same product "to the cent")).

#### Price Increase Letters and Actual Prices

**\*30**  Ordover next attempts to demonstrate that Defendants were unable to implement actual price increases in the full amount mentioned in price letters. Ordover begins by examining in two ways the relationship between announced price increases and actual prices charged. For both examinations, Ordover uses Leitzinger's "impact" regression dataset, and assumes "that the impact of [a] price [increase letter] is on that quarter's price change [*i.e.,* the quarter in which the price increase letter is issued] from the prior quarter."

First, Ordover compares the announced price increase to the average increase in prices charged in that quarter showing, at least with respect to these identified quarters, Defendants failed to implement the full amount of the announced price increase. Ordover also shows the variance in actual price changes, reporting, for a quarter, the percentage of customer-product observations that show prices increases, or price declines, or no change in price from the prior quarter. Ordover finds, for example, while "Leitzinger's data indicates an 11 percent announced price increase for Future Foam, the average price increase in 2003 Q2 was 3 percent" and that in the same quarter for the same Defendant "18 percent of prices changes are negative, while 67 percent of price changes are positive, and there are zero price changes in 15 percent of the observations."

Second, Ordover analyzes "the patterns of price changes for all Defendants in Dr. Leitzinger's regression dataset for all periods in which Dr. Leitzinger's data indicate that Defendants issued price announcements" for both slabstock and underlay products. That analysis shows that, on average, a substantial portion of customers did not experience an increase in prices during quarters in which price increase letters were issued as compared to the prior quarter. Ordover claims that for both poured foam and underlay products, 60 percent of customers experienced price increases. However, 40 percent of customers who purchased slabstock or underlay did not experience a price increase.

The results of this actual-price-effects analysis is significant to Ordover because if prices did not increase for a particular customer during a quarter in which Defendants issued a price increase letter, "there was no antitrust impact" for those customers. *See also id.* at 109 (arguing that with respect to the 40 percent of slabstock and underlay customers who, on average, did not experience price increases "there was no impact from these price announcements"); Doc. 892–1 at 10 (urging an impact analysis with respect to a customer's "entire basket" of purchases). Ordover concludes that because such a large portion of the Direct Purchaser class suffered no "impact," as he defines that term, Direct Purchasers necessarily cannot demonstrate through common evidence that all or nearly all class members suffered antitrust impact.

Ordover, like Defendants, again misunderstands what it means for a customer to suffer antitrust impact. Ordover's actual-price-effects analysis does not consider the price increase letter's effect in the so-called "but-for" world, as Leitzinger's impact models do. Under Ordover's view (and despite protests to the contrary), the lack of an actual price increase indicates an absence of antitrust impact. On that line of reasoning, an agreement among competitors that serves to slow, but not reverse, a decline in price does not allow antitrust recovery. This cannot be the law.

**\*31**  If market forces would lead to a decline in competitive prices, a group of defendants cannot collude to slow that decline, just as participants in more vibrant industries may not collude to generate more pronounced increases in prices than market forces would otherwise produce. *See, e.g.,* 🔖 *In re Wellbutrin XL Antitrust Litig. .,* 282 F.R.D. 126, 140 (E.D.Pa.2011). Defendants' alleged unlawful coordination of price increase letters set the benchmark for negotiations with customers over actual prices. Leitzinger claims those "benchmark" levels were higher than they would have been

Case 1:19-md-02875-RMB-SAK   Document 2058-1   Filed 05/10/22   Page 141 of 172
PageID: 70684
In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

absent the alleged agreement. *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* 2006 U.S. Dist. LEXIS 39841, at *47 (N.D.Cal.); *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 266 (D.D.C.2002). It stands to reason, then, that if because of an antitrust conspiracy a seller and buyer's jumping-off point for negotiations is higher than market forces would otherwise determine, that buyer suffers injury.

Setting aside Defendants' questionable definition of "impact," this Court cannot even draw any firm conclusions from Ordover's analysis regarding the number of class members who did not experience an increase in price in the same quarter in which a price increase was issued. This is so because, as Leitzinger explains, Ordover identifies impact with respect to "customer-product observations" for purposes of his actual-price-effects analysis. But Defendants' transactional dataset includes purchases from "customers" under product IDs; each entry represents one item purchased by a customer under what, in effect, is a given account number. Because some customers can purchase foam product under multiple product IDs, Leitzinger constructs the master billing ID datapoint. By disregarding that unit of aggregation, Ordover concludes that a customer is not impacted if it did not experience a price increase with respect to a specific *purchase,* even if, with respect to other purchases, the same customer *did* experience a price increase driven by the alleged collusive agreement (*see* Doc. 744–49 at 23 ("By conflating impact to a customer with the extent to which there were overcharges on every product the customer purchased, Dr. Ordover misses the full extent of common impact across members of the proposed class. To illustrate, suppose ten members of the proposed class each purchased ten products" but each experienced price increases with respect to only six of those purchases. "From that fact pattern Dr. Ordover's method for analyzing impact would lead to the conclusion that, 40 percent of the time, there is no impact. *In fact, however, 100 percent of those customers were impacted.*") (emphasis added)). *See also* ABA SECTION ON ANTITRUST LAW, ECONOMETRICS 210–11 (2005) ("Generally, when the prices for some customers are going up while the prices of other customers are not, there is reason to doubt that the different customers (class members) are experiencing a common impact. However, if the observed differences are due to measurable and systematic factors that can be controlled for in a regression, a common impact may be shown and class treatment may still be appropriate.").

**\*32** Ordover next discusses the fact that Defendants entered into long-term purchase contracts with customers. Some of those long-term contracts included clauses that limited the extent to which Defendants could seek price increases ("price escalation" clauses). These price escalation clauses typically limited price increases according to a formula tied to the price of foam inputs. Other such contracts prohibited price increases of any kind during certain periods, or determined prices at the outset. These contracts, in Ordover's view, mean "the price announcement letters would not have increased prices already specified in these contracts and therefore the alleged conspiracy would not result in antitrust injury to these customers." Determining which customers had such contracts, and whether the contracts operated as Ordover describes, would require "individualized analysis" to identify those customers who, because of such contracts, "*could not* have been impacted by the allegedly coordinated price announcements."

From the observation that a customer *may* have had a purchase contract with *one* Defendant for a limited period of time (which would have protected that customer, in part or in full, from the effects of price increase letters issued during the life of the contract) Ordover concludes that holders of such long term contracts could not have been impacted by the conspiracy at all. Missing in this line of reasoning are two critical considerations. First, to suffer "impact," a customer need only be able to point to having paid a supracompetitive premium as a result of one price increase letter. Second, the customer need not have suffered this adverse impact with respect to a price increase letter issued by each Defendant.

Even if the purchase contracts operated as Ordover claims, the "protected" customer could still have been affected by a price increase letter issued by the same Defendant when no such price protections existed, or by a *different* Defendant at a point in time when that price increase letter would have generated antitrust impact. Direct Purchasers are not litigating 21 cases alleging that 21 conspiracies each issued a single price increase letter that carried a supracompetitive premium; they allege that *one* conspiracy issued 21 sets of unlawful price increase letters. They need only offer a workable method of proof with respect to that one case. *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 607 (N.D.Cal.2010) *amended in part,* 2011 WL 3268649 (N.D.Cal.2011) ("The Court agrees with plaintiffs that defendants may not recast plaintiffs' allegations [regarding the nature of the conspiracy], and plaintiffs have consistently alleged a single, overriding conspiracy spanning the entire class period.").

Direct Purchasers' proof on this point is, again, Leitzinger's regression models. Leitzinger claims "if a customer had a contract in place which effectively insulated it from the effects of one or more price increase [letters] from a specific defendant, *then presumably the data feeding into my regression would reflect that fact.*" In other words, Leitzinger's models would predict no impact with respect to each purchase entry made under a "protective" agreement if Ordover's description of those contracts is accurate. Ordover describes these purchase agreements as closely tied to the cost of inputs. Those close ties would mean that Leitzinger's regressors fully explain the actual price charged, as Ordover himself admits. But the models may well disclose impact with respect to the same master billing ID for purchases from another Defendant in the same quarter or from purchases in other quarters in which price protections do not exist.

 **\*33** Further, the record reveals long-term contract holders very likely suffered some impact. None of the long-term agreements extended throughout the Class Period. For example, Tempur–Pedic purchased foam for roughly seven years outside of a longterm contract, while Comfor–Products did the same for roughly six years. Contract negotiations thus took place in the context of artificially inflated baseline pricing, effects which likely became "baked into" the contracts. *See In re Urethane Antitrust Litig.,* 251 F.R.D. 629, 644 (D.Kan.2008). To the extent a contract pegs increases to input cost increases, the record reveals that actual costs were closely guarded secrets (*see* Doc. 954 at 76 ("The prices that we paid for our chemicals are strategic to [a particular Defendant]. Company President and CEO [ ]and head of purchasing [ ] are the only two in the company that knew what the actual net-net-net prices were, and we set the standard price to ensure that.").

Moreover, a purchaser who negotiated such a contract would have been at least partly affected by the alleged industry-wide artificial price inflation. The seller could justify a price increase by reference to similar price increases issued by other Defendants (or resist a call for a price decrease by referencing other Defendants' pricing). *See In re Urethane Antitrust Litig.,* 251 F.R.D. at 637–38. Finally, at points in the Class Period, long-term contracts were simply disregarded.

**Leitzinger's Impact Model Design**
So far, Ordover has pointed to factors that cause individual Direct Purchasers' interactions with individual Defendants to vary, while Leitzinger finds that many of the varying individual factors are accounted for in his transactional data

and, thus, the regression results. But for that to be so, Leitzinger's regression models must themselves be designed appropriately. Ordover argues Leitzinger's models are flawed with respect to impact for six reasons, addressed below in turn.

*Multicollinearity*
Leitzinger agrees there may well be some relationship between two of his models' regressors: the challenged price increase letters and the BLS cost index. In other words, not only is there a relationship between the dependent variable, actual prices charged, and each of the regressors, there is also a relationship between the models' regressors. Ordover explains that multicollinearity can result in parameter estimates which are not "precise," or reliable, and so the models do not provide powerful hypothesis testing.

After carefully considering all positions on this point, this Court agrees with Leitzinger. Any input cost regressor would inject this quality into Leitzinger's models. Direct Purchasers claim that increases in the price of inputs like TDIs and polyols served as a screen for conspiratorial price increases. While Direct Purchasers do allege that each and every price increase letter was a product of the conspiracy, they do *not* allege that each and every percentage of the price increase reflected in those letters was in excess of what market forces would have otherwise demanded. In other words, some portion of the price increase letters were legitimate, and the magnitude of the estimated coefficients bears this point out. One legitimate driver of price increases would be input costs. Any reasonably well-designed model must account for that variable, and so it must include an input cost index as one of its regressors. *See* ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 151 (2010) (noting that in the presence of multicollinearity "the best course of action" is to retain collinear variables that represent economically significant factors in explaining some phenomenon).

 **\*34** But that simple fact does not doom the models. "That many of our explanatory variables are highly collinear is a fact of life." This "fact of life" does not ultimately affect the magnitude of the estimated coefficient, which in turn determines the key inquiry here: whether impact can be proven with respect to all or nearly all class members (*see id.* at 48–49 ("[E]ven where multicollinearity is present, the resulting coefficients are still the best unbiased estimates of the underlying relationship.")). *See also id.* at 49 n. 219 (citing the same economist and textbook as Ordover does in

explaining the impact of multicollinearity for the proposition that the "ordinary least squares estimator in the presence of multicollinearity remains unbiased"); FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 324 (3d. ed.2011). Multicollinearity *does* ultimately affect the statistical significance of those estimated coefficients. Therefore, if Ordover's critiques with respect to statistical significance level prove fatal for Leitzinger's models, then multicollinearity contributes to the models' demise on that count. Without more though, the unavoidable existence of multicollinearity in Leitzinger's models is not grounds for holding it may not be used as common proof of impact.

### Statistical Significance

Ordover argues Leitzinger ignores "the conventional and regularly accepted approach that coefficients are statistically significant if they are distinguishable from zero at the 95 percent confidence level [ ("the conventional level") ]" because Leitzinger notes impact for each master billing ID for which one purchase from one Defendant shows a positive impact coefficient, regardless of significance level. Leitzinger's approach is flawed, Ordover argues, because Leitzinger cannot conclude that the coefficient estimate is statistically different from zero according to the "conventional" confidence level. "Statistical significance" in this context means "the likelihood that a coefficient result would have occurred [by chance, or spuriously,] notwithstanding the absence of any real relationship linking the variables in question." [7] When Leitzinger's coefficient estimates are examined according to that "conventional" confidence level, "over 65 percent of the estimated 'impact' coefficients are not statistically different from zero."

It is undisputed that generating statistically significant positive coefficients turns on sample size. Here, the relevant "sample size" with respect to estimating a statistically significant impact coefficient for a given master billing ID is not the very extensive all-Defendants transactional data set, which records some 50 million transactions (minus Woodbridge and Mohawk sales). Instead, "sample size" for statistical significance purposes is the number of transactions appearing in Defendants' transactional data that *specifically relate to a given master billing ID*. Not surprisingly, the transactional data reveal large and frequent buyers. But the transactional data also reveal a substantial number of low-volume, infrequent customers, and Leitzinger must attempt to produce impact results for each of these small buyers.

Because the sample size is small for the small buyer, it is not surprising to see the models produce the results that they do. The sample size problem with respect to small buyers, borne of industry realities, is further compounded by the fact that Leitzinger's models are capable of estimating a coefficient for a specific master billing ID only when the data contain "[a] minimum of three quarters of consecutive purchases under a given [master billing ID] from a particular defendant for a particular product type"; the models measure price changes from quarter to quarter, and requires three observations to produce a result.

**\*35** To show the sample size problem is in fact at work in skewing statistical results, Leitzinger groups master billing IDs by number of associated observations (*e.g.,* 3–5 observations, 30–50 observations). He then identifies, with respect to each grouping of master billing IDs, the proportion of master billing IDs or purchase activity that show statistically significant impact results at the "conventional" level. When only 3–5 observations exist, just over 11 percent of the 1,138 estimated coefficients for that data grouping show impact at the "conventional" level. When more than 125 observations exist, more than 83 percent of the estimated coefficients have p-values of .05 or less. And master billing IDs with that amount of data represent the vast majority of "purchase dollars." More broadly, Leitzinger reports "there is a high correlation (0.74) between the amount of transactional activity under each [master billing ID] and the significance level associated with the corresponding impact coefficient."

Of course, Ordover's critique assumes the "conventional" significance level is required to analyze the particular phenomena in this case. That proposition is an oversimplification as a statistical matter, and not compelled as a legal matter. *See* Matrixx *Initiatives, Inc. v. Siracusano*, —— U.S. ——, ——, 131 S.Ct. 1309, 1319, 179 L.Ed.2d 398 (2011) (rejecting the premise that "statistical significance is the only reliable indication of causation" because "[s]tatistically significant data are not always available" and a phenomenon being examined can be "subtle or rare" such that experts in the relevant field must rely on other tools); *In re High–Tech Employee Antitrust Litig.,* 289 F.R.D. at 581. Because, as described above, statistical significance is so closely tied to sample size, statisticians employ statistical significance levels less restrictive than the "conventional" level when examining phenomena for which data is limited, reaching the 10 percent—20 percent levels. Moreover, Krieger, a 40–year faculty member at the Wharton School's Department of

Statistics, confirms that it would be "erroneous" to reject a particular model result which does not attain statistical significance at the conventional level (Doc. 886–1 at 113 (distinguishing material significance)). *See also* ABA SECTION OF ANTITRUST LAW, ECONOMETRICS 15–16 (2005) (same); NEW WIGMORE: EXPERT EVIDENCE § 12.8.2 ("In short, the p-value does not measure the strength or importance of an association").

