# Exhibit E

Case 1:19-md-02875-RMB-SAK   Document 2058-4   Filed 05/10/22   Page 2 of 15
Case 1-19-cv-02875-FB-SAK  Document 648-2  Filed 05/04/21  Page 2 of 10 PageID #: 7524
PageID: 70756

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RESTASIS (CYCLOSPORINE OPHTHALMIC EMULSION) ANTITRUST LITIGATION | Case No. 18-MD-2819 (NG) (LB)<br><br>**SECOND DECLARATION OF ERIC J. MILLER IN SUPPORT OF END-PAYOR PLAINTIFFS' MOTION TO AUTHORIZE DISTRIBUTION OF CLASS CERTIFICATION NOTICE TO THE END-PAYOR CLASS** |
| THIS DOCUMENT APPLIES TO:<br>ALL END-PAYOR PLAINTIFF CLASS ACTIONS | |

I, Eric J. Miller, declare as follows:

1.      I am the Senior Vice President of Case Management with A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data"). This Declaration is based upon my personal knowledge and information provided by Plaintiffs' counsel, my associates, and A.B. Data staff members and if called as a witness, I could and would testify competently thereto. I submit this Declaration at the request of Plaintiffs' counsel in connection with the above-captioned action (the "Action") and in response to Allergan, Inc.'s Opposition to End-Payor Plaintiffs' Supplemental Memorandum in Support of Motion to Authorize Distribution of Class Certification Notice to the End-Payor Class.

2.      As further described in the Declaration of Eric J. Miller in Support of End-Payor Plaintiffs' Motion to Authorize Distribution of Class Certification Notice to the End-Payor Class dated January 7, 2021 (the "January Miller Declaration") and filed with this Court, I have more than 20 years of experience administering class or *parens patriae* actions, including experience in more than 25 indirect purchaser pharmaceutical class cases.

3.      A.B. Data has been appointed as Notice, Claims, and/or Settlement Administrator in hundreds of high-volume securities, antitrust, consumer, civil rights, insurance, ERISA, and wage and hour cases, including some of the largest and most complex class action settlements of all time, that have involved all aspects of media, direct, and third-party notice plans, data management, claims administration, and settlement fund distribution.

4.      Following the November Hearing, and after consultation with Plaintiffs' counsel, A.B. Data provided a Revised Notice Plan (attached as Exhibit 2 to the Declaration of Adam Gitlin in Support of End-Payor Plaintiffs' Supplemental Memorandum in Support of Motion to Authorize Distribution of Class Certification Notice to the End-Payor Class). In addition to the notice via U.S. Mail (for TPPs), electronic media (for TPPs and consumers), and earned media (for TPPs and consumers), we added print publication in *People Magazine* and *AARP, The Bulletin* (primarily for consumers).

## Consumer Notice

5.      A.B. Data's Revised Notice Plan is designed to deliver an estimated reach of at least 80% to the consumer target audience, which in A.B. Data's experience is an adequate proxy for 80% of the Class's consumer members. With the addition of print publications *People Magazine* and *AARP, The Bulletin*, the Notice Plan increases its reach by 8% above the initial notice plan.

6.      A.B. Data typically recommends the use of digital media, earned media, and print publication to provide notice in consumer cases involving pharmaceuticals. It is generally more cost-effective, less burdensome, and can be completed in a shorter period of time. The reach utilizing this form of notice as opposed to the subpoena process is the same or better. In other

2

words, the class would be noticed at a level equal to or better than the subpoena process would allow but much quicker and at a much lower cost.

7. A.B. Data and members of its team have handled virtually all, if not all, indirect purchaser notice plans that have utilized subpoenas to the largest PBMs and retail pharmacies in the country, including: (i) *In re Relafen Antitrust Litigation*, 01-cv122239-WGY (D. Mass.); (ii) *In re Tricor Indirect Purchaser Antitrust Litigation*, Civ. No. 05-360-SLR (D. Del.); (iii) *State of New York, et al., v. Cephalon, Inc., et al.*, Civ. No. 16-4234-MSG (E.D. Pa..); (iv) *Mahoney v. Endo Health Solutions, Inc. et al.*, Case No. 15-cv-9841-DLC (S.D.N.Y.); and (v) *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation ("EpiPen")*, No. 17-md-02785 (D. Kan.).

8. I personally have been involved in the notice plan implementation of each of the cases referenced above. The subpoena process, as I have mentioned before, is an alternative method of notice that can also satisfy the reach requirements of Rule 23. However, the process is more costly, more burdensome, and more time consuming. A typical subpoena process will take at least 6 months from the distribution of subpoenas through the completion of notice. Some have taken longer.

