# Exhibit 2

REDACTED

Page 1

1          UNITED STATES DISTRICT COURT

              DISTRICT OF NEW JERSEY

2   - - - - - - - - - - - - - - - - - x

    IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3   IRBESARTAN PRODUCTS LIABILITY     :

    LITIGATION,                       :

4                                     :

    THIS DOCUMENT RELATES TO          :

5   ALL ACTIONS                       :

    - - - - - - - - - - - - - - - - - x

6

7

8          ***RESTRICTED CONFIDENTIAL***

9

10         Veritext Virtual Zoom Videotaped

11   deposition of RENA M. CONTI, Ph.D., taken on Friday,

12   February 11, 2022, in Glenside, Pennsylvania,

13   commencing at 9:04 a.m. Eastern Standard Time,

14   before Jamie I. Moskowitz, a Certified Court

15   Reporter and Certified Livenote Reporter.

16

17

18

19

20

21

22

23

24

25

Page 2

```
1   A P P E A R A N C E S :
2
    HONIK LLC
3   BY:  RUBEN HONIK, ESQUIRE
    ruben@honiklaw.com
4   1515 Market Street - Suite 1100
    Philadelphia, Pennsylvania 19102
5   267.435.1300
    Counsel for the Witness Rena M. Conti, Ph.D.
6
7   MAZIE SLATER KATZ FREEMAN
    BY:  ADAM M. SLATER, ESQUIRE
8   aslater@mazieslater.com
    103 Eisenhower Parkway
9   Roseland, New Jersey 07068
    973.228.9898
10  Counsel for the Plaintiffs
11
    SLACK DAVIS SANGER LLP
12  BY:  JOHN R. DAVIS, ESQUIRE
    jdavis@slaterdavis.com
13  6001 Bold Ruler Way - Suite 100
    Austin, Texas 78746
14  512.795.8686
    Counsel for the Plaintiffs
15
16  LIEFF CABRASER HYMAN & BERNSTEIN, LLP
    BY:  RACHEL J. GEMAN, ESQUIRE
17  rgeman@lchb.com
    250 Hudson Street
18  New York, New York 10013
    212.355.9500
19  Counsel for the Plaintiffs
20
    KANNER & WHITELEY, L.L.C.
21  BY:  CONLEE S. WHITELEY, ESQUIRE
    c.whiteley@kanner-law.com
22  BY:  DAVID J. STANOCH, ESQUIRE
    d.stanoch@kanner-law.com
23  BY:  LAYNE C. HILTON, ESQUIRE
    l.hilton@kanner-law.com
24  701 Camp Street
    New Orleans, Louisiana 70130
25  504.524.5777
    Counsel for the Plaintiffs
```

Page 3

```
1   A P P E A R A N C E S :
2
    DUANE MORRIS LLP
3   BY:  SETH A. GOLDBERG, ESQUIRE
    sagoldberg@duanemorris.com
4   BY:  COLEEN W. HILL, ESQUIRE
    cwhill@duanemorris.com
5   BY:  ALEK W. SMOLIJ, ESQUIRE
    awsmolij@duanemorris.com
6   BY:  DANA B. KLINGES, ESQUIRE
    30 South 17th Street
7   Philadelphia, Pennsylvania 19103
    215.979.1000
8   Counsel for the Defendants Prinston Pharmaceutical
    Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
9   Healthcare U.S., LLC and Huahai U.S., Inc.
10
    DUANE MORRIS LLP
11  BY:  REBECCA E. BAZAN, ESQUIRE
    rebazan@duanemorris.com
12  BY:  DREW T. DORNER, ESQUIRE
    dtdorner@duanemorris.com
13  505 9th Street NW - Suite 1000
    Washington, DC 20004
14  202.776.7800
    Counsel for the Defendants Prinston Pharmaceutical
15  Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
    Healthcare U.S., LLC and Huahai U.S., Inc.
16
17  MORGAN, LEWIS & BOCKIUS LLP
    BY:  JOHN K. GISLESON, ESQUIRE
18  john.gisleson@morganlewis.com
    BY:  STEVEN N. HUNCHUCK, ESQUIRE
19  steven.hunchuck@morganlewis.com
    One Oxford Centre - 32nd Floor
20  Pittsburgh, Pennsylvania 15219
    412.560.3300
21  Counsel for Defendant Aurobindo Pharma Ltd.
22
23
24
25
```

Page 4

```
1   A P P E A R A N C E S :
2
    GREENBERG TRAURIG, LLP
3   BY:  TIFFANY M. ANDRAS, ESQUIRE
    andrast@gtlaw.com
4   BY:  GREG E. OSTFELD, ESQUIRE
    ostfeldg@gtlaw.com
5   77 West Wacker Drive - Suite 3100
    Chicago, Illinois 60601
6   312.456.1065
    Counsel for Defendant Teva Pharmaceuticals
7   Industries Ltd.
8
    NORTON ROSE FULBRIGHT US LLP
9   BY:  ELLIE NORRIS, ESQUIRE
    ellie.norris@nortonrosefulbright.com
10  BY:  D'LESLI M. DAVIS, ESQUIRE
    dlesli.davis@nortonrosefulbright.com
11  2200 Ross Avenue - Suite 3600
    Dallas, Texas 75201-7932
12  214.855.8221
    Counsel for McKesson Corporation
13
14  HUSCH BLACKWELL
    BY:  MATTHEW D. KNEPPER, ESQUIRE
15  matt.knepper@huschblackwell.com
    190 Carondelet Plaza - Suite 600
16  St. Louis, Missouri 63105
    314.480.1500
17  Counsel for the Defendant Express Scripts
18
    BUCHANAN INGERSOLL & ROONEY PC
19  BY:  JONATHAN D. JANOW, ESQUIRE
    jonathan.janow@bipc.com
20  1700 K Street - Suite 300
    Washington, DC 20006
21  202.452.7900
    Counsel for the Defendant Albertsons LLC
22
23
24
25
```

Page 5

```
1   A P P E A R A N C E S :
2
    BUCHANAN INGERSOLL & ROONEY PC
3   BY:  CHRISTOPHER B. HENRY, ESQUIRE
    christopher.henry@bipc.com
4   227 West Trade Street - Suite 600
    Charlotte, North Carolina 28202
5   704.444.3475
    Counsel for the Defendant Albertsons LLC
6
    BARNES & THORNBURG LLP
7   BY:  KARA M. KAPKE, ESQUIRE
    kara.kapke@btlaw.com
8   11 South Meridian Street
    Indianapolis, Indiana 46204
9   317.236.1313
10  Counsel for CVS and Rite Aid
11
    CROWELL & MORING LLP
12  BY:  LUKE J. BRESNAHAN, ESQUIRE
    lbresnahan@crowell.com
13  BY:  DANIEL T. CAMPBELL, ESQUIRE
    dcampbell@crowell.com
14  1001 Pennsylvania Avenue NW
    Washington, DC 20004
15  202.624.2500
    Counsel for the Defendant Cardinal Health Inc.
16
17  HILL WALLACK LLP
    BY:  WILLIAM E. MURTHA, ESQUIRE
18  wmurtha@hillwallack.com
    BY:  ERIC I. ABRAHAM, ESQUIRE
19  eabraham@hillwallack.com
    BY:  CARLO J. DEHART, ESQUIRE
20  cdehart@hillwallack.com
    21 Roszel Road
21  Princeton, New Jersey 08540
    609.924.0808
22  Counsel for the Defendants Hetero Drugs Limited and
    Hetero Labs Limited
23
24
25
```

2 (Pages 2 - 5)

CONFIDENTIAL

<table>
<tr><td colspan="2">Page 6</td></tr>
</table>

Page 6

1 A P P E A R A N C E S :
2
  PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
3 BY: FRANK H. STOY, ESQUIRE
  fhs@pietragallo.com
4 38th Floor - One Oxford Centre
  Pittsburg, Pennsylvania 15219
5 412.263.4397
  Counsel for the Defendants Mylan Laboratories
6 Limited and Mylan Pharmaceuticals Inc.
7
  WALSH PIZZI O'REILLY FALANGA LLP
8 BY: CHRISTINE I. GANNON, ESQUIRE
  cgannon@walshlaw.com
9 BY: LIZA M. WALSH, ESQUIRE
  lwalsh@walshlaw.com
10 Three Gateway Center
   100 Mulberry Street - 15th Floor
11 Newark, New Jersey 07102
   973. 757.1100
12 Counsel for the Defendant Teva Pharmaceuticals
13
   HINSHAW & CULBERTSON LLP
14 BY: GEOFFREY M. COAN, ESQUIRE
   gcoan@hinshawlaw.com
15 53 State Street - 27th Floor
   Boston, Massachusetts 02109
16 617.213.7045
   Counsel for the Defendant Sciegen Pharmaceuticals
17
18 DORSEY & WHITNEY LLP
   BY: SHEVON D. ROCKETT, ESQUIRE
19 rockett.shevon@dorsey.com
   51 West 52nd Street
20 New York, New York 10019-6119
   212.415.9357
21 Counsel for the Defendant OptumRx
22
23
24
25

Page 7

1 A P P E A R A N C E S :
2
  FALKENBERG IVES LLP
3 BY: KIRSTIN B. IVES, ESQUIRE
  kbi@falkenbergives.com
4 BY: MEGAN A. ZMICK, ESQUIRE
  maz@falkenbergives.com
5 230 West Monroe - Suite 2220
  Chicago, Illinois 60606
6 312.566.4803
  Counsel for the Defendant Humana Pharmacy, Inc.
7
8 ULMER & BERNE LLP
  BY: JEFFREY D. GEOPPINGER, ESQUIRE
9 jgeoppinger@ulmer.com
  312 Walnut Street - Suite 1400
10 Cincinnati, Ohio 45202-4029
   513.698.5000
11 Counsel for the Defendant AmerisourceBergen
12
   ALSO PRESENT:
13
   JUSTIN BILY
14 Legal Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 8

1                    E X H I B I T S
2
  EXHIBIT NUMBER   DESCRIPTION          PAGE
3
  Conti 7    Retailer Damages Output      18
4           Excel Spreadsheet
5 Conti 8    Expert Report of Rena       208
           Conti, Ph.D in the Blue
6           Cross Blue Shield
           Association versus
7           GlaxoSmithKline Matter
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1 REQUEST PAGE
2
3 INSTRUCTIONS NOT TO ANSWER:
4 Page Line
5 None
6 REQUEST FOR PRODUCTION OF DOCUMENTS:
7 Page Line         Description
8 None
9 STIPULATIONS:
10 Page Line
11 None
12 QUESTIONS MARKED:
13 Page Line
14
15
16
17
18
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1    TABLE OF CONTENTS
2  RENA M. CONTI, Ph.D.
3
     Examination
4
     By Ms. Kapke..........................Page  11
5
     By Mr. Campbell.......................Page 100
6
     By Mr. Ostfeld........................Page 182
7
     Index of Exhibits.....................Page   8
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 11

1         THE VIDEOGRAPHER:  The time is 9:04.
2  This begins Media Unit Number 1.  We're back on
3  the record.
4         MR. GOLDBERG:  Good morning, Doctor.
5  This is Seth Goldberg, again.  I'm not on
6  video.  I will be momentarily.  But at this
7  point, I'm going to pass the witness to the
8  next questioning counsel.  I am not concluding
9  my questioning, but in the interest of time, I
10  want to give other counsel an opportunity to
11  ask questions.
12         THE COURT REPORTER:  Kara, you're on
13  mute.
14  EXAMINATION BY MS. KAPKE:
15     Q    Good morning, Dr. Conti.  My name is
16  Kara Kapke.  I represent CVS and Rite Aid, and I'm
17  going to be asking you questions primarily about
18  your opinions vis-a-vis the retail pharmacy
19  defendants.
20         My first question is, do you
21  understand that you're still under oath here today?
22     A    Yes.
23     Q    Great.  Did you review any documents
24  or materials last night or this morning before
25  starting today's deposition?

Page 12

1     A    Yes.
2     Q    What did you review?
3     A    My report.
4     Q    Anything else?
5     A    I looked up some statistics regarding
6  the revenues of retailers and wholesalers in this
7  case.
8     Q    Statistics from your report or
9  statistics that were independent of references in
10  your report?
11     A    The shareholder reports of the -- the
12  retailers and the wholesalers.
13     Q    So, like, the 10-Ks?
14     A    Correct.
15     Q    Okay.  Okay.  Gotcha.
16         And I -- I honestly don't remember
17  that.  Are those cited in your report?  Are the --
18  are retailers' --
19     A    No, they're not.  No, they're not.
20  But there -- there are things that I do very
21  typically when I'm preparing for a deposition.
22  They're public.  They're also things that I -- I
23  spend time teaching, using.  In fact, some of the
24  defendants in this case are companies that my class
25  on Strategy in the Pharmaceutical Industry is

Page 13

1  currently studying, so part of my review was to get
2  ready for my class on Monday.
3     Q    Got it.  Okay.
4         Did you -- we talked about, yesterday,
5  you not reviewing any depositions, and I wanted to
6  confirm that you have not reviewed any depositions
7  of retailer pharmacy witnesses in this case; is that
8  correct?
9     A    That's correct.
10     Q    Did you review any deposition exhibits
11  from the depositions of the retail pharmacy 30(b)(6)
12  witnesses?
13     A    Why don't we check my Appendix B?
14  There's a lot of documents, so, let's just check.
15         So there is a declaration -- so are
16  you asking for declarations?  Is that correct?
17     Q    I'm asking if you reviewed any
18  written -- any -- strike that.
19         I'm asking if you reviewed any
20  deposition exhibits from the depositions of the
21  retail pharmacy deponents.
22     A    No, I did not, not that I'm aware of.
23     Q    How about any meet and confer letters
24  or correspondence from -- from counsel for the
25  retail pharmacy defendants?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1    A    No.
2    Q    Have you reviewed any opinions
3  relating to discovery from Special Master
4  Judge Vanaskie or Judge Schneider?
5         THE COURT REPORTER:  Or Judge...
6         MS. KAPKE:  Schneider.
7         THE COURT REPORTER:  Okay.
8         THE WITNESS:  There's a weird echo,
9    and I didn't hear half your sentence.  I'm
10   sorry.
11  BY MS. KAPKE:
12   Q    No, that's okay.
13        Have you reviewed any opinions
14  relating to discovery from Special Master
15  Judge Vanaskie or Judge Schneider?
16   A    No.  All I know is that I have very
17  limited data -- limited data from the retailers.
18   Q    And you mentioned yesterday that you
19  read one of Judge Kugler's opinions in -- in this
20  case.  What opinions of Judge Kugler's have you read
21  for purposes of this litigation?
22   A    Just what I read to you -- you all
23  yesterday.
24   Q    Okay.  Did you read the entire opinion
25  that -- that the snippet that you read yesterday

Page 15

1  came from, or just a portion of it?
2    A    I read the full paragraph that that
3  portion I read came from, but that's it.
4    Q    Okay.  I -- I want to turn to your
5  report, Conti Exhibit 5, and Attachment B, which we
6  just talked about.  And on Pages 4 to 8 of the
7  attachment, under the heading "Electronic Data," and
8  then the subheading, "Retailer Claims Data," you
9  have a listing of specific documents relating to
10  retail pharmacy defendants that you reviewed,
11  correct?
12   A    Yes.
13   Q    Is it okay if I refer to that group of
14  data by the subheading "Retailer Claims Data"?
15   A    Sure.
16   Q    Okay.  I -- I just want to make sure
17  that you'll understand that if I'm referring to
18  retailer claims data that that's what I'm referring
19  to.  B -- go ahead.
20   A    Okay.  Yeah.  Just one thing that I
21  should tell you is that -- so in my research, I have
22  spent a fair amount of time working with data from
23  CVS and also from Walgreens, specifically the
24  Walgreens -- Walgreens and the University of Chicago
25  had --

Page 16

1         THE COURT REPORTER:  I'm sorry,
2  Walgreens...
3         THE WITNESS:  Walgreens and the
4  University of Chicago had a long-standing data
5  collaborative, and I was in charge of that data
6  collaborative.  I wrote several papers with the
7  head of public economics at Walgreens when I
8  was faculty there.
9         THE THE COURT REPORTER:  When you were
10  faculty there?
11        THE WITNESS:  When I was faculty at
12  the University of Chicago.
13  BY MS. KAPKE:
14   Q    Did you rely on the data that you
15  reviewed in your faculty life relating to Walgreens
16  and CVS for purposes of your opinions in this
17  matter?
18   A    Well, so we talked about this
19  yesterday.  I primarily am a researcher, and I teach
20  about the pharmaceutical industry.  And so the
21  papers that I wrote with Walgreens data are in my
22  CV.  They're listed.  And to the extent that I know
23  something about how these pharmacies are collecting
24  information, what data they have on dispensing
25  prescriptions, is -- is informed both by the work

Page 17

1  that I do in research, but also the work that I've
2  done in --
3  BY MS. KAPKE:  That you've done in...
4         THE WITNESS:  This particular matter.
5  BY MS. KAPKE:
6    Q    In terms of the actual calculations
7  you made, not in your opinions, but the actual
8  calculations that you made, did you rely on any of
9  that, I'll call it faculty data, or did you solely
10  rely on the retailer claims data?
11   A    I relied on the retailer claims data
12  that was provided to me in this matter to do my
13  calculation.  But I have a broader understanding of
14  what is collected by the retail pharmacies that
15  included the ones that are named in this matter.
16   Q    Okay.
17   A    Due --
18        THE COURT REPORTER:  I'm sorry?
19        THE WITNESS:  Due to the research that
20  I have done with them.
21  BY MS. KAPKE:
22   Q    Understood.
23        The documents listed here for the
24  retailer claims data are not identified by a Bates
25  number, but is it your understanding that the

5 (Pages 14 - 17)

1 documents referenced there are the documents
2 produced by the retail pharmacy defendants in this
3 litigation with Bates numbers?
4     A    That is my understanding.
5     MS. KAPKE: I'm going to introduce,
6 and mark as Conti Exhibit 7, the retailer
7 damages output Excel spreadsheet file from the
8 materials that you provided. And it's on the
9 screen. And for the record --
10     (Whereupon, Exhibit Conti 7 was marked
11 for Identification.)
12     THE WITNESS: Can you refer me to a
13 specific one?
14 BY MS. KAPKE:
15     Q    I'm sorry. What?
16     A    Can you refer me to the specific
17 output that's listed on my Exhibit B?
18     Q    This is the retailer damages output
19 Excel spreadsheet that you provided.
20     A    I'm asking you, is it the backup, or
21 is it one of the documents that is listed --
22     Q    It's the backup.
23     A    -- in Exhibit B. I can't hear you.
24 I'm sorry.
25     Q    So if you -- this is something that

1 you derived, and you -- I'm -- I'm not sure I
2 understand your --
3     A    I'm asking, is this the backup that we
4 provided to you, or is it one of the documents that
5 you listed here -- I'm sorry -- that I listed here
6 in Exhibit B?
7     Q    No. This is the backup that you
8 provided to us.
9     A    Just wanted to make sure.
10     Q    Yes. And so I will represent for the
11 record that this spreadsheet has 3,741 rows, and as
12 you can see --
13     MS. KAPKE: Maybe it can be made a
14 little bit larger.
15 BY MS. KAPKE:
16     Q    There are five columns across the top
17 reading retailer, entity, state, product name and
18 consumer impact. Do you --
19     A    Okay.
20     THE WITNESS: Can we -- can we scroll
21 all the way down so I can see -- make sure that
22 this is actually a full document, please?
23     Keep on going. Okay. Okay. So just
24 give me a second. And this is for -- the
25 backup for which exhibit?

1 BY MS. KAPKE:
2     Q    So I'm marking it Conti Exhibit 7.
3 You, in the materials provided to us, labeled it,
4 entitled it "Retailer Damages Output."
5     A    But for -- for unjust enrichment or
6 liability?
7     Q    You did not make a distinction in what
8 materials were sent to us.
9     A    I see. Well, I'm going to have to
10 double check with my staff then, please.
11     Q    What are you double checking?
12     A    Whether this is this for the liability
13 claims or for the unjust enrichment calculation.
14     Q    Is it your suggestion that you have
15 two spreadsheets -- a backup data for those?
16     A    No. As I testified yesterday, the
17 unjust enrichment and liability estimates are
18 slightly different. You can see that in my Table 2
19 and Table 3 of my report. And -- and the difference
20 is largely related to the inclusion or exclusion of
21 specific states.
22     There is no indicater here for
23 whether -- for when the state is indicated for which
24 calculation. And so I just want to double check
25 with my staff. And I --

1     Q    I'm -- and I'm sorry. I'm not trying
2 to be difficult. I just don't understand what you
3 need to double check.
4     A    All I want to know is whether this
5 backup is for the liability or for the unjust
6 enrichment calculations. That's all.
7     You'll see there's Table 2.
8     Q    Right.
9     A    Then there's Table 3. And they
10 are -- there's two theories of liability for
11 Table 2. They differ underlying Table 2. And then
12 in Table 3, there's an unjust enrichment
13 calculation. And each one in the series of damages
14 vary slightly for the retailers, related to what
15 states are included, which are not listed here.
16     Q    Right. Let's' -- we'll -- we'll get
17 to that.
18     Was there any dispensing or
19 prescription data that went into the creation of
20 this spreadsheet besides the retailer claims data?
21     A    I don't understand your question. I'm
22 sorry.
23     Q    Was there any prescription data or
24 dispensing data or any other data that went into the
25 creation of this output file, besides what we talked

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1  about earlier, being the retailer claims data?
2      A      Well, how do you define prescription
3  data versus claims data versus dispensing data?  I'm
4  not -- I'm not familiar with those -- those are not
5  terms of art.
6      Q      Okay.  That's -- that's fair.  And
7  that's a bad question.  Thank you for pointing out a
8  bad question.
9          I'm just trying to figure out if
10 there's any data that you used to generate this
11 spreadsheet besides what we talked about, being
12 retailer claims data?
13     A      So my understanding is that the
14 retailers provided my staff a -- data on spending by
15 consumers for the at-issue products by state, month
16 and year, and product -- and product subcategory,
17 really NDC code.  And that they represented, the
18 retailers, that the dispensing fee, which I think is
19 what you've referred to by "dispensing data," was
20 already taken out, as was the payment made by the
21 third-party payor --
22     Q      Okay.  I --
23     A      -- for the insured prescriptions.
24     Q      I think we're talking past each other,
25 because my -- my question just relates to, are there

Page 23

1  any -- any prescriptions, any fills, any -- I'm not
2  talking about individual fees.  I'm just talking
3  about to, generate this spreadsheet, did you use any
4  type of document other than what's in the retailer
5  claims data?
6          THE COURT REPORTER:  Did you use any
7  other type of...
8          MS. KAPKE:  Document.
9          THE WITNESS:  I have -- honestly, I
10 don't think I understand what you're saying at
11 all.  So retailer pharmacies are sitting on an
12 incredible amount of data.  So I think, you
13 know, there's millions of transactions that are
14 being done, all across the United States, every
15 single day, dispensed drugs.
16         What we were provided by the retailer
17 pharmacies in this setting were very simple.
18 There were co-insurance and co-payment,
19 customer-paid amounts by product, manufacturer,
20 month and year and state.  They took out the
21 dispensing fees, which are usually charged when
22 a consumer goes and fills a prescription, and
23 the retailer pharmacies also took out the
24 payments that were made by the commercial
25 insurers when these -- when these prescriptions

Page 24

1  were dispensed.
2          All we had was the information that
3  was provided to us.
4  BY MS. KAPKE:
5      Q      That's -- that's what I'm trying to --
6  to make sure I understand.
7          When you generated this output file,
8  did you rely on anything other than what was
9  provided to you?
10     A      We relied on the names and NDC codes
11 and time periods of the at-issue valsartan and other
12 products.
13     Q      Okay.  And that -- that makes sense.
14         Am I correct that this spreadsheet was
15 created using the SAS software?
16         THE COURT REPORTER:  Using the what?
17         MS. KAPKE:  The SAS software.
18         THE WITNESS:  Do you mean SAS?
19 BY MS. KAPKE:
20     Q      Yes.
21     A      I don't know.  Bennett programs in SAS
22 and in SETA.  And also, as you can see, this is an
23 Excel file.  So he may have actually done this
24 calculation in -- in Excel.
25     Q      I want to talk about the relevant time

Page 25

1  period used to generate this exhibit.  It's my
2  understanding, from your report, that you did not
3  include any bills after the month of recall; is that
4  correct?
5      A      After the final month of recall for
6  each at-issue product.  That's why the name of the
7  manufacturer and the product name at the NDC code
8  was so critical in our analysis.  And what I already
9  mentioned, we used -- we used the date.  We used the
10 month and year, plus the manufacturer and the
11 product name for each of our assessments.
12     Q      And for bills of Hetero NDCs, you did
13 not include any bills before May 2018, correct?
14     A      Correct.  And we stopped at
15 August 2018.
16     Q      Logistically, how did you filter out
17 those dates?  Was that something Bennett did?
18     A      Again, retail pharmacies provided the
19 data to us by month and year for every single
20 product and defined by NDC code, manufacturer and
21 state.  It was the month variable that was provided
22 to us that allowed us to filter and confine it to
23 the specific time periods.
24         Again, pharmacies are -- in the
25 United States, such as the ones listed here, are

7 (Pages 22 - 25)

Case 1:19-md-02875-RBK-SAK Document 2095-2 Filed 05/18/22 Page 9 of 98 PageID: 63547
Case 1:19-md-02875-RBK-SAK Document 2095-2 Filed 05/18/22 Page 9 of 98 PageID: 63547
Page ID: 271949

CONFIDENTIAL

Page 26

1 at-issue here, are sitting on daily transactions
2 with a -- literally with a hour, minute stamp
3 associated with them.
4     Q    Okay. But --
5     A    Hold on.
6         So if -- my understanding is that the
7 information that was provided to us was aggregated
8 by the retail pharmacies themselves, up into a
9 particular time period, and then provided to us.
10 They could have given us the disaggregated data at
11 literally the minute, hour, second time period, if
12 they wanted to, so.
13     Q    Okay. But that wasn't my question.
14         My question was how -- how you or your
15 staff took the retailer claims data and turned it
16 into this output file, not -- not the inceptions
17 underlying that.
18     A    I answered that question. So I told
19 you we acquired information with month, year,
20 product -- product, NDC -- identified at the NDC
21 code level and the manufacturer and the state. What
22 we did was simply aggregate that information up
23 after limiting it to the relevant time period for
24 each specific product.
25     Q    Let's go to your --

Page 27

1         THE WITNESS: There -- there's, like,
2 a very loud stomping, or something else, noise,
3 in the background. It's very hard to hear. It
4 sounds like it stopped now.
5 BY MS. KAPKE:
6     Q    Okay. I want to go back to your
7 report, Conti Exhibit 5. In paragraph 60, you state
8 that "Expenditures by plaintiffs for the at-issue
9 valsartan products can be expressed as the product
10 of price and quantity over the relevant time period
11 of the alleged misconduct."
12         I want to ask you about the phrase
13 "time period of the alleged misconduct." What
14 misconduct are you referring to, if any, on the part
15 of the retail pharmacy defendants?
16     A    What I was asked to assume and what
17 was outlined in the complaint that I reference in
18 the first couple of paragraphs of my report.
19     Q    For unjust enrichment, you defined the
20 time period as each at-issue valsartan product sold
21 by the defendant retailers from January 1st, 2012
22 until the at-issue valsartan products were recalled
23 in 2018 and 2019 for being adulterated and
24 misbranded. That's in paragraph 63.
25     A    Yeah. I was going to say, I don't see

Page 28

1 that in the paragraph just referenced.
2     Q    Yeah. Sorry about that.
3     A    Let me just make sure I'm on the same
4 page with you.
5     Q    It is on the screen now, if that's
6 helpful.
7     A    Yeah. I prefer -- prefer the paper,
8 but thank you. So, right. And then there is a
9 footnote -- a footnote -- so there's a footnote that
10 ends that paragraph, which is 63. And that -- that
11 refers back to Footnote 3, as I mentioned in the
12 beginning of my report. And then in the beginning
13 of my report, I reference the complaint, and then go
14 onto reference the at-issue products.
15     Q    And --
16     A    Excuse me. And their time period.
17         And -- and my question is, are the
18 relevant time periods the same for paragraphs 60 and
19 63?
20     A    Yes. The time periods relate to the
21 sale of prescription drugs from the relevant
22 manufacturers in the relevant time period as
23 enumerated in Footnote 3 and discussed in the
24 complaint. I do not make a distinction between
25 manufacturer and retailer.

Page 29

1     Q    Got it.
2         MS. KAPKE: Okay. I want to go back
3 to Conti Exhibit 7, the output file.
4 BY MS. KAPKE:
5     Q    I think I understand what each of
6 these columns represent, but I just want to go
7 through and double check that my understanding is
8 correct.
9         So Column A is going to represent the
10 retail pharmacy defendants in this case, correct?
11     A    That's what is listed, sure.
12     Q    Okay. And then Column B will
13 represent the manufacturer defendants at-issue in
14 the case, which you identified through the NDC code,
15 correct?
16     A    Well, it's -- it's listed from this
17 FDA recall list, the manufacturer.
18     Q    Okay. To -- when you were processing
19 the retailer claims data to create this output file,
20 did you exclude any prescription fills in the
21 retailer claims data based on NDC codes?
22     A    Yes, I already discussed this
23 yesterday. There were some -- we -- I was provided,
24 from attorneys, the list of manufacturers and NDC
25 codes from the FDA recall list, and then some of the

8 (Pages 26 - 29)

1 NDCs were also -- that were at-issue, were
2 repackaged, relabeled or privately labeled by
3 manufacturers downstream. That happens actually
4 quite frequently in the -- in the U.S. market. We
5 picked up those NDC codes and included them here.
6     Q     Did you exclude any prescription
7 fills?
8     A     We didn't have prescription fill data.
9 You did not -- that's not what you gave us. We had
10 aggregate sales to specific consumers, paid by
11 co-pays and co-insurance. Fills are much larger --
12 or contain a lot more information, but you did not
13 provide that information. Fills, again, provide the
14 dispensing fee, whether or not the individual used
15 their insurance to pay for a portion or the entirety
16 of the prescription, the date, the time, of the
17 dispensing. It could include the -- the name of the
18 customer, their address, and on and on. We
19 didn't -- we didn't have that aggregate of data.
20 You did not provide that to us.
21     Q     How much time did you spend looking at
22 the actual retailer claims data?
23     A     I spent some time with my staff.
24     Q     What does that mean?
25     A     I spent some time with my staff.

1     Q     What does "some time" mean?
2     A     I spent some time over the course of
3 the time that I was working on this case. In
4 addition, I spoke with my staff on a regular basis
5 about the analysis that they were doing at my
6 direction.
7     Q     Did you --
8     A     That's kind of the normal course of
9 doing research and also working on these cases, is
10 that we look at data that was provided. We clean
11 and double check the completion of the data. We
12 look to see what fields are provided. We look to
13 see what fields were not provided that we would
14 expect to provide -- to be provided. We do some
15 double checks to make sure there's not missing data,
16 and if there is missing data, how do we think about
17 that, and on and on. That's all part of the process
18 of doing the work that I do every day.
19     Q     Did you, yourself, ever open an actual
20 spreadsheet in the retailer claims data?
21     A     No, but Bennett and the rest of my
22 staff opened it. And we discussed it at length and
23 multiple times -- and over multiple times, over the
24 time period of this analysis.
25     Q     Column C of Exhibit 7 is the state at

1 issue, correct?
2     A     It lists the state.
3     Q     Correct. And your report, at
4 paragraph 78 --
5         MS. KAPKE: And we can go --
6         THE WITNESS: Hold on. Hold on,
7     paragraph 78.
8         MS. KAPKE: -- to that.
9         THE WITNESS: Paragraph 78. Okay.
10     Just give me a second to read. Okay.
11 BY MS. KAPKE:
12     Q     It discusses how you used the state in
13 which the retail pharmacy was located for -- I
14 assume you're talking about physical brick and
15 mortar stores at that -- at that point, correct?
16     A     I'm assuming.
17     Q     And then for mail order pharmacy
18 claims, you used the state where the prescription
19 was mailed. Does that mean the state where the
20 prescription was mailed to or where it was mailed
21 from?
22     A     It was mailed to because, again,
23 injury occurs at the point of sale. So for retail
24 pharmacies, the dispensed prescription is the
25 location of the injury. And for mail order, it's

1 the -- where the -- the prescription was mailed to.
2     Q     How did you and your staff group
3 particular fills to particular states to derive that
4 output file?
5     A     It is contained -- the state is
6 contained in the information -- in the information
7 that the retailers provided to us.
8     Q     What did you or your staff do when the
9 Excel spreadsheet and the retailer claims data left
10 the state field blank?
11     A     I don't recall. And I don't know
12 the -- the occurrence of that. Again, I'm more than
13 happy to check with my staff.
14     Q     Well, today is my -- my opportunity to
15 depose you about the contents of your report. So
16 what did you or your staff do when an Excel
17 spreadsheet in the retailer claims data used a
18 question mark in the state field?
19     A     I'm not aware that that was -- yeah,
20 I'm not aware that that was -- that occurred at all.
21     Q     Same question if an abbreviation "AA"
22 was used in the state field?
23     A     Again, I'm not aware that that
24 occurred at all or at what frequency it occurred.
25 If it did, my assumption is that --

9 (Pages 30 - 33)

1      THE THE COURT REPORTER:  Is that what?
2      THE WITNESS:  That it was excluded,
3    those scripts were excluded.
4  BY MS. KAPKE:
5      Q     Does the abbreviation "AA" mean
6  anything to you?
7      A     It does not, and I've never
8  encountered it in any of the research work I've
9  done.
10     Q     How about the abbreviation "AE"?
11     A     Same.  But, again, I suspect that
12  those were excluded for my analysis.  Without a
13  state attribution that actually means something, I
14  don't -- I wouldn't feel comfortable including that
15  information.  I'm a little Type A about data
16  analysis, as you probably have -- have surmised.
17     MS. KAPKE:  I want to go back to
18    Exhibit 7.
19  BY MS. KAPKE:
20     Q     Column D is the product name.  That --
21  the product name is just derived from the NDC --
22     A     I -- I don't know what you're talking
23  about, and you have --
24     Q     Yeah.
25     A     Okay.  Thank you.

1      So I'm sorry.  This is -- I'm sorry.
2  I didn't hear the last -- is that -- was that a
3  question or a statement?
4      Q     I'm just asking you to confirm that
5  the product name is derived from the NDC code.
6      A     Yes.
7      Q     Okay.  And then I want to talk about
8  Column E, the customer impact column.
9      A     That's not what it says, ma'am.
10     Q     Oh, I'm sorry.  Consumer.  My -- my
11  apologies.  Thank you.
12     The consumer impact column.  To derive
13  that, you would total the full patient paid amount
14  for each qualifying prescription for the particular
15  retailer, manufacturer, state and script; is that
16  correct?
17     A     Correct.  And year -- and -- and time.
18     Q     And relevant time period.  And that is
19  just simple addition, correct?
20     A     So it's aggregated over quantity and
21  paid amount.
22     Q     The -- there's -- the aggregation is
23  just adding numbers up, correct?
24     A     Well, it's -- sure.
25     Q     Okay.  I want to go back to when it

1  was appropriate -- strike that.
2      I want to go back and talk about when
3  you included fills.
4      A     I don't know what you mean by "fills,"
5  ma'am.
6      Q     Okay.  That's -- that's fair.  Thank
7  you for -- for clarifying that.  Did you -- I'll
8  strike that and ask a different question.
9      Did you ask plaintiffs' counsel
10  whether it was appropriate to assume that the data
11  in -- provided by the retail pharmacy defendants in
12  the retailer claims data were actually filled at one
13  of the defendant pharmacies?
14     A     I don't understand your question.  I'm
15  sorry.
16     Q     Did you ask plaintiffs' counsel --
17  I'll ask it again.
18     Did you ask plaintiffs' counsel about
19  any limitations in the retailer claims data?
20     A     I mean, there are significant
21  limitations in the claims data that was provided to
22  me.  So again, dispensing fees were not included.
23  Nor were the payments made by the insurer.  Nor were
24  any information provided about whether or not these
25  patients were insured at all.  Nor was any

1  other -- I mean, there's -- again, retail pharmacies
2  are sitting on tons of data that they collect when
3  they're dispensing prescriptions.  We were provided
4  very limited data, considering the universe of data
5  that they have registered and are required to have
6  when they're dispensing prescription drugs in the
7  U.S. chain.
8      Q     Did you ask plaintiffs' counsel to ask
9  for additional data?
10     A     We had discussions about what
11  was -- what was the data that we wanted very early
12  on in this case, given the theories of liability and
13  damage, which included some of the information that
14  I provided -- I enumerated to you.
15     Q     Did you ask plaintiffs' counsel to
16  confirm to you that the data produced by the retail
17  pharmacy defendants in the retailer claims data only
18  reflected prescriptions that were actually filled at
19  a defendant pharmacy?
20     A     That was always represented to us as
21  being provided by the retail pharmacies, that they
22  were actually dispensed prescriptions.
23     Q     And when you say --
24     A     For the at-issue drugs in the at-issue
25  time periods by the at-issue manufacturers.  Again,

10 (Pages 34 - 37)

Page 38

1  the retail pharmacies provided this information to
2  us. They are sitting on much more information that
3  was not provided to us. They did this cut of the
4  data, and we had to live with the cut that they
5  were -- they provided to us.
6      Q   When you say that was all that was
7  represented to us, who is the "us" in that sentence?
8      A   Myself and my staff.
9          MS. WHITELY: Objection. Counsel, to
10  the extent that you're asking for
11  attorney/client privileged information and work
12  product information, we're objecting to that.
13         The witness may answer.
14         THE WITNESS: Thank you.
15  Myself and my staff.
16  BY MS. KAPKE:
17     Q   So who made that representation to
18  you? Was that -- and I -- I don't want to get into
19  privileged communication, but it is an assumption
20  under proving your opinion. So I want to confirm
21  whether that's an assumption that you got from
22  plaintiffs' counsel or if there's some document that
23  you read from -- from the retail pharmacy defendants
24  that confirms that.
25     A   I think we have already established

Page 39

1  this, ma'am.
2      Q   I -- then -- then answer the question
3  again. I don't -- I don't know the answer.
4      A   I don't understand your question that
5  you just asked, frankly. It was a multiple,
6  compound question.
7      Q   Okay. Did plaintiffs' counsel tell
8  you to assume that the retailer claims data only
9  included prescriptions that were actually filled at
10  a defendant pharmacy?
11         MS. WHITELY: Same objection.
12         You may answer.
13         THE WITNESS: I don't understand your
14  question, ma'am. I -- I know a lot about the
15  data that retail pharmacies generate when they
16  are dispensing a prescription. There is a ton
17  of data that is generated, as I have already
18  alluded to.
19         There's the name of the consumer.
20  There's their address. There's their telephone
21  number. There is whether or not that
22  prescription is insured and by whom, by what
23  insurer. Then there is the claim amount, and
24  then there is the paid amount.
25         And there's other information as well;

Page 40

1  the date, timestamp of when that prescription
2  is actually dispensed to the consumer, there is
3  the dispensing fee. And -- and many other --
4  there's the name of the prescribing physician
5  and their -- usually their national prescriber
6  ID number, and on and on.
7          We were not provided that data, myself
8  and my staff.
9          The -- my understanding is that the
10  retail pharmacies provided a very limited view
11  of the data that they have access to, that was
12  related, as we have already discussed, to
13  the -- the manufacturer name; the product name,
14  including the NDC code, the month, year and
15  state, and whether -- and whether and how much
16  the consumer paid out-of-pocket as a function
17  of co-insurance or co-payment analysis.
18          That's all we were provided out of
19  this universe of much more data that they must
20  collect for every single dispensed prescription
21  in America.
22  BY MS. KAPKE:
23     Q   Were you aware of whether the retailer
24  claims data included information from PBMs?
25     A   What do you mean by that?

Page 41

1      Q   I'm asking if, to your knowledge, the
2  retailer claims data includes PBM customer data?
3      A   What is PBM customer data? Who is the
4  customer -- I mean, the consumer -- the patient is
5  the customer, right? They're the person who's
6  dispensed the prescription. They're the customer of
7  the pharmacy. What is PBM customer data?
8      Q   Do you understand that there
9  are -- I'll -- I'll ask a different question.
10         Did the data you were provided include
11  prescriptions dispensed from pharmacies other than
12  the pharmacies who are defendants in this case?
13     A   I'm not sure I'm following your
14  question. I'm sorry.
15     Q   So the retailer claims data has --
16     A   Right.
17     Q   -- has data from -- that -- that
18  reflects prescription fills at those defendant
19  pharmacies, CVS, Rite Aid, other -- other defendant
20  pharmacies. Are you with me there?
21     A   I don't know -- I don't know what you
22  mean by "other defendant pharmacies." The data that
23  I have are the -- are the retailer pharmacies that
24  we reviewed when we first started talking. They're
25  listed in my Attachment B, right? We established

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1  that those were the ones that were provided to me.
2     Q    Right.
3     A    I'm happy to go through them again.
4  So there's Albertsons, CVS, Kroger, Optum,
5  Express Scripts, Walgreens and Walmart.
6     Q    Correct.  Does the data in -- in the
7  retailer claims data contain information about
8  prescriptions dispensed from pharmacies who are not
9  defendants in this case?
10     A    Are you asking me whether Albertsons
11  gave me data from non-Albertsons pharmacies?
12     Q    In general, yes.
13     A    I don't understand the question.  I
14  don't understand -- I don't understand how
15  Albertsons would have data from CVS or CVS would
16  have data from Walmart or Walgreens.
17     Q    Okay.
18     A    I -- I mean, you know, I -- I don't
19  understand that.  I'm sorry.
20     Q    Okay.  So --
21     A    These are massive public companies.  I
22  don't see how they would have access to other public
23  companies' dispensing data at the level of
24  aggregation that we were provided.
25     Q    Are you aware of the concept in the

Page 43

1  pharmaceutical industry of a data sale from one
2  pharmacy to another?
3     A    No.
4     Q    Did you consider whether any of the
5  retailer claims data included within it included
6  prescription fills from non-defendant pharmacies
7  that subsequently sold their consumer data to one of
8  the defendant pharmacies?
9     A    I -- I'm sorry.  They may do that for
10  intelligence purposes, but I am not aware that that
11  is the data that was provided.
12        We were provided transaction data at
13  the pharmacy level.  Each pharmacy has a pharmacy
14  identifier.  It's standard.  It's actually required
15  to be reported and kept by the regulators.  And so
16  I'm assuming that the data that was provided, at
17  least the native format of the data, has that
18  pharmacy ID.
19        But, again, if the retail pharmacies
20  that -- were the ones who provided the data in the
21  form that they gave it to me, if they did not -- if
22  they mistakenly did not include their own pharmacy
23  ID or accurately counted their own pharmacy ID in
24  the data they had, that's upstream of -- there's no
25  way that I could check that in the data that was

Page 44

1  provided to me.
2     Q    I want to move now to how you used
3  Conti Exhibit 7, what you did with it.
4        Am I correct that the retailer damages
5  output file is the basis of the calculations that
6  are listed for the retail pharmacy defendants in
7  Attachments G, H and I of your report?
8     A    It's the output file that corresponds
9  to the exhibits.
10     Q    Okay.  So let's -- let's go through
11  the --
12     A    It's not -- it's not the native data,
13  right?
14     Q    Correct.
15     A    And it's not the -- it's not the --
16  it's aggregated.
17     Q    Correct.
18        Okay.  So let's -- I want to go
19  through Attachment -- Attachments G, H and I.  So
20  let's take a look at G.1.
21     A    G.1.
22     Q    This the state grouping file --
23     A    Just one second.  Just one second,
24  please.  I'm not there yet.  Okay.  G.1, okay.
25     Q    That's the state grouping file

Page 45

1  provided to you by plaintiffs' counsel, correct?
2        THE COURT REPORTER:  I'm sorry, was
3  there an answer?
4        THE WITNESS:  I said correct.
5  BY MS. KAPKE:
6     Q    And you have no opinion on whether
7  these groupings are accurate, correct?
8     A    What do you mean by "accurate"?
9        MR. HONIK:  Object to form and to the
10  extent it calls for a legal conclusion.
11        Good morning, Kara.  I apologize for
12  joining late.
13        MS. KAPKE:  No -- no worries.
14  BY MS. KAPKE:
15     Q    And I just want to make sure that
16  these groupings aren't a reflection of a legal
17  conclusion on your part.  They're just information
18  and assumptions given to you by plaintiffs' counsel,
19  correct?
20        MR. HONIK:  Thank you.
21        THE WITNESS:  So in the notes of
22  Attachment G-1 -- please scroll down to the
23  next page.  It states very clearly, "Retailer
24  Implied Warranty Table, provided by counsel."
25

12 (Pages 42 - 45)

Page 46

1  BY MS. KAPKE:
2      Q    Right. I -- I understand that it was
3  provided to you by counsel. And I just want to
4  confirm that that also means that these groupings
5  are not a reflection of any opinions that you have
6  regarding liability or state laws or legal
7  ramifications?
8           MR. HONIK: Object to form.
9           THE WITNESS: I'm an economist and
10     expert on the pharmaceutical industry. I'm not
11     a lawyer. I don't have an opinion about these
12     groupings. They were provided to me by
13     counsel. I think we've established that.
14 BY MS. KAPKE:
15     Q    Okay. And the same is true for
16 Attachment H.1 and I.1 as well?
17     A    Let's look. So if you go to the next
18 page in H.1, same thing noted, "Retailer Consumer
19 Protection Act Claims Table, provided by counsel."
20     Q    So the answer to my question is yes,
21 you don't have an opinion about these groupings --
22     A    Actually, you didn't ask me a
23 question. Again, this information was provided to
24 me by counsel. I don't have a legal opinion. I'm
25 not a lawyer.

Page 47

1      Q    Okay. So --
2      A    And then you asked me for another
3  attachment, H.1. And then which other table?
4      Q    I.1.
5      A    I.1. So I.1, again, has the same
6  note, "Retailer Unjust Enrichment Table, provided by
7  counsel."
8      Q    So the same caveat as you made before,
9  that you don't have a legal opinion, you're not a
10 lawyer, would also apply to I.1, correct?
11     A    It's not a caveat. You asked me a
12 question, do I have a legal opinion. And I'm saying
13 I'm an economist. I'm not a lawyer. I don't have
14 an opinion on liability other than -- or the
15 inclusion, other than what was provided to me by
16 counsel to calculate.
17     Q    Right. Okay. So what I want to do is
18 make sure that I understand how you derived the
19 remainder of the Attachments to G, H and I. And
20 what I think you did to create the remainder of
21 those attachments is simply sum up the totals for
22 the relevant state and retailer found within
23 Conti Exhibit 7 where called for, according to
24 attachment G.1, H.1 or I.1.; is that correct?
25     A    Let's go back to my report and assess.

Page 48

1  It's -- it's explained. So in paragraphs 63 and 64,
2  I explain what I did for the defendant retailers for
3  unjust enrichment. I list, "Retailers profited from
4  the sale of at-issue valsartan products to consumers
5  at the point of sale. Profits are defined as
6  revenues minus cost for each at-issue valsartan
7  product sold by the defendant retailers from
8  January 1st until the at-issue valsartan products
9  were recalled in 2018 and 2019 for being adulterated
10 and misbranded."
11         I then have, again, a footnote where
12 we have established which of the products at-issue
13 and at what time periods. All I did was take the
14 information that was provided to me by the at-issue
15 retailers for the relevant time periods, the
16 relevant manufacturers and the relevant product
17 categories, and matched them with the states
18 relevant for the unjust enrichment damages and
19 summed them up.
20         I did the exact same thing for the
21 liability claims, and I think that is listed and
22 explained in my report, in the preceding section, in
23 Paragraphs 60, 61 and 62.
24     Q    And what I'm trying to -- to
25 understand and make sure that I -- I follow, is what

Page 49

1  you're doing is you're basically sorting and
2  filtering on the Excel spreadsheet that is
3  Conti Exhibit 7, correct?
4           MR. HONIK: Object to the form.
5           THE WITNESS: Okay. So it's probably
6      easiest just to go back to the paragraph where
7      I explained the procedure again. It's in
8      paragraph 78 under, "Defendant Retailer
9      Liability Damages and Unjust Enrichment
10     Damages."
11         So in the paragraph, I explain what we
12     did. To calculate defendant retailer theory of
13     liability damages and unjust enrichment
14     damages, I rely upon the defendant retailer
15     pharmacy claims data. These claims datasets
16     have been limited to the consumer paid amounts.
17     That is, they exclude the all third-party payor
18     amounts, and thus represent the revenues
19     described in the section previous. I already
20     provided that information.
21         The consumer paid amounts in the
22     defendant retailer pharmacy claim datasets
23     provided to me do not include data on
24     dispensing fees, nor any of the other
25     information that I already discussed as

13 (Pages 46 - 49)

1  potentially relevant but not -- again, that
2  they have but was not provided to me.
3       Therefore, I don't subtract page
4  dispensing fees to offset the cost of the
5  retailer pharmacies dispensing these products
6  to consumers. This offset has already been
7  done by the defendant retailer. For each set
8  of defendant retailer pharmacy claims, I limit
9  the claims to the at-issue valsartan product
10  NDC codes found in the IQVIA dataset and
11  provided to me by counsel.
12       I then sum the total consumer paid
13  amounts by product, defendant retailer and
14  state. When there is a difference for retail
15  pharmacy claims, I use the state in which the
16  retailer pharmacy was located. For mail order
17  pharmacy claims, I use the state where the
18  prescription was mailed.
19       I then -- and then all I did was match
20  that to the states at issue for the specific
21  theory of liability, whether it be liability 1,
22  2 or unjust enrichment claims. And all they
23  are varying by is the states that are included
24  in that. It's exactly the same procedure.
25

1    Q    And I -- I appreciate that you're
2  trying to be helpful, but you don't need to -- to
3  read the report. What -- what I'm -- what I'm
4  trying to -- to understand is if the state groupings
5  were to change, if plaintiffs gave you a different
6  version of G.1, H.1 or I.1 with different state
7  groupings, would we need your expertise to create a
8  subsequent version of attachments G, H and I, or
9  could we do that based on what you already gave us
10  with the Conti Exhibit 7, the output file, and
11  simply sort, filter, and subtotal to create new
12  Attachments G, H and I?
13    A    So my method is flexible to
14  accommodate other -- other assumptions, that
15  inclusion or exclusions of states. I think you
16  would have to go back to the data that was provided
17  to me by the retailer pharmacies and the
18  manufacturer NDC groupings where we picked up --
19  remember, I mentioned we picked up repackager and --
20  and private label drugs that have recast or
21  relabeled NDC codes in order to make that
22  calculation.
23       But any trained analyst could -- could
24  do that calculation, following the -- following the
25  instructions that are provided in my report and the

1  data that might be -- the data that was -- that
2  underlies each one of those steps.
3    Q    Is there anything that you just talked
4  about with manufacturer NDC groupings, or the
5  instructions in your report, that is not contained
6  already in Exhibit 7?
7       MR. HONIK: Object to form.
8       THE WITNESS: I'm sorry. What's
9    Exhibit 7?
10  BY MS. KAPKE:
11    Q    The output file.
12    A    There's -- that data is -- there's
13  underlying data underneath that that you would
14  probably need.
15    Q    What data would you need underlying
16  the output file to create new Attachments G, H and I
17  if you were given new states at issue?
18    A    You would need the data that you, the
19  retailers, provided to me.
20    Q    Why? Why isn't that already addressed
21  in your output file?
22       MR. HONIK: Object to form.
23       THE WITNESS: I'm not following your
24    question. I'm sorry.
25

1  BY MS. KAPKE:
2    Q    What I'm trying to understand is
3  say -- say we took out -- you know, we changed two
4  states in Attachment G, G.1. Why can't I go to
5  the -- the output file and just do a sort and filter
6  and then create new numbers? What -- what data are
7  you using?
8       I don't think you're using anything.
9  I think it's a simple sort and filter. And so
10  that's what I'm trying to understand. Is there
11  something you are doing or can -- can anyone do --
12  do it once you have the output file?
13       MR. HONIK: Object to form, asked and
14    answered.
15       THE WITNESS: So, Ms. Kapke, I don't
16    feel comfortable with the idea that you just
17    sort and filter. That's not what good data
18    analysts do. They build that -- if you're
19    going to redo the calculations to -- based
20    on -- on other assumptions, good data practices
21    is to go back to the original dataset, ensure
22    the data is complete, doesn't contain any
23    mistakes, and then go through the steps again
24    to get to the calculation that's at issue.
25       I told you that the steps that we went

14 (Pages 50 - 53)

| Page 54 | Page 56 |
|---|---|

**Page 54**

1 through are listed in my report. They're very
2 clear, and they're very simple. And so any
3 analyst, who is well trained, should be able to
4 follow the steps if the states change, if the
5 NDC codes change, if there are additional
6 calculations that need to get done.
7     I would never tell, even, like, my
8 undergrads where the IT stats are to, to just
9 sort and filter to get the right -- to get a
10 different data. That is bad data management
11 practice. You go back to the original data and
12 you would calculate it.
13 BY MS. KAPKE:
14 Q    Okay. I'm going to move on to --
15     THE WITNESS: So actually, I'd like to
16 take a break, please. So can I have
17 five minutes?
18     MS. KAPKE: Sure.
19     MR. HONIK: Let's resume at 10:20.
20     THE VIDEOGRAPHER: The time is 10:14.
21 This ends Media Unit Number 1. We're off the
22 record.
23     (Whereupon, a short break was taken.)
24     THE VIDEOGRAPHER: The time is 10:22.
25 This begins Media Unit Number 2. We're back on

**Page 55**

1 the record.
2 BY MS. KAPKE:
3 Q    Dr. Conti, during the break, did you
4 talk to any of your staff?
5 A    No.
6 Q    Okay. So I'm going to ask you about
7 what you were saying regarding deduplication of
8 damages in your report. I think I understand, but I
9 want to use an example to make sure that I'm -- I'm
10 following what you're saying. So let's look --
11 A    Can you -- can you direct me -- can
12 you direct me to where in my report you're focused
13 on?
14 Q    Sure.
15     So in your summary of damages in
16 paragraph 79, you say, "I present deduplicated
17 aggregate damages." And I'm just focused on the
18 word "deduplicated."
19 A    I don't see the -- that in paragraph
20 79. Hold on. You mean in reference to Table 1 and
21 then in reference to Table 2 and 3?
22 Q    Yes.
23 A    There are two footnotes and one
24 paragraph where deduplication is referred to.
25 Q    Right. I understand.

**Page 56**

1     And I -- I think I get it, but I'm --
2 I want to make sure that I do. So I want to use an
3 example to make sure that I understand. And -- and
4 if I get my example wrong, you can correct me.
5     So do you recall --
6 A    Wait. Hold on. I just want to make
7 sure that I understand. So are we focused on the
8 retailer damages, or are we focused on Table 1 where
9 the manufacturer damages is?
10 Q    I'm going to give you an example
11 that's focused on the retailer examples.
12 A    Okay. Table 2 and 3, correct?
13 Q    Yeah. I'm looking specifically at --
14 the attachment is what I want to look at. So what I
15 want to look at is -- let's say consumer protection
16 damages for CVS for Arizona. So that's in
17 Table H.2.
18 A    Wait. Hold on. So -- so I'm on
19 Table 2 where we talk about deduplication
20 and -- okay. So --
21 Q    I want you to go to Attachment H.2.
22 A    H.2, okay.
23 Q    And you've got a calculation there for
24 consumer protection damages for CVS for Arizona -- I
25 just picked a state at random -- for ▮▮▮▮▮▮▮

**Page 57**

1 right?
2 A    I see that.
3 Q    Okay. And -- and that is the sum
4 total, equal to the full patient paid amount, for
5 the at-issue valsartan for the relevant time period
6 as reflected in the retailer claims data produced by
7 CVS, correct?
8 A    Under this period of damage, correct.
9 Q    Okay.
10 A    And for all of the included --
11     THE COURT REPORTER: I'm sorry?
12     THE WITNESS: And for all of the
13     included NDC codes and manufacturers at-issue
14     in the relevant time period.
15 BY MS. KAPKE:
16 Q    Got it. We're on the same page here.
17 This shouldn't be controversial, I don't think. I
18 just want to make sure that I understand.
19 A    I just want to -- I just want to make
20 sure that I understand what you're saying because
21 there's clearly been some mismatch in the language
22 that you're using as opposed to what I understand is
23 this data or these analyses.
24 Q    And please. Please always --
25 that's -- that's one of the first things that

Page 58

1 Mr. Goldberg told you yesterday, was if you don't
2 understand a question, let us know. And -- and we
3 definitely want that.
4 So let's go to Attachment I.2, which
5 is the unjust enrichment calculations. And the
6 total is the exact same for CVS for Arizona on
7 unjust enrichment calculations, correct?
8 A For Arizona, yes.
9 Q So when you talk about total damages
10 across defendant manufacturers and retailers not
11 being intended to be summed, you're not intending
12 for anyone to sum both consumer protection damages
13 and unjust enrichment damages for Arizona or CVS; is
14 that correct?
15 MR. HONIK: Note my objection to the
16 extent it calls for a legal conclusion.
17 But you may answer.
18 THE WITNESS: So, the -- the -- that's
19 why I referred to Table 2 and Table 3, if we
20 could go back and explain the deduplication.
21 Right. So the liability damages per state and
22 per manufacturer are deduplicated.
23 So what I mean by that is, if the
24 liability damages were calculated for one
25 state, let's just say Arizona, in one theory of

Page 59

1 liability, and then calculated for another --
2 for exactly the same state, for another theory
3 of liability for retailers, they were only
4 counted once in Table 2.
5 The unjust enrichment damages are a
6 separate calculation for every relevant state
7 manufacturer NDC code finding. So you're
8 actually comparing apples to oranges. The
9 unjust enrichment tables are their own thing.
10 And they are listed under Table 3.
11 Deduplication is referring to the liability
12 claims, and they are listed in Table 2. That's
13 why the deduplication note is referencing
14 Table 2, not Table 3.
15 BY MS. KAPKE:
16 Q Are you giving an opinion that a
17 consumer plaintiff would be entitled to unjust
18 enrichment and liability damages from a retail
19 pharmacy defendant for a particular state?
20 THE COURT REPORTER: I'm sorry. Can
21 I -- can I hear the end of the question,
22 please?
23 MS. KAPKE: For a particular state.
24 MR. HONIK: Note my objection to the
25 extent it requires a legal expert opinion or

Page 60

1 conclusion.
2 You may answer.
3 THE WITNESS: Thank you.
4 Allocation and apportionment is
5 outside of the scope of my report.
6 BY MS. KAPKE:
7 Q You would agree that they reflect the
8 same -- for a particular state and particular
9 manufacturer, they represent the same data which is
10 the full patient paid amount, correct?
11 MR. HONIK: Object to the form.
12 THE WITNESS: I disagree with that
13 characterization.
14 BY MS. KAPKE:
15 Q Correct it then, please.
16 MR. HONIK: Object to form.
17 You can answer.
18 THE WITNESS: Okay. So let's go back
19 to the basis of liability versus unjust
20 enrichment.
21 Liability is related to what was paid
22 at the point of sale. In this case, by the --
23 by the consumer and TPP, if we're taking this
24 from a theoretical perspective. And so the
25 full amount of retailer liability is the -- the

Page 61

1 full amount that -- that was paid by the
2 consumer and by the third-party payor at the
3 point of sale, and does not include offsets
4 such as rebates or discounts that might have
5 been applied later.
6 Whereas unjust enrichment, if you go
7 to Section C of my report, paragraph 64,
8 entails understanding what the retailer profits
9 from that sale are. And that would include,
10 again, in theory, what the customer paid, what
11 the third-party payor paid, inclusive, minus
12 the retailer costs.
13 Now, those costs, the retailers have
14 already taken out the dispensing fee, but one
15 can imagine there would be potentially other
16 costs of dispensing those specific products
17 that may be related to the point of sale, and
18 might include other offsets that could have
19 occurred.
20 I discussed that in Footnote 84 where
21 I say, "When calculating profits, the other
22 offsets may be removed from gross profit should
23 the jury or court find these to be reasonable
24 deductions." That is relevant to unjust
25 enrichment. It's not relevant to liability.

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1  BY MS. KAPKE:
2      Q      In terms of the actual calculation in
3  Attachment I --
4      A      Which -- which attachment -- which
5  exhibit?
6      Q      I.
7      A      Right, which exhibit?
8      Q      Your report, Exhibit 5.
9             MR. HONIK:  I think there are multiple
10  Is.
11            THE WITNESS:  Yeah.  There are
12  multiple Is.  There are -- there are -- are
13  multiple -- there's -- I think there are five
14  Is.
15  BY MS. KAPKE:
16      Q      Okay.  We can pick any one of them,
17  I.2, I.3, I --
18      A      I can't hear you.  I'm sorry.
19      Q      We can just go to I.2.
20      A      Okay, I.2.  Okay.  That's the unjust
21  enrichment table.
22      Q      Correct.
23      A      Right --
24      Q      It's --
25      A      Right.  Which was -- which -- right?

Page 63

1  Which is enumerated in sum in Table 3.
2      Q      Correct.
3             In terms of the actual calculations
4  done in Attachment I.2 --
5      A      For CVS?
6      Q      For CVS.
7      A      Uh-huh.
8      Q      It is equal to the full patient paid
9  amount, correct?
10      A      Well, it's equal to the amount of
11  co-insurance and co-payments.  There might be other
12  payments that were made, including a dispense fee.
13  There might be other payments that are made or other
14  offsets that were made.  We just have what we were
15  provided by CVS, which is the consumer co-insurance
16  and co-payment amounts.
17      Q      If you look at the notes, if you --
18  you reference it being equal to the full patient
19  paid amount?
20      A      But, again, as I mentioned, there are
21  other amounts which include the dispensing fee that
22  consumers usually pay at the pharmacy counter.
23  Those were taken out to arrive at these sums.
24             And the point of unjust enrichment is
25  that it's based on the profit that CVS made, so

Page 64

1  there might be -- so this is the revenue paid for
2  this specific claim, aggregated over multiple drugs,
3  multiple --
4             THE COURT REPORTER:  Multiple what?
5             THE WITNESS:  Manufacturers, multiple
6  time periods.
7             But there might be additional costs
8  that CVS incurred in dispensing that product in
9  a particular time period.  All I have is what
10  was paid.  But from a theoretical perspective,
11  unjust enrichment should account for the cost
12  of dispensing that prescription, which might be
13  captured by the dispensing fee, but might have
14  additional costs on top of it.  That's very
15  different than the theory of liability.
16  BY MS. KAPKE:
17      Q      Putting aside this theoretical
18  perspective, in terms of the actual generation of
19  Attachment I.2, compared to the actual generation of
20  Attachment H.2 --
21      A      Wait.  Hold on.  Let's go back to H.2
22  because I'm not sure.  I just want to follow along
23  with you.
24             Okay.  So I.2 is unjust enrichment for
25  CVS, and H.2 is liability claim for CVS.  Okay.

Page 65

1      Q      So putting aside the theoretical
2  perspective, the numbers generated in both H.2 and
3  I.2 are both based on the CVS retail claims data
4  equal to full patient paid amount?
5      A      That's correct.
6             MR. HONIK:  Object to form.
7  BY MS. KAPKE:
8      A      So I mean, mechanically, they are the
9  same, but theoretically, they are not the same.  And
10  so for my calculation, I only had the data that was
11  provided to me.  When -- when and if a jury from
12  there to be -- an award to be made, there's a
13  different process that would go into consumers or
14  third-party payors claiming the amount that they are
15  owed.
16             And that's where the theory matters
17  because the liability amounts in the actual world
18  are going to be related to the paid amounts.
19  Whereas, the unjust enrichment claims would be paid
20  amounts minus cost or revenues minus the cost of
21  that prescription being dispensed, which might be --
22  which might have a particular offset associated with
23  it.
24      Q      I'm going to go back to Tables 1 and
25  2.

17 (Pages 62 - 65)

Case 1:19-md-02875-RBK-SAK Document 2009-2 Filed 04/02/2021 Page 19 of 98 PageID: 60957

Page 66

1    A    Okay.  Do you mean 2 and 3?
2    Q    No, I actually mean 1 and 2.  I want
3  to understand the interplay between Table 1, the
4  aggregate manufacturer group damages and Table 2,
5  the aggregate retailer damages across liability
6  theories of damages.
7         By necessity, any damage you've
8  calculated in Table 2 for a retail pharmacy
9  defendant would already be included in the
10  manufacturer defendant calculations in Table 1,
11  correct?
12         MR. HONIK:  Object to form.
13         You can answer.
14         THE WITNESS:  Are you asking me
15    whether the IQVIA data that goes into the
16    calculation for Table 1 would include or be
17    inclusive of the retailer liability calculation
18    in Table 2 for each manufacturer retailer?
19  BY MS. KAPKE:
20    Q    Sure.  You can answer that question.
21         THE COURT REPORTER:  I'm sorry?
22  BY MS. KAPKE:
23    Q    Yeah.  Please answer that question.
24    A    Yes, but not in entirety.  Because,
25  again, the retailers are only focused on the -- the

Page 67

1  retailer liability claims are only focused on
2  consumers' co-insurance and co-payment amounts.
3  Whereas, the manufacturer liability claims are
4  related to total payments for the at-issue drugs in
5  the at-issue time periods and the at-issue data.
6    Q    So suppose a manufacturer -- strike
7  that.
8         Suppose the manufacturers paid to
9  consumers all of the damages in Table 1 under
10  "Consumer Damages."  That would mean the consumers
11  were satisfied in full, correct?  There'd be no
12  damages left for the retail pharmacy defendants to
13  pay?
14         MR. HONIK:  Object to the form and to
15    the extent it calls for a legal conclusion
16    regarding ultimate allocation.
17         THE THE COURT REPORTER:  Ultimate...
18         MR. HONIK:  Allocation.
19         THE COURT REPORTER:  Thank you.
20         THE WITNESS:  Again, allocation
21    concerns are outside the scope of my analysis.
22  BY MS. KAPKE:
23    Q    And I -- and I understand that.  And
24  actually that was going to be my next question.
25         Do you ever -- you know, do you make

Page 68

1  allocation determinations?  And it's good to know
2  that you don't.
3    A    I have already testified to that -- to
4  that three times this morning.
5    Q    I appreciate that.
6         But -- but let's engage in a
7  hypothetical world where the manufacturers pay all
8  of the damages.  So we're not in a -- in a world
9  where allocation needs to be made, because the
10  manufacturers have paid everything in the "Consumer
11  Damages" column of Table 1.  If that's the
12  hypothetical position that you assume, are there any
13  damages left for the retail pharmacy defendants to
14  pay?
15         MR. HONIK:  Note my -- excuse me --
16    note my objection on a couple of bases.
17         Number 1, in the statement that was in
18    your question, Kara, that confirmed at least in
19    your question, that Dr. Conti made no
20    allocations, that's not correct.  She didn't
21    make legal allocations, but she made lots and
22    lots of mathematical allocations, and she spent
23    hours talking about that.  That's number 1.
24         MS. KAPKE:  Sure.
25         MR. HONIK:  And number 2, I just want

Page 69

1  to preserve my ongoing objection that your
2  question really requires a legal conclusion
3  about what liability will yield in the way of
4  an allocation as directed by a court or a
5  jury's verdict or otherwise.
6         With that, she can answer.
7         THE WITNESS:  Thank you.
8         So this is your hypothetical, and
9  these are your assumptions.  They're not mine.
10         And my understanding is that -- that
11  those determinations are ones that will be
12  answered by a court and a jury.  They are --
13  they are outside my purview as I've already
14  testified.
15  BY MS. KAPKE:
16    Q    Okay.  I'm going to try to ask another
17  hypothetical question to get at it -- to get at it a
18  different way.
19         Assume a world in which all of -- all
20  that has occurred to date has occurred except the
21  filing of the lawsuit.  And Aurobindo and Hetero and
22  Mylan and Teva and Torrent and ZHP paid to consumers
23  the sum total of ███████, whatever the number is
24  on the bottom of that --
25         MS. KAPKE:  Which I should note, for

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1  the record, that's considered -- that
2  number is considered a confidential number for
3  purposes -- thank you for zooming in -- for
4  purposes of the protective order. I'm going to
5  start my question over.
6      THE WITNESS: Thank you.
7  BY MS. KAPKE:
8      Q    Yeah. Assume a world in which
9  everything has occurred except for the filing of
10 the -- of this lawsuit. And independent of a
11 lawsuit, the manufacturers listed in Table 1 pay out
12 to consumers the damages listed in column -- the
13 column marked "Consumer Damages" in Table 1.
14      So outside of the legal realm, in that
15 instance, do the consumers have any damages left?
16      MR. HONIK: Note my objection on the
17   same basis as previously stated and insofar as
18   this is an improper hypothetical and goes
19   beyond the scope of a health economist's
20   opinion as expressed here. Finally, I would
21   just add by way of objection that what you're
22   really getting at is a kind of reallocation,
23   not allocation. And I remind everyone that
24   what Dr. Conti has done is to simply present a
25   methodology for assessing damages, the

Page 71

1  allocation of which, at trial or otherwise, is
2  outside the scope of the purview of her
3  assignment.
4      You may answer.
5      THE WITNESS: I have no answer. I
6  mean, I have no -- I'm not a lawyer, and I have
7  no assessment of whether or not that payment --
8      THE THE COURT REPORTER: That
9  payment...
10     THE WITNESS: That payment is --
11  satisfies the claims or not. It's completely
12  outside the scope of my assignment in this
13  case.
14      MR. HONIK: Are you making an offer,
15   Kara?
16      MS. KAPKE: Sorry. I was chewing ice.
17   Oh, that was your attempt at being funny.
18   Sorry, Ruben. I should have laughed.
19  BY MS. KAPKE:
20     Q    Does Table 1, "Consumer Damages,"
21  represent a full refund of all the consumers spent
22  on the at-issue valsartan?
23      MR. HONIK: Object to the form and for
24   the reasons previously stated.
25      THE WITNESS: I don't understand your

Page 72

1  question. I'm sorry. Are we still in
2  that -- this weird hypothetical world?
3  BY MS. KAPKE:
4      Q    No.
5      A    I wasn't asked to calculate or do any
6  analysis of?
7      Q    No. I'm asking a separate question.
8      A    Oh, okay.
9      Q    Does -- would the -- the consumer
10 damages total represent a full refund of all the
11 money that the consumer spent on the at-issue
12 valsartan?
13      MR. HONIK: Same objection as
14   previously stated.
15      THE WITNESS: A full refund? What do
16   you mean by "a full refund"? I don't use that
17   term in my report, so I would like you
18   to -- I'd like you to define it for me.
19  BY MS. KAPKE:
20     Q    Would it -- I'll -- I'll withdraw that
21  question.
22      What do the numbers in the "Consumer
23  Damages" column of Table 1 represent?
24      MR. HONIK: Objection, asked and
25   answered.

Page 73

1      THE WITNESS: Let's go back to my
2   explanation of how Table 1 was calculated.
3  BY MS. KAPKE:
4      Q    You know what? I can withdraw that
5  question. That's okay.
6      A    I'm happy to go -- I mean, I'm on
7  paragraph 60. It's described as paragraph 60
8  through 62.
9      Q    And that's fine. Ruben's right. You
10 have -- you've answered that question.
11      I -- I want to ask about -- it says
12 right above Table 1, "Total damages across defendant
13 manufacturers and retailers are not intended to be
14 summed."
15      Can you elaborate on what you mean by
16 that?
17      A    I'm not there yet. Hold on.
18      So, again, this is about the
19 deduplication that we have been talking about for a
20 while now. Let's start from the beginning of the
21 paragraph. It's the -- it's the paragraph -- it's
22 the previous page. Thank you.
23      In paragraph 79, I explain, "The
24 following tables present aggregate damages across
25 all theories of liability. Details on aggregate

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    damages for defendant manufacturers and retailers at
2    the group, subgroup and state level are provided in
3    the attachments in this declaration.  In Table 1, I
4    present deduplicated aggregate damages across all
5    theories of liability for the defendant
6    manufacturers.  In Table 2, I prevent" -- "I present
7    deduplicated aggregate damages across all theories
8    of liability for the defendant retailers.  In
9    Table 3, I present deduplicated aggregate unjust
10   enrichment damages for the defendant retailers.  As
11   described in footnote 62 above, some claims fall
12   into multiple theories of liability.  Therefore,
13   total damages across defendant manufacturers," full
14   stop, "and retailers are not intended to be summed."
15       What I mean by that is, the Table 1
16   damages are deduplicated.  Table 2 damages, across
17   different theories of liability, are also
18   deduplicated.  I also have footnotes, 72 and 73, for
19   Tables 1 and 2 that -- that make that clear as well.
20       Q    Do you have an estimation of what
21   percentage of the pharmacy market is covered by the
22   pharmacy defendants in this case?
23           MR. HONIK:  Object to form.
24           THE WITNESS:  Well, some of the
25       largest pharmacies in America are listed in the

Page 75

1    retailers table.  CVS, Walgreens, Walmart are
2    absolutely enormous sellers of prescription
3    drugs in the U.S. market.
4    BY MS. KAPKE:
5        Q    And do you have an estimate of -- of
6    what percentage that is?
7        A    No.
8            THE COURT REPORTER:  I'm sorry.
9    You're both talking on top of each other.
10       So I have, "Do you have an estimate of
11   what percentage that is" as a question.  And I
12   have, "No" as an answer.
13           THE WITNESS:  No.  I said not off the
14   top of my head.
15   BY MS. KAPKE:
16       Q    That's fine.
17       Okay.  I want to -- let's go back to
18   the formulas in your report on paragraph 60 and 61.
19       A    Are we changing topics?
20       Q    Yeah.
21       A    Okay.  Great.  I would like to take a
22   break then, please.
23           MS. KAPKE:  Okay.
24           THE VIDEOGRAPHER:  The time is 10:55.
25   We're going off the record.

Page 76

1            (Whereupon, a short break was taken.)
2            THE VIDEOGRAPHER:  The time is 11:03.
3    We're back on the record.
4    BY MS. KAPKE:
5        Q    Dr. Conti, during the last break, or
6    any breaks today, have you had any communications
7    with anyone?
8            MR. HONIK:  Note my objection to the
9            extent it may reveal confidential and
10           privileged counsel communication.
11           But without waiver of the objection,
12       she may answer.
13           THE WITNESS:  I have spoken to my
14   counsel.
15   BY MS. KAPKE:
16       Q    During both breaks?
17           MR. HONIK:  Same objection.
18       You may answer.
19           THE WITNESS:  Yes.
20   BY MS. KAPKE:
21       Q    Okay.  Have you -- have you had any
22   communications with staff?
23       A    You already asked me that question at
24   the last break, and I said no.  So at this same
25   break -- at this next break, no, I did not have any

Page 77

1    communications with my staff.
2        Q    Okay.  Perfect.
3        So I have a couple of questions that,
4    again, I'm not really intending to be super
5    controversial.  But I just want to make sure I
6    understand.
7        So let's go to your report.  And
8    paragraph 60 and 61, you reference consumer class
9    expenditures by breaking down into full payments for
10   uninsured cash paying purchases on the one hand --
11           THE COURT REPORTER:  I'm sorry, Kara.
12   I'm sorry.  I lost you.
13           THE WITNESS:  Yeah.  I -- I don't see
14   it either.
15           THE COURT REPORTER:  "Consumer class
16   expenditure by breaking it down into full
17   payments for the uninsured"...
18           MS. KAPKE:  Cash paying purchases on
19   one hand, and this is the formula.  And co-pays
20   for insurance -- or for insured consumers.
21           THE WITNESS:  I'm sorry.  You -- hold
22   on.  I just want to try to understand what
23   you're asking.  So you referenced paragraph 60.
24   Where do you see that?  Because I don't see it.
25

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1 BY MS. KAPKE:
2    Q    Your formula.
3    A    In paragraph -- in paragraph 60 on
4 Formula 1? It is not related -- it does not break
5 down into different types of payor types.
6    Q    I'm looking at Formula 2 in
7 paragraph 61.
8    A    Okay. So you said -- you directed me
9 to paragraph 60 and 61. I'm just trying to follow.
10   Q    Okay. Here's my question. When you
11 reference uninsured cash paying purchases, are you
12 referring to anyone who did not have a co-pay, or
13 are you referring to a subset of those who paid with
14 physical cash?
15   A    I don't understand your question. I'm
16 sorry.
17   Q    In other words, are you -- are you
18 including in your formula uninsured patients who
19 paid for valsartan with a credit card? Do
20 you -- what do you mean by cash?
21   A    Okay. Cash is cash, right? So what I
22 mean by this is they are paying out of pocket. The
23 method of payment, whether it be literally a $5 bill
24 or using a credit card, from the industry's
25 perspective, both of those types of payments, that

Page 79

1 people are paying out of pocket, they are paying in
2 cash.
3    Q    Okay. That's what I assumed. I need
4 to check all of my assumptions, and that's what
5 we're here to do here today.
6         So for the uninsured cash paying
7 purchases, the formula requires input of the full
8 purchase price of the product. How is that
9 determined for the uninsured cash paying purchaser?
10        MR. HONIK: Objection, asked and
11   answered.
12        You can answer.
13        THE WITNESS: It's the full amount
14   that they paid at the pharmacy counter for the
15   at-issue drugs.
16 BY MS. KAPKE:
17   Q    Okay. And then for the other part of
18 the formula, you're looking at insured co-pay or
19 co-insurance paying purchasers -- purchasers,
20 correct?
21   A    Right. That's what it says here.
22   Q    Yes. Here -- here is my question: Is
23 there a difference between insured co-pay or
24 co-insurance paying purchasers? Is there some sort
25 of delineation between those three groups?

Page 80

1         MR. HONIK: Object to form.
2         You can answer.
3         THE WITNESS: I'm not following. What
4    are the three groups?
5 BY MS. KAPKE:
6    Q    The insured, co-pay or co-insurance
7 pay group purchasers?
8    A    Hold on. Those are two groups, not
9 three.
10        MR. HONIK: Yeah.
11 BY MS. KAPKE:
12   Q    That's what I don't understand --
13        THE COURT REPORTER: I can't take this
14   down. I cannot do that. One at a time.
15        MR. HONIK: Kara, respectfully, I
16   think you misspoke. You said insured. I think
17   you meant cash. It's cash, co-pay,
18   co-insurance.
19 BY MS. KAPKE:
20   Q    No. So I'm looking at the third --
21 under where -- the third line there, it says, Qdt
22 co-pay equals the quantity of product d purchased at
23 time period t for, 1, insured, 2, co-pay or 3,
24 co-insurance paying purchasers.
25        I don't know and -- I don't know what

Page 81

1 you mean, if there is a distinction between those
2 three words, insured, co-pay or co-insurance. Or do
3 they all mean the same thing?
4    A    Are you asking me for the definition
5 of insured, co-pay, co-insurance?
6    Q    I'm asking if there's a difference
7 between those -- those three things.
8    A    Okay. There is a variable in the
9 Xponent data that delineates or distinguishes
10 between people who are paying cash -- they're
11 uninsured for that specific prescription -- and
12 people who are -- who are insured and still are
13 required to pay a co-insurance or co-pay amount.
14        So the first part of this last phrase,
15   "insured or cash" in the previous tab under
16   "quantity," delineates the distinction. Are these
17 people cash paying, or are these people insured and
18 paying a co-payment or a co-insurance? And the way
19 that you can tell the difference is if you go to the
20 term "Qdt cash," those are uninsured cash paying
21 purchasers.
22        THE WITNESS: And for the court
23   reporter, you should actually highlight the
24   first row. Dt cash equals uninsured cash
25   paying purchasers.

21 (Pages 78 - 81)

1  BY MS. KAPKE:
2  Q    Okay. And this --
3  A    Hold on, just to make sure that we're
4  on the same page.
5        And then for people who are insured,
6  sometimes they don't have to pay anything when they
7  get their prescription filled, particularly for
8  really low-cost generic drugs. And sometimes they
9  are still required by their insurer to pay a
10  co-insurance and a -- or a co-payment amount, and
11  then their insurer may pay the remainder.
12        That is the distinction that we are
13  making here -- or that I am making here.
14  Q    Thank you. That's helpful.
15        Is there a difference between a co-pay
16  and a co-insurance?
17  A    Yes.
18  Q    What is that?
19  A    So co-payments tend to be flat. In
20  other words, $5 for every -- every generic
21  prescription or $1 for every generic prescription.
22  Whereas co-insurance is a percentage of the total
23  paid amount or the total charge for their
24  prescription. So it's -- to make it really
25  concrete, it will be 15 percent of the total paid

1  amount.
2  Q    Got it. Thank you.
3        Okay. Let's go to Paragraph 56 of
4  your report. And can you read to yourself
5  the -- that paragraph?
6  A    So that's finished.
7  Q    Let me know when you're done.
8        MR. HONIK: It's a request. She'd
9  like you to read it.
10        THE WITNESS: Oh, okay. It's a
11  request, all right. Just -- just following.
12        MR. HONIK: Yeah.
13        THE WITNESS: Okay.
14  BY MS. KAPKE:
15  Q    Are you alleging that the retail
16  pharmacy defendants committed fraud?
17        MR. HONIK: Object to the form and to
18  the extent it calls for a legal conclusion.
19        You can answer.
20        THE WITNESS: We already talked about
21  this multiple times. I was asked to assume
22  what was in the complaint and discussed in my
23  Paragraphs 1, 2 and 3.
24  BY MS. KAPKE:
25  Q    Got it.

1        So the economic price for damages
2  equals the price of each at-issue prescription sold
3  and paid. That relates to the liability damages
4  that you offered up a formula for, not the unjust
5  enrichment damages that you offered an opinion on;
6  is that correct?
7        MR. HONIK: Object to form.
8  A    I don't follow your question.
9  BY MS. KAPKE:
10  Q    Okay. I'll -- I'll withdraw it.
11        Okay. Let's go to the unjust
12  enrichment formula. I don't remember what paragraph
13  that is.
14        MR. HONIK: 63.
15        MS. KAPKE: Thanks. Thank you, Ruben.
16  BY MS. KAPKE:
17  Q    The basic formula you list here is
18  revenue minus costs, and then you expand that out to
19  provide additional detail. And I want to ask about,
20  first, revenue.
21        To determine revenue, you offer a
22  formula of average out-of-pocket costs for Unit 2
23  consumers of product d sold by the retailer over
24  time period t. In this formula, does this average
25  out --

1  A    I don't see that. I'm sorry.
2        So actually, I -- I define retail
3  revenue of product -- product d, sold to consumers
4  over time period t. Is that what you're referring
5  to?
6  Q    Uh-huh.
7  A    Okay. And then I go on to talk about
8  revenue expressed in Formula 5.
9  Q    Correct.
10  A    Correct. Okay.
11  Q    And in Formula 5, the consumer, PPU,
12  is the average out-of-pocket cost per unit to
13  consumers of product d sold by the retailer over
14  time period t?
15        MR. HONIK: Object to form.
16        You can answer.
17        THE WITNESS: That's what it says
18  here.
19  BY MS. KAPKE:
20  Q    Okay. Does that average out-of-pocket
21  cost per unit to consumers in your formula include
22  only class members or all individuals who are
23  dispensed at-issue valsartan?
24        MR. HONIK: Object to form and to the
25  extent it calls for a legal conclusion.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    You can answer.
2        THE WITNESS: I'm sorry, I don't
3    understand the question you're asking. Can you
4    please clarify?
5  BY MS. KAPKE:
6    Q    For purposes of your formula, when
7  you're calculating the average out-of-pocket cost
8  per unit to consumers, are you including in
9  consumers, in your theoretical world, all consumers
10 of at-issue valsartan or only class members?
11       MR. HONIK: Object to form, calls for
12   a legal conclusion.
13       You may answer.
14       THE WITNESS: I mean, as a -- as a
15   mechanical concern, we're only -- or I'm only
16   calculating based on consumers that paid for
17   the at-issue drugs in the at-issue time period,
18   their out-of-pocket cost.
19 BY MS. KAPKE:
20   Q    Would the average out-of-pocket cost
21 include consumers who paid nothing?
22       MR. HONIK: Object to the form, and
23   class membership is a legal matter, beyond the
24   scope.
25       THE WITNESS: I don't understand what

Page 87

1  you're asking. I'm sorry.
2        MS. KAPKE: Okay. And, Ruben, I'm
3    going to just ask a question that's untethered
4    to my prior questions.
5  BY MS. KAPKE:
6    Q    So in looking at this formula --
7        MR. HONIK: Does "untethered" mean
8    crazy?
9        MS. KAPKE: No.
10 BY MS. KAPKE:
11   Q    I just want to -- I want to try and
12 figure out this -- how you're deriving average
13 out-of-pocket cost per unit to consumers.
14       MR. HONIK: Okay.
15       THE WITNESS: There's a formula. Then
16   there's a mechanical calculation. Those are
17   two different things, right?
18       MR. HONIK: That's the mash-up
19   problem, Kara. You're mashing up two things.
20       THE WITNESS: Yeah. I don't --
21       MS. KAPKE: Okay.
22       MR. HONIK: I'm sure Dr. Conti can
23   explain it to you though.
24 BY MS. KAPKE:
25   Q    Okay. When you are, from a

Page 88

1  theoretical perspective, saying that you need to
2  factor in the average cost of product -- the average
3  out-of-pocket cost per unit to consumers, when
4  you're doing that average, are you including
5  consumers --
6    A    In theory -- in theory or in practice?
7    Q    In theory.
8    A    Okay.
9    Q    In theory, does your average include
10 those consumers who paid nothing?
11       MR. HONIK: Object to the form.
12       You can answer.
13       THE WITNESS: So by definition,
14   mechanically, they would contribute 0, right?
15   And so there is no payment made.
16 BY MS. KAPKE:
17   Q    So do you include them in the
18 denominator?
19   A    They fall out of the denominator in
20 theory because they pay 0.
21   Q    Okay. I want to go to the formula to
22 determine costs in your report.
23       So retailer costs of dispensing
24 product d to consumers over time period t, do you
25 see that?

Page 89

1    A    Yes.
2    Q    Are you referring in your formula
3  here, from the theoretical perspective, only to the
4  amount of money that a pharmacy would pay to a
5  wholesaler or directly to a manufacturer for the
6  dispensed product?
7    A    Go down to Formula 6 on the next page,
8  and you can see how I defined costs. Retail costs
9  of dispensing to consumers can be expressed in
10 Formula 6 as a function of the quantity of units of
11 product d sold to consumer over time period t and
12 the average retailer cost per unit of product d over
13 time period t to dispense to consumers. It is the
14 cost of dispensing.
15   Q    And that would include what?
16   A    Well, the retailers took
17   out -- interpreted that as the dispensing fee and
18   took the dispensing fee for each prescription out of
19   the data that was provided to us.
20   Q    I want to -- I want to remove the
21   mechanical aspects and just talk about this from a
22   theoretical perspective.
23       If you are -- are looking at this from
24 a purely academic perspective, what do you want to
25 see in terms of defining retailer costs for purposes

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1  of this formula?
2       MR. HONIK: Object to form.
3       THE WITNESS: I'm not calculating
4    retailer costs here. I'm talking -- I'm
5    referring to dispensing costs. They are
6    different things.
7  BY MS. KAPKE:
8     Q    Okay.
9     A    I mean, that's what's listed here.
10 Retailer cost of this dispensing to consumers,
11 that's what I'm -- that's the object in
12 theory that I'm referring to.
13    Q    Okay. And the same question; taking
14 away the mechanical aspect of this, in theory, from
15 a purely academic perspective, what do you want to
16 see in terms of retailer cost of dispensing to
17 consumers?
18       MR. HONIK: Object to form.
19       THE WITNESS: It's the unit cost of
20    dispensing a given prescription to a given
21    patient.
22 BY MS. KAPKE:
23    Q    What goes into that?
24    A    The marginal cost of dispensing will
25 be the labor cost of filling the -- vial and

Page 91

1  actually giving it to the patient. It might include
2  some additional costs as well. But they are
3  marginal -- marginal to the dispensing of an actual
4  unit to a patient at the point of sale.
5       THE COURT REPORTER: I'm sorry?
6       THE WITNESS: At -- excuse me -- the
7    point of sale.
8       THE COURT REPORTER: Thank you.
9       THE WITNESS: It can be the cost of
10    the vial itself. It can be the cost of a paper
11    bag. It can be the cost of the clerk sitting
12    at the pharmacy counter actually giving it to
13    the patient and ringing them up for the charge.
14    It could be the incremental cost of the
15    pharmacist, actually their time inputting the
16    drug into the -- the unit, and then into the
17    bag that they get at the pharmacy counter.
18    Those are dispensing costs.
19 BY MS. KAPKE:
20    Q    Does your formula take into account,
21 in addition to dispensing costs, the actual cost of
22 the drug that retailer pharmacy defendants would pay
23 to whomever they obtained the drug for -- from?
24       MR. HONIK: Object to form.
25       THE WITNESS: Are you saying that

Page 92

1  those are point of sale costs, because my
2  understanding is that -- is that they are not.
3  BY MS. KAPKE:
4     Q    I'm asking you if -- what your formula
5  takes into consideration.
6     A    I already defined that. It's the cost
7  of dispensing a product to the consumer.
8     Q    Okay. So if -- and let's just take a
9  hypothetical --
10    A    Another hypothetical.
11    Q    -- outside -- outside of valsartan.
12       Say a drug -- say a pharmacy purchases
13 a drug from -- directly from a manufacturer for $10
14 and then sells that drug to an uninsured customer
15 for $20. And say that the dispensing costs are $5,
16 and we're in this weird world where we know that the
17 dispensing costs are $5. Is the profit, under your
18 formula, $5 or $10?
19       MR. HONIK: Object to form.
20       THE WITNESS: Okay. So you have a
21    very -- that is -- that is a hypothetical that
22    is bizarre in many ways. And I'm not aware of
23    a generic drug having a dispensing fee of $5
24    ever associated with it. So let's just
25    dispense it.

Page 93

1       At the end of the day, it is the
2    cost -- the dispensing costs are the costs that
3    are incremental to a given patient in a given
4    drug at the point of sale.
5       So as I mentioned before, it's the
6    cost of putting the drug in the vial. It's the
7    cost of putting it in the bag. It's the cost
8    of printing the label and giving all the
9    consumer information to the consumer. It might
10    be the labor cost of the pharmacist talking to
11    the patient about the benefits and side-effects
12    of taking this drug relative to others, and
13    side-effect profile of that drug at the point
14    of sale. That's what I think dispensing cost
15    means.
16 BY MS. KAPKE:
17    Q    Thank you for that.
18       And I'm -- I'm just trying to
19 understand if your -- if the cost of procurement is
20 included in your formula for cost?
21    A    Where do you see in my report that the
22 cost of procurement is included in my definition of
23 dispensing costs?
24    Q    I'm asking you a question.
25    A    I have defined dispensing cost five

24 (Pages 90 - 93)

Page 94

1  separate times. It's also defined very clearly in
2  my report. This is a --
3      Q      I'm not asking you --
4      A      Excuse me. This is a term of art in
5  this field. I am using it correctly and precisely,
6  and I have restated over and over again the
7  definition of dispensing cost.
8      Q      I understand that.
9          I'm not asking you if your -- so your
10  formula is revenue minus costs?
11      A      No. My formula is retail cost of
12  dispensing to consumers. That is in Formula 6 --
13      Q      Okay. I'm looking at --
14      A      -- where I define the cost of
15  dispensing to the consumer at the point of sale.
16  It's the quantity of the unit times average retailer
17  cost per unit of dispensing to the consumer.
18  Dispensing to the consumer is a cost. Anyone who
19  knows anything about this industry knows what a
20  dispensing cost is. It's related to the labor and
21  capital that goes into handing a prescription of the
22  drug to a patient at the pharmacy counter. That is
23  what I am using here as cost.
24      Q      Let's look at Formula 4, please.
25      A      No. I'm not -- I mean, I'm happy to

Page 95

1  go back to Formula 4. But, again, I define the cost
2  in Formula 4 as related to Formula 6, the cost of
3  dispensing to consumers. They are one and the same.
4      Q      Okay. That's what I'm trying to
5  understand. And -- and I'm sorry if I am -- I -- I
6  don't under- -- I don't understand the answer to
7  this question.
8          Does the formula in Formula 4, when it
9  says revenue minus costs, does costs there refer to
10  any costs other than the dispensing costs that you
11  have identified for me and explained?
12      A      Again, the cost defined in Formula 4,
13  cost dt, is defined underneath cost dt equals the
14  retailer cost of dispensing product d to consumers
15  over time period t.
16          I then go on to define cost in more
17  detail where I say, retailer costs of dispensing to
18  consumers can be expressed in Formula 6 as cost dt
19  equals Qdt, the quantity of units of product d sold
20  to consumers over time period t times the retailer
21  CPUdt, the average retailer cost per unit of product
22  d over time period t to dispense to consumers. I
23  can't -- I can't be any clearer than that.
24          And clearly, the retailers know what a
25  dispensing fee is because they actually took that

Page 96

1  out of the data they gave me. There's no -- this is
2  not a theoretical. This is an -- this relates to an
3  actual thing, that you, the retailers, know what it
4  is because you took it out of the data that was
5  provided to myself and my staff.
6      Q      What are DIR fees?
7      A      They are payments that can be made
8  between entities in the pharmaceutical industry.
9      Q      Is it your understanding that DIR fees
10  are typically collected retrospectively after the
11  point of sale?
12      A      My understanding is that there's a
13  range of different arrangements.
14          THE THE COURT REPORTER: There is or
15  there isn't a range?
16          THE WITNESS: There is a range of
17  different arrangements. And they only relate
18  to certain types of products and a certain type
19  of transaction and certain time periods. The
20  use of DIR fees have been growing over time.
21  BY MS. KAPKE:
22      Q      Are there other fees besides DIR fees
23  that are assessed after the point of sale?
24      A      For who to who?
25      Q      For commercial plans.

Page 97

1      A      I don't -- I don't understand -- I
2  don't understand the question.
3      Q      Okay. I'll withdraw it.
4          Can you explain, generally, what a
5  dispensing fee is?
6          MR. HONIK: Objection, asked and
7  answered.
8          THE WITNESS: Like, seven times, but
9  who's counting?
10          So a dispensing fee is a fee that is
11  charged to consumers and to third-party payors
12  for the dispensing of a prescription at the
13  point of sale.
14  BY MS. KAPKE:
15      Q      Who do you believe pays the dispensing
16  fee?
17      A      Well, I'll tell you that I went to the
18  pharmacy earlier this week, and I paid the
19  dispensing fee. So usually for oral drugs,
20  consumers at the point of sale pay dispensing fees
21  if they --
22          THE THE COURT REPORTER: If they what?
23          THE WITNESS: If they are required to.
24  If they have insurance that covers those
25  dispensing fees, insurers will pay for those

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1  dispensing fees. It depends on the
2  arrangement.
3  BY MS. KAPKE:
4  Q    What pharmacy do you -- did you use?
5  A    CVS. They're my favorite.
6  Q    Who determines what the dispensing fee
7  is?
8  A    I don't know. I'm assuming the
9  pharmacy itself, but I don't know.
10  Q    Is it negotiated over time?
11  MR. HONIK: Object to form.
12  THE WITNESS: I don't know.
13  BY MS. KAPKE:
14  Q    How much do you think a dispensing fee
15  typically amounts to?
16  A    For an oral generic drug, it can be on
17  the order of cents or a dollar. Usually, it's
18  nominal, but it really depends.
19  Q    In terms of your profit calculations,
20  did the cost of the ingredients factor in in any
21  way?
22  MR. HONIK: Object to the form, asked
23  and answered.
24  THE WITNESS: Again, I have defined
25  the cost related to the dispensing fee.

Page 99

1  Dispensing fees, as I understand them, do not
2  relate to the cost of the ingredient, but might
3  relate to whether the product is generic or
4  branded or the formulation of the product.
5  Because, again, there's labor costs associated
6  with that dispensing fee, and some drugs
7  require more labor costs and more capital
8  to -- to deal with them.
9  BY MS. KAPKE:
10  Q    You mentioned a couple of times how
11  products are commonly repackaged and relabeled by
12  private label distributors and retailers. Are you
13  making any allegations in this case that CVS, or any
14  retail pharmacy defendant in this case, repackaged
15  or relabeled valsartan?
16  MR. HONIK: Object to the form.
17  THE WITNESS: I don't know.
18  MS. KAPKE: I am, for purposes of
19  time, am going to pass the witness.
20  MR. HONIK: Thank you.
21  THE WITNESS: Thank you.
22  I think now is a good time for me to
23  take a break then, please.
24  MR. HONIK: Okay. Five minutes
25  enough?

Page 100

1  THE WITNESS: That's great. Thank
2  you.
3  THE VIDEOGRAPHER: The time is 11:41.
4  This ends Media Number 2. We're going off the
5  record.
6  (Whereupon, a short break was taken.)
7  MR. HONIK: Plaintiffs are back at
8  11:46 and are ready to proceed.
9  THE VIDEOGRAPHER: The time is 11:49.
10  This begins Media Unit Number 3. We're back on
11  the record.
12  EXAMINATION BY MR. CAMPBELL:
13  Q    Okay. Good morning, still, Dr. Conti.
14  My name is Dan Campbell. I'm going to ask you some
15  questions about your opinions --
16  THE COURT REPORTER: I'm sorry. You
17  trailed off. You're going to ask questions...
18  BY MR. CAMPBELL:
19  Q    Regarding your opinions about the
20  wholesalers in this case.
21  A    Okay.
22  Q    Can you hear me okay, Dr. Conti?
23  A    Yes.
24  Q    Okay.
25  MR. CAMPBELL: And, Madam Court

Page 101

1  Reporter, can you hear me okay, also?
2  THE COURT REPORTER: You're a little
3  low, but I can hear you.
4  MR. CAMPBELL: Okay. I pulled the
5  microphone as close as I can get it here, so I
6  will do the best I can.
7  BY MR. CAMPBELL:
8  Q    So, Dr. Conti, you talked a lot
9  yesterday about your role as a professor, your
10  coursework, your class work. How much of that
11  coursework, that class work, involves
12  wholesaler-specific issues?
13  A    I have spent some time understanding a
14  wholesaler's role in this industry. I have had the
15  pleasure of working with some folks at Cardinal and
16  at AmerisourceBergen and in multiple contexts.
17  THE THE COURT REPORTER: Did you say
18  -- did you say Americsource?
19  THE WITNESS: AmerisourceBergen.
20  THE COURT REPORTER: Okay.
21  BY MR. CAMPBELL:
22  Q    In what sort of context --
23  A    And Cardinal.
24  Q    Thank you.
25  A    Yeah.

26 (Pages 98 - 101)

CONFIDENTIAL

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    Q    In what context did you work with
2  those folks at Cardinal and AmerisourceBergen?
3    A    Again, just in the normal course of my
4  business, I spend a lot of time trying to understand
5  how this industry works and the role wholesalers has
6  is part of the -- part of the ecosystem.
7    Q    Were you --
8    A    So I can be -- I can be more specific.
9  I've been on -- I've been on panels and conferences.
10  I've been in closed-door meetings, discussing
11  various issues related to reimbursement, financing,
12  organization, regulation, where wholesaler
13  representatives have been there. And I know
14  something about the wholesaler data that -- that
15  wholesalers such as Cardinal and AmerisourceBergen
16  maintain. What else should I tell you?
17        I teach about the role of wholesalers
18  in this ecosystem and have had the pleasure of
19  reviewing shareholder reports of AmerisourceBergen,
20  Cardinal and other public wholesalers operating in
21  the U.S. market.
22    Q    And so you mentioned that earlier this
23  morning. Those are the public finance reports that
24  you reviewed either last night or this morning?
25    A    No, I mean -- so, again, I'm talking

**Page 103**

1  generally. So part of my course that I teach on
2  Strategy in the Pharmaceutical Industry requires
3  that my students do shareholder report analysis.
4  And we focus both on pharmaceutical manufacturers,
5  but also other entities that are important in the
6  supply chain, which include the wholesalers and also
7  include some of the retailers that we've talked
8  about.
9        There are a handful of shareholder
10  reports that I looked at over the past couple of
11  days that include Mylan, Teva -- I think maybe one
12  more of the defendant manufacturers. And I
13  certainly looked over gross revenues of the retailer
14  pharmacies as well.
15    Q    Do you remember any specific
16  individuals at Cardinal or AmerisourceBergen at any
17  of those conferences or panels when you were there
18  with them?
19    A    Not off the top of my head. I am in
20  email correspondence with a number of former
21  executives working on some work related to private
22  labeling activities for some drugs that went into
23  short supply, but not ones that are related in this
24  matter. I'm more than happy to tell you who those
25  are. I just don't have them off the top of my head.

**Page 104**

1    Q    Okay. All right. We may follow up
2  with your counsel on that.
3    A    Sure.
4    Q    Have you -- you mentioned earlier
5  today a study that you did, I think when you were a
6  professor at Chicago, involving Walgreens and data
7  that you were working with from -- from Walgreens.
8  Do you remember that discussion?
9    A    Yes.
10    Q    Okay. Have you ever done any sort of
11  similar study with the wholesaler or with wholesaler
12  data like the Walgreens study?
13    A    I have -- so, I have never published
14  work in --
15        THE THE COURT REPORTER: I'm sorry. I
16  have never published working...
17        THE WITNESS: Work in collaboration
18  with the wholesalers who are members in this
19  matter. I have looked at wholesaler data where
20  the -- it was shared with me at a screen share.
21  BY MR. CAMPBELL:
22    Q    What sort of wholesale data was shared
23  with you on a screen share?
24    A    Transaction data for specific drugs.
25    Q    Related to the drugs at-issue in this

**Page 105**

1  case?
2    A    No.
3    Q    And do you remember the components of
4  the transaction data that were shared with you?
5    A    Yeah. There were drug names, units
6  and --
7        THE COURT REPORTER: And...
8        THE WITNESS: Paid amounts.
9        And there were also, I think,
10  manufacturer names as well. But in this
11  specific context, we were -- we were actually
12  looking at the differences in --
13        THE THE COURT REPORTER: I'm sorry.
14  Somebody is shuffling papers.
15        We were looking at the differences
16  in...
17        THE WITNESS: We were looking at
18  transactions -- I'm sorry. There's a lot of
19  background noise. I hear it too.
20        There's -- there were transactions
21  related to manufacturers and -- for specific
22  drugs. And then the relabeling of certain
23  product by the wholesaler distributors for
24  certain types of product.
25

27 (Pages 102 - 105)

BY MR. CAMPBELL:

1   BY MR. CAMPBELL:
2       Q      Were there any confidentiality
3   agreements related to that data that you were shown?
4       A      I -- in at least one interaction, I
5   did sign a confidentiality agreement.  But it wasn't
6   for any of the wholesalers that are named in this.
7       Q      You said that was a screen share.  So
8   did you take any documents back with you?  Do you
9   have any documents on your computer or on your desk
10  or anything like that?
11      A      No.  I wish, but no.  Yeah.
12      Q      And was it that experience and looking
13  at that data that informed your opinions here about
14  the damages calculation as to wholesalers?
15      A      Well, we talked about this yesterday,
16  that -- I mean, I've spent every day for the past
17  20 years thinking about how this -- how this system
18  works, and specifically how prescription drugs go
19  from base ingredients to -- to API to fill and
20  finish, manufacturing, you know, through the supply
21  chain, which includes distributers and then,
22  ultimately, to reach our pharmacies or to hospitals
23  or to medical groups and then, finally, to be
24  infused, injected or dispensed to consumers.
25             Certainly, the role of wholesalers is

1   a very important one in this field, and one that I'm
2   involved -- I routinely understand and -- and am
3   thinking about in -- in my academic roles.  So
4   therefore, by definition, it informs how I think
5   about their role in this case.  But...
6       Q      Got you.
7       A      I actually haven't spent that much
8   time writing about distributors and wholesalers, in
9   part because the data is all --
10             THE COURT REPORTER:  The what?
11             THE WITNESS:  The data is opaque.
12      It's not normally what we -- I have access to
13      in my -- in the course of my daily research --
14      research.
15  BY MR. CAMPBELL:
16      Q      You mentioned yesterday that the
17  report, which is, I think, Exhibit 5, that that
18  report took you, I think you said many months to
19  write.  Do you remember that?
20      A      Yes.
21      Q      Okay.  And we looked at some of the
22  hours yesterday, and let's just say dozens of hours
23  to write your report, right?
24      A      I don't understand your question.  I'm
25  sorry.

1       Q      It took you many hours, also, to write
2   the report, correct?
3       A      Yes.
4       Q      Okay.  All right.  Do you remember how
5   much of that time you actually spent writing the
6   last two pages of the report, which has the formulas
7   for the wholesalers, the proposed formulas?
8       A      Yeah.  I thought a lot about those
9   last two -- those last two pages.
10      Q      Do you know the number of hours you
11  spent on those last two pages?
12      A      No, sorry, not off the top of my head.
13  As I told you, I -- I have been a little bit remiss
14  in getting my time together.  I like to double and
15  triple check it before I submit it, and it's been a
16  busy couple of months.  So I don't know.  I'm sorry.
17      Q      That's all right.
18             And in the records that you do have of
19  the time that you spent on the report, would they
20  indicate which parts of the report you were working
21  on?
22      A      Not really.
23      Q      So will we ever see an invoice, for
24  example, that breaks down which portions of the
25  report you were working on in a given time entry?

1       A      Do you mean, like, Section 1, 2 and 3?
2       Q      Yes, or -- or by page number?
3       A      I haven't apportioned to that.  That's
4   just not how I work, so no.
5       Q      Okay.  If you --
6             MR. CAMPBELL:  If Mr. or Ms. Tech
7       could pull up the report, I think it's
8       Exhibit 5.  And, Dr. Conti, I'm going to refer
9       you to Attachment B to start with, please.
10  BY MR. CAMPBELL:
11      Q      Dr. Conti, let me know when you're at
12  Attachment B.
13      A      Just give me a second.
14      Q      Sure.
15      A      Okay.
16      Q      And I'm going to stay on the first
17  page of Attachment B, so you don't have to worry
18  about flipping pages here.  Do you see the section
19  that's the second section that's called "Case
20  Documents"?
21      A      Yes.
22      Q      All right.  So in this section of case
23  documents, is this a list of all the documents that
24  are -- in this matter, in this case, that you --
25  that you reviewed?

Page 110

1    A    Yes.
2    Q    So there are no documents coming out
3  of this case that you reviewed but did not list?
4    A    Right.  Other than in the course of
5  normal events in my daily life, I know something
6  about all of these -- all of the defendants.
7  Defenses.
8    Q    Right.  Okay.  And so you list here
9  one declaration of Matthew Sample.  Do you see that?
10  It's the second one listed.
11    A    Yes.
12    Q    Do you know who Matthew Sample is an
13  employee of?
14    A    I don't, not off the top of my head.
15  Oh, I do, actually.  It's in Footnote 76, defendant
16  wholesaler AmerisourceBergen Corporation represented
17  that producing such data would be --
18       THE COURT REPORTER:  I'm sorry,
19  Doctor.  Producing such data would be...
20       THE WITNESS:  Sorry.  Footnote 76, if
21  we can go back to my main report.
22  BY MR. CAMPBELL:
23    Q    And, Dr. Conti, you don't need to read
24  it.  I just wanted to ask you a simple question.
25  Did you review any other -- or any declarations from

Page 111

1  any other wholesaler representatives --
2    A    Not -- not off the top --
3    Q    -- in this case?
4    A    Not off the top of my head.
5    Q    And did you review any documents that
6  were produced by either Cardinal Health or McKesson
7  or AmerisourceBergen?
8    A    No.
9    Q    Did you review any deposition
10  testimony from any representatives of
11  Cardinal Health, McKesson or AmerisourceBergen?
12    A    No.
13    Q    And a little bit further down, I
14  believe the first page of Attachment B -- I'm
15  sorry.  I misspoke earlier when I said we were going
16  to stick on Page 1 of the Attachment B.
17       If you can please go to Page 4 of
18  Attachment B.  Do you see Page 4 here, Dr. Conti?
19  It has a section called "Electronic Data"?
20    A    I see that.
21    Q    And it goes over Page 5 for several
22  pages after that, correct?
23    A    Correct.
24    Q    I just want to confirm you did not
25  review any electronic data from either

Page 112

1  Cardinal Health, McKesson or AmerisourceBergen in
2  this case, correct?
3    A    Correct.
4    Q    Did you ask to see any electronic data
5  from any of them?
6    A    Yes.
7    Q    All right.  And so who did you ask?
8    A    Counsel.
9    Q    What were you told?
10       MR. HONIK:  Let me note my -- note my
11  objection.  It invades the attorney work
12  product and other privileges.
13       But without waiver of that objection,
14  she may answer.
15       THE WITNESS:  That there were -- that
16  there was no --
17       THE THE COURT REPORTER:  That there
18  was no...
19       THE WITNESS:  Data produced.
20  BY MR. CAMPBELL:
21    Q    Let me refer you back in your report
22  to Paragraph 3, early on in your report --
23       MR. CAMPBELL:  If the tech can get
24  back to that area, please.
25

Page 113

1  BY MR. CAMPBELL:
2    Q    And I just want to ask you, Dr. Conti,
3  while -- I'll set it up for you while the tech is
4  going back.  I want to ask you about some of the
5  assumptions regarding wholesalers specifically.
6  Okay?
7    A    Okay.
8    Q    So you say in Paragraph 3 that,
9  "Plaintiffs' counsel have also asked me to assume
10  that a subset of these at-issue valsartan products
11  were sold by defendants AmerisourceBergen Co,
12  Cardinal Health and McKesson Co, collectively
13  referred to as the defendant wholesalers."
14       Do you see that Paragraph 3?
15    A    I do.
16    Q    What do you mean in here when you
17  wrote the word "subset"?
18    A    That some of the at-issue products
19  were sold to -- in the...
20       THE THE COURT REPORTER:  I'm sorry.
21  In the...
22       THE WITNESS:  I said the at-issue
23  drugs were sold by the manufacturers to these
24  specific wholesalers.  There were other --
25  there are other wholesalers, obviously,

29 (Pages 110 - 113)

Page 114

1    involved in the U.S. market. And at a given
2    period in time, manufacturers are going to sell
3    specific drugs to specific wholesalers.
4        That's what I mean.
5    BY MR. CAMPBELL:
6        Q    And then there were also transactions
7    where the manufacturer sold directly to the retail
8    pharmacies?
9        A    Correct.
10        Q    Were you asked to assume any
11    particular percentage of this subset that were sold
12    through the wholesalers?
13        A    I was -- I was not, and that's because
14    during the at-issue time period, 2012 through 2018,
15    there was very significant asymmetric information.
16    And so the contamination of the products was
17    not -- was known by the manufacturers, but they were
18    not known by other members of the supply chain.
19        THE THE COURT REPORTER: Of the...
20        THE WITNESS: Supply chain.
21    BY MR. CAMPBELL:
22        Q    Were you told to -- in this case, in
23    rendering your opinions in this declaration, were
24    you told to assume anything about the wholesalers'
25    conduct?

Page 115

1        A    Other than what was laid out in the
2    complaint and listed in my Paragraphs 1, 2 and 3.
3        Q    So you are not offering any opinions
4    yourself in this declaration about the wholesalers'
5    conduct in this case, correct?
6        MR. HONIK: Object to the form.
7        You can answer.
8        THE WITNESS: Correct. Correct. This
9    is...
10        THE THE COURT REPORTER: Can you
11    repeat that, please?
12        THE WITNESS: Sure.
13        It's on instruction or for -- it's on
14    instruction by counsel.
15    BY MR. CAMPBELL:
16        Q    You're not offering any opinions
17    whether wholesalers are liable for unjust
18    enrichment?
19        A    I'm not a lawyer, sir, so no. I was
20    asked to assume certain details for the purposes of
21    my report.
22        Q    So your opinions, with respect to the
23    wholesalers in this case, is limited to essentially
24    proposing a formula for calculating unjust
25    enrichment damages?

Page 116

1        MR. HONIK: Object to the form.
2        THE WITNESS: Correct. I don't -- I
3    don't actually mechanically do any
4    calculations. All I'm doing is laying out how
5    I would think about calculating unjust
6    enrichment in this matter for these specific
7    drugs at-issue in this specific period.
8    BY MR. CAMPBELL:
9        Q    In any of the prior cases where you
10    have been an expert, have you similarly attempted to
11    calculate unjust enrichment damages for wholesalers?
12        A    Not that I can recall off the top of
13    my head.
14        MR. CAMPBELL: If I could please ask
15    the tech to go to Paragraph 50 of your report.
16    BY MR. CAMPBELL:
17        Q    And, Dr. Conti, please just let me
18    know when you're there.
19        A    Okay.
20        Q    And I actually want to refer you to
21    the second sentence in Paragraph 50, "Given that the
22    at-issue valsartan products are small molecule
23    orally formulated generic drugs, the majority of
24    purchases are made by pharmacies from
25    wholesalers/distributors."

Page 117

1        Do you see that sentence?
2        A    Yes.
3        Q    Why does the fact, as you write here,
4    that the at-issue valsartan products are small
5    molecule orally formulated generic drugs -- why does
6    that mean that the majority of purchases were made
7    by pharmacies from wholesalers and distributors?
8        A    Yeah. So the -- for me, the context
9    is important. So the supply chain for specialty
10    drugs that are infused or injected can be different.
11    And so those products can be handled by different
12    distributors or group purchasing organizations.
13    Usually, they have different storage requirements,
14    and their end consumer is different too. It's
15    usually hospitals or outpatient clinics, maybe some
16    specialty pharmacies. It's just a -- it's just a
17    different supply chain.
18        The orally formulated generic drugs
19    are the ones that are really are at-issue in this
20    matter, and here, they are largely going through the
21    distributors, as listed here.
22        Q    And you just said, "largely." And in
23    your report, you say, "majority," but you don't know
24    exactly what the percentage is, right?
25        A    I think in the Deloitte and Touche

Page 118

1  article, I -- I footnote to this paragraph. It has,
2  "A number of distributers handles 92 percent of
3  pharmaceutical sales in the U.S. market." And that
4  is largely related to orals. It's not related to
5  these specialty drugs. If you actually look at the
6  backup of the Deloitte paper, the Deloitte paper
7  also talks about 11 million prescription units being
8  sold each day and handled through the distributers
9  at-issue -- such as these in this case.
10  Q    That article is talking about industry
11  wide, right?
12  A    Industry wide, absolutely.
13  Q    Okay. So for the at-issue valsartan
14  products in this case, you have no idea what the
15  percentage is that were sold through the
16  wholesalers?
17  A    Well, so again, in that same footnote,
18  Footnote 47, the first paragraph, Mylan and Teva in
19  their public reporting talk about total sales going
20  through the -- through distributers. Shareholder
21  reports specifically report those type of sales in
22  aggregate and not for specific drug NDC codes, which
23  is really at-issue here. So we know one thing, but
24  we don't know at the actual NDC batch lot number
25  that we -- we might switch to.

Page 119

1  Q    Okay. So for the at-issue valsartan
2  products here, we don't know what the percentage is
3  that were sold through the wholesaler distributers?
4  A    Right. We just have these industry
5  averages and averages that are specific to the
6  manufacturers, not at the NDC code level.
7  Q    And just to confirm, wholesalers, they
8  don't sell these products into the consumer market,
9  correct?
10  MR. HONIK: Object to the form, it may
11  call for a legal conclusion.
12  THE WITNESS: I'm sorry. What do you
13  mean by that?
14  BY MR. CAMPBELL:
15  Q    I couldn't hear what you said. You
16  didn't know what I meant. So what was your
17  question?
18  A    Can you please ask it again? Thank
19  you.
20  Q    Yes. Yes. Just to confirm,
21  wholesalers do not sell these products directly to
22  patients, correct?
23  A    Okay. So I think what you mean is
24  that, as a general matter, retail pharmacies sell to
25  consumers. Wholesalers occupy a different art of

Page 120

1  the supply chain. Is that correct? Is that what
2  you're asking?
3  Q    Yes, if you could answer that
4  question; is that correct?
5  A    Yes, that is correct.
6  Q    Okay. All right.
7  A    Again, as a general matter.
8  Q    As a general matter. Great.
9  So with respect to its role in the
10  supply chain, wholesalers are not putting the
11  product out into the -- into the consumer market?
12  MR. HONIK: Object to the form, may
13  call for a legal conclusion.
14  You can answer.
15  THE WITNESS: Thank you.
16  So -- well, I mean, I guess -- I mean,
17  they are an important part of the supply chain,
18  and wholesalers do take --
19  THE COURT REPORTER: They do take
20  what?
21  THE WITNESS: Do take title from
22  manufacturers. They hold those drugs in a
23  warehouse, usually, and then hand them off to
24  the resale -- to the -- sorry -- to the retail
25  pharmacies. Or it might be a little bit of an

Page 121

1  accounting mix where they take title, but
2  actually, the manufacturers drop ship directly
3  from their warehouse to the --
4  THE COURT REPORTER: To the what?
5  THE WITNESS: To the retail
6  pharmacies.
7  BY MR. CAMPBELL:
8  Q    And then it's the retail pharmacies
9  that sell to the patients, correct?
10  A    That's my understanding -- well,
11  for -- for products that are sold in the retail
12  class of trade. There are -- there are drugs that
13  are sold to physicians and hospitals or specialty
14  pharmacies -- pharmacies that have a slightly
15  different distribution chain. But that's not what
16  we're -- that's largely not what we're talking about
17  here.
18  Q    These products at-issue in this case,
19  the at-issue valsartan products, were sold by the
20  retail pharmacies to the consumers, to patients?
21  A    Right. So there probably are
22  valsartan that were sold -- there are probably
23  at-issue valsartan products that were sold to
24  hospitals or sold to outpatient clinics for their
25  own stocking to take care of patients. But as a

31 (Pages 118 - 121)

Page 122

1  mechanical matter, my damage estimation is focused
2  on largely the retail class of trade.
3        I can actually see a cross trade in
4  the IQVIA data, but we're largely focused on the
5  retail class of trade.
6    Q    All right.
7        MR. CAMPBELL:  If you can -- if the
8    tech can, please, go to Paragraph 80.
9  BY MR. CAMPBELL:
10   Q    And -- and if you could go there too,
11  Dr. Conti, please.
12   A    Sure.  I'm trying to follow.  Hold on.
13  Okay.
14   Q    All right.  And I'm really just going
15  to focus on this first sentence here at 80 where you
16  wrote, "I have also been asked by plaintiffs'
17  counsel to develop a methodology for calculating
18  defendant wholesaler unjust enrichment damages for
19  the at-issue valsartan products."
20       Do you see that?
21   A    Yes.
22   Q    What is your understanding of unjust
23  enrichment?
24       MR. HONIK:  Note my objection to the
25    extent it calls for a legal opinion.

Page 123

1        THE WITNESS:  Okay.  So, again, I'm
2    not a lawyer.  What I view is that the
3    wholesalers took title of these products and
4    then resold them into the retail class of
5    trade.  And it's the difference between what
6    they acquire the drugs at -- for -- from when
7    they purchase from the manufacturer to what
8    they received from the retailers when they sold
9    it into the market and the delta that is
10   at-issue here.
11       And later on in this section, I'm a
12   little bit more specific about the profit that
13   is made off -- through the wholesalers moving
14   these products from A to B.
15  BY MR. CAMPBELL:
16   Q    Okay.  And we'll get to those formulas
17  in just a couple of minutes, as you probably were
18  expecting.
19       Are you aware, when it comes to unjust
20  enrichment, that there are different elements of
21  proof from one state to another for an unjust
22  enrichment claim?
23   A    I am generally aware of -- that states
24  have different rules for unjust enrichment.
25   Q    And same for the proper measure of

Page 124

1  damages, are you aware that that might vary from
2  state to state, depending on the state law?
3        MR. HONIK:  Note my objection to the
4    extent it calls for a legal opinion.
5        THE WITNESS:  Nothing in the U.S. is
6    easy.  But basically, I would say, yes.  I
7    understand generally that state -- there are
8    state rules related to damage calculations and
9    specifically related to liability and also
10   unjust enrichment.  But, again, I'm not a
11   lawyer.  I understand these as a mechanical
12   issue.
13  BY MR. CAMPBELL:
14   Q    And did your proposed formula for
15  calculating unjust enrichment damages as to
16  wholesalers take into account, in any way, those
17  differences from one state to another?
18       MR. HONIK:  Same objection as
19    previously noted.
20       THE WITNESS:  So I didn't do this -- I
21    didn't have any data.  So I didn't do that at
22    the state level, but I expect if I had the
23    data, this would be limited by state law,
24    according to instructions from counsel for the
25    jury.

Page 125

1        THE COURT REPORTER:  For what?
2        THE WITNESS:  For the jury.  From
3    instruction of counsel, the court or the jury.
4    My -- my method is flexible to accommodate
5    those state-specific rules.
6  BY MR. CAMPBELL:
7    Q    Have you been given any descriptions
8  of those differences in a law from one state to
9  another so far?
10       MR. HONIK:  Note my objection to the
11    extent it may invade the attorney work product
12    privilege and other confidentiality privileges.
13       But with that and without waiver of
14    those objections, I'll allow her to answer.
15       THE WITNESS:  Again, I didn't have any
16    data to do this calculation mechanically, so it
17    wasn't really -- it wasn't a detail that I
18    focused on.
19  BY MR. CAMPBELL:
20   Q    When you say the detail that you were
21  focused on, you mean a difference between one state
22  versus another state and how the damages are
23  calculated for unjust enrichment?
24   A    No.  I mean by that, that I didn't
25  mechanically calculate anything for wholesalers.

32 (Pages 122 - 125)

Page 126

1  And so to the extent that unjust enrichment as
2  applied to the wholesalers in this matter for these
3  at-issue drugs might differ, I didn't do anything
4  with that information because I had nothing to do.
5  I don't have the data to do that based on the state.
6  That's kind of a different part of the calculation
7  even for what I did for retailers or for defendants
8  in the different theories of liability.
9      Q.     Can you tell us now how you would
10 account in you formula for those differences from
11 one state to another, or is that something that you
12 would reserve for later?
13         MR. HONIK:  Note my objection to the
14     extent it calls for a legal conclusion and/or
15     instruction from judge, jury or counsel.
16         You may answer.
17         THE WITNESS:  Thank you.
18         Honestly, I think of it as a
19     mechanical issue and one that I would wait on
20     the instruction of counsel, the court or the
21     jury to -- to do.
22 BY MR. CAMPBELL:
23     Q.     And the formula that you propose for
24 the unjust enrichment damages is essentially
25 profits.  And that's defined as revenues minus cost

Page 127

1  as you have there at the beginning of Paragraph 81,
2  right?
3      A.     Correct.
4      Q.     Why did you decide on that being the
5  formula for unjust enrichment damages?  Where did
6  that come from?
7      A.     Because, again, as I understand it,
8  unjust enrichment is simply the amount of money made
9  off of the transaction for moving drugs from one
10 place to another net of cost.
11     Q.     Did you rely on any written materials
12 that told you that was the proper measure of damages
13 for unjust enrichment?
14     A.     I relied on counsel's instruction and
15 kind of general understanding of what I know of
16 unjust enrichment.
17     Q.     So is counsel's instruction that the
18 proper calculation of damages for unjust enrichment
19 is revenues minus cost?
20         MR. HONIK:  Object to the form.
21         THE WITNESS:  Thank you.
22         I should wait.  Yes.
23 BY MR. CAMPBELL:
24     Q.     If you could -- actually, go back real
25 quick to Paragraph 8 in the -- in your report,

Page 128

1  please.  And I just want to clarify one thing.
2         You see in this Paragraph 8,
3  "Consequently, the appropriate measure of damages in
4  this matter is the total amount paid by each
5  plaintiff for the at-issue valsartan products
6  manufactured and/or sold by the defendants."
7         Do you see that paragraph?
8      A.     Yes.
9      Q.     That's not referring to the proper
10 measure of damages for wholesalers, right?
11     A.     Under the theory of unjust enrichment.
12         THE COURT REPORTER:  I'm sorry.
13         THE WITNESS:  Under the theory of
14     unjust enrichment, correct.
15 BY MR. CAMPBELL:
16     Q.     So this -- what's described in
17 Paragraph 8 refers to other defendants, not
18 wholesalers?
19     A.     That is correct.
20         MR. HONIK:  Object to form.
21         I think -- Jamie, did you get the
22     answer?
23         THE COURT REPORTER:  Yes.
24         MR. HONIK:  Thank you.
25

Page 129

1  BY MR. CAMPBELL:
2      Q.     Okay.  Back to your calculation of
3  unjust enrichment damages, so we talked a lot
4  yesterday about the value of the product or about
5  the lack of value of the product in -- in your
6  opinion.  I don't want to get into any of that.  I
7  just want to ask you one simple question about the value
8  of the product.
9         Do you base your calculation of unjust
10 enrichment damages as to wholesalers on the basic
11 premise that the products are worthless?
12         THE COURT REPORTER:  That the profits
13     are worthless?
14         MR. CAMPBELL:  That the products.
15         THE COURT REPORTER:  Thank you.
16         THE WITNESS:  I am -- so in the
17     wholesaler context, really, all that's at play
18     here is the wholesalers moved at-issue products
19     from one place to another.  And therefore, they
20     profited off of that movement.
21         The full value of the products that
22     they moved from one place to another is related
23     to the price that they paid for them over every
24     unit that they paid for them minus their cost
25     of acquiring, storing, other --

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1    THE COURT REPORTER: Other...
2    THE WITNESS: Other offsets that they
3  may -- may have experienced.
4    So, really, it's just the full price
5  that the wholesalers acquired those products at
6  minus all of their costs that -- that is -- is
7  related to my calculation here.
8  BY MR. CAMPBELL:
9    Q    And so your calculation as to the
10  wholesalers for unjust enrichment damages, it
11  doesn't matter if the products are -- are worthless
12  or not?
13    MR. HONIK: Object to the form.
14    THE WITNESS: For my purposes, I am --
15  I was asked to -- so for my purposes, it's just
16  the amount of money that the wholesalers made
17  off moving these products from one place to
18  another.
19  BY MR. CAMPBELL:
20    Q    Okay.
21    MR. CAMPBELL: And if the tech could
22  go back to Paragraph 80, and next -- next page
23  on Paragraph 80. Okay.
24  BY MR. CAMPBELL:
25    Q    You see the sentence that starts off

Page 131

1  with, "Like the defendant retailers"? We don't have
2  the first couple of words, but the first couple
3  words highlighted here are "like the"?
4    A    Yes.
5    Q    Okay. "Like the defendant retailers,
6  these companies profited from the distribution of
7  the at-issue valsartan products to pharmacies and
8  other entities."
9    On what do you base that statement
10  there, that these companies profited?
11    A    Right. So this is just the theory of
12  unjust enrichment that as -- so just kind of as a
13  general matter, we know that wholesalers move
14  drug -- they take title of drugs. And then they
15  move them to other purchasers, or they sell them to
16  other purchasers. So it's just the difference
17  between the -- the amount they sold and the amount
18  that they gained that is of issue here.
19    Q    Okay. So this is the theory. It's
20  not based on any actual records or documents that
21  you've seen so far?
22    MR. HONIK: Object to the form of the
23  question.
24    THE COURT REPORTER: I'm sorry, I
25  didn't hear an answer.

Page 132

1    THE WITNESS: I said correct. I said
2  correct. And these are -- I'm sorry. My
3  computer wants to reboot. Correct.
4    I mean, these are major Fortune 500 or
5  Fortune 1,000 companies. They have -- as you
6  know, AmerisourceBergen and Cardinal and others
7  have revenues, annual revenues, on the order of
8  Costco. And these are huge public -- publicly
9  traded companies. They must profit off their
10  business, or they wouldn't report revenue that
11  looks like that. But I have not been shown any
12  data to assess exactly how much they -- these
13  wholesalers made off of moving from point A to
14  point B, the specific issues in this matter.
15    THE COURT REPORTER: In what?
16    THE WITNESS: The specific drugs in
17  this matter.
18    THE VIDEOGRAPHER: Counsel, I'm
19  getting a lot of background noise. If we can
20  just try to reduce that as best as we can.
21  Thank you.
22  BY MR. CAMPBELL:
23    Q    All right. And in the next couple of
24  sentences in Paragraph 80, you talk about,
25  "Wholesalers did not manufacture the products, nor

Page 133

1  did they sell the products to consumers and TPPs."
2    And then you say, "Consequently, the
3  data that could be used to calculate unjust
4  enrichment damages for defendant wholesalers differs
5  from that of the defendant retailers described
6  above."
7    Do you see that sentence?
8    A    Yes, that's what it says.
9    Q    Okay. In what ways does the data that
10  could be used to calculate unjust enrichment damages
11  for wholesalers differ from the retailers?
12    A    So, again, the -- the wholesalers
13  purchased these products at one price and -- in
14  aggregate and then sell them at another. It's just
15  the delta that matters.
16    And the -- the purchase price is going
17  to be reported in data just like -- and the products
18  themselves, the name of the manufacturers, the lot,
19  the batch, the NDC code, all of that should be
20  preserved in this data. But the actual cost of
21  sales will be -- will be different.
22    Q    And have you ever seen that sort of
23  data for -- for wholesalers other than -- I think
24  you mentioned the screen share earlier in the call.
25  But have you otherwise ever seen that sort of data

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1  for wholesalers?
2      A.    Yeah.  I have seen that data,
3  and -- under Track and Trace and earlier versions of
4  Track and Trace that are maintained by the states
5  through the EPedigree system.  My understanding is
6  that wholesalers keep track of that data down to the
7  unit penny.
8      Q.    And you're referring to the cost of
9  the -- you said the cost of the sales earlier.  So
10  you mean the sale to the retailer?
11      A.    Yeah.  And -- and the price that the
12  wholesalers are paying to the manufacturers as well.
13  So they -- they know how much they're purchasing and
14  at what price for what.  And they know how much
15  they're selling for, by whom, for what, down to the
16  retailer level as well.
17      Q.    And I just want to make sure I
18  understand.  On what is that based, your
19  understanding that they -- they know all those
20  things?
21      A.    Again -- well, so under Track and
22  Trace, they are required -- wholesalers are required
23  to keep that information at that level of this
24  aggregation, at the NDC manufacturer level and the
25  unit level.  And then states, on top of Track and

Page 135

1  Trace, have EPedigree systems that require all
2  members of the supply chain in the United States to
3  maintain units sold or purchased, which types of
4  drugs by which types of manufacturers to ensure that
5  they are not counterfeit.
6      Q.    Have you ever had any specific
7  conversations with someone who works for a
8  wholesaler about the input needed to calculate
9  profits on any given transaction or -- or drug?
10      A.    I mean -- this field is awash in data,
11  and I am aware that wholesalers are keeping track of
12  their unit costs and their unit --
13          THE COURT REPORTER:  Their unit what?
14          THE WITNESS:  Or their revenues
15      for -- for each transaction that they are going
16      through every single day.  Again, 11 million
17      prescriptions units a day are going through the
18      wholesalers in the U.S. market.
19  BY MR. CAMPBELL:
20      Q.    Have you ever had any specific
21  conversations with any of the wholesalers in this
22  case, employees of the wholesalers in this case,
23  that they are keeping that sort of data regarding
24  the at-issue valsartan?
25      A.    Again, any product that is allowed to

Page 136

1  enter the retail class of trade in the U.S. has a
2  barcode and is -- is traced through the entire
3  system.  So by definition, if the manufacturers are
4  entering these products into the retail class of
5  trade, then downstream members of the supply chain,
6  whether it be wholesalers or retailers, are required
7  to keep track of that product at the barcode level,
8  which will contain information about the product,
9  the -- the unit and -- and the manufacturers.
10      Q.    What about elements of price?  Does it
11  track the elements of price?
12      A.    What do you mean by "elements of
13  price"?
14      Q.    Well, the amounts received.  Let's
15  start, first of all, with the revenues.
16      A.    Sure.
17      Q.    Okay?  Which is -- let's go to that
18  part of your formula about the revenues, and that's
19  in Paragraph 82.
20      A.    Yeah.
21      Q.    Okay.
22      A.    I have that.
23      Q.    All right.  And it -- it says
24  wholesaler revenue can be expressed in Formula 10 as
25  Qdt multiplied by PPUdt.  Do you see that?

Page 137

1      A.    Yes.
2      Q.    Did you consider any other inputs in
3  determining revenue here for -- with respect to
4  wholesalers?
5      A.    Like what?
6      Q.    Well, that's what I'm asking you.  I'm
7  asking you.
8      A.    I don't -- I don't understand.
9      Q.    Sure.
10          You have QDt --
11      A.    Right.
12      Q.    -- and PPUdt as the two inputs that
13  you multiply together to get revenue, right?
14      A.    Right.
15      Q.    Okay.  Did you consider any other
16  things to multiply or include in this part of the
17  formula that you decided should not be included?
18      A.    This is a general formula.  So it is
19  inclusive of the aggregate units and the transaction
20  prices for these units.  Transaction prices could
21  be -- are probably expressed in aggregate over
22  products.  And there may be a difference between
23  gross prices paid and net prices paid.  There might
24  be offsets, return of goods, et cetera, that
25  are -- that are part of either the revenue or part

35 (Pages 134 - 137)

Page 138

1 of the cost.
2 Q And how does that factor into your
3 formula here?
4 A It's inclusive.
5 Q In what way?
6 A And you can -- well, you can see
7 in -- in Footnote 75, when calculating profit,
8 offset may be removed from gross profit, so the jury
9 or court find these to be reasonable deductions.
10 These additional costs can be easily included.
11 THE COURT REPORTER: Can be easily...
12 THE WITNESS: Included.
13 BY MR. CAMPBELL:
14 Q So your Paragraph 75 there, is that
15 referring to -- for example, if we start with inputs
16 to revenue, does that include rebates?
17 A It could. It could, yes. So there's
18 a gross price, and then there's returned goods.
19 There's rebates that might be paid on aggregate
20 purchased products or sold products. All of those
21 would be considered, not gross revenue or not gross
22 prices, but net prices and could be a part of those
23 calculations if counsel or the court or the jury
24 find that they should be included.
25 Q Do you have an opinion on whether they

Page 139

1 should be included?
2 MR. HONIK: Note my objection to the
3 extent it calls for a legal conclusion.
4 THE WITNESS: My method and the
5 formula that's listed here is -- is general.
6 BY MR. CAMPBELL:
7 Q And I'm not asking you in a legal
8 opinion. I'm asking you as the expert health
9 economist here. If you were calculating profits for
10 a particular set of drugs for a wholesaler, would
11 you factor in rebates?
12 MR. HONIK: Note my objection. The
13 ultimate answer to the question requires,
14 respectfully, a legal determination, one that's
15 beyond the scope.
16 But with that, she can answer the
17 question.
18 THE WITNESS: Thank you.
19 So, again, I'm not a lawyer. I'm an
20 economist. I would say if I didn't think that
21 they -- that those factors should be
22 considered, I would not have dropped the
23 footnote that I did. We were just talking
24 about Footnote 75. And, again, the method that
25 is proposed is -- is flexible to accommodate

Page 140

1 those inclusions if the court or the jury or
2 counsel determined they should be included.
3 BY MR. CAMPBELL:
4 Q Hypothetically, if a wholesaler came
5 to you and asked you to help them calculate profits
6 on a particular set of drugs outside the context of
7 any litigation, would you include rebates in that
8 calculation of profits?
9 MR. HONIK: Note my objection,
10 improper hypothetical.
11 THE WITNESS: Okay. I think we've all
12 established how much I love hypothetical
13 questions, and I think the answer to this one
14 is just, it depends. It depends on the
15 context.
16 BY MR. CAMPBELL:
17 Q So in some context, you would include
18 rebates?
19 THE COURT REPORTER: I'm sorry, can
20 you repeat that question?
21 MR. CAMPBELL: Sure.
22 Q In some context, you would include
23 rebates in the calculation of revenues?
24 THE COURT REPORTER: I'm sorry, can
25 MR. HONIK: Object to the form of the

Page 141

1 question.
2 THE WITNESS: And you mean profits?
3 BY MR. CAMPBELL:
4 Q Profits, sure.
5 A Possibly.
6 Q And with respect to rebates, do you
7 understand that different customers have different
8 rebate structures? I should say different
9 wholesaler customers have different rebate
10 structures?
11 A What do you mean by "customers"?
12 Q Sure.
13 So one particular customer for a
14 wholesaler might have a rebate structure that has
15 these numbers or these incentives. And another
16 customer for that same wholesaler might have a
17 totally different rebate structure.
18 MR. HONIK: Object to the form.
19 THE WITNESS: I think I'm asking a
20 much more basic question, which is who is the
21 customer.
22 BY MR. CAMPBELL:
23 Q It doesn't matter. Let's say --
24 A Customer of whom?
25 THE COURT REPORTER: I'm sorry?

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1      MR. CAMPBELL: I'm sorry.
2      THE WITNESS: Let's start from the
3   beginning. Customer of whom?
4   BY MR. CAMPBELL:
5   Q    Yeah. A wholesaler customer.
6   A    Okay. So is that the manufacturer?
7   So remember, wholesalers operate a two-sided market.
8   So they are -- they have manufacturers that they are
9   purchasing products from. That is one type of
10  customer.
11      And then they are selling downstream
12  to other customers that are retail pharmacies and
13  other members of the supply chain. So that's
14  another type of customer. So I'm asking you which
15  customer.
16  Q    Okay. So now I'm in the category of
17  revenues, so I'm talking about the downstream
18  customers.
19  A    Okay. Great.
20  Q    Okay. The -- the retail pharmacies,
21  pick any two that you want to for the wholesalers.
22  Do you understand that different customers,
23  different retail or pharmacy customers, might have
24  different rebate structures?
25  A    So as a general matter, I understand

Page 143

1   that these contracts may include rebates that are
2   generally paid in aggregate and are contracted to an
3   advance of any specific transaction. So they're
4   contracts that cover a period prospectively.
5      If -- whether they differ materially
6   from each other, I -- I think that they may differ
7   in time. In other words, the contracting that
8   occurs in 2020 as a general rule looks different
9   than the contracting that might have occurred in
10  2012. But if a differ -- I mean, AmerisourceBergen
11  and Cardinal, they're really major players in this
12  market. And they have significant market power. So
13  I'm assuming that they have a pretty uniform
14  contract that they are -- they have for signing with
15  their downstream customers, the retailers.
16  Q    So your assumption is that, for
17  example, for Cardinal Health, its contracts are
18  going to look the same with respect to rebates with
19  its retailer customers, no matter who the retailer
20  costumer is?
21      MR. HONIK: Object to the form.
22  That's not her testimony.
23      THE WITNESS: No -- yeah, I think
24  you're mischaracterizing my testimony. What
25  I'm saying is that AmerisourceBergen, Cardinal,

Page 144

1   the other wholesalers at-issue here, they are
2   massive corporations. Again, they have annual
3   revenues larger than Costco. So they have --
4   they hold very significant market power over
5   their downstream retail customers.
6      So in that setting, as a general
7   matter, the entity that holds the more
8   significant market power gets to dictate the
9   terms of the contract. And so I'm assuming
10  that AmerisourceBergen dictates the terms of
11  the contract, and I expect those terms of the
12  contract in a given period of time to not
13  differ very significantly between retail
14  customer or retail pharmacy -- between retail
15  pharmacy and the retail pharmacy.
16      Might there be slight deviations
17  between them? Sure. But the general content
18  is going to be driven by the entity that holds
19  the market power.
20  BY MR. CAMPBELL:
21  Q    So you agree that --
22  A    Which is the wholesaler.
23  Q    So you agree that there might be
24  slight variations in, for example, the amount of
25  rebates given to one retailer versus another?

Page 145

1   A    If they exist at all, right? I mean,
2   there could be just cost contracts all together. It
3   probably depends on the year and the products.
4   Q    And beyond just rebates, there might
5   be other terms in the contracts that might differ
6   from one retailer customer to another?
7      MR. HONIK: Object to the form, calls
8   for a legal conclusion.
9      THE WITNESS: Again, I haven't really
10  thought about that in this matter that much.
11  What I would say is, the contracts probably
12  dictate a variety of different terms that are
13  general -- that are general, amount sold at
14  prices over which types of products in a given
15  time period, what to do about charge backs or
16  spoiled goods, what to do about whether there's
17  aggregate volume discounts for purchasing a
18  very large quantity of their certain products.
19      There might also be wholesale rebates
20  for -- in aggregate after the products have
21  already been sold into the supply chain and
22  maybe even to customers that are freed up
23  later. Are all likely part of the contracts
24  and might differ over time.
25

37 (Pages 142 - 145)

Page 146

1  BY MR. CAMPBELL:
2  Q  Did you review any wholesaler and
3  retailer contracts produced in this litigation?
4  A  No, not in this matter, but I have
5  seen contracts between wholesalers and retail
6  pharmacies in the course of business.
7  Q  Any related to the products at-issue
8  in this litigation?
9  A  No. But, again, these are
10  really -- these are, you know, cheap generic drugs.
11  The -- and so I don't expect them to differ that
12  much or to be special in any way. Where I have seen
13  carve out or special considerations are for products
14  that have very special types of handling or shelf
15  life.
16  Q  And going to your formula for cost,
17  which is at the bottom of Page 33, it's Formula 11.
18  Well, one thing I wanted to --
19  A  Hold on. Hold on. Let me just get
20  there.
21  Q  One thing before I continue on that,
22  one of the elements of your formulas is -- is the
23  concept of unit, correct?
24  A  Yes.
25  Q  All right. What is your definition

Page 147

1  for -- for unit here in this formula for
2  wholesalers?
3  A  Yeah, it's -- it's quantity. It's
4  quantity, and usually at the wholesaler level,
5  they'll be -- it will be bottles or packages of
6  pills. But it might also be aggregated over larger
7  units, so, like, multiple pill packs or multiple
8  boxes of products.
9  Q  So a unit can be a different size,
10  basically?
11  A  Units can be different sizes, and the
12  size and the aggregate amounts contained in those
13  units are things that the wholesaler knows and keeps
14  track of. It's part of the requirements of Track
15  and Trace and also the EPedigree system that I
16  mentioned earlier.
17  Q  Does your formula account for the
18  differences in sizes between units?
19  A  Yes. And if I -- again, this
20  is -- this is a theoretical exercise. I have no
21  data. But I tend to be very anal about units sizes,
22  and so this would be done at a unit that may -- at
23  the most disaggregated unit that was appropriate.
24  And usually units for cost would match the units for
25  revenues, if I was doing this with data.

Page 148

1  Q  Okay. So let me go to your formula
2  for cost. For the formula for cost, Formula 11, I
3  guess it is. It continues on to the top of the next
4  page. In this part of your formula for cost, did
5  you consider including charge backs?
6  A  Again, this is what I mean by,
7  in -- in that Footnote 75, that there could be
8  offsets to profit that could be considered, either
9  in the cost side or in the revenue side.
10  I think I have already mentioned
11  charge backs as being an offset in the -- in our
12  earlier conversation. They may be related here or
13  important.
14  Q  And you would say the same thing for
15  rebates?
16  A  Again, I think of volume discounted as
17  being a more relevant term, but there might also be
18  rebates there.
19  Q  You mentioned discounts. You're
20  aware --
21  A  Wait a minute. I'm sorry. Just a
22  minute. Just to finish my thought.
23  Again, I didn't do this mechanically.
24  I didn't have any data to do that, and so my method
25  that's being proposed here is general. And it's

Page 149

1  really a different phase of the case, either upon
2  the instruction of counsel and upon of the
3  instruction from the court or jury, that those type
4  of offsets, if they exist, either for cost or for
5  revenue.
6  Q  But you would defer to the court or
7  the jury to decide whether those sorts of things
8  should be included?
9  A  Correct.
10  Q  And with the same -- you mentioned
11  discounts. Would the same thing apply, for example,
12  on the cost side, logistics fees or service fees?
13  A  For unjust enrichment calculations,
14  yes, that -- those also could potentially be
15  accounted for. My method is flexible to account for
16  them, again, upon the instruction of counsel, the
17  court or the jury.
18  Q  What about non-product-related costs,
19  for example, wholesaler overhead or employee costs
20  or IT costs, those sorts of things? Are those also
21  included in the offsets that you would defer to
22  whether the court or the jury says they should be
23  counted?
24  A  I think of all of these things -- so
25  to the extent that they're all related to cost of

38 (Pages 146 - 149)

Page 150

1  goods, they would be related. Usually, I've seen
2  cost of goods break out those type of costs
3  separately.
4      Q      Employee costs, information technology
5  costs, store costs, those sort of things?
6      A      I mean there's -- they're -- they're
7  huge. They're so big. You know, they're their own
8  separate line items. They're -- they have their own
9  department that -- that accrues those costs and
10  accounts for those costs and that keeps track of
11  those costs and reports them to their shareholders.
12  I've -- I've used those as different cost of goods
13  for the unit being moved from one place to another.
14  Usually, that -- in gap accounting, they're
15  accounted for separately.
16      Q      Okay. And then on the other inputs
17  for the costs, of all the things that you said,
18  maybe offsets, and you would defer to the court or
19  the jury to decide whether they're -- they're
20  counted. Those also will, or could, vary from
21  manufacturer to manufacturer depending on the
22  contract, right?
23      A      Okay. So I think we're switching. So
24  I think what you mean is that -- so now the customer
25  is the upstream customer to the wholesaler, right?

Page 151

1  It's the manufacturer?
2      Q      That's right?
3      A      Is that right?
4      Q      Yes.
5      A      Okay. So, again, same general gist,
6  which is wholesalers are method in terms of revenue
7  and in terms of market share relative to each
8  individual pharmaceutical company that they're
9  dealing with. And so for the contract between
10  AmerisourceBergen, for example, and any specific
11  small generic manufacturer, the entity that holds
12  the bargaining power is the wholesaler, not
13  generally the -- the manufacturer.
14      So, again, I expect, just as a manner
15  of management, that the wholesalers here can dictate
16  the terms of purchase to these upstream
17  manufacturers, and they might differ a little bit by
18  time, by type of product, et cetera. But I don't
19  anticipate that within time and for a particular
20  type of product, there -- there to be very
21  significant differences.
22      Q      Did you review any of the contracts
23  between the wholesalers and the manufacturers that
24  were produced in this case?
25      A      No. Those are very closely held

Page 152

1  secrets in my general understanding of -- of how
2  this world works. I -- I wish I could see them, but
3  I haven't seen them in -- in -- in this matter. And
4  I have asked lots of questions of my wholesaler
5  friends about, kind of, generally how these work,
6  but I have never seen a contract.
7      Q      And do you agree that wholesalers
8  typically negotiate with the manufacturers when
9  they're entering into one of these contracts over a
10  bundle of goods and not with any one particular type
11  of product?
12      A      I mean, it depends on who the
13  wholesale -- I mean, it depends on who the
14  manufacturer is, right, and what the products are.
15  But -- so I do not -- I don't know the specifics of
16  the contracts between the wholesaler and the
17  specific manufacturers in this case.
18      Q      Okay. And I think you already
19  mentioned when you talked about the concept of time,
20  but it's your understanding that the contracts, both
21  types of contracts, the contracts between the
22  wholesalers and the manufacturers, and then the
23  wholesalers and the retail pharmacies, those
24  contracts can change over time, correct?
25      A      Yes. Typically, wholesalers would

Page 153

1  contract upstream and downstream prospectively, and
2  those contracts will have a term. So they'll be
3  for -- prospectively, for a year, two years.
4      Q      And the terms may vary from
5  manufacturer to manufacturer or from retail pharmacy
6  to retail pharmacy?
7          MR. HONIK: Objection, asked and
8  answered.
9          THE WITNESS: So, again, you're -- if
10  you're a Fortune 1,000 company, such as these
11  in the U.S., they tend to be pretty routinized,
12  and also it's important to be routinized for
13  the principles of gap reporting for
14  shareholders. Again, these are public
15  companies. So --
16          THE COURT REPORTER: They're to be
17  routinized?
18          THE WITNESS: Routinized.
19          THE COURT REPORTER: Routinized?
20          THE WITNESS: Yes.
21          THE COURT REPORTER: Okay.
22          THE WITNESS: Routinized.
23      But as a general matter, my
24  understanding is that the contracts are for a
25  year or two, both upstream and downstream.

39 (Pages 150 - 153)

Page 154

1     MR. HONIK: And let me -- let me just
2 note that it's the 1 o'clock hour. I think we
3 had a hard stop at this time, but to the extent
4 y'all need more time, I think Dr. Conti will
5 make herself available at 4 p.m.
6     THE WITNESS: Yeah, I apologize. I'm
7 actually late to meet my Dean. That's not a
8 good -- that's not a good look for me.
9     MR. HONIK: Let's go off the record
10 and release the witness for now, and counsel
11 can confer.
12     THE VIDEOGRAPHER: The time is 1 p.m.
13 This ends Media Unit Number 3. We're going off
14 the record.
15     (Whereupon, a break was taken from
16 1 p.m. to 4 p.m.)
17     THE VIDEOGRAPHER: The time is 4:03.
18 This begins Media Unit Number 4. We're back on
19 the record.
20 BY MR. ABRAHAM:
21     Q     Good afternoon, Dr. Conti.
22     A     Good afternoon.
23     Q     My name is Eric Abraham -- Hetero Labs
24 and Hetero Drugs. Can you hear me? You're
25 making --

Page 155

1     A     No, I can't -- you just cut out again.
2     MR. HONIK: You briefly cut out, Eric.
3 Keep going. Let's see how it goes. We'll let
4 you know if it's a problem.
5 BY MR. ABRAHAM:
6     Q     Okay. Let's make sure we get the
7 important point. I represent Hetero Drugs and
8 Hetero Labs, and I'm going to be taking just a few
9 additional questions today. All right?
10     Do you still have your report in front
11 of you?
12     THE WITNESS: I'm sorry. Does
13     everyone hear the background noise? It's very
14     significant. There's -- it's like a computer
15     noise.
16     THE VIDEOGRAPHER: The time is 4:04.
17     We're going off the record.
18     (Whereupon, a discussion was held off
19     the record.)
20     THE VIDEOGRAPHER: The time is 4:05.
21     We're back on the record.
22 BY MR. ABRAHAM:
23     Q     Good afternoon, Dr. Conti. My name is
24 Eric Abraham from law firm Hill Wallack, and I
25 represent Hetero Labs and Hetero Drugs. I have just

Page 156

1 a few questions for you.
2     Do you still have your expert report
3 in front of you?
4     A     I do.
5     Q     Okay. I'd would like to draw your
6 attention, please, to Paragraph 60.
7     A     Just give me one second.
8     Q     It's on Page 23. Do you have it?
9     A     Just one minute.
10     Q     Okay.
11     A     Yeah. Okay. I'm there.
12     Q     Okay. And this -- in this, you
13 express the formula or the methodology for
14 calculating liability damages as -- effectively,
15 quantity as of the date and time for a particular
16 product over time period, times the price for that
17 product over the same time period; is that correct?
18     A     Correct.
19     Q     Okay. And I believe that you
20 testified earlier today that, for Hetero, you
21 confined your damages analysis to prescriptions that
22 were filled between May and August of 2018, correct?
23     A     That's correct.
24     Q     Okay. And that's consistent with
25 Footnote 67 of your report, right?

Page 157

1     A     Just give me one second. I have to
2 double check. Yes, that's correct.
3     Q     Did you do any investigation to
4 determine whether any of Hetero's valsartan was sold
5 within that timeframe, May through August of 2018,
6 that did not contain an alleged nitrosamine
7 impurity?
8     A     I did not, and that's because my
9 analysis is prospective and under the assumption
10 that consumers and third-party payors could not tell
11 whether a product was contaminated or not -- or
12 could not tell whether a product was contaminated or
13 not with the nitrosamines and other potential
14 products.
15     Q     So is it fair to say that you assumed,
16 for purposes of your analysis, that if a
17 prescription was filled within that timeframe, May
18 through August 2018, the valsartan contained the
19 nitrosamine impurity?
20     MR. HONIK: Object to form.
21     THE WITNESS: Right. So, again, and
22 as I write this -- I write in my report, there
23 is fundamental asymmetric information in this
24 market. In other words, while the manufacturer
25 might know the extent of the contamination of

40 (Pages 154 - 157)

CONFIDENTIAL

| Page 158 | Page 160 |
|---|---|
| 1 their products, consumers nor third-party | 1 both end-payor and consumer damages, attributable to |
| 2 payors knew of at the time that they were | 2 the Hetero Labs. Do you see that? |
| 3 making -- | 3 A I do. |
| 4 THE COURT REPORTER: That they were | 4 Q Does that calculation follow the |
| 5 making... | 5 formula that we talked about a few moments ago? It |
| 6 THE WITNESS: At the time that they | 6 was on Paragraph 60 of your report, in other words, |
| 7 were making those purchases. And therefore, | 7 quantity times price? |
| 8 because my perspective is prospective, I'm | 8 A Quantity times price, correct of all |
| 9 doing the analysis from the -- from the | 9 products in that time period that are relevant for |
| 10 perspective that -- of them and their | 10 that specific set of NDCs. |
| 11 asymmetric information. I am counting all | 11 Q Tell me what the quantity of pills you |
| 12 products that were available for sale and | 12 used was for the Hetero Labs end-payor damages |
| 13 ultimately sold in the U.S. market. That does | 13 calculation that resulted in roughly ▮▮▮▮ in |
| 14 not count -- that does not take into account | 14 damages? |
| 15 that there may have been different levels of | 15 A Sure. Sales -- |
| 16 contamination that the manufacturer might have | 16 Q No, just a number. What was the |
| 17 known about their own product. | 17 number? |
| 18 BY MR. ABRAHAM: | 18 A So sales of the product as recorded in |
| 19 Q Okay. So to the extent that there may | 19 the IQVIA data in the relevant time period among |
| 20 have been valsartan manufactured by Hetero without | 20 consumers that were -- among payors -- among |
| 21 the impurity that was still sitting on the shelf at | 21 prescriptions that were dispensed and paid for by |
| 22 the pharmacy in the May to August timeframe, those | 22 third-party payors. |
| 23 sales would be included with -- in your damages | 23 Q I may not have been clear. I would |
| 24 analysis, correct? | 24 like to know what the number was that you used for |
| 25 A Correct. At -- | 25 quantity within your equation. |

| Page 159 | Page 161 |
|---|---|
| 1 Q I -- | 1 A So I don't have it in my report, but |
| 2 A Wait. At this point in time -- | 2 it is easily discernable in the data that I have. |
| 3 Q Right. I have very limited time, | 3 I'm more than happy to provide that to you. |
| 4 Dr. Conti. | 4 Q Please do. I'll ask your counsel to |
| 5 A No. No. No. I understand. I just | 5 provide me with that number. |
| 6 need to -- but it's -- | 6 And what was the price that you used |
| 7 Q You've answered my question. | 7 to calculate the ▮▮▮▮ number for end-payor |
| 8 MR. HONIK: No, she hasn't. She | 8 damages? |
| 9 hasn't finished her answer. | 9 A Same -- same answer, it was the price |
| 10 THE WITNESS: So, again, from my | 10 that was paid by end-payors recorded in IQVIA data, |
| 11 perspective, at this point in time, my | 11 according to the inclusion/exclusion criteria for |
| 12 assignment was to think about damages in a | 12 the specific products that are Hetero -- that are |
| 13 prospective way from the consumer and | 13 assigned to Hetero Labs. |
| 14 third-party payors' perspective. They did not | 14 BY MR. ABRAHAM: |
| 15 know whether the products that were being sold | 15 Q But I would like to know what the |
| 16 and consumed by themselves or paid for by | 16 number was. Are you saying you don't know right now |
| 17 themselves were contaminated or not, even if | 17 what that number was? |
| 18 the manufacturer did know. | 18 A I just said it's the same answer to |
| 19 BY MR. ABRAHAM: | 19 the question, which is -- by definition, it is price |
| 20 Q Can you please turn to Table 1 of your | 20 times quantity that you're seeing here. And that -- |
| 21 report? | 21 the native price recorded in the IQVIA data for each |
| 22 A Yes. | 22 product, month, year and payor is available in the |
| 23 Q It's on Page 31. | 23 IQVIA data. And I'm more than happy to provide it |
| 24 A Yeah. | 24 to you. |
| 25 Q And you see you have a line here for | 25 Q Okay. So same questions for consumer |

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  damages, in other words, you would have to look back
2  at some data to tell me what the quantity was and
3  what the price was that you multiplied to come up
4  with your ▓▓▓▓
5      A     Right, subject to the criteria of
6  inclusion and exclusion, and subject to the
7  methodology as outlined in my report, by definition,
8  these quantities represent actual quantities and
9  prices that were paid by consumers among the
10  at-issue drugs in the at-issue time period for the
11  at-issue payors.
12     Q     Right.
13           THE COURT REPORTER:  I'm sorry, the
14     at-issue...
15           THE WITNESS:  Payors.
16           THE COURT REPORTER:  Thank you.
17           THE WITNESS:  The prices for
18     consumers.
19  BY MR. ABRAHAM:
20     Q     But, Dr. Conti, I just want to make
21  sure, there's no place I can look in your report
22  that would tell me what the price and quantity
23  numbers are that you used for those two
24  calculations; is that fair?
25     A     Well, what we're providing -- what I'm

Page 163

1  providing in my report is the conjunction, price
2  times quantity.  I'm more than happy to provide you
3  the -- I think what you're asking for is what is the
4  native price and quantity for each -- for Hetero
5  underlying the consumer damages listed here.  And,
6  again, it's in my data.  I'm more than happy to
7  provide it to you.
8      Q     Thank you.
9           MR. ABRAHAM:  I'll make that request,
10     please, of your counsel, to provide me with the
11     quantity and price that went into your
12     end-payor damages and consumer damages
13     calculations.  I appreciate that.
14  BY MR. ABRAHAM:
15     Q     Do you know the quantity of Hetero's
16  valsartan that was recalled as a result of the
17  allegedly impure nature of the pills?
18     A     No.  And, again, it was of no moment
19  in my analysis because -- because of the significant
20  asymmetric information and the perspective of my
21  analysis, which was prospectively from the consumer
22  and third-party payors' perspective.  They had no
23  ability to know which products were recalled versus
24  which ones were not -- or which ones were
25  contaminated versus which ones were not,

Page 164

1  prospectively.
2      Q     Does your damages analysis address in
3  any way the impact of the recall upon damages to
4  either the end-payor or consumer classes?
5      A     Just in terms of the time period that
6  was used.
7      Q     Okay.  Do you know who Hetero's U.S.
8  repackager or distributor was in the chain of
9  comments?
10     A     Not off the top of my head, no.
11     Q     Okay.  Do you know what payments, if
12  any, were made by that repackager or distributor --
13           THE COURT REPORTER:  I'm sorry, can
14     you repeat that?  Can you repeat that?
15           MR. ABRAHAM:  Sure.
16  BY MR. ABRAHAM:
17     Q     Do you know what payments, if any,
18  were made by the repackager or distributer of
19  Hetero's product to any party in the chain of
20  distribution as a result of the recall?
21     A     I'm sorry, I don't completely
22  understand.  What do you mean -- do you mean
23  distributor of the wholesale distributor, just to be
24  specific?
25     Q     Let's take -- let's take that example.

Page 165

1      A     Yeah.  Okay.  So -- and are you asking
2  about payments that Hetero made to their distributor
3  or --
4      Q     I mean --
5      A     -- to other --
6           THE COURT REPORTER:  Okay.  I cannot
7     -- I can't have you both speaking at one time.
8     It's too fast, and I can't do it.
9           MR. ABRAHAM:  Sorry.  My fault.
10  BY THE WITNESS:
11     Q     I mean, not necessarily payments made
12  by Hetero's manufacturer, but made by Hetero's
13  United States repackager or distributor.
14     A     So do you mean that there were --
15  there were refunds that were made by the distributor
16  to consumers or to third-party payors for recalled
17  products?
18     Q     That's a fair hypothetical.  So in
19  other words, yes.  Did you, in any way in your
20  damages analysis, consider if those had occurred and
21  what the impact would be in your damages
22  calculation?
23     A     So, again, my -- my damage calculation
24  is flexible and could accommodate the possibility of
25  refunds that were made for recalled or contaminated

42 (Pages 162 - 165)

Page 166

1  product to end-payors. I did not have that data for
2  this analysis that I conducted. My understanding is
3  that whether or not that would be ultimately
4  included in damages for settlement purposes, that is
5  something that would be settled by counsel, court or
6  the judge.
7      Q    Okay. Did your damages analysis in
8  any way address the charge backs, rebates, bill
9  backs, administrative fees or cash discounts
10 attributable to sales of Hetero's valsartan that was
11 allegedly contaminated or unpure as a result of the
12 nitrosamine?
13     A    That's a really compound question. So
14 let's take that apart.
15         So if discounts were given to
16 consumers at the point of sale, then by definition,
17 they are included in my damages because they would
18 offset the actual payment that patients made at the
19 pharmacy counter. And that would be included in the
20 IQVIA data that's listed in my report.
21     Q    Did you analysis -- I'm sorry. Go
22 ahead. I didn't mean to interrupt.
23     A    No. It's okay.
24         We don't have rebate data. That is
25 something that is confidential and available from

Page 167

1  the manufacturers themselves. From a theory of
2  liability, rebates are not necessarily things that
3  would be considered to be offsets, because injury
4  occurs at the point of sale, and rebates are paid
5  after the products are sold at some other point in
6  time in aggregate and may not be directly related to
7  any specific transaction.
8          But to the extent that Hetero or their
9  agents negotiated prices with third-party payors,
10 that varied by product, they would be in the IQVIA
11 data. Because, by definition, the IQVIA data is
12 providing the price that was actually paid by the
13 third-party at the pharmacy counter for those
14 products.
15         So if discounts were given, if Hetero
16 gave discounts to, I don't know, let's say, take one
17 of the third-party payors in this case,
18 prospectively, that would be in my calculation -- in
19 the damages that are calculated here.
20     THE COURT REPORTER: And what?
21     THE WITNESS: That would be in the
22 damages that are calculated here.
23     MR. ABRAHAM: Okay. Subject to
24 receiving the information that you agreed to
25 provide, I have no further questions for the

Page 168

1  witness. Thank you very much for your time.
2      MR. HONIK: Eric, but for the benefit
3  of the record, I just would like to note that
4  the backup data that you asked of Dr. Conti
5  that pertains to Hetero and Table 1, the
6  aggregate of damages, was provided to you and
7  all defense counsel concomitantly with our
8  serving our class cert motion and brief. So if
9  you'll do nothing more than look at the files
10 that we served, you'll find the data points
11 that you're looking for there.
12     MR. ABRAHAM: Let's have this
13 discussion offline. I don't want to consume
14 the doctor's time.
15     MR. HONIK: Understood. I wanted the
16 record to reflect that it's already been served
17 on counsel.
18     Next -- next up?
19     MR. KNEPPER: Yes. This is
20 Matthew Knepper from Husch Blackwell. I will
21 go next.
22     THE WITNESS: I'm sorry. From where?
23     MR. KNEPPER: Husch Blackwell. I
24 represent Express Scripts.
25     THE WITNESS: -- as the pharmacy, just

Page 169

1  so I understand.
2      THE COURT REPORTER: I'm sorry?
3      THE WITNESS: I can't hear you.
4      THE COURT REPORTER: What was your
5  last question to Mr. Knepper?
6      THE WITNESS: As the pharmacy benefit
7  manager or as the mail order pharmacy?
8      MR. KNEPPER: As the pharmacy -- the
9  defendant in this case.
10     THE WITNESS: Thank you so much for
11 that clarification.
12 BY MR. KNEPPER:
13     Q    So I'd like to turn to Page 32 in your
14 report, Table 3. This is "Aggregate Retailer Unjust
15 Enrichment Damages." Dr. Conti, the dollar figures
16 reflected in Table 3 for unjust enrichment damages
17 represent your calculation of the profits each
18 pharmacy defendant had from the sale of at-issue
19 valsartan, right?
20     A    Correct.
21     Q    These dollar figures actually reflect
22 the retail pharmacies' profits if the pharmacies
23 obtained the drug for free, right?
24     A    No.
25     MR. HONIK: Object to form.

43 (Pages 166 - 169)

Page 170

BY MR. KNEPPER:
1
2    Q    Can you show me where in your
3  report -- well, let me strike that.
4         Earlier, we talked about dispensing
5  fees and how those were removed from -- you said
6  removed from the dispensing data produced from the
7  retail pharmacies, right?
8         THE COURT REPORTER:  From the what?
9         MR. KNEPPER:  From the retail
10  pharmacies' data.
11        THE WITNESS:  Earlier when, sir?
12  BY MR. KNEPPER:
13    Q    Earlier in the deposition when you
14  were talking to Ms. Kapke.
15    A    Sorry, who's Ms. Kathy?
16    Q    Ms. Kapke, Kara, who questioned you
17  this morning.
18    A    You mean for CVS?
19    Q    Correct.
20    A    I am following you now.  Thank you for
21  the clarification.
22    Q    Okay.  You said that you removed or --
23  or took into account the fact that what you called
24  dispensing fees were not included in the data that
25  was provided by the retail pharmacy defendants in

Page 171

1  this case.  Do you remember that?
2    A    That's not what I said, sir.  That's a
3  mischaracterization of my testimony.
4    Q    Well, we will go -- I'm not -- I'm not
5  trying to be controversial.  We can go to page -- or
6  Paragraph 78 of the report?
7    A    No.  I mean, why don't we just go to
8  the methodology for calculation of unjust enrichment
9  in --
10    Q    Let's go to Page 78 first.
11    A    -- Paragraph 64 --
12    Q    Let's go to Paragraph 78.
13        THE COURT REPORTER:  I can't do this.
14        THE WITNESS:  In Paragraph 64, where I
15  explain that -- that dispensing fees to
16  consumers were removed from the calculation,
17  the retailer unjust enrichment claims that were
18  enumerated by -- offset by pharmacies in
19  Table 3.
20  BY MR. KNEPPER:
21    Q    Okay.  Other than the statement that
22  the -- the dispensing fees were removed, where in
23  your report are you taking into account the fact
24  that these pharmacies had to pay for the medication
25  before they dispensed it.

Page 172

1         MR. HONIK:  Object to the form.
2         THE WITNESS:  That is of no moment in
3  my analysis, sir.
4         MR. KNEPPER:  Okay.  Let's go to
5  Paragraph 64, if we could.
6  BY MR. KNEPPER:
7    Q    Okay.  Before I ask about
8  Paragraph 64, in your experience in this industry,
9  would you agree that, before a pharmacy can dispense
10  a medication, it has to purchase either a finished
11  dose or the active ingredient?
12    A    Well, most pharmacies, in my
13  understanding, have significant stores of
14  prescription drugs already available for dispensing.
15  Walgreens, for example, and CVS moving millions
16  of prescriptions per day through the U.S. supply
17  chain.  So those things are not stocked in an
18  instantaneous way.  They are stocked in a warehouse
19  and ready to be dispensed immediately when consumers
20  come, especially among generic drugs as frequently
21  used as the ones at-issue here.
22    Q    All right.  Is it your understanding
23  that the medication that you just referenced, stored
24  in Walgreens' warehouse, had to be at one time
25  purchased by Walgreens and stored in that warehouse?

Page 173

1    A    How is that in any moment to me, sir?
2    Q    Is that a yes?  I need to know.  Do
3  you agree that Walgreens would have to purchase the
4  drug, or do you believe that they get it for free?
5    A    It's not something, sir, that I
6  considered -- it's not in my report.  Nowhere do I
7  talk about the purchasing of these products by these
8  retail pharmacies, because that is not of moment.
9         The only thing that is of moment to my
10  analysis is that injury occurred at the point of
11  sale, and the only cost at the point of sale that is
12  relevant is the dispensing fee, which you, the
13  retailer, has already taken out of the data.  So by
14  definition, you have already -- you have already
15  said that, yes, that is the cost to you for each
16  individual prescription that you moved out of your
17  store.  You took it out.
18    Q    Okay.  I'm going to move forward.
19  This is not my line of questioning.
20        Paragraph 63 that you referenced and
21  64, Paragraph 63 says, "Retailers profited from the
22  sale of the at-issue valsartan," all right?  And
23  profits are defined as revenue minus costs.
24        And so what I'm asking you about is
25  how you calculated the profit that is contained in

44 (Pages 170 - 173)

Page 174

1 Table 3. And what I understand --
2    A    I --
3    Q    I'm not done with my question.
4        What I understand is that you took the
5 revenue that was reflected as being paid by -- the
6 patient responsibility, and you added that up by
7 state. And then you note that the dispensing fee is
8 not present, but unless you're going to tell me
9 there's some other data about the cost to acquire
10 the data that you can speak of the drugs that you
11 considered, I don't see where you considered the
12 cost of purchasing the drug. So can you explain
13 where that is in your report?
14        MR. HONIK: Object -- hold on a
15 second.
16        Object to form. Asked and answered.
17        You may answer.
18        THE WITNESS: Thank you.
19        The retail pharmacies subtracted the
20 fee, their costs for dispensing the product at
21 the point of sale. From their --
22    Q    I'm not talking about --
23        MR. HONIK: You cannot interrupt --
24 you cannot interrupt the witness.
25        MR. KNEPPER: I'm limited on time.

Page 175

1        MR. HONIK: In doesn't matter.
2        MR. KNEPPER: She is answering a
3 question I am not asking.
4        MR. HONIK: You're not permitted to
5 cut off the witness. If you -- we can stop the
6 deposition. That's up to you, but you can't --
7 you can't prevent her from answering.
8        MR. KNEPPER: Proceed.
9        THE WITNESS: Can you please read back
10 the question?
11        MR. KNEPPER: I'm going to ask you a
12 different one.
13 BY MR. KNEPPER:
14    Q    Can you cite --
15        MR. HONIK: Are you withdrawing the
16 question?
17        MR. KNEPPER: I'm withdrawing the
18 question.
19        MR. HONIK: Thank you.
20 BY MR. KNEPPER:
21    Q    Can you cite any piece of literature
22 to support your idea that one can calculate retail
23 pharmacy profits without including, as a cost, the
24 pharmacy's cost from actually procuring the goods?
25        MR. HONIK: Objection, asked and

Page 176

1 answered.
2        THE WITNESS: Sir, I'm going to use
3 the -- I'm going to walk you through this as
4 best as I possibly can, and simply, so I think
5 it will be very clear.
6        We asked the pharmacies what their
7 profits were, the revenue from the products
8 that they sold and their cost. Each retailer
9 provided us with only the revenues they
10 received from consumer payments, not the amount
11 of money that they received from the
12 third-party payors, which by definition, would
13 be larger than the consumers in this case.
14        Instead, the retailers limited the
15 data that they produced to just the payments
16 that the consumers paid in the form of
17 co-insurance and co-payments. The retailers
18 also only provided to us information about
19 that -- the cost that they viewed as being
20 relevant were the dispensing costs.
21 BY MR. KNEPPER:
22    Q    I thought you said that --
23    A    Excuse me. Hold on, please, sir.
24 Please let me finish.
25    Q    That was a long pause.

Page 177

1    A    Therefore -- therefore, I calculated
2 the profits as a function of revenue minus cost,
3 where the retailers only provided the payments that
4 were made by consumers minus the costs that they
5 provided, that they consented to were -- that were
6 the dispensing costs. From my perspective, those
7 are the costs of dispensing a prescription to an
8 individual patient.
9    Q    So can you point to a treatise that
10 supports the idea that you can calculate retail
11 pharmacy profits without including a cost of -- that
12 the pharmacy spent to procure the goods? Can you
13 point to that treatise?
14    A    This is the retailers' data. It's
15 on -- it's on the retailers to provide a treatise to
16 support their subtraction of -- or accounting of
17 only the dispensing cost. It's not on me. Injury
18 occurs at the point of sale. So it's the only thing
19 that matters at the point of sale.
20    Q    To calculate profit?
21    A    From the retailers' own perspective.
22 That is not -- has nothing to do with my
23 perspective. That is the retailers' data that was
24 provided to me.
25    Q    All right. The --

45 (Pages 174 - 177)

Page 178

1    THE COURT REPORTER: I'm sorry?
2    MR. KNEPPER: I was talking to myself.
3  Withdraw that. Or strike it.
4  BY MR. KNEPPER:
5    Q    I'm going to take it that, sitting
6  here today, you are not going to name a piece of
7  literature or treatise that will support the idea
8  that you can calculate the -- the profits of a
9  pharmacy if you don't include the amount of money
10  that the pharmacy spent procuring the goods?
11    MR. HONIK: Object to form. It's been
12  asked and answered. It's painfully clear that
13  you don't understand, and I -- I -- she can't
14  answer it any differently.
15    MR. KNEPPER: Okay. Then we'll move
16  on. I withdraw the question. I withdraw the
17  question.
18    THE WITNESS: I don't --
19    MR. KNEPPER: I'm withdrawing the
20  question.
21    THE COURT REPORTER: I can't hear
22  anybody. I hear nobody.
23    THE WITNESS: I don't -- are you
24  withdrawing the question and striking the
25  question? Because I'm more than happy to

Page 179

1  answer your question.
2  BY MR. KNEPPER:
3    Q    No, I'm going to withdraw.
4    I feel like if there was a treatise
5  available, or treatise or an article or piece of
6  literature to support it, you would have named it.
7  I'm going to move forward.
8    MR. HONIK: Move to strike. That's
9  not a -- excuse me. That's not a question.
10  You can't testify.
11    MR. KNEPPER: Got it.
12  BY MR. KNEPPER:
13    Q    You understand that a dispensing fee
14  is typically set by a pharmacy benefit manager as
15  part of a pharmacy being in that pharmacy benefit
16  manager's network, right?
17    MR. HONIK: Objection, asked and
18  answered.
19    THE WITNESS: That is not my
20  answer -- that is not my understanding, sir.
21  There are many, many transactions here that
22  have nothing to do with the existence of a
23  pharmacy benefit manager.
24  BY MR. KNEPPER:
25    Q    I asked about the setting of a

Page 180

1  dispensing. I believe earlier you testified --
2    A    No, that's not --
3    Q    I'm not done asking my question.
4    Earlier, you testified that a pharmacy
5  sets the dispensing fee. And I want to clarify my
6  understanding as -- in this industry is that
7  typically, the dispensing fee is set by a PBM as
8  part of the network agreement. Is that true?
9    A    That is not my understanding because
10  there are many, many dispensing prescription drugs
11  that have nothing to do with a pharmacy benefit
12  manager.
13    Q    I don't understand that answer.
14    MR. HONIK: Are you just going to make
15  comments and speak to yourself and create a
16  record?
17    MR. KNEPPER: Is that an objection?
18    THE WITNESS: That's what you're
19  doing.
20    MR. HONIK: That's what you're doing.
21  You're just -- it's like a color commentary to
22  the testimony. You're here and permitted to
23  ask a question and receive an answer. That's
24  it. You're not supposed to -- you know, reveal
25  your own befuddlement at the answers.

Page 181

1  BY MR. KNEPPER:
2    Q    Under the -- you went -- in order to
3  calculate your damages model, I believe earlier you
4  said you tallied up the total amount of patient
5  responsibilities by state. And then you put on the
6  charts other and attached it to your report, right?
7  That's how you got to the full amount of damages?
8    A    I don't understand your question.
9    MR. HONIK: Object to form.
10  BY MR. KNEPPER:
11    Q    Are you aware that in some
12  circumstances a pharmacy might end up actually being
13  reimbursed less than the amount it paid to acquire a
14  drug?
15    MR. HONIK: Object to form, asked and
16  answered.
17    You can respond.
18    THE WITNESS: I don't understand the
19  question, sir.
20  BY MR. KNEPPER:
21    Q    Are you aware as an -- as someone who
22  is familiar with the industry and these
23  circumstances, which -- because of the reimbursement
24  that is offered by a third-party payor otherwise,
25  that a pharmacy may end up receiving less than the

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1   amount indicated in the expense to acquire the drug?
2          MR. HONIK: Object to the form, asked
3   and answered. Are you referring to pre- and
4   post-point of sale transactions?
5          MR. KNEPPER: I mean, I'm asking the
6   question.
7          MR. HONIK: She answered you. She
8   said she doesn't --
9          MR. KNEPPER: No, you answered it.
10         MR. HONIK: No, I didn't answer it.
11         MR. KNEPPER: You answered another
12  question.
13         MR. HONIK: She didn't understand your
14  question. I'm trying -- I'm trying to help
15  you.
16         MR. KNEPPER: I'm going to stop.
17         MR. HONIK: Okay.
18         MR. OSTFELD: I think that means I'm
19  up.
20  EXAMINATION BY MR. OSTFELD:
21      Q    Good afternoon, Doctor.
22         THE COURT REPORTER: Hold on. Who's
23  going next?
24         MR. OSTFELD: This is Greg Ostfeld --
25         THE COURT REPORTER: Hold on.

Page 183

1          MR. OSTFELD: -- from Greenberg
2   Traurig.
3          THE WITNESS: I'm sorry, I'd like to
4   take a break. I'll take five minutes, please.
5          MR. HONIK: Okay.
6          THE VIDEOGRAPHER: The time is 4:34.
7   We're going off the record.
8          (Whereupon, a short break was taken.)
9          THE VIDEOGRAPHER: The time is 4:40.
10  We're back on the record.
11  BY MR. OSTFELD:
12      Q    Good afternoon, Dr. Conti. My name's
13  Greg Ostfeld. And I represent the Teva group of
14  defendants, which includes both Teva and Actavis.
15  The good news is you're almost done.
16         So --
17      A    I hope you don't yell at me like the
18  previous attorney, or bully me.
19      Q    I'm not a yeller, Dr. Conti.
20      A    That sounds good.
21      Q    I mean, if we can try to be nice to
22  each other for the last 15 minutes, we can end on an
23  upbeat note going into the weekend.
24      A    Okay.
25      Q    When you calculated damages for

Page 184

1   manufacturers like Teva, did you make any
2   adjustments to account for differences in different
3   states, measures and damages?
4          MR. HONIK: Note my objection, asked
5   and answered. And to the extent it calls for a
6   legal conclusion, I further object.
7          But you may answer.
8          THE WITNESS: We have already talked
9   about this numerous times. So the theories of
10  liability and unjust enrichment are by
11  definition state specific. And therefore, the
12  calculations are, for each of the damage
13  calculations that are presented in my report,
14  are month, year, product and state specific.
15  BY MR. OSTFELD:
16      Q    Okay. And those calculations are
17  agnostic with respect to the state law measure of
18  damage for each state, correct?
19         MR. HONIK: Object to the form, asked
20  and answered.
21         THE WITNESS: Again, my understanding
22  is that they are based on instruction from
23  counsel.
24  BY MR. OSTFELD:
25      Q    Okay. So when you get instructions

Page 185

1   from counsel, the court or a jury, that would be
2   when you would make adjustments to account for
3   state-specific differences?
4          MR. HONIK: Object to form.
5          THE WITNESS: I think I'm a little
6   confused.
7          What I'm saying is, my damage
8   calculations that are presented in this report
9   are already adjusted for state-specific issues.
10  And there might be additional adjustments that
11  are made. My method is flexible to account for
12  them and would be up to the court or the jury
13  to decide.
14  BY MR. OSTFELD:
15      Q    All right. In my client's case, you
16  calculated separate damages for their generic
17  versions of Diovan and Exforge; is that right?
18         THE COURT REPORTER: Diovan and -- I'm
19  sorry.
20         MR. OSTFELD: Exforge.
21         THE COURT REPORTER: Yes. Uh-huh.
22         THE WITNESS: That is my
23  understanding, yes.
24  BY MR. OSTFELD:
25      Q    Okay. Now, the brand-name versions of

47 (Pages 182 - 185)

Page 186

1 those two drugs, those were not adulterated or
2 misbranded under the assumptions you've applied to
3 your method, correct?
4         MR. HONIK:  Object to the form.
5         THE WITNESS:  I don't understand.  I'm
6     sorry.
7 BY MR. OSTFELD:
8     Q     That's okay.  You were not asked to
9 assume that brand-name Diovan was adulterated or
10 misbranded for purposes of your analysis of this
11 case, correct?
12     A     So the products that are at issue are
13 enumerated in Footnote 3 and discussed in -- at
14 length in the complaint.  The attorneys, the
15 counsel, gave me the NDC codes and the month, years
16 at issue.  And that's what was applied to the data
17 that I got from IQVIA or to the retailers as we've
18 already discussed at length.
19     Q     Okay.  And you have not applied the
20 assumptions of adulteration or misbranding to any
21 other forms of valsartan beyond those that
22 were -- that you just described that are delineated
23 in your footnote and that were provided to you by
24 counsel by NDC code?
25         MR. HONIK:  Object to form.

Page 187

1         THE WITNESS:  Again, counsel provided
2     me the list of NDC codes.  We picked up a
3     number of additional NDC codes that were
4     repackaged or private-labeled but were related
5     to the upstream at-issue products, and then
6     applied that forward to the calculation.
7 BY MR. OSTFELD:
8     Q     All right.  During the same time
9 period that the at-issue valsartan was sold, did
10 brand-name Diovan have a legitimate supply curve?
11     A     Again, my opinion related to the
12 legitimate supply curve is related to the products
13 at-issue.
14     Q     Right.  And that's all I'm asking you.
15 For one of the products that's not at issue,
16 brand-name Diovan, did it have a legitimate supply
17 curve?
18         MR. HONIK:  Object to the form.  It's
19     been asked and answered, and it's beyond the
20     scope.
21         You may respond.
22         THE WITNESS:  Yeah.  I don't quite
23     understand your question.  I'm sorry.
24 BY MR. OSTFELD:
25     Q     Okay.  I'm going to ask you to make a

Page 188

1 different assumption from the assumption that you
2 made in preparing your analysis in this case.
3 Plaintiffs' counsel asked you to make one
4 assumption, I'm going to now ask you to make a
5 different one.
6         I will ask you to assume, for the
7 purposes of my next few questions -- and I know you
8 don't love hypotheticals.  But we're talking about
9 assumptions here, so I'm going to have to ask you to
10 make a few.
11         So I will ask you to assume, for
12 purposes of my next questions, that some
13 manufacturers' versions of generic valsartan were
14 not adulterated and/or not misbranded.  Okay?
15 That's the assumption I'm asking you to make.  The
16 question is coming.
17     A     In what time period, sir?
18     Q     During the same time period that the
19 at-issue valsartan was being sold.
20     A     Okay.  And they were in the retail
21 profit trade in the U.S.?
22     Q     Yes.
23     A     And their non-contamination was known
24 by the manufacturer and also communicated to the
25 FDA?

Page 189

1     Q     That -- sure.  We can make that
2 assumption as well.
3     A     And it was also asserted to or
4 attested to by those manufacturers to the
5 Food and Drug Administration and the downstream
6 consumers?
7     Q     That they were not adulterated and not
8 misbranded, yes.  You can make that assumption as
9 well.
10     A     Great.  And those attestations were
11 not incorrect, in fact?
12     Q     That is -- that is the assumption I'm
13 asking to you make, yes.
14     A     Okay.  Just trying to understand
15 exactly what contours of the hypothetical are.
16     Q     Absolutely.  I like that you are
17 precise, and I want to make sure you have a good set
18 of assumptions.  So you're comfortable with those
19 assumptions?
20         MR. HONIK:  Object to the form.
21         THE WITNESS:  I'll let you know if I
22     have other questions.
23 BY MR. OSTFELD:
24     Q     Okay.  Using the assumptions that
25 we've just agreed to, would it be your opinion that

48 (Pages 186 - 189)

Page 190

1 there was a legitimate supply curve for
2 non-adulterated, non-misbranded, generic valsartan
3 drugs, applying all of the assumptions you just
4 made?
5 A    Yes, from a -- from a prospective form
6 perspective, if the products were not adulterated,
7 not misbranded and -- and were cGMP compliant in
8 their material production, and met all of the rest
9 of the FDA requirements, safety, efficacy, purity,
10 et cetera, then yes, correct.  They would be a --
11 there is a legitimate supply curve for those
12 products.
13 Q    And would that apply retrospectively,
14 as well, to the products that were already sold and
15 ingested?
16 A    No.
17 Q    And why not?
18 A    Because my analysis is a prospective
19 one, not a retrospective one.
20 Q    Understood.
21       So your analysis could not apply
22 retrospectively.  Understood.
23 A    No.  That's not what I said, sir.
24 That's not my testimony.
25 Q    Okay.  That's okay.  I'll move on.

Page 191

1       Under the same changed assumptions
2 that we just agreed to, would you agree that
3 non-adulterated, non-misbranded, generic valsartan
4 drugs have economic value as well as therapeutic
5 value?
6       MR. HONIK:  Object to the form.
7       THE WITNESS:  I have no opinion on
8   therapeutic value.  It was not of any moment in
9   my analysis because therapeutic value is -- is
10   related to the demand curve.  And I'm not
11   analyzing the demand curve here.  I'm focused
12   on the supply curve.
13 BY MR. OSTFELD:
14 Q    Okay.  I'll exclude therapeutic value
15 from my question.
16       Under the same assumptions that we
17 just agreed to, would you agree that
18 non-adulterated, non-misbranded generic valsartan
19 drugs have economic value?
20 A    In -- where there was no asymmetric
21 information?
22 Q    Correct.
23 A    Yes.
24 Q    And that economic value was true --
25 would be true of both consumers and third-party

Page 192

1 payors?
2 A    I just asked you about the condition
3 of asymmetric information.  If -- if consumers and
4 third-party payors, plus the regulator, all knew the
5 exact same information that the manufacturer did
6 regarding the purity, strength, adulteration or
7 non-adulteration, non-misbranding, et cetera, if the
8 product was exactly what it said it was or what was
9 represented, and every consumer and third-party
10 payor had full transparency over that, then, yes,
11 prospectively, that would make absolute sense that
12 there was full economic value.
13 Q    Okay.
14 A    We, of course, don't live in a world
15 of full information.
16 Q    Okay.  I understand that you have
17 relied on the allegations of the complaint
18 referenced in Footnote 1 in the first paragraph of
19 your report as the basis for your assumption of
20 adulteration and misbranding; is that correct?
21 A    I'm sorry.  There's a -- there's
22 numerous things that you said in that sentence,
23 so --
24 Q    Okay.  I guess what I'm trying to --
25 I'm not asking to you repeat testimony, but I want

Page 193

1 to make sure I accurately understand your earlier
2 testimony.
3       I think I understood you earlier to
4 testify that the basis for your assumption that the
5 at-issue valsartan was adulterated and misbranded,
6 is what is contained in the complaint in this case;
7 is that correct?
8       MR. HONIK:  Object to form,
9   mischaracterizes the testimony.  You can
10   respond.
11       THE WITNESS:  As instructed by counsel
12 and laid out in my report, yes.
13       THE COURT REPORTER:  I'm sorry.  I've
14 been instructed by counsel...
15       MR. HONIK:  As instructed.
16       THE WITNESS:  As instructed by counsel
17 and laid out in my report.
18       THE COURT REPORTER:  Thank you.
19 BY MR. OSTFELD:
20 Q    Other than the complaint, is there any
21 other basis on which you have relied for your
22 assumption that the at-issue valsartan of my
23 clients, Teva, was adulterated and misbranded?
24       MR. HONIK:  Object to form, asked and
25   answered.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1    THE WITNESS: Well, I think we've
2 already talked about this, that the FDA had
3 very -- there was a lot of communications about
4 the products at-issue and the contamination,
5 which includes discussions of the contamination
6 and the recall for the Teva-specific products.
7 BY MR. OSTFELD:
8  Q Do you have any personal knowledge of
9 whether Teva's valsartan was adulterated or
10 misbranded?
11  A Define "personal knowledge," sir.
12  Q Is it your opinion that Teva violated
13 good -- current good manufacturing practices?
14    MR. HONIK: Object to form.
15    THE WITNESS: I mean, we talked about
16 this earlier. I'd be more than happy to go
17 through what the FDA said. It's --
18    THE COURT REPORTER: I'm sorry. What
19 was just said?
20    MR. OSTFELD: Guys, somebody needs to
21 mute.
22    MR. HONIK: It's Eric Abraham.
23    THE COURT REPORTER: Okay. So we
24 talked about this earlier. I'm more than happy
25 to go through what the FDA said...

Page 195

1 BY MR. OSTFELD:
2  Q Doctor, I'll withdraw my question. I
3 see that I'm running short on time, and there's one
4 more topic I wanted to cover.
5    MR. HONIK: I think there's only a
6 minute or so left.
7    MR. OSTFELD: I think 2:45 is what
8 I've got on my timer.
9 BY MR. OSTFELD:
10  Q You told Mr. Goldberg yesterday that
11 you wrote your declaration in this case. Did you
12 write the entire declaration?
13  A I'm sorry, is that a compound
14 question?
15  Q No. I'm asking, did you write your
16 entire declaration in this case? It's one question.
17  A Are you asking me about what I said to
18 Mr. Goldberg?
19  Q I'm asking you a separate question.
20 Did you write your entire declaration in this case?
21  A I wrote my declaration in this case.
22  Q Did anyone else draft any --
23  A Hold on. With the assistance of my
24 staff.
25  Q All right. Is your declaration in

Page 196

1 this case an original document that you prepared
2 specifically for this case?
3    MR. HONIK: Object to form. What do
4 you mean by "original"?
5    THE WITNESS: Yeah. I don't
6 understand what that means.
7 BY MR. OSTFELD:
8  Q Are there any parts of your
9 declaration in this case that you copied or adapted
10 from another report in your case?
11  A What other case?
12  Q I'm asking you. Are there any parts
13 of your declaration in this case that you copied or
14 adapted from an earlier report in another case?
15  A I'm asking you to be specific, sir.
16  Q Any case, any report in any other
17 case.
18  A I mean, I'm happy to go through and
19 look. Certainly, there are parts of my
20 qualifications that are pretty standard. So if we
21 can go through -- so we go -- I'm answering your
22 question, sir.
23  Q I'm not asking you to go through your
24 report. I'm asking --
25  A I have asked you for specifics several

Page 197

1 times. You --
2  Q All right. Well, I'm going to
3 withdraw my question.
4  A -- and now I'm going to try to answer
5 it.
6  Q I'm going to withdraw my question, and
7 ask you a more specific question.
8    You previously prepared an expert
9 report in Blue Cross Blue Shield Association versus
10 GlaxoSmithKline?
11  A I'm sorry, what case is that, sir?
12  Q Blue Cross Blue Shield Association
13 versus GlaxoSmithKline.
14  A Can you refer to me in my CV which
15 case that is?
16  Q Did you copy or adapt portions of your
17 expert report in this case from your report in
18 Blue Cross Blue Shield Association versus
19 GlaxoSmithKline?
20  A I'm asking you which specific case is
21 that. Can you point to me in my CV or in my
22 declaration what case that is?
23    MR. HONIK: Excuse me. Or
24 alternatively, show the witness the other
25 document, and she will compare it and answer

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1    your question, either way.
2  BY MR. OSTFELD:
3    Q    That is the name of the case in your
4  CV, ma'am.
5    A    Okay.  So show me where it is in my
6  CV.
7    Q    I don't have your CV in front of me,
8  but let me pull it up.
9    A    Okay.
10   Q    If you look on Page 5 of your CV, the
11  second to last --
12   A    Give me a second to get there.
13  Page 5.  Okay.  So there are multiple reports, June,
14  August, September 2018.  Blue Cross Blue Shield
15  Association et al. versus GlaxoSmithKline.  Is that
16  the one you're talking about?
17   Q    That is the case that I'm talking
18  about.
19   A    And it says, "Written reports," with
20  an S, "and deposition," correct?
21   Q    Correct.
22   A    Okay.  So as I mentioned before,
23  before you interrupted me, my qualifications don't
24  change much.  So I'm assuming if we go to Page 4 of
25  this report, of the current report, I expect that

Page 199

1  Paragraph 12 and probably Paragraph 13, probably
2  Paragraph 14, in whole or in part -- I think that
3  changed a little over time.  Certainly Paragraph 15
4  has changed over time, because I've added that I've
5  been a consultant for the FDA's office of generic
6  drugs, that I'm currently serving as an ad hoc
7  advisor to the national license -- advisor to the
8  Engineering invention -- Medicine's Committee on the
9  security --
10       THE COURT REPORTER:  I'm sorry, one
11  more -- you're serving as an ad hoc advisor to
12  the...
13       THE WITNESS:  I am currently serving
14  as an ad hoc advisor to the National Academy of
15  Sciences, Engineering and Medicine's Committee
16  on Security of America's Medical Supply --
17  Product Supply Change.  That's now.
18       So 16 has definitely been updated to
19  reflect the fact that I was -- that I have
20  submitted testimony in another cGMP violation
21  matter, which is the case that we were just
22  talking about, the Blue Cross Blue Shield
23  versus GlaxoSmithKline case.  But also, that
24  I've been involved in a variety of other cases
25  since that case concluded.  That information is

Page 200

1  also provided in my CV.
2       17 probably hasn't changed so much.
3  18 definitely has changed.  19 may or may not
4  be in that report.  Then we can go through the
5  institutional background on the regulation.
6  BY MR. OSTFELD:
7    Q    Okay.
8    A    So that other case was also a cGMP
9  case, and many of the institutions are obviously the
10  same.  Probably, there is overlap.
11   Q    To complete this exercise, would it be
12  helpful to you if I put the other report in so you
13  can compare them side-by-side?
14   A    I mean, there are actually multiple
15  reports, and there's a deposition.  So which -- I'd
16  like to see them all.
17   Q    Well, I only have one, but I'll put it
18  on the screen.  And if you --
19   A    I'm sorry.  If you're going to provide
20  new information to me and ask me to compare and
21  contrast and go through, then I'd like to see them
22  all.
23   Q    Dr. Conti, I only have one.  I can
24  only give you what I have.
25   A    Then I think -- then I think that we

Page 201

1  don't have enough time to do this, in all fairness.
2  I'm more than happy to go through, line-by-line, my
3  report and other reports.  But, you know, if you're
4  going to refer me to the reports that I -- that I
5  wrote for the center case, I want to do them all,
6  not just one, and not just cherry pick things that
7  might be convenient for you, but everything.
8       MR. HONIK:  Yeah.  And I think our
9  time is up.  Justin, can you report to us where
10  we are?
11       THE VIDEOGRAPHER:  Do you want me to
12  go off the record and do that?
13       MR. HONIK:  Sure, off the record.
14       THE VIDEOGRAPHER:  We are going off
15  the record.  The time is 5:00 p.m.
16       (Whereupon, a discussion was held off
17  the record.)
18       MR. HONIK:  Counsel has exceeded the
19  10-hour limit, number 1.  Number 2, with --
20  astonishingly, with about 60 or 30 seconds
21  left, he produced one of, apparently, multiple
22  reports that are revealed in Dr. Conti's CV,
23  and has asked her to determine what parts of
24  it, if any, are replicated or appear in the
25  current report.  She's not had an opportunity

51 (Pages 198 - 201)

CONFIDENTIAL

1    to look at the document, and now defendants
2    exist -- insist, having exceeded the 10-hour
3    limit, to mark an exhibit that the witness has
4    not seen or been given an opportunity to
5    review. Therefore, I object to its being
6    marked.
7         It's sort of like piling on at the end
8    and clipping news articles and asking them to
9    be attached as exhibits. It's entirely
10   improper. You haven't asked the witness a
11   single question, nor has she had an opportunity
12   to look at it, and I object.
13        MR. OSTFELD: I will state, for the
14   record, that the question I asked the witness
15   was, "Did you copy or adapt portions of your
16   expert report from Blue Cross Blue Shield
17   Association versus GlaxoSmithKline for your
18   declaration in this case?"
19        The witness then indicated that she
20   wished to go, paragraph by paragraph, through
21   her report and to compare it to the reports
22   from Blue Cross Blue Shield Association.
23        MR. HONIK: She did no such thing.
24        THE WITNESS: -- mischaracterizing my
25   statement --

1         MR. OSTFELD: Excuse me. Excuse me.
2    Please -- please allow me to finish my
3    statement for record, Ruben. I didn't
4    interrupt you.
5         And, Dr. Conti, I didn't interrupt
6    you. And these are being -- these are -- these
7    are records that are being made for the court.
8         So I then put into the record the one
9    report that I have in my possession from that
10   case so that Dr. Conti could reference it to
11   complete her analysis. There was a question
12   pending. We were trying to answer it in the
13   manner in which she wanted to answer it, which
14   was going through her report. And Mr. Honik
15   has now taken the view that time has expired.
16        I would object to terminating the
17   deposition when there was a pending question
18   and where counsel was attempting to provide
19   Dr. Conti with the mechanism she asked for to
20   answer the question.
21        MR. HONIK: Yeah. Mr. Ostfeld, that
22   is about as big a distortion as one could --
23   could possibly state. The witness did not ask
24   to go line by line. You asked her a question
25   without the -- excuse me -- without the benefit

1    of the document. She merely asked to look at
2    the document. And for minutes that took you
3    past, as a matter of fact, the 10-hour limit,
4    it's not my position that you went past the
5    10-hour time limit. You went past the 10-hour
6    time limit.
7         And you then finally offered her one
8    of the multiple reports that she prepared. And
9    she tried to answer your question, and it
10   ended. That's an improper use of an exhibit.
11   It is beyond the pale to have done so with 30
12   or 60 seconds. It's the worst form of lawyerly
13   got you imaginable, and I object. And we'll
14   move to strike at the appropriate time.
15        I can't prevent you saying it's
16   being -- it's being marked, but we will move to
17   strike it. And it is really unseemly that you
18   have chosen to do that.
19        That concludes the deposition.
20        MR. OSTFELD: This report is being
21   marked, and I will provide --
22        THE COURT REPORTER: I can only do
23   this one at a time. Greg -- Greg, this report
24   is being marked...
25        MR. OSTFELD: Hang on. Madam Court

1    Reporter, can you please hang on? I'll let
2    you -- don't talk over me so that you can't
3    hear what I'm saying.
4         Ruben, we know you are concluding the
5    deposition, but you can't do it the way you are
6    doing it. Okay? We still have to finish the
7    deposition the right way. You can't just stop
8    it. Okay. Yes, we can't just go off the
9    record in a ladder.
10        MR. HONIK: Yes, we're --
11        MR. OSTFELD: Now, I'm gonna say
12   something, Ruben.
13        Dr. Conti, during the deposition, you
14   were texted by counsel. I'm going to ask you
15   that you not delete that text. Do not delete
16   any text that you received from counsel during
17   this deposition.
18        MR. HONIK: You're mischaracterizing
19   the record.
20        MR. GOLDBERG: Ruben --
21        MR. HONIK: No. No. No. No.
22        MR. GOLDBERG: We will address this
23   issue later, but it is important that this
24   record be preserved. And I don't want
25   Dr. Conti to leave until we have made that

Page 206

1   record.
2           MR. HONIK: You can make whatever
3   record you want.
4           MR. GOLDBERG: Now --
5           THE COURT REPORTER: I can't do this.
6   I can't. I can't do it. One at a time. One
7   at a time.
8           MR. GOLDBERG: Okay. Now that we have
9   done that -- okay. Let the record reflect that
10  the witness has just walked away during the
11  deposition.
12          MR. HONIK: Are you 12 years old,
13  Seth?
14          MR. GOLDBERG: No.
15          MR. HONIK: As far as the witness is
16  concerned, it's over. There are no more
17  questions that you may be permitted to ask
18  Dr. Conti. She can get up and stretch her
19  legs, do whatever she wishes in the world,
20  number 1.
21          Number 2, Mr. Ostfeld apparently has
22  now attached as an exhibit a report that makes
23  reference to an Austin and Burke PowerPoint
24  that Teva clawed back. So Teva has now waived
25  their privilege as to that document being

Page 207

1   admitted into evidence into this case. Is
2   there anything else you need to say?
3           MR. GOLDBERG: Yeah, I do. And then
4   certainly Mr. Ostfeld can.
5           We are keeping this deposition open,
6   because the witness has now testified during
7   the deposition, potentially, to documents that
8   she has not produced, including her invoices.
9   It's not clear whether there were other
10  documents that she hasn't produced. We'll come
11  back to you on that, Ruben. But we are not
12  closing this deposition until we get a complete
13  record from Dr. Conti of the work she has done
14  in response to the deposition notice.
15          Now, I'll turn it -- turn it to
16  Mr. Ostfeld to address your last point.
17          MR. OSTFELD: I am putting into the
18  record as an exhibit a document titled, "Expert
19  Report of Rena Conti, Ph.D" from the case
20  Blue Cross Blue Shield Association versus
21  GlaxoSmithKline.
22          This is taken from the public court
23  file in that case. It has the court stamp at
24  the top of it. It is document 286-2 from that
25  court file. That is the only document that I

Page 208

1   am attaching as an exhibit and putting in.
2           And I will provide it to the court
3   reporter as an exhibit. And we certainly do
4   not waive anything that is not in the public
5   court file in that case.
6           (Whereupon, Exhibit Conti 8 was marked
7   for Identification.)
8           MR. HONIK: Anything else?
9           MR. OSTFELD: That's it for me.
10          MR. HONIK: We're concluded. Thank
11  you, Jamie.
12          (Whereupon, the deposition concluded
13  at 5:08 p.m.)

Page 209

1           C E R T I F I C A T E
2
3           I, Jamie I. Moskowitz, a Shorthand
4   (Stenotype) Reporter and Notary Public, do hereby
5   certify that the foregoing Deposition, of the
6   witness, RENA M. CONTI, Ph.D., taken at the time and
7   place aforesaid, is a true and correct transcription
8   of my shorthand notes.
9           I further certify that I am neither
10  counsel for nor related to any party to said action,
11  nor in any way interested in the result or outcome
12  thereof.
13          IN WITNESS WHEREOF, I have hereunto set
14  my hand this 17 day of February 2022.
15
16
17          Jamie Ilyse Moskowitz
            License No. XI01658
18
19
20
21
22
23
24
25

53 (Pages 206 - 209)

CONFIDENTIAL

1  RUBEN HONIK, ESQUIRE
2  ruben@honiklaw.com
3          February 17, 2022.
4  RE:   In Re: Valsartan, Losartan, Et Al v.
5     2/11/2022, Rena Conti, PH.D (#5073516)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

1  In Re: Valsartan, Losartan, Et Al v.
2  Rena Conti, PH.D (#5073516)
3      E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Rena Conti, PH.D            Date
25

1  In Re: Valsartan, Losartan, Et Al v.
2  Rena Conti, PH.D (#5073516)
3      ACKNOWLEDGEMENT OF DEPONENT
4   I, Rena Conti, PH.D, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Rena Conti, PH.D            Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18      _____
19  NOTARY PUBLIC
20
21
22
23
24
25

Veritext Legal Solutions
800-227-8440                              973-410-4040

Case 1:19-cv-00837-RGA-SRF Document 457 Filed 06/03/2020 Page 156 of 657 PageID: 68964 1996

CONFIDENTIAL

| & |
|---|
| **&** 2:16,20 3:17 4:18 5:2,7,11 6:2 6:13,18 7:8 |

| 0 |
|---|
| **0** 88:14,20 |
| **02109** 6:15 |
| **07068** 2:9 |
| **07102** 6:11 |
| **08540** 5:21 |

| 1 |
|---|
| **1** 11:2 45:22 50:21 54:21 55:20 56:8 65:24 66:2,3,10,16 67:9 68:11,17,23 70:11,13 71:20 72:23 73:2,12 74:3,15,19 78:4 80:23 82:21 83:23 109:1 111:16 115:2 154:2,12,16 159:20 168:5 192:18 201:19 206:20 |
| **1,000** 132:5 153:10 |
| **10** 12:13 92:13,18 136:24 201:19 202:2 204:3,5,5 |
| **100** 2:13 6:10 10:5 |
| **1000** 3:13 |
| **1001** 5:14 |
| **10013** 2:18 |
| **10019-6119** 6:20 |
| **103** 2:8 |
| **10:14** 54:20 |
| **10:20** 54:19 |
| **10:22** 54:24 |
| **10:55** 75:24 |
| **11** 1:12 5:8 10:4 118:7 135:16 |

146:17 148:2
| **1100** 2:4 |
| **1154** 209:16 |
| **11:03** 76:2 |
| **11:41** 100:3 |
| **11:46** 100:8 |
| **11:49** 100:9 |
| **12** 199:1 206:12 |
| **13** 199:1 |
| **14** 199:2 |
| **1400** 7:9 |
| **15** 82:25 183:22 199:3 |
| **1515** 2:4 |
| **15219** 3:20 6:4 |
| **15th** 6:10 |
| **16** 199:18 |
| **17** 200:2 209:14 210:3 |
| **1700** 4:20 |
| **17th** 3:6 |
| **18** 8:3 200:3 |
| **182** 10:6 |
| **19** 200:3 |
| **190** 4:15 |
| **19102** 2:4 |
| **19103** 3:7 |
| **1st** 27:21 48:8 |

| 2 |
|---|
| **2** 20:18 21:7,11,11 50:22 54:25 55:21 56:12,19 58:19 59:4,12,14 65:25 66:1,2,4,8,18 68:25 74:6,16,19 78:6 80:23 83:23 84:22 100:4 109:1 115:2 201:19 206:21 |
| **2,532,769** 56:25 |

| **2/11/2022** 210:5 |
|---|
| **20** 92:15 106:17 212:15 |
| **20004** 3:13 5:14 |
| **20006** 4:20 |
| **2012** 27:21 114:14 143:10 |
| **2018** 25:13,15 27:23 48:9 114:14 156:22 157:5,18 198:14 |
| **2019** 27:23 48:9 |
| **202.452.7900** 4:21 |
| **202.624.2500** 5:15 |
| **202.776.7800** 3:14 |
| **2020** 143:8 |
| **2022** 1:12 209:14 210:3 |
| **208** 8:5 |
| **21** 5:20 |
| **212.355.9500** 2:18 |
| **212.415.9357** 6:20 |
| **214.855.8221** 4:12 |
| **215.979.1000** 3:7 |
| **2200** 4:11 |
| **2220** 7:5 |
| **227** 5:4 |
| **23** 156:8 |
| **230** 7:5 |
| **250** 2:17 |
| **267.435.1300** 2:5 |
| **27th** 6:15 |
| **28202** 5:4 |
| **286-2** 207:24 |
| **2875** 1:2 |
| **2:45** 195:7 |

| 3 |
|---|
| **3** 20:19 21:9,12 28:11,23 55:21 56:12 58:19 59:10 59:14 63:1 66:1 |

| **74:9 80:23 83:23** |
|---|
| 100:10 109:1 112:22 113:8,14 115:2 154:13 169:14,16 171:19 174:1 186:13 |
| **3,741** 19:11 |
| **30** 3:6 13:11 201:20 204:11 210:17 |
| **300** 4:20 |
| **31** 159:23 |
| **3100** 4:5 |
| **312** 7:9 |
| **312.456.1065** 4:6 |
| **312.566.4803** 7:6 |
| **314.480.1500** 4:16 |
| **317.236.1313** 5:9 |
| **32** 169:13 |
| **32nd** 3:19 |
| **33** 146:17 |
| **3600** 4:11 |
| **38th** 6:4 |

| 4 |
|---|
| **4** 15:6 94:24 95:1 95:2,8,12 111:17 111:18 154:5,16 154:18 198:24 |
| **412.263.4397** 6:5 |
| **412.560.3300** 3:20 |
| **45202-4029** 7:10 |
| **46204** 5:9 |
| **47** 118:18 |
| **4:03** 154:17 |
| **4:04** 155:16 |
| **4:05** 155:20 |
| **4:34** 183:6 |
| **4:40** 183:9 |

Case 1:19-md-02875-RBK-SAK Document 757 Filed 09/10/20 Page 57 of 98 PageID: 18997

**5**

**5**  15:5 27:7 62:8
78:23 82:20 85:8
85:11 92:15,17,18
92:23 107:17
109:8 111:21
162:4 198:10,13
**50**  116:15,21
**500**  132:4
**504.524.5777**  2:25
**505**  3:13
**5073516**  210:5
211:2 212:2
**51**  6:19
**512.795.8686**  2:14
**513.698.5000**  7:10
**52nd**  6:19
**53**  6:15
**56**  83:3
**58**  160:13 161:7
**5:00**  201:15
**5:08**  208:13

**6**

**6**  13:11 89:7,10
94:12 95:2,18
**60**  27:7 28:18
48:23 73:7,7
75:18 77:8,23
78:3,9 156:6
160:6 201:20
204:12
**600**  4:15 5:4
**6001**  2:13
**60601**  4:5
**60606**  7:5
**609.924.0808**  5:21
**61**  48:23 75:18
77:8 78:7,9
**617.213.7045**  6:16

**62**  48:23 73:8
74:11
**63**  27:24 28:10,19
48:1 84:14 173:20
173:21
**63105**  4:16
**64**  48:1 61:7
171:11,14 172:5,8
173:21
**67**  156:25

**7**

**7**  8:3 18:6,10 20:2
29:3 31:25 34:18
44:3 47:23 49:3
51:10 52:6,9
**701**  2:24
**70130**  2:24
**704.444.3475**  5:5
**72**  74:18
**73**  74:18
**75**  138:7,14 139:24
148:7
**75201-7932**  4:11
**757.1100**  6:11
**76**  110:15,20
**77**  4:5
**776**  69:23
**78**  32:4,7,9 49:8
171:6,10,12
**78746**  2:13
**79**  55:16,20 73:23

**8**

**8**  8:5 10:7 15:6
127:25 128:2,17
208:6
**80**  122:8,15 130:22
130:23 132:24
**81**  127:1
**82**  136:19

**84**  61:20

**9**

**92**  118:2
**973**  6:11
**973.228.9898**  2:9
**9:04**  1:13 11:1
**9th**  3:13

**a**

**a.m.**  1:13
**aa**  33:21 34:5
**abbreviation**
33:21 34:5,10
**ability**  163:23
**able**  54:3
**abraham**  5:18
154:20,23 155:5
155:22,24 158:18
159:19 161:14
162:19 163:9,14
164:15,16 165:9
167:23 168:12
194:22
**absolute**  192:11
**absolutely**  75:2
118:12 189:16
**academic**  89:24
90:15 107:3
**academy**  199:14
**access**  40:11 42:22
107:12
**accommodate**
51:14 125:4
139:25 165:24
**account**  64:11
91:20 124:16
126:10 147:17
149:15 158:14
170:23 171:23
184:2 185:2,11

**accounted**  149:15
150:15
**accounting**  121:1
150:14 177:16
**accounts**  150:10
**accrues**  150:9
**accuracy**  210:9
**accurate**  45:7,8
**accurately**  43:23
193:1
**acknowledgement**
212:3
**acknowledgment**
210:12
**acquire**  123:6
174:9 181:13
182:1
**acquired**  26:19
130:5
**acquiring**  129:25
**act**  46:19
**actavis**  183:14
**action**  209:10
**actions**  1:5
**active**  172:11
**activities**  103:22
**actual**  17:6,7
30:22 31:19 62:2
63:3 64:18,19
65:17 91:3,21
96:3 118:24
131:20 133:20
162:8 166:18
**ad**  199:6,11,14
**adam**  2:7
**adapt**  197:16
202:15
**adapted**  196:9,14
**add**  70:21
**added**  174:6 199:4

Case 1:19-md-02875-RBK-SAK Document 2757-11 Filed 06/02/2023 Page 58 of 98 PageID:
Page 100998

adding 35:23
addition 31:4
  35:19 91:21
additional 37:9
  54:5 64:7,14
  84:19 91:2 138:10
  155:9 185:10
  187:3
additions 212:6
address 30:18
  39:20 164:2 166:8
  205:22 207:16
addressed 52:20
adjusted 185:9
adjustments 184:2
  185:2,10
administration
  189:5
administrative
  166:9
admitted 207:1
adulterated 27:23
  48:9 186:1,9
  188:14 189:7
  190:2,6 191:3,18
  193:5,23 194:9
adulteration
  186:20 192:6,7,20
advance 143:3
advisor 199:7,7,11
  199:14
ae 34:10
aforesaid 209:7
afternoon 154:21
  154:22 155:23
  182:21 183:12
agents 167:9
aggregate 26:22
  30:10,19 55:17
  66:4,5 73:24,25
  74:4,7,9 118:22

133:14 137:19,21
138:19 143:2
145:17,20 147:12
167:6 168:6
169:14
aggregated 26:7
  35:20 44:16 64:2
  147:6
aggregation 35:22
  42:24 134:24
agnostic 184:17
ago 160:5
agree 60:7 144:21
  144:23 152:7
  172:9 173:3 191:2
  191:17
agreed 167:24
  189:25 191:2,17
agreement 106:5
  180:8
agreements 106:3
ahead 15:19
  166:22
aid 5:10 11:16
  41:19
al 198:15 210:4
  211:1 212:1
albertsons 4:21
  5:5 42:4,10,11,15
alek 3:5
alfano 6:2
allegations 99:13
  192:17
alleged 27:11,13
  157:6
allegedly 163:17
  166:11
alleging 83:15
allocation 60:4
  67:16,18,20 68:1,9
  69:4 70:23 71:1

allocations 68:20
  68:21,22
allotted 210:20
allow 125:14
  203:2
allowed 25:22
  135:25
alluded 39:18
alternatively
  197:24
america 40:21
  74:25
america's 199:16
americsource
  101:18
amerisourceberg...
  7:11 101:16,19
  102:2,15,19
  103:16 110:16
  111:7,11 112:1
  113:11 132:6
  143:10,25 144:10
  151:10
amount 15:22
  23:12 35:13,21
  39:23,24 57:4
  60:10,25 61:1
  63:9,10,19 65:4,14
  79:13 81:13 82:10
  82:23 83:1 89:4
  127:8 128:4
  130:16 131:17,17
  144:24 145:13
  176:10 178:9
  181:4,7,13 182:1
amounts 23:19
  49:16,18,21 50:13
  63:16,21 65:17,18
  65:20 67:2 98:15
  105:8 136:14
  147:12

anal 147:21
analyses 57:23
analysis 25:8 31:5
  31:24 34:12,16
  40:17 67:21 72:6
  103:3 156:21
  157:9,16 158:9,24
  163:19,21 164:2
  165:20 166:2,7,21
  172:3 173:10
  186:10 188:2
  190:18,21 191:9
  203:11
analyst 51:23 54:3
analysts 53:18
analyzing 191:11
andras 4:3
andrast 4:3
annual 132:7
  144:2
answer 9:3 38:13
  39:2,3,12 45:3
  46:20 58:17 60:2
  60:17 66:13,20,23
  69:6 71:4,5 75:12
  76:12,18 79:12
  80:2 83:19 85:16
  86:1,13 88:12
  95:6 112:14 115:7
  120:3,14 125:14
  126:16 128:22
  131:25 139:13,16
  140:13 159:9
  161:9,18 174:17
  178:14 179:1,20
  180:13,23 182:10
  184:7 197:4,25
  203:12,13,20
  204:9
answered 26:18
  53:14 69:12 72:25

CONFIDENTIAL

73:10 79:11 97:7
98:23 153:8 159:7
174:16 176:1
178:12 179:18
181:16 182:3,7,9
182:11 184:5,20
187:19 193:25
**answering** 175:2,7
196:21
**answers** 180:25
**anticipate** 151:19
**anybody** 178:22
**apart** 166:14
**api** 106:19
**apologies** 35:11
**apologize** 45:11
154:6
**apparently** 201:21
206:21
**appear** 201:24
**appended** 212:7
**appendix** 13:13
**apples** 59:8
**applicable** 210:8
**applied** 61:5 126:2
186:2,16,19 187:6
**apply** 47:10
149:11 190:13,21
**applying** 190:3
**apportioned** 109:3
**apportionment**
60:4
**appreciate** 51:1
68:5 163:13
**appropriate** 36:1
36:10 128:3
147:23 204:14
**area** 112:24
**arizona** 56:16,24
58:6,8,13,25

**arrangement** 98:2
**arrangements**
96:13,17
**arrive** 63:23
**art** 22:5 94:4
119:25
**article** 118:1,10
179:5
**articles** 202:8
**aside** 64:17 65:1
**asked** 27:16 39:5
47:2,11 53:13
72:5,24 76:23
79:10 83:21 97:6
98:22 113:9
114:10 115:20
122:16 130:15
140:5 152:4 153:7
168:4 174:16
175:25 176:6
178:12 179:17,25
181:15 182:2
184:4,19 186:8
187:19 188:3
192:2 193:24
196:25 201:23
202:10,14 203:19
203:24 204:1
**asking** 11:17
13:16,17,19 18:20
19:3 35:4 38:10
41:1 42:10 66:14
72:7 77:23 81:4,6
86:3 87:1 92:4
93:24 94:3,9
120:2 137:6,7
139:7,8 141:19
142:14 163:3
165:1 173:24
175:3 180:3 182:5
187:14 188:15

189:13 192:25
195:15,17,19
196:12,15,23,24
197:20 202:8
**aslater** 2:8
**aspect** 90:14
**aspects** 89:21
**asserted** 189:3
**assess** 47:25
132:12
**assessed** 96:23
**assessing** 70:25
**assessment** 71:7
**assessments** 25:11
**assigned** 161:13
**assignment** 71:3
71:12 159:12
**assistance** 195:23
**associated** 26:3
65:22 92:24 99:5
**association** 8:6
197:9,12,18
198:15 202:17,22
207:20
**assume** 27:16
32:14 36:10 39:8
68:12 69:19 70:8
83:21 113:9
114:10,24 115:20
186:9 188:6,11
**assumed** 79:3
157:15
**assuming** 32:16
43:16 98:8 143:13
144:9 198:24
**assumption** 33:25
38:19,21 143:16
157:9 188:1,1,4,15
189:2,8,12 192:19
193:4,22

**assumptions** 45:18
51:14 53:20 69:9
79:4 113:5 186:2
186:20 188:9
189:18,19,24
190:3 191:1,16
**astonishingly**
201:20
**asymmetric**
114:15 157:23
158:11 163:20
191:20 192:3
**attached** 181:6
202:9 206:22
210:11
**attaching** 208:1
**attachment** 15:5,7
41:25 44:19 45:22
46:16 47:3,24
53:4 56:14,21
58:4 62:3,4 63:4
64:19,20 109:9,12
109:17 111:14,16
111:18
**attachments** 44:7
44:19 47:19,21
51:8,12 52:16
74:3
**attempt** 71:17
**attempted** 116:10
**attempting** 203:18
**attention** 156:6
**attestations**
189:10
**attested** 189:4
**attorney** 38:11
112:11 125:11
183:18 210:13
**attorneys** 29:24
186:14

Case 3:19-md-02885-MCR-HTK Document 4575 Filed 09/04/2024 Page 170 of 652 PageID
Page 69992000
CONFIDENTIAL

**attributable** 160:1
  166:10
**attribution** 34:13
**august** 25:15
  156:22 157:5,18
  158:22 198:14
**aurobindo** 3:21
  69:21
**austin** 2:13 206:23
**available** 154:5
  158:12 161:22
  166:25 172:14
  179:5 210:6
**avenue** 4:11 5:14
**average** 84:22,24
  85:12,20 86:7,20
  87:12 88:2,2,4,9
  89:12 94:16 95:21
**averages** 119:5,5
**award** 65:12
**aware** 13:22 33:19
  33:20,23 40:23
  42:25 43:10 92:22
  123:19,23 124:1
  135:11 148:20
  181:11,21
**awash** 135:10
**awsmolij** 3:5

**b**

**b** 3:6 5:3 7:3 8:1
  13:11,13 15:5,19
  18:17,23 19:6
  29:12 41:25 109:9
  109:12,17 111:14
  111:16,18 123:14
  132:14
**back** 11:2 27:6
  28:11 29:2 34:17
  35:25 36:2 47:25
  49:6 51:16 53:21
  54:11,25 58:20

60:18 64:21 65:24
  73:1 75:17 76:3
  95:1 100:7,10
  106:8 110:21
  112:21,24 113:4
  127:24 129:2
  130:22 154:18
  155:21 162:1
  175:9 183:10
  206:24 207:11
**background** 27:3
  105:19 132:19
  155:13 200:5
**backs** 145:15
  148:5,11 166:8,9
**backup** 18:20,22
  19:3,7,25 20:15
  21:5 118:6 168:4
**bad** 22:7,8 54:10
**bag** 91:11,17 93:7
**barcode** 136:2,7
**bargaining** 151:12
**barnes** 5:7
**base** 106:19 129:9
  131:9
**based** 29:21 51:9
  53:19 63:25 65:3
  86:16 126:5
  131:20 134:18
  184:22
**bases** 68:16
**basic** 84:17 129:10
  141:20
**basically** 49:1
  124:6 147:10
**basis** 31:4 44:5
  60:19 70:17
  192:19 193:4,21
**batch** 118:24
  133:19

**bates** 17:24 18:3
**bazan** 3:11
**befuddlement**
  180:25
**beginning** 28:12
  28:12 73:20 127:1
  142:3
**begins** 11:2 54:25
  100:10 154:18
**believe** 97:15
  111:14 156:19
  173:4 180:1 181:3
**benefit** 168:2
  169:6 179:14,15
  179:23 180:11
  203:25
**benefits** 93:11
**bennett** 24:21
  25:17 31:21
**berne** 7:8
**bernstein** 2:16
**best** 101:6 132:20
  176:4
**beyond** 70:19
  86:23 139:15
  145:4 186:21
  187:19 204:11
**big** 150:7 203:22
**bill** 78:23 166:8
**bills** 25:3,12,13
**bily** 7:13
**bipc.com** 4:19 5:3
**bit** 19:14 108:13
  111:13 120:25
  123:12 151:17
**bizarre** 92:22
**blackwell** 4:14
  168:20,23
**blank** 33:10
**blue** 8:5,6 197:9,9
  197:12,12,18,18

198:14,14 199:22
  199:22 202:16,16
  202:22,22 207:20
  207:20
**bockius** 3:17
**bold** 2:13
**bosick** 6:2
**boston** 6:15
**bottles** 147:5
**bottom** 69:24
  146:17
**boxes** 147:8
**brand** 185:25
  186:9 187:10,16
**branded** 99:4
**break** 54:16,23
  55:3 75:22 76:1,5
  76:24,25,25 78:4
  99:23 100:6 150:2
  154:15 183:4,8
**breaking** 77:9,16
**breaks** 76:6,16
  108:24
**bresnahan** 5:12
**brick** 32:14
**brief** 168:8
**briefly** 155:2
**broader** 17:13
**btlaw.com** 5:8
**buchanan** 4:18 5:2
**build** 53:18
**bully** 183:18
**bundle** 152:10
**burke** 206:23
**business** 102:4
  132:10 146:6
**busy** 108:16

**c**

**c** 2:1,23 3:1 4:1 5:1
  6:1 7:1 31:25 61:7
  209:1,1

Case 1:19-md-02875-RBK-SAK Document 2009-2 Filed 04/02/2022 Page 1 of 3 PageID: 68992

| | | | |
|---|---|---|---|
| **c.whiteley** 2:21 | 185:8 | **care** 121:25 | **caveat** 47:8,11 |
| **cabraser** 2:16 | **call** 17:9 119:11 | **carlo** 5:19 | **cdehart** 5:20 |
| **calculate** 47:16 | 120:13 133:24 | **carolina** 5:4 | **center** 6:10 201:5 |
| 49:12 54:12 72:5 | **called** 47:23 | **carondelet** 4:15 | **centre** 3:19 6:4 |
| 116:11 125:25 | 109:19 111:19 | **carve** 146:13 | **cents** 98:17 |
| 133:3,10 135:8 | 170:23 | **case** 12:7,24 13:7 | **cert** 168:8 |
| 140:5 161:7 | **calls** 45:10 58:16 | 14:20 29:10,14 | **certain** 96:18,18 |
| 175:22 177:10,20 | 67:15 83:18 85:25 | 31:3 37:12 41:12 | 96:19 105:22,24 |
| 178:8 181:3 | 86:11 122:25 | 42:9 60:22 71:13 | 115:20 145:18 |
| **calculated** 58:24 | 124:4 126:14 | 74:22 99:13,14 | **certainly** 103:13 |
| 59:1 66:8 73:2 | 139:3 145:7 184:5 | 100:20 105:1 | 106:25 196:19 |
| 125:23 167:19,22 | **camp** 2:24 | 107:5 109:19,22 | 199:3 207:4 208:3 |
| 173:25 177:1 | **campbell** 5:13 | 109:24 110:3 | **certified** 1:14,15 |
| 183:25 185:16 | 10:5 100:12,14,18 | 111:3 112:2 | **certify** 209:5,9 |
| **calculating** 61:21 | 100:25 101:4,7,21 | 114:22 115:5,23 | **cetera** 137:24 |
| 86:7,16 90:3 | 104:21 106:1 | 118:9,14 121:18 | 151:18 190:10 |
| 115:24 116:5 | 107:15 109:6,10 | 135:22,22 149:1 | 192:7 |
| 122:17 124:15 | 110:22 112:20,23 | 151:24 152:17 | **cgannon** 6:8 |
| 138:7 139:9 | 113:1 114:5,21 | 167:17 169:9 | **cgmp** 190:7 |
| 156:14 | 115:15 116:8,14 | 171:1 176:13 | 199:20 200:8 |
| **calculation** 17:13 | 116:16 119:14 | 185:15 186:11 | **chain** 37:7 103:6 |
| 20:13,24 21:13 | 121:7 122:7,9 | 188:2 193:6 | 106:21 114:18,20 |
| 24:24 51:22,24 | 123:15 124:13 | 195:11,16,20,21 | 117:9,17 120:1,10 |
| 53:24 56:23 59:6 | 125:6,19 126:22 | 196:1,2,9,10,11,13 | 120:17 121:15 |
| 62:2 65:10 66:16 | 127:23 128:15 | 196:14,16,17 | 135:2 136:5 |
| 66:17 87:16 | 129:1,14 130:8,19 | 197:11,15,17,20 | 142:13 145:21 |
| 106:14 125:16 | 130:21,24 132:22 | 197:22 198:3,17 | 164:8,19 172:17 |
| 126:6 127:18 | 135:19 138:13 | 199:21,23,25 | **change** 51:5 54:4,5 |
| 129:2,9 130:7,9 | 139:6 140:3,16,21 | 200:8,9 201:5 | 152:24 198:24 |
| 140:8,24 160:4,13 | 140:22 141:3,22 | 202:18 203:10 | 199:17 211:4,7,10 |
| 165:22,23 167:18 | 142:1,4 144:20 | 207:1,19,23 208:5 | 211:13,16,19 |
| 169:17 171:8,16 | 146:1 | **cases** 31:9 116:9 | **changed** 53:3 |
| 187:6 | **capital** 94:21 99:7 | 199:24 | 191:1 199:3,4 |
| **calculations** 17:6 | **captured** 64:13 | **cash** 77:10,18 | 200:2,3 |
| 17:8 21:6 44:5 | **card** 78:19,24 | 78:11,14,20,21,21 | **changes** 210:10 |
| 53:19 54:6 58:5,7 | **cardinal** 5:15 | 79:2,6,9 80:17,17 | 212:6 |
| 63:3 66:10 98:19 | 101:15,23 102:2 | 81:10,15,17,20,20 | **changing** 75:19 |
| 116:4 124:8 | 102:15,20 103:16 | 81:24,24 166:9 | **characterization** |
| 138:23 149:13 | 111:6,11 112:1 | **categories** 48:17 | 60:13 |
| 162:24 163:13 | 113:12 132:6 | **category** 142:16 | **charge** 16:5 82:23 |
| 184:12,13,16 | 143:11,17,25 | | 91:13 145:15 |

**[charge - concluded]**

148:5,11 166:8
**charged** 23:21
97:11
**charlotte** 5:4
**charts** 181:6
**cheap** 146:10
**check** 13:13,14
20:10,24 21:3
29:7 31:11 33:13
43:25 79:4 108:15
157:2
**checking** 20:11
**checks** 31:15
**cherry** 201:6
**chewing** 71:16
**chicago** 4:5 7:5
15:24 16:4,12
104:6
**chosen** 204:18
**christine** 6:8
**christopher** 5:3
**christopher.henry**
5:3
**cincinnati** 7:10
**circumstances**
181:12,23
**cite** 175:14,21
**cited** 12:17
**claim** 39:23 49:22
64:2,25 123:22
**claiming** 65:14
**claims** 15:8,14,18
17:10,11,24 20:13
21:20 22:1,3,12
23:5 26:15 29:19
29:21 30:22 31:20
32:18 33:9,17
36:12,19,21 37:17
39:8 40:24 41:2
41:15 42:7 43:5
46:19 48:21 49:15

49:15 50:8,9,15,17
50:22 57:6 59:12
65:3,19 67:1,3
71:11 74:11
171:17
**clarification**
169:11 170:21
**clarify** 86:4 128:1
180:5
**clarifying** 36:7
**class** 12:24 13:2
77:8,15 85:22
86:10,23 101:10
101:11 121:12
122:2,5 123:4
136:1,4 168:8
**classes** 164:4
**clawed** 206:24
**clean** 31:10
**clear** 54:2 74:19
160:23 176:5
178:12 207:9
**clearer** 95:23
**clearly** 45:23
57:21 94:1 95:24
**clerk** 91:11
**client** 38:11
**client's** 185:15
**clients** 193:23
**clinics** 117:15
121:24
**clipping** 202:8
**close** 101:5
**closed** 102:10
**closely** 151:25
**closing** 207:12
**coan** 6:14
**code** 22:17 25:7,20
26:21 29:14 35:5
40:14 59:7 119:6
133:19 186:24

**codes** 24:10 29:21
29:25 30:5 50:10
51:21 54:5 57:13
118:22 186:15
187:2,3
**coleen** 3:4
**collaboration**
104:17
**collaborative** 16:5
16:6
**collect** 37:2 40:20
**collected** 17:14
96:10
**collecting** 16:23
**collectively** 113:12
**color** 180:21
**column** 29:9,12
31:25 34:20 35:8
35:8,12 68:11
70:12,13 72:23
**columns** 19:16
29:6
**come** 127:6 162:3
172:20 207:10
**comes** 123:19
**comfortable** 34:14
53:16 189:18
**coming** 110:2
188:16
**commencing** 1:13
**commentary**
180:21
**comments** 164:9
180:15
**commercial** 23:24
96:25
**committed** 83:16
**committee** 199:8
199:15
**commonly** 99:11

**communicated**
188:24
**communication**
38:19 76:10
**communications**
76:6,22 77:1
194:3
**companies** 12:24
42:21,23 131:6,10
132:5,9 153:15
**company** 151:8
153:10
**compare** 197:25
200:13,20 202:21
**compared** 64:19
**comparing** 59:8
**complaint** 27:17
28:13,24 83:22
115:2 186:14
192:17 193:6,20
**complete** 53:22
200:11 203:11
207:12 212:8
**completed** 210:17
**completely** 71:11
164:21
**completion** 31:11
**compliant** 190:7
**components** 105:3
**compound** 39:6
166:13 195:13
**computer** 106:9
132:3 155:14
**concept** 42:25
146:23 152:19
**concern** 86:15
**concerned** 206:16
**concerns** 67:21
**concluded** 199:25
208:10,12

CONFIDENTIAL

[concludes - copy]                                                    Page 8

**concludes** 204:19
**concluding** 11:8
  205:4
**conclusion** 45:10
  45:17 58:16 60:1
  67:15 69:2 83:18
  85:25 86:12
  119:11 120:13
  126:14 139:3
  145:8 184:6
**concomitantly**
  168:7
**concrete** 82:25
**condition** 192:2
**conduct** 114:25
  115:5
**conducted** 166:2
**confer** 13:23
  154:11
**conferences** 102:9
  103:17
**confidential** 1:8
  70:2 76:9 166:25
**confidentiality**
  106:2,5 125:12
**confine** 25:22
**confined** 156:21
**confirm** 13:6 35:4
  37:16 38:20 46:4
  111:24 119:7,20
**confirmed** 68:18
**confirms** 38:24
**confused** 185:6
**conjunction** 163:1
**conlee** 2:21
**consented** 177:5
**consequently**
  128:3 133:2
**consider** 43:4
  137:2,15 148:5
  165:20

**consideration** 92:5
**considerations**
  146:13
**considered** 70:1,2
  138:21 139:22
  148:8 167:3 173:6
  174:11,11
**considering** 37:4
**consistent** 156:24
**consultant** 199:5
**consume** 168:13
**consumed** 159:16
**consumer** 19:18
  23:22 35:10,12
  39:19 40:2,16
  41:4 43:7 46:18
  49:16,21 50:12
  56:15,24 58:12
  59:17 60:23 61:2
  63:15 67:10 68:10
  70:13 71:20 72:9
  72:11,22 77:8,15
  85:11 89:11 92:7
  93:9,9 94:15,17,18
  117:14 119:8
  120:11 159:13
  160:1 161:25
  163:5,12,21 164:4
  176:10 192:9
**consumers** 22:15
  30:10 48:4 50:6
  63:22 65:13 67:2
  67:9,10 69:22
  70:12,15 71:21
  77:20 84:23 85:3
  85:13,21 86:8,9,9
  86:16,21 87:13
  88:3,5,10,24 89:9
  89:13 90:10,17
  94:12 95:3,14,18
  95:20,22 97:11,20

106:24 119:25
121:20 133:1
157:10 158:1
160:20 162:9,18
165:16 166:16
171:16 172:19
176:13,16 177:4
189:6 191:25
192:3
**contain** 30:12 42:7
  53:22 136:8 157:6
**contained** 33:5,6
  52:5 147:12
  157:18 173:25
  193:6
**contaminated**
  157:11,12 159:17
  163:25 165:25
  166:11
**contamination**
  114:16 157:25
  158:16 188:23
  194:4,5
**content** 144:17
**contents** 10:1
  33:15
**context** 101:22
  102:1 105:11
  117:8 129:17
  140:6,15,17,23
**contexts** 101:16
**conti** 1:11 2:5 8:3
  8:5,5 10:2 11:15
  15:5 18:6,10 20:2
  27:7 29:3 44:3
  47:23 49:3 51:10
  55:3 68:19 70:24
  76:5 87:22 100:13
  100:22 101:8
  109:8,11 110:23
  111:18 113:2

116:17 122:11
154:4,21 155:23
159:4 162:20
168:4 169:15
183:12,19 200:23
203:5,10,19
205:13,25 206:18
207:13,19 208:6
209:6 210:5 211:2
211:24 212:2,4,12
**conti's** 201:22
**continue** 146:21
**continues** 148:3
**contours** 189:15
**contract** 143:14
  144:9,11,12
  150:22 151:9
  152:6 153:1
**contracted** 143:2
**contracting** 143:7
  143:9
**contracts** 143:1,4
  143:17 145:2,5,11
  145:23 146:3,5
  151:22 152:9,16
  152:20,21,21,24
  153:2,24
**contrast** 200:21
**contribute** 88:14
**controversial**
  57:17 77:5 171:5
**convenient** 201:7
**conversation**
  148:12
**conversations**
  135:7,21
**copied** 196:9,13
**copies** 210:14
**copy** 197:16
  202:15

| | | | |
|---|---|---|---|
| **corporation** 4:12 | 82:8 85:12,21 | 6:16,21 7:6,11 | 107:13 110:4 |
| 110:16 | 86:7,18,20 87:13 | 11:8,10 13:24 | 146:6 192:14 |
| **corporations** | 88:2,3 89:12,14 | 36:9,16,18 37:8,15 | **coursework** |
| 144:2 | 90:10,16,19,24,25 | 38:9,22 39:7 45:1 | 101:10,11 |
| **correct** 12:14 13:8 | 91:9,10,11,14,21 | 45:18,24 46:3,13 | **court** 1:1,14 11:12 |
| 13:9,16 15:11 | 92:6 93:2,6,7,7,10 | 46:19,24 47:7,16 | 14:5,7 16:1,9 |
| 24:14 25:4,13,14 | 93:14,19,20,22,25 | 50:11 76:10,14 | 17:18 23:6 24:16 |
| 29:8,10,15 32:1,3 | 94:7,11,14,17,18 | 104:2 112:8 113:9 | 34:1 45:2 57:11 |
| 32:15 35:16,17,19 | 94:20,23 95:1,2,12 | 115:14 122:17 | 59:20 61:23 64:4 |
| 35:23 42:6 44:4 | 95:13,13,14,16,18 | 124:24 125:3 | 66:21 67:17,19 |
| 44:14,17 45:1,4,7 | 95:21 98:20,25 | 126:15,20 132:18 | 69:4,12 71:8 75:8 |
| 45:19 47:10,24 | 99:2 126:25 | 138:23 140:2 | 77:11,15 80:13 |
| 49:3 56:4,12 57:7 | 127:10,19 129:24 | 149:2,16 154:10 | 81:22 91:5,8 |
| 57:8 58:7,14 | 133:20 134:8,9 | 161:4 163:10 | 96:14 97:22 |
| 60:10,15 62:22 | 138:1 145:2 | 166:5 168:7,17 | 100:16,25 101:2 |
| 63:2,9 65:5 66:11 | 146:16 147:24 | 184:23 185:1 | 101:17,20 104:15 |
| 67:11 68:20 79:20 | 148:2,2,4,9 149:4 | 186:15,24 187:1 | 105:7,13 107:10 |
| 84:6 85:9,10 | 149:12,25 150:2 | 188:3 193:11,14 | 110:18 112:17 |
| 108:2 111:22,23 | 150:12 173:11,15 | 193:16 201:18 | 113:20 114:19 |
| 112:2,3 114:9 | 174:9,12 175:23 | 203:18 205:14,16 | 115:10 120:19 |
| 115:5,8,8 116:2 | 175:24 176:8,19 | 209:10 210:14 | 121:4 125:1,3 |
| 119:9,22 120:1,4,5 | 177:2,11,17 | **counsel's** 127:14 | 126:20 128:12,23 |
| 121:9 127:3 | **costco** 132:8 144:3 | 127:17 | 129:12,15 130:1 |
| 128:14,19 132:1,2 | **costs** 61:12,13,16 | **count** 158:14 | 131:24 132:15 |
| 132:3 146:23 | 64:7,14 84:18,22 | **counted** 43:23 | 135:13 138:9,11 |
| 149:9 152:24 | 88:22,23 89:8,8,25 | 59:4 149:23 | 138:23 140:1,19 |
| 156:17,18,22,23 | 90:4,5 91:2,18,21 | 150:20 | 141:25 149:3,6,17 |
| 157:2 158:24,25 | 92:1,15,17 93:2,2 | **counter** 63:22 | 149:22 150:18 |
| 160:8 169:20 | 93:23 94:10 95:9 | 79:14 91:12,17 | 153:16,19,21 |
| 170:19 184:18 | 95:9,10,10,17 99:5 | 94:22 166:19 | 158:4 162:13,16 |
| 186:3,11 190:10 | 99:7 130:6 135:12 | 167:13 | 164:13 165:6 |
| 191:22 192:20 | 138:10 149:18,19 | **counterfeit** 135:5 | 166:5 167:20 |
| 193:7 198:20,21 | 149:20 150:2,4,5,5 | **counting** 97:9 | 169:2,4 170:8 |
| 209:7 212:8 | 150:9,10,11,17 | 158:11 | 171:13 178:1,21 |
| **corrections** 212:6 | 173:23 174:20 | **couple** 27:18 | 182:22,25 185:1 |
| **correctly** 94:5 | 176:20 177:4,6,7 | 68:16 77:3 99:10 | 185:12,18,21 |
| **correspondence** | **costumer** 143:20 | 103:10 108:16 | 193:13,18 194:18 |
| 13:24 103:20 | **counsel** 2:5,10,14 | 123:17 131:2,2 | 194:23 199:10 |
| **corresponds** 44:8 | 2:19,25 3:8,14,21 | 132:23 | 203:7 204:22,25 |
| **cost** 48:6 50:4 | 4:6,12,17,21 5:5 | **course** 31:2,8 | 206:5 207:22,23 |
| 64:11 65:20,20 | 5:10,15,22 6:5,12 | 102:3 103:1 | 207:25 208:2,5 |

Case 3:11-md-02330-RS Document 200-7 Filed 06/08/2012 Page 175 of 655 Page ID:
Page 60972 2005

| | | | |
|---|---|---|---|
| **cover** 143:4 195:4 | 143:19 144:5 | 71:20 72:10,23 | 42:6,7,11,15,16,23 |
| **covered** 74:21 | 145:22 | 73:12,24 74:1,4,7 | 43:1,5,7,11,12,16 |
| **covers** 97:24 | **cut** 38:3,4 155:1,2 | 74:10,13,16,16 | 43:17,20,24,25 |
| **cpudt** 95:21 | 175:5 | 84:1,3,5 106:14 | 44:12 49:15,23 |
| **crazy** 87:8 | **cv** 16:22 197:14,21 | 115:25 116:11 | 51:16 52:1,1,12,13 |
| **create** 29:19 47:20 | 198:4,6,7,10 200:1 | 122:18 124:1,15 | 52:15,18 53:6,17 |
| 51:7,11 52:16 | 201:22 | 125:22 126:24 | 53:20,22 54:10,10 |
| 53:6 180:15 | **cvs** 5:10 11:16 | 127:5,12,18 128:3 | 54:11 57:6,23 |
| **created** 24:15 | 15:23 16:16 41:19 | 128:10 129:3,10 | 60:9 65:3,10 |
| **creation** 21:19,25 | 42:4,15,15 56:16 | 130:10 133:4,10 | 66:15 67:5 81:9 |
| **credit** 78:19,24 | 56:24 57:7 58:6 | 156:14,21 158:23 | 89:19 96:1,4 |
| **criteria** 161:11 | 58:13 63:5,6,15,25 | 159:12 160:1,12 | 102:14 104:6,12 |
| 162:5 | 64:8,25,25 65:3 | 160:14 161:8 | 104:19,22,24 |
| **critical** 25:8 | 75:1 98:5 99:13 | 162:1 163:5,12,12 | 105:4 106:3,13 |
| **cross** 8:6 122:3 | 170:18 172:15 | 164:2,3 165:20,21 | 107:9,11 110:17 |
| 197:9,12,18 | **cwhill** 3:4 | 166:4,7,17 167:19 | 110:19 111:19,25 |
| 198:14 199:22 | **d** | 167:22 168:6 | 112:4,19 122:4 |
| 202:16,22 207:20 | | 169:15,16 181:3,7 | 124:21,23 125:16 |
| **crowell** 5:11 | **d** 4:14,19 6:18 7:8 | 183:25 184:3 | 126:5 132:12 |
| **crowell.com** 5:12 | 34:20 80:22 84:23 | 185:16 | 133:3,9,17,20,23 |
| 5:13 | 85:3,13 88:24 | **dan** 100:14 | 133:25 134:2,6 |
| **cs** 210:15 | 89:11,12 95:14,19 | **dana** 3:6 | 135:10,23 147:21 |
| **culbertson** 6:13 | 95:22 | **daniel** 5:13 | 147:25 148:24 |
| **current** 194:13 | **d'lesli** 4:10 | **data** 14:17,17 15:7 | 160:19 161:2,10 |
| 198:25 201:25 | **d.stanoch** 2:22 | 15:8,14,14,18,22 | 161:21,23 162:2 |
| **currently** 13:1 | **daily** 26:1 107:13 | 16:4,5,14,21,24 | 163:6 166:1,20,24 |
| 199:6,13 | 110:5 | 17:9,10,11,24 | 167:11,11 168:4 |
| **curve** 187:10,12 | **dallas** 4:11 | 20:15 21:19,20,23 | 168:10 170:6,10 |
| 187:17 190:1,11 | **damage** 37:13 | 21:24,24 22:1,3,3 | 170:24 173:13 |
| 191:10,11,12 | 57:8 66:7 122:1 | 22:3,10,12,14,19 | 174:9,10 176:15 |
| **customer** 23:19 | 124:8 165:23 | 23:5,12 25:19 | 177:14,23 186:16 |
| 30:18 35:8 41:2,3 | 184:12,18 185:7 | 26:10,15 29:19,21 | **dataset** 50:10 |
| 41:4,5,6,7 61:10 | **damages** 8:3 18:7 | 30:8,19,22 31:10 | 53:21 |
| 92:14 141:13,16 | 18:18 20:4 21:13 | 31:11,15,16,20 | **datasets** 49:15,22 |
| 141:21,24 142:3,5 | 44:4 48:18 49:9 | 33:9,17 34:15 | **date** 25:9 30:16 |
| 142:10,14,15 | 49:10,13,14 55:8 | 36:10,12,19,21 | 40:1 69:20 156:15 |
| 144:14 145:6 | 55:15,17 56:8,9,16 | 37:2,4,4,9,11,16 | 211:24 212:12 |
| 150:24,25 | 56:24 58:9,12,13 | 37:17 38:4 39:8 | **dates** 25:17 |
| **customers** 141:7,9 | 58:21,24 59:5,18 | 39:15,17 40:7,11 | **david** 2:22 |
| 141:11 142:12,18 | 66:4,5,6 67:9,10 | 40:19,24 41:2,2,3 | **davis** 2:11,12 4:10 |
| 142:22,23 143:15 | 67:12 68:8,11,13 | 41:7,10,15,17,22 | |
| | 70:12,13,15,25 | | |

**day** 23:15 31:18 93:1 106:16 118:8 135:16,17 172:16 209:14 212:15
**days** 103:11 210:17
**dc** 3:13 4:20 5:14
**dcampbell** 5:13
**deal** 99:8
**dealing** 151:9
**dean** 154:7
**decide** 127:4 149:7 150:19 185:13
**decided** 137:17
**declaration** 13:15 74:3 110:9 114:23 115:4 195:11,12 195:16,20,21,25 196:9,13 197:22 202:18
**declarations** 13:16 110:25
**declare** 212:4
**deductions** 61:24 138:9
**deduplicated** 55:16,18 58:22 74:4,7,9,16,18
**deduplication** 55:7,24 56:19 58:20 59:11,13 73:19
**deemed** 212:6
**defendant** 3:21 4:6,17,21 5:5,15 6:12,16,21 7:6,11 27:21 36:13 37:19 39:10 41:18,19,22 43:6,8 48:2,7 49:8 49:12,14,22 50:7,8 50:13 58:10 59:19

66:9,10 73:12 74:1,5,8,10,13 99:14 103:12 110:15 113:13 122:18 131:1,5 133:4,5 169:9,18
**defendants** 3:8,14 5:22 6:5 11:19 12:24 13:25 15:10 18:2 27:15 29:10 29:13 36:11 37:17 38:23 41:12 42:9 44:6 67:12 68:13 74:22 83:16 91:22 110:6 113:11 126:7 128:6,17 170:25 183:14 202:1
**defense** 168:7
**defenses** 110:7
**defer** 149:6,21 150:18
**define** 22:2 72:18 85:2 94:14 95:1 95:16 194:11
**defined** 25:20 27:19 48:5 89:8 92:6 93:25 94:1 95:12,13 98:24 126:25 173:23
**defining** 89:25
**definitely** 58:3 199:18 200:3
**definition** 81:4 88:13 93:22 94:7 107:4 136:3 146:25 161:19 162:7 166:16 167:11 173:14 176:12 184:11

**dehart** 5:19
**delete** 205:15,15
**delineated** 186:22
**delineates** 81:9,16
**delineation** 79:25
**deloitte** 117:25 118:6,6
**delta** 123:9 133:15
**demand** 191:10,11
**denominator** 88:18,19
**department** 150:9
**depending** 124:2 150:21
**depends** 98:1,18 140:14,14 145:3 152:12,13
**deponent** 210:13 212:3
**deponents** 13:21
**depose** 33:15
**deposing** 210:13
**deposition** 1:11 11:25 12:21 13:10 13:20 111:9 170:13 175:6 198:20 200:15 203:17 204:19 205:5,7,13,17 206:11 207:5,7,12 207:14 208:12 209:5
**depositions** 13:5,6 13:11,20
**derive** 33:3 35:12
**derived** 19:1 34:21 35:5 47:18
**deriving** 87:12
**described** 49:19 73:7 74:11 128:16 133:5 186:22

**description** 8:2 9:7
**descriptions** 125:7
**desk** 106:9
**detail** 84:19 95:17 125:17,20
**details** 73:25 115:20
**determination** 139:14
**determinations** 68:1 69:11
**determine** 84:21 88:22 157:4 201:23
**determined** 79:9 140:2
**determines** 98:6
**determining** 137:3
**develop** 122:17
**deviations** 144:16
**dictate** 144:8 145:12 151:15
**dictates** 144:10
**differ** 21:11 126:3 133:11 143:5,6,10 144:13 145:5,24 146:11 151:17
**difference** 20:19 50:14 79:23 81:6 81:19 82:15 123:5 125:21 131:16 137:22
**differences** 105:12 105:15 124:17 125:8 126:10 147:18 151:21 184:2 185:3
**different** 20:18 36:8 41:9 51:5,6 54:10 64:15 65:13

Case 3:11-cv-02389-PGS-DEA Document 2009-757 Filed 09/04/20 Page 17 of 67 PageID: 68092

| | | | |
|---|---|---|---|
| 69:18 74:17 78:5 | discusses 32:12 | 180:10 | 116:4 147:25 |
| 87:17 90:6 96:13 | discussing 102:10 | distinction 20:7 | 158:9 180:19,20 |
| 96:17 117:10,11 | discussion 104:8 | 28:24 81:1,16 | 205:6 |
| 117:13,14,17 | 155:18 168:13 | 82:12 | dollar 98:17 |
| 119:25 121:15 | 201:16 | distinguishes 81:9 | 169:15,21 |
| 123:20,24 126:6,8 | discussions 37:10 | distortion 203:22 | door 102:10 |
| 133:21 141:7,7,8,9 | 194:5 | distributer 164:18 | dorner 3:12 |
| 141:17 142:22,23 | dispense 63:12 | distributers 99:12 | dorsey 6:18 |
| 142:24 143:8 | 89:13 92:25 95:22 | 106:21 118:2,8,20 | dorsey.com 6:19 |
| 145:12 147:9,11 | 172:9 | 119:3 | dose 172:11 |
| 149:1 150:12 | dispensed 23:15 | distribution | double 20:10,11 |
| 158:15 175:12 | 24:1 32:24 37:22 | 121:15 131:6 | 20:24 21:3 29:7 |
| 184:2 188:1,5 | 40:2,20 41:6,11 | 164:20 | 31:11,15 108:14 |
| differently 178:14 | 42:8 65:21 85:23 | distributor 164:8 | 157:2 |
| differs 133:4 | 89:6 106:24 | 164:12,23,23 | downstream 30:3 |
| difficult 21:2 | 160:21 171:25 | 165:2,13,15 | 136:5 142:11,17 |
| diovan 185:17,18 | 172:19 | distributors | 143:15 144:5 |
| 186:9 187:10,16 | dispensing 16:24 | 105:23 107:8 | 153:1,25 189:5 |
| dir 96:6,9,20,22 | 21:18,24 22:3,18 | 116:25 117:7,12 | dozens 107:22 |
| direct 55:11,12 | 22:19 23:21 30:14 | 117:21 | dr 11:15 55:3 |
| directed 69:4 78:8 | 30:17 36:22 37:3 | district 1:1,1 | 68:19 70:24 76:5 |
| direction 31:6 | 37:6 39:16 40:3 | dlesli.davis 4:10 | 87:22 100:13,22 |
| directly 89:5 | 42:23 49:24 50:4 | doctor 11:4 | 101:8 109:8,11 |
| 92:13 114:7 | 50:5 61:14,16 | 110:19 182:21 | 110:23 111:18 |
| 119:21 121:2 | 63:21 64:8,12,13 | 195:2 | 113:2 116:17 |
| 167:6 | 88:23 89:9,14,17 | doctor's 168:14 | 122:11 154:4,21 |
| disaggregated | 89:18 90:5,10,16 | document 1:4 | 155:23 159:4 |
| 26:10 147:23 | 90:20,24 91:3,18 | 19:22 23:4,8 | 162:20 168:4 |
| disagree 60:12 | 91:21 92:7,15,17 | 38:22 196:1 | 169:15 183:12,19 |
| discernable 161:2 | 92:23 93:2,14,23 | 197:25 202:1 | 200:23 201:22 |
| discounted 148:16 | 93:25 94:7,12,15 | 204:1,2 206:25 | 203:5,10,19 |
| discounts 61:4 | 94:17,18,20 95:3 | 207:18,24,25 | 205:13,25 206:18 |
| 145:17 148:19 | 95:10,14,17,25 | documents 9:6 | 207:13 |
| 149:11 166:9,15 | 97:5,10,12,15,19 | 11:23 13:14 15:9 | draft 195:22 |
| 167:15,16 | 97:20,25 98:1,6,14 | 17:23 18:1,1,21 | draw 156:5 |
| discovery 14:3,14 | 98:25 99:1,6 | 19:4 106:8,9 | drew 3:12 |
| discussed 28:23 | 170:4,6,24 171:15 | 109:20,23,23 | drive 4:5 |
| 29:22 31:22 40:12 | 171:22 172:14 | 110:2 111:5 | driven 144:18 |
| 49:25 61:20 83:22 | 173:12 174:7,20 | 131:20 207:7,10 | drop 121:2 |
| 186:13,18 | 176:20 177:6,7,17 | doing 31:5,9,18 | dropped 139:22 |
| | 179:13 180:1,5,7 | 49:1 53:11 88:4 | |

**drug** 91:16,22,23
92:12,13,14,23
93:4,6,12,13 94:22
98:16 105:5
118:22 131:14
135:9 169:23
173:4 174:12
181:14 182:1
189:5
**drugs** 5:22 23:15
28:21 37:6,24
51:20 64:2 67:4
75:3 79:15 82:8
86:17 97:19 99:6
103:22 104:24,25
105:22 106:18
113:23 114:3
116:7,23 117:5,10
117:18 118:5
120:22 121:12
123:6 126:3 127:9
131:14 132:16
135:4 139:10
140:6 146:10
154:24 155:7,25
162:10 172:14,20
174:10 180:10
186:1 190:3 191:4
191:19 199:6
**dt** 81:24 95:13,13
95:18
**dtdorner** 3:12
**duane** 3:2,10
**duanemorris.com**
3:3,4,5,11,12
**due** 17:17,19

**e**

**e** 2:1,1 3:1,1,11 4:1
4:1,4 5:1,1,17 6:1
6:1 7:1,1 8:1 35:8
209:1,1 211:3,3,3

**eabraham** 5:19
**earlier** 22:1 97:18
102:22 104:4
111:15 133:24
134:3,9 147:16
148:12 156:20
170:4,11,13 180:1
180:4 181:3 193:1
193:3 194:16,24
196:14
**early** 37:11 112:22
**easiest** 49:6
**easily** 138:10,11
161:2
**eastern** 1:13
**easy** 124:6
**echo** 14:8
**economic** 84:1
191:4,19,24
192:12
**economics** 16:7
**economist** 46:9
47:13 139:9,20
**economist's** 70:19
**ecosystem** 102:6
102:18
**effect** 93:13
**effectively** 156:14
**effects** 93:11
**efficacy** 190:9
**eisenhower** 2:8
**either** 77:14
102:24 111:6,25
137:25 148:8
149:1,4 164:4
172:10 198:1
**elaborate** 73:15
**electronic** 15:7
111:19,25 112:4
**elements** 123:20
136:10,11,12

146:22
**ellie** 4:9
**ellie.norris** 4:9
**email** 103:20
**employee** 110:13
149:19 150:4
**employees** 135:22
**encountered** 34:8
**ended** 204:10
**ends** 28:10 54:21
100:4 154:13
**engage** 68:6
**engineering** 199:8
199:15
**enormous** 75:2
**enrichment** 20:5
20:13,17 21:6,12
27:19 47:6 48:3
48:18 49:9,13
50:22 58:5,7,13
59:5,9,18 60:20
61:6,25 62:21
63:24 64:11,24
65:19 74:10 84:5
84:12 115:18,25
116:6,11 122:18
122:23 123:20,22
123:24 124:10,15
125:23 126:1,24
127:5,8,13,16,18
128:11,14 129:3
129:10 130:10
131:12 133:4,10
149:13 169:15,16
171:8,17 184:10
**ensure** 53:21
135:4
**entails** 61:8
**enter** 136:1
**entering** 136:4
152:9

**entire** 14:24 136:2
195:12,16,20
**entirely** 202:9
**entirety** 30:15
66:24
**entities** 96:8 103:5
131:8
**entitled** 20:4 59:17
**entity** 19:17 144:7
144:18 151:11
**entry** 108:25
**enumerated** 28:23
37:14 63:1 171:18
186:13
**epedigree** 134:5
135:1 147:15
**equal** 57:4 63:8,10
63:18 65:4
**equals** 80:22 81:24
84:2 95:13,19
**equation** 160:25
**eric** 5:18 154:23
155:2,24 168:2
194:22
**errata** 210:11,13
210:17
**erratas** 210:15
**especially** 172:20
**esquire** 2:3,7,12
2:16,21,22,23 3:3
3:4,5,6,11,12,17
3:18 4:3,4,9,10,14
4:19 5:3,7,12,13
5:17,18,19 6:3,8,9
6:14,18 7:3,4,8
210:1
**essentially** 115:23
126:24
**established** 38:25
41:25 46:13 48:12
140:12

Case 1:19-md-02875-RBK-SAK Document 2009-757 Filed 04/02/22 Page 179 of 661 PageID: 60867

**estimate** 75:5,10
**estimates** 20:17
**estimation** 74:20
  122:1
**et** 137:24 151:18
  190:10 192:7
  198:15 210:4
  211:1 212:1
**events** 110:5
**evidence** 207:1
**exact** 48:20 58:6
  192:5
**exactly** 50:24 59:2
  117:24 132:12
  189:15 192:8
**examination** 10:3
  11:14 100:12
  182:20
**example** 55:9 56:3
  56:4,10 108:24
  138:15 143:17
  144:24 149:11,19
  151:10 164:25
  172:15
**examples** 56:11
**exceeded** 201:18
  202:2
**excel** 8:4 18:7,19
  24:23,24 33:9,16
  49:2
**exclude** 29:20 30:6
  49:17 191:14
**excluded** 34:2,3
  34:12
**exclusion** 20:20
  161:11 162:6
**exclusions** 51:15
**excuse** 28:16
  68:15 91:6 94:4
  176:23 179:9
  197:23 203:1,1,25

**executives** 103:21
**exercise** 147:20
  200:11
**exforge** 185:17,20
**exhibit** 8:2 15:5
  18:6,10,17,23 19:6
  19:25 20:2 25:1
  27:7 29:3 31:25
  34:18 44:3 47:23
  49:3 51:10 52:6,9
  62:5,7,8 107:17
  109:8 202:3
  204:10 206:22
  207:18 208:1,3,6
**exhibits** 10:7
  13:10,20 44:9
  202:9
**exist** 145:1 149:4
  202:2
**existence** 179:22
**expand** 84:18
**expect** 31:14
  124:22 144:11
  146:11 151:14
  198:25
**expecting** 123:18
**expenditure** 77:16
**expenditures** 27:8
  77:9
**expense** 182:1
**experience** 106:12
  172:8
**experienced** 130:3
**expert** 8:5 46:10
  59:25 116:10
  139:8 156:2 197:8
  197:17 202:16
  207:18
**expertise** 51:7
**expired** 203:15

**explain** 48:2 49:11
  58:20 73:23 87:23
  97:4 171:15
  174:12
**explained** 48:1,22
  49:7 95:11
**explanation** 73:2
**express** 4:17 42:5
  156:13 168:24
**expressed** 27:9
  70:20 85:8 89:9
  95:18 136:24
  137:21
**extent** 16:22 38:10
  45:10 58:16 59:25
  67:15 76:9 83:18
  85:25 122:25
  124:4 125:11
  126:1,14 139:3
  149:25 154:3
  157:25 158:19
  167:8 184:5

## f

**f** 209:1
**fact** 12:23 117:3
  170:23 171:23
  189:11 199:19
  204:3
**factor** 88:2 98:20
  138:2 139:11
**factors** 139:21
**faculty** 16:8,10,11
  16:15 17:9
**fails** 210:19
**fair** 15:22 22:6
  36:6 157:15
  162:24 165:18
**fairness** 201:1
**falanga** 6:7
**falkenberg** 7:2

**falkenbergives.c...**
  7:3,4
**fall** 74:11 88:19
**familiar** 22:4
  181:22
**far** 125:9 131:21
  206:15
**fast** 165:8
**fault** 165:9
**favorite** 98:5
**fda** 29:17,25
  188:25 190:9
  194:2,17,25
**fda's** 199:5
**february** 1:12
  209:14 210:3
**fee** 22:18 30:14
  40:3 61:14 63:12
  63:21 64:13 89:17
  89:18 92:23 95:25
  97:5,10,10,16,19
  98:6,14,25 99:6
  173:12 174:7,20
  179:13 180:5,7
**feel** 34:14 53:16
  179:4
**fees** 23:2,21 36:22
  49:24 50:4 96:6,9
  96:20,22,22 97:20
  97:25 98:1 99:1
  149:12,12 166:9
  170:5,24 171:15
  171:22
**fhs** 6:3
**field** 33:10,18,22
  94:5 107:1 135:10
**fields** 31:12,13
**figure** 22:9 87:12
**figures** 169:15,21
**file** 18:7 21:25
  24:7,23 26:16

CONFIDENTIAL

29:3,19 33:4 44:5
44:8,22,25 51:10
52:11,16,21 53:5
53:12 207:23,25
208:5
**files** 168:9
**filing** 69:21 70:9
**fill** 30:8 106:19
**filled** 36:12 37:18
39:9 82:7 156:22
157:17
**filling** 90:25
**fills** 23:1,22 29:20
30:7,11,13 33:3
36:3,4 41:18 43:6
**filter** 25:16,22
51:11 53:5,9,17
54:9
**filtering** 49:2
**final** 25:5
**finally** 70:20
106:23 204:7
**finance** 102:23
199:7
**financing** 102:11
**find** 61:23 138:9
138:24 168:10
**finding** 59:7
**finds** 65:11
**fine** 73:9 75:16
**finish** 106:20
148:22 176:24
203:2 205:6
**finished** 83:6
159:9 172:10
**firm** 155:24
**first** 11:20 27:18
41:24 57:25 81:14
81:24 84:20
109:16 111:14
118:18 122:15

**131**:2,2 136:15
171:10 192:18
**five** 19:16 54:17
62:13 93:25 99:24
183:4
**flat** 82:19
**flexible** 51:13
125:4 139:25
149:15 165:24
185:11
**flipping** 109:18
**floor** 3:19 6:4,10
6:15
**focus** 103:4 122:15
**focused** 55:12,17
56:7,8,11 66:25
67:1 122:1,4
125:18,21 191:11
**folks** 101:15 102:2
**follow** 48:25 54:4
64:22 78:9 84:8
104:1 122:12
160:4
**following** 41:13
51:24,24 52:23
55:10 73:24 80:3
83:11 170:20
**food** 189:5
**footnote** 28:9,9,9
28:11,23 48:11
61:20 74:11
110:15,20 118:1
118:17,18 138:7
139:23,24 148:7
156:25 186:13,23
192:18
**footnotes** 55:23
74:18
**foregoing** 209:5
212:5

**form** 43:21 45:9
46:8 49:4 52:7,22
53:13 60:11,16
65:6 66:12 67:14
71:23 74:23 80:1
83:17 84:7 85:15
85:24 86:11,22
88:11 90:2,18
91:24 92:19 98:11
98:22 99:16 115:6
116:1 119:10
120:12 127:20
128:20 130:13
131:22 140:25
141:18 143:21
145:7 157:20
169:25 172:1
174:16 176:16
178:11 181:9,15
182:2 184:19
185:4 186:4,25
187:18 189:20
190:5 191:6 193:8
193:24 194:14
196:3 204:12
**format** 43:17
**former** 103:20
**forms** 186:21
**formula** 77:19
78:2,4,6,18 79:7
79:18 84:4,12,17
84:22,24 85:8,11
85:21 86:6 87:6
87:15 88:21 89:2
89:7,10 90:1
91:20 92:4,18
93:20 94:10,11,12
94:24 95:1,2,2,8,8
95:12,18 115:24
124:14 126:10,23
127:5 136:18,24

**137**:17,18 138:3
139:5 146:16,17
147:1,17 148:1,2,2
148:4 156:13
160:5
**formulas** 75:18
108:6,7 123:16
146:22
**formulated** 116:23
117:5,18
**formulation** 99:4
**fortune** 132:4,5
153:10
**forward** 173:18
179:7 187:6
**found** 47:22 50:10
**frank** 6:3
**frankly** 39:5
**fraud** 83:16
**free** 169:23 173:4
**freed** 145:22
**freeman** 2:7
**frequency** 33:24
**frequently** 30:4
172:20
**friday** 1:11
**friends** 152:5
**front** 155:10 156:3
198:7
**fulbright** 4:8
**full** 15:2 19:22
35:13 57:4 60:10
60:25 61:1 63:8
63:18 65:4 67:11
71:21 72:10,15,16
74:13 77:9,16
79:7,13 129:21
130:4 181:7
192:10,12,15
**function** 40:16
89:10 177:2

Case 3:19-md-02875-RBK-SAK Document 2009-7 Filed 04/03/22 Page 18 of 21 PageID: 68962

**fundamental**
157:23
**funny** 71:17
**further** 111:13
167:25 184:6
209:9

**g**

**g** 44:7,19 45:22
47:19 51:8,12
52:16 53:4
**g.1** 44:24 47:24
51:6
**g.1.** 44:20,21 53:4
**gained** 131:18
**gannon** 6:8
**gap** 150:14 153:13
**gateway** 6:10
**gcoan** 6:14
**geman** 2:16
**general** 42:12
119:24 120:7,8
127:15 131:13
137:18 139:5
142:25 143:8
144:6,17 145:13
145:13 148:25
151:5 152:1
153:23
**generally** 97:4
103:1 123:23
124:7 143:2
151:13 152:5
**generate** 22:10
23:3 25:1 39:15
**generated** 24:7
39:17 65:2
**generation** 64:18
64:19
**generic** 82:8,20,21
92:23 98:16 99:3
116:23 117:5,18

146:10 151:11
172:20 185:16
188:13 190:2
191:3,18 199:5
**geoffrey** 6:14
**geoppinger** 7:8
**getting** 70:22
108:14 132:19
**gisleson** 3:17
**gist** 151:5
**give** 11:10 19:24
32:10 56:10
109:13 156:7
157:1 198:12
200:24
**given** 26:10 37:12
45:18 52:17 90:20
90:20 93:3,3
108:25 114:1
116:21 125:7
135:9 144:12,25
145:14 166:15
167:15 202:4
212:9
**giving** 59:16 91:1
91:12 93:8
**glaxosmithkline**
8:7 197:10,13,19
198:15 199:23
202:17 207:21
**glenside** 1:12
**go** 15:19 26:25
27:6 28:13 29:2,6
32:5 34:17 35:25
36:2 42:3 44:10
44:18 46:17 47:25
49:6 51:16 53:4
53:21,23 54:11
56:21 58:4,20
60:18 61:6 62:19
64:21 65:13,24

73:1,6 75:17 77:7
81:19 83:3 84:11
85:7 88:21 89:7
95:1,16 106:18
110:21 111:17
116:15 122:8,10
127:24 130:22
136:17 148:1
154:9 166:21
168:21 171:4,5,7
171:10,12 172:4
194:16,25 196:18
196:21,21,23
198:24 200:4,21
201:2,12 202:20
203:24 205:8
**goes** 23:22 66:15
90:23 94:21
111:21 155:3
**going** 11:7,17 18:5
19:23 20:9 27:25
29:9 53:19 54:14
55:6 56:10 65:18
65:24 67:24 69:16
70:4 75:25 87:3
99:19 100:4,14,17
109:8,16 111:15
113:4 114:2
117:20 118:19
122:14 133:16
135:15,17 143:18
144:18 146:16
154:13 155:3,8,17
173:18 174:8
175:11 176:2,3
178:5,6 179:3,7
180:14 182:16,23
183:7,23 187:25
188:4,9 197:2,4,6
200:19 201:4,14
203:14 205:14

**goldberg** 3:3 11:4
11:5 58:1 195:10
195:18 205:11,20
205:22 206:4,8,14
207:3
**gonna** 205:11
**good** 11:4,15
45:11 53:17,20
68:1 99:22 100:13
154:8,8,21,22
155:23 182:21
183:12,15,20
189:17 194:13,13
**goods** 137:24
138:18 145:16
150:1,2,12 152:10
175:24 177:12
178:10
**gordon** 6:2
**gotcha** 12:15
**great** 11:23 75:21
100:1 120:8
142:19 189:10
**greenberg** 4:2
183:1
**greg** 4:4 182:24
183:13 204:23,23
**gross** 61:22 103:13
137:23 138:8,18
138:21,21
**group** 15:13 33:2
66:4 74:2 80:7
117:12 183:13
**grouping** 44:22,25
**groupings** 45:7,16
46:4,12,21 51:4,7
51:18 52:4
**groups** 79:25 80:4
80:8 106:23
**growing** 96:20

**gtlaw.com**  4:3,4
**guess**  120:16
  148:3 192:24
**guys**  194:20

**h**

**h**  6:3 8:1 44:7,19
  47:19 51:8,12
  52:16 211:3
**h.1**  46:16,18 47:24
  51:6
**h.1.**  47:3
**h.2**  56:22 64:20,21
  64:25 65:2
**h.2.**  56:17,21
**half**  14:9
**hand**  77:10,19
  120:23 209:14
**handful**  103:9
**handing**  94:21
**handled**  117:11
  118:8
**handles**  118:2
**handling**  146:14
**hang**  204:25 205:1
**happens**  30:3
**happy**  33:13 42:3
  73:6 94:25 103:24
  161:3,23 163:2,6
  178:25 194:16,24
  196:18 201:2
**hard**  27:3 154:3
**head**  16:7 75:14
  103:19,25 108:12
  110:14 111:4
  116:13 164:10
**heading**  15:7
**health**  5:15 70:19
  111:6,11 112:1
  113:12 139:8
  143:17

**healthcare**  3:9,15
**hear**  14:9 18:23
  27:3 35:2 59:21
  62:18 100:22
  101:1,3 105:19
  119:15 131:25
  154:24 155:13
  169:3 178:21,22
  205:3
**held**  151:25
  155:18 201:16
**help**  140:5 182:14
**helpful**  28:6 51:2
  82:14 200:12
**henry**  5:3
**hereto**  212:7
**hereunto**  209:13
**hetero**  5:22,22
  25:12 69:21
  154:23,24 155:7,8
  155:25,25 156:20
  158:20 160:2,12
  161:12,13 163:4
  165:2 167:8,15
  168:5
**hetero's**  157:4
  163:15 164:7,19
  165:12,12 166:10
**highlight**  81:23
**highlighted**  131:3
**hill**  3:4 5:17
  155:24
**hillwallack.com**
  5:18,19,20
**hilton**  2:23
**hinshaw**  6:13
**hinshawlaw.com**
  6:14
**hoc**  199:6,11,14
**hold**  26:5 32:6,6
  55:20 56:6,18

64:21 73:17 77:21
  80:8 82:3 120:22
  122:12 144:4
  146:19,19 174:14
  176:23 182:22,25
  195:23
**holds**  144:7,18
  151:11
**honestly**  12:16
  23:9 126:18
**honik**  2:2,3 45:9
  45:20 46:8 49:4
  52:7,22 53:13
  54:19 58:15 59:24
  60:11,16 62:9
  65:6 66:12 67:14
  67:18 68:15,25
  70:16 71:14,23
  72:13,24 74:23
  76:8,17 79:10
  80:1,10,15 83:8,12
  83:17 84:7,14
  85:15,24 86:11,22
  87:7,14,18,22
  88:11 90:2,18
  91:24 92:19 97:6
  98:11,22 99:16,20
  99:24 100:7
  112:10 115:6
  116:1 119:10
  120:12 122:24
  124:3,18 125:10
  126:13 127:20
  128:20,24 130:13
  131:22 139:2,12
  140:9,25 141:18
  143:21 145:7
  153:7 154:1,9
  155:2 157:20
  159:8 168:2,15
  169:25 172:1

174:14,23 175:1,4
  175:15,19,25
  178:11 179:8,17
  180:14,20 181:9
  181:15 182:2,7,10
  182:13,17 183:5
  184:4,19 185:4
  186:4,25 187:18
  189:20 191:6
  193:8,15,24
  194:14,22 195:5
  196:3 197:23
  201:8,13,18
  202:23 203:14,21
  205:10,18,21
  206:2,12,15 208:8
  208:10 210:1
**honiklaw.com**  2:3
  210:2
**hope**  183:17
**hospitals**  106:22
  117:15 121:13,24
**hour**  26:2,11
  154:2 201:19
  202:2 204:3,5,5
**hours**  68:23
  107:22,22 108:1
  108:10
**huahai**  3:8,9,15,15
**hudson**  2:17
**huge**  132:8 150:7
**huh**  63:7 85:6
  185:21
**humana**  7:6
**hunchuck**  3:18
**husch**  4:14 168:20
  168:23
**huschblackwell....**
  4:15
**hyman**  2:16

Case 1:19-md-02875-RBK-SAK Document 2009-7 Filed 04/02/02 Page 73 of 98 PageID: 60952

**hypothetical**  68:7
68:12 69:8,17
70:18 72:2 92:9
92:10,21 140:10
140:12 165:18
189:15
**hypothetically**
140:4
**hypotheticals**
188:8

**i**

**i.1**  46:16 47:5,10
51:6
**i.1.**  47:4,5,24
**i.2**  58:4 62:17 63:4
64:19,24 65:3
**i.2.**  62:19,20
**i.3**  62:17
**ice**  71:16
**idea**  53:16 118:14
175:22 177:10
178:7
**identification**
18:11 208:7
**identified**  17:24
26:20 29:14 95:11
**identifier**  43:14
**illinois**  4:5 7:5
**ilyse**  209:17
**imaginable**  204:13
**imagine**  61:15
**immediately**
172:19
**impact**  19:18 35:8
35:12 164:3
165:21
**implied**  45:24
**important**  103:5
107:1 117:9
120:17 148:13
153:12 155:7

205:23
**improper**  70:18
140:10 202:10
204:10
**impure**  163:17
**impurity**  157:7,19
158:21
**incentives**  141:15
**inceptions**  26:16
**include**  25:3,13
30:17 41:10 43:22
49:23 61:3,9,18
63:21 66:16 85:21
86:21 88:9,17
89:15 91:1 103:6
103:7,11 137:16
138:16 140:7,17
140:23 143:1
178:9
**included**  17:15
21:15 30:5 36:3
36:22 37:13 39:9
40:24 43:5,5
50:23 57:10,13
66:9 93:20,22
137:17 138:10,12
138:24 139:1
140:2 149:8,21
158:23 166:4,17
166:19 170:24
**includes**  41:2
106:21 183:14
194:5
**including**  34:14
40:14 63:12 78:18
86:8 88:4 148:5
175:23 177:11
207:8
**inclusion**  20:20
47:15 51:15
161:11 162:6

**inclusions**  140:1
**inclusive**  61:11
66:17 137:19
138:4
**incorrect**  189:11
**incredible**  23:12
**incremental**  91:14
93:3
**incurred**  64:8
**independent**  12:9
70:10
**index**  10:7
**indiana**  5:9
**indianapolis**  5:9
**indicate**  108:20
**indicated**  20:23
182:1 202:19
**indicater**  20:22
**individual**  23:2
30:14 151:8
173:16 177:8
**individuals**  85:22
103:16
**industries**  4:7
**industry**  12:25
16:20 43:1 46:10
94:19 96:8 101:14
102:5 103:2
118:10,12 119:4
172:8 180:6
181:22
**industry's**  78:24
**information**  16:24
24:2 26:7,19,22
30:12,13 33:6,6
34:15 36:24 37:13
38:1,2,11,12 39:25
40:24 42:7 45:17
46:23 48:14 49:20
49:25 93:9 114:15
126:4 134:23

136:8 150:4
157:23 158:11
163:20 167:24
176:18 191:21
192:3,5,15 199:25
200:20
**informed**  16:25
106:13
**informs**  107:4
**infused**  106:24
117:10
**ingersoll**  4:18 5:2
**ingested**  190:15
**ingredient**  99:2
172:11
**ingredients**  98:20
106:19
**injected**  106:24
117:10
**injury**  32:23,25
167:3 173:10
177:17
**input**  79:7 135:8
**inputs**  137:2,12
138:15 150:16
**inputting**  91:15
**insist**  202:2
**insofar**  70:17
**instance**  70:15
**instantaneous**
172:18
**institutional**  200:5
**institutions**  200:9
**instructed**  193:11
193:14,15,16
**instruction**  115:13
115:14 125:3
126:15,20 127:14
127:17 149:2,3,16
184:22

CONFIDENTIAL

**instructions** 9:3 51:25 52:5 124:24 184:25
**insurance** 23:18 30:11,15 40:17 63:11,15 67:2 77:20 79:19,24 80:6,18,24 81:2,5 81:13,18 82:10,16 82:22 97:24 176:17
**insured** 22:23 36:25 39:22 77:20 79:18,23 80:6,16 80:23 81:2,5,12,15 81:17 82:5
**insurer** 36:23 39:23 82:9,11
**insurers** 23:25 97:25
**intelligence** 43:10
**intended** 58:11 73:13 74:14
**intending** 58:11 77:4
**interaction** 106:4
**interest** 11:9
**interested** 209:11
**interplay** 66:3
**interpreted** 89:17
**interrupt** 166:22 174:23,24 203:4,5
**interrupted** 198:23
**introduce** 18:5
**invade** 125:11
**invades** 112:11
**invention** 199:8
**investigation** 157:3

**invoice** 108:23
**invoices** 207:8
**involved** 107:2 114:1 199:24
**involves** 101:11
**involving** 104:6
**iqvia** 50:10 66:15 122:4 160:19 161:10,21,23 166:20 167:10,11 186:17
**irbesartan** 1:3
**issue** 22:15 24:11 25:6 26:1 27:8,20 27:22 28:14 29:13 30:1 32:1 37:24 37:24,25 48:4,6,8 48:12,14 50:9,20 52:17 53:24 57:5 57:13 67:4,5,5 71:22 72:11 79:15 84:2 85:23 86:10 86:17,17 104:25 113:10,18,22 114:14 116:7,22 117:4,19 118:9,13 118:23 119:1 121:18,19,23 122:19 123:10 124:12 126:3,19 128:5 129:18 131:7,18 135:24 144:1 146:7 162:10,10,11,14 169:18 172:21 173:22 186:12,16 187:5,9,13,15 188:19 193:5,22 194:4 205:23
**issues** 101:12 102:11 132:14

185:9
**items** 150:8
**ives** 7:2,3

**j**

**j** 2:16,22 5:12,19
**jamie** 1:14 128:21 208:11 209:3,17
**janow** 4:19
**january** 27:21 48:8
**jdavis** 2:12
**jeffrey** 7:8
**jersey** 1:1 2:9 5:21 6:11
**jgeoppinger** 7:9
**john** 2:12 3:17
**john.gisleson** 3:18
**joining** 45:12
**jonathan** 4:19
**jonathan.janow** 4:19
**judge** 14:4,4,5,15 14:15,19,20 126:15 166:6
**june** 198:13
**jury** 61:23 65:11 69:12 124:25 125:2,3 126:15,21 138:8,23 140:1 149:3,7,17,22 150:19 185:1,12
**jury's** 69:5
**justin** 7:13 201:9

**k**

**k** 3:17 4:20
**kanner** 2:20,21,22 2:23
**kapke** 5:7 10:4 11:14,16 14:6,11 16:13 17:3,5,21

18:5,14 19:13,15 20:1 23:8 24:4,17 24:19 27:5 29:2,4 32:5,8,11 34:4,17 34:19 38:16 40:22 45:5,13,14 46:1,14 52:10 53:1,15 54:13,18 55:2 57:15 59:15,23 60:6,14 62:1,15 64:16 65:7 66:19 66:22 67:22 68:24 69:15,25 70:7 71:16,19 72:3,19 73:3 75:4,15,23 76:4,15,20 77:18 78:1 79:16 80:5 80:11,19 82:1 83:14,24 84:9,15 84:16 85:19 86:5 86:19 87:2,5,9,10 87:21,24 88:16 90:7,22 91:19 92:3 93:16 96:21 97:14 98:3,13 99:9,18 170:14,16
**kara** 5:7 11:12,16 45:11 68:18 71:15 77:11 80:15 87:19 170:16
**kara.kapke** 5:8
**kathy** 170:15
**katz** 2:7
**kbi** 7:3
**keep** 19:23 134:6 134:23 136:7 155:3
**keeping** 135:11,23 207:5
**keeps** 147:13 150:10

**kept** 43:15
**kind** 31:8 70:22
    126:6 127:15
    131:12 152:5
**kirstin** 7:3
**klinges** 3:6
**knepper** 4:14
    168:19,20,23
    169:5,8,12 170:1,9
    170:12 171:20
    172:4,6 174:25
    175:2,8,11,13,17
    175:20 176:21
    178:2,4,15,19
    179:2,11,12,24
    180:17 181:1,10
    181:20 182:5,9,11
    182:16
**knew** 158:2 192:4
**know** 14:16 16:22
    21:4 23:13 24:21
    33:11 34:22 36:4
    39:3,14 41:21,21
    42:18 53:3 58:2
    67:25 68:1 73:4
    80:25,25 83:7
    92:16 95:24 96:3
    98:8,9,12 99:17
    102:13 106:20
    108:10,16 109:11
    110:5,12 116:18
    117:23 118:23,24
    119:2,16 127:15
    131:13 132:6
    134:13,14,19
    146:10 150:7
    152:15 155:4
    157:25 159:15,18
    160:24 161:15,16
    163:15,23 164:7
    164:11,17 167:16

173:2 180:24
    188:7 189:21
    201:3 205:4
**knowledge** 41:1
    194:8,11
**known** 114:17,18
    158:17 188:23
**knows** 94:19,19
    147:13
**kroger** 42:4
**ks** 12:13
**kugler's** 14:19,20

**l**

**l.l.c.** 2:20
**label** 51:20 93:8
    99:12
**labeled** 20:3 30:2
    187:4
**labeling** 103:22
**labor** 90:25 93:10
    94:20 99:5,7
**laboratories** 6:5
**labs** 5:22 154:23
    155:8,25 160:2,12
    161:13
**lack** 129:5
**ladder** 205:9
**laid** 115:1 193:12
    193:17
**language** 57:21
**large** 145:18
**largely** 20:20
    117:20,22 118:4
    121:16 122:2,4
**larger** 19:14 30:11
    144:3 147:6
    176:13
**largest** 74:25
**late** 45:12 154:7
**laughed** 71:18

**law** 124:2,23
    125:8 155:24
    184:17
**law.com** 2:21,22
    2:23
**laws** 46:6
**lawsuit** 69:21
    70:10,11
**lawyer** 46:11,25
    47:10,13 71:6
    115:19 123:2
    124:11 139:19
**lawyerly** 204:12
**laying** 116:4
**layne** 2:23
**lbresnahan** 5:12
**lchb.com** 2:17
**leave** 205:25
**left** 33:9 67:12
    68:13 70:15 195:6
    201:21
**legal** 7:14 45:10,16
    46:6,24 47:9,12
    58:16 59:25 67:15
    68:21 69:2 70:14
    83:18 85:25 86:12
    86:23 119:11
    120:13 122:25
    124:4 126:14
    139:3,7,14 145:8
    184:6 210:23
**legitimate** 187:10
    187:12,16 190:1
    190:11
**legs** 206:19
**length** 31:22
    186:14,18
**letters** 13:23
**level** 26:21 42:23
    43:13 74:2 119:6
    124:22 134:16,23

134:24,25 136:7
    147:4
**levels** 158:15
**lewis** 3:17
**lhilton** 2:23
**liability** 1:3 20:6
    20:12,17 21:5,10
    37:12 46:6 47:14
    48:21 49:9,13
    50:21,21 58:21,24
    59:1,3,11,18 60:19
    60:21,25 61:25
    64:15,25 65:17
    66:5,17 67:1,3
    69:3 73:25 74:5,8
    74:12,17 84:3
    124:9 126:8
    156:14 167:2
    184:10
**liable** 115:17
**license** 209:17
**lieff** 2:16
**life** 16:15 110:5
    146:15
**limit** 50:8 201:19
    202:3 204:3,5,6
**limitations** 36:19
    36:21
**limited** 5:22,22 6:6
    14:17,17 37:4
    40:10 49:16
    115:23 124:23
    159:3 174:25
    176:14
**limiting** 26:23
**line** 9:4,7,10,13
    80:21 150:8
    159:25 173:19
    201:2,2 203:24,24
    211:4,7,10,13,16
    211:19

**list**　29:17,24,25
　48:3 84:17 109:23
　110:3,8 187:2
**listed**　16:22 17:23
　18:17,21 19:5,5
　21:15 25:25 29:11
　29:16 41:25 44:6
　48:21 54:1 59:10
　59:12 70:11,12
　74:25 90:9 110:10
　115:2 117:21
　139:5 163:5
　166:20
**listing**　15:9
**lists**　32:2
**literally**　26:2,11
　78:23
**literature**　175:21
　178:7 179:6
**litigation**　1:3
　14:21 18:3 140:7
　146:3,8
**little**　19:14 34:15
　101:2 108:13
　111:13 120:25
　123:12 151:17
　185:5 199:3
**live**　38:4 192:14
**livenote**　1:15
**liza**　6:9
**llc**　2:2 3:9,15 4:21
　5:5
**llp**　2:11,16 3:2,10
　3:17 4:2,8 5:7,11
　5:17 6:2,7,13,18
　7:2,8
**located**　32:13
　50:16
**location**　32:25
**logistically**　25:16

**logistics**　149:12
**long**　16:4 176:25
**look**　31:10,12,12
　44:20 46:17 55:10
　56:14,15 63:17
　94:24 118:5
　143:18 154:8
　162:1,21 168:9
　196:19 198:10
　202:1,12 204:1
**looked**　12:5
　103:10,13 104:19
　107:21
**looking**　30:21
　56:13 78:6 79:18
　80:20 87:6 89:23
　94:13 105:12,15
　105:17 106:12
　168:11
**looks**　132:11 143:8
**losartan**　1:2 210:4
　211:1 212:1
**lost**　77:12
**lot**　13:14 30:12
　39:14 101:8 102:4
　105:18 108:8
　118:24 129:3
　132:19 133:18
　194:3
**lots**　68:21,22 152:4
**loud**　27:2
**louis**　4:16
**louisiana**　2:24
**love**　140:12 188:8
**low**　82:8 101:3
**luke**　5:12
**lwalsh**　6:9

---
**m**
---

**m**　1:11 2:5,7 4:3
　4:10 5:7 6:9,14
　10:2 209:6

**ma'am**　35:9 36:5
　39:1,14 198:4
**madam**　100:25
　204:25
**mail**　32:17,25
　50:16 169:7
**mailed**　32:19,20
　32:20,22 33:1
　50:18
**main**　110:21
**maintain**　102:16
　135:3
**maintained**　134:4
**major**　132:4
　143:11
**majority**　116:23
　117:6,23
**making**　71:14
　82:13,13 99:13
　154:25 158:3,5,7
**management**
　54:10 151:15
**manager**　169:7
　179:14,23 180:12
**manager's**　179:16
**manner**　151:14
　203:13
**manufacture**
　132:25
**manufactured**
　128:6 158:20
**manufacturer**
　23:19 25:7,10,20
　26:21 28:25 29:13
　29:17 35:15 40:13
　51:18 52:4 56:9
　58:22 59:7 60:9
　66:4,10,18 67:3,6
　89:5 92:13 105:10
　114:7 123:7
　134:24 142:6

**150:21,21 151:1
　151:11,13 152:14
　153:5,5 157:24
　158:16 159:18
　165:12 188:24
　192:5
**manufacturers**
　28:22 29:24 30:3
　37:25 48:16 57:13
　58:10 64:5 67:8
　68:7,10 70:11
　73:13 74:1,6,13
　103:4,12 105:21
　113:23 114:2,17
　119:6 120:22
　121:2 133:18
　134:12 135:4
　136:3,9 142:8
　151:17,23 152:8
　152:17,22 167:1
　184:1 188:13
　189:4
**manufacturing**
　106:20 194:13
**marginal**　90:24
　91:3,3
**mark**　18:6 33:18
　202:3
**marked**　9:12
　18:10 70:13 202:6
　204:16,21,24
　208:6
**market**　2:4 30:4
　74:21 75:3 102:21
　114:1 118:3 119:8
　120:11 123:9
　135:18 142:7
　143:12,12 144:4,8
　144:19 151:7
　157:24 158:13

Case 1:19-md-02875-RBK-SAK Document 2009-7 Filed 04/03/2021 Page 77 of 98 PageID: 60872
CONFIDENTIAL

| | | | |
|---|---|---|---|
| **marking** 20:2 | **mazieslater.com** | **measures** 184:3 | 139:24 148:24 |
| **mash** 87:18 | 2:8 | **mechanical** 86:15 | 149:15 151:6 |
| **mashing** 87:19 | **mckesson** 4:12 | 87:16 89:21 90:14 | 185:11 186:3 |
| **massachusetts** | 111:6,11 112:1 | 122:1 124:11 | **methodology** |
| 6:15 | 113:12 | 126:19 | 70:25 122:17 |
| **massive** 42:21 | **mdl** 1:2 | **mechanically** 65:8 | 156:13 162:7 |
| 144:2 | **mean** 24:18 30:24 | 88:14 116:3 | 171:8 |
| **master** 14:3,14 | 31:1 32:19 34:5 | 125:16,25 148:23 | **microphone** 101:5 |
| **match** 50:19 | 36:4,20 37:1 | **mechanism** | **million** 69:23 |
| 147:24 | 40:25 41:4,22 | 203:19 | 118:7 135:16 |
| **matched** 48:17 | 42:18 45:8 55:20 | **media** 11:2 54:21 | 160:13 161:7 |
| **material** 190:8 | 58:23 65:8 66:1,2 | 54:25 100:4,10 | 162:4 |
| **materially** 143:5 | 67:10 71:6 72:16 | 154:13,18 | **millions** 23:13 |
| **materials** 11:24 | 73:6,15 74:15 | **medical** 106:23 | 172:15 |
| 18:8 20:3,8 | 78:20,22 81:1,3 | 199:16 | **mine** 69:9 |
| 127:11 | 86:14 87:7 90:9 | **medication** 171:24 | **minus** 48:6 61:11 |
| **mathematical** | 94:25 102:25 | 172:10,23 | 65:20,20 84:18 |
| 68:22 | 106:16 109:1 | **medicine's** 199:8 | 94:10 95:9 126:25 |
| **matt.knepper** | 113:16 114:4 | 199:15 | 127:19 129:24 |
| 4:15 | 117:6 119:13,23 | **meet** 13:23 154:7 | 130:6 173:23 |
| **matter** 8:7 16:17 | 120:16,16 125:21 | **meetings** 102:10 | 177:2,4 |
| 17:4,12,15 86:23 | 125:24 132:4 | **megan** 7:4 | **minute** 26:2,11 |
| 103:24 104:19 | 134:10 135:10 | **members** 85:22 | 148:21,22 156:9 |
| 109:24 116:6 | 136:12 141:2,11 | 86:10 104:18 | 195:6 |
| 117:20 119:24 | 143:10 145:1 | 114:18 135:2 | **minutes** 54:17 |
| 120:7,8 122:1 | 148:6 150:6,24 | 136:5 142:13 | 99:24 123:17 |
| 126:2 128:4 | 152:12,13 164:22 | **membership** | 183:4,22 204:2 |
| 130:11 131:13 | 164:22 165:4,11 | 86:23 | **misbranded** 27:24 |
| 132:14,17 141:23 | 165:14 166:22 | **mentioned** 14:18 | 48:10 186:2,10 |
| 142:25 143:19 | 170:18 171:7 | 25:9 28:11 51:19 | 188:14 189:8 |
| 144:7 145:10 | 182:5 183:21 | 63:20 93:5 99:10 | 190:2,7 191:3,18 |
| 146:4 152:3 | 194:15 196:4,18 | 102:22 104:4 | 193:5,23 194:10 |
| 153:23 175:1 | 200:14 | 107:16 133:24 | **misbranding** |
| 199:21 204:3 | **means** 34:13 46:4 | 147:16 148:10,19 | 186:20 192:7,20 |
| **matters** 65:16 | 93:15 182:18 | 149:10 152:19 | **mischaracterizat...** |
| 133:15 177:19 | 196:6 | 198:22 | 171:3 |
| **matthew** 4:14 | **meant** 80:17 | **merely** 204:1 | **mischaracterizes** |
| 110:9,12 168:20 | 119:16 | **meridian** 5:8 | 193:9 |
| **maz** 7:4 | **measure** 123:25 | **met** 190:8 | **mischaracterizing** |
| **mazie** 2:7 | 127:12 128:3,10 | **method** 51:13 | 143:24 202:24 |
| | 184:17 | 78:23 125:4 139:4 | 205:18 |

Case 1:19-md-02875-RBK-SAK Document 2009-7 Filed 04/02/22 Page 78 of 98 PageID: 68958

CONFIDENTIAL

**misconduct** 27:11
27:13,14
**mismatch** 57:21
**missing** 31:15,16
**missouri** 4:16
**misspoke** 80:16
111:15
**mistakenly** 43:22
**mistakes** 53:23
**mix** 121:1
**model** 181:3
**molecule** 116:22
117:5
**moment** 163:18
172:2 173:1,8,9
191:8
**momentarily** 11:6
**moments** 160:5
**monday** 13:2
**money** 72:11 89:4
127:8 130:16
176:11 178:9
**monroe** 7:5
**month** 22:15
23:20 25:3,5,10,19
25:21 26:19 40:14
161:22 184:14
186:15
**months** 107:18
108:16
**morgan** 3:17
**morganlewis.com**
3:18,19
**moring** 5:11
**morning** 11:4,15
11:24 45:11 68:4
100:13 102:23,24
170:17
**morris** 3:2,10
**mortar** 32:15

**moskowitz** 1:14
209:3,17
**motion** 168:8
**move** 44:2 54:14
131:13,15 173:18
178:15 179:7,8
190:25 204:14,16
**moved** 129:18,22
150:13 173:16
**movement** 129:20
**moving** 123:13
127:9 130:17
132:13 172:15
**mulberry** 6:10
**multiple** 31:23,23
39:5 62:9,12,13
64:2,3,4,5 74:12
83:21 101:16
147:7,7 198:13
200:14 201:21
204:8
**multiplied** 136:25
162:3
**multiply** 137:13
137:16
**murtha** 5:17
**mute** 11:13 194:21
**mylan** 6:5,6 69:22
103:11 118:18

**n**

**n** 2:1 3:1,18 4:1
5:1 6:1 7:1
**name** 11:15 19:17
25:6,7,11 30:17
34:20,21 35:5
39:19 40:4,13,13
100:14 133:18
154:23 155:23
178:6 185:25
186:9 187:10,16
198:3

**name's** 183:12
**named** 17:15
106:6 179:6
**names** 24:10 105:5
105:10
**national** 40:5
199:7,14
**native** 43:17 44:12
161:21 163:4
**nature** 163:17
**ndc** 22:17 24:10
25:7,20 26:20,20
29:14,21,24 30:5
34:21 35:5 40:14
50:10 51:18,21
52:4 54:5 57:13
59:7 118:22,24
119:6 133:19
134:24 186:15,24
187:2,3
**ndcs** 25:12 30:1
160:10
**necessarily** 165:11
167:2
**necessary** 212:6
**necessity** 66:7
**need** 21:3 51:2,7
52:14,15,18 54:6
79:3 88:1 110:23
154:4 159:6 173:2
207:2
**needed** 135:8
**needs** 68:9 194:20
**negotiate** 152:8
**negotiated** 98:10
167:9
**neither** 209:9
**net** 127:10 137:23
138:22
**network** 179:16
180:8

**name's** 183:12

**never** 34:7 54:7
104:13,16 152:6
**new** 1:1 2:9,18,18
2:24 5:21 6:11,20
6:20 51:11 52:16
52:17 53:6 199:17
200:20
**newark** 6:11
**news** 183:15 202:8
**nice** 183:21
**night** 11:24 102:24
**nitrosamine** 157:6
157:19 166:12
**nitrosamines**
157:13
**noise** 27:2 105:19
132:19 155:13,15
**nominal** 98:18
**non** 42:11 43:6
149:18 188:23
190:2,2 191:3,3,18
191:18 192:7,7
**normal** 31:8 102:3
110:5
**normally** 107:12
**norris** 4:9
**north** 5:4
**norton** 4:8
**nortonrosefulbri...**
4:9,10
**notary** 209:4
212:13,19
**note** 47:6 58:15
59:13,24 68:15,16
69:25 70:16 76:8
112:10,10 122:24
124:3 125:10
126:13 139:2,12
140:9 154:2 168:3
174:7 183:23
184:4 210:10

CONFIDENTIAL

**noted** 46:18
124:19 212:7
**notes** 45:21 63:17
209:8
**notice** 207:14
**number** 8:2 11:2
17:25 39:21 40:6
54:21,25 68:17,23
68:25 69:23 70:2
70:2 100:4,10
103:20 108:10
109:2 118:2,24
154:13,18 160:16
160:17,24 161:5,7
161:16,17 187:3
201:19,19 206:20
206:21
**numbers** 18:3
35:23 53:6 65:2
72:22 141:15
162:23
**numerous** 184:9
192:22
**nw** 3:13 5:14

**o**

**o'clock** 154:2
**o'reilly** 6:7
**oath** 11:21
**object** 45:9 46:8
49:4 52:7,22
53:13 60:11,16
65:6 66:12 67:14
71:23 74:23 80:1
83:17 84:7 85:15
85:24 86:11,22
88:11 90:2,11,18
91:24 92:19 98:11
98:22 99:16 115:6
116:1 119:10
120:12 127:20
128:20 130:13

131:22 140:25
141:18 143:21
145:7 157:20
169:25 172:1
174:14,16 178:11
181:9,15 182:2
184:6,19 185:4
186:4,25 187:18
189:20 191:6
193:8,24 194:14
196:3 202:5,12
203:16 204:13
**objecting** 38:12
**objection** 38:9
39:11 58:15 59:24
68:16 69:1 70:16
70:21 72:13,24
76:8,11,17 79:10
97:6 112:11,13
122:24 124:3,18
125:10 126:13
139:2,12 140:9
153:7 175:25
179:17 180:17
184:4
**objections** 125:14
**obtained** 91:23
169:23
**obviously** 113:25
200:9
**occupy** 119:25
**occurred** 33:20,24
33:24 61:19 69:20
69:20 70:9 143:9
165:20 173:10
**occurrence** 33:12
**occurs** 32:23
143:8 167:4
177:18
**offer** 71:14 84:21

**offered** 84:4,5
181:24 204:7
**offering** 115:3,16
**office** 199:5
**offline** 168:13
**offset** 50:4,6 65:22
138:8 148:11
166:18 171:18
**offsets** 61:3,18,22
63:14 130:2
137:24 148:8
149:4,21 150:18
167:3
**oh** 35:10 71:17
72:8 83:10 110:15
**ohio** 7:10
**okay** 12:15,15
13:3 14:7,12,24
15:4,13,16,20
17:16 19:19,23,23
22:6,22 24:13
26:4,13 27:6 29:2
29:12,18 32:9,10
34:25 35:7,25
36:6 39:7 42:17
42:20 44:10,18,24
44:24 46:15 47:1
47:17 49:5 54:14
55:6 56:12,20,22
57:3,9 60:18
62:16,20,20 64:24
64:25 66:1 69:16
72:8 73:5 75:17
75:21,23 76:21
77:2 78:8,10,21
79:3,17 81:8 82:2
83:3,10,13 84:10
84:11 85:7,10,20
87:2,14,21,25 88:8
88:21 90:8,13
92:8,20 94:13

95:4 97:3 99:24
100:13,21,22,24
101:1,4,20 104:1
104:10 107:21
108:4 109:5,15
110:8 113:6,7
116:19 118:13
119:1,23 120:6
122:13 123:1,16
129:2 130:20,23
131:5,19 133:9
136:17,21 137:15
140:11 142:6,16
142:19,20 148:1
150:16,23 151:5
152:18 153:21
155:6 156:5,10,11
156:12,19,24
158:19 161:25
164:7,11 165:1,6
166:7,23 167:23
170:22 171:21
172:4,7 173:18
178:15 182:17
183:5,24 184:16
184:25 185:25
186:8,19 187:25
188:14,20 189:14
189:24 190:25,25
191:14 192:13,16
192:24 194:23
198:5,9,13,22
200:7 205:6,8
206:8,9
**old** 206:12
**once** 53:12 59:4
**ones** 17:15 25:25
42:1 43:20 69:11
103:23 117:19
163:24,24,25
172:21

CONFIDENTIAL

ongoing 69:1
opaque 107:11
open 31:19 207:5
opened 31:22
operate 142:7
operating 102:20
opinion 14:24
  38:20 45:6 46:11
  46:21,24 47:9,12
  47:14 59:16,25
  70:20 84:5 122:25
  124:4 129:6
  138:25 139:8
  187:11 189:25
  191:7 194:12
opinions 11:18
  14:2,13,19,20
  16:16 17:7 46:5
  100:15,19 106:13
  114:23 115:3,16
  115:22
opportunity 11:10
  33:14 201:25
  202:4,11
opposed 57:22
optum 42:4
optumrx 6:21
oral 97:19 98:16
orally 116:23
  117:5,18
orals 118:4
oranges 59:8
order 32:17,25
  50:16 51:21 70:4
  98:17 132:7 169:7
  181:2
organization
  102:12
organizations
  117:12

original 53:21
  54:11 196:1,4
orleans 2:24
ostfeld 4:4 10:6
  182:18,20,24,24
  183:1,11,13
  184:15,24 185:14
  185:20,24 186:7
  187:7,24 189:23
  191:13 193:19
  194:7,20 195:1,7,9
  196:7 198:2 200:6
  202:13 203:1,21
  204:20,25 206:21
  207:4,16,17 208:9
ostfeldg 4:4
outcome 209:11
outlined 27:17
  162:7
outpatient 117:15
  121:24
output 8:3 18:7,17
  18:18 20:4 21:25
  24:7 26:16 29:3
  29:19 33:4 44:5,8
  51:10 52:11,16,21
  53:5,12
outside 60:5 67:21
  69:13 70:14 71:2
  71:12 92:11,11
  140:6
overhead 149:19
overlap 200:10
owed 65:15
oxford 3:19 6:4

**p**

p 2:1,1 3:1,1 4:1,1
  5:1,1 6:1,1 7:1,1
p.m. 154:5,12,16
  154:16 201:15
  208:13

packages 147:5
packs 147:7
page 8:2 9:1,4,7,10
  9:13 10:4,5,6,7
  28:4 45:23 46:18
  50:3 57:16 73:22
  82:4 89:7 109:2
  109:17 111:14,16
  111:17,18,21
  130:22 146:17
  148:4 156:8
  159:23 169:13
  171:5,10 198:10
  198:13,24 211:4,7
  211:10,13,16,19
pages 15:6 108:6,9
  108:11 109:18
  111:22
paid 23:19 30:10
  35:13,21 39:24
  40:16 49:16,21
  50:12 57:4 60:10
  60:21 61:1,10,11
  63:8,19 64:1,10
  65:4,18,19 67:8
  68:10 69:22 78:13
  78:19 79:14 82:23
  82:25 84:3 86:16
  86:21 88:10 97:18
  105:8 128:4
  129:23,24 137:23
  137:23 138:19
  143:2 159:16
  160:21 161:10
  162:9 167:4,12
  174:5 176:16
  181:13
painfully 178:12
pale 204:11
panels 102:9
  103:17

paper 28:7 91:10
  118:6,6
papers 16:6,21
  105:14
paragraph 15:2
  27:7,24 28:1,10
  32:4,7,9 49:6,8,11
  55:16,19,24 61:7
  73:7,7,21,21,23
  75:18 77:8,23
  78:3,3,7,9 83:3,5
  84:12 112:22
  113:8,14 116:15
  116:21 118:1,18
  122:8 127:1,25
  128:2,7,17 130:22
  130:23 132:24
  136:19 138:14
  156:6 160:6 171:6
  171:11,12,14
  172:5,8 173:20,21
  192:18 199:1,1,2,3
  202:20,20
paragraphs 27:18
  28:18 48:1,23
  83:23 115:2
parkway 2:8
part 13:1 27:14
  31:17 45:17 79:17
  81:14 102:6,6
  103:1 107:9
  120:17 126:6
  136:18 137:16,25
  137:25 138:22
  145:23 147:14
  148:4 179:15
  180:8 199:2
particular 17:4
  26:9 33:3,3 35:14
  59:19,23 60:8,8
  64:9 65:22 114:11

139:10 140:6
141:13 151:19
152:10 156:15
**particularly** 82:7
**parts** 108:20 196:8
196:12,19 201:23
**party** 22:21 49:17
61:2,11 65:14
97:11 157:10
158:1 159:14
160:22 163:22
164:19 165:16
167:9,13,17
176:12 181:24
191:25 192:4,9
209:10
**pass** 11:7 99:19
**patient** 35:13 41:4
57:4 60:10 63:8
63:18 65:4 90:21
91:1,4,13 93:3,11
94:22 174:6 177:8
181:4
**patients** 36:25
78:18 119:22
121:9,20,25
166:18
**pause** 176:25
**pay** 30:15 63:22
67:13 68:7,14
70:11 78:12 79:18
79:23 80:6,7,17,22
80:23 81:2,5,13,13
82:6,9,11,15 88:20
89:4 91:22 97:20
97:25 171:24
**paying** 77:10,18
78:11,22 79:1,1,6
79:9,19,24 80:24
81:10,17,18,20,25
134:12

**payment** 22:20
23:18 40:17 63:16
67:2 71:7,9,10
78:23 81:18 82:10
88:15 166:18
**payments** 23:24
36:23 63:11,12,13
67:4 77:9,17
78:25 82:19 96:7
164:11,17 165:2
165:11 176:10,15
176:17 177:3
**payor** 22:21 49:17
61:2,11 78:5
160:1,12 161:7,22
163:12 164:4
181:24 192:10
**payors** 65:14
97:11 157:10
158:2 159:14
160:20,22 161:10
162:11,15 163:22
165:16 166:1
167:9,17 176:12
192:1,4
**pays** 30:11 77:19
97:15
**pbm** 41:2,3,7
180:7
**pbms** 40:24
**pc** 4:18 5:2
**pending** 203:12,17
**pennsylvania** 1:12
2:4 3:7,20 5:14
6:4
**penny** 134:7
**people** 79:1 81:10
81:12,17,17 82:5
**percent** 82:25
118:2

**percentage** 74:21
75:6,11 82:22
114:11 117:24
118:15 119:2
**perfect** 77:2
**period** 25:1 26:9
26:11,23 27:10,13
27:20 28:16,22
31:24 35:18 57:5
57:8,14 64:9
80:23 84:24 85:4
85:14 86:17 88:24
89:11,13 95:15,20
95:22 114:2,14
116:7 143:4
144:12 145:15
156:16,17 160:9
160:19 162:10
164:5 187:9
188:17,18
**periods** 24:11
25:23 28:18,20
37:25 48:13,15
64:6 67:5 96:19
**permitted** 175:4
180:22 206:17
**person** 41:5
**personal** 194:8,11
**perspective** 60:24
64:10,18 65:2
78:25 88:1 89:3
89:22,24 90:15
158:8,10 159:11
159:14 163:20,22
177:6,21,23 190:6
**pertains** 168:5
**ph.d** 8:5 207:19
210:5 211:2,24
212:2,4,12
**ph.d.** 1:11 2:5 10:2
209:6

**pharma** 3:21
**pharmaceutical**
3:8,8,14,15 12:25
16:20 43:1 46:10
96:8 103:2,4
118:3 151:8
**pharmaceuticals**
4:6 6:6,12,16
**pharmacies** 16:23
17:14 23:11,17,23
25:18,24 26:8
32:24 36:13 37:1
37:21 38:1 39:15
40:10 41:11,12,19
41:20,22,23 42:8
42:11 43:6,8,19
50:5 51:17 74:25
103:14 106:22
114:8 116:24
117:7,16 119:24
120:25 121:6,8,14
121:14,20 131:7
142:12,20 146:6
152:23 169:22,22
170:7,10 171:18
171:24 172:12
173:8 174:19
176:6
**pharmacist** 91:15
93:10
**pharmacy** 7:6
11:18 13:7,11,21
13:25 15:10 18:2
27:15 29:10 32:13
32:17 36:11 37:17
37:19 38:23 39:10
41:7 43:2,13,13,13
43:18,22,23 44:6
49:15,22 50:8,15
50:16,17 59:19
63:22 66:8 67:12

Case 3:19-md-02885-MCR-HTC Document 2757 Filed 06/02/2022 Page 82 of 98

68:13 74:21,22
79:14 83:16 89:4
91:12,17,22 92:12
94:22 97:18 98:4
98:9 99:14 142:23
144:14,15,15
153:5,6 158:22
166:19 167:13
168:25 169:6,7,8
169:18 170:25
172:9 175:23
177:11,12 178:9
178:10 179:14,15
179:15,23 180:4
180:11 181:12,25
**pharmacy's**
175:24
**phase** 149:1
**philadelphia** 2:4
3:7
**phrase** 27:12
81:14
**physical** 32:14
78:14
**physician** 40:4
**physicians** 121:13
**pick** 62:16 142:21
201:6
**picked** 30:5 51:18
51:19 56:25 187:2
**piece** 175:21 178:6
179:5
**pietragallo** 6:2
**pietragallo.com**
6:3
**piling** 202:7
**pill** 147:7
**pills** 147:6 160:11
163:17
**pittsburgh** 3:20
6:4

**pizzi** 6:7
**place** 127:10
129:19,22 130:17
150:13 162:21
209:7
**plaintiff** 59:17
128:5
**plaintiffs** 2:10,14
2:19,25 27:8 36:9
36:16,18 37:8,15
38:22 39:7 45:1
45:18 51:5 100:7
113:9 122:16
188:3
**plans** 96:25
**play** 129:17
**players** 143:11
**plaza** 4:15
**please** 19:22 20:10
44:24 45:22 54:16
57:24,24 59:22
60:15 66:23 75:22
86:4 94:24 99:23
109:9 111:17
112:24 115:11
116:14,17 119:18
122:8,11 128:1
156:6 159:20
161:4 163:10
175:9 176:23,24
183:4 203:2,2
205:1
**pleasure** 101:15
102:18
**plus** 25:10 192:4
**pocket** 40:16
78:22 79:1 84:22
85:12,20 86:7,18
86:20 87:13 88:3
**point** 11:7 32:15
32:23 48:5 60:22

61:3,17 63:24
91:4,7 92:1 93:4
93:13 94:15 96:11
96:23 97:13,20
132:13,14 155:7
159:2,11 166:16
167:4,5 173:10,11
174:21 177:9,13
177:18,19 182:4
197:21 207:16
**pointing** 22:7
**points** 168:10
**portion** 15:1,3
30:15
**portions** 108:24
197:16 202:15
**position** 68:12
204:4
**possession** 203:9
**possibility** 165:24
**possibly** 141:5
176:4 203:23
**post** 182:4
**potential** 157:13
**potentially** 50:1
61:15 149:14
207:7
**power** 143:12
144:4,8,19 151:12
**powerpoint**
206:23
**ppu** 85:11
**ppudt** 136:25
137:12
**practice** 54:11
88:6
**practices** 53:20
194:13
**pre** 182:3
**preceding** 48:22

**precise** 189:17
**precisely** 94:5
**prefer** 28:7,7
**premise** 129:11
**prepared** 196:1
197:8 204:8
**preparing** 12:21
188:2
**prescriber** 40:5
**prescribing** 40:4
**prescription** 21:19
21:23 22:2 23:22
28:21 29:20 30:6
30:8,16 32:18,20
32:24 33:1 35:14
37:6 39:16,22
40:1,20 41:6,18
43:6 50:18 64:12
65:21 75:2 81:11
82:7,21,21,24 84:2
89:18 90:20 94:21
97:12 106:18
118:7 157:17
172:14 173:16
177:7 180:10
**prescriptions**
16:25 22:23 23:1
23:25 37:3,18,22
39:9 41:11 42:8
135:17 156:21
160:21 172:16
**present** 7:12 55:16
70:24 73:24 74:4
74:6,9 174:8
**presented** 184:13
185:8
**preserve** 69:1
**preserved** 133:20
205:24
**pretty** 143:13
153:11 196:20

**prevent** 74:6
175:7 204:15
**previous** 49:19
73:22 81:15
183:18
**previously** 70:17
71:24 72:14
124:19 197:8
**price** 27:10 79:8
84:1,2 129:23
130:4 133:13,16
134:11,14 136:10
136:11,13 138:18
156:16 160:7,8
161:6,9,19,21
162:3,22 163:1,4
163:11 167:12
**prices** 137:20,20
137:23,23 138:22
138:22 145:14
162:9,17 167:9
**primarily** 11:17
16:19
**princeton** 5:21
**principles** 153:13
**prinston** 3:8,14
**printing** 93:8
**prior** 87:4 116:9
**private** 51:20
99:12 103:21
187:4
**privately** 30:2
**privilege** 125:12
206:25
**privileged** 38:11
38:19 76:10
**privileges** 112:12
125:12
**probably** 34:16
49:5 52:14 121:21
121:22 123:17

137:21 145:3,11
199:1,1 200:2,10
**problem** 87:19
155:4
**procedure** 49:7
50:24
**proceed** 100:8
175:8
**process** 31:17
65:13
**processing** 29:18
**procure** 177:12
**procurement**
93:19,22
**procuring** 175:24
178:10
**produced** 18:2
37:16 57:6 111:6
112:19 146:3
151:24 170:6
176:15 201:21
207:8,10
**producing** 110:17
110:19
**product** 19:17
22:16,16 23:19
25:6,7,11,20 26:20
26:20,24 27:9,20
34:20,21 35:5
38:12 40:13 48:7
48:16 50:9,13
64:8 79:8 80:22
84:23 85:3,3,13
88:2,24 89:6,11,12
92:7 95:14,19,21
99:3,4 105:23,24
112:12 120:11
125:11 129:4,5,8
135:25 136:7,8
149:18 151:18,20
152:11 156:16,17

157:11,12 158:17
160:18 161:22
164:19 166:1
167:10 174:20
184:14 192:8
199:17
**production** 9:6
190:8
**products** 1:3
22:15 24:12 27:9
27:22 28:14 48:4
48:8,12 50:5
61:16 96:18 99:11
113:10,18 114:16
116:22 117:4,11
118:14 119:2,8,21
121:11,18,19,23
122:19 123:3,14
128:5 129:11,14
129:18,21 130:5
130:11,17 131:7
132:25 133:1,13
133:17 136:4
137:22 138:20,20
142:9 145:3,14,18
145:20 146:7,13
147:8 152:14
157:14 158:1,12
159:15 160:9
161:12 163:23
165:17 167:5,14
173:7 176:7
186:12 187:5,12
187:15 190:6,12
190:14 194:4,6
**professor** 101:9
104:6
**profile** 93:13
**profit** 61:22 63:25
92:17 98:19
123:12 132:9

138:7,8 148:8
173:25 177:20
188:21
**profited** 48:3
129:20 131:6,10
173:21
**profits** 48:5 61:8
61:21 126:25
129:12 135:9
139:9 140:5,8
141:2,4 169:17,22
173:23 175:23
176:7 177:2,11
178:8
**programs** 24:21
**proof** 123:21
**proper** 123:25
127:12,18 128:9
**propose** 126:23
**proposed** 108:7
124:14 139:25
148:25
**proposing** 115:24
**prospective** 157:9
158:8 159:13
190:5,18
**prospectively**
143:4 153:1,3
163:21 164:1
167:18 192:11
**protection** 46:19
56:15,24 58:12
**protective** 70:4
**provide** 30:13,13
30:20 31:14 84:19
161:3,5,23 163:2,7
163:10 167:25
177:15 200:19
203:18 204:21
208:2

CONFIDENTIAL

**provided** 17:12
18:8,19 19:4,8
20:3 22:14 23:16
24:3,9 25:18,21
26:7,9 29:23
31:10,12,13,14
33:7 36:11,21,24
37:3,14,21 38:1,3
38:5 40:7,10,18
41:10 42:1,24
43:11,12,16,20
44:1 45:1,24 46:3
46:12,19,23 47:6
47:15 48:14 49:20
49:23 50:2,11
51:16,25 52:19
63:15 65:11 74:2
89:19 96:5 168:6
170:25 176:9,18
177:3,5,24 186:23
187:1 200:1
**providing** 162:25
163:1 167:12
**proving** 38:20
**public** 12:22 16:7
42:21,22 102:20
102:23 118:19
132:8 153:14
207:22 208:4
209:4 212:19
**publicly** 132:8
**published** 104:13
104:16
**pull** 109:7 198:8
**pulled** 101:4
**purchase** 79:8
123:7 133:16
151:16 172:10
173:3
**purchased** 80:22
133:13 135:3

138:20 172:25
**purchaser** 79:9
**purchasers** 79:19
79:19,24 80:7,24
81:21,25 131:15
131:16
**purchases** 77:10
77:18 78:11 79:7
92:12 116:24
117:6 158:7
**purchasing** 117:12
134:13 142:9
145:17 173:7
174:12
**purely** 89:24
90:15
**purity** 190:9 192:6
**purposes** 14:21
16:16 43:10 70:3
70:4 86:6 89:25
99:18 115:20
130:14,15 157:16
166:4 186:10
188:7,12
**purview** 69:13
71:2
**put** 181:5 200:12
200:17 203:8
**putting** 64:17 65:1
93:6,7 120:10
207:17 208:1

**q**

**qdt** 80:21 81:20
95:19 136:25
137:10
**qualifications**
196:20 198:23
**qualifying** 35:14
**quantities** 162:8,8
**quantity** 27:10
35:20 80:22 81:16

89:10 94:16 95:19
145:18 147:3,4
156:15 160:7,8,11
160:25 161:20
162:2,22 163:2,4
163:11,15
**question** 11:20
21:21 22:7,8,25
26:13,14,18 28:17
33:18,21 35:3
36:8,14 39:2,4,6
39:14 41:9,14
42:13 46:20,23
47:12 52:24 58:2
59:21 66:20,23
67:24 68:18,19
69:2,17 70:5 72:1
72:7,21 73:5,10
75:11 76:23 78:10
78:15 79:22 84:8
86:3 87:3 90:13
93:24 95:7 97:2
107:24 110:24
119:17 120:4
129:7 131:23
139:13,17 140:20
141:1,20 159:7
161:19 166:13
169:5 174:3 175:3
175:10,16,18
178:16,17,20,24
178:25 179:1,9
180:3,23 181:8,19
182:6,12,14
187:23 188:16
191:15 195:2,14
195:16,19 196:22
197:3,6,7 198:1
202:11,14 203:11
203:17,20,24
204:9

**questioned** 170:16
**questioning** 11:8,9
173:19
**questions** 9:12
11:11,17 77:3
87:4 100:15,17
140:13 152:4
155:9 156:1
161:25 167:25
188:7,12 189:22
206:17
**quick** 127:25
**quite** 30:4 187:22

**r**

**r** 2:1,12 3:1 4:1 5:1
6:1 7:1 209:1
211:3,3
**rachel** 2:16
**ramifications** 46:7
**random** 56:25
**range** 96:13,15,16
**raspanti** 6:2
**reach** 106:22
**read** 14:19,20,22
14:24,25 15:2,3
32:10 38:23 51:3
83:4,9 110:23
175:9 210:9 212:5
**reading** 19:17
**ready** 13:2 100:8
172:19
**real** 127:24
**reallocation** 70:22
**really** 22:17 69:2
70:22 77:4 82:8
82:24 98:18
108:22 117:19
118:23 122:14
125:17 129:17
130:4 143:11
145:9 146:10

CONFIDENTIAL

[really - repackaged]                                                                Page 30

149:1 166:13
204:17
**realm** 70:14
**reason** 210:11
211:6,9,12,15,18
211:21
**reasonable** 61:23
138:9
**reasons** 71:24
**rebate** 141:8,9,14
141:17 142:24
166:24
**rebates** 61:4
138:16,19 139:11
140:7,18,24 141:6
143:1,18 144:25
145:4,19 148:15
148:18 166:8
167:2,4
**rebazan** 3:11
**rebecca** 3:11
**reboot** 132:3
**recall** 25:3,5 29:17
29:25 33:11 56:5
116:12 164:3,20
194:6
**recalled** 27:22
48:9 163:16,23
165:16,25
**recast** 51:20
**receipt** 210:18
**receive** 180:23
**received** 123:8
136:14 176:10,11
205:16
**receiving** 167:24
181:25
**record** 11:3 18:9
19:11 54:22 55:1
70:1 75:25 76:3
100:5,11 154:9,14

154:19 155:17,19
155:21 168:3,16
180:16 183:7,10
201:12,13,15,17
202:14 203:3,8
205:9,19,24 206:1
206:3,9 207:13,18
**recorded** 160:18
161:10,21
**records** 108:18
131:20 203:7
**redo** 53:19
**reduce** 132:20
**refer** 15:13 18:12
18:16 95:9 109:8
112:21 116:20
197:14 201:4
**reference** 27:17
28:13,14 55:20,21
63:18 77:8 78:11
203:10 206:23
**referenced** 18:1
28:1 77:23 172:23
173:20 192:18
210:6
**references** 12:9
**referencing** 59:13
**referred** 22:19
55:24 58:19
113:13
**referring** 15:17,18
27:14 59:11 78:12
78:13 85:4 89:2
90:5,12 128:9
134:8 138:15
182:3
**refers** 28:11
128:17
**reflect** 60:7 168:16
169:21 199:19
206:9

**reflected** 37:18
57:6 169:16 174:5
**reflection** 45:16
46:5
**reflects** 41:18
**refund** 71:21
72:10,15,16
**refunds** 165:15,25
**regarding** 12:5
46:6 55:7 67:16
100:19 113:5
135:23 192:6
**registered** 37:5
**regular** 31:4
**regulation** 102:12
200:5
**regulator** 192:4
**regulators** 43:15
**reimbursed**
181:13
**reimbursement**
102:11 181:23
**relabeled** 30:2
51:21 99:11,15
**relabeling** 105:22
**relate** 28:20 96:17
99:2,3
**related** 20:20
21:14 40:12 60:21
61:17 65:18 67:4
78:4 94:20 95:2
98:25 102:11
103:21,23 104:25
105:21 106:3
118:4,4 124:8,9
129:22 130:7
146:7 148:12
149:18,25 150:1
167:6 187:4,11,12
191:10 209:10

**relates** 1:4 22:25
84:3 96:2
**relating** 14:3,14
15:9 16:15
**relative** 93:12
151:7
**release** 154:10
**relevant** 24:25
26:23 27:10 28:18
28:21,22 35:18
47:22 48:15,16,16
48:18 50:1 57:5
57:14 59:6 61:24
61:25 148:17
160:9,19 173:12
176:20
**relied** 17:11 24:10
127:14 192:17
193:21
**rely** 16:14 17:8,10
24:8 49:14 127:11
**remainder** 47:19
47:20 82:11
**remember** 12:16
51:19 84:12
103:15 104:8
105:3 107:19
108:4 142:7 171:1
**remind** 70:23
**remiss** 108:13
**remove** 89:20
**removed** 61:22
138:8 170:5,6,22
171:16,22
**rena** 1:11 2:5 8:5
10:2 207:19 209:6
210:5 211:2,24
212:2,4,12
**rendering** 114:23
**repackaged** 30:2
99:11,14 187:4

Case 1:19-md-02875-RBK-SAK Document 2009-5 Filed 04/03/2022 Page 86 of 98 PageID: 68942

**repackager** 51:19
164:8,12,18
165:13
**repeat** 115:11
140:20 164:14,14
192:25
**replicated** 201:24
**report** 8:5 12:3,8
12:10,17 15:5
20:19 25:2 27:7
27:18 28:12,13
32:3 33:15 44:7
47:25 48:22 51:3
51:25 52:5 54:1
55:8,12 60:5 61:7
62:8 72:17 75:18
77:7 83:4 88:22
93:21 94:2 103:3
107:17,18,23
108:2,6,19,20,25
109:7 110:21
112:21,22 115:21
116:15 117:23
118:21 127:25
132:10 155:10
156:2,25 157:22
159:21 160:6
161:1 162:7,21
163:1 166:20
169:14 170:3
171:6,23 173:6
174:13 181:6
184:13 185:8
192:19 193:12,17
196:10,14,16,24
197:9,17,17
198:25,25 200:4
200:12 201:3,9,25
202:16,21 203:9
203:14 204:20,23
206:22 207:19

**reported** 43:15
133:17
**reporter** 1:15,15
11:12 14:5,7 16:1
16:9 17:18 23:6
24:16 34:1 45:2
57:11 59:20 64:4
66:21 67:17,19
71:8 75:8 77:11
77:15 80:13 81:23
91:5,8 96:14
97:22 100:16
101:1,2,17,20
104:15 105:7,13
107:10 110:18
112:17 113:20
114:19 115:10
120:19 121:4
125:1 128:12,23
129:12,15 130:1
131:24 132:15
135:13 138:11
140:19 141:25
153:16,19,21
158:4 162:13,16
164:13 165:6
167:20 169:2,4
170:8 171:13
178:1,21 182:22
182:25 185:18,21
193:13,18 194:18
194:23 199:10
204:22 205:1
206:5 208:3 209:4
**reporting** 118:19
153:13
**reports** 12:11
102:19,23 103:10
118:21 150:11
198:13,19 200:15
201:3,4,22 202:21

204:8
**represent** 11:16
19:10 29:6,9,13
49:18 60:9 71:21
72:10,23 155:7,25
162:8 168:24
169:17 183:13
**representation**
38:17
**representatives**
102:13 111:1,10
**represented** 22:17
37:20 38:7 110:16
192:9
**request** 9:1,6 83:8
83:11 163:9
**require** 99:7 135:1
**required** 37:5
43:14 81:13 82:9
97:23 134:22,22
136:6 212:13
**requirements**
117:13 147:14
190:9
**requires** 59:25
69:2 79:7 103:2
139:13
**resale** 120:24
**research** 15:21
17:1,19 31:9 34:8
107:13,14
**researcher** 16:19
**reserve** 126:12
**resold** 123:4
**respect** 115:22
120:9 137:3 141:6
143:18 184:17
**respectfully** 80:15
139:14
**respond** 181:17
187:21 193:10

**response** 207:14
**responsibilities**
181:5
**responsibility**
174:6
**rest** 31:21 190:8
**restated** 94:6
**restricted** 1:8
**result** 163:16
164:20 166:11
209:11
**resulted** 160:13
**resume** 54:19
**retail** 11:18 13:11
13:21,25 15:10
17:14 18:2 25:18
26:8 27:15 29:10
32:13,23 36:11
37:1,16,21 38:1,23
39:15 40:10 43:19
44:6 50:14 59:18
65:3 66:8 67:12
68:13 83:15 85:2
89:8 94:11 99:14
114:7 119:24
120:24 121:5,8,11
121:20 122:2,5
123:4 136:1,4
142:12,20,23
144:5,13,14,14,15
146:5 152:23
153:5,6 169:22
170:7,9,25 173:8
174:19 175:22
177:10 188:20
**retailer** 8:3 13:7
15:8,14,18 17:10
17:11,24 18:6,18
19:17 20:4 21:20
22:1,12 23:4,11,16
23:23 26:15 28:25

Case 3:19-md-02918-MMC Document 757-14 Filed 09/02/2022 Page 187 of 872 PageID: 60,952

29:19,21 30:22
31:20 33:9,17
35:15 36:12,19
37:17 39:8 40:23
41:2,15,23 42:7
43:5 44:4 45:23
46:18 47:6,22
49:8,12,14,22 50:5
50:7,8,13,16 51:17
56:8,11 57:6
60:25 61:8,12
66:5,17,18 67:1
84:23 85:13 88:23
89:12,25 90:4,10
90:16 91:22 94:16
95:14,17,20,21
103:13 134:10,16
143:19,19 144:25
145:6 146:3
169:14 171:17
173:13 176:8
**retailers** 12:6,12
12:18 14:17 21:14
22:14,18 27:21
33:7 48:2,3,7,15
52:19 58:10 59:3
61:13 66:25 73:13
74:1,8,10,14 75:1
89:16 95:24 96:3
99:12 103:7 123:8
126:7 131:1,5
133:5,11 136:6
143:15 173:21
176:14,17 177:3
177:14,15,21,23
186:17
**retrospective**
190:19
**retrospectively**
96:10 190:13,22

**return** 137:24
210:13,17
**returned** 138:18
**reveal** 76:9 180:24
**revealed** 201:22
**revenue** 64:1
84:18,20,21 85:3,8
94:10 95:9 132:10
136:24 137:3,13
137:25 138:16,21
148:9 149:5 151:6
173:23 174:5
176:7 177:2
**revenues** 12:6
48:6 49:18 65:20
103:13 126:25
127:19 132:7,7
135:14 136:15,18
140:24 142:17
144:3 147:25
176:9
**review** 11:23 12:2
13:1,10 110:25
111:5,9,25 146:2
151:22 202:5
210:7
**reviewed** 13:6,17
13:19 14:2,13
15:10 16:15 41:24
102:24 109:25
110:3
**reviewing** 13:5
102:19
**rgeman** 2:17
**right** 21:8,16 28:8
41:5,16,25 42:2
44:13 46:2 47:17
54:9 55:25 57:1
58:21 62:7,23,25
62:25 73:9,12
78:21 79:21 83:11

87:17 88:14 104:1
107:23 108:4,17
109:22 110:4,8
112:7 117:24
118:11 119:4
120:6 121:21
122:6,14 127:2
128:10 131:11
132:23 136:23
137:11,13,14
145:1 146:25
150:22,25 151:2,3
152:14 155:9
156:25 157:21
159:3 161:16
162:5,12 169:19
169:23 170:7
172:22 173:22
177:25 179:16
181:6 185:15,17
187:8,14 195:25
197:2 205:7
**ringing** 91:13
**rite** 5:10 11:16
41:19
**road** 5:20
**rockett** 6:18
**rockett.shevon**
6:19
**role** 101:9,14
102:5,17 106:25
107:5 120:9
**roles** 107:3
**rooney** 4:18 5:2
**rose** 4:8
**roseland** 2:9
**ross** 4:11
**roszel** 5:20
**roughly** 160:13
**routinely** 107:2

**routinized** 153:11
153:12,17,18,19
153:22
**row** 81:24
**rows** 19:11
**ruben** 2:3,3 71:18
84:15 87:2 203:3
205:4,12,20
207:11 210:1,2
**ruben's** 73:9
**rule** 143:8
**ruler** 2:13
**rules** 123:24 124:8
125:5
**running** 195:3

**s**

**s** 2:1,21 3:1 4:1 5:1
6:1 7:1 8:1 198:20
211:3
**safety** 190:9
**sagoldberg** 3:3
**sale** 28:21 32:23
43:1 48:4,5 60:22
61:3,9,17 91:4,7
92:1 93:4,14
94:15 96:11,23
97:13,20 134:10
158:12 166:16
167:4 169:18
173:11,11,22
174:21 177:18,19
182:4
**sales** 30:10 118:3
118:19,21 133:21
134:9 158:23
160:15,18 166:10
**sample** 110:9,12
**sanger** 2:11
**sas** 24:15,17,18,21
**satisfied** 67:11

Case 1:19-md-02875-RBK-SAK Document 2009-7 Filed 04/08/22 Page 18 of 32 PageID: 68076

CONFIDENTIAL

satisfies 71:11
saying 23:10 47:12
55:7,10 57:20
88:1 91:25 143:25
161:16 185:7
204:15 205:3
says 35:9 73:11
79:21 80:21 85:17
95:9 133:8 136:23
149:22 173:21
198:19
schneider 14:4,6
14:15
sciegen 6:16
sciences 199:15
scope 60:5 67:21
70:19 71:2,12
86:24 139:15
187:20
screen 18:9 28:5
104:20,23 106:7
133:24 200:18
script 35:15
scripts 4:17 34:3
42:5 168:24
scroll 19:20 45:22
second 19:24
26:11 32:10 44:23
44:23 109:13,19
110:10 116:21
156:7 157:1
174:15 198:11,12
seconds 201:20
204:12
secrets 152:1
section 48:22
49:19 61:7 109:1
109:18,19,22
111:19 123:11
security 199:9,16

see 19:12,21 20:9
20:18 21:7 24:22
27:25 31:12,13
42:22 55:19 57:2
77:13,24,24 85:1
88:25 89:8,25
90:16 93:21
108:23 109:18
110:9 111:18,20
112:4 113:14
117:1 122:3,20
128:2,7 130:25
133:7 136:25
138:6 152:2 155:3
159:25 160:2
174:11 195:3
200:16,21
seeing 161:20
seen 131:21
133:22,25 134:2
146:5,12 150:1
152:3,6 202:4
sell 114:2 119:8,21
119:24 121:9
131:15 133:1,14
sellers 75:2
selling 134:15
142:11
sells 92:14
sense 24:13 192:11
sent 20:8 210:14
sentence 14:9 38:7
116:21 117:1
122:15 130:25
133:7 192:22
sentences 132:24
separate 59:6 72:7
94:1 150:8 185:16
195:19
separately 150:3
150:15

september 198:14
series 21:13
served 168:10,16
service 149:12
serving 168:8
199:6,11,13
set 50:7 113:3
139:10 140:6
160:10 179:14
180:7 189:17
209:13
seta 24:22
seth 3:3 11:5
206:13
sets 180:5
setting 23:17
144:6 179:25
settled 166:5
settlement 166:4
seven 97:8
share 104:20,23
106:7 133:24
151:7
shared 104:20,22
105:4
shareholder 12:11
102:19 103:3,9
118:20
shareholders
150:11 153:14
she'd 83:8
sheet 210:11
shelf 146:14
158:21
shevon 6:18
shield 8:6 197:9,12
197:18 198:14
199:22 202:16,22
207:20
ship 121:2

short 54:23 76:1
100:6 103:23
183:8 195:3
shorthand 209:3,8
show 170:2 197:24
198:5
shown 106:3
132:11
shuffling 105:14
side 93:11,13
148:9,9 149:12
200:13,13
sided 142:7
sign 106:5 210:12
signature 209:16
signed 210:20
significant 36:20
114:15 143:12
144:4,8 151:21
155:14 163:19
172:13
significantly
144:13
signing 143:14
similar 104:11
similarly 116:10
simple 23:17
35:19 53:9 54:2
110:24 129:7
simply 26:22
47:21 51:11 70:24
127:8 176:4
single 23:15 25:19
40:20 135:16
202:11
sir 115:19 170:11
171:2 172:3 173:1
173:5 176:2,23
179:20 181:19
188:17 190:23
194:11 196:15,22

Case 1:19-md-02875-RBK-SAK Document 2009-57 Filed 04/03/2020 Page 189 of 198 PageID: 68072
Page 68072029

CONFIDENTIAL

197:11
**sitting** 23:11 26:1
  37:2 38:2 91:11
  158:21 178:5
**size** 147:9,12
**sizes** 147:11,18,21
**slack** 2:11
**slater** 2:7,7
**slaterdavis.com**
  2:12
**slight** 144:16,24
**slightly** 20:18
  21:14 121:14
**small** 116:22
  117:4 151:11
**smolij** 3:5
**snippet** 14:25
**software** 24:15,17
**solco** 3:8,15
**sold** 27:20 43:7
  48:7 84:2,23 85:3
  85:13 89:11 95:19
  113:11,19,23
  114:7,11 118:8,15
  119:3 121:11,13
  121:19,22,23,24
  123:8 128:6
  131:17 135:3
  138:20 145:13,21
  157:4 158:13
  159:15 167:5
  176:8 187:9
  188:19 190:14
**solely** 17:9
**solutions** 210:23
**somebody** 105:14
  194:20
**sorry** 14:10 16:1
  17:18 18:15,24
  19:5 21:1,22 28:2
  35:1,1,10 36:15

41:14 42:19 43:9
  45:2 52:8,24
  57:11 59:20 62:18
  66:21 71:16,18
  72:1 75:8 77:11
  77:12,21 78:16
  85:1 86:2 87:1
  91:5 95:5 100:16
  104:15 105:13,18
  107:25 108:12,16
  110:18,20 111:15
  113:20 119:12
  120:24 128:12
  131:24 132:2
  140:19 141:25
  142:1 148:21
  155:12 162:13
  164:13,21 165:9
  166:21 168:22
  169:2 170:15
  178:1 183:3
  185:19 186:6
  187:23 192:21
  193:13 194:18
  195:13 197:11
  199:10 200:19
**sort** 51:11 53:5,9
  53:17 54:9 79:24
  101:22 104:10,22
  133:22,25 135:23
  150:5 202:7
**sorting** 49:1
**sorts** 149:7,20
**sounds** 27:4
  183:20
**south** 3:6 5:8
**speak** 174:10
  180:15
**speaking** 165:7
**special** 14:3,14
  146:12,13,14

**specialty** 117:9,16
  118:5 121:13
**specific** 15:9 18:13
  18:16 20:21 25:23
  26:24 30:10 50:20
  61:16 64:2 81:11
  101:12 102:8
  103:15 104:24
  105:11,21 113:24
  114:3,3 116:6,7
  118:22 119:5
  123:12 125:5
  132:14,16 135:6
  135:20 143:3
  151:10 152:17
  160:10 161:12
  164:24 167:7
  184:11,14 185:3,9
  194:6 196:15
  197:7,20
**specifically** 15:23
  56:13 106:18
  113:5 118:21
  124:9 196:2
**specifics** 152:15
  196:25
**spend** 12:23 30:21
  102:4
**spending** 22:14
**spent** 15:22 30:23
  30:25 31:2 68:22
  71:21 72:11
  101:13 106:16
  107:7 108:5,11,19
  177:12 178:10
**spoiled** 145:16
**spoke** 31:4
**spoken** 76:13
**spreadsheet** 8:4
  18:7,19 19:11
  21:20 22:11 23:3

24:14 31:20 33:9
  33:17 49:2
**spreadsheets**
  20:15
**st** 4:16
**staff** 20:10,25
  22:14 26:15 30:23
  30:25 31:4,22
  33:2,8,13,16 38:8
  38:15 40:8 55:4
  76:22 77:1 96:5
  195:24
**stamp** 26:2 207:23
**standard** 1:13
  43:14 196:20
**standing** 16:4
**stanoch** 2:22
**start** 70:5 73:20
  109:9 136:15
  138:15 142:2
**started** 41:24
**starting** 11:25
**starts** 130:25
**state** 6:15 19:17
  20:23 22:15 23:20
  25:21 26:21 27:7
  31:25 32:2,12,18
  32:19 33:5,10,18
  33:22 34:13 35:15
  40:15 44:22,25
  46:6 47:22 50:14
  50:15,17 51:4,6
  56:25 58:21,25
  59:2,6,19,23 60:8
  74:2 123:21 124:2
  124:2,2,7,8,17,22
  124:23 125:5,8,21
  125:22 126:5,11
  174:7 181:5
  184:11,14,17,18
  185:3,9 202:13

| | | | |
|---|---|---|---|
| 203:23 | stoy 6:3 | sum 47:21 50:12 | surmised 34:16 |
| stated 70:17 71:24 | strategy 12:25 | 57:3 58:12 63:1 | suspect 34:11 |
| 72:14 | 103:2 | 69:23 | switch 118:25 |
| statement 35:3 | street 2:4,17,24 | summary 55:15 | switching 150:23 |
| 68:17 131:9 | 3:6,13 4:20 5:4,8 | summed 48:19 | sworn 212:14 |
| 171:21 202:25 | 6:10,15,19 7:9 | 58:11 73:14 74:14 | system 106:17 |
| 203:3 | strength 192:6 | sums 63:23 | 134:5 136:3 |
| states 1:1 20:21 | stretch 206:18 | super 77:4 | 147:15 |
| 21:15 23:14 25:25 | strike 13:18 36:1,8 | supply 103:6,23 | systems 135:1 |
| 33:3 45:23 48:17 | 67:6 170:3 178:3 | 106:20 114:18,20 | **t** |
| 50:20,23 51:15 | 179:8 204:14,17 | 117:9,17 120:1,10 | t 3:12 5:13 8:1 |
| 52:17 53:4 54:4 | striking 178:24 | 120:17 135:2 | 80:23 84:24 85:4 |
| 123:23 134:4,25 | structure 141:14 | 136:5 142:13 | 85:14 88:24 89:11 |
| 135:2 165:13 | 141:17 | 145:21 172:16 | 89:13 95:15,20,22 |
| 184:3 | structures 141:8 | 187:10,12,16 | 209:1,1 211:3,3 |
| statistics 12:5,8,9 | 141:10 142:24 | 190:1,11 191:12 | tab 81:15 |
| stats 54:8 | students 103:3 | 199:16,17 | table 10:1 20:18 |
| stay 109:16 | study 104:5,11,12 | support 175:22 | 20:19 21:7,9,11,11 |
| stenotype 209:4 | studying 13:1 | 177:16 178:7 | 21:12 45:24 46:19 |
| steps 52:2 53:23 | subcategory 22:16 | 179:6 | 47:3,6 55:20,21 |
| 53:25 54:4 | subgroup 74:2 | supports 177:10 | 56:8,12,17,19 |
| steven 3:18 | subheading 15:8 | suppose 67:6,8 | 58:19,19 59:4,10 |
| steven.hunchuck | 15:14 | supposed 180:24 | 59:12,14,14 62:21 |
| 3:19 | subject 162:5,6 | sure 15:15,16 19:1 | 63:1 66:3,4,8,10 |
| stick 111:16 | 167:23 | 19:9,21 24:6 28:3 | 66:16,18 67:9 |
| stipulations 9:9 | submit 108:15 | 29:11 31:15 35:24 | 68:11 70:11,13 |
| stocked 172:17,18 | submitted 199:20 | 41:13 45:15 47:18 | 71:20 72:23 73:2 |
| stocking 121:25 | subscribed 212:14 | 48:25 54:18 55:9 | 73:12 74:3,6,9,15 |
| stomping 27:2 | subsequent 51:8 | 55:14 56:2,3,7 | 74:16 75:1 159:20 |
| stop 74:14 154:3 | subsequently 43:7 | 57:18,20 64:22 | 168:5 169:14,16 |
| 175:5 182:16 | subset 78:13 | 66:20 68:24 77:5 | 171:19 174:1 |
| 205:7 | 113:10,17 114:11 | 82:3 87:22 104:3 | tables 59:9 65:24 |
| stopped 25:14 | subtotal 51:11 | 109:14 115:12 | 73:24 74:19 |
| 27:4 | subtract 50:3 | 122:12 134:17 | take 44:20 48:13 |
| storage 117:13 | subtracted 174:19 | 136:16 137:9 | 54:16 75:21 80:13 |
| store 150:5 173:17 | subtraction | 140:21 141:4,12 | 91:20 92:8 99:23 |
| stored 172:23,25 | 177:16 | 144:17 155:6 | 106:8 120:18,19 |
| stores 32:15 | suggestion 20:14 | 160:15 162:21 | 120:21 121:1,25 |
| 172:13 | suite 2:4,13 3:13 | 164:15 189:1,17 | 124:16 131:14 |
| storing 129:25 | 4:5,11,15,20 5:4 | 193:1 201:13 | 158:14 164:25,25 |
| | 7:5,9 | | 166:14 167:16 |

CONFIDENTIAL

**[take - third]** Page 36

178:5 183:4,4
**taken** 1:11 22:20
54:23 61:14 63:23
76:1 100:6 154:15
173:13 183:8
203:15 207:22
209:6
**takes** 92:5
**talk** 24:25 35:7
36:2 55:4 56:19
58:9 85:7 89:21
118:19 132:24
173:7 205:2
**talked** 13:4 15:6
16:18 21:25 22:11
52:3 83:20 101:8
103:7 106:15
129:3 152:19
160:5 170:4 184:8
194:2,15,24
**talking** 22:24 23:2
23:2 32:14 34:22
41:24 68:23 73:19
75:9 90:4 93:10
102:25 118:10
121:16 139:23
142:17 170:14
174:22 178:2
188:8 198:16,17
199:22
**talks** 118:7
**tallied** 181:4
**teach** 16:19
102:17 103:1
**teaching** 12:23
**tech** 109:6 112:23
113:3 116:15
122:8 130:21
**technology** 150:4
**telephone** 39:20

**tell** 15:21 39:7
54:7 81:19 97:17
102:16 103:24
126:9 157:10,12
160:11 162:2,22
174:8
**tend** 82:19 147:21
153:11
**term** 72:17 81:20
94:4 148:17 153:2
**terminating**
203:16
**terms** 17:6 22:5
62:2 63:3 64:18
89:25 90:16 98:1
144:9,10,11 145:5
145:12 151:6,7,16
153:4 164:5
**testified** 20:16
68:3 69:14 156:20
180:1,4 207:6
**testify** 179:10
193:4
**testimony** 111:10
143:22,24 171:3
180:22 190:24
192:25 193:2,9
199:20 210:9,18
212:8
**teva** 4:6 6:12
69:22 103:11
118:18 183:13,14
184:1 193:23
194:6,12 206:24
206:24
**teva's** 194:9
**texas** 2:13 4:11
**text** 205:15,16
**texted** 205:14
**thank** 22:7 28:8
34:25 35:11 36:6

38:14 45:20 60:3
67:19 69:7 70:3,6
73:22 82:14 83:2
84:15 91:8 93:17
99:20,21 100:1
101:24 119:18
120:15 126:17
127:21 128:24
129:15 132:21
139:18 162:16
163:8 168:1
169:10 170:20
174:18 175:19
193:18 208:10
**thanks** 84:15
**theoretical** 60:24
64:10,17 65:1
86:9 88:1 89:3,22
96:2 147:20
**theoretically** 65:9
**theories** 21:10
37:12 66:6 73:25
74:5,7,12,17 126:8
184:9
**theory** 49:12
50:21 58:25 59:2
61:10 64:15 65:16
88:6,6,7,9,20
90:12,14 128:11
128:13 131:11,19
167:1
**therapeutic** 191:4
191:8,9,14
**thereof** 209:12
**thing** 15:20 46:18
48:20 59:9 81:3
96:3 118:23 128:1
146:18,21 148:14
149:11 173:9
177:18 202:23

**things** 12:20,22
57:25 81:7 87:17
87:19 90:6 134:20
137:16 147:13
149:7,20,24 150:5
150:17 167:2
172:17 192:22
201:6
**think** 22:18,24
23:10,12 29:5
31:16 38:25 46:13
47:20 48:21 51:15
53:8,9 55:8 56:1
57:17 62:9,13
80:16,16 93:14
98:14 99:22
103:11 104:5
105:9 107:4,17,18
109:7 116:5
117:25 119:23
126:18 128:21
133:23 139:20
140:11,13 141:19
143:6,23 148:10
148:16 149:24
150:23,24 152:18
154:2,4 159:12
163:3 176:4
182:18 185:5
193:3 194:1 195:5
195:7 199:2
200:25,25 201:8
**thinking** 106:17
107:3
**third** 22:21 49:17
61:2,11 65:14
80:20,21 97:11
157:10 158:1
159:14 160:22
163:22 165:16
167:9,13,17

CONFIDENTIAL

**[third - typically]**                                                  Page 37

176:12 181:24
191:25 192:4,9
**thornburg** 5:7
**thought** 108:8
145:10 148:22
176:22
**three** 6:10 68:4
79:25 80:4,9 81:2
81:7
**tiffany** 4:3
**time** 1:13 11:1,9
12:23 15:22 24:11
24:25 25:23 26:9
26:11,23 27:10,13
27:20 28:16,18,20
28:22 30:16,21,23
30:25 31:1,2,3,24
35:17,18 37:25
48:13,15 54:20,24
57:5,14 64:6,9
67:5 75:24 76:2
80:14,23 84:24
85:4,14 86:17
88:24 89:11,13
91:15 95:15,20,22
96:19,20 98:10
99:19,22 100:3,9
101:13 102:4
107:8 108:5,14,19
108:25 114:2,14
143:7 144:12
145:15,24 151:18
151:19 152:19,24
154:3,4,12,17
155:16,20 156:15
156:16,17 158:2,6
159:2,3,11 160:9
160:19 162:10
164:5 165:7 167:6
168:1,14 172:24
174:25 183:6,9

187:8 188:17,18
195:3 199:3,4
201:1,9,15 203:15
204:5,6,14,23
206:6,7 209:6
210:19
**timeframe** 157:5
157:17 158:22
210:8
**timer** 195:8
**times** 31:23,23
68:4 83:21 94:1
94:16 95:20 97:8
99:10 156:16
160:7,8 161:20
163:2 184:9 197:1
**timestamp** 40:1
**title** 120:21 121:1
123:3 131:14
**titled** 207:18
**today** 11:21 33:14
76:6 79:5 104:5
155:9 156:20
178:6
**today's** 11:25
**told** 26:18 53:25
58:1 108:13 112:9
114:22,24 127:12
195:10
**ton** 39:16
**tons** 37:2
**top** 19:16 64:14
75:9,14 103:19,25
108:12 110:14
111:2,4 116:12
134:25 148:3
164:10 207:24
**topic** 195:4
**topics** 75:19
**torrent** 69:22

**total** 35:13 50:12
57:4 58:6,9 67:4
69:23 72:10 73:12
74:13 82:22,23,25
118:19 128:4
181:4
**totally** 141:17
**totals** 47:21
**touche** 117:25
**tpp** 60:23
**tpps** 133:1
**trace** 134:3,4,22
135:1 147:15
**traced** 136:2
**track** 134:3,4,6,21
134:25 135:11
136:7,11 147:14
147:14 150:10
**trade** 5:4 121:12
122:2,3,5 123:5
136:1,5 188:21
**traded** 132:9
**trailed** 100:17
**trained** 51:23 54:3
**transaction** 43:12
96:19 104:24
105:4 127:9 135:9
135:15 137:19,20
143:3 167:7
**transactions** 23:13
26:1 105:18,20
114:6 179:21
182:4
**transcript** 210:6
210:20 212:5,8
**transcription**
209:7
**transparency**
192:10
**traurig** 4:2 183:2

**treatise** 177:9,13
177:15 178:7
179:4,5
**trial** 71:1
**tried** 204:9
**triple** 108:15
**true** 46:15 180:8
191:24,25 209:7
212:8
**try** 69:16 77:22
87:11 132:20
183:21 197:4
**trying** 21:1 22:9
24:5 48:24 51:2,4
53:2,10 78:9
93:18 95:4 102:4
122:12 171:5
182:14,14 189:14
192:24 203:12
**turn** 15:4 159:20
169:13 207:15,15
**turned** 26:15
**two** 20:15 21:10
53:3 55:23 80:8
87:17,19 108:6,9,9
108:11 137:12
142:7,21 153:3,25
162:23 186:1
**type** 23:4,7 34:15
96:18 118:21
142:9,14 149:3
150:2 151:18,20
152:10
**types** 78:5,5,25
96:18 105:24
135:3,4 145:14
146:14 152:21
**typically** 12:21
96:10 98:15 152:8
152:25 179:14
180:7

Case 3:19-md-02875-RBK-SAK Document 2033 Filed 05/03/22 Page 93 of 98 PageID: 68065

| u | | | |
|---|---|---|---|
| **u.s.** 3:9,9,15,15 | 141:7 142:22,25 | **united** 1:1 23:14 | 72:16 96:20 98:4 |
| 30:4 37:7 75:3 | 159:5 164:22 | 25:25 135:2 | 176:2 204:10 |
| 102:21 114:1 | 169:1 174:1,4 | 165:13 | **usually** 23:21 40:5 |
| 118:3 124:5 | 178:13 179:13 | **units** 89:10 95:19 | 63:22 97:19 98:17 |
| 135:18 136:1 | 180:13 181:8,18 | 105:5 118:7 135:3 | 117:13,15 120:23 |
| 153:11 158:13 | 182:13 186:5 | 135:17 137:19,20 | 147:4,24 150:1,14 |
| 164:7 172:16 | 187:23 189:14 | 147:7,11,13,18,21 | |
| 188:21 | 192:16 193:1 | 147:24,24 | v |
| **uh** 63:7 85:6 | 196:6 | **universe** 37:4 | **v** 210:4 211:1 |
| 185:21 | **understanding** | 40:19 | 212:1 |
| **ulmer** 7:8 | 17:13,25 18:4 | **university** 15:24 | **valsartan** 1:2 |
| **ulmer.com** 7:9 | 22:13 25:2 26:6 | 16:4,12 | 24:11 27:9,20,22 |
| **ultimate** 67:16,17 | 29:7 40:9 61:8 | **unjust** 20:5,13,17 | 48:4,6,8 50:9 57:5 |
| 139:13 | 69:10 92:2 96:9 | 21:5,12 27:19 | 71:22 72:12 78:19 |
| **ultimately** 106:22 | 96:12 101:13 | 47:6 48:3,18 49:9 | 85:23 86:10 92:11 |
| 158:13 166:3 | 121:10 122:22 | 49:13 50:22 58:5 | 99:15 113:10 |
| **undergrads** 54:8 | 127:15 134:5,19 | 58:7,13 59:5,9,17 | 116:22 117:4 |
| **underlies** 52:2 | 152:1,20 153:24 | 60:19 61:6,24 | 118:13 119:1 |
| **underlying** 21:11 | 166:2 172:13,22 | 62:20 63:24 64:11 | 121:19,22,23 |
| 26:17 52:13,15 | 179:20 180:6,9 | 64:24 65:19 74:9 | 122:19 128:5 |
| 163:5 | 184:21 185:23 | 84:4,11 115:17,24 | 131:7 135:24 |
| **underneath** 52:13 | **understood** 17:22 | 116:5,11 122:18 | 157:4,18 158:20 |
| 95:13 | 168:15 190:20,22 | 122:22 123:19,21 | 163:16 166:10 |
| **understand** 11:21 | 193:3 | 123:24 124:10,15 | 169:19 173:22 |
| 15:17 19:2 21:2 | **uniform** 143:13 | 125:23 126:1,24 | 186:21 187:9 |
| 21:21 23:10 24:6 | **uninsured** 77:10 | 127:5,8,13,16,18 | 188:13,19 190:2 |
| 29:5 36:14 39:4 | 77:17 78:11,18 | 128:11,14 129:3,9 | 191:3,18 193:5,22 |
| 39:13 41:8 42:13 | 79:6,9 81:11,20,24 | 130:10 131:12 | 194:9 210:4 211:1 |
| 42:14,14,19 46:2 | 92:14 | 133:3,10 149:13 | 212:1 |
| 47:18 48:25 51:4 | **unit** 11:2 54:21,25 | 169:14,16 171:8 | **value** 129:4,5,7,21 |
| 53:2,10 55:8,25 | 84:22 85:12,21 | 171:17 184:10 | 191:4,5,8,9,14,19 |
| 56:3,7 57:18,20,22 | 86:8 87:13 88:3 | **unpure** 166:11 | 191:24 192:12 |
| 58:2 66:3 67:23 | 89:12 90:19 91:4 | **unseemly** 204:17 | **vanaskie** 14:4,15 |
| 71:25 77:6,22 | 91:16 94:16,17 | **untethered** 87:3,7 | **variable** 25:21 |
| 78:15 80:12 86:3 | 95:21 100:10 | **upbeat** 183:23 | 81:8 |
| 86:25 93:19 94:8 | 129:24 134:7,25 | **updated** 199:18 | **variations** 144:24 |
| 95:5,6 97:1,2 99:1 | 135:12,12,13 | **upstream** 43:24 | **varied** 167:10 |
| 102:4 107:2,24 | 136:9 146:23 | 150:25 151:16 | **variety** 145:12 |
| 124:7,11 127:7 | 147:1,9,22,23 | 153:1,25 187:5 | 199:24 |
| 134:18 137:8 | 150:13 154:13,18 | **use** 23:3,6 50:15 | **various** 102:11 |
| | | 50:17 55:9 56:2 | **vary** 21:14 124:1 |
| | | | 150:20 153:4 |

Case 1:19-md-02875-RBK-SAK Document 2009-5 Filed 04/02/22 Page 94 of 98 PageID: 68072

**varying** 50:23
**verdict** 69:5
**verify** 210:9
**veritext** 1:10
  210:14,23
**veritext.com**
  210:15
**version** 51:6,8
**versions** 134:3
  185:17,25 188:13
**versus** 8:6 22:3,3
  60:19 125:22
  144:25 163:23,25
  197:9,13,18
  198:15 199:23
  202:17 207:20
**vial** 90:25 91:10
  93:6
**video** 11:6
**videographer** 7:14
  11:1 54:20,24
  75:24 76:2 100:3
  100:9 132:18
  154:12,17 155:16
  155:20 183:6,9
  201:11,14
**videotaped** 1:10
**view** 40:10 123:2
  203:15
**viewed** 176:19
**violated** 194:12
**violation** 199:20
**virtual** 1:10
**vis** 11:18,18
**volume** 145:17
  148:16

**w**

**w** 3:4,5
**wacker** 4:5
**wait** 56:6,18 64:21
  126:19 127:22

148:21 159:2
**waive** 208:4
**waived** 206:24
**waiver** 76:11
  112:13 125:13
**walgreens** 15:23
  15:24,24 16:2,3,7
  16:15,21 42:5,16
  75:1 104:6,7,12
  172:15,24,25
  173:3
**walk** 176:3
**walked** 206:10
**wallack** 5:17
  155:24
**walmart** 42:5,16
  75:1
**walnut** 7:9
**walsh** 6:7,9
**walshlaw.com** 6:8
  6:9
**want** 11:10 15:4
  15:16 20:24 21:4
  24:25 27:6,12
  29:2,6 34:17 35:7
  35:25 36:2 38:18
  38:20 44:2,18
  45:15 46:3 47:17
  55:9 56:2,2,6,14
  56:15,21 57:18,19
  57:19 58:3 64:22
  66:2 68:25 73:11
  75:17 77:5,22
  84:19 87:11,11
  88:21 89:20,20,24
  90:15 111:24
  113:2,4 116:20
  128:1 129:6,7
  134:17 142:21
  162:20 168:13
  180:5 189:17

192:25 201:5,11
  205:24 206:3
**wanted** 13:5 19:9
  26:12 37:11
  110:24 146:18
  168:15 195:4
  203:13
**wants** 132:3
**warehouse** 120:23
  121:3 172:18,24
  172:25
**warranty** 45:24
**washington** 3:13
  4:20 5:14
**way** 2:13 19:21
  43:25 69:3,18
  70:21 81:18 98:21
  124:16 138:5
  146:12 159:13
  164:3 165:19
  166:8 172:18
  198:1 205:5,7
  209:11
**ways** 92:22 133:9
**we've** 46:13 103:7
  140:11 186:17
  189:25 194:1
**week** 97:18
**weekend** 183:23
**weird** 14:8 72:2
  92:16
**went** 21:19,24
  53:25 97:17
  103:22 163:11
  181:2 204:4,5
**west** 4:5 5:4 6:19
  7:5
**whereof** 209:13
**whiteley** 2:20,21
**whitely** 38:9 39:11

**whitney** 6:18
**wholesale** 104:22
  145:19 152:13
  164:23
**wholesaler** 89:5
  101:12 102:12,14
  104:11,11,19
  105:23 110:16
  111:1 119:3
  122:18 129:17
  135:8 136:24
  139:10 140:4
  141:9,14,16 142:5
  144:22 146:2
  147:4,13 149:19
  150:25 151:12
  152:4,16
**wholesaler's**
  101:14
**wholesalers** 12:6
  12:12 100:20
  102:5,15,17,20
  103:6 104:18
  106:6,14,25 107:8
  108:7 113:5,13,24
  113:25 114:3,12
  114:24 115:4,17
  115:23 116:11,25
  117:7 118:16
  119:7,21,25
  120:10,18 123:3
  123:13 124:16
  125:25 126:2
  128:10,18 129:10
  129:18 130:5,10
  130:16 131:13
  132:13,25 133:4
  133:11,12,23
  134:1,6,12,22
  135:11,18,21,22
  136:6 137:4 142:7

Case 1:19-md-02875-RBK-SAK Document 2009-75 Filed 04/03/2022 Page 95 of 98 PageID:
Page 68072035
CONFIDENTIAL

142:21 144:1
146:5 147:2 151:6
151:15,23 152:7
152:22,23,25
**wide** 118:11,12
**william** 5:17
**wish** 106:11 152:2
**wished** 202:20
**wishes** 206:19
**withdraw** 72:20
73:4 84:10 97:3
178:3,16,16 179:3
195:2 197:3,6
**withdrawing**
175:15,17 178:19
178:24
**witness** 2:5 11:7
14:8 16:3,11 17:4
17:19 18:12 19:20
23:9 24:18 27:1
32:6,9 34:2 38:13
38:14 39:13 45:4
45:21 46:9 49:5
52:8,23 53:15
54:15 57:12 58:18
60:3,12,18 62:11
64:5 66:14 67:20
69:7 70:6 71:5,10
71:25 72:15 73:1
74:24 75:13 76:13
76:19 77:13,21
79:13 80:3 81:22
83:10,13,20 85:17
86:2,14,25 87:15
87:20 88:13 90:3
90:19 91:6,9,25
92:20 96:16 97:8
97:23 98:12,24
99:17,19,21 100:1
101:19 104:17
105:8,17 107:11

110:20 112:15,19
113:22 114:20
115:8,12 116:2
119:12 120:15,21
121:5 123:1 124:5
124:20 125:2,15
126:17 127:21
128:13 129:16
130:2,14 132:1,16
135:14 138:12
139:4,18 140:11
141:2,19 142:2
143:23 145:9
153:9,18,20,22
154:6,10 155:12
157:21 158:6
159:10 162:15,17
165:10 167:21
168:1,22,25 169:3
169:6,10 170:11
171:14 172:2
174:18,24 175:5,9
176:2 178:18,23
179:19 180:18
181:18 183:3
184:8,21 185:5,22
186:5 187:1,22
189:21 191:7
193:11,16 194:1
194:15 196:5
197:24 199:13
202:3,10,14,19,24
203:23 206:10,15
207:6 209:6,13
210:8,10,12,19
**witnesses** 13:7,12
**wmurtha** 5:18
**word** 55:18 113:17
**words** 78:17 81:2
82:20 131:2,3
143:7 157:24

160:6 162:1
165:19
**work** 16:25 17:1
31:18 34:8 38:11
101:10,11 102:1
103:21 104:14,17
109:4 112:11
125:11 152:5
207:13
**working** 15:22
31:3,9 101:15
103:21 104:7,16
108:20,25
**works** 102:5
106:18 135:7
152:2
**world** 65:17 68:7
68:8 69:19 70:8
72:2 86:9 92:16
152:2 192:14
206:19
**worries** 45:13
**worry** 109:17
**worst** 204:12
**worthless** 129:11
129:13 130:11
**write** 107:19,23
108:1 117:3
157:22,22 195:12
195:15,20
**writing** 107:8
108:5
**written** 13:18
127:11 198:19
**wrong** 56:4
**wrote** 16:6,21
113:17 122:16
195:11,21 201:5

| x |
|---|
| **x** 1:2,5 8:1 |
| **xi01658** 209:17 |
| **xponent** 81:9 |

| y |
|---|

**y'all** 154:4
**yeah** 15:20 27:25
28:2,7 33:19
34:24 56:13 62:11
66:23 70:8 75:20
77:13 80:10 83:12
87:20 101:25
105:5 106:11
108:8 117:8 134:2
134:11 136:20
142:5 143:23
147:3 154:6
156:11 159:24
165:1 187:22
196:5 201:8
203:21 207:3
**year** 22:16 23:20
25:10,19 26:19
35:17 40:14 145:3
153:3,25 161:22
184:14
**years** 106:17
153:3 186:15
206:12
**yell** 183:17
**yeller** 183:19
**yesterday** 13:4
14:18,23,25 16:19
20:16 29:23 58:1
101:9 106:15
107:16,22 129:4
195:10
**yield** 69:3
**york** 2:18,18 6:20
6:20

Case 1:19-md-02875-RBK-SAK Document 2009-7 Filed 04/03/22 Page 96 of 98 PageID: 68042

**[zhejiant - zooming]**                                        Page 41

| z |
|---|
| **zhejiant** 3:8,15 |
| **zhp** 69:22 |
| **zmick** 7:4 |
| **zoom** 1:10 |
| **zooming** 70:3 |

Case 1:19-md-02875-RBK-SAK   Document 2009-7   Filed 04/03/20   Page 97 of 98 PageID: 68059

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.