# Exhibit 1

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                    DISTRICT OF NEW JERSEY

 3

 4

 5    IN RE: VALSARTAN              )

      LOSARTAN, AND IRBESARTAN     )

 6    PRODUCTS LIABILITY           )

      LITIGATION                   )

 7                                 )

                                   )  No.  2875

 8                                 )

                                   ) HON. ROBERT B. KUGLER

 9    This Document Relates to     )

      All Actions                  )

10                                 )

                                   )

11

12              CONFIDENTIAL INFORMATION

13            SUBJECT TO PROTECTIVE ORDER

14                     REMOTE

15                 VIDEO-RECORDED

16           EXPERT WITNESS TESTIMONY OF

17               ROGER WILLIAMS, M.D.

18

19       Thursday, February 17, 2022, 7:18 a.m.

20                    - - - -

21

22

23

24    REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

25
```

## APPEARANCES

For the Plaintiffs:
BY: LAYNE HILTON, ESQ.
BY: DAVID STANOCH, ESQ.
BY: CONLEE WHITELEY, ESQ.
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, Louisiana 70130
504.524.5777
D.Stanoch@kanner-law.com
L.hilton@kanner-law.com
C.Whiteley@kanner-law.com

For the Defendants Teva Pharmaceuticals USA, Inc.;
Teva Pharmaceutical Industries, Ltd; Actavis LLC;
and Actavis Pharma, Inc.:

BY: BRIAN RUBENSTEIN, ESQ.
BY: KENNETH DZIKOWSKI, ESQ.
BY: VICTORIA DAVIS LOCKARD, ESQ.
BY: JAMES BROWNING, ESQ.
BY: NILDA ISIDRO, ESQ.
BY: STEVE HARKINS, ESQ.
Greenberg Traurig LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
678.553.2103
Lockardv@gtlaw.com
Rubensteinb@gtlaw.com
Dzikowskik@gtlaw.com
Harkinss@gtlaw.com
Browningj@gtlaw.com
Isidron@gtlaw.com

BY: CHRISTINE I. GANNON, ESQ.
BY: LIZA WALSH, ESQ.
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
973.757.1100
Cgannon@walsh.law
Lwalsh@walsh.law

For the Defendant Albertsons Pharmacy:
BY: CHRISTOPHER B. HENRY, ESQ.
Buchanan Ingersoll & Rooney, P.C.
227 West Trade Street, Suite 600
Charlotte, North Carolina 28202
704.444.3475
Christopher.henry@bipc.com

For the Defendants CVS Pharmacy and Rite Aid:
BY: MITCHELL CHARCHALIS, ESQ.
Barnes & Thornburg, LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
310.284.3766
Mcharchalis@btlaw.com

For the Defendant Mylan Laboratories:

BY: FRANK H. STOY, ESQ.
Pietragallo Gordon Alfano
    Bosick & Raspanti, LLP
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
412.263.4397
FHS@pietragallo.com

For the Defendant Hetero Labs:
BY: WILLIAM P. MURTHA, JR., ESQ.
Hill Wallack LLP
2 Bridge Avenue, Suite 211
Red Bank, New Jersey 07701
732.924.8171
Wmurtha@hillwallack.com

For the Defendants Zhejiang Huahai Pharmaceutical
Co., Ltd: Prinston Pharmaceutical, Inc.; Huahai
U.S., Inc.; and Solco Healthcare U.S., LLC
BY: COLEEN W. HILL ESQ.
Duane Morris, LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103-4196
215.979.1000
CWHill@duanemorris.com

For the Defendant Humana Pharmacy, Inc.:

BY: MEGAN A. ZMICK, ESQ.
Falkenberg Ives LLP
230 W. Monroe Street, Suite 2220
Chicago, Illinois 60606
312.566.4808
Maz@falkenbergives.com

For the Defendant Sciengen Pharmaceuticals Inc.:
BY: KATHLEEN E. KELLY, ESQ.
Hinshaw & Culbertson LLP
53 State Street, 27th Floor
Boston, Massachusetts 02109
617.213.7047
Kekelly@hinshawlaw.com

Also present:

Kristina Lee, videographer

## INDEX OF EXAMINATIONS

| EXAMINATIONS | PAGE |
| --- | --- |
| MR. STANOCH | 9 |
| MS. LOCKARD | 284 |
| MR. STANOCH | 320 |

## INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Report of Roger Lea Williams, M.D., February 17, 2022 | 11 |
| Exhibit 2 | Roger Williams, List of Materials Considered - 2.17.22 | 11 |
| Exhibit 3 | E-mail, 6/21/2018, To: Abid Hashmi, et al., From: Teva.net, TEVA-MDL2875-00565758 through 00565764 | 62 |
| Exhibit 4 | PowerPoint, Nitrosamine Impurities, An Overview, 2 pages | 86 |
| Exhibit 5 | Letter, undated, General Advice from Department of Health and Human Services | 104 |
| Exhibit 6 | M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk, Guidance for Industry | 112 |

Confidential Information - Subject to Protective Order

Page 6

1  Exhibit 7    Valsartan USP Monograph,    128
        January 28, 2022
2
3  Exhibit 8    Impurities in Drug Products    145
        and Drug Substances - A USP
4        Approach, Ravi Ravichandran,
        Principal Scientific Liaison
5  Exhibit 9    Overview of USP General    152
        Chapters <476> and <1086>,
6        Prescription/Non-Prescription
        Stakeholder Forum, October 19,
7        2017
8  Exhibit 10    FDA's Overview of the Guidance    156
        for Industry: Control of
9        Nitrosamine Impurities in
        Human Drugs, David Keire,
10        Ph.D., and Dongmei Lu, Ph.D.,
        Office of Pharmaceutical
11        Quality, October 2, 2020
12  Exhibit 11    E-mail, 06 July 2018, To: All,    165
        From: Global Quality
13        Compliance, Re: Lift of Hold
        Status for All Finished
14        Products Manufactured using
        Valsartan API from Jubilant
15        and Mylan
16  Exhibit 12    Generic Drug Manufacturer    210
        Ranbaxy Pleads Guilty and
17        Agrees to Pay $500 Million to
        Resolve False Claims
18        Allegations, cGMP Violations
        and False Statements to the
19        FDA
20  Exhibit 13    Orange Book Preface    224
21  Exhibit 14    Expert: Nitrosamines 'Can Slip    256
        Through the Manufacturing
22        Process,' Making Reference
        Standards Essential to Avoid
23        this Carcinogen in the Drug
        Supply Chain, June 29, 2021
24
25  Exhibit 15    Invoices, 5 pages    270

Page 7

1  Exhibit 16    NDA Partners LLC, Curriculum    284
        Vitae of Roger Williams, M.D.,
2        November 2021
3  Exhibit 17    Video    284
4  Exhibit 18    Complete set of materials sent    292
        to Dr. Williams
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          THE VIDEOGRAPHER:  Okay.  We are now on
2  the record.
3          My name is Kristina Lee.  I am a
4  videographer for Golkow Litigation Services.
5          Today's date is February 17th, 2022, and
6  the time is 7:18 Pacific.
7          This remote video deposition is being held
8  in the matter of Valsartan, Losartan and Irbesartan
9  Products Liability Litigation, MDL No. 2875, for the
10  United States District Court, District of New
11  Jersey.  The deponent is Roger Williams.
12          All parties to this deposition are
13  appearing remotely and have agreed to the witness
14  being sworn in remotely.  Due to the nature of
15  remote reporting, please pause briefly before
16  speaking to ensure all parties are heard completely.
17          All counsel will be noted on the
18  stenographic record.
19          The court reporter is Elaina Bulda-Jones,
20  and she will now swear in the witness.
21          ROGER WILLIAMS, M.D.,
22  called as a witness by the Plaintiffs herein, being
23  first duly sworn by the Certified Shorthand Reporter
24  was thereupon examined and testified as is
25  hereinafter set forth.

Page 9

1          THE REPORTER:  Mr. Stanoch.
2          MR. STANOCH:  Thank you.
3          EXAMINATION
4  BY MR. STANOCH:
5      Q.  Good morning, Dr. Williams.
6      A.  Good morning, Mr. Stanoch.
7      Q.  Could you tell us where you are located
8  today?
9      A.  I'm in San Francisco, California, in 4
10  Embarcadero Center in the offices of Greenberg
11  Traurig.
12      Q.  Thank you.
13          And other than Teva's counsel, Ms. Lockard
14  and Mr. Harkins, and perhaps any tech people, are
15  there anybody else in the room with you?
16      A.  No, there are not.
17      Q.  Other than a box which we have yet to open
18  of potential documents that we sent to your counsel,
19  do you have any documents with you in your room?
20      A.  I see three documents that my counsel has
21  put before me.  One is the report, one is the
22  materials considered, and one is the deposition
23  request.
24      Q.  Perfect.  Anything else?
25      A.  I have a blank pad of paper and a pen, and

Confidential Information - Subject to Protective Order

Page 10

1 nothing else.

2    Q.   Thank you.

3         Now, you have been deposed a number of

4 times before; is that fair?

5    A.   That's true, Mr. Stanoch.

6    Q.   Right.  So you understand the general

7 rules we will be following here today, that I will

8 be asking you a series of questions, you'll be

9 providing answers, everything everyone says on the

10 record will be taken down by the stenographer and on

11 the video; you understand that?

12    A.   I do.

13    Q.   Right.  And if you do not understand the

14 question, I ask, please tell me; otherwise I will

15 assume you understand; is that fair?

16    A.   That's fair.

17    Q.   Do you understand you should answer the

18 question unless your counsel instructs you

19 otherwise?

20    A.   I do understand that.

21    Q.   Is there any reason why you cannot testify

22 truthfully and accurately today?

23    A.   There is no reason.

24    Q.   Excellent.  Let's do some housekeeping

25 with exhibits, Dr. Williams.  First, before we get

Page 11

1 going, I am going to mark as Williams 1 the revised

2 expert report that your counsel provided to us 20 or

3 so minutes ago.

4         MR. STANOCH:  Stand by, everyone.

5         (Whereupon, Exhibit 1 was marked for

6 identification.)

7 BY MR. STANOCH:

8    Q.   So, Dr. Williams, the copy of your report

9 in front of you given to you by your counsel, we

10 will call that Exhibit 1, and for everyone else's

11 benefit, it's available as Exhibit 1 on the

12 electronic shared files.  Are you good with that,

13 Doctor?

14    A.   I am.

15    Q.   Excellent.  I am going to mark also the

16 revised list of the materials you considered that

17 your counsel also provided a little earlier this

18 morning.  Stand by.

19         (Whereupon, Exhibit 2 was marked for

20 identification.)

21 BY MR. STANOCH:

22    Q.   Exhibit 2, Dr. Williams, that's the list

23 of materials considered that were provided to us 20

24 or so minutes ago.  You have a physical copy in

25 front of you, I understand, from your counsel,

Page 12

1 correct?

2    A.   Yes, I do, Mr. Stanoch.

3    Q.   Very good.  And as a housekeeping matter,

4 Dr. Williams, could you tell us what revisions were

5 made in the copy of your report that we have marked

6 as Exhibit 1 over the report that was originally

7 provided on January 12th, 2022?

8    A.   Yes.  There were two references that

9 needed to be changed.

10         One was a reference to a guidance of FDA

11 that talks about drug substances for ANDAs.  In the

12 unrevised report, that was not provided, so we have

13 now provided that guidance.  And it's listed in the

14 materials considered as well as cited in my report.

15 And I'll be glad to answer questions about that

16 guidance if you wish, Mr. Stanoch.

17         The other change was a reference to a USP

18 guidance that talks about submitting requests for

19 revisions to the United States Pharmacopeia-National

20 Formulary.  And the reason for the change was when I

21 looked at it recently, it spoke to requests for

22 revisions of dietary supplements, which of course is

23 not pertinent in this matter.  So we changed it to

24 requests for revisions for chemical substances, and

25 that is now referenced in the revised report and

Page 13

1 also in the materials considered.  Again, I'll be

2 glad to answer questions about that document if you

3 wish, Mr. Stanoch.

4         And then there were two additional

5 documents that were important to my report relating

6 to the Orange Book, and those were not listed in the

7 materials considered, so we adjusted the materials

8 considered to include those references.  One was an

9 Orange Book from January 2019 summarizing the prior

10 year, 2018.  And then the other Orange Book

11 reference was the Orange Book Supplement No. 8,

12 August for 2018, and those are both referenced in my

13 report and also now listed in the materials

14 considered.

15    Q.   Okay.  Thank you, Doctor.

16         And regarding your report first, I believe

17 the particular footnotes that were updated with the

18 two materials you noted, those are Footnotes 20 and

19 21 of page 17 of your report; is that right?

20    A.   Let me take a quick look just to confirm.

21 Yes, you have it exactly right, Mr. Stanoch.

22    Q.   Very good.  And the materials considered,

23 the two Orange Book references that are now listed

24 in your revised materials considered, I believe it's

25 your testimony that you had relied on them in

Confidential Information - Subject to Protective Order

Page 14

1  preparing your report, they just didn't make it into
2  the reliance materials initially; is that fair?
3      A.  Yes, the materials considered listing.
4  But they were referenced in my report appropriately
5  and cited.
6      Q.  Understood.  And do you happen to have the
7  page of the reliance materials where the two Orange
8  Book sources are now listed?
9      A.  I'm sure I do, but it might help me if we
10  agree on what page that is.
11      Q.  I think it may be page 2, but if you
12  cannot do it quickly, Doctor, we can certainly take
13  care of it at a break.  I don't think there is a
14  controversy on this.
15      A.  Oh, yeah, there it is.  It's under
16  "Regulatory Guidances, Standards, and Documents,"
17  and there is a 2019 Orange Book, which is the second
18  listing in that category, and then the 2018 Orange
19  Book, Cumulative Supplement 8, August 2018, which is
20  the third listing.
21      MR. HARKINS:  Did we lose Mr. Stanoch?
22      THE WITNESS:  Oh, I think he is looking at
23  the materials considered.
24      (Whereupon, a brief discussion off the
25  record.)

Page 15

1      THE VIDEOGRAPHER:  Okay.  We're going off
2  the record.  The time is 7:29.
3      (Whereupon, a brief recess was taken.)
4      THE VIDEOGRAPHER:  Okay.  We're coming
5  back on the record.  The time on the video monitor
6  is 7:37.  Please begin.
7  BY MR. STANOCH:
8      Q.  Okay.  Doctor, thank you for bearing with
9  us with the technical issues.  I believe we were
10  just looking at your revised reliance materials,
11  correct, that's where we were?
12      A.  Yes, I understand.
13      Q.  Uh-huh.  And you were showing us, you
14  know, the two Orange Book sources that are now
15  listed under the "Regulatory Guidances" heading, I
16  believe it was, right?
17      A.  Yes.
18      Q.  All right.  Other than the updates of
19  Footnotes 20 and 21 of your report, does the revised
20  report that's been produced today have any other
21  changes to it over your original January 12th, 2022,
22  report?
23      A.  No, it does not.
24      Q.  Okay.  Thank you.
25      A.  There is a new signature page,

Page 16

1  Mr. Stanoch, with today's date.
2      Q.  Understood.  Other than the two footnote
3  revisions we discussed and the new signature page,
4  are there any other changes in your report, now
5  dated February 17th, 2022, over the original
6  iteration of your report from January 12th, 2022?
7      A.  No, there are not.
8      Q.  Okay.  And on your lists of materials
9  considered, I think there were a few other things
10  that were added between your original lists from
11  January 12th and today besides the two Orange Book
12  sources.  And do you recall that generally, sir?
13      A.  No, actually I can't say I do,
14  Mr. Stanoch.
15      Q.  That's fine.  And, you know, for instance,
16  if you look at page 1 of Exhibit 2, your latest
17  iteration of materials considered, there is now a
18  section that says, "Defendants' Expert Reports (with
19  exhibits)."  Do you see that?
20      A.  Page 1?  Oh, yes, I do see that.
21      Q.  Right.  And the first line is the report
22  of Timothy Anderson.  Do you see that?
23      A.  I do see that.
24      Q.  And then it continues on, correct?
25      A.  Yes.

Page 17

1      Q.  And you could say it in your own words,
2  but it looks like your revised materials here of
3  2/17/2022 is showing that you have now reviewed all
4  of the other defense expert reports listed here,
5  whereas you had not reviewed them at the time you
6  rendered your original report of January 12th, 2022;
7  is that right?
8      A.  Yes.  I think I did not see these expert
9  reports before I concluded my January 12th report.
10      Q.  Uh-huh.  Okay.  And so the --
11      MS. LOCKARD:  And just for the record,
12  Dave, the list updating the list of materials with
13  the new expert report was included in the 2/15
14  production.  So just, I think, to clarify, to you have
15  received -- prior version that did have the expert
16  reports listed.
17      MR. STANOCH:  No, I agree, Counsel.  And
18  this isn't controversial.  It's just more
19  housekeeping.
20      MS. LOCKARD:  Right.
21  BY MR. STANOCH:
22      Q.  But I just wanted to establish,
23  Dr. Williams, that as of the date of your original
24  January 12th, 2022, report, you had not reviewed any
25  defense expert reports in this case, right?

Confidential Information - Subject to Protective Order

Page 18

1    A.   That's true.
2    Q.   And since then, you did review them all at
3 some point, correct?
4    A.   Well, what I would say --
5        MS. LOCKARD:  Objection.  Form.
6        THE WITNESS:  -- is I looked at all of
7 them, and some of them I looked at more carefully
8 than others.
9        MS. LOCKARD:  All of them on the list.
10       THE WITNESS:  All of them on the list,
11 yes.
12 BY MR. STANOCH:
13    Q.   And because you looked at the defense
14 expert reports on the list we're looking at in
15 Exhibit 2 after you issued your original report, is
16 it fair to say that you did not rely on any defense
17 expert report in rendering your January 12th, 2022,
18 opinions?
19    A.   That's accurate, Mr. Stanoch.  Thank you.
20    Q.   Right.  And further, because you only
21 noted two changes, to Footnotes 20 and 21, in your
22 report dated today, did anything in the defense
23 expert reports listed here in Exhibit 2 alter or
24 change your opinions as they were originally
25 expressed in your January 12th, 2022, report?

Page 19

1    A.   No, nothing at all.
2    Q.   It also appears, Doctor, looking at
3 Exhibit 2, your reliance materials list of today,
4 page 2, you see "Deposition Transcripts"?  Do you
5 see that?
6    A.   Yes, I do.
7    Q.   All right.  And I believe you now list
8 four entries there, beginning with, "Transcript of
9 Edward Kaplan," through "Transcript of Ron Najafi
10 Deposition"; do you see those four entries?
11    A.   I do.
12    Q.   Right.  And those were not listed in your
13 original reliance materials in January 12th, 2022,
14 right, because these transcripts postdated your
15 report; is that fair?
16    A.   Exactly.  You can see that from the date
17 in the first part of each entry.
18    Q.   Absolutely right.  And my only point is
19 going to be, Doctor, is that you did not rely on the
20 transcripts of Edward Kaplan, Kali Panagos, John
21 Quick or Ron Najafi in rendering your January 12th,
22 2022, opinions, correct?
23    A.   That's correct.
24    Q.   And nothing in those four transcripts have
25 led you to change or alter your opinions from your

Page 20

1 original January 12th report to your February 17th
2 report, right?
3    A.   No, I have not changed my opinions at all.
4    Q.   Very good.  Thank you, Doctor.  Let's put
5 that aside, and if there is other sort of
6 housekeeping things with the reliance materials, we
7 can hit it later, okay?
8    A.   Thank you.
9    Q.   So, Doctor, your report -- and we will use
10 Exhibit 1, which is the one dated February 17th,
11 2022, this report includes all opinions you are
12 currently offering in this matter, correct?
13    A.   Yes.
14    Q.   At this time, do you intend to offer any
15 other opinions in this matter besides those
16 reflected in your report, Exhibit 1?
17    A.   No.
18        MS. LOCKARD:  I'm going to object to that,
19 as it calls for attorney work product.  Obviously we
20 reserve the right to use Dr. Williams in the
21 liability portion and for liability opinions, but he
22 is not intending to give those opinions today.
23        Court Reporter, can you hear me?
24        THE REPORTER:  Yes, ma'am.
25        MR. STANOCH:  I heard you too,

Page 21

1 Ms. Lockard.
2        MS. LOCKARD:  Okay.
3        MR. STANOCH:  I had nothing to respond to.
4        MS. LOCKARD:  Okay.  No problem.  I just
5 didn't see it come up on the realtime, so I thought
6 maybe we had lost someone, but I see it now.
7 BY MR. STANOCH:
8    Q.   Doctor, you reference, you know, this
9 litigation by caption in Paragraph 2 of your report,
10 right?
11    A.   I'm looking at Paragraph -- "I make this
12 disclosure," is that what you are talking about,
13 Mr. Stanoch?
14    Q.   Yes, sir.  Yes, sir.
15    A.   Yes, that's correct.
16    Q.   And what is your understanding, generally,
17 of this litigation, sir?
18    A.   It relates to the presence of nitrosamine
19 impurities, in terms of my report, in Tab 4, ANDAs
20 that were approved by FDA for Teva.  And there are
21 of course many ramifications to that statement, but
22 I'll stop there in terms of what my report focuses
23 on.
24    Q.   And you can look at your reliance
25 materials, Doctor, but I believe you did not review

Confidential Information - Subject to Protective Order

Page 22

1 any plaintiff-specific discovery materials, did you?

2    A.  I'm not sure I understand your question.

3 Can you point out what you are talking about on my

4 materials-considered list?

5    Q.  Sure.  You did not review any transcripts

6 of any plaintiffs in this litigation, correct?

7    A.  As part of my report?

8    Q.  Correct.

9    A.  Yes, I was speaking particularly in my

10 report about the expert report of Dr. Panagos,

11 Mr. Quick, and Dr. Najafi.  But as I already said, I

12 did not rely on the transcript of the deposition to

13 inform my opinions.  I was looking more at their

14 expert reports.

15    Q.  Understood, Doctor.  You did not review

16 any transcripts of depositions taken of any

17 plaintiff, as opposed to a plaintiff expert, in this

18 litigation, correct?

19    A.  You know, plaintiffs' expert reports, I'm

20 looking at my materials considered, and I think the

21 answer to that question is yes.  I did not review

22 plaintiffs' depositions.

23    Q.  Okay.  You did not --

24    A.  If I am answering -- yeah.  If I am

25 answering your question correctly, Mr. Stanoch.

Page 23

1 Please help me if you think I didn't.

2    Q.  No, this is not a trick question,

3 Dr. Williams.  I agree with you that nowhere in your

4 reliance materials do you list transcripts of

5 depositions taken of a plaintiff, as opposed to a

6 plaintiff expert, so I just wanted to make sure my

7 understanding was correct.  And it sounds like we

8 are in accord, right?

9    A.  Yes.  Yes.  I think we're in agreement

10 now.  One of the reasons I was struggling, I was

11 trying to look for something that wasn't on the

12 list, and that's a little difficult.

13    Q.  Of course.  And you did not review any

14 documents produced by any plaintiff in this

15 litigation, correct?

16    MS. LOCKARD:  And I'll just make the

17 objection that I'll say it's vague and confusing

18 because I don't know that Dr. Williams knows who

19 produced what.  But, I mean, I don't want to answer

20 the question for him, but --

21    THE WITNESS:  Well, yeah, I think

22 Ms. Lockard is stating it correctly.  I don't know

23 what was produced by plaintiffs.  But I find it hard

24 to believe that they wouldn't have produced some of

25 the material that also came to me from my counsel,

Page 24

1 but I wouldn't be able to safely say it was --

2 Mr. Stanoch, does that help?

3 BY MR. STANOCH:

4    Q.  Well, again, Dr. Williams, this is not

5 trying to be a gotcha.  I don't see in your reliance

6 materials, for example, any Bates number for a

7 document that a plaintiff produced the documents.

8 And I just want to confirm, then, you did not look

9 at any documents that were Bates-stamped as being

10 produced from plaintiffs.

11    A.  I think I can agree with that unless my

12 counsel wishes to object.

13    MS. LOCKARD:  No.  I assume you are

14 talking about discovery documents.  And obviously

15 there are plaintiff pleadings and disclosures and

16 then whatnot on the list, but --

17    MR. STANOCH:  Yes, that's right.  And my

18 questions were about discovery materials, Counsel,

19 you know, right.  Right.

20    Q.  And, Dr. Williams, again, so you did not

21 review, except, copies of individual plaintiff

22 pharmacy records that any given plaintiff might have

23 produced, right?  You don't recall seeing any of

24 that, right?

25    A.  No, you are correct, Mr. Stanoch.

Page 25

1    Q.  Right.  And you don't recall ever

2 reviewing any medical records that a particular

3 plaintiff might have produced in this litigation,

4 correct?

5    A.  I did not.

6    Q.  Uh-huh.  And you don't recall reviewing

7 any insurance materials that any particular

8 plaintiff might have produced in this litigation,

9 correct?

10    A.  I did not.

11    Q.  Uh-huh.  Do your opinions in this case

12 depend on the number of the potential plaintiffs in

13 the litigation?

14    A.  No.

15    Q.  Right.  If this litigation involved one

16 plaintiff or 10,000 plaintiffs, your opinions as

17 expressed in your report would be the same, correct?

18    A.  Yes.

19    Q.  Were you asked to assume by counsel

20 anything for purposes of your report, sir?

21    A.  No, I was not.

22    Q.  Were you asked to assume that Teva's

23 finished-dose valsartan products contained any

24 nitrosamines?

25    A.  Was I asked to make that assumption?  No,

Page 26

1  I was not asked to make that assumption.
2      Q.  Do you have any opinion on whether Teva's
3  finished-dose products did contain nitrosamines?
4      MS. LOCKARD:  Outside the scope of his
5  report.  Objection.
6      THE WITNESS:  My understanding is that FDA
7  asked Teva to test some samples of their finished --
8  of their drug product manufactured under the four
9  ANDAs and that Teva did supply that information to
10  FDA.  But it's not something I cited to in my
11  report.
12  BY MR. STANOCH:
13      Q.  Uh-huh.  So you don't know one way or the
14  other whether Teva's finished-dose valsartan
15  products contained nitrosamines?
16      MS. LOCKARD:  Objection.  Vague.
17      I think if you want to ask him if he has
18  personal knowledge, that would be a better question.
19      THE WITNESS:  Well, in any case, I do
20  recall seeing some numbers that Teva provided to
21  FDA, but they are not in my report and I don't
22  recollect them now.
23  BY MR. STANOCH:
24      Q.  Uh-huh.  And you are not opining, are you,
25  Doctor, on the levels of nitrosamines that may or

Page 27

1  may not have been in Teva's finished-dose products,
2  correct?
3      A.  No, I'm not.
4      Q.  Uh-huh.  Were you asked to assume by
5  counsel that Teva's finished-dose products did not
6  contain nitrosamines?
7      A.  No, I was not.
8      Q.  Uh-huh.  Were you asked to assume that
9  Teva had no knowledge about the chemical synthesis
10  processes necessary to create valsartan API?
11      A.  I was not asked to make that assumption.
12      Q.  Okay.  Right.  You were not asked to make
13  any assumptions in rendering your opinions, correct?
14      A.  Yes, that's correct.
15      Q.  Okay.  When an API manufacturer becomes
16  aware of a potential genotoxic impurity, sir, what
17  should they do?
18      MS. LOCKARD:  Objection.  Form.  Outside
19  the scope -- his report and the class-certification
20  phase.
21      THE WITNESS:  The way I would answer that,
22  Mr. Stanoch, is it depends on when the discovery was
23  made.  If it is during the development process,
24  prior to approval of either the NDA or ANDA, a
25  company may be able to mitigate the presence of the

Page 28

1  impurity.  After approval, it depends on a number of
2  factors, including -- I'm sorry, Mr. Stanoch.  Were
3  you asking generally about impurities, genotoxic
4  impurities, or nitrosamine impurities?
5  BY MR. STANOCH:
6      Q.  Potential genotoxic impurities generally,
7  not specific to nitrosamines at this question.
8      A.  Okay.  Good.  I would say after approval,
9  if such an impurity is discovered, I think there
10  would be an attempt to work with FDA for a marketed
11  drug in the United States to determine what the
12  limit should be and what corrective action should
13  need to be taken.
14      Q.  Uh-huh.  Should a API manufacturer who
15  becomes aware of a potential genotoxic impurity in
16  API notify their customers who buy that API?
17      MS. LOCKARD:  Objection.  Outside the
18  scope of Dr. Williams' class-certification report
19  opinions and gets into the liability issue.
20      THE WITNESS:  Well, I'm thinking of the
21  specific example in this matter where, yes, you
22  know, the API manufacturer did inform customers.  So
23  I would say that is a good practice in my personal
24  opinion.
25

Page 29

1  BY MR. STANOCH:
2      Q.  You mentioned in your answer the API
3  manufacturer did inform customers here.  What do you
4  mean?
5      A.  Well, if I understand the history in this
6  matter, Prinston, which is a company associated with
7  ZHP in China, did inform FDA that they were finding
8  the NDMA nitrosamine impurity, and I think in turn
9  then FDA began working with the various
10  manufacturers using the ZHP drug substance.
11      Q.  Uh-huh.  When, to your recollection, did
12  ZHP become aware of the potential nitrosamine
13  impurities in valsartan API that you alluded to in
14  your prior answer?
15      MS. LOCKARD:  Objection.  Speculation.
16      THE WITNESS:  I think we can look at my
17  report.
18  BY MR. STANOCH:
19      Q.  Sure.
20      A.  Is it all right if I look at my report
21  now, Mr. Stanoch?
22      Q.  Of course, Doctor.
23      A.  I would say when this became generally
24  known to the public was July 13th, 2018, with the
25  first FDA press release.  And FDA noted in the press

Confidential Information - Subject to Protective Order

Page 30

1  release that their understanding came from Prinston
2  Pharmaceuticals, as I said, which in turn, became
3  aware of the impurity through the efforts of ZHP.
4  And when we are talking about the impurity, we are
5  talking about NDMA.
6      Q.  Okay.  What paragraph are you looking at,
7  Doctor, so we can be on the same page?
8      A.  It's Paragraph 92.
9      Q.  Right.  And this is the July 13, 2018,
10 reference to an FDA press release about NDMA in the
11 ZHP valsartan API.  My question was:  When do you
12 recall that ZHP became aware of the NDMA impurity in
13 the valsartan API?
14     MS. LOCKARD:  Objection.  Form.
15 Speculation.
16     THE WITNESS:  Yes, I don't think I have
17 that information in my report or that I cited to it.
18 BY MR. STANOCH:
19     Q.  You don't know when ZHP discovered the
20 potential NDMA impurity in valsartan API?
21     MS. LOCKARD:  Same objection.  Asked and
22 answered as well.
23     THE WITNESS:  I don't think I stated it in
24 my report, Mr. Stanoch.
25

Page 31

1  BY MR. STANOCH:
2      Q.  Don't you think it would be important for
3  you to know when ZHP became aware of the potential
4  for NDMA impurities in valsartan API in rendering
5  your opinions?
6      MS. LOCKARD:  Objection.  Argumentative.
7      THE WITNESS:  Remember, I'm speaking to
8  Teva, so, you know, for the most part, I don't focus
9  on ZHP.  I'm talking about Teva's actions in the
10 context of the finding of nitrosamine impurities.
11 BY MR. STANOCH:
12     Q.  Wouldn't you need to know, sir, when ZHP
13 became aware of the NDMA in valsartan API to assess
14 when Teva, as the customer, should have known about
15 that as well?
16     A.  No, I don't believe so.  I think Teva was
17 aware in the weeks before the FDA press release.
18 But again, my focus is on Teva's activities and what
19 they did when they became aware of the presence of
20 nitrosamine impurities in the ZHP drug substance.
21     Q.  Let's focus on Teva.  When did Teva learn
22 of the potential for NDMA genotoxic impurities in
23 valsartan API?
24     A.  Well --
25     MS. LOCKARD:  I'm going to object to that

Page 32

1  as vague to the extent you are asking about
2  potential genotoxic impurities.
3      MR. STANOCH:  How would you like me to fix
4  the question, Counsel?
5      MS. LOCKARD:  Well, if you are asking
6  about nitrosamines, the presence of nitrosamines,
7  that's more specific than potential genotoxic
8  impurities.
9      MR. STANOCH:  Okay.  I withdraw my prior
10 question.
11     Q.  Doctor, when did Teva become aware of the
12 potential nitrosamine contamination in valsartan
13 API?
14     A.  It was around the time Teva put on hold
15 the manufacture of its four ANDAs because of the
16 presence of these impurities in the ZHP drug
17 substance.
18     Q.  Uh-huh.  And when --
19     A.  And that, I believe, was in June of 2018.
20 Then there were a number of activities that Teva
21 undertook, which of course is a core part of my
22 report, but the most important one in terms of my
23 report were the recalls of the products that
24 contained the ZHP drug substance.
25     Q.  Okay.  Should a drug manufacturer such as

Page 33

1  Teva have quality systems in place to ensure that
2  its API suppliers notify them upon the discovery of
3  potential genotoxic impurities?
4      MS. LOCKARD:  Objection.  Outside the
5  scope of the class-certification expert report.
6      THE WITNESS:  Yes, I did not comment on
7  that in my report.  If you are asking me as a
8  personal question, I could say I would think it
9  likely that Teva would have that kind of agreement
10 or understanding.
11 BY MR. STANOCH:
12     Q.  Uh-huh.  Did you undertake to assess
13 whether that agreement or understanding existed here
14 between Teva and ZHP for valsartan API?
15     A.  No, that was not part of my report or my
16 opinions.
17     MS. LOCKARD:  Objection.  That's outside
18 the scope of the expert report on
19 class-certification issues.
20 BY MR. STANOCH:
21     Q.  Isn't it a finished-dose manufacturer's
22 responsibility to obtain material information about
23 genotoxic impurities from their API source in a
24 timely manner?
25     MS. LOCKARD:  Objection.  It's liability

Confidential Information - Subject to Protective Order

Page 34

¹ question. It's outside the scope of the
² class-classification expert report opinions.
³      MR. STANOCH: Counsel, you have said
⁴ outside the scope and liability issue a number of
⁵ times. Could you just -- I'm not picking a fight.
⁶ I just want to know what you mean by that.
⁷      MS. LOCKARD: Well, okay. We are in the
⁸ class-certification phase of the case, correct?
⁹ There are opinions that are very specific that have
¹⁰ been directed by Dr. Williams in his report. These
¹¹ are not liability opinions.
¹²      The majority of your questions so far this
¹³ morning have been, what should manufacturers do?
¹⁴ What should their quality systems be? And they are
¹⁵ all liability opinions, and that is not the
¹⁶ substance of his report. That's not within his
¹⁷ report. These are squarely liability questions.
¹⁸      MR. STANOCH: Well, I appreciate that,
¹⁹ Ms. Lockard. I'll just say I don't necessarily
²⁰ agree with you that these are outside the scope of
²¹ the report that he has issued at class, but I'll
²² note your objection and we can keep going.
²³      I'm sorry, Madam Reporter. Would you be
²⁴ kind enough? Did I have a question pending?
²⁵      THE REPORTER: Let me check for you.

Page 35

¹      MR. STANOCH: Thank you.
²      (Whereupon, the reporter read the record
³ as follows:
⁴      "Question: Isn't it a finished-dose
⁵ manufacturer's responsibility to obtain material
⁶ information about genotoxic impurities from their
⁷ API source in a timely manner?")
⁸      MS. LOCKARD: Same objection.
⁹      THE WITNESS: You know, the understanding
¹⁰ that a drug substance and the corresponding drug
¹¹ product may have genotoxic impurities has been a
¹² challenge to FDA and the pharmaceutical industry
¹³ over many years. The FDA guidance that spoke to how
¹⁴ to deal with that actually came out in 2015.
¹⁵      So when you ask a general question like
¹⁶ that, it's very difficult for me to answer. But
¹⁷ definitely if the manufacturer of a drug product
¹⁸ feels there could be a genotoxic impurity, there is
¹⁹ an obligation to work with FDA to understand that
²⁰ and to limit it if necessary.
²¹      I hope that's responsive to your question,
²² Mr. Stanoch.
²³ BY MR. STANOCH:
²⁴      Q. Partially, but I appreciate you trying,
²⁵ Dr. Williams. I really do.

Page 36

¹      The next question: What common evidence
² would you need to look at to determine whether it is
³ a finished-dose manufacturer's responsibility to
⁴ obtain important information about genotoxic
⁵ impurities from their API source in a timely
⁶ fashion?
⁷      MS. LOCKARD: Objection. Vague.
⁸ Confusing. Outside the scope of the
⁹ class-certification expert report.
¹⁰      Did you say common evidence? Or I might
¹¹ have misheard you.
¹²      THE WITNESS: Are you waiting for
¹³ Mr. Stanoch to answer, Ms. Lockard?
¹⁴      MS. LOCKARD: It's okay. I was, but I
¹⁵ have the -- I see on the transcript what he said.
¹⁶      All right. I stand by the objection.
¹⁷      THE WITNESS: You know, the way I would
¹⁸ answer it, Mr. Stanoch, it's a very general
¹⁹ question. It's probably more important to focus on
²⁰ nitrosamine impurities because that's what my report
²¹ focuses on.
²²      And all I can say is FDA at many points in
²³ this episode said that the finding of these
²⁴ genotoxic nitrosamine impurities was unexpected. So
²⁵ I don't think I can speculate as to when either a

Page 37

¹ drug-substance manufacturer or a dosage-form
² manufacturer would expect something that was -- or
³ anticipate something that was unexpected. I think
⁴ it's important to keep in mind that these impurities
⁵ were unexpected.
⁶ BY MR. STANOCH:
⁷      Q. Are you finished, Doctor?
⁸      A. Yes.
⁹      Q. Thank you.
¹⁰      I may ask you that from time to time, just
¹¹ for the video, to make sure I don't step over you
¹² and vice versa; is that okay?
¹³      A. Yes, no problem, Mr. Stanoch.
¹⁴      Q. Thank you. I appreciate your patience
¹⁵ there.
¹⁶      You said "unexpected" a number of times in
¹⁷ your answer there, and we will certainly get to
¹⁸ that. But let me -- you said that my question would
¹⁹ be different if I asked about nitrosamines versus
²⁰ genotoxic impurities generally, so I'm going to ask
²¹ you the question differently.
²²      Question: What evidence would you need to
²³ look at in order to determine whether it is a
²⁴ finished-dose manufacturer's responsibility to
²⁵ obtain important information about nitrosamine

Confidential Information - Subject to Protective Order

Page 38

1   impurities from their API source in a timely
2   fashion?
3        MS. LOCKARD: Objection. Vague.
4   Confusing. Outside the scope of the
5   class-certification expert report.
6        THE WITNESS: You know, it might be
7   helpful, Mr. Stanoch, to back up a little bit on
8   what are the responsibilities of an ANDA filer in
9   terms of assessing impurities in its drug substance
10  and its drug product.
11       The presence of genotoxic impurities I
12  would say doesn't really come up too often in that
13  primary responsibility. So I think you are asking
14  for something that, if I may say so, is not routine
15  as part of the ANDA requirements or recommendations
16  by FDA.
17  BY MR. STANOCH:
18       Q.  Are you saying it's not the responsibility
19  of a drug-product manufacturer to identify potential
20  genotoxic impurities?
21       MS. LOCKARD: Objection. Clearly outside
22  the scope of the class-certification opinions in the
23  expert report. It's clearly a liability question.
24       MR. STANOCH: This is his last answer,
25  Counsel.

Page 39

1        Q.  Go ahead, Mr. Williams.
2        A.  What I would say, Mr. Stanoch, is, you
3   know, the ANDA applicant has a responsibility to
4   look at the impurities in their drug substance and
5   their drug product and decide whether they need to
6   be reported, identified, and qualified. And those
7   are general recommendations that appear in the
8   guidances I cited.
9        It was only until 2015 that FDA produced
10  the guidance on how to deal with genotoxic
11  impurities, and that, of course, came to a head
12  three years later with the finding of the
13  nitrosamine impurities.
14       So I really can't answer your question
15  about the responsibility of a drug-product
16  manufacturer other than to refer you to that 2015
17  guidance.
18       Q.  You are saying there was no guidance to
19  the drug industry about genotoxic impurities until
20  2015?
21       A.  No, I think there were guidances, which I
22  allude to in my report. But the M7 guidance that
23  we're talking about now I think clarified it in
24  terms of how manufacturers need to focus on the
25  possibility of genotoxic impurities.

Page 40

1        Q.  Was there any industry guidance on
2   genotoxic impurities prior to 2015, Doctor?
3        A.  I think if we look at my report, I could
4   find reference to other documents that had been
5   produced by FDA or the EMA or in ICH, so -- and
6   those documents preceded the 2015 guidance.
7        Q.  Do you agree that a drug-product
8   manufacturer is ultimately responsible for the API
9   that it incorporates into its finished-dose product?
10       A.  Yes, I think that's generally a fair
11  statement, Mr. Stanoch.
12       Q.  Yeah. So Teva is ultimately responsible
13  for the valsartan API that was in its finished-dose
14  valsartan product, correct?
15       A.  Yes, I think I can agree with that.
16       MS. LOCKARD: Objection. It's vague.
17  BY MR. STANOCH:
18       Q.  And that would include the identification,
19  characterization, testing, and control of any
20  potential genotoxic impurities, correct?
21       MS. LOCKARD: Objection. Compound.
22  Vague. Outside the scope of the class-certification
23  expert report.
24       THE WITNESS: Well, remember, ZHP and Teva
25  are working according to FDA requirements that speak

Page 41

1   to identity, strength, quality, purity, and potency.
2   When we talk about purity, we're talking about
3   impurities.
4        And the guidances that ZHP and Teva would
5   use are the ones I cited in my report, both the ICH
6   Q3A and Q3B with revisions, and then also the
7   corresponding ANDA guidances. None of those
8   guidances mention genotoxic impurities.
9   BY MR. STANOCH:
10       Q.  Are you saying, then, that Teva had no
11  obligation to potentially identify genotoxic
12  impurities in its finished-dose valsartan products?
13       MS. LOCKARD: Objection. Vague. Outside
14  the scope of class-certification expert report.
15       THE WITNESS: You know, I think it's clear
16  in my report that FDA gives recommendations in these
17  guidances, and that is what Teva and ZHP would be
18  following to submit their ANDA to FDA for review and
19  approval.
20       Now, if FDA had some concern about
21  genotoxic impurities based on the route of synthesis
22  of the drug substance, they could certainly bring
23  that to Teva's attention or the DMF-holder's
24  attention, in this case, ZHP.
25       But again, to talk about it generally in

Page 42

1 terms of responsibility and liability is not
2 something I dealt with in my report.
3 BY MR. STANOCH:
4    Q.  Uh-huh.  So you are not offering any
5 opinion at this time about which firm would be
6 responsible for the identification of genotoxic
7 impurities in Teva's finished-dose valsartan
8 product?
9    A.  I think if there was some reason to
10 suspect the presence of a genotoxic impurity, any
11 drug manufacturer would have to consider that and
12 discuss it with FDA in terms of what to do, but that
13 was not the case here.
14    Q.  Uh-huh.  Would it be your expectation that
15 Teva would have had systems in place to assure that
16 ZHP would promptly notify it in the event ZHP
17 identified a potential genotoxic impurity in
18 valsartan API?
19       MS. LOCKARD:  Objection.  Vague.  Outside
20 the scope of the class-certification expert report.
21       THE WITNESS:  You know, again, you are
22 asking these very general questions, but I would say
23 both ZHP and Teva are sort of marching, if you will,
24 to laws, regulations and guidances that come from
25 FDA, and for the most part those guidances don't

Page 43

1 speak to genotoxic impurities.
2       So if you are talking about a general
3 moral obligation, I could only answer in a personal
4 opinion, but I'm really trying to focus on the
5 regulatory requirements for an ANDA to be considered
6 and, if possible, approved.
7 BY MR. STANOCH:
8    Q.  Well, Doctor, you are opining on whether
9 or not Teva followed GMP or proper regulatory
10 practice, I'm looking at Paragraph 116, right?
11    A.  116 speaks to Dr. Najafi's report.  Is
12 that where we're looking, Mr. Stanoch?
13    Q.  Oh.  Well, that might be a separate issue,
14 Doctor.  You know, your January 12th report, the
15 numbering -- there is two Paragraph 116s.  It went
16 from 116 to 127, and then it restarted at 110.  I
17 was looking at your conclusion.  Maybe you fixed
18 that in your latest report.  Let's take a look.
19    A.  I'm sorry for those typo errors.
20       Can you point me exactly to where you are
21 looking, then?  Is there a page number?
22    Q.  I am looking at page 46, Doctor.
23    A.  Okay.  Good.
24    Q.  And you see the heading "Conclusion"?
25    A.  Yes, I do.

Page 44

1    Q.  Right.  And the paragraph number there is
2 116.  Do you see that?
3    A.  I do.  I do see that.  Thank you.
4    Q.  Right.  Sure.
5    A.  And your question about that is?  I'm
6 sorry.
7    Q.  Yeah, we will get back to that.  Let's do
8 this housekeeping.  So we scroll back up, that's
9 actually some misnumbering issue.  You have another
10 Paragraph 116 starting under "Dr. Najafi's
11 Declaration" on page 38, right?
12    A.  Yes, I apologize for these errors.  I'm
13 sorry.
14       But I'm sure we can find the part of the
15 report that you want me to talk about.
16    Q.  Sure.
17    A.  So --
18    Q.  Well, hold on.  Hold on.  Sure.  We could
19 fix.  And just to button this up, so then it looks
20 like your paragraph numbering restarts, for the
21 record, on page 44, under the "Rebuttal to
22 Mr. Quick's Expert Declaration."  Do you see that?
23    A.  Yes, I do.  It jumps from 127 and then to
24 110.
25    Q.  Right.

Page 45

1    A.  So I think to make sure we're always
2 talking about the right thing, I think if we just
3 give the paragraph number and the page, we should be
4 fine.  Would that be all right with you,
5 Mr. Stanoch?
6    Q.  Absolutely fine.  And, Doctor, was there
7 some cutting-and-pasting issue with the section on
8 your rebuttal to Mr. Quick that messed up your
9 numbering of your paragraphs here?
10    A.  No, I would say it was a word-processing
11 error, where you have to sort of back up and make
12 sure that the Word program numbers the paragraph
13 correctly.
14    Q.  Sure.  I have been there, Doctor.  I'm
15 sure we all have.
16       No, did you write this whole section, the
17 "Rebuttal to Mr. Quick's Expert Declaration" in your
18 report?
19    A.  I would say, you know, I wrote the report,
20 and I apologize for the limits on my word-processing
21 skills.
22       I did try to correct this.  I think we
23 noticed some of the misnumbering when we were
24 looking at drafts, and apparently I failed to do it
25 in the final document.

Page 46

1   Q. Again, that's totally understandable. I
2 was just getting at -- to say if you wrote this
3 section here, "Rebuttal to Mr. Quick's Expert
4 Declaration," or not?
5   A. Yes, I did.
6   Q. Uh-huh. And no one gave you that to cut
7 and paste into the report and that messed up your
8 numbering?
9   A. No.
10   Q. Uh-huh. You said "we" noticed some
11 pagination errors before. Who is the "we" in your
12 answer a couple answers ago?
13   A. Well, first of all, it's not a pagination
14 error, it's a paragraph-numbering error. I can tell
15 you exactly how it happens. But I think when we
16 were looking at drafts, one of the counsel pointed
17 out that the numbering was not consistent.
18   Q. Okay. Moving on, I'm looking at page 46,
19 your "Conclusions," Doctor. Tell me when you are
20 there.
21   A. Okay, Mr. Stanoch, I'm there.
22   Q. And the Paragraph 116 on this page, you
23 write in part, "Teva did not fail to follow cGMP or
24 proper regulatory practice." Do you see that?
25   A. I do.

Page 47

1   Q. Right. So you are opining on whether or
2 not Teva followed cGMP and proper regulatory
3 practice, right?
4   A. Yes.
5   Q. Right. So in the context of your opinions
6 on cGMP and proper regulatory practice, my question,
7 now several questions ago is: Do you believe that
8 Teva was following proper regulatory practice in
9 terms of its relationship with ZHP to ensure that it
10 was promptly notified about potential genotoxic
11 impurities in valsartan API?
12   A. I think the answer is yes. I think ZHP
13 was communicating to Prinston, they were
14 communicating with FDA, FDA was communicating with
15 Teva. And Teva promptly recalled all these
16 products, as my report says. So to me, that's the
17 way the system should work.
18       And Teva never was under any particular
19 GMP failure notice from FDA. I think FDA was
20 pleased with the way Teva worked out its recalls in
21 order to protect the public when they found out
22 about the nitrosamine impurities. I don't see a
23 failure, Mr. Stanoch. I see success.
24   Q. So you are saying, Doctor, that Teva acted
25 reasonably promptly in the summer of 2018 upon

Page 48

1 learning from ZHP about the NDMA in valsartan API?
2   A. You know, you are asking a question that
3 sort of asks me to take your word for it. I don't
4 think I commented on when ZHP or FDA actually
5 informed Teva, but it was certainly in the May,
6 June, July time frame, and I think Teva acted
7 promptly to recall two of its ANDA valsartan
8 products from the U.S. market.
9       And that's the way the system is supposed
10 to work. That's what recalls do. It allows the
11 removal of a product that, for one reason or
12 another, needs to be removed from the market, either
13 because it fails GMPs or it fails a specification.
14       What is unusual, and I noted this in my
15 report, is the recall occurred before FDA had set a
16 limit on the nitrosamine impurity. So Teva was
17 acting, and I'm going to use FDA words, with what I
18 might call an abundance of caution to remove the two
19 valsartan products manufactured in Malta from the
20 U.S. market.
21   Q. Uh-huh. So what I hear you saying is the
22 system worked as it should here.
23       ZHP discovered NDMA in valsartan API
24 sometime in the summer of 2018 or shortly before,
25 right?

Page 49

1   A. Yes, I think you are saying it correctly,
2 Mr. Stanoch.
3   Q. ZHP told Teva, correct?
4   A. Well, again, I'm not sure of the routes of
5 communication. I think Prinston told FDA and FDA
6 told Teva, and pretty soon everybody is talking
7 about this difficult situation.
8   Q. Well, that's fine, whatever your
9 understanding of the route is. So ZHP told its
10 affiliate company, Prinston, right?
11   A. If you want to postulate the route of
12 communication, that's fine with me, Mr. Stanoch.
13   Q. No, I'm not postulating anything, Doctor.
14 I'm just trying to -- whatever your understanding
15 is, I'm not bickering with it. I'm just trying to
16 make sure I establish what you think the route is,
17 right? So ZHP, we already determined, identified
18 NDMA in valsartan API in 2018, right? We agree with
19 that?
20   A. And that information came to Prinston and
21 Prinston brought it to FDA, and then FDA started
22 looking at all the manufacturers of valsartan, and
23 there were several, who used the ZHP product. And
24 that included Teva for two of its four ANDAs.
25   Q. So how did the information about the NDMA

Page 50

1 in 2018 get to Teva?
2    A.  I would be speculating, but to me, it
3 might have come from FDA.
4    Q.  Well, whatever you think your answer is.
5 I'm just trying to see what the telephone route of
6 communication is.
7        And that's what you were referring to more
8 generally as the system working, that the API
9 manufacturer passed the information along, and it
10 went to the FDA and at some point it got to Teva,
11 and then Teva, as you said, instituted its recalls
12 for its product that contained the valsartan API,
13 right?
14        MS. LOCKARD:  Objection.  Vague.
15 Compound.  And outside of the scope to the extent
16 this line of questioning is asking about what ZHP
17 did or should have done.
18        THE WITNESS:  Yeah, I don't want to get
19 into the details of the way you described the routes
20 of communication, but I can certainly say that when
21 these things come up, everybody needs to talk to
22 everybody, including FDA, and FDA is the one that
23 prompted Teva to make the recalls.
24 BY MR. STANOCH:
25    Q.  Yeah, right.  You opine that FDA asked

Page 51

1 Teva to recall its valsartan containing the API from
2 ZHP, right?
3    A.  Well, the recall was voluntary on Teva's
4 part, but they certainly worked closely with FDA to
5 make sure that FDA was satisfied with the way their
6 recall occurred.
7    Q.  Uh-huh.
8    A.  And that recall was in, I want to say,
9 June of 2018.  Wait a minute.  I may have the month
10 wrong.  I'm sorry, Mr. Stanoch.  I can check that if
11 you wish.
12    Q.  Well, I'm looking at Paragraph 109 of your
13 report, Doctor.  Tell me when you are there.
14    A.  All right.  Which paragraph?
15    Q.  109.
16    A.  And I see that on -- can you say the page,
17 Mr. Stanoch?
18    Q.  37, sir.
19        MS. LOCKARD:  It starts on 36.
20        THE WITNESS:  Okay, yes.  I see that,
21 Paragraph 109 on page 36.
22 BY MR. STANOCH:
23    Q.  Stand by.  Right.  Yeah, you know, I have
24 the earlier version of your report, not the one
25 given to me this morning, so I'm sorry if I'm off by

Page 52

1 a page number.  But yes, your Exhibit 1, page 36,
2 Paragraph 109.  It begins, "Somewhat unusual,"
3 right?
4    A.  Yes.  Yes.  We are in the same place,
5 Mr. Stanoch.
6    Q.  Perfect.  And you wrote, "the FDA asked
7 for recalls of drug products"; do you see that?
8    A.  Yes.  I do see that.  And I think that
9 corresponds with what I said previously.
10    Q.  Right, right, right.  Well, you were
11 saying that FDA and Teva were talking previously,
12 but you write in your report that FDA asked for the
13 recalls, right?
14    A.  Well, FDA works with the manufacturer to
15 make a voluntary recall.  I would say the decision
16 on the recall is up to the manufacturer.
17    Q.  Well, that's not what you wrote here in
18 Paragraph 109, is it?
19    A.  You know, I think the way it works is FDA
20 wishes a recall, and a manufacturer -- I don't think
21 FDA has the authority to compel a recall.  So the
22 reason I say it's voluntary is it's up to Teva to
23 say, yes, we will do this recall at your request,
24 and that's what Teva did.
25        I don't think we should quibble about, you

Page 53

1 know, who was actually driving the decision.  I
2 think it's a joint decision between FDA and Teva,
3 but it's a voluntary act on the part of Teva.
4    Q.  Well, you know, Doctor, I can only ask
5 questions about what you opine and write in your
6 report, and what you wrote in your report twice in
7 this paragraph is about the FDA asking for these
8 recalls, correct?
9    A.  That could well be how a recall occurs,
10 FDA finds something and they work with the company
11 to execute a recall.  But Teva was voluntarily
12 making these recalls, and they did so successfully.
13 And they kept FDA apprised of what they were doing,
14 and FDA agreed with it.
15    Q.  Well, you don't write here in this
16 paragraph or anywhere in your report that Teva went
17 to the FDA and said, we're going to recall our
18 product, did you?
19    A.  You know, I stand by the words in the
20 document.  Are you providing alternate words,
21 Mr. Stanoch?
22    Q.  I'm not providing anything alternate,
23 Dr. Williams.  I'm focused on your words in
24 Paragraph 109 of your report, where you twice say
25 the FDA asked for the recalls.

Page 54

1  A.  Yes, I have no problem with FDA asking for
2  recalls.  Does that seem a problem in terms of how
3  Teva executed the recall?
4      Q.  I'm trying to establish based on your
5  words in your report, Doctor, that Teva did not go
6  to the FDA and said, we need to recall our product,
7  rather, the FDA asked Teva to recall the valsartan
8  product, correct?
9      A.  I'm not going to debate the words with
10  you.  I think you are right, Mr. Stanoch, that
11  Teva -- FDA was asking Teva and Teva responded to
12  this request.  It was voluntary because I think Teva
13  could have said, no, we're not going to recall.
14  Teva did not do that.  They voluntarily recalled.
15      But you are right, Teva initiated the
16  request based on their findings working with ZHP and
17  other manufacturers.
18      Q.  I'm going to go back to sort of the chain
19  of communication about the NDMA discovery in June
20  2018.  So do you think there was any direct
21  communication between ZHP and Teva about the NDMA
22  discovered in June 2018?
23      A.  Well, I would have to speculate.  It may
24  be in my materials considered, but I didn't cite
25  anything in that report, so at this point it would

Page 55

1  be speculative for me to answer.  I would be very
2  surprised if ZHP and Teva weren't communicating on
3  this point.
4      Q.  Okay.  Would it be proper regulatory
5  practice for ZHP to be in communication with its
6  customer Teva about the discovery of NDMA in the
7  valsartan API?
8      MS. LOCKARD:  Object to the extent you are
9  asking him about what ZHP should or shouldn't have
10  done.  It's outside the report.
11      THE WITNESS:  It seems to me, if a
12  drug-substance manufacturer finds an unidentified
13  impurity that is problematic in their drug
14  substance, they would certainly notify their
15  purchasers.
16  BY MR. STANOCH:
17      Q.  What cGMP procedures did Teva have in
18  place to assure that ZHP would inform Teva about any
19  genotoxic impurities in APIs that Teva was
20  purchasing?
21      MS. LOCKARD:  Objection.  Vague.  Scope.
22      THE WITNESS:  You know, Mr. Stanoch, we
23  may look for it in my materials considered, but I
24  did not study that to form my opinions, and I don't
25  think I cite anything into that part of my -- any

Page 56

1  part of my report.  And I'm not a GMP expert, so I
2  very carefully combined my GMP opinions through
3  brief statements in this report.
4  BY MR. STANOCH:
5      Q.  That's confusing to me, Doctor, because
6  the conclusion paragraph we were looking at is you
7  are opining that Teva did not fail to follow cGMP or
8  proper regulatory practice, right?
9      A.  And I base that on my review of
10  inspections of Teva that occurred over the decade of
11  2010 to the present time.  Teva did not have GMP
12  issues insofar as FDA was concerned, including GMP
13  issues related to the nitrosamine impurities.
14      Q.  So the only basis for your opinion that
15  Teva did not fail to follow cGMP or proper
16  regulatory practice is the status of any FDA
17  inspections of Teva finished-dose facilities?
18      A.  Yes, exactly.  And that's where I spent
19  some time in my report, on that inspectional
20  history, and for the most part, I did not see any
21  particular GMP problems that FDA was bringing to
22  Teva's attention.
23      Q.  So your opinions are not based in any way
24  on Teva's compliance with cGMP or proper regulatory
25  practice vis-à-vis its API suppliers ZHP and Mylan?

Page 57

1      MS. LOCKARD:  Objection.  Vague.
2  Confusing.
3      THE WITNESS:  Yes, I did not explore
4  separate from FDA inspections how Teva's SOPs
5  conform to FDA's requirements on GMPs.  That was not
6  part of my report.
7  BY MR. STANOCH:
8      Q.  Okay.  Well, why do you list all Teva's
9  SOPs in your reliance materials, then, Doctor?
10      A.  There is a huge amount of material in my
11  materials-considered document, and I would say only
12  a small fraction of that was cited in my report, and
13  even that small fraction was voluminous.
14      Q.  So am I to take it, then, that the
15  materials that you only relied on for your opinions
16  at this stage are the ones quoted in the -- or cited
17  in the body of your report, not all of them listed
18  in your reliance materials?
19      A.  No, I think if it is cited in my report,
20  it should be listed in my materials-considered list.
21  Was that your question, Mr. Stanoch?
22      Q.  No.  My question is a little different,
23  Doctor.  You know, you list a lot of stuff in your
24  reliance materials, including Teva's SOPs, but now
25  you are telling me your opinions don't turn on

Confidential Information - Subject to Protective Order

Page 58

1 Teva's SOPs as it relates to Teva's relationship
2 with its API suppliers, right?
3     MS. LOCKARD:  Objection.  Lacks
4 foundation.  Vague.  Misstates the document.
5     THE WITNESS:  Yes, I think I make -- my
6 opinions are clearly stated both at the beginning
7 and at the end of the report and I provide citations
8 to support those opinions, but I certainly didn't
9 get into the adequacy of Teva's SOPs with regard to
10 conformance to FDA's GMPs.  That would have been a
11 completely different report.
12 BY MR. STANOCH:
13     Q.  So how am I to know from your reliance
14 materials, Doctor, which materials you are relying
15 on, the opinions in the body of your report?
16     A.  I think the best way I could answer that,
17 Mr. Stanoch, is to look at the citations in my
18 report, which are also listed in the materials
19 considered.
20     Q.  Got it.  So --
21     MS. LOCKARD:  Objection to that question
22 because you continue to name the list of materials
23 considered as his reliance materials, which is
24 confusing and vague and lacks foundation.
25

Page 59

1 BY MR. STANOCH:
2     Q.  So let me make sure I fully understand it,
3 then.  So the materials you rely upon to render your
4 opinions reflected in your report are the ones that
5 are cited in the body of the report?
6     A.  Yes, I think as a general statement,
7 Mr. Stanoch, that's correct.  And as you can see,
8 it's only a small fraction of all the materials
9 listed in the materials-considered document.
10     Q.  Okay.  So if an item is listed in your
11 materials considered but not cited in the body of
12 the report, you are not relying on that material in
13 rendering your opinions at this time?
14     A.  I think I can agree with that.
15     Q.  That's fine.  It will make the day go
16 faster, Doctor.  Again, I just want to make sure
17 we're on the same field.  I appreciate that.
18     MS. LOCKARD:  So I think we have been
19 going about an hour, if you are at a point in
20 time -- you are changing topics --
21     MR. STANOCH:  That's fine.  Doctor, would
22 you like a break?
23     THE WITNESS:  That would be very nice,
24 Mr. Stanoch.
25     MR. STANOCH:  Let's do it.

Page 60

1     THE VIDEOGRAPHER:  Okay.  So we're going
2 off the record.  The time is 8:42.
3     (Whereupon, a brief recess was taken.)
4     THE VIDEOGRAPHER:  Okay.  We're coming
5 back on the record.  The time on the video monitor
6 is 8:51.  Please begin.
7 BY MR. STANOCH:
8     Q.  Doctor, just yes/no, did you talk to your
9 counsel during the break?
10     A.  Yes, I did.
11     Q.  Did you talk to anyone else?
12     A.  No, not at all.
13     Q.  Did you look at any documents?
14     A.  Did we look at any documents?
15     Q.  Correct.
16     A.  I think there was one document we looked
17 at.
18     Q.  What did you look at?
19     A.  It was a management document of Teva that
20 went out globally to many scores of people about --
21 and it's cited in my report -- about the problem
22 with the ZHP drug substance having nitrosamine
23 impurities.
24     Q.  Where is that cited in your report?
25     THE WITNESS:  Can you tell me where it is

Page 61

1 in the cited materials?
2     Okay.  It's on page 9, and it's Reference
3 9 on page 9, I believe.
4 BY MR. STANOCH:
5     Q.  Is that "Notification Letter from
6 Valsartan re" -- sorry.  Start over.  "Notification
7 Letter from re Valsartan" "update"?
8     MS. LOCKARD:  Just to clear it up, it's --
9 sorry, you're not trying to -- I know you are just
10 trying to figure out which document it is.  The
11 document is 565758.
12     THE WITNESS:  Yes, and it's Reference 9.
13 There are actually two references in Reference 9,
14 and it's the first that we looked at briefly.
15 BY MR. STANOCH:
16     Q.  Why don't you tell me the Bates numbers of
17 the two documents you looked at?
18     MS. LOCKARD:  He looked at one document.
19 He is saying there are two documents referenced in
20 Footnote 9.
21     MR. STANOCH:  Oh, I'm sorry, Counsel.  I
22 thought he was looking at his materials considered.
23 We are looking at his footnote in his report.  Thank
24 you.  That's helpful.  I see it now, thank you.
25     Q.  Did that document refresh your

Confidential Information - Subject to Protective Order

Page 62

1 recollection about anything you had looked at
2 before?
3     A.  No.  I don't think it's really pertinent
4 to the questioning.  I'm glad to ask questions about
5 it if you wish, Mr. Stanoch.
6     Q.  Sure.  I just need to get a copy of it and
7 to share it for all of our colleagues who are
8 remote, so give me one second.  Okay.  We will mark
9 that document as Williams Exhibit 3.
10         (Whereupon, Exhibit 3 was marked for
11 identification.)
12         THE WITNESS:  And if I -- Mr. Stanoch, may
13 I point out something in the document that was
14 helpful to some of your questions?
15 BY MR. STANOCH:
16     Q.  Before you do that, let's make sure I have
17 the same document as you.  I'm going to share my
18 screen, Doctor.  You will see it looks like a --
19 it's an e-mail from June 21, 2018, Bates No. 565758.
20 Is this the same document you are holding?
21     A.  Yes, I believe so.
22     Q.  Great.  I'm going to stop sharing now that
23 we're on the same page.
24         This is the document you were referring to
25 that you looked at, right?

Page 63

1     A.  Yes.  And if you look at the four-digit
2 page number ending 5763 --
3     Q.  Okay.
4     A.  -- you can see at the top there is a
5 reference to when ZHP informed Teva that "they came
6 to be aware of a previously unknown impurity that
7 may have genotoxic potential," and that was on
8 June 20th, 2018.
9     Q.  Got it.  And it's your opinion that Teva
10 acted appropriately, promptly, after receiving
11 notification from ZHP on June 20th, 2018?
12     A.  Yes.  The way I would say it, if you look
13 further down, where it says "Investigation," "sites
14 to requested to remove any materials or products
15 using Valsartan API from Zhejiang" -- ZHP.
16         So to me, you know, this is a very rapid
17 response on the part of Teva to a problem brought to
18 their attention by ZHP.  Remember, the date of the
19 e-mail is 6/21 and they are notified by ZHP on 6/20,
20 so I don't think you could have a much more rapid
21 response.
22         And then subsequently to this notice, Teva
23 also issued the recall.  And I believe that was in
24 July 16th, 2018, so that was about a month later.
25         And again, as we discussed before the

Page 64

1 break, FDA asked for the recall, but Teva
2 voluntarily did the recall, working with FDA and to
3 FDA's satisfaction.
4     Q.  You think it was appropriate for Teva to
5 wait, as you said, a month later after being told by
6 ZHP about the NDMA impurity, to institute its
7 recalls?
8         MS. LOCKARD:  Objection to the form of
9 that question.  It lacks foundation and it misstates
10 the evidence.
11         THE WITNESS:  Well, you know, you can
12 imagine, I'm speaking generally, not to anything I
13 said in my report, but this is an incredibly
14 difficult finding, inspecting a company making
15 products all over the globe, including FDA.  And of
16 course FDA is a very stringent regulatory authority,
17 so it doesn't surprise me at all that by the time
18 they sorted through the issues, it took about a
19 month to get the product off the U.S. market.
20 BY MR. STANOCH:
21     Q.  Okay.
22     A.  And that's what my report says.  And at no
23 time was Teva's product ever deemed adulterated or
24 misbranded, and it was always AB-rated.  So I think
25 Teva acted with incredible swiftness.

Page 65

1         And remember, the issue is not could the
2 nitrosamine impurity be there or not.  It could be
3 there.  It just didn't have a limit.  And FDA set
4 that limit in December 2018.
5     Q.  Uh-huh.  Well, nothing stopped Teva from
6 taking its valsartan with ZHP API in it off the
7 market sooner than when the FDA asked, right?
8         MS. LOCKARD:  Objection.  Vague.
9         THE WITNESS:  No, I think you're asking
10 for sort of a personal opinion.  It seemed to me it
11 happened remarkably quickly, Mr. Stanoch.  It wasn't
12 anything that was delayed.
13         You know, to issue a recall and discuss
14 with the FDA how to do the recall takes some time.
15 So if you ask me, a few weeks, was that unusual, I
16 don't think it was unusual at all.
17 BY MR. STANOCH:
18     Q.  Uh-huh.  It's your opinion that this is
19 how it's supposed to happen, right?  ZHP became
20 aware of the impurity, looks like they told Teva,
21 and then Teva acted, based on this Exhibit 3, right?
22         MS. LOCKARD:  Objection.  Vague.
23         THE WITNESS:  Again, it -- I think I'm
24 speaking personally, but I think Teva's activities
25 here were highly responsible and laudatory.

Confidential Information - Subject to Protective Order

Page 66

¹ BY MR. STANOCH:

² Q. Okay. And would you say that this is an

³ example of -- in your words from prior to the

⁴ break -- as how the system is supposed to work in

⁵ terms of notification about the impurity with

⁶ genotoxic potential finding its way back to Teva?

⁷ A. Yes, I appreciate those words,

⁸ Mr. Stanoch. Thank you.

⁹ Q. And you would expect this to be the case

¹⁰ of how it should work for the discovery of genotoxic

¹¹ impurities in API that a manufacturer like Teva is

¹² buying generally, right?

¹³ A. Well, that's a very general statement.

¹⁴ But I think in terms of the specifics here with a

¹⁵ very difficult impurity to identify and measure,

¹⁶ which can be there, it just needs a limit, Teva did

¹⁷ something quite remarkable. They might --

¹⁸ Q. If -- I'm sorry. Go ahead.

¹⁹ A. I'm speculating, but they might have said

²⁰ to FDA, well, let's wait until we figure out what

²¹ the limit should be, and, you know, they may not

²² have needed to do a recall at all. But they acted

²³ highly responsibly at FDA's request.

²⁴ Q. Uh-huh. Right. If ZHP came to be aware

²⁵ of a genotoxic impurity earlier than 2018, would you

Page 67

¹ expect ZHP to inform Teva of that?

² MS. LOCKARD: Objection. Outside the

³ scope of his opinions. He is not here to give

⁴ liability opinions about ZHP.

⁵ THE WITNESS: Yes, and I don't have any

⁶ information on that, Mr. Stanoch, and I don't

⁷ believe I cited anything about that question.

⁸ BY MR. STANOCH:

⁹ Q. In your answer a moment ago, you said Teva

¹⁰ did something quite remarkable. Is it your opinion

¹¹ that Teva should have allowed their valsartan to be

¹² sold on the market while the FDA came up with

¹³ interim limits?

¹⁴ A. I think that's a possible conjecture.

¹⁵ Q. So you are saying Teva could have --

¹⁶ strike that.

¹⁷ So you are saying Teva could have kept

¹⁸ selling its valsartan with the NDMA in it until the

¹⁹ FDA came up with interim limits?

²⁰ MS. LOCKARD: Objection. Vague.

²¹ Speculation.

²² THE WITNESS: Yeah, I am speculating, but

²³ I point out that it was unusual for FDA to ask a

²⁴ recall of an impurity which FDA says can be in a

²⁵ drug product and a drug substance. What was missing

Page 68

¹ from the equation is the limits that FDA set in

² December 2018.

³ BY MR. STANOCH:

⁴ Q. Were there any acceptable limits for

⁵ nitrosamines in valsartan API as of June 20, 2018?

⁶ A. Not that I'm aware of, no.

⁷ Q. Uh-huh. Right. Nitrosamines were --

⁸ there was -- strike that.

⁹ Right. There was no established

¹⁰ acceptable limit for nitrosamines in any valsartan

¹¹ products prior to June 2018, correct?

¹² A. Or any chemically synthesized drug in the

¹³ U.S. market.

¹⁴ Q. Right. Because no one expected the

¹⁵ nitrosamines to be in them, correct?

¹⁶ A. You are reiterating what FDA said. This

¹⁷ was unexpected.

¹⁸ Q. Well, unexpected, you say that numerous

¹⁹ times in your report, Doctor. We will get back to

²⁰ that.

²¹ But is it your opinion that without the

²² interim guidelines, there were no guidances out

²³ there which would have indicated what level of

²⁴ nitrosamines were allowable in valsartan API or

²⁵ finished dose?

Page 69

¹ A. That's my understanding.

² Q. Right. So until the FDA caught ZHP, it

³ was okay for any amount of nitrosamines to be in

⁴ valsartan API; is that what you are saying?

⁵ MS. LOCKARD: Objection to the form of the

⁶ question. Argumentative.

⁷ THE WITNESS: Yeah, no, I'm not saying

⁸ that at all, but of course, you are dealing with an

⁹ impurity which has a presence in food, and sometimes

¹⁰ quite high levels. So FDA had just never crossed

¹¹ this bridge, nor had U.S. industry. Now, as a

¹² result of the events of the summer of 2018, they

¹³ have crossed the bridge, so things are better.

¹⁴ BY MR. STANOCH:

¹⁵ Q. So you are saying until the FDA

¹⁶ established acceptable intake limits for

¹⁷ nitrosamines, it was okay whatever limit -- strike

¹⁸ that.

¹⁹ You are saying that valsartan API could

²⁰ have nitrosamines in it until the FDA established

²¹ interim acceptable limits?

²² A. Well, that's true now. You can have --

²³ FDA will allow nitrosamine in drug products as long

²⁴ as they are within the acceptable intake limits.

²⁵ FDA is not saying that a product needs to have no

Page 70

1 nitrosamine impurities. That is not true.
2     Q.  So it's your opinion that a drug
3 manufacturer could have had any amount of
4 nitrosamines in their drugs prior to the interim
5 limits and that did not pose any concern?
6     A.  I don't believe I said that anywhere in my
7 report, but if you can point it out, Mr. Stanoch, I
8 would be glad to comment.
9     Q.  Well, I'm asking you now if that's your
10 opinion, Doctor.
11     A.  You want me to add that to my opinion in
12 my report?
13     Q.  Are you of the view that prior to the
14 FDA's establishment of acceptable intake limits for
15 nitrosamines, there was no prohibition on the amount
16 of nitrosamines that could be in a drug product?
17     A.  I think you are saying that correctly,
18 because FDA didn't know how to measure for it,
19 neither did industry.  That all had to be worked
20 out.  And then once you could measure it, then you
21 could begin, you know, following the recommendations
22 of the 2015 guidance.  And FDA did all that and came
23 to a limit.
24        Now, you are sort of asking the question:
25 What happens before you do all that work?  And I

Page 71

1 guess the answer is, you know, that's how science
2 progresses, that's how regulation progresses, and
3 we're all the better for it now.  I really can't
4 speak to the past.
5     Q.  Well, isn't it incumbent on a drug
6 manufacturer to identify potential genotoxic
7 impurities in its product?
8     A.  You know, Mr. Stanoch, you keep asking
9 these questions that are very general.  Let me point
10 out -- I don't know if you consider this germane,
11 but let me say in the 1980s, before there was
12 analytical technology, there were a whole bunch of
13 impurities that neither FDA nor industry could even
14 measure.  What do you say about that?
15        I mean, are drugs more pure now, better
16 controlled than they were in the 1980s?  And my
17 answer to that is yes.  No question about it.  You
18 know, ICH and FDA worked together to bring that
19 better control for what I will call usual impurities
20 through the ICH documents.
21        And then later on, now, FDA came out with
22 the guidance in 2015 that extended it to genotoxic
23 impurities.  And then the nitrosamine brought it all
24 to the fore for a particular genotoxic impurity.  So
25 we're better off now.

Page 72

1     Q.  Uh-huh.
2     A.  Time marches on, regulation marches on.
3 If you want to go back in the past and say
4 everything was awful or not as good as it is now, I
5 don't want to say that.
6     Q.  Well, respectfully, Dr. Williams, things
7 in the past were awful for some of the plaintiffs
8 who got these drugs with a genotoxic carcinogen in
9 it.  So we are talking about that today, all right?
10 Do you understand that?
11        MS. LOCKARD:  I'm going to object to that.
12 That's not a question --
13        MR. STANOCH:  Withdrawn.  I will withdraw
14 it.
15     Q.  You understand this case is about in part
16 folks who took the drug, and they had nitrosamines
17 in it, right?
18     A.  I do understand that, and I would be loath
19 to have an opinion about whether or how people were
20 damaged by the presence of those nitrosamines.  I'm
21 not offering a toxicology or pharmacology opinion.
22     Q.  Right.  And it's your opinion, though,
23 that until the FDA established the acceptable intake
24 limits -- and when was that?  The final guidance
25 was, what, February 2021, I believe you say?

Page 73

1     A.  No, but there were interim limits
2 established in December 2018, and those carried
3 forward into the guidance that appeared in
4 September 2020, with an update in February 2021.
5     Q.  Uh-huh.  So it's your opinion that prior
6 to December 2018, a drug can have any amount of NDMA
7 in it with no regulatory consequence?
8     A.  I wouldn't offer that opinion.  I think it
9 seems like a dangerous opinion to offer, and I'm
10 surprised you state it.
11     Q.  If a drug had 1,000 nanograms of NDMA in
12 it in January of 2018, would that be appropriate?
13        MS. LOCKARD:  Objection.  Vague.
14        THE WITNESS:  You know, I just can't
15 comment on those kind of questions.  You are getting
16 into how does the FDA set limits for certain
17 impurities.  And, you know, it has to be done
18 carefully and in the context of background, food
19 impurities that are nitrosamine impurities.  I just
20 can't answer that question, Mr. Stanoch.
21 BY MR. STANOCH:
22     Q.  Uh-huh.  So you see no problem with a drug
23 product that had a thousand nanograms of NDMA in it
24 in January 2018?
25     A.  I didn't offer that opinion.

Page 74

1    Q.  I'm asking you, do you see any issue with
2  a drug having a thousand nanograms of NDMA in it in
3  January 2018?
4        MS. LOCKARD:  Objection.  Vague.  Outside
5  the scope of his class-certification report.
6        THE WITNESS:  You know, and some of it, as
7  you well know, Mr. Stanoch, relates to the amount of
8  drug in the drug product and the duration of dosing.
9  I mean, your hypothesis might be okay for a drug
10  that's just taken once and never taken again as a
11  single oral tablet.
12  BY MR. STANOCH:
13    Q.  Uh-huh.
14    A.  I just can't answer your question.  There
15  are too many factors that you are not specifying.
16    Q.  Uh-huh.  Uh-huh.  So you can't tell me
17  whether it was okay for any valsartan drug to have
18  NDMA in it prior to the interim limits of
19  December 2018?
20        MS. LOCKARD:  Objection.  Vague.
21        THE WITNESS:  No, I do know that.  FDA has
22  said you could have nitrosamine in your drug
23  product.  They say that even now.  The question is:
24  What are the limits?  And, you know, you can read
25  about it in the guidance in terms of daily dose and

Page 75

1  duration of dose.  That's how they come to these
2  limits.
3  BY MR. STANOCH:
4    Q.  Do you agree that there was no acceptable
5  limit for nitrosamines prior to December 2018?
6    A.  That's my understanding.  The FDA did not
7  have limits for the nitrosamine impurities before
8  December 2018.
9    Q.  So without an acceptable limit, then the
10  limit is zero, isn't it?
11    A.  No.  No, no.  I wouldn't say that at all.
12  I don't know how you come to zero.
13    Q.  Uh-huh.  Well, the purpose of a limit is
14  to say you can have this much of a substance in the
15  drug, right?
16    A.  Up to the limit.
17    Q.  Correct.  Up to the limit.  Right.  And so
18  until that limit was determined, you can't have more
19  than zero amount of a substance in it, can you?
20    A.  No, no, I wouldn't agree with that at all.
21    Q.  Well, so even without an interim limit,
22  you are saying it was appropriate for a drug to have
23  some amount of nitrosamine in it?
24        MS. LOCKARD:  Objection.  Asked and
25  answered.

Page 76

1        THE WITNESS:  Yes, I think that's what FDA
2  would say.  And remember, there can be many
3  impurities in a drug substance that are below
4  detectable limit that you just never know about.  I
5  mean, we're getting into hypotheticals that are
6  beyond my report.
7  BY MR. STANOCH:
8    Q.  Is it your opinion, sir, that without the
9  interim guidelines, there were no guidances
10  available which would have indicated what levels of
11  nitrosamines could be present in valsartan?
12        MS. LOCKARD:  Objection.  Asked and
13  answered.
14        THE WITNESS:  Yes, that's my
15  understanding, that those limits came in
16  December 2018 from FDA.
17  BY MR. STANOCH:
18    Q.  Uh-huh.  So prior to December 2018, there
19  was no guidance available to the industry about
20  levels of nitrosamines in valsartan?
21        MS. LOCKARD:  Objection.  Asked and
22  answered.
23        THE WITNESS:  Yes, I -- do you want me to
24  repeat my answer, Mr. Stanoch?
25

Page 77

1  BY MR. STANOCH:
2    Q.  Please answer the question.
3    A.  No, my understanding is I don't think
4  there were specified limits for any nitrosamine
5  impurity before December 2018.
6    Q.  So I'm trying to understand your opinions,
7  Doctor.  So if there is not an established limit for
8  a certain substance in a drug, then you can have
9  that substance in the drug?
10        MS. LOCKARD:  Objection.  Vague.  Also
11  outside the scope of his expert report for class
12  certification.
13        THE WITNESS:  Yes, and I'm looking at my
14  opinion where -- if we go to Page 46, where I look
15  at my conclusions, I don't think I speak to the
16  limit in that set of conclusions.  But if you think
17  I did, please draw my attention to it, Mr. Stanoch.
18  BY MR. STANOCH:
19    Q.  Doctor, you reference interim limits
20  throughout your report, don't you?
21    A.  As provided by FDA in December 2018.  I
22  don't speak to them in any other context, just
23  something that came from FDA.
24    Q.  Uh-huh.  So if there is not an established
25  limit for a certain substance in a drug, you are

Page 78

1 saying that substance can be in the drug, no
2 problem?
3        MS. LOCKARD: Objection. Vague. Asked
4 and answered. Outside the scope of the
5 class-certification expert report.
6        THE WITNESS: And that really isn't what
7 I'm saying. I would say if somebody found a
8 nitrosamine impurity in their drug product in 2018,
9 they would properly follow the 2015 guidance and try
10 to figure out a limit. But as I point out in my
11 report, FDA did that for the entire industry. They
12 didn't wait for a single manufacturer to do it.
13 BY MR. STANOCH:
14    Q. Uh-huh. If a manufacturer found a
15 nitrosamine impurity in their drug product in 2018,
16 they should have properly followed the 2015 guidance
17 to try to figure out a limit, correct?
18    A. I think you are saying it correctly. I'll
19 give a little bit more specification to your
20 example. Let's say an NDA applicant who is building
21 an application for consideration by FDA, if they
22 found a nitrosamine impurity, they could follow the
23 2015 guidance and figure out a limit for it and then
24 submit that to FDA, and FDA would review it and say,
25 yeah, that limit is okay, or, no, we want you to do

Page 79

1 something different.
2        But in this case, FDA did that work for
3 industry. So I would say industry now doesn't need
4 to figure out their own limits. FDA has done that
5 for them. And that's what is described in the
6 guidance that I cite.
7    Q. Uh-huh. And you referenced a 2015
8 guidance. What are you talking about?
9    A. I think that's the M7 guidance.
10    Q. That's the ICH M7(R1) guidance, correct?
11    A. Yes. And I think I do cite that, so it
12 should be in my materials considered.
13    Q. No, you do. I'm not -- issuing with that.
14 I want to make sure I understood what you meant by
15 2015 guidance in your answer.
16        So I understand you are saying the FDA
17 here set limits eventually for nitrosamines. But if
18 a manufacturer had reason to believe its product
19 contained nitrosamines, the appropriate course would
20 have been for them to work towards establishing
21 limits on their own prior to any FDA guidance,
22 correct?
23        MS. LOCKARD: Objection. Outside the
24 scope of his class-certification expert opinions.
25        THE WITNESS: Yes, I could imagine, and

Page 80

1 I'm speculating, that before FDA set limits, an
2 individual company could have done it, and that
3 might have been perfectly okay.
4        And even now, I suppose -- company or a
5 consortium of company could try to convince FDA to
6 set higher limits than the ones they set in
7 December 2018. It's all subject to good data and a
8 good scientific review.
9 BY MR. STANOCH:
10    Q. Uh-huh.
11    A. So I'm not debating what you are saying at
12 all, Mr. Stanoch.
13    Q. Good. And I think we can agree, then,
14 that under the ICH M7(R1) guidance from 2015, it
15 would be incumbent on the manufacturer that
16 discovered a genotoxic impurity to attempt to
17 characterize, test it and potentially set limits on
18 its own without regulatory action, correct?
19        MS. LOCKARD: Objection. Outside the
20 scope.
21        THE WITNESS: Well, I would agree with
22 your statement, except without regulatory action,
23 because whatever the company would do would be
24 subject to FDA review and approval.
25

Page 81

1 BY MR. STANOCH:
2    Q. Fair enough. So then, I guess, to clarify
3 it, we agree, then, that under the ICH M7(R1)
4 guidance from 2015, it would be incumbent on the
5 manufacturer that suspected genotoxic impurity to
6 attempt to characterize it, test it, and potentially
7 set limits for it, and letting the regulatory body
8 know?
9    A. And letting the regulatory body see the
10 data and review it and approve it.
11    Q. That's fair. Let's take that same
12 situation and say we're talking about an API
13 manufacturer first, okay? You with me?
14    A. Okay.
15    Q. Okay. Right. Would you agree that under
16 the ICH M7(R1) guidance from 2015, it would be
17 incumbent on an API manufacturer that suspected a
18 genotoxic impurity to attempt to characterize it,
19 test it and potentially set limits for it, not only
20 in connection with the regulatory body, but also
21 customers purchasing that API?
22        MS. LOCKARD: Objection. This is getting
23 far outside the scope of his class-certification
24 expert report, Counsel. You are asking him about
25 API manufacturers and their requirements. That's a

Confidential Information - Subject to Protective Order

Page 82

1 liability opinion. He hasn't been retained for that
2 issue, and specifically not for ZHP or any API
3 manufacturers.
4        THE WITNESS: You know, and I would add,
5 Mr. Stanoch, that if we're going to talk about it,
6 it might be good to put that guidance on the screen
7 and see exactly who it's directed to. Usually, when
8 FDA creates a guidance with recommendations, they
9 identify who it's intended for. And I'll be glad to
10 review that with you if we could sort of find it.
11       It did not figure prominently in my report
12 or my opinions because, as I have already noted, FDA
13 did this for industry. I didn't have to look at
14 what an industry drug-substance or drug-product
15 manufacturer would have or should have done.
16 BY MR. STANOCH:
17    Q. We can look at the ICH guidance in a
18 little bit, but sitting here right now, Doctor, is
19 it your view that the ICH M7(R1) guidance applies
20 only to finished-dose manufacturers, not API
21 manufacturers?
22    A. No, I wouldn't say that. And if I looked
23 at the nitrosamine guidance, I think when -- if we
24 put that up, I think FDA is speaking to
25 manufacturers of drug products and also drug

Page 83

1 substances.
2    Q. Uh-huh. All right. I'm going to repeat
3 my question a little bit ago because you didn't
4 answer it when you said you wanted to look at the
5 MCH guidance.
6        So would you agree that under the ICH
7 M7(R1) guidance from 2015, it would be incumbent on
8 an API manufacturer that suspected a genotoxic
9 impurity to attempt to characterize it, test it,
10 potentially set limits for it, and to let the
11 regulatory body and its API customers know?
12       MS. LOCKARD: I am going to object to this
13 question. He said he's not going to answer it. He
14 wants to look at the document. So you are asking
15 him to interpret a document and you are refusing to
16 provide it to him, so I have an objection.
17       We can take a break and get it if you want
18 him to interpret it. It's also outside the scope of
19 his expert opinion, however.
20 BY MR. STANOCH:
21    Q. Go ahead, Dr. Williams.
22    A. I'm sorry, Mr. Stanoch.
23    Q. Please answer the question.
24       MS. LOCKARD: If you can answer the
25 question.

Page 84

1        MR. STANOCH: Enough, Counsel.
2        THE WITNESS: I would say at this point in
3 time, Mr. Stanoch, I can't add anything more to what
4 I have already said.
5        But I'm not going to disagree with you
6 that, you know, a drug-substance manufacturer that
7 suspects a genotoxic impurity would want to follow
8 the guidance and, you know, make sure that it's a
9 selling point to customers that we're controlling
10 genotoxic impurities. That's a good drug substance.
11 BY MR. STANOCH:
12    Q. Uh-huh. Do you agree that nitrosamines
13 are probable human carcinogens?
14       MS. LOCKARD: Objection. Outside the
15 scope of his retention, his expert report, his
16 disclosure.
17       THE WITNESS: Yeah, I'm certainly not
18 offering opinion about that, but I have read the
19 statements in the materials cited and some of the
20 materials considered that would cause me to agree
21 with what you said, Mr. Stanoch.
22 BY MR. STANOCH:
23    Q. Do you agree that nitrosamines are
24 genotoxic?
25    A. Yeah, for purposes of discussions I will

Page 85

1 agree with that, Mr. Stanoch.
2    Q. Do you agree that nitrosamines are not an
3 active ingredient in any FDA-approved drug?
4        MS. LOCKARD: Objection. Speculation.
5        THE WITNESS: To the best of my knowledge,
6 Mr. Stanoch, I can agree with that.
7 BY MR. STANOCH:
8    Q. Uh-huh. Do you agree that the presence of
9 nitrosamines even at trace level is considered
10 unacceptable because these impurities are probable
11 human carcinogens?
12       MS. LOCKARD: Objection. Outside the
13 scope of his retention and his expert report on
14 class certification. He is not here to testify
15 about whether the drug is a potential human
16 carcinogen. But if you want to waste your time
17 asking him causation questions, have at it.
18       MR. STANOCH: Counsel, I don't need the
19 colloquy. Thank you.
20       Please answer, Dr. Williams.
21       THE WITNESS: Would you restate the
22 question, Mr. Stanoch? I'm sorry.
23 BY MR. STANOCH:
24    Q. Sure. Do you agree that the presence of
25 nitrosamines even at trace level is considered

Page 86

1 unacceptable because these impurities are probable
2 human carcinogens?
3        MS. LOCKARD:  Same objection.  It's
4 outside of his scope, the class-certification expert
5 report.  He is not here to give a causation opinion.
6        THE WITNESS:  But in answer to your
7 question, Mr. Stanoch, no, I don't agree with that.
8 BY MR. STANOCH:
9    Q.  Stand by.  Stand by, sir.
10       You are familiar with the U.S.
11 Pharmacopeia Association, right, the USP?
12   A.  Yes, Mr. Stanoch, I am.
13   Q.  Yeah, you mean you used to be affiliated
14 with them, right?
15   A.  I was an employee of USP between 2000 and
16 2014.
17   Q.  Right.  I'm going to mark another exhibit.
18       (Whereupon, Exhibit 4 was marked for
19 identification.)
20 BY MR. STANOCH:
21   Q.  You are going to have to look on your
22 screen, unfortunately, Dr. Williams.  I don't have a
23 copy of this in the binder available.
24       Can you pull it up, or would you like me
25 to share my screen?  Exhibit 4.

Page 87

1    A.  Oh, I'll rely on you to give me something
2 that I can look at.
3    Q.  Okay.  Stand by, sir.
4        I'm now sharing my screen.  This is
5 Exhibit 4 in the public folder.
6        Do you see this, sir?
7    A.  Could we open the box and get it out of
8 the box?
9        MS. LOCKARD:  Is it in the binder?
10       MR. STANOCH:  It's not in the binder.  I'm
11 sorry.
12       THE WITNESS:  I think you are showing
13 me -- it looks like a PowerPoint; is that correct?
14 BY MR. STANOCH:
15   Q.  Yeah, this is the -- correct.  This is the
16 cover page of a webinar in which Naiffer Romero of
17 USP spoke on nitrosamine impurities?
18   A.  Yeah, I don't see it very clearly.  Can
19 you expand it or --
20       MS. LOCKARD:  Can you get it up out of the
21 box?
22       THE WITNESS:  I don't --
23       MR. STANOCH:  It's not in the box,
24 Counsel, I'm sorry.
25       THE WITNESS:  Not in the box.

Page 88

1        MR. HARKINS:  The exhibit share is what
2 you are talking about.
3        MS. LOCKARD:  The exhibit-share box is
4 what I'm talking about.
5        THE WITNESS:  Oh.
6        MR. HARKINS:  Open the chat, Roger.
7        THE WITNESS:  Oh.
8        (Whereupon, a brief discussion off the
9 record.)
10       THE WITNESS:  Okay.  I'm opening the chat
11 room, and --
12       MR. HARKINS:  Hold on.  Let me -- someone
13 repaste the link to the exhibit share, please?
14       Sorry.  Can someone please repaste the
15 link to the exhibit share?
16       All right.  Can you hear me in the room?
17       MR. STANOCH:  We can hear you, Steve.
18       THE VIDEOGRAPHER:  I might be able to
19 retrieve it from the chat.
20       MR. HARKINS:  Oh.  I think that's it.
21       THE VIDEOGRAPHER:  Okay.  Yeah, you got
22 it.
23       MR. HARKINS:  You control it here on the
24 separate screen, and you can scroll it down from
25 there.

Page 89

1        THE WITNESS:  Can I make it bigger?
2        MR. HARKINS:  You should be able to zoom,
3 yeah.
4        THE WITNESS:  Okay.  I'm looking at it,
5 Mr. Stanoch.
6 BY MR. STANOCH:
7    Q.  Okay.  Great.
8    A.  Please proceed.
9    Q.  Sure.  And you see the title page of this
10 slide, it's a USP webinar presentation?
11   A.  I think I do see that, yes.
12   Q.  All right.  And then there is -- I have an
13 excerpt here, I have Slide 8 from that webinar on
14 the next page, if you scroll down, sir.  The slide
15 says, "Background."
16   A.  Okay.  I'm looking at "Background."
17   Q.  Great.  And you will see that it's -- and
18 the highlighting, by the way, is original in the
19 document.  I didn't modify this.
20   A.  Okay.
21   Q.  Do you see on the right it says, "Although
22 nitrosamines are also present in some foods and
23 drinking-water supplies, their presence in
24 medicines, even at trace level is considered
25 unacceptable because these impurities are probable

Page 90

1 human carcinogens."  Did I read that right?
2     A.  Yes, I think you read it correctly.  And
3 can you tell me the date of this document?
4     Q.  It's 2020.
5     A.  Oh, I see.  All right.  Thank you.
6     Q.  Uh-huh.  And do you agree with that
7 statement from this USP presentation?
8         MS. LOCKARD:  Objection.  Asked and
9 answered.
10         THE WITNESS:  I would say what I rely on
11 is FDA's guidance document, which it does say you
12 can have nitrosamine impurities within acceptable
13 limits.
14 BY MR. STANOCH:
15     Q.  Uh-huh.
16     A.  So I would not agree with this statement.
17     Q.  Okay.  And you see there in the middle,
18 there is a fake Post-it that says, "Purpose of ICH
19 M7"; do you see that?
20     A.  Yes, I do see that.
21     Q.  It reads, "Provide a practical framework
22 that is applicable to the identification
23 categorization, qualification, and control of
24 mutagenic impurities to limit potential carcinogenic
25 risk."  Did I read that right?

Page 91

1     A.  Yes, I think you are reading it correctly.
2     Q.  And would you agree with that statement
3 about the purpose of ICH M7?
4     A.  Yes, that seems like a general statement,
5 and I agree with it.
6     Q.  Right.  And that would have been the case
7 with ICH M7 guidance prior to the FDA's first take
8 at establishing interim limits for nitrosamines in
9 December 2018, correct?
10     A.  And although I didn't offer this as an
11 opinion, I think FDA itself tended to follow the ICH
12 M7 document, particularly with regard to the word
13 "control."  So when FDA is saying control, they are
14 saying, we can put a limit on the NDMA impurity.
15     Q.  Well, the guidance is to the industry to
16 deal with impurities when they find them in their
17 drug substance or their drug products, right?
18     A.  Now, are you asking about M7?
19     Q.  Yes.
20     A.  Yes.  And it's a general statement, but I
21 think a specific example is the nitrosamine
22 impurities, and that's what I alluded to in my
23 report.
24     Q.  Right.  Well, you mention control in the
25 context of the FDA setting limits.  The point is,

Page 92

1 though, that a drug-substance or product
2 manufacturer would follow ICH M7 guidance to
3 identify, characterize, qualify, and control
4 mutagenic impurities on its own, correct?
5     A.  It could do.  I mean, I'm not a
6 toxicologist, but my understanding is that there
7 could be many mutagenic impurities beyond the
8 nitrosamine impurities that we're considering in
9 this matter.
10     Q.  Right.  And it's the expectation that
11 manufacturers on their own would work to identify,
12 characterize, qualify, and control mutagenic
13 impurities to limit potential carcinogenic risk,
14 correct?
15         MS. LOCKARD:  Objection.  Outside the
16 scope of his class-certification opinions.
17         THE WITNESS:  Yes, and I'm certainly not
18 debating with you the content of the M7 document,
19 Mr. Stanoch.  If you read statements from that, I
20 would probably generally agree with your statements.
21 BY MR. STANOCH:
22     Q.  Right.  And you agree that it's the
23 expectation that manufacturers would follow the ICH
24 M7 guidance themselves, correct?
25         MS. LOCKARD:  Objection.  Asked and

Page 93

1 answered.  Outside the scope.
2         THE WITNESS:  With the exception of
3 nitrosamine, where, if I may say so, FDA did the
4 work of M7 on behalf of the entire industry.
5 BY MR. STANOCH:
6     Q.  Well, prior to December 2018 there were no
7 FDA interim limits, right?
8     A.  That's true.
9     Q.  Okay.  But we had ICH M7 guidance,
10 correct?
11     A.  Yes.
12     Q.  And the guidance set forth that
13 manufacturers should identify, characterize,
14 qualify, and control mutagenic impurities to limit
15 potential carcinogenic risk, yes?
16     A.  I'm not debating the words of the
17 guidance, if that's your question.  I agree with the
18 words of the guidance.
19     Q.  Well, I'm asking you about the application
20 of the guidance, Dr. Williams, that even in the
21 absence of the FDA interim limits in December 2018,
22 was the expectation that a manufacturer would still
23 attempt to identify, characterize, qualify, and
24 control mutagenic impurities to limit potential
25 carcinogenic risk?

Confidential Information - Subject to Protective Order

Page 94

1     MS. LOCKARD: Objection. Vague. Outside
2  the scope.
3     THE WITNESS: Yeah, I didn't really
4  comment on this, Mr. Stanoch. Do you want me to
5  speculate?
6  BY MR. STANOCH:
7     Q. I would like you to answer the question,
8  Dr. Williams.
9     A. You know, the way I would say it, and I
10 think I have already alluded to this previously, is,
11 you know, an ANDA applicant generally follows the
12 guidances I cited in my report.
13    And to the extent that they -- you know,
14 when they get into qualifying an impurity, they may
15 have to consider mutagenic or DNA-reactive
16 impurities, and then they would turn to the M7
17 guidance. But that is certainly a case-by-case
18 decision, and you would have to suspect the impurity
19 was present and you would have to be able to measure
20 it. So you are asking a very general question.
21    Q. And the ICH M7 guidance is not confined to
22 ANDA applications, correct?
23    A. That's my understanding. Again, if you
24 are going to ask me questions about it, it would
25 probably be best if I could see it.

Page 95

1     Q. Well, we will get to specific parts of it,
2  but -- your understanding that the ICH M7 guidance
3  applies to the life of a drug from application
4  through commercialization, correct?
5     A. Again, you know, I feel very uncomfortable
6  answering questions about a document that I haven't
7  seen and that I cite in my report, but I would say
8  it was not particularly important to my opinions.
9     But again, you know, I'll be glad to walk
10 through it with you, Mr. Stanoch. I don't think it
11 is particularly appropriate for my opinions or
12 important to my opinions, but again, I'm certainly
13 here to be responsive to your questions.
14    Q. Right. And you agree that the ICH M7
15 guidance applies throughout the life of a drug,
16 correct?
17    A. I don't believe I said that. I think what
18 I said is if we're going -- if you are going to ask
19 me that question, I feel like I need to see the
20 guidance.
21    Q. You can't tell me anything about the ICH
22 M7 guidance general applicability without looking at
23 it?
24    A. I think, yes, I'm saying that. I would be
25 hesitant to make statements about the guidance along

Page 96

1  the lines of your questioning.
2     Q. So you can't tell me one way or the other
3  about whether the ICH M7 guidance applies throughout
4  the life of a drug?
5     MS. LOCKARD: Objection. Asked and
6  answered.
7     He said if you are going to ask him
8  questions about the application and interpretation
9  of the guidance, he wants to have it in front of
10 him, which is a fair request.
11 BY MR. STANOCH:
12    Q. You can answer the question, Dr. Williams.
13    MS. LOCKARD: Objection. It's
14 argumentative.
15    THE WITNESS: I prefer not to answer the
16 question without seeing the guidance.
17 BY MR. STANOCH:
18    Q. And which guidance do you want to see,
19 Doctor?
20    A. M7.
21    Q. What version?
22    A. The current version.
23    Q. What year?
24    A. I think it's 2015.
25    Q. Show me where it is in your reliance

Page 97

1  materials and report, which version you want.
2     MS. LOCKARD: Let me just put an objection
3  on the record. You are asking him questions about a
4  guidance that you haven't identified. He is asking
5  to see the guidance that you were questioning him
6  about. If you want to question him about a
7  document, identify it. Now you are telling him
8  to --
9     MR. STANOCH: Counsel, enough. Enough,
10 Counsel. Counsel, enough.
11    (Overlapping speakers.)
12    MR. STANOCH: I'm asking him to tell me
13 the document he wants. I'm asking him to tell me
14 what document he wants. I'm trying to comply with
15 his request, Counsel. Please, let him tell me what
16 he wants to see. Thank you.
17    We have lost Dr. Williams. Dr. Williams,
18 we can't see you.
19    MS. LOCKARD: We're on break. We can go
20 off the record. You can keep running.
21    MR. STANOCH: Wait a minute. Wait a
22 minute. Wait a minute. Wait a minute. I am not
23 agreeing to go off the record. I have a pending
24 question to the witness to tell me what document he
25 said he needs to see. I am not agreeing to go off

Page 98

1  the record.
2      Q.  Are you going to answer the question,
3  Dr. Williams?
4          MR. STANOCH:  Or, Counsel, are you going
5  to instruct him not to answer it?
6          Well, let it be noted that despite the
7  nonagreement and the pending question, both the
8  witness and counsel have gone off.
9          Let's keep running.
10         THE WITNESS:  I have been instructed by
11 counsel to come back, Mr. Stanoch, and now I'm
12 trying to look for the guidance that you are
13 alluding to.
14         MR. STANOCH:  Thank you.
15         THE WITNESS:  And I would say we can look,
16 if you agree, to the guidance for industry
17 genotoxic -- the other one -- I would really
18 appreciate it if you would pick the guidance because
19 you are talking about it.  But yes, here it is.
20         I have been handed it in a copy.  M7,
21 Revision 1, Addendum to ICH M7.  Now, that makes me
22 a little nervous because it's an addendum, and it
23 makes me wonder, where is the M7(R1)?  But if we can
24 look at M7(R1), I'll be glad to answer questions
25 about it if I can.

Page 99

1  BY MR. STANOCH:
2      Q.  I'm --
3      A.  Can you proceed, Mr. Stanoch?
4      Q.  Well, I want to make sure we have the
5  right documents in front of us, and I have to mark
6  it, Dr. Williams.  So why don't you tell me the date
7  of the document you are looking at?
8      A.  Well, what I have been handed is M7(R1),
9  dated March 31st, 2017, and then a M7(R1) addendum,
10 so it's lot of paper and I'm looking at two
11 documents.
12         MS. LOCKARD:  And for the record, I still
13 don't know what it is that your question is asking
14 about, so we are trying to print whatever we think
15 you are asking about, but you have refused so far to
16 identify -- counsel has refused to identify the
17 specific guidance that he is asking the doctor to
18 interpret, so --
19         THE WITNESS:  Okay.  I'm prepared to
20 answer questions.  Did you get the dates of the
21 documents I'm looking at?  The M7, Revision 1, is
22 March 2017.
23         MS. LOCKARD:  Can you hear us?
24         MR. STANOCH:  Yeah, I'm trying to pull up
25 the version that you have in the hard copy for the

Page 100

1  benefit of all of your colleagues on Zoom.  Well,
2  that's going to take me time.
3      Q.  Doctor, I can pull up the March 2018
4  guidance.  You want to work with that for now?  Or
5  would --
6      A.  And I also think it would be important to
7  go to my report where I reference this document.
8  Let me see if I can find that.
9          MS. LOCKARD:  And while he is doing that,
10 Exhibit 4 was the USP PowerPoint.  It looks like
11 there are only two pages of that.  Do you have
12 the -- are you making the full PowerPoint the
13 exhibit?
14         MR. STANOCH:  Those are excerpts from the
15 webinar.  We will mark the entire webinar.
16     Q.  Well, Doctor, let's see if we can cut
17 through this a little bit, shall we?  You agree, do
18 you not, that ICH M7 guidance has been in effect --
19 has been effective in different forms for quite some
20 time, yes?
21     A.  I can agree with that, Mr. Stanoch,
22 please, if the --
23     Q.  Sure.  Sure.  And why don't we get a
24 ballpark.  I mean, can we say that at least since
25 2003 there has been some form of ICH M7 guidance?

Page 101

1      A.  You know, I'd hesitate from that, but for
2  purpose of a discussion let me agree so that we can
3  go forward.
4      Q.  I appreciate that.  I won't hold you to
5  the particular date.  I was just trying to pick a
6  date that we could just move forward from.  So --
7  and we can agree, can we not, that there has been
8  revisions and addenda to the M7 guidance over time,
9  correct?
10     A.  Okay.  Let me agree.
11     Q.  And would you agree that even in the
12 absence of FDA interim limits for nitrosamines,
13 there was an expectation that a manufacturer would
14 adhere to the ICH M7 guidance concerning genotoxic
15 impurities, whatever the status of that guidance was
16 at the particular time?
17         MS. LOCKARD:  Objection.  These are
18 liability opinions and outside the scope of his
19 report.
20         THE WITNESS:  Yeah, I am very hesitant
21 with your general statements, but again, I won't
22 contest them so we can move forward.  Go ahead,
23 Mr. Stanoch.
24 BY MR. STANOCH:
25     Q.  I'm a little unclear what you mean by

Page 102

1 don't contest them.  Does that mean you will agree
2 with that question?
3       MS. LOCKARD:  Objection.  Vague.
4       THE WITNESS:  You know, it would be
5 much -- can you restate the question?
6 BY MR. STANOCH:
7    Q.  Sure.  Would you agree that even in the
8 absence of FDA interim limits for nitrosamines,
9 there was an expectation that a manufacturer would
10 adhere to the ICH M7 guidance concerning genotoxic
11 impurities as that guidance stood at the particular
12 time?
13       MS. LOCKARD:  Objection.  Vague.  Outside
14 the scope of his expert report.
15       THE WITNESS:  Yes, it's not any opinion I
16 offered, but I won't debate what you are saying, so
17 I can agree with it, Mr. Stanoch.
18 BY MR. STANOCH:
19    Q.  Fair enough.  And do you agree that the
20 ICH M7 guidance includes nitrosamines in the cohort
21 of concern?  And if you need to look at the version
22 in front of you, that's fine, and we could mark it
23 later.
24    A.  I don't know where I see nitrosamines
25 here, and I didn't look for it.

Page 103

1    Q.  All right.  Let --
2    A.  Can you point it out where you see it,
3 Mr. Stanoch?
4    Q.  Sure.  Put that aside, then.  Let's put it
5 a different way.  Are you aware that the FDA has
6 stated that N-nitroso compounds are identified as a
7 cohort of concern in ICH M7 guidance?
8       MS. LOCKARD:  Objection.  Outside the
9 scope of his expert report.
10       THE WITNESS:  Yeah, I see no reason to
11 deny what you are saying, so I'll agree with it to
12 continue the discussion, Mr. Stanoch.
13 BY MR. STANOCH:
14    Q.  Thank you.  I appreciate that, Doctor.
15       And a substance that falls within the ICH
16 cohort of concern should be controlled, correct?
17       MS. LOCKARD:  Objection.  Falls outside of
18 the scope of his class-certification opinions.
19       THE WITNESS:  You know, I could probably
20 agree more readily if you could show me where you
21 are reading in the guidance.  But again, for
22 purposes of the discussion, I won't debate what you
23 are saying, Mr. Stanoch.  I'm sure you are reading
24 it correctly.
25       MS. LOCKARD:  I wouldn't assume that he is

Page 104

1 reading anything correctly.
2       THE WITNESS:  No, okay.
3       All right.  Well, I'm a little hesitant
4 about answering, Mr. Stanoch.
5       MR. STANOCH:  Then stand by for an
6 exhibit, sir.
7       I'm going to mark the next exhibit, sir.
8       (Whereupon, Exhibit 5 was marked for
9 identification.)
10 BY MR. STANOCH:
11    Q.  Exhibit 5.  This is actually Tab 2 in your
12 binder.  You can take the binder out of the box we
13 sent you as a courtesy.
14       MS. LOCKARD:  Hold on.  We are opening the
15 box.  There is one black binder in here.  Tab 2?
16       MR. STANOCH:  Yes, please.
17       MS. LOCKARD:  Okay.
18 BY MR. STANOCH:
19    Q.  Tell me when you have that, Doctor.
20    A.  I think I'm looking at it.  Tab 2, it is a
21 letter from FDA to -- I don't see who it's to.  But
22 it looks to be about a five-page letter.
23    Q.  Right.  It's a general advice letter from
24 the FDA.  You see that in the upper right, "General
25 Advice"?

Page 105

1    A.  I do see that.
2    Q.  Uh-huh.  And do you see --
3       MS. LOCKARD:  There is no Bates number,
4 for those on the call.
5 BY MR. STANOCH:
6    Q.  Would you look at the last paragraph of
7 the first page, sir?
8    A.  Last paragraph, first page.
9    Q.  It begins, "Nitrosamine compounds."  Do
10 you see that?
11    A.  Wait a minute.  Oh, "Nitrosamine
12 compounds."  Yes, I'm with you, Mr. Stanoch.  Go
13 ahead.
14    Q.  Wonderful.  Why don't you read for us the
15 first few sentences of that paragraph?
16    A.  "Nitrosamine compounds are potent
17 genotoxic carcinogens in several nonclinical species
18 and are classified as probable human carcinogens by
19 the International Agency for Research on Cancer.  In
20 fact, 'N-nitroso' compounds are identified as a
21 'cohort of concern' in internationally" recognized
22 "guidance, ICH M7," and then it states the name.
23       Should I stop there?
24    Q.  Keep going.  Slowly, please, for the court
25 reporter.

Page 106

1    A.  "ICH M7 recommends that known mutagenic
2 carcinogens, such as nitrosamines," to "be
3 controlled at or below the acceptable cancer risk
4 level.  Due to their known potent carcinogenic
5 effects, and because it is feasible to limit these
6 impurities by taking reasonable steps to prevent or
7 eliminate their presence, FDA has determined that
8 there is no acceptable specification for
9 nitrosamines in ARB API and DP."
10    Q.  That's fine.  Okay.  And, oh, actually,
11 why don't you read the one more sentence?
12    A.  "Therefore, FDA advises that nitrosamines
13 should be absent (not detectable as described below)
14 from ARB API and ARB drug products."
15    Q.  Okay.  Thank you.
16       So, first of all, were you aware of this
17 general advice letter from the FDA prior to right
18 now?
19    A.  No.
20    Q.  Okay.  Second of all, do you agree with
21 the FDA's statement in this letter that nitrosamine
22 compounds are potent genotoxic carcinogens?
23       MS. LOCKARD:  Objection.  Outside the
24 scope of his class-certification opinions.  He is
25 not here to give a causation opinion.

Page 107

1       THE WITNESS:  And I know I'm not supposed
2 to ask questions, but I don't see a date on this
3 letter.  Is there a date?
4 BY MR. STANOCH:
5    Q.  It doesn't appear that it has a date on
6 it.
7    A.  And also, if I may say so, I think this
8 conflicts with the FDA guidance on nitrosamine
9 impurities, but we can have that conversation if you
10 wish.
11       But anyway, back to you, Mr. Stanoch.  Am
12 I answering your questions about this document?
13    Q.  Well, not yet.  The question was:  Do you
14 agree with the FDA's statement that nitrosamine
15 compounds are potent genotoxic carcinogens?
16       MS. LOCKARD:  Objection.  Outside the
17 scope of his class-certification opinions.  He is
18 not here to give a causation opinion.
19       THE WITNESS:  Yes, and I'm not going to
20 debate the wording in this letter.  It seems like a
21 formal letter from the agency, and I'm not in a
22 position to disagree with FDA on this point.
23       So please continue, Mr. Stanoch.
24 BY MR. STANOCH:
25    Q.  I certainly will.  Thank you, Doctor.

Page 108

1       And the next sentence, do you agree with
2 the FDA that N-nitroso compounds are part of the
3 cohort of concern under ICH M7 guidance?
4    A.  Yes, I see the words, and I think you are
5 reading them correctly.
6    Q.  And do you agree with that statement,
7 regardless of whether I read it correctly?
8       MS. LOCKARD:  Does he agree that it --
9 right.  Objection.  Vague.
10       THE WITNESS:  I see no reason to disagree
11 with the words in this letter.
12 BY MR. STANOCH:
13    Q.  Perfect.  And do you agree, then, that as
14 part of the cohort of concern, nitrosamines should
15 be controlled?
16    A.  Yes, I can agree with that.
17    Q.  All right.  And do you agree generally
18 that nitrosamines can be controlled?
19    A.  Yes, I think FDA documented that in its
20 December 2018 statement.
21    Q.  And do you agree that nitrosamines can be
22 avoided entirely?
23    A.  You know, that's sort of a case-by-case
24 question.
25       But what is perplexing me about this

Page 109

1 letter is I think the FDA guidance says you can have
2 nitrosamine impurities as long as they stay within
3 the acceptable intake limits.
4    Q.  Uh-huh.
5    A.  So I see a dissonance between this letter
6 and the FDA guidance.
7    Q.  Uh-huh.
8    A.  But please continue.
9    Q.  And you say "a case-by-case basis."  Do
10 you mean by that that it would be on a particular
11 manufacturer to assess whether nitrosamines could be
12 avoided entirely in its manufacturing process?
13    A.  Yes, I agree with the way you stated that.
14 Thank you.
15    Q.  Uh-huh.  Yep.  And were you aware prior to
16 seeing this letter that at one point the FDA said
17 that it had determined that there is no acceptable
18 specification for nitrosamines in ARB API and DP?
19    A.  Well, as I say, I think that's not what
20 the guidance says, but I see where it says it here
21 in this letter.
22    Q.  Uh-huh.  You keep saying "guidance."
23 Which guidance do you mean specifically?
24    A.  It was the nitrosamine impurities guidance
25 that I cite in my report.  It came out in September

Confidential Information - Subject to Protective Order

Page 110

1  of 2020, and then it was updated in February of
2  2021.
3      Q.  Uh-huh.  So at the time this FDA general
4  advice letter was put out, it was the FDA's view
5  that there is no acceptable specification for
6  nitrosamines in ARB API and DP, correct?
7      A.  Yes, and we don't quite know when because
8  we can't see a date on this letter.
9      Q.  Well, I believe the letter was from
10 sometime in 2019.
11         MS. LOCKARD:  Objection to counsel
12 testifying.
13 BY MR. STANOCH:
14     Q.  Assume the letter was from 2019, Doctor,
15 okay?
16     A.  Okay.  I'm willing to make that
17 assumption.  It may have come out, then --
18     Q.  Great.
19     A.  It may have come out, then, before the
20 first iteration of the draft September 2020
21 guidance, and therefore the guidance superseded this
22 document.
23     Q.  Sure.  Then --
24     A.  That would resolve my dissonance.
25     Q.  And that may be the sequence of events,

Page 111

1  Doctor.  But at the time this letter came out,
2  right, the FDA had determined there is no acceptable
3  specification for nitrosamines in ARB API and DP,
4  right?
5      A.  I see the wording in the letter.  I don't
6  disagree with the way you are stating the wording.
7  And I'm willing to make the assumption it came out
8  sometime in 2019.
9      Q.  So then, at the time of this letter, there
10 should be no nitrosamines in any valsartan API or
11 drug product, correct?
12         MS. LOCKARD:  Objection.  Vague.
13 Foundation.
14         THE WITNESS:  Well, I think FDA is even
15 saying in this letter that they provided interim
16 acceptable limits for nitrosamine impurities in
17 ARBs.  So I don't know how to kind of piece together
18 what it's saying here versus, well, the other
19 realities of their December 2018 decision and the
20 guidance that I cited in my report.
21 BY MR. STANOCH:
22     Q.  Uh-huh.  The FDA goes on to say that they
23 used the interim limits only to guide immediate
24 decision-making for the product recalls.  Do you see
25 that?

Page 112

1         MS. LOCKARD:  What paragraph are you
2  looking at?
3         MR. STANOCH:  Same one.
4         THE WITNESS:  Uh-huh.  Well, we can keep
5  on looking at this letter.  Is there a question
6  pending, Mr. Stanoch?
7  BY MR. STANOCH:
8      Q.  There was.  The FDA goes on to say they
9  used the interim limits only to guide immediate
10 decision-making for the product recalls.  Do you see
11 that?
12     A.  I do see that.
13     Q.  Uh-huh.  And were you aware of that prior
14 to today?
15         MS. LOCKARD:  Objection.  Vague.
16         THE WITNESS:  And this is the first time I
17 have seen this letter.
18 BY MR. STANOCH:
19     Q.  Okay.  Let's put that aside for now,
20 Doctor.
21     A.  Okay.  Thank you.
22     Q.  Why don't you flip to Tab 3 in your
23 binder.  It will be introduced as Exhibit 6.
24         (Whereupon, Exhibit 6 was marked for
25 identification.)

Page 113

1  BY MR. STANOCH:
2      Q.  Tell me when you are there, Doctor.
3      A.  I'm there.  I see it.  M7(R1).  Is that
4  what we're talking about, March 2018?
5      Q.  Yes, sir.  We're on the same document.
6  That's a good step.  So are you familiar with this
7  document?
8      A.  I'm aware of it.  I did not study it
9  closely for my report.
10     Q.  That's okay.  But you understand that it's
11 the ICH guidance as of March 2018, correct?
12     A.  Yes, I do.  And then the one I had printed
13 out for me before was dated 31 March 2017.
14     Q.  Right.  And I don't have a copy of exactly
15 what you were handed.  We can get it.
16         But this goes back to our point that the
17 guidance might have went through various iterations
18 over time generally, right?
19     A.  Yes, exactly.  That's how the ICH
20 guidances work.  So I'm prepared to consider this
21 with you, Mr. Stanoch.
22     Q.  That's great.  So why don't we turn to
23 page 5 of this document, sir?
24     A.  All right.
25     Q.  And tell me when you are there.

Confidential Information - Subject to Protective Order

Page 114

1    A.  I'm there.  Where it says, "General
2  Principles"?
3    Q.  Yes, sir.  And then you see the paragraph
4  in the middle, "A Threshold of Toxicological
5  Concern"?
6    A.  I do see that.
7    Q.  Uh-huh.  And do you see at the end that
8  this March 2018 guidance states, "This group of high
9  potency mutagenic carcinogens, referred to as the
10  cohort of concern, comprises aflatoxin-like-,
11  N-nitroso-, and alkyl-azoxy compounds," correct?
12    A.  Yes, I do see that.
13    Q.  All right.  And N-nitroso compounds, those
14  would include the NDMA and NDEA nitrosamines that
15  you discuss in your report, correct?
16    A.  I think you are saying that correctly.
17  Thank you, Mr. Stanoch.
18    Q.  And then what is your understanding of
19  cohort of concern, sir?
20    A.  As the words say here, it's a group of
21  high-potency mutagenic carcinogens that comprises
22  the three -- excuse me, Mr. Stanoch -- that
23  comprises the three types of compounds stated in the
24  sentence.  A cohort of concern, apparently they are
25  trying to classify some particularly mutagenic

Page 115

1  carcinogens, as stated here in the sentence.
2    Q.  And the purpose of that is to alert
3  industry that limits for the cohort of concern might
4  be much lower than the threshold of toxicological
5  concern that might otherwise be defined per the
6  guidance, right?
7    MS. LOCKARD:  Objection.  Vague.  And
8  outside the scope of his testimony.
9    THE WITNESS:  Yeah.  And you are beginning
10  to ask me questions that I would call
11  pharmacology/toxicology questions.
12    I can read the sentences here and agree
13  with them, Mr. Stanoch.  For example, it says, "Some
14  structural groups were identified to be of such high
15  potency," and then the sentence continues.  And
16  these high potency are referred to as a cohort of
17  concern, and then it lists the three compounds that
18  fall into the structural categories that we have
19  already discussed.
20  BY MR. STANOCH:
21    Q.  Uh-huh.  And then the threshold of
22  toxicological concern, what does that relate to?
23    MS. LOCKARD:  Objection.  Vague.  Outside
24  the scope.
25    THE WITNESS:  Well, if we go back to the

Page 116

1  beginning of the paragraph, it says, "was developed
2  to define an acceptable intake for any unstudied
3  chemical that poses a negligible risk."  So I guess
4  if it is below the threshold, the risk is
5  negligible, but if it is above, you begin to have
6  some concern.  Please correct me if --
7  BY MR. STANOCH:
8    Q.  Right.  I apologize.  Are you done,
9  Doctor?
10    A.  Yes, I think I am.  Thank you,
11  Mr. Stanoch.
12    Q.  Yes.  And just following along, you see
13  later in that paragraph it says, "For application of
14  a TTC in the assessment of acceptable limits of
15  mutagenic impurities," and the sentence continues.
16  Do you see that?
17    A.  I do.
18    Q.  Right.  And the purpose of the TTC was to
19  assess acceptable limits of impurities in drug
20  substances, correct?
21    MS. LOCKARD:  Objection.  Outside the
22  scope of his expert opinion.  You are asking him
23  what the purpose of the TTC was.  This is not part
24  of his class-certification report.
25    THE WITNESS:  Yeah, and -- the only thing

Page 117

1  I can do is read the words and sort of say I have a
2  general understanding of what they are saying.  I'm
3  certainly not a pharmacologist-toxicologist.
4  BY MR. STANOCH:
5    Q.  I'm not asking for a pharmacology or
6  toxicology opinion, Doctor.  I'm asking your
7  understanding in the context of a report where you
8  talk about thresholds of limits that may or may not
9  have existed.
10    We're looking now here at the ICH
11  guidance, the March 20th, 2018, version, and it's
12  talking about acceptable limits of mutagenic
13  impurities, right?
14    A.  But I still don't see limits.  Am I
15  missing limits?
16    Q.  Well, the whole thrust is talking about
17  assessment of acceptable limits, is it not?
18    A.  I think it's talking about it generally,
19  but when I spoke about it in my report, I was
20  talking specifically about the limits that FDA
21  created in December 2018 and nothing more.
22    Q.  Right.  And what I'm getting at, Doctor,
23  is:  Prior to the FDA's interim limits, there
24  already was industry guidance on acceptable limits
25  of mutagenic impurities, correct?

Page 118

1     MS. LOCKARD: Objection. Outside the
2 scope of his opinions.
3     THE WITNESS: If you are talking about
4 this document, I would certainly agree with you.
5 BY MR. STANOCH:
6     Q. Great. And you would agree for any other
7 iteration of this M7(R1) guidance prior to this one
8 that spoke of acceptable limits of mutagenic
9 impurities as well, correct?
10     A. Well, that's a broad statement, but again,
11 let me agree for purposes of discussion.
12     Q. I appreciate that. And then let's flip to
13 page 14. Let me know when you are there, sir.
14     A. Okay. I'm there.
15     Q. And do you see Section E, sir?
16     A. I do.
17     Q. Right. And do you see there is three
18 bullets under Section E?
19     A. I do.
20     Q. And the third bullet is talking about the
21 cohort of concern impurities again, fair?
22     A. I see that, yes.
23     Q. And it notes, "If these compounds are
24 found as impurities in pharmaceuticals, acceptable
25 intakes for these high-potency carcinogens would

Page 119

1 likely be significantly lower than the acceptable
2 intakes defined in this guidance."
3     Did I read that right?
4     A. I can agree with your reading of the
5 words.
6     Q. Uh-huh. Right. And then you see it
7 further says, "Although the principles of this
8 guidance can be used, a case-by-case approach
9 using," for example, "carcinogenicity data from
10 closely related structures, if available, should
11 usually be developed to justify acceptable intakes
12 for pharmaceutical development and marketed
13 products."
14     Did I read that correctly?
15     A. I think you are reading it correctly, yes,
16 no question about that.
17     Q. I appreciate that, Doctor.
18     And so what the guidance we're looking at
19 here is saying is that for the cohort of concern
20 impurities, which includes the nitrosamine
21 compounds, at least as of the date of this guidance
22 of March 2018, that acceptable intake limits for it
23 should be developed for both the development and
24 marketing of pharmaceutical products?
25     A. Well, I agree with you. I think that's

Page 120

1 what we're talking about, what are the acceptable
2 intake limits. And I think FDA has -- they provided
3 those in December 2018. That's what I stated in my
4 report.
5     Q. You --
6     A. You know, as long as we're sort of looking
7 at this ad hoc document that I did not study or cite
8 in my report other than to notice its availability,
9 Mr. Stanoch, I might draw your attention to the
10 first bullet on this page, where it says, "Higher
11 acceptable intakes may be justified when human
12 exposure to the impurity will be much greater from
13 other sources, e.g., food." Now, of course that's
14 exactly the case with nitrosamines.
15     Q. Well, thank you for the gratuitous
16 statement, Doctor, but let's talk about that.
17     All three of these bullets we are looking
18 at, flexibilities in approaches, they are suggesting
19 to manufacturers to conduct a case-by-case approach
20 to come up with acceptable intake limits for
21 products, correct?
22     A. Yes, and in the case of nitrosamines, in
23 the current matter, FDA did that for manufacturers,
24 as the prior letter you showed me noticed, in
25 December 2018.

Page 121

1     Q. Right. Well, prior to the FDA's interim
2 limits for nitrosamines in December of 2018, there
3 already was industry guidance, was there not, that
4 manufacturers should be conducting their own
5 assessments to potentially set limits for impurities
6 such as nitrosamines?
7     MS. LOCKARD: Objection. Outside the
8 scope of his class-certification opinions.
9     THE WITNESS: Yes, and remember, we're
10 dealing with a situation where FDA said this was
11 unexpected, they didn't know how it occurred. They
12 had many other caveats that indicated, if you will,
13 their surprise that came about in the summer of
14 2018. These are very low-level impurities, and you
15 would have to suspect them and then have analytical
16 capability to identify them, notwithstanding all the
17 words in this guidance.
18     So I'm glad to walk through the guidance
19 with you. I think it's an interesting and important
20 guidance, Mr. Stanoch, but it really only is
21 tangentially related to my report.
22 BY MR. STANOCH:
23     Q. So it's not important to your opinions
24 that there already was industry guidance on how to
25 address levels of nitrosamines in drugs prior to the

Page 122

1 December 2018 FDA interim guidance?
2         MS. LOCKARD:  Objection.  Outside of the
3 scope of his opinions.  That's not what he was
4 retained, that's not what he discussed in his expert
5 report.
6         THE WITNESS:  Yeah, I'm listening to the
7 two counsel, and I think the way you both said it is
8 correct.  I was considering other factors and
9 information that I cited in my report that led to my
10 opinions, and I certainly haven't changed my
11 opinions as a result of the review of this document.
12 BY MR. STANOCH:
13     Q.  Okay.  Are you aware of any Novartis
14 Diovan product sold in the --
15         (Reporter clarification.)
16         MR. STANOCH:  No problem.  Let's start
17 over.
18     Q.  Are you aware of any Novartis Diovan
19 product sold in the United States that contained
20 NDMA?
21     A.  I am not.
22     Q.  Are you aware of any Novartis Diovan
23 product sold in the United States that contained
24 NDEA?
25     A.  No, I am not.

Page 123

1     Q.  You are aware, are you not, that Novartis
2 detected NDMA in ZHP's valsartan API prior to
3 June 20th, 2018, correct?
4     A.  You know, I have heard statements to that
5 effect from counsel, but I don't think I have ever
6 seen any documents for it.  I don't think a document
7 exists on my materials-considered list, and I
8 certainly didn't cite anything like that in my
9 report.
10     Q.  Uh-huh.  Can you tell us how --
11     A.  But I would be glad to look at such a
12 document if you have it, Mr. Stanoch.
13     Q.  Uh-huh.  Can you tell us how Novartis was
14 able to identify NDMA in ZHP's valsartan API prior
15 to June 20, 2018?
16         MS. LOCKARD:  Objection.  Outside the
17 scope of his expert opinions on class certification.
18 Lacks foundation.  Speculation.
19         THE WITNESS:  You know, I'm not,
20 Mr. Stanoch.  I just don't have any documents to
21 speak to that.  I would be glad to look at them if
22 you have them.
23 BY MR. STANOCH:
24     Q.  Uh-huh.  Can you tell us how Novartis was
25 able to identify NDMA in ZHP's valsartan API prior

Page 124

1 to June 20, 2018, but Teva could not?
2         MS. LOCKARD:  Objection.  Outside the
3 scope of his expert opinion on class-certification
4 issues.  Vague.  Lacks foundation.  Argumentative.
5         THE WITNESS:  Again, Mr. Stanoch, I just
6 have not seen any documents to that point.  If you
7 can point to them in my materials considered, I
8 would be glad to look at them with you.
9 BY MR. STANOCH:
10     Q.  Uh-huh.  Well, you tell me, Doctor, did
11 you look at any materials that identify how Novartis
12 was able to discover NDMA in ZHP's valsartan API?
13         MS. LOCKARD:  Objection.  Outside the
14 scope of his class-certification opinions.  Lacks
15 foundation.  Speculation.
16         THE WITNESS:  And my apologies,
17 Mr. Stanoch.  I thought I had answered that
18 question.  I have not seen any documents, anywhere,
19 that speak to Novartis' testing of any products for
20 nitrosamines.
21 BY MR. STANOCH:
22     Q.  Can you tell me what methods Novartis used
23 to detect NDMA in ZHP's valsartan API?
24         MS. LOCKARD:  Objection.  Outside the
25 scope of his class-certification opinions.  Lacks

Page 125

1 foundation.  Speculation.
2         THE WITNESS:  No, I cannot, Mr. Stanoch.
3 BY MR. STANOCH:
4     Q.  You cannot tell me why Novartis would have
5 a method for detecting NDMA in ZHP's valsartan API,
6 can you?
7         MS. LOCKARD:  Objection.  Outside the
8 scope of his class-certification opinions.  Lacks
9 foundation.  Calls for speculation.
10         THE WITNESS:  No, I can't, Mr. Stanoch.
11 BY MR. STANOCH:
12     Q.  Why would -- strike that.  Start over.
13         Why would Novartis be testing ZHP's
14 valsartan API for NDMA in the first place?
15         MS. LOCKARD:  Objection.  Outside the
16 scope of his class-certification opinions.  Calls
17 for speculation.  Lacks foundation.
18         THE WITNESS:  I just have no idea,
19 Mr. Stanoch.  It would be guessing, and I could only
20 guess.
21 BY MR. STANOCH:
22     Q.  Well, there is no specification in the
23 Diovan monograph, for example, for nitrosamines,
24 right?
25     A.  When you say "Diovan monograph," I assume

Confidential Information - Subject to Protective Order

Page 126

1  you are talking about the USP monographs for
2  valsartan API and valsartan drug product, and if
3  that's what we are talking about, Mr. Stanoch, there
4  are no tests for nitrosamine in those monographs.
5      Q.   That would be for both the branded Diovan
6  product as well as generic valsartan products,
7  correct?
8      A.   I think you are saying that correctly,
9  Mr. Stanoch, that USP doesn't distinguish between
10  manufacturers.  The monographs are supposed to apply
11  to all manufacturers of the named article.
12     Q.   When you refer in your report to
13  compendial requirements, what do you mean?
14     A.   Well, in brief, I think, as we have
15  already discussed, we're talking about the
16  monographs, in this case, for valsartan drug
17  substance and valsartan drug product.
18     Q.   Right.  And you have looked at a couple of
19  monographs for valsartan, correct?
20     A.   Yes, I think they were part of the
21  information I looked at, and I think they are in my
22  materials considered.  And I'm glad to talk about
23  them if you wish, Mr. Stanoch.
24     Q.   Of course.  Would you agree that
25  compendial requirements includes the general USP

Page 127

1  chapters?
2      A.   Yes, the way I would say it is there is
3  general notices, which appear at the front of USP
4  and are generally applicable, and then a monograph
5  can reference general chapters that give detailed
6  information about a particular test or procedure.
7      Q.   Got it.  So it's fair to say, then, that
8  compendial requirements includes a drug monograph,
9  general notices and requirements, and conformance to
10  standards?
11     A.   Yes.  And if a monograph references a
12  general chapter, that would be part of the
13  monograph.
14     Q.   And those also would include notices on
15  impurities, correct?
16     A.   My sense is that impurities are a
17  universal test and should be present in most, if not
18  all, drug-substance and drug-product monographs, and
19  that would certainly be true of the valsartan
20  monographs.
21     Q.   Uh-huh, uh-huh.  And we talked earlier
22  that the FDA nitrosamine impurities guidance, I
23  think you said, was updated last September 2021?
24     A.   Well, it appeared first in draft in
25  September '20, and then it was updated in

Page 128

1  February 2021.
2      Q.   I apologize.  That's correct.  I agree
3  with you there.
4          I'm going to mark an exhibit.  Stand by,
5  sir.
6          (Whereupon, Exhibit 7 was marked for
7  identification.)
8  BY MR. STANOCH:
9      Q.   Stand by.
10         Okay.  Exhibit 7, sir, has now been
11  marked.  It also should be Tab 17 in your binder if
12  you would like to look at the hard copy.  Tell me
13  when you are there.
14     A.   Yes, I'm looking at it, Mr. Stanoch.
15  I'm --
16     Q.   Excellent.  And this appears to be a copy
17  of the valsartan USP monograph printed January 28th,
18  2022.  Do you see that?
19     A.   Yes, and -- okay.  Yes, I'm prepared to
20  discuss.
21     Q.   Very good.  So this would be an example of
22  a USP monograph that we were talking moments ago,
23  correct?
24     A.   Exactly.
25     Q.   All right.  And this monograph is for

Page 129

1  valsartan, correct?
2      A.   Yes.
3      Q.   And the date of this is current official
4  from last month, so this was after the FDA's last
5  turn of its nitrosamine impurities guidance in
6  February 2021, right?
7      A.   I'm not sure I understood what you said.
8  It says, "Official Date:  Official as of" May 1,
9  2020.  Are we looking at the same thing?
10     Q.   Right.  And "Official Status" right above
11  that, sir, "Official Status:  Currently Official on
12  28-Jan-2022."  You see that?
13     A.   I do, and that would be about a year after
14  the nitrosamine guidance.
15     Q.   I can agree with that.  And do you see any
16  mention of a test for nitrosamines in this valsartan
17  monograph?
18     A.   All right.  Now hold on just a sec.  Okay.
19  When we get to "Impurities," I see, "Procedure 1:
20  Limit of Valsartan Related Compound A."  "Procedure
21  2: Limit of Valsartan Related Compound B, Valsartan
22  Related Compound C, and Other Related Compounds."
23  And that's all I see.  I do not see tests for
24  nitrosamine impurities.
25     Q.   Do you see any reference to acceptable

Confidential Information - Subject to Protective Order

1 limits for nitrosamines in this monograph?
2     A.  I do not.
3     Q.  Do you see any mention whatsoever of
4 nitrosamines in this valsartan monograph?
5     A.  I don't believe -- I do not, Mr. Stanoch.
6 Please correct me if you think I'm wrong.
7     Q.  No, I think you are correct.  I just
8 wanted to make sure we're on the same page.  I don't
9 see any mention of nitrosamines whatsoever in this
10 monograph, and it sounds like you agree with me,
11 correct?
12     A.  Yes.
13     Q.  So if a drug manufacturer made valsartan
14 exactly per this monograph, they wouldn't
15 necessarily be doing anything to test or control for
16 NDMA, would they?
17     A.  If they just followed the monograph, I
18 think I would agree with you.
19     Q.  Right.  Following a monograph alone would
20 not mean that a product was complying with the FDA's
21 nitrosamine impurity guidance and limits, correct?
22     A.  Oh, I'm sorry.  I'm hesitating a little
23 bit because you alluded back to the nitrosamine
24 impurities guidance.
25     Q.  Well, I'll withdraw the question and I'll

1 phrase it again.  Following this monograph alone to
2 manufacture valsartan would not have any specified
3 way of identifying and controlling nitrosamines,
4 correct?
5     A.  I think you are -- yes, I agree with you,
6 Mr. Stanoch.
7     Q.  Uh-huh.  So the fact that a drug complies
8 with a USP monograph alone does not mean the drug is
9 free of any nitrosamine impurities?
10     A.  Yes, I think you are right.  That ability
11 to control nitrosamine would come up in the
12 application to FDA and the FDA review.  It would not
13 be in the USP monograph.
14     Q.  Okay.  And the USP is not responsible for
15 identifying genotoxic impurities in drug product or
16 drug substance, right?
17     A.  No, I agree with your -- that to me is
18 more a regulatory matter.
19     Q.  All right.  USP believes companies are
20 responsible for identifying and assessing genotoxic
21 impurities in their drug product or substance,
22 correct?
23     A.  Yes.  It's up to the manufacturer working
24 with FDA to detect -- I'm trying to think of the
25 string of words -- report, identify, qualify, and

1 that specifically applies to a genotoxic impurity
2 such as nitrosamines.
3     Q.  Uh-huh.  Uh-huh.  As of the date of this
4 valsartan monograph, January 28, 2022, if a
5 manufacturer followed it exactly, it would have no
6 way of testing and identifying nitrosamines in the
7 product, correct?
8         MS. LOCKARD:  Objection.  Vague.
9         THE WITNESS:  I think I'll agree with you,
10 Mr. Stanoch.
11 BY MR. STANOCH:
12     Q.  So whether a product was made according to
13 a USP monograph or not does not definitively speak
14 to whether the product contains nitrosamines,
15 correct?
16     A.  Well, remember, you don't make a product
17 according to a monograph.  This is a monograph that
18 has tests, procedures, acceptance criteria, that if
19 you -- I'm trying to get into the USP
20 understanding -- if your drug substance conforms to
21 all these tests, then you can confirm that you have
22 valsartan.
23         Now, as you are discussing, and I agree
24 with you, it doesn't say, does your valsartan have
25 nitrosamine impurities that are adequately

1 controlled?  That is a separate matter that is
2 adjudicated by FDA.
3     Q.  Uh-huh.  And USP general notices and
4 requirements may also guide a manufacturer on how to
5 identify nitrosamine impurities, correct?
6     A.  Well, yeah, there may be some statements
7 in there that are very general statements, for
8 example, that you have to follow GMPs, and GMPs may
9 say, yes, you have to think about a genotoxic
10 impurity.
11         And I have heard it said, although I
12 haven't seen it, Mr. Stanoch, I have heard that USP
13 has general chapters on how to measure nitrosamine
14 impurities.
15     Q.  Uh-huh.
16     A.  But I can't confirm that.  I just heard
17 it.  Maybe you are aware of it and I'm not.
18     Q.  And is that discussed anywhere in your
19 report, sir?
20     A.  No, not at all.  And as a matter of fact,
21 this monograph is not discussed in my report.  I
22 think I am talking about monographs that were
23 official at the time of the 2018 time period.
24     Q.  So, well, we can pull those up too,
25 Doctor.  But if someone followed the USP monograph

Confidential Information - Subject to Protective Order

Page 134

1  for valsartan products in the 2018 time period, so
2  too they would have nothing from the monograph
3  itself about identifying nitrosamines, correct?
4      A.  Yes.  I agree with that, Mr. Stanoch.
5      Q.  Uh-huh.  That does not mean, though, that
6  the drug ultimately might not contain any
7  nitrosamines, right?
8      A.  Or that they might be controlled in
9  another way.
10     Q.  Correct.  And it may be that even if a
11 valsartan product was made according to the 2018
12 monograph, that the drug could still be adulterated
13 under FDA regulations.
14         MS. LOCKARD:  Objection.  Vague.
15 Speculation.
16         THE WITNESS:  I'm struggling a little bit
17 with what you said.  Now, if you are citing the act,
18 I think we would say it was not adulterated
19 according to the provisions of the act that talk
20 about a USP standard, but it could be adulterated
21 under a private specification, which is allowed in
22 the act in the citation I provided.
23 BY MR. STANOCH:
24     Q.  Uh-huh.
25     A.  Or it could be part of a GMP violation.

Page 135

1      Q.  Let's take examples of some other drugs,
2  Dr. Williams.  Let's take an example of a drug that
3  was made according to USP compendial standards.  You
4  with me so far?
5      A.  I'm a little hesitant to talk about making
6  a drug according to the standards because USP does
7  not give process steps.  So you might make a drug
8  according to your process steps and then test it
9  according to a USP monograph.
10     Q.  Uh-huh.  Well, that's a fair point,
11 Doctor, that a manufacturer's individual process may
12 have issues arise through it that are not covered by
13 the monograph itself.
14     A.  Yes, exactly.
15     Q.  Right.  And it would be incumbent on the
16 manufacturer to understand its own individual
17 process and to assess the potential for any
18 impurities in the product even if the manufacturer
19 is otherwise following the monograph, right?
20     A.  I agree with the way you stated that.
21 Thank you.
22     Q.  Okay.  And so let me go back to my
23 example.  I'll try to think -- I'll try to phrase it
24 more accurately for you.
25         Let's take a drug that met all compendial

Page 136

1  requirements.  Is that okay?
2      A.  Okay.
3      Q.  Is that an accurate articulation of a
4  product, that it can meet compendial requirements?
5      A.  It seems to me you are making a statement
6  about a hypothetical, and I don't disagree with your
7  hypothetical.
8      Q.  Okay.  So let's say there is a drug that
9  meets all compendial requirements, but it contains
10 anthrax.  Is that drug adulterated?
11         MS. LOCKARD:  Objection.  Speculation.
12         MR. STANOCH:  I can ask a hypothetical,
13 Counsel.
14     Q.  Go ahead, Dr. Williams.
15         MS. LOCKARD:  Incomplete hypothetical.
16 Objection.
17         THE WITNESS:  You know, it's a
18 hypothetical, and I would say, yes, it's got an
19 unacceptable contaminant.
20 BY MR. STANOCH:
21     Q.  Let's say a different, slightly different
22 hypothetical.  Say a drug met all compendial
23 requirements but there was rat poison in it.  Can it
24 be adulterated?
25         MS. LOCKARD:  Objection.  Calls for

Page 137

1  speculation.  Incomplete hypothetical.
2          THE WITNESS:  Again, I would say it has a
3  unacceptable contaminant.
4  BY MR. STANOCH:
5      Q.  Even though the compendial requirements
6  may not have a test for rat poison, correct?
7      A.  Exactly.
8      Q.  Uh-huh.  And let's take another example.
9  Let's say there is a drug that met all compendial
10 requirements, but broken glass are in the capsules.
11 Could it be adulterated?
12         MS. LOCKARD:  Objection.  Speculation.
13 Incomplete hypothetical.
14         THE WITNESS:  Well, it could be
15 adulterated according to GMPs, but I think it could
16 not be adulterated according to the compendial
17 standard in the act.
18         I have got another good example, which is
19 the tampering of the Tylenol many years ago where
20 somebody put needles in the bottles.  I don't know
21 if you remember that, Mr. Stanoch.  Do you recall
22 that?
23 BY MR. STANOCH:
24     Q.  No, I don't.
25     A.  Well, FDA went to great trouble working

Confidential Information - Subject to Protective Order

Page 138

1  with a highly responsible manufacturer to get that
2  product off the shelves.
3      Q.  And was that product considered
4  adulterated because of the presence of needles in
5  the bottles?
6      A.  I think you could probably say that it was
7  a GMP failure of some kind, but --
8      Q.  Uh-huh.
9      A.  At a certain point in time, FDA could take
10 action, you know, as it deems appropriate for public
11 health.
12     Q.  Uh-huh.  And in your example of the
13 Tylenols with needles in the bottle, did a consumer
14 who got a bottle with a needle in it before any FDA
15 action, were they holding an adulterated product?
16     A.  I can't remember the details.  I think you
17 are asking sort of a speculative question.  I think
18 you could say it was adulterated because of failure
19 of GMPs.
20     Q.  But you could --
21     A.  You know, FDA has broad authority to
22 remove adulterated products from the market.  I can
23 say that.
24     Q.  Sure.  I would agree with that.  But you
25 can have a product, in this example we're talking

Page 139

1  about, the consumer's holding a bottle of Tylenol
2  with needles in it.  That product they are holding
3  is adulterated even prior to an FDA action against
4  the manufacturer, is it not?
5      A.  I think you could say that.  I think
6  people wouldn't quibble with that designation.
7      Q.  Okay.  You can say the same with sort of
8  the other examples.  For example, I mean, we talked
9  about a drug made to compendial requirements that
10 contained anthrax.  That drug in a consumer's hand
11 would be adulterated prior to the FDA taking
12 official action against the manufacturer, correct?
13     MS. LOCKARD:  Objection.  Speculation.
14 Incomplete hypothetical.
15     THE WITNESS:  Yeah, I -- I'm sorry.  I
16 have lost track of your question.  The hypothetical
17 that the product has been willfully adulterated?
18 BY MR. STANOCH:
19     Q.  The question simply was another example.
20 I'll say it again.  Assume you have a product that
21 met all compendial requirements, except it also
22 contained anthrax.  You with me?
23     A.  Yes.  I think you are making general
24 statements that are quite true, Mr. Stanoch, that
25 the compendial standard really is designed to assess

Page 140

1  what is there according to tests, procedures, and
2  acceptance criteria.  It couldn't possibly assess
3  all the possible negative things that might be
4  there.
5      Q.  Right.  And in this example, assuming you
6  have a product that met all compendial requirements
7  except it also contained anthrax, the consumer
8  holding that product is holding an adulterated
9  product prior to any FDA action against that
10 manufacturer, fair?
11     A.  Yes.  And as long as we're staying with
12 these hypotheticals, I can say a valsartan monograph
13 could have an impurity procedure for nitrosamines.
14 Of course, it would take very specialized equipment,
15 and it might have the limits set by FDA via the
16 guidance.  So there is nothing precluding that.
17     Q.  So --
18     A.  And I'm not exactly sure why it hasn't
19 occurred, but maybe companies are figuring out a way
20 to keep their manufacturing process such that the
21 limits are met without testing.
22     Q.  Okay.  And you have not seen any USP
23 monograph for valsartan that contains any impurity
24 procedures for nitrosamines, right?
25     A.  I have not.

Page 141

1      Q.  Uh-huh.
2      MS. LOCKARD:  We have been going about an
3  hour since the last break, so whenever you get to a
4  stopping point, I would like a break.
5      MR. STANOCH:  Now is fine.
6  Doctor, would you like to take a break?
7      THE WITNESS:  That would be nice,
8  Mr. Stanoch.  Thank you.
9      MR. STANOCH:  Let's do it.  Great.
10     THE VIDEOGRAPHER:  Great.  Then we are
11 going off the record.  The time is 10:49.
12     (Whereupon, a brief recess was taken.)
13     THE VIDEOGRAPHER:  Okay.  We are coming
14 back on the record.  The time on the video monitor
15 is 11:07.  Please begin.
16 BY MR. STANOCH:
17     Q.  Welcome back, Dr. Williams.
18     A.  Hi, Mr. Stanoch.
19     Q.  Did you talk with anyone besides your
20 counsel during the break?
21     A.  No, I did not.
22     Q.  Did you talk with your counsel during the
23 break?
24     A.  Yes, I did.
25     Q.  And did you look at any documents during

Confidential Information - Subject to Protective Order

Page 142

1 the break?
2    A.  We sort of looked through the documents in
3 the binder you provided, but we didn't review any.
4 And we didn't get through all the documents.  There
5 were a few at the end we didn't look at, at all.
6    Q.  You flipped through the binder of
7 potential exhibits?
8    A.  Yes.
9        MS. LOCKARD:  Just very briefly.
10       MR. STANOCH:  Counsel, I'm going to --
11       MS. LOCKARD:  We didn't go through these
12 documents.
13       MR. STANOCH:  Counsel, and I didn't think
14 I needed to state this, but I'll put on the record,
15 I object to you flipping through the courtesy binder
16 of potential exhibits we prepared at your request
17 for the convenience of the witness.
18       Not all of them may be used.  We want them
19 not to be looked at, certainly to be destroyed
20 without looking at them, the witness or counsel,
21 especially when we're doing it as a courtesy to you
22 and the witness, when we have asked for similar
23 courtesies from your side, not you, Counsel, but
24 other counsel on your side, we have been flat-out
25 rejected when we have asked for hard copies.

Page 143

1    So it's very troubling to me that you are
2 looking through all potential exhibits we provided,
3 and I would ask that that not happen again, now or
4 at a future deposition.
5        MS. LOCKARD:  As the witness said, we did
6 not discuss these documents.  I'm trying to make
7 sure I have copies of them in hand.  We have one
8 binder here that I'm having to walk over and look
9 over Dr. Williams' shoulder, so --
10       MR. STANOCH:  Every single document I
11 marked from the binder, Counsel, is also put up on
12 the screen for all counsel on the Zoom to see.  So I
13 would just ask that no one looks at the binder until
14 the witness is directed to do it.  Thank you.
15       MS. LOCKARD:  Well, I would like to have
16 hard copies in my hand because on some of these we
17 don't even have the full document up on the screen,
18 just showing pages.
19       MR. STANOCH:  Well, first of all, that
20 wasn't the request.  It was for your witness.
21       Second of all, when we have asked for the
22 same thing for our witness, let alone us, we have
23 been flat-out refused by some on your side, not you.
24 So going forward, we can talk about this, but again,
25 for now I'm asking, do not look at the binder until

Page 144

1 an exhibit is marked.  Thank you.
2        MS. LOCKARD:  That's fine.  You may have
3 to give me a moment to find the document in hard
4 copy if I need to.  So --
5 BY MR. STANOCH:
6    Q.  Did you look at any other documents,
7 Doctor, during the break?
8    A.  No, no other documents.
9    Q.  Okay.  Doctor, would you agree that if a
10 manufacturer controls impurities and degradation
11 products in accordance with only a pharmacopeial
12 monograph, that is acceptable to regulators?
13    A.  I think it can be, yes.  If it is a good
14 monograph, it can be sufficient to control the
15 product in the marketplace.
16    Q.  What if the individual monograph is
17 inadequate to control an impurity?
18    A.  If we're talking about the nitrosamine, I
19 would say then there needs to be additional
20 requirements that are private, agreed to with FDA.
21    Q.  Uh-huh.  Well, what agreements with FDA
22 does any valsartan manufacturer have today, given
23 that we looked at the valsartan monograph and there
24 is nothing about nitrosamines in it?
25    A.  Well, I can only speak to Teva, and the

Page 145

1 answer to that is clear, there are no Teva valsartan
2 products in the U.S. marketplace.  As we have
3 already discussed, Teva immediately recalled them --
4 "immediately" can be a little debatable -- when the
5 impurities were discovered.
6    Q.  Uh-huh.  Is it incumbent on the
7 manufacturer that discovers an impurity to develop
8 and validate appropriate analytical procedures,
9 establish acceptance criteria, and communicate with
10 USP?
11    A.  There is no obligation for a manufacturer
12 to work with USP at all.  That's voluntary.
13    Q.  Uh-huh.
14    A.  I would say there is a requirement to do
15 so with FDA if you come to the private
16 specification.
17    Q.  I'm going to mark the next exhibit.  Stand
18 by.
19       (Whereupon, Exhibit 8 was marked for
20 identification.)
21 BY MR. STANOCH:
22    Q.  I have marked Exhibit 8, Doctor, it's
23 actually Tab 12 in your -- tell me when you're
24 there, sir.
25       (Reporter clarification.)

Page 146

BY MR. STANOCH:

Q. Binder. Tell me when you are there.

A. Okay. I have been handed Tab 12, which looks like it's about 20 or 30 pages of a USP webcast. So I'm there, Mr. Stanoch.

Q. Very good. And this is a USP presentation entitled "Impurities in Drug Products and Drug Substances - A USP Approach," yes?

A. Yes.

Q. And you see the last update on the first page is March 2018, right?

A. Wait a minute. I'm trying to find March 2018. Where is that?

Q. Slide 1, lower left, light gray text.

A. Yes, it's very faint in my print, but yes, I can see it. Thank you, Mr. Stanoch.

Q. Not a problem. It's faint in mine too and in the original. That's why I was happy to draw your attention to it.

So this is prior to the valsartan recalls that began in the summer of 2018, right?

A. March 2018. Okay. I'm with you. Yes. Thank you. I agree.

Q. Good. Let's flip to Slide 36. So if you are looking at the little page numbers in the lower

Page 147

right, it would be the page that has Slides 35 and 36 on it.

A. 34. So I am looking at 35 and 36. Yes, I'm there.

Q. Okay. You see there is a Q and A on Slide 36, correct?

A. I do see that.

Q. And the question is: "If a manufacturer controls impurities and degradation products in accordance with only a pharmacopeial monograph, is that acceptable to the regulators?" Did I read that right?

A. Yes, you did.

Q. Then there is a three-bullet answer, correct?

A. Yes, I do see that.

Q. Okay. And it notes first the monographs are based on historic preparation, right?

A. Yes. I'm not exactly sure what that means, but you are reading it correctly.

Q. And then the next bullet notes that, "A particular manufacturer's manufacturing method for formulation components may lead to unexpected impurities, due to a different route of synthesis, different reagents, et cetera. Different processes

Page 148

may lead to different impurities."

Did I read that right?

A. Yes, you read that correctly.

Q. Do you agree with that statement?

A. I do agree with it.

Q. Then it also reads, "If an individual monograph is inadequate to control an impurity, the manufacturer is responsible for developing and validating appropriate analytical procedures, establishing acceptance criteria, and communicating with USP."

Did I read that right?

A. Yes, you did. And I agree with that statement.

Q. Okay. So what USP is advising in this slide is that it's -- the onus on the manufacturer to understand and evaluate its own process and any impurities that may arise in that process for a drug, correct?

A. Yes, I think you are stating it correctly.

Q. Uh-huh. If you can flip to the slide -- page 63. Let me know when you are there.

A. Okay. I'm on page 63, top of the page.

Q. Great. And it says, "Setting Acceptance Criteria for Impurities," right?

Page 149

A. Yes.

Q. And there is three bullets there?

A. Yes, I see that.

Q. Let me direct your attention to the third bullet. Are you there?

A. Yes.

Q. And read the first sentence for us.

A. "If a limit for a specified impurity does not exist in the USP, FDA recommends that you qualify the impurity by comparing it to the observed amounts of the impurity in the reference listed drug. Your acceptance criterion should be similar to the level observed in the" reference listed drug. "Alternatively, the acceptance criteria may be set based on a qualified level that is justified by scientific literature, metabolite data, or toxicity studies."

Q. Do you agree with that statement?

A. I do.

Q. Uh-huh. So the event that, say, a valsartan USP monograph did not contain a limit for a nitrosamine, the recommendation would be for the manufacturer to qualify the impurity, correct?

A. If the impurity existed in their product, I think you could make that claim.

Page 150

1    Q.  Do you know if, prior to the summer of
2  2018, Teva ever made any effort to qualify any
3  nitrosamine impurity in its valsartan products?
4    A.  I think they did not.  They did not
5  suspect them, and their analytical tests in their
6  private or public specification wouldn't have picked
7  up a nitrosamine impurity.
8    Q.  Uh-huh.  Again, though, you don't know
9  like what tests Teva in particular might have been
10  employing for valsartan at the time, right?
11    A.  Well, it seems to me we could assume they
12  were following the USP monograph for valsartan --
13    Q.  Uh-huh.
14    A.  -- and valsartan drug product.
15    Q.  Uh-huh.  But you don't know how Novartis
16  was able to detect NDMA in valsartan API whereas
17  Teva did not?
18       MS. LOCKARD:  Objection.  Asked and
19  answered.
20       THE WITNESS:  Yeah, that is sort of a
21  different set of questions.  And Novartis would have
22  been following the monograph, too, for valsartan and
23  valsartan drug product if it existed.
24  BY MR. STANOCH:
25    Q.  Well, that's sort of the point, Doctor,

Page 151

1  that Novartis, following the monograph that did not
2  contain any mention of nitrosamines, nonetheless did
3  a test that detected the nitrosamines, right?
4       MS. LOCKARD:  Objection.  Lacks
5  foundation.  Speculation.  Outside the scope of his
6  opinions.
7       THE WITNESS:  Yeah, I have already stated,
8  Mr. Stanoch, I have no understanding of what
9  Novartis was doing.
10  BY MR. STANOCH:
11    Q.  Would you agree, though, that Novartis
12  performed some test that was not in the monograph
13  that detected the nitrosamines, correct?
14       MS. LOCKARD:  Objection.  Speculation.
15  Lacks foundation.  Outside of his opinions in the
16  class-certification report.
17       THE WITNESS:  I think what I was trying to
18  say is that when Novartis released its Diovan into
19  the U.S. market, it would try to make sure it
20  conformed to the USP valsartan and valsartan
21  drug-product monographs.  Those monographs, as I
22  have already said, apply to brand and generic
23  manufacturers.
24       Now, speaking hypothetically, any company,
25  including Novartis, could do any kind of testing it

Page 152

1  wanted on another product for a myriad of reasons,
2  but I just don't have any information about what
3  Novartis was doing with the ZHP product.
4  BY MR. STANOCH:
5    Q.  You look on the next page, on 65, sir.
6  Tell me when you are there.
7    A.  Yes.  Top of the page?
8    Q.  Yes.  It reads, "USP General Chapters for
9  Impurities: <476> & <1086>"?
10    A.  Yes, I do see that.
11    Q.  And these are examples of general chapters
12  in the USP that would be part of so-called
13  compendial requirements, correct?
14    A.  Yes.  I think we have alluded to this
15  before in our prior discussion.
16    Q.  Thank you.  You can put that aside for
17  now.
18       I'm going to mark the next exhibit.  Stand
19  by, sir.
20       (Whereupon, Exhibit 9 was marked for
21  identification.)
22  BY MR. STANOCH:
23    Q.  This will be Exhibit 9.  It's Tab 13 in
24  your binder, sir.  Tell me when you are there.
25    A.  Okay.  I'm seeing it.  It, again, is a USP

Page 153

1  document.
2    Q.  Correct.
3    A.  "Overview of" -- "General Chapters <476>
4  and <1086>."
5    Q.  Yes, sir.  And the date on that document?
6    A.  Another visual acuity test.  I don't
7  see --
8    Q.  I see October 19th, 2017, right on the
9  title page.
10    A.  Oh, right, yeah.  Right.  Thank you.
11    Q.  Is that right?
12    A.  Yes, exactly, thank you.
13    Q.  Oh, good.  No problem.  And have you seen
14  this -- actually -- strike that.
15       Have you seen the last exhibit prior to
16  today, sir?
17    A.  No, I haven't, nor this one.
18    Q.  Thank you.  Okay.  So let's flip to page
19  13, sir.  Tell me when you are there.
20    A.  And where will I see the page numbers?
21    Q.  It's the lower right of the pages.
22  The title is, "Manufacturers responsibilities in
23  <1086> and <476>."
24    A.  Okay.  I'm there.  I see it.
25    Q.  Okay.  In this slide in the USP

Confidential Information - Subject to Protective Order

Page 154

1 presentation, sets forth what it says are
2 "Manufacturer's Responsibilities in General Chapter
3 <1086>" and "Manufacturer's Responsibilities in
4 General Chapter <476>." Do you see that?
5     A.   I do see that.
6     Q.   And then why don't you read that first
7 bullet that begins, "If a new impurity"?
8     A.   "If a new impurity is detected above the
9 appropriate identification threshold or when the
10 level of a specified related compound increases as
11 compared to its characteristic impurity profile, the
12 manufacturer is responsible for evaluating the
13 impact on the safety and efficacy of the drug
14 substance or drug product."
15        Shall I continue?
16     Q.   Do you agree with that -- no, why don't
17 you -- just that bullet.  Do you agree with that
18 statement, sir?
19     A.   Yes, I do.
20     Q.   Okay.  Why don't you read the second
21 bullet.
22     A.   "For marketed products, the manufacturers
23 are responsible for controlling organic impurities
24 in accordance with current regulatory standards."
25     Q.   Do you agree with that statement, sir?

Page 155

1     A.   I do.
2     Q.   Could you read the next one under the
3 subheading "Manufacturer's Responsibilities in
4 General Chapter <476>"?
5     A.   The first bullet?
6     Q.   Yes, sir.
7     A.   "If an individual monograph is inadequate
8 to control does not include a procedure for
9 qualifying an impurity or acceptance criterion for
10 an observed impurity, the manufacturer is
11 responsible for developing and validating
12 appropriate analytical procedures and establishing
13 appropriate acceptance criteria."
14     Q.   Do you agree with that statement, sir?
15     A.   Yes, it seems -- I can agree with it.
16     Q.   Could you kindly read the next one, sir?
17     A.   "Manufacturers shall validate or verify,
18 as appropriate analytical procedures must
19 demonstrate their suitability for detection and
20 quantification of impurities in the drug substances
21 and drug products."
22     Q.   Thank you.
23     A.   "Manufacturers shall develop" -- oh, I'm
24 sorry.  I went on.
25     Q.   That's fine.  Let's just stop there at

Page 156

1 that statement you just read.  Do you agree with
2 that statement, sir?
3     A.   I do agree with it.
4     Q.   And could you read the final bullet, sir?
5     A.   Right.  "Manufacturers shall develop
6 acceptance criteria for impurities justified by
7 appropriate safety considerations and consistent
8 with current applicable regulatory guidances."
9     Q.   Do you agree with that statement as well,
10 sir?
11     A.   I do.
12     Q.   Okay.  Thank you.  Let's put that aside
13 for now.  Stand by for the next exhibit.
14        (Whereupon, Exhibit 10 was marked for
15 identification.)
16 BY MR. STANOCH:
17     Q.   I am marking Exhibit 10.  Sir, that should
18 be Tab 14 in your binder.  Let me know when you are
19 there.
20     A.   Yes, I'm there.
21     Q.   Okay.  This is a slide deck from the FDA.
22 You see that, sir?
23     A.   I do.  Dated October 2, 2020.
24     Q.   Correct.  And you see the two names of the
25 presenters there, Dr. -- is it Keire and Dr. Lu?

Page 157

1     A.   I do see those names.
2     Q.   Did you work with them when you were at
3 the FDA?
4     A.   I don't recognize these names.
5     Q.   Quite all right.  And have you seen this
6 slide presentation before, sir?
7     A.   No, I haven't.
8     Q.   Let's turn to page 3.  Tell me when you
9 are there.
10     A.   Is this the one that states,
11 "Pharmaceutical Quality"?
12     Q.   Yes, sir.
13     A.   Yes, I'm there.
14     Q.   It states, "A quality product of any kind
15 consistently meets the expectations of the user,"
16 correct?
17     A.   Yes, I see that.
18     Q.   And then flip to the next slide.  You
19 there?
20     A.   Yes.
21     Q.   Now it says, "A quality product of any
22 kind consistently meets the expectations of the
23 user.  Drugs are no different," correct?
24     A.   I see that.
25     Q.   Do you agree with that characterization of

Confidential Information - Subject to Protective Order

Page 158

1 pharmaceutical quality?
2          MS. LOCKARD: Objection. Outside the
3 scope of his class-certification opinions. Vague.
4          THE WITNESS: I don't want to debate what
5 the FDA is saying here, but I will say that users,
6 sometimes including me, can be very uninformed about
7 what the expectation for a product should be. But I
8 don't want to debate it. You know, I certainly can
9 agree with it generally.
10 BY MR. STANOCH:
11     Q. Understood. And would you agree, though,
12 that users of a drug have no way of knowing if the
13 drug contains nitrosamines absent the disclosure by
14 the manufacturer or regulator?
15          MS. LOCKARD: Objection. Speculation.
16 Vague.
17          THE WITNESS: Yes, some kind of
18 disclosure. And I think you were more specific
19 about what I was trying to say. It's very hard for
20 a user to understand what the quality expectations
21 of a medicine are.
22 BY MR. STANOCH:
23     Q. Uh-huh. And you can flip to the next page
24 of the slide, sir.
25     A. "Patients expect safe and effective"?

Page 159

1     Q. Yes. Just read the sentence for me.
2     A. "Patients expect safe and effective
3 medicines with every dose they take."
4     Q. As a general matter do you agree with
5 that?
6          MS. LOCKARD: Objection. Calls for
7 speculation. Vague.
8          THE WITNESS: Yeah, and it's very hard for
9 me to know what patients really expect, but I
10 certainly don't disagree generally with the
11 statement.
12 BY MR. STANOCH:
13     Q. Uh-huh. And then let's flip to the next
14 page, sir.
15     A. "Assuring every dose is safe"?
16     Q. Yeah. Why don't you just read that whole
17 statement there on the slide?
18     A. "Pharmaceutical quality is assuring every
19 dose is safe and effective, free of contamination
20 and defects."
21     Q. Uh-huh. Do you generally agree with that
22 statement?
23     A. Yeah, I don't see anything specifically
24 objectionable.
25     Q. Uh-huh. And if you can flip to page 9,

Page 160

1 sir. You can tell me when you are there.
2     A. Oh, wait. Okay. Yes, I'm on 9.
3     Q. And here we see reference to the ICH M7
4 guidance again?
5     A. Yes, I do. Yes, exactly.
6     Q. And again, there is reference to the
7 nitroso compounds being part of a cohort of concern,
8 right?
9     A. Yes, I see that.
10     Q. I think we established earlier, but you
11 can correct me if I'm wrong, that we agree that the
12 ICH M7 includes nitroso compounds in the so-called
13 cohort of concern, right?
14          MS. LOCKARD: Objection. Asked and
15 answered. Outside the scope of his deposition.
16          THE WITNESS: Yes. And this is a very
17 general statement, but I see nothing to disagree
18 with.
19 BY MR. STANOCH:
20     Q. Go back to the slide we were looking at
21 prior to this, the pharmaceutical quality slide.
22     A. "Pharmaceutical quality is assuring every
23 dose"?
24     Q. Yes, sir.
25     A. I'm there, Mr. Stanoch.

Page 161

1     Q. Very good. Do you believe a valsartan
2 drug that contained nitrosamines was safe and
3 effective and free of contamination and defects?
4          MS. LOCKARD: Objection. Outside the
5 scope of his expert opinion for class certification.
6          THE WITNESS: I'm sorry. Could you say
7 the question again, Mr. Stanoch?
8 BY MR. STANOCH:
9     Q. Do you believe a valsartan drug that
10 contained nitrosamines was safe and effective and
11 free of contamination and defects?
12          MS. LOCKARD: Same objection. And vague.
13          THE WITNESS: Yeah. Speaking separate
14 from my report, I think it's possible it could be
15 free of contamination and defects, so I guess I'm
16 answering yes to your question.
17 BY MR. STANOCH:
18     Q. And you opine that a, you know, recall is
19 taken by companies to remove defective products in
20 the market, correct?
21     A. Yes. I would say that's the general
22 purpose of a recall.
23     Q. Uh-huh. Right. And so when Teva
24 instituted its recalls for its valsartan products,
25 it was removing defective drug product from the

Confidential Information - Subject to Protective Order

Page 162

1  market, correct?
2      MS. LOCKARD: Objection. Outside the
3  scope of his opinion. Also vague and speculation.
4  Asking him to give legal opinion.
5  BY MR. STANOCH:
6      Q. I'm reading from your report, sir. There
7  is no speculation.
8      A. Yeah, I would say Teva recalled its
9  valsartan-containing drug products because of
10 nitrosamine contamination.
11     Q. Right. And that contamination is what
12 rendered them defective, making the voluntary recall
13 action appropriate?
14     A. Well, but what --
15     MS. LOCKARD: Same objections.
16     THE WITNESS: The way I would say it, it
17 was -- I'm hesitating on the word "contamination."
18 The nitrosamines could be there within acceptable
19 limits. When -- but working with FDA, Teva recalled
20 even though the limits hadn't been set. I'm trying
21 to be specific in terms of what my report says.
22 BY MR. STANOCH:
23     Q. Okay. And so let's slightly rephrase
24 that, then, to see if we get on the same page. You
25 write -- and you can look at Paragraph 69 of your

Page 163

1  report if you would like -- "A recall is a voluntary
2  action taken by a company to remove a defective drug
3  product from the market"; is that right?
4      A. All right. I'm going to my report.
5      Q. Of course.
6      A. Paragraph 69.
7      Yes, I'm reading from my report, and I see
8  where you are reading, Mr. Stanoch.
9      Q. And you characterize elsewhere in your
10 report that Teva's recalls of its valsartan products
11 were voluntary, that's what you say, right?
12     A. Right, right.
13     Q. And the defect behind the Teva voluntary
14 recalls of its valsartan products were the
15 nitrosamine impurities; is that right?
16     MS. LOCKARD: Objection. Vague. Outside
17 of the scope of his report.
18     THE WITNESS: Well, the way I would say it
19 is FDA and Teva working together agreed that the
20 levels of nitrosamine impurities were unacceptable.
21 But I have also alluded in my report that it was
22 unusual because neither FDA nor Teva at the time had
23 a specific limit as to what was unacceptable.
24     But I don't think I'm debating you,
25 Mr. Stanoch. Let me agree that the recall was

Page 164

1  because of a defective product.
2  BY MR. STANOCH:
3      Q. And is it your understanding that Teva
4  recalled all of its valsartan-containing drug
5  products in the summer of 2018?
6      A. No. No. I think there was -- the recalls
7  in summer of 2018 were for the valsartan drug
8  products using ZHP drug substance. And then, based
9  on further information that came in over the fall,
10 FDA recalled its valsartan drug products containing
11 the Mylan product.
12     Q. Right. Were you aware that Teva initially
13 instituted a hold on the marketing of all its
14 valsartan finished-dose products when it heard from
15 ZHP in late June 2018?
16     A. Yes. I think I am aware of that, and I
17 think that's one of the documents -- there are two
18 documents I cite in that regard.
19     Q. That is correct. And then shortly after
20 its hold, Teva lifted its hold on valsartan
21 finished-dose made with non-ZHP API, correct?
22     A. Yes, I think you are stating it correctly,
23 because Teva had no reason to think that it had
24 objectionable nitrosamine impurity levels.
25     Q. Right. And I'm going to put up a document

Page 165

1  just to help us with the timeline. Stand by,
2  Doctor.
3      This will be Teva Exhibit 11. It should
4  be Tab 24 in your binder, sir. Let me know when you
5  are there.
6      (Whereupon, Exhibit 11 was marked for
7  identification.)
8      THE WITNESS: Should I put away the FDA
9  overview exhibit?
10 BY MR. STANOCH:
11     Q. Yes.
12     A. Yes, I see this lift of hold dated July 6,
13 2018.
14     Q. Very good. So this document appears to be
15 a Teva memo dated July 6, 2018, about lifting hold
16 status for certain valsartan products, correct?
17     A. Yes.
18     Q. And so sometime prior to this Teva, as we
19 talked about, instituted a hold on all of its
20 valsartan products, right?
21     A. Yes.
22     Q. Right. And then as of July 6, 2018, Teva,
23 it appears, lifted its hold on valsartan
24 finished-dose products that used non-ZHP valsartan
25 API, correct?

Page 166

1    A.  Yes, I agree.

2    Q.  Uh-huh.  And it looks like Teva had been

3 using valsartan API from Jubilant as well, correct?

4    A.  I would --

5        MS. LOCKARD:  Objection.  Speculation.

6 Foundation.

7 BY MR. STANOCH:

8    Q.  You can look at the document, Doctor.

9    A.  I see the document.  I wasn't aware of

10 the Teva valsartan products used Jubilant drug

11 substance.

12    Q.  Oh, I see.  You also see that Teva lifted

13 the hold on valsartan products as of July 6, 2018,

14 that contained API from Mylan, correct?

15    A.  Yes, I do see that.

16    Q.  Okay.  I think you alluded to that a few

17 questions ago, that you understood that Teva had

18 used Mylan API for some valsartan products sold in

19 the U.S., right?

20    A.  Yes, particularly the -- I'm trying to

21 think.  These were the ones made in the Jerusalem

22 facility.

23    Q.  I would agree with that, sir, yes.  I

24 think we're on the same page.

25        Are you aware of any testing that Teva did

Page 167

1 of its own finished dose that -- just let me start

2 over.

3        Are you aware of any testing that Teva did

4 of its own finished dose that contained API from

5 Mylan prior to its lifting the hold?

6        MS. LOCKARD:  Objection.  Vague.

7        THE WITNESS:  I am not.

8 BY MR. STANOCH:

9    Q.  Are you aware of whether Mylan tested

10 valsartan API that it was selling to Teva prior to

11 Teva's lifting its hold?

12    A.  You know, I have a feeling that there may

13 be some documentation in the materials considered,

14 but I'm not aware of it and I didn't cite it in my

15 report.

16    Q.  Did Teva ever test its own valsartan

17 finished dose that contained API from Mylan prior to

18 Teva's recalling that product later in 2018?

19        MS. LOCKARD:  Objection.  Vague.

20        THE WITNESS:  I just can't say.  I didn't

21 cite it in my report, so I don't know.

22 BY MR. STANOCH:

23    Q.  Do you know when, if at all, Mylan tested

24 valsartan API it was selling to Teva for

25 nitrosamines after this July 6, 2018, hold memo?

Page 168

1    A.  Well, my understanding of the sequence of

2 events is Mylan was saying it couldn't be in their

3 drug substance for valsartan, but Swissmedic did

4 some testing, and that's when Teva became aware that

5 there could be NDEA in the Mylan drug substance.

6 And that went to Teva's recall in November of 2018.

7    Q.  Uh-huh.  Was it appropriate for Teva to

8 lift its hold on products without testing it?

9        MS. LOCKARD:  Objection.  Outside the

10 scope of his class-certification report.

11        THE WITNESS:  Well, I don't know that they

12 didn't test it, so I can't respond to that question.

13 BY MR. STANOCH:

14    Q.  Uh-huh.  Are you aware of whether tests

15 had been developed after June 2018 to detect

16 nitrosamines?

17    A.  Well, the FDA was working on tests, and I

18 think Teva was as well.  And I think Teva's test

19 didn't come along -- online until later, but I don't

20 have those facts readily available now.

21    Q.  Right.  Right.  Are you aware that, at the

22 very least, the FDA announced in the summer of 2018

23 that it had found NDEA in a different manufacturer,

24 Torrent's valsartan products?

25    A.  I am actually not aware of that.

Page 169

1    Q.  Uh-huh.  And I can certainly pull up the

2 notice, but the FDA said that Torrent products were

3 included in the company's recall in August 23rd,

4 2018.  Were you aware of that?

5    A.  I'm sure I looked at it, but I'm not

6 specifically aware of it until you mention it now,

7 Mr. Stanoch.

8    Q.  Uh-huh.  You would agree, then, that if

9 the FDA was testing and finding NDEA in a different

10 manufacturer's product, there were testing methods

11 available to determine NDEA by August 2018, correct?

12        MS. LOCKARD:  Objection.  Speculation.

13 Vague.  And outside the scope of his report.

14        THE WITNESS:  Yeah, I just don't have

15 information to answer the question.

16 BY MR. STANOCH:

17    Q.  Uh-huh.  Can you say one way or the other

18 whether Teva ever tested any of its own product for

19 NDEA prior to its November 2018 recalls?

20    A.  I am sure that information exists, but I

21 don't have it -- I didn't cite it in my report and I

22 didn't comment, and so I can't answer.

23    Q.  Okay.  That's outside the scope of this

24 report; is that fair?

25    A.  But I would be guessing just because I

Confidential Information - Subject to Protective Order

1 don't have the information readily available.
2    Q.   That's a little different.  One is if you
3 want the information, you can look at it in your
4 report; but if you are not opining on it at this
5 time, then you have no opinion at this time, sir.
6 So which is it?
7    A.   I think the way you said it second.  I
8 have no opinion at this time is a good way to state
9 it.
10    Q.   Very well, sir.  We don't need to belabor
11 it.  Thank you.
12        Now, is it appropriate for a drug
13 manufacturer to not test its drug for nitrosamines
14 after being asked to do so by regulators?
15        MS. LOCKARD:  Objection.  That's a
16 liability question, and it's outside the scope of
17 his class-certification report.  Also incomplete
18 hypothetical, vague.
19        THE WITNESS:  Do I answer?
20        MS. LOCKARD:  If you are able to.
21        THE WITNESS:  You know, I would generally
22 say the answer to your question is no, it's not
23 appropriate.
24 BY MR. STANOCH:
25    Q.   Are you aware of whether Teva ever tested

1 its valsartan product for any nitrosamines after
2 receiving a request from any regulator to do so?
3    A.   Well, I know they did test their
4 nitrosamine -- I'm sorry, their valsartan-containing
5 drug products at FDA's request, and they provided
6 FDA with that information.
7    Q.   And that was for NDMA, those tests, I
8 think, right?
9    A.   I agree, it was for NDMA, and I can't say
10 whether it was for NDEA.
11    Q.   Okay.  If a finished-dose customer asked
12 Teva, do your products contain NDEA, would it be
13 appropriate for Teva to conduct that testing and see
14 if NDEA is in the products?
15        MS. LOCKARD:  Objection.  Confusing.
16 Vague.
17        THE WITNESS:  Well, I would say if Teva
18 had reason to believe that there was no NDEA in
19 their valsartan products, Teva would refuse.  I
20 mean, it might be a very big deal to do that kind of
21 testing.
22 BY MR. STANOCH:
23    Q.   Uh-huh.
24    A.   So I would say it's not appropriate.
25    Q.   Uh-huh.  And what information would you

1 need to have reason to believe you may need to test
2 your product for NDEA?
3    A.   Well, I think in the particular example,
4 Mylan was saying they had reason to believe that
5 there was no possibility of NDEA being in their drug
6 substance.
7    Q.   Uh-huh.
8    A.   And Teva could look at the other
9 ingredients in the manufacturing process and
10 conclude that there was no reason to test --
11    Q.   Uh-huh.
12    A.   -- and that it could be in the market.
13 And I think that's what this memo speaks to.
14    Q.   Okay.  Did Teva, to your knowledge, in
15 fact, look at the Mylan manufacturing process to
16 determine whether or not NDEA could arise?
17        MS. LOCKARD:  Objection.  Vague.  Outside
18 the scope.
19        THE WITNESS:  I can't say I can speak to
20 that, Mr. Stanoch.  My belief is they did.  They
21 were working with Mylan to get the needed
22 information.  But I don't have specific documents to
23 support that view.
24 BY MR. STANOCH:
25    Q.   Uh-huh.  If we go back to the exhibit we

1 were looking at a moment ago, the lift hold status
2 memo; do you have that still, sir?
3    A.   Yes, I'm looking at it.  July 6, 2018?
4    Q.   Uh-huh.  Right.  And it states that,
5 "Mylan confirmed via e-mail to not have received any
6 intermediates from Huahai."  Do you see that?
7    A.   I do see that.
8    Q.   And further, so that -- strike that.
9        So that was one basis for Teva's lifting
10 the hold of the Mylan API product, right?
11    A.   Yes.  And you can see in the last bullet
12 on the thing where Teva's concluding possibility for
13 NDMA impurity is negligible.  I don't think the
14 focus was on NDEA just yet.
15    Q.   Uh-huh.  Right.  At the time Teva lifted
16 its hold, it wasn't even discussing, at least in
17 this memo, anything about NDEA, right?
18    A.   Right.  And I think that was the case for
19 FDA.  The concern about NDEA came later, after NDMA.
20    Q.   Uh-huh.  And what is your understanding of
21 the route of how nitrosamines came to be in Mylan's
22 valsartan API?
23    A.   I have seen a description of it, and I
24 think I have even seen statements from Mylan saying
25 that the process was such that nitrosamines couldn't

Confidential Information - Subject to Protective Order

Page 174

1  be formed. But beyond that, I don't have any
2  specific information now.
3      Q.  I mean, do you understand that it was an
4  issue relating to the residual solvents that Mylan
5  was using in the valsartan API manufacturing
6  process?
7      A.  Yes, I do understand that, and that
8  relates to FDA's inspection of Lantech and a warning
9  letter to Lantech about failure to look for the
10  nitrosamine impurity.
11     Q.  You are aware that Lantech was the vendor
12  that was managing the solvent recovery process for
13  Mylan when Mylan was making valsartan API for Teva,
14  right?
15     A.  Yes, I am aware of that.
16     Q.  Uh-huh. And you understand that Lantech
17  was faulted by the FDA for the manner in which it
18  managed the solvent recovery process for Mylan,
19  right?
20     A.  Yes, I had that general understanding.
21     Q.  And that was the root cause for the NDEA
22  contamination of Mylan's valsartan API, right?
23     A.  That's my understanding as well.
24     Q.  Did Teva know that Mylan was using a
25  solvent-recovery vendor in the manufacture of

Page 175

1  valsartan API?
2      A.  I don't know that. I couldn't answer that
3  question.
4      Q.  All right. Sitting here today, can you
5  recall anything you saw suggesting that Teva ever
6  asked Mylan if Mylan was using a vendor for the
7  solvent recovery process in the manufacture of
8  valsartan API?
9      A.  I can't answer that. I don't have that
10  information.
11     Q.  Uh-huh. Did Teva know that Mylan was
12  using recycled solvents at all in the manufacture of
13  valsartan API?
14     A.  I can't say what Teva knew or didn't know.
15     Q.  Sitting here today, can you tell me
16  anything you saw suggesting, even, that Teva knew
17  that Mylan was using recycled solvents in the
18  manufacture of valsartan API?
19     A.  I think there is information about it, but
20  I don't have it and I can't comment.
21     Q.  Uh-huh. Right. You can't elaborate any
22  more on that, can you?
23     A.  No.
24     Q.  Right. Shouldn't Teva, as the
25  finished-dose manufacturer, understand whether or

Page 176

1  not its API supplier was using recycled solvents in
2  the valsartan API manufacturing process?
3          MS. LOCKARD: Objection. Lacks
4  foundation. Outside the scope of his report.
5          THE WITNESS: You know, well, one of the
6  ways I might answer that question is that the DMF
7  system might preclude Teva from knowing because the
8  processes of the DMF may be secret between Mylan and
9  Teva.
10  BY MR. STANOCH:
11     Q.  Well, do you see anything suggesting that
12  Teva ever asked Mylan about whether it was using
13  recycled solvents?
14     A.  I don't recall seeing any information to
15  that point.
16     Q.  Do you recall looking at anything
17  suggesting that Teva ever asked to see Mylan's DMF
18  for valsartan API?
19          MS. LOCKARD: Objection. Asked and
20  answered. It's outside the scope.
21          THE WITNESS: No, it wasn't a focus of my
22  report, and I don't recall seeing it.
23  BY MR. STANOCH:
24     Q.  Do you agree that the "Residual Solvents"
25  chapter of the USP would be part of the chapters and

Page 177

1  notices which manufacturers should take into account
2  when they are manufacturing their own finished-dose
3  valsartan?
4          MS. LOCKARD: Objection. Vague.
5          THE WITNESS: I think "Residual Solvents"
6  is an ICH document that is important to
7  manufacturers as a recommendation, so I think I
8  would answer that yes.
9  BY MR. STANOCH:
10     Q.  Uh-huh. Do you know whether Teva adhered
11  to the USP "Residual Solvents" Chapter 467 in
12  assessing the valsartan API it purchased from Mylan?
13     A.  I think my understanding would be that in
14  the certificate of analysis for valsartan, there may
15  be a test for residual solvents. And we could
16  certainly look at that.
17     Q.  Well, you looked at a number of
18  certificates, I believe, listed in your materials
19  considered, right?
20     A.  No. That doesn't mean I looked at them.
21  They are listed in my materials considered, but they
22  weren't important to my report and I didn't cite
23  them.
24     Q.  Fair enough. Can you say sitting here
25  today whether you saw any mention of the use of

Confidential Information - Subject to Protective Order

Page 178

1  recycled solvents by Mylan in the manufacture of
2  valsartan API?
3      A.  No, I didn't see anything about recycled
4  solvents.
5      Q.  And a moment ago you were talking about
6  the potential confidentiality of DMFs.  Do you
7  remember that?
8      A.  I do.
9      Q.  Is the mere existence of a third-party
10  vendor secret?
11      MS. LOCKARD:  Objection.  Foundation.
12  Speculation.
13      THE WITNESS:  I don't quite understand.
14  Secret from whom?
15  BY MR. STANOCH:
16      Q.  Does the fact that Mylan was using a
17  third-party vendor, Lantech, to manage the solvent
18  recovery process for valsartan API -- strike that.
19      You were suggesting, were you not, that
20  some of Mylan's DMF might have been confidential and
21  not shareable with Teva, right?
22      A.  Right, right.
23      Q.  Right.  So is it your position, sir, that
24  the mere fact that Mylan was using a third-party
25  vendor at all for the solvent recovery process was

Page 179

1  something that would be confidential and not
2  shareable with Teva?
3      A.  Well, it could be.  I just don't know what
4  Mylan wanted to keep confidential in the DMF.
5      Q.  Uh-huh.  And if -- oh.
6      A.  And again, remember, typically what you
7  see in the DMF for the purchaser, in this case,
8  Teva, is the certificate of analysis, the
9  specification for the drug substance.
10      Q.  And again, those certificates and
11  analysis, to the extent you recall sitting here
12  today, made no mention of the use of recycled
13  solvents?
14      A.  It may have a specification for residual
15  solvents.  We would have to look at one to see.  But
16  I don't think that necessarily would tell anything
17  about whether the solvents were recycled or not.
18      Q.  Uh-huh.  And one way Teva could have had
19  additional information about Lantech would be if it
20  had a quality agreement in place with Mylan,
21  correct?
22      MS. LOCKARD:  Objection.  Speculation.
23      THE WITNESS:  You know, quality agreements
24  may relate to contract manufacturers, but for both
25  ZHP and Mylan, these are not contract manufacturers.

Page 180

1  These are sellers of a drug substance that Teva
2  purchased.
3  BY MR. STANOCH:
4      Q.  Uh-huh.  So it's your position that -- oh,
5  strike that.
6      Would it surprise you to know that Mylan
7  was contracting with a third-party vendor in India
8  who had never been inspected by the FDA?
9      A.  No, it wouldn't surprise me.
10      Q.  And do you think Teva would have any issue
11  if it learned that Mylan was contracting with a
12  third-party vendor in India who had never been
13  inspected by the FDA?
14      MS. LOCKARD:  Objection --
15      MR. STOY:  Frank Stoy for Mylan.  I am
16  just going to object to the form of the question.
17      (Reporter clarification.)
18      MR. STOY:  Yes, I just stated an objection
19  to the form of the question.  Thank you.
20      MS. LOCKARD:  I objected as well as vague.
21  And calls for speculation.
22      THE WITNESS:  But I feel like I'm losing
23  Mr. Stanoch.
24  BY MR. STANOCH:
25      Q.  Can you hear me, sir?

Page 181

1      A.  Yeah, now I can hear you clearly.
2      Q.  I will repeat the --
3      A.  Can you repeat --
4      Q.  I would love to because of the
5  interference -- I don't mean that pejoratively --
6  from defense counsel.
7      Sir, do you think Teva would have an issue
8  if it learned that Mylan was using a third-party
9  vendor in India who had never been inspected by the
10  FDA to manage the solvent recovery process?
11      MS. LOCKARD:  Same objection.
12      THE WITNESS:  I can't really speculate
13  what Teva would think about it.  It doesn't seem to
14  me a big issue whether there is or is not an FDA
15  inspection.
16  BY MR. STANOCH:
17      Q.  It's not a big issue if Teva was buying
18  valsartan API from Mylan where Mylan was using a
19  third-party vendor not disclosed to Teva who had
20  never been inspected by the FDA; is that your
21  testimony?
22      A.  I'm not really an expert on solvent
23  recovery processes, but my understanding is that
24  many companies use them.  It's not unusual.  And to
25  me it might be part of the DMF that Mylan would want

Page 182

1  to keep confidential.
2        And then the issue of an FDA inspection
3  is -- to tell you the truth, Mr. Stanoch, when I saw
4  that FDA had inspected Lantech, this was the first
5  time I had ever heard of FDA inspecting a
6  solvent-recovery manufacturer.
7     Q.  Uh-huh.  And that happened after news of
8  the nitrosamines broke in 2018, though, right?
9     A.  Yes, that's when the inspection occurred
10 for Lantech.
11    Q.  Right.  And Teva never inspected Lantech
12 prior to 2018, did it?
13    A.  I don't know that.
14    Q.  Right.  And did you see anything in any of
15 the documents you reviewed suggesting that Teva ever
16 inspected Lantech prior to 2018?
17    A.  No, I didn't see anything like that.
18    Q.  And you never saw anything even suggesting
19 Teva knew who Lantech was prior to 2018, correct?
20    A.  I never saw anything to that point.
21    Q.  Would it surprise you to know that Mylan
22 was also using Lantech to do second-crop harvesting
23 of valsartan API?
24        MS. LOCKARD:  Objection.  Foundation.
25 Speculation.  Outside the scope of his report.

Page 183

1        THE WITNESS:  I don't understand the
2  question and I have no information to answer it.
3  BY MR. STANOCH:
4     Q.  Uh-huh.  Teva could not make its
5  assessment about the recycled-solvent process
6  without knowing anything about it, correct?
7        MS. LOCKARD:  Objection.  Vague.
8        THE WITNESS:  That seems like a generally
9  true statement, so I can agree.
10 BY MR. STANOCH:
11    Q.  Uh-huh.  And absent a contractual
12 arrangement that would obligate Mylan to disclose
13 that information, Mylan didn't have to disclose it
14 to Teva; is that your statement?
15    A.  No, I'm not making that statement.
16    Q.  Uh-huh.  If there was a contract between
17 Mylan and Teva that governed disclosure of the
18 processes and entities involved in the valsartan API
19 manufacturing process, Teva could have learned about
20 Lantech prior to all the recalls in 2018, right?
21        MS. LOCKARD:  Objection.  Speculation.
22 Foundation.  Outside the scope of his
23 class-certification opinions.
24        THE WITNESS:  Yeah, I would have to
25 speculate on that.  I just have no information to

Page 184

1  support an answer.
2  BY MR. STANOCH:
3     Q.  Okay.  Wouldn't a contract between Mylan
4  and Teva allow those two firms to exchange
5  confidential information?
6        MS. LOCKARD:  Objection.  Speculation.
7  Outside the scope.
8        THE WITNESS:  I could imagine a contract
9  that would support that kind of exchange of
10 information.
11 BY MR. STANOCH:
12    Q.  Right.
13    A.  But it can occur without a contract.
14    Q.  It certainly could, but that exchange did
15 not occur here between Teva and Mylan about the
16 recycled solvents and Lantech, did it?
17    A.  I just have no information to that point,
18 but if that's what you say, I certainly wouldn't
19 debate you.
20    Q.  And you would agree, though, that Teva
21 could have contractually required Mylan to disclose
22 information about the solvent recovery process,
23 correct?
24        MS. LOCKARD:  Objection.  Speculation.
25 Outside the scope.

Page 185

1        THE WITNESS:  Yeah, again, everything you
2  are asking me, I would be required to speculate
3  because I just don't have the information.
4  BY MR. STANOCH:
5     Q.  Do you know whether Teva ever performed a
6  residual solvent analysis with respect to Mylan
7  valsartan API?
8     A.  I do not.
9     Q.  Do you know whether Mylan itself ever
10 conducted a residual solvent analysis for the
11 valsartan API it made?
12    A.  I do not know that.
13    Q.  Uh-huh.  Did Teva ever ask to audit
14 Lantech?
15    A.  Not that I'm aware of.
16    Q.  Right.  Teva didn't even know who Lantech
17 was, right?
18    A.  I don't know that.
19    Q.  Do you have any information suggesting
20 that Teva knew about Lantech and its role in the
21 Mylan valsartan API manufacturing process prior to
22 the recalls?
23        MS. LOCKARD:  Objection.  Speculation.
24 Foundation.  Outside the scope.
25        THE WITNESS:  I just don't know, and it

Page 186

1  wasn't pertinent to my report.
2  BY MR. STANOCH:
3      Q.   Uh-huh.  Are you aware of any evidence
4  that Teva ever reviewed ZHP's route of synthesis for
5  valsartan API prior to the 2018 recalls?
6          MS. LOCKARD:  Outside the scope.
7  Objection.
8          THE WITNESS:  Well, I think if we look at
9  the Watson CBE-30s -- Watson, of course, is a
10  predecessor company to Teva -- there was information
11  about the route of synthesis and the synthesis
12  change.
13  BY MR. STANOCH:
14      Q.   You are talking about the ZHP process
15  change, correct?
16      A.   Yes.
17      Q.   Right.  And regarding that, ZHP was
18  changing its manufacturing process for valsartan API
19  that it was selling to, at the time, Actavis,
20  correct?
21      A.   I would say Watson, but they were all
22  predecessor companies to Teva.
23      Q.   That's fine.  We can agree that Watson was
24  a predecessor to Actavis and then Actavis was a
25  predecessor to current Teva, right?

Page 187

1      A.   Yes, that sounds right.
2      Q.   Great.  So we can use -- we can understand
3  that as we go through.  So ZHP changed it
4  manufacturing process for the valsartan API it was
5  selling to Watson, right?
6      A.   Yes, that's correct.
7      Q.   And ZHP characterized that as a minor to
8  moderate change, correct?
9      A.   I would have to see the letters from
10  Watson to FDA, but I think you are correct.
11      Q.   And a minor to moderate process change
12  does not require preapproval from the FDA, does it?
13      A.   Well, I couldn't agree with that, because
14  Watson was asking for FDA approval, but they
15  submitted it as a CBE-30.
16      Q.   Right.  And a CBE-30, Change Being
17  Effected, does not technically require preapproval
18  by the FDA, correct?
19      A.   The way I would say it is FDA will always
20  come in and review it, but the change can be
21  implemented if FDA doesn't respond within 30 days.
22      Q.   Right.  A major process change requires a
23  different level of review by the FDA, correct?
24      A.   That would be called the postapproval
25  supplement.

Page 188

1      Q.   So the fact that Watson characterized the
2  ZHP process change as minor to moderate meant that
3  it could implement its change immediately if it
4  wanted, correct?
5      A.   Well, I would say the letter was the
6  CBE-30, so they would wait to hear from FDA and then
7  they could implement after 30 days.
8      Q.   Uh-huh.  And in that context of that
9  submission, did Watson, to your knowledge, review
10  ZHP's entire DMF?
11      A.   As far as I know, they did not.
12      Q.   All right.  Did Watson, Actavis, or Teva,
13  to your knowledge, ever ask ZHP for a copy of ZHP's
14  DMF for valsartan API?
15      A.   As far as I know, they did not.
16      Q.   Nothing stopped any of them from
17  requesting that, correct?
18      A.   Well, I think it would be counter to the
19  way a DMF works, that it's a separate filing to the
20  agency.  So I would say Teva would not ask for it.
21      Q.   Well, that wasn't quite my question, so.
22  The question was that nothing stopped Teva or its
23  predecessor entities from asking ZHP for a copy of
24  the DMF for valsartan API, correct?
25      A.   I think you are correct.  I mean, the two

Page 189

1  companies could agree to completely share the
2  contents of the DMF.
3      Q.   Right.
4      A.   But typically a DMF is not shared with the
5  purchaser, such as Teva.
6      Q.   Uh-huh.  And the DMF was not shared in
7  this instance, as far as you know, with Teva or its
8  predecessor entities?
9          MS. LOCKARD:  Objection.  Asked and
10  answered.
11          THE WITNESS:  I have to say I just don't
12  know.  If I had to guess, I would say not.
13  BY MR. STANOCH:
14      Q.   Uh-huh.  To your knowledge, did Teva ever
15  ask ZHP to confirm that ZHP's valsartan API did not
16  contain any genotoxic substances?
17      A.   As far as I know, it was not an issue or a
18  basis for communication until the summer of 2018.
19      Q.   Nothing's prevented Teva from ever asking
20  ZHP to confirm that ZHP's valsartan API did not
21  contain any genotoxic substances, correct?
22      A.   Are you saying nothing prevented them?
23      Q.   Yes.  I'll restate it.  Nothing prevented
24  Teva from ever asking ZHP to confirm that ZHP's
25  valsartan API did not contain any genotoxic

Confidential - Information Subject to Protective Order

Page 190

1 substances, correct?

2    A.   Well, if it was expected, I suppose Teva
3 could certainly have asked, but it was unexpected.

4    Q.   Well, it was unexpected because ZHP said
5 so; isn't that right?

6        MS. LOCKARD:  Objection to form.

7        THE WITNESS:  No, the reason I say it was
8 unexpected, because FDA said so.

9 BY MR. STANOCH:

10    Q.   Well, FDA said it's unexpected because
11 that's how ZHP characterized it originally when it
12 was forced to break all this news in June 2018;
13 isn't that right?

14        MS. LOCKARD:  Objection to form.

15        MS. HILL:  Objection.  Argument.

16        THE WITNESS:  I just don't know that,
17 Mr. Stanoch.  If you know that, it's news to me.

18 BY MR. STANOCH:

19    Q.   Uh-huh.  Uh-huh.  Do you have any
20 information as to where FDA may have gotten the term
21 "unexpected" as to the nitrosamines found in
22 valsartan products?

23    A.   I don't.

24    Q.   And would it surprise you if it came
25 originally from ZHP?

Page 191

1        MS. LOCKARD:  Objection.  Speculation.
2 Foundation.

3        THE WITNESS:  Yeah, I just can't answer.
4 I don't know where it came from.

5 BY MR. STANOCH:

6    Q.   Uh-huh.  If ZHP told the world this
7 nitrosamine impurity was unexpected, but it had
8 information suggesting it knew a year earlier, would
9 that be important?

10        MS. LOCKARD:  Objection to form.

11        THE WITNESS:  I just have to speculate.  I
12 don't know when ZHP had its information.  It seemed
13 to me it was closer to the summer of 2018 time
14 frame.

15 BY MR. STANOCH:

16    Q.   Uh-huh.  Did you evaluate whether ZHP had
17 any information suggesting there may be nitrosamines
18 in its valsartan API prior to June 2018?

19    A.   I did not see any information to that
20 point.

21    Q.   Was that even part of your analysis for
22 purposes of your class-certification report?

23    A.   No.

24    Q.   Uh-huh.  In the context of your consulting
25 work, sir, would you advise a company to purchase

Page 192

1 API from ZHP?

2    A.   I think now they have resolved their
3 issues with FDA, as I understand it, that arose and
4 were summarized in the warning letter, and
5 everything is fine between FDA and the company.

6    Q.   Uh-huh.  So you would?

7    A.   Yes.

8    Q.   Uh-huh.  How about before 2018?

9        MS. LOCKARD:  Objection.  Vague.

10        THE WITNESS:  Well, I would say yes.  My
11 understanding is they had good FDA inspections, and
12 many companies get warning letters where things can
13 be resolved, and that's what happened for ZHP.

14 BY MR. STANOCH:

15    Q.   Uh-huh.  And it's important, then, to know
16 if your API supplier is receiving any adverse
17 inspections from the FDA, correct?

18    A.   That's a separate topic.  And -- is that a
19 question?  I'm sorry.

20    Q.   It's important to know if your API
21 supplier is receiving any adverse inspection
22 findings from the FDA, correct?

23    A.   I think it could be important, yes.

24    Q.   Okay.  Yes.  And a reasonable
25 pharmaceutical manufacturer would want to know if

Page 193

1 its API supplier is receiving adverse inspections
2 and findings from the FDA, correct?

3        MS. LOCKARD:  Objection.  Outside the
4 scope.  That's clearly a liability question.

5        THE WITNESS:  And I -- you know, there are
6 so many variables underlying your question.  I mean,
7 FDA may inspect and make a few observations that are
8 quickly resolved.  I'm not sure that needs to be
9 communicated to buyers.

10 BY MR. STANOCH:

11    Q.   Uh-huh.  If a manufacturer of
12 finished-dose product learns about an FDA inspection
13 and requests information about it from its API
14 supplier, would it be your expectation that the API
15 supplier would provide the information?

16        MS. LOCKARD:  Objection.  Speculation.
17 Foundation.  Incomplete hypothetical.

18        THE WITNESS:  Yes, and I just don't have
19 any basis to have an answer to that question.

20 BY MR. STANOCH:

21    Q.   Well, you consult pharmaceutical
22 manufacturers, don't you, sir?

23    A.   I would say now I am doing primarily
24 litigation, and I have never consulted on the type
25 of questions you are raising now.

Confidential Information - Subject to Protective Order

Page 194

1    Q.  Right, uh-huh.  Have you ever advised a
2  company that it's prudent for them to have all
3  available information about regulatory inspections
4  of their API supplier?
5    A.  I have not.
6    Q.  Uh-huh.  Are there ways for pharmaceutical
7  manufacturers to independently check on whether
8  their API suppliers have had adverse regulatory
9  findings?
10   A.  Well, certainly a warning letter is
11 public, so that could come to light independent of a
12 drug-substance manufacturer.
13   Q.  Uh-huh.  Are you aware of any processes
14 Teva had in place prior to June 2018 to monitor
15 whether its API suppliers were receiving adverse
16 findings from regulators?
17   A.  I am not.
18   Q.  Uh-huh.  And back to ZHP and Teva.  To
19 your knowledge, Teva never asked ZHP to confirm that
20 ZHP's valsartan API did not contain any genotoxic
21 substances, correct?
22       MS. LOCKARD:  Objection.  Asked and
23 answered.
24       THE WITNESS:  Yes, I am not aware of any
25 communication like that.

Page 195

1  BY MR. STANOCH:
2    Q.  Uh-huh.  Wouldn't it have been prudent for
3  Teva to request such a statement from ZHP regarding
4  the valsartan API?
5        MS. LOCKARD:  Objection.  Outside the
6  scope of his report.  It's liability opinion.
7        You are just -- I'm sorry, Mr. Stanoch,
8  but you have just completely disregarded any sort of
9  line, bright or not, between liability opinion and
10 his class-certification opinion.  I'm honestly at a
11 loss as to whether we need to suspend and call a
12 judge or meet and confer on this.
13       But, I mean, I hate to just keep objecting
14 to every question, but every question is, you know,
15 what would a prudent manufacturer do?  What would be
16 reasonable?  You know, what should they do?  Would
17 it be appropriate?  These are all liability
18 opinions.
19       MR. STANOCH:  Are you done, Counsel?
20       MS. LOCKARD:  No, because I'm having a
21 problem here.
22       MR. STANOCH:  Are you done, Counsel?
23       MS. LOCKARD:  No.  Do you want to go off
24 the record or you want to discuss it on the record?
25 What is your response?

Page 196

1        MR. STANOCH:  Counsel, I'm not debating
2  you now on the record.  I'm going to keep asking my
3  questions.  You are lodging your objections.  I'm
4  asking questions on the facts on which he is opining
5  about.  It's within the scope of his report.
6        He says a number of factual --
7        MS. LOCKARD:  I just want to --
8        MR. STANOCH:  Excuse me.  He makes a
9  number of statements about facts.  I'm entitled to
10 probe the facts as they relate to the opinions in
11 this report.
12       MS. LOCKARD:  You are not asking about
13 facts, though.  You are asking about his opinion as
14 to whether something is reasonable, prudent,
15 appropriate, and those are the questions that I'm
16 objecting to.  Now, I understand --
17       MR. STANOCH:  You have stated your
18 objections.
19       MS. LOCKARD:  -- you are going to keep
20 asking, but we're going to move to strike all this
21 testimony and you are not going to be able to come
22 back and ask him or anyone else these questions.
23       MR. STANOCH:  Well, I disagree with that.
24 I'm asking him questions relating to the facts and
25 the opinions in this report.  And we will keep

Page 197

1  going.
2        MS. LOCKARD:  Well, this will be taken up
3  with Judge Vanaskie, so --
4        MR. STANOCH:  I don't appreciate the
5  threat, Counsel.
6        MS. LOCKARD:  It is not a threat -- a
7  statement.  But go ahead.
8        MR. STANOCH:  For the record, Counsel,
9  I'll state that in his own report, Dr. Williams
10 opines on reasonableness a number of times in terms
11 of methods, in terms of what one would do, in terms
12 of risk assessments, et cetera, so it's in the
13 report.  We can look at it later.
14   Q.  So, Doctor --
15       MS. LOCKARD:  I disagree with your
16 assessment.
17       (Reporter clarification.)
18       MS. LOCKARD:  I said I disagree with the
19 assessment, but go ahead.
20 BY MR. STANOCH:
21   Q.  Uh-huh.  Dr. Williams, you state in
22 Paragraph 84 of your report that there is no issue
23 with the FDA inspection of ZHP in 2017 because an
24 EIR was provided; is that right?
25   A.  Wait a minute, if I could get to where you

Confidential Information - Subject to Protective Order

Page 198

1  are now.  Which paragraph?
2      Q.  84.
3      A.  And what page?  Yeah.
4      Q.  I don't have a printed copy of the report
5  you produced this morning, so I can't tell you the
6  exact page, sir.  Sorry.  It's Paragraph 84.
7      A.  Page 28.  Yes.  And, of course, others
8  will comment on ZHP's inspectional history, but this
9  is an example of an inspection that ZHP got in 2017,
10  an FDA 483 with a small number of observations, and
11  as FDA does, they provided an EIR, indicating that
12  the inspection was closed.
13      Q.  Are you suggesting here that because the
14  FDA did not continue the inspection, there were no
15  problems with ZHP's valsartan API?
16      A.  Well, that's a difficult question to give
17  a conjecture about.  What I would say is I can't say
18  more than what the facts state, that ZHP responded
19  to the observations, FDA found them satisfactory and
20  issued an EIR.
21      Q.  Was Teva ever made aware of the FDA
22  inspection of ZHP's facility in 2017?  Did it learn
23  of that in the year 2017?
24      A.  I don't know that.
25      Q.  Right.  Do you know when, if at all, Teva

Page 199

1  learned that FDA inspected ZHP's API facility in
2  2017?
3      A.  I'm not aware of what FDA knew about ZHP
4  inspectional history.  Of course they knew about the
5  warning letter because that was public.
6      Q.  Well, the warning letter was from 2018,
7  after the recalls, right?
8      A.  Yes.
9      Q.  Right.  So I'm asking -- a different
10  question is:  What is your understanding of when
11  Teva knew about the FDA inspection of ZHP that
12  occurred in 2017?
13      A.  I have no information about that.
14      Q.  Right.  So you don't know one way or the
15  other when Teva might have learned that the FDA
16  inspected ZHP's API facility in 2017?
17      A.  Yes, I don't know that.
18      Q.  Do you know when if at all ZHP revealed
19  the observations from the 2017 FDA inspection to
20  Teva?
21      A.  I don't know that they revealed it to
22  Teva.
23      Q.  Was Teva ever relying on the FDA to
24  determine the acceptability of ZHP's valsartan API?
25      A.  Well, I think Teva would be aware that FDA

Page 200

1  was reviewing the DMF and was certainly likely to
2  imagine that FDA would inspect ZHP, so it would be
3  hard to imagine that Teva didn't have some
4  understanding of those possibilities.  But in terms
5  of the discrete facts of those possibilities, I have
6  no information.
7      Q.  Uh-huh.  Is there only a potential cGMP
8  problem with an API supplier if the FDA catches it
9  first?
10      A.  No.  I don't think that is a fair
11  statement.  I would say the essence of GMPs is the
12  manufacturer is supposed to create their own
13  approach to GMPs that then is suitable for an FDA
14  inspection, but the FDA inspection may occur
15  infrequently.
16      Q.  Uh-huh.  Right.  It's incumbent on a
17  manufacturer sourcing API to conduct its own due
18  diligence of the API manufacturer, correct?
19      A.  Are you talking about the purchaser?
20      Q.  Yes.  It's incumbent on the finished-dose
21  manufacturer purchasing API to conduct its own due
22  diligence of the API supplier, correct?
23      A.  I think that's a reasonable statement,
24  yes.
25      Q.  Uh-huh.  And further down in your report,

Page 201

1  beginning Section F, do you see this?  It's "FDA
2  Inspections of Teva Drug Product Manufacturing
3  Facilities"; do you see that, sir?
4      A.  I do.
5      Q.  Okay.  And here you talk about FDA
6  inspections of Teva's own finished-dose facilities
7  that had been manufacturing valsartan prior to the
8  recalls; is that fair?
9      A.  Yes, FDA inspections.
10      Q.  Right.  And are you suggesting that just
11  because the FDA didn't find a problem relating to
12  valsartan, that there was no issue with the
13  valsartan API that the Malta and Jerusalem
14  facilities were sourcing from ZHP and Mylan?
15      A.  I don't know that.  I couldn't comment.
16      Q.  And are you suggesting here that because
17  the FDA did not find any adulteration during the
18  inspections you list in your report here, that
19  Teva's product could not be adulterated with
20  nitrosamines during these same time periods?
21      A.  I'm saying that Teva in my report had
22  recalled all its valsartan products from the market
23  before FDA made any determinations related to
24  adulteration.
25      Q.  Well, Teva's products had API with

Confidential Information - Subject to Protective Order

Page 202

1  nitrosamines in it prior to the recalls, right?
2      A.  Yes, I think that was the basis for the
3  recall.
4      Q.  Right.  So are you telling me that a
5  valsartan product made by Teva the day before the
6  recalls with nitrosamines is not adulterated, but
7  then once the recall is issued the next day, now
8  that product is adulterated?
9      A.  No, I'm saying the adulteration label, if
10 somebody wanted to say, when did it occur, it
11 occurred with the warning letters that went to ZHP
12 and Mylan, and it also occurred after FDA set limits
13 for the nitrosamine impurities in December 2018.
14 But before that, Teva had recalled all product from
15 the U.S. market.
16     Q.  Uh-huh.
17     A.  Both made in Jerusalem and Malta.
18     Q.  Uh-huh.  Are you saying that valsartan
19 sold by Teva prior to the FDA's issuance of warning
20 letters to ZHP and Mylan could not be considered
21 adulterated?
22     A.  Yes.
23     Q.  So a Teva valsartan product on a certain
24 day that had nitrosamines in it is not adulterated
25 until the FDA issues a warning letter to ZHP or

Page 203

1  Mylan, and then once that happens, then it's
2  adulterated?
3      A.  That's when a formal regulatory definition
4  of adulteration could be stated to have occurred.
5  And it could also have been stated to have occurred
6  when FDA set limits for nitrosamine in December of
7  2018.
8      Q.  So going back to our examples we had
9  talked about before a couple breaks, if there is a
10 product that is containing anthrax, it's not
11 adulterated until the FDA issues a Form 483?
12     A.  No, no, no.  I would say a 483 is not a
13 FDA determination of adulteration.  A regulatory
14 determination of adulteration by FDA is a very
15 serious matter and, you know, it's carefully
16 considered by FDA, and I am suggesting that it could
17 have been determined to have occurred on those three
18 points that I just stated.
19         But Teva had recalled all of its product
20 before FDA made any kind of statement that could be
21 deemed an interpretation of adulteration.
22     Q.  So it sounds like the only three points
23 that you say adulteration could be found is when,
24 number one, FDA issued a warning letter to ZHP,
25 right?

Page 204

1      A.  Yes, yes, go ahead.
2      Q.  Number two would be when FDA issued a
3  warning letter to Mylan, right?  Right?
4      A.  Yes, uh-huh.
5      Q.  Number three would be when FDA set interim
6  limits, which you say occurred in December of 2018,
7  correct?
8      A.  Yes, I think that's -- I'm looking at my
9  report to see if those opinions are clearly stated.
10 Let me check.  But that corresponds to my opinion.
11     Q.  So let's say the FDA never set interim
12 limits and let's say the FDA never issued warning
13 letters to ZHP or Mylan.  In that case, Teva's
14 finished-dose valsartan could never be considered
15 adulterated, according to you?
16     A.  Yes, I think the issue of adulteration
17 arose and was determined, to the extent it was
18 determined at all, after Teva had recalled all
19 product from the market.
20     Q.  So then the answer is that Teva's
21 valsartan products would never be considered
22 adulterated in a world where the FDA did not issue
23 warning letters to ZHP and Mylan and the FDA set no
24 interim limits?
25     A.  Yeah, I don't think FDA -- yeah, if we

Page 205

1  say, was the Mylan product adulterated, I would say
2  it couldn't -- FDA had not made a decision in that
3  regard at least until those three prongs, if you
4  will, had been met.
5      Q.  Say a warning letter finds a product
6  adulterated on January 1, 2022.  Does that mean that
7  on December 31, 2021, that same product was not
8  adulterated?
9      A.  Yeah, I think the issue of adulteration
10 is -- and I'm looking at page 8 in my opinion, under
11 B, and my opinion is clear.  "My opinion that Teva's
12 valsartan products were, at all times prior to
13 Teva's voluntary recalls, AB-rated to their branded
14 counterparts and were not adulterated or
15 misbranded."  That's what I'm saying.
16         Now, if somebody wants to raise an issue
17 of when adulteration occurred, I would say it was
18 when the warning letters went to ZHP and Mylan or
19 when FDA set limits on the nitrosamine impurities in
20 December 2018.  I think that's a very clear
21 conclusion on my report.
22     Q.  Well, how does the FDA take action for
23 adulterated product, then, for product that had
24 already been sold if nothing is adulterated until
25 they issue a warning letter?

Page 206

1    A.  FDA can ask for recalls of products that
2  are objectionable for various reasons.  You
3  mentioned examples yourself.  But it doesn't mean
4  that FDA is making an adulteration charge.  That's a
5  separate issue.
6    Q.  So according to you, adulteration can only
7  exist if the FDA issues a warning letter?
8    A.  I would say an adulteration charge is a
9  regulatory determination by FDA that is very
10  carefully considered.  Even a warning letter doesn't
11  necessarily mean, you know, an adulteration charge.
12  It's really a signal to a company that they need to
13  focus a little bit more on improving their GMPs.
14      All I'm saying is that Teva products were
15  not adulterated at the time of the recall, so Teva
16  never had adulterated product in the U.S. market.
17    Q.  Because you are saying the warning letters
18  were not issued to ZHP or Mylan until after Teva's
19  recalls?
20    A.  Yes.  If somebody wants to make an
21  adulteration claim here, it seems to me it would
22  occur then, or when FDA set limits and a product was
23  above those limits.  The FDA -- oh.
24    Q.  So all the --
25    A.  FDA could have set limits that would have

Page 207

1  let the Teva product be okay.  It was just an
2  uncertainty there.  But because FDA thought the
3  limits were unacceptably high, without a limit being
4  set, Teva and FDA agreed that these products should
5  come off the market, first ZHP-containing product
6  and then the Mylan product.
7    Q.  Uh-huh.
8    A.  And then Teva decided not to reenter the
9  market at all.
10      So Teva never had an adulterated product
11  for any of its four valsartan-containing products in
12  the U.S. market.
13    Q.  Uh-huh.  So from 2012 on, assume all of
14  Teva's products had nitrosamines in it leading up to
15  the recall.  You are saying all of that product
16  cannot be considered adulterated?
17    A.  It was not adulterated --
18    Q.  Uh-huh.
19    A.  -- according to an FDA regulatory
20  determination.
21    Q.  Uh-huh.  The FDA found that the API that
22  Teva was using that entire time was adulterated,
23  though, correct?
24    A.  When do you say that occurred?
25    Q.  Well, you tell me.  It's in the 483s that

Page 208

1  you cite in your report, sir.
2    A.  Is it?  I don't recall FDA making an
3  adulteration claim in the 483s.  Can you show me
4  that?
5    Q.  In the warning letters, I apologize.  In
6  the warning letters the FDA said that Mylan and
7  ZHP's API was adulterated, correct?
8    A.  Yes.  I mean, you are reiterating my
9  claim.  That's a point at which FDA could be said to
10  have determined a charge of adulteration.
11    Q.  Uh-huh.  So --
12    A.  And that is a very carefully considered
13  charge.
14    Q.  All right.  So if I am selling a product
15  starting today, and it contains rat poison, I can
16  keep selling that and keep selling it until the FDA
17  issues me a warning letter, correct?
18    A.  No.  I think your hypothetical, it needs
19  to be refined for this particular case.  There is an
20  impurity, an impurity that we have already talked
21  about is undesirable.  It's part of that cohort of
22  concern.
23      But it can have a limit set on it such
24  that the product is safe and effective and of good
25  quality.  FDA did not do that until December 2018.

Page 209

1  But FDA still had the concern that the levels were
2  too high, so they worked with Teva to recall all
3  product.
4      This is separate from a determination of
5  adulteration.  The only time I have ever seen
6  adulteration raised in this matter is when FDA sent
7  those warning letters, as you say, to ZHP and Mylan.
8    Q.  If not adulterated, what would you call
9  all of Teva's products prior to the FDA's issuance
10  of warning letters to ZHP and Mylan?
11    A.  I would call them AB-rated and of good
12  value to the consumer.
13    Q.  Even if they contained genotoxic
14  impurities above any limit that was ever set to the
15  present?
16    A.  Well, you are getting to the core issue in
17  this matter.
18      First of all, my claim is, and I state it
19  in my report, they were AB-rated.  They were
20  pharmaceutically equivalent.  They were
21  bioequivalent.  They were not misbranded.  They had
22  the appropriate labeling relative to the Novartis
23  reference listed drug.
24      Now, if you have an impurity that comes to
25  light, it's a very low-level impurity, it was

Confidential Information - Subject to Protective Order

Page 210

1 unexpected, there are not analytical procedures to
2 adequately measure it, it all of a sudden comes to
3 life, does that make the product worthless?  No.  It
4 makes the product really fine until FDA and the
5 companies sort through what the appropriate limits
6 should be.
7        Teva didn't do anything wrong.  They were
8 making good product at their Malta and Jerusalem
9 facilities.  And then FDA comes up with a limit.  So
10 then you can say, okay, well, products in the
11 marketplace shouldn't have nitrosamine impurities
12 above that limit.  And before all that occurred,
13 Teva had removed all product from the market.
14    Q.  Uh-huh.  Are you familiar with the FDA's
15 actions against Ranbaxy concerning generic Lipitor?
16        MS. LOCKARD:  Outside the scope.
17        THE WITNESS:  You know, I could probably
18 be reminded of it, and please do if you think it
19 would be helpful -- if you think it would be
20 helpful, please remind me of that.
21 BY MR. STANOCH:
22    Q.  Sure.  I'll mark Exhibit 12.
23        (Whereupon, Exhibit 12 was marked for
24 identification.)
25

Page 211

1 BY MR. STANOCH:
2    Q.  Unfortunately, I don't think it's in your
3 binder, but it's relatively short.  Let me know when
4 you can see it.
5    A.  I think it's coming to me; is that right?
6        MS. LOCKARD:  It's not in the binder, so
7 it's only on video screen.
8        THE WITNESS:  And I don't see it on the
9 video screen yet.
10        (Whereupon, a brief discussion off the
11 record.)
12        MR. STANOCH:  What are you whispering to
13 your counsel about, Doctor?
14        MS. LOCKARD:  He asked me to remind him of
15 your name, and I said Stanoch.
16        THE WITNESS:  I'm sorry.  I had a senior
17 moment.
18        MR. STANOCH:  Oh, it's okay, Doctor.  I
19 wasn't going to call you out before, and I apologize
20 I did now.  It's a long day.
21        MS. LOCKARD:  You are right.  I should not
22 be whispering.  I should have done it louder.
23        MR. STANOCH:  It's a --
24        THE WITNESS:  Well, I apologize, too.  I
25 may be getting hypoglycemic.

Page 212

1        MS. LOCKARD:  It is 12:45 here.  I don't
2 know, how long have been we been on the record,
3 Ms. Videographer, can you say?
4        MR. HARKINS:  Two hours since the last
5 break.
6        MS. LOCKARD:  Two hours since the last
7 break, so let's ask the questions about this, and
8 then --
9        THE VIDEOGRAPHER:  An hour 35 since the
10 last break.
11        MS. LOCKARD:  You need a new watch.
12 BY MR. STANOCH:
13    Q.  Let me know when you can see this exhibit,
14 sir.  I'm trying to screen-share now, if that helps
15 as well.
16    A.  Okay.  I see the screen share.
17    Q.  All right.  And you see this is a
18 Department of Justice announcement, May 13, 2013?
19    A.  Yes, I do see this, and I'm familiar with
20 this fine.
21    Q.  Right.  And you are familiar that the DOJ
22 fined Ranbaxy, a generic drug manufacturer, 500
23 million relating to cGMP violations and false
24 statements?
25    A.  Yes, I do see that.

Page 213

1    Q.  Right.  And can you still see it?
2    A.  I do see it, yes, thank you.
3    Q.  Oh, good.  I just wanted to make sure you
4 were able to look at it.  And you can look at this
5 document all you want, sir, but the issue here is
6 Ranbaxy, I think, was making generic Lipitor, and it
7 was found to contain pieces of glass, right?
8    A.  I would have to read more closely to see
9 the pieces of glass, but I'll take your word for it.
10 Go ahead.
11    Q.  Okay.  And so would you call generic
12 Lipitor that contained pieces of glass AB-rated?
13    A.  Well, we're getting into what causes the
14 FDA to remove an AB rating.  An AB rating relates to
15 the review process.  So, yes, I would say it's
16 AB-rated.
17        Now, after it's in the market and you find
18 something objectionable or it fails a specification
19 or it's not in conformance with GMPs, it needs to be
20 withdrawn from the market.
21    Q.  So would you --
22    A.  And that's what happened here.
23    Q.  So would you consider Ranbaxy's generic
24 Lipitor that contained pieces of glass adulterated
25 prior to the date of its guilty plea?

Page 214

1    A.  It's not my decision.  It's an agency
2  decision.  Did the agency make a judgment of
3  adulteration?
4    Q.  Well, that's what I'm asking you, sir.
5    A.  I don't see it here.  If you can point it
6  out to me, I would be glad to offer an opinion.
7    Q.  Uh-huh.  It says right there --
8    A.  And I don't --
9    Q.  -- in the first paragraph about the
10  "distribution of certain adulterated drugs."
11    A.  Yes, adulterated drugs, okay.  So there
12  the agency is making a decision that the drugs were
13  adulterated.
14    Q.  Right.  And if you look on, you know, the
15  next page here, "Ranbaxy USA admitted to introducing
16  into interstate commerce certain batches of
17  adulterated drugs that were produced at Paonta Sahib
18  in 2005 and 2006."  You see that?
19    A.  Wait a minute.  I'm trying to catch up
20  with where you are reading.  What paragraph are you
21  in?
22    Q.  Second full paragraph of the second page.
23    A.  Oh.  Yes, I see that.  And your question,
24  I'm sorry, is?
25    Q.  Right.  So you see here, right, that

Page 215

1  Ranbaxy admitted that it was selling batches of
2  adulterated drugs produced at a facility in 2005 and
3  2006, right?
4    A.  Yes.
5    Q.  And that is, what, seven or eight years
6  prior to its guilty plea per this notice of
7  May 13th, 2013, right?
8    A.  I'm trying to stay up with your dates.
9  Okay.  Yes, I see the dates you are emphasizing.
10    Q.  Right.  So Ranbaxy was pleading guilty
11  that it was selling adulterated products for nearly
12  ten years prior to the institution of regulatory
13  action against it, right?
14    A.  Yes.  I see that.
15    Q.  But it sounds like you are telling me that
16  you would not consider any of that Ranbaxy product
17  adulterated up and until the point where the FDA
18  actually issued a warning letter; is that right?
19    A.  No, the way I read this, I think Ranbaxy
20  stated their drugs were adulterated in 2005, 2006,
21  and that's an agency determination.
22    Q.  Right.  They retrospectively made that
23  determination?
24    A.  Well, I don't know if it is retrospective
25  or not, but -- go on.  I'll try to answer your

Page 216

1  questions.
2    Q.  Right.  The FDA said at a later point that
3  the drugs you had been selling since 2005 were
4  adulterated, right?
5    A.  FDA can make a certain decision in time.
6  But in this case, FDA made the decision when it
7  issued the warning letters for ZHP and Mylan.
8    Q.  Right.  And it said in that decision that
9  the valsartan API that you have been making up until
10  this point is adulterated, correct?
11    A.  No, I'm not agreeing with that.
12    Q.  So --
13    A.  I'm saying FDA had -- I'm saying Teva had
14  recalled all product before the agency determination
15  of adulteration.
16    Q.  So the fact that Teva was selling product
17  that the FDA later said contained adulterated API,
18  you are saying that has no effect on whether or not
19  Teva was selling adulterated products?
20    A.  You know, I think we're confusing a lot of
21  issues here.  First of all, we have to look at the
22  warning letters to ZHP and Mylan.  And I'm glad to
23  discuss those if you want to give them to me as
24  exhibits.
25          But FDA made the general statement that

Page 217

1  products -- or drug substances produced at ZHP were
2  adulterated within the meaning of the act because of
3  GMP violations.  I would have to see it.  I'm not
4  even sure it mentions nitrosamines --
5    Q.  Uh-huh.  Okay.
6    A.  -- or the fact that the products
7  containing nitrosamines were adulterated.
8    Q.  Okay.  Let's take out nitrosamines.  So
9  Teva selling valsartan that contained API that the
10  FDA eventually said was adulterated because of cGMP
11  violations has no impact on whether Teva's product
12  was adulterated?
13    A.  Well, I would -- is it possible to look at
14  the ZHP warning letter?
15    Q.  If you have a copy there, sir, go ahead.
16  I don't know if I have it.
17    A.  It's not in your exhibits?
18        MS. LOCKARD:  We have a copy of it.
19        THE WITNESS:  I don't think I cited it in
20  my report.  I don't think it's in a --
21        MS. LOCKARD:  There is no question
22  pending, so you don't have to answer.
23  BY MR. STANOCH:
24    Q.  Uh-huh.  Did you cite the ZHP warning
25  letter from the FDA in your report, sir?

Page 218

1    A.  I don't think it's in my materials cited.
2  I don't recall seeing it there.  And that's true
3  also for Mylan.  So --
4    Q.  Okay.  Well, we will figure that out.
5  Let's put all this aside for now, and we can come
6  back to it, but we want to go --
7        (Whereupon, a brief discussion off the
8  record.)
9        THE VIDEOGRAPHER:  Okay.  We are going off
10  the record.  The time is 12:51.
11        (Whereupon, a brief recess was taken.)
12        THE VIDEOGRAPHER:  Okay.  We are coming
13  back on the record.  The time on the video monitor
14  is 1:34.  Please begin.
15  BY MR. STANOCH:
16    Q.  Welcome back, Dr. Williams.
17    A.  Thank you, Mr. Stanoch.
18    Q.  During our lunch break did you speak with
19  anyone besides your counsel there with you in San
20  Francisco?
21    A.  No, I didn't.
22    Q.  Did you text or e-mail anybody about your
23  testimony today?
24    A.  No, not at all.
25    Q.  And did you review any documents?

Page 219

1    A.  We did not.
2    Q.  Okay.  Thank you.
3        Could you describe for me what it means
4  that your expert report is only for class
5  certification and not for liability?
6    A.  My understanding is the liability
7  litigation will occur later, and right now we're
8  looking at class certification that relates to
9  economic loss for individual plaintiffs and also
10  large payors.
11    Q.  Uh-huh.  Right.  And prior to the break we
12  were talking a little bit about the Teva recalls,
13  and I think you said that Teva had recalled all of
14  its valsartan product from the market and has not
15  reintroduced it, correct?
16    A.  Yes, that's true, Mr. Stanoch.
17    Q.  Okay.  Are you aware of whether Teva has
18  been undertaking to introduce a new generic
19  combination product that includes valsartan?
20    A.  You know, I believe in the course of some
21  of my research or discussions with counsel, I did
22  hear that.  But I know very little about what they
23  are doing, and it's certainly not in my report.
24    Q.  Okay.  I was going to say, do your
25  opinions in any way relate to the fact that Teva is

Page 220

1  trying to market in the U.S. a new generic
2  combination product that includes valsartan?
3        MS. LOCKARD:  Objection.  Foundation.
4        THE WITNESS:  Was that a question,
5  Mr. Stanoch?
6  BY MR. STANOCH:
7    Q.  Yes.  Did your opinions in any way relate
8  to the fact that Teva is trying to market in the
9  U.S. a new generic combination product that includes
10  valsartan?
11    A.  No, not at all.
12    Q.  Uh-huh.  Uh-huh.  Do you think it would be
13  pertinent to your opinions in this case if you were
14  to eventually evaluate the testing and other
15  parameters that Teva is applying for its new generic
16  combination product that includes valsartan that it
17  may introduce in the U.S.?
18        MS. LOCKARD:  Objection.  Confusing.
19        THE WITNESS:  No, I can't see how that
20  would have any impact on my report --
21  BY MR. STANOCH:
22    Q.  Uh-huh.
23    A.  -- and it certainly wouldn't change my
24  opinions.
25    Q.  Well, would you like to know what testing

Page 221

1  Teva is doing of this new product under development
2  for nitrosamines?
3    A.  I would always be interested in what Teva
4  is doing because of their sophistication as a
5  pharmaceutical company, but it doesn't relate to my
6  report and it doesn't impact my opinions.
7    Q.  Uh-huh.  But if Teva is testing for
8  nitrosamines now for a new product in ways that were
9  available to it prior to 2018, that would be
10  pertinent, would it not?
11        MS. LOCKARD:  Objection.  Speculation.
12  Foundation.
13        THE WITNESS:  Well, the way I would try to
14  couch it in terms of my report is Teva should be
15  following the 2021 guidance on nitrosamine
16  impurities, and how they deal with those
17  recommendations from FDA, as I say, would be of
18  scientific interest to me, but not pertinent to my
19  report.
20  BY MR. STANOCH:
21    Q.  That's fair.  Do you know whether Teva is
22  following the FDA 2021 guidance on nitrosamine
23  impurities regarding its development of a new
24  valsartan combination product for the U.S. market?
25    A.  Do I know what about that?  I'm sorry.

Confidential Information - Subject to Protective Order

Page 222

1    Q.  Do you know whether Teva -- or strike
2 that.
3        Do you know how, if at all, Teva is
4 following the FDA 2021 guidance on nitrosamine
5 impurities regarding Teva's development of a new
6 valsartan combination product for the U.S. market?
7    A.  No, I have no idea, and I'm sure Teva
8 might regard that as confidential information.
9    Q.  Uh-huh.  You reference throughout your
10 report, and we can look at particular paragraphs,
11 pharmaceutically equivalent and bioequivalent; is
12 that right?
13    A.  Yes, I do speak to those points,
14 Mr. Stanoch.
15    Q.  Okay.  And we can look -- you can look at
16 any paragraph you like, but you can look at, say,
17 Paragraph 60, where you mention both these terms, if
18 that's helpful.
19    A.  Okay.  Thank you.  I'll go to Paragraph
20 60.  Okay.  And that's on page 19?
21    Q.  Are you there?
22    A.  Yes, I am, sir.
23    Q.  Okay.  Now, what do you mean by
24 "bioequivalent," as you use the term in your report?
25    A.  Well, it's a requirement for a generic

Page 223

1 manufacturer to show bioequivalence between their
2 proposed product and the reference listed drug.  And
3 it's expressed in law and regulations as an absence
4 of difference in terms of the rate and extent of the
5 generic product compared to the reference listed
6 drug.
7    Q.  What do you mean by the term
8 "pharmaceutically equivalent" as used in your
9 report?
10    A.  Well, if you, again, look at the law and
11 regulations, "pharmaceutical equivalence" means the
12 same active ingredient; different impurities,
13 possibly; the same dose form; the same strength; and
14 the same route of administration.
15        So the two terms together, if they are met
16 by a generic manufacturer, allow the agency to
17 declare that the products are therapeutically
18 equivalent, and if those requirements are satisfied,
19 among other things, then FDA can give an AB rating
20 in the Orange Book.
21    Q.  And then I think in this paragraph, the
22 second sentence, you explain what you mean by
23 therapeutic equivalence; is that right?
24    A.  Yes, and I may have gotten a little bit
25 ahead of your questioning, but therapeutic

Page 224

1 equivalence means both pharmaceutically equivalent
2 and bioequivalent.
3    Q.  Uh-huh.  Isn't it true, Doctor, that
4 therapeutic equivalence includes pharmaceutical
5 equivalence, bioequivalence, as well as having the
6 same clinical effect and safety profile?
7    A.  No, I wouldn't add that, Mr. Stanoch.  I
8 think the purpose of the bioequivalence study is to
9 say the bioequivalence study substitutes for
10 assessment of clinical safety and efficacy.
11    Q.  Okay.  Let's look at the next exhibit.
12 Stand by.
13        This will be Exhibit 13.  It's Tab 10 in
14 your binder, sir.
15        (Whereupon, Exhibit 13 was marked for
16 identification.)
17 BY MR. STANOCH:
18    Q.  Let me know when you are there.
19    A.  Okay.  I'm looking at the Orange Book
20 preface.
21    Q.  Right.  This is a copy of the Orange Book
22 preface, correct?
23    A.  Yes.
24    Q.  And you are certainly familiar with the
25 Orange Book, I take it, right?

Page 225

1    A.  Yes.
2    Q.  And what is the Orange Book?
3    A.  It's an FDA publication entitled Approved
4 Drug Products with Therapeutic Equivalence
5 Evaluations.  And then after that, we always say,
6 "commonly referred to as the Orange Book."  And the
7 reason for that, it is an orange book.
8        I even know how it came to have the color
9 orange.  It was actually created around the time of
10 Halloween, so that's why it's colored orange.
11        But it lists the FDA-approved products
12 approved under the NDA/ANDA system.
13        I'll stop there, Mr. Stanoch.
14    Q.  Okay.  I appreciate that answer, including
15 the color commentary on the Orange Book, Doctor.
16        If you can turn to the section 1.2,
17 "Therapeutic Equivalence-Related Terms."
18    A.  Yeah, I'm getting there.  1.1.
19        Okay.  I'm there.
20    Q.  And this section talks about certain
21 terms.  Do you see that?
22    A.  I do.
23    Q.  And one of those terms is "therapeutic
24 equivalents," correct?
25    A.  Yes.  Under 1.2.

Confidential Information - Subject to Protective Order

Page 226

1    Q.  Yes.  And could you just read us that
2  first paragraph there for "Therapeutic Equivalents,"
3  where it says, "Approved drug products are"?
4    A.  "Are drug products in identical dosage
5  forms and route(s) of administration" and "contain
6  identical amounts" --
7    Q.  Oh, oh.  Oh, oh, oh, oh, Doctor.  I'm
8  sorry to stop you.  I was trying to direct you to
9  the paragraph that is there for "Therapeutic
10  Equivalents."  Do you see that a little down?
11    A.  Oh, sure.  Down below?
12    Q.  Yes.  And just that -- it's three lines,
13  the first paragraph.  Do you see that?
14    A.  Yeah, where it says, "Approved drug
15  products"?
16    Q.  Yes, sir.  Could you just read that
17  paragraph?
18    A.  Sure.  "Approved drug products are
19  considered to be therapeutic equivalents if they are
20  pharmaceutical equivalents for which bioequivalence
21  has been demonstrated, and they can be expected to
22  have the same clinical effect and safety profile
23  when administered to patients under the conditions
24  specified in the labeling."
25    Q.  Right.  And that second clause there that

Page 227

1  you read, that is something that is absent from your
2  characterization of therapeutic equivalence in
3  Paragraph 60 of your report, correct?
4    A.  Yes.  I think -- my hope -- everything is
5  aligned and in agreement, but that is what I mean
6  when I made those statements in Paragraph 60.
7    Q.  And earlier I think you said that same
8  clinical effect and safety is not part of
9  therapeutic equivalence.  Are you changing your
10  testimony that you agree that a therapeutic
11  equivalent can be expected to have the same clinical
12  effect and safety profile when administered to
13  patients under the conditions specified in the
14  label?
15    A.  Well, I think, without quibbling with you,
16  Mr. Stanoch, what I was trying to say is in terms of
17  the application process, the demonstration is the
18  end of the sentence.  And if those two types of
19  equivalence are demonstrated, then, as you want to
20  go on and say, they can be expected to have the same
21  clinical effect and safety.  But in terms of the
22  concept of therapeutic equivalence, it stops with
23  demonstration.
24    Q.  Well, because I don't see anywhere in your
25  report, doing a word search, and you can certainly

Page 228

1  look through it, that you don't mention anything
2  about a therapeutic equivalent having the same
3  clinical effect and safety profile.
4    A.  Well --
5    Q.  Why did you leave that part out?
6    A.  You know, Mr. Stanoch, I have to say, it's
7  an unimportant question.  I think everybody knows
8  that if you show pharmaceutical equivalence and
9  bioequivalence, you then are allowed to have the
10  same labeling as the reference listed drug,
11  substantively, and this means you will have the same
12  clinical effect and safety.
13        I don't know why you are questioning my
14  words in my report, so perhaps you can explain that
15  at the right time.
16    Q.  Well, we can agree that your Paragraph 60
17  does not include the words "same clinical effect and
18  safety profile," right?
19    A.  No, and it's certainly understood, and I
20  think any reasonable person would understand, what I
21  meant when I talked about pharmaceutical equivalence
22  and bioequivalence.
23    Q.  So show me in Paragraph 60 where those
24  words appear then, Doctor.
25    A.  Which words?

Page 229

1    Q.  "Same clinical effect and safety profile."
2    A.  I don't say that.  That's what therapeutic
3  equivalence means.
4    Q.  Uh-huh.
5    A.  "Therapeutic equivalence" are the same
6  words as "same clinical effect and safety profile."
7    Q.  Uh-huh.  Right.  And those words do not
8  appear anywhere in your report, though?
9    A.  "Therapeutic equivalence" appears there,
10  and it means the same thing as identical safety and
11  efficacy outcomes.  That's what it means to have the
12  same labeling as the reference listed drug.
13    Q.  Well, Doctor, I want to make sure we're
14  not talking past each other.  I'm looking at your
15  Paragraph 60, and it says, "Therapeutic equivalence
16  means that the drug is pharmaceutically equivalent
17  and bioequivalent for the same use," period; is that
18  right?
19    A.  Mr. Stanoch, I just really am not
20  following your line of questioning.  Can you be more
21  clear?
22    Q.  Oh, absolutely, Doctor.  I'm looking at
23  the words you wrote.
24    A.  I think I'm --
25    Q.  So let's look at Paragraph -- go ahead.

Confidential Information Subject to Protective Order

Page 230

1    A.  Mr. Stanoch, let me finish my answer.
2    Q.  Please.
3    A.  I think I am perfectly clear here.
4 Anybody would understand what I'm saying who
5 understands generic substitution.  Now, what is it
6 about my statement or my words that you are not
7 getting?
8    Q.  I'm getting it about the words that are
9 not there, Doctor, that's my first step.  I'm
10 looking at Paragraph 60.  Can we agree --
11    A.  Well --
12    Q.  Let me finish my question, Doctor, I let
13 you finish your answer, please.
14       Your Paragraph 60, when you're defining
15 therapeutic equivalence, you say, "Therapeutic
16 equivalence means that the drug is pharmaceutically
17 equivalent and bioequivalent for the same use,"
18 period, correct?
19    A.  I don't think you are reading my words
20 correctly.
21    Q.  Well, you turn to Paragraph 60,
22 Dr. Williams.
23    A.  Would you please try to read my words
24 correctly?
25    Q.  Why don't you read Paragraph 60 to me,

Page 231

1 Dr. Williams?
2    A.  All right.  I'll be glad to.  "Generic
3 drugs that are pharmaceutically equivalent and
4 bioequivalent to the" reference listed drug "are
5 deemed therapeutically equivalent and are
6 interchangeable with the" reference listed drug.
7 Now, what part of that don't you understand?
8    Q.  Please keep reading, Doctor.
9    A.  "Therapeutic equivalence means" "the drug
10 is pharmaceutically equivalent and bioequivalent for
11 the same use."  We're talking about the labeling.
12 In other words, if you're pharmaceutically
13 equivalent and bioequivalent, you get to use the
14 same labeling as the referenced listed drug.  If you
15 have the same labeling, you will necessarily have
16 the same clinical effect and safety profile.
17       I think these words are almost
18 self-evident, and I really wonder why I haven't been
19 clear about it with you.
20    Q.  Doctor, I'm asking you to tell us where in
21 Paragraph 60 you write that therapeutic equivalence
22 can be expected to have the same clinical effect and
23 safety profile?
24    A.  I don't write it.  I never said I did.
25    Q.  And you don't write it anywhere in your

Page 232

1 report, correct?
2    A.  I don't need to write it in my report.
3 It's not pertinent.  It's unnecessary.
4    Q.  Uh-huh.  And does valsartan containing
5 nitrosamine impurities have the same safety profile
6 as valsartan that do not have nitrosamine
7 impurities?
8    A.  Impurities are not a determinant of either
9 pharmaceutical equivalence or bioequivalence, and
10 that would include nitrosamine impurities.
11    Q.  We're talking therapeutic equivalence now,
12 aren't we?
13    A.  I don't know.  Is that your question?
14    Q.  That's what we have been talking about,
15 Dr. Williams.  Let me ask it again.
16       Do you believe valsartan containing
17 nitrosamines have the same safety profile as
18 valsartan that does not contain any nitrosamines?
19    A.  Okay.
20       MS. LOCKARD:  Objection.  Form of the
21 question.  Vague.
22       THE WITNESS:  That is a different
23 question.  And I would say, with appropriate limits,
24 yes, the answer to your question is yes.
25

Page 233

1 BY MR. STANOCH:
2    Q.  Well, what do you mean by "appropriate
3 limits"?
4    A.  Well, for example, the interim limits that
5 FDA set in December 2018 for --
6    Q.  In absence of those limits, do you believe
7 valsartan containing nitrosamines has the same
8 safety profile as valsartan that does not contain
9 any nitrosamines?
10    A.  Are you asking my personal opinion?  Or
11 are you asking me as part of my report?
12    Q.  You are the one opining on therapeutic
13 equivalence, Doctor, so I'm asking you, both in your
14 opinions and in your personal knowledge.
15    A.  I would say it would have the same
16 therapeutic outcome in terms of safety and efficacy.
17 If somebody wants to give data that suggests
18 otherwise, the FDA could look at that data.
19    Q.  Uh-huh.  You are talking about therapeutic
20 outcomes, you are referring to whether the drug
21 works for its intended purpose, right?
22    A.  I would say when we look at these words,
23 yes, we are talking about the valsartan molecule.
24    Q.  Right.  And still the issue we're trying
25 to get at here, Doctor, is:  In the absence of

Confidential Information - Subject to Protective Order

Page 234

1  interim limits, do you believe valsartan containing
2  nitrosamines, which you have agreed is part of the
3  cohort of concern, has the same safety profile as
4  valsartan that does not contain nitrosamines?
5      A.  Well, let's back up a little bit.  First
6  of all, we understand that the impurity profile can
7  be different in the drug substance of the generic
8  compared to the reference listed drug.  And there
9  could be many, many impurities in those two drug
10 substances with unknown pharmacologic effects.
11         When you see a particular impurity of
12 concern, you would like to put a limit on it,
13 including whether it's a genotoxic impurity or not.
14 That's the whole idea behind reporting,
15 identification, and qualification.
16         I think nitrosamine impurities here are
17 part of the general approach to impurity handling.
18 So I would say if nitrosamine impurities are handled
19 the way other impurities are handed in the world of
20 generic substitution, yes, you would get the same
21 safety and efficacy outcomes.
22     Q.  What if they are not handled in the way
23 other impurities are handled?
24     A.  Well, if I don't -- can you be more
25 specific in your question in terms of how they would

Page 235

1  be handled differently?
2      Q.  Sure.  Prior to June 2018, assume there is
3  valsartan that contains nitrosamines and valsartan
4  that does not contain nitrosamines.  Do they have
5  the same safety profile?
6      A.  We just don't know that.
7      Q.  So then how --
8      A.  I mean, for all I know, the valsartan drug
9  substances that contain nitrosamine may have been at
10 perfectly safe levels.  I just don't know that.
11     Q.  Uh-huh.
12     A.  FDA finally decided they need to be below
13 certain interim limits.  But even there, I think FDA
14 would say the risk was very low and that their
15 limits were very conservative.  So you are asking a
16 question that would be very difficult to answer.
17     Q.  Uh-huh.  Well, in the real world, Doctor,
18 right, if you go to a patient and you say to the
19 patient, do you want this valsartan that contains
20 nitrosamines or do you want this valsartan that does
21 not contain nitrosamines, what do you advise your
22 patient?
23         MS. LOCKARD:  Objection.  Outside the
24 scope of his expertise.
25         THE WITNESS:  I would say nitrosamines are

Page 236

1  commonly found in foodstuffs and they can be allowed
2  in chemically synthesized drugs at certain levels.
3  And the goal here of this whole effort really has
4  been to identify them and make sure they do not
5  exceed those levels.
6  BY MR. STANOCH:
7      Q.  Would you advise patients to keep taking
8  recalled valsartan products?
9          MS. LOCKARD:  Objection.  Speculation.
10 Outside the scope.
11         THE WITNESS:  Well, that seems a very odd
12 question since they were recalled.  Is that a
13 hypothetical?
14 BY MR. STANOCH:
15     Q.  Well, we are just trying to say what you
16 would do with a patient, Doctor.  And by the way,
17 you are a doctor, correct?
18     A.  That's right.
19     Q.  You have an active medical license,
20 correct?
21     A.  I do not.
22     Q.  You do not.  When was your medical license
23 last active?
24     A.  In 1990.  I stopped treating patients
25 clinically when I went to FDA in 1990.

Page 237

1      Q.  Uh-huh.  Uh-huh.  And would you advise a
2  patient, if given the choice, to take valsartan that
3  contained nitrosamines or valsartan that did not
4  contain nitrosamines?
5          MS. LOCKARD:  Objection.  Outside the
6  scope of his expert report and opinions.
7          THE WITNESS:  You know, it's a
8  hypothetical.  I'm going to give you an answer that
9  may not seem appropriate.
10         But I worked once with a very
11 sophisticated chemist at FDA who said you get more
12 impurities in the back of a Washington, D.C., bus
13 than you will ever get from your medicines.
14         So, you know, it's a question of risk,
15 relative risk, severity of risk, and I just don't
16 think I can answer your question.
17 BY MR. STANOCH:
18     Q.  You have a -- oh, sorry.  Go ahead.
19     A.  I would say to patients, FDA will control
20 impurities within the -- nitrosamine impurities
21 within your medical products appropriately in
22 accordance with the new guidance.
23     Q.  Uh-huh.  Prior to the FDA guidance in
24 December 2018, right, would you advise a patient to
25 take valsartan with nitrosamines or the valsartan

Confidential Information - Subject to Protective Order

Page 238

1  without nitrosamines?
2      A.  Well, let me point out that FDA told
3  people to keep on taking their valsartan products
4  before the interim limits were set.
5      Q.  And that was so they don't drop dead of a
6  heart attack, correct?
7          MS. LOCKARD:  Objection.  Speculation.
8          THE WITNESS:  I would not say that it way.
9  BY MR. STANOCH:
10     Q.  Right.  Because they did not want to go
11 off your medication for hypertension abruptly until
12 you had a substitute; isn't that right, Doctor?
13     A.  Well, they did not want people to abruptly
14 stop their medicines containing valsartan.
15     Q.  Absolutely correct.  But don't you think
16 the idea there was:  Don't abruptly stop, but you
17 should probably get a different valsartan product or
18 other substitute as soon as you can?
19         MS. LOCKARD:  Objection.  Speculation.
20 Outside the scope of his expert testimony and this
21 report.
22         THE WITNESS:  I'll just stand by what FDA
23 said.  They said, don't -- you know, the risk here
24 is very low.  The recall classification risk was
25 low.  And they were saying, don't stop your

Page 239

1  valsartan medicines abruptly under these
2  circumstances.
3  BY MR. STANOCH:
4      Q.  Uh-huh.  All right.  So let's go back to
5  the safety profile one more time, Doctor.  You are
6  not going to tell us whether you think a valsartan
7  with nitrosamines might have a different safety
8  profile than a valsartan without nitrosamines?
9      A.  I absolutely don't know, and to answer
10 that question would be a very difficult comparative
11 clinical trial.
12     Q.  Uh-huh.  Well, let's say right now with --
13 let's say today --
14         MS. LOCKARD:  Wait.  Hold on a minute.
15 Let him --
16 BY MR. STANOCH:
17     Q.  Oh, go ahead, Doctor.
18     A.  And if you think about what it would take
19 to answer that question, imagine a comparative
20 clinical trial where you have patients randomized
21 between two valsartan-containing products, one with
22 one limit set by FDA and one with no limits before
23 FDA set limits.  Imagine the outcome of that
24 clinical trial.  I think it would be very hard to
25 see a difference.

Page 240

1      Can you imagine how many patients you
2  would have to study to see a difference even if it
3  existed?
4      Q.  Let's talk about today, right.  The FDA
5  limits for nitrosamines exist today, right?
6      A.  Yes.
7      Q.  Does a valsartan drug that contains
8  nitrosamines above those limits have the same safety
9  profile as a valsartan drug with nitrosamines below
10 those limits?
11     A.  Far as I know, they have the same safety
12 and efficacy outcomes.
13     Q.  So then what is the point of the interim
14 limits, then, which say, if you have more than this,
15 you can't sell it?
16     A.  You have to set some kind of limits.
17 That's what an impurity is.  An impurity needs a
18 limit.
19     Q.  But you just said, Doctor, that a
20 valsartan product with nitrosamines above the limits
21 as they exist today is just as safe as one that has
22 nitrosamines below the limit, didn't you?
23     A.  I have no understanding that it has a
24 different safety profile in terms of any kind of
25 risk.

Page 241

1      Q.  If not for safety, Doctor, then why is the
2  FDA setting limits for nitrosamines in the first
3  place?
4      A.  They need to set a limit for the impurity,
5  and they base it on that M7 guidance in terms of how
6  you set limits for genotoxic impurities.
7      Q.  Which is --
8      A.  Remember, it's a very difficult decision
9  because nitrosamine impurities are present in food
10 and foodstuffs and in the environment, in the water.
11 And you saw it in the M7 guidance.  How do you set
12 limits when that kind of impurity is present all
13 around us, if you will?
14         FDA has to do something.  They do it out
15 of an abundance of caution.  But it doesn't mean
16 that something above the limit was therefore toxic.
17     Q.  You can't sell a product today that is
18 above the nitrosamine limits, correct?
19     A.  Well, I'll generally agree with you, but I
20 will also say that in the guidance they say you can
21 be above limits under certain circumstances with FDA
22 approval.
23     Q.  Are you aware of any manufacturer who has
24 sought FDA approval to sell a product with
25 nitrosamines above the now-current limits?

Page 242

1    A.  No, I am not.
2    Q.  Uh-huh.  And you are telling me that the
3 FDA limits on nitrosamines have nothing to do with
4 the safety of the drug; is that your testimony
5 today, sir?
6    A.  I think they have to do with reducing
7 risk, and that is how FDA would state it in terms of
8 the M7 guidance and also the nitrosamine guidance.
9    Q.  Risk of what?
10    A.  But that risk is very difficult to
11 quantify.
12    Q.  Risk of what?
13    A.  Risk of whatever a nitrosamine impurity
14 might do.
15    Q.  Uh-huh.  What might it do?
16    MS. LOCKARD:  Objection.  Speculation.
17 Outside the scope of his opinions.
18    THE WITNESS:  I'm sorry.  Was that a
19 question, Mr. Stanoch?  I didn't hear it.
20 BY MR. STANOCH:
21    Q.  Yes, sir.  What might it do, the risk?
22    A.  Well, you can see it in the M7 guidance,
23 that it has the propensity in certain settings to
24 cause cancer.
25    Q.  Right.  Right.  The purpose of the FDA's

Page 243

1 limits currently is because there is a risk, however
2 quantified, to a patient if they take a pill that
3 has nitrosamines above the limit, right?
4    MS. LOCKARD:  Objection.  That's far
5 outside the scope of his opinions.  He's not giving
6 a causation opinion.
7    THE WITNESS:  Yeah, I am not definitely
8 not getting into causation.
9 BY MR. STANOCH:
10    Q.  I'm not asking you either that, Doctor.
11 What we're trying to understand here now is the
12 safety profile of a drug that has nitrosamines above
13 the limit.  And you were telling me, correct me if
14 I'm wrong, that it has nothing to do with safety,
15 correct?
16    A.  No, I'm saying I don't know if there is a
17 difference between the safety profile of the two
18 products.
19    Q.  So --
20    A.  It may be exactly the same, and to prove
21 that it's different would take a lot of work.
22 That's my point.
23    Q.  Uh-huh.  So you are saying that a
24 valsartan drug with nitrosamines above the current
25 limits may be just as safe as a valsartan product

Page 244

1 with nitrosamines below the limit or quantified at
2 zero?
3    MS. LOCKARD:  Objection.  Outside the
4 scope of his opinions.
5    THE WITNESS:  I'm saying that
6 hypothetically that could easily be possible.
7 BY MR. STANOCH:
8    Q.  Uh-huh.  Okay.  Let's look at the exhibit
9 some more.  The next paragraph, do you see where it
10 reads, "FDA classifies as therapeutically
11 equivalent"?  Do you see that?
12    A.  Yes.
13    Q.  And then it lists a number of criteria
14 which the Orange Book says the FDA classifies for
15 purposes of therapeutic equivalence, right?
16    A.  Yes.  Are you reading that final paragraph
17 on this page?
18    Q.  Yes, sir.  The sentence reads, "FDA
19 classifies as therapeutically equivalent those drug
20 products that meet the following general criteria";
21 do you see that?
22    A.  Yes, I do, and then it goes one, two,
23 three -- I guess the last one is four -- five.  It
24 continues on, and I think it ends with five.
25    Q.  Yes, sir.  I agree with that.

Page 245

1    And these are criteria that the Orange
2 Book reports that the FDA uses for classifying drug
3 products as therapeutically equivalent, correct?
4    A.  Yes.
5    Q.  All right.  And one of those is Number 5,
6 is whether the drug product is "manufactured in
7 compliance with Current Good Manufacturing Practice
8 regulations," correct?
9    A.  Yes, I see that.
10    Q.  And another one is 2(b), which is that the
11 drug products "meet compendial or other applicable
12 standards of strength, quality, purity, and
13 identity"; did I read that correctly?
14    A.  Yes, you did.
15    Q.  Right.  So for therapeutic equivalence,
16 meaning compendial standards alone may not be
17 sufficient per the Orange Book's guidance, correct?
18    A.  That's quite true, because sometimes there
19 isn't a compendial standard, so in that case there
20 would be a private, FDA-agreed standard.
21    Q.  Uh-huh.  And there may be other examples
22 as well, correct?
23    A.  Well, I don't know what you mean by that.
24 I'm thinking of the case where there is no
25 compendial standard.

Confidential Information - Subject to Protective Order

Page 246

1    Q.   Uh-huh.  And there may be standards
2  reflected in ICH or other industry guidance,
3  correct?
4    A.   No, I wouldn't go there.  I'm trying to
5  think of a simple case, that many times FDA doesn't
6  have a monograph for a drug substance or a drug
7  product --
8    Q.   Uh-huh.
9    A.   -- in which case, the quality would be
10  controlled with a private specification agreed to
11  with FDA as part of the review process.
12    Q.   Uh-huh.  This criteria 2(b) does not say
13  anything about the absence of a compendial standard,
14  correct?
15    A.   Well, I think it does.  It says, "meet
16  compendial or other applicable standards."
17    Q.   Uh-huh.
18    A.   The other applicable standards would be
19  the private specification agreed to with FDA.
20    Q.   Uh-huh.  And I think you testified about
21  this earlier, that a manufacturer can agree to
22  different specifications or standards for a drug in
23  consultation with the regulator, right?
24    A.   Yeah, I think that's generally part of
25  what I'm saying here.

Page 247

1    Q.   Then let's flip a few more pages.
2  Unfortunately it's not numbered, Doctor.  This is
3  the section that has 1.7, "Therapeutic Equivalence
4  Evaluation Codes."  Tell me when you are there.
5    A.   Okay.  I'm there.
6    Q.   And if you look at the first paragraph of
7  that page, it begins in bold, "Every product in the
8  Orange Book is subject at all times to regulatory
9  action."  Do you see that?
10    A.   Yes, I do, at the very top of the page.
11    Q.   And you can read that full paragraph if
12  you like, but I want to direct your attention to the
13  penultimate sentence that begins, "FDA believes that
14  retention"; do you see that?
15    A.   Yes, I do see that.
16    Q.   Could you just read that sentence, just
17  that sentence, sir?
18    A.   "FDA believes that retention of a
19  violative product in the Orange Book will not have
20  any significant adverse health consequences, because
21  other legal mechanisms are available to the Agency
22  to prevent the product's actual marketing."
23    Q.   Thank you.  And that means, does it not,
24  that just because a drug is listed in the Orange
25  Book, does not mean that it's immune from being

Page 248

1  found to be adulterated or otherwise improperly
2  marketed, right?
3    A.   Yeah.  I think what we're getting at here,
4  too, is the idea that there can be recalls if a
5  product fails its specifications, and that happens
6  all the time, as I stated in my report.  That
7  doesn't mean it will be taken out of the Orange Book
8  or its AB rating will be changed.  I think that's
9  what we're talking about here.
10    Q.   You can put that aside for now.
11        (Whereupon, a brief discussion off the
12  record.)
13  BY MR. STANOCH:
14    Q.   Are you aware of whether Teva has a master
15  drug file for valsartan?
16    A.   If I understand your question,
17  Mr. Stanoch, are you saying Teva makes its own
18  valsartan?
19    Q.   Right.  Do you understand Teva to have a
20  drug master file for valsartan?
21    A.   Yes, thank you.
22        No, I am not aware of that.  I would think
23  it would be possible.
24    Q.   Would seeing documents related to Teva's
25  own valsartan DMF be pertinent to you in terms of

Page 249

1  whether Teva could have known about nitrosamines
2  forming as part of the API manufacturing process for
3  valsartan?
4        MS. LOCKARD:  Objection.  Lacks
5  foundation.
6        THE WITNESS:  I wouldn't rule it out, but
7  I don't think -- I didn't see any documents like
8  that.
9  BY MR. STANOCH:
10    Q.   Uh-huh.  Stand by.
11        Could you turn in your report, sir -- it's
12  beginning around Paragraph 120, the first Paragraph
13  120.  I think it's around page 41.  I don't have the
14  exact copy you have in front of you.
15    A.   120?
16    Q.   Yes, sir.
17    A.   On page 41?
18    Q.   Yes.
19    A.   "Doctor Panagos asserts"?
20    Q.   Yes.  Are you there?
21    A.   Yes, I am.
22    Q.   Great.  And in this subsection, you're
23  rebutting, if you will, opinions offered by
24  Dr. Panagos, correct?
25    A.   Yes, I agree.

Confidential Information - Subject to Protective Order

Page 250

1    Q.   Right.  And why don't you read the first
2  couple sentences for us there in Paragraph 120?
3    A.   "Dr. Panagos asserts that the safety and
4  efficacy of a medication must be proven by the
5  manufacturer to the FDA so that the medication may
6  receive approval."  I think it's a she.  She
7  "further states that this information serves as a
8  warranty for the medication ensuring that it meets
9  the quality standards outlined by" "FDA."
10       Should I stop?
11   Q.   You can stop now.
12   A.   Okay.
13   Q.   And you picked up on part of it.  You
14  understand, you know, Dr. Panagos is a female,
15  correct?
16   A.   Yes, I see that now.
17   Q.   Okay.  If you can scroll down, sir, to
18  Paragraph 123.  Tell me when you are there.
19   A.   Yes, I see that statement.
20   Q.   Right.  And it begins, "Dr. Panagos
21  describes TPPs as payors at risk for purchases of
22  affected valsartan containing drugs products."
23   A.   Yes.
24   Q.   And what are TPPs, as you refer to it
25  there?

Page 251

1    A.   I think Dr. Panagos uses that abbreviation
2  for third-party payors.
3    Q.   What is your understanding of a
4  third-party payor in this case?
5    A.   It might be an insurance company or -- you
6  know, I'm trying to think of a term.  You know, a
7  medical care organization that pays for medicinal
8  products.
9    Q.   Uh-huh.  Right.  And then in the next
10  sentence you talk about risk about stopping your
11  antihypertensive treatment?
12   A.   Yes.
13   Q.   Right.  You are talking about two
14  different types of risk here in this paragraph,
15  aren't you?
16   A.   Well, I'm not sure I understand your
17  question.  Perhaps you could continue.
18   Q.   Sure.  So in the first sentence you are
19  referring to TPPs as payors at risk, right?
20   A.   Okay.
21   Q.   Right.  And then later you talk about, you
22  know, risks of stopping antihypertensive treatment,
23  right?
24   A.   Yes.
25   Q.   Right.  So what I'm clarifying is:  You

Page 252

1  are not saying that TPPs were at any sort of
2  physical risk involving valsartan, right?
3    A.   No, as I understand Dr. Panagos, she was
4  referring to financial risk.
5    Q.   Right.  I would agree with that.  You
6  understand that TPPs are at financial risk for
7  purchases of their, say, insureds, right?
8    A.   Yes.  And now I see your point.  It is two
9  different kinds of risks.
10   Q.   Well, I appreciate your clarification.  I
11  think we're on the same page.
12       And then in the next paragraph, in the
13  second sentence, you mention, "Both the TPPs and
14  patients got value for these products up to the
15  point they were recalled from the market."  Do you
16  see that?
17   A.   Yes.
18   Q.   What do you mean by "value" there?
19   A.   Well, I think it gets to my general
20  opinion that these were useful products.  They were
21  pharmaceutical equivalent.  They were bioequivalent.
22  They were AB-rated.  And practitioners and patients
23  used them successfully for the indications such as
24  hypertension.
25   Q.   Right.  So are you opining on whether or

Page 253

1  not patients or TPPs received value for the
2  valsartan they purchased prior to the recalls?
3    A.   I think if you look at my concluding
4  opinions, we have to pay attention to that.
5    Q.   Of course.
6    A.   My opinions are they were not adulterated.
7  They were pharmaceutically equivalent and
8  bioequivalent, and they were AB-rated.  They were
9  not misbranded.
10   Q.   Right.  I'm --
11   A.   So I think I'm answering your question and
12  speaking specifically to my opinions.
13   Q.   Right.  I'm looking at your conclusions,
14  Doctor, at the very last page of your report, and I
15  don't see anything about opinions on who might have
16  received what value for valsartan products, so
17  that's what I'm trying to understand here.
18   A.   I guess if I wanted to extend my
19  conclusions, my opinions to this particular
20  paragraph, I would say third-party payors got value.
21   Q.   Uh-huh.  And again, you define the value
22  that the third-party payors got as what?
23   A.   In terms of getting a safe and effective
24  product that could be used to treat patients in
25  accordance with labeled indications.

Page 254

1    Q.  And you are including in your definition
2  of a safe and effective drug products that have
3  nitrosamines in them, right?
4    A.  Yes.  And we know the products can have
5  nitrosamines in them.
6    Q.  Including products that had nitrosamines
7  above the FDA's eventual limits, correct?
8    A.  Well, that's the debatable point, and I'm
9  saying I just don't know if they had any different
10  safety and efficacy compared to the products below
11  that limit.
12    Q.  Got it.  You are not a -- you don't know
13  one way or the other whether a valsartan drug that
14  contains nitrosamines above the now-current FDA
15  limits had a different safety profile than valsartan
16  with nitrosamines below the now-current limits?
17    A.  I think you are stating that correctly,
18  Mr. Stanoch.
19    Q.  Uh-huh.  Do patients have a choice when it
20  comes to the drugs that they are prescribed?
21    MS. LOCKARD:  Objection.  Speculation.
22  Outside the scope.
23    THE WITNESS:  Well, they can certainly
24  talk to their doctors, and FDA encourages that, of
25  course.  I would encourage it if I were at FDA.  And

Page 255

1  I would say, yes, they do have a choice.
2  BY MR. STANOCH:
3    Q.  But they would have no way of knowing,
4  would they, about whether the valsartan they
5  received prior to the recalls contained nitrosamines
6  or not, right?
7    A.  Well, I'll make the general statement that
8  I don't think any label for a new drug approved by
9  the NDA or ANDA process has information about
10  impurities on the label.
11    Q.  Uh-huh.  So then based on the --
12  valsartan's labeling part of the recalls, there is
13  no way a consumer would be able to make a decision
14  as to whether they wanted a valsartan product that
15  did or did not contain nitrosamines?
16    A.  The only way they would know in this
17  particular instance is to read the FDA press
18  releases and talk to their physicians and
19  pharmacists.
20    Q.  Right.  And prior to those FDA press
21  releases, there was no way for them to know based on
22  the labeling alone?
23    A.  Well, I think that's generally true, but
24  I'm not sure entirely.
25    Q.  Okay.  Let's mark another exhibit.  Stand

Page 256

1  by, Doctor.
2    (Whereupon, Exhibit 14 was marked for
3  identification.)
4  BY MR. STANOCH:
5    Q.  This is Exhibit 14.  It should be Tab 32
6  in your binder.  Tell me when you are there, sir.
7    A.  Yes, I see this.  Begins, "Expert:
8  Nitrosamines 'Can Slip Through.'"
9    Q.  Correct.  It's an article in Pharmacy
10  Times from June 29, 2021.  Do you see that?
11    A.  Yes, I do see it.
12    Q.  And it says it includes a discussion with
13  "Edwin Gump, Ph.D., vice president of the Small
14  Modules Department at U.S. Pharmacopeia (USP)."  Do
15  you see that?
16    A.  Yes, I do see that.
17    Q.  Are you familiar with Dr. Gump?
18    A.  No, I'm not.
19    Q.  Are you familiar with the Small Molecules
20  Department at USP?
21    A.  Yes, I think I would -- I am familiar with
22  that.
23    Q.  Uh-huh.  And then if you want to -- if you
24  would flip to the third page of this document, sir.
25  Tell me when you are there.

Page 257

1    MS. LOCKARD:  You can -- to review it if
2  you need to.
3    THE WITNESS:  Yeah, I'm looking at the
4  whole document just a second.  It appears to be an
5  interview between a reporter, Alana, and Dr. Gump in
6  a publication for Pharmacy Times.  So you want me to
7  go to the third page?  One, two, three?
8  BY MR. STANOCH:
9    Q.  Yes.  Yep.
10    A.  At the top it starts with, "class"?
11    Q.  Yes, sir.  If you could --
12    A.  Okay.  Got it.
13    Q.  Great.  If you can go on that page down,
14  do you see the bolded name of the reporter, "Alana";
15  you see that?
16    A.  I do see that.
17    Q.  Uh-huh.  And she asks, "Right.  Why are
18  nitrosamines of such particular concern?"  You see
19  that?
20    A.  Yes, yes.
21    Q.  And why don't you read Dr. Gump's response
22  to that question, that first paragraph there,
23  beginning, "So"?
24    A.  "So, I'm not a toxicologist, but
25  nitrosamines, from my reading, these are compounds

Page 258

1 that have been studied for a number of years.
2 There's at least a number of compounds in this class
3 that are known mutagenic carcinogens. So, they're
4 basically fairly nasty cancer-causing actives."
5      Should I stop there?
6      Q. Yes. That's fine. I can ask questions on
7 that.
8      So do you agree with Dr. Gump that
9 nitrosamines are fairly nasty cancer-causing
10 actives?
11      MS. LOCKARD: Objection. Outside the
12 scope of his expert opinion in the
13 class-certification phase. You are asking him
14 causation opinions.
15      THE WITNESS: Well, I guess what I would
16 agree with is Dr. Gump says he is not a
17 toxicologist, and neither am I, so I agree with him
18 there.
19 BY MR. STANOCH:
20      Q. So would you agree with him that
21 nitrosamines are fairly nasty cancer-causing
22 actives?
23      MS. LOCKARD: Objection. Outside the
24 scope of his testimony. Asked and answered.
25      THE WITNESS: You know, I don't agree with

Page 259

1 him there. That seems to be a fairly off-the-cuff
2 comment that would take a very sophisticated expert
3 to speak about the clinical impact of a particular
4 nitrosamine impurity.
5 BY MR. STANOCH:
6      Q. Uh-huh. Then would you agree with
7 Dr. Gump that nitrosamines are compounds that have
8 been studied for a number of years?
9      A. Yes, I think that's true. I would agree
10 with that.
11      Q. Uh-huh. Okay. Then why don't you move to
12 the last paragraph of that same page? It reads,
13 "But the one place."
14      A. "But the one place that people don't
15 really have a choice -- you can choose not to eat
16 that grilled burger -- but people shouldn't have to
17 make a choice" to "have concerns about the quality
18 of their medicines."
19      Q. Right. Do you agree with that statement
20 from Dr. Gump?
21      A. Well, again, these seem kind of very
22 general, unscientific statements. I mean, people
23 shouldn't have to make a -- can choose not to drink
24 your water that has nitrosamines. Does he want to
25 say that, that people should not drink their water?

Page 260

1 I mean, these are very general statements, but I
2 don't have a particular opinion about them, and they
3 don't relate to my report.
4      Q. Well, respectfully, sir, you are opining
5 on the value received from the drugs that are at
6 issue here. And I'm asking you, then, here if you
7 agree with Dr. Gump from the USP Small Molecule
8 Department about whether people don't really have a
9 choice when it comes to their drugs as opposed to
10 different foodstuffs and other things.
11      A. Is it --
12      MS. LOCKARD: There is not a question
13 pending.
14      THE WITNESS: I just don't understand the
15 question. I mean, was there a question? Could you
16 rephrase it, perhaps, Mr. Stanoch?
17 BY MR. STANOCH:
18      Q. Do you agree that people can choose not to
19 eat their grilled burger, but people shouldn't have
20 to make a choice or have concerns about the quality
21 of their medicines?
22      MS. LOCKARD: Objection. Vague. Outside
23 the scope of his testimony for class certification.
24      THE WITNESS: And, you know, just
25 continuing on, you know, we can certainly

Page 261

1 cherry-pick statements out of this, but on the next
2 page it says, "The U.S. medicines supply is probably
3 the safest, or safe as any in the world, and we want
4 to make sure that the public really feels confident"
5 about "when they need to take a medicine that they
6 can do so and not have other things they have to
7 concern themselves about like nitrosamines."
8      I can certainly agree with that.
9 BY MR. STANOCH:
10      Q. You are agreeing to a different statement
11 that I didn't ask you about; is that what you just
12 did, Doctor?
13      A. Well, you are asking me to read at the
14 bottom of -- maybe I misread where you asked me to
15 read. If so, I apologize.
16      Q. Well, we have been at the same page,
17 Doctor.
18      A. Well, maybe I skipped over a page. Yes,
19 you had me read at the bottom of page 3; is that
20 correct, Mr. Stanoch?
21      Q. Yes, sir.
22      A. Yes, okay. I'm sorry. I jumped ahead.
23      Q. Again, do you agree with Dr. Gump's
24 statement in that paragraph, "But the one place that
25 people don't really have a choice -- you can choose

Page 262

1  not to eat that grilled burger -- but people
2  shouldn't have to make a choice or have concerns
3  about the quality of their medicines"?
4       MS. LOCKARD: Objection. Vague. Outside
5  the scope of the expert witness report on class
6  certification.
7       THE WITNESS: If you are asking me if I
8  agree with Dr. Gump, I have to say I don't because,
9  you know, the presence of nitrosamine in food and
10 water and foodstuff is very uncertain, and it's
11 certainly not anything I talked about in my report.
12 But I'm not sure people can choose their foods and
13 their water so that they avoid nitrosamines. I just
14 don't know that.
15      Maybe he could make that point with regard
16 to a grilled burger, but what about all the other
17 grilled products and all the other foods that have
18 nitrosamines? It's a very general, if I may say,
19 uninformed statement, so that's why I am hesitating
20 to agree with it.
21 BY MR. STANOCH:
22      Q. So you don't agree?
23      A. I certainly agree that we need to control
24 nitrosamines in our medicines, and that's what this
25 entire effort, which began in 2018, is all about.

Page 263

1       Q. Are you aware of any efforts to control
2  nitrosamines in drug products prior to 2018?
3       A. I am not aware of that, Mr. Stanoch.
4       Q. Uh-huh. Would that be pertinent to the
5  opinions you are offering currently in this case?
6       A. I think it is generally in the sense that
7  science marches on, FDA marches on, drug regulation
8  gets better. We have many, many examples of that in
9  the United States.
10      And is it perfect? Are drugs perfect now?
11 No. But we can hope that in 10 or 20 years they
12 will be better than they are now. And what we see
13 happening here is an example of that happening with
14 regard to valsartan and nitrosamines.
15      Q. So you agree, then, that if information
16 was made known to a API manufacturer prior to the
17 2018 recalls about the potential for nitrosamine
18 impurities, that that should have been something
19 that was dealt with at that time, correct?
20      MS. LOCKARD: Objection. Vague.
21      THE WITNESS: I can't agree with it. It
22 does seem very vague. Perhaps you can restate the
23 question.
24 BY MR. STANOCH:
25      Q. Well, it sounds like you are saying nobody

Page 264

1  knew about nitrosamines until the summer of 2018,
2  right?
3       A. That's what FDA says. I'm not saying
4  that.
5       Q. Uh-huh. Well, you are opining that
6  allegedly the FDA said it was unexpected and nobody
7  knew about it until summer of 2018, right?
8       A. Yes, FDA made a series of statements along
9  those lines.
10      Q. Right.
11      A. And it's definitely a part of my report.
12      Q. It certainly is. I can agree with that.
13      And then once the information came to
14 light about the nitrosamine impurities in valsartan,
15 the regulators in the industry took action, right?
16      A. Well, there was a series of events that
17 now have extended over the past four years and
18 extends to all the chemically synthesized drugs in
19 the country. So I guess you could say it's a very
20 comprehensive set of activities.
21      Q. And if that series of events -- oh, strike
22 that.
23      And if the information about nitrosamine
24 impurities in valsartan came to light earlier, that
25 series of events would have started earlier,

Page 265

1  correct?
2       MS. LOCKARD: Objection. Vague.
3       THE WITNESS: I suppose you could make
4  that hypothetical, and I wouldn't debate you.
5  BY MR. STANOCH:
6       Q. Let's flip to the fourth page of the
7  article in front of you, Doctor.
8       A. One, two, three, four. Okay. Is this the
9  page that starts at the top, "ones that" "need"?
10      Q. Correct, sir. If you can go down to the
11 paragraph where Mr. Gump's name is bolded again, and
12 it begins, "That's a great question." Do you see
13 that?
14      A. Yes, Dr. Gump, "That's a great question."
15      Q. Right. And then can you read the next
16 sentence?
17      A. "So, I think I mentioned that
18 manufacturers have a responsibility to evaluate
19 their processes and their products and look for
20 chance where they could have a risk of
21 nitrosamines."
22      Q. Do you agree with that statement?
23      A. Well, certainly, because Dr. Gump is
24 echoing the FDA guidance that came out well before
25 this interview --

Confidential Information - Subject to Protective Order

Page 266

1    Q.  Uh-huh.
2    A.  -- particularly in February 2021, and this
3   is the end of June 2021.
4    Q.  Uh-huh.
5    A.  Dr. Gump, if I may say so, is on very safe
6   ground.
7    Q.  And would --
8      (Reporter clarification.)
9      THE WITNESS:  Safe ground, S-A-F-E.
10  BY MR. STANOCH:
11   Q.  Would you agree that prior to summer of
12  2018 manufacturers had a responsibility to evaluate
13  their processes and their products to look for the
14  chances of genotoxic impurities?
15     MS. LOCKARD:  Objection.  Outside the
16  scope.
17     THE WITNESS:  Yes, I think that is what
18  the guidance that we looked at before speaks to, and
19  that had a date -- I guess it was a final date of
20  2018.
21  BY MR. STANOCH:
22   Q.  You are referring to the ICH guidance,
23  correct?
24   A.  Yes, the M7.
25   Q.  Right.  And then there were prior

Page 267

1   iterations of that same guidance, right?
2    A.  Yes.  And other guidances, too, an ICH
3   guidance and, I believe, an EMA guidance.
4    Q.  Uh-huh.  And manufacturers would have
5   responsibilities to evaluate their processes and
6   products for genotoxic impurities under the prior
7   iterations of the ICH and EMA guidance, whatever
8   they may be at that period of time, right?
9    A.  Yes, and there are certainly other
10  statements in Dr. Gump's interview that we could
11  look to.  But I'll wait for your questions,
12  Mr. Stanoch.
13   Q.  Okay.  Very good.  So why don't we
14  actually put that aside for now, Doctor.
15     Some other questions about your
16  professional experience, sir.
17   A.  Yes, please.
18   Q.  You are not a Pharm.D., correct?
19   A.  I am not.
20   Q.  Have you ever dispensed a drug?
21   A.  I have not.
22   Q.  Have you ever prescribed any valsartan or
23  Diovan?
24   A.  I have not.
25   Q.  Have you prescribed any drug since 1990?

Page 268

1    A.  You know, actually, I haven't.  I don't
2   write prescriptions.
3    Q.  Do you know what a pharmacy and
4   therapeutics committee is?
5    A.  I do.
6    Q.  Okay.  And what is that?
7    A.  Well, I would say it's a group of experts
8   that build a formulary for a defined benefit offered
9   to a community.  So, for example, a hospital, a big
10  hospital in an inner city may have a P&T committee
11  that builds a formulary that the physicians and
12  pharmacists in that community can use to write and
13  dispense drugs -- write prescriptions and dispense
14  drugs.
15   Q.  We can call that pharmacy and therapeutics
16  committee a P&T committee, right?
17   A.  Yes, sir.
18   Q.  Have you ever served on a P&T committee?
19   A.  No.
20   Q.  Have you ever consulted with any P&T
21  committee?
22   A.  Well, I remember during my days at USP I
23  met with the Kaiser P&T committee to discuss how
24  they work, but I wouldn't call that a consultation.
25   Q.  Okay.  The --

Page 269

1    A.  They weren't asking my opinion.  It was
2   more an exchange of information.
3    Q.  Fair enough.  And roughly when was that?
4    A.  Oh, gee.  2010.
5    Q.  2010.  Have you ever been asked by any
6   third-party payor to consult on their formulary
7   designs?
8    A.  No.  But I should mention perhaps at this
9   point that USP was asked to consider model
10  guidelines for formularies as part of the Medicare
11  Part D benefit.  And that was a large effort for the
12  organization when I was there, and as far as I know,
13  it's still continuing.
14   Q.  Were you part of that effort while you
15  were working at USP?
16   A.  Yes, as a matter of fact, I chaired an
17  expert committee which created the first model
18  guidelines, and that was a very interesting effort.
19   Q.  Uh-huh.  And what are the name of the
20  guidelines?
21   A.  I would call them the USP model guidelines
22  for the Part D -- to assess Part D formulary plans.
23   Q.  Uh-huh.  You are not opining here, Doctor,
24  about what information a P&T committee relies on
25  when making decisions about reimbursements for drug

Page 270

1 products, correct?
2    A.   No, I am not.
3    Q.   All right.  Have you ever worked for a
4 third-party payor?
5    A.   I have not.
6    Q.   Do you know what a PBM is?
7    A.   It's a pharmacy benefit manager.
8    Q.   Have you ever worked for a PBM?
9    A.   No, I have not.
10    Q.   Have you ever consulted with a PBM
11 professionally?
12    A.   No, I haven't.
13    Q.   Right.  You are not here to opine on
14 anything a PBM might rely on when it's making any
15 determinations regarding a pharmacy benefit,
16 correct?
17    A.   No.  No.  I don't believe that's any part
18 of my opinions.
19    Q.   Okay.  Let's mark another exhibit.  Stand
20 by.
21        (Whereupon, Exhibit 15 was marked for
22 identification.)
23 BY MR. STANOCH:
24    Q.   This is Exhibit 15.  It should be Tab 31
25 in your binder, sir.  Just let me know when you are

Page 271

1 there.
2    A.   I think it's coming toward me.
3        Okay.  I see something called ProPharma
4 Group.
5    Q.   Right.  And you can look through these
6 pages, but this is all of the invoices that were
7 produced to us for your work in this case.  And if
8 you can just look through them and confirm that this
9 is the totality of the invoices for your work thus
10 far in this case.
11    A.   ProPharma.  I'm a little confused about
12 ProPharma Group.  Oh, maybe I shouldn't be confused
13 about that group.  Okay, yes, I see these are my
14 invoices, and these invoices should be concurrent
15 until the end of January of this year.  Okay.
16    Q.   Right.  I mean, the first few pages, I see
17 the ProPharma Group, dated 11/30/21.  Do you see
18 that?
19    A.   11/30/2021, yes, I do see that.
20    Q.   Right.  And then the next few pages is for
21 work from an invoice dated 12/31/21, right?
22    A.   Yes, I submit my hours monthly.
23    Q.   And then the next page after that is an
24 invoice for your work through January 31, 2022,
25 right?

Page 272

1    A.   Well, wait a minute.  I see a third page
2 that looked like July 2021.  Yes, that could be
3 true.
4    Q.   Right.  Well, I guess there is a couple
5 things here.  First is:  Why do some of your
6 invoices say ProPharma Group and the other one at
7 the end says NDA Partners?
8    A.   My consulting group, NDA Partners, was
9 sold in 2021 to a larger company called Planet
10 Pharma, and then Planet Pharma in turn merged with
11 ProPharma, so the overarching organization for my
12 consulting group, which still exists as NDA
13 Partners, is ProPharma Group.
14    Q.   Got it.
15    A.   And they do the billing.
16    Q.   Did anyone at NDA Partners or ProPharma
17 Group assist you in the preparation of your report
18 that you submitted in this case?
19    A.   No, not at all.
20    Q.   Okay.  You and you alone wrote your
21 report?
22    A.   Yes, I think that's quite true.  I wrote
23 this report.
24    Q.   And the invoice at the end that is on the
25 NDA Partners letterhead, it's dated 7/31/2021?

Page 273

1    A.   Yeah, I think we may be looking at the
2 transition from NDA Partners to ProPharma --
3    Q.   Uh-huh.
4    A.   -- so that's an interesting observation.
5    Q.   And it looks like your first billed work
6 in this matter was 7/1/2021, right?
7    A.   That's when I was first contacted by
8 counsel, and then there was a hiatus.  I really
9 didn't begin substantive work on this report until
10 November.  You can see that in the invoices.
11        And the reason I didn't do any detailed
12 work in July until November was because I was not
13 involved in the causation discussions.
14    Q.   Then if you look on the ProPharma Group
15 invoice dated 1/31/2022, the first entry is for work
16 on January 3rd, 2022, correct?
17    A.   Wait a minute.  I'm having trouble
18 catching up with you.  But I'm setting aside the
19 July one.  Now there is one -- I see a July invoice.
20 If that's what you are talking about, yes, I see
21 that invoice.
22    Q.   And just to go through this, a few things.
23 You say, "Review 82 documents in triplicate."  Do
24 you see that?
25    A.   Yes, I do.

Confidential Information - Subject to Protective Order

Page 274

1    Q.   What do you mean by "in triplicate"?

2    A.   Well, I'm laughing a little bit because I
3  think I got the same folder three times.  I had to
4  check with counsel many times to make sure that they
5  were the same documents in the three folders.  So
6  that's what that was all about, and I did have a
7  good review with counsel about the materials I
8  received and where it was all filed.

9    Q.   Uh-huh.  And then further down here, you
10  have some entries for, "Read DB deposition," "Read
11  EG deposition"; do you see those?

12    A.   Yes, those refer -- for example, "EG"
13  refers to Elizabeth Gray.  The "DB" refers, I
14  believe, to Daniel Barreto.

15    Q.   Uh-huh.

16    A.   And then you can see Panagos expert
17  reports.

18    Q.   Uh-huh.  And then that last entry, should
19  that be DB deposition as well?

20    A.   Well, I'm not sure about that.  No, I
21  think it may be a Binsol deposition.

22    Q.   Uh-huh.  So sometimes you listed the
23  specific deposition you read, and sometimes you
24  didn't, it looks like; is that right?

25    A.   I could agree that the way I fill out my

Page 275

1  hours might not be entirely consistent.

2    Q.   And I'm not going to take issue with that,
3  Doctor.  I just want to make sure, though, that even
4  if you call out specific deposition transcripts here
5  in your invoices, is it your position that you did
6  review all the deposition transcripts that were in
7  your materials considered?

8    A.   No, I didn't look at all the depositions.
9  I selected certain depositions that seemed
10  particularly important.

11    Q.   Which ones, then, did you review?

12    A.   Well, we can see from this, I would say
13  Daniel Barreto, Elizabeth Gray and Mr. Binsol.
14  There may have been others, but I might have left
15  them out of my invoice.

16    Q.   Uh-huh.  And if you flip back to the -- I
17  guess the second page.

18    A.   I'm trying to stay with you on page
19  numbers.

20    Q.   Well, I guess it -- yeah, I guess it would
21  be page 1 of 2.

22    A.   Is this December?

23    Q.   Yes.  December 31, 2021.

24    A.   Yes, I'm looking at all that.

25    Q.   Uh-huh.

Page 276

1    A.   How can I assist?

2    Q.   When you say, "Write CBE-30," are you
3  referring to sections of your report?

4    A.   Yes.

5    Q.   Okay.  You weren't writing a CBE-30
6  separately outside of your work, right?

7    A.   Not at all.  Oh, no, no, that would not be
8  true.

9    Q.   Uh-huh.  And when you say, "Attempt to
10  review ANDA files," what does that mean?

11    A.   Well, ANDA, as you know, the ANDA files
12  were very broad and deep and complex.  So I would
13  say I could review them from a high level, but I
14  would not claim that -- I certainly wouldn't claim
15  to counsel that I was reviewing the ANDAs in detail.

16    Q.   Got it.  And it looks that throughout all
17  of your invoice work, your rate was the same, the
18  $695 an hour?

19    A.   Yes.  And remember, that is what goes to
20  the company.  That's not what comes to me.

21    Q.   Uh-huh.  What portion do you get?

22    A.   It's 80 percent.

23    Q.   Okay.  And you don't need a calculator,
24  Doctor, unless you want it, but ballpark it looks
25  like the invoices for your work to date for this

Page 277

1  matter is approximately $90,000 or so?

2    A.   Yes.  Let's say 80 percent of that would
3  come to me, if we're calculating it that way.

4    Q.   Understood.  All right.  You can put those
5  aside for now.  Thank you.

6       Can you pull up your -- I guess it would
7  be Exhibit A to your report, sir.  I'm looking at
8  page 28 of 29 of Exhibit A.  It's your prior
9  deposition testimony.

10    A.   Yes, I think it's coming to me.  Just a
11  second.

12    Q.   Sure.  Let me know when you are there.

13    A.   Wait a minute.  I have it in my CV here.

14       (Whereupon, a brief discussion off the
15  record.)

16       THE WITNESS:  I should have it in front of
17  me.  Hold on just a sec.

18       MS. LOCKARD:  Here you go.

19       THE WITNESS:  Oh.

20       Okay.  I'm with you, Mr. Stanoch.  Please
21  proceed.

22  BY MR. STANOCH:

23    Q.   Great.  And here you have listed, it looks
24  like, 14 matters in the last four years, right?

25    A.   I'm counting 20, with the most recent

Page 278

1  being the trial testimony in November 17th.  Are you
2  cutting off some because they are not in the last
3  four years?
4      Q.  Oh, no, I'm sorry.  The one I'm looking
5  at -- maybe I have an older version in front of
6  me -- only had 14 numbered entries.  Let me look at
7  something else.
8      A.  It got cut off, but I see 20 in my CV in
9  the final pages.  But you may be right if we are
10  just counting the last four years.
11     Q.  Well, how many numbered matters do you
12  have in the version that you are looking at, Doctor,
13  20?
14     A.  I have 20, yes.
15     Q.  Okay.  And starting from the top of that,
16  could you -- I just want to know what party you were
17  retained by and in whose behalf you were offering
18  opinions.
19     A.  Oh, the first one I actually can't
20  remember.  I'd have to look it up to tell you.
21        The second one was sort of a -- it was
22  a -- I could say it this way.  It was a squabble
23  between a lot of people.  It really didn't have
24  much -- it didn't have anything to do with FDA,
25  really.  And it was an individual where some people

Page 279

1  were complaining that he had taken intellectual
2  property from a firm.
3        Supernus versus Actavis I think was a
4  patent issue, and I was on the Supernus side.
5        The fourth one I think was antitrust.
6        The fifth one was a debate about a generic
7  company versus Shire, and I was on the Shire side.
8        Solodyn was antitrust.  I was on the part
9  of plaintiffs.
10        Loestrin I think was antitrust, and that
11  was on the part of plaintiffs.
12        Arbor versus ANI was sort of a company
13  squabble, and I was on the ANI side.
14        Fresenius Kabi and Par was an argument
15  about -- I'm summarizing very briefly, but I think
16  it was restraint of trade, and I was on the Par
17  side.  They were the defendants, as I recall.
18        Galderma versus Teva was patent, and I was
19  on the Teva side as the -- I'm struggling with what
20  they were.  Yeah, they got sued, so they were the
21  defendant.
22        Belcher versus Hospira.  I don't remember
23  that one.  I'd have to look it up.  I apologize.
24        Continuing, Vision versus Sunrise, that
25  was a sort of company squabble over GMPs.

Page 280

1        Restasis was antitrust.
2        Biogen was -- versus Acorda was related to
3  an FDA guidance where I offered testimony.
4        Stewart, Sandoz was failure to warn.
5        Glumetza was antitrust, and that's still
6  active.
7        Braeburn versus Camurus, that was a
8  company squabble where I was on the side of
9  Braeburn.
10        And then Ranbaxy is still -- I'm sorry.
11  The Glumetza, I think, settled, and the Ranbaxy is
12  still in progress, but it's antitrust.  I'm on the
13  side of the plaintiffs.
14        Genentech versus InterMune was patent.  I
15  was on the side of InterMune, the pioneer.
16        Mallinckrodt versus debtors, that was a
17  squabble between third-party payors, if you will,
18  and Mallinckrodt, and I was on the Mallinckrodt
19  side.
20        Is that helpful, Mr. Stanoch?
21     Q.  No, it is.  I appreciate you going through
22  that.
23        And, Doctor, for the prior cases you have
24  offered expert opinions in, for those that are class
25  actions, is it fair to say you have always been

Page 281

1  retained by a defendant in those actions?
2      A.  You know, I'm not sure that I would
3  identify any of those as class actions.  I have to
4  say I'm a little uncertain about just what a class
5  action is, and so I couldn't say I was on one side
6  or the other.
7        If you say an antitrust is a class action,
8  I think I would agree with you that I'm usually on
9  the side of plaintiffs, but I have one now where I
10  believe it's antitrust and I'm on the side of the
11  pioneer --
12     Q.  But you just said --
13     A.  -- so I don't think I can agree with you
14  that I'm always on one side versus another.
15     Q.  Uh-huh.  But you are on the side of the
16  defendants now in this case, right?
17     A.  Yes.
18     Q.  All right.  And, the extent you remember,
19  just go through and tell me where you think you were
20  on the side of the defendants in your list of cases.
21     A.  Oh, dear.  Well, I'll give some examples.
22  I think Mallinckrodt was the defendant.  They were
23  getting -- in Genentech I was on the side of the
24  plaintiff.
25        Ranbaxy, I was on the side of plaintiff.

Confidential Information - Subject to Protective Order

Page 282

1    Braeburn, I think they were the
2  defendants.
3    At Stewart, I was on the side of Sandoz.
4  That was the defendants.
5    Can't remember Biogen.
6    Restasis I was on the side of the payors,
7  so they would be the plaintiffs.
8    I better stop there because I'm a little
9  uncertain about my answers.
10   Q.  Okay.  If you are uncertain, that's okay,
11 Doctor.  I don't need you to guess.  That's quite
12 all right.
13   Stand by.
14   MS. LOCKARD:  We have been going over an
15 hour, so if you get to a good breaking point, that
16 would be helpful.
17 BY MR. STANOCH:
18   Q.  All right.  Doctor, I just want --
19   MR. STANOCH:  Yeah, we'll take a break
20 soon, Counsel.
21   Q.  Doctor, I just want to go back to your --
22 oh, what was it, Tab -- I think it was Exhibit 2.
23 It was Exhibit 2, sir.  It was the Roger Williams
24 list of materials considered, 2/17/2022.
25   A.  Yes, I have that before me, Mr. Stanoch.

Page 283

1    Q.  And I want to make sure I understood this.
2  So the materials listed here, you may or may not
3  have looked at some of these things, but you are
4  only relying on them for purposes of your report if
5  they are cited in the body or footnotes of your
6  report, right?
7    A.  Yes, I think that's a fair summary.
8    Q.  Fine.
9    MR. STANOCH:  Let's take a break, then.
10   THE VIDEOGRAPHER:  Okay.  We are going off
11 the record.  The time is 3:00 p.m.
12   (Whereupon, a brief recess was taken.)
13   THE VIDEOGRAPHER:  Okay.  We are coming
14 back on the record.  The time on the video monitor
15 is 3:35.  Please begin.
16 BY MR. STANOCH:
17   Q.  Okay.  Welcome back, Doctor.  During that
18 lengthy break, did you talk to anyone besides your
19 counsel?
20   A.  No, not at all.
21   Q.  Did you communicate with anyone besides
22 the counsel in the room with you about your
23 testimony?
24   A.  No, not at all.
25   Q.  Did you review any documents?

Page 284

1    A.  No.
2    Q.  Okay.  All right.  I'm going to mark,
3  Doctor, a copy of the CV and your prior testimony in
4  cases which was provided to me by Teva's counsel
5  during the break that will be marked as Exhibit 16.
6    (Whereupon, Exhibit 16 was marked for
7  identification.)
8    MR. STANOCH:  So that should be available
9  to everyone.
10   I will also mark at this time, as
11 Exhibit 17, the video webinar from which the USP
12 excerpt stills were taken.
13   (Whereupon, Exhibit 17 was marked for
14 identification.)
15   MR. STANOCH:  And I have no further
16 questions at this time.  I'll reserve my time
17 pending counsel's questions.  Thank you,
18 Dr. Williams.
19   THE WITNESS:  Thank you, Mr. Stanoch.
20   (Whereupon, a brief discussion off the
21 record.)
22   EXAMINATION
23 BY MS. LOCKARD:
24   Q.  Okay.  Dr. Williams, a copy of your CV was
25 just marked as Exhibit No. 16.

Page 285

1    Do you have a copy of that in front of
2  you?
3    (Whereupon, a brief discussion off the
4  record.)
5    THE WITNESS:  Yes, I do.
6  BY MS. LOCKARD:
7    Q.  All right.  For the benefit of the jury
8  and counsel, can you please give us the benefit of
9  your educational background?
10   MR. STANOCH:  Objection to form.  Beyond
11 the scope.
12 BY MS. LOCKARD:
13   Q.  You can continue.
14   A.  My undergraduate degree was a premed
15 degree, and then after I completed my undergraduate
16 studies, I went to medical school at the University
17 of Chicago.  I stayed on after my medical degree and
18 obtained an internship and residency in internal
19 medicine at the University of Chicago.  And I
20 received honors, both in undergraduate, Phi Beta
21 Kappa, as well as medical school, called AOA, which
22 is the equivalent of Phi Beta Kappa.
23   Then I entered the U.S. Army, and that was
24 a deferred draft, where I stayed for three years.  I
25 actually did research on malaria at Walter Reed

Page 286

1 during the latter half of my service. In the first
2 half I was stationed in Seoul, Korea.
3         When I finished that service, I entered a
4 clinical pharmacology fellowship at the University
5 of California, San Francisco. That lasted three
6 years. And based on my training, I was able to
7 obtain Board certification in both internal medicine
8 and clinical pharmacology.
9     Q.   Were you an officer in the Army?
10    A.   Yes, I was a major.
11    Q.   What licenses have you held?
12    A.   I was licensed to practice medicine in
13 California, but I didn't continue that or my Board
14 certifications when I came to FDA in 1990 because it
15 was a full-time job at FDA and I was not practicing
16 clinical medicine.
17    Q.   Have you held any licenses in
18 pharmacology?
19    A.   Clinical pharmacology. There is no
20 licensure, but I was Board-certified in clinical
21 pharmacology.
22    Q.   What did you do when you left private
23 practice or -- as a medical doctor?
24        MR. STANOCH: Objection to form.
25        Go ahead.

Page 287

1         THE WITNESS: I would say I was never in
2 private practice. I worked at the University of
3 California, San Francisco, doing clinical
4 investigations for NDA and ANDA sponsors. And it
5 was there that I built a focus on bioavailability
6 and bioequivalence that I think has continued
7 throughout my career.
8         I spent a year after my service at UCSF in
9 a small company in South San Francisco that was
10 studying an HIV medicine.
11        And then Dr. Carl Peck, who has been a
12 very good mentor and friend, brought me to FDA in
13 1990 to head up the Office of Generic Drugs. And
14 for those who may remember, that was a difficult
15 time for both the generic industry and FDA. It had
16 to do with something that briefly is called the
17 generic drug scandal.
18        But I was very pleased to work in the
19 Office of Generic Drugs. We worked with Congress
20 and with industry to sort of straighten it all out.
21 And I think we did get it straightened out. We sort
22 of put it back on a solid footing. And the office
23 has zoomed, if you will, ever since then over the
24 ensuing decades.
25        In 1993, Dr. Peck left, so I came up to

Page 288

1 the level of the center, where I held multiple
2 positions, but I ended my career and the last
3 several years of my time at FDA working as a deputy
4 director for the center director, who was Dr. Janet
5 Woodcock at the time. Dr. Woodcock is now the
6 commissioner of FDA on an acting basis.
7         And in my role as deputy center director,
8 I had a lot of responsibilities, but I was
9 principally the director of the Office of
10 Pharmaceutical Science. That office is now the
11 Office of Pharmaceutical Quality at FDA. And I had
12 oversight for the Office of Generic Drugs, the
13 Office of Clinical Pharmacology and Biopharmaceutics
14 and the Office of Testing and Research and also the
15 Office of Chemistry. So I had a terrific experience
16 overseeing about four or five of the disciplines
17 that contribute to the review of an NDA, as well as
18 oversight for the Office of Generic Drugs and many
19 other responsibilities.
20        I then left FDA in 2000. I became chief
21 executive officer and chair of the Council of
22 Experts. And I would say over my 14-year period
23 there was a rapid expansion of USP, a globalization
24 of our activities, a focus on the science of
25 metrology, which I think is the undergirding science

Page 289

1 for what USP does, and the addition of a lot of
2 compendia.
3         USP started out, when I was there, with
4 USP-NF. Those are official compendia of the United
5 States. But we added Food Chemical Codex, a Dietary
6 Supplement Compendium. We even experimented with a
7 novel compendium that we called the Medicines
8 Compendium.
9         And overall it was a very remarkable
10 experience, and I am forever grateful for having
11 that experience.
12    Q.   What --
13    A.   After leaving USP, I became a consultant
14 at the invitation of Dr. Peck again. Dr. Peck has
15 been a great mentor, and he was the center director
16 who brought me to FDA. And I have continued doing
17 consulting in his consulting group, called NDA
18 Partners, as we have discussed, and over the last
19 several years I've focused primarily on litigation.
20    Q.   How many years were you at the FDA,
21 Dr. Williams?
22        MR. STANOCH: Objection to the form.
23        THE WITNESS: Ten.
24 BY MS. LOCKARD:
25    Q.   How many years were you at the United

Page 290

1  States Pharmacopeial Convention, the USP?
2      A.  Fourteen.
3          MR. STANOCH:  Same objection.
4  BY MS. LOCKARD:
5      Q.  What year did you leave the USP?
6      A.  It was the beginning of 2014.
7      Q.  And your CV that was marked as Exhibit 16,
8  I was following along, but it has the dates and
9  specific responsibilities and titles for your
10 positions at FDA, USP and otherwise.  Is that still
11 accurate?
12     A.  Yes, no changes.
13     Q.  There are a number of honors and awards
14 listed here in your CV.  Are those still active?
15         MR. STANOCH:  Objection.
16         THE WITNESS:  Yes, no changes.
17         (Reporter clarification.)
18         THE WITNESS:  No changes in those honors
19 and awards.
20 BY MS. LOCKARD:
21     Q.  Have there been any changes in your board
22 memberships or research awards listed on your CV?
23     A.  No, none.  And I would say in my quasi
24 retirement that's all been -- it's been replaced, if
25 you will, by the litigation efforts.

Page 291

1      Q.  Have you done any teaching work?
2          MR. STANOCH:  Objection.
3          THE WITNESS:  Yes, I would say at UCSF I
4  taught pharmacy and medical students and also worked
5  with graduate students on their Ph.D.s.
6  BY MS. LOCKARD:
7      Q.  Have you served on any editorial boards?
8          MR. STANOCH:  Objection.
9          THE WITNESS:  I have been a reviewer for
10 multiple journals and --
11 BY MS. LOCKARD:
12     Q.  Any that would be relevant to this
13 litigation?
14         MR. STANOCH:  Uh-huh.  A standing
15 objection to background.
16         Go ahead.
17         THE WITNESS:  Well, yes, I think all of my
18 writings and research in one way or another relate
19 to what we're talking about here in this, the
20 quality of medicines, therapeutic equivalence,
21 substitution, metrology, measurements.  I feel
22 everything in my wheelhouse, if you will, is related
23 to this litigation.
24 BY MS. LOCKARD:
25     Q.  Do you have any estimates in terms of how

Page 292

1  many journal articles you have contributed to?
2      A.  Well, if you add all my publications,
3  including the USP publications, I think we're well
4  over 200.
5      Q.  Have you participated in writing any books
6  or book chapters?
7      A.  Yes, I have done that.
8      Q.  How many of those?
9      A.  I think you would have to look at the CV,
10 but I'm sure we're in the scores, maybe, or between
11 10 and 20.
12     Q.  And are those journal articles and book
13 chapters all listed on your CV, Dr. Williams?
14     A.  Yes, I think the CV is complete.
15     Q.  Oh, I would like to attach as Exhibit 18 a
16 complete copy of your set of materials that we sent
17 for your consideration.  And we have been handed a
18 thumb drive of that which we can get to the court
19 reporter.
20         (Whereupon, Exhibit 18 was marked for
21 identification.)
22         MS. LOCKARD:  Exhibit 18, for the record,
23 is going to be Dr. Williams' file.
24         MR. STANOCH:  Counsel, this is everything
25 listed in the -- what do you call it, the materials

Page 293

1  considered, Exhibit 2?
2          MS. LOCKARD:  That's correct.
3          MR. HARKINS:  Yes, yeah.
4          MS. LOCKARD:  Yes.
5          MR. STANOCH:  Okay.
6          MR. HARKINS:  Also including the copy of
7  the revised list of materials considered that was
8  submitted with the production of those materials two
9  days ago.
10         (Whereupon, a brief discussion off the
11 record.)
12 BY MS. LOCKARD:
13     Q.  All right.  Dr. Williams, you were asked
14 about a document we reviewed earlier today on a
15 break that was identified as Exhibit 3, and it was
16 the GNTM e-mail.  Do you recall being asked about
17 that?
18     A.  I do recall.
19     Q.  And did that document refresh your
20 recollection about how Teva learned of the
21 nitrosamine issue initially?
22         MR. STANOCH:  Objection to form.
23         THE WITNESS:  Yes.
24         MR. STANOCH:  Asked and answered.
25         Go ahead.

Confidential Information - Subject to Protective Order

Page 294

1    THE WITNESS:  Yes.  This is definitely a
2  document I cited.  It was very important to my
3  opinions.
4    And it has a huge distribution list, GNTM,
5  global notice to management, where Teva is
6  communicating to its scores of sites across the
7  globe.
8    And it starts -- it's an incident
9  category, foreign matter, and it says, "On
10  June 20th, 2018, vendor" ZHP "notified Teva that
11  they came to be aware of a previously unknown
12  impurity that may have genotoxic potential."
13  BY MS. LOCKARD:
14    Q.  But let me stop you there and ask:  So
15  does that clarify for you how Teva learned of the
16  potential --
17    A.  Yes.
18    Q.  -- impurity?
19    A.  Yes.
20    MR. STANOCH:  Objection.
21    THE WITNESS:  And then it --
22  BY MS. LOCKARD:
23    Q.  Okay.  And the next question is:  On that
24  date of the initial notification, is there anything
25  there that indicates what the potential impurity

Page 295

1  was?
2    A.  I don't see that here.  I may be missing
3  it, but I don't see that it states the impurity.
4    Q.  You can put that aside for the moment.
5    Are 483s a final agency determination?
6    A.  No.  I would say they are a set of
7  observations from an Office of Regulatory inspector,
8  typically, who is visiting a manufacturing site and
9  writing observations over a several-day period,
10  either in the United States or overseas.
11    Q.  Are warning letters a final agency
12  determination?
13    A.  The way I would say it is the warning
14  letter is an escalation of FDA's concern.  I
15  sometimes say it's kind of a shot across the bow of
16  a company, that they better pay closer attention to
17  what FDA is saying and do something.
18    But even there, the company is allowed to
19  respond, allowed to resolve issues and ultimately
20  allowed to have their manufacturing site cleared of
21  the issues and the inspection closed out by FDA
22  satisfactorily.
23    Q.  So then is a warning letter necessarily a
24  final determination by FDA?
25    MR. STANOCH:  Objection to form.

Page 296

1    THE WITNESS:  No, I would say it is not.
2  BY MS. LOCKARD:
3    Q.  You were asked some questions about
4  Novartis and testing they allegedly did on some of
5  their products.  Do you recall that?
6    A.  I do.
7    Q.  Do you have any information about
8  Novartis' testing of their Diovan or any other
9  products with respect to nitrosamines?
10    A.  No, I don't recall seeing any information,
11  and it was not pertinent to my report.
12    Q.  Do you know why Novartis was testing or
13  what they were testing, if at all?
14    A.  No, I really don't.  I have no information
15  about it that I remember.
16    Q.  -- Novartis testing relevant to any of the
17  opinions you have given to date in this case?
18    MR. STANOCH:  Objection.
19    THE WITNESS:  It is not.
20  BY MS. LOCKARD:
21    Q.  You were asked some questions about the
22  limits of the nitrosamine, either interim limits or
23  permanent limits, by FDA.  Are you offering any
24  opinions about whether those limits were
25  appropriate?

Page 297

1    A.  No, I am not.
2    Q.  Have you endeavored to render any opinions
3  about the testing methodology employed to detect
4  limits of nitrosamines?
5    A.  No, it's not part of my opinion, although
6  I mention it in my report.
7    Q.  Do you have any opinions in this case
8  about whether nitrosamines are or are not
9  carcinogenic?
10    MR. STANOCH:  Objection to form.
11    THE WITNESS:  No, I'm not offering any
12  opinion that speaks to pharmacology/toxicology of
13  the nitrosamines.
14  BY MS. LOCKARD:
15    Q.  Do you intend to offer any opinions about
16  whether nitrosamines in the Teva products were a
17  potential human carcinogen?
18    MR. STANOCH:  Objection to form.
19    THE WITNESS:  No, I don't offer that
20  either.
21  BY MS. LOCKARD:
22    Q.  Counsel made the point earlier today that
23  even if the USP does not provide for testing of
24  nitrosamines, that a manufacturer can still
25  institute its own testing for nitrosamine.

Confidential Information - Subject to Protective Order

Page 298

1    MR. STANOCH:  Objection.  There's no
2  question.
3    THE WITNESS:  That's absolutely true.  A
4  manufacturer can build additional testing into its
5  private specification working with FDA.
6  BY MS. LOCKARD:
7    Q.  Well, in order for a company to initiate
8  testing of a genotoxic impurity, what do they need
9  to know?
10    A.  Well, that relates to something FDA said
11  in some of their public announcements.  You have to
12  suspect that it's there.  You wouldn't test for it
13  if you didn't think it was there, so you first have
14  to have a suspicion that it's there.  And then I
15  would say you would have to see some identifiable
16  peak on a chromatogram that raises your concern, and
17  that would lead into an understanding of looking at
18  the impurity and assessing its genotoxic potential.
19    Q.  Did you in this case endeavor to do an
20  independent assessment, at this stage of the case,
21  whether Teva violated any cGMPs?
22    MR. STANOCH:  Objection to form.
23    THE WITNESS:  The only thing I did was
24  look at FDA's record of inspections of Teva's GMPs
25  at its Malta and Jerusalem sites, but I didn't do

Page 299

1  any independent evaluation of Teva's GMP adherence.
2  BY MS. LOCKARD:
3    Q.  Have you endeavored to do any independent
4  assessment of Teva's compliance with any of its
5  policies or procedures?
6    A.  No, not at all.  That was not part of my
7  report, and then I didn't cite to any documents to
8  that point.
9    Q.  Now, you were asked about the purpose of
10  your report, and you have heard a lot of objections
11  today about the class-certification opinions that
12  you rendered in your report.  Do you have an
13  understanding that you have not been asked by me or
14  my firm to provide any liability opinions at this
15  point in time?
16    MR. STANOCH:  Objection to form.
17    THE WITNESS:  I do understand that.
18  BY MS. LOCKARD:
19    Q.  Have you intended to give liability
20  opinions today?
21    A.  No.
22    MR. STANOCH:  Objection.  Form.
23    THE WITNESS:  I have tried not to give
24  liability opinions.
25

Page 300

1  BY MS. LOCKARD:
2    Q.  Do you understand that at some point we
3  may ask you to review additional materials and
4  render liability opinions?
5    A.  Yes, I understand that may come later on,
6  but it is not happening now.
7    Q.  Are you willing to do that if so asked?
8    A.  Yes.
9    Q.  Are you qualified to do so at certain
10  elements if so asked?
11    MR. STANOCH:  Objection.  Form.
12    THE WITNESS:  I believe so.
13  BY MS. LOCKARD:
14    Q.  You were asked some questions about what
15  do plaintiffs or patients expect; do you remember
16  that?
17    A.  I do remember that.
18    Q.  Do you intend to offer any opinions about
19  plaintiffs' expectations in this case?
20    MR. STANOCH:  Objection to form.
21    THE WITNESS:  No, I mean, I tried to
22  answer those questions as best I could, but they
23  were not part of my report and not part of my
24  opinions.
25

Page 301

1  BY MS. LOCKARD:
2    Q.  Do you intend to offer any opinions about
3  various choices available to plaintiffs who were
4  prescribed hypertension medications; is that what --
5    MR. STANOCH:  Objection to form.
6  BY MS. LOCKARD:
7    Q.  -- hired to do?
8    MR. STANOCH:  Sorry.  Sorry, Counsel.
9  Objection to form.
10    THE WITNESS:  No, I --
11    (Reporter clarification.)
12    MR. STANOCH:  I apologize.  I was just
13  objecting.  I'm sorry, Victoria.
14    THE REPORTER:  Okay.  So sorry.
15  BY MS. LOCKARD:
16    Q.  I think I said, is that what you were
17  hired to do?
18    A.  No.
19    Q.  And recognizing you have a medical degree,
20  but do you prescribe, consult, discuss with patients
21  hypertension medications?
22    A.  No, not at all.  I am not a practicing
23  clinical doctor.
24    Q.  You were also asked to discuss some issues
25  with respect to recycled solvents in the API that

Page 302

1  Teva was supplied.  Do you recall that?
2      A.  I do.
3      Q.  And are you familiar with recycled
4  solvents being used in pharmaceutical manufacturing?
5      A.  You know, actually I'm not.  The first
6  time I read about it was when I started reading
7  materials for this report.
8      Q.  Is it something that you would ordinarily
9  be involved in, in terms of your role at USP or FDA,
10  to investigate recycled solvents?
11          MR. STANOCH:  Objection to form.
12          THE WITNESS:  No.  No, really not.  To me
13  it seems more like a GMP issue, and I don't speak as
14  a GMP expert.
15          (Whereupon, a brief discussion off the
16  record.)
17  BY MS. LOCKARD:
18      Q.  So you don't -- bless you.
19          You don't intend to offer any opinions in
20  this case criticizing the use of recycled solvents,
21  do you?
22          MR. STANOCH:  Objection.
23          THE WITNESS:  No.  As far as I can
24  remember from my report, I don't speak at all to
25  recycled solvents, although FDA speaks about that in

Page 303

1  their guidance as a source of nitrosamine
2  impurities.
3  BY MS. LOCKARD:
4      Q.  Which guidance are you referring to?
5      A.  The 2021 nitrosamine impurities guidance.
6      Q.  You aren't aware of any FDA guidance in
7  2018 or prior that identified recycled solvents as a
8  source of impurities, are you?
9      A.  No.  And to me --
10          MR. STANOCH:  Objection.
11          THE WITNESS:  Oh, I'm sorry.
12          To me it's an example of how FDA and
13  industry learned a great deal from this experience
14  beginning in 2018.
15  BY MS. LOCKARD:
16      Q.  Ultimately, is it important to your review
17  and opinions whether Mylan was using recycled
18  solvents or not in the API it supplied Teva?
19          MR. STANOCH:  Objection.
20          THE WITNESS:  No, to me it doesn't impact
21  my report one way or the other.
22  BY MS. LOCKARD:
23      Q.  Does the presence or absence of a quality
24  agreement with Mylan and Teva impact your opinions
25  in your report in any way?

Page 304

1      A.  No.  And my understanding is that a
2  quality agreement is not pertinent to the purchase
3  of a drug substance from a manufacturer by a
4  drug-product manufacturer.
5      Q.  You were asked about Teva's submission of
6  their CBE-30 --
7      A.  Yes.
8      Q.  -- for the change in ZHP supply of API; do
9  you recall that?
10      A.  I do recall that.
11      Q.  Based on your experience, do you have any
12  concerns with the use of the CBE-30 to convey those
13  changes to FDA by Teva?
14          MR. STANOCH:  Objection.
15          THE WITNESS:  No, I think Teva, Watson at
16  the time, was following FDA guidance, and if FDA had
17  any concerns, they could certainly have communicated
18  that to Teva right away.  And they could have asked
19  Teva to wait and they could have converted it to a
20  postapproval supplement.
21  BY MS. LOCKARD:
22      Q.  Did they do that?
23      A.  They did not.  In fact, in both instances,
24  they approved very rapidly the CBE-30, within days
25  of its submission.

Page 305

1      Q.  You were shown a press release about
2  Ranbaxy and a negotiated guilty plea they entered
3  with respect to their products; do you remember
4  that?
5      A.  I do see it.  As a matter of fact, it's
6  still on my screen.  I'm looking at it to my right.
7      Q.  And you have read through this document,
8  or to some extent; is that correct?
9      A.  I have an understanding of what it's
10  saying.
11      Q.  And to the extent that the document itself
12  and the negotiated plea deal suggests that there was
13  some retrospective determination that Ranbaxy
14  products were determined to be adulterated, is that
15  analogous in any way to the situation with Teva's
16  products?
17          MR. STANOCH:  Objection to form.
18          THE WITNESS:  This entire matter with
19  Ranbaxy, to me, it is a completely different set of
20  circumstances.
21          First of all, it involves the Department
22  of Justice.  It has a huge civil penalty.  It
23  involves fraud and false statements to the agency.
24  It certainly involves GMP violations.
25          And what happens when you see an

Page 306

1  announcement like this, you are seeing the result of
2  years of effort on the part of FDA and the
3  Department of Justice to have Ranbaxy agree to a set
4  of statements, including the statement about
5  adulteration in the prior years.
6        So I would say it has no relationship at
7  all to my current report or my opinions.
8  BY MS. LOCKARD:
9        Q.  So in the Ranbaxy situation, was the
10 language that was referenced about adulteration, to
11 your knowledge, was that the product of negotiation
12 between Ranbaxy --
13       MR. STANOCH:  Objection to the --
14       (Reporter clarification.)
15 BY MS. LOCKARD:
16       Q.  Government?
17       THE REPORTER:  Thank you.
18       MR. STANOCH:  Objection.  Objection.
19       THE WITNESS:  Well, to the extent I know
20 what happened here, and I know it was a very
21 detailed effort on the part of the agency, yes, it
22 was a negotiated settlement where Ranbaxy and FDA
23 and the Department of Justice are agreeing to the
24 statement that appears on my screen.
25

Page 307

1  BY MS. LOCKARD:
2        Q.  To your knowledge, has Teva been involved
3  in any DOJ investigation, criminal proceeding, FDA
4  fines, like that described in the Ranbaxy press
5  release with respect to its --
6        A.  No, I have not --
7        (Whereupon, a brief discussion off the
8  record.)
9  BY MS. LOCKARD:
10       Q.  Okay.  My question to you, Dr. Williams,
11 was:  To your knowledge, has Teva been involved in
12 any DOJ investigation, criminal proceeding, FDA
13 fines or fraud with respect to its valsartan like
14 that that was described in this Ranbaxy press
15 release that you were provided today?
16       MR. STANOCH:  Objection.
17       THE WITNESS:  Not at all.
18 BY MS. LOCKARD:
19       Q.  Does this Ranbaxy press release and the
20 findings in any way undercut your opinions that you
21 have rendered in this case about Teva's valsartan
22 not being adulterated?
23       MR. STANOCH:  Objection.
24       THE WITNESS:  No, not at all.
25

Page 308

1  BY MS. LOCKARD:
2        Q.  The confidentiality of DMFs was discussed
3  earlier today.  Do you remember that?
4        A.  I do.
5        Q.  Is there any part of the DMF that FDA
6  actually considers to be open?
7        A.  If we look at some of the documents I
8  cited, you will see that FDA considers the DMF
9  entirely confidential.  In Europe sometimes they
10 talk about an open part or a closed part, but FDA
11 thinks of it as all closed, all confidential.
12       Q.  You had said that theoretically you
13 suppose companies could decide on their own to
14 share, but are you familiar with that happening in
15 this case?
16       MR. STANOCH:  Objection.
17       THE WITNESS:  I'm not, and it seems
18 unusual.  It seems to undercut the purpose of the
19 DMF, which is to keep some parts of it confidential.
20       What the buyer, in this case the ANDA
21 holder, would see is the certificate of analysis,
22 which is the specification you use to test the drug
23 substance, and that's all they would see.
24 BY MS. LOCKARD:
25       Q.  And in this situation, would you expect

Page 309

1  Teva and its API suppliers to share the DMF or
2  supply Teva with anything other than the certificate
3  of analyses?
4        MR. STANOCH:  Objection to form.
5        THE WITNESS:  I didn't see any documents
6  otherwise, so my belief is that the two
7  drug-substance manufacturers were keeping their DMF
8  confidential, as is typical of the way DMFs are
9  handled.
10 BY MS. LOCKARD:
11       Q.  Right.  So is it surprising to you if you
12 learn that the companies in this case didn't -- did
13 not share the DMF portion?
14       A.  That would not be surprising.
15       MR. STANOCH:  Objection.
16       THE WITNESS:  That would not be
17 surprising.  That would be typical.
18 BY MS. LOCKARD:
19       Q.  Now, you were asked a line of questions
20 referencing back to your report, and it was under
21 "The FDA Drug Approval Process" section in your
22 report.  You were asked about a line that said, "A
23 recall is a voluntary action taken by a company to
24 remove a defective drug product from the market."
25       Do you recall that?

Page 310

1    MR. STANOCH: Objection.
2    THE WITNESS: I do recall that.
3  BY MS. LOCKARD:
4    Q.  And had you taken that as a quote from an
5  FDA general statement about drug recalls?
6    MR. STANOCH: Objection.
7    THE WITNESS: I think if we look at the
8  FDA website and see what it says about recalls, that
9  is what it says. That's the terminology they use.
10 BY MS. LOCKARD:
11   Q.  Can a recall occur for reasons other than
12 a defective product?
13   MR. STANOCH: Objection.
14   THE WITNESS: Well, I would say this is an
15 interesting example, because at the time Teva and
16 FDA agreed to recall their valsartan products, there
17 was no understanding the products were defective.
18 They were not defective. FDA had not set limits on
19 nitrosamine impurities. But still FDA and Teva
20 agreed that they should come off the market because
21 of the presence of the nitrosamine impurities.
22   Later on, when FDA set limits, you could
23 say, well, they might have been considered
24 adulterated, but in the summer of 2018, with regard
25 to the ZHP drug substance, I do not see them as

Page 311

1  being defective products.
2  BY MS. LOCKARD:
3    Q.  So just to be clear, do you hold any
4  opinion that the valsartan products that were sold
5  to customers by Teva were sold in a defective state?
6    MR. STANOCH: Objection to form.
7    THE WITNESS: I wouldn't use those words,
8  and that is not part of my opinion.
9  BY MS. LOCKARD:
10   Q.  Does the presence -- does the sheer
11 presence of any nitrosamine render a product
12 defective?
13   MR. STANOCH: Objection to form.
14   THE WITNESS: No. I would say,
15 particularly if we look at the nitrosamine guidance,
16 FDA will allow nitrosamine impurities in ingredients
17 and products as long as they stay within acceptable
18 intake limits.
19 BY MS. LOCKARD:
20   Q.  So is it your opinion that if a drug
21 product is sold -- well, strike that.
22   You were asked about Exhibit 14. See if
23 we can get a copy of that for you. It was an
24 interview in the Pharmacy Times.
25   A.  I don't think I have that.

Page 312

1    Q.  Let's see, actually.
2    A.  Oh.
3    Q.  Pull that out of my --
4    A.  Oh.
5    Q.  It's there.
6    A.  Yes. I see it, thank you.
7    Q.  Are you familiar with the Pharmacy Times?
8    A.  Yes, somewhat.
9    Q.  Have you ever seen this article before
10 today?
11   A.  No, I have not.
12   Q.  Do you see what the date on this article
13 was?
14   A.  June 29th, 2021.
15   Q.  Are you familiar with Edwin Gump?
16   A.  I actually am not.
17   Q.  Are you familiar with the Small Molecules
18 Department at U.S. Pharmacopeia, USP?
19   A.  Yes.
20   MR. STANOCH: Objection. Form.
21   THE WITNESS: I would say I helped create
22 that department when I first came to USP in 2000.
23 BY MS. LOCKARD:
24   Q.  There is also a reference on the second
25 page to the USP Nitrosamines Joint Subcommittee.

Page 313

1  Was that a subcommittee in effect at FDA when you
2  were there?
3    A.  No, it was not.
4    Q.  When was that formed, if you know?
5    A.  I actually don't know, and I'm not sure I
6  see where you are reading. Could you help me,
7  Ms. Lockard?
8    Q.  If you are looking at the bottom of what
9  is page 2. Are you with me there?
10   A.  Actually, I am still not. There is
11 something where it speaks to a subcommittee of an
12 expert committee?
13   Q.  Yeah, it is the very end of page 2, where
14 it says "Alana Hippensteele," she says, "That's
15 fascinating."
16   A.  Oh.
17   Q.  "What is the USP Nitrosamines Joint
18 Subcommittee" --
19   A.  Yes, I see.
20   Q.  -- "and why was it established?" Do you
21 see that?
22   A.  Yes, I can, you know, understand, I think,
23 what that subcommittee was doing and how it was
24 formed.
25   Q.  Okay. Can you explain briefly your

Confidential Information - Subject to Protective Order

Page 314

1 understanding of what it was doing and how it was
2 formed?
3     A.  Well, USP has the Council of Experts,
4 which has many expert committees.  But the expert
5 committees have the possibility of forming
6 subcommittees, drawing on expertise from different
7 committees.  So I see a subcommittee being formed
8 jointly from several expert committees to consider
9 particularly the topic of nitrosamines in
10 small-molecule medicines.
11     Q.  To your knowledge, did the USP
12 Nitrosamines Joint Subcommittee exist before 2018?
13     A.  I don't know that.  As far as I know, it
14 didn't exist.
15     Q.  All right.  So if you turn to page 4, I
16 believe you were asked to read some of the text on
17 this page, and you were asked if you agreed with it.
18 Do you remember that?
19     A.  Page 4.  Is this the one down at the
20 bottom where he's talking about the grilled burger?
21     Q.  Let me see.  I know the pages aren't
22 numbered, which makes it difficult, but I'm just
23 counting three, four.
24     A.  Oh, okay.  All right.  Thank you.
25     Q.  Okay.  So the very last paragraph on

Page 315

1 page 4, that begins, "So, and again"; do you see
2 that?
3     A.  Yes, I do see that.
4     Q.  Oh, good.  Can you read that paragraph as
5 well?
6     A.  "So, and again, I think I mentioned, we're
7 talking about really ultratrace levels, parts per
8 million, part per billion.  So, these are not easy
9 analyses to perform.  They require highly complex
10 analytical equipment, and with any test, you need to
11 kind of have what's the control to that test."
12     Q.  So do you agree with that statement?
13     A.  I certainly do.
14     Q.  And if you look at the following page,
15 first paragraph.
16     A.  Yes, and I can read it, but I think what
17 USP is doing is talking about its reference
18 materials, and they are talking about reference
19 materials for nitrosamine impurities.
20     Q.  And in Paragraph 2 it says, "So, having
21 the reference standards is a really important tool
22 for manufacturers."
23     A.  Yeah.
24     Q.  Did I read that correctly?
25     A.  Yes, that's quite true.

Page 316

1     Q.  And if you skip down, midway on the page
2 Edwin Gump is speaking.
3     A.  He is.
4     Q.  He says, "It's a good question.  So, one
5 of the things that I think the pharmaceutical
6 industry has generally for the most part done very
7 well is look at impurities."  Do you agree with
8 that?
9     A.  I do.
10     Q.  He goes on to say, "I think nitrosamines,
11 for the reasons I just described, are kind of a
12 unique case where they can sort of crop up."  Do you
13 agree with that?
14     A.  I do agree with that.
15     Q.  He goes on, "They aren't necessarily
16 readily identified as part of the components during
17 the manufacturing process, and so they sort of slip
18 through."  Is that your understanding as well?
19     A.  I think I could agree with that.
20     Q.  "Whereas, other types of impurities, I
21 think, manufacturers have a" "better handle on how
22 to control those."
23     A.  Yes, I think he is speaking to what I was
24 trying to comment on as well, that there are sort of
25 general ways of dealing with impurities, but the

Page 317

1 nitrosamine impurities are -- as FDA said, are very
2 unusual, unexpected.  You have to think that they
3 may be there, and then even when you think that,
4 they are at very low levels and require very special
5 techniques to measure.
6     Q.  So towards the bottom of the page,
7 finally, Mr. Gump is saying, "It really is, I think,
8 a lot better than people think.  You tend to hear
9 about the few problems that occur, but you don't
10 hear about the millions or billions of pills that
11 get distributed every year and help people deal with
12 their health conditions."  Do you agree with that
13 sentiment?
14     A.  I can certainly attest to that.
15     Q.  So, Dr. Williams, you know, just to be
16 clear for the record, you weren't really asked much
17 about your report and your opinions in it.  But have
18 you heard anything today that causes you to change
19 your opinions as stated in your expert report?
20         MR. STANOCH:  Objection to form.
21         THE WITNESS:  No, nothing at all.
22 BY MS. LOCKARD:
23     Q.  Have you been shown any documents today or
24 testimony that changes your opinion in any way?
25     A.  No.

Confidential Information - Subject to Protective Order

Page 318

1    Q.  So in terms of, really, if we can get to
2  the heart of your opinions, what are your core
3  opinions in this case?
4        MR. STANOCH:  Objection.
5        THE WITNESS:  You know, the way I would
6  summarize those, I think they appear in the last
7  page or two of my report, and I'll try to say it
8  this way.
9        Teva's products, all four
10  valsartan-containing drug products were always
11  pharmaceutically equivalent and bioequivalent to the
12  Diovan reference listed drugs made by Novartis.
13  While they were in the market, they were always
14  AB-rated by FDA.  They were not misbranded because
15  FDA required them to have substantively the same
16  label as Diovan.
17        And they were not adulterated in my view
18  until -- and you could even debate it after that
19  point, but they certainly were not adulterated or
20  defective until FDA issued warning letters to ZHP
21  and Mylan or when FDA set limits in December of
22  2019.
23        So what you have -- and I said it in the
24  report, it's a very unusual situation, where we all
25  know nitrosamine impurities can be genotoxic.  We

Page 319

1  know they are very low level.  They are hard to
2  measure.  They can creep into a product, as Dr. Gump
3  said.
4        And FDA and Teva in the summer of '22
5  (verbatim) were faced with this issue.  Well, we
6  have got them there.  What are we going to do?  And
7  FDA and Teva working together decided to recall,
8  first, all the ZHP products from the market before
9  there was any possibility of a decision about
10  adulteration, and then subsequently, after the
11  Swissmedic report, all the Mylan product from the
12  market, again, before there was any possibility of a
13  decision about adulteration.
14        As I said in the report, this is not a
15  failure.  This is a success story where a
16  responsible company is making a huge effort to
17  protect consumers, to protect patients, and FDA is
18  working very hard to find out what is going on.
19        It spills over into other products.  It
20  keeps spilling over into other products.  And now
21  FDA is asking that essentially all chemical
22  medicines in the market or being developed for the
23  market be assessed for nitrosamine impurities.
24        I'm gratified with the effort.  This is
25  how drug regulation advances.  And I just don't see

Page 320

1  that Teva did anything wrong and everything right.
2        MS. LOCKARD:  I don't have any more
3  questions for you at this time.  I imagine there may
4  be more questions.  Thank you, Dr. Williams.  And I
5  may follow up.
6        EXAMINATION
7  BY MR. STANOCH:
8    Q.  Dr. Williams, prior to your
9  question-and-answer session with Ms. Lockard, you
10  spoke with her during the lengthy 35-minute break,
11  didn't you?
12        MS. LOCKARD:  Object to form.
13  Argumentative.
14        THE WITNESS:  I would say I sat there and
15  listened to her talk out how she was going to
16  question me, but I really didn't engage in that
17  discussion in any substantive way.
18        MR. STANOCH:  Stand by.
19        Nothing further, Doctor.
20        MS. LOCKARD:  Any other questions from
21  others?
22        MR. STANOCH:  And, Counsel, I'll just ask
23  on the record that the binder of potential exhibits
24  be destroyed or returned to me without looking at
25  it, please.

Page 321

1        MS. LOCKARD:  All right.  I did take the
2  exhibits you used out of the binder.
3        MR. STANOCH:  That's fair.  I understand.
4  Thank you.
5        MS. LOCKARD:  I'll put them back.  But I
6  didn't remove the ones that you haven't used and I
7  haven't looked at all of those, so --
8        MR. STANOCH:  I appreciate that.  Thank
9  you, Counsel.
10        THE VIDEOGRAPHER:  Anything further on the
11  record?
12        Okay.  Well, this concludes today's
13  deposition of Dr. Roger Williams.  We are going off
14  the record at 4:24.
15        (Whereupon, the deposition was concluded
16  at 4:24 p.m.)
17
18
19
20
21
22
23
24
25

Page 322

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over carefully
4    and make any necessary corrections.  You should
5    state the reason in the appropriate space on the
6    errata sheet for any corrections that are made.
7        After doing so, please sign the errata
8    sheet and date it.
9        You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12       It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the deposition
15   transcript by you.  If you fail to do so, the
16   deposition transcript may be deemed to be accurate
17   and may be used in court.
18
19
20
21
22
23
24
25

Page 324

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4
5        I,_____, do hereby certify
6    that I have read the foregoing pages, and that the
7    same is a correct transcription of the answers given
8    by me to the questions therein propounded, except
9    for the corrections or changes in form or substance,
10   if any, noted in the attached Errata Sheet.
11
12
13   _____  _____
14   ROGER WILLIAMS, M.D.          DATE
15
16
17
18
19
20
21
22
23
24
25

Page 323

ERRATA SHEET

1
2
3    PAGE  LINE   CHANGE
4    ____  ____  _____
5        REASON:_____
6    PAGE  LINE   CHANGE
7    ____  ____  _____
8        REASON:_____
9    PAGE  LINE   CHANGE
10   ____  ____  _____
11       REASON:_____
12   PAGE  LINE   CHANGE
13   ____  ____  _____
14       REASON:_____
15   PAGE  LINE   CHANGE
16   ____  ____  _____
17       REASON:_____
18   PAGE  LINE   CHANGE
19   ____  ____  _____
20       REASON:_____
21   PAGE  LINE   CHANGE
22   ____  ____  _____
23       REASON:_____
24
25

Page 325

1    STATE OF CALIFORNIA  )
2    COUNTY OF YOLO       )
3        I, ELAINA BULDA-JONES, a Certified Shorthand
4    Reporter of the State of California, duly authorized
5    to administer oaths pursuant to Section 2025 of the
6    California Code of Civil Procedure, do hereby
7    certify that
8            ROGER WILLIAMS, M.D.,
9    the witness in the foregoing deposition, was by me
10   duly sworn to testify the truth, the whole truth and
11   nothing but the truth in the within-entitled cause;
12   that said testimony of said witness was reported by
13   me, a disinterested person, and was thereafter
14   transcribed under my direction into typewriting and
15   is a true and correct transcription of said
16   proceedings.
17       I further certify that I am not of counsel or
18   attorney for either or any of the parties in the
19   foregoing deposition and caption named, nor in any
20   way interested in the outcome of the cause named in
21   said deposition dated the 22nd day of February, 2022.
22
23
24
25   ELAINA BULDA-JONES, CSR 11720

## WORD INDEX

**< $ >**
**$500**  6:*17*
**$695**  276:*18*
**$90,000**  277:*1*

**< 0 >**
**00565764**  5:*17*
**02109**  4:*15*
**06**  6:*12*
**07701**  3:*21*

**< 1 >**
**1**  5:*12*  11:*1*,
*5, 10, 11*  12:*6*
*16:16, 20*
*20:10, 16*
*52:1*  98:*21*
*99:21*  129:*8,*
*19*  146:*14*
*205:6*  275:*21*
**1,000**  73:*11*
**1.1**  225:*18*
**1.2**  225:*16, 25*
**1.7**  247:*3*
**1/31/2022**
273:*15*
**1:34**  218:*14*
**10**  6:*8*
*156:14, 17*
*224:13*
*263:11*  292:*11*
**10,000**  25:*16*
**10:49**  141:*11*
**100**  2:*23*
**104**  5:*20*
**1086**  6:*5*
*152:9*  153:*4,*
*23*  154:*3*
**109**  51:*12, 15,*
*21*  52:*2, 18*
*53:24*
**11**  5:*12*  6:*12*
*165:3, 6*
**11/30/2021**
271:*19*
**11/30/21**
271:*17*
**11:07**  141:*15*

**110**  43:*16*
*44:24*
**112**  5:*22*
**116**  43:*10, 11,*
*16*  44:*2, 10*
*46:22*
**116s**  43:*15*
**11720**  1:*24*
*325:25*
**12**  6:*16*
*145:23*  146:*3*
*210:22, 23*
**12/31/21**
271:*21*
**12:45**  212:*1*
**12:51**  218:*10*
**120**  249:*12,*
*13, 15*  250:*2*
**123**  250:*18*
**127**  43:*16*
*44:23*
**128**  6:*1*
**12th**  12:*7*
*15:21*  16:*6,*
*11*  17:*6, 9, 24*
*18:17, 25*
*19:13, 21*
*20:1*  43:*14*
**13**  6:*20*  30:*9*
*152:23*
*153:19*
*212:18*
*224:13, 15*
**13th**  29:*24*
*215:7*
**14**  6:*21*
*118:13*
*156:18*  256:*2,*
*5*  277:*24*
*278:6*  311:*22*
**145**  6:*1*
**14-year**  288:*22*
**15**  6:*23*
*270:21, 24*
**152**  6:*5*
**15219**  3:*16*
**156**  6:*8*
**15th**  2:*23*
**16**  7:*1*  284:*5,*
*6, 25*  290:*7*

**165**  6:*12*
**16th**  63:*24*
**17**  1:*19*  5:*12*
*7:3*  13:*19*
*128:11*
*284:11, 13*
**17th**  4:*4*  8:*5*
*16:5*  20:*1, 10*
*278:1*
**18**  7:*4*
*292:15, 20, 22*
**19**  6:*6*  222:*20*
**19103-4196**
4:*4*
**1980s**  71:*11,*
*16*
**1990**  236:*24,*
*25*  267:*25*
*286:14*  287:*13*
**1993**  287:*25*
**19th**  153:*8*

**< 2 >**
**2**  3:*21*  5:*12,*
*18*  6:*11*
*11:19, 22*
*14:11*  16:*16*
*18:15, 23*
*19:3, 4*  21:*9*
*104:11, 15, 20*
*129:21*
*156:23*
*275:21*
*282:22, 23*
*293:1*  313:*9,*
*13*  315:*20*
**2(b**  245:*10*
*246:12*
**2.17.22**  5:*14*
**2/15**  17:*13*
**2/17/2022**
17:*3*  282:*24*
**20**  11:*2, 23*
*13:18*  15:*19*
*18:21*  68:*5*
*123:15*  124:*1*
*127:25*  146:*4*
*263:11*
*277:25*  278:*8,*
*13, 14*  292:*11*

**200**  2:*16*
*292:4*
**2000**  86:*15*
*288:20*  312:*22*
**2003**  100:*25*
**2005**  214:*18*
*215:2, 20*
*216:3*
**2006**  214:*18*
*215:3, 20*
**2010**  56:*11*
*269:4, 5*
**2012**  207:*13*
**2013**  212:*18*
*215:7*
**2014**  86:*16*
*290:6*
**2015**  35:*14*
*39:9, 16, 20*
*40:2, 6*  70:*22*
*71:22*  78:*9,*
*16, 23*  79:*7,*
*15*  80:*14*
*81:4, 16*  83:*7*
*96:24*
**2017**  6:*7*
*99:9, 22*
*113:13*  153:*8*
*197:23*  198:*9,*
*22, 23*  199:*2,*
*12, 16, 19*
**2018**  6:*12*
*13:10, 12*
*14:18, 19*
*29:24*  30:*9*
*32:19*  47:*25*
*48:24*  49:*18*
*50:1*  51:*9*
*54:20, 22*
*62:19*  63:*8,*
*11, 24*  65:*4*
*66:25*  68:*2, 5,*
*11*  69:*12*
*73:2, 6, 12, 24*
*74:3, 19*  75:*5,*
*8*  76:*16, 18*
*77:5, 21*  78:*8,*
*15*  80:*7*  91:*9*
*93:6, 21*
*100:3*  108:*20*
*111:19*  113:*4,*

**11**  114:*8*
*117:11, 21*
*119:22*  120:*3,*
*25*  121:*2, 14*
*122:1*  123:*3,*
*15*  124:*1*
*133:23*  134:*1,*
*11*  146:*11, 13,*
*21, 22*  150:*2*
*164:5, 7, 15*
*165:13, 15, 22*
*166:13*
*167:18, 25*
*168:6, 15, 22*
*169:4, 11, 19*
*173:3*  182:*8,*
*12, 16, 19*
*183:20*  186:*5*
*189:18*
*190:12*
*191:13, 18*
*192:8*  194:*14*
*199:6*  202:*13*
*203:7*  204:*6*
*205:20*
*208:25*  221:*9*
*233:5*  235:*2*
*237:24*
*262:25*  263:*2,*
*17*  264:*1, 7*
*266:12, 20*
*294:10*  303:*7,*
*14*  310:*24*
*314:12*
**2019**  13:*9*
*14:17*  110:*10,*
*14*  111:*8*
*318:22*
**2020**  6:*11*
*73:4*  90:*4*
*110:1, 20*
*129:9*  156:*23*
**2021**  6:*23*
*7:2*  72:*25*
*73:4*  110:*2*
*127:23*  128:*1*
*129:6*  205:*7*
*221:15, 22*
*222:4*  256:*10*
*266:2, 3*
*272:2, 9*

275:*23*  303:*5*
312:*14*
**2022**  1:*19*
5:*12*  6:*1*  8:*5*
12:*7*  15:*21*
16:*5, 6*  17:*6,*
*24*  18:*17, 25*
19:*13, 22*
20:*11*  128:*18*
132:*4*  205:*6*
271:*24*
273:*16*  325:*21*
**2025**  325:*5*
**2029**  3:*9*
**20th**  63:*8, 11*
117:*11*  123:*3*
294:*10*
**21**  13:*19*
15:*19*  18:*21*
62:*19*
**210**  6:*16*
**211**  3:*21*
**215.979.1000**
4:*5*
**22**  319:*4*
**2220**  4:*9*
**224**  6:*20*
**227**  3:*3*
**22nd**  325:*21*
**230**  4:*9*
**23rd**  169:*3*
**24**  165:*4*
**2500**  2:*16*
**256**  6:*21*
**270**  6:*23*
**27th**  4:*15*
**28**  6:*1*  132:*4*
198:*7*  277:*8*
**28202**  3:*3*
**284**  5:*5*  7:*1, 3*
**2875**  1:*7*  8:*9*
**28-Jan-2022**
129:*12*
**28th**  128:*17*
**29**  6:*23*
256:*10*  277:*8*
**292**  7:*4*
**29th**  312:*14*

**< 3 >**

**3**  5:*15*  62:*9,*
*10*  65:*21*
112:*22*  157:*8*
261:*19*  293:*15*
**3:00**  283:*11*
**3:35**  283:*15*
**30**  4:*4*  146:*4*
187:*21*  188:*7*
322:*14*
**300**  3:*9*
**301**  3:*15*
**30305**  2:*17*
**31**  113:*13*
205:*7*  270:*24*
271:*24*  275:*23*
**310.284.3766**
3:*10*
**312.566.4808**
4:*10*
**31st**  99:*9*
**32**  256:*5*
**320**  5:*6*
**3333**  2:*16*
**34**  147:*3*
**35**  147:*1, 3*
212:*9*
**35-minute**
320:*10*
**36**  51:*19, 21*
52:*1*  146:*24*
147:*2, 3, 6*
**37**  51:*18*
**38**  44:*11*
**38th**  3:*15*
**3rd**  273:*16*

**< 4 >**

**4**  5:*18*  9:*9*
21:*19*  86:*18,*
*25*  87:*5*
100:*10*
314:*15, 19*
315:*1*
**4:24**  321:*14,*
*16*
**41**  249:*13, 17*
**412.263.4397**
3:*16*
**44**  44:*21*
**46**  43:*22*

46:*18*  77:*14*
**467**  177:*11*
**476**  6:*5*
152:*9*  153:*3,*
*23*  154:*4*
155:*4*
**483**  198:*10*
203:*11, 12*
**483s**  207:*25*
208:*3*  295:*5*

**< 5 >**

**5**  5:*20*  6:*23*
104:*8, 11*
113:*23*  245:*5*
**500**  212:*22*
**504.524.5777**
2:*7*
**53**  4:*15*
**565758**  61:*11*
62:*19*
**5763**  63:*2*

**< 6 >**

**6**  5:*22*
112:*23, 24*
165:*12, 15, 22*
166:*13*
167:*25*  173:*3*
**6/20**  63:*19*
**6/21**  63:*19*
**6/21/2018**  5:*15*
**60**  222:*17, 20*
227:*3, 6*
228:*16, 23*
229:*15*
230:*10, 14, 21,*
*25*  231:*21*
**600**  3:*3*
**60606**  4:*10*
**617.213.7047**
4:*16*
**62**  5:*15*
**63**  148:*22, 23*
**65**  152:*5*
**678.553.2103**
2:*17*
**69**  162:*25*
163:*6*

**< 7 >**

**7**  6:*1*  128:*6,*
*10*
**7/1/2021**  273:*6*
**7/31/2021**
272:*25*
**7:18**  1:*19*  8:*6*
**7:29**  15:*2*
**7:37**  15:*6*
**701**  2:*6*
**70130**  2:*6*
**704.444.3475**
3:*4*
**732.924.8171**
3:*22*

**< 8 >**

**8**  6:*1*  13:*11*
14:*19*  89:*13*
145:*19, 22*
205:*10*
**8:42**  60:*2*
**8:51**  60:*6*
**80**  276:*22*
277:*2*
**82**  273:*23*
**84**  197:*22*
198:*2, 6*
**86**  5:*18*

**< 9 >**

**9**  5:*4*  6:*5*
61:*2, 3, 12, 13,*
*20*  152:*20, 23*
159:*25*  160:*2*
**90067**  3:*9*
**92**  30:*8*
**973.757.1100**
2:*24*

**< A >**

**a.m**  1:*19*
**AB**  213:*14*
223:*19*  248:*8*
**abbreviation**
251:*1*
**Abid**  5:*15*
**ability**  131:*10*
**able**  24:*1*
27:*25*  88:*18*
89:*2*  94:*19*
123:*14, 25*

124:*12*
150:*16*
170:*20*
196:*21*  213:*4*
255:*13*  286:*6*
**AB-rated**
64:*24*  205:*13*
209:*11, 19*
213:*12, 16*
252:*22*  253:*8*
318:*14*
**abruptly**
238:*11, 13, 16*
239:*1*
**absence**  93:*21*
101:*12*  102:*8*
223:*3*  233:*6,*
*25*  246:*13*
303:*23*
**absent**  106:*13*
158:*13*
183:*11*  227:*1*
**Absolutely**
19:*18*  45:*6*
229:*22*
238:*15*  239:*9*
298:*3*
**abundance**
48:*18*  241:*15*
**acceptability**
199:*24*
**acceptable**
68:*4, 10*
69:*16, 21, 24*
70:*14*  72:*23*
75:*4, 9*  90:*12*
106:*3, 8*
109:*3, 17*
110:*5*  111:*2,*
*16*  116:*2, 14,*
*19*  117:*12, 17,*
*24*  118:*8, 24*
119:*1, 11, 22*
120:*1, 11, 20*
129:*25*
144:*12*
147:*11*
162:*18*  311:*17*
**acceptance**
132:*18*  140:*2*
145:*9*  148:*10,*

Confidential Information - Subject to Protective Order

**24** 149:*12*, *14*
155:*9*, *13*
156:*6*
**accord** 23:*8*
**account** 177:*1*
**accurate**
18:*19* 136:*3*
290:*11* 322:*16*
**accurately**
10:22 135:*24*
**ACKNOWLE**
**DGMENT**
324:*1*
**Acorda** 280:2
**act** 53:*3*
134:*17*, *19*, 22
137:*17* 217:2
**Actavis** 2:*11*
186:*19*, 24
188:*12* 279:*3*
**acted** 47:*24*
48:*6* 63:*10*
64:*25* 65:*21*
66:22
**acting** 48:*17*
288:*6*
**action** 28:*12*
80:*18*, 22
138:*10*, 15
139:*3*, *12*
140:*9* 162:*13*
163:2 205:22
215:13 247:9
264:*15* 281:*5*,
7 309:*23*
**Actions** 1:*9*
31:*9* 210:*15*
280:*25* 281:*1*,
*3*
**active** 85:*3*
223:*12*
236:*19*, *23*
280:*6* 290:*14*
**actives** 258:*4*,
*10*, 22
**activities**
31:*18* 32:*20*
65:*24* 264:*20*
288:*24*
**actual** 247:22

**acuity** 153:*6*
**ad** 120:*7*
**add** 70:*11*
82:*4* 84:*3*
224:*7* 292:2
**added** 16:*10*
289:*5*
**addenda** 101:*8*
**Addendum**
98:*21*, 22 99:*9*
**addition** 289:*1*
**additional**
13:*4* 144:*19*
179:*19* 298:*4*
300:*3*
**address**
121:25
**adequacy** 58:*9*
**adequately**
132:25 210:2
**adhere** 101:*14*
102:*10*
**adhered**
177:*10*
**adherence**
299:*1*
**adjudicated**
133:2
**adjusted** 13:*7*
**administer**
325:5
**administered**
226:23 227:*12*
**administration**
223:*14* 226:*5*
**admitted**
214:*15* 215:*1*
**adulterated**
64:*23* 134:*12*,
*18*, 20 136:*10*,
*24* 137:*11*, *15*,
*16* 138:*4*, *15*,
*18*, 22 139:*3*,
*11*, *17* 140:*8*
201:*19* 202:*6*,
*8*, *21*, *24*
203:2, *11*
204:*15*, 22
205:*1*, *6*, *8*, *14*,
*23*, *24* 206:*15*,
*16* 207:*10*, *16*,

*17*, 22 208:*7*
209:*8* 213:*24*
214:*10*, *11*, *13*,
*17* 215:2, *11*,
*17*, *20* 216:*4*,
*10*, *17*, *19*
217:2, *7*, *10*,
*12* 248:*1*
253:*6* 305:*14*
307:22
310:24
318:*17*, *19*
**adulteration**
201:*17*, 24
202:*9* 203:*4*,
*13*, *14*, *21*, *23*
204:*16* 205:*9*,
*17* 206:*4*, *6*, *8*,
*11*, *21* 208:*3*,
*10* 209:*5*, *6*
214:*3* 216:*15*
306:*5*, *10*
319:*10*, *13*
**advances**
319:25
**adverse**
192:*16*, *21*
193:*1* 194:*8*,
*15* 247:20
**Advice** 5:*20*
104:*23*, *25*
106:*17* 110:*4*
**advise** 191:25
235:*21* 236:*7*
237:*1*, *24*
**advised** 194:*1*
**advises** 106:*12*
**advising**
148:*15*
**affiliate** 49:*10*
**affiliated**
86:*13*
**aflatoxin-like**
114:*10*
**Agency**
105:*19*
107:*21*
188:*20* 214:*1*,
*2*, *12* 215:*21*
216:*14*
223:*16*

247:*21* 295:*5*,
*11* 305:*23*
306:*21*
**ago** 11:*3*, *24*
46:*12* 47:*7*
67:*9* 83:*3*
128:22
137:*19*
166:*17* 173:*1*
178:*5* 293:*9*
**agree** 14:*10*
17:*17* 23:*3*
24:*11* 34:*20*
40:*7*, *15*
49:*18* 59:*14*
75:*4*, *20*
80:*13*, *21*
81:*3*, *15* 83:*6*
84:*12*, *20*, *23*
85:*1*, *2*, *6*, *8*,
*24* 86:*7* 90:*6*,
*16* 91:*2*, *5*
92:*20*, 22
93:*17* 95:*14*
98:*16* 100:*17*,
*21* 101:*2*, *7*,
*10*, *11* 102:*1*,
*7*, *17*, *19*
103:*11*, 20
106:*20*
107:*14* 108:*1*,
*6*, *8*, *13*, *16*, *17*,
*21* 109:*13*
115:*12* 118:*4*,
*6*, *11* 119:*4*,
*25* 126:*24*
128:2 129:*15*
130:*10*, *18*
131:*5*, *17*
132:*9*, *23*
134:*4* 135:*20*
138:*24* 144:*9*
146:*23* 148:*4*,
*5*, *13* 149:*18*
151:*11*
154:*16*, *17*, *25*
155:*14*, *15*
156:*1*, *3*, *9*
157:25 158:*9*,
*11* 159:*4*, *21*
160:*11*

163:25 166:*1*,
*23* 169:*8*
171:*9* 176:*24*
183:*9* 184:*20*
186:*23*
187:*13* 189:*1*
227:*10*
228:*16*
230:*10*
241:*19*
244:*25*
246:*21*
249:*25* 252:*5*
258:*8*, *16*, *17*,
*20*, *25* 259:*6*,
*9*, *19* 260:*7*,
*18* 261:*8*, *23*
262:*8*, *20*, 22,
*23* 263:*15*, *21*
264:*12*
265:22
266:*11*
274:25 281:*8*,
*13* 306:*3*
315:*12* 316:*7*,
*13*, *14*, *19*
317:*12*
**agreed** 8:*13*
53:*14* 144:*20*
163:*19* 207:*4*
234:2 246:*10*,
*19* 310:*16*, *20*
314:*17*
**agreeing**
97:*23*, *25*
216:*11*
261:*10* 306:*23*
**agreement**
23:*9* 33:*9*, *13*
179:*20* 227:*5*
303:*24* 304:2
**agreements**
144:*21* 179:*23*
**Agrees** 6:*17*
**ahead** 39:*1*
66:*18* 83:*21*
101:22
105:*13*
136:*14* 197:*7*,
*19* 204:*1*
213:*10*

Confidential Information - Subject to Protective Order

217:*15*
223:*25*
229:*25*
237:*18*
239:*17*
261:*22*
286:*25*
291:*16* 293:*25*
**Aid** 3:*7*
**al** 5:*15*
**Alana** 257:*5, 14* 313:*14*
**Albertsons** 3:*1*
**alert** 115:*2*
**Alfano** 3:*14*
**aligned** 227:*5*
**alkyl-azoxy**
114:*11*
**Allegations**
6:*18*
**allegedly**
264:*6* 296:*4*
**allow** 69:*23*
184:*4* 223:*16*
311:*16*
**allowable**
68:*24*
**allowed** 67:*11*
134:*21* 228:*9*
236:*1* 295:*18, 19, 20*
**allows** 48:*10*
**allude** 39:*22*
**alluded** 29:*13*
91:*22* 94:*10*
130:*23*
152:*14*
163:*21* 166:*16*
**alluding** 98:*13*
**alter** 18:*23*
19:*25*
**alternate**
53:*20, 22*
**Alternatively**
149:*14*
**amount** 57:*10*
69:*3* 70:*3, 15*
73:*6* 74:*7*
75:*19, 23*
**amounts**
149:*11* 226:*6*

**analogous**
305:*15*
**analyses**
309:*3* 315:*9*
**analysis**
177:*14* 179:*8, 11* 185:*6, 10*
191:*21* 308:*21*
**analytical**
71:*12* 121:*15*
145:*8* 148:*9*
150:*5* 155:*12, 18* 210:*1*
315:*10*
**ANDA** 27:*24*
38:*8, 15* 39:*3*
41:*7, 18* 43:*5*
48:*7* 94:*11, 22* 255:*9*
276:*10, 11*
287:*4* 308:*20*
**ANDAs** 12:*11*
21:*19* 26:*9*
32:*15* 49:*24*
276:*15*
**Anderson**
16:*22*
**Angeles** 3:*9*
**ANI** 279:*12, 13*
**announced**
168:*22*
**announcement**
212:*18* 306:*1*

**announcements**
298:*11*
**answer** 10:*17*
12:*15* 13:*2*
22:*21* 23:*19*
27:*21* 29:*2, 14* 35:*16*
36:*13, 18*
37:*17* 38:*24*
39:*14* 43:*3*
46:*12* 47:*12*
50:*4* 55:*1*
58:*16* 67:*9*
71:*1, 17*
73:*20* 74:*14*
76:*24* 77:*2*

79:*15* 83:*4, 13, 23, 24*
85:*20* 86:*6*
94:*7* 96:*12, 15* 98:*2, 5, 24*
99:*20* 145:*1*
147:*14*
169:*15, 22*
170:*19, 22*
175:*2, 9*
176:*6* 177:*8*
183:*2* 184:*1*
191:*3* 193:*19*
204:*20*
215:*25*
217:*22*
225:*14* 230:*1, 13* 232:*24*
235:*16* 237:*8, 16* 239:*9, 19*
300:*22*
**answered**
30:*22* 75:*25*
76:*13, 22*
78:*4* 90:*9*
93:*1* 96:*6*
124:*17*
150:*19*
160:*15*
176:*20*
189:*10*
194:*23*
258:*24* 293:*24*
**answering**
22:*24, 25*
95:*6* 104:*4*
107:*12*
161:*16* 253:*11*
**answers** 10:*9*
46:*12* 282:*9*
324:*7*
**anthrax**
136:*10*
139:*10, 22*
140:*7* 203:*10*
**anticipate** 37:*3*
**antihypertensiv e** 251:*11, 22*
**antitrust**
279:*5, 8, 10*

280:*1, 5, 12*
281:*7, 10*
**anybody** 9:*15*
218:*22* 230:*4*
**anyway**
107:*11*
**AOA** 285:*21*
**API** 6:*14*
27:*10, 15*
28:*14, 16, 22*
29:*2, 13*
30:*11, 13, 20*
31:*4, 13, 23*
32:*13* 33:*2, 14, 23* 35:*7*
36:*5* 38:*1*
40:*8, 13*
42:*18* 47:*11*
48:*1, 23*
49:*18* 50:*8, 12* 51:*1* 55:*7*
56:*25* 58:*2*
63:*15* 65:*6*
66:*11* 68:*5, 24* 69:*4, 19*
81:*12, 17, 21, 25* 82:*2, 20*
83:*8, 11*
106:*9, 14*
109:*18* 110:*6*
111:*3, 10*
123:*2, 14, 25*
124:*12, 23*
125:*5, 14*
126:*2* 150:*16*
164:*21*
165:*25* 166:*3, 14, 18* 167:*4, 10, 17, 24*
173:*10, 22*
174:*5, 13, 22*
175:*1, 8, 13, 18* 176:*1, 2, 18* 177:*12*
178:*2, 18*
181:*18*
182:*23*
183:*18* 185:*7, 11, 21* 186:*5, 18* 187:*4*
188:*14, 24*

189:*15, 20, 25*
191:*18* 192:*1, 16, 20* 193:*1, 13, 14* 194:*4, 8, 15, 20*
195:*4* 198:*15*
199:*1, 16, 24*
200:*8, 17, 18, 21, 22* 201:*13, 25* 207:*21*
208:*7* 216:*9, 17* 217:*9*
249:*2* 263:*16*
301:*25*
303:*18* 304:*8*
309:*1*
**APIs** 55:*19*
**apologies**
124:*16*
**apologize**
44:*12* 45:*20*
116:*8* 128:*2*
208:*5* 211:*19, 24* 261:*15*
279:*23* 301:*12*
**apparently**
45:*24* 114:*24*
**appear** 39:*7*
107:*5* 127:*3*
228:*24* 229:*8*
318:*6*
**APPEARANC ES** 2:*1*
**appeared**
73:*3* 127:*24*
**appearing**
8:*13*
**appears** 19:*2*
128:*16*
165:*14, 23*
229:*9* 257:*4*
306:*24*
**applicability**
95:*22*
**applicable**
90:*22* 127:*4*
156:*8* 245:*11*
246:*16, 18*
**applicant**
39:*3* 78:*20*
94:*11*

Confidential Information - Subject to Protective Order

**application**
78:21 93:19
95:3 96:8
116:13
131:12 227:17
**applications**
94:22
**applies** 82:19
95:3, 15 96:3
132:1
**apply** 126:10
151:22
**applying**
220:15
**appreciate**
34:18 35:24
37:14 59:17
66:7 98:18
101:4 103:14
118:12
119:17 197:4
225:14
252:10
280:21 321:8
**apprised** 53:13
**Approach** 6:3
119:8 120:19
146:8 200:13
234:17
**approaches**
120:18
**appropriate**
64:4 73:12
75:22 79:19
95:11 138:10
145:8 148:9
154:9 155:12,
13, 18 156:7
162:13 168:7
170:12, 23
171:13, 24
195:17
196:15
209:22 210:5
232:23 233:2
237:9 296:25
322:5
**appropriately**
14:4 63:10
237:21

**approval**
27:24 28:1, 8
41:19 80:24
187:14
241:22, 24
250:6 309:21
**approve** 81:10
**approved**
21:20 43:6
225:3, 12
226:3, 14, 18
255:8 304:24
**approximately**
277:1
**ARB** 106:9,
14 109:18
110:6 111:3
**Arbor** 279:12
**ARBs** 111:17
**Argument**
190:15 279:14
**Argumentative**
31:6 69:6
96:14 124:4
320:13
**Army** 285:23
286:9
**arose** 192:3
204:17
**arrangement**
183:12
**article** 126:11
256:9 265:7
312:9, 12
**articles** 292:1,
12
**articulation**
136:3
**aside** 20:5
103:4 112:19
152:16
156:12 218:5
248:10
267:14
273:18 277:5
295:4
**asked** 25:19,
22, 25 26:1, 7
27:4, 8, 11, 12
30:21 37:19
50:25 52:6,

12 53:25
54:7 64:1
65:7 75:24
76:12, 21
78:3 90:8
92:25 96:5
142:22, 25
143:21
150:18
160:14
170:14
171:11 175:6
176:12, 17, 19
189:9 190:3
194:19, 22
211:14
258:24
261:14 269:5,
9 293:13, 16,
24 296:3, 21
299:9, 13
300:7, 10, 14
301:24 304:5,
18 309:19, 22
311:22
314:16, 17
317:16
**asking** 10:8
28:3 32:1, 5
33:7 38:13
42:22 48:2
50:16 53:7
54:1, 11 55:9
65:9 70:9, 24
71:8 74:1
81:24 83:14
85:17 91:18
93:19 94:20
97:3, 4, 12, 13
99:13, 15, 17
116:22 117:5,
6 138:17
143:25 162:4
185:2 187:14
188:23
189:19, 24
196:2, 4, 12,
13, 20, 24
199:9 214:4
231:20
233:10, 11, 13

235:15
243:10
258:13 260:6
261:13 262:7
269:1 319:21
**asks** 48:3
257:17
**asserts** 249:19
250:3
**assess** 31:13
33:12 109:11
116:19
135:17
139:25 140:2
269:22
**assessed**
319:23
**assessing** 38:9
131:20
177:12 298:18
**Assessment**
5:22 116:14
117:17 183:5
197:16, 19
224:10
298:20 299:4
**assessments**
121:5 197:12
**assist** 272:17
276:1
**associated**
29:6
**Association**
86:11
**assume** 10:15
24:13 25:19,
22 27:4, 8
103:25
110:14
125:25
139:20
150:11
207:13 235:2
**assuming**
140:5
**assumption**
25:25 26:1
27:11 110:17
111:7
**assumptions**
27:13

**assure** 42:15
55:18
**Assuring**
159:15, 18
160:22
**Atlanta** 2:17
**attach** 292:15
**attached**
322:11 324:10
**attack** 238:6
**attempt** 28:10
80:16 81:6,
18 83:9
93:23 276:9
**attention**
41:23, 24
56:22 63:18
77:17 120:9
146:19 149:4
247:12 253:4
295:16
**attest** 317:14
**attorney**
20:19 322:13
325:18
**audit** 185:13
**August** 13:12
14:19 169:3,
11
**authority**
52:21 64:16
138:21
**authorized**
325:4
**availability**
120:8
**available**
11:11 76:10,
19 86:23
119:10
168:20
169:11 170:1
194:3 221:9
247:21 284:8
301:3
**Avenue** 3:21
**Avoid** 6:22
262:13
**avoided**
108:22 109:12

awards
290:*13, 19, 22*
aware 27:*16*
28:*15* 29:*12*
30:*3, 12* 31:*3,*
*13, 17, 19*
32:*11* 63:6
65:*20* 66:*24*
68:6 103:5
106:*16*
109:*15*
112:*13* 113:8
122:*13, 18, 22*
123:*1* 133:*17*
164:*12, 16*
166:*9, 25*
167:*3, 9, 14*
168:*4, 14, 21,*
*25* 169:*4, 6*
170:*25*
174:*11, 15*
185:*15* 186:*3*
194:*13, 24*
198:*21* 199:*3,*
*25* 219:*17*
241:*23*
248:*14, 22*
263:*1, 3*
294:*11* 303:6
awful 72:*4, 7*

< B >
back 15:5
38:7 44:*7, 8*
45:*11* 54:*18*
60:5 66:6
68:*19* 72:*3*
98:*11* 107:*11*
113:*16*
115:*25*
130:*23*
135:*22*
141:*14, 17*
160:*20*
172:*25*
194:*18*
196:*22* 203:8
218:6, *13, 16*
234:5 237:*12*
239:*4* 275:*16*
282:*21*

283:*14, 17*
287:*22*
309:*20* 321:5
background
73:*18* 89:*15,*
*16* 285:*9*
291:*15*
ballpark
100:*24* 276:*24*
Bank 3:*21*
Barnes 3:8
Barreto
274:*14* 275:*13*
base 56:*9*
241:5
based 41:*21*
54:*4, 16*
56:*23* 65:*21*
147:*18*
149:*15* 164:8
255:*11, 21*
286:6 304:*11*
basically 258:*4*
basis 56:*14*
109:*9* 173:*9*
189:*18*
193:*19* 202:2
288:6
batches
214:*16* 215:*1*
Bates 24:6
61:*16* 62:*19*
105:*3*
Bates-stamped
24:*9*
bearing 15:8
began 29:*9*
146:*21* 262:*25*
beginning
19:8 58:6
115:*9* 116:*1*
201:*1* 249:*12*
257:*23* 290:6
303:*14*
begins 52:2
105:*9* 154:*7*
247:*7, 13*
250:*20* 256:*7*
265:*12* 315:*1*
behalf 93:*4*
278:*17*

belabor
170:*10*
Belcher
279:*22*
belief 172:*20*
309:6
believe 13:*16,*
*21* 15:*9, 16*
19:*7* 21:*25*
23:*24* 31:*16*
32:*19* 47:*7*
61:*3* 62:*21*
63:*23* 67:*7*
70:6 72:*25*
79:*18* 95:*17*
110:*9* 130:5
161:*1, 9*
171:*18* 172:*1,*
*4* 177:*18*
219:*20*
232:*16* 233:6
234:*1* 267:*3*
270:*17*
274:*14*
281:*10*
300:*12* 314:*16*
believes
131:*19*
247:*13, 18*
benefit 11:*11*
100:*1* 268:8
269:*11* 270:*7,*
*15* 285:*7, 8*
best 58:*16*
85:5 94:*25*
300:*22*
Beta 285:*20,*
*22*
better 26:*18*
69:*13* 71:*3,*
*15, 19, 25*
263:8, *12*
282:8 295:*16*
316:*21* 317:8
beyond 76:6
92:*7* 174:*1*
285:*10*
bickering
49:*15*

big 171:*20*
181:*14, 17*
268:*9*
bigger 89:*1*
billed 273:5
billing 272:*15*
billion 315:8
billions 317:*10*
binder 86:*23*
87:*9, 10*
104:*12, 15*
112:*23*
128:*11* 142:*3,*
*6, 15* 143:*8,*
*11, 13, 25*
146:*2* 152:*24*
156:*18* 165:*4*
211:*3, 6*
224:*14* 256:6
270:*25*
320:*23* 321:2
Binsol 274:*21*
275:*13*
bioavailability
287:5
bioequivalence
223:*1* 224:*5,*
*8, 9* 226:*20*
228:*9, 22*
232:*9* 287:6
bioequivalent
209:*21*
222:*11, 24*
224:2 229:*17*
230:*17* 231:*4,*
*10, 13* 252:*21*
253:8 318:*11*
Biogen 280:2
282:5
Biopharmaceut
ics 288:*13*
bit 38:7
78:*19* 82:*18*
83:*3* 100:*17*
130:*23*
134:*16*
206:*13*
219:*12*
223:*24* 234:5
274:2

big 171:*20*
black 104:*15*
blank 9:*25*
bless 302:*18*
Board 286:*7,*
*13* 290:*21*
Board-
certified
286:*20*
boards 291:*7*
body 57:*17*
58:*15* 59:*5,*
*11* 81:*7, 9, 20*
83:*11* 283:5
bold 247:*7*
bolded 257:*14*
265:*11*
Book 6:*20*
13:6, *9, 10, 11,*
*23* 14:8, *17,*
*19* 15:*14*
16:*11* 223:*20*
224:*19, 21, 25*
225:2, *6, 7, 15*
244:*14* 245:2
247:8, *19, 25*
248:*7* 292:*6,*
*12*
books 292:5
Book's 245:*17*
Bosick 3:*14*
Boston 4:*15*
bottle 138:*13,*
*14* 139:*1*
bottles 137:*20*
138:5
bottom
261:*14, 19*
313:8 314:*20*
317:6
bow 295:*15*
box 9:*17*
87:*7, 8, 21, 23,*
*25* 88:*3*
104:*12, 15*
Braeburn
280:*7, 9* 282:*1*
brand 151:*22*
branded
126:5 205:*13*
break 14:*13*
59:*22* 60:*9*

64:*1*  66:*4*
83:*17*  97:*19*
141:*3, 4, 6, 20,
23*  142:*1*
144:*7*  190:*12*
212:*5, 7, 10*
218:*18*
219:*11*
282:*19*  283:*9,
18*  284:*5*
293:*15*  320:*10*
**breaking**
282:*15*
**breaks**  203:*9*
**BRIAN**  2:*11*
**Bridge**  3:*21*
69:*11, 13*
**brief**  14:*24*
15:*3*  56:*3*
60:*3*  88:*8*
126:*14*
141:*12*
211:*10*  218:*7,
11*  248:*11*
277:*14*
283:*12*
284:*20*  285:*3*
293:*10*
302:*15*  307:*7*
**briefly**  8:*15*
61:*14*  142:*9*
279:*15*
287:*16*  313:*25*
**bright**  195:*9*
**bring**  41:*22*
71:*18*
**bringing**  56:*21*
**broad**  118:*10*
138:*21*  276:*12*
**broke**  182:*8*
**broken**  137:*10*
**brought**  49:*21*
63:*17*  71:*23*
287:*12*  289:*16*
**BROWNING**
2:*14*
**Browningj@gtl
aw.com**  2:*20*
**Buchanan**  3:*2*
**build**  268:*8*

298:*4*
**building**  78:*20*
**builds**  268:*11*
**built**  287:*5*
**BULDA-
JONES**  1:*24*
8:*19*  325:*3, 25*
**bullet**  118:*20*
120:*10*
147:*21*  149:*5*
154:*7, 17, 21*
155:*5*  156:*4*
173:*11*
**bullets**  118:*18*
120:*17*  149:*2*
**bunch**  71:*12*
**burger**  259:*16*
260:*19*  262:*1,
16*  314:*20*
**bus**  237:*12*
**button**  44:*19*
**buy**  28:*16*
**buyer**  308:*20*
**buyers**  193:*9*
**buying**  66:*12*
181:*17*


< C >
**C.Whiteley@k
anner-law.com**
2:*8*
**calculating**
277:*3*
**calculator**
276:*23*
**California**  3:*9*
9:*9*  286:*5, 13*
287:*3*  325:*1,
4, 6*
**call**  11:*10*
48:*18*  71:*19*
105:*4*  115:*10*
195:*11*  209:*8,
11*  211:*19*
213:*11*
268:*15, 24*
269:*21*  275:*4*
292:*25*
**called**  8:*22*
187:*24*  271:*3*
272:*9*  285:*21*

287:*16*  289:*7,
17*
**calls**  20:*19*
125:*9, 16*
136:*25*  159:*6*
180:*21*
**Camp**  2:*6*
**Camurus**
280:*7*
**Cancer**
105:*19*  106:*3*
242:*24*
**cancer-causing**
258:*4, 9, 21*
**capability**
121:*16*
**capsules**
137:*10*
**caption**  21:*9*
325:*19*
**Carcinogen**
6:*23*  72:*8*
85:*16*  297:*17*
**Carcinogenic**
5:*24*  90:*24*
92:*13*  93:*15,
25*  106:*4*
297:*9*
**carcinogenicity**
119:*9*
**carcinogens**
84:*13*  85:*11*
86:*2*  90:*1*
105:*17, 18*
106:*2, 22*
107:*15*  114:*9,
21*  115:*1*
118:*25*  258:*3*
**care**  14:*13*
251:*7*
**career**  287:*7*
288:*2*
**carefully**  18:*7*
56:*2*  73:*18*
203:*15*
206:*10*
208:*12*  322:*3*
**Carl**  287:*11*
**Carolina**  3:*3*
**carried**  73:*2*

**case**  17:*25*
25:*11*  26:*19*
34:*8*  41:*24*
42:*13*  66:*9*
72:*15*  79:*2*
91:*6*  120:*14,
22*  126:*16*
173:*18*  179:*7*
204:*13*
208:*19*  216:*6*
220:*13*
245:*19, 24*
246:*5, 9*
251:*4*  263:*5*
271:*7, 10*
272:*18*
281:*16*
296:*17*  297:*7*
298:*19, 20*
300:*19*
302:*20*
307:*21*
308:*15, 20*
309:*12*
316:*12*  318:*3*
**case-by-case**
94:*17*  108:*23*
109:*9*  119:*8*
120:*19*
**cases**  280:*23*
281:*20*  284:*4*
**catch**  214:*19*
**catches**  200:*8*
**catching**
273:*18*
**categories**
115:*18*
**categorization**
90:*23*
**category**
14:*18*  294:*9*
**caught**  69:*2*
**causation**
85:*17*  86:*5*
106:*25*
107:*18*  243:*6,
8*  258:*14*
273:*13*
**cause**  84:*20*
174:*21*

242:*24*
325:*11, 20*
**causes**  213:*13*
317:*18*
**caution**  48:*18*
241:*15*
**caveats**  121:*12*
**CBE-30**
187:*15, 16*
188:*6*  276:*2,
5*  304:*6, 12, 24*
**CBE-30s**
186:*9*
**Center**  2:*23*
9:*10*  288:*1, 4,
7*  289:*15*
**Centre**  3:*15*
**Century**  3:*9*
**certain**  73:*16*
77:*8, 25*
138:*9*  165:*16*
202:*23*
214:*10, 16*
216:*5*  225:*20*
235:*13*  236:*2*
241:*21*
242:*23*  275:*9*
300:*9*
**certainly**
14:*12*  37:*17*
41:*22*  48:*5*
50:*20*  51:*4*
55:*14*  58:*8*
84:*17*  92:*17*
94:*17*  95:*12*
107:*25*  117:*3*
118:*4*  122:*10*
123:*8*  127:*19*
142:*19*  158:*8*
159:*10*  169:*1*
177:*16*
184:*14, 18*
190:*3*  194:*10*
200:*1*  219:*23*
220:*23*
224:*24*
227:*25*
228:*19*
254:*23*
260:*25*  261:*8*
262:*11, 23*

Confidential Information - Subject to Protective Order

264:*12*
265:*23*  267:*9*
276:*14*
304:*17*
305:*24*
315:*13*
317:*14*  318:*19*
**certificate**
177:*14*  179:*8*
308:*21*  309:*2*
**certificates**
177:*18*  179:*10*
**certification**
77:*12*  85:*14*
123:*17*  161:*5*
219:*5, 8*
260:*23*  262:*6*
286:*7*
**certifications**
286:*14*
**Certified**  8:*23*
325:*3*
**certify**  324:*5*
325:*7, 17*
**cetera**  147:*25*
197:*12*
**Cgannon@wals**
**h.law**  2:*24*
**cGMP**  6:*18*
46:*23*  47:*2, 6*
55:*17*  56:*7,*
*15, 24*  200:*7*
212:*23*  217:*10*
**cGMPs**  298:*21*
**Chain**  6:*23*
54:*18*
**chair**  288:*21*
**chaired**  269:*16*
**challenge**
35:*12*
**chance**  265:*20*
**chances**
266:*14*
**change**  12:*17,*
*20*  18:*24*
19:*25*  186:*12,*
*15*  187:*8, 11,*
*16, 20, 22*
188:*2, 3*
220:*23*  304:*8*
317:*18*  323:*3,*

*6, 9, 12, 15, 18,*
*21*
**changed**  12:*9,*
*23*  20:*3*
122:*10*  187:*3*
248:*8*
**changes**  15:*21*
16:*4*  18:*21*
290:*12, 16, 18,*
*21*  304:*13*
317:*24*
322:*10*  324:*9*
**changing**
59:*20*  186:*18*
227:*9*
**chapter**
127:*12*  154:*2,*
*4*  155:*4*
176:*25*  177:*11*
**Chapters**  6:*5*
127:*1, 5*
133:*13*  152:*8,*
*11*  153:*3*
176:*25*  292:*6,*
*13*
**characteristic**
154:*11*
**characterizatio**
**n**  40:*19*
157:*25*  227:*2*
**characterize**
80:*17*  81:*6,*
*18*  83:*9*  92:*3,*
*12*  93:*13, 23*
163:*9*
**characterized**
187:*7*  188:*1*
190:*11*
**CHARCHALI**
**S**  3:*8*
**charge**  206:*4,*
*8, 11*  208:*10,*
*13*
**Charlotte**  3:*3*
**chat**  88:*6, 10,*
*19*
**check**  34:*25*
51:*10*  194:*7*
204:*10*  274:*4*
**chemical**
12:*24*  27:*9*

116:*3*  289:*5*
319:*21*
**chemically**
68:*12*  236:*2*
264:*18*
**chemist**
237:*11*
**Chemistry**
288:*15*
**cherry-pick**
261:*1*
**Chicago**  4:*10*
285:*17, 19*
**chief**  288:*20*
**China**  29:*7*
**choice**  237:*2*
254:*19*  255:*1*
259:*15, 17*
260:*9, 20*
261:*25*  262:*2*
**choices**  301:*3*
**choose**  259:*15,*
*23*  260:*18*
261:*25*  262:*12*
**CHRISTINE**
2:*20*
**CHRISTOPHE**
**R**  3:*2*
**Christopher.he**
**nry@bipc.com**
3:*4*
**chromatogram**
298:*16*
**circumstances**
239:*2*  241:*21*
305:*20*
**citation**  134:*22*
**citations**  58:*7,*
*17*
**cite**  54:*24*
55:*25*  79:*6,*
*11*  95:*7*
109:*25*  120:*7*
123:*8*  164:*18*
167:*14, 21*
169:*21*
177:*22*  208:*1*
217:*24*  299:*7*
**cited**  12:*14*
14:*5*  26:*10*
30:*17*  39:*8*

41:*5*  57:*12,*
*16, 19*  59:*5,*
*11*  60:*21, 24*
61:*1*  67:*7*
84:*19*  94:*12*
111:*20*  122:*9*
217:*19*  218:*1*
283:*5*  294:*2*
308:*8*
**citing**  134:*17*
**city**  268:*10*
**civil**  305:22
325:*6*
**claim**  149:*25*
206:*21*  208:*3,*
*9*  209:*18*
276:*14*
**Claims**  6:*17*
**clarification**
122:*15*
145:*25*
180:*17*
197:*17*
252:*10*  266:*8*
290:*17*
301:*11*  306:*14*
**clarified**  39:*23*
**clarify**  17:*14*
81:*2*  294:*15*
**clarifying**
251:*25*
**class**  34:*21*
77:*11*  85:*14*
123:*17*  161:*5*
219:*4, 8*
257:*10*  258:*2*
260:*23*  262:*5*
280:*24*  281:*3,*
*4, 7*
**class-**
**certification**
27:*19*  28:*18*
33:*5, 19*  34:*8*
36:*9*  38:*5, 22*
40:*22*  41:*14*
42:*20*  74:*5*
78:*5*  79:*24*
81:*23*  86:*4*
92:*16*  103:*18*
106:*24*
107:*17*

116:*24*  121:*8*
124:*3, 14, 25*
125:*8, 16*
151:*16*  158:*3*
168:*10*
170:*17*
183:*23*
191:*22*
195:*10*
258:*13*  299:*11*
**class-**
**classification**
34:*2*
**classification**
238:*24*
**classified**
105:*18*
**classifies**
244:*10, 14, 19*
**classify**  114:*25*
**classifying**
245:*2*
**clause**  226:*25*
**clear**  41:*15*
61:*8*  145:*1*
205:*11, 20*
229:*21*  230:*3*
231:*19*  311:*3*
317:*16*
**cleared**  295:*20*
**Clearly**  38:*21,*
*23*  58:*6*
87:*18*  181:*1*
193:*4*  204:*9*
**clinical**  224:*6,*
*10*  226:*22*
227:*8, 11, 21*
228:*3, 12, 17*
229:*1, 6*
231:*16, 22*
239:*11, 20, 24*
259:*3*  286:*4,*
*8, 16, 19, 20*
287:*3*  288:*13*
301:*23*
**clinically**
236:*25*
**closed**  198:*12*
295:*21*
308:*10, 11*

closely 51:4
113:9 119:10
213:8
closer 191:13
295:16
Code 325:6
Codes 247:4
Codex 289:5
cohort 102:20
103:7, 16
105:21 108:3,
14 114:10, 19,
24 115:3, 16
118:21
119:19 160:7,
13 208:21
234:3
COLEEN 4:3
colleagues
62:7 100:1
colloquy 85:19
color 225:8, 15
colored 225:10
combination
219:19 220:2,
9, 16 221:24
222:6
combined 56:2
come 21:5
38:12 42:24
50:3, 21 75:1,
12 98:11
110:17, 19
120:20
131:11
145:15
168:19
187:20
194:11
196:21 207:5
218:5 277:3
300:5 310:20
comes 209:24
210:2, 9
254:20 260:9
276:20
coming 15:4
60:4 141:13
211:5 218:12
271:2 277:10
283:13

comment 33:6
70:8 73:15
94:4 169:22
175:20 198:8
201:15 259:2
316:24
commentary
225:15
commented
48:4
commerce
214:16
commercializat
ion 95:4
commissioner
288:6
committee
268:4, 10, 16,
18, 21, 23
269:17, 24
313:12
committees
314:4, 5, 7, 8
common 36:1,
10
commonly
225:6 236:1
communicate
145:9 283:21
communicated
193:9 304:17

communicating
47:13, 14
55:2 148:10
294:6

communication
49:5, 12 50:6,
20 54:19, 21
55:5 189:18
194:25
community
268:9, 12
companies
131:19
140:19
161:19
181:24
186:22 189:1

192:12 210:5
308:13 309:12
company
27:25 29:6
49:10 53:10
64:14 80:2, 4,
5, 23 151:24
163:2 186:10
191:25 192:5
194:2 206:12
221:5 251:5
272:9 276:20
279:7, 12, 25
280:8 287:9
295:16, 18
298:7 309:23
319:16
company's
169:3
comparative
239:10, 19
compared
154:11 223:5
234:8 254:10
comparing
149:10
compel 52:21
compendia
289:2, 4
compendial
126:13, 25
127:8 135:3,
25 136:4, 9,
22 137:5, 9,
16 139:9, 21,
25 140:6
152:13
245:11, 16, 19,
25 246:13, 16
Compendium
289:6, 7, 8
complaining
279:1
Complete 7:4
292:14, 16
completed
285:15
completely
8:16 58:11
189:1 195:8
305:19

complex
276:12 315:9
Compliance
6:13 56:24
245:7 299:4
complies 131:7
comply 97:14
complying
130:20
components
147:23 316:16
Compound
40:21 50:15
129:20, 21, 22
154:10
compounds
103:6 105:9,
12, 16, 20
106:22
107:15 108:2
114:11, 13, 23
115:17
118:23
119:21
129:22 160:7,
12 257:25
258:2 259:7
comprehensive
264:20
comprises
114:10, 21, 23
concept
227:22
concern 41:20
70:5 102:21
103:7, 16
105:21 108:3,
14 114:5, 10,
19, 24 115:3,
5, 17, 22
116:6 118:21
119:19 160:7,
13 173:19
208:22 209:1
234:3, 12
257:18 261:7
295:14 298:16
concerned
56:12

concerning
101:14
102:10 210:15
concerns
259:17
260:20 262:2
304:12, 17
conclude
172:10
concluded
17:9 321:15
concludes
321:12
concluding
173:12 253:3
conclusion
43:17, 24
56:6 205:21
Conclusions
46:19 77:15,
16 253:13, 19
concurrent
271:14
conditions
226:23
227:13 317:12
conduct
120:19
171:13
200:17, 21
conducted
185:10
conducting
121:4
confer 195:12
confident
261:4
CONFIDENTI
AL 1:12
178:20 179:1,
4 182:1
184:5 222:8
308:9, 11, 19
309:8
confidentiality
178:6 308:2
confined 94:21
confirm 13:20
24:8 132:21
133:16

189:*15, 20, 24*
194:*19* 271:*8*
**confirmed**
173:*5*
**conflicts** 107:*8*
**conform** 57:*5*
**conformance**
58:*10* 127:*9*
213:*19*
**conformed**
151:*20*
**conforms**
132:*20*
**confused**
271:*11, 12*
**confusing**
23:*17* 36:*8*
38:*4* 56:*5*
57:*2* 58:*24*
171:*15*
216:*20* 220:*18*
**Congress**
287:*19*
**conjecture**
67:*14* 198:*17*
**CONLEE** 2:*5*
**connection**
81:*20*
**consequence**
73:*7*
**consequences**
247:*20*
**conservative**
235:*15*
**consider**
42:*11* 71:*10*
94:*15* 113:*20*
213:*23*
215:*16* 269:*9*
314:*8*
**consideration**
78:*21* 292:*17*
**considerations**
156:*7*
**Considered**
5:*14* 9:*22*
11:*16, 23*
12:*14* 13:*1, 7,*
*8, 14, 22, 24*
14:*3, 23* 16:*9,*
*17* 22:*20*

43:*5* 54:*24*
55:*23* 58:*19,*
*23* 59:*11*
61:*22* 79:*12*
84:*20* 85:*9,*
*25* 89:*24*
124:*7* 126:*22*
138:*3* 167:*13*
177:*19, 21*
202:*20*
203:*16*
204:*14, 21*
206:*10*
207:*16*
208:*12*
226:*19* 275:*7*
282:*24* 293:*1,*
*7* 310:*23*
**considering**
92:*8* 122:*8*
**considers**
308:*6, 8*
**consistent**
46:*17* 156:*7*
275:*1*
**consistently**
157:*15, 22*
**consortium**
80:*5*
**consult**
193:*21* 269:*6*
301:*20*
**consultant**
289:*13*
**consultation**
246:*23* 268:*24*
**consulted**
193:*24*
268:*20* 270:*10*
**consulting**
191:*24* 272:*8,*
*12* 289:*17*
**consumer**
138:*13* 140:*7*
209:*12* 255:*13*
**consumers**
319:*17*
**consumer's**
139:*1, 10*
**contacted**
273:*7*

**contain** 26:*3*
27:*6* 134:*6*
149:*21* 151:*2*
171:*12*
189:*16, 21, 25*
194:*20* 213:*7*
226:*5* 232:*18*
233:*8* 234:*4*
235:*4, 9, 21*
237:*4* 255:*15*
**contained**
25:*23* 26:*15*
32:*24* 50:*12*
79:*19* 122:*19,*
*23* 139:*10, 22*
140:*7* 161:*2,*
*10* 166:*14*
167:*4, 17*
209:*13*
213:*12, 24*
216:*17* 217:*9*
237:*3* 255:*5*
**containing**
51:*1* 164:*10*
203:*10* 217:*7*
232:*4, 16*
233:*7* 234:*1*
238:*14* 250:*22*
**contains**
132:*14* 136:*9*
140:*23*
158:*13*
208:*15* 235:*3,*
*19* 240:*7*
254:*14*
**contaminant**
136:*19* 137:*3*
**contamination**
32:*12* 159:*19*
161:*3, 11, 15*
162:*10, 11, 17*
174:*22*
**content** 92:*18*
**contents** 189:*2*
**contest**
101:*22* 102:*1*
**context** 31:*10*
47:*5* 73:*18*
77:*22* 91:*25*
117:*7* 188:*8*
191:*24*

**continue**
58:*22* 103:*12*
107:*23* 109:*8*
154:*15*
198:*14*
251:*17*
285:*13* 286:*13*
**continued**
287:*6* 289:*16*
**continues**
16:*24* 115:*15*
116:*15* 244:*24*
**continuing**
260:*25*
269:*13* 279:*24*
**contract**
179:*24, 25*
183:*16* 184:*3,*
*8, 13*
**contracting**
180:*7, 11*
**contractual**
183:*11*
**contractually**
184:*21*
**contribute**
288:*17*
**contributed**
292:*17*
**Control** 5:*22*
6:*8* 40:*19*
71:*19* 88:*23*
90:*23* 91:*13,*
*24* 92:*3, 12*
93:*14, 24*
130:*15*
131:*11*
144:*14, 17*
148:*7* 155:*8*
237:*19*
262:*23* 263:*1*
315:*11* 316:*22*
**controlled**
71:*16* 103:*16*
106:*3* 108:*15,*
*18* 133:*1*
134:*8* 246:*10*
**controlling**
84:*9* 131:*3*
154:*23*

**controls**
144:*10* 147:*9*
**controversial**
17:*18*
**controversy**
14:*14*
**convenience**
142:*17*
**Convention**
290:*1*
**conversation**
107:*9*
**converted**
304:*19*
**convey** 304:*12*
**convince** 80:*5*
**copies** 24:*21*
142:*25* 143:*7,*
*16*
**copy** 11:*8, 24*
12:*5* 62:*6*
86:*23* 98:*20*
99:*25* 113:*14*
128:*12, 16*
144:*4* 188:*13,*
*23* 198:*4*
217:*15, 18*
224:*21*
249:*14* 284:*3,*
*24* 285:*1*
292:*16* 293:*6*
311:*23*
**core** 32:*21*
209:*16* 318:*2*
**correct** 12:*1*
15:*11* 16:*24*
18:*3* 19:*22,*
*23* 20:*12*
21:*15* 22:*6, 8,*
*18* 23:*7, 15*
24:*25* 25:*4, 9,*
*17* 22:*2, 13,*
*14* 34:*8*
40:*14, 20*
45:*22* 49:*3*
53:*8* 54:*8*
59:*7* 60:*15*
68:*11, 15*
75:*17* 78:*17*
79:*10, 22*
80:*18* 87:*13,*

Confidential Information - Subject to Protective Order

15 91:9 92:4,
14, 24 93:10
94:22 95:4,
16 101:9
103:16 110:6
111:11
113:11
114:11, 15
116:6, 20
117:25 118:9
120:21 122:8
123:3 126:7,
19 127:15
128:2, 23
129:1 130:6,
7, 11, 21
131:4, 22
132:7, 15
133:5 134:3,
10 137:6
139:12 147:6,
15 148:19
149:23
151:13
152:13 153:2
156:24
157:16, 23
160:11
161:20 162:1
164:19, 21
165:16, 25
166:3, 14
169:11
179:21
182:19 183:6
184:23
186:15, 20
187:6, 8, 10,
18, 23 188:4,
17, 24, 25
189:21 190:1
192:17, 22
193:2 194:21
200:18, 22
204:7 207:23
208:7, 17
216:10
219:15
224:22
225:24 227:3
230:18 232:1

236:17, 20
238:6, 15
241:18
243:13, 15
245:3, 8, 17,
22 246:3, 14
249:24
250:15 254:7
256:9 261:20
263:19 265:1,
10 266:23
267:18 270:1,
16 273:16
293:2 305:8
324:7 325:15
**corrections**
322:4, 6 324:9
**corrective**
28:12
**correctly**
22:25 23:22
45:13 49:1
70:17 78:18
90:2 91:1
103:24 104:1
108:5, 7
114:16
119:14, 15
126:8 147:20
148:3, 20
164:22
230:20, 24
245:13
254:17 315:24
**corresponding**
35:10 41:7
**corresponds**
52:9 204:10
**couch** 221:14
**Council**
288:21 314:3
**counsel** 8:17
9:13, 18, 20
10:18 11:2, 9,
17, 25 17:17
23:25 24:12,
18 25:19
27:5 32:4
34:3 38:25
46:16 60:9
61:21 81:24

84:1 85:18
87:24 97:9,
10, 15 98:4, 8,
11 99:16
110:11 122:7
123:5 136:13
141:20, 22
142:10, 13, 20,
23, 24 143:11,
12 181:6
195:19, 22
196:1 197:5,
8 211:13
218:19
219:21 273:8
274:4, 7
276:15
282:20
283:19, 22
284:4 285:8
292:24
297:22 301:8
320:22 321:9
325:17
**counsel's**
284:17
**counter**
188:18
**counterparts**
205:14
**counting**
277:25
278:10 314:23
**country**
264:19
**COUNTY**
325:2
**couple** 46:12
126:18 203:9
250:2 272:4
**course** 12:22
21:21 23:13
29:22 32:21
39:11 64:16
69:8 79:19
120:13
126:24
140:14 163:5
186:9 198:7
199:4 219:20
253:5 254:25

**COURT** 1:1
8:10, 19
20:23 105:24
292:18 322:17
**courtesies**
142:23
**courtesy**
104:13
142:15, 21
**cover** 87:16
**covered**
135:12
**create** 27:10
200:12 312:21
**created**
117:21 225:9
269:17
**creates** 82:8
**creep** 319:2
**criminal**
307:3, 12
**criteria**
132:18 140:2
145:9 148:10,
25 149:14
155:13 156:6
244:13, 20
245:1 246:12
**criterion**
149:12 155:9
**criticizing**
302:20
**crop** 316:12
**crossed** 69:10,
13
**CSR** 1:24
325:25
**Culbertson**
4:14
**Cumulative**
14:19
**current** 96:22
120:23 129:3
154:24 156:8
186:25
243:24 245:7
306:7
**currently**
20:12 129:11
243:1 263:5

**Curriculum**
7:1
**customer**
31:14 55:6
171:11
**customers**
28:16, 22
29:3 81:21
83:11 84:9
311:5
**cut** 46:6
100:16 278:8
**cutting** 278:2
**cutting-and-**
**pasting** 45:7
**CV** 277:13
278:8 284:3,
24 290:7, 14,
22 292:9, 13,
14
**CVS** 3:7
**CWHill@duan**
**emorris.com**
4:5

**< D >**
**D.C** 237:12
**D.Stanoch@ka**
**nner-law.com**
2:7
**daily** 74:25
**damaged**
72:20
**dangerous**
73:9
**Daniel** 274:14
275:13
**data** 80:7
81:10 119:9
149:16
233:17, 18
**date** 8:5 16:1
17:23 19:16
63:18 90:3
99:6 101:5, 6
107:2, 3, 5
110:8 119:21
129:3, 8
132:3 153:5
213:25
266:19

Confidential Information – Subject to Protective Order

276:*25*
294:*24*
296:*17*
312:*12*  322:*8*
324:*14*
**dated**  16:*5*
18:*22*  20:*10*
99:*9*  113:*13*
156:*23*
165:*12, 15*
271:*17, 21*
272:*25*
273:*15*  325:*21*
**dates**  99:*20*
215:*8, 9*  290:*8*
**Dave**  17:*12*
**DAVID**  2:*4*
6:*9*
**DAVIS**  2:*13*
**day**  59:*15*
202:*5, 7, 24*
211:*20*  325:*21*
**days**  187:*21*
188:*7*  268:*22*
293:*9*  304:*24*
322:*14*
**DB**  274:*10, 13,*
*19*
**dead**  238:*5*
**deal**  35:*14*
39:*10*  91:*16*
171:*20*
221:*16*
303:*13*
305:*12*  317:*11*
**dealing**  69:*8*
121:*10*  316:*25*
**dealt**  42:*2*
263:*19*
**dear**  281:*21*
**debatable**
145:*4*  254:*8*
**debate**  54:*9*
102:*16*
103:*22*
107:*20*  158:*4,*
*8*  184:*19*
265:*4*  279:*6*
318:*18*
**debating**
80:*11*  92:*18*

93:*16*  163:*24*
196:*1*
**debtors**  280:*16*
**decade**  56:*10*
**decades**
287:*24*
**December**
65:*4*  68:*2*
73:*2, 6*  74:*19*
75:*5, 8*  76:*16,*
*18*  77:*5, 21*
80:*7*  91:*9*
93:*6, 21*
108:*20*
111:*19*
117:*21*  120:*3,*
*25*  121:*2*
122:*1*  202:*13*
203:*6*  204:*6*
205:*7, 20*
208:*25*  233:*5*
237:*24*
275:*22, 23*
318:*21*
**decide**  39:*5*
308:*13*
**decided**  207:*8*
235:*12*  319:*7*
**decision**  52:*15*
53:*1, 2*  94:*18*
111:*19*  205:*2*
214:*1, 2, 12*
216:*5, 6, 8*
241:*8*  255:*13*
319:*9, 13*
**decision-
making**
111:*24*  112:*10*
**decisions**
269:*25*
**deck**  156:*21*
**Declaration**
44:*11, 22*
45:*17*  46:*4*
**declare**  223:*17*
**deemed**  64:*23*
203:*21*  231:*5*
322:*16*
**deems**  138:*10*
**deep**  276:*12*
**defect**  163:*13*

**defective**
161:*19, 25*
162:*12*  163:*2*
164:*1*  309:*24*
310:*12, 17, 18*
311:*1, 5, 12*
318:*20*
**defects**  159:*20*
161:*3, 11, 15*
**Defendant**  3:*1,*
*10, 19*  4:*5, 13*
279:*21*  281:*1,*
*22*
**Defendants**
2:*8*  3:*7*  4:*1*
16:*18*  279:*17*
281:*16, 20*
282:*2, 4*
**defense**  17:*4,*
*25*  18:*13, 16,*
*22*  181:*6*
**deferred**
285:*24*
**define**  116:*2*
253:*21*
**defined**  115:*5*
119:*2*  268:*8*
**defining**
230:*14*
**definitely**
35:*17*  243:*7*
264:*11*  294:*1*
**definition**
203:*3*  254:*1*
**definitively**
132:*13*
**degradation**
144:*10*  147:*9*
**degree**  285:*14,*
*15, 17*  301:*19*
**delayed**  65:*12*
**demonstrate**
155:*19*
**demonstrated**
226:*21*  227:*19*
**demonstration**
227:*17, 23*
**deny**  103:*11*
**Department**
5:*20*  212:*18*
256:*14, 20*

260:*8*  305:*21*
306:*3, 23*
312:*18, 22*
**depend**  25:*12*
**depends**
27:*22*  28:*1*
**deponent**  8:*11*
324:*1*
**deposed**  10:*3*
**deposing**
322:*13*
**deposition**  8:*7,*
*12*  9:*22*  19:*4,*
*10*  22:*12*
143:*4*  160:*15*
274:*10, 11, 19,*
*21, 23*  275:*4,*
*6*  277:*9*
321:*13, 15*
322:*3, 11, 14,*
*16*  325:*9, 19,*
*21*
**depositions**
22:*16, 22*
23:*5*  275:*8, 9*
**deputy**  288:*3,*
*7*
**describe**  219:*3*
**described**
50:*19*  79:*5*
106:*13*  307:*4,*
*14*  316:*11*
**describes**
250:*21*
**DESCRIPTIO
N**  5:*11*
173:*23*
**designation**
139:*6*
**designed**
139:*25*
**designs**  269:*7*
**despite**  98:*6*
**destroyed**
142:*19*  320:*24*
**detail**  276:*15*
**detailed**  127:*5*
273:*11*  306:*21*
**details**  50:*19*
138:*16*

**detect**  124:*23*
131:*24*
150:*16*
168:*15*  297:*3*
**detectable**
76:*4*  106:*13*
**detected**
123:*2*  151:*3,*
*13*  154:*8*
**detecting**
125:*5*
**detection**
155:*19*
**determinant**
232:*8*
**determination**
203:*13, 14*
206:*9*  207:*20*
209:*4*  215:*21,*
*23*  216:*14*
295:*5, 12, 24*
305:*13*
**determinations**
201:*23*  270:*15*
**determine**
28:*11*  36:*2*
37:*23*  169:*11*
172:*16*  199:*24*
**determined**
49:*17*  75:*18*
106:*7*  109:*17*
111:*2*  203:*17*
204:*17, 18*
208:*10*  305:*14*
**develop**  145:*7*
155:*23*  156:*5*
**developed**
116:*1*  119:*11,*
*23*  168:*15*
319:*22*
**developing**
148:*8*  155:*11*
**development**
27:*23*  119:*12,*
*23*  221:*1, 23*
222:*5*
**dietary**  12:*22*
289:*5*
**difference**
223:*4*  239:*25*
240:*2*  243:*17*

Confidential Information - Subject to Protective Order

**different**
37:*19*  57:*22*
58:*11*  79:*1*
100:*19*  103:*5*
136:*21*
147:*24, 25*
148:*1*  150:*21*
157:*23*
168:*23*  169:*9*
170:2  187:*23*
199:9  223:*12*
232:22  234:7
238:*17*  239:7
240:*24*
243:*21*
246:22
251:*14*  252:9
254:9, *15*
260:*10*
261:*10*
305:*19*  314:6
**differently**
37:*21*  235:*1*
**difficult**  23:*12*
35:*16*  49:7
64:*14*  66:*15*
198:*16*
235:*16*
239:*10*  241:8
242:*10*
287:*14*  314:22
**diligence**
200:*18, 22*
**Diovan**
122:*14, 18, 22*
125:*23, 25*
126:*5*  151:*18*
267:*23*  296:8
318:*12, 16*
**direct**  54:*20*
149:*4*  226:8
247:*12*
**directed**
34:*10*  82:7
143:*14*
**direction**
325:*14*
**director**  288:*4,*
*7, 9*  289:*15*
**disagree**  84:*5*
107:22

108:*10*  111:6
136:6  159:*10*
160:*17*
196:*23*
197:*15, 18*
**disciplines**
288:*16*
**disclose**
183:*12, 13*
184:*21*
**disclosed**
181:*19*
**disclosure**
21:*12*  84:*16*
158:*13, 18*
183:*17*
**disclosures**
24:*15*
**discover**
124:*12*
**discovered**
28:9  30:*19*
48:*23*  54:22
80:*16*  145:5
**discovers**
145:7
**discovery**
22:*1*  24:*14,*
*18*  27:22
33:2  54:*19*
55:6  66:*10*
**discrete**  200:5
**discuss**  42:*12*
65:*13*  114:*15*
128:*20*  143:6
195:*24*
216:*23*
268:*23*
301:*20, 24*
**discussed**
16:*3*  63:*25*
115:*19*  122:*4*
126:*15*
133:*18, 21*
145:*3*  289:*18*
308:2
**discussing**
132:*23*  173:*16*
**discussion**
14:*24*  88:*8*
101:2  103:*12,*

*22*  118:*11*
152:*15*
211:*10*  218:7
248:*11*
256:*12*
277:*14*
284:*20*  285:*3*
293:*10*
302:*15*  307:7
320:*17*
**discussions**
84:*25*  219:*21*
273:*13*
**disinterested**
325:*13*
**dispense**
268:*13*
**dispensed**
267:*20*
**disregarded**
195:*8*
**dissonance**
109:5  110:*24*
**distinguish**
126:*9*
**distributed**
317:*11*
**distribution**
214:*10*  294:*4*
**DISTRICT**
1:*1, 2*  8:*10*
**DMF**  176:6, *8,*
*17*  178:*20*
179:*4, 7*
181:*25*
188:*10, 14, 19,*
*24*  189:2, *4, 6*
200:*1*  248:*25*
308:5, *8, 19*
309:*1, 7, 13*
**DMF-holder's**
41:*23*
**DMFs**  178:6
308:2  309:8
**DNA**  5:22
**DNA-reactive**
94:*15*
**Doctor**  11:*13*
13:*15*  14:*12*
15:8  19:2, *19*
20:*4, 9*  21:8,

*25*  22:*15*
26:25  29:22
30:7  32:*11*
37:7  40:2
43:8, *14, 22*
45:6, *14*
46:*19*  47:*24*
49:*13*  51:*13*
53:4  54:5
56:5  57:9, *23*
58:*14*  59:*16,*
*21*  60:8
62:*18*  68:*19*
70:*10*  77:7,
*19*  82:*18*
96:*19*  99:*17*
100:*3, 16*
103:*14*
104:*19*
107:*25*
110:*14*  111:*1*
112:*20*  113:2
116:9  117:*6,*
*22*  119:*17*
120:*16*
124:*10*
133:*25*
135:*11*  141:6
144:7, 9
145:*22*
150:*25*  165:2
166:8  197:*14*
211:*13, 18*
224:*3*  225:*15*
226:7  228:*24*
229:*13, 22*
230:9, *12*
231:8, *20*
233:*13, 25*
235:*17*
236:*16, 17*
238:*12*  239:*5,*
*17*  240:*19*
241:*1*  243:*10*
247:2  249:*19*
253:*14*  256:*1*
261:*12, 17*
265:7  267:*14*
269:*23*  275:*3*
276:*24*
278:*12*

280:*23*
282:*11, 18, 21*
283:*17*  284:*3*
286:*23*
301:*23*  320:*19*
**doctors**  254:*24*
**Document**  1:*9*
13:2  24:7
45:*25*  53:*20*
57:*11*  58:*4*
59:9  60:*16,*
*19*  61:*10, 11,*
*18, 25*  62:9,
*13, 17, 20, 24*
83:*14, 15*
89:*19*  90:*3,*
*11*  91:*12*
92:*18*  95:6
97:7, *13, 14,*
*24*  99:7
100:7  107:*12*
110:22  113:*5,*
*7, 23*  118:*4*
120:7  122:*11*
123:*6, 12*
143:*10, 17*
144:*3*  153:*1,*
*5*  164:*25*
165:*14*  166:*8,*
*9*  177:6
213:5  256:*24*
257:*4*  293:*14,*
*19*  294:*2*
305:7, *11*
**documentation**
167:*13*
**documented**
108:*19*
**documents**
9:*18, 19, 20*
13:5  14:*16*
23:*14*  24:7, *9,*
*14*  40:*4, 6*
60:*13, 14*
61:*17, 19*
71:20  99:5,
*11, 21*  123:*6,*
*20*  124:*6, 18*
141:*25*  142:*2,*
*4, 12*  143:6
144:6, 8

164:*17, 18*
172:*22*
182:*15*
218:*25*
248:*24*  249:*7*
273:*23*  274:*5*
283:*25*  299:*7*
308:*7*  309:*5*
317:*23*
**doing**  53:*13*
100:*9*  130:*15*
142:*21*  151:*9*
152:*3*  193:*23*
219:*23*  221:*1,
4*  227:*25*
287:*3*  289:*16*
313:*23*  314:*1*
315:*17*  322:*7*
**DOJ**  212:*21*
307:*3, 12*
**Dongmei**  6:*10*
**dosage**  226:*4*
**dosage-form**
37:*1*
**dose**  68:*25*
74:*25*  75:*1*
159:*3, 15, 19*
160:*23*  167:*1,
4, 17*  223:*13*
**dosing**  74:*8*
**DP**  106:*9*
109:*18*  110:*6*
111:*3*
**Dr**  7:*4*  9:*5*
10:*25*  11:*8,
22*  12:*4*
17:*23*  20:*20*
22:*10, 11*
23:*3, 18*  24:*4,
20*  28:*18*
34:*10*  35:*25*
43:*11*  44:*10*
53:*23*  72:*6*
83:*21*  85:*20*
86:*22*  93:*20*
94:*8*  96:*12*
97:*17*  98:*3*
99:*6*  135:*2*
136:*14*
141:*17*  143:*9*
156:*25*  197:*9,

21*  218:*16*
230:*22*  231:*1*
232:*15*
249:*24*  250:*3,
14, 20*  251:*1*
252:*3*  256:*17*
257:*5, 21*
258:*8, 16*
259:*7, 20*
260:*7*  261:*23*
262:*8*  265:*14,
23*  266:*5*
267:*10*
284:*18, 24*
287:*11, 25*
288:*4, 5*
289:*14, 21*
292:*13, 23*
293:*13*
307:*10*
317:*15*  319:*2*
320:*4, 8*
321:*13*
**draft**  110:*20*
127:*24*  285:*24*
**drafts**  45:*24*
46:*16*
**draw**  77:*17*
120:*9*  146:*18*
**drawing**  314:*6*
**drink**  259:*23,
25*
**drinking-water**
89:*23*
**drive**  292:*18*
**driving**  53:*1*
**drop**  238:*5*
**Drug**  6:*1, 3,
16, 23*  12:*11*
26:*8*  28:*11*
29:*10*  31:*20*
32:*16, 24, 25*
35:*10, 17*
38:*9, 10*  39:*4,
5, 19*  41:*22*
42:*11*  52:*7*
55:*13*  60:*22*
67:*25*  68:*12*
69:*23*  70:*2,
16*  71:*5*
72:*16*  73:*6,

11, 22*  74:*2, 8,
9, 17, 22*
75:*15, 22*
76:*3*  77:*8, 9,
25*  78:*1, 8, 15*
82:*25*  84:*10*
85:*3, 15*
91:*17*  95:*3,
15*  96:*4*
106:*14*
111:*11*
116:*19*  126:*2,
16, 17*  127:*8*
130:*13*  131:*7,
8, 15, 16, 21*
132:*20*  134:*6,
12*  135:*2, 6, 7,
25*  136:*8, 10,
22*  137:*9*
139:*9, 10*
146:*7*  148:*19*
149:*12, 13*
150:*14, 23*
154:*13, 14*
155:*20, 21*
158:*12, 13*
161:*2, 9, 25*
162:*9*  163:*2*
164:*4, 7, 8, 10*
166:*10*  168:*3,
5*  170:*12, 13*
171:*5*  172:*5*
179:*9*  180:*1*
201:*2*  209:*23*
212:*22*  217:*1*
223:*2, 6*
225:*4*  226:*3,
4, 14, 18*
228:*10*
229:*12, 16*
230:*16*  231:*4,
6, 9, 14*
233:*20*  234:*7,
8, 9*  235:*8*
240:*7, 9*
242:*4*  243:*12,
24*  244:*19*
245:*2, 6, 11*
246:*6, 22*
247:*24*
248:*15, 20*

254:*2, 13*
255:*8*  263:*2,
7*  267:*20, 25*
269:*25*
287:*17*  304:*3*
308:*22*
309:*21, 24*
310:*5, 25*
311:*20*
318:*10*  319:*25*
**drug-product**
38:*19*  39:*15*
40:*7*  82:*14*
127:*18*
151:*21*  304:*4*
**Drugs**  6:*9*
70:*4*  71:*15*
72:*8*  121:*25*
135:*1*  157:*23*
214:*10, 11, 12,
17*  215:*2, 20*
216:*3*  231:*3*
236:*2*  250:*22*
254:*20*  260:*5,
9*  263:*10*
264:*18*
268:*13, 14*
287:*13, 19*
288:*12, 18*
318:*12*
**drug-
substance**
37:*1*  55:*12*
82:*14*  84:*6*
92:*1*  127:*18*
194:*12*  309:*7*
**Duane**  4:*3*
**Due**  8:*14*
106:*4*  147:*24*
200:*17, 21*
**duly**  8:*23*
325:*4, 10*
**duration**  74:*8*
75:*1*
**DZIKOWSKI**
2:*13*
Dzikowskik@gt
law.com  2:*19*

< E >
**e.g**  120:*13*

**earlier**  11:*17*
51:*24*  66:*25*
127:*21*
160:*10*  191:*8*
227:*7*  246:*21*
264:*24, 25*
293:*14*
297:*22*  308:*3*
**easily**  244:*6*
**East**  3:*9*
**easy**  315:*8*
**eat**  259:*15*
260:*19*  262:*1*
**echoing**
265:*24*
**economic**
219:*9*
**editorial**  291:*7*
**educational**
285:*9*
**Edward**  19:*9,
20*
**Edwin**  256:*13*
312:*15*  316:*2*
**effect**  100:*18*
123:*5*  216:*18*
224:*6*  226:*22*
227:*8, 12, 21*
228:*3, 12, 17*
229:*1, 6*
231:*16, 22*
313:*1*
**Effected**
187:*17*
**effective**
100:*19*
158:*25*  159:*2,
19*  161:*3, 10*
208:*24*
253:*23*  254:*2*
**effects**  106:*5*
234:*10*
**efficacy**
154:*13*
224:*10*
229:*11*
233:*16*
234:*21*
240:*12*  250:*4*
254:*10*

Confidential Information - Subject to Protective Order

effort 150:2
236:3 262:25
269:11, 14, 18
306:2, 21
319:16, 24
efforts 30:3
263:1 290:25
eight 215:5
EIR 197:24
198:11, 20
either 27:24
36:25 48:12
232:8 243:10
295:10
296:22
297:20 325:18
elaborate
175:21
ELAINA 1:24
8:19 325:3, 25
electronic
11:12
elements
300:10
eliminate
106:7
Elizabeth
274:13 275:13
else's 11:10
EMA 40:5
267:3, 7
E-mail 5:15
6:12 62:19
63:19 173:5
218:22 293:16
Embarcadero
9:10
emphasizing
215:9
employed
297:3
employee
86:15
employing
150:10
encourage
254:25
encourages
254:24
endeavor
298:19

endeavored
297:2 299:3
ended 288:2
ends 244:24
engage 320:16
ensuing
287:24
ensure 8:16
33:1 47:9
ensuring 250:8
entered
285:23 286:3
305:2
entire 78:11
93:4 100:15
188:10
207:22
262:25 305:18
entirely
108:22
109:12
255:24 275:1
308:9
entities
183:18
188:23 189:8
entitled 146:7
196:9 225:3
entries 19:8,
10 274:10
278:6
entry 19:17
273:15 274:18
environment
241:10
episode 36:23
equation 68:1
equipment
140:14 315:10
equivalence
223:11, 23
224:1, 4, 5
225:4 227:2,
9, 19, 22
228:8, 21
229:3, 5, 9, 15
230:15, 16
231:9, 21
232:9, 11
233:13
244:15

245:15 247:3
291:20
Equivalence-
Related
225:17
equivalent
209:20
222:11 223:8,
18 224:1
227:11 228:2
229:16
230:17 231:3,
5, 10, 13
244:11, 19
245:3 252:21
253:7 285:22
318:11
equivalents
225:24 226:2,
10, 19, 20
errata 322:6,
7, 10, 13
323:1 324:10
error 45:11
46:14
errors 43:19
44:12 46:11
escalation
295:14
especially
142:21
ESQ 2:4, 5,
11, 13, 14, 15,
20, 22 3:2, 8,
10, 20 4:3, 5,
14
essence 200:11
Essential 6:22
essentially
319:21
establish
17:22 49:16
54:4 145:9
established
68:9 69:16,
20 72:23
73:2 77:7, 24
160:10 313:20
establishing
79:20 91:8
148:10 155:12

establishment
70:14
estimates
291:25
et 5:15
147:25 197:12
Europe 308:9
evaluate
148:17
191:16
220:14
265:18
266:12 267:5
evaluating
154:12
Evaluation
247:4 299:1
Evaluations
225:5
event 42:16
149:20
events 69:12
110:25 168:2
264:16, 21, 25
eventual 254:7
eventually
79:17 217:10
220:14
everybody
49:6 50:21,
22 228:7
evidence 36:1,
10 37:22
64:10 186:3
exact 198:6
249:14
exactly 13:21
19:16 43:20
46:15 56:18
82:7 113:14,
19 120:14
128:24
130:14 132:5
135:14 137:7
140:18
147:19
153:12 160:5
243:20
EXAMINATIO
N 9:3 284:22
320:6

EXAMINATIO
NS 5:1, 3
examined 8:24
example 24:6,
21 28:21
66:3 78:20
91:21 115:13
119:9 125:23
128:21 133:8
135:2, 23
137:8, 18
138:12, 25
139:8, 19
140:5 172:3
198:9 233:4
263:13 268:9
274:12
303:12 310:15
examples
135:1 139:8
152:11 203:8
206:3 245:21
263:8 281:21
exceed 236:5
Excellent
10:24 11:15
128:16
exception 93:2
excerpt 89:13
284:12
excerpts
100:14
exchange
184:4, 9, 14
269:2
excuse 114:22
196:8
execute 53:11
executed 54:3
executive
288:21
Exhibit 5:12,
15, 18, 20, 22
6:1, 5, 8, 12,
16, 20, 21, 23
7:1, 3, 4 11:5,
10, 11, 19, 22
12:6 16:16
18:15, 23
19:3 20:10,
16 52:1 62:9,

Confidential Information - Subject to Protective Order

10 65:21
86:17, 18, 25
87:5 88:1, 13,
15 100:10, 13
104:6, 7, 8, 11
112:23, 24
128:4, 6, 10
144:1 145:17,
19, 22 152:18,
20, 23 153:15
156:13, 14, 17
165:3, 6, 9
172:25
210:22, 23
212:13
224:11, 13, 15
244:8 255:25
256:2, 5
270:19, 21, 24
277:7, 8
282:22, 23
284:5, 6, 11,
13, 25 290:7
292:15, 20, 22
293:1, 15
311:22
**EXHIBITS**
5:10 10:25
16:19 142:7,
16 143:2
216:24
217:17
320:23 321:2
**exhibit-share**
88:3
**exist** 149:9
206:7 240:5,
21 314:12, 14
**existed** 33:13
117:9 149:24
150:23 240:3
**existence**
178:9
**exists** 123:7
169:20 272:12
**expand** 87:19
**expansion**
288:23
**expect** 37:2
66:9 67:1
158:25 159:2,

9 300:15
308:25
**expectation**
42:14 92:10,
23 93:22
101:13 102:9
158:7 193:14
**expectations**
157:15, 22
158:20 300:19
**expected**
68:14 190:2
226:21
227:11, 20
231:22
**experience**
267:16
288:15
289:10, 11
303:13 304:11
**experimented**
289:6
**EXPERT**
1:16 6:21
11:2 16:18
17:4, 8, 13, 15,
25 18:14, 17,
23 22:10, 14,
17, 19 23:6
33:5, 18 34:2
36:9 38:5, 23
40:23 41:14
42:20 44:22
45:17 46:3
56:1 77:11
78:5 79:24
81:24 83:19
84:15 85:13
86:4 102:14
103:9 116:22
122:4 123:17
124:3 161:5
181:22 219:4
237:6 238:20
256:7 258:12
259:2 262:5
269:17
274:16
280:24
302:14

313:12 314:4,
8 317:19
**expertise**
235:24 314:6
**experts** 268:7
288:22 314:3
**explain**
223:22
228:14 313:25
**explore** 57:3
**exposure**
120:12
**expressed**
18:25 25:17
223:3
**extend** 253:18
**extended**
71:22 264:17
**extends** 264:18
**extent** 32:1
50:15 55:8
94:13 179:11
204:17 223:4
281:18 305:8,
11 306:19

**< F >**
**faced** 319:5
**facilities**
56:17 201:3,
6, 14 210:9
**facility** 166:22
198:22 199:1,
16 215:2
**fact** 105:20
131:7 133:20
172:15
178:16, 24
188:1 216:16
217:6 219:25
220:8 269:16
304:23 305:5
**factors** 28:2
74:15 122:8
**facts** 168:20
196:4, 9, 10,
13, 24 198:18
200:5
**factual** 196:6

**fail** 46:23
56:7, 15
322:15
**failed** 45:24
**fails** 48:13
213:18 248:5
**failure** 47:19,
23 138:7, 18
174:9 280:4
319:15
**faint** 146:15,
17
**fair** 10:4, 15,
16 14:2
18:16 19:15
40:10 81:2,
11 96:10
102:19
118:21 127:7
135:10
140:10
169:24
177:24
200:10 201:8
221:22 269:3
280:25 283:7
321:3
**fairly** 258:4, 9,
21 259:1
**fake** 90:18
**Falanga** 2:22
**Falkenberg**
4:9
**fall** 115:18
164:9
**falls** 103:15,
17
**False** 6:17, 18
212:23 305:23
**familiar** 86:10
113:6 210:14
212:19, 21
224:24
256:17, 19, 21
302:3 308:14
312:7, 15, 17
**far** 34:12
81:23 99:15
135:4 188:11,
15 189:7, 17
240:11 243:4

269:12
271:10
302:23 314:13
**fascinating**
313:15
**fashion** 36:6
38:2
**faster** 59:16
**faulted** 174:17
**FDA** 6:19
12:10 21:20
26:6, 10, 21
28:10 29:7, 9,
25 30:10
31:17 35:12,
13, 19 36:22
38:16 39:9
40:5, 25
41:16, 18, 20
42:12, 25
47:14, 19
48:4, 15, 17
49:5, 21 50:3,
10, 22, 25
51:4, 5 52:6,
11, 12, 14, 19,
21 53:2, 7, 10,
13, 14, 17, 25
54:1, 6, 7, 11
56:12, 16, 21
57:4 64:1, 2,
15, 16 65:3, 7,
14 66:20
67:12, 19, 23,
24 68:1, 16
69:2, 10, 15,
20, 23, 25
70:18, 22
71:13, 18, 21
72:23 73:16
74:21 75:6
76:1, 16
77:21, 23
78:11, 21, 24
79:2, 4, 16, 21
80:1, 5, 24
82:8, 12, 24
91:11, 13, 25
93:3, 7, 21
101:12 102:8
103:5 104:21,

Confidential Information - Subject to Protective Order

24  106:7, 12,
17  107:8, 22
108:2, 19
109:1, 6, 16
110:3  111:2,
14, 22  112:8
117:20  120:2,
23  121:10
122:1  127:22
131:12, 24
133:2  134:13
137:25  138:9,
14, 21  139:3,
11  140:9, 15
144:20, 21
145:15  149:9
156:21  157:3
158:5  162:19
163:19, 22
164:10  165:8
168:17, 22
169:2, 9
171:6  173:19
174:17  180:8,
13  181:10, 14,
20  182:2, 4, 5
187:10, 12, 14,
18, 19, 21, 23
188:6  190:8,
10, 20  192:3,
5, 11, 17, 22
193:2, 7, 12
197:23
198:10, 11, 14,
19, 21  199:1,
3, 11, 15, 19, 23,
25  200:2, 8,
13, 14  201:1,
5, 9, 11, 17, 23
202:12, 25
203:6, 11, 13,
14, 16, 20, 24
204:2, 5, 11,
12, 22, 23, 25
205:2, 19, 22
206:1, 4, 7, 9,
22, 23, 25
207:2, 4, 19,
21  208:2, 6, 9,
16, 25  209:1,
6  210:4, 9

213:14
215:17  216:2,
5, 6, 13, 17, 25
217:10, 25
221:17, 22
222:4  223:19
225:3  233:5,
18  235:12, 13
236:25
237:11, 19, 23
238:2, 22
239:22, 23
240:4  241:2,
14, 21, 24
242:3, 7
244:10, 14, 18
245:2  246:5,
11, 19  247:13,
18  250:5, 9
254:14, 24, 25
255:17, 20
263:7  264:3,
6, 8  265:24
278:24  280:3
286:14, 15
287:12, 15
288:3, 6, 11,
20  289:16, 20
290:10
295:17, 21, 24
296:23  298:5,
10  302:9, 25
303:6, 12
304:13, 16
306:2, 22
307:3, 12
308:5, 8, 10
309:21  310:5,
8, 16, 18, 19, 22
311:16  313:1
317:1  318:14,
15, 20, 21
319:4, 7, 17, 21
**FDA-agreed**
245:20
**FDA-approved**
85:3  225:11
**FDA's**  6:8
57:5  58:10
64:3  66:23
70:14  90:11

91:7  106:21
107:14  110:4
117:23  121:1
129:4  130:20
171:5  174:8
202:19  209:9
210:14
242:25  254:7
295:14  298:24
**feasible**  106:5
**February**
1:19  5:12
8:5  16:5
20:1, 10
72:25  73:4
110:1  128:1
129:6  266:2
325:21
**feel**  95:5, 19
180:22  291:21
**feeling**  167:12
**feels**  35:18
261:4
**fellowship**
286:4
**female**  250:14
**FHS@pietragal
lo.com**  3:17
**field**  59:17
**fifth**  279:6
**fight**  34:5
**figure**  61:10
66:20  78:10,
17, 23  79:4
82:11  218:4
**figuring**
140:19
**file**  248:15, 20
292:23
**filed**  274:8
**filer**  38:8
**files**  11:12
276:10, 11
**filing**  188:19
**fill**  274:25
**final**  45:25
72:24  156:4
244:16
266:19  278:9
295:5, 11, 24

**finally**  235:12
317:7
**financial**
252:4, 6
**find**  23:23
40:4  44:14
82:10  91:16
100:8  144:3
146:12
201:11, 17
213:17  319:18
**finding**  29:7
31:10  36:23
39:12  64:14
66:6  169:9
**findings**  54:16
192:22  193:2
194:9, 16
307:20
**finds**  53:10
55:12  205:5
**fine**  16:15
45:4, 6  49:8,
12  59:15, 21
102:22
106:10  141:5
144:2  155:25
186:23  192:5
210:4  212:20
258:6  283:8
**fined**  212:22
**fines**  307:4, 13
**finish**  230:1,
12, 13
**Finished**  6:13
26:7  37:7
68:25  167:1,
4, 17  286:3
**finished-dose**
25:23  26:3,
14  27:1, 5
33:21  35:4
36:3  37:24
40:9, 13
41:12  42:7
56:17  82:20
164:14, 21
165:24
171:11
175:25  177:2
193:12

200:20  201:6
204:14
**firm**  42:5
279:2  299:14
**firms**  184:4
**first**  8:23
10:25  13:16
16:21  19:17
29:25  46:13
61:14  81:13
91:7  105:7, 8,
15  106:16
110:20
112:16
120:10
125:14
127:24
143:19
146:10
147:17  149:7
154:6  155:5
182:4  200:9
207:5  209:18
214:9  216:21
226:2, 13
230:9  234:5
241:2  247:6
249:12  250:1
251:18
257:22
269:17
271:16  272:5
273:5, 7, 15
278:19  286:1
298:13  302:5
305:21
312:22
315:15  319:8
**five**  244:23,
24  288:16
**five-page**
104:22
**fix**  32:3  44:19
**fixed**  43:17
**flat-out**
142:24  143:23
**flexibilities**
120:18
**flip**  112:22
118:12
146:24

Confidential Information - Subject to Protective Order

148:*21*
153:*18*
157:*18*
158:*23*
159:*13, 25*
247:*1* 256:*24*
265:*6* 275:*16*
**flipped** 142:*6*
**flipping**
142:*15*
**Floor** 2:*23*
3:*15* 4:*15*
**focus** 31:*8, 18,*
*21* 36:*19*
39:*24* 43:*4*
173:*14*
176:*21*
206:*13* 287:*5*
288:*24*
**focused** 53:*23*
289:*19*
**focuses** 21:*22*
36:*21*
**folder** 87:*5*
274:*3*
**folders** 274:*5*
**folks** 72:*16*
**follow** 46:*23*
56:*7, 15* 78:*9,*
*22* 84:*7*
91:*11* 92:*2,*
*23* 133:*8*
320:*5*
**followed** 43:*9*
47:*2* 78:*16*
130:*17* 132:*5*
133:*25*
**following** 10:*7*
41:*18* 47:*8*
70:*21* 116:*12*
130:*19* 131:*1*
135:*19*
150:*12, 22*
151:*1* 221:*15,*
*22* 222:*4*
229:*20*
244:*20* 290:*8*
304:*16* 315:*14*
**follows** 35:*3*
94:*11*

**food** 69:*9*
73:*18* 120:*13*
241:*9* 262:*9*
289:*5*
**foods** 89:*22*
262:*12, 17*
**foodstuff**
262:*10*
**foodstuffs**
236:*1* 241:*10*
260:*10*
**footing** 287:*22*
**footnote** 16:*2*
61:*20, 23*
**footnotes**
13:*17, 18*
15:*19* 18:*21*
283:*5*
**forced** 190:*12*
**fore** 71:*24*
**foregoing**
324:*6* 325:*9,*
*19*
**foreign** 294:*9*
**forever** 289:*10*
**Form** 18:*5*
27:*18* 30:*14*
55:*24* 64:*8*
69:*5* 100:*25*
180:*16, 19*
190:*6, 14*
191:*10*
203:*11*
223:*13*
232:*20*
285:*10*
286:*24*
289:*22*
293:*22*
295:*25*
297:*10, 18*
298:*22*
299:*16, 22*
300:*11, 20*
301:*5, 9*
302:*11*
305:*17* 309:*4*
311:6, *13*
312:*20*
317:*20*
320:*12* 324:*9*

**formal** 107:*21*
203:*3*
**formed** 174:*1*
313:*4, 24*
314:2, *7*
**forming** 249:*2*
314:*5*
**forms** 100:*19*
226:*5*
**formularies**
269:*10*
**Formulary**
12:*20* 268:*8,*
*11* 269:*6, 22*
**formulation**
147:*23*
**forth** 8:*25*
93:*12* 154:*1*
**Forum** 6:*6*
**forward** 73:*3*
101:*3, 6, 22*
143:*24*
**found** 47:*21*
78:*7, 14, 22*
118:*24*
168:*23*
190:*21*
198:*19*
203:*23*
207:*21* 213:*7*
236:*1* 248:*1*
**foundation**
58:*4, 24* 64:*9*
111:*13*
123:*18* 124:*4,*
*15* 125:*1, 9,*
*17* 151:*5, 15*
166:*6* 176:*4*
178:*11*
182:*24*
183:*22*
185:*24* 191:*2*
193:*17* 220:*3*
221:*12* 249:*5*
**four** 19:*8, 10,*
*24* 26:*8*
32:*15* 49:*24*
207:*11*
244:*23*
264:*17* 265:*8*
277:*24* 278:*3,*

*10* 288:*16*
314:*23* 318:*9*
**four-digit** 63:*1*
**Fourteen**
290:*2*
**fourth** 265:*6*
279:*5*
**fraction** 57:*12,*
*13* 59:*8*
**frame** 48:*6*
191:*14*
**framework**
90:*21*
**Francisco** 9:*9*
218:*20* 286:*5*
287:*3, 9*
**FRANK** 3:*10*
180:*15*
**fraud** 305:*23*
307:*13*
**free** 131:*9*
159:*19* 161:*3,*
*11, 15*
**Fresenius**
279:*14*
**friend** 287:*12*
**front** 11:*9, 25*
96:*9* 99:*5*
102:*22* 127:*3*
249:*14* 265:*7*
277:*16* 278:*5*
285:*1*
**full** 100:*12*
143:*17*
214:*22* 247:*11*
**full-time**
286:*15*
**fully** 59:*2*
**further** 18:*20*
63:*13* 119:*7*
164:*9* 173:*8*
200:*25* 250:*7*
274:*9* 284:*15*
320:*19*
321:*10* 325:*17*
**future** 143:*4*

**< G >**
**Galderma**
279:*18*

**GANNON**
2:*20*
**Gateway** 2:*23*
**gee** 269:*4*
**Genentech**
280:*14* 281:*23*
**General** 5:*20*
6:*5* 10:*6*
35:*15* 36:*18*
39:*7* 42:*22*
43:*2* 59:*6*
66:*13* 71:*9*
91:*4, 20*
94:*20* 95:*22*
101:*21*
104:*23, 24*
106:*17* 110:*3*
114:*1* 117:*2*
126:*25* 127:*3,*
*5, 9, 12* 133:*3,*
*7, 13* 139:*23*
152:*8, 11*
153:*3* 154:*2,*
*4* 155:*4*
159:*4* 160:*17*
161:*21*
174:*20*
216:*25*
234:*17*
244:*20*
252:*19* 255:*7*
259:*22* 260:*1*
262:*18* 310:*5*
316:*25*
**generally**
16:*12* 21:*16*
28:*3, 6* 29:*23*
37:*20* 40:*10*
41:*25* 50:*8*
64:*12* 66:*12*
92:*20* 94:*11*
108:*17*
113:*18*
117:*18* 127:*4*
158:*9* 159:*10,*
*21* 170:*21*
183:*8* 241:*19*
246:*24*
255:*23* 263:*6*
316:*6*

Confidential Information - Subject to Protective Order

**Generic** 6:*16*
126:*6* 151:*22*
210:*15*
212:*22* 213:*6,*
*11, 23* 219:*18*
220:*1, 9, 15*
222:*25* 223:*5,*
*16* 230:*5*
231:*2* 234:*7,*
*20* 279:*6*
287:*13, 15, 17,*
*19* 288:*12, 18*
**genotoxic**
27:*16* 28:*3, 6,*
*15* 31:*22*
32:*2, 7* 33:*3,*
*23* 35:*6, 11,*
*18* 36:*4, 24*
37:*20* 38:*11,*
*20* 39:*10, 19,*
*25* 40:*2, 20*
41:*8, 11, 21*
42:*6, 10, 17*
43:*1* 47:*10*
55:*19* 63:*7*
66:*6, 10, 25*
71:*6, 22, 24*
72:*8* 80:*16*
81:*5, 18* 83:*8*
84:*7, 10, 24*
98:*17* 101:*14*
102:*10*
105:*17*
106:*22*
107:*15*
131:*15, 20*
132:*1* 133:*9*
189:*16, 21, 25*
194:*20*
209:*13*
234:*13* 241:*6*
266:*14* 267:*6*
294:*12* 298:*8,*
*18* 318:*25*
**Georgia** 2:*17*
**germane** 71:*10*
**getting** 46:*2*
73:*15* 76:*5*
81:*22* 117:*22*
209:*16*
211:*25*

213:*13*
225:*18* 230:*7,*
*8* 243:*8*
248:*3* 253:*23*
281:*23*
**give** 20:*22*
45:*3* 62:*8*
67:*3* 78:*19*
86:*5* 87:*1*
106:*25*
107:*18* 127:*5*
135:*7* 144:*3*
162:*4* 198:*16*
216:*23*
223:*19*
233:*17* 237:*8*
281:*21* 285:*8*
299:*19, 23*
**given** 11:*9*
24:*22* 51:*25*
144:*22* 237:*2*
296:*17* 324:*7*
**gives** 41:*16*
**giving** 243:*5*
**glad** 12:*15*
13:*2* 62:*4*
70:*8* 82:*9*
95:*9* 98:*24*
121:*18*
123:*11, 21*
124:*8* 126:*22*
214:*6* 216:*22*
231:*2*
**glass** 137:*10*
213:*7, 9, 12, 24*
**Global** 6:*12*
294:*5*
**globalization**
288:*23*
**globally** 60:*20*
**globe** 64:*15*
294:*7*
**Glumetza**
280:*5, 11*
**GMP** 43:*9*
47:*19* 56:*1, 2,*
*11, 12, 21*
134:*25* 138:*7*
217:*3* 299:*1*
302:*13, 14*
305:*24*

**GMPs** 48:*13*
57:*5* 58:*10*
133:*8* 137:*15*
138:*19*
200:*11, 13*
206:*13*
213:*19*
279:*25* 298:*24*
**GNTM**
293:*16* 294:*4*
**Go** 39:*1* 54:*5,*
*18* 59:*15*
66:*18* 72:*3*
77:*14* 83:*21*
97:*19, 23, 25*
100:*7* 101:*3,*
*22* 105:*12*
115:*25*
135:*22*
136:*14*
142:*11*
160:*20*
172:*25* 187:*3*
195:*23* 197:*7,*
*19* 204:*1*
213:*10*
215:*25*
217:*15* 218:*6*
222:*19*
227:*20*
229:*25*
235:*18*
237:*18*
238:*10* 239:*4,*
*17* 246:*4*
257:*7, 13*
265:*10*
273:*22*
277:*18*
281:*19*
282:*21*
286:*25*
291:*16* 293:*25*
**goal** 236:*3*
**goes** 111:*22*
112:*8* 113:*16*
244:*22*
276:*19*
316:*10, 15*
**going** 11:*1, 15*
15:*1* 19:*19*

20:*18* 31:*25*
34:*22* 37:*20*
48:*17* 53:*17*
54:*9, 13, 18*
59:*19* 60:*1*
62:*17, 22*
72:*11* 82:*5*
83:*2, 12, 13*
84:*5* 86:*17,*
*21* 94:*24*
95:*18* 96:*7*
98:*2, 4* 100:*2*
104:*7* 105:*24*
107:*19* 128:*4*
141:*2, 11*
142:*10*
143:*24*
145:*17*
152:*18* 163:*4*
164:*25*
180:*16* 196:*2,*
*19, 20, 21*
197:*1* 203:*8*
211:*19* 218:*9*
219:*24* 237:*8*
239:*6* 275:*2*
280:*21*
282:*14*
283:*10* 284:*2*
292:*23* 319:*6,*
*18* 320:*15*
321:*13*
**Golkow** 8:*4*
**Good** 9:*5, 6*
11:*12* 12:*3*
13:*22* 20:*4*
28:*8, 23*
43:*23* 72:*4*
80:*7, 8, 13*
82:*6* 84:*10*
113:*6* 128:*21*
137:*18*
144:*13* 146:*6,*
*24* 153:*13*
161:*1* 165:*14*
170:*8* 192:*11*
208:*24*
209:*11* 210:*8*
213:*3* 245:*7*
267:*13* 274:*7*
282:*15*

287:*12* 315:*4*
316:*4*
**Gordon** 3:*14*
**gotcha** 24:*5*
**gotten** 190:*20*
223:*24*
**governed**
183:*17*
**Government**
306:*16*
**graduate**
291:*5*
**Grant** 3:*15*
**grateful**
289:*10*
**gratified**
319:*24*
**gratuitous**
120:*15*
**gray** 146:*14*
274:*13* 275:*13*
**Great** 62:*22*
89:*7, 17*
110:*18*
113:*22* 118:*6*
137:*25* 141:*9,*
*10* 148:*24*
187:*2* 249:*22*
257:*13*
265:*12, 14*
277:*23*
289:*15* 303:*13*
**greater** 120:*12*
**Greenberg**
2:*15* 9:*10*
**grilled** 259:*16*
260:*19* 262:*1,*
*16, 17* 314:*20*
**ground** 266:*6,*
*9*
**group** 114:*8,*
*20* 268:*7*
271:*4, 12, 13,*
*17* 272:*6, 8,*
*12, 13, 17*
273:*14* 289:*17*
**groups** 115:*14*
**guess** 71:*1*
81:*2* 116:*3*
125:*20*
161:*15*

Confidential Information - Subject to Protective Order

189:*12*
244:*23*
253:*18*
258:*15*
264:*19*
266:*19*  272:*4*
275:*17, 20*
277:*6*  282:*11*
**guessing**
125:*19*  169:*25*
**Guidance**
5:*24*  6:*8*
12:*10, 13, 16,*
*18*  35:*13*
39:*10, 17, 18,*
*22*  40:*1, 6*
70:*22*  71:*22*
72:*24*  73:*3*
74:*25*  76:*19*
78:*9, 16, 23*
79:*6, 8, 9, 10,*
*15, 21*  80:*14*
81:*4, 16*  82:*6,*
*8, 17, 19, 23*
83:*5, 7*  84:*8*
90:*11*  91:*7,*
*15*  92:*2, 24*
93:*9, 12, 17,*
*18, 20*  94:*17,*
*21*  95:*2, 15,*
*20, 22, 25*
96:*3, 9, 16, 18*
97:*4, 5*  98:*12,*
*16, 18*  99:*17*
100:*4, 18, 25*
101:*8, 14, 15*
102:*10, 11, 20*
103:*7, 21*
105:*22*  107:*8*
108:*3*  109:*1,*
*6, 20, 22, 23, 24*
110:*21*
111:*20*
113:*11, 17*
114:*8*  115:*6*
117:*11, 24*
118:*7*  119:*2,*
*8, 18, 21*
121:*3, 17, 18,*
*20, 24*  122:*1*
127:*22*  129:*5,*

*14*  130:*21, 24*
140:*16*  160:*4*
221:*15, 22*
222:*4*  237:*22,*
*23*  241:*5, 11,*
*20*  242:*8, 22*
245:*17*  246:*2*
265:*24*
266:*18, 22*
267:*1, 3, 7*
280:*3*  303:*1,*
*4, 5, 6*  304:*16*
311:*15*
**Guidances**
14:*16*  15:*15*
39:*8, 21*  41:*4,*
*7, 8, 17*  42:*24,*
*25*  68:*22*
76:*9*  94:*12*
113:*20*  156:*8*
267:*2*
**guide**  111:*23*
112:*9*  133:*4*
**guidelines**
68:*22*  76:*9*
269:*10, 18, 20,*
*21*
**Guilty**  6:*16*
213:*25*  215:*6,*
*10*  305:*2*
**Gump**  256:*13,*
*17*  257:*5*
258:*8, 16*
259:*7, 20*
260:*7*  262:*8*
265:*14, 23*
266:*5*  312:*15*
316:*2*  317:*7*
319:*2*
**Gump's**
257:*21*
261:*23*
265:*11*  267:*10*

< H >
**half**  286:*1, 2*
**Halloween**
225:*10*
**hand**  139:*10*
143:*7, 16*

**handed**  98:*20*
99:*8*  113:*15*
146:*3*  234:*19*
292:*17*
**handle**  316:*21*
**handled**
234:*18, 22, 23*
235:*1*  309:*9*
**handling**
234:*17*
**happen**  14:*6*
65:*19*  143:*3*
**happened**
65:*11*  182:*7*
192:*13*
213:*22*  306:*20*
**happening**
263:*13*  300:*6*
308:*14*
**happens**
46:*15*  70:*25*
203:*1*  248:*5*
305:*25*
**happy**  146:*18*
**hard**  23:*23*
99:*25*  128:*12*
142:*25*
143:*16*  144:*3*
158:*19*  159:*8*
200:*3*  239:*24*
319:*1, 18*
**HARKINS**
2:*15*  9:*14*
14:*21*  88:*1, 6,*
*12, 20, 23*
89:*2*  212:*4*
293:*3, 6*
**Harkinss@gtla**
**w.com**  2:*19*
**harvesting**
182:*22*
**Hashmi**  5:*15*
**hate**  195:*13*
**head**  39:*11*
287:*13*
**heading**  15:*15*
43:*24*
**Health**  5:*21*
138:*11*
247:*20*  317:*12*
**Healthcare**  4:*2*

**hear**  20:*23*
48:*21*  88:*16,*
*17*  99:*23*
180:*25*  181:*1*
188:*6*  219:*22*
242:*19*  317:*8,*
*10*
**heard**  8:*16*
20:*25*  123:*4*
133:*11, 12, 16*
164:*14*  182:*5*
299:*10*  317:*18*
**heart**  238:*6*
318:*2*
**held**  8:*7*
286:*11, 17*
288:*1*
**help**  14:*9*
23:*1*  24:*2*
165:*1*  313:*6*
317:*11*
**helped**  312:*21*
**helpful**  38:*7*
61:*24*  62:*14*
210:*19, 20*
222:*18*
280:*20*  282:*16*
**helps**  212:*14*
**HENRY**  3:*2*
**hereinafter**
8:*25*
**hesitant**  95:*25*
101:*20*  104:*3*
135:*5*
**hesitate**  101:*1*
**hesitating**
130:*22*
162:*17*  262:*19*
**Hetero**  3:*19*
**Hi**  141:*18*
**hiatus**  273:*8*
**high**  69:*10*
114:*8*  115:*14,*
*16*  207:*3*
209:*2*  276:*13*
**higher**  80:*6*
120:*10*
**highlighting**
89:*18*

**highly**  65:*25*
66:*23*  138:*1*
315:*9*
**high-potency**
114:*21*  118:*25*
**Hill**  3:*20*  4:*3*
190:*15*
**HILTON**  2:*4*
**Hinshaw**  4:*14*
**Hippensteele**
313:*14*
**hired**  301:*7,*
*17*
**historic**  147:*18*
**history**  29:*5*
56:*20*  198:*8*
199:*4*
**hit**  20:*7*
**HIV**  287:*10*
**hoc**  120:*7*
**Hold**  6:*13*
32:*14*  44:*18*
88:*12*  101:*4*
104:*14*
129:*18*
164:*13, 20*
165:*12, 15, 19,*
*23*  166:*13*
167:*5, 11, 25*
168:*8*  173:*1,*
*10, 16*  239:*14*
277:*17*  311:*3*
**holder**  308:*21*
**holding**  62:*20*
138:*15*  139:*1,*
*2*  140:*8*
**HON**  1:*8*
**honestly**
195:*10*
**honors**  285:*20*
290:*13, 18*
**hope**  35:*21*
227:*4*  263:*11*
**Hospira**
279:*22*
**hospital**  268:*9,*
*10*
**hour**  59:*19*
141:*3*  212:*9*
276:*18*  282:*15*

Confidential Information - Subject to Protective Order

hours 212:4, 6
271:22 275:1
housekeeping
10:24 12:3
17:19 20:6
44:8
Huahai 4:1
173:6
huge 57:10
294:4 305:22
319:16
Human 5:21
6:9 84:13
85:11, 15
86:2 90:1
105:18
120:11 297:17
Humana 4:5
hypertension
238:11
252:24 301:4,
21
hypoglycemic
211:25
hypothesis
74:9
hypothetical
136:6, 7, 12,
15, 18, 22
137:1, 13
139:14, 16
170:18
193:17
208:18
236:13 237:8
265:4
hypothetically
151:24 244:6
hypotheticals
76:5 140:12

< I >
ICH 40:5
41:5 71:18,
20 79:10
80:14 81:3,
16 82:17, 19
83:6 90:18
91:3, 7, 11
92:2, 23 93:9
94:21 95:2,

14, 21 96:3
98:21 100:18,
25 101:14
102:10, 20
103:7, 15
105:22 106:1
108:3 113:11,
19 117:10
160:3, 12
177:6 246:2
266:22 267:2,
7
idea 125:18
222:7 234:14
238:16 248:4
identical
226:4, 6
229:10
identifiable
298:15
identification
11:6, 20
40:18 42:6
62:11 86:19
90:22 104:9
112:25 128:7
145:20
152:21 154:9
156:15 165:7
210:24
224:16
234:15 256:3
270:22 284:7,
14 292:21
identified
39:6 42:17
49:17 97:4
103:6 105:20
115:14
293:15 303:7
316:16
identify 38:19
41:11 66:15
71:6 82:9
92:3, 11
93:13, 23
97:7 99:16
121:16
123:14, 25
124:11

131:25 133:5
236:4 281:3
identifying
131:3, 15, 20
132:6 134:3
identity 41:1
245:13
Illinois 4:10
imagine 64:12
79:25 184:8
200:2, 3
239:19, 23
240:1 320:3
immediate
111:23 112:9
immediately
145:3, 4 188:3
immune
247:25
impact 154:13
217:11
220:20 221:6
259:3 303:20,
24
imperative
322:12
implement
188:3, 7
implemented
187:21
important
13:5 31:2
32:22 36:4,
19 37:4, 25
95:8, 12
100:6 121:19,
23 177:6, 22
191:9 192:15,
20, 23 275:10
294:2 303:16
315:21
improperly
248:1
improving
206:13
Impurities
5:18, 23 6:1,
9 21:19 28:3,
4, 6 29:13
31:4, 10, 20,
22 32:2, 8, 16

33:3, 23 35:6,
11 36:5, 20,
24 37:4, 20
38:1, 9, 11, 20
39:4, 11, 13,
19, 25 40:2,
20 41:3, 8, 12,
21 42:7 43:1
47:11, 22
55:19 56:13
60:23 66:11
70:1 71:7, 13,
19, 23 73:17,
19 75:7 76:3
84:10 85:10
86:1 87:17
89:25 90:12,
24 91:16, 22
92:4, 7, 8, 13
93:14, 24
94:16 101:15
102:11 106:6
107:9 109:2,
24 111:16
116:15, 19
117:13, 25
118:9, 21, 24
119:20 121:5,
14 127:15, 16,
22 129:5, 19,
24 130:24
131:9, 15, 21
132:25 133:5,
14 135:18
144:10 145:5
146:7 147:9,
24 148:1, 18,
25 152:9
154:23
155:20 156:6
163:15, 20
202:13
205:19
209:14
210:11
221:16, 23
222:5 223:12
232:5, 7, 8, 10
234:9, 16, 18,
19, 23 237:12,
20 241:6, 9

255:10
263:18
264:14, 24
266:14 267:6
303:2, 5, 8
310:19, 21
311:16
315:19 316:7,
20, 25 317:1
318:25 319:23
impurity
27:16 28:1, 9,
15 29:8 30:3,
4, 12, 20
35:18 42:10,
17 48:16
55:13 63:6
64:6 65:2, 20
66:5, 15, 25
67:24 69:9
71:24 77:5
78:8, 15, 22
80:16 81:5,
18 83:9 84:7
91:14 94:14,
18 120:12
130:21 132:1
133:10
140:13, 23
144:17 145:7
148:7 149:8,
10, 11, 23, 24
150:3, 7
154:7, 8, 11
155:9, 10
164:24
173:13
174:10 191:7
208:20
209:24, 25
234:6, 11, 13,
17 240:17
241:4, 12
242:13 259:4
294:12, 18, 25
295:3 298:8,
18
inadequate
144:17 148:7
155:7
incident 294:8

Confidential Information - Subject to Protective Order

include 13:8
40:18 114:14
127:14 155:8
228:17 232:10
included
17:13 49:24
169:3
includes
20:11 102:20
119:20
126:25 127:8
160:12
219:19 220:2,
9, 16 224:4
256:12
including
28:2 50:22
56:12 57:24
64:15 151:25
158:6 225:14
234:13 254:1,
6 292:3
293:6 306:4
Incomplete
136:15 137:1,
13 139:14
170:17 193:17
incorporates
40:9
increases
154:10
incredible
64:25
incredibly
64:13
incumbent
71:5 80:15
81:4, 17 83:7
135:15 145:6
200:16, 20
independent
194:11
298:20 299:1,
3
independently
194:7
INDEX 5:1, 10
India 180:7,
12 181:9

indicated
68:23 76:10
121:12
indicates
294:25
indicating
198:11
indications
252:23 253:25
individual
24:21 80:2
135:11, 16
144:16 148:6
155:7 219:9
278:25
Industries
2:11
Industry 5:24
6:8 35:12
39:19 40:1
69:11 70:19
71:13 76:19
78:11 79:3
82:13, 14
91:15 93:4
98:16 115:3
117:24 121:3,
24 246:2
264:15
287:15, 20
303:13 316:6
inform 22:13
28:22 29:3, 7
55:18 67:1
INFORMATIO
N 1:12 26:9
30:17 33:22
35:6 36:4
37:25 49:20,
25 50:9 67:6
122:9 126:21
127:6 152:2
164:9 169:15,
20 170:1, 3
171:6, 25
172:22 174:2
175:10, 19
176:14
179:19 183:2,
13, 25 184:5,
10, 17, 22

185:3, 19
186:10
190:20 191:8,
12, 17, 19
193:13, 15
194:3 199:13
200:6 222:8
250:7 255:9
263:15
264:13, 23
269:2, 24
296:7, 10, 14
informed 48:5
63:5
infrequently
200:15
Ingersoll 3:2
ingredient
85:3 223:12
ingredients
172:9 311:16
initial 294:24
initially 14:2
164:12 293:21
initiate 298:7
initiated 54:15
inner 268:10
insofar 56:12
inspect 193:7
200:2
inspected
180:8, 13
181:9, 20
182:4, 11, 16
199:1, 16
inspecting
64:14 182:5
inspection
174:8 181:15
182:2, 9
192:21
193:12
197:23 198:9,
12, 14, 22
199:11, 19
200:14 295:21
inspectional
56:19 198:8
199:4
inspections
56:10, 17

57:4 192:11,
17 193:1
194:3 201:2,
6, 9, 18 298:24
inspector
295:7
instance
16:15 189:7
255:17
instances
304:23
institute 64:6
297:25
instituted
50:11 161:24
164:13 165:19
institution
215:12
instruct 98:5
instructed
98:10
INSTRUCTIO
NS 322:1
instructs 10:18
insurance
25:7 251:5
insureds 252:7
intake 69:16,
24 70:14
72:23 109:3
116:2 119:22
120:2, 20
311:18
intakes
118:25 119:2,
11 120:11
intellectual
279:1
intend 20:14
297:15
300:18 301:2
302:19
intended 82:9
233:21 299:19
intending
20:22
interchangeabl
e 231:6
interest 221:18
interested
221:3 325:20

interesting
121:19
269:18 273:4
310:15
interference
181:5
interim 67:13,
19 68:22
69:21 70:4
73:1 74:18
75:21 76:9
77:19 91:8
93:7, 21
101:12 102:8
111:15, 23
112:9 117:23
121:1 122:1
204:5, 11, 24
233:4 234:1
235:13 238:4
240:13 296:22
intermediates
173:6
InterMune
280:14, 15
internal
285:18 286:7
International
105:19
internationally
105:21
internship
285:18
interpret
83:15, 18
99:18
interpretation
96:8 203:21
interstate
214:16
interview
257:5 265:25
267:10 311:24
introduce
219:18 220:17
introduced
112:23
introducing
214:15
investigate
302:10

Confidential Information - Subject to Protective Order

**Investigation**
63:*13*  307:*3,
12*
**investigations**
287:*4*
**invitation**
289:*14*
**invoice**
271:*21, 24*
272:*24*
273:*15, 19, 21*
275:*15*  276:*17*
**Invoices**  6:*23*
271:*6, 9, 14*
272:*6*  273:*10*
275:*5*  276:*25*
**involved**
25:*15*  183:*18*
273:*13*  302:*9*
307:*2, 11*
**involves**
305:*21, 23, 24*
**involving**
252:*2*

**IRBESARTAN**
1:*5*  8:*8*
**ISIDRO**  2:*14*
Isidron@gtlaw.
com  2:*20*
**issuance**
202:*19*  209:*9*
**issue**  28:*19*
34:*4*  43:*13*
44:*9*  45:*7*
65:*1, 13*  74:*1*
82:*2*  174:*4*
180:*10*  181:*7,
14, 17*  182:*2*
189:*17*
197:*22*
201:*12*
204:*16, 22*
205:*9, 16, 25*
206:*5*  209:*16*
213:*5*  233:*24*
260:*6*  275:*2*
279:*4*  293:*21*
302:*13*  319:*5*
**issued**  18:*15*
34:*21*  63:*23*

198:*20*  202:*7*
203:*24*  204:*2,
12*  206:*18*
215:*18*  216:*7*
318:*20*
**issues**  15:*9*
33:*19*  56:*12,
13*  64:*18*
124:*4*  135:*12*
192:*3*  202:*25*
203:*11*  206:*7*
208:*17*
216:*21*
295:*19, 21*
301:*24*
**issuing**  79:*13*
**item**  59:*10*
**iteration**  16:*6,
17*  110:*20*
118:*7*
**iterations**
113:*17*  267:*1,
7*
**its**  32:*15*
33:*2*  38:*9, 10*
40:*9, 13*
41:*12*  47:*9,
20*  48:*7*  49:*9,
24*  50:*11, 12*
51:*1*  55:*5*
56:*25*  58:*2*
64:*6*  65:*6*
66:*6*  67:*18*
71:*7*  79:*18*
80:*18*  83:*11*
92:*4*  108:*19*
109:*12*  120:*8*
129:*5*  135:*16*
148:*17*  150:*3*
151:*18*
154:*11*
161:*24*  162:*8*
163:*10, 14*
164:*4, 10, 13,
20*  165:*19, 23*
167:*1, 4, 5, 11,
16*  168:*8*
169:*18, 19*
170:*13*  171:*1*
173:*16*  176:*1*
183:*4*  185:*20*

186:*18*  188:*3,
22*  189:*7*
191:*12, 18*
193:*1, 13*
194:*15*
200:*17, 21*
201:*22*
203:*19*
207:*11*
213:*25*  215:*6*
219:*14*
220:*15*
221:*23*
233:*21*  248:*5,
8, 17*  294:*6*
297:*25*  298:*4,
18, 25*  299:*4*
304:*25*  307:*5,
13*  309:*1*
315:*17*
**Ives**  4:*9*

**< J >**
**JAMES**  2:*14*
**Janet**  288:*4*
**January**  6:*1*
12:*7*  13:*9*
15:*21*  16:*6,
11*  17:*6, 9, 24*
18:*17, 25*
19:*13, 21*
20:*1*  43:*14*
73:*12, 24*
74:*3*  128:*17*
132:*4*  205:*6*
271:*15, 24*
273:*16*
**JERSEY**  1:*2*
3:*21*  8:*11*
**Jerusalem**
166:*21*
201:*13*
202:*17*  210:*8*
298:*25*
**job**  286:*15*
**John**  19:*20*
**joint**  53:*2*
312:*25*
313:*17*  314:*12*
**jointly**  314:*8*

**journal**  292:*1,
12*
**journals**
291:*10*
**JR**  3:*20*
**Jubilant**  6:*14*
166:*3, 10*
**judge**  195:*12*
197:*3*
**judgment**
214:*2*
**July**  6:*12*
29:*24*  30:*9*
48:*6*  63:*24*
165:*12, 15, 22*
166:*13*
167:*25*  173:*3*
272:*2*  273:*12,
19*
**jumped**
261:*22*
**jumps**  44:*23*
**June**  6:*23*
32:*19*  48:*6*
51:*9*  54:*19,
22*  62:*19*
63:*8, 11*  68:*5,
11*  123:*3, 15*
124:*1*  164:*15*
168:*15*
190:*12*
191:*18*
194:*14*  235:*2*
256:*10*  266:*3*
294:*10*  312:*14*
**jury**  285:*7*
**Justice**  212:*18*
305:*22*  306:*3,
23*
**justified**
120:*11*
149:*15*  156:*6*
**justify**  119:*11*

**< K >**
**Kabi**  279:*14*
**Kaiser**  268:*23*
**Kali**  19:*20*
**Kanner**  2:*5*
**Kaplan**  19:*9,
20*

**Kappa**  285:*21,
22*
**KATHLEEN**
4:*14*
**keep**  34:*22*
37:*4*  71:*8*
97:*20*  98:*9*
105:*24*
109:*22*  112:*4*
140:*20*  179:*4*
182:*1*  195:*13*
196:*2, 19, 25*
208:*16*  231:*8*
236:*7*  238:*3*
308:*19*
**keeping**  309:*7*
**keeps**  319:*20*
**Keire**  6:*9*
156:*25*
Kekelly@hinsh
awlaw.com
4:*16*
**KELLY**  4:*14*
**KENNETH**
2:*13*
**kept**  53:*13*
67:*17*
**kind**  33:*9*
34:*24*  73:*15*
111:*17*  138:*7*
151:*25*
157:*14, 22*
158:*17*
171:*20*  184:*9*
203:*20*
240:*16, 24*
241:*12*
259:*21*
295:*15*
315:*11*  316:*11*
**kindly**  155:*16*
**kinds**  252:*9*
**knew**  175:*14,
16*  182:*19*
185:*20*  191:*8*
199:*3, 4, 11*
264:*1, 7*
**know**  15:*14*
16:*15*  21:*8*
22:*19*  23:*18,
22*  24:*19*

Confidential Information - Subject to Protective Order

26:13  28:22
30:19  31:3, 8,
12  34:6  35:9
36:17  38:6
39:3  41:15
42:21  43:14
45:19  48:2
51:23  52:19
53:1, 4, 19
55:22  57:23
58:13  61:9
63:16  64:11
65:13  66:21
70:18, 21
71:1, 8, 10, 18
73:14, 17
74:6, 7, 21, 24
75:12  76:4
81:8  82:4
83:11  84:6, 8
94:9, 11, 13
95:5, 9  99:13
101:1  102:4,
24  103:19
107:1  108:23
110:7  111:17
118:13  120:6
121:11  123:4,
19  136:17
137:20
138:10, 21
148:22  150:1,
8, 15  156:18
158:8  159:9
161:18  165:4
167:12, 21, 23
168:11
170:21  171:3
174:24  175:2,
11, 14  176:5
177:10  179:3,
23  180:6
182:13, 21
185:5, 9, 12,
16, 18, 25
188:11, 15
189:7, 12, 17
190:16, 17
191:4, 12
192:15, 20, 25
193:5  195:14,

16  198:24, 25
199:14, 17, 18,
21  201:15
203:15
206:11
210:17  211:3
212:2, 13
214:14
215:24
216:20
217:16
219:20, 22
220:25
221:21, 25
222:1, 3
224:18  225:8
228:6, 13
232:13  235:6,
8, 10  237:7,
14  238:23
239:9  240:11
243:16
245:23
250:14  251:6,
22  254:4, 9,
12  255:16, 21
258:25
260:24, 25
262:9, 14
268:1, 3
269:12  270:6,
25  276:11
277:12
278:16  281:2
296:12  298:9
302:5  306:19,
20  313:4, 5,
22  314:13, 21
317:15  318:5,
25  319:1
**knowing**
158:12  176:7
183:6  255:3
**knowledge**
26:18  27:9
85:5  172:14
188:9, 13
189:14
194:19
233:14

306:11  307:2,
11  314:11
**known**  29:24
31:14  106:1,
4  249:1
258:3  263:16
**knows**  23:18
228:7
**Korea**  286:2
**Kristina**  4:16
8:3
**KUGLER**  1:8

< L >
**L.hilton@kann
er-law.com**
2:8
**label**  202:9
227:14  255:8,
10  318:16
**labeled**  253:25
**labeling**
209:22
226:24
228:10
229:12
231:11, 14, 15
255:12, 22
**Laboratories**
3:10
**Labs**  3:19
**Lacks**  58:3,
24  64:9
123:18  124:4,
14, 25  125:8,
17  151:4, 15
176:3  249:4
**language**
306:10
**Lantech**
174:8, 9, 11,
16  178:17
179:19  182:4,
10, 11, 16, 19,
22  183:20
184:16
185:14, 16, 20
**large**  219:10
269:11
**larger**  272:9

**lasted**  286:5
**late**  164:15
**latest**  16:16
43:18
**laudatory**
65:25
**laughing**  274:2
**law**  223:3, 10
**laws**  42:24
**LAYNE**  2:4
**Lea**  5:12
**lead**  147:23
148:1  298:17
**leading**  207:14
**learn**  31:21
198:22  309:12
**learned**
180:11  181:8
183:19  199:1,
15  293:20
294:15  303:13
**learning**  48:1
**learns**  193:12
**leave**  228:5
290:5
**leaving**  289:13
**led**  19:25
122:9
**Lee**  4:16  8:3
**left**  146:14
275:14
286:22
287:25  288:20
**legal**  162:4
247:21
**lengthy**
283:18  320:10
**Letter**  5:20
61:5, 7
104:21, 22, 23
106:17, 21
107:3, 20, 21
108:11  109:1,
5, 16, 21
110:4, 8, 9, 14
111:1, 5, 9, 15
112:5, 17
120:24  174:9
188:5  192:4
194:10  199:5,
6  202:25

203:24  204:3
205:5, 25
206:7, 10
208:17
215:18
217:14, 25
295:14, 23
**letterhead**
272:25
**letters**  187:9
192:12
202:11, 20
204:13, 23
205:18
206:17  208:5,
6  209:7, 10
216:7, 22
295:11  318:20
**letting**  81:7, 9
**level**  68:23
85:9, 25
89:24  106:4
149:13, 15
154:10
187:23
276:13  288:1
319:1
**levels**  26:25
69:10  76:10,
20  121:25
163:20
164:24  209:1
235:10  236:2,
5  315:7  317:4
**LIABILITY**
1:6  8:9
20:21  28:19
33:25  34:4,
11, 15, 17
38:23  42:1
67:4  82:1
101:18
170:16  193:4
195:6, 9, 17
219:5, 6
299:14, 19, 24
300:4
**Liaison**  6:4
**license**  236:19,
22

Confidential Information - Subject to Protective Order

licensed 286:12

licenses 286:11, 17

licensure 286:20

life 95:3, 15 96:4 210:3

Lift 6:13 165:12 168:8 173:1

lifted 164:20 165:23 166:12 173:15

lifting 165:15 167:5, 11 173:9

light 146:14 194:11 209:25 264:14, 24

Limit 5:23 28:12 35:20 48:16 65:3, 4 66:16, 21 68:10 69:17 70:23 75:5, 9, 10, 13, 16, 17, 18, 21 76:4 77:7, 16, 25 78:10, 17, 23, 25 90:24 91:14 92:13 93:14, 24 106:5 129:20, 21 149:8, 21 163:23 207:3 208:23 209:14 210:9, 12 234:12 239:22 240:18, 22 241:4, 16 243:3, 13 244:1 254:11

limits 45:20 67:13, 19 68:1, 4 69:16, 21, 24 70:5, 14 72:24 73:1, 16

List 74:18, 24 75:2, 7 76:15 77:4, 19 79:4, 17, 21 80:1, 6, 17 81:7, 19 83:10 90:13 91:8, 25 93:7, 21 101:12 102:8 109:3 111:16, 23 112:9 115:3 116:14, 19 117:8, 12, 14, 15, 17, 20, 23, 24 118:8 119:22 120:2, 20 121:2, 5 130:1, 21 140:15, 21 162:19, 20 202:12 203:6 204:6, 12, 24 205:19 206:22, 23, 25 207:3 210:5 232:23 233:3, 4, 6 234:1 235:13, 15 238:4 239:22, 23 240:5, 8, 10, 14, 16, 20 241:2, 6, 12, 18, 21, 25 242:3 243:1, 25 254:7, 15, 16 296:22, 23, 24 297:4 310:18, 22 311:18 318:21

line 16:21 50:16 195:9 229:20 309:19, 22 323:3, 6, 9, 12, 15, 18, 21

lines 96:1 226:12 264:9

link 88:13, 15

Lipitor 210:15 213:6, 12, 24

List 5:12 11:16, 22 17:12 18:9, 10, 14 19:3, 7 22:4 23:4, 12 24:16 57:8, 20, 23 58:22 123:7 201:18 281:20 282:24 293:7 294:4

listed 12:13 13:6, 13, 23 14:8 15:15 17:4, 16 18:23 19:12 57:17, 20 58:18 59:9, 10 149:11, 13 177:18, 21 209:23 223:2, 5 228:10 229:12 231:4, 6, 14 234:8 247:24 274:22 277:23 283:2 290:14, 22 292:13, 25 318:12

listened 320:15

listening 122:6

listing 14:3, 18, 20

lists 16:8, 10 115:17 225:11 244:13

literature 149:16

LITIGATION 1:6 8:4, 9 21:9, 17 22:6, 18 23:15 25:3, 8, 13, 15 193:24 219:7 289:19 290:25 291:13, 23

little 11:17 23:12 38:7

57:22 78:19 82:18 83:3 98:22 100:17 101:25 104:3 130:22 134:16 135:5 145:4 146:25 170:2 206:13 219:12, 22 223:24 226:10 234:5 271:11 274:2 281:4 282:8

LIZA 2:22

LLC 2:5, 11 4:2 7:1

LLP 2:15, 22 3:8, 14, 20 4:3, 9, 14

loath 72:18

located 9:7

LOCKARD 2:13 5:5 9:13 17:11, 20 18:5, 9 20:18 21:1, 2, 4 23:16, 22 24:13 26:4, 16 27:18 28:17 29:15 30:14, 21 31:6, 25 32:5 33:4, 17, 25 34:7, 19 35:8 36:7, 13, 14 38:3, 21 40:16, 21 41:13 42:19 50:14 51:19 55:8, 21 57:1 58:3, 21 59:18 61:8, 18 64:8 65:8, 22 67:2, 20 69:5 72:11 73:13 74:4, 20 75:24 76:12, 21 77:10 78:3 79:23 80:19 81:22 83:12,

24 84:14 85:4, 12 86:3 87:9, 20 88:3 90:8 92:15, 25 94:1 96:5, 13 97:2, 19 99:12, 23 100:9 101:17 102:3, 13 103:8, 17, 25 104:14, 17 105:3 106:23 107:16 108:8 110:11 111:12 112:1, 15 115:7, 23 116:21 118:1 121:7 122:2 123:16 124:2, 13, 24 125:7, 15 132:8 134:14 136:11, 15, 25 137:12 139:13 141:2 142:9, 11 143:5, 15 144:2 150:18 151:4, 14 158:2, 15 159:6 160:14 161:4, 12 162:2, 15 163:16 166:5 167:6, 19 168:9 169:12 170:15, 20 171:15 172:17 176:3, 19 177:4 178:11 179:22 180:14, 20 181:11 182:24 183:7, 21 184:6, 24 185:23 186:6 189:9 190:6, 14 191:1, 10 192:9 193:3, 16 194:22

Confidential Information - Subject to Protective Order

**195**:5, *20, 23*
**196**:7, *12, 19*
**197**:*2, 6, 15,*
*18*  **210**:*16*
**211**:6, *14, 21*
**212**:*1, 6, 11*
**217**:*18, 21*
**220**:*3, 18*
**221**:*11*
**232**:*20*
**235**:*23*  **236**:9
**237**:5  **238**:7,
*19*  **239**:*14*
**242**:*16*  **243**:4
**244**:*3*  **249**:*4*
**254**:*21*  **257**:*1*
**258**:*11, 23*
**260**:*12, 22*
**262**:4  **263**:20
**265**:2  **266**:15
**277**:18
**282**:*14*
**284**:*23*  **285**:6,
*12*  **289**:*24*
**290**:*4, 20*
**291**:6, *11, 24*
**292**:22  **293**:2,
*4, 12*  **294**:*13,*
*22*  **296**:2, *20*
**297**:*14, 21*
**298**:6  **299**:2,
*18*  **300**:*1, 13*
**301**:*1, 6, 15*
**302**:*17*  **303**:*3,*
*15, 22*  **304**:*21*
**306**:8, *15*
**307**:*1, 9, 18*
**308**:*1, 24*
**309**:*10, 18*
**310**:*3, 10*
**311**:2, *9, 19*
**312**:*23*  **313**:7
**317**:22  **320**:2,
*9, 12, 20*
**321**:*1, 5*
**Lockardv@gtla**
**w.com**  *2:18*
**lodging**  **196**:*3*
**Loestrin**
**279**:*10*

**long**  **69**:*23*
**109**:2  **120**:6
**140**:*11*
**211**:20  **212**:2
**311**:*17*
**look**  **13**:*20*
**16**:16  **21**:24
**23**:*11*  **24**:8
**29**:16, *20*
**36**:2  **37**:*23*
**39**:*4*  **40**:*3*
**43**:*18*  **55**:*23*
**58**:*17*  **60**:*13,*
*14, 18*  **63**:*1,*
*12*  **77**:*14*
**82**:*13, 17*
**83**:*4, 14*
**86**:*21*  **87**:2
**98**:*12, 15, 24*
**102**:*21, 25*
**105**:6  **123**:*11,*
*21*  **124**:8, *11*
**128**:*12*
**141**:25  **142**:5
**143**:8, *25*
**144**:6  **152**:5
**162**:25  **166**:8
**170**:*3*  **172**:8,
*15*  **174**:9
**177**:*16*
**179**:*15*  **186**:8
**197**:*13*  **213**:4
**214**:*14*
**216**:*21*
**217**:*13*
**222**:*10, 15, 16*
**223**:*10*
**224**:*11*  **228**:*1*
**229**:*25*
**233**:*18, 22*
**244**:8  **247**:6
**253**:*3*  **265**:*19*
**266**:*13*
**267**:*11*  **271**:5,
*8*  **273**:*14*
**275**:8  **278**:*6,*
*20*  **279**:*23*
**292**:9  **298**:*24*
**308**:7  **310**:7
**311**:*15*
**315**:*14*  **316**:7

**looked**  **12**:*21*
**18**:6, *7, 13*
**60**:*16*  **61**:*14,*
*17, 18*  **62**:*1,*
*25*  **82**:22
**126**:*18, 21*
**142**:2, *19*
**144**:*23*  **169**:5
**177**:*17, 20*
**266**:*18*  **272**:2
**283**:*3*  **321**:7
**looking**  **14**:22
**15**:*10*  **18**:*14*
**19**:2  **21**:*11*
**22**:*13, 20*
**30**:6  **43**:*10,*
*12, 17, 21, 22*
**45**:*24*  **46**:*16,*
*18*  **49**:22
**51**:*12*  **56**:6
**61**:22, *23*
**77**:*13*  **89**:*4,*
*16*  **95**:22
**99**:7, *10, 21*
**104**:20  **112**:2,
*5*  **117**:*10*
**119**:*18*  **120**:6,
*17*  **128**:*14*
**129**:9  **142**:20
**143**:2  **146**:25
**147**:*3*  **160**:*20*
**173**:*1, 3*
**176**:16  **204**:8
**205**:*10*  **219**:8
**224**:*19*
**229**:*14, 22*
**230**:*10*
**253**:*13*  **257**:*3*
**273**:*1*  **275**:24
**277**:7  **278**:*4,*
*12*  **298**:*17*
**305**:6  **313**:8
**320**:*24*
**looks**  **17**:2
**44**:*19*  **62**:*18*
**65**:*20*  **87**:*13*
**100**:*10*
**104**:22
**143**:*13*  **146**:*4*
**166**:2  **273**:5
**274**:*24*

**276**:*16, 24*
**277**:*23*
**Los**  **3**:9
**LOSARTAN**
**1**:5  **8**:8
**lose**  **14**:*21*
**losing**  **180**:22
**loss**  **195**:*11*
**219**:9
**lost**  **21**:6
**97**:*17*  **139**:*16*
**lot**  **57**:*23*
**99**:*10*  **216**:20
**243**:*21*
**278**:*23*  **288**:8
**289**:*1*  **299**:*10*
**317**:8
**louder**  **211**:22
**Louisiana**  **2**:6
**love**  **181**:*4*
**low**  **235**:*14*
**238**:*24, 25*
**317**:*4*  **319**:*1*
**lower**  **115**:*4*
**119**:*1*  **146**:*14,*
*25*  **153**:*21*
**low-level**
**121**:*14*  **209**:*25*
**Lu**  **6**:*10*
**156**:*25*
**lunch**  **218**:*18*
**Lwalsh@walsh.**
**law**  *2:25*

**< M >**
**M.D**  **1**:*17*
**5**:*12*  **7**:*1*
**8**:*21*  **324**:*14*
**325**:8
**M7**  **39**:22
**79**:9  **90**:*19*
**91**:*3, 7, 12, 18*
**92**:2, *18, 24*
**93**:*4, 9*  **94**:*16,*
*21*  **95**:2, *14,*
*22*  **96**:*3, 20*
**98**:20, *21*
**99**:*21*  **100**:*18,*
*25*  **101**:8, *14*
**102**:*10, 20*
**103**:7  **105**:22

**106**:*1*  **108**:*3*
**160**:*3, 12*
**241**:*5, 11*
**242**:8, *22*
**266**:*24*
**M7(R1**  **5**:22
**79**:*10*  **80**:*14*
**81**:*3, 16*
**82**:*19*  **83**:7
**98**:*23, 24*
**99**:*8, 9*  **113**:*3*
**118**:7
**ma'am**  **20**:*24*
**Madam**  **34**:*23*
**major**  **187**:22
**286**:*10*
**majority**  **34**:*12*
**Making**  **6**:22
**53**:*12*  **64**:*14*
**100**:*12*  **135**:5
**136**:5  **139**:*23*
**162**:*12*
**174**:*13*
**183**:*15*  **206**:*4*
**208**:2  **210**:8
**213**:6  **214**:*12*
**216**:9  **269**:*25*
**270**:*14*  **319**:*16*
**malaria**
**285**:*25*
**Mallinckrodt**
**280**:*16, 18*
**281**:22
**Malta**  **48**:*19*
**201**:*13*
**202**:*17*  **210**:8
**298**:*25*
**manage**
**178**:*17*  **181**:*10*
**managed**
**174**:*18*
**management**
**60**:*19*  **294**:5
**manager**
**270**:7
**managing**
**174**:*12*
**manner**  **33**:*24*
**35**:7  **174**:*17*
**manufacture**
**32**:*15*  **131**:2

174:*25* 175:*7, 12, 18* 178:*1*
**Manufactured** 6:*14* 26:*8* 48:*19* 245:*6*
**Manufacturer** 6:*16* 27:*15* 28:*14, 22* 29:*3* 32:*25* 35:*17* 37:*1, 2* 38:*19* 39:*16* 40:*8* 42:*11* 50:*9* 52:*14, 16, 20* 55:*12* 66:*11* 70:*3* 71:*6* 78:*12, 14* 79:*18* 80:*15* 81:*5, 13, 17* 82:*15* 83:*8* 84:*6* 92:*2* 93:*22* 101:*13* 102:*9* 109:*11* 130:*13* 131:*23* 132:*5* 133:*4* 135:*16, 18* 138:*1* 139:*4, 12* 140:*10* 144:*10, 22* 145:*7, 11* 147:*8* 148:*8, 16* 149:*23* 154:*12* 155:*10* 158:*14* 168:*23* 170:*13* 175:*25* 182:*6* 192:*25* 193:*11* 194:*12* 195:*15* 200:*12, 17, 18, 21* 212:*22* 223:*1, 16* 241:*23* 246:*21* 250:*5* 263:*16* 297:*24* 298:*4* 304:*3, 4*

**manufacturers** 29:*10* 34:*13* 39:*24* 49:*22* 54:*17* 81:*25* 82:*3, 20, 21, 25* 92:*11, 23* 93:*13* 120:*19, 23* 121:*4* 126:*10, 11* 151:*23* 153:*22* 154:*22* 155:*17, 23* 156:*5* 177:*1, 7* 179:*24, 25* 193:*22* 194:*7* 265:*18* 266:*12* 267:*4* 309:*7* 315:*22* 316:*21*

**manufacturer's** 33:*21* 35:*5* 36:*3* 37:*24* 135:*11* 147:*22* 154:*2, 3* 155:*3* 169:*10*
**Manufacturing** 6:*21* 109:*12* 140:*20* 147:*22* 172:*9, 15* 174:*5* 176:*2* 177:*2* 183:*19* 185:*21* 186:*18* 187:*4* 201:*2, 7* 245:*7* 249:*2* 295:*8, 20* 302:*4* 316:*17*
**March** 99:*9, 22* 100:*3* 113:*4, 11, 13* 114:*8* 117:*11* 119:*22* 146:*11, 13, 22*
**marches** 72:*2* 263:*7*
**marching** 42:*23*

**mark** 11:*1, 15* 62:*8* 86:*17* 99:*5* 100:*15* 102:*22* 104:*7* 128:*4* 145:*17* 152:*18* 210:*22* 255:*25* 270:*19* 284:*2, 10*
**marked** 11:*5, 19* 12:*5* 62:*10* 86:*18* 104:*8* 112:*24* 128:*6, 11* 143:*11* 144:*1* 145:*19, 22* 152:*20* 156:*14* 165:*6* 210:*23* 224:*15* 256:*2* 270:*21* 284:*5, 6, 13, 25* 290:*7* 292:*20*
**market** 48:*8, 12, 20* 64:*19* 65:*7* 67:*12* 68:*13* 138:*22* 151:*19* 161:*20* 162:*1* 163:*3* 172:*12* 201:*22* 202:*15* 204:*19* 206:*16* 207:*5, 9, 12* 210:*13* 213:*17, 20* 219:*14* 220:*1, 8* 221:*24* 222:*6* 252:*15* 309:*24* 310:*20* 318:*13* 319:*8, 12, 22, 23*
**marketed** 28:*10* 119:*12* 154:*22* 248:*2*
**marketing** 119:*24* 164:*13* 247:*22*

**marketplace** 144:*15* 145:*2* 210:*11*
**marking** 156:*17*
**Massachusetts** 4:*15*
**master** 248:*14, 20*
**material** 23:*25* 33:*22* 35:*5* 57:*10* 59:*12*
**Materials** 5:*14* 7:*4* 9:*22* 11:*16, 23* 12:*14* 13:*1, 7, 13, 18, 22, 24* 14:*2, 3, 7, 23* 15:*10* 16:*8, 17* 17:*2, 12* 19:*3, 13* 20:*6* 21:*25* 22:*1, 20* 23:*4* 24:*6, 18* 25:*7* 54:*24* 55:*23* 57:*9, 15, 18, 24* 58:*14, 18, 22, 23* 59:*3, 8, 11* 61:*1, 22* 63:*14* 79:*12* 84:*19, 20* 97:*1* 124:*7, 11* 126:*22* 167:*13* 177:*18, 21* 218:*1* 274:*7* 275:*7* 282:*24* 283:*2* 292:*16, 25* 293:*7, 8* 300:*3* 302:*7* 315:*18, 19*
**materials-considered** 22:*4* 57:*11, 20* 59:*9* 123:*7*
**matter** 8:*8* 12:*3, 23* 20:*12, 15* 28:*21* 29:*6* 92:*9* 120:*23*

131:*18* 133:*1, 20* 159:*4* 203:*15* 209:*6, 17* 269:*16* 273:*6* 277:*1* 294:*9* 305:*5, 18*
**matters** 277:*24* 278:*11*
**Maz@falkenbergives.com** 4:*11*
**MCH** 83:*5*
**Mcharchalis@btlaw.com** 3:*10*
**MDL** 8:*9*
**mean** 23:*19* 29:*4* 34:*6* 71:*15* 74:*9* 76:*5* 86:*13* 92:*5* 100:*24* 101:*25* 102:*1* 109:*10, 23* 126:*13* 130:*20* 131:*8* 134:*5* 139:*8* 171:*20* 174:*3* 177:*20* 181:*5* 188:*25* 193:*6* 195:*13* 205:*6* 206:*3, 11* 208:*8* 222:*23* 223:*7, 22* 227:*5* 233:*2* 235:*8* 241:*15* 245:*23* 247:*25* 248:*7* 252:*18* 259:*22* 260:*1, 15* 271:*16* 274:*1* 276:*10* 300:*21*
**meaning** 217:*2* 245:*16*
**means** 147:*20* 219:*3* 223:*11* 224:*1* 228:*11* 229:*3, 10, 11, 16* 230:*16* 231:*9* 247:*23*

Confidential Information - Subject to Protective Order

meant 79:14
188:2 228:21
measure
66:15 70:18,
20 71:14
94:19 133:13
210:2 317:5
319:2
measurements
291:21
mechanisms
247:21
medical 25:2
236:19, 22
237:21 251:7
285:16, 17, 21
286:23 291:4
301:19
Medicare
269:10
medication
238:11 250:4,
5, 8
medications
301:4, 21
medicinal
251:7
medicine
158:21 261:5
285:19 286:7,
12, 16 287:10
medicines
89:24 159:3
237:13
238:14 239:1
259:18
260:21 261:2
262:3, 24
289:7 291:20
314:10 319:22
meet 136:4
195:12
244:20
245:11 246:15
meets 136:9
157:15, 22
250:8
MEGAN 4:5
memberships
290:22

memo 165:15
167:25
172:13 173:2,
17
mention 41:8
91:24 129:16
130:3, 9
151:2 169:6
177:25
179:12
222:17 228:1
252:13 269:8
297:6
mentioned
29:2 206:3
265:17 315:6
mentions
217:4
mentor
287:12 289:15
mere 178:9, 24
merged 272:10
messed 45:8
46:7
met 135:25
136:22 137:9
139:21 140:6,
21 205:4
223:15 268:23
metabolite
149:16
method 125:5
147:22
methodology
297:3
methods
124:22
169:10 197:11
metrology
288:25 291:21
middle 90:17
114:4
midway 316:1
Million 6:17
212:23 315:8
millions
317:10
mind 37:4
mine 146:17
minor 187:7,
11 188:2

minute 51:9
97:21, 22
105:11
146:12
197:25
214:19
239:14 272:1
273:17 277:13
minutes 11:3,
24
misbranded
64:24 205:15
209:21 253:9
318:14
misheard
36:11
misnumbering
44:9 45:23
misread
261:14
missing 67:25
117:15 295:2
Misstates
58:4 64:9
MITCHELL
3:8
mitigate 27:25
model 269:9,
17, 21
moderate
187:8, 11
188:2
modify 89:19
Modules
256:14
molecule
233:23 260:7
Molecules
256:19 312:17
moment 67:9
144:3 173:1
178:5 211:17
295:4
moments
128:22
monitor 15:5
60:5 141:14
194:14
218:13 283:14
Monograph
6:1 125:23,

25 127:4, 8,
11, 13 128:17,
22, 25 129:17
130:1, 4, 10,
14, 17, 19
131:1, 8, 13
132:4, 13, 17
133:21, 25
134:2, 12
135:9, 13, 19
140:12, 23
144:12, 14, 16,
23 147:10
148:7 149:21
150:12, 22
151:1, 12
155:7 246:6
monographs
126:1, 4, 10,
16, 19 127:18,
20 133:22
147:17 151:21
Monroe 4:9
month 51:9
63:24 64:5,
19 129:4
monthly
271:22
moral 43:3
morning 9:5,
6 11:18
34:13 51:25
198:5
Morris 4:3
move 101:6,
22 196:20
259:11
Moving 46:18
Mulberry 2:23
multiple
288:1 291:10
MURTHA
3:20
Mutagenic
5:22 90:24
92:4, 7, 12
93:14, 24
94:15 106:1
114:9, 21, 25
116:15

117:12, 25
118:8 258:3
Mylan 3:10
6:15 56:25
164:11
166:14, 18
167:5, 9, 17,
23 168:2, 5
172:4, 15, 21
173:5, 10, 24
174:4, 13, 18,
24 175:6, 11,
17 176:8, 12
177:12 178:1,
16, 24 179:4,
20, 25 180:6,
11, 15 181:8,
18, 25 182:21
183:12, 13, 17
184:3, 15, 21
185:6, 9, 21
201:14
202:12, 20
203:1 204:3,
13, 23 205:1,
18 206:18
207:6 208:6
209:7, 10
216:7, 22
218:3 303:17,
24 318:21
319:11
Mylan's
173:21
174:22
176:17 178:20
myriad 152:1

< N >
Naiffer 87:16
Najafi 19:9,
21 22:11
Najafi's 43:11
44:10
name 8:3
58:22 105:22
211:15
257:14
265:11 269:19
named 126:11
325:19, 20

names 156:24
157:1, 4
nanograms
73:11, 23 74:2
nasty 258:4, 9,
21
nature 8:14
NDA 7:1
27:24 78:20
255:9 272:7,
8, 12, 16, 25
273:2 287:4
288:17 289:17
NDA/ANDA
225:12
NDEA 114:14
122:24 168:5,
23 169:9, 11,
19 171:10, 12,
14, 18 172:2,
5, 16 173:14,
17, 19 174:21
NDMA 29:8
30:5, 10, 12,
20 31:4, 13,
22 48:1, 23
49:18, 25
54:19, 21
55:6 64:6
67:18 73:6,
11, 23 74:2,
18 91:14
114:14
122:20 123:2,
14, 25 124:12,
23 125:5, 14
130:16
150:16 171:7,
9 173:13, 19
NE 2:16
nearly 215:11
necessarily
34:19 130:15
179:16
206:11
231:15
295:23 316:15
necessary
27:10 35:20
322:4

need 28:13
31:12 36:2
37:22 39:5,
24 54:6 62:6
79:3 85:18
95:19 102:21
144:4 170:10
172:1 195:11
206:12
212:11 232:2
235:12 241:4
257:2 261:5
262:23 265:9
276:23
282:11 298:8
315:10
needed 12:9
66:22 142:14
172:21
needle 138:14
needles
137:20 138:4,
13 139:2
needs 48:12
50:21 66:16
69:25 97:25
144:19 193:8
208:18
213:19 240:17
negative 140:3
negligible
116:3, 5
173:13
negotiated
305:2, 12
306:22
negotiation
306:11
neither 70:19
71:13 163:22
258:17
nervous 98:22
never 47:18
69:10 74:10
76:4 180:8,
12 181:9, 20
182:11, 18, 20
193:24
194:19
204:11, 12, 14,
21 206:16

207:10
231:24 287:1
NEW 1:2 2:6
3:21 8:10
15:25 16:3
17:13 154:7,
8 212:11
219:18 220:1,
9, 15 221:1, 8,
23 222:5
237:22 255:8
news 182:7
190:12, 17
nice 59:23
141:7
NILDA 2:14
Nitrosamine
5:18 6:9
21:18 28:4
29:8, 12
31:10, 20
32:12 36:20,
24 37:25
39:13 47:22
48:16 56:13
60:22 65:2
69:23 70:1
71:23 73:19
74:22 75:7,
23 77:4 78:8,
15, 22 82:23
87:17 90:12
91:21 92:8
93:3 105:9,
11, 16 106:21
107:8, 14
109:2, 24
111:16
119:20 126:4
127:22 129:5,
14, 24 130:21,
23 131:9, 11
132:25 133:5,
13 144:18
149:22 150:3,
7 162:10
163:15, 20
164:24 171:4
174:10 191:7
202:13 203:6
205:19

210:11
221:15, 22
222:4 232:5,
6, 10 234:16,
18 235:9
237:20 241:9,
18 242:8, 13
259:4 262:9
263:17
264:14, 23
293:21
296:22
297:25 303:1,
5 310:19, 21
311:11, 15, 16
315:19 317:1
318:25 319:23
Nitrosamines
6:21 25:24
26:3, 15, 25
27:6 28:7
32:6 37:19
68:5, 7, 10, 15,
24 69:3, 17,
20 70:4, 15,
16 72:16, 20
75:5 76:11,
20 79:17, 19
84:12, 23
85:2, 9, 25
89:22 91:8
101:12 102:8,
20, 24 106:2,
9, 12 108:14,
18, 21 109:11,
18 110:6
111:3, 10
114:14
120:14, 22
121:2, 6, 25
124:20
125:23
129:16 130:1,
4, 9 131:3
132:2, 6, 14
134:3, 7
140:13, 24
144:24 151:2,
3, 13 158:13
161:2, 10
162:18

167:25
168:16
170:13 171:1
173:21, 25
182:8 190:21
191:17
201:20 202:1,
6, 24 207:14
217:4, 7, 8
221:2, 8
232:17, 18
233:7, 9
234:2, 4
235:3, 4, 20,
21, 25 237:3,
4, 25 238:1
239:7, 8
240:5, 8, 9, 20,
22 241:2, 25
242:3 243:3,
12, 24 244:1
249:1 254:3,
5, 6, 14, 16
255:5, 15
256:8 257:18,
25 258:9, 21
259:7, 24
261:7 262:13,
18, 24 263:2,
14 264:1
265:21 296:9
297:4, 8, 13,
16, 24 312:25
313:17 314:9,
12 316:10
nitroso 160:7,
12
N-nitroso
103:6 105:20
108:2 114:11,
13
nonagreement
98:7
nonclinical
105:17
non-ZHP
164:21 165:24
North 3:3
note 34:22
noted 8:17
13:18 18:21

Confidential Information - Subject to Protective Order

29:25  48:14
82:12  98:6
322:10  324:10
notes  118:23
147:17, 21
Nothing's
189:19
notice  47:19
63:22  120:8
169:2  215:6
294:5
noticed  45:23
46:10  120:24
notices  127:3,
9, 14  133:3
177:1
Notification
61:5, 6  63:11
66:5  294:24
notified  47:10
63:19  294:10
notify  28:16
33:2  42:16
55:14
notwithstandin
g  121:16
Novartis
122:13, 18, 22
123:1, 13, 24
124:11, 19, 22
125:4, 13
150:15, 21
151:1, 9, 11,
18, 25  152:3
209:22  296:4,
8, 12, 16
318:12
novel  289:7
November  7:2
168:6  169:19
273:10, 12
278:1
now-current
241:25
254:14, 16
number  10:3
24:6  25:12
28:1  32:20
34:4  37:16
43:21  44:1
45:3  52:1

63:2  105:3
177:17  196:6,
9  197:10
198:10
203:24  204:2,
5  244:13
245:5  258:1,
2  259:8
290:13
numbered
247:2  278:6,
11  314:22
numbering
43:15  44:20
45:9  46:8, 17
numbers
26:20  45:12
61:16  146:25
153:20  275:19
numerous
68:18

< O >
oaths  325:5
object  20:18
24:12  31:25
55:8  72:11
83:12  142:15
180:16  320:12
objected
180:20
objecting
195:13
196:16  301:13
Objection
18:5  23:17
26:5, 16
27:18  28:17
29:15  30:14,
21  31:6  33:4,
17, 25  34:22
35:8  36:7, 16
38:3, 21
40:16, 21
41:13  42:19
50:14  55:21
57:1  58:3, 21
64:8  65:8, 22
67:2, 20  69:5
73:13  74:4,
20  75:24

76:12, 21
77:10  78:3
79:23  80:19
81:22  83:16
84:14  85:4,
12  86:3  90:8
92:15, 25
94:1  96:5, 13
97:2  101:17
102:3, 13
103:8, 17
106:23
107:16  108:9
110:11
111:12
112:15  115:7,
23  116:21
118:1  121:7
122:2  123:16
124:2, 13, 24
125:7, 15
132:8  134:14
136:11, 16, 25
137:12
139:13
150:18  151:4,
14  158:2, 15
159:6  160:14
161:4, 12
162:2  163:16
166:5  167:6,
19  168:9
169:12
170:15
171:15
172:17  176:3,
19  177:4
178:11
179:22
180:14, 18
181:11
182:24  183:7,
21  184:6, 24
185:23  186:7
189:9  190:6,
14, 15  191:1,
10  192:9
193:3, 16
194:22  195:5
220:3, 18
221:11

232:20
235:23  236:9
237:5  238:7,
19  242:16
243:4  244:3
249:4  254:21
258:11, 23
260:22  262:4
263:20  265:2
266:15
285:10
286:24
289:22  290:3,
15  291:2, 8,
15  293:22
294:20
295:25
296:18
297:10, 18
298:1, 22
299:16, 22
300:11, 20
301:5, 9
302:11, 22
303:10, 19
304:14
305:17
306:13, 18
307:16, 23
308:16  309:4,
15  310:1, 6,
13  311:6, 13
312:20
317:20  318:4
objectionable
159:24
164:24  206:2
213:18
objections
162:15  196:3,
18  299:10
obligate
183:12
obligation
35:19  41:11
43:3  145:11
observation
273:4
observations
193:7  198:10,

19  199:19
295:7, 9
observed
149:10, 13
155:10
obtain  33:22
35:5  36:4
37:25  286:7
obtained
285:18
Obviously
20:19  24:14
occur  184:13,
15  200:14
202:10
206:22  219:7
310:11  317:9
occurred
48:15  51:6
56:10  121:11
140:19  182:9
199:12
202:11, 12
203:4, 5, 17
204:6  205:17
207:24  210:12
occurs  53:9
October  6:6,
11  153:8
156:23
odd  236:11
offer  20:14
73:8, 9, 25
91:10  214:6
297:15, 19
300:18  301:2
302:19
offered
102:16
249:23  268:8
280:3, 24
offering  20:12
42:4  72:21
84:18  263:5
278:17
296:23  297:11
Office  6:10
287:13, 19, 22
288:9, 10, 11,
12, 13, 14, 15,
18  295:7

**officer** 286:*9*
288:*21*
**offices** 9:*10*
**official** 129:*3,*
*8, 10, 11*
133:*23*
139:*12* 289:*4*
**off-the-cuff**
259:*1*
**Oh** 14:*15, 22*
16:*20* 43:*13*
61:*21* 87:*1*
88:*5, 7, 20*
90:*5* 105:*11*
106:*10*
130:*22*
153:*10, 13, 21*
155:*23* 160:*2*
166:*12* 179:*5*
180:*4* 206:*23*
211:*18* 213:*3*
214:*23* 226:*7,*
*11* 229:*22*
237:*18*
239:*17*
264:*21* 269:*4*
271:*12* 276:*7*
277:*19* 278:*4,*
*19* 281:*21*
282:*22*
292:*15*
303:*11* 312:*2,*
*4* 313:*16*
314:*24* 315:*4*
**Okay** 8:*1*
13:*15* 15:*1, 4,*
*8, 24* 16:*8*
17:*10* 20:*7*
21:*2, 4* 22:*23*
27:*12, 15*
28:*8* 30:*6*
32:*9, 25* 34:*7*
36:*14* 37:*12*
43:*23* 46:*18,*
*21* 51:*20*
55:*4* 57:*8*
59:*10* 60:*1, 4*
61:*2* 62:*8*
63:*3* 64:*21*
66:*2* 69:*3, 17*
74:*9, 17*

78:*25* 80:*3*
81:*13, 14, 15*
87:*3* 88:*10,*
*21* 89:*4, 7, 16,*
*20* 90:*17*
93:*9* 99:*19*
101:*10* 104:*2,*
*17* 106:*10, 15,*
*20* 110:*15, 16*
112:*19, 21*
113:*10*
118:*14*
122:*13*
128:*10, 19*
129:*18*
131:*14*
135:*22* 136:*1,*
*2, 8* 139:*7*
140:*22*
141:*13* 144:*9*
146:*3, 22*
147:*5, 17*
148:*15, 23*
152:*25*
153:*18, 24, 25*
154:*20*
156:*12, 21*
160:*2* 162:*23*
166:*16*
169:*23*
171:*11*
172:*14* 184:*3*
192:*24* 201:*5*
207:*1* 210:*10*
211:*18*
212:*16*
213:*11*
214:*11* 215:*9*
217:*5, 8*
218:*4, 9, 12*
219:*2, 17, 24*
222:*15, 19, 20,*
*23* 224:*11, 19*
225:*14, 19*
232:*19* 244:*8*
247:*5* 250:*12,*
*17* 251:*20*
255:*25*
257:*12*
259:*11*
261:*22* 265:*8*

267:*13* 268:*6,*
*25* 270:*19*
271:*3, 13, 15*
272:*20* 276:*5,*
*23* 277:*20*
278:*15*
282:*10*
283:*10, 13, 17*
284:*2, 24*
293:*5* 294:*23*
301:*14*
307:*10*
313:*25*
314:*24, 25*
321:*12*
**older** 278:*5*
**once** 70:*20*
74:*10* 202:*7*
203:*1* 237:*10*
264:*13*
**ones** 41:*5*
57:*16* 59:*4*
80:*6* 166:*21*
265:*9* 275:*11*
321:*6*
**online** 168:*19*
**onus** 148:*16*
**open** 9:*17*
87:*7* 88:*6*
308:*6, 10*
**opening** 88:*10*
104:*14*
**opine** 50:*25*
53:*5* 161:*18*
270:*13*
**opines** 197:*10*
**opining** 26:*24*
43:*8* 47:*1*
56:*7* 170:*4*
196:*4* 233:*12*
252:*25* 260:*4*
264:*5* 269:*23*
**opinion** 26:*2*
28:*24* 42:*5*
43:*4* 56:*14*
63:*9* 65:*10,*
*18* 67:*10*
68:*21* 70:*2,*
*10, 11* 72:*19,*
*21, 22* 73:*5, 8,*
*9, 25* 76:*8*

77:*14* 82:*1*
83:*19* 84:*18*
86:*5* 91:*11*
102:*15*
106:*25*
107:*18*
116:*22* 117:*6*
124:*3* 161:*5*
162:*3, 4*
170:*5, 8*
195:*6, 9, 10*
196:*13*
204:*10*
205:*10, 11*
214:*6* 233:*10*
243:*6* 252:*20*
258:*12* 260:*2*
269:*1* 297:*5,*
*12* 311:*4, 8,*
*20* 317:*24*
**opinions**
18:*18, 24*
19:*22, 25*
20:*3, 11, 15,*
*21, 22* 22:*13*
25:*11, 16*
27:*13* 28:*19*
31:*5* 33:*16*
34:*2, 9, 11, 15*
38:*22* 47:*5*
55:*24* 56:*2,*
*23* 57:*15, 25*
58:*6, 8, 15*
59:*4, 13* 67:*3,*
*4* 77:*6* 79:*24*
82:*12* 92:*16*
95:*8, 11, 12*
101:*18*
103:*18*
106:*24*
107:*17* 118:*2*
121:*8, 23*
122:*3, 10, 11*
123:*17*
124:*14, 25*
125:*8, 16*
151:*6, 15*
158:*3* 183:*23*
195:*18*
196:*10, 25*
204:*9* 219:*25*

220:*7, 13, 24*
221:*6* 233:*14*
237:*6* 242:*17*
243:*5* 244:*4*
249:*23* 253:*4,*
*6, 12, 15, 19*
258:*14* 263:*5*
270:*18*
278:*18*
280:*24* 294:*3*
296:*17, 24*
297:*2, 7, 15*
299:*11, 14, 20,*
*24* 300:*4, 18,*
*24* 301:*2*
302:*19*
303:*17, 24*
306:*7* 307:*20*
317:*17, 19*
318:*2, 3*
**opposed**
22:*17* 23:*5*
260:*9*
**oral** 74:*11*
**Orange** 6:*20*
13:*6, 9, 10, 11,*
*23* 14:*7, 17,*
*18* 15:*14*
16:*11* 223:*20*
224:*19, 21, 25*
225:*2, 6, 7, 9,*
*10, 15* 244:*14*
245:*1, 17*
247:*8, 19, 24*
248:*7*
**ORDER** 1:*13*
37:*23* 47:*21*
298:*7*
**ordinarily**
302:*8*
**O'Reilly** 2:*22*
**organic** 154:*23*
**organization**
251:*7* 269:*12*
272:*11*
**original** 15:*21*
16:*5, 10* 17:*6,*
*23* 18:*15*
19:*13* 20:*1*
89:*18* 146:*18*
322:*13*

originally
12:6  18:24
190:11, 25
Orleans  2:6
outcome
233:16
239:23  325:20
outcomes
229:11
233:20
234:21  240:12
outlined  250:9
Outside  26:4
27:18  28:17
33:4, 17  34:1,
4, 20  36:8
38:4, 21
40:22  41:13
42:19  50:15
55:10  67:2
74:4  77:11
78:4  79:23
80:19  81:23
83:18  84:14
85:12  86:4
92:15  93:1
94:1  101:18
102:13  103:8,
17  106:23
107:16  115:8,
23  116:21
118:1  121:7
122:2  123:16
124:2, 13, 24
125:7, 15
151:5, 15
158:2  160:15
161:4  162:2
163:16  168:9
169:13, 23
170:16
172:17  176:4,
20  182:25
183:22  184:7,
25  185:24
186:6  193:3
195:5  210:16
235:23
236:10  237:5
238:20
242:17  243:5

244:3  254:22
258:11, 23
260:22  262:4
266:15  276:6
overall  289:9
overarching
272:11
Overlapping
97:11
overseas
295:10
overseeing
288:16
oversight
288:12, 18
Overview
5:18  6:5, 8
153:3  165:9
Oxford  3:15

< P >
P&T  268:10,
16, 18, 20, 23
269:24
P.C  3:2
p.m  283:11
321:16
Pacific  8:6
pad  9:25
PAGE  5:3, 11
13:19  14:7,
10, 11  15:25
16:3, 16, 20
19:4  30:7
43:21, 22
44:11, 21
45:3  46:18,
22  51:16, 21
52:1  61:2, 3
62:23  63:2
77:14  87:16
89:9, 14
105:7, 8
113:23
118:13
120:10  130:8
146:11, 25
147:1  148:22,
23  152:5, 7
153:9, 18, 20
157:8  158:23

159:14, 25
162:24
166:24  198:3,
6, 7  205:10
214:15, 22
222:20
244:17  247:7,
10  249:13, 17
252:11
253:14
256:24  257:7,
13  259:12
261:2, 16, 18,
19  265:6, 9
271:23  272:1
275:17, 18, 21
277:8  312:25
313:9, 13
314:15, 17, 19
315:1, 14
316:1  317:6
318:7  323:3,
6, 9, 12, 15, 18,
21
pages  5:19
6:23  100:11
143:18  146:4
153:21  247:1
271:6, 16, 20
278:9  314:21
324:6
pagination
46:11, 13
Panagos
19:20  22:10
249:19, 24
250:3, 14, 20
251:1  252:3
274:16
Paonta  214:17
paper  9:25
99:10
Par  279:14, 16
Paragraph
21:9, 11  30:6,
8  43:10, 15
44:1, 10, 20
45:3, 12
46:22  51:12,
14, 21  52:2,
18  53:7, 16,

24  56:6
105:6, 8, 15
112:1  114:3
116:1, 13
162:25  163:6
197:22  198:1,
6  214:9, 20,
22  222:16, 17,
19  223:21
226:2, 9, 13,
17  227:3, 6
228:16, 23
229:15, 25
230:10, 14, 21,
25  231:21
244:9, 16
247:6, 11
249:12  250:2,
18  251:14
252:12
253:20
257:22
259:12
261:24
265:11
314:25  315:4,
15, 20
paragraph-
numbering
46:14
paragraphs
45:9  222:10
parameters
220:15
Park  3:9
part  19:17
22:7  31:8
32:21  33:15
38:15  42:25
44:14  46:23
51:4  53:3
55:25  56:1,
20  57:6
63:17  72:15
108:2, 14
116:23
126:20
127:12
134:25
152:12  160:7
176:25

181:25
191:21
208:21  227:8
228:5  231:7
233:11  234:2,
17  246:11, 24
249:2  250:13
255:12
264:11
269:10, 11, 14,
22  270:17
279:8, 11
297:5  299:6
300:23  306:2,
21  308:5, 10
311:8  315:8
316:6, 16
Partially  35:24
participated
292:5
particular
13:17  25:2, 7
47:18  56:21
71:24  101:5,
16  102:11
109:10  127:6
147:22  150:9
172:3  208:19
222:10
234:11
253:19
255:17
257:18  259:3
260:2
particularly
22:9  91:12
95:8, 11
114:25
166:20  266:2
275:10
311:15  314:9
parties  8:12,
16  325:18
Partners  7:1
272:7, 8, 13,
16, 25  273:2
289:18
parts  95:1
308:19  315:7
party  278:16

Confidential Information - Subject to Protective Order

passed 50:9
paste 46:7
patent 279:4, 18 280:14
patience 37:14
patient 235:18, 19, 22 236:16 237:2, 24 243:2
Patients 158:25 159:2, 9 226:23 227:13 236:7, 24 237:19 239:20 240:1 252:14, 22 253:1, 24 254:19 300:15 301:20 319:17
pause 8:15
Pay 6:17 253:4 295:16
payor 251:4 269:6 270:4
payors 219:10 250:21 251:2, 19 253:20, 22 280:17 282:6
pays 251:7
PBM 270:6, 8, 10, 14
peak 298:16
Peck 287:11, 25 289:14
pejoratively 181:5
pen 9:25
penalty 305:22
pending 34:24 97:23 98:7 112:6 217:22 260:13 284:17
Pennsylvania 3:16 4:4
penultimate 247:13
people 9:14 60:20 72:19 139:6 238:3, 13 259:14, 16,

22, 25 260:8, 18, 19 261:25 262:1, 12 278:23, 25 317:8, 11
percent 276:22 277:2
Perfect 9:24 52:6 108:13 263:10
perfectly 80:3 230:3 235:10
perform 315:9
performed 151:12 185:5
period 133:23 134:1 229:17 230:18 267:8 288:22 295:9
periods 201:20
permanent 296:23
perplexing 108:25
person 228:20 325:13
personal 26:18 28:23 33:8 43:3 65:10 233:10, 14
personally 65:24
pertinent 12:23 62:3 186:1 220:13 221:10, 18 232:3 248:25 263:4 296:11 304:2
Ph.D 6:10 256:13
Ph.D.s 291:5
Pharm.D 267:18
Pharma 2:11 272:10

Pharmaceutical 2:11 4:1 6:10 35:12

119:12, 24 157:11 158:1 159:18 160:21, 22 192:25 193:21 194:6 221:5 223:11 224:4 226:20 228:8, 21 232:9 252:21 288:10, 11 302:4 316:5
pharmaceutical ly 209:20 222:11 223:8 224:1 229:16 230:16 231:3, 10, 12 253:7 318:11
Pharmaceutical s 2:8 4:13 5:23 30:2 118:24
pharmacists 255:19 268:12
pharmacologic 234:10
pharmacologist -toxicologist 117:3
pharmacology 72:21 117:5 286:4, 8, 18, 19, 21 288:13
pharmacology/t oxicology 115:11 297:12
Pharmacopeia 86:11 256:14 312:18
pharmacopeial 144:11 147:10 290:1
Pharmacopeia- National 12:19
Pharmacy 3:1, 7 4:5 24:22 256:9 257:6 268:3, 15 270:7, 15

291:4 311:24 312:7
phase 27:20 34:8 258:13
Phi 285:20, 22
Philadelphia 4:4
phrase 131:1 135:23
physical 11:24 252:2
physicians 255:18 268:11
pick 98:18 101:5
picked 150:6 250:13
picking 34:5
piece 111:17
pieces 213:7, 9, 12, 24
Piedmont 2:16
Pietragallo 3:14
pill 243:2
pills 317:10
pioneer 280:15 281:11
Pittsburgh 3:16
Pizzi 2:22
place 33:1 42:15 52:4 55:18 125:14 179:20 194:14 241:3 259:13, 14 261:24
plaintiff 22:17 23:5, 6, 14 24:7, 15, 21, 22 25:3, 8, 16 281:24, 25
Plaintiffs 2:3 8:22 22:6, 19, 22 23:23 24:10 25:12, 16 72:7 219:9 279:9, 11 280:13 281:9 282:7

300:15, 19 301:3
plaintiff- specific 22:1
Planet 272:9, 10
plans 269:22
plea 213:25 215:6 305:2, 12
pleading 215:10
pleadings 24:15
Pleads 6:16
please 8:15 10:14 15:6 23:1 60:6 77:2, 17 83:23 85:20 88:13, 14 89:8 97:15 100:22 104:16 105:24 107:23 109:8 116:6 130:6 141:15 210:18, 20 218:14 230:2, 13, 23 231:8 267:17 277:20 283:15 285:8 320:25 322:3, 7
pleased 47:20 287:18
point 18:3 19:18 22:3 43:20 50:10 54:25 55:3 59:19 62:13 67:23 70:7 71:9 78:10 84:2, 9 91:25 103:2 107:22 109:16 113:16 124:6, 7 135:10 138:9 141:4

Confidential Information - Subject to Protective Order

150:25
176:15
182:20
184:17
191:20 208:9
214:5 215:17
216:2, 10
238:2 240:13
243:22 252:8,
15 254:8
262:15 269:9
282:15
297:22 299:8,
15 300:2
318:19
**pointed** 46:16
**points** 36:22
203:18, 22
222:13
**poison** 136:23
137:6 208:15
**policies** 299:5
**portion** 20:21
276:21 309:13
**pose** 70:5
**poses** 116:3
**position**
107:22
178:23 180:4
275:5
**positions**
288:2 290:10
**possibilities**
200:4, 5
**possibility**
39:25 172:5
173:12 314:5
319:9, 12
**possible** 43:6
67:14 140:3
161:14
217:13 244:6
248:23
**possibly** 140:2
223:13
**postapproval**
187:24 304:20
**postdated**
19:14
**Post-it** 90:18

**postulate**
49:11
**postulating**
49:13
**potency** 41:1
114:9 115:15,
16
**potent** 105:16
106:4, 22
107:15
**Potential** 5:23
9:18 25:12
27:16 28:6,
15 29:12
30:20 31:3,
22 32:2, 7, 12
33:3 38:19
40:20 42:17
47:10 63:7
66:6 71:6
85:15 90:24
92:13 93:15,
24 135:17
142:7, 16
143:2 178:6
200:7 263:17
294:12, 16, 25
297:17
298:18 320:12
**potentially**
41:11 80:17
81:6, 19
83:10 121:5
**PowerPoint**
5:18 87:13
100:10, 12
**practical**
90:21
**practice** 28:23
43:10 46:24
47:3, 6, 8
55:5 56:8, 16,
25 245:7
286:12, 23
287:2
**practicing**
286:15 301:22
**practitioners**
252:22
**preapproval**

187:12, 17
**preceded** 40:6
**preclude** 176:7
**precluding**
140:16
**predecessor**
186:10, 22, 24,
25 188:23
189:8
**Preface** 6:20
224:20, 22
**prefer** 96:15
**premed**
285:14
**preparation**
147:18 272:17
**prepared**
99:19 113:20
128:19 142:16
**preparing**
14:1
**prescribe**
301:20
**prescribed**
254:20
267:22, 25
301:4
**Prescription/N
on-
Prescription**
6:6
**prescriptions**
268:2, 13
**presence**
21:18 27:25
31:19 32:6,
16 38:11
42:10 69:9
72:20 85:8,
24 89:23
106:7 138:4
262:9 303:23
310:21
311:10, 11
**present** 4:16
56:11 76:11
89:22 94:19
127:17
209:15 241:9,
12

**presentation**
89:10 90:7
146:6 154:1
157:6
**presenters**
156:25
**president**
256:13
**press** 29:25
30:10 31:17
255:17, 20
305:1 307:4,
14, 19
**pretty** 49:6
**prevent** 106:6
247:22
**prevented**
189:19, 22, 23
**previously**
52:9, 11 63:6
94:10 294:11
**primarily**
193:23 289:19
**primary** 38:13
**Principal** 6:4
**principally**
288:9
**Principles**
114:2 119:7
**Prinston** 4:1
29:6 30:1
47:13 49:5,
10, 20, 21
**print** 99:14
146:15
**printed**
113:12
128:17 198:4
**prior** 13:9
17:15 27:24
29:14 32:9
40:2 66:3
68:11 70:4,
13 73:5
74:18 75:5
76:18 79:21
91:7 93:6
106:17
109:15
112:13
117:23 118:7

120:24 121:1,
25 123:2, 14,
25 139:3, 11
140:9 146:20
150:1 152:15
153:15
160:21
165:18 167:5,
10, 17 169:19
182:12, 16, 19
183:20
185:21 186:5
191:18
194:14 201:7
202:1, 19
205:12 209:9
213:25 215:6,
12 219:11
221:9 235:2
237:23 253:2
255:5, 20
263:2, 16
266:11, 25
267:6 277:8
280:23 284:3
303:7 306:5
320:8
**private**
134:21
144:20
145:15 150:6
245:20
246:10, 19
286:22 287:2
298:5
**probable**
84:13 85:10
86:1 89:25
105:18
**probably**
36:19 92:20
94:25 103:19
138:6 210:17
238:17 261:2
**probe** 196:10
**problem** 21:4
37:13 54:1, 2
60:21 63:17
73:22 78:2
122:16
146:17

153:*13*
195:*21* 200:*8*
201:*11*
**problematic**
55:*13*
**problems**
56:*21* 198:*15*
317:*9*
**procedure**
127:*6* 129:*19,*
*20* 140:*13*
155:*8* 325:*6*
**procedures**
55:*17* 132:*18*
140:*1, 24*
145:*8* 148:*9*
155:*12, 18*
210:*1* 299:*5*
**proceed** 89:*8*
99:*3* 277:*21*
**proceeding**
307:*3, 12*
**proceedings**
325:*16*
**Process** 6:*22*
27:*23* 109:*12*
135:*7, 8, 11,*
*17* 140:*20*
148:*17, 18*
172:*9, 15*
173:*25* 174:*6,*
*12, 18* 175:*7*
176:*2* 178:*18,*
*25* 181:*10*
183:*5, 19*
184:*22*
185:*21*
186:*14, 18*
187:*4, 11, 22*
188:*2* 213:*15*
227:*17*
246:*11* 249:*2*
255:*9* 309:*21*
316:*17*
**processes**
27:*10* 147:*25*
176:*8* 181:*23*
183:*18*
194:*13*
265:*19*
266:*13* 267:*5*

**produced**
15:*20* 23:*14,*
*19, 23, 24*
24:*7, 10, 23*
25:*3, 8* 39:*9*
40:*5* 198:*5*
214:*17* 215:*2*
217:*1* 271:*7*
**product** 20:*19*
26:*8* 35:*11,*
*17* 38:*10*
39:*5* 40:*9, 14*
42:*8* 48:*11*
49:*23* 50:*12*
53:*18* 54:*6, 8*
64:*19, 23*
67:*25* 69:*25*
70:*16* 71:*7*
73:*23* 74:*8,*
*23* 78:*8, 15*
79:*18* 92:*1*
111:*11, 24*
112:*10*
122:*14, 19, 23*
126:*2, 6, 17*
130:*20*
131:*15, 21*
132:*7, 12, 14,*
*16* 134:*11*
135:*18* 136:*4*
138:*2, 3, 15,*
*25* 139:*2, 17,*
*20* 140:*6, 8, 9*
144:*15*
149:*24*
150:*14, 23*
152:*1, 3*
154:*14*
157:*14, 21*
158:*7* 161:*25*
163:*3* 164:*1,*
*11* 167:*18*
169:*10, 18*
171:*1* 172:*2*
173:*10*
193:*12* 201:*2,*
*19* 202:*5, 8,*
*14, 23* 203:*10,*
*19* 204:*19*
205:*1, 5, 7, 23*
206:*16, 22*

207:*1, 5, 6, 10,*
*15* 208:*14, 24*
209:*3* 210:*3,*
*4, 8, 13*
215:*16*
216:*14, 16*
217:*11*
219:*14, 19*
220:*2, 9, 16*
221:*1, 8, 24*
222:*6* 223:*2,*
*5* 238:*17*
240:*20*
241:*17, 24*
243:*25* 245:*6*
246:*7* 247:*7,*
*19* 248:*5*
253:*24*
255:*14*
306:*11*
309:*24*
310:*12*
311:*11, 21*
319:*2, 11*
**production**
17:*14* 293:*8*
**PRODUCTS**
1:*6* 6:*1, 14*
8:*9* 25:*23*
26:*3, 15* 27:*1,*
*5* 32:*23*
41:*12* 47:*16*
48:*8, 19* 52:*7*
63:*14* 64:*15*
68:*11* 69:*23*
82:*25* 91:*17*
106:*14*
119:*13, 24*
120:*21*
124:*19* 126:*6*
134:*1* 138:*22*
144:*11* 145:*2*
146:*7* 147:*9*
150:*3* 154:*22*
155:*21*
161:*19, 24*
162:*9* 163:*10,*
*14* 164:*5, 8,*
*10, 14* 165:*16,*
*20, 24* 166:*10,*
*13, 18* 168:*8,*

*24* 169:*2*
171:*5, 12, 14,*
*19* 190:*22*
201:*22, 25*
204:*21*
205:*12* 206:*1,*
*14* 207:*4, 11,*
*14* 209:*9*
210:*10*
215:*11*
216:*19* 217:*1,*
*6* 223:*17*
225:*4, 11*
226:*3, 4, 15,*
*18* 236:*8*
237:*21* 238:*3*
239:*21*
243:*18*
244:*20* 245:*3,*
*11* 250:*22*
251:*8* 252:*14,*
*20* 253:*16*
254:*2, 4, 6, 10*
262:*17* 263:*2*
265:*19*
266:*13* 267:*6*
270:*1* 296:*5,*
*9* 297:*16*
305:*3, 14, 16*
310:*16, 17*
311:*1, 4, 17*
318:*9, 10*
319:*8, 19, 20*
**product's**
247:*22*
**professional**
267:*16*
**professionally**
270:*11*
**profile** 154:*11*
224:*6* 226:*22*
227:*12* 228:*3,*
*18* 229:*1, 6*
231:*16, 23*
232:*5, 17*
233:*8* 234:*3,*
*6* 235:*5*
239:*5, 8*
240:*9, 24*
243:*12, 17*
254:*15*

**program**
45:*12*
**progress**
280:*12*
**progresses**
71:*2*
**prohibition**
70:*15*
**prominently**
82:*11*
**prompted**
50:*23*
**promptly**
42:*16* 47:*10,*
*15, 25* 48:*7*
63:*10*
**prongs** 205:*3*
**propensity**
242:*23*
**proper** 43:*9*
46:*24* 47:*2, 6,*
*8* 55:*4* 56:*8,*
*15, 24*
**properly** 78:*9,*
*16*
**property**
279:*2*
**ProPharma**
271:*3, 11, 12,*
*17* 272:*6, 11,*
*13, 16* 273:*2,*
*14*
**proposed**
223:*2*
**propounded**
324:*8*
**protect** 47:*21*
319:*17*

**PROTECTIVE**
1:*13*
**prove** 243:*20*
**proven** 250:*4*
**provide** 58:*7*
83:*16* 90:*21*
193:*15*
297:*23* 299:*14*
**provided** 11:*2,*
*17, 23* 12:*7,*
*12, 13* 26:*20*
77:*21* 111:*15*

Confidential Information - Subject to Protective Order

120:2  134:22
142:3  143:2
171:5  197:24
198:11  284:4
307:15
**providing**
10:9  53:20, 22
**provisions**
134:19
**prudent**  194:2
195:2, 15
196:14
**public**  29:24
47:21  87:5
138:10  150:6
194:11  199:5
261:4  298:11
**publication**
225:3  257:6
**publications**
292:2, 3
**pull**  86:24
99:24  100:3
133:24  169:1
277:6  312:3
**purchase**
191:25  304:2
**purchased**
177:12  180:2
253:2
**purchaser**
179:7  189:5
200:19
**purchasers**
55:15
**purchases**
250:21  252:7
**purchasing**
55:20  81:21
200:21
**pure**  71:15
**purity**  41:1, 2
245:12
**purpose**  75:13
90:18  91:3
101:2  115:2
116:18, 23
161:22  224:8
233:21
242:25  299:9
308:18

**purposes**
25:20  84:25
103:22
118:11
191:22
244:15  283:4
**pursuant**
325:5
**put**  9:21  20:4
32:14  82:6,
24  91:14
97:2  103:4
110:4  112:19
137:20
142:14
143:11
152:16
156:12
164:25  165:8
218:5  234:12
248:10
267:14  277:4
287:22  295:4
321:5

**< Q >**
**Q3A**  41:6
**Q3B**  41:6
**qualification**
90:23  234:15
**qualified**  39:6
149:15  300:9
**qualify**  92:3,
12  93:14, 23
131:25
149:10, 23
150:2
**qualifying**
94:14  155:9
**Quality**  6:11,
12  33:1
34:14  41:1
157:11, 14, 21
158:1, 20
159:18
160:21, 22
179:20, 23
208:25
245:12  246:9
250:9  259:17
260:20  262:3

288:11
291:20
303:23  304:2
**quantification**
155:20
**quantified**
243:2  244:1
**quantify**
242:11
**quasi**  290:23
**question**
10:14, 18
22:2, 21, 25
23:2, 20
26:18  28:7
30:11  32:4,
10  33:8  34:1,
24  35:4, 15,
21  36:1, 19
37:18, 21, 22
38:23  39:14
44:5  47:6
48:2  57:21,
22  58:21
64:9  67:7
69:6  70:24
71:17  72:12
73:20  74:14,
23  77:2  83:3,
13, 23, 25
85:22  86:7
93:17  94:7,
20  95:19
96:12, 16
97:6, 24  98:2,
7  99:13
102:2, 5
107:13
108:24  112:5
119:16
124:18
130:25
138:17
139:16, 19
147:8  161:7,
16  168:12
169:15
170:16, 22
175:3  176:6
180:16, 19
183:2  188:21,

22  192:19
193:4, 6, 19
195:14
198:16
199:10
214:23
217:21  220:4
228:7  230:12
232:13, 21, 23,
24  234:25
235:16
236:12
237:14, 16
239:10, 19
242:19
248:16
251:17
253:11
257:22
260:12, 15
263:23
265:12, 14
294:23  298:2
307:10  316:4
320:16
**question-and-**
**answer**  320:9
**questioning**
50:16  62:4
96:1  97:5
223:25
228:13  229:20
**questions**
10:8  12:15
13:2  24:18
34:12, 17
42:22  47:7
53:5  62:4, 14
71:9  73:15
85:17  94:24
95:6, 13  96:8
97:3  98:24
99:20  107:2,
12  115:10, 11
150:21
166:17
193:25  196:3,
4, 15, 22, 24
212:7  216:1
258:6  267:11,
15  284:16, 17

296:3, 21
300:14, 22
309:19  320:3,
4, 20  324:8
**quibble**  52:25
139:6
**quibbling**
227:15
**quick**  13:20
19:21  22:11
45:8
**quickly**  14:12
65:11  193:8
**Quick's**  44:22
45:17  46:3
**quite**  66:17
67:10  69:10
100:19  110:7
139:24  157:5
178:13
188:21
245:18
272:22
282:11  315:25
**quote**  310:4
**quoted**  57:16

**< R >**
**raise**  205:18
**raised**  209:6
**raises**  298:16
**raising**  193:25
**ramifications**
21:21
**Ranbaxy**  6:16
210:15
212:22  213:6
214:15  215:1,
10, 16, 19
280:10, 11
281:25  305:2,
13, 19  306:3,
9, 12, 22
307:4, 14, 19
**Ranbaxy's**
213:23
**randomized**
239:20
**rapid**  63:16,
20  288:23

Confidential Information - Subject to Protective Order

**rapidly** 304:*24*
**Raspanti** 3:*14*
**rat** 136:*23*
137:*6* 208:*15*
**rate** 223:*4*
276:*17*
**rating** 213:*14*
223:*19* 248:*8*
**Ravi** 6:*3*
**Ravichandran**
6:*3*
**Reactive** 5:*22*
**read** 35:*2*
74:*24* 84:*18*
90:*1, 2, 25*
92:*19* 105:*14*
106:*11* 108:*7*
115:*12* 117:*1*
119:*3, 14*
147:*11* 148:*2,
3, 12* 149:*7*
154:*6, 20*
155:*2, 16*
156:*1, 4*
159:*1, 16*
213:*8* 215:*19*
226:*1, 16*
227:*1* 230:*23,
25* 245:*13*
247:*11, 16*
250:*1* 255:*17*
257:*21*
261:*13, 15, 19*
265:*15*
274:*10, 23*
302:*6* 305:*7*
314:*16* 315:*4,
16, 24* 322:*3*
324:*6*
**readily**
103:*20*
168:*20* 170:*1*
316:*16*
**reading** 91:*1*
103:*21, 23*
104:*1* 108:*5*
119:*4, 15*
147:*20* 162:*6*
163:*7, 8*
214:*20*
230:*19* 231:*8*

244:*16*
257:*25* 302:*6*
313:*6*
**reads** 90:*21*
148:*6* 152:*8*
244:*10, 18*
259:*12*
**reagents**
147:*25*
**real** 235:*17*
**realities**
111:*19*
**really** 35:*25*
38:*12* 39:*14*
43:*4* 62:*3*
71:*3* 78:*6*
94:*3* 98:*17*
121:*20*
139:*25* 159:*9*
181:*12, 22*
206:*12* 210:*4*
229:*19*
231:*18* 236:*3*
259:*15* 260:*8*
261:*4, 25*
273:*8* 278:*23,
25* 296:*14*
302:*12* 315:*7,
21* 317:*1, 16*
318:*1* 320:*16*
**realtime** 21:*5*
**reason** 10:*21,
23* 12:*20*
42:*9* 48:*11*
52:*22* 79:*18*
103:*10*
108:*10*
164:*23*
171:*18* 172:*1,
4, 10* 190:*7*
225:*7* 273:*11*
322:*5* 323:*5,
8, 11, 14, 17, 20,
23*
**reasonable**
106:*6* 192:*24*
195:*16*
196:*14*
200:*23* 228:*20*
**reasonableness**
197:*10*

**reasonably**
47:*25*
**reasons** 23:*10*
152:*1* 206:*2*
310:*11* 316:*11*
**Rebuttal**
44:*21* 45:*8,
17* 46:*3*
**rebutting**
249:*23*
**recall** 16:*12*
24:*23* 25:*1, 6*
26:*20* 30:*12*
48:*7, 15* 51:*1,
3, 6, 8* 52:*15,
16, 20, 21, 23*
53:*9, 11, 17*
54:*3, 6, 7, 13*
63:*23* 64:*1, 2*
65:*13, 14*
66:*22* 67:*24*
137:*21*
161:*18, 22*
162:*12* 163:*1,
25* 168:*6*
169:*3* 175:*5*
176:*14, 16, 22*
179:*11* 202:*3,
7* 206:*15*
207:*15* 208:*2*
209:*2* 218:*2*
238:*24*
279:*17*
293:*16, 18*
296:*5, 10*
302:*1* 304:*9,
10* 309:*23, 25*
310:*2, 11, 16*
319:*7*
**recalled** 47:*15*
54:*14* 145:*3*
162:*8, 19*
164:*4, 10*
201:*22*
202:*14*
203:*19*
204:*18*
216:*14*
219:*13* 236:*8,
12* 252:*15*

**recalling**
167:*18*
**recalls** 32:*23*
47:*20* 48:*10*
50:*11, 23*
52:*7, 13* 53:*8,
12, 25* 54:*2*
64:*7* 111:*24*
112:*10*
146:*20*
161:*24*
163:*10, 14*
164:*6* 169:*19*
183:*20*
185:*22* 186:*5*
199:*7* 201:*8*
202:*1, 6*
205:*13* 206:*1,
19* 219:*12*
248:*4* 253:*2*
255:*5, 12*
263:*17* 310:*5,
8*
**receipt** 322:*14*
**receive** 250:*6*
**received**
17:*15* 173:*5*
253:*1, 16*
255:*5* 260:*5*
274:*8* 285:*20*
**receiving**
63:*10* 171:*2*
192:*16, 21*
193:*1* 194:*15*
**recess** 15:*3*
60:*3* 141:*12*
218:*11* 283:*12*
**recognize**
157:*4*
**recognized**
105:*21*
**recognizing**
301:*19*
**recollect** 26:*22*
**recollection**
29:*11* 62:*1*
293:*20*
**recommendatio
n** 149:*22*
177:*7*

**recommendatio
ns** 38:*15* 39:*7*
41:*16* 70:*21*
82:*8* 221:*17*
**recommends**
106:*1* 149:*9*
**record** 8:*2, 18*
10:*10* 14:*25*
15:*2, 5* 17:*11*
35:*2* 44:*21*
60:*2, 5* 88:*9*
97:*3, 20, 23*
98:*1* 99:*12*
141:*11, 14*
142:*14*
195:*24* 196:*2*
197:*8* 211:*11*
212:*2* 218:*8,
10, 13* 248:*12*
277:*15*
283:*11, 14*
284:*21* 285:*4*
292:*22*
293:*11*
298:*24*
302:*16* 307:*8*
317:*16*
320:*23*
321:*11, 14*
**records** 24:*22*
25:*2*
**recovery**
174:*12, 18*
175:*7* 178:*18,
25* 181:*10, 23*
184:*22*
**recycled**
175:*12, 17*
176:*1, 13*
178:*1, 3*
179:*12, 17*
184:*16*
301:*25* 302:*3,
10, 20, 25*
303:*7, 17*
**recycled-
solvent** 183:*5*
**Red** 3:*21*
**reducing**
242:*6*

Confidential Information - Subject to Protective Order

**Reed** 285:*25*
**reenter** 207:*8*
**refer** 39:*16*
126:*12*
250:*24* 274:*12*
**Reference**
6:22 12:*10*,
*17* 13:*11*
21:8 30:*10*
40:*4* 61:2, *12*,
*13* 63:5
77:*19* 100:7
127:5 129:*25*
149:*11, 13*
160:*3, 6*
209:*23* 222:9
223:2, 5
228:*10*
229:*12* 231:*4*,
*6* 234:*8*
312:*24*
315:*17, 18, 21*
318:*12*
**referenced**
12:*25* 13:*12*
14:*4* 61:*19*
79:7 231:*14*
306:*10*
**references**
12:8 13:*8, 23*
61:*13* 127:*11*
**referencing**
309:*20*
**referred**
114:*9* 115:*16*
225:6
**referring** 50:7
62:*24* 233:*20*
251:*19* 252:*4*
266:*22* 276:*3*
303:*4*
**refers** 274:*13*
**refined** 208:*19*
**reflected**
20:*16* 59:*4*
246:2
**refresh** 61:*25*
293:*19*
**refuse** 171:*19*
**refused** 99:*15,*

*16* 143:*23*
**refusing** 83:*15*
**regard** 58:*9*
91:*12* 164:*18*
205:*3* 222:*8*
262:*15*
263:*14* 310:*24*
**regarding**
13:*16* 186:*17*
195:*3* 221:*23*
222:5 270:*15*
**regardless**
108:7
**regulation**
71:2 72:2
263:7 319:*25*
**regulations**
42:*24* 134:*13*
223:*3, 11*
245:*8*
**regulator**
158:*14* 171:2
246:*23*
**regulators**
144:*12*
147:*11*
170:*14*
194:*16* 264:*15*
**Regulatory**
14:*16* 15:*15*
43:5, 9 46:*24*
47:2, *6, 8*
55:*4* 56:*8, 16,
24* 64:*16*
73:7 80:*18,
22* 81:7, *9, 20*
83:*11* 131:*18*
154:*24* 156:*8*
194:*3, 8*
203:*3, 13*
206:*9* 207:*19*
215:*12* 247:*8*
295:7
**reimbursement
s** 269:*25*
**reintroduced**
219:*15*
**reiterating**
68:*16* 208:*8*
**rejected**
142:*25*

**relate** 115:*22*
179:*24*
196:*10*
219:*25* 220:7
221:5 260:*3*
291:*18*
**related** 56:*13*
119:*10*
121:*21*
129:20, *21, 22*
154:*10*
201:*23*
248:*24* 280:2
291:*22*
**Relates** 1:*9*
21:*18* 58:*1*
74:7 174:*8*
213:*14* 219:*8*
298:*10*
**relating** 13:5
174:*4* 196:*24*
201:*11* 212:*23*
**relationship**
47:*9* 58:*1*
306:6
**relative**
209:*22* 237:*15*
**relatively**
211:*3*
**release** 29:*25*
30:*1, 10*
31:*17* 305:*1*
307:5, *15, 19*
**released**
151:*18*
**releases**
255:*18, 21*
**relevant**
291:*12* 296:*16*
**reliance** 14:2,
*7* 15:*10* 19:*3,
13* 20:6
21:*24* 23:*4*
24:5 57:*9, 18,
24* 58:*13, 23*
96:*25*
**relied** 13:*25*
57:*15*
**relies** 269:*24*
**rely** 18:*16*
19:*19* 22:*12*

59:*3* 87:*1*
90:*10* 270:*14*
**relying** 58:*14*
59:*12* 199:*23*
283:*4*
**remarkable**
66:*17* 67:*10*
289:*9*
**remarkably**
65:*11*
**Remember**
31:7 40:*24*
63:*18* 65:*1*
76:2 121:*9*
132:*16*
137:*21*
138:*16* 178:7
179:*6* 241:*8*
268:*22*
276:*19*
278:*20*
279:*22*
281:*18* 282:5
287:*14*
296:*15*
300:*15, 17*
302:*24* 305:*3*
308:*3* 314:*18*
**remind**
210:*20* 211:*14*
**reminded**
210:*18*
**REMOTE**
1:*14* 8:7, *15*
62:*8*
**remotely** 8:*13,
14*
**removal** 48:*11*
**remove** 48:*18*
63:*14* 138:*22*
161:*19* 163:2
213:*14*
309:*24* 321:6
**removed**
48:*12* 210:*13*
**removing**
161:*25*
**render** 59:*3*
297:2 300:*4*
311:*11*

**rendered** 17:6
162:*12*
299:*12* 307:*21*
**rendering**
18:*17* 19:*12*
27:*13* 31:*4*
59:*13*
**repaste** 88:*13,
14*
**repeat** 76:*24*
83:2 181:2, *3*
**rephrase**
162:*23* 260:*16*
**replaced**
290:*24*
**Report** 5:*12*
9:*21* 11:2, *8*
12:5, *6, 12, 14,
25* 13:5, *13,
16, 19* 14:*1, 4*
15:*19, 20, 22*
16:4, *6, 21*
17:6, *9, 13, 24*
18:*15, 17, 22,
25* 19:*15*
20:*1, 2, 9, 11,
16* 21:9, *19,
22* 22:7, *10*
25:*17, 20*
26:5, *11, 21*
27:*19* 28:*18*
29:*17, 20*
30:*17, 24*
32:22, *23*
33:5, *7, 15, 18*
34:*2, 10, 16,
17, 21* 36:*9,
20* 38:5, *23*
39:22 40:*3,
23* 41:5, *14,
16* 42:2, *20*
43:*11, 14, 18*
44:*15* 45:*18,
19* 46:7
47:*16* 48:*15*
51:*13, 24*
52:*12* 53:*6,
16, 24* 54:*5,
25* 55:*10*
56:*1, 3, 19*
57:6, *12, 17,*

Confidential Information - Subject to Protective Order

19 58:7, 11, 15, 18 59:4, 5, 12 60:21, 24 61:23 64:13, 22 68:19 70:7, 12 74:5 76:6 77:11, 20 78:5, 11 81:24 82:11 84:15 85:13 86:5 91:23 94:12 95:7 97:1 100:7 101:19 102:14 103:9 109:25 111:20 113:9 114:15 116:24 117:7, 19 120:4, 8 121:21 122:5, 9 123:9 126:12 131:25 133:19, 21 151:16 161:14 162:6, 21 163:1, 4, 7, 10, 17, 21 167:15, 21 168:10 169:13, 21, 24 170:4, 17 176:4, 22 177:22 182:25 186:1 191:22 195:6 196:5, 11, 25 197:9, 13, 22 198:4 200:25 201:18, 21 204:9 205:21 208:1 209:19 217:20, 25 219:4, 23 220:20 221:6, 14, 19 222:10, 24 223:9 227:3, 25 228:14 229:8 232:1, 2

233:11 237:6 238:21 248:6 249:11 253:14 260:3 262:5, 11 264:11 272:17, 21, 23 273:9 276:3 277:7 283:4, 6 296:11 297:6 299:7, 10, 12 300:23 302:7, 24 303:21, 25 306:7 309:20, 22 317:17, 19 318:7, 24 319:11, 14 **REPORTED** 1:24 39:6 325:12 **reporter** 8:19, 23 9:1 20:23, 24 34:23, 25 35:2 105:25 122:15 145:25 180:17 197:17 257:5, 14 266:8 290:17 292:19 301:11, 14 306:14, 17 325:4 **reporting** 8:15 234:14 **Reports** 16:18 17:4, 9, 16, 25 18:14, 23 22:14, 19 245:2 274:17 **request** 9:23 52:23 54:12, 16 66:23 96:10 97:15 142:16 143:20 171:2, 5 195:3 **requested** 63:14

**requesting** 188:17 **requests** 12:18, 21, 24 193:13 **require** 187:12, 17 315:9 317:4 **required** 184:21 185:2 318:15 **requirement** 145:14 222:25 **requirements** 38:15 40:25 43:5 57:5 81:25 126:13, 25 127:8, 9 133:4 136:1, 4, 9, 23 137:5, 10 139:9, 21 140:6 144:20 152:13 223:18 **requires** 187:22 **Research** 105:19 219:21 285:25 288:14 290:22 291:18 **reserve** 20:20 284:16 **residency** 285:18 **residual** 174:4 176:24 177:5, 11, 15 179:14 185:6, 10 **Resolve** 6:17 110:24 295:19 **resolved** 192:2, 13 193:8 **respect** 185:6 296:9 301:25 305:3 307:5, 13 **respectfully** 72:6 260:4

**respond** 21:3 168:12 187:21 295:19 **responded** 54:11 198:18 **response** 63:17, 21 195:25 257:21 **responsibilities** 38:8 153:22 154:2, 3 155:3 267:5 288:8, 19 290:9 **responsibility** 33:22 35:5 36:3 37:24 38:13, 18 39:3, 15 42:1 265:18 266:12 **responsible** 40:8, 12 42:6 65:25 131:14, 20 138:1 148:8 154:12, 23 155:11 319:16 **responsibly** 66:23 **responsive** 35:21 95:13 **restarted** 43:16 **restarts** 44:20 **Restasis** 280:1 282:6 **restate** 85:21 102:5 189:23 263:22 **restraint** 279:16 **result** 69:12 122:11 306:1 **retained** 82:1 122:4 278:17 281:1 **retention** 84:15 85:13 247:14, 18 **retirement**

290:24 **retrieve** 88:19 **retrospective** 215:24 305:13 **retrospectively** 215:22 **return** 322:12 **returned** 320:24 **revealed** 199:18, 21 **review** 18:2 21:25 22:5, 15, 21 23:13 24:21 41:18 56:9 78:24 80:8, 24 81:10 82:10 122:11 131:12 142:3 187:20, 23 188:9 213:15 218:25 246:11 257:1 273:23 274:7 275:6, 11 276:10, 13 283:25 288:17 300:3 303:16 **reviewed** 17:3, 5, 24 182:15 186:4 293:14 **reviewer** 291:9 **reviewing** 25:2, 6 200:1 276:15 **revised** 11:1, 16 12:25 13:24 15:10, 19 17:2 293:7 **Revision** 98:21 99:21 **revisions** 12:4, 19, 22, 24 16:3 41:6 101:8 **Right** 10:6, 13 13:19, 21 15:16, 18 16:21 17:7,

20, 25  18:20 19:7, 12, 14, 18  20:2, 20 21:10  23:8 24:17, 19, 23, 24  25:1, 15 27:12  29:20 30:9  36:16 43:10  44:1, 4, 11, 25  45:2, 4 47:1, 3, 5 48:25  49:10, 17, 18  50:13, 25  51:2, 14, 23  52:3, 10, 13  54:10, 15 56:8  58:2 62:25  65:7, 19, 21  66:12, 24  68:7, 9, 14 69:2  72:9, 17, 22  75:15, 17 81:15  82:18 83:2  86:11, 14, 17  88:16 89:12, 21 90:1, 5, 25 91:6, 17, 24 92:10, 22 93:7  95:14 99:5  103:1 104:3, 23, 24 106:17  108:9, 17  111:2, 4 113:14, 18, 24 114:13  115:6 116:8, 18 117:13, 22 118:17  119:3, 6  121:1 125:24 126:18 128:25  129:6, 10, 18  130:19 131:10, 16, 19 134:7  135:15, 19  140:5, 24 146:11, 21 147:1, 12, 18 148:2, 12, 25 150:10  151:3

153:8, 10, 11, 21  156:5 157:5  160:8, 13  161:23 162:11  163:3, 4, 11, 12, 15 164:12, 25 165:20, 22 166:19 168:21  171:8 173:4, 10, 15, 17, 18  174:14, 19, 22  175:4, 21, 24  177:19 178:21, 22, 23 182:8, 11, 14 183:20 184:12 185:16, 17 186:17, 25 187:1, 5, 16, 22  188:12 189:3  190:5, 13  194:1 197:24 198:25  199:7, 9, 14  200:16 201:10  202:1, 4  203:25 204:3  208:14 211:5, 21 212:17, 21 213:1, 7 214:7, 14, 25 215:3, 7, 10, 13, 18, 22 216:2, 4, 8 219:7, 11 222:12 223:23 224:21, 25 226:25 228:15, 18 229:7, 18 231:2  233:21, 24  235:18 236:18 237:24 238:10, 12 239:4, 12 240:4, 5

242:25  243:3 244:15  245:5, 15  246:23 248:2, 19 250:1, 20 251:9, 13, 19, 21, 23, 25 252:2, 5, 7, 25 253:10, 13 254:3  255:6, 20  257:17 259:19  264:2, 7, 10, 15 265:15 266:25  267:1, 8  268:16 270:3, 13 271:5, 16, 20, 21, 25  272:4 273:6  274:24 276:6  277:4, 24  278:9 281:16, 18 282:12, 18 283:6  284:2 285:7  293:13 304:18  305:6 309:11 314:15, 24 320:1  321:1
**Risk**  5:24 90:25  92:13 93:15, 25 106:3  116:3, 4  197:12 235:14 237:14, 15 238:23, 24 240:25  242:7, 9, 10, 12, 13, 21 243:1  250:21 251:10, 14, 19 252:2, 4, 6 265:20
**risks**  251:22 252:9
**Rite**  3:7
**Road**  2:16
**ROBERT**  1:8
**ROGER**  1:17 5:12  7:1

8:11, 21  88:6 282:23 321:13 324:14  325:8
**role**  185:20 288:7  302:9
**Romero**  87:16
**Ron**  19:9, 21
**room**  9:15, 19 88:11, 16 283:22
**Rooney**  3:2
**root**  174:21
**roughly**  269:3
**route**  41:21 49:9, 11, 16 50:5  147:24 173:21  186:4, 11  223:14
**route(s**  226:5
**routes**  49:4 50:19
**routine**  38:14
**RUBENSTEIN**  2:11
**Rubensteinb@
gtlaw.com**
2:18
**rule**  249:6
**rules**  10:7
**running**  97:20 98:9

**< S >**
**safe**  158:25 159:2, 15, 19 161:2, 10 208:24 235:10 240:21 243:25 253:23  254:2 261:3  266:5, 9
**S-A-F-E**  266:9
**safely**  24:1
**safest**  261:3
**safety**  154:13 156:7  224:6, 10  226:22 227:8, 12, 21 228:3, 12, 18

229:1, 6, 10 231:16, 23 232:5, 17 233:8, 16 234:3, 21 235:5  239:5, 7  240:8, 11, 24  241:1 242:4  243:12, 14, 17  250:3 254:10, 15
**Sahib**  214:17
**samples**  26:7
**San**  9:9 218:19  286:5 287:3, 9
**Sandoz**  280:4 282:3
**sat**  320:14
**satisfaction**  64:3
**satisfactorily**  295:22
**satisfactory**  198:19
**satisfied**  51:5 223:18
**saw**  175:5, 16 177:25  182:3, 18, 20  241:11
**saying**  38:18 39:18  41:10 47:24  48:21 49:1  52:11 61:19  67:15, 17  69:4, 7, 15, 19, 25  70:17 75:22  78:1, 7, 18  79:16 80:11  91:13, 14  95:24 102:16 103:11, 23 109:22 111:15, 18 114:16  117:2 119:19  126:8 158:5  168:2 172:4  173:24 189:22 201:21  202:9,

*18* 205:*15*
206:*14, 17*
207:*15*
216:*13, 18*
230:*4* 238:*25*
243:*16, 23*
244:5 246:*25*
248:*17* 252:*1*
254:9 263:*25*
264:*3* 295:*17*
305:*10* 317:7
**says** 10:*9*
16:*18* 47:*16*
63:*13* 64:*22*
67:*24* 89:*15,
21* 90:*18*
109:*1, 20*
114:*1* 115:*13*
116:*1, 13*
119:7 120:*10*
129:*8* 148:*24*
154:*1* 157:*21*
162:*21* 196:*6*
214:7 226:*3,
14* 229:*15*
244:*14*
246:*15*
256:*12*
258:*16* 261:*2*
264:*3* 272:7
294:9 310:*8,
9* 313:*14*
315:*20* 316:*4*
**scandal** 287:*17*
**school** 285:*16,
21*
**science** 71:*1*
263:7 288:*10,
24, 25*
**Sciengen** 4:*13*
**Scientific** 6:*4*
80:*8* 149:*16*
221:*18*
**scope** 26:*4*
27:*19* 28:*18*
33:*5, 18* 34:*1,
4, 20* 36:*8*
38:*4, 22*
40:*22* 41:*14*
42:*20* 50:*15*
55:*21* 67:*3*

74:5 77:*11*
78:4 79:*24*
80:*20* 81:*23*
83:*18* 84:*15*
85:*13* 86:*4*
92:*16* 93:*1*
94:2 101:*18*
102:*14* 103:*9,
18* 106:*24*
107:*17* 115:*8,
24* 116:*22*
118:*2* 121:*8*
122:*3* 123:*17*
124:*3, 14, 25*
125:*8, 16*
151:5 158:*3*
160:*15* 161:*5*
162:*3* 163:*17*
168:*10*
169:*13, 23*
170:*16*
172:*18* 176:*4,
20* 182:*25*
183:*22* 184:*7,
25* 185:*24*
186:6 193:*4*
195:6 196:*5*
210:*16*
235:*24*
236:*10* 237:*6*
238:*20*
242:*17* 243:*5*
244:*4* 254:*22*
258:*12, 24*
260:*23* 262:*5*
266:*16* 285:*11*
**scores** 60:*20*
292:*10* 294:*6*
**screen** 62:*18*
82:6 86:*22,
25* 87:*4*
88:*24* 143:*12,
17* 211:*7, 9*
212:*16* 305:*6*
306:*24*
**screen-share**
212:*14*
**scroll** 44:*8*
88:*24* 89:*14*
250:*17*
**search** 227:*25*

**sec** 129:*18*
277:*17*
**second** 14:*17*
62:*8* 106:*20*
143:*21*
154:*20* 170:7
214:*22*
223:*22*
226:*25*
252:*13* 257:*4*
275:*17*
277:*11*
278:*21* 312:*24*
**second-crop**
182:*22*
**secret** 176:*8*
178:*10, 14*
**section** 16:*18*
45:7, *16* 46:*3*
118:*15, 18*
201:*1* 225:*16,
20* 247:*3*
309:*21* 325:*5*
**sections** 276:*3*
**see** 9:*20*
16:*19, 20, 22,
23* 17:*8* 19:*4,
5, 10, 16* 21:*5,
6* 24:*5* 36:*15*
43:*24* 44:*2, 3,
22* 46:*24*
47:*22, 23*
50:5 51:*16,
20* 52:7, *8*
56:*20* 59:7
61:*24* 62:*18*
63:*4* 73:*22*
74:*1* 81:*9*
82:7 87:*6, 18*
89:*9, 11, 17,
21* 90:*5, 17,
19, 20* 94:*25*
95:*19* 96:*18*
97:*5, 16, 18,
25* 100:*8, 16*
102:*24* 103:*2,
10* 104:*21, 24*
105:*1, 2, 10*
107:*2* 108:*4,
10* 109:*5, 20*
110:*8* 111:*5,*

*24* 112:*10, 12*
113:*3* 114:*3,
6, 7, 12*
116:*12, 16*
117:*14*
118:*15, 17, 22*
119:6 128:*18*
129:*12, 15, 19,
23, 25* 130:*3,
9* 143:*12*
146:*10, 16*
147:5, 7, *16*
149:*3* 152:*10*
153:7, *8, 20,
24* 154:*4, 5*
156:*22, 24*
157:*1, 17, 24*
159:*23* 160:*3,
9, 17* 162:*24*
163:7 165:*12*
166:*9, 12, 15*
171:*13* 173:*6,
7, 11* 176:*11,
17* 178:*3*
179:7, *15*
182:*14, 17*
187:9 191:*19*
201:*1, 3*
204:9 211:*4,
8* 212:*13, 16,
17, 19, 25*
213:*1, 2, 8*
214:5, *18, 23,
25* 215:9, *14*
217:*3* 220:*19*
225:*21*
226:*10, 13*
227:*24*
234:*11*
239:*25* 240:*2*
242:*22* 244:*9,
11, 21* 245:9
247:*9, 14, 15*
249:7 250:*16,
19* 252:*8, 16*
253:*15* 256:7,
*10, 11, 15, 16*
257:*14, 15, 16,
18* 263:*12*
265:*12* 271:*3,
13, 16, 17, 19*

272:*1* 273:*10,
19, 20, 24*
274:*11, 16*
275:*12* 278:*8*
295:*2, 3*
298:*15* 305:*5,
25* 308:*8, 21,
23* 309:*5*
310:*8, 25*
311:*22* 312:*1,
6, 12* 313:*6,
19, 21* 314:7,
21* 315:*1, 3*
319:*25*
**seeing** 24:*23*
26:*20* 96:*16*
109:*16*
152:*25*
176:*14, 22*
218:*2* 248:*24*
296:*10* 306:*1*
**seen** 95:7
112:*17* 123:*6*
124:*6, 18*
133:*12*
140:*22*
153:*13, 15*
157:*5* 173:*23,
24* 209:*5*
312:*9*
**selected** 275:*9*
**self-evident**
231:*18*
**sell** 240:*15*
241:*17, 24*
**sellers** 180:*1*
**selling** 67:*18*
84:9 167:*10,
24* 186:*19*
187:*5* 208:*14,
16* 215:*1, 11*
216:*3, 16, 19*
217:*9*
**senior** 211:*16*
**sense** 127:*16*
263:*6*
**sent** 7:*4* 9:*18*
104:*13* 209:*6*
292:*16*
**sentence**
106:*11* 108:*1*

Confidential Information - Subject to Protective Order

114:*24*  115:*1*, *15*  116:*15*
149:*7*  159:*1*
223:22
227:*18*
244:*18*
247:*13*, *16*, *17*
251:*10*, *18*
252:*13*  265:*16*
**sentences**
105:*15*
115:*12*  250:2
**sentiment**
317:*13*
**Seoul**  286:2
**separate**
43:*13*  57:4
88:*24*  133:*1*
161:*13*
188:*19*
192:*18*  206:5
209:*4*
**separately**
276:6
**September**
73:4  109:*25*
110:*20*
127:*23*, *25*
**sequence**
110:*25*  168:*1*
**series**  10:8
264:8, *16*, *21*,
*25*
**serious**  203:*15*
**served**  268:*18*
291:7
**serves**  250:7
**service**  286:*1*,
*3*  287:8
**Services**  5:*21*
8:*4*
**session**  320:9
**set**  7:*4*  8:*25*
48:*15*  65:3
68:*1*  73:*16*
77:*16*  79:*17*
80:*1*, 6, *17*
81:7, *19*
83:*10*  93:*12*
121:5  140:*15*
149:*14*

150:*21*
162:20
202:*12*  203:6
204:5, *11*, *23*
205:*19*
206:22, *25*
207:4  208:*23*
209:*14*  233:5
238:4  239:22,
*23*  240:*16*
241:*4*, 6, *11*
264:20
292:*16*  295:6
305:*19*  306:*3*
310:*18*, 22
318:*21*
**sets**  154:*1*
**setting**  91:*25*
148:*24*  241:2
273:*18*
**settings**  242:*23*
**settled**  280:*11*
**settlement**
306:22
**seven**  215:5
**several-day**
295:9
**severity**
237:*15*
**share**  62:7, *17*
86:*25*  88:*1*,
*13*, *15*  189:*1*
212:*16*
308:*14*  309:*1*,
*13*
**shareable**
178:*21*  179:2
**shared**  11:*12*
189:*4*, 6
**sharing**  62:22
87:*4*
**sheer**  311:*10*
**sheet**  322:6, 8,
*10*, *13*  323:*1*
324:*10*
**shelves**  138:2
**Shire**  279:7
**short**  211:*3*
**Shorthand**
8:*23*  325:*3*

**shortly**  48:*24*
164:*19*
**shot**  295:*15*
**shoulder**  143:9
**Show**  96:*25*
103:*20*  208:*3*
223:*1*  228:8,
*23*
**showed**  120:*24*
**showing**
15:*13*  17:*3*
87:*12*  143:*18*
**shown**  305:*1*
317:*23*
**side**  142:*23*,
*24*  143:*23*
279:*4*, 7, *13*,
*17*, *19*  280:8,
*13*, *15*, *19*
281:5, *9*, *10*,
*14*, *15*, 20, *23*,
*25*  282:*3*, 6
**sign**  322:7
**signal**  206:*12*
**signature**
15:*25*  16:*3*
**significant**
247:*20*
**significantly**
119:*1*
**signing**  322:9
**similar**
142:22  149:*12*
**simple**  246:5
**simply**  139:*19*
**single**  74:*11*
78:*12*  143:*10*
**sir**  16:*12*
21:*14*, *17*
25:*20*  27:*16*
31:*12*  51:*18*
76:8  86:9
87:*3*, 6  89:*14*
104:6, 7
105:7  113:5,
*23*  114:*3*, *19*
118:*13*, *15*
128:5, *10*
129:*11*
133:*19*
145:*24*  152:5,

*19*, *24*  153:5,
*16*, *19*  154:*18*,
*25*  155:6, *14*,
*16*  156:2, *4*,
*10*, *17*, 22
157:6, *12*
158:24
159:*14*  160:*1*,
*24*  162:6
165:4  166:*23*
170:5, *10*
173:2  178:*23*
180:*25*  181:7
188:*21*
191:*25*
193:22  198:6
201:*3*  208:*1*
212:*14*  213:5
214:*4*  217:*15*,
*25*  222:22
224:*14*
226:*16*  242:5,
*21*  244:*18*, *25*
247:*17*
249:*11*, *16*
250:*17*  256:6,
*24*  257:*11*
260:4  261:*21*
265:*10*
267:*16*
268:*17*
270:*25*  277:7
282:*23*
**site**  295:8, *20*
**sites**  63:*13*
294:6  298:*25*
**sitting**  82:*18*
175:*4*, *15*
177:*24*  179:*11*
**situation**  49:7
81:*12*  121:*10*
305:*15*  306:9
308:*25*  318:*24*
**skills**  45:*21*
**skip**  316:*1*
**skipped**
261:*18*
**slide**  89:*10*, *13*,
*14*  146:*14*, *24*
147:5  148:*16*,
*21*  153:*25*

156:*21*  157:6,
*18*  158:*24*
159:*17*
160:*20*, *21*
**Slides**  147:*1*
**slightly**
136:*21*  162:*23*
**Slip**  6:*21*
256:8  316:*17*
**Slowly**  105:*24*
**small**  57:*12*,
*13*  59:8
198:*10*
256:*13*, *19*
260:7  287:9
312:*17*
**small-molecule**
314:*10*
**so-called**
152:*12*  160:*12*
**Solco**  4:2
**sold**  67:*12*
122:*14*, *19*, *23*
166:*18*
202:*19*
205:*24*  272:9
311:*4*, *5*, *21*
**solid**  287:22
**Solodyn**  279:8
**solvent**
174:*12*, *18*
175:7  178:*17*,
*25*  181:*10*, 22
184:22  185:6,
*10*
**solvent-
recovery**
174:*25*  182:6
**solvents**  174:4
175:*12*, *17*
176:*1*, *13*, *24*
177:5, *11*, *15*
178:*1*, 4
179:*13*, *15*, *17*
184:*16*
301:*25*  302:*4*,
*10*, 20, *25*
303:7, *18*
**somebody**
78:7  137:*20*
202:*10*

Confidential Information - Subject to Protective Order

205:*16*
206:*20* 233:*17*
**Somewhat**
52:*2* 312:*8*
**soon** 49:*6*
238:*18* 282:*20*
**sooner** 65:*7*
**sophisticated**
237:*11* 259:*2*
**sophistication**
221:*4*
**SOPs** 57:*4, 9,
24* 58:*1, 9*
**sorry** 28:*2*
34:*23* 43:*19*
44:*6, 13*
51:*10, 25*
61:*6, 9, 21*
66:*18* 83:*22*
85:*22* 87:*11,
24* 88:*14*
130:*22*
139:*15*
155:*24* 161:*6*
171:*4* 192:*19*
195:*7* 198:*6*
211:*16*
214:*24*
221:*25* 226:*8*
237:*18*
242:*18*
261:*22* 278:*4*
280:*10* 301:*8,
13, 14* 303:*11*
**sort** 20:*5*
42:*23* 45:*11*
48:*3* 54:*18*
65:*10* 70:*24*
82:*10* 108:*23*
117:*1* 120:*6*
138:*17* 139:*7*
142:*2* 150:*20,
25* 195:*8*
210:*5* 252:*1*
278:*21*
279:*12, 25*
287:*20, 21*
316:*12, 17, 24*
**sorted** 64:*18*
**sought** 241:*24*

**sounds** 23:*7*
130:*10* 187:*1*
203:*22*
215:*15* 263:*25*
**source** 33:*23*
35:*7* 36:*5*
38:*1* 303:*1, 8*
**sources** 14:*8*
15:*14* 16:*12*
120:*13*
**sourcing**
200:*17* 201:*14*
**South** 4:*4*
287:*9*
**space** 322:*5*
**speak** 40:*25*
43:*1* 71:*4*
77:*15, 22*
123:*21*
124:*19*
132:*13*
144:*25*
172:*19*
218:*18*
222:*13* 259:*3*
302:*13, 24*
**speakers** 97:*11*
**speaking** 8:*16*
22:*9* 31:*7*
64:*12* 65:*24*
82:*24* 151:*24*
161:*13*
253:*12* 316:*2,
23*
**speaks** 43:*11*
172:*13*
266:*18*
297:*12*
302:*25* 313:*11*
**special** 317:*4*
**specialized**
140:*14*
**species** 105:*17*
**specific** 28:*7,
21* 32:*7* 34:*9*
91:*21* 95:*1*
99:*17* 158:*18*
162:*21*
163:*23*
172:*22* 174:*2*
234:*25*

274:*23* 275:*4*
290:*9*
**specifically**
82:*2* 109:*23*
117:*20* 132:*1*
159:*23* 169:*6*
253:*12*
**specification**
48:*13* 78:*19*
106:*8* 109:*18*
110:*5* 111:*3*
125:*22*
134:*21*
145:*16* 150:*6*
179:*9, 14*
213:*18*
246:*10, 19*
298:*5* 308:*22*
**specifications**
246:*22* 248:*5*
**specifics** 66:*14*
**specified** 77:*4*
131:*2* 149:*8*
154:*10*
226:*24* 227:*13*
**specifying**
74:*15*
**speculate**
36:*25* 54:*23*
94:*5* 181:*12*
183:*25* 185:*2*
191:*11*
**speculating**
50:*2* 66:*19*
67:*22* 80:*1*
**Speculation**
29:*15* 30:*15*
67:*21* 85:*4*
123:*18*
124:*15* 125:*1,
9, 17* 134:*15*
136:*11* 137:*1,
12* 139:*13*
151:*5, 14*
158:*15* 159:*7*
162:*3, 7*
166:*5* 169:*12*
178:*12*
179:*22*
180:*21*
182:*25*

183:*21* 184:*6,
24* 185:*23*
191:*1* 193:*16*
221:*11* 236:*9*
238:*7, 19*
242:*16* 254:*21*
**speculative**
55:*1* 138:*17*
**spent** 56:*18*
287:*8*
**spilling** 319:*20*
**spills** 319:*19*
**spoke** 12:*21*
35:*13* 87:*17*
117:*19* 118:*8*
320:*10*
**sponsors** 287:*4*
**squabble**
278:*22*
279:*13, 25*
280:*8, 17*
**squarely** 34:*17*
**stage** 57:*16*
298:*20*
**Stakeholder**
6:*6*
**Stand** 11:*4,
18* 36:*16*
51:*23* 53:*19*
86:*9* 87:*3*
104:*5* 128:*4,
9* 145:*17*
152:*18*
156:*13* 165:*1*
224:*12*
238:*22*
249:*10*
255:*25*
270:*19*
282:*13* 320:*18*
**standard**
134:*20*
137:*17*
139:*25*
245:*19, 20, 25*
246:*13*
**Standards**
6:*22* 14:*16*
127:*10* 135:*3,
6* 154:*24*
245:*12, 16*

246:*1, 16, 18,
22* 250:*9*
315:*21*
**standing**
291:*14*
**STANOCH**
2:*4* 5:*4, 6*
9:*1, 2, 4, 6*
10:*5* 11:*4, 7,
21* 12:*2, 16*
13:*3, 21*
14:*21* 15:*7*
16:*1, 14*
17:*17, 21*
18:*12, 19*
20:*25* 21:*3, 7,
13* 22:*25*
24:*2, 3, 17, 25*
26:*12, 23*
27:*22* 28:*2, 5*
29:*1, 18, 21*
30:*18, 24*
31:*1, 11* 32:*3,
9* 33:*11, 20*
34:*3, 18* 35:*1,
22, 23* 36:*13,
18* 37:*6, 13*
38:*7, 17, 24*
39:*2* 40:*11,
17* 41:*9* 42:*3*
43:*7, 12* 45:*5*
46:*21* 47:*23*
49:*2, 12*
50:*24* 51:*10,
17, 22* 52:*5*
53:*21* 54:*10*
55:*16, 22*
56:*4* 57:*7, 21*
58:*12, 17*
59:*1, 7, 21, 24,
25* 60:*7* 61:*4,
15, 21* 62:*5,
12, 15* 64:*20*
65:*11, 17*
66:*1, 8* 67:*6,
8* 68:*3* 69:*14*
70:*7* 71:*8*
72:*13* 73:*20,
21* 74:*7, 12*
75:*3* 76:*7, 17,
24* 77:*1, 17,*

Confidential Information - Subject to Protective Order

18  78:13
80:9, 12  81:1
82:5, 16
83:20, 22
84:1, 3, 11, 21,
22  85:1, 6, 7,
18, 22, 23
86:7, 8, 12, 20
87:10, 14, 23
88:17  89:5, 6
90:14  92:19,
21  93:5  94:4,
6  95:10
96:11, 17
97:9, 12, 21
98:4, 11, 14
99:1, 3, 24
100:14, 21
101:23, 24
102:6, 17, 18
103:3, 12, 13,
23  104:4, 5,
10, 16, 18
105:5, 12
107:4, 11, 23,
24  108:12
110:13
111:21  112:3,
6, 7, 18  113:1,
21  114:17, 22
115:13, 20
116:7, 11
117:4  118:5
120:9  121:20,
22  122:12, 16
123:12, 20, 23
124:5, 9, 17,
21  125:2, 3,
10, 11, 19, 21
126:3, 9, 23
128:8, 14
130:5  131:6
132:10, 11
133:12  134:4,
23  136:12, 20
137:4, 21, 23
139:18, 24
141:5, 8, 9, 16,
18  142:10, 13
143:10, 19
144:5  145:21

146:1, 5, 16
150:24  151:8,
10  152:4, 22
156:16
158:10, 22
159:12
160:19, 25
161:7, 8, 17
162:5, 22
163:8, 25
164:2  165:10
166:7  167:8,
22  168:13
169:7, 16
170:24
171:22
172:20, 24
176:10, 23
177:9  178:15
180:3, 23, 24
181:16  182:3
183:3, 10
184:2, 11
185:4  186:2,
13  189:13
190:9, 17, 18
191:5, 15
192:14
193:10, 20
195:1, 7, 19,
22  196:1, 8,
17, 23  197:4,
8, 20  210:21
211:1, 12, 15,
18, 23  212:12
217:23
218:15, 17
219:16  220:5,
6, 21  221:20
222:14  224:7,
17  225:13
227:16  228:6
229:19  230:1
233:1  236:6,
14  237:17
238:9  239:3,
16  242:19, 20
243:9  244:7
248:13, 17
249:9  254:18
255:2  256:4

257:8  258:19
259:5  260:16,
17  261:9, 20
262:21  263:3,
24  265:5
266:10, 21
267:12
270:23
277:20, 22
280:20
282:17, 19, 25
283:9, 16
284:8, 15, 19
285:10
286:24
289:22  290:3,
15  291:2, 8,
14  292:24
293:5, 22, 24
294:20
295:25
296:18
297:10, 18
298:1, 22
299:16, 22
300:11, 20
301:5, 8, 12
302:11, 22
303:10, 19
304:14
305:17
306:13, 18
307:16, 23
308:16  309:4,
15  310:1, 6,
13  311:6, 13
312:20
317:20  318:4
320:7, 18, 22
321:3, 8
**Start**  61:6
122:16
125:12  167:1
**started**  49:21
264:25  289:3
302:6
**starting**  44:10
208:15  278:15
**starts**  51:19
257:10  265:9
294:8

**State**  4:15
73:10  142:14
170:8  197:9,
21  198:18
209:18  242:7
311:5  322:5
325:1, 4
**stated**  30:23
58:6  103:6
109:13
114:23  115:1
120:3  135:20
151:7  180:18
196:17  203:4,
5, 18  204:9
215:20  248:6
317:19
**statement**
21:21  40:11
59:6  66:13
80:22  90:7,
16  91:2, 4, 20
106:21
107:14  108:6,
20  118:10
120:16  136:5
148:4, 14
149:18
154:18, 25
155:14  156:1,
2, 9  159:11,
17, 22  160:17
183:9, 14, 15
195:3  197:7
200:11, 23
203:20
216:25  230:6
250:19  255:7
259:19
261:10, 24
262:19
265:22  306:4,
24  310:5
315:12
**Statements**
6:18  56:3
84:19  92:19,
20  95:25
101:21  123:4
133:6, 7
139:24

173:24  196:9
212:24  227:6
259:22  260:1
261:1  264:8
267:10
305:23  306:4
**STATES**  1:1
8:10  12:19
28:11  105:22
114:8  122:19,
23  157:10, 14
173:4  250:7
263:9  289:5
290:1  295:3,
10
**stating**  23:22
111:6  148:20
164:22  254:17
**stationed**
286:2
**Status**  6:13
56:16  101:15
129:10, 11
165:16  173:1
**stay**  109:2
215:8  275:18
311:17
**stayed**  285:17,
24
**staying**  140:11
**stenographer**
10:10
**stenographic**
8:18
**step**  37:11
113:6  230:9
**steps**  106:6
135:7, 8
**STEVE**  2:15
88:17
**Stewart**  280:4
282:3
**stills**  284:12
**stood**  102:11
**stop**  21:22
62:22  105:23
155:25
225:13  226:8
238:14, 16, 25
250:10, 11

Confidential Information - Subject to Protective Order

258:5  282:8
294:14
**stopped**  65:5
188:16, 22
236:24
**stopping**
141:4  251:10,
22
**stops**  227:22
**story**  319:15
**STOY**  3:10
180:15, 18
**straighten**
287:20
**straightened**
287:21
**Street**  2:6, 23
3:3, 15  4:4, 9,
15
**strength**  41:1
223:13  245:12
**strike**  67:16
68:8  69:17
125:12
153:14  173:8
178:18  180:5
196:20  222:1
264:21  311:21
**string**  131:25
**stringent**
64:16
**structural**
115:14, 18
**structures**
119:10
**struggling**
23:10  134:16
279:19
**students**
291:4, 5
**studied**  258:1
259:8
**studies**  149:17
285:16
**study**  55:24
113:8  120:7
224:8, 9  240:2
**studying**
287:10
**stuff**  57:23

**Subcommittee**
312:25  313:1,
11, 18, 23
314:7, 12
**subcommittees**
314:6
**subheading**
155:3
**SUBJECT**
1:13  80:7, 24
247:8  322:9
**submission**
188:9  304:5,
25
**submit**  41:18
78:24  271:22
**submitted**
187:15
272:18  293:8
**submitting**
12:18
**subsection**
249:22
**subsequently**
63:22  319:10
**substance**
29:10  31:20
32:17, 24
34:16  35:10
38:9  39:4
41:22  55:14
60:22  67:25
75:14, 19
76:3  77:8, 9,
25  78:1
84:10  91:17
103:15
126:17
131:16, 21
132:20
154:14  164:8
166:11  168:3,
5  172:6
179:9  180:1
234:7  246:6
304:3  308:23
310:25  324:9
**Substances**
6:3  12:11, 24
83:1  116:20
146:8  155:20

189:16, 21
190:1  194:21
217:1  234:10
235:9
**substantive**
273:9  320:17
**substantively**
228:11  318:15
**substitute**
238:12, 18
**substitutes**
224:9
**substitution**
230:5  234:20
291:21
**success**  47:23
319:15
**successfully**
53:12  252:23
**sudden**  210:2
**sued**  279:20
**sufficient**
144:14  245:17
**suggesting**
120:18  175:5,
16  176:11, 17
178:19
182:15, 18
185:19  191:8,
17  198:13
201:10, 16
203:16
**suggests**
233:17  305:12
**suitability**
155:19
**suitable**
200:13
**Suite**  2:16
3:3, 9, 21  4:9
**summarize**
318:6
**summarized**
192:4
**summarizing**
13:9  279:15
**summary**
283:7
**summer**
47:25  48:24
69:12  121:13

146:21  150:1
164:5, 7
168:22
189:18
191:13  264:1,
7  266:11
310:24  319:4
**Sunrise**  279:24
**Supernus**
279:3, 4
**superseded**
110:21
**Supplement**
13:11  14:19
187:25  289:6
304:20
**supplements**
12:22
**supplied**
302:1  303:18
**supplier**
176:1  192:16,
21  193:1, 14,
15  194:4
200:8, 22
**suppliers**  33:2
56:25  58:2
194:8, 15
309:1
**supplies**  89:23
**Supply**  6:23
26:9  261:2
304:8  309:2
**support**  58:8
172:23  184:1,
9
**suppose**  80:4
190:2  265:3
308:13
**supposed**  48:9
65:19  66:4
107:1  126:10
200:12
**sure**  14:9
22:2, 5  23:6
29:19  37:11
44:4, 14, 16,
18  45:1, 12,
14, 15  49:4,
16  51:5  59:2,
16  62:6, 16

79:14  84:8
85:24  89:9
99:4  100:23
102:7  103:4,
23  110:23
129:7  130:8
138:24
140:18  143:7
147:19
151:19  169:5,
20  193:8
210:22  213:3
217:4  222:7
226:11, 18
229:13  235:2
236:4  251:16,
18  255:24
261:4  262:12
274:4, 20
275:3  277:12
281:2  283:1
292:10  313:5
**surprise**
64:17  121:13
180:6, 9
182:21  190:24
**surprised**
55:2  73:10
**surprising**
309:11, 14, 17
**suspect**  42:10
94:18  121:15
150:5  298:12
**suspected**
81:5, 17  83:8
**suspects**  84:7
**suspend**
195:11
**suspicion**
298:14
**swear**  8:20
**swiftness**
64:25
**Swissmedic**
168:3  319:11
**sworn**  8:14,
23  325:10
**synthesis**  27:9
41:21  147:24
186:4, 11

Confidential Information - Subject to Protective Order

synthesized
68:*12*  236:2
264:*18*
system  47:*17*
48:*9, 22*  50:8
66:4  176:7
225:12
systems  33:*1*
34:*14*  42:15

< T >
Tab  21:*19*
104:*11, 15, 20*
112:22
128:*11*
145:*23*  146:*3*
152:23
156:*18*  165:4
224:*13*  256:5
270:*24*  282:22
tablet  74:*11*
take  13:*20*
14:*12*  43:*18*
48:*3*  57:*14*
81:*11*  83:*17*
91:7  100:2
104:*12*  135:*1,
2, 25*  137:8
138:9  140:*14*
141:*6*  159:*3*
177:*1*  205:22
213:9  217:8
224:*25*  237:2,
*25*  239:*18*
243:2, *21*
259:2  261:5
275:2  282:*19*
283:9  321:*1*
taken  10:*10*
15:*3*  22:16
23:5  28:*13*
60:*3*  74:10
141:*12*
161:*19*  163:2
197:2  218:*11*
248:7  279:*1*
283:*12*
284:*12*
309:*23*  310:4
takes  65:*14*

talk  41:2, *25*
44:*15*  50:*21*
60:*8, 11*  82:5
117:8  120:*16*
126:22
134:*19*  135:5
141:*19, 22*
143:*24*  201:5
240:4  251:*10,
21*  254:*24*
255:*18*
283:*18*
308:*10*  320:*15*
talked  127:*21*
139:8  165:*19*
203:9  208:20
228:*21*  262:*11*
talking  21:*12*
22:3  24:*14*
30:*4, 5*  31:9
39:*23*  41:2
43:2  45:2
49:6  52:*11*
72:9  79:8
81:*12*  88:2, *4*
98:*19*  113:4
117:*12, 16, 18,
20*  118:*3, 20*
120:*1*  126:*1,
3, 15*  128:22
133:22
138:25
144:*18*  178:5
186:*14*
200:*19*
219:*12*
229:*14*
231:*11*
232:*11, 14*
233:*19, 23*
248:9  251:*13*
273:20
291:*19*
314:*20*  315:7,
*17, 18*
talks  12:*11,
18*  225:20
tampering
137:*19*
tangentially

121:*21*
taught  291:*4*
teaching  291:*1*
tech  9:*14*
technical  15:9
technically
187:*17*
techniques
317:5
technology
71:*12*
telephone  50:5
tell  9:7  10:*14*
12:4  46:*14,
19*  51:*13*
60:25  61:*16*
74:*16*  90:*3*
95:*21*  96:2
97:*12, 13, 15,
24*  99:6
104:*19*  113:2,
*25*  123:*10, 13,
24*  124:*10, 22*
125:4  128:*12*
145:*23*  146:2
152:6, *24*
153:*19*  157:8
160:*1*  175:*15*
179:*16*  182:*3*
198:5  207:25
231:*20*  239:6
247:4  250:*18*
256:6, *25*
278:20  281:*19*
telling  57:*25*
97:7  202:4
215:*15*  242:2
243:*13*
ten  215:*12*
289:*23*
tend  317:8
tended  91:*11*
term  190:*20*
222:*24*  223:7
251:6
terminology
310:9
Terminus  2:*16*
terms  21:*19,
22*  32:22
38:9  39:*24*

42:*1, 12*  47:9
54:2  66:5, *14*
74:25  162:*21*
197:*10, 11*
200:4  221:*14*
222:*17*  223:4,
*15*  225:*17, 21,
23*  227:*16, 21*
233:*16*
234:25
240:*24*  241:5
242:7  248:25
253:23
291:*25*  302:9
318:*1*
terrific  288:*15*
test  26:7
80:*17*  81:*6,
19*  83:9
127:6, *17*
129:*16*
130:*15*  135:8
137:6  151:*3,
12*  153:6
167:*16*
168:*12, 18*
170:*13*  171:*3*
172:*1, 10*
177:*15*
298:*12*
308:22
315:*10, 11*
tested  167:*9,
23*  169:*18*
170:25
testified  8:*24*
246:*20*
testify  10:*21*
85:*14*  325:*10*
testifying
110:*12*
TESTIMONY
1:*16*  13:*25*
115:8  181:*21*
196:*21*
218:23
227:*10*
238:20  242:4
258:24
260:*23*  277:9
278:*1*  280:*3*

283:*23*  284:*3*
317:*24*  325:*12*
testing  40:*19*
124:*19*
125:*13*  132:6
140:*21*
151:25
166:*25*  167:*3*
168:*4, 8*
169:*9, 10*
171:*13, 21*
220:*14, 25*
221:7  288:*14*
296:4, *8, 12,
13, 16*  297:*3,
23, 25*  298:*4, 8*
tests  126:*4*
129:*23*
132:*18, 21*
140:*1*  150:*5,
9*  168:*14, 17*
171:7
Teva  2:8, *11*
21:*20*  26:7, *9,
20*  27:9  31:*8,
14, 16, 21*
32:*11, 14, 20*
33:*1, 9, 14*
40:*12, 24*
41:*4, 10, 17*
42:*15, 23*
43:9  46:23
47:2, *8, 15, 18,
20, 24*  48:5, *6,
16*  49:*3, 6, 24*
50:*1, 10, 11,
23*  51:*1*
52:*11, 22, 24*
53:2, *3, 11, 16*
54:*3, 5, 7, 11,
12, 14, 15, 21*
55:2, *6, 17, 18,
19*  56:7, *10,
11, 15, 17*
60:*19*  63:5, *9,
17, 22*  64:*1, 4,
25*  65:5, *20,
21*  66:6, *11,
16*  67:*1, 9, 11,
15, 17*  124:*1*
144:*25*  145:*1,

*3* 150:2, *9, 17*
161:*23* 162:*8,
19* 163:*13, 19,
22* 164:*3, 12,
20, 23* 165:*3,
15, 18, 22*
166:*2, 10, 12,
17, 25* 167:*3,
10, 16, 24*
168:*4, 7, 18*
169:*18*
170:*25*
171:*12, 13, 17,
19* 172:8, *14*
173:*15*
174:*13, 24*
175:5, *11, 14,
16, 24* 176:7,
*9, 12, 17*
177:*10*
178:*21* 179:*2,
8, 18* 180:*1,
10* 181:7, *13,
17, 19* 182:*11,
15, 19* 183:*4,
14, 17, 19*
184:*4, 15, 20*
185:5, *13, 16,
20* 186:*4, 10,
22, 25* 188:*12,
20, 22* 189:*5,
7, 14, 19, 24*
190:2 194:*14,
18, 19* 195:*3*
198:2*1, 25*
199:*11, 15, 20,
22, 23, 25*
200:*3* 201:*2,
21* 202:*5, 14,
19, 23* 203:*19*
204:*18*
206:*14, 15*
207:*1, 4, 8, 10,
22* 209:*2*
210:7, *13*
216:*13, 16, 19*
217:9 219:*12,
13, 17, 25*
220:8, *15*
221:*1, 3, 7, 14,
21* 222:*1, 3, 7*

248:*14, 17, 19*
249:*1* 279:*18,
19* 293:*20*
294:*5, 10, 15*
297:*16*
298:*21* 302:*1*
303:*18, 24*
304:*13, 15, 18,
19* 307:*2, 11*
309:*1, 2*
310:*15, 19*
311:5 319:*4,
7* 320:*1*
**Teva.net** 5:*16*
**TEVA-
MDL2875-
00565758** 5:*16*
**Teva's** 9:*13*
25:22 26:*2,
14* 27:*1, 5*
31:*9, 18*
41:*23* 42:7
51:*3* 56:22,
*24* 57:*4, 8, 24*
58:*1, 9* 64:*23*
65:*24* 163:*10*
167:*11, 18*
168:*6, 18*
173:*9, 12*
201:*6, 19, 25*
204:*13, 20*
205:*11, 13*
206:*18*
207:*14* 209:*9*
217:*11* 222:*5*
248:*24* 284:*4*
298:*24* 299:*1,
4* 304:*5*
305:*15*
307:*21* 318:*9*
**text** 146:*14*
218:22 314:*16*
**Thank** 9:*2, 12*
10:*2* 13:*15*
15:*8, 24*
18:*19* 20:*4, 8*
35:*1* 37:*9, 14*
44:*3* 61:*23,
24* 66:*8*
85:*19* 90:*5*
97:*16* 98:*14*

103:*14*
106:*15*
107:*25*
109:*14*
112:2*1*
114:*17*
116:*10*
120:*15*
135:2*1* 141:*8*
143:*14* 144:*1*
146:*16, 23*
152:*16*
153:*10, 12, 18*
155:22
156:*12*
170:*11*
180:*19* 213:*2*
218:*17* 219:*2*
222:*19*
247:*23*
248:*21* 277:*5*
284:*17, 19*
306:*17* 312:*6*
314:*24* 320:*4*
321:*4, 8*
**theoretically**
308:*12*
**therapeutic**
223:*23, 25*
224:*4* 225:*4,
17, 23* 226:*2,
9, 19* 227:*2, 9,
10, 22* 228:*2*
229:*2, 5, 9, 15*
230:*15* 231:*9,
21* 232:*11*
233:*12, 16, 19*
244:*15*
245:*15* 247:*3*
291:*20*
**therapeutically**
223:*17* 231:*5*
244:*10, 19*
245:*3*
**therapeutics**
268:*4, 15*
**thing** 45:*2*
116:*25* 129:*9*
143:*22*
173:*12*
229:*10* 298:*23*

**things** 16:*9*
20:*6* 50:*21*
69:*13* 72:*6*
140:*3* 192:*12*
223:*19*
260:*10* 261:*6*
272:*5* 273:22
283:*3* 316:*5*
**think** 14:*11,
13, 22* 16:*9*
17:*8, 14*
22:*20* 23:*1, 9,
21* 24:*11*
26:*17* 28:*9*
29:*8, 16*
30:*16, 23*
31:*2, 16* 33:*8*
36:*25* 37:*3*
38:*13* 39:*21,
23* 40:*3, 10,
15* 41:*15*
42:*9* 45:*1, 2,
22* 46:*15*
47:*12, 19*
48:*4, 6* 49:*1,
5, 16* 50:*4*
52:*8, 19, 20,
25* 53:*2*
54:*10, 12, 20*
55:*25* 57:*19*
58:*5, 16* 59:*6,
14, 18* 60:*16*
62:*3* 63:*20*
64:*4, 24* 65:*9,
16, 23, 24*
66:*14* 67:*14*
70:*17* 73:*8*
76:*1* 77:*3, 15,
16* 78:*18*
79:*9, 11*
80:*13* 82:*23,
24* 87:*12*
88:*20* 89:*11*
90:*2* 91:*1, 11,
21* 94:*10*
95:*10, 17, 24*
96:*24* 99:*14*
100:*6* 104:2*0*
107:*7* 108:*4,
19* 109:*1, 19*
111:*14*

114:*16*
116:*10*
117:*18*
119:*15, 25*
120:*2* 121:*19*
122:*7* 123:*5,
6* 126:*8, 14,
20, 21* 127:*23*
130:*6, 7, 18*
131:*5, 10, 24*
132:*9* 133:*9,
22* 134:*18*
135:*23*
137:*15* 138:*6,
16, 17* 139:*5,
23* 142:*13*
144:*13*
148:*20*
149:*25* 150:*4*
151:*17*
152:*14*
158:*18*
160:*10*
161:*14*
163:*24* 164:*6,
16, 17, 22, 23*
166:*16, 21, 24*
168:*18* 170:*7*
171:*8* 172:*3,
13* 173:*13, 18,
24* 175:*19*
177:*5, 7, 13*
179:*16*
180:*10* 181:*7,
13* 186:*8*
187:*10*
188:*18, 25*
192:*2, 23*
199:*25*
200:*10, 23*
202:*2* 204:*8,
16, 25* 205:*9,
20* 208:*18*
210:*18, 19*
211:*2, 5*
213:*6* 215:*19*
216:*20*
217:*19, 20*
218:*1* 219:*13*
220:*12*
223:*21* 224:*8*

227:4, 7, 15
228:7, 20
229:24  230:3,
19  231:17
234:16
235:13
237:10
238:15  239:6,
18, 24  242:6
244:24  246:5,
15, 20, 24
248:3, 8, 22
249:7, 13
250:6  251:1,
6  252:11, 19
253:3, 11
254:17  255:8,
23  256:21
259:9  263:6
265:17
266:17  271:2
272:22  273:1
274:3, 21
277:10  279:3,
5, 10, 15
280:11  281:8,
13, 19, 22
282:1, 22
283:7  287:6,
21  288:25
291:17  292:3,
9, 14  298:13
301:16
304:15  310:7
311:25
313:22  315:6,
16  316:5, 10,
19, 21, 23
317:2, 3, 7, 8
318:6
**thinking**
28:20  245:24
**thinks**  308:11
**third**  14:20
118:20  149:4
256:24  257:7
272:1
**third-party**
178:9, 17, 24
180:7, 12
181:8, 19

251:2, 4
253:20, 22
269:6  270:4
280:17
**thirty**  322:14
**Thornburg**
3:8
**thought**  21:5
61:22  124:17
207:2
**thousand**
73:23  74:2
**threat**  197:5, 6
**Three**  2:23
9:20  39:12
114:22, 23
115:17
118:17
120:17  149:2
203:17, 22
204:5  205:3
226:12
244:23  257:7
265:8  274:3,
5  285:24
286:5  314:23
**three-bullet**
147:14
**Threshold**
114:4  115:4,
21  116:4
154:9
**thresholds**
117:8
**thrust**  117:16
**thumb**  292:18
**Thursday**  1:19
**time**  8:6  15:2,
5  17:5  20:14
32:14  37:10
42:5  48:6
56:11, 19
59:13, 20
60:2, 5  64:17,
23  65:14
72:2  84:3
85:16  100:2,
20  101:8, 16
102:12  110:3
111:1, 9
112:16

113:18
133:23  134:1
138:9  141:11,
14  150:10
163:22  170:5,
8  173:15
182:5  186:19
191:13
201:20
206:15
207:22  209:5
216:5  218:10,
13  225:9
228:15  239:5
248:6  263:19
267:8  283:11,
14  284:10, 16
287:15  288:3,
5  299:15
302:6  304:16
310:15  320:3
**timeline**  165:1
**timely**  33:24
35:7  36:5
38:1
**times**  10:4
34:5  37:16
68:19  197:10
205:12  246:5
247:8  256:10
257:6  274:3,
4  311:24
312:7
**Timothy**  16:22
**title**  89:9
153:9, 22
**titles**  290:9
**today**  9:8
10:7, 22
15:20  16:11
18:22  19:3
20:22  72:9
112:14
144:22
153:16  175:4,
15  177:25
179:12
208:15
218:23
239:13  240:4,
5, 21  241:17

242:5  293:14
297:22
299:11, 20
307:15  308:3
312:10
317:18, 23
**Today's**  8:5
16:1  321:12
**told**  49:3, 5, 6,
9  64:5  65:20
191:6  238:2
**tool**  315:21
**top**  63:4
148:23  152:7
247:10
257:10  265:9
278:15
**topic**  192:18
314:9
**topics**  59:20
**Torrent**  169:2
**Torrent's**
168:24
**totality**  271:9
**totally**  46:1
**toxic**  241:16
**toxicity**  149:16
**Toxicological**
114:4  115:4,
22
**toxicologist**
92:6  257:24
258:17
**toxicology**
72:21  117:6
**TPPs**  250:21,
24  251:19
252:1, 6, 13
253:1
**trace**  85:9, 25
89:24
**track**  139:16
**Trade**  3:3
279:16
**training**  286:6
**transcribed**
325:14
**Transcript**
19:8, 9  22:12
36:15  322:15,
16

**transcription**
324:7  325:15
**Transcripts**
19:4, 14, 20,
24  22:5, 16
23:4  275:4, 6
**transition**
273:2
**Traurig**  2:15
9:11
**treat**  253:24
**treating**
236:24
**treatment**
251:11, 22
**trial**  239:11,
20, 24  278:1
**trick**  23:2
**tried**  299:23
300:21
**triplicate**
273:23  274:1
**trouble**
137:25  273:17
**troubling**
143:1
**true**  10:5
18:1  69:22
70:1  93:8
127:19
139:24  183:9
218:2  219:16
224:3  245:18
255:23  259:9
272:3, 22
276:8  298:3
315:25  325:15
**truth**  182:3
325:10, 11
**truthfully**
10:22
**try**  45:22
78:9, 17  80:5
135:23
151:19
215:25
221:13
230:23  318:7
**trying**  23:11
24:5  35:24
43:4  49:14,

Confidential Information - Subject to Protective Order

15 50:5 54:4
61:9, 10 77:6
97:14 98:12
99:14, 24
101:5 114:25
131:24
132:19 143:6
146:12
151:17
158:19
162:20
166:20
212:14
214:19 215:8
220:1, 8
226:8 227:16
233:24
236:15
243:11 246:4
251:6 253:17
275:18 316:24
**TTC** 116:14,
18, 23
**turn** 29:8
30:2 57:25
94:16 113:22
129:5 157:8
225:16
230:21
249:11
272:10 314:15
**twice** 53:6, 24
**two** 12:8
13:4, 18, 23
14:7 15:14
16:2, 11
18:21 43:15
48:7, 18
49:24 61:13,
17, 19 99:10
100:11 122:7
156:24
164:17 184:4
188:25 204:2
212:4, 6
223:15
227:18 234:9
239:21
243:17
244:22
251:13 252:8

257:7 265:8
293:8 309:6
318:7
**Tylenol**
137:19 139:1
**Tylenols**
138:13
**type** 193:24
**types** 114:23
227:18
251:14 316:20
**typewriting**
325:14
**typical** 309:8,
17
**typically**
179:6 189:4
295:8
**typo** 43:19

< U >
**U.S** 4:2 48:8,
20 64:19
68:13 69:11
86:10 145:2
151:19
166:19
202:15
206:16
207:12 220:1,
9, 17 221:24
222:6 256:14
261:2 285:23
312:18
**UCSF** 287:8
291:3
**Uh-huh** 15:13
17:10 25:6,
11 26:13, 24
27:4, 8 28:14
29:11 32:18
33:12 42:4,
14 46:6, 10
48:21 51:7
65:5, 18
66:24 68:7
72:1 73:5, 22
74:13, 16
75:13 76:18
77:24 78:14
79:7 80:10

83:2 84:12
85:8 90:6, 15
105:2 109:4,
7, 15, 22
110:3 111:22
112:4, 13
114:7 115:21
119:6 123:10,
13, 24 124:10
127:21 131:7
132:3 133:3,
15 134:5, 24
135:10 137:8
138:8, 12
141:1 144:21
145:6, 13
148:21
149:20 150:8,
13, 15 158:23
159:13, 21, 25
161:23 166:2
168:7, 14
169:1, 8, 17
171:23, 25
172:7, 11, 25
173:4, 15, 20
174:16
175:11, 21
177:10 179:5,
18 180:4
182:7 183:4,
11, 16 185:13
186:3 188:8
189:6, 14
190:19 191:6,
16, 24 192:6,
8, 15 193:11
194:1, 6, 13,
18 195:2
197:21 200:7,
16, 25 202:16,
18 204:4
207:7, 13, 18,
21 208:11
210:14 214:7
217:5, 24
219:11
220:12, 22
221:7 222:9
224:3 229:4,
7 232:4

233:19
235:11, 17
237:1, 23
239:4, 12
242:2, 15
243:23 244:8
245:21 246:1,
8, 12, 17, 20
249:10 251:9
253:21
254:19
255:11
256:23
257:17 259:6,
11 263:4
264:5 266:1,
4 267:4
269:19, 23
273:3 274:9,
15, 18, 22
275:16, 25
276:9, 21
281:15 291:14
**ultimately**
40:8, 12
134:6 295:19
303:16
**ultratrace**
315:7
**unacceptable**
85:10 86:1
89:25 136:19
137:3 163:20,
23
**unacceptably**
207:3
**uncertain**
262:10 281:4
282:9, 10
**uncertainty**
207:2
**unclear** 101:25
**uncomfortable**
95:5
**undated** 5:20
**undercut**
307:20 308:18
**undergirding**
288:25
**undergraduate**
285:14, 15, 20

**underlying**
193:6
**understand**
10:6, 11, 13,
15, 17, 20
11:25 15:12
22:2 29:5
35:19 59:2
72:10, 15, 18
77:6 79:16
113:10
135:16
148:17
158:20 174:3,
7, 16 175:25
178:13 183:1
187:2 192:3
196:16
228:20 230:4
231:7 234:6
243:11
248:16, 19
250:14
251:16 252:3,
6 253:17
260:14
299:19 300:2,
5 313:22
321:3

**understandable**
46:1
**understanding**
21:16 23:7
26:6 30:1
33:10, 13
35:9 49:9, 14
69:1 75:6
76:15 77:3
92:6 94:23
95:2 114:18
117:2, 7
132:20 151:8
164:3 168:1
173:20
174:20, 23
177:13
181:23
192:11
199:10 200:4
219:6 240:23

Confidential Information - Subject to Protective Order

251:*3*  298:*17*
299:*13*  304:*1*
305:*9*  310:*17*
314:*1*  316:*18*
**understands**
230:*5*
**Understood**
14:*6*  16:*2*
22:*15*  79:*14*
129:*7*  158:*11*
166:*17*
228:*19*  277:*4*
283:*1*
**undertake**
33:*12*
**undertaking**
219:*18*
**undertook**
32:*21*
**undesirable**
208:*21*
**unexpected**
36:*24*  37:*3, 5,*
*16*  68:*17, 18*
121:*11*
147:*23*  190:*3,*
*4, 8, 10, 21*
191:*7*  210:*1*
264:*6*  317:*2*
**unfortunately**
86:*22*  211:*2*
247:*2*
**unidentified**
55:*12*
**unimportant**
228:*7*
**uninformed**
158:*6*  262:*19*
**unique**  316:*12*
**UNITED**  1:*1*
8:*10*  12:*19*
28:*11*  122:*19,*
*23*  263:*9*
289:*4, 25*
295:*10*
**universal**
127:*17*
**University**
285:*16, 19*
286:*4*  287:*2*

**unknown**
63:*6*  234:*10*
294:*11*
**unnecessary**
232:*3*
**unrevised**
12:*12*
**unscientific**
259:*22*
**unstudied**
116:*2*
**unusual**  48:*14*
52:*2*  65:*15,*
*16*  67:*23*
163:*22*
181:*24*
308:*18*  317:*2*
318:*24*
**update**  61:*7*
73:*4*  146:*10*
**updated**
13:*17*  110:*1*
127:*23, 25*
**updates**  15:*18*
**updating**
17:*12*
**upper**  104:*24*
**USA**  2:*8*
214:*15*
**use**  20:*9, 20*
41:*5*  48:*17*
177:*25*
179:*12*
181:*24*  187:*2*
222:*24*
229:*17*
230:*17*
231:*11, 13*
268:*12*
302:*20*
304:*12*
308:*22*  310:*9*
311:*7*
**useful**  252:*20*
**user**  157:*15,*
*23*  158:*20*
**users**  158:*5, 12*
**uses**  245:*2*
251:*1*
**USP**  6:*1, 3, 5*
12:*17*  86:*11,*

*15*  87:*17*
89:*10*  90:*7*
100:*10*  126:*1,*
*9, 25*  127:*3*
128:*17, 22*
131:*8, 13, 14,*
*19*  132:*13, 19*
133:*3, 12, 25*
134:*20*  135:*3,*
*6, 9*  140:*22*
145:*10, 12*
146:*4, 6, 8*
148:*11, 15*
149:*9, 21*
150:*12*
151:*20*  152:*8,*
*12, 25*  153:*25*
176:*25*
177:*11*
256:*14, 20*
260:*7*  268:*22*
269:*9, 15, 21*
284:*11*
288:*23*  289:*1,*
*3, 13*  290:*1, 5,*
*10*  292:*3*
297:*23*  302:*9*
312:*18, 22, 25*
313:*17*  314:*3,*
*11*  315:*17*
**USP-NF**  289:*4*
**usual**  71:*19*
**Usually**  82:*7*
119:*11*  281:*8*

**< V >**
**vague**  23:*17*
26:*16*  32:*1*
36:*7*  38:*3*
40:*16, 22*
41:*13*  42:*19*
50:*14*  55:*21*
57:*1*  58:*4, 24*
65:*8, 22*
67:*20*  73:*13*
74:*4, 20*
77:*10*  78:*3*
94:*1*  102:*3,*
*13*  108:*9*
111:*12*
112:*15*  115:*7,*

*23*  124:*4*
132:*8*  134:*14*
158:*3, 16*
159:*7*  161:*12*
162:*3*  163:*16*
167:*6, 19*
169:*13*
170:*18*
171:*16*
172:*17*  177:*4*
180:*20*  183:*7*
192:*9*  232:*21*
260:*22*  262:*4*
263:*20, 22*
265:*2*
**validate**  145:*8*
155:*17*
**validating**
148:*9*  155:*11*
**VALSARTAN**
1:*5*  6:*1, 14*
8:*8*  25:*23*
26:*14*  27:*10*
29:*13*  30:*11,*
*13, 20*  31:*4,*
*13, 23*  32:*12*
33:*14*  40:*13,*
*14*  41:*12*
42:*7, 18*
47:*11*  48:*1, 7,*
*19, 23*  49:*18,*
*22*  50:*12*
51:*1*  54:*7*
55:*7*  61:*6, 7*
63:*15*  65:*6*
67:*11, 18*
68:*5, 10, 24*
69:*4, 19*
74:*17*  76:*11,*
*20*  111:*10*
123:*2, 14, 25*
124:*12, 23*
125:*5, 14*
126:*2, 6, 16,*
*17, 19*  127:*19*
128:*17*  129:*1,*
*16, 20, 21*
130:*4, 13*
131:*2*  132:*4,*
*22, 24*  134:*1,*
*11*  140:*12, 23*

144:*22, 23*
145:*1*  146:*20*
149:*21*  150:*3,*
*10, 12, 14, 16,*
*22, 23*  151:*20*
161:*1, 9, 24*
163:*10, 14*
164:*7, 10, 14,*
*20*  165:*16, 20,*
*23, 24*  166:*3,*
*10, 13, 18*
167:*10, 16, 24*
168:*3, 24*
171:*1, 19*
173:*22*  174:*5,*
*13, 22*  175:*1,*
*8, 13, 18*
176:*2, 18*
177:*3, 12, 14*
178:*2, 18*
181:*18*
182:*23*
183:*18*  185:*7,*
*11, 21*  186:*5,*
*18*  187:*4*
188:*14, 24*
189:*15, 20, 25*
190:*22*
191:*18*
194:*20*  195:*4*
198:*15*
199:*24*  201:*7,*
*12, 13, 22*
202:*5, 18, 23*
204:*14, 21*
205:*12*  216:*9*
217:*9*  219:*14,*
*19*  220:*2, 10,*
*16*  221:*24*
222:*6*  232:*4,*
*6, 16, 18*
233:*7, 8, 23*
234:*1, 4*
235:*3, 8, 19,*
*20*  236:*8*
237:*2, 3, 25*
238:*3, 14, 17*
239:*1, 6, 8*
240:*7, 9, 20*
243:*24, 25*
248:*15, 18, 20,*

Confidential Information — Subject to Protective Order

25 249:3
250:22 252:2
253:2, 16
254:13, 15
255:4, 14
263:14
264:14, 24
267:22
307:13, 21
310:16 311:4
**valsartan-containing**
162:9 164:4
171:4 207:11
239:21 318:10
**valsartan's**
255:12
**value** 209:12
252:14, 18
253:1, 16, 20,
21 260:5
**Vanaskie**
197:3
**variables**
193:6
**various** 29:9
113:17 206:2
301:3
**vendor**
174:11, 25
175:6 178:10,
17, 25 180:7,
12 181:9, 19
294:10
**verbatim**
319:5
**verify** 155:17
**versa** 37:12
**version** 17:15
51:24 96:21,
22 97:1
99:25 102:21
117:11 278:5,
12
**versus** 37:19
111:18 279:3,
7, 12, 18, 22, 24
280:2, 7, 14,
16 281:14
**vice** 37:12
256:13

**VICTORIA**
2:13 301:13
**Video** 7:3
8:7 10:11
15:5 37:11
60:5 141:14
211:7, 9
218:13
283:14 284:11
**videographer**
4:16 8:1, 4
15:1, 4 60:1,
4 88:18, 21
141:10, 13
212:3, 9
218:9, 12
283:10, 13
321:10
**VIDEO-RECORDED**
1:15
**view** 70:13
82:19 110:4
172:23 318:17
**violated**
298:21
**violation**
134:25
**Violations**
6:18 212:23
217:3, 11
305:24
**violative**
247:19
**vis-à-vis** 56:25
**Vision** 279:24
**visiting** 295:8
**visual** 153:6
**Vitae** 7:1
**voluminous**
57:13
**voluntarily**
53:11 54:14
64:2
**voluntary**
51:3 52:15,
22 53:3
54:12 145:12
162:12 163:1,
11, 13 205:13

309:23

**< W >**
**Wait** 51:9
64:5 66:20
78:12 97:21,
22 105:11
146:12 160:2
188:6 197:25
214:19
239:14
267:11 272:1
273:17
277:13 304:19
**waiting** 36:12
**walk** 95:9
121:18 143:8
**Wallack** 3:20
**WALSH** 2:22
**Walter** 285:25
**want** 23:19
24:8 26:17
34:6 44:15
49:11 50:18
51:8 59:16
70:11 72:3, 5
76:23 78:25
79:14 83:17
84:7 85:16
94:4 96:18
97:1, 6 99:4
100:4 142:18
158:4, 8
170:3 181:25
192:25
195:23, 24
196:7 213:5
216:23 218:6
227:19
229:13
235:19, 20
238:10, 13
247:12
256:23 257:6
259:24 261:3
275:3 276:24
278:16
282:18, 21
283:1
**wanted** 17:22
23:6 83:4

130:8 152:1
179:4 188:4
202:10 213:3
253:18 255:14
**wants** 83:14
96:9 97:13,
14, 16 205:16
206:20 233:17
**warn** 280:4
**warning**
174:8 192:4,
12 194:10
199:5, 6
202:11, 19, 25
203:24 204:3,
12, 23 205:5,
18, 25 206:7,
10, 17 208:5,
6, 17 209:7,
10 215:18
216:7, 22
217:14, 24
295:11, 13, 23
318:20
**warranty**
250:8
**Washington**
237:12
**waste** 85:16
**watch** 212:11
**water** 241:10
259:24, 25
262:10, 13
**Watson** 186:9,
21, 23 187:5,
10, 14 188:1,
9, 12 304:15
**way** 26:13
27:21 36:17
47:17, 20
48:9 50:19
51:5 52:19
56:23 58:16
63:12 66:6
89:18 94:9
96:2 103:5
109:13 111:6
122:7 127:2
131:3 132:6
134:9 135:20
140:19

158:12
162:16
163:18
169:17 170:7,
8 179:18
187:19
188:19
199:14
215:19
219:25 220:7
221:13
234:19, 22
236:16 238:8
254:13 255:3,
13, 16, 21
274:25 277:3
278:22
291:18
295:13
303:21, 25
305:15
307:20 309:8
317:24 318:5,
8 320:17
325:20
**ways** 176:6
194:6 221:8
316:25
**webcast** 146:5
**webinar**
87:16 89:10,
13 100:15
284:11
**website** 310:8
**weeks** 31:17
65:15
**Welcome**
141:17
218:16 283:17
**well** 12:14
18:4 23:21
24:4 26:19
28:20 29:5
30:22 31:15,
24 32:5 34:7,
18 40:24
43:8, 13
44:18 46:13
49:4, 8 50:4
51:3, 12
52:10, 14, 17

Confidential Information - Subject to Protective Order

53:4, 9, 15
54:23  57:8
64:11  65:5
66:13, 20
68:18  69:22
70:9  71:5
72:6  74:7
75:13, 21
80:21  91:15,
24  93:6, 19
95:1  98:6
99:4, 8  100:1,
16  104:3
107:13
109:19  110:9
111:14, 18
112:4  115:25
117:16  118:9,
10  119:25
120:15  121:1
124:10
125:22  126:6,
14  127:24
130:25
132:16  133:6,
24  135:10
137:14, 25
143:15, 19
144:21, 25
150:11, 25
156:9  162:14
163:18  166:3
168:1, 11, 17,
18  170:10
171:3, 17
172:3  174:23
176:5, 11
177:17  179:3
180:20  186:8
187:13  188:5,
18, 21  190:2,
4, 10  192:10
193:21
194:10
196:23  197:2
198:16  199:6,
25  201:25
205:22
207:25
209:16
210:10

211:24
212:15
213:13  214:4
215:24
217:13  218:4
220:25
221:13
222:25
223:10  224:5
227:15, 24
228:4, 16
229:13
230:11, 21
233:2, 4
234:5, 24
235:17
236:11, 15
238:2, 13
239:12
241:19
242:22
245:22, 23
246:15
251:16
252:10, 19
254:8, 23
255:7, 23
258:15
259:21  260:4
261:13, 16, 18
263:25  264:5,
16  265:23, 24
268:7, 22
272:1, 4
274:2, 19, 20
275:12, 20
276:11
278:11
281:21
285:21
288:17
291:17  292:2,
3  298:7, 10
306:19
310:14, 23
311:21  314:3
315:5  316:7,
18, 24  319:5
321:12
**went**  43:15
50:10  53:16

60:20  113:17
137:25
155:24  168:6
202:11
205:18
236:25  285:16
**We're**  15:1, 4
18:14  23:9
39:23  41:2
43:12  45:1
53:17  54:13
59:17  60:1, 4
62:23  71:3,
25  76:5
81:12  82:5
84:9  92:8
95:18  97:19
113:4, 5
117:10
119:18  120:1,
6  121:9
126:15  130:8
138:25
140:11
142:21
144:18
166:24
196:20
213:13
216:20  219:7
229:13
231:11
232:11
233:24
243:11  248:3,
9  252:11
277:3  291:19
292:3, 10
315:6
**West**  3:3
**whatnot**  24:16
**whatsoever**
130:3, 9
**wheelhouse**
291:22
**whispering**
211:12, 22
**WHITELEY**
2:5
**willfully**
139:17

**WILLIAM**
3:20
**WILLIAMS**
1:17  5:12
7:1, 4  8:11,
21  9:5  10:25
11:1, 8, 22
12:4  17:23
20:20  23:3,
18  24:4, 20
28:18  34:10
35:25  39:1
53:23  62:9
72:6  83:21
85:20  86:22
93:20  94:8
96:12  97:17
98:3  99:6
135:2  136:14
141:17  143:9
197:9, 21
218:16
230:22  231:1
232:15
282:23
284:18, 24
289:21
292:13, 23
293:13
307:10
317:15  320:4,
8  321:13
324:14  325:8
**willing**  110:16
111:7  300:7
**wish**  12:16
13:3  51:11
62:5  107:10
126:23
**wishes**  24:12
52:20
**withdraw**
32:9  72:13
130:25
**Withdrawn**
72:13  213:20
**within-entitled**
325:11
**WITNESS**
1:16  8:13, 20,
22  14:22

18:6, 10
23:21  26:6,
19  27:21
28:20  29:16
30:16, 23
31:7  33:6
35:9  36:12,
17  38:6
40:24  41:15
42:21  50:18
51:20  55:11,
22  57:3  58:5
59:23  60:25
61:12  62:12
64:11  65:9,
23  67:5, 22
69:7  73:14
74:6, 21  76:1,
14, 23  77:13
78:6  79:25
80:21  82:4
84:2, 17  85:5,
21  86:6
87:12, 22, 25
88:5, 7, 10
89:1, 4  90:10
92:17  93:2
94:3  96:15
97:24  98:8,
10, 15  99:19
101:20  102:4,
15  103:10, 19
104:2  107:1,
19  108:10
111:14  112:4,
16  115:9, 25
116:25  118:3
121:9  122:6
123:19  124:5,
16  125:2, 10,
18  132:9
134:16
136:17  137:2,
14  139:15
141:7  142:17,
20, 22  143:5,
14, 20, 22
150:20  151:7,
17  158:4, 17
159:8  160:16
161:6, 13

162:*16*
163:*18*  165:*8*
167:*7, 20*
168:*11*
169:*14*
170:*19, 21*
171:*17*
172:*19*  176:*5,*
*21*  177:*5*
178:*13*
179:*23*
180:*22*
181:*12*  183:*1,*
*8, 24*  184:*8*
185:*1, 25*
186:*8*  189:*11*
190:*7, 16*
191:*3, 11*
192:*10*  193:*5,*
*18*  194:*24*
210:*17*  211:*8,*
*16, 24*  217:*19*
220:*4, 19*
221:*13*
232:*22*
235:*25*
236:*11*  237:*7*
238:*8, 22*
242:*18*  243:*7*
244:*5*  249:*6*
254:*23*  257:*3*
258:*15, 25*
260:*14, 24*
262:*5, 7*
263:*21*  265:*3*
266:*9, 17*
277:*16, 19*
284:*19*  285:*5*
287:*1*  289:*23*
290:*16, 18*
291:*3, 9, 17*
293:*23*  294:*1,*
*21*  296:*1, 19*
297:*11, 19*
298:*3, 23*
299:*17, 23*
300:*12, 21*
301:*10*
302:*12, 23*
303:*11, 20*
304:*15*

305:*18*
306:*19*
307:*17, 24*
308:*17*  309:*5,*
*16*  310:*2, 7,*
*14*  311:*7, 14*
312:*21*
317:*21*  318:*5*
320:*14*  322:*1*
325:*9, 12*
**Wmurtha@hill**
**wallack.com**
3:*22*
**wonder**  98:*23*
231:*18*
**Wonderful**
105:*14*
**Woodcock**
288:*5*
**Word**  45:*12*
48:*3*  91:*12*
162:*17*  213:*9*
227:*25*
**wording**
107:*20*  111:*5,*
*6*
**word-**
**processing**
45:*10, 20*
**words**  17:*1*
48:*17*  53:*19,*
*20, 23*  54:*5, 9*
66:*3, 7*  93:*16,*
*18*  108:*4, 11*
114:*20*  117:*1*
119:*5*  121:*17*
131:*25*
228:*14, 17, 24,*
*25*  229:*6, 7,*
*23*  230:*6, 8,*
*19, 23*  231:*12,*
*17*  233:*22*
311:*7*
**work**  20:*19*
28:*10*  35:*19*
47:*17*  48:*10*
53:*10*  66:*4,*
*10*  70:*25*
79:*2, 20*
92:*11*  93:*4*
100:*4*  113:*20*

145:*12*  157:*2*
191:*25*
243:*21*
268:*24*  271:*7,*
*9, 21, 24*
273:*5, 9, 12,*
*15*  276:*6, 17,*
*25*  287:*18*
291:*1*
**worked**  47:*20*
48:*22*  51:*4*
70:*19*  71:*18*
209:*2*  237:*10*
270:*3, 8*
287:*2, 19*
291:*4*
**working**  29:*9*
40:*25*  50:*8*
54:*16*  64:*2*
131:*23*
137:*25*
162:*19*
163:*19*
168:*17*
172:*21*
269:*15*  288:*3*
298:*5*  319:*7,*
*18*
**works**  52:*14,*
*19*  188:*19*
233:*21*
**world**  191:*6*
204:*22*
234:*19*
235:*17*  261:*3*
**worthless**
210:*3*
**write**  45:*16*
46:*23*  52:*12*
53:*5, 15*
162:*25*
231:*21, 24, 25*
232:*2*  268:*2,*
*12, 13*  276:*2*
**writing**  276:*5*
292:*5*  295:*9*
**writings**
291:*18*
**wrong**  51:*10*
130:*6*  160:*11*

210:*7*  243:*14*
320:*1*
**wrote**  45:*19*
46:*2*  52:*6, 17*
53:*6*  229:*23*
272:*20, 22*

**< Y >**
**yeah**  14:*15*
22:*24*  23:*21*
40:*12*  44:*7*
50:*18, 25*
51:*23*  67:*22*
69:*7*  78:*25*
84:*17, 25*
86:*13*  87:*15,*
*18*  88:*21*
89:*3*  94:*3*
99:*24*  101:*20*
103:*10*  115:*9*
116:*25*  122:*6*
133:*6*  139:*15*
150:*20*  151:*7*
153:*10*  159:*8,*
*16, 23*  161:*13*
162:*8*  169:*14*
181:*1*  183:*24*
185:*1*  191:*3*
198:*3*  204:*25*
205:*9*  225:*18*
226:*14*  243:*7*
246:*24*  248:*3*
257:*3*  273:*1*
275:*20*
279:*20*
282:*19*  293:*3*
313:*13*  315:*23*
**year**  13:*10*
96:*23*  129:*13*
191:*8*  198:*23*
271:*15*  287:*8*
290:*5*  317:*11*
**years**  35:*13*
39:*12*  137:*19*
215:*5, 12*
258:*1*  259:*8*
263:*11*
264:*17*
277:*24*  278:*3,*
*10*  285:*24*
286:*6*  288:*3*

289:*19, 20, 25*
306:*2, 5*
**Yep**  109:*15*
257:*9*
**yes/no**  60:*8*
**YOLO**  325:*2*

**< Z >**
**zero**  75:*10, 12,*
*19*  244:*2*
**Zhejiang**  4:*1*
63:*15*
**ZHP**  29:*7, 10,*
*12*  30:*3, 11,*
*12, 19*  31:*3, 9,*
*12, 20*  32:*16,*
*24*  33:*14*
40:*24*  41:*4,*
*17, 24*  42:*16,*
*23*  47:*9, 12*
48:*1, 4, 23*
49:*3, 9, 17, 23*
50:*16*  51:*2*
54:*16, 21*
55:*2, 5, 9, 18*
56:*25*  60:*22*
63:*5, 11, 15,*
*18, 19*  64:*6*
65:*6, 19*
66:*24*  67:*1, 4*
69:*2*  82:*2*
152:*3*  164:*8,*
*15*  179:*25*
186:*14, 17*
187:*3, 7*
188:*2, 13, 23*
189:*15, 20, 24*
190:*4, 11, 25*
191:*6, 12, 16*
192:*1, 13*
194:*18, 19*
195:*3*  197:*23*
198:*9, 18*
199:*3, 11, 18*
200:*2*  201:*14*
202:*11, 20, 25*
203:*24*
204:*13, 23*
205:*18*
206:*18*  209:*7,*
*10*  216:*7, 22*

Confidential Information - Subject to Protective Order

217:*1, 14, 24*
294:*10*  304:*8*
310:*25*
318:*20*  319:*8*
**ZHP-**
**containing**
 207:*5*
**ZHP's**  123:*2,*
*14, 25*  124:*12,*
*23*  125:*5, 13*
 186:*4*  188:*10,*
*13*  189:*15, 20,*
*24*  194:*20*
 198:*8, 15, 22*
 199:*1, 16, 24*
 208:*7*
**ZMICK**  4:*5*
**zoom**  89:*2*
 100:*1*  143:*12*
**zoomed**
 287:*23*