# Exhibit B

REDACTED

Confidential Information - Subject to Protective Order

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2

 3

         *****************************
 4       IN RE:  VALSARTAN, LOSARTAN,
         AND IRBESARTAN PRODUCTS        MDL No. 2875
 5       LIABILITY LITIGATION
 6       *****************************
         THIS DOCUMENT APPLIES TO ALL  HON ROBERT B.
 7       CASES                         KUGLER
 8       *****************************
 9                 - CONFIDENTIAL INFORMATION -
                  SUBJECT TO PROTECTIVE ORDER
10

11              Videotaped Deposition of PUNAM
12       ANAND KELLER, Ph.D., commencing at 9:19 a.m.
13       Eastern, on the 10th of March, 2022, at the
14       offices of Duane Morris, 100 High Street,
15       Boston, Massachusetts, before Maureen
16       O'Connor Pollard, Registered Diplomate
17       Reporter, Realtime Systems Administrator,
18       Certified Shorthand Reporter.
19

20                        - - -
21

              GOLKOW LITIGATION SERVICES
22         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
23

24
```

Confidential Information - Subject to Protective Order

Page 2

APPEARANCES:

GOLOMB & HONIK PC
BY:  RUBEN HONIK, ESQ.
    1835 Market Street, Suite 2900
    Philadelphia, Pennsylvania 19102
    215-327-9166
    ruben@honiklaw.com
    Representing the Plaintiffs

SLACK DAVIS SANGER, LLP
BY:  JOHN R. DAVIS, ESQ.
BY:  BETH QUESTAD, Paralegal (remotely)
    6001 Bold Ruler Way, Suite 100
    Austin, Texas 78746
    512-795-8686
    jdavis@slackdavis.com
    Representing the Plaintiffs

KANNER & WHITELEY, LLC
BY:  CONLEE WHITELEY, ESQ. (Remotely)
    701 Camp Street
    New Orleans, Louisiana 70130
    504-524-5777
    c.whiteley@kanner-law.com
    Representing the Plaintiffs

DUANE MORRIS, LLP
BY:  SETH A. GOLDBERG, ESQ.
BY:  ALEKSANDER SMOLIJ, ESQ.
BY:  DANA B. KLINGES, ESQ. (Remote)
    30 South 17th Street
    Philadelphia, Pennsylvania 19103
    215-979-1164
    sgoldberg@duanemorris.com
    dklinges@duanemorris.com
    Representing the Defendants Zhejiang
    Huahai Pharmaceutical Co., Ltd.,
    Prinston Pharmaceutical Inc., Huahai
    U.S., Inc., and Solco Healthcare US,
    LLC

Page 3

APPEARANCES (Continued):

DUANE MORRIS LLP
BY:  REBECCA BAZAN, ESQ. (Remote)
    505 9th Street, N.W., Suite 1000
    Washington, DC 20004-2166
    202-776-5253
    rebazan@duanemorris.com
    Representing the Defendants Zhejiang
    Huahai Pharmaceutical Co., Ltd.,
    Prinston Pharmaceutical Inc., Huahai
    U.S., Inc., and Solco Healthcare US,
    LLC

CROWELL & MORING LLP
BY:  DANIEL T. CAMPBELL, ESQ. (Remote)
    1001 Pennsylvania Avenue, NW
    Washington, DC 20004
    202-624-2774
    dcampbell@crowell.com
    Representing the Defendant Cardinal
    Health, Inc.

GREENBERG TRAURIG LLP
BY:  TIFFANY M. ANDRAS, ESQ.
    77 West Wacker Drive, Suite 3100
    Chicago, Illinois 60601
    312-456-1065
    andrast@gtlaw.com
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

HUSCH BLACKWELL LLP
BY:  SARAH ZIMMERMAN, ESQ. (Remote)
    190 Carondelet Plaza
    St. Louis, Missouri 63105
    314-345-6664
    sarah.zimmerman@huschblackwell.com
    Representing the Defendant Express
    Scripts, Inc.

Page 4

APPEARANCES (Continued):

GREENBERG TRAURIG, LLP
BY:  DOUGLAS JOHNSON, ESQ. (Remote)
    Terminus 200
    3333 Piedmont Road NE
    Suite 2500
    Atlanta, Georgia 30305
    678-553-2100
    johnsondo@gtlaw.com
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

WALSH PIZZI O'REILLY
BY:  CHRISTINE I. GANNON, ESQ. (Remote)
    Three Gateway Center
    100 Mulberry Street, 15th Floor
    Newark, New Jersey 07102
    973-757-1017
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY:  FRANK H. STOY, ESQ. (Remote)
    One Oxford Centre
    Pittsburgh, Pennsylvania 15219
    412-263-1840
    fhs@pietragallo.com
    Representing the Defendant, Mylan
    Pharmaceuticals, Inc.

Page 5

APPEARANCES (Continued):

NORTON ROSE FULBRIGHT US LLP
BY:  D'LESLI M. DAVIS, ESQ. (Remote)
    2200 Ross Avenue, Suite 3600
    Dallas, Texas 75201
    214-855-8000
    dlesli.davis@nortonrosefulbright.com
    Representing the Defendant McKesson
    Corporation

HINSHAW & CULBERTSON, LLP
BY:  GEOFFREY M. COAN, ESQ. (Remote)
    53 State Street
    Boston, Massachusetts 02109
    617-213-7047
    gcoan@hinshawlaw.com
    Representing the Defendant SciGen
    Pharmaceuticals

BARNES & THORNBURG, LLP
BY:  KARA KAPKE, ESQ. (Remote)
    11 S. Meridian Street
    Indianapolis, Indiana 46204
    317-231-6491
    kara.kapke@btlaw.com
    Representing the Defendants CVS
    Pharmacy, Inc., and Rite Aid
    Corporation

FALKENBERG IVES, LLP
BY:  MEGAN A. ZMICK, ESQ. (Remote)
    230 W. Monroe Street, Suite 2220
    Chicago, Illinois 60606
    312-566-4808
    maz@falkenbergives.com
    Representing the Defendant Humana

Page 6

1  APPEARANCES (Continued):
2
   BUCHANAN INGERSOLL & ROONEY PC
3  BY:  ASHLEY D.N. JONES, ESQ. (Remote)
       1700 K Street, N.W., Suite 300
4      Washington, DC 20006-3807
       202-452-7318
5      ashley.jones@bipc.com
       Representing the Defendant,
6      Albertsons, LLC
7
8  Videographer:  Alex Jandrow
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1
8     Three graphs, Monthly ZHP Rxs by
2     Valsartan Product................  181
3  9   Diovan (valsartan) Tablets,
      Highlights of Prescribing
4     Information......................  199
5  10   Excerpts of the Samuel Cisneros
      December 3, 2021 deposition
6     transcript.......................  210
7  11   MTD Opinion 3: Warranty Claim.....  225
8  12   2/3/22 invoice from Analysis
      Group.............................  234
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1               INDEX
2  EXAMINATION                      PAGE
3  PUNAM ANAND KELLER, Ph.D.
4  BY MR. DAVIS                       11
5
6
7          E X H I B I T S
8  NO.       DESCRIPTION          PAGE
9  1    Punam Anand Keller's bio from
        Analysis Group website............   19
10
11  2    January 12, 2022 Expert
        Declaration of Professor Punam
12       A. Keller, PhD....................   37
13  3    Report to GTMRx National Task
        Force: Building Vaccine
14       Confidence in the Medical
        Neighborhood.  Background and
15       Resources to Build Vaccine
        Confidence in the Health
16       Neighborhood, March 2001..........   60
17  4    Document titled Generic Drugs:
        Questions & Answers...............   79
18  5    Accutane label....................  138
19  6    May 13, 2013 Department of
        Justice press release, Generic
20       Drub Manufacturer Ranbaxy Pleads
        Guilty and Agrees to Pay $500
21       Million to Resolve False Claims
        Allegations, cGMP Violations and
22       False Statements to the FDA.......  142
23  7    Copy of 21 U.S. Code Section 331
24       - Prohibited Acts.................  172

Page 9

1              - - -
2       DEPOSITION SUPPORT INDEX
3              - - -
4  Direction to Witness Not to Answer
   PAGE  LINE
5  None.
6
7
8  Request for Production of Documents
   PAGE  LINE
9
10  245     15
11  Stipulations
    PAGE  LINE
12  None.
13
14  Questions Marked Highly Confidential
    PAGE  LINE
15  None.
16
17
18
19
20
21
22
23
24

Confidential Information - Subject to Protective Order

Page 10

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now
on the record.  My name is Alex
Jandrow, I'm a videographer for Golkow
Litigation Services.

Today's date is March 10, 2022,
and the time is 9:19 a.m.

This video deposition is being
held in Duane Morris LLP of Boston
Massachusetts in the matter of
Valsartan, Losartan, and Irbesartan
Products Liability Litigation, MDL
Number 2875, for the United States
District Court, District of New
Jersey.

The deponent is Punam Keller,
MD.

And the court reporter is
Maureen O'Connor Pollard.

Counsel will now introduce
themselves for the record.

MR. DAVIS:  John Davis and
Ruben Honik for the plaintiffs.

Page 11

MR. GOLDBERG:  Seth Goldberg on
behalf of the ZHP defendants and
defendants.

MR. SMOLIJ:  Alek Smolij on
behalf of the ZHP defendants.

MS. ANDRAS:  Tiffany Andras on
behalf of Teva and Actavis
Pharmaceuticals.

MR. DAVIS:  Good morning,
Dr. Keller.  How are you today?

///

PUNAM ANAND KELLER, Ph.D.,
having been duly identified and sworn, was
examined and testified as follows:

///

THE WITNESS:  And the first
thing I want to do is, it's not MD,
it's Ph.D.

EXAMINATION
BY MR. DAVIS:

Q.    Okay.  Let me try that again.
Good morning, Dr. Keller.  How
are you this morning?

A.    Good.  How are you?

Page 12

Q.    Okay.  Let me start just with
some background questions for you.
When were you engaged as an
expert in this case?

A.    In -- at the end of last year.

Q.    Okay.  So November, December?

A.    Yes, that period.

Q.    Okay.  Have you given testimony
under oath before?

A.    Yes.

Q.    Okay.  About how many times?

A.    Three, including this one.

Q.    Okay.  So two prior times.
Would that have been in the
capacity as an expert witness?

A.    Yes.

Q.    Your CV, I believe, lists two
Johnson & Johnson pelvic mesh cases.  Is that
what you're referring to for your past
testimony?

A.    Yes.

Q.    Okay.  Have you offered an
expert report in a case where you have not
been deposed under oath?

Page 13

A.    Yes.

Q.    About how many times?

A.    Three.

Q.    Okay.  And the -- going back to
the J&J pelvic mesh cases, on whose behalf
did you submit an expert report?

A.    Defendants.

Q.    That would be the Johnson &
Johnson defendants?

A.    Johnson & Johnson/Ethicon.

Q.    Which is a subsidiary of
Johnson & Johnson?

A.    Yes.

Q.    To the best of your
recollection, what did those expert opinions
relate to?

A.    They related to my expertise on
consumer decision-making.

Q.    In the context of evaluating
Ethicon/J&J's marketing of their pelvic mesh
products?

A.    Could you repeat that question?

Q.    Sure.
Would that have been in the

Confidential Information — Subject to Protective Order

Page 14

1 context of J&J and Ethicon's marketing and
2 promotion of their pelvic mesh products?
3    A.    Could you be more specific?
4    Q.    Well, sure.
5         Why don't you tell me what
6 your -- what you were evaluating from a
7 consumer decision-making standpoint regarding
8 Ethicon's pelvic mesh products.
9    A.    I was providing opinions on how
10 consumers -- the range of consumer responses
11 to Ethicon's marketing communication for the
12 pelvic mesh.
13    Q.    You mentioned Ethicon's
14 marketing communications.  Can you describe
15 to me what those included?
16    A.    It's been a while.  So to the
17 best of my recollection, it was brochures,
18 and I don't remember anything else.
19    Q.    Okay.  Brochures like the
20 product labeling, or handouts to physicians?
21    A.    I don't recall.
22    Q.    Okay.  Did you do any kind of
23 empirical study, like a survey, in that case?
24    A.    That was not my -- no, that was

Page 15

1 not my task.
2    Q.    Okay.  Have you ever done a
3 damages analysis as an expert in a
4 litigation?
5    A.    Define what you mean by
6 "analysis."
7    Q.    Have you ever been tasked, for
8 example, with calculating the amount of
9 litigation damages in a case?
10    A.    No.
11    Q.    Okay.  Have you -- I believe
12 you may have answered this indirectly, but
13 you said you did not do a survey or other
14 empirical study of any kind in the J&J case.
15 Have you ever done a survey or empirical
16 study of any kind in litigation in an expert
17 capacity at all?
18    A.    No.
19    Q.    Okay.  Have you ever conducted
20 a survey or some other kind of empirical
21 study outside the context of litigation?
22    A.    Yes, frequently.
23    Q.    Frequently.
24         Okay.  Describe for me, just

Page 16

1 walk me through briefly your educational
2 background, if you don't mind.
3    A.    I have a bachelor's in -- from
4 -- it used to be called Bombay University,
5 because that was the name of the city, it's
6 now been changed to Mumbai, but it was first
7 Bombay University.  And I majored in
8 economics and statistics, and -- major in
9 economics, minor in statistics.
10         And then I got an MBA with a
11 major in marketing also from Bombay.  The
12 name of the school also has been changed a
13 little bit, but it used to be called, in
14 short, JBIMS.
15         And then I came to get a Ph.D
16 in marketing from Northwestern University in
17 the Kellogg school of management.
18    Q.    Thank you.
19         So your postgraduate degrees,
20 meaning your MBA and Ph.D, those are in the
21 field of marketing?
22    A.    Yes.
23    Q.    Okay.
24    A.    I'd like to just add with, my

Page 17

1 specialization is consumer behavior.
2    Q.    Okay.  I've seen that variously
3 referred to as consumer psychology.  Similar
4 concept?
5    A.    Yes.
6    Q.    Okay.  Did you go straight to
7 academia after obtaining your postgraduate
8 degrees?
9    A.    Yes.
10    Q.    Okay.  Walk me through just
11 very briefly that history, if you don't mind,
12 and conclude with what you're doing
13 currently.
14    A.    I -- upon graduation from the
15 Ph.D program, I have held marketing positions
16 in multiple institutions.
17         Do you need a list of all the
18 institutions?
19    Q.    I don't believe so, but let me
20 clarify.
21         You said "marketing positions."
22 You mean like faculty?
23    A.    Yes, I was a marketing
24 professor.

Confidential Information - Subject to Protective Order

Page 18

1    Q.    Marketing professors.
2         Okay.  And you're currently a
3 professor of marketing at Dartmouth?
4    A.    At the Tuck School of Business
5 at Dartmouth.
6    Q.    Do you teach undergrad or
7 graduate students there?
8    A.    Both.
9    Q.    Both.  Okay.
10        All marketing classes?
11   A.    All related to marketing.
12   Q.    Okay.  My next question was
13 what's your research focus, but I believe you
14 answered that by telling me it's consumer
15 behavior and consumer psychology.  Is that
16 how you would describe your research focus?
17   A.    That would be the broadest
18 description.  A more specific description
19 would be with an emphasis on how consumers
20 process information, form attitudes and
21 beliefs, intentions to purchase, and purchase
22 products and services.  And the two contexts
23 that I study are health and financial
24 well-being.

Page 19

1         MR. DAVIS:  Okay.  I'm going to
2 mark Keller Exhibit 1, which I'm
3 handing to the reporter.
4    A.    Thank you.
5         (Whereupon, Keller Exhibit
6         Number 1 was marked for
7         identification.)
8 BY MR. DAVIS:
9    Q.    Do you recognize that as a web
10 bio for you, Dr. Keller, from the Analysis
11 Group website?
12   A.    I have actually not seen this
13 on the website before, but, okay.
14   Q.    So your testimony is you've
15 never seen this bio for you that's on the
16 Analysis Group website?
17   A.    No, I didn't say that.  I know
18 that they sought approval for putting my bio
19 on their website, and they asked me for some
20 information, and my recall is that I approved
21 it.  But I didn't actually see it on the
22 website.
23   Q.    Okay.  So under -- there's a
24 paragraph under "Summary of Experience"

Page 20

1 there.  Did you draft that and provide that
2 to them?
3    A.    I don't recall.
4    Q.    Okay.  But you did say you
5 approved the content, I suppose, right?
6    A.    Yes.
7    Q.    Okay.  It says that "Professor
8 Keller is an expert in consumer information
9 processing and choice behavior.  She studies
10 the application of social marketing
11 principles and behavioral theory in consumer
12 and employee contexts, with a focus on
13 designing and implementing consumer
14 communication programs."
15        Did I read that correctly?
16   A.    Yes.
17   Q.    Do you agree with that
18 description of your expertise?
19   A.    It's a subset of my expertise,
20 yes.
21   Q.    When you say "a subset," what
22 do you mean by that?
23   A.    I just shared, you know, I have
24 broad expertise that goes beyond how

Page 21

1 consumers process information.  It also
2 includes how consumers form attitudes and
3 beliefs, intentions to purchase, and purchase
4 behavior of products and services.
5    Q.    Okay.  So this -- you would say
6 that this description that I just read
7 from your Analysis Group bio would be sort of
8 a subset, as you say, of your broader
9 expertise in the field of consumer behavior?
10   A.    Yes.  I view it as a summary.
11 Like any summary bio, it is not going to be
12 exhaustive.
13   Q.    Have you ever taught an
14 economics class, Dr. Keller?
15   A.    No.
16   Q.    Do you have any postgraduate
17 degrees in economics?
18   A.    No.
19   Q.    Do you research in the field of
20 economics?
21   A.    Please be more specific.
22   Q.    Well, does any of your
23 research -- would you characterize any of the
24 research that you've done or publications

Confidential Information - Subject to Protective Order

Page 22

1  that you've authored, have they been in the
2  field of economics?
3      A.   Yes, in the field of behavioral
4  economics.
5      Q.   Explain what you mean by
6  "behavioral economics."
7      A.   So -- and I'm going to try to
8  simplify things, and just for the purposes of
9  comparison.
10         By no means do I want to say
11 that what I'm saying is an exhaustive
12 description of both fields because that would
13 take us many, many days.
14         From my point of view, and many
15 others, economics -- when economists, or in
16 the field of economics, when they study
17 consumers they use utility theory, and the
18 field of behavioral economics was formed
19 because utility theory was inadequate to
20 explain consumer behavior.
21         To the best of my recollection,
22 there are at least four Nobel Prize winners
23 in the four economic sciences, the Nobel
24 Prize in economic sciences that work on

Page 23

1  behavioral economics."
2      Q.   Okay.  But I guess if I'm
3  understanding you correctly, and keeping it
4  high level, when you say "behavioral
5  economics," you're still -- that still falls
6  within the field of consumer behavior,
7  correct?
8      A.   It is, and beyond.  So I have
9  co-authors that are behavioral economists
10 that are in the economics department.
11     Q.   But your focus would be on the
12 behavioral aspect of it, correct?
13     A.   In large part, yes.
14     Q.   Okay.  Are you on any review
15 boards, editorial boards, or do you have any
16 peer-review duties for any economics-related
17 journal?
18     A.   Yes.  And I want to give you an
19 example.  The Journal of Consumer Research,
20 for which in the past I was an area editor,
21 which is even higher than an editorial board
22 member, and have been on the editorial board
23 for many years until recently, is made up of
24 multiple subdisciplines such as psychology,

Page 24

1  sociology, economics, and anthropology.
2      Q.   Can you think of any other
3  journals, or is that the one?
4      A.   So Journal of Consumer
5  Psychology is similar.  Many of the journals
6  are multidisciplinary, and so it's hard for
7  me to separate the disciplines.
8      Q.   You said that there were
9  multiple subdisciplines, for example, for the
10 Journal of Consumer Research.  Was your --
11 and I think you said you were an area editor?
12     A.   Correct.
13     Q.   Okay.  What do you mean by
14 "area editor"?
15     A.   So the review process varies
16 for different journals, but a common review
17 process is when a paper is submitted for
18 review for possible publication in the
19 journal, the editor works with the area
20 editor to determine who those reviewers will
21 be, and after the reviews are -- after the
22 reviews do their peer reviews, the area
23 editor gets all of the reviews and makes a
24 recommendation to the editor for the

Page 25

1  progression of that manuscript for maybe a
2  revision, rejection, acceptance, etcetera.
3      Q.   So by "area editor," is that by
4  -- sort of by discipline?  "Area" means sort
5  of discipline, and you would assign out --
6  you would, as the area editor, say you got a
7  manuscript in, you would review the
8  manuscript and say, Oh, well, this pertains
9  mostly to the psychological subdiscipline, so
10 I'm going to send it over to this particular
11 reviewer?  Is that sort of how it works?
12     A.   It's quite close, yes.
13     Q.   Okay.
14     A.   You try to find reviewers who
15 are experts in the subject matter of the
16 article -- sorry, of the paper, not an
17 article yet, so that they can provide an
18 expert opinion.
19     Q.   Okay.  So as the area editor,
20 you would not have been doing the peer
21 reviewing yourself, you would have been
22 assigning it out to peer reviewers based on
23 their area of expertise?
24     A.   I write a separate report, and

1 that also in that report includes my own
2 review of the article. And it's, I would
3 say, similar to what I would do as a reviewer
4 on the editorial review board.
5      Q.    Okay. Putting aside your
6 behavioral economics, you wouldn't hold
7 yourself out as an expert in economic theory,
8 would you?
9      A.    Please define what you mean by
10 "economic theory."
11      Q.    Well, sure. I mean, would you
12 agree that the field of economics, like
13 there's, for example -- let me strike that.
14          There's an economics department
15 at Dartmouth, for example, correct?
16      A.    Yes.
17      Q.    Okay. And you said you've
18 never taught an economics class there?
19      A.    Correct.
20      Q.    Okay. Or anywhere, correct?
21      A.    Correct.
22      Q.    Okay. For any of the course
23 subject matter that would be subject to a
24 Ph.D in economics, you wouldn't characterize

1 yourself as an expert on any of that, would
2 you?
3      A.    I'm sorry, what do you mean by
4 "any of that"?
5      Q.    Well, any -- let me reframe.
6          So you had to do quite a bit of
7 work to get your Ph.D in marketing, correct?
8      A.    Yes.
9      Q.    Okay. Would you imagine that
10 there's -- to get a Ph.D in economics, you
11 have to also do quite a bit of work that's
12 different?
13      A.    Yes. And I'm sure there's some
14 overlap as well.
15          For example, in a Ph.D program,
16 and I was in a Ph.D program in the business
17 school where people were getting their Ph.Ds
18 with different specializations, and we all
19 had to take core classes, so our core classes
20 overlapped. And then we had what you might
21 call elective, so they're not called that in
22 a Ph.D program. So we all had core classes,
23 and then elective classes for our
24 specialization. Yeah.

1      Q.    Sure. I don't disagree with
2 you that there's some level of crossover, but
3 do you agree that economics is a separate and
4 distinct discipline from marketing?
5      A.    I do not. Marketing is really
6 a combination of multiple disciplines, which
7 is why the premier journal, the Journal of
8 Consumer Research, has in their description
9 of why the journal was formed was to
10 encourage researchers from multiple
11 disciplines, including economics, to study
12 the intersection between consumer research
13 and economics, because we're talking about
14 economics, it's true also for psychology,
15 anthropology, etcetera.
16          So it is very difficult for me
17 to say that as a consumer researcher that I
18 don't have any knowledge of economics.
19      Q.    I'm not saying that you don't
20 have any knowledge of economics. I'm just
21 asking if you would agree that it's a
22 separate discipline.
23      A.    Is there a separate degree in
24 economics, yes.

1      Q.    Okay. And, for example, at
2 Dartmouth there's a separate department of
3 economics that has a separate faculty of
4 professors and Ph.Ds who teach economics,
5 correct?
6      A.    Yes. And since the time that
7 I've been at the Tuck School of Business at
8 Dartmouth, three of the faculty members from
9 the department of economics at Dartmouth
10 College in the college of arts and sciences
11 are now faculty members in the Tuck School of
12 Business.
13      Q.    Okay. Faculty members of what
14 exactly?
15      A.    We are all faculty members of
16 management with subspecialties.
17      Q.    Okay. And their subspecialty,
18 for example, would be the economics side of
19 what you would study to get an MBA from Tuck,
20 correct?
21      A.    Yes.
22      Q.    Okay. Do you have any what I
23 would call -- well, are you familiar with the
24 prescription drug approval process in the

Confidential - Information Subject to Protective Order

Page 30

```
1   United States?
2       A.    I am not an expert, and don't
3   have an opinion on that.
4       Q.    Okay.  You do some
5   health-related messaging initiatives, though,
6   don't you?  And you study -- I believe you
7   said one of your consumer behavior sort of
8   sub-research interest was health choices,
9   correct?
10      A.    Yes.
11      Q.    Okay.  So does that -- do you
12  have some level of knowledge of how
13  prescription drugs are approved in the US?
14      A.    I am an expert on how consumers
15  make health-related decisions.  I am not an
16  expert on the approval process for health
17  products and services.
18      Q.    Okay.  Do you know what an NDA
19  is, for example?
20      A.    No.
21      Q.    What about an ANDA?
22      A.    No.
23      Q.    Okay.  Do you at least have an
24  understanding that prescription drugs can't
```

Page 31

```
1   just simply be sold in the United States,
2   that they actually have to go through a
3   pre-approval process?
4       A.    Yes.
5       Q.    You shrugged a little bit
6   there.  Is there some level of confusion
7   or...
