Exhibit A

RESTRICTED CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

                DISTRICT OF NEW JERSEY

2   - - - - - - - - - - - - - - - - - x

    IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3   IRBESARTAN PRODUCTS LIABILITY      :

    LITIGATION,                        :

4                                      :

    THIS DOCUMENT RELATES TO           :

5   ALL ACTIONS                        :

    - - - - - - - - - - - - - - - - - x

6

7

8              ***RESTRICTED CONFIDENTIAL***

9

10             Veritext Virtual Zoom Videotaped

11  deposition of RENA M. CONTI, Ph.D., taken on

12  Thursday, February 10, 2022, in Glenside,

13  Pennsylvania, commencing at 10:17 a.m. Eastern

14  Standard Time, before Jamie I. Moskowitz, a

15  Certified Court Reporter and Certified Livenote

16  Reporter.

17

18

19

20

21

22

23

24

25

RESTRICTED CONFIDENTIAL

Page 2

```
 1    A P P E A R A N C E S:
 2

      HONIK LLC
 3    BY:  RUBEN HONIK, ESQUIRE
      ruben@honiklaw.com
 4    1515 Market Street - Suite 1100
      Philadelphia, Pennsylvania 19102
 5    267.435.1300
      Counsel for the Witness Rena M. Conti, Ph.D.
 6
 7    MAZIE SLATER KATZ FREEMAN
      BY:  ADAM M. SLATER, ESQUIRE
 8    aslater@mazieslater.com
      103 Eisenhower Parkway
 9    Roseland, New Jersey 07068
      973.228.9898
10    Counsel for the Plaintiffs
11

      SLACK DAVIS SANGER LLP
12    BY:  JOHN R. DAVIS, ESQUIRE
      jdavis@slaterdavis.com
13    6001 Bold Ruler Way - Suite 100
      Austin, Texas 78746
14    512.795.8686
      Counsel for the Plaintiffs
15
16    LIEFF CABRASER HYMAN & BERNSTEIN, LLP
      BY:  RACHEL J. GEMAN, ESQUIRE
17    rgeman@lchb.com
      250 Hudson Street
18    New York, New York 10013
      212.355.9500
19    Counsel for the Plaintiffs
20

      KANNER & WHITELEY, L.L.C.
21    BY:  CONLEE S. WHITELEY, ESQUIRE
      c.whiteley@kanner-law.com
22    BY:  DAVID J. STANOCH, ESQUIRE
      d.stanoch@kanner-law.com
23    BY:  LAYNE C. HILTON, ESQUIRE
      lhilton@kanner-law.com
24    701 Camp Street
      New Orleans, Louisiana 70130
25    504.524.5777
      Counsel for the Plaintiffs
```

RESTRICTED CONFIDENTIAL

Page 3

```
 1    A P P E A R A N C E S:
 2

      DUANE MORRIS LLP
 3    BY:  SETH A. GOLDBERG, ESQUIRE
      sagoldberg@duanemorris.com
 4    BY:  COLEEN W. HILL, ESQUIRE
      cwhill@duanemorris.com
 5    BY:  ALEK W. SMOLIJ, ESQUIRE
      awsmolij@duanemorris.com
 6    BY:  DANA B. KLINGES, ESQUIRE
      30 South 17th Street
 7    Philadelphia, Pennsylvania 19103
      215.979.1000
 8    Counsel for the Defendants Prinston Pharmaceutical
      Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
 9    Healthcare U.S., LLC and Huahai U.S., Inc.
10

      DUANE MORRIS LLP
11    BY:  REBECCA E. BAZAN, ESQUIRE
      rebazan@duanemorris.com
12    BY:  DREW T. DORNER, ESQUIRE
      dtdorner@duanemorris.com
13    505 9th Street NW - Suite 1000
      Washington, DC 20004
14    202.776.7800
      Counsel for the Defendants Prinston Pharmaceutical
15    Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
      Healthcare U.S., LLC and Huahai U.S., Inc.
16

17    MORGAN, LEWIS & BOCKIUS LLP
      BY:  JOHN K. GISLESON, ESQUIRE
18    john.gisleson@morganlewis.com
      BY:  STEVEN N. HUNCHUCK, ESQUIRE
19    steven.hunchuck@morganlewis.com
      One Oxford Centre - 32nd Floor
20    Pittsburgh, Pennsylvania  15219
      412.560.3300
21    Counsel for Defendant Aurobindo Pharma Ltd.
22
23
24
25
```

