Exhibit B

CONFIDENTIAL

Page 1

1                 UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW JERSEY

2       - - - - - - - - - - - - - - - - - x

        IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3       IRBESARTAN PRODUCTS LIABILITY     :

        LITIGATION,                       :

4                                         :

        THIS DOCUMENT RELATES TO          :

5       ALL ACTIONS                       :

        - - - - - - - - - - - - - - - - - x

6

7

8                 ***RESTRICTED CONFIDENTIAL***

9

10                Veritext Virtual Zoom Videotaped

11      deposition of RENA M. CONTI, Ph.D., taken on Friday,

12      February 11, 2022, in Glenside, Pennsylvania,

13      commencing at 9:04 a.m. Eastern Standard Time,

14      before Jamie I. Moskowitz, a Certified Court

15      Reporter and Certified Livenote Reporter.

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
                                                      Page 2

  1      A P P E A R A N C E S:
  2

         HONIK LLC
  3      BY:  RUBEN HONIK, ESQUIRE
         ruben@honiklaw.com
  4      1515 Market Street - Suite 1100
         Philadelphia, Pennsylvania 19102
  5      267.435.1300
         Counsel for the Witness Rena M. Conti, Ph.D.
  6
  7      MAZIE SLATER KATZ FREEMAN
         BY:  ADAM M. SLATER, ESQUIRE
  8      aslater@mazieslater.com
         103 Eisenhower Parkway
  9      Roseland, New Jersey 07068
         973.228.9898
 10      Counsel for the Plaintiffs
 11
         SLACK DAVIS SANGER LLP
 12      BY:  JOHN R. DAVIS, ESQUIRE
         jdavis@slaterdavis.com
 13      6001 Bold Ruler Way - Suite 100
         Austin, Texas 78746
 14      512.795.8686
         Counsel for the Plaintiffs
 15
 16      LIEFF CABRASER HYMAN & BERNSTEIN, LLP
         BY:  RACHEL J. GEMAN, ESQUIRE
 17      rgeman@lchb.com
         250 Hudson Street
 18      New York, New York 10013
         212.355.9500
 19      Counsel for the Plaintiffs
 20
         KANNER & WHITELEY, L.L.C.
 21      BY:  CONLEE S. WHITELEY, ESQUIRE
         c.whiteley@kanner-law.com
 22      BY:  DAVID J. STANOCH, ESQUIRE
         d.stanoch@kanner-law.com
 23      BY:  LAYNE C. HILTON, ESQUIRE
         lhilton@kanner-law.com
 24      701 Camp Street
         New Orleans, Louisiana 70130
 25      504.524.5777
         Counsel for the Plaintiffs
```

CONFIDENTIAL

Page 3

```
 1    A P P E A R A N C E S:
 2

      DUANE MORRIS LLP
 3    BY:  SETH A. GOLDBERG, ESQUIRE
      sagoldberg@duanemorris.com
 4    BY:  COLEEN W. HILL, ESQUIRE
      cwhill@duanemorris.com
 5    BY:  ALEK W. SMOLIJ, ESQUIRE
      awsmolij@duanemorris.com
 6    BY:  DANA B. KLINGES, ESQUIRE
      30 South 17th Street
 7    Philadelphia, Pennsylvania 19103
      215.979.1000
 8    Counsel for the Defendants Prinston Pharmaceutical
      Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
 9    Healthcare U.S., LLC and Huahai U.S., Inc.
10

      DUANE MORRIS LLP
11    BY:  REBECCA E. BAZAN, ESQUIRE
      rebazan@duanemorris.com
12    BY:  DREW T. DORNER, ESQUIRE
      dtdorner@duanemorris.com
13    505 9th Street NW - Suite 1000
      Washington, DC 20004
14    202.776.7800
      Counsel for the Defendants Prinston Pharmaceutical
15    Inc., Zhejiant Huahai Pharmaceutical Co., Ltd, Solco
      Healthcare U.S., LLC and Huahai U.S., Inc.
16

