# Appendix of Unpublished Authorities

Tab No.

*Altieri v. State Farm Fire & Cas. Co.*,
    2011 WL 1883054 (E.D. Pa. May 17, 2011)..................................................1

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
    2019 WL 4751883 (E.D. Pa. Sept. 30, 2019)..............................................2

*Geiss v. Target Corp.*,
    2013 WL 4675377  (D.N.J. 2013) ..................................................3

*Gen. Employees' Retirement Sys. v. Prudential Fin., Inc.*,
    2015 WL 5097883 (D.N.J. Aug. 3, 2015) ......................................4

*In re Actiq Sales & Mktg. Pracs. Litig.*,
    2014 WL 3572932 (E.D. Pa. July 21, 2014) ..................................5

*In re DVI, Inc. Sec. Litig.*,
    2014 WL 4634301 (E.D. Pa. Sep. 16, 2014)..................................6

*In re Front Loading Washing Mach. Class Action Litig.*,
    2013 WL 3466821 (D.N.J. July 10, 2013) ....................................7

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    2015 WL 5767415 (E.D. Pa. July 29, 2015) ..................................8

*In re Novo Nordisk Sec. Litig.*,
    2020 WL 502176 (D.N.J. Jan. 31, 2020)..................................9

*Jama v. Esmor Corr. Servs., Inc.*,
    2007 WL 1847385 (D.N.J. June 25, 2007)..................................10

*KCH Servs. v. Vanaire, Inc.*,
    2010 WL 1416672 (W.D. Ky. Mar. 31, 2010) ............................11

*Korolshteyn v. Costco Wholesale Corp.*,
    2017 WL 1020391 (S.D. Cal. Mar. 16, 2017)............................12

*Lambeth Magneti Structures, LLC v. Seagate Tech. (US) Holdings, Inc.*,
    2022 WL 864170 (W.D. Pa. Mar. 22, 2022)..................................13

*Nielsen Audio, Inc. v. Clem*,
    2017 WL 1483353 (M.D. Fla. Apr. 24, 2017) ............................14

## Appendix of Unpublished Authorities

Tab No.

*Rhoads Indus., Inc. v. Shoreline Found., Inc.*,
    2021 WL 2778562 (E.D. Pa. July 2, 2021) ....................................................15

*U.S. Accu-Measurements, LLC v. Ruby Tuesday, Inc.*,
    2013 WL 1792463 (D.N.J. Apr. 26, 2013)....................................................16

*W. Palm Police Pension Fund v. DFC Global Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016)....................................................17

2011 WL 1883054
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Nicola ALTIERI
v.
STATE FARM FIRE AND CASUALTY COMPANY.

Civil Action No. 09–2342.
|
May 17, 2011.

**Attorneys and Law Firms**

Joseph A. Zenstein, Steven C. Feinstein, Zenstein Gallant & Parlow PC, Philadelphia, PA, for Nicola Altieri.

Yolanda Konopacka Desipio, Bennett, Bricklin & Saltzburg, Blue Bell, PA, for State Farm Fire and Casualty Company.

*MEMORANDUM AND ORDER*

ELIZABETH T. HEY, United States Magistrate Judge.

**\*1** In this case, Plaintiff, Nicola Altieri, seeks insurance coverage for the collapse of a wall of his commercial garage. At the time of the collapse, the property was insured by Defendant, State Farm. However, Defendant has denied coverage, based on an exclusion in the policy. The question ultimately is the cause of the collapse. Plaintiff's expert has authored a report stating that weight of pooled water on the roof caused the collapse, while the defense expert has determined that the collapse was caused by hydrostatic pressure. The former is a covered cause of loss; the latter is not. Plaintiff has filed a motion to preclude the defense expert's testimony. For the reasons that follow, I will deny the Plaintiff's motion.

**I. *FACTUAL AND PROCEDURAL HISTORY***

On April 16, 2007, the rear wall of the commercial garage at 4278–4282 Penn Street in Philadelphia collapsed. *See* Doc. 1 Exh. A at ¶ 5. At the time, the garage was owned by Plaintiff and insured by Defendant. *Id.* Gregory Pagano, a public adjuster hired by Plaintiff, submitted the claim to Defendant on April 24, 2007. *See* Doc. 12 Exh. D. After representatives from Defendant inspected the property, Defendant hired a structural engineer, Russell E. Daniels, P.E., to inspect the property. *See* Doc. 13–2 at 1. Mr. Daniels inspected the property on May 14, 2007, and prepared a report concluding that the collapse was caused by soil/hydrostatic pressure. *See* Doc. 32 Exh. A at 3. Based on Mr. Daniels' report, Defendant denied Plaintiff's claim on May 31, 2007. *See* Doc. 12 Exh. H. Mr. Daniels supplemented his original report on December 14, 2009, after reviewing Plaintiff's deposition, additional photographs, the Philadelphia Department of Licenses and Inspection's file ("the L & I file"), and Plaintiff's expert report. *See* Docs. 12 Exh. K; 33 Exh. B. Mr. Daniels concluded that the evidence he reviewed was consistent with his original opinion that the collapse was caused by hydrostatic pressure. *Id.*

On March 7, 2008, John Hare, P.E., an engineer retained by Plaintiff, authored a report in which he opined that the collapse was caused by the weight of pooled water on the roof. *See* Doc. 12 Exh. J. Plaintiff brought suit in the Philadelphia Court of Common Pleas on April 13, 2009, alleging breach of contract and bad faith. *See* Doc. 1 Exh. A. Defendant removed the case to the federal court on May 22, 2009, on the basis of diversity jurisdiction. *See* Doc. 1. On December 16, 2009, Defendant sought partial summary judgment on the bad faith claim, *see* Doc. 12, which was granted by the Honorable Mary McLaughlin on February 9, 2010. *See* Doc. 19. Judge McLaughlin referred the case to the undersigned with the consent of the parties on February 18, 2011. *See* Doc. 28.

On April 18, 2011, Plaintiff filed this motion, seeking to preclude the report and testimony of Mr. Daniels and evidence that Plaintiff's property was damaged as a result of hydrostatic pressure. *See* Doc 32. Defendant has filed a response. *See* Doc. 33. Considering these filings, I do not find it necessary to hold a hearing in order to make a determination. *See* Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("The trial court must have ... latitude in deciding how to test an expert's reliability, and to decide whether special briefing or other proceedings are necessary ..."); Meeks v. APV Ltd., No. 00–4191, 2002 WL 32348524, at \*2 (E.D.Pa. Feb.5, 2002) (Hart, M.J.) (denying *Daubert* motion without a hearing). Thus, the issue is now ripe for disposition.

**II. *LEGAL STANDARD***
**\*2** The admissibility of expert testimony is primarily governed by Federal Rule of Evidence 702:

Case 1:19-md-02875-RMB-SAK     Document 2086-6     Filed 06/02/22     Page 4 of 208
PageID: 72746
Altieri v. State Farm Fire and Cas. Co., Not Reported in F.Supp.2d (2011)

2011 WL 1883054

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in a form or an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Thus, Rule 702 sets forth three principle requirements—"(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or other specialized knowledge; and (3) the expert testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir.2008) (citing In Re: Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–42 (3d Cir.1994)). Rule 702 has "a liberal policy of admissibility." Pineda, 520 F.3d at 243 (quoting Kannankeril v. Terminix Inter., Inc., 128 F.3d 802, 806 (3d Cir.1997)).

In Daubert v. Merrell Dow Pharm., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court explained that, under the Federal Rules of Evidence, the trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." 509 U.S. at 589; Pineda, 520 F.3d at 244. "[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244 (quoting Paoli, 35 F.3d at 742). Thus, the focus of the inquiry is on the methodology used by the expert, rather than the conclusions reached. See id.

There is no definitive checklist used in evaluating expert testimony, and the court's inquiry must be tied to the specific facts of a particular case. Kumho Tire, 526 U.S. at 150. The

Third Circuit has suggested the following list of factors that the trial judge may consider in determining reliability:

(1) Whether a method consists of a testable hypothesis;

(2) Whether a method has been the subject of peer review;

(3) The known or potential rate of error;

(4) The existence and maintenance of standards controlling the techniques and operations;

(5) Whether the method is generally accepted;

(6) The relationship of the technique to methods which have been established as reliable;

(7) The qualifications of the expert testifying based on the methodology; and

(8) The non-traditional uses to which the method has been put.

Pineda, 520 F.3d at 248 (citing Paoli, 35 F.3d at 742 n. 8). In determining the admissibility of Mr. Daniels' opinion, I will be guided by the Kumho criteria.

## III. DISCUSSION

The first requirement of Rule 702 is that the proposed expert witness be qualified to render expert opinions. See Pineda, 520 F.3d at 244; see also Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir.2003) (qualification requires "that the witness possess specialized expertise"). Plaintiff does not challenge Mr. Daniels' expertise, and I agree that he is qualified. Mr. Daniels' curriculum vitae establishes that he has worked as a consulting civil and structural engineer since 1987, including investigations of the damage to residential, industrial, and commercial buildings. See Doc. 33 Exh. C.

*3 The second principle set forth in Rule 702 is that the proposed expert must testify about matters requiring scientific, technical or other specialized knowledge, meaning that the process or technique used in formulating the expert opinion must be reliable. See Pineda, 520 F.3d at 244. Plaintiff contends that Mr. Daniels' report is "devoid of any testing, scientific information, or even any mathematical equations," does not discuss soil type or water tables, and suggests that Mr. Daniels' opinion "amounts to nothing more

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 5 of 208
PageID: 72747
Altieri v. State Farm Fire and Cas. Co., Not Reported in F.Supp.2d (2011)
2011 WL 1883054

than a 'net opinion' which has no factual support and no indicia of reliability." Doc. 32 Memo. at 1, 2.

In preparing his original report, Mr. Daniels relied on his own inspection of the property approximately one month after the collapse. *See* Doc. 33 Exh. A at 2. He explained that the rear foundation wall of the garage was attached to an adjacent property's retaining wall, and that both walls collapsed. Mr. Daniels observed that the garage rear foundation wall showed evidence of "severe movement/bulging prior to the collapse," including "large cracks filled with spray foam." *Id.* In addition, Mr. Daniels explained that the damage was not caused by the weight of ponded water on the roof. "The rear wall that collapsed was parallel to the roof framing, thus it wasn't a bearing wall for the roof." *Id.* Moreover, Mr. Daniels explained in his supplemental report that the photographs in the L & I file show that it was the bottom of the wall that collapsed, not the upper portion, consistent with hydrostatic pressure rather than a collapse caused by weight on the roof. *See* Doc. 33 Exh. B at 1–2.

In addressing Plaintiff's challenge, I note that Mr. Daniels' report offers an experienced-based opinion. The fact that Mr. Daniels is qualified to render such an opinion argues in favor or its reliability. *See Boring v. Cabela's Inc.,* No. 08–1574, 2011 WL 43018, at *3 (W.D.Pa. Jan.6, 2011) (engineer's technical testimony and his qualifications argue in favor of finding opinions to be sufficiently reliable) (citing *In re TMI Litigation,* 193 F.3d 613, 664–65 (3d Cir.1999)). Moreover, although Mr. Daniels' report lacks engineering jargon, there is nothing in Mr. Daniels' report to suggest that he was not guided by accepted principles of engineering in reaching his opinions. Therefore, his methodology appears sufficiently reliable to allow the jury to consider his opinions. There is nothing to suggest anything improper, inappropriate or contrary to standard investigative and engineering procedures. Mr. Daniels made first-hand observations of the collapse and applied his knowledge and experience of structural design and engineering to reach conclusions regarding the cause of the collapse. The mere fact that his conclusions do not match Plaintiff's expert is not a basis for preclusion.

The shortcomings in Mr. Daniels' report identified by Plaintiff (lack of testing, scientific information or mathematical equations) are certainly areas for cross-examination, as are

Mr. Daniels' bases for his conclusions. However, under the circumstances, these go to the credibility, not the admissibility of his opinion.

**\*4** I find Mr. Daniels' methodology based on his experience to be sufficiently reliable. *See, e.g., Boring,* 2011 WL 43018, at *3 (finding engineer reliable based on general technical knowledge and experience); *Meeks,* 2002 WL 32348524, at *2 (finding expert reliable based on general nature of expert's theories, extensive experience in expert's CV, and general acceptance of engineering principles); *see also Kumho Tire,* 526 U.S. at 150 (stating cases exist in which "the relevant reliability concerns may focus upon [an expert's] personal knowledge or experience").

The third principle set forth in Rule 702 is that the expert testimony must assist the trier of fact. *See Pineda,* 520 F.3d at 244. Although Plaintiff does not specifically argue this point, in arguing that Mr. Daniels' opinion is unreliable, Plaintiff suggests that Mr. Daniels' proposed testimony would not assist the jury. For the reasons I articulated in finding Mr. Daniels' methodology reliable, I disagree. Plaintiff may attempt to discredit Mr. Daniels' ultimate opinion through cross-examination, but has failed to establish that his testimony would not aid the jury.

For the aforementioned reasons, I conclude that Defendant's expert should be permitted to testify and to have his suppositions tested by cross-examination, rather than to have such testimony barred completely. *See Daubert,* 509 U.S. at 596 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). Such a conclusion is consistent with "the liberal policy of admissibility" embodied by Rule 702. *See Pineda,* 520 F.3d at 244. Therefore, I will deny Plaintiff's motion to preclude Mr. Daniels' testimony and introduction of his report.

An appropriate Order follows.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1883054

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4751883
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

BLUE CROSS BLUE SHIELD ASSOCIATION, et al.

v.

GLAXOSMITHKLINE LLC

CIVIL ACTION No. 13-4663
|
Filed 09/30/2019

**Attorneys and Law Firms**

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, for Blue Cross Blue Shield Association, Aetna, Inc., Amerigroup/HMS, Avmed Health Plans, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Montana, Inc., Blue Cross and Blue Shield of North Carolina, Blue Cross & Blue Shield of Rhode Island, Blue Cross and Blue Shield of South Carolina, Bluecross Blueshield of Tennessee, Carefirst of Maryland, Inc., Connecticut General Life Insurance Company, Emblem Health, Government Employees Health Association, Group Health Cooperative, Group Hospitalization and Medical Services, Inc., Health Net, Inc., Healthnow New York, Highmark Inc., Highmark West Virginia Inc., HMO Partners, Inc., Kps Health Plans, Medical Mutual of Ohio, Noridian, Premera Blue Cross, Priority Health, The Regence Group, Usable Mutual Insurance Company, Wellcare Health Plans, Inc., Wellcare Health Plan of Iowa, Inc., Wellmark, Inc., Wellpoint, Inc.

G. Robert Blakey, Paradise Valley, AZ, Geoffrey M. Horn, Noelle Ruggiero, Peter D. St. Phillip, Uriel Rabinovitz, Jennifer Risener, Lowey Dannenberg, PC, White Plains, NY, Gerald Lawrence, Jr., Laura Killian Mummert, Lowey Dannenberg PC, West Conshohocken, PA, Lesley Ann Skillen, Neil V. Getnick, Stuart Altschuler, Courtney Finerty-Stelzner, Erika Nicole Ithurburn, Gregory Krakower, Margaret J. Finerty, Getnick & Getnick LLP, New York, NY, Mark D. Fischer, Robert C. Griffith, Rawlings & Assoc. PLLC, Lagrange, KY, James J. Breen, The Breen Law Firm PA, Alpharetta, GA, John Gregory Murphy, Baton Rouge, LA, for Louisiana Health Service Indemnity Company.

David H. Pittinsky, Edward D. Rogers, Stephen J. Kastenberg, William B. Igoe, Leslie E. John, Barbara A. Schwartz, Daniel Mullin, Elizabeth P. Weissert, JoAnna Rebecca Hess Kunz, Juliana Carter, Thomas J. Gallagher, IV, Ballard Spahr Andrews & Ingersoll LLP, Ricky Mario Guerra, Blank Rome LLP, Philadelphia, PA, Joseph E. O'Neil, John J. O'Donnell, Campbell Conroy & O'Neil, P.C., Berwyn, PA, Mark H. Lynch, Covington & Burling, Matthew F. Dunn, Matthew J. O'Connor, Michael M. Maya, Jason C. Raofield, Covington & Burling LLP, Washington, DC, William Mark LaNier, Houston, TX, for GlaxoSmithKline LLC.

**MEMORANDUM**

Juan R. Sánchez, C.J.

**\*1** Plaintiffs, 38 private health insurance companies that purchased billions of dollars' worth of adulterated pharmaceutical drugs from Defendant GlaxoSmithKline LLC (GSK), bring the instant action, alleging they purchased the drugs at issue based on GSK's misrepresentations that the drugs were manufactured in accordance with the Food and Drug Administration's "current Good Manufacturing Practices." [1] Plaintiffs claim the adulterated drugs were worthless and had they known of the adulteration they would not have included the drugs in their formularies. GSK has moved to exclude Plaintiffs' five expert witnesses pursuant to Federal Rule of Evidence 702—Phillip Russ; David A. Kessler, M.D.; Matthew Perri III, B.S. Pharm, PhD, RPh; Stephen W. Schondelmeyer, PhD; and Rena Conti, PhD. GSK's motion will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the Motion will be denied.

**BACKGROUND**

This case arises out of Plaintiffs' providing prescription drug coverage for seventeen drugs—Albenza, Avandia, Avandamet, Bactroban, Compazine, Coreg, Denavir, Dibenzyline, Dyazide, Dyrenium, Factive, Horowitz, Kytril, Paxil IR, Paxil OS, Stelazine, and Thorazine (collectively, the At-Issue Drugs). The drugs were manufactured by GSK's corporate affiliate, SB Pharmco Puerto Rico Inc. (SB Pharmco), at a pharmaceutical manufacturing plant in Cidra, Puerto Rico (the Cidra Plant). From 2000 to 2005 (the Relevant Period), Plaintiffs assert SB Pharmco's poor manufacturing process and quality control system at the Cidra Plant were non-compliant with the Food and Drug Administration's (FDA) "current Good Manufacturing Practices" (cGMP). According to Plaintiffs, the drugs were therefore "adulterated" under the Food, Drug & Cosmetic Act (FDCA). *See* 🚩21 U.S.C. §§ 331(a), 🚩351(a)(2)(B). Plaintiffs allege GSK fraudulently misrepresented that the At-Issue Drugs manufactured at the Cidra Plant were cGMP compliant, resulting in Plaintiffs providing coverage for adulterated drugs they claim were worthless.[2] In support of their case, Plaintiffs have retained the five expert witnesses.

Plaintiffs retained Philip Russ to analyze the nature and extent of the cGMP violations at the Cidra Plant during the Relevant Period. *See* Pls.' Resp. in Opp'n to Def.'s *Daubert* Mot. (Pls.' Opp'n) 2. Russ is the owner and president of Innovative Consultants GXP, which "provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device, and biologics industry." GSK's Mot. to Exclude Expert Test. of Phillip Russ, Drs. David Kessler, Matthew Perri, Stephen Schondelmeyer, and Rena Conti (GSK Mot.) Ex. 3, at 4. Russ has twenty-three years of experience in the pharmaceutical, medical device, and biologics industry, focusing on the regulatory compliance aspects of developing and managing quality management systems and cGMP compliance. *See id.* Russ's report evaluates "the extent to which manufacturing at the [Cidra Plant] was in material violation of 🚩21 U.S.C. § 351." *Id.* at 3. Russ's report is based upon a review of (1) cGMP records of compliance activities; (2) FDA inspection results; (3) GSK's internal audits; (4) internal GSK emails and other correspondence and memoranda related to the Quality Management System (QMS) at the Cidra Plant; and (5) the observations of Quantic Regulatory Services, the third-party expert engaged by GSK to evaluate cGMP compliance at the Cidra Plant as a result of a Consent Decree entered into between GSK and the FDA. *Id.* at 3-4. After review of these documents, Russ concluded "all products manufactured

at the Cidra Plant between 2000 and 2005 were materially non-compliant with cGMPs and lacked the assurance of conformance to their represented properties." *Id.* at 105.

**\*2** Plaintiffs retained David A. Kessler, M.D., as an expert on cGMP regulations and cGMP compliance. Dr. Kessler was FDA Commissioner from 1990 until 1997. *See id.* Ex. 7, at ¶ 2 As the FDA Commissioner, Dr. Kessler oversaw the FDA's promulgation and implementation of proposed and finalized regulations concerning cGMPs for pharmaceuticals. *See id.* at ¶ 5-7. Dr. Kessler's expert report opines on four central questions: (1) "[w]hy is compliance with cGMPs important?"; (2) "[w]hy are a drug manufacturer's responsibilities with regard to cGMP compliance?"; (3) "[f]rom a regulatory point of view, what types of cGMP violations can have a 'material impact' on a drug?"; (4) "[i]f specific drugs are recalled from the market or seized from a plant because they violate cGMPs, what conclusions can be drawn as to whether other drugs at the same plant are cGMP compliant?" *id.* at ¶ 11(a)-(d). Dr. Kessler opines that (A) cGMP compliance is important "because it assures that what a drug manufacturer says is in a drug is actually in the drug;" *id.* at ¶ 12, (B) drug manufacturers "[can]not sell products that fall below the represented standards," *id.* at ¶ 28, and must "investigate, understand, and correct quality deviations," *id.* at ¶ 30, (C) there "are three categories of cGMP violations that can have a 'material impact' on a drug," *id.* at ¶ 35, and (D) "[t]he fact that specific drug products are recalled from the market or seized from a plant because they violate cGMPs does not mean that other drugs are cGMP-compliant," *id.* at ¶ 43.

Matthew Perri III, B.S. Pharm, PhD, RPh, is offered as an expert in pharmaceutical marketing and his expert report assesses "the nature and significance of the marketing activities of [GSK] related to ongoing problems at [the Cidra Plant]." *Id.* Ex. 8, at 3. Dr. Perri is a Professor at the University of Georgia, teaching undergraduate and graduate courses in healthcare and pharmaceutical marketing and other related areas. *See id.* at ¶ 1-3. Dr. Perri offers seven opinions including, inter alia, (1) it is the pharmaceutical manufacturer's job to ensure its drug products are manufactured in compliance with all FDA regulations; (2) patients, pharmacists, prescribers, and third-party payers rely on the assurance that a drug is what the manufacturer represents it to be; (3) major pharmaceutical manufacturers control the information their personnel disseminate into the market place; and (4) it is not feasible, or expected, for third-party payers to monitor FDA enforcement actions, given the

number of drugs listed on third-party payers' formularies. *See id.* at 3. In reaching his conclusions, Dr. Perri asserts his opinions are based on "universally accepted principles of marketing." *Id.* at ¶ 11.

Next, Plaintiffs offer Stephen Schondelmeyer, PhD, as a causation expert to demonstrate that, had Plaintiffs known about the cGMP violations at the Cidra Plant, they would have removed the At-Issue Drugs from their formularies and that non-cGMP compliant drugs have no economic value to third-party payors. Dr. Schondelmeyer is a Professor of Pharmaceutical Management and Economics at the University of Minnesota. *See id.* Ex. 11, at ¶¶ 1, 4. Dr. Schondelmeyer has more than 40 years of experience related to pharmaceutical economics and public policy research. *See id.* at ¶ 4. In his six-page opinion, Dr. Schondelmeyer concludes, based on his experience, "no payer in the United States would knowingly and willingly pay for such material non-compliant drugs [and] [s]uch drug products for all practical purposes have no value in the U.S. market and would be considered non-salable." *Id.* at ¶ 19.

Finally, Plaintiffs offer Rena Conti, PhD, as an expert on damages. Dr. Conti is an Associate Professor at Boston University's Questrom School of Business and an economist for the FDA's Center for Drug Evaluation and Research. *See id.* Ex. 15, at ¶ 8. She focuses her research on the market for prescription drugs and the pricing of pharmaceutical products in the United States market. *See id.* at ¶ 10. Dr. Conti concludes only prescription drugs "manufactured in compliance with [cGMPs] may be assigned a non-zero value by patients and third-party payers, and drugs which fail to meet those standards have no economic value." *Id.* at ¶ 4. Applying the economic principle of supply and demand, Dr. Conti concluded there can be no legitimate supply curve to establish an economic value because the FDCA prohibits the sale of adulterated drugs. *See id.* at ¶ 37-40. Dr. Conti further determined that, "[b]ecause GSK produced and sold non-compliant drugs, plaintiffs paid for illegitimate products that have no economic value." *Id.* at ¶ 5. As a result, Dr. Conti calculated the aggregate damages for all Plaintiffs as $2.82 billion, and individual damages for each Plaintiff as ranging between $3.3 million to $483.7 million. *See id.* at ¶ 52.

## DISCUSSION

**\*3** Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) that testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The United States Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* that Rule 702 creates a "a gatekeeping role for the [trial] judge." 509 U.S. 579, 597 (1993). However, "the court's role as a gatekeeper is not intended to serve as a replacement for the adversary system," because, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Crowley v. Chait,* 322 F. Supp. 2d 530, 536 (D. Del. 2004) (internal quotation marks and alterations omitted).

Following *Daubert,* the Third Circuit Court of Appeals has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003). The party offering the expert evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir. 1999). Rule 702 envisions a "liberal policy of admissibility." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l Inc.,* 128 F.3d 802, 806 (3d Cir. 1997)). GSK does not seek to exclude Plaintiffs' experts based on their qualifications and this requirement will therefore not be further discussed.

To meet the "reliability" requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable ... [but] the evidentiary requirement of reliability is lower than the merits standard of correctness."

*Pineda*, 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.' " *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (citation omitted). The Court must focus on the expert's methodology—not his or her conclusions. *In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 746 (3d Cir. 1994) ("[T]he issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions.")

When evaluating the reliability of a witness's methodology, the Court is guided by several factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

**\*4** *id.* at 742 n.8. The Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

To meet the "fit" requirement "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. Like a typical relevance inquiry, the standard for analyzing the fit of an expert's analysis is "not that high." *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir. 2007). Nevertheless, expert testimony can be powerful and misleading, and the Third Circuit has cautioned district courts to "tread carefully when evaluating proffered expert testimony." *Id.* at 219 n.6. With these standards in mind, the Court turns to GSK's motion to exclude.

GSK first moves to exclude Russ's testimony arguing it does not fit the question before the Court. GSK contends the question before the Court is whether Plaintiffs can prove that GSK's cGMP violations had a "material impact" on the drugs for which they paid. GSK asserts Russ proposes to testify only that GSK could not assure that the At-Issue Drugs were not impacted by the cGMP violations at the plant. GSK claims such testimony would confuse the jury and is irrelevant. GSK's argument is unpersuasive.

In denying GSK's motion to dismiss, this Court previously held "Plaintiffs [were] entitled prove that the nature of GSK's [cGMP] violations had a material impact on the drugs for which they paid." *See* Mem. 11, Nov. 9, 2016, ECF No. 105. Russ's report finds the Cidra Plant had significant fundamental failures in all six essential quality systems—which relate to a manufacturer's ability to certify a drug's purity, uniformity, quality, and manufacturing. The report concludes that, due to these chronic failures, GSK could not assure the At-Issue Drugs "conformed to their represented properties of safety, identity, strength, purity, and quality." GSK Mot. Ex. 4, at 9. This testimony fits the question in this case and is relevant because a reasonable jury could find GSK's cGMP violations had a material impact on the value of the At-Issue Drugs as GSK could not assure their conformance to their representative properties—i.e., their quality was not as labeled and advertised.

GSK also argues Russ's opinion fails the reliability test because (1) his opinion applies to every product made at the Cidra plant during the relevant time period, not just the At-Issue Drugs; (2) he has never used the phrase "material violation" before this litigation and it does not have the same meaning as "material impact"; and (3) he could not answer why the FDA chose to seize a certain drug manufactured at the Cidra Plant but concurrently stated consumers could continue to take another drug manufactured at the Cidra Plant with confidence. These arguments, however, go to the weight and credibility of Russ's testimony and can be explored through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Crowley*, 322 F. Supp. 2d at 536. Therefore, GSK's motion to exclude Russ's testimony will be denied.

**\*5** GSK next moves to exclude Dr. Kessler's expert opinion asserting it draws an impermissible legal conclusion. GSK contends Dr. Kessler's opinion is merely a legal conclusion because he seeks to interpret the "material impact" language

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 10 of 208
PageID: 72752
Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....
2019 WL 4751883

from the Court's November 9, 2016, Memorandum. GSK argues this is a legal term the Court must instruct the jury on, and therefore, Dr. Kessler may not opine on it.

GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact." Quoting the Court's November 9, 2016, Memorandum, Dr. Kessler seeks to opine on "what types of cGMP violations have a 'material impact' on a drug" and interpret the language in the Court's Memorandum. *See* GSK Mot. Ex. 8, at 2 ("The Court in this case cited the FDA's statement, then noted that Plaintiffs are entitled to show a "material impact" on drugs for which they paid. From a regulatory point of view, what types of cGMP violations can have a "material impact" on a drug?"). Allowing Dr. Kessler to opine on what constitutes a material impact on the case would run afoul of *Daubert* as it would allow Dr. Kessler to directly opine on the legal issue in this case. *See Whitmill v. City of Philadelphia*, 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998)("As a general rule an expert's testimony on issues of law is inadmissible.")(quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also In re Wellbutrin SR Antitrust Lit.*, Nos. 04-5525, 05-5898, 05-396, 2010 WL 8425189, at *3-5 (E.D. Pa. Mar. 31, 2010) (collecting cases and finding the experts in the instant case could testify about the background of patent law and procedure but could not testify about whether a previous patent lawsuit was objectively baseless—a legal issue in the case). Therefore, Dr. Kessler will be precluded from defining "material impact." However, Dr. Kessler will be permitted to testify about FDA regulations generally and how cGMP violations occur on a spectrum, including how violations range in severity and provide examples of how cGMP violations fall on that spectrum. [3] Therefore, GSK's motion to exclude Dr. Kessler's testimony will be granted insofar as Dr. Kessler will prohibited from defining "materiality" or referring to certain cGMP violations as having a "material impact" during his testimony at trial. [4]

**\*6** Next, GSK moves to exclude Dr. Perri's testimony based on reliability. [5] GSK argues Dr. Perri's opinion must be excluded because he fails to explain or define the reliable methodology he used to come to his opinion. Specifically, GSK asserts Dr. Perri explains he applied "universally accepted principles of marketing," *see* GSK Mot. Ex. 8, at ¶ 11, but never defined the principles, applied specific principles, or explained why these principles would assist the jury in determining whether Plaintiffs would have removed the At-Issue Drugs from its formularies.

GSK's arguments are unpersuasive. While GSK focuses on the phrase "universal principles of marketing" to argue Dr. Perri's analysis is unreliable, Dr. Perri applies the case study method—an objective methodology—and consults additional academic sources regarding the pharmaceutical industry, to apply his own pharmaceutical and healthcare marketing experience to the facts of the instant case and draw his conclusions. *See generally id.* ¶ 13-75. As other courts have held, this is sufficient to meet the reliability prong under *Daubert*. *See Wolfe v. McNeil–PPC, Inc.*, No. 07–348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011) (finding three doctor's testimony sufficiently reliable where the doctors used the case study method and "extensive[ly] review[ed] of plaintiff's medical records and deposition testimony of plaintiff's treating physicians" and determined "the three doctors' use of case studies in reaching their conclusion affects only the weight to be given their testimony, not its admissibility...."); *Acosta v. WPN Corp.*, No. 14-1494, 2018 WL 3707418, at *6 (W.D. Pa. Aug. 3, 2018) (admitting expert testimony where the expert used "her experience and specialized knowledge" to discern a standard of fiduciary care and apply it to the facts of the case). In any event, the issues GSK takes with Dr. Perri's analysis pertain to the credibility and weight of Dr. Perri's testimony, which GSK may test through cross-examination and the presentation of contrary evidence. *See Crowley*, 322 F. Supp. 2d at 536.

GSK further asserts Dr. Perri's expert opinion should be excluded because it is similar to the excluded opinion he offered in *United States v. AseraCare, Inc.*, No 12-0245, 2014 WL 6879254, at *1 (N.D. Ala. Dec. 4, 2014). In *AseraCare*, the Government sought to offer Dr. Perri as a "marketing expert" to support its theory that an operator of hospice facilities knew it had submitted false Medicare claims. *Id.* at *11. To support his opinion, Dr. Perri relied on "universal principles of marketing." *Id.* at *12. The court ultimately excluded Dr. Perri's opinion, stating "Dr. Perri has no experience in the hospice industry, did not study any other hospice companies, and did not review any of the guidance from [the Centers for Medicare and Medicaid Services] regarding many of the topics on which he opined." *Id.* at *11. GSK contends *AseraCare* is nearly identical to this case, and the Court should therefore exclude Dr. Perri's testimony on the same grounds.

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 11 of 208
PageID: 72753

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

2019 WL 4751883

GSK's reliance in *AseraCare* is misplaced. Dr. Perri's opinion in *AseraCare* was excluded because he did not have *any* experience in the hospice industry and failed to explain why his universal principles of marketing methodology had any bearing in the hospice industry. *Id.* at *12. Unlike *AseraCare*, in the instant case, Dr. Perri has significant experience in the pharmaceutical marketing industry—a point which GSK does not dispute. *See* GSK Mot. Ex. 7, at ¶ 1-11 (discussing Dr. Perri's qualifications). Further, unlike *AseraCare*, Dr. Perri has connected his "universally accepted principles of marketing" to the pharmaceutical industry. *See id.* at ¶ 13-17 (describing marketing principles generally and how they apply in the pharmaceutical market). Therefore, the reasons for excluding Dr. Perri's testimony in *AseraCare* do not apply and GSK's motion to exclude Dr. Perri's testimony will be denied.

**\*7** Turning Dr. Schondelmeyer, GSK argues Dr. Schondelmeyer's testimony should be excluded because it is unreliable. GSK asserts Dr. Schondelmeyer's report states he provided his opinion as an "expert on economic and public policy issues," GSK Mot. Ex. 11, at ¶ 1, but when deposed he stated his opinion was "not really" economic in nature, *id.* Ex. 12, at 176:18-20. GSK further contends Dr. Schondelmeyer failed to tie his expert opinion to the facts of the case by failing to cite any source for his key opinions. The Court agrees with GSK and finds Dr. Schondelmeyer has failed to offer a reliable methodology as the basis for his opinion.

Initially, the type of expert analysis Dr. Schondelmeyer purports to provide is unclear. In his report, Dr. Schondelmeyer states he provides his opinion as an "independent expert on economic and public policy issues." GSK Mot. Ex. 11, at ¶ 1. However, in his deposition, he stated his opinion provides no economic analysis. *See id.* Ex. 12, at 176:18-20. Yet, in his reply report, Dr. Schondelmeyer states his opinion is that non-cGMP-compliant drugs have "no economic value," *id.* Ex. 13, at ¶ 5 ("Under federal law, materially non-compliant drugs cannot be lawfully distributed and sold. For payers acting within the law, therefore, such drugs have no economic value." (footnote omitted)). Adding further confusion is Plaintiffs' presentation of Dr. Schondelmeyer as a "healthcare insurance expert." *See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 17 ("Dr. Stephen Schondelmeyer (Plaintiffs' healthcare insurance expert)."). The Court is hard pressed to find an acceptable basis on which to allow Dr. Schondelmeyer to testify about non-cGMP-compliant drugs having "no economic value"

while claiming he is not providing an economic analysis and being offered as a healthcare expert.

In any event, Dr. Schondelmeyer provides no reliable basis for his opinions. In two brief paragraphs of his short six-page report, Dr. Schondelmeyer concludes that, based on his experience, insurers rely on a drug manufacturer's assurances regarding cGMP compliance and no insurer or third-party payer would pay for drugs with material cGMP violations. *See* GSK Mot. Ex. 11, at ¶ 18-19. Dr. Schondelmeyer's opinion, however, provides no more than a paradigm example of "say-so" expert testimony. While the Court does not doubt his qualifications and experience in the pharmaceutical industry, Dr. Schondelmeyer has failed to demonstrate or explain how his experience is reliably applied to the facts of this case. *See id.* ("My experience includes consulting for payers that provide drug benefits to insured individuals or beneficiaries, including, but not limited to, self-insured employers ... In my experience, no payer in the United States would knowingly and willingly pay for such materially non-compliant drug products."). Unlike Dr. Perri, whose experience-based testimony was applied to the instant case through the objective case study methodology and supplemented with additional academic sources, Dr. Schondelmeyer's experience-based testimony is *entirely subjective* and premised solely on his say-so, which cannot be adequately tested through cross-examination. 🔖 *In re TMI Litig.*, 193 F.3d at 703 n.144 ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology."). The Court will therefore grant GSK's motion to exclude Dr. Schondelmeyer's testimony. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."); *see also* 🔖 *Player v. Motiva Enters., LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) (stating the "District Court certainly had the discretion to exclude opinion evidence that is connected to existing data only by the ipse dixit [or say-so] of the expert." (internal citations omitted)).

**\*8** Finally, GSK moves to exclude Dr. Conti's expert testimony on four grounds: (1) she impermissibly bases her opinion on a legal interpretation of the FDCA; (2) she provides no reliable economic methodology for her opinion;

Blue Cross Blue Shield Association v. GlaxoSmithKline LLC, Not Reported in Fed....

2019 WL 4751883

(3) she improperly regurgitates Plaintiffs' allegations; and (4) she fails to account for the rebates Plaintiffs received for purchasing the At-Issue Drugs and fails to consider the cost of alternative treatment options. GSK's arguments to exclude Dr. Conti's testimony are unavailing.

First, Dr. Conti's testimony does not render an impermissible legal conclusion. Dr. Conti's expert report states the FDCA prevents companies from introducing adulterated drugs into the market place. *See* ⚐ 21 U.S.C. § 331(a) ("The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."). According to Dr. Conti, based on this prohibition, economic principles state there is no legitimate supply curve for these drugs. *See, e.g.*, GSK Mot. Ex. 15, at ¶¶ 4, 38, 39. Because GSK Mot. Ex. 15, at ¶¶ 4, 38, 39. Because Dr. Conti is explaining the FDCA's prohibition on adulterated drugs —based on her own previous experience and discussions with pharmaceutical companies—and not providing a legal conclusion, she is not rendering an impermissible legal opinion. *See Hartle v. FirstEnergy Gen. Corp.*, Nos. 08–1019, 08–1025, 08–1030, 2014 WL 5089725, at *1-2 (W.D. Pa. Oct. 9, 2014) (permitting an expert to explain regulations but not offer an opinion on whether the defendant violated the provisions at issue).

Second, GSK's argument that Dr. Conti's expert opinion is not based on a reliable economic methodology is similarly without merit. As her expert report demonstrates, Dr. Conti relied on peer-reviewed journal articles, textbooks, studies regarding the economic value of drugs, *see id.* Ex. 17, at ¶ 9 n.15-16, conversations with providers and insurers, *see id.* Ex. 16, at 83:23-84:7, and the generally accepted economic principles of supply and demand in support of her opinion, *see id.* Ex. 15, at ¶ 38 ("There is no equilibrium between the demand for compliant prescription drugs and the supply of non-compliant drugs."). Dr. Conti has therefore provided a sufficient reliable basis and methodology for her expert opinion. ⚐ *In re Paoli*, 35 F.3d at 744 ("[Proponents of expert testimony] do not have to demonstrate to the judge ... that the assessments of their experts are correct, they only have to demonstrate ... that their opinions are reliable."). To the extent GSK argues Dr. Conti's analysis is superficial and conclusory, this argument goes to the credibility of Dr. Conti's testimony and may be elicited through cross-examination. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("[T]he burden of exploring the facts and assumptions underlying the testimony of an expert witness [is placed] on opposing counsel during cross-examination.").

Third, GSK's argument that Dr. Conti merely parrots Plaintiffs' allegations because she lacks real-world experience as a third-party payor is not a reason to exclude Dr. Conti's testimony. GSK points to two lines in Dr. Conti's deposition where she said she is not a third-party payer and has never worked for one. *See* GSK Mot. Ex. 16, at 153:6-8 ("I'm not a third-party payer. I've never worked in a third-party payer"). And GSK argues Dr. Conti has no basis to opine on the value insurers assign to non-complaint drugs. GSK's argument again goes to the credibility and weight of Dr. Conti's testimony, not the admissibility of her opinion. *See Stecyk*, 295 F.3d at 414.

**\*9** Finally, Dr. Conti's damages calculation is not flawed for not factoring in any rebates Plaintiffs may have received for the At-Issue Drugs or any therapeutic alternatives they may have had to cover as a result of discontinuing coverage for the At-Issue Drugs. GSK's argument that Dr. Conti should have reduced her damages amount—as suggested by GSK's expert Dr. Mohan Rao—is not a basis to exclude Dr. Conti's analysis. Rather, it demonstrates a fact question the jury must resolve because it requires a credibility determination and comparison of each expert's methodology. *Compare* GSK Mot. Ex. 15, at ¶ 43 ("Based on my assessment that spending on prescription drugs cannot be separated from the quality manufacturing assured by the manufacturer and overseen by government regulators, non-compliant prescription drugs have no economic value. Therefore, the appropriate measure of damages in this matter is the total amount paid....") *with* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. 222, at ¶ 48 ("Dr. Conti fails to account for rebates received by Plaintiffs after the initial reimbursement of a claim, causing her to overstate Plaintiffs' purchases by approximately 8 percent. She also fails to deduct payments on claims where Plaintiffs served in an administrative role only...."). Accordingly, GSK's motion to exclude Dr. Conti's testimony will be denied. *See* ⚐ *In re Asbestos Prods. Liab. Lit. (No. VI)*, 714 F. Supp. 2d 535, 547 (E.D. Pa. 2010) ("[I]t is up to the jury to decide whether the expert used the best or most reliable methodology, what weight to accord to his testimony and which of [the] competing experts' opinions should be credited.").

**CONCLUSION**

In sum, GSK's motion to exclude will be granted insofar as Dr. Kessler will be precluded from defining "material impact" or referring to certain cGMP violations as having a "material impact" during his testimony at trial, and Dr. Schondelmeyer will be excluded from testifying at trial. The balance of the motion will be denied.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4751883

## Footnotes

1    At the time of filing, 41 private health insurance companies were named as plaintiffs in this action. Since filing, three plaintiffs—Blue Cross of Idaho Health Service, Inc., Health Care Services Corporation, and Horizon Blue Cross Blue Shield of New Jersey—have settled with GSK.

2    In light of the Court having provided a detailed recitation of the facts of this case in its September 30, 2019, Memorandum granting in part and denying in part GSK's Motion for Summary Judgment, the Court will not further discuss the factual background of this case.

3    GSK also moves to exclude Dr. Kessler's opinion on what constitutes a "material impact" because there is no FDA practice or policy grounding his opinion. However, because the Court will prevent Dr. Kessler from defining "material impact," GSK's argument is moot.

4    GSK directs the Court to a handful of cases, which it asserts demonstrate that Dr. Kessler's testimony has regularly been excluded. However, in the majority of the cases GSK relies on, Dr. Kessler's testimony was not excluded but merely narrowed. *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-02641, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Dr. Kessler is qualified to opine on FDA regulatory issues that relate to Bard filters, and his testimony in this regard would prove helpful to the jury. But no expert, including Dr. Kessler, will be permitted to give ultimate legal opinions on state law claims, improperly narrate or regurgitate facts, or speculate about motives or intent."); Order, *Bartolini v. Abbott Labs., Inc.*, No. 15-702 (S.D. Ill. May 23, 2017), ECF No. 277 (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *In re Prograf Antitrust Litig.*, No. 11-2242, 2014 WL 7641156, at *2-3 (D. Mass. Dec. 23, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *Drake v. Allergan, Inc.*, No. 13-234, 2014 WL 5392995, at *5-6 (D. Vt. Oct. 23, 2014) ("Allergan's Motion [to exclude Dr. Kessler's testimony] is granted to the extent it sought the general guidance given above and denied to the extent that some objections will have to be raised at trial"); *Allen v. Takeda Pharm. N.A., Inc.*, Nos. 11-2299, 12-64, 2014 WL 120973, at *4-19 (W.D. La. Jan. 10, 2014) (granting in part and denying in part motion to exclude Dr. Kessler's testimony); *Wells v. Allergan*, No. 12-973, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) (allowing defendants to object at trial if Dr. Kessler speculates or regurgitates facts).

5    GSK's motion to exclude also states GSK seeks to exclude Dr. Perri's testimony on the basis of fit. *See* GSK Mot. 1. GSK's arguments, however, all pertain to the reliability of Dr. Perri's opinion.

---

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

City of Sterling Heights General Employees' Retirement..., Not Reported in...

Fed. Sec. L. Rep. P 98,620

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by    In re AVEO Pharmaceuticals, Inc. Securities
Litigation,   D.Mass., November 14, 2017

2015 WL 5097883

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

CITY OF STERLING HEIGHTS GENERAL
EMPLOYEES' RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

PRUDENTIAL FINANCIAL, INC., et al., Defendants.

Civil Action No. 12–5275.
|
Signed Aug. 31, 2015.

**Attorneys and Law Firms**

Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann &
Knopf, LLP, Saddle Brook, NJ, for Plaintiffs.

Daniel C. Fleming, Wong Fleming, Princeton, NJ, for
Defendants.

**OPINION**

ARLEO, District Judge.

**\*1**  Before this Court are the following motions: (1)
The motion of Lead Plaintiffs National Shopmen Pension
Fund ("National Shopmen"), Heavy & General Laborers'
Locals 472 & 172 Pension and Annuity Funds, and
Roofers Local No. 149 Pension Fund (collectively, "Lead
Plaintiffs") to certify a class, appoint National Shopmen
as class representative, and appoint class counsel pursuant
to   Federal Rule of Civil Procedure 23 [Dkt. No. 133];
and (2) the motion of Defendants Prudential Financial, Inc.
("Prudential"), John R. Strangfeld, Richard J. Carbone, and
Mark B. Grier (collectively, "Defendants") to exclude the
expert testimony of Lead Plaintiffs' expert [Dkt. No. 185]. No
oral argument was heard pursuant to Federal Rule of Civil
Procedure 78 and Local Civil Rule 78.1. In consideration of
the parties' submissions in connection with these motions,
and for the reasons set forth herein, Lead Plaintiffs' motion is
**GRANTED** and Prudential's motion is **DENIED**.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case is a putative securities class action in which Lead
Plaintiffs allege that Prudential violated Sections 10(b) and
20(a) of the Securities Exchange Act of 1934 (the "Exchange
Act") between May 5, 2010, and November 4, 2011 (the
"Class Period"), by making false and misleading statements
that overstated Prudential's income and understated its
expenses. *See generally* Dkt. No. 22, Am. Compl. Prudential
is a public corporation headquartered in New Jersey. *Id.* ¶ 2.
Its common stock trades on the New York Stock Exchange
("NYSE"). *Id.* Defendants Strangfeld, Carbone, and Grier are
current and former high-level executives of Prudential against
whom Lead Plaintiffs allege direct liability under § 10(b) and
control person liability under § 20(a). [1] *Id.* ¶¶ 34, 32–44. Lead
Plaintiffs are purchasers of Prudential's common stock during
the Class Period. *Id.* ¶ 29.

Prudential is principally engaged in the business of "life
insurance, annuities and retirement-related services." *Id.* ¶
5. [2] Lead Plaintiffs claim that Prudential knowingly or
recklessly failed to account for life insurance policies that
were eligible for payment to a beneficiary or escheatment to
a state, which falsely inflated Prudential's reported financial
results during the Class Period. *Id.* ¶¶ 11–12, 54, 57. At
the heart of Lead Plaintiffs' allegations are Prudential's
historical use of the Social Security Administration's Death
Master File (the "DMF") and various states' investigations
into Prudential's unclaimed property practices that began
in 2009 and ended with a global settlement in January
2012. *See id.* ¶¶ 8, 57(e), 101–07. The DMF is a database
maintained by the Social Security Administration that tracks
deaths in the United States. *Id.* ¶ 8. Lead Plaintiffs claim
that for many years, Prudential regularly used the DMF
to identify deceased annuity policyholders in order to stop
annuity payments, but only sometimes used the DMF to
identify deceased life insurance policyholders and locate
their beneficiaries or, if there were no beneficiaries under
a given policy, inform the relevant state authorities that
the policy was eligible for escheatment. *Id.* ¶¶ 9–10, 57(c).
As a result, Lead Plaintiffs allege, Prudential knowingly
retained monies that did not belong to it and understated its
liabilities to policyholders. *Id* . ¶¶ 1011. Lead Plaintiffs allege
that Defendants therefore materially overstated Prudential's
financial strength in financial reports and other disclosures
made during the Class Period. *Id.* ¶¶ 12, 16, 45–56.

**\*2**  The Class Period begins on May 5, 2010, when
Prudential issued a press release announcing its financial

results for the first quarter of 2010. *Id.* ¶ 45. Prudential reiterated its first quarter results on May 7, 2010, when it filed its Form 10–Q for the first quarter of 2010. *Id.* ¶ 46. Lead Plaintiffs allege that essentially all announcements of Prudential's financial results during the Class Period were materially false and misleading such that Prudential's common stock traded at inflated prices throughout the Class Period. *Id.* ¶¶ 47–56, 61–63, 66–68, 71–75, 80–85.

Prudential allegedly began to disclose the truth about its unclaimed property practices and the ongoing state investigations on August 5, 2011, when it acknowledged the breadth of those investigations and confirmed that they would "result in additional payments and impact claims revenues." *Id.* ¶ 86. S & P downgraded the United States' credit rating on the same day. *Id.* ¶ 87. At the close of trading on August 8, 2011—the next trading day—Prudential's per-share stock price stood at $48.14, down from a close of $53.99 on August 5. *Id.* ¶ 89. On November 2, 2011, Prudential issued a press release announcing the company's financial results for the third quarter of 2011. *Id.* ¶ 91. In the press release, Prudential revealed that it would take a pre-tax $99 million charge (the "DMF Charge") to its reserves to account for additional payments expected to result from the use of new DMF matching criteria. *Id.* Prudential also announced several other unrelated charges in the press release, including a $435 million charge "to strengthen reserves for guaranteed death and income benefits." *Id.* Mr. Carbone reiterated the DMF Charge on a conference call the next day. *Id.* ¶ 94. Prudential again acknowledged the DMF Charge when it filed its third quarter 2011 Form 10–Q ("3Q11 Form 10–Q") on November 4, 2011.[3] *Id.* ¶ 97. Specifically, Mr. Carbone noted on the conference call that the DMF Charge resulted in a $0.15 per share impact on Prudential's stock. *Id.* ¶ 94. The 3Q11 Form 10–Q provided additional detail regarding the state investigations and the new DMF matching criteria that resulted therefrom. *Id.* ¶ 98. After closing at $53.67 per share on November 2, 2011, Prudential's stock price closed at $53.05 and $52. 19 on November 3 and November 4, respectively. *Id.* ¶ 99.

Plaintiff City of Sterling Heights General Employees' Retirement Systems instituted this action on August 22, 2012. Dkt. No. 1, Compl. Lead Plaintiffs and Lead Plaintiffs' counsel were appointed as lead plaintiffs and lead counsel on March 21, 2013. Dkt. No. 21. Lead Plaintiffs filed the Amended Complaint on May 6, 2013. Dkt. No. 22, Am. Compl. Defendants thereafter moved to dismiss the Amended Complaint, and the Honorable Susan D. Wigenton,

U.S.D.J., issued an order on February 6, 2014, granting in part and denying in part Defendants' motion. Dkt. No. 34, Order on Mot. to Dismiss. Lead Plaintiffs now move for certification of a class consisting of all purchasers of Prudential's common stock during the Class Period, with the exception of Defendants and various entities and persons connected to Defendants. Dkt. No. 133, Mot. for Class Cert. Defendants oppose class certification and move to exclude the report and opinions of Lead Plaintiffs' expert, Professor Steven P. Feinstein (the "Feinstein Report"). Dkt. No. 185, Mot. to Exclude Expert Report.

## II. LEGAL STANDARD

### A. Class Certification Requirements

**\*3** Federal Rule of Civil Procedure 23 sets forth the requirements that must be fulfilled before a case may proceed as a class action. There are four basic prerequisites for class action treatment:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These are known as the numerosity, commonality, typicality, and adequacy requirements. *See In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 780 (3d Cir.2009). Second, plaintiffs must also meet the requirements of one of Rule 23(b)'s provisions. *Id.* Here, Lead Plaintiffs seek certification under Rule 23(b)(3), which permits certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "The twin requirements of Rule 23(b)(3) are known as predominance and superiority." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 310 (3d Cir.2008). In general, Rule 23(b)(3)'s predominance requirement is the most crucial requirement in securities class actions.

City of Sterling Heights General Employees' Retirement..., Not Reported in...

Fed. Sec. L. Rep. P 98,620

*Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II),* —— U.S. ——, ——, 134 S.Ct. 2398, 2412, 189 L.Ed.2d 339 (2014). This case is no different.

A plaintiff "must affirmatively demonstrate" that Rule 23's requirements are satisfied, *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011), by providing actual evidentiary proof that the requirements are met. *Comcast Corp. v. Behrend,* —— U.S. ——, ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013). Therefore, a reviewing court must conduct a "rigorous analysis" of each of Rule 23's requirements, *Dukes,* 131 S.Ct. at 2551, and must be satisfied that each requirement is established by a preponderance of the evidence. *In re Blood Reagents Antitrust Litig.,* 783 F.3d 183, 187 (3d Cir.2015). This analysis frequently overlaps with "the merits of the plaintiff's underlying claim." *Dukes,* 131 S.Ct. at 2551. The merits may be considered, however, "only to the extent ... that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, ——, — — —, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013).

### B. Admissibility of Expert Opinion

Courts are also frequently called upon to consider expert opinion offered to support or oppose class certification. *Hydrogen Peroxide,* 552 F.3d at 323. Where an expert opinion is critical to class certification and a party challenges the reliability of that opinion, the reviewing court must engage in a two-step analysis before analyzing whether Rule 23's requirements have been met: (1) whether the party's challenges bear upon "those aspects of [the] expert testimony offered to satisfy Rule 23" and (2) if so, whether the opinion is admissible as to those aspects under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Blood Reagents,* 783 F.3d at 188.

**\*4** Federal Rule of Evidence 702 provides the general parameters of admissible expert testimony:

A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding whether to admit expert testimony, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 14748, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (applying *Daubert* standard to all expert testimony). The Court considers whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, i.e., it must "fit" the facts of the case. *See United States v. Schiff,* 602 F.3d 152, 172 (3d Cir.2010). The proponent of the expert testimony must prove these three requirements by a preponderance of the evidence. *Mahmood v. Narciso,* 549 F. App'x 99, 102 (3d Cir.2013) (citing *In re TMI Litig.,* 193 F.3d 613, 663 (3d Cir.1999)).

In determining whether proposed expert testimony is reliable, the trial court should examine:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7)

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 17 of 208
PageID: 72759

City of Sterling Heights General Employees' Retirement..., Not Reported in...

Fed. Sec. L. Rep. P 98,620

the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994); *see also* ⚠ *Schneider,* 320 F.3d at 405. Each step of the expert's analysis must be reliable, including "the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 291 (3d Cir.2012). But proponents of expert testimony need not "prove their case twice-they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000).

**C. Section 10b and Rule 10b–5**

Section 10b and Rule 10b–5, *see* 15 U.S.C. § 78j and 17 C.F.R. 240.10b–5, prohibit deception in relation to the sale of securities. In order to recover, a plaintiff must prove the following elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 167 (3d Cir.2014).

**\*5** At the class certification stage, materiality and loss causation need not be considered. *See* *Amgen,* 133 S.Ct. at 1199 (materiality); *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I*), 563 U.S. 804, 131 S.Ct. 2179, 2185–86, 180 L.Ed.2d 24 (2011) (loss causation). Conversely, the element of reliance must be considered at class certification. *Halliburton II,* 134 S.Ct. at 2407–08.

In order to establish reliance, the plaintiff may invoke the rebuttable presumption set forth in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), which presumes that all investors rely on the integrity of the market price when deciding whether to buy or sell stock. *Id. at* 247. The presumption is based on the "fraud-on-the-market" theory, which provides that where a company's stock trades on an efficient market, its stock price incorporates all material public information, including misrepresentations. *See* *id. at 246* (internal quotations and citation omitted). In order to invoke the *Basic* presumption of reliance, the plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II,* 134 S.Ct. at 2408. [4]

Because market efficiency is so crucial to the invocation of the *Basic* presumption, "which in turn is necessary to meet the Rule 23(b)(3) predominance requirement, a district court should conduct a rigorous market efficiency analysis." 🚩*In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 638 (3d Cir.2011), *abrogated on other grounds by* *Amgen v. Conn. Ret. Plans & Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). The defendant may rebut the presumption by proving that the alleged misrepresentation(s) had no impact on the stock price, thereby precluding class certification under Rule 23(b)(3). *Halliburton II,* 134 S.Ct. at 2414.

**III. ANALYSIS**

**A. Defendants' Motion to Exclude Lead Plaintiffs' Expert Report**

Here, Lead Plaintiffs use the Feinstein Report to establish market efficiency and invoke the *Basic* presumption. Because the Feinstein Report bears directly on issues relevant to class certification, the Court first analyzes the report's admissibility to the extent it concerns matters relevant to class certification.

**1. Expert Qualifications**

Defendants do not challenge Professor Feinstein's qualifications. His credentials and experience qualify him to offer an expert opinion in this case. *See* Dkt. No. 133–7, Decl. & Report of Steven P. Feinstein ¶¶ 6–16, Exhibit 2. Professor Feinstein holds a Ph.D. in Economics, a Master of Philosophy in Economics, a Master of Arts in Economics, all from Yale University, and a Bachelor of Arts in Economics from Pomona College. He is a chartered financial analyst and has taught undergraduate and masters-level courses at Babson

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 18 of 208
PageID: 72760
City of Sterling Heights General Employees' Retirement..., Not Reported in...
Fed. Sec. L. Rep. P 98,620

College in Valuation, Capital Markets, Quantitative Methods, and Security Valuation, among others. Before his time at Babson College, he taught finance at Boston University and worked as an Economist for the Federal Reserve Bank of Atlanta. He has also been published extensively in the field of finance. The qualification requirement is construed liberally; "a broad range of knowledge, skills, and training qualify an expert." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003). Professor Feinstein is qualified.

### 2. Reliability

**\*6** Defendants dispute the reliability of Professor Feinstein's testimony on two bases. First, they argue that Professor Feinstein's testimony fails to prove that the DMF Charge on November 2, 2011, affected the price of Prudential stock because, *inter alia,* there were other disclosures on the same day for which Professor Feinstein does not account. Second, Defendants argue that Lead Plaintiffs' damages model is barebones and unimplemented, and so does not satisfy Daubert.

### a. Market Efficiency Analysis

As an initial matter, Defendants do not challenge the reliability of the Feinstein Report's market efficiency analysis. The Court is satisfied that Professor Feinstein's analysis on that point is reliable.

Professor Feinstein's market analysis is based on the factors set forth in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989); *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D.Tex.2001); and *Unger v. Amedisys,* 401 F.3d 316 (5th Cir.2005). *Cammer* identifies five relevant factors to determine whether a company's stock trades in an efficient market: (1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S–3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price. *Cammer,* 711 F.Supp. at 1286–87. *Krogman* and *Unger* identify three additional factors that should be considered: (1) the magnitude of the company's market capitalization; (2) the size of the bid-ask spread for the company's stock, i.e., the difference between

the price that potential buyers are willing to pay and the price at which potential sellers are willing to sell; and (3) the company's float, i.e., the percentage of shares that are publicly held. *Krogman,* 202 F.R.D. at 478; *Unger,* 401 F.3d at 323. The use of these factors has been cited with approval in a majority of circuits. *See In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 634 n. 16 (3d Cir.2011) (collecting cases).

In his report, Professor Feinstein explores these factors and concludes that Prudential's stock trades in an efficient market. *See* Feinstein Report ¶¶ 29–153. He also conducts an event study to analyze the fifth *Cammer* factor-i.e., whether there exists an empirically demonstrable causal relationship between the release of Prudential-specific information and movement in Prudential's stock price. An event study includes "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II,* 134 S.Ct. at 2415. Defendants do not challenge the reliability of the event study method, and there is no dispute that the method is widely accepted in the academic community and in the courts.

*See* Feinstein Report ¶¶ 91–92; *see, e.g. In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090, at \*12 n. 24 (E.D.Pa. Sept.3, 2010).

**\*7** The event study examines the movement of Prudential's stock price on seven dates during the Class Period immediately following earnings announcements or changes in earnings guidance. *See* Feinstein Report ¶¶ 99–100. The first six dates concern earnings announcements during the Class Period that Lead Plaintiffs allege were false and misleading, while the seventh date concerns the disclosure of, *inter alia,* the DMF Charge. The dates examined contained earnings announcements and changes in earnings guidance-information virtually all economists agree is important to investors. *Id.* ¶¶ 96–98. The event study then contains a detailed regression analysis that sought to isolate the impact of Prudential's earnings announcements from other potentially confounding factors. *Id.* ¶¶ 102–14. Professor Feinstein's analysis ultimately found statistically significant changes in Prudential's stock price attributable to the earnings announcements on six of the seven days examined. *Id.* ¶¶ 115–22, Ex. 7. Based on this result, Professor Feinstein concluded that Prudential's stock traded in an efficient market during the Class Period. *Id.* ¶ 120. Defendants do not dispute that Prudential's stock trades on an efficient market. The Court is therefore satisfied that Professor Feinstein's opinion concerning market efficiency is reliable.

#### b. The DMF Charge

Defendants argue that Professor Feinstein does not provide a reliable basis from which to conclude that the DMF Charge announced on November 2, 2011, caused the downward price movement the following day. Lead Plaintiffs agree that Professor Feinstein does not offer such a conclusion at this stage because such an opinion is not required for plaintiffs to invoke the presumption of reliance at class certification. Dkt. No. 216, Pls.' Opp. at 13. The parties, in effect, agree on the scope of Professor Feinstein's opinion. This dispute is therefore not a challenge to admissibility, but a question of whether the Feinstein Report provides sufficient proof to certify the class.

Professor Feinstein did not compartmentalize each disclosure made concurrently with the DMF Charge, but he did not need to do so. Such an analysis would require the expert to wade into questions of loss causation and materiality, issues that are not properly before the Court at the class certification stage. *See* 🚩 *Amgen,* 133 S.Ct. at 1199 (materiality not relevant at class certification); *Halliburton I,* 131 S.Ct. 2184–87 (loss causation not relevant at class certification); *see also* 🚩 *Blood Reagents,* 783 F.3d at 188. Professor Feinstein's event study does not seek to prove that the DMF Charge caused Prudential's stock price to drop, but that is not cause for exclusion under Rule 702.

#### c. Plaintiffs' Damages Model

Defendants also attack the reliability of Professor Feinstein's damages model, arguing that Professor Feinstein merely describes a framework for calculating damages without actually applying it in this case. But as will be discussed in the context of Lead Plaintiffs' motion for class certification, class treatment would still be appropriate here even if damages were required to be calculated on an individual basis. *See* 🚩 *Neale v. Volvo Cars of N. Am., LLC,* ——F.3d ——, 2015 WL 4466919, at *17 (3d Cir. July 22, 2015) (denial of class certification solely because damages require individual calculation would be abuse of discretion). The Court therefore need not consider the reliability of Professor Feinstein's damages model at this stage. 🚩 *Blood Reagents,* 783 F.3d at 188.

#### 3. Fit

**\*8** Defendants also do not challenge the helpfulness of Professor Feinstein's report, so long as it is reliable. To satisfy the third requirement, expert testimony must be "relevant for the purposes of the case" and helpful to the factfinder. 🚩⚠️ *Schneider,* 320 F.3d at 404. Professor Feinstein's opinion helps establish that Prudential's stock traded in an efficient market. *See* Feinstein Decl. & Report ¶ 2. It therefore bears directly upon reliance through a detailed empirical analysis of market efficiency. *See id.* ¶¶ 29–157. Lead Plaintiffs have also satisfied the third requirement of fit.

In light of the foregoing, Defendants' motion to exclude Professor Feinstein's expert report is denied. The Court now turns to Lead Plaintiffs' motion for class certification.

#### B. Lead Plaintiffs' Motion for Class Certification

Defendants challenge adequacy and predominance. Under adequacy, they argue that National Shopmen is insufficiently educated about the case to serve as class representative under 🚩 Rule 23(a)(4). Under predominance, Defendants advance three arguments. Specifically, Defendants argue that (1) Plaintiffs cannot invoke the *Basic* presumption of fraud-on-the-market because they have not shown that the DMF Charge was responsible for the subsequent drop in stock price because of contemporaneous disclosures; (2) those same contemporaneous disclosures rebut the *Basic* presumption, even if it is invoked, because they raise a triable issue as to price impact; and (3) Lead Plaintiffs have failed to provide an adequate model for the calculation of damages on a class-wide basis.[5] The Court first addresses the 🚩 Rule 23(a) prerequisites before reaching the 🚩 Rule 23(b)(3) predominance inquiry.

#### 1. 🚩 Rule 23(a) Prerequisites

#### a. Numerosity, Commonality, and Typicality

Defendants do not challenge class certification on numerosity, commonality, or typicality grounds. The Court is satisfied that those requirements are met here.

"Numerosity requires a finding that the putative class is 'so numerous that joinder of all members is impracticable.' " 🚩 *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 182 (3d Cir.2001) (quoting 🚩 Fed.R.Civ.P. 23(a)(1)). This requirement is readily met in securities cases

Fed. Sec. L. Rep. P 98,620

involving an issuer whose stock trades publicly on the NYSE. *See, e.g., In re Honeywell Int'l Inc. Sec. Litig.,* 211 F.R.D. 255, 260 (D.N.J.2002). As Prudential stock trades on the NYSE with significant daily volume, *see* Feinstein Report ¶ 47, it is clear that joinder would be impracticable. The numerosity requirement is therefore easily met here.

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Newton,* 259 F.3d at 183 (internal quotations and citations omitted). The standard for meeting this requirement is therefore not particularly demanding, *see id.,* and the Court finds that it is easily met here. For example, the issues of materiality and loss causation both present common questions of law and fact and can be proven with common evidence. *See Amgen* 133 S.Ct. at 1198; *Halliburton I,* 131 S.Ct. at 2185.

**\*9** The standard for demonstrating typicality under Rule 23(a)(3) is similarly undemanding and requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." *Newton,* 259 F.3d at 183–84. Additionally, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 599 (3d Cir.2009). The factual and legal predicates of National Shopmen's (the proposed class representative) claims are the same as those for the class members. Defendants have not identified any unique defense to which National Shopmen is exposed. Rule 23(a)(3)'s typicality requirement is therefore met.

**b. Adequacy**

Defendants challenge National Shopmen's adequacy as class representative, arguing that deposition testimony of its corporate representative shows that National Shopmen is inadequately informed about the details of this litigation and is therefore unfit to serve as class representative. The Court disagrees.

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." In assessing adequacy, the Court first examines the qualifications of proposed class counsel. *Schering*

*Plough,* 589 F.3d at 602. Here, Defendants do not challenge proposed class counsel's qualifications. It is clear that proposed class counsel is highly qualified to represent the class. *See* Dkt. No. 133–6, Ex. D to Williams Decl. Next, the Court determines whether the proposed class representative has "interests antagonistic to those of the class." *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 313 (3d Cir.2007) (internal quotations and citations omitted). This inquiry principally focuses on whether there are "conflicts of interest between named parties and the class they seek to represent." *Schering Plough,* 589 F.3d at 602 (internal quotations omitted). Where, as here, the proposed class representative has retained adequate counsel, the class representative is not inadequate simply because it lacks "particularized knowledge concerning the dispute at issue." *Szczubelek v. Cendant Mortg. Corp.,* 215 F.R.D. 107, 120 (D.N.J.2003). Instead, a class representative may be adequate even when it possesses only minimal knowledge regarding the litigation. *New Directions,* 409 F.3d at 313.

National Shopmen easily meets this standard. To be sure, National Shopmen's corporate representative inaccurately characterized certain facts regarding this litigation during his deposition. But Lead Plaintiffs also point to his many accurate statements regarding the litigation during the same deposition. The deposition testimony meets the threshold "minimal knowledge" standard set forth above. The Court therefore rejects Defendants' contention that National Shopmen cannot adequately serve as class representative. The adequacy requirement of Rule 23(a)(4) is satisfied.

**\*10** Lead Plaintiffs have therefore satisfied the Rule 23(a) prerequisites to class certification. The Court now shifts its attention to Rule 23(b)(3)'s predominance requirement.

**2. Predominance Under Rule 23(b)(3)**

Class certification under Rule 23(b)(3) is appropriate only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

City of Sterling Heights General Employees' Retirement... Not Reported in...

Fed. Sec. L. Rep. P 98,620

This requirement is considerably more demanding than Rule 23(a)'s commonality prerequisite and "imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 297 (3d Cir.2011).

The Court's predominance inquiry in this case focuses on the reliance element of Lead Plaintiffs' Rule 10b–5 claim. In particular, the Court must determine whether Lead Plaintiffs establish entitlement to the *Basic* presumption of reliance and, if so, whether Defendants successfully rebut that presumption by showing a lack of price impact.

### a. Establishing the *Basic* Presumption: Market Efficiency

In order to establish entitlement to the *Basic* presumption, Lead Plaintiffs must prove that Prudential stock trades in an efficient market. [6] *Halliburton II,* 134 S.Ct. at 2416. Defendants then may rebut that presumption with evidence demonstrating a lack of price impact attributable to the alleged misrepresentations. *Id.* at 2415. If the Court finds the *Basic* presumption does not apply, either because market efficiency was not established or because Defendants proved there was no price impact, then individual issues of reliance would predominate over common issues in this case, "rendering class certification inappropriate." *Id.* at 2416.

Lead Plaintiffs have proven that Prudential's stock traded in an efficient market. For one, Prudential's stock trades on the NYSE. *See In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 634 (3d Cir.2011) (trading on the NYSE strongly supports a finding of market efficiency); *see also In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,* No. 05–1151, 2013 WL 396117, at *11 (D.N.J. Jan.30, 2013) (no further market efficiency analysis necessary where the defendant's stock traded on the NYSE and was a component of the Dow Jones Industrial Average). Professor Feinstein's expert report also establishes that each of the widely-cited *Cammer/Krogman* factors weighs in favor of a finding of market efficiency. *See* Feinstein Report ¶¶ 35–153. Defendants do not argue to the contrary. *See* Dkt. No. 184–1, Decl. & Report of Daniel R. Fischel ¶¶ 5–30. The Court is therefore convinced that Prudential's stock trades in an efficient market. Thus, the *Basic* presumption affirms that the investors relied on the

alleged misrepresentations unless Defendant can prove an absence of price impact.

### b. Loss Causation

**\*11** Defendants argue that Lead Plaintiffs are not entitled to the *Basic* presumption because Lead Plaintiffs have not proven that the DMF Charge affected the price of Prudential stock. Defendants do not dispute that Prudential's stock dropped following the DMF Charge. Instead, they argue that this drop was caused by contemporaneous disclosures and Professor Feinstein failed to isolate the price impact of the DMF Charge from the impact of other contemporaneous disclosures.

This is loss causation, and loss causation need not be proven at this stage.

> "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory."

*Halliburton I,* 131 S.Ct. at 2186.

Price impact and loss causation are distinct. Price impact asks "whether the alleged misrepresentations affected the market price" of the stock. *Halliburton I,* 131 S.Ct. at 2187. Loss causation, on the other hand, asks whether the subsequent decline in the price of the stock was caused by a correction of the prior misrepresentations or by other confounding factors. *Id.* at 2185 (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). The distinction is subtle: "whether the alleged misrepresentations affected the market price in the first place"—i.e., whether there was "price impact"—is a different inquiry than whether those same representations

"also caused a subsequent economic loss." *Id.* at 2186. This is particularly important at class certification because evidence of loss causation is irrelevant at that stage, *See id.* at 2187, while evidence of price impact, or lack thereof, is highly relevant. *See Halliburton II,* 134 S.Ct. at 2415–16. Whether the initial misrepresentations affected the stock price is price impact. Whether the final disclosure later caused the stock price to drop is loss causation. Defendants' argument here relies solely on the latter, and is therefore inappropriate at this stage.

Defendants' citations to authority for the contrary proposition are inapposite. In *Sicav v. James Jun Wang,* the Southern District of New York rejected class certification which was premised not on a theory of corrective disclosures, as in this case, but on a theory based in "the mechanics by which shares of stock were priced during a protracted period of open-market trading." No. 12–6682, 2015 WL 268855, at *3 (S.D.N.Y. Jan.21, 2015). The Court noted that such claims "have almost always been held ill-suited to classwide resolution." *Id.* Specifically, "the need for a trade-by-trade inquiry into whether or not there was persistent price inflation" prevented common issues from predominating. *Id.* The case also did not deal with or cite to *Basic.* Defendants only other case decided at class certification, *In re Xcelera.com Securities Litigation,* No. 00–11649, 2008 U.S. Dist. LEXIS 77807, 2008 WL 7084626 (D.Mass. Apr. 25, 2008), was decided before *Amgen* and *Halliburton* established that loss causation and materiality need not be proven at class certification. Defendants' remaining authority concern the plaintiffs' proof requirements at summary judgment and trial, not at class certification. *See Schiff,* 602 F.3d at 171–72, 174–76 (materiality immediately before trial); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82, 96 (1st Cir.2014) (loss causation at summary judgment); *In re Exec. Telecard Sec. Litig.,* 979 F.Supp. 1021, 1023–25 (S.D.N.Y.1997) (damages at summary judgment); *In re Omnicom Grp., Inc. Sec. Litig.,* 541 F.Supp.2d 546, 550–51 (S.D.N.Y.2008) (loss causation at summary judgment), *aff'd,* 597 F.3d 501 (2d Cir.2010).

**\*12** Defendants do not contest that Prudential's stock price dropped significantly following the DMF Charge. The argument that the drop may have been caused by other

contemporaneous disclosures, not the DMF Charge, goes to loss causation, an issue inappropriate for consideration at class certification.

### c. Rebutting the *Basic* Presumption: Price Impact

Defendants argue that rebutting the *Basic* presumption merely requires Defendants to introduce evidence raising a triable issue of fact as to whether there was a price impact, citing Federal Rule of Evidence 301. The Court disagrees.

A plaintiff is not required to prove price impact in order to rely on the *Basic* presumption. *See Halliburton II,* 134 S.Ct. at 2414. Instead, the plaintiff can establish entitlement to the presumption through evidence of publicity and market efficiency—"an indirect way of showing price impact." *Id.* at 2415. Once those prerequisites are established, the defendant bears the burden to prove a lack of price impact through direct evidence. *Id.* at 2415–16; *see also id.* at 2417 (Ginsburg, J., concurring) (emphasizing that "it is incumbent upon the defendant to show the absence of price impact"); *Aranaz v. Catalyst Pharm. Partners, Inc.,* 302 F.R.D. 657, 673 (S.D.Fla.2014) (stating that the defendants' burden to prove absence of price impact is "daunting"). The Northern District of Texas considered and rejected the same argument Defendants advance here. *See Erica P. John Fund, Inc. v. Halliburton Co.,* No. 02–1152, —— F.R.D. ——, 2015 WL 4522863, at *4–7 (N.D.Tex. July 25, 2015) (finding that the defendant bore the burdens of both production and persuasion to prove lack of price impact). Merely pointing to other potential causes for a stock price change following a corrective disclosure is therefore not enough to rebut the *Basic* presumption.

Here, Professor Feinstein's event study analysis establishes positive, statistically significant price movements following five of six alleged misrepresentations. *See* Feinstein Report ¶¶ 96–122, Exhibit 7. [7] Professor Feinstein chose those alleged misrepresentations for his event study because they were initial announcements of financial results and earnings guidanceinformation that is widely accepted to be important to investors. *Id.* ¶ ¶ 96–98. Defendants do not challenge those findings or provide any evidence that those price movements are attributable to something other than the alleged misrepresentations. *See* Fischel Report ¶¶ 5–30; Dkt. No. 23412, Rebuttal Report of Steven P. Feinstein ¶¶ 30–40. Instead, Professor Fischel criticizes the fact that Professor Feinstein did not find statistically significant price impact

following fourteen other alleged misrepresentations and did not relate the statistically significant price impacts to the alleged misrepresentations. Fischel Report ¶¶ 17–18, Ex. 1.

But virtually all of the fourteen other alleged misrepresentations were either: (1) repeat announcements of the financial results to which Prudential's stock price did react in a statistically significant manner or (2) statements having nothing to do with Prudential's financial results. *See* Fischel Report Ex. 1; Am. Compl. ¶¶ 46, 50, 59–60, 66, 69, 72–74, 78, 90. Defendants provide no rebuttal to Professor Feinstein's justifications for choosing the dates that he did for his event study. They also provide no reason why the absence of a statistically significant price impact following some alleged misrepresentations should be given more weight than the presence of statistically significant price impact following the five alleged misrepresentations of financial results. [8] Lead Plaintiffs have produced evidence showing statistically significant changes in Prudential's stock price following important financial disclosures. In the face of these, Defendants have not successfully proven lack of price impact. The *Basic* presumption therefore stands unrebutted. Reliance can be proven here through common evidence.

#### d. Damages

**\*13** Defendants also argue that class certification must be denied because Lead Plaintiffs have failed to demonstrate that damages are capable of measurement on a class-wide basis. Defendants cite *Comcast Corp. v. Behrend,* ––– U.S. ––––, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), for the proposition that Lead Plaintiffs must affirmatively establish at class certification that damages can be calculated class-wide in order to satisfy the Rule 23(b)(3) predominance requirement.

But *Comcast* was an antitrust case in which there was only one viable theory of antitrust impact and the plaintiffs' damages model did not measure damages in accordance with that theory. *Id.* at 1433. Based on the particular facts of that case, issues common to the proposed class would have been overwhelmed by individual damage calculations. *See id.* The Court therefore required an inquiry into the merits of the plaintiffs' damages model at the class certification stage. *See id.* at 1432–35. The case did not stand for the general proposition that in all class actions, a plaintiff must prove that damages are calculable on a class-wide basis before class certification can be granted

Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages. *See Neale v. Volvo Cars of N. Am., LLC,* ––– F.3d ––––, 2015 WL 4466919, at \*16–17, \*17 n. 10 (3d Cir. July 22, 2015) (holding that the predominance analysis in *Comcast* "was specific to the antitrust claim at issue" and reiterating the well-established proposition that class certification is not necessarily defeated because of individual damages calculations). Indeed, in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be "an abuse of discretion." *See id.* at \*17. Because common issues predominate on all other issues of law and fact presented to the Court, the Court need not assess the validity of Plaintiff's damages model at this stage.

In light of the foregoing, the Court finds that common issues of law and fact predominate over individual issues. Rule 23(b)(3)'s predominance requirement is satisfied.

#### 3. Superiority Under Rule 23(b)(3)

Finally, the Court is satisfied that "a class action is superior to other available methods for fairly and efficiently adjudicating" this case. Fed.R.Civ.P. 23(b)(3). In determining superiority, the Court should weigh the following non-exhaustive list of factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.; Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615–16, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Garcia v. Freedom Mortg. Corp.,* 274 F.R.D. 513, 516 (D.N.J.2011). Consideration of those factors makes clear that the class action is superior to any other method of adjudicating this case. Perhaps most importantly, the class likely consists of a significant number of investors with relatively small losses

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 24 of 208
PageID: 72766
City of Sterling Heights General Employees' Retirement... — Not Reported in...

Fed. Sec. L. Rep. P 98,620

who would have decreased motivation to pursue their cases individually. *See Krangel v. Golden Rule Res., Ltd.,* 194 F.R.D. 501, 506 (E.D.Pa.2000). The remaining three factors also weigh in favor of class treatment. The Court is not aware of any pending cases by or against class members, and concentration of the litigation here is desirable to ensure consistency in adjudication. There is also no indication that there will be any particular difficulties in managing this case as a class action. Indeed, it is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases. *See In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55, 80 (S.D.N.Y.2009). The superiority requirement is met.

## IV. CONCLUSION

**\*14** In light of the foregoing, Defendants' motion to exclude Lead Plaintiffs' expert report is **DENIED** and Lead Plaintiffs' motion for class certification is **GRANTED.** An appropriate order follows.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5097883, Fed. Sec. L. Rep. P 98,620

## Footnotes

1    The Amended Complaint also originally asserted a cause of action under § 20(b), but that claim was dismissed in a February 6, 2014, order. Dkt. No. 34, Order on Mot. to Dismiss.

2    Prudential's operations are comprised of two separate lines of business: the Financial Services Businesses—the bulk of Prudential's operations—and the Closed Block Business. *See* Am. Compl. ¶ 5. The Financial Services Businesses are composed of four broad divisions: (1) U.S. Retirement Solutions and Investment Management; (2) U.S. Individual Life and Group Insurance; (3) International Insurance and International Investments; and (4) Corporate and Other. *Id.* The Closed Block Business is essentially a legacy business composed of life insurance products that Prudential ceased to offer following Prudential's demutualization; accordingly, its assets and liabilities have been segregated from the Financial Services Businesses. *Id.* Prudential consistently represented during the Class Period that only the performance of the Financial Services Businesses impacted the value of Prudential's common stock. *Id.* ¶ 6.

3    Lead Plaintiffs allege that the charge was actually increased to $139 million due to a $40 million charge against the Closed Block Business. Am. Compl. ¶ 97. Lead Plaintiffs acknowledge, however, that Prudential consistently represented that the Closed Block Business had no impact on the value of Prudential's common stock. *Id.* ¶ 6. Given that fact, the $40 million charge to the Closed Block Business is not at issue here.

4    As mentioned above, the Supreme Court has ruled that materiality is not an inquiry for the class certification stage. *See Amgen,* 133 S.Ct. at 1199.

5    Defendants also claim that Lead Plaintiffs are not entitled to the presumption in the first instance because they have failed to identify a corrective disclosure. Their arguments under this point rely on disputable interpretations of various facts and are inappropriate to reach at this stage.

6    The three other requirements to invoke the presumption are all easily met here. Materiality will always rise or fall by common evidence, and publicity and market timing are not in dispute. Thus, the *Basic* presumption will be invoked if market efficiency is shown.

7    The Report also finds a statistically significant movement following the disclosure of the DMF Charge, as discussed above. *Id.*

City of Sterling Heights General Employees' Retirement..., Not Reported in...

Fed. Sec. L. Rep. P 98,620

8    Also, it also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact. It is possible that those statements assisted in maintaining an inflated price for Prudential's stock-a possibility that Defendants do not rule out. *See, e.g.,* 🚩 *In re Bristol–Myers Squibb Sec. Litig.,* No. 00–1990, 2005 WL 2007004, at *17–18 (D.N.J. Aug.17, 2005) (finding that "a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further").

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 26 of 208
PageID: 72768
Geiss v. Target Corp., Not Reported in F.Supp.2d (2013)

2013 WL 4675377
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Sandra GEISS and Robert Geiss h/w, Plaintiffs,

v.

TARGET CORPORATION and/or Target
Corporation of Minnesota, John Does 1–5
(fictitious persons) and ABC Corps 1–5 (fictitious
corporations), Defendants/Third Party Plaintiff(s),

v.

Virtua Memorial Hospital, Virtua Memorial
Hospital—Mt. Holly, Virtua West, John Does
1–10 (names unknown) and ABC Corps 1–
10 (names unknown), Third Party Defendant(s).

Civil No. 09–2208 (RBK/KMW).
|
Aug. 30, 2013.

**Attorneys and Law Firms**

Gary Frederick Piserchia, Parker McCay P.A., Mount Laurel, NJ, for Plaintiffs.

Christopher Eugene McIntyre, Fishman McIntyre P.C., East Hanover, NJ, for Defendants/Third Party Plaintiffs.

John A. Talvacchia, Stahl & DeLaurentis, P.C., Voorhees, NJ, for Third Party Defendants.


**OPINION**

KUGLER, District Judge.

**\*1** This matter comes before the Court upon the motion of Target Corporation ("Target") for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, against Sandra and Robert Geiss ("Plaintiffs"). Virtua Memorial Hospital ("Virtua"), a third party defendant in this case, also now moves for summary judgment. For the reasons expressed herein, Target's motion for summary judgment is **DENIED.** However, Virtua's motion for summary judgment is **GRANTED.**


**I. FACTS AND PROCEDURAL HISTORY**

According to Plaintiffs, this matter arises out of a fall that Plaintiff Sandra Geiss sustained at a Target store in Burlington, New Jersey. Because Plaintiff's medical history and post-fall treatment are relevant to the conflicting theories of causation advanced by both parties, the Court will provide a detailed background to this case. Although the Court presents a composite of facts from Plaintiffs, Target, and Virtua, the Court will construe all facts in the light most favorable to the non-moving parties, as it must at this stage in the litigation.

In January 2006, Plaintiff underwent knee replacement surgery in which her right knee joint was removed and replaced with a prosthetic component. Target's Mot. Summ. J., Ex. P–1 at 1. Plaintiff alleges that on July 25, 2007, she tripped over an uneven rug while passing through the entrance of the Burlington, NJ Target store, landing on her stomach and knees. *Id.,* Ex. B at 2; Target's Statement of Undisputed Material Facts ("SUMF"), ¶ 2. Plaintiff did not experience immediate pain on the day of her fall, but days later developed increasing pain in her right knee and required a cane and walker to ambulate. *Id.,* Ex. T at 33–40. On August 2, 2012, Plaintiff visited her primary care physician, Dr. Chatyrka, complaining of right knee pain. Target's SUMF, ¶ 3. Dr. Chatyrka determined that Plaintiff was suffering from sciatica and recommended that she obtain an X-ray of her right knee. Target's Mot. Summ. J., Ex. C. The X-ray indicated that the prosthetic components were properly positioned and undamaged, but also revealed a fluid collection of unknown origin. *Id.,* Ex. D.

On August 17, 2012, Dr. Schoifet, the orthopedic surgeon who performed Plaintiff's knee replacement in 2006, examined Plaintiff's knee. *Id.,* Ex. E. Dr. Schoifet noted Plaintiff's complaints of increasing knee pain, but found that Plaintiff had no instability in her knee and confirmed that the X-ray demonstrated good positioning of the prosthetic components. *Id.;* Target's SUMF, ¶ 5–6. He ultimately concluded that Plaintiff suffered a right knee contusion as a result of her fall. *Id.*

On August 29, 2012, Plaintiff Sandra Geiss presented to Virtual Memorial Hospital complaining of "back pain, leg pain, numbness, pain radiating from back into legs and extreme pain when ambulating." Pls.' Supplemental Statement of Disputed Material Facts ("SDMF"), ¶ 7. A few hours after Plaintiff's arrival, tests revealed that Plaintiff had an elevated white blood cell count, elevated blood pressure, high blood sugar, and a high temperature. Target's Mot. Summ. J. at 4; *see also* Ex. F at 6–8. Soon thereafter, Plaintiff

Geiss v. Target Corp., Not Reported in F.Supp.2d (2013)
Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 27 of 208
PageID: 72769

was diagnosed with hypoxia and pneumonia. *Id.,* Ex. F at
9. Plaintiff was admitted to the hospital, and then to the
Intensive Care Unit, where she was intubated. *Id.,* Ex. I
at 2. Blood cultures also revealed that Plaintiff had MSSA
(Methicillin–Sensitive Staphylococcus Aureus), a bacterial
infection. *Id.* Plaintiff spent some time in the ICU in order to
receive treatment for her various ailments and to stabilize her
condition. *See* Pls.' Opp'n, Ex. A at 42–43. Dr. Lee does not
recall exactly how long Plaintiff remained in the ICU.[1] *Id.*
at 42–43.

 **\*2** Much of the controversy in this case surrounds an "event"
which allegedly occurred during Plaintiff's hospitalization.
On September 25, 2007, an X-ray of Plaintiff's right knee
revealed that her previously intact right knee prosthesis had
subluxed (dislocated) by 3cm. Target's Mot. Summ. J., Ex. J.
Plaintiff underwent emergency repair surgery on September
26, 2007, while her immune system was still compromised
from the treatment of her other ailments. *Id.,* Ex. Q at 99–
100. Despite the repair, Plaintiff subsequently developed an
infection in her right knee requiring further treatment. Target's
SUMF, ¶ 32. The infection persisted, which required doctors
to remove the prosthesis and insert an antibiotic spacer. *Id.*
at ¶ 33. Ultimately, Dr. Schoifet had to perform a "right knee
arthrodesis," or fusion of Plaintiff's right knee. *Id.* at ¶ 34.
Plaintiff's knee fusion has caused her significant pain, led to
difficulty walking, and altered the range of activities in which
she can participate. Dep. of Sandra Geiss at 90–94.

Although the subluxation was discovered on September 25,
2007, Plaintiff has no memory as to when or how it occurred.
Target's Mot. Summ. J., Ex. T at 56–57. According to
Plaintiff's expert, Dr. Gleimer, this subluxation occurred at
some point while Plaintiff was hospitalized, but he cannot
pinpoint a specific event, place or date. *Id.,* Ex. P–1 at 3. He
does note, however, that the prosthetic is inherently stable and
would not sublux on its own. *Id.* This confusion is enhanced
due to a number of missing medical records. Specifically,
Virtua cannot locate progress notes from August 29, 2007
to September 14, 2007, physician orders from September 4,
2007 to September 17, 2007, medical administration records
from September 4, 2007 to September 19, 2007, and flow
records from September 14, 2007, September 18, 2007 and
October 3, 2007. Target's SUMF, ¶ 35. The Custodian of
Records for Virtua, Jennfier Raio, attributes the loss of the
records to human error. Virtua's Mot. Summ. J., Ex. D at 64–
65.

On the basis of these events, Plaintiffs filed suit against Target
on March 26, 2009 in the Superior Court of New Jersey,
Burlington County. In the Complaint, Plaintiffs assert claims
against Target for negligence and loss of consortium on behalf
of Plaintiff Robert Geiss. Target was served on April 6, 2009.
Within one month, Target properly moved the matter to this
Court. On July 29, 2010, Target impleaded Virtua as a third
party defendant in the case. In the Third Party Complaint,
Target contends that Plaintiff's knee subluxation constitutes a
superseding, intervening cause and that any injuries resulting
therefrom are due solely to Virtua's negligence. Target
seeks contribution and indemnification from Virtua for any
damages for which Target may be liable to Plaintiffs in the
underlying suit. Target's Third Party Compl., ¶ 11. Target
also claims that it has been prejudiced by Virtua's failure to
preserve all of Plaintiff's medical records and asserts a tort
action for careless, negligent, and/or intentional spoliation of
evidence, seeking contribution and/or indemnification as a
remedy. *Id.* at 3–4.

 **\*3** Both Virtua and Target now move for summary
judgment. Target argues that Plaintiff's knee subluxation
was neither actually nor proximately caused by Target's
negligence. Target also contends that the expert opinion
causally relating Plaintiff's fall at Target to her subsequent
hospitalization should be barred as a net opinion. In its motion
for judgment on the Third–Party Complaint, Virtua argues
that neither party has adduced evidence supporting a prima
facie case of negligence. Accordingly, Virtua asserts that there
is no issue of material fact and that the hospital is entitled to
judgment as a matter of law based on the current record.

## II. STANDARD OF REVIEW

The court should grant a motion for summary judgment when
the moving party "shows that there is no genuine dispute as to
any material fact and that the movant is entitled to judgment
as a matter of law." Fed.R.Civ.P. 56(a). An issue is "material"
to the dispute if it could alter the outcome, and a dispute
of a material fact is "genuine" if "a reasonable jury could
return a verdict for the non-moving party." *Anderson v.
Liberty Lobby, Inc. .,* 477 U.S. 242, 249, 106 S.Ct. 2505,
91 L.Ed.2d 202 (1986); *Matsushida Elec. Indus. Co., Ltd.
v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348,
89 L.Ed.2d 538 (1986) ("Where the record taken as a whole
could not lead a rational trier of fact to find for the non-
moving party, there is no 'genuine issue for trial.' ") (quoting
*First National Bank of Arizona v. Cities Service Co.,* 391

U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson,* 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in her favor. *Id.* at 255; *Matsushida,* 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson,* 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION & ANALYIS

Target's Third Party Complaint seeks contribution and indemnification from Virtua for any liability that Target may face in Plantiffs' underlying action. If Target's motion is granted, Virtua's motion for summary judgment would be rendered moot. Therefore, it is prudent for the Court to first address Target's motion for summary judgment.

### A. Target's Motion for Partial Summary Judgment

Target moves for summary judgment based on Plaintiffs' alleged failure to establish causation. Target argues that its alleged negligence was neither the actual nor proximate cause of Plaintiff's knee subluxation and the complications resulting therefrom. Target further posits that Plaintiff's knee subluxation was a superseding intervening cause which severs the causal chain of liability. Target also seeks to bar Dr. Gleimer's conclusion that "all hospitalizations subsequent to July 25, 2007 related to Ms. Geiss' knee, back or related infection or problems were caused by the fall at Target." *See* Target's Mot. Summ. J. at 31. Target argues that Dr. Gleimer's statement is a "net opinion," which is unsubstantiated by objective evidence. *Id.* The Court will address these arguments in reverse order, beginning with Target's challenge to Plaintiffs' expert.

### a. Sufficiency of Expert Testimony

**\*4** Target challenges Dr. Gleimer's conclusion that all hospitalizations subsequent to July 25, 2007 are causally related to Plaintiff's fall at Target, arguing that it is a "net opinion" that is unsupported by the factual record. Admissibility of expert testimony is governed by Rule 702, which was amended in 2000 to reflect the Supreme Court decision in *Daubert.* The Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. This rule requires a court to act as a "gatekeeper" to ensure that expert testimony is both relevant and reliable. *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir.2008). Rule 702 has a " 'liberal policy of admissibility.' " *Id.* (quoting *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997)). The burden of showing expert testimony is admissible, once challenged, lies with the offering party. *See Kannankeril,* 128 F.3d at 807.

To be admissible, expert testimony must satisfy three requirements under Rule 702: 1) the witness must be an expert (i.e., must be qualified); 2) the expert must testify about matters requiring scientific, technical, or specialized knowledge (i.e., must be reliable); and 3) the expert's testimony must assist the trier of fact (i.e, must fit). *Id.* at 806 (citing *In re Paoli R.R. Yard PCB Litig. (Paoli II),* 35 F.3d 717, 742 (3d Cir.1994)); *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000) (stating three requirements are qualifications, reliability, and fit). An expert is qualified if

he " 'possesses specialized expertise.' " *Pineda,* 520 F.3d at 244 (quoting *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003)). The qualification requirement is liberally construed. *Id* .

A reliable opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli II,* 35 F.3d at 742 (quoting *Daubert,* 509 U.S. at 589). The focus of the reliability inquiry is on the expert's principles and methodology, not on his conclusions. *Daubert,* 509 U.S. at 595. In determining reliability, a court may look to several non-exhaustive factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non judicial uses to which the method has been put.

**\*5** *Elcock,* 233 F.3d at 745–46 (quoting *Paoli II,* 35 F.3d at 742 n. 8). Finally, an opinion fits a particular case (and thus helps the trier of fact) when there is a " 'connection between the scientific research or test result to be presented and particular disputed factual issues in the case.' " *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000) (quoting *Paoli II,* 35 F.3d at 743). Fit is an issue of relevance and simply means that scientific validity of the method or principles applies to the issues at hand. *U.S. v. Ford,* 481 F.3d 215, 220 n. 6 (3d Cir.2007).

Target has not raised a proper *Daubert* challenge. Target does not challenge Dr. Gleimer's expertise, the reliability of his methodology, or the relevance of his opinion to this

particular case. Target merely challenges the reliability of his conclusions. This is not the "inquiry envisioned by Rule 702."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As the Supreme Court cautioned, the overarching subject of a challenge under Rule 702 is "the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* Consequently, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.*

Even construing Target's motion as a challenge to the reliability of Dr. Gleimer's methodology, Target has not raised any justification for barring his opinions. Target first argues that Dr. Gleimer "elected to disregard the medical evidence" and failed to explain how Plaintiff's presentation to the emergency room could have been caused by her fall. Target Mot. Summ. J. at 30. Target also finds significant that Dr. Gleimer cannot state exactly how and when the knee dislocation occurred, but attributes the dislocation to "some event/injury while in the hospital." *Id.* Target further contends that Dr. Gleimer failed to explicitly state that his opinions are based upon a reasonable degree of medical probability or certainty. *Id.* at 31. However, Dr. Gleimer did explain at length his reasons for reaching this conclusion. *See* Dr. Gleimer Dep. at 42–45. The balance of Target's arguments may be properly raised on cross-examination, not on a Rule 702 challenge. Therefore, the Court will deny Target's request to bar Dr. Gleimer's opinions.

**b. Negligence**

In order to establish negligence under the laws of New Jersey, a plaintiff must establish: (1) a duty of care owed to Plaintiff, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages. *Jersey Cent. Power & Light Co. v. Melcar Utility Co.,* 212 N.J. 576, 594 (2013). Target only challenges Plaintiffs' ability to establish the third prong—actual and proximate causation.

**i. Proximate Causation**

Target argues that Plaintiff cannot establish that Target's negligence was the proximate cause of her knee subluxation. Target accords little weight to Dr. Gleimer's opinion that an "event" occurred during her hospitalization, but argues that even accepting this conclusion, "it is not foreseeable [that] any treatment for this alleged injury would cause a stable, intact knee prosthetic to dislocate, even if that treatment

was negligently administered." Target's Mot. Summ. J. at 27. Target also highlights that Plaintiff's own expert "does not state [that] plaintiff was receiving treatment for her back when the knee dislocation occurred, or that the dislocation of plaintiff's was a foreseeable consequence of such treatment." *Id.* However, none of these arguments justify summary judgment.

**\*6** Under well-established principles of tort law, "a tortfeasor is generally held answerable for the injuries which result in the ordinary course of events from his negligence and it is generally sufficient if his negligent conduct was a substantial factor in bringing about the injuries." *Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1, 9 (N.J.1959). Therefore, to be considered a proximate cause, "conduct need only be a cause which sets off a foreseeable sequence of consequences, unbroken by any superseding cause, and which is a substantial factor in producing the particular injury." *Bendar v. Rosen,* 247 N.J.Super. 219, 588 A.2d 1264, 1269 (N.J.Super.Ct.App.Div.1991) (quoting *Scafidi,* 574 A.2d at 398). The New Jersey Supreme Court has been clear that "[p]roximate cause is a factual issue, to be resolved by the jury after appropriate instruction by the trial court." *Scafidi v. Seiler,* 119 N.J. 93, 574 A.2d 398, 402 (N.J.1990).

Contrary to Target's arguments, Plaintiffs have identified a triable issue of fact as to causation. First, Plaintiffs have offered ample evidence that Plaintiff's visit to the emergency room was spurred by severe back and knee pain. In her deposition, Plaintiff states that she had her husband call an ambulance "because of the excruciating pain she was experiencing in her knee and back." Pls.' SDMF, ¶ 3. Dr. Gleimer opines, and some of the emergency records indicate, that Plaintiff presented to the hospital with complaints of severe left leg pain, back pain, and ambulatory pain. *Id.,* Ex. F; Ex. P–2 at 1. The records also note that Plaintiff complained of "pain to lower back" and that Plaintiff "ambulate[d] slowly without assistance." *Id.* at 6–7.

Although, as Plaintiff concedes, the reasons for her actual admission remain less certain, Plaintiffs have also produced sufficient evidence on this point to survive summary judgment. Plaintiffs' expert, Dr. Gleimer, concluded that there were multiple reasons for Plaintiff's admission and observed that she was treated almost exclusively for her low back pain and sciatica. Pls.' Opp'n at 5(citing Gleimer Dep. at 44–45). Dr. Gleimer notes that these painkillers can also

suppress respiration. *Id.* Dr. Gleimer also highlights that Virtua's Admission Record lists back pain as "one of the conditions chiefly responsible for Ms. Geiss' admission to Virtua." *Id.* (citing Gleimer Dep. at 45–46). Dr. Lee, the admitting doctor on the date in question, also testified that Plaintiff was admitted, at least in part, for "low back pain." *Id.* (citing Lee Dep. at 29). Thus, Plaintiffs have produced adequate evidence for a jury to find that Target's initial negligence was a proximate cause of her knee subluxation.

### ii. Actual Causation

Target also argues that Plaintiff's fall was not the actual cause of her knee subluxation. Essentially, Target argues that because an x-ray confirmed that Plaintiff's prosthetic knee was in place after her initial fall and because Dr. Gleimer cannot state with certainty how or when the knee dislocation occurred, Target cannot be the actual cause of her subsequent injury. This argument fundamentally misconstrues the meaning of "actual cause." Actual cause serves as an "important corollary to the proximate cause rule." *See Dawson v. Bunker Hill Plaza Associates,* 289 N.J.Super. 309, 326, 673 A.2d 847 (App.Div.1996). In order to impose liability, a plaintiff must also establish that defendant's negligent conduct was "a substantial factor in bringing about harm to another." *Id.* An actor's conduct is not a substantial factor, "if [the injury] would have been sustained even if the actor had not been negligent.' " *Id.*

**\*7** Taking the evidence in the light most favorable to the non-moving party, Plaintiffs have established that Target's conduct was an actual cause of the knee subluxation. Target incorrectly focuses on whether the fall was the direct cause of Plaintiff's injury. However, the law is clear that Target can be liable, "even where there are 'other intervening causes which were foreseeable or were normal incidents of the risk created.' " *Camp v. Jiffy Lube No. 114,* 309 N.J.Super. 305, 309–10, 706 A.2d 1193 (App.Div.1998). Target has not provided any valid basis for summary judgment. Therefore, Target's motion for summary judgment is DENIED.

### B. Virtua's Motion for Summary Judgment

Virtua has also moved for summary judgment on Target's Third–Party Complaint against the hospital. Virtua argues that "[n]o party has factually established a prima facie claim against Virtua for negligence." Virtua Mot. Summ. J. at 5. Virtua also contends that to the extent that Target's claim against Virtua alleges medical malpractice, expert

testimony is required to establish a deviation from accepted medical standards. *Id.* at 4, 706 A.2d 1193. Target responds with a number of arguments, none of which are presented with particular lucidity. Target first argues that it need not produce expert testimony because the "common knowledge" exception applies. Target then contends that Virtua's negligent spoliation of evidence entitles Target to an adverse inference. Target also raises the doctrine of "unclean hands" to thwart Virtua's motion for summary judgment. Finally, Target attempts to assert a claim for fraudulent concealment. The Court will address these arguments in turn.

**a. Negligence**

It is axiomatic that "the mere showing of an incident causing the injury sued upon is not alone sufficient to authorize the finding of an incident of negligence." *Long v. Landy,* 35 N.J. 44, 54, 171 A.2d 1 (1961). As a third-party plaintiff, Target bears the burden of demonstrating the existence of negligence. *See* *Buckelew v. Grossbard,* 87 N.J. 512, 435 A.2d 1150, 1157 (N.J.1981) ("We start with the basic proposition that ordinarily negligence must be proved and will never be presumed, that indeed there is a presumption against it, and that the burden of proving negligence is on the plaintiff"). Negligence may only be inferred from proven facts and circumstances and cannot be based on speculation or conjecture. *Long,* 35 N.J. at 54, 171 A.2d 1.

Target largely ignores these well-settled principles and attempts to survive summary judgment without providing any competent evidence of Virtua's negligence. Target argues that "the 'event' presumably occurred as a result of the carelessness, negligence, and/or gross negligence of Virtua." Target's Opp'n at 9. However, the law is clear that negligence "will never be presumed." *Buckelew,* 435 A.2d at 1157. Target first attempts to surmount this obstacle by invoking the "common knowledge" exception. According to Target, the common knowledge exception is applicable "where a lay person using ordinary understanding and experience is sufficient to determine a defendant's negligence without the benefit of expert testimony." Target's Opp'n (citing *Bender v. Walgreen Eastern Co. ., Inc.,* 399 N.J.Super. 584, 590, 945 A.2d 120 (N.J.Super.Ct.App.Div.2008)). Target previously raised this same exception in its opposition to Virtua's prior motion to dismiss in relation to the Affidavit of Merit requirement. The Court rejected its application then and will do so again. [2] *See* Doc. No. 30 at 7. Moreover, even if

the Court did apply the common knowledge exception, it would not obviate Target's obligation to establish negligence. It merely alters the proofs upon which a plaintiff may rely to demonstrate a deviation from the standard of care.

***8** In addition to raising the common knowledge exception, Target makes two ill-fated attempts to establish a duty by Virtua. Target Mot. Summ. J. at 11. Target appears to argue that Virtua breached some duty to Target by failing to preserve evidence, which prejudiced Target. However, Target has not identified the source of such a duty. To the extent that Target relies on a common law duty to preserve evidence, Target has not established any of the required elements. The duty to preserve evidence only arises when there is pending or likely litigation between two parties, knowledge of this fact by the alleged spoliator, evidence relevant to the litigation, and the foreseeability that the opposing party would be prejudiced by the disposal of this evidence. *Cockerline v. Menendez,* 411 N.J.Super. 596, 620, 988 A.2d 575 (App.Div.2010). Target also argues that Virtua violated a statutory duty, imposed by N.J. 13:35–6.5, by failing to maintain complete and accurate records. [3] However, the statute does not give rise to a cause of action. *See* *Proske v. St. Barnabas Med. Ctr.,* 313 N.J.Super. 311, 318–19, 712 A.2d 1207 (App.Div.1998) (finding that N.J.S.A. 26:8–5 does not create a statutory cause of action and that "violation of the statute did not have a causal relation to the physical injury suffered"). Therefore, Target has not alleged any fact, much less provided competent evidence, of Virtua's negligence. [4]

**b. Fraudulent Concealment of Evidence**

Target also asserts a claim for fraudulent concealment of evidence against Virtua. [5] In order to prove this tort, a plaintiff must demonstrate that: (1) the defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with *existing* or *pending* litigation, (2) the evidence was material to the litigation, (3) the plaintiff could not have reasonably obtained the evidence elsewhere, (4) the defendant *intentionally* withheld, altered, or destroyed evidence with purpose to disrupt litigation, (5) Plaintiff was damaged by having to rely on an incomplete record that did not contain the evidence defendant concealed. (emphasis added) *Rosenblit v. Zimmerman,* 166 N.J. 391, 406–07, 766 A.2d 749 (2001). Target has not established these elements. Target has not provided any evidence that the missing records may have been material to this litigation. Target has not even established that Virtua intentionally

withheld the missing entries. Even under the favorable standard of review on summary judgment, Target's claims cannot survive.

In the Third–Party Complaint, Target alleged claims for negligence and what this Court will construe as fraudulent concealment of evidence against Virtua. However, Target has failed to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex,* 477 U.S. at 322. Therefore, the Court will grant Virtua's motion for summary judgment. [6]

### IV. CONCLUSION

For the foregoing reasons, Target's Motion for Partial Summary Judgment is DENIED. Virtua's motion for summary judgment is GRANTED. An appropriate order shall issue today.

### ORDER

**\*9 THIS MATTER** having come before the Court on the motions of Virtua Memorial Hospital ("Virtua") and Target Corporation ("Target") for summary judgment, pursuant to Federal Rule of Civil Procedure 56, and the Court having considered the moving papers and attached documents, and the responses thereto, and for the reasons expressed in the Opinion issued this date;

**IT IS HEREBY ORDERED** that Target's motion for summary judgment is **DENIED.**

**IT IS HEREBY FURTHER ORDERED** that Virtua's motion for summary judgment on Target's Third Party Complaint is **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4675377

### Footnotes

1    Plaintiff remained in the hospital until she was discharged on October 11, 2007. Target's SUMF, ¶ 24.

2    In the August 2, 2011 Opinion and Order, the Court stated: "Target has not demonstrated that its claim turns on common knowledge. Target alleges only that 'something' happened while Mrs. Geiss was at Virtua that caused her injuries. Target does not allege that an obvious error by Virtua or its employees caused Mrs. Geiss' injuries. Rather, Target acknowledges that it does not know the exact cause of her injuries. Because Mrs. Geiss received medical treatment, her injuries may have resulted from negligent medical care that requires expert testimony to prove."

3    Virtua notes that Target relies on the wrong statutory provision provision. According to Virtua, NJAC 13:35–6.5 is an administrative code and is not applicable to institutions. Virtua instead posits that NJSA 26:8–5 is the appropriate statutory provision mandating the maintenance of records.

4    Virtua also urges the Court to apply the doctrine of "unclean hands" and deny Virtua's motion for summary judgment. This doctrine "gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in the suit." *Faustin v. Lewis,* 85 N.J. 507, 427 A.2d 1105, 1107 (N.J.1981). As with every other argument in Target's opposition, Target has not demonstrated how this doctrine would be applicable. Although it is unfortunate that Virtua could not provide Plaintiff's complete medical record in discovery, Target has not provided any evidence of "wrongdoing with respect to the subject matter in the suit." Jennifer Raio testified that despite their best efforts in searching, her team had not been able to uncover the missing records. Jennifer Raio Dep., Target's Opp'n, Ex. D, 33–34. Moreover, Target has not produced any evidence or testimony linking Virtua's failure to maintain records to Plaintiff's actual injury.

5    The Third Party Complaint does not explicitly articulate a claim for fraudulent concealment, but it does contain
     allegations of spoliation of evidence. As Target states, spoliation of evidence claims are recognized as the
     tort of fraudulent concealment. *See* 🚩 *Rosenblit v. Zimmerman,* 166 N.J. 391, 406, 766 A.2d 749 (2001).

6    Target also seeks an adverse inference jury instruction based on Virtua's alleged spoliation of evidence. Even
     if the Court were denying Virtua's motion, the Court would not be inclined to address jury instruction requests
     on a motion for summary judgment.

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 3572932

2014 WL 3572932
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re ACTIQ SALES AND MARKETING
PRACTICES LITIGATION.

Civil Action No. 07–4492.
|
Signed July 21, 2014.

***MEMORANDUM OPINION***

TUCKER, Chief Judge.

**\*1** This putative class action suit, filed pursuant to 28 U.S.C. § 1332, arises from the alleged losses sustained by the Pennsylvania Turnpike Commission and the Indiana Carpenters Welfare Fund (collectively, "Plaintiffs") for allegedly excessive payments made to Defendant Cephalon, Inc. ("Cephalon"). Plaintiffs allege that Cephalon engaged in unlawful marketing of Actiq, a drug approved by the U.S. Food and Drug Administration ("FDA") for use by oncologists trained to prescribe Schedule II opioids to treat persistent pain in cancer patients. Specifically, Plaintiffs allege that as third party payors ("TPPs") for prescriptions of Actiq, they suffered monetary losses through the payment of excessive prescription costs for treatment of conditions not approved by the FDA and for whom a wide array of less expensive pain management drugs were appropriate. The excessive Actiq prescription costs shouldered by Plaintiffs were allegedly caused by Cephalon's marketing and sale of the drug for purposes other than those approved by the FDA.

This matter is before the Court on Cephalon's Motion to Exclude the Declaration and Testimony of Dr. Meredith Rosenthal, Plaintiffs' damages expert. In its motion, Cephalon challenges Dr. Rosenthal's expert opinion, and seeks to exclude her declaration and testimony under the admissibility requirements of Federal Rule of Evidence 702 and the principles espoused in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Upon consideration of the parties' motions with briefs and exhibits, and following oral argument presented on July 24, 2013, the Court will deny Cephalon's Motion to Exclude for the reasons set forth below.

**I. FACTUAL BACKGROUND**

The factual background of this matter was previously set forth in detail in the Court's March 23, 2011 Memorandum Opinion. *In re Actiq Sales & Mktg. Practices Litig.,* 2011 U.S. Dist. LEXIS 30749, 2011 WL 1103796 (E.D.Pa. Mar.23, 2011). The Court therefore only discusses those facts relevant to the instant motion.

Actiq is a Schedule II drug containing the highly addictive substance fentanyl, which makes it a drug with an associated risk of fatal overdose. (Am.Compl.¶¶ 13, 25, 27.) In November 1998, the FDA granted restricted marketing approval for Actiq, limiting Cephalon's marketing to cancer patients experiencing pain "with malignancies who had developed a tolerance to less dangerous therapies." (Am.Compl.¶ 27.) Furthermore, the FDA specified that Actiq should not be marketed for off-label uses, stating that the drug "must not be used in opioid non-tolerant patients" and must be prescribed solely to cancer patients by oncologists and pain specialists specifically trained in the use of Schedule II opioids to treat pain in cancer patients. (Am.Compl.¶ 27.)

In 2000, Cephalon generated $15 million in revenue from the sale of Actiq. The revenue realized by Cephalon increased sharply, so that by 2005 sales reached $412 million, making Actiq the second highest selling drug sold by Cephalon. (Am.Compl.¶ 34.) On September 6, 2006, the FDA further narrowed the scope of Actiq by placing an additional warning on its label indicating the dangerousness of the drug, and its potential for abuse, misuse, or diversion. (Am.Compl.¶ 32.) Plaintiffs contend that this explosion in Actiq sales was due to Cephalon's illegal marketing scheme of targeting physicians "lacking experience in the use of Schedule II opioids and the treatment of cancer patients, and to patients without malignant cancer or a history of resistance to safer pain medication." (Am.Compl.¶ 35.)

**\*2** In the instant Motion to Exclude, Cephalon challenges the qualifications, reliability, and "fit" of Dr. Rosenthal's expert opinion. Dr. Rosenthal holds a Ph.D. in health economics from Harvard University and is a Professor of Health Economics and Policy at the Harvard School of Public Health. Dr. Rosenthal's research concerns the economics of healthcare industry, including pharmaceuticals. (Rosenthal Decl. ¶ 1.) Dr. Rosenthal was asked by Plaintiffs

2014 WL 3572932

to "calculate damages equal to the net profits earned by Cephalon on sales of Actiq that were reimbursed by private third-party payors and resulted from the allegedly illegal off-label marketing." (Rosenthal Decl., Executive Summary.) Dr. Rosenthal concluded that "[u]sing the Defendant's own accounting data and standard methods for calculating net profits, [she] ha[s] calculated damages incurred by the Class to be $698.9 million." (*Id.*)

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides are follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702 (2011). The Third Circuit has explained that Rule 702 has "three major requirements": the proffered witness must (1) "be an expert, i.e. must be qualified"; (2) "testify about matters requiring scientific, technical[,] or specialized knowledge"; and (3) present testimony that "assist [s] the trier of fact." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008). Thus, in order to be admitted, an expert's testimony must demonstrate "qualification, reliability, and fit." *Schneider ex. Rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003 .) "The party offering the expert must prove each of these requirements by a preponderance of the evidence." *Mahmood v. Narciso,* 549 F. App'x 99, 102 (3d Cir.2013) (citing *In re TMI Litig.,* 193 F.3d 613, 663 (3d Cir.1999)).

Rule 702 has "a liberal policy of admissibility." *Pineda,* 520 F.3d at 243 (quoting *Kannankeril v. Terminix Inter., Inc.,* 128 F.3d 802, 806 (3d Cir.1997)). As such, the "rejection

of expert testimony is the exception and not the rule." Fed.R.Evid. 702 advisory committee's notes. In the seminal case *Daubert v. Merrell Dow Pharm.,* the Supreme Court explained that, under the Federal Rules of Evidence, the trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." 509 U.S. at 589; *see also Pineda,* 520 F.3d at 244; *Czarnecki v. Home Depot USA, Inc.,* C IV.A.07–4384, 2009 WL 1706582 (E.D.Pa. June 15, 2009). "[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda,* 520 F.3d at 244 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 (3d Cir.1994)). Accordingly, the focus of the Court's inquiry is on the methodology used by the expert, not the conclusions reached. *See id.* Exclusion of expert testimony is the exception rather than the rule because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Fed.R.Evid. 702 advisory committee's notes (citing *Daubert,* 509 U.S. at 595).

## III. DISCUSSION

**\*3** In the present matter, Cephalon contends Dr. Rosenthal's expert report fails each of the Rule 702 requirements, and thus her declaration and testimony must be excluded. Plaintiffs, however, contend that each of Cephalon's arguments go to the weight of Dr. Rosenthal's opinion, but not the admissibility of her testimony. The Court will examine each of Cephalon's arguments in turn.

### A. Qualification

"Qualification requires the witness possess specialized expertise," *Pineda,* 520 F.3d at 244 (citing *Schneider,* 320 F.3d at 404), which encompasses a "broad range of knowledge, skills, and training," *Pineda,* 520 F.3d at 244 (citing *In re Paoli,* 35 F.3d at 741). The Third Circuit "ha[s] interpreted Rule 702's qualification requirement liberally." *Id.* (citing *Schneider,* 320 F.3d at 404 and *In re Paoli,* 35 F.3d at 741.) Additionally, the Third Circuit has made clear that a witness may be qualified based solely on practical experience. *In re Paoli,* 35 F.3d at

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 3572932

741 ("Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts.") Formal qualifications, such as a degree in a particular field, are therefore not required.

Cephalon first asserts that Dr. Rosenthal is not qualified to offer expert testimony in this case because she is not an expert in cost accounting. In particular, Cephalon emphasizes the conclusions reached by its expert, Christine Hammer, CPA. Hammer was retained by Cephalon to discuss widely accepted methodologies for calculating product profitability in the context of profit disgorgement, and review the data and methodology utilized by Dr. Rosenthal to calculate damages. (Hammer Rpt. ¶ 13.) According to Cephalon and Hammer, cost accounting provides the analytical framework necessary to understand which costs should be included in a product profitability calculation. Hammer further claims that cost accounting principles are widely accepted by corporations and the federal government as the correct framework for determining the costs and profitability of a product. Thus, Cephalon and Hammer contend that cost accounting is necessary because Plaintiffs seek a profit disgorgement remedy with respect to particular Actiq prescriptions, which requires a determination of product-level profits for Actiq. (*See id.* ¶¶ 17, 20–24.)

The Court finds that Cephalon and Hammer's arguments here are based on the unsupported assumption that only an accountant with specific expertise in cost accounting has the necessary expertise to testify regarding economic loss. Dr. Rosenthal is not an accountant, and she concedes that she has no specialized knowledge, training, or expertise in cost accounting. (Rosenthal Dep. 13:3–20, 149:4–17.) It is equally true, however, that Dr. Rosenthal makes no pretense that she used cost accounting concepts and practices when performing her profit disgorgement analysis. [1] It may be, as Cephalon argues, that an accountant such as Hammer would be better qualified to offer opinion testimony regarding damages because Dr. Rosenthal's approach fails to take into account certain costs when calculating Cephalon's alleged profits. (*See* Hammer Rpt. ¶¶ 37–41.) This, however, does not render Dr. Rosenthal unqualified to offer her opinion. The Court need not find that Dr. Rosenthal is the best qualified in a particular specialization for it to be appropriate to admit her testimony. Rather, Dr. Rosenthal's lack of specialization in cost accounting merely goes to the weight of her opinion, not its admissibility. *See* Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 782 (3d Cir.1996) ("Because of our liberal approach to admitting expert testimony, most arguments

about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility. Thus, witnesses may be competent to testify as experts even though they may not, in the court's eyes, be the 'best' qualified. Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree."); *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.,* 99 CIV. 1725 (VM), 2003 WL 1878246, at *3 (S.D.N.Y. Apr. 11, 2003) (admitting expert witness's testimony, because "[t]he fact that a witness's qualifications are not unassailable does not mean the witness is incompetent to testify; [r]ather it is ... for the jury, with the assistance of vigorous cross examination, to measure the worth of the opinion[s]") (internal citation omitted) (alteration in original);

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.,* 387 F.Supp.2d 794, 802 (N.D.Ill.2005) ("No case of which we are aware remotely suggests, let alone holds, that only a certified public accountant has the necessary expertise to testify about economic loss. In fact, being a certified public accountant does not ensure admissibility of testimony.")

**\*4** Dr. Rosenthal has analyzed pharmaceutical manufacturer transactional data and provided expert testimony in more than twenty cases. In particular, she has testified in litigation concerning allegations of improper marketing of the following prescription drugs: Bextra, Lupron, Neurontin, Risperdal, Rituxan, Vioxx, Zyrexa, and Premarin. (Rosenthal Decl. ¶ 2.) It is therefore evident that Dr. Rosenthal has significant experience in analyzing how pharmaceutical manufacturers calculate product-specific profits. *See* In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 42 (1st Cir.2013) *cert. denied,* ––– U.S. –––, 134 S.Ct. 786, 187 L.Ed.2d 594 (U.S.2013) ("It is clear that Dr. Rosenthal's evidence met several requirements of Federal Rule of Evidence 702. Dr. Rosenthal is a witness with the requisite "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, and her opinion would assist the trier of fact to understand the evidence or to determine a fact in issue, Fed.R.Evid. 702(a).")

Accordingly, the Court finds that Dr. Rosenthal is qualified to offer her expert opinion regarding Plaintiffs' alleged damages in this case.

## B. Reliability

The Third Circuit has interpreted the reliability requirement "to mean that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 3572932

opinion is reliable.' " 🚩 *Pineda,* 520 F.3d at 244 (quoting 🚩 *In re Paoli,* 35 F.3d at 742). Additionally, the expert's principles and methods must be reliably applied to the facts of the case. 🚩 *In re Paoli,* 35 F.3d at 745; Fed.R.Evid. 702 advisory committee's notes. Importantly, "[w]hile a litigant has to make more than a prima facie showing that his expert's methodology is reliable ... '[t]he evidentiary requirement of reliability is lower than the merits standard of correctness.' " 🚩 *Pineda,* 520 F.3d at 247 (quoting 🚩 *In re Paoli,* 35 F.3d at 744). The Third Circuit has recognized at least eight factors that a court may consider in assessing whether a particular methodology is reliable: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* at 247–48 (citing 🚩 *In re Paoli,* 35 F.3d at 742 n. 8). These factors "are neither exhaustive nor applicable in every case." 🚩 *Kannankeril,* 128 F.3d at 806–07; *see also* 🚩 *United States v. Davis,* 397 F.3d 173, 178 (3d Cir.2005). "The District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert."* 🚩 *Simmons v. Ford Motor Co.,* 132 Fed.Appx. 950, 952 (3d Cir.2005) (quoting 🚩 *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152–53, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

 **\*5** Additionally, "the reliability analysis [required by *Daubert* ] applies to all aspects of an experts testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." 🚩 *Heller v. Shaw Indus. ., Inc.,* 167 F.3d 146, 155 (3d Cir.1999). In *In re Paoli,* the Third Circuit clarified that "if a court finds that an expert has employed a methodology only slightly different from a methodology that the court thinks is clearly

reliable, the court should be more likely to accept the altered methodology than if it was evaluating that methodology as an original matter." 🚩 *In re Paoli,* 35 F.3d at 745 n. 14. A judge should only exclude evidence if the flaw is large enough that the expert lacks "good grounds for his or her conclusions." 🚩 *Id.* at 746. Further, the proponent of the evidence does not have to demonstrate that the assessments of the expert are correct—they only have to demonstrate by a preponderance of the evidence that their opinions are reliable. 🚩 *Id.* at 744. " 'The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.' " 🚩 *Oddi v. Ford Motor Co.,* 234 F.3d 136, 146 (3d Cir.2000) (quoting 🚩 *Kannankeril,* 128 F.3d at 806).

Here, generally speaking there are roughly five steps in Dr. Rosenthal's damages analysis. Dr. Rosenthal first calculated gross product sales for Actiq for each year of the Proposed Class Period (Step 1). Dr. Rosenthal then deducted product-specific costs, including discounts and rebates, costs of goods sold, marketing expenditures, field sales costs, scientific communications (such as continuing medical education, investigator sponsored trials, and publications), clinical trials and regulatory costs, and miscellaneous other costs (Step 2). Next Dr. Rosenthal calculated the net profits attributable to TPPs for each year of the Proposed Class Period (Step 3). Dr. Rosenthal then calculated the percentage off-label prescr standard" IMS Health National Disease and Therapeutic Index ("NDTI") data (Step 4). Having calculated the percentage of off-label prescriptions, Dr. Rosenthal then subtracted 15% (Step 5). This 15% figure is from the Actiq Risk Management Program ("RMP"), and according to Plaintiffs represents the "allowed for" off-label margin. Thus, of the alleged total amount of off-label prescriptions from which Cephalon derived profits, 15% of this total amount is allegedly not subject to damages. The table below summarizes the results of Dr. Rosenthal's damages calculations.

**Actiq Profits Due to Off–Label Marketing Attributable to the Class of Third Party Payors Less 15%**

| Year | Damages |
|------|---------|
| 2002 | $40,165,808 |
| 2003 | $92,181,366 |

| 2004 | $125,227,226 |
| 2005 | $154,204,744 |
| 2006 | $287,150,432 |
| **Total** | **$698,929,575** |

Cephalon claims Dr. Rosenthal's methodology is not reliable for the following reasons.

*1. Dr. Rosenthal's Use of the 2007 Product Contribution Report (Step 1)*

**\*6** Cephalon first argues that Dr. Rosenthal's analysis is not reliable because she began with a flawed starting point: the 2007 Product Contribution Report produced from Cephalon's files during discovery.

A Product Contribution Report "typically reflect[s] a manufacturer's internal decision-making process with respect to which costs related to a particular product, the manufacturer's methodology for allocating costs to a product, and the manufacturer's internal calculation of product-specific incremental profits." (Rosenthal Rebuttal ¶ 14.) In Step 1 of her analysis, Dr. Rosenthal used the 2007 Product Contribution Report "as a general guide for the line items that would be useful in the calculation of Actiq net profit." (Rosenthal Decl., Attach. C.2 at 1.) Dr. Rosenthal then submitted questions to Cephalon regarding the Product Contribution Report, and received two letter responses from Cephalon. (*Id.*) Using observations from the Product Contribution Report, raw data from Cephalon's database, and the responses from Cephalon, Dr. Rosenthal arrived at the gross product sales for Actiq for each year of the Proposed Class Period. (*Id.*)

Cephalon asserts Dr. Rosenthal's use of the 2007 Product Contribution Report is improper because the report is not designed to calculate product-level profitability; the report relates to a period of time after the Proposed Class Period;[2] and Dr. Rosenthal does not know who prepared it, the manner in which it was prepared, or even how it was used. Cephalon is correct in all of these observations. Cephalon, however, ignores several keys facts. As previously stated, the Product Contribution Report was created by someone at Cephalon, and was produced by Cephalon in the course of discovery; it is not something that Dr. Rosenthal herself created. The fact that Cephalon is unable to determine whom at its own company

created the document, or for what purpose they did so, is not a reason for faulting Dr. Rosenthal's use of the document in her analysis.

Additionally, because of the uncertain circumstances surrounding the document, it is clear that Dr. Rosenthal took appropriate strides to limit her use of the report. For example, Dr. Rosenthal submitted questions to Cephalon in order to verify line items in the Product Contribution Report and inform her understanding of its contents, and excluded more questionable costs.[3] (*See* Rosenthal Dep. 165:18–167:3.) Importantly, Cephalon's rebuttal expert, Hammer, does not challenge Dr. Rosenthal's assertion that her use of the Product Contribution Report was relatively conservative.

Further, Dr. Rosenthal's use of the Product Contribution Report was necessitated by the fact that Cephalon "did not systematically produce product-level profit and loss statements—i.e., allocate profits to specific products—during the Class Period." (Rosenthal Decl. ¶ 11; *see also* Rosenthal Dep. 156:11–157:16.)[4] According to Hammer the fact that Cephalon did not utilize product level profitability analyses in the ordinary course of business is not unusual. (Hammer Rpt. ¶ 46.) Dr. Rosenthal counters that in her experience over the course of a more than a dozen pharmaceutical cases, manufacturers produce profitability statements by product in the regular course of business. (Rosenthal Rebuttal ¶ 14.) Dr. Rosenthal therefore finds it "difficult to understand" why Cephalon "never created any kind of product-level profitability report for Actiq or any other product during the Class period." (*Id.*) Whichever perspective is correct, the fact remains that Dr. Rosenthal's task of calculating Cephalon's alleged gross product sales from Actiq inherently involves recreating data that Cephalon does not itself contemporaneously keep in the ordinary course of business. Given that Cephalon does not itself keep product-specific information, and that there are no Product Contribution Reports prior to 2007, it is unclear what data other than the 2007 Product Contribution Report Dr. Rosenthal could have used. Notably, there has been no suggestion by Cephalon or Hammer that better data was available.

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 3572932

**\*7** Under these circumstances, the Court agrees with Plaintiffs that Dr. Rosenthal's use of the 2007 Product Contribution Report was a reasonable starting point for understanding which transactional data related to Actiq. The Court is therefore satisfied that Dr. Rosenthal has articulated "good grounds" for the use of the 2007 Product Contribution Report in her damages analysis. *See* In re Paoli R.R., 35 F.3d at 742 (the expert must have "good grounds" for his or her opinion) (citing Daubert, 509 U.S. at 590); *see also id.* at 743 ("[T]he requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.")

2. *Costs Not Included in Dr. Rosenthal's Analysis (Step 2)*
Cephalon next argues Dr. Rosenthal failed to consider numerous categories of cost in her analysis. In this regard Cephalon again relies on Hammer's expert opinion.

Hammer again emphasizes that cost accounting provides the appropriate analytical framework to understand which costs should be included in a product profitability calculation. Hammer opines that because she understands profit disgorgement to be "a legal concept that varies by state," there can be no single reasonable estimate of Actiq's profitability." (Hammer Rpt. ¶ 10.) Hammer avers that any analysis must first begin by defining the expenses to be properly included given a particular state's standard for profit disgorgement, and only then calculating profits using the relevant expenses. (*Id.*) Hammer opines that three analytical steps are necessary: (1) identifying the costs associated with all business functions that are needed to produce and sell Actiq in order to estimate the product profitability of Actiq;[5] (2) understanding the fixed and variable costs required to produce and sell Actiq in order to estimate Actiq's profitability over the Proposed Class Period;[6] and (3) understanding how Cephalon's accounting system recorded the direct and indirect costs associated with producing and selling Actiq.[7] (*Id.* ¶¶ 28–29.) In sum, Hammer argues that analyzing costs by business function provides the basis for determining which costs should be included given individual state guidelines for profit disgorgement. This is because it identifies which of those costs can be directly traced and which costs must be allocated to Actiq.

Based on the foregoing, Hammer concludes that Dr. Rosenthal's methodology, in part because it relied on the aforementioned 2007 Product Contribution Report, only considered direct variable costs. Accordingly, Hammer charges that Dr. Rosenthal's methodology for estimating relevant costs is flawed in at least three ways: (1) Dr. Rosenthal has not considered fixed direct costs in her analysis;[8] (2) Dr. Rosenthal has not *fully* considered variable indirect costs in her analysis;[9] and (3) Dr. Rosenthal has not considered fixed indirect costs in her analysis.[10] Hammer opines that a calculation of profits for the purpose of profit disgorgement must take into account the relevant legal guidelines of each individual state. However, Dr. Rosenthal's methodology does not conduct its profitability analysis on a state-by-state basis, and allegedly lacks the flexibility to include or exclude cost components as required by each state. Thus, because Hammer asserts Dr. Rosenthal's analysis fails to take account of cost accounting principles, it is insufficient for determining damages in this matter. (*Id.* ¶¶ 50–76.)

**\*8** Dr. Rosenthal counters by averring that Hammer's criticisms of her methodology are misplaced. Dr. Rosenthal first argues it is inappropriate to include fixed indirect costs in the calculations. Dr. Rosenthal argues a cost accountant may have a standard approach to assessing profitability for public reporting or other purposes, but these standards do not relate to the law and economics concept of profit disgorgement. (Rosenthal Rebuttal ¶ 7.) It is Dr. Rosenthal's opinion, as an economist, that the calculation of net profits from Actiq sales "is appropriately approached as a problem of incremental profits—the difference between the net revenues earned on these sales and the marginal costs of producing and selling these units." (*Id.* ¶ 8.) Dr. Rosenthal asserts neither indirect nor fixed costs belong in such a calculation because "by definition neither of these categories of costs directly varies with the number of units. Since these costs are fixed, they would be borne in the actual world and in the but-for world."[11] (*Id.*) Dr. Rosenthal claims that in order to justify deducting the costs identified by Hammer from the incremental net profit calculation, one would have to create different scenarios in which Cephalon makes different investment or overhead decisions. (*Id.* ¶ 10.) However, Dr. Rosenthal argues, this is not the purpose of the economic measure of damages. The purpose of an economic analysis of damages is to accurately measure the increase in profits caused by an allegedly unlawful act. As such, Dr. Rosenthal contends that sunk costs (i.e., fixed costs incurred in the past that are not recoverable) and costs that would have been the

2014 WL 3572932

same in both the actual world and the but-for world should not be included. (*Id.*)

Dr. Rosenthal therefore maintains that she has included all direct and indirect product costs that are appropriate.[12] Plaintiffs thus argue that Dr. Rosenthal's calculation of damages provides a reasonable approximation of the amount of wrongful gain, and is therefore consistent with § 51 of the Restatement (Third) of Restitution and Unjust Enrichment.[13] Plaintiffs further argue that'd the question of whether Dr. Rosenthal should have allocated additional costs to Actiq is a question for the jury, not a basis on which to disqualify her opinion as unreliable. Similarly, Plaintiffs maintain that the question of whether Dr. Rosenthal failed to consider certain categories of cost is an issue that does to the weight of her opinion, not to admissibility.

The Court agrees with Plaintiffs. The Court again notes that that Hammer's criticisms of Dr. Rosenthal's methodology rest on the erroneous assumption that cost accounting is the only appropriate measure for determining damages in this matter. The Court, however, finds that the issue of whether certain costs should have been included in Dr. Rosenthal's analysis is ultimately more a question of the accuracy of her analysis, not necessarily the methodology she used in conducting her analysis. Underscoring such potential inaccuracies is the purpose of cross-examination.

*9 Further, as the foregoing discussion demonstrates, Hammer's critiques of Dr. Rosenthal's analysis primarily represent a difference of opinion. Hammer, speaking from the arguably more exacting point of view of cost accounting, essentially argues that Dr. Rosenthal's analysis fails to include certain categories of costs, and therefore is an inaccurate representation of Actiq's profitability. Dr. Rosenthal, speaking from the arguably more general point of view of an economist, outlines her reasons for concluding that inclusion of many of these costs is inappropriate. Which of these opinions is a more accurate reflection of Cephalon's profits, and therefore Plaintiffs' alleged damages, is a question for the jury. *Cf. Kansas Gas & Elec. Co. v. United States,* 95 Fed. Cl. 257, 308 (Fed.Cl.2010) *aff'd in part, rev'd in part,* 685 F.3d 1361 (Fed.Cir.2012) ("what makes for good business accounting does not translate automatically into a fair and reasonable apportionment of damages.") It is not a ground for excluding Dr. Rosenthal's declaration and testimony in its entirety.

### 3. *Dr. Rosenthal's Use of NDTI Data (Step 4)*

Cephalon next argues that Dr. Rosenthal's methodology for determining the percentage of off-label prescriptions written during each year of the Proposed Class Period is unreliable because it relies on IMS Health National Disease and Therapeutic Index ("NDTI") data. NDTI collects data on the disease and treatment patterns faced by office-based private practice physicians in the United States. (Bradford Rpt. ¶ 106.) The survey captures "drug appearances" (i.e., prescriptions), along with the specialty of the surveyed physician and detailed diagnostic information. (*Id.*) The IMS generates national estimates for drug prescriptions by weighing the sample data based on physician specialty and geographic location. (*Id.*) According to David Bradford, Ph.D,[14] Cephalon's expert, Dr. Rosenthal utilizes NDTI national estimates for Actiq prescriptions along with physician specialty and diagnosis data in her damages calculations in the following manner: Dr. Rosenthal classifies diagnoses as on-label or off-label based on the ICD–9 diagnostic codes and calculates the alleged off-label prescriptions as a percentage of the national estimates. (*Id.* ¶ 107.) Dr. Rosenthal herself states:

> The IMS NDTI data contain ICD–9 codes that describe the indication for which Actiq was prescribed. I have designated all ICD–9 codes related to cancer as on-label, and all remaining codes have been designated as off-label. (Rosenthal Decl. ¶ 15.) Cephalon concedes that NDTI data "may be reliable for certain purposes, particularly in providing estimates with respect to widely-prescribed drugs," but nonetheless claims that the data is *"wholly unreliable* for Rosenthal's purposes here." (Def.'s Mot. Exclude 15) (emphasis added). Cephalon contends the NDTI data is flawed for at least three reasons.

#### a. *Small Sample Size*

*10 First, Cephalon claims the NDTI data's sample size is too small, and therefore is unreliable for estimating the amount of prescriptions that were off-label for Actiq for any given year. Dr. Bradford states the total number of Actiq prescriptions in the NDTI sample across the entire Proposed Class Period (2002–2006) is 82. (Bradford Rpt. ¶ 109.) This small sample forms the basis for Dr. Rosenthal estimating national Actiq prescriptions to be 202,489 for the Proposed Class Period. (*Id.* ¶ 110.) National Actiq prescriptions are estimated for each of the five years using annual samples ranging in size from 6 to 30 prescriptions. (*Id.* ¶¶ 109.) The average annual sample size from 2002

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 3572932

to 2006 is 16.4 prescriptions. (*Id.* ¶ 110.) Bradford argues that from a statistical standpoint, the small sample size is problematic because it results in unreliable national estimates of Actiq off-label prescriptions. (*Id.* ¶ 111.) For her part, Dr. Rosenthal concedes that the sample size is small. (Rosenthal Rebuttal ¶ 21; Rosenthal Dep. 255–19–256:2; 263:19–265:16.) Nonetheless, Dr. Rosenthal maintains there is no reason to expect bias in her results (i.e., random errors around the estimates of off-label use). Dr. Rosenthal also points out that any random errors in measuring off-label use would be less when considered over the whole Proposed Class Period, because annual errors will tend to offset one another. (Rosenthal Rebuttal ¶ 21.)

The Court declines to disregard Dr. Rosenthal testimony based on her use of the NDTI due to its small sample size. Whatever its empirical deficiencies, NDTI data is generally accepted as the academic, government, and industry standard for the estimation of the number of prescriptions linked to specific diagnoses in the United States. (*See* Rosenthal Rebuttal ¶¶ 18) ("NDTI data are the gold standard for the estimation of national prescription medication use linked to specific diagnoses and related to promotional activities in academic, government and industry research and forecasting. The methods employed to present this information in my Declaration are standard practice in the relevant peer reviewed literature."). Indeed, as Plaintiffs point out, Dr. Bradford in his own research has published studies based in IMS data. (*See* Pls.' Resp. Opp'n 22 n. 44.) Still further, other courts have recognized IMS data to be the "gold standard" for purposes of calculating damages on behalf of TPPs. *See e.g., New England Carpenters Health Benefits Fund v. First DataBank, Inc.,* 248 F.R.D. 363, 370 (D.Mass.2008); *In re Neurontin Mktg. & Sale Practices Litig.,* 244 F.R.D. 89 (D.Mass.2007);  *In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508, 526 (E.D.Mich.2003) (holding, for settlement purposes, the Plaintiffs used IMS data to "make an informed judgment of ... the potential damages arising" from the alleged antitrust violation).

Additionally, of particular relevance to this case, Actiq's Risk Management Program ("RMP") specifically states that NDT I data is to be used to monitor Actiq's prescription and use. Section 8.2.2 of the RMP provides: "National prescription data segmented by physician specialty and by indication from the IMS National Disease and Therapeutic Index (NDTI) will be analyzed." (Pls.' Proffer of Facts, Ex. 4, § 8.2.2 at 23.) The RMP also went so far as to attach an example of an NDTI data sheet to the RMP. (*Id.*) Thus, Plaintiffs rightly argue that the

FDA was clear that the monitoring of prescriptions of Actiq should occur through examination of NDTI data. [15]  For this reason, it was reasonable for Dr. Rosenthal to use the same NDTI data to calculate the percentage of off-label use for purposes of damages.

### b. *Specialties Excluded*

**\*11**  Second, Cephalon contends another flaw in Dr. Rosenthal's reliance on the NDTI data is the fact that the survey did not include physicians from all medical specialties who prescribed Actiq during the Proposed Class Period. Dr. Bradford concludes the NDTI estimates for Actiq prescriptions are based on a sample that is not representative of the entire population of physicians prescribing Actiq. (Bradford Rpt. ¶ 114.) Instead, the NDTI survey only includes physicians from all primary care specialties involved in direct patient care. (*Id.*) This means, for example, that anesthesiologists are not included in the survey. Dr. Bradford argues this is a considerable flaw because "anesthesiologists prescriptions during the Proposed Class Period. (*Id.*) Dr. Bradford further argues that, because the survey only includes office-based private practice physicians, Dr. Rosenthal's conclusions about the overall off-label Actiq prescriptions could be different to the extent that physicians in other settings such as non-private clinics or hospitals have different on- and off-label prescribing patterns. (*Id.* ¶ 115.) Likewise another of Cephalon's experts, Dr. Michael Ashburn, [16]  notes that neither pain specialists nor hospice and palliative medicine specialists are included in the NDTI data. (Ashburn Rpt. ¶ 47.) Cephalon concludes these limitations in the NDTI data are significant because "anesthesiologists/pain specialists wrote over half of all Actiq prescriptions during the Class Period"; thus, their exclusion means that the "prescribing trends of critical physician groups is simply not reflected in the NDTI data and Rosenthal has no way of knowing whether their level of off-label prescribing was higher, lower, or the same as the handful of doctors who did participate in the NDTI survey and reported prescribing Actiq." (Def.'s Mot. Exclude 18.)

Dr. Rosenthal acknowledged at her deposition that anesthesiologists are not included in the survey, (Rosenthal Dep. 213:10–22; 218:14–16), and that she did not know whether pain specialists were included, (*id.* 214:15–23.) Dr. Rosenthal rebuts Drs. Bradford and Ashburn's criticism, however, by asserting that the fact that NDTI does not include anesthesiologists or pain specialists is not something that can be addressed empirically because of the absence of data. (Rosenthal Rebuttal ¶ 22.) Dr. Rosenthal also points out

2014 WL 3572932

that Actiq was specifically approved for breakthrough cancer pain, while anesthesiologists, pain specialists, and palliative medicine specialists have a broader scope of practice. (*Id.*) Thus, in theory, these generalists (and any other physician category outside of oncology) would tend to increase the percentage of off-label use, not decrease it as Dr. Bradford seems to suggest. (*Id.*)

Based on the arguments presented, the Court will not exclude Dr. Rosenthal's declaration and testimony simply because the NDTI data she relied on does not include physicians from certain medical specialties. As with Cephalon's argument that certain costs should have been included in Dr. Rosenthal's analysis, the Court likewise finds that the issue of whether certain specialties should (or could) have been included in Dr. Rosenthal's calculation is ultimately more a question of the accuracy of her analysis, not the methodology she used in conducting her analysis. The Court would also again observe that there has been no suggestion by Cephalon or Drs. Bradford and Ashburn that better data in available. Further, whether the inclusion or exclusion of these specialties would increase (as Dr. Bradford suggests) or decrease (as Dr. Rosenthal suggests) the percentage of off-label prescribing remains an open question that can only be resolved by the jury. It is not a ground for excluding Dr. Rosenthal's testimony in its entirety.

### c. *IMS Coding*

**\*12** Finally, Cephalon claims there are significant limitations in the IMS coding system. Dr. Bradford asserts that Dr. Rosenthal's classification of the diagnoses in the NDTI data as on- and off-label is both inconsistent and inaccurate. Dr. Bradford states that many diagnosis codes in the NDTI data are not obviously related or unrelated to cancer, especially to a layperson such as Dr. Rosenthal. (Bradford Rpt. ¶ 116.) Dr. Bradford claims that correcting for inconsistencies in 2003 reduces the percentage of off-label prescriptions in 2003 from 87.5% to 72%, and in 2005 from 80.9% to 70.5%. (*Id.*) Dr. Bradford further points out that the NDTI only records one diagnosis for one drug prescription. (Id.¶ 117.) However, in reality, a physician may have several diagnoses for a particular patient related to various symptoms and conditions, a fact acknowledged by Dr. Rosenthal. (*Id.*) (citing Rosenthal Dep. 256:15–257:13.) This possibility of coding for a symptom rather than the cause of pain is also confirmed by Dr. Deborah Leiderman,[17] Plaintiffs' regulatory expert, in her deposition. (*Id.*) (citing Leiderman Dep. 281:9–18.)

Likewise, Dr. Ashburn also opines that it is impossible for Dr. Rosenthal to make a determination of whether off-label prescriptions were inappropriate based solely on examining the IMS NDTI data and the ICD–9 coding. (Ashburn Rpt. ¶ 43.) Dr. Ashburn claims this is because the ICD–9 coding is not a reliable indicator of the reasons for a prescription. (*Id.* ¶ 45.) As a result, Dr. Ashburn concludes, only careful review of the individual patient's medical records can lead to a proper determination of whether the use of Actiq was medically necessary. (*Id.*) Finally, Dr. Ashburn again asserts the NDTI data used by Dr. Rosenthal may have excluded pain specialists, and these specialists need to be included in the assessment. (*Id.* ¶ 46.)

Both Dr. Rosenthal and Dr. Leiderman agree there are problems inherent in the ICD–9 coding. (*See* Rosenthal Dep. 244:19–21; Leiderman Dep. 282:7–283:10.) As such, Dr. Rosenthal concedes it is possible that a true on-label use would appear to be off-label. (Rosenthal Rebuttal ¶ 23.) However, Dr. Rosenthal again maintains that this data is the best available data for identifying specific uses of prescription drugs. (*Id.*) Dr. Rosenthal also argues that her methodology has assumed that all cancer-related pain indications are on-label, even though Actiq is only approved for breakthrough cancer pain. (*Id.*) As such, Rosenthal maintains her calculations are conservative. (*Id.; see also* Rosenthal Dep. 249:10–21.)

For the reasons previously outlined, the Court again declines to exclude Dr. Rosenthal's declaration based on admitted deficiencies in the IMS coding. It simply defies reason for Cephalon to suggest that data which was deemed reliable for purposes of monitoring off-label prescriptions when Actiq was approved by the FDA is somehow "wholly unreliable" in estimating the percentage of off-label prescriptions for purposes of calculating damages. There again has been no suggestion by Cephalon or its experts that better data is available. Beyond this, Dr. Ashburn's suggestion that every patient file should be reviewed individually presents obvious practical difficulties which the Court need not address.

### 4. *Dr. Rosenthal's "Causation Assumption" (Step 5)*

**\*13** Cephalon next contends that Dr. Rosenthal's methodology is unreliable because Dr. Rosenthal impermissibly accepted Class counsel's assumption that all off-label prescriptions in excess of 15% "resulted from the allegedly illegal off-label marketing." (Def.'s Mot. Exclude 11) (quoting Rosenthal Decl., Executive Summary); (*see*

*also* Rosenthal Dec. ¶ 14) ("Counsel has advised me that they are seeking damages in the form of profits only for the portion of sales relating to the allegedly fraudulent off-label marketing of Actiq. On-label prescriptions of Actiq are not subject to damages. Furthermore, I have been asked to assume that all off-label uses of Actiq in excess of 15% of total prescriptions are subject to damages.") Dr. Rosenthal's presumption that "all off-label uses of Actiq in excess of 15% of total prescriptions are subject to damages" is centered on the FDA's Actiq Risk Management Program ("RMP"), which was adopted when Actiq was first approved by the FDA in 1998. (Rosenthal Decl. ¶ 14.) Specifically, Section 9.1.2. of the Actiq RMP reads as follows:

> If groups of physicians (such as a particular specialty) are identified as having prescribed Actiq inappropriately, and these prescriptions represent potential off-label usage greater than 15% of total quarterly Actiq prescriptions, Abbott will contact the appropriate professional society (i.e. American College of Surgeons, American Society of Anesthesiologists). This letter will outline concerns and offer to implement an educational program in conjunction with the professional society in a national setting.

> Prescribing patterns will be monitored for the physician groups in question and should the level continue to exceed 15% of total Actiq prescriptions for 2 additional quarters, an aggressive educational program will be initiated by mail clearly warning of the potential liabilities of prescribing Actiq to inappropriate patient populations.

(Pls.' Proffer of Facts, Ex. 4, at 26–27.) Dr. Rosenthal avers that the Actiq RMP embodies a presumption "that there is a positive level of off-label prescribing that can result from clinical judgment by physicians, but this level of prescribing would not exceed 15% of total quarterly Actiq prescriptions absent the alleged misconduct." (Rosenthal Decl. ¶ 14.)

Dr. Leiderman explains that RMPs (also known as RiskMAPS) were developed by FDA for selected drug products that demonstrated patient benefit while also posing significant risk. (Leiderman Decl. ¶ 12.) According to Dr. Leiderman an RMP is, essentially, "a safety program designed to meet specific objectives in minimizing product risks while preserving the benefits." (*Id.*); (*see also* Gottlieb Rpt. ¶¶ 37–38) (defining an RMP as a "strategic safety program" designed to minimize the known risks of a product and preserve its benefits.) In order to balance product risk and patient safety, RMPs "may incorporate a range of programs and tools such as registries, education programs

for prescribers and/or patients, etc. that extend beyond the routine drug product label or package insert to support safe use." (Leiderman Decl. ¶ 12.) According to Dr. Leiderman, Actiq was the first analgesic opioid approved with a RMP and with restrictions to ensure safe use. (*Id* . ¶ 13.) In 1998, FDA explicitly approved Actiq only for breakthrough pain associated cancer. Dr. Leiderman avers FDA CDER's Division of Analgesic Products specifically approved Actiq under 21 CFR 314.520 (Subpart H), a special provision reserved for drug products that meet unmet medical need but have significant safety risks. (*Id.*) From this, Dr. Leiderman concludes:

> **\*14** In its decision to approve Actiq under the Subpart H regulations with restrictions on the use of Actiq, and with the requirement for extensive ongoing monitoring and reporting of prescribing patterns to the FDA—well beyond routine safety and reporting requirements—FDA was using its full authority to limit the use of Actiq to the intended, cancer pain population.

(*Id.* ¶ 16.) Dr. Leiderman further opines that "FDA would not have approved the drug Actiq containing the high potency narcotic fentanyl, historically used for analgesia in hospitals, for use at home by patients, except for the pressing need for relief of severe cancer pain not adequately controlled by other narcotic therapy." (*Id.* ¶ 21.) Dr. Leiderman also notes that FDA required Anesta (the company that, along with Abbott Laboratories, developed Actiq) to monitor and report prescribing patterns by indication and specialty of prescriber as a component of the RMP at the time of approval. (*Id.* ¶ 22.) Dr. Leiderman's asserts that this detailed reporting has been required for very few products, and that these additional requirements attest to the FDA's seriousness about compliance with the labeled indication. (*Id.* ¶¶ 22–23.)

Cephalon, however, contends that Dr. Rosenthal's assumption of a 15% threshold is both arbitrary and inconsistent with Dr. Rosenthal's academic work. For instance, Cephalon points out that Dr. Rosenthal admitted she did not know how the 15% was derived (*see* Rosenthal Dep. 82:8–21), and that Dr. Leiderman herself described the 15% trigger as "pretty arbitrary." (Leiderman Dep. 270:10–18.) Cephalon's experts, meanwhile, opine that there is no causal link between off-

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 3572932

label promotion and the 15% threshold articulated in the RMP. Dr. Scott Gottlieb,[18] Cephalon's regulatory expert, opines that because RMPs are not intended to regulate the practice of medicine, they do not explicitly limit the off-label use of drugs or dictate when a drug is medically appropriate for a given patient. Dr. Gottlieb claims that since determination of a product's safety is an individualized assessment and the FDA does not regulate the practice of medicine, RMPs are not intended to limit or provide a bright line rule for when a physician may prescribe a medicine off-label. Partly for this reason, Dr. Gottlieb concludes that Plaintiffs misinterpret the Actiq RMP. Dr. Gottlieb avers that Dr. Leiderman's conclusion that through the Actiq RMP FDA "was using its full authority to limit the use of Actiq to the intended, cancer pain population" is incorrect. (Gottlieb Rpt. ¶ 45.) Dr. Gottlieb counters Dr. Leiderman's opinion by stating that the Actiq RMP did not prevent or restrict physicians from exercising their independent medical judgment when prescribing Actiq. (Id. 45.) The Actiq RMP also did not control access to Actiq for off-label purposes. (Id. ¶ 46.) Further, the FDA, through the Actiq RMP did not attempt to use all the tools it could have to influence physicians to prescribe Actiq on-label. (Id.) Instead, the Actiq RMP only required the sponsor to implement an education program if the percentage of offlabel prescriptions exceeded 15% of quarterly Actiq prescriptions. (Id. ¶ 47.) The purpose of the education program was to ensure that the physicians could be properly informed of Actiq's potential risks for "opioid non-tolerant patients"—i.e., patients who were considered to be naïve about opioid therapy. (Id. ¶ 49.) Dr. Gottlieb further opines that by addressing the offlabel usage, the Actiq RMP "contemplated that off-label prescribing of Actiq would occur." (Id. ¶ 51.) However, Dr. Gottlieb asserts there is simply no link between the 15% threshold in the Actiq RMP and the off-label promotion.

*15 Similarly, Cephalon's marketing expert, Pradeep Chintagunta,[19] also asserts that Dr. Rosenthal's reliance on the RMP is flawed for two reasons. First, Chintagunta notes that the language of the Actiq RMP does not support Dr. Rosenthal's conclusions. For instance Section 9.1.1 of the RMP states that if "groups of physicians (such as a particular specialty) are identified as having prescribed Actiq inappropriately, and these prescriptions represent potential off-label usage greater than 15% of total quarterly Actiq prescriptions," then Cephalon must undertake certain educational efforts. (Chintagunta Rpt. ¶ 30.) Chintagunta states that, despite Dr. Rosenthal's assertions to the contrary, the Actiq RMP does not state that off-label marketing is the

cause of off-label prescriptions. Chintagunta asserts the RMP makes no observations as to why physicians might prescribe Actiq for off-label indications. (Id. ¶ 31.) Indeed, Chintagunta notes, Dr. Leiderman testified (1) that the FDA did not have the authority to dictate to practitioners that they could only prescribe drugs for indications on the label, and (2) no link exists between off-label promotion and the 15% threshold. (Id.)

Second, Chintagunta asserts that Dr. Rosenthal's own academic research, which uses econometric methods, has concluded that many factors other than promotions affect drug sales and the likelihood that patients are prescribed a particular drug. (Id. ¶ 34.) These factors include the type of health plan, the availability of co-insurance, physician specialty, patient gender, and the region where the patient lives.[20] (Id. ¶ 35.) Similarly, Cephalon argues that Dr. Rosenthal's causation assumption is inconsistent with her analysis in other cases involving alleged off-label promotion. In these cases, Cephalon contends Dr. Rosenthal has used regression analysis to try to establish causation. (Rosenthal Dep. 75:9–19.) Dr. Rosenthal has further testified that regression analysis is the "standard approach" for economists. (Id. 77:1–11.) However, by her own admission, Dr. Rosenthal has not used that "standard approach" in this matter. (Id. 79:18–20.)

The Court finds that Cephalon and its experts have identified numerous deficiencies with Dr. Rosenthal's causation assumption. Plaintiffs broadly aver that *Daubert* permits damages experts to assume causation. (Pls.' Resp. Opp'n 16–17). While this is generally true, Cephalon has correctly noted that while experts are permitted to rely on assumptions, to be admissible the assumption must be based on sound methodology. *See* 🚩 *In re TMI Litig.,* 193 F.3d 613, 677 (3d Cir.1999) *amended,* 🚩199 F.3d 158 (3d Cir.2000) ("Although *Daubert/Paoli* analysis does not preclude testimony merely because it may be based upon an assumption, the supporting assumption must be sufficiently grounded in sound methodology, and reasoning to allow the conclusion it supports to clear the reliability hurdle. Assumption-based conclusions that do not meet that test can hardly be relied upon as "good science."); *see also* 🚩 *Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir.2000) (finding the district court abused its discretion in permitting an expert's testimony because the testimony was based on "several empirical assumptions that were not supported by the record.) Cephalon asserts that because Dr. Rosenthal's

In re Actiq Sales and Marketing Practices Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 3572932

"causation assumption was provided by counsel" it is not "grounded in sound methodology." Plaintiffs seek to argue that Dr. Rosenthal was entitled to assume that all off-label prescriptions were caused by Cephalon's alleged off-label promotion. This, however, is not the relevant issue. The relevant issue is far narrower: whether Dr. Rosenthal was entitled to assume that all off-label prescriptions in excess *the precise amount of 15%* resulted from the allegedly illegal off-label marketing.

**\*16** As Cephalon and its experts point out, the RMP merely calls for Anesta/Abbott/Cephalon to undertake certain remedial measures should off-label prescriptions of Actiq exceed 15% of total quarterly Actiq prescriptions. The RMP, however, expounds no obvious judgments as to why this off-label prescribing would occur. It only evidences the FDA's conclusion that off-label prescriptions in excess of 15% are, for unspecified reasons, intolerable. It remains unclear from this record through what means or for what reasons the FDA determined that off-label prescriptions in excess of 15% to be so intolerable so as to necessitate remedial measures. The Court is therefore inclined to agree with Cephalon that Plaintiffs and Dr. Rosenthal appear to have read quite a lot into the RMP's 15% trigger.

Nonetheless, the Court cannot find that Dr. Rosenthal's assumption "that there is a positive level of off-label prescribing that can result from clinical judgment by physicians, but this level of prescribing would not exceed 15% of total quarterly Actiq prescriptions absent the alleged misconduct" is so lacking in basis that her declaration and testimony must be excluded. Ideally, Dr. Rosenthal would have engaged in more rigorous examination in this final step of her damages calculation. However, the fact remains that the 15% figure is derived from the FDA's RMP, and is not something that Plaintiffs or Dr. Rosenthal made up out of thin air. Given Rule 702's liberal policy of admissibility, the fact that the 15% threshold comes from the FDA is sufficiently "good grounds" to support Dr. Rosenthal's use of the threshold in her calculation. In re Paoli, 35 F.3d at 745–46.

## C. Fit

Finally, in assessing the third requirement for the admissibility of expert testimony, the testimony's "fit," the Court must ascertain whether the testimony is "relevant for the purposes of the case" and whether it "assist[s] the trier of fact." Schneider, 320 F.3d at 404; *see also* Daubert,

509 U.S. at 591. This "helpfulness standard" requires a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* (quoting Daubert, 509 U.S. at 591–92).

Cephalon claims Dr. Rosenthal's opinion does not "fit" the claims in this case for two reasons. First Cephalon claims Dr. Rosenthal does not account for the "equities" which bear directly on whether any class member or group of class members is entitled to recover. Cephalon appears to consider the "equities" to be the differences amongst class members or the individual circumstances of any prescribing decision. The Court is unpersuaded by this argument, and has little difficulty in concluding that Dr. Rosenthal's testimony is relevant to this case. The "equities" that Cephalon emphasizes are essentially the same arguments Cephalon advances in opposing Plaintiffs' Motion for Class Certification. These arguments—while entirely relevant in determining whether Plaintiffs have met their burden of proving class certification should be granted—are not relevant to the question of whether Dr. Rosenthal's testimony would assist the trial of fact in measuring the Proposed Class's damages as a result of Cephalon's alleged off-label promotion. Thus, Cephalon's contention that the "equities" must be considered is an argument best resolved in the context of Plaintiffs' Motion for Class Certification, not through the exclusion of Dr. Rosenthal's declaration and testimony.

**\*17** Additionally, to the extent Cephalon contends Dr. Rosenthal's damages analysis does not "fit" the claims in this case because her analysis does not comport with the Supreme Court's decision in Comcast Corp. v. Behrend, ——U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), it is mistaken. (*See* Def.'s Reply 2–6.) *Comcast* involved antitrust claims brought pursuant to Sections 1 and 2 of the Sherman Act. The Supreme Court reversed certification of a class of Comcast subscribers in the Philadelphia market. In doing so, the Supreme Court held that the plaintiffs had not met the predominance requirement of Federal Rule of Civil Procedure 23(b) (3) because they had not adequately demonstrated that damages were "susceptible of measurement across the entire class for Rule 23(b) (3) purposes." 133 S.Ct. at 1433. This was due to the fact that the plaintiffs in *Comcast* had presented four theories of antitrust impact, but the district court found only one of these theories was capable of class-wide proof. *Id.* at 1431. Problematically, however, the district court assumed

damages could be measured on a class-wide basis even though the plaintiffs' expert's damages model was not tied to the specific liability theory certified. *Id.* The Supreme Court emphasized that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 1433. Here, unlike in *Comcast,* Plaintiffs assert only one theory of liability and Dr. Rosenthal's damages calculation is based solely on that theory: unjust enrichment. Thus, there is no comparable risk that Dr. Rosenthal's damages model "identif[ies] 'damages' that are not the result of" the alleged wrong. *Id.* at 1434.

Secondly, Cephalon contends Dr. Rosenthal's opinion does not "fit" because Dr. Rosenthal does not attempt to support Plaintiffs' alternative classes. Plaintiffs have proposed various alternative, state-based classes in the event the Court rejects nationwide class certification. Dr. Rosenthal, however, has not calculated damages based on Plaintiffs' alternative classes; rather, she has simply averred: "[i]f I am asked to do so by counsel, I can calculate damages by state using standard data and standard methods." (Rosenthal Decl. ¶ 10 n. 29); (*see also* Rosenthal Dep. 47:6–52:20.) Accordingly, Cephalon contends that Dr. Rosenthal's "untested promise to calculate damages on a state-by-state basis in the future is not enough to satisfy *Plaintiffs' class certification burden.*" (Def.'s Mot. to Exclude 24) (emphasis added).

As Cephalon's own phrasing makes clear, Cephalon's argument is an issue best resolved in the context of the Motion for Class Certification. Until such time as the Court resolves Plaintiffs' Motion for Class Certification, Cephalon's argument is premature. Further, Cephalon arguably overstates the difficulty of calculating Cephalon's profits on a state-by-state basis. According to Dr. Rosenthal, the methodology for calculating net profits attributable to Actiq would not differ by state; rather, the only additional step would be apportionment of profits based on the percentage of sales of Actiq per state through publicly-maintained data. (Rosenthal Rebuttal ¶ 25.) Cephalon has not refuted Dr. Rosenthal's contention, and instead merely contends, essentially, that Dr.

Rosenthal has not apportioned damages *yet.* Such a bare contention is insufficient. *See* In re Flonase Antitrust Litig., 284 F.R.D. 207, 233 (E.D.Pa.2012); In re Wellbutrin SR Direct Purchaser Antitrust Litig., 2008 WL 1946848, at *9 (E.D.Pa. May 2, 2008) (reasoning that the court's inquiry is "limited to whether or not the proposed methods are so insubstantial as to amount to no method at all") (quoting In re Potash Antitrust Litig., 159 F.R.D. 682, 697 (D.Minn.1995); In re Vitamins Antitrust Litig., 209 F.R.D. 251, 268 (D.D.C.2002) ("At the certification stage, the preliminary inquiry in assessing the proposed methods of proving damages is limited: The inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis.").

## IV. CONCLUSION

**\*18** For the reasons set forth above, the Court finds that Dr. Rosenthal's declaration and testimony satisfy the qualification, reliability, and fit requirements of Rule 702 and *Daubert.* Accordingly, Cephalon's Motion to Exclude is denied. An appropriate order follows.

## *ORDER*

**AND NOW,** this _____ day of July, 2014, upon consideration of Defendant's Motion to Exclude the Declaration and Testimony of Meredith Rosenthal (Doc. 371), Plaintiffs' Response in Opposition (Doc. 389), and Defendant's Reply in Support (Doc. 405), **IT IS HEREBY ORDERED AND DECREED** that Defendant's Motion is **DENIED.**

### All Citations

Not Reported in F.Supp.3d, 2014 WL 3572932

## Footnotes

1    Dr. Rosenthal explains she calculated damages from an economist's point of view. Specifically, Dr. Rosenthal testified as follows:

Q. Do you think it's appropriate for a cost accountant to allocate indirect costs to a product for purposes of developing a P and L [profit and loss statement]?

A. Well, let me start by saying I'm not a cost accountant and I'm not opining on what might be appropriate for a cost accountant. *For an economist* when we discuss the profits associated with a product, to me that means the revenues associated with that product less costs that would specifically go away if the product went away.

(Rosenthal Dep. 192:12–23) (objections omitted) (emphasis added).

2    There are, apparently, no Product Contribution Reports prior to 2007. (Rosenthal Decl., Attach. C.2 at 1 n. 1.)

3    Specifically, Dr. Rosenthal testified:

I have used this document merely as a general guide. I examined every Actiq-related account or cost center in the data and evaluated whether and how to include these line items into my profit calculation. Where it was unclear whether a given data element or line should be included in my profit calculation, I have attempted to be conservative by including costs and excluding revenues. If a given undocumented line item was *de minimis* in magnitude (typically less than $1,000 for a given year), I have disregarded such items.

(Rosenthal Decl., Attach. C.2 at 1.)

4    Specifically, Dr. Rosenthal offered the following explanation for why she used the Product Contribution Report as a starting point for understanding the raw data:

Because I was told that the company did not produce product profit and loss statements. That's where I [usually] would have started. In other analyses for similar matters when I have been asked to calculate unjust enrichment, I have used company profit and loss statements for their products.

Dr. Rosenthal further elaborated:

And so [the 2007 Product Contribution Report] at least allowed me to go into [Cephalon's] account system, understand how it was organized, because I could map the totals here to that accounting system ... [I]t allowed me to get a first look at, for example, the way the codes in the accounting system assigned costs to a particular product and a particular cost center to understand that logic.

(Rosenthal Dep. 156–11:157:16.)

5    According to Hammer, there are six primary business functions that are required to produce and sell a pharmaceutical product: (1) research; (2) development/design; (3) production; (4) marketing; (5) distribution; and (6) customer service (collectively, the "value chain" of the product). (Hammer Rpt. ¶¶ 29–35.) In addition, each of these business functions requires general and administrative support functions (i.e., corporate governance, regulatory and legal expertise, HR, accounting and finance, IT, employee salaries, facilities costs, training costs, etc.) (*Id.* ¶ 36.)

6    According to Hammer variable costs are costs that change in proportion to volume, while fixed costs are those that remain unchanged for a given time period despite wide changes in volume. (Hammer Rpt. ¶¶ 38–39.) However, according to Hammer, all costs become variable in the long run. (*Id.* ¶ 39.) Hammer asserts that she "[has] not yet encountered a business in which a five-year horizon would not be sufficient for the firm to 'change all of its inputs' making most, if not all, of Actiq's costs variable during the Proposed Class Period." (*Id.*)

7    Hammer asserts that the costs required to produce and sell a given product can also be direct or indirect, in addition to being fixed or variable. Direct costs are those that can be traced directly to a given product, and include production costs, honorariums for conference speakers, Actiq clinical trials, and Actiq marketing literature. (Hammer Rpt. ¶ 43.) Indirect costs are those that cannot be traced to a product in an economically feasible way, but which are required to produce and sell a product. (*Id.*)

8    These are costs directly related to Actiq that do not fluctuate with volume. Hammer claims Dr. Rosenthal has completely ignored fixed direct costs incurred to produce and sell Actiq. For example, Dr. Rosenthal did not consider both the cost to acquire Actiq as part of Cephalon's $340 million acquisition of Anesta (the company that developed the product) and the costs of acquiring the U.S. Actiq marketing rights from Abbott Laboratories in 2000 ($23.85 million amortized over the subsequent 10 year period). (*See* Hammer Rpt. ¶¶ 54–55, 60–65.)

9    These are costs that relate to more than one product, and do fluctuate with volume. According to Hammer, the only variable indirect cost Dr. Rosenthal considered in her analysis was sales force expenditures. However, Hammer argues Dr. Rosenthal ignored other variable indirect costs such as the costs of R & D, sales and marketing, customer support, and the general and administrative functions supporting each of these business functions. Additionally, Dr. Rosenthal did not consider the tens of millions of dollars that Cephalon spent on programs such as quality assurance and "Drug Safety & Disposition." (*See* Hammer Rpt. ¶¶ 54–55, 66–74.)

10    These are costs that relate to more than one product, and do fluctuate with volume. Hammer claims Dr. Rosenthal has completed ignored fixed indirect costs incurred to produce and sell Actiq. For example, Dr. Rosenthal did not consider millions of dollars in corporate governance costs. (*See* Hammer Rpt. ¶¶ 54–55, 75–76.)

11    Dr. Rosenthal further notes the legal concept of disgorgement has conceptual parallels to "but-for" analyses that are common in damages calculations. (Rosenthal Rebuttal ¶ 9.)

12    For instance, Dr. Rosenthal testified:

> For an economist when we discuss the profits associated with a product, to me that means the revenues associated with that product less costs that would specifically go away if the product went away. And the CEO would still receive a salary. And so those costs are not allocated, and the general counsel would also receive a salary if Actiq suddenly mysteriously 70 percent of it disappeared. So the costs that I've included are those that are truly product-specific.

(Rosenthal Dep. 192:19–194:17.)

13    Section 51 provides, is relevant part:

### § 51 Enrichment by Misconduct; Disgorgement; Accounting

* * *

(4) Unless the rule of subsection (2) imposes a greater liability, the unjust enrichment of a conscious wrongdoer, or of a defaulting fiduciary without regard to notice or fault, is the net profit attributable to the underlying wrong. The object of restitution in such cases is to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty. Restitution remedies that pursue this object are often called "disgorgement" or "accounting."

(5) In determining net profit the court may apply such tests of causation and remoteness, may make such apportionments, may recognize such credits or deductions, and may assign such evidentiary burdens,

as reason and fairness dictate, consistent with the object of restitution as specified in subsection (4). The following rules apply unless modified to meet the circumstances of a particular case:

* * *

(d) A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain. Residual risk of uncertainty in calculating net profit is assigned to the defendant.

Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011).

14    Dr. Bradford is the Chair of Public Policy and a Professor in the Department of Public Administration and Policy at the University of Georgia. He has 20 years of research experience in the area of health economics, which include the study of the health insurance sector. For the past ten years, Bradford has also researched how pharmaceutical advertising affects patients and physicians.

15    Additionally, Plaintiffs point out that in order to obtain the FDA's approval of Actiq, the original manufacturer of Actiq provided assurances to the FDA's Center for Drug Evaluation and Research Anesthetic and Life Support Drugs Advisory Committee regarding how the NDTI data would be used. For example, the manufacturer testified:

I mentioned this morning that we were going to be doing an ongoing monitoring of different surveillance programs out there, and ... NDTI ... will give us information, as I said, on a quarterly basis as to who's prescribing the drug for what indication. And you can check very easily there and see whether the oncologists are prescribing Actiq™ or whether dermatologists—terrible thought—would be prescribing Actiq™. So that will give us an indication of whether or not it's being used appropriately.

(Pls.' Rebuttal Proffer of Facts ¶¶ 15–16) (Transcript of Meeting before the Food and Drug Administration's Center for Drug Evaluation and Research Anesthetic and Life Support Drugs Advisory Committee, Sept. 17, 1997, at 196.) The manufacturer further testified before the FDA that it would use the NDTI data to analyze whether Actiq was being prescribed on- or off-label.

We have what we call a quality assurance program which is really our vigilance program, and how we're going to monitor how this drug is used. There are a variety of surveillance programs that we will be using, including national databases such as the NDTI and the NPRA which are programs that routinely track how drugs are being prescribed, who's prescribing them, what the diagnosis is.

(Id. at 100.)

16    Dr. Ashburn is a professor in the Department of Anesthesiology and Critical Care at the University of Pennsylvania Perelman School of Medicine. He is also a senior fellow at University of Pennsylvania, Leonard Davis Institute of Health Economics. Dr. Ashburn is a pain management and palliative care physician, and his clinical practice is dedicated to the diagnosis and treatment of pain.

17    Dr. Leiderman is a Board Certified Neurologist and Fellow at the American Academy of Neurology. Dr. Leiderman has extensive experience in pharmacology, clinical trials, the development of medications that affect the brain or central nervous system, and in drug regulation. Dr. Leiderman conducted and directed clinical trials within the pharmaceutical industry for three years and at the National Institutes of Health for ten years prior to joining the FDA Center for Drugs (CDER) for seven and a half years. Dr. Leiderman served as Director of the Controlled Substance Staff at FDA CDER from 2000 to 2007.

18    From 2003–2004, Dr. Gottlieb was first a Senior Advisor to the FDA Commissioner and then served as FDA's Director of Medical Policy Development. After leaving the FDA in 2004, Gottlieb returned from 2005–2007 to

serve as FDA Deputy Commissioner for Medical and Scientific Affairs by appointment of President George W. Bush. Gottlieb is currently an attending physician at NYU's Tisch Hospital and a Clinical Assistant Professor at the NYU School of Medicine. Gottlieb is also a Resident Fellow at the American Enterprise Institute.

19    Pradeep Chintagunta is a Professor of Marketing at the University of Chicago Booth School of Business.

20    Nonetheless, Chintagunta also argues that econometric models are not sufficient to measure the impact of Cephalon's alleged off-label promotion because many of the factors that influence prescribing behavior are not appropriately measured at the aggregate level. (Chintagunta Rpt. ¶ 36.)

---

**End of Document**                                         © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4634301
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

In re DVI, INC. SECURITIES LITIGATION.

Civil Action No. 03–5336.
|
Signed Sept. 15, 2014.
|
Filed Sept. 16, 2014.

*MEMORANDUM*

LEGROME D. DAVIS, District Judge.

**\*1** Plaintiff investors in Diagnostic Ventures, Inc. ("DVI")[1] sue for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5.[2] Jurisdiction is the Exchange Act, 15 U.S.C. § 78aa, and federal question, 28 U.S.C. § 1331.

Both sides respectively moved twice to preclude the other's loss causation and damages expert from testifying.[3] On the second round of motions in 2013, Lead Plaintiffs— Cedar Street Fund, Cedar Street Offshore Fund, and Kenneth Grossman—moved to preclude the testimony of Defendant Deloitte & Touche LLP's expert, Neil H. Demchick (Doc. No. 876). Defendant Deloitte then moved to preclude the testimony of Lead Plaintiffs' expert, Chad Coffman (Doc. No. 868). Each movant asserted that the other's expert offers opinions that are inadmissible under Federal Rule of Evidence 702[4] and 🔖 *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), among other obstacles to the proffered opinions.

By Order dated November 18, 2013 (Doc. No. 897), the motion to preclude Demchick's opinion testimony was denied. It was ruled that the asserted shortcomings related entirely to the weight to be given by the jury to his qualifications and opinions, and he would be permitted to testify at trial as an expert on loss causation and damages consistently with the opinions set forth in his May 3, 2013 report. A ruling on the motion to preclude the opinion testimony of Coffman was reserved, and the parties were permitted to submit additional briefing on specific issues regarding proof of loss causation and damages. *See* Mem.,

dated Nov. 18, 2013 (Doc. No. 896). The parties did so. *See* Lead Pls.' Br. (Doc. No. 898); Def. Br. (Doc. No. 899).

In essence, Deloitte's motion asserts that Coffman's opinions are inadmissible because they do not "disaggregate certain alleged non-fraud-related negative information about DVI" from the disclosures identified in his reports as being partial corrections of fraudulent inflation in the price of DVI's securities. Def. Mem. of Law at 1–2 (Doc. No. 870). Also, it is asserted that Coffman "admits ... he made no effort to disaggregate among the various defendants named in this case their alleged responsibility for the price declines in DVI securities." *Id.* Furthermore, it is asserted that Coffman's opinions do not satisfy "the more rigorous showing required" to establish actual damages. *Id.* The reports of Deloitte's experts, Demchick and Terry L. Musika, CPA, identify these problems in Coffman's opinions. *Id.*

Lead Plaintiffs oppose the motion to preclude Coffman's testimony on several grounds. Pls. Resp. (Doc. No. 873). Their principal contention is that Coffman's opinions rest upon "good grounds" and "should be tested by the adversary process" at trial. Pls. Mem. of Law at 14 (Doc. No. 873). And "disaggregation and apportionment among defendants ... should be decided by a jury." *Id.* at 15, 17 (jury should decide the proper interpretation of the event disclosures).

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural History

**\*2** Lead Plaintiffs' expert, Chad Coffman, submitted an initial report positing two theories for determining loss causation and damages in this case—an insolvency approach and an event study. Coffman Rep., dated Oct. 1, 2008, Pls. Resp., Ex. 1 (Doc. No. 873–1). In response, another of Deloitte's experts, Kenneth Lehn, Ph.D., submitted his report on loss causation and damages. Lehn prepared his own event study and offers opinions on whether Plaintiffs were damaged by the alleged acts or omissions of Deloitte. Lehn Rep., dated Nov. 17, 2008, Def. Resp. to Pls. Mot. to Exclude Lehn, Ex. A (Doc. No. 739). Coffman rebutted Lehn's opinions. Coffman Rebuttal Rep., dated Dec. 17, 2008, Pls. Resp., Ex. 2 (Doc. No. 873–2).

On April 30, 2009, Deloitte moved to exclude Coffman's initial reports and testimony (Doc. No. 686, 690). On July 6, 2009, Lead Plaintiffs moved to exclude Lehn's report and testimony (Doc. No. 702). On September 3, 2010, both

motions were decided. *In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090, at *7–14 (E.D .Pa. Sept. 3, 2010) (Order & Mem., Doc. Nos. 789, 790). Coffman's insolvency theory was found to be in conflict with Supreme Court and Third Circuit precedent on loss causation. It was also ruled that the theory was unreliable and unfit, and therefore inadmissible. *Id.,* 2010 WL 3522090, at *9–12. It was further ruled that both Coffman's and Lehn's event studies were reliable and admissible. *Id.,* 2010 WL 3522090, at *12–14. However, portions of those event studies were excluded as irrelevant: "to the extent that Mr. Coffman and Dr. Lehn opine on the revelations that occurred on September 25, 2002, May 13, 2003, June 5–6, 2003, and July 16, 2003, their opinions will not assist the jury in resolving any factual dispute, as the disclosures on those days are not corrective disclosures as a matter of law." *Id.,* 2010 WL 3522090, at *14.

Deloitte timely disclosed Terry L. Musika, CPA, as an expert witness and produced his report. Musika Rep., dated Nov. 17, 2008, Def. Mem. of Law, Ex. B (Doc. No. 870). Deloitte's counsel timely notified the Court that Mr. Musika passed away on December 18, 2012. Counsel's letter, dated Jan. 11, 2013, Def. Ex. 1 (Doc. No. 889). Deloitte was permitted to substitute another expert. *See* Feb. 19, 2013 Order–Mem. (Doc. No. 862); *id.* at 1 ("The testimony of the expert so designated shall be limited to the topics upon which Mr. Musika previously opined.").

On May 3, 2013, Deloitte timely produced the report of its newly designated expert, Neil H. Demchick. Demchick Rep., dated May 3, 2013, Def. Mem. of Law, Ex. A (Doc. No. 870) (excerpts); Def. Ex. 3(Doc. No. 889) (full report). In response to Demchick's opinions, Lead Plaintiffs timely produced Coffman's rebuttal report. Coffman Rebuttal Rep., dated June 24, 2013, Pls. Resp., Ex. 3 (Doc. No. 873–3).

On August 23, 2013, Deloitte again moved to preclude Coffman's trial testimony. Def. Mot. (Doc. No. 868). On October 2, 2013, Lead Plaintiffs, in turn, moved to preclude Demchick's opinions (Doc. No. 876). As mentioned above, Lead Plaintiffs' motion to preclude Demchick's opinions was denied, and a ruling on Deloitte's motion to preclude Coffman's opinions was reserved (Order, dated Nov. 18, 2013, Doc. No. 897). That motion is decided here.

B. *Deloitte's Criticisms of Coffman's Reports*

**\*3** Coffman's rebuttal of Demchick's testimony is faulted for being "purely subjective"—that is, for being "unaccompanied by any reliable methodology or analysis, concerning his failure to disaggregate certain information." Def. Mem. of Law at 3–4 (Doc. No. 870). In Deloitte's view, Coffman erred by basing his conclusions on certain assumptions that are not established on the record. *Id.* at 4, 19–20 (citing portions of Coffman's reports, which are quoted below).

Specifically, Deloitte challenges Coffman's acknowledgment of the following assumptions made in his reports:

> I have been asked by counsel for Plaintiffs in this matter to quantify the damages suffered by the Class under the assumption that Defendants are found liable in this matter under the Securities Exchange Act of 1934.

Coffman Rep., dated Oct. 1, 2008, ¶ 2, Pls. Resp., Ex. 1 (Doc. No. 873–1). Coffman explains that his opinions are based on a fundamental assumption of fact—as directed by counsel in defining the scope of his retention as an expert—that Defendants together are "collectively" or jointly responsible for all of the asserted fraudulent inflation in the price of DVI's securities:

> Mr. Musika also suggests that I do not consider the "impact of multiple parties" and that I "fail to analyze the impact of numerous defendants in this matter." I was asked by counsel to calculate the total damages to class members as a result of the alleged fraud.... My analysis is based on the presumption that Defendants are collectively responsible for the inflation I measure in the prices of DVI's common stock and Senior Notes. It is unnecessary to form an opinion regarding the relative contribution of any particular Defendant to the fraud, inflation or damages to answer the question I have been asked.

Coffman Rebuttal Rep., dated Dec. 17, 2008, ¶ 70, Pls. Resp., Ex. 2 (Doc. No. 873–2).

Most recently, in 2013, Coffman reiterated and again acknowledged his previous assumptions of the joint liability of all Defendants named in this case for private securities fraud:

In re DVI, Inc. Securities Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 4634301

I was asked to quantify the total amount of inflation in DVI securities as a result of Plaintiffs' allegations, not just those resulting from D & T specific acts. Moreover, I was not asked to apportion the inflation by Defendant, nor does it make sense to do so.... [I]f D & T is found liable, it would be reasonable to conclude that there is butfor and foreseeable causation between D & T's misstatements and all of the artificial inflation after D & T's alleged misstatements and omissions.

Coffman Rebuttal Rep. (re: Demchick's opinions), dated June 24, 2013, ¶ 7(iv), Pls. Resp., Ex. 3 (Doc. No. 873–3). *See also id.,* ¶ 7(vii) (incorporating his previous rebuttal of Musika's opinions quoted above as to "other potentially responsible parties or other sources of recovery"); *id.,* ¶ 35 (reiterating the statements in his earlier reports quoted above); *id.,* ¶ 37 ("It was therefore outside my scope to partition inflation and damages among the individual Defendants, including D & T"). And Coffman once more acknowledged that his opinions are grounded on the fundamental assumption that Deloitte is jointly liable for misrepresentations in DVI's financial reports and Deloitte's clean audit reports regarding those financial statements:

> **\*4** Mr. Demchick asserts that I do not consider that there are multiple defendants. My analysis is based on the presumption that Defendants are collectively responsible for the inflation I measure in the prices of DVI's common stock and Senior Notes. I was asked by counsel to calculate total damages to class members as a result of the alleged fraud and the methodologies employed in my Expert Report are appropriate for that purpose. It is unnecessary to form an opinion regarding the relative contribution of any particular Defendant to the fraud, inflation, or

damages to answer the question I have been asked.... Moreover, it is my understanding that Dr. Epstein [5] supports the position that D & T was aware of and facilitated the concealment of the material misstatements in DVI's financial statements during the Class period; the result of which could lead to D & T being joint and severally liable, or at least held to a high percentage under a proportionate liability theory. *Id.,* ¶¶ 59, 58–59. In sum, Coffman assumes as fact that Deloitte is liable for private securities fraud, and opines to the effect that any reasonable jury would or should ultimately so find.

III. *DISCUSSION*

Federal Rule of Evidence 702, which governs the admissibility of expert opinion testimony, has three major requirements:

> (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.

*Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008). These requirements have been summarized as "a trilogy of restrictions on expert testimony: qualification, reliability and fit ." *Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–43 (3d Cir.1994) (citing *Daubert, supra* )). Furthermore, the Rules of Evidence "embody a strong preference for admitting any evidence that may assist the trier of fact," and take a "liberal policy of admissibility" with respect to expert testimony. *Pineda,* 520 F .3d at 243

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 54 of 208
PageID: 72796
In re DVI, Inc. Securities Litigation, Not Reported in F.Supp.2d (2014)
2014 WL 4634301

(citing *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997)).

There is no dispute that Coffman has the requisite "scientific, technical, or other specialized" expertise to testify as an expert on loss causation and damages in this case. Fed.R.Evid. 702. Instead, Deloitte challenges the reliability and fit of Coffman's opinions. However, a careful review of the record discloses that Coffman's opinions are based on "good grounds"—that is, sufficient facts or data and reliable principles and methods. *Daubert,* 509 U.S. at 590; *see* Fed.R.Evid. 702 (standard of evidentiary reliability). For the reasons set forth in the Court's previous decision—*In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090 (E.D.Pa. Sept. 3, 2010)—Coffman's testimony is admissible. Neither side presents anything here that warrants a departure from that ruling at this juncture. And Deloitte's present objections to Coffman's opinion testimony merit a short discussion.

**\*5** Rule 702 and *Daubert* require a district court to ensure that there is a "sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider." *United States v.. Schiff,* 602 F.3d 152, 172–73 (3d Cir.2010) (citing *Daubert,* 509 U.S. at 591). In order to satisfy the "fit" requirement, the " 'expert testimony proffered [must be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* at 173 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). "Put another way," our Court of Appeals explains, "this is a question relevance." *Id.* And "expert evidence which does not relate to an issue in the case is not helpful." *In re TMI Litig.,* 193 F.3d 613, 670 (1999) (citing *Daubert,* 509 U.S. at 591). The standard for this factor "is not that high," but "higher than bare relevance." *Schiff,* 602 F.3d at 173 (quoting *In re Paoli,* 35 F.3d at 745).

Rule 702 and *Daubert* also require a district court to ensure that "expert testimony is not only relevant, but reliable." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 291 (3d Cir.2012), *cert. denied,* 133 S.Ct. 2025 (U.S.2013). As our Court of Appeals has "made clear, the reliability analysis required [by *Daubert* ] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.' "

*Id.* (alterations in original) (quoting *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir.1999)). The standard for determining reliability "is not that high." *In re Paoli,* 35 F.3d at 745. Proponents of expert testimony do not "have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744 (emphasis in original) ("evidentiary requirement of reliability is lower than the merits standard of correctness"); *accord Pure Earth, Inc. v. Call,* 531 F. App'x 256, 259 (3d Cir.2013).

Deloitte disclaims the fitness and reliability of Coffman's opinions, but does not present a cogent challenge to the event-study methods that he used to reach his conclusions. Essentially, Deloitte says that Coffman's opinions are incomplete—that is, he did not do enough analysis to formulate sufficient opinions to satisfy a plaintiff's burden of proving all requirements of the element of loss causation. In Deloitte's view, Coffman should have but did not disaggregate —that is, separately identify and account for—negative information and events that are not related to the fraud allegedly committed by Deloitte, but affect the price of DVI's securities. In addition, Deloitte says that Coffman should have but did not allocate the alleged inflation (or deflation) in DVI's securities among the potentially liable defendants, and should have but did not apportion or attribute the inflation (or deflation) that allegedly results from Deloitte's acts or omissions. Furthermore, in regard to proof of actual economic damages, Coffman should have but did not allocate losses in the value of DVI's securities among the potentially liable defendants, and should have but did not apportion or attribute the losses that allegedly result from Deloitte's acts or omissions. However, there is no requirement that Coffman have done so.

**\*6** This is so because a qualified expert may offer testimony concerning an ultimate issue in the case. Fed.R.Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."). *Accord Forrest v. Beloit Corp.,* 424 F.3d 344, 353 (3d Cir.2005) (citing *Salas v. Wang,* 846 F.2d 897, 905 (3d Cir.1988) (Rule 704 would permit an expert to testify as to the ultimate issue of aggregate damages)). It is also well-established that an expert may offer an opinion based on hypothetical facts reasonably consistent with the evidence. *Id.,* 424 F.3d at 353 (citing *Wilburn v. Maritrans GP*

In re DVI, Inc. Securities Litigation, Not Reported in F.Supp.3d (2014)
2014 WL 4634301

*Inc.,* 139 F.3d 350, 356 (3d Cir.1998) (" 'a qualified expert may answer hypothetical questions' " (quoting 🚩 *Teen–Ed, Inc. v. Kimball Int'l, Inc.,* 620 F.2d 399, 404 (3d Cir.1980)). In this case, whether the factual assumptions upon which Coffman's opinions are proffered are "fairly and fully stated" are "a question for discussion to the jury." *Moyer v. Aetna Life Ins. Co.,* 126 F.2d 141, 144 (3d Cir.1942) (internal quotation marks and citation omitted). Moreover, his opinions, just like the opinion of any other expert, "can be of no value, when the facts of which the opinion is predicated, are not established." *Id.* And "whether they are so established is for the subsequent consideration of the jury." *Id.*

Here, Coffman assumes—at the direction of counsel that retained him—that Defendants are in fact liable for private securities fraud. He opines that Deloitte should be found so liable by a jury. He also assumes that the collective acts or omissions of all Defendants together—including those of "the defendant" here, Deloitte—jointly caused the loss for which Lead Plaintiffs seeks to recover damages. Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(b)(4).[6] Lead Plaintiffs mayor may not be able to prove these assumptions at trial. But Coffman's assumptions alone do not establish that his opinions are inadmissible here. His opinions are supported by record evidence, just not all of the evidence that Deloitte submits should be offered in order for it to held liable. Moreover, there is no requirement that Lead Plaintiffs use Coffman's testimony alone to satisfy all aspects of their burden to prove loss causation and damages. They may proffer other admissible evidence on these points. Furthermore, to the extent that Coffman's opinions are fit and reliable, they are within "the range where experts might reasonably differ," and the jury, not the trial court, must be the one to decide among conflicting views of different experts. 🚩 *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999).

Coffman's opinions do not contradict or conflict with this Court's previous rulings. *See, e.g., In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2010 WL 3522090, at *13 (expert opinion evidence is required to " 'distinguish between fraud-related and non-fraud related influences of the stock's price behavior" (quoting 🚩 *In re Imperial Credit Indus., Inc., Sec. Litig.,* 252 F.Supp.2d 1005, 1014–15 (C.D.Cal.2003)); 🚩 *WM High Yield Fund v. O'Hanlon,* No. 04–3423, 2013 WL 3230667, at *8–9, 11–13,15–17 (E.D. Pa. June 27, 2013) (proof of loss causation and damages requires disaggregation

of non-fraud related influences as well as allocation of responsibility among multiple, potentially liable defendants). Instead, Coffman's reports focus narrowly on whether certain events corrected artificial inflation in DVI's securities, and he simply does not proffer opinions that disaggregate non-fraud related influences on the price of DVI's securities or that allocate responsibility among multiple potentially liable defendants.

*7 Moreover, Coffman's opinions in large part are consistent with requirements set by the Supreme Court and our Court of Appeals for proof of loss causation and damages. 🚩 *See, e.g., Dura Pharm., Inc. v. Brad,* 544 U.S. 336, 342–43 (2005); 🚩 *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 425–26 (3d Cir.2007) ("must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff") (citing 🚩 *Semerenko v. Cendant Corp.,* 223 F.3d 165, 184–85, 187 (3d Cir.2000) and 🚩 *EP MedSystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 884 (3d Cir.2000)); 🚩 *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 301 (3d Cir.1991) (generally, expert testimony is required to establish "both the fact of damage and the appropriate method of calculation"). *Accord Pure Earth,* 531 F. App'x at 260 ("The loss causation inquiry asks 'whether the misrepresentation or omission proximately caused the economic loss.' ") (quoting 🚩 *McCabe,* 494 F.3d at 425–26)).[7]

Our Court of Appeals instructs that the "ultimate touchstone" for determining the reliability of proffered expert opinion

> is helpfulness to the trier of fact, and ... helpfulness turns on whether the expert's technique or principle is sufficiently reliable so that it will aid the jury in reaching accurate results.

🚩 *In re Paoli,* 35 F.3d at 744 (internal quotation marks, citations, and alteration omitted). Here, the record establishes that Coffman's opinion testimony might assist the jury in resolving factual disputes as to whether certain events were a substantial factor in proximately causing declines in the price

of DVI's securities, thereby creating actual economic losses for Plaintiffs.

Inasmuch as expert witnesses may express their opinions on matters about which they have no firsthand knowledge, Fed.R.Evid. 703, and an expert's testimony may be given substantial weight by the jury due to the expert's status, a trial judge must be vigilant in exercising a "gatekeeper" role. Daubert, 509 U.S. at 595; Kumho Tire Co., 526 U.S. at 148. Mindful of that role, it is nonetheless well recognized that:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Daubert, 509 U.S. at 596. Additionally, in the event a scintilla of evidence is adduced to support the position of an expert for either side, and it is concluded that the evidence is insufficient to allow a reasonable juror to find that the position more likely than not is true, a judgment could be directed. See id. (citing Fed.R.Civ.P. 50(a)). These procedural safeguards, rather than exclusion of an expert's testimony that satisfies the evidentiary requirements for admission under Rule 702, are appropriate here.

For the above reasons, Deloitte's motion to preclude the trial testimony of Lead Plaintiffs' expert, Coffman, will be denied. In addition, trial will not be further delayed to accommodate the production of supplemental expert reports. See Pls. Mem. of Law at 4, 24, 32, 33 (Doc. No. 873) (requests to supplement). Cf Def. Mem. of Law at 3–4, 11–12, 19–20 (Doc. No. 870); Def. Reply Br. at 12–13 (Doc. No. 885).

**\*8** An Order accompanies this Memorandum.

### ORDER

**AND NOW,** this 15th day of September, 2014, upon consideration of the parties' submissions, [1] it is hereby ORDERED that Defendant Deloitte & Touche LLP's "Motion to Exclude From Trial Any Testimony From Lead Plaintiffs' Purported Expert Chad Coffman" (Doc. No. 868) is DENIED. Coffman will be permitted to testify at trial as an expert on loss causation and damages consistently with the opinions set forth in his reports dated October 1, 2008, December 17, 2008, and June 24, 2013.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4634301

---

## Footnotes

1    In the mid–1980s, Diagnostic Ventures, Inc. was formed as a Delaware corporation. About 1986, it changed its name to DVI, Inc. By the mid–1990s, it operated as a finance company for healthcare providers through two subsidiaries—DVI Business Credit, Inc. ("DVI BC") and DVI Financial Services, Inc. ("DVI FS"). Here, "DVI" refers collectively to all of these business entities unless noted otherwise. See Fifth Am. Compl. ¶¶ 5, 25, 69–70 (Doc. No. 298); Def. Cohn's Statement of Facts ¶¶ 1–7 (Doc. No. 683–2 at 1–2).

2    For the history and factual background of this action see: In re DVI, Inc. Sec. Litig., No. 03–5336, 2010 WL 3522090 (E.D.Pa. Sept. 3, 2010) (Order & Mem., Doc. Nos. 789, 790 re Plaintiffs' and Defendant Deloitte & Touche LLP's respective motions to exclude the other's loss causation expert, and Deloitte's motion for summary judgment); id., 249 F.R.D. 196 (E.D.Pa.2008), aff'd, 639 F.3d 623 (3d Cir.2011) (Order & Mem., Doc. No. 609 re class certification); id., 2005 WL 1307959 (E.D.Pa. May 31, 2005) (Order & Mem., Doc. No. 181 re dismissal motions filed by numerous defendants).

In re DVI, Inc. Securities Litigation, Not Reported in F.Supp.3d (2014)

2014 WL 4634301

3    The parties' submissions: Lead Plaintiffs' "Motion to Strike and Exclude Deloitte & Touche LLP's Purported Causation and Damages Expert Neil H. Demchick" (Doc. No. 876), Mem. of Law (Doc. No. 880) with Exs. 1–20 (Doc. No. 881), and Reply Br. (Doc. No. 895); Deloitte's Resp. with Exs. 1–6 (Doc. No. 889). Defendant Deloitte's "Motion to Exclude From Trial Any Testimony From Lead Plaintiffs' Purported Expert Chad Coffman" (Doc. No. 868), Mem. of Law with Exs. A–E (Doc. No. 870), and Reply Br. (Doc. No. 885); Lead Plaintiffs' Resp. with Exs. 1–4 (Doc. No. 873).

4    "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702.

5    Barry Jay Epstein, Ph.D., CPA, prepared a report, dated Oct. 3, 2008, Pls. Resp. to Def. Initial Mot. to Exclude Coffman, Ex. 17 (Doc. No. 706). Here, Deloitte does not challenge Epstein's opinions.

6    "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which plaintiff seeks to recover damages." Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(b)(4).

7    The Supreme Court recognized that a "tangle of factors" affects the price of securities and, therefore, determinations of loss causation and damages: "Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.... Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the loss." Dura Pharm., Inc. v. Brad, 544 U.S. 336, 342–43 (2005).

1    The parties' submissions: Defendant Deloitte & Touche LLP's Mot. (Doc. No. 868), Mem. of Law with Exs. A–E (Doc. No. 870), and Reply Br. (Doc. No. 885); Lead Plaintiffs' Resp. with Exs. 1–4 (Doc. No. 873). The parties were permitted to respond to the Order and Memorandum, dated Nov. 18, 2013 (Doc. No. 897): *see* Lead Pls.' Br. (Doc. No. 898); Def. Deloitte's Br. (Doc. No. 899).

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Front Loading Washing Mach. Class Action Litigation, Not Reported in F.Supp.2d...

2013 WL 3466821

2013 WL 3466821
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

In re FRONT LOADING WASHING
MACHINE CLASS ACTION LITIGATION.

Civil Action No. 08–51(FSH).
|
July 10, 2013.

OPINION

HOCHBERG, District Judge.

**\*1** This matter comes before the Court upon Plaintiffs' motion for class certification.[1] Defendant opposes class certification and moves to strike evidence relied upon by Plaintiffs in support of its Motion for Class Certification as inadmissible. Defendant has also filed a *Daubert* motion to exclude expert testimony. Plaintiffs have also filed a *Daubert* motion to exclude testimony from Defendant's expert witnesses.

*I. Background*

Plaintiffs bring the instant action on behalf of themselves and a nationwide class of persons who purchased front-loading automatic washing machines that were marketed and sold by LG, and that allegedly have a common drainage defect that causes the proliferation of mold and mildew, as well as foul odors in the machines and on clothing washed in the machine. More specifically, Plaintiffs allege that all of LG's front load washing machines ("LG FLW" or "FLW") have a common design defect in the dryer drum and/or door gasket that causes water to not fully or properly drain after each wash cycle, and that this remaining water causes the proliferation of mold and mildew. Plaintiffs assert claims against Defendant under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8–1, et seq., Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, et seq., for breach of express and implied warranties under New Jersey law, and for unjust enrichment under New Jersey law. In the alternative, Plaintiffs bring claims for breaches of express and implied warranties, unjust enrichment and consumer fraud and deception under the laws of the states where Plaintiffs reside.

Plaintiffs have moved to certify a nation-wide class of those who purchased LG FLW in the United States and, in the alternative, have moved to certify classes to apply the substantive law of the state where the Plaintiffs reside and/or purchased their LG FLW. Plaintiffs move to apply New Jersey law to the entire class if certified as a whole, arguing that Defendant's principal place of business is in New Jersey, many members of the class reside in New Jersey, Defendant's alleged misconduct occurred in New Jersey and New Jersey has a significant interest in seeing this matter litigated within the state.

*II. DISCUSSION*

*A. Daubert Motions*

**1.** *Legal Standard*

Federal Rule of Evidence 702 provides the relevant legal standard in a *Daubert* motion. Pursuant to Fed.R.Evid. 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The United States Court of Appeals for the Third Circuit has determined that Rule 702 "has a liberal policy of admissibility."[2]

**\*2** Two United States Supreme Court cases, *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), have further defined the legal standard for expert testimony. The goals of the *Daubert* standard, as established by the Supreme

In re Front Loading Washing Mach. Class Action Litigation, Not Reported in F.Supp.2d...
2013 WL 3466821

Court, are to determine: 1) whether the expert utilized the scientific method and whether the expert's testimony is based on scientifically valid principles; and 2) whether the expert testimony is relevant to the proposing party's argument. [3]

In *Kumho,* the Court expanded the scope of the *Daubert* standard, explaining that while the Court in *Daubert* directly addressed scientific testimony, the resulting standard was not intended to apply exclusively to scientific testimony. Instead, *Kumho* established that the *Daubert* standard is appropriate for all experts providing specialized knowledge and held that "[t]he trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge." [4] This is true even if the experts are providing experience-based testimony. [5]

To determine if the testimony is reliable, the Third Circuit has established an eight-part test which this Court must consider:

(1) whether a method consists of a testable hypothesis;

(2) whether the method has been subject to peer review;

(3) the known or potential rate of error;

(4) the existence and maintenance of standards controlling the techniques operation;

(5) whether the method is generally accepted; [6]

(6) the relationship of the technique to methods which have been established to be reliable;

(7) the qualifications of the expert witness testifying based on the methodology; and

(8) the non judicial uses to which the method has been put. [7]

🚩 *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 742 (3d Cir.1994). This test may be more flexibly applied in cases where the expert testimony is based on experience. [8]

As explained by the Court in *Kumho,* the expert's testimony must be related to the case at hand as well. According to this Court, "[t]he role of the judge with regard to expert testimony is to serve as a gatekeeper, and it is the judge who must decide

if an expert's testimony reliably "fits" the case." [9] The party proffering the expert will have the burden to demonstrate that the testimony is admissible, on a preponderance of the evidence standard . [10]

## 2. Defendant's Pending *Daubert* Motion to Exclude Inadmissible Expert Testimony

Plaintiffs have proffered two witnesses: Dr. R. Gary Wilson ("Wilson") and Dr. Chin Yang ("Yang"). Defendant contends that this Court should exclude the opinions of Wilson and Yang because both allegedly lack a reliable methodology and opine in areas where neither is qualified to serve as an expert witness. [11]

### a. Dr. R. Gary Wilson

**\*3** Plaintiffs offer Dr. Wilson's testimony in support of class certification to establish that: (1) every LG FLW, regardless of model, year, or platform, shares a materially uniform design because all of them "provide the perfect environment for mold and mildew ... a humid environment with little ventilation;" and (2) every LG FLW, regardless of model, year, or platform, fails to self clean, which leads to biofilm accumulation that results in foul odors. [12] Wilson Supp. Rep. at 4, 5–6. Dr. Wilson's opinions are intended to demonstrate commonality and predominance [13] in support of Plaintiffs' class certification motion. According to Plaintiffs, the testimony provided by Wilson is mainly experience-based, supplemented by research conducted by Wilson for this litigation.

Defendant argues that Wilson has never designed a front-load washing machine and that before he was retained by Plaintiffs, he had no experience with LG FLWs. Defendant argues that because of his lack of previous experience, Wilson's opinions about LG FLWs are based solely on the work he did in this case. LG claims that Wilson did almost no work in this case because he never tested any LG FLW and inspected just a few LG FLWs. Of the 19 LG FLWs owned by Plaintiffs, Defendant claims that Wilson disassembled and inspected just one and also inspected three other LG FLWs provided to him by Plaintiffs' counsel. Accordingly, Defendant argues that Wilson's opinions are admissible only if based on testing or some other reliable methodology, and that Dr. Wilson has none.

Dr. Wilson has a Ph.D. in Mechanical Engineering from Case Western Reserve University and a Masters Degree in

2013 WL 3466821

Mechanical Engineering from the University of Illinois. [14] Wilson is also a Lecturer in the Mechanical Engineering & Engineering Sciences Department at the University of North Carolina. Dr. Wilson worked for Whirlpool for 23 years, working with both top-loading washing machines and front-loading machines. When he retired from Whirlpool he was the Director of Laundry Technology.

While there does not appear to be a dispute about Wilson's knowledge of mechanical engineering, the parties disagree about the characterization of Wilson's experience. According to Plaintiffs, Wilson has two decades of experience with designing washing machines but Defendant argues that Wilson has never actually designed a front-loading washer and has spent a majority of his career working on refrigerators, air-conditioners and dishwashers. Defendant further argues that Wilson only worked on Whirlpool washing machines from 1985–1988, and even then the work was not on FLW, making the experience irrelevant.

While Defendant claims Wilson has limited practical work experience with washing machines, it is apparent from some of Defendant's submissions, as well as Dr. Wilson's own characterization of his experience, that he was the director of laundry technology at Whirlpool from 1997–99. Wilson was employed by Whirlpool from 1976 to 1999.

 **\*4** After considering the testimony rendered at the *Daubert* hearing and the record in this matter, the Court will permit the expert testimony of Dr. Wilson. The Court agrees with the Court in *Butler v. Sears,* No. 06–7023 (N.D.Ill. September 30, 2011), which found on a *Daubert* challenge of Dr. Wilson that:

> The value of Wilson's testimony is not based upon his sampling methods; it is instead based upon his knowledge of washer technology and his understanding of the principles that generally keep machines functionally clean, as well as the extent to which the subject machines depart from those principles. In the court's view, Wilson is clearly qualified to use his knowledge of those principles to offer an opinion, for purposes of a class certification motion, that all front loading high efficiency machines are similarly defective in design. The fact

> that his opinion does not account for mitigating model changes that do not alter the machines' basic design is relevant to the weight to be assigned to his opinion, but does not indicate that the opinion is inadmissible in support of the certification motion.

*Id.* at 6–7. Dr. Wilson's opinion is based on the extensive experience he has gained during his more than 20 years as an engineer with Whirlpool, his education, his training, his technical expertise, as well as his review and analysis of the FLWs in this and related litigation. The fact that Dr. Wilson has not undertaken his own testing does not disqualify him as an expert for the purposes for which he is proffered.

Wilson is qualified to testify regarding Plaintiffs' theory of the case and Plaintiffs are entitled to attempt to prove their theory of the case, *i.e.,* that Defendant's washing machines contain a common design defect. [15] Accordingly, the Court is satisfied that Dr. Wilson has satisfied Fed.R.Evid. 702 and his expert report will be permitted for purposes of the Motion for Class Certification.

### b. Dr. Chin S. Yang

Dr. Yang is a PhD microbiologist who specializes in mycology, the study of fungi, and he has expertise in the identification and growth of fungi. He is employed as the Scientific & Technical Advisor and Senior Consulting Scientist at Prestige EnviroMicrobiology, Inc., a company that specializes in analyzing samples for fungi, mold and bacteria. He has testified regarding the environments inside FLW and microbiology issues associated with FLW in at least three other cases.

Plaintiffs offer Dr. Yang's testimony for the proposition that LG's FLW "provide an ideal environment for Biofilm growth" in part because they contain "spaces for trapping moisture and nutrients" and for the proposition that "[t]he trend of using a lower washing machine temperature increases the risk of microbes surviving laundering." Dr. Yang is offered primarily as a rebuttal expert. [16] He analyzed the "mold and fungi testing data collected by LG's experts and concluded that the testing was not performed in conformity with the lab's standard operating procedure, [and] that the testing did not include tests for bacteria, a major odor-causing component of biofilm." His testimony also would support Dr. Wilson's and

2013 WL 3466821

Plaintiffs' theory of the case, *i.e.,* that a common design defect has caused the proliferation of mold and mildew. Defendant maintains that Dr. Yang's opinions fail the reliability test of *Daubert* because Dr. Yang hasn't conducted any testing, and in fact, hasn't done anything but look at photographs.

**\*5** After considering the record, the Court will permit the testimony of Dr. Yang. Dr. Yang's opinions are based on his education and experience as a mycologist, as well as the significant number of articles he has researched and written in this field and his analytic experience. Dr. Yang can rely on the testing done by other experts and opine as to whether their methods of testing would mimic the growth of mold in the real world. As a microbiologist who specializes in mycology, he certainly is qualified to look at photographs and opine on whether what he is looking at is biofilm, mold, mildew, fungi or bacteria. He is qualified to opine with respect to how mold grows, the types of environments that mold typically grows in and whether it might exist even if you cannot see it. Dr. Yang does not need to have conducted his own testing to rebut Dr. Caulfield's opinion that the machines he tested had no mold in them and that he had done his testing in a way that mimicked the way Plaintiffs should have been using their LG FLWs. Accordingly, Defendant's *Daubert* challenge to Dr. Yang is denied and he will be permitted to rebut the expert testimony of Dr. Caulfield for class certification purposes.

### 3. Plaintiffs' Pending *Daubert* Motion to Exclude Inadmissible Expert Testimony

Defendant has proffered three witnesses: Dr. Charles J. Wysocki ("Wysocki"), Dr. Edward M. Caulfield ("Caulfield") and Dr. Thomas Maronick ("Maronick"). Plaintiffs argue that the Court should exclude all three opinions, contending that Wysocki's opinion fails the "fit" aspect of the *Daubert* test, and that both Caulfield's and Maronick's opinions fail to fit and are unreliable.

### a. Dr. Charles J. Wysocki

Defendant offers Dr. Wysocki for the purpose of helping the Court determine whether it is proper to assume that every LG FLW owner experienced an intense bad smell from the machine, and explain why it is improper to reach such a conclusion. Dr. Wysocki opines: (1) that each person's olfactory abilities and experiences are different; (2) whether a person perceives an odor, whether it is perceived as pleasant or unpleasant, and whether it is perceived intense, depends on a variety of factors that vary from person to person; and (3)

it is therefore not possible to generalize about the olfactory experiences of all LG FLW owners.

According to Defendant, Wysocki is "one of the world's leading experts on individual difference in olfaction." A member of Monell Chemical Senses Center, the only independent, non-profit scientific institute dedicated to the research of smell and taste, Wysocki has his Ph.D. in psychobiology from Florida State University and has also been a teacher at the University of Pennsylvania. He has spent decades studying individual differences in olfaction. The National Institutes of Health have supported his research into individual differences in odor perception for over 25 years.

Plaintiffs do not contend that Dr. Wysocki lacks the education or experience to testify as an expert witness for Defendant. Instead, Plaintiffs contend that Defendant presents Dr. Wysocki as an expert on the basis of the scientific tests he conducted for this proceeding and that Dr. Wysocki should be excluded because these scientific tests fail to meet the *Daubert* criteria.

**\*6** According to Plaintiffs, there are five reasons why Dr. Wysocki should not be allowed to testify as to the Rule 23 criteria Plaintiffs must establish to certify their class, including:

1. There is no linkage or fit between Dr. Wysocki's opinion and the facts of the case;

2. Dr. Wysocki makes no effort to relate his knowledge to the facts;

3. Dr. Wysocki admits having no idea whether his opinions would be helpful to the case;

4. Dr. Wysocki has not tested the Plaintiffs' ability to smell; and

5. Dr. Wysocki has not tested the FLW to see what odorants existed.

Defendant argues that Dr. Wysocki was not required to show these things, as he was there to offer his opinions about olfactory abilities and experience among all people generally. Essentially, Dr. Wysocki supports Defendant's argument that there can never be a class certified on the basis of odors, as there is too much variation among people's abilities to smell.

In re Front Loading Washing Mach. Class Action Litigation, Not Reported in F.Supp.2d...
2013 WL 3466821

The Court will permit the testimony of Defendant's olfaction expert, Dr. Wysocki. He is proffered by Defendant in an effort to attempt to defeat Plaintiffs' arguments regarding commonality and typicality. The Court accepts Defendant's proposition, via Dr. Wysocki, that people smell things differently. For many of the same reasons that the Court will permit Dr. Wilson for Plaintiffs, the Court will permit Dr. Wysocki for Defendant.

Clearly, the parties have divergent theories of the case. Plaintiffs believe that LG's FLWs have a common design defect and Defendant believes that because everyone has a different sense of smell, the commonality prong of class certification cannot be met. The Court will honor each party's right to demonstrate its theory of the case through its expert that supports its theory. From the record before the Court as well as the *Daubert* hearing, it is evident that Dr. Wysocki has the educational and practical expertise to opine that the class cannot satisfy the commonality prong because different people smell different things differently. The Court finds that there is a fit between Dr. Wysocki's opinion and the facts of this case and he has satisfied the *Daubert* analysis.

**b. Dr. Thomas Maronick**

Defendant offers Dr. Maronick to challenge Plaintiffs' assertion of predominance in support of their class certification motion. To assess whether the problems asserted by Plaintiffs were widespread, LG retained Dr. Maronick to conduct an internet-based consumer survey to determine the incidence of problems among the population of LG FLW owners and the overall satisfaction or dissatisfaction with the machines. Plaintiffs argue that Dr. Maronick's survey evidence should be excluded because it is not the result of any scientific or otherwise reliable testing. Plaintiffs also challenge his methodology. Plaintiffs assert that while he conducted an internet-based opinion poll, no controls were put in place to ensure that respondents were representative of anything. Therefore, Plaintiffs assert that Dr. Maronick's survey is not reliable and should therefore be excluded under *Daubert*.

**\*7** Dr. Maronick is a Professor of Marketing at Towson University in Maryland, where he teaches "the proper methods and procedures for designing and implementing consumer surveys, including internet-based surveys," and is the Director of Impact Evaluation in the Bureau of Consumer Protection at the FTC where he has gained experience designing and implementing over 300 marketing and consumer surveys. Dr. Maronick has written numerous articles relating to consumer and internet surveys and has frequently qualified as an expert witness in litigation.

The Court will not permit the testimony of Dr. Maronick because it is just too unreliable to be of help in deciding class certification. Dr. Maronick only asked highly general questions. For example, He never asked "does your machine smell?" or any other similar question of that nature designed to elicit a response that would have indicated whether or not the survey responders had the same mold and odor issues as Plaintiffs. Dr. Maronick also cannot say much of anything about who answered his internet survey. It is unclear whether the people who took the survey were paid or otherwise rewarded to take it. There is no way of knowing how many people Dr. Maronick surveyed. In his survey results, he included identical answers to questions even when they were open-ended because he had no way of knowing if they were from different individuals. Dr. Maronick can't say for sure whether any survey-takers actually owned LG FLWs. Identifying data was not requested, such as serial number or other criteria tending to establish that the survey responder really owned the product. Defendant is taking an inferential leap by arguing that this survey leads to an inference that the survey-takers never smelled any mold in their machines just because they indicated during the survey that they were happy with their machines, without any specific query about smell, when that could easily have been asked. For all of these reasons, the Court finds that Dr. Maronick's opinion does not satisfy Fed.R.Evid. 702. His opinion is not helpful in deciding class certification.

**c. Dr. Edward M. Caulfield**

Defendant proffers Dr. Caulfield for class certification purposes to show there is no uniform design defect in the machines, but rather, that the improper use and maintenance of Plaintiffs' washing machines caused the buildup and odors. He opines that owners who follow instructions will not have them. [17] Dr. Caulfield is a mechanical engineer with a Ph.D. in theoretical and applied mathematics, is a registered Professional Engineer in two states, taught at a university level, and has decades of engineering work experience which includes design reviews, evaluations, and testing.

Plaintiffs contend that Dr. Caulfield's testing does not fit the issues of the case because it does not accurately reflect ordinary use of the LG FLWs. Plaintiffs also maintain that Caulfield's test is unreliable because it does not test what it purports to test. For example, Caulfield offers no objective

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 63 of 208
PageID: 72805

In re Front Loading Washing Mach. Class Action Litigation, Not Reported in F.Supp.2d...

2013 WL 3466821

criteria to support his premise that, when testing whether mold and/or smells develop in the FLW, 15 loads per week for 24 weeks is equivalent to 7.5 loads per week for 52 weeks (the same total number of loads that an average household runs in a year).

**\*8** The arguments made by Plaintiffs are generally substantive disagreements with the timing choices in his testing process, which can be tested on cross examination. They do not disqualify him as an expert. Although Caulfield chose to perform a test, rather than rely on his extensive knowledge, experience and education, his tests are relevant to the matter at hand. The Court recognizes that Dr. Caulfield changed the typical actual usage of washing machines by shortening the span of usage time. This is a factor that goes to the weight the Court will afford Dr. Caulfield's opinion, and not to its admissibility. The Court will consider Dr. Caulfield's testimony for what it is worth. Although Dr. Caulfield's testimony might be stronger had he actually ran his test over a year-long period, doing 7.5 loads per week like the average household, this factor goes to weight and not admissibility. Accordingly, the Court finds that Dr. Caulfield's opinion could be helpful to the Court in determining whether class certification is appropriate in this action.[18]

### B. Pending Motion to Strike Inadmissible Evidence in Plaintiffs' Motion for Class Certification

Defendant has moved to strike alleged inadmissible evidence included within Plaintiffs' Motion for Class Certification. This alleged inadmissible evidence can be grouped into five separate categories. These groups consist of: 1) evidence already stricken from the case; 2) declarations Plaintiffs submit in support of their motion that contradict sworn deposition testimony; 3) subsequent remedial design changes presented to prove a design defect; 4) inadmissible hearsay statements made by other companies; and 5) incomplete, uncertified translations.

### 1. Evidence Already Stricken From This Case

Defendant argues that Plaintiffs have included three expert reports within their motion for class certification which make references to declarations that have already been deemed inadmissible by Judge Shipp because they were disclosed by Plaintiffs after the close of discovery. Plaintiffs concede that references to the declarations in the reports were inadvertently included and will be removed. However, this issue does not end here as Defendant asks the Court to strike all of Plaintiffs' expert reports due to the references to the declarations.

It does not appear that Plaintiffs acted in bad faith in including this evidence; rather, it was simply a matter of inadvertence. Therefore, the Court will not strike the entirety of the expert reports. However, Plaintiffs are cautioned that when they re-file their motion for class certification, they cannot rely on evidence previously stricken from the case; Plaintiffs, as well as their experts, must comply with Court orders. Accordingly, Defendant's motion to strike the full reports is denied.

### 2. Sworn Deposition Testimony and Declarations

Defendant argues that in support of their motion for class certification, every Plaintiff but one has submitted a declaration and that most of these declarations contradict Plaintiffs' deposition testimony. The statements within the declarations giving rise to the instant motion pertain to: purchase as a result of advertisement, the date at which Plaintiffs first noticed mold and odor, and review of the original complaint. Plaintiffs respond to Defendant's claims by arguing that the declarations are consistent and are really just clarifications. Assuming arguendo that the declarations were inconsistent, Plaintiffs argue that the "sham affidavit doctrine" is not applicable here.

**\*9** According to the United States Court of Appeals for the Third Circuit, the sham affidavit doctrine states that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase,* 392 F.3d 609, 624 (3d Cir.2004).

This Court is not currently facing a summary judgment motion, a clear aspect of the sham affidavit rule as explained by the Third Circuit in *Baer;* but rather a motion to certify a class. Therefore, a sham affidavit doctrine argument is not currently appropriate and does not require the Court to disregard the Plaintiffs' disputed declarations.

Moreover, the inconsistencies that do exist do not rise to the level of sham pleadings. *See Cottrell v. Zagami, LLC,* 2010 U.S. Dist. LEXIS 63371, 2010 WL 2652229 (D.N.J. June 23, 2010). In *Cottrell,* the defendants argued that even if the plaintiff was not subject to the sham affidavit doctrine because the case was not yet at the summary judgment stage, the court should have refused to accept sham pleadings. *Id.* at \* 19. Because the inconsistencies were "not so outlandish as to be facially false" nor were they indicative of gamesmanship, the

In re Front Loading Washing Mach. Class Action Litigation, Not Reported in F.Supp.2d...
2013 WL 3466821

*Cottrell* court found it could not declare that the plaintiff had submitted sham pleadings. *Id.* at * 19–20.

Here, the inconsistencies complained of by Defendant seem to pertain to differences in interpretation. Defendant finds the phrase "advertised as an efficient appliance," to mean all Plaintiffs viewed an advertisement, while Plaintiffs intended the phrase to mean that Plaintiffs were aware at some point in the buying process that LG marketed the appliances as efficient. In the same vein, Defendant argues that all Plaintiffs did not view the original complaint, as some joined after the complaint had been amended, while Plaintiffs argue they intended to convey that all Plaintiffs viewed *their* original complaint, where the amended complaint was the original complaint for some Plaintiffs. Finally, the issues with the dates appear to be mainly clerical errors.

The Court finds that the small differnces between the declarations and the depositions, if any, do not appear to be facially false as to be sham pleadings. Accordingly, Defendant's motion to strike Plaintiffs' declarations pursuant to the sham affidavit doctrine is denied. However, Plaintiffs are directed to correct the clerical errors with respect to the dates. The Court notes that there was really no objective basis for invoking these doctrines screaming "sham" and asks both sides to tone down the rhetoric and file only motions that are genuinely based on the circumstances. Any further waste of court time on groundless motions will risk sanctions, and all parties are now on notice.

### 3. Remedial Design Defects

Federal Rule of Evidence 407 states that:
When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:

> *10 • negligence;

> • culpable conduct;

> • a defect in a product or its design; or

> • a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control or the feasibility of precautionary measures.

The Court is well aware of what is, and is not, permitted by Rule 407 and will be mindful of the appropriate purposes when ruling on the class certification motion. Plaintiffs will be permitted at trial to introduce evidence of remedial design defects only in a manner consistent with Rule 407, *i.e.,* Plaintiffs will not be able to use the evidence for any purpose barred by Rule 407 and can introduce the evidence for purposes consistent with the last sentence of Rule 407, with a proper limiting instruction. These rulings will be made at trial.

### 4. Hearsay Statements

Defendant argues that the motion for class certification impermissibly relies on inadmissible hearsay statements made by other companies. Defendant relies on one case, *Agere Sys. v. Adv. Enviro Tech.,* 602 F.3d 204, 232 (3d Cir.2010), in support of this proposition. However, as Plaintiffs aptly point out, *Agere* did not involve class certification and did not hold that documents containing hearsay should be stricken during class certification.

The Federal Rules of Evidence are not stringently applied during class certification and courts may consider evidence that might later be ruled inadmissible at trial. *See, e.g., Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (court's determination of class certification is based upon "tentative findings, made in the absence of established safeguards" and explaining that class certification is "of necessity ... not accompanied by the traditional rules and procedures applicable to civil trials"); *Lujan v. Cabana Mgmt., Inc.,* No. 10–755, 2011 WL 317984, *4 (E.D.N.Y. Feb.1, 2011); ("courts frequently consider hearsay in deciding whether to issue class notice"); *Hayden v. Freightcar Am., Inc.,* No. 07–201, 2008 WL 375762, at *2 (W.D.Pa. Jan.11, 2008) (evidence proffered in support of a motion to certify a class need not be admissible at trial); *Vinson v. Seven Seventeen HB Phila. Corp.,* No. 00–6334, 2001 WL 1774073, at *20 n. 28 (E.D.Pa.Oct.31, 2001) ("On a motion for class certification, the evidentiary rules are not strictly applied and courts will consider evidence that may not be admissible at trial."); *In re Hartford Sales Practices Litig.,* 192 F.R.D. 592, 597 (D.Minn.1999) ("On a motion for class certification, the evidentiary rules are not strictly applied and courts will consider evidence that may not be admissible at trial."). In addition, at the class certification stage, courts often examine pleadings as well as affidavits, containing hearsay. *See Eisenberg v. Gagnon,* 766 F.2d

In re Front Loading Washing Mach. Class Action Litigation, Not Reported in F.Supp.2d...
2013 WL 3466821

770, 786 (3d Cir.1985); *Roe v. Operation Rescue,* 123 F.R.D. 500, 502 (E.D.Pa.1988).

**\*11** Plaintiffs may rely on the challenged documents which may or may not contain hearsay in support of their class certification motion. The Court recalls that at least some of the documents complained of were produced by parent or affiliate companies of LG and as such, may be admissions and not constitute hearsay at all. The Court notes that it is rather hard for LG to argue that documents from its parent company are inherently unreliable.

### 5. Translations

Defendant argues that Plaintiffs' motion papers have taken out of context and mischaracterized statements in all of the Korean-language documents. Defendant essentially maintains that Plaintiffs failed to comply with the Federal Rules of Evidence because: (1) Plaintiffs often attach to their motion only selected pages of a document, rather than the complete document in violation of Fed.R.Evid. 106's rule of completeness; (2) Plaintiffs never translate the entire document to provide its complete context and content also in violation of Fed.R.Evid. 106's rule of completeness; and (3) Plaintiffs do not provide any certified translations in violation of Fed.R.Evid. 604.

A party may provide the Court with excerpted portions of testimony and evidence in support of its motion and LG is free to provide the Court with the full exhibits to provide context of the documents and corrected translations if it wishes to do so. For key disputes about translation, certified translations will be required.

To save time, the Court asks the parties to meet and confer and provide the Court with a joint translation and joint set of the relevant portions of the documents sought by both sides by July 16, 2013. If agreement cannot be reached, the Court will refer the parties to a Special Master and will cost-shift if it determines that either side acted inflexibly or unreasonably.

### III. CONCLUSION

For the reasons stated above, Defendant's motion to exclude Plaintiffs' experts Dr. Wilson and Dr. Yang is denied. Plaintiffs' motion to exclude Defendant's experts Dr. Caulfield and Dr. Wysocki also is denied. However, Plaintiffs' motion to exclude Defendant's expert Dr. Maronick is granted. Defendant's motion to strike inadmissible evidence is denied. An appropriate Order shall issue.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3466821

---

### Footnotes

1    The Court administratively terminated Plaintiffs' Motion for Class Certification on July 7, 2011 so that it could rule on the three other pending motions and then determine whether new briefing on the Motion for Class Certification was required.

2    ⚑ *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir.2008).

3    ⚑ *Daubert,* 509 U.S. at 580.

4    ⚑ *Kumho Tire Co.,* 526 U.S. at 149.

5    *Id.*

6    The Supreme Court determined, however, that the expert's theory or technique was not required to have "general acceptance" throughout the relevant scientific community. ⚑ *Daubert,* 509 U.S. at 597.

7    ⚑ *U.S. v. Mitchell,* 365 F.3d 215, 235 (3d Cir.2004).

8      *Kumho,* 526 U.S. at 141–42.

9      *U.S. v. Schiff,* 538 F.Supp.2d 818, 834 (D.N.J.2008) (citing ⚑ *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d at 748 ("*Daubert* makes clear for the first time at the Supreme Court level that courts have to play a gatekeeping role with regard to experts")).

10      ⚑ *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

11      Specifically, Defendant argues: "Because Wilson and Yang did no work and no testing and instead looked at just a few LG FLWs hand-picked by Plaintiffs' counsel, their opinions flunk the reliability requirement under Federal Rule of Evidence 702 and *Daubert.* Their opinions are in fact only testable hypotheses, but they did no testing and applied no other reliable methodology." Brief in Support of Defendant LG USA's *Daubert* Motion at 2.

12      The Rule 23 class factors he is being offered to support are commonality and predominance.

13      To the extent that commonality and predominance overlap with typicality, Dr. Wilson's opinions also are offered in support of that.

14      Plaintiff's Exhibit 11: Dr. Wilson's Expert Report, 15.

15      Many of Defendant's arguments in support of its *Daubert* motion to exclude the testimony of Dr. Wilson appear to relate to the credibility of Wilson as an expert, a question of fact that is left to a fact-finder, rather than Dr. Wilson's admissibility. Defendant's disagreement with Plaintiffs' theory of the case and with Dr. Wilson's testimony and report goes to the weight the Court will give the expert testimony and not to whether Dr. Wilson is himself qualified to give his expert opinion on Plaintiffs' theory of the case and the LG FLWs.

16      For example, Dr. Yang is introduced to rebut the expert opinion of Dr. Caulfield, one of LG's experts. Dr. Caulfield ran certain tests where he accelerated the rate at which laundry was done in an effort to mimic the way Plaintiffs were using their machines and in an attempt to demonstrate that doing laundry the "right" way would not cause the proliferation of mold. Dr. Yang is introduced by Plaintiffs to opine that accelerated testing cannot accelerate mold growth because it takes a certain amount of time for mold to grow.

17      Defendants maintain that use is therefore an individual factor for every member of the class. Additionally, they argue that this also relates to typicality.

18      Because Dr. Caulfield admits he doesn't know if the machines contained mold or not he will not be able to opine as to that.

---

**End of Document**              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 5767415

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by    AngioDynamics, Inc. v. C.R. Bard, Inc.,    N.D.N.Y.,
May 5, 2021

2015 WL 5767415
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE MUSHROOM DIRECT
PURCHASER ANTITRUST LITIGATION.
This Document Relates to All Actions.

Master File NO. 06–0620
|
Signed July 29, 2015

### MEMORANDUM

O'NEILL, District Judge

 *1  Presently before me in this antitrust litigation are Eastern Mushroom Marketing Cooperative (EMMC) defendants' motion to exclude the expert opinions of Professor Einer Elhauge (Dkt. No. 515), defendant M.D. Basciani's motion to exclude Prof. Elhauge's opinions (Dkt. No. 521), direct purchaser plaintiffs' response (Dkt. No. 535), defendants' replies (Dkt. No. 550, 553) and various surreplies (Dkt.Nos.561, 565, 569, 595, 633). On May 19 and 20, 2015, the Court held a *Daubert* hearing regarding these motions. For the reasons that follow, I will deny defendants' motions.

### BACKGROUND

Plaintiffs in this action are purchasers of fresh agaricus mushrooms. *See* Dkt. No. 670 at 2, Direct purchaser plaintiffs' motion for class certification is pending before me. Dkt. No. 514, Defendants include the EMMC and other entities that were Members of the EMMC or were affiliates of members of the EMMC. *See* Dkt. No. 670 at 2. Plaintiffs claim that defendants committed antitrust violations when they agreed to set minimum prices for fresh agaricus mushrooms and to restrict the supply of fresh agaricus mushrooms by purchasing and deed restricting mushroom farms. *Id.* I will now turn to the background immediately relevant to the instant *Daubert* motions.

Direct purchaser plaintiffs submitted an expert report by Prof. Elhauge in support of their motion for class certification and estimating damages. *See* Elhauge Rpt. Prof. Elhauge is a professor at Harvard Law School specializing in antitrust law and antitrust economics. Elhauge Rpt. ¶¶ 4–5, Ex. A. He also provides expert testimony in legal matters and is a graduate of Harvard Law School. *Id.* EMMC defendants submitted an expert report by Dr. John Johnson in support of their opposition to class certification. *See* Johnson Rpt. Dr. Johnson is the CEO of a consulting firm that provides expert economic and financial analysis. Johnson Rpt. at ¶¶ 18–19. He also teaches a class on antitrust and public policy at Georgetown University and has a Ph.D. in economics with a specialization in econometrics from M.I.T. *Id.* M.D. Basciani also submitted an expert report by Dr. Rigoberto Lopez criticizing Prof. Elhauge's opinions. *See* Lopez Rpt. Dr. Lopez is a professor and the head of the Department of Agricultural and Resource Economics at the University of Connecticut. Lopez Rpt. at ¶¶ 1, 2. He is also the director of the Zwick Center for Food and Resource Policy at the University of Connecticut, specializes in the economies of food systems and has a Ph.D. in Food and Resource Economics from the University of Florida. *Id.* Prof. Elhauge submitted a reply report addressing Dr. Johnson and Lopez's reports. *See* Elhauge Reply. Dr. Lopez submitted a supplemental report in support of M.D. Basciani's motion to exclude Prof. Elhauge's expert testimony. *See* Lopez Supp. Rpt. The Court denied direct purchaser plaintiffs' motion to strike Dr. Lopez's supplemental report. *See* Dkt. No. 623. Prof. Elhauge filed a supplemental report in response.[1] *See* Elhauge Supp. Rpt.

 *2  Prof. Elhauge concludes in his report that (1) the EMMC's minimum pricing policy likely impacted all or nearly all class members, Elhauge Rpt. at ¶¶ 7–13; (2) there were class–wide damages from the EMMC's minimum pricing policy with an estimated damages total of _____ million, *id.* at ¶ 14; (3) the EMMC's supply control agreement had common anticompetitive impact on the putative class, *id.* at ¶ 15; and (4) damages resulting from the supply control agreement total an estimated _____ million. *Id.*

### STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When faced with expert testimony, the district court acts "as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief or unsupported speculation."

2015 WL 5767415

*ZF Mentor, LLC v. Eaton Corp.,* 696 F.3d 254, 290 (3d Cir.2012) (internal quotations omitted). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the ease.

Fed.R.Evid. 702. In short, Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003). The party offering expert testimony bears the burden of demonstrating compliance with Rule 702. *See Mercedes–Benz USA, Inc. v. Coast Auto. Grp., Ltd.,* 362 F. App'x 332, 335 n.2 (3d Cir.2010).

First, expert qualification "refers to the requirement that the witness possess specialized expertise." *Schneider,* 320 F.3d at 404. The Court of Appeals has "interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert." *Id.*

Second, the Court of Appeals has "made clear" that "the reliability analysis required by *Daubert* applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *ZF Mentor,* 696 F.3d at 291 (internal quotations omitted). "Thus, the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 743 (3d Cir.1994). At the same time, *Daubert* "focuses on principles and methodology, not on

the conclusions generated by principles and methodology." *Id.* Under *Daubert* and Rule 702, "[p]roponents of expert testimony do not have to prove their case twice–they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re DVI, Inc. Sec. Litig.,* No. 03–5336, 2014 WL 4634301, at *5 (RD.Pa. Sept. 16, 2014) (emphasis in original), *citing* *Paoli,* 35 F.3d at 744.

Third, the requirement of "fit" means that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider,* 320 F.3d at 404. Concretely, that means that the expert's "knowledge must be connected to the question at issue...." *Paoli,* 35 F.3d at 791. The Court of Appeals has "emphasize[d] that the standard is not that high" but at least "is higher than bare relevance." *Id.* at 745. Indeed, the "ultimate touchstone" of the *Daubert* inquiry "is helpfulness to the trier of fact" which means that a "judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Paoli,* 35 F.3d at 744–45.

**\*3** "[A] plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert.*" *In re Blood Reagents Antitrust Litig.,* 783 F.3d 183, 184 (3d Cir.2015). Additionally, while there will inevitably be "overlap" in the consideration of expert testimony in the *Daubert* and class certification inquiries, finding "expert testimony admissible under *Daubert* does not preclude the Court from denying class certification." *In re Processed Egg Products Antitrust Litig.,* No. 08–2002, 2015 WL 337224, at *6 (E.D.Pa. Jan. 26, 2015).

## DISCUSSION

Defendants argue that Prof, Elhauge's opinions are inadmissible for four primary reasons: (1) he is not qualified to offer expert opinion in the form of multiple regression analysis; (2) his regression model, supply control model and analysis of the relevant markets are unreliable or do not fit

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 69 of 208
PageID: 72811

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

the case; (3) he is not credible; and (4) the potential prejudice of his testimony outweighs its probative value. *See* Dkt. No. 515 at 4–5; Dkt, No. 521 at 2–3. I will address each of these contentions in turn. [2]

## I. Expert Qualifications

Defendants contend that Prof. Elhauge is not qualified to provide expert testimony in the form of multiple regression analysis because he does not have a degree in economics, econometrics or statistics. *See* Dkt. No. 515 at 13; Dkt. No. 521 at 6–13. Plaintiffs argue that Prof. Elhauge is qualified in the area of antitrust economics, which they contend is sufficient to qualify him to conduct regression analysis of common impact and damages in an antitrust case. *See* Dkt No. 535 at 10. The crux of the parties' dispute is whether an expert must be qualified in econometrics, economics or statistics as opposed to antitrust economics in order to apply statistical methods in analyzing issues in antitrust class actions such as common impact and damages.

In *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998), the Court of Appeals discussed the expert qualifications standard under Rule 702, which

> requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman ...." (internal citations omitted).

Defendants' argument that Prof. Elhauge must have advanced degrees in econometrics or statistics in order to conduct multiple regression analysis in this case is no doubt "superficially attractive" but I will "decline to rule on that basis." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 505 F.Supp. 1313, 1379 (E.D.Pa.1980), *aff'd in part, rev'd in part on other grounds sub nom, In re Japanese Elec. Prods. Antitrust Litig.,* 723 F.2d 238 (3d Cir.1983), *rev'd sub nom, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). It is attractive because Prof. Elhauge "is not qualified as an expert in economics generally speaking

or econometrics...." *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* No. 05–12024, 2009 WL 3053855 at *3 (D.Mass. Sept. 21, 2009). Prof. Elhauge has little formal education in statistics and economics as fields independent of applied statistics in the antitrust context. Daubert Hr'g Tr. (May 19, 2015) at 103:20–105:2. But the formal division between econometrics or statistics and antitrust economics does not mean Prof. Elhauge is unqualified to apply regression analysis in the antitrust context.

**\*4** Econometrics is "[t]he branch of economics that expresses economic theory in mathematical terms and that seeks to verify theory through statistical methods." Econometrics, Black's Law Dictionary (10th ed.2014). The parties do not dispute that "antitrust economics" is "the application of economic principles and methods to antitrust issues." Dkt. No. 535 at 10; *see also Natchitoches,* 2009 WL 3053855 at *3 (same). Thus, antitrust economics is a "variet[y] of applied economies" in which "econometric methods and modeling have had a profound impact...." Joshua Wright, Fed. Trade Comm'r, Address at Bates White 10th Annual Antitrust Conference, *Simple but Wrong or Complex but More Accurate? The Case for an Exclusive Dealing–Based Approach to Evaluating Loyalty Discounts,* 2013 WL 2902683, at *1 (June 3, 2013) (noting impact of a famous econometrician and his econometric methods in applied economics disciplines such as antitrust economics). There is no dispute that setting aside the issue of regression analysis in particular, courts have admitted Prof. Elhauge as an expert in antitrust economics generally. *See* Dkt. No. 535 at 11 n.17 (collecting cases).

Multiple regression analysis "is taught to students in extremely diverse fields, including statistics, economics, political science, sociology, psychology, anthropology, public health, and history.... Any individual with substantial training in and experience with multiple regression and other statistical methods may be qualified as an expert." Daniel L. Rubinfeld, Fed. Judicial Ctr., *Reference Guide on Multiple Regression,* in *Reference Manual on Scientific Evidence 328* (3d ed.2011). Thus, education and experience applying multiple regression analysis in a specific discipline may qualify an expert to present evidence in the form of regression analysis within that disciplinary context under Rule 702. Indeed, in the antitrust context "a witness lacking a Ph.D. in economics but experienced in particular methods used in antitrust may be well qualified to testify using such methods." The Sedona Conference, *The Sedona Conference Commentary on the Role of Economics in Antitrust Law,* 7

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 70 of 208
PageID: 72812

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

Sedona Conf. J. 69, 83 (2006). The opposite also holds true – for example, a respected economist with no background in antitrust markets could be unqualified to testify regarding the relevant market in an antitrust case. *See Nelson v. Monroe Reg'l Med. Ctr.,* 925 F.2d 1555, 1572 (7th Cir.1991).

Of course, antitrust law as a field has a "more or less direct relationship to economics" compared to most other disciplines or areas of law. Alex Kozinski, *Who Gives A Hoot About Legal Scholarship?,* 37 Hous. L.Rev. 295, 317 (2000). Indeed, the "role of economics in antitrust law" has been described as "the whole game." Rebecca Haw, *Adversarial Economics in Antitrust Litigation: Losing Academic Consensus in the Battle of the Experts,* Nw. U.L.Rev. 1261, 1306 (2012). Because of the close relationship between the fields, the difference between qualification in statistics as opposed to the application of statistical models in antitrust economics "is of necessity indistinct, and it is not clear to [me] that" Prof. Elhauge's opinions "are beyond [his] sphere of expertise, especially since he will be subject to cross–examination." 🚩 *Zenith,* 505 F.Supp. at 1379.

Prof. Elhauge has been described as a "highly qualified antitrust titan[ ]." *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,* 247 F.R.D. 253, 273 (D.Mass.2008). As the *Reference Manual on Scientific Evidence* contemplates in its description of interdisciplinary education in statistical modeling, *see supra,* Prof. Elhauge studied the economic analysis of law in addition to antitrust law at Harvard Law School. *Daubert* Hr'g Tr. (May 19, 2015) at 103:24–104:1. He is the author of numerous books and articles located at the intersection of antitrust law and economics and one of those works has been cited by the Supreme Court. *See Am. Needle, Inc. v. Nat'l Football League,* 560 U.S., 183, 194 n.5 (2010), *citing* E. Elhauge & D. Geradin, *Global Antitrust Law and Economics* (2007). [3] Prof. Elhauge has been qualified by the District of Massachusetts to perform "regressions and other technical statistical analyses" in the antitrust class certification context as an expert in the "field of antitrust economics...." *Natchitoches,* 2009 WL 3053855 at *3. In that case, the Court appointed an independent econometrics expert to review Prof. Elhauge's econometric and statistical opinions but the expert found no technical errors in Prof. Elhauge's analysis. *Id.* at *1, 3. Additionally, the Court admitted Prof. Elhauge's opinions, including regression analysis, over a *Daubert* challenge in *Retractable Technologies, Inc. v. Becton Dickinson & Co,* No. 08–16, Memorandum Order (E.D. Texas Sept. 2, 2013). Prof. Elhauge also clearly has familiarity with

the literature regarding calculation of antitrust damages. *Cf.* 🚩 *Waldorf,* 142 F.3d at 626 (affirming admission of an expert based on his familiarity with the literature in the relevant field and experience despite thin formal credentials); 🚩 *Elcock v. Kmart Corp.,* 233 F.3d 734, 744 (3d Cir.2000) (affirming admission of an expert due to his experience and "review of the literature in the field" which gave him substantially more knowledge than the average lay person regarding the field). For example, Prof. Elhauge is the editor of the *Research Handbook on the Economies of Antitrust Law,* which includes an article analyzing how to calculate antitrust damages. *See* Daniel Rubinfeld, *Antitrust Damages, in Research Handbook on the Economics of Antitrust Law* 378 (Einer Elhauge ed., 2013); Einer Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics, in Research Handbook on the Economics of Antitrust Law* 1 (Einer Elhauge ed., 2013). Further, Prof. Elhauge's reports in this case responding to defendants' experts' criticisms of his regression analysis and his presentation at the *Daubert* hearing demonstrated his command of the technical issues related to multiple regression analysis in the antitrust context.

**\*5** The Court of Appeals has reiterated that it "has had, for some time, a generally liberal standard of qualifying experts." 🚩 *Elcock v. Kmart Corp.,* 233 F,3d 734, 742 (3d Cir.2000). The Court of Appeals has not sought to make the boundaries of expert qualification align exactly with the formal definitions of academic disciplines. "If the liberal standard of Rule 702 allows an engineer who teaches auto mechanics to testify in a products liability action about tractors" and "allows a trained internist who has spent significant time reviewing the literature on PCBs to testify as to whether PCBs caused illness in plaintiffs," 🚩 *Paoli,* 35 F.3d at 754 (internal citations omitted), then surely it allows an expert in antitrust economics such as Prof. Elhauge to testify regarding the use of statistical models in the context of showing common impact and damages in an antitrust case. There is no serious question that Prof. Elhauge "possess[es] skill or knowledge" in conducting regression analysis in antitrust cases that is "greater than the average layman" even if it were conceded that his expertise with multiple regression analysis as an econometric tool in general is not as deep as that of an econometrician." 🚩 *Waldorf,* 142 F.3d at 625.

While Prof. Elhauge is qualified to perform regression analysis in the antitrust context, he does not have the same educational background in econometrics that appears

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 71 of 208
PageID: 72813

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

to be typical of experts admitted to conduct regressions in antitrust cases. *See, e.g.,* ⚑ *In re Linerboard Antitrust Litig.,* 497 F.Supp.2d 666, 668 n.6 (RD.Pa.2007) (considering economic models offered by economics professor who wrote graduate level econometrics text book and where defendants did not object to expert's qualification); *In re Chocolate Confectionary Antitrust Litig.,* 289 F.R.D. 200, 209 (M.D.Pa.2012) (qualifying economics professor as an expert in econometrics where defendants expressed no objection given the expert's extensive background in economics). The solution to this issue was "made clear in *Paoli II* " where the Court of Appeals found "an expert's 'level of expertise may affect the reliability of the expert's opinion.'" ⚑ *Elcock,* 233 F.3d at 749 (affirming the admission of an expert with "thin" credentials), *citing* ⚑ *Paoli,* 35 F.3d at 741. I find that here as well "the lack of econometric/economic credentials affects the weight" although "not the admissibility, of Professor Elhauge's testimony." *Natchitoches,* 2009 WL 3053855 at *3. Thus, to the extent defendants' contend Prof. Elhauge is unqualified to offer opinions in the form of multiple regression analysis in this antitrust litigation I will deny defendants' motions to exclude his opinions.

## II. Methodological Deficiencies

Defendants argue that three specific areas of Elhauge's expert analysis are inadmissible: (1) the regression model, (2) the supply control model and (3) the relevant market analysis. *See* Dkt. No. 515 at 6–9. I will address each of these contentions in turn,

### A. Regression Model

"The essential starting point" for determination of antitrust impact and damages in a price fixing case is to "isolate the effect of the [antitrust] violation on the plaintiff from the effects of all other events" in order to determine the difference between the actual prices paid by the plaintiff and the prices the plaintiff would have paid in a hypothetical world absent the anticompetitive conduct. ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 53–54 (2d ed.2010). By constructing a regression model, an expert can "uncover the relationship between a dependent variable" such as prices and "one or more explanatory variables" such as anticompetitive conduct or costs. *Id.* at 125. In that way, the expert can demonstrate that anticompetitive conduct impacted the prices paid by a plaintiff. The difference between the actual amount the plaintiff paid and the lower amount the plaintiff would have

paid in the but–for world absent the anticompetitive conduct yields the estimated overcharge damages. *Id.* at 129.

To construct his regression model Prof. Elhauge carried out three fundamental tasks. First he defined the conduct and conduct free periods, meaning that he defined the period before and after the alleged conspiracy was effective. Elhauge Rpt. at ¶ 64. Second, he determined what factors could affect mushroom prices besides the EMMC's pricing policies and created control variables. *Id.* at ¶ 70. Third, he determined what pricing data to input into his regression model from the data available to him and calculated the results. *Id.* at ¶¶ 85, 88.

**\*6** Defendants essentially attack Prof. Elhauge's methodology regarding each of the three fundamental tasks he performed and contend that these errors render Prof. Elhauge's regression model too unreliable to be admitted as evidence of anticompetitive impact and damages. Defendants contend: (1) Prof. Elhauge made improper benchmark period determinations; (2) Prof. Elhauge did not control for all important factors that influenced mushroom prices; (3) Prof. Elhauge utilized unrepresentative data; (4) Prof. Elhauge's model is demonstrably unreliable because it generates false positive results when alternative data is input into the model; and (5) Prof. Elhauge's regression model does not "fit" the facts of the case under *Daubert* because it is "incapable" of meeting the standards required for class certification. I will address each of these arguments in turn, but first must discuss some of the legal premises which underlie motions to exclude regression analysis evidence.

### 1. *Daubert* Standard and Regression Analysis

As a threshold matter, "Where is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages" and injury in antitrust cases. *In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 486 (W.D.Pa.1999) (collecting cases). Dispute typically occurs over whether the expert's construction and implementation of the regression model is reliable and helpful in determining the variable of interest, such as the impact of a conspiracy on prices, and whether the model is based upon reliable data. *See* ABA, *supra* at 129. That is because an expert must not only use a sound methodology, but reliability must "extend[ ] to each step in an expert's analysis all the way through the step

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 72 of 208
PageID: 72814

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

that connects the work of the expert to the particular case." *Paoli,* 35 F.3d at 743.

It is helpful to emphasize that under *Daubert,* because the evidentiary requirement of reliability is lower than the merits standard of correctness, the standard for determining scientific reliability is not that high. The test is not [whether the ... expert might have done a better job." *Oddi v. Ford Motor Co.,* 234 F.3d 136, 155–56 (3d Cir.2000) (internal citations omitted). This is particularly true regarding the testimony in this case because economics and statistics "require the use of professional judgment, [so] expert testimony [in those fields] is less likely to be excluded because challenges may ultimately be viewed as matters in which reasonable experts may differ." *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06–1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014) (internal citations omitted); *see also* Fed. R. Evid. 702 advisory committee's notes (2000) (noting that "[s]ome types of expert testimony will be more objectively verifiable" than others but that all testimony must be reliable). In fact, "[a] somewhat unique body of law has developed governing whether and under what circumstances statistical analysis proffered by an expert —and, in particular, regression analyses ... —pass muster under Rule 702." *In re Live Concert Antitrust Litig.,* 863 F.Supp.2d 966, 973 (C.D.Cal.2012).

Because it is a recurring issue in defendants' motions, it is important to address here the question of how objections to expert testimony relating to factual disputes and factual assumptions underlying an expert's opinions are considered under Rule 702. The Advisory Committee's Notes to Rule 702 put it well: "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed.R.Evid. 702 advisory committee's notes (2000). *Daubert* "does not preclude testimony merely because it may be based upon an assumption." *In re Dill Litig.,* 193 F.3d 613, 677 (3d Cir.1999) *amended,* 199 F.3d 158 (3d Cir.2000). Thus, "[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross–examination." *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir.2002).

I am only to consider "the reliability of the expert's method, which may properly include making assumptions so long as those assumptions are sufficiently grounded in available facts." *Edison Wetlands Ass'n. Inc. v. Akzo Nobel Chemicals, Inc.,* No. 08–419, 2009 WL 5206280, at *4 (D.N.J. Dec. 22, 2009). Courts have found that "most contentions that [expert] assumptions are unfounded go to the weight, not the admissibility, of the testimony, and a district court has discretion ... to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *In re Air Cargo,* 2014 WL 7882100, at *15 (internal citations omitted); *see also Synergetics, Inc. v. Hurst,* 477 F.3d 949, 955756 (8th Cir.2007) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross–examination.").

## 2. Agnostic Periods

**\*7** The first step Prof. Elhauge took in constructing his regression model was that he defined the conduct and conduct free periods, meaning that he defined the period before, during and after the alleged EMMC minimum pricing conspiracy was effective. Elhauge Rpt. at ¶ 64. Prof. Elhauge defined the pre–conduct period as beginning on _____, which is the beginning of defendants' available pricing data, and ending _____. Elhauge Rpt. at ¶ 66. Prof. Elhauge defined the conduct period as beginning on _____, which is the beginning of defendants' available pricing data, and ending on _____, which reflects the official implementation and suspension of the EMMC minimum pricing policy. *Id.* at ¶ 67. The purpose of separating conduct free periods and conduct periods is to create a benchmark conduct free period as "an evidentiary foundation for inferring what the prices would have been in the [conduct] period[s] but for the [alleged] illegal activity." *Live Concert,* 863 F.Supp.2d at 974, *citing* 2A P. Areeda & H. Hovenkamp, Antitrust Law ¶ 399b, p. 446 (3d ed.2006). Prof. Elhauge represents this separation of conduct and conduct free periods mathematically the following way. His regression equation includes a conduct variable with a coefficient that represents the percentage price overcharge isolated as a consequence of anticompetitive conduct as opposed to other control variables. When sales data is input during a "conduct" period, the conduct variable is set equal to one. Elhauge Rpt. at ¶¶ 90–91. Where the data is input during a conduct free period, the conduct variable is set to zero. *Id.* Dr. Lopez

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 5767415

expressly acknowledges this is the way Prof. Elhauge's model functions mathematically with regard to the conduct variable. *See* Lopez Rpt. at 137. The parties do not dispute that creating benchmark periods in a regression model to help isolate the impact of anticompetitive conduct on prices is a reliable methodology.

Defendants' challenge arises because despite having sales data from the defendants for the relevant time periods, Prof. Elhauge remained "agnostic" about whether there was anticompetitive conduct from _____ until February 3, 2001 to reflect his consideration of evidence that defendants began discussing minimum pricing during that period but that the level of actual anticompetitive conduct is "murky." Elhauge Rpt. at ¶¶ 90–91. Prof. Elhauge also remained "agnostic" about the period after _____, 2005, citing evidence of continuing anticompetitive conduct in the form of a non–compete agreement between some EMMC members, but concluding that the evidence was not definitive enough to support treating the entire period as either a conduct or a conduct free period. *Id.* Practically speaking, no sales data is input for agnostic time periods in Prof. Elhauge's model. In mathematical terms, Prof. Elhauge says that the "value of the Conduct variable" is set to "missing" during the agnostic periods. Elhauge Reply at ¶ 320.

Defendants argue that Prof. Elhauge's decision to use agnostic periods is unreliabie and that it inflated the overcharge shown by his regression analysis. *See* Dkt. No. 515 at 26; Johnson Rpt. at ¶¶ 133–34; Lopez Rpt. at ¶ 63. Defendants' and their experts' contentions regarding Prof. Elhauge's use of agnostic periods are three–fold: (1) being agnostic about unclear periods of anticompetitive conduct where underlying data is available is methodologically improper, Dkt. No. 515 at 29; *Daubert* Hr'g Tr. (May 20, 2015) at 77; (2) sensitivity testing demonstrates Prof. Elhauge's agnostic period determinations are unreliable, Dkt. No. 515 at 28; and (3) even if it were proper to be agnostic about periods of unclear anticompetitive conduct, Prof. Elhauge's second agnostic period is not "unclear" because there are no lingering effects of anticompetitive behavior during the period. *Id.* at 30–31.

Defendants provide an explanation for why they contend the use of agnostic periods biases Prof. Elhauge's results: it excludes the decrease in mushroom supply caused by the closing of a mushroom farm in 1999, four mushroom farms in 2000–2001 and a farm in 2006. Dkt. No. 515 at 26. Plaintiffs respond that (1) there is no evidence the closed

farms were producing the relevant product, fresh agaricus mushrooms, as opposed to cannery grade mushrooms [4] and (2) that the timing of the closures does not affect Prof. Elhauge's confirmatory price–spike analysis. *See* Dkt No. 535 at 31; Elhauge Reply at ¶¶ 241–257. Defendants respond that the closed farms did in fact compete in the fresh agaricus mushroom market. *See* Dkt. No. 550 at 13–14. Additionally, Dr. Johnson conducted "sensitivity testing" meant to demonstrate the excess overcharge Prof. Elhauge created by including agnostic periods for the time periods in which the mushroom farms at issue closed. Johnson Rpt. at ¶¶ 133–34.

**\*8** As a threshold matter, "the benchmark methodology is widely accepted for calculating overcharges in antitrust cases." *In re Blood Reagents Antitrust Litig.,* 283 F.R.D. 222, 241 (E.D.Pa.2012). But, "[w]hen constructing a benchmark statistic, the regression analyst may not 'cherry–pick' the time–frame or data points so as to make her ultimate conclusion stronger." *Reed Const. Data Inc. v. McGraw–Hill Companies, Inc.,* No. 09–8578, 2014 WL 4746130, at \*6 (S.D.N.Y. Sept. 24, 2014). At the same time, while "[s]tatistics tuned to the proper time period are more probative than statistics not so tuned, [ ] categorical rejection of the latter is not warranted." *Valentino v. U.S. Postal Serv.,* 674 F.2d 56, 71 (D.C.Cir.1982). To the extent an expert's benchmark determination rests on "facts and assumptions as the basis for his opinion" then the opposing party "can highlight those weaknesses through effective cross–examination." *Stecyk,* 295 F.3d at 414. Even "shaky" evidence may be "admissible" and better suited to "the traditional and appropriate means [of] attacking' evidence: "[v]igorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof...." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993). Thus, generally criticisms ... of potential benchmark years go to the weight of [expert] opinions and not their admissibility." *In re Urethane Antitrust Litig.,* No. 04–1616, 2012 WL 6681783, at \*6 (D.Kan. Dec. 21, 2012) *aff'd,* 768 F.3d 1245 (10th Cir.2014). But *Daubert* "does require more than the haphazard, intuitive inquiry...." *Oddi,* 234 F.3d at 156.

The first issue is whether the use of agnostic periods is a reliable methodology generally. Dr. Johnson contends that agnostic periods are methodologically unsound because econometrician will always "test" to "separate out the lawful

from the unlawful conduct" rather than remaining agnostic about whether a benchmark period was a conduct or no conduct period. *Daubert* Hr'g Tr. (May 20, 2015) at 77:8–10. In that vein, Dr. Johnson testified that remaining "agnostic is [ ] a concession that your model can't separate lawful from unlawful conduct" and that "there's no reason to remain agnostic, because [Prof. Elhauge's] actual versus but–for world should pick up any conduct in those periods." *Id.* at 77:19–23.

In contrast, Prof. Elhauge testified that "being agnostic is simply the same thing as choosing the right benchmark period and not choosing periods that are in fact improper benchmark periods." *Daubert* Hr'g Tr. (May 20, 2015) at 203:10–12. There does not seem to be any question that when choosing benchmark periods, "[i]t is important to ensure that the supposedly unaffected periods really are unaffected." ABA, *supra* at 171 n.174. That is because "the effect of the conspiracy will be underestimated if either the defined conduct–free period covers a period when the conspiracy actually existed or the defined conduct period covers a period when the [alleged] conspiracy actually did not exist." Elhauge Rpt. at ¶ 65. Thus, Prof. Elhauge concluded that he "should exclude any period during which one is uncertain whether or not the conspiracy was in place" in order to neither underestimate nor overestimate the overcharge based upon a factual assumption about the beginning and end of the EMMC's alleged anticompetitive conduct. *Id.* at ¶¶ 90–91.

The parties do not dispute that, at least in the way Prof. Elhauge's model functions, one must first make factual assumptions about when there was anticompetitive conduct happening at a given time in order to code the regression's conduct variable as a "conduct," "conduct free" or an "agnostic" period. Dr. Johnson appears to accept that a benchmark period must actually be unaffected in order to serve as a proper conduct free period, but he contends that one must "test" the model's benchmark periods by running the model itself with various assumptions about when a period qualifies as a conduct or a conduct free period. But to "test" the model in the way Dr. Johnson suggests presumes a determination of conduct, conduct free or agnostic periods.[5] Prof. Elhauge argues that Dr. Johnson's testing method is equivalent to testing an accurate scale by observing whether its results differ from an inaccurate scale because Dr. Johnson' sensitivity testing avoids the basic question of whether Prof. Elhauge's model is based on accurate or inaccurate factual assumptions about the beginning and end of the conduct and conduct free periods. Elhauge Reply at ¶ 322. Put another

way, while Dr. Johnson contends that the purpose of the regression is to "separate out the lawful from the unlawful conduct" Prof. Elhauge responds directly. "that's not the point of the regression at all. The point of the regression is to ask what is the price effect of unlawful conduct." *Daubert* Hr'g Tr. (May 20, 2015) at 201:6–7.

**\*9**  This matter is substantially clarified in Prof. Elhauge's favor by Dr. Johnson's sensitivity testing of Prof. Elhauge's model. Again, the crux of Dr. Johnson's "argument for the importance of his sensitivity tests is that "if Elhauge thought there was conduct" during the agnostic periods "and if his model is working properly, then he should have run the model and included it and tested whether or not that made a difference."[6] *Id.* at 80:13–15, 77:11–12. Prof. Elhauge's original model including both his agnostic periods generated an estimated overcharge of 6.6–6.9%, Elhauge Rpt. at ¶ 93. Dr. Johnson attempted to demonstrate that Prof. Elhauge's inclusion of agnostic periods created an unreliable model of overcharges by running four permutations of the model: (1) including sales data from Prof. Elhauge's first agnostic period which generated an overcharge of _____ percent; (2) including sales data from the second agnostic period which generated an overcharge of _____ percent; (3) including sales data from both agnostic periods which generated an overcharge of _____ percent; and (4) including only the second agnostic period and excluding Prof. Elhauge's pre–conduct period data which generated an overcharge of _____ percent. Johnson Rpt. at ¶ 133–34, Ex. 28.

Dr. Johnson contends these modifications demonstrate Prof. Elhauge's model is unreliable because they show Prof. Elhauge's results are "sensitive" to the specification of the benchmark periods. But in each of his modifications, Dr. Johnson assumed that Prof. Elhauge's agnostic periods are conduct free periods. Elhauge Reply at ¶¶ 301, 320. Thus, he seems to ignore the predicate question of determining how the data should be included in the regression based on a factual analysis of the presence of anticompetitive conduct. In order to "test" and "separate out the lawful from the unlawful" Dr. Johnson presumes the very thing he claims to be testing that the agnostic periods are conduct free. Prof. Elhauge emphasizes that the conduct free determination has mathematical significance – it involves deciding the value of the conduct variable in the regression equation. Elhauge Reply at ¶¶ 319–20. That leads Prof. Elhauge to contend that Dr. Johnson is actually "making up" data rather than "including" known datasets. *Id.*

2015 WL 5767415

Indeed, the importance of being circumspect about the predicate conduct determination in terms of overcharge results is evidenced by Dr. Johnson's sensitivity analysis and Prof. Elhauge's response. Prof. Elhauge points out that under Dr. Johnson's logic Dr. Johnson also should have "tested" the model by "including" the agnostic periods as "conduct" periods. Elhauge Rpt. at ¶¶ 320–21. Prof. Elhauge ran that test by including both his agnostic periods as conduct periods instead of conduct free periods, input the relevant sales data and generated an average overcharge of _____ percent compared to Dr. Johnson's _____ percent. *Id.* at ¶ 321. Prof. Elhauge ran the test to include just the second agnostic period as a conduct period instead of a conduct free period and generated an estimated overcharge of _____ percent instead of Dr. Johnson's _____ percent. *Id.* These results show that it is indeed significant whether a time period is included as a conduct or a conduct free period in the regression model and supports Prof. Elhauge's decision to use agnostic periods as a conservative method of mediating the underlying factual uncertainty that would give rise to such disparate results depending on the expert's factual assumptions.

But even accepting Dr. Johnson's sensitivity analysis on its face, he does not demonstrate that Prof. Elhauge's use of agnostic periods creates an unreliable model. Assuming Prof. Elhauge's agnostic periods were conduct free periods does not always create such pronounced effects that excluding Prof. Elhauge's model would be justified. For example, Dr. Johnson reduced the estimated overcharge from _____ percent to _____ percent by changing the first agnostic period to a conduct free period. Elhauge Reply at ¶ 327. While Dr. Johnson emphasizes that he was able to generate a _____ percent overcharge by altering Prof. Elhauge's benchmark periods, *Daubert* Hr'g Tr. (May 20, 2015) at 86:21, 93:6–8, 13–20, to reach that result Dr. Johnson must make what seem to be unreasonable assumptions – not only that the second agnostic period is a conduct free period but also that all of the pre–conduct period data should be disregarded, including data from before _____, 2000, a time that the parties do not even dispute is a conduct free period. *See* Elhauge Reply at ¶ 326.

**\*10** Lastly, defendants contend that Prof. Elhauge's second agnostic period is improper because Dr. Johnson can empirically demonstrate there was no overcharge during that time period. *Daubert* Hr'g Tr. (May 20, 2015) at 84:22. Prof. Elhauge's decision to use a second agnostic period was based on two considerations: (1) potential lingering effects of the minimum pricing policy and (2) evidence of another possible conspiracy to affect prices through a non–compete agreement after the expiration of the minimum pricing policy. Elhauge Rpt. at ¶ 67. Dr. Johnson attempts to demonstrate that there were no lingering effects of the alleged conspiracy during Prof. Elhauge's second agnostic period by changing Prof. Elhauge's average overcharge model to vary the overcharge by month. *Daubert* Hr'g Tr. (May 20, 2015) at 85:1–16. Dr. Johnson's modification resulted in the model generating no overcharge towards the end of Prof. Elhauge's conduct period from August, 2004 until _____ 2005. *Id.* at 86:16–17. Dr. Johnson concludes that if there was no overcharge at the end of the conduct period, that there is no reason to assume there would be lingering effects after the conduct period to justify Prof. Elhauge's inclusion of a second agnostic period rather than a conduct free period.

First, to the extent Prof. Elhauge's decision to use an agnostic period is due to the existence of a non–compete agreement among some EMMC members following the cessation of the minimum pricing policy, I find that Dr. Johnson's analysis focusing on a decline in overcharges at the end of the minimum pricing policy conduct period is inapposite. *See* Elhauge Reply at ¶¶ 291–93. Second, Prof. Elhauge contends that Dr. Johnson's monthly overcharge example produces negative coefficients on some of the variables which indicates a multicollinearity problem. Multicollinearity exists when independent variables are highly correlated with each other and it prevents the model from isolating which variable is causing observed effects. *See* Elhauge Reply at ¶ 333. Prof. Elhauge argues that using two month intervals removes the multicollinearity problem and generates a more accurate model. *Id.* at ¶ 336. It appears that reasonable experts could disagree about what Dr. Johnson's modification of Prof. Elhauge's overcharge coefficient suggests about the reliability of Prof. Elhauge's model. At least, I find that Prof. Elhauge has effectively addressed Dr. Johnson's modifications and established the reliability of his model. I also note that Prof. Elhauge has provided several convincing analogies and formal hypothetical models/proofs to illustrate that remaining agnostic about periods of unclear anticompetitive impact does not bias – and indeed can generate more accurate – results than making an alternative assumption that the period is either a conduct or conduct free period. *See Id.* at ¶¶ 294–314.

To conclude the discussion of Prof. Elhauge's use of agnostic periods, Prof. Elhauge has relied upon "facts and assumptions as the basis for his opinion", and defendants "can highlight those weaknesses" if any "through effective cross–examination." *Stecyk,* 295 F.3d at 444. Prof. Elhauge's

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 76 of 208
PageID: 72818

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

analysis, as discussed above, is clearly not a "haphazard" inquiry. *Oddi*, 234 F.3d at 156. "[T]hose assumptions" that Prof. Elhauge has made to support his agnostic period determinations "are sufficiently grounded in available facts" such as evidence of pre–conduct discussions of the minimum pricing policies and of a non–compete agreement in the post-conduct period to establish the reliability of his agnostic periods under Rule 702. *Edison Wetlands,* 2009 WL 5206280, at *4. I reiterate that Prof. Elhauge's benchmark determinations need not be perfect, indeed they could even be "shaky" but "admissible" under *Daubert.* 509 U.S. 579, 596 (1993). Defendants' "criticisms" of Prof. Elhauge's "potential benchmark years go to the weight of [his expert] opinions and not their admissibility." *Urethane,* 2012 WL 6681783 at *6, *aff'd,* 768 F.3d 1245 (10th Cir.2014). For the reasons stated above, I find that Prof. Elhauge's use of agnostic periods in his regression analysis is reliable under Rule 702.

### 2. Omitted Variables

Prof. Elhauge's second step in constructing his regression model was to determine what market factors affect mushroom prices and create control variables for those factors. *Id.* at ¶ 70. Defendants contend that Prof. Elhauge's regression fails to account for mushroom farm closings that affected mushroom prices. Dkt. No. 515 at 19.

 *11  While it is the case that a regression analysis must account for all of the major explanatory variables to ensure its reliability, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday,* 478 U.S. 385, 400 (1986). Applying *Bazemore* to the antitrust context, "it is only the rare case where the regressions are so incomplete as to be irrelevant and the expert's decisions regarding control variables are the basis to exclude the analysis." *Linerboard,* 497 F.Supp.2d at 678 (internal citations omitted); see, e.g., *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 152 F.3d 588, 593 (7th Cir.1998) (finding expert damages reports were "worthless" because they controlled for only a single factor). Indeed, defendants "cannot exclude a regression analysis ... simply by pointing to variables not taken into account." *Mehus v. Emporia State Univ.,* 222 F.R.D. 455, 462 (D.Kan.2004). "Rather, the challenging party must introduce evidence to support its contention that the failure to include

those variables would actually change the outcome of the analysis," *In re Indus. Silicon Antitrust Litig.,* No. 95–1131, 1998 WL 1031507, at *9 (W.D.Pa. Oct. 13, 1998); *see also In re Polypropylene Antitrust Litig.,* 93 F.Supp.2d 1348, 1365 (N.D.Ga.2000). Thus, defendants must generally provide alternative variables or attempt an alternative regression analysis that might "weaken the results of [the expert's] analysis." *Indus. Silicon,* 1998 WL 1031507, at *9; *see also Live Concert,* 863 F.Supp.2d at 974 (stating there "must be some indication that the excluded variables would have impacted the results").

As a threshold issue, defendants' argument about an omitted control variable for mushroom farm closings is closely related to the issue of Prof. Elhauge's agnostic periods because they contend the inclusion of agnostic periods essentially "omitted" the first group of mushroom farm closings during the first agnostic period and the mushroom farm closing that occurred during the second agnostic period. Dkt. No. 515 at 23. However, defendants seem to conflate the two issues methodologically by primarily discussing mushroom farm closings that occurred during Prof. Elhauge's first agnostic period as a question of omitted variable bias. *Cf. Daubert* Hr'g Tr. (May 20, 2015) at 82:14–17 *with id.* at 83:10–12; *see* Dkt. No. 515 at 23–24. The two issues are distinct, however, since the issue of omitted variable bias relates to whether Prof. Elhauge has included the proper control variables, not whether his model excludes otherwise relevant data such as through benchmark determinations.

I have already found that Prof. Elhauge's agnostic periods are reliable, so the only issue is whether Prof. Elhauge's model is unreliable because he did not include a control variable for mushroom farm closings during the conduct period. Defendants argue four farm closings during the conduct period should have–been accounted for in Prof. Elhauge's model. *See* Dkt. No. 515 at 23. First, defendants have not shown how failing to account for those closings rendered his "regressions [ ] so incomplete as to be irrelevant...." *Linerboard,* 497 F.Supp.2d at 678 (internal citations omitted). Defendants have "simply [ ] point[ed] to variables not taken into account," *Mehus v. Emporia State Univ.,* 222 F.R.D. 455, 462 (D.Kan.2004), but have not provided an alternative mushroom farm closing variable that might "weaken the results of [Elhauge's] analysis." *Indus. Silicon,* 1998 WL 1031507, at *9. Again, that Dr. Johnson ran sensitivity analysis regarding Prof. Elhauge's use of agnostic periods during times that mushroom farms closed is separate

from whether defendants have offered alternative control variables to account for mushroom farm closings in the regression.

Second, Prof. Elhauge's model controls for a number of important variables relevant to mushroom price. In fact, M.D. Basciani's expert Dr. Lopez suggested alternative variables for a number of other factors he believed more accurately reflect mushroom prices. Lopez Rpt. at ¶¶ 46–52. Prof. Elhauge ran his regressions with Dr. Lopez's suggestions and in many cases the regression then generated a larger overcharge due to defendants' alleged conspiracy than with Prof. Elhauge's original variables. Elhauge Reply at ¶¶ 240–82. Here, Prof. Elhauge's "failure to include variables" regarding mushroom farm closings, if any, will only "affect the analysis' probativeness, not its admissibility."

🚩 *Bazemore,* 478 U.S. at 400. Thus, I find that Prof. Elhauge has sufficiently included and justified his control variables to conclude his regression is reliable under Rule 702.

### 3. Representativeness of the Data

**\*12** Prof. Elhauge's third step in constructing his regression model was to determine what price data to input from the available sales data and to calculate the results. Elhauge Rpt. at ¶¶ 85, 88. Prof. Elhauge did not use paper transaction data supplied by some defendants due to the cost of converting voluminous paper records to electronic form. Elhauge Reply ¶¶ 224–25. He also did not utilize data from defendants who did not buy the same products in both pre–conduct and conduct periods to ensure the statistical validity of his analysis. *Id.* at ¶¶ 232–36. Thus, in constructing his model Prof. Elhauge used all of the electronic transaction data produced by defendants who supplied data for both the pre–conduct and conduct periods. [7]

Then, in order to estimate overcharges and damages for defendants who did not produce electronic sales data Prof. Elhauge began with an estimated sales volume using the EMMC's interrogatory responses. Elhauge Rpt. at ¶ 114. Second, he multiplied that by partial years to account for the beginning and end dates of the conduct period. *Id.* Third, from this amount he excluded sideways sales – sales between EMMC members. *Id.* Fourth, he multiplied the resulting sales volume by the average price per pound based on the electronic sales data. *Id.*

Defendants contend that I should exclude Prof. Elhauge's regression model because the data sample he used in his model is not representative of defendants generally and therefore is statistically unreliable. In particular, defendants argue that Prof. Elhauge's sample is unreliable because (1) he only utilized electronic sales data and (2) his sample is too small because it only includes 31 percent of defendants. *See* Dkt. No. 515 14–19; Dkt. No. 521 at 13–23. [8] Also, M.D. Basciani contends that I should exclude Prof. Elhauge's regression model as unreliable with respect to defendants who did not produce electronic sales data because Prof. Elhauge's damages estimates regarding those defendants are inflated. *See* Dkt. No. 595.

As a general matter, "[m]odels are not the real world; rather, such models–are a reasoned and educated attempt to describe reality by accepted methods of statistical analysis using available real world observations, data, and knowledge. The process is not like a Pythagorean demonstration of a mathematical truth that can be revealed indisputably. Neither is it simple 'numbers crunching.' " *Falise v. Am. Tobacco Co.,* 258 F.Supp.2d 63, 67 (E.D.N.Y.2000). Indeed, "[e]ven if the data relied on by the expert is 'imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.' " *Hartle v. FirstEnergy Generation Corp.,* No. 084019, 2014 WL 1317702, at \*9 (W.D.Pa. Mar. 31, 2014) *reconsid. denied sub nom. Patrick v. FirstEnergy Generation Corp.,* No. 084025, 2014 WL 5463885 (W.D.Pa. Oct. 27, 2014); *citing* 🚩🔺*i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 856 (Fed.Cir.2010), *aff'd,* 🚩131 S.Ct. 2238 (2011). [9]

**\*13** Though speaking in the context of an omitted variable question, the Court of Appeals for the Seventh Circuit concluded that "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." 🚩*Manpower, Inc. v. Ins. Co. of Pa.,* 732 F.3d 796, 808 (7th Cir.2013). Thus, in *Chocolate Confectionary,* the District Court determined that despite the representativeness of the data underlying an expert's econometric model on class certification creating "limitations" and rendering it "imperfect" the model was still admissible because the expert had utilized the data produced by the defendants "to the extent possible." 289 F.R.D. at 213. Similarly, in *Inline Connection Corp. v. AOL Time Warner Inc.,* 470 F.Supp.2d 435, 441–42

2015 WL 5767415

(D.Del.2007), the District Court disregarded the defendants' "contention that the data lacks 'intellectual vigor' because of the experts' inability to provide a larger sample" and found that argument "goes to weight, and not reliability...." The Court elaborated that, since the experts "did not base their conclusions solely on unverifiable sources or merely on conjecture ... [their] theories are clearly explained and documented in their reports" and "[t]heir analyses, sources and conclusions can be tested through cross–examination," they were reliable under Rule 702. *Id.*

First, defendants contend that Prof. Elhauge unreasonably did not consider sales data produced by defendants in paper rather than electronic format, which they contend results in a sample size that is unrepresentative and therefore statistically unreliable. Prof. Elhauge responds that manually coding the tens of thousands of paper invoices was infeasible. Elhauge Reply ¶¶ 224–25. Prof. Elhauge also points out that even if all of that data was manually coded there is no way to know if it would offer enough data to generate statistically reliable results for those defendants. *Id,* at ¶ 226. Economic modeling in the litigation context poses real world constraints. Prof. Elhauge does not need to utilize the best data set imaginable to satisfy the reliability standard under Rule 702. His decision not to code thousands of paper sales invoices alone does not impugn the reliability of Prof. Elhauge's sample itself – the question is whether his decision leads to seriously biased results.

Second, defendants contend that because Prof. Elhauge's sample includes only larger producers who used electronic sales records that it is statistically unreliable. Plaintiffs respond that Prof. Elhauge focused on 31 percent of the putative class members to ensure accuracy of the results since these class members were the subset of customers who had purchases in both the pre–conduct and conduct periods and thus provided the best statistical sample. Further, those 31 percent of class members represent 71 percent of all sales volume. *See* Dkt. No. 535 at 26–27. An expert does not run afoul of Rule 702 simply for extrapolating data from one defendant to another. *See Chocolate Confectionary,* 289 F.R.D. at 213. Prof. Elhauge has sufficiently shown that his decision to use a subset of defendants' data was reliable since those defendants produced the most complete data over the relevant time period and represented the majority of total sales made by defendants.

Third, in his supplemental report Dr. Lopez, M.D. Basciani's expert, contends that Prof. Elhauge's estimated damages

for paper data defendants are unreliable because (1) the sales data from which he extrapolated included processed mushrooms that are not part of the relevant product market definition and (2) the sales estimates produced in the BMW's interrogatory responses are unreliable. Lopez Supp. at ¶ 2, Dr. Lopez attempts to demonstrate that these issues lead to overestimated damages for paper data defendants by applying Prof. Elhauge's model for estimated paper defendant damages to electronic data defendants who provided full electronic sales data. Dr. Lopez finds that when Prof. Elhauge's method is cross–applied in this way, the model overestimates sales for electronic defendants anywhere from .27 percent at the least to 263.7 percent at the most, which Dr. Lopez opines indicates the model is flawed. *See* Lopez Supp. Table 1.

**\*14** It bears repeating that "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in [Rule 702] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed.R.Evid. 702 advisory committee's notes (2000). Fundamentally, the question of whether the EMMC's fee assessment base included sales of processed mushrooms outside of the plaintiffs market definition is the kind of factual issue inappropriate for resolution on a *Daubert* motion. Indeed, this issue is largely an extension of the parties' continuing disputed over the factual relationship between processed mushrooms and fresh mushrooms. *See supra* n.4; Elhauge Supp. Rpt. ¶ 2. Next, to the extent that the EMMC's own sales data was unreliable, it is not difficult to appreciate the irony in M.D. Basciani's contention that Prof. Elhauge's report should be excluded for relying upon the data as it was produced by the defendants themselves. Experts are allowed to rely on a defendant's relevant interrogatory responses as a basis for their opinions. *See Tormenia v. First Investors Realty Co.,* 251 F.3d 128, 135 (3d Cir, 2000) (affirming district court's admission of expert testimony relying in part on a defendant's interrogatory responses). Finally, the extent to which Dr. Lopez's cross–application of Prof. Elhauge's methodology for paper data defendants to electronic data defendants raises legitimate questions regarding the accuracy of the estimated damages conclusions that Prof. Elhauge reached is grist for the mill of cross–examination. Thus, I decline to exclude Prof. Elhauge's opinions on the basis of the representativeness of the data which underlies them.

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

#### 4. False Positives

Dr. Johnson ran Prof. Elhauge's model on mushroom sales by EMMC member Monterrey in California, which is outside Prof. Elhauge's proposed geographical market, and returned a _____ percent "overcharge" attributable to anticompetitive conduct. Dkt. No. 515 at 24. Defendants contend that this is a "false positive" that confirms Prof. Elhauge's regression analysis is unreliable. *Id.* Prof. Elhauge offers a variety of responses to defendants' false positive analysis: (1) there is evidence that there was possibly anticompetitive conduct at play in the mushroom market in the Western United States through an organization called the Western Mushroom Marketing Association (WMMA), Elhauge Reply at ¶ 132; (2) that _____, as a member of both the EMMC and the WMMA, could have shared pricing information between the two organizations to prevent buyers in the border regions between the markets from switching suppliers, *id.;* and (3) that Dr. Johnson only utilized the data of a single grower in California and that this result thus demonstrates little about the reliability of Prof. Elhauge's model generally. *Id.* at ¶ 133.

Defendants cite two cases in support of their argument that false positives may demonstrate that a regression analysis is unreliable and inadmissible: 🔖 *In re Rail Freight Fuel Surcharge Antitrust Litig., MDL No. 1869,* 725 F.3d 244 (D.C.Cir.2013) and 🔖 *Comcast Corp. v. Behrend,* 133 S.Ct. 1426 (2013). Neither of those cases decided the admissibility of expert regression analysis, but only considered how false positives impacted the weight given to regression analyses on class certification. Thus, those cases more accurately imply that it is proper to consider the issue of false positives as going to the weight of Prof. Elhauge's analysis at class certification rather than exclusion on a *Daubert* motion. Additionally, in *Rail Freight* the false positive analysis relied upon comparison to a group of shippers "indisputably unaffected by the conspiracy" while in this case "the task is considerably more complex" given the possibility that the WMMA cooperative set minimum prices for mushrooms in the Western United States. *Allen v. Dairy Mktg. Servs., LLC,* No. 09–230, 2013 WL 6909953, at *17 n.9 (D.Vt. Dec. 31, 2013)* (denying *Daubert* motion to exclude expert's regression analysis on the basis of false positives and distinguishing *Rail Freight* ). Prof. Elhauge has raised sufficient questions with a foundation in the record to mitigate the explanatory power of Dr. Johnson's false positive analysis at the *Daubert* stage. Therefore, I find that Dr. Johnson's false positive analysis at

most goes to the weight that should be accorded to Elhauge's conclusions and that Mange's regression model is sufficiently reliable under Rule 702.

#### 5. Fit of the Regression Model

Defendants argue that "Prof. Elhauge's regression is incapable of meeting the standards required of Plaintiffs on class certification and on the merits" because it cannot prove injury to every class member and therefore it does not meet the requirement of "fit" under Rule 702. *See* Dkt. No. 515 at 31–32. Defendants contend that Prof. Elhauge "simply posits applying an average overcharge to all purchases in the Class period" which they argue is insufficient to show individual injury to all or nearly all putative class members. *Id.* at 31. Again, the "fit" requirement means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." 🔖 ⚠️ *Schneider,* 320 F.3d at 404.

**\*15** Prof. Elhauge explains that the function of his unitary overcharge model is not to demonstrate impact on each individual class member for purposes of the common impact analysis on class certification but rather "is intended to show anticompetitive impact on the market." Elhauge Reply at ¶ 135. In his initial report Prof. Elhauge stated that he ran his unitary overcharge regression to "*see* whether the EMMC price–fixing conspiracy raised prices throughout the period when it was in place." Elhauge Rpt. at ¶ 64. Prof. Elhauge does state in his report, however, that because the unitary overcharge regression "controlled for any and all individual buyer characteristics that remain fixed over the period" it "indicates that the proven anticompetitive impact affected all or nearly all customers when coupled" with other evidence of common impact. *Id.* at ¶ 96. Prof. Elhauge does not primarily rest on his unitary overcharge model in reaching the conclusion of injury to all or nearly all putative class plaintiffs. Thus he is correct that the defendants' contention that his unitary overcharge model does not "fit" the purposes of proving anticompetitive impact on all customers is largely off–base. Prof. Elhauge also runs individual regressions for each putative class member and concludes that at least among the statistically significant results _____ percent of customers suffered an anticompetitive impact in each of two conduct periods he delineated for the purpose of his common impact analysis for the time periods following the publication of two EMMC price lists. Elhauge Rpt. at ¶¶ 105, 108. Although defendants contend that a proper interpretation of Prof. Elhauge's regression results leads to the conclusion

Case 1:19-md-02875-RBM-SAK   Document 2086-6   Filed 06/02/22   Page 80 of 208
PageID: 72822

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

that _____ percent or possibly _____ percent of customers were impacted, *see* Dkt. No. 515 at 33, the dispute over how many putative class members Prof. Elhauge's model indicates were actually injured goes to the sufficiency of Prof. Elhauge's evidence on class certification rather than whether his regressions methodologically "fit" the "purposes of the case" at the *Daubert* stage. *Paoli*, 35 F.3d at 743 (emphasis in original). In *Paoli*, the Court of Appeals explained that the application of a scientific test to humans that is meant to be used on animals would not "fit" a case involving humans if it was not methodologically established that there were "good grounds" to apply the test to humans. *Id.* In contrast, Prof. Elhauge's regressions clearly have more than "bare relevance" methodologically to the issue of common impact, even if they might not ultimately show that all or nearly all class members were impacted at a later stage of the litigation. *Id.* at 745. At least, Prof. Elhauge has robustly supported his conclusions of common impact and opines that the application of his regression model to individual class members shows that all or nearly all class members were injured, in addition to presenting other evidence of common impact such as the nature of the alleged conspiracy and price–spike analysis, Dkt. No. 535 at 18–19; Elhauge Rpt. at ¶¶ 105–106; Elhauge Reply at ¶ 137. I am persuaded that Prof. Elhauge's regression analyses, even if they might not be ultimately persuasive at later stages of the litigation, will assist in those later considerations by providing an empirical basis upon which to consider plaintiffs' motion for class certification. Thus, I find that Prof. Elhauge's regression model sufficiently fits the case under Rule 702 and will not exclude it.

**B. Supply Control Model**

In addition to his regression analysis, in his report Prof. Elhauge conducts a separate and alternative analysis of defendants' supply control program as evidentiary support for common impact and damages. *See* Elhauge Rpt. at ¶ 117. To conduct his supply control analysis, Prof. Elhauge uses an elasticity demand formula, *id.* at ¶ 119, then plugs in a price elasticity of demand figure for mushroom sales taken from a Mushroom Council study and farm production estimates from the EMMC to generate an estimate of damages caused by the supply restrictions beginning on the date the farms were purchased until June 2003. *Id.* at ¶¶ 119–22, Prof. Elhauge makes several factual assumptions in order to run this model.

First, Prof. Elhauge assumes that defendants' farm purchases and deed restrictions actually prevented the closed mushroom farms from going back into production – meaning he assumes the very purpose of the EMMC's supply control program. For the purposes of calculating damages, that means he assumes that had the supply control program not existed, the farms would have gone back into production at full capacity from the time that they were purchased from the EMMC. Defendants argue that since the farms were in poor condition and were already dosed when the EMMC purchased them, the assumption that they would have been producing mushrooms at full capacity but–for the EMMC's conduct is an assumption not grounded in the record. *See* Dkt. No. 515 at 38. Second, Prof. Elhauge assumes that the supply control program removed ___ million pounds of mushroom production. Elhauge Rpt. at ¶ 121, Table 7. Defendants 'contend that Prof. Elhauge cannot rely upon that estimate because he cannot testify to whether that data is reliable. Dkt. No. 515 at 40. Third, Prof. Elhauge uses a "marketwide" elasticity figure because, in his words, "the EMMC's supply control agreement reduced the marketwide quantity of multiple mushroom types." Elhauge Reply at ¶ 397. Defendants contend the figure is inappropriate because (a) Prof. Elhauge drew the figure from a third party source and he has not assessed its reliability independently; (b) the figure includes exotic mushrooms; and (c) he applies a single elasticity to various kinds of fresh agaricus mushrooms. *See* Dkt. No. 515 at 42. Fourth, Prof. Elhauge used an elasticity demand formula from the Mushroom Council that defendants contend was improper to use without independently assessing its reliability and that Prof. Elhauge did not assess whether the mushroom market behaves the way the elasticity demand formula models. *Id.*

Again, *Daubert* "does not preclude testimony merely because it may be based upon an assumption." *In re TMI Litig.*, 193 F.3d at 677. That principle is of even greater significance in the context of factual assumptions underlying expert damages calculations. First, even on the merits, "the actual amount of damages may result from a reasonable estimate, as long as the jury verdict is not the product of speculation or guess work." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir, 1993) (internal citations omitted). Second, the extent of damages will often be determined by the resolution of underlying disputed factual issues that are the province of the factfinder. Rather than requiring an expert to calculate "damages for every fore*see*able interpretation of the record and factual finding ... it is more practical for each expert to base his calculations on a particular factual scenario, presumably as posited by or on behalf of the party offering

the expert." *Brill v. Marandola,* 540 F.Supp.2d 563, 570 (E.D.Pa.2008). Thus, "[f]ederal courts applying the standards established by Rule 702 and 703 have permitted damages experts to make the assumptions of fact necessary to render a, sound opinion, so long as such assumptions have a reasonable basis in the available record and are disclosed to the finder of fact." *Id.* at 568.

**\*16** For example, in an employment case where damages depended on how long an employee would have been employed with the plaintiff but–for the defendants' conduct, the Court concluded that "how long [the employee] would have remained employed with Plaintiff is a disputed material fact to be decided by the jury at trial. The jury may then choose to rely upon or disregard" the expert testimony to the extent it relied upon a factual assumption the jury has rejected on the merits. *Meyer–Chatfield v. Century Bus. Servicing, Inc.,* 732 F.Supp.2d 514, 525–26 (E.D.Pa.2010). As long as

> the experts present their factual findings as hypothetical (i.e., if propositions A, B and C are found to be true, then the damages amount to X), then testimony regarding their assumptions is admissible. However, an expert may not state such hypothetical propositions as objective facts, unless such facts are clearly undisputed.

*Brill,* 540 F.Supp.2d at 570. Prof. Elhauge clearly contemplates this scenario when he explains in his report that, if the factfinder does not credit the EMMC's own estimation of the mushrooms the supply control program prevented from entering the market, it would be straightforward to plug an alternative number into his model to generate an alternative damages calculation. [10] *See* Elhauge. Reply at ¶ 378.

**\*17** I find that Prof. Elhauge's damages analysis of the supply control program has "a reasonable basis in the available record" with regard to the question of whether the supply control program reduced supply and the magnitude of that reduction, even if defendants dispute the record evidence. *Brill,* 540 F.Supp.2d at 568. I find Prof. Elhauge's choice to begin his damages calculation on the date that the EMMC acquired the mushroom farms as part of its supply control

agreement has sufficient basis in the factual record. I also find that Prof. Elhauge's use of _____ million pounds as the amount of production reduced by the supply control agreement was sufficiently based in the factual record. Prof. Elhauge based that estimate on defendants' own estimates. *See* Elhauge Rpt. at ¶ 117. Defendants' witnesses have testified that number was inflated. *See* Dkt. No. 515 at 40, *citing* Ex. K, Ex. K; Elhauge Reply at ¶ 388. Defendants point out that the Department of Justice estimated that 42–44 million pounds were removed from supply by defendants' supply control agreement. *Id.* Which number is most accurate is a disputed question of fact for the factfinder. Prof. Elhauge's use of _____ million pounds is clearly based on "sufficient, though perhaps not overwhelming, facts and assumptions" which the defendants may challenge "through effective cross–examination" and presentation of contradicting evidence including their own expert testimony. *Stecyk,* 295 F.3d at 414; *Brill,* 540 F.Supp.2d at 568 (noting each side had opposing experts to address assumptions made by the other expert).

Finally, I find that Prof. Elhauge's use of industry data in the form of an elasticity demand formula and elasticity figure did not render his opinions unreliable or represent improper factual assumptions. This challenge to Prof. Elhauge's reliance on industry data implicates Federal Rule of Evidence 703, which provides in relevant part that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed.R.Evid. 703. In conducting that analysis, I "should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *Montgomery Cnty. v. Microvote Corp.,* 320 F.3d 440, 448 (3d Cir.2003) (citation omitted). I find that an industry elasticity demand study and an industry elasticity demand formula are the kind of evidence that an expert calculating damages would reasonably rely upon. *See Viking Yacht Co. v. Composites One LLC,* 613 F.Supp.2d 637, 642 (D.N.J.2009) (noting that the expert properly relied on "industry publications, academic articles, and the record evidence" even though he "did not test each of the[ ] alternative causes" that could have led to the gel coat cracking at issue in the case). Prof. Elhauge has "good grounds" to rely upon an independent mushroom industry study calculating the elasticity of demand for mushrooms. *Montgomery,* 320 F.3d 440, 448 (3d Cir.2003). Additionally, I will ensure that Prof. Elhauge's factual assumptions are "disclosed to

2015 WL 5767415

the finder of fact" at trial and that Prof. Elhauge presents his damages estimate as a hypothetical based on certain factual predicates. *Brill,* 540 F.Supp.2d at 568. Thus, while there might be a factual dispute about the true extent of any reduction in supply caused by the EMMC's supply control efforts, Prof. Elhauge's analysis has sufficient foundation in the factual record to be admissible.

### C. Market Analysis

#### 1. Product Market

Prof. Elhauge defines the relevant product market in this case as fresh agaricus mushrooms. Elhauge Rpt. at ¶ 47. "The relevant product market is defined as those commodities reasonably interchangeable by consumers for the same purposes. Factors to be considered include price, use and qualities." *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991) (internal citations omitted). M.D. Basciani's expert Dr. Lopez opines that it is not disputed the relevant product market in this case is fresh agaricus mushrooms, though he takes issue with Prof. Elhauge's methodology for defining the market. Lopez Rpt. at ¶ 32. Dr. Johnson contends that the relevant product market is not all fresh agaricus mushrooms, but that white and brown mushrooms are in separate markets. Johnson Rpt. at ¶ 96.

**\*18** Defendants argue that Prof. Elhauge's market definition is based upon analysis that is "insufficient as a matter of law" to prove anything about the relevant markets because he does not conduct a "cross–elasticity study" and thus does not "fit" the legal standards applicable to market definition. Dkt. No. 515 at 43, 45. As a matter of law "[t]he inquiry with respect to fit under *Daubert* is not whether expert testimony is sufficient to meet any of the [legal] elements; rather, the fit inquiry 'goes primarily to relevance.' " *Patrick v. FirstEnergy Generation Corp.,* No. 08–1025, 2014 WL 1318017, at *12 (W.D.Pa. Mar. 31, 2014). Thus, "[w]hether [expert] testimony is sufficient to meet plaintiffs' burden on the merits of those elements is not properly before the court on a *Daubert* motion." *Id.* Defendants do not cite a case in the section of their brief addressing Prof. Elhauge's relevant market analysis that discusses admissibility under Rule 702. [11]

Prof. Elhauge provides three analyses of the relevant product market that are all relevant to the question of the proper product market definition in this case. First, he opines that price correlation evidence supports the conclusion that fresh agaricus mushrooms are all in the same market with each other but not with either canned or fresh non–agaricus mushrooms. *See* Elhauge Rpt. at ¶¶ 50–52; Elhauge Reply at ¶ 83. Defendants assert that Prof. Elhauge only conducted a price correlation as evidence of his market definition. *See* Dkt. No. 515 at 45. But contrary to defendants' contentions, Prof. Elhauge does not rely exclusively on a price correlation analysis as evidence of the relevant product market definition. Rather, Prof. Elhauge uses price correlation as only one piece of evidence supporting his product definition. *See* Elhauge Reply at ¶¶ 84–88.

Second, Prof. Elhauge opines that fresh agaricus mushrooms are not functionally interchangeable with canned and fresh non–agaricus mushrooms. *See* Elhauge Rpt. at ¶¶ 49; Elhauge Reply at ¶¶ 80–81. Defendants do not dispute Prof. Elhauge's functional interchangeability analysis or address its relevance to the question of market definition other than to say it is only "supportive" evidence and fails to meet the legal standard for product definition on the merits. Dkt. No. 550 at 35; Elhauge Reply at ¶ 81.

**\*19** Third, defendants contend that Prof. Elhauge's opinion is faulty because he did not perform the SSNIP test. Dkt. No. 515 at 46. The SSNIP test seeks to answer whether a hypothetical monopolist in the posited market could sustain a profitable price increase of at least five percent above the competitive level. *See* Elhauge Rpt. at ¶ 50. Prof. Elhauge argues that his overcharge regression satisfies the hypothetical monopolist test because it is direct evidence that the EMMC could raise prices profitably over five percent in the relevant market. *See* Elhauge Rpt. at ¶ 54; Elhauge Reply at ¶ 82–83. I find that Prof. Elhauge has sufficiently established that direct evidence of market power such as his regression analysis is at least relevant to the question of market definition (though he contends it is actually superior to other methods of market definition) and "fits" the case. *See* Elhauge Reply at ¶ 82. Without deciding the ultimate significance of his direct evidence of market power on the relevant market definition, I note that where direct evidence of market power is offered courts have found a plaintiff only needs to "show the rough contours of a relevant market...." *In re Comp. of Managerial, Prof'l & Technical Empls. Antitrust Litig.,* No. 02–2924, 2008 WL 3887619, at *7 (D.N.J. Aug. 20, 2008). Further, the Court of Appeals has noted that "market share and barriers to entry are merely surrogates for determining the existence of monopoly power ... direct proof does not require a definition of the relevant market." *Broadcom Corp. v. Qualcomm, Inc.,* 501 F.3d 297, 307

(3d Cir.2007). Indeed, Dr. Johnson testified at the *Daubert* hearing that "market definition is an evolving antitrust exercise" – in contrast to defendants' claims in their *Daubert* briefing that Prof. Elhauge was required to perform a specific form of analysis to render his product market testimony admissible. *Daubert* Hr'g Tr. (May 20, 2015) at 114;17–18. Defendants also object to Prof. Elhauge's direct evidence of market definition because they argue his regression analysis is unreliable. *See* Lopez Rpt. at ¶ 34. I have already found that Prof. Elhauge's regression analysis is sufficiently reliable under Rule 702. Thus, I will deny defendants' motions to exclude Prof. Elhauge's product market analysis.

### 2. Geographic Market

Prof. Elhauge defines the relevant geographic market as the non–Western United States, which he specifies is the area east of the Rocky Mountains. Elhauge Rpt. at ¶¶ 55–57. "The relevant geographic market, from which the court calculates the market share in the relevant product markets, is that area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 212 (3d Cir.2005). Further, "[t]he geographic scope of a relevant product market is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry being considered." *Id.* Elhauge reaches his opinion regarding the relevant geographic market by considering (1) that fresh mushrooms are highly perishable and that transport over the Rocky Mountains is impractical and (2) that his regression analysis provides direct evidence of the EMMC's ability to raise prices in the non–Western United States. *See* Elhauge Rpt. at ¶¶ 56–57. Dr. Johnson opines that Prof. Elhauge's geographic market definition is too large and should be limited to smaller regional markets in part because (1) of the perishability concerns also relied upon by Prof. Elhauge as well as (2) the existence of Canadian imports in border states and other regional variations in mushroom production and distribution. *See* Johnson Rpt. at ¶¶ 100–04. In contrast, Dr. Lopez opines that Prof. Elhauge's geographic market definition is too small and should be expanded to include the entire United States. *See* Lopez Rpt. at ¶ 32. Prof. Elhauge argues that Dr. Johnson's proposal of smaller relevant markets in particular is irrelevant because (1) Prof. Elhauge's regression controls for differences in geographic location; (2) the EMMC minimum price lists applied in every region; and (3) if Prof. Elhauge's proposed market was too broad it would

only understate defendants' market power. *See* Elhauge Reply at ¶ 106.

Defendants do not frame their opposition to Elhauge's geographic market definitions under the legal standard applicable on a *Daubert* motion. They simply argue that "because Prof. Elhauge has not conducted a legally sufficient relevant geographic market analysis, he should be precluded from testifying to the jury about his opinions on the relevant geographic market." Dkt. No. 515 at 45. Defendants improperly assert that if evidence is insufficient on the merits that it should be excluded under Rule 702. Indeed, Prof. Elhauge's geographic market analysis is clearly relevant to the question of the geographic market in this case because he relies upon similar considerations, such as perishability and transportation concerns, that are considered in defendants' own geographic market analysis. *See* Johnson Rpt. at ¶ 104. Prof. Elhauge's report provides direct quantitative evidence of market power in the defined geographic market. *See* Elhauge Rpt. at ¶ 57. Additionally, as Prof. Elhauge argues, to the extent that his geographic Market definition is too large, that would only understate market power in the relevant market. Elhauge Reply at ¶ 106. Dr. Lopez's critique that the mushroom price correlations between California and Pennsylvania show that the states are in the same geographic market is a matter appropriate for cross examination rather than support for exclusion of Prof. Elhauge's testimony. *See* Lopez Rpt. at ¶ 36. Thus, I will deny defendants' motions to exclude Prof. Elhauge's opinion regarding the relevant geographic market.

### III. Credibility

**\*20** M.D. Basciani moves to exclude Prof. Elhauge's opinions as biased and not credible because Prof. Elhauge is: (1) a practicing attorney; (2) has an agenda; (3) is a plaintiffs' expert; and (4) has previously served as an expert for putative class plaintiffs' counsel. *See* Dkt. No. 521 at 50–59. Yet the Court of Appeals has found that the district courts should not generally consider an expert's "credibility as a witness when assessing the reliability of his methods."

*Elcock,* 233 F.3d at 751; *see also* *Egg Products,* 2015 WL 337224, at \*4 (following *Elcock* and declining to consider an expert's credibility at the *Daubert* stage). The Court of Appeals noted that certain exceptions to that rule exist where there is a close nexus between credibility and the methodology in question at the *Daubert* stage. *See Id.* at n.8 (giving the example of "prior dishonest acts involv[ing] fraud committed in connection with the earlier phases of a

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)
2015 WL 5767415

research project that serves as the foundation for the expert's proffered opinion"). Defendants have not made any allegation against Prof. Elhauge's credibility sufficient to warrant my consideration of this issue on a *Daubert* motion. These are issues properly brought out, if at all, on cross–examination. Thus, I will deny M.D. Basciani's motion to exclude Prof. Elhauge's opinions on credibility grounds.

## IV. M.D. Basciani's Rule 403 Motion

M.D. Basciani also moves to exclude Prof. Elhauge from testifying at trial under Federal Rule of Evidence 403 because his "status as a professor of law at Harvard Law School is likely to mislead the jury when he purports to give a strictly economic and not legal opinion." Dkt. No. 521 at 12. Rule 403 provides that "Who court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403. "Rule 403 necessarily requires that the District Court engage in balancing to determine whether the probative value of the evidence is 'substantially outweighed' by the negative factors listed in Rule 403." *Coleman v. Home Depot, Inc.,* 306 F.3d 1333, 1344 (3d Cir.2002). The Court of Appeals has "stress[ed] that *pretrial* Rule 403 exclusions should rarely be granted" and that "if ... testimony survives the rigors of Rule 702 ... Rule 403 is an unlikely basis for exclusion." *Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 859 (3d Cir, 1990). M.D. Basciani relies on *In re Titanium Dioxide Antitrust Litig.,* No. 100318, 2013 WL 1855980, at *8 (D.Md. May 1, 2013), where the Court found that a law professor was not qualified to give economic testimony in an antitrust case under Rule

702 and that in addition his "status as a law professor [was] likely to mislead the jury when he purports to give a strictly economic and not legal opinion." But the Court in *Titanium Dioxide* also found that the potential prejudice "substantially outweighed] the limited probative value of [the professor's] testimony," which it had already determined was inadmissible under Rule 702. *Id.* In contrast, I have determined that Prof. Elhauge's testimony is admissible under Rule 702. I find that the probative value of Prof. Elhauge's testimony, upon which plaintiffs' motion for class certification and damages analysis largely rests, is not outweighed by any potential prejudice to defendants before the jury resulting from Prof. Elhauge's status as a law professor. Of course, to reduce any potential prejudice to the defendants, the jury may be instructed at trial regarding the proper limits of Prof. Elhauge's expert testimony. *See* *United States v. Lee,* 612 F.3d 170, 192 (3d Cir.2010) (affirming Rule 403 decision by district court partially because of the limiting instruction given at trial). Thus, I will deny M.D. Basciani's motion to exclude Prof. Elhauge's expert opinions under Rule 403.

## CONCLUSION

For the reasons set forth above, I will deny defendants' motions to exclude the expert opinions of Professor Elhauge,

An appropriate Order follow

## All Citations

Not Reported in Fed. Supp., 2015 WL 5767415

## Footnotes

1    I will only discuss the opinions contained in Dr. Johnson and Dr. Lopez's reports insofar as they relate to the arguments advanced by the defendants in their motions to exclude Prof. Elhauge's testimony.

2    I will conduct a more extensive review of defendants' *Daubert* challenge than might be applied in other contexts due to the extensive nature of the parties' *Daubert* briefs and expert reports, the multiple parties and sometimes overlapping expert opinions involved, the complexity of the econometric issues underlying the experts' opinions and the importance of the *Daubert* inquiry prior to deciding class certification.

3    Prof. Elhauge's more general works on antitrust law have been cited by the Supreme Court as well.

4    Prof. Elhauge opines that the relevant product market is fresh agaricus mushrooms and that those mushrooms are not interchangeable with cannery grade mushrooms. Elhauge Rpt. at ¶ 47. There is factual dispute regarding the proper definition of "fresh" agaricus mushrooms and mushrooms that are "cannery grade" that influences whether the restriction of supply from mushroom farms that may have been selling to canneries affected fresh mushroom pricing. *Cf. Daubert* Hr'g Tr. (May 19, 2015) at 145:15–9:6 *with Id.* at 48:13–50:18.

5    Prof. Elhauge does not dispute that sensitivity testing of regression models is theoretically possible, but contends that Dr. Johnson's modifications of his agnostic periods are not reasonable and therefore are not truly "sensitivity" tests. Elhauge Reply at ¶ 324. There may be other methods of testing the accuracy of benchmark periods that have not been put forward as criticisms of Prof. Elhauge's analysis.

6    Prof. Elhauge contends that both assumptions to include conduct or conduct free periods in place of his agnostic periods are equally objectionable because they assume facts about anticompetitive conduct that are not sufficiently based in the record. *See* Elhauge Reply at ¶ 321.

7    A dispute has evolved through the briefing of these motions about exactly what data was produced by defendants and considered by Elhauge. *See e.g.,* Dkt. No. 561 at 4–5; 565 at 8–11. I find that Elhauge has considered enough sales data to make his analysis reliable.

8    Defendants even imply that Prof. Elhauge's sample needs to be randomized in order to be considered reliable under Rule 702. *See* Dkt. No. 515 at 15, 18;Lopez Rpt. at ¶ 53 (stating Prof. Elhauge's model is flawed because "it is, non–random and therefore not representative of the market"). It is important that "[m]ost statistical analyses pertinent to judicial proceedings, and certainly those dealing with economic and antitrust issues, are not based on randomized controlled experiments. Rather they are observational studies grounded in real world data." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No: 3, AFL–CIO,* 313 F.Supp.2d 213, 233 (S.D.N.Y.2004).

9    Prof. Elhauge reiterated at the *Daubert* hearing that in antitrust economics one never has perfect information and that an expert must "do the best with the data you actually have available." *Daubert* Hr'g Tr. (May 19, 2015) at 54:14–55:9.

10    Defendants argue that the standard of admissibility for damages experts making factual assumptions is stricter. First, defendants rely upon ⚑ *Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir.2000), where the plaintiff's expert constructed a damages model to show the plaintiff's lost income due to disability. The Court of Appeals reasoned that the expert's opinion was inadmissible because he (1) had simply assumed 100 percent. disability despite the record specifically identifying the level of disability at 75 percent or less, (2) completely ignored actual evidence of the plaintiff's income, (3) simply substituted his own income figures for income and (4) ignored the fact the plaintiff had continued earning income after becoming disabled.

⚑ *Id. at 755–56.* In contrast to the expert in *Elcock,* Prof. Elhauge does not rely upon factual assumptions that are blatantly contradicted by the record. For example, Prof. Elhauge assumes that defendants' deed restrictions prevented the closed mushroom farms from going back into production meaning he assumes the very purpose of the deed restrictions themselves. That is not "pure speculation," but rather is a plausible inference within the context of defendants' alleged attempt to restrict mushroom supply through buying and deed restricting closed farms. "[E]xperts are expected to make inferences and state opinions and they are granted wide latitude in determining what data is needed to reach a conclusion." *Brill,* 540 F.Supp.2d at 568.

Second, defendants rely on ⚑ *In re TMI Litigation,* 193 F.3d 613, 671 (3d Cir.1999), where the Court of Appeals excluded an expert's opinion regarding radiation exposure in part because he had received a critical piece of data needed "to calculate the radiation exposure from Trial Plaintiffs' counsel" and did not attempt

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 86 of 208
PageID: 72828

In re Mushroom Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2015)

2015 WL 5767415

to verify the data. But the Court of Appeals also reasoned that the expert was not qualified in radiation dose reconstruction, "violated an elementary principle of credible dose reconstruction" and that he could not justify his calculations after they were contradicted by another expert. *Id.* Prof. Elhauge's assumptions are also not analogous to the expert's errors in TMI, Prof. Elhauge reasonably relied upon record evidence produced by defendants regarding the market impact of their supply reduction program.

In *ZF Meritor,* the Court of Appeals stated that "[i]n some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." 696 F.3d at 292. There, the plaintiff's expert had "relied on a one-page set of profit and volume projections" to calculate damages that the plaintiff prepared and provided. *Id.* Here, Prof. Elhauge relies upon record evidence of defendants' own contemporaneous internal estimates of the effectiveness of their supply control program. Where a factual issue is disputed and there are reasonable grounds for experts' contradicting assumptions, it is for the jury to weigh the parties' respective evidence regarding the amount of mushroom production removed from the market as a result of the defendants' supply control agreement in determining damages, It is sufficient under Rule 702 that Prof. Elhauge grounded his opinion on factual evidence in the record produced by defendants.

Finally, defendants also contend that *Total Containment, Inc. v. Dayco Products, Inc.,* No.1997–6013, 2001 WL 1167506, at *7 (E.D.Pa, Sept. 6, 2001) supports their position because there the Court excluded the plaintiff's expert's testimony based upon unconfirmed business projections by the plaintiff's own executive and where the executive could "provide[ no explanation of how he arrived at that crucial figure under accepted accounting or economics methods." In *Total Containment,* however, the expert relied upon the executive's unconfirmed projections rather than the "sales figures" which "were presented to [the expert] in abundance, and [the expert] could have computed such a crucial figure on his own, [but] he did not." *Id.* Defendants do not contend that Prof. Elhauge ignored undisputed mushroom farm production data in favor of relying upon the EMMC's supply control impact estimations.

11    Instead, defendants cite *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962), which found on appeal from a final judgment of antitrust liability that market boundaries can be determined by "examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Defendants next cite to *U.S. Horticultural Supply v. Scotts Co.,* 367 F. App'x 305, 311 (3d Cir.2010), which found on summary judgment that a plaintiff had not carried its burden of showing the relevant product market. But far from mandating any special kind of analysis, the Court of Appeals simply noted that the plaintiff's evidence had failed "to discuss price and use implications within its proposed market," that the expert report at issue did not even include information "relating to price increases or price stability for substitute products" 'or "to provide any economic analysis of these substitutes." *Id.* Finally defendants cite to *Queen City Pizza, Inc. v. Domino's Pizza. Inc.,* 124 F.3d 430, 436 (3d Cir.1997), which found that a plaintiff had failed to plead the relevant product market under Rule 12(b)(6) because it did not even "reference ... reasonable interchangeability and cross–elasticity of demand...." In addition to the different procedural posture here, Prof. Elhauge's product market analysis is more complete he discusses practical indicia of market boundaries, functional interchangeability of the products at issue, price correlations and direct evidence of market power in the relevant market.

---

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 87 of 208
PageID: 72829

In re Novo Nordisk Securities Litigation, Not Reported in Fed. Supp. (2020)

2020 WL 502176

2020 WL 502176
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

IN RE NOVO NORDISK SECURITIES LITIGATION

Case No. 3:17-cv-00209-BRM-LHG
|
Signed 01/31/2020

**OPINION**

Martinotti, District Judge

**\*1** Before this Court is: (1) the motion of Defendants Novo
Nordisk A/S ("Novo"), Lars Rebien Sorensen ("Sorensen"),
Jesper Brandgaard ("Brandgaard"), and Jakob Riis ("Riis")
(collectively, "Defendants") to exclude expert testimony
of Plaintiffs' expert (ECF No. 146-1); and (2) Plaintiffs
Central States, Southeast and Southwest Areas Pension
Fund, Lehigh County Employees' Retirement System,
Oklahoma Firefighters Pension and Retirement System,
Boston Retirement System, and Employees' Pension Plan of
the City of Clearwater (collectively, "Plaintiffs") Motion to
Certify Class. (ECF No. 136-1.) Both Motions are opposed.
(ECF Nos. 147 152.) Pursuant to Federal Rule of Civil
Procedure 78(b), the Court did not hear oral argument. For
the reasons set forth below, Defendants' Motion to Exclude
Plaintiffs' Expert's Report is **DENIED,** and Plaintiff's Motion
to Certify Class is **GRANTED.**

**I. BACKGROUND**
Following the Court's consolidation of related cases (ECF
No. 42), Plaintiffs filed an Amended Complaint on August 4,
2017. (ECF No. 71.) Plaintiffs assert claims for (1) violations
of Section 10(b) and Rule 10b-5 of the Exchange Act against
all Defendants (Count I), and (2) violations of Section 20(a)
of the Exchange Act against Individual Defendants (Count
II). Defendants filed a Motion to Dismiss the Amended
Complaint, and, following oral argument, the Court denied
Defendants' Motion to Dismiss. (ECF No. 99.) A more
detailed account of the facts can be found in that opinion; only
the relevant facts are included below.

In this federal securities class action, Plaintiffs allege Novo
made "a series of material misstatements and omissions

about Novo's sales of its core insulin drugs in the United
States." (ECF No. 71 ¶ 4.) Specifically, Plaintiffs contend
Novo falsely attributed its revenue and growth to its
innovation, "when in fact they were the result of a scheme
whereby Novo paid increasingly large kickbacks to Pharmacy
Benefit Managers" ("PBMs"). (*Id.* ¶ 4.) "PBMs are the
middlemen between manufacturers and health insurers who
controlled market access in exchange for placement on their
formularies (i.e., the lists of covered drugs recommended
to providers)." (*Id.*) Novo is a global healthcare company
that derives roughly 80% of its revenue from insulin-based
medications and roughly 54% of its revenue from the U.S.
insulin market. (*Id.* ¶ 3.) Sorensen was Novo's President and
CEO at all times relevant to this action until December 31,
2016. (*Id.* ¶ 35.) Brandgaard was at all relevant times, and
remains, Novo's Executive Vice President and CFO. (*Id.* ¶
36.) Riis was Novo's Executive Vice President for North
America and President of Novo Nordisk Inc., Novo's U.S.
subsidiary, from September 2016 through March 2017. (*Id.*
¶ 37.) Riis was also Novo's Executive Vice President for
China, Pacific & Marketing from January 2013 to September
2016, and Novo's Senior Vice President of Global Marketing
from January 2006 through September 2016. (*Id.*) A more
detailed account of the facts of the case can be found in the
Court's denial of Defendants' Motion to Dismiss the Verified
Complaint. (ECF No. 99.)

**\*2** Plaintiffs bring their claims pursuant to Federal
Rule of Civil Procedure 23 on behalf of a purported class
(the "Class") of all persons and entities "who purchased
or otherwise acquired Novo American Depository Receipts
('ADRs') between February 3, 2015 and February 2, 2017,
inclusive (the 'Class Period')." (*Id.* ¶ 2.) In its Motion,
Plaintiffs argue the Class should be certified because it
satisfies the Rule 23(a) requirements of numerosity,
commonality, typicality, and adequacy, and the Rule 23(b)
requirements of predominance and superiority. (ECF No.
136-1 at 10.) Further, they request the Court appoint Plaintiffs
as Class representatives; and appoint Robbins Geller Rudman
& Dowd LLP ("Robbins Geller") and Bernstein Litowitz
Berger & Grossman LLP ("Bernstein Litowitz") as Class
Counsel, and Seeger Weiss LLP ("Seeger Weiss") and
Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.
("Carella Byrne") as Co-Liaison Counsel. (*Id.*)

Defendants, however, argue the Court should deny Plaintiff's
Motion to Certify because Plaintiffs have not demonstrated
they are adequate Class representatives, nor have they

In re Novo Nordisk Securities Litigation, Not Reported in Fed. Supp. (2020)

2020 WL 502176

shown common issues predominate. (ECF No. 147 at 6-7.) Additionally, Defendants move to exclude the report and opinions of Plaintiffs' expert, Dr. Steven F. Feinstein ("Feinstein Report") (ECF No. 136-3). (ECF No. 146-1.)

## II. STANDARD OF REVIEW

### A. Admissibility of Expert Opinion

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469, (1993). The Third Circuit has held "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC,* 849 F.3d 61, 80 (3d Cir. 2017)

(quoting *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir. 1994))).

> First, the witness must be qualified to testify as an expert. Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such. Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.

*Calhoun v. Yamaha Motor Corp.,* U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quotations and citations omitted).

### B. Class Certification

The Third Circuit has consistently observed that " Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests." *In re Comm. Bank of N. Va.,* 622 F.3d 275, 291 (3d Cir. 2010) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 799 (3d Cir. 1995) (alterations omitted)). Rule 23 contains two sets of requirements. First, a party seeking class certification must demonstrate the class satisfies the requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy].

Fed. R. Civ. P. 23(a).

Second, plaintiffs must show that the requirements of one of the provisions of Rule 23(b) are met. Because Plaintiffs here seek certification under Rule 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are known as predominance and superiority. *In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 780 (3d Cir. 2009).

**\*3** Importantly, the Third Circuit has instructed that "each Rule 23 component [must] be satisfied" for a court to certify a class. *In re Hydrogen Peroxide,* 552 F.3d 305,

In re Novo Nordisk Securities Litigation, Not Reported in Fed. Supp. (2020)

2020 WL 502176

310 (3d Cir. 2008) (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 630, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In that regard, "[c]lass certification is an especially serious decision, as it 'is often the defining moment in class actions (for it may sound the 'death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle [non-meritorious] claims on the part of defendants)." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 162 (3d Cir. 2001). In *Hydrogen Peroxide,* the Third Circuit urged district courts, where appropriate, to "delve beyond the pleadings to determine whether the requirements for class certification are satisfied." 552 F.3d at 316 (quoting *Newton,* 259 F.3d at 167). "An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met." *Id.* Importantly, the predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since "the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Id.* at 310-11 (citations omitted). "If proof of the essential elements of the cause of action requires individual treatment," then predominance is defeated and a class should not be certified. *Id.* (quoting *Newton,* 259 F.3d at 172); *see In re Constar,* 585 F.3d at 780.

## III. DECISION

### A. Defendants' Motion to Exclude Lead Plaintiffs' Expert Report

Here, Lead Plaintiffs use the Feinstein Report to establish market efficiency and create a methodology for calculating damages. Because the Feinstein Report involves issues directly related to class certification, the Court first analyzes the report's admissibility.

#### 1. Expert Qualifications

Defendants do not challenge Dr. Feinstein's qualifications. His credentials and experience qualify him to offer an expert opinion in this case. (*See* ECF No. 136-3 ¶¶ 6-16.) Additionally, this Court has previously found Dr. Feinstein to be credible to offer expert opinions on market efficiency, loss

causation, and damages in securities-fraud cases. *City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.,* No. 12-5275, 2015 WL 5097883, at *1-2, 2015 U.S. Dist. LEXIS 115287 at *5 (D.N.J. August 31, 2015). Therefore, the Court finds Dr. Feinstein qualified.

#### 2. Reliability

Defendants dispute the reliability of Dr. Feinstein's Report on two grounds. First, they argue Dr. Feinstein "fails to offer a functioning damages methodology." (ECF No. 146-1 at 11.) Second, Defendants argue Dr. Feinstein's Report "makes no real attempt to fit his damages proposal with plaintiffs' theory of liability or with a proper measure of claimed damages." (*Id.*)

Specifically, Defendants contend Dr. Feinstein's Report is not reliable because he concedes he is unable to construct an actual damages model until discovery is complete and the record is fully developed. (*Id.* at 13.) Additionally, Defendants urge the Court to follow the Northern District of Ohio's ruling in finding a similar report submitted by Dr. Feinstein unreliable. (ECF No. 146-1 at 13.) In recognizing that case is not binding, the Court finds Defendant's argument premature. At this stage of litigation, Plaintiffs are not required to produce a detailed damages model. *See Li v. Aeterna Zentaris,* No. 14-7081, 2018 WL 1143174, at *2, 2018 U.S. Dist. LEXIS 37811 at *7 (D.N.J. Feb. 28, 2018); *see also Prudential,* 2015 WL 5097883, at *7, 2015 U.S. Dist. LEXIS 115287 at *20, 34-36 (citing *Neale v. Volvo Cars of N. Am., LLC,* 794 F.3d 353, 373-75 (3d Cir. 2015). Nevertheless, Dr. Feinstein's event study approach has been approved as a methodology in previous cases. *See, e.g., WM High Yield Fund v. O'Hanlon,* No. 04-3423, 2013 U.S. Dist. LEXIS 90323, at *11, 2013 WL 3230667 (E.D. Pa. June 27, 2013); *Aeterna Zentaris,* 2018 WL 1143174, at *2; *In re DVI, Inc. Sec. Litig.,* No. 03-05336, 2010 U.S. Dist. LEXIS 92888, at *13, 2010 WL 3522086 (E.D. Pa. Sep. 3, 2010). Because the Court need not consider the reliability of Dr. Feinstein's damages model at this stage, Plaintiffs have satisfied the reliability requirement under FRE 702.

#### 3. Fit

**\*4** To satisfy the third requirement, expert testimony must be "relevant for the purposes of the case" and be helpful to

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 90 of 208
PageID: 72832

In re Novo Nordisk Securities Litigation, Not Reported in Fed. Supp. (2020)

2020 WL 502176

the factfinder. ⚠️ *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has explained the "fit" requirement is one of relevance, and the standard for this factor "is not that high." *United States v. Schiff*, 602 F.3d 152, 172-72 (3d Cir. 2010) ("[E]xpert evidence which does not relate to an issue in the case is not helpful."). At this stage, all that is required is for Dr. Feinstein's model to be helpful in establishing Plaintiffs' case.

Plaintiffs' theory of liability arises from alleged misrepresentations and omissions that caused artificial inflation in Novo's stock price. (ECF No. 71 ¶ 4.) Dr. Feinstein's model isolates and identifies the artificial inflation for those who purchased Novo shares during the Class Period. (*See* ECF No. 136-3 ¶¶ 196-205.) Specifically, Dr. Feinstein proposes a three-step method of calculating damages on a per share basis. First, Dr. Feinstein proposes using "valuation tools, which would include [an] event study analysis" to measure the artificial inflation in the stock due to the alleged misrepresentations and omissions. (*Id.* ¶ 203.) Second, Dr. Feinstein proposes creating an "inflation ribbon," or a "time series of the difference between an ADR's actual price observed in the marketplace, and the estimated price that the ADR would have traded at each day had there been a full disclosure from the outset of the Class Period." (*Id.*) Finally, Dr. Feinstein would calculate damages for each Class member by determining "the difference between the inflation on the date the ADRs were purchased and the inflation on the date those same ADRs were subsequently sold, excluding any inflation dissipation caused by factors other than corrective disclosure." (*Id.*) This exact three-step model has been accepted by other courts. *See Wilson v. LSB Indus.*, No. 15-7614, 2018 WL 3913115, at *16-17, 2018 U.S. Dist. LEXIS 138832, at *48 (S.D.N.Y. Aug. 13, 2018); *see also Aeterna Zentaris,* 2018 WL 1143174, at *2, 2018 U.S. Dist. LEXIS 37811, at *6.

Additionally, while Dr. Feinstein concedes his model requires the "full development of the record," he has presented a model which may be "adjusted to isolate misrepresentations and omissions that the trier of fact ultimately deems fraud-related." (ECF No. 152 at 59, *see also* ECF No. 136-3 ¶¶ 203, 205.) Nevertheless, Dr. Feinstein is not required to produce a detailed damages model at this time. *See Prudential,* 2015 WL 5097883, at *7, 12-13, 2015 U.S. Dist. LEXIS 115287, at *20; *see also In re JPMorgan Chase & Co. Sec. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *7 (S.D.N.Y. Sept.

29, 2015). Accordingly, Defendants' Motion to Exclude Dr. Feinstein's Report is **DENIED**, and the Court will consider it in Plaintiffs' Motion for Class Certification.

**B. Lead Plaintiffs' Motion for Class Certification**

### 1. Rule 23(a) Inquiry

First, the Court must determine whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a). In their arguments against class certification, Defendants only address adequacy under Rule 23(a). Specifically, Defendants argue Plaintiffs are not adequate Class representatives and their counsel cannot fairly and adequately represent the class. (ECF No. 147 at 6.) Nevertheless, the Court will address all elements.

#### i. Numerosity

With respect to numerosity, a party need not precisely enumerate the class members to proceed as a class action. *In re Lucent Tech. Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 640 (D.N.J. 2004). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice S 23.22[3][a] (Matthew Bender 3d ed. 1999)).

 **\*5** Numerosity "is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE." *Prudential,* 2015 WL 5097883, at *8, 2015 U.S. Dist. LEXIS 115287 at *8. Novo stock trades with an average weekly volume of 10.07 million ADRs. (ECF No. 136-3 ¶¶ 57, 88.) As such, it is clear joinder of all members would be impractical, and the Court finds numerosity is satisfied.

#### ii. Commonality

Commonality requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The threshold for establishing commonality is straightforward:

2020 WL 502176

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Indeed, as the Third Circuit pointed out, "It is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a) (2)." *In re Schering Plough*, 589 F.3d at 97 n.10. Therefore, there is a low threshold for satisfying this requirement. *Newton*, 259 F.3d at 183; *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (highlighting that the threshold of commonality is not high (citations omitted)).

Moreover, this requirement does not require all putative class members to share identical claims, *see Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988), as "factual differences among the claims of the putative class members do not defeat certification." *Baby Neal*, 43 F.3d at 56. In that regard, class members can assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice. *Hassine*, 846 F.2d at 177-78. "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded." *Baby Neal*, 43 F.3d at 56.

This case presents numerous questions of law and fact that are common to all members. Specifically, the Amended Complaint alleges a "common course of conduct arising from materially false and misleading statements and omissions Defendants made to the investing public in Novo's SEC filings and press releases and on conference calls." (ECF No. 136-1 at 15.) Insofar as Plaintiffs allege the course of conduct violated the Exchange Act, those violations and related remedies would apply to all Class members.

### ii. Typicality

Rule 23(a)(3) requires that the representative's claim be typical of the members of the class. "The concepts of commonality and typicality are broadly defined and tend to merge, because they focus on similar aspects of the alleged claims." *Newton*, 259 F.3d at 182. "Both criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." *Baby Neal*, 43 F.3d at 56; *see Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Despite their similarity, commonality—like numerosity—evaluates the sufficiency of the class itself, and typicality—like adequacy of representation—evaluates the sufficiency of the named plaintiff. *See Hassine*, 846 F.2d at 177 n.4; *Weiss v. York Hosp.*, 745 F.2d 786, 810 (3d Cir. 1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

**\*6** Specifically, Rule 23(a)(3) requires that "the claims ... of the representative parties [be] typical of the claims of the class." *See* Fed. R. Civ. P. 23(a)(3). Typicality acts as a bar to class certification only when "the legal theories of the named representatives potentially conflict with those of the absentees." *Georgine v. Amchem Prods.*, 83 F.3d 610, 631 (3d Cir. 1996); *Newton*, 259 F.3d at 183. "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id.* at 184. In other words, the typicality requirement is satisfied as long as representatives and the class claims arise from the same event or practice or course of conduct and are based on the same legal theory. *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 146 (D.N.J. 1999).

Here, typicality is clearly satisfied because Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other Class members and are based on the same legal theory. Therefore, the typicality requirement of Rule 23(a)(3) is met.

### iii. Adequacy

A class may not be certified unless the representative class members "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). " Rule 23(a)'s adequacy of representation requirement 'serves to uncover conflicts of interest between named parties and the class they

2020 WL 502176

seek to represent.' " *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 343 (3d Cir. 2010) (quoting *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231). Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citation omitted).

This requirement has traditionally entailed a two-pronged inquiry: first, the named plaintiff's interests must be sufficiently aligned with the interests of the absentees; and second, the plaintiff's counsel must be qualified to represent the class. *Gen. Motors*, 55 F.3d at 800. A named plaintiff is "adequate" if his interests do not conflict with those of the class. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 312 (3d Cir. 1998). Pursuant to Rule 23(g), adequacy of class counsel is considered separately from the determination of the adequacy of the class representatives.

Defendants argue Plaintiffs are inadequate Class representatives because the "formation and composition of the plaintiff group—an amalgam of five dissimilar and unrelated pension funds ... prevents the group from fairly and adequately representing the [C]lass." (ECF No. 147 at 30.) Further, Defendants argue Plaintiffs are inadequate Class representatives because their "lack of involvement and engagement in the prosecution ... demonstrates that the lawyers rather than plaintiffs are driving the litigation."

"[A] class representative 'need only possess a minimal degree of knowledge necessary to meet the adequacy standard.' " *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 296 F.R.D. 299, 316 (D.N.J. 2013) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). "[A] proposed representative's lack of particularized knowledge concerning the dispute at issue 'does not render [a class representative] inadequate ... [if] she has retained adequate counsel to represent her.' " *Szczubelek v. Cendant Mortg. Corp.*, 215 F.R.D. 107, 120 (D.N.J. 2003) (quoting *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 122 F.R.D. 177, 182 (E.D. Pa. 1988)).

The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), expressly provides a group of plaintiffs may be deemed most adequate plaintiffs. *In re Nice Sys. Secs. Litig.*, 188 F.R.D. 206,

220 (D.N.J. 1999). Here, proposed Lead Plaintiffs consist of five pension funds—Central States, Southeast and Southwest Areas Pension Fund; Lehigh County Employees' Retirement System; Oklahoma Firefighters Pension and Retirement System; Boston Retirement System; and Employees' Pension Plan of the City of Clearwater. Collectively, these funds "invest approximately $22.5 billion in assets on behalf of nearly 450,000 participants. (Decl. of Christopher A. Seeger in Support of Plaintiffs' Motion for Class Certification, ECF No. 136-2, Ex. 2 ¶ 2, Ex. 3 ¶ 2, Ex. 4 ¶ 2, Ex. 5 ¶ 2, Ex. 6 ¶ 2.) In assessing whether a group satisfies the adequacy prong of Rule 23, a court must determine whether it "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." *In re Cendant Corp. Litig.*, 264 F.3d 201, 265 (3d Cir. 2001) (quoting *Hassine*, 846 F.2d at 179). Additionally, because Plaintiffs are a group of investment funds, the Court must also determine whether the group is too large to represent the Class in an adequate manner. *In re Cendant Corp. Litig.*, 264 F.3d at 267.

**\*7** Plaintiffs argue they have satisfied the adequacy prong of Rule 23 because, primarily, "the interests of Plaintiffs are perfectly aligned with those of the Class." (ECF No. 136-1 at 19.) Plaintiffs, like all Class members, "purchased Novo ADRs at inflated market prices during the Class Period and were injured by Defendants' misconduct." (*Id.*) Because of this, Plaintiffs argue, they are "incentivized to establish Defendants' liability and maximize their recovery, and by doing so, [they] will necessarily do the same for absent Class members." (*Id.*) Further, when "[l]ead [p]laintiffs have a strong interest in establishing liability under federal securities law, and seek similar damages for similar injuries, the adequacy requirement can be met." *In re Schering-Plough Corp.*, No. 9-397, 2012 WL 4482032, at \*6, 2012 U.S. Dist. LEXIS 138078 at \*21 (D.N.J. Sep. 25, 2012) (*quoting La. Mun. Police Employees Ret. Sys. v. Dunphy*, No. 3-4372, 2008 WL 700181, at \*4, 2008 U.S. Dist. LEXIS 19616 at \*6 (D.N.J. March 13, 2008)). Additionally, Plaintiffs argue they have demonstrated the ability to vigorously serve as Class representatives because they have "demonstrated [their] commitment to this litigation through [their] active participation in the discovery process, including [ ] receiving and reviewing periodic updates ... from counsel, reviewing pleadings and other documents... producing documents and

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 93 of 208
PageID: 72835

In re Novo Nordisk Securities Litigation, Not Reported in Fed. Supp. (2020)

2020 WL 502176

providing responses to ... interrogatories ... and participating in discussions with counsel." (ECF No. 136-1 at 19-20.) Defendants do not dispute Plaintiffs have interests aligned with members of the purported Class. (*See generally*, ECF No. 147.) Therefore, based on Plaintiffs' active participation in litigation, their shared interests with the purported Class, and their appointment of qualified counsel, the Court is satisfied Plaintiffs have the ability and incentive to represent these claims vigorously.

Indeed, because Plaintiffs are a group of investment funds, the Court must also determine whether the group is too large to represent the Class in an adequate manner. *In re Cendant Corp. Litig.*, 264 F.3d at 267. While the Third Circuit has determined the PSLRA simply requires that any such group "fairly and adequately protect the interests of the class," there is a point where a group of plaintiffs may become "too large for its members to operate effectively as a single unit." *Id.* Indeed, there is not a "hard-and-fast rule," and therefore a common sense "rule of reason prevails." *Id.* Nevertheless, the Third Circuit generally agrees with the Securities and Exchange Commission's presumption that groups with more than five members are too large to work effectively. *Id.* The group of lead plaintiffs here consists of a group of five pension funds, which is not presumptively too large under Third Circuit jurisprudence. Therefore, and considering the rule of reason, the group of entities purported to be Class representatives is not too large as to fail the adequacy requirement.

Plaintiffs have made a threshold showing of adequacy based on their commitment to litigation, shared interests with members of the purported Class, and hiring of experienced counsel. Additionally, the Court finds the group of five pension funds is not too large to adequately represent the interests of the Class. As such, Plaintiffs have demonstrated their adequacy class representatives under Rule 23(a).

Defendants attempt to rebut the presumption that Plaintiffs are adequate as lead plaintiffs. However, this presumption "may be rebutted only upon proof *by a member of the purported plaintiff class* that the presumptively most adequate plaintiff (a) will not fairly and adequately protect the interests of the class; or (b) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added). Because Defendants are not members of the purported Class, the Court

may not consider arguments to rebut the presumption of Plaintiffs' adequacy." *In re Cendant Corp. Litig.*, 264 F.3d at 268 (citing *Gluck v. Cellstar Corp.*, 976 F. Supp. 542, 550 (N.D. Tex. 1997) ("The statute is clear that only potential plaintiffs may be heard regarding he appointment of a Lead Plaintiff.").

## 2. Rule 23(b)(3) Factors: Common Questions Predominate and the Class Is Superior to Other Methods of Adjudication

After meeting the threshold requirements of Rule 23(a), a plaintiff must establish the proposed class meets the requirements of Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court must find that "the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. Civ. P. 23(b)(3). In this case, both considerations weigh in favor of class certification.

### i. Predominance under Rule 23(b)(3)

**\*8** Here, Plaintiffs satisfy the predominance and superiority criteria of Rule 23(b)(3). In determining whether common questions predominate, courts have focused on the claims of liability against defendants. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977); *Smith v. Suprema Specialties, Inc.*, No. 02-168, 2007 WL1217980, at \* 9 (D.N.J. 2007) (citations omitted) ("The focus of the predominance inquiry is on liability, not damages."). When common questions are a significant aspect of a case and they can be resolved in a single action, class certification is appropriate. *See* 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, § 1788, at 528 (1986).

In this action, Defendants' alleged liability arises from materially false misrepresentations and omissions about Novo's growth and revenue that caused those who purchased

2020 WL 502176

Novo ADRs during the Class Period to suffer losses. (ECF No. 136-1 at 8.) Plaintiffs are pursuing claims under §§ 10(b) and 20(a) of the Exchange Act, which requires a showing of "(1) a material misrepresentation of omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation of omission; (5) economic loss; and (6) loss causation." (*Id.* at 23 (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013)).) Defendants do not dispute that the claims pursued by Plaintiffs are common to all members of the class. However, to certify a class under Rule 23(b), the Court must determine whether Lead Plaintiffs establish entitlement to the basic presumption of reliance. *Prudential,* 2015 WL 5097883, at *10, 2015 U.S. Dist. LEXIS 115287 at *26.

To establish reliance, Plaintiffs put forth a fraud-on-the-market theory. (ECF No. 136-1 at 25.) The premise of the fraud-on-the-market reliance theory is that reliance on a misleading statements may be presumed where the company's stock is traded "in an open and developed securities market." *Basic, Inc. v. Levinson,* 486 U.S. 224, 242 (1988). This is because "the price of a company's stock is determined by the available material information regarding the company and its business ... misleading statements will therefore defraud purchaser of stock even if the purchasers do not directly rely on those misstatements." *Id.*

To invoke the basic presumption, Plaintiffs must prove Novo stock trades in an efficient market. *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 283, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014). If the Court finds the basic presumption does not apply—either because market efficiency was not established or because Defendants proved there was no price impact—then individual issues of reliance would predominate over common issues, and therefore class certification would be inappropriate. *Id.* at 282, 134 S.Ct. 2398.

Plaintiffs have proven market efficiency. Primarily, Novo's stock trades on the NYSE, "one of the most efficient capital markets in the world." *In re PHP Healthcare Corp.,* 128 F. App'x 839, 848 (3d Cir. 2005); *see also In re DVI Inc. Sec. Litig.,* 639 F.3d 623, 634 (3d Cir. 2011) (trading on the NYSE strongly supports a finding of market efficiency). Additionally, Dr. Feinstein establishes each of the *Cammer*

and *Krogman* factors weigh in favor of market efficiency. *See Feinstein Rpt.* ¶¶ 73-195. Defendants do not dispute this. Because Plaintiffs have established market efficiency, and Defendants do not offer any arguments against this, Plaintiffs are entitled to the basic presumption.

**\*9** Defendants do, however, argue Plaintiffs cannot meet the predominance requirement because Plaintiffs have not met their burden in showing by a preponderance of the evidence that "damages can be determined on a Class-wide basis using the same model and formula for all Class members." (ECF No. 147 at 41 (citing ECF No. 136-1 at 17-18).)

Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages. *Prudential,* 2015 WL 5097883, at *13, 2015 U.S. Dist. LEXIS 115287 at *35. Additionally, "in securities cases ... where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be an 'abuse of discretion.' " *Id.* (quoting *Neal,* 794 F.3d at 375). The Court finds—and Defendants do not dispute—common issues predominate all other issues of law and fact in this case. Therefore, the Court "need not assess the validity of Plaintiffs' damages model at this stage." *Id.* As such, Plaintiffs have satisfied the predominance requirement under Rule 23(b).

### ii. Superiority Under Rule 23(b)(3)

The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co.,* 148 F.3d at 316 (internal citations omitted); *In re Warfarin,* 391 F.3d at 532-33. In its assessment, the Court must weigh: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

In re Novo Nordisk Securities Litigation, Not Reported in Fed. Supp. (2020)
2020 WL 502176

In considering those factors, the Court concludes class action is superior than any other method of adjudication. Specifically, class actions are appropriate in securities cases where a significant number of investors with relatively small losses would likely have decreased motivation to pursue their claims individually. *See Krangel v. Golden Rule Res., Ltd.*, 194 F.R.D. 501, 506 (E.D. Pa. 2000). Additionally, the Court is unaware of any related individual actions, and concentrating litigation here is desirable for efficient and consistent adjudication. Further, there is no indication there will be any difficulties managing this case. Accordingly, Plaintiffs' Motion to Certify Class is **GRANTED**.

### III. CONCLUSION

For the reasons set forth above: (1) Defendants' Motion to Exclude Lead Plaintiffs' Expert Report is **DENIED** and (2) Plaintiffs' Motion to Certify Class is **GRANTED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 502176

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1847385
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Hawa Abdi JAMA, et al., Plaintiffs,
v.
ESMOR CORRECTIONAL
SERVICES, INC., et al., Defendants.

Civ. No. 97–3093(DRD).
|
June 25, 2007.

**Attorneys and Law Firms**

Frank Askin, Esq., Penny M. Venetis, Esq., Rutgers Constitutional Litigation Clinic, Rutgers Law School, Newark, NJ, Sean Mack, Esq., Mary Beth Hogan, Esq., Drew M. Dorman, Esq., Debevoise & Plimpton, LLP, New York, NY, for Plaintiffs Hawa Abdi Jama, Jeyakumar Anantharajah, Abu Bakar, Cecilia Jeffrey, Abraham Kenneh, Shaminus Nanteza, Dennis Raji, Agatha Serwaa, and Sarah Tetteh Yower.

Larry S. Reich, Esq., Blank Rome LLP, New York, NY, Steven D. Weinstein, Esq., New Jersey Resident Partner, Kira Feeny Spaman, Blank Rome, LLP, Cherry Hill, NJ, Frank R. Volpe, Esq., Matthew B. Hsu, Esq., Sidley Austin Brown & Wood, LLP, Washington, DC, for Defendants, Esmor Correctional Services, Inc., James F. Slattery, John Lima, Richard Staley, Aaron Speisman.

**OPINION**

DEBEVOISE, Senior District Court Judge.

**\*1** There are presently before the court Plaintiffs' and Defendants' *Daubert* motions.

### I. *Background*

The Plaintiffs in this action, Hawa Abdi Jama, Jeyakumar Anantharajah, Abu Bakar, Cecilia Jeffrey, Abraham Kenneh, Shamimu Nanteza, Dennis Raji Agatha Serwaa, and Sarah Tetteh Yower, were undocumented aliens who were detained at a facility (the "Facility") that the

Immigration and Naturalization Service ("INS") maintained in Elizabeth, New Jersey pending determination of their asylum status. Defendant, Esmor Correctional Services, Inc. (now Correctional Services Corporation) ("Esmor") operated the facility under contract with the INS. The other defendants are James Slattery (Esmor's President and CEO), Aaron Speisman (Esmor's Vice President of Finances), Richard Staley (Vice President of Operations), John Lima (a facility administrator for a period of time and assistant facility administrator for a period of time), and Willard Stovall (facility administrator for a period of time), Diane McClure and Phillip Johnson (Esmor employees).

On June 16, 1997, Plaintiffs filed their original complaint in this court alleging that while they were detainees at the Facility, they were tortured, beaten, harassed and otherwise mistreated by Esmor guards, and they were subjected to abysmal living conditions, including inadequate sanitation, exercise and medical treatment. The original and an amended complaint asserted numerous causes of action and named numerous defendants. Many of the causes of action and defendants have been dismissed from the case.

There remain the following claims against Esmor its officers Slattery, Speisman, Staley, Lima and Stovall, and its employees McClure and Johnson:

> i) Plaintiffs' claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 (the "ATCA"), alleging that the inhumane treatment of a large number of persons detained on account of no criminal acts was a violation of the law of nations;

> ii) Plaintiffs' claims under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000 bb, et seq. (the "RFRA");

> iii) Plaintiffs' state law claims based on Esmor's and its Defendant Officers' alleged negligent failure to safeguard Plaintiffs' property and negligent hiring, training, supervision and retention of employees [1].

Plaintiffs have moved on *Daubert* grounds to strike or limit the testimony of the following of Defendants' experts: Gary W. DeLand (concerning detention facilities); Dr. Stuart Grassian (concerning Plaintiffs' psychiatric conditions); and Dr. Lawrence Mendel (concerning the medical condition and treatment of plaintiffs). In addition, plaintiffs moved to preclude the testimony of Dr. Grassian for Defendants' alleged spoliation of evidence. Defendants have moved to exclude

the testimony of Dr. Frances Geteles (concerning Plaintiffs' psychiatric conditions).

The parties submitted extensive briefs, declarations and exhibits in support of their motions. The court conducted a hearing on June 21, 2007.

## II. *Discussion*

**\*2** A. *General Principles:* The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides: "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise." Fed.R.Evid. 702.

In *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), the United States Supreme Court held that the Court must exercise a gatekeeping function when determining the admissibility of proposed expert testimony under Rule 702. The objective of the gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony" and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). The standards of admissibility under Rule 702 and the Court's gatekeeping function are applicable not only to scientific expert testimony, but also to any expert testimony that is based on technical and other specialized knowledge. *Id.* at 141. "[T]he permissible scope of expert testimony is quite broad, and District Courts are vested broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H., Rostock,* 435 F.3d 404, 423 (3d Cir.2006).

Under Rule 702, there are two major requirements for admissibility. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir.1994). First, the expert must be qualified as an expert based on a broad range of specialized knowledge, skill or training. *Id.* While the level of expertise may affect the reliability of a particular expert, the Third Circuit Court of Appeals generally has espoused a policy of liberal admissibility with respect to an expert's qualifications. *See id.*

"The second requirement of Rule 702 is that the expert must testify to 'scientific, technical or other specialized knowledge [that] will assist the trier of fact.' " *Id.* at 742 (quoting Fed.R.Evid. 702). The testimony is admissible so long as the "process or technique the expert used in formulating the opinion is reliable." *Id.* "[T]he expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id.* The factors that are important in this determination include:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

**\*3** *Id.* However, the test of reliability is a flexible one and the list of factors 'neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire,* 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (citing *General Electric Co. v. Joiner,* 522 U.S. 136, 143 (1997).

Additionally, "rule 702 requires that the expert's testimony must assist the trier of fact." 35 F.3d at 742–43. The "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.' " *Id.* at 743 (quoting *U.S. v. Downing,* 753 F.2d 1224, 1237 (3d Cir.1985)). "Thus, the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Id.*

B. *Gary W. DeLand:* Mr. DeLand's 63 page single-spaced Report is accompanied by a nine page Appendix A setting forth Mr. DeLand's "Qualifications and Expertise" and a 27–page Curriculum Vitae, reciting his vast range of experience, all in the criminal field.

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 98 of 208
PageID: 72840

1. *The Report:* At the outset, the Report states that Mr. DeLand, in giving his opinions, relies on his 34 years of corrections experience, including Executive Director, Utah Department of Corrections; Jail Commander, Salt Lake County Jail; Executive Director, Utah Sheriffs' Association; technical assistance provider and trainer for the National Institute of Corrections, American Jail Association, Americans for Effective Law Enforcement, National Indian Police Academy Fred House Corrections Academy (State of Utah), and Utah Sheriffs' Association's Advanced Management Training Institute; the Ministry of Justice, Iraqi Correctional Services; jail and prisons standards writer; and policy and procedures writer for several agencies. In addition, Mr. DeLand states that he relied on "ongoing professional interaction with various state corrections officials, county and other local jail administrators, criminal justice researchers and writers, and other corrections experts and officials ... my experience in writing policies and procedures, writing jail standards and development of corrections academic and other training procedures.. my layman's understanding of prisoners' rights as defined in federal case law."

Further, the Report sets forth files and documents provided by defense counsel upon which he relied, including correspondence, pleadings and documents filed by Defendants supporting their position in the case, Plaintiffs' expert reports, miscellaneous documents, and exhibits.

Section A of Mr. DeLand's Report concerns the use of detention standards to establish authoritative benchmarks for the operation and management of detention facilities. The opinions are as follows:

  **\*4** A–1 It is my opinion that it is important to understand what is meant by standards to be able to properly evaluate whether they have any value in establishing operational benchmarks.

A–2 It is my opinion that detention standards reflect the agendas, philosophies, doctrines and beliefs of the organizations that created them; however, they do not provide the scientific or objective validation for individual provisions of the standards or even the rationale that drives each provision.

A–3 It is my opinion that the various standards differ regarding what is deemed to be acceptable or required to comply with the organization's version of best corrections practice; thus, allowing standards to set the benchmarks

would result in confusion as to exactly what the minimum standards are.

A–4 It is my opinion that international standards are even less well suited to evaluate the validity of policies, procedures, practices or conditions in U.S. jails and prisons.

A–5 It is my opinion that there is no consensus among officials regarding best corrections practices.

Mr. DeLand sets forth extensive Comments to these opinions. The long and short of the opinions, as explicated by the Comments, is that there is no agency in the field of detention that is qualified to create or has created useful standards applicable to detention facilities or that could confirm or dispute the opinions expressed by Mr. DeLand. This leaves Mr. DeLand as the only qualified expert in the field.

Mr. DeLand grudgingly acknowledges two sets of national standards which receive significant attention from correction officials, "(1) those promulgated by the American Correctional Association (ACA) which are reasonably comprehensive and provide separate sets of standards for many different types of corrections; and (2) the standards promulgated by the National Commission on Correctional Health Care which focus only on medical and mental health care for prisoners." Acknowledging that "some (perhaps many) of the individual provisions of the standards may have a salutary effect of some aspects of a corrections facility's operations" Mr. DeLand goes on to state "these standards are not a viable benchmark against which to determine whether a facility is being operated in a constitutional or otherwise legal manner." Like all the other standards that Mr. DeLand rejects as driven by the ideological and philosophical agendas of their drafters, these two minimally acceptable standards are "based on the philosophy, doctrine, or beliefs of the organization that promulgated the standards." Further, "[n]one of the organizations have promulgated corrections standards that create, define, or mirror constitutional minima. Thus, compliance with or accreditation under any of these standards does not ensure that the user is compliant with constitutional or other legal requirements and does not provide a defense against prisoner-filed litigation."

Apparently, Mr. DeLand, unlike every other creator of detention standards, is capable of opining that facility practices and conduct do or do not comply with "constitutional or other legal requirements."

2007 WL 1847385

**\*5** The next section of the Report provides opinions related to administrative liability. The opinions are as follows:

B–1.1 It is my opinion that the operation and management of any jail or prison facility offers very difficult challenges to administrators to reasonably ensure safety, security, order, and discipline within the facility while providing humane care to detainees; however, the degree of difficulty is dramatically higher for Elizabeth facility officials who house detainees from a wide variety of nations, who speak a multitude of languages and dialects, and whose cultural expectations are very different from those that generally exist in the United States.

B–1.2 It is my opinion that James Slattery, Aaron Speisman and Richard Staley as corporate officials lack the responsibility and capability of micro-managing the Elizabeth Facility.

B–1.3 It is my opinion that the most efficient and effective way for Slattery, Speisman, and Staley to manage the corporation was to delegate to qualified, trained subordinates the responsibility for the individual facilities and functions within the corporation. While delegation is an indispensable management function, it also separates administration from real-time knowledge of events, decisions and actions as they occur.

B–1.4 It is my opinion that the most efficient and effective way for Stovall and Lima to manage Elizabeth Facility was to delegate to trained subordinates the responsibility of the day-to-day functions of the facility.

B 1–1.5 It is my opinion that proper delegation requires that corporate administrators such as Slattery, Speisman, and Staley provide a reasonable degree of structure and direction to their subordinates. The structure and direction should be in the form of written policies and procedures, staff training and staff supervision.

B–2.1 It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and implemented reasonable screening and hiring practices.

B–2.2 It is my opinion that INS had the authority to control the selection and hiring process; thus, could remedy any problems related to hiring by denying clearances to the candidates for employment.

Opinion B–2.2 constitutes Mr. DeLand's interpretation of the contract between Esmor and INS. This, of course, constitutes

a legal opinion or, if the contract is ambiguous, a factual determination for a jury to make.

B–3.1 It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and implemented adequate and competent written policies and procedures to guide staff.

B–3.2 It is my opinion that procedures were in place to ensure staff access to the manual and to verify that they have read it.

B–3.3 It is my opinion that Stovall had no role in the writing or adopting of the Esmor manual.

The authority for this factual statement is a Reply Brief on Behalf of Defendant Willard Stovall in Further Support of Motion for Summary Judgment. If Plaintiffs dispute this fact, Stovall's Reply Brief is hardly authority for this "opinion."

**\*6** B–3.4 It is my opinion that Stovall made reasonable efforts to improve the operations by negotiating with the INS COTR modifications in the contract.

B–3.5 It is my opinion that Stovall made reasonable efforts to improve policy, procedure, and practices by seeking to become ACA accredited.

B–4.1 It is my opinion that Defendants Slattery, Speisman, Staley, Stovall and Lima adopted and implemented a reasonable training program.

B–4.2 It is my opinion that nothing in the record which I have reviewed (including the report of Plaintiffs' expert, Miller) would lead to a reasonable inference that allegedly inadequate training was the cause of any staff misconduct.

Obviously, Mr. DeLand has not read the entire record in the case and does not know what the evidence will be at the trial. He is not in a position to make the factual finding set forth in Opinion B–4.2, and even if he were, "cause" is for the jury.

B–4.3 It is my opinion that training programs should provide instruction to staff regarding those topics which they know to a moral certainty are necessary to protect the lives, safety, and clearly established rights of the detainee population; however, no matter how competent and well-designed a program may be the level of comprehensive and achievement will vary widely among trainees.

B–4.4 It is my opinion that training, regardless of how well designed and delivered, cannot guarantee perfect outcomes.

2007 WL 1847385

B–4.5 It is my opinion that the training program adopted by Defendants Slattery, Speisman, and Staley and implemented by Lima and Stovall was adequate and met the requirements set by INS.

B–5.1 It is my opinion that the Esmor Defendants have adopted and implemented a chain of command to facilitate efficient supervision of staff members.

B–5.2 It is my opinion that the Esmor Defendants adopted and implemented an employee evaluation system as a part of managing and supervising employees.

B–5.3 It is my opinion that Esmor officials facilitated the supervision process by maintaining personnel records.

B–5.4 It is my opinion that Esmor officials facilitated the supervision process by having a probationary period of employment during which they can more closely observe and evaluate employees before giving them full-time status.

B5.5 It is my opinion that Esmor officials facilitated the supervision process by adopting standards of conduct, ethics requirements, and an employee discipline system.

C–1 It is my opinion that many of the religion-related claims were of questionable validity.

C–2 It is my opinion that some detainee claims appear to have been exaggerated.

D–1 It is my opinion that if any Esmor staff misappropriated detainee money or property, as alleged, the theft could be handled as a violation of criminal law; however, such cases are often difficult to prosecute.

D–2 It is my opinion that there is nothing in the record that would support an inference that corporate or facility were involved in, approved of, or acquiesced to the misappropriation of detainees' money or property.

 **7  D–3 It is my opinion that any guards involved in misconduct would make every effort to limit the potential for discovery by facility or corporate officials.

D–4 It is my opinion that Esmor has adopted policies and procedures which provide a reasonable and appropriate process for receiving, inventorying, receipting, and safely storing detainee property until it is appropriate to release the property to the detainee from whom it was taken.

D–5 It is my opinion that any detainee who suffered the loss of property whether by theft or mishandling should have been compensated for such losses.

E–1 It is my opinion the Esmor policies and procedures provide access to courts and counsel.

E–2 It is my opinion that Plaintiffs were permitted to telephone their attorneys from the Elizabeth facility.

E–3 It is my opinion that Plaintiffs were permitted to correspond with their attorneys.

E–4 It is my opinion that Plaintiffs were permitted to visit and communicate with their attorneys at the Elizabeth facility.

E–5 It is my opinion that Plaintiffs' rights of access to courts and counsel were not violated due to the lack of a law library, an inadequate law library, or inadequate access to an existing law library.

In his Comment to Opinion E–5, Mr. DeLand states that "I offer no opinions regarding when a law library was provided, whether it was adequate, or how much access detainees had to the library. He then explains that the basis for an opinion that the Esmor officials did not unreasonably interfere with Plaintiffs' access to courts and legal representation was: "1. it is my understanding that Plaintiffs were represented by counsel; 2. based on my layman's understanding of the law, even U.S. prisoners do not have a free-standing right to a law library; and 3. neither Plaintiffs nor their expert witness, Miller, has explained how any named Plaintiff suffered actual harm as a result of a lack of access to a law library." Thus, Mr. DeLand's opinion is based on a factual finding made without resort to a full record or trial evidence, a layman's understanding of the law, and an argument related to the issue of causation.

F–1 It is my opinion that Esmor officials did not deprive [Plaintiffs] of the basic necessities of life.

F–2.1 It is my opinion that Esmor officials did not deprive detainees of shelter.

F–2.2 It is my opinion that there is no justification for a conclusion that the design of the Elizabeth facility was flawed to a level that it created a substantial threat of serious harm to detainees or that it was otherwise inadequate to humanely house detainees.

F–2.3 It is my opinion regarding lighting that Stovall took reasonable measures to remedy the concerns of detainees regarding the light levels during sleeping hours.

F–2.4 It is my opinion regarding heating and air conditioning that Stovall made reasonable efforts to upgrade the heating and air conditioning in the kitchen area.

F–2.5 It is my opinion regarding sanitation that Elizabeth facility officials engaged in efforts to meet sanitation needs.

**\*8** F–3 It is my opinion that Esmor officials did not deprive detainees of adequate clothing.

In the last two paragraphs of his Comments upon Opinion F–3, Mr. DeLand engages in a legal analysis of Plaintiffs' claims, citing out of context a provision of the Prison Litigation Reform Act.

F–4 It is my opinion that Esmor officials did not deprive Plaintiffs of adequate food.

F–5.1 It is my opinion that detainees were provided medical care at the Elizabeth Facility, and that the system as described in written policies and procedures met basic medical care requirements for a correctional or detention facility.

F–5.2 It is my opinion that Stovall also sought to add stress management assistance to the health care program.

F–6.1 It is my opinion that detainees were provided an opportunity for exercise.

F–6.2 It is my opinion that limited natural light and fresh air do not prevent detainees from receiving the primary benefits of exercise.

The last paragraph of the comment to Opinion F–6.2 finds support for the opinion in "the U.S. Supreme Court's analysis of two Circuit Court decisions regarding outdoor recreation."

F–7.1 It is my opinion that privacy is inconsistent with the requirements of incarceration.

In the Comments to Opinion F–7.1, Mr. DeLand quotes from two Supreme Court decisions that refer to privacy rights

in prisons, *Bell v. Wolfish,* 441 U.S. 529, 537 (1979) and *Hudson v. Palmer,* 468 U.S. 517, 525–526 (1984).

G–1.1 It is my opinion that many detainees prefer to work to escape the boredom of confinement [in] individual housing units.

G–1.2 It is my opinion that un-sentenced detainees should not be subjected to forced labor.

H–1.1 It is my opinion that detainee discipline is essential to maintaining safety, security, and order.

H–1.2 It is my opinion that there is a difference between discipline (which is punitive) and classification or other housing decisions which are implemented for non-punitive management reasons.

Mr. DeLand concludes his perfectly reasonable Comment about Opinion H–1.2 with the observation "(as the Supreme Court has ruled many times over the last 30 years)."

H–2.1 It is my opinion that due process is not required for non-punitive segregation.

H–2.2 It is my opinion that if a detainee is segregated for punitive reasons minimal due process is required.

I–1.1 It is my opinion that torture or other brutality against detainees would be unacceptable and unlawful.

I–1.2 It is my opinion that Esmor officers Slattery, Speisman, and Staley and Elizabeth facility administrators Lima and Stovall were not involved in torture or other brutality against detainees, nor did they condone such actions or acquiesced in it.

In his Comment upon Opinion I–1.2, Mr. DeLand states that he reviewed "the records at hand" and saw nothing to support a conclusion that brutality was allowed or acquiesced in by Esmor or Elizabeth administrators. He also notes the policy manual which "is devoid of even a hint that brutality toward detainees is encouraged, condoned, or excused." This is a totally inadequate basis for the "opinion" Mr. DeLand expresses.

**\*9** I–2.1 It is my opinion that use of force is not the equivalent of brutality and use of force is sometimes necessary to maintain or restore order.

I–2.2 It is my opinion that force should not be applied in a brutal, sadistic, or malicious manner.

I–2.3 It is my opinion on my review of the documents I have been provided, that there is no record of a policy or practice of excessive force.

J–1 It is my opinion that searches are a critical element of facility security and safety.

J–2 It is my opinion that living areas are not the equivalent of the detainees' home and cannot be afforded protection from searches.

J–3 It is my opinion that the appropriateness of personal searches should be evaluated considering he degree of intrusion, justification for search and level of intrusion, and the manner in which searches were conducted.

The Comment to Opinion J–3 includes for support a quotation from ⚑ *Bell v. Wolfish,* 441 U.S. 520, 559 (1970) but otherwise constitutes a general discussion of the objectives of, need for and problems encountered during body searches.

> J–4 It is my opinion that Esmor/
> Elizabeth policies and procedures for
> searching detainees balance the safety
> and security interests of the facility
> with interest of detainees.

2. *Plaintiffs' Objections:* Plaintiffs initially challenge Mr. DeLand's qualifications to testify as an expert. They note, correctly, that all of his vast experience has been in the corrections field, the detention of persons charged with, or sentenced for, criminal acts. By way of contrast, the Esmor Facility was an INS detention center housing civil detainees awaiting hearings on their immigration status. Mr. DeLand himself recognizes that INS detention facilities are different from criminal facilities and that INS detainees are different from criminal offenders. (DeLand Dep. at 16:24–17:9, 317:21–318:2). He acknowledges that these differences necessarily affect the policies and procedures that a facility should implement. (*Id.* at 139:22–140:16, 142:23–144:9). Mr. DeLand has no academic training or practical experience at such a facility. Thus, Plaintiffs argue, "DeLand lacks the specialized expertise to opine on whether or not the Facility's policies and procedures were appropriate and adequate for the special needs of the detained population." (Plaintiffs' Memo, at 3).

I conclude, however, that despite the differences between correctional and INS facilities and between their detainees, they are sufficiently comparable to enable Mr. DeLand's experience with all kinds of correctional facilities to be transferable to INS facilities. Correctional institutions encompass a huge range of inmates. There are those that have the most violent criminals; there are those that house youths; there are those that handle non-dangerous defendants who can be given extensive privileges both within and outside the institution; and there are those falling at all levels of security in between the extreme ranges. Policies and procedures have to be adapted to meet each level of security, and Mr. DeLand undoubtedly dealt with them all.

 **\*10** INS facilities, even though they house persons involved in civil proceedings, include many persons who have been convicted of crimes, which may be the reason they are involved in deportation proceedings. The Facility, like other INS facilities, detained not only perfectly harmless individuals but also persons who have committed and been convicted of crimes in the past or who pose a potential danger to the staff and other detainees. Thus, conditions in this and other INS facilities are not so dissimilar from conditions in many correctional facilities that Mr. DeLand is disqualified from expressing his opinions as to standards to be applied to places of detention, including INS facilities. ⚑ *Elcock v. Kmart Corp.,* 233 F.3d 734, 743–44 (3d Cir.2000). His lack of experience specifically with INS detentions centers will, no doubt, be a subject of cross-examination.

As Plaintiffs point out, however, Mr. DeLand's Report covers subjects that extend far beyond detention facility standards and about which he is clearly unqualified to testify as an expert. He distinguishes himself from other formulators of prison standards on the basis of his knowledge of federal constitutional law. He cites Supreme Court and Court of Appeals decisions in support of certain of his opinions, quoting snippets of the texts of opinions. Undoubtedly in the course of his career, Mr. DeLand has heard lectures or taken courses on developing case law relating to prisons, but this in no way makes him an expert on the law of prisons. Even if he were, it would be totally inappropriate for him to tell a jury that Supreme Court or other court decisions are a basis for his opinion.

For similar reasons, Mr. DeLand is not qualified to interpret the contract between Esmor and the INS. He has no special expertise in contract law, and even if he did, contract

2007 WL 1847385

interpretation is not the function of an expert in detention standards.

Plaintiffs also contend that Mr. DeLand has no medical expertise and is not qualified to give an opinion with regard to health or medical care. As in a number of his opinions, Mr. DeLand's opinions concerning medical care are ambiguous. He states:

> It is my opinion that detainees were provided medical care at the Elizabeth Facility, and that the system as described in written policies and procedures met basic medical care requirements for a correctional or detention facility. (Opinion F–5.1).

This can be interpreted to mean that Esmor's written policies and procedures for medical care met general correctional standards for medical care in detention facilities. If that is all that Mr. DeLand meant, he is qualified by training and experience to give that opinion. On the other hand, if Mr. DeLand was opining that the Facility, in practice, met basic medical care requirements, he is not qualified to give that opinion. He has not reviewed all the evidence concerning that issue and is making a factual finding (in the form of an opinion) that he is not qualified to make.

 **\*11**  Mr. DeLand's Opinion F–6.2 is a pure medical opinion which he is unqualified to give:

> It is my opinion that limited natural light and fresh air do not prevent detainees from receiving the primary benefits of exercise.

This defect occurs quite often throughout Mr. DeLand's Report. For example Opinion B–3.1 states:

> It is my opinion that Defendants Slattery, Speisman, Staley and Lima adopted and *implemented* adequate and competent written policies and

procedures to guide staff. (emphasis added).

To the extent that this is an opinion that the written policies and procedures to guide staff were adequate and competent to guide staff, this is within Mr. DeLand's area of expertise. To the extent that it is an opinion that Slattery, Speisman, Staley and Lima *implemented* these adequate and competent policies and procedures, it is totally outside Mr. DeLand's area of competency and constitutes a finding of fact based on only a partial review of the record.

This defect occurs in a number of opinions concerning policies and procedures that Esmor adopted. Finding that the policies and procedures were adequate and appropriate, Mr. DeLand suggests or states that some or all of the Defendants acted in accordance with the policies and procedures. There are occasions where, based on a review of a smattering of the record, Mr. DeLand delivers an opinion that is an undisguised factual finding. For example:

> It is my opinion that nothing in the record which I have reviewed (including the report of Plaintiffs' expert, Miller) would lead to a reasonable inference that allegedly inadequate training was the cause of any staff misconduct (Opinion B–4.2).

This is inappropriate as it is based on an inadequate foundation and beyond Mr. DeLand's competence. *Bickerstaff v. Vassar College,* 196 F.3d 435, 449 (2d Cir.1999).

Plaintiffs challenge the reliability of all of Mr. DeLand's opinions, not just those for which he lacks the necessary expertise and those in which he makes factual findings in the form of an opinion. As stated earlier in this opinion, the Court of Appeals has listed a number of factors to consider when determining if an expert opinion is reliable. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994). Most of the factors enumerated in *Paoli* are pertinent when an opinion concerns a scientific or technical subject, e.g., testable hypothesis, subject to peer review, known or potential rate of

error, etc. In a field such as that involved in the present cases the experience of the expert and the confirming or negating opinions of others who are expert in the field are reference points to which a court can look to evaluate the reliability of the expert's opinion.

The problem in this case is that, if Mr. DeLand is to be taken at his word, there are no experts in the field, other than himself, to which the court can turn to test the reliability of his opinions. All existing "detention standards reflect the agenda, philosophies, doctrines, and beliefs of the organizations that created them; however, they do not provide the scientific or objective validation for individual provisions of the standards or even the rationale that drives each opinion." (Opinion A–2). Even the two standards to which Mr. DeLand gives some credence (those adopted by the American Correctional Association and those adopted by the National Commission on Correctional health Care) "are not a viable benchmark against which to determine whether a facility is being operated in a constitutional or otherwise legal manner." (Comment to Opinion A–5).

**\*12** This comment reveals what it is that Mr. DeLand believes separates him from the other persons and entities that have created detention standards; "compliance with accreditation under any of these standards does not ensure that the user is compliant with constitutional or other legal requirements and does not provide a defense against prisoner-filed litigation." By implication, Mr. DeLand believes that only his opinions do not reflect agendas, philosophies, doctrines and beliefs, and he alone can give an opinion whether a detention facility complies with constitutional or other legal standards.

As previously stated, the court concludes that while Mr. DeLand is qualified to give his opinion as to whether a detention facility meets general detention facility standards, he is not qualified to express his opinion in constitutional or legal terms. This puts him on a par with many other creators of detention facility standards. During the course of nearly 28 years on the bench, the court has encountered a number of such standards against which Mr. DeLand's opinions can be tested. After the objectionable portions of Mr. DeLand's opinions and comments are deleted, the remaining portions, when tested against other detention center standards, do not constitute subjective belief or unsupported speculation and survive the test for reliability.

To be admissible, a substantial portion of Mr. DeLand's Report must be struck and his testimony limited accordingly. The categories of material that must be struck are:

1. Improper legal opinions;

2. Improper medical opinions;

3. Opinions setting forth factual conclusions for which Mr. DeLand did not have a sufficient basis in the record. Mr. DeLand listed the material on which he based his opinion. This included Defendant's briefs, certifications and statements of undisputed facts. Significantly it did not include critical depositions and record material. The most grievous omission was his failure to review the INS's Elizabeth, New Jersey Contract Detention Facility Operated by Esmor Interim Report which Mr. DeLand received but admitted that he did not use in formulating any of his opinions concerning the manner in which the Esmor Facility had been conducted. There could hardly be a more reliable statement of INS policies and procedure and findings as to what actually happened at the Facility while Esmor managed it. An expert's opinion based on insufficient facts or data is unreliable. *e.g., U.S. v. Tim Yat Chin,* 371 F.3d 31, 40 (2d Cir.2004).

4. A subset of item 3 above consists of opinions that find policy and procedure manuals to be appropriate. To that extent, they are permissible but they are followed by the impermissible factual conclusion that Esmor and its officers acted in accordance with the manuals.

5. Opinions as to the credibility of witnesses.

In accordance with the foregoing, the following Opinions of Mr. DeLand must be struck or limited. His testimony must reflect these modifications of his Report:

**\*13** *Introduction:* Part C, D and E must be deleted as stating legal opinions and an incorrect statement as to his role in this case.

*Opinions A–1 through A–5:* These opinions will be deleted in their entirety. They set forth Mr. DeLand's opinion that, other than Mr. DeLand's standards, all national and international detention guidelines and standards lack authoritativeness because their authors are influenced by their philosophies, doctrines and beliefs and because "... these standards do not ensure that the user is compliant with constitutional or other legal requirements and [do] not provide a defense against

prisoner—filed litigation" (Comment to Opinion A–1). Mr. DeLand's opinions, on the other hand, presumably are not influenced by philosophies, doctrines and beliefs and do ensure that the user is compliant with constitutional or other legal requirements and is provided a defense against prisoner —filed litigation. Based on his experience in the practical and real-world operational context and his understanding of the law Mr. DeLand proposes to "provide opinions relating [to] the issues/claims being litigated ..." (Introduction at C and D).

The court has rejected Mr. DeLand's opinion that there is no other person or agency that has provided or is capable of providing expert opinions concerning the operations of correctional facilities. Had it not done so, in all likelihood Mr. DeLand's opinions would have to be excluded in their entirety, because there would be no other professional standards against which his opinions could be judged. His opinions would be unsupported by any objective standards and would constitute merely "subjective belief or unsupported speculation." *In re Paoli,* 35 F.3d at 742. The existence of other correctional standards saves him.

The court has also held that Mr. DeLand's opinions cannot rely upon his interpretation of the law. Opinions A–1 through A–5 rest upon the premise that Mr. DeLand is qualified, and others are not, because of his knowledge of the law, a knowledge he gives as a basis for many of his opinions. This too is error and a reason why Opinions A–1 and A–5 must be struck.

*Opinion B–1.2:* Plaintiffs object to this opinion because it concerns corporate management, an area beyond Mr. DeLand's expertise. Mr. DeLand's wide experience running or otherwise dealing with correctional institutions qualifies him to give opinions concerning prison management. To the extent that the Comment purports to opine that in fact the Esmor management properly exercised its management facilities, it extends beyond Mr. DeLand's competence.

*Opinion B–2.1:* This Opinion is permissible except to the extent that the word "implement" suggests that Defendants acted in accordance with the screening and hiring practices. The last paragraph of the Comments must be struck as argumentative and as making factual findings Mr. DeLand is not competent to make.

*Opinion B–2.2:* This Opinion purports to construe the INS contract with Esmor. As such it constitutes an improper legal opinion and will be struck.

*14 *Opinion B–3.1:* In reciting that Defendants adopted adequate and competent written policies to guide staff, this opinion also states the Defendants "implemented" the policies and procedures. This is a factual finding that Mr. DeLand is not competent to make and the word "implemented" will be struck from the opinion.

*Opinion B–3.5:* The first paragraph of the Comment to this Opinion must be struck for the reasons that Opinions A- through A–5 were deleted.

*Opinion B–4.1:* This Opinion describes the training program that Defendants adopted. It is permissible except to the extent it suggests that Defendants acted fully in accordance with the training program.

*Opinion B–4.2:* This is an Opinion about the ultimate factual and legal conclusion of proximate cause. The Opinion and Comment must be struck as making an impermissible legal conclusion and factual finding on an inadequate record.

*Opinion B–4.4:* The Opinion is permissible, but the second paragraph of the Comment cites and quotes Supreme Court opinions and must be struck.

*Opinion B–4.5:* This Opinion is permissible except to the extent that the word "implemented" suggests that Defendants acted fully in accordance with the training program.

*Opinion B–5.1:* This Opinion is permissible except to the extent that the word "implemented" suggests that Defendants acted fully in accordance with the chain of command to facilitate efficient supervision of staff members.

*Opinion B–5.2:* This Opinion is permissible except to the extent that the word "implement" suggests that Defendants acted fully in accordance with its evaluation system.

*Opinion C–1 and C–2:* The Comments to Mr. DeLand's general opinions "that many of the religion-related claims were of questionable validity" and that "some detainee claims appear to have been exaggerated" establish that the Opinions are based solely on arguments from the facts in portions of the record and casting doubt on the credibility of the plaintiffs. This is beyond the role of an expert and these two Opinions and the Comments to them will be struck.

2007 WL 1847385

*Opinion D–2:* This Opinion also constitutes a factual finding based on an incomplete review of the record and the Opinion and the Comment will be struck.

*Opinion D–5:* This Opinion is permissible, but the second paragraph of the Comment constitutes a legal opinion and must be struck.

*Opinion E–5:* This constitutes a legal opinion as to Plaintiffs' right of access to courts and counsel based, as stated in the Comments, upon Mr. DeLand's understanding of the law and Supreme Court and Tenth Circuit Court of Appeals authority. Thus, it is an improper opinion that must be struck.

*Opinion F–2.1:* The reference to the Supreme Court must be deleted from the Comment to this Opinion.

*Opinion F–3:* While this Opinion, like Opinions F–2.3, F–2.4 and F–2.5, is supported by Comments that contain factual findings, Mr. DeLand balances what was reported by Plaintiffs and what Defendants asserted and presented his views based on his wide knowledge of prisons and other detention centers. However, the last two paragraphs of the Comments to Opinion F–3 veer off into an exposition of the law. This is beyond his area of expertise and inappropriate even if it were accurate, which it is not. Those two paragraphs will be struck.

**\*15** *Opinion F–5.1:* To the extent that this Opinion states "that the system [of medical care] as described in written policies and procedures met basic medical care requirements for a correctional or detention facility," it is permissible as within Mr. DeLand's area of expertise. To the extent that it implies that Plaintiffs "were provided [such] medical care at the Elizabeth Facility," it goes beyond Mr. DeLand's area of expertise and is further based on an inadequate familiarity with the record. To that extent the Opinion will be struck.

*Opinions F–6.1 and F–6.2:* These Opinions must be struck because they constitute medical opinions that are beyond Mr. DeLand's area of expertise. Further, they are buttressed in the Comments by legal opinions supported by five Supreme Court and Court of Appeals decisions.

*Opinion F–7.1:* The Opinion that "privacy is inconsistent with the requirement of incarceration" can remain, but the extraordinary amount of court opinions summarized, quoted or cited in the Comments must be struck. There can remain in the Comments the first paragraph up to the sentence that begins, "In addition to my years of experience working in the correction field, I also draw support for my opinion from Supreme Court rulings." There can also remain in the Comments the final paragraph of the Comments. The indented legal material coming between the permitted section and the two footnotes citing Supreme Court cases must be deleted.

*Opinion H–1.2:* The last clause of the Comment to this Opinion (beginning "yet classification decisions ...") must be deleted as an impermissible effort to reinforce Mr. DeLand's Opinion with Supreme Court authority.

*Opinion H–2.1 and H–2.2:* These Opinions are objectionable in that they are phrased in the legal terminology of "due process." This would inevitably enmesh the questioning of witnesses and embroil the jury in complex legal concepts. The Opinions may be replaced to express in laymen's terms when, in Mr. DeLand's opinion, a hearing or other procedures are appropriate and when they are not.

*Opinion J–3:* Because it relies on a reference to the Supreme Court and to U.S. Constitution, there must be deleted from the first paragraph of the Comment the sentence beginning, "As the Supreme Court recognized ...", and there must be deleted the first sentence of the third paragraph of the Comments.

An order will be entered denying Plaintiffs' motion to preclude Mr. DeLand from testifying at trial but striking portions of his Report and limiting his testimony in the manner set forth in this opinion.

*C. Dr. Francis Geteles:*

1. *The Reports:* Dr. Francis Geteles, Ph.D. ("Dr.Geteles") states in her 2001 and 2006 Reports concerning Plaintiffs that she is a clinical psychologist and that she earned her Ph.D. from Columbia University in 1965. Dr. Geteles has received training in the medical detection and documentation of torture in a program jointly sponsored by Physicians for Human Rights, Columbia University, and the Bellevue Treatment Center for Torture Victims, and for the past thirteen years has been working with victims of human rights abuses. She has submitted psychological expert reports to Immigration Courts in 78 asylum, stay of deportation, or T-visa cases and has testified as an expert witness in 15 of those cases. Dr. Geteles is Professor Emeritus at the City College of New York and had been the college's primary appointment in the SEEK Program, which serves under-prepared, low income, minority and immigrant students.

**\*16**  Dr. Geteles's 2006 Report (the "2006 Report"), which incorporates and supplements her 2001 Report (the "2001 Report"), sets forth her opinions and conclusions about the psychological effects on the Plaintiffs of the alleged abuses at the Esmor Detention Facility. Dr. Geteles's Reports and psychological evaluations are based primarily on her interviews with each of the Plaintiffs. She also refers to the Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM IV"); the "Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment" ("The Istanbul Protocol"); as well as numerous materials provided by the Plaintiffs' attorneys regarding submissions and decisions of the trial at hand. (2001 Report at 2).

The Reports are accompanied by detailed descriptions of Dr. Geteles's interviews and evaluations of each of the Plaintiffs. The Conclusion of the 2001 Report sets forth an overall summary of her opinion:

> In view of the above, it is my judgment that the detainees at the Esmor Detention Center under the auspices of the INS were the victims of cruel, inhuman, and degrading treatment and continue to suffer the effects of these experiences. The conditions at Esmor were sufficiently brutal to cause one detainee, who was not an asylum seeker and who did not have psychological problems when her detention began, to develop such problems so that she is now suffering from PTSD and depression. The asylum seekers who had experienced severe trauma in their home countries and who already had psychological problems with symptoms of depression and PTSD or other stress or anxiety disorders as a result of those experiences, had no chance for their psychological injuries to heal and instead were re-traumatized. For most of the asylum seekers, the symptoms of psychological impairment have been increased in number and severity, have become enduring and chronic, and will likely result in permanent disabilities. Moreover, most of the Plaintiffs have developed medical problems that are related to these psychological impairments, which are also likely to have permanent effects. Thus their mental health and their physical health have been compromised by their treatment at Esmor.

(2001 Report at 19–20)

Defendants do not challenge Dr. Geteles's qualifications, her psychological diagnoses or the appropriateness of her techniques in seeking these diagnoses. Rather, Defendants challenge Dr. Geteles's bases and methodology, or lack thereof, "for offering opinion testimony regarding the causes of plaintiffs' mental conditions." (Defs. Reply Br. 6). In so doing, Defendants move to preclude Dr. Geteles from testifying pursuant to Rule 702 on the grounds that her Reports are unreliable because they are excessively dependent on self-reports of Plaintiffs as to the cause of their psychological conditions, biased, neglectful of alternative explanations for Plaintiffs' alleged injuries, and subjective and speculative.

**\*17**  2. *Plaintiffs' "Self–Reports"*: Defendants assert that because Dr. Geteles relied almost solely on her conversations with Plaintiffs and did very little additional research or analysis, her opinion is unreliable and should be excluded.

*In re Paoli* establishes that one applies the same reliability standard under Fed.R.Evid. 703 (applicable in this situation because the analysis is of the data underlying the expert's opinion) as under Rule 702, 35 F.3d at 749. The court noted::

> Rule 703 permits experts to rely upon hearsay. The guarantee of trustworthiness is that it be of the kind normally employed by experts in the field.... Nevertheless, the court may not abdicate its *independent* responsibilities to decide if the bases meet minimum standards of reliability

as a condition of admissibility. *See* Fed. R. Ev. 104(a). If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.

35 F.3d at 748 (emphasis added) (quoting *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985)).

*In re Paoli* thus acknowledges the appropriateness of Dr. Geteles basing her opinions on the accounts of the Plaintiffs, even if they are unverified. The burden is on the court to analyze the bases on which the expert relied. Dr. Geteles' professional expertise equipped her to evaluate the truthfulness and accuracy of Plaintiffs' statements. Regarding other sources, Plaintiffs correctly point out that Rule 703 dictates that Dr. Geteles should not base her opinion about a patient's mental health on documents that she is not trained to evaluate (Pls.Br.15).

For a physician's (in this case psychologist's) expert report to be admissible under Rule 703, it is sufficient that he/she examine the patient. *In re Paoli,* 35 F.3d at 762. Dr. Geteles and Plaintiffs' lawyers have, at a considerable expense, met this guideline for admissibility set forth in *In re Paoli* by having Dr. Geteles examine each of the Plaintiffs.

3. *Bias:* Defendants assert that Dr. Geteles's testimony is biased. Defendants' primary illustration of alleged bias is Dr. Geteles's statement regarding the purpose of her interviews as being to discern the "psychological effects of the persecution" at the Esmor facility. (Defs.Br.21). Defendants contend that this is reflective of a bias because it shows a presumption of persecution at Esmor and a presumption regarding causation before the interviews ever commenced. Plaintiffs counter that Dr. Geteles's stated purpose does not indicate any presumption regarding psychological harm. (Pls.Br.27–28).

Dr. Geteles's purpose was to evaluate the Plaintiffs, ascertain the state of their psychological health, and to give an opinion whether conditions at the facility were the cause of any impairments. This is not reflective of bias. She was not assigned the task of determining the existence of abuse at the detention center. She did, however, evaluate the Plaintiffs in anticipation of litigation regarding abuse at the facility.

**\*18** Defendants' other primary example of Dr. Geteles's alleged bias is her disregard of how monetary incentives may have factored into the Plaintiffs' statements to her. (Defs.Br.22). Defendants refer to the applicable passage from the DSM IV which states that, "[m]alingering should be ruled out in those situations in which financial remuneration, benefit eligibility, and forensic determinations play a role." (Defs.Br.Ex.D). Defendants are correct in contending that Dr. Geteles failed to specifically rule out malingering in her evaluations in any of the Plaintiffs. This might be deemed a flaw. Nevertheless, this flaw, if it be one, is not egregious enough so as to disqualify the Reports or risk misleading the jury. Defendants do not proffer sufficient reasons, either regarding Dr. Geteles's presumptions or her evaluation techniques, to warrant exclusion of any of her findings on account of bias.

4. *Alternative explanations for Plaintiffs' alleged injuries:* Defendants point out that there are multiple other possible causes of Plaintiffs' psychological distress "e.g., trauma suffered in their home countries, detention by the INS attendant to their attempt to illegal (sic) enter the United States, intrinsic stress of confinement, fear of deportation, current life stressors, or plaintiffs' self-interest in the litigation" (Defs. Reply Br. at 4). As an example, Defendants point to the devastating effect upon Ms. Jama of the receipt of news that her mother had died in a Kenyan refugee camp. As another example Defendants note that Mr. Anantharajah was adjusting well to life after his release from detention and his establishment of a successful business, but that his mood deteriorated after his business failed, a result he and Dr. Geteles attribute to his detention at the Esmor facility.

Defendants argue that the basis of Dr. Geteles's opinion that the conditions at the Esmor facility were the cause of Plaintiffs' psychological conditions is nothing more than the Plaintiffs' own statements that those conditions were the cause of their psychological impairments. When there are multiple possible causes of PTSD, Defendants contend, "experts must use differential diagnosis to both diagnose and to rule out alternative causes." *Paoli,* 35 F.3d at 759 n. 27; *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp. [2d] 584, 609 (D.N.J.2002)." (Def. Reply Br. At 8).

Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 1847385

In *Paoli,* the Court of Appeals articulated a two prong test for determining whether a medical expert's opinion as to the specific source or cause of a Plaintiff's medical conditions is unreliable. The test is:

> (1) [the doctor] engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes or ... (2) the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions and ... [the doctor] offered no reasonable explanations as to why he or she still believed that the defendants' action were a substantial factor in bringing about that illness.

**\*19** *Paoli,* 35 F.3d at 760.

The Court of Appeals has recognized differential diagnosis "as a technique that involves assessing causation with respect to a particular individual." *Kannankeril v. Terminix Int'l. Inc,* 128 F.3d 802, 807 (3d. Cir.1997) (citing *In re Paoli,* 35 F.3d 717, 758). Differential diagnosis is "the determination of which of two or more diseases with similar symptoms as the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Kannankeril,* 128 F.3d at 807.

Defendants may criticize the results of Dr. Geteles's analysis, but her methodology met the requirements of a differential analysis. She did far more than consider each Plaintiff's self report. She interviewed each of the Jama Plaintiffs for several hours twice-once in 2001 and again in 2006. The average time for each interview was approximately six hours. As *Paoli* requires, an expert "should seek more than a patient's self report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted." 35 F.3d at 762. This requirements applies equally to the determination of causation.

Dr. Geteles stated that she based her conclusion on several factors including body language, signs of appropriate effort, and consistency of Plaintiffs' narratives. This was not a situation in which Dr. Geteles relied solely on summaries of plaintiffs' physical complaints produced by employees of plaintiffs' counsel, *In re TMI Litigation,* 193 F.3d 613, 698 (3d Cir.1999); or a situation in which the medical expert based his opinion on a medical history questionnaire completed by Plaintiffs without examination of plaintiffs by the expert, *In re Paoli,* 35 F.3d at 763; or a situation in which an expert based her opinion on form statements signed by each plaintiff or plaintiffs' counsel, or both, accompanied by a checklist of symptoms, *In re Agent Orange,* 611 F.Supp. at 1223.

In her Reports Dr. Geteles repeatedly referred to the other causes of trauma to the Plaintiffs. Devastating experience in their countries of origin was one of them, e.g.: "Refugees, including asylum seekers, carry with them past experiences of severe oppression and trauma. They may have experienced military harassment, threats of death, the death of family or friends, imprisonment, violence, rape or other forms of abuse and torture." (2001 Report 4; see also 2001 Report at 16; 2006 Report at 25).

Dr. Geteles noted the status of detention even under benevolent conditions as a cause for stress, e.g.: "Detention centers are prisons, and share those conditions that make captivity stressful in any context: confinement and lack of freedom, including freedom from harm; loss of control over almost all aspects of one's life; separation from family members; and, the loss of social networks. (2001 Report at 5; see also 2006 Report at 23).

**\*20** Dr. Geteles noted that most of the Plaintiffs suffered social and/or family problems which could be a cause of stress or the result of conditions suffered at the Esmor facility, e.g., 2001 Report at 18. She referred to business failure, which could be another form of stress.

Dr. Geteles has not, as Defendants contend, simply accepted Plaintiffs' statements that the conditions of confinement caused their present distress. She set forth her reasons for concluding that the events at the Esmor facility superseded the effects of the terrible things that may have happened to them in their home countries. (2006 Report at 24). She explains the interactions between post traumatic stress syndrome resulting from the Esmor facility experiences and current life stressors. (2006 Report at 31–32). Dr. Stuart Grassian, Defendants'

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 110 of 208
PageID: 72852
Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)
2007 WL 1847385

expert psychiatrist, in his expert opinion criticizes these causation conclusions and even the methods of arriving at them, but Dr. Geteles's methods meet the requirements of *Daubert* and *In re Paoli,* and it will be up to the jury to evaluate the strengths and weaknesses of Dr. Geteles's Reports.

5. *Subjectivity and Speculation:* In order to pass *Daubert* and Rule 702 muster, Dr. Geteles must elucidate the reliability of her methodology and convey to the court that her conclusions are not based on subjective or speculative reasoning. The Court of Appeals for the Third Circuit, however, employs a flexible standard in evaluating an expert's work, and it is liberalized further in consideration of Dr. Geteles's vast experience and expertise in making such psychological evaluations as those at issue in this case. *General Electric Co. V. Joiner,* 522 U.S. 136, 143 (1997); *Kumho Tire,* 526 U.S. at 141.

Defendants contend that because Dr. Geteles does not in certain instances specifically link particular tortuous activities at the detention center to particular symptoms of the diseases, her testimony is speculative and excludable. (Defs. Reply Br. 7). But unlike many of the circumstances in cases Defendants cite, issues of psycho-analysis, particularly regarding causation, are in a sense inherently subjective; thus, when evaluating reliability, a greater emphasis is placed on the psychologist's qualifications. *Ferris v. Pennsylvania Federation Broth.of Maintenance of Way Employee,* 153 F.Supp.2d 736, 741–42 (E.D.Pa.2001). Therefore, in the case at hand, the court need only evaluate Dr. Geteles's qualifications, whether she has discerned tortuous activities/ conduct, whether she has discerned symptoms of the diseases she diagnoses, and finally whether the latter symptoms could reasonably follow from the former tortuous activities/ conduct.

Dr. Geteles indicates that she has specifically detected a causal connection between the alleged tortuous circumstances at the detention center and the Plaintiffs' particular symptoms of mental illness. (2006 Report at p. 31). Dr. Geteles also delineates such a connection for each of the individual plaintiffs. This analysis is sufficient to render her opinion admissible.

**\*21** 6. *Medical Opinions:* Dr. Geteles's Reports include opinions about medical conditions that affect Plaintiffs. The concluding summary of the 2001 Report states "[m]oreover, most of the plaintiffs have developed medical problems that are related to these psychological impairments, which are likely to have permanent effects." (2001 Report at p. 19).

In particular Dr. Geteles describes the medical conditions that Mr. Kenneh related to her in an October 2005 interview. In the past few years "[h]e has twice had surgery for a heart condition (which he says was diagnosed as cardiomiopathy), which he has been told by his doctor is very unusual for someone her age—i.e. 35 years old." (2006 Report at p. 90).

Further on in the Report Dr. Geteles states: "As noted above, Mr. Kenneh has had potentially life-threatening medical problems. According to the suggestions of her physician, these problems may have resulted, at least in part, from her psychological problems, which in turn stem from the extreme stresses to which he has been subjected." (2006 Report at p. 92).

This would be completely impermissible testimony. Dr. Geteles is not herself qualified to give a medical opinion and she cannot testify about the medical opinions of an unidentified physician whose qualifications are unknown and who has not been the subject of examination by the Defendants.

The medical opinions of Dr. Geteles must be stricken.

7. *Conclusion:* For the reasons set forth above the Defendants' motion to exclude the testimony of Dr. Geteles will be denied except that she will not be permitted to give medical opinions.

D. *Dr. Lawrence Mendel:* Dr. Lawrence Mendel, Acting Medical Director for the Ohio prison system, prepared a twelve-page report (the "Mendel Report" or "Report") dated July 31, 2006. The Report is accompanied by a six-page curriculum vitae setting forth his experience in correctional medicine.

The Report states that Dr. Mendel, in providing his opinions and conclusions, relies on his twenty-two years of experience in medicine, including: Staff Physician, Ohio Reformatory for Women; Correctional Consultant, Jackie Moore and Associates; Clinical Assistant Professor, Ohio State University; Staff Physician, Franklin County Jail; Consultant on accreditation and operational issues, Franklin County Jail; Acting Regional Medical Director and consultant, Central Region; Medical Monitor, Northeast Ohio Correctional Center; Telemedicine Consultant; Medical

2007 WL 1847385

Director, Ohio Department of Rehabilitation and Correction; Emergency Medicine at various hospitals; and accreditation surveyor, National Commission on Correctional Healthcare. Dr. Mendel is also a member of three national correctional healthcare organizations and regularly attends and participates in correctional medical conferences. Dr. Mendel has testified in five cases and been deposed in eleven, and states that he is "familiar with the standard of care and reasonable practice of correctional healthcare." (Mendel Report 2).

**\*22** 1. *The Report:* Section I of the Report lists the documents upon which the Report is based, including: Dr. Steven Spencer's deposition and report on medical care at the Facility; Plaintiffs' medical records and depositions; Facility policies; the Facility contract; INS detention standards and interim report; National Commission on Correctional Healthcare (NCCHC) standards for health services in jail; and discovery excerpts.

Section II describes the clinical care Plaintiffs received, as recorded in their charts. The summaries of such care are as follows:

Jaykumar Anantharajah completed a physical exam, a tuberculosis skin test that indicated a 12 mm induration, and a chest x-ray. Dr. Mendel notes that Mr. Anantharajah "received no further tests or treatment for this condition before he departed the facility on April 17, 1995." (*Id.*).

Abu Bakar [2] completed a physical exam, which indicated dental caries and poor oral hygiene. He underwent dental treatment and received Ibuprofen and Anbesol for his pain. Mr. Bakar's tuberculosis skin test was non-reactive. Dr. Mendel states that Mr. Bakar "submitted a total of sixteen requests for medical treatment. His complaints were addressed promptly and appropriately, averaging 1.44 days for treatment after submission." (*Id.* at 3).

Hawa Abdi Jama completed a physical exam, a tuberculosis skin test that indicated a 10 mm induration, and a chest x-ray. She reported various medical concerns, including dental pain and fingernail infections, and submitted twenty-eight medical request forms. According to Dr. Mendel, "The Esmor staff appears to have been responsive to her medical concerns and she was seen on the day the form was submitted 16 times and overall within an average of 1.59 days." (*Id.*). After the death of her mother, Ms. Jama exhibited a "strong grief reaction," refused to eat, had difficulty sleeping and depressive symptoms, and expressed thoughts of suicide. (*Id.* at 4). A psychiatrist diagnosed her as having severe depression "with extrinsic factors including her detention noted as a major factor. Antidepressant medication was prescribed but Ms. Jama expressed reluctance to take medication." (*Id.*).

Cecilia Jeffrey [3] sought medical care for skin conditions on three occasions and received medication. (*Id.* at 5).

Abraham Kenneh completed a physical exam, a tuberculosis skin test that indicated a 4 mm induration, a chest film, a blood count, and a syphilis test. He underwent oral surgery and was also seen by an optometrist. Dr. Mendel states that Dr. Spencer "listed no specific criticisms of the care of Mr. Kenneh in his report except for his general comments about tuberculosis prevention and testing." (*Id.* at 5).

Sahimu Nanteza completed a physical exam, a tuberculosis skin test that indicated a 20 mm induration, and a chest x-ray. She submitted eleven health requests, each of which "resulted in a prompt nurse or physician evaluation." (*Id.*). Dr. Mendel further notes, "[m]edical access occurred on the same day that the form was received in nine instances, on the following day in another.... Average waiting time for medical care was 0.2 days." (*Id.*).

**\*23** Dennis Raji completed a physical exam and tuberculosis skin test that indicated an 8 mm induration, but his chest x-ray "was not obtained and was not required by the prevailing practice of jails and short-term detention centers." (*Id.* at 5–6). Mr. Raji requested medical care on five occasions and was seen within two days of his request.

Agatha Serwaa completed a tuberculosis skin test and submitted four health requests for rash, itching, and stomach pains. Despite the policy requirement of a physical exam within fourteen days of admission into the Facility, she did not undergo a physical examination. However, Dr. Mendel opines that Ms. Serwaa had regular access to the medical staff and that "the lack of a few physical exams would not prevent the facility from receiving accreditation if it had been sought and does not constitute deliberate indifference." (*Id.* at 9).

Sarah Tetteh completed a physical exam but no tuberculosis skin test, which she completed at another facility. She sought medical care on various occasions for itchy skin, pimples, and a boil. Dr. Mendel states that her records "demonstrate repeated episodes of timely and appropriate care." (*Id.*).

Section III of the Report summarizes the healthcare issues Dr. Spencer raised in his two reports and addresses his criticism of Plaintiffs' inadequate medical treatment. Dr. Mendel points out that Dr. Spencer's claims do not reference specific detainee cases and are not supported by evidence of alleged harm.

With regard to tuberculosis screening, Dr. Mendel maintains that "published testing standards consider 10 mm to represent a positive test and an indication for a chest x-ray." (*Id.* at 7). He concedes that various medical conditions may necessitate a chest film, but notes that "there is no indication that any of these medical conditions applied in any of the cases cited by Dr. Spencer in his report." (*Id.*).

In response to Dr. Spencer's criticism of the absence of HIV testing for detainees with reactions to their tuberculosis skin tests, Dr. Mendel states that such testing was not required by accrediting bodies such as the NCCHC and ACA, and was not routine practice in jails until the end of 1996. (*Id.*).

The Report also addresses Dr. Spencer's criticism of the lack of Isoniazid (INH) treatment, which may increase the lifetime risk of tuberculosis. Dr. Mendel explains that since a patient must undergo at least six months of INH therapy, such treatment was rarely initiated in jails and not required by the accrediting agencies in 1994 or 1995. In addition, he notes that the Facility was "a short-term detention facility and this was undoubtedly a factor in their decision not to provide this therapy." (*Id.*). Dr. Mendel further states that the greatest risk of developing tuberculosis occurs in the first two years after exposure, if preventive treatment is not administered.

With regard to dental treatment at the Facility, Dr. Mendel opines that "Motrin and other non-steroidal anti-inflammatory medications are the most widely used medications for dental pain and represent the standard of care for most dental conditions .... these agents yield effective pain relief equivalent to Tylenol with codeine...." (*Id.*).

**\*24** In response to Dr. Spencer's claim that Mr. Bakar's dental condition "was probably deserving of something stronger than Tylenol and Motrin for relief," Dr. Mendel notes that Mr. Bakar had received Anbesol and did not require stronger medication. (*Id.* at 8). He also states that Mr. Bakar's dental appointment "was completed within a timeframe comparable to, or better than most detention

facilities and in fact is well within the access timeframe for non-incarcerated individuals in the general community." (*Id.*).

The next section of the Report discusses the clinical care of Ms. Jama. In discussing her depression, Dr. Mendel argues that her "records and subsequent course are more consistent with a grief reaction that was self-limited" and that the Facility medical staff responded "with supportive measures and psychotropic medication." (*Id.*). Ms. Jama later visited a psychiatrist when her symptoms worsened, but refused to take medication. In response to the claim that Ms. Jama should have been sent to a psychiatrist sooner, Dr. Mendel states that Dr. Spencer neither explains "how the earlier referral would have changed her unwillingness to take a prescribed medication," nor addresses the "strong role of extrinsic factors that were cited by a psychiatrist as a major factor in her condition ." (*Id.*). He dismisses Dr. Spencer's claim that the Facility displayed "a gross degree of systemic indifference to mental health problems" and that the detainees had a high rate of mental illness. (*Id.* at 9).

The Report next assesses the existence of mental illness at the Facility. Dr. Mendel dismisses Dr. Spencer's opinion that depression was a pervasive problem among detainees. Dr. Mendel states in particular, "[w]hile a prevalence of depression of 40% is claimed, none of the 79 [4] health request forms sought mental health treatment and even complaints that could be reflect [sic] somatic complaints represent only eight of the forms submitted." (*Id.*).

Dr. Mendel states that the hours of physician coverage exceeded NCCHC guidelines for physician staffing, response to sick calls was timely, the physicians followed immunization recommendations, and Plaintiffs' charts did not reveal any chronic medical illnesses.

Section IV of the Report describes favorably Plaintiffs' medical treatment at the Facility. Dr. Mendel uses the words "timely," "appropriate," and "effective" to describe the medical care, and states that "facility residents were evaluated by a nurse in an average of 1.24 days after submitting medical requests. Cases referred to a physician were seen in 1.9 days on average." (*Id.* at 10). He further opines that "[m]edical care was provided in a manner consistent with accreditation standards." (*Id.*).

Section IV also describes the terms of the 1994 contract between the Facility and INS. According to Dr. Mendel, the contract required that medical care comport with 1992

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 113 of 208
PageID: 72855
Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 1847385

NCCHC standards and that the Facility monitor "infectious and communicable disease among inmates ." (*Id.* at 11). However, the contract did not require the Facility to conduct HIV testing, INH preventive treatment, counseling, or tuberculosis testing to become accredited. With regard to the latter, Dr. Mendel states that every Plaintiff "had documentation of a timely TB test result and every individual with a positive result completed a chest x-ray within one week of arrival, averaging 6.25 days and written documentation was obtained of a negative result in every case." (*Id.*).

**\*25** Dr. Mendel concludes in Section V that Plaintiffs received "timely and appropriate access to medical care" and treatment "consistent with applicable correctional standards." (*Id.*). Plaintiffs "waited an average of 1.24 days to be evaluated by a nurse" and the overall tuberculosis screening program "would have required few changes to achieve full accreditation." (*Id.*). Finally, Dr. Mendel opines that treatment different than that which Plaintiffs received would not have "substantially altered the outcomes in these cases." (*Id.*).

2. *Discussion:* In the present case, Dr. Mendel is clearly qualified to provide an expert opinion regarding the medical care of detainees at the Facility. Dr. Mendel is a physician with twenty-two years of experience in correctional medicine (Mendel Report 1). He has worked for over eleven years as a medical director for the Ohio prison system, has produced four publications regarding correctional medicine, and regularly attends correctional medical conferences. (*Id.*). Dr. Mendel has also previously testified in five cases, and is familiar with the standard of care and reasonable practices of correctional healthcare, including NCCHC and ACA accreditation standards. (*Id.* at 2). Given his extensive curriculum vitae focusing on correctional medicine, Dr. Mendel satisfies the first admissibility requirement of Rule 702.

Plaintiffs do not dispute the qualifications of Dr. Mendel, but rather move to prohibit him from testifying as to certain statements made in his expert report. In particular, they seek to preclude on grounds that: (1) Dr. Mendel's conclusions regarding the overall quality of Esmor medical services are drawn from a non-representative sample; and (2) Dr. Mendel's statistical analysis could potentially mislead and confuse the jury. (Pls.Br.3). Plaintiffs list the particular conclusions from the Report they find objectionable:

> On average, facility residents were evaluated by a nurse in an average of 1.24 days after submitting medical requests. Cases referred to a physician were seen in 1.9 days on average.... Medical orders were consistently completed as ordered within an acceptable timeframe.... The large volume of medical encounters on a timely basis ... provides incontrovertible evidence of an effective healthcare system that directly contradicts the claims of systemic deficiencies.... [T]he records in this case demonstrate timely and appropriate access to medical care and medical treatment consistent with applicable correctional standards. Requests for care were promptly processed and detainees waited an average of 1.24 days to be evaluated by a nurse.

(Mendel Report 10–11). Plaintiffs contend that Dr. Mendel's statistical analysis is unreliable and lacks the "standards to control the techniques and operations," *In re Paoli,* 35 F.3d at 740 n. 8, because Dr. Mendel's conclusions about the general quality of Esmor medical care are not drawn from a randomly selected sample. (Pls.Br.4).

**\*26** To evaluate the effectiveness of the Esmor medical staff, Dr. Mendel analyzed seventy-nine medical request forms drawn solely from the nine plaintiffs. (Mendel Dep. 168:25, 169:1–4; Mendel Report 9). Plaintiffs argue that since "78 forms for 9 individuals" do not represent all forms submitted by the 1600 detainees at the Facility, Dr. Mendel's conclusions about the general quality of Esmor medical care are flawed and therefore excludable. (Pls.Br.6).

Plaintiffs claim that Dr. Mendel engaged in "convenience sampling": the selection of items for a sample because they are easy to obtain rather than representative of the whole population. (Pls. Reply Br. 4). They contend that Dr. Mendel's sample "consisted solely of those forms that it was easy for him to obtain rather than those randomly selected from all

of the medical request forms submitted by detainees during the operation of the Facility." (Pls.Br.7). Plaintiffs argue that since it is impossible to know how the results from this non-randomly selected sample will compare to the results of the overall detainee population, Dr. Mendel's use of convenience sampling is unreliable. (Pls. Reply Br. 2).

In addition, Plaintiffs maintain that Dr. Mendel's analysis is flawed because his sample size is too small to generate reliable statistics. They cite *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n. 20 (1977), for the proposition that an inadequate sample size may detract from the value of statistical evidence, and *State v. Harvey*, 151 N.J. 117, 291 (N.J.1997), which provides that small sample size does not represent, to a certainty, the actual population.

Plaintiffs further contend that Dr. Mendel's statistical analysis fails to account for similarities between the Plaintiffs that the general detainee population did not share, such as the Plaintiffs' lengthier stay at the Facility. (Pls.Br.8). Such differences among the detainees, according to Plaintiffs, are relevant to both the speed and level of medical care at the Facility. (*Id.*).

Defendants' primary argument is that Plaintiffs' challenge to Dr. Mendel's conclusions is a weight rather than an admissibility issue, and that admissibility requires only that the methodology in formulating the expert opinion is reliable. (Defs.Br.4). Defendants claim that Dr. Mendel's methodology of taking a sample is scientifically accepted in the field of statistics. (*Id.* at 2). They maintain that seventy-eight medical requests constitutes a valid sample size, especially "given Plaintiffs' relatively lengthy stays at the Facility." (*Id.* at 7). Dr. Mendel himself testified that "evaluation of more than 30 health care request forms would have been sufficient to establish internal validity." (Mendel Dep. 169:17–20.) In response to Dr. Mendel's supposed convenience sampling, Defendants assert that any potential bias arising from the size of Dr. Mendel's sample would favor the Plaintiffs, given their lengthy stays at the Facility and dissatisfaction with their medical care (Defs.Br.5), and the fact that the medical staff would take longer to respond to Plaintiffs' medical requests than they would for the average detainee. (Pls. Reply Br. 5–6).

**\*27** The Supreme Court has recognized that samples may qualitatively be too small to yield reliable statistical evidence. *See* *Mayor of Philadelphia v. Educ. Equal. League,* 415

U.S. 605, 620–21 (a sample of only 13 people cannot generate significant findings); *United States v. Landsdowne Swim Club,* 713 F.Supp. 785 (E.D.Pa.1989) ("The Supreme Court has recognized that small sample size may detract from the value of statistical evidence. The danger posed by small samples is that they may produce short-term results that would not hold over in the long run."). However, some statisticians have asserted a rule of thumb that "a sample size numbering thirty provides stable statistics." J. Loewen, *Social Science in the Courtroom* 222 (1982). Applying this rule, Dr. Mendel's use of seventy-nine medical request forms submitted by the nine plaintiffs is a sample sufficiently sized to have probative value. Since each request form represents an independent occurrence, each bears independent statistical significance. Dr. Mendel could arguably have collected a larger sample size from the 1600 detainees, but the court in *Boehringer* has concluded that surveys need not be excluded if they do not randomly draw samples from the *entire* universe. *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Labs.,* 532 F.Supp. 1040, 1054 (D.N.J.1980) (emphasis added).

Further, Plaintiffs have not shown that Dr. Mendel's methodology of taking a sample is scientifically flawed. Instead, they focus on their disagreement with the conclusions he generated from his sample. The Supreme Court in *Daubert* has stated that the focus of the inquiry should be solely on principles and methodology, not on the conclusions that they generate. *Daubert,* 509 U.S. at 596. Regardless of whether Dr. Mendel's conclusions were correct, his methodology was reasonably reliable.

Defendants correctly state that Plaintiffs' challenges to the accuracy of Dr. Mendel's conclusions go to the weight of the evidence. Indeed, courts have recognized that minor methodological errors affect the weight given the survey's conclusions, rather than to their admissibility as evidence. *J & J Snack Foods, Corp. v. Earthgrains Co.,* 220 F.Supp.2d 358, 369 (D.N.J.2002) ( "Methodological deficiencies in a survey generally relate to the weight given the survey's conclusions rather than to its admissibility"). The judge should only exclude evidence if the flaw is large enough that the expert lacks "good grounds" for his conclusion. *Daubert,* 35 F.3d at 746 n. 19.

In the present case, Dr. Mendel has committed no major errors in his methodology. He uses the scientifically accepted

technique of sampling to draw general conclusions about Esmor medical services, his sample size of seventy-nine forms is adequate, and he bases his conclusions on sound review of Plaintiffs' deposition transcripts, the INS interim report, and NCCHC accreditation standards. Dr. Mendel's statistical data is of a type reasonably relied upon by experts, and will aid the jury in making factual determinations. Plaintiffs may challenge the weight of Dr. Mendel's conclusions by cross-examination at trial, but his methodology is reliable and his opinion will not be excluded.

**\*28** Plaintiffs' second argument to preclude Dr. Mendel from testifying is that his statistical analysis could potentially confuse or mislead the jury. They assert that Dr. Mendel's conclusion that Plaintiffs were medically evaluated an average of 1.24 days after submitting medical requests is not probative, since the data shows that "95% of the time, the Esmor nurses' response time to medical complaints could be anywhere from 0 to 6 days, and, in fact, could be as much as 15 days." (Pls.Br.13). According to Plaintiffs, average response times can mislead the jury into believing that they represent the usual response times. (Pls. Reply Br. 7). Plaintiffs additionally claim that Dr. Mendel's explanation of the high variance of data would confuse the jury because the concepts of standard deviation and data variability are difficult to explain, (Pls.Br.14), and because Dr. Mendel is a doctor, not a statistician trained to interpret and explain statistical analysis. (Pls. Reply Br. 8).

Defendants maintain that Dr. Mendel's conclusions will not confuse the jury. They contend that if anything, it is imperative that Dr. Mendel explain standard deviations, averages, and other statistics; otherwise, his evidence would be "meaningless, confusing, and irrelevant." (Defs. Br. 11, citing *Wingfield v. United Tech. Corp.*, 678 F.Supp. 973, 983 (D.Conn.1988)). Defendants point out that Plaintiffs offer no support for their conclusion that statistical information will be difficult to communicate effectively to the jury. (*Id.* at 12).

Plaintiffs' attempt to preclude Dr. Mendel's statistical analysis on grounds that it would confuse or mislead the jury is baseless. Courts increasingly feel comfortable evaluating statistical testimony and consequently exercise their judgment in assessing the probative value of sampling evidence. *See, e.g.,* *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977); *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F.Supp.2d 358 (D.N.J.2002); *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms.*

*Co.*, 129 F.Supp.2d 351 (D.N.J.2000). Courts "cannot exclude a scientific technique as too confusing and overwhelming simply based on its conclusion that scientific techniques ... confuse and overwhelm the jury. There must be something about the particular scientific technique such as its posture of mythic infallibility that makes it especially overwhelming." *United States v. Downing.*, 723 F.2d 1224, 1239 (3d Cir.1985).

In the instant case, Dr. Mendel's statistics are a necessary aspect of his evaluation of Plaintiffs' medical care at the Facility; if explained appropriately, his data would assist rather than confound the jury. Plaintiffs' statement that Dr. Mendel is a doctor, not a statistician, bears no significance to their argument to exclude Dr. Mendel's testimony on grounds that statistics would mislead or confuse the jury. Statistics are an integral part of the medical school curriculum, and Dr. Mendel himself used numerous statistical measures when he was a medical director. (Mendel Dep. 168:9–13). Dr. Mendel's statistical analysis does not fall short of *Daubert* standards of evidentiary reliability and is therefore admissible.

**\*29** E. *Stuart Grassian, M.D.:* Dr. Stuart Grassian ("Dr.Grassian"), a Board-certified psychiatrist, prepared a forty-eight-page report (the "Report") concerning the psychological issues in the case with respect to the Plaintiffs. He states that he has "substantial experience in evaluating the psychiatric status of individuals in confinement, and in evaluating the psychological effects of such confinement." (Report 1). Attached to the Report are a list of documents that Dr. Grassian reviewed and an eleven-page curriculum vitae ("C.V.") which sets forth his extensive education and experience in the field of psychiatry.

According to Dr. Grassian's C.V., he is licensed to practice medicine in the Commonwealth of Massachusetts and received his B.A. from Harvard University, his M.A. in sociology from Brandeis University, and his M.D. from New York University School of Medicine. In addition to serving as a clinical instructor in psychiatry at Harvard Medical School for over twenty-five years, Dr. Grassian has been in private practice in psychiatry since 1977 and has practiced at several other treatment facilities. Dr. Grassian has several board certifications in psychiatry and has served as a consultant and board member to multiple organizations with respect to his knowledge in the field of psychiatry and correctional facilities. He is a member of several professional psychiatric societies, has had multiple teaching appointments, and has conducted numerous scholarly and

2007 WL 1847385

media presentations. Dr. Grassian's C.V. states that his major interests in forensic psychiatry include: (1) psychiatric effects of solitary confinement; (2) strip search procedures, sexual and physical assault; (3) addictive disorders; and (4) civil rights issues.

The list of documents that Dr. Grassian reviewed include: (1) Reports on Health Care at Esmor of Steven Spencer, M.D.: (2) Reports of Frances Geteles, Ph.D. dated May 30, 2001 (the 2001 Report") and March 30, 2006 (the "2006 Report"); (3) Report of Penologist E. Eugene Miller; (4) Report of R.W. Powitz and Associates; (5) Interim Report of INS regarding Esmor Detention Facility; (6) Esmor medical record of Abdi Hawa Jama; (7) contract between INS and Esmor; (8) Medical Policies and Procedures governing Esmor detention; (9) depositions of Plaintiffs, Abu Bakar, Jeyakumar Anantharajah, Abraham Kenneh, Dennis Raji, Abdi Jama, Agatha Serwaa, and Cecilia Jeffrey; (10) deposition of Frances Geteles, Ph.D. dated May 30, 2006; (11) several statements of facts by the parties from 2003 and 2004; and (12) Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment dated November 26, 2003.

1. *The Report:* In the Report, Dr. Grassian states that he was asked to review the 2001 and 2005 reports of Frances Geteles, Ph.D. ("Dr.Geteles") and other documents and offer his feedback regarding the opinions expressed in the reports. (Report 1).

Dr. Grassian begins his analysis by adopting Dr. Geteles's accounts of non-disputed factual assertions as to the Plaintiffs' histories. (*Id.* at 1–2). He describes these non-disputed facts as follows: (1) all but one Plaintiff arrived in the U.S. with invalid or falsified documents; (2) all but one Plaintiff came to the U.S. seeking political asylum, and many were ultimately adjudicated to have had a legitimate fear of persecution if returned to their native country; (3) however, at the time of their arrival in the U.S., the veracity of their claims had not yet been adjudicated; (4) as a result, they were arrested by the INS and placed in Esmor pending judicial review of their application for asylum. (*Id.* at 2).

 **\*30** The Report does not attempt to independently evaluate the Plaintiffs' psychological conditions, and in fact, Dr. Grassian never interviewed or otherwise examined the Plaintiffs. Rather, the Report criticizes and attacks Dr. Geteles's methodology in reaching her conclusions regarding the cause of Plaintiffs' psychological disorders. Specifically,

the Report finds that Dr. Geteles's findings are flawed and unreliable because she failed to distinguish between the many possible causes of Plaintiffs' psychological distress, in particular, the trauma each experienced in their home countries before traveling to the United States. Additionally, Dr. Grassian criticizes Dr. Geteles for accepting, as fact, allegations about the conditions at Esmor and ignoring undisputed evidence which contradicts her assertions.

a. *Plaintiffs' Trauma Prior to Arriving in the United States*

Citing portions of Dr. Geteles's 2001 Report, Dr. Grassian first notes that it appears that many of the Plaintiffs arrived in the United States after having suffered severe trauma in their native country. (Report 7). Dr. Grassian also points out that Dr. Geteles emphasized that Plaintiffs's sudden and indefinite detention caused the Plaintiffs to suffer additional trauma upon there arrival in the United States. Dr. Grassian states that despite these two traumatic events, "Dr. Geteles appears oblivious to the fact that the decision to arrest and detain the plaintiffs was made by the INS, and that Esmor had absolutely no input into these decisions." (Report 8–9).

b. *Medical Care at Esmor*

In the Report, Dr. Grassian states that although Dr. Geteles and Dr. Spencer, the Plaintiffs' medical expert, complain about conditions, policies, and procedures at Esmor, it is not clear whether the Plaintiffs' descriptions of those conditions are accurate. (*Id.* at 9). Dr. Grassian provides two examples regarding Plaintiffs' medical care.

First, Dr. Grassian points to the care provided to Plaintiff, Abu Bakar ("Bakar"), for an abscessed tooth. Dr. Grassian notes that in Bakar's interview with Dr. Geteles, Bakar claimed that he had to wait an excessive amount of time to receive dental care, and that the Esmor staff were indifferent to his suffering. (*Id.*). Dr. Grassian states in his Report, that despite this claim by Bakar, the record shows that: (1) Bakar's dental problem was noted by staff on the day he arrived at Esmor; (2) he was seen by a facility physician the next day, August 5, 1994; (3) a request was placed to the INS to allow for a dental consultation; (4) Bakar continued to be seen in clinic everyday until a dental consultation was approved by the INS; (5) after approval, an appointment was scheduled and transportation was arranged; (6) Bakar saw a dentist and the tooth was extracted on August 9, 1994. (*Id.*). Dr. Grassian states that the record shows the Esmor staff did all they could

2007 WL 1847385

for Bakar by giving him Ambusol and over-the-counter pain killers. (*Id.* at 9–10).

 **\*31** Second, Dr. Grassian states that although Dr. Geteles argues that Esmor was indifferent to Hawa Abdi Jama's ("Jama") psychiatric difficulties, especially her depression, the record reveals that the Esmor staff and its site manager, Willard Stovall ("Stovall"), made great efforts to help her. (*Id.* at 10). Dr. Grassian states that after Jama's November 1994 hospitalization, the medical record suggests that her psychiatric status was stable until February 1995, when she heard bad news about her family in Kenya and was informed of delays in her judicial proceedings. (*Id.*). He states that when it became clear she was still depressed, Stovall made a request that an outside psychiatrist be brought in; the psychiatrist saw Jama and prescribed her the anti-depressant medication Zoloft, which Jama refused to take. (*Id.*). Dr. Grassian also points out that Stovall's mother came in to provide emotional support to Jama and that Stovall noted that Jama was smiling one day. (*Id.* at 10–11). Dr. Grassian concludes that "[i]nstead of demonstrating indifference, Ms. Jama's situation clearly demonstrates both the willingness of Esmor to bring in outside professional help and also a deep concern for Ms. Jama shown by the head of the Esmor facility. (*Id.* at 11).

### c. *Conditions at Esmor*

Dr. Grassian's Report states that Dr. Geteles "appears to uncritically accept a sweeping proposition—that plaintiffs' allegations are accurate that there was a systematic pattern of abuse and indifference manifest in the practices at the Esmor facility." (*Id.*). He further contends that this assumption "is actually a factual predicate for her conclusion that the Esmor experience was terribly traumatic and frightening for the detainees." (*Id.*). Dr. Grassian states that there is dispute regarding many factual issues concerning the conditions at Esmor "as well as issue regarding the locus of responsibility and authority for structural and policy decisions governing immigrant detention at the facility." (*Id.* at 12).

Dr. Grassian uses the quality of the food at Esmor as an example. (*Id.*). Dr. Grassian states that although plaintiffs endorse the proposition that the food was spoiled, rotten, and unhygienic, Defendants vigorously dispute this allegation and the record reveals at least one fact that would contradict plaintiffs' allegation: the INS Interim Report notes that the same food which was provided to the detainees was also

offered to the Esmor staff, who were required to pay for their meals. (*Id.*). Dr. Grassian opines that in this example and others, Dr. Geteles fails to conduct a differential diagnosis and states that "an expert must consider the full range of possible explanations of a claimant's statement ... the expert must seek evidence from sources *other* than the claimant's statements." (*Id.* at 13). Dr. Grassian adds that "the convincing evidence that Esmor staff were paying to eat the same food which was served to the detainees decisively contradicts the plaintiff's assertion of systematic indifference to the freshness of food of the hygienic standards used in its preparation." (*Id.*).

 **\*32** Dr. Grassian contends that allegations of theft by Esmor staff are another example. Dr. Grassian opines that while the records provide some evidence of a few instances of theft, "the records do not demonstrate a systematic pattern of indifference toward this problem." (*Id.*). Dr. Grassian states that "[t]o the contrary, contemporaneous records actually support the assertion that ... Stovall[ ] was quite concerned about the issue, and confronted in writing the night shift supervisor, whom he felt had some involvement or responsibility in the thefts." (*Id.*).

Finally, Dr. Grassian opines that "Dr. Geteles accepts uncritically the reports by detainees that they were physically or sexually abused by Esmor staff, and by accepting all these reports as valid, she concludes that there was a pervasive pattern of abuse at Esmor." (*Id.* at 14). Dr. Grassian contends that the fact that Plaintiffs are in a lawsuit would tend to bias there memory and reporting and that the fact that they were victims in their homeland would "inevitably predispose them to be overly vigilant to the possibility of abuse, and over identify situations as situations of abuse." (*Id.*). Dr. Grassian reiterates his view that Dr. Geteles again "accepts uncritically the plaintiffs' claims, while ignoring other explanations— failing to examine the "differential diagnosis." (*Id.*).

### d. *Causation*

In the Report, Dr. Grassian states that although it is "inherently difficult to disentangle all the factors which might have contributed to causing" Plaintiffs' psychological harm, "the most obvious factor of all is the trauma ... [they] experienced in their native land, prior to their arrival at Esmor." (*Id.*). Dr. Grassian adds:

Moreover, this task is made more complex because not only are the interviewed former detainee plaintiffs in a lawsuit, but also, as Dr. Geteles herself recognizes, trauma victims are hyper-sensitive—all too prone to react to new situations as though they were akin to the traumas of the past. In the face of this difficulty, Dr. Geteles at times resorts to virtually arbitrary attribution of cause.

(*Id.* at 14–15).

Before addressing each individual Plaintiff, Dr. Grassian concludes, in part, the following:

There is in the records at least evidence that the Esmor facility was indeed envisioned as a short-term housing facility. The detainees' lengthy detention there, and the indefinite nature of that detention, must have contributed greatly to their distress and frustration. In addition to the length of detention, there may well have been some instances at Esmor of staff abuse towards detainees; probably that evidence applies especially to a few individuals on the night shift. There may well have been some instances of undercooked food. There may have been structural problems with the facility, especially when it was used to house detainees for prolonged period of times [sic]. But systematic abuse and indifference? The evidence clearly suggests the opposite. What is not in dispute is that almost universally, the Esmor detainees had experienced severe trauma prior to their arrival at the facility, and that their arrest and detention immediately upon arrival in the United States, along with their consequent fear of deportation, were

terrible and frightening shocks. And, clearly the fact of arrest and detention was very difficult, especially so because the detainees were apparently unprepared for it. These stressors were enormous, and certainly would cause many or most of them to suffer severe psychological harm. The plaintiffs attempt to assert that conditions of confinement over which Esmor had control were so egregious and traumatic as to add substantially to that harm. Their experts fail entirely to establish these propositions.

**\*33** (*Id.* at 16–17).

Finally, Dr. Grassian's Report criticizes Dr. Geteles's opinions with respect to each Plaintiff and opines that "[t]he deficiencies of Dr. Geteles's report are highlighted in her evaluations of the *Jama* plaintiffs." (*Id.* at 17). With respect to almost every Plaintiff, Dr. Grassian concludes that "there is simply no evidence to support the proposition that particularities of his conditions of detention at Esmor created any meaningful additional harm."[5] (Report at 27, 31, 34, 38, 40, 42, 44–45, 47).

2. *Plaintiffs' Objections:* In Plaintiffs' ninety-one-page brief, they assert a plethora of arguments why Dr. Grassian should be precluded from testifying as an expert.

a. *Qualifications*

Plaintiffs challenge Dr. Grassian's qualifications as an expert and contend that he is unqualified because: (1) he has no basis upon which to evaluate the cause of Plaintiffs' psychological conditions or to critique Dr. Geteles's findings; and (2) his report and testimony are filled with extensive discussions about topics he is not qualified to address.

First, Plaintiffs contend that because he failed to examine Plaintiffs, he is not qualified to testify about the causes of Plaintiffs' "psychological suffering." (Pls.' Br. 7). Plaintiffs argue that "[a] medical expert must either examine a patient or review that patient's medical records. (*Id.* at 8 (citing *Paoli, 35 F.3d at 762*)). Plaintiffs argue that throughout the Report, Dr. Grassian reaches the "unsupportable psychological conclusion" that "there is simply no evidence to support the

proposition that particularities of his conditions of detention at Esmor created any meaningful additional harm." (Pls.' Br. 11).

In addition, Plaintiffs list several portions of the Report which Plaintiffs characterize as "unsupportable findings":

*Hawa Jama*

- "First of all, there is no evidence presented that Ms. Jama was decompensating at Esmor prior to hearing of her mother's death. In fact, her record suggests that during the first two months of her detention at Esmor, Ms. Jama's psychological status apparently did not markedly change, though possibly it improved a bit; she began to "connect with the other girls" and took a job in the facility laundry." (Report 19).

  - "Her mother's death was clearly a terrible blow, leaving her orphaned and bringing back all the deaths and traumas she had experienced before she arrived in the United States. The evidence clearly points to the conclusion that Ms. Jama's suffering was a product of the traumas she had experienced prior to her arrival in the United States, rather than being a product of conditions of her detention at Esmor." (*Id.*).

  - "Clearly, such instinctive reactions must have caused her to greatly fear the Esmor staff without the staff having done anything to her. Entering the facility with such a fearful and biased mindset, it would not be surprising to find her over identifying situations at Esmor as intimidating or abusive." (*Id.* at 20).

  - *34 • "And while Ms. Jama apparently believes that the Esmor staff was punitive in its response to her suffering, the medical record strongly suggests otherwise—that Esmor staff appear to have been quite empathic in their response to her." (*Id.*).

  - "This contemporaneous memo [written by Stovall] thus not only evidences that Ms. Jama was *not* emotionally deteriorating prior to hearing about the judicial delay, but also evidences an attitude of caring about her welfare by Esmor staff." (*Id.* at 22).

  - "Ms. Jama claims that her psychological distress is primarily a response to the conditions she experienced at Esmor, rather than a product of

all the horrors she had experienced before her arrival in the United States. It is almost a grotesque assertion ." (*Id.* at 23).

- "Dr. Geteles' report states that Ms. Jama can 'barely talk about what happened in Somalia. At the slightest question, she began crying and could not stop.' ... This is consistent with my opinion that any psychological damage that Ms. Jama sustained was the result of events extrinsic to her detention at Esmor...." (*Id.* at 24).

*Abu Bakar*

- "Over the years of this litigation, Ms. Jama apparently came to believe increasingly that Esmor was the major cause of her emotional problems. The same is true of Mr. Bakar. He even came to magnify his perception of how impaired he in fact was after his release from detention." (*Id.* at 26).

*Jeyakumar Anantharajah*

- "Given both Mr. Anantharajah's strong adjustment to life after his release from confinement, and also the *content* ... of the psychological burdens which he was still carrying at the time of the 2001 Geteles interview, it would seem quite clear that Mr. Anantharajah had no supportable claim of psychological harm as a result of the detention conditions at Esmor." (*Id.* at 29).

  - "Dr. Geteles re-interviewed Mr. Anantharajah in 2005, and as was the case with Ms. Jama, by 2005 Esmor had morphed grotesquely in Mr. Anantharajah's mind into the greatest source of his psychological problems." (*Id.* at 30).

  - "Now, clearly here Mr. Anantharajah's anger at 'Esmor' is actually anger at the entire 29 ½ months of his life which he wasted in U.S. jails, not just that relatively small part of his detention which was spent at Esmor: 'Mr. Anantharajah says that he thinks a lot about his experiences at Esmor because it was the start of a horrible period of 29 ½ months in jails here in the United States.' " (*Id.*).

*Abraham Kenneh*

- "First, [Dr. Geteles] offers Mr. Kenneh's report to her that he began having suicidal thoughts while housed at Esmor. Yet, even if this is an accurate report, it does virtually nothing to establish causation. After all, before

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 120 of 208
PageID: 72862
Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 1847385

arrival in the United States, Mr. Kenneh was scared for his life. His time in detention—no matter what the conditions of detention—would undoubtedly given him much time to reflect on the catastrophic losses he had suffered. (*Id.* at 36–37).

*Shamimu Nanteza*

**\*35** • "Ms. Nanteza arrived in the United States in a terrible state of fear and despair. Immediately she was placed in detention, where she had little to do besides remember the pain and horror of what she had just experienced in Uganda. Almost inevitably, her experience at Esmor would become contaminated by traumatic memories of her past." (*Id.* at 40).

*Sarah Tetteh Yower*

• "By the time of the follow-up interview in 2005, Ms. Yower apparently declared to Dr. Geteles that 'the changes in her personality, which had resulted from her experiences at Esmor, are still part of her ...' How does Ms. Yower reach this medical conclusion about causation?" (*Id.* at 47).

Plaintiffs argue that "*Paoli* dictates that because Dr. Grassian did not consult medical reports or examine Plaintiffs, he was not qualified to make any of the above listed evaluations or other assessments of the causes of Plaintiff's psychological suffering." (Pls.' Br. 14). Plaintiffs seek to exclude his testimony in its entirety.

In *Paoli,* the Third Circuit Court of Appeals distinguished between the requirements for a doctor evaluating the cause of an illness and what illness the patient is suffering from. As to causation, the Court held that "the opinion of a doctor who has engaged in few standard diagnostic techniques should be excluded unless the doctor offers a good justification for his or her conclusion...." 🚩 35 F.3d at 761. In distinguishing causation from what illness the patient is suffering from, the Court stated:

> We also think that the view of defendants' experts that a physical examination and review of medical records are integral parts of differential diagnosis is not based solely on their claim that these diagnostic techniques are necessary to assess *causation* but also on a view that these techniques are

necessary to determine *what illness* a patient has contracted in the first place.

*Id.* (emphasis added). As to the latter, the Court concluded that "generally, a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice-but the doctor does need at least one of these sources." *Id.*

As to the former, the court noted that "there will be some cases in which a physician can offer a reliable differential diagnosis without examining the patient, looking at medical records, taking a medical history, and performing laboratory tests." *Id.* at 762. However, the Court also found that "performance of physical examinations, taking of medical histories, and employment of reliable laboratory tests all provide significant evidence of a reliable differential diagnosis, and that their absence makes it much less likely that a differential diagnosis is reliable." *Id.* at 758.

Here, Defendants make clear that "Dr. Grassian is not giving a clinical diagnosis at all ... [and that] the fundamental purpose of his testimony is [to] point out the methodological flaws of another expert." (Defs.' Br. 9). Additionally, Defendants state that Dr. Grassian "is not challenging either Dr. Geteles's clinical diagnosis that the Plaintiffs are suffering depression, PTSD and other psychological conditions. Dr. Grassian's critique of Dr. Geteles is that because of her flawed methodology, she cannot reliably opine on the *cause* of Plaintiffs' injuries." (*Id.* at 11 n. 4).

**\*36** Given the stated purpose given by Defendants for Dr. Grassian's testimony, i.e., to critique Dr. Geteles's methodology, he will be permitted to testify in that capacity.

*See* 🚩 *United States v. Velasquez,* 64 F.3d 844, 848 (3d Cir.1995) (district court erred in excluding handwriting expert's testimony criticizing "the standards employed in that field of expertise"). The *Velasquez* Court found that the expert's "testimony as a critic of handwriting analysis would have assisted the jury in evaluating the Government's expert witness." *Id.* Similarly, Dr. Grassian will be permitted to testify as to his criticism of Dr. Geteles's methodology because Dr. Grassian is qualified as an expert and his testimony will assist the trier of fact.

However, Dr. Grassian will not be permitted to testify as to the causes of Plaintiff's psychological conditions. Although he may give his opinion as to whether Dr. Geteles has reliably

opined on the causes of Plaintiff's injuries, he may not himself opine as to the causes. While *Paoli* does not foreclose on the situation where "a physician can offer a reliable differential diagnosis without examining the patient, looking at medical records, taking a medical history, and performing laboratory tests[,]" *Id.* at 762, this is not such a case. Given the extensive psychological illnesses that the Plaintiffs are suffering from, in order to be reliable, any opinion by Dr. Grassian as to causation would have to be as the result of a thorough examination of the Plaintiffs or their medical records. Here, because Dr. Grassian has done neither, he will be precluded from testifying as to the cause of Plaintiffs psychological conditions. [6]

Thus, the Court will strike the following portions of the Report: (1) the fourteen bulleted statements listed above (Report at 19, 20, 22, 23, 24, 26, 29, 30, 36–37, 40, 47); (2) the last sentence of the individual opinions as to Abu Bakar, Jeyakumar Anantharajah, Cecilia Jeffrey, Abraham Kenneh, Shamimu Nanteza, Dennis Raji, Agatha Serwaa, and Sarah Yower to the effect that "there is simply no evidence to support the proposition that particularities of his conditions of detention at Esmor created any meaningful additional harm." (Report at 27, 31, 34, 38, 40, 42, 44–45, 47); (3) the paragraph of the Report beginning on page three, starting with "Assuming these assertions to be true ..." and the first sentence of the paragraph on page four beginning with "Thus, if one accepts ..." (Report at 3–4); (4) the section titled "Conclusion" on page sixteen to seventeen, except that paragraph one and the second sentence of paragraph two will not be stricken.

Second, Plaintiffs contend that "Dr. Grassian should be excluded as a witness because he is not qualified to offer expert testimony on matters outside his area of expertise." (Pls.' Br. 21). Specifically, Plaintiffs seek to preclude Dr. Grassian's testimony with respect to medical and dental care and penology and sanitation at Esmor.

**\*37** Dr. Grassian provides two examples concerning medical and dental care. First, Dr. Grassian opines with respect to the dental care of Abu Bakar, that "[c]ontrary to the plaintiff's accusation, the record indicates that Esmor clinical staff acted professionally and compassionately in their care of Mr. Bakar." (Report 9–10). Second, provides an opinion with respect to the medical care of Ms. Jama. (Report 10–11). Dr. Grassian concluded that "[i]nstead of demonstrating indifference, Ms. Jama's situation clearly demonstrates both the willingness of Esmor to bring in outside professional help

and also a deep concern for Ms. Jama shown by the head of the Esmor facility." (*Id.* at 11).

Dr. Grassian also provided an opinion concerning the conditions and sanitation at Esmor. Dr. Grassian found that "[c]ontrary to Dr. Geteles's uncritical acceptance of the plaintiffs' assertions, there is in fact dispute regarding many factual issues concerning the conditions at the Esmor facility, as well as issues regarding the locus of responsibility and authority for structural and policy decisions governing immigrant detention at the facility." (*Id.* at 12). Grassian provided three examples of such factual disputes: (1) allegations that the food was spoiled; (2) allegations of theft; and (3) allegations of physical and sexual abuse. (*Id.* at 12–14).

Defendants state that "Dr. Grassian has not and will not offer expert opinions regarding the dental care provided at the Esmor facility nor will he offer opinions regarding penology or sanitation ." (Defs.' Br. 11). Defendants contend that "Dr. Grassian's discussion of the dental care provided to Plaintiff Abu Bakar is meant only to illustrate the disconnect between the documentary record of his dental care and his account of that care in his interview with Dr. Geteles." (*Id.* at 12). Similarly, Defendants argue that, with respect to Plaintiffs' contention that Dr. Grassian opines on penological or sanitation matters, "[t]he single observation from which Plaintiffs manufacture this contention is Dr. Grassian's observation that Plaintiffs' other experts commit the same analytical error as Dr. Geteles: accepting everything that the Plaintiffs say as true." (*Id.*).

Rule 702 requires that in order to testify as an expert, the expert must be qualified "as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Additionally, the testimony must assist the trier of fact. *Id.* The court has already found, and it is uncontested, that Dr. Grassian is qualified to testify in the filed of psychiatry. However, Dr. Grassian is not qualified to testify as to medical, dental, penological, or sanitation matters. Although Defendants characterize his testimony as illustrating a disconnect between the documentary record and the Plaintiffs' contentions, the court finds that the testimony in the Report impermissibly opines on issues that are not within his area of expertise and that those opinions will not assist the trier of fact. Thus, Dr. Grassian will not be permitted to testify as to these matters and the following portions of Dr. Grassian's Report will be excluded: (1) section 1.3 in its entirety (Report

2007 WL 1847385

at 9–11); and (2) section 2 in its entirety, except that the following portion will not be excluded:

> **\*38** Dr. Geteles ignores one of the most fundamental concepts in all of clinical medicine, and especially so in the practice of forensic analysis —that of differential diagnosis; the expert must consider the full range of possible explanations of a claimant's statement. In the course of litigation, the expert must always remain aware of the possibility that a claimant may consciously or unconsciously distort his memory of a past event.

(Report at 11–14).

b. *Reliability*

Plaintiffs contend that "[i]n addition to not being qualified to testify as an expert, Dr. Grassian should be precluded from testifying because his report is unreliable." (Pls.' Br. 31). First, Plaintiffs contend that Dr. Grassian should be excluded as a witness because his theories concerning Plaintiffs' credibility have been previously rejected. Plaintiffs contend that the court in *United States v. You,* 1997 WL 269341 (4th Cir.1997) specifically rejected Dr. Grassian's testimony on this issue. (Pls.' Br. 33). Affirming the district court, the *You* Court held that "Grassian's testimony concerning how traumatic events influence perception and memory would essentially challenge the victim's credibility and therefore invade the exclusive purview of the jury." *Id.* at * 1. Plaintiffs argue that the theory rejected by the You Court permeates the Report in that Grassian "repeatedly concludes that Plaintiffs' perceptions were somehow altered because they suffered trauma before arriving to the U.S." (*Id.*).

Defendants argue that *You* bears little resemblance to the present case because there, "Dr. Grassian was asked to opine specifically on a witness's memory, a topic that the *You* court found strayed too close to impermissible credibility testimony." (Defs.' Br. 18). Defendants contend that here, "Dr, Grassian will offer no opinions about whether Plaintiffs are credible or not credible—his purpose is to critique Dr. Geteles's analysis." (*Id.*).

Because the court has determined that, as Defendants point out, Dr. Grassian's testimony will be limited to his criticism of Dr. Geteles's methodology, the following statement will be excluded: "Ms. Jama's perception of widespread abuse and indifference thus appears to reflect a significant distortion of the objective record—a distortion which is consistent with her history of terrible trauma prior to her arrival at Esmor." (Report 22). [7] Additionally, any similar testimony as to Plaintiffs' credibility will also be excluded as invading the exclusive purview of the jury.

Second, Plaintiffs contend that Dr. Grassian should be excluded because he uses unscientific methods to critique Dr. Geteles's methodology. (Pls.' Br. 35). They argue that "Dr. Grassian wrongfully challenges Dr. Geteles's methodology, alleging that she failed to conduct a 'differential diagnosis' of each Plaintiff." (*Id.*). Plaintiffs further contend that the Report is unreliable because his definition of "differential diagnosis" is wrong and that Dr. Geteles did, in fact, conduct a differential diagnosis of each Plaintiff. (*Id.* at 36, 40). Plaintiffs add that "[c]ontrary to Dr. Grassian's beliefs, a differential diagnosis does *not* require an expert to conduct independent research to verify Plaintiff's statements. Instead, a differential diagnosis consists of considering and rejecting diagnosis of diseases from which patients are suffering." (*Id.* at 38).

**\*39** Defendants argue that Plaintiffs mischaracterize Dr. Grassian's Report and testimony "which never claimed that a differential diagnosis must address every 'conceivable' alternative explanation." (Defs.' Br. 13–14). Defendants add that "an expert performing a forensic analysis—unlike a clinical analysis which focuses on treatment and is less concerned with issues of causation—must consider a broader array of sources than the patient's self-report and must at least consider alternative causation." (*Id.* at 13).

In *Paoli,* the Court addressed the requirements of a differential diagnosis. There, the Court stated, "at the core of differential diagnosis is a requirement that experts at least consider alternative causes-this almost has to be true of any technique that tries to find a cause of something." 35 F.3d at 759. The Court added:

> Moreover, performance of standard diagnostic techniques provides prima facie evidence that a doctor has considered such causes and has

attempted to test his or her initial hypothesis as to cause. But ... a doctor does not always have to employ all of these techniques in order for the doctor's differential diagnosis to be reliable.

*Id.*

The court finds that, to the extent Dr. Grassian has opined that a physician must conduct independent research in performing a "differential diagnosis," his testimony will be precluded. Defendants have not cited, nor has the court found, any support for this proposition. However, this error will not preclude Dr. Grassian's testimony critiquing Dr. Geteles's methodology. As *Paoli* points out, the core requirement of a differential diagnosis is that experts consider alternative causes. Dr. Grassian's main critique of Dr. Geteles is that she failed to do so.

Third, Plaintiffs seek to preclude Dr. Grassian from testifying that Dr. Geteles's theories and conclusions are not supported by medical or psychological literature. In his Report, Dr. Grassian makes the following statements:

• "Yet there is no medical literature at all supporting such a proposition...." (Report 15).

• "Yet there is no medical literature to support the idea that an experience of starvation leads to a persistent avoidance of food; indeed the literature generally indicates that the opposite is true." (*Id.* at 26).

• "The medical literature is quite clear that for many individuals, PTSD becomes a chronic, resistant burden, and that a failure to achieve significant remission of symptoms within six months after the trauma predicts very poor prognosis. Dr. Geteles herein offers an opinion which simply has no basis in the psychiatric literature." (*Id.* at 37).

Because these statements are unsupported by any citation to an actual source and because Dr. Grassian did not list any medical or psychological literature in the Report as having been reviewed, they will be excluded, and Dr. Grassian will be precluded from testifying in this regard.

**\*40** Fourth, Plaintiffs argue that Dr. Grassian's Report is unreliable because it is based on incorrect facts with respect to the following issues: (1) medical care; (2) dental care; (3) the cause of Ms. Jama's psychological suffering; and (4) the placement of the Plaintiffs in segregation. Because the court has already excluded Grassian's testimony in the areas of medical and dental care, the court will not discuss those issues.

Plaintiffs argue that Dr. Grassian's finding that the conditions at Esmor were not a major factor in Ms. Jama's decompensation because she did not discuss Esmor's conditions when she was hospitalized in November 1994 concerning Ms. Jama "demonstrates the complete lack of reliability of Dr. Grassian's assessment of the conditions at the Facility and the cause of Ms. Jama's psychological suffering." Plaintiffs point to the following excerpt from the Report:

> [W]hen [Ms. Jama] was able to talk with medical professionals who were not Esmor employees—she could have spoken about her experience at Esmor, yet the medical record fails to reveal any mention of it. Instead, her preoccupation during the hospitalization was entirely with the her [sic] mother's death and with the trauma, tragedies and losses she had experienced before arrival in the United States.

(Report 19). Plaintiffs contend that in reaching his conclusion, Dr. Grassian relied on a two-page report by Dr. L. Hankoff dated April 25, 1995 but that Dr. Hankoff was retained on April 25, 1995, five months after Ms. Jama's November hospitalization. (Pls.' Br. 53). Additionally, Plaintiffs contend that "despite Dr. Grassian's attempt to assert the contrary, the April 1995 psychiatric record supports Dr. Geteles's diagnoses that Ms. Jama suffers from major depression, and that the depression was, in part, caused by the conditions at Esmor." (*Id.* at 54). Plaintiffs assert that his Report is unreliable because he "invented facts about Ms. Jama's November hospitalization, and misrepresented the findings of the only psychological evaluation that was conducted on Ms. Jama while she was at Esmor." (*Id.* at 55).

"It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d

2007 WL 1847385

408, 414 (3d Cir.2002). That is not the case here. Although it is unclear how Dr. Grassian's findings relate to Ms. Jama's November hospitalization, his opinion is not "lacking any foundation in the record." Any discrepancies will be resolved at trial through cross-examination.

Plaintiffs also contend that Dr. Grassian's Report is based on incorrect facts and is excludable because: (1) it conflicts with the I.N.S. Report finding that segregation was used punitively; and (2) it conflicts with the Plaintiffs' testimony that segregation was used in an arbitrary and punitive way.

In the Report, Grassian states the following:

> Consider also that after Ms. Jama learned that her mother had died, she became agitated and subsequently was restrained in four-points restraints, and later she was placed in a segregation cell. Dr. Geteles and Ms. Jama both describe this as a cruel and punitive response to Ms. Jama's suffering. Yet was it really? The reality is that after she learned of her mother's death, Ms. Jama became very agitated, flailing about. In reality, she *had* to be restrained in some fashion; this might well have occurred even if she were in a psychiatric hospital, rather than a detention facility. And while Ms. Jama apparently believes that the Esmor staff was punitive in its response to her suffering, the medical record strongly suggests otherwise—that Esmor staff appear to have been quite empathic in their response to her. When she was placed in restraints, she was given Valium to try to help her calm herself, and then an interpreter sat with her continuously for *three hours* in an effort to help her calm herself. That degree of effort would be extremely commendable, *even* in a psychiatric hospital. Moreover, while it is true Ms. Jama *was* then placed in a segregation cell, there is no evidence that this was done with punitive intent. Instead, as Dr. Spencer (plaintiffs' medical expert)

actually notes, it was explained to her at the time that she was being taken to segregation on order to have time for grieving. The record reveals that she was, in fact, being placed in a segregation cell for her own protection —because of concern that she might be suicidal. And she did calm down; she was subsequently noted to be rational and cooperative with staff, and then, two days after being housed in segregation, she was transferred back to the women' dormitory. Where, then, is the evidence of abuse? Agitated or suicidal patients in a psychiatric hospital are often treated in a similar manner—they are kept in a segregated "quiet room" until the acute risk is over. In the end, especially given the limited resources available to the Esmor staff (they could not, for example, simply page a psychiatrist to come to their residential unit), they appear to have responded with commendable compassion to Ms. Jama's crisis. The allegation that they responded with cruelty and indifference is not consistent with the record, but rather appears to demonstrate a distortion and selective reading of that record.

**\*41** (Report 20–21).

Plaintiffs contend that the I.N.S. Interim Report "found that 'the segregation unit was used as a means both of punishing detainees for relatively minor offenses, and for more general harassment.' " (Pls.' Br. 56). Plaintiffs argue that the I.N.S. Report supports Dr Geteles's findings that segregation use was arbitrary and punitive and that the I.N.S. Report "concluded that such practices constitute a serious violation of both Esmor policy but also the standards of the American Correctional Association (ACA)." (*Id.*). Plaintiffs argue that Dr. Grassian completely ignores the findings of the I.N.S. Report and that his "failure to consider the Interim Report demonstrates that his report's conclusion regarding the use of solitary confinement are based on incorrect facts." (*Id.*).

Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 1847385

As an initial point, Plaintiffs take the language of the I.N. S. Report out of context. The portions referred to states as follows:

> Another serious policy violation was alleged during a confidential interview with an ESMOR guard. The guard revealed that placement of detainees into segregation without a charging document was a frequent occurrence. This would be a violation of ESMOR's policy and procedures as well as the standards of the American Correctional Association (ACA).... According to the interviewed guard, the segregation unit was used as a means both of punishing detainees for relatively minor offenses, and for more general harassment.

(I.N.S. Interim Report at 8). Thus, the I.N.S. Report characterizes the practice of segregation as an allegation and not, as Plaintiffs do, as a "finding."

In essence, Plaintiffs' argument is that because Dr. Grassian did not consider the I.N.S. Report, his Report should be excluded. The court disagrees. First, Dr. Grassian lists the I.N. S. Report as one of the many documents he reviewed in developing his Report. Second, the fact that the I.N.S. Report identified *allegations* of segregation that, if true, would be a violation, by no means converts those allegations into undisputed facts. Thus, the court will not preclude Dr. Grassian from testifying on this ground.

Next, Plaintiffs contend that Dr. Grassian should be precluded from testifying about segregation because his opinion conflicts with the Plaintiffs' testimony that segregation was used in an arbitrary and punitive way. (Pls.' Br. 56–65). Plaintiffs maintain that because Dr. Grassian ignored Plaintiffs' testimony, his conclusions are unreliable. (*Id.*). Plaintiffs also contend that Dr. Grassian's own testimony contradicts his Report's conclusions about solitary confinement. (*Id.* at 65). Plaintiffs' argument is based on the assumption that Plaintiffs' allegations are undisputed. Plaintiffs argue that because Dr. Grassian testified that certain acts would be punitive and arbitrary and Plaintiffs testified that those acts occurred, this demonstrates that Dr.

Grassian's discussions in his Report on solitary confinement are unreliable. (*Id.* at 65–67).

**\*42** The court rejects these arguments as well. Just as the allegations of an Esmor guard in the I.N.S. report are not undisputed facts, Plaintiffs' testimony does not make their allegations undisputed. "A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming fact and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." *Stecyk,* 295 F.3d at 414.

Fifth, Plaintiffs contend that Dr. Grassian should be precluded as an expert because he "grossly mischaracterizes and distorts the facts to support his conclusions." (Pls.' Br. 67). Plaintiffs seek to preclude Dr. Grassian from testifying because they claim he: (1) makes critical errors in his discussion of Ms. Jeffrey's allegations of sexual abuse; (2) unprofessionally critiques Dr. Geteles for allegedly concluding that Mr. Kenneh's cardiomyopathy was caused by the conditions at Esmor [8]; (3) omits critical portions of Dr. Geteles's expert report to reach conclusions that Esmor was not responsible for Plaintiffs' suffering [9]; (4) improperly concludes that Dr. Geteles is biased; (5) distorts the report of Dr. Spencer with respect to segregation; and (6) mischaracterizes and distorts the documents he reviewed with respect to Ms. Jama's as well as others' psychological suffering and the conditions at Esmor. Thus, Plaintiffs argue his testimony is unreliable and should be excluded.

Plaintiffs challenge the following statement as to Ms. Jeffrey: "She claims that she was a strong and vocal advocate for the women in her dorm. If so, why did she not reveal her own sexual abuse during those meetings?" Because this statement is not reliable and could not possibly assist the jury, it will be excluded.

As to bias, Plaintiffs challenge Dr. Grassian's opinion that Dr. Geteles "has reached her conclusion about causation before she ever *begins* the evaluation." (Report 33–34).

Plaintiffs contend that Dr. Grassian uses the following portion of Dr. Geteles's Report to support his conclusion: "[t]he purpose of these interviews was to evaluate the psychological effects of the persecution, which [Ms. Jeffrey] reports having experienced during her detention...." (Geteles Report 70). Plaintiffs argue that Grassian "dishonestly omitted" the end of this statement in Dr. Geteles's Report which states: "[m]y assessment is based on the history she related as well as my

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 126 of 208
PageID: 72868
Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)
2007 WL 1847385

observation of her demeanor and mood in the course of the interview." (*Id.*). Plaintiffs claim that this demonstrates Dr. Geteles is not biased and further highlights that Dr. Grassian's conclusions cannot be trusted. (Pls.' Br. 71–72). The court finds that, contrary to Plaintiffs' argument, Dr. Grassian's omission does not taint his Report to the extent that it should be excluded.

Further, Plaintiffs contend that "Dr. Grassian improperly quotes a citation to the medical record in Dr. Spencer's Expert Report referencing Ms. Jama's 'flailing her arms and legs.' " (*Id.* at 72). Plaintiffs argue that "Dr. Spencer's report states clearly that 'in [his] experience with witnessing the grieving of death in west and east African cultures, loud moaning and crying, and flinging the body about and onto the ground is a normal and expected behavior.' " (*Id.*). The court finds that Dr. Grassian did not improperly quote the comment in Dr. Spencer's Report that Ms. Jama was "flailing her arms and legs." Dr. Spencer's Report in fact states that Ms. Jama "became agitated, flailing her arms about ..." (Spencer Report 5). The fact that Dr. Spencer has witnessed the grieving process in African cultures does not make Dr. Grassian's opinion that she had to be restrained in some fashion unreliable or otherwise inadmissible.

**\*43** Finally, Plaintiffs contend that Dr. Grassian mischaracterizes and distorts the documents he reviewed with respect to the Plaintiffs' psychological suffering and the conditions at Esmor. Specifically, Plaintiffs refer to Dr. Grassian's opinion that: "At Esmor, no one was being murdered; there is even one document noting that the detainees were enjoying a table tennis tourney, and another commenting on an upcoming volleyball tournament." (Report 24). Plaintiffs argue, "[t]hat Dr. Grassian would even refer to these documents as evidence that the conditions at Esmor were benign demonstrates his lack of intellectual rigor and lack of candor."

Dr. Grassian's statement regarding the lack of murder and reference to recreational activities that may or may not have taken place, clearly does not demonstrate that abuse did not occur at Esmor. Moreover, Dr. Grassian testified to this effect:

Q. My question is, does the fact that there may have been a table tennis tournament or there may have been a volleyball tournament preclude that the conditions at the facility at Esmor were harmful?

A. No, not at all.

(Grassian Dep. 273:2–7, Nov. 2, 2006). Because there is nothing in this statement that would assist the jury, it will be excluded.

c. *Helpfulness to the Jury*

Finally, in a blanket effort to completely preclude Dr. Grassian from testifying, Plaintiffs contend that Dr. Grassian: (1) reaches legal conclusions that are not helpful to the jury and invade the court's province; and (2) calls into question the credibility of the Plaintiffs and Plaintiffs' experts. Specifically, Plaintiffs seek to preclude the following statements as legal conclusions [10]:

- "[Ms. Jama's] course at Esmor certainly does reflect some of the limitations of the policies and procedures governing medical care as Esmor, although it is also quite clear that these procedures were created and controlled by INS, not by Esmor." (Report 23).

  - "Dr. Geteles clearly fails to appreciate the fact that this situation was the result of decisions of the INS, and not at all under the control of Esmor itself." (*Id.* at 25).

  - "[Ms. Nanteza] claimed that Ms. Jama was beaten, and that other women were sexually abused by female guards, but it is not clear how much of this description was merely hearsay ..." (*Id.* at 38–39).

  - "[Dr. Geteles] ignores entirely, undisputed evidence which contradicts her assertions of abuse and indifference by Esmor staff ..." (*Id.* at 6).

  - "Where then, is the evidence of abuse?" (*Id.* at 21).

  - "The allegation that [Esmor] responded with cruelty and indifference is not consistent with the record, but rather appears to demonstrate a distortion and selective reading of that record." (*Id.*).

The court finds that the foregoing statements are impermissible legal or factual conclusions which will not assist the jury. Thus, they will be excluded.

Plaintiffs also seek to preclude the following statements, which they argue improperly question the credibility of the Plaintiffs:

**\*44** • "[Dr. Geteles] does not even consider the possibility that plaintiffs in a lawsuit will have a natural inclination to distort their memory in a direction which advances their lawsuit." (*Id.* at 5).

This statement will not be excluded because, contrary to Plaintiffs' assertion, this statement reflects Dr. Grassian's critique of Dr. Geteles's methodology rather than Dr. Grassian's opinion on the Plaintiffs' credibility.

• "[Dr. Geteles] fails to raise any questions as to whether Mr. Bakar might have misinterpreted the officer's intentions, or might have experienced something in a dream or a confused, half-awake state." (*Id.* at 25).

This statement goes beyond a critique of Dr. Geteles's methodology and instead suggests that Mr. Bakar is not credible. Because the statement will not assist the jury, it will be excluded.

Finally, Plaintiffs contend that Dr. Grassian impermissibly criticizes the Plaintiffs' expert witnesses [11]. Plaintiffs argue that Dr. Grassian's critique of Dr. Geteles is the most objectionable because he repeatedly calls her credibility into question in a disrespectful manner. (Pls.' Br. 89). Plaintiffs provide the following examples:

• "There are times in her report when Dr. Geteles appears to be on kind of a witch hunt.... [A]t times the report reads more like the diatribes of a zealot, than like the sober, thoughtful, balanced approach of an expert." (Report 31).

• "[A]t times Dr. Geteles stretches credulity in order to argue that Mr. Raji has remained very impaired since his release from detention." (*Id.* at 42).

• "[Dr. Geteles's] opinion stretches credulity to the breaking point." (*Id.*).

• "Dr. Geteles simply distorts the facts in order to get them to fit into her preconceived conclusions." (*Id.*).

• "[Dr. Geteles's] report is more a polemic than an expert report." (*Id.* at 48).

The court finds that these statements add nothing to the Report and will not assist the jury in its fact-finding. Thus, the foregoing statements will be excluded.

*F. Plaintiffs' Motion to Preclude the Testimony of Dr. Grassian for Defendants' Spoliation of Evidence and for Violating Fed.R.Civ.P. 37(c)(1)*

In addition to their *Daubert* motion, Plaintiffs move for sanctions against Defendants for spoliation of evidence and for failure to comply with discovery requests pursuant to Fed.R.Civ.P. 37(c)(1). Plaintiffs seek the exclusion of Dr. Grassian's testimony, costs, and attorneys' fees.

In reviewing the documents and certifications submitted to the court, the court finds that the following occurred. On June 30, 2006, Plaintiffs sent a document request to Defendants and Dr. Grassian requesting the production of all drafts and other documents considered or created in connection with the Report. (Certification of Penny M. Venetis ("Venetis Cert.") Ex. C).

At Dr. Grassian's November 2, 2006 deposition, the following colloquy took place:

**\*45** Q. Did you write any drafts of the report before you signed the final copy?

A. Oh, yes. Well, I mean, there was—you know, working in a—with a word processor, with a computer, it's a continuing process of changing, growing, adding as you move along.

Q. Did you share any of these prior incarnations of the report with Defendants' lawyers?

A. Yes.

Q. In what form did you do that?

A. Electronic.

Q. So you emailed them the—

A. Yes.

Q. And did—who in particular did you send the copies to?

A. Must have been Matt, Matt Hsu.

Q. Anybody else, any of the other lawyers?

A. I don't recall whether it was broadcast to other people. I think I just sent it to Matt, and he—I'm sure he sent it to others. I don't know.

* * *

Ms. Venetis: We would ask that you produce the prior drafts of the document. We requested it in our document request. We have not received those.

Mr. Reich: Well, we'll take that under advisement.

Q. And did any of the Defendants' lawyers comment to you about your prior drafts?

A. Sure.

Q. In what form was that done?

A. You mean whether it was done electronically or by phone? One or the other or both.

Q. So you did receive electronic communications from Defendants' lawyers with comments about your previous drafts?

A. Well, I don't—

Mr. Livelli: Objection.

A. You know, I don't recall whether I received feedback just over the phone or—or whether there were any written things sent to me. I don't recall that.

* * *

Ms. Venetis: Again, I also renew my request for any—any electronic or other correspondence that defense counsel had with Doctor Grassian about his expert report. And we requested that in our—in our document requests, and you all should have produced it.

Mr. Reich: We'll take it under advisement. Same as before.

(Grassian Dep. 29:18–31:4, Nov. 2, 2006). Thereafter, Plaintiffs' counsel sent two letters to Defendants' counsel, one on November 13, 2006 and the second on November 22, 2006, requesting the draft documents of the Report that Dr. Grassian referenced at his deposition. (Venetis Cert. Ex. D). In the November 22, 2006 letter, Plaintiffs' counsel threatened to file a motion to compel the production of documents and a motion for sanctions. (*Id.*). Thereafter, Defendants complied and sent Plaintiffs additional documents. (Pls.' Br. 2, Venetis Cert. ¶ 9). In early December, 2006, the court granted Plaintiffs' request to re-depose Dr. Grassian. (Venetis Cert. ¶ 10).

At Dr. Grassian's January 12, 2007 deposition, Dr. Grassian testified as follows:

Q. In May were you asked when you were retained by the defendant's lawyers, were you ever asked by any of them to make sure that you kept copies of correspondence with them, or communications with them?

A. No. To the best of my recollection, the first time the issue came up, was at the time of my first deposition.

Q. So prior to that—

**\*46** A. To my best of my knowledge.

Q. So prior to that you have no recollection of anyone saying we need any documents you have related to the Jama case in your files?

A. No, no. I probably would have printed them out or something if I had, if I had been told that.

(Grassian Dep. 385:2–18, Jan. 12, 2007). Additionally, Dr. Grassian testified that in June or July 2006, he experienced a problem with his computer and lost many documents and may have lost documents relating to this case. He stated

And he also—either Larry or Frank reminded me one of the reasons I was a little dicey on my documents and stuff, you know, correspondence or whatever for this case, was that I had some problems with my computer—oh, I don't know if the computer or my handling of the computer, but I lost a lot of documents. They ended up all as aliases, but the original seemed to disappear in to the ethers. I actually lost a lot of stuff, including stuff for this case. If you ask me what stuff, of course I don't know, because I can't find it. Who knows what it was. Hopefully it was all recovered. I mean, not my notes or anything, notes I might have taken, but other stuff.

Q. So what do you think, do you have a sense of what you may have lost related to this case?

A. I mean, I hope it's all been recovered, and—I don't know. That was a long time ago. That was back—

(*Id.* at 367:2–20). Dr. Grassian did not hire a computer specialist to try and recover any lost documents. (*Id.* at 368:19–23).

On February 1, 2007, Plaintiffs' counsel sent a letter to Defendants' counsel indicating that Dr. Grassian referenced

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 129 of 208
PageID: 72871
Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 1847385

documents that had not been produced and requesting the same. (Venetis Cert. Ex. F). At a status conference before this court on February 5, 2007, counsel for Plaintiffs informed the court that, according to Dr. Grassian's testimony, Defendants' counsel never instructed Dr. Grassian to preserve documents and that certain documents were never produced. (Venetis Cert. ¶ 15). In response, Defendants' counsel stated that no additional documents existed and that Dr. Grassian was informed to preserve discoverable documents. (*Id.*). The court instructed Defendants' counsel to either produce an affidavit from Dr. Grassian stating that he was instructed to preserve discoverable documents, or to submit an affidavit in his own name providing that information. (*Id.* at ¶ 16).

On April 30, 2007, Defendants' counsel sent a letter to Plaintiff's counsel stating that they had located two additional pieces of correspondence between Ryan Nelson, a former attorney who worked at Defendants' law firm, and Dr. Grassian. (Venetis Supp. Cert. Ex. B). On May 1, 2007, Defendants' counsel sent another letter to Plaintiffs' counsel indicating that, during a search of their files, Defendants discovered a July 18, 2006 e-mail and draft report, which had not previously been provided to Plaintiffs. (*Id* . at Ex. C).

On May 2, 2007, Defendants submitted a declaration of Matthew Hsu, counsel for Defendants, in support of their opposition to Plaintiffs' motion, which included a declaration of Dr. Grassian. Mr. Hsu's declaration indicates that after receiving Plaintiffs' June 30, 2006 document request, Mr. Hsu mailed the document request to Dr. Grassian and advised Dr. Grassian that after he completed his Report, that Mr. Hsu would need to collect all of his case-related documents and materials, including his notes, and produce them to Plaintiffs. (Declaration of Matthew B. Hsu ("Hsu Decl.") ¶ 1). After Dr. Grassian completed his Report and it was submitted to Plaintiffs, Mr. Hsu called Dr. Grassian to remind him that he needed to collect his documents and sent him an e-mail reminder. (Hsu Decl. ¶ 2). Mr. Hsu also indicated that he performed the April 30, 2007 search that revealed the July 18, 2006 e-mail and draft report. (*Id.* at ¶ 9). His declaration indicates that the e-mail and draft report were omitted inadvertently from the production to Plaintiffs. (*Id.*). The declaration also indicates that the July 18 draft report falls between a draft dated July 10 and a draft dated July 21, both of which were previously produced to Plaintiffs, and that the July 18 draft incorporates an email that Dr. Grassian sent to Mr. Hsu on July 16, which had been previously provided to Plaintiffs.

**\*47** Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*MOSAID Technologies Inc. v. Samsung Elecs. Co., Ltd.,* 348 F.Supp.2d 332, 335 (D.N.J.2004) (citation omitted). Sanctions for spoliation include: (1) dismissal of a claim or granting summary judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference; (4) fines; and (5) attorneys' fees and costs. *Id.* "There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the Court." *Sarmiento v. Montclair State Univ.,* Civ. A. No. 04–4176, 2007 WL 1381755, at \*17 (D.N.J. May 9, 2007) (citing *Paramount Pictures Corp. v. Davis,* 234 F.R.D. 102, 111 (E.D.Pa.2005). Sanctions serve three functions: (1) a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without the spoliation; (2) a punitive function by punishing the spoliator for its actions; and (3) a deterrent function by sending a message to other potential litigants that the behavior will not be tolerated. 348 F.Supp. at 335.

In deciding which sanctions are appropriate, the court must consider that dismissal or suppression of evidence are the two most drastic sanctions and that they should only be imposed in the most extraordinary circumstances. *Id.* The key considerations in determining the proper sanction are: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party...." *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994).

The spoliation inference is a less drastic sanction which "permits a jury to infer that 'destroyed evidence might or would have been unfavorable to the position of the offending party.' " 348 F.Supp. at 335–36 (quoting *Scott v. IBM Corp.,* 196 F.R.D. 233, 248 (D.N.J.2000)). In order for the inference to apply, four factors must be satisfied: (1) the evidence in question must be within the party's control; (2) there must have been actual suppression or withholding of the evidence; (3) the evidence must have been relevant to the claims or defenses; and (4) it must have been reasonably foreseeable that the evidence would later be discoverable. *Id.* (citations omitted). Importantly,

negligent destruction of relevant evidence can be sufficient to give rise to the spoliation inference. If a party has notice that evidence is relevant to an action, and either proceeds to destroy that evidence or allows it to be destroyed by failing to take precautions, common sense dictates that the party is more likely to have been threatened by that evidence.

**\*48** *Id.* at 338.

Plaintiffs similarly seek sanctions under the Federal Rules of Civil Procedure. Pursuant to Fed.R.Civ.P. 37(c)(1):

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) ... is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

Fed.R.Civ.P. 37(c)(1). "Notwithstanding its mandatory language, the Rule vests courts with discretion in its provision that no sanction should be imposed if there was substantial justification for the non-disclosure, or if the non-disclosure was harmless." *ABB Air Preheater, Inc. v. Regenerative Envtl. Equip. Co., Inc.,* 167 F.R.D. 668, 671 (D.N.J.1996).

### 1. *Spoliation*

Plaintiffs contend that Defendants should be sanctioned for spoliation of evidence because they willfully failed to preserve information considered by Dr. Grassian in forming his opinion. First, Plaintiffs assert that Grassian's testimony should excluded. They contend that under the considerations articulated in *Schmid,* Defendants' degree of fault warrants suppression and that under Rule 26(a)(2)(B), Defendants had a duty to preserve relevant evidence and had an obligation to automatically disclose such evidence. (Pls.' Br. 7–9). Plaintiffs argue that Defendants did neither. (*Id.* at 13).

Relying on Trigon Ins. Co. v. United States, 204 F.R.D. 277 (E.D.Va.2001), Plaintiffs argue that "Defendants failure to discharge its known duty is sufficient to support a finding of willful destruction." (Pls.' Br. 15).

In *Trigon,* plaintiffs requested drafts of the defendant's testifying experts' reports. 204 F.R.D. at 281. At that time, defendant's counsel directed its litigation consultant, AGE, and its testifying experts to preserve all draft reports and communications. *Id.* However, by that time, much of that information had been deleted as a result of AGE's document retention policy and the individual practices of each of the testifying experts. The Court found that the "documents and communications were willfully and intentionally destroyed by the United States' non-testifying and testifying experts." *Id.* at 289.

The facts of this case are clearly distinguishable. Although Dr. Grassian testified that he did not *recall* whether he was ever asked by Defendants' counsel to make sure that he kept copies of correspondence and communications with them, Defendants' counsel states in his certification that he did in fact tell Dr. Grassian to do so. Furthermore, even if counsel did not advise Dr. Grassian to retain all documents, Dr. Grassian states in his certification that because it is his practice to retain all factual material that he reviews, he "is confident that [he] did not dispose of any factual material that [he] reviewed during the drafting process or relied upon to reach [his] opinions in the case." (Grassian Decl. ¶ 7).

**\*49** Additionally, there is no evidence that: (1) any evidence was destroyed; or (2) that any evidence was destroyed willfully and intentionally. In fact, the only evidence that Dr. Grassian *may* have lost discoverable documents is that, when he had computer problems, he lost documents and never recovered all of them. Thus, although Plaintiffs may have been prejudiced to some degree, there is no evidence of willful

or intentional destruction and Dr. Grassian's testimony will not be excluded.

Second, Plaintiffs argue that if the court finds exclusion is not warranted, the court should instruct the jury on the spoliation inference. (Pls.' Br. 21). Plaintiffs argue that because the four factors have been satisfied, they are entitled to such a sanction.

The court finds that although the first, third, and fourth factors have been satisfied, the second factor has not. Clearly, the evidence in question was within Defendants' control, was relevant to Plaintiffs' claims, and it was reasonably foreseeable that the evidence would be discoverable. However, the court finds that there was no actual suppression or withholding of evidence. Although intentional or willful conduct is not required, and negligent destruction can be sufficient to give rise to the spoliation inference, the court finds that Defendants did not fail to take reasonable precautions to prevent it from being destroyed. As noted above, although Dr. Grassian testified that he did not recall whether he was advised to retain all his case-related documents, Defendants' counsel states that he advised Dr. Grassian that he would be collecting all of Dr. Grassian's materials to produce to Plaintiffs.

Third, Plaintiffs seek attorneys' fees and costs associated with obtaining compliance with discovery rules. Specifically, Plaintiffs seek fees and costs for attorney time: (1) drafting letters requesting documents; (2) drafting letters to the court requesting a conference call and outlining the dispute; (3) preparing for and conducting Dr. Grassian's re-deposition; and (4) drafting the subsequent motion to strike and preclude Dr. Grassian's testimony. (Pls.' Br. 26). Although the court has found that Defendants' conduct with respect to advising Dr. Grassian was not negligent, wilful, or intentional, Defendants failure to promptly respond to discovery demands requires some monetary sanction. Therefore, Plaintiffs will be permitted to recover attorneys' fees and costs associated with the tasks listed above.

### 2. *Rule 37(c)(1)*

Plaintiffs contend that sanctions under Fed.R.Civ.P. 37(c)(1) are mandatory because Defendants failed to comply with their disclosure obligations under Fed.R.Civ.P. 26(a)(2)(B). (Pls.' Br. 26). Plaintiffs argue that Defendants "clearly violated Rule 26(a)(2)(B)" because they never instructed Dr. Grassian to preserve discoverable documents and, as a result, documents were not produced, not preserved, or destroyed. (*Id.* at 27).

Because, as previously stated, the court does not find, as a matter of fact, that Defendants failed to advise Dr. Grassian on his obligations to retain discoverable documents, any failure to comply with Rule 26(a)(2)(B) is substantially justified. Any other technical violations that may have occurred will be accounted for in the court's order permitting attorney's fees and costs set forth above.

### III. *Conclusion*

**\*50** The various *Daubert* motions and Plaintiffs' motion to strike the testimony of Dr. Grassian are resolved as follows:

1. Plaintiffs' motion to preclude Mr. DeLand from testifying at trial will be denied. There shall be struck from his Report, and he shall be precluded from testifying about, those subjects specified above.

2. Defendants' motion to exclude the testimony of Dr. Geteles will be denied. There shall be struck from her Report, and she shall be precluded from testifying about, her medical opinions, the medical opinions that medical doctors purportedly gave to one or more of the Plaintiffs and any other matters specified above.

3. Plaintiffs motion to preclude Dr. Mendel from testifying about the statistical conclusions at which he arrived will be denied.

4. Plaintiffs' motion to exclude Dr. Grassian's testimony concerning his critique of the methodology that Dr. Geteles employed in rendering an opinion on causation will be denied. There shall be struck from his Report, and he shall be precluded from testifying about, the subject matters set forth in this opinion.

5. Plaintiffs' motion to strike Dr. Grassian's Report on grounds of spoliation of evidence will be granted to the extent that Plaintiffs will be awarded their attorneys' fees and costs associated with the four tasks described in Part II F1 of this opinion and is denied in all other respects.

The court will enter an order implementing this opinion.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 1847385

Jama v. Esmor Correctional Services, Inc., Not Reported in F.Supp.2d (2007)
2007 WL 1847385

# Footnotes

1    One of Plaintiffs' claims against the Esmor guards was held not to be barred by the statute of limitations and thus survived the summary judgment motions—Cecilia Jeffrey's claim against Defendant Phillip Johnson for sexual assault, a claim that may be pursued as a *Bivens* claim for violation of the Fifth Amendment and as a claim pursuant to New Jersey State law.

2    Although Abu Bakar is also referred to as "Moussa Sacko" in the Report, the Court will refer to him only as "Abu Bakar."

3    Although referred to as "Kou Jeffrey" in the Report, the Court will refer to her only as "Cecilia Jeffrey."

4    Although the parties refer to seventy-eight medical request forms, Dr. Mendel states in his Report that he analyzed seventy-nine forms of the nine plaintiffs.

5    Although the language of each conclusion is not identical to the one quoted, the similarity in each statement makes the recitation of each unnecessary.

6    Although Dr. Grassian states in his Report that he reviewed the Esmor Medical Record of Ms. Jama, the review of one record of one Plaintiff is insufficiently reliable.

7    Although Plaintiffs seek to exclude other portions of the Report, those portions have already been excluded and will not be repeated.

8    Because Dr. Geteles's opinion regarding Mr. Kenneh's cardiomyopathy has been excluded, this argument is moot.

9    This contention is specifically addressed to a statement in the Report with respect to Mr. Anantharajah that the court has already excluded.

10   For the sake of efficiency, the court will not address those statements that have been excluded.

11   Although Dr. Grassian stated that Plaintiffs "experts fail entirely to establish these propositions[,]" (Report 17), this statement has already been excluded by the court.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1416672

2010 WL 1416672
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court, W.D. Kentucky,
Louisville Division.

KCH SERVICES, INC., Plaintiff,
v.
VANAIRE, INC., et al., Defendants.

Civil Action No. 05-777-C.
|
March 31, 2010.

**Attorneys and Law Firms**

Brian P. McGraw, James R. Higgins, Jr., Scot A. Duvall, Middleton Reutlinger, Louisville, KY, Nicholas P. Alexander, Morrison Mahoney LLP, Boston, MA, for Plaintiff.

Clare Feler Cox, Donald L. Cox, Jessica T. Sorrels, Reva D. Campbell, Lynch, Cox, Gilman & Goodman, P.S.C., Gregory Haynes, Wyatt, Tarrant & Combs LLP, Louisville, KY, for Defendant.

***MEMORANDUM OPINION AND ORDER***

JENNIFER B. COFFMAN, District Judge.

**\*1** This matter is before the court upon the plaintiff's motions to exclude the testimony of Andrew Cobb (R. 245), Thomas Cooper (R. 246), and Stephen Bowen (R. 247); reference to commercially available software such as SMLayout and Design2Fab (R. 249); testimony about money damages by Thomas Cooper (R. 253); and evidence of the defendants' alleged use of AutoCAD to perform layout functions (R. 255). Also pending are the plaintiff's motion to allow it to present unjust enrichment damages based on presently and recently available information (R. 257); and the defendants' motions to exclude testimony based on late expert disclosures and implied amendments to the plaintiff's complaint (R. 260); testimony or damages calculations that treat router usage as proprietary to the plaintiff (R. 262); and testimony of Joseph Gemini (R. 267). The court will address each in turn.

A. *Legal Standard*

Federal Rule of Evidence 702 governs the use of expert testimony. *See also* Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[A] proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Fed.R.Evid. 702. Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' *Id.* Third, the testimony must be reliable. *Id.*

In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528-29 (6th Cir.2008).

In evaluating the reliability of expert testimony, the court may examine "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance of the relevant scientific community...." *United States v. Langan,* 263 F.3d 613, 621 (6th Cir.2001) (citing Daubert, 509 U.S. at 593-94). However, "[t]he test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." In re Scrap Metal, 527 F.3d at 529 (quoting Kuhmo Tire, 526 U.S. at 150). The court's function as "gatekeeper" to exclude unreliable expert testimony applies to all expert testimony, not just testimony based on "scientific" knowledge. See Fed.R.Evid. 702 advisory committee's notes, 2000 amend.; Kuhmo Tire, 526 U.S. at 147.

As a preliminary matter, the testimony of all experts who will be allowed to testify in this case will be limited to opinions within their respective areas of expertise, and will include only those which they are qualified to provide.

B. *Joseph Gemini*

The plaintiff seeks to offer Gemini's expert testimony on damages calculations. The court will deny the defendant's motion to exclude his testimony (R. 267). First, Gemini is qualified due to his knowledge, skill, training, expertise,

2010 WL 1416672

and education. He holds Bachelor's and Master's degrees in his field, has worked as a certified public accountant for approximately twenty-three (23) years, and is a member of the American Institute of Certified Public Accountants. He has provided depositions and trial testimony in numerous cases, including those in federal courts, and has consulted in the areas of trade secrets and business valuations. He has testified in at least seventy-five (75) legal proceedings involving calculations of damages.

**\*2** Second, Gemini's testimony is relevant because it will assist the trier of fact in understanding the evidence and determining facts in issue. Damages in a trade secret can be difficult to compute. *See* Avery Dennisson Corp. v. Four Pillars Enter. Co., 45 Fed. Appx. 479, 485 (6th Cir.2002). The defendants argue that Gemini's testimony would not be helpful because he would simply use numbers provided by Kenneth Hankinson, president of the plaintiff corporation and one of its witnesses, associated with the value of a trade secret and would apply nothing more than simple addition, subtraction, division, and multiplication in providing testimony on damages. The defendants submit that the jury can grasp such basic mathematics without the use of an expert. However, the value of an accountant such as Gemini is not that he can perform simple mathematical calculations, but rather that he is able, unlike a lay person, to know which numbers to add, subtract, divide, and multiply in calculating damages from alleged trade secret misappropriation. In offering his opinion, Gemini provides the jury with an application of an accepted method to calculate the ways proprietary technology provides the user of the technology with an economic advantage. In this case, these ways might include reduction in production costs that may result from increased manufacturing speeds, reduction in the cost of labor used to manufacture the product, premium pricing of the user's product that the user would otherwise be unable to charge, and savings on router research, software development, productivity, time, training, and experience. Gemini also provides an application of methods to calculate direct costs, variable costs and expenses, fixed costs and expenses, average and median profits per job performed, incremental profit, gross profit margins, actual gross margins, and adjustments for inflation. The jury will benefit from an expert's explanation of these calculations.

Third, Gemini's expected testimony is reliable. He relies on known, albeit disputed, figures to which Hankinson will testify at trial, holds significant professional qualifications, and uses methods in accordance with an industry standard, as

discussed below. The defendants dispute the figures provided by Hankinson. However, a court will "generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." In re Scrap Metal, 527 F.3d at 530. Under Federal Rule of Evidence 611, the court can require Hankinson to testify before Gemini does so. *See also* Fed.R.Evid. 703. The defendant will have an opportunity to cross-examine Hankinson on matters raised during direct examination, which may include dollar values associated with alleged trade secrets. "[W]eakness in the factual basis of an expert witness'[s] opinion," such as the numbers used by the plaintiff in this case to compute damages, "bear on the weight of the evidence rather than on its admissibility." McLean v. 988011 Ontario Ltd., 224 F.3d 797, 801 (6th Cir.2000) (quoting United States v. L.E. Cooke Co., 991 F.2d 336, 342 (6th Cir.1993)). While the defendants attack Gemini's use of Hankinson's figures in formulating an opinion on damages, Gemini used data that was available. *See* Digital Filing Sys., LLC v. Aditya Int'l, 323 Fed. Appx. 407, 419 (6th Cir.2009); Bell v. Pro Arts, Inc., 511 F.2d 451, 453 (6th Cir.1975); Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1572 (Fed.Cir.1996). The American Institute of Certified Public Accountants has set forth professional standards for litigation services for accountants or economic experts in obtaining the data used to support their expert opinions, and these standards permit the expert to rely on "facts or assumptions" provided by the party seeking to offer the expert's opinion. *See* Inline Connection Corp. v. AOL Time Warner, Inc., 470 F.Supp.2d 435, 443 (D.Del.2007) (quoting Litigation Services and Applicable Professional Standards, AICPA Special Report 03-1, 2003 New York, NY). "[R]ejection of expert testimony is the exception, rather than the rule." In re Scrap Metal, 527 F.3d at 530 (quoting Fed.R.Evid. 702 advisory committee's note, 2000 amend.). Due to his qualifications and the relevancy and reliability of his expected testimony, Gemini will be allowed to testify.

**\*3** Federal Rule of Civil Procedure 26(a)(2)(D) states, "The parties must supplement ... disclosures when required under Rule 26(e)." Rule 26(e) states,

> (1) ... A party who has made a disclosure under Rule 26(a) ... must supplement or correct its disclosure ...
> (A) in a timely manner if the

party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.... (2) ... For an expert whose report must be disclosed ..., the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a) (3) are due.

Gemini acknowledged in his initial report that it may be necessary to provide supplemental reports, and the plaintiff had a duty to supplement his reports once new evidence was discovered that the plaintiff intended to use in calculating damages. Accordingly, the plaintiff filed Gemini's supplemental reports. These reports were based on newly discovered, significant evidence that followed discovery disputes. While elements of damages were added based on new information, Gemini did not fundamentally change his method of calculating damages from one report to the next. After his initial report, Gemini's qualifications and the nature of his expected testimony remained largely the same. By the plaintiff's fulfilling of its duty to supplement Gemini's reports under Rule 26(e), Gemini did not become a "moving target" for purposes of a *Daubert* motion by the defendants.

*See* Pride v. BIC Corp., 218 F.3d 566, 579 (citing *In Re TMI Litigation*, 922 F.Supp. 997, 1005 (M.D.Pa.1996));

*see also* Outley v. New York, 837 F.2d 587, 590-91 (2d Cir.1988); Citizens Bank v. Ford Motor Co., 16 F.3d 965, 966 (8th Cir.1994). Separately from their *Daubert* motion, the defendants move to exclude Gemini's testimony based on late expert disclosures and what they deem implied amendments to the plaintiff's complaint (R. 260). For the reasons stated above, the court will deny the defendants' motion in regard to late expert disclosures. In regard to what they deem implied complaint amendments, the defendants argue that since the specific allegations concerning a preventive maintenance program and the F-16-related contract were not included by the plaintiff in its latest amended complaint, evidence

concerning these allegations should be excluded. However, these allegations, all of which were included in answers to the defendants' discovery requests and presented to the defendants before the deadline for dispositive motions, are part of the plaintiff's claim of unfair competition. The allegedly tortious conduct involving the preventive maintenance programs and F-16-related contract occurred, in large part, by virtue of employees who worked for the plaintiff and then went to work for the defendants, a significant aspect of the plaintiff's claim of unfair competition. Therefore, the court will deny the defendants' motion in limine (R. 260) in regard to implied complaint amendments.

**\*4** The plaintiff moves separately to allow it to present unjust enrichment damages based on presently and recently available information (R. 257). Because unjust enrichment damages are expressly authorized by statute, *see* KY.REV.STAT. ANN. 365 .884 (2010), and the plaintiff has a duty to supplement its expert's initial report as required by the Federal Rules of Civil Procedure, the court will grant the plaintiff's motion. In regard to damages calculations, the defendants move to exclude trial testimony that treats router usage as proprietary to the plaintiff (R. 262). The court will deny the defendants' motion because the capabilities and value to the defendants of the alleged trade secrets in question are questions of fact for the jury.

### C. *Thomas Cooper*

For the same reasons that the court will deny the defendants' motion to exclude Gemini's testimony, it will also deny the plaintiff's motion to exclude the testimony of Thomas Cooper (R. 246). Cooper is qualified due to his knowledge, skill, training, expertise, and education. He holds a Bachelor's degree in his field, has worked as a certified public accountant for over forty (40) years, and is a member of the American Institute of Certified Public Accountants. He has provided depositions and trial testimony in numerous cases, including expert deposition testimony in a federal court. He will be permitted to rebut Joseph Gemini's testimony, provided that his opinions are limited to those which he is qualified to formulate and provide to the jury. For example, he may testify concerning calculations of damages from the ways allegedly proprietary technology provides the user of the technology with an economic advantage. However, his methods need not mirror Gemini's exactly. "When a trial court rules ... that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." Fed.R.Evid. 702 advisory committee's note, 2000 amend. The plaintiff moves to preclude the defendants from offering

2010 WL 1416672

testimony relating to money damages through Cooper (R. 253). The plaintiff's motion will be denied, and Cooper will be allowed to rebut Gemini's testimony concerning damages, in accordance with his report.

### D. *Andrew Cobb*

The defendants seek to offer testimony of Andrew Cobb to explain software that was on the defendants' computers during the time period in question. The court will deny the plaintiff's motion to exclude the testimony of Andrew Cobb (R. 245) in that Cobb will be conditionally allowed to testify. First, Cobb is qualified due to his knowledge, skill, training, expertise, and education. He holds Bachelor's and Master's degrees in Electrical Engineering and a Doctorate in Philosophy in Computer Science and Engineering. He is currently employed as a professor in his field of expertise at a major university. He has worked with computer technology for approximately fifteen (15) years and is a member of professional organizations within his field. He has published multiple works in his general field of expertise and has provided expert analysis and testimony in numerous cases.

**\*5** Second, Cobb's expected testimony is relevant. His report states, "The version of SMLayout currently used by Vanaire remains unchanged since the early 1990's. More specifically, the LISP files are the same in both the 1991 and 1999 versions. This was verified using digital signatures, a widely accepted method for verifying that two files have the same content." If allowed, this testimony will assist the jury in understanding how it is possible that the defendants had at their disposal commercially available software that could have been used to perform functions similar to those performed by the plaintiff's proprietary software, making it less likely that the defendants would have needed to possess and use the plaintiff's proprietary software during the time period in question.

While Cobb is qualified to testify, and his expected testimony is relevant, it is not reliable at this juncture. According to the plaintiff, the defendants have not yet produced any evidence that commercially available software such as SMLayout was on the defendants' computers and in use by the defendants. That is, the defendants did not provide copies of the software, search terms with which data was extracted, or screen shots that would show that the defendants were in possession of SMLayout and other commercially available software. An attachment to Cobb's report, "Media Imaging Protocol," describes a procedure by which imaging can be performed, but does not include a verification

that the procedure described was, in fact, the method by which imaging occurred in this case. The defendants argue that the commercially available software is protected by copyright, and therefore not discoverable by the plaintiffs from the defendants. Yet the defendants may use the stipulated protective order of June 30, 2006, or other device with which to facilitate discovery of any evidence of their possession of commercially available software that may not already be obtained under the doctrine of "fair use" for purposes of litigation. *See* R. 39; 🚩 *Bridgeport Music, Inc. v. UMG Recordings, Inc.,* 585 F.3d 267, 277 (6th Cir.2009). The court will require the defendants to deliver to the plaintiff all facts and data upon which Cobb's opinions rest, *see* Fed.R.Evid. 705, and will require a preliminary hearing to determine the admissibility of Cobb's testimony at trial. *See* Fed.R.Evid. 104.

### E. *Stephen Bowen*

The defendants seek to offer Stephen Bowen's testimony to show that the commercially available software in the possession of the defendants during the period in question is similar to the plaintiff's proprietary software. The court will deny the plaintiff's motion to exclude the testimony of Stephen Bowen (R. 247) in that Bowen will be conditionally allowed to testify.

First, Bowen may be qualified due to his knowledge, skill, training, expertise, and education. However, significant details of an expert's professional background are absent from his report. Though by no means dispositive in considering whether he is qualified, *see generally* 🚩 *Kuhmo Tire,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238, he does not hold a Bachelor's degree, has not published in his field, and has never previously been deemed qualified and testified in a case. However, the issue is not "qualifications ... in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." 🚩 *Berry v. Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994). His report does include information concerning his practical experience with software, which may provide a sufficient foundation for his expert testimony.

**\*6** Second, whether or not he is qualified, Bowen's expected testimony is relevant. If allowed, it will assist the jury in understanding what the defendants claim are similarities in the plaintiff's proprietary software and commercially available software, such that the defendant would not have

2010 WL 1416672

needed to use the plaintiff's software during the time period at issue. Third, however, Bowen's expected testimony is not yet reliable. The facts and data upon which his opinions rest were not provided with his report, nor are his qualifications known to the court strong indicia of reliability of his opinions. Following submission by the defendants to the plaintiff of all facts and data upon which Bowen's opinions in this case are based, *see* Fed.R.Evid. 705, the court will require a preliminary hearing to determine the admissibility of his testimony at trial. *See* Fed.R.Evid. 104.

F. *Commercially available software*

The plaintiff moves to exclude evidence of commercially available software such as SMLayout, Design2Fab, and AutoCAD because the defendants have not produced evidence of ownership or use of these programs for the time period in question (R. 249, 255). The plaintiff requested evidence of the programs, and the defendant produced 1) an invoice for purchase of SMLayout dated "2006," which is outside the time period in question; 2) a user manual for SMLayout; 3) statements from the defendant Guillermo Vanegas, Sr. in a deposition that SMLayout "would have" and "might have" been used for work by the defendant Vanaire, Inc. during the period in question; 4) an opinion from Andrew Cobb, without accompanying, foundational facts or data, in his expert report that SMLayout has been on the defendants' computers since the early 1990's; and 5) informative literature on the software Design2Fab. The evidentiary value of these items is largely circumstantial in showing that the defendants possessed and used such commercially available software during the time period in question. Just as the court will order the defendants to deliver to the plaintiff all facts and data upon which Cobb and Bowen's opinions rest, it will order the defendants to deliver to the plaintiff evidence of ownership or use of the commercially available software, which may include but is not limited to purchase invoices that reflect ownership during the period in question, screen shots, original disks, licensing agreements, registration numbers, serial numbers, and authorization codes associated with the defendants' copies of commercially available software. This production may fall under the stipulated protective order of June 30, 2006. *See* R. 39. Since the defendants will be given another opportunity to provide such evidence in advance of trial, the court will deny without prejudice the plaintiff's motions in limine to exclude evidence of the commercially available software (R. 249, 255), with leave to renew these two motions at a later date. Accordingly,

**\*7  IT IS ORDERED** that the plaintiff's motions to exclude the testimony of Thomas Cooper (R. 246) and testimony concerning money damages by Cooper (R. 253) are **DENIED.**

**IT IS FURTHER ORDERED** that the plaintiff's motions to exclude the testimony of Andrew Cobb (R. 245), Stephen Bowen (R. 247), reference to commercially available software such as SMLayout and Design2Fab (R. 249), and evidence or testimony related to its alleged use of AutoCAD to perform layout function (R. 255) are **DENIED** without prejudice, with leave to renew at a later date.

**IT IS FURTHER ORDERED** that the plaintiff's motion to allow it to present unjust enrichment damages based on presently and recently available information (R. 257) is **GRANTED.**

**IT IS FURTHER ORDERED** that the defendants' motions to exclude testimony based on late expert disclosures and implied amendments to the plaintiff's complaint (R. 260), testimony or damages calculations that treat router usage as proprietary to the plaintiff (R. 262), and the testimony of Joseph Gemini (R. 267) are **DENIED.**

**IT IS FURTHER ORDERED** that no later than ten (10) days from the date of entry of this order, the defendants shall provide to the plaintiff all facts and data upon which Andrew Cobb and Stephen Bowen's opinions in this case are based.

**IT IS FURTHER ORDERED** that no later than ten (10) days from the date of entry of this order, the defendants shall provide to the plaintiff evidence of ownership or use of commercially available software of which the defendants intend to introduce evidence at trial.

**IT IS FURTHER ORDERED** that the court will require preliminary hearings under Federal Rule of Evidence 104(a), outside the hearing of the jury, to determine the admissibility of Andrew Cobb's and Stephen Bowen's expected testimony. The hearings will occur on the days preceding the expected days for testimony of Cobb and Bowen, respectively.

**IT IS FURTHER ORDERED** that no later than ten (10) days from the date of entry of this order, the parties shall brief the court on whether Kentucky or North Carolina substantive law applies in this case.

**KCH Services, Inc. v. Vanaire, Inc., Not Reported in F.Supp.2d (2010)**
2010 WL 1416672

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1416672

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Korolshteyn v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1020391

2017 WL 1020391
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Tatiana KOROLSHTEYN, on behalf of herself
and all others similarly situated, Plaintiff,

v.

COSTCO WHOLESALE CORPORATION
and NBTY, Inc., Defendants.

Case No.: 3:15-cv-709-CAB-RBB
|
Signed 03/16/2017

**Attorneys and Law Firms**

Max A. Stein, Boodell & Domanskis, LLC, Stewart Weltman, Siprut PC, Chicago, IL, Patricia N. Syverson, Bonnett, Fairbourn, Friedman & Balint, PC, San Diego, CA, Elaine A. Ryan, Bonnett, Fairbourn, Friedman & Balint, PC, Phoenix, AZ, for Plaintiff.

Eileen M. Ahern, Megan O'Neill, Nicole Diaz, William Alexander Delgado, Willenken Wilson Loh & Delgado LLP, Los Angeles, CA, for Defendants.

**ORDER GRANTING MOTION
FOR CLASS CERTIFICATION**

Hon. Cathy Ann Bencivengo, United States District Judge

**\*1** This matter is before the Court on Plaintiff's motion for class certification. The motion has been fully briefed, and the Court deems it suitable for submission without oral argument. As discussed below, the motion is granted.

**I. Background**

This case arises out of Defendants' alleged false statements about the health benefits of TruNature Gingko Biloba with Vinpocetine ("TruNature Gingko"), which is manufactured by Defendant NBTY, Inc. ("NBTY") and sold at the stores of Defendant Costco Wholesale Corporation ("Costco"). The labels of TruNature Gingko represent that the product "supports alertness & memory," that "Gingko biloba can help with mental clarity and memory," and that "[i]t also helps maintain healthy blood flow to the brain to assist mental clarity and memory, especially occasional mild memory

problems associated with aging." [Doc. No. 100 at ¶ 1.] According to the TAC, these representations are false because studies show that gingko biloba and vinpocetine do not provide any mental clarity, memory or mental alertness benefits. [*Id.* at ¶ 2.] Plaintiff Tatiana Korolshteyn alleges she bought a bottle of TruNature Gingko based on the allegedly false representations on the product label and filed this lawsuit on behalf of herself and a putative class of consumers who purchased TruNature Gingko in California. The TAC asserts two claims: (1) violation of California's unfair competition law (the "UCL"), California Business & Professions Code § 17200 *et seq.*; and (2) violation of California's Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq.* The prayer for relief asks for restitution and disgorgement of Defendants' revenues, actual, statutory and punitive damages, and attorneys' fees and costs. [*Id.* at p. 15.] She now moves to certify a class.

**II. Legal Standard for Class Certification**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted). "Parties seeking class certification must satisfy each of the four requirements of [Federal Rule of Civil Procedure] 23(a) ... and at least one of the requirements of Rule 23(b)." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017). "Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class). *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (internal quotation marks, brackets, and ellipses omitted).

Plaintiff here contends that in addition to satisfying these four Rule 23(a) requirements, class certification is warranted under Rule 23(b)(3). Rule 23(b)(3) "requires that common questions of law or fact found under Rule 23(a)(2) 'predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 140 of 208
PageID: 72882

Koroshteyri v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1020391

controversy.' " *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016).

**\*2**  In considering class certification, district courts must engage in "a rigorous analysis" to determine whether "the prerequisites of 🔖 Rule 23(a) have been satisfied." *Dukes*, 564 U.S. at 350-51 (citing 🔖 *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class." 🔖 *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Thus, "a district court *must* consider the merits if they overlap with the 🔖 Rule 23(a) requirements." *Id.* (*emphasis* in original). At the same time, courts "consider merits questions at the class certification stage *only* to the extent they are relevant to whether 🔖 Rule 23 requirements have been met." 🔖 *Torres*, 835 F.3d at 1133 (*emphasis* added). "While some evaluation of the merits frequently cannot be helped in evaluating commonality, that likelihood of overlap with the merits is no license to engage in free-ranging merits inquiries at the certification stage." 🔖 *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014) (internal quotation marks and citation omitted). "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not turn class certification into a mini-trial on the merits." 🔖 *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015).

### III. Motions to Exclude or Strike Declarations and Expert Reports

"On a motion for class certification, the Court makes no findings of fact and announces no ultimate conclusions on Plaintiffs' claims." 🔖 *Keilholtz v. Lennox Hearth Prod. Inc.*, 268 F.R.D. 330, 337 (N.D. Cal. 2010). Thus, at the class certification stage, "the Court may consider evidence that may not be admissible at trial." 🔖 *Aguirre v. Genesis Logistics*, No. SACV1200687JVSANX, 2016 WL 6573986, at \*2 (C.D. Cal. July 20, 2016). One court even noted that a "district court may certify a class without supporting evidence." 🔖 *Dominguez v. Schwarzenegger*, 270 F.R.D. 477, 483 n.5 (N.D. Cal. 2010) (citing 🔖 *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)). "Accordingly, the court need not address the ultimate admissibility of the parties'

proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the motion for class certification." 🔖 *Aguirre*, 2016 WL 6573986, at \*2 (internal quotation marks and brackets omitted).

Here, in conjunction with the motion, the parties have combined to submit numerous declarations and expert reports and dozens of exhibits that they claim support their arguments for or against class certification. Perhaps unsurprisingly, these voluminous evidentiary submissions have yielded three separate motions to exclude the reports or declarations of four different experts or witnesses purportedly offering expert testimony. That the evidence does or does not support the putative class' claims is a separate question from whether a plaintiff may assert those claims on behalf of a class. The parties may disagree about the admissibility various expert reports and other declarations, but the admissibility of this testimony is largely inconsequential to the Court's current task of determining whether Plaintiff's claims are appropriate for determination on a classwide basis. Accordingly, the motions to exclude or strike the declarations, testimony or reports of Richard Bazinet, Beth Snitz, Susan Mitmesser, and Edward Rosick are all denied without prejudice. The parties are welcome to re-file these motions in connection with summary judgment motions or as motions in limine consistent with the deadlines set by the applicable case management orders and local rules.

### IV. Discussion

#### A. The Proposed Class(es)

Plaintiff seeks certification of a California-only UCL Class and a California-only CLRA Class, but the classes are identical: "All California consumers who, within the applicable statute of limitations, purchased TruNature Gingko Biloba with Vinpocetine until the date notice is disseminated." [Doc. No. 107 at 20.] "For purposes of class certification, the UCL ... and CLRA are materially indistinguishable." 🔖 *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK (MRWx), 2014 WL 1410264, at \*9 (C.D. Cal. Apr. 9, 2014). "[C]lass certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue." 🚩 *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014).

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 141 of 208
PageID: 72883

Koroshkeyri v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1020391

**\*3** "To state a claim under the UCL ... 'based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.' " *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). "This inquiry does not require 'individualized proof of deception, reliance and injury.' " *Id.* (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 320). "Thus, a court need not make individual determinations regarding entitlement to restitution. Instead, restitution is available on a classwide basis once the class representative makes the threshold showing of liability under the UCL." *Id.* at 986.

Meanwhile, "[u]nlike the UCL, the CLRA demands that each potential class member have both an actual injury and show that the injury was caused by the challenged practice. However, if a material misrepresentation has been made to the entire class, an inference of reliance arises as to the class." *Berger*, 741 F.3d at 1069-70 (internal citation and quotation marks omitted). "As a general rule, materiality may be established by common proof '[b]ecause materiality is judged according to an objective standard,' and so '[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.' " *Mullins v. Premier Nutrition Corp.*, No. 13-cv-1271-RS, 2016 WL 1535057, at \*5 (N.D. Cal. Apr. 15, 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013)); *see also* *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB OP, 2014 WL 1779243, at \*14 (C.D. Cal. Jan. 13, 2014) ("[T]he determination of materiality, and thus reliance, is determined using objective criteria that apply to the entire class and do not require individualized determination."); *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (Cal. Ct. App. 2010) ("Materiality of the alleged misrepresentation generally is judged by a 'reasonable man' standard.").

Here, the only alleged misrepresentations in question appeared on the labels of the products purchased by class members. Whether these representations were material to a reasonable person can be determined on a classwide basis. Therefore, the different requirements for UCL and CLRA claims do not warrant different outcomes in the class certification analysis. For this reason, and because neither party makes arguments unique to either proposed class, the Court does not separately analyze whether the two proposed classes satisfy the requirements of Rule 23(a) and (b)(3).

## B. Numerosity

The "numerosity" requirement is satisfied if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendants do not dispute that this requirement is satisfied, and in light of evidence that Costco sold over 1 million units of TruNature Gingko to thousands of consumers during the class period, the putative class easily meets this requirement for class certification.

## C. Typicality

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis*, 657 F.3d at 984; *see also* Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[W]hen determining typicality, the Court focuses on the defendant's conduct and the plaintiff's legal theory, not the specific facts from which the claim arises." *Allen v. Similasan Corp.*, 306 F.R.D. 635, 645 (S.D. Cal. 2015) (citing *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Torres*, 835 F.3d at 1141 (quoting *Hanon*, 976 F.2d at 508).

**\*4** Here, Plaintiff's theory is that the statements on the labels of TruNature Gingko are false because it provides no health benefits. Every class member was exposed to these statements on the labels of the TruNature Gingko they purchased. According to Plaintiff, anyone who purchased TruNature Gingko suffered the same harm because they would not have purchased TruNature Gingko but for these false statements and as a result paid money for a worthless product. The

2017 WL 1020391

wrongful conduct (the allegedly false statements) and the resulting harm (the amount paid to purchase TruNature Gingko) are the same. In other words, none of Defendants' allegedly wrongful conduct is unique to the named plaintiff or any member of the proposed class. Therefore, the typicality requirement is satisfied.

### D. Adequacy

The "adequacy" requirement is satisfied if the class representative and the attorneys she hired "fairly and adequately protect the interests of the class." 🔖 Fed. R. Civ. P. 23(a)(4); 🚩 Hanlon, 150 F.3d at 1020. Defendants do not contest that Plaintiff's counsel can adequately represent the class, but they argue that Korolshteyn is not an adequate named plaintiff because of what they deem to be credibility issues. The Court is not persuaded.

Defendants rely on a conversation on Facebook between Korolshteyn and her friend Peter Crane, who is an attorney. The transcript of this Facebook conversation indicates that Crane first advised her of the alleged worthlessness of Gingko biloba after she had purchased TruNature Gingko but before she had used it. Defendants then point to Korolshteyn's deposition testimony that she took the product within a day or two of purchasing it, which would mean that she took it before her Facebook conversation with Crane. [Doc. No. 112-26 at 18-20.] [1] However, the Facebook conversation transcript also makes clear that Korolshteyn had purchased TruNature Gingko before the Facebook conversation with Crane, and that she did so based on a hope that "it would help with sleepy mommy brain." [Doc. No. 112-27 at 3.] Moreover, at her deposition Korolshteyn testified that she read and relied on the label of the bottle before purchasing it. [Doc. No. 112-26 at 14.]

Ultimately, the evidence on which Defendants' rely does not necessarily undermine Korolshteyn's credibility or make her an inadequate representative plaintiff. The Facebook conversation and deposition transcript demonstrate that Korolshteyn's experience in purchasing TruNature Gingko is consistent with the plaintiff class' theory that the statements about health benefits on the TruNature Gingko packaging are material to the average consumer and that consumers rely on the statements when purchasing the product. For all of the reasons discussed below, when Korolshteyn took TruNature Gingko, or even if she took it at all, is irrelevant to the claims

for which she seeks to represent the class. Accordingly, the adequacy requirement for class certification is satisfied.

### E. Commonality and Predominance

To satisfy the commonality requirement, a plaintiff must establish that "there are questions of law or fact common to the class." 🔖 Fed. R. Civ. P. 23(a)(2). As the Ninth Circuit recently explained:

> Although 🔖 Rule 23(a)(2) refers to common "questions of law or fact" in the plural, even a single common question will do. 🔖 Wal–Mart, 131 S.Ct. at 2556. But because " '[a]ny competently crafted class complaint literally raises common questions,' " 🔖 id. at 2551 (alteration in original) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–32 (2009)), courts should look for a "common contention" in determining whether putative class members' claims can be litigated together. Id. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. Thus, it is not just the common contention, but the answer to that contention, that is important: "What matters to class certification ... is not the raising of common 'questions'—even in droves —but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (alterations in original) (quoting Nagareda, supra, at 132)."

**\*5** 🔖 Alcantar v. Hobart Serv., 800 F.3d 1047, 1052 (9th Cir. 2015).

"There is substantial overlap between the 🔖 Rule 23(a)(2) commonality test and the 🔖 Rule 23(b)(3) predominance tests, but the 🔖 Rule 23(b)(3) test is 'far more demanding.' " 🔖 Allen v. Hyland's Inc., 300 F.R.D. 643, 666 (C.D. Cal. 2014) (quoting 🔖 Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010)); see also 🔖 Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432 (2013) ("If anything, 🔖 Rule 23(b)(3)'s predominance criterion is

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 143 of 208
PageID: 72885

*Koroshteyri v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)*

2017 WL 1020391

even more demanding than Rule 23(a)."). "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen,* 133 S. Ct. at 1191 (emphasis in original). To satisfy Rule 23(b)(3), "the common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger,* 741 F.3d at 1068 (internal quotation marks and ellipses omitted).

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones. For purposes of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Torres,* 835 F.3d at 1134 (citing *Tyson Foods v. Bouaphakeo,* 136 S.Ct. 1036, 1045 (2016)) (internal quotation marks and brackets omitted).

Plaintiff argues that the common questions that predominate here include whether the statements on the product label are false, and whether those statements are material and likely to deceive a reasonable consumer. [Doc. No. 107 at 22.] "By definition, class members were exposed to these labeling claims, creating a 'common core of salient facts.' " *McCrary,* 2014 WL 1779243, at *10 (quoting *Hanlon,* 150 F.3d at 1019-20). Courts routinely certify consumer classes where the claims concerned false statements about the efficacy of nutritional supplements or homeopathic remedies in part because the plaintiffs' argument is that the product is worthless because the advertised benefits are not true. *See, e.g., Allen v. Similasan Corp.,* 306 F.R.D. 635, 651 (S.D. Cal. 2015) (certifying class concerning claims of false statements of effectiveness of homeopathic ear, nose, and eye remedies); *Allen v. Hyland's Inc.,* 300 F.R.D. 643, 672 (C.D. Cal. 2014) (certifying class for claims of false statements of effectiveness of various homeopathic remedies); *Forcellati,* 2014 WL 1410264, at *12 (certifying class for claims of false statements of effectiveness of various homeopathic cold and flu remedies); *cf. Ries v. Arizona Bev. USA LLC,* 287 F.R.D. 523, 537

(N.D. Cal. 2012) (finding commonality requirement satisfied as to questions of "whether the use of the terms 'All Natural' or '100% Natural' to advertise beverages that contain HFCS or citric acid violates the UCL, FAL, or CLRA").

**\*6** Here, Plaintiff's entire lawsuit rides on her claim that TruNature Gingko provides no benefits and that the statements on the product labels are false. The answer to these questions will be the same for the entire class. Likewise, the determination of whether the statements on the label are material and likely to deceive a reasonable consumer will be the same for the entire class. The answers to these questions will resolve issues that are central to the validity of each class members' claims in one stroke. *Alcantar,* 800 F.3d at 1052. These common questions are not only more significant than other questions at issue in this suit, they are the most significant questions in this lawsuit. Therefore, these questions predominate over any individual questions that may arise.

Defendants argue that common questions do not predominate because some customers may have received a benefit from TruNature Gingko and thus are not entitled to damages. However, "[t]hat some people believe [Gingko biloba] provides benefits as advertised is beside the point. [Plaintiff's] 'claims do not rise or fall on whether individual consumers experienced health benefits, due to the placebo effect or otherwise. They rise or fall on whether [Defendant's] representations were deceptive." *Mullins v. Premier Nutrition Corp.,* 2016 WL 1535057, at *3 (quoting *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 673 (7th Cir. 2015)). "It stands to reason that a product that, in effect, has tricked people into thinking that they received a benefit should not be given credit for actually conferring a benefit." *Allen v. Hyland's Inc.,* 300 F.R.D. at 671 n.26. Moreover, "if Plaintiffs' theory is correct, the belief of some users that the products are effective would necessarily be attributable to the placebo effect. Thus, each of Defendants' arguments goes to the merits of Plaintiffs' case, but they fail to demonstrate that Plaintiffs' claims are not subject to common proof." *Id.* at 661; *Forcellati,* 2014 WL 1410264, at *9 (holding that if the plaintiff could prove allegations that the products' effectiveness is solely a placebo effect, "Defendants' representations about the products' effectiveness would constitute false advertising 'even though some consumers may experience positive results' ") (citing *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1100 (9th Cir. 1994)); *see also*

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 144 of 208
PageID: 72886
Korolishyri v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2017)
2017 WL 1020391

*Torres, 835 F.3d at 1137* ("[F]ortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition."). [2] Ultimately, if Plaintiff can prove that the class would not have purchased TruNature Gingko but for the alleged false statements on the label, class members are entitled to full restitution of the purchase price regardless of any benefit received after the purchase. *See Pulaski & Middleman, LLC, 802 F.3d at 989* (holding that the restitution calculation under the UCL "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase," meaning "the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information.").

**\*7** Defendants also speculate that class members may have purchased TruNature Gingko based on Defendants' competitors' advertising about the benefits of Gingko biloba or based on the instructions of doctors or others who recommended Gingko biloba. That class members may have learned about Gingko biloba or TruNature Gingko from other sources does not absolve Defendants from liability for false statements that appeared on the labels of the products purchased by the class members. *Mullins v. Premier Nutrition Corp., 2016 WL 1535057, at \*3* ("How consumers first learned about Joint Juice—from a doctor, parent, Joe Montana, or the packaging—does not matter if 'they nonetheless decided to purchase the product only for its purported health benefits.' ") (quoting *Rikos v. Proctor & Gamble Co., 799 F.3d 497, 512 (6th Cir. 2015)); see also Ries, 287 F.R.D. at 537* ("[V]ariation among class members in their motivation for purchasing the product, the factual circumstances behind their purchasing, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality.").

Defendants also argue that Plaintiff does not have a workable damages model. This argument reflects a misunderstanding of Plaintiff's claims. The TAC alleges, and Plaintiff argues, that TruNature Gingko has no value whatsoever and that any perceived benefits by consumers are merely the result of a placebo effect. If Plaintiff can prove that TruNature Gingko does not have any impact on brain health or memory and therefore does not perform as advertised on the labels and is

worthless, the putative class will be entitled to restitution of the full amount they paid for the product. This full refund damages model, particularly considering Costco's records of purchases of TruNature Gingko, is entirely workable.

The cases on which Defendants' rely are distinguishable because they involve products that could provide some value to their purchasers even if they did not perform as advertised and for which it strains credulity to argue that no consumers would have purchased them if not for the allegedly false statement. This is the case with many food products, because if nothing else, they provide calories, hydration or good taste to the consumer. *See In re Pom Wonderful LLC, No. ML 10-2199 DDP (RZx), 2014 WL 1225184, at \*3 (C.D. Cal. Mar. 25, 2014)* (holding that the plaintiffs could not "plausibly contend that they did not receive any value at all from Defendants' juice products."). It is also true for a product like a television where consumers value a variety of factors when choosing which television to buy. *See Pierce-Nunes v. Toshiba Am. Info. Sys., Inc., No. CV 14-7242-DMG (KSx), 2016 WL 5920345, at \*7 (C.D. Cal. Jun. 23, 2016).* Unlike these other products, it is plausible to contend that no one would have purchased TruNature Gingko if not for the representations on the label, and that if the representations on the label are false, consumers who purchased TruNature Gingko did not receive any value and are entitled to a full refund of their purchase price. In this regard, supplements like Gingko biloba are entirely distinct from food or televisions because consumers know generally the purpose of food and the function of a TV without reading a description on the label. Consumers do not necessarily know what benefit a supplement like Gingko biloba provides without reading the label. Accordingly, any damages calculation issues are not an obstacle to class certification.

In sum, "[t]he Court finds that Plaintiff's full refund damages model matches h[er] theories of liability. Plaintiff claims that [Gingko biloba] is valueless, and Plaintiff has produced evidence that supports h[er] claim. If the finder of fact finds that [Gingko biloba] is in fact valueless then that justifies fully refunding the class for their purchases." *Lambert v. Nutraceutical Corp., No. CV 13-05942-AB (Ex), 2015 WL 12655388, at \*4 (C.D. Cal. Feb. 20, 2015).*

**\*8** Because common questions that are subject to resolution using classwide proof predominate, the commonality and predominance requirements are met.

## F. Superiority

" Rule 23(b)(3) requires that a class action be 'superior to other available methods for fairly and efficiently adjudicating the controversy,' and it specifically mandates that courts consider 'the likely difficulties in managing a class action.' "

*Briseno*, 844 F.3d at 1128 (quoting Fed. R. Civ. P. 23(b)(3)(D)). Defendants argue that a class action is not superior because Costco offers refunds without a receipt and that it would be easier to simply allow dissatisfied class members to obtain refunds from Costco. However, as Plaintiff points out in her reply, allowing class members to obtain a refund is not an alternative to "adjudicating" whether Defendants are liable for material misrepresentations on the labels of their products. If it were, then Costco (and any retail store) could freely misrepresent the benefits of their products secure in the knowledge that their return policy effectively immunizes them from any suit seeking restitution. Moreover, to require each absent class member to drive to a Costco store, wait in line, deal with an employee and ask for a relatively small refund is not superior to obtaining relief as a class. Accordingly, the superiority requirement is satisfied.

## V. Conclusion

For the foregoing reasons, the Court finds that: (a) the class is sufficiently numerous; (b) named plaintiff Tatiana Korolshteyn's claims are typical of the class and that she and her counsel will adequately represent the class; (c) common questions subject to classwide proof predominate; and (d) a class action is superior to other methods of adjudicating this controversy and will not be difficult to manage. Accordingly, it is hereby **ORDERED** as follows:

1. Plaintiff's motion for class certification [Doc. No. 105] is **GRANTED**.

2. The following class is certified:

   All California consumers who, within the applicable statute of limitations, purchased TruNature Gingko Biloba with Vinpocetine until the date notice is disseminated. [3]

3. Plaintiff Tatiana Korolshteyn is appointed as class representative.

4. Plaintiff's counsel of record Bonnett, Fairbourn, Friedman, & Balint, P.C. and Boodell & Domanskis, LLC are appointed as class counsel.

5. Defendants' motion to exclude Plaintiffs' expert testimony [Doc. No. 113] is **DENIED** without prejudice.

6. Plaintiff's motion to strike the declaration of Dr. Susan Mitmesser [Doc. No. 122] is **DENIED** without prejudice.

7. Plaintiff's motion to strike the declaration and revised report of Dr. Edward Rosick [Doc. No. 125] is **DENIED** without prejudice.

8. On or before **March 31, 2017**, class counsel shall meet and confer with defense counsel regarding the proposed method and form of class notice. Any agreed-upon notice shall be presented to the Court for approval no later than **April 7, 2017**. In the event the Parties cannot agree upon the form of the notice, each side shall file its proposal on **April 7, 2017**.

It is **SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1020391

## Footnotes

1    The deposition testimony is hardly clear in this regard. Plaintiff purchased the product on October 29, 2014, and her conversation with Crane began several days later on November 3, 2014. When asked at her deposition eighteen months later about when she first took TruNature Gingko, she estimated that she took it only once or twice either the day that she brought it home or the day after, but also stated that she couldn't recall exactly. [Doc. No. 105-26 at 21-22.]

2017 WL 1020391

2    Defendants argue throughout their opposition that, contrary to Plaintiff's allegations and evidence, Gingko biloba helps some consumers with memory problems. This dispute over whether Gingko biloba, and more specifically TruNature Gingko, performs as advertised on the label goes to the heart of Plaintiff's case. If Plaintiff cannot prove that the statements on the labels were false and that Gingko biloba has no benefit to memory or otherwise, the class claims will fail. That the class may include non-injured individuals "merely highlights the possibility that an injurious course of conduct may sometimes fail to cause injury to certain class members. However, it fails to reveal a flaw that may defeat predominance, such as the existence of large numbers of class members who were never exposed to the challenged conduct to begin with." *Torres, 835 F.3d at 1136*. "When, as here, the concern about the proposed class is ... an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification." *Id. at 1140* (quoting *Tyson Foods, 136 S.Ct. at 1047*).

3    The motion seeks certification of two classes, but they are defined identically. The motion does not explain why a separate class for each claim is needed and the opposition does not distinguish between the two classes when arguing why the motion should be denied. Presumably, the only reason for seeking certification of two identically defined classes is a difference in the statute of limitations between the two claims. However, because the relief sought for each claim is identical, the Court is unclear why this distinction is needed. In any event, this distinction is something that can be addressed, if needed, on any notice to the class.

---

End of Document             © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1483353
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

NIELSEN AUDIO, INC., Plaintiff,

v.

Bubba CLEM a/k/a Bubba The Love Sponge
and Bubba Radio Network, Inc., Defendants.

Case No. 8:15–cv–2435–T–27AAS
|
Signed 04/24/2017

**Attorneys and Law Firms**

Alfred R. Fabricant, Pro Hac Vice, Lawrence C. Drucker, Pro Hac Vice, Brown Rudnick, LLP, New York, NY, Jessica Lu, Pro Hac Vice, Brown Rudnick, LLP, Boston, MA, Mark James Ragusa, Gunster, Yoakley & Stewart, PA, Tampa, FL, for Plaintiff.

Todd Alan Foster, Zachary David Grimland, Richard Rodriguez Todd Foster, PLLC, Tampa, FL, Warren A. Zimmerman, Warren A. Zimmerman, P.A., Lutz, FL, for Defendants.

**ORDER**

JAMES D. WHITTEMORE, United States District Judge

**\*1 BEFORE THE COURT** is Defendants' Motion to Exclude the Expert Reports and Testimony of David A. Haas. (Dkt. 94). Plaintiff has responded in opposition. (Dkt 103).[1] Upon consideration, Defendants' motion is **DENIED.**

David A. Haas, a certified licensing professional who has an M.B.A. with a specialization in management accounting, was retained by Plaintiff to provide expert testimony on its damages in this case. He analyzed documents provided by Plaintiff and had discussions with its personnel to develop his opinion about the expenses and the lost goodwill and reputation suffered by Plaintiff. Haas's report is based on the assumption that Defendants are found liable.

**STANDARD**

A witness qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion if "(a) the expert's ... specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. Trial courts act as gatekeepers to ensure expert testimony is relevant and reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). To determine reliability, a district court considers whether (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of specialized expertise, to understand the evidence or to determine a fact in issue. Adams v. Laboratory Corp. of Am., 760 F.3d 1322, 1328 (11th Cir. 2014) (per curiam).

Expert testimony must also assist the trier of fact to be admissible. Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1340–41 (11th Cir. 2003). It will do so "if it concerns matters that are beyond the understanding of the average lay person." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004). Expert testimony is generally not helpful, and therefore not admissible, when "it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262–63.

The party offering an expert witness has the burden of laying the proper foundation for admission of the expert's testimony by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Ultimately, trial courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire, 526 U.S. at 152. It is not the role of the court "to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Tech. DC–8, 326 F.3d at 1341.

**DISCUSSION**

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 148 of 208
PageID: 72890

Niesen Audio, Inc. v. Clem, Not Reported in Fed. Supp. (2017)
2017 WL 1483353

**\*2** Haas opines on the proper measure of damages for the investigative, legal, and other expenses Plaintiff incurred, and for its lost reputation and goodwill. Many courts have recognized that expert reports and testimony on damages can assist the jury. *See, e.g., Micro Man Distribs., Inc. v. Louis Glunz Beer,* Case No. 13–cv–639–T–27MAP, Dkt. 62 pp. 2–3 (M.D. Fla. July 21, 2014). Haas's curriculum vitae shows that he has testified, been published, and given speeches on the different types of damages suffered by businesses in a variety of industries. (Dkt. 103–1). Haas formed his opinion in this case after reviewing documents showing Plaintiff's expenses, having discussions with its personnel who have knowledge of the facts surrounding this case, and reviewing documents relating to customer contract claims. (Response, Dkt. 103 at pp. 7–9). Haas's testimony regarding damages would assist a jury in understanding Plaintiff's evidence, particularly testimony discussing the techniques used to measure the present value of future harm. (*Id.* at p. 11).

Defendants argue that Haas's testimony and report will not assist the trier of fact and must be excluded because (1) he is not an expert in either the radio industry or the measurement of radio audiences; (2) he accepted Plaintiff's data relating to its expenses, the harm to its reputation, and lost goodwill without independently verifying it; (3) a layperson is capable of making Haas's conclusions; (4) he did not investigate or analyze other potential sources of Plaintiff's damages; and (5) even if Haas's opinion is relevant and reliable, it would be unduly prejudicial under Rule 403.

Haas's curriculum vitae shows that he has an M.B.A. with a specialization in management accounting, and that he has experience in calculating damages in dozens of cases involving a variety of industries. (Dkt. 103–1). An individual need not be an expert in a particular field to offer an expert opinion on damages that is based on broadly applicable calculations and measurements. *See ▯Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir. 2001). Defendants have not shown that specific experience in the radio industry is required to calculate Plaintiff's damages in this case, so its citations to cases where specific expertise was required are inapposite.

*See, e.g., ▯Taylor v. Cooper Tire & Rubber Co.,* 130 F.3d 1395, 1396–97 (10th Cir. 1997) (holding general expertise in materials failure did not qualify an expert to testify about a tire failure). The fact that Defendants' rebuttal expert has experience in the radio industry does not diminish the relevance and reliability of Haas's own opinion, but rather goes to the respective persuasiveness and weight of the two

experts' opinions, which is an issue better addressed by a jury. *See ▯Quiet Tech. DC–8,* 326 F.3d at 1341.

Haas is not simply repeating Plaintiff's own findings regarding its damages, as Defendants suggest. Rather, Haas created an itemized report describing the expenses incurred by Plaintiff that is supported by invoices and other documentation. *See* (Response, Dkt. 103 at p. 7). He included additional investigation and remediation expenses after discussions with Plaintiff's personnel with first-hand knowledge of these expenses. (*Id.* at pp. 7–8).[2] Haas is entitled to rely on Plaintiff's documents and discussions with its personnel in forming his opinions regarding its damages, as this is the sort of information typically relied on by an expert calculating a party's damages. *See* FED. R. CIV. P. 703; *see also, e.g., ▯International Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.,* 851 F.2d 540, 545 (1st Cir. 1988); *United States v. Affleck,* 776 F.2d 1451, 1456–57 (10th Cir. 1985). Plaintiff also points out that there are not outside sources which Haas could use to independently verify Plaintiff's internal data. (Response, Dkt. 103 at p. 8).

**\*3** As for Haas's opinions regarding Plaintiff's lost goodwill and reputation, he relied on Plaintiff's licensing agreements with its customer Cox Media Group, discussions with Plaintiff's personnel, documents prepared by Cox, and e-mails exchanged between Plaintiff and Cox to determine that there is a historical annual 3 percent price increase for the Cox licensing agreement. (Response, Dtk. 103 at p. 9). There are documents supporting Haas's conclusion that Cox will again seek pricing concessions from Plaintiff during the next contract negotiation, and that Cox will cite Defendants' actions as the reason for a concession. (*Id.* at pp. 11–12). Nevertheless, Defendants contend that Haas's opinion regarding lost goodwill and reputation is not reliable because Plaintiff did not grant Cox's previous request for a pricing concession and will not need to grant a concession in the future "because of its virtual monopoly over the radio ratings industry." (Motion, Dkt. 94 at pp. 5, 7–8). If Defendants have evidence supporting this position, then such evidence goes to the persuasiveness of Haas's opinion, not its admissibility.

Defendants' argument that a layperson could make Haas's conclusions because all he did was "accept the figures provided by [Plaintiff] and add them up" is without basis. (Motion to Exclude, Dkt. 94 at p. 7). Plaintiff indicates that the "bulk" of Haas's damages calculation consists of the harm to its reputation and goodwill. (Response, Dkt. 103 at p. 11).

Nielsen Audio, Inc. v. Clem, Not Reported in Fed. Supp. (2017)

2017 WL 1483353

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 149 of 208
PageID: 72891

Haas calculated this harm by reviewing the data and using a financial modeling technique that calculates the present value of future harm. (Response, Dkt. 103 at p. 11). The standard is whether an expert's opinion, if relevant and reliable, will assist a jury in understanding the evidence. *Quiet Tech. DC–8,* 326 F.3d at 1340–41. Haas's opinion will assist the jury's understanding of Plaintiff's damages to the extent they require calculation of the present value of future harm, which is likely beyond the understanding of the average layperson.

*See Frazier,* 387 F.3d at 1262.

Defendant's argument that Haas did not examine potential alternate sources of Plaintiff's damages is not a basis for excluding his testimony and report. As noted, Haas was entitled to rely on Plaintiff's data in forming his opinions, and he acknowledged that his damages model relies on the assumption that Defendants are found liable for the losses suffered by Plaintiff. (Response, Dkt. 103 at p. 12). The questions of whether Haas adequately considered if Defendants' conduct in fact affected Plaintiff's ratings, if some or all of Plaintiff's losses may be attributable to other factors, or if errors in Plaintiff's ratings system impacted its data are all questions that go to the weight of Haas's opinion, not its admissibility. *See Quiet Tech. DC–8,* 326 F.3d at 1341.

Defendants' final argument that Haas's opinion and report should be excluded under Rule 403 is not persuasive. Rule 403 provides a basis to exclude Haas's testimony only if the relevance of reliability of that opinion is substantially outweighed by risks including unfair prejudice, confusion, or misleading the jury. *See* FED. R. EVID. 403. The only risk identified by Defendants is that if Haas testifies as an expert, the jury will assume "anything discussed by him is reliable and highly pertinent to their inquiry." (Motion to Exclude, Dkt. 94 at p. 11). This general risk does not substantially outweigh the relevance and reliability of his damages calculation. Further, a risk that the jury may accord greater weight to Haas's opinion simply because he is testifying as an expert can be addressed and mitigated through cross examination and the testimony of a rebuttal expert. *See Daubert,* 509 U.S. at 596 (noting that "[v]igorous cross-examination" and the "presentation of contrary evidence" are the appropriate means for attacking admissible expert evidence).

Accordingly, Defendants' Motion to Exclude the Expert Reports and Testimony of David A. Haas (Dkt. 94) is **DENIED.**

Done And Order this 24th day of April, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1483353

---

## Footnotes

1 Neither party provided Haas's expert report with their filings, but both referred to specific provisions of the report in support of their respective positions. *See, e.g.,* (Motion to Exclude, Dkt. 94 at p. 1 n, 1; Response, Dkt. 103 at p. 7). The admissibility of Haas's opinion and report will, therefore, be determined based on the specific provisions of his report cited by each party, the arguments supported by such references, and Haas's curriculum vitae that Plaintiff provided as evidence of his qualification to testify as a damages expert in this case. (Dkt. 103–1).

2 Defendants also take issue with Haas including legal fees in his damages analysis because attorney's fees are generally not recoverable unless a statute or contract provides otherwise. (Motion, Dkt. 94 at p. 6) (citing *Price v. Tyler,* 860 So. 2d 246, 250 (Fla. 2004)). Haas's inclusion of these amounts in his calculations does not establish Plaintiff's entitlement to recover them, and therefore is not a basis for excluding his testimony and report.

**Nielsen Audio, Inc. v. Clem, Not Reported in Fed. Supp. (2017)**

2017 WL 1483353

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2778562
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

RHOADS INDUSTRIES, INC., et al

v.

SHORELINE FOUNDATION, INC., et al
Rhoads Industries, Inc., et al

v.

Triton Marine Contruction Corp.

Civil Action No. 15-921, Civil Action No. 17-266
|
Signed 07/02/2021

**Attorneys and Law Firms**

Jennifer D. Katz, Iselin, NJ, Brian M. Collins, Jay M. Levin, Rebecca Prosper, Offit Kurman, PA, Philadelphia, PA, for Rhoads Industries, Inc.

Albert M. Saltz, Saltz Nalibotsky, Wayne, PA, for Shoreline Foundation, Inc. et al.

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE UNITED STATES MAGISTRATE JUDGE

 **\*1**  Presently before the Court are the motions to preclude or limit expert testimony of Plaintiffs Rhoads Industries, Inc. and Rhoads Marine Industries, Inc. (collectively "Rhoads") and Defendants (collectively "Defendants") Triton Marine Construction Corporation ("Triton"), TranSytems Corporation ("TranSystems"), and Shoreline Foundation, Inc. ("Shoreline"). Rhoads filed motions to preclude seven of Defendants' experts, and Defendants', jointly or individually, filed four motions to preclude Rhoads' experts. In this omnibus opinion, we address separately each of these eleven motions. First, we provide the relevant background information. Next, we set out the legal standards governing motions to preclude expert testimony. Finally, we discuss and reach a determination on each individual motion.

**Contents**

I. BACKGROUND...........................................................

II. LEGAL STANDARDS...................................................

III. DISCUSSION............................................................
A. Rhoads' motion to preclude Mark Kilgore (Civ. No. 17-266, Doc. 145)............................8 B. Defendants' motion to preclude Edward Garbin (Civ. No. 15-921, Doc. 139)................10

1. Qualification.................................................................

2. Reliability....................................................................

3. Fit...............................................................................
C. Defendants' motion to preclude David Wilshaw (Civ. No. 15-921, Doc. 141)...............23

1. Whether "Wilshaw's opinion that vibration from pile driving was the/a cause of the subsidence...must be precluded"...........................................................................24

2. Whether "Wilshaw's opinion that the pile driving caused or exacerbated soil piping into the dry dock or caused damage to the dry dock or Building 669 must be precluded"..27

3. Whether "Wilshaw's opinion that the Defendants should have recommended vibration monitoring or more expansive vibration monitoring to the Navy should be precluded"...........................................................................

4. Whether "Wilshaw's opinions regarding the impact of [other phenomena] as potential contributing causes of subsidence must be precluded".....................................................30

5. Whether "Wilshaw must be precluded from offering any opinion as to the means and methods of pile driving".........................................................................................3
D. Rhoads' motion to preclude Bryan Strohman (Civ. No. 17-266, Doc. 149)................32

E. Rhoads' motion to preclude Bengt Fellenius (Civ. No. 17-266, Doc. 151)......................34

F. Rhoads' motion to preclude Benjamin Irwin (Civ. No. 17-266, Doc. 147)......................39

G. Rhoads' motion to preclude John Vitzthum (Civ. No. 17-266, Doc. 144)...................45 1. Defendants' expert disclosures are noncompliant with Fed.R.Civ.P. 26(a)...............46 2. Exclusion of Vitzthum's testimony is appropriate.......................................48

H. Rhoads' motion to preclude James Schofield (Civ. No. 17-266, Doc. 148).................54 1. Qualification...........................................54 2. Reliability.............................................57 3. Fit......................................................59

I. Rhoads' motion to preclude Wesley Grover (Civ. No. 17-266, Doc. 150)......................60 1. Reliability...........................................60 2. Fit......................................................62

J. Defendants' motion to preclude Greg Cowhey (Civ. No. 15-921, Doc. 143)...................64 1. Qualifications.........................................65 2. Reliability...........................................66 3. Fit......................................................73

K. Defendants' motion to preclude Charles Boland (Civ. No. 17-266, Doc. 146)................74 1. Qualification.........................................74 2. Reliability...........................................75 3. Fit......................................................79

IV. CONCLUSION.........................................................

involved pile driving, in the Philadelphia Navy Yard ("Navy Yard"), within the vicinity of certain properties and structures leased by Rhoads, allegedly causing damage.

**\*2** More particularly, Rhoads leased property in the Navy Yard from the Philadelphia Authority for Industrial Development on November 3, 2010. (Civ. No. 17-266, Doc. 1 ¶ 10.) In relevant part, that property includes Dry Dock 2 ("the dry dock" or "Dry Dock 2") and Building 669. (*Id.*) The United States Navy then undertook a project to complete certain improvements to property adjacent to Rhoads' property. (Civ. No. 15-921, Doc. 1 ¶ 16.) The project and its specifications were designed by TranSystems, and the Navy awarded the contract for the execution of the project to Shoreline. (*Id.* ¶¶ 17–18.) Between approximately August 2011 and January 2013, Shoreline drove piles on various occasions in the area to the west of the dry dock as part of its construction activities. Subsequently, the Navy undertook another project, and this time awarded the contract to Triton. (Civ. No. 17-266, Doc. 1 ¶ 10.) Beginning in 2014 and during the course of its work on the project, Triton drove piles in the area to the east of the dry dock. (*Id.* ¶ 15.)

Rhoads alleges that Defendants' pile driving caused subsidence, or sinkholes, to form in the areas to both the east and west of the dry dock, and that the subsidence caused "significant damage" to its property, resulting in repair cost damages and lost business income. Defendants do not dispute the existence of the subsidence but maintain that their pile driving activities were not the cause of any subsidence that impacted Rhoads' property. Further, Defendants contend that, even if Rhoads prevails on liability, the extent of its damages is overstated. This case therefore presents complex questions of causation, standard of care, and damages, necessitating extensive expert testimony. In resolving these motions to preclude or limit that testimony, we observe that the parties have been nimble enough to significantly adjust their views as to what constitutes an opinion that is "qualified" and "reliable," and that "fits," based upon which side of a motion they find themselves. We now turn to set out the legal standards governing these motions.

## I. BACKGROUND

As we write primarily for the parties, to whom the relevant facts and circumstances of these motions are well known, we provide here only a brief statement of relevant background information. This litigation arises from a situation in which Defendants were completing construction projects, which

## II. LEGAL STANDARDS

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, was "amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and to the many cases applying *Daubert*, including *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167

(1999)." Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments. In *Daubert*, the Supreme Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science." *Id.* The rule provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. The Third Circuit has "explained that 'Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge[, *i.e.*, reliability]; and (3) the expert's testimony must assist the trier of fact[, *i.e.*, fit].' " *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)) (alterations in original). The trial court "acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Schiff*, 602 F.3d at 172 (internal citation omitted). To that end, "the trial judge evaluates its admissibility based on these three requirements." *Id.* The burden is on the proponent of the expert testimony to establish "by a preponderance of proof" that each requirement is satisfied. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593 n.10).

**\*3** With respect to the first admissibility requirement, an expert is "qualified" if "the witness possess[es] specialized expertise." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has "interpreted this requirement liberally, holding that 'a broad range of knowledge, skills, and training qualify an expert.' " *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). Accordingly, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996). At a minimum, however, "a proffered expert witness must possess skill or knowledge greater than the average layman." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (internal quotations, citations, and alterations omitted).

The second requirement of Fed.R.Evid. 702 is that "the process or technique the expert used in formulating the opinion is reliable." *Paoli*, 35 F.3d at 742. To meet the reliability standard, the proffered testimony must "be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80–81 (3d Cir. 2017) (quoting *In re TMI Litig.*, 193 F.3d 613, 703–04 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (internal quotations omitted). " 'The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.' Instead, the court looks to whether the expert's testimony is supported by 'good grounds.' " *Id.* at 81 (quoting *TMI*, 193 F.3d at 665); *see also Paoli*, 35 F.3d at 742 (explaining that there may be good grounds "even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result."). "The standard for reliability is 'not that high.' " *Karlo*, 849 F.3d at 81 (quoting *TMI*, 193 F.3d at 665). It is "lower than merits standard of correctness," *id.*, but it is "higher than bare relevance." *Paoli*, 35 F.3d at 744. "As long as an expert's scientific testimony rests upon good grounds it should be tested by the adversary process —competing expert testimony and active cross-examination —rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) (internal citation and quotations omitted).

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)

2021 WL 2778562

The Third Circuit has set out several factors that trial courts may consider in determining whether a particular methodology is reliable, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda*, 520 F.3d at 247–48 (citing *Paoli*, 35 F.3d at 742 n.8). These factors, however, "are neither exhaustive nor applicable in every case." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806–07 (3d Cir. 1997). Testimony on technical or other specialized subjects, for example, "forensic engineering evaluations," may not "fit neatly" within the elements listed in *Paoli*. See *Pineda*, 520 F.3d at 248; *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 329 (E.D. Pa. 2015). Rather, "[t]he inquiry envisioned by Rule 702 is a flexible one." *Id.* (quoting *Daubert*, 509 U.S. at 594) (internal quotations and alterations omitted).

**\*4** The "fit" requirement ensures that there is a sufficient nexus "between the expert's testimony and the facts that the jury is being asked to consider." *Schiff*, 602 F.3d at 173 (citing *Daubert*, 509 U.S. at 591). The testimony must be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Id.*; *see also TMI*, 193 F.3d at 663 (quoting Fed.R.Evid. 702(a)) (evidence or testimony "fits" where it "[helps] the trier of fact to understand the evidence or to determine a fact in issue") (alteration in original). "Put another way, [the fit requirement] is a question of relevance, and Rule 702 has a liberal policy of admissibility if [expert testimony] has the potential for assisting the trier of fact." *Schiff*, 602 F.3d at 173 (internal citations and quotations omitted). Like the reliability prong, the fit standard "is not that high," but "is higher than bare relevance." *Paoli*, 35 F.3d at 745.

Finally, we note that, in general Fed.R.Evid. 702 has a "liberal policy of admissibility," *Pineda*, 520 F.3d at 243, and that, as such, the "rejection of expert testimony is the exception and not the rule." Fed.R.Evid. 702, Advisory Committee Note, 2000 Amendments. In determining whether to admit expert testimony, we do "not weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein." *Walker v. Gordon*, 46 Fed.Appx. 691, 695 (3d Cir. 2002). Rather, "the credibility and weight of [the expert] testimony is to be determined by the jury, not the trial judge." *Id.* (internal citation and quotations omitted); *see also Daubert*, 509 U.S., at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### III. DISCUSSION

#### A. Rhoads' motion to preclude Mark Kilgore (Civ. No. 17-266, Doc. 145)

Rhoads moves to exclude the testimony of TranSystem's expert Mark Kilgore. (Civ. No. 17-266, Doc. 145.) TranSystems has proffered Kilgore to testify to the standard of care that applies to engineers on maritime projects, and to whether TranSystem's conduct fell within that standard. Doc. 162 at 2. Rhoads moves to exclude Kilgore solely on the basis that he is allegedly unqualified to offer an opinion on this subject in that he "has never practiced engineering in Philadelphia or Eastern Pennsylvania." Doc. 145-2 at 4. Rhoads' argument is based on Kilgore's deposition testimony that the relevant standard of care is not documented but rather is something that is learned through experience "practicing engineering in [the relevant] geographic area." *Id.* at 3–4 (citing Kilgore Dep. at 20:25–22:20). Rhoads thus argues that Kilgore is not qualified "[b]ased on his own criteria," because the relevant geographic location is "Philadelphia or eastern Pennsylvania," and Kilgore admits that he has not worked on projects in that specific geographic area. *Id.* at 3–4 (citing Kilgore Dep. at 22:25–23:21).

We are unpersuaded by Rhoads' argument. First, while Rhoads would have us accept that Kilgore is not qualified to

testify as to the standard of care based on his own criteria, the opposite is true. In fact, a review of his deposition testimony confirms that Rhoads does meet the subjective criteria for qualification that he articulated. Indeed, immediately after stating that one becomes familiar with the regional standard of care by practicing engineering "in the City of Philadelphia or Eastern Pennsylvania," Kilgore affirmatively answered the question, "Have you ever done any projects in the Philadelphia area?" stating, "Yes, I have." Kilgore Dep. at 22:25– 23:3. He then explained that he had worked on a project in Wilmington, Delaware. Id. at 23:5– 23:9. Viewing his statements in context, it is clear that under Kilgore's subjective criteria for qualification, Wilmington, Delaware also falls within his subjective definition of the "Philadelphia area." We will not accept Rhoads' invitation to preclude a witness on the basis of this apparently inadvertent miscue or miscommunication in a deposition.

**\*5** Moreover, it is not for a witness to set the bounds of what qualifies an expert through subjective criteria in deposition testimony. Rather, the Federal Rules of Civil Procedure and courts interpreting them have set out standards by which we determine whether an expert is qualified. Those standards require simply that "the witness possess specialized expertise." *Schneider, 320 F.3d at 404.* The Third Circuit has explicitly "interpreted this requirement liberally," explaining that a "a broad range of knowledge, skills, and training qualify an expert." *Id.* (quoting *Paoli, 35 F.3d at 741*). It has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *Id.*

Here, Rhoads asks us to impose a specific requirement that would be determinative of qualification, that the expert himself, seemingly inadvertently, invented in a deposition. We decline to do so. As TranSystems argues, Kilgore meets the standard for qualification as set out by the Third Circuit through his "education, practical experience, training, and credentials." Kilgore has been proffered to testify to the standard of care for engineers working on maritime projects. On that subject, he holds a bachelor's degree in mechanical engineering, a master's degree in civil engineering, and a Ph.D. in construction management. Doc. 162-2 at 1. He holds professional licensure as a Registered Professional Engineer in twelve states, including Pennsylvania. *Id.* He testified that he has worked on maritime projects specifically involving pile driving. Kilgore Dep. at 92:17. Thus, while Kilgore may be even more qualified to offer the opinion had he

practiced specifically in Philadelphia or eastern Pennsylvania, excluding him on that basis would contravene "Rule 702's liberal policy of admissibility." *Paoli, 35 F.3d at 741.* Indeed, "exclusion [is] not the proper remedy simply because the experts [do] not have the degree or training which the district court [thinks] would be *most* appropriate." *Id.* (emphasis added) (internal citation and quotations omitted). Accordingly, Rhoads' motion to exclude Kilgore (Doc. 145) is denied.

**B. Defendants' motion to preclude Edward Garbin (Civ. No. 15-921, Doc. 139)**

Rhoads retained Garbin "to assess whether the pile driving operations on adjacent sites triggered sinkhole-like depressions on both the west and east sides of Dry Dock 2." (Civ. No. 15-921, Doc. 145.) In his report, Garbin concluded that "the pile driving operations at the Barge Basin and Pier 4 are responsible for the major ground subsidence events and resulting damage observed at [Dry Dock 2, Building 669], and the crane rail. (Doc. 145-2 at 9) ("Garbin Rep.").

**1. Qualification**

Defendants first contend that Garbin "is not qualified to offer testimony regarding the process or effects of pile driving." Doc. 139 at 9. Defendants argue that he is not qualified in that he allegedly "lacks any particular training, education, knowledge, or professional skill with regards to pile driving or dry dock construction." *Id.* They further allege that Garbin "has not done any work projects where he was tasked with inspecting or overseeing pile driving activities." *Id.* In response, Rhoads contends that Defendants' emphasis on "personal experience driving piles" is "too narrow a qualification and is not supported by the *Daubert* analysis." We agree.

Garbin's qualifications are extensive. He holds a Ph.D. in Civil Engineering with an emphasis on geotechnical engineering, as well as the Diplomate, Geotechnical Engineering certification from the American Society of Civil Engineers, which Rhoads asserts is "one of the highest designations in the Geo-Profession." Doc. 145 at 2. Garbin's academic training in geotechnical engineering is directly relevant to the issues on which he opines. Geotechnical engineering concerns the "disciplines of rock and soil mechanics to investigate subsurface and geologic conditions . . . to design, and build

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)
2021 WL 2778562

foundations, earth structures, and pavement subgrades." *Geotechnical Engineering*, AM. SOC. GEOTECHNICAL ENGRS., https://www.asce.org/geotechnical-engineering/geotechnical-engineering/. Geotechnical engineering includes study of the mechanics of soil and rock and its application to the design and construction of foundations that are supported by soil and rock. *See What is Geotechnical Engingeering?*, SOC'Y SOIL MECH. AND GEOTECHNICAL ENGR., http://www.whatisgeotech.org/. As such, geotechnical engineering is the academic field most closely related to the issues in this case, as it concerns the conditions of subsurface material.

**\*6** Garbin testified that he has academic training in soil dynamics, structural dynamics, and vibrations, and that he has taken continuing education courses in pile driving. Garbin Dep. at 27:6-27:23 In addition to his academic training, he testified that Garbin has personally investigated "the cause of subsidence" "many times," and that he has worked on "deep foundation projects," including driven pile projects. *Id.* at 34:19-37:9

Defendants' characterization of the category of expertise required to offer an opinion on this subject matter is too narrow. To the contrary, "a broad range of knowledge, skills, and training qualify an expert." 🚩 *Paoli*, 35 F.3d at 741. Indeed, it is not required that Garbin be an expert in "pile driving." Rather, the question in this case is whether and to what extent pile driving had an impact on subsurface conditions in the areas around the dry dock. His knowledge of these conditions goes to helping a factfinder understand the effect of the pile driving on the subsurface materials. His testimony focuses upon the cause of soil subsidence, an area in which he has extensive training and experience in his capacity as a geotechnical engineer. Accordingly, Garbin is qualified.

### 2. Reliability

Next, Defendants argue that "Garbin's testimony lacks scientific basis or support and therefore is not reliable under *Daubert*." Doc. 139 at 11. Defendants set out three specific grounds in seeking to preclude his testimony as unreliable. First, they argue that Garbin "lacks data and reliable sources to conclude that pile driving by Defendants caused any damage at the dry dock." Doc. 139 at 12. Next, they argue that he "lacks any scientific basis for his opinions that pile driving caused cracks in the dry dock to increase or caused

the amount of mud infiltrating the dry dock to increase." *Id.* at 17. Finally, they contend that Garbin's conclusion that Defendants' should have recommended vibration monitoring is unreliable "because there is no admissible evidence that there were any significant vibrations at the dry dock caused by pile driving." *Id.* at 18. In response, Rhoads argues that there is sufficient evidence to support Garbin's conclusions such that they are reliable under *Daubert*. We consider each of Defendants' arguments in turn.

#### a. Whether Garbin "lacks data and reliable sources to conclude that pile driving caused any damage at the dry dock"

Defendants first argue that Garbin "lacks data and reliable sources to conclude that pile driving caused any damage at the dry dock." In support of this argument, Defendants rely on the absence of vibration monitoring data regarding pile driving that occurred on the west side of the dock, and the minimal amount of vibration monitoring data regarding pile driving on the east side of the dock. They contend that without this data Garbin cannot reliably conclude that vibrations from pile driving reached, and therefore caused damage to, the dry dock. *Id.* at 15. They thus argue that Garbin's conclusions are merely speculative. *Id.* at 14. Additionally, they contend that the scientific literature upon which Garbin relies in support of his conclusions is distinguishable from the circumstances of this case.

We have reviewed Garbin's expert report and conclude that Defendants' allegations that it lacks sufficient support are unfounded. Defendants arguments are predicated on the supposed lack of "vibration monitoring data" to support Garbin's conclusions. They aver that without actual, hard data collected during the pile driving activities, Garbin cannot reliably conclude that vibrations were strong enough to reach the dry dock with enough energy to have caused damage. Essentially, Defendants ask us to preclude this testimony because there is no literal, contemporaneous proof that it is correct. However, *Daubert* does not require actual proof for an expert's testimony to be reliable. To the contrary, "a *Daubert* reliability assessment does not test whether the expert's testimony 'has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.' " *Scalia v. E. Penn Mfg. Co.*, 2020 WL 5409164, at \*5 (E.D. Pa. Sept. 9, 2020) (quoting *Karlo*, 849 F.3d at 81). Rather, "[t]he standard for reliability is not that high," and it is satisfied so long as the expert has

2021 WL 2778562

"good grounds." *Karlo*, 849 F.3d at 81 (internal citation and quotations omitted).

**\*7** Here, Garbin has "good grounds" for his conclusions. As Rhoads highlights and as Defendants tacitly acknowledge, there was in fact vibration monitoring performed during the pile driving on the east side of the dry dock. *See* Doc. 145 at 8; Doc. 139 at 12. Garbin considered this vibration monitoring data in his report, writing that "[v]ibration monitoring was done during east side pile driving only and shows that low frequency vibrations from pile driving over 1,000 feet away reached the dry dock and therefore the soils adjacent to it." Doc. 145-2 at 1 ("Garbin Rep."). While no vibration monitoring was performed during west side pile driving, Garbin considered that pile driving on the west side was substantially closer to the dry dock, only 160 feet away, than it was on the east side, 1,000 feet or more away. *Id.* Additionally, Garbin considered the results of a published, peer-reviewed case study that found that vibrations from pile driving could have reached "as far away as 1,300 feet to cause unacceptable [soil] settlement." *Id.* at 1–2. Based on the foregoing, Garbin concluded that vibrations from the pile driving reached the dry dock.

Next, Garbin considered several "soil investigations, both geotechnical and geophysical, [that were] completed for [the dry dock] site and surrounding sites." These studies "identified sensitive soils in the vicinity of [the dry dock] that are prone to liquefaction," meaning that they "are also susceptible to vibration-induced settlement." *Id.* at 1. Further, Garbin considered vibration monitoring data regarding the strength of vibrations that occurred during pile driving. He also reviewed data from the pile driving logs concerning the frequency and strength of the pile driving. Based on this information, he approximated the strength of the vibrations reaching the area of the dry dock, and considered peer-reviewed literature and guidance from the Federal Highway Administration concerning the level at which vibrations from pile driving can cause soil settlement. *Id.* at 3. Based on the vulnerability of the "pockets of particularly vibration-sensitive material...on both sides of [the dry dock]," the strength of the pile driving vibrations, and the temporal relationship between the pile driving activities and subsidence formation, Garbin concluded that the "aggregate effect" of the vibrations was to cause subsidence that resulted in damage to the dry dock, Building 669, and the crane rail. *Id.* at 1, 6, 7, and 8.

While we accept that that there is limited data regarding vibration that occurred during the pile driving, it was permissible for Garbin to extrapolate from the data that does exist. Indeed, "trained experts commonly extrapolate from existing data," and it is acceptable for them to do so, provided that there is not "too great an analytical gap" between the data and the opinion proffered. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, there is no such gap. Using his training and experience, he extrapolated from vibration monitoring data of the relevant site, pile driving records, peer-reviewed scientific literature, and published federal safety guidance. Therefore, it cannot be said that his opinion is based simply on "subjective belief or unsupported speculation." *Kannankeril*, 128 F.3d at 806. Still, we acknowledge that Garbin's methodology may be subject to differing interpretations. For example, we accept that, as Defendants' point out, his report did not address potential alternative causes of the subsidence (*e.g.*, "truck traffic, the operation of heavy machinery or recent earthquakes"). Doc. 139 at 16. However, considering the directive that "the reliability requirement should not be applied too strictly," *See* *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 784 (3d Cir. 1995), we find that Garbin's methodology constitutes "good grounds" for his opinion such that it should be tested by the adversary process. Indeed, as *Daubert* instructs, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S., at 596.

**b. Whether Garbin "lacks any scientific basis for his opinions that pile driving caused cracks in the dry dock...or the amount of mud infiltrating [it] to increase"**

**\*8** Next, Defendants aver that Garbin "lacks any scientific basis" to conclude that their pile driving activities caused cracks in the dry dock to increase or the amount of mud infiltrating the dry dock to increase. Defendants' sole argument on this point is that Garbin's conclusion is unreliable because it is not based on actual measurements of the size of the cracking or amount of mud in the dry dock but rather is based on the observations of Rhoads' Director of Operations Bob Orbaugh. Doc. 139 at 17–18. Defendants discount Orbaugh's observations as "hearsay statements by a layperson who is employed by the Plaintiff." *Id.* at 18. They

therefore argue that without "objective data...there is no way to make a before-and-after causation determination." *Id.* In response, Rhoads argues that Orbaugh's observations are "not hearsay by a random person" but rather is "sworn testimony by a fact witness with responsibilities that align with the issues Garbin is assessing." Doc. 145 at 15. Rhoads therefore argues that Garbin's conclusions regarding the increase in cracking and mud infiltration is based on sound evidence, and that any doubt regarding the same should be resolved by a factfinder, not precluded from evidence entirely. (*Id.*)

The parties' dispute on this point comes down to a straightforward disagreement as to the quality of the evidence underpinning Garbin's conclusion. Defendants argue that Garbin's testimony cannot be reliable unless it is supported by before-and-after measurements of the size of the cracking and amount of mud infiltration. Rhoads argues that Garbin's reliance on the observations of an employee as to the change in cracking and mud infiltration is sufficient.

In deciding this question, we again note that "[t]he test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *TMI*, 193 F.3d at 665. We further observe that "[g]enerally, 'an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.' Fed.R.Evid. 703. An expert need not base his opinion on first-hand knowledge, and in fact can rely on observations made by others as well as their own expertise." *Corner Pocket, Inc. v. Travelers Ins.*, 2013 WL 3993967, at *6 (W.D. Pa. Aug. 5, 2013) (citation in original) (citing *Daubert*, 509 U.S. at 592). As one district court in our circuit has explained, "[t]he Court finds no reason to reject [the expert's] testimony merely because she relied on the observations of lay observers as to matters within the lay observer's competency and personal knowledge." *McHugh v. Jackson*, 2010 WL 744125, at *7 n.13 (D.N.J. Mar. 2, 2010). Further, the Third Circuit has made clear that, "[a]n expert is...permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon*, 46 Fed. App'x. 691, 695 (3d Cir. 2002).

Here, Garbin relied on the testimony of Rhoads' then-Director of Operations, in which he "report[ed] a substantial increase in the amount of mud (silt) accumulating in [the dry dock] that began after the west side subsidence occurred, and that the water pumps used to keep [the dry dock] dry had

to be switched from intermittent to continuous operation." Garbin Rep. at 2. Orbaugh testified that he was responsible for maintenance activities including "mud removal" and overseeing the soil piping system. Orbaugh Dep. at 23:12-17. He further testified that, as part of his job position, he was "on site every day," *id.* at 86:20-21, and that the amount of mud infiltrating the dry dock "increased considerably" following the pile driving activities. *Id.* at 75:4-8. Clearly, the amount of soil piping and mud accumulation in the dry dock is within Orbaugh's "competency and personal knowledge," and it was permissible for Garbin to consider this testimony in combination with the other data he reviewed and his knowledge and experience. *See McHugh*, 2010 WL 744125, at *7.

It is of course the case that actual measurements of the cracking and amount of mud accumulation would be preferable to Orbaugh's observations. However, neither party has alleged that such measurements exist from before the pile driving occurred. Thus, it appears that the observations of those familiar with the cracking and mud accumulation before and after the pile driving may well be the best evidence available. Further, as noted above, it is permissible for experts to "rely on observations made by others," *Corner Pocket, Inc.*, 2013 WL 3993967, at *6, including the observations of lay observers as to matters within the lay observer's competency and personal knowledge." *McHugh*, 2010 WL 744125, at *7 n.13. In these circumstances, we conclude that Garbin's opinion regarding increased cracking and mud accumulation rests on sufficiently "good grounds" such that "it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny." *Mitchell*, 365 F.3d at 234.

### c. Whether "Garbin should be precluded from testifying that vibration monitoring...should have been recommended because there is no admissible evidence [of] significant vibration"

**\*9** Finally, Defendants contend that Garbin should be precluded from testifying that "TranSystems and/or Shoreline should have recommended that the Navy perform vibration monitoring and that Triton should have recommended more expansive vibration monitoring than what was required in the Naval contracts." Doc. 139 at 18. Defendants argue that he should be precluded from testifying as such unless he first establishes that "vibration monitoring would have recorded both the requisite frequency and intensity of vibrations from

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)
2021 WL 2778562

pile driving to reasonably be considered as capable of causing damage to [the dry dock]." *Id.* at 19. They argue that he has not reliably done so because he allegedly "lack[s]...any scientific or empirical testing or data to support [his] opinion that pile driving caused damage to the dry dock." *Id.* Essentially, Defendants argue that without proving that more expansive vibration monitoring would have been effective, Garbin cannot opine that it should have been completed. Without such evidence, Defendants aver that his opinion is "tethered to his personal beliefs instead of being moored to the factual record."

In response, Rhoads argues that, contrary to Defendants' assertions, there *is* evidence supporting Garbin's opinion that vibrations from the pile driving reached the dry dock. Given that the alleged lack of evidence is the basis for Defendants' argument on this point, Rhoads contends that the existence of the evidence means their argument must fail. Further, Rhoads argues that Daubert does not require Garbin to have conducted "actual testing" to render his opinion reliable, and that Defendants' concern regarding the "lack of testing is an area for cross examination." Doc. 145 at 17.

We find that Garbin's opinion as to whether Defendants should have recommended vibration monitoring is reliable. First, we have discussed at length above that Garbin has "good grounds" for his opinion that vibrations from the pile driving reached the dry dock. Therefore, Defendants' argument that Garbin should be precluded from testifying that vibration monitoring should have been performed must fail to the extent it is predicated solely on an alleged lack of evidence that vibrations would have reached the dry dock. Moreover, even setting aside the question of whether vibrations reached the dry dock, we find that Garbin has "good grounds" for his opinion that more expansive vibration monitoring should have been recommended. In support of this opinion, Garbin considered the Federal Highway Administration's "Design and Construction of Driven Pile Foundations" publication, which "warns that the distance [for continual vibration monitoring] should be increased to 500 feet for 'older structures, structures or utilities in poor condition, or highly vibration sensitive equipment.' " Garbin Rep. at 7 (quoting *Design and Construction of Driven Pile Foundations*, Pub. No. FHWA-NHI-16-009, FED. HIGHWAY ADMIN. (2017). In light of this guidance, Garbin further considered the "age, condition and sensitivity of the structures and utilities near the work area," in concluding that "TranSystems, Shoreline, and Triton had an obligation to...complete...continual vibration monitoring." *Id.* Garbin's opinion is thus based upon more

than what Defendants characterize as his subjective beliefs or conjecture. We therefore conclude, in accordance with the liberal admissibility standards embodied in Fed.R.Evid. 702, that Garbin has "good grounds" for his opinion which could be seriously tested by the adversary process.

### 3. Fit

Finally, Defendants challenge whether Garbin's testimony fits the question the fact finder is asked to consider. Their argument on this point is limited to Garbin's testimony regarding "practical refusal." They argue essentially that testimony regarding practical refusal is irrelevant and therefore does not "fit." Accordingly, we first provide a brief discussion of practical refusal and Garbin's opinion regarding it.

Practical refusal is "a condition where the pile being driven cannot be advanced further with reasonable, safe effort." Garbin Rep. at 4. It occurs at "the point where the pile being driven provides increasing resistance to advancement due to the density of the strata in which it is being used." Doc. 139 at 21. In his report, Garbin discussed practical refusal at length and opined that Defendants should have established "practical refusal criteria" for their projects. Practical refusal criteria are standards that reflect the number of hammer blows required to drive a pile a given distance into the soil.[1] *See* Garbin Rep. at 4. Where a pile has been driven sufficiently deep into the soil such that it requires an excessive number of blows to move it a small distance deeper, practical refusal has been reached. *Id.* The precise standards for defining practical refusal may vary for each individual project, but there are "several sources typically referenced as industry standards." *Id.* When practical refusal is reached, "pile driving should [be] stopped to avoid damage and safety issues." *Id.*

**\*10** Here, Garbin opines that Defendants should have established and adhered to practical refusal criteria. He explained that the hammers that Defendants were using to drive piles came with manufacturer-specified practical refusal criteria, and that Defendants drove piles beyond the accepted safe point established by those criteria, resulting in what he refers to as "hard driving." *Id.* at 5.

Defendants argue that Garbin should be precluded from offering this testimony in that "practical refusal criteria are intended to protect the safety of the workers, as well as the machinery" but "have absolutely no relation to managing

vibrations from pile driving." Doc. 139 at 21. Defendants rely on Garbin's deposition testimony for the proposition that practical refusal criteria do not bear on potential damage to the area surrounding the pile driving. Specifically, Garbin was asked "whether or not [practical refusal] recommendations are made because of potential damage to the hammer as opposed to the area around where the pile hammer is being used." In response, he stated that there are two reasons for practical refusal criteria: "the first is to protect the safety and welfare of the people on the site doing the work," and the second is to avoid "damage [to] the equipment or the pile." Doc. 139 at 22 (citing Garbin Dep. at 52:18-53:15). Based on this testimony, Defendants argue that "by his own admission, Garbin confirm[ed] that practical refusal criteria are related only to protecting the safety of the workers . . . [and] the hammer and equipment." *Id.* at 23. They thus contend that practical refusal criteria "have no bearing on vibrations into the surrounding area" and that "there is no connection between [Garbin's] opinions of practical refusal and the alleged damages at issue." *Id.* at 23–24.

In response, Rhoads argues that in addition to worker and equipment protection, practical refusal criteria bear on vibrations and soil subsidence resulting from the pile driving. In support, Rhoads references a passage from Garbin's rebuttal report in which he explained that "the fuel setting on the pile driving hammer is typically increased once hard driving is encountered..., so the energy transferred to pile and soil also increases. Repeated, high energy hammer impacts certainly affected the surrounding soils negatively...." Doc. 145 at 22 (quoting Garbin Rebuttal Report at 2, Doc. 145-9 at 3). Rhoads therefore seeks to "connect" practical refusal criteria to the damages at issue in this action by explaining that increased pile driving force is required when practical refusal is exceeded, which impacts the surrounding soil.

We acknowledge Garbin's testimony that the practical refusal concept may focus upon equipment damage and worker safety, but that does not necessarily preclude its consideration here. In answering the question of whether his testimony on this topic "fits," we first observe that fit is essentially "a question of relevance" and that Fed.R.Evid. 702 "has a liberal policy of admissibility" for testimony that "has the potential for assisting the trier of fact." 📙 *Schiff*, 602 F.3d at 172. The "fit" standard "is not that high, but is higher than bare relevance." *Id.* (citation omitted). At the outset, we accept Defendants' argument that practical refusal criteria are not relevant to a factual dispute in this case to the extent they are solely meant to protect workers and pile driving equipment.

We further acknowledge Garbin's deposition testimony that practical refusal criteria have only two purposes: to protect workers, and to prevent damage to equipment. However, we also observe that in his report, Garbin opined that "pile driving over [the practical refusal] limit is considered excessive and damage to the equipment, the piles, *and/or the surroundings* may result." Garbin Rep. at 5 (emphasis added). Therefore, to the extent that Garbin opines that exceeding practical refusal criteria poses a risk to areas surrounding the pile driving activity, that testimony has the potential to assist the trier of fact.

**\*11** Taken together, we conclude, in the exercise of our "broad discretion," that Garbin's testimony regarding practical refusal criteria is not precluded to the extent that he opines that exceeding such criteria poses a risk to the soil and surrounding areas. We find that this testimony could well assist the jury in understanding the evidence in this case and determining facts at issue. Accordingly, we decline to grant Defendants' motion as to Garbin's testimony.

### C. Defendants' motion to preclude David Wilshaw (Civ. No. 15-921, Doc. 141)

Defendants' next seek to preclude Rhoads' other causation expert, David Wilshaw. (Civ. No. 15-921, Doc. 141.) Like Garbin, Wilshaw's report concludes that vibrations from Defendants' pile driving activities resulted in the subsidence that occurred on both the west and east sides of the dry dock, causing damage to the dry dock and Building 669. Doc. 146-2 at 45 ("Wilshaw Rep."). Defendants present arguments as to why Wilshaw's testimony should be precluded, all of which appear to go to the reliability of his opinion. Here, we address Defendants' arguments in turn. Inasmuch as Wilshaw and Garbin are both causation experts for Plaintiff, we have already resolved above several of the issues raised here.

### 1. Whether "Wilshaw's opinion that vibration from pile driving was the/a cause of the subsidence...must be precluded"

Defendants first contend that Wilshaw's opinion that vibrations from pile driving were "the cause of the subsidence that occurred on the west and east sides of the dry dock clearly fails the reliability requirement...for one simple and undeniable reason: ***Neither Wilshaw nor any other expert retained by Rhoads*** performed any vibration testing

2021 WL 2778562

or monitoring to record *both* the frequency and intensity (particle velocity) of the actual vibrations that did or even could have reached the areas of the dry dock that subsided from any pile driving...." Doc. 141-2 at 7–8 (emphasis in original). Defendants further argue that, given the lack of vibration monitoring data, Wilshaw is based only on a single case study that is distinguishable from the circumstances of this case. *Id.* at 10–11. They conclude that "without any actual vibration monitoring or testing or mathematical calculations whatsoever underpinning [his] opinions that the pile driving...caused the subsidence..., Defendants have no substantive avenue in which to challenge his opinion on the merits." *Id.* at 12.

In response, Rhoads argues that "Wilshaw's opinions are not flawed," as "[h]e inspected the site, directed and observed Cone Penetration Testing, and reviewed relevant data and records." Doc. 146 at 8. Rhoads further contends that "Defendants are trying to impose a requirement of actual vibration monitoring" but that "[t]here is no such requirement." *Id.* It disputes Defendants' assertion that Wilshaw's opinion is "without empirical testing and measurable data," explaining that "Wilshaw's observation (through direct testing) of the presence of soft soils at the depth at which [Defendant's expert] estimated the pile tips and his experience and training that piled foundations are driven to a hard bearing point is empirical testing." *Id.* at 4–5.

We have reviewed Wilshaw's report and find that the methodology underpinning his opinion that vibrations from Defendants' pile driving activities were a cause of the subsidence is sufficiently reliable such that it will not be precluded. Defendants seem to argue that there is only one reliable method by which an expert in this case could conclude that Defendants' pile driving activities caused the damage to the dry dock and Building 699, and that is to have performed "vibration testing or monitoring...of the actual vibrations that did or even could have reached the areas of the dry dock that subsided." Doc. 141-2 at 8. However, as Rhoads points out, conducting such testing after the fact is a methodology not without limitations. Doc. 146 at 3 ("[V]ibration testing or monitoring after the subsidence occurred...is a costly exercise in futility because the soils have already been compromised."). Moreover, whether a better methodology exists is not the test for reliability under *Daubert. See, e.g., Dalton v. McCourt Elec. LLC,* 112 F. Supp. 3d 320, 329 (E.D. Pa. 2015) ("Even if conducting a particular test may have rendered the opinion "more" reliable, that does not mean that without it, the opinion is unreliable."). Rather,

the standard for reliability is satisfied so long as the expert has "good grounds." *Karlo,* 849 F.3d at 81.

**\*12** Here, Wilshaw directed "deep Cone Penetration Test[ing]" in the areas adjacent to the dry dock. This testing measured the "shear wave velocity" of soil in the area to "create a layered profile of the ground," and thereby determine the characteristics of the soil within. *See* Wilshaw Rep. at 29; Wilshaw Dep. at 75:12-13. Wilshaw's report explains that the results of this testing showed the "presence of very weak buried soil deposit (river silt)," which has a "high susceptibility to liquefaction," that were "underlain by very hard and dense sandy Trenton Gravel soils." Wilshaw Rep. at 1–2. Wilshaw explained in his deposition that the Trenton Gravel "is a very dense material with very high shear wave velocity" that "transmit[s] energy for a long distance very quickly," and therefore "when piles are driven into that very hard layer[,] that energy doesn't dissipate when it passes through that layer." Wilshaw also considered pile driving data, including the location, number, and size of the piles and the depth to which they were driven. Wilshaw Rep. at 1–2, 41. Wilshaw then used his training and experience to apply accepted scientific principles of "wave propagation theory" to this data. Wilshaw Rep. at 35–39. Additionally, he reviewed the findings of published, peer-reviewed studies of the impact of pile driving vibrations on soils to inform his analysis. Wilshaw Rep. at 39–40. He concluded, in light of the "spatial evidence"—including the location of the weak soil susceptible to liquefaction and the dense soil capable of transmitting vibrations over longer distances, as well as the depth of the piles—and application of wave propagation theory principles, that "repetitive vibration caused by driving pies into the Trenton Gravel led to [the] susceptible silt layer either liquefying or collapsing into internal void spaces." Wilshaw Rep. at 2.

We accept that Defendants have raised legitimate questions regarding Wilshaw's conclusions. However, "Rule 702 mandates a policy of liberal admissibility." *Paoli,* 35 F.3d at 741. Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. To that end, we observe that the Third Circuit has upheld trial court decisions to admit expert testimony simply "[b]ecause the record contains *some* factual basis—albeit shaky—for [the] testimony." *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414, 415 n.3 (3d Cir. 2002) (emphasis in original).

2021 WL 2778562

Here, there is undoubtedly a factual basis for Wilshaw's opinion that pile driving caused the subsidence events on the sides of the dry dock. As such, we find that he has "good enough grounds" such that his testimony is admissible. *See Dalton*, 112 F. Supp. 3d at 329.

### 2. Whether "Wilshaw's opinion that the pile driving caused or exacerbated soil piping into the dry dock or caused damage to the dry dock or Building 669 must be precluded"

Defendants next argue that Wilshaw's opinion that Defendants' pile driving "caused or worsened cracks in the dry dock that accelerated the piping of soil into the dry dock" is unreliable. Doc. 142-2 at 13. Like their arguments in regard to Garbin's similar conclusion, Defendants aver that Wilshaw's opinion does not rest on strong enough grounds in that it is not based on actual before-and-after measurements of the size of cracking in the dry dock or amount of soil piping, but is instead based on the testimony of Rhoads employees as to these changes. (Doc. 141-2 at 13–14.) Defendants further argue that Wilshaw's opinion is therefore based on nothing more than the testimony of the Rhoads employees and "his own intuition." *Id.* at 15. In response, Rhoads argues that it is permissible for Wilshaw to have relied on the testimony of Rhoads employees with personal knowledge of the cracking and soil piping, particularly Bob Orbaugh, Rhoads' former director of operations, who was responsible for overseeing maintenance including mud removal. Doc. 146 at 9–10. Rhoads therefore contends that the reliance on Orbaugh's testimony and the lack of before-and-after measurements of the cracks or amount of mud infiltration "goes to weight, not admissibility." *Id.*

For the same reasons that we have set out above with respect to Garbin's testimony, we find that Wilshaw's testimony regarding increased cracking and soil piping rests on sufficiently "good grounds." That is, it is permissible for an expert to "rely on observations made by others as well as their own expertise," *Corner Pocket, Inc.*, 2013 WL 3993967, at *6, and there is "no reason to reject [an expert's] testimony merely because she relied on the observations of lay observers as to matters within the lay observer's competency and personal knowledge." *McHugh*, 2010 WL 744125, at *7 n.13. We have already concluded that the amount of soil piping and mud accumulation in the dry dock is within Orbaugh's "competency and personal knowledge." Accordingly, it was permissible for Wilshaw to consider it in combination with the

other data he reviewed and his knowledge and experience. *See McHugh*, 2010 WL 744125, at *7; *see also Walker*, 46 Fed. App'x. 691, 695 ("An expert is...permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury.").

### 3. Whether "Wilshaw's opinion that the Defendants should have recommended vibration monitoring or more expansive vibration monitoring to the Navy should be precluded"

**\*13** Defendants next contend that "Wilshaw's opinion that the Defendants should have recommended vibration monitoring or more expansive vibration monitoring to the Navy should be precluded." Doc. 141-2 at 16. However, Wilshaw has not offered the opinion Defendants seek to preclude. Indeed, while Defendants assert that Wilshaw opined that they should have recommended vibration monitoring "in his reports," they provide no citation as to where in his reports he is supposed to have offered this opinion. *Id.* Further, Rhoads clarifies in its response that only its other causation expert, "Dr. Garbin, not Mr. Wilshaw, opined about recommending vibration monitoring." Doc. 146 at 17; *see also id.* at 12. Moreover, our review of Wilshaw's reports and deposition testimony further confirmed that no opinions as to whether Defendants should have recommended vibration monitoring are contained therein.[2] To the contrary, to the extent that whether Defendants "should have" recommended vibration monitoring bears on the standard of care, Wilshaw expressly stated that he does not intend to offer any such opinion:

> Q:...I just wanted to be extremely clear, you are giving no opinion whatsoever as to the standard of care that should be employed while pile driving. Is that correct?
>
> A: My opinions relate to the impacts of the pile driving, but in terms of the standard of care that a contractor should have during pile driving in regards to the piles, I'm not giving an opinion on that.

Wilshaw Dep. at 32:15-24.

Despite Rhoads' repeated acknowledgements in its response that Wilshaw does not offer the opinion that Defendants seek to preclude, it nonetheless argues that "[i]t is also proper for Wilshaw to opine as to the reasonableness of Triton's actions" in having performed vibration monitoring "only within 200 feet of the pier." Doc. 146 at 14 n.18. However, we are simply

2021 WL 2778562

unable to assess the reliability of an opinion that has not been offered. We thus conclude that Rhoads, as the proponent of the witness, has not met its burden to demonstrate the admissibility of the opinion by a preponderance of the evidence. [3] Accordingly, Defendants' motion is granted on the narrow point that Wilshaw is precluded from offering an opinion that Defendants should have recommended vibration monitoring or expanded vibration monitoring by the Navy. [4]

### 4. Whether "Wilshaw's opinions regarding the impact of [other phenomena] as potential contributing causes of subsidence must be precluded"

Defendants next seek to preclude "Wilshaw's opinions regarding the impact of earthquakes, historical rainfall/ storms or vibration from other sources such as construction equipment, truck traffic or crane operation as potential contributing causes of subsidence." Doc. 141-2 at 19. Defendants contend that "[i]n his expert and rebuttal reports, Wilshaw purports to dispute the assertions of Defendants' liability experts that earthquakes, increased rainfall (including Superstorm Sandy) and vibrations from the operation of construction equipment, heavy vehicle traffic and the use of the heavy cranes over the crane rails are potential causes of the subsidence at issue," but that he failed to actually consider these causes or had no factual basis for ruling them out. *Id.* at 20. In response, Rhoads argues that Wilshaw's opinions are reliable in that he measured groundwater conditions, which inform his opinions as to whether "historical rainfall/storms" contributed to the subsidence, and that he did not review earthquake or construction equipment data only because none exists. Doc. 146 at 19.

**\*14** We first note that Wilshaw does not appear to have offered any opinion in his expert report as to whether these potential alternative causes actually impacted the subsidence. Further, we acknowledge that Defendants have again failed to provide any citation to as where in his report Wilshaw is supposed to have offered these opinions, despite stating in their brief that he offered them "in his expert *and* rebuttal reports." Doc. 141-2 at 19 (emphasis added). Our review of Wilshaw's reports, however, concludes that he only addressed these alternative causes in his rebuttal report. *See* Wilshaw Rebuttal Rep. at 9–10.

Of the potential contributory causes Defendants contemplate in this motion, Wilshaw's rebuttal report addressed "truck traffic and crane operations," as well as "increased rainfall in

2011, the August 2011 Virginia Earthquake, [and] Hurricane Sandy in October 2012." *Id.* With regard to the "truck traffic and crane operations" and the 2011 earthquake, Wilshaw merely opined that Defendants' expert had insufficient data and information to conclude that either contributed to the subsidence. With regard to the impact of increased rainfall in 2011 and Hurricane Sandy in 2012, Wilshaw opined that "higher annual rainfall amounts will [not] significantly impact the groundwater regime at Dry Dock 2." In support of this opinion, he discussed the tidal characteristics of the relevant area of the Delaware River, and he considered data about its groundwater table and soil profile. *Id.*

To the extent Defendants now seek to preclude his rebuttal testimony, we find that Wilshaw's opinions as to whether Defendants' experts had sufficient support for their conclusions are admissible and properly a subject for cross-examination. We further find that Wilshaw's opinions as to the impact of rainfall and Hurricane Sandy rests on good grounds. Accordingly, his testimony on these subjects will not precluded.

### 5. Whether "Wilshaw must be precluded from offering any opinion as to the means and methods of pile driving"

Finally, Defendants contend that Wilshaw must be precluded from testifying as to the "means and methods of pile driving or the standard of care associated therewith." Doc. 141-2 at 20. They argue that "Wilshaw admits that he is not a pile driving expert." *Id.* Rhoads' *entire* response on this point is that "Mr. Wilshaw has not offered, and did not intend to offer, any opinion as to the means and method of pile driving. Accordingly, this section of Defendants' motion is unnecessary." Doc. 146 at 10. We observe that Wilshaw expressly confirmed in his deposition that he does not purport to offer an opinion as to the "means and methods of pile driving," Wilshaw Dep. at 37:17-20, or to the "standard of care." *Id.* at 32:14-24. Given the foregoing, Defendants' motion on this point is granted as unopposed.

### D. Rhoads' motion to preclude Bryan Strohman (Civ. No. 17-266, Doc. 149)

We now turn to Rhoads' motion to preclude Defendants' expert Bryan Strohman of the Simpson Gumpertz & Heger firm ("SGH"). (Civ. No. 17-266, Doc. 149). Rhoads challenges only the reliability of Strohman's opinion, not whether it "fits" or whether he is qualified to render it. Doc.

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)
2021 WL 2778562

149-2 at 1. Specifically, Rhoads contends that Strohman lacks support for his opinion that other "potential contributors" exist that "possibly exacerbated and contributed to" the subsidence. *Id.* at 2–3 (citing Strohman Rep. at 142). These "potential contributors" include: "continuous inflow of water and soil, lack of maintenance, failure to perform regular inspections and repairs, increased rainfall, hurricane Sandy, the August 2011 earthquake in Virginia, waterline leaks, loading of the crane rail foundations, vibrations from the crane operation, and construction equipment operating on the ground surface above the crane rails. *Id.* Based on the alleged lack of support for Strohman's proffered alternative causes, Rhoads moves to preclude any and all testimony by Strohman or any of his associates from SGH. *Id.* at 9. In response, Defendants argue that the portion of Strohman's report with which Rhoads takes issue makes up only three pages of the 142-page report, and that narrowly focusing on a small portion of the report is not a basis on which to preclude it. Doc. 160 at 4–5. Further, they contend that Strohman's opinions regarding various "potential contributors" are supported by sufficient evidence to be admissible. *Id.* at 5–7.

**\*15** We have reviewed Strohman's report and the parties' briefing, and we conclude that Rhoads' arguments are without merit. Throughout its brief, Rhoads' overarching argument is that Strohman's opinion is unreliable because he "does not know if these 'potential contributors' *actually contributed* to the subsidence." Doc. 149-2 at 3 (emphasis added); *see also, e.g., id.* at 5, 7, 8. This argument, however, relies upon a mischaracterization or a misinterpretation of Strohman's opinion. Indeed, Strohman does not purport to opine that the "potential contributors" he discusses "actually contributed" to the subsidence. To be sure, Strohman's report is abundantly clear that his opinion is merely that the potential contributors "*possibly* exacerbated and contributed to the premature collapse of soil." Strohman Rep. at 142; *see also id.* at 133 ("[I]t is *possible* that other events, such as increased rainfall, the August 2011 Virginia Earthquake, Hurricane Sandy, and waterline leaks exacerbated and contributed to premature collapse of soil.") (emphasis added).

Despite Rhoads' assertion that Strohman's opinion is unreliable because he does not "know" that the potential contributors "actually contributed," Strohman does not need such knowledge or evidence of "actual contribution" to support his opinion of "possible contribution." Rhoads seems to argue that simply because Strohman opines that something is "possible," rather than "certain," his opinion is impermissibly speculative. *See* Doc. 171 at 7. But Strohman

is not speculating at all as to what is merely *possible*. To the contrary, he has "good grounds" for his opinion that it is *possible* that other phenomena contributed to the subsidence. *Id.* at 133–35 (discussing the factual basis for his opinion that "it is *possible* that other events...contributed to [the subsidence]"); *id.* at 130–33 (discussing the factual basis for his opinion that a lack of maintenance and failure to perform inspections and repairs "*likely* contributed to the...subsidence"). [5]

Here, Strohman has good grounds for his opinion that "potential contributors" exist. While his testimony may not be sufficient to prove that any of these "potential contributors" *actually* contributed to the subsidence, it is not the Defendants' burden to prove causation. Rather, Strohman's opinions as to the possibility of other contributing causes will undoubtedly assist the jury in evaluating Rhoads' theory of causation and will be admitted for that purpose. *See* Wolfe v. McNeil-PPC, Inc., 2011 WL 1673805, at *14 (E.D. Pa. May 4, 2011) (citing Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 786 (3d Cir. 1996)) ("[W]here [the] defendant seeks to introduce evidence merely to cast doubt on the plaintiff's theory of causation, the expert need not definitively rule out plaintiff's theory for his testimony to be admitted.") That Strohman only opines that these potential alternative causes "possibly" contributed to the subsidence, instead of "definitely" did so, is an area appropriate for cross-examination at trial.

### E. Rhoads' motion to preclude Bengt Fellenius (Civ. No. 17-266, Doc. 151)

Rhoads next moves to preclude Defendants TranSystems' and Shoreline's expert Bengt Fellenius "from providing expert testimony at trial on the impact, or role, of rainfall in the subsidence." (Civ. No. 17-266, Doc. 151-2 at 12.) Rhoads challenges the reliability and fit of Fellenius's opinion regarding rainfall, not his qualifications to proffer it. *Id.* at 1. Rhoads contends that his opinion "is not reliable because [he] has not identified the basis of his 'analysis,' an analysis that results in an improperly skewed result." *Id.* at 1–2. Specifically, Rhoads argues that Fellenius's "rainfall analysis" is unreliable in that it utilized a "five-year running average difference to the average rainfall," allegedly without "(a) defining what that is, (b) providing the raw data he used, (c) explaining how he performed his calculations, and (d) disclosing why he used a five-year average." *Id.* at 2, 5.

Further, Rhoads briefly argues that Fellenius's opinion does not "fit" because his analysis allegedly "creates a skewed result" and will thus "only confuse, not assist the jury." *Id.* at 11.

**\*16** In response, TranSystems and Shoreline argue that Fellenius's testimony is reliable in that it "scientifically explains why excessive rainfall saturating the soil could have accelerated the soil piping that led to the formation of the [subsidence]." Doc. 161 at 4. They further argue that Fellenius's report and testimony "explains...the relationship between rainfall/water accumulation on the migration of soils" and that "this explanation is based on a testable methodology" such that "Rhoads may cross-examine Fellenius on this issue." *Id.*

We have reviewed Fellenius's report and the deposition testimony the parties provided, and we are not persuaded by Rhoads' arguments. First, we observe that the import of his report is his opinion that pile driving did not cause the subsidence. Doc. 161-2 at 10–17 ("Fellenius Rep."). Rhoads does not challenge this most significant portion of his opinion, which upon our review, is supported by good grounds. Instead, Rhoads challenges only Fellenius's secondary opinion, that "[t]he depression and ground settlement are most likely a consequence of the increased flow of water in the ground due to rain and the associated increase of piping-erosion and soil migration." *See* Doc. 151-2 at 4–5 (quoting Fellenius Rep. at 18). Rhoads challenges this opinion in part based on the argument that "[a] 'most likely' opinion is also unreliable as speculative." (Doc. 172 at 4.) Rhoads is incorrect. Rather, experts commonly testify as to the "most likely" cause of some event, and it is permissible for them to do so long as that opinion rests on "good grounds." *See, e.g.,* ⚑ *Heller,* 167 F.3d at 154. This is particularly true in the scenario of defense causation experts proffered to counter a plaintiff's causation theory. *See* ⚑ *Holbrook,* 80 F.3d at 786; *see also* ⚑ *St. Paul Fire & Marine Ins. Co.,* 2005 WL 1168380, at \*11.

Here, Fellenius has good grounds for his opinions regarding the impact of rainfall. He considered rainfall data from the National Oceanic and Atmospheric Administration ("NOAA") and modeled it as a five-year running average to determine that "[t]he rainfall in the years immediately before the depression appeared were considerably larger than over any similar period over the preceding 130 years." Fellenius Rep. at 18. He then considered the relationship between increase rainfall, groundwater table levels, and soil migrations. *Id.* In doing so, he explained that increased rainfall "will result in higher than average groundwater table," and that areas with "loose sand" soil are susceptible to subsidence in the event of an increased water table level. *Id.* He considered empirical data regarding the soil profile in the area of the subsidence and determined that it is susceptible to such subsidence. *Id.* at 5–9. Applying this empirical data to principles of geophysics, including the relationship between rainfall, water tables, and soil migration, he opined that "[t]he depression and ground settlement are most likely a consequence of the increased flow of water in the ground due to rain and the associated increase of piping-erosion and soil migration." *Id.* at 18.

Rhoads' challenges to Fellenius's methodology are without merit. First, Rhoads argues that Fellenius did not define what a "five-year running average difference to the average rainfall" is, or "how it is calculated." Doc. 151-2 at 5. This argument is unfounded. Fellenius's report explains that the table he prepared shows the "five-year running average average difference to the average rainfall for 1880 through 2018 two years before and two years after each indicated year." *Id.* at 3. We are unsure how Fellenius could be more clear about what his table represents. It simply compares to the average yearly rainfall the five-year running average of rainfall for each year. *Id.* He calculated the five-year running average for each given year using the two years preceding and succeeding it. *Id.* If Rhoads is unclear as to what a "running average" is, that is certainly not a basis to preclude Fellenius's testimony.

**\*17** Further, Rhoads argues that Fellenius did not explain "why he calculated" a five-year running average of rainfall as opposed to simply considering the amount of rainfall in each individual year. Curiously, Rhoads also cites Fellenius's deposition testimony in which he explains precisely why he used a running average:

Q: Okay. Now, you used a five-year running average. Why?

A: Because rainfall varies from year to year. When you have a period of a hundred years, and more here, you'd like to see a trend. And as you look at that trend, you have to average the data to eliminate the variations and changes that are not related to the – the trend. So doing a rounding average of the data, you can see that – the trend of more rainfall a few years, and less another couple of years, becomes very clear.

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)
2021 WL 2778562

Q. Why pick a five-year running – I'm sorry.

A. That removes the peaks, more than anything, at the average.

Q. What is the significance to your analysis of this running average of rainfall?

A. It shows that the – when comparing to the average rainfall over this hundred-year period, there are a couple of years where you have more than other years and a couple of years where you have less. Some years it rains more. Other years it rains less. We know that. Now, when you're running your [geo]metric averages like this, you'll come out and see quite clearly which years had more rainfall than other years. And it shows that the last couple of years before – around – the last five years we had more rainfall than any other period of five years.

Doc. 151-2 at 5–6 (quoting Fellenius Dep. at 77:1–79:10).

Further, Fellenius explained in his report that "[t]he process will be slow and intermittent with occasionally a larger event occurring without a direct trigger is discerned [sic]. The loss of volume accumulates over time and is visible as ground settlement." Fellenius Rep. at 18. Clearly, and contrary to Rhoads' assertion, Fellenius has explained "why he calculated" a five-year running average.

We acknowledge Rhoads' arguments as to the alleged shortcomings of utilizing a running average rather than simply viewing each year individually. *See* Doc. 151-2 at 7–8. However, we observe that " '[t]he test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research.' " *Karlo*, 849 F.3d at 81 (quoting 📄 *TMI*, 193 F.3d at 665); *see also Paoli*, 35 F.3d at 742 (explaining that there may be good grounds "even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result."). Here, we find that the alleged flaws Rhoads has identified do not warrant preclusion, as Fellenius's opinion rests on "good grounds." [6]

**\*18** Finally, we also conclude that Fellenius's opinion satisfies the "fit" prong in that it will "help the trier of fact to understand the evidence or to determine a fact in issue." 📄 *TMI*, 193 F.3d at 663 (quoting Fed.R.Evid. 702(a)) (alterations omitted). Rhoads argues that Fellenius's opinion

regarding the impact of rainfall does not fit in that his reliance on five-year running averages instead of individual annual rainfall "creates a skewed result" that will "only confuse, not assist the jury." Doc. 151-2 at 11. We disagree. We find that Fellenius's testimony on this subject will aid the jury in understanding a fact at issue, namely, the cause of the subsidence. [7] For the foregoing reasons, Rhoads' motion to preclude Fellenius's testimony is denied.

### F. Rhoads' motion to preclude Benjamin Irwin (Civ. No. 17-266, Doc. 147)

Rhoads next moves to preclude the testimony Triton's expert Benjamin Irwin of the HAAG Engineering firm. (Civ. No. 17-266, Doc. 147-2.) Rhoads does not seek to preclude Irwin on the basis of any of the trilogy of restrictions under Fed.R.Evid. 702. Rather, it challenges Irwin's testimony based only on an alleged "failure to comply with [Fed.R.Civ.P.] 26." *Id.* at 1. Rhoads alleges that Irwin's testimony is noncompliant with Fed.R.Civ.P. 26 in that he "failed to include 'all' his opinions in his report," and he "changed his opinion, but waited to reveal that change until he appeared for deposition." *Id.* at 1–2. On these bases, Rhoads moves to preclude Irwin's testimony in its entirety. For the reasons that follow, this motion will be denied. We first set out the relevant Fed.R.Civ.P. 26 requirements and Fed.R.Civ.P. 37 provisions pursuant to which Rhoads argues for preclusion of Irwin's entire testimony.

First, Fed.R.Civ.P. 26(a)(2) requires disclosure of expert testimony, which "must be accompanied by a written report" that includes "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed.R.Civ.P. 26(a)(2)(B)(i). That rule further provides that "[t]he parties must supplement these disclosures when required under Rule 26(e)." Fed.R.Civ.P. 26(a)(2)(E). In turn, Fed.R.Civ.P. 26(e) requires supplementation "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed.R.Civ.P. 26(e)(1)(A). The "duty to supplement extends both to information included in the report and to information given during the expert's deposition," and "any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed.R.Civ.P. 26(e)(2).

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)

2021 WL 2778562

**\*19** Where a party fails to provide the required information or supplementation, Fed.R.Civ.P. 37(c) provides that the court may impose appropriate sanctions at its discretion, including exclusion of the evidence at trial, unless the failure "was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1)(C). However, "[t]he exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997). In determining whether exclusion of evidence is appropriate, we consider: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 298 (3d. Cir. 2012) (internal citations and quotations omitted).

Here, Rhoads specifically takes issue with Irwin's opinion as to whether there was "foundation movement at Building 669." Doc. 147-2 at 4. As Rhoads points out, Irwin opined in his report that "[t]here was no credible scientific evidence of recent structural damage to Building 669 resulting from Triton's pile driving work," and he explained that part of the basis for this conclusion was that "[t]he deep foundation system of [Building 669] had not recently moved laterally westward toward the reported sinkhole repair location." Doc. 147-4 at 2–3 ("Irwin Rep."). However, at his deposition, Irwin opined differently, stating that there was in fact westward lateral movement of the grade beams and columns of Building 669. Irwin Dep. at 16:3–17:23. Irwin explained that he changed his opinion based on his preliminary review of "new information" that was only made available to him subsequent to the completion of his initial report. Irwin Dep. at 13:11–14:5. He further testified that his analysis of this new data was "not complete" but that it was ongoing. Irwin Dep. at 15:12–18:5. Rhoads contends that because Irwin's report is incomplete, it necessarily does not include "all" his opinions, as is required by Fed.R.Civ.P. 26(a)(2)(B)(i). Rhoads further argues that despite Irwin's ongoing analysis and change of opinion, "Triton's counsel has not served any additional or supplemental disclosure for Irwin," Doc. 147-2 at 6, and that doing so at this point would be untimely and in contravention of Fed.R.Civ.P. 26. Id. at 8. As a result, Rhoads argues that

the appropriate sanction under Fed.R.Civ.P. 37 is preclusion of Irwin's testimony in its entirety. Id.

In response, Triton first argues that Rhoads' motion is untimely because it "cannot argue at this late juncture that [it] was unaware of Irwin's [role as an expert and the general subject matter of his testimony]." Doc. 159 at 4. Triton further argues that it is somehow improper for Rhoads to have "raised issues regarding the alleged new opinions of [Irwin]...[f]or the first time upon filing of these motion [sic]." Id. at 6. Next, Triton contends that Irwin did not offer "new opinions at his deposition," id. at 4, but rather that the opinions stated at his deposition "are contained within the four corners of his report," such that the supplementation requirements of Fed.R.Civ.P. 26(e) are not invoked. Id. at 7. Alternatively, Triton argues that "should the court deem the opinions are new," Irwin should nonetheless be permitted to testify because the "four factor test [for determining whether to] preclud[e] testimony for failure to comply with pre-trial requirements" weighs against preclusion. Id. at 7. Here, Triton argues that it is permissible for Irwin to testify beyond the scope of his report where he has "simply expanded" on the opinions in his report rather than offered entirely new ones. Id. at 8.

**\*20** In resolving this motion, we first note that we are not persuaded by Triton's argument that Rhoads' motion to preclude Irwin is somehow untimely. To the contrary, Rhoads submitted this motion—a motion to preclude expert testimony—on the date that "motions to preclude or limit expert testimony" were due. Triton has not cited any authority for its position that Rhoads' motion is untimely, nor is the Court aware of any authority supporting the proposition that the time period in which to file motions to preclude expert testimony is somehow a "late juncture" for such motions or is not the proper venue to raise "for the first time" issues regarding the experts opinion. Triton's argument as to the timeliness of Rhoads' motion is thus entirely without merit.

Next, we are not persuaded by Triton's argument that Irwin's changed opinion as to the lateral movement of Building 669's foundation is not "new" and therefore does not invoke the supplementation requirements of Fed.R.Civ.P. 26(e). While the parties have dedicated significant space in their briefing to arguing as to whether Irwin expressed a "new" opinion or merely "expanded" on the opinions in his report, this semantic difference is ultimately inconsequential. Indeed, Fed.R.Civ.P. 26(e) requires supplementation "in a timely manner if the party learns that in some material respect the disclosure or

2021 WL 2778562

response is incomplete or incorrect." The rule thus does not distinguish between expert opinions that are "new" or are simply "expansions" of prior opinions, as the parties seem to suggest. Here, additional data was made available to Irwin after the completion of his report. Doc. 159 at 4. Through his preliminary analysis of this new data, Irwin learned that his opinion that "[t]he deep foundation system of [Building 669] had not recently moved laterally westward" was incorrect. Further, he testified that, as of the time of his deposition, his analysis of this new data was "not complete" and was ongoing. Thus, regardless of whether his opinion stated in his deposition was "new," Irwin's discovery that the opinion stated in his report was incorrect and that his analysis was incomplete invokes Fed.R.Civ.P. 26(e).

Despite Irwin's learning that one of the opinions in his report was incorrect and that his analysis was incomplete, Triton did not serve any supplemental disclosure, and in fact, as of the parties' briefing on this motion, it still has not done so. However, with regard to Irwin's changed opinion as to the foundation movement at Building 669, we note that the "inconsistency between his report and his deposition testimony...goes to the weight of the evidence" and therefore is not a basis for preclusion of his testimony on that subject.

🚩 *Allstate Ins. Co. v. Anderson*, 2016 WL 2939506, at *6 (E.D. Pa. May 20, 2016), *as amended*, 2016 WL 2997675 (E.D. Pa. May 23, 2016). Further, while Triton did not provide a supplemental report of Irwin's changed opinion, that information has now "otherwise been made known" to Rhoads through his deposition testimony. Fed.R.Civ.P. 26(e)(1)(A) (requiring supplementation "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"). Moreover, the new data upon which Irwin's changed opinion is based is data that was collected by one of Rhoads' experts. *See* Doc. 147-2 at 3–4. Given that Rhoads has been made aware of Irwin's updated opinion and is familiar with the data underpinning it, it cannot be said that Rhoads will suffer prejudice or unfair surprise in allowing Irwin to testify on this subject. The inconsistency between his report and deposition testimony is thus an appropriate area for cross examination, but it does not warrant preclusion of his testimony.

**\*21** However, while Irwin's changed opinion as to the movement of Building 669's foundation has been made known to Rhoads, the results of his incomplete analysis of the new data have not. Triton therefore had a duty to supplement its disclosure of Irwin's report, but it has not done so. Accordingly, imposition of sanctions pursuant to

Fed.R.Civ.P. 37(c)(1) may be appropriate. In making this determination, we consider the factors prescribed by the Third Circuit and set out above. *See* 🚩 *ZF Meritor, LLC*, 696 F.3d at 298.

First, Rhoads would be prejudiced if Irwin were permitted to testify regarding the results of his analysis of the new information because it was unable to depose him on the subject, as his analysis was "not complete" at the time of his deposition. Next, Rhoads' ability to cure that prejudice is significantly curtailed by the fact that Triton still has not submitted a supplemental report to give Rhoads notice of any change to Irwin's opinions. Further, the only way to cure this prejudice would be to reopen expert discovery to allow Rhoads to re-depose Irwin and to refile an updated motion to preclude his testimony if necessary. This cure would undoubtedly disrupt the orderly and efficient trial of the case, as expert discovery has been closed for more than five months. Next, while we will not speculate as to whether Triton's actions were borne of bad faith or willfulness, we note that Triton delayed in providing the new information to Irwin for his review, and that it has offered no explanation for its failure to promptly provide it to him. [8] Finally, because Triton has not provided a supplemental report and Irwin was unable to testify to the outcome of his incomplete analysis at his deposition, we are unable to assess the potential importance of the information his analysis might produce.

Taken together, it is clear that these factors weigh in favor of precluding Irwin from testifying as to the portions of his analysis that were incomplete at the time of his deposition. However, these concerns are not present with regard to his report in its entirety or to the opinions he expressed at his deposition. Accordingly, Rhoads' requested relief—that Irwin be precluded from testifying entirely—is not warranted. Rather, any prejudice to Rhoads can be alleviated simply by limiting Irwin's trial testimony to scope of his report and deposition testimony. Accordingly, Irwin is precluded from testifying as to his analysis that remained incomplete at the time of his deposition. Otherwise, his testimony will be limited only to the degree that expert testimony is limited in the normal course.

### G. Rhoads' motion to preclude John Vitzthum (Civ. No. 17-266, Doc. 144)

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)
2021 WL 2778562

Rhoads next moves to preclude the testimony of Defendants' expert John Vitzthum of DM Consulting. (Civ. No. 17-266, Doc. 144-2.) Rhoads first argues that Vitzthum's testimony should be precluded in that Triton failed to comply with Fed.R.Civ.P. 26 and provide a complete and timely expert disclosure. *Id.* at 8. Rhoads further challenges Vitzthum's qualifications to proffer the opinions contained in his report and the reliability of his opinions. For the reasons that follow, we conclude that Triton's failure to comply with Fed.R.Civ.P. 26 disclosure requirement warrants preclusion of Vitzthum's testimony. We first set out the relevant Fed.R.Civ.P. 26(a) requirements and determine that Defendants failed to comply with them. We then set out the relevant Fed.R.Civ.P. 37(c) provisions and determine that exclusion of Vitzthum's testimony is warranted.

**1. Defendants' expert disclosures are noncompliant with Fed.R.Civ.P. 26(a)**

**\*22** As set out above, Fed.R.Civ.P. 26(a)(2) requires disclosure of expert testimony and mandates that "this disclosure must be accompanied by a written report" that includes:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B)(i)–(vi). Further, "[a] party must make these disclosures at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(D).

Here, our scheduling order stated that "Defendants' expert reports regarding damages are due no later than September 15, 2020." Doc. 118. Accordingly, the disclosures that those reports must accompany were due on that same date.

Fed.R.Civ.P.(a)(2)(D). Rhoads alleges that, as of the date motions in limine were due and the date it submitted this motion, Triton had failed to provide an expert disclosure that is compliant with Fed.R.Civ.P. 26(a)(2) requirements. Doc. 144-2 at 8. Rhoads contends that at that time, the only expert disclosure produced was Vitzthum's three-page expert report (Doc. 144-4) ("Vitzthum Rep."), which, "in direct contravention" of Fed.R.Civ.P. 26 fails to include: "Vitzthum's qualifications," "a list of publications authored in prior 10 years," "a list of all cases (in prior 4 years) in which he testified (at trial or deposition) as an expert," and "a statement of his compensation for his 'report' and testimony in this case." *Id.*

In response, Defendants do not dispute Rhoads' assertions as to Triton's failure to provide expert disclosures. Instead, they merely contend that "Plaintiff's argument is now moot as the required 26(B) [sic] disclosures have now been provided." Doc. 165 at 8. Defendants' attachments to their brief includes a letter to Rhoads' counsel that states that it contains the required Fed.R.Civ.P. 26 disclosures and is dated April 8, 2021, the same date that Defendants served their response in opposition to Rhoads' motion. Doc. 165-3. In arguing that this subsequent disclosure was timely, Defendants misconstrue the Federal Rules and cite "Rule 26 (2)(D)(i)" [sic] for the proposition that expert "disclosure must be provided at least 90 days prior to the date set for trial or for the case to be ready for trial." *Id.* In doing so, Defendants ignore the qualifying phrase from Fed.R.Civ.P. 26(a)(2)(D), which states that "[a] party must make these disclosures at the times and in the sequence that the court orders." Fed.R.Civ.P. 26(a)(2)(D). Indeed, subsection (i) of that Rule, cited by Defendants, is only applicable "[a]bsent a stipulation or a court order" governing the "times" and "sequence" of expert disclosures. *Id.* Here, our scheduling order set a deadline for Defendants' damages expert reports of September 15, 2020. Doc. 118. Expert disclosures were thus due on that date, and not on the default date provided by the Federal Rules in the event a court does not set a deadline. Accordingly, Defendants' April 8, 2021 disclosure was untimely, and only Triton's original disclosure, the inadequacy of which Defendants do not dispute, was timely.

**\*23** Further, even setting aside its untimeliness, Defendants April 8, 2021 disclosure still fails to comply with Fed.R.Civ.P. 26(a)(2). As Rhoads points out in its reply, this disclosure still does not contain any information regarding Vitzthum's compensation. Further, the list of cases in which the witness

2021 WL 2778562

has testified provides virtually no identifying information. The entire list is as follows:

Year  Law Office  Case

2018  Lawrence Shea  Voyager

Doc. 165-3. The publications list Defendants provided is similarly inadequate. It states the titles of two publications, with the only additional identifying information being the year one publication was "last updated," and a conference at which the other publication was presented. *Id.*

Taken together, it is clear that Defendants' disclosures are not compliant with Fed.R.Civ.P. 26(a). Indeed, they have not disputed that their only timely disclosure, Vitzthum's three-page expert report propounded on September 14, 2020, is noncompliant. Further, their subsequent disclosure, which they contend satisfies Fed.R.Civ.P. 26(a) is untimely and inadequate. Having determined that their disclosures are noncompliant, we now turn to determine the appropriate remedy.

### 2. Exclusion of Vitzthum's testimony is appropriate

Fed.R.Civ.P. 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). However, "[t]he exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997). As discussed above, the Third Circuit has set out five factors that trial courts may consider in determining whether exclusion of evidence or a witness is appropriate: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence." *ZF Meritor*, 696 F.3d at 298 (internal citations and quotations omitted). We are further mindful that "[t]he importance of the evidence

is often the most significant factor," *id.*, and that "[t]he non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless." *Klatch-Maynard v. Sugarloaf Twp.*, 2011 WL 2006424, at *2 (M.D. Pa. May 23, 2011) (internal quotations and citations omitted). In applying these factors, we conclude that preclusion of Vitzthum's testimony is appropriate.

First, we find that Rhoads has been prejudiced by Defendants' failure to provide a timely expert disclosure. This prejudice primarily flows from Defendants' deprivation of Rhoads' opportunity to prepare a comprehensive Daubert motion to preclude Vitzthum's testimony. That is, Rhoads was unable to prepare a challenge to Vitzthum's qualifications because it did not receive any disclosure of Vitzthum's qualifications until after the deadline to submit motions in limine. Further, as Rhoads points out, it is also unable to fully prepare a challenge to the reliability of Vitzthum's opinions because it "still does not have the basis for his opinions." Doc. 167 at 3. Indeed, while Vitzthum's original report listed four "referenced documents used in this analysis," Defendants' in their response identified several other forms of data upon which Vitzthum's report relies but that were not disclosed prior to deadline for motions in limine. Doc. 165 at 5–6.

**\*24** Further, Rhoads is unable to cure this prejudice at this stage, as expert discovery closed on January 15, 2021 (Doc. 127), and the deadline for submitting motions to preclude or limit expert testimony was March 8, 2021 (Doc. 129). On this point, Defendants argue that Rhoads has foregone its opportunity to cure this prejudice in that it "elected not to notice the deposition of Vitzthum" and did not "raise any issue regarding Vitzthum's credentials or experience until the filing of this motion." Doc. 165 at 6. First, we note that "the filing of this motion," a motion to preclude expert testimony, is in fact the proper time for Rhoads to have raised "issues regarding Vitzthum's credentials or experience." Next, we are not persuaded that its decision not to depose Vitzthum weighs against Rhoads. Indeed, Defendants have an affirmative obligation to provide compliant expert disclosures. To the contrary, Rhoads has no affirmative obligation to depose Defendants' witnesses, and it is certainly has no obligation to utilize its depositions as a substitute for Defendants' compliant disclosures or to remedy Defendants' failure to provide them. Rather, as Rhoads asserts, the only way to cure this prejudice at this stage would be to reopen expert discovery, which has been closed for over five months, require Defendants to provide a compliant expert disclosure, permit Rhoads to depose Vitzthum and to submit a new

*Daubert* motion. However, Defendants have not so much as requested the opportunity to pursue any cure, and instead rest only on their attempt to direct blame at Rhoads' decision not to depose Vitzthum. We are therefore unwilling to pursue the cumbersome, costly, and time-consuming cure that would be necessary at stage, particularly considering the circumstance that Defendants have not even requested it.

Further, we find that Defendants' apathetic response to Rhoads' concerns regarding their expert disclosures raises legitimate questions with respect to whether there was "any bad faith or willfulness" in failing to comply. That is, Defendants did not offer any reason whatsoever, let alone any "substantial justification," for their failure to timely provide a compliant expert disclosure. Rather, they merely attempt to argue that their failure was harmless by shifting the blame to Rhoads for opting not to depose Vitzthum. Moreover, the untimely disclosure that they provided in response to Rhoads' motion appears to have been haphazardly and inattentively assembled. Even after being put on notice of the obvious shortcomings of their initial disclosure, that subsequent disclosure fails to provide basic information expressly required by Fed.R.Civ.P. 26(a), and it includes only the barest descriptions of Vitzthum's past testimony and publications, with insufficient details to enable to Rhoads to actually identify that information. Defendants also delayed in providing that subsequent disclosure for one month following Rhoads' motion that identified the inadequacies in their previous motion, and they have not even requested the opportunity to cure any of these deficiencies. At best, Defendants' conduct evinces a lack of regard for the seriousness of their obligation to comply with the Federal Rules. At worst, their failure to provide a compliant disclosure even after being put on notice of the inadequacies in their initial disclosure, along with their delay in providing the subsequent disclosure and failure to provide any explanation whatsoever for these deficiencies, gives rise to an inference of willfulness or bad faith.

Finally, we turn to "the most significant factor," the importance of the evidence to be excluded. We have reviewed Vitzthum's cursory expert report, and we find that his "opinions" are of relatively low importance and that Defendants will likely be able to introduce much of this same evidence with fact witnesses and/or through cross examination of Rhoads' witnesses. Vitzthum is proffered as a damages expert who will rebut the claims of Rhoads' damages experts. Defendants characterize his opinions as follows. They assert that he "explain[s] that the

requirements relating to dry-docking of government ships" and "conclude[s] after reviewing the history of the subject dry dock, coupled with his extensive industry knowledge...that Dry Dock 2 would currently require extensive...repairs prior to...being able to pass the referenced forms of certification." Doc. 165 at 13–14. Defendants further assert that he "concludes that from his review of materials little to no maintenance had been performed at the dry dock, or maintenance records kept, for almost 30 years." *Id.* at 14. He further "opines that Rhoads['] relative inexperience," along with "other factors"—such as the dry dock's "physical limitations . ..configuration and available water depths," and geographic location—would "impact their ability to win bids." *Id.* Finally, Defendants state that he "opines based upon the data provided that the dock has not had any form of certification since [1994]." *Id.* at 15.

**\*25** We initially note that expert testimony on issues of causation and liability generally are more consequential in this case than such testimony as it relates to damages. We also acknowledge that Vitzthum's report does not include any actual damages calculations to rebut Rhoads' experts. Rather, his opinions seem to serve only to cast doubt generally over Rhoads' damages experts' calculations. Moreover, we observe that several of the "opinions" Vitzthum offers are not opinions at all but are simply statements of disputed facts. For example, it is not an "opinion" whether the dry dock "had any form of certification" since 1994. It either did have certifications or it did not. Nor is it an "opinion" whether maintenance was performed on the dry dock or whether maintenance records exist. Accordingly, Defendants may introduce this evidence at trial without Vitzthum's testimony. Further, Vitzthum's opinions as to Rhoads' inability to win government bids is directly aimed at rebutting Rhoads' damages experts' testimony. As such, Defendants will still be able to introduce the information underlying those opinions through effective cross-examination of Rhoads' witnesses. Taken together, we conclude that Vitzthum's testimony, as a damages rebuttal expert, is of relatively low importance, as Defendants will likely still be able to introduce much of the information to which he would testify, and to challenge Rhoads' damages experts, through fact witnesses and effective cross examination. Finally, and significantly, we observe that Defendants provided no argument in response to Rhoads' motion to exclude Vitzthum as to the importance or significance of his testimony.

Given the foregoing analysis, we find that the five factors set out by the Third Circuit weigh in favor of excluding

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)

2021 WL 2778562

Vitzthum's testimony. We further observe that Defendants seem to have not taken seriously their burden under the Federal Rules to prove that their failure to comply was substantially justified or is harmless. Indeed, they neglected entirely to provide any explanation or justification for their failure, and they argued that it was harmless only by attempting to shift the blame to Rhoads for not deposing Vitzthum. Accordingly, while we acknowledge that "exclusion of expert testimony is a harsh sanction," *Kennedy v. Norfolk S. Ry. Co.*, 2008 WL 975063, at *3 (W.D. Pa. Apr. 9, 2008), we find that it is appropriate under the circumstances here. [9]

### H. Rhoads' motion to preclude James Schofield (Civ. No. 17-266, Doc. 148)

Rhoads next moves to preclude TranSystems' expert James Schofield, who "was proffered to opine on the age, maintenance, and repair of the dry dock." (Civ. No. 17-266, Doc. 148-2 at 1.) He concluded that the condition of the dry dock was consistent with its age and that it had suffered from a lack of maintenance since the 1970s. Schofield Rep. at 22. He further concluded that Rhoads failed to appreciate the degree to which its facilities and the surrounding soils required restoration and that its maintenance plans were inadequate to address the long-term deterioration. *Id.* at 23. Rhoads challenges Schofield's qualifications to proffer opinions on these subjects, the reliability of his opinions, and their fit. For the reasons that follow, Rhoads' motion will be denied.

### 1. Qualification

*26  Rhoads first challenges Schofield's qualifications to opine as to the age, maintenance, and state of repair of the dry dock. Doc. 148-2 at 5. Rhoads' argument on this point is predicated entirely on Schofield's deposition testimony that he does not consider himself to be "an expert on dry dock repair and maintenance" and that he has never "done any projects involving repair or maintenance of dry docks." *Id.* at 3, 5 (quoting Schofield Dep. at 48:23–49:16). Based on those statements, Rhoads argues that "the preferred expert testimony 'falls outside a witness's expertise'" and should therefore be excluded. *Id.* at 5 (quoting *Ferris v. Pennsylvania Fed'n Bhd. of Maint. of Way Emps.*, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001)). In response, TranSystems contends that it is not necessary for Schofield to have

"specific expertise on one particular topic," but rather that "*Daubert's* qualification standard is liberal and flexible." Doc. 163 at 4. TranSystems argues that he satisfies this standard based on his academic credentials and professional experience, "the majority [of which] has involved projects in or around the United States Navy and naval bases." *Id.* at 3.

We find that Schofield is qualified, under the liberal standards for qualification. Indeed, while an expert must possess "specialized expertise" to be qualified, this requirement has been "interpreted liberally," with the Third Circuit holding that "a broad range of knowledge, skills, and training qualify an expert." *Paoli*, 35 F.3d at 741. In fact, "it is an abuse of discretion to exclude testimony simply because...the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook*, 80 F.3d at 782. Despite its liberal construction of the qualification requirement, the Third Circuit has "not pursued a policy of qualifying *any* proffered witness as an expert." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). Rather, "at a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman." *Id.* (internal citations, quotations, and alterations omitted). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril*, 128 F.3d at 809. However, we also acknowledge that "[a]n expert may be generally qualified but may lack qualifications to testify outside his area of expertise." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003). With these principles in mind, we "consider both academic training and practical experience to determine if the expert has more knowledge than the average lay person on the subject." *In re: Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2016 WL 4056026, at *2 (E.D. Pa. July 27, 2016) (citations and quotations omitted).

Schofield has extensive relevant academic training, including a Bachelor of Science in Ocean Engineering, a Master of Science in Construction Management, and a Master of Engineering in Civil Engineering. (Doc. 163-4 at 1) ("Schofield CV"). In addition to his academic training, he has held several job positions within the Navy in engineering and construction management roles, including as Resident Officer in Charge of Construction at the Southwest Division Naval Facilities Engineering Command in San Diego, CA and later at the Naval Academy in Annapolis, MD. *Id.* at 2. He testified at his deposition that his responsibilities at the latter

2021 WL 2778562

included overseeing waterfront construction and renovation projects, including repairs of failing seawalls associated with "loss of fill" from incidents of subsidence. Schofield Dep. at 37:14–25. He further testified that his role as Ocean Construction Division Contracting Officer at the Naval Facilities Engineering Service Center included "leading a team that was advertising and awarding overarching contracts for...Navy [ocean construction] work all over the world." *Id.* at 30:9–15.

Clearly, Schofield has extensive training and experience in engineering and construction management, particularly with regard to waterfront projects, as well as strong familiarity with naval maintenance and repair standards. Despite this expertise, Rhoads argues that his testimony should be precluded because he is admittedly not an expert specifically in "dry dock maintenance and repair." However, we find that Rhoads' characterization of the required expertise is too narrow in light of broad, liberal standard under *Daubert*. See, e.g., Johnson v. SJP Mgmt. LLC, 2009 WL 367539, at *8 (E.D. Pa. Feb. 12, 2009) ("[Expert's] expertise in the field...is sufficient to permit him to offer an expert opinion, notwithstanding his lack of experience with the specific technology at issue here."); *see also* Kannankeril, 128 F.3d at 809.

**\*27**  Further, we find that Rhoads' reliance on Schofield's statement that he does not consider himself a "dry dock repair and maintenance" expert is misplaced. [10] The Third Circuit addressed a similar circumstance in *Pineda*. There, the Court found abuse of discretion where the district court "determined that the only permissible expert was a 'warnings expert,' " and consequently precluded an expert based on his own testimony "that he did not offer himself as a warnings expert." Pineda, 520 F.3d at 244–45. In reversing the district court's ruling, the Third Circuit stated that "[l]ooking beyond this single statement, we find that [the expert's] formal qualifications are unassailable," and that the expert's general expertise "was more than sufficient to satisfy Rule 702's substantive qualification requirement." *Id.* at 245. Following this guidance, we have similarly "look[ed] beyond" Schofield's "single statement" that he does not consider himself an expert on dry dock repair and maintenance. In doing so, we find that he "possess[es] skill or knowledge greater than average layman" in the area of his testimony as a result of his academic training in engineering and construction management, as well as his practical experience overseeing waterfront construction

projects and his familiarity with naval repair and maintenance standards. Accordingly, we conclude that Schofield "meets liberal minimum qualifications." Kannankeril, 128 F.3d at 809. As such, concern as to "the level of [his] expertise goes to credibility and weight, not admissibility." *Id.*

### 2. Reliability

Rhoads further challenges Schofield's testimony based on its reliability. Rhoads' sole argument on this point is that Schofield's "process was simply reviewing documents and concluding there was no maintenance or repair at the dry dock" and that he "has not identified any other methodology utilized to form his opinions." Doc. 148-2 at 6. We are not persuaded by Rhoads' argument.

First, we note that Rhoads has mischaracterized Schofield's methodology as relying solely on document review. Indeed, he performed a site inspection of the dry dock and Rhoads' other facilities. Schofield Rep. at 7. In his report, he stated that he observed: "major repairs to Wharf 4B and 4A had been completed," "Ongoing flow of water and silt from the dock walls and floor," "vegetative materials flourishing on the dock walls," "steady seepage and flow of water accumulating," and "multiple and various pavements and utility cuts in the areas surrounding Dry Dock 2, consistent with the 100 year age of the facility." *Id.*

Further, we note that Rhoads has not offered any explanation as to why Schofield's document review does not constitute "good grounds" for his opinions. To the contrary, our review finds that his document review and site inspection constitute a sufficient factual basis to support his opinions. Here, Schofield opines as to the current condition of the dry dock, the extent to which it has been maintained in the years preceding and following Rhoads leasing it, the extent to which repairs would be needed to restore it to operational status, and whether Rhoads had performed those repairs since taking over the dry dock. Schofield Rep. at 22–23. In reaching those opinions, Schofield reviewed documentation and testimony produced in this case concerning the "construction, maintenance, and repair history" of the dry dock to understand the degree to which it had been maintained in the years and decades prior to Rhoads leasing it. *Id.* at 10–16. Further, he reviewed the lease terms between Rhoads and the City, which included provisions regarding Rhoads' maintenance budget for the dry dock and other facilities. *Id.* at 19. He also reviewed documentation regarding the standards for dry

2021 WL 2778562

dock maintenance as set out by the Navy. *Id.* at 16–18. He concluded, in essence, that the current state of the dry dock is consistent with its more than 100 year age, that it had been inadequately maintained since the 1970s, and that Rhoads only budgeted for routine maintenance while more extensive " 'capital improvements' of the civil/structural state of the drydock" were required to restore it to an operational status.

**\*28**  Given the nature of Schofield's opinions, we find that his extensive review of discovery materials, along with his site inspection and his experience and training, are "good grounds" for his testimony. Indeed, as set out above, there is undoubtedly at least "*some* factual basis" for his testimony. *Stecyk*, 295 F.3d at 415 n.3 (holding that expert testimony was admissible "[b]ecause the record contains *some* factual basis —albeit shaky—for [the] testimony").

### 3. Fit

Finally, Rhoads challenges the "fit" of Schofield's testimony. Rhoads argues that his testimony will not "aid the jury in resolving a factual dispute" because he "based his opinion on merely reviewing documents produced in this litigation." Doc. 148-2 at 6. Rhoads thus contends that his testimony is unnecessary in that "[t]he jury can review and understand those documents with the assistance of a fact witness." We are not persuaded. First, we note again that Rhoads' argument ignores Schofield's site inspection, at which he made observations that are central to his report. Moreover, we reject Rhoads' contention that an expert opinion that is based on discovery materials is inherently unhelpful to a jury. Rather, expert testimony "fits" where it "[helps] the trier of fact to understand the evidence." *TMI*, 193 F.3d at 663 (quoting Fed.R.Evid. 702(a)). Here, we find that Schofield's testimony will assist the jury in understanding the evidence as it relates to Rhoads' damages claims. Accordingly, his testimony is admissible and Rhoads' motion is denied.

### I. Rhoads' motion to preclude Wesley Grover (Civ. No. 17-266, Doc. 150)

Rhoads next moves to preclude Defendants' damages expert Wesley Grover of FTI Consulting, Inc. (Civ. No. 17-266, Doc. 150.) Defendants retained Grover "to assist in the evaluation of the financial claims by [Rhoads]." Doc. 164-1 at 4 ("Grover Rep."). He concluded that five categories of damages calculations Rhoads' experts provided—Lost Income, Extra Expenses, Future Extra Expenses, Dry Dock 2 and Crane Repair Costs, and Building 669 Repair and Replacement Costs—are "overstated," "speculative," and/or "unsupported" and therefore "should not be relied upon." Rhoads challenges the reliability and fit of Grover's opinions, not his qualifications to proffer them. Doc. 150-2 at 3. For the reasons that follow, we find that Grover's opinions are sufficiently reliable and will assist the jury.

### 1. Reliability

Rhoads contends that Grover's opinions are unreliable in that his "process was simply the selective review of documents and portions of Rhoads' experts" and that "he has not...identified any other methodology utilized to form his opinions." Doc. 150-2 at 3–4. In support, Rhoads asserts that "[t]he unreliability of his opinion is illustrated in his testimony about: (a) lost revenue; (b) extra expenses related to rental lifts; and (c) crane rail repair costs." *Id.* at 4. First, Rhoads argues that Grover's analysis regarding lost revenue was "restrictive." *Id.* Specifically, Rhoads contends that Grover's assertion that "three major players in the [dry docking] industry" were "eroding" its market share and that was inadequately researched, as were his opinions as to Rhoads' bids for government contracts. *Id.* at 4–6. Rhoads further argues that Grover's analyses as to "rental lift expenses" and "crane rail repair costs" are insufficient in that he performed only a "limited review of documents." *Id.* at 7– 8.

In response, Defendants argue that Grover's methodology is reliable in that he "reviewed voluminous materials in this matter, including all transcripts, discovery, documents, and performed his own research (cite any articles) [sic] and then came to his conclusions based upon his years of specialized training, education, and experience." Doc. 164 at 7. Defendants further contend that Grover's opinions "are centered on longstanding engineering and economic principles." *Id.* More specifically, Defendants argue that his consideration of "the factual history of the dry dock...including its construction and maintenance history, as well as the financial loses calculated by Plaintiffs' expert," coupled with his "education, training and relevant work experience on construction matters," renders his opinion reliable. *Id.* at 12.

**\*29**  We have reviewed Grover's report and find that his opinions are reliable. We first observe that Grover is proffered only as a damages rebuttal expert. His report does not

contain any independent damages calculations or otherwise provide any alternative damages figures to contradict those of Rhoads' experts. Rather, he merely opines that Rhoads' expert's damages calculations are flawed in that they are based on assumptions that are "contrary to industry values or trends" and are "unsupported" or "overstated." Grover Rep. at 38. In reaching these conclusions, Grover first considered the maintenance history of the dry dock and the surrounding area in the Navy Yard and reviewed deposition testimony and documentation produced in this case. *Id.* at 6–8. He then extensively reviewed the reports of Rhoads' damages experts and provided a thorough discussion of their methodologies with regard to each specific subset of damages Rhoads' experts identified. Finally, drawing on his experience calculating lost income and construction repair costs and his knowledge and research of relevant industry trends, he identified a number of alleged shortcomings in Rhoads' damages expert's opinions. For example, with regard to Rhoads' experts projected profit margins, Grover pointed out that their analysis utilized a constant figure to calculate projected profits, but that doing so was "contrary to...the industry's reported...decline in profit margin from 2015 to 2020." *Id.* at 21.

We find that this methodology constitutes "good grounds" for Grover's opinions, considering the purpose for which they have been proffered. That is, it is permissible for Grover, as a rebuttal expert, to have reviewed Rhoads' experts reports and to have applied his experience and training to opine as to whether those reports are sound. *See, e.g.*, *In re Front Loading Washing Mach. Class Action Litig.*, 2013 WL 3466821, at *4 (D.N.J. July 10, 2013). Indeed, there are "circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it."

🚩 *Oddi*, 234 F.3d at 158. Here, Rhoads has not challenged whether Grover's training and experience is sufficient, and our review finds that it is extensive. Rather, Rhoads challenges to Grover's opinions are primarily centered on assertions that his review of Rhoads experts reports was too "restrictive" or too "limited." Undoubtedly, Rhoads has highlighted areas where Grover's opinions may have been bolstered by more expansive review. *See, e.g.*, Doc. 150-2 at 6–7 (discussing that Grover based his opinions regarding Rhoads' government contract bids only on his document review and did not "call any clients to ask for bid evaluations"). But these challenges go to the weight of Grover's opinions, not their admissibility. Indeed, the extent of Grover's review can be probed on cross-examination.

### 2. Fit

In addition to its reliability, Rhoads challenges the "fit" of Grover's testimony. Specifically, Rhoads argues that "Grover does not add any value" in that "[h]e merely acts like an attorney conducting cross-examination of an expert witness." Doc. 150-2 at 10. Rhoads further contends that "[t]he issues [Grover] raised to rebut Rhoads' damages can be addressed through cross-examination of Rhoads' experts. Using a rebuttal expert to replace (or supplement) cross-examination of Rhoads' expert will confuse, rather than assist, the jury." *Id.* In response, Defendants argue that Grover's opinions "fit" in that "they will assist the jury in understanding [the] complex financial loss claims arising out of the operation of a dry dock." Doc. 164 at 13.

We are not persuaded by Rhoads' arguments. First, we note that Rhoads has not cited any authority for the proposition that rebuttal testimony that raises "issues [that]...can be addressed through cross-examination" of the adverse witness is inadmissible, nor is the Court aware of any such authority. To the contrary, the Third Circuit has made clear that it views "competing expert testimony" as going hand-in-hand with "active cross examination" in making up the "adversary process" through which expert testimony should be tested.

🚩 *Mitchell*, 365 F.3d at 234 (3d Cir. 2004) ("As long as an expert's scientific testimony rests upon good grounds it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.") (internal citation and quotations omitted). Further, we are not persuaded that rebuttal evidence will "confuse, rather than assist the jury" simply because it concerns subject matter that may also arise on cross-examination. We thus reject Rhoads' invitation to exclude rebuttal expert testimony because it bears on issues that may also be the subject of cross-examination. Instead, we find that Grover's testimony will assist the jury in evaluating the complexities of Rhoads' experts' damages calculations.[11] *See, e.g.*, 🚩 *Schiff*, 602 F.3d at 173 (explaining that the fit requirement "is a question of relevance, and Rule 702 has a liberal policy of admissibility if [expert testimony] has the potential for assisting the trier of fact.") (internal citations and quotations omitted). For that reason, we conclude that Grover's testimony "fits" and Rhoads' motion to preclude it is denied.

### J. Defendants' motion to preclude Greg Cowhey (Civ. No. 15-921, Doc. 143)

**\*30** Defendants next seek to preclude Rhoads' damages expert Greg Cowhey. (Civ. No. 15-921, Doc. 143.) Rhoads retained Cowhey to perform "an analysis of the lost business income and extra expenses suffered by Rhoads as a result of the actions of the Defendants." (Doc. 147-2 at 1) ("Cowhey Rep."). He concluded that Rhoads' amount of lost business income ranges from $12,652,287 to $22,090,248, and that the amount of extra expenses is $2,594,387. *Id.* at 2. Defendants challenge Cowhey's testimony based on his qualifications, its reliability, and its fit. For the reasons that follow, Defendants' motion is denied. Cowhey will not be precluded from testifying.

### 1. Qualifications

Defendants argue that "Cowhey offers several opinions which are beyond the scope of his qualifications as an accountant." Doc. 143 at 22. Specifically, Defendants argue that "Cowhey is not an engineer and not qualified to offer opinions as to the cause of the sinkholes," and that he "has no experience and is not qualified to offer opinions regarding the management of a marine business or dry dock." *Id.* at 23, 24. In response, Rhoads contends that "Defendants know full well that Mr. Cowhey is not offering such opinions, yet they raise this non-issue." (Doc. 147 at 2.)

Our review confirms that Rhoads has accurately characterized this challenge to Cowhey's qualifications as a "non-issue." First, it is clear that Cowhey does not purport to offer any opinions as to causation, despite Defendants assertions otherwise. To be sure, his damages report is predicated on the assumption that Rhoads will prevail on issues of liability, including causation. He expressly states as much on the first page of his report: "RSM was asked to assume Plaintiffs successfully establish liability against Defendants." Cowhey Rep. at 1. Operating under that assumption, however, is not tantamount to offering an opinion as to causation. In fact, "[a]ll damages expert opinions are dependent...on the assumption that liability has been proven." ▯ *Dorman Prod., Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663, 690 (E.D. Pa. 2016), *as amended* (Oct. 17, 2016).

Next, we find that Defendants argument as to Cowhey's lack of experience in managing a marine business or dry dock is without merit. Defendants contend that Cowhey is not qualified to testify because "he does not consider himself an expert on whether or not a dry dock meets certification," "[h]e is not an expert in appraising the condition of a building," "[h]e is not an expert concerning proper maintenance for a dry dock," and "he has no experience being a Navy operator deciding whether or not a particular entity gets a contract or not." Doc. 143 at 24. These arguments are confounding. Even a cursory review of Cowhey's report reveals that he does not purport to offer any such opinions. Rhoads proffers him as a "financial damages" expert and the opinions in his report clearly relate to that topic. It is not required that he be an expert in all aspects of dry dock management, and there is certainly no requirement that have "experience being a Navy operator."

To the contrary, Cowhey is clearly qualified to testify to the financial damages opinions that he proffers by nature of education, training, and experience. While Defendants do not challenge Cowhey's financial expertise, we observe that it is extensive. Indeed, Cowhey holds a Bachelor of Science in Finance and a Master of Business Administration in Accounting. He testified that he has over thirty-five years of experience in forensic accounting and business valuation, and that experience specifically includes performing such analyses for marine industry companies. He has authored publications on business valuation and is a frequent speaker at relevant "professional, trade and business organizations...on matters ranging from accounting and finance, [and] business and intangible asset valuations." He has previously qualified as an expert witness on, among other areas, business valuations and economic damages analyses, and he has "frequently been appointed by Special Masters and judges to serve as the 'court's expert' in business and intangible asset valuation disputes and forensic accounting and tracing matters." *See generally* Doc. 147-3 at 27–29. He is qualified.

### 2. Reliability

**\*31** Defendants next challenge the reliability of Cowhey's testimony as to both of the topics on which he opines— Rhoads' lost profits damages and its "damages to repair the dry dock and surrounding property." Doc. 143 at 25, 31. We address their arguments as to each of these areas of Cowhey's testimony in turn.

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)

2021 WL 2778562

### a. Lost profits

Defendants argue that Cowhey's lost profits opinion is unreliable in that he allegedly "uncritically accepted Rhoads' own management financial projections," and "made numerous assumptions...which run completely contrary to industry averages or trends." *Id.* at 25–26. In response, Rhoads contends that the points Defendants have raised "are matters to address on cross-examination, not in a Daubert motion." Doc. 147 at 6. Rhoads further argues that Cowhey was not required to "independently verify or audit the Rhoads data used to calculate damages," and that, in fact, he "verified the accuracy of numbers in Rhoads' general ledger." For the reasons that follow, we find that Defendant's arguments are without merit and that Cowhey's opinion as to Rhoads' lost profits are reliable.

At the outset, we observe that Cowhey calculated Rhoads' lost business income under two distinct scenarios. In "Scenario 1," he calculated lost profits by "research[ing] dry dock industry trends and the reported annual change in the industry's revenue for 2013 through 2019." Cowhey Rep. at 10. He then applied that industry-wide annual change to Rhoads' actual revenue figure from 2012 to determine what Rhoads' annual revenue would have been had its growth remained consistent with industry trends. *Id.* at 6–7, 10. In "Scenario 2," he calculated lost profits utilizing Rhoads management's projected revenue for the years 2014 through 2019. *Id.* He also calculated projected profit margins by "review[ing] the actual margins from two years prior to the first sinkhole being used in forming management projections," as well as by reviewing the actual profit margins of specific dry dock projects. *Id.* at 10–12. He then applied these profit margin projections to revenue projections for Scenarios 1 and 2 to determine lost profits. *Id.* at 13. Defendants take issue only with Cowhey's methodology in calculating Scenario 2. They argue that he improperly relied on "Rhoads' own financial management projections" without independently verifying them. This argument is without merit.

While it is true that challenges to the "facts and assumptions underlying the testimony of an expert witness" generally go to the weight of the testimony and not its admissibility, *Stecyk, 295 F.3d at 414*, it is also the case that "[i]f the data underlying 'the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.' " *Montgomery Cty. v.*

*Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (quoting *In re TMI Litig.*, 193 F.3d at 697). More specifically, as then-Magistrate Judge Restrepo wrote, an expert's "reliance on projections supplied by [the party], without independent verification, renders his analysis unreliable." *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012).

However, the circumstance before us is not one in which the expert has failed to independently verify projections supplied to him. To the contrary, Cowhey dedicated a significant portion of his report to explaining the steps taken "[t]o confirm the reasonableness of Rhoads' projected revenues." Cowhey Rep. at 6. To that end, Cowhey explained that he "independently researched industry trends, federal contracts, interviewed Rhoads' management and customers, and analyzed supporting records to identify historical commercial and government contracts from 2013 through 2019 which either Rhoads lost the bid, or did not submit a bid, due to the various limitations and higher operating costs caused by the sinkholes." *Id.* Accordingly, Defendants' arguments that Cowhey "uncritically accepted" Rhoads' projections are unfounded. Indeed, he does not suffer from any "lack of familiarity with the methods and the reasons underlying [the] projections [that would] preclude any assessment of the validity of the projections through cross-examination." *ZF Meritor*, 696 F.3d at 298 (internal citations and quotations omitted).

**\*32** Turning to Defendants' second argument, that Cowhey "made numerous assumptions in calculating lost business income which run completely contrary to industry averages or trends," we find that Cowhey's assumptions were permissible, and his methodology is reliable. Here, Defendants contend that Cowhey improperly assumed that Rhoads "would be competitive in the dry docket market" despite its alleged status as a "relative neophyte" in the industry. Doc. 143 at 29. Further, they allege that he improperly assumed that the sinkholes were the cause of Rhoads' failure to obtain certain certifications for operation and to win bids for contracts. *Id.* at 29–30. These arguments are without merit.

First, we note that Cowhey only "assumes that Rhoads...would be competitive in the dry dock market," despite its alleged inexperience, to the extent that that assumption underlies Rhoads' revenue projections, which Cowhey utilized in his Scenario 2 calculations. However, as we have already set out above, it was permissible for

2021 WL 2778562

Cowhey to utilize those projections, as he independently verified their reasonableness. Moreover, his verification of Rhoads' projections reasonableness evinces a sufficient factual basis for the underlying assumption that Rhoads "would be competitive in the dry dock market." Indeed, he studied industry trends, analyzed Rhoads' contractual bids, and interviewed Rhoads' management and customers. He also utilized Rhoads' actual revenue data from 2012, its first year operating the dry dock, in which it reported $7,478,053 in revenue. Clearly, Cowhey had a sufficient factual basis to assume that Rhoads would be competitive in the market, notwithstanding any alleged inexperience.

Next, we find that Defendants' arguments as to Cowhey's assumptions that the sinkholes were the cause of Rhoads' failure to obtain certifications or to win contractual bids is misplaced. Here again, Defendants have misconstrued fundamental causation assumptions to be Cowhey's opinions. This misapprehension is illustrated in the conclusion of Defendants' arguments on this point, where they again aver that "Cowhey is not an expert in dry dock maintenance or the certification process and can offer no opinions or testimony about Rhoads' pursuit of dry dock certification," and that he "conducted no investigation regarding the reasons that Rhoads was not awarded contracts." Doc. 143 at 29–30. Defendants have essentially set out the same arguments here, under their challenge to Cowhey's reliability, as they did above in challenging his qualifications. Our resolution is thus the same. That is, Cowhey does not purport to offer opinions as to causation. He is proffered merely as a financial expert whose opinions necessarily rest on assumptions of causation and liability. *See* 📁 *Dorman*, 201 F. Supp. 3d at 690 ("All damages expert opinions are dependent...on the assumption that liability has been proven."). Rhoads will have the burden of proof at trial to establish causation and liability, and Defendants will have the opportunity to cross-examine Rhoads' causation experts as to whether their actions caused Rhoads to miss out on certifications and contracts, but it is "[t]he role of a damages expert is to calculate hypothetical damages given an assumed set of facts." *Brill v. Marandola*, 540 F. Supp. 2d 563, 570 (E.D. Pa. 2008). Accordingly, Cowhey's damages opinions are admissible, and his underlying assumptions may be probed on cross examination. [12]

**b. Extra expenses**

**\*33** Next, Defendants argue that Cowhey's opinion "regarding Rhoads' damages to repair the dry dock and surround property" are unreliable "because he does not adequately account for the conditions at the property." Doc. 143 at 31. That is, Defendants aver that Cowhey's opinion as to the cost of repairs is unreliable in that he did not establish a "baseline" condition of the property and therefore "could not segregate what repairs were the result of lack of maintenance and pre-existing conditions, or the result of pile driving...that existed prior to any Triton activity." *Id.* at 33. Specifically, Defendants take issue with Cowhey's assumption that nearly all of the repair costs resulted from the second sinkhole, which occurred following Triton's pile driving activities, as opposed to from the first sinkhole, which appeared after TranSystems' and Shoreline's pile driving. Cowhey Rep. at 15. They contend that his opinion as to these costs unreliably fails to account for damage that was present prior to any pile driving, and fails to separate damage that allegedly occurred from TranSystems' and Shoreline's pile driving, thereby pinning the entire cost on Triton. Doc. 143 at 33.

Here again, Defendants seem to have blurred the line between Cowhey's assumptions as to causation and his opinions as to damages. Indeed, Cowhey himself does not opine as to whether the first or second sinkhole caused specific damage to Rhoads' property. Rather, his opinion rests on "an assumed set of facts" (*i.e.*, that the majority of the cost of repairs resulted from the second sinkhole), as is permissible, "so long as those assumed facts are reasonably based on the evidence in the record." *Brill*, 540 F. Supp. 2d at 570. Here, the facts upon which Cowhey's opinion relies are clearly based on evidence in the record. In fact, his calculations as to repair costs are directly based on Rhoads' actual, dated invoices for the repair activities, which are appended to his report, as well as his interviews with Rhoads management. *See* Cowhey Rep. at 15; *id.* at Ex. 4.1–4.5.

While we acknowledge, as Defendants have pointed out, that some of the assumptions underpinning these specific damage calculations may conflict with other record evidence, we are also mindful that expert testimony is admissible so long as "the record contains *some* factual basis—albeit shaky—for [the] testimony." *Stecyk*, 295 F.3d at 415 n.3 (emphasis in original); *id.* ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."); *See also Giterman v. Pocono Med. Ctr.*,

Rhoads Industries, Inc. v. Shoreline Foundation, Inc., Slip Copy (2021)
2021 WL 2778562

2019 WL 1452936, at *7 (M.D. Pa. Apr. 2, 2019) ("[T]he existence of conflicting evidence is not a basis to exclude an expert's testimony."). As one district court within this circuit explained, with this background in mind, "[h]ere, the facts relied upon by [the witness] are neither nonexistent nor insufficient; they are simply disputed and should be addressed on cross-examination." *Guy Chem. Co., Inc. v. Romaco Inc.,* 2009 WL 10690008, at *3 (W.D. Pa. Oct. 26, 2009). Given the foregoing, we conclude that Cowhey's opinion regarding the cost of repairs rests on a sufficient factual basis to support its admissibility and that any deficiencies can be explored on cross examination. [13]

### 3. Fit

**\*34** Finally, Defendants challenge the "fit" of Cowhey's testimony. Their arguments here are similar to the ones we have already rejected with regard to Cowhey's qualification and reliability. That is, they contend that he "(1) made numerous unsupported assumptions; (2) relied upon unverified data provided exclusively by Plaintiff; (3) lacks any knowledge as to the industry; and (4) lacked any knowledge as to critical issues, such as certifications, that underpinned Rhoads' own projections." Doc. 143 at 34–35. They further argue that "Cowhey is not being as an independent expert" and that "[h]is testimony is nothing more than way [sic] to provide legitimacy to Rhoads' own rose-colored beliefs." *Id.* at 36.

These arguments fail with regard to the fit of Cowhey's testimony for the same reasons they failed with regard to his qualification and reliability. Namely, Cowhey's assumptions have sufficient factual support in the record, and Defendants' assertion that he failed to independently verify data is inaccurate. Further, he performed thorough research to familiarize himself with the industry, and it is not necessary for him to be an expert in dry dock certification. For these reasons, we reject Defendants' overarching argument that Cowhey is essentially a trojan horse for admitting Rhoads' projections under the guise of expert testimony. To the contrary, he utilized Rhoads' projections in calculating damages under one of two hypothetical scenarios included in his report. While one is a scenario in which Rhoads performance reached their projections, the other is a scenario in which Rhoads tracked the industry trend. More importantly, though, Cowhey did not merely shoehorn Rhoads' projection into his calculations, as Defendants allege. Rather, he independently verified their reasonableness

through extensive market research and interviews with Rhoads management and customers. We thus find that Defendants' arguments are without merit, and that Cowhey's testimony will assist the jury in understanding Rhoads claims for damages. *See TMI,* 193 F.3d at 663. Accordingly, his testimony satisfies the fit prong.

### K. Defendants' motion to preclude
### Charles Boland (Civ. No. 17-266, Doc. 146)

Finally, Triton moves to preclude another Rhoads damages expert, Charles Boland of Greyhawk, LLC. (Civ. No. 17-266, Doc. 146.) Boland was retained to provide "assistance in evaluating damage to Building 669 resulting from the sinkhole, and in determining the scope and cost of remedial measures necessary for repair of the damaged components of the building." (Doc. 158-3 at 1) ("Boland Jan. 2018 Rep."). To that end, Boland "developed cost estimates for . . .remedial work to repair impacts to Building 669 caused by the sinkhole." *Id.;* Doc. 146-2 at 1 ("Boland Feb. 2018 Rep."). Triton challenges Boland's testimony based on his qualifications, its reliability, and its fit. Triton's challenge here is predicated largely on similar bases as Defendants' challenge to Greg Cowhey's testimony. As such, Triton's motion will be denied for reasons similar to those set out above.

### 1. Qualification

Triton contends that Boland is not qualified to testify in that he is "simply not qualified to offer causation opinions in this matter given that he is not a structural or geotechnical engineer." Doc. 146 at 18. As with Cowhey, Triton's argument as to Boland improperly focuses upon his lack of qualifications to offer causation opinions despite the fact that he is proffered only as a damages expert. In fact, Triton quotes Boland's deposition testimony in which he expressly states that he is not "giving any opinions...as to causation." *Id.* at 19. Still, Triton asserts that he is "essentially offering opinions that pile driving caused the damages to Building 669." *Id.*

**\*35** Triton misapprehends Boland's opinions. Our review of his reports concludes that it is clear that he offers no opinions as to causation. Rather, as was the case with Cowhey, Boland's damages opinions are predicated on an assumption that Rhoads is able to prove liability. Specifically, Boland assumes

that Rhoads' will successfully prove Defendants' liability for the damages identified by its structural engineering expert, the O'Donnell & Naccarato ("O&N"). Boland Jan. 2018 Rep. at 2. Indeed, Boland's role is merely to prepare a "cost estimate of the remedial scope of work developed by O&N. *Id.* As discussed above, "[e]xpert opinions on damages commonly assume liability, which must be established independently." *U.S. Accu-Measurements, LLC v. Ruby Tuesday, Inc.*, 2013 WL 1792463, at *8 (D.N.J. Apr. 26, 2013). Accordingly, it was permissible for Boland to assume liability, and it is not required that he be qualified to offer an opinion as causation, as he simply does not offer any such opinion.

Triton also contends that Boland is not qualified "given his dearth of experience in maritime construction and the specific issues in this case." Doc. 146 at 19. This argument is without merit. First, there is no requirement that Boland have experience in the "specific issues in this case," as it is well established that "a broad range of knowledge, skills, and training qualify an expert." *Paoli*, 35 F.3d at 741. Moreover, as Rhoads points out, Boland "is offering an opinion about the cost to repair a two-story industrial brick and mortar building located inland dozens of yards away from the dry dock and riverfront. He is not, therefore, required to have maritime or marine construction experience." (Doc. 158 at 3.) We agree. Indeed, Triton does not challenge Boland's expertise in construction and cost analysis, which is extensive and directly applicable to the opinions he offers here. Boland has "over 40 years of experience in engineering, construction, project management, and in cost/schedule analysis." (Doc. 158-6 at 1) ("Boland CV"). Accordingly, he is qualified to testify to the opinions he offers here.

### 2. Reliability

Triton first contends that Boland's testimony is unreliable in that he did not "determine the state of Building 669 prior to the sinkhole events," and thus is unable "to segregate what repairs were the result of lack of maintenance and pre-existing conditions, or the result of pile driving from the west side...prior to any Triton activity." Doc. 146 at 20, 23. Triton's argument on this point fails for the same reason as their argument regarding Boland's qualifications; namely, it misconstrues Boland's causation and liability assumptions to be his opinions. Indeed, Triton incorrectly asserts that Boland is offering causation opinions, and that without ascertaining the pre-existing state of the Building, he cannot reliably determine which damages were caused by Triton's

pile driving as opposed to those that may have been caused by, for example, a lack of maintenance. *Id.* at 23–24. However, Boland does not offer, nor does he purport to offer, any opinions as to the cause of the damage at Building 669. Rather, his role as an expert is simply to calculate the costs of implementing the repairs that have been identified by Rhoads' causation experts as resulting from Defendants' pile driving activities. His opinion thus necessarily rests on an assumption of liability that Rhoads will prevail in proving causation for the damages identified by its causation experts.

*See* *Dorman*, 201 F. Supp. 3d at 690 ("All damages expert opinions are dependent...on the assumption that liability has been proven."). Triton therefore argues that Boland's "assumption of causation renders his testimony unreliable, but [it] does so without attacking his methodology." *Guy Chem. Co., Inc.*, 2009 WL 10690008, at *2. This argument is misdirected at Boland, as a damages expert, and is not a basis to exclude his testimony. Rhoads will have the burden at trial to independently prove liability prior to proffering Boland's opinions as to damages, and the challenges Triton has articulated here will be more properly directed at Rhoads' causation and liability experts, not Boland.

**\*36** Next, Triton argues that Boland's opinion is unreliable in that it is "now moot," as it was partially based on a bid from a contractor that "was put out to bid years ago and the contractor bid has certainly expired." Doc. 146 at 25. In addition to being "moot," Triton contends that the estimate is unreliable because it relies on a single bid, whereas Boland testified that he would have "prefer[red] to have multiple bids." *Id.* Unlike its argument with regard to causation assumptions, Triton's contention here properly challenges Boland's methodology and the reliability of his opinion. Nonetheless, we are not persuaded by Triton's argument and conclude that Boland's opinion is reliable.

The specific bid with which Triton takes issue relates to Boland's estimate of the cost to "repair visible above ground damage." *See* Boland Jan. 2018 Rep. at 1; Boland July 2020 Rep. (Doc. 158-7) at 1, 3. In his January 2018 report, Boland originally estimated the cost for this work to be $354,280. Boland Jan. 2018 Rep. at 2. In July 2020, Boland prepared a supplemental report that "provides updated cost information for repairs based on actual proposals." Boland July 2020 Rep. at 1. "To better gauge the cost associated with required repairs," Boland "put the work out for bid." *Id.* Boland initially did not receive any bids, and "[i]t was determined that additional information was necessary to allow the contractors to price the work." *Id.* He then sent out

another invitation for bids and this time received a bid from only one contractor, General Masonry and Restoration Inc. ("General Masonry"). *Id.* General Masonry estimated the cost to "repair visible above ground damage" to be $2,657,359. [14] *Id.* Triton contends that Boland's methodology is unreliable in that he received only a single bid, and that the scope of the work for the second round of bid invitations was increased relative to the first round. We are not persuaded.

We note initially that soliciting and reviewing actual bids from contractors strikes us as being a generally reliable methodology for estimating the cost to complete construction projects. Indeed, Triton does not appear to take exception with the use of bids to obtain cost estimates generally. Rather, it specifically contends that one bid is insufficient, particularly in light of Boland's testimony that he would have "prefer[red] to have multiple bids." It further contends that the scope of the work outlined in the bid invitation was improper. In response, Rhoads argues that Boland's reliance on General Masonry's bid is permissible in that he testified that he found the bid to be "comprehensive" and that General Masonry is an experienced contractor. Doc. 153 at 7. Rhoads further argues that it was necessary for Boland to expand the scope of the work in the second bid invitation, because as Boland explained, "one of the reasons no bids were provided after the first invitation is because the contractors did not think it was safe or feasible" to perform only the more limited repairs outlined in the first bid invitation. *Id.* at 7–8.

 **\*37** While we agree with Triton—and with Boland, for that matter—that more bids may have been preferable, we are not persuaded that this warrants preclusion of Boland's testimony. Indeed, it is not required that an expert's testimony "has the best foundation, or even [that]...the opinion is supported by the best methodology or unassailable research." *Karlo*, 849 F.3d at 81). Rather, "expert testimony is admissible so long as "the record contains *some* factual basis— albeit shaky—for [the] testimony." *Stecyk*, 295 F.3d at 415 n.3 (emphasis in original); *id.* ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").

Here, Boland explained in his deposition that General Masonry "provided a comprehensive bid" and was experienced in completing the specific work that was called for. Boland Dec. 21, 2020 Dep. at 32:7–33:15. Further, the fact that the scope of the work to be completed was increased

for the second round of bid invitations does not render his opinion unreliable, particularly considering his determination that it was necessary to expand the scope to make it "safe and feasible" for the work to be completed. Accordingly, we conclude that there is a sufficient factual basis for Boland's opinion and that the scope of quantity of bids that informed that opinion may be explored on cross examination. *See* 🚩 *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 3. Fit

Finally, Triton challenges the "fit" of Boland's opinion. It argues that his testimony will not help the jury to "understand the evidence or to determine a fact in issue" because his "estimates were based solely on RS Means Construction estimates" and "[t]he estimates he provided were not specific to this case." Doc. 146 at 27. These arguments are without merit.

Boland's reports demonstrate that the estimates he provided were in fact "specific to this case." Indeed, he worked directly with Rhoads' causation experts to understand what repairs were needed based on their determinations of the damage caused by Defendants' pile driving. *See, e.g.*, Boland Jan. 2018 Rep. at 1. For example, his report specifically states that O&N "identified specific areas of distress visible at [Building 669]...that were occasioned by the sinkhole," and that he prepared cost estimates for the "remedial construction work scope" suggested by O&N. *Id.* at 2. Thus, it cannot be said that his estimates "were not specific to this case." Further, it was permissible for him to determine the cost of those repairs suggested by O&N using RS Means. *See* 🚩 *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 205 (E.D. Pa. 2014) ("RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country. It has been used in the construction/building industry for almost 40 years.").

Taken together, we conclude that Triton's arguments as to the fit of Boland's opinions are without merit. Rather, his testimony will assist the jury to understand and evaluate the cost to repair damages to Building 669 allegedly resulting

from Defendants' pile driving activities. *See* 🚩 *TMI*, 193 F.3d at 663. Accordingly, his testimony satisfies the fit prong.

## IV. CONCLUSION

For the reasons set out above, we have determined, in light of the liberal standards of admissibility embodied in Fed.R.Evid. 702, that the parties' expert witnesses are largely "qualified" and that their opinions are "reliable" and "fit" the facts of this case. Our resolution of the motions addressed in this omnibus opinion is therefore consistent with the directive that "rejection of expert testimony is the exception and not the rule." Fed.R.Evid. 702. An appropriate order follows, setting out our specific resolution of each motion, consistent with the determinations and reasoning discussed herein.

**All Citations**

Slip Copy, 2021 WL 2778562

## Footnotes

1    For example, in a given project, practical refusal criteria may establish that practical refusal occurs where pile driving requires "4 to 5 blows for 0.25 inches of penetration." Garbin Rep. at 4.

2    While we note that Wilshaw reviewed reports prepared by third parties that discuss recommendation of vibration monitoring, see Wilshaw Rep. at 16, 25, we observe that Wilshaw himself did not offer any opinions as to whether or what extent Defendants should have recommended vibration monitoring.

3    Additionally, we note that the omission of any opinion as to the recommendation of vibration monitoring from Wilshaw's report is itself a sufficient basis upon which to preclude him, in the exercise of our discretion, from offering testimony to that effect. *See* Fed.R.Civ.P. 26(a)(2)(B)(i) (expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them"); *see also* Fed.R.Civ.P. 37(c)(1) ("If a party fails to provide information...as required by Rule 26(a)...the party is not allowed to use that information...at a trial, unless the failure was substantially justified or is harmless.").

4    We note, however, that this determination does not necessarily foreclose the possibility that Wilshaw could be permitted to offer rebuttal testimony on this subject in the event that Defendants' experts' testimony opens the door to it, pursuant to Fed.R.Evid. 703. *See, e.g.,* 🚩 *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006).

5    We acknowledge that Strohman's opinion regarding maintenance and repairs express a higher degree of likelihood than his opinions regarding other potential contributors. However, we nonetheless find that his opinion with regard to these causes similarly rests on good grounds in that he considered dry dock repair requirements, dry dock maintenance records, and deposition testimony of Rhoads employees. Strohman Rep. at 130–33.

6    We also note Rhoads' argument that Fellenius's opinion is unreliable because he "did not include the raw data" from NOAA used to assess the amount of rainfall and create the chart contained in his report. Rhoads has not cited any authority supporting the proposition that a failure to include underlying data, where the expert has provided a summary of it, is sufficient grounds for the preclusion of expert testimony. Rather, there are numerous less drastic remedies than preclusion available for this issue, by which TranSystems and Shoreline could provide the underlying data to Rhoads. However, we also note that Rhoads has apparently already obtained this data, as he references it in his brief in arguing that Fellenius's use of it is unreliable. Doc. 151-2 at 8.

7    To the extent that Rhoads also challenges the admissibility of this opinion under Fed.R.Evid. 403, we reject that argument as well. That rule permits the Court to exclude evidence "if its probative value is substantially outweighed by a danger of," inter alia, "confusing the issues [and] misleading the jury. Fed.R.Evid. 403. We find that Fellenius's testimony has high probative value and only a small risk of confusing the issues or misleading the jury. Rhoads seems to argue that the difference between a running average of rainfall and individual yearly rainfall is misleading to the jury. However, any confusion that might result from this distinction can easily be alleviated through effective cross-examination. *See, e.g.,* 🚩 *Mitchell*, 365 F.3d at 234 (reliable testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.").

8    Rhoads asserts, and Triton does not dispute, that Triton was provided the relevant new data at least by October 8, 2020, when expert paper discovery concluded. However, Triton did not then provide to Irwin for his review until November 23, 2020, only one day prior to his scheduled deposition. This delay resulted in Triton rescheduling Irwin's deposition. Triton has offered no explanation or justification for this delay.

9    Further, even if were not to exclude Vitzthum's testimony pursuant to Fed.R.Civ.P. 37(c) for failure to comply with Fed.R.Civ.P. 26(a), we would nonetheless preclude it pursuant to Fed.R.Civ.P. 702 as unreliable. Indeed, while "[t]he standard for reliability is not that high," expert testimony must still be supported by "good grounds." *Karlo*, 849 F.3d at 81. Further, while the facts and assumptions underlying an expert's opinion are generally issues for cross examination and not preclusion, the opinions must still have at least "*some* factual basis," even if it is "shaky." *Stecyk*, 295 F.3d at 415 n.3; *see also, e.g., Guy Chem. Co., Inc. v. Romaco Inc.*, 2009 WL 10690008, at *3 (W.D. Pa. Oct. 26, 2009)* ("Expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to the jury.") (quoting 🚩 *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983))). Here, Vitzthum summarizes his opinion as follows: "It is my opinion, within a reasonable degree of professional certainty, that Rhoads' claim that it potentially lost government contracts and revenue from 2013 to present, when the dry dock has not had any form of certification since 1993, is unreasonable." Vitzthum Rep. at 2. There is no factual support in the record for the proposition that "the dry dock has not had any form of certification since 1993." To the contrary, Rhoads has provided certifications from 2012 (Doc. 144-6), 2015 (Doc. 144-7), 2017 (Doc. 144-8), and 2020 (Doc. 144-9). This contradiction with record evidence is not merely the sort of "conflicting evidence that is not a basis to exclude an expert's testimony." *See Giterman v. Pocono Med. Ctr.*, 2019 WL 1452936, at *7 (M.D. Pa. Apr. 2, 2019). Rather, Vitzthum's inaccurate assertion that Rhoads' dry dock had no certifications after 1993 finds no support in the record, yet it is central to his conclusions. Under these circumstances, it cannot be said that Vitzthum's opinion has a sufficient factual basis to be reliable.

10    Further, to the extent that Rhoads argues that Schofield's statements as to the areas of his own expertise are determinative, he has also included on his CV that he is an expert in "Construction Management," "Underwater Construction and Inspection," "Building Science," "Diving and Underwater Inspection," and "Property Maintenance." Schofield CV at 1. All of these areas of expertise are related to his inspection of Rhoads' facilities at issue.

11    We note that, had the issue properly been raised, we may have been inclined to preclude certain of Grover's opinions, namely, those that may amount to legal conclusions. Indeed, "[t]he Federal Rules do not permit experts to testify as to legal conclusions." *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 533 (D. Del. 2009) (citing *Highway Materials, Inc. v. Whitemarsh Tp., Montgomery County, Pa.*, 2004 WL 2220974, at *19 (E.D. Pa. Oct. 4, 2004)). Here, however, Grover has stated that Rhoads "ha[d] the responsibility to mitigate its damages" but that it "has not performed its duty to mitigate its damages." Grover Rep. at 38, 39. Grover also opined that, "unless the Plaintiffs can prove to the trier of fact that the pile driving activity caused the sinkholes to form, then absent such proof, there are no damages

2021 WL 2778562

for Lost Business Income attributable to the Defendants." *Id.* at 9. However, the issue as to whether these particular opinions should be precluded as impermissible legal conclusions was not properly raised in the motion before us. While Rhoads complained in its initial brief that Grover "acts like an attorney conducting cross-examination of an expert witness," it did not argue that any of his opinions should be precluded as legal conclusions. Doc. 150-2 at 10. Further, although Rhoads in its reply brief highlighted Grover's opinions as to the duty to mitigate damages and the burden to prove liability, it still did not argue that these opinions should be precluded as legal conclusions. Moreover, even if Rhoads had clearly articulated such a challenge, it was impermissible for it do so in the first instance in its reply brief, as doing so would deprive Defendants' opportunity to respond. Of course, our resolution of this motion is without prejudice to Rhoads' ability to object at trial should Grover attempt to opine as to a legal conclusion. *See Holman Enterprises v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) ("The district court must limit expert testimony so as to not allow experts to opine on 'what the law required' or 'testify as to the governing law.' ") (quoting *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir.1991)).

12    Additionally, we note Defendants' argument that Cowhey's application of industry trends based on information from the IBIS World Industry Report is unreliable in that he "ignored the fact that the publication predicted a major decline of 4.8% relative to Covid and other factors." However, as Rhoads points out, any covid-related decline in the industry would not bear on Cowhey's report in that his calculations only extend out until 2019. Defendants' contention on this point is unfounded.

13    We observe that, in addition to challenging Cowhey's testimony on his alleged failure to account for the condition of the property, Defendants assert that Cowhey's calculations resulted in figures that are "overstated, inappropriate and/or unsupported." Doc. 143 at 33. They contend that this deficiency results from "a lack of objective data," for example, regarding "the historical frequency and volume of mud removal." *Id.* We find that this contention is without merit. As set out above, Cowhey relied on documentation including invoices from repair activities to determine expenses. To the extent that Defendants dispute that data underpinning his calculations, they have articulated a challenge to the weight of Cowhey's opinions, not their admissibility. *See Walker v. Gordon*, 46 F. App'x 691, 695–96 (3d Cir. 2002). ("An expert is...permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury.").

14    Triton's argument does not specifically address the significant difference between Boland's initial estimate and the one updated to reflect the bid received from General Masonry. Nonetheless, we observe that, in his report, Boland explained that the cost estimate differed from his initial estimate due to "the extent of the work to be done." *Id.* That is, he explained that his initial estimate "was based on doing only the brick and concrete replacement specifically depicted on the drawing prepared by O'Donnell & Naccarato," which included only repairing "the first-floor area of the brick wall." *Id.* at 2. However, he explained that "one of the reasons no bids were provided after the first invitation is because the contractors did not think it was safe or feasible to repair only the first-floor portion of the wall," and that consequently, "the second [bid] invitation included instruction to rebuild the damaged façade all the way to the parapet at the roof of the building. The length of time for this additional work...increased the estimated costs from the original estimate by Greyhawk." *Id.*

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1792463

2013 WL 1792463
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

U.S. ACCU–MEASUREMENTS, LLC, et al., Plaintiffs,

v.

RUBY TUESDAY, INC., Defendant.

Civ. No. 2:10–5011 (KM).
|
April 26, 2013.

**Attorneys and Law Firms**

SM Chris Franzblau, Franzblau Dratch, PC, Livingston, NJ, for Plaintiffs.

Edward A. Greenberg, Ward Greenberg Heller & Reidy LLP, Marlton, NJ, for Defendants.

**OPINION**

KEVIN McNULTY, District Judge.

**\*1** This action arises from a dispute between Ruby Tuesday, Inc. ("Ruby Tuesday"), and two of its external lease auditors, U.S. Accu–Measurements, LLC ("USAM"), and Ross Consulting Group, Inc. ("RCG"). [1] USAM and RCG undertook to audit leases to determine if Ruby Tuesday, a restaurant chain, was being overcharged by its landlords. The agreements between Ruby Tuesday and the auditors contained a contingent fee arrangement, the scope of which is disputed. As plaintiffs, USAM and RCG claim a percentage of overcharges uncovered by their audits. The plaintiffs also contend that Ruby Tuesday used or should have used the audit results to prise favorable settlements from the landlords, and claim a share of the resulting savings as well.

USAM and RCG have proffered the report of an expert on damages, Lawrence Chodor. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Federal Rule of Evidence 702, Ruby Tuesday has moved to preclude Chodor from testifying. Ruby Tuesday's motion includes a summary judgment component because it alleges that, once Chodor's testimony is excluded, USAM cannot make a *prima facie* case of damages.

Ruby Tuesday has proffered the reports of its own damages expert, David H. Glusman, and an expert on the restaurant business, Ronald N. Gorodesky. USAM and RCG have cross-moved to exclude their testimony.

I find that the proffered expert testimony comports with the applicable legal standards under Rule 702 and *Daubert*. I will therefore deny both parties' motions.

**I. FACTS & PROCEDURAL HISTORY** [2]

A. *The USAM and RCG Agreements*

Ruby Tuesday engaged USAM and RCG to audit certain leases. The audits were to focus on overcharges or inaccuracies in common area maintenance ("CAM") charges for which landlords billed Ruby Tuesday. (Def. Statement of Material Facts ("DSMF") ¶ 2 [ECF No. 15–2] ). Ruby Tuesday entered into two relevant audit agreements: the USAM Agreement and the RCG Agreement.

The USAM Agreement, dated May 29, 1998, is confined to certain listed leases. (Ex. A to DSMF at 2 [ECF No. 15–4] ). It states that USAM is to be paid a contingent fee, based upon

> a realization in fact by [Ruby Tuesday] of refunds made by landlords or their assigns, predicated upon information documented by [USAM] that overcharges in fact occurred. Remuneration is to be made ... only when, as and if refunds and cost reductions are realized, as received by [Ruby Tuesday], and whether in cash, kind, or by way of rental credit.

(*Id.* at 1).

That contingent fee is to be calculated in two ways. USAM is to receive

- 50% of Ruby Tuesday's gross monetary recovery for overpayments from the date of the lease's inception through the year the lease was analyzed, and

- 25% of the gross adjustments and/or corrections of overcharges which would have taken place over the five years subsequent to the year the lease was analyzed.

(*Id.*). Both sides pledge "good faith cooperation" to achieve effective results for Ruby Tuesday under the Agreement. (*Id.* at 2).

**\*2** The RCG Agreement, dated April 6, 2001, is confined to leases with a particular landlord, the Simon Property Group ("Simon Property"). (Ex. B to DSMF at 1–2 [ECF No. 15–5] ). It incorporates the contingent fee structure of the USAM Agreement. (*Id.*). It contains an additional provision in which Ruby Tuesday "agrees to immediately advise RCG if Landlord attempts to negotiate a settlement(s) directly with [Ruby Tuesday]. If [Ruby Tuesday] elects to negotiate directly with Landlord, [Ruby Tuesday] agrees to work closely with RCG during said negotiations and to fully disclose the terms of the proposed and final settlement(s) to RCG." (*Id.* at 2).

B. *The USAM Audit and the General Growth Properties Settlement*
Around 2001, USAM prepared an audit of Ruby Tuesday's leases with General Growth Properties ("General Growth"), the landlord for two Ruby Tuesday-operated restaurants at the Mizner Park mall in Boca Raton, Florida. (*Id.* ¶¶ 15, 19). That audit found that Ruby Tuesday had a $900,000 claim (*id.* ¶ 21), which General Growth disputed (*id.* ¶ 28).

In 2009, Ruby Tuesday and General Growth reached a settlement (the "General Growth Settlement") with respect to the early termination of the lease for a closed restaurant at the Mizner Park mall. (*id.* ¶ 47). Ruby Tuesday agreed to waive the claims in the USAM audit report and, in exchange, General Growth forgave $165,000 in back rent. Ruby Tuesday then paid RCG $82,500; that represented RCG's 50% share, under the RCG Agreement, of the $165,000 in back rent saved in the General Growth Settlement. (*Id* . ¶ 48).

C. *The RCG Audit and the Simon Property Group Settlement*
Around 2003, RCG prepared a lease audit involving 27 Ruby Tuesday restaurants at shopping centers owned by Simon Property. (DSMF ¶¶ 15–16). The audit report established a total claim of $1,052,000.00 against the landlord, Simon Property. (*id.* ¶ 21).

In 2009, Ruby Tuesday began negotiating with Simon Property for the early termination of leases for seven restaurants located in Simon Property shopping centers. (*id.*

¶ 40). Simon threatened to end negotiations on the lease terminations unless Ruby Tuesday dropped all claims based on the issues identified in RCG's audit report. (*id.* ¶ 41).

Ruby Tuesday did drop the claims identified in the RCG audit report. Indeed, to terminate these leases early, Ruby Tuesday paid Simon Property $2,015,000. That payment represented 47.3% of the total future rents that would have come due if the terminated leases had remained in effect for their full terms. (the "Simon Property Settlement"). (*id.* ¶¶ 42–43).

D. *USAM Files Suit*
Superior Court of New Jersey, Chancery Division, Essex County. The Complaint alleged that Ruby Tuesday had failed to pay the contingent fees owed to USAM and RCG in the wake of the Simon Property and General Growth Settlements. It included causes of action for breach of contract, breach of express and implied covenants of good faith and fair dealing, unjust enrichment, and an accounting.

**\*3** On September 29, 2010, Ruby Tuesday timely removed the case to this Court. USAM is a limited liability company whose sole member, Martin C. Mayer, is a citizen of Florida. RCG is a New Jersey corporation with its principal place of business in New Jersey. Ruby Tuesday is a corporation formed under the laws of Georgia with its principal place of business in Tennessee. Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, subject matter jurisdiction is proper. 28 U.S.C. § 1332. Venue is proper because this District encompasses the state court where the action was originally filed. 28 U.S.C. § 1441(a).

On January 12, 2012, Ruby Tuesday filed this Motion to Exclude Expert Testimony and for Summary Judgment. On February 7, 2012, USAM and RCG filed a Cross–Motion to Exclude Expert Testimony. The motions were administratively terminated to permit mediation, but they were restored to the calendar on August 2, 2012.

**II. LEGAL STANDARD**

A. *Expert Testimony*
Federal Rule of Evidence 702 ("Rule 702"), which covers the admissibility of expert testimony, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–43 (3d Cir.1994) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc. .,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993))).

"Qualification refers to the requirement that the witness possess specialized expertise." *Schneider,* 320 F.3d at 404. This is interpreted liberally: "a broad range of knowledge, skills, and training qualify an expert." *Paoli,* 35 F.3d at 741. A reliable opinion is "based on 'the methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' " *Paoli,* 35 F.3d at 742 (citing *Daubert,* 509 U.S. at 590). Reliability is a "flexible" test. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (internal citation omitted). Last, the expert opinion must fit the issues in the case, i.e., it must be relevant and "assist the trier of fact." *Paoli,* 35 F.3d at 742–43.

Rule 702 also requires that "[t]he party offering the proposed expert testimony bear[ ] the burden of establishing the admissibility of the testimony by a preponderance of the evidence." *In re Human Tissue Products Liab. Litig.,* 582 F.Supp.2d 644, 655 (D.N.J.2008) (citing *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 417–18 (3d Cir.1999). The inquiry

requires the court to "examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

**\*4** The District Court serves as a gatekeeper to prevent expert testimony that falls short of these requirements from reaching the jury. *Daubert,* 509 U.S. at 592–95. A judge has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire,* 526 U.S. at 142 (internal citation omitted) (emphasis in original).

B. *Summary Judgment*

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law"); *Alcoa, Inc. v. U.S.,* 509 F.3d 173, 175 (3d Cir.2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex,* 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex,* 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial ." Fed.R.Civ.P. 56(e); *see* *Anderson,* 477 U.S. at 247–48. In evaluating a summary judgment motion, a court must view all evidence in the light most

**U.S. Accu-Measurements, LLC v. Ruby Tuesday, Inc., Not Reported in F.Supp.2d (2013)**
2013 WL 1792463

favorable to the nonmoving party. 📙 *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); 📙 *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

### III. ANALYSIS

Each party argues that the other's expert testimony should be excluded for failure to meet the standards set forth in Rule 702 and *Daubert.* Ruby Tuesday also moves for summary judgment on the grounds that if the plaintiffs' expert is excluded, they cannot make a *prima facie* case of breach of contract.

#### A. *Ruby Tuesday's Motion to Exclude the Wiss Report (Chodor) Testimony*

Ruby Tuesday contends that the testimony of the plaintiffs' damages expert, Lawrence Chodor, is not reliable and should be excluded. Ruby Tuesday contends that (1) Chodor accepted the plaintiffs' version of the facts without verifying or analyzing the underlying audit data; (2) Chodor's methodology for calculating damages does not account for Ruby Tuesday's alternative explanations; and (3) Chodor's opinions incorporate legal conclusions. [3]

**\*5** The governing standard is a flexible one. After reviewing the underlying reports, I do not find that Chodor's testimony must be excluded. As a basis for his opinion, he was entitled to rely on the audits. The underlying facts are of course subject to proof (and to attack) based on the testimony of witnesses and documentary evidence. Chodor's methodology for calculating damages meets the reliability requirement of Rule 702 and *Daubert.* What Ruby Tuesday calls "legal conclusions" are really this damages expert's assumptions as to the substance of a breach of contract claim that may (or may not) be established at trial. Therefore, Ruby Tuesday's motion is denied.

#### 1. *The Wiss Reports*

Lawrence Chodor, assisted by Joseph L. Ottaiano, CPA, issued three reports. The first, entitled "Economic Damages Report," is dated August 15, 2011. ("Wiss Report"[4] at 1, Ex. M to DSMF [ECF No. 15–18] ). In that first report, Chodor concludes that Ruby Tuesday's breach of contract caused USAM total economic damages of $1,143,683. (*Id.*). My analysis focuses on this report.

In preparing the Wiss Report, Chodor spoke to the principals of USAM and RCG, who prepared the audits, and also reviewed and relied upon numerous documents, including the pertinent leases, agreements, settlements, emails and correspondence. (*Id.* at 8–10 (listing documents)). The report assumes the validity of the allegations of contractual breach—*i.e.,* that Ruby Tuesday used the audits to bring about the Simon Property Settlement and did not fully pursue the claims uncovered by the General Growth audit, in violation of the parties' agreements. (*Id.* at 3).

The component of the plaintiffs' damages resulting from the Simon Property Settlement, as calculated in the report, totals $776,183. (*Id.* at 4). To reach that figure, Chodor started from the value of the rent payments Ruby Tuesday would have been obligated to make over the remaining term of the cancelled leases. This figure he discounted to a present value by applying a risk-free (20–year Treasury bond) rate of return. From that discounted figure Chodor subtracted the amount that Ruby Tuesday had already paid Simon Property in connection with the settlement. (*Id.* at 3). The difference between the value of what Ruby Tuesday would have paid on the leases and what it did pay in the settlement amounted to $1,552,365. From this figure Chodor took 50%, RCG's share under the contingent fee portion of the agreement. (*Id.* at 3, 4).

The component of the plaintiffs' damages resulting from the General Growth Settlement is calculated at $367,500. (*Id.*). Here, Chodor took at face value the audit's conclusion that Ruby Tuesday had a claim against General Growth in the amount of $900,000, and assumed that Ruby Tuesday's failure to pursue that claim gave rise to liability. Pursuant to the 50% contingent fee arrangement, USAM would have been entitled to $450,000. From that figure, however, Chodor subtracted the $82,500 that Ruby Tuesday had already paid USAM in connection with the General Growth settlement. (*Id.* at 3–4). [5]

#### 2. *Chodor's Use of the Audits and Related Challenges*

**\*6** Ruby Tuesday argues primarily that Chodor's opinion is invalid because it relies on the USAM and RCG audits without verification or analysis. In Ruby Tuesday's view, the Agreements entitle USAM and RCG, not to a share of all savings on the relevant leases, but only to amounts Ruby Tuesday saved *as a direct result* of the audits. Ruby Tuesday also disagrees with Chodor's use of a low, "risk-free" discount rate to calculate the present value of future lease payments. These errors, claims Ruby Tuesday, render

2013 WL 1792463

Chodor's testimony unreliable and therefore inadmissible. I disagree. [6]

*First,* I find that Chodor's reliance on the USAM and RCG audits satisfies the requirements of Rule 702. Such audits are no different from other sources commonly relied on by experts in the field. (I also note that the audits were not the entire factual foundation for Chodor's calculation of damages.)

An "expert's testimony must be accompanied by a sufficient factual foundation...." 🏴 *Gumbs v. Int'l Harvester, Inc.,* 718 F.2d 88, 98 (3d Cir.1983); *see* 🏴 *Elcock v. Kmart Corp.,* 233 F.3d 734, 755 (3d Cir.2000) (damage calculations require a sufficient factual foundation). That foundation, however, need not consist of admissible evidence:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. Fed.R.Evid. 703; *see* 🏴 *Daubert,* 509 U.S. at 592 ("an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"). To put it another way, the information relied on by the expert need not itself satisfy the *Daubert* requirements. *See id.* at 593–95.

Here, Chodor reviewed and relied upon the USAM and RCG audits themselves, interviews with the principals, and various documents, including the pertinent leases, agreements, settlements, emails and correspondence. (*See* Wiss Report at 8–10, Ex. M to DSMF [ECF No. 15–18] ). The audits were conducted by USAM and RCG, professionally qualified firms. Ruby Tuesday commissioned the audits and seemingly relied upon them for its own business purposes, including the extraction of concessions from its landlords. As professional assessments of the validity, or not, of the landlords' charges under the leases, they were relevant to Chodor's formulation of his opinion as to damages. While Chodor concededly did not personally verify the audits, he was not required to do so. His brief was limited: assuming the results of the audits to be valid, he was to calculate what damages would result. Of course the plaintiffs will have to establish liability, as well as damages, but they are entitled to make their case one witness at a time. As USAM and RCG point out, fact witnesses will establish (at this procedural

stage, I would say *attempt* to establish) the foundation of the audits. Attacking the factual foundations of an expert opinion is the ordinary stuff of cross-examination at trial. If the plaintiffs' proofs fail to convince the fact finder of the validity of the audits, then Chodor's calculations of damages may likewise fail. [7]

**\*7** *Second,* I cannot find that that Chodor's opinions are inadmissible merely because they are inconsistent with Ruby Tuesday's interpretation of the USAM and RCG Agreements. Ruby Tuesday views the Agreements as requiring payment only for dollar savings that were the direct result of the audits. The relevant provision of the USAM Agreement (incorporated in the RCG Agreement), however, is not so clearly limited. It states that the auditors' "remuneration is contingent and based upon a realization in fact by [Ruby Tuesday] of refunds made by landlords ... predicated upon information documented by [USAM] that overcharges in fact occurred." (Ex. A to DSMF at 1). Moreover, the Agreements contain express and implied obligations of good faith cooperation. The RCG Agreement appears also to contain explicit safeguards against Ruby Tuesday's dealing directly with the landlords to circumvent the contingent fee obligation.

This could all mean what Ruby Tuesday says it does. It could also mean, however, that the auditors should be paid based on any benefit Ruby Tuesday extracted from the landlords after USAM or RCG identified overcharges. Or the correct interpretation could be somewhere in the middle. Ultimately, whether Ruby Tuesday is in breach of the payment provision of the Agreements is for the fact finder to decide.

The conclusions of damages experts are quite commonly contingent upon the establishment of liability. Chodor was not unreasonable in calculating damages based on his clients' theory of liability, which, as I have said, remains to be established but is not unreasonable. (*See* Wiss Reply Report at 4). *If* the plaintiffs' interpretation of the Agreements does not prevail, or prevails only in part, then the validity of Chodor's conclusions may suffer accordingly. But that is not a basis to exclude Chodor's testimony.

Ruby Tuesday contends that the use of two different methodologies renders Chodor's testimony arbitrary and inconsistent, but I do not reach the same conclusion. In one instance, the Simon Property Settlement, Ruby Tuesday allegedly used the RCG audit in negotiations to obtain benefits from the landlord. Chodor used the amount of that

2013 WL 1792463

settlement as a basis for his damages calculation. As to the General Growth Settlement, the situation is different. Defendants do not claim that Ruby Tuesday directly used the audit to pressure the landlord. Rather, the claim is that Ruby Tuesday failed to fully pursue claims against the landlord, thus denying USAM its contingent share. Different situation, different methodology. The expert's methods may be subject to attack, but that is not a basis to exclude his testimony entirely.

*Third,* I will not exclude Chodor's testimony based on his use of a risk-free rate of return to calcula te the present value of future lease payments in connection with the Simon Property Settlement. His report states:

> We do not believe that the use of Simon's cost of capital rate in lieu of the risk-free interest rate is appropriate. In any event, the period included in the Wiss present-value calculation is 2009 through 2015. Based on the current interest rate environment, Simon's 5.69% rate seem[s] high. We believe that Ruby Tuesday's risk of default was low and that a risk free rate is justified.

**\*8** (Wiss Reply Report at 5). Chodor's decision to use the risk-free rate of return was not arbitrary. Current interest rates are historically low, and have been so for some time. Chodor also noted what he viewed as Ruby Tuesday's low risk of default. To Chodor, a rate of 5.69% was therefore overly generous. May these assumptions be attacked? Certainly. But they meet the standard for admissibility set forth in Rule 702 and *Daubert.*

### 3. *Ruby Tuesday's Alternative Explanations*
Ruby Tuesday argues that Chodor's testimony is unreliable because he does not account for factors other than the audits that may have contributed to the Simon Property and General Growth Settlements.

Chodor addresses this critique in the Wiss Reply Report. He states that these concurrent factors, identified in the report of Gorodesky,

address the potential mind set of a landlord in a broad sense. It is impossible to attempt to quantify these factors or place relative weights on them as they pertain to the [Simon Property Settlement]. They are subjective factors and concepts for which neither the RAS Report nor the Marcum Report can place a value.... Their exact impact on the negotiations and ultimately the termination amount is impossible to quantify.

We note that Ruby Tuesday, a major national tenant in a real estate environment of increasing vacancies, would likely find Simon receptive to Ruby Tuesday's CAM audit claims and that Simon would be motivated to resolve the outstanding issues equitably and not attempt to strong-arm or stonewall any negotiation attempts by Ruby Tuesday.

(Wiss Reply Report at 5, Ex. 4 to Chodor Dep., Ex. P–1 to DSMF at 229).

That is a reasonable explanation for Chodor's exclusion of these concurrent factors from his damages calculation. *Paoli,* 35 F.3d at 760. [8] Once again, Ruby Tuesday has identified potential bases to attack Chodor's opinion, not to exclude it.

### 4. *The "Legal Conclusions" in the Wiss Report*
Ruby Tuesday argues that the Wiss Report is rife with legal conclusions that render Chodor's testimony excludable. The contested statements boil down to two types.

The first type of statement concerns Ruby Tuesday's alleged breach of the Agreements. (*See* Ruby Tuesday Br. at 28 [ECF No. 15–3] (listing statements)). Such statements are not, and are not presented as, Chodor's expert conclusions. They are more properly viewed as assumptions regarding liability on which Chodor based his calculation of damages. Expert opinions on damages commonly assume liability, which must be established independently.

The second type of statement relates to the calculation of the auditors' contingent fees. Chodor took the Agreements to mean that USAM was entitled to 50% of any savings realized from settlements where the claims in its audit were fully pursued. Where the claims were not fully pursued, USAM was entitled to 50% of the value of the claims uncovered by the audit. That is a reasonable assumption upon which to base a calculation of damages. If the assumption does not pan out before the fact finder, Chodor's opinion may turn out

to be worth little. But again, that is a merits issue, not an admissibility issue.

**\*9** That distinction between the threshold of admissibility and the burden of persuasion must always be kept in mind in the Rule 702 context. "The evidentiary requirement of reliability is not that high." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 247 (3d Cir.2008. (quoting *In re TMI Litig.,* 193 F.3d 613, 665 (3d Cir.1999)). "While a litigant has to make more than a prima facie showing that his expert's methodology is reliable, we have cautioned that '[t]he evidentiary requirement of reliability is lower than the merits standard of correctness.' " *Id.* (quoting *Paoli,* 35 F.2d at 744). That "merits standard of correctness" is for the fact finder to consider and apply. Before the fact finder does so, Ruby Tuesday will have the chance to attack USAM's and RCG's figures through cross-examination and the presentation of contrary evidence. *See Daubert,* 509 U.S. at 596.

Rule 702 permits a wide range of testimony as long as the expert is qualified and the testimony is reliable and relevant. Chodor's proffered testimony meets the standard of admissibility under Rule 702. Ruby Tuesday's motion to exclude his testimony will therefore be denied.

### B. *Ruby Tuesday's Motion for Summary Judgment*

Ruby Tuesday has moved for summary judgment because, in its view, once Chodor's testimony is excluded, the plaintiffs cannot make an adequate showing of damages. Without proof of damages, the plaintiffs' cause of action for breach of contract would be lacking an essential element.

Because I have found that Chodor's testimony should not be excluded, *see supra* III.A., the basis for Ruby Tuesday's motion drops out. *See Murphy v. Implicito,* 392 N.J.Super. 245, 265, 920 A.2d 678, 689 (App.Div.2007). Summary judgment in favor of Ruby Tuesday is therefore inappropriate, and its motion is denied.

### C. *USAM's Cross–Motion to Exclude Ruby Tuesday's Expert Reports*

The plaintiffs, USAM and RCG, have cross-moved to exclude Ruby Tuesday's proffered expert testimony, previewed in two expert reports. First, the plaintiffs argue that the RAS Report, prepared by Ronald Gorodesky, is not relevant because it discusses factors generally at play in landlord-tenant negotiations without tying them to the particulars of

this case. Second, the Marcum Report, written by David Glusman, relies on the RAS Report. Once the RAS Report is excluded, say the plaintiffs, the Marcum Report must also fall out of the case. [9]

The crux of the plaintiffs' case is that Ruby Tuesday used or should have used the USAM and RCG audits to prise favorable settlements from Simon Property and General Growth. Ruby Tuesday, however, contends (*inter alia* ) that factors independent of the audits led to, or contributed to, these settlements. Identification of such other factors would therefore be relevant to this dispute.

The RAS Report is dated September 11, 2011. (RAS Report, Ex. L to DSMF [ECF No. 15–17] ). In it, Gorodesky cites seven factors that a landlord considers when negotiating the early termination of a tenant's lease in return for a lump sum payment. (*Id.* at 2–3, 920 A.2d 678). The Report also states that the discount a tenant tends to receive, expressed as a percentage of total future rent due, varies widely from 10% to 90% but is typically 40–50%. (*Id.* at 4, 920 A.2d 678). As noted by the plaintiffs, Gorodesky does not connect these general principles to the settlements between Ruby Tuesday and Simon Property/General Growth or to any other fact specific to this case. In the plaintiffs' view, this renders the report irrelevant and inadmissible.

**\*10** The Advisory Committee Notes to Rule 702 explicitly authorize an expert opinion as to general principles:

> [I]t might also be important in some cases for **an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.** For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment [codifying the reliability standards in *Daubert* and *Kumho Tire* ] does not alter **the venerable practice of using expert testimony to educate the factfinder on general principles.** For this kind

of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed.R.Evid. 702 (comments addressing 2000 Amendments) (emphasis added).

Gorodesky's testimony fits within the principles outlined in the quoted Comments to Rule 702. First, USAM does not challenge Gorodesky's qualifications, and Ruby Tuesday highlights his experience in the restaurant and real estate industries. Second, the RAS Report addresses the factors at play in landlord-tenant lease negotiations and the amount of savings a tenant may achieve in terminating a lease early, matters that may be helpful to the fact finder. Third, his testimony is reliable because it is grounded in his experience in the industry. See, e.g., Kumho Tire, 526 U.S. at 151 (Rule 702 encompasses experience-based, as well as academic, expertise). Fourth, the general principles he recites are relevant to the case because Ruby Tuesday alleges that factors other than the audits contributed to the Simon Property and General Growth Settlements. Accepting arguendo for purposes of this cross-motion that Ruby Tuesday's view of the

Agreements is correct (as I accepted the plaintiffs' view on the main motion), the compensation of USAM or RCG may be reduced to the extent that other factors contributed to the settlements with the landlords. The same caveat that applies to the plaintiffs' reports applies here: Ruby Tuesday's view of the Agreements might or might not prevail; Ruby Tuesday might or might not prove, through other evidence, that such factors did in fact influence the negotiations. But the RAS report, in combination with other proofs, is relevant and helpful, and therefore admissible. The cross-motion of USAM and RCG to exclude the RAS report is therefore denied.

The plaintiffs' argument that the Marcum Report should be excluded is premised on the exclusion of the RAS Report. For the reasons stated above, the RAS Report will not be excluded. Therefore, USAM's cross-motion to exclude the Marcum Report is also denied.

## IV. CONCLUSION

**\*11** For the reasons stated above, (1) Ruby Tuesday's Motion to Preclude Expert Testimony and for Summary Judgment and (2) USAM's and RCG's Cross–Motion to Exclude Expert Testimony are **DENIED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1792463

---

## Footnotes

1    USAM and RCG are apparently joint venture partners. (Wiss Report at 1, Ex. M to DSMF [ECF No. 15–18] ).

2    Pursuant to L. Civ. R. 56.1, Ruby Tuesday has submitted a statement of material facts that it believes are undisputed and USAM has filed a corresponding response. The facts discussed here are taken from these submissions, attached exhibits, supporting affidavits, and, where appropriate, legal memoranda.

In its Reply Brief, Ruby Tuesday argues that many of USAM's responses to Ruby Tuesday's undisputed facts are deficient, and urges that they be deemed admissions. (Reply Br. at 2–9 [ECF No. 21] ). I have reviewed the allegedly deficient responses and for the most part do not find them to be improper. Even assuming arguendo that they were, genuine issues of material fact would still exist as to liability and damages, as discussed below.

3    Ruby Tuesday does not challenge Mr. Chodor's qualifications or the relevance of his testimony. Chodor appears to be well credentialed as, inter alia, an accountant and forensic financial analyst.

---

4    Chodor and Ottaiano are affiliated with Wiss & Company, LLP. I follow the parties in referring to this as the "Wiss Report." For simplicity, I refer to the expert witness as Chodor, but the substitution of Ottaiano would not alter the analysis.

5    Chodor issued a Supplemental Economic Damages Report dated August 23, 2011. That report adjusts the calculation of USAM's damages upward to $1,238,745. (Wiss Supplemental Report, at 1, Ex. O to DSMF [ECF No. 15–21] ). This second report differs from the first in that, for the Simon Property component, it applies a 3% inflation factor to each of the annual expense recovery amounts, and, for the General Growth Mizner Park leases, it adds $25,000 in claims per year for 2008, 2009 and 2010. (*Id.*). Chodor's third and final report, dated October 10, 2011, responds to Ruby Tuesday's expert reports. (Wiss Reply Report, Ex. 4 to Chodor Dep., Ex. P–1 to DSMF at 225–231 [ECF No. 15–22] ). These two additional reports do not alter the analysis of the Rule 702 issue, *infra* at Section III.A.2–4.

6    In analyzing this issue, I am additionally inclined to grant some latitude because the sole issue is damages, as to which New Jersey law does not require absolute precision. *See, e.g.,* Tessman v. Grosner, 23 N.J. 193, 128 A.2d 467 (1957) ("If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient.").

7    Ruby Tuesday's principal cases are distinguishable. *Paoli* disallowed medical testimony based on the "plaintiff's self-report of illness in preparation for litigation." 35 F.3d at 762. That is not the case here-the audits were prepared for Ruby Tuesday to use in obtaining refunds from landlords for overcharges, not for the present suit. In addition, the Wiss Reply Report explained why Chodor's conclusions were reliable; no such explanation existed for the testimony excluded in *Paoli. See id.* at 763.

     In *Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l, Inc.,* an opinion from the District of Delaware, the court barred a damages expert from testifying because, to calculate lost profits, he blindly relied upon a third parry's sales estimates and essentially made up estimates of yearly growth of the market. 350 F.Supp.2d 582, 589–594 (D.Del.2004). Chodor, by contrast, reviewed the audits and numerous other documents, and he interviewed the individuals that prepared the audits. In addition, USAM has indicated that its principals will testify as to the factual foundation of the audits. Chodor's calculation of amounts *actually* overcharged is a far cry from the *Chemipal* expert's estimate of hypothetical profits that would have been realized if the company had spent a certain amount on marketing and reached its market share goal.

     In *In re Wagner,* the court considered whether to exclude the testimony of a forensic pathologist who relied on the opinion of another expert, a toxicologist, to render his own opinion on the identical issue: the blood-alcohol content of the driver who caused the fatal traffic accident. Civ. No. 06–1026, 2007 WL 966010, at *3 (E.D.Pa. Mar. 29, 2007). The toxicologist was not available to testify as to his report. The court noted that if the forensic pathologist were merely parroting the toxicologist's opinion, his testimony would be excluded, but found that not to be the case. *Id .* at *4. Because the pathologist's findings rested on a mix of subjective analysis (i.e., the toxicologist's report) and other objective data, his opinion had value and therefore was not excluded. *Id.* In this case, Chodor is not testifying about the same subject matter—*i.e.,* he is not rendering an opinion on what was or was not an overcharge under the terms of the lease. In any case, the auditors are available to testify as to their findings.

8    Magistini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584 (D.N.J.2002), cited by Ruby Tuesday, is unhelpful here. There, the issue was the cause of the plaintiffs leukemia. Differential diagnosis is an established expert medical procedure, one that requires a quantitative assessment of each exposure that could have caused the illness. Id. at 610. So far as I have been made aware, there is no corresponding

**U.S. Accu-Measurements, LLC v. Ruby Tuesday, Inc., Not Reported in F.Supp.2d (2013)**
2013 WL 1792463

established methodology for the analysis of lease negotiations. And indeed, even Ruby Tuesday's expert reports merely list confounding factors, without attempting to quantify the role that each of them played.

9    The plaintiffs do not challenge the qualifications of Ruby Tuesday's experts. Glusman appears to be well credentialed as, *inter alia,* an accountant and forensic financial analyst. Gorodesky is the president of a restaurant business consulting firm, Restaurant Advisory Services, Inc.

---

**End of Document**                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 195 of 208
PageID: 72937
West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

2016 WL 4138613
United States District Court, E.D. Pennsylvania.

WEST PALM BEACH POLICE PENSION FUND, on
behalf of itself and all others similarly situated, Plaintiffs,
v.
DFC GLOBAL CORP., et al., Defendants.

CIVIL ACTION No. 13-6731
|
Signed 08/04/2016

**Attorneys and Law Firms**

Angus F. Ni, John Rizio-Hamilton, Hannah Ross, Jai Chandrasekhar, Katherine Sinderson, Katherine Stefanou, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, Jeffrey W. Golan, Jeffrey A. Barrack, Lisa M. Port, Barrack Rodos & Bacine, Philadelphia, PA, for Plaintiffs.

David Wiener, Jordan Eth, Judson Lobdell, Philip T. Besirof, Randall Zack, Morrison & Foerster, San Francisco, CA, Jay A. Dubow, Erica Hall Dressler, Gay Barlow Parks Rainville, Hedya Aryani, Michele Crimaldi Zarychta, Pepper Hamilton LLP, John S. Summers, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, Bradley J. Butwin, Jonathan Rosenberg, Moshe Mandel, William J. Sushon, O'Melveny & Myers LLP, New York, NY, for Defendants.

**MEMORANDUM**

Schiller, J.

*1 Lead Plaintiffs, the Arkansas Teacher Retirement System, the Macomb County Employees Retirement System, and the Laborers' District Council and Contractors' Pension Fund of Ohio, have sued DFC Global Corp.; directors and executives Jeffrey Weiss, Randy Underwood, William Athas, David Jessick, Kenneth Schwenke, Clive Kahn, John Gavin, Ronald McLaughlin (collectively, the "Executive Defendants"); and underwriters Credit Suisse Securities (USA) LLC, and Nomura Securities International, Inc. (Collectively, the "Underwriter Defendants"). They allege Defendants violated the securities laws by misleading them and other investors about the lending practices of DFC Global, causing them to lose a significant amount of their investments. Presently before the Court is Lead Plaintiffs'

Motion for Class Certification. For the reasons provided below, the Court grants the motion.

# I. BACKGROUND [1]

## A. The Payday Loan Industry and Regulation

DFC Global provides unsecured short-term consumer loans, often referred to as "payday loans," and secured pawn loans, primarily to unbanked and under-banked consumers. (Consol. Class Action Compl. ¶ 20.) "DFC Global maintains the largest market share of all payday lenders in the U.K. and is the largest pawn lender in Europe measured by loan portfolio." (Id.) DFC Global's U.K. business operated under various names, including The Money Shop, Dollar Financial, Month End Money, and Payday Express Limited. (Id. ¶ 43.) At the time the Consolidated Class Action Complaint was filed, Jeffrey Weiss had been the Chairman and CEO of DFC Global since 1990; Randy Underwood had been the CFO since 2004; and William Athas had been the Chief Accounting Officer, Senior Vice President of Finance, and Corporate Controller since 2011. (Id. ¶¶ 23-25.) Defendants David Jessick, Kenneth Schwenke, Clive Kahn, John Gavin, Ronald McLaughlin, and Michael Kooper have all served on DFC Global's board of directors. (Id. ¶¶ 28-33.) Defendants Credit Suisse and Nomura Securities International, Inc., served as underwriters for DFC's April 2011 common stock offering and were responsible for ensuring the truthfulness and accuracy of the statements made in the offering materials. (Id. ¶¶ 35-37.)

Payday loans are small loans made to customers experiencing short-term money problems. (Id. ¶ 39.) DFC Global made money from payday loans in three ways: (1) origination fees when the loans were issued; (2) interest rates for loans paid off in their initial term; and (3) interest rates for rolled-over loans. (Id. ¶¶ 40-41.) If a borrower could not repay a loan when it came due, he or she could roll over, or extend, the loan by paying a finance charge to keep the loan current. (Id. ¶ 41.) Payday loans are risky loans because the customer is often "unemployed, underemployed or otherwise income-restrained." (Id. ¶ 42.) DFC Global's customers typically fell into two demographics: ALICE (asset limited, income constrained, and employed) and ARTI (asset rich, temporarily illiquid). "ALICE customers are generally struggling workers that are forced to hold more than one low-paying job in order to satisfy their monthly bills and living expenses. ARTI customers, on the other hand, often fall within several income and wealth categories, but generally include temporarily unemployed individuals in need of short-term credit." (Id.)

**\*2** DFC Global "distinguished itself from its competitors as a conservative lender and manager of risk," touting its " 'conservative approach to extending consumer credit,' " its " 'very effective' credit analytics function," and its "ability to underwrite a customer's ability to repay." (*Id.* ¶ 44.) DFC Global held itself out as "a leader for responsible behavior in the marketplace." (*Id.*) Investors relied on DFC Global's conservative approach to help the company withstand additional regulation in the payday loan industry and ensure that the company would appropriately manage risk. (*Id.* ¶ 45.) DFC Global is a charter member of the Consumer Finance Association ("CFA"), the industry's leading trade association. (*Id.*)

Payday lenders in the United Kingdom must adhere to regulations of the Consumer Credit Act and guidance on lending from the Office of Fair Trading ("OFT"). (*Id.* ¶ 46.) In 2011, the OFT deemed certain lending practices to be irresponsible, including: (1) failing to establish and implement effective policies and procedures to assess affordability; (2) failing to undertake a reasonable assessment of affordability; and (3) encouraging borrowers to roll over existing debt. (*Id.* ¶ 47.) The Consumer Credit Act mandated that lenders assess borrower creditworthiness based on sufficient information obtained from the borrower and a credit reference agency, if necessary, to ensure that the borrower could reasonably repay the loan. (*Id.* ¶ 48.) The Act also instructed payday lenders to work with struggling borrowers to develop repayment plans that would not increase the borrower's indebtedness. (*Id.* ¶ 49.)

During the class period, scrutiny of payday lenders in the U.K. increased. For example, following an extensive review of fifty payday lenders, including DFC Global, the OFT announced that these lenders would face enforcement actions unless they improved their lending practices. (*Id.* ¶¶ 50, 95.)

### B. DFC Global's Lending Practices

The Consolidated Class Action Complaint paints a bleak picture of DFC Global's business practices. Contrary to public statements, "DFC Global's underwriting and risk management practices were not 'conservative' or 'responsible.' The Company also misled investors about critical metrics reported in DFC Global's financial results, including its loan loss reserves and net income." (*Id.* ¶ 54.) DFC Global extended loans to those who could not repay them and repeatedly rolled over loans to borrowers for a fee, without any additional credit assessment, in order to avoid

reporting defaults. (*Id.* ¶ 54.) To make their case, Plaintiffs rely on a number of confidential witnesses to explain DFC Global's lending practices. These confidential witnesses, employees of DFC Global, contend that the company made risky loans with little or no oversight or concern about the ability of the borrower to repay the loan. (*See id.* ¶¶ 58-69.) For example, loans were often approved without verifying a borrower's income or determining if the borrower could repay the loan. (*Id.* ¶¶ 58-60.) One confidential witness stated that The Money Shop would target borrowers with bad credit, calling them to the store to offer loans. (*Id.* ¶ 61.) Indeed, "the Company's overriding focus was on generating more loans....Management instructed employees to do whatever it took to get a loan." (*Id.* ¶ 62.) Management would often override a decision to reject a loan. (*Id.*) DFC Global also targeted those in desperate need of cash, a practice barred by the OFT and the CFA. (*Id.* ¶ 63.)

Rollovers were vital to DFC Global, as they generated at least 60% of the company's total payday lending revenue. (*Id.* ¶ 80.) The company also had a policy of pressing borrowers to roll over their loans, thereby generating new fees and delaying defaults by deeming as current rolled-over loans. (*Id.* ¶ 69.) These repeated rollovers were often made without any additional assessment as to whether the borrower could repay the loan. (*Id.* ¶ 70.) This practice was contrary to OFT guidance. (*Id.* ¶¶ 70-71.) Confidential witnesses stated that there were no limits on the number of times a borrower could roll over a loan, and that employees had rollover quotas. (*Id.* ¶¶ 73-77.) Indeed, borrowers were encouraged to roll over loans rather than pay them off, even if the borrower did not understand the financial implications of continuous rollovers. (*Id.* ¶ 73.) DFC Global executives, including Weiss, Underwood, and Athas, regularly discussed loan rollovers and how they affected the bottom line of DFC Global. (*Id.* ¶ 78.)

**\*3** "During the Class Period, [D]efendants repeatedly represented that the Company had instituted a credit analytics function that effectively managed risk in its consumer loan activities, and the Executive Defendants certified in quarterly and annual SEC filings that the Company had instituted adequate internal controls." (*Id.* ¶¶ 81-82.) However, despite public statements to the contrary, Athas later admitted on behalf of DFC Global that the company could not consistently track loan data on a global basis. (*Id.* ¶ 83.) In reality, the company "utterly failed to effectively manage its risk by not analyzing rollovers or extensions on a global basis and taking them into account when extending credit or setting

Case 1:19-md-02875-RMB-SAK    Document 2086-6    Filed 06/02/22    Page 197 of 208
PageID: 72939
West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

the Company's loan loss reserves." (*Id.* ¶ 84.) Confidential witnesses supported this allegation, one of them reporting that: "There was nothing in place for monitoring the quality of the loans." (*Id.*)

Moreover, Plaintiffs charge, DFC Global's decision to exclude rolled-over loans from its loan loss reserves violated generally accepted accounting principles ("GAAP"). (*Id.* ¶ 85.) "[C]ontrary to the Company's representations that it complied with GAAP, the Company understated its loan loss reserves in order to inflate its income and to disguise the poorly underwritten and high-risk loans in its loan portfolio." (*Id.* ¶ 87.) DFC Global also failed to properly account for rolled-over loans by treating them as new, current loans rather than placing them into default. (*Id.* at 88-91.) "In doing so, the Company effectively wiped out the negative credit history associated with borrowers who had a demonstrated inability to repay their loans." (*Id.* ¶ 88.) DFC Global's policy of treating rolled over loans as new loans with no additional risk came directly from senior management. (*Id.* ¶ 89.) Following the OFT's increased regulatory scrutiny, DFC Global had to increase its loan loss reserves as its borrowers increasingly defaulted. (*Id.* ¶ 92.)

**C. The OFT Report**

Following its investigation, the OFT reported that the U.K. payday lending industry was rife with irresponsible lending practices, including the failure to properly assess affordability. (*Id.* ¶ 96.) "The OFT report revealed exactly the types of practices that DFC Global had been engaged in throughout the Class Period. In fact, each of DFC Global's subsidiaries operating in the U.K. received letters from the OFT identifying deficiencies in operations." (*Id.* ¶ 98.) DFC Global was warned that if changes were not implemented within ninety days, DFC Global's business units that provided payday loans in the United Kingdom would be shut down. (*Id.* ¶ 98.)

Despite statements to the contrary from Weiss, the company failed to comply with lending regulations, and "the governing bodies...had grave doubts that DFC Global could ever become compliant in light of its business practices." (*Id.* ¶¶ 100-01.) For example, a confidential witness stated that the company "never got in compliance with the OFT's regulations, despite the Company's purported assurance to the contrary." (*Id.* ¶ 101.) The same confidential witness claimed that DFC Global rolled over loans more than three times, even though the company assured others that it was in compliance with the rollover rule that disallowed so many rollovers. (*Id.* ¶ 102.)

**D. False Statements**

Plaintiffs allege that "[t]hroughout the Class Period... [D]efendants regularly made statements about DFC Global's 'conservative approach' to underwriting, distinguishing the company from its competitors as a 'responsible' lender, and reassured investors that its approach to extending credit was designed to 'get the money back.' " (*Id.* ¶ 106.) For instance, during a January 27, 2011 conference call, Weiss stated that, "[t]he implementation of what we believe to be industry leading proprietary credit scoring model and our continued conservative approach to extending consumer credit in the midst of a still-weakened economy resulted in a loan loss provision expressed as a percentage of gross consumer lender revenue of 16.6%." (*Id.* ¶ 107.) During a June 7, 2011 conference, Weiss stated, "We have, we think, the best analytics, underwriting and collection metrics in the industry." (*Id.* ¶ 108.) Underwood stated that DFC Global "undertook a conscious effort to...become more selective in the loans we put out, not knowing exactly where the recession was going, probably less money on the table, and we're pretty certain of that, but we feel a lot better about things having a very conservative approach during the recession until we saw what was going to ultimately happen." (*Id.* ¶¶ 108-09.)

**\*4** During a January 26, 2012 conference call to discuss the company's second quarter 2012 results, Weiss stated:

> Well, first we like to get the money back, not only to give it out. So that's always our most important consideration. But I think it's a combination of really many years of investment in credit analytics and the really superior work of our credit analytics group, which encompasses not only underwriting, but the ability to stratify our borrowers and make sure collections are effective. Secondly, our decade of experience in storefront lending has provided us with a base of knowledge and experience that I think is relatively unique in this space.

2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

* * *

> We can underwrite to the ninth decimal point a customer's ability to repay. We're getting better at underwriting a customer's willingness to repay.

(*Id.* ¶ 111.) On January 24, 2013, Weiss praised the company's ability to keep its second quarter 2013 losses lower than expected:

> First we are more selective. Again, repeating what I said, no trick in giving the money out. I think we are more selective particularly in the UK, given the regulatory issues that we have discussed. I think we continue to improve in our ability to figure out how much to lend and to whom and how to collect from people who have difficulty making a full or partial repayment on time. But I think it's part and parcel of our considered stance to the environment in the UK.

(*Id.* ¶ 114.) Weiss assured analysts that further regulation of the industry would be helpful to DFC Global:

> What we have discovered is regulation is the friend of the responsible....We think that we are on the road to [a] situation in the UK where lots of small lenders who simply lack the infrastructure or inclination to build the appropriate credit analytics and responsible collection apparatus will no longer be able to participate in the marketplace because relevant authorities will simply prevent it.

(*Id.* ¶ 115.) Plaintiffs contend that these statements were false, as DFC Global was neither conservative nor selective. Rather, it did not adhere to even minimal underwriting standards and instead targeted individuals unlikely to pay back their loans. (*Id.* ¶ 116.) The failure to disclose DFC Global's shortcomings meant that "investors were misled about the Company's true lending practices and the creditworthiness of the Company's loans." (*Id.* ¶ 117.)

DFC Global's SEC filings contained numerous false and misleading statements regarding its purportedly effective credit analytics, risk management and related financial results. DFC Global's second quarter 2011 Form 10-Q (repeated in numerous other SEC filings) stated:

> The Company has instituted control mechanisms and a credit analytics function that have been very effective in managing risk in its consumer loan activities. Collection activities are also an important aspect of the Company's operations, particularly with respect to its consumer loan products due to the relatively high incidence of unpaid balances beyond stated terms. The Company operates centralized collection centers to coordinate a consistent approach to customer service and collections in each of its markets. The Company's risk control mechanisms include, among others, the daily monitoring of initial return rates with respect to payments made on its consumer loan portfolio.

**\*5** (*Id.* ¶¶ 118-19.) During an April 30, 2012 conference call discussing the company's third quarter 2012 fiscal results, Underwood said:

> [O]ur vast investment in credit analytics folks, and we have them in several of our business units, as well as corporately, I think certainly has paid off for us many, many times over. And it not only helps out on the front end but it certainly helps out

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 199 of 208
PageID: 72941

West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

> on the back end as we prioritize how
> to go about collection activities. So,
> I think we're happy being what we
> think is pretty conservative. It very
> well could be that we'd be leaving
> money on the table [by lowering
> underwriting standards]...But we think
> our performance is just fine with being
> as cautious as we are[.]

(*Id.* ¶ 125.) In SEC filings, the company also touted its centralized facilities, which "have helped us both to improve our loan servicing significantly and to reduce credit losses on loans originated by us, and significantly enhances our ability to manage the compliance responsibilities related to our consumer lending operations." (*Id.* ¶ 126.) In reality, and contrary to these numerous false and misleading statements, DFC Global's deficient lending and credit assessment practices increased the company's credit risk and related losses. (*Id.* ¶ 129.) The company also made misrepresentations about monitoring loans and "being in the forefront of government and community relations on regulatory issues." (*Id.* ¶¶ 130-33.)

Additionally, DFC Global made false statements about the payment status of loans, as well as its loan loss reserves. The company failed to properly report the actual payment status for loans that it rolled over by categorizing such loans as extended or current, when the loans were essentially past due. (*Id.* ¶¶ 135-36.) "By categorizing rolled over or extended loans as current, the Company avoided classifying them as past due and disclosing the true attendant credit risks and losses." (*Id.* ¶ 136.) DFC Global also failed to inform investors that it performed almost no underwriting when the loans were first originated or when they were subsequently rolled over. (*Id.* ¶ 139.) "The Company's loss reserve policy...and its reported net income, loan loss provision, and loan loss reserve...were each false and misleading because when calculating its loan loss reserve, the Company did not take into account the increased credit risk of its loans due to its deficient underwriting; the increased credit risk of continuously rolling over loans without conducting additional underwriting; or the true past due nature of the rolled over loans." (*Id.* ¶ 142.) These practices led DFC Global to understate its loan loss reserve and to overstate its net income. (*Id.* ¶¶ 142-43.)

**E. Performance Issues**

On April 1, 2013, DFC Global preannounced its third fiscal quarter 2013 results in a press release filed with the SEC and a conference call. (*Id.* ¶ 151.) The company reported that its consolidated loan loss provision as a percentage of gross consumer lending revenue was expected to spike. (*Id.*) This spike impacted the company's reported net income, which declined. (*Id.*) DFC Global also reported that it was cutting its earnings per share by nearly 30%. (*Id.* ¶ 152.) On April 1, 2013, DFC Global's stock price fell from $16.64 to $13.04. (*Id.*) Despite these performance issues, Weiss and Underwood continued to tout the company as a responsible lender that maintained conservative underwriting practices. (*Id.* ¶¶ 153-54.) Weiss stated that DFC Global remained confident that it was well positioned for the long term "as irresponsible lenders are eventually targeted by the OFT and removed from the UK market." (*Id.* ¶ 153.) When the company announced its third fiscal quarter results on May 1, 2013, its consolidated loan loss provision as a percentage of gross consumer lending spiked more than previously anticipated. (*Id.* ¶ 156.) DFC Global also confirmed that the company's three business units in the United Kingdom that provided payday and single payment loans received "action required" letters from the OFT regarding their improper lending practices in a number of areas. (*Id.* ¶ 157.) Weiss discounted this news as a "bump in the road" and Underwood "continued to misleadingly describe the Company's lending practices during the regulatory transition period as responsible." (*Id.* ¶ 158.) When DFC Global reported its fiscal year 2013 earnings, it announced that defaulting loans would continue to be a problem through at least the first half of fiscal year 2014. (*Id.* ¶ 160.) Underwood also announced that DFC Global expected to incur $10-$15 million in expenses every year for regulatory, legal, audit, and compliance-related costs. (*Id.* ¶ 161.) This news sent the company's stock down from a close of $15.90 on August 22 to $11.31 on August 23. (*Id.*)

*6  On October 30, 2013, DFC announced that as a result of higher loan defaults in the United Kingdom, its loan loss provision had increased. (*Id.* ¶ 163.) Weiss also explained that DFC Global instituted a number of restrictive changes to assure investors that the company maintained a conservative regulatory posture. (*Id.*) Underwood reported that poor performance was the result of confusion about regulatory requirements; he also stated that he believed the stock was a bargain. (*Id.* ¶ 164.)

DFC Global's loan losses caused it to experience liquidity problems. (*Id.* ¶ 166.) These liquidity problems led the

2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

company to announce a private offering of senior notes to institutional investors. (*Id.*) The company was forced to withdraw the offering just a few days later, however, because "it could not draw sufficient investor interest in its debt." (*Id.*) This withdrawal caused a drop in the price of DFC Global stock. (*Id.*) Moreover, the company's consolidated loan loss provision continued to increase. (*Id.* ¶ 167.) The price of the stock continued to decline: on January 31, 2014, the price decreased from $10.57 to $7.52. (*Id.* ¶ 168.) "Defendants falsely blamed the Company's poor financial results on the fact that regulatory guidance in the U.K. was not yet definitive and that its competitors were engaging in lending practices that DFC Global had stopped." (*Id.* ¶ 169.) On February 3, 2014, Norm Miller, DFC Global's President and COO, resigned. (*Id.* ¶ 170.) On February 4, 2014, the price of the stock fell further, from $7.09 to $6.76. (*Id.*)

On April 1, 2014, the Financial Conduct Authority ("FCA") took control over payday lending in the United Kingdom (*Id.* ¶ 173.) On April 2, 2014, DFC Global announced that it had entered into an agreement with Lone Star Funds, a private equity company, to take DFC Global private. (*Id.*) Pursuant to the agreement, DFC Global shareholders were slated to receive $9.50 in cash per share of common stock. (*Id.*) Shareholders approved the merger on June 6, 2014, which was viewed as "the Company's only viable escape route, given the Company's apparent inability to operate under the new regulations." (*Id.* ¶¶ 177-78.) On June 13, 2014, DFC Global announced that its acquisition by Lone Star Funds had been completed. (*Id.* ¶ 179.) On July 1, 2014, the FCA's new regulations went into effect. (*Id.* ¶ 180.)

**F. Plaintiffs' Claims**

Plaintiffs filed a class action lawsuit on behalf of all persons who purchased shares of DFC Global common stock during the class period, specifically between January 28, 2011 and February 3, 2014. Plaintiffs seek relief under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, alleging that DFC Global and the Executive Defendants carried out a scheme to deceive the investing public through false statements and material omissions. (*Id.* ¶¶ 224-232.) They also seek relief under § 20(a) of the Securities Exchange Act of 1934, alleging controlling person liability against Weiss, Underwood, and Athas.

Plaintiffs also bring claims pursuant to the Securities Act of 1933. Plaintiffs state that these are strict liability and negligence claims that "do not allege, and do not sound in, fraud." (*Id.* ¶ 239.) With respect to these claims, Plaintiffs

allege that on April 7, 2011, DFC Global conducted a public offering of six million shares of common stock at $20.75 per share. (*Id.* ¶ 241.) This offering generated $130.2 million in gross proceeds for DFC Global; Arkansas Teacher Retirement System purchased 28,500 shares in the offering. (*Id.* ¶¶ 241-42.) The offering was conducted pursuant to a registration statement filed with the SEC and signed by Weiss and Underwood. (*Id.* ¶ 243.) DFC Global issued a prospectus, which it later supplemented. The offering materials contained materially untrue and misleading statements and omissions about DFC Global's effective credit analytics and risk management, the payment status of the company's payday loans, its financial results, and its internal results. (*Id.* ¶ 244-260.)

**\*7** Plaintiffs' third claim for relief is brought pursuant to § 11 of the Securities Act of 1933 against all Defendants based on the false and misleading statements made in materials published for the offering. (*Id.* ¶¶ 261-71.) The fourth and fifth claims for relief are brought pursuant to § 12(a)(2) and § 15 of the Securities Act of 1933, respectively. (*Id.* ¶¶ 272-85.)

**II. STANDARD OF REVIEW**

The Federal Rules of Civil Procedure provide that a class action may be maintained only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to the requirements of Rule 23(a), a court must consider Rule 23(b), which allows for a class action to be maintained "if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Prior to certifying a class, the district court must perform a rigorous analysis as to whether the prerequisites of Rule 23 have been met. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015). This rigorous analysis requires that the district court resolve factual or legal disputes relevant to class certification, even if those disputes touch on the merits of the case. *Id.* The court must make factual determinations

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 201 of 208
PageID: 72943

West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

supporting its 🚩 Rule 23 findings by a preponderance of the evidence. *Id.* at 484-85.

## III. DISCUSSION

### A. 🚩 Rule 23(a)

#### 1. Numerosity

"Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." 🚩 *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir. 2001). While there is no precise number of putative class members that will ensure the numerosity requirement is met, a potential class exceeding forty members is generally considered sufficient. 🚩 *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001); *see also* 🚩 *Serventi v. Bucks Tech. High Sch.*, 225 F.R.D. 159, 165 (E.D. Pa. 2004) (finding that the settlement class, which contained at least forty-seven potential members, met the numerosity requirement); *Godshall v. The Franklin Mint Co.*, Civ. A. No. 01–6539, 2004 WL 2745890, at *2 (E.D. Pa. Dec. 1, 2004) (finding that the proposed class, which consisted of 112 members, was "sufficiently large that joinder of all members would impracticable").

Defendants do not contest—and the Court readily concludes —that the numerosity requirement is met. DFC Global's stock traded on the NASDAQ, and as Plaintiffs note, there were millions of shares of stock outstanding. The exact size of the proposed class is currently unknown, but it certainly meets the numerosity requirement. *See In re Vicuron Pharm., Inc. Sec. Litig.*, 233 F.R.D. 421, 425 (E.D. Pa. 2006) ("During the proposed class period, Vicuron stock was listed and traded on the NASDAQ. Hundreds, if not thousands, of investors traded in Vicuron stock during that time. At a minimum, it is clear that the proposed class is very large and that its members could not be realistically joined in one action. Therefore, plaintiffs have satisfied the numerosity requirement.").

#### 2. Commonality

 **\*8** A putative class satisfies the commonality requirement if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes*, 802 F.3d at 486. The bar to satisfy the commonality requirement is not

high: a single common question is sufficient. *Id.* Defendants do not dispute that Plaintiffs have satisfied the commonality requirement, and the Court finds that Plaintiffs have met this requirement. Courts have noted that the commonality requirement is readily satisfied in securities fraud cases. *See, e.g.*, 🚩 *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 296 (D. Del. 2003) ("[T]he commonality requirement has been permissively applied in the context of securities fraud class actions."). There are a number of common questions of law or fact, including whether Defendants violated the securities law, whether Defendants made false statements or omitted material statements, and whether Defendants acted with the requisite mental state. Thus, the commonality requirement is satisfied.

#### 3. Typicality

Typicality examines "whether the named plaintiff's individual circumstances are markedly different [from those of unnamed class members] or...the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based." 🚩 *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985); *see also* 🚩 *Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994). When considering typicality, courts should determine whether the class meets the following requirements: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class. 🚩 *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012). Typicality does not require that putative class members share identical claims. 🚩 *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531–32 (3d Cir. 2004). Instead, "[t]he heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." 🚩 *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1984). If a plaintiff's claim arises from the same event, practice, or course of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory

West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

as the claims of the class. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992).

According to Defendants, Plaintiffs cannot meet the typicality requirement because the Arkansas Teacher Retirement System was an in-and-out trade of DFC Global stock during the class period. (DFC Defs.' Mem. of Law in Opp'n to Lead Pls.' Mot. for Class Certification [Defs.' Opp'n] at 12-13; DFC Defs.' Suppl. Br. in Further Opp'n to Class Cert. Noting Recent Authority and Addressing New Issues Raised by Lead Pls. in Their Reply Br. [Defs.' Apr. 26, 2016 Br.] at 5-7.) Plaintiffs counter that the Arkansas Teacher Retirement System is not an in-and-out-trader and that it is not subject to unique defenses. (Lead Pls.' Reply Br. in Supp. of Their Mot. for Class Cert. [Pls.' Mar. 24, 2016 Reply] at 8-10; Lead Pls.' Br. in Resp. to the DFC Defs.' Suppl. Br. Filed Apr. 27, 2016 [Pls.' May 4, 2016 Reply] at 10-14.)

Courts have expressed misgivings about allowing in-and-out traders to represent a class because such traders may not be able to demonstrate loss causation. If an investor purchased and sold shares of stock prior to any corrective disclosure, how could that investor show that its loss was caused by a misrepresentation or omission that, when uncovered, negatively affected the value of the stock? *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009). Indeed, a number of courts have decided that a class represented by in-and-out-traders should not be certified because those representatives were subject to unique defenses that could become the focus of the litigation.

*See, e.g.,* *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, Civ. A. No. 11-4209, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, Civ. A. No. 11-7533, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013) ("As in-and-out traders, the named plaintiffs again subject themselves to unique inquiries regarding their trading patterns and why they made investment decisions, whether the fraud was in fact irrelevant to their purchasing and sale decisions, and whether on individual trades they profited. These inquiries will also require considerable time and resources and indeed threaten to become the focus of the litigation.").

*\*9* Other courts, however, have allowed in-and-out traders to be included in a securities class. *See, e.g.,* *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016) ("[D]efendants argue that USS is atypical in that

it alternated between purchases and sales throughout the class period. But such 'in-and-out' trading is not atypical in a class that contains, by defendants' own admission, numerous sophisticated institutional investors.");

*McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 698-99 (W.D. Wash. 2010).

If the Arkansas Teacher Retirement System had purchased and sold all of its DFC Global shares prior to any corrective disclosure, Plaintiffs would have a problem. However, it is undisputed that it did not. Rather, the Arkansas Teacher Retirement System retained a considerable number of shares following the alleged corrective disclosures. (Lead Pls.' Mot. for Class Cert. Ex. 9.) Without question, the Arkansas Teacher Retirement System held on a significant number of shares throughout the class period and has presented evidence that it suffered losses following the corrective disclosures. The Court concludes that Plaintiffs have satisfied the typicality requirement by a preponderance of the evidence.

### 4. Adequacy of representation

A court cannot certify a class unless it is satisfied that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement touches on whether the interests of the class representatives conflict with the interests of class members and whether class counsel is able to adequately represent the class. *Newton*, 259 F.3d at 185.

### a. Who is running the show?

Defendants argue that the class representatives are not adequate because this litigation is being directed by class counsel, who are pulling the strings of the puppet Plaintiffs. Defendants argue that "Plaintiffs have done nothing to direct the litigation," and have failed to enact any procedures for overseeing the progress of the litigation or communicating among themselves. (Defs.' Opp'n at 9.) Defendants have accused Plaintiffs of misleading the Court when they sought appointment as Lead Plaintiffs. (*Id.*)

In seeking to be appointed Lead Plaintiff, they promised to accept "the fiduciary obligations it will assume if appointed Lead Plaintiff in this action." (Mem. of Law in Supp. of the Mot. of the Institutional Investor Grp. for Appointment As

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 203 of 208
PageID: 72945
West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

Lead Pl. and Approval of Its Selection of Lead Counsel at 10.) It further affirmed "its understanding of the duties owed to Class members through its commitment to oversee and monitor the prosecution of this action in the best interests of the Class." (*Id.*) To carry out these commitments, the members of the Institutional Investor Group conducted a joint conference call during which the group "discussed the merits of the action, the benefits of working together jointly to prosecute the litigation, as well as the procedures and mechanisms...to ensure that the Class will benefit from [their] supervision of counsel." (Decl. of Jeffrey Golan in Supp. of Lead Pls.' Mot. for Class Cert. Ex. 2 [Joint Decl. in Supp. of Mot. of the Institutional Investor Grp. for Appointment as Lead Pl.] ¶ 7.) Moreover, the group "established procedures for overseeing the progress of the litigation and communicating regularly among [themselves] and with counsel." (*Id.*), The Court found that the Institutional Investor Group, having sworn to remain committed to prosecuting this litigation, would be able to fairly and adequately protect the interests of the Class. *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, Civ. A. No. 13-6731, 2014 WL 1395059, at *8-9 (E.D. Pa. Apr. 10, 2014). The Court also found that "[t]he members of the Institutional Investors Group are sophisticated entities that to date have demonstrated an ability and willingness to forcefully advocate for the class. Moreover, the Institutional Investor Group has selected counsel well versed in this area and able to devote the resources to this litigation. The Court also concludes that there are no conflicts that render the Institutional Investor Group unable to fulfill its obligations as lead plaintiff." *Id.* at *9.

**\*10** Relying on deposition testimony, Defendants claim that Lead Plaintiffs have failed to keep their word. They complain that there has been no communication among Plaintiffs regarding this litigation, nor have Lead Plaintiffs enacted procedures to further this litigation. (Defs.' Opp'n at 11.) Unsurprisingly, Plaintiffs dispute Defendants' take on Plaintiffs' participation—or lack thereof—in this litigation. (Pls.' Mar. 24, 2016 Reply at 4-8.)

Would it be advantageous for Lead Plaintiffs to communicate more frequently? Likely. To date, however, no deadlines have been missed, no discovery has gone unanswered, and no motion has gone unfiled or response unaddressed. Plaintiffs have testified that they have communicated with their lawyers, reviewed filings prior to their submission to the Court, and have aided counsel in responding to discovery requests. Moreover, Plaintiffs' representatives who

have testified to date have shown a basic understanding of the facts and claims underlying this litigation. That is all that is required. ⚑ *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 430 (3d Cir. 2016) (noting that "a minimal degree of knowledge about the litigation is adequate"); ⚑ *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) ("A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.").

There are no conflicts that would render Lead Plaintiffs unable to protect the interests of the class. There is also nothing in the record that would lead this Court to conclude that counsel is unable to adequately represent the class. Accordingly, the Court finds that Plaintiffs have demonstrated that the adequacy of representation requirement has been satisfied here.

### b. Standing

Defendants argue that the Arkansas Teacher Retirement System is an inadequate class representative because it lacks standing to bring claims pursuant to §§ 11 and 12(a)(2) of the Securities Act of 1933 on behalf of those who purchased shares in the April 7, 2011 stock offering. (Defs.' Opp'n at 14-15.)

Section 11 of the Securities Act of 1933 creates a claim based on false statements made in registration statements. It reads:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue.

Case 1:19-md-02875-RMB-SAK   Document 2086-6   Filed 06/02/22   Page 204 of 208
PageID: 72946

West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....

2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

15 U.S.C. § 77k(a). Both §§ 11 and 12 claims may only be brought by purchasers and sellers of securities. *See In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 274 (S.D. Tex. 2005). Plaintiffs have submitted evidence that the Arkansas Teacher Retirement System purchased thousands of shares of DFC Global stock the day after the April 7, 2011 offering, at the offering price, and from one of the Defendants who underwrote the offering. Moreover, deposition testimony confirmed that the purchase was made on behalf of the Arkansas Teacher Retirement System in the April 2011 public offering. (Pls.' Mot. for Class Cert. Ex. 10 [Hasso Dep.] at 99.) The Court deems this evidence sufficient to demonstrate standing. *See In re Dynegy*, 226 F.R.D. at 274; *see also Smith v. Suprema Specialities, Inc.*, Civ. A. No. 02-168, 2007 WL 1217980, at *6 (D.N.J. Apr. 23, 2007).

### B. Rule 23(b)(3) Predominance

**\*11** In addition to satisfying the requirements of Rule 23(a), the Court cannot certify a class unless it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry encompasses "the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action." *Id.* Because the predominance test examines whether common issues of law or fact predominate over non-common, individualized issues of law or fact, the mere presence of individual legal or factual questions does not foreclose a finding of predominance. *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 370-71 (3d Cir. 2015).

Defendants cite two reasons that Plaintiffs cannot satisfy the predominance requirement. First, "Plaintiffs cannot establish class-wide reliance...because they have failed to prove that the market for DFC's stock was efficient during the Class Period." (Defs.' Opp'n at 15.) Second, "Plaintiffs have proffered *no* damages model showing that damages can be measured on a class-wide basis, consistent with their theory of liability." (*Id.*)

#### 1. Reliance

To answer the predominance question, courts should begin with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). To state a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

The Court will focus on the reliance requirement. In a securities fraud case, if individual issues of reliance predominate, class certification is unsuitable. *See Malack v. BDO Seidman, LLP*, 617 F.3d 743, 746-47 (3d Cir. 2010) ("Proving reliance for individual class members can quickly become a cumbersome endeavor that overwhelms the questions of law or fact common to the proposed class, and could preclude class certification."). However, "[r]eliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." *Newton*, 259 F.3d at 175. This presumption of reliance is based on the fraud-on-the-market theory, which posits that in an open and developed securities market, the price of a company's stock is determined by the available material information about the company and its business. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42, 246 (1988) ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."). Thus, misleading statements will defraud stock purchasers even if the purchasers did not directly rely on the misleading statements. *Id.* As the Supreme Court has stated, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Id.* at 247.

To establish a presumption of reliance based on the fraud-on-the-market theory, a plaintiff must show that: (1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the stock traded

in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014). A defendant can rebut this presumption through any showing that severs the link between the alleged misrepresentation and either the price paid by the plaintiff, or the decision to trade at a fair market price. *Id.*; *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016) ("*Halliburton II* held that defendants may submit price impact evidence prior to class certification for the purpose of rebutting the *Basic* presumption."). The battle here relates to whether DFC Global stock traded in an efficient market. "[A] market is efficient when the prices of securities incorporate most public information such that they respond reasonably promptly to new material information." *Strougo*, 312 F.R.D. at 314-15.

**\*12** Plaintiffs suggest that because DFC Global stock was traded on the NASDAQ, the Court should presume an efficient market. (Pls.' Mar. 24, 2016 Reply at 13-14.) The NASDAQ is "one of the two largest stock exchanges in the United States, the largest electronic-equity securities trading market in the United States, and one of the largest stock exchanges in the world." *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012). Indeed, the Third Circuit Court of Appeals has referred to the NASDAQ as "open and developed" and therefore "well suited for application of the fraud on the market theory." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011). Some courts have concluded that being listed on a major exchange is sufficient for a plaintiff to demonstrate market efficiency. *See, e.g.*, *In re Merck & Co. Sec., Derivative & ERISA Litig.*, MDL No. 1658, 2013 WL 396117, at \*11 (D.N.J. Jan. 30, 2013) ("This case involves the common stock of a company which not only trades on a major and efficient exchange, but in fact is a component of the Dow Jones 30 Industrial Average. These facts more than suffice to meet Plaintiffs' burden on this motion of demonstrating market efficiency."); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 559 n.6 (W.D. Pa. 2006). A number of courts have concluded that—even if a presumption of efficiency is unwarranted—the listing of a stock on a major exchange like the NASDAQ weighs in favor of finding market efficiency. *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 634 ("Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *Smilovits*

*v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013) ("[T]he Court concludes that the trading of First Solar stock on NASDAQ—a major, well-developed stock exchange— weighs in favor of finding market efficiency."); *Lumen*, 295 F.R.D. at 459 ("It would be remarkable for a court to conclude NASDAQ is not an efficient market—which is why securities traded on NASDAQ are often presumed to be traded on an efficient market."); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 591 (N.D. Cal. 2009) ("In this case, Plaintiffs made a *prima facie* showing that the fraud-on-the-market presumption of reliance applied because Plaintiffs sufficiently established that Juniper's stock was actively traded on an efficient market—the NASDAQ."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 (D. Mass. 2006) (concluding that an efficiency presumption for stocks traded on a national exchange was not appropriate, but highlighting the importance of being listed on a national exchange in the efficiency analysis).

Courts that must determine whether a market is efficient have turned to the factors laid out in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). The *Cammer* factors are: (1) the company's average weekly trading volume; (2) the number of analysts who follow the stock; (3) the existence of market makers and arbitrageurs; (4) the ability of the company to file a Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price. *Id.* at 1286-87.

In support of their motion for class certification, Plaintiffs have provided the Court with the expert report of Michael L. Hartzmark, Ph.D., President of Hartzmark Economics Litigation Practice, LLC, which is a firm that specializes in the application of economics and finance to legal, commercial, and regulatory issues. (Pls.' Mot. for Class Cert. Ex. 5 [Hartzmark Report] ¶ 4.) Hartzmark's ultimate opinion is that "throughout the Class Period, DFC common stock traded in an open, well-developed and efficient market." (*Id.* ¶ 10.) His opinion analyzes the *Cammer* factors. With respect to those factors, Defendants' attack on Dr. Hartzmark's opinion focuses on the fifth factor, the cause and effect relationship. The Court finds that the first four *Cammer* factors favor a finding of market efficiency and the Court will therefore turn to the fifth factor. (*See* Pls.' Mot. for Class Cert. Ex. 13 [*Cammer* factors summary]; *see also* Mem. of Law in Supp. of Lead Pls.' Mot. for Class Cert. [Pls. Mem.] at 18-20.)

*West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....*

2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

Defendant, relying on a quote from the Third Circuit Court of Appeals, argues that the cause-and-effect factor is the most important of the *Cammer* factors. (Defs.' Opp'n at 17 (citing 🚩 *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 634 ("However, because an efficient market is one in which information important to reasonable investors... is immediately incorporated into stock prices, the cause-and-effect relationship between a company's material disclosures and the security price is normally the most important factor in an efficiency analysis.")).) The Court understands the import of Defendants' argument to be that if Plaintiffs fail to persuade the Court that there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price, Plaintiffs will have failed to demonstrate market efficiency. That, however, may not be the case. Courts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency. *See, e.g.,* 📁 *Strougo*, 312 F.R.D. at 320-21 ("[T]here would be no need for a five factor test ... if one factor were dispositive in every context. Not surprisingly, no court has adopted a per se rule that any one *Cammer* factor is dispositive."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69, 83-84 (S.D.N.Y. 2015); *Forsta AP-Fonden v. St. Jude Med., Inc.,* 312 F.R.D. 511, 520 (D. Minn. 2015).

**\*13** Regardless, the Court concludes that Plaintiffs have established the fifth *Cammer* factor by a preponderance of the evidence. To address the fifth *Cammer* factor, Dr. Hartzmark employed an event study. (Hartzmark Report ¶ 34.) An event study "is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." 📁 *United States v. Schiff,* 602 F.3d 152, 173 n.29 (3d Cir. 2010). As described by Dr. Hartzmark:

> To perform an event study, one begins by separating the impact on security price movements of market– and industry-wide factors from firm-specific factors. This approach uses a so-called market model to partition a company's common stock price movement on each trading day into three parts: the movement caused by market-wide factors, or the 'market effect'; the movement caused by industry-wide factors, or the 'industry effect'; and the movement caused

by the 'firm specific effect.'...[O]n each day the firm-specific effect is obtained by subtracting the stock price movement that is *predicted* for that day...from the *actual* stock price movement on that same day. This subtraction yields the 'abnormal result' for that day, and represents the portion of the return that is not predicted by market– and industry-wide factors.

(Hartzmark Report ¶ 35.)

Defendants' expert, Dr. David Marcus, counters that "Dr. Hartzmark's event study methodology is insufficient to establish the existence of a cause-and-effect relationship between DFC Global's stock price and new, value-relevant information throughout the entire Proposed Class Period and thus does not prove that the market in which DFC Global's common stock traded during the Proposed Class Period was efficient." (Defs.' Opp'n Ex. 1 [Marcus Report] ¶ 6.)

Dr. Marcus states that "[i]f a cause-and-effect relationship is not present, then the market for that security is not efficient." (Marcus Report ¶ 21.) He continues: "[i]f an event study does not reveal sufficient evidence of a cause-and-effect relationship throughout the relevant period, one cannot reliably conclude that a market was efficient during that period, even if the other *Cammer* factors indicate that the market was open and developed." (*Id.*)

Whatever the economic import of these statements may be, this rigid viewpoint fails to comport with the legal landscape of market efficiency. As noted previously, some courts have not performed a *Cammer* analysis when the security was traded on a public exchange such as the NASDAQ. Other courts have performed the *Cammer* analysis, but have pointed out that the absence of a cause-and-effect relationship does not foreclose the possibility of an efficient-market finding.

Dr. Marcus also takes Dr. Hartzmark to task for performing an event study that failed to actually test for market efficiency. (Marcus Report ¶ 27.) Dr. Marcus questions Dr. Hartzmark's methodology for testing marketing efficiency, noting that Dr. Hartzmark did not identify events that would be expected to have either a positive or negative effect on DFC Global's stock price in an efficient market, and then test whether or not

the price moved as expected. (*Id.* ¶ 28.) Defendants' expert also argues that Dr. Hartzmark's peer index was not truly representative of DFC Global's industry, and thus failed to properly control for industry factors. (*Id.* ¶ 29.)

The Court concludes that Plaintiffs have the better of this battle of the experts. For one, Dr. Hartzmark's numbers are essentially unchallenged. While Defendants' strategy here appears to call into question Plaintiffs' expert's conclusions, Defendants have not tried to show that the market for DFC Global stock was inefficient. Moreover, without an attack on the underlying numbers, the Court ultimately concludes that the fifth *Cammer* factor points toward market efficiency. Dr. Hartzmark's report includes data to support the conclusion that abnormal returns were experienced on dates that included corrective disclosures. Essentially, the experts are talking over each other, but Dr. Hartzmark has data underlying his conclusions and Dr. Marcus just has noise. Finally, the Court sees no problem with the peer index used by Dr. Hartzmark. DFC Global deemed as peers some of the companies included in Dr. Hartzmark's peer index. Moreover, Dr. Marcus did not develop an alternative peer index or even offer a suggestion as to what "peers" he would have added or eliminated from Dr. Hartzmark's peer index. Thus, this Court is left with a vague and unsubstantiated critique of the peer index.

**\*14** The Court concludes that DFC Global traded on an efficient market, and that Plaintiffs are entitled to the presumption of reliance outlined in *Basic*.

### 2. Rebutting the Basic presumption

A defendant can rebut the *Basic* presumption by providing direct evidence that demonstrates that the relevant corrective disclosures did not impact the security's price. 🚩 *Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.,* Civ. A. No. 12-5275, 2015 WL 5097883, at \*12 (D.N.J. Aug. 31, 2015). Because a defendant's burden of proving a lack of price impact is "daunting," simply "pointing to other potential causes for a stock price change following a corrective disclosure is therefore not enough to rebut the *Basic* presumption." *Id.*

To support their argument that they have rebutted the presumption of reliance, Defendants contend that the record evinces a lack of price impact stemming from the vast majority of the alleged misrepresentations. (Defs.' Opp'n at 20-21.) Specifically, Defendants point out that "Plaintiff's

own expert...determined that a statistically positive price movement did **not** follow **nineteen** of the twenty days on which Plaintiffs claim DFC made materially misleading statements." (*Id.* at 20.)

Defendants have failed to rebut the *Basic* presumption with direct evidence. They did not include their own event study and instead have simply tried to attack Plaintiff's expert. *See* 🚩 *Strougo,* 312 F.R.D. at 325. Furthermore, even accepting that the stock did not increase immediately following a misstatement, it does not "necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact." 🚩 *Sterling Heights,* 2015 WL 5097883, at \*12 n.8. Perhaps the misstatements aided in keeping the price of the stock artificially high. *See id.*; *see also Barclays,* 310 F.R.D. at 95. Regardless, Plaintiffs produced evidence of price impact upon the disclosure of the misrepresentations, and Defendants have failed to provide a valid reason to discount that evidence. Therefore, the Court concludes that Defendants have failed to overcome the *Basic* presumption.

### 3. Damages

Defendants also charge that Plaintiffs cannot satisfy the predominance requirement because they cannot show that their alleged damages are measurable on a class-wide basis. (Defs.' Opp'n at 24.) To support this argument, Defendants rely on 🚩 *Comcast v. Behrend,* 133 S. Ct. 1426 (2013). In *Comcast,* the Supreme Court concluded that the class was improperly certified because the model used to calculate damages failed to measure damages resulting from the particular antitrust injury that had served as the basis for the class's theory of liability. The Supreme Court decided that a damages model that did not even attempt to measure damages in accordance with the class's theory of liability "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of 🚩 Rule 23(b)(3)." 🚩 *Id.* at 1433.

The problem with Defendants' argument is that the Third Circuit has addressed the import of the *Comcast* decision: "A close reading of [*Comcast*] makes it clear that the predominance analysis was specific to the antitrust claim at issue." 🚩 *Neale,* 794 F.3d at 374. Subsequent to the decision in *Comcast,* it remains the law in the Third Circuit

West Palm Beach Police Pension Fund v. DFC Global Corp., Not Reported in Fed....
2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

that the need to perform individual damages calculations does not foreclose class certification under 🚩 Rule 23(b)(3). *Id.* at 374-75; *see also* 🚩 *Sterling Heights,* 2015 WL 5097883, at *13 ("Class certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages. Indeed, in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be an abuse of discretion.").

 **\*15** Defendants are aware of the uphill battle their damages argument faces and make clear that they are preserving this argument on the applicability of *Comcast* to securities cases pending Supreme Court review of a cert petition filed in a case in the Fifth Circuit. (*See* Defs.' Apr. 26, 2016 Br. at 10-11.) The Court appreciates Defendants' need to advocate this position, but holds that the current state of the law in the Third Circuit forecloses Defendants' position on damages.

## IV. CONCLUSION

The parties have presented their arguments, and the Court has sifted through the filings, considered the arguments, and even learned some things about economics. To date, both sides have performed ably on behalf of their clients. Ultimately, the Court concludes that Plaintiffs have shown by a preponderance of the evidence that they have satisfied the requirements of 🚩 Rule 23. Accordingly, Plaintiffs' motion for class certification is granted. An Order consistent with this Memorandum will be docketed separately.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4138613, Fed. Sec. L. Rep. P 99,253

## Footnotes

1    This factual recitation is taken largely from the Court's June 16, 2015 Memorandum.

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.