IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | No. 19-md-2875-RBK |
| | Hon. Robert Kugler |
| This document relates to: | |
| *All Actions* | |

**MEDICAL MONITORING PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE THE OPINIONS OF ZIRUI SONG, M.D., PH.D.**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................1

II.    DR. SONG'S QUALIFICATIONS AND OPINIONS ...................................1

    A.    Qualifications ...........................................................1

    B.    Opinions ................................................................2

III.    ARGUMENT...................................................................4

    A.    Legal Standard...........................................................4

    B.    Dr. Song's Opinions Satisfy Rule 702 and the *Daubert* Standard .........................................................5

        1.    Dr. Song is Qualified to Opine on Medical Monitoring............5

        2.    Dr. Song's Testimony is Reliable under *Daubert* ......................5

        3.    Dr. Song's Testimony is Relevant ............................7

    C.    Defendants' Arguments Fail .................................................9

        1.    Dr. Song's Analysis is Based on the Reasonable Application of Well-Established Sources. .................................9

            a.    Dr. Song's methodology was not speculative. ................9

            b.    Dr. Song's selection and application of source material was reliable........................................11

            c.    Dr. Song's Report Provides Important Information and Should Not be Excluded Based on the Absence of an Identified "Quantity" ..............................18

        2.    Dr. Song's Opinions "Fit" Because They are Relevant and Helpful................................................20

IV.    CONCLUSION................................................................23

- i -

# TABLE OF AUTHORITIES

**Page**

**Cases**

Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.,
    321 F.R.D. 193 (E.D. Pa. 2017) .............................................................................23

*Daniels-Feasel v. Forest Pharm., Inc.*,
    No. 17 CV 4188-LTS-JLC, 2021 U.S. Dist. LEXIS 168292 (S.D.N.Y.
    Sep. 3, 2021).........................................................................................................17

*Diaz v. Carnival Corp.*,
    544 F. Supp. 3d 1352 (S.D. Fla. 2021) ...................................................................7

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000) ...................................................................................6

*Floyd v. United States*,
    No. 3:08-CV-122 (CDL), 2010 U.S. Dist. LEXIS 125247 (M.D. Ga. Nov.
    26, 2010).................................................................................................................14

*Frost v. Teco Barge Line, Inc*.,
    No. 04-cv-752-DRH, 2007 U.S. Dist. LEXIS 10470 (S.D. Ill. Feb. 15,
    2007)........................................................................................................................11

*Geiss v. Target Corp*.,
    No. 09–2208 RBK/KMW, 2013 U.S. Dist. LEXIS 124413 (D.N.J. 2013).......6, 8

General Electric Co. v. Joiner,
    522 U.S. 136 (1997) ........................................................................................ 15,16

*Hardwick v. 3M Co*.,
    No. 2:18-cv-1185 U.S. Dist. LEXIS 39300 (S.D. Ohio Mar. 7, 2022) ...............19

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015)........................................................................ 4, 19, 20

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    No. 18-cv-864, 2022 U.S. Dist. LEXIS 11261 (N.D. Ill. Jan. 21, 2022)............12

In re Hydrogen Peroxide Antitrust Litig.,
    552 F.3d 305 (3d Cir. 2008)..................................................................................19

# TABLE OF AUTHORITIES
## (continued)

Page

In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.,
  509 F. Supp. 3d 116 (D.N.J. 2020) ...................................................................12

*In re Marriott Int'l, Inc.*,
  No. MDL No. 19-md-2879, 2022 U.S. Dist. LEXIS 80510 (D. Md. May 3, 2022)..................................................................................................................4

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  No. 06-0620, 2015 U.S. Dist. LEXIS 120892 (E.D. Pa. July 29, 2015) .............13

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)...................................................................................5

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019), aff'd sub nom. In re Suboxone
  (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig., 967 F.3d
  264 (3d Cir. 2020) ...............................................................................................8

*In re TMI Litig. Cases Consol. II*,
  922 F. Supp. 1038 (M.D. Pa. 1996) ...................................................................18

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ...... 5, 21, 22

In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,
  45 F. Supp. 3d 724 (N.D. Ohio 2014)...................................................................7

In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.,
  858 F.3d 787 (3d Cir. 2017)......................................................................... 17,18

*In re Zoloft*,
  26 F. Supp. 3d 449 (E.D. Pa. 2014) ...................................................................14

*Jones v. U.S.*,
  933 F. Supp. 894 (N.D. Cal. 1996) ............................................................. 14-15

Karlo v. Pittsburgh Glass Works, LLC,
  849 F.3d 61 (3d Cir. 2017)....................................................................................5

Lithuanian Commerce Corp. v. Sara Lee Hosiery,
  179 F.R.D. 450 (D.N.J. 1998) ............................................................................10

- iii -

# TABLE OF AUTHORITIES
## (continued)

**Page**

Magistrini v. One Hour Martinizing Dry Cleaning,
180 F. Supp. 2d 584 (D.N.J. 2002) ...................................................................15

