# Appendix of Unpublished Authorities

*Macaluso v. Herman Miller, Inc.*,
    2005 WL 563169 (S.D.N.Y. Mar. 10, 2005)......................................................1

*Saavedra v. Eli Lilly & Co.*,
    2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)..................................................2

 KeyCite Yellow Flag - Negative Treatment
Distinguished by Derienzo v. Trek Bicycle Corp., S.D.N.Y., July 14, 2005

2005 WL 563169
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George MACALUSO and Sandra Macaluso, Plaintiffs
v.
HERMAN MILLER, INC., Defendant.

No. 01 Civ. 11496(JGK).
|
March 10, 2005.

*OPINION & ORDER*

KOELTL, J.

**\*1** The plaintiffs, George Macaluso ("Macaluso") and his spouse Sandra Macaluso, brought this action seeking damages for injuries allegedly sustained as a result of Macaluso's use of a chair manufactured by the defendant, Herman Miller, Inc. The complaint alleges that Macaluso was injured in an accident caused by a design or manufacturing defect in the chair or by a failure to warn of an inherent danger in the use of the chair. The complaint alleges causes of action by Macaluso for negligence (first cause of action), breach of express and implied warranties (second cause of action), and strict liability in tort (third cause of action). Sandra Macaluso seeks damages for loss of consortium and other losses she allegedly sustained as a result of the injuries sustained by Macaluso (fourth cause of action).

This action was originally brought in New York State Supreme Court, Bronx County, and removed to this Court on the basis of diversity of citizenship jurisdiction. The defendant now moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing all claims against it. For the reasons stated below, the defendant's motion for summary judgment is granted.

I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); *see also* Consol. Edison, Inc. v. Northeast Utilities, 332 F.Supp.2d 639, 642 (S.D.N.Y.2004).

Summary judgment is appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial. *See* Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795, 805–06 (1999); Celotex, 477 U.S at 322; Powell v. Nat. Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir.2004); Trumps v. Toastmaster, 969 F.Supp. 247, 254 (S.D.N.Y.1997). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); *see also* Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See* Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its initial burden of

showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir.1998); *Consol. Edison,* 332 F.Supp.2d at 643.

II.

**\*2** The following facts are undisputed unless otherwise noted.

The plaintiffs claim that on or about February 12, 2000, Macaluso was using a chair manufactured by the defendant when the chair broke, causing Macaluso to fall and sustain injuries. (Compl. at ¶¶ 11–15.) Macaluso described the accident in a deposition taken on June 27, 2002. (Deposition of George Macaluso, dated June 27, 2002 ("Macaluso Deposition"), attached at Affirmation of Gerald Neal Swartz in Support of Motion for Summary Judgment, dated June 24, 2004 ("Def.Aff."), Ex. D.) Macaluso described how the accident happened:

> Q: Now, let's get to the accident itself, if you would be good enough; could you tell us in your words how it happened?
>
> A: Okay. I was sitting to the right of my station, I had typed something into a computer and I sat back and as a[sic] sat back the seat kept going. My legs went up in the air. (Witness indicating) And the chair was rolling backwards and then fell over.
>
> Q: Okay. When you say and then fell over, are you referring to the chair falling over?
>
> A: Yes.
>
> Q: Of course you were in it and you fell over also; is that correct, sir?
>
> A: Yes.
>
> ....
>
> Q: What is your impression or perception of what caused you to and the chair to start moving backwards?
>
> A: Well, when I was, I had been typing, when I set [sic] in the chair I set [sic] back and as I set [sic] back the chair just popped. And when it popped, I just, I jumped, you know, like my legs went up in the air. (Witness indicating.) As they went up in the air I fell back and the chair was rolling back and just hit something and fell over.
>
> Q: Do you have any understanding of what made the chair roll back?
>
> A: I guess my momentum when my legs went up in the air.
>
> Q: As you described just now?
>
> A: Yes, sir.
>
> ....
>
> Q: You mentioned before in describing part of the accident, you said while the chair was rolling it hit something or it might have hit something.
>
> A: Yes, sir.
>
> Q: Could you tell us did you ever find out or determine what that was?
>
> A: Yes, sir.
>
> Q: And how did you go about making that determination? How did you find out what it was?
>
> A: Well, by looking down.
>
> Q: And how long after the accident happened did you look down?
>
> A: Well, right after I, after I got up I looked down. And I seen it was a lip in the tile.
>
> Q: Excuse me.
>
> A: A lip in the tile.
>
> Q: Could you explain what you mean by that?
>
> A: Well, the way they're situated the tiles are supposed to come straight together and it looked like from wear and tear it was down. (Witness indicating). There was a lip; one tile was higher than the other.

(Macaluso Deposition, at 27, 28, 31, 32.)

Using visual aids, Macaluso described the condition of the chair before and after the alleged accident. Macaluso stated that before the alleged accident the chair had been upright. (*Id.* at 37–38.) He indicated that, of two chairs in a photograph taken by Macaluso and marked as "Defendant's Exhibit A," the chair to the left had the same appearance as Macaluso's chair before he had fallen. (*Id.* at 21–25; Defendant's Exhibit A, attached at Def. Aff., Ex. F.) He stated that after the accident he picked up the chair, and the cradle of the chair was "tilted backwards like a recliner chair" and the switch that controlled the angle of the chair's recline "swiveled loosely" and "wasn't making the connection." (Macaluso Deposition at 36–38.) Macaluso indicated that the chair to the right in Defendant's Exhibit A had the same appearance as his chair after he had fallen. (*Id.* at 21–23; Defendant's Exhibit A, attached at Def. Aff., Ex. F.)

**\*3** Macaluso identified two other chairs in his office that he was aware had also broken, although he had not actually seen either chair break. (Macaluso Deposition at 52.) One chair had broken at the base, while on the other chair the switch that controlled the chair's angle of recline was broken.[1] (*Id.* at 52–58.) Macaluso stated that he had seen only one chair that had broken at the base, and that he had taken a photograph of that chair. (*Id.* at 52–53.) The photograph was marked for identification at the deposition as "Defendant's Exhibit C." (*Id.;* Defendant's Exhibit C, attached at Def. Aff., Ex. G.) The photograph actually shows a fractured chair base completely separated from a chair.

In May 2000, Macaluso repeated his description of the incident when he filed an Employee's Notice of Injury form with the City of New York. (Employee's Notice of Injury, dated May 10, 2000, attached at Def. Aff., Ex. E.) Macaluso signed the Notice and described how the accident allegedly happened: "while sitting in chair moving sideway's [sic] chair struck a raised part of tile that caused the back of chair to go from upright position to a reclining position and tipping over chair." (*Id.*)

On December 19, 2003, the plaintiffs and the defendant sent engineers acting as expert witnesses to a storage facility in Queens, New York, to examine the chair. (Plaintiff's Affirmation in Opposition to the Motion for Summary Judgment, dated September 27, 2004 ("Pl.Aff."), ¶ 4; Affidavit of Joseph R. Petrella, dated March 30, 2004 ("Petrella Aff."), ¶ 3.) The chair, however, was not available for examination, and the experts were presented with what the plaintiffs allege is an "exemplar chair." (Pl.Aff., ¶ 4.) The plaintiff was employed by the Department of Transportation of the City of New York and the exemplar chair was produced by the Department of Transportation. To date, the chair in which the alleged accident occurred has not been located or made available for examination.

The plaintiffs' expert, Arthur P. Weber ("Weber"), relied on the exemplar chair and photocopies of photographs of other chairs in his analysis. One such photograph was Defendant's Exhibit A, which depicted the two chairs that Macaluso, when deposed, said resembled his chair before and after the alleged accident. (Affirmation of Arthur P. Weber, dated Sept. 25, 2004, Ex. 2. ("Weber Report") at 1; Macaluso Deposition at 21–25.) Weber described Defendant's Exhibit A as a photograph of "intact chairs in service." (Weber Report at 1.) Weber also relied upon Defendant's Exhibit C, the photograph that Macaluso, when deposed, said depicted the base of a different chair, that had broken at the base. (Weber Report at 1; Macaluso Deposition at 52–53.) Weber stated that this photograph depicted the chair base "that, at the time of the occurrence, had broken away from the seat and back assembly." (Weber Report at 1.)

