# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B. Kugler,<br><br>District Court Judge |

**DECLARATION OF JACQUES DELISLE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 37 SANCTIONS AGAINST ZHP**

I, Jacques deLisle, declare as follows:

**A.     Background**

1. I am the Stephen A. Cozen Professor of Law, Professor of Political Science, Director of the Center for the Study of Contemporary China, and Co-Director of the Center for Asian Law at the University of Pennsylvania. From 2009 to 2019, I was Director of the Center for East Asian Studies at the University of Pennsylvania (which was, for most of that period, a federally funded National Resource Center for East Asian Studies), where I continue to serve as a member of the Executive Committee.

2. I am an associate member of the International Academy of Comparative Law, a member of the executive committee and the board of directors of the American Society of Comparative Law, vice president-elect and member of the board of the American Association of Chinese Studies, past vice chair of the Pacific Rim interest group of the American Society of International Law, and a member of the National Committee on U.S.-China Relations. I am director of the Asia Program and the China Center at the Foreign Policy Research Institute. I have been an honorary professor at Renmin University Law School, and I am an inaugural member of the global law faculty of

1

      Peking University Law School, both of which are among China's top-ranking law schools.

3. My research, writing, and teaching for more than 35 years have focused on contemporary Chinese law and Chinese politics and policy. I specialized in Chinese law and Chinese politics while earning my J.D. at Harvard Law School and in the Ph.D. program in the Government Department at Harvard University. I also focused partly on Chinese politics, policy, and foreign relations at what was then the Woodrow Wilson School of Public and International Affairs at Princeton University, where I received an A.B.

4. I have published scholarship on these subjects in law journals, international affairs journals, edited volumes, and other media. I regularly conduct research on law, politics, and domestic and foreign policy in contemporary China, and I regularly monitor new laws and legal, political, and economic developments in China.

5. At the University of Pennsylvania (and as a visiting professor at other leading universities in East Asia and elsewhere), I teach courses and supervise law, social science, and business graduate students' theses and doctoral dissertations focusing on legal, political, and economic issues in contemporary China and China's external legal relations and foreign relations. I am a member of the faculty graduate group and teach in the Lauder Program at the Wharton School, a program that awards a joint M.B.A.-M.A. degree in regional studies, including Chinese studies.

6. I also conduct research and have published in the fields of international law, comparative law, tort law, and international law-related aspects of United States law. I also regularly teach courses on public international law, comparative law and politics, and international relations.

7. I have served as a consultant, advisor, or lecturer for programs on United States and international law for Chinese lawyers, and programs supported by the United States government, major private foundations and international organizations to provide advice to China's legislation-drafters and government officials, primarily in the fields of civil and economic law (including company law, torts, property, foreign investment, and intellectual property) and government regulation (including administrative procedure law). I also have conducted substantial research and scholarship on foreign legal advice and assistance programs (including those focusing on economic law and rule-of-law reforms) targeting China and other transitional post-socialist states. I have twice been a member of the U.S. delegation to the U.S.-China bilateral "rule of law" dialogue (a "track 1.5" dialogue involving government officials and academic/private sector experts from both sides).

8. I contribute to scholarly and policy-related programs on contemporary Chinese law and politics for a variety of governmental and non-governmental organizations. I regularly serve as a peer reviewer for major United States and East Asian scholarly journals and academic presses in fields relevant to my scholarship, and for major United States and foreign providers of funding for academic research on the law and politics of the PRC. I

2

serve on the editorial boards of several journals in my fields of specialization, and have been the co-editor of a series of books on Chinese law.

9. Before joining the faculty at the University of Pennsylvania, I did substantial work on issues of Chinese law and country conditions and aspects of China's external relations in my capacity as an attorney-advisor in the Office of Legal Counsel in the U.S. Department of Justice and in association with leading U.S.-based international law firms.

10. I have served as an expert witness and consultant on matters of Chinese law, policies, and practices in litigation in United States federal and state courts, arbitration proceedings and proceedings before federal agencies in dozens of cases over more than 20 years.

