# Exhibit 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2                       CAMDEN VICINAGE
 3

     ****************************
 4   IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
     AND IRBESARTAN PRODUCTS
 5   LIABILITY LITIGATION
 6   ***************************   HON ROBERT B.
     THIS DOCUMENT APPLIES TO ALL   KUGLER
 7   CASES
 8   ***************************
 9
                  - CONFIDENTIAL INFORMATION -
10                 SUBJECT TO PROTECTIVE ORDER
11
12
13              Remote Videotaped Deposition of
14   DAVID L. CHESNEY, commencing at 9:40 a.m., on
15   the 21st of March, 2022, before Maureen
16   O'Connor Pollard, Registered Diplomate
17   Reporter, Realtime Systems Administrator,
18   Certified Shorthand Reporter.
19
20                         - - -
21
              GOLKOW LITIGATION SERVICES
22         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
23
24
```

Page 2

REMOTE APPEARANCES:

MAZIE SLATER KATZ & FREEMAN, LLC
BY:  ADAM SLATER, ESQ.
BY:  JULIA S. SLATER, ESQ.
BY:  CHRISTOPHER GEDDIS, ESQ.
    103 Eisenhower Parkway
    Roseland, New Jersey 07068
    973-228-9898
    aslater@mazieslater.com
    cgeddis@mazieslater.com
    Representing the Plaintiffs

RIVERO MESTRE LLP
BY:  JORGE MESTRE, ESQ.
BY:  ZALMAN KASS, ESQ.
    2525 Ponce De Leon Boulevard
    Miami, Florida 33134
    305-445-2500
    Representing the Plaintiffs

GREENBERG TRAURIG LLP
BY:  KATE M. WITTLAKE, ESQ.
    4 Embarcadero Center, Suite 3000
    San Francisco, California 94111
    415-655-1285
    wittlakek@gtlaw.com
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

GREENBERG TRAURIG, LLP
BY:  STEVEN M. HARKINS, ESQ.
    Terminus 200
    3333 Piedmont Road NE
    Suite 2500
    Atlanta, Georgia 30305
    678-553-2100
    harkinss@gtlaw.com
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,

Page 3

APPEARANCES (Continued):
WALSH PIZZI O'REILLY LLP
BY:  CHRISTINE I. GANNON, ESQ.
By:  LIZA WALSH, ESQ.
    Three Gateway Center
    100 Mulberry Street, 15th Floor
    Newark, New Jersey 07102
    973-757-1017
    Representing the Defendants Teva
    Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals SA, Inc., Actavis LLC,
    and Actavis Pharma, Inc.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY:  THOMAS E. FOX, ESQ.
    One Manhattan West
    New York, New York 10001-8602
    212-735-2165
    thomas.fox@skadden.com
    Representing the Defendants Zhejiang
    Huahai Pharmaceutical Co., Ltd.,
    Prinston Pharmaceutical Inc., Huahai
    U.S., Inc., and Solco Healthcare US,
    LLC

HINSHAW & CULBERTSON, LLP
BY:  GEOFFREY M. COAN, ESEQ.
    53 State Street
    Boston, Massachusetts 02109
    617-213-7047
    gcoan@hinshawlaw.com
    Representing the Defendant SciGen
    Pharmaceuticals

BARNES & THORNBURG, LLP
BY:  MITCHELL CHARCHALIS, ESQ.
    2029 Century Park E, Suite 300
    Los Angeles, California 90067
    310-284-3896
    mcharchalis@btlaw.com
    Representing the Defendants CVS
    Pharmacy, Inc., and Rite Aid
    Corporation

Page 4

APPEARANCES (Continued):

FALKENBERG IVES, LLP
BY:  MEGAN A. ZMICK, ESQ.
    230 W. Monroe Street, Suite 2220
    Chicago, Illinois 60606
    312-566-4808
    maz@falkenbergives.com
    Representing the Defendant Humana

BUCHANAN INGERSOLL & ROONEY PC
BY:  ASHLEY D.N. JONES, ESQ.
