# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | Hon. Robert. B. Kugler |
| This Document Relates To: *All Actions* | Civ. No. 19-2875 (RBK/JS) |

## MSPRC's BRIEF ON DISCOVERY ISSUES
## <u>AS ORDERED BY THE COURT ON OCTOBER 6, 2022</u>[1]

---

[1] Defendants argue in their motion that the Court should set deadlines for damage experts. This is not the issue on which the Court requested briefing. What's more, defendants only proposed a schedule for damages experts today. Plaintiffs intend to meet and confer with defendants on this issue. The issue of deadlines is a case-management decision that the Court ought to make after the parties have fully conferred and is not the subject of this motion. This is not a subject of the briefing permitted by the Court, and Plaintiffs assume the Court will set such deadlines as a case management decision at the appropriate time.

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................. iii

**INTRODUCTION** ............................................................................. 1

**ARGUMENT** .................................................................................... 7

**I.    DEFENDANTS' DISCOVERY DEMANDS ARE UNTIMELY, NOTWITHSTANDING MSPRC'S GOOD-FAITH EFFORT TO RESPOND TO THEM** ..................................................................... 7

**II.   THE REQUESTS, WHICH SEEK AGGREGATED DATA FOR ALL MEDICARE PART D PRESCRIPTIONS FOR THE PAST DECADE, ARE NOT RELEVANT** ............................................................... 9

     *A.    Background—CMS Bids are Filled with Proprietary Projections* ..... 9

     *B.    CMS Bids and Projected Pharmacy Spends Are Irrelevant* ............. 10

**III.  THE REQUESTS ARE UNDULY BURDENSOME AND NOT PROPORTIONAL TO THE NEEDS OF THE ACTION** ...................... 14

     *A.    Alternative, Less Intrusive Means Exist to Obtain Responsive Data and a Rebuttal Damages Model* ........................................ 15

     *B.    The Assignors' CMS Bids and Are Highly Confidential Trade Secrets* .............................................................................. 17

     *C.    Data for All Part D Prescriptions for the Past 10 Years Would be Unduly Burdensome to Produce* ............................................. 20

**CONCLUSION** ................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Mortg. Corp. v. Great N. Ins. Co.*,

    2018 WL 341661 (N.D. Ill. Jan. 9, 2018)......................................................14

*AVCO Corp. v. Turn & Bank Holdings, Inc.*,

    2015 WL 12834519 (M.D. Pa. 2015)............................................................15

*Bayer AG v. Betachem, Inc.*,

    173 F.3d 188 (3d Cir. 1999) ..........................................................................11

*Caver v. City of Trenton*,

    192 F.R.D. 154 (D.N.J. 2000) .......................................................................11

*In re Namenda Indirect Purchaser Antitrust Litig.*,

    2022 WL 3362429 (S.D.N.Y. Aug. 15, 2022) ....................................... 11, 12

*In re Namenda Indirect Purchaser Antitrust Litig.*,

    338 F.R.D. 527 (S.D.N.Y. 2021)...................................................................12

*Plump v. La Salle Univ.*,

    2020 WL 3250532 (E.D. Pa. June 15, 2020)................................................11

*Synthes Spine Co., L.P. v. Nash*,

    2006 WL 8459388 (E.D. Pa. 2006) ........................................................ 13, 18

*United States v. Town of Irmo, S.C.*,

    2020 WL 1025686 (D.S.C. Mar. 3, 2020)....................................................14

*Upshaw v. Janssen Res. & Dev., LLC*,

    2014 WL 1244047 (E.D. Pa. Mar. 26, 2014) ...............................................11

**<u>Other Authorities</u>**

Fed. R. Civ. P. 26(b)(1)........................................................................... 10, 14

Fed. R. Civ. P. 26(b)(2)(C)(i) .....................................................................15

## <u>INTRODUCTION</u>

Defendants have belatedly requested a long list of categories of discovery from the TPP Plaintiffs through a letter dated September 1, 2022, years after fact discovery closed. Plaintiffs nonetheless compromised their objections to the requests and agreed to produce the majority of the documents requested; specifically, documents from seven of the ten categories of materials defendants sought.

