# Exhibit G

# M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk

# Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**March 2018**
**ICH**

# M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk

# Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

*or*

*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone: 800-835-4709 or 240-402-8010*
*Email: ocod@fda.hhs.gov*
*https://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**US Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**March 2018**
**ICH**

*Contains Nonbinding Recommendations*

## TABLE OF CONTENTS

I.    INTRODUCTION (1) ................................................................................................... 3

III.  GENERAL PRINCIPLES (3) ..................................................................................... 5

IV.   CONSIDERATIONS FOR MARKETED PRODUCTS (4) ....................................... 6

   A.   Post-Approval Changes to the Drug Substance Chemistry, Manufacturing, and Controls
      (4.1) ....................................................................................................................... 6

   B.   Post-Approval Changes to the Drug Product Chemistry, Manufacturing, and Controls (4.2)
      ........................................................................................................................... 7

   C.   Changes to the Clinical Use of Marketed Products (4.3) ............................................. 7

   D.   Other Considerations for Marketed Products (4.4) ..................................................... 7

V.    DRUG SUBSTANCE AND DRUG PRODUCT IMPURITY ASSESSMENT (5) ...... 8

   A.   Synthetic Impurities (5.1) ........................................................................................ 8

   B.   Degradation Products (5.2) ...................................................................................... 9

   C.   Considerations for Clinical Development (5.3) .......................................................... 9

VI.   HAZARD ASSESSMENT ELEMENTS (6) ............................................................... 9

VII.  RISK CHARACTERIZATION (7) ........................................................................... 11

   A.   TTC-Based Acceptable Intakes (7.1) ...................................................................... 11

   B.   Acceptable Intakes Based on Compound-Specific Risk Assessments (7.2) ................ 11

      *1. Mutagenic Impurities With Positive Carcinogenicity Data (Class 1 in Table 1) (7.2.1) ............. 11*
      *2. Mutagenic Impurities With Evidence for a Practical Threshold (7.2.2) ...................................... 12*

   C.   Acceptable Intakes in Relation to Less-Than-Lifetime (LTL) Exposure (7.3) ............ 12

      *1. Clinical Development (7.3.1) ................................................................................................. 13*
      *2. Marketed Products (7.3.2) ..................................................................................................... 13*

   D.   Acceptable Intakes for Multiple Mutagenic Impurities (7.4) ..................................... 13

   E.   Exceptions and Flexibility in Approaches (7.5) ....................................................... 14

VIII. CONTROL (8) ......................................................................................................... 15

   A.   Control of Process Related Impurities (8.1) ............................................................. 15

   B.   Considerations for Control Approaches (8.2) ........................................................... 17

   C.   Considerations for Periodic Testing (8.3) ................................................................ 17

   D.   Control of Degradation Products (8.4) ..................................................................... 18

   E.   Lifecycle Management (8.5) ................................................................................... 18

   F.   Considerations for Clinical Development (8.6) ......................................................... 19

IX.   DOCUMENTATION (9) .......................................................................................... 19

   A.   Clinical Trial Applications (9.1) .............................................................................. 19

1

*Contains Nonbinding Recommendations*

B.    Common Technical Document (Marketing Application) (9.2) ................................. 20

**NOTES** .............................................................................................................................. 21

**REFERENCES** ................................................................................................................. 26

**APPENDICES** ................................................................................................................. 28

**APPENDIX 1:  SCOPE SCENARIOS FOR APPLICATION OF THE ICH M7
GUIDANCE** ........................................................................................................................ 28

**APPENDIX 2:  CASE EXAMPLES TO ILLUSTRATE POTENTIAL CONTROL
APPROACHES** ................................................................................................................ 29

**APPENDIX 3:  ADDENDUM TO ICH M7** ................................................................. 32

**LIST OF ABBREVIATIONS** ........................................................................................ 32

Introduction ......................................................................................................... 34

Methods ............................................................................................................... 35

Acceptable Intakes (AIs) or Permissible Daily Exposures (PDEs) .................... 42

Acrylonitrile (CAS# 107-13-1) ........................................................................... 43

Aniline (CAS# 62-53-3) and Aniline Hydrochloride (CAS# 142-04-1) .............. 50

Benzyl Chloride (α-Chlorotoluene, CAS# 100-44-7) ......................................... 58

Bis(chloromethyl)ether (BCME, CAS# 542-88-1) .............................................. 65

p-Chloroaniline (CAS# 106-47-8) and p-Chloroaniline HCl (CAS# 20265-96-7) ........................... 69

1-Chloro-4-Nitrobenzene (para-Chloronitrobenzene, CAS# 100-00-5) ................ 75

p-Cresidine (2-Methoxy-5-Methyl Aniline, CAS# 120-71-8) ............................. 81

Dimethylcarbamyl chloride (CAS# 79-44-7) ...................................................... 87

Dimethyl Sulfate (CAS# 77-78-1) ....................................................................... 91

Ethyl chloride (Chloroethane, CAS# 75-00-3) .................................................... 96

Glycidol (CAS# 556-52-5) ................................................................................... 99

Hydrazine (CAS# 302-01-2) ................................................................................ 103

Hydrogen Peroxide (CAS# 7722-84-1) ................................................................ 109

Methyl chloride (Chloromethane, CAS# 74-87-3) ............................................... 115

Note 1 ................................................................................................................... 119

Note 2 ................................................................................................................... 122

Note 3 ................................................................................................................... 125

**GLOSSARY** ...................................................................................................................... 128

*Contains Nonbinding Recommendations*

# M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk
# Guidance for Industry[1]

This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not create any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.

## I.    INTRODUCTION (1)[2]

The synthesis of drug substances involves the use of reactive chemicals, reagents, solvents, catalysts, and other processing aids. As a result of chemical synthesis or subsequent degradation, impurities reside in all drug substances and associated drug products. While ICH *Q3A Impurities in New Drug Substances* (Revision 2) (Q3A) and *Q3B(R2) Impurities in New Drug Products* (Q3B) (Refs. 1 and 2)[3] provide guidance for qualification and control for the majority of the impurities, limited guidance is provided for those impurities that are DNA reactive. The

---

[1] This guidance was developed within the Expert Working Group (Multidisciplinary) of the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH) (formerly the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use), and has been subject to consultation by the regulatory parties, in accordance with the ICH process. This document was endorsed by the ICH Steering Committee at Step 4 of the ICH process, June 2014. At *Step 4* of the process, the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan, and the United States.

This guidance updates and replaces the May 2015 guidance for industry *M7 Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk*. This guidance finalizes the draft guidance *M7(R1) Addendum to ICH M7: Assessment and Control of DNA Pharmaceuticals To Limit Potential Carcinogenic Risk; Application of the Principles of the ICH M7 Guidance to Calculation of Compound-Specific Acceptable Intakes* (Appendix 3), issued September 28, 2015 (80 FR 58261). This guidance incorporates Appendix 3: Addendum to M7.

[2] Arabic numbers reflect the organizational breakdown in the document endorsed by the ICH Steering Committee at *Step 4* of the ICH process, June 2014.

[3] We update guidances periodically. To make sure you have the most recent version of a guidance, check the FDA Drugs guidance Web page at https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm or the Vaccines, Blood & Biologics Web page at https://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

*Contains Nonbinding Recommendations*

purpose of this guidance is to provide a practical framework that is applicable to the identification, categorization, qualification, and control of these mutagenic impurities to limit potential carcinogenic risk. This guidance is intended to complement ICH Q3A, Q3B (Note 1), and *M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals* (Ref. 3).

