# APPENDIX OF UNPUBLISHED AUTHORITIES

*Cole's Wexford Hotel, Inc. v. Highmark, Inc.*,
   No. 2:10-cv-01609-JFC,
2019 U.S. Dist. LEXIS 142214 (W.D. Pa. May 31, 2019)................................ Tab 1

 Neutral

As of: December 19, 2022 9:04 PM Z

## *Cole's Wexford Hotel, Inc. v. Highmark, Inc.*

United States District Court for the Western District of Pennsylvania

May 31, 2019, Decided; May 31, 2019, Filed

Case No. 2:10-cv-01609-JFC

**Reporter**

2019 U.S. Dist. LEXIS 142214 *; 2019 WL 3778090

COLE'S WEXFORD HOTEL, INC., On their own behalf and on behalf of all others similarly situated, Plaintiff, v. HIGHMARK, INC., Defendant.

**Prior History:** *Royal Mile Co. v. UPMC, 2013 U.S. Dist. LEXIS 190042 (W.D. Pa., Apr. 9, 2013)*

**Counsel:** [*1] For RICHARD A. LEVIE, Special Master: Richard A. Levie, LEAD ATTORNEY, JAMS, Washington, DC.

For ROBERT J. TOWN, Special Master: Robert Town, LEAD ATTORNEY, Philadelphia, PA.

For ROYAL MILE COMPANY, INC., PAMELA LANG, COLE'S WEXFORD HOTEL, INC., on their own behalf and on behalf of all others similarly situated, Plaintiffs: Andrew M. Stone, LEAD ATTORNEY, Stone Law Firm, LLC, Pittsburgh, PA; Kathleen S. Kiernan, LEAD ATTORNEY, Evan E. North, PRO HAC VICE, Hamish Hume, Melissa Felder Zappala, Boies, Schiller & Flexner LLP, Washington, DC; Scott Michael Hare, LEAD ATTORNEY, Pittsburgh, PA; Arthur H. Stroyd , Jr., Patrick K. Cavanaugh, Stephen J. Del Sole, Del Sole Cavanaugh Stroyd LLC, Pittsburgh, PA; David S. Stone, Stone and Magnanini, Berkeley Heights, NJ; Joshua P. Riley, PRO HAC VICE, Boies, Schiller & Flexner, LLP, Washington, DC; Julio C. Gomez, PRO HAC VICE, Stone & Magnanini LLP, Berkeley Heights, NJ.

For UPMC, and, Defendant: Keith E. Whitson, LEAD ATTORNEY, Emily Ayoub Spanovich, George E. McGrann, Paul H. Titus, Schnader, Harrison, Segal & Lewis, Pittsburgh, PA; Anderson T. Bailey, Leon F. DeJulius, Rebekah B. Kcehowski, Jones Day, Pittsburgh, PA; Kathryn M. Fenton, PRO HAC VICE, [*2] Jones Day, Washington, DC.

For HIGHMARK, INC., Defendant: Alexander W. Saksen, John G. Ebken, LEAD ATTORNEY, Gordon & Rees, Pittsburgh, PA; Allyson M. Maltas, Elyse M. Greenwald, LEAD ATTORNEY, Jennifer L. Giordano, Margaret M. Zwisler, PRO HAC VICE, Latham & Watkins LLP, Washington, DC; William M. Friedman, LEAD ATTORNEY, Latham & Watkins LLP, Washington, DC; Alfred C. Pfeiffer, PRO HAC VICE, Latham & Watkins LLP, San Francisco, CA; Richard T. Victoria, Gordon & Rees, Pittsburgh, PA.

For PG PUBLISHING CO., Intervenor: Frederick N. Frank, LEAD ATTORNEY, Frank, Gale, Bails, Murcko, & Pocrass, P.C., Pittsburgh, PA; Ellis W. Kunka, Frank, Gale, Bails, Murcko & Pocrass, P.C., Pittsburgh, PA; John M. Schaffranek, Pittsburgh, PA.

## Opinion

**Special Master Report and Recommendation No. 6 Requests to Seal Certain Materials Related to Plaintiff's Motion for Class Certification**

Go to table1

**Introduction**

Pending before the Special Master are requests by Highmark, Inc. and the University of Pittsburgh Medical Center (UPMC) to seal, in whole or in part, written materials related to Plaintiff's Motion for Class Certification. Currently, Highmark's sealing chart numbers 116 single-spaced pages, while

2019 U.S. Dist. LEXIS 142214, *2

UPMC's sealing chart numbers 56 pages, on tabloid-size paper. Highmark and UPMC's primary argument is that the public's presumptive right of access to these materials is outweighed by their interest in maintaining the secrecy of confidential commercial information so that their competitors do not gain a competitive advantage over them. The documents Highmark and UPMC[1] seek to seal include portions of the transcripts of the court hearings on class certification, exhibits submitted during those hearings, excerpted deposition transcripts, class certification documents filed with the Court, and reports of Plaintiff's and **[*5]** Highmark's experts.

As matters have proceeded in court on the class certification issues, the Court recently appointed a Technical Advisor to assist the Court. The advisor prepared a report, a redacted version of which was filed with the Court. (ECF Nos. 642/639). The parties then filed responses to the Technical Advisor's report under seal, and the advisor filed a reply. (ECF Nos. 646, 647, 668). In connection with the work done by Plaintiff's expert on the class certification issues, the Court held a *Daubert* hearing on May 15, 2019. Plaintiff and Highmark filed redacted briefs on the *Daubert* issues. (ECF 655, 656). Highmark has requested sealing of portions of the *Daubert* hearing transcript, the Technical Advisor's report, and the *Daubert* briefs, but has not submitted a sealing chart or argument to the Special Master as of the time of this Report and Recommendation.

Plaintiff takes no position on Highmark's and UPMC's efforts on sealing documents filed in connection with the class certification proceedings. (*See, e.g.*, ECF No. 534 at 2). Moreover, to date,

no third party has sought to intervene to argue for public access to the class certification proceedings.[2]    Thus,    consideration **[*6]** of Highmark's and UPMC's efforts to keep documents sealed is not informed by an adversarial process. Nevertheless, the jurisprudence of the Third Circuit makes clear that, regardless of whether any opposition is presented, the Court has an independent obligation to assess whether Highmark and UPMC have satisfied their burdens to overcome the strong presumption of public access. (*See infra* Section IV.A. pp. 32).

In the course of examining the requests for sealing, Highmark and UPMC have had extensive opportunities to make their legal arguments as evidenced by the submission of six formal letter briefs and responses to numerous emails sent by the Special Master seeking additional information or clarification of their positions. In addition, Highmark and UPMC each had separate, in-person hearings with the Special Master regarding their sealing requests. The Special Master has also held multiple teleconferences with Highmark and UPMC and, in some instances, with Plaintiff.

To satisfy the burdens and responsibilities the Third Circuit places on the moving parties and the court (here the Special Master), a significant factual **[*7]** record had to be developed covering events from the late 1990s to the present. Highmark and UPMC had a full opportunity to develop a detailed factual and legal record in support of their claims of confidentiality, moving from their original arguments for sealing categories of information to detailed arguments at a document-level, if not a line by line level. In addition to revising their sealing charts a number of times to better explain their factual arguments for sealing, the moving parties have also submitted numerous declarations. To date, Highmark submitted eight declarations from two employees,

---

[1] By the time the Motion for Class Certification was filed, UPMC had settled with Plaintiff. Plaintiff and UPMC reached a settlement agreement, which the Court approved in July 2016. (ECF Nos. 414, 415). UPMC was then dismissed from the action. (*Id.*) Inasmuch as UPMC documents are included in the record before the Court on the class certification motion, UPMC has requested the sealing, in whole or part, of certain of its documents. It also seeks to seal other documents from Highmark's files that contain information about Highmark-UPMC transactions that UPMC does not want to disclose to other competitors.

[2] Members of the press attended at least one day of the class certification hearings (*see, e.g.*, Matthew Santoni, *Insurer Says Hotel Can't Prove Alleged Conspiracy's Impact*, Law360 (Sept.         19,         2018, https://www.law360.com/articles/1084270/insurer-says-hotel-can-t-prove-alleged-conspiracy-s-impact).    Part    of    that proceeding was conducted in a sealed courtroom.

and UPMC submitted three revisions of a declaration from one employee, with the last revision totaling 41 pages of text.

To their credit, Highmark and UPMC in many cases seek to seal discrete portions of the documents; only rarely do they seek to seal an entire document. This specificity, however, exponentially increases the number of sealing decisions before the Special Master, and prolongs the time necessary to complete the Court's charge to the Special Master.[3]

A factual issue that came to the Special Master's attention in May is whether information relating to the terms of the 2002, 10-year [*8] agreement between Highmark and UPMC are confidential as the moving parties claim or are, in fact, in the public domain. [*See* _West Penn Allegheny Health System, Inc. v. UPMC, 2011 U.S. Dist. LEXIS 149143, 2011 WL 13133997 (Dec. 29, 2011)_ (J. Schwab)(declining to seal documents when Court found "West Penn Allegheny and Highmark have released specific financial and other purportedly confidential business information through their own websites, advertisements, and news releases.")]. Given the length and nature of the relationship between Highmark and UPMC, it is not surprising that information regarding the relationship between Highmark and UPMC appears in many of the historic documents filed by the parties, and is quoted and discussed in the expert reports and testimony. Highmark and UPMC responded to an inquiry posed by the Special Master with letter briefs on May 21, 2019. The Special Master is now examining the findings and recommendations that he had previously prepared before this issue came to light; the Special Master's recommendations will be set forth in the upcoming supplemental report and recommendation.

As a result of the volume of material submitted for review, the expansion of materials filed with the Court and the exchange of communications between the Special Master and Highmark [*9] and UPMC, the Special Master believes that the submission of an initial Report and Recommendation, followed by one or more supplemental Reports and Recommendations is the preferable way to present these matters to the Court.

This Report and Recommendation No. 6 contains a detailed analysis of current Third Circuit law on sealing, and the Special Master's findings and recommendations related to nine issues of raised by Highmark and/or UPMC which impact multiple exhibits. This Report and Recommendation also provides findings and recommendations for a specific number of documents.

Following issuance of the instant Report and Recommendation, the Special Master expects to supplement this Report and Recommendation to make recommendations on sealing additional documents submitted in connection with the class certification motion plus materials related to the Technical Advisor's report, the *Daubert* briefs and the *Daubert* hearing.[4]

For the reasons that follow, the Special Master recommends that the Court grant in part and deny in part the requests of Highmark and UPMC to seal documentary materials related to class certification.

## I. Background

## A. Factual Background

### 1. Alleged Anti-competitive Conspiracy [*10] [5]

---

[3] The materials sought to be sealed make up seven large binders: three binders of exhibits submitted with the class certification briefs; one binder of previously sealed exhibits submitted by Highmark; one revised binder for Pl. Ex. 14 and 28; and two binders containing the transcripts of the hearings on class certification, as well as materials submitted to the Court during those hearings. In addition to the binders are the letter briefs related to class certification, which contain requested redactions.

[4] Another topic for a supplement to this Report and Recommendation relates to sealing the letter briefs submitted to the Special Master by Highmark and UPMC concerning their sealing requests.

[5] In describing Plaintiff's allegations here the Special Master draws from and quotes Plaintiff's Third Amended Complaint

2019 U.S. Dist. LEXIS 142214, *10

This putative class action alleges the largest health insurer (Highmark) and the largest hospital system (UPMC) in Western Pennsylvania conspired to "monopolize both the market for medical care and the market for health insurance in the Western Pennsylvania area." [Plaintiff's Third Amended Complaint (ECF No. 286 at □□ 1-2)]. This conspiracy, Plaintiff alleges, allowed Highmark to impose "inflated, supracompetitive premiums on its small group plan subscribers." (*Id.*).

In particular, Plaintiff alleges that UPMC and Highmark were bitter rivals until the CEO of UPMC, Mr. Romoff, proposed a "truce" with Highmark in the late 1990s. (*Id.* at □ 70). In the summer of 2002, Plaintiff alleges Highmark agreed to the truce, which led to "frequent meetings between Highmark executives, including at least Ken Melani, and UPMC executives, including at least UPMC Executive Vice President John Paul." (*Id.* □ 72). "These discussions led to the formation of a broad, and illegal, agreement between Highmark and UPMC to restrain health care competition in the Pittsburgh community." (*Id.*)

As part of this overall agreement, the two parties in 2002 "entered into a new 10-year participating provider agreement-originally **[*11]** set to expire in June 2012 . . . ." (*Id.* at □ 73). In the Third Amended Complaint Plaintiff characterizes 2002-2012 as the "Conspiracy Period" asserting that "Highmark and UPMC have conspired to protect one another from competition, enhancing and ensuring their respective monopolies." (*Id.* at □ 21). Plaintiff alleges further that UPMC agreed to protect Highmark "by refusing to contract on reasonable terms with any competing health insurer or to sell its health insurance affiliate to any competing health insurer, thus relegating major national insurers such as United, Coventry, and Aetna to marginal participation (at best) in the Western Pennsylvania market."

According to the Third Amended Complaint, UPMC agreed to curtail marketing its own "competing insurance products." (*Id.* at □ 22). In exchange, Highmark agreed to close its "low-cost Community Blue product," pay "excessive reimbursement to UPMC while maintaining depressed reimbursements for UPMC's competitors, especially West Penn Allegheny," among other agreements. (*Id.*) Plaintiff alleges Highmark passed on the increased "costs of UPMC's charges to employers, consumers, and patients by charging higher premiums." (*Id.*)

## 2. The Putative **[*12]** Class

The putative class consists of "over 10,000 small businesses in Western Pennsylvania." [Plaintiff's Memorandum in Support of Motion for Class Certification at 1 (ECF No. 534-1)]. Specifically, the putative class are businesses that purchased small group health insurance from Highmark "or similar for-profit subsidiary of Highmark, Inc. between approximately July 1, 2010 and approximately March 21, 2012." (*Id.* at ¶ 11)(the "Class Period"). Plaintiff, as a purchaser of small group insurance from Highmark and its subsidiary, filed suit on behalf of several named plaintiffs and others similarly situated in the case. One named Plaintiff now remains in the case.

## B. Procedural Background

## 1. Motion to Certify Class

In February 2018, Plaintiff filed a Motion to for Class Certification. (ECF Nos. 524). Both Plaintiff and Defendant Highmark filed expert reports by economists in support of their positions. (*See* Pl. Exs. 1[6] and 42[7] Def. Exs. 1[8] and 11).

The primary dispute between Plaintiff and Highmark regarding class certification appears to be whether Plaintiff has met the requirements of *Rule 23(b)(3) of the Federal Rules of Civil*

---

(ECF No. 286). The description of Plaintiff's allegations here does not represent any finding by the Special Master.

---

[6] Expert Report of Robin Cantor, Ph.D. (Mar. 13, 2018)(ECF No. 527-1 and ECF No. 548-6).

[7] Rebuttal Expert Report of Robin Cantor, Ph.D. (June 11, 2018) (ECF No. 527-42).

[8] Expert Report of Dr. John H. Johnson, IV (May 17, 2018) (ECF No. 548-1).

2019 U.S. Dist. LEXIS 142214, *12

*Procedure* that common questions predominate over individual questions. [*See, e.g.*, Highmark's Opp. Br. at i (ECF No. 547) and Sept. **[\*13]** 19, 2018, Tr. at 19-23)]. Because Plaintiff's economic expert has run various analyses of data from and about Highmark and UPMC to show that increased costs increased premiums during the alleged conspiracy period, Plaintiff argues that there is common evidence to show common impact. Central to the methodology of Plaintiff's expert is "Highmark's own rate-setting formula." (*See, e.g.*, Pl. Exs. 1 at 43 and 51 submitted at Sept. 19, 2018, Hearing). Highmark argues, among other things, that Plaintiff misunderstands how Highmark sets its base rate. (*See, e.g.*, Highmark June 1, 2018, Ltr. Br. n.3,[9] and Sept.19, 2018, Tr. 115:2-11).[10]

On September 19, November 9, and November 20, 2018, the Court held hearings on class certification. During the hearings, the experts presented by Plaintiff (Dr. Cantor) and Highmark (Dr. Johnson) testified in a "hot tub proceeding."[11] In addition, Mr. William Cashion, Highmark's Chief Actuary, testified as a fact witness.[12] Each party

also made oral presentations to the Court, accompanied by PowerPoint presentations. Counsel for UPMC attended the September 19 hearing, including the "hot tub" portion, to "protect" UPMC information that had been produced under the Stipulated **[\*14]** Protective Order and conditionally sealed. (*See, e.g.*, Sept. 19, 2018, Tr. at 7-8). At the request of Highmark, the Court closed portions of the hearings by clearing the courtroom for certain portions of the testimony and argument. (*See* Tr. Sept. 19, 2018, at 26-28; Tr. Nov. 9, 2018, at 5-6; and Tr. Nov. 20, 2018, at 8-9).

After considering the testimony presented by the parties, the Court "[i]n light of diametrically opposing views of the parties and the difficult economic issues raised by their arguments," on January 25, 2019, appointed a technical advisor to assist the Court in assessing the reliability of the proposed methodology of Plaintiff's expert. (ECF Nos. 619 and 630 at 3).

On March 1, **[\*15]** 2019, the Court entered an order denying Plaintiff's motion to certify a class as premature "because the parties did not address *Daubert* in their briefing with respect to class certification or cite to evidence of record in support of *Daubert* requirements." (ECF No. 630 at 15; *see also* ECF No. 631).

The court-appointed technical advisor's report was provided to the parties and a redacted version of the report was filed on March 6, 2019. (ECF No. 639). The Court allowed Plaintiff and Highmark to file responses to the Technical Expert report, and the Technical Expert was permitted to file a reply. (*See* Minute Entry Mar. 3, 2019). The Court allowed these documents to be conditionally filed under seal. (*See* ECF No. 644). The parties also

---

[9] "The expert report and deposition testimony of Plaintiff's expert (Pl. Ex. 1; Def. Exs. 3, 6) also grossly misstate the confidential process by which HHIC set small group health plan premiums . . . ." (Highmark June 1, 2018, Ltr. Br. n.3).

[10] The Special Master notes these arguments to provide factual context for recommendations concerning sealing. The Special Master takes no position on the merits of the parties' arguments concerning class certification.

[11] Pursuant to Order for Presentation of Concurrent Expert Evidence, filed July 25, 2018 (ECF 567), the experts of each party were sworn in and placed in the jury box, side by side- the "hot tub." Each expert gave opening statements of their opinions, and then were invited to ask "each other questions and engage in a discussion with respect to the matters of disagreement" (ECF 567 □ 4). Thereafter counsel cross examined the experts and the experts made closing statements.

[12] Highmark's counsel argued that Mr. Cashion should be allowed to testify as a fact witness, because:

Dr. Cantor has not identified a reliable method capable of common proof to show that that alleged increase in healthcare costs automatically increased base rates and an increase in base rates automatically increased premiums. She has no method to show that. That is because she used, instead of making up her own

method, she used Highmark's own methodology for setting rates. That's why we brought Mr. Cashion to testify, because he's in charge of this. He is the chief actuary for Highmark."

(Sept. 19, 2018, Tr. 69:6-15). Thereafter, the Court directed Plaintiffs be allowed to depose Mr. Cashion again before he testified in Court on November 19, 2018, (*id.* at 182:21-183:6), and directed the experts to file supplemental reports after Mr. Cashion's deposition and in-court testimony. (*Id.* 183:8-189:8),

Case 1:19-md-02875-RMB-SAK    Document 2208-10    Filed 12/19/22    Page 7 of 45
PageID: 76195

Page 6 of 44
2019 U.S. Dist. LEXIS 142214, *15

were permitted to file briefs under seal seeking to exclude the opinions of each other's expert related to class certification. (*Id.*). The Court heard argument on the *Daubert* issues on May 15, 2019. (ECF No. 632).

## 2. Requests to Seal

### (a) Court Direction to Special Master Regarding Sealing

In granting a joint Motion for Conditional Sealing of Class Certification Briefing,[13] the Court directed the Special Master to issue a "Report and Recommendation that addresses **[*16]** all materials for which a sealing request has been made in connection with the class certification briefing." (ECF No. 546). Many of the exhibits on which Plaintiff relies in the class certification motion had been designated "Highly Confidential-Outside Counsel/Experts Only" by defendant Highmark or then-defendant UPMC when they produced these documents during discovery in accordance with the Stipulated Protective Order (ECF No. 76).[14] The Protective Order was an umbrella order limiting how the parties could use the materials produced to and by them during discovery. Consistent with LCvR 5.4, the discovery materials, when produced,

---

[13] *Rule 5.2.H* of the Local Rules of the Western District provides:

> **Leave of Court Required to File Under Seal.** A party wishing to file any document under seal must obtain prior leave of Court for each document that is requested to be filed under seal. A party must file a motion seeking leave to file such documents under seal. Only after obtaining an order of Court granting such a motion will a party be permitted to file a document under seal.

[14] The Stipulated Protective Order (ECF No. 76) was a broad protective order, under which the parties could unilaterally designate as "Highly Confidential-Outside Counsel/Experts Only" materials the designating party "reasonably and in good faith believes" are "highly sensitive confidential or proprietary information" and which, if disclosed, would "have a substantial likelihood of compromising or jeopardizing that Party's business interests . . .." [*Id.* at (C)(1)]. Notably, the parties were not required to challenge the propriety of the designations at the time the designation were made. [*Id.* at (C)(7)].

were not filed with the Clerk of Court.

In addition to the documents submitted, the Court directed the Special Master to review those portions of the class certification hearing **[*17]** transcripts that the Court conditionally had sealed and to make a recommendation on final sealing. (Minute Entry, Aug. 21, 2018). Highmark and UPMC identified for the Special Master those portions of the hearing transcripts for which they requested sealing, as well as those portions of materials submitted to the Court during the hearings for which they requested sealing. (*See* Highmark's Dec. 7, 2018, Sealing Chart and Third Supplemental Declaration of William J. Cashion, and Dec. 7, 2018, UPMC Letter to the Special Master).