Direct Purchasers show high correlations between sample size and statistical significance; high proportions of large buyers, responsible for the overwhelming majority of Class Period sales, suffering impact at conventional levels; the smallest of the "small" buyers with impact test results at 48 standard deviations from what one would expect if there were no independent underlying relationship between price increase letters and actual prices; impressive results from a random coefficients model with all 73 regressions showing an "average implied share of negative coefficients [of] roughly two percent"; conclusions that can be drawn regarding the likely impact suffered by certain master billing IDs based on a different level of aggregation, affected purchase dollars, which is discussed below; and qualitative evidence showing the likelihood of common impact.

**\*36** This Court will not adopt what is in essence a "blinders" approach to examining impact, nor accept the proposition that "susceptibility" of classwide proof at this stage of the proceedings requires an impossibly high standard of impact results, recorded at the conventional level, for the entire universe of customers in Defendants' transactional data, no matter the data limitations. *Schumacher v. Tyson Fresh Meats, Inc.,* 2006 WL 47504, at \*7 (D.S.D.2006) ("Even the best regression equation cannot prove causation. The most it can show is a correlation that can give rise to an inference that causation exists."). Rather, Direct Purchasers must show (and have shown) that the central impact issue in this case is susceptible of class-wide proof. *In re Whirlpool Corp.,* 722 F.3d at 860. Should this case reach a factfinder, Defendants are free to argue that despite Direct Purchasers having shown common questions are *susceptible* of classwide proof, Direct Purchasers do not, at the end of the day, succeed in using this common evidence to show impact *in fact* due to (for example) a lack of a sufficient number of coefficients coming in at the conventional significance level. *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,* 256 F.R.D. 82, 96 (D.Conn.2009) (noting that in the context of contesting a motion for class certification "defendants should be focused on disputing the use of the methodology itself, not

the results of the methodology"). This Court concludes that imposing the conventional significance level as a necessary condition for certification is not warranted in the context of this case and this industry.

### Measuring Antitrust Impact by Master Billing IDs vs. Purchase Dollars

Leitzinger asserts that his models demonstrate impact for customers who account for 99 percent of sales, or $18.1 billion out of $18.3 billion. In addition, he reports that he can estimate positive coefficients for over 14,000 master billing IDs, but at this point in his analysis does not identify results for the universe of master billing IDs that appear in Defendants' transactional data. Ordover does. He correctly asserts that Leitzinger's impacted-purchase dollars metric "does not look at the *number* of customers with at least one positive 'impact' coefficient, but rather the amount of *purchases* associated with customers with at least one positive 'impact' coefficient." To show antitrust impact with respect to all or nearly all class members, Ordover argues, Leitzinger should focus on customers, not purchase dollars.

Ordover proceeds to show the full range of coefficient estimates for all "customers" in Leitzinger's dataset (excluding Mohawk and Woodbridge). Ordover understands a master billing ID to be a "customer." He finds a total of 18,668 master billing IDs in Leitzinger's dataset. He further finds that Leitzinger estimates positive impact coefficients for 14,396 master billing IDs, regardless of significance level, and negative impact coefficients for 68 master billing IDs. Finally, Ordover shows that no coefficients are estimable for 4,204 master billing IDs. That is so, Ordover explains, either because these non-estimable master billing IDs: did not purchase foam products in consecutive quarters; or did not purchase foam in a quarter in which a price increase letter had not been issued by the seller-Defendant *and* in a quarter in which a price increase letter had been issued by the same Defendant. Because 22.5 percent of the master billing IDs do not return an estimated coefficient, Ordover concludes that Leitzinger's models necessarily cannot show that all or nearly all direct purchasers suffered antitrust impact.

**\*37** One could equate master billing IDs with class members if each class member purchased foam from Defendants from only one physical purchasing location. But Ordover provides no evidence to support that assumption, and Leitzinger disproves it.

For example, L & L Carpet is represented in Defendants' transactional data by 11 different master billing IDs, and therefore using master billing IDs as a proxy for class members would tend to underreport the actual impact rate among class members. Leitzinger deliberately and candidly chose to report his models' results on the basis of impacted purchase dollars, and not solely on the percentage of master billing IDs for which positive coefficients are estimable (*see* Doc. 584–14 at 65 ("Inasmuch as a given member of the proposed class can be associated with multiple [m]aster [b]illing IDs (because of multiple locations with multiple account numbers, multiple customer names with multiple account numbers, or differing terminology used by different Defendants to describe the same customer), this level of aggregation is more detailed than the Class member level" and is not subject to over-aggregation)). And he chose the quarter-by-quarter approach-which leads to "missing" customers-because it avoided certain other difficulties that would have arose had he estimated coefficients based on a longer time period (Doc. 954–1 at 205–07 (explaining that by using annual time periods, the longer period would have created "great damage" to the models' ability to control for supply and demand factors)).

In an ideal world, the regression models would estimate positive coefficients for the required number of class members *as* class members, but this shortcoming in the models is borne of data shortfalls and the type of conduct being measured, not a demonstrable absence of relationship between price increase letters and actual prices charged that defeats other inferences that can be drawn from the models. And the models are not the sole sources of evidence advanced by Direct Purchasers to show impact in this case is susceptible of class-wide proof.

### Regressor Coefficient Estimates that Do Not Conform to Economic Theory

Ordover's fourth criticism of Leitzinger's models is that they are unreliable because they produce relationships between different variables that do not conform to economic theory (*see* Doc. 682 at 64). Ordover explains that if a regressor representing Defendants' costs (*e.g.,* Leitzinger's BLS index) or consumer demand (*e.g.,* the durable goods and housing starts indices) increases in value, price should also increase, and vice versa. Ordover notes this is not always the case with Leitzinger's models, reflected in a chart showing the models produce counterintuitive coefficients in a large number of cases.

Leitzinger explains he employed a "reduced form equation," often used in antitrust litigation. Such a model captures "the joint operation of supply and demand factors on price," but in the process produces these "counterintuitive" coefficients even though supply and demand variables in fact interact with price in the expected manner. So, while Ordover does not criticize the use of a reduced form equation, he attempts to undermine Leitzinger's models by pointing to a predictable result of this equation, an equation endorsed by the American Bar Association Antitrust Law Section. The model is appropriate in this context, where all parties agree that supply and demand factors play a role in determining actual prices. *See* ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 156–157 (2010).

### Input Cost Index

**\*38** Ordover next argues that Leitzinger's models wrongly select one cost index rather than another. As noted above, Leitzinger uses a BLS PPI as a proxy for TDI and polyol costs. That choice is challenged by Ordover because (1) Leitzinger uses this index as his cost regressor for both slabstock and underlay models, even though slabstock and underlay costs do not track each other, and (2) "estimates for prices for these products themselves are readily available from chemical industry analyst ICIS," a measure used by some Defendants to gauge costs in some long-term purchase contracts, and by Lamb in designing his Direct Purchaser Regression.

ICIS data, Ordover argues, more closely tracks the "average price of poured polyurethane foam" and "a measure of scrap foam costs appears to track the prices of rebond carpet cushion more closely" than the BLS index. When these "better" cost indices are incorporated into Leitzinger's models, the master billing IDs' estimated coefficients change in value and significance.

Leitzinger's justifications for his chosen input cost indexes are persuasive. Ordover points to only two long-term purchase contracts in which the ICIS index is used; ICIS data does not account for volume or customer discounts, which Defendants enjoyed owing to their status as the largest domestic buyers of TDIs and polyols; the price Defendants paid for these chemicals under purchase contracts were not included in the ICIS index because those prices were not transparent enough to meet ICIS's criteria for inclusion; employees or agents for four Defendants testified that ICIS data was unreliable or was not consulted by that individual in the ordinary course of business; and the ICIS index excludes diphenylmethane

diisocyanate ("MDI"), an important ingredient in viscoelastic foam (Doc. 744–49 at 34–38). *See also* Doc. 954 at 75 (noting no Defendant witness testified that ICIS is a reliable cost measure); Doc. 954–1 at 153–55 (explaining BLS more accurately gauges surveyed firms' long-term costs). At a more basic level, Leitzinger explains (Doc. 967 at 21–22):

> I think sometimes you have the comment made: Well, ICIS correlates better with prices. Well, that's not the right test. We're trying to use the regressions to find the role that costs played. We don't presume that the answer, the best answer[,] is the highest correlation we can find. We want to let the data-I want to let the data tell me what that relationship looks like. And for that purpose I'm going to pick what I think is the most carefully put together, the most authoritative index. And I think the BLS does a better job.

Moreover, ICIS and BLS are, in fact, highly correlated with *one another*. That fact is borne out in the impact results generated when the ICIS measure is incorporated into the models. Specifically, using the BLS index, 14,396 master billing IDs show impact, while use of the ICIS index results in 14,257 such impact results. Granted, inferences with respect to classwide impact become less strong, but the difference is not so substantial as to make the models unworkable.

 **\*39** Leitzinger's use of BLS data for underlay regressions is rooted in the particulars of this case. Ordover's preferred index is determined by third-party prices for scrap, a measure that is perhaps relevant if most of the Defendant underlay manufacturers purchased scrap on the open market. But, only Mohawk did for the entire Class Period. Instead, all other firms are or were "integrated producers," meaning that Defendants use cast off from their own slabstock production to source some or all of the trim used in producing underlay. With respect to those firms, Leitzinger's BLS index is an appropriate measure-the amount a Defendant pays for the primary inputs of the slabstock that, in turn, generates the scrap used in its underlay processes would be more closely tied to actual underlay input prices than the price of scrap selling on the open market. Defendants themselves made this

connection-between slabstock input costs and scrap costs-when justifying underlay price increases to customers.

Finally, Ordover claims the BLS index Leitzinger used does not include polyols, pointing to a different BLS PPI index as including specific chemicals that fall within the "large class of chemicals" to which "polyols" refers. BLS confirms that the polyols Leitzinger measures are included in his BLS index. The BLS PPI index is an appropriate proxy for Defendants' chemical costs; Defendants may continue to dispute the appropriateness of the chemical costs captured by that index if and when the case reaches a factfinder.

### Failure to Include a Hurricane Dummy Variable

Finally, Ordover advocates the use of a hurricane dummy variable in the Fourth Quarter of 2005 when Hurricanes Katrina and Rita resulted in foam input cost increases and, at times, order allocations. Order allocations mean "chemical manufactures did not allow the market to fully clear through prices, but instead through rationing," so that "changes in chemical prices did not fully reflect changes in Defendants' costs." Ordover calculates the effect of including this dummy variable, after substituting his preferred input cost indices into the models. On that basis, the dummy variable causes the total initial quarterly overcharges for slabstock to drop from $107.7 million to a negative $87.7 million.

With one exception, customer allocation in this context meant that Defendants were limited to their average monthly chemical purchases, during a quarter when no party describes any reason why that limitation would have led to an input cost index not fully reflecting the price of those inputs (*i.e.,* that chemical orders during this period would have exceeded the average monthly order). This limitation would prevent Defendants from engaging in arbitrage or hoarding chemicals during a period in which future chemical pricing was highly uncertain. The record does reflect, however, that beginning in October 2005, Leggett & Platt saw allocation below these average-month levels.

 **\*40** Leitzinger explains that even if it were proper to include a dummy variable in his models, that change has only a marginal effect on his models' ability to demonstrate common impact with respect to all or nearly all class members. The particular quarter that would be affected by the dummy variable's operation also included price increase letters announcing the largest percentage slabstock price increase of the Class Period. The same period, of course, saw input cost shocks. But Defendants' documents show

at least some Defendants saw increased profit margins as compared to past quarters. The dummy variable would be too blunt in accounting for these price increases beyond increased cost (*id.* at 46 ("Dr. Ordover's preferred approach would be to essentially ascribe the entirety of the late 2005 price increases to the allocated-related effects of the hurricanes," understating both antitrust impact and damages should those price increase letters be determined to have in fact been the result of an antitrust conspiracy)).

This Court agrees that, regardless of whether a dummy variable should be included in Leitzinger's models to prove damages in fact, including or omitting that variable at this stage of the litigation does not alter this Court's predominance analysis.

**Burtis Challenges Leitzinger's Models**
Defendants Mohawk and Leggett & Platt offer Burtis' testimony to oppose class certification. As noted above, these two Defendants produce underlay: exclusively so in Mohawk's case, and likewise for Leggett & Platt since its 2007 sale of poured foam capabilities.

Certain critiques by Burtis proceed along lines similar to those raised by Ordover. This Court will not rehash the particulars of those arguments, because at best they only provide additional detail as to Mohawk and Leggett & Platt. Burtis also advances additional critiques of Leitzinger's models not previously discussed, or versions of similar arguments (*e.g.*, Leitzinger's choice of cost inputs) that warrant exploration: specifically, Burtis' views that Leitzinger fails to establish the alleged conspiracy impacted all or nearly all Mohawk or Leggett & Platt customers, and fails to gauge input costs according to an appropriate scrap index.

*Impact for Mohawk or Leggett & Platt Customers*
Leitzinger "did not have usable transactional data for Mohawk" to incorporate into his initial models. Discussion with respect to impact as to Mohawk customers begins then with Burtis who purports to apply Leitzinger's models to the Mohawk transactional data. She finds 20,368 "Mohawk carpet underlayment customers" with results for 10,890 of those customers, only 5,288 of which were impacted at statistically significant levels. 47 percent of Mohawk "customers" fall out of the models because they did not make the minimum number and type of quarterly purchases of Mohawk products required by Leitzinger's models, and

customers who account for 74 percent of Mohawk sales were impacted "after adjusting for statistical significance."

**\*41** Leitzinger responds by first providing his own impacted-dollar amount results based on Mohawk data alone, but this time does not limit that figure to purchase activity showing impact at conventional significance levels. Under that approach, impact is shown "as to 97 percent of the purchase activity," mirroring impacted-dollar estimates for other Defendants. In addition, Leitzinger ran Mohawk's data through his models and combines Mohawk-specific results with the outputs described in his initial report. He reports a total of 36,798 master billing IDs, 21,598 of which have sufficient data for his models to operate. 19,322 of those master billing IDs (or 88 percent) show impact, with more than half at conventional significance levels. On an impacted-dollars basis, customers accounting for 99 percent of purchase activity are impacted, with customers accounting for 94 percent of that purchase activity showing impact at statistically significant levels.

The Burtis model results emphasize why the conventional level should not be made the *sine qua non* of Direct Purchasers' predominance proof in the context of this case. As noted above, the purchase activity of 9,478 "customers" fall out of the model because they do not meet the model's minimum data requirements. But, as Leitzinger reports, customers who account for 97 percent of *all* Mohawk purchase activity show impact (equating to 9,834 customers), and customers who account for 74 percent of all Mohawk purchase activity show statistically significant impact (equating to 5,288 customers).