9. Allergan has suggested that because EPP's expert, Laura Craft stated data is available to "ascertain the identity of up to 97% to 99% of consumer class members and all, or virtually all, TPP class members" individual notice in the "best notice practicable under the circumstances."

10. The first point to discuss is related to the difference between "identifying" 97%-99% of the class versus "providing individual notice" to 97%-99% of the class based on this data.

3

11. It is an incorrect assumption that utilizing this data will result in individual notice to 97% to 99% of the class. The subpoena data obtained through PBMs and large retail pharmacies does not provide 97%-99% deliverable address information for each class member. Pharmaceutical class or *parens patriae* actions typically involve a class period that runs over several years. Due to class members moving and addresses being outdated, a number of these notices are returned as undeliverable, and updated addresses are not obtainable through third party databases, such as Transunion or LexisNexis. Therefore, all notice programs utilizing the subpoena process also incorporate other methods of notice to consumer class members, including digital media, earned media, and/or print publication.

12. The second point is related to whether or not the subpoena process is burdensome and costly. In our experience, a notice plan utilizing the subpoena process is more burdensome than a notice plan consisting of digital media, earned media, and/or print publication. A.B. Data is able to commence and complete a notice plan involving digital media, earned media, and/or print publication in a less costly and time consuming manner.

13. The subpoena process requires subpoenas to be issued to the largest PBMs and retail pharmacies in the country. Obtaining the purchase data from the PBMs and retail pharmacies typically takes in excess of six months. In our most recent case involving the subpoena process, *EpiPen,* subpoenas were issued in June of 2020 and A.B. Data received files up through December of 2020. Throughout this time of obtaining the data, there are communications with the PBMs and pharmacies to discuss the logistics of providing the data in a secure manner and the efforts of PBMs and pharmacies to compile the required information from different data sources within their databases. In addition, through the years PBMs and retail pharmacies have consolidated and therefore the data may be stored in multiple places.

14. Upon receipt of the subpoena data, A.B. Data processes the data in preparation for creating usable mail files to provide mailed notice to potential class members. These steps include parsing address information from the files containing millions of records, attempting to remove duplicative records within each file as well as across files from different PBMs and pharmacies, identifying and removing records that are lacking enough information to be a deliverable address, processing the files to obtain email addresses (if required), and coordinating the mailings with the printer.

15. Once notices are mailed and/or emailed to potential class members, further efforts are necessary to re-mail notices where the email notice "bounced" or the hard copy notice was returned undeliverable by the United States Postal Service.

16. In contrast, A.B. Data can typically implement a notice plan utilizing digital media, earned media, and/or print publication within one to two months without six or more months elapsing between when the subpoenas are issued and when notice is completed. Although a plan involving digital media, earned media, and/or print publication requires coordinating with publishers and digital media vendors, the time involved is far less than that required by the subpoena process.

17. The third point is related to the cost of a subpoena process. We have estimated the consumer class size to be approximately 1 to 1.5 million consumer class members in this matter. The estimated cost of effectuating the Revised Notice Plan, including print publication in *People Magazine* and *AARP, The Bulletin* is approximately $425,000. The estimated cost to provide notice incorporating subpoena and a reduced digital media, earned media, and print publication while maintaining a reach of 80% or above with an estimated class size of approximately 1 to 1.5

5

million consumer class members is approximately $1.1 to $1.25 million, a difference of up to $825,000.

      18.     In summary, A.B Data's Revised Notice Plan meets the requirements of Rule 23 and provides a cost-effective and efficient notice to potential members of the Class. The Court's concerns regarding the availability of print media for members of the Class have been resolved with the inclusion of *AARP, The Bulletin* with its total audited[1] circulation of 22.5 million and total audience of 38 million adults age 50 and older and *People Magazine* with its total audited circulation of 3.4 million and total audience of 36.2 million. AARP members receive *AARP, The Bulletin* as a benefit of their membership ten times a year. They are familiar with it and look forward to receiving it each time and spend on average 45 minutes with each issue. An unexpected postcard notice coming in the mail without any identifying information due to HIPAA restrictions may not be even opened. In my opinion and A.B. Data's experience, it is not necessary to include additional notice by direct mail to meet the requirements of notice and any subpoena process including direct mail will only increase the cost and time to effectuate notice with minimal benefits.