8       A.    I shrugged because there were
9   two questions, but I decided to answer
10  because it was approval and pre-approval.
11  And that's okay.
12      Q.    Sure.  And if any of my
13  questions are unclear, just ask me for
14  clarification.
15      A.    Thank you.
16           MR. HONIK:  Before you proceed.
17      Maureen, I have an e-mail from someone
18      saying they're waiting to get in.  I
19      don't know who is letting people into
20      the Zoom.
21           THE WITNESS:  Clearly I'm not.
22           THE VIDEOGRAPHER:  Do you want
23      to go off the record so I can let them
24      in?
```

Page 32

```
1            MR. HONIK:  You can stay on.
2       It will just take a second, right?
3       Thank you.
4            Sorry for the interruption.
5            (Pause.)
6   BY MR. DAVIS:
7       Q.    Okay.  So just to clarify my
8   last question, you do understand that
9   prescription drugs have to be pre-approved in
10  the US, but I think your testimony is that
11  you don't know much beyond just that fact, is
12  that right?
13           MR. GOLDBERG:  Objection to
14      form.
15      A.    That is not what I said.  You
16  asked me the question, and I answered it.
17  And you did not ask me about anything beyond
18  that, because that is vague, I don't know
19  what beyond that means.
20  BY MR. DAVIS:
21      Q.    Okay.  So, well, let me
22  rephrase it.
23           What you're saying is you're
24  generally familiar with the fact that
```

Page 33

```
1   prescription drugs have to be pre-approved in
2   the US, but you are not familiar with the
3   details of how that happens?
4       A.    I am not an expert on the
5   pre-approval or the approval process --
6       Q.    Okay.
7       A.    -- for prescription drugs.
8       Q.    And likewise, is it your
9   testimony that you would not have any
10  expertise in FDA regulations regarding
11  prescription pharmaceuticals after the point
12  of approval?
13      A.    Could you repeat that?
14      Q.    Sure.
15           Would it likewise be your
16  testimony that you don't have any particular
17  expertise regarding FDA regulations of
18  prescription pharmaceuticals after the point
19  of approval?
20      A.    I don't understand the
21  question.
22      Q.    Sure.
23           Do you understand that there
24  are FDA regulations of approved prescription
```

Confidential Information - Subject to Protective Order

Page 34

1 pharmaceuticals?
2    A.    Yes.
3    Q.    Okay.  Have you studied them in
4 any detail?
5    A.    You would have to be more
6 specific.
7    Q.    Have you studied those FDA
8 regulations that you just testified existed
9 in any detail?
10    A.    What does it mean "in any
11 detail"?
12    Q.    Have you looked at the -- for
13 example, have you looked at Title 21 of the
14 Code of Federal Regulations?
15    A.    No.
16    Q.    Okay.  Have you looked at any
17 FDA regulations regarding prescription
18 pharmaceuticals?
19    A.    You would need to be more
20 specific.
21    Q.    Sure.
22        You testified you were retained
23 in this case in, I think, November or
24 December of last year you said, correct?

Page 35

1    A.    Yes.
2    Q.    Since that time, do you recall
3 looking at, as part of your work on this
4 case, any FDA regulations regarding
5 prescription pharmaceuticals?
6    A.    As is outlined in my report, I
7 looked at some FDA-sourced material related
8 to the valsartan recall.
9    Q.    That would be FDA announcements
10 and the like specifically related to
11 valsartan, correct?
12    A.    To the best of my recall, yes.
13    Q.    Okay.  Do you recall looking at
14 any FDA regulations of general applicability
15 to prescription pharmaceuticals as part of
16 your work in this case?
17    A.    Not that I recall.
18    Q.    Do you know what cGMPs are?
19    A.    I know what the acronym stands
20 for.
21    Q.    Okay.  What is that?
22    A.    Current manufacturing -- sorry,
23 current good manufacturing practices.
24    Q.    Okay.  Have you actually looked

Page 36

1 at what the FDA regulations are regarding
2 cGMPs?
3    A.    I am not an expert on
4 manufacturing processes.  I'm an expert on
5 consumer decision-making.
6    Q.    Okay.  Have you reviewed any
7 FDA or congressional definitions of
8 adulteration and misbranding of drugs?
9    A.    First, those were multiple
10 questions.  Could you ask, and be specific.
11    Q.    Sure, I'll break it down.
12        Have you reviewed any FDA or
13 congressional definitions of "adulteration"?
14    A.    No.
15    Q.    Okay.  Same question for
16 "misbranding."
17    A.    No.
18    Q.    You don't have any expertise in
19 chemistry, do you?
20    A.    Please define "expertise in
21 chemistry."
22    Q.    Have you studied chemistry
23 ever?
24    A.    Only in school, high school.

Page 37

1    Q.    Okay.  So you would not call
2 yourself an expert chemist?
3    A.    No.
4    Q.    How about toxicology?
5    A.    I would not consider myself an
6 expert in toxicology.
7    Q.    I'm going to mark your report,
8 Dr. Keller, as Exhibit 2.
9        (Whereupon, Keller Exhibit
10 Number 2 was marked for
11 identification.)
12        MR. GOLDBERG:  She has a copy
13 of it.
14    A.    A copy of my report, yes.  It's
15 okay, I'm happy to use yours.
16 BY MR. DAVIS:
17    Q.    You can keep mine, the marked
18 copy, but if you feel more comfortable
19 reviewing yours, that's fine.
20    A.    No, I'm fine with either copy.
21        MR. DAVIS:  Do you want a copy,
22 Seth?
23        MR. GOLDBERG:  I'll take it
24 just for recordkeeping purposes.

Case 1:19-md-02875-RMB-SAK   Document 2083-3   Filed 06/02/22   Page 12 of 65
confidential Information - Subject to Protective order
PageID: 72301

Page 38

1    Thank you.
2  BY MR. DAVIS:
3    Q.    Do you recognize what I've
4  handed to you as your expert report in this
5  case?
6    A.    Yes.
7    Q.    Okay.  In drafting that expert
8  report, did you familiarize yourself at all
9  with Federal Rule of Civil Procedure 26 which
10 governs the use of an expert report in
11 federal court litigation?
12   A.    No, I did not do it for this
13 case, but I did in the past when I had to
14 create an expert witness report.
15   Q.    I'm going to read a statement
16 from that rule, and I'm going to ask you if
17 you feel your report complies with that.  It
18 says, "The report must contain a complete
19 statement of all opinions the witness will
20 express, and the basis and reasons for them."
21       Do you feel that your report
22 complies with that provision of Rule 26?
23   A.    Yes.
24   Q.    Okay.  Thank you.

Page 39

1       So there are no opinions that
2  you would be seeking to offer in this case
3  that are not in your report, is that correct?
4    A.    Yes.
5    Q.    And you've cited everything
6  that -- to the best of your ability, you've
7  cited everything that would support your
8  opinions in that report?
9    A.    No, I cannot cite everything
10 that would support my opinions.  This is a
11 subset of citations that would support my
12 opinions.
13   Q.    Sure.  Let me reframe the
14 question.
15       Are there any cites that are
16 out there that you intended to put in your
17 report that didn't make it in, to the best of
18 your memory and knowledge?
19       MR. GOLDBERG:  Objection to
20 form.
21   A.    Yeah, I don't know how to
22 answer the question.
23 BY MR. DAVIS:
24   Q.    Well, I'm just asking, and

Page 40

1  maybe I should rephrase it, is, are there any
2  citations out there to anything that you
3  neglected to put in your report that you want
4  to tell me about today?
5    A.    Well, I did not cite many of my
6  own publications because I felt that my
7  experience and my opinions reflected that
8  research expertise.
9    Q.    Okay.  So with the exception of
10 your research in publications, is there any
11 citation that's not in your report that you'd
12 like to tell me about today?
13   A.    No.
14   Q.    Okay.  I believe your report is
15 signed January 12, 2022, is that right?  I
16 believe that would be on the last page of
17 your report.
18   A.    Yes.
19   Q.    Do you recognize that as your
20 signature?
21   A.    This one isn't signed.
22       MR. DAVIS:  Seth, do you know
23 why that would be?
24       MR. GOLDBERG:  I don't.  I

Page 41

1  don't know how you would have a not
2  signed copy.  That's interesting.
3       Can I see what you have there?
4       THE WITNESS:  (Handing).
5       MR. DAVIS:  It looks like it's
6  a digital signature.  Perhaps it just
7  got -- when it got printed, that got
8  removed from the printing.
9    A.    My copy is signed.
10 BY MR. DAVIS:
11   Q.    My electronic copy is also
12 signed, so it must be a printing error.
13       Okay.  So looking at --
14   A.    Can I have --
15       MR. HONIK:  Here's one with a
16 signature if you want it.
17       MR. DAVIS:  Should we trade
18 out?
19       MR. GOLDBERG:  Sure.  We can do
20 that later.
21 BY MR. DAVIS:
22   Q.    So when you signed your report
23 on January 12, 2022, did you feel that you
24 had set forth your complete statement of your

Confidential Information - Subject to Protective Order

1   opinions and the basis and reasons for them?
2       A.    Yes.
3       Q.    Okay.  You didn't do any kind
4   of survey or empirical study as part of your
5   assignment in this case, did you?
6       A.    No, because I felt that there
7   was evidence from consumers as well as
8   literature from consumers that were
9   sufficient to support my opinions.
10      Q.    We'll get into that a little
11  bit later.
12            But your answer is no, you did
13  not do a survey or any kind of empirical
14  study as part of your assignment in this
15  case?
16      A.    Yes.
17      Q.    Okay.  Have you been asked to
18  at some point in the future?
19      A.    No.
20      Q.    I think you said earlier that
21  you've done some consumer messaging in the
22  field of healthcare, is that correct?
23      A.    Yes.
24      Q.    Okay.  Can you describe that

1   work generally to me?
2       A.    I use my expertise in consumer
3   decision-making to design communications that
4   would create value for consumers.
5       Q.    And I think -- so is it fair to
6   say that that messaging is directed to
7   consumers specifically?
8       A.    In large part.  I have also
9   done work to design health communication to
10  physicians to help them create value for
11  consumers.
12      Q.    What was -- let's start with
13  the messaging to consumers that you
14  described.  What would be the substance of
15  those messaging campaigns that you've
16  designed?
17      A.    As I've stated in my report,
18  message factors are part of one of my
19  frameworks, acronym MICI -- that stands for
20  message-individual-contextual factors and the
21  interaction between those -- are very
22  important, so the message part of that is
23  very important for consumers to consider as
24  inputs when they are making a health product

1   or service valuation.  And the messages
2   contain information on the benefits and the
3   costs of the advocated action to help
4   consumers make the value determination.
5       Q.    Well, let's move away from the
6   theoretical for a moment.
7             And on the specific sort of
8   messaging that you've designed for healthcare
9   consumers, can you give me some examples of
10  what the substance of those messages conveyed
11  to them were?
12      A.    So first I object to it being
13  characterized as "theoretical," because it is
14  also very practical.
15            And an example of the message
16  would be, you know, here are the benefits of
17  following -- in the message, there's a
18  portion of the message that would focus on,
19  Here are the benefits of following the
20  advocated recommendations.
21      Q.    Let me --
22      A.    For example --
23      Q.    I didn't mean to cut you off.
24      A.    For example, one of my studies

1   is on encouraging women to get a -- to get
2   screened regularly for mammograms, and so,
3   you know, I would list the benefits of
4   getting a mammogram, and then also try to
5   anticipate some of the costs from a consumer
6   point of view and try to overcome those.
7             So, for example, a potential
8   cost for a consumer might be the discomfort
9   or pain from the mammogram testing procedure,
10  and in my message I might include some coping
11  methods for that, including managing
12  expectations and maybe, you know, asking them
13  to check to see if they can take pain
14  medication and the like.
15      Q.    Okay.  So you've given me an
16  example, I believe, of an advocated
17  recommendation, I believe that's the term you
18  used, and that's getting screened for a
19  mammogram.  That would be an example of an
20  advocated recommendation --
21      A.    Yes.
22      Q.    -- is that correct?
23            For mammograms, let's run with
24  that example.  For a mammogram, are there any

Confidential Information - Subject to Protective Order

Page 46

1   sort of guidances or anything similar to that
2   about when and how often individuals should
3   get screened?
4       A.   Yes.
5       Q.   Okay.  Would some of the
6   content that's conveyed with that advocated
7   recommendation, for example, cite to those
8   guidances around compliance and the like?
9       A.   In the mammogram example,
10  because there are multiple guidelines -- and
11  this again supports my MICI framework because
12  based on some individual differences such as
13  your age, your health status, for example, or
14  history of breast cancer, or cancer as
15  another example, contexts in which the
16  decision is made, you know, whether it is --
17  whether one has a relationship with a primary
18  care physician or specialist, all of those
19  factors are considered in the design of -- in
20  my research, in the design of multiple
21  communication that is tailored to different
22  audiences.
23      Q.   So I believe you said that
24  there was -- there were some guidances, for

Page 47

1   example, about when and how often to get
2   screened for a mammogram, correct?
3       A.   Yes.
4       Q.   Okay.  Who issues those
5   guidances?
6       A.   I don't know.  I work with
7   physicians, or someone from the medical
8   community, that gives me the information, and
9   I use that information in the messages.
10          When I have to do an experiment
11  where it's a hypothetical situation, I
12  don't -- you know, I go through a human
13  subject review committee.
14          When it's in a practical
15  context, there are other reviewers.
16      Q.   So I believe you said you did
17  use that information regarding when and how
18  often to get screened in the messages you
19  designed, for example, in this instance for
20  mammograms, correct?
21      A.   Yes.
22      Q.   Okay.  Have you done any
23  similar messaging for pharmaceutical
24  products?

Page 48

1       A.   Yes.
2       Q.   Does the messages supporting
3   the advocated recommendation for
4   pharmaceuticals often center around
5   compliance?
6       A.   Sorry, I don't understand the
7   question.
8       Q.   Sure.
9           For pharmaceuticals that you've
10  given advocated recommendations for, has the
11  messaging accompanying the advocated
12  recommendation often incorporated messaging
13  around patient compliance, i.e., you know,
14  staying on schedule with the drug and
15  following -- you know, taking it as
16  prescribed, etcetera?
17      A.   The study that's coming to my
18  mind now as I answer your question, so the
19  answer is yes, and I'm going to qualify it.
20          It's for a diabetes medication,
21  and my messaging is text messaging, and there
22  are over 60 different types of text messages
23  to remind -- in different formats to remind
24  people to not only stay on schedule for their

Page 49

1   medication, but also diet and exercise and
2   screening.
3       Q.   Okay.  Thank you for that.
4           I see that you've also designed
5   some messaging around COVID vaccine
6   hesitancy, correct?
7       A.   I'm sorry, what are you
8   referring to so I can make sure I understand
9   the context?
10      Q.   Are you on some kind of panel
11  related to designing messaging to tackle
12  COVID vaccine hesitancy?
13      A.   I am -- I would not
14  characterize it as a panel.  I would say that
15  I am a member of a team that -- of multiple
16  teams.  One of the teams, yes.
17      Q.   Sorry.
18      A.   I apologize, I started to
19  explain.  You didn't ask that.  You just
20  asked am I a member of panel, and it's not a
21  panel, it was a team, and I started
22  describing it, but you may not need that.
23      Q.   Sure.  I mean, that was going
24  to be my next question, is, describe to me

Page 50

1 what it is and what your involvement with it
2 is.
3    A.    So I'm on multiple ones.
4 Starting with the research that I'm doing is
5 to, and this is gathering primary data, is to
6 encourage those with COVID-19 vaccine
7 hesitancies to either get vaccinated or to
8 get boosted.  It's actually in Massachusetts.
9    Q.    Okay.
10    A.    The second study I'm thinking
11 about is on a team to understand how
12 behavioral economics -- how behavioral
13 economic principles have worked during the
14 pandemic to reduce vaccine hesitancy and to
15 encourage vaccination and COVID-19 booster
16 shots.
17          And the third one is on a large
18 team organized by the Get the Medication
19 Right X, GTMRx, and that study, or that
20 publication/paper, it is not a peer-reviewed
21 paper, but that paper that is put out by that
22 institution, I was part of a team to think
23 about structural issues, process issues,
24 system issues related to -- and this is why I

Page 51

1 was invited as an expert -- related to MICI,
2 the messaging, individual differences, and
3 the context, and how we might improve those
4 to not only address the current pandemic, but
5 any future pandemics.
6    Q.    Let's take the second one for a
7 moment, and this might be a fruitful example
8 to help me understand what you mean by
9 "behavioral economics."
10          So I guess draw the connection
11 for me between overcoming COVID vaccine
12 hesitancy and how behavioral economics shaped
13 into that.
14    A.    Right.  And I can do that, and
15 actually will also give you insight on the
16 first study, which is based on behavioral
17 economic principles as well.
18          So one example -- and there are
19 many, many behavioral economists out there
20 and, as I said, made up of people with
21 multiple disciplinary backgrounds, and they
22 have tried different things such as, should
23 we pay people to get vaccinated is one
24 example; should we create a lottery, right,

Page 52

1 to encourage people to get vaccinated; should
2 we frame the message positively or
3 negatively; should we say here's what you
4 gain if you get the vaccine, here's what you
5 lose if you don't get the vaccine.  So those
6 are just examples, okay, just to give you a
7 few.
8          And so, you know, how well
9 have -- and there's a variety of principles,
10 how well have those -- sometimes they call
11 them nudges, a lot of the times behavioral
12 economists call them nudges, the
13 interventions that they use to nudge
14 consumers to take the recommended or
15 advocated actions.  But those are examples.
16          And in the first study that I
17 was describing where I'm actually doing the
18 study here in the State of Massachusetts, we
19 are looking at -- and I'm with a team that is
20 funded -- that sits in the Mass
21 General/Brigham Young Hospital and the
22 Harvard Medical School, and it's a center
23 for -- that's related to use of behavioral
24 economics to improve medication adherence.

Page 53

1    Q.    Okay.
2    A.    And -- okay.  And this
3 particular -- I'm doing the study with that
4 group, with a subset of that group, and we
5 are looking at some eligible patients or
6 consumers get -- why one should get the
7 vaccine.  Some get a message on how to get
8 the vaccine, and that includes the booster.
9 And the third arm is usual care.
10          And then we track and see which
11 message is the most effective compared to
12 each other, one arm to the other, in a
13 randomized control trial.
14    Q.    Okay.  Let me try and see if I
15 understand this.
16          So I think you mentioned that
17 some of these nudges, for example, for
18 behavioral economics might have been a
19 lottery or to pay people to get vaccinated or
20 what they might gain or lose, for example,
21 losing a job, or something like that?
22    A.    No, gain or loss, sorry, I
23 refer to in a framed message.
24    Q.    Okay.  Understood.

Confidential Information - Subject to Protective Order

---

Page 54

1    So it seems like the baseline
2  for all of that is that it's like a monetary
3  incentive, is that --
4      A.    That is incorrect.  Monetary
5  incentives are a subset of the -- as nudges
6  used in behavioral economics.  For example, I
7  mentioned frames, you know, you're focused on
8  the benefits or the gains versus the losses
9  are a very popular behavioral economics
10  messaging, not related to money, messaging
11  nudge, and, in fact, the foundation for that
12  is prospect theory, and to prominent
13  economists Kahneman and Tversky, both Nobel
14  Prize laureates, who created the foundation
15  for these and other nudges.
16      Q.    So -- and perhaps monetary
17  incentives could be a subset, I suppose, is
18  what you're saying?
19      A.    Yes.
20      Q.    Okay.  Gotcha.
21      So it's any kind of reward or
22  disincentive, sort of, that affects behavior,
23  I suppose.  Is that a more accurate,
24  wholistic way of capturing the idea?

---

Page 55

1      A.    I would prefer to rephrase that
2  in terms of benefits and costs.  If you think
3  about rewards as benefits, there's some
4  overlap, but not perfect overlap.
5      And by costs, I am not just
6  referring to monetary costs.  There are
7  switching costs, transaction costs,
8  convenience costs.  So just want to clarify
9  that we are talking about value as a function
10  of costs and benefits, and those benefits
11  could be a range of benefits.
12      Q.    So, and I'm happy to adopt your
13  terminology there.
14      It's essentially cost benefit
15  for behavioral economics; what are the
16  benefits of the behavior, what are the costs
17  of the behavior, is that right?
18      A.    (Nodding in the affirmative).
19      Q.    Okay.  Flip, if you don't mind,
20  in your report, which is Exhibit 2, to
21  page 17, and that's footnote 36 specifically.
22      That footnote reads -- let me
23  paraphrase it, I guess.  I don't want to read
24  the whole thing.  But essentially is what

---

Page 56

1  you're saying there that the -- in ranking --
2  there's empirical evidence out there that in
3  ranking topics of importance for medical
4  therapy, that consumers and physicians place
5  safety and efficacy routinely at the top of
6  those priorities?
7      A.    So because you are referencing
8  a specific paper, I will say that in this
9  particular paper they look at -- so, for
10  example, there are about 108 consumers, and
11  about 115 or so, a little higher, physicians,
12  that 33 consumers rated safety as the most
13  important topic, the topic of importance for
14  them during initiation of medical therapy.
15  So it's very important to get the details.
16      And what that means is
17  basically 70-plus consumers did not rate
18  safety as the most important topic during the
19  initiation of medical therapy.
20      So I just want to make sure
21  that this data is understood correctly, that
22  it will be a range of -- even in the study, a
23  range of consumer responses as to the
24  importance of specific features and the

---

Page 57

1  weight -- sorry, their -- yeah, weight on
2  those features, and that, as I say in my
3  report, is likely to change during the
4  consumers' and the physicians' experience
5  with the consumer taking the drug over time.
6      Q.    Okay.  But to -- but what
7  you're saying is the results of that survey
8  show that numerically the most common answer
9  was safety number one, efficacy number two?
10      A.    During the -- topic of
11  importance during the initiation of medical
12  therapy.
13      Q.    Okay.  And did you look at the
14  survey design and read the article in citing
15  it in this paper?
16      A.    Yes.
17      Q.    Okay.  All right.  Thank you.
18      Do you feel like it was a
19  well-designed survey?
20      MR. GOLDBERG:  Objection to
21  form.
22      A.    I -- it was well designed.  It
23  was a good survey.  Are there things that
24  could have been -- could have been done

---

Confidential Information - Subject to Protective Order

Page 58

1 differently? Yes.
2 BY MR. DAVIS:
3      Q.    Okay. Well, would you agree it
4 was reliable enough for you to cite it in
5 your report?
6      A.    Yes. I mean, you know, it's --
7 yes.
8      Q.    You wouldn't cite any kind of
9 study or survey or piece of literature in
10 your report that you thought had significant
11 reliability issues, would you?
12      A.    No. The quality of the report
13 is the most important.
14      Q.    So back to your messaging
15 campaigns that you've done, and maybe let's
16 stick with COVID as the example. In the
17 COVID messaging -- vaccine messaging
18 campaigns, how were concerns about safety and
19 efficacy addressed in the communications that
20 supported the advocated recommendation, which
21 was to get vaxed or boosted?
22      A.    I mentioned multiple studies,
23 but I will talk about the question -- I can
24 answer the question for one of those, which

Page 59

1 is the three arms of how and why and usual
2 care messaging.
3           So the messaging goes to people
4 who are eligible for the vaccine or the
5 booster, and I rely on the hospital system
6 and the electronic database, health record
7 database. I am not involved with actually
8 sending out these messages, I only design the
9 messages, but they -- the rest of the team
10 works on the eligibility of the participants.
11      Q.    Okay. So, and you said you
12 were responsible for designing the content of
13 the message, correct?
14      A.    The letter that goes to the
15 patients, yeah.
16      Q.    So what sort of -- in terms of
17 the content of the messages that you
18 designed, what sort of content did you
19 include to address safety or efficacy
20 concerns that may exist amongst the un- or
21 undervaccinated?
22      A.    In these particular messages,
23 to the best of my recall, we use language
24 that the vaccine is -- has been demonstrated

Page 60

1 to be shown as effective for mitigating the
2 risk associated with the COVID-19 virus.
3      Q.    Is part of the messaging that
4 the vaccines have gone through an approval
5 process that demonstrated, for example, their
6 efficacy and safety?
7      A.    I'm sorry, can you repeat that?
8      Q.    Was one of the messages that
9 you designed, was the content of one of those
10 messages, did that emphasize the fact that
11 the vaccines had gone through an approval
12 process to demonstrate scientifically their
13 safety and efficacy?
14      A.    I don't recall.
15      Q.    Okay. You sit on the COVID
16 vaccine hesitancy task force, right?
17      A.    One of them, yes.
18      Q.    Let me just mark something as
19 an exhibit then.
20           MR. DAVIS: This is being
21 handed to the reporter to be marked as
22 Keller 3.
23           (Whereupon, Keller Exhibit
24 Number 3 was marked for

Page 61

1 identification.)
2           MS. ANDRAS: Since we don't
3 have electronic exhibits, could you
4 for the record and counsel who don't
5 have copies, introduce the exhibit
6 with a little more specificity?
7           MR. DAVIS: Sure. And I'll do
8 that on the record when I'm going
9 through it with the witness.
10 BY MR. DAVIS:
11      Q.    For the record, this Exhibit 3
12 is a -- the cover page to it is a report to
13 the GTR -- GTMRx National Task Force, and
14 it's titled "Background and Resources to
15 Build Vaccine Confidence in the Health
16 Neighborhood" dated March 2021.
17           Do you see that, Dr. Keller?
18      A.    Yes.
19      Q.    And if you flip to the -- if
20 you go one, two, three, four pages in, do you
21 see your name under "Task Force Participants"
22 there?