RESTRICTED CONFIDENTIAL

Page 4

```
 1   A P P E A R A N C E S:
 2

     GREENBERG TRAURIG, LLP
 3   BY:  TIFFANY M. ANDRAS, ESQUIRE
     andrast@gtlaw.com
 4   BY:  GREG E. OSTFELD, ESQUIRE
     osfeldg@gtlaw.com
 5   77 West Wacker Drive - Suite 3100
     Chicago, Illinois 60601
 6   312.456.1065
     Counsel for Defendant Teva Pharmaceuticals
 7   Industries Ltd.
 8

     NORTON ROSE FULBRIGHT US LLP
 9   BY:  ELLIE NORRIS, ESQUIRE
     ellie.norris@nortonrosefulbright.com
10   BY:  D'LESLI M. DAVIS, ESQUIRE
     dlesli.davis@nortonrosefulbright.com
11   2200 Ross Avenue - Suite 3600
     Dallas, Texas 75201-7932
12   214.855.8221
     Counsel for McKesson Corporation
13

14   HUSCH BLACKWELL
     BY:  MATTHEW D. KNEPPER, ESQUIRE
15   matt.knepper@huschblackwell.com
     190 Carondelet Plaza - Suite 600
16   St. Louis, Missouri 63105
     314.480.1500
17   Counsel for the Defendant Express Scripts
18

     BUCHANAN INGERSOLL & ROONEY PC
19   BY:  JONATHAN D. JANOW, ESQUIRE
     jonathan.janow@bipc.com
20   1700 K Street - Suite 300
     Washington, DC 20006
21   202.452.7900
     Counsel for the Defendant Albertsons LLC
22
23
24
25
```

RESTRICTED CONFIDENTIAL

Page 5

```
 1    A P P E A R A N C E S:
 2

      BUCHANAN INGERSOLL & ROONEY PC
 3    BY:  CHRISTOPHER B. HENRY, ESQUIRE
      christopher.henry@bipc.com
 4    227 West Trade Street - Suite 600
      Charlotte, North Carolina 28202
 5    704.444.3475
      Counsel for the Defendant Albertsons LLC
 6
 7    BARNES & THORNBURG LLP
      BY:  KARA M. KAPKE, ESQUIRE
 8    kara.kapke@btlaw.com
      11 South Meridian Street
 9    Indianapolis, Indiana 46204
      317.236.1313
10    Counsel for CVS and Rite Aid
11

      CROWELL & MORING LLP
12    BY:  LUKE J. BRESNAHAN, ESQUIRE
      lbresnahan@crowell.com
13    BY:  DANIEL T. CAMPBELL, ESQUIRE
      dcampbell@crowell.com
14    1001 Pennsylvania Avenue NW
      Washington, DC 20004
15    202.624.2500
      Counsel for the Defendant Cardinal Health Inc.
16
17    HILL WALLACK LLP
      BY:  WILLIAM E. MURTHA, ESQUIRE
18    wmurtha@hillwallack.com
      BY:  ERIC I. ABRAHAM, ESQUIRE
19    eabraham@hillwallack.com
      BY:  CARLO J. DEHART, ESQUIRE
20    cdehart@hillwallack.com
      21 Roszel Road
21    Princeton, New Jersey 08540
      609.924.0808
22    Counsel for the Defendants Hetero Drugs Limited and
      Hetero Labs Limited
23
24
25
```

RESTRICTED CONFIDENTIAL

Page 6

1    A P P E A R A N C E S:
2

      PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
3     BY:  FRANK H. STOY, ESQUIRE
      fhs@pietragallo.com
4     38th Floor - One Oxford Centre
      Pittsburgh, Pennsylvania 15219
5     412.263.4397
      Counsel for the Defendants Mylan Laboratories
6     Limited and Mylan Pharmaceuticals Inc.
7