17    MORGAN, LEWIS & BOCKIUS LLP
      BY:  JOHN K. GISLESON, ESQUIRE
18    john.gisleson@morganlewis.com
      BY:  STEVEN N. HUNCHUCK, ESQUIRE
19    steven.hunchuck@morganlewis.com
      One Oxford Centre - 32nd Floor
20    Pittsburgh, Pennsylvania  15219
      412.560.3300
21    Counsel for Defendant Aurobindo Pharma Ltd.
22
23
24
25
```

CONFIDENTIAL

Page 4

```
 1    A P P E A R A N C E S:
 2

      GREENBERG TRAURIG, LLP
 3    BY:  TIFFANY M. ANDRAS, ESQUIRE
      andrast@gtlaw.com
 4    BY:  GREG E. OSTFELD, ESQUIRE
      ostfeldg@gtlaw.com
 5    77 West Wacker Drive - Suite 3100
      Chicago, Illinois 60601
 6    312.456.1065
      Counsel for Defendant Teva Pharmaceuticals
 7    Industries Ltd.
 8

      NORTON ROSE FULBRIGHT US LLP
 9    BY:  ELLIE NORRIS, ESQUIRE
      ellie.norris@nortonrosefulbright.com
10    BY:  D'LESLI M. DAVIS, ESQUIRE
      dlesli.davis@nortonrosefulbright.com
11    2200 Ross Avenue - Suite 3600
      Dallas, Texas 75201-7932
12    214.855.8221
      Counsel for McKesson Corporation
13

14    HUSCH BLACKWELL
      BY:  MATTHEW D. KNEPPER, ESQUIRE
15    matt.knepper@huschblackwell.com
      190 Carondelet Plaza - Suite 600
16    St. Louis, Missouri 63105
      314.480.1500
17    Counsel for the Defendant Express Scripts
18

      BUCHANAN INGERSOLL & ROONEY PC
19    BY:  JONATHAN D. JANOW, ESQUIRE
      jonathan.janow@bipc.com
20    1700 K Street - Suite 300
      Washington, DC 20006
21    202.452.7900
      Counsel for the Defendant Albertsons LLC
22