Manpower, Inc. v. Insurance Co. of Pennsylvania,
732 F.3d 796 (7th Cir. 2013)............................................................................13

*Meadows v. Anchor Longwall & Rebuild, Inc.,*
306 F. App'x 781 (3d Cir. 2009)............................................................ 8, 20,21

*Mihalick v. Delvaux,*
Civil Action No. 21-93, 2022 U.S. Dist. LEXIS 39092 (W.D. Pa. Mar. 4, 2022)...................................................................................................................7

*N.J. Dep't of Envtl. Prot. v. Amerada Hess Corp.,*
Civil Action No. 15-6468 (FLW) (LHG), 2019 U.S. Dist. LEXIS 1463363 (D.N.J. Aug. 28, 2019) .......................................................................................13

*Schultz v. Akzo Nobel Paints, LLC,*
721 F.3d 426 (7th Cir. 2013)..............................................................................13

Stecyk v. Bell Helicopter Textron, Inc.,
295 F.3d 408 (3d Cir. 2002)...............................................................................23

Stollings v. Ryobi Technologies, Inc.,
725 F.3d 753 (7th Cir. 2013)..............................................................................13

UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,
949 F.3d 825 (3d Cir. 2020)...............................................................................22

*Williams v. Rene,*
72 F.3d 1096 (3d Cir. 1995).........................................................................9, 10

*Zink v. McClung,*
No. 5:14CV25, 2014 U.S. Dist. LEXIS 193162 (N.D.W. Va. Nov. 14, 2014)...................................................................................................................7

**Rules**

Fed. R. Civ. P. 23(b)(2)............................................................................ 18, 19, 20

Fed. R. Civ. P. 23(b)(3)...................................................................................19

Fed. R. Civ. P. 702 ........................................................................................5, 7

# TABLE OF AUTHORITIES
## (continued)

**Page**

**Treatises**

Michael D. Green et al., Reference Guide on Epidemiology, in Reference
Manual on Scientific Evidence 333 (2d ed. 2000)...............................................14

**Other Authorities**

Eric Lopez, et al., *How Much More Than Medicare Do Private Insurers
Pay? A Review of the Literature*, Kaiser Fam. Found. (Apr. 15, 2020),
available at https://www.kff.org/report-section/how-much-more-than-
medicare-do-private-insurers-pay-a-review-of-the-literature-issue-brief/... 11, 12,
15

2421792.1

## I.    INTRODUCTION

Plaintiffs submitted the expert report of Dr. Zirui Song, an economist, public health expert, and medical doctor, as part of their record in support of class certification for their medical monitoring claim.  Dr. Song's report demonstrates that the total price tag for the medical monitoring program can be identified using a common methodology.

Defendants' Daubert motion against Dr. Song argues that his methods were unreliable and that his opinions are not helpful to a trier of fact.  These arguments fail for the following reasons.

First, Dr. Song's qualifications are unchallenged. Second, Dr. Song reliably selected and applied appropriate and well-established sources without resorting to speculation or arbitrary exclusion. Finally, Dr. Song produced a relevant opinion because his proffered methodology will assist the fact finder in determining the total spending that would accrue under Plaintiffs' medical monitoring program.

## II.    DR. SONG'S QUALIFICATIONS AND OPINIONS

### A.    Qualifications

Dr. Song is an Associate Professor of Health Care Policy at Harvard Medical School and an internal medicine physician at Massachusetts General Hospital. He received a M.D., Magna Cum Laude, from Harvard Medical School in 2014, a Ph.D. in Health Policy (Economics) from Harvard University in 2012, and a B.A. in Public Health Studies with Honors from Johns Hopkins University in 2006.

MEDICAL MONITORING PLNTFFS' OPPO. TO DEFS' JOINT MOTION TO EXCLUDE NO. 19-MD-2875-RBK

Dr. Song has taught health policy and health economics in undergraduate, Masters-level, and Ph.D.-level courses in the Harvard Graduate School of Arts and Sciences, Harvard T.H. Chan School of Public Health, Harvard Kennedy School, and Harvard Business School. He has also taught classes on health policy and health economics to medical students and clinical trainees (residents and fellows) at Harvard Medical School, Massachusetts General Hospital, and the Brigham and Women's Hospital, along with guest lectures at the University of Pennsylvania.

Dr. Song's research in health policy and economics focuses on health care financing, payment, and spending in the U.S. health care system. This work examines the pricing of health care services, policies and market forces that influence spending, and changes in provider behavior associated with changes in payment systems and incentives. He has published approximately one hundred peer-reviewed academic research articles, essays, and book chapters (including recent studies on Medicare and commercial pricing of medical services).

### B.    <u>Opinions</u>

In keeping with Dr. Song's expertise and research work, he has prepared a report demonstrating that medical monitoring spending can be determined on a class-wide basis using a common methodology.