Weber used the exemplar chair and these photographs to analyze "the design, assembly and modus operandi of the [exemplar] chair, all as would relate to [Macaluso's fall] from another such chair that had broken apart from under him." (Weber Report at 1.) Based upon his examination of the exemplar chair and the photographs of the three other chairs, Weber concluded that "[t]he hub [of Macaluso's chair] had fractured and broken completely apart" and that "[t]he proximate cause of the failure of [Macaluso's chair], as it was caused to break apart from under George Macaluso at the time of the occurrence ... was the deficient design and/or defective manufacture [of the chair's hub]." (*Id.* at 4, 6.)

**\*4** The defendant's expert, Joseph R. Petrella ("Petrella"), however, found no evidence that the chair in which the alleged accident occurred was defective in any manner. Petrella found that the exemplar chair was "designed and manufactured in accordance with sound engineering principles and was suitable for its intended use." (Petrella Aff., ¶ 6.) Moreover, Petrella argued that Weber's conclusion that Macaluso's chair was defective because a vertical post in the base fractured at the time of the alleged accident was inconsistent with Macaluso's deposition testimony. (*Id.,* ¶ 7.) Petrella concluded

that, without an examination of the chair in which Macaluso had the alleged accident, there was no reason to believe that Macaluso's chair had been designed or manufactured defectively. (*Id.*)

III

A.

Under New York Law, a manufacturer can be liable for injury caused by the manufacturer's product under theories of negligence, breach of express or implied warranty, and strict liability in tort. *Merced v. Auto Pak Co.,* 533 F.2d 71, 75–76 (2d Cir.1976); *Heller v. U.S. Suzuki Motor Corp.,* 477 N.E.2d 434, 437 (N.Y.1985); *Voss v. Black & Decker Mfg. Co.,* 450 N.E.2d 204, 207 (N.Y.1983); *Victorson v. Bock Laundry Mach. Co.,* 335 N.E.2d 275, 276–77 (N.Y.1975). Macaluso has alleged each of these theories in his complaint.[2] (Compl. at ¶¶ 13–15, 19–21, 24.)

A claim of negligence requires that the plaintiff prove that the manufacturer was responsible for a defect that caused injury, and that the manufacturer could have foreseen the injury. *Robinson v. Reed–Prentice Div.,* 403 N.E.2d 440, 444 (N.Y.1980). A breach of implied warranty claim requires that the plaintiff prove that the product is not "fit for the ordinary purposes for which such goods are used." *See Denny v. Ford Motor Co.,* 662 N.E.2d, 730, 736 (N.Y.1995); *Robinson,* 403 N.E.2d at 443. A claim under strict products liability law requires a showing that: (1) the product is "defective" because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; and (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care. *Urena v. Biro Manufacturing Co.,* 114 F.3d 359, 363 (2d Cir.1997).

An essential element of all of these claims is the existence of a defect in the product. *See Denny,* 662 N.E.2d at 736 (comparing defect required for strict products liability with defect required for breach of implied warranty); *Robinson,* 403 N.E.2d at 444 (describing requirement of defect in product liability action based on theory of negligence); *Tardella v. RJR Nabisco, Inc.,* 576 N.Y.S.2d 965, 966 (App.Div.1991) ("[W]hether the action is pleaded in strict products liability, breach of warranty or negligence, it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury and ... that the defect complained of existed at the time the product left the manufacturer or entity in the line of distribution being sued.")

*5 The elements that the plaintiff must prove in order to show a defect, however, differ depending on the claim. A product is defective for the purposes of breach of an implied warranty claim if it is not "fit for the ordinary purposes for which such goods are used" when the product leaves the hands of the manufacturer. *See Denny,* 662 N.E.2d at 736; *Robinson,* 403 N.E.2d at 443. A product is defective for the purposes of a negligence or strict products liability claim if it is "not reasonably safe." *Denny,* 662 N.E.2d at 735–36.

Moreover, in strict products liability and negligence claims, the plaintiff must prove the elements of each type of defect the plaintiff is alleging. There are three types of defects in products liability cases: a design defect, a manufacturing defect, and a defect in the form of the absence or inadequacy of warnings for the use of the product. *McCarthy v. Olin Corp.,* 119 F.3d 148, 155 (2d Cir.1997); *Sage v. Fairchild–Swearingen Corp.,* 517 N.E.2d 1304, 1307 (N.Y.1987); *Robinson,* 403 N.E.2d at 443. In a design defect case, the plaintiff must prove: (1) although the product was manufactured according to its intended design, the design itself devised a product that was not reasonably safe, and (2) there was a feasible alternative design for the product that would have been safer and that would have prevented the plaintiff's injury. *See Urena,* 114 F.3d at 364–65; *Rypkema v. Time Mfg. Co.,* 263 F.Supp.2d 687, 692 (S.D.N.Y.2003) (citing *Voss,* 450 N.E.2d at 208); *Denny,* 662 N.E.2d at 735, n. 3. In a manufacturing defect case, the plaintiff must prove that the product failed to perform in the intended manner due to a flaw in the manufacturing process. *Denny,* 662 N.E.2d at 735, n. 3. To prove a defect in the form of a failure to warn, the plaintiff must show that: (1) the defendant manufacturer had a duty to warn; (2) against dangers resulting from foreseeable uses about which the defendant knew or should have known; and (3) failure to warn was the proximate

cause of the harm. See *Santoro v. Donnelly,* 340 F.Supp.2d 464, 485 (S.D.N.Y.2004); *see also Caruoulo v. John Crane, Inc.,* 226 F.3d 46, 51 (2d Cir.2000); *Liriano v. Hobart Corp.,* 700 N.E.2d 303, 305 (N.Y.1998). There is no duty to warn of well-known or obvious dangers. *Burke v. Spartanics, Ltd.,* 252 F.3d 131, 137 (2d Cir.2001); *Jiminez v. Dreis & Krump Mfg. Co.,* 736 F.2d 51, 55 (2d Cir.1984); *Billiar v. Minnesota Mining & Mfg. Co.,* 623 F.2d 240, 243 (2d Cir.1980).

B.

On a motion for summary judgment, the moving party bears the initial burden of showing the absence of a material issue of fact. *Celotex,* 477 U.S. at 323; *Weinstock v. Columbia University,* 224 F.3d 33, 41 (2d Cir.2000). Once the moving party has made an initial showing that there is no material issue of fact, the burden shifts to the non-moving party to show the existence of a material issue of fact. *Celotex,* 477 U.S. at 323–24; *Weinstock,* 224 F.3d at 41; *Scotto,* 143 F.3d at 115 (1998); *Ying Jing Gan,* 996 F.2d at 532.

*6 Here, the defendant has made an initial showing that there is no material issue of fact as to the existence of a defect and that there is no evidence of a defect in the chair used by the plaintiff. The defendant argues that the plaintiffs cannot prove the existence of a defect in the chair because Weber's conclusion, based on the exemplar chair, is too speculative and scientifically unreliable to constitute proof of a defect in the chair in which the alleged accident occurred and, moreover, it is based on the erroneous assumption that Macaluso's chair fractured at the base during the alleged accident. This assumption, the defendant argues, is precluded by Macaluso's deposition testimony, which described the chair as reclining suddenly but does not support any allegation that the base fractured. The defendant also argues that the plaintiffs have offered no proof of a feasible alternative design for the chair that would have been safer and would have prevented the plaintiff's injury, that the chair failed to perform in the intended manner due to a flaw in the manufacturing process, or that there was a danger inherent in the chair that created a duty to warn that the defendant did not satisfy.