11. I have conducted extensive research in residence in China. Since 1986, I have traveled regularly to China, and on several occasions, I have been a visiting scholar or visiting researcher at major research universities in the region. I have frequent, extended discussions about the subjects noted in the preceding paragraphs with Chinese lawyers, judges, legal academics, social scientists, government officials, and ordinary Chinese citizens in China and elsewhere. I read Chinese and speak Mandarin, the standard national dialect of Chinese. Much of my research is conducted in that language.

12. I also have undertaken extensive research outside of the PRC on matters relating to Chinese law, politics, and economics. In that capacity, I have reviewed documentary evidence and conducted many interviews of lawyers who advise and represent PRC clients and non-PRC clients who conduct business in China, PRC and non-PRC businesspeople who conduct business in China, and government officials and foundations, industry organizations, and other non-profit officers who have been involved in promoting or monitoring economic and legal reform in China.

### B.    Assignment

13. I have been asked by counsel for Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP" or the "Company") to review materials relevant to plaintiffs' request for sanctions in connection with the denial of Mr. Chen Baohua's request to travel to Macau for a deposition in this matter, and to provide a declaration explaining the circumstances surrounding the denial.

14. In preparing this declaration, I have reviewed the Approval Form for Leading Cadres to Go Abroad (Border) for Private Purposes ("Approval Form") [*lingdao ganbu yin si chu guo (jing) shenpi biao*], the Declaration of Sihan Lu ("Lu Declaration"), and other materials referenced in this declaration. I also have relied on my background knowledge and expertise in relevant aspects of Chinese law, policy, and practice.

### C.    Findings and Analysis

15. The materials that I have reviewed are consistent with a conclusion that Chen Baohua was unable to secure a required permission to leave China to be deposed in this litigation

3

despite serious and good-faith efforts by him and his staff to secure the required permission.

16. Rules issued by major organs of the party and state require leading cadres [*lingdao ganbu*] seeking to leave the country for private matters [*yin si chu guo (jing)*] to subject their requests to examination and to secure approval from the relevant authorities.[1] The Approval Form at issue in this case implements this requirement. Chen's leaving China to be deposed in civil litigation abroad involving ZHP—the company where he serves as "president" [*zhongcai*] according to the Approval Form—would be considered "private" [*yin si*] rather than "public" [*yin gong*] matters, and thus would be within the scope of the requirements reflected in the Approval Form (assuming other criteria, discussed below, were met as well).

17. The completed Approval Form also lists several positions held by Chen outside the Company. These roles include Chairman of the Taizhou Federation of Industry and Commerce ("Federation") [*Taizhou gongshangye lianhe hui*]. (The official website of the Federation also indicates that Chen, the president of ZHP, is Chairman of the Federation.)[2] Although the rules do not explicitly define what posts are "leading cadre" [*lingdao ganbu*] roles, the position of federation of industry and commerce chairman is generally considered a "leading cadre" post, and thus, its occupant would be required to file the Approval Form. An authoritative document from the Chinese Communist Party ("CCP") defines the "principal scope" [*zhuyao fanwei*] of "leading cadre" [*lingdao ganbu*]—the term used in the Approval Form—to include leading positions in federations of industry and commerce [*gongshang lian jiguan*]—a term synonymous with the one used in the name of the Taizhou Federation of Industry and Commerce.[3]

---

[1] Numerous party and state documents speak to this issue. Among the most detailed in relevant respects is a Notice by the Central Commission for Discipline Inspection, the Organization Department of the Chinese Communist Party Central Committee, the Ministry of Foreign Affairs, the Ministry of Public Security, the Ministry of State Security, the Ministry of Supervision, the Ministry of Personnel, and the Ministry of Commerce on Further Strengthening the Administration of Party Members and Cadres Going Abroad (2004) [*guanyu jin yibu jiaqiang dangyuan ganbu chuguo (jing) guanli de tongzhi*] ("Notice"). It provides that cadres who seek to leave the country for private reasons [*ganbu yin si chu guo (jing)*] must undergo strict examination and approval procedures [*yange luxing shenpi shouxu*] as required by the cadre management authorities [*ganbu guanli quanxian*], and mandates "strict scrutiny" [*yange shencha*] in cases of leading cadres and those holding important management positions. Notice §2(1); *see also* Notice §4(1),(4) (directing relevant departments within the party and in the state—including branches of the Public Security Bureau—to implement the Notice's requirements effectively and establish effective mechanisms for managing related information, including applications and approvals).