BY:  DEBORAH HOPE, ESQ.
    1700 K Street NW, Suite 300
    Washington, DC 20006-3807
    202-452-7318
    ashley.jones@bipc.com
    Representing the Defendant Albertsons
    LLC

Videographer:  David Stone

Page 5

                INDEX
EXAMINATION                         PAGE
DAVID L. CHESNEY
BY MR. SLATER                        10
BY MR. FOX                          276
BY MR. SLATER                       311
BY MR. FOX                          348

                E X H I B I T S
NO.         DESCRIPTION             PAGE
1    Notice to Take
     Videotaped Deposition.....      13
2    ZHP Defendants' Response
     and Objections to Notice
     to Take Videotaped Oral
     Deposition of David
     Chesney..................       14
3    DL Chesney Consulting,
     LLC Invoices..............      15
4    Expert Report of David
     L. Chesney, MSJ...........      24
5    IARC Monographs on the
     Evaluation of the
     Carcinogenic Risk of
     Chemicals to Humans, May
     1978.....................       116
6    Document titled
     Purification of
     Laboratory Chemicals......     122

Page 6

7      Article in Tetrahedron, N,N-Dimethylformamide: Much more than a solvent..   128

8      Sun, et al, Theoretical Investigation of N-Nitrosodimethylamine Formation from Nitrosation of Trimethylamine............   131

9      PowerPoint titled Advanced analytical Technology Center (CEmat) introduction......   201

10     E-mail titled Notice on the Results of the Report of the Preliminary Investigation on the Formation of Unknown Impurities Resulting from the Sodium Azide Quenching in Crude Irbesartan, Bates ZHP00190573 and 574.......   207

11     PowerPoint titled Quality Management Essentials, Expert Advice on Building a Compliant System..........   233

12     Deviation Report Form, Bates ZHP00004352 through 4471...............   266

13     November 29, 2018 Warning Letter, Bates ZHP01544159 through 4164..   320

14     Investigation Report, Bates ZHP00662283 through 2309..............   336

Page 7

15     August 26, 2018 Response to FDA Inspection on July 23 - August 3, 2018, Bates ZHP02115600 through 5603..............   338

16     Establishment Inspection Report, Bates PRINSTON00162349 through 2406....................   344

Defendant 1   January 25, 2019 FDA Statement on the FDA's ongoing investigation into valsartan and ARB class impurities and the agency's steps to address the root causes of the safety issues......   291

Defendant 2   August 30, 2018 FDA Statement on FDA's ongoing investigation into valsartan impurities and recalls and an update on FDA's current findings..........   297

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE  LINE
None.

Request for Production of Documents
PAGE  LINE
None.

Stipulations
PAGE  LINE
None.

Questions Marked Highly Confidential
PAGE  LINE
None.

Page 9

PROCEEDINGS

THE VIDEOGRAPHER:  We are now recording and on the record.  My name is David Stone.  I'm a legal video specialist on behalf of Golkow Litigation Services.

Today's date is March 21st, and the time is 9:40 a.m.

This is the deposition of David Chesney in the matter of In Re: Valsartan, Losartan, and Irbesartan Products Liability Litigation, plaintiffs, versus -- in the United States District Court, District of New Jersey, Case Number, MDL Number 2875.

This deposition is being taken via remote recording on behalf of the plaintiffs.

The court reporter is Maureen Pollard.

Counsel will state their appearances, and the court reporter will administer the oath.

Page 230

1 this quality problem, right?
2      MR. FOX: Objection to form.
3   A.   Yes.
4 BY MR. SLATER:
5   Q.   And you've actually written on
6 that subject and published on that subject,
7 correct?