Unsatisfied, in their October 4, 2022 letter to the Court, defendants raised a dispute as to three remaining document requests to MSP Recovery Claims, Series LLC ("MSPRC"). Dkt. No. 2167 at 5. These requests seek documents that are of no use to defendants (or their experts) and can only be characterized as a fishing expedition for highly proprietary and confidential documents. Defendants seek the production of documents or information responsive to the following requests (the numbering is the same as that in defendants' October 4 letter; MSPRC already agreed to produce materials in response to Nos. 1, and 5-10):

2. **Subsidy, Reimbursement, and Rebate Data**: TPP Plaintiff shall produce in Excel format data reflecting all subsidies, reimbursements, and rebates received by TPP Plaintiff from Center for Medicare and Medicaid Services ("CMS"), including but not limited to all prescription drug event ("PDE") reports and all PDE payment records reflecting reimbursement requests and payments for valsartan drugs, during the time period for which TPP Plaintiff is seeking damages (the "Relevant Time Period").

3. **CMS [Centers for Medicare & Medicaid Services] Bids**: TPP Plaintiff shall produce all materials submitted in connection with its bid

submissions to CMS as a sponsor for Medicare Part D prescription drug plans for each of the contract years that correspond with the Relevant Time Period.

4.      **Internal Reporting**: TPP Plaintiff shall produce any internal reporting analyzing or reflecting projections and actual spend on Part D prescription drugs during the Relevant Time Period.

Subsequent to the October 6, 2022 hearing, as part of a proposed compromise, MSPRC told defendants that it is open to producing documents related to the "Subsidy, Reimbursement, and Rebate Data" that defendants seek. Yet defendants insist on the production of 10 years of highly confidential and proprietary CMS bids, and 10 years of the assignors' internal reports analyzing *projections* (not actual spend) on all Part D prescription drug expenditures (not just valsartan), where these forward-looking estimates and projections are not, and cannot be, proof of actual damages.

Defendants contend that all three categories of documents are necessary to "evaluate and challenge Plaintiffs' damages methodology." Dkt. No. 2167 at 7. Defendants have failed to demonstrate, or even suggest, how this plainly proprietary and highly confidential information would be relevant, much less necessary, to their analysis. In fact, one of their own experts opined that it would be "very difficult to accurately determine the amount paid for the at-issue VCDs." Dkt. No. 2009-18, Timothy Kosty Rep. at 49. The Court should deny the requests for several reasons.

2

*First*, as part of a significant compromise, MSPRC told defendants that it was open to producing historical facts, that is, data on Medicare rebates, reimbursements, and pharmacy expenditures for past years—in other words, what was *actually* paid by CMS. This, despite the fact that this data is aggregated, meaning that it is not specific to any particular drug or service, and thus provides no competent evidence to prove what defendants apparently seek—that is, that the government paid any particular amount to the TPPs as a "reimbursement" for what was spent to purchase valsartan. In fact, to date, defendants have been unable to articulate any model or methodology by which they could derive amounts attributable to valsartan from this aggregate data.

Projections on future pharmacy expenditures are even more attenuated and are similarly aggregated and not relevant or probative to any damages assessment. The assignors' pharmacy-spend projections, which also are included in their CMS bids, are aggregated *for all drugs and all plan members.* This litigation concerns defendants' manufacture, distribution, and sale of contaminated, valsartan-containing drugs ("VCDs"). Quite apart from the fact that defendants' requests seek hypothetical projections, they demand information that does not pertain to what MSPRC's assignors paid for the contaminated VCDs, because the assignors' pharmacy-spend projections, which also are included in their CMS bids, are aggregated *for all drugs and all plan members*. In fact, the Court denied plaintiffs'

similar discovery requests to the wholesaler and distributor defendants, which successfully argued, in opposing discovery, that profits are aggregated and not kept on a per-product basis. *See* July 6, 2020 Hr'g Tr. 66-67 (wholesalers and distributors argued that profits are not kept on a per-product basis, and an undue burden would result, because IT, accountants, sales, tax and business units all would need to be involved); Dkt. No. 507 at 1-2 (denying demand for "price and profit" discovery). Even defendants' own class expert, Timothy Kosty, agrees.[2] The demanded data is not required to assess damages, and, indeed, cannot be used for that purpose.