This guidance emphasizes considerations of both safety and quality risk management in establishing levels of mutagenic impurities that are expected to pose negligible carcinogenic risk. It outlines recommendations for assessment and control of mutagenic impurities that reside or are reasonably expected to reside in final drug substance or product, taking into consideration the intended conditions of human use.

In general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.


## II.    SCOPE OF GUIDANCE (2)

This document is intended to provide guidance for new drug substances and new drug products during their clinical development and subsequent applications for marketing. It also applies to post-approval submissions of marketed products, and to new marketing applications for products with a drug substance that is present in a previously approved product – in both cases, only where:

- Changes to the drug substance synthesis result in new impurities or increased acceptance criteria for existing impurities;

- Changes in the formulation, composition or manufacturing process result in new degradation products or increased acceptance criteria for existing degradation products;

- Changes in indication or dosing regimen are made which significantly affect the acceptable cancer risk level.

Assessment of the mutagenic potential of impurities as described in this guidance is not intended for the following types of drug substances and drug products: biological/biotechnological, peptide, oligonucleotide, radiopharmaceutical, fermentation, herbal, and crude products of animal or plant origin.

This guidance does not apply to drug substances and drug products intended for advanced cancer indications as defined in the scope of ICH S9 (Ref. 4). Additionally, there may be some cases where a drug substance intended for other indications is itself genotoxic at therapeutic concentrations and may be expected to be associated with an increased cancer risk. Exposure to a mutagenic impurity in these cases would not significantly add to the cancer risk of the drug

*Contains Nonbinding Recommendations*

substance. Therefore, impurities could be controlled at acceptable levels for non-mutagenic impurities.

Assessment of the mutagenic potential of impurities as described in this guidance is not intended for excipients used in existing marketed products, flavoring agents, colorants, and perfumes. Application of this guidance to leachables associated with drug product packaging is not intended, but the safety risk assessment principles outlined in this guidance for limiting potential carcinogenic risk can be used if warranted. The safety risk assessment principles of this guidance can be used if warranted for impurities in excipients that are used for the first time in a drug product and are chemically synthesized.


## III.     GENERAL PRINCIPLES (3)

The focus of this guidance is on DNA reactive substances that have a potential to directly cause DNA damage when present at low levels leading to mutations and therefore, potentially causing cancer. This type of mutagenic carcinogen is usually detected in a bacterial reverse mutation (mutagenicity) assay. Other types of genotoxicants that are non-mutagenic typically have threshold mechanisms and usually do not pose carcinogenic risk in humans at the level ordinarily present as impurities. Therefore, to limit a possible human cancer risk associated with the exposure to potentially mutagenic impurities, the bacterial mutagenicity assay is used to assess the mutagenic potential and the need for controls. Structure-based assessments are useful for predicting bacterial mutagenicity outcomes based upon the established knowledge. There are a variety of approaches to conduct this evaluation, including a review of the available literature and/or computational toxicology assessment.

A Threshold of Toxicological Concern (TTC) concept was developed to define an acceptable intake for any unstudied chemical that poses a negligible risk of carcinogenicity or other toxic effects. The methods upon which the TTC is based are generally considered to be very conservative since they involve a simple linear extrapolation from the dose giving a 50% tumor incidence ($TD_{50}$) to a 1 in $10^6$ incidence, using $TD_{50}$ data for the most sensitive species and most sensitive site of tumor induction. For application of a TTC in the assessment of acceptable limits of mutagenic impurities in drug substances and drug products, a value of 1.5 micrograms ($\mu g$)/day corresponding to a theoretical $10^{-5}$ excess lifetime risk of cancer can be justified. Some structural groups were identified to be of such high potency that intakes even below the TTC would theoretically be associated with a potential for a significant carcinogenic risk. This group of high potency mutagenic carcinogens, referred to as the *cohort of concern*, comprises aflatoxin-like-, N-nitroso-, and alkyl-azoxy compounds.

During clinical development, it is expected that control strategies and approaches will be less developed in earlier phases where overall development experience is limited. This guidance bases acceptable intakes for mutagenic impurities on established risk assessment strategies. Acceptable risk during the early development phase is set at a theoretically calculated level of approximately one additional cancer per million. For later stages in development and for marketed products, acceptable increased cancer risk is set at a theoretically calculated level of approximately 1 in 100,000. These risk levels represent a small theoretical increase in risk when

*Contains Nonbinding Recommendations*

compared to human overall lifetime incidence of developing any type of cancer, which is greater than 1 in 3. It is noted that established cancer risk assessments are based on lifetime exposures. Less-Than-Lifetime (LTL) exposures both during development and marketing can have higher acceptable intakes of impurities and still maintain comparable risk levels. The use of a numerical cancer risk value (1 in 100,000) and its translation into risk-based doses (TTC) is a highly hypothetical concept that should not be regarded as a realistic indication of the actual risk. Nevertheless, the TTC concept provides an estimate of safe exposures for any mutagenic compound. However, exceeding the TTC is not necessarily associated with an increased cancer risk given the conservative assumptions employed in the derivation of the TTC value. The most likely increase in cancer incidence is actually much less than 1 in 100,000. In addition, in cases where a mutagenic compound is a non-carcinogen in a rodent bioassay, there would be no predicted increase in cancer risk. Based on all the above considerations, any exposure to an impurity that is later identified as a mutagen is not necessarily associated with an increased cancer risk for patients already exposed to the impurity. A risk assessment would determine whether any further actions would be taken.

Where a potential risk has been identified for an impurity, an appropriate control strategy leveraging process understanding and/or analytical controls should be developed to ensure that the mutagenic impurity is at or below the acceptable cancer risk level.

There may be cases when an impurity is also a metabolite of the drug substance. In such cases, the risk assessment that addresses mutagenicity of the metabolite can qualify the impurity.


## IV.    CONSIDERATIONS FOR MARKETED PRODUCTS (4)

This guidance is not intended to be applied retrospectively (i.e., to products marketed prior to adoption of this guidance). However, some types of post-approval changes warrant a reassessment of safety relative to mutagenic impurities. This section applies to these post-approval changes for products marketed prior to, or after, the adoption of this guidance. Section VIII.E (8.5) (Lifecycle Management) contains additional recommendations for products marketed after adoption of this guidance.

### A.    Post-Approval Changes to the Drug Substance Chemistry, Manufacturing, and Controls (4.1)

Post-approval submissions involving the drug substance chemistry, manufacturing, and controls should include an evaluation of the potential risk impact associated with mutagenic impurities from changes to the route of synthesis, reagents, solvents, or process conditions after the starting material. Specifically, changes should be evaluated to determine whether the changes result in any new mutagenic impurities or higher acceptance criteria for existing mutagenic impurities. Reevaluation of impurities not impacted by changes is not recommended. For example, when only a portion of the manufacturing process is changed, the assessment of risk from mutagenic impurities should be limited to whether any new mutagenic impurities result from the change, whether any mutagenic impurities formed during the affected step are increased, and whether any known mutagenic impurities from up-stream steps are increased. Regulatory submissions

6

*Contains Nonbinding Recommendations*

associated with such changes should describe the assessment as outlined in Section IX.B (9.2). Changing the site of manufacture of drug substance, intermediates, or starting materials or changing raw materials supplier will not require a reassessment of mutagenic impurity risk.

When a new drug substance supplier is proposed, evidence that the drug substance produced by this supplier using the same route of synthesis as an existing drug product marketed in the assessor's region is considered to be sufficient evidence of acceptable risk/benefit regarding mutagenic impurities and an assessment per this guidance is not required. If this is not the case, then an assessment per this guidance is strongly recommended.