### (b) Refining the Volume of Documents for Sealing

The Court and the Special Master requested the parties and UPMC to reduce the volume of materials sought to be placed under seal. At the Court's request, Plaintiff, Highmark, and UPMC met and conferred in an effort to minimize the amount of material filed under seal in connection with the Class Certification motion. Highmark and UPMC agreed that some of the exhibits they had produced need not be designated "Highly Confidential-Outside Counsel/Experts Only" and thus did not need to be submitted under seal. (*See* ECF Nos. 535-540). Highmark also modified its initial request to seal the expert reports in their entirety **[*18]** to request redaction only of designated portions of those reports. (*See* Highmark July 13, 2018, Ltr. Br. at 1). In conference calls throughout the summer of 2018, the Special Master urged Plaintiff to consider whether it needed to submit full copies of various exhibits. Plaintiff then excerpted some of the exhibits it had submitted to support class certification. (*See, e.g.*, July 13, 2018, Ltr. Br., Ms. Kcehowski to the Special Master at 2).

The Special Master also requested Plaintiff to again review Plaintiff Exhibits 17 and 29 for possible reduction of portions requiring sealing, noting that these two exhibits were over 600 pages and Plaintiff had cited only nine of those pages in its briefs on class certification. [*See* Feb. 11, 2019

Ltr., Special Master to Plaintiff]. Plaintiff declined to excerpt Plaintiff Exhibits 17 and 29, (*see* Feb. 19, 2019 Ltr., Mr. D. Stone to the Special Master, at 1-2), for reasons addressed *infra* Section IV.H (pp. 60).

c. Materials Submitted to the Special Master in Connection with Requests for Sealing

The Special Master has considered:
- the June 1, 2018, June 20, 2018, and the July 2, 2018, letter briefs submitted by Highmark and UPMC;

- Highmark's August 31, 2018, letter and September 13, 2018, email concerning documents Highmark states Judge Conti had previously **[*19]** sealed;
- Highmark's September 14, 2018, February 22, 2019, and March 22, 2019, letters concerning Pl. Exs. 17 and 29;
- Highmark's September 13, 2018, email responding to questions from the Special Master;
- UPMC's Sept. 21, 2018, letter withdrawing sealing request for the 230% figure in Pl. Ex. 1 and Def. Ex. 6;
- UPMC's February 20, 2019, letter responding to the Special Master's email of February 13, 2019, seeking background on the 2002 Term Sheet (Pl. Ex. 14) and the 2002 Payor-Provider contracts;
- Plaintiff's March 27, 2019, email providing Plaintiff's Exhibit 12 and confirming Plaintiff had not withdrawn this exhibit;
- UPMC's and Highmark's May 21, 2019, letters responding the Special Master's requests to review a number of specified exhibits in light of public documents suggesting sealing was being sought to protect information that was in the public domain;
- Numerous letter briefs from Highmark and UPMC that are referenced in this Report and Recommendation in connection with specific issues before the Special Master.

d. Third-Party Requests

Third-party Allegheny Health Network sent letters to the Special Master arguing for the sealing of Plaintiff's Exhibits 22 and 23. These two **[*20]** documents had been produced in the course of this litigation from what then was West Penn Allegheny Health System, Inc.[15] (*See* Aug. 8, 2018, Ltr. from Ms. Bauer, General Counsel to Allegheny Health Network to the Special Master). Allegheny Health Network then sent a second letter requesting that the Special Master seal Plaintiff's Exhibits 17 and 29. (*See* Ltr. from Ms. Bauer to the Special Master, undated, rec'd by email Aug. 14, 2018).

Shortly after receiving Allegheny Health Network's first request to seal, the Special Master sent a detailed letter to Allegheny Health Network noting deficiencies in its request to seal and inviting Allegheny Health Network to correct what the Special Master stated were deficiencies in its August 8th letter under Third Circuit law. (*See* Aug. 8, 2018, Ltr. Special Master to Ms. Bauer).[16] After hearing nothing from Allegheny Health Network regarding Plaintiff's Exhibits 22 and 23 and seeing that Allegheny Health Network's requests to seal Plaintiff's Exhibits 17 and 29 contained similar deficiencies as had Allegheny Health Network's request regarding Exhibits 22 and 23, the Special Master and his Counsel each followed up with Allegheny Health Network in **[*21]** September 2018. (*See* Sept. 19, 2018, email from Ms. Anderson to Ms. Bauer, and Sept. 20, 2018, email

---

[15] In 2013, Allegheny Health Network became the sole member of West Penn Allegheny Health System, Inc. (*See* Fitzpatrick Aug. 21, 2018, Decl. at □ 18, and Aug. 8, 2018, Ltr. from Ms. Bauer to the Special Master at 1).

[16] Allegheny Health Network did not provide any evidence or declarations to support of the factual statements in the letters written by its General Counsel. [*Cf. Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 529 F. Supp. 866, 891 (E.D. Pa. 1981)*(Becker, J.) ("the specific instances where disclosure will inflict a competitive disadvantage should be set forth in more than the briefs or the hearsay allegations of counsel's affidavit, for a protective order should not issue on that basis alone")]. If the absence of such support would be fatal to issuance of a **Rule 26(c)** protective order, the absence here with a much higher burden upon the movant is critical. The Special Master called these omissions to the attention of AHN by email dated Sept. 17, 2018.

2019 U.S. Dist. LEXIS 142214, *21

from the Special Master to Ms. Bauer). Allegheny Health Network did not respond to the email from the Special Master or his Counsel.

Allegheny Health Network argues that these reports contain "competitively sensitive data and information," which WPAHS had supplied to PID with the expectation that PID would maintain as confidential. (Ltr. from Ms. Bauer to the Special Master, undated, rec'd by email Aug. 14, 2018, at 2). AHN states that PID has maintained the confidentiality of those reports, although it notes the PID has on its website a redacted version of Plaintiff's Exhibit 17. (*Id.* at n.1 and 2). Allegheny Health Network also makes several specific arguments that the release of these 2012 and 2013 reports will reveal proprietary information to its competitors. (*Id.* at 2-3). Allegheny Health Network's final argument is that Plaintiff's Exhibits 17 and 29 should be sealed because much of the content of "these reports has no relevance to plaintiff's class certification motion" and "plaintiff does not rely on any (or virtually any) of WPAHS's or [the Integrated Delivery and Financing System's] **[*22]** confidential information." (*Id.* at 3). These arguments, consisting solely of assertions by counsel, mirror the moving parties arguments, which are addressed *infra* Sections IV.B (pp. 36-39) and IV.H (pp. 58-59, 64-68).

Defendant Highmark indicated that another third-party, Highmark Health,[17] also wanted to seal Plaintiff's Exhibits 17 and 29. (*See* Sept. 14, 2018, Highmark Ltr. Br.). Although the Special Master offered to consider any argument and declarations Highmark Health submitted (*see* Sept. 17, 2018, email from Ms. Anderson, Counsel to the Special Master, to Highmark, Inc.), Highmark Health submitted nothing to the Special Master, either directly or through Highmark, Inc. Accordingly, inasmuch as Highmark Health submitted nothing to the Special Master, the Special Master has no basis for making a sealing recommendation as to Plaintiff's Exhibits 17 and 29 based upon any

interest of Highmark Health.

With both Highmark and third parties seeking to seal Plaintiff Exhibits 17 and 29 on the ground that the Pennsylvania Commissioner of Insurance (PID) deemed these documents to be confidential, the Special Master sent a letter to the PID, asking whether the department desired to maintain the confidentiality-in **[*23]** whole or in part-of the reports submitted with Plaintiff's Class Certification Motion as Exhibits 17 and 29. (*See* Ltr. Jan. 19, 2019, Special Master to Commissioner Altman). The Chief Counsel of the PID responded by letter, dated February 8, 2019, "urg[ing] that the unredacted Compass Lexecon and Harris Reports remain confidential."[18] The recommendation of the Special Master with respect to Plaintiff Exhibits 17 and 29 (*infra* Section IV.H pp. 58-68) is based upon the arguments advanced by Highmark, UPMC, and the PID only.

## II. Arguments of Highmark and UPMC

### A. Highmark

Highmark contends that public disclosure of the material it seeks to seal will cause Highmark to suffer "severe competitive injury." (*See, e.g.*, June 1, 2018, Highmark Ltr. Br. at 3). Highmark divides the material it asks to seal into three broad categories: (1) documents containing Highmark's actuarial modeling and data, pricing, rates, and contract terms; (2) documents discussing Highmark's internal deliberation and strategies related to its negotiations with hospitals and, also, with its competitors; and (3) documents discussing Highmark's internal deliberations and strategies related to the Community Blue insurance **[*24]** product that it marketed and sold from 1998 to 2004. (*See* Highmark June 1, 2018, Ltr. Br. at 2).

Additionally, Highmark argues that categories 1 and 3 contain information that, if made public, will result in public confusion to Highmark's commercial

---

[17] Highmark Health is the parent corporation of Allegheny Health Network and Highmark, Inc. (*See* Fitzpatrick Aug. 21, 2018, Decl. at □ 18, and Aug. 8, 2018, Ltr., Ms. Bauer to the Special Master at 1).

[18] The reasoning underlying this conclusion by PID and the Special Master's recommendation is discussed in detail *infra* Section IV.H (pp. 58-68).

detriment; accordingly, it asks that these documents be sealed to avoid that confusion. (*See* Highmark June 1, 2018, Ltr. Br. at n.3 and at p. 6).

Highmark also asserts that the Court already has sealed certain materials in the context of briefing for the UPMC settlement and Highmark's motion for summary judgment and that those earlier sealing orders should be accepted as dispositive here. (*See* Highmark Aug. 31, 2018, Ltr. Br. at 1-2, and Sept. 13, 2018, email from Highmark to Ms. Anderson).

To establish a factual record for its sealing requests, Highmark submitted four declarations of Thomas J. Fitzpatrick, Highmark's Senior Vice President for Provider Contracting, Relations, and Partnerships (May 30, 2018, July 10, 2018, August 21, 2018, and Feb. 22, 2019), and four declarations of William J. Cashion, Highmark's Chief Actuary (May 31, 2018, July 12, 2018, August 23, 2018, and December 6, 2018).

## B. UPMC

UPMC argues that failure to seal or redact **[*25]** the documents it has identified will disclose confidential business information and inflict "clearly defined and serious injury" to UPMC's competitive standing. (*See* UPMC June 2, 2018, Ltr. Br. at 5). UPMC asserts that the "subject matter of confidential business information is broad, including a wide variety of business information.'" (UPMC June 1, 2018, Ltr. Br. at 4).

UPMC identifies three categories of documents for sealing: (1) documents produced by UPMC, which it characterizes as containing, among other information, "highly sensitive patient-treatment and claims data, portions of UPMC emails and memoranda drafted and received by UPMC's most senior leadership regarding strategic issues and decisions, and excerpts from a deposition of UPMC's CEO discussing high-level UPMC strategies;" (2) documents produced by Highmark before UPMC settled (to which UPMC's outside counsel has access); and (3) documents produced by the parties after UPMC settled, including the parties' expert reports. (*See* UPMC June 1, 2018,

Ltr. Br. at 3-4). UPMC explains it has "independent confidentiality interests in the second and third categories" because these documents reflect, among other information, "UPMC's **[*26]** strategic planning and financial analyses; UPMC's business goals, plans for growth, and contracting and negotiating strategies," as well as "confidential descriptions of high-level business interactions between UPMC and Highmark." (*Id.* at 4).

UPMC additionally argues that, as it is no longer a party to this litigation, it has "a heightened privacy interest in preventing disclosure of its confidential information." (UPMC June 20, 2018, Ltr. Br. at 5 and 7). It styles itself as a third-party and cites cases affording non-involved entities added protection on privacy grounds.

Finally, UPMC argues that those portions of exhibits attached to briefs, but not quoted in the briefs, are not judicial records subject to the presumptive right of public access. (*See, e.g.*, UPMC Aug. 31, 2018, Ltr. Br. at 5-6).

In support of its factual arguments about confidential commercial information and competitive harm, UPMC submitted a declaration from David Farner, UPMC Executive Vice President and Chief Strategic and Transformation Officer, with three subsequent revisions. (May 31, 2018, July 12, 2018, and August 29, 2018).

## III. Applicable Law

It is beyond dispute that there is a strong presumption that United States' **[*27]** courts will operate, not in secret, but in the public eye. Although the doctrine of public access was first identified by the Supreme Court in the context of criminal trials, [*see Nixon v. Warner Communications, 435 US 589, 598, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978)* and *Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)* (plurality opinion)], the Third Circuit extended the doctrine to civil proceedings and judicial records almost 35 years ago in *Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984)*. In *Publicker* the Third Circuit made the prescient observation

Case 1:19-md-02875-RMB-SAK    Document 2208-10    Filed 12/19/22    Page 11 of 45
PageID: 76199

Page 10 of 44
2019 U.S. Dist. LEXIS 142214, *27

that "we can be reasonably certain of the recurrence of the exclusion of the public and the press from hearings to decide whether potentially injurious business matters should be kept secret." (*733 F.2d at 1066*).

*Publicker* went on to hold that the public and press possess a right of access to civil proceedings under both the common law and the *First Amendment*. (*Id. at 1071*). It explained public access to civil proceedings is important because access: "enhances the quality and safeguards the integrity of the factfinding process;" "fosters an appearance of fairness;" "heightens 'public respect for the judicial process;'" "permits the public to participate and serve as a check upon the judicial process-an essential component in our structure of self-government," and "plays an important role in the participation and the free discussion of governmental affairs." **[*28]** [*Id. at 1070* (citations omitted)]. "The practical effect of the right to access doctrine is to create an independent right for the public to view proceedings and to inspect judicial records." (*In re Cendant Corp., 260 F.3d 183, 193 (3d Cir. 2001)*).

Since *Publicker*, the Third Circuit developed "three distinct standards when considering various challenges to the confidentiality of documents." (*Avandia Marketing, Sales Practices and Products Liability Litigation, 924 F.3d 662, 2019 WL 2119630 at *2 (3d. Cir. May 15, 2019)*. The first applicable to issuance of protective orders for discovery under *Federal Rule of Civil Procedure 26* is not at issue in the present matter.[19] Here, the "more rigorous common law right of access when discovery materials are filed as court documents" is at issue, as potentially is the most stringent standard which attaches under the *First Amendment*. (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *2)*. The Special Master discusses the common law and *First Amendment* standards in turn, and then outlines the qualified exception to public access most relied on by the movants here.

## A. Common Law

The common law standard begins with the presumption that "the public has a right of access to judicial materials." (*924 F.3d 662, Id. at *4*). "The common law right of access 'antedates the Constitution.'" [*Id.*, quoting *Bank of America v. Hotel Rittenhouse, 800 F.2d 339, 343 (3d Cir. 1986)]*. This right attaches to judicial proceedings and records." (*Cendant, 260 F.3d at 192*). Whether a document in issue is considered to be a "judicial record," "depends on whether [the] document has been filed with **[*29]** the court or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." (*Id.*). The act of filing is the most significant consideration in determining if a document is judicial record. [*See North Jersey Media Group, Inc. v. United States, 836 F.3d 421, 434 (3d Cir. 2016)]*. The Special Master reads and applies *Cendant's* articulation of "judicial record" to mean that documents submitted to the Special Master, functioning as a *Rule 53* adjunct of the Court, are "incorporated [and] integrated "in the Court's adjudicatory process.

Although the early cases focused on judicial records in the form of transcripts of court proceedings and exhibits admitted during those proceedings, the Third Circuit found "judicial records" to include motions and attached documents filed with the court. The heart of the inquiry is directed to the question of whether the district court's "action on a motion [is a] matter[ ] which the public has a right to know about and evaluate." (*Bank of America v. Hotel Rittenhouse, 800 F.2d 339, 344*). The Third Circuit has drawn a clear line between discovery motions and non-discovery motions - "there is a presumptive right to public access to all material filed in connection with non-discovery pretrial motions, whether these motions are case dispositive or not." (*Leucadia, Inc. v. Applies Extrusion Technologies, Inc., 998 F.2d 157, 165 (3d Cir. 1993)*. The applicability **[*30]** here of this distinction is discussed *infra* Section IV.A (pp. 29-36).

"Although the common law right to public access is a recognized and venerated principle, courts have

---

[19] See *Avandia, 924 F.3d 662, 2019 WL 2119630 at *3* [discussing the standard for discovery protective orders entered pursuant to *Fed. R. Civ. P. 26(c)*].

Case 1:19-md-02875-RMB-SAK    Document 2208-10    Filed 12/19/22    Page 12 of 45
PageID: 76200

Page 11 of 44
2019 U.S. Dist. LEXIS 142214, *30

also recognized the accompanying principle that 'the right is not absolute'" -it may be rebutted." [*Cendant, 260 F.3d at 194* (citations omitted)]. The burden is on the parties seeking to overcome the presumption of public access to show their "interest in secrecy outweighs the presumption." (*Id.*, quoting *Bank of America v. Rittenhouse, 800 F.2d at 344*). More specifically, the parties "seeking the closure of a hearing or the sealing of part of the judicial record 'bear[] the burden of showing that the material is the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure.'" [*Id.* (citations omitted)]. The injury must be shown with specificity. "Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient." (*Id.*). "Mere embarrassment is insufficient to overcome the strong presumption of public access inherent in the common right [of access]." (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *9).*

The test for overcoming the common law right of access in class actions is the "compelling countervailing interests" standard. **[*31]** (*Id.*). This standard, as applied here, reflects the "peculiar posture of class actions whereby some members of the public are also parties to the class action." (*Cendant, 260 F.3d at 193*). Such suits involve public interests beyond the "public's general educative and monitoring interests." [*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 529 F. Supp. 866, 907 (E.D. Pa. 1981)*( Becker, J.)]. The Third Circuit found that all the general reasons why public right of access to judicial records apply with "even greater force" in class actions:

> Protecting the access right in class actions "promotes [class members'] confidence" in the administration of the case. . . . Additionally, the right of access diminishes the possibility that "injustice, incompetence, perjury, [or] fraud" will be perpetrated against those class members who have some stake in the case but are not at the forefront of the litigation. . . . Finally, openness of class actions provides class members with "a more complete understanding of the [class action process] and a better perception of its fairness."

[*Cendant, 260 F.3d at 193* (parentheticals in original), quoting *Littlejohn v. Bic Corp., 851 F.2d 673, 678 (3d Cir. 1988)*].

Private anti-trust actions, whether class actions or not, are another type of lawsuit in which the public has a heightened interest. In these cases, "plaintiffs bringing damages actions under **[*32]** the Clayton Act are 'private attorneys general,' whose successful lawsuits vindicate societal interests as well as their own." [*Zenith, 529 F. Supp. at 905*, citing *Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972)* and *Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139, 88 S. Ct. 1981, 20 L. Ed. 2d 982 (1968)*].[20]

The Sixth Circuit recently found that the public has a strong interest in the conduct at issue in antitrust cases, because these cases involve "secrecy [which] insulate the participants, masking impropriety, obscuring incompetence, and concealing corruption." [*Shane Group, Inc. v. Blue Cross Blue Shield of Michigan, 825 F.3d 299, 305 (6th Cir. 2016)*].[21] Similar to the present case,

---

[20] In addition, the Supreme Court has found "[e]very violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress," and thus Congress offered "potential litigants the prospect of a recovery in three times the amount of their damages . . . [to] encourage[] these persons to serve as 'private attorneys general.'" (*Hawaii v. Standard Oil Co. of Cal., 405 U.S. at 262*). The Supreme Court has also observed that antitrust law encourages plaintiff's suits "to further the overriding public policy in favor of competition." (*Perma Life Mufflers, 392 U.S. at 139*).

[21] The Third Circuit has recognized a number of other types of lawsuits that concern issues and remedies affecting the public. [*See, e.g., Publicker, 733 F.2d at 1074* (weighing "the policy interest in protecting unsuspecting people from investing in Publicker in light of its bad business practices"); *Republic of the Philippines v. Westinghouse Elec., Corp., 949 F.2d 653, 664 (3d Cir. 1991)* ("the allegation of bribes by a major United States corporation to the leader of a foreign country is a matter of public interest, which could give rise to public debate"); *Mine Safety Appliances Co. v. North River Ins. Co., 73 F. Supp. 3d 544, 567 (W.D. PA 2014)* (insurance coverage action for bodily injury claims under standard-form liability insurance policy "has the potential to affect the rights and remedies of other carriers, insureds, and third-party claimants"); *see also Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165,*

2019 U.S. Dist. LEXIS 142214, *32

*Shane* was a class action in which it was alleged that Michigan's largest health insurer had engaged in a price-fixing scheme with some of Michigan's largest hospital systems. Unlike the present case, the district court in *Shane* had sealed "most of the parties' substantive filings from public view," including "Plaintiffs' Motion for Class Certification and Blue Cross's Response, and Blue Cross's motion to strike the report and testimony of the Plaintiffs' expert witness . . . ." (*Shane, 825 F.3d at 302*). After settlement was reached and the class was certified, class members objected to the settlement and sought to unseal court records. (*Id. at 304*). According to the Sixth Circuit, "the expert report . . . would determine the rights of . . . millions of citizens." (*Id. at 302*). The Sixth Circuit relied **[*33]** in part on *Cendant, 260 F.3d 183*, in reversing the sealing order of the district court. (*See, Shane, 825 F.3d at 305, 307*).

In performing its decisional role on sealing, the District Court must satisfy certain requirements when balancing the public right of access under the common law against claims of injury due to disclosure. It "must articulate 'the compelling, countervailing interests to be protected.'" (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *4*, citing *Cendant 260 F.3d at 194*). Further, it must make "specific findings on the record concerning the effects of disclosure," after conducting careful factfinding and balancing of competing interests. (*Id.*) "To that end, the District Court must 'conduct[] a document-by-document review' of the contents of the challenged documents." (*Id.*, citation omitted).[22] In class actions, as here, involving a heightened public interest, "the test for overriding the right of access should be applied . . . with particular strictness." (*Cendant, 260 F.3d at 194*).

---

*1180-81 (6th Cir. 1983)* (citizens "have an interest in knowing the accurate "tar" and nicotine content of the various brands of cigarettes on the market" and "how the government agency has responded to allegations of error in the testing program")].

[22] In *Avandia* the Third Circuit stated that "[t]o be clear, we do not require a district court to provide lengthy, detailed discussion of each individual document. Yet it must be clear from the record that the district court engaged in a particularized, deliberate assessment of the standard as it applies to each disputed document." (*Avandia, 924 F.3d 662, 2019 WL 2119620 at *8 n. 11*).

There is an important temporal aspect to review by the courts. "The strong presumption of public access forces district courts to be cognizant of when the reasons supporting sealing in a specific case . . . have either passed or weakened." (*Id. at 197*) In other words, the harm alleged must not be stale. Even if documents **[*34]** were properly ordered to be sealed, that order "must be lifted at the earliest possible moment when the reasons for sealing no longer obtain." (*Id.*). Every sealing decision must be based on "*current evidence* to show how public dissemination of the pertinent materials *now* would cause the competitive harm they claim." [*Leucadia, 998 F.2d at 167* (quoting *Westinghouse, 949 F.2d at 663*) (emphasis in original)].