One could draw two inferences as to the "small" buyers not captured by the models. First, one could conclude that if high volume purchasers of Mohawk's products were impacted at the conventional confidence level, small buyers were even less likely to have escaped impact. Or one could conclude that, despite the models' impact findings, small buyers, with no bargaining power or a continuous relationship with Mohawk avoided the antitrust injury inflicted on larger buyers with relatively more bargaining power and who are repeat Mohawk customers. That second inference turns Ordover's argument regarding the top–50 buyers list on its head-again, Ordover claims that if *anyone* could avoid injury from collusive price increase letters, it would be *large* buyers-and is, to put it bluntly, implausible. Again, Leitzinger's base models identify just over 7,000 master billing IDs for which only one impact coefficient could be estimated. He finds

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

impact with respect to 5,589 of these master billing IDs. In the absence of any independent relationship between price increase letters and actual prices, one would expect a 50/50 split in positive and negative impact results. But instead, he generates impact results for the smallest of the "small" buyers that have a "less than one in a billion" chance of occurring by chance.

The Burtis discussion with respect to Leggett & Platt is similar. Unlike Mohawk, Leitzinger's initial report analyzed Leggett & Platt transactional data. Leitzinger's models show 7,683 Leggett & Platt customers, but shows results for only 4,282 of those customers, and positive impact for 3,726 (or 87 percent of customers for whom impact coefficients are estimable).

 **\*42**  Burtis also identifies "proposed class members who only purchased polyurethane foam carpet underlayment products from Leggett & Platt" and were not impacted under the Leitzinger models. She further dices the data to identify 4,807 such customers, running a "unique-customer" regression that shows Leitzinger estimating impact results of any kind for half of those unique customers, and positive impact results for 21 percent of unique customers at conventional significance levels.

By subtraction, 2,876 Leggett & Platt customers (or 37 percent of all Leggett & Platt customers) also purchased from other Defendants, and are excluded from the unique-customer regression. And as Leitzinger explains, this 37 percent of Leggett & Platt's customer base accounts for three-fourths of Leggett & Platt sales. What is left, then, is 62.5 percent of Leggett & Platt's customer base, who account for one-quarter of Leggett & Platt sales. It is therefore not surprising to see a substantial portion of master billing IDs fall out of the unique-customer results, and to see the proportion of impact coefficients that are statistically significant drop when Leggett & Platt's largest (and non-unique) customers, who show impact at rates consistent with the base models' aggregate results, are removed. In sum, Burtis' specific examination of Mohawk and Leggett & Platt's impact results is consistent with Leitzinger's results and his models are workable for showing classwide impact.

### Costs According to a Scrap Index

As noted earlier, the Mohawk and Leggett & Platt underlay operations differ from other underlay producers. While other Defendants generate scrap in-house, Mohawk purchased scrap on the open market throughout the Class Period, while

Leggett & Platt has done the same since shedding its pouring capabilities in a March 2007 sale. Still, Leitzinger uses the BLS index as a supply variable in all his models, even as to Mohawk and Leggett & Platt. Burtis notes that data showing the prices Leggett & Platt paid for scrap are available throughout the Class Period, while Mohawk's scrap cost data begins in January 2005. She also notes that because Leitzinger runs regression models Defendant–by–Defendant, he presumably could include a scrap cost index only as to Leggett & Platt or Mohawk, while retaining the BLS index for other Defendants. She swaps out the BLS index, uses the scrap cost index in its place, and notes significant declines in the number of impacted customers.

Leitzinger explained his choice not to use a scrap cost index. He frames the key question as "what cost would the market have passed through in the absence of the conspiracy?" He concludes it would not be the cost reflected in the scrap index:

> [G]enerally in economics we expect the price of the primary product [*i.e.,* slabstock] to affect the price of the byproduct [*i.e.,* scrap]. And my concern is if, as is alleged, there was a conspiracy that's inflating [slabstock] foam prices, the effects of that very likely show up in scrap prices as well. And if I put a scrap price index into the regression, I have the very real possibility that what I am capturing in that variable is part of the conspiracy effect. And so as Dr. Burtis describes, you may get-you do get some difference. It's not as dramatic in my view as she describes, [but] you get some difference in the coefficient estimates. But that may very well simply be that what's happening when you put that variable into the model is you're capturing the conspiracy in part over in scrap prices because higher foam prices are drawing higher scrap prices. And that's why I followed the course that I did.

 **\*43**  That conclusion is reasonable, and Leitzinger is entitled to rely on it in designing his models. Recall, Leitzinger forms

his models on the *assumption* that the conspiracy operated as Direct Purchasers allege; that structure includes scrap brokers who participated in the conspiracy. He therefore should design his regression models with that assumed conspiracy structure in mind. *See* ABA SECTION OF ANTITRUST LAW, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES 213 (2010) (noting that in a horizontal price-fixing case "the values of some independent variables may have been influenced by the conspiracy" and using the example of "conspirators [who] agree on price, but compete on advertising and promotion" so that "expenditures on promotion will raise above the level that [promotion prices] would have assumed but for the collusion."). Moreover, Leitzinger notes that for most of the Class Period, integrated producers sold the vast bulk of underlay, such that the market price for scrap, as opposed to an individual manufacturer's costs, would be better represented by integrated producers' costs. He concludes the "true" market price for scrap cannot be determined in any event, and Direct Purchasers show that certain of Defendants' cost data are themselves misleading, and represent standard costs or internal transfer prices.

Leitzinger does not attempt to identify a cost index that most closely aligns with a particular Defendant's costs, but rather picks a variable that most accurately gauges the cost of the relevant input in the but-for world. With respect to most Defendants, the BLS index is reasonably understood to do both-it reasonably gauges actual costs for slabstock and, thus, internally-sourced scrap, and it reflects a but-for world cost because Defendants' conspiratorial conduct is not alleged to have affected the price of polyols or TDIs. Actual costs, then, align with the but-for costs. Not so for Mohawk and Leggett & Platt-actual costs (*e.g.,* the scrap index) do not equal the but-for cost for the two firms' primary input. Leitzinger adequately addresses that difference-between the self-sourcing Defendants on the one hand, and Mohawk and Leggett & Platt on the other-even though he uses the same index for all Defendants. Burtis' view that Leitzinger is required to select a different cost measure is a *non sequitur* (Doc. 967 at 76 ("So if what Dr. Leitzinger is worried about, this taint that is the scrap price was affected by the alleged conspiracy being too high, then the analysis that he needs in order to determine whether or not [Mohawk and Leggett & Platt's] customers were affected has to be different than it is for the other [D]efendants.")). Of course, Mohawk and Leggett & Platt argue it would make no economic sense for them to conspire with the principal producers of their primary input, but that point is disputed, and is not bound up

with Direct Purchasers' predominance burden as it relates to impact.

## Antitrust Injury Can Be Demonstrated Using Common Proof

**\*44** Direct Purchasers produced the convincing analysis of a qualified expert who this Court had the opportunity to personally examine, and deems credible. This Court reviewed Direct Purchasers' method of proof in great detail and finds it persuasive on its own terms as to its ability to show impact on a classwide basis. Further, this Court concludes the method of proof withstands Defendants' extended assault, much of which reads as if it were written on the understanding that Direct Purchasers must *prove* impact *now. See In re Hyrdrogen Peroxide Antitrust Litig.,* 552 F.3d at 311–12. They do not. Direct Purchasers have not simply pointed to "potential approaches" to prove common impact. *See id.* at 321. They have constructed versions of proof that would be, and could be, used at trial to in an effort to show impact on a classwide basis. This Court has no "free-ranging license" to accept or reject Defendants' "sneak preview" of arguments attempting to answer the ultimate question of whether the impact models in fact establish impact on a classwide basis.

## Method of Calculating Damages is Appropriate

Finally, Direct Purchasers must show damages are "susceptible of measurement across the entire class for purposes of Rule 23(b) (3)," though damages need not be "exact." *Comcast Corp.,* 133 S.Ct. at 1433. In an antitrust action, that "classwide" figure can be an aggregate damages sum. *See In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 534 (6th Cir.2008). And, "it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co. .,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (cited with approval in *Comcast Corp.,* 133 S.Ct. at 1433). The "approximate" damages formulation embodies the principle that a too-demanding damages standard would act as an "inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). *See also J. Truett*

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

*Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 566, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

Even according to that standard though, if damages are not susceptible to computation using a "mathematical or formulaic" calculation, class treatment may be inappropriate.

*Bell Atl. Corp. v. AT & T Corp.,* 339 F.3d 294, 307 (5th Cir.2003). *See also In re Scrap Metal Antitrust Litig.,* 527 F.3d 74 at 535 ("[W]e have never required a *precise* mathematical calculation of damages before deeming a class worthy of certification.") (emphasis added). But the presence of "some individualized damages issues" will not preclude class treatment if common issues otherwise predominate.

*Beattie,* 511 F.3d at 564. Finally, so-called *Comcast* error, or a "model['s] fail[ure] to measure damages resulting from the particular antitrust injury on which [a defendant's] liability in [an] action is premised," will bar a finding that damages are susceptible of classwide proof. *Comcast Corp.,* 133 S.Ct. at 1433–34.

**\*45** Leitzinger bases his damages model on his impact models. He proposes calculating classwide damages as follows:

(1) With respect to each coefficient the impact models are able to estimate, assign a "weight" to that coefficient in the form of the purchase amount for each master billing ID, and then produce the average price announcement effect for actual prices for each defendant and product type (that is, for Carpenter's conventional buns, viscoelastic buns, *etc.*) (hereafter "the Defendant/product-specific average price announcement effect"). Include coefficients showing negative impact, reducing the Defendant/product-specific average price announcement effect.

(2) Calculate the amount of price increase in each quarter for each Defendant and product type that is attributable to the alleged conspiracy (hereafter "the quarterly supracompetitive premium"). Calculate that quarterly supracompetitive premium by first identifying with respect to each Defendant the quarters in which that Defendant issued a price increase letter for a given product type (assuming the letter is a product of the conspiracy). In each such quarter, multiply the percentage price increase reflected in the relevant price increase letter by the Defendant/product-specific average price announcement effect. Record the quarterly supracompetitive premium in percentage terms.

(3) Calculate the overcharge imposed in each quarter for each product type offered by each Defendant. That number would be the product of two figures: Each Defendant's total sales for each quarter and product type, and the quarterly supracompetitive premium for that Defendant/quarter/product-type combination.

(4) Calculate for each Defendant the overcharge imposed throughout the Class Period. That number would be calculated by summing across all product types and quarters the overcharge incurred by direct purchasers as a result of purchases from each Defendant.

(5) Calculate the overcharge incurred by all direct purchasers as a result of purchases from all Defendants by summing these Defendant-specific overcharge incurred figures.

Completing that series of computations, and assuming each price increase letter was the product of the conspiracy, Leitzinger calculates "Total Initial Quarter Overcharges" for slabstock and underlay. He labels that sum an "initial" overcharge because his damages model adds a further overcharge element: so-called "persistence effects." The initial quarterly overcharge figures calculated above "relate solely to the quarters in which they were made," but Leitzinger finds "no reason to believe that the overcharges associated with the conspiratorial price increase announcements automatically ceased with the end of the calendar quarter." Instead, he posits that direct purchasers would continue to suffer overcharges in subsequent quarters, regardless of whether those subsequent quarters also included further conspiratorial price increase letters, until such time as market forces corrected matters (*id.*). That continuing effect would be represented by a factor of between zero and one, "reflecting the portion of the price increase announcement effect which persists in each successive quarter" (*id.*). In other words, the persistence factor is a "decay rate."

**\*46** Leitzinger suggests the actual persistence factor could be determined in one of two ways: "introducing lagged price announcement effects into the regression model, thereby allowing it to generate estimates of the effects on current prices for both current and past price announcements"; or consulting the regression model results to see "how soon after an announcement actual prices tended to realign with prices predicted by the model" absent a subsequent price increase letter.

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

Leitzinger illustrates how persistence effects could be calculated, correctly stating that the true persistence factor "belongs to the merits stage of the damages analysis because it would relate to the quantum of impact suffered by the Class." The actual persistence factor can only be determined once Direct Purchasers prove which price increase letters, if any, were tinged by an antitrust conspiracy. What matters at this stage, then, is whether persistence damages can be calculated on a classwide basis. Using an illustrative persistence factor of .5, Leitzinger calculates persistence overcharges for each Defendant. Leitzinger proposes adding those persistence overcharges to the initial quarter overcharges, yielding the total classwide damages.

Ordover (and Ordover alone among Defendants' experts) criticizes Leitzinger's damages model on three grounds. First, he argues the damages model is unreliable because adjustments to the impact model result in large reductions in estimated initial quarterly overcharge calculations. As previously discussed though, this Court concludes Direct Purchasers demonstrate the appropriateness of Leitzinger's impact models.

Second, Ordover argues the model "produces results that make no economic sense," in part because Leitzinger's model uses averaging. Recall, Leitzinger's model first assigns weights to the estimated coefficients by purchase amount, calculates the Defendant/product-specific *average* price announcement effect, and then multiples that average effect by a relevant quarter's price increase letter to determine the dollar amount of that announced price increase percentage that is attributable to the alleged conspiracy. As Ordover understands it, that averaging would "award[ ] a positive damage amount" even to master billing IDs for which negative coefficients were estimated-and therefore no antitrust impact existed-and to those master billing IDs for which impact coefficients were not estimable.

But in fact the damages methodology does *not* award damages; it *calculates* damages on a classwide basis. Leitzinger's use of averaging "embodies no imputation (let alone awarding) of damages to individual members of the proposed class." Direct Purchasers characterize this facet of Ordover's analysis as a "straw man fallacy," a description this Court finds apt. That is because Direct Purchasers propose to "divide [damages] among class members based on the transaction-level impact analysis." That tactic avoids Ordover's claim that a master billing ID with estimated positive coefficients above the Defendant/product-specific

average price announcement effect will be awarded damages that *undercompensates* that class member relative to the harm they suffered, or that a master billing ID with positive estimated coefficients *less than* the Defendant/product-specific average price announcement effect will receive damages that *overcompensates* that class member relative to the harm it suffered. Questions of allocation need not definitively be resolved now. Direct Purchasers must only show they can prove classwide damages using common evidence. *See In re Flonase Antitrust Litig.,* 284 F.R.D. 207, 233 (E.D.Pa.2012). And though questions of allocation will likely require individualized analysis, that is typical of aggregate litigation, and does not cause individual issues to predominate over common questions in this case. *See Beattie,* 511 F.3d at 564.

**\*47** Finally, Defendants criticize Leitzinger's use of a persistence damages measure. That argument comes in two parts. First, Ordover argues the "approach that Dr. Leitzinger takes to estimating persistence damages ... is wholly speculative and not economically supported." That attack is confusing because Ordover recognizes that Leitzinger's selected persistence factor is only "assumed for purposes of [an] illustrative calculation," but then goes on to criticize the manner in which that illustrative calculation was performed. He faults Leitzinger for providing "no economic justification for the amount or duration of the persistence effects." But an "illustrative" calculation is meant only to demonstrate that this issue is *susceptible* of calculation using common proof; an evidentiary basis for the exemplar persistence factor need not be fleshed out at this stage. It may be that none of the price increase letters were conspiratorial in their origins. But what matters is that *if* Direct Purchasers can prove a given price increase letter is conspiratorial, and *if* impact is proven with respect to that letter, the Leitzinger model is capable of doing the work that a persistence damages measure requires-that is, that the regression models can either function under the lagged price-announcements method, or are capable of determining how long it tended to take for actual prices to realign with the model's but-for price predictions. Ordover does not dispute this aspect of the damages model.