---

[1] MRI-Simmons ("MRI") is the country's largest, most comprehensive, and most reliable consumer and media and product/service usage database. Data from MRI's Survey of the American Consumer, conducted continuously since 1979, is used in the majority of media and marketing plans written in the United States. The firm's multidimensional database is the largest and most reliable source for integrated media planning. About 450 U.S. advertising agencies, including 90 of the top 100, subscribe to MRI, as does A.B. Data; more than 200 national marketers access the MRI database. MRI offers the most detailed and representative picture of U.S. demographics and lifestyles, including information on usage of nearly 6,000 product and service brands across 550 categories, the magazines and newspapers audiences read, the websites they look at, the television programs they watch, and the radio stations they listen to. MRI algorithms that develop the reach numbers quoted by advertising agencies have been relied upon for decades in marketing some of the largest brands in the U.S. that invest hundreds of millions of dollars annually based on this information. MRI has been accredited by the Media Ratings Council ("MRC") since 1988. MRC requires its members to disclose all the methodological aspects, meet MRC standards for rating research, and submit to MRC-designed audits. A.B. Data is a subscriber to MRI-Simmons.

**TPP Notice**

19. As further described in the January Miller Declaration, A.B. Data maintains a proprietary database (the "TPP Database") of approximately 42,000 entities that include insurance companies; health maintenance organizations; self-insured entities such as certain large corporations, labor unions, and employee benefit and pension plans; and certain entities that provide administrative services to TPPs, such as pharmacy benefit managers ("PBMs") and third-party administrators ("TPAs"). A.B. Data has also included in this database certain law firms known to A.B. Data to represent the largest insurers. This database was compiled using publicly available sources, including U.S. Department of Labor filings and the Pharmacy Benefits Management Institute, along with numerous prior name-brand and generic-drug litigations that A.B. Data has administered. It is regularly updated, most recently in October 2020.

20. The Revised Notice Plan contemplates mailing, and emailing where email addresses are available, a Postcard Notice in a form approved by the Court directly to each TPP identified in this database along with a banner ad campaign will be purchased to be carried via the website www.ThinkAdvisor.com/life-health. This website is affiliated with the former publication *National Underwriter Life & Health*. It is uniquely positioned to provide insurance agents, brokers, and TPP administrators with timely, insightful information as they navigate the specialty insurance markets and sort through critical industry developments.

21. A.B. Data recommends mailing direct notice to TPPs because the database of TPPs already exists, has been approved on multiple occasions, and mailed notice to entities is more practicable and cost efficient than developing a digital media plan to attempt to provide notice to these potential class members that are more sophisticated and likely to read and understand a notice of class action.

7

22. A.B. Data previously advised that it does not have the ability to precisely calculate the reach of the proposed notice plan to TPP class members. However, this method of notice to TPPs has been utilized in multiple class actions involving TPP class members and A.B. Data has no knowledge of this method of notice ever resulting in a challenge to class certification as a result of a TPP failing to receive notice. At the request of EPP Counsel, A.B. Data has begun the efforts of comparing the Xponent data to A.B. Data's TPP list, including using SQL programming to match list members to Xponent plan names, thereby minimizing the amount of manual checking that will be required.

23. Although providing the specific reach of TPP class members is not possible, A.B. Data's TPP list has been approved in numerous class actions for providing notice to TPPs. In terms of reach, A.B. Data's database includes the largest PBMs in the country, and the top six PBMs represent more than 95% of the prescription claims in the United States.[2] Each of these entities is included in A.B. Data's TPP Mailing Database.

24. In addition, A.B. Data's TPP Mailing Database includes the largest insurers and representatives of the largest insurers in the country. To put this in perspective, in addition to mailing to those health and welfare plans required to file Form 5500 tax documents with the IRS, which may in itself be sufficient direct notice to TPPs, A.B. Data has direct contact information for individuals who represent insurers that collectively cover well over 200 million people.

25. Taken together, these facts and A.B. Data's experience make the number of TPPs in the United States not reached through a mailing from A.B. Data's TPP Mailing Database, including through their PBMs and attorneys, likely extremely low, much lower than 20% of the

---

[2] Adam J. Fein, *2019 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers*, https://www.drugchannels.net/2019/05/cvs-express-scripts-and-evolution-of.html.

8

TPPs in the United States. Therefore, it is reasonable to say that the reach of a TPP Mailing Database mailing is greater than 80%, even if a specific target percentage cannot be stated.

26. In conclusion, endeavoring to identify additional TPPs through the subpoena process will likely yield minimal benefit to the already comprehensive notice plan because these plans will likely receive notice through other means including through their PBMs, being included in Form 5500 filings, or through the banner ad campaign.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 4th day of February 2021 in Palm Beach Gardens, Florida.

Eric J. Miller

9