23      A.    Yes.
24           MR. GOLDBERG: John, let me

Confidential Information - Subject to Protective Order

Page 62

1    just say, if you're going to ask about
2    the document, I do think the witness
3    should be able to take a chance to
4    review it.
5         MR. DAVIS:  I mean, I have very
6    limited questions regarding it.
7    BY MR. DAVIS:
8         Q.    Why don't I ask them, and if
9    you feel like you want to review it, then we
10   can go off the record and you can take a look
11   at it.
12        A.    Can I just stop you for a
13   moment?
14        Q.    Sure.
15        A.    I'm going to ask you to review
16   it regardless of the question you ask, so I
17   don't want you to think that --
18        Q.    Sure.
19        MR. DAVIS:  Why don't we go off
20   the record, then, and you can review
21   it.
22        MR. GOLDBERG:  I think we're
23   going to stay on the record.  You can
24   review it.  If it takes more than a

Page 63

1    few minutes, then we can go off the
2    record.  That's the rule in this case.
3         The rule is that we start
4    reviewing, if it's going to take a
5    long time, then we'll go off the
6    record.  But that's what we do in this
7    case.
8         (Witness reviewing document.)
9         A.    Okay.
10   BY MR. DAVIS:
11        Q.    And I promise I don't have
12   detailed questions for you on this.
13        A.    Thank you.  I --
14        MR. GOLDBERG:  There's not a
15   question pending.  Just let counsel
16   ask a question.
17   BY MR. DAVIS:
18        Q.    So you saw on the first page
19   that this is dated March 2021, correct?
20        A.    Yes.
21        Q.    At the time of March 2021,
22   COVID vaccines were operating under an
23   emergency use authorization, correct, or a
24   EUA?

Page 64

1         A.    I'm not sure.
2         Q.    Why don't you flip to page,
3    what's numbered as page 6 in the bottom left
4    corner.  You'll see some numbering in the
5    bottom left corner, there's a page 6.
6         Do you see there's a third
7    block bullet, a blue block?  Do you see that?
8    Actually yours is black and white.  Sorry.
9         There's a third block there
10   that says, "COVID-19 vaccines have been
11   approved under emergency use authorization."
12        Do you see that?
13        A.    Yes.
14        Q.    Okay.  These vaccines now have
15   full approval, correct, full FDA approval?
16   Is that your understanding?
17        A.    I'm not sure.
18        Q.    Okay.  Do you see that there's
19   a third bullet under that bullet I pointed
20   out to you, a smaller bullet that says,
21   "Others warn that EUAs exacerbate the
22   deterioration of the public's confidence in
23   science"?
24        Do you see that?

Page 65

1         A.    I need a moment to just look at
2    the context.
3         (Witness reviewing document.)
4         A.    Okay.
5         Q.    Was that one of the findings of
6    this task force that's in this report that
7    you sat on, was that among the vaccine
8    hesitant there was -- some of that was
9    related to the fact at the time of this
10   report that the vaccines had not undergone a
11   full approval process?
12        MR. GOLDBERG:  Objection to
13   form.  Vague, mischaracterizes the
14   document.
15        A.    Could you please be more
16   specific?
17   BY MR. DAVIS:
18        Q.    Did you assist in drafting this
19   report?
20        A.    I was a member of the task
21   force that reviewed certain sections of the
22   document, and participated in discussions on
23   the creation of the document.
24        Q.    Let me just tell you where I'm

Confidential Information - Subject to Protective Order

Page 66

1  going with this, which is that, would you
2  agree -- and maybe we can bypass all of this.
3  Would you agree that consumers and physicians
4  look at approval by the regulator as an
5  important piece of information to consider in
6  making a consumer choice?
7      A.   You need to be more specific.
8  Those are two questions.
9      Q.   What are the two questions in
10 there?
11     A.   You said "consumers and
12 physicians."
13     Q.   Okay.  Well, let's take it from
14 the consumers first.  So the same question,
15 just for consumers.
16     A.   Could you repeat the question?
17     Q.   Sure.
18         Would you agree that consumers
19 in making choices regarding medications or
20 medical therapy view approval by the
21 regulator as an important piece of
22 information?
23     A.   There is a range of consumer
24 responses, as I have explained in my report,

Page 67

1  in various section -- subsections of Section
2  IV in my report, such as IV.B, that using
3  different decision rules, compensatory and
4  non-compensatory, some may and some may not.
5         Same with the MICI factors in
6  Section IV.C of my report, some consumers may
7  pay attention to the information or approval
8  from the FDA as part of the messaging that
9  they consider, and some may not.
10         For example, they may pay much
11 more attention to their individual health
12 status or the context such as their
13 relationship with the physician, rely on the
14 physician to give them guidance.
15     Q.   Let's take it back to the COVID
16 vaccines for a second.
17         You're currently, I think you
18 testified, doing some messaging encouraging
19 vaccination and boosting, correct?
20     A.   Yes.
21     Q.   Okay.  Is part of the substance
22 of that message that's being conveyed now
23 that these vaccines have full safety and
24 efficacy endorsement by the FDA; they're, in

Page 68

1  other words, approved as safe and effective
2  by the FDA?  Is that part of the messaging?
3      A.   I do not recall.  My task in
4  this project is to focus on the how versus
5  why components of that message.  There are
6  other team members that are focused on other
7  aspects of who gets the message and the
8  context in which they get the message.
9      Q.   Okay.  Let's transition.
10         MR. GOLDBERG:  John, if we are
11 transitioning, can we take a break?
12         MR. DAVIS:  Sure.  Yeah, that's
13 fine.
14         THE VIDEOGRAPHER:  Off the
15 record at 10:43.
16         (Whereupon, a recess was
17 taken.)
18         THE VIDEOGRAPHER:  Back on the
19 record at 11:04.
20 BY MR. DAVIS:
21     Q.   Do you have any understanding
22 of how generic drugs specifically get
23 approved in the US?
24     A.   No.

Page 69

1      Q.   Do you have any understanding
2  of what -- how generic drugs are supposed to
3  compare to their brand counterparts?
4          MR. GOLDBERG:  Objection to
5  form.  Vague.
6      A.   Please clarify.
7  BY MR. DAVIS:
8      Q.   Sure.
9          What is a generic drug, can you
10 tell me that?
11     A.   From a marketing perspective, a
12 generic drug is an unbranded drug.
13     Q.   And compared to branded drugs,
14 what are unbranded drugs supposed to be in
15 comparison to them?
16     A.   One thing they're supposed to
17 be is cheaper.
18     Q.   Okay.  Do you understand that
19 they're supposed to be therapeutically
20 equivalent?
21     A.   In a prescription drug context,
22 yes.
23     Q.   In fact, would you agree that
24 many aspects of our healthcare system rely on

Confidential Information - Subject to Protective Order

---

Page 70

1  an assumption that generic drugs are
2  therapeutically equivalent to their brand
3  counterparts?
4      A.    Could you please repeat?
5          MR. DAVIS:  Could you repeat
6  the question?
7          (Whereupon, the reporter read
8  back the question:
9          QUESTION:  In fact, would you
10  agree that many aspects of our
11  healthcare system rely on an
12  assumption that generic drugs are
13  therapeutically equivalent to their
14  brand counterparts?)
15          MR. GOLDBERG:  Objection.
16  Vague.
17      A.    Many aspects of our healthcare
18  system, it's too -- it's not specific enough
19  for me.
20  BY MR. DAVIS:
21      Q.    Okay.  Are you familiar with
22  automatic generic substitution at the
23  pharmacy level as a concept?
24      A.    Could you repeat that?

---

Page 71

1      Q.    Are you familiar with automatic
2  generic substitution at the pharmacy level as
3  a concept?
4      A.    What do you mean "as a
5  concept"?
6      Q.    Well, let's take that off.
7          Are you familiar with automatic
8  generic substitution at the pharmacy level?
9      A.    I know that -- I don't know who
10  does it, but I know that sometimes when
11  you -- as a consumer when you expect a
12  branded drug you are given a generic.
13      Q.    Well, it's regardless of
14  whether a consumer expects a branded drug or
15  not, the substitution occurs, does it not?
16          MR. GOLDBERG:  Objection to
17  form.
18      A.    I don't know.
19  BY MR. DAVIS:
20      Q.    Okay.  Do you have any
21  familiarity with how reimbursement or
22  formulary decisions are made in response to
23  the market entry of a generic vis-à-vis the
24  brand?

---

Page 72

1      A.    No, I am not an expert on that.
2      Q.    Okay.  Are you familiar with
3  the fact that when a physician writes a
4  prescription on a prescription pad, even if
5  the physician writes the brand name, that
6  oftentimes if there's a generic, the generic
7  will be dispensed because of generic
8  substitution laws?
9      A.    I don't have an opinion on
10  that.
11      Q.    And I believe you said you
12  don't know what generic manufacturers have to
13  demonstrate to the FDA to get their generic
14  drugs approved for sale in the US, correct?
15      A.    I do not recall saying that.
16      Q.    Okay.  Well, then, let me ask
17  it then.
18          Are you aware --
19      A.    Can you please repeat it?
20      Q.    Are you aware of what generic
21  drug manufacturers have to demonstrate to the
22  FDA in order to get their generic drugs
23  approved for marketing and sale in the US?
24      A.    I am not an expert.  I don't

---

Page 73

1  have an opinion.
2      Q.    Well, the question is do you
3  know.
4      A.    No.
5      Q.    Are you familiar with the fact
6  that generic pharmaceutical manufacturers do
7  not routinely engage in promotional
8  activities for their drugs?
9      A.    I do not know.
10      Q.    When I refer to FDA-approved
11  labeling, do you know what that means?
12      A.    Could you be more specific?
13      Q.    Sure.
14          Do you know what an
15  FDA-approved label is?
16      A.    No.
17      Q.    Have you looked at any
18  FDA-approved labeling for any of the generic
19  valsartan products at issue in this case?
20      A.    I have looked at some labels of
21  valsartan.  I do not know if they are
22  FDA-approved or not.
23      Q.    In general terms, the labels
24  that you looked at, what kind of information

---

Page 74

1 did they contain?
2     A.    To the best of my recall, they
3 contained the name of the drug, the dosage,
4 the manufacturer, and the country of
5 manufacture.
6     Q.    Did you see any section in
7 those labels that had warnings or
8 contraindications or side effect information,
9 anything like that?
10     A.    I do not recall.
11     Q.    Okay.  What about a listing of
12 ingredients?
13     A.    I do not recall.
14     Q.    Would you agree that the
15 purpose of those labels that you reviewed was
16 to provide information regarding the drug?
17     A.    Please define "information."
18     Q.    Well, sure.  I mean, you
19 mentioned what it is, who manufactures it,
20 things like that.  Would that in your mind
21 constitute information regarding the drug?
22     A.    In my mind it would constitute
23 some information regarding the drug.  There
24 could be other information regarding the drug

Page 75

1 that is not on the label or that I do not
2 recall was on the label.
3     Q.    If the purpose of FDA-approved
4 labeling was to provide information to
5 consumers and physicians regarding the drug,
6 what's in it, potential side effects,
7 etcetera, would you disagree with that?
8     A.    Please repeat the question.
9     Q.    Would you disagree with the
10 proposition that FDA-approved labeling is
11 designed to provide to consumers and
12 physicians certain information regarding the
13 drug?
14         MR. GOLDBERG:  Objection to
15 form.  Foundation.
16     A.    I cannot answer that question.
17 BY MR. DAVIS:
18     Q.    So you don't know the purpose
19 of FDA-approved labeling?
20     A.    That was not the question you
21 asked, but is that the question you're asking
22 now?
23     Q.    Well, that's my new question,
24 yes.

Page 76

1     A.    No.
2     Q.    Have you ever studied health
3 messaging to consumers or physicians
4 regarding generic drugs vis-à-vis brand
5 drugs?
6         MR. GOLDBERG:  Objection to
7 form.  Ambiguous.
8     A.    Could you repeat that, please?
9 BY MR. DAVIS:
10     Q.    Sure.
11         Have you ever studied any kind
12 of health messaging to consumers or
13 physicians regarding generic drugs?
14     A.    Not that I recall.
15     Q.    Okay.  Not in your work in this
16 case, and not ever, is that your testimony?
17     A.    I don't understand the
18 question.
19     Q.    Sure.  I'm trying to clarify
20 whether your answer is you haven't looked at
21 that in this case or you haven't looked at
22 that at all ever.
23     A.    Okay.  So can you repeat the
24 question again so I understand the context?

Page 77

1     Q.    Sure.
2         The question that you said "no"
3 to was whether you had any occasion to
4 look at health messaging to consumers or
5 physicians regarding generic drugs, and I
6 believe you said "no" to that, right?
7     A.    I'm going to qualify.  If by
8 "health messaging" you are also including
9 what the FDA said about generic valsartan,
10 then I did have a chance to look at that for
11 this case.
12     Q.    I'm talking about from a
13 general proposition, so regarding generic
14 drugs generally, their uses, their benefits,
15 what they are, etcetera.
16         Have you ever looked at any
17 generalized messaging to physicians or
18 consumers regarding generic drugs as a
19 therapeutic sort of class?
20     A.    Not that I recall.
21     Q.    Okay.  Not in this case?
22     A.    I can't answer the question.
23 Could you repeat the question?
24         MR. DAVIS:  Could you repeat

Page 78

1 the question?
2        (Whereupon, the reporter read
3 back the following:
4        QUESTION: I'm talking about
5 from a general proposition, so
6 regarding generic drugs generally,
7 their uses, their benefits, what they
8 are, etcetera.
9        Have you ever looked at any
10 generalized messaging to physicians or
11 consumers regarding generic drugs as a
12 therapeutic sort of class?
13        THE WITNESS: Not that I
14 recall.
15        QUESTION: Okay. Not in this
16 case?)
17    A.    So the challenge I'm facing is
18 you asked about as a general proposition, and
19 I answered, and then now you're saying "not
20 in this case," and so I'm just trying to make
21 sure I understand the question, which is a
22 very specific proposition.
23 BY MR. DAVIS:
24    Q.    Okay. So let me just try it

Page 79

1 again.
2        In this case, have you looked
3 at any generalized messaging to physicians or
4 consumers regarding generic drugs generally
5 as a therapeutic option or class?
6        MR. GOLDBERG: Objection to
7 form. Ambiguous.
8    A.    Can you give me an example of
9 what that messaging would look like so I'm
10 better able to understand?
11 BY MR. DAVIS:
12    Q.    Sure.
13        MR. DAVIS: I'm handing to be
14 marked as Exhibit 4 a 14-page
15 document.
16        (Whereupon, Keller Exhibit
17 Number 4 was marked for
18 identification.)
19        MR. HONIK: Is this 16, John?
20        MR. DAVIS: Yes.
21        MS. ANDRAS: Can you describe
22 for the record for counsel who do not
23 have copies of these what document
24 you've marked?

Page 80

1        MR. DAVIS: Sure. For the
2 record, this is an FDA resource from
3 the FDA's website titled "Generic
4 Drugs: Questions and Answers."
5 BY MR. DAVIS:
6    Q.    Have you ever seen this
7 document before, or this content on the FDA
8 website?
9    A.    I would like to check my
10 report. It looks familiar, but I'm not sure.
11    Q.    Sure. If you want to check
12 your report, that's fine.
13        (Witness reviewing document.)
14    A.    Okay. Thank you.
15    Q.    You don't see it in your
16 report, do you?
17    A.    I do not.
18    Q.    Okay. And is it your testimony
19 that you've never seen this before or
20 reviewed it on the FDA's website?
21    A.    Correct, yes.
22    Q.    Okay. This, Dr. Keller, is an
23 example of, like you asked for, of what I'm
24 talking about here. Do you see that this is

Page 81

1 a sort of general resource put out by the FDA
2 titled "Generic Drugs: Questions & Answers"?
3    A.    That's what the title says,
4 yes.
5    Q.    And it has some subsections
6 like, "What are generic drugs? How does the
7 FDA ensure generic medicines work the same as
8 brand-name medicines?"
9        Do you see that?
10    A.    I see that on the first page,
11 but I have not had a chance to review this
12 document, so...
13    Q.    Well, I only provided this as
14 an example.
15        So as an example of what I was
16 talking about prior to showing you this
17 document, have you reviewed or had any
18 occasion to review any kind of general
19 resources similar to the one that I've marked
20 as Exhibit 4 that have to do with generic
21 drugs generally?
22    A.    I cannot answer that question
23 about how -- whether I've reviewed anything
24 similar without knowing what this is to make

Page 82

1 that comparison. I need time to review this
2 document.
3     Q.    Okay.
4         (Witness reviewing document.)
5         MR. GOLDBERG: Dr. Keller, if
6 you're going to go further, we can go
7 off the record for a minute until you
8 finish, okay? That's fine.
9         Can we go off the record?
10        THE VIDEOGRAPHER: Off record
11 at 11:25.
12        (Off the record.)
13        THE VIDEOGRAPHER: Back on the
14 record at 11:30.
15 BY MR. DAVIS:
16     Q.    Okay. Dr. Keller, you had a
17 chance to flip through every page of that
18 document, correct?
19     A.    Yes.
20     Q.    Okay. And you read it, you
21 didn't just flip the pages?
22     A.    I, I'm going to use the word
23 surveyed, or looked broadly over would be a
24 better term for it. I tried -- it was not a

Page 83

1 lot of time. I tried to look at it as
2 carefully as I could.
3     Q.    Okay. Have you ever seen a --
4 you see that this is a Q&A titled "Generic
5 Drugs: Questions & Answers"?
6     A.    Yes.
7     Q.    Have you ever seen a Q&A or an
8 FAQ document in any context?
9     A.    Yes.
10    Q.    And this is an example of one
11 of those, but for generic drugs, put out by
12 the FDA, correct?
13    A.    Yes.
14    Q.    Okay. Would you characterize
15 this as an educational resource having looked
16 at it?
17    A.    You need to be more specific.
18 What does "educational resource" mean?
19    Q.    Well, for example, did you --
20 in reading it, were you able to educate
21 yourself a little bit on generic drugs?
22    A.    Yes.
23    Q.    Okay. Thank you.
24        Is the -- having looked at it

Page 84

1 now, would you agree that the basic message
2 that's being put out by the FDA is that
3 generic drugs are just as safe, effective,
4 and high quality as their brand name
5 counterparts?
6         MR. DAVIS: Could you repeat
7 the question?
8         (Whereupon, the reporter read
9 back the following:
10        QUESTION: Having looked at it
11 now, would you agree that the basic
12 message that's being put out by the
13 FDA is that generic drugs are just as
14 safe, effective, and high quality as
15 their brand name counterparts?)
16    A.    Yes, from -- more true, yes,
17 from the FDA's perspective. No, that would
18 not be my uniform takeaway from a consumer
19 perspective.
20 BY MR. DAVIS:
21    Q.    Well, what's unclear about the
22 first page, the little graphic that the FDA
23 provides, where it says "Generic, Safe,
24 Effective, High-Quality" all with checkmarks,

Page 85

1 "Brand-Name, Safe, Effective, High-Quality,"
2 all with checkmarks?
3         Do you see that?
4     A.    Yes.
5     Q.    Okay. And the message that the
6 FDA is trying to convey is that generic drugs
7 are just as safe, effective, and high quality
8 as their brand name counterparts. Is that
9 not the message the FDA is trying to convey
10 here?
11    A.    You are correct that those
12 checkmarks appear on the first page. But
13 when I read the information on subsequent
14 pages, as I read information such as The
15 generic may act differently from the brand
16 name, for example, in absorption.
17    Q.    So you disagree that the FDA is
18 attempting to convey a message here that
19 generic drugs and brand name drugs are
20 interchangeable?
21    A.    No.
22        MR. GOLDBERG: Objection to
23 form.
24    A.    Please specify.

Confidential Information - Subject to Protective Order

Page 86

BY MR. DAVIS:

Q.    Okay.  Well, let's start with my prior question.

You agree, yes, that the FDA's intended message with this document, and specifically with this graphic on the first page, is that generic drugs are just as safe, effective, and high quality as their brand name counterparts?

A.    Incorrect.  I said that the graphic displays that.  But if you said the document, which I'm assuming you're referring to the document before me, that that has information in there, and I gave you only one example from my quick read or survey of the information that led me to believe that they are not the same.

For example, on effectiveness, I just told you that I read that the absorption for generics may be different from brand products, brand name products.

Q.    Do you know what "absorption" means?

A.    Again, I need to look at the

Page 87

document.

Q.    Well, why don't I take you to page 12 of the document.  Do you see the heading "How Does FDA monitor side effects or safety issues with generic medicines?"  Do you see that heading on page 12?

A.    Before I answer that, can I assume when you ask a different question without my answering the previous one that you are striking it?

Q.    Sure.  Yeah.  I'm moving on.

A.    Okay.

Q.    I might come back to it.

So do you see the header there on page 12?

A.    "How Does FDA monitor side effects or safety issues with generic medicines?"

Q.    It says there that the "FDA takes several actions to ensure safety and quality before and after a new or generic medicine is approved."

Do you see that?

A.    Yes.

Page 88

Q.    And then it reads further down that part of that is ensuring, last two lines, "that every generic drug is safe, effective, high quality, and substitutable to the brand name drug."

Do you see that?

A.    I do not, sorry.  Where is that?

Q.    That would be the last two lines of the first paragraph.

A.    Oh, the last two lines, okay.  I went to the bottom of the page.

Yes, I see that.

Q.    Okay.  And so the FDA is essentially stating in text there what it stated in the graphic on the first page, correct?

A.    I do not view them the same.

Q.    What's different to you?

A.    So for me, when I see a graphic with the checkmarks, the checkmarks look the same, and it appears to be the same for generic and brand name.

But when I look at the text

Page 89

here, the text that you asked -- that you referred to for this question, when it says that the word "to ensure" is not telling -- they're saying they're trying their best, that's my interpretation of "ensure," but that does not mean that they are, for example, in a marketing context doing something more, like saying it is the same.

Q.    Well, they're not saying anything about trying their best here, they're saying that they "ensure that every generic drug is safe, effective, high quality, and substitutable to the brand name drug."  They say that right there, correct?

A.    They say that.  You asked me why I didn't think it was the same in the graphic and the document, and I'm telling you that it appears to me to be the same, brand and generic on those three features in the graphic, but not in the document.

And the reason it is not for me the same in the document is because of the language that is used here, specifically in this particular case in the sentence you

Confidential Information - Subject to Protective Order

Page 90

1  asked me to read on ensure, that makes me
2  believe that it may not be the same, or that
3  FDA is doing something to ensure that it is
4  the same, but it's not saying it is the same.
5      Q.    Okay.  Do you know what would
6  happen, for example, if the FDA, despite
7  their best efforts, found out that a generic
8  drug was not safe, not effective, or not high
9  quality?  Do you know what would happen in
10 that case?
11     A.    I'm not an expert.  I cannot
12 tell you for sure.
13     Q.    Okay.  Go to page 2 of the
14 document, if you don't mind.
15     A.    The same document?
16     Q.    Same document.  Exhibit 4 for
17 the record.
18          That first question there that
19 appears in this Q&A is, "What are generic
20 drugs?"
21          Do you see that?
22     A.    Yes.
23     Q.    And it says, "A generic drug is
24 a medication created to be the same as an

Page 91

1  already marketed brand-name drug in dosage
2  form, safety, strength, route of
3  administration, quality, performance
4  characteristics, and intended use."
5          And then if you go down to the
6  last sentence you'll see, "In other words,
7  you can take a generic medicine as an equal
8  substitute for its brand-name counterpart."
9          Do you see that?
10     A.    Yes.
11     Q.    Okay.  Who is the "you" there
12 in this document?  Who do you imagine the FDA
13 is referring to as "you" here?
14     A.    Whoever is reading the message.
15     Q.    Or whoever is taking the
16 generic medicine, as they say, correct?  "You
17 can take a generic medicine."
18     A.    No.  It says you can take it.
19 It doesn't mean they're taking it.
20     Q.    Do you read "you" here as being
21 directed to the consumer, the person who
22 takes the generic medicine?
23     A.    I need to look at the document
24 again.

Page 92

1          So you're referring to the last
2  sentence, "In other words, you can take a" --
3  yes, I see that, yes.
4      Q.    And the "you" there is the
5  patient, correct, the consumer?
6      A.    The consumer for whom this
7  medicine is applicable, right.
8      Q.    And to borrow some terminology
9  you used before, this would be the advocated
10 recommendation, correct, by the FDA regarding
11 generic drugs?
12     A.    Yes and no.  Yes if this
13 document was defined as a communication
14 message to consumers; no because it's not
15 clear to me what the specific advocated
16 action is.
17     Q.    What makes you think that this
18 might not be a document directed to
19 consumers?
20     A.    I don't know.  I don't know the
21 context in which this was created, or when it
22 was created, and for whom it was intended.  I
23 don't have that information.
24     Q.    You can't derive that from

Page 93

1  having just read this?
2      A.    As a health communication
3  expert, I would not like to make that
4  determination.
5      Q.    Okay.  Well, you did agree with
6  me earlier that the "you" in that sentence
7  was directed towards the consumer or patient,
8  correct?
9      A.    I said that it was directed at
10 a person for whom a decision about a generic
11 or brand name selection was applicable.
12     Q.    And that would be a consumer or
13 a patient, correct?
14     A.    If a consumer was considering
15 whether -- what the difference was, they
16 might or might not seek this information.
17 There would be a range.
18     Q.    And that advocated
19 recommendation there that we read, "you can
20 take a generic medicine as an equal
21 substitute for its brand-name counterpart,"
22 that's founded on the assumption that the
23 generic drug and the brand-name drug are both
24 safe, effective, and high quality, and

Page 94

1  substitutable as we saw on page 12 that we
2  just read, correct?