      WALSH PIZZI O'REILLY FALANGA LLP
8     BY:  CHRISTINE I. GANNON, ESQUIRE
      cgannon@walshlaw.com
9     Three Gateway Center
      100 Mulberry Street - 15th Floor
10    Newark, New Jersey 07102
      973. 757.1100
11    Counsel for the Defendant Teva Pharmaceuticals
12

      HINSHAW & CULBERTSON LLP
13    BY:  GEOFFREY M. COAN, ESQUIRE
      gcoan@hinshawlaw.com
14    53 State Street - 27th Floor
      Boston, Massachusetts 02109
15    617.213.7045
      Counsel for the Defendant Sciegen Pharmaceuticals
16
17    DORSEY & WHITNEY LLP
      BY:  SHEVON D. ROCKETT, ESQUIRE
18    rockett.shevon@dorsey.com
      51 West 52nd Street
19    New York, New York 10019-6119
      212.415.9357
20    Counsel for the Defendant OptumRx
21

      FALKENBERG IVES LLP
22    BY:  KIRSTIN B. IVES, ESQUIRE
      kbi@falkenbergives.com
23    BY:  MEGAN A. ZMICK, ESQUIRE
      maz@falkenbergives.com
24    230 West Monroe - Suite 2220
      Chicago, Illinois 60606
25    312.566.4803
      Counsel for the Defendant Humana Pharmacy, Inc.

RESTRICTED CONFIDENTIAL

Page 7

1    A P P E A R A N C E S:

2

     ULMER & BERNE LLP

3    BY:  JEFFREY D. GEOPPINGER, ESQUIRE

     jgeoppinger@ulmer.com

4    312 Walnut Street - Suite 1400

     Cincinnati, Ohio 45202-4029

5    513.698.5000

     Counsel for the Defendant AmerisourceBergen

6

7    ALSO PRESENT:

8    JUSTIN BILY

     Legal Videographer

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESTRICTED CONFIDENTIAL

Page 116

1          efficacious as -- as attested to in the drug's

2          manufacturing report to the

3          Food and Drug Administration.

4      BY MR. GOLDBERG:

5          Q        So products that have such an

6      attestation have value, right?

7                      MR. HONIK:  Object to form.

8                      THE WITNESS:  You mischaracterized my

9          testimony.

10     BY MR. GOLDBERG:

11         Q        I'm asking you a question.  Products

12     that have the attestation you described have value,

13     correct?

14                     MR. HONIK:  Object to form.

15                     THE WITNESS:  Okay.  Again,

16         prescription -- pharmaceutical manufacturers

17         are not allowed to sell products into the U.S.

18         market that are not produced in a manner of

19         cGMP compliant, plus are safe and efficacious

20         as judged by the Food and Drug Administration.

21               There is a long and very complicated

22         route for a product to be judged, a drug, a

23         prescription drug, that is allowed to be

24         entered into the U.S. class of trade.

25         Manufacturers have to meet all of those

RESTRICTED CONFIDENTIAL

Page 117

1          standards, both in terms of attestation -- in

2          other words, they can say these things, but

3          they -- but they are also judged by the

4          regulator itself about whether or not these

5          things are actually --

6                    THE COURT REPORTER:  Are actually...

7                    THE WITNESS:  True.

8     BY MR. GOLDBERG:

9          Q          So products that are sold with that

10     attestation have value?

11                    MR. HONIK:  Object to form, asked and

12          answered.

13                    THE WITNESS:  Okay.  Again, it's not

14          just the attestation that matters.  The U.S.

15          regulator requires that any products that want

16          to be sold into the U.S. market that is going

17          to be considered a prescription drug, must be

18          produced in accordance with cGMP and be safe

19          and efficacious.  And the manufacturer just --

20          can't just say that.  They actually have to

21          prove it to the regulator.