23

24

25
```

CONFIDENTIAL

Page 5

```
 1      A P P E A R A N C E S:
 2
        BUCHANAN INGERSOLL & ROONEY PC
 3      BY:  CHRISTOPHER B. HENRY, ESQUIRE
        christopher.henry@bipc.com
 4      227 West Trade Street - Suite 600
        Charlotte, North Carolina 28202
 5      704.444.3475
        Counsel for the Defendant Albertsons LLC
 6
 7      BARNES & THORNBURG LLP
        BY:  KARA M. KAPKE, ESQUIRE
 8      kara.kapke@btlaw.com
        11 South Meridian Street
 9      Indianapolis, Indiana 46204
        317.236.1313
10      Counsel for CVS and Rite Aid
11
        CROWELL & MORING LLP
12      BY:  LUKE J. BRESNAHAN, ESQUIRE
        lbresnahan@crowell.com
13      BY:  DANIEL T. CAMPBELL, ESQUIRE
        dcampbell@crowell.com
14      1001 Pennsylvania Avenue NW
        Washington, DC 20004
15      202.624.2500
        Counsel for the Defendant Cardinal Health Inc.
16
17      HILL WALLACK LLP
        BY:  WILLIAM E. MURTHA, ESQUIRE
18      wmurtha@hillwallack.com
        BY:  ERIC I. ABRAHAM, ESQUIRE
19      eabraham@hillwallack.com
        BY:  CARLO J. DEHART, ESQUIRE
20      cdehart@hillwallack.com
        21 Roszel Road
21      Princeton, New Jersey 08540
        609.924.0808
22      Counsel for the Defendants Hetero Drugs Limited and
        Hetero Labs Limited
23
24
25
```

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

                 DISTRICT OF NEW JERSEY

2      - - - - - - - - - - - - - - - - x

       IN RE: VALSARTAN, LOSARTAN, AND   :  MDL NO. 2875

3      IRBESARTAN PRODUCTS LIABILITY        :

       LITIGATION,                          :

4                                           :

       THIS DOCUMENT RELATES TO             :

5      ALL ACTIONS                          :

       - - - - - - - - - - - - - - - - x

6

7

8              ***RESTRICTED CONFIDENTIAL***

9

10             Veritext Virtual Zoom Videotaped

11     deposition of RENA M. CONTI, Ph.D., taken on Friday,

12     February 11, 2022, in Glenside, Pennsylvania,

13     commencing at 9:04 a.m. Eastern Standard Time,

14     before Jamie I. Moskowitz, a Certified Court

15     Reporter and Certified Livenote Reporter.

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
                                              Page 2

 1     A P P E A R A N C E S:
 2

       HONIK LLC
 3     BY:  RUBEN HONIK, ESQUIRE
       ruben@honiklaw.com
 4     1515 Market Street - Suite 1100
       Philadelphia, Pennsylvania 19102
 5     267.435.1300
       Counsel for the Witness Rena M. Conti, Ph.D.
 6
 7     MAZIE SLATER KATZ FREEMAN
       BY:  ADAM M. SLATER, ESQUIRE
 8     aslater@mazieslater.com
       103 Eisenhower Parkway
 9     Roseland, New Jersey 07068
       973.228.9898
10     Counsel for the Plaintiffs
11
       SLACK DAVIS SANGER LLP
12     BY:  JOHN R. DAVIS, ESQUIRE
       jdavis@slaterdavis.com
13     6001 Bold Ruler Way - Suite 100
       Austin, Texas 78746
14     512.795.8686
       Counsel for the Plaintiffs
15
16     LIEFF CABRASER HYMAN & BERNSTEIN, LLP
       BY:  RACHEL J. GEMAN, ESQUIRE
17     rgeman@lchb.com
       250 Hudson Street
18     New York, New York 10013
       212.355.9500
19     Counsel for the Plaintiffs
20
       KANNER & WHITELEY, L.L.C.
21     BY:  CONLEE S. WHITELEY, ESQUIRE
       c.whiteley@kanner-law.com
22     BY:  DAVID J. STANOCH, ESQUIRE
       d.stanoch@kanner-law.com
23     BY:  LAYNE C. HILTON, ESQUIRE
       lhilton@kanner-law.com
24     701 Camp Street
       New Orleans, Louisiana 70130
25     504.524.5777
       Counsel for the Plaintiffs
```

CONFIDENTIAL

Page 48

1    It's -- it's explained.  So in paragraphs 63 and 64,

2    I explain what I did for the defendant retailers for

3    unjust enrichment.  I list, "Retailers profited from

4    the sale of at-issue valsartan products to consumers

5    at the point of sale.  Profits are defined as

6    revenues minus cost for each at-issue valsartan

7    product sold by the defendant retailers from

8    January 1st until the at-issue valsartan products

9    were recalled in 2018 and 2019 for being adulterated

10   and misbranded."

11                 I then have, again, a footnote where

12   we have established which of the products at-issue

13   and at what time periods.  All I did was take the

14   information that was provided to me by the at-issue

15   retailers for the relevant time periods, the

16   relevant manufacturers and the relevant product

17   categories, and matched them with the states

18   relevant for the unjust enrichment damages and

19   summed them up.

20                 I did the exact same thing for the

21   liability claims, and I think that is listed and

22   explained in my report, in the preceding section, in

23   Paragraphs 60, 61 and 62.

24        Q       And what I'm trying to -- to

25   understand and make sure that I -- I follow, is what

CONFIDENTIAL

Page 60

1          conclusion.

2                    You may answer.

3                    THE WITNESS:  Thank you.

4                    Allocation and apportionment is

5          outside of the scope of my report.

6      BY MS. KAPKE:

7          Q       You would agree that they reflect the

8      same -- for a particular state and particular

9      manufacturer, they represent the same data which is

10     the full patient paid amount, correct?