As Dr. Song explains, each medical service is assigned a Current Procedural Terminology (CPT) code. This "coding system" provides a "common language" by

MEDICAL MONITORING PLNTFFS' OPPO. TO DEFS' JOINT MOTION TO EXCLUDE NO. 19-MD-2875-RBK

establishing a standardized code for each health care service. *See* Expert Report of Zirui Song ("Song Rep.") (Exhibit A) at ¶17. Next, Dr. Song explains how prices are determined for medical services. *Id.* at ¶¶18-23. Dr. Song then illustrates the functionality of his methodology by using data from the 2021 Medicare fee schedules to test his model and show that the price of any service contemplated by the medical monitoring program is knowable. *Id.* at ¶33. Next, he identifies the method of pricing medical services under commercial insurance or Medicaid.[1] *Id.* at ¶¶35, 37. In assessing medical services, Dr. Song uses a conservative ratio of commercial-to-Medicare prices derived from a literature review covering nineteen different studies on the subject. *Id.* at ¶¶22, 35. Similarly, Dr. Song identifies a ratio of Medicaid-to-Medicare prices based on an index prepared by the Kaiser Family Foundation. *Id.* at ¶37. These ratios allow one to use the published Medicare prices to ascertain Medicaid and commercial prices. In so doing, he renders the total estimated spending on medical monitoring discoverable by solving the first variable (price) in the fundamental equation of price x quantity=spending. *Id.* at ¶33; *see*Deposition of Zirui Song ("Song Dep.") (Exhibit B) 65:23-25. This goes to the existence and reasonable necessity of medical monitoring as a remedy for the

---

[1] Under the Protecting Access to Medicare Act of 2014 ("PAMA"), laboratory commercial prices equal Medicare prices. "Medicare prices are determined by the commercial prices reported to federal regulators as specified by PAMA." *Id.* at ¶34.

MEDICAL MONITORING PLNTFFS' OPPO. TO DEFS' JOINT MOTION TO EXCLUDE NO. 19-MD-2875-RBK

population exposed to the lifetime cumulative threshold of contaminated valsartan.

## III.   ARGUMENT

Dr. Song has produced reliable and relevant testimony that is more than sufficient to survive a *Daubert* challenge.

### A.   Legal Standard

The standards governing the admissibility of expert testimony at the class certification stage are set forth in Plaintiff's Memorandum of Law in Opposition to Motion to Exclude Opinions of Dr. Edward H. Kaplan, M.D. (Dkt. 2072), and are incorporated fully herein.[2] A recent decision in another MDL at the class certification stage has further elucidated the standard of review. *See In re Marriott Int'l, Inc.*, No. MDL No. 19-md-2879, 2022 U.S. Dist. LEXIS 80510, at *324 (D. Md. May 3, 2022) (largely rejecting defendant's *Daubert* challenge and finding that "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a seachange over federal evidence law,' and 'the trial court's role of gatekeeper is not intended to serve as a replacement for the adversary system"—where "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

---

[2] In this Circuit, "courts limit the *Daubert* inquiry to expert testimony offered to prove satisfaction of Rule 23's requirements." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 188 n.8 (3d Cir. 2015). Dr. Song's testimony is relevant to show that a common methodology will demonstrate whether the elements of medical monitoring are satisfied.

the traditional and appropriate means of attacking shaky but admissible evidence." (internal citations and quotations omitted)).

### B.    Dr. Song's Opinions Satisfy Rule 702 and the *Daubert* Standard

#### 1.    Dr. Song is Qualified to Opine on Medical Monitoring

Dr. Song is qualified by his education, experience, and training. *See supra* section II.A. Defendants do not contest Dr. Song's qualification to show how a monitoring program would be priced.

#### 2.    Dr. Song's Testimony is Reliable under *Daubert*

The second Rule 702 requirement (also known as reliability) is taken to "mean[] that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (citation omitted). While such "good grounds" for an expert's opinion are required, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Id.* at 744. Good grounds may exist even if the court believes there "are better grounds for some alternative conclusion" or that "a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result." *Id.* Courts do not look for whether "a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended,*

199 F.3d 158 (3d Cir. 2000)). To analyze reliability for scientific opinions, the Supreme Court has set out a list of non-exhaustive factors known as the Daubert factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Geiss v. Target Corp.*, No. 09–2208 RBK/KMW, 2013 U.S. Dist. LEXIS 124413, at *12-13 (D.N.J. 2013) (*quoting Elcock v. Kmart Corp.*, 233 F.3d 734, 745-47 (3d Cir. 2000)).