Because the defendant has made an initial showing that the plaintiff cannot prove the existence of a defect in the chair in which the alleged accident occurred, the burden has shifted to the plaintiffs to show that there is a material issue of fact as to the existence of a defect in the chair, an essential element for each of the plaintiffs' claims.

C.

The plaintiffs argue that the chair was defective in design, manufacture, and failure to warn. In support of the claim that the chair was defective in design and manufacture, the plaintiffs offer the Weber report and the affidavit of Macaluso dated September 27, 2004, which claim that the chair's defect caused the chair's stem to fracture. To support the claim of a failure to warn, the plaintiffs offer an additional affidavit of George Macaluso dated February 8, 2005, in which Macaluso affirms that the defect in the chair caused the chair's hub extension at the base to break off when he leaned back, that there were no warnings on the chair advising him of the danger of the stem fracturing if he were to lean back, and that, had such a warning been present, he would not have leaned back in the chair or he would have used a different chair. (Affirmation of George Macaluso dated Feb. 8, 2005 ("Pl. Second Aff.").)

The conclusions drawn by the plaintiffs' expert, Weber, must be disregarded because they were based on the erroneous assumption that the alleged accident occurred when the chair in which Macaluso was sitting fractured at the base. There is no admissible evidence to support that assumption. Through no fault of the defendant, the chair has been unavailable for examination, and thus the chair itself provides no evidence of any fractured base. It is plain from Weber's report that he believed incorrectly that Defendant's Exhibit C, the photograph of a fractured base completely separated from a chair, was a photograph of Macaluso's chair after the alleged accident, and that, based on this belief, Weber assumed that Macaluso's chair had fractured at the base at the time of the alleged accident. (Weber Report at 1.) It is also plain that Weber believed that Defendant's Exhibit A showed two chairs in proper working condition. (Weber Report at 1.) The assumption that Exhibit C was a photograph of the chair Macaluso used is contradicted by Macaluso's own deposition testimony. Macaluso described Exhibit C as a chair with a fractured base, in contradistinction to his identification of the chairs in Exhibit A, which depicted his chair before and after the accident.

**\*7** The assumption that Macaluso's chair fractured at the base at the time of the alleged accident is contradicted by the description of the accident that Macaluso gave in his deposition testimony. At his 2002 deposition, Macaluso described the chair in which he had his accident as malfunctioning with respect to the chair's angle of recline, not with respect to the base. (Macaluso Deposition at 36–38 .) He described how the chair rolled backwards, hit something, and then tipped over. (*Id.* at 28.) Macaluso indicated that, after the accident, the chair was "tilted backwards like a recliner chair" and the switch that controlled the angle of the chair's recline "swiveled loosely" and "wasn't making the connection." (*Id.*) Macaluso testified that he picked up the chair after the accident, not that he picked up pieces of the chair. (*Id.* at 37.) He moved it aside and grabbed another chair. (*Id.* at 36.) Macaluso never testified in his 2002 deposition that the base of the chair in which the alleged accident occurred had fractured.

At the deposition, Macaluso pointed to a photograph of a chair that he stated looked identical to his chair after the alleged accident. (*Id.* at 21–23; Defendant's Exhibit A.) In this photograph, the base of the chair is plainly intact. (Defendant's Exhibit A.) Moreover, Macaluso distinguished the picture of the chair with a fractured base, Defendant's Exhibit C, as being a picture of a different chair from the one in which the accident occurred. (Macaluso Deposition at 21–23.) Macaluso stated that the chair in Defendant's Exhibit C was the only chair that he had seen that was broken at the base. (Macaluso Deposition at 52–53.) Macaluso's deposition testimony is therefore inconsistent with the factual assumptions in Weber's report.

The affidavits of George Macaluso submitted in opposition to the current motion are inadmissible to the extent that they contradict his earlier deposition testimony. It is well-settled that an affidavit submitted by a party in response to a motion for summary judgment must be disregarded to the extent that it contradicts that party's prior deposition testimony. *Mack v. United States,* 814 F .2d 120, 124 (2d Cir.1987); *Reisner v. General Motors Corp.,* 671 F.2d 91, 93 (2d Cir.1982). In his affadavit dated September 27, 2004, Macaluso states that the chair hit an uneven part of the tile floor and "made a loud popping sound" that led Macaluso to believe that the base of the chair had broken. (*Id.,* ¶ 3.) Macaluso states that when he examined the chair after the accident, he saw that it had "fractured at the stem." (*Id.*) Similarly, in his affidavit dated February 8, 2005, Macaluso states that the latent danger in the chair was that leaning back in the chair caused the hub extension at the base to fracture. (Pl Second Aff., ¶ 3.) For the reasons explained above, these statements are plainly inconsistent with Macaluso's earlier deposition testimony, and therefore must be disregarded.

**\*8** Weber's conclusions are not sufficiently reliable to be admissible. *See Daubert v. Merrel Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993). Federal Rule of Evidence 702 requires a trial judge to ensure that all expert testimony is both relevant and reliable. Fed.R.Evid. 702. In order for an expert's opinion to be reliable, the trial court must ensure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702; *see also Colon v. Molina,* 199 F.Supp.2d 53, 69 (S.D.N.Y.2001).

Weber's analysis fails to meet this standard because it is based on incorrect factual assumptions that render all of his subsequent conclusions purely speculative. Moreover, without the ability to inspect the original chair, all of Weber's conclusions with respect to the "exemplar" chair are speculative because there is no evidence that the exemplar chair had the same condition that caused the actual chair back to recline in the way described by Macaluso at his deposition. Weber's conclusion as to the existence of a defect is purely speculative, revealing "too great an analytical gap between the data and the opinion proffered." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152–58 (1999) (finding no abuse of discretion in trial court's decision to exclude expert testimony in product liability case against tire manufacturer and distributor, based on finding that expert could not reliably determine cause of failure of particular tire at issue); *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (finding no error in district court's decision to exclude evidence "connected to the existing data only by *ipse dixit* of the expert"); *Davidov v. Louisville Ladder Group, LLC,* No. 02 Civ. 486734, at \*2 (S.D.N.Y. Mar. 1, 2005) (excluding expert testimony inconsistent with facts of case); *Mink Mart, Inc. v. Reliance Ins. Co.,* 65 F.Supp.2d 176, 181 (S.D.N.Y.1999), *aff'd,* 2000 WL 33223395 (2d Cir. May 30, 2000) (finding expert's affidavit inadmissible because it was based on mere speculation and not evidence that specific product in question malfunctioned).

When Weber's purported expert report and Macaluso's recent affidavits that contradict his deposition testimony are excluded, the plaintiffs have provided no evidence that the chair in which the alleged accident occurred was defective. Without any evidence based on the actual chair involved in the alleged accident, the plaintiffs have no potentially viable claim that the chair was defective. See *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 92 (2d Cir.2000) (per curiam) (affirming district court's decision granting summary judgment dismissing products liability case where plaintiff's proposed expert testimony was properly excluded as speculative); *Davidov,* 2005 WL 486734, at *3 (granting summary judgment in products liability case, after excluding expert evidence, because there was no evidence of defect); *Trumps,* 969 F.Supp. at 253–54, n. 8 (granting defendant's motion for summary judgment when, after plaintiff's expert testimony was excluded as insufficiently reliable, plaintiff's showing that "[s]omething [h]appened" was insufficient to prove defendant's liability); *Ali v. Capitol Products Corp.,* No. 92 Civ. 7806, 1995 WL 368446, at *3, n. 5 (S.D.N.Y. June 20, 1995) (finding summary judgment appropriate where plaintiff presented no evidence that product had defect when manufactured, particularly because plaintiff's expert never examined actual product, which had since been lost).