[2] *Taizhou Shi Gongshanglian*, m.576tv.com/Home/Tzs/tzgsl.

[3] *Zhong jiwei xiangjie "dangyuan lingdao ganbu" fanwei*, Oct. 30, 2016. This document was posted on the official website of the Central Commission for Discipline Inspection ("CCDI"), the principal organ for monitoring, controlling, and sanctioning the actions of party members, including those who hold cadre—including leading cadre—positions. (Since 2018, its functions have been merged with those of a newly created State Supervision Commission, extending jurisdiction over non-party members not previously covered by the CCDI). The document recounts the contents of a report in *People's Daily*, the

18. This characterization is fully consistent with long-standing and well-established Chinese practice. "Cadre" [*ganbu*] is a broad and imprecisely defined term in China and in many (but not all) cases refers to full-time staff of government or party organs, but it encompasses a broader range of party, state, and quasi-party-state positions, including positions that the Approval Form indicates Chen holds. Federations of industry and commerce in China are nominally "mass organizations," but they are more accurately described as quasi-party-state organs. Mass organizations are a key mechanism for linking the party-state to various social and economic groups and sectors. They are a principal means for exercising party-state leadership over such groups and sectors, and receiving information and views from them. Top-level positions in such organizations, such as "chairman," traditionally have been considered "leading cadre" posts.[4]

19. According to the Approval Form, Chen is (or was—the form is not entirely clear) a member of the Standing Committee of the Taizhou Municipal Chinese People's Political Consultative Conference ("CPPCC"). Under the definitions set forth in the same authoritative CCP source discussed above (*supra* ¶ 17), this position, too, qualifies as a "leading cadre" position. The document states that "leading cadres" include leading positions in "organs of the People's Political Consultative Conference" [*zhengxie jiguan*]. Membership in the standing committee of such an organization is very likely to be deemed a "leading cadre" position.

20. The Approval Form states that the Chinese Communist Party Committee within ZHP approved/agreed [*tongyi*] to Chen's request to travel abroad for private matters.[5] In the space for determinations by the "approval authority," the Form states "not approved / not agreed to go abroad (border)" [*bu tongyi chu guo (jing)*], followed by the phrase [*bu yu banli*]. This phrase is best rendered as "not handled/managed" and, in context, a statement (possibly by a second entity) that the request for reversal of the denial of

---

official newspaper of the CCP. That report recounts the responses of the "law office" [*fagui shi*] of the CCDI to questions concerning the scope of application of the term "leading cadre" [*lingdao ganbu*] in two major documents issued by the Chinese Communist Party Central Committee—the party's principal rule-making body. (The two documents are "The Chinese Communist Party Guidelines on Integrity and Self-Discipline" and "The Disciplinary Regulations of China.".)

[4] *See generally* Hon S. Chan, "Cadre Personnel Management in China," 204 *China Q.* 703, 713, 724 (2004) (federation of industry and commerce head as "leading cadre"); Jonathan Unger and Anita Chan, "Associations in a Bind: The Emergence of Political Corporatism," in *Associations and the Chinese State* (Jonathan Unger, ed. 2008) (describing the role of "mass organizations," including federations of industry and commerce); *see also* Chinese Communist Party Central Committee, "Regulations on United Front Work," art. 29 (2020) (federations of industry and commerce are popular [*minying*] organizations under the leadership of the party [*dang lingdao*], are economic and non-governmental/societal in nature [*jingjixing he minjianxing*], and are charged with promoting the healthy development of the non-public sector of the economy and participants therein).