8   A.   Yes.
9   Q.   You would agree with me as a
10 matter of GMP that the information in this
11 e-mail could not be ignored; it needed to be
12 aggressively evaluated by the so-called,
13 quote-unquote, leaders as soon as it was
14 brought to their attention, right?
15      MR. FOX: Objection to form.
16   A.   Yes.
17 BY MR. SLATER:
18   Q.   And we know in retrospect that
19 what Dr. Lin said about the valsartan
20 quenching creating the NDMA and this being a
21 common problem in the production and
22 synthesis of sartan APIs, we know in
23 retrospect he was 100 percent correct about
24 those statements. You've seen that in the

Page 231

1 materials you've reviewed for this case,
2 right?
3      MR. FOX: Objection to form.
4   Argumentative.
5   A.   Ultimately that information was
6 developed, yes.
7 BY MR. SLATER:
8   Q.   Are you stunned to see this
9 e-mail, and to see that this information was
10 being circulated within ZHP as of July 2017?
11 Because you said it's the first time you've
12 become aware of that.
13      MR. FOX: Objection to form.
14 BY MR. SLATER:
15   Q.   Are you stunned, shocked,
16 surprised? What word would you put on it?
17   A.   I wouldn't say stunned. It
18 sounds to me like an appropriate notification
19 based on some information that is outlined in
20 the e-mail.
21      It's a few months before --
22 actually about -- let's see here, about 10 or
23 11 months before the recall, and these things
24 are -- complex scientific issues like this

Page 232

1 don't get resolved overnight.
2      I don't know what was done
3 about this, whether this was a triggering
4 point for further work that culminated in the
5 notification to FDA and the recall, or what.
6      But it certainly is responsible
7 for Dr. Lin to have made this notification,
8 and it looks like he made it to the right
9 people.
10   Q.   We know, again in retrospect,
11 that what Dr. Lin said is accurate, and we
12 know that he must have had a way to know it
13 because -- well, rephrase.
14      You're certainly not taking the
15 position that he just came up with this out
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23      MR. FOX: Objection.
24      MR. SLATER: Chris, let's go to

Page 233

1 the article in the Quality Management
2 Essentials publication that I just
3 mentioned a moment ago indirectly,
4 please.
5      And I'm not sure what exhibit
6 number would this be for the record,
7 if anybody knows.
8      MR. GEDDIS: That would be
9 Exhibit 5.
10      (Whereupon, Chesney Exhibit
11 Number 11 was marked for
12 identification.)
13      MR. FOX: Which exhibit is this
14 on the screen?
15      MR. SLATER: I think I was just
16 told Exhibit 5.
17      MR. FOX: So this has not been
18 used before.
19      MR. SLATER: This has not been
20 used before.
21 BY MR. SLATER:
22   Q.   And you recognize this
23 publication, Quality Management Essentials,
24 Expert Advice on Building a Compliant System?

Page 234

 1  You recognize this publication from 2018,
 2  correct?
 3     A.   I don't recognize the artwork,
 4  but I recognize the title, yes.
 5     Q.   And if we go to the third page,
 6  the Table of Contents, we can see that you
 7  actually wrote an article that was included
 8  in this publication titled Executive
 9  Responsibility for Quality, correct?
10     A.   Yes, that's correct.
11     Q.   Let's go to your article which
12  comes right after that.  And this is
13  titled -- rephrase.
14          Your article is titled
15  Executive Responsibility for Quality, and I
16  want to go to the section titled Importance
17  of Quality just below that.
18         MR. SLATER:  Chris, could you
19     make it a little bigger, please?
20     Perfect.
21     A.   That's fine.
22     Q.   This says, "Importance of
23  Quality.
24          "Executive commitment to

Page 235

 1  quality in the pharmaceutical industry is
 2  critical, not only to ensure continuing
 3  profitability of the company, but also for
 4  the safety and well-being of patients and to
 5  meet the needs of healthcare providers who
 6  prescribe and use pharmaceutical products
 7  every day."