Defendants have indicated that the projected expenditures are relevant to damages because their expert, Lauren Stiroh, will opine that plaintiffs' damages are the difference between projected expenditures and amounts spent on VCDs. That theory convolutes what actually happens and makes no logical sense whatsoever. Plaintiffs' and class members' damages here are the full amounts paid for worthless drugs that could not lawfully be sold. Their projections are irrelevant. What the MAOs believed they might spend (in the aggregate) has no bearing

---

[2] Dkt. No. 2009-18, Kosty Rpt. at ¶ 50 ("The payments provided from the federal government to plan sponsors ***are independent of spending on a specific drug***") (emphasis added); ¶ 84.b ("[Medicare] risk corridor payments are made in aggregate at the end of the benefit period and are not directly attributed to specific products, classes of products, or individual claims.").

whatsoever on what they actually paid for VCDs and cannot possibly be the basis for any damages model that any credible economist could ever concoct.

Further, MSPRC already produced data showing the amounts its assignors paid for the VCDs prior to the recall, and the amounts paid for replacement drugs after the recall (which is also irrelevant to damages). With that data in hand, there certainly is no need for speculative projections as to the estimated future spend for VCDs at any point in time. Defendants have the cold, hard facts, set off with dollar signs. The absurdity of their overly broad requests is well illustrated by their demand for pharmacy-spend projections *for the past decade*. Defendants could never demonstrate that projections of Medicare Part D expenditures for years preceding the recall have any bearing on damages. This is nothing more than an overbroad fishing expedition in search of a methodology that does not exist and has never been proffered by defendants.

*Second*, the assignors' CMS bids are highly confidential, quintessential trade secrets. CMS bidding is highly competitive, and the assignors' internal spending projections and analyses are the very heart of their business. *See* Declaration of T. Mrakovich ¶¶ 2, 3, *attached as* **Exhibit A**; Declaration of B. Riff ¶¶ 2, 3, 4, 6, *attached as* **Exhibit B**. The manifestly unnecessary and invasive production of its CMS bids, which contain not only historical data but also closely guarded cost projections and other confidential market assumptions, would present an

unnecessary risk to both SummaCare's and Emblem's core operations. Exhibit B ¶ 2; Exhibit A ¶ 4. In fact, SummaCare, a Medicare Advantage Plan, provides services in the most competitive county in the United States. Exhibit B ¶ 2.

The methodology for making bids is at the heart of the assignors' businesses and are the critical sources and methods of how they compete. Exhibit A ¶ 2; Exhibit B ¶ 2. This is a significant, and unreasonable burden, invading the proprietary foundation of the assignors' businesses, and is the flip side to certain defendants' successful arguments blocking plaintiffs' discovery requests, such as the retail pharmacies' successful argument blocking production of their sale and price data. Dkt No. 507. These burdens far outweigh the defendants' hypothetical "need" for this aggregated information that they cannot competently utilize as to any claim brought.

*Third*, it would be unduly burdensome to require production of highly confidential, closely guarded, proprietary CMS bids and Part D projected expenditures for the past 10 years. The uncontroverted assignor declarations support a finding of undue burden. In addition to the highly confidential nature of this information, the production of CMS bids and internal expenditure projections for the past 10 years would be an unduly time-consuming process that would detract from their open-enrollment duties. The assignors are currently in the open-enrollment period for Medicare, which is the busiest time of year for all Medicare

Advantage plans. Exhibit A ¶ 7. Attempting to respond to defendants' overbroad requests for irrelevant, speculative projections would put an unnecessary burden on the assignors' business and their ability to provide healthcare insurance. *Id*.