### B.    Post-Approval Changes to the Drug Product Chemistry, Manufacturing, and Controls (4.2)

Post-approval submissions involving the drug product (e.g., change in composition, manufacturing process, dosage form) should include an evaluation of the potential risk associated with any new mutagenic degradation products or higher acceptance criteria for existing mutagenic degradation products. If appropriate, the regulatory submission should include an updated control strategy. Reevaluation of the drug substance associated with drug products is not recommended or expected provided there are no changes to the drug substance. Changing the site of manufacture of drug product will not require a reassessment of mutagenic impurity risk.

### C.    Changes to the Clinical Use of Marketed Products (4.3)

Changes to the clinical use of marketed products that can warrant a reevaluation of the mutagenic impurity limits include a significant increase in clinical dose, an increase in duration of use (in particular when a mutagenic impurity was controlled above the lifetime acceptable intake for a previous indication that may no longer be appropriate for the longer treatment duration associated with the new indication), or a change in indication from a serious or life-threatening condition where higher acceptable intakes were justified (Section VII.E (7.5)) to an indication for a less serious condition where the existing impurity acceptable intakes may no longer be appropriate. Changes to the clinical use of marketed products associated with new routes of administration or expansion into patient populations that include pregnant women and/or pediatrics will not warrant a reevaluation, assuming no increases in daily dose or duration of treatment.

### D.    Other Considerations for Marketed Products (4.4)

Application of this guidance to marketed products may be warranted if there is specific cause for concern. The existence of impurity structural alerts alone is considered insufficient to trigger follow-up measures, unless it is a structure in the cohort of concern (Section III (3)). Howeva a specific cause for concern would be new relevant impurity hazard data (classified as Class 1 or 2, Section 6) generated after the overall control strategy and specifications for market authorization were established. This new relevant impurity hazard data should be derived from high-quality scientific studies consistent with relevant regulatory testing guidelines, with data records or reports readily available. Similarly, a newly discovered impurity that is a known Class 1 or

7

*Contains Nonbinding Recommendations*

Class 2 mutagen that is present in a marketed product could also be a cause for concern.  In both cases when the applicant becomes aware of this new information, an evaluation per this guidance should be conducted.

## V.    DRUG SUBSTANCE AND DRUG PRODUCT IMPURITY ASSESSMENT (5)

Actual and potential impurities that are likely to arise during the synthesis and storage of a new drug substance, and during manufacturing and storage of a new drug product, should be assessed.

The impurity assessment is a two-stage process:

- Actual impurities that have been identified should be considered for their mutagenic potential.
- An assessment of potential impurities likely to be present in the final drug substance is carried out to determine whether further evaluation of their mutagenic potential is warranted.

The steps as applied to synthetic impurities and degradation products are described in Sections V.A (5.1) and V.B (5.2), respectively.

### A.    Synthetic Impurities (5.1)

Actual impurities include those observed in the drug substance above the ICH Q3A reporting thresholds.  Identification of actual impurities is expected when the levels exceed the identification thresholds outlined by ICH Q3A.  It is acknowledged that some impurities below the identification threshold may also have been identified.

Potential impurities in the drug substance can include starting materials, reagents, and intermediates in the route of synthesis from the starting material to the drug substance.

The risk of carryover into the drug substance should be assessed for identified impurities that are present in starting materials and intermediates, and impurities that are reasonably expected by-products in the route of synthesis from the starting material to the drug substance.  As the risk of carryover may be negligible for some impurities (e.g., those impurities in early synthetic steps of long routes of synthesis), a risk-based justification could be provided for the point in the synthesis after which these types of impurities should be evaluated for mutagenic potential.

For starting materials that are introduced late in the synthesis of the drug substance (and where the synthetic route of the starting material is known), the final steps of the starting material synthesis should be evaluated for potential mutagenic impurities.

Actual impurities where the structures are known and potential impurities as defined above should be evaluated for mutagenic potential as described in Section VI (6).

*Contains Nonbinding Recommendations*

### B.    Degradation Products (5.2)

Actual drug substance degradation products include those observed above the ICH Q3A reporting threshold during storage of the drug substance in the proposed long-term storage conditions and primary and secondary packaging.  Actual degradation products in the drug product include those observed above the ICH Q3B reporting threshold during storage of the drug product in the proposed long-term storage conditions and primary and secondary packaging, and also include those impurities that arise during the manufacture of the drug product.  Identification of actual degradation products is expected when the levels exceed the identification thresholds outlined by ICH Q3A/Q3B.  It is acknowledged that some degradation products below the identification threshold may also have been identified.

Potential degradation products in the drug substance and drug product are those that may be reasonably expected to form during long-term storage conditions.  Potential degradation products include those that form above the ICH Q3A/Q3B identification threshold during accelerated stability studies (e.g., $40°C/75\%$ relative humidity for 6 months) and confirmatory photostability studies as described in ICH Q1B (Ref. 5), but are yet to be confirmed in the drug substance or drug product under long-term storage conditions in the primary packaging.

Knowledge of relevant degradation pathways can be used to help guide decisions on the selection of potential degradation products to be evaluated for mutagenicity, e.g., from degradation chemistry principles, relevant stress testing studies, and development stability studies.

Actual and potential degradation products likely to be present in the final drug substance or drug product and where the structure is known should be evaluated for mutagenic potential as described in Section VI (6).

### C.    Considerations for Clinical Development (5.3)

It is expected that the impurity assessment described in Sections V.A (5.1) and V.B (5.2) applies to products in clinical development.  However, it is acknowledged that the available information is limited.  For example, information from long-term stability studies and photostability studies may not be available during clinical development and thus information on potential degradation products may be limited.  Additionally, the thresholds outlined in ICH Q3A/Q3B do *not* apply to products in clinical development and, consequently, fewer impurities will be identified.

## VI.    HAZARD ASSESSMENT ELEMENTS (6)

Hazard assessment involves an initial analysis of actual and potential impurities by conducting database and literature searches for carcinogenicity and bacterial mutagenicity data in order to classify them as Class 1, 2, or 5 according to Table 1.  If data for such a classification are not available, an assessment of Structure-Activity Relationships (SAR) that focuses on bacterial mutagenicity predictions should be performed.  This could lead to a classification into Class 3, 4, or 5.

*Contains Nonbinding Recommendations*

**Table 1: Impurities Classification With Respect to Mutagenic and Carcinogenic Potential and Resulting Control Actions**

| Class | Definition | Proposed action for control (details in Section VII (7) and VIII (8)) |
|---|---|---|
| 1 | Known mutagenic carcinogens | Control at or below compound-specific acceptable limit |
| 2 | Known mutagens with unknown carcinogenic potential (bacterial mutagenicity positive,* no rodent carcinogenicity data) | Control at or below acceptable limits (appropriate TTC) |
| 3 | Alerting structure, unrelated to the structure of the drug substance; no mutagenicity data | Control at or below acceptable limits (appropriate TTC) or conduct bacterial mutagenicity assay; If non-mutagenic = Class 5 If mutagenic = Class 2 |
| 4 | Alerting structure, same alert in drug substance or compounds related to the drug substance (e.g., process intermediates) which have been tested and are non-mutagenic | Treat as non-mutagenic impurity |
| 5 | No structural alerts, or alerting structure with sufficient data to demonstrate lack of mutagenicity or carcinogenicity | Treat as non-mutagenic impurity |

*Or other relevant positive mutagenicity data indicative of DNA-reactivity-related induction of gene mutations (e.g., positive findings in in vivo gene mutation studies)

A computational toxicology assessment should be performed using Quantitative Structure-Activity Relationship ((Q)SAR) methodologies that predict the outcome of a bacterial mutagenicity assay (Ref. 6). Two (Q)SAR prediction methodologies that complement each other should be applied. One methodology should be expert rule-based, and the second methodology should be statistical-based. (Q)SAR models utilizing these prediction methodologies should follow the general validation principles set forth by the Organisation for Economic Co-operation and Development (OECD).