## B. *First Amendment*

The public also has a *First Amendment* right of access to civil trials. (*See Avandia, 924 F.3d 662, 2019 WL 2119630 at *4*, citing *Publicker, 733 F.2d at 1070*.) The right of access can include documents involved in those proceedings. (*See North Jersey Media Group, 836 F.3d at 429*). Despite being based in the Constitution, this right of access also is not absolute and may be overcome, but it is "'accorded the due process protection that other fundamental rights enjoy.'" (*Id.*, quoting *Publicker, 733 F.2d at 1070*).

The Third Circuit uses a two-prong test to determine whether this right of access attaches: (1) the experience prong asks "whether the place and process have historically been open to the press and general public," and the logic prong asks "whether public access plays a significant positive role in the functioning of the particular process in question.'" [*North Jersey Media Group, 836 F.3d at 429*, quoting *Press-Enterprise Co. v. Superior Court of Cal. For Riverside Cty, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)]* If both prongs are satisfied, a *First Amendment* right of public access attaches. (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5*; *North Jersey Media Group, 836 F.3d at 429*).

If a *First Amendment* right of access attaches,

2019 U.S. Dist. LEXIS 142214, *34

"[t]he party **[*35]** seeking closure may rebut the presumption of openness only if able to demonstrate 'an overriding interest [in excluding the public] based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5* quoting *Publicker, 733 F.2d at 1073*). The burden on parties seeking closure or sealing is to show that "'the material is the kind of information that courts will protect and that there is good cause for a [sealing] order to issue.'" (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5* quoting *Publicker, 733 F.2d at 1071*).

"Good cause means 'that disclosure will work a clearly defined and serious injury to the party seeking closure'; '[t]he injury must be shown with specificity.' [] 'For example, an interest in safeguarding a trade secret may overcome a presumption of openness.' [] Bad business practices, in the absence of other circumstances, do not overcome the presumption." (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5* quoting *Publicker., 733 F.2d at 1071, 1073, 1074*).

The Third Circuit described the trial court's review obligations in a *First Amendment* analysis as requiring the court to "'both articulate the countervailing interest it seeks to protect and make findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5* quoting *Publicker, 733 F.2d at 1071*).

The Third Circuit reiterated that the "'*First Amendment* right of **[*36]** access requires a much higher showing than the common law right [of] access before judicial proceedings can be sealed.'" [*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5*, quoting *Cendant, 260 F.3d at 198 n.13* (dicta)]. From that flows the conclusion that the district court must review any restriction on the right of public access "under strict scrutiny." [*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5*, quoting *PG Publishing Co. v. Aichele, 705 F.3d 91, 104 (3d Cir. 2013)*].

In *Avandia* the Court of Appeals noted its practice in prior cases of not deciding *First Amendment* access issues if analysis under the common law results in public access. (*Avandia 924 F.3d 662, 2019 WL 2119630 at *10*). In remanding the matter there, however, the Third Circuit explicitly directed the district court to conduct an analysis under the *First Amendment* right of public access if analysis under the common law leads to a conclusion of continued confidentiality (sealing). (*Id.*). In accordance with *Avandia*, the Special Master will not conduct a *First Amendment* analysis if access is warranted under a common law analysis, but will do so if a common law analysis results in a finding of continued confidentiality.

## C. Qualified Exception to Presumption of Public Access

The Third Circuit, again looking back to *Publicker*, recently reiterated that "an interest in safeguarding a trade secret may overcome the presumption of openness." (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5*). *Publicker* recognized a broader interest, which it characterized **[*37]** as "a party's interest in confidential commercial information, such as a trade secret." (*Publicker, 733 F.2d at 1071*). This is not to say, however, that trade secrets or confidential commercial information both are entitled to absolute exception from public access. If "confidential commercial information" does not qualify as a trade secret, then that information "is not entitled to the same level of protection from disclosure as trade secret information." (*Littlejohn, 851 F.2d at 685*). Additionally, not all commercial harms or financial losses are entitled to court protection from disclosure. For example: potential embarrassment and injury to corporate reputation ration is insufficient to rebut a presumption of public access (*see Avandia, 924 F.3d 662, 2019 WL 2119630 at *9*; *Westinghouse, 949 F.2d at 663*); information that may cause the value of stock to decline does not override public access (*see Littlejohn, 851 F.2d at 685*); and information about "poor management" is not the kind of business information protected (*see Publicker, 733 F.2d at 1065*). [*See also Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1137 (9th Cir. 2003)* (litigant is not entitled to be

2019 U.S. Dist. LEXIS 142214, *37

protected from exposure to additional liability and litigation arising from disclosure of filed documents pursuant to common law right of access to court records, citing *Nestle Foods Corp. v. Aetna Cas. and Sur. Co., 129 F.R.D. 483, 486 (D.N.J. 1990)*].

Applying this qualified exception to public access is not as straight forward as is, for example, the **[*38]** analysis of the attorney-client privilege. Although a general definition exists of what a "trade secret" is, volumes have been written to discern whether specific information is or is not a trade secret; "confidential commercial information" of the type "courts will protect" is even more vague. Nevertheless, the current motions require the Court to undertake this analysis.

To that end, evaluating the various types of confidential commercial information, trade secret law is instructive, but not alone determinative. "Trade secret" is defined in the Pennsylvania Uniform Trade Secrets Act, *12 Pa. C.S.A. §§ 5302* as:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Whether information rises to the level of a trade secret under the Pennsylvania Uniform Trade Secrets Act (PUTSA) is a question of fact. [*Synthes, Inc. v. Emerge Medical, Inc., 25 F. Supp. 3d 617, 705 (E.D. Pa. 2014)*]. Moreover, **[*39]** there are no precise criteria to determine the existence of a trade secret. "The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information." [*Restatement (Third) of Unfair Competition § 39* (1995)].

"Information that is public knowledge or that is generally known in an industry cannot be a trade secret." [(*Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1982)*]. A party claiming rights to a trade secret "bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection." (*Cf. Restatement (Third) of Unfair Competition § 39* (1995) (addressing burden in cases of misappropriation); *see also Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d Cir. 2003)*)("the prima facie elements of the tort of misappropriation of a trade secret are derived from the Restatement (First) of Torts § 757," which lists among the prima facie elements "the existence of a trade secret")].[23] Furthermore, if a party discloses its trade secret to others "who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, [the party's] property right is extinguished." (*Id.*). Finally, a trade secret can lose its status if it becomes stale or becomes **[*40]** public information. [*See West Penn Allegheny Health Systems, Inc. v. UPMC, 2011 U.S. Dist. LEXIS 149143, 2011 WL 13133997 at *1 (J. Schwab)*(denying a request to seal information alleged to be "Highly Confidential" because Court found "West Penn Allegheny and Highmark have released specific financial and other purportedly confidential business information through their own websites, advertisements, and news releases.")]. These general principles are helpful in assessing the moving parties' arguments for protection of trade secrets as well as "confidential commercial information."[24]

---

[23] *Cf. Agency Solutions.Com, LLC v. TriZetto Grp., Inc., 819 F. Supp. 2d 1001, 1017 (E.D. Cal. 2011)*( party seeking injunctive relief under California Uniform Trade Secrets Act action must describe the subject matter of the trade secret with sufficient particularity to permit the defendant and the court to ascertain the boundaries of the secret); M. Lemley, *The Surprising Virtues of Treating Trade Secrets as IP Rights*, *61 Stan. L. Rev. 311, 344 (2008)* (plaintiff should be required to "clearly define what it claims to own, rather than (as happens all too often in practice) falling back on vague hand waiving")].

[24] In response to the Special Master's request for clarification of its position on the applicable legal standard (*see Email, May

## IV. Findings and Recommendations on Key Issues

Having set out the legal standards for sealing, the Special Master turns to apply those standards to the materials Highmark and UPMC seek to seal.

## A. Presumptive Right of Public Access Attaches to All Materials

Both Highmark and UPMC agree the common law presumption applies to the materials they seek to seal. [See Highmark May 21, 2019, Ltr. to the Special Master, at 3 ("the *Cendant* common law standard applies"); (UPMC June 2, 2018, Ltr. Br. at 5)]. However, UPMC argues that *Cendant's* heightened "compelling countervailing interests" standard does not apply. In addition, Highmark and UPMC argue **[*41]** the *First Amendment* presumption does not attach because their requests to seal are unopposed.

## 1. Common Law Right of Access

Because the moving parties agree that the common law presumption attaches, the Special Master merely notes that the class certification motion and the *Daubert* motion before the Court are not discovery motions. These motions do require the Court to render adjudicatory decisions.

The issue UPMC contests is whether the "compelling countervailing interests" standard of *Cendant* applies to materials filed in connection with a class certification proceeding. (*Cendant, 260 F.3d at 194*). UPMC seeks to distinguish *Cendant* by arguing that it applies only to bid auctions for class counsel and that class certification is merely a "preliminary procedural" matter. [*See* UPMC July 2, 2018, Ltr. Br. at 2; *see also* Highmark's July 20,

20, 2019, Special Master to Highmark), Highmark stated that "the *Cendant* common law standard applies" and went on to specify that "Highmark has the burden of showing that 'the materials are the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure." [Ltr. May 21, 2019, Highmark to the Special Master at 3 (quoting *Cendant, 260 F.3d at 194*)].

2018, Ltr. Br. at 4 ("The motion at issue [currently before the Court] calls on the Court to make a purely legal decision as to whether the requirements of *Rule 23* have been satisfied.")]. The Special Master does not agree with this claimed distinction for two reasons. The Special Master believes that *Cendant's* "compelling countervailing interests" standard must be applied and met.

First, the public **[*42]** interests identified in *Cendant* apply more broadly than only to selection of class counsel. Certainly selection of class counsel is an important decision in a class action suit, but so too is class certification. Class certification involves central, substantive issues of a suit. As the Supreme Court observed in *Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)*, the "rigorous analysis" in which a district court must engage at the class certifications stage will frequently entail "overlap with the merits of the plaintiff's underlying claim." That is so because the "'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" [*Id.* (citation omitted)]. The Third Circuit similarly noted that the class certification decision is "often decisive." [*In re National Football League Players Concussion Injury Litigation, 775 F.3d 570, 577 (3d Cir. 2014)* (quoting Advisory Committee notes to 1998 explaining that the addition of *subdivision (f) to Federal Rule of Civil Procedure 23* was to allow interlocutory review of class certification decisions); *see also Shane, 825 F.3d at 306* (Motion for Class Certification is "arguably the most important filing in any putative class action")]. Indeed, failure to achieve class certification may effectively end a lawsuit for any number of reasons.

Second, this class certification proceeding **[*43]** involves heightened public interests compared to the more routine civil action between private parties and, arguably, even other class actions. Here, the Court's decision on class certification may affect 10,000 members of the public, almost all of whom are unnamed members of the putative class. In addition, the action concerns the cost of health care—a subject of intense national debate,

as well as one that impacts individual household budgets. As such, this suit involves public interests beyond the "public's general educative and monitoring interests." (*Zenith, 529 F. Supp. at 907*). Furthermore, the lawsuit is for alleged antitrust violations. As noted above, private anti-trust plaintiffs are "private attorneys general" seeking to "vindicate societal interests as well as their own." (*Id. at 905*). Given the heightened public interest in this antitrust class action, the Special Master concludes it is appropriate to test the arguments of Highmark and UPMC in favor of secrecy "with particular strictness" and to require them to establish a "compelling countervailing interest" to override the presumption of public access. (*Cendant, 230 F.3d at 194*).

In making findings and recommendations on a document-by-document basis *infra* Section V. (pp. 69-99), **[\*44]** if the Special Master determines that an analysis under the requirements of the *Cendant* common law standard is warranted, any conclusion stating that the standard is met indicates that the Special Master finds that all requirements noted above have been established and that sealing is warranted. If, however, the Special Master finds that any one or more of the requirements under the *Cendant* common law standard is/are not met, the deficiency will be explicitly identified and noted.

## 2. *First Amendment* Right of Access

Both Highmark and UPMC make cursory arguments that the *First Amendment* presumption of public access does not apply because their motions to seal lack opposition. Highmark notes "[t]his sealing request is unopposed; no one is asking the Court to make any of these materials public." (*See* Highmark June 1, 2018, Ltr. Br. at 1). UPMC argues briefly that "there is no *First Amendment* challenge to UPMC's instant requests, so the less demanding common law standard applies." (UPMC June 1, 2018, Ltr. Br. at 5). It also argues that "the confidential information that UPMC seeks to seal is not the sort of information that is historically subject to public access," citing the Special Master's Report and Recommendation No. 3 at 7-8. **[\*45]** (*Id.* at n.2).

This latter argument is misplaced. In Report and Recommendation No. 3, the Special Master, dealt with a discovery matter, found that, "because the material in question was submitted in connection with a discovery motion, neither the common law nor the *First Amendment* establishes a presumptive right of public access to it." (R&R No. 3 at 5-6). The Special Master did state: "[w]hile the Supreme Court has not directly considered the "experience" prong of the 'experience and logic' test, it has determined that the civil discovery process has not traditionally been open to the public," citing *Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32-33, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984)*. (R&R No. 3 at 8). This finding about historic public access to discovery materials is not persuasive where, as here, the issue before the Court involves public access to court hearings, transcripts of those hearings, and substantive, non-discovery briefs and attachments, placed in the court's record for adjudication, such as are before the Court here. The instant proceeding does not involve a discovery dispute.

At its core, the argument of Highmark and UPMC is that, unless a party opposes the motions to seal, the *First Amendment* standard does not attach, although the common law presumption does. Neither Highmark nor **[\*46]** UPMC cite any case law to support this contention. The Special Master does not accept this argument. The lack of opposition does not obviate the district court's duty, and preliminarily the duty of the Special Master, to weigh the competing interests claimed by the movants against the presumption of public access. Public access to judicial proceedings and records is a recognized bedrock principle. The Third Circuit ruled that the "practical effect of the right to access doctrine is to create an independent right for the public to view proceedings and to inspect judicial records." (*Cendant, 260 F.3d at 193*). In addition, the absence of adversarial parties does not relieve a district court of the procedural and substantive requirements imposed on it under Third Circuit law in rendering sealing decisions. (*See e.g., Avandia, 924 F.3d 662, 2019 WL 2119630 \*5* (the district court must "both articulate the countervailing interest it seeks to protect and make findings specific enough that a reviewing court can

determine whether the closure order was properly entered.")].

The Special Master notes that Judge Cercone confronted a similar situation, and found that, although "the parties have not . . . requested review," the district court will *sua sponte* examine **[*47]** whether "the use of its authority to keep matters from public scrutiny is being properly employed." (*Mine Safety Appliances, 73 F. Supp. 3d at 557*).[25] The Special Master thus concludes that the court has an independent duty to assess whether the materials sought to be sealed should be sealed and to assess what standard applies to that determination regardless whether motions to seal are currently opposed or not.[26]

The Special Master begins his analysis of whether the *First Amendment* right of access attaches to the materials before him by conducting the two-prong test used by the Third Circuit. (S*ee, e.g., Avandia, 924 F.3d 662, 2019 WL 2119630 at *5*). With respect to the "experience prong," which asks "whether the place and process have historically been open to the press and general public," (*id.*), the Special Master notes that the Third Circuit recently conducted "a historical review of representative actions." [*See Neale v. Volvo Cars*

---

[25] *See also Littlejohn*, 851 F.2d n. 15 (rejecting BIC's contention that the court must "hold that a stipulated protective order gave BIC the unilateral power to designate which of its documents would become a part of the public record, even when admitted into evidence at trial, absent a showing of compelling need by some member of the public.").

[26] That no third party has yet sought to intervene in this process to argue for public access does not mean such a motion will not be filed at a later date. [*See, e.g., Leucadia, Inc. v. Applies Extrusion Technologies, Inc., 998 F.2d 157, 161, n. 5 (3d Cir. 1993)*(permitting a motion to intervene in a settled case to challenge sealing of documents "even after the underlying dispute between the parties has long been settled" citing *United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir.1990)* ("permitting intervention three years after underlying action had settled and noting that "courts have widely recognized that the correct procedure for a third-party to challenge a protective order is through intervention for that purpose"); *Beckman Industries, Inc. v. International Ins. Co., 966 F.2d 470, 471-73 (9th Cir. 1992)* ("same, for intervention motion filed two years after case was settled and dismissed")].

*of North America, LLC, 794 F.3d 353, 362-364 (3d Cir. 2015)*]. It found that "'group litigation has a remarkably deep history' dating back to medieval times." (*Id. at 362*, citation omitted). The Circuit identified group litigation practices in the English Chancery in the seventeenth and eighteenth centuries (*id. at 362-63*), noted that representative actions under English law "crossed the pond" to nineteenth-century America (*id.* **[*48]** ), recognized that this country's representative actions trace back to at least Justice Joseph Story's scholarship, and closed by tracing the inception and development of what is today's *Rule 23 of the Federal Rules of Civil Procedure*. (*Id.*)

Thus, it appears that class actions have a lengthy, historic pedigree within common law jurisprudence and experience. Although the history lesson set forth in *Neale* does not reveal whether these representative actions were open to the public, *Publicker* contains a complementary lesson on the history of public access to civil trials (*see 733 F.2d at 1068-1071*), which can be summarized as civil and criminal trials have traditionally been open to the public "for many centuries." (*Id. at 1067*). Class certification proceedings are conducted before a judge in a courthouse resulting in a binding decision with a right of appeal. It follows that the type of proceeding here (determining if a class should be certified) falls easily within the long history of open access to civil trials.

The logic prong asks "whether public access plays a significant positive role in the functioning of the particular process in question." (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *5*). Notably, the Third Circuit found "public access is particularly compelling" in class action suits. (*Cendant, 260 F.3d at 193*).[27] As detailed above, **[*49]** the reasons that led the Third Circuit to this conclusion also apply in the context of examining the *First Amendment* standard to explain that public access to a class certification proceeding may well "play [a] significant positive role in the functioning of the

---

[27] Although the Third Circuit was dealing with the common law right to access in *Cendant*, this posture does not alter the fact that "public access is particularly compelling" in class action suits. (*260 F.3d at 193*).

particular process in question." (*North Jersey Media Group, 836 F.3d at 429*).

In the context of the importance of public access to class action proceedings, the Sixth Circuit recently observed that class actions affect not only the interests of the parties and the counsel in the case, but also the interests of the unnamed class members. (*Shane, 825 F.3d at 309*). The *Shane* court further observed that class actions inherently involve "adverse incentives"—the named plaintiffs and their counsel could short-change the unnamed class members. (*Id.*).[28] Thus, these unnamed members of the public have a particular interest in class actions. That said, the Sixth Circuit made this observation without discussing the applicability of the *First Amendment* standard (or the common law standard). Nevertheless, the Special Master reads *Shane* as identifying one way that public access plays a "significant positive role" in determinations of whether to proceed as a class action. (*See North Jersey Media Group, 836 F.3d at 429*).

The Special Master thus concludes that both **[*50]** prongs of the *First Amendment* test are satisfied and the *First Amendment* right of access attaches to the transcripts of the court hearings, the materials presented to the Court during those hearings, as well as to the briefs and their attached exhibits. For reasons set out *supra* Section III.A (p. 19), the Special Master finds that these same considerations and standards apply to materials currently before the Special Master.

In making findings and recommendations on a document-by-document basis *infra* Section V. (pp. 69-99) , if the Special Master determines that an analysis under the requirements of the *First Amendment* is warranted, any conclusion stating that the *First Amendment* standard is met indicates that the Special Master finds that all requirements noted above have been established and that sealing is warranted. If, however, the Special Master finds, in the course of conducting an

analysis under the *First Amendment*, that any one or more of the requirements under the *First Amendment* is/are not met, the deficiency will be explicitly identified and noted.

**B. Exhibits Entered into the Record in Support of a Non-discovery Motion are "Judicial Records" Regardless of Allegations of "Irrelevancy"**

UPMC argues that portions of 12 exhibits[29] submitted by Plaintiff in support of **[*51]** its Motion for Class Certification are not judicial records because those portions are "irrelevant." (*See* UPMC Aug. 31, 2018, Ltr. Br. at 5-6). UPMC argues that Plaintiff cited only a small portion of multi-page exhibits and submitted pages with "extraneous UPMC confidential information" (*id.*). Thus, UPMC asks that those portions "be sealed and excluded from the public record as irrelevant." (*See, e.g.*, UPMC's Sealing Chart at 9 regarding Pl. Ex. 3). In support of this irrelevancy argument UPMC cites four, unpublished trial court decisions outside the Third Circuit for the proposition that documents "do not qualify as judicial documents [if] the court has not used them in 'determining litigants' substantive rights.'" [UPMC Aug. 31, 2018, Ltr. Br. at 5-6 citing *Argo v. Makhteshim Agan of N. Am., 2011 WL 13157168 at *4 (M.D.N.C. 2011)*].

The Special Master does not find UPMC's irrelevancy argument persuasive for several reasons. First, the cases UPMC cites in support of this argument are at odds with Third Circuit law that it is the act of filing documents in the court's record that qualifies them as "judicial records." [*See North Jersey Media Group, 836 F.3d at 434* (the "act of filing, in fact, seems to be the most significant consideration"); *see also Leucadia, 998 F.2d at 161* (it is "the act of filing *vel non* that trigger[s] the presumption **[*52]** of access...")].

---

[28] This reference to *Shane* is recognition of a possibility in the general nature of class action suits and should not be read as any reflection on the conduct of Plaintiff's counsel in this lawsuit.

[29] The exhibits at issue are: Pl. Exs. 3, 5, 6, 7, 12, 14, 17, 28, 29, 44, 45, and 47. The Special Master addresses Pl. Exs. 17 and 29 separately *infra* Section IV.H (pp. 58-68).