Second, and with more vigor, Defendants argue that Direct Purchasers and Leitzinger commit *Comcast* error by including a persistence measure in their damages model. Ordover views Leitzinger's impact model as, first, estimating the "normal" relationship between price and the supply and demand regressors, and, second, "ascrib[ing] the 'abnormal'

relationship between changes in supply and demand factors and price to the alleged conspiracy." But by including the persistence figure, the model "implies that each customer's quarterly prices are a function not just of that quarter's price announcements, but also of prior price announcements as well." Defense counsel developed the same line of argument at this Court's hearing:

> You can't have it both ways. [Leitzinger] set up a model. Either his model is wrong, or his damages are wrong. Because they're totally inconsistent. You can't set up a regression that says it is premised on the notion that I've got a clean period; I have a but-for period built into my regression that I can compare and draw relationships with my variable that exists there because I'm going to assume that ... when I've got price letters, there's going to be impact; when there's no price letters, there's not going to be impact. It's either clean or it's not clean for purposes of making those calculations. And if you make that assumption, then you can't then turn around and say, by the way, for damage purposes, that's not true.

**\*48** *See also id.* at 102 (describing Leitzinger's impact models as "comparison[s] between the price letters which he claims are collusive and periods when not").

Direct Purchasers might have committed *Comcast* error if, as Defendants and Ordover argue, the theories of liability and impact are premised on price-increase quarters being preceded by "clean" periods, with clean here meaning a "period during which that coordination is not taking place." That theory of liability and impact would, again, transform this case into one in which Direct Purchasers allege 21 different conspiracies, each of which was formed to issue a specific price increase, the effects of which ceased in the same quarter in which the letter was issued. But Direct Purchasers make no such allegation. Direct Purchasers have consistently litigated this case as one featuring a decade-long conspiracy. Leitzinger measures "impact" by reference to a benchmark period, the quarter preceding the quarter in which a price

increase letter issued. That benchmark period is not "clean," under Direct Purchasers' theory of the case. And that fact does not infect Leitzinger's impact findings.

Leitzinger further explains (emphasis in original):

> [M]y impact model ... operates not on price levels but on quarterly price changes. In other words, it attempts to explain the percentage change in actual prices from one quarter to the next as a function of announced price increase percentages for the quarter (and other variables). Thus the dependent variable (the change in actual price) will reflect only the *additional* price increase announcement effect during the quarter in question. Even if the price in any given quarter was also inflated because of persistence, that inflation would have been in the prior quarter as well and therefore it would disappear once the difference in quarters is used.

"The first step in a damages study is the translation of the *legal theory of the harmful event* [*i.e.,* collusive price increase letters, causing impact to customers] into an analysis of the economic impact *of that event* [*i.e.,* within-quarter overcharges, which extended until market forces corrected matters]." *Comcast Corp.,* 133 S.Ct. at 1435 (emphasis in original). Leitzinger's impact theory is consistent with his damages theory because it does not award damages to class members that are "not the result of the wrong" caused by the accepted theory of antitrust harm. *Id.* at 1434. In fact, the damages figures are directly connected to the impact coefficients estimated earlier by Leitzinger. The two models fit.

To the extent this *Comcast* error argument attacks the impact models themselves, essentially arguing Direct Purchasers must employ a before-during-after regression model to measure within-Class Period prices by reference to a "clean" period preceding or following the Class Period, this Court has already found the impact models meet Direct Purchasers' Rule 23 burden.

**\*49** Finally, Ordover articulates a view of damages calculation that conflicts with the longstanding antitrust standard of producing "only an approximate" classwide damages figure. He argues:

> You have to ask yourself the question: Was this persistence the same for everybody? Was it the same for somebody who actually has a contract that would not allow any one of those manufacturers to raise the price to that particular customer, and so on and so forth. You cannot just get up without doing any whatsoever [*sic* ] empirical work and say that three quarters or three months or six months is the right decay factor. That is all made up. But it's not made up without a cost to the foamers.

Again, the .5 persistence factor is offered for illustrative purposes only, and Direct Purchasers have shown their models' ability to do the "empirical work" of predicting, in quarters subsequent to the issuance of a conspiratorial price increase letter, the prices that would be dictated by supply and demand. That demonstration can be conducted on a classwide basis with respect to each price increase letter. It need not look to the particulars of (for example) whether a specific class member might have "read in ICIS that the cost of the inputs have come down" and was able to bargain away some of the persistence effects.

**Common Proof of Fraudulent Concealment**

Finally, Direct Purchasers must show the issue of fraudulent concealment is susceptible of proof on a classwide basis in order to toll the four-year statute of limitations. *See* 15 U.S.C. § 15b. Fraudulent concealment requires proof of: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Carrier Corp.,* 673 F.3d at 446. Concealment by silence is not enough-Direct Purchasers must show Defendants took affirmative acts to conceal the conspiracy. But once an affirmative act by one Defendant (or even non-defendant co-

conspirators) is shown it may be imputed to other members of the conspiracy. *In re Scrap Metal Antitrust Litig.,* 527 F.3d at 538. "The actual exercise of diligence is irrelevant because the standard is an objective one." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 836 (11th Cir.1999) *amended in part on other grounds,* 211 F.3d 1224 (11th Cir.2000).

As common proof of fraudulent concealment, Direct Purchasers offer a series of e-mails and faxes, all of which feature direct or indirect communications between Defendants related to pricing. The senders of some of these emails or faxes instruct the recipients not to share the information with anyone else (*see, e.g.,* Doc. 584–8 at 130 (e-mail from scrap broker to Carpenter and Leggett & Platt, sharing Flexible Foam pricing letter and instructing the letter is "for your files only"); *id.* at 146 (email from Carpenter employee distributing Mohawk price increase letter and instructing recipient "do not forward."); *id.* at 160)). Another directs a scrap broker to fax, not email, price increase letters (*id.* at 158 ("In the future would you please fax these type messages ...")). Direct Purchasers also allege that conspiracy members would share pricing information by fax, using non-company fax machines (*id.* at 154 (Carpenter price increase letter, sent from a Staples fax machine, to Vitafoam, who then forwarded the letter to Domfoam or Valle Foam, who produced the letter in discovery in this matter)). Direct Purchasers produce ten price increase letters of four different Defendants, dated between 2008 and 2009, showing the letter's address fields or fax transmission header information blacked-out Finally, a senior Defendant employee describes communicating with other Defendants in a way to avoid detection of unlawful activity (Doc. 584–11 at 18–19 (noting the senior employee often spoke to, or exchanged emails with, a Carpenter employee who joined in these discussions "from outside [the Carpenter employee's] office," and that the senior employee understood the Carpenter staffer "was aware it was illegal for two competitors to discuss price increases with one another, and [so] actively took steps to minimize any trace that he was having those types of communications with me.")).

**\*50** Defendants do not argue this evidence cannot serve as common evidence of fraudulent concealment, and this Court so finds. Direct Purchasers offer evidence of affirmative acts of concealment that are common to the class. Moreover, because the due diligence standard is an objective one, it can be established using evidence common to the class. *Amgen Inc.,* 133 S.Ct. at 1191 (holding in the context of a securities-

fraud action that "[b]ecause materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class [plaintiff] would represent" and would be answered with common evidence).

**Superiority is Established**

Finally, 📄 Rule 23(b)(3) directs this Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule identifies as relevant factors for this Court's consideration to include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

As the Advisory Committee notes to 📄 Rule 23 explain, "[t]he interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable."

This Court concludes Direct Purchasers show superiority, a point Defendants do not directly dispute. Litigating the class claims through qualified proposed Class Counsel will ensure procedural fairness for Class members. Likewise, as noted above, the Class contains a substantial number of "small buyers" who may have suffered antitrust impact but do not have an individually viable claim in light of the immense expense required to litigate this action. Nor does the fact that there are comparatively "large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own ... militate against class certification." 📄 *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. at 325. Requiring separate proceedings to litigate what Direct Purchasers have shown are common questions would unnecessarily burden federal and state courts, and would risk

reaching inconsistent answers to those common questions. *See* 📄 *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 699 (D.Minn.1995).

Litigation by representation is appropriate in this case, and manageability issues that might arise can be handled with any number of tools. *See, e.g.,* 📄 Federal Civil Rule 23(d)(2). *See also* 📄 *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 539 (6th Cir.2012) (noting that "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification"). Finally, an antitrust class action in which common questions otherwise predominate is "an important component in the federal scheme for deterring anti-competitive behavior." 📄 *In re Mercedes–Benz Antitrust Litig.,* 213 F.R.D. 180, 184 (D.N.J.2003).

**Appointment of Class Counsel is Approved**

**\*51** Having considered the 📄 Rule 23(g)(1)(A) criteria, and based on a review of the proposed Direct Purchaser class counsels' credentials and this Court's interaction with proposed class counsel over the past three years, this Court hereby appoints as Direct Purchaser class counsel William Isaacson, of Boies, Schiller & Flexner LLP, and Stephen Neuwirth, of Quinn Emanuel Urquhart & Sullivan, LLP. Class counsel will "fairly and adequately represent the interests of the class." 📄 Rule 23(g)(4).

\* \* \*

**Indirect Purchasers' Liability Proof**

Because the Direct Purchaser class and the putative Indirect Purchaser class bring similar claims against members of the same alleged conspiracy, Plaintiffs' common evidence with respect to liability is largely the same (*see* Doc. 578 at 11 & n. 2 (noting the putative Indirect Purchaser class and the Direct Purchaser class "worked closely ... in developing the factual record" and incorporating by reference Direct Purchasers' Statement of Facts and all exhibits (except expert reports) cited in the Direct Purchasers' Motion)). For the same reasons as noted above, this Court finds Indirect Purchasers have demonstrated liability is susceptible of proof using evidence common to members of the class.

Unlike Leitzinger, Lamb, the expert retained by Indirect Purchasers, extends his analysis to identifying "class-wide

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

evidence that will be available at trial which may be used to show that the alleged cartel operated in the market for [flexible foam]." Lamb begins with economic theory predictions that, owing to a variety of factors like "different cost hedging strategies," some firms in the flexible foam market "would be under greater pressure to raise prices quickly in response to market conditions than others." As a result, theory would predict that absent collusion "price increases would have occurred at various times and in various amounts."

But, pricing activity in the flexible foam market during the Class Period does not fit those predictions. He finds common evidence that "Defendants announced multiple, nearly-simultaneous, nearly-identical price increases in letters to [their] customers," including "many instances" shown in a "selection" of price increase letters "where at least three (and as many as eight) of the Defendants announced price increases for the same product type within a two-month period that were within two percentage points of each other." Lamb views such behavior as Defendants' efforts to "confirm their cartel behavior and signal to each other" and to customers that collusively-determined prices would be enforced market-wide.

Lamb notes, like Leitzinger before him, that when a market is dominated by a relatively small number of firms, the likelihood of a cartel increases. This is so because "the costs of coordinating pricing behavior among firms increase exponentially as the number of cartel members increases." In short: fewer market members, lower coordination costs, more durable cartel.

**\*52** Lamb, like Leitzinger, finds that concentration within the flexible foam market render that market susceptible to collusion, noting 79 percent of 2009 slabstock production was tied to Foamex, Carpenter, Flexible Foam, and Hickory Springs, and a former senior Foamex employee estimating these same four firms, plus Future Foam, controlled the flexible foam market during that employee's time at Foamex-any "competitive fringe" was only a "small part of the overall market." In 2004, Defendants accounted for 93.5 percent of the flexible foam industry, or an HHI of 1,851 indicating a "moderately concentrated" market.

Lamb further describes concentration in the end-user markets. Defendants' share of foam contained in flooring underlay products was 87.8 percent in 2001, and 86.9 percent in 2009. In 2003, Defendants' products accounted for 96 percent of

the foam used in bedding applications. Defendants' market share in the furniture applications market decreased from 91.4 percent in 2001 to 80 percent in 2005, but HHI increased from 2,047 to 2,220.

Lamb offers one further observation about the consequences of market concentration. In addition to facilitating coordination, he describes economic theory as predicting that this type of market concentration would see dominant firms' pricing decisions create a "pricing umbrella" for smaller firms on the "competitive fringe." That "pricing umbrella" allows small firms to set prices at or just below the dominant firms' pricing levels, on the assumption that firms on the competitive fringe would aim to price as high as possible without losing market share. Small firm pricing decisions would be limited "only by the artificially-inflated prices of the [D]efendants and their co-conspirators," not market considerations.

Lamb and Leitzinger both claim that flexible foam is a commodity. Lamb cites Defendants' own prelitigation documents-for example, Flexible Foam's email correspondence with a customer, a Leggett & Platt Carpet Cushion Division presentation, a Vita marketing plan, a Future Foam customer letter, an FXI internal sales review, and several Hickory Springs documents-all of which refer to flexible foam products as "commodities" or by similar terms (*e.g.,* a product that cannot be differentiated from a competitor product).

Lamb broaches a new topic: the presence of many buyers in the market for flexible foam. Lamb ties this market characteristic to economic theory by explaining "the incentive to a cartel member to cheat on the conspiracy by undercutting the agreed-upon price is lower where there are many, smaller purchasers." On this view, each cartel member faces a risk/reward calculus when deciding whether to abide by the collusive agreement. On the one hand, the firm can cheat on the agreement by dropping its prices below the agreed-upon level in hopes of gaining greater market share. But if the conspirator cheats and is detected by other cartel members, the cheating could disrupt the cartel and cause supracompetitive profits to decline as all conspirators turn to cheating. Thus, cheating on the cartel is only worthwhile if the additional customers that could be gained are substantial buyers. Lamb points to evidence suggesting that would not be the case in the flexible foam market, including a UBS Warburg report of "over 5,000 furniture manufacturers in the U.S.," Defendants' internal documents describing their customers as relatively small,

and Defendants' transactional data, revealing up to 30,000 domestic flexible foam customers. (By contrast, Lamb's claim that high barriers to entry surround the flexible foam market does not break new ground when compared to Leitzinger's treatment of the same topic. Therefore, this Court will not address this portion of the report in detail.)

**\*53** Lamb continues his analysis by discussing the significance of industry maturity to cartel formation. A mature industry is one in which a firm's "ability to increase sales is limited to population growth and the replacement of existing products." New market share can only be captured through price-based competition, especially if the mature market is also properly categorized as a commodity market. Evidence of the flexible foam market maturity includes a market survey noting "growth is largely dependent on the level of activity in end-use markets," that new products are not emerging, and that players are consolidating, as well as other Defendant documents identifying the relevant market as mature. Lamb also finds evidence that end-use markets are mature. He cites industry publications that describe the end-use underlay market as more than 90 percent penetrated. Indeed, one industry analyst, in addition to describing the furniture and bedding applications as mature, described underlay as more than just mature-underlay is a "declining market," meaning "growth is non-existent as sales and profits decline," overcapacity and market exit increase, and prices (should) continue to drop.