3          MR. GOLDBERG:  Objection to
4      form.  Foundation.
5      A.    That is not how I interpret
6  that.
7  BY MR. DAVIS:
8      Q.    What's incorrect about my
9  interpretation?
10     A.    I'll highlight one.
11     Q.    Sure.
12     A.    First, very simply, this
13 information appears before page 12, so I
14 don't know whether this was based on what is
15 in page 12, especially if it appears before.
16 I'll stop there.
17     Q.    Okay.  Well, I mean, what about
18 what appears just before the sentence on
19 page 2, "A generic drug is a medication that
20 is created to be the same as an already
21 marketed brand-name drug in dosage form,
22 safety, strength, route of administration,
23 quality, performance characteristics,
24 intended use," those various things, do you

Page 95

1  think safety, efficacy, and high quality are
2  encompassed by those terms in that sentence?
3      A.    No.
4      Q.    You don't?
5      A.    No.
6      Q.    Okay.  Explain to me why not.
7      A.    From -- as a consumer expert,
8  consumer health decision-making expert, one
9  example would be that for me, efficacy is
10 broken down into self efficacy and response
11 efficacy.
12         Response efficacy is, you know,
13 does the drug do what it's supposed to do;
14 self efficacy is, you know, will the drug
15 work for me.
16     Q.    Okay.  You testified earlier
17 that you have very little knowledge of what's
18 required for drug approval in the US,
19 correct?
20     A.    Yes.
21     Q.    Okay.  So you really don't know
22 what the FDA means by "efficacy" in terms of
23 approval of a brand or generic drug, is that
24 correct?

Page 96

1      A.    Actually please repeat that
2  question.
3          MR. DAVIS:  Can you read the
4      question back?
5          (Whereupon, the reporter read
6      back the question:
7          QUESTION:  Okay.  So you really
8      don't know what the FDA means by
9      "efficacy" in terms of approval of a
10     brand or generic drug, is that
11     correct?)
12     A.    I'm not going to form an
13 opinion on that.
14 BY MR. DAVIS:
15     Q.    Okay.  You're a health
16 communication expert, correct?
17     A.    I'm an expert on consumer
18 decision-making with a focus on health.
19     Q.    In fact, you testified today
20 that you've designed some of the content of
21 the messages to consumers, correct?
22     A.    The content of some of the
23 health communication to consumers.
24     Q.    Correct.

Page 97

1          And having just leafed through
2  this document here, Exhibit 4, using your --
3  you know, relying on your expertise as
4  someone who does this for a living, what is
5  the message that the FDA is trying to impart
6  with this Q&A document that's Exhibit 4?
7      A.    There's a lot of information
8  here.  I would not be comfortable telling you
9  what the FDA's intentions are or what they
10 are trying to impart.
11     Q.    You don't think they're trying
12 to impart to a consumer or patient that they
13 can take a generic medicine as an equal
14 substitute for its brand-name counterpart?
15     A.    I've tried to answer that
16 question.  As a communication expert, I'm
17 leery of any sentence that starts with "in
18 other words."
19     Q.    Aren't they -- I mean, the in
20 other words to me is the FDA trying to take a
21 complex regulatory system of drug approval
22 and put it in simple terms for a patient or
23 consumer.  Do you not read it that way?
24     A.    I do not, because I'm putting

Page 98

1  on my consumer hat, and I see a lot of things
2  here that -- route of administration,
3  etcetera -- that are not -- may not be
4  familiar to some consumers, they may be
5  familiar to other consumers, but I'm going to
6  predict a range of what consumers take away
7  from that message.
8      Q.    Flip to page 6. You'll see
9  some pagination in the bottom right corner of
10 page 6 of 14. The header there is "What
11 standards must generic medicines meet to
12 receive FDA approval?"
13         Do you see that?
14     A.    Yes.
15     Q.    Okay. And I think you
16 testified earlier that you didn't know what
17 an ANDA was. I'll represent to you that an
18 ANDA is an Abbreviated New Drug Application,
19 which is what a generic manufacturer submits
20 to the FDA for approval of its proposed
21 generic medicine to be marketed in the US.
22         Do you understand that?
23     A.    I see here it says "drug
24 companies," it does not say "generic

Page 99

1  manufacturers." But I see the rest.
2      Q.    Well, I'll represent to you
3  that an ANDA, or A-N-D-A, Abbreviated New
4  Drug Application is what a generic
5  manufacturer submits to market a generic
6  drug, okay? And then it says below that, "An
7  ANDA must show the generic medicine is
8  equivalent to the brand in the following
9  ways:"
10         Do you see that?
11     A.    Yes.
12     Q.    And then there's some bullet
13 points that start on 6, go down to 7 and 8,
14 and conclude on page 9, I believe.
15         Do you see that?
16     A.    Yes.
17     Q.    Okay. If you flip to page 7,
18 you'll see that the last bullet point there
19 says that "It" -- being the generic drug --
20 "is manufactured under the same strict
21 standards as the brand-name medicine."
22         Do you see that?
23     A.    Yes.
24     Q.    Okay. Did you have any idea

Page 100

1  that that was a requirement for ANDA approval
2  of a generic drug to be marketed in the US?
3      A.    I saw that in Dr. Conti's
4  report.
5      Q.    Do you have any reason to
6  disagree with what's in this bullet point
7  here --
8      A.    NO.
9      Q.    -- on page 7?
10         Let's say that the FDA, that
11 you've worked -- strike that.
12         You've worked with regulatory
13 bodies in the US, correct, like, for example,
14 the CDC?
15     A.    Yes.
16     Q.    Okay. Let's say that the FDA
17 came to you and said, Dr. Keller, we've
18 noticed that consumers/patients in the US,
19 there's a distrust for generic medicines, we
20 want you to design a messaging campaign to
21 advocate -- to create an advocated
22 recommendation that patients can trust their
23 generic drugs.
24         Are you following me?

Page 101

1      A.    Mm-hmm.
2      Q.    Okay. Would not one of the
3  messages you would include in that advocated
4  recommendation to patients, would not one of
5  those messages be exactly what the FDA is
6  emphasizing here, which is that generic drugs
7  are subject to -- are substitutable as we saw
8  on page 12, that they are safe, effective,
9  high quality as we saw on page 1, and that
10 they are manufactured under the same strict
11 standards as the brand-name medication as we
12 see on page 7?
13         Would those not be messages you
14 might want to include in your communication
15 to patients to overcome that objection to
16 generic drugs?
17         MR. GOLDBERG:  Objection.
18    Ambiguous, compound.
19     A.    I don't know how -- I stopped
20 counting how many questions there were in
21 that question. Could you please break it
22 down?
23 BY MR. DAVIS:
24     Q.    I mean, I thought it was quite

Page 102

1 clear, to be honest.
2          Would you not want to include
3 those messages that we've called out and read
4 in this document in your advocated
5 recommendation to consumers that the FDA in
6 this hypothetical assignment is giving you?
7          MR. GOLDBERG:  Same objection.
8     A.    I cannot answer that question.
9 I was even flipping pages, and I'm on
10 page 12, and I cannot in my quick survey even
11 find the word "substitutable," so I cannot
12 answer that question.
13 BY MR. DAVIS:
14     Q.    We read it.  It's the last
15 sentence of the first paragraph there.
16 "Ensure that every generic drug is safe,
17 effective, high quality, and substitutable to
18 the brand-name drug."
19     A.    Thank you.
20     Q.    Would you not want to include
21 those messages that we've read in this
22 document just now in your communication to
23 consumers/patients in this hypothetical
24 assignment from the FDA?

Page 103

1     A.    If the FDA came to me with this
2 assignment, I would need a lot of information
3 on consumers to make a decision about the
4 different types of effective -- the different
5 types of messages that may be effective for
6 different types of consumers based on -- I'll
7 just give you examples because it was a long
8 question -- where and how and from whom they
9 would trust the message, or message factors,
10 I'm using MICI, their individual differences,
11 for example education level, language
12 fluency, etcetera; the context in which they
13 were making this decision, for example with a
14 trusted physician or a new physician; and the
15 interaction of those factors.
16          I would also want to know
17 information on the features that patients
18 take into account when they're making such a
19 decision.
20          I testified earlier about
21 the -- how I create communication to create
22 and communicate value to consumers, so I
23 would need to know what kind of benefits
24 different consumers are seeking in the

Page 104

1 communication and what kind of costs I need
2 to address or overcome in the communication.
3          My research shows that these
4 factors vary across individuals, and all of
5 my work and my report supports, along with
6 many, many others, the need to get this
7 information in order to tailor this
8 communication so that I can understand how
9 consumers would evaluate my advocated
10 recommendation, "my" as in in my task.
11     Q.    Do you think there's a single
12 consumer out there in the US who if they went
13 to the pharmacy and got dispensed a generic
14 drug, that they would not want that generic
15 drug to be substitutable to the brand-name
16 drug?
17     A.    As a consumer behavior expert,
18 you never want to make an assumption about
19 uniformity on consumer reactions or
20 valuations of work.
21     Q.    So are you saying that you
22 think it's a possibility that there are
23 consumers out there who, when they went to
24 the pharmacy to fill a prescription and they

Page 105

1 got dispensed the generic drug, that they
2 would not want that generic drug to be
3 substitutable to the brand-name drug?
4     A.    I'm going to say yes and no.
5          I will say yes, they will
6 expect that they are getting something from
7 the pharmacy that the pharmacist or someone
8 else who made the decision believes is
9 similar.
10          No as in they don't know
11 whether it would be similar for them because
12 they don't -- they have more information and
13 agency on what has worked for them in the
14 past, what has not worked for them in the
15 past, the individual factors that I'm talking
16 about, how they take their medication, you
17 can't make an assumption, you know, are they
18 used to taking it once a day, multiple times
19 a day, whether they take it with food,
20 without food.
21          There are so many additional
22 factors where they would have questions about
23 similarity or substitutability, because from
24 a consumer behavior perspective it's not what

Confidential Information - Subject to Protective Order

Page 106

1  someone else is saying is similar, it's how
2  they're experiencing similarity, or if their
3  experience is the same.
4      Q.    If a generic drug were not
5  substitutable to the brand-name drug, do you
6  have any idea whether that would be a
7  non-approved drug?
8      A.    I am not familiar with the FDA
9  regulations, so I cannot answer that
10  question.
11     Q.    Have you ever designed any kind
12  of messaging to consumers or physicians that
13  advocated that they take or prescribe
14  unapproved medications?
15     A.    No.
16     Q.    Have you ever designed any kind
17  of messaging to consumers or physicians that
18  they take or prescribe adulterated
19  medications?
20     A.    Not to my knowledge.
21     Q.    Misbranded medications?
22     A.    Please define "misbranded."
23     Q.    Do you know what misbranded
24  means?

Page 107

1      A.    From Dr. Conti's report I have
2  a general understanding.
3      Q.    And what's that understanding?
4      A.    That the -- what is in the
5  brand -- in the product is not the same as
6  what is on the description.
7      Q.    Right.  That the label is false
8  or misleading in any particular, correct?
9      A.    Well, no, I will not go that
10  far.  I will not say the label is false or
11  misleading.  That will vary by the consumer.
12     Q.    Well, you don't know whether
13  that's, in fact, the definition that congress
14  provides for misbranding.
15     A.    Agreed, I'm not an expert.
16     Q.    Okay.  Have you ever designed
17  any kind of communication or messaging to
18  physicians or consumers that they take or use
19  any kind of medication that was illegally
20  sold or distributed to them?
21     A.    Not that I'm aware of.
22         MR. DAVIS:  I'm at a transition
23     point.  Do we want to take lunch, or
24     do you want to keep going?

Page 108

1         MR. GOLDBERG:  Up to you.  I
2  know lunch is here.
3         THE WITNESS:  I'm indifferent.
4         MR. DAVIS:  Why don't we go off
5  the record for a second.
6         THE VIDEOGRAPHER:  Off the
7  record at 12:01.
8         (Whereupon, a luncheon recess
9  was taken.)

Page 109

1         AFTERNOON SESSION
2
3         THE VIDEOGRAPHER:  Back on the
4     record at 12:40.
5  BY MR. DAVIS:
6      Q.    Okay.  Dr. Keller, your report,
7  Exhibit 2, would you mind pulling that out?
8  I want to ask you --
9      A.    You mean Appendix B?
10     Q.    No, no, just your report, which
11  is -- I've marked as Exhibit 2.
12     A.    I'm so sorry.  I misunderstood.
13     Q.    Not a problem.
14         So I just want to ask a
15  clarifying question regarding your assignment
16  on paragraph 1, which is on the first page.
17         You say, "I have been asked by
18  counsel for Defendants to review health care
19  decision-making and how valuation of VCDs
20  should be viewed in light of the voluntary
21  recall of VCDs in 2018 and '19."
22         Are you with me there?
23     A.    Yes.
24     Q.    Okay.  I'm just trying to

Confidential Information - Subject to Protective Order

Page 110

1  understand the word "and" there.  Is that two
2  assignments, or is that one assignment?
3      A.   I'd say that the assignments
4  are connected.
5      Q.   Okay.  And what do you mean by
6  that?
7      A.   That I reviewed the healthcare
8  decision-making literature to help inform my
9  opinion on how consumers -- the range of
10  consumer responses for those taking the VCDs,
11  how they might respond, if at all, to the
12  recall of the VCDs in 2018 and 2019.
13      Q.   Okay.  So when you say
14  healthcare decision-making there, you're
15  referring to the portion of your report
16  discussing and setting forth compensatory
17  decision analysis and noncompensatory, and
18  non-MICI, that acronym, that's what you mean
19  by healthcare decision-making?
20      A.   Could you please repeat that
21  question?
22      Q.   Sure.  I'm just trying to
23  connect your assignment to the substance of
24  your report.

Page 111

1      So when you say you've been
2  asked by counsel for defendants to review
3  healthcare decision-making, am I to
4  understand the healthcare decision-making
5  there to refer to the portion of your report
6  that discusses the compensatory decision rule
7  and noncompensatory decision rule that you
8  explain in your report, as well as the MICI
9  factors?
10      A.   Yes and no.  The yes is that I
11  have reviewed the literature on the
12  compensatory/noncompensatory decision rules,
13  and reported a subset of that literature as
14  well as the MICI framework, but not just for
15  the -- how consumers might react to the
16  recall of the VCDs in question, because
17  there's a second part of the paragraph, which
18  I also reviewed the literature to evaluate
19  from a consumer's perspective Dr. Conti's
20  claim, in particular that the VCDs at issue
21  were worthless to consumers as a result of
22  the recall.
23      Q.   Well, and I'm -- we'll get to
24  that.  I'm just trying to connect your

Page 112

1  assignment to what's in your report.
2      And so you reviewed healthcare
3  decision-making as a general proposition from
4  a consumer and physician standpoint, correct?
5      A.   Yes.
6      Q.   Okay.  And that's discussed in
7  sort of your general outline of compensatory
8  and noncompensatory decision rules and MICI,
9  correct?
10      A.   Yes.
11      Q.   Okay.  And then you applied
12  that framework to the facts of this case, or
13  attempted to, correct?
14      A.   No, to perform my task that you
15  just highlighted in the first paragraph.
16      Q.   So are you telling me you did
17  not apply that framework to -- or attempt to
18  apply that framework to the facts of this
19  case?
20      A.   I didn't say that.  I think I
21  said just the opposite.
22      Q.   Well, that's what I was asking
23  you to confirm, and you wouldn't confirm it.
24      A.   Yes.

Page 113

1      Q.   So let me rephrase it so we're
2  on the same page.
3      You then applied the
4  compensatory/noncompensatory decision rule
5  analysis and MICI to the facts of this case,
6  correct?
7      A.   I would not go so far as to the
8  facts of this case.  There are many facts of
9  this case that I -- that are not part of my
10  task.
11      Q.   So are you saying you did not
12  apply -- what did you -- let me ask this
13  way.
14      What did you apply those
15  healthcare decision-making concepts that you
16  outlined?  What did you apply those to?
17      A.   The
18  compensatory/noncompensatory rules for how
19  consumers make a value judgment based on the
20  alternatives they consider, the weights of
21  the different attributes they consider, and
22  the ratings that they give to those
23  attributes in different combinations, and the
24  MICI factors were used by me or applied by me

Confidential Information Subject to Protective Order

---

Page 114

1  to make an assessment of how consumers might
2  respond to the recall -- to the recall VCDs,
3  and to answer the question would all
4  consumers uniformly believe that the recall
5  VCDs were worthless.
6      Q.    You're not a physician, are
7  you?
8      A.    No.
9      Q.    Okay.  And you're not a public
10 health official?
11     A.    Define "public health
12 official."
13     Q.    Like you don't work for the FDA
14 or the CDC, or you're not a public health
15 official, are you?
16     A.    I am not a full-time employee
17 of a government agency.
18     Q.    Okay.  And you wouldn't hold
19 yourself out as being an expert on the
20 substance of any medical decisions,
21 treatments, that a physician might make or
22 the FDA might recommend, correct?
23     A.    Please define "substance."
24     Q.    Sure.

---

Page 115

1          You wouldn't be -- you wouldn't
2  step into the role of a physician and say --
3  to tell consumers do this or don't do this
4  from a medical standpoint, would you?
5      A.    Please define "from a medical
6  standpoint."
7      Q.    Exactly what physicians do
8  every day when they talk to their patients,
9  you wouldn't step into that role, would you?
10     A.    As shown in my report, and one
11 recent project comes to mind, I provide
12 communication strategies for physicians to
13 tailor their messages and recommendations to
14 their patients.
15     Q.    But you wouldn't come up with
16 the recommendation itself; you're coming up
17 with the messaging around that
18 recommendation, correct?
19     A.    I'm having a hard time
20 separating some of those, or trying to
21 understand what you're getting at.
22     Q.    It's a simple question.
23          You don't practice medicine, do
24 you?

---

Page 116

1      A.    No.
2      Q.    And as far as the medical
3  substance of medical care, you don't step
4  into the role of the physician and actually
5  advocate of your own accord treatment
6  decisions, do you?
7      A.    No.
8      Q.    Okay.  And same thing for --
9  same question for public health officials,
10 you don't substitute your judgment for that
11 of the regulator, for example the FDA, in any
12 of the decisions that are within its
13 regulatory ambit, do you?
14          MR. GOLDBERG:  Objection to
15 form.  Ambiguous.
16     A.    I'm not clear on the question.
17 BY MR. DAVIS:
18     Q.    Okay.  I mean, I asked a
19 variation of that question right before
20 lunch, which was, you would never advocate in
21 any message that physicians take or a
22 patient -- physicians prescribe or patients
23 take unapproved medications, for example,
24 would you?

---

Page 117

1      A.    I do not recall that question,
2  so...
3      Q.    Well, let me ask that question
4  again.
5          Would you ever advocate in any
6  kind of health communication messaging that a
7  physician prescribe an unapproved medication?
8          MR. GOLDBERG:  Objection to
9  form.
10     A.    Please repeat that.
11          MR. DAVIS:  Can you read the
12 question back?
13          (Whereupon, the reporter read
14 back the question:
15          QUESTION:  Would you ever
16 advocate in any kind of health
17 communication messaging that a
18 physician prescribe an unapproved
19 medication?)
20          MR. GOLDBERG:  Objection to
21 form.  Ambiguous.
22     A.    Unapproved by?
23 BY MR. DAVIS:
24     Q.    You understand that drugs have

---

Case 1:19-md-02875-BMB-SAK    Document 2083-3    Filed 06/02/22    Page 32 of 65
confidential Information Subject to Protective Order
PageID: 72321

Page 118

1  to be pre-approved, correct?
2      A.    So I just want to make sure
3  that this is not unapproved by the physician
4  or somebody else.  I just want to be clear.
5      Q.    Yes.  When I say "unapproved
6  medication," I'm talking about FDA approval
7  that's required for all drug products in the
8  US.
9          So the question is, would you
10  ever in any of your health communication
11  messaging advocate for the use of an
12  unapproved medication?
13      A.    In this particular case I have
14  reviewed and included in my report materials
15  where physicians continued to ask -- to
16  recommend to their patients that they take a
17  VCD that was recalled.
18      Q.    That's not answering my
19  question.
20      A.    So if I -- you said are there
21  any circumstances.  So just like your
22  previous hypothetical that if the FDA asked
23  me to create a communication, if a physician
24  asked me to create a communication I would

Page 119

1  not -- I would try to say no, I'm not going
2  to do that because the FDA has not approved
3  this communication.  And that's why I gave
4  you the example I did.
5          If there is some understanding
6  that they should continue to take the
7  medication, then I would help them do that.
8      Q.    Well, I'm not -- you're not
9  following the thrust of my question.  I'm
10  asking you about --
11      A.    Sorry.
12      Q.    -- a drug that was never
13  approved.
14      A.    Oh, I'm sorry, I didn't hear
15  never approved.
16      Q.    That's what I mean by
17  "unapproved medication," something that
18  wasn't approved.
19          So would you ever advocate --
20  and this gets to my broader question about
21  you not substituting your judgment or making
22  any kind of public health judgments that are
23  preserved for the regulator, correct?  And
24  the question is, would you ever advocate for

Page 120

1  the use of an unapproved drug?  And by that I
2  mean something that was never approved by the
3  FDA.
4          MR. GOLDBERG:  Objection to
5      form.  Ambiguous, speculative.
6      A.    I don't ask those questions.
7  There is a review process for the work that I
8  do, and I leave it to others to make those
9  determinations.
10          I have a very specific role
11  that I play in designing the message
12  communication, and that role does not require
13  any expertise or knowledge on my part on
14  regulatory approval or unapproved or anything
15  of that spectrum.
16      Q.    Right.  And that's simply my
17  question, is you rely on those people to do
18  their job, right?  You rely on the FDA to do
19  the business of public health regulation,
20  correct?
21      A.    That is not what I said.  You
22  asked me in my projects, in all my previous
23  work, you know, do I -- this is my
24  understanding of what you asked me, do I

Page 121

1  ensure, or do I seek information or -- sorry,
2  I'm sorry, it was dinging away and I
3  didn't --
4          MR. GOLDBERG:  Can we just go
5      off the record for a second?
6          THE VIDEOGRAPHER:  Off record
7      at 12:54.
8          (Off the record.)
9          THE VIDEOGRAPHER:  Back on at
10      12:54.
11      A.    So I agree that that was not my
12  job on these projects.  I'm not agreeing that
13  it's the FDA's job.  I'm saying, depending on
14  the project, I don't know who takes care of
15  different aspects of the job.
16  BY MR. DAVIS:
17      Q.    Let me ask it this way.
18          Have you ever designed any kind
19  of messaging that's health-related to
20  consumers or physicians that you knew was
21  inconsistent with what the FDA's position was
22  on that very subject?
23      A.    I have never checked to see
24  whether what I'm designing a message -- a

Page 122

1  health message for has or has not been
2  approved by the FDA.
3      Q.    Well, I'm not saying approved
4  by the FDA.  I'm saying, have you ever done
5  that, have you ever designed a message
6  related to healthcare that goes out to a
7  consumer or physician that you knew was
8  inconsistent with the FDA's position on that
9  very same subject matter?
10      A.    I'm not an expert on the FDA,
11  and that is not something that I would seek
12  or look for information on before I designed
13  the message.
14      Q.    Okay.  You wouldn't hold
15  yourself out as an expert on how to
16  appropriately address from a medical care
17  standpoint a patient who was taking
18  nitrosamine-contaminated VCDs, would you?
19      A.    Please repeat that question.
20      Q.    You wouldn't hold yourself out
21  as an expert on the medical care decisions
22  that a physician and patient may want to make
23  in response to a patient's exposure to
24  nitrosamines in their valsartan, would you?

Page 123

1      A.    I'm not an expert in this.  I
2  would not have an opinion.
3      Q.    Okay.  And when you discuss
4  healthcare decision-making, for example in
5  paragraph 1 of your report that we just read
6  in your assignment, you're not discussing the
7  decisions of congress and the FDA regarding
8  structural aspects of our healthcare system,
9  are you?  That healthcare decision-making
10  you're focused on here is related to
11  physicians' and consumers' choices, correct?
12      A.    It's more specific.  It's
13  related to how consumers, sometimes on their
14  own and sometimes in conjunction with their
15  physicians, would assess the worthiness or
16  value of a drug, and in this particular case
17  the recalled VCDs.
18      Q.    Okay.  Let's stick with my
19  question, which is, you're not critiquing or
20  in any way discussing in your discussion of
21  healthcare decision-making the structural
22  aspects of our healthcare system that
23  congress and the FDA have set up, are you?
24          MR. GOLDBERG:  Objection to

Page 124

1  form.  Ambiguous.
2      A.    I don't know what those
3  structural elements are, and I'm not an
4  expert on what congress and the FDA have --
5  the system that they've created, and I'm not
6  going to give you an opinion on that.
7  BY MR. DAVIS:
8      Q.    Right.
9          And you're not taking any issue
10  with any of that is my question, correct?
11      A.    I'm -- if I'm not an expert on
12  it and I'm not giving an opinion on it, I
13  should not be interpreted as taking issue
14  with it.  I have nothing to say about it.
15      Q.    Okay.  You -- continuing in
16  that assignment paragraph, you say you've
17  been tasked with evaluating certain
18  assertions from Dr. Conti, particularly her
19  claim that VCDs in this case were worthless.
20          Do you see that?
21      A.    Yes.
22      Q.    And you call her -- you call
23  her analysis -- you basically say that she's
24  applying a non -- uniform noncompensatory

Page 125

1  decision rule, do you not?