22                    It is in that meaning that I mean that

23          those products have value.  In other words,

24          products that -- I can say it in a different

25          way, which is products have value.  There is a

RESTRICTED CONFIDENTIAL

Page 118

```
 1         legitimate supply curve if and only if they are

 2         produced according to cGMP and are safe and

 3         efficacious, both by attestation and by

 4         proof -- by empirical proof.

 5    BY MR. GOLDBERG:

 6         Q        If the FDA is permitting those

 7    products to be sold, they have value?

 8         A        For prescription drugs, drugs that are

 9    actually called "drugs" by the

10    Food and Drug Administration, they -- and are sold

11    at pharmacies, and dispensed to American patients by

12    physicians or by pharmacy chains, those products

13    must meet the evidentiary standard of, they are

14    produced according to cGMP, they are not adulterated

15    or misbranded, and they are safe and efficacious,

16    for the -- for the disease -- specific indication

17    that the Food and Drug Administration approves that

18    product for.

19                 COURT REPORTER:  I'm sorry.  The

20         Food and Drug Administration...

21                 THE WITNESS:  Approves that product to

22         be sold for or used for.

23    BY MR. GOLDBERG:

24         Q        So if the FDA has permitted --

25    if -- permitted prescription drugs to be sold at
```

RESTRICTED CONFIDENTIAL

Page 124

1          And I am just confirming.  So you're

2     not thinking about it in terms of demand, you're

3     thinking about it in terms of supply?

4          A          What is "it" in your question?

5          Q          The -- the question of whether the

6     drug is -- a drug is worthless?

7          A          So, again, from an economic

8     perspective, there is no legitimate supply curve for

9     a product that is adulterated and misbranded.  That

10     is by statute.  Consumers can demand products that

11     are illegal or illegitimate, but they're -- but a

12     pharmacy can't sell a product that does not -- for

13     which the manufacturer has not met the evidentiary

14     standard and have been approved by the U.S.

15     regulator for use in that -- in that context.

16          Q          Do you have any -- I don't see it

17     here.  Did you cite to any economic treatise for the

18     notion that if there is -- there is no legitimate

19     supply curve for a product that is adulterated and

20     misbranded?

21          A          This is one of the most -- one of the

22     most highly regulated consumer product markets

23     that -- that exists in the United States.  U.S.

24     is -- maintains the gold standard for quality of its

25     prescription drug supply.

RESTRICTED CONFIDENTIAL

Page 125

1              Every pharmaceutical manufacturer that

2      sells products through to pharmacies and ultimately

3      to American consumers, knows what the rules are.

4      The rules are they must meet the evidentiary

5      standard of permitting to quality manufacturing and

6      be safe and efficacious.

7              From an economic standpoint, that --

8      it is meeting those regulations that allow there to

9      be a supply of a product.  I don't need to -- you

10     can't think about the supply curve of prescription

11     drugs without understanding what the regulation is

12     that allows them to be sold to the U.S.  That's

13     your -- that's actually health economics 101.

14     Q      Well, I'm trying to understand which

15     health economics 101 treatise or authority you're

16     citing for the notion that -- because in your view,

17     there's no legitimate supply curve, a drug is

18     worthless?

19             MR. HONIK:  Object to form, asked and

20         answered.

21             I'm sorry.  Please answer, Dr. Conti.

22             THE WITNESS:  Thank you.

23             It's not my view.  This is the U.S.

24         regulator's perspective.  The U.S. regulator

25         does not -- does not view -- does not allow

RESTRICTED CONFIDENTIAL

Page 126

1          drugs to be sold into the U.S. market that do

2          not meet the evidentiary standard.  And it's

3          prescription drug manufacturers themselves that

4          have wanted that standard to be as it is.

5                    And so I -- I mean, there's plenty of

6          published literature that talks about this, the

7          importance of the evidentiary standard to the

8          supply of these products, and I cite some of

9          that in my report.  But every pharmaceutical

10         manufacturer that is allowed to sell into the

11         U.S. market knows what the standard is.

12    BY MR. GOLDBERG:

13         Q        You're -- you're not answering my

14    question.  My question is what economic support do

15    you have for the notion that, if there's no supply,

16    the drug is worthless?

17                    MR. HONIK:  Object to the form, asked

18         and answered.

19                    THE WITNESS:  This is economics 101.

20         If you go -- I'm more than happy to show you

21         the picture.  But there can be no price for a

22         product that does not have a demand curve

23         meeting a supply curve.  There is no economic

24         price if there is no legitimate supply curve.