11                   MR. HONIK:  Object to the form.

12                   THE WITNESS:  I disagree with that

13         characterization.

14     BY MS. KAPKE:

15         Q       Correct it then, please.

16                   MR. HONIK:  Object to form.

17                   You can answer.

18                   THE WITNESS:  Okay.  So let's go back

19         to the basis of liability versus unjust

20         enrichment.

21                   Liability is related to what was paid

22         at the point of sale.  In this case, by the --

23         by the consumer and TPP, if we're taking this

24         from a theoretical perspective.  And so the

25         full amount of retailer liability is the -- the

CONFIDENTIAL

Page 61

1          full amount that -- that was paid by the

2          consumer and by the third-party payor at the

3          point of sale, and does not include offsets

4          such as rebates or discounts that might have

5          been applied later.

6                    Whereas unjust enrichment, if you go

7          to Section C of my report, paragraph 64,

8          entails understanding what the retailer profits

9          from that sale are.  And that would include,

10         again, in theory, what the customer paid, what

11         the third-party payor paid, inclusive, minus

12         the retailer costs.

13                   Now, those costs, the retailers have

14         already taken out the dispensing fee, but one

15         can imagine there would be potentially other

16         costs of dispensing those specific products

17         that may be related to the point of sale, and

18         might include other offsets that could have

19         occurred.

20                   I discussed that in Footnote 84 where

21         I say, "When calculating profits, the other

22         offsets may be removed from gross profit should

23         the jury or court find these to be reasonable

24         deductions."  That is relevant to unjust

25         enrichment.  It's not relevant to liability.

CONFIDENTIAL

Page 101

1           Reporter, can you hear me okay, also?

2                    THE COURT REPORTER:  You're a little

3           low, but I can hear you.

4                    MR. CAMPBELL:  Okay.  I pulled the

5           microphone as close as I can get it here, so I

6           will do the best I can.

7      BY MR. CAMPBELL:

8           Q      So, Dr. Conti, you talked a lot

9      yesterday about your role as a professor, your

10     coursework, your class work.  How much of that

11     coursework, that class work, involves

12     wholesaler-specific issues?

13          A      I have spent some time understanding a

14     wholesaler's role in this industry.  I have had the

15     pleasure of working with some folks at Cardinal and

16     at AmerisourceBergen and in multiple contexts.

17                   THE THE COURT REPORTER:  Did you say

18          -- did you say Americsource?

19                   THE WITNESS:  AmerisourceBergen.

20                   THE COURT REPORTER:  Okay.

21     BY MR. CAMPBELL:

22          Q      In what sort of context --

23          A      And Cardinal.

24          Q      Thank you.

25          A      Yeah.

CONFIDENTIAL

Page 102

1          Q          In what context did you work with

2    those folks at Cardinal and AmerisourceBergen?

3          A          Again, just in the normal course of my

4    business, I spend a lot of time trying to understand

5    how this industry works and the role wholesalers has

6    is part of the -- part of the ecosystem.

7          Q          Were you --

8          A          So I can be -- I can be more specific.

9    I've been on -- I've been on panels and conferences.

10   I've been in closed-door meetings, discussing

11   various issues related to reimbursement, financing,

12   organization, regulation, where wholesaler

13   representatives have been there.  And I know

14   something about the wholesaler data that -- that

15   wholesalers such as Cardinal and AmerisourceBergen

16   maintain.  What else should I tell you?

17                    I teach about the role of wholesalers

18   in this ecosystem and have had the pleasure of

19   reviewing shareholder reports of AmerisourceBergen,

20   Cardinal and other public wholesalers operating in

21   the U.S. market.

22         Q          And so you mentioned that earlier this

23   morning.  Those are the public finance reports that

24   you reviewed either last night or this morning?

25         A          No, I mean -- so, again, I'm talking

CONFIDENTIAL

Page 103

1    generally.  So part of my course that I teach on

2    Strategy in the Pharmaceutical Industry requires

3    that my students do shareholder report analysis.