As detailed herein, Dr. Song's report more than satisfies this standard. In his report, Dr. Song applies his substantial academic and practical experience to a large body of research on the prices of medical services to show that medical monitoring spending can be calculated using common methodology. Specifically, Dr. Song identified the relationship between the publicly available Medicare prices for medical services and prices for the same services under commercial insurance and Medicaid. He then used these ratios to show that one could work from the Medicare prices to find pricing information for medical services for members of the proposed class. In so doing, he lays out a clear and thoughtful approach that is more than

sufficient to survive a *Daubert* challenge in the context of estimating future medical costs.[3]  Furthermore, Dr. Song's extensive qualifications by way of his research and expertise on the subject of medical service pricing also weighs in favor of the reliability of his report. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 724, 736 (N.D. Ohio 2014) (expert qualified to opine on design defect based on "his own experience in washer design", though he "conducted no scientific testing in the strict sense"); *Zink v. McClung*, No. 5:14CV25, 2014 U.S. Dist. LEXIS 193162, at *13 (N.D.W. Va. Nov. 14, 2014) (pathologist was qualified to opine on a plaintiff's cause of death "through his specialized knowledge and experience").

### 3.    Dr. Song's Testimony is Relevant

The third requirement of Rule 702, relevance, is satisfied "if an opinion fits a particular case (and thus helps the trier of fact)" – i.e., there must be a "connection

---

[3] *See e.g.*, *Mihalick v. Delvaux*, Civil Action No. 21-93, 2022 U.S. Dist. LEXIS 39092, at *6-7 (W.D. Pa. Mar. 4, 2022) ("Regarding Cline's underlying methodology, which Defendant broadly challenges, Cline testified that she uses a variety of published resources to come up with a localized cost estimate for medical procedures, office visits, prescriptions, durable medical equipment, and the like, in accordance with the recommendations from the individual's medical provider... Cline does not provide any of her own medical diagnoses or recommendations…Given the limited role in assessing proffered expert testimony, the Court finds that the record demonstrates that Cline's proposed expert testimony meets the remaining *Daubert* requirements of "reliability" and "fit," such it is suitable for presentation to the jury."); *Diaz v. Carnival Corp.*, 544 F. Supp. 3d 1352, 1359–60 (S.D. Fla. 2021) (similarly rejecting Daubert challenge to plaintiff's expert's opinion on future medical expenses).

between the scientific research or test result to be presented and particular disputed factual issues in the case." *Geiss*, 2013 U.S. Dist. LEXIS 124413, at *13 (internal quotation marks omitted). "The standard for the factor is not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citations omitted).

Dr. Song's opinions are relevant because his proffered methodology will assist the fact finder in determining the total health care spending that would accrue under Plaintiffs' medical monitoring program. In so doing, Dr. Song's helps answer the most important question at this stage of proceedings: can the eventual medical monitoring spending calculations be accomplished using a common methodology? To analogize from relevant cases in the antitrust context, where experts routinely estimate the economic costs of antitrust injury, it is not necessary that Dr. Song provide an exact calculation of how much the monitoring will cost, only that such a cost of such a remedy can be ascertained. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 35–40 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) ("[a]t the class certification stage we do not require that Plaintiffs tie each theory of antitrust impact to an exact calculation of damages, but instead that they assure us that if they can prove antitrust impact,

the resulting damages are capable of measurement and will not require labyrinthine individual calculations."). In his data-driven explanation of medical prices, Dr. Song conclusively shows that eventual medical monitoring spending calculations can indeed be done using a common methodology. Song Rep. ¶¶33-37, 42.

### C.    Defendants' Arguments Fail

#### 1.    Dr. Song's Analysis is Based on the Reasonable Application of Well-Established Sources

Defendants' arguments are unavailing. They rely upon inapposite caselaw that fails to demonstrate that Dr. Song's testimony features flawed methodology or sources.

#### a.    Dr. Song's methodology was not speculative

First, Defendants argue that Dr. Song engaged in speculation as to pricing and, in so doing, ignored the complexity and variations within healthcare pricing. *See* Defendants' Memorandum of Law in Support of Motion to Exclude Opinions of Zirui Song, M.D., Ph.D. (Dkt. 2032) ("Def. Br.") at 11. Not so. Dr. Song does not contend that prices are uniform, instead his methodology harmonizes differences by using a national average relationship between Medicare and commercial insurance prices. Song Rep. at ¶¶35, 37. In so doing, he shows that medical monitoring spending can be determined using a common methodology. *See Id*. at ¶¶33-37, 42. Additionally, Dr. Song's report is grounded in the direct application of reliable data rather than speculation. He therefore differs from the expert in *Williams v. Rene* who

claimed that the plaintiff's earnings would triple over his career without providing any evidence that the plaintiff was qualified for any higher-wage positions. 72 F.3d 1096, 1102 (3d Cir. 1995). Moreover, unlike the actuarial expert in *Williams*, who was testifying as to actual damages at trial, Dr. Song has been asked to demonstrate that a common methodology will be used to show how the program will be priced—rather than calculate the price now. *Id.*; Song Rep. at ¶8-9.