*9 It follows that the plaintiffs have also failed to provide any evidence that the particular elements of the specific theories of liability could be proved. The plaintiffs have not provided evidence of a design or manufacturing defect, or that any such defect existed at the time the product was manufactured. The plaintiffs have not provided any evidence that there was a feasible alternative design for the chair that would have been safer and that would have prevented Macaluso's injury. Such a showing is essential to a claim that the chair was defective in design. See, *McCarthy,* 119 F .3d at 155; *Rypkema,* 263 F.Supp.2d at 692. Nor have the plaintiffs offered any evidence that there was a flaw in the fabrication process at the time it was manufactured that caused the chair to fail to perform in the intended manner, a showing that is essential to a claim that the chair was manufactured defectively. See *Denny,* 662 N.E.2d at 735, n. 3. Without evidence of either type of defect alleged, the plaintiffs cannot prove an essential element of its products liability claims.

The plaintiffs have also failed to provide evidence of a defect in the form of a failure to warn. The plaintiffs claim that the latent danger was the danger that the chair would fracture if the user leaned back in it and that, were Macaluso warned of this danger, he would not have used the chair or leaned back in it, causing the chair to fracture and Macaluso to fall and sustain injuries. (Pl. Second Aff., ¶ 3.) For the reasons explained above, there is no evidence that such a danger of the chair fracturing existed or that the chair did indeed fracture in this manner, and thus there was no duty to warn of such a danger. The plaintiffs have provided no evidence of a latent danger in the chair resulting from foreseeable uses about which the defendant knew or should have known, and that the failure to warn of this danger was the proximate cause of the plaintiffs' injury.

Because the plaintiffs have presented no evidence from which a reasonable jury could conclude that they had established the elements of any of their claims, summary judgment should be granted to the defendants dismissing all of the plaintiffs' claims.[3]

## CONCLUSION

For the reasons explained above, the defendant's motion for summary judgment dismissing the complaint is granted. The Clerk is directed to enter judgment dismissing the complaint and closing this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 563169

**Footnotes**

| | |
|---|---|
| 1 | Although this is a similar description to the description the plaintiff gave of the chair in which the plaintiff had fallen, the plaintiff stated that the condition of this other chair was not identical to the condition of the plaintiff's chair after his accident. (Macaluso Deposition at 56–58.) |
| 2 | The plaintiff conceded at the argument of the motion that he was no longer contending that there was a breach of an express warranty and indeed there is no evidence of any express warranty. (Transcript of Oral Argument held Jan. 21, 2005, at 17.) |
| 3 | Sandra Macaluso's claim must be dismissed because, under New York law, it is completely derivative of the existence of a claim by Macaluso. *See* *Liff v. Schildkrout,* 404 N.E.2d 1288, 1291. (N . Y.1980) (finding that spouse's cause of action for loss of consortium does not exist in common law independent of injured spouse's right to maintain action for injuries sustained); *Millington v. Southeastern Elevator Co.,* 239 N.E.2d 897, 902–03 (N.Y.1968) ("Where, however, the husband's cause of action has been terminated either by judgment, settlement or otherwise, that should operate to bar the wife's cause of action for consortium"). |

**End of Document**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Follow by   Dean v. Colgate-Palmolive Co.,   C.D.Cal.,   March 8, 2018

2014 WL 7338930
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Jennifer L. SAAVEDRA, Dr. Melissa Strafford, Carol Jacquez, and David Matthews, on behalf of themselves and all other persons similarly situated, Plaintiffs,
v.
ELI LILLY AND COMPANY, an Indiana corporation, Defendant.

No. 2:12–cv–9366–SVW (MANx).
|
Signed Dec. 18, 2014.

**Attorneys and Law Firms**

Bijan Esfandiari, Baum, Heldlund, Aristel and Goldman PC, Los Angeles, CA, Gretchen Freeman Cappio, Juli E. Farris, Lynn L. Sarko, Michael D. Woerner, Keller Rohrback LLP, Seattle, WA, Harris L. Pogust, Terence Matthew Leckman, Pogust Braslow and Millrood LLC, Conshohocken, PA, Havila C. Unrein, Keller Rohrback LLP, Santa Barbara, CA, Mark D. Samson, Keller Rohrback PLC, Phoenix, AZ, Michael Lin Baum, Robert Brent Wisner, Baum Hedlund Aristei and Goldman PC, Los Angeles, CA, Samuel S. Deskin, Deskin Law Firm PLC, Encino, CA, for Plaintiffs.

Clara J. Shin, Covington and Burling LLP, San Francisco, CA, Colleen A. Kelly, Mark H. Lynch, Michael X. Imbroscio, Phyllis A. Jones, Covington and Burling LLP, Washington, DC, for Defendant.

ORDER DENYING PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION PURSUANT TO 🚩FEDERAL RULES OF CIVIL PROCEDURE 23(b)(3) OR 🚩23(c)(4) [73, 74]

STEPHEN V. WILSON, District Judge.

**I. INTRODUCTION**

**\*1** This is a putative class action arising from defendant Eli Lilly and Company's ("Lilly") alleged misrepresentations regarding its antidepressant, Cymbalta. Plaintiffs filed this action on October 31, 2012. In their corrected First Amended Complaint ("FAC"), Plaintiffs assert claims under four states' consumer protection laws. (Dkt.44.)

Presently before the Court are Plaintiffs' alternative motions for class certification under 🚩Federal Rules of Civil Procedure 23(b)(3) and 🚩23(c)(4). (Dkts. 73 & 74.) For the reasons discussed below, the Court DENIES both motions.

**II. FACTUAL AND PROCEDURAL BACKGROUND**

Lilly's antidepressant, Cymbalta, is available only by prescription. (Perahia Decl. ¶ 3.) Since the Food and Drug Administration approved Cymbalta in 2004, Cymbalta's United States Package Insert (called its "label") has included a warning about possible discontinuation symptoms. (Hoog Decl. ¶¶ 7, 10.) The warning states that withdrawal symptoms occurred "at a rate greater than or equal to 1% and at a significantly higher rate in duloxetine [Cymbalta's chemical name]-treated patients compared to those discontinuing from placebo." (Hoog Decl. ¶ 12.) This warning has undergone only minor revisions since 2004. (Hoog Decl. ¶ 10.) Plaintiffs Jennifer Saavedra, Melissa Strafford, Carol Jacquez, and David Matthews, Jr. (collectively, "Plaintiffs") claim that the risk of withdrawal symptoms following Cymbalta is in fact approximately 44%. (Corrected First Amended Complaint ("FAC") ¶ 30.) Plaintiffs thus claim that in marketing and advertising Cymbalta,[1] Lilly misrepresented the risk of experiencing withdrawal symptoms upon its discontinuation.

Plaintiffs filed their FAC on January 10, 2013. (Dkt.44.) In their FAC, Plaintiffs assert claims under: (1) California's Consumer Legal Remedies Act ("CLRA"), 🚩Cal. Civ Code §§ 1750, et seq.; (2) California's Unfair Competition Law ("UCL"), 🚩Cal. Bus. & Prof.Code §§ 17200, et seq.; (3) California's False Advertising Law ("FAL"), 🚩Cal Bus. & Prof.Code §§ 17500, et seq.; (4) Massachusetts's Consumer Protection Act, 🚩Mass. Gen. Laws Ch. 93A, §§ 1, et seq.; (5) Missouri's Merchandising Practices Act ("MPA"), Mo.Rev.Stat. §§ 407.010, et seq.; and (6) New York's Consumer Protection from Deceptive Acts and Practices Law, 🚩N.Y. Gen. Bus. Law §§ 349, et seq.[2]

On February 26, 2013, this Court granted Lilly's motion to dismiss Plaintiffs' claims for injunctive and declaratory relief for lack of standing. (Dkt 52.) The Court otherwise denied Lilly's motion to dismiss the complaint. (*Id.*)

On March 27, 2013, Lilly moved for summary judgment on the grounds that the learned intermediary doctrine barred relief and that the labels were not misleading to doctors. On June 13, 2013, the Court held that the learned intermediary doctrine applies to Plaintiffs' claims and that Plaintiffs were entitled to additional discovery before a motion for summary judgment would be heard. (Dkt. 72: Order, at 6.) The Court also directed Plaintiffs to move for class certification. (*Id.*) The Court directed the parties to assume for purposes of the motion that plaintiffs will prevail in showing that the warnings given to physicians were inadequate as alleged in the FAC. (*Id.* at 8.)