[5] Under China's Company Law, private—that is, non-state-owned, companies such as ZHP—are required to establish party committees. *See* Company Law of the People's, Republic of China, art. 19 (2018); *see also* Charter of the Chinese Communist Party, art. 30 (2107) (requiring any enterprise with three or more party members to establish a party organization).

permission was rejected / would not be accepted.[6] (It could also be read as a simple restatement—again, possibly by a second entity—that permission has been denied.) This portion of the Approval Form bears the seals of two entities: the Taizhou Federation of Industry and Commerce and the Taizhou Public Security Bureau Exit/Entry Administration. The latter entity is the local, Taizhou branch of the state body that regulates entry into and exit from China. Its authority includes granting (or denying) permission for Chinese citizens to travel abroad for "private" [*yin si*—the same term used in the Approval Form] matters.[7]

21. The Lu Declaration recites a sequence of events consistent with the description in the preceding paragraph. The facts described in the Lu Declaration are consistent with known patterns of Chinese bureaucratic process and practice.

22. I understand that plaintiffs have suggested that, as chairman of the Federation, Chen could have secured the requisite approval if he or others at ZHP had tried to do so. *See, e.g.*, Pls.' Reply Br. in Supp. of R. 37 Sanctions against ZHP at 7-8. I understand that plaintiffs also suggest that the reasons given on the Approval Form for Chen's request for authorization to travel abroad, and the choice not to attach the Special Master's ruling ordering Chen to provide deposition testimony, manifest a lack of good-faith or serious effort to obtain approval. *See* Hr'g Tr. 52:9-20, Sept. 8, 2022 (discussing Special Master Order No. 28 (D.N.J. June 22, 2021)). Plaintiffs' inferences are not the most plausible explanations for the rejection of Chen's application or the choice of language on the form, or the decision not to attach the Special Master's ruling.

---

[6] The phrase *buyu banli* is relatively rarely used in Chinese laws (although various synonyms are more common). A search of a comprehensive database of Chinese laws and national-level regulations reveals fourteen instances. All are consistent with the understanding set forth in the text here—that is, they are directives for the relevant (usually state) entity not to accept / handle / approve actions or documents addressed by the law or regulation. The usage most similar to the document at issue here is in the Exit and Entry Administration Law, art. 36 (2013). It provides that a decision made by the exit/entry administration of the public security authority (the seal of the Taizhou branch of which is on the Approval Form) "not to handle" / "to reject" [*buyu banli*] an application for extension, renewal, or reissuance of a foreign national's visa or residence permit is a final decision [*zui zong jueding*]. The translation of article 36 offered by a reliable bilingual database maintained by Peking University Law School uses the phrase "not to handle," and the translation of article 36 provided by the Ministry of Foreign affairs uses "rejecting," to translate *buyu banli*.

[7] *See* generally Overview of National Immigration Authority, https://www.nia.gov.cn/n741430/n741506/index.html (official website of the National Immigration Bureau of the PRC, stating that the National Immigration Bureau is generally responsible for "management of entry and exit of Chinese citizens for private matters [*fuze Zhongguo gongmin yin si churujing guanli*], and that the Public Security Organ Entry/Exit Administration organs at each level (including municipalities such as Taizhou) are authorized and entrusted by the National Immigration Bureau with responsibility for managing Chinese citizens going abroad for private matters [*gongmin yin si chu guo (jing) guanli*] and for receiving and approving/issuing citizens' documents seeking permission to go abroad for private matters [*shouli qianfa gongmin yin si shi churujing zhengjian*].

23. The chairmanship of a federation of industry and commerce is a position of prominence at various levels in China (as the characterization of it as a "leading cadre" position suggests).  But that does not confer on the occupant control over the organization, including the ability to secure the Federation's approval of its chairman's request for permission to travel abroad.  Such federations do not have the institutional and hierarchical structure that is characteristic of a business enterprise (such as ZHP) or a government bureaucracy (such as the exit/entry administration in the Public Security Bureau).  A federation chairman generally would not have the degree of authority over the federation that, say, a company president often has over a company in China.  In this respect, it is noteworthy that, according to the Approval Form, the party committee in ZHP—where Chen is president—approved his request, while the Federation—where Chen is chairman—did not.