 8          That's what you wrote, correct?
 9     A.   Yes.
10     Q.   The primary concern has to
11  always be the safety and well-being of
12  patients, right?
13     A.   Yes.
14     Q.   It would never be acceptable
15  for ZHP or any other company to place profits
16  over safety, right?
17         MR. FOX:  Objection to form.
18     A.   I agree with that.
19  BY MR. SLATER:
20     Q.   For example, if it turned out
21  that ZHP was making so much money with the
22  zinc chloride process to manufacture
23  valsartan API that they chose to keep secret
24  from its customers and the regulatory

Page 236

 1  authorities that they knew there was NDMA in
 2  the valsartan because they were so enamored
 3  with the profits they were making and put
 4  that ahead of the safety of people using
 5  those pills, that would be reprehensible,
 6  right?
 7         MR. FOX:  Objection to the
 8     form.  Argumentative, no foundation,
 9     beyond the scope of his expertise.
10     A.   It would be of great concern,
11  yes.
12  BY MR. SLATER:
13     Q.   It would be reprehensible,
14  right?
15         MR. FOX:  Objection.  Same
16     objection.
17     A.   That's a value judgment word.
18  I prefer more precise terminology.  But it
19  would not be a good thing.
20  BY MR. SLATER:
21     Q.   Going down a little further to
22  the fourth full paragraph under Importance of
23  Quality, there's a paragraph that says, "For
24  these reasons, quality assurance (QA) and GMP

Page 237

 1  compliance may be viewed differently in the
 2  pharmaceutical industry than in those
 3  industries where a reputation for high
 4  quality drives sales.  Quality assurance may
 5  be viewed as a 'cost of doing business' or an
 6  internal 'police department' issuing
 7  directives that delay or prevent product
 8  release.  That viewpoint can result in a low
 9  priority being assigned to quality operations
10  and resourcing, which can lead in turn to
11  quality problems, regulatory difficulties,
12  unnecessary expense, adverse publicity,
13  lawsuits and investor disappointment.  All
14  these consequences are preventable if
15  executive managers understand the importance
16  of the quality assurance function and treat
17  it as a critical business operation just like
18  other critical areas, such as strategic
19  planning, financial management and others."
20          That's what you wrote because
21  you believed it to be true, correct?
22     A.   Yes, sir.
23     Q.   Let's go now to the next page.
24  There's a heading that says Regulatory

Page 238

1  Considerations. And you wrote, "In addition
2  to the business benefits, health regulatory
3  agencies around the world both require and
4  expect top management to support a strong
5  quality assurance function for their
6  companies."
7         Top management would include,
8  for example, the chairman of ZHP, Mr. Baohua
9  Chen; he would fall within the context of top
10 management, right?
11     A.    Yes.
12         MR. FOX: Objection.
13         I'm sorry, Adam, I didn't hear
14 the name that you mentioned.
15         MR. SLATER: I said Baohua
16 Chen. Mr. Baohua Chen.
17 BY MR. SLATER:
18     Q.    You then go through, after
19 introducing this section, a couple of cases
20 from the US Supreme Court that addressed the
21 executive responsibility for certain
22 regulatory violations, correct?
23     A.    Yes.
24     Q.    The first case you talk about

Page 239

1  is US versus Dotterweich where you say that
2  "Mr. Dotterweich's company, Buffalo
3  Pharmacal, was inspected by the FDA,
4  resulting in direct adulteration and
5  misbranding findings. The FDA criminally
6  prosecuted Mr. Dotterweich and the company,
7  charging that as president, he was ultimately
8  responsible for the company's actions and
9  therefore should be found guilty of violating
10 the law."
11         And you put that in the article
12 because you found that to be a significant
13 case and a significant cautionary tale,
14 correct?