For these reasons, and as further demonstrated below, the Court should deny the defendants' Requests.

## **ARGUMENT**

### I. **Defendants' Discovery Demands Are Untimely, Notwithstanding MSPRC's Good-Faith Effort to Respond to Them**

While MSPRC does not argue that timeliness alone is reason enough to deny Defendants' requests, it is important to note that background against which these current requests, served last month, arose.

MSPRC already answered an exhaustive fact sheet's narrative questions and document demands and produced additional documents in response to defendants' follow-up first set of document requests. MSPRC's assignors separately responded to subpoenas issued to them by defendants. Not once in all the years since then did defendants bother to seek the highly-sensitive information they now contend they sorely need.

General fact discovery closed quite some time ago. Specifically, under CMO No. 23 (Dkt. No. 863) (dated February 11, 2021), both "phase I" and "phase II" fact discovery closed on June 1, 2021, and October 4, 2021, respectively. As recently as this summer, the Special Master reminded the parties that fact

discovery long-since closed: "[Special Master Vanaskie]: Discovery is supposed to have been closed except for expert discovery." July 13, 2022 Hr'g Tr. at 16.

As case in point, over a year ago, manufacturer defendants attempted to serve their "First Set of Global Interrogatories and Requests for Production" on all plaintiffs. Special Master Vanaskie disallowed this discovery as untimely and not contemplated under existing scheduling and case management orders. *See* Special Master Order No. 23 (Dkt. No. 1304). Judge Kugler overruled defendants' objection to Special Master Order No. 23. *See* Op. & Order (Dkt. No. 1471). In so ruling, Judge Kugler noted, among other things, that within the context of this MDL, discovery has already been quite fulsome:

> The Court has also reviewed the context of this MDL in its entirety to find that document production requests this close to the end of discovery emerge as an unthought-out afterthought. The Court has considered the parties' and the Special Master's efforts to hammer out and amend discovery schedules, not once, but twice, earlier this year as well as the parties' active engagement throughout this year to work through the scheduling of depositions, expert reports and other key discovery. The Court finds the defendants could have raised their discovery requests earlier when the parties were conferring actively.

*Id.* Defendants had a years-long opportunity to seek the discovery they purportedly needed from MSPRC and its assignors. MSPRC and its assignors timely responded to every request and subpoena propounded on them. Discovery is now over and has been for quite some time.

Again, while MSPRC does not contend here that defendants' requests for the three remaining categories of materials from the ten they sought last month should be denied on the timeliness alone, it is important to acknowledge that defendants made the tactical litigation decision to forego this discovery during the multi-year fact discovery period, and only to pursue it over a year after fact discovery closed.

## II.     The Requests, which Seek Aggregated Data for All Medicare Part D Prescriptions for the Past Decade, Are Not Relevant

### A.     Background—CMS Bids are Filled with Proprietary Projections

CMS bids and internal projections on pharmacy spends are aggregated data that contain historical information, risk assessments, cost projections, and other market assumptions to arrive at an estimated cost of administering pharmacy benefits under Medicare Part D. Below is a brief summary of the CMS bidding process and Medicare Part D statutory and regulatory framework.

CMS bidding is highly specialized, technical, and complex. A bid is essentially a series of data fields and data points submitted to CMS. A Medicare Part D sponsor must submit a separate bid for each prescription drug plan that it intends to offer. *See* CMS, *CY 2023 Bid Pricing Tools (BPT) and Instructions*, available at https://www.cms.gov/medicarehealth-plansmedicareadvtgspecratestatsbid-forms-instructions/2023 (last accessed Oct. 20, 2022). CMS requires specific information to be submitted electronically through a CMS-approved electronic format, its Prescription Drug Bid Pricing Tool.