The absence of structural alerts from two complementary (Q)SAR methodologies (expert rule-based and statistical) is sufficient to conclude that the impurity is of no mutagenic concern, and no further testing is recommended (Class 5 in Table 1).

If warranted, the outcome of any computer system-based analysis can be reviewed with the use of expert knowledge in order to provide additional supportive evidence on relevance of any

10

*Contains Nonbinding Recommendations*

positive, negative, conflicting, or inconclusive prediction and to provide a rationale to support the final conclusion.

To follow up on a relevant structural alert (Class 3 in Table 1), either adequate control measures could be applied or a bacterial mutagenicity assay with the impurity alone can be conducted. An appropriately conducted negative bacterial mutagenicity assay (Note 2) would overrule any structure-based concern, and no further genotoxicity assessments would be recommended (Note 1). These impurities should be considered non-mutagenic (Class 5 in Table 1). A positive bacterial mutagenicity result would warrant further hazard assessment and/or control measures (Class 2 in Table 1). For instance, when levels of the impurity cannot be controlled at an appropriate acceptable limit, it is recommended that the impurity be tested in an in vivo gene mutation assay in order to understand the relevance of the bacterial mutagenicity assay result under in vivo conditions. The selection of other in vivo genotoxicity assays should be scientifically justified based on knowledge of the mechanism of action of the impurity and expected target tissue exposure (Note 3). In vivo studies should be designed taking into consideration existing ICH genotoxicity guidances. Results in the appropriate in vivo assay may support setting compound specific impurity limits.

An impurity with a structural alert that is shared (e.g., same structural alert in the same position and chemical environment) with the drug substance or related compounds can be considered as non-mutagenic (Class 4 in Table 1) if the testing of such material in the bacterial mutagenicity assay was negative.


## VII.    RISK CHARACTERIZATION (7)

As a result of hazard assessment described in Section VI (6), each impurity will be assigned to one of the five classes in Table 1. For impurities belonging in Classes 1, 2, and 3, the principles of risk characterization used to derive acceptable intakes are described in this section.

### A.    TTC-Based Acceptable Intakes (7.1)

A TTC-based acceptable intake of a mutagenic impurity of 1.5 µg per person per day is considered to be associated with a negligible risk (theoretical excess cancer risk of <1 in 100,000 over a lifetime of exposure) and can, in general, be used for most pharmaceuticals as a default to derive an acceptable limit for control. This approach would usually be used for mutagenic impurities present in pharmaceuticals for long-term treatment (> 10 years) and where no carcinogenicity data are available (Classes 2 and 3).

### B.    Acceptable Intakes Based on Compound-Specific Risk Assessments (7.2)

*1.    Mutagenic Impurities With Positive Carcinogenicity Data (Class 1 in Table 1) (7.2.1)*

Compound-specific risk assessments to derive acceptable intakes should be applied instead of the TTC-based acceptable intakes where sufficient carcinogenicity data exist. For a known

*Contains Nonbinding Recommendations*

mutagenic carcinogen, a compound-specific acceptable intake can be calculated based on carcinogenic potency and linear extrapolation as a default approach. Alternatively, other established risk assessment practices such as those used by international regulatory bodies may be applied either to calculate acceptable intakes or to use already existing values published by regulatory authorities (Note 4).

Compound-specific calculations for acceptable intakes can be applied case-by-case for impurities which are chemically similar to a known carcinogen compound class (class-specific acceptable intakes) provided that a rationale for chemical similarity and supporting data can be demonstrated (Note 5).

> 2. *Mutagenic Impurities With Evidence for a Practical Threshold (7.2.2)*

The existence of mechanisms leading to a dose response that is non-linear or has a practical threshold is increasingly recognized, not only for compounds that interact with non-DNA targets but also for DNA-reactive compounds, whose effects may be modulated by, for example, rapid detoxification before coming into contact with DNA, or by effective repair of induced damage. The regulatory approach to such compounds can be based on the identification of a No-Observed Effect Level (NOEL) and use of uncertainty factors (see ICH Q3C(R5), Ref. 7) to calculate a permissible daily exposure (PDE) when data are available.

The acceptable intakes derived from compound-specific risk assessments (Section VII.B (7.2)) can be adjusted for shorter duration of use in the same proportions as defined in the following sections (Section VII.C.1 (7.3.1) and VII.C.2 (7.3.2)) or should be limited to not more than 0.5%, whichever is lower. For example, if the compound-specific acceptable intake is 15 µg/day for lifetime exposure, the less than lifetime limits (Table 2) can be increased to a daily intake of 100 µg (> 1-10 years treatment duration), 200 µg (> 1-12 months) or 1200 µg (< 1 month). However, for a drug with a maximum daily dose of, for instance, 100 milligrams (mg), the acceptable daily intake for the < 1-month duration, would be limited to 0.5% (500 µg) rather than 1200 µg.

## C.    Acceptable Intakes in Relation to Less-Than-Lifetime (LTL) Exposure (7.3)

Standard risk assessments of known carcinogens assume that cancer risk increases as a function of cumulative dose. Thus, cancer risk of a continuous low dose over a lifetime would be equivalent to the cancer risk associated with an identical cumulative exposure averaged over a shorter duration.

The TTC-based acceptable intake of 1.5 µg/day is considered to be protective for a lifetime of daily exposure. To address LTL exposures to mutagenic impurities in pharmaceuticals, an approach is applied in which the acceptable cumulative lifetime dose (1.5 µg/day x 25,550 days = 38.3 mg) is uniformly distributed over the total number of exposure days during LTL exposure. This would allow higher daily intake of mutagenic impurities than would be the case for lifetime exposure and still maintain comparable risk levels for daily and non-daily treatment regimens. Table 2 is derived from the above concepts and illustrates the acceptable intakes for LTL to lifetime exposures for clinical development and marketing. In the case of intermittent

*Contains Nonbinding Recommendations*

dosing, the acceptable daily intake should be based on the total number of dosing days instead of the time interval over which the doses were administered and that number of dosing days should be related to the relevant duration category in Table 2.  For example, a drug administered once per week for 2 years (i.e., 104 dosing days) would have an acceptable intake per dose of 20 µg.

**Table 2:  Acceptable Intakes for an Individual Impurity**

| Duration of treatment | ≤ 1 month | >1 - 12 months | >1 - 10 years | >10 years to lifetime |
|---|---|---|---|---|
| Daily intake [µg/day] | 120 | 20 | 10 | 1.5 |

1.    *Clinical Development (7.3.1)*

Using this LTL concept, acceptable intakes of mutagenic impurities are recommended for limited treatment periods during clinical development of up to 1 month, 1 to 12 months and more than 1 year up to completion of Phase 3 clinical trials (Table 2).  These adjusted acceptable intake values maintain a $10^{-6}$ risk level in early clinical development when benefit has not yet been established and a $10^{-5}$ risk level for later stages in development (Note 6).