Two of the cases UPMC cites[30] rely on the unpublished Fourth Circuit opinion *In re Policy Management Systems Corp., 1995 U.S. App. LEXIS 25900, 1995 WL 541623 at \*4 (4th Cir. 1995)*, which held that documents submitted with a motion to dismiss were not judicial records because the court would not consider documents beyond the complaint in deciding a 12(b)(6) motion: a "motion to dismiss tests only the facial sufficiency of the complaint." (*Id.*). The Fourth Circuit itself later described the limited nature of *In re Policy Management* in *In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290-91 (4th Cir. 2013)*, explaining that in "*In re Policy Management Systems Corp.*, we refrained from ascribing the *First Amendment* right of access to documents not considered by the court but filed with a motion to dismiss, reasoning that they "do not play any role in the adjudicative process."[31]

Second, although the Third Circuit has not specifically addressed an irrelevancy argument in the context of deciding what is a "judicial record," it

---

[30] *See Argo v. Makhteshim Agan of N. Am., 2011 WL 13157168 at \*4 (M.D.N.C. 2011)* and *Good v. American Water Works Co., Inc., 2016 U.S. Dist. LEXIS 42193, 2016 WL 1261140 at \* 3 (S.D.W. Va. 2016)*(involving a motion to dismiss). In contrast to a motion to dismiss, a motion for class certification may be resolved with reference to materials outside the four corners of the complaint.

[31] The Special Master also does not find in the other two cases cited by UPMC to provide a principled reason to adopt UPMC's "irrelevancy" argument. UPMC cites *Saint Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd., 2015 U.S. Dist. LEXIS 18932, 2015 WL 632311 at \* 2-3 (D. Idaho 2015)*, where the court expressly found in the first instance that the documents should be sealed because they contained trade secrets while other documents revealed individual doctor's compensation and productivity. The court stated secondarily—and arguably superfluously—that these documents "played no role in the Court's decision and do[] not help the public understand the Court's decision." UPMC also cites *In re General Motors LLC Ignition Switch Litigation, 2015 U.S. Dist. LEXIS 97308, 2015 WL 4522778 (S.D.N.Y. 2015)*, in which the court concluded "all the exhibits submitted under seal were ... seemingly intended to condemn the conduct of New GM rather than to illuminate the legal and factual bases behind ... [the] opposition to New GM's motion" for a protective order to enjoin Plaintiffs' counsel from releasing these materials to the press.

has had the opportunity to do so when it addressed sealing issues raised after the substantive motion was decided by the court. In those cases, the fact that the court did not expressly rely on a record did not mean the document was never or ceased to be a judicial record. [*See, e.g., Republic of the Philippines, 949 F.2d at 660* (documents filed [\*53] with motion for summary judgment are not entitled to be shielded from public access merely because district court denies motion); *cf. Littlejohn v. BIC, 851 F.2d at 680 n.12* (BIC's argument that only those portions of documents specifically referred to during trial were admitted into evidence rejected with the court observing "BIC might have objected to the admission of undiscussed portions of the plaintiff's exhibits at trial, but it failed to do so. *Cf., Matter of Continental Illinois Securities Litigation, 732 F.2d 1302, 1312-13 (7th Cir.1984)* (fact that entire report not read aloud is not determinative, references and scattered quotes sufficient to support public access)"].[32]

Third, the Special Master finds instructive and persuasive the reasoning in *Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 123 (2d Cir. 2006)*:

"If the rationale behind access is to allow the public an opportunity to assess the correctness

---

[32] The practical effect of UPMC's argument is that the sealing decision would be delayed until the court has ruled on the substantive motion. To delay a sealing decision until after an adjudication on the merits would hide the documents from public view, which could compromise the ability of the public to monitor and participate in the proceeding. This delay could be of particular concern in class actions where unnamed members of the class are numerous. Contemporaneous access is an integral part of public access. [*See, e.g., Richmond Newspapers, 448 U.S. 555, 592, 100 S. Ct. 2814, 65 L. Ed. 2d 973* (Brennan, J., concurring) ("'contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power'")]. When contemporaneous access is not possible, the Third Circuit expects sealing decisions to be made as expeditiously as possible. [*See, e.g., Publicker, 733 F.2d at 1072* ("a district court in deciding whether to conduct a proceeding in camera must not relax the standard necessary to close a proceeding simply because a transcript of that closed proceeding can be made available at a later date.")].

of the judge's decision . . . documents that the judge *should* have considered or relied on, but did not, are just as deserving of disclosure as those that actually entered into the judge's decision.' . . . Moreover, "[o]nce those submissions come to the attention of the district judge, they can be fairly assumed to play a role in the court's deliberations." (citations omitted).

This reasoning dovetails with the Third Circuit's observation that, by **[*54]** submitting "motions to the court for decision, one enters the public arena of courtroom proceedings and exposes oneself, as well as the opposing party, to the risk . . . of public scrutiny." (*Leucadia, 998 F.2d. at 164*). The fact that a judicial decision does not cite arguments or materials submitted by a party as persuasive does not mean that the court [or the Special Master] did not consider them.

Accordingly, the Special Master finds the following exhibits are judicial records in their entirety: Pl. Exs. 3, 5, 6, 7, 12, 14, 28, 44, 45, and 47, but not Pl. Exs. 17 and 29, for reasons discussed *infra* Section IV.G (pp. 56-57).

## C. "Confidential commercial information, such as trade secrets" of health insurance companies and health care providers.

Highmark and UPMC seek to seal information which each states is "some of the most commercially sensitive information" of their companies, although somewhat surprisingly neither characterizes the vast majority of the information they seek to seal as "trade secrets." The declarants are not lawyers but the Special Master does not find the absence of the nomenclature as trade secrets determinative one way or the other. Rather, the Special Master will focus on the nature of **[*55]** what is asserted to be confidential information, how integral it is to company's existence and the steps the companies take and have taken to maintain the information's secrecy.

### 1. Highmark's "Base Rate Model" and "Cashion

Spreadsheet" contain trade secrets.

Highmark seeks to seal materials related to its "Base Rate Model" and the "Cashion Spreadsheet." (See Highmark June 1, 2018, Ltr. Br. at 3-4).[33] Both the Model and Spreadsheet concern the premiums Highmark charges small group insurers. In support of sealing, Highmark submits declarations from Mr. Cashion, Highmark's Chief Actuary.[34] Mr. Cashion's repeated and overarching declaration is that this information is "some of the most commercially sensitive information that exists at Highmark" and it is "information that Highmark maintains in the strictest of confidence." (*See, e.g.*, Cashion May 31, 2018, Decl. □ 5).[35]

Mr. Cashion states [Cashion July 12, 2018, Decl. □ 7(b)] that the "Base Rate Model" is Highmark's "proprietary actuarial formulas", which Highmark uses "to determine individual small group premiums." (Cashion Aug. 23, 2018, Decl. □ 7). "It contains detailed statistics about a wide variety of Highmark information **[*56]** and data, including, for example, historical medical costs, predicted future costs, actuarial assessment of future healthcare trends and account retentions." (*Id.*). Mr. Cashion

---

[33] Plaintiff Exhibit 37, and Defendant Exhibits 7, 8, 9, and 10 are either the "Base Rates Model" or the "Cashion Spreadsheet." Mr. Cashion testified to these exhibits both in depositions (*see* Def. Exs. 5 and 12), and during the class certification hearing. (*See* Nov. 9, 2018, Tr. ). In addition, both Plaintiff's and Defendant's expert reports, depositions, and testimony at the hearings refer extensively to the "Base Rates Model" and the "Cashion Spreadsheet." (*See* Pl. Exs. 1, 39-40, 42-44; Cantor Nov. 14, 2018, Supplemental Expert Report; Def. Exs. 1, 3-5, 11, 12, many portions of the hearing transcripts for Sept. 19 and Nov. 20, 2018, and some portions of the slides submitted to the Court during those hearings).

[34] Mr. Cashion was the Chief Actuary of Highmark, Inc. from April 2002 through December 2013, and since then he has been the Chief Actuary of Highmark Health. (*See* Cashion Aug. 23, 2018, Decl. □ 1). Mr. Cashion testified that, during the Class Period, he was "responsible for the actuarial functions" of Highmark Health Insurance Company (HHIC), a wholly owned subsidiary of defendant Highmark, (*See* Nov. 9, 2018, Tr. at 9-19; 3d Amended Complaint at □ 11).

[35] The Special Master addresses Highmark's arguments to seal negotiated reimbursement rates separately *infra* at Section IV.C(3)(pp. 44-47).

states that Highmark "uses essentially the same model today" as the model which is at issue in the expert reports. (*Id.* □ 8). He also states that health insurers rely on "historical information in order to help them predict potential future expenses." (*Id.* □ 9). Thus, he concludes that historic "information, data, and methodology in the Base Rate Model is not stale today." (*Id.*).

Mr. Cashion also states that "actuaries at Highmark's health insurance competitors could use this model [were it disclosed to the public] to . . . better compete against Highmark for customers." (*Id.* □ 8). Throughout his declarations, he stresses that the Base Rate Model "is some of Highmark's most sensitive proprietary information." (Cashion July 12, 2018, Decl. □ 6). The "Cashion Spreadsheet" contains "detailed information about how health plan premiums are determined for small groups" insured by Highmark. (Cashion July 12, 2018, Decl. □ 5).

The Special Master has reviewed the spreadsheet and finds Mr. Cashion's description of it to **[*57]** be accurate:

> The Cashion Spreadsheet discloses (1) the specific name of every Highmark small group customer from 2009 to 2013, (2) the specific product each small group elected to purchase . . . , (3) the amount Highmark charged each of those small group customers for each of those products . . . and (4) numerous individual rating factors that impacted the premium rates each group received . . . [including] client-specific details . . . as well as personally sensitive details about individual characteristics of the client's employees . . .

(Cashion Aug. 23, 2018, Decl. □ 3). Mr. Cashion explains that the information in the spreadsheet "remains competitively sensitive today" because many of the customers listed remain Highmark customers. He declares that disclosure of this list to health insurance competitors would enable the competitors "to target" and "to steal them away from Highmark" and that disclosure of personally sensitive information would allow its competitors "to target Highmark's healthier small groups," which groups are particularly desirable to competitors. (*Id.*). Mr. Cashion declares further that

release of the premiums charged would also enrich Highmark's insurance competitors **[*58]** and allow them to better compete for Highmark's customers. (*Id.*). Finally, disclosure of the Cashion Spreadsheet would reveal "the ratings factors and methodology Highmark uses to approach pricing for its small group customers on a client-specific basis." (*Id.* □ 5).

The Special Master finds that the foregoing excerpts of Mr. Cashion's declarations show with particularity that Highmark's "Base Rate Model" and the "Cashion Spreadsheet" are current trade secrets of Highmark, and that disclosure of them to Highmark's insurance competitors would cause Highmark to suffer current, "irreparable harm," sufficient to override any compelling public interest in materials entered into the record for the class certification motion. Thus, the Special Master recommends sealing Defendant Exhibits 7 and 9, which are different versions of the Base Rate Model, in their entirety, as well as Plaintiff Exhibit 37 and Defendant Exhibits 8 and 10, which are different versions of the Cashion Spreadsheet.

The Special Master notes other documents and transcripts disclose the details of the Base Rate Model and the contents of the Cashion Spreadsheet. (See Pl. Exs. 1, 39-40, 42-44, Cantor Nov. 14, 2018, Supplemental **[*59]** Expert Report; Def. Exs. 1, 3-5, 11, 12, portions of the transcripts of Mr. Cashion's deposition, many portions of the hearing transcripts for Sept. 19, Nov. 9, and Nov. 20, 2018, and some portions of the slides submitted to the Court during those hearings). In section V. below, which contains the document-by-document analysis, the Special Master identifies the specific portions of these latter exhibits, transcripts, and slides that the Special Master recommends be sealed on the ground that they contain Highmark trade secrets.

The Special Master finds Highmark has shown with specificity that there is "good cause" within the meaning of *Avandia* and *Publicker* to seal the information in the "Base Rate Model" and the "Cashion Spreadsheet." Further, the Special Master finds Highmark has also shown that it would suffer current, serious competitive injury

were its "Base Rate Model" or the "Cashion Spreadsheet" be disclosed, and that injury is likely. The Special Master concludes Highmark's interest in maintaining the secrecy of the information in the "Base Rate Model" and the "Cashion Spreadsheet" overrides the presumption of public access under both the "compelling countervailing interest" [*60] standard of *Cendant* and the *First Amendment* standard.

## 2. UPMC's Claims Data are Trade Secrets.

UPMC states that its claims data "has never been made public and are among UPMC's most closely-guarded and confidential information," (UPMC Aug. 31, 2018, Ltr. Br. at 7, relying on Farner Aug. 29, 2018, Decl. □ 34), in part because "in the healthcare industry, past claims and pricing data are the primary bases for future contractual negotiations between providers and payors." (*Id.* at ¶ 36). By "claims data," UPMC means "details regarding patient treatment and billing" as well as "UPMC's pricing and rates for services charged to many of UPMC's payors." (Farner Aug. 29, 2018, Decl. at ¶ 31). "UPMC, in fact, uses these claims and pricing data in negotiations or payor-provider contracts and amendments to existing contracts." (*Id.*). UPMC states it would be "severely prejudice[d]" if its provider competitors (i.e., competing hospitals and physicians) had UPMC's claims data because that data would allow them to "extract a better deal and increased rates from payors." (*Id.* at ¶ 37). In addition, UPMC is concerned that, were insurance companies to access to its claims data and discovered the reimbursement rates UPMC [*61] had agreed to with other payors, the insurers could negotiate lower reimbursement rates in their contracts with UPMC. (*Id.* at ¶ 36). UPMC's contracts with insurers (payors) contain confidentiality provisions barring disclosure of the negotiated reimbursement rates with UPMC. (*Id.* at ¶ 35).

Based on those declarations, the Special Master finds that UPMC claims data rises to the level of a trade secret, which courts will protect. The Special Master further finds UPMC has shown with specificity that there is "good cause" within the

meaning of *Avandia* and *Publicker* to seal its claims data. UPMC has also shown that it would suffer current, serious competitive injury were its raw claims data be disclosed, and that injury is likely. The Special Master concludes UPMC's interest in maintaining the secrecy of this claims data overrides the presumption of public access under both the "compelling countervailing interest" standard of *Cendant* and the *First Amendment* standard. Accordingly, the Special Master recommends sealing Plaintiff Exhibit 27, and, as detailed *infra* Section V. (pp. 69-99), other materials that reveal UPMC's claims data.

The Special Master, however, does not agree with UPMC's other argument that [*62] "all calculations" performed by Plaintiff's and Highmark's experts "based on UPMC's confidential and proprietary claims data are also confidential and proprietary" and thus the entirety of each document referencing UPMC claims and pricing data should be sealed. (UPMC Aug. 31, 2018, Ltr. Br. at 7, relying on Farner Aug. 29, 2018, Decl. ¶ 37). The Special Master does not accept such a broad, sweeping assertion. Thus, the Special Master will not make such a wholesale sealing recommendation regarding the experts' use of UPMC's claims and pricing data in their reports and testimony. Rather, the Special Master will make a document by document, if not line by line, evaluation of whether that document or line contains UPMC's secret claims data and whether that should be sealed. (*See infra* Section V. pp. 69-99).

## 3. Negotiated Reimbursement Rates between Payors and Providers Are Confidential Commercial Information.

Highmark and UPMC both seek to seal information in the class-certification record that reflects reimbursement rates, i.e., the amounts a payor (insurance company) agrees to reimburse a healthcare provider for providing service to the payor's members. Plaintiff filed two exhibits that [*63] are "payor-provider" contracts. (*See* Pl.

Exs. 28 and 48[36]). Highmark seeks to seal portions of both of these "payor-provider" contracts (*see* Fitzpatrick Feb. 22, 2019, Third Supp. Decl. at □ 2),[37] while UPMC seeks to seal Exhibits I and II of Plaintiff Exhibit 28. (*See* UPMC's Sealing Chart, Aug. 31, 2019, at 41-42).

In "the healthcare industry, past claims and pricing data are the primary bases for future contractual negotiations between providers and payors." (Farner, Aug. 29, 2018, Decl. □ 36). UPMC, for example, "conducts extensive and detailed analysis of how particular rate and contract terms will affect UPMC's financial performance," which analysis "is built on UPMC's past service and payment data." (*Id.* at □ 16). Past reimbursement rate information plays a role in payor-provider contract negotiations, with payors and providers assessing their own data to argue for rate "benchmarks." (*Id.* at □ 17).

Highmark and UPMC argue negotiated reimbursement rates are highly confidential information, protected by strict contractual confidentiality provisions as well as by industry practice. (*See* Farner Aug. 29, 2018, Decl. □ 20; and Fitzpatrick Feb. 22, 2019 Decl. □□ 6-7).

The Highmark and **[*64]** UPMC declarants make clear that payor-provider contracts are "integral" to the financial well-being of the contracting companies. (*See, e.g.,* Farner, Aug. 29, 2018, Decl. □ 13; Fitzpatrick July 10, 2018, Decl. □ 2). These contracts set the terms of how the provider "will be reimbursed for delivering healthcare services to patients with an insurance plan offered by a particular insurer." (*Id.*). The reimbursement rates "are among the most heavily negotiated terms of UPMC's payor-provider contracts because even small changes can have significant financial implications for UPMC." (*Id.* at □ 16). UPMC states it "devotes substantial resources and executive time to preparing for and conducting payor-provider negotiations," and notes it "has a team of personnel whose primary responsibility is to prepare for and manage these negotiations and contracting issues." (*Id.* at □ 14; *cf.* Fitzpatrick July 10, 2018, Decl. □ 2).

Highmark and UPMC explain the negotiated reimbursement rates vary across insurance companies, individual hospitals, and type of health care services. (*See* Fitzpatrick Aug. 21, 2018, Decl. □ 10, and Farner Aug. 29, 2018, Decl. □ 19). UPMC states that it "may receive different rates **[*65]** at different hospitals for the same surgical procedure." (Farner Aug. 29, 2018, Decl. □ 19).

In addition, another insurance company "may reimburse UPMC differently for the same service at that hospital." (*Id.*). In yet another variation noted by UPMC, a third insurance company "may reimburse UPMC more favorably for physician services, but less favorably for hospital stays or outpatient services." (*Id.*). From the other side of the negotiating table, Highmark states that "the rates and terms that Highmark agrees to vary from provider to provider," and "Highmark's provider negotiations are individualized" with Highmark seeking to "negotiate the best rates and terms with each hospital based on Highmark's assessment of that hospital." (Fitzpatrick Aug. 21, 2018, Decl. □10).

Both Highmark and UPMC state they maintain strict confidentiality about reimbursement rates and endeavor to ensure that these rates are not disclosed to other insurance companies or health care providers. (*See* Fitzpatrick Aug. 21, 2018, Decl. □□10-11; Fitzpatrick Feb. 22, 2019, Decl. □□ 6-7; Farner Aug. 29, 2018, Decl. □ 20). Indeed, both payor-provider contracts entered into the record as Pl. Exs. 28 and 48 contain confidentiality **[*66]** clauses, generally prohibiting the signatories from disclosing the contract terms. (*See* Pl. Ex. 28 at □ 7.2.2 and Pl. Ex. 48 at § C). Highmark and UPMC state that, were the rate information to fall into the hands of their

_____

[36] Pl. Ex. 28 is a contract between Highmark and UPMC's Presbyterian Hospital, dated June 28, 2002. Pl. Ex. 48 is a contract between Highmark and The Western Pennsylvania Hospital, dated May 23, 2008.

[37] Although Highmark originally sought to seal Plaintiff's Exhibits 28 and 47 in their entirety, it reconsidered that request and "decided to request only certain limited portions of these two documents remain confidential," *i.e.*, "certain commercially sensitive contract terms" and "specific financial terms." (Fitzpatrick Third Supp. Decl., Feb 22, 2019, □□ 3-4).

competitors or their counterparts, those other entities would use that detailed information to negotiate better rates for themselves. (*See* Fitzpatrick Feb. 22, 2019, Decl. □ 6; and Farner Aug. 29, 2018, Decl. □ 20).

Based on these declarations, the Special Master finds that negotiated reimbursement rates are confidential commercial information of the sort courts protect. Further, the Special Master credits the declarants' statements to the effect that disclosure of these rates will cause each of their companies to suffer current, serious injury, with the likelihood of that injury being a significant threat to each company's current and future negotiating abilities. The Special Master notes and credits the declarations stating that past reimbursement rates play a role in setting reimbursement rates today for Highmark and UPMC. Thus, the Special Master finds prior negotiated reimbursement rates are not stale. As such, the Special Master finds Highmark and UPMC have shown **[\*67]** an overriding interest in maintaining the secrecy of those rates that overcomes the presumption of public access to those materials that have been put in the judicial record under both the "compelling countervailing interest" standard of *Avanti* and *Cendant* and the *First Amendment* standard. In this Report and Recommendation, this finding applies to Plaintiff Exhibits 28 and 48, but this finding may be expanded to additional documents or portions of documents based upon materials discussed in supplements to this Report and Recommendation.

### 4. "Deal Points" in Provider-Payor Hospital Contracts.

Highmark and UPMC seek to seal documents on the grounds they reflect contractual "deal points" between providers and payors. (*See e.g.*, Highmark June 1, 2018, Ltr. Br. at 3; UPMC Aug. 31, 2018, Ltr. Br. at 9-10). As to contractual "deal points," UPMC identifies provisions common to most commercial contracts, such as the term of the contract and rescission clauses, as well as ones specific to the health care industry, such as what facilities are "in network," what specific services are covered, etc. (*See* Farner Aug. 21, 2018, Decl.

21). Not surprisingly, given the sophistication of the contracting parties, these **[\*68]** terms are not negotiated one-by-one, but the parties will negotiate holistically, capitulating on some terms to gain concessions on others. (*Id.* 22).[38]

Neither Highmark nor UMPC has made a sufficiently particularized showing that identify which "deal points" they claim are confidential commercial information such that the Special Master can make a general recommendation concerning "deal points" (other than the negotiated reimbursement rates) in hospital contracts. The Special Master will evaluate contractual "deal points" on a document-by-document basis below in section V.

### D. Highmark-UPMC 2002, 10 year Agreement

*Intentionally omitted. Analysis of this agreement will be included in the Supplemental Report and Recommendation.*

### E. "Public Confusion" is not a Basis to Seal Highmark's Historic Community Blue Product.

With respect to its Community Blue product, which Highmark marketed between 1998 and 2004,[39] Highmark argues that potential public confusion is a stand-alone reason to seal documents. [Highmark June 1, 2018, Ltr. Br. at n.3 and at 6), citing *United States v. Amodeo, 71 F.3d 1044 (2d Cir. 1995)]*. Highmark characterizes the materials it seeks to seal as "discuss[ing] the historical Community Blue product that Highmark discontinued in 2004." (Fitzpatrick **[\*69]** Aug. 21, 2018, Decl. ¶ 4). It goes on to explain that the documents it seeks to seal "mostly reflect Highmark's internal decision-making process regarding the decision to discontinue the old

---

[38] The Special Master accepts UPMC's explanation as accurate for the healthcare insurance industry in Western Pennsylvania, even though Highmark did not provide this level of detail in its briefs or declarations.