On a similar note, Lamb asserts that during the Class Period demand for flexible foam held steady or declined, a market characteristic that makes cartel formation more likely as "weak demand puts downward pressure on prices, making collusion an attractive means to bolster price and profit." Lamb presents data on domestic consumption of flexible foam, estimating consumption at 870,000 metric tons in 2004, and 593,500 metric tons in 2008. In percentage terms, consumption declined in the flexible foam market by 31.8 percent. Similar declines in consumption occurred in the end-use applications markets.

Lamb concludes his general discussion with evidence of Defendants' excess capacity. Again, like Leitzinger, Lamb explains "[i]n an industry with large fixed costs, firms attempt to raise sales in order to be close to capacity because high sales allow [firms] to spread their fixed costs over a larger quantity of goods." With significant excess capacity, a firm operating in a competitive market would increase revenues by selling more product at a lower price. Lamb finds evidence

of Defendants' excess capacity in a series of documents where: Defendants refer to their own excess capacity; one Defendant refers to another Defendant's excess capacity (*e.g.,* a Carpenter document describing Hickory Springs' excess capacity); or foam customers reference Defendants' excess capacity (*e.g.,* a Simmons' quality audit of Flexible Foam).

Defendants incorporate arguments leveled against Direct Purchasers' Motion for Class Certification and apply those arguments to Indirect Purchasers' liability proof. To the extent Defendants re-raise arguments asserting competition within the flexible foam market was intense, and that the intra-Defendant communications were mere "field chatter," those arguments are premature in that they reach the merits question of whether the conspiracy existed. Indirect Purchasers present generalized evidence which could be used at trial to demonstrate the existence of a conspiracy in the foam industry.

### Indirect Purchasers' Impact Proof

**\*54** Indirect Purchasers' approach to showing that impact is capable of proof using evidence common to the class differs from that of the Direct Purchaser class. Specifically:

> Because [Indirect Purchasers] did not purchase ... products directly from the [D]efendants, they propose to prove [impact] through a two-step process. First, plaintiffs will prove that the conspiracy resulted in higher prices for [D]efendants' customers-those companies that directly purchased [flexible foam] from [D]efendants. Second, [Indirect Purchasers] will show that this initial overcharge was "passed through" the manufacturing and retail chains and was included in the final price they paid for their [underlay, bedding, or furniture] goods.

*In re TFT–LCD (Flat Panel) Antitrust Litig.,* 2012 WL 555090, at \*1 (N.D.Cal.2012).

Indirect Purchasers offer four categories of generalized proof to show injury is susceptible of proof on a classwide

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

basis: (1) documentary and deposition proof that Defendants monitored pricing in downstream markets; (2) documentary and deposition proof of discrete instances of overcharge passthrough; (3) Defendants' pricing increase letters; and (4) Lamb's analysis.

Indirect Purchasers claim Defendants "were keenly aware" of the relationship between flexible foam prices and the prices of end-use products, demonstrating knowledge that the conspiracy's overcharge was passed through to indirect purchasers. Defendants also joined trade associations related to end-user markets. Indirect Purchasers present evidence of direct purchasers sharing their own price information with Defendants. 10–K filings and news reports discuss direct purchasers who connected foam price increases to price increases for finished goods.

Lamb concludes "common evidence and methods are available to show that the alleged misconduct, if it is found to have taken place, would have inflated the prices for [flexible foam] paid by all direct purchasers above the level that would have prevailed but for the alleged misconduct." He first finds evidence of artificially-inflated prices in the flexible foam market generally, and then finds evidence that direct purchasers paid those artificially-inflated prices. Next, he shows how inflated pricing in the direct purchaser market affected Indirect Purchasers, asserting there is "class-wide evidence ... to demonstrate that all, or nearly all, members of the proposed Indirect Purchaser Class would have been injured" by seeing direct purchasers pass through to them some portion of the artificially-inflated prices for flexible foam. This Court reviews those three analytical steps, and then turns to a discussion of Ordover's critiques of Lamb's approach.

### Generally Inflated Direct Purchaser Prices

Lamb finds that foam prices in the direct purchaser market generally were inflated owing to declining demand, the commodity nature of foam, and the fact that during the Class Period actual prices generally rose. He recognizes that that fact alone does not indicate these upward-trending prices were artificially-inflated above a competitive level. Instead, he argues "it is the combination of increasing prices with evidence ... of stable or declining demand among Defendants during the proposed Class Period that constitutes class-wide evidence that the alleged misconduct succeeded" in artificially inflating prices.

### Impact to Direct Purchasers

 **\*55**  Lamb next shows why all or nearly all direct purchasers would have paid these artificially inflated prices. First, in addition to Defendants' domination of the foam market and the high barriers to entry, Lamb points to evidence of a pricing structure in the flexible foam market during the Class Period. A pricing structure exists when "prices paid by different purchasers for the same product from a single seller, or for the same product from different sellers tend to move together over time," and likewise for a single firm's purchases of similar products from different sellers. Buyers in the flexible foam market are subject to a pricing structure because they face common demand (*e.g.,* the commodity nature of foam) and common supply factors (*e.g.,* foamers' common input costs). The existence of an industry-wide pricing structure is confirmed through a series of charts depicting the price for Defendants' ten best-selling flexible foam products (expressed in board-feet terms) charged to Defendants' five largest customers for that product. The charts confirm that the actual prices moved together over time.

Second, Lamb identifies evidence showing flexible foam has "no available economic substitutes." New here, Lamb discusses the results of a market research report conducted in the aftermath of Hurricanes Katrina and Rita. The survey asked furniture and bedding manufacturers whether such firms planned on substituting other products for flexible foam, the price of which had increased substantially owing (in part) to chemical price increases. "[Seventy] percent [of furniture manufacturers] did not change their polyurethane use in any way" despite these price shocks, while the remainder attempted to reduce foam density or alter cushioning use in limited ways. The same furniture manufacturers generally described flexible foam as a superior product, and expressed concern that switching to some potentially less durable materials (*e.g.,* fiber products) would cause furniture product quality to suffer. Bedding manufacturers expressed similar concerns, noting that if they included less foam in their bedding products (*e.g.,* by increasing the amount of springs in an inner spring mattress), the bedding manufacturer would have to inform retailers of that change in product specifications, risking the product's perceived quality in light of foam's reputation in the industry.

Lamb then supplements this qualitative evidence of direct purchaser impact with the results of his "Direct Purchaser Regression." He uses a "before-during-after benchmark" method to "compare the prices actually paid by consumers during a conspiracy period with the prices that would have

been paid in a non-conspiratorial world." *See also* In re Scrap Metal Antitrust Litig., 527 F.3d at 529. Under this approach, Lamb compares flexible foam prices in two periods: during the Class Period, and during a "benchmark period" falling outside the Class Period, on the assumption that during that benchmark period the alleged conspiracy no longer functioned and the competitive price prevailed. Lamb selects as his benchmark "the period from September 2010 to December 2011" (Doc. 582 at 15), noting that if the conspiracy continued into this benchmark period despite its revelation to law enforcement, Lamb's model "make[s] the overcharge measured by the multiple regression lower than it actually is."

 **\*56** But a during-after benchmark only gets Lamb so far in measuring overcharge, because it is unlikely that the alleged antitrust conspiracy alone accounts for flexible foam price variance between the Class Period and the benchmark period. So, like Leitzinger, he constructs multiple regression models, allowing him to examine the impact of specific regressors on his variable of interest, actual price charged, while the effect of other regressors are held constant. He feeds into this model a set of Defendants' transactional data with 41 million "usable observations" of actual prices.

Lamb's Direct Purchaser Regression includes several regressors meant to account for various supply and demand factors that might affect actual prices. He understands demand for flexible foam as being a function of demand for the various end-use products that incorporate flexible foam. To gauge demand, he uses "data on new residential construction ... published by the U.S. Census Bureau," and lags that data by three months to produce an "adjusted three-month trailing moving average of housing starts" because "it may take some time" for demand borne of new housing construction to "show up in demand for ... carpet, bedding[,] or furniture." Lamb understands "the supply of [flexible foam as] a function of the cost of inputs" used to produce flexible foam. To account for those costs, he uses data on TDIs and polyols produced by ICIS, creating from that data a supply variable that features polyol and TDI prices in a 2:1 ratio, mirroring the manner in which Defendants' own documents characterize their input costs. He also lags that measure by three months. Finally, Lamb includes in his model an "indicator variable [that] takes the value of either one or zero, depending on whether a specific condition [ (*e.g.,* the conspiracy) ] is present or not." Lamb explains that the estimated coefficient for the indicator variable "shows the overcharge since it would measure the amount by which prices were higher as a result of the alleged

misconduct than they otherwise would have been," holding other price-related factors constant.

Lamb sees his Direct Purchaser Regression produce robust results, including an R-squared-"[a] statistic that measures the percentage of the variation in the dependent variable that is accounted for by all the explanatory variables," FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 345 (3d ed.2011)-of .95 and similarly robust F-test results. His indicator variable's statistically significant coefficient is .0928, "indicating that prices were nearly 10 percent higher"-specifically, 9.72 percent higher-"during the proposed Class Period than they would have been but for Defendants' alleged misconduct." If a factfinder determines (or could determine) the conspiracy existed for only a portion of the Class Period, or extended to only a portion of the Defendants, or that Indirect Purchasers fail to establish fraudulent concealment, Lamb's model can be re-run to accommodate a more limited conspiracy.

### Indirect Purchasers Paid Artificially Inflated Prices
 **\*57** Lamb next shows "at least some portion of [direct purchasers'] higher prices would have been passed on to proposed [Indirect Purchaser] Class members." This passthrough analysis is "well established" from an economic standpoint, and is an outgrowth of "incidence theory," which "involves determining if a tax imposed as a particular level of a distribution channel can be passed through to indirect purchasers along the distribution channel and ultimately to consumers." The amount of passthrough is a function of both elasticity of supply and elasticity of demand, which gauge a seller or buyer's willingness to sell or buy a quantity of product at a given price. Lamb determines elasticities by looking to several types of generalized proof.

First, he describes the "competitive landscape of the market for the product being sold," meaning the end-use markets. These industries are "workably competitive," which means "a high percentage of the monopoly overcharge will be passed on." A series of IBISWorld Reports support that classification, noting "key buying industries" according to their "competition level" and "competition trend."

Indirect purchasers would incur, "for a given pass-through rate," overcharge amounts that would rise as the proportion of the purchased end-use product's foam content rises. Lamb recognizes that "across and within the markets for [end-use applications] the percentage of total cost accounted for by [flexible foam] will vary," but claims his regression

model can control for that variance. He then cites statements from substantial direct purchasers who incorporate flexible foam into finished products (*e .g.,* La–Z–Boy Inc., the Mattress Factory, Ashley, and Sealy Corp.) in which each firm attributes increases in finished product cost to increases in flexible foam pricing. Though "several of the examples refer to market conditions, such as Hurricanes Katrina and Rita, as reasons for increased" end-use product price increases, Lamb correctly observes there is no reason to believe direct purchasers passed on hurricane-related costs but *not* costs attributable to the conspiracy.

Lamb next constructs Indirect Purchaser regressions to "measure the overcharge paid by proposed Class members." He states Indirect Purchaser class members could be identified through several sources of "information that could be made available," including:

(1) With respect to underlay products, information derived from the Carpet and Rug Institute's ("CRI") "Green Label" program, which identifies underlay products that CRI certifies as low-emissions products. Each product that passes the CRI certification process is assigned a "product label ID number," which can be used to identify the firm that produced the flexible foam incorporated into the underlay. All Defendants except Woodbridge (which firm does not produce underlay) participate in the program.

(2) With respect to furniture and bedding, information contained in product labels that furniture and bedding manufacturers must affix to finished goods under state law. The "International Association of Bedding and Furniture Law Officials ("IABFLO") has developed the usage Uniform law Labels," which labels include "Uniform Registration Numbers" or URNs. A URN must appear on the finished product's label, allowing for "identification of the manufacturing facility (and its location) that produced the product." All states "require or allow" a registration number to be used on the label, and "all states accept or have formally adopted" the URN system. Seventeen of the indirect purchaser states and the District of Columbia have adopted Label Laws, and two other Indirect Purchaser states have adopted Label Laws for secondhand products.

**\*58** (3) With respect to bedding, the Consumer Product Safety Act ("CPSA") contains "flammability standards for mattresses and mattress pads," requiring that covered products include a label reflecting the month

and year of manufacture and manufacture location. At oral argument, Indirect Purchasers provided more information on the extent of the CPSA's product label requirement.

(4) With respect to bedding, federal law requires mattress and mattress pad manufacturers to keep records of manufacturing specifications for each such product's prototype, including a prototype identification number. That prototype identification number then "can be shown at the bottom of the [IABFLO] law label" discussed above.

Indirect Purchasers further explained how the claims administration process for a certified Indirect Purchaser class would function:

> [T]he [D]efendant's transaction data that we were able to obtain through discovery [went] down to the manufacturer like the [Direct Action Plaintiffs] and the direct purchasers.... [W]e do know that these [D]efendants have between 85 and 90–over 90 percent of the polyurethane foam market. Serta testified at their depositions and have made public statements that they exclusively buy from one of the [D]efendants. We can trace that. If a member of the class purchased a Serta bed, we know where that foam came from. If a Simmons purchaser bought a bed, we know where that came from because we can track that automatically from the [D]efendant's transaction data.... [But t]here are no records that show direct connection [in some cases]. So you do have to trace back a little bit. If we get into the claims administration, what we did in the *Potash* case is each member of the class who filed a claim had to indicate the product they purchased, the state [in which] they purchased [the product], and the amount they purchased. That is really like a self-identification. But what we're talking about [with respect to the

lack of a direct connection between Defendants' transactional data and direct and indirect purchasers] is the fringe. We're talking about maybe ten percent of the class because we know that the defendants control over 90 percent [of the foam market].

Concluding Indirect Purchaser class members are identifiable, Lamb employs separate regression models for each of the three end-use product segments-underlay, furniture, and bedding-measuring "the amount of [the overcharge determined in the Direct Purchaser Regression that] was passed through from [d]irect [p]urchasers either to [intermediate] purchasers and ultimately to Class members or to Class members directly."

There are "links" in the distribution chain separating indirect purchasers from direct purchasers, as noted above. In the bedding and furniture markets, Defendants typically sell foam products to OEM manufacturers, who in turn sell finished products to retailers, who then sell furniture and bedding products to indirect purchasers, while the distribution chain for underlay is shorter. But the length of the distribution chain does not significantly affect passthrough measurements. In all cases, "the portion of the overcharge borne by the proposed Class member is the product of the passthrough rates measured" at each link in the chain, such as "from [d]irect [p]urchasers to retailers and [from] retailers to proposed class members." Lamb can use that simple arithmetic to calculate passthrough because of the "law of one price," a "fundamental principle of economics" which holds that "the price for a product at the same point in the distribution chain, and for the same product at the same place and the same time must be the same across suppliers," such that the passthrough rate at each possible distribution channel need not be determined individually.