2      A.    I do not say that.
3      Q.    Take a look at paragraph 9 of
4  your report, first bullet point.  You say in
5  the middle of that bullet point, "In doing
6  so, Dr. Conti's analysis implicitly relies on
7  a uniform noncompensatory decision-rule for
8  calculating damages."
9          Do you see that?
10      A.    Yes.
11      Q.    So you are saying that she's
12  applying a uniform noncompensatory decision
13  rule, do you not?
14      A.    You forgot a critical word.
15  No, I did not say that, I said she is
16  implicitly applying.
17      Q.    How is that different from her
18  applying, which is my question?
19      A.    The different between an
20  explicit and an implicit application.  She
21  does not mention a noncompensatory decision
22  rule, but her assertions are consistent with
23  a noncompensatory decision rule, which is why
24  I said she implicitly applies a

Confidential Information - Subject to Protective Order

Page 126

1  noncompensatory decision rule.
2      Q.    Okay.  Thank you for that.
3  That was going to be my next question, is
4  Dr. Conti never uses that term in her report,
5  does she?
6      A.    No.
7      Q.    Thank you.
8          That's a term -- compensatory
9  decision rules, noncompensatory decision
10 rules, those are terms that are borne out of
11 the field of sort of behavioral science,
12 right?  Consumer behavior, consumer
13 psychology, your field of expertise, correct?
14     A.    As I mentioned in my testimony
15 earlier, the foundation for some of this work
16 on compensatory/noncompensatory decision
17 rules came from economists, and I mentioned
18 several, Simon, Tversky, Kahneman, amongst
19 others.
20         Simon actually was the first
21 one that came up, from what I know, or is at
22 least given credit for the first
23 noncompensatory rule satisfying.  This is
24 Herbert Simon, he's an economist.

Page 127

1      Q.    This is behavioral economics,
2  correct?
3      A.    At that time it was not defined
4  as such, but he's an economist, and now it is
5  commonly adopted in behavioral economics as
6  well.
7      Q.    Let's go to paragraphs 21
8  through 28 of your report.  And this is where
9  you set forth some discussion and definitions
10 of what you mean by compensatory decision
11 rules and noncompensatory decision rules, is
12 that correct?
13     A.    Yes.
14     Q.    For example, in paragraph 22
15 you state that "The compensatory
16 decision-rule involves physicians and
17 consumers placing a higher value of one drug
18 feature to compensate for a lesser value of
19 another feature," correct?
20     A.    Yes.
21     Q.    There's an assumption there, is
22 there not, that the information regarding
23 those features is available for them to
24 actually weigh, correct?

Page 128

1      A.    No.
2      Q.    Explain to me how that could
3  not be.
4      A.    Some consumers use their
5  experiences to make judgments about which
6  features are important, what weights they
7  want to put on those features, and how they
8  would evaluate those features even if they
9  did not have any external information.
10     Q.    So what you're saying is that
11 even if -- the consumers may make, you know,
12 make -- draw conclusions without the
13 information, correct?
14     A.    Yes.
15     Q.    Okay.  But to actually weigh
16 the benefits, the costs and benefits of a
17 particular feature, that feature has to be
18 disclosed to them, does it not?
19     A.    Explain what you mean by
20 "disclosed."
21     Q.    How can someone weigh the costs
22 and benefits of a particular feature of a
23 medicine, for example, if the feature itself
24 is not known to them?

Page 129

1      A.    Well, I think you're making an
2  assumption that the feature is not known to
3  them unless someone else gives them the
4  information.
5          If they have no information on
6  the feature regardless of the source, I agree
7  with you, then they would probably not
8  include it in their decision-making and their
9  valuation.  But they can get information from
10 a variety of sources and decide which source
11 they want to include, which source they don't
12 want to include, and make the deliberation
13 accordingly.
14     Q.    There's also an assumption here
15 in this paragraph 22 that the drug, like the
16 hypothetical drug you discuss here, you say,
17 "placing a higher value of one drug feature
18 to compensate for a lesser value of another
19 feature," right?  So you're discussing this
20 in the context of a pharmaceutical drug
21 product, correct?
22     A.    I don't believe a chewable
23 multivitamin is a pharmaceutical drug
24 product, but maybe it is.

Page 130

1    Q.    Well, I'm not asking about
2  chewable multivitamins.  I'm asking about the
3  first sentence of paragraph 22, "The
4  compensatory decision-rule involves
5  physicians and consumers placing a higher
6  value of one drug feature to compensate for a
7  lesser value of another feature."
8        Do you see that?
9    A.    Yes.
10    Q.    Okay.  And by "drug" there you
11  mean a prescription drug, because you're
12  saying physicians as well as consumers,
13  correct?
14    A.    That is incorrect.
15    Q.    Okay.  Well, it could
16  include -- when you say "drug," what do you
17  mean there?
18    A.    It could mean any kind of drug,
19  over-the-counter, prescription, any kind of
20  drug.
21    Q.    Okay.  So that term "drug" does
22  include prescription drugs?
23    A.    Yes.
24    Q.    Okay.  Thank you.

Page 131

1        There's an assumption in there
2  that that drug is actually available to them,
3  correct, for them to be able to engage in
4  some kind of meaningful compensatory decision
5  rule, correct?
6    A.    Incorrect.
7    Q.    How could that be?
8    A.    As a consumer, I could think
9  about, even if I -- something was available
10  but not accessible to me, or not available
11  because it was in short supply, or for some
12  other reason, I could think about what the
13  drug would -- how much value I would place on
14  the drug if it were available, for example.
15    Q.    Okay.  But you're not going to
16  end up paying anything for it, correct,
17  because it's not available regardless of what
18  the outcome of the decision is, right?
19    A.    I mean, if there's no product
20  or service, in this case a drug to pay for,
21  I'm not going to pay for nothing.
22    Q.    Right.  Exactly.
23    A.    Yes.
24    Q.    Let's take -- are you familiar

Page 132

1  with the drug Fen-Phen?  Do you remember
2  Fen-Phen?
3    A.    It sounds familiar, but I don't
4  remember any details.
5    Q.    Okay.  Fen-Phen was a weight
6  loss drug that was widely used, and then
7  pulled from the market in the late '90s due
8  to severe side effects, so it's not available
9  today.
10        Do you understand that?
11    A.    I'll take your word for it.
12    Q.    Okay.  Can a physician in --
13  let's say a consumer patient goes in to their
14  doctor today and says, I want you to
15  prescribe me Fen-Phen.
16        Do you follow me?
17    A.    Yes.
18    Q.    And the drug has been withdrawn
19  from the market, it's not available.
20        Do you follow me there?
21    A.    Yes.
22    Q.    Okay.  What would -- the result
23  of that discussion, no matter how much the
24  patient wanted Fen-Phen, is that the patient

Page 133

1  is not going to get Fen-Phen, right?
2    A.    I will say that the physician
3  cannot prescribe Fen-Phen.
4    Q.    Right.  And the patient will
5  not be able to lawfully get Fen-Phen,
6  correct?
7        MR. GOLDBERG:  Objection to
8    form.
9    A.    I don't want to make any
10  assumptions here.  So, for example, they
11  could go to another country and lawfully get
12  Fen-Phen.  I don't want to make an
13  assumption.
14  BY MR. DAVIS:
15    Q.    Okay.  I'm talking --
16  everything we're talking about today, I'm
17  talking about in the US.
18    A.    Okay.
19    Q.    In the US, a patient really
20  wants Fen-Phen, they go in to their doctor
21  and ask for it, they're not going to be able
22  to get it here because of the way our
23  prescription drug system works, right?  You
24  need a prescription from a doctor to get

Confidential - Information - Subject to Protective Order

Page 134

1  Fen-Phen, and it needs to be available,
2  approved, and able to be marketed, correct?
3      A.    If Fen-Phen was a prescription
4  drug, yes.
5      Q.    So whatever the decision
6  analysis that the consumer, you know, arrived
7  at based on what they wanted out of Fen-Phen,
8  the serious side effects that ultimately made
9  it unavailable, the outcome of that is going
10  to be they're not going to get Fen-Phen in
11  the US, correct?
12      A.    In your hypothetical example,
13  yes.
14      Q.    Right.
15          And therefore, they're not
16  going to pay anything for Fen-Phen, correct?
17      A.    Again, there's an assumption
18  there.  There are some consumers who would
19  have had to pay nothing even if Fen-Phen was
20  available, so yes.
21      Q.    Okay.  Right.  They're not
22  going to pay for it, correct?
23      A.    Right.  I'm just clarifying
24  that they may not have had to pay for it even

Page 135

1  if it were available in some circumstances.
2      Q.    I'll grant you that.
3          But the outcome is going to be
4  they're not going to pay for it, right?
5      A.    Correct.
6      Q.    You mentioned your multivitamin
7  example, I believe that's in
8  paragraph twenty -- yeah, paragraph 22,
9  sorry, just on the next page, and then
10  spilling over into paragraph 23, right?
11      A.    Right.
12      Q.    Do you know whether
13  multivitamins are subject to the same
14  approval framework as prescription drugs?
15      A.    No.
16      Q.    Okay.  Do you know whether any
17  generic multivitamin must demonstrate that
18  it's somehow equivalent to some brand
19  multivitamin in order to be marketed?
20      A.    No.
21      Q.    Another example you provide is
22  Accutane.
23          Do you recall that?
24      A.    Yes.

Page 136

1      Q.    Okay.  And that appears around
2  paragraphs 38 and 39 of your report, right?
3      A.    Right.
4      Q.    Okay.  What's the point you're
5  trying to make with this Accutane example
6  here?
7      A.    The general point I'm trying to
8  make is as a consumer behavior expert, I want
9  to emphasize that consumers have agency, and
10  that they can and do make choices even when
11  they may know about negative side effects to
12  others and even to themselves.
13      Q.    Okay.  Those side effects you
14  mention, those are all inherent to the drug
15  itself, correct?
16          MR. GOLDBERG:  Objection to
17      form.  Vague and ambiguous.
18      A.    I don't understand.
19  BY MR. DAVIS:
20      Q.    Sure.
21          Is there some version of
22  Accutane out there that you're aware of that
23  does not carry those side effects?
24      A.    I cannot speak to that.

Page 137

1      Q.    You haven't investigated that
2  one way or the other?
3      A.    No.
4      Q.    Can't you deduce that if a
5  generic drug like we've talked about has to
6  show that it's the same as the brand drug in
7  a lot of ways, can't you deduce that Accutane
8  and its generic equivalents out there would
9  all carry the same risk of these various side
10  effects?
11      A.    No.
12      Q.    You can't deduce that?
13      A.    No.
14      Q.    Okay.  Do you know whether the
15  FDA label -- have you looked at the FDA label
16  for Accutane?
17      A.    No.
18      Q.    Okay.  That's -- do you
19  understand that the FDA label would be
20  exactly where those side effects are
21  disclosed regarding Accutane?
22      A.    I'm not an expert.  I'll take
23  your word for it.
24      Q.    Okay.  And do you have any

Page 138

1  understanding of whether the generic label
2  for generic Accutane has to read exactly the
3  same way with regard to those side effects as
4  brand Accutane's label?
5      A.   Not an expert.  I'll take your
6  word for it.
7      Q.   And you don't understand why
8  the FDA requires that that label be read the
9  same way, do you?
10     A.   Not an expert on the FDA
11 processes.  I'm not going to form an opinion.
12         MR. DAVIS:  I'm handing
13     Exhibit 5 to be marked.
14         (Whereupon, Keller Exhibit
15     Number 5 was marked for
16     identification.)
17 BY MR. DAVIS:
18     Q.   I'm not going to burden you
19 with reading the entire Accutane label here.
20 Did you -- I guess just answer me this.
21         Did you, in coming up with your
22 Accutane example in your report, did you look
23 at the label for the drug?  I think you said
24 no, right?

Page 139

1      A.   No.
2          MR. GOLDBERG:  Objection.
3      Asked and answered.
4  BY MR. DAVIS:
5      Q.   In your report on paragraph 38
6  you mention that Accutane "has a number of
7  potentially serious side effects, including:
8  eye irritation; skin infection; bone
9  tenderness; vision loss; birth defects (in
10 pregnant women); skin inflammation."
11         Do you see that?
12     A.   Yes.
13     Q.   Where did you get that
14 information from?
15     A.   Footnote 62, and it's in
16 Appendix B of my report.
17     Q.   Okay.  So that is -- that
18 appears to be the label, so you did --
19     A.   I didn't know that's what the
20 label was.  Thank you.
21     Q.   Yes.  So this is the label.  So
22 you have looked at this?
23     A.   Yes.
24     Q.   And that's how you pulled out

Page 140

1  for example, these potential side effects,
2  was from looking at what's been marked as
3  Exhibit 5, correct?
4      A.   Sorry, can you repeat the
5  question?  What has been -- sorry, can you
6  ask the question again?
7      Q.   Sure.
8          The way you came to understand
9  that Accutane carries the risk of these side
10 effects that you discuss in paragraph 38 is
11 because, as you cite in footnote 62, you
12 actually went and looked at the label for the
13 drug, correct?
14     A.   That's right.
15     Q.   Okay.  And that's where those
16 side effects were disclosed?
17     A.   I'm sure -- there may be more,
18 but that's where the ones I've listed were
19 disclosed, yes.
20     Q.   So essentially what happened
21 here is the FDA approved Accutane, correct?
22 The FDA granted approval for Accutane to be
23 marketed to Roche, which was the brand
24 company as you see there.

Page 141

1          Do you understand that?
2      A.   I take your word for it.
3      Q.   And they approved Accutane
4  despite the drug carrying these disclosed
5  side effects, correct?
6      A.   I'll take your word for it.
7      Q.   And left it up to physicians
8  and consumers to weigh the costs and benefits
9  of taking the medicine with those -- with the
10 knowledge of those disclosed side effects in
11 the label, right?
12     A.   Yes.
13     Q.   Okay.  Let me ask you, how do
14 you think users of --
15     A.   Should I put this away?
16     Q.   Sure, if you want to.
17         How do you think users of
18 generic Accutane manufactured by Ranbaxy
19 weighed the fact that that generic Accutane
20 was contaminated?
21     A.   Could you please repeat the
22 question?
23     Q.   Sure.
24         Are you familiar with a company

1  called Ranbaxy?
2      A.   No.
3      Q.   Okay.  Let me mark something
4  else for you.
5          MR. DAVIS:  I'm handing
6      Exhibit 6 to the reporter to be
7      marked.
8          (Whereupon, Keller Exhibit
9      Number 6 was marked for
10     identification.)
11 BY MR. DAVIS:
12     Q.   Okay.  I'm handing you a --
13 Exhibit 6, for the record, is a US Department
14 of Justice press release titled "Generic Drug
15 Manufacturer Ranbaxy Pleads Guilty and Agrees
16 to Pay $500 Million to Resolve False Claims
17 Allegations, cGMP Violations and False
18 Statements to the FDA."
19         Do you see that?
20     A.   I see it.
21     Q.   That's dated May 13, 2013?
22     A.   I see.
23     Q.   Okay.  So, in fact, if you --
24 just to orient you, if you go back to

1  Exhibit 5 just for a moment, which is the
2  Roche label for Accutane, do you see what the
3  generic name for that drug is?
4      A.   Exhibit -- where?  It's a big
5  document.
6      Q.   Well, actually it's in your
7  report at paragraph 38, "As an example,
8  Accutane, or isotretinoin."
9      A.   Yes.
10     Q.   Do you know that Accutane's
11 generic name is isotretinoin?
12     A.   Yes.
13     Q.   Okay.  I'm going to direct your
14 attention to page 2 of Exhibit 6, which is
15 this DOJ announcement.
16     A.   Okay.
17     Q.   And you'll see in the second
18 paragraph on that page, "Ranbaxy USA admitted
19 to introducing into interstate commerce
20 certain batches of adulterated drugs that
21 were produced at Paonta Sahib in 2005 and '6,
22 including Sotret, gabapentin, and
23 ciprofloxacin."
24         And then it says, "Sotret is

1  Ranbaxy's branded generic form of
2  isotretinoin," which is Accutane, correct?
3      A.   Is the generic form.
4      Q.   Right.
5      A.   Yes.
6      Q.   So do you see there that
7  Ranbaxy admitted that in 2005 and '6 that
8  they distributed adulterated isotretinoin?
9      A.   According to this statement,
10 yes.
11     Q.   Okay.  So my question is, how
12 do you think consumers of Ranbaxy's Sotret or
13 isotretinoin manufactured by them who got
14 that drug in 2005 and 2006 were able to weigh
15 at the moment they went to the pharmacy and
16 got it the fact that it was adulterated?
17         MR. GOLDBERG:  Objection to
18     form.
19         I think it would be fair to
20     allow the witness to review the
21     document, given the question.
22 BY MR. DAVIS:
23     Q.   You don't need to review the
24 document to answer the question.  I'm asking

1  you what I think is a pretty simple question.
2          How do you think consumers of
3  Ranbaxy's Sotret, which is, as we've seen,
4  generic Accutane, how do you think those
5  consumers in 2005 and '6 were able to weigh
6  the fact that it was adulterated when it was
7  dispensed to them at the time they purchased
8  the drug?
9          MR. GOLDBERG:  I'm going to
10     place the same objection.  I think the
11     witness can read the document, that
12     statement that you're asking her about
13     into context.  You're sort of showing
14     her a document --
15         MR. DAVIS:  This is
16     filibustering.
17         MR. GOLDBERG:  It is not.
18 BY MR. DAVIS:
19     Q.   Feel free, Dr. Keller, if you
20 want --
21         MR. GOLDBERG:  You placed a
22     document in front of the witness, you
23     didn't give her a chance to review it.
24     Let her review the document, and let

Confidential Information - Subject to Protective Order

Page 146

1 her answer the question.
2 BY MR. DAVIS:
3    Q.   I'm not sure how helping the
4 document is going -- or reviewing the
5 document is going to help you answer the
6 question. I've set forth a fact that was
7 admitted to by Ranbaxy, which is that they
8 distributed in 2005 and 2006 certain
9 adulterated batches of isotretinoin.
10      You see that in the document,
11 do you not?
12    A.   Yes.
13    Q.   Okay. And you have no reason
14 to dispute what Ranbaxy is admitting there,
15 correct, that they did that?
16    A.   Right.
17    Q.   Okay. So my question to you
18 is, how do you think consumers who purchased
19 those adulterated isotretinoin prescriptions
20 in 2005 and 2006 were able to weigh the fact
21 that they were adulterated in 2005 and '6
22 when they actually bought the drugs?
23    A.   This is the reason for wanting
24 to read the document, to see if there is any

Page 147

1 context that would help me answer the
2 question more accurately.
3    Q.   The fact is they couldn't,
4 right? The answer is no, they can't weigh
5 that information, right, because they didn't
6 know it, right?
7      MR. GOLDBERG: Objection to
8 form.
9    A.   Again, I don't know that. I
10 accepted what you said earlier when you
11 pointed to where I -- where that was in the
12 report. If you let me read this report, I'll
13 see if that same statement is made in the
14 report, and then you can ask me the question
15 again whether I have any reason to doubt it.
16 BY MR. DAVIS:
17    Q.   Okay. Take a few moments.
18      MR. DAVIS: Let's go off the
19 record.
20      MR. GOLDBERG: No, let's not go
21 off the record. The document is a
22 couple of pages. Under the rules in
23 this case, the witness gets to read
24 the document for a few minutes, if

Page 148

1 it's going to take longer we'll go off
2 the record. But we don't go off the
3 record automatically just because a
4 document is presented. That's how it
5 goes.
6 BY MR. DAVIS:
7    Q.   Feel free to give the document
8 a cursory review.
9    A.   I'm sorry, I'm going to
10 undertake my task so that I can answer your
11 question to the best of my ability.
12    Q.   Sure. Okay.
13    A.   Thank you.
14    Q.   Review the document.
15    A.   Thank you.
16      (Witness reviewing document.)
17    A.   Thank you.
18    Q.   Sure. So let's start with the
19 portion of the document that I called out to
20 you.
21      You agree that Ranbaxy admitted
22 to distributing in 2005 and 2006 certain
23 batches of adulterated isotretinoin, which is
24 generic Accutane, correct?

Page 149

1    A.   Yes.
2    Q.   Okay. So my question is, how
3 can consumers who purchased those drugs in
4 2005 and '6 have weighed the fact that they
5 were adulterated at the time that they
6 purchased them?
7    A.   You are making an assumption
8 that consumers uniformly would have wanted to
9 weigh that fact.
10    Q.   No, that's not my question, and
11 you're not answering my question.
12      My question is, how could they
13 have weighed that information when it wasn't
14 disclosed to them?
15    A.   But the assumption is that they
16 would even want to. So if I don't want to,
17 the issue of how I could is irrelevant.
18    Q.   Well, you're taking it --
19 you're taking my question and you're
20 answering a different question.
21    A.   I see.
22    Q.   My question is, how can
23 consumers who purchased adulterated Ranbaxy
24 isotretinoin in 2005 and 2006 that was

Confidential Information - Subject to Protective Order

Page 150

1  adulterated, how could they have weighed the
2  fact that it was adulterated?  If they wanted
3  to weigh that fact, how could they have
4  weighed that fact that it was adulterated?
5  They couldn't, right?
6      A.    Again, I'll explain why I'm
7  having a hard time answering that question
8  directly.
9          Based on my understanding of
10 consumer behavior, there are consumers who
11 think drugs are adulterated when they're not
12 and consider that.  And the example that I
13 give in my report was on -- because we were
14 talking about COVID vaccine earlier, about
15 bleach, and I cited a supporting document,
16 you know, something from the CDC on the
17 percentage of people that were using bleach
18 because they thought that was more
19 efficacious for them or safer or whatever set
20 of reasons they had that I'm unsure of than
21 the COVID-19 vaccine.
22         So I don't -- I said this
23 earlier, I don't think that consumers need to
24 get specific information in order for them to

Page 151

1  include features, whether they're benefits or
2  costs or both in some cases, in order to make
3  a determination of how they impact the value
4  that they are assessing.
5      Q.    You don't think consumers are
6  entitled -- you don't think these Ranbaxy
7  isotretinoin consumers were entitled to know
8  that the drug they got was adulterated?  Is
9  that what you're saying?
10     A.    No, I did not say that.  I
11 actually don't know what you mean by
12 "entitled."
13     Q.    You don't think it would have
14 been right for them to know that the drug
15 they were getting was adulterated?
16     A.    There are some consumers who
17 would say, It is my right to know, and there
18 are others who would say, I don't care.
19         There is a range of consumer
20 behavior, and I don't think that you can
21 uniformly assume any consumer would be
22 exactly the same in this context of they
23 would feel that they have the right to know.
24     Q.    But you're not answering my

Page 152

1  question.  You're answering a different
2  question, which is how they might have
3  weighed that information or not have weighed
4  that information.
5          My question is, it wasn't
6  disclosed to them, so even if they wanted to
7  weigh it they couldn't have, right?  Even if
8  they would have considered that in their
9  decision-making, they couldn't have, right,
10 because it wasn't disclosed to them.  Would
11 you agree with that?
12     A.    So you're saying make the
13 assumption that people -- that there were
14 people who wanted to know, and then -- you're
15 asking me to make a lot of assumptions.
16     Q.    Well, I don't think it's a big
17 assumption to assume that people would want
18 to know that their drug was contaminated.
19     A.    Some will and some will not,
20 and that's what I said.
21     Q.    Assume it for me, Dr. Keller,
22 assume that there were patients of Ranbaxy's
23 Sotret who would have wanted to know that
24 information.

Page 153

1      A.    Okay.
2      Q.    But they didn't know that
3  information at the time they purchased the
4  drug, right?
5      A.    Correct.
6      Q.    Okay.  How could they have
7  weighed that information when it wasn't
8  disclosed to them?  They couldn't have,
9  right?  They could not have weighed that
10 information, correct?
11     A.    They could not have weighed the
12 specific information, but they could have
13 weighed related information.
14     Q.    What do you mean by "related
15 information"?
16     A.    You know, there are consumers
17 out there who believe that pure drugs is an
18 oxymoron, and that -- you know, and as I
19 state in my report in Section IV, I think it
20 was IV.B, which is what we were referring to
21 earlier, there are some consumers who learn
22 over time that things that they thought were
23 safe were not safe, and things that they
24 thought may have not been safe have reentered

confidential information - subject to protective order

Page 154

1  the market in a different form or in some
2  other form.
3        So I think the situation is
4  much more fluid, and that consumers are aware
5  of this.
6     Q.   So you're saying that you don't
7  think consumers should be entitled to expect
8  that the drugs that are distributed to them
9  at the pharmacy are as approved by the FDA?
10    A.   I would never use consumers, if
11 your -- I would never agree to any sentence
12 that says "consumers" if by that you mean all
13 consumers.
14    Q.   I'm asking, because you said
15 that -- I think you said that the notion of a
16 pure drug was an oxymoron.  Is that what you
17 said?
18    A.   I said for some consumers, not
19 for -- remember, I'm doing -- I'm applying
20 the same rule to myself that I'm applying to
21 you.  I said for some consumers.  I would not
22 say for all consumer a pure drug is an
23 oxymoron.
24    Q.   So what you're saying is you

Page 155

1  don't think consumers of pharmaceuticals
2  dispensed in the US should be entitled to a
3  belief or an expectation that those drugs are
4  dispensed to them as described and approved
5  by the FDA?
6     A.   Again, I don't believe that is
7  the case for all consumers.  I think many
8  consumers don't think about whether the drug
9  is approved or not approved, or who approves
10 it or doesn't approve it.
11       And I'm going to break one of
12 my own rules and give you an example where if
13 I was taking a drug, and it could be this one
14 that you have as an example, and I thought it
15 was working brilliantly for me, I might not
16 want to know that the drug -- I mean, sorry,
17 I can say drug, yeah -- that the drug was
18 adulterated because I would like to continue
19 taking the drug without any trepidation.