25                    There are plenty of economic textbooks

RESTRICTED CONFIDENTIAL

Page 127

```
 1          that explain that an economic price is related

 2          to both demand and supply, and its -- and, you

 3          know, its relationship to each other.

 4     BY MR. GOLDBERG:

 5          Q        Was it -- there was an economic --

 6     there was an economic price that was paid for

 7     valsartan between 2012 and 2018, right?

 8                   MR. HONIK:  Object to the form.  Are

 9          you asking if consumers paid for it, paid for

10          this drug?

11                   THE WITNESS:  I don't understand what

12          you're asking.

13                   MR. GOLDBERG:  Counsel --

14     BY MR. GOLDBERG:

15          Q        I'm using your phrase, "economic

16     price."  There was an economic price paid for

17     valsartan between 2012 and 2018, right?

18                   MR. HONIK:  Right.  And our lawsuit

19          seeks --

20                   MR. GOLDBERG:  Counsel, you're not --

21          counsel, don't testify.  Don't interrupt.  Let

22          the witness answer the question.

23                   MR. HONIK:  You have now asked the

24          same question six times.

25                   MR. GOLDBERG:  Counsel, don't --
```

RESTRICTED CONFIDENTIAL

Page 156

1    BY MR. GOLDBERG:

2        Q        And did John -- so we talked about the

3    therapeutic benefits that may have -- that -- that

4    consumers who took the at-issue valsartan products

5    may have experienced.  You don't dispute that

6    consumers who took valsartan at-issue products may

7    have experienced therapeutic benefits?

8                MR. HONIK:  Object to the form, asked

9         and answered, beyond the scope.

10                You may answer.

11                THE WITNESS:  Again, the demand curve

12         for these products may exist.  From an economic

13         theory perspective, the demand curve represents

14         individual assessments of benefits and costs of

15         prescription drugs.  I am not disputing that

16         there may have been a demand curve for these

17         products.  That is not my opinion.

18                My opinion is related to the supply

19         curve.  In other words, that products that do

20         not meet the evidentiary standard are not

21         allowed into the U.S. products of trade, they

22         are not viewed as being legitimate products.

23         From my perspective, those products are

24         worthless.

25

RESTRICTED CONFIDENTIAL

Page 165

1           products that do not meet the evidentiary

2           standard of the U.S. government.

3                   I was asked to assume that

4           products -- that these products at issue

5           between 2012 and 2018 did not meet the

6           evidentiary standard.  They were adulterated

7           and misbranded.  Therefore, there was no supply

8           curve, in my analysis.

9    BY MR. GOLDBERG:

10        Q       Are you familiar with what the FDA

11   advised patients to do when the recalls were

12   announced?

13                  MR. HONIK:  Object to the form,

14          outside the scope.

15                  THE WITNESS:  Specifically, what do

16          you mean?

17   BY MR. GOLDBERG:

18        Q       Are you aware that the FDA advised

19   people that they should not discontinue their use of

20   valsartan until they spoke with their doctor about

21   it?

22                  MR. HONIK:  Object to the form, asked

23          and answered, outside the scope.

24                  THE WITNESS:  Again, my understanding

25          is that there were multiple FDA communications

RESTRICTED CONFIDENTIAL

Page 166

1          when the contamination of these products and

2          their adulteration became known.  Is there a

3          specific communication that you are referring

4          to?

5     BY MR. GOLDBERG:

6          Q      Well, I think my first question

7     is -- and you can answer no if it's no.

8                 Are you aware of the FDA telling

9     patients they should not discontinue the use of

10    their valsartan when the FDA announced the recalls?

11                MR. HONIK:  Same objection as

12          previously stated.

13                THE WITNESS:  Okay.  The FDA had

14          multiple communications with consumers and

15          other suppliers about these products.  I'm

16          asking you to be specific.

17    BY MR. GOLDBERG:

18         Q      Do you want to turn to Tab 2 in your

19    binder?

20         A      Which binder?

21         Q      Tab 2 is binder -- that would be

22    binder, I guess, Volume 1 of 3?

23                THE COURT REPORTER:  Will this be a

24          new exhibit?