4    And we focus both on pharmaceutical manufacturers,

5    but also other entities that are important in the

6    supply chain, which include the wholesalers and also

7    include some of the retailers that we've talked

8    about.

9              There are a handful of shareholder

10   reports that I looked at over the past couple of

11   days that include Mylan, Teva -- I think maybe one

12   more of the defendant manufacturers.  And I

13   certainly looked over gross revenues of the retailer

14   pharmacies as well.

15        Q       Do you remember any specific

16   individuals at Cardinal or AmerisourceBergen at any

17   of those conferences or panels when you were there

18   with them?

19        A       Not off the top of my head.  I am in

20   email correspondence with a number of former

21   executives working on some work related to private

22   labeling activities for some drugs that went into

23   short supply, but not ones that are related in this

24   matter.  I'm more than happy to tell you who those

25   are.  I just don't have them off the top of my head.

CONFIDENTIAL

Page 106

1    BY MR. CAMPBELL:

2         Q        Were there any confidentiality

3    agreements related to that data that you were shown?

4         A        I -- in at least one interaction, I

5    did sign a confidentiality agreement.  But it wasn't

6    for any of the wholesalers that are named in this.

7         Q        You said that was a screen share.  So

8    did you take any documents back with you?  Do you

9    have any documents on your computer or on your desk

10   or anything like that?

11        A        No.  I wish, but no.  Yeah.

12        Q        And was it that experience and looking

13   at that data that informed your opinions here about

14   the damages calculation as to wholesalers?

15        A        Well, we talked about this yesterday,

16   that -- I mean, I've spent every day for the past

17   20 years thinking about how this -- how this system

18   works, and specifically how prescription drugs go

19   from base ingredients to -- to API to fill and

20   finish, manufacturing, you know, through the supply

21   chain, which includes distributers and then,

22   ultimately, to reach our pharmacies or to hospitals

23   or to medical groups and then, finally, to be

24   infused, injected or dispensed to consumers.

25                 Certainly, the role of wholesalers is

CONFIDENTIAL

Page 107

1    a very important one in this field, and one that I'm

2    involved -- I routinely understand and -- and am

3    thinking about in -- in my academic roles.  So

4    therefore, by definition, it informs how I think

5    about their role in this case.  But...

6        Q        Got you.

7        A        I actually haven't spent that much

8    time writing about distributors and wholesalers, in

9    part because the data is all --

10              THE COURT REPORTER:  The what?

11              THE WITNESS:  The data is opaque.

12        It's not normally what we -- I have access to

13        in my -- in the course of my daily research --

14        research.

15   BY MR. CAMPBELL:

16        Q        You mentioned yesterday that the

17   report, which is, I think, Exhibit 5, that that

18   report took you, I think you said many months to

19   write.  Do you remember that?

20        A        Yes.

21        Q        Okay.  And we looked at some of the

22   hours yesterday, and let's just say dozens of hours

23   to write your report, right?

24        A        I don't understand your question.  I'm

25   sorry.

CONFIDENTIAL

Page 165

1         A         Yeah.  Okay.  So -- and are you asking

2    about payments that Hetero made to their distributor

3    or --

4         Q         I mean --

5         A         -- to other --

6                   THE COURT REPORTER:  Okay.  I cannot

7         -- I can't have you both speaking at one time.

8         It's too fast, and I can't do it.

9                   MR. ABRAHAM:  Sorry.  My fault.

10   BY THE WITNESS:

11        Q         I mean, not necessarily payments made

12   by Hetero's manufacturer, but made by Hetero's

13   United States repackager or distributor.

14        A         So do you mean that there were --

15   there were refunds that were made by the distributor

16   to consumers or to third-party payors for recalled

17   products?

18        Q         That's a fair hypothetical.  So in

19   other words, yes.  Did you, in any way in your

20   damages analysis, consider if those had occurred and

21   what the impact would be in your damages

22   calculation?