Defendants make the same error in their cite to *Lithuanian Commerce Corp. v. Sara Lee Hosiery*. There, unlike Dr. Song, the expert "was retained to calculate damages". *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 458 (D.N.J. 1998). Additionally, the expert in *Sara Lee Hosiery* made wild estimations and speculations, including guesswork derived from great leaps taken from a single witness's testimony. *See id.* at 460-461 ("Cummiskey's assumption 'that Baltic women consume approximately ten pair of pantyhose per year is not based on any survey of Baltic women . . . [but rather] on a survey of American women and an LCC management conclusion that Baltic women consume less pantyhose per year than women in the United States… He also assumed, with no apparent basis, that LCC controlled 10% of the relevant markets, that LCC's share of the Lithuanian market would have increased at a rate of 1% annually and that LCC's participation in various markets would last for certain durations."). In sharp contrast, Dr. Song did not base his spending analysis on farfetched assumptions, he based it on the direct

application of the findings made by well-established studies, which are commonly cited sources in the field.

Defendants' reference to *Frost* is even further afield. There, a medical expert's testimony was excluded in a personal injury case because he erroneously assumed that the plaintiff did not "suffer from back pain prior to her fall." *Frost v. Teco Barge Line, Inc.*, No. 04-cv-752-DRH, 2007 U.S. Dist. LEXIS 10470, at *10-11 (S.D. Ill. Feb. 15, 2007). Once informed of his misunderstanding, the *Frost* expert acknowledged that "he would have to 're-evaluate' his opinion regarding the source (or cause) of Plaintiff's pain." *Id*. Here, by contrast, Dr. Song has not predicated his report on any such misunderstanding and certainly has not indicated that he will have to re-evaluate his report.  These cases are inapposite.

> **b.    Dr. Song's selection and application of source material was reliable**

Defendants next lodge a series of attacks on Dr. Song's use of the Lopez study, which "reviews the findings of 19 recent studies comparing Medicare and private health insurance payment rates for hospital care and physician services."[4]  Def. Br. 12-18. Defendants' complaints appear to fall into four buckets: 1) geographic and other price variations mean that Dr. Song should not have applied the Lopez study's

---

[4] Eric Lopez, et al., *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, Kaiser Fam. Found. (Apr. 15, 2020), available at https://www.kff.org/report-section/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature-issue-brief/.

aggregate ratios; 2) Dr. Song's application of the Lopez study somehow conflicted with the findings of its authors; 3) Dr. Song's use of the Lopez study is a function of subjective cherry-picking of sources; and 4) a difference in populations between the Lopez study and medical monitoring class precludes any direct application of the Lopez study. *Id.* Contrary to their assertions, Dr. Song's use and application of sources is appropriate given the scope of the proposed classes, is objectively reasonable, and not in conflict with the report itself. *Id.*

Defendants' attacks on Dr. Song's use of the Lopez meta-analysis study are not consistent with the Daubert gatekeeping standard because they go to the weight, not admissibility of the testimony. *See, e.g.*, *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 184 (D.N.J. 2020) ("[T]he fact that experts may disagree as to how to interpret the relevant studies at issue does not indicate one expert is more reliable than the other. Moreover, to the extent there are competing studies relied upon by the parties' experts, a weighing of those studies is reserved for the factfinder at trial."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2022 U.S. Dist. LEXIS 11261, at *31 (N.D. Ill. Jan. 21, 2022) ("Rule 702's requirement that expert opinions be supported by sufficient facts or data means that the expert considered sufficient data to employ the methodology . . . . For example, if an expert seeks to testify about an average gross sales price but is going to base the testimony on sales to only a single

customer, a court would appropriately exclude the testimony because a single observation does not provide a sufficient basis for calculating an average . . . . Whether an expert selected the best data set to use, however, is a question for the jury, not the judge.") (quoting in part *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) and *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013)) (internal citations and quotation marks excluded); *N.J. Dep't of Envtl. Prot. v. Amerada Hess Corp.*, Civil Action No. 15-6468 (FLW) (LHG), 2019 U.S. Dist. LEXIS 146336, at *23 (D.N.J. Aug. 28, 2019) ("In other words, in Getty's view, Brown simply did not consider the best data in reaching his conclusions, which in and of itself is not a proper basis to exclude an expert's testimony."); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 U.S. Dist. LEXIS 120892, at *53 (E.D. Pa. July 29, 2015) ("[A]rguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." (quoting *Manpower*, 732 F.3d at 808)). Indeed, where there is "a rational connection between the data and the opinion," the "expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower*, 732 F.3d at 809.[5]

---

[5] "Our system relies on cross-examination to alert the jury to the difference between good data and speculation." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432 (7th Cir. 2013).

Meta-analysis studies like the Lopez study are helpful precisely because they combine individual studies into a more coherent and accurate average:

> Meta-analysis is a method of pooling study results to arrive at a single figure to represent the totality of the studies reviewed. It is a way of systematizing the time-honored approach of reviewing the literature, which is characteristic of science, and placing it in a standardized framework with quantitative methods . . . .