**\*2** Plaintiffs now move to certify a class, including four subclasses, under Rule 23(b)(3). The class and subclasses are defined as:

> All natural persons within the Commonwealth of Massachusetts and the States of Missouri, New York, and California who purchased and/or paid for Cymbalta manufactured, distributed, and/or marketed by Lilly from Cymbalta's August 2004 launch until the present, divided into the following four subclasses:
>
> (1) A California UCL/FAL/CLRA class of consumers who purchased and/or paid for Cymbalta in California between August 2004 and the present;
>
> (2) A Missouri Merchandising Practices Act class of consumers who purchased and/or paid for Cymbalta in Missouri between August 2004 and the present;
>
> (3) A New York General Business Law §§ 349–350 class of consumers who purchased and/or paid for Cymbalta in New York between August 2004 and the present;
>
> (4) A Massachusetts General Law Chapter 93A class of consumers who purchased and/or paid for Cymbalta in Massachusetts between August 2004 and the present

(Dkt. 73: Ps' Mot. Class Cert. Pursuant to Rule 23(b)(3), at 2–3.) Plaintiffs also filed an alternative motion to certify a similarly defined issue class and subclasses under Rule 23(c)(4). (Dkt.74.) Plaintiffs propose certifying this issue class with respect to "the particular issue of whether Lilly's omissions regarding Cymbalta were materially misleading under the state laws of Missouri, New York, Massachusetts, and California." (Dkt. 74: Ps' Mot. Class Cert. Pursuant to Rule 23(c)(4), at 3–4.)

### III. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(3)

**A. Legal Standard**

A party seeking class certification must satisfy two requirements. *See Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1186 (9th Cir.2001), *amended by* 273 F.3d 1266 (9th Cir.2001). First, the moving party must show that the proposed class meets four criteria: (1) the members of the proposed class must be so numerous that joinder of all claims would be impracticable ("numerosity"); (2) there must be questions of law and fact common to the class ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of absent class members ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy"). Fed.R.Civ.P. 23(a).

Second, the moving party must demonstrate that the class fulfills the conditions of at least one of the three subdivisions of Rule 23(b). "The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser,* 253 F.3d at 1186.

Plaintiffs assert that the class meets the requirements for Rule 23(b)(3). To qualify for certification under this subsection, a class must satisfy two conditions: (1) common questions of law or fact must "predominate over any questions affecting only individual members," and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The predominance requirement is satisfied where common questions comprise a significant portion of the case and can be resolved for all class members in one adjudication. *See In re ConAgra Foods, Inc.,* —— F.R.D ——, No. CV 11–05379 MMM AGRX, 302 F.R.D. 537, 2014 WL

Case 1:19-md-02875-RMB-SAK   Document 2107-2   Filed 06/16/22   Page 12 of 19
                                                 PageID: 73942
Saavedra v. Eli Lilly and Co., Not Reported in F.Supp.3d (2014)

4104405, at *29 (C.D.Cal. Aug.1, 2014). Rule 23(b)(3)'s predominance requirement also requires the moving party to show that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend,* ––– U.S. ––––, 133 S.Ct. 1426, 1433, 185 L.Ed.2d 515 (2013). Specifically, this requires plaintiffs to tie their method of proving damages to their theory of liability.[3] *Id.*

**\*3** A party seeking to certify a class may not merely rest on his pleadings. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are ***in fact*** sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (emphasis added). Thus, a trial court is expected to engage in a "rigorous analysis" to determine if the moving party has discharged its burden. *Dukes,* 131 S.Ct. at 2551 (quoting *Falcon,* 457 U.S. at 161). This analysis often "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.*

### B. Application

Because Plaintiffs' motion for class certification raises more significant problems under Rule 23(b)(3) than under Rule 23(a), the Court first addresses Rule 23(b)(3).

#### 1. Rule 23(b)(3) Requirements

*a. Predominance*

Much of the predominance inquiry hinges on Plaintiffs' unusual theory of injury and damages.

*(1) Determining Classwide Damages*

Plaintiffs rely on Dr. Joel W. Hay ("Dr.Hay") to establish their method of proving classwide damages.

*(a) Legal Standard*

Federal Rule of Evidence 702 governs the admissibility of expert testimony in the federal courts. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

In considering expert testimony presented in connection with a motion for class certification, a district court should act as a "gatekeeper" to exclude evidence that doesn't meet Rule 702's reliability standard. *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir.2011). Moreover, in conducting its rigorous analysis of the motion for class certification, the court must go beyond assessing admissibility under *Daubert;* the court must also assess the persuasiveness of the evidence. *Ellis,* 657 F.3d at 982–84.

*(b) Application*

At the heart of Plaintiffs' case lies their novel theory of damages. Plaintiffs do not seek damages for personal injuries. Instead, Plaintiffs argue that class members were harmed because they purchased a product that was represented to have a roughly 1% risk of withdrawal side effects but that actually had an approximately 44% risk of withdrawal side effects. Thus, Plaintiffs claim they were injured because the drug as received was worth less than the drug as represented. However, Plaintiffs do not assert that class members were harmed by being overcharged or by being induced to purchase something that they would not have otherwise purchased. Instead, Plaintiffs argue that the harm was in receiving a product that had less *value* than the value of the product as class members expected to receive it. (Suppl. Br. Supp. Ps' Mot. Class Cert., at 4–7.)

**\*4** Plaintiffs use the term "value" to mean consumer utility—a concept distinct from price. (*Id.* at 5) (describing method of calculating damages and stating that the analysis will

"measure the benefit that consumers were *deprived* of by Lilly's deception" rather than price). According to Plaintiffs, consumer value (also called "utility") "is the measure of the benefit that consumers believe they will obtain by using or owning a product." It thus appears that consumer value [4] is a subjective concept distinct from the fair market value concept commonly used when calculating benefit-of-the-bargain damages. In contrast to consumer value, fair market value is the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." [5] VALUE, Black's Law Dictionary (9th ed.2009); *Schwab v. C.I.R.,* 715 F.3d 1169, 1178 (9th Cir.2013) (quoting Black's Law Dictionary (9th ed.2009).

Plaintiffs' theory of injury is distinct from the typical benefit-of-the bargain claim because it focuses only on the demand side of the equation, rather than on the intersection of supply and demand. In other words, Plaintiffs seek to prove injury by proving that each class member received a drug that the average consumer subjectively values less than the average consumer subjectively values the drug he expected to purchase. In contrast, the typical benefit-of-the bargain claim relies on a difference in fair market value (i.e. the amount that a willing buyer and willing seller would both accept) between the product as represented and the product actually received. As discussed below, this twist on the usual argument causes significant problems. See *Apple, Inc. v. Samsung Electronics Co.,* No. 11–CV–01846–LHK, 2014 WL 976898, at *11 (N.D.Cal. Mar.6, 2014) (rejecting a damages model that failed to provide a way to compare "willingness to pay metrics—which relate only to demand for the patented feature —to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices").