24. Moreover, as the Approval Form and the authoritative party and state "Notice" indicate, the Taizhou Federation of Industry and Commerce is not the only entity beyond ZHP whose approval is necessary for Chen to travel abroad in this case.  The granting of permission to travel abroad for "private" business also depends, unremarkably, on a state entity—the Taizhou Public Security Bureau Exit/Entry Administration—with authority over border entry and exit, immigration, and related matters.  This fully state entity (whose seal appears on the Approval Form next to the denial of Chen's request) is not subordinate to the "mass organization" or quasi-party-state entity—the federation of industry and commerce—at the same level (in this case, Taizhou municipality).

25. The text at issue in the Approval Form states that the travel abroad was necessary due to requirements in handling overseas litigation of ZHP, and the form apparently did not attach a copy of the Special Master's ruling ordering Chen's deposition.  It is quite plausible that a senior company official seeking permission to travel abroad, and worried that the request might be denied, might well hope that a seemingly routine request would receive relatively little scrutiny and thus be more likely to win approval.  Concern about close scrutiny, and in turn denial of an evidently non-routine request (such as permission to travel for a deposition in litigation abroad to comply with a foreign court's order), would likely be all the greater for an applicant who holds the cluster of prominent and partly political posts listed for Chen on the Approval form, including delegate to the National People's Congress (China's legislature) and standing committee membership in the Taizhou People's Political Consultative Conference (a state advisory body).

26. The approach taken to describing the purpose of travel makes still more sense if the applicant and his staff saw the initial submission of the Approval Form as the first step in a potentially multi-step process where an initial rejection might be revisited.  The Lu Declaration describes such a process, including:  follow-up contacts with the Federation after the submission of the form while a decision was still pending; further discussions with the Federation after receipt of an oral (but not-yet-written) notice that the request would be denied and seeking reconsideration; and a request for permission to disclose the

7

        Approval Form (perhaps as a step toward further efforts to obtain reconsideration or reversal of the denial).[8]  *See* Lu Declaration ¶¶ 3-13, Feb. 2, 2022.

27. The efforts described in the Lu Declaration are consistent with known patterns of efforts by applicants seeking government approvals of various types in China.  Informal contacts and informal requests for reconsideration are commonplace and coexist with more formal application and review processes.  And they sometimes—but far from always—are successful.

28. The choice of wording on the Application Form, the non-inclusion of the Special Master's ruling, and the rejection of the application are also consistent with, and may reflect, broader concerns that party and state authorities in China have expressed and embedded in policies and rules.  The Notice and kindred documents reflect the party's commitment that people in Chen's and kindred positions (including cadres who work full-time in party and state organs, and leading cadres of any type, going abroad for public business) not be allowed to travel abroad without careful and probing scrutiny of their reasons for doing so.  Authoritative sources have issued repeated calls to party and state authorities at all levels to implement such rules and restrictions more strictly and zealously and have articulated serious concerns about the consequences for the economy and the country of lax implementation and enforcement of the relevant rules.[9]

29. A request to exit mainland China to be deposed in litigation in a foreign court proceeding raises particular concerns about which a relatively sophisticated applicant might well worry (and, in turn, such an applicant would seek to avoid drawing attention to this purpose in a request for permission to travel).  Taking depositions of Chinese citizens in China for use in judicial proceedings abroad, including in the United States, is generally to be handled through procedures set forth in the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, and Chinese laws paralleling or implementing the Convention.[10]  With respect to China, the Hague Convention process requires that a proper request go to China's Ministry of Justice (which China has designated as its central authority for the Convention), after which China's Supreme People's Court reviews the request, passing approved requests on to the relevant court in China for implementation, including through orders to parties in China.  Attempting to take a deposition of a Chinese national in China without going through this cumbersome process is unlawful and extremely ill-advised, and the United States Department of State has pointedly warned against doing so.[11]

---

[8] The cover page of the Approval Form states that it is an internal document [*neibu ziliao*] not to be disclosed publicly [*bu de gongkai*]—a point also stated in the Lu Declaration.  Thus, permission would have been needed to disclose the Approval Form.