15     A.    Yes.
16     Q.    You said, "Following a District
17 Court case and subsequent appeal, the Supreme
18 Court ruled on his case and concluded that as
19 president, he could be held responsible for
20 the acts of the corporation even though he
21 did not know of the violations and did not
22 intend for them to occur. This has become
23 known in the US as the Doctrine of Strict
24 Liability, or 'Responsible Corporate Officer'

Page 240

1  doctrine. It applies to those who, in the
2  words of the Court, '...stand in a
3  responsible relationship to the acts of the
4  corporation.'"
5         And again, you stated this
6  because you're cautioning the executives in
7  pharmaceutical companies to take their
8  quality obligations very seriously, right?
9      A.   Yes.
10     Q.    You then talk about the Park
11 case, US v. Park, and you say in part, "Like
12 Mr. Dotterweich, Mr. Park defended himself by
13 claiming that he was not involved in the
14 conduct that violated the law and that he had
15 delegated authority to 'dependable
16 subordinates' he trusted to do the right
17 thing."
18         And a little further down you
19 actually quote from the majority opinion from
20 the Supreme Court stating, "The Act imposes
21 not only a positive duty to seek out and
22 remedy violations when they occur but also,
23 and primarily, a duty to implement measures
24 that will ensure that violations will not

Page 241

1  occur.
2         "The requirements of foresight
3  and vigilance imposed on responsible
4  corporate agents are beyond question
5  demanding and even onerous, but they are no
6  more stringent than the public has the right
7  to expect. We are satisfied that the Act
8  imposes the highest standard of care and
9  permits conviction of responsible corporate
10 officials, who in light of this standard of
11 care, have the power to prevent or correct
12 violations."
13         And you quoted that language
14 because you felt it to be, again, not only a
15 cautionary tale, but right on point to get
16 the attention of executives, correct?
17     A.    That's right.
18     Q.    When you talk about demanding
19 and even onerous obligations and the highest
20 standard of care, those statements would
21 apply to ZHP, too, right, and their
22 executives, correct?
23         MR. FOX: Objection to form.
24 Calls for conclusion.

Page 242

1  A. In my opinion they apply to
2  anyone in the FDA-regulated industries.
3  BY MR. SLATER:
4  Q. Looking now on page 5, if you
5  could. Towards the bottom, you provide at
6  the bottom, you say, "some general
7  suggestions that apply to all companies in
8  this industry, regardless of size or
9  complexity."
10      And number 1, you say,
11 "Executive managers must recognize the
12 criticality of a strong quality assurance
13 organization and quality system to patient
14 safety and to the company's business
15 success."
16      And that's an important
17 foundational point, right, that QA has to be
18 prioritized? Right?
19 A. Yes.
20 Q. Looking at number 2, "Quality
21 management must be seen as similar to other
22 critical business management activities
23 executives participate in, such as strategic
24 planning, budget management, succession

Page 243

1  planning and other areas."
2      And then number 3, you say,
3  "Executive management teams must support
4  their QA organization with authority and
5  resources that are equal to the
6  responsibility they have."
7      And then you say a little
8  further down that the structures within the
9  company "must assure that the quality unit
10 can make decisions without undue influence
11 from other organizational components and
12 avoid conflict of interest."
13      Again, these are all what you
14 believe to be very important points for any
15 responsible company to follow, correct?
16 A. Yes, that's correct.
17 Q. Number 4, you wrote, "Executive
18 management must establish a strong quality
19 policy that makes it clear the company is
20 committed to consistently producing
21 high-quality products that perform clinically
22 as intended. Day-to-day statements and
23 actions of top level executives must
24 demonstrate that this commitment is real, not

Page 244

1  just words on paper."
2      I wanted to ask you about the
3  "words on paper" part, because that jumped
4  out to me when I read this.
5      That's an important point to
6  you, that it's not enough just to put these
7  policies in writing, but you actually have to
8  be committed to following through with them
9  and taking these obligations seriously,
10 right?