*See* CMS, *Instructions for Completing the Prescription Drug Plan Bid Pricing Tool for Contract Year 2023*, at 1, available at

https://www.cms.gov/medicarehealth-plansmedicareadvtgspecratestatsbid-forms-instructions/2023 (last accessed Oct. 20, 2022). The bid must reflect the revenue requirement of the expected population. Thus, Part D sponsors "must use credible bid-specific experience in the development of projected allowed costs." *Id.* at 6. Part D sponsors are required to complete several worksheets as part of the bidding process. These worksheets require data on numerous items such as risk scores, number of members, total number of prescriptions, total allowed dollars, average allowed amount per member, average paid amount per member, average cost sharing per member, rebates, reimbursements, per-member per month non-benefit expenses, and per-member per-month premium revenue. *Id.* at 29-33. Projections based on utilization of drugs, costs of drugs (including inflation trends and formulary changes) also are required. *Id.* at 35-37. None of this has anything at all to do with what the assignors paid for contaminated VCDs or what they received from Medicare.

### B.    CMS Bids and Projected Pharmacy Spends Are Irrelevant

Under Federal Rule of Civil Procedure 26(b)(1), a party may obtain discovery on any nonprivileged matter that is "relevant to any party's claim or defense and is proportional to the needs of the case . . . ." Although the scope of

discovery is broad, "it is not unlimited." *Plump v. La Salle Univ.*, 2020 WL 3250532, at *2 (E.D. Pa. June 15, 2020) (citing *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999)). "Discovery should not serve as a fishing expedition." *Id.* (citing *Upshaw v. Janssen Res. & Dev., LLC*, 2014 WL 1244047, at * 3 (E.D. Pa. Mar. 26, 2014)). The party seeking discovery "has the burden of showing that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). Here, defendants' requests for CMS bids and internal spend projections are irrelevant for at least three reasons.

*First*, this Court already found "that contaminated drugs are *economically worthless* at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure." ECF No. 775 at 20 (emphasis added). Any inquiry into whether plaintiffs' aggregated Part D expenses exceeded their projections is wholly irrelevant. Defendants cite a fully distinguishable case, *In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 WL 3362429, at *11 (S.D.N.Y. Aug. 15, 2022), to argue that CMS bids and projected pharmacy spends are somehow relevant to plaintiffs' damages. Unlike *In re Namenda,* this action does not allege anticompetitive behavior or violations of antitrust laws in delaying the market entry of generic drug competition. *See In re Namenda Indirect Purchaser*

11

*Antitrust Litig.*, 338 F.R.D. 527, 538 (S.D.N.Y. 2021). That is a very different context from here. Further, although the *In re Namenda* district court concluded, without citation of any authority or analysis, that actual reimbursements and subsidies should be deducted from damages, *see* 2022 WL 3362429, at *11, it did not hold that CMS bids or internal pharmacy-spend projections were relevant to damages in any way. *See id.* Thus, *In re Namenda* does not support defendants' argument that the requested information is relevant.

*Second*, defendants' requests demand production of irrelevant, non-probative information because CMS bids and internal pharmacy-spend projections are aggregated data. Exhibit A ¶¶ 4, 5; Exhibit B ¶ 3. This litigation concerns the defendants' manufacture, distribution, and sale of contaminated VCDs. It is simply impossible to identify drug-level projections or even condition-based projections from the aggregated projections for all Part D expenditures contained in CMS bids.

*Third*, even if defendants somehow could disaggregate the data (they can't) it still would be irrelevant to damages. Defendants incorrectly contend that pharmacy-spend projections are relevant to damages because their expert, Lauren Stiroh, may, in the future, opine that TPP's damages are the difference between their projected expenditures and actual spend on VCDs. This makes no economic sense because what a plaintiff thought its expenses might have been going forward is irrelevant to the damage that it actually suffered. It also ignores the fact that the

same expert *already testified* that ██████████████████████

████████████████████████████████████████████████████

██████████████████████████ Dkt. No. 2046-2 (under seal), L. Stiroh

Dep. Tran. 89:3-5; 94:10-11 (emphasis added). The value received here was zero,

as the Court already held.