An alternative approach to the strict use of an adjusted acceptable intake for any mutagenic impurity could be applied for Phase 1 clinical trials for dosing up to 14 days.  For this approach, only impurities that are known mutagenic carcinogens (Class 1) and known mutagens of unknown carcinogenic potential (Class 2), as well as impurities in the cohort of concern chemical class, should be controlled (see Section VIII (8)) to acceptable limits as described in Section VII (7).  All other impurities would be treated as non-mutagenic impurities.  This includes impurities which contain structural alerts (Class 3), which alone would not trigger action for an assessment for this limited Phase 1 duration.

2.    *Marketed Products (7.3.2)*

The treatment duration categories with acceptable intakes in Table 2 for marketed products are intended to be applied to anticipated exposure durations for the great majority of patients.  The proposed intakes, along with various scenarios for applying those intakes, are described in Note 7, Table 4.  In some cases, a subset of the population of patients may extend treatment beyond the marketed drug's categorical upper limit (e.g., treatment exceeding 10 years for an acceptable intake of 10 µg/day, perhaps receiving 15 years of treatment).  This would result in a negligible increase (in the example given, a fractional increase to 1.5/100,000) compared to the overall calculated risk for the majority of patients treated for 10 years.

**D.    Acceptable Intakes for Multiple Mutagenic Impurities (7.4)**

13

*Contains Nonbinding Recommendations*

The TTC-based acceptable intakes should be applied to each individual impurity. When there are two Class 2 or Class 3 impurities, individual limits apply. When there are three or more Class 2 or Class 3 impurities specified on the drug substance specification, total mutagenic impurities should be limited as described in Table 3 for clinical development and marketed products.

For combination products, each active ingredient should be regulated separately.

**Table 3:  Acceptable Total Daily Intakes for Multiple Impurities**

| Duration of treatment | ≤ 1 month | >1 - 12 months | >1 - 10 years | >10 years to lifetime |
|---|---|---|---|---|
| Total Daily intake [μg/day] | 120 | 60 | 30 | 5 |

Only specified Class 2 and 3 impurities on the drug substance specification should be included in the calculation of the total limit. However, impurities with compound-specific or class-related acceptable intake limits (Class 1) should not be included in the total limits of Class 2 and Class 3 impurities. Also, degradation products that form in the drug product would be controlled individually and a total limit would not be applied.

### E.    Exceptions and Flexibility in Approaches (7.5)

- Higher acceptable intakes may be justified when human exposure to the impurity will be much greater from other sources, e.g., food, or endogenous metabolism (e.g., formaldehyde).

- Case-by-case exceptions to the use of the appropriate acceptable intake can be justified in cases of severe disease, reduced life expectancy, late onset but chronic disease, or limited therapeutic alternatives.

- Compounds from some structural classes of mutagens can display extremely high carcinogenic potency (cohort of concern), i.e., aflatoxin-like-, N-nitroso-, and alkyl-azoxy structures. If these compounds are found as impurities in pharmaceuticals, acceptable intakes for these high-potency carcinogens would likely be significantly lower than the acceptable intakes defined in this guidance. Although the principles of this guidance can be used, a case-by-case approach, using, e.g., carcinogenicity data from closely related structures, if available, should usually be developed to justify acceptable intakes for pharmaceutical development and marketed products.

The above risk approaches described in Section VII (7) are applicable to all routes of administration, and no corrections to acceptable intakes are generally warranted. Exceptions to consider may include situations where data justify route-specific concerns that should be

14

*Contains Nonbinding Recommendations*

evaluated case by case. These approaches are also applicable to all patient populations based upon the conservative nature of the risk approaches being applied.


# VIII.   CONTROL (8)

A control strategy is a planned set of controls derived from current product and process understanding that assures process performance and product quality (ICH Q10, Ref. 8). A control strategy can include, but is not limited to, the following:

- Controls on material attributes (including raw materials, starting materials, intermediates, reagents, solvents, primary packaging materials);
- Facility and equipment operating conditions;
- Controls implicit in the design of the manufacturing process;
- In-process controls (including in-process tests and process parameters);
- Controls on drug substance and drug product (e.g., release testing).

When an impurity has been characterized as Class 1, 2, or 3 in Table 1, it is important to develop a control strategy that assures that the level of this impurity in the drug substance and drug product is below the acceptable limit. A thorough knowledge of the chemistry associated with the drug substance manufacturing process, and of the drug product manufacturing process, along with an understanding of the overall stability of the drug substance and drug product is fundamental to developing the appropriate controls. Developing a strategy to control mutagenic impurities in the drug product is consistent with risk management processes identified in ICH Q9 (Ref. 9). A control strategy that is based on product and process understanding and utilization of risk management principles will lead to a combination of process design and control and appropriate analytical testing, which can also provide an opportunity to shift controls upstream and minimize the need for end-product testing.

## A.    Control of Process Related Impurities (8.1)

There are 4 potential approaches to development of a control strategy for drug substance:

## Option 1

Include a test for the impurity in the drug substance specification with an acceptance criterion at or below the acceptable limit using an appropriate analytical procedure.

For an Option 1 control approach, it is possible to apply periodic verification testing per ICH Q6A (Ref 10). Periodic verification testing is justified when it can be shown that levels of the mutagenic impurity in the drug substance are less than 30% of the acceptable limit for at least 6 consecutive pilot scale or 3 consecutive production scale batches. If this condition is not fulfilled, a routine test in the drug substance specification is recommended. See Section VIII.C (8.3) for additional considerations.

*Contains Nonbinding Recommendations*

**Option 2**

Include a test for the impurity in the specification for a raw material, starting material or intermediate, or as an in-process control, with an acceptance criterion at or below the acceptable limit using an appropriate analytical procedure.

**Option 3**

Include a test for the impurity in the specification for a raw material, starting material or intermediate, or as an in-process control, with an acceptance criterion above the acceptable limit of the impurity in the drug substance, using an appropriate analytical procedure coupled with demonstrated understanding of fate and purge and associated process controls that assure the level in the drug substance is below the acceptable limit without the need for any additional testing later in the process.

This option can be justified when the level of the impurity in the drug substance will be less than 30% of the acceptable limit by review of data from laboratory scale experiments (spiking experiments are encouraged) and, where warranted, is supported by data from pilot scale or commercial scale batches. See Appendix 2, Case Examples 1 and 2.  Alternative approaches can be used to justify Option 3.

**Option 4**

Understand process parameters and impact on residual impurity levels (including fate and purge knowledge) with sufficient confidence that the level of the impurity in the drug substance will be below the acceptable limit such that no analytical testing is recommended for this impurity (i.e., the impurity does not need to be listed on any specification).

A control strategy that relies on process controls in lieu of analytical testing can be appropriate if the process chemistry and process parameters that have an impact on the levels of mutagenic impurities are understood and the risk of an impurity residing in the final drug substance above the acceptable limit is determined to be negligible.  In many cases, justification of this control approach based on scientific principles alone is sufficient.  Elements of a scientific risk assessment can be used to justify an option 4 approach.  The risk assessment can be based on physicochemical properties and process factors that influence the fate and purge of an impurity, including chemical reactivity, solubility, volatility, ionizability, and any physical process steps designed to remove impurities.  The result of this risk assessment might be shown as an estimated purge factor for clearance of the impurity by the process (Ref. 11).

Option 4 is especially useful for those impurities that are inherently unstable (e.g., thionyl chloride that reacts rapidly and completely with water) or for those impurities that are introduced early in the synthesis and are effectively purged.

In some cases an Option 4 approach can be appropriate when the impurity is known to form, or is introduced late in the synthesis; however, process-specific data should then be provided to justify this approach.