[39] (*See* Fitzpatrick May 30, 2018, Decl. at ¶¶ 5-6). Plaintiff alleges Highmark discontinued this product in 2004 as part of the anti-trust conspiracy with UPMC. (*See supra* p. 6, quoting Plaintiff's Third Amended Complaint at 22).

Community Blue product in 2004." (*Id.* at ¶ 5).

Highmark currently markets a product under the name "Community Blue," but the current produce differs in many respects from the discontinued product of the same name. (Fitzpatrick Aug. 21, 2018, Decl. ¶¶ 4-7). Nevertheless, Highmark is concerned that "inevitable marketplace confusion ... will result from disclosing information about the old Community Blue . . . ." (*See, e.g.*, *id.* at ¶6).

In response to the Special Master's request for a more detailed explanation of current, competitive harm, Highmark submitted a second supplemental declaration of Mr. Fitzpatrick. Mr. Fitzpatrick stated that disclosure of internal documents relating to the discontinuation of the historic Community Blue product in 2004 would cause current Highmark customers to read "misleading press reports" (*id.* ¶6), and conclude that: (1) "Highmark will be discontinuing the current Community Blue product," and thus that (2) they need to purchase new insurance, and act on that **[*70]** mistaken assumption. (*Id.* at ¶6). Highmark also made a related argument that customers would conclude "Highmark was going to raise their premiums substantially." (*Id.*). Mr. Fitzpatrick indicates that "other health insurers like UPMC Health Plan, United, Cigna, and Aetna" will "capitalize on"— which the Special Master reads as "foment"— marketplace confusion to gain Highmark's current customers. (*Id.*).

The Special Master is not persuaded by Highmark's general conclusion that marketplace confusion is likely, let alone "inevitable." Additionally, Highmark's recitation of the anticipated chain of events Highmark outlined in Mr. Fitzpatrick's August 21st Declaration does not convince the Special Master that harm is reasonably certain to occur or that the harm will be severe. Materials that are 15 to 20 years old regarding a discontinued product are stale and Mr. Fitzpatrick's concerns are speculative, and without sufficient factual support to overcome the presumption of public access.

The current product of the same name has been in existence since 2012 and, presumably, is well-established at this time — seven years after

introduction of this new, current product. Furthermore, even were the **[*71]** press to report the contents of these documents or were a competitor to try to create marketplace confusion, Highmark can dispel any confusion about these stale documents via its website and by supplying clarifying information to its agents, brokers and even directly to its customers. Essentially, the Special Master finds Highmark's allegation of some potential, remote, unspecified competitive harm does not satisfy its obligation to show that "good cause" exists at this time to issue a sealing order for documents concerning the historic Community Blue product. (*See Publicker, 733 F.2d at 1071*). Thus, Highmark has not overcome the presumption of public access under the *Cendant* common law standard.

The Special Master does not read the Second Circuit's ruling in *Amodeo* as persuasively establishing "public confusion" grounds in the circumstances here to seal what are here "judicial records" submitted with adjudicative motions. *Amodeo* concerned investigative reports by a court-appointed officer to investigate allegations of corruption in a local arm of the AFL-CIO, which she did by subpoenaing documents and interviewing "hundreds of witnesses." (*Amodeo, 71 F.3d at 1047*). The officer submitted periodic reports to the court on her own initiative." **[*72]** (*Id. at 1052*).

The Second Circuit noted in *Amodeo* that parts of the submission there contained unsworn accusations "some or all may be of doubtful veracity, possibly stemming in part from apparent personality conflicts" and that other information had been redacted. (*Id.*). In those circumstances, the Second Circuit found that making public this aspect of the report submitted to the court would "more likely [act] to mislead [rather] than inform the public." (*Id.*). The materials at issue in *Amodeo*, submitted to the court for reasons not directly connected to the court's adjudicative function there, are qualitatively different than those at issue here. The danger for immediate reputational harm to an individual under criminal investigation, which was present in *Amodeo*, is not present here, and Highmark has failed to demonstrate a specific

identifiable harm here.[40]

Accordingly, the Special Master does not recommend sealing materials concerning the historic Community Blue product on the grounds they may cause public confusion, to wit, Pl. Ex. 1 at 49-50; Pl. Ex. 2, 246:3-248:22; Pl. Ex. 4, at 899, 900 2, 901 5, 902-908; Pl. Ex. 8; Pl. Ex. 9; Pl. Ex. 13; Pl. Ex. 30; Pl. Ex. **[*73]** 32; and Pl. Ex. 47 at 176:15-179:11 and Def. Ex. 6 at 49-50 (same as Pl. Ex. 1).

## F. Allegations that Reports and Testimony of Plaintiffs Expert Contain "False" or "Incorrect" Information are not Bases Upon Which to Seal.

Highmark seeks to seal portions of the reports and testimony of Dr. Cantor, Plaintiffs expert, on the ground that these portions "grossly misstate" the process Highmark uses to set small group premiums. Highmark argues disclosure of such "false information" would "mislead "the public, Highmark's customers and competitors." (Highmark June 1, 2018, Ltr. Br. n. 3). Highmark claims it "would have no way to correct the false claims without revealing additional highly confidential information." (*Id.*).[41]

To support this argument, Highmark submitted two declarations by William Cashion, Highmark's Chief Actuary. In his Dec. 6, 2018, Third Supplemental Declaration (¶ 12), Mr. Cashion stated that he had reviewed Dr. Cantor's September 19, 2018, testimony before the Court, her deposition, her reports and his Second Supplemental Declaration. Based on this review he broadly testified in deposition that much of Dr. Cantor's testimony misinterprets how the base rate model and premium-setting **[*74]** process works (*e.g.*, Tr. 132:9-134:8; 138:18-20). In his Supplemental Declaration, he asserted that, "[a]s I have explained previously regarding Dr. Cantor's deposition testimony and expert reports, disclosure of this misleading and inaccurate information would be damaging because Highmark would have no way to correct the false claims without revealing publicly highly confidential information about the way the premium-setting process actually works. *See* July 12, 2018, Suppl. Decl. of William Cashion 7d-f." (Cashion Dec. 6, 2018, Decl. 12).

In his July 12, 2018, Declaration, Mr. Cashion made similarly general allegations, stating, for example, "[p]ortions of the Expert Report of Robin Cantor (Pl. Ex. 1) discuss, largely incorrectly, Highmark's processes for determining small group premiums. *See* Pl. Ex. 1 at 6, 7, 10, 12-13, 17-18, 35, 50-53, 56-58." [Cashion July 12, 2018, Decl. 7(d)].[42]

The Special Master finds Highmark's "false information" argument fails to satisfy Highmark's burden. First, alleged "false information" self-evidently cannot be trade secrets or other confidential commercial information of Highmark; thus, such statements are not "the kind of information that courts will **[*75]** protect."

---

[40] Highmark seeks to bolster its "confusion argument" by noting a trial court grant of an injunction in a case where the court found, in part, that "selective and out-of-context disclosure may lead to confusion in the patient community and undeserved reputational harm." [*In re Zyprexa Injunction, 474 F. Supp. 2d 385, 425 (E.D.N.Y. 2007)*]. *Zyprexa* concerned a breach of a discovery protective order by a lawyer in the case, who provided discovery documents from Eli Lilly to the New York Times for publication. The issue before the court in *Zyprexa* was whether to issue an injunction to prohibit public dissemination of the ill-gotten Lilly documents Although Highmark signals this case as analogous, using a "*cf.*" cite, the Special Master notes that this case helpful. The reasons for sealing laid out in *Publicker*, do not include protecting the public from possible confusion. In addition, the Special Master notes that on appeal, the Second Circuit found irreparable harm in the disclosure of Eli Lilly's trade secret—it did not mention the trial court's *dicta* about public confusion. [*Eli Lilly & Co. v. Gottstein, 617 F.3d 186, 196 (2d Cir. 2010)*].

[41] Highmark makes this "false information" argument in connection with Pl. Ex. 1; Pl. Ex. 42; Pl. Ex. 44; Def. Ex. 1; Def. Ex. 3; Def. Ex. 6 (same as Pl. Ex. 1), Dr. Cantor's Supplemental Expert Report (ECF No. 591), as well as

Plaintiff's briefs filed in support of Class Certification (ECF Nos. 526, 556, 575). Highmark makes this argument in throughout its sealing requests for Dr. Cantor's three reports, her deposition testimony and testimony before the Court. Highmark also argues to seal some portions of Dr. Johnson's reports and testimony where he "corrects" Dr. Cantor.

[42] In the July 12 Declaration Mr. Cashion made identical statements with respect to Dr. Cantor's Rebuttal Report (Pl. Ex. 42), and her deposition transcript (Pl. Ex. 44 and Def. Ex. 3). [ 7(e) and (f)].

(*Cendant, 260 F.3d at 194*; *Publicker, 733 F.2d at 1071*). Only "certain exceptions to the presumption of openness of judicial proceedings" exist. (*Publicker, 733 F.2d at 1070*). As in *Publicker*, "the exception that is closest in this case is the protection of a party's interest in confidential commercial information, such as a trade secret." (*Id. at 1071*). As noted above, not all commercial harms or financial losses are entitled to court protection via sealing, including information that embarrasses or injures corporate reputation, that may cause the value of stock to decline, or poor management. (*See supra* Section III. pp. 20, 25). Highmark's concerns of "disparagement" are viewed by the Special Master as a variation on "embarrassment," which the Third Circuit has made clear is not within the exception to public access. [*See Avandia, 924 F.3d 662, 2019 WL 2119630 at * 9* ["Mere embarrassment is insufficient to overcome the strong presumption of public access inherent in the common law right" citing *Brown & Williamson Tobacco Corp., 710 F.2d at 1180*, for the proposition that "'Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know.'"].

Second, the Special Master finds Highmark failed to show that good cause exists for sealing the so-called "false information" by Dr. Cantor. **[*76]** (*Id.*).[43] Mr. Cashion's declarations are so general that the Special Master is unable to discern what specific information Highmark claims Dr. Cantor is misrepresenting or what the precise nature of the

---

[43] At times Highmark identifies a different injury due to disclosure of Dr. Cantor's so-called "false statements" about Highmark's premium-setting process; to wit, Mr. Cashion declares in reference to certain portions of Dr. Cantor's reports or testimony that, "although Dr. Cantor often misinterprets how the base rates model and premium-setting process works, the discussion has enough detail that it would be commercially detrimental if the information were disclosed." [(Cashion July 12, 2018, Decl., July 12, 2018, 7(d)]. This argument for sealing is plausible on its face. Thus where Highmark makes this argument, the Special Master will assess in the context of a document by document review whether Dr. Cantor's statements, if made public, could reveal confidential commercial information of Highmark. (*See infra* Section V. pp. 69-99).

claimed harm is.

Although the Special Master gathers that Highmark contends that Dr. Cantor misunderstands its premium-setting process, Highmark has not identified with specificity the errors it believes Dr. Cantor commits. Mere references to pages in reports and transcripts are insufficient to illuminate what Highmark contends are "false." In other words, the support for this argument is Highmark's *ipse dixit*. Similarly, Highmark's allegations of harm are too general. Mr. Cashion declares that "disclosure of this misleading and inaccurate information could be damaging because Highmark would have no way to correct the false claims without revealing publicly highly confidential information about the way the premium-setting process actually works." (Cashion Dec. 6, 2018, Decl. 12).

Mr. Cashion goes on to assert that Highmark cannot counter those claims without revealing confidential information, but nowhere in his declaration does he identify a specific harm Highmark will suffer. **[*77]** Highmark has not shown that disclosure of the alleged "false information" will likely work a severe or irreparable harm. Highmark broadly claims that it would have "no way" to correct the claims other than by disclosing confidential information. Making public information that Mr. Cashion claims is false does not prevent Highmark from asserting that Dr. Cantor is incorrect.

Finally, the credibility of and weight to be given to Dr. Cantor's reports and testimony are issues better resolved by the Court. The Court has had the benefit of hearing the testimony of Dr. Cantor, Dr. Johnson, Mr. Cashion and others, of reading the reports and declarations and of the advice of the Court's Technical Advisor. On this record, the Court is well positioned to determine if Dr. Cantor's reports and/or testimony are false and, if so, to revisit afresh the question of whether and what should be sealed. The record before the Special Master in this referral for a recommendation on sealing is a much more limited record than that before the Court.

Accordingly, on the basis of the record presented

2019 U.S. Dist. LEXIS 142214, *77

to the Special Master, the Special Master finds Highmark has failed to make its two required showings under *Avandia* **[*78]**—"kind of information courts protect" and "good cause for sealing." (*Avandia, 924 F.3d 662, 2019 WL 2119630 at *4*, citing *Cendant, 269 F.3d at 194*). Thus, Highmark has not overridden the presumption of public access under the common law standard. The Special Master recommends not sealing materials on the grounds that Highmark alleges those materials contain "false information" by Dr. Cantor.

### G. Prior Conditional Sealing by the Court in Connection with Other Motions did not Resolve the Sealing Issues Now Presented.

Highmark argues that the Court already has sealed certain materials at issue here in the context of briefing for the UPMC settlement and Highmark's motion for summary judgment and should consider the issue decided. (*See* Highmark Aug. 31, 2018, Ltr. Br. at 1-2, and Sept. 13, 2018, email from Mr. Friedman to W. Anderson).[44] Highmark identifies certain docket entries as evidence that the Court already has sealed certain materials: (ECF 380, 381, 454, 459, 469, and 473).

The Special Master has reviewed those docket entries and notes that the Court's entry stated - "decision to unseal documents deferred." (ECF 454, 469). The Special Master reads that language as evidence the Court intended only to conditionally seal those documents.

Although Highmark **[*79]** cites *Franklin v. EAN Tr.*, 2012 WL 12996184, at *4 (W.D. Ky., Sept. 4, 2012), for the proposition that "the contents of the order, and not any descriptive docket notation which may have been written by the court clerk, are controlling," the Special Master notes that

*Franklin* involved which of two conflicting deadlines applied—the one in the written order or the one in the docket entry.

In contrast, here there is no conflict between the Court's written orders (*see* ECF Nos. 454 and 469) and the docket entries. Furthermore, a single, four-page brief was submitted for the documents Highmark sought to seal in connection with its motion for summary judgment (ECF No. 453). It is understandable that the Court would have conditionally sealed the documents submitted with summary judgment briefing. The Special Master has reviewed Highmark's sealing brief. The brief does not appear to the Special Master to meet the heavy burden imposed on movants by the Third Circuit for a final and binding decision on sealing. [*See, e.g., Cendant, 260 F.3d at 194* ("Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient")]. Furthermore, as noted above, the law is clear that sealing decisions must be based on the current state of affairs (*id.*); here, current decisions **[*80]** mean 2019, not when the Court decided summary judgment in August 2017 (*see Cole's Wexford Hotel, Inc. v. Highmark, Inc., 2017 U.S. Dist. LEXIS 129181, 2017 WL 3492692 (Aug. 15, 2017)). (Id. at 196*).

With the understanding that the Court only conditionally sealed these documents set out above, the Special Master will undertake to review these documents and make recommendations on sealing them as the Special Master does for all other materials before him. If the Special Master's misunderstands the Court's intent with respect to any of the Court's earlier actions, the Court will make clear the scope and nature of its ruling.[45]

---

[44] The class certification exhibits that Highmark states were subject to previous sealing decisions by the Court are: Pl. Ex. 35, Pl. Ex. 39, Def. Ex. 8, also Pl. Ex. 1 at 57 ("on page 57 this section contains a screenshot of a document that Judge Conti has already sealed in this case in connection with briefing for summary judgment") and Def. Ex. 4 (Highmark's Responses to Plaintiff's Second Set of Interrogatories—Class Certification).

[45] Highmark makes a related argument throughout its Sealing Chart, that either the Court or the Special Master have previously sealed similar documents. [*See, e.g.*, Highmark Sealing Chart at 42 in support of sealing Pl. Ex. 4 states: "R&R #2 at 52 (recommending sealing competitive strategy documents.)"]. On the basis of the record currently before the Special Master, the Special Master is unable to verify these allegations as to any similarity of the documents considered in R&R #2. Thus, the Special Master is not willing to rely on earlier findings as to unspecified documents as binding here. [*See Avandia, 924 F.3d 662, 2019 WL 2119630* at n. 12

## H. Plaintiff Exhibits 17 and 29

In support of its motion to certify the class, Plaintiff filed exhibits 17[46] and 29,[47] which are economic reports concerning PID's regulatory approval of Highmark's affiliation with WPAHS and the implementation of an integrated delivery and financing system (IDFS).[48] These exhibits total more than 600 pages. Plaintiff cited nine pages of these exhibits in its briefs.[49] [50] Highmark seeks to

_____

(requests for sealing cannot be supported by an 8-year-old declaration about "the same type of documents," when the court has "no way to verify that assertion")]. In any event, the true inquiry is whether documents qualify for sealing at this time, not based on a record of several years ago.

[46] Pl. Ex. 17 is a report titled "Economic Analysis of Highmark's Affiliation with WPAHS and Implementation of an Integrated Delivery System," which was prepared by Compass Lexecon, dated April 24, 2013 (the "Compass Lexecon Report").

[47] Pl. Ex. 29 contains what appears to be multiple reports. The first is "Amended April Report of Barry C. Harris, Economists Incorporated, Oct. 15, 2012,"(HMK CW 0002373-2533) submitted to PID to address "questions and issues identified in the PID Information Requests." (See HMK CW 00002376). Pl. Ex. 29 also contains supplements to the "Amended April Report," all dated Oct. 15, 2012, including: "Amended Supplement 3 to Amended April Report" (HMK CW 00002534-2552); "Amended Supplement 4 to Amended April Report" (HMK CW 00002553-2580); "Amended Supplement 5 to Amended April Report" (HMK CW 00002581-2597); and "Supplement 6 to Amended April Report" (HMK CW 00002598-2646). Each of these supplements are individually paginated.

[48] These reports were prepared "in connection with a lengthy regulatory review [by the PID] of the then-proposed affiliation between Highmark and WPAHS." (Cashion Dec. 6, 2018, Decl. at ¶ 5). Compass Lexecon served as the economics expert of the PID, while Dr. Harris was retained by Highmark. The PID published a redacted version of the Compass Lexecon Report on the PID website; the PID maintains the entire Harris Report as confidential. Ultimately, the PID approved the Highmark/WPAHS affiliation in April 2013 (see, e.g., Feb. 8, 2019, Ltr. PID to the Special Master at 2), which resulted in Allegheny Health Network and Highmark becoming "the second largest integrated delivery and financing system in the country, known as an 'IDFS.'" (Cashion Dec. 6, 2018, Decl. at ¶ 6). According to Highmark, UPMC is "the primary competitor" of the AHN/Highmark IDFS. (Id.).

[49] In its briefs on class certification, Plaintiff does not quote or even paraphrase the content of Pl. Exs. 17 and 29. Rather

seal the non-public version of Plaintiff Exhibit 17 and the entire Plaintiff Exhibit 29.

Highmark makes two general arguments for sealing. First, PID deems these reports to be confidential and, second, the reports contain trade secrets and other **[*81]** confidential commercial information, disclosure of which will cause significant competitive harm to Highmark. (See, e.g., Feb. 22, 2019, Ltr. Highmark to J. Levie).[51] In this section, the Special Master only addresses Highmark's argument that the fact PID maintains the reports as confidential is an independent reason to seal these exhibits.

### 1. Plaintiff Exhibits 17 and 29 Should be Excerpted.

Before addressing sealing, there is an issue as to whether Plaintiff, which only referenced nine pages of these exhibits in its briefs, complied with LRCvP 5.4(B) when it filed Exhibits 17 and 29, totaling over 600 pages. This local rule provides: "A party making or responding to a motion or seeking relief under the Federal Rules of Civil Procedure shall file only that portion of discovery requests and responses as needed to decide the motion or determine whether relief should be granted." For the reasons set forth below, the Special Master finds Plaintiff has not complied with this rule, and

_____

Plaintiff includes pinpoint citations to pages in those exhibits. For example, on page 4 of Plaintiff's Memorandum in Support of Motion for Class Certification (ECF 534-1), Plaintiff states that "The conspiracy allowed Highmark to maintain and strengthen its market power.17" Note 17 reads: "17 See Cantor Report at 23-24; Ex. 17 29-34, Ex. 29 18-19."

[50] Plaintiff's expert (Dr. Cantor) listed these two exhibits in her expert report and testimony, along with a number of other "Expert Reports," including other reports from Dr. Harris and Compass Lexecon. [See Pl. Ex. 1, Attachment 3, "Material Considered," at 5-6; Pl. Ex. 42, Attachment 3, "Materials Considered," at 5-6; notably Supplemental Expert Report of Cantor, dated Nov. 14, 2018, (no exhibit number), includes no mention of Harris, Compass Lexecon or PID].

[51] Highmark also stated in its Feb. 22, 2019, letter that it would continue to seek sealing of Pl. Ex. 29 in its entirety and sealing of the non-public version of Pl. Ex. 17. Highmark did submit arguments to seal each redaction already made by PID in Pl. Ex. 17. (See Highmark Feb. 22, 2019 Sealing Chart at 48-61).

recommends Plaintiff Exhibits 17 and 29 be withdrawn and only those portions cited by Plaintiff be filed.

After the Special Master verified that the PID currently views these exhibits as confidential and asks **[\*82]** that the confidentiality be maintained in this litigation,[52] the Special Master requested Plaintiff to specify the "portions of the reports, testimony or statements it wishes to submit for the record and withdraw other portions," noting the volume of these exhibits. (*See* Feb. 11, 2019 Ltr., Special Master to Plaintiff and Highmark; and April 26, 2019 Email, Special Master to Plaintiff and Highmark).[53] The Special Master explained that the PID's recommendation to maintain the confidentiality of these exhibits "[did] not obviate the need for the Special Master and the Court to carry out independent evaluations of whether the presumption of public access has been overridden by a compelling countervailing interest demonstrated by the party moving to seal." (*Id.*). The Special Master concluded that,

> [u]nless Plaintiff can make a strong showing to the contrary, it seems that only the references of the portions of the reports cited by Plaintiff in its briefs on class certification or in Dr. Cantor's reports, submitted to Judge Conti during the hearings, or any oral testimony or statements by Dr. Canto during the hearings before Judge Conti should be part of the record and subject to a review for **[\*83]** sealing.