**\*59**  Therefore, Lamb's Indirect Purchaser regression models measure the dependent variable, actual prices charged, between direct purchasers and retailers (the "Direct–Purchaser–to–Retailer regression"), and then between retailers and end users (the "Retailer–to–Indirect Purchaser regression"). Lamb feeds the Direct–Purchaser–to–Retailer regression with a dataset of 35,000 "usable observations of the [retail] prices paid" for end-use products obtained from such firms as Home Depot, Lowe's, Art Van, Costo, and Macy's.[8] Lamb then adds a series of regressors. First, using data

from the U.S. Department of Commerce, Lamb constructs a "disposable personal income" regressor for all three models, and lags that regressor by six months. This regressor accounts for changes in demand in each of the relevant end-use markets, noting that industry analysts see "the level of disposable income [as being] a key determinant for the demand" for all three end-use products. His supply regressor with respect to bedding and furniture is (in the Direct–Purchaser–to–Retailer regression) an OEM's costs for flexible foam, or (in the Indirect–Purchaser–to–Retailer regression) the retailer's cost for furniture or bedding products. He uses data from an underlay firm to create an underlay supply regressor measuring the direct purchaser's underlay cost. He rounds out the models with a series of indicator variables, specific to each of the three end-use markets, to "capture any differences in pricing related to various factors affecting the retailer or product," including, for instance, using an indicator to control for mattress size.

Lamb's Indirect Purchaser regression models show different passthrough rates in each market. The underlay regression estimates that 83 percent of changes in unit cost were passed on to indirect purchasers. Owing to their relatively more complex distribution chain, the bedding and furniture regression models estimate passthrough in two steps.

With respect to bedding, the Direct–Purchaser–to–Retailer regression estimates passthrough of 124 percent of the change in costs, indicating that at this link in the distribution chain costs were passed through in full, along with a Direct Purchaser mark-up. The Retailer–to–Indirect Purchaser regression estimates passthrough of 148 percent, again reflecting a full overcharge passthrough paired with an almost fifty percent retailer markup. With respect to furniture, the Direct Purchaser–to–Retailer regression estimates passthrough of costs at 48 percent. The Retailer–to–Indirect–Purchaser regression estimates cost passthrough of 152 percent.

**Ordover's Challenge to Lamb's Approach**
Substantial portions of Ordover's Indirect Purchaser Report are identical to his Direct Purchaser Report. Rather than recite those criticisms and this Court's conclusions with respect to each such criticism, this Court relies on its reasoning with respect to the Direct Purchaser Motion on the same points.

**\*60**  It suffices that Lamb: successfully rebuts Ordover's claims regarding market concentration in the foam industry; notes additional specific evidence supporting the conclusion

that foam is a commodity product and distinguishes between product heterogeneity and interchangeability; and finds Defendants did not distinguish between local geographic markets in their pricing letters, and that supply and demand conditions affecting flexible foam products were national in scope.

### Price Increase Letters

Ordover disputes that price increase letters were issued for "the same percentage amount and at around the same time period." He claims Lamb ignores a legitimate explanation for such price increase letters-increase in input costs-and criticizes Lamb's failure to highlight certain quarters in which Defendants announced significantly different percentage price increases. Ordover creates a line graph using slabstock and scrap cost indices, and then superimposes on the chart lines indicating quarters in which at least six Defendants issued price increase letters, which he asserts serves as "evidence of a link between the [price increase letters] and changes in industry-wide costs." Given this relationship between costs and price increase letters, Ordover claims the price increase letters "do not provide evidence that direct purchasers of polyurethane foam would be commonly impacted" by the alleged conspiracy. He repeats his analysis of the extent to which price increase letters resulted in quarter-over-quarter increases in actual prices charged.

Indirect Purchasers' theory is, among other things, "[t]he general pretext used to explain the conspiratorial price increases was increases in raw material costs" (Doc. 371 at ¶ 76). It is consistent with that theory to see price increase letters issued during quarters in which Defendants' costs rose. To the extent the percentage price increase reflected in these letters outpaced rising raw materials cost, Lamb's regression expressly includes an input cost variable-Ordover's preferred ICIS variable-to account for input cost-related changes in the actual prices charged. It therefore can show whether, even as to direct purchasers who saw a decline in actual prices charged in the conspiratorial world, Defendants succeeded in their bid to "fix, ... maintain, and/or stabilize prices" in a market characterized by declining demand and excess capacity (Doc. 371 at ¶ 3).

### Pricing Structures

Ordover also criticizes the Lamb Report (Appendix C), which contains 90 graphs, showing each Defendant's ten most popular products and the prices paid by the five largest buyers of those products. Ordover's critiques on this point do not

undermine Lamb's claim to generalized evidence of pricing structures. Ordover simply asserts Lamb's use of graphs is not an acceptable methodology, and then notes that *his* price dispersion and costumer-product actual price change charts-charts that, unlike Appendix C, do not control for price differences tied to differences in foam grades-belie the general pricing trends reflected throughout most of Appendix C. Lamb uses Defendants' own transactional data to construct Appendix C charts, and presents that data in an appropriate manner. *See* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 236 (3d ed.2011).

*See also* 📄 *In re Bulk (Extruded) Graphite Products Antitrust Litig.,* 2006 WL 891362, at *13 (D.N.J.2006).

### *"Cleaning" of Defendants' Transactional Data*

**\*61** Ordover also criticizes Lamb's "cleaning" of Defendants' transactional data, in preparation for feeding that dataset into his Direct Purchaser Regression. Lamb excludes a substantial portion of the transactional dataset because it (1) omits customer-product observations that Lamb could not convert to a board-foot unit of measure; (2) removes product returns and outliers; and (3) does not run the Direct Purchaser Regression against Carpenter's "Legacy" data, which comprise 42 percent of that Defendant's Class Period sales.

To the extent Defendants argue Lamb's regression results cannot serve as common proof of impact unless the regressions incorporate *all* of the transactions contained in Lamb's transactional dataset, they are wrong. Lamb provides a reasonable explanation for omitting data that cannot convert to the standard unit of measure required by his Direct Purchaser Regression. Moreover, courts have deemed impact to be susceptible of classwide proof even though a plaintiff's showing on that point does not incorporate data for all defendants or for all of a defendant's challenged conduct. *See, e .g., In re Chocolate Confectionary Antitrust Litig.,* 289 F.R.D. 200, 224–25 (M.D.Pa.2012). This Court sees no meaningful distinction between, on the one hand, a finding that generalized proof of antitrust injury exists with respect to a model that relies on data produced by only some defendants, and, on the other hand, the same finding with respect to a model that relies on the *usable* data produced by Defendants. That is especially so where, as here, the model's usable dataset is extensive enough to permit the model to explain the overwhelming majority of changes in actual prices. Omission of data (despite the reasonable basis for those exclusions) goes to the weight a factfinder should assign Lamb's models,

not whether the models are workable. *Cf.* *In re Scrap Mental Antitrust Litig.,* 527 F.3d at 531.

Lamb responds to Ordover's critiques regarding omission of Carpenter legacy data and the inclusion of "products used for purposes excluded from the indirect purchaser's class, such as automotive or packaging products" by incorporating Carpenter legacy data and excluding irrelevant data. These data adjustments yield results similar to Lamb's initial Direct Purchase regression.

### Constant Overcharge Effects

Lamb's approach "assumes that the same collusive overcharge applies to every one of the purchases in his data sample, including purchases by all direct purchasers, of all products, from all Defendants, and at all times during the proposed class period." Ordover notes four dimensions along which the dummy variable could change-customer, Defendant, product form, and on an annual basis-and runs "unrestricted" versions of Lamb's "restricted" Direct Purchaser Regression, allowing the dummy variable to change along each of the four possible dimensions. As compared to Lamb's "restricted" model, Ordover finds his "unrestricted" models "yield a more statistically informative regression analysis," and all four versions reject Lamb's assumption that the dummy variable does not change. Ordover similarly finds that Lamb's Indirect Purchaser regressions should be permitted to vary according to time, retailer, and product.

 **\*62**  Based on this comparison, Ordover concludes impact coefficients should be estimated "for each individual direct purchaser" included in Lamb's Direct Purchaser Regression. A majority of the dataset customers fall out of this individual-coefficient approach-that is, such customers did not purchase foam during both the Class Period and the benchmark period-and Ordover finds statistically significant impact results for only 20 percent of customers.

There is much back and forth among the experts on this point, but this Court's role is not to decide whether Ordover's "unpooling" approach is more "statistically appropriate" than Lamb's single-dummy variable approach. It may only-indeed, must only-determine whether Indirect Purchasers offer generalized proof showing impact is susceptible of classwide proof. On this point, it bears noting that other district courts have accepted the same during-after benchmark methodology in circumstances in which the underlying assumption of constant overcharges was present as here.

*See* *In re Titanium Dioxide Antitrust Litig.,* 284 F.R.D. 328, 347 (D.Md.2012) *amended,* 962 F.Supp.2d 840 (D.Md.2013) (accepting Lamb's single overcharge regression model); *In re Chocolate Confectionary Antitrust Litig.,* 289 F.R.D. at 212–13. Moreover, though Lamb understands his model necessarily depends on an assumption of invariance, he presents evidence specific to this case (*e.g.,* the existence of pricing structures and the commodity nature of foam products) that justify use of such a model.

Of course, Defendants dispute Lamb's characterization of the foam market, and so dispute that this particular market is one for which an invariance-based regression model is inappropriate. Further, Defendants argue actual prices charged to customers, which varied widely, directly contradict the notion that customers suffered similar impact from the alleged conspiracy. But those actual prices are historical prices that may have included sums attributable to the alleged conspiracy, which may have served in part to slow the decline of prices. Lamb's model is meant to control for that variance in actual prices by incorporating supply and demand variables-variables Defendants do not challenge. Defendants argue "un-pooling" Defendants' transactional data and estimating impact coefficients by year, customer, or Defendant is the "statistically appropriate" thing to do. Lamb disagrees, and provides a reasonable basis for doing so, rooted in evidence specific to this case. That suffices. *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 2012 WL 555090, at \*5 (N.D.Cal.2012) ("Even if regression models are not enough, standing alone, to establish classwide impact, they may nevertheless be relevant to the issue. A large average overcharge, for example, might make it more likely that every direct purchaser was overcharged to some degree.").

### No Comcast Error

Defendants argue Lamb's single-overcharge model commits *Comcast* error because it "does not in any way account for the mechanisms of the conspiracy alleged by [Indirect Purchasers]-coordinated price announcements." Ordover makes the same point, drawing a legal conclusion as to the fit of Indirect Purchasers' theory of the case with Lamb's regression model.

 **\*63**  This discussion of *Comcast* error assumes Indirect Purchasers' legal theory extends only to recovery of overcharges that are the result of collusive price increase letters. The Complaint states otherwise. Indirect Purchasers allege Defendants "contracted, combined, or conspired to

fix, raise, maintain, and/or stabilize prices and allocate customers for" flexible foam by engaging in "specific and detailed communications between and among" Defendants' executives and employees aimed at fixing prices and allocating customers (Doc. 371 at ¶ 3). The exchange of draft and already-published price increase letters played a prominent role in those discussions, but such letters are not alleged to be the exclusive mechanisms by which indirect purchasers suffered injury. Moreover, Indirect Purchasers allege the exchange of price increase letters was a signaling device. Their case proceeds on the theory that Defendants "charg[ed] supracompetitive prices even when price increase [letters were not issued]." And as a matter of econometrics, Lamb's regression model fits this broader conception of the conspiracy. Ordover agrees that Lamb's model is tied to a legal theory in which Indirect Purchasers allege "supracompetitive prices were charged by the alleged conspirators even in times of declining demand" and not just during points in time when Defendants issued price increase letters (Doc. 742 at 330 (explaining "Dr. Lamb's econometrics is geared to a claim that assumes or that poses that supracompetitive prices were charged throughout [class period]")).

### The Law of One Price

Defendants next argue Lamb cannot establish passthrough of the direct purchaser overcharge on a classwide basis because the theoretical bedrock for Lamb's analysis on this point-the law of one price-does not apply to the foam market. Ordover explains the law of one price "applies under restrictive conditions which do not always apply to the" slabstock and underlay industries. It is a "theoretical proposition" which holds only "under conditions of product homogeneity, zero transactions costs, zero search costs, no informational asymmetries, and no market imperfections." The results of a survey conducted by his staff, using an "internet price comparison service," shows wide dispersions in price for the "same" product sold by different firms in the Chicago area. He also probes Lamb's third-party retailer transactional data, and finds "large [price] dispersions within [a] retailer, as well as different price patterns across retailers."

Fundamentally Ordover's criticism on this point boils down to his view that the law of one price is theorized to apply in conditions not present in this market (*see* Doc. 892–3 at 25 ("[T]he economic theory of the law of one price requires a perfectly competitive market for the law to hold.")). In his words, the law of one price is "not a law. It is a variant with respect to the key dimensions of competition." Defendants argue that because the law of one price does not apply in

its theorized state, Lamb must measure discrete passthrough rates at every link in the distribution chain. This Court disagrees.

**\*64** "The question of what would have happened but for [the alleged conspiratorial] overcharge is a hypothetical, and a hypothetical question generally cannot be answered by historical data about what actually happened, but must often be answered by general principles about what generally tends to happen. Thus, average pass through rates appear reasonable and even necessary to prove damages here." *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 605 (N.D.Cal.2010) (quoting *Gordon v. Microsoft Corp.,* 2003 WL 23105550, at \*3 (D.Ct.Minn.)); *In re Static Random Access memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603, 614 (N.D.Cal.2009) (same). *See also* *In re Cathode Ray Tube (CRT) Antitrust Litig.,* 2013 WL 5391159 (N.D.Cal.2013) (granting class certification with indirect purchaser plaintiffs' use of averaged data as generalized evidence of common impact).

Lamb produces evidence that when one compares prices for the same types of products, price dispersions are quite small. Granted, the dispersions in prices charged and differences in retailer margins do not evaporate as Ordover shows. But in requiring Lamb to produce a workable model, this Court cannot "let a quest for perfect evidence become the enemy of good evidence." *Messner,* 669 F.3d at 808. *See also* *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 2012 WL 555090, at \*3–4, 9 (rejecting defendants' argument that indirect purchasers "must identify the overcharge that was placed on every LCD panel sold during the conspiracy period and trace that overcharge through the manufacturing and retail distribution chains until plaintiffs can identify the overcharge paid by a particular class member for a particular LCD product" because indirect purchasers had presented evidence that the affected product was fungible).

### The Fact of Passthrough

Defendants also dispute whether passthrough in fact occurred. Defendants present deposition testimony of direct purchasers who "did not always pass" foam price increases onto customers. For example, an employee of direct purchaser Ultra Comfort testified that with respect to some foam price increases, he would ask *his* customers if they would accept an increase in Ultra Comfort's product pricing. "Sometimes it would work. Sometimes it wouldn't." As a result, Defendants

contend Indirect Purchasers "cannot rely upon common evidence either to ascertain the members of the class or to establish common impact to any putative class."

This Court notes portions of this testimony are ambiguous, showing at most direct purchasers "ate" a portion of the price increase. Other evidence that passthrough did not occur is not persuasive. Indirect Purchasers have shown passthrough *did* occur, and that retailers' margins remained more or less constant during and after the conspiracy, which would not have been the case if, as Defendants argue, "retailers absorbed the overcharges paid by Direct Purchasers" during the Class Period.