20    Q.   You might not want to know?
21    A.   I might not want to know.
22    Q.   Well, what if -- I mean, we're
23 talking about just one manufacturer's version
24 of generic Accutane, you wouldn't want to

Page 156

1  know that so you could just take another
2  manufacturer's version of generic Accutane
3  that wasn't adulterated?
4     A.   It's a hypothetical, so I'm
5  giving you a hypothetical back, and that is,
6  if I like this one that I'm taking and it's
7  worked for me -- and back to my framework
8  that I talk about in the model, and I'll use
9  MICI this time, which is, depending on the
10 message that I got -- and I can give you
11 examples, depending on -- I'm focusing on the
12 individual differences, that if I've tried
13 other acne medicines and they haven't worked
14 for me, and then I find one that I really
15 like and it seems to work for me, and then
16 there is this information out there, I'm
17 saying that there are some consumers in those
18 situations that might not want to know or not
19 care about this information about the
20 adulteration from this specific batch because
21 they don't want to switch, they don't want to
22 consider any alternative products.
23    Q.   Do you understand that the
24 point of our generic drug system is that all

Page 157

1  the generics are supposed to work in the same
2  way to each other and to the brand?
3        MR. GOLDBERG:  Objection.
4  BY MR. DAVIS:
5     Q.   Do you understand that?
6        MR. GOLDBERG:  Objection to
7  form.  Asked and answered.
8     A.   I am not an expert on how
9  generics are supposed to work, and I will not
10 give you an opinion on that.
11 BY MR. DAVIS:
12    Q.   Let's back up for a second.
13       You talk a lot about this
14 choice exercise that consumers make in the
15 healthcare context, right?
16    A.   Which context are you speaking?
17 We were talking about how a consumer might
18 value the drug that they have, so when you
19 say "choice exercise," I'm trying to
20 understand the context.
21    Q.   Sure.
22       Your whole report is about
23 healthcare decision-making, right?  And that
24 involves a choice, right?

Confidential Information - Subject to Protective Order

A. I would say that that's a bit of a mischaracterization. The bulk of my report is focused on how consumers would assess the value or worth of a drug to them.

Q. Okay. And once they make that assessment, at what point is the decision finalized for them?

A. Lots of cases, never. In some cases, they try one, they never switch. That varies by consumer.

Q. Well, the choice is culminated when they go buy the drug, right? They're acting, would you agree --

A. No, no.

Q. Would you agree that a consumer, when they go fill a prescription, they're acting on a choice that they've made, correct? They may -- I hear what you're saying, they may reevaluate that choice in the future, but they're acting on a choice that they made prior to that, because they had to -- I mean, it's just common sense, you go fill a prescription, you're doing an act, right?

A. As I mentioned to you earlier, the consumer value is defined as a comparison of benefits and costs, and the price they pay or the act of actually exchanging a product for money is only one aspect of the cost.

Q. It's an action, though, that a consumer is taking, correct?

A. It's one of several.

Q. As a result of the decision and choice analysis that they went through prior to engaging in that act, right?

A. I take objection to that. As I explain in my report, and this is in Section IV.B of my report, consumers use a variety of different methods to make those choices. Some of them are noncompensatory or reflexive, they haven't thought about anything, they've just gone and done it spontaneous, others -- there's a range -- others will spend a lot of time and think about the plusses and minuses. There's a range.

Q. I'm not going into the qualitative aspect of that choice. All I'm

saying is that in order to act, which is to go fill the prescription at the pharmacy, some level of choice had to be made to go do that. We're not talking about zombies here who are just like, you know, going to the pharmacy, this is a choice that humans make to go fill a prescription, is it not?

A. I would say some will go fill and some will not. And again, as is explained in my report, many consumers do not fill their prescriptions, and many consumers who fill their prescriptions do not take their drugs. So those are also actions.

Q. So with this Sotret example, which consumers affirmatively made the choice to go get adulterated Sotret from Ranbaxy?

A. I have no idea.

Q. None, right?

A. Well, no, that is -- I have no information on that. I can't tell you that.

Q. If you don't know -- if they didn't know about it, how could they affirmatively go choose that at the time? They can't, right?

A. I'm going to repose -- I'm going to, sorry, reframe, reframe that question.

Compare that to a consumer who should have had the information, could have had the information but did not, right? What is the difference between their action and someone who could not have known?

Q. Do you have any -- is there any indication in this DOJ announcement that you read that any consumer had any indication, or any ability to even go and find out that Ranbaxy's Sotret was adulterated at the time it was dispensed to them?

A. That information is not contained in this document.

Q. In fact, the opposite is contained in the document, right? Part of the settlement was related to Ranbaxy knowing and not telling the FDA until 2007, which is years after the adulterated Sotret was distributed in 2005 and '6, right? So the indication in this document at least is that no one knew except Ranbaxy, right?

Confidential Information - Subject to Protective Order

Page 162

1    A.   I don't know that to be a fact.
2    Q.   Okay.  Take a look at the last
3  paragraph of page 3 of this document.  It
4  says -- and this is a quote from John Roth,
5  the director of the FDA's office of criminal
6  investigations.  He says, "The FDA expects
7  that companies will comply with the cGMP
8  requirements mandated by law so that consumers
9  can be assured that their medical products
10  are safe and pure."
11          Do you see that?
12    A.   Yes.
13    Q.   Okay.  Is there anything about
14  that statement that you disagree with?
15    A.   I am not an expert on the FDA,
16  so I have no idea what they expect companies
17  to do.
18    Q.   Do you think that consumers are
19  entitled to the same expectation that the FDA
20  has here, which is that their medical
21  products are safe and pure?
22    A.   Again, it depends on how you
23  ask consumers those questions.  If they had
24  to make trade-offs, they might make different

Page 163

1  trade-offs on how important safety or purity
2  might be to them if it meant lower efficacy
3  or lower experience for them.
4    Q.   So you're saying that consumers
5  of prescription drugs in the US should be
6  forced into a position of making a trade-off
7  that includes whether their products are safe
8  or pure?
9    A.   That is not what I said.
10    Q.   Wouldn't that position
11  completely undermine our prescription drug
12  approval framework in this country?
13    A.   I am not an expert on the
14  approval drug process, and I am not offering
15  an opinion on it.
16    Q.   Okay.  Go back to page 1 of
17  this document, which is Exhibit 6 for the
18  record.  Another quote from Stuart Delery,
19  who was acting assistant attorney general for
20  the civil division of the department -- U.S.
21  Department of Justice.  He says, "When
22  companies sell adulterated drugs, they
23  undermine the integrity of the FDA's approval
24  process and may cause patients to take drugs

Page 164

1  that are substandard, ineffective, or
2  unsafe."
3          Do you see that?
4    A.   Yes.
5    Q.   Okay.  Do you agree from a --
6  put your marketing consumer-patient messaging
7  hat on -- do you agree that that would
8  complicate your job if the integrity of the
9  FDA's approval process was undermined?
10    A.   I cannot answer that question.
11    Q.   Okay.  You don't think it would
12  be harder, for example, to advocate for
13  medication compliance when -- if the approval
14  process for that very medication was -- the
15  integrity of it was undermined because
16  companies were selling adulterated drugs?
17          MR. GOLDBERG:  Objection to
18      form.  Ambiguous.
19    A.   I cannot answer that question.
20  BY MR. DAVIS:
21    Q.   On page 3, back to page 3 of
22  Exhibit 6, you'll see a paragraph, second to
23  last paragraph, "Last year" -- which would
24  have been 2012 based on the date of this

Page 165

1  document -- "FDA and Ranbaxy agreed to an
2  injunction that prevents drugs produced at
3  the Paonta Sahib and Dewas facilities from
4  entering the US market until the facilities
5  have been brought into full compliance with
6  the FDCA and its implementing regulations."
7          Do you see that?
8    A.   Yes.
9    Q.   So for that period of time from
10  the beginning of the injunction until a
11  determination of full compliance was made,
12  there was no consumer in the US market who
13  could have gotten a Ranbaxy drug produced at
14  those two facilities, right?  Is that what
15  that says?
16    A.   I will make that assumption
17  that there were no leftovers or -- there's
18  many assumptions there, but okay.
19    Q.   And so, therefore, there would
20  have been no supply of drugs from those
21  facilities, correct, entering the US market?
22          MR. GOLDBERG:  Objection to
23      form.
24    A.   Please explain that.

Confidential Information Subject to Protective Order

Page 166

BY MR. DAVIS:
1  Q.    I'm not sure what there is to
3  explain.
4          There would have been no supply
5  of drugs from those two facilities that could
6  have entered the US market for the period of
7  the injunction, correct?
8          MR. GOLDBERG:  Objection to
9      form.  Foundation.
10     A.    So can you please explain what
11  period we're talking about?
12  BY MR. DAVIS:
13     Q.    Sure.
14         The period that I thought we
15  had understood, which was the beginning of
16  the injunction until full compliance.
17     A.    So I'm not a lawyer, and, you
18  know, I need to understand.  You know, these
19  are fluent terms for you.
20         So when you say "the beginning
21  of the injunction," what -- and you're asking
22  me about a time period, so what time period
23  am I referring to?
24     Q.    The date of the injunction last

Page 167

1  year, so 2012, FDA and Ranbaxy agreed to an
2  injunction.
3     A.    So from 2012 to?
4     Q.    Whatever that date was that
5  they were brought into full compliance, if
6  that date ever occurred, would you agree with
7  me that there was no supply of Ranbaxy drugs
8  from those two facilities that could have
9  entered the US market?
10     A.    I am not an expert on this and
11  I cannot answer that question.
12     Q.    I mean, it just plainly says it
13  there, doesn't it?
14         MR. GOLDBERG:  Objection to
15      form.  Argumentative.
16     A.    It's not plain to me.
17  BY MR. DAVIS:
18     Q.    So the FDA and Ranbaxy agreeing
19  to an injunction that, quote, prevents drugs
20  produced at the two facilities from entering
21  the US market, that doesn't suggest to you
22  that, for that time period, that there was no
23  supply of Ranbaxy drugs into the US market
24  from those two facilities?

Page 168

1     A.    I will repeat why I am not
2  saying that there was no supply.  In part, I
3  don't know what supply there already was in
4  the marketplace, I don't know what -- how it
5  was recalled, I don't know what instructions
6  people gave, physicians and otherwise, as to
7  what people should do with whatever supply
8  was available, and I actually from this
9  sentence don't even know.
10         It says earlier that they're
11  going to work with them.  I don't know when
12  they started working with them and allowed
13  them to reenter the market.  I don't know.
14     Q.    Do you know what happens to the
15  supply of pharmaceuticals that are already in
16  the market once a recall is announced?  Do
17  you know what happens to those pills that are
18  sitting on warehouse shelves or pharmacy
19  shelves after the recall is announced?
20     A.    I am not an expert on this, and
21  I will not form an opinion.
22         MR. GOLDBERG:  John, I think
23      we've been going about 90 minutes.
24         MR. DAVIS:  Sure.  Five

Page 169

1  minutes?
2         We can go off the record.
3         MR. GOLDBERG:  Yes, let's go
4      off the record.
5         THE VIDEOGRAPHER:  Off the
6      record at 1:53.
7         (Whereupon, a recess was
8      taken.)
9         THE VIDEOGRAPHER:  Back on the
10      record at 2:09.
11  BY MR. DAVIS:
12     Q.    Okay.  Dr. Keller, we left off,
13  I was asking you about this FDA Ranbaxy
14  injunction, I was asking you how that would
15  have affected the supply of Ranbaxy's in this
16  case Sotret that we were talking about into
17  the market that was produced at these two
18  facilities, into the US market.
19         Do you recall that discussion?
20     A.    I recall the discussion before
21  the break, yes.
22     Q.    Okay.
23     A.    Should I bring this document
24  forth again?

Confidential Information - Subject to Protective Order

Page 170

1    Q.    No, I was resetting our --
2    A.    I'm sorry.  Okay.
3    Q.    -- context here.
4          Have you examined in any detail
5    how the fact of adulteration in this case,
6    for example, affects a company's ability to
7    supply their drugs into the US?
8    A.    I need a clarification.
9    Q.    Sure.
10   A.    In this case are we talking
11   about the Ranbaxy case, or are we talking
12   about the VCD case, or some other case?
13   Q.    I'm just talking generally
14   about pharmaceutical prescription drugs.
15   Okay.
16   Q.    Did you as part of this
17   assignment, or not as part of this
18   assignment, just generally, have you ever
19   studied how the fact of a prescription drug's
20   adulteration affects its ability to be
21   distributed, marketed, sold, dispensed in the
22   United States?
23        MR. GOLDBERG:  Objection.
24   Ambiguous and compound.

Page 171

1    A.    I am not an expert on many of
2    the things that were raised, and I'm not
3    going to give an opinion.
4    BY MR. DAVIS:
5    Q.    So you haven't looked into how
6    the fact of adulteration might affect the
7    supply of a drug in the US?
8    A.    Not prior to this case.
9    Q.    Did you in this case?
10   A.    I reviewed Dr. Conti's report,
11   so yes.
12   Q.    Okay.  I'm asking not did you
13   review Dr. Conti's report.  I'm asking if you
14   did any independent analysis of your own how
15   the fact of adulteration under the law might
16   affect the supply or the ability of a
17   manufacturer to supply its drug product in
18   the United States market?
19   A.    No.  I am a consumer behavior
20   expert.  I have no opinion on drug supply for
21   the example you've given.
22        MR. DAVIS:  I'm going to mark
23   Exhibit 7.
24        ///

Page 172

1          (Whereupon, Keller Exhibit
2    Number 7 was marked for
3    identification.)
4    BY MR. DAVIS:
5    Q.    I understand you're not a
6    lawyer, Dr. Keller.  What I'm showing --
7        MS. ANDRAS:  Can you please
8    identify it with specificity on the
9    record?
10       MR. DAVIS:  Sure.  For the
11   record, this is Exhibit 7, which is 21
12   USC 331, part of the US Code entitled
13   "Prohibited Acts."
14   BY MR. DAVIS:
15   Q.    Do you see that?
16   A.    Yes.
17   Q.    Do you have familiarity with
18   what the US Code is?
19   A.    No.
20   Q.    Do you understand that that's
21   federal law enacted by congress, signed by
22   the President?
23       MR. GOLDBERG:  Objection to
24   form.  Foundation.

Page 173

1    A.    I did not know that.  I'm not
2    an expert on the law.
3    BY MR. DAVIS:
4    Q.    Okay.  I'm granting you that.
5          It says there that, "The
6    following acts and the causing thereof are
7    prohibited."  And then it says, "(a) The
8    introduction or delivery" into -- sorry.
9    "The introduction or delivery for
10   introduction into interstate commerce of
11   any," and it lists several things, including
12   drugs, that are adulterated or misbranded.
13        Do you see that?
14   A.    Yes.
15   Q.    Okay.  And then (c) says, "The
16   receipt in interstate commerce of any" of the
17   same categories, including drugs, that are
18   adulterated or misbranded, and the delivery
19   or preferred delivery thereof for pay or
20   otherwise.
21        Do you see that?
22   A.    I do.
23   Q.    Okay.  Were you aware -- your
24   testimony is you're not aware of these

Page 174

1  prohibitions under federal law, are you?
2      A.   Correct.
3      Q.   Okay.  Thank you.
4          MR. GOLDBERG:  Are you done
5  with this one?
6          MR. DAVIS:  For the moment,
7  yes.
8  BY MR. DAVIS:
9      Q.   Do you have any opinion about,
10 or -- let me rephrase it.
11         Do you have any understanding
12 about whether the at-issue VCDs in this case
13 were deemed to be adulterated or misbranded
14 under the law?
15     A.   I don't have an opinion.
16     Q.   Okay.  You don't have any
17 understanding, correct?
18     A.   That's not what you asked.  You
19 asked if I had an opinion.  So could you
20 reask the question?
21     Q.   Sure.
22         MR. HONIK:  I'd like Maureen to
23 read it exactly as John posed.
24         THE WITNESS:  Thank you.

Page 175

1          (Whereupon, the reporter read
2  back the question:
3          QUESTION:  Do you have any
4  understanding about whether the
5  at-issue VCDs in this case were deemed
6  to be adulterated or misbranded under
7  the law?)
8          MR. HONIK:  Not opinion.
9      A.   I apologize.
10         Could you read that again?
11         (Whereupon, the reporter read
12 back the question:
13         QUESTION:  Do you have any
14 understanding about whether the
15 at-issue VCDs in this case were deemed
16 to be adulterated or misbranded under
17 the law?)
18     A.   I am not a lawyer.  I do not --
19 I am not going to offer any opinion on that.
20 BY MR. DAVIS:
21     Q.   Okay.  And the question was,
22 you don't have any understanding of whether
23 they were or not, correct?
24     A.   Please explain what you mean by

Page 176

1  "understanding."
2      Q.   So my question was, do you have
3  any understanding of whether the at-issue
4  VCDs in this case were deemed to be
5  adulterated or misbranded under the law?
6      A.   I will answer to the best of my
7  ability.  I have read the -- as you can see
8  in Appendix B of my report, I have read a
9  couple of legal documents that explain that
10 some of the at-issue VCDs were found to be
11 adulterated and unbranded under the law.
12     Q.   Okay.  But you're not sure how
13 many, right?  You said "some."  You're not
14 sure whether it's some or all of them, are
15 you?
16     A.   I am -- my understanding, which
17 is what you asked, is that of the VCDs that
18 were voluntarily recalled by the
19 manufacturers, some of them, not all of them,
20 were adulterated or unbranded.
21     Q.   You're not sure how many that
22 is, though?
23     A.   No.
24     Q.   Okay.  And you didn't do any

Page 177

1  independent analysis of whether that's true
2  or not true, right?
3      A.   Correct.
4      Q.   Okay.  Do you have any
5  understanding of whether there are
6  valsartan-containing drugs out there that
7  don't have and never had NDMA and NDEA in
8  them?
9      A.   I am not an expert.  I will
10 qualify that some of the material that I have
11 in my supporting documents suggested --
12 indicated to me that there were levels of
13 these two impurities that you just mentioned,
14 but I am assuming they were acceptable
15 levels.
16     Q.   So my -- that's not my
17 question, though.  My question -- and I'll
18 reask it just to make sure we're clear, my
19 question is, do you have any understanding of
20 whether there are not at-issue VCDs
21 manufactured by entities other than the
22 defendants in this case that did not have any
23 NDEA or NDMA in them?
24     A.   I have no information on them.

Page 178

1    Q.    You have no information on
2  that.
3        Didn't look at it?
4    A.    No.
5    Q.    Didn't investigate it?
6    A.    No.  Not part of my task.
7    Q.    Do you have any understanding
8  of whether NDMA or NDEA are supposed to be in
9  valsartan drugs?
10    A.    I'm not an expert on the
11  formulation of these drugs.  I have no
12  opinion.
13    Q.    Okay.  So you don't know
14  whether these two substances are supposed to
15  or not supposed to be in valsartan drugs?
16    A.    I am not an expert.  I cannot
17  comment as to the presence, absence, or
18  extent to which these are or are not
19  necessary for these drugs.
20    Q.    Well, the drugs were recalled,
21  as you said, right?
22    A.    (Nodding in the affirmative).
23    Q.    Doesn't that indicate to you
24  that they weren't supposed to be in there?

Page 179

1    A.    My caveat is when you say
2  they're not supposed to be there, my
3  understanding is that they are there, it's
4  just not they're not supposed to be there
5  above certain levels, and that's what I'm
6  qualifying.
7    Q.    But you don't know whether
8  they're supposed to be there at all or not,
9  correct?
10        MR. GOLDBERG:  Objection to
11  form.  Foundation.
12    A.    No.
13  BY MR. DAVIS:
14    Q.    Did you look at a valsartan
15  label like you looked at the Accutane label?
16    A.    I already testified that I
17  looked at valsartan product labels.
18    Q.    Can you point me -- it may be
19  in there, I just want to you point me to
20  where in your materials considered that would
21  be.
22    A.    I can show you from my report,
23  but I don't have the binder of all the -- and
24  actually there's maybe six on a page, they're

Page 180

1  visuals, in case you have those materials and
2  you're trying to look for them, but I can
3  help.
4        (Witness reviewing document.)
5    A.    I'm -- I wish I had my
6  materials in front of me, but I'm going to --
7  I don't want to guess.  It could be in the
8  drugs.com or the MedlinePlus.  I'm picturing
9  the page in front of me, and they're pictures
10  of multiple labels with on the left side the
11  name, and on the right side the drug
12  manufacturer and the place of manufacture.
13  That's what I'm picturing.
14    Q.    Okay.  You say -- flip to
15  page 30 of your report, if you don't mind,
16  Exhibit 1.
17    A.    Of course.
18    Q.    The title of that section is
19  "Real-world Evidence Indicates that the
20  At-Issue VCDs Held Value," correct?
21    A.    Yes.
22    Q.    Okay.  Did you look at any
23  sales data of -- sorry.
24        Did you look at any sales data

Page 181

1  of the actual sales of these drugs after the
2  recalls were announced?
3    A.    Only information that was part
4  of Dr. Conti's report, not otherwise.
5    Q.    So do you know what happened to
6  sales of these products after the recalls?
7    A.    I don't recall.
8    Q.    Sorry, give me a few moments
9  here.  I should have two copies of all this
10  somewhere, but I don't.  I'm just going to
11  mark one, it's big enough for, I think, you
12  to see it.
13        MR. DAVIS:  This is being
14  marked as Exhibit 8, let's start with
15  that.
16        (Whereupon, Keller Exhibit
17  Number 8 was marked for
18  identification.)
19  BY MR. DAVIS:
20    Q.    Let me represent to you that
21  what I'm showing you there is the monthly
22  prescription data for --
23    A.    Should I put the -- my report
24  away?

Confidential Information - Subject to Protective Order

Page 182

1    Q.   Sure, sure.
2    A.   Thank you.  Okay.
3    Q.   What I'm representing to you
4  here is that what's marked as Exhibit 8 is a
5  graph showing monthly prescription data for
6  ZHP manufactured valsartan products.
7         Do you understand what I mean
8  by that?
9    A.   Yes.
10        Can I ask a clarifying
11  question --
12   Q.   Sure.
13   A.   -- so I know how to interpret
14  this graph?
15   Q.   Yes.
16   A.   I see that the X axis is
17  labeled as time, but the Y axis is not
18  labeled, and so I'm not quite sure how to
19  interpret a graph with only one labeled axis.
20  I could be missing something.
21   Q.   Read for me, if you don't mind,
22  the header up at the top there.
23   A.   "Monthly ZHP Rxs by Valsartan
24  Product."

Page 183

1    Q.   Okay.  So what I'll represent
2  to you that the Y axis is there is Rxs, which
3  is prescriptions.
4         Do you understand that?
5    A.   So these are prescription --
6  just clarifying, these are prescriptions of
7  valsartan over this period of time.
8    Q.   Correct, manufactured by ZHP.
9    A.   Right.  Prescriptions that were
10  given, filled, or -- just again clarifying,
11  because it isn't labeled.
12   Q.   Prescriptions that were filled.
13   A.   Thank you.
14   Q.   Yes.  Absolutely.
15        You didn't look -- I think your
16  testimony was you didn't actually look at any
17  of the sales data, did you?
18   A.   Not unless it was in
19  Dr. Conti's appendices.
20   Q.   Do you see that the sales
21  abruptly dropped to zero?
22   A.   So can I now assume in the Y
23  axis that the bottom is the zero?
24   Q.   Yes, yes.

Page 184

1    A.   Okay.  Then yes.
2    MR. GOLDBERG:  Objection to
3  form.
4  BY MR. DAVIS:
5    Q.   Do you understand why for ZHP
6  the monthly sales dropped to zero?
7    A.   I don't have that information.
8    Q.   Did you come to any
9  understanding or investigate whether similar
10  to Ranbaxy, ZHP was barred from importing
11  prescription drug products to the US?
12   A.   I just want to make sure,
13  exporting, that ZHP was barred from -- we
14  barred them from imports of their product,
15  right?
16   Q.   Yes.  ZHP products were made
17  illegal to sell in the US, correct?
18   A.   Yes.
19   MR. GOLDBERG:  Objection to
20  form.
21  BY MR. DAVIS:
22   Q.   And subject to seizure by
23  federal agents if they were imported or
24  attempted to be distributed?

Page 185

1    A.   I am not an expert on this
2  process.  I cannot form an opinion.
3    Q.   Well, you sort of do form an
4  opinion, though.  If you look at paragraph 71
5  of your report, you have a hypothetical
6  supply-demand curve, do you not?
7    A.   Excuse me, I need to get there.
8         Could you ask that question
9  again?
10   Q.   Sure.
11        You said you don't have an
12  opinion one way or the other on whether ZHP
13  was barred from importing or selling its
14  products in the US.  Am I right about that?
15   A.   I'm not sure, that may have
16  been before your last question, I don't
17  recall that as your last question, so I'm
18  trying to be accurate.
19   MR. DAVIS:  Could you read that
20  last question?  Sorry.
21        (Whereupon, the reporter read
22  back the following:
23        QUESTION:  And subject to
24  seizure by federal agents if they were

Confidential Information - Subject to Protective Order

Page 186

imported or attempted to be
distributed?
       THE WITNESS:  I am not an
expert on this process.  I cannot form
an opinion.
       QUESTION:  Well, you sort of do
form an opinion, though.  If you look
at paragraph 71 of your report, you
have a hypothetical supply-demand
curve, do you not.
       THE WITNESS:  Excuse me, I need
to get there.
       Could you ask that question
again?
       QUESTION:  Sure.