25                MR. GOLDBERG:  Yeah -- we'll mark this

RESTRICTED CONFIDENTIAL

Page 169

1      Q        Okay.  And at the bottom of that page,
2   there are two bullet points at the very bottom.  Do
3   you see those?  And --
4      A        Is that a question?
5      Q        The first bullet point --
6      A        Is that a question?
7      Q        The first bullet point -- the first
8   bullet point, the FDA is instructing patients taking
9   at-issue valsartan that they should continue taking
10  their current medicine until their doctor or
11  pharmacist provides a replacement or a different
12  treatment option.  Did I read that correctly?
13     A        I think you asked me two questions,
14  but I see that you have read that -- that text
15  correctly.
16     Q        Did you consider at all in your
17  assessment the FDA's instructing patients to
18  continue -- to continue taking their medicine until
19  they found an alternative?
20              MR. HONIK:  Object to form, asked and
21         answered, beyond the scope.
22              THE WITNESS:  Again, from my
23         perspective, there is a demand for these
24         products.  In my report, I was asked to assume
25         that these products were contaminated,

RESTRICTED CONFIDENTIAL

Page 170

1          adulterated and misbranded.  And therefore,

2          there is no --

3                    THE COURT REPORTER:  I'm sorry.  There

4          is no...

5                    THE WITNESS:  There is no legitimate

6          supply curve.  The fact that the FDA reaffirms

7          that there is a demand curve for these products

8          and many other products that might treat

9          someone's hypertension, is in my report.  It

10         is, by definition, considered.

11                   My report is about the supply of these

12         products.

13    BY MR. GOLDBERG:

14         Q       The FDA is acknowledging that the

15    at-issue valsartan may be providing a therapeutic

16    benefit to the consumers who are taking it, right?

17                   MR. HONIK:  Object to the form, asked

18         and answered, beyond the scope.

19                   THE WITNESS:  That's not what it says

20         here on this -- on this document, sir.

21                   MR. GOLDBERG:  You can take down that

22         document.

23    BY MR. GOLDBERG:

24         Q       You're aware that there have been a

25    number of recalls of valsartan since that one in

RESTRICTED CONFIDENTIAL

Page 183

1           theory, price cannot be arrived at without

2           there being both demand and supply.  I have

3           been asked to assume there is -- these products

4           were adulterated and misbranded, and therefore,

5           there is no supply that is legitimate for these

6           products as -- as a matter of U.S. policy.  And

7           therefore, there can be no price.

8     BY MR. GOLDBERG:

9           Q        Is -- is -- in your opinion, is price

10    the same as value?

11          A        So according to the FDA alone, there

12    is both an economic price and a therapeutic -- well,

13    an economic value and a therapeutic value.  We've

14    also talked about this quite a lot today.

15                   There might be therapeutic value, in

16    other words, that is encapsulated in the demand

17    curve.  People -- people trade off the benefits and

18    costs of products.  But there is no supply of

19    illegitimate, adulterated and misbranded products in

20    my -- in my model.  And therefore, there is no

21    price.

22    BY MR. GOLDBERG:

23          Q        You said, "According to the FDA alone,

24    there is both an economic price and a therapeutic

25    value."

RESTRICTED CONFIDENTIAL

Page 188

```
 1        Q        Just in terms of the FDA --
 2        A        And -- wait, and -- just so that
 3    you're not mischaracterizing me.
 4                 It's also the pharmaceutical
 5    industry's view that they want to be known as
 6    producing and entering products into the U.S. and
 7    selling products into the U.S. that are legitimate,
 8    that do meet the evidentiary standard as
 9    distinguished from products that do not.
10        Q        Just as you don't want me to interrupt
11    you, I'd appreciate it if you don't interrupt me.
12        A        I was just trying to clarify your
13    mischaracterization of my position.
14        Q        In your answer, going back, you refer
15    to the economic theory of supply and demand.  What
16    economic treatises have you been relying on for the
17    theory that where there's no legitimate supply,
18    there -- there's no possibility for a delivery of
19    price?
20        A        That's Economics 101.
21                 MR. HONIK:  Objection, asked and
22        answered.
23                 THE WITNESS:  It's Economics 101.
24                 MR. HONIK:  I think you got your
25        answer, Seth.
```