23        A         So, again, my -- my damage calculation

24   is flexible and could accommodate the possibility of

25   refunds that were made for recalled or contaminated

CONFIDENTIAL

Page 166

1    product to end-payors.  I did not have that data for

2    this analysis that I conducted.  My understanding is

3    that whether or not that would be ultimately

4    included in damages for settlement purposes, that is

5    something that would be settled by counsel, court or

6    the judge.

7         Q        Okay.  Did your damages analysis in

8    any way address the charge backs, rebates, bill

9    backs, administrative fees or cash discounts

10   attributable to sales of Hetero's valsartan that was

11   allegedly contaminated or unpure as a result of the

12   nitrosamine?

13        A        That's a really compound question.  So

14   let's take that apart.

15               So if discounts were given to

16   consumers at the point of sale, then by definition,

17   they are included in my damages because they would

18   offset the actual payment that patients made at the

19   pharmacy counter.  And that would be included in the

20   IQVIA data that's listed in my report.

21        Q        Did you analysis -- I'm sorry.  Go

22   ahead.  I didn't mean to interrupt.

23        A        No.  It's okay.

24               We don't have rebate data.  That is

25   something that is confidential and available from

CONFIDENTIAL

Page 167

1    the manufacturers themselves.  From a theory of

2    liability, rebates are not necessarily things that

3    would be considered to be offsets, because injury

4    occurs at the point of sale, and rebates are paid

5    after the products are sold at some other point in

6    time in aggregate and may not be directly related to

7    any specific transaction.

8                    But to the extent that Hetero or their

9    agents negotiated prices with third-party payors,

10   that varied by product, they would be in the IQVIA

11   data.  Because, by definition, the IQVIA data is

12   providing the price that was actually paid by the

13   third-party at the pharmacy counter for those

14   products.

15                   So if discounts were given, if Hetero

16   gave discounts to, I don't know, let's say, take one

17   of the third-party payors in this case,

18   prospectively, that would be in my calculation -- in

19   the damages that are calculated here.

20                   THE COURT REPORTER:  And what?

21                   THE WITNESS:  That would be in the

22       damages that are calculated here.

23                   MR. ABRAHAM:  Okay.  Subject to

24       receiving the information that you agreed to

25       provide, I have no further questions for the

CONFIDENTIAL

Page 168

1        witness.  Thank you very much for your time.

2                  MR. HONIK:  Eric, but for the benefit

3        of the record, I just would like to note that

4        the backup data that you asked of Dr. Conti

5        that pertains to Hetero and Table 1, the

6        aggregate of damages, was provided to you and

7        all defense counsel concomitantly with our

8        serving our class cert motion and brief.  So if

9        you'll do nothing more than look at the files

10       that we served, you'll find the data points

11       that you're looking for there.

12                  MR. ABRAHAM:  Let's have this

13       discussion offline.  I don't want to consume

14       the doctor's time.

15                  MR. HONIK:  Understood.  I wanted the

16       record to reflect that it's already been served

17       on counsel.

18                  Next -- next up?

19                  MR. KNEPPER:  Yes.  This is

20       Matthew Knepper from Husch Blackwell.  I will

21       go next.

22                  THE WITNESS:  I'm sorry.  From where?

23                  MR. KNEPPER:  Husch Blackwell.  I

24       represent Express Scripts.

25                  THE WITNESS:  -- as the pharmacy, just

CONFIDENTIAL

Page 208

1          am attaching as an exhibit and putting in.

2                    And I will provide it to the court

3          reporter as an exhibit.  And we certainly do

4          not waive anything that is not in the public

5          court file in that case.

6                    (Whereupon, Exhibit Conti 8 was marked

7          for Identification.)

8                    MR. HONIK:  Anything else?

9                    MR. OSTFELD:  That's it for me.

10                   MR. HONIK:  We're concluded.  Thank

11         you, Jamie.

12                   (Whereupon, the deposition concluded

13         at 5:08 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25