*Floyd v. United States*, No. 3:08-CV-122 (CDL), 2010 U.S. Dist. LEXIS 125247, at *37 n.5 (M.D. Ga. Nov. 26, 2010) (quoting Michael D. Green et al., Reference Guide on Epidemiology, in Reference Manual on Scientific Evidence 333, 380 (2d ed. 2000)). It is both reasonable and prudent to rely upon a study that incorporates data from nineteen independent studies into a clear representation of the average relationship between public and private medical prices.

The purportedly analogous cases cited by Defendants on the matter are grossly dissimilar and inapplicable. Unlike in *In re Zoloft*, Dr. Song does not inject "subjective beliefs" into his data-based analysis. 26 F. Supp. 3d 449, 462 (E.D. Pa. 2014). There, the expert cherry-picked evidence on grounds inconsistent with her own prior publications and failed to provide sufficient support as to why her opinion had completely reversed from testimony she provided in 2012. *Id*. More importantly, Defendants never identify any of Dr. Song's opinions as subjective so there is no basis for the application of this case.

Likewise, *Jones v. U.S.* concerned causation experts that "took data from

articles that found no statistically significant correlation between antibiotic use and increased failure of oral contraceptives, and used the data to reach a conclusion contrary to the articles' own authors." 933 F. Supp. 894, 898 (N.D. Cal. 1996). Here, despite Defendants' selected quotations and suggestions, they offer no indication of how Dr. Song's data was used in direct contradiction to their findings.

Next, Defendants' argument regarding the difference in populations between the Lopez study and medical monitoring class is inapplicable. Def. Br. at 14. A patient's age and medical history do not change the price of a medical service. Song Dep. 172:9-23, 228:8-229:8. As a result, there is no "analytical gap" to bridge.[6]  Dr. Song's application of the ratios produced from the Lopez meta-analysis study is also not comparable to the analysis in *Magistrini*—where the expert failed to provide good grounds for relying on studies which examined 1) carcinogens not at issue in the case and 2) cancers not at issue in the case. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 603 (D.N.J. 2002). Similarly, *General Electric Co. v. Joiner* concerned a causation expert who only relied on studies that were either inconclusive or grossly inapplicable. 522 U.S. 136, 144-46 (1997). The

---

[6] Moreover, Defendants' characterization of the Lopez report as a single study on a single population is misleading. The Lopez study in fact aggregates 19 studies of patient populations' medical prices. Eric Lopez, et al., *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, Kaiser Fam. Found. (Apr. 15, 2020), available at https://www.kff.org/report-section/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature-issue-brief/.

epidemiological studies reached by the causation expert in *Joiner* were either inconclusive or concerned other carcinogens. *Id.* Additionally, the animal studies relied upon in *Joiner* were fundamentally "dissimilar to the facts presented in this litigation." *Id.* at 144.[7] This is not a case of a causation expert who reached for studies with no bearing on the injury at issue or which fail to provide adequate support. Dr. Song does not opine on general causation; his opinions are appropriately cabined to assisting the fact finder in determining the total spending that would accrue under Plaintiffs' medical monitoring program and Dr. Song applied appropriate data to render his opinions.

Defendants' subsequent arguments point to medical service price variations depending on the geographic location and facility. Def. Br. at 15. Conspicuously missing, however, is any citation or support following Defendants' bold assertion that "the geographical variation between commercial insurers in one location and those in another is so great that it cannot possibly be accounted for by a single meta-analysis purporting to average prices." *Id.* Defendants' hyper-localized and sub-

---

[7] "The infant mice in the studies had had massive doses of PCBs injected directly into their peritoneums or stomachs. Joiner was an adult human being whose alleged exposure to PCBs was far less than the exposure in the animal studies. The PCBs were injected into the mice in a highly concentrated form. The fluid with which Joiner had come into contact generally had a much smaller PCB concentration of between 0-500 parts per million. The cancer that these mice developed was alveologenic adenomas; Joiner had developed small-cell carcinomas." *Id.* at 144

categorical analysis does not invalidate nationwide averages taken from multiple studies.  Rather than engage with Dr. Song's correctly formulated aggregate analysis, Defendants are attempting to drag Dr. Song into an unnecessary mire of city-by-city and even hospital-by-hospital analysis. This is not in keeping with above-discussed *Daubert* standard.

Unlike the experts in *In re Zoloft* and *Daniels-Feasel Forest Pharms,* Dr. Song's reliance on the meta-analysis in Lopez is proper in light of the vastly larger data set contained within. *C.f. Daniels-Feasel v. Forest Pharm., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 U.S. Dist. LEXIS 168292, at *22-23 (S.D.N.Y. Sep. 3, 2021) (excluding opinions of expert who defendants accused of "repeatedly cherry-pick[ing] the findings on which he chooses to rely while disregarding the limitations expressed by the studies he cites in support of his conclusions, and dismiss[ing] inconsistent findings without explanation.") (appeal pending); *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 798 (3d Cir. 2017) ("Dr. Jewell emphasized the insignificance of results reporting odds ratios below 1 but not the insignificance of those reporting odds ratios above 1").