Dr. Hay proposes calculating class members' lost consumer value using conjoint analysis. Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay. (Dkt. 83: Decl. of Dr. Joel W. Hay ("First Hay Decl."), ¶ 16). Conjoint analysis "predicts how, on average, all consumers value a particular attribute." (First Hay Decl., ¶ 18). Dr. Hay claims that he would be able to use conjoint analysis to determine the *relative* value that "consumers place on a drug with a withdrawal risk of 'greater than or equal to 1%' compared to a drug whose risk is 'at least 44%.' " (Dkt. 131: Decl. of Dr. Joel W. Hay ("Third Hay Decl."), ¶ 24). This raises the question of how to turn the relative valuation ascertained via conjoint analysis into an absolute valuation to be awarded as damages. Dr. Hay would use the relative value to determine a "refund ratio," which he would then apply to each class member's out-of-pocket costs to determine her damages. [6] (Third Hay Decl., ¶ 25). Thus, if the value of a drug with a 1% withdrawal risk is 30% higher than a drug with a 44% withdrawal risk, then a class member's damages would be equal to 30% of her out-of-pocket costs. (*Id.*).

**\*5** Even assuming that conjoint analysis can be used to compute the relative value that consumers place on a drug having a lower withdrawal risk (which Lilly disputes), Dr. Hay's proposed measure of damages is highly flawed.

First, as discussed above, Dr. Hay's model looks only to the demand side of the market equation. By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants. The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell). [7]

Second, as Dr. Hay readily admits, the prescription drug market is not an efficiently functioning market. (Third Hay Decl., ¶ 9). Unlike markets for ordinary consumer goods, the prescription drug market is heavily regulated and restricted. (*Id.*). The market is further complicated by insurance plans' (or their absense's) determinative effect on the price that an individual pays. (Suppl. Brief in Supp. Def.'s Opp. to Ps' Motions for Class Cert., at 14.) This price, in turn, relies on prices set by a complex array of contracts between such entities as health plan sponsors, third-party payers, pharmacy benefit managers, retail pharmacy chains, and the drug manufacturer. (*Id.*) Thus, depending on her insurance plan, an individual might pay nothing, a percentage of a "full price" determined by a contract between her insurance provider and another entity, a flat co-payment, or some other "full" price.

In an ordinary market, price is a proxy for value. (Third Hay Decl., ¶ 12.) Thus, the price paid for a good that was misrepresented to have a given characteristic can serve as a proxy for the value of a product with the misstated characteristic. Therefore, applying Dr. Hay's refund ratio

to the price paid by consumers in such a market would yield a valid approximation of the value lost due to the misrepresentation. Although the refund ratio determined via conjoint analysis still looks only to the demand side of the equation, applying this ratio to the market price at least tethers it to a functioning market and thus to the product's fair market value.

In contrast, the numerous complicating factors in the prescription drug market sever the relationship between price and value. See *In re POM Wonderful LLC,* No. ML 10–02199 DDP RZX, 2014 WL 1225184, at \*4 (C.D.Cal. Mar.25, 2014) (stating that in contrast to an efficient market, in an inefficient market some information is not reflected in an item's price). In other words, a consumer's out-of-pocket cost for a drug is not a proxy for the drug's value to the consumer. *Id.;* (Dkt. 96: Suppl. Decl. of Dr. Joel W. Hay ("Second Hay Decl."), ¶ 13). Thus, class members' out-of-pocket costs are not a proxy for the value of Cymbalta as represented. Therefore, applying the refund ratio to class members' out-of-pocket costs fails to tether the consumers' relative valuations of product features to Cymbalta's fair market value. Instead, it yields an arbitrary amount that is unrelated to the amount of harm incurred by individual class members.

**\*6** Dr. Hay's attempt to overcome this problem fails. Dr. Hay argues that under basic economic principles:

> [A]ny money spent by the consumer, whether it is the full price or as part of a co-pay, was spent based on an overall valuation of the medication. Since [in this case] that valuation was inflated by a certain percent, i.e. the refund ratio, it makes sense to refund that percent to the consumer.

(Third Hay Decl., ¶ 57c.) While Dr. Hay is correct that a rational consumer would not pay more for the drug than she believes it is worth, he forgets that a rational consumer would surely pay less than she believes the drug is worth. Thus, it does not follow that a consumer who pays a $20 co-payment believes that the drug is only worth $20.[8] Therefore applying the refund ratio to that consumer's co-payment does not yield an accurate approximation of the difference between the consumer's subjective valuation of the drug as represented and the drug as actually received.

Additionally, Dr. Hay's model suffers from serious methodological flaws. He proposes conducting a survey in 2014 (or later) to estimate consumers' valuation of Cymbalta as allegedly represented and as allegedly received. He plans to apply this estimate to harms incurred by class members from 2004 to 2014. Plaintiffs assert that "absent evidence suggesting that consumers have changed their valuation of withdrawal risk itself, changes in the antidepressant marketplace over the last decade—even changes that affect the demand for Cymbalta itself—will not affect the validity of Dr. Hay's proposed study." (Supp. Brief in Supp. of Ps' Motions Class Cert., at 26). Lilly points to several changes that it asserts show that consumers have changed their valuation of withdrawal risk, including: new competitive entries, increased awareness of discontinuation side effects, consumer sensitivity to price, changes in the mix of the Cymbalta patient base, and the recent entry of six generic substitutes for Cymbalta. (Yoram Decl., ¶ 32). Dr. Hay refutes these contentions with bare statements of disagreement. *See, e.g.,* (Third Hay Decl., ¶ 60b) ("[S]imply because consumers are more aware that withdrawal risk exists, there is no reason to assume that their valuation of that risk is any different."). Dr. Hay's bald assertions are unpersuasive in light of Lilly's evidence of events that common sense tells are potentially significant to consumer valuation.

Finally, and perhaps most importantly, Dr. Hay has yet to design the survey and method he will use in his conjoint analysis. Dr. Hay has not yet collected any data from which he will determine the refund ratio. He has not decided which attributes will be included in his model or whether he will analyze data from each of the four subclass members' states together or separately. *See* (Third Hay Decl., ¶¶ 15–24.) Dr. Hay admits that only relevant attributes should be included in a conjoint analysis survey. (Third Hay Decl. ¶ 18). However, he has not yet determined that the risk of withdrawal side effects is a relevant and thus appropriate attribute for inclusion in a conjoint analysis of Cymbalta. (Third Hay Decl. ¶ 55) ("As of right now, we cannot state the outcome of this first step [determining the appropriate attributes] of my proposed conjoint analysis, but there is simply no evidence that withdrawal risk is inappropriate as an attribute.") Thus, Plaintiffs have done worse than not even advancing a reliable method of calculating classwide damages —they have advanced "no damages model at all." *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 2014 WL 4104405,

at *6–7 (refusing to consider expert's conjoint analysis-based damages model in putative consumer class action because expert failed to identify variables to be included in his model or data in his possession to which the model could be applied).

**\*7** Moreover, given the disconnect between the price paid by a given individual and that individual's valuation of the product, the Court finds that Dr. Hay's method is inadequate to calculate damages even on an individual basis. Accordingly, Plaintiffs have failed to show that damages could be "feasibly and efficiently calculated" once liability issues common to the class are decided. *Rahman v. Mott's LLP,* No. 13–CV–03482–SI, 2014 WL 6815779, at *8 (N.D.Cal. Dec.3, 2014); *accord Lilly v. Jamba Juice Co.,* No. 13–CV–02998–JST, 2014 WL 4652283, at *9–10 (N.D.Cal. Sept.18, 2014) (same).

For all of these reasons, Plaintiffs' have failed to present a method of calculating damages that is tied to their theory of liability. The Court therefore DECLINES Plaintiff's motion to certify a damages class under Rule 23(b)(3).