[9] *See generally* the "Notice" and several documents cited therein.

[10] Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters; Civil Procedure Law of the People's Republic of China, arts. 283-286 (2021) ("Civil Procedure Law").

[11] *See* Civil Procedure Law, art. 284 (broadly prohibiting collection of evidence by foreign agency or individual in China).  According to the State Department's webpage on "China Judicial Assistance":

30. Because of these restrictions, parties to litigation abroad seeking to depose or make available for deposition a witness in China often arrange for what was envisioned in this litigation: for Chen (and others at ZHP) to travel outside mainland China (including to Macau), where depositions can be conducted without violating Chinese law. (Other workarounds have been used as well, including having potential deponents who cannot travel outside mainland China make written declarations or respond to written questions.) A prospective deponent in Chen's position—one who must undergo the application and approval process for a leading cadre seeking permission to travel abroad for a private matter—could reasonably be concerned that an application form explicitly stating "deposition" as the purpose for travel might be read by the reviewing authorities as seeking to circumvent the Hague Convention-based process that China has embraced, and, in turn, that such an application would be more likely to be denied.

31. Chen and his senior staff at ZHP are likely to be aware of some or all of the foregoing considerations. In addition to being chairman of the Federation, Chen also holds or has held (as indicated on the Approval Form) positions as representative to the National People's Congress ("NPC"), and member of the Standing Committee of the Taizhou branch of the CPPCC, positions that indicate a significant degree of sophistication and insight about the operation of party and state organs and procedures in China. The NPC is China's national legislature, and includes many party and state officials and prominent businesspeople among its delegates. The standing committee is the leading body of (in this case) the Taizhou municipal branch of an auxiliary, non-legislative advisory and "united front" organ that includes, and represents, a less heavily party-affiliated constituency. Both bodies perform significant functions in representing the interests and views of social constituencies to the party-state authorities that determine laws and policies.

32. These posts often both reflect, and, in turn, help create in their occupants, a relatively high degree of political insight, savvy, and sophistication.[12] This likely includes the

---

"China does **not** permit attorneys to take depositions in China for use in foreign courts. Under its Declarations and Reservations to the Hague Evidence Convention and subsequent diplomatic communications, China has indicated that taking depositions, whether voluntary or compelled, and obtaining other evidence in China for use in foreign courts may, as a general matter, only be accomplished through requests to its Central Authority under the Hague Evidence Convention. Consular depositions would require permission from the Central Authority on a case-by-case basis, and the Department of State will not authorize the involvement of consular personnel in a deposition without that permission. Participation in such activity could result in the arrest, detention or deportation of the American attorneys and other participants." https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/China.html.

[12] On the other hand, as with the chairmanship of the Federation, membership in the NPC or the executive body of the local CPPCC do not reliably confer, or reflect, the power to secure approval of an exit permit application from the Federation or the local Public Security Bureau. The NPC is a body of several thousand members that meets very infrequently to approve legislation prepared by other state and party organs. It—and its members—occupy much less powerful positions in China than do, say, Congress and Members of Congress in the United States. The CPPCC is a less politically significant organization. Neither is a body with oversight power or command authority over the Federation or the Taizhou Public Security Bureau (except in the highly notional sense that all state organs—including the Taizhou PSB—

bases for a strong sense of how to apply for an exit permit to provide deposition testimony in litigation outside China in a way that maximized the chances for approval by the relevant authorizing bodies, but still could not guarantee success.

I declare under penalty of perjury that the foregoing is true and correct.

*Jacques de Lisle*
Jacques deLisle

Executed on ___October 13, 2022_____

---

are, under broad constitutional principles, formally subordinate to the NPC in China's system of legislative supremacy).

10