11     MR. FOX: Objection to form.
12 A. Yes.
13 BY MR. SLATER:
14 Q. Number 5, you say, "As with
15 other management responsibilities, executive
16 teams must be kept aware of the performance
17 of the quality system and of any emerging
18 problems that are being dealt with."
19     MR. FOX: Is that a question?
20 BY MR. SLATER:
21 Q. That's another important point
22 that you felt needed to be communicated to
23 executive management in pharmaceutical
24 companies, correct?

Page 245

1  A. Yes.
2  Q. And I think overall what I'm
3  hearing here is that the top level management
4  has to essentially make very clear to
5  everyone in the company that quality is very
6  important, safety is very important, and it
7  should never be minimized and never be put
8  aside for considerations of profit, correct?
9      MR. FOX: Objection to form.
10 A. Yes, correct.
11 BY MR. SLATER:
12 Q. Did you read in the FDA
13 documents where Jung Du told the FDA
14 investigator that the zinc chloride process
15 allowed them to increase their yield and
16 lower their cost, and to thus dominate the
17 world market for valsartan?
18     Did you see that statement?
19 A. Yes, I did.
20 Q. That's a concerning statement
21 to you, isn't it?
22     MR. FOX: Objection to form.
23     Calls for speculation.
24 A. Well, it's a statement that's

Page 246

1 not unreasonable to make if there are
2 benefits to -- you know, enhancing the
3 process for those reasons, that's fine, as
4 long as these other principles we've been
5 discussing are given proper consideration.
6 There's nothing wrong with improving a
7 process, there's nothing wrong with being
8 profitable for that matter, provided that
9 these other principles are respected.
10 BY MR. SLATER:
11     Q.    With regard to the e-mail I
12 showed you from July of 2017, matched up
13 against what Jung Du told the FDA
14 investigator, does that cause you some
15 concern about whether or not ZHP kept secret
16 its knowledge that there was NDMA in their
17 valsartan because they were making so much
18 money?
19         MR. FOX:  Objection.  Calls for
20     speculation.
21     A.    I don't see any connection on
22 the surface of it.  I think that e-mail by
23 itself certainly is the type of upward
24 communication that I'm talking about here

Page 247

1 that should be made on a regular basis.  But
2 there are many questions about what was then
3 done about it, how complete and accurate its
4 foundation was and all that.
5         But that's exactly the sort of
6 thing that should be -- questions that should
7 be asked when someone like Dr. Lin raises
8 that kind of an issue to upper management.
9 BY MR. SLATER:
10     Q.    If a decision was made not to
11 investigate in any detail this issue and not
12 to disclose it in any reports or to anybody
13 because of the profits that were being made
14 with this valsartan API, that would be a
15 very, very serious problem, right?
16         MR. FOX:  Objection to form.
17     Calls for speculation, argumentative.
18     A.    I've certainly seen no evidence
19 that that was the case.  But if it was the
20 case, then yes, it would be of concern.
21 BY MR. SLATER:
22     Q.    Going now to the Summary at
23 the -- one second actually.
24         Looking at the next section, it

Page 248

1 says, "Common Mistakes Executive Teams Make,"
2 number 3 you wrote, "Emphasizing production
3 quotas and market demands to the extent that
4 quality problems are overlooked or regarded
5 as unimportant - worst case, deliberate
6 coverup of known quality problems through
7 falsification of records."  I'm going to stop
8 there.
9         When you say, "worst case,
10 deliberate coverup of known quality problems
11 through falsification of records," you're
12 saying that would be as bad as it gets pretty
13 much, right?
14     A.    Yes.
15     Q.    Are you aware that -- well,
16 rephrase.
17         To the extent that ZHP knew
18 there was NDMA in its valsartan as of July
19 2017 or earlier, yet continued to represent
20 to customers and regulators and the world
21 that what they were selling was valsartan of
22 the expected quality and the expected purity
23 and didn't disclose the NDMA deliberately,
24 that would be as bad as it gets, right?