Finally, MSPRC has already produced the historical data on the assignors'

actual expenditures for VCDs during the relevant time period, has already

produced data on payments made for replacement drugs necessitated by

defendants' contaminated VCDs, and has stated that it was open to producing the

aggregated data related to any rebates, reimbursements, or premiums for all Part D

prescriptions. MSPRC should not be required to produce CMS bids and internal

spend projections would contain voluminous data that is entirely irrelevant to

payments for VCDs, such as projections for offsets, inflation, and population risk.

The overbreadth of the defendants' requests strongly militates against production.

*See, e.g., Synthes Spine Co., L.P. v. Nash*, 2006 WL 8459388, at *1 (E.D. Pa.

2006) (denying motion to compel where requests for access to a party's computer

failed to "protect from disclosure both privileged documents and highly private or

personal information with no relevance to this litigation").

Accordingly, the Court should deny defendants' requested discovery.

13

### III.  The Requests Are Unduly Burdensome and not Proportional to the Needs of the Action

Rule 26(b)(1) requires that even relevant discovery must be proportional to the needs of the action, considering "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Defendants demand production of CMS bids and internal projection data for all Medicare Part D prescriptions for the past 10 years. This request is, on its face, overly broad and unduly burdensome. *E.g., United States v. Town of Irmo, S.C.*, 2020 WL 1025686, at *6 (D.S.C. Mar. 3, 2020) ("The ten-year timeframe of [the discovery requests] are overly broad."); *Apex Mortg. Corp. v. Great N. Ins. Co.*, 2018 WL 341661, at *7 (N.D. Ill. Jan. 9, 2018) ("[R]equiring [defendant] to locate the requested documents for the requested ten-year time span would be unduly burdensome and not proportional to the needs of this case.").

As noted above, the Court previously denied discovery on similar grounds. Plaintiffs sought discovery of price and profits from the wholesaler and retailer defendants. ECF No. 507 at 1-2. Those defendants argued that they do not keep track of profits on a per-product basis. *See* July 6, 2020 Hr'g Tr. 66-67 (arguing profits are not kept on product basis; arguing burden involved, such as IT,

accountants, sales, tax, business units). The Court agreed, and the discovery was denied. As demonstrated above, the assignors' pharmacy-spend projections and the host of data they are based on are irrelevant to plaintiffs' damages. Even if it were otherwise, they would not be proportional to the needs of the case.

### A.   Alternative, Less Intrusive Means Exist to Obtain Responsive Data and a Rebuttal Damages Model

The rules also require a court to "limit the frequency or extent of discovery otherwise allowed . . . if it determines that the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). "It is well established that discovery need not be required of documents of public record which are equally accessible to all parties." *AVCO Corp. v. Turn & Bank Holdings, Inc.*, 2015 WL 12834519, at *2 (M.D. Pa. 2015) (internal quotations omitted).

Defendants may access or otherwise request certain non-confidential bid data from CMS. CMS lists all Part D sponsors on its website, which can be used to identify each sponsor's contract number. *See* CMS, *Part D Contracts*, available at https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/PartDContacts (last accessed Oct. 20, 2022). For example, SummaCare's Part D contract number with CMS in 2018 was H3660. *Id.* With that contract number, defendants could identify MSPRC's

assignors' nonconfidential bid data, which is also available online on CMS's

website: https://www.cms.gov/Medicare/Health-

Plans/MedicareAdvtgSpecRateStats/DataFiles (last accessed Oct. 20, 2022).

That publicly available data includes data from 2006 through 2018, which

encompasses the time period for the discovery that defendants seek. *Id.* The data

sets from CMS include more than 2,915 fields for each of the plans that submitted

bids. The data dictionary for 2018 bids is attached as **Exhibit C**.[3] Defendants have

not offered up any argument demonstrating that the publicly available bid

information is inadequate. The Court should deny defendants' demand for

confidential projections, other trade secrets, and proprietary, confidential data that

were used to determine bid amounts which are publicly available from CMS.