*Contains Nonbinding Recommendations*

### B.      Considerations for Control Approaches (8.2)

For Option 4 approaches where justification based on scientific principles alone is not considered sufficient, as well as for Option 3 approaches, analytical data to support the control approach is strongly recommended. This could include, as appropriate, information on the structural changes to the impurity caused by downstream chemistry (*fate*); analytical data on pilot scale batches; and, in some cases, laboratory scale studies with intentional addition of the impurity (*spiking studies*). In these cases, it is important to demonstrate that the fate/purge argument for the impurity is robust and will consistently assure a negligible probability of an impurity residing in the final drug substance above the acceptable limit. Where the purge factor is based on developmental data, it is important to address the expected scale-dependence or independence. In the case that the small scale model used in the development stage is considered to not represent the commercial scale, confirmation of suitable control in pilot scale and/or initial commercial batches is generally appropriate. The need for data from pilot/commercial batches is influenced by the magnitude of the purge factor calculated from laboratory or pilot scale data, point of entry of the impurity, and knowledge of downstream process purge points.

If Options 3 and 4 cannot be justified, then a test for the impurity on the specification for a raw material, starting material or intermediate, or as an in-process control (Option 2) or drug substance (Option 1) at the acceptable limit should be included. For impurities introduced in the last synthetic step, an Option 1 control approach would normally be expected unless otherwise justified.

The application of *As Low As Reasonably Practicable* (ALARP) is not necessary if the level of the mutagenic impurity is below acceptable limits. Similarly, it is not necessary to demonstrate that alternate routes of synthesis have been explored.

In cases where control efforts cannot reduce the level of the mutagenic impurity to below the acceptable limit and levels are as low as reasonably practical, a higher limit may be justified based on a risk/benefit analysis.

### C.      Considerations for Periodic Testing (8.3)

The above options include situations where a test is recommended to be included in the specification, but where routine measurement for release of every batch may not be necessary. This approach, referred to as *periodic or skip testing* in ICH Q6A could also be called *Periodic Verification Testing*. This approach may be appropriate when it can be demonstrated that processing subsequent to impurity formation/introduction clears the impurity. It should be noted that allowance of Periodic Verification Testing is contingent upon use of a process that is under a state of control (i.e., produces a quality product that consistently meets specifications and conforms to an appropriately established facility, equipment, processing, and operational control regimen). If upon testing, the level of the mutagenic impurity fails to meet the acceptance criteria established for the periodic test, the drug producer should immediately commence full testing (i.e., testing of every batch for the attribute specified) until the cause of the failure has been conclusively determined, corrective action has been implemented, and the process is again

17

*Contains Nonbinding Recommendations*

documented to be in a state of control.  As noted in ICH Q6A, regulatory authorities should be notified of a periodic verification test failure to evaluate the risk/benefit of previously released batches that were not tested.

### D.    Control of Degradation Products (8.4)

For a potential degradation product that has been characterized as mutagenic, it is important to understand if the degradation pathway is relevant to the drug substance and drug product manufacturing processes and/or their proposed packaging and storage conditions.  A well-designed accelerated stability study (e.g., $40^{\circ}$C/75% relative humidity, 6 months) using the proposed packaging, with appropriate analytical procedures, is recommended to determine the relevance of the potential degradation product.  Alternatively, well-designed kinetically equivalent shorter-term stability studies at higher temperatures using the proposed commercial packaging may be used to determine the relevance of the degradation pathway prior to initiating longer-term stability studies.  This type of study would be especially useful to understand the relevance of those potential degradation products that are based on knowledge of potential degradation pathways but not yet observed in the product.

Based on the result of these accelerated studies, if it is anticipated that the degradation product will form at levels approaching the acceptable limit under the proposed packaging and storage conditions, then efforts to control formation of the degradation product is recommended.  In these cases, monitoring for the drug substance or drug product degradation in long-term primary stability studies at the proposed storage conditions (in the proposed commercial pack) is expected unless otherwise justified.  Whether a specification limit for the mutagenic degradation product is appropriate will generally depend on the results from these stability studies.

If it is anticipated that formulation development and packaging design options are unable to control mutagenic degradation product levels to less than the acceptable limit and levels are as low as reasonably practicable, a higher limit can be justified based on a risk/benefit analysis.

### E.    Lifecycle Management (8.5)

This section is intended to apply to those products approved after the issuance of this guidance.

The quality system elements and management responsibilities described in ICH Q10 are intended to encourage the use of science-based and risk-based approaches at each lifecycle stage, thereby promoting continual improvement across the entire product lifecycle.  Product and process knowledge should be managed from development through the commercial life of the product up to and including product discontinuation.

The development and improvement of a drug substance or drug product manufacturing process usually continues over its lifecycle.  Manufacturing process performance, including the effectiveness of the control strategy, should be periodically evaluated.  Knowledge gained from commercial manufacturing can be used to further improve process understanding and process performance and to adjust the control strategy.

*Contains Nonbinding Recommendations*

Any proposed change to the manufacturing process should be evaluated for the impact on the quality of drug substance and drug product. This evaluation should be based on understanding of the manufacturing process and should determine whether appropriate testing to analyze the impact of the proposed changes is warranted. Additionally, improvements in analytical procedures may lead to structural identification of an impurity. In those cases, the new structure would be assessed for mutagenicity as described in this guidance.

Throughout the lifecycle of the product, it will be important to reassess if testing is recommended when intended or unintended changes occur in the process. This applies when there is no routine monitoring at the acceptable limit (Option 3 or Option 4 control approaches), or when applying periodic rather than batch-by-batch testing. This testing should be performed at an appropriate point in the manufacturing process.

In some cases, the use of statistical process control and trending of process measurements can be useful for continued suitability and capability of processes to provide adequate control on the impurity. Statistical process control can be based on process parameters that influence impurity formation or clearance, even when that impurity is not routinely monitored (e.g., Option 4).

All changes should be subject to internal change management processes as part of the quality system (ICH Q10). Changes to information filed and approved in a dossier should be reported to regulatory authorities in accordance with regional regulations and guidelines.

### F.    Considerations for Clinical Development (8.6)

It is recognized that product and process knowledge increases over the course of development and therefore it is expected that data to support control strategies in the clinical development trial phases will be less than at the marketing registration phase. A risk-based approach based on process chemistry fundamentals is encouraged to prioritize analytical efforts on those impurities with the highest likelihood of being present in the drug substance or drug product. Analytical data may not be expected to support early clinical development when the likelihood of an impurity being present is low, but in a similar situation analytical data may be appropriate to support the control approach for the marketing application. It is also recognized that commercial formulation design occurs later in clinical development and therefore efforts associated with drug product degradation products will be limited in the earlier phases.

## IX.    DOCUMENTATION (9)

Information relevant to the application of this guidance should be provided at the following stages:

### A.    Clinical Trial Applications (9.1)

- It is expected that the number of structures assessed for mutagenicity and the collection of analytical data will both increase throughout the clinical development period.

*Contains Nonbinding Recommendations*

- For Phase 1 studies of 14 days or less, a description of efforts to mitigate risks of mutagenic impurities focused on Class 1 and Class 2 impurities and those in the cohort of concern as outlined in Section VII (7) should be included. For Phase 1 clinical trials of more than 14 days and for Phase 2a clinical trials as well, Class 3 impurities that have analytical controls should also be included.

- For Phase 2b and Phase 3 clinical development trials, a list of the impurities assessed by (Q)SAR should be included, and any Class 1, 2, or 3 actual and potential impurities should be described along with plans for control. The *in silico* (Q)SAR systems used to perform the assessments should be described. The results of bacterial mutagenicity tests of actual impurities should be reported.