Plaintiff declined to excerpt Plaintiff Exhibits 17 and 29. Plaintiff contended that it "is in no position to limit record evidence . . . that supports it's expert's analysis" because Highmark "has taken the

position that Dr. Cantor has presented no methodology, much less any reasonable methodology to certify the class." (*See* Feb. 19, 2019 Ltr., Mr. D. Stone to the Special Master at 1-2).[54]

Highmark responded to that argument, noting:

> the only reason that plaintiff insists that the other 500+ pages of these reports must remain in the record at all is on the off-chance that the Court or its technical advisor might sort through that morass and find something potentially relevant that plaintiff has not itself called out. If plaintiff itself cannot even identify precisely what in these voluminous reports it is relying on to support its class certification arguments, then surely neither the public nor the putative class members have such a compelling need to see all of this information that it would justify jeopardizing the consumer protection function of the Pennsylvania Insurance Department and causing current competitive harm to third parties and Highmark Inc.

(Feb. 22, 2019 Highmark Ltr. At 2).

The Special Master does not find Plaintiff's **[\*84]** argument to place 600 plus pages of these exhibits in the record persuasive. These exhibits were attached to Plaintiff's briefs filed in support of its motion for class certification; these briefs cited to a few, limited portions of these reports. The Special Master notes that Dr. Cantor, although citing these two reports along with eight other reports that she characterized as "Expert Reports," did not attach any of these documents to her reports. (*See* Pl. Exs. 1 and 42 both include a 10-page "Materials Considered" as Attachment 3). Dr. Cantor's reports are, in this respect, not inconsistent with the practice of not filing source material with an expert report—a practice which likely exists for the same reasons as discovery materials are no longer placed in the court docket, *i.e.*, expense and storage constraints. In any event, in the

---

[52] See Jan. 9, 2019 Ltr., Special Master to PID Commissioner Altman, and Feb. 9, 2019 Ltr., Chief Counsel of the PID to the Special Master.

[53] The April 26th email attached a two-page list of the pinpoint citations to Plaintiff's briefs and Dr. Cantor's report and testimony that the Special master had identified, as well as footnotes referencing the documents from which the list was made. On May 11th , the Special Master followed up with Plaintiff's counsel for a response and re-sent the detailed list on May 14th. (See Email, Ms. Anderson to Mr. Cavanaugh with attachment).

---

[54] Plaintiff also "demand[ed] that Highmark make the required showing necessary to continue [*sic*] any redacted information from public view." (Feb. 19, 2019 Ltr., Mr. Stone to the Special Master at 1).

2019 U.S. Dist. LEXIS 142214, *84

circumstances here, the Special Master believes it appropriate to view Plaintiff Exhibits 17 and 29 as possible source material for the Court, if the Court wishes to verify or examine the original material. Of course, the Court can easily announce a desire to examine any source material.

The Special Master also notes that Plaintiff offers only Dr. Cantor **[\*85]** as its expert. Neither Dr. Guerin-Calvert, who authored the 2013 Compass Lexecon Report (Pl. Ex. 17) nor Dr. Harris, who authored Plaintiff Exhibit 29, is offered as an expert in this litigation, and their reports are not offered as expert reports. Dr. Cantor may consider whatever source material she deems appropriate, subject to the requirements of *Federal Rule Civil Procedure 26(a)(2)(B)* and *Federal Rules of Evidence 701-705*. To the extent she quotes from, relies on, or otherwise adopts portions of the Compass Lexecon or Harris reports, that information can reasonably be expected to be found in her own reports and testimony and, in turn, be before the Court as it renders a decision on class certification.

The Special Master recognizes Plaintiff's concern that Highmark has challenged Dr. Cantor's methodology, and Plaintiff's desire to counter that challenge. Placing 600 plus pages into the record without direction or guidance as to how that material intersects with Dr. Cantor's conclusions or methodology does not seem an effective or cost-effective way to present evidence. The Special Master also is mindful that addressing sealing of this volume of pages, particularly ones involving technical matters, imposes a costly and time-consuming burden on Highmark **[\*86]** and the Court. The Special Master does not find such an undertaking to be proportionate to the needs of the case.

As the Third Circuit recently commented in another context: "We decline to root through the record below and make [Plaintiff's] case for him." [*Zimmermann v. United States Nat'l Labor Relations Bd., 749 F. App'x 148, 150 (3d Cir. 2019)*, referencing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")]. In other words, the onus is on Plaintiff to identify what

portions of the 600 pages that make up Plaintiff Exhibits 17 and 29 it is relying for class certification and not leave it to the Court to ferret out information that Plaintiff might deem helpful to its case.

For the foregoing reasons, the Special Master recommends Plaintiff Exhibits 17 and 29 be withdrawn and only those portions cited or relied upon by Plaintiff be refiled.[55]

Nevertheless, to expedite the sealing review procedure, the Special Master reviewed the briefs, expert reports and hearing transcripts[56] to identify the page citations to Plaintiff Exhibits 17 and 29.[57] Based on the foregoing, the Special Master recommends excerpting the reports to include the following pages cited in Plaintiffs briefs regarding class certification and will make appropriate recommendations of the following **[\*87]** material:

- Pl. Ex. 17 pages: 29-34; 118
- Pl. Ex. 29
    - Harris Amended April Report pages 18-19
    - Harris Amended Supplement 5 pages: 6-7 ( 10); and 10 ( 16).

Although Dr. Cantor did not attach Plaintiff Exhibits 17 and 29 to her expert reports, the Special Master recommends the excerpted exhibits include the pages that Dr. Cantor directly cited in her reports or in her slides presented during the class certification hearing; this recommendation is made as a convenience to the Court in evaluating Dr. Cantor's written and oral testimony:

_____

[55] If the Court requests additional material be included from these exhibits, the Special Master, of course, will review it and make supplementary recommendations on sealing.

[56] For this Report and Recommendation No. 6, the Special Master has reviewed only the class certification materials currently before him.

[57] The pinpoint cites that are listed here reflect input from Highmark (*see* Email Apr. 29, 2019, Highmark to the Special Master). The Special Master twice asked Plaintiff to comment on the pinpoint citations identified, (*see* emails, April 26, 2019, J. Levie to Plaintiff and Highmark, and May 14, 2019, Ms. Anderson to Plaintiff), but Plaintiff expressly refused the Special Master's follow up request for input. (*See* email, Plaintiff to the Special Master, May 17, 2019).

Pl. Ex. 17 (2013 Compass Lexecon Report) pages:
7, 9, 10, 33, 35, 39, 40, 42, 52, 70, 88-89, 111-
112, 115-116, 118, 121,183, 189-190.

Pl. Ex 29 (Harris Reports)
• Harris Amended April Report pages: 3-9 ( 8-
14); 4 n.3; 16 ( 27); 18 ( 10); 18 n. 36; 37 (¶¶
62-63); 40 ( 71); 44 n. 91; 45 n. 94; 47 ( 88);
• Harris Amended Supplement 3 pages: 6 ( 7);
8 ( 9); and last page Table 1;
• Harris Amended Supplement 5 pages: 1 ( 2);
2 n.1; 3 ( 4, 5); 6 ( 10); 10-11 ( 16); and Table
3;
• Harris Amended Supplement 6 pages: 2 ( 5);
8( 12);15-16 ( 20).

For the purposes of making sealing
recommendations, the Special Master only
considers those pages listed above.


**2. PID's [*88] Designation of Exhibits 17 and 29
as "Confidential" does not Obviate the Court's
Burden to Apply the Common Law and, if
necessary, *First Amendment* Standards.**

Highmark argues that the PID maintains as
"confidential" the non-public portions of Plaintiff
Exhibits 17 and all of Exhibit 29, and seems to
argue that this confidentiality designation is an
independent basis to seal these exhibits. As
discussed below, the Special Master finds that the
PID maintains these reports as "confidential"
because Highmark, Highmark, Inc. and/or WPAHS
identified them as "containing confidential and/or
trade secret information by Highmark, Highmark
Inc. and/or WPAHS." (Feb. 9, 2019 Ltr., Chief
Counsel of the PID to the Special Master, at 2).
While the reason for maintaining the reports as
confidential in the regulatory process overlaps with
the reason for sealing the reports in the judicial
process, the processes differ with respect to who
decides—the commercial entity or the Court?

The Special Master wrote to the Commissioner of
the Pennsylvania Insurance Department inquiring
whether the PID desired that the confidentiality of
these two reports be maintained and inquiring as to
the legal basis on which the PID relies in
designating reports confidential. (*See* Jan. 9, 2019
Ltr., Special [*89] Master to PID Commissioner

Altman). The Chief Counsel of the PID responded
that "the Department urges that the unredacted
Compass Lexecon and Harris Reports remain
confidential." (Feb. 9, 2019 Ltr., Chief Counsel of
the PID to the Special Master, at 3). The Chief
Counsel noted that, in the course of exercising its
regulatory responsibilities, the PID received
documents that Highmark Inc. and WPAHS the
involved entities indicated that some of the
materials provided to the Department contained
confidential and/or trade secret information and
requested that the Department not make those
materials available to the public." (*Id. at 2*).
According to the Chief Counsel, based upon the
designation by Highmark and/or WPAHS as
containing "confidential and/or trade secret
information . . . . [and in the case of the Compass
Lexecon Report] certain financial and strategic
information . . . deemed proprietary and
confidential . . . .," certain materials were not made
public and, with respect to the Compass Lexecon
Report, redacted. (*Id. at 2*). The Chief Counsel did
not expand on the Harris Report, noting only that
"[t]he same holds true for information contained in
the Harris Report." (*Id.*). Nor did the Chief Counsel
identify any applicable legislative or regulatory
provisions. [*90] The Special Master notes that,
after this exchange of letters with the PID,
Highmark apprised the Special Master that the
reports are not subject to confidential treatment
under *40 P.S. § 991.1407*.[58] (*See* March 22, 2019

---

[58] *40 P.S. § 991.1407* Confidential Treatment

(a) All information, documents, materials and copies
thereof in the possession or control of the department
that are produced by, obtained by or disclosed to the
department or any other person in the course of an
examination or investigation made pursuant to *section
1406* or investigation made pursuant to *section 1406.1* or
*1406.2* 2 and all information reported pursuant to
*sections 1402(b)(11.1)* and *(11.2)*, *1404* and *1405* 3 shall
be privileged and given confidential treatment and shall
not be:

    (1) Subject to discovery or admissible in evidence in
    a private civil action.

    (2) Subject to subpoena.

    (3) Subject to the act of February 14, 2008 (*P.L. 6,
    No. 3*), known as the "Right-to-Know Law."

Ltr. Highmark to the Special Master).

In addition, the issue before the Special Master and the Court is qualitatively different than the situation with the PID. The burden on the Court is to apply the common law and *First Amendment* standards to sealing requests by a commercial entity. As the Special Master understands the representations by the PID Chief Counsel, the PID did not perform its own analysis as to the confidential or sensitive nature of the materials submitted by Highmark but, rather, accepted Highmark's determination of the need for and request for confidentiality. The Special Master does not believe that unilateral statements by a submitting party to the State regulator that the information merits sealing, without more, compels a recommendation of sealing in a judicial proceeding. That said, the Special Master does acknowledge the request for confidentiality with respect to the materials submitted to the PID as being a factor to be evaluated under the **[*92]** common law and *First Amendment*.

The Special Master, of course, will consider Highmark's sealing requests for Plaintiff Exhibits 17 and 29 under the exception for "confidential commercial information, such as trade secrets." (*Publicker, 733 F.2d at 1071*). To the extent these exhibits include confidential commercial information about third parties, such as WPAHS, AHN, the Special Master also will consider disclosure of their information under the privacy exception afforded third parties.[59] The Special

---

(4) Made public by the department or any other person, except to regulatory or law enforcement officials of other jurisdictions or group supervisors or members of a supervisory college in accordance with *subsection (c)*, without the prior written consent of the insurer to which it pertains unless the department, after giving the insurer and its affiliates who **[*91]** would be affected thereby notice and opportunity to be heard, determines that the interest of policyholders, shareholders or the public will be served by the publication thereof, in which event it may publish all or any part thereof in such manner as it may deem appropriate.

---

[59] Contrary to Highmark's repeated assertions that "third-party Highmark Health . . . has not had an opportunity to provide its

Master is still waiting for Highmark's identification of which portions of Pl. Ex. 29 of the pages it wishes to seal and on what basis.

The Special Master notes that, although Highmark initially sought to seal Dr. Cantor's and Dr. Johnson's expert reports in their entirety, Highmark now seeks to seal only a small portions those reports. Thus, significant portions of the expert reports in this case will be publicly available. Further, the PID apprises the Special Master that the public version of the 2013 Compass Lexecon report is available on PID's website.

## I. UPMC is not entitled to Heightened Privacy Because it has Settled.

Plaintiff and UPMC reached a settlement agreement, which the Court approved in July 2016. (ECF Nos. 414, 415). **[*93]** UPMC was then dismissed from the action. (*Id.*) Now, UPMC seeks to be treated as a third-party with a "heightened privacy in preventing disclosure of its confidential information." (UPMC June 20, 2018, Ltr. Br. at 5 and 7).

Although the Third Circuit recognizes that "reputational and privacy interests of third parties might outweigh the strong presumption of public access," [*United States v. Smith, 776 F.2d 1104, 1110 (3d Cir. 1985)]*, UPMC is not the traditional third-party which the courts have been willing to protect. For example, UPMC is not an unnamed co-conspirator [*see, e.g., United States v. Criden, 681 F.2d 919, 922 (3d Cir. 1982)* and *Smith, 776 F.2d at 1114*] nor is it a private individual whose medical or personnel information may be redacted. [*See, e.g., Foltz v. State Farm Mut. Auto. Ins. Co.,*

---

position on these proceedings to establish the current competitive harm it would suffer as an IDFS in competition with the UPMC IDFS" (Highmark Feb. 22, 2019 Sealing Chart at 48 and 66), the Special Master, in fact, afforded Highmark Health the opportunity to participate in this sealing process, but Highmark Health has not accepted his invitations. (*See* Sept. 17, 2018, email from Ms. Anderson, Counsel to the Special Master, to Highmark, Inc.). Thus, the Special Master finds that Highmark Health's lack of participation and lack of substantiation to support its concerns are not grounds to seal either the non-public version of Pl. Ex. 17 or Pl. Ex. 29.

*331 F.3d 1122, 1137 (9th Cir. 2003)].*

Rather, UPMC is a settling defendant in this lawsuit. It produced virtually all the documents it now seeks to seal at a time when it was a litigant.[60] Furthermore, the gravamen of Plaintiff's complaint is that Highmark and UPMC conspired with each other to drive up premiums for small groups; as such, UPMC's conduct is deeply intertwined with the litigation. [*See, e.g.,* *Shane, 825 F.3d at 308* (distinguishing between the "privacy interests of innocent third parties" and "the conduct of hospitals that agreed to MFN clauses with Blue Cross," which conduct was "intricately bound up with **[*94]** the subject of the lawsuit")]. Indeed, "UPMC" appears 409 times in Plaintiff's Third Amended Complaint, virtually on every page of the 76-page document. (ECF No. 286).

Notably, UPMC has cited no cases for the proposition that a settlement transforms a litigant into an uninvolved third-party entitled to heightened protection. Finally, although UPMC argues that not affording it heightened protection will "cut against public policy favoring settlements" (UPMC Aug. 31, 2018, Ltr. Br. at 6), the Third Circuit has held the "generalized interest in encouraging settlements does not rise to the level of interests that we have recognized may outweigh the public's common law right of access." [*Bank of America v. Hotel Rittenhouse, 800 F.2d 339, 346 (3d Cir. 1986)].* Accordingly, the Special Master does not recommend affording UMPC's interests in secrecy to heightened protection based upon its current status as a third party.

## V. Findings and Recommendations as to Individual Documents

The Special Master now turns to the findings and recommendations on individual documents. The findings and recommendations in Section IV. "Findings and Recommendations on Pervasive Issues" resolve numerous aspects of the review of individual documents. In those cases, the Special Master **[*95]** will refer back to the section number and header to incorporate those findings and recommendations in the individual document review in a streamlined manner. For issues that were not addressed in Section IV. (pp. 28-48), the Special Master will provide a more detailed analysis below.

To be clear, in any instance that the Special Master recommends sealing, it is because the Special Master has found the information to be "confidential commercial information, such as a trade secret," and that "there is a sufficient threat of irreparable harm" if the information is publicly disclosed. (*Publicker, 733 F.2d 1059, 1071*). Further, recommendations to seal are based on the Special Master's findings that the interest in maintaining the secrecy of the information overrides the presumption of public access under both the common law standard as set forth in *Cendant,* and the *First Amendment* standard. (*See supra* Section IV.A (pp. 29-36).

Unless otherwise stated, the Highmark Sealing Chart referenced below is to the version submitted to the Special Master on Feb. 22, 2019, while the UPMC Sealing Chart referenced is the version submitted on August 31, 2018.

| Doc | Doc Description and Sealing Requests | Special Master's Findings and Recommendations |
|---|---|---|
| Pl. Ex. 1 | Expert Report of Dr. Cantor, Plaintiff's expert, Mar. 13, 2018<br><br>*Highmark and UPMC seek to seal portions of this expert report.* | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 2 | Deposition (excerpts), Kenneth Melani, Highmark's then CEO, taken by the DOJ on Feb. 16, 2009 | Highmark seeks to seal portions of a deposition taken nearly a decade ago of its former CEO, concerning events that are at least two decades old. |

---

[60] The one exception is that, after UPMC settled, it "produced highly confidential claims data pursuant to a subpoena from Plaintiff." (UPMC Aug. 31, 2018, Ltr. Br. at 7). UPMC states the "claims data produced by UPMC has never been made public and are among UPMC's most closely-guarded and confidential information." (Farner Aug. 29, 2018, Decl. 34). Accordingly, the Special Master evaluates whether UPMC's claims data qualifies as "confidential commercial information, such as trade secrets" which should be sealed, as noted *supra* Section IV.C(2) (pp. 43-44) on a document by document or line-by-line basis.

| | | |
|---|---|---|
| | Email, Stan Marks (UPMC) to Mr. Melani (Highmark), dated Mar. 15, 2006 | |
| Pl. Ex. 22 | Email, David Samuel (WPAHS CFO) to Citigroup, dated Sept. 28, 2005<br><br>*Allegheny Health Network seeks to seal Pl. Ex. 22 in its entirety.* | Allegheny Health Network seeks to seal Pl. Exs. 22 and 23, making nearly identical arguments as Highmark made in arguing to seal documents discussing its historic Community Blue Product. AHN argued that Pl. Ex. 22 and 23 should be sealed to avoid "public confusion" because it could cause "the public into questioning AHN's current financial strength. AHN also cites *Amodeo*. AHN argues further that these documents could confuse the public as to view of Highmark." It "sponsors the contents [of these documents]" or "create confusion about its view of Highmark."<br><br>The reasoning *supra* Section IV.E(pp. 49-52) that public confusion is not a grounds to seal judicial records applies to this argument by AHN.<br><br>The Special Master also considers AHN's substantive concerns that disclosure of this 14-year-old information could harm AHN today<br><br>The Special Master finds that AHN's allegations that AHN's argument is not supported despite the Special Master having offered AHN the opportunity to submit such evidence. Therefore, there is nothing presented to the Special Master to support a claim for sealing under Third Circuit law. Moreover, conjectural concerns about whether such old documents might suggest AHN "sponsors the contents or create confusion about its view of Highmark" are similarly nonspecific, conclusory, and fail to show specific, serious, reasonably certain, current competitive harm.<br><br>Although the Special Master sent AHN a detailed letter identifying the above-noted deficiencies in its letter and offered it an opportunity to correct those deficiencies, it did not submit any further argument or a declaration. The Special Master reiterated his offer by email on Sept. 20, 2018, but again AHN did not reply. |

| | | |
|---|---|---|
| | | **Accordingly, the Special Master recommends Pl. Ex. 22 not be sealed.** |
| Pl. Ex. 23 | Email, David Samuel (WPAHS CEO) to internal distribution, dated Apr. 28, 2005<br><br>*Allegheny Health Network seeks to seal Pl. Ex. 23 in its entirety.* | For the reasons set forth *supra* as to Pl. Ex. 22, and adopted here, **the Special Master recommends that Pl. Ex. 23 not be sealed.** |
| Pl. Ex. 24 | Spreadsheet listing Highmark/HHIC small-group customers from 2010 and 2012 and the premiums the customers paid.<br><br>*Highmark seeks to seal Pl.'s Ex. 24 in its entirety.* | Customer lists are information courts frequently protect from public disclosure on grounds of competitive harm. (*See*, 12 Pa. C.S.A. §§ 5302 (list of trade secrets includes "customer lists.")) In this document, disclosure of a list of small-group customers linked with their premiums would likely give Highmark's competitors the means to target Highmark's customers and undercut Highmark's ability to retain those customers. (*See* July 10, 2018, Fitzpatrick Decl., ¶ 5.) This poses a threat of serious, competitive harm to Highmark were this data to be made public.<br><br>That this list dates from 2010 to 2012, does not make it stale; many of the customers listed remain Highmark customers today. (*See* August 23, 2018, Cashion Second Suppl Decl. ¶ 4.) In addition, the historic record of premiums inform how current premiums are set throughout the health insurance market.<br><br>Disclosure of individual customer premiums could breach these customers' expectation of privacy.<br><br>Under both the *Cendant* common law standard and the First Amendment, the Special Master finds that Highmark's interest in maintaining the secrecy of its customers lists and premiums paid |

| | | |
|---|---|---|
| | | by customers overrides the public's interest in reviewing Pl.'s Ex. 24.<br><br>**Accordingly, the Special Master recommends Pl.'s Ex. 24 be sealed in its entirety.** |
| Pl. Ex. 25 | PowerPoint, "Labor Advisory Meeting" dated March 19, 2012 (HMKCW00032963-2997)<br><br>PowerPoint, "Highmark Board Update," dated Feb. 29, 2012 (HMKCW00032998-3021)<br><br>*Highmark seeks to seal Pl. Ex. 25 in its entirety.*<br><br>The Special Master notes that there actually are two separate PowerPoints in this exhibit. | Highmark argues this exhibit should be sealed, claiming it discusses "at length Highmark's interpretation of the competitive landscape, its strategy for the future, its financial performance along key metrics, and market share," as well as "particular rates and pricing information between it and providers." (*See* Highmark Sealing Chart at 63). In support, Highmark cites to Fitzpatrick Decl. (May 30, 2018) ¶ 11; Fitzpatrick Suppl. Decl. (July 10, 2018) ¶ 7, which broadly states Pl. Ex. 25, along with some other exhibits are "competitive strategy" exhibits. "Labor Advisory Meeting" PowerPoint. The Special Master finds that, on the material presented to him, the title of the first PowerPoint—"Labor Advisory Meeting"—raises the issue of whether the information was shared outside of Highmark. In a May 15, 2019, email to Highmark the Special Master noted that "much of the information in these exhibits seems to come from, or at least, mirror information in the public documents attached to Dr. Cantor's rebuttal report as appendices . . . Notably, I have no information before me that these exhibits [25, 26, 45], which are Power Points, were prepared for internal Highmark personnel." The May 21 response from Highmark's counsel made no reference to these exhibits. The Special Master also notes that slide 31 (HMKCW00032993) raises the question unanswered by Highmark as to whether the intended audience was external, reading "Committed to Organized Labor—Highmark is committed to using Organized Labor for building and construction projects; ERECT Fund commitment of $10 million; Committed $4 million apprenticeship and training programs." The next two slides detail "Major Renovation Projects" for five hospitals. |

| | | |
|---|---|---|
| | | The Special Master, having read the paragraphs of the declarations cited, finds these declarations to be generalized and broad, and lacking sufficient specificity as to any alleged harm or current, imminent harm. Also, the fact that Highmark did not respond to the Special Master's inquiry as to whether or not the first PowerPoint in Pl. Ex. 25 was prepared for internal Highmark related only to competitive strategy causes the Special Master to conclude that Highmark has not carried its burden for sealing.<br><br>**Accordingly, the Special Master does not recommend sealing the Power Point titled "Labor Advisory Meeting" in Pl. Ex. 25 based on Highmark's arguments.**<br><br>PowerPoint, "Highmark Board Update." This PowerPoint on its face indicates that the audience for it is Highmark's Board. The Special Master also finds this PowerPoint contains highly detailed information on Highmark's client counts, client locations, and client "spends." Further there are slides titled "Top Priorities over the Next 18 Months," "Tactical Plan," "Strategic Context," among others. The Special Master finds this information for the Board is confidential commercial information that courts will protect, and disclosure of which would cause Highmark competitive harm today. This latter finding stems from the fact that this PowerPoint reflects the alignment of Highmark and WPAHS into an integrated delivery system, which system is in effect today. The Special Master concludes that Highmark's interest in maintaining the confidentiality of its strategic and tactical plans with its Board overrides the public interest under both the Cendant common law and the First Amendment standards.<br><br>**Accordingly, the Special Master recommends sealing PowerPoint "Highmark Board Update," HMKCW00032998-3021.** |