 **\*65**  Moreover, focusing on the decisions of individual direct purchasers in isolation may be misleading. "[A]s a business person [is] faced with what we call a shock to price, they see a price change, they don't know whether that price change is permanent or transitory, and they may immediately try to absorb that price increase." But a longterm view of likely pricing decisions is a more reliable indicator as to passthrough to the class. When a series of price increases are "more than a significant share of their costs, when the prices are going up nearly 100 percent during the class period, it just is inconsistent with economic principles to think that they could have absorbed that" level of sustained price increases. This Court does not doubt that an alleged colluder could find an instance in which, in the short-term, a direct purchaser failed to pass on the amount of an antitrust overcharge. That fact alone cannot defeat an otherwise proper offer of generalized evidence of overcharge passthrough; it instead goes to the weight of evidence offered to prove if passthrough in fact occurred, and the amount of that passthrough.

### Antitrust Injury Can Be Demonstrated

To review, Indirect Purchasers present generalized evidence that the flexible foam industry is a concentrated industry with high barriers to entry and contains many buyers for a fungible set of products. Indirect Purchasers also present generalized evidence that Defendants had substantial excess capacity, and that demand for the relevant products declined substantially over the Class Period. Indirect Purchasers also show actual prices for the same products tended to move together over time, which is indicative of a pricing structure. They also present evidence of a substantial number of quarters in which a significant number of Defendants issued price increase letters announcing the same or similar percentage price increase, and that these letters did not differentiate between local geographic markets in

announcing prices. Finally, Indirect Purchasers offer Lamb's expert testimony, which contains a detailed examination of discovery material produced in this matter, corroborating Indirect Purchasers' understanding of Defendants' business. Lamb presents commonly-accepted regression models to measure the amount of overcharge suffered by direct purchasers, and then measures the extent to which that overcharge found its way through the distribution chain to indirect purchasers.

Defendants' sustained attack of antitrust injury proof goes too far, reaching merits issues not bound up with Indirect Purchasers' predominance showing. *See also In re Cathode Ray Tube (CRT) Antitrust Litig.,* 2013 WL 5391159, at \*5 (N.D.Cal.2013) ("Defendants' argument ... is essentially that [indirect purchaser plaintiffs] must be able to prove at the class certification stage that every single (or basically every single) class member was injured by Defendants' conduct. This contention is wrong. The Court's job at this stage is simple: determine whether [indirect purchaser plaintiffs] showed that there is a reasonable method for determining, on a classwide basis, the antitrust impact's effects on the class members."). Lamb's averaging approach may have some weaknesses, but Indirect Purchasers have met their burden.

### Classwide Proof of Damages

 **\*66**  Indirect Purchasers claim Lamb's analysis can be used to show "for each category of end product ... whether and how much the consumer price increased as a result of the Defendants' overcharges." Indirect Purchasers propose a trial plan as to damages proceeding as follows: "While [Indirect Purchasers'] proof of impact is separate from [Indirect Purchasers'] proof of damages, they are related. Part of [Indirect Purchasers'] proof of impact will consist of common evidence that Defendants' actions caused overcharges that were passed on to [Indirect Purchasers]. [Indirect Purchasers'] proof of damages will consist of estimates of the amount of the overcharges paid by Plaintiffs when purchasing various types of end user goods (*e.g.,* carpet padding). Because proof of the existence of the overcharges will overlap proof on the amount of overcharges, the liability and damages evidence should be presented in a single proceeding. Findings regarding overcharges for the types of end user goods will be made via special interrogatories, based upon factual evidence and expert opinions presented by Dr. Lamb."

Lamb then presents several steps for calculating "damages paid by proposed Class members." First, he would determine

the dollar value of the flexible foam contained in the indirect purchaser's product. The "dollar value" would be figured by determining how much board-feet of foam the product contains, and then multiplying that board-foot figure by Defendants' price per board foot of foam. Second, Lamb would multiply the dollar value of flexible foam contained in the indirect purchaser's product (as determined in step one) by the Direct Purchaser overcharge. That calculation yields the dollar amount by which a direct purchaser was overcharged for the flexible foam contained in the indirect purchaser's product. Third, Lamb would multiply the direct purchaser overcharge (determined in step two) by the applicable passthrough rate for underlay, bedding, or furniture.

Defendants argue this damages methodology fails at the outset because it lacks a workable method for identifying class members. Defendants note, for instance, that two Indirect Purchasers testified neither knew which company produced the foam contained in the products upon which each putative class representative's claims were predicated. Similarly Defendants attack Lamb's self-identification method, noting, for instance, that uniform law labels "identify the manufacturer of the product, not the manufacturer of the foam."

But so long as indirect purchasers are able to identify the manufacturer of the end-use product-which all the various self-identification methods allow-then Indirect Purchasers can use Defendants' transactional data to provide a sufficient connection between an end-use consumer and a Defendant (*see* Doc. 967 at 132 ("Serta testified at their depositions and have made public statements that they exclusively buy from one of the defendants. We can trace that. If a member of the class purchased a Serta bed, we know where that foam came from. If a Simmons purchaser bought a bed, we know where that came from because we can track that automatically from the [D]efendant's transaction data.")). Deposition testimony of Indirect Purchasers also show the labels can be used to trace end-use product foam to one of the Defendants.

**\*67**  And if Indirect Purchasers cannot trace Defendant foam in this manner, then a claim cannot be made and Defendants do not owe any damages as to the failed claimant. Indirect Purchasers correctly note that damages calculations can be approximate (hence the use of single overcharge rates), but there still remains an irreducible requirement that a claimant establish standing to recover for any overcharge. Indirect Purchasers' suggestions to the contrary-that "courts have found antitrust defendants liable for price inflation caused by

their anticompetitive conduct, including on purchases from non-defendants" under the umbrella theory of pricing-get the law wrong, and support cited for that proposition are inapt. *In re Cardizem CD Antitrust Litigation* does not support recovery for purchases from non-defendants; the court stated: "Plaintiffs are purchasers of Defendants' products" who pursued "antitrust damages based on the overcharges they paid as purchasers of price-fixed goods." 200 F.R.D. at 310. Likewise, *In re Uranium Anitrust Litigation* permitted recovery for antitrust claims arising from an "overcharge ... paid to a named defendant or a *non-defendant coconspirator.*" 552 F.Supp. 518, 522 (N.D.Ill.1982) (emphasis added).

Indirect Purchasers' theory would find injury in *all* end-use purchases, even from non-defendant, non-coconspirator firms, including (presumably) Direct Action Plaintiffs and Direct Purchaser class members who competed with Defendants in the manufacture of certain foam products. Individuals who clearly fall outside of the class definition could then file claims and obtain recovery, even though they cannot establish (or under Indirect Purchasers' theory, would even *need* to establish) that they are a person or entity who purchased "not for resale, [qualifying end-use products] which were manufactured, produced or supplied *by Defendants or their unnamed co-conspirators* from January 1, 1999 to the present." *See also* Mid–W. Paper Products Co. v. Cont'l Grp., Inc., 596 F.2d 573, 587 (3d Cir.1979) (concluding that an individual who is a "a purchaser of consumer bags from [non-coconspirator] competitors of the defendants[ ] has no standing to sue the defendants for treble damages allegedly resulting from such purchases" under an umbrella pricing theory).

As presented though, Indirect Purchasers present a workable damages methodology. Through the Direct and Indirect Purchaser regressions, Indirect Purchasers can prove with generalized evidence the end-use overcharge rates, which rates Defendants can fully contest at trial. Those overcharge rates then can be applied to each verified claim, yielding a class member's recovery. The fact that class members must engage in Lamb's form of self-identification does not cause individual questions to predominate over common questions of law and fact. Some such form of self-identification would be required to make out a claim whether this case proceeded as a class or not, and so it serves the interest of judicial economy to determine liability, impact, and damages in one proceeding. *See* Olden v. LaFarge Corp., 383 F.3d 495, 508 (6th Cir.2004); Klay v. Humana, Inc., 382 F.3d

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

1241, 1259–60 (11th Cir.2004) ("Particularly where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification") (footnotes omitted), *abrogated on other grounds by,* Bridge v. Phoenix Bond & Indemn. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008); Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir.2003) ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); In re Titanium Dioxide Antitrust Litig., 2013 WL 1855980, at *17 (D.Md.2013) ("If the Defendants are found liable, then it may be appropriate for this Court to appoint a special master or Magistrate Judge of this Court, who could oversee the apportionment of individual damages. As W. Rubenstein explains, that proceeding may involve 'little more than an application of the damages formula found by the jury' at trial.") (internal citations omitted); NEWBERG ON CLASS ACTIONS § 18:53 & n. 4 (4th ed.) (collecting cases that stand for the proposition that "Class proof of damages, either by an aggregate lump sum award to the class as a whole or by application of mechanical formulae or statistical methods to individual class members' claims, has received approval in several antitrust cases").

**Vitafoam Damages**

**\*68** As noted above, the Vitafoam Defendants are uniquely situated. As DOJ Corporate Leniency program applicants, Vitafoam potentially may qualify for liability limitations under ACEPRA. That statute provides (Pub.L. No. 108–237, § 213(a), 118 Stat. 665), 666 (2004)):

> [I]n any civil action alleging a violation of section 1 or 3 of the Sherman Act, or alleging a violation of any similar State law, based on conduct covered by a currently effective antitrust leniency agreement, the amount of damages recovered by or on behalf of a claimant from an antitrust leniency applicant who satisfies the requirements of subsection (b), together with

the amounts so recovered from cooperating individuals who satisfy such requirements, shall not exceed that portion of the actual damages sustained by such claimant which is attributable to the commerce done by the applicant in the goods or services affected by the violation.

But for that damage limitation to apply to an antitrust leniency applicant (*id.* 213(b), 118 Stat. at 667):

> [T]he court in which the civil action is brought [must] determine[ ], after considering any appropriate pleadings from the claimant, that the applicant or cooperating individual, as the case may be, has provided satisfactory cooperation to the claimant with respect to the civil action, which cooperation shall include:
>
> (1) providing a full account to the claimant of all facts known to the applicant or cooperating individual, as the case may be, that are potentially relevant to the civil action; (2) furnishing all documents or other items potentially relevant to the civil action that are in the possession, custody, or control of the applicant or cooperating individual, as the case may be, wherever they are located; and (3)(A) in the case of a cooperating individual-(i) making himself or herself available for such interviews, depositions, or testimony in connection with the civil action as the claimant may reasonably require; and (ii) responding completely and truthfully, without making any attempt either falsely to protect or falsely to implicate any person or entity, and without intentionally withholding any potentially relevant information, to all questions asked by the claimant in interviews, depositions, trials, or any other court proceedings in connection with the civil action; or (B) in the case of an antitrust leniency applicant, using its best efforts to secure and facilitate from cooperating individuals covered by the agreement the cooperation described in clauses (i) and (ii) and subparagraph (A).

In short, if this Court determines Vitafoam qualifies for ACPERA protection, Vitafoam will be liable for only the actual damages suffered by customers who purchased Vitafoam products-it will not be jointly and severally liable for the harm caused by other Defendants' product sales, nor will it be saddled with treble damages for injury caused by its own sales.

Vitafoam argues this potential damages limitation "can and should [be] consider[ed in connection with deciding the Indirect Purchaser Motion for Class certification] because it is highly probative of whether common or individual issues will predominate at the damages phase." Vitafoam argues "this Court must make a preliminary factual finding as to whether [Vitafoam's] damages will be limited by ACPERA. Such a finding is necessary at the certification stage to determine whether common issues will predominate over individual issues in the calculation of damages against [Vitafoam]." Vitafoam suggests use of the procedure endorsed in *Gariety v. Grant Thornton, LLP,* 368 F.3d 356 (4th Cir.2004). There, the Fourth Circuit required proof of market efficiency at class certification. To prove that fact, the court of appeals suggested that the district court, on remand, engage in something like a preliminary injunction analysis. *Id.* at 366. Under such an analysis, "there is a substantial likelihood that [Vitafoam] will succeed in satisfying ACPERA."

**\*69** With that likely damages limitation in mind, Vitafoam argues the Indirect Purchasers' damages methodology is unworkable because it "prove[s] damages *collectively* against all defendants, rather than *individually* against any of them" and so cannot tease out the only price-fixed sales for which Vitafoam would be liable: its own. Vitafoam backs up that assertion with the expert analysis of Dr. Robert Maness, who finds Lamb's damages methodology cannot isolate the harm caused by Vitafoam's own sales. First, he concludes Lamb's self-identification framework is unworkable to identify which end-use products incorporated Vitafoam foam. Second, he concludes Vitafoam's estimates for each Defendant's domestic market share cannot serve as a basis for apportioning Vitafoam's liability, noting Lamb only cites slabstock and underlay market share in certain years, but has not demonstrated those specific market share estimates are representative of Defendants' market shares during other portions of the Class Period. Vitafoam asserts it would be reversible error for this Court to certify the Indirect Purchaser class for damages purposes. This Court believes the reverse is true.

In originally briefing this matter, Vitafoam stated that this Court "need not and should not make any finding on [whether Vitafoam's ACPERA cooperation is sufficient to warrant ACPERA protection] at this stage of the case, because [Vitafoam is] continuing to cooperate with the [Indirect Purchasers] and other plaintiffs." While that assertion no

longer quite captures Vitafoam's position, it underscores why a definitive determination of ACPERA eligibility cannot, and should not, be made at this stage of the proceedings. No court to consider ACPERA protection has determined ACPERA questions ought to be broached at class certification, where certification is sought for litigation purposes. At the earliest, a district court considered the matter appropriate only after defendants had moved for summary judgment. *In re Aftermarket Auto. Lighting Products Antitrust Litig.,* 2013 WL 4536569, at *1 (C.D.Cal.2013). Another court determined "the Court's assessment of an applicant's cooperation occurs at the time of imposing judgment or otherwise determining liability and damages." *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 618 F.Supp.2d 1194, 1196 (N.D.Cal.2009). Indeed, the text of the statute itself suggests ACPERA cooperation obligations continue through trial, in that antitrust leniency applicants and cooperating individuals' obligations expressly include or relate to trial testimony. And it is at trial, when the preponderance burden is imposed, that plaintiffs most need an ACPERA leniency applicant's cooperation.

Even if probing ACPERA issues would be appropriate at this stage of the proceeding, Vitafoam presents this Court with a document containing only three bullet points listing Vitafoam's cooperation with Indirect Purchasers through August 2013. Granted, counsel for Indirect Purchasers agreed at this Court's hearing on class certification that, after some initial difficulty with certain Requests for Admission had been resolved, Vitafoam has cooperated "up to this point." But the text of the statute imposes on *this* Court the obligation to ensure an antitrust leniency applicant has "provided satisfactory cooperation to the claimant with respect to the civil action." This Court does not believe it simply can rely on the agreement of counsel in this case that an ACPERA obligation has been carried-that is a fact that must be *shown*. After all, the interests of counsel in this case do not necessarily align with the broader public interest, a component of which includes the interest in assuring ACPERA protection is not granted cavalierly.

**\*70** A full-blown ACPERA assessment is therefore not appropriate at this stage of the litigation. But is an informed guess, along the lines of *Gariety* ? This Court concludes it is not. There is a fundamental difference between the issue subject to a preliminary determination in *Gariety* and the damages limitation that *might* arise in this case. As the Court in *Amgen* explained, a putative securities fraud class representative must establish the fact of market efficiency

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

at class certification or else there would be "no basis for presuming that the defendant's alleged misrepresentations were reflected in the security's market price, and hence no grounding for any contention that investors indirectly relied on those misrepresentations through their reliance on the integrity of the market price," in which case individual issues would necessarily predominate because the class would be required to establish, member by member, actual reliance.