       You said you don't have an
opinion one way or the other on
whether ZHP was barred from importing
or selling its products in the US.  Am
I right about that?)
BY MR. DAVIS:
   Q.    So let me -- I'll withdraw the
last question.
       You do at paragraph 71 on

Page 187

page 43, the next page over, supply a
hypothetical supply-demand curve, do you not?
   A.    Several.
   Q.    Well --
   A.    Several demand curves, and
therefore --
   Q.    You have several demand curves,
but you have one supply, correct?
   A.    Yes, so a combination would be
several supply-demand curves.
   Q.    Right.  But with one supply
line, correct?
   A.    Yes.
   Q.    And this is hypothetical,
right?  This is a hypothetical supply-demand
curve, is it not?
   A.    Well, it is a figure, and the
changes or the alternatives of the demand
curve that I'm sharing with you here reflect
my argument that consumers have
different assessments of what the drug would
be -- what the at-issue VCD would be to them,
and based on the compensatory/noncompensatory
decision rules and MICI.

Page 188

       And some consumers would say, I
don't want any of this product, it is not
worth anything to me, all the way to the
other end of the continuum where you have
some consumers who would say, I'm consuming
these impurities in multiple forms and it's
of no consequence to me, and everything in
between.
       That's what these alternative
demand curves, or multiple demand curves are
meant to represent.
       So when you ask the question,
you know, are they hypothetical demand
curves, yes, they are, as that they're not
based on data, nor is the supply curve, by
the way, based on data, they're just
representing how my frameworks and opinions
would translate into alternative demand
curves.
   Q.    Okay.  And that was -- I think
you've answered my next question, which is,
this is not informed by any look at data, is
it?  These are hypothetical scenarios you're
putting forward, right?

Page 189

   A.    Yes.
   Q.    And in fact, your supply curve
is just inconsistent with the facts if you
accept, for example, the ZHP graph as
actually representing the sales situation,
correct?
   A.    It is incorrect, because the
example that I'm giving you in my report is
that one can retrospectively go to those
consumers -- because there was supply, they
were supplied the product.  I mean, I'm not a
lawyer, but how do you have a recall if
there's -- no product was given?  How do you
make, what, ZHP or any manufacturer say they
committed fraud because they sold something
if they didn't sell anything.  So if there's
no supply, how is it possible if someone
sells something that there's no supply.
       So I'm just saying that this to
me is not relevant -- sorry, your -- what
exhibit is this?
   Q.    This is Exhibit 8.
   A.    Sorry.  Oh, I see that.
       Exhibit 8 does not help inform

Page 190

1  my figure on page 43, because they were
2  supplied.  And I'm saying that if you went
3  back retrospectively and asked those
4  consumers, Hey, given what you know now about
5  the impurities and whichever way you want to
6  define it -- and that is going to make a
7  difference how you define it and how you
8  communicate it and who communicates it -- how
9  would you assess the value of the work of
10  this -- of the at-issue VCD that you took.
11          And all this is saying here in
12  my figure is that you will get a range of
13  responses.
14      Q.    What literature do you have to
15  support what appears to be your proposition
16  that an economic damages analysis should be
17  based on a retrospective look as opposed to
18  measuring at the time of injury?
19      A.    I am not a lawyer.  I don't
20  have an opinion on that.
21      Q.    Okay.  And you're not offering
22  an economic damages analysis here, are you?
23      A.    No.
24      Q.    And you're not qualified to do

Page 191

1  that, correct?
2          MR. GOLDBERG:  Objection to
3      form.
4      A.    It was not my task.  I did not
5  do that.
6  BY MR. DAVIS:
7      Q.    So -- and we'll get to the
8  retrospective aspect of this later.
9      A.    Should I put it away?
10      Q.    Sure.
11          But my question is, after the
12  point of recall, there was no supply of ZHP
13  valsartan in the US, was there?
14          MR. GOLDBERG:  Objection to
15      form.  Foundation.
16      A.    No.  According to this graph,
17  based on how you described it to me, no more
18  prescriptions were filled for this product
19  after this period on the X axis.
20  BY MR. DAVIS:
21      Q.    Correct.  That means there was
22  no more supply of it, correct, in the US
23  market?
24          MR. GOLDBERG:  Same objection.

Page 192

1      A.    That is incorrect.
2  BY MR. DAVIS:
3      Q.    How is that incorrect?
4      A.    Because the information in this
5  case, and some of it is described in Section
6  IV.E of my report, that not only was there
7  evidence that consumers continued to take the
8  recalled valsartan based on depositions from
9  plaintiffs, but that -- and I've quoted some
10  of them, but that physicians, and I've also
11  quoted some of them, encouraged some of their
12  patients to continue taking the recalled
13  valsartan until they had other options.
14          That is my understanding of why
15  there had to be supply if that was -- if the
16  information I just shared is true.
17      Q.    That's existing supply, right,
18  what had been distributed, dispensed to
19  patients prior to the recall, correct?
20          My question is, after the point
21  of recall, are you aware of any evidence of a
22  single prescription of ZHP valsartan being
23  dispensed to a patient after the point of
24  recall?

Page 193

1      A.    I don't have that information.
2      Q.    Okay.  So your supply curve
3  here that you supply is just inconsistent
4  with the facts, correct?
5      A.    No.
6          MR. GOLDBERG:  Objection to
7      form.  Argumentative.
8      A.    And I'm assuming now you're
9  referring to my report, because we have
10  multiple supply curves here.
11  BY MR. DAVIS:
12      Q.    I'm talking about your
13  hypothetical supply curve, not what the
14  actual data show.
15      A.    Got it.
16          So could you please repeat the
17  question?
18      Q.    Your hypothetical supply curve
19  here is uninformed by the facts of this case,
20  is it not?
21      A.    This figure is -- and you can
22  look at the context before and after, and I
23  will read it out to you because it's on the
24  same page, 72, "As shown in the figure above,

Page 194

1  there existed some original supply and demand
2  curve (denoted by 'Demand0' and 'Supply'),
3  which resulted in an equilibrium price, P0,
4  and equilibrium quantity, Q*.  Instead of
5  removing the supply curve, and assuming zero
6  demand, it is more appropriate to envision
7  how each consumer's demand would shift due to
8  knowledge of the presence (or potential
9  presence) of impurities."
10      Q.    Let me ask you about that.
11          You say that there would be an
12  equilibrium price, you just read me that,
13  right?
14      A.    That's one.  There are multiple
15  equilibrium prices based on which demand
16  curve you're referring to.
17      Q.    Let me ask you a very specific
18  question, which is, after the point of recall
19  for ZHP, since you have that data right in
20  front of you, after the point of recall there
21  would have been no supply -- there would have
22  been no equilibrium price because there was
23  no supply, right?
24      A.    Yes and no.

Page 195

1      Q.    Okay.  Well, how is it
2  different from what you -- do you recall our
3  discussion of Fen-Phen earlier?
4      A.    Yes.
5      Q.    And you agreed with me that
6  even if a patient wanted to get Fen-Phen they
7  couldn't get it, they couldn't pay for it,
8  right?  How is it different after the point
9  of recall for ZHP valsartan?
10      A.    Let's use your Fen-Phen
11  example.  What I'm trying to communicate here
12  is how consumers make decisions about what a
13  product is worth to them, and price is one
14  manifestation or reflection of that.  It is
15  not the only one.  Let me just finish.
16          Your Fen-Phen example, you
17  brought it up again, the way -- from my
18  recall of how you described the situation is
19  it was recalled, and if a consumer of
20  Fen-Phen went to their physician and asked
21  for Fen-Phen, they could not write a
22  prescription for Fen-Phen.  Am I right?  Is
23  that a good --
24      Q.    Yes.

Page 196

1      A.    The very fact that consumers
2  are going and asking their physician for
3  Fen-Phen -- I'm not making any assumptions
4  about all consumers here, you know that --
5  and there's a possibility that they knew
6  about the recall, and I'm going to go one
7  step further and say given my knowledge of
8  consumer-physicians' interactions, they might
9  have even asked the physician why it was
10  recalled, they still wanted it.
11          So that gives you some sense of
12  how consumers will calculate what is valuable
13  to them or what is worth to them, even if in
14  your example the product is not available.
15      Q.    So, but my question is
16  different.  My question is, there is no
17  equilibrium price.  Let's say there was some
18  crazy consumer who said, Yes, I want the
19  carcinogen-laced valsartan, and went in and
20  asked their physician for that, the physician
21  couldn't give them ZHP valsartan, could he?
22          MR. GOLDBERG:  Objection to
23      form.  Argumentative.
24      A.    Well, first I want to say, and

Page 197

1  I'm relying on my frameworks, depending on
2  how that message was communicated, if you say
3  carcinogen-laced the way you said it versus a
4  valsartan that may contain impurities, the
5  individual's -- I'm using MICI factors -- the
6  individual's status, so if they were happy
7  with their valsartan and had -- as I shared
8  in my report in Section IV.E, they were happy
9  with their valsartan, they had serious health
10  issues, they may have even tried alternative
11  medications and felt that the valsartan was
12  the best at controlling their hypertension,
13  and contextual factors, how much their
14  relationship with their doctor and their
15  ability or inability to have a healthy
16  lifestyle, all of those factors would have an
17  impact on what they thought the drug was
18  worth.
19  BY MR. DAVIS:
20      Q.    Okay.  But you're not answering
21  my question.
22          My question is, if there's no
23  supply after the recall, as you can see from
24  the sales data, even if a consumer -- like

Confidential Information Subject to Protective Order

1 let's just assume that there is a consumer
2 who does want ZHP valsartan after the recall
3 and wants to go get a new prescription of it
4 from their doctor, the result is just like it
5 was with Fen-Phen, they can't get it, right?
6      A.    I'm assuming that is the case,
7 yes.
8      Q.    And they would end up,
9 therefore, paying no money for it, correct?
10      A.    Yes.
11      Q.    Okay.  Thank you.
12          And there would be no
13 intersection of -- sorry, showing you my
14 screen, you've got it right there.
15      A.    Yes.
16      Q.    There would be no intersection
17 of supply and demand in that very specific
18 situation I just asked you about, correct?
19      A.    Correct.
20      Q.    Okay.  Thank you.
21      A.    Should I put these away?
22      Q.    Sure.
23      A.    Okay.
24          MR. DAVIS:  I'm marking

1      Exhibit 9.
2          (Whereupon, Keller Exhibit
3          Number 9 was marked for
4          identification.)
5 BY MR. DAVIS:
6      Q.    This is a -- can you identify
7 this document for me?
8      A.    No.
9      Q.    I'll represent to you that it's
10 a valsartan -- I'll represent to you that
11 it's a valsartan label, which may or may
12 not -- I think, we looked at your materials
13 considered.
14          Is this a document you recall
15 seeing ever?
16      A.    No.
17      Q.    Okay.  I'll represent to you --
18 but, you know, you're free to look, but I'll
19 represent to you that there's no mention of
20 nitrosamines, NDMA, NDEA, anywhere in this
21 label.
22          Are you willing to accept that,
23 or do you want to take a look?
24      A.    I actually don't have any idea

1 what is in this label period, so I don't know
2 how to understand the absence of the two
3 impurities you just mentioned.
4      Q.    Well, I'm not asking you yet to
5 understand the absence of them.  I'm just
6 asking you if you see any reference to them
7 in that document.
8      A.    I cannot do that.  You're
9 asking if there's any reference, and I don't
10 know if there's any reference without having
11 a chance to review the document.
12      Q.    Okay.  So you're not willing to
13 take my word for it that they're not in
14 there?  You're willing to look.  Why don't
15 you take a look, that's fine.
16          Do you want to look at -- and I
17 can direct your attention, for example, to
18 make this go a little faster, okay, if you
19 don't mind, go to the very last page.
20          Do you see that last question
21 there, "What are the ingredients in Diovan?"
22      A.    I do.
23      Q.    Okay.  Do you see any reference
24 to NDEA, NDMA?

1      A.    I am not a chemist.  I don't
2 know the different forms and labels.  Those
3 drugs may be represented some other way.  I
4 cannot answer the question.
5      Q.    Would you agree with me --
6 let's start with just a very general
7 proposition.
8          Would you agree with me that a
9 manufacturer of valsartan when they
10 distribute it into the US market, by calling
11 it valsartan and by distributing this label
12 with it, they're conveying some kind of
13 message to the people that will interact with
14 it, namely physicians and consumers, correct?
15          MR. GOLDBERG:  Objection to
16 form.  Foundation.
17      A.    Please be more specific.
18 BY MR. DAVIS:
19      Q.    Do you think that by -- when a
20 manufacturer of valsartan distributes
21 valsartan in the US market, by calling it
22 valsartan, are they conveying a message that
23 it's valsartan?  It's a pretty general
24 proposition, right?

Confidential Information - Subject to Protective Order

Page 202

1    A.    They're saying it's valsartan.
2  I'm not going to speak to what that means to
3  consumers, or physicians or anybody else.
4    Q.    But there's a message embedded
5  in there, right, that this is valsartan,
6  correct?
7    A.    I am not an expert on the drug
8  ingredients, and I don't know what that
9  communication would mean.
10    All I'm willing to acknowledge
11  is if they say it's valsartan, that that may
12  have meaning, and different meanings to
13  different people.  I am not an expert on
14  valsartan, and I cannot give you an opinion.
15    Q.    Sure.
16    And let's excise that from the
17  question, which by that I mean whatever
18  valsartan means, by calling it valsartan, the
19  manufacturer is conveying a message that it's
20  valsartan, whatever that means, right?
21    A.    I'm just -- I am always
22  representing the consumer point of view, and
23  valsartan would just have different meanings
24  for different consumers based on the

Page 203

1  different messages and the context in which
2  these, you know, messages and drugs were
3  taken.
4    So I don't want to give the
5  impression that if there was a term valsartan
6  that all consumers would derive the same
7  meaning from it.
8    Q.    Well, I'm not talking about the
9  recipient of the message right now.  I'm
10  talking about the entity delivering the
11  message.
12    I'm saying that -- what I'm
13  asking you is do you agree that by calling it
14  valsartan, the manufacturer that calls it
15  valsartan is intending to convey a message
16  that it's valsartan, whatever that means?
17    A.    Okay.
18    Q.    You don't take any issue with
19  that, right?  It's a pretty simple
20  proposition.
21    A.    I don't like answering
22  questions that end in "whatever it means."
23  That's just my comfort level.
24    Q.    Whatever valsartan means.  I'm

Page 204

1  trying to --
2    A.    I understand.
3    Q.    I heard what you said about
4  that.
5    A.    I understand.
6    Q.    So what I'm trying to do is
7  just focus on a very simple question here.
8    And is there anything about
9  that that you disagree with, that a
10  manufacturer is not attempting to convey the
11  message that this is valsartan by calling it
12  valsartan, whatever that term valsartan
13  means?
14    A.    Okay.
15    Q.    And similarly with Exhibit 9
16  we're looking at, this label, prescribing
17  information, there's a message there, or
18  multiple messages in fact, but they all
19  relate to valsartan, correct?
20    A.    Now I will need to read the
21  document.  I anticipated this.
22    Q.    You don't think that this
23  document that has to do with valsartan
24  conveys a message about valsartan, or

Page 205

1  multiple messages?  It's a pretty simple
2  question.
3    A.    I cannot answer that question.
4  I mean, if you're just saying is there
5  communication about valsartan in here?  I
6  would say yes.  For me, a message has a
7  different meaning, and I would need to read
8  the document to understand what the
9  message -- multiple messages might be.
10    Q.    Okay.  Let's go back to your
11  report for a moment, and again that section E
12  that's titled Real-world evidence indicates
13  that the at-issue VCDs held value.
14    A.    Yes.
15    Q.    And I understand you have --
16  you know, and I'm going to try and
17  short-circuit a long back and forth here by
18  stating that I understand that you have quite
19  a few sources of general applicability here
20  to support what you're saying amounts to
21  real-world evidence of value.
22    My question very specifically
23  here is, what evidence from this fact
24  situation and case specifically, what

Confidential Information - Subject to Protective Order

Page 206

1 valsartan-specific evidence do you have that
2 is real-world evidence that indicates that
3 the VCDs at issue had value?
4        A.    I have evidence from the
5 individual depositions from the plaintiffs,
6 and I have quoted some of them, who said that
7 the at-issue VCDs provided them with
8 therapeutic benefit.
9              I want to qualify, this is a
10 small subset of depositions.  I know that
11 there were probably thousands if not tens of
12 thousands consumers who took valsartan and
13 this is a small group.  But this is one
14 source of evidence that consumers who took
15 the at-issue valsartan said that -- some of
16 them, not all of them -- that it helped them
17 with controlling their blood pressure, that
18 they had fewer side effects such as
19 light-headedness and dizziness and nausea,
20 and that they did not suffer any extreme
21 emotional consequences to the point of
22 actually seeking professional help.  So those
23 are just some examples of value from the
24 real-world evidence.

Page 207

1              I also -- the other sources of
2 value also come from information in the
3 public press as well as in some of the
4 depositions, in the individual plaintiff
5 depositions, where physicians are either
6 publicly recommended, for example, I believe
7 Dr. Neeson, to AARP group members that, you
8 know, they should not stop taking the
9 at-issue VCDs on their own without talking to
10 their physicians because it is more important
11 to control their blood pressure, and they
12 could face very serious consequences, health
13 consequences if they stopped, and that it
14 would be -- the trade-off would be -- even if
15 there were any problems in the short or the
16 long-term with regard to any of the potential
17 cancers, which again would vary across
18 individuals, that the immediate serious
19 health consequence of stopping their at-issue
20 VCDs would be serious.
21              So the sources, just to sum,
22 are the plaintiff depositions as well as --
23 as well as physicians.  This includes
24 cardiologists who shared that the at-issue

Page 208

1 VCDs held value.
2        Q.    Anything else, or those two?
3        A.    I will also add -- thank you
4 for asking -- the FDA also mentioned that
5 consumers or patients who were taking the
6 at-issue VCDs should not stop taking the
7 VCDs, thereby indicating that they held
8 value, unless, you know, an alternative was
9 available to them.  So that is also a source.
10              So I appreciate your giving me
11 a chance.
12        Q.    Sure.
13              So you've identified those
14 three things.  Is that everything?
15        A.    To the best of my recall.
16        Q.    Sure.  Okay.  Well, let's, I
17 guess, take them somewhat in order.
18              You concede, you know, for the
19 first point, which is the plaintiff
20 depositions, you do concede at paragraph 52
21 that in your view "The statements of
22 consumers, particularly those...in
23 litigation, regarding their retrospective
24 valuation of at-issue VCDs may not be

Page 209

1 reliable measures of even individual value
2 assessments," right?
3        A.    I will say yes and no.
4        Q.    Why are you saying yes and no
5 to something you wrote in your report?
6        A.    Again, because of the context
7 in which you are reading out that one
8 sentence, and I'm going to do the following
9 sentence, which is -- okay, so I read it so I
10 don't have to go through the -- this will be
11 more efficient.
12              "Nonetheless, testimony of
13 several consumer-plaintiffs in this case
14 corroborates this post-awareness value for
15 the at-issue VCDs," and then we have a quote
16 from Samuel Cisneros.  I hope I didn't
17 butcher that.
18              And "Additionally, many other
19 consumers that even with their current
20 knowledge of the impurities, the VCDs they
21 took were effective in treating their
22 hypertension."
23        Q.    Since you called out
24 Mr. Cisneros particularly, I'm going to mark

Page 210

1  Exhibit 10 here.
2       (Whereupon, Keller Exhibit
3       Number 10 was marked for
4       identification.)
5  BY MR. DAVIS:
6       Q.    Did you read the entirety of
7  Mr. Cisneros' deposition?
8       A.    I did.
9       Q.    Did you read the entirety of
10 every class rep deposition that you cite in
11 your materials considered?
12      A.    I read some of them, and I
13 reviewed the rest.
14      Q.    How did you make a decision
15 about which ones to read in their entirety
16 and which ones to read portions of?
17      A.    I used a couple of different
18 selection criteria.  I was -- in alignment
19 with my MICI framework, I was looking for
20 different types of individuals, you know,
21 male, female, race, education, just to get
22 some variety or variance in those individual
23 characteristics.
24      I also, for contextual

Page 211

1  variance, I looked at things like whether
2  they were smokers or drank alcohol or
3  consumed red meat, so just to give you an
4  example of my methodology.
5       So I selected as -- like a
6  researcher, I tried to select different types
7  of consumers in the set of depositions.
8       Q.    Were you provided the full
9  transcripts, or were you provided some full
10 transcripts and some incomplete transcripts?
11      A.    I was provided the full
12 transcripts.
13      Q.    Okay.  And I get -- I hear what
14 you're saying, that you tried to review some
15 of them based on varying individual
16 characteristics.
17      How did you decide which of
18 those to review in full and which of those to
19 review selections of?
20      A.    I -- once I started looking and
21 I started reading it, if I thought it was
22 interesting I read the whole thing.
23      I will admit that sometimes,
24 you know, if it was shorter I was more

Page 212

1  motivated, if it was 173 pages versus 349
2  pages.
3       And at other times I felt, you
4  know, I was not getting any new insights or
5  information, so then I would just review the
6  rest of the document.
7       Q.    Okay.  I mean, we're talking
8  about thousands upon thousands of pages of
9  testimony here, right?
10      A.    I am aware.  I don't want to
11 say -- I'm not going to multiply or give you
12 a number, but I know that there were over 40
13 depositions, and the range was typically
14 anywhere from like 150, 160 pages to like 350
15 or 400-plus pages, so yes.
16      Q.    Okay.  So many thousands of
17 pages?
18      A.    Correct.
19      Q.    So would you have reviewed
20 page 99 of Mr. Cisneros' deposition that I
21 have for you there?  Do you see where he says
22 on lines 11 through 13, "████████████████
23 ████████████████████████████████████████
24 █████████████████."

Page 213

1       Do you see that?
2       A.    Yes, I do.
3       Q.    Does that sound like someone
4  who would pay a dime for contaminated
5  valsartan?
6       A.    ██████████████████████
7  ███████████████████████, which I'm
8  going to object to now because I don't
9  believe that that is necessarily the message
10 that he was given, "███████████████████████
11 █████████" is not saying that he did
12 not get any value from it.  Because I just
13 quoted something in my report that said██
14 ███████████████████████████████████████
15 ███████████████.
16      Q.    Right.  So let me see if I
17 understand what you're saying.
18      You're drawing a distinction
19 between therapeutic value and economic value,
20 right?
21      A.    In part correct.  I am saying
22 that the value or worth of a drug will vary
23 by consumers who are going to compare the
24 benefits, and that includes therapeutic

Page 214

1 benefits just like you describe, and the
2 costs of the drug, and that includes price.
3        So you have many other
4 variables going on simultaneously on the
5 benefit and the cost side in order to make an
6 assessment of value.
7    Q.    And for you that's therapeutic
8 value in the context that we're talking about
9 right here with Mr. Cisneros?
10   A.    All I'm saying is as a
11 researcher who is looking at this, I would
12 not assume the value is zero or the drug is
13 worth nothing to him because ████████████
14 ███████████████████████████████
15 ████████████████████████████
16 ████████████████████████████
17 ████
18        And even though what I just
19 read is -- ███████████████████████
20 ████████ it does not mean that the calculation
21 of what the drug is worth is zero.
22   Q.    Do you have any reason to doubt
23 ██████████████████████████████
24 ████

Page 215

1    A.    I don't have any context to
2 answer that question.
3    Q.    Then you -- back to your
4 report, you provide a citation, this is
5 paragraph 52, to it looks like about a dozen
6 or so class reps, right?
7    A.    Yes.
8    Q.    Okay.  Did you read all of
9 those transcripts in their entirety?
10   A.    I read or reviewed all of them.
11   Q.    Okay.  So were you aware, for
12 example, that Eric Erwin in his deposition,
13 who is in your footnote here, that he stated
14 that non-contaminated VCDs wouldn't even hold
15 value for him if they came from a facility
16 that had issues?
17   A.    I don't recall that exact
18 statement, but I'll take your word for it.
19        And it supports my general
20 premise that different consumers will take
21 into account different message variables,
22 their individual differences will lead them
23 to put weights on different pieces of
24 information, and the context in which that

Page 216

1 they are making this decision, that includes
2 not only their physician but their diet and
3 lifestyle, would all have an impact on how
4 they would use either a compensatory or
5 non-compensatory decision.
6        So I mean just go back to this
7 footnote.  Part of what I learned from
8 reading and reviewing these plaintiff
9 depositions was the fact that many of the
10 variables that I've just mentioned, the
11 message, the individual difference, and the
12 context, were all part of the ecosystem or
13 the wholistic inputs into thinking about the
14 drug.
15   Q.    Okay.  You also refer to a
16 Mr. Dennis Kaplan's testimony in your
17 footnote there.  Did you read at page 145 of
18 his deposition that "they should never have
19 enabled it to be out in the market where I
20 and other people could have taken it"?  Did
21 you read that portion of his deposition?
22   A.    Again, I don't recall that
23 exact thing, but I believe you.  If you are
24 stating that was in his deposition, I believe

Page 217

1 you.
2        And again, just your last two
3 examples showed how much variance there is in
4 how consumers would respond to this
5 information.
6    Q.    What about page 18 of Mary
7 McLean's deposition where she says, "I
8 wouldn't have taken it knowing that it was
9 contaminated."  Do you recall reading that?
10   A.    Again, I do not recall
11 specifically, but it does -- it does not go
12 against my premise that consumers will have a
13 range of reactions to the recall.
14   Q.    Okay.  But you're citing these
15 people in particular to say that they
16 acknowledged it had value, but they're all
17 telling you -- or they're all telling under
18 oath that it had no economic value for them,
19 that they wouldn't have purchased it, right?