Moreover, the expert challenged in *In re Zoloft* performed his own deeply flawed "meta-analysis", which drew from only two studies and failing to provide an adequate explanation for why those two studies could be lumped together despite their inconsistent fundamental definitions. *Id.* This conduct is not comparable to Dr.

Song's above-discussed decision to rely upon the existing meta-analysis produced by the Lopez study to ascertain a ratio in keeping with the broad geographic scope of the class allegations.[8]  This matter further differs from *In re Zoloft* because the Lopez meta-analysis was not prepared in anticipation of litigation.

Meanwhile, Defendants' reference to the omission of the *Chernew* study ignores Dr. Song's explicit decision to adopt a conservative ratio by specifically using physician service figures—thus rendering distinctions between physician service fees, inpatient fees, and outpatient fees irrelevant. Song Rep. ¶35. Moreover, "the failure to consider certain potentially relevant data goes to the weight of the testimony" and not its admissibility. *In re TMI Litig. Cases Consol. II*, 922 F. Supp. 1038, 1043–44 (M.D. Pa. 1996).

### c.    Dr. Song's Report Provides Important Information and Should Not be Excluded Based on the Absence of an Identified "Quantity"

Finally, Defendants argue in passing that Dr. Song's analysis should have been accompanied by guidance on how to calculate the "quantity factor". Def. Br. 18. Defendants fail to cite a *single* case in which an expert's testimony was excluded on these grounds. *Id*. at 18-19.

Here, it warrants mentioning again that Plaintiffs primarily seek Rule 23(b)(2)

---

[8] Defendants also fail to acknowledge paragraph 36 of Dr. Song's report, which proposes an alternative to a ratio-based approach to calculating commercial prices: using "a large commercial insurer claims database."

certification, which is injunctive in nature. The sole cases cited by Defendant in this section concern class certification under Rule 23(b)(3). *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 185-87 (3d Cir. 2015). Both *In re Hydrogen Peroxide* and *In re Blood Reagents* were antitrust cases where the plaintiffs sought a Rule 23(b)(3) class certification for damages classes. Further, the bar for certification of antitrust claims is higher and inherently more individualized because they require additional analysis of "individual injury (also known as antitrust impact)" and separate "measurable damages." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311. Therefore, even if the *In re Hydrogen Peroxide* and *In re Blood Reagents* opinions had excluded expert testimony, which they did not, the relevant factual considerations in both decisions are too dissimilar from the present Rule 23(b)(2) case—which primarily seeks injunctive relief. *See e.g., Hardwick v. 3M Co.*, No. 2:18-cv-1185, 2022 U.S. Dist. LEXIS 39300, at *60 (S.D. Ohio Mar. 7, 2022).

But even if this Court were inclined to certify a Rule 23(b)(3) rather than a Rule 23(b)(2) class, neither *In re Hydrogen Peroxide* and *In re Blood Reagents* preclude the admissibility of Dr. Song's opinion because they are also factually distinguishable. Both of those cases involved questions of whether antitrust impact was capable of proof through evidence common to the class, not the relatively simpler issue here of estimating the pricing of medical monitoring services, which

- 19 -

are consistent across populations.

### 2. Dr. Song's Opinions "Fit" Because They are Relevant and Helpful

Although Defendants argue that his opinions are too incomplete to be relevant, Dr. Song's opinions fit the facts of this case. As noted above, "[t]he standard for the factor is not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows*, 306 F. App'x 781, 790 (3d Cir. 2009) (citations omitted). Fitness is primarily a question of relevance. *Id.* at 790.

Dr. Song's opinions are relevant because his proffered methodology will assist the fact finder in determining the total health care spending that would accrue under Plaintiffs' medical monitoring program.[9]  Specifically, in his report and his deposition testimony, Dr. Song draws on his academic and practical experience as well as a body of research to establish (1) a model that can be used to determine potential class-wide health care spending associated with a medical monitoring program based on a common methodology, and (2) health care pricing information. *See* Song Rep. ¶¶ 32-42; Song Dep. 229:14-230:8. Importantly, Dr. Song establishes that medical services have standardized prices that do not vary based on patient

---

[9] Plaintiffs note that this testimony is not necessary for class certification under Rule 23(b)(2); testimony that is not "critical to proving class certification requirements" is exempt from the Daubert standard at this stage. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).

health, age, location, and other factors. *See* Song Dep. 172:9-23; 228:8-229:8. This scientifically rigorous common methodology for determining class-wide health care spending is both relevant and helpful. *See Meadows*, 306 F. App'x at 790 (explaining that fitness "requires a valid scientific connection to the pertinent inquiry . . . ." (internal quotation marks omitted)).