*(2) Predominance of Other Common Issues*

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011) (quoting Rule 23(b)(3)). Plaintiffs and Lilly dispute the precise requirements that Plaintiffs must show to prove each of their asserted claims. Much of their dispute centers around the relevant standard of causation that must be satisfied for each claim—specifically whether proof of "but for" causation is required. Nevertheless, the parties apparently agree that each of Plaintiffs' claims requires proof of some form of causation (which Plaintiffs contend is satisfied by proof of materiality) and of some type of injury. Assuming *arguendo* that each of the relevant laws allows for classwide proof of causation and injury, Plaintiffs still fail to show that classwide proof of causation and injury is appropriate in this case.

The causation inquiry is complicated by Plaintiffs' unique, subjective theory of injury. In the ordinary consumer protection case allowing classwide proof of causation, the theory is: (1) a misrepresentation was made to all class members; (2) a reasonable person would find the misrepresentation important; (3) this important misrepresentation either induced individual class members to buy something they wouldn't have otherwise bought or was absorbed into the market and artificially increased the product's price; and thus, (4) class members were harmed by either buying something they would not have bought but for the misrepresentation or by overpaying for the product due to the artificially increased demand. *See, e.g., Werdebaugh v. Blue Diamond Growers,* No. 12–CV–2724–LHK, 2014 WL 2191901, at *1, *12–14 *18–21 (N.D.Cal. May 23, 2014) (allowing classwide proof of materiality and reliance for a class of consumers who purchased a product with an allegedly misleading label and who claimed they would not have purchased the product but for the purported misstatements); *Brown v. Hain Celestial Grp., Inc.,* No. C 11–03082 LB, 2014 WL 6483216, at *15–18 (N.D.Cal. Nov.18, 2014) (allowing classwide proof of materiality and reliance for class of consumers who purchased a product with an allegedly misleading label and who claimed the label caused them to overpay).

**\*8** Under either of these scenarios, classwide proof of causation makes sense because each class member claims that an objectively material misstatement was made to each class member and caused them each to incur an objectively measurable harm—either paying an inflated fair market price or paying any price at all. In other words, classwide proof of causation is feasible in these circumstances because the same misstatement generally acted in a similar manner on each class member to produce a similar effect.

In stark contrast to this typical pattern, Plaintiffs argue that they each purchased something that they expected would be worth more to the average consumer than the thing they actually received—and that this difference in value exists irrespective of price. *See* (Supp. Br. in Support of Pls.' Mot. Class Cert. 5–6) (stating that the amount that Plaintiffs paid for Cymbalta beyond what they claim they should have paid represents "the incrementally greater value that *Plaintiffs* placed on Cymbalta [as a result of the alleged misrepresentation]-it does not represent a higher price") (emphasis added). As discussed above, Plaintiffs' theory of damages (and thus of injury) is essentially subjective. Because Plaintiffs divorce their injury from price, their asserted injury is akin to subjective disappointment with the product received. Assuming *arguendo* that subjective disappointment is a cognizable harm, the existence and degree of Plaintiffs' claimed injury will differ based on each individual's (or the individual's physician's) consideration of Cymbalta's withdrawal symptom risk relative to Cymbalta's

other attributes. In other words, the causal effect of Lilly's alleged misstatements will differ widely between individuals. It is thus inappropriate to assume that because the alleged misstatement would be important to a reasonable person that it must have induced Plaintiffs to purchase Cymbalta or to otherwise incur some objectively measurable harm.

Physicians' roles in prescribing Cymbalta further attenuates the causation and materiality inquiries. The importance of the risk of withdrawal side effects to a reasonable physician may differ depending on the severity of the patient's depression or other symptoms treated with Cymbalta. In other words, the reasonable physician can defined only in relation to a patient—an elusive inquiry at best. Even ignoring the learned intermediary doctrine, the extent of a given class member's reliance on her doctor's advice—possibly to the exclusion of all other considerations—will differ depending on the person and her regard and trust in her physician. [9]

Plaintiffs attempt to transmute their subjective injury into an objective one by expressing their theory of injury in terms of value to the average consumer. While this measure has some superficial appeal, it is nonetheless inapt. Aside from pointing to the inability to calculate fair market value in the inefficient prescription drug market, Plaintiffs fail to justify using the average consumer's willingness to pay to define injuries classwide. It is unclear to the Court why any individual is harmed when she purchases a product that the average person (but not necessarily the purchaser) subjectively overvalues because of a misrepresentation. It is also not readily apparent that an objectively important misstatement would cause Plaintiffs to pay more than Cymbalta was subjectively worth to them. This argument is akin to relying on proof of the personal injuries incurred by the average car accident victim to show that a particular car accident caused that same amount of harm to a particular victim. Neither argument rests on a sound causal nexus.

*9 The Court thus finds that classwide proof of reliance and causation is not appropriate under Plaintiffs' theory of the case. Cf. *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 2014 WL 4104405, at *30 (quoting *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1022–23 (9th Cir.2011)) (internal quotation marks omitted) ("Citing California law, the Ninth Circuit has held that if a misrepresentation is not material as to all class members, the issue of reliance var[ies] from consumer to consumer and no classwide inference arises.").

*Jimenez v. Allstate Ins. Co.,* 765 F.3d 1161, 1169 (9th Cir.2014) (finding the use of statistical sampling among class members to determine liability permissible where the district court accepted a model "capable of leading to a fair determination" of the defendant's liability). For similar reasons, the Court finds that classwide proof of injury is not appropriate under Plaintiffs' theory of their case.

Finally, these concerns regarding common proof of causation and injury are compounded by the problems with Plaintiffs' damages model discussed above. Given the Court's finding that no classwide inference of causation is available in this case, Plaintiffs would need to offer some other proof that causation can be established classwide. They claim to do this through Dr. Hay's proposed model. However, the deficiencies in this model render it incapable of showing that causation may be proven classwide. Additionally, the Court is not convinced that causation could be established classwide via experts or class representatives' testimony.

For the aforementioned reasons, Plaintiffs failed to establish how causation could be proven on a classwide basis. Thus, they do not satisfy their burden of showing that common questions predominate. See *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 2014 WL 4104405, at *30 (holding that plaintiffs failed to satisfy predominance requirement where plaintiffs did not demonstrate that reliance and causation were provable on a classwide basis).

*b. Superiority*

In determining whether a class action is superior to other available methods of adjudication, courts consider: (1) class members' interest in "individually controlling the prosecution or defense of separate actions"; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Rule 23(b)(3)(A)-(D); *Zinser,* 253 F.3d at 1190.

Where damages suffered by each class member are not large, the first factor weighs in favor of class certification. *Id.* Here, the damages are not large. Plaintiffs seek only a percentage of their out-of-pocket costs for Cymbalta. For example, Plaintiff Saavedra seeks only a portion of the $455 of her own money that she alleges she spent on Cymbalta. (Second Hay Decl. ¶ 21). The second factor is neutral: Other individual lawsuits have been filed against Lilly regarding Cymbalta. However, those suits primarily involve personal injuries. The Court

Case 1:19-md-02875-RMB-SAK   Document 2107-2   Filed 06/16/22   Page 17 of 19
                                         PageID: 73947
Saavedra v. Eli Lilly and Co., Not Reported in F.Supp.3d (2014)

is unaware of another consumer protection action regarding Cymbalta that is similar to the case at bar. The third factor favors class treatment. Given the small amount of damages claimed by each putative class member it is desirable to consolidate all claims before one forum. See *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 2014 WL 4104405, at *32.

**\*10** However, the fourth factor—the likely difficulties in managing a class action-strongly counsels against certification. As discussed above, Plaintiffs failed to put forth a reliable and feasible method for calculating classwide damages. See *Leyva,* 716 F.3d at 515 (finding superiority requirement met where plaintiffs showed that individual damages could feasibly be calculated). Given the inability to calculate classwide damages, the need for individualized proof of causation and damages, and the fact-intensive individualized inquiry that will likely be required to show damages, a class action would be unmanageable. These issues are compounded by the enormous size of the putative subclasses. Plaintiffs estimate that there are over 1 million members in the California subclass, over 576,000 members in the New York subclass, over 192,000 class members in the Massachusetts subclass, and over 174,000 class members in the Missouri subclass. It would be completely unfeasible to decide each putative class member's damages (and possibly causation) in one proceeding. Thus, a class action is not the superior method for adjudicating plaintiffs' claims.