Page 249

1         MR. FOX:  Objection to form.
2 BY MR. SLATER:
3     Q.    If that happened, that's as bad
4 as it gets, right?
5         MR. FOX:  Objection to form.
6     Lacks foundation, calls for
7     speculation.
8     A.    I don't see enough in the
9 July 2017 e-mail to enable me to conclude
10 with finality that the premise of your
11 question is accurate.
12         There certainly are some
13 concerns expressed there that are appropriate
14 to express, they're being expressed to the
15 right people.  But full background and all
16 the facts would have to be delved into with
17 considerable effort in order to reach a
18 conclusion that would have that much impact.
19 BY MR. SLATER:
20     Q.    If the conclusion that I
21 postulated were the facts, you would agree
22 that that would be about as bad as it gets,
23 right?
24         MR. FOX:  Objection to the

Page 250

1  form.  Calls for -- it's
2  argumentative.
3      A.    Once again, if after a complete
4  investigation considered all the facts, if it
5  was established and proven based on objective
6  evidence that information existed that was
7  known was deliberately covered up or anything
8  was falsified, then that would be a very
9  serious violation, yes.
10 BY MR. SLATER:
11     Q.    Looking now at the Summary, you
12 talked about the fact that there is a
13 "growing consensus about the most critical
14 quality management concepts."  And you say,
15 "First among those is that executive
16 management teams are the key to a company's
17 ability to successfully meet quality
18 standards on a consistent basis.  Doing so is
19 critical to proper clinical performance of
20 the products of this industry and therefore,
21 ultimately, to global public health."
22          And you would apply those --
23 that point to ZHP?  Those points would apply
24 to ZHP, right?

Page 251

1      A.    I'm sorry, Adam, can you just
2  have that repeated?  It got garbled.
3      Q.    This would apply to ZHP,
4  correct?
5          MR. FOX:  I'll object to the
6      form because I didn't hear it.
7  BY MR. SLATER:
8      Q.    I read the -- I'll do it again.
9          You say in the Summary that
10 certain -- rephrase.
11         You say in the Summary that
12 there's a "growing consensus about the most
13 critical quality management concepts.  First
14 among those is that executive management
15 teams are the key to a company's ability to
16 successfully meet quality standards on a
17 consistent basis.  Doing so is critical to
18 proper clinical performance of the products
19 of this industry and therefore, ultimately,
20 to global public health."
21         And you would agree that within
22 ZHP, the ultimate responsibility lies with
23 the executive management team, correct?
24         MR. FOX:  Objection to form.

Page 252

1      A.    Yes, I would agree it applies
2  to ZHP and everybody else in the industry.
3  BY MR. SLATER:
4      Q.    Let's go to the last page,
5  please.  It's there already, sorry.
6          The last paragraph of this
7  article says, "Prudent management teams
8  recognize this and support their quality
9  units both philosophically and materially,
10 with strong policies backed up by consistent
11 actions, authority and resources.  Failure to
12 do so may have both serious business
13 consequences for the company and potentially
14 even personal consequences for individual
15 executives."
16         Again, that's a statement that
17 you believe would hold true for ZHP and any
18 company in this industry, right?
19     A.    Yes, any company in this
20 industry.
21     Q.    Going back to the events of
22 2017, if ZHP knew that there was NDMA in its
23 valsartan as of at least July 2017, yet
24 continued to manufacture that valsartan with

Page 253

1  the zinc chloride process, didn't change
2  anything, didn't tell anybody, every pill
3  manufactured with that process would be
4  adulterated, right?
5          MR. FOX:  Objection to form.
6      A.    I'm sorry, I'm giving some
7  thought to the way you phrased that, not the
8  concept, but just the phraseology.
9          If there was proven evidence
10 that the process was contributing NDMA at
11 harmful levels, and they allowed that to
12 continue and continued to sell the product,
13 and particularly if there was any deliberate
14 effort to conceal that, then yes, that would
15 be very serious.