Further, as noted above, MSPRC already produced data showing the

amounts its assignors paid for the VCDs prior to the recall and the amounts paid

for replacement drugs after the recall. As such, there is no need to produce

speculative projections as to what the assignors *thought they might spend for VCDs*

---

[3] Additional data on Part D benefits also is publicly available from CMS. *See* CMS, *Benefits Data*, available at *https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Benefits-Data?combine=&items_per_page=10&page=0&order=dlf_2_report_period&sort=desc* (last accessed Oct. 20, 2022) (containing data from 2001 to the present).

*at any point in time*,[4] because defendants have the data showing what the assignors *actually spent* for VCDs before the recall and for replacement drugs after the recall.[5]

### B.  The Assignors' CMS Bids and Are Highly Confidential Trade Secrets

Defendants contend that they are entitled to production of EmblemHealth's and SummaCare's Medicare Part D bids to CMS to "test Plaintiffs' damages methodology and to develop [defendants'] defense . . . ." Ltr. at 7. This is essentially an admission that this is nothing but a fishing expedition. Further, the assignors' CMS bids and internal pharmacy-spend projections are highly confidential, quintessential trade secrets. What's more, CMS bidding is highly competitive, so the defendants' weak justification is far outweighed by the burdens.

Although the actual bids and much background data are publicly available, the method by which a Part D sponsor arrives at those figures involves complex,

---

[4] To be clear, such data does not exist, because all pharmacy-spend data is in aggregate form. We make this point assuming, for the sake of argument, that the data somehow could be disaggregated. It cannot.

[5] MSPRC does not concede that this is a proper method of calculating damages or that defendants, could be entitled to any reduction in damages for their unlawful sale of VCDs that were worthless at the point of sale. MSPRC simply states that defendants have sufficient data to run their hypothetical damages models.

closely guarded mathematical formulas and market assumptions by its actuaries. Exhibit A ¶ 2; Exhibit B ¶ 4. In fact, SummaCare is a Medicare Advantage Plan in the most competitive county in the United States, Summit County, Ohio. Exhibit B ¶ 2. The wholesale production of its CMS bids, containing historical data, cost projections, and other market assumptions, would pose an unnecessary and improper risk to its core operations. Exhibit A ¶ 4; Exhibit B ¶ 2; *Synthes Spine Co.*, 2006 WL 8459388, at \*1 (Requests for access to a party's computer failed to "protect from disclosure both privileged documents and highly private or personal information with no relevance to this litigation."). This alone is an unfair burden.

There also would be a real concern here over the potential disclosure of confidential information contained within the CMS bids. The parties to this litigation consist of various pharmaceutical actors all along the supply chain, including drug manufacturers, wholesalers, distributors, retail pharmacies and pharmacy benefit managers. The confidentiality order in this case does not protect against the disclosure of MSPRC's assignors' sensitive business information to potential competitors. For example, CVS Health Corporation, a retail defendant here, offers Medicare Part D benefits through its subsidiary, Aetna, which owns Silverscript. *See* CMS, *PDP Plan Directory*, available at

https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/PDP-Plan-Directory (last accessed Oct. 20,

2022) (identifying Silverscript Insurance Company with contract number S5601 as a subsidiary of CVS Health Corp.); CVS Health, *CVS Health Completes Acquisition of Aetna, Marking the Start of Transforming the Consumer Health Experience* (Nov. 28, 2018), available at https://www.cvshealth.com/news-and-insights/press-releases/cvs-health-completes-acquisition-of-aetna-marking-the-start-of (last accessed Oct. 20, 2022). It is also important to understand that the contract between plaintiffs' assignor SummaCare and its actuary, Milliman, forbids the use or disclosure of information contained in or used in connection with CMS bids. Exhibit B ¶ 4. Plaintiffs should not be forced to expose their assignors to the risk of unfair competition by producing trade secrets.