- Chemistry arguments may be appropriate instead of analytical data for potential impurities that present a low likelihood of being present as described in Section VIII.F (8.6).

### B.    Common Technical Document (Marketing Application) (9.2)

- For actual and potential process related impurities and degradation products where assessments according to this guidance are conducted, the mutagenic impurity classification and rationale for this classification should be provided:

  o This would include the results and description of *in silico* (Q)SAR systems used and, as appropriate, supporting information to arrive at the overall conclusion for Class 4 and 5 impurities.
  o When bacterial mutagenicity assays were performed on impurities, study reports should be provided for bacterial mutagenicity assays on impurities.

- Justification for the proposed specification and the approach to control should be provided (e.g., ICH Q11 example 5b, Ref. 12). For example, this information could include the acceptable intake, the location, and sensitivity of relevant routine monitoring. For Option 3 and Option 4 control approaches, a summary of knowledge of the purge factor, and identification of factors providing control (e.g., process steps, solubility in wash solutions), is important.

*Contains Nonbinding Recommendations*

## NOTES

*Note 1*    The ICH M7 Guidance recommendations provide a state-of-the-art approach for assessing the potential of impurities to induce point mutations and ensure that such impurities are controlled to safe levels so that below or above the ICH Q3A/Q3B qualification threshold, no further qualification for mutagenic potential is required. This includes the initial use of (Q)SAR tools to predict bacterial mutagenicity.  In cases where the amount of the impurity exceeds 1 mg daily dose for chronic administration, evaluation of genotoxic potential as recommended in ICH Q3A/Q3B could be considered.  In cases where the amount of the impurity is less than 1 mg, no further genotoxicity testing is required regardless of other qualification thresholds.

*Note 2*    To assess the mutagenic potential of impurities, a single bacterial mutagenicity assay can be carried out with a fully adequate protocol according to ICH S2(R1) and OECD 471 guidelines (Refs. 13 and 14).  The assays should be performed in compliance with Good Laboratory Practices (GLP) regulations; however, lack of full GLP compliance does not necessarily mean that the data cannot be used to support clinical trials and marketing authorizations.  Such deviations should be described in the study report.  For example, the test article may not be prepared or analyzed in compliance with GLP regulations.  In some cases, the selection of bacterial tester strains may be limited to those proven to be sensitive to the identified alert.  For impurities that are not feasible to isolate or synthesize or when compound quantity is limited, it may not be possible to achieve the highest test concentrations recommended for an ICH-compliant bacterial mutagenicity assay according to the current testing guidelines.  In this case, bacterial mutagenicity testing could be carried out using a miniaturized assay format with proven high concordance to the ICH-compliant assay to enable testing at higher concentrations with justification.

*Note 3*    Tests to Investigate the in vivo Relevance of in vitro Mutagens (Positive Bacterial Mutagenicity)

| In vivo test | Factors to justify choice of test as fit-for-purpose |
|---|---|
| Transgenic mutation assays | • For any bacterial mutagenicity positive.  Justify selection of assay tissue/organ |
| *Pig-a* assay (blood) | • For directly acting mutagens (bacterial mutagenicity positive without S9)* |
| Micronucleus test (blood or bone marrow) | • For directly acting mutagens (bacterial mutagenicity positive without S9) and compounds known to be clastogenic* |
| Rat liver Unscheduled DNA Synthesis (UDS) test | • In particular for bacterial mutagenicity positive with S9 only<br>• Responsible liver metabolite known<br>    o  to be generated in test species used<br>    o  to induce bulky adducts |

21

*Contains Nonbinding Recommendations*

| Comet assay | • Justification should be provided (chemical class specific mode of action to form alkaline labile sites or single-strand breaks as preceding DNA damage that can potentially lead to mutations<br>• Justify selection of assay tissue/organ |
|---|---|
| Others | • With convincing justification |

*For indirect acting mutagens (requiring metabolic activation), adequate exposure to metabolite(s) should be demonstrated.

*Note 4*    Example of linear extrapolation from the $TD_{50}$

It is possible to calculate a compound-specific acceptable intake based on rodent carcinogenicity potency data such as $TD_{50}$ values (doses giving a 50% tumor incidence equivalent to a cancer risk probability level of 1:2). Linear extrapolation to a probability of 1 in 100,000 (i.e., the accepted lifetime risk level used) is achieved by simply dividing the $TD_{50}$ by 50,000. This procedure is similar to that employed for derivation of the TTC.

Calculation example: Ethylene oxide

$TD_{50}$ values for ethylene oxide according to the Carcinogenic Potency Database are 21.3 mg/kg body weight/day (rat) and 63.7 mg/kg body weight/day (mouse). For the calculation of an acceptable intake, the lower (i.e., more conservative) value of the rat is used.

To derive a dose to cause tumors in 1 in 100,000 animals, divide by 50,000:

21.3 mg/kilograms (kg) $\div$ 50,000 = 0.42 µg/kg

To derive a total human daily dose:

0.42 µg/kg/day x 50 kg body weight = 21.3 µg/person/day

Hence, a daily life-long intake of 21.3 µg ethylene oxide would correspond to a theoretical cancer risk of $10^{-5}$ and therefore be an acceptable intake when present as an impurity in a drug substance.

Alternative methods and published regulatory limits for cancer risk assessment

As an alternative of using the most conservative $TD_{50}$ value from rodent carcinogenicity studies irrespective of its relevance to humans, an in-depth toxicological expert assessment of the available carcinogenicity data can be done in order to initially identify the findings (e.g., species, organ) with highest relevance to human risk assessment as a basis for deriving a reference point for linear extrapolation. Also, in order to better take into account directly the shape of the dose-response curve, a benchmark dose such as a benchmark dose lower confidence limit 10% (BMDL10, an

*Contains Nonbinding Recommendations*

estimate of the lowest dose which is 95% certain to cause no more than a 10% cancer incidence in rodents) may be used instead of $TD_{50}$ values as a numerical index for carcinogenic potency. Linear extrapolation to a probability of 1 in 100,000 (i.e., the accepted lifetime risk level used) is then achieved by simply dividing the BMDL10 by 10,000.

Compound-specific acceptable intakes can also be derived from published recommended values from internationally recognized bodies such as World Health Organization (WHO, International Program on Chemical Safety [IPCS] Cancer Risk Assessment Programme) and others using the appropriate $10^{-5}$ lifetime risk level. In general, a regulatory limit that is applied should be based on the most current and scientifically supported data and/or methodology.

Note 5    A compound-specific calculation of acceptable intakes for mutagenic impurities may be applied for mutagenic impurities (without carcinogenicity data) which are structurally similar to a chemically defined class of known carcinogen. For example, factors that are associated with the carcinogenic potency of monofunctional alkyl chlorides have been identified (Ref. 15) and can be used to modify the safe acceptable intake of monofunctional alkyl chlorides, a group of alkyl chlorides commonly used in drug synthesis. Compared to multifunctional alkyl chlorides, the monofunctional compounds are much less potent carcinogens with $TD_{50}$ values ranging from 36 to 1810 mg/kg/day (n=15; epichlorohydrin with two distinctly different functional groups is excluded). A $TD_{50}$ value of 36 mg/kg/day can thus be used as a still very conservative class-specific potency reference point for calculation of acceptable intakes for monofunctional alkyl chlorides. This potency level is at least 10-fold lower than the $TD_{50}$ of 1.25 mg/kg/day corresponding to the default lifetime TTC (1.5 µg/day) and therefore justifies lifetime and less-than-lifetime daily intakes for monofunctional alkyl chlorides 10 times the default ones.