2019 U.S. Dist. LEXIS 142214, *95

| | | |
|---|---|---|
| | UPMC seeks to seal certain slides from the "Labor Advisory" PowerPoint, HMKCW0032973-81 | UPMC seeks to seal eight slides on the grounds they contains confidential UPMC rate and pricing information. The Special Master does not agree. First, slides HMKCW0032978-79 contain quotations from newspapers, and thus are not confidential. Second, the slides on HMKCW0032976-77, indicate the information in Highmark's "Internal Claims Data." Third, much of the information on the other slides appear in public documents taken from the PID's website by Dr. Cantor and are attached to Pl. Ex. 42. The Special Master also notes the UPMC is seeking to seal information dating from 2002 to 2011. This information is stale both as a function of passage of time, and as a function of a now-historic business paradigm; the current health care market in Western Pennsylvania in 2019 differs in many respects from that of 2002-2011 including the present one has two Integrated Delivery Systems. The Special Master concludes that UPMC has failed to show that this is confidential information of UPMC that courts will protect, and further that UPMC's interest in keeping confidential another party's information about UPMC does not override the presumption of public access under the Cendant common law standard.<br><br>**Accordingly, the Special Master does not recommend sealing HMKCW0032973-81 of the "Labor Advisory" PowerPoint, for the reasons set forth by UPMC.** |
| Pl. Ex. 26 | PowerPoint, "Highmark/WPAHS Affiliation: Discussion with the Pennsylvania Insurance Department," dated Dec. 15, 2011<br><br>*Highmark seeks to seal Pl. Ex. 26 in its entirety.* | Highmark seeks to seal this PowerPoint because it discusses "at length Highmark's interpretation of the competitive landscape, its strategy for the future, its financial performance along key metrics, and market share." (Fitzpatrick Decl. July 10, 2018, ¶17). It argues disclosure of this document "would give Highmark's competitors valuable insight into Highmark's strategic thinking," which "would be harmful for Highmark." (*Id.*). |
| | | The Special Master notes each page of this PowerPoint bears the word "CONFIDENTIAL" in red letters and in all capitals, in such a position that indicates this designation appeared on the original document. (A separate bates stamp designation is also appears "Highly Confidential – Outside Counsel/Experts Only"). The Special Master, relying on the title of the document and the "CONFIDENTIAL" mark on every pages, finds Highmark used this PowerPoint in making a confidential presentation to the PID. Also mindful of the PID's interest in having its regulated entities be forthcoming with the PID, the Special Master finds that Pl. Ex. 26 is the type of confidential information courts will protect.<br><br>Further, the Special Master finds Pl. Ex. 26 is not stale. It lays out Highmark's long term plans if PID approves the Highmark-WPAHS alliance. The plans and projects in Pl. Ex. 26 are extensive and detailed, and appear to require years to bring to fruition. Given that PID did approve the alliance in April 2013 (see PID Ltr. to J. Levie, Feb. 8, 2019, at 1), these strategic plans and projects appear to still be in effect.<br><br>While the declarations cited by Highmark are not sufficiently detailed and specific to be of help in evaluating this document, review of the document itself, the context in which it was prepared and used, the more recent nature of the transaction referenced and the information contained in it all suffice to support Highmark's overall request that the document be sealed in its entirety.<br><br>The Special Master finds Highmark's interest in maintaining the secrecy of this information overrides the presumption of public access under both the *Cendant* common law and First Amendment standards.<br><br>**Accordingly, the Special Master recommends sealing Pl. Ex. 26.** |

| | | |
|---|---|---|
| | *UPMC seeks to seal slide bates stamped HMKCW00033073* | HMKCW00033073. UPMC's outside counsel was permitted to review Pl. Ex. 26, and urges this one slide be sealed arguing that the comparison of reimbursement rates among UPMC hospitals would enable provider competitors to push for higher rates, and it would allow other insurance companies to push for lower reimbursement rates. (See UPMC Sealing Chart at 40).<br><br>The Special Master accepts UPMC's arguments for sealing this one slide. As stated in section IV.(C)(3), "negotiated reimbursement rates between payors and providers are confidential commercial information," which override the presumption of public access.<br><br>Accordingly, independent of the recommendations on Highmark's request to seal the entire document, the **Special Master recommends sealing slide bates stamped HMKCW00033073 of Pl. Ex. 26 as requested by UPMC.** |
| Pl. Ex. 27 | UPMC payment history/rates 2002-2013, dated July 9, 2013.<br><br>*UPMC and Highmark seek to seal Pl. Ex. 27 in its entirety.* | The Special Master addressed UPMC's claims data and found *supra* Section IV.C(2) (pp. 43-44), Pl. Ex. 27 contains trade secrets of UPMC, and merits sealing.<br><br>**Accordingly, the Special Master recommends sealing Pl. Ex. 27 in its entirety.** |
| Pl. Ex. 28 | Contract between Highmark and UPMC Presbyterian Hospital, dated June 28, 2002<br><br>*Highmark seeks to seal portions of Pl.'s Ex. 28 on pages: 1, 2, 3, 20, 21, 25, 27, and discrete portions of Exhibits I and II.* | Highmark seeks to seal what it characterizes as "particular rates and terms" throughout the contract, while UPMC seeks to seal Exhibits I and II, in their entirety, arguing these contain negotiated reimbursement rates.<br><br>The Special Master has reviewed those portions that Highmark and UPMC seek to seal, and, finds the portions identified by Highmark on pages 20, 21, 25, 27 and the following portions of Exhibits I and II contain negotiated reimbursement rates. |
| | *UPMC seeks to seal Exhibit I and II to the contract.* | Consistent with the findings *supra* Section IV.C(3)(pp. 44-47), that "Negotiated Reimbursement Rates . . . are Confidential Commercial Information," which merit sealing, **the Special Master recommends sealing pages 20, 21, 25, and 27 as requested by Highmark, and the following portions of Exhibits I and II to Pl. Ex. 28: all case rates; unit rates; percentages; payment rates; incentive payments; and financing advances.**<br><br>**However, the Special Master does not recommend sealing those portions highlighted by Highmark on pages 1, 2 or 3.** The contents of these highlights concern 17-year-old possible marketing or benefit plans. Highmark has failed to demonstrate that the information on these pages is not stale. Highmark's declarations are too vague and general to qualify as "confidential commercial information" that the Court should protect under *Publicker.* Further, Highmark has not shown with specificity that it would likely suffer a current, imminent, serious harm were these portions disclosed to the public. |
| Pl. Ex. 29 | Report, Barry Harris Report Regarding Highmark-WPAHS affiliation, dated Oct. 1, 2012<br><br>*Highmark seeks to seal Pl. Ex. 29 . . . .*<br><br>Harris Amended April Report<br>Pages 3-9 (¶¶ 8-14)<br><br>Harris Amended Supplement 3<br><br>Harris Amended Supplement 5 | *Intentionally omitted; this exhibit will be included in the Supplemental Report and Recommendation.* |

| | | |
|---|---|---|
| | UPMC seeks to seal portions of page bates numbered HMKC#0002583, which is page 2 of Harris Amended Supplement 5<br><br>Harris Amended Supplement 6 | |
| Pl. Ex. 30 | Document, "Community Blue Network Shutdown," created sometime between Jan. 2004 and Apr. 2004<br><br>Highmark seeks to seal Pl.'s Ex. 30 in its entirety. | Consistent with the findings supra Section IV.E (pp. 49-52), the Special Master does not recommend sealing Pl. Ex. 30 on the grounds that disclosure of information about the historic Community Blue product would cause public confusion. Inasmuch as possible disparagement is not a sufficient basis for sealing, the Special Master rejects this argument. |
| Pl. Ex. 31 | Emails between Highmark officials regarding a contemplated strategy of creating a subsidiary company at Highmark, dated Aug. 5, 2005<br><br>Highmark seeks to seal Pl.'s Ex. 31 in its entirety. | Highmark argues that this set of Aug. 2005 emails should be sealed as they reveal a corporate strategy that Highmark considered but did not implement. In particular, Highmark argues disclosure "would reveal internal Highmark strategic thinking," and "could potentially" cause marketplace confusion and/or be "exploited by Highmark's competitors." (Highmark Sealing Chart at 67, citing Fitzpatrick May 30, 2018, Decl.☐☐ 11-12)<br><br>Consistent with the findings supra Section IV.E (pp. 49-52), the Special Master does not accept Highmark's argument the public or marketplace confusion is grounds to seal. Further, the Special Master finds that Highmark's argument and the declaration are too speculative as to the likelihood or seriousness of the competitive harm it might suffer. The Special Master also, having read the text of these emails, does not find they reveal "internal Highmark strategic thinking."<br><br>Accordingly, the Special Master does not recommend sealing Pl. Ex. 31. |
| Pl. Ex. 32 | Emails among Highmark executives regarding the termination of Community Blue, dated Jan. 20 and 21, 2004<br><br>Highmark seeks to seal portions of the emails | Consistent with the findings supra Section IV.E (pp. 49-52), that "public confusion" is not grounds to seal information about the historic Community Blue product, the Special Master does not recommend sealing Pl. Ex. 32. The August 21, 2018, Fitzpatrick Second Suppl. Decl. ¶ 6 references possible impact of disclosure on its current Community Blue product, but this assertion is based upon speculation and is insufficient to justify a recommendation of sealing. |
| Pl. Ex. 33 | Emails exchange between Highmark executives, dated June 18, 2004<br><br>Highmark seeks to seal portions of Pl.'s Ex. 33, which is identified by highlighting the exhibit submitted to the Special Master for in camera review. | Through redactions Highmark seeks to maintain the secrecy of one of its specific customers. It also seeks to redact a percentage in this email, which it claims is pricing information.<br><br>The Special Master accepts the privacy interests of individual customers but believes this privacy interest can be protected by merely redacting the name of the customer.<br><br>Highmark also argues these emails contain "pricing information which is a trade secret," and references the Cashion Decl. 8-23-2018, ¶6, and the Fitzpatrick Decl. 5-30-2018, ¶ 10-12, as support for this argument. However, the Special Master, after reading the emails and the references, finds the only "pricing information" to be the single percentage that appears in these emails. The Special Master does not read the Cashion or Fitzpatrick declarations as supportive of Highmark's claims.<br><br>The customer's privacy interest and Highmark's interest in maintaining the secrecy of the percentage override the public's interest in knowing these two details, otherwise, Highmark has not established an interest that overrides the presumption of the public's interest in reviewing judicial records.<br><br>Accordingly, the Special Master recommends sealing the name of the customer the three |

| | | |
|---|---|---|
| 11:16 – 16:22 | | 11:16-16:22 This portion of the deposition concerns Highmark's observations and concerns in the "mid-to late 2000," and "the mid-1990s to late 1990s" about UPMC, and Highmark states the information "reveals strategies Highmark could still use today when negotiating with providers." (emphasis added) However, two-decade-old information is stale. Furthermore, Highmark's general claim it "could" use such a negotiating strategy today is too uncertain and vague to demonstrate that disclosure of this information would cause a serious, specific, competitive injury to it today.<br><br>Accordingly, the Special Master does not recommend sealing 11:16-15:15 or 16:10-16:22. |
| | 153:1-156:22 | 153:1-156:22 Highmark argues public disclosure of this portion of the deposition would reveal negotiating "strategies Highmark could still use today." Highmark fails to identify with specificity what the negotiating strategy is such that it is entitled to protection as "confidential commercial information" under Publicker. Indeed, Highmark does not provide any insight about the strategy thereby depriving the Special Master from any ability to objectively evaluate Highmark's claim. Moreover, Highmark's allegations are too uncertain, too vague for the Special Master to find it would suffer a serious, imminent competitive harm if these pages of a decade old deposition were to be released now. Accordingly, the Special Master does not recommend sealing 153:1-156:22. |
| | 246:3-248:22 | 246:3-248:22 concern testimony about the historic Community Blue product, which Highmark claims would cause "public confusion" if it is disclosed. The Special Master found supra Section IV.E. (pp. 49-52), that public confusion is not a basis to seal judicial records. Highmark's efforts to establish possible disparagement is |
| | | times it appears in these emails and the percentage but does not recommend the remainder of Pl.'s Ex. 33 be sealed. |
| Pl. Ex. 34 | Internal email chain among Highmark executives concerning average small group rate increases, dated Feb. 1-14, 2006<br><br>Highmark seeks to seal portions of Pl.'s Ex. 34, which it identified by highlighting the exhibit submitted to the Special Master for in camera review. | Highmark seeks to seal its average rate increases data found in these 13-year-old emails, arguing among other things that such data remains competitively sensitive today because current small group customers could use this rate information to negotiate different rates for themselves. (See Cashion Decl. 8-23-2018, ¶6.) The Special Master finds this one argument persuasive in line with the findings supra Section IV.C(1)(pp. 39-43).<br><br>The Special Master further finds Highmark's interest in maintaining the confidentiality of its premium rates overrides the public's interest in reviewing the percentages under both Cendant's common law and the First Amendment standards.<br><br>Accordingly, the Special Master recommends sealing all percentages which appear in these emails plus the reference on HMKE00881733 to the specific "book split," but the Special Master does not recommend sealing any other portions of Pl. Ex. 34. |
| Pl. Ex. 35 | "Brand Perception Study: Western PA Employer 2006," presented to Highmark Feb. 2, 2007<br><br>Highmark seeks to seal Pl.'s Ex. 35 in its entirety. | According to the study, Highmark hired an outside firm to conduct a survey of employers in Western Pennsylvania to determine how Highmark was perceived compared to its competitors, assess market penetration of the various entities, and identify opportunities and threats for Highmark. The study sought to measure changes between 2001-2006. Such studies are quintessential proprietary data, which courts protect so that competitors do not get the benefit of the data created at cost to Highmark.<br><br>The main question before the Special Master is whether this 11-year-old study is stale. Mr. Fitzpatrick declares that public disclosure of this document would cause harm today because |

| Exhibit | Description | Recommendation |
|---|---|---|
| | | disclosure would reveal to Highmark's competitors Highmark's priorities and strategies that it could be using today. (Decl. 5-30-2018, ¶¶ 11-12). The study shows what categories of information were, and, according to Fitzpatrick, are important to Highmark in measuring its impact in the market. These are important considerations.

Although these declarations are not a model of specificity as to current harm, the Special Master believes that Highmark has made a sufficient showing that, in the context of the health insurance market, trend studies of customer opinions and wants, remain relevant today, and would give current competitors that had not conducted such studies in 2006, a competitive advantage, which would disadvantage Highmark competitively.

The Special Master concludes Highmark's interest in secrecy in its market research overrides the presumption of public interest under the *Cendant* common law and the First Amendment standards.

**Accordingly, the Special Master recommends sealing Pl.'s Ex. 35 in its entirety.** |
| Pl. Ex. 37 | Cashion spreadsheet (excerpt) / *Highmark seeks to seal Pl.'s Ex. 37 in its entirety.* | The Special Master discussed and found *supra* Section IV.C.(1)(pp. 39-43), that Pl. Ex. 37 constitutes a trade secret of Highmark which merits sealing. **Accordingly, the Special Master recommends sealing Pl. Ex. 37 in its entirety.** |
| Pl. Ex. 38 | Deposition (excerpts), Thomas J. Fitzpatrick, Highmark VP Sales, taken Jan. 10, 2018 / *Highmark seeks to seal these portions of Pl. Ex. 38:* | |
| | 87:5-11 | 87:5-11. Highmark seeks to seal a discussion about whether a particular factor played a role in Highmark's negotiations of reimbursement rates with geographically defined entities between 2009 and 2012. The Special Master finds disclosure of this factor does disclose commercially confidential information of Highmark as to a factor that Highmark deemed important in negotiations. The Special Master is satisfied that Highmark has established that this information has applicability beyond the time period in the excerpt and that Highmark has shown that it would suffer a specific, serious, current competitive threat were these lines be made public.

**Accordingly, the Special Master recommends 87:5-11 be sealed.** |
| | 88:21-89:5, 89:8-14 | 88:21-89:5, 89:8-14. This portion of the deposition transcript concerns what Highmark knew in 2009 about UPMC's contracts with other payors. This information is stale as it is 10 years old, and Highmark has not shown that the information is confidential commercial information of Highmark. Finally, Highmark has not shown it would suffer a specific, serious, current competitive threat were these lines be made public.

**Accordingly, the Special Master does not recommend sealing 88:21-89:5 and 89:8-14.** |
| | 89:15-90:24 | 89:15-90:24. This portion of the deposition discusses at a general level whether two providers received incentives under Highmark's "Quality Blue" program between 2009 to 2012. The declarations submitted by Highmark explain why this type of information about relationship with other entities is sensitive commercial information that should not be exposed to competitors.

**Accordingly, the Special Master recommends sealing 89:15-90:24.** |
| Pl. Ex. 39 | Deposition (excerpts), William J. Cashion, Highmark's Chief Actuary, taken Jan. 13, 2017 / *Highmark seeks to seal Pl.'s Ex. 39 in its entirety.* | Much of Pl.'s Ex. 39 contains testimony about individual columns of Mr. Cashion's spreadsheet (portions of which spreadsheet are Pl.'s Ex. 37); these columns reflect the factors Highmark uses to set small-group premiums and it's methodology of setting the premiums. For the same reasons that the Special Master found *supra* Section IV.C.(1) (pp. 39-43), that the Cashion spreadsheet should be sealed, the same reasoning applies to much of Pl. Ex. 39.

Thus, the Special Master recommends sealing of the transcript references with the exception of the deposition transcript on 180:6, starting with the words "those base rates" through 181:16, as well as 184:15-185:24, 183:2-18 and 184:15-185:24 because these references do not concern the details of the Cashion spreadsheet, but rather concern the general filing requirements with the Pennsylvania Department of Insurance (PID). These excluded portions do not reveal any proprietary information of Highmark.

**Accordingly, the Special Master recommends sealing Pl.'s Ex. 39 from 170:1-184:14 but not sealing 180:6, starting with the words "those base rates" through 181:16, as well as 184:15-185:24, 183:2-18 and 184:15-185:24.** |
| Pl. Ex. 40 | Deposition (excerpts), William J. Cashion, Highmark's Chief Actuary, taken Jan. 12, 2018 / *Highmark seeks to seal these portions of Pl.'s Ex. 40:* | |
| | 23:24-25:25 | 23:24-25:25 relate to how past claims data factors into Highmark's setting rates for policyholders. |
| | 38:4-45:25 | 38:4-45:25 relate to how Highmark establishes certain factors to set it's premiums and includes detailed testimony about the Cashion spreadsheet |
| | 54:1-61:25, 74:1-77:25; 94:1-101:25 | 54:1-61:25, 74:1-77:25, and 94:1-101:25 relate to details on the components of Highmark's base rate model.

For the reasons set forward *supra* Section IV.C.(1)(pp. 39-43), **the Special Master recommends sealing 23:24-25:25, 38:4-45:25, 54:1-61:25, 74:1-77:25, and 94:1-101:25 of Pl.'s Ex.40.** |
| Pl. Ex. 42 | Expert Rebuttal Report, Dr. Cantor, Plaintiff's Expert, dated June 11, 2018. / Highmark and UPMC seek to seal these portions of Pl. Ex. 42: | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 43 | Deposition, Dr. Johnson, Highmark's Expert, taken May 31, 2018 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 44 | Deposition, Dr. Cantor, Plaintiff's Expert, taken May 1, 2018 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 45 | PowerPoint, "Health Services Overview," July 2012 over Highmark logo / *Highmark seeks to seal Pl. Ex. 45 in its entirety.* | Highmark seeks to seal Pl. Ex. 45, claiming this "document discusses at length Highmark's interpretation of the competitive landscape, its strategy for the future, its financial performance along key metrics, and market share." (Fitzpatrick Decl. July 10, 2018, ¶7). It argues disclosure of this document "would give Highmark's competitors valuable insight into Highmark's strategic thinking," which "would be harmful for Highmark." (*Id.*).