*Amgen Inc.,* 133 S.Ct. at 1199.

Here, by contrast, at the time Indirect Purchasers moved for class certification, Vitafoam was (and at least in the absence of an ACPERA finding to the contrary, remains) jointly and severally liable for the trebled damages of the entire conspiracy. Vitafoam therefore asks this Court to deny an otherwise properly supported Motion for Class Certification because Vitafoam *might* qualify for ACPERA protection, and Indirect Purchasers *might* be unable to zero-out the actual damages attributable to Vitafoam with requisite precision-which is to say, "as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co.,* 282 U.S. at 563. Setting aside the speculative nature of that request, this Court lacks the power to deny certification based on "findings" with respect to a question, like ACPERA applicability, that is not bound up with Indirect Purchasers' ability to maintain, on a classwide basis, causes of action against Defendants under the facts that exist now. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 398, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) ("By its terms [ Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action.") (plurality opinion).

The solution to Vitafoam's quandary is simple. If Indirect Purchasers' damages model is unable to function as described, then Vitafoam may "file motions seeking to reduce or decertify the class" as to Vitafoam. *In re Air Cargo Shipping Servs. Antitrust Litig.,* 2009 WL 3077396, at *8 (E.D.N.Y.2009). A pretrial motion raising this same issue, filed after the Rule 23(c) notice period has run, allowing this Court a sense of the difficulties (if any) in identifying Indirect Purchaser class members, could be well-taken.

Indirect Purchasers argue Vitafoam's concerns are, in any event, without merit, because the damages model can accommodate Vitafoam's concerns and isolate with requisite precision the damages for which it would be responsible, in the event Vitafoam wins ACPERA protection. That argument is based on: Lamb's testimony explaining that Vitafoam would still see its ACPERA-capped damages calculated using the end-use passthrough overcharge rates, and that those overcharge rates could be applied to Vitafoam's transactional data to determine the portion of Class Period foam sales for which Vitafoam is accountable; the fact that Vitafoam has settled with Direct Purchasers in this case, revealing to Direct Purchasers financial information that could inform market share calculations; and the fact that allocation issues with respect to Vitafoam's Direct Purchaser settlement have not proven intractable.

**\*71** Vitafoam suggests this Court's decision "set[s] a precedent that could only discourage other potential leniency applicants," thereby undermining ACPERA's "central purpose" as disclosed by the legislative floor statements of the statute's sponsors. To the extent this Court's ruling discourages ACPERA cooperation, it has a *de minimis* effect. In deciding whether to come forward and reveal the existence of a previously-concealed antitrust conspiracy, a prospective leniency applicant weighs, on the one hand, the possibility of protection from criminal prosecution and damages limitations, and, on the other hand, the necessary consequence of most leniency applications that become public-civil filings like the present cases, in which actual damages alone can be substantial. This Court doubts that requiring Vitafoam to revisit this issue (if at all) at a more appropriate time affects that balance in any perceptible way. And of course the solution to a *de minimis* disincentive is not to read into Rule 23 a requirement for preliminary findings about potential case developments not connected to Indirect Purchasers' ability to establish under the facts that exist now that Vitafoam fixed the prices of foam sold in the United States, which eventually wound up in a recliner, sofa, or pillow.

### Common Proof of Fraudulent Concealment

Indirect Purchasers offer as common proof of fraudulent concealment the same evidence cited in Direct Purchasers' Motion. And again, Defendants do not challenge Indirect Purchaser's predominance showing with respect to this issue. For the same reasons as noted above in this Court's discussion of Direct Purchasers' fraudulent concealment offer of proof, this Court concludes Indirect Purchasers also demonstrate this issue is susceptible to classwide proof.

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

**Superiority is Established**

All the bases for finding that classwide adjudication of Direct Purchasers' claims is superior to other forms of litigation apply with special force to Indirect Purchasers' claims. That is, recovery for the overwhelming majority of end-use purchasers is only possible in the context of a class proceeding-no one would file an antitrust suit to seek recovery of the few dollars' overcharge they incurred in purchasing a pillow, footstool, or even a mattress. *See Beattie., 511 F.3d at 567.* Moreover, while direct purchasers, intermediate purchasers, and not-for-resale indirect purchasers all suffer antitrust overcharge and so are injured as a matter of law, it is likely that not-for-resale indirect purchasers suffer most. *See Illinois Brick Co. v. Illinois, 431 U.S. 720, 764, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)* (Brennan, J., dissenting) (noting that because direct purchasers and intermediate purchasers are likely to pass on antitrust overcharges in part or in full "in many instances, consumers, although indirect purchasers, bear the brunt of antitrust violations."); *Comes v. Microsoft Corp., 646 N.W.2d 440, 450 (Iowa 2002)* ("It is the indirect purchaser, not the direct purchaser, who is most frequently injured.").

**\*72** But the putative Indirect Purchaser class presents an added complexity not present with Direct Purchasers bearing on this Court's superiority analysis. Specifically, the Indirect Purchaser class spans 29 states and the District of Columbia. Because of the *Illinois Brick* indirect-purchaser rule, indirect purchasers must seek relief under a relevant state statute (to the extent that state does not follow the indirect-purchaser rule). But Indirect Purchasers argue this multiplicity of claims does not render class adjudication unmanageable. With respect to the state antitrust claims, Indirect Purchasers compiled a "survey of state antitrust statutes" showing that all relevant jurisdictions have adopted, by statute or through decisional law, "harmonization" rules according to which basic elements of the state's antitrust statute are construed consistent with the Sherman Act. And with respect to the state consumer fraud or unfair competition claims, Indirect Purchasers present a similar survey showing a majority of the listed states have adopted statutory causes of action that "track" the Federal Trade Commission Act.

Defendants argue that certifying the putative Indirect Purchaser class "presents insurmountable problems under both Rule 23(a) and 23(b)(3)" because the class asserts "multiple types of claims based upon multiple state statutes."

Defendants then cite a series of cases in which other courts have found broad classes to be unmanageable.

When common questions of fact and law otherwise predominate, courts rarely deny certification simply because the class spans many states and asserts state-law claims.

*See In re Pharm. Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 107 (D.Mass.2008)* ("A national class action under state laws with similar standards is superior to the other option: dividing up this monster case, certifying thirty-plus separate class actions and forcing the same ... plaintiffs, defendants, expert and fact witnesses and multiple courts to try this case over thirty times in states that have substantially similar standards. A national class action will save substantial judicial and party resources. In my view, it is desirable to concentrate the litigation of these claims in one forum .").

*In re American Medical Systems, Inc., 75 F.3d 1069 (6th Cir.1996),* cited by Defendants, is easily distinguishable. There, the Sixth Circuit found "[a] single litigation addressing every complication in every model of prosthesis, including changes in design, manufacturing, and representation over the course of twenty-two years, as well as the unique problems of each plaintiff, would present a nearly insurmountable burden on the district court," including because the common-law negligence basis for the plaintiffs' claims could vary across the various states. *Id. at 1085.* Nor does this case pose a novel theory of antitrust harm, such that it might be questionable whether a specific state statute extends to prohibit the complained-of conduct. *See Paul v. Intel Corp.,* 2010 U.S. Dist. LEXIS 144511, at \*9 (D.Mass.2010) (multistate class certification motion, challenging Intel's use of exclusive purchasing relationships, rebates, technical standards, and other business tactics in a monopolization case).

**\*73** Here, Indirect Purchasers have shown the essential elements of their claims are susceptible of proof on a classwide basis, and have presented analysis of the relevant state laws suggesting any differences that might exist among the various state statutes are minimal and can be addressed with special verdict forms. *See, e.g.,* COLO. REV. STAT. § 6–1–113 (entitling a plaintiff to treble actual damages upon a showing of "clear and convincing evidence that [a defendant] engaged in bad faith conduct," with "bad faith" defined as "fraudulent, willful, knowing, or intentional conduct that causes injury").

**Appointment of Class Counsel is Approved**

Having considered the Rule 23(g)(1)(A) criteria, and based on a review of the proposed Indirect Purchaser class counsel's credentials and this Court's interaction with proposed class counsel over the past three years, this Court appoints as Indirect Purchaser class counsel Marvin Miller, of Miller Law LLC. Class counsel will "fairly and adequately represent the interests of the class." Rule 23(g)(4).

**CONCLUSION**

In this lengthy Opinion, this Court has addressed the issues required at this stage of the litigation and concluded class certification is appropriate. Direct Purchasers' Motion is granted; Indirect Purchasers' Motion is granted. Class counsel for each class will, by **April 16, 2014,** file a proposed Order pursuant to Federal Civil Rule 23(c)(1)(B).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6461355

---

**Footnotes**

1    Defendants note that Indirect Purchasers appear to name Leah Kapoor as an Indirect Purchaser Plaintiff in their Motion. If so, that would be Kapoor's debut in this case, never having been listed in any prior filing nor proposed to be joined as an Indirect Purchaser Plaintiff. In reply, Indirect Purchasers refer to Kapoor as a "member of the Class," but in the next sentence assert "[p]ersons *other than* named plaintiffs are routinely identified as adequate class representatives." This Court understands that response as a concession that Kapoor cannot be a named Indirect Purchaser Plaintiff. Therefore, this Court grants Defendants' Motion to Strike Kapoor's name from Indirect Purchaser's Motion under Federal Civil Rule 12(f). Unnamed plaintiffs may "routinely be identified as adequate class representatives" in Private Securities Litigation Reform Act ("PSLRA") actions (*see id.* (citing *In re Oxford Health Plans, Inc.,* 191 F.R.D. 369, 378 (S.D.N.Y.2000)

      ("[B]eing a Lead Plaintiff under the PSLRA is not the same as being a Class Representative under Rule 23")), but Indirect Purchasers have identified no comparable aspect of antitrust class action litigation that makes the same appointment scheme permissible, much less "routine."

2    The Department of Justice ("DOJ") and Federal Trade Commission ("FTC") use HHI to estimate how a horizontal merger or acquisition might affect concentration in a market. *See generally* U.S. DEPARTMENT OF JUSTICE AND THE FEDERAL TRADE COMM., HORIZONTAL MERGER GUIDELINES, *available at* http://ftc.gov/os/2010/08/100819hmg.pdf. Prior to 2010 revisions to the Merger Guidelines, the foam industry's HHI score fell within the "highly concentrated" market (Doc. 581 at 21).

3    This Court denied FXI's Request for Leave to File the Declaration of Dr. Su Sun, attacking aspects of Dr. Leitzinger's impact and damages models. FXI's Motion came fully nine months after Dr. Leitzinger's initial report, which was accompanied by all the data upon which Dr. Sun's declaration relies. Moreover, Defendants had at least *seven* opportunities to critique Dr. Leitzinger's analysis-Defendants (1) filed an Opposition to the Direct Purchaser Motion, (2–3) deposed Dr. Leitzinger twice, (4–5) filed two rounds of expert reports (the latter of which gave Defendants the "last word" in the written back-and-forth between experts, contrary to the initial briefing order), (6) presented attorney argument and their own experts' comments on Leitzinger's analysis at this Court's hearing on class certification, and (7) filed hearing binders, containing written responses to this Court's pre-hearing questions. That amount of argument and evidence suffices, and FXI presents this Court no good reason why Dr. Sun's analysis could not have earlier been brought to this Court's attention.

Case 1:19-md-02875-RMB-SAK   Document 2058-1   Filed 05/10/22   Page 171 of 172
PageID: 70714
In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

This Court will, however, accept as undisputed Direct Purchasers' concession that technical foam is not part of the class definition.

4    Incidentally, this Court asked the parties for their "best case" demonstrating whether class certification should be granted or denied with respect to Direct Purchasers. Defense counsel cited not a case, but a summary order, issued by the Sixth Circuit and directing the district court in *Merenda* to reconsider, in light of *Comcast,* its earlier order certifying an antitrust class. Defense counsel argues that summary order, issued after the opinion on remand in *In re Whirlpool Corp.,* means the "Sixth Circuit now gives attention to *Comcast.*" *See Cason–Merenda,* 2014 WL 905828, at *1 (discussing the summary order). Upon reconsideration, the district court reaffirmed its earlier conclusion.

5    This Court has reviewed the expert reports of Dr. Matthew Gordon, the Sentinel Group, and Gordon's reply report. Gordon's analysis uses the "Palantir Gotham platform" to "produce a visual representation of the events and entities" in this case, selecting three case studies to describe, in narrative and graphic form, the "webs" of communications between Defendants in three-month periods in which price increase letters were issued. The Sentinel Group assails Gordon's analysis to some effect, noting for example that Gordon does not demonstrate any particular knowledge of the industry he examines or, critically in this Court's view, provide any context for the communication "webs." *See also id.* at 16 ("Without an assessment and understanding of 'normal' communications patterns in the foam industry, Dr. Gordon has no basis to conclude that communications 'spiked' before price increase letters were issued or that the existence of communications before price increase letters was anomalous or indicative of anti-competitive behavior."). However, in view of the other common liability evidence offered, and that discovery of Gordon's source materials is ongoing, this Court need not examine these reports in detail because it can reach a predominance determination based on other common evidence of liability.

6    Defendants claim Leitzinger's models is misspecified because it uses as its but-for benchmark the quarter preceding a price increase letter. In Defendants' view, the *true* but-for benchmark would be that in a quarter which price increase letters were issued, but no conspiracy is alleged to have existed (*see* Doc. 967 at 107 ("In a but-for world there are no agreements and you have price letters"); Doc. 892–1 at 31–32). Defendants never confront Leitzinger's persuasive justification for using a quarter-over-quarter benchmark-that it is contrary to economic theory to assume a valid price increase letter would *independently* drive prices higher than market conditions otherwise would demand. Leitzinger asserts the but-for price is one generated without the incremental and anticompetitive price affects of a conspiratorial letter, and Defendants present no persuasive economic basis suggesting a valid price increase letter might generate similar incremental price affects.

7    The Supreme Court recently explained, " '[a] study that is statistically significant has results that are unlikely to be the result of random error....' To test for significance, a researcher develops a "null hypothesis"-*e.g.,* the assertion that there is no relationship between [price increase letters] and [actual prices]. The researcher then calculates the probability of obtaining the observed data (or more extreme data) if the null hypothesis is true (called the *p*-value). Small *p*-values are evidence that the null hypothesis is incorrect. The researcher compares the *p*-value to a preselected value called the significance level. If the *p*-value is below the preselected value, the difference is deemed 'significant.' " " *Matrixx Initiatives, Inc. v. Siracusano,* ——U.S. ——, —— n. 6, 131 S.Ct. 1309, 1319 n. 6, 179 L.Ed.2d 398 (2011) (internal citations omitted).

8    In its "downstream discovery" orders, this Court denied Indirect Purchasers access to Direct Purchasers and Direct Action Plaintiffs' cost and sales information. Indirect Purchasers pursued such information, for purposes of passthrough analysis, using third-party subpoenas. Indirect Purchasers correctly note in their *Daubert* Opposition that obtaining comprehensive cost and sales data from "millions of individual purchases throughout the [end-use] chain of distribution ... would be hideously expensive ."

In re Polyurethane Foam Antitrust Litigation, Not Reported in F.Supp.3d (2014)

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.