20   A.    I'm sorry to repeat this again.
21 Value equals benefit minus cost.  They're
22 acknowledging there was therapeutic benefit.
23 That means something positive.  Even if some
24 of them are acknowledging that there is no

Confidential Information - Subject to Protective Order

Page 218

economic value, one cannot assume that the sum or the difference between all of their benefits and costs would equal not only uniform, but would equal zero.

Q.    I want you to -- and I hear what you're saying regarding therapeutic benefit, that there's -- your assertion is that there's therapeutic value here and that has to be accounted for, right?

A.    My assertion is that there are benefits and costs that need to be assessed in order to make a determination of worth, and therapeutic benefit is one example of benefit.

Q.    So let me ask you to -- I'm going to set forth a hypothetical for you, and I want -- I'm going to walk through it step-by-step, and indulge me here, if you don't mind.

I want you to assume that for all of the at-issue VCDs, that they were all adulterated.

Do you follow me there?

A.    Okay.

Page 219

Q.    Okay.  And as I showed you in the US Code exhibit I showed you, 21 USC 331, I showed you that it's illegal to distribute adulterated drugs, right?

A.    That's the document I did not have a chance to review, is that correct?  Are you referring to Exhibit 9?

Q.    I'm referring to Exhibit 7 here.

A.    Oh, I'm so sorry.

Okay.  That's also a document that I did not review completely, and you just read the first page.

Q.    Well, indulge my hypothetical here, that all the at-issue VCDs here were adulterated, and indulge me also that it was illegal to sell those adulterated drugs, for example, under 21 USC 331 or Exhibit 7.

Do you follow me so far?

A.    Mm-hmm.

Q.    I want you to also assume that these VCDs are economically worthless at the point of sale regardless of any medical benefit they provide.  I want you to assume

Page 220

that for me.  I know you disagree with it, but I want you to assume that with me, right?  Okay?

A.    Okay.

Q.    Assuming those things, would you not agree that the value of these drugs is zero dollars?

A.    I disagree.

Q.    Okay.  How do you disagree with that?

A.    As I said, there is a set of benefits.  The therapeutic benefits is just one benefit.  So saying to me that there is no therapeutic benefit just makes the value of therapeutic benefits in the set of benefits zero, but not the other benefits.

When you say it's unavailable and the price is zero, yes, there is no economic price or cost in the set of costs, but there are many other costs.

So again, the remaining, not the therapeutic value which you asked me to assume is zero, and not the price that you asked me to assume is zero, there are other

Page 221

variables in this equation that would determine worth.

Q.    I think you misheard the third part there.  Let me try it again.

So I've got -- I think we're through two points, right, in this hypothetical, which is that all the at-issue VCDs here are adulterated, that the sale of those drugs would have been prohibited under the law, correct?

A.    Correct.

Q.    Okay.  Meaning that there would have been no supply of them in the market, and no ability for consumers to purchase them, right?

A.    Okay.

Q.    Okay.  And then I want you to assume that the value of those drugs from an economic standpoint as applied to -- that every single person was found to have derived zero economic value from these drugs regardless of the medical benefit they may have provided.

Do you follow me?

Confidential Information - Subject to Protective Order

Page 222

1    A.    I do follow you, and I
2  disagree.  I cannot -- I cannot respond
3  because I disagree with the basic premise.
4    Q.    Okay.  So, well, let me show
5  you something then.
6         Well, follow me through.  I
7  know you disagree with the premise.
8    A.    Okay.
9    Q.    But follow me through here.
10    A.    Okay.
11    Q.    And let's just take it as a
12  fact, even if you disagree with that fact,
13  that for every single consumer of these drugs
14  that there was zero economic value for them
15  at the time of sale, that the drugs were
16  economically worthless at the time of sale
17  regardless of any medical benefit to be
18  derived from them.  Assume that for me, that
19  that applies to everyone.
20         Would you not agree that,
21  assuming those things, that the value of the
22  drugs in that case would be zero dollars,
23  granted that you disagree with the premise?
24         MR. GOLDBERG:  Objection to

Page 223

1  form.  Foundation.
2    A.    I'm going to go back to my
3  formula and say that there will be a range of
4  consumers, and I have this information in my
5  report, actually throughout my report, so I
6  can't even tell you which section of IV this
7  would belong to, but that there would be a
8  range of consumers who would say that the
9  drug had value to me, or has value to me --
10  even if they cannot get it, that the drug has
11  value to me because I did not have side
12  effects; the drug has value to me because I
13  had peace of mind; the drug had value to me
14  because I could take it in a single pill
15  form.
16         And I'll go to the cost side,
17  not paying anything, as you said, that I
18  don't -- the drug had value to me because it
19  was familiar and now I have to learn about
20  another drug; the drug has value to me
21  because now I have to go and talk to my
22  physician about another prescription; the
23  drug has value to me because -- okay.
24         I'll stop there.  So you got my

Page 224

1  general idea.
2  BY MR. DAVIS:
3    Q.    Sure.  And I'm trying to
4  exclude that from this hypothetical, and I
5  know you disagree with the premise, I know
6  you do, and you've articulated that.  But
7  just follow me through with the premise here,
8  which is that it's been determined for every
9  single one of these consumers who you just
10  posited a list of questions they might ask or
11  opinions they may have, just assume for me
12  that it's been determined that the drugs are
13  economically worthless for them regardless of
14  all that stuff.
15         Do you follow me?
16    A.    Yes.
17    Q.    Okay.  And in that situation,
18  combine that with the fact that all the drugs
19  are posited to have been adulterated and
20  therefore illegally sold, couldn't have
21  gotten them, couldn't have paid anything for
22  them, at that point, with all those premises
23  and stuff that you don't agree with, but just
24  follow me through, would you agree with me at

Page 225

1  that point, if all those things were true,
2  which I get you don't agree with, that the
3  drugs would have no value at that point,
4  economic value?
5    A.    Whoever made that determination
6  was wrong.
7    Q.    Okay.
8         MR. DAVIS:  I'm going to mark
9  an exhibit here.
10         MR. GOLDBERG:  John, do you
11  want to take a minute break?  We've
12  been going another 90 minutes.
13         MR. DAVIS:  I just want to
14  finish this real fast, and then I'm
15  close to being done, to be honest.
16         MR. GOLDBERG:  Okay.  Got it.
17         MR. DAVIS:  I'll probably want
18  to take a quick break just to go
19  through my notes.
20         MR. GOLDBERG:  Sure.  Got it.
21         MR. DAVIS:  I'm going to mark
22  Exhibit 11.
23         (Whereupon, Keller Exhibit
24  Number 11 was marked for

Confidential Information - Subject to Protective Order

Page 226

1    identification.)
2  BY MR. DAVIS:
3    Q.   Just to pick up where we left
4  off, you testified to me that you thought
5  that that person who made that determination
6  would be wrong, correct?
7    A.   Yes.
8    Q.   Okay.  Do you understand that
9  the Court is that person that's made that
10 determination in this case?
11      MR. GOLDBERG:  Objection to
12      form.  Foundation, mischaracterizes
13      the document.
14 BY MR. DAVIS:
15   Q.   Why don't you flip to --
16      MR. GOLDBERG:  You're marking
17      this as --
18      MR. DAVIS:  This is Exhibit 11,
19      I believe.
20 BY MR. DAVIS:
21   Q.   I want you to turn to page 20
22 of the document.  The numbering is very small
23 in the top right corner.
24   A.   And again, I haven't had time

Page 227

1  to review this document.
2      MR. GOLDBERG:  Somehow we're
3      going to have to figure out what you
4      want to do here.  She hasn't reviewed
5      the document.  I know you want to ask
6      her about page 20.
7      MR. DAVIS:  I don't really have
8      much to ask her.  I just want to --
9      MR. GOLDBERG:  I think you
10      should explain to her what the
11      document is, and give her a second to
12      at least scan it for a minute or two
13      so she can get familiar with the
14      document.
15 BY MR. DAVIS:
16   Q.   I will represent to you this is
17 an opinion that the Court has issued in this
18 case, a written opinion.  Do you see the case
19 header up there, "In Re: Valsartan"?
20   A.   I see that.
21   Q.   And do you see that on the
22 right in bold there it says, "MTD Opinion 3:
23 Warranty Claims"?
24   A.   Yes.

Page 228

1    Q.   You then you see "Kugler,
2  United States District Judge"?
3    A.   Yes.
4    Q.   Okay.  And in fact, that blue
5  version at the top -- sorry, it's blue in my
6  version, but it printed black and white, but
7  you'll see the case number information, Case
8  1:19-md-2875, document number 775, filed on
9  to the docket January 22, 2021.
10      Do you see that?
11   A.   Yes.
12   Q.   Okay.  So I'll represent to you
13 that this is an opinion of the Court that's
14 been entered into this case.  And I just want
15 to -- I'm not going to ask you any detailed
16 questions about it, but on page 20 --
17   A.   Sorry for clarification.  So
18 when you say "an opinion of the Court," is
19 that the same thing as the opinion of the
20 judge?
21   Q.   Yes, yes.  The judge's order.
22   A.   Thank you.
23   Q.   And on page 20 the Court says,
24 "This court finds that contaminated drugs are

Page 229

1  economically worthless at the point of sale
2  by virtue of the dangerousness caused by
3  their contamination, regardless whether the
4  sole VCDs actually achieved the medical
5  purpose of lowering blood pressure.  Put
6  differently, contaminated drugs, even if
7  medically efficacious for their purpose,
8  cannot create a benefit of the bargain
9  because the contaminants, and their dangerous
10 effects, were never bargained for."
11      Do you see that?
12   A.   Yes.
13   Q.   And your testimony is you
14 disagree with that?
15   A.   I did not testify that I
16 disagreed with this.  I testified that I
17 disagreed with your example.
18      I will now say that I don't
19 know the context in which this determination
20 or this decision was made.  I don't know what
21 other facts were provided to the Court or to
22 the judge.  I am not a lawyer.  And I don't
23 know what was the input for this decision,
24 and how -- what the laws are that helped make

Confidential Information - Subject to Protective Order

Page 230

1 this determination, but to say that a drug is
2 worthless because it's -- let me read that
3 again, even if it is efficacious that the
4 economic value is zero is wrong.
5      Q.   Okay.  But you testified
6 earlier that you've never done an economic
7 damages analysis in litigation, have you?
8      A.   Correct.
9      Q.   And you've never done one
10 period, right?
11      A.   Correct.
12      Q.   Okay.  And you're not an
13 economist, right?
14      A.   I have a bachelor's in
15 economics, but I'm not an economist.
16      Q.   All right.  Thank you.
17           MR. DAVIS:  Let's take a quick
18      break, five minutes, and I'm pretty
19      close.
20           MR. GOLDBERG:  Okay.
21           MR. DAVIS:  We can go off the
22      record.
23           THE VIDEOGRAPHER:  Off the
24      record at 3:29.

Page 231

1           (Whereupon, a recess was
2      taken.)
3           THE VIDEOGRAPHER:  Back on the
4      record at 3:46.
5 BY MR. DAVIS:
6      Q.   I've just got ten more minutes
7 of questions maybe and one new document for
8 you.
9           So just to re-cover one area
10 very briefly, do you remember talking with me
11 about -- we were going back and forth about
12 the fact that there's a message embedded in
13 calling the product valsartan, whatever the
14 consumer made of that message or whatever the
15 term valsartan means, I think we agreed that
16 there was a message embedded in there, right?
17      A.   My recall is that this was in
18 response to the document that you showed me
19 that's Exhibit 9 that I didn't review in
20 total, and that I said I would concede that
21 there is communication in there.
22           In my expertise on health
23 message processing, I could not make a
24 determination if there was a message in

Page 232

1 there.
2      Q.   But there's a communication,
3 right?
4      A.   There's some material, written
5 material in there.
6      Q.   Okay.  And your -- and I don't
7 want to overgeneralize here, but your whole
8 focus is oriented towards the consumer,
9 right?  You look at things from a mostly
10 consumer standpoint, and that also includes
11 the physician, I suppose, but your whole
12 focus is sort of consumer-oriented, right?
13      A.   I am an expert on how consumers
14 assess value or worth of products and
15 services they're considering, have consumed,
16 or want to continue consuming.  And so yes,
17 from that perspective I'm focused on the
18 consumers' assessment of worthiness.
19      Q.   Okay.  Would you agree with me
20 that the communication that -- you know, and
21 I'll adopt your term here, communication --
22 that the communication of calling the drug
23 valsartan, that was a communication that
24 consumers really had no choice but to rely

Page 233

1 on, right?
2      A.   Incorrect.  It is very clear
3 that consumers have a lot of different
4 sources of communication from different
5 people, from -- in different formats, and
6 that who would seek what kind of information
7 in different times, in different formats
8 would depend on the individual.  It would
9 need to be an individual inquiry.
10      Q.   That's your opinion?
11      A.   Yes.
12      Q.   Okay.  Well, flip to -- back to
13 Exhibit 11, if you don't mind.
14      A.   Sure.
15      Q.   And go to page 14.
16      A.   Just give me a moment because I
17 can't see it.  All right.
18      Q.   Do you see in the last --
19 second to last full paragraph on that page it
20 starts with "The manufacturer's very naming
21 of the drug"?
22      A.   Yes.
23      Q.   It reads, "The manufacturer's
24 very naming of the drug as valsartan or

Page 234

1 valsartan-containing amounted to an express
2 warranty on which plaintiffs had no choice
3 but to 'rely' when they were prescribed the
4 drug and bought it as a medication for their
5 high blood pressure."
6         Do you see that?
7     A.    Yes.
8     Q.    Okay.  And do you see that
9 that's part of this Court opinion that I
10 showed you earlier?
11    A.    Yes.
12    Q.    And you disagree with that?
13    A.    I said I did not have an
14 opinion on that because I am not a lawyer and
15 I do not have all the information that was
16 presented to this Court before this
17 determination was made.  I cannot agree or
18 disagree with this statement.
19         MR. DAVIS:  Okay.  I'm going to
20 mark Exhibit 12.
21         (Whereupon, Keller Exhibit
22         Number 12 was marked for
23         identification.)
24         ///

Page 235

1 BY MR. DAVIS:
2     Q.    Do you recognize this as -- I
3 suppose it's not technically your invoice,
4 but it's Analysis Group's invoice to
5 Mr. Goldberg here.
6         Do you see that?
7     A.    I do.
8     Q.    Okay.  And it includes -- it
9 includes the statement that this is just the
10 ZHP share of that invoice for 16.67 percent
11 of the total.
12        Do you see that on page 1?
13    A.    I do.  But I'll be honest with
14 you, I'm not sure exactly what that 16.6
15 refers to.
16    Q.    Let me ask it a different way.
17        Did you prepare this invoice?
18    A.    No, no.
19    Q.    All right.
20    A.    When you say "this," you're
21 talking about the page that you're just
22 referring to, right?
23    Q.    Yes.
24    A.    I don't know what's on the

Page 236

1 remaining pages.
2     Q.    Did you actually send this
3 invoice to -- okay, somebody else did that?
4     A.    I did not prepare or send the
5 invoice.
6     Q.    You'll see on page 1 it says
7 that the invoice is "For professional
8 services rendered in connection with the
9 above referenced case for the period ending
10 December 31, 2021," right?
11    A.    Yes.
12    Q.    Okay.  And your report was
13 signed on January 12th, correct?
14    A.    Correct.
15    Q.    And you've also done some work
16 on the case since that point, right?
17    A.    Yes.
18    Q.    You're sitting here today, for
19 example.  Did you sit for any preparation
20 sessions?
21    A.    Yes.
22    Q.    Okay.  About how many would
23 that be?
24    A.    Sessions defined by what unit

Page 237

1 of time?
2     Q.    Hours.
3     A.    Hours.
4         Are you talking about
5 preparation that I did for the depo on my
6 own, or only in some other context?
7     Q.    Sure.  Any context.
8         What I'm trying to get at is
9 what your next invoice might look like.
10    A.    I cannot -- I cannot give you
11 an exact number because I have not calculated
12 it.
13    Q.    Do you think that it's -- for
14 example in this invoice you had billed -- you
15 personally had billed 37 hours.  Do you think
16 it's more than that?
17    A.    I don't want to guess.  I'd
18 like to go back to my records to check.
19    Q.    Okay.  When do you anticipate
20 the next invoice being submitted to the
21 defendants in this case by Analysis Group?
22    A.    Oh, I don't know when Analysis
23 Group would submit it.
24    Q.    Do these invoices get sent out

Confidential Information - Subject to Protective Order

Page 238

1  monthly or quarterly?
2      A.    I don't know what their
3  procedure is.
4      Q.    Okay.  It says your rate here
5  is $1,000 per hour, is that correct?
6      A.    Yes.
7      Q.    Okay.  And then there's a
8  number of Analysis Group professionals that
9  are also listed here, correct?
10     A.    Should I turn the page?
11     Q.    Sure, on page 2, yeah.
12     A.    Yes.
13     Q.    Do you recognize all those
14  names?
15     A.    Yes.
16     Q.    How did you select those people
17  to work with on this report?
18     A.    I did not select them to work
19  with me on the report.  One of the members of
20  the team, Brian Ellman, got in touch with me
21  and asked me if I would be interested in
22  speaking to some lawyers about this case, and
23  I agreed, and I did so.  And the lawyers
24  decided to retain me, and this team came as

Page 239

1  part of that.
2      Q.    So you don't know who --
3  putting aside Mr. Ellman, all the names below
4  him, you don't know how those individuals
5  were assigned to your team?
6      A.    No.
7      Q.    Okay.  Did you independently go
8  and vet any of their credentials?
9      A.    No.
10     Q.    Okay.  And do the hour
11  allocations here on page 2 look accurate to
12  you, that you billed 37 hours, and this whole
13  team here billed 326 hours --
14     A.    Well --
15     Q.    -- up to this point?
16     A.    -- I'm assuming it's accurate.
17  It's not something that I ever saw until this
18  document was presented to me.
19     Q.    If you go to the third page,
20  the next page.
21     A.    Yes.
22     Q.    You'll see that this is your
23  line item of your work on the case, right?
24     A.    Yes.

Page 240

1      Q.    Did you write those narrative
2  entries there?
3      A.    I did.
4      Q.    And would that be the same
5  for -- to the best of your understanding,
6  maybe you don't have any idea, but for these
7  other individuals at Analysis Group, Ellman,
8  O'Laughlin, below, would they have written
9  their own narrative descriptions?
10     A.    I have no idea.
11     Q.    You have no idea.
12           You would expect they probably
13  would have, though?
14     A.    I have no idea.
15     Q.    So what did these Analysis
16  Group employees do for you on this case?
17     A.    The short answer is that I use
18  them the way I use research assistants.  As
19  you mentioned, I got the case -- not the
20  case, sorry.
21           I got the request to be an
22  expert witness and write a report late last
23  year, and that is when the students are on
24  break.  And just like I use the students as

Page 241

1  research assistants, I did the same with the
2  AG team.
3      Q.    Okay.  Did that include them
4  writing any of your report in its draft form?
5      A.    The way it works is I work on
6  the report, I ask them for collaborating or
7  supporting material on -- for my opinions, I
8  ask them to read those materials that I
9  provided and find similar materials to help
10  me make a list of the references that I might
11  want to cite or I might not want to cite.
12           And I also, you know, ask them
13  as they were going through this if they had
14  any ideas, you know, they're welcome to share
15  them.  But at the end of the day it's my
16  report, I care about quality, and I accept or
17  reject, you know, any ideas from anyone.
18     Q.    Okay.  And your invoice, your
19  time here is complete, in your opinion, up
20  through December 31st?
21     A.    I mean, I will say that I, as
22  in other cases, I don't put in time that's
23  related to thinking or abstract things that
24  are associated with some of the case

Page 242

1  preparation. And, yeah, so I will say it's
2  pretty accurate.
3      Q.    Okay. But more tangible things
4  like actually writing the report, that would
5  something you would bill, right?
6      A.    So reading, writing, revising,
7  editing, checking, searching for literature
8  myself, those would be tangible things.
9      Q.    Why is it in your line items
10 for time that the first time the mention of
11 any draft report appears is on December 16,
12 2021 where you say you reviewed an already
13 existed draft report?
14     A.    That's not how I interpret
15 "review." For me, as I mentioned earlier, as
16 a reviewer and an aid, I think of review as
17 creating drafts, revising drafts, editing
18 drafts, for me it's all part of a review
19 process.
20     Q.    So what you're saying is you
21 may have miswritten the narrative here and
22 this is when you started writing the report,
23 December 16th?
24     A.    No. From my perspective I'm

Page 243

1  not misrepresenting it. That's what review
2  means for me.
3          So, for example, if you use the
4  page that we're looking at, when I say
5  "Review of Conti Declaration and Protective
6  Order," 12/09, I'm already reviewing and
7  writing the report based on what I'm seeing
8  from Dr. Conti's declaration and thoughts in
9  response to the protective order.
10         When I say "Review of online
11 Valsartan recall materials," I'm already
12 writing parts of the report because I'm
13 thinking about -- I'm thinking about what
14 will go into forming my opinions in the
15 report that are connected with these
16 materials.
17     Q.    Sure.
18         Go down to Mr. Ellman's hours
19 on page 4, the next page. He says on
20 December 10th that he had a call with the
21 case team and reviewed an outline.
22         Do you recall what he is
23 referring to by the "outline" there?
24     A.    I do not.

Page 244

1      Q.    Okay. Was that something that
2  was provided by counsel?
3      A.    I do not know that.
4      Q.    Okay. You'll see that a number
5  of the other Analysis Group employees do have
6  narrative line items regarding their work
7  drafting the report.
8          Take a look at Laura O'Laughlin
9  on page 4. For example, on December 8th she
10 says, "Assist in preparing expert report."
11         Do you see that?
12     A.    Yes.
13     Q.    Same thing on the 9th, same
14 thing on the 10th.
15         And then if you go down to Kate
16 Schoenbach, I believe -- I hope I pronounced
17 that right, she says she "assisted with
18 drafting," and then something is redacted
19 there for a number of days.
20     A.    Correct.
21     Q.    Okay. Same thing with
22 Mr. Jacob Eby, he says that he -- for
23 example, on December 13th he said he assisted
24 in drafting.

Page 245

1      A.    Yes.
2      Q.    And that's all prior to
3  December 16th where you first mention
4  reviewing a draft report, right?
5      A.    As I mentioned earlier, for me,
6  I started writing the report, you know, and
7  thinking -- you know, thinking through what I
8  would be looking for during that first call
9  with counsel. And I continued doing it on
10 the 9th, on the 10th, on the 16th, on the
11 17th, on the dates that you see there.
12         MR. DAVIS: Okay. All right.
13 I believe that's all the questions I
14 have.
15         I will make a formal request
16 that when the next invoice is
17 submitted that that be produced to us
18 as soon as possible.
19         And thank you, Dr. Keller. I
20 appreciate your time today.
21         THE WITNESS: Thank you very
22 much, I appreciate it.
23         MR. GOLDBERG: Just give us a
24 two-minute break and we can figure out

Confidential Information - Subject to Protective Order

Page 246

1   if we have any questions for
2   Dr. Keller.
3         MR. DAVIS:  Sure.
4         THE VIDEOGRAPHER:  Off the
5   record at 4:03.
6         (Whereupon, a recess was
7   taken.)
8         THE VIDEOGRAPHER:  Back on the
9   record at 4:07.
10        MR. GOLDBERG:  We have no
11  questions for Dr. Keller at this time.
12  Thank you.
13        MR. DAVIS:  Okay.  Thanks.
14        THE WITNESS:  Thank you very
15  much, everyone.
16        THE VIDEOGRAPHER:  Off record
17  at 4:07.
18        (Whereupon, the deposition was
19  concluded.)
20
21
22
23
24

Page 248

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8         After doing so, please sign the errata
9   sheet and date it.  It will be attached to
10  your deposition.
11        It is imperative that you return the
12  original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Page 247

1   COMMONWEALTH OF MASSACHUSETTS )
2   SUFFOLK, SS.                  )
3         I, MAUREEN O'CONNOR POLLARD,
4   Registered Diplomate Reporter and Notary
5   Public in and for the Commonwealth of
6   Massachusetts, do certify that on the 10th
7   day of March, 2022, at 9:19, the person
8   above-named was duly sworn to testify to the
9   truth of their knowledge, and examined, and
10  such examination reduced to typewriting under
11  my direction, and is a true record of the
12  testimony given by the witness.  I further
13  certify that I am neither attorney, related
14  or employed by any of the parties to this
15  action, and that I am not a relative or
16  employee of any attorney employed by the
17  parties hereto, or financially interested in
18  the action.
19        In witness whereof, I have
20  hereunto set my hand this 14th day of March,
21  2022.
22  _____
23  MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
24  CSR #149108

Page 249

1              - - - - - -
               E R R A T A
2              - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5     REASON: _____
6   ____  ____  _____
7     REASON: _____
8   ____  ____  _____
9     REASON: _____
10  ____  ____  _____
11    REASON: _____
12  ____  ____  _____
13    REASON: _____
14  ____  ____  _____
15    REASON: _____
16  ____  ____  _____
17    REASON: _____
18  ____  ____  _____
19    REASON: _____
20  ____  ____  _____
21    REASON: _____
22  ____  ____  _____
23
24

Page 250

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4      I, _____, do
Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9

_____
10  PUNAM ANAND KELLER, Ph.D.          DATE
11
12
13
14
15
16

Subscribed and sworn
17  To before me this
_____ day of _____, 20_____.
18
My commission expires: _____
19
20  _____
Notary Public
21
22
23
24

Page 251

1          LAWYER'S NOTES
2  PAGE  LINE
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____