In addition to his model for determining total potential spending in a medical monitoring program, Dr. Song has solved one half of the equation—i.e. prices—ultimately the other half—i.e. quantities of services for the future class and subclasses—will necessarily be determined at a later date. *See* Song Dep. 163:13-19 ("You're asking about the quantities in price times quantity equals spending, and I'm again just emphasizing my report and my scope of work in this case is about prices. Price times quantity equals spending. And I respect your questions about quantities, but quantities are the domain of the other expert . . . ."); 174:21-175:7. This is proper and commonplace, especially in complex litigation, for experts to cabin their opinions and work in tandem to clarify issues of fact. *See In re TMI Litig.*, 193 F.3d 613, 662 (3d Cir. 1999) (explaining that the opinion of one of plaintiffs' experts depended on the opinion of a second of plaintiffs' experts).

Although Dr. Song has not yet offered an opinion on the ultimate spending for the medical monitoring services for the proposed class, Defendants presume that he has already failed in that task. Defendants wrongly insist that his opinions must

be excluded because he has not already "compute[d] the full cost of the medical-monitoring program" for a class of plaintiffs that has not yet been certified and would require "highly individualized inquiries into the circumstances of each class member's medical care." Def's Br. at 21-22. These attacks fail for the same reason: fitness does not require that Dr. Song's opinions resolve every possible variable and reach a definitive answer. Indeed, had Dr. Song sought to calculate the class-wide price of the monitoring program before the class was certified and its contours known, Defendants would likely accuse him of speculation.

Defendants' legal arguments rest on a handful of quotes cherry-picked from inapposite cases, which provide no basis for the proposition that an expert opinion must account for all relevant data to be admissible. *See* Def. Br. at 21. In support of this radical proposition, Defendants cite *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, a case where the Third Circuit held that the District Court should have excluded plaintiff's damages expert's testimony at trial for lack of fit when the expert's conclusions were derived from non-analogous factual scenarios and were—by his own admission—based on "leaps of logic, elements of subjectivity, and even speculation." 949 F.3d 825, 835 (3d Cir. 2020). Similarly, in an earlier Third Circuit case cited by Defendants, *In re TMI Litig.*, the Court excluded expert testimony that consisted of "a series of sketches he drew to illustrate" his theory because it was "based on pure speculation." 193 F.3d at 669.

- 22 -

The final case Defendants cite in support of their theory is also inapplicable as it concerns expert testimony that was legally irrelevant. *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 204 (E.D. Pa. 2017) (excluding damages expert's opinion in breach of express warranty case when his model ignored state law requiring a different calculation). The common thread in these three cases is that the experts' testimony was excluded because it was so speculative or irrelevant that it was unhelpful—not because the opinions might benefit from "future data," as Defendants assert. To the contrary, it is clear that an expert opinion may rely on assumptions so long as they are supported by the record. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (holding that an expert's assumption was admissible due to adequate factual foundation).

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, this Court can and should properly consider Dr. Song's opinions in ruling on whether a medical monitoring class or classes should be certified.

Dated:  June 2, 2022

Respectfully submitted,

By: */s/ Nicholas Migliaccio*
Nicholas Migliaccio
nmigliaccio@classlawdc.com
Jason Rathod
jrathod@classlawdc.com
MIGLIACCIO & RATHOD LLP
412 H Street NE, Suite 302
Washington, DC 20002
Telephone:  (202) 470-3520
Facsimile:  (202) 800-2730

*Proposed Medical Monitoring Co-Lead Class Counsel*

By: */s/ Daniel Nigh*
Daniel Nigh
LEVIN, PAPANTONIO,
THOMAS, MITCHELL,
RAFFERTY & PROCTOR,
P.A.
316 South Baylen Street
Pensacola, FL 32502
Phone: (850) 435-7013
dnigh@levinlaw.com

By: */s/ Ruben Honik*
Ruben Honik
HONIK LLC
1515 Market Street, Ste. 1100
Philadelphia, PA 19102
Phone (267) 435-1300
ruben@honiklaw.com

By: */s/ Rachel Geman*
Rachel Geman
rgeman@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Proposed Medical Monitoring Co-Lead Class Counsel*

By: */s/ Adam Slater*
Adam Slater
MAZIE, SLATER, KATZ &
FREEMAN, LLC
103 Eisenhower Pkwy, 2nd Flr.
Roseland, NJ 07068
Phone (973) 228-9898
aslater@mazieslater.com

By: */s/ Conlee S. Whiteley*
Conlee S. Whiteley
KANNER & WHITELEY,
LLC
701 Camp Street
New Orleans, LA 70130
Phone: (504)-524-5777
c.whiteley@kanner-law.com

*MDL Plaintiffs' Co-Lead Counsel, on behalf of the Plaintiffs' Executive Committee and all Plaintiffs*

MEDICAL MONITORING PLNTFFS' OPPO. TO DEFS' JOINT MOTION TO EXCLUDE NO. 19-MD-2875-RBK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of June, 2022, I caused a true and correct copy of the foregoing to be filed and served upon all counsel of record by operation of the Court's CM/ECF system. In addition, I certify that unredacted versions of the foregoing will be served contemporaneously upon liaison counsel for Defendants as well as the Court.

/s/ <i>Nicholas Migliaccio</i>
Nicholas Migliaccio