For the foregoing reasons, The Court DENIES Plaintiffs' motion to certify a class under Rule 23(b)(3).

### IV. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER RULE 23(C)(4)

In the alternative, Plaintiffs seek certification of an issue class under Federal Rule of Civil Procedure 23(c)(4) with respect to the "issue of whether Lilly's omissions regarding Cymbalta were materially misleading under the ... [relevant] state laws."

Federal Rule of Civil Procedure 23(c)(4) states that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Federal Rule of Civil Procedure 23(c)(4). The Ninth Circuit has approved the use of issue classes where certification under Rule 23(b)(3) is not proper because common questions do not predominate. See *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996). However, neither the Ninth Circuit nor the Supreme Court has established when certification of an issue class is appropriate. One problem posed by the certification of issue classes is that this could be used as an end-run around Rule 23(b)(3)'s predominance requirement. See *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n. 21 (5th Cir.1996). On the other hand, refusing to certify any issue class under Rule 23(c)(4) unless the predominance requirement was met would render Rule 23(c)(4) a nullity. See *In re Nassau County Strip Search Cases,* 461 F.3d 219, 226 (2d Cir.2006).

Mindful of these competing concerns, the Court finds that certification of an issue class is not proper here. Though materiality is often evaluated on a classwide basis, as discussed above, it is not appropriate to do so here. Moreover, Plaintiffs fail to show that damages can be determined even on an individual basis once liability is decided. Thus certification of an issue class would not advance the resolution of this litigation. See *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 2014 WL 4104405, at *33 (declining to certify a liability issue class because it was unclear that certification of the issue class would fundamentally advance the resolution of the litigation).

**\*11** In *Rahman v. Mott's LLP,* the court refused to certify an issue class under Rule 23(c)(4). The court found that plaintiff failed to show that damages could be calculated on a class-wide basis. *Rahman,* 2014 WL 6815779, at *8. The court acknowledged that the Ninth Circuit seems to have implicitly endorsed other Circuits' approach of allowing the certification of liability-only classes where the plaintiff failed to establish predominance on the damages issue. *Id.* (citing *Jimenez,* 765 F.3d at 1168). The court also distinguished *Lilly v. Jamba Juice Company.* According to *Rahman, Jamba Juice* certified a liability class where the plaintiff failed to present any evidence regarding class-wide calculation of damages because "[s]ome of the difficulties in determining individual damages may fall away after liability is determined[.]" *Id.* at *9 (alteration in original) (quoting *Jamba Juice,* 2014 WL 4652283, at *11). In contrast to *Jamba Juice,* Rahman's claims were already refined by the court's summary judgment order and Rahman had engaged in sufficient discovery to produce the evidence required to show that damages could be proved classwide. *Id.*

As in *Rahman* and unlike in *Jamba Juice,* Plaintiffs have already engaged in extensive litigation. Their claims were refined by several of this Court's Orders (particularly by those regarding Defendant's motion to dismiss and motion for summary judgment). (Dkts.52, 72.) The parties have already engaged in substantial discovery, including expert disclosures. Plaintiffs had "ample opportunity to produce evidence necessary to satisfy the requisites of *Comcast* and certify a class as to both liability and damages." *Rahman,* 2014 WL 6815779, at *9. Plaintiffs nevertheless failed to do so.

For the aforementioned reasons, the Court finds that certifying a liability-only issue class under Rule 23(c)(4) will not materially advance this case's resolution. The Court therefore DECLINES Plaintiffs' motion to certify an issue class under Rule 23(c) (4). [10]

### V. ORDER

1. For the aforementioned reasons, the Court DENIES Plaintiffs' motion to certify a class under Rule 23(b)(3).

2. For the aforementioned reasons, the Court DENIES Plaintiffs' motion to certify a class under Rule 23(c)(4).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 7338930

---

### Footnotes

1    There is some debate over whether the misrepresentations complained of appeared only in the Cymbalta label or in Lilly's nationwide advertising materials. *See* (Def's Opp. Ps' Motion Class Cert., at 20.)

2    Plaintiffs also assert several individual claims not relevant to the issue of class certification.

3    Nevertheless, class certification is not defeated solely by the requirement to engage in individualized damages calculations. *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir.2013) (allowing class certification where individualized damages could readily be calculated from computerized payroll records).

4    For clarity's sake, "consumer value" is used to refer to the concept of value that Plaintiffs use.

5    The Court rejects Plaintiffs' assertion that price is determined only by the seller. (Pls.' Resp. to Def.'s Supp. Submission, at 18.)

6    In his earlier declarations, Dr. Hay also mentions measuring damages as the dollar amount of consumers' willingness to pay for a drug with a 1% withdrawal risk rather than a 44% withdrawal risk, up to the amount of the class member's out-of-pocket costs. *See* (Second Hays Decl., ¶ 19). Because neither party focuses on this measure and because it was seemingly abandoned in Dr. Hay's third declaration, the Court declines to address it.

7    Plaintiffs advance *Plubell v. Merck & Co., Inc.,* 289 S.W.3d 707 (Mo.Ct.App.2009) in support of this proposition. *Plubell* considered consumers' claim that a prescription drug manufacturer violated Missouri's consumer protection statute and held that "because Plaintiffs alleged Vioxx was worth less than the product as represented, they stated an objectively ascertainable loss under the MMPA using the benefit-of-the-bargain rule." *Id.* at 715. However, *Plubell* did not make this statement while considering whether a loss in consumer value (rather than fair market value) could serve as the measure of damages. Moreover, *Plubell* made this statement while considering class certification under a state procedural rule that did not allow

Case 1:19-md-02875-RMB-SAK   Document 2107-2   Filed 06/16/22   Page 19 of 19
                                  PageID: 73949
Saavedra v. Eli Lilly and Co., Not Reported in F.Supp.3d (2014)

courts to conduct even a preliminary inquiry into the merits of plaintiffs' claims. *See id* . at 712. Thus, the court declined to address defendant's argument that pharmaceutical pricing didn't vary with risk, and stated that whether plaintiffs could prove their theory of liability was irrelevant. *Id.* at 715, 715 n. 6. This is at odds with the Rule 23 inquiry, which is strict and often overlaps with the merits of plaintiffs' claims. *See Dukes,* 131 S.Ct. at 2551.

8   Admittedly, the same could be said with respect to a product's price in a functioning market—that some consumers value the product more highly than the market and are happy to pay less for the product than they perceive it to be worth. However, this is unproblematic in the typical benefit-of-the-bargain analysis. Such a theory of liability relies on differences in fair market value rather than differences in individuals' subjective valuations.

9   This case is distinguishable from *Krueger v. Wyeth, Inc.,* No. 03CV2496 JAH AJB, 2011 WL 8971449 (S.D.Cal. Mar.30, 2011). In *Krueger* there was no less risky alternative product and plaintiff sought a refund of the entire purchase price (thus obviating the need for "individualized assessment of the drug's value to each class member [or] an individualized assessment of the proper comparator drug for each class member."). *Id.* at *6. In contrast, there are generic substitutes available for Cymbalta, as well as other antidepressants. Also, Plaintiffs seek to recover an individualized assessment of Cymbalta's alleged value rather than their entire purchase price.

10  In light of the Court's conclusions regarding the Rule 23(b) (3) requirements and Rule 23(c)(4), the Court finds it unnecessary to address the other requirements for class certification.

---

**End of Document**　　　　　　　　　　　　　　© 2022 Thomson Reuters. No claim to original U.S. Government Works.