16         MR. SLATER:  If you guys need a
17     break, this would be a good point
18     because I'm going to shift to
19     something else.  But if you don't need
20     a break, I can do it.
21         MR. FOX:  Let's take a break,
22     Adam, because I have to take care of
23     something else for a few minutes, too.
24     A.    I need a couple minutes.

Page 254

1      How much time do you want to
2  take here?
3           MR. FOX:  About 3:15?
4           THE WITNESS:  Okay.  What time
5  is it now?
6           MR. SLATER:  That's fine.
7           THE WITNESS:  Okay.  3:15 is
8  good.
9           MR. SLATER:  Thank you.
10          THE VIDEOGRAPHER:  The time is
11  2:54 p.m.  We are off the record.
12          (Whereupon, a recess was
13  taken.)
14          THE VIDEOGRAPHER:  The time is
15  3:23 p.m.  We are back on the record.
16  BY MR. SLATER:
17      Q.   Mr. Chesney, have you seen any
18  indication in anything you've seen that ZHP
19  has ever notified the FDA about the contents
20  of the July 2017 e-mail we discussed earlier?
21          MR. FOX:  Objection to form.
22      A.   The existence of the e-mail
23  itself?
24          ///

Page 255

1  BY MR. SLATER:
2      Q.   Well, the contents we've been
3  talking about, including that there was NDMA
4  in valsartan --
5      A.   Well, the --
6      Q.   -- how it was being created at
7  the quenching of the sodium azide, the sodium
8  nitrite, and that it was a common problem
9  with sartan APIs?
10          MR. FOX:  Objection to form.
11          Argumentative, lacks foundation.
12      A.   There was extensive back and
13  forth with the FDA.  ZHP submitted a
14  tremendous amount of scientific data.  FDA
15  asked questions, ZHP responded.  I've seen a
16  lot of that.  Some of it may have contained
17  information that was foundational to that
18  July of '17 e-mail or may not.
19          But the existence of the e-mail
20  itself, I haven't seen reference.  It's just
21  the information that it refers to may have
22  been wrapped up and included in some other
23  discussions that were held with the FDA.
24          ///

Page 256

1  BY MR. SLATER:
2      Q.   I understand you're saying
3  maybe it was, but nothing you can recall
4  seeing as you sit here now, right?
5      A.   No, and nothing specific about
6  that particular e-mail.
7      Q.   Did you see any indication in
8  anything you reviewed where ZHP suggested to
9  the FDA or anybody else that it was known
10  internally that there was NDMA in valsartan,
11  and that this was caused by the quenching of
12  the sodium azide with the sodium nitrite,
13  that that was known before June of 2018?
14  Have you seen anything indicating they ever
15  told that to anybody?
16          MR. FOX:  Objection to form.
17          Lacks foundation, argumentative.
18      A.   Again, I would have to look at
19  the correspondence back and forth to refresh
20  my memory as to what happened when and what
21  they told the FDA about the timeline.  But as
22  I sit here, I can't recall anything.
23  BY MR. SLATER:
24      Q.   I'm going to jump through a

Page 257

1  couple of things with you.
2          One of the things I noticed in
3  your report was that you said that the time
4  period that you focused on was August 2013 to
5  October 2019, other than, I think, one
6  complaint from 2010 that you found on the FDA
7  website.
8          Do I understand that correctly?
9      A.   Not exactly.  That wasn't a
10  complaint on the FDA website.  It was a
11  record of a prior inspection.  And there
12  was -- you know, that was not within that
13  bracketed time period.
14          But the majority of the
15  documents I reviewed were within that
16  bracketed time period.
17      Q.   Do you have any
18  understanding -- rephrase.
19          Why would the time period you
20  were looking at beginning 2013 when the
21  manufacturing process change was vetted and
22  evaluated in 2011?
23      A.   Well, the primary remit I was
24  given was to opine on what the record showed