Indeed, retail pharmacy and wholesaler defendants vigorously resisted producing their purchase data *and upstream data for payments by TPPs*, and heavily redacted their supply contracts, on the basis that the information was so extraordinarily commercially sensitive (and constituted trade secrets) that it simply could not be produced. And Magistrate Judge Schneider *agreed* and ruled that these defendants need not produce purchasing or cost data. *See* July 7, 2020 Order (Dkt No. 507). If defendants were relieved from having to produce their *actual cost data* and their contractual formulae for how they arrived at those costs because of its commercial sensitivity (notwithstanding a protective order), then certainly MSPRC should not have to produce equally sensitive *bidding* information and

*projections*, when it already has produced what its assignors *actually spent* on VCDs.

### C.   Data for All Part D Prescriptions for the Past 10 Years Would be Unduly Burdensome to Produce

The uncontroverted declarations of B. Riff and T. Mrakovich demonstrate that the 10 years' worth of information that defendants have requested is highly proprietary and that it would be an undue burden to produce responsive documents. Exhibit A ¶¶ 4, 7; Exhibit B ¶ 2. The assignors are currently in the open-enrollment period for Medicare, which is the busiest time of year for all Medicare Advantage plans. Attempting to respond to defendants' overbroad requests for irrelevant, speculative projections would be an unduly time-consuming process that would put an unnecessary burden on the assignors' business and their ability to provide healthcare insurance.

Further, MSPRC is open to producing historical data on payments made and reimbursements/rebates received in an effort to reach a compromise. MSPRC's assignors should not be required to bear the additional, undue burden of producing irrelevant trade secrets, merely because defendants speculate that it is relevant to their own speculative damages model, which, even considered in the light most favorable to them, makes absolutely no economic sense. Again, this is similar to the categories of discovery defendants have blocked and objected to as well.

For these good and sufficient reasons, the Court should deny defendants' requests to MSPRC to produce its assignors' historical data and confidential CMS bid data and pharmacy-spend projections.

## CONCLUSION

For the good and sufficient reasons set forth above, the Court should deny defendants' requests for highly proprietary and confidential documents that have no use whatsoever in this litigation.

Dated: October 20, 2022        Respectfully Submitted,

/s/ *Jorge A. Mestre*        /s/ *Gregory P. Hansel*
Jorge A. Mestre        Gregory P. Hansel
Andres Rivero        **PRETI, FLAHERTY,**
**RIVERO MESTRE LLP**        **BELIVEAU &**
2525 Ponce de Leon Blvd., Suite        **PACHIOS, CHARTERED,**
1000        **LLP**
Miami, FL 33134        One City Center
Phone (305) 445-2500        P.O. Box 9546
jmestre@riveromestre.com        Portland, ME 04112
        Phone: (207) 791-3000
        ghansel@preti.com

*Proposed Third-Party Payor Economic Loss Co-Lead Class Counsel*

Ruben Honik        Daniel Nigh
**HONIK LLC**        **LEVIN, PAPANTONIO, THOMAS,**
1515 Market Street        **MITCHELL, RAFFERTY**
Suite 1100        **& PROCTOR, P.A.**
Philadelphia, PA 19102        316 South Baylen Street
267-435-1300        Pensacola, FL 32502
ruben@honiklaw.com        Phone: (850) 435-7013
        dnigh@levinlaw.com

Adam Slater
**MAZIE, SLATER, KATZ &**
**FREEMAN, LLC**
103 Eisenhower Pkwy, 2nd Flr.
Roseland, NJ 07068
Phone (973) 228-9898
aslater@mazieslater.com

Conlee S. Whiteley
**KANNER & WHITELEY, LLC**
701 Camp Street
New Orleans, LA 70130
Phone: (504)-524-5777
c.whiteley@kanner-law.com

*MDL Plaintiffs' Co-Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of October 2022, a true and correct

copy of the foregoing was filed and served on all counsel of record by the Court's

CM/ECF system.

/s/ *Jorge A. Mestre*
JORGE A. MESTRE