Note 6    Establishing less-than-lifetime acceptable intakes for mutagenic impurities in pharmaceuticals has precedence in the establishment of the staged TTC limits for clinical development (Ref. 16). The calculation of less-than-lifetime Acceptable Intakes (AI) is predicated on the principle of Haber's rule, a fundamental concept in toxicology where concentration (C) x time (T) = a constant (k). Therefore, the carcinogenic effect is based on both dose and duration of exposure.

*Contains Nonbinding Recommendations*



<u>Figure 1</u>: Illustration of calculated daily dose of a mutagenic impurity corresponding to a theoretical 1:100,000 cancer risk as a function of duration of treatment in comparison to the acceptable intake levels as recommended in Section VII.C (7.3).

The solid line in Figure 1 represents the linear relationship between the amount of daily intake of a mutagenic impurity corresponding to a $10^{-5}$ cancer risk and the number of treatment days. The calculation is based on the TTC level as applied in this guidance for life-long treatment, i.e., 1.5 µg per person per day using the formula:

Less-than-lifetime AI = $\dfrac{1.5 \text{ µg} \times (365 \text{ days} \times 70 \text{ years lifetime} = 25{,}550)}{\text{Total number of treatment days}}$

The calculated daily intake levels would thus be 1.5 µg for treatment duration of 70 years, 10 µg for 10 years, 100 µg for 1 year, 1270 µg for 1 month and approximately 38.3 mg as a single dose, all resulting in the same cumulative intake and therefore theoretically in the same cancer risk (1 in 100,000).

The dashed step-shaped curve represents the actual daily intake levels adjusted to less-than-lifetime exposure as recommended in Section VII (7) of this guidance for products in clinical development and marketed products. These proposed levels, are, in general, significantly lower than the calculated values thus providing safety factors that increase with shorter treatment durations.

24

*Contains Nonbinding Recommendations*

The proposed accepted daily intakes are also in compliance with a $10^{-6}$ cancer risk level if treatment durations are not longer than 6 months and are therefore applicable in early clinical trials with volunteers/patients where benefit has not yet been established. In this case, the safety factors as shown in the upper graph would be reduced by a factor of 10.

*Note 7*

**Table 4**: Examples of clinical use scenarios with different treatment durations for applying acceptable intakes

| Scenario[1] | Acceptable Intake (µg/day) |
|---|---|
| **Treatment duration of ≤ 1 month**: e.g., drugs used in emergency procedures (antidotes, anesthesia, acute ischemic stroke), actinic keratosis, treatment of lice | 120 |
| **Treatment duration of > 1-12 months:** e.g., anti-infective therapy with maximum up to 12 months treatment (Hepatitis C Virus), parenteral nutrients, prophylactic flu drugs (~ 5 months), peptic ulcer, Assisted Reproductive Technology (ART), pre-term labor, preeclampsia, pre-surgical (hysterectomy) treatment, fracture healing (these are acute use but with long half-lives) | 20 |
| **Treatment duration of >1-10 years:** e.g., stage of disease with short life expectancy (severe Alzheimer's), non-genotoxic anticancer treatment being used in a patient population with longer-term survival (breast cancer, Chronic Myelogenous Leukemia), drugs specifically labeled for less than 10 years of use, drugs administered intermittently to treat acute recurring symptoms[2] (chronic Herpes, gout attacks, substance dependence such as smoking cessation), macular degeneration, Human Immunodeficiency Virus (HIV)[3] | 10 |
| **Treatment duration of >10 years to lifetime:** e.g., chronic use indications with high likelihood for lifetime use across broader age range (hypertension, dyslipidemia, asthma, Alzheimer's Disease (AD) (except severe AD), hormone therapy (e.g., Growth Hormone, Thyroid Hormone, Para Thyroid Hormone), lipodystrophy, schizophrenia, depression, psoriasis, atopic dermatitis, Chronic Obstructive Pulmonary Disease (COPD), cystic fibrosis, seasonal and perennial allergic rhinitis | 1.5 |

[1] This table shows general examples; each example should be examined on a case-by-case basis. For example, 10 µg/day may be acceptable in cases where the life expectancy of the patient may be limited, e.g., severe Alzheimer's disease, even though the drug use could exceed 10-year duration.

[2] Intermittent use over a period >10 yrs., but based on calculated cumulative dose, it falls under the >1-10 yr. category.

[3] HIV is considered a chronic indication, but resistance develops to the drugs after 5-10 years and the therapy is changed to other HIV drugs.

*Contains Nonbinding Recommendations*

# REFERENCES

1. ICH guidance for industry, 2006, Q3A Impurities in New Drug Substances (Revision 2).

2. ICH guidance for industry, 2006, Q3B(R2) Impurities in New Drug Products.

3. ICH guidance for industry, 2010, M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals.

4. ICH guidance for industry, 2010, S9 Nonclinical Evaluation for Anticancer Pharmaceuticals.

5. ICH guidance for industry, 1996, Q1B Photostability Testing of New Drug Substances and Products.

6. Sutter A, Amberg A, Boyer S, Brigo A, Contrera JF, Custer LL, Dobo KL, Gervais V, Glowienke S, van Gompel J, Greene N, Muster W, Nicolette J, Reddy MV, Thybaud V, Vock E, White AT, Müller L (2013).  Use of in silico systems and expert knowledge for structure-based assessment of potentially mutagenic impurities.  Regul Toxicol Pharmacol 2013 67:39-52.

7. International Conference on Harmonisation, 2011, Q3C(R5): Impurities: Guideline for Residual Solvents, available at http://www.ich.org/fileadmin/Public_Web_Site/ICH_Products/Guidelines/Quality/Q3C/Step4/Q3C_R5_Step4.pdf.

8. ICH guidance for industry, 2009, Q10 Pharmaceutical Quality System.

9. ICH guidance for industry, 2006, Q9 Quality Risk Management.

10. ICH guidance for industry, 2000, Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances.

11. Teasdale A, Elder D, Chang S-J, Wang S, Thompson R, Benz N, Sanchez Flores I, (2013).  Risk assessment of genotoxic impurities in new chemical entities: strategies to demonstrate control.  Org Process Res Dev 17:221−230.

12. ICH guidance for industry, 2012, Q11 Development and Manufacture of Drug Substances.

13. ICH guidance for industry, 2012, S2(R1) Genotoxicity Testing and Data Interpretation for Pharmaceuticals Intended for Human Use.

14. Test 471. Bacterial Reverse Mutation Test, OECD Guideline for Testing of Chemicals, Section, 4 July 1997.

*Contains Nonbinding Recommendations*

15. Brigo, A and Müller, L (2011). Development of the Threshold of Toxicological Concern Concept and Its Relationship to Duration of Exposure, in Genotoxic Impurities (Ed. A. Teasdale), John Wiley & Sons, Inc., Hoboken, NJ, USA. doi: 10.1002/9780470929377.ch2.

16. Müller L, Mauthe RJ, Riley CM, Andino MM, De Antonis D, Beels C, DeGeorge J, De Knaep AGM, Ellison D, Fagerland J, Frank R, Fritschel B, Galloway S, Harpur E, Humfrey CDN, Jacks ASJ, Jagota N, Mackinnon J, Mohan G, Ness DK, O'Donovan MR, Smith MD, Vudathala G, Yotti L (2006). A rationale for determining, testing, and controlling specific impurities in pharmaceuticals that possess potential for genotoxicity. Regul Toxicol Pharmacol 44:198-211.