The Special Master finds Highmark has accurately described this exhibit. The Special Master notes that most of the slides bear the notation "Proprietary & Confidential." In |

addition, having reviewed this exhibit, the Special Master finds it to contain a vast amount of data and analysis of premiums, enrollment counts, comparisons, broken down by specific geographic region. The Special Master would characterize this exhibit as a deep dive into Highmark's data. As such, the Special Master find this exhibit to contain confidential commercial information that courts will protect. Disclosure of this information would benefit Highmark's competitors as well as providers it will negotiate with. Consistent with findings supra Section IV.(C)(2) and (3)(pp. 43-47) the Special Master does not find this exhibit to be stale. He also notes that the majority of pages contain trade data.

Further the Special Master finds that Highmark has shown that disclosure of this document is likely to cause a serious, imminent, current competitive harm, and that Highmark's interest in maintaining the confidentiality of this exhibit overrides the presumption of public access under both the *Conduct* common law and the First Amendment standards.

**Accordingly, the Special Master recommends sealing Pl. Ex. 45 in its entirety, as Highmark requests.**

*UPMC seeks to seal pages bates stamped HMKC#32912, 32921,32922, 32924-25*

UPMC's outside counsel was permitted to review Pl. Ex. 45, and argues that five slides be sealed. However, the Special Master finds that although some of the information on these slides is about UPMC, there is no information suggesting this information came from UPMC—indeed some slides note their "source" is "Highmark Internal Claims Data and Contract Pricing Data." (*See, e.g.,* HMKCW32922). Thus, there is no basis for UPMC to claim the information is confidential information of UPMC's.

**Accordingly, the Special Master does not conclude UPMC has an independent basis to seal HMKCW32912, 32921,32922, 32924-25;**

| | | This finding does not alter the Special Master's recommendation that Pl. Ex. 45 should be sealed in its entirety as Highmark request. |
| Pl. Ex. 47 | Deposition (excerpts), Sandra Tomlinson, Highmark Senior VP of Provider Services, taken Feb. 4, 2009 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 48 | Contract between Highmark and The Western Pennsylvania Hospital, dated May 23, 2008 *Highmark seeks to seal portions of Pl.'s Ex. 48.* | This 2008 contract between Highmark and a hospital provider had a five-year term. (*See* Fitzpatrick Decl. 8-21-2018, ¶13). Highmark argues that "the details of this contract are not stale because they reveal the types of terms that Highmark is willing to accept." (*Id.*) Highmark states that both its health insurance competitors and other hospital providers in the region would use these contract terms and rates to negotiate to Highmark's competitive disadvantage. (*Id.*) The Special Master finds that disclosure of this recently terminated contract, with a hospital the Highmark continues to do business with, would cause competitive harm to Highmark, sufficient to override the presumption of public right of access to judicial records under both *Conduct's* common law and the First Amendment standards. **Accordingly, the Special Master recommends sealing Pl.'s Ex. 48 in its entirety.** |
| Not numbered | Supplemental Expert Report of Cantor, dated Nov. 14, 2018 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Def. Ex. 1 | Expert Report, Dr. Johnson, Highmark's Expert, May 17, 2018 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |

| Def. Ex. 3 | Deposition, Dr. Cantor, Plaintiff's Expert, taken May 1, 2018 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Def. Ex. 4 | Defendant Highmark Objections and Response to Plaintiff's 2d Set of Interrogatories—Class Certification, served Nov. 3, 2017 *Highmark seeks to seal Def. Ex. 4 in its entirety, arguing sealing only portions would not be practicable.* | In this set of interrogatories, Plaintiff seeks information about how premium rates were set during the class period. As the Special Master found *supra* Section IV.C(1)(pp. 39-43), Highmark's rate setting process is a trade secret that the Special Master recommends sealing. **Accordingly, the Special Master recommends sealing the answer to Interrogatory No. 5, sealing page 4 through page 7, including the footnotes on those pages.** The Special Master does not find information the reveals trade secrets or confidential commercial information of Highmark in any other part of Def. Ex. 4. **Accordingly, the Special Master does not recommend sealing any other portion of the Objections and Responses in Def. Ex. 4.** |
| Def. Ex. 5 | Deposition (excerpts), Mr. Cashion, Highmark's Chief Actuary, taken Jan. 12, 2018 *Highmark seeks to seal Def. Ex. 5 in its entirety* | The Special Master finds that Highmark accurately observes the excerpts that make up Def. Ex. 5 as "discuss[ing] almost exclusively the Cashion Spreadsheet and the base rates model." (Highmark Sealing Chart, at 101-02). Consistent with the Special Master's findings in Section IV.C(1) (pp. 39-43), that "Highmark's 'Base Rate Model' and the 'Cashion Spreadsheet' contain trade secrets" of Highmark, and agreeing with Highmark that "redactions of this document would not be practicable" (Highmark Sealing Chart at 102), **the Special Master recommends sealing Def. Ex. 5 in its entirety.** |
| Def. Ex. 6 | Expert Report of Dr. Cantor, Plaintiff's Expert, Mar. 13, 2018 | Def. Ex. 6 is same as Pl. Ex. 1. *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Def. Ex. 7 | Highmark's Base-Rate Model (excerpts) *Highmark seeks to seal Def. Ex. 7 in its entirety.* | Based on the May 31, 2018, Cashion Decl. (¶¶ 5-6), the July 12, 2018, Cashion Suppl. Decl. (¶ 6); the August 23, 2018, Cashion Second Suppl. Declaration (¶¶ 7-9) and as set out *supra* in Section IV.C(1) (pp. 39-43), this document contains trade secret information which merits sealing under the applicable Third Circuit common law and First Amendment standards. **Accordingly, the Special Master recommends sealing Def. Ex. 7 in its entirety.** |
| Def. Ex. 8 | Excerpt of the Cashion Spreadsheet *Highmark seeks to seal Def. Ex. 8 in its entirety.* | Based on the May 31, 2018, Cashion Decl. (¶ 5), the July 12, 2018, Cashion Suppl. Declaration (¶¶ 3-6), and as set out *supra* in Section IV.C(1) (pp. 39-43), this document contains trade secret information which merits sealing under the applicable Third Circuit legal standards. **Accordingly, the Special Master recommends sealing Def. Ex. 8 in its entirety.** |
| Def. Ex. 9 | Highmark's Base-Rate Model (native Excel version) *Highmark seeks to seal Def. Ex. 9 in its entirety.* | Based on the May 31, 2018, Cashion Decl. (¶¶ 5-6), the July 12, 2018, Cashion Suppl. Decl. (¶ 6); the August 23, 2018, Cashion Second Suppl. Declaration (¶¶ 7-9), as set out *supra* in Section IV.C(1) (pp. 39-43) this document contains trade secret information which merits sealing under the applicable Third Circuit common law and First Amendment standards. **Accordingly, the Special Master recommends sealing Def. Ex. 9 in its entirety.** |
| Def. Ex. 10 | Cashion Spreadsheet (native Excel version of the entire spreadsheet) *Highmark seeks to seal Def. Ex. 10 in its entirety.* | Based on the May 31, 2018 Cashion Decl. (¶ 5); the July 12, 2018, Cashion Suppl. Decl. (¶ 5); the August 23, 2018, Cashion Second Suppl. Declaration (¶¶ 3-6), as set out *supra* in Section IV.C(1) (pp. 39-43) this document contains trade |

2019 U.S. Dist. LEXIS 142214, *95

| | | secret information which merits sealing under the applicable Third Circuit legal standards. *Accordingly, the Special Master recommends sealing Def. Ex. 10 in its entirety.* |
|---|---|---|
| Def. Ex. 11 | Supplemental Highmark Expert Report of Dr. Johnson, Nov. 16, 2018 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Def. Ex. 12 | Deposition (excerpts), William J. Cashion, Highmark Chief Actuary, taken Oct. 26, 2018 Exhibit includes: pp 26-28, 35-37, 54-67, 81-85, 143-145, 153-55, 157-160, 163-245 *Highmark seeks to seal this exhibit in its entirety except for 167:1-175:19; 234:2-235:14; 237:11-238:1* | Consistent with the findings *supra* Section IV.C(1)(pp. 39-43), that "Highmark's "Base Rate Model and "Cashion Spreadsheet" constitute trade secrets of Highmark which merits sealing under the applicable Third Circuit legal standards, **the Special Master recommends sealing these portions of Def. Ex. 12: 26:1-28:25; 35:1-37:25; 54:1-67:25; 81:1-85:25, 143:1-145:25; 153:1-155:25; 157:1-160:25; 163:1-166:25; 175:20-234:1; 235:16-237:10; and 238:2-242:5, which the Special Master finds discusses these trade secrets of Highmark.** Given that Highmark does not seek sealing of the following pages, the Special Master does not recommend sealing the following pages and lines: 167:1-175:19; 234:2-235:15; 237:11-238:1; 242:6-245:9. |
| Transcript Sept. 19, 2018 | Transcript of hearing on hearing Sept. 19, 2018, on Class Certification | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Transcript Nov. 9, 2018 | Transcript of hearing on Nov. 9, 2018, related to Class Certification *Highmark seeks to seal this transcript in its entirety.* | Consistent with the findings *supra* Section IV.C(1)(pp. 39-43), that "Highmark's "Base Rate Model and "Cashion Spreadsheet" constitute trade secrets of Highmark which merits sealing under the applicable Third Circuit legal standards, the Special Master finds these portions of the transcript to contain these trade secrets of Highmark. |

| | | speculative and possible disparagement is not a basis on which to order sealing. **Accordingly, the Special Master does not recommend sealing 246:3-248:22.** |
|---|---|---|
| Pl. Ex. 3 | Deposition (excerpts), Jeffrey Romoff, UPMC's CEO, taken by DOJ on Feb. 5, 2009 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 4 | Emails between Kenneth Melani, Highmark's then CEO, and Thomas Kerr, dated June 11 and 13, 2001, and attachment titled "Community Blue 'Repositioning & Repricing Strategy,'" dated June 6, 2001. *Highmark seeks to seal portions of Pl.'s Ex. 4* | Pages HMKE00024899, 900 □2, and 901 □5. Consistent with the findings *supra* Section IV.E (pp. 49-52 ), that disclosure of information about the historic Community Blue product would not cause current public confusion and that public confusion is not grounds to seal, the Special Master finds that here Highmark has not provided sufficient information to justify a conclusion that this old information will cause current, imminent competitive harm. **Accordingly, the Special Master does not recommend sealing pages HMKE00024899, 900 □2, and 901 □5.** HMKE00024900 ¶ 1. Highmark argues that the email sets out Highmark negotiating strategies which are still in use, citing Fitzpatrick Second Suppl. Decl. ¶¶ 8-12. The Special Master agrees with respect to the proposed redaction noted here. This information, while specific for the time, sets out in sufficient detail *how* Highmark strategizes |

| | | **Accordingly, the Special Master recommends sealing virtually all of the transcript from 10:6-104:6, with the limited exceptions noted below.** **The Special Master, however, does not recommend sealing pages/lines 3:1-10:5, and 104:-7-105:15 because these pages do not contain confidential information.** |
|---|---|---|
| Transcript Nov. 20, 2018 | Transcript of hearing Nov. 20, 2018, related to Class Certification | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| | | which, as Mr. Fitzpatrick declares, has currency today. Highmark has established that this information, if disclosed publicly, can harm it competitively in today's market. **Accordingly, the Special Master recommends sealing HMKE00024900 ¶ 1 from line 3 starting with the parenthetical through the end of the second parenthetical ending with "etc.".** However, the remainder of ¶ 1 does not merit sealing because Highmark has not established the requisite grounds for sealing. HMKE00024901 ¶ 6. The Special Master recommends that 901 ¶ 6 not be sealed because Highmark has not made a sufficient showing that its process of negotiating reflected in this historical document could have any viability at this time. HMKE00024902-908 is the attachment to the emails, titled "Community Blue Repositioning & Repricing Strategy." Consistent with the findings *supra* Section IV.E (pp. 49-52), the Special Master recommends not sealing HMKE00024902-908. This 2001 document about a product Highmark discontinued in 2004 is stale. In addition, Highmark's assertions of current harm are too speculative and too ambiguous to warrant sealing. Highmark has not made a sufficient showing that disclosure will cause confusion with respect to Highmark's current Community Blue product or harm sale of its current Community Blue product. |
| Pl. Ex. 5 | Email from Ken Melani, Highmark's then CEO, to Sandra Tomlinson, a senior vice president, dated Feb.15, 2002 *Highmark seeks to seal Pl.'s Ex. 5 in its entirety.* | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |

| | | |
|---|---|---|
| Pl. Ex. 6 | UPMC fax[45] sent May 24, 2002, from John W. Paul to G. Nicholas Beckwith, UPMC's then-Chief Operating Officer to UPMC's past and present Chairman of the Board, faxing an 8-page presentation titled "UPMC-Highmark Contract Negotiations Proposal Summary: Provisions Agreed to 5-24-02- between J. Paul & K. Melani," "Confidential Draft 5/24/2002" (Bates stamped UPMC DOJ 1155144-152) | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 7 | Internal Highmark email, dated June 25, 2002, attaching a 10-page presentation to Highmark's Executive Committee, titled "UPMC Health System Provider Agreement Summary" for "Highmark Executive Committee Meeting, June 26, 2002" (Bates Stamped HMKE00131856-866) | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 8 | Highmark internal memo, "Subject: Community Blue," dated July 1, 2002 *Highmark seeks to seal Pl.'s Ex. 8 in its entirety.* | Highmark argues this 17-year-old document should be sealed in its entirety because (1) disclosure would cause confusion due to Highmark having both a current and historic products both named "Community Blue," and (2). |

[45] Although Highmark claims this is an internal Highmark document (*see* Highmark Sealing Chart at 44), the Special Master finds this is a UPMC document because it is bates stamped with the UPMC prefix and because the fax coversheet indicates it was sent among UPMC staff and board member. (*See also* Farner 2d Supp. Decl. ¶ 46).

| | | |
|---|---|---|
| | | the document contains detailed rating and pricing information. Consistent with the findings supra Section IV.E (pp. 49-52), that public confusion is not grounds to seal information about the historic Community Blue product, the Special Master does not recommend sealing Pl. Ex. 8. The Special Master, having reviewed this internal memo, does not find it contains "detailed rating and pricing information," contrary to Highmark's characterization of the contents. This memo contains 17-year-old aggregate information on such items as membership--both number of accounts and number of contracts--as well as 17-year-old projections on profitability and sales. Although there are estimates of how much rates may increase or decrease, these estimates are quantified in terms of percentage change—no actual rates are identified. Moreover, no customers are identified or rate-setting methodologies revealed. Given that Highmark terminated this Community Blue product in 2004, 15 years ago, the Special Master finds the information in Pl.'s Ex. 8 to be stale. The Special Master concludes that Highmark has not articulated a specific, countervailing reason for secrecy which overrides the public's presumptive right to access to this judicial record. Inasmuch as *possible* disparagement is not a sufficient basis for sealing, the Special Master rejects this argument. **Accordingly, the Special Master recommends not sealing Pl.'s Ex. 8.** |
| Pl. Ex. 9 | Internal Highmark emails, Ken Melani (Highmark's then CEO) to Sandra Tomilson (Sr. VP) and Thomas Kerr, forwarding email from Highmark's Dan | Highmark argues these two 17-year-old emails should be sealed because (1) disclosure would cause confusion due to Highmark having both a current and historic products both named "Community Blue," and (2) the document contains detailed rating and pricing information. |

| | | |
|---|---|---|
| | Holtz, Re: Community Blue, dated Nov. 13, 2002 *Highmark seeks to seal Pl.'s Ex. 9 in its entirety.* | Consistent with the findings *supra* Section IV.E (pp. 49-52), the Special Master does not recommend sealing Pl. Ex. 9 on the grounds that disclosure of information about the historic Community Blue product would cause public confusion. The Special Master, having reviewed the two emails, does not find they contain "detailed rating and pricing information." The only data the emails contain relate to how attractive Community Blue was to new members in 2002, and that is communicated with a percentage, not a raw number count. Again, Highmark terminated this Community Blue product in 2004. Given the foregoing, the Special Master finds these emails to be stale, and concludes that Highmark has not articulated a specific, countervailing reason for secrecy which overrides the public's presumptive right to access to this judicial record. Inasmuch as *possible* disparagement is not a sufficient basis for sealing, the Special Master rejects this argument. **Accordingly, the Special Master recommends not sealing Pl.'s Ex. 9.** |
| Pl. Ex. 11 | UPMC Memo, "Summary of the Harmful Effects on the Communities of Western Pennsylvania resulting from the Formation of Highmark Blue Cross Blue Shield in 1996 and the Financing to be Provided by Highmark in 1999 to Enable West Penn Hospital to Acquire Control of AUH-West Hospitals," DRAFT Apr, 13, 1999 *Highmark seeks to seal portions of Pl. Ex. 11* *UPMC does NOT seek to seal Pl. Ex. 11* | Highmark seeks to seal numeric portions of this memo, arguing those portions "concern rate and contractual information between Highmark and providers," and disclosure of this information "would provide insight into how Highmark contracts with healthcare providers generally." (Highmark Sealing Chart, at 46). The Special Master notes no reimbursement rates in the portions Highmark identifies. Finally, the Special Master finds the entire memorandum is more than 20 years old and looks back to earlier years. As such the information is stale. Because Highmark has not shown that disclosure of this 1999 memo which looks back to 1996 would cause Highmark specific, serious, reasonably certain, current competitive harm, the Special Master finds Highmark has not overridden the presumption of public access. **Accordingly, the Special Master recommends not sealing Pl. Ex. 11.** |
| Pl. Ex. 12 | Internal emails between Jeffary Romoff (UPMC's CEO) and David Farner, and others inside UPMC, dated Dec. 21, 2004 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 13 | UPMC emails, Re: "Discontinuation of Highmark's Community Blue Network," dated March 29, 2004 *Highmark seeks to seal Pl. Ex. 13 in its entirety.* *UPMC does not seek to seal Pl. Ex. 13.* | Highmark seeks to seal UPMC emails circulating "correspondence from Highmark outlining the discontinuance of Community Blue network." Highmark seeks to seal these UPMC emails, claiming (1) disclosure of this 15-year-old information about Community Blue would cause public confusion, (2) cause possible disparagement of a Highmark current product and (3) the document "includes incorrect information that Highmark's competitors could exploit." Consistent with the findings *supra* Section IV.E (pp. 49-52), the Special Master does not recommend sealing Pl. Ex. 13 on the grounds that disclosure of information about the historic Community Blue product, in use between 2002-2004, would cause public confusion or subject Highmark to *possible* disparagement. Inasmuch as *possible* disparagement is not a sufficient basis for sealing, the Special Master rejects this argument. As to the "incorrect information" claims, the Special Master notes Highmark's counsel made this one-sentence allegation unsupported by a declaration or further factual context. As such, this allegation is insufficient to satisfy Highmark's burden to overcome the public's presumption to access. |

2019 U.S. Dist. LEXIS 142214, *95

| | | Accordingly, the Special Master does not recommend sealing Pl.'s Ex. 13. |
|---|---|---|
| Pl. Ex. 14 | Term sheet for "Contract Terms Between Highmark, Inc. and UPMC Health System," and signed Highmark UPMC, dated June 25, 2002 Bates No. UPMC0030000279-295. | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 17 | Report, "Economic Analysis of Highmark's Affiliation with WPAHS and Implementation of an Integrated Healthcare Delivery System," April 24, 2013, prepared by Compass Lexecon | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 20 | Notes by Highmark's former CEO, John Brouse, re Highmark's proposed strategy regarding a deal with West Penn. *Highmark is seeking this document be sealed in its entirety.* | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |
| Pl. Ex. 21 | Emails dated Feb, and March 2006 Email, Mr. Farner (UPMC) to UPMC's CEO Mr. Romoff, dated Feb, 15, 2006 Email, Ken Melani, then-CEO of Highmark to Stan Marks (UPMC), Mar. 15, 2006 | *Intentionally omitted. This exhibit will be included in the Supplemental Report and Recommendation.* |

## VI. Conclusion

For the foregoing reasons, the Special Master **[*96]** recommends the Court grant in part and deny in part the requests of Highmark, UPMC, and AHN to seal the above-identified materials related to Plaintiff's motion for class certification.

Date: May 31, 2019

/s/ Hon. Richard A. Levie (Ret.)

Special                                        Master

2019 U.S. Dist. LEXIS 142214, *96

**Table1 (**_Return to related document text_**)**

**Introduction**

**I. Background**

**A. Factual Background**

**1. Alleged Anti-competitive Conspiracy**

**2. The Putative Class**

**B. Procedural Background**

**1. Motion to Certify Class**

**2. Requests to Seal**

**II. Arguments of Highmark and UPMC**

**A. Highmark**

**B. UPMC**

**III. Applicable Law**

**A. Common Law**

**B. First Amendment**

**C. Qualified Exception to Presumption of Public Access [*3]**

**IV. Findings and Recommendations on Key Issues**

**A. Presumptive Right of Public Access Attaches to All Materials**

**1. Common Law Right of Access**

**2. First Amendment Right of Access**

**B. Exhibits Entered into the Record in Support of a Non-discovery
Motion are "Judicial Records" Regardless of Allegations
of "Irrelevancy"**

2019 U.S. Dist. LEXIS 142214, *3

C. "Confidential commercial information, such as trade secrets" of
health insurance companies and health care providers

1. Highmark's "Base Rate Model" and "Cashion Spreadsheet"
contain trade secrets.

2. UPMC's Claims Data are Trade Secrets

3. Negotiated Reimbursement Rates between Payors
and Providers Are Confidential Commercial Information

4. "Deal Points" in Provider-Payor Hospital Contracts

D. Highmark-UPMC 2002, 10 year Agreement

E. "Public Confusion" is not a Basis to Seal Highmark's Historic
Community Blue Product

F. Allegations that Reports and Testimony of Plaintiff's
Expert Contain "False" or "Incorrect" Information are not Bases
Upon Which to Seal.

G. Prior Conditional Sealing by the Court in Connection with
Other Motions did not Resolve the Sealing Issues Now Presented

H. Plaintiff Exhibits 17 and 29

1. Plaintiff Exhibits 17 and 29 Should be Excerpted

2. PID's Designation of Exhibits 17 [*4]  and 29 as "Confidential" does
not Obviate the Court's Burden to Apply the Common Law and, if necessary,
First Amendment Standards

I. UPMC is not entitled to Heightened Privacy Because it has Settled

V. Findings and Recommendations as to Individual Documents

VI. Conclusion

**Table1 (***Return to related document text***)**