Ameritox, Ltd. v. Aegis Sciences Corp., Not Reported in F.Supp.2d (2009)

2009 WL 305874

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Verde v. Stoneridge, Inc.,   E.D.Tex.,
September 23, 2015

2009 WL 305874
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

AMERITOX, LTD., Plaintiff,

v.

AEGIS SCIENCES CORP., Defendant.

Civil Action No. 3:08–CV–1168–D.
|
Feb. 9, 2009.

West KeySummary

1    **Patents** ⚷ Identity of cause of action
or theory of recovery

Denial of a motion to amend in an
earlier-filed action pending in another
federal court precluded a patent owner
from bringing the instant second action,
asserting a patent infringement claim that
it was unable to bring in the earlier-filed
action. The patent owner was prohibited
from prosecuting the patent infringement
claim under the bar against claim-
splitting. Therefore, the alleged infringer's
motion to dismiss was granted.

32 Cases that cite this headnote

**Attorneys and Law Firms**

Clyde Moody Siebman, Bryan H. Burg, Siebman
Reynolds Burg Phillips & Smith, LLP, Sherman, TX,
Christian G. Stahl, Emily R. Sherrer, Michael R.
Osterhoff, Bell Boyd & Lloyd LLP, Chicago, IL, for
Plaintiff.

Daryl G. Dursum, Adams & Reese LLP, Houston, TX,
Joel T. Galanter, Adams & Reese LLP, Nashville, TN,
for Defendant.

*MEMORANDUM OPINION AND ORDER*

SIDNEY A. FITZWATER, Chief Judge.

**\*1** The court must decide whether the denial of
a motion to amend in an earlier-filed case pending
in another federal court precludes the plaintiff from
bringing this second suit asserting the claim that it was
unable to bring in the first suit. Concluding under the
bar against claim-splitting that plaintiffs are prohibited
from prosecuting the claim in this court, the court
grants defendant's motion to dismiss and dismisses this
action with prejudice.

I

In June 2007 plaintiffs Ameritox, Ltd. and U.D.
Testing, Inc. (collectively, "Ameritox") brought a
two-count complaint for patent infringement against
defendant Aegis Sciences Corp. ("Aegis") in the
United States District Court for the Southern District
of Florida. Aegis answered and counterclaimed,
seeking declaratory judgments of non-infringement
and patent invalidity, and asserting claims for
commercial disparagement under the Lanham Act,
15 U.S.C. § 1125(a), injurious falsehood/unfair
competition under Florida law, and violation of the
Florida Deceptive and Unfair Trade Practices Act
("FDUTPA"). The scheduling order in the Florida suit
required that any amendments to the pleadings be
made by December 21, 2007. Ameritox timely moved
to amend its complaint to add claims for a violation
of the FDUTPA, tortious interference with business
relationship, fraudulent misrepresentation, and false
marking. Over Aegis' objection, the Southern District
of Florida permitted Ameritox to amend its complaint.
In response, Aegis brought additional claims of patent
misuse and sham litigation under the Sherman Anti–
Trust Act.

On May 8, 2008 Ameritox sought leave to amend its
complaint to dismiss its patent infringement claims

2009 WL 305874

without prejudice and to add a claim under the Lanham Act for false advertising, in violation of 🚩 15 U.S.C. § 1125(a). The Southern District of Florida denied the motion because, without showing good cause under Fed.R.Civ.P. 16(b), Ameritox filed it nearly five months after the deadline.

On July 9, 2008 (the same day the court rejected Ameritox's motion to amend), Ameritox filed this lawsuit, presenting the same Lanham Act claim against Aegis that the Southern District of Florida had denied Ameritox leave to file: a false advertising claim under the Lanham Act, 🚩 15 U.S.C. § 1125(a). In response, Aegis filed a motion in the Southern District of Florida seeking to enjoin Ameritox from litigating its Lanham Act claim in this court. That court denied Aegis' motion, reasoning, in relevant part:

> Under the facts of this case, [Aegis'] reliance on the first-filed rule is misplaced. By virtue of denying [Ameritox's] motion to amend [its] complaint, the Lanham Act claim was never before this Court. Therefore, this Court is not the first court to be presented with the Lanham Act claim. Furthermore, given that the Texas action only involves a Lanham Act claim, and does not involve any other claim currently pending before this Court, there is no overlapping issue. Lastly, the Court declines to adopt [Aegis'] novel theory, for which no legal authority has been provided, that this Court is empowered to enjoin a party from filing a lawsuit in another jurisdiction.

  **\*2**  *Ameritox, Ltd. v. Aegis Servs. Corp.,* No. 07–80498–CIV–MARRA/JOHNSON, slip op. at 2–3 (S.D.Fla. Oct. 10, 2008) (footnote omitted). [1]

Aegis now moves to dismiss or stay [2] the instant suit. It maintains that Ameritox's action should be dismissed under the first-filed rule as an improper serial litigation of a claim that has been denied by a court of competent jurisdiction in a first-filed action in the Southern District of Florida that substantially overlaps with the instant case. Ameritox counters that this suit is not barred because (1) the doctrine of res judicata does not apply, (2) the Southern District of Florida, which is the proper court to determine whether the first-filed rule applies, has held that the first-filed rule does not apply, and (3) there is a compelling public interest in permitting Ameritox to litigate this claim.

II

As an initial matter, the court agrees with Ameritox that the present action is not barred on the basis of res judicata (claim preclusion). "For *a prior judgment* to bar action on the basis of res judicata, the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been *a final judgment on the merits* and the same cause of action must be involved in both cases." *Langston v. Ins. Co. of N. Am.,* 827 F.2d 1044, 1046 (5th Cir.1987) (emphasis added). Here, as Aegis concedes, the Southern District of Florida's rejection of Ameritox's untimely Lanham Act claim asserted in the proposed second amendment has not yet become a final judgment on the merits because that case is still pending. *Cf., e.g., Integrated Techs. Ltd. v. BioChem Immunosystems (U.S.), Inc.,* 2 F.Supp.2d 97, 102 (D.Mass.1998) (holding that if plaintiff sought, but was denied on timeliness grounds, leave to assert claim in first case and then, *after the first case was over,* attempted to assert claim in separate lawsuit, claim would be barred by res judicata); 📁 *Nilsen v. City of Moss Point, Miss.,* 701 F.2d 556, 560, 563 (5th Cir.1983) ("[R]es judicata ... bars all claims that were or *could have been* advanced in support of the *cause* of action on the occasion of its *former adjudication"* and "theories which were the subject of an untimely motion to amend, filed in the earlier action, 'could have been brought' there.") (second emphasis added). Consequently, the doctrine of res judicata does not apply to bar the present action. *See Oxbow Energy, Inc. v. Koch Indus., Inc.,* 686 F.Supp.

Ameritox, Ltd. v. Aegis Sciences Corp., Not Reported in F.Supp.2d (2009)

2009 WL 305874

278, 282 (D.Kan.1988) (holding that res judicata does not apply to claims rejected as untimely in first suit and subsequently brought in new action where the first suit is still pending).

### III

The fact that res judicata does not bar Ameritox's suit does not mean, however, that the first-to-file rule is inapplicable or that this suit is not barred by the related rule against claim-splitting.

### A

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999) (citing *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997); *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728 (5th Cir.1985)). "The rule rests on principles of comity and sound judicial administration." *Id.* (citing *Save Power Ltd.,* 121 F.3d at 950; *W. Gulf Maritime Ass'n,* 751 F.2d at 728). "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *W. Gulf Maritime Ass'n,* 751 F.2d at 729 (citations omitted). When faced with duplicative litigation, "[i]n addition to outright dismissal, it sometimes may be appropriate to transfer the action or to stay it. A stay may, for example, be appropriate to permit the court of first filing to rule on a motion to transfer." *Id.* at 729 n. 1.

**\*3** "The Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd.,* 121 F.3d at 950; *Cadle Co.,* 174 F.3d at 606 ("The 'first to

file rule' not only determines which court may decide the merits of substantially similar issues, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated."). The Southern District of Florida, however, has deferred to this court the determination of whether this action can proceed. *See Ameritox,* slip op. at 2–3. It concluded that it is not the "first court" in the first-to-file equation because it was not the first court presented with the Lanham Act claim. It also concluded that this court should determine whether res judicata prevents Ameritox from pursuing its Lanham Act claim. *Id.* at 3 n.1.

Ameritox contends that the first-to-file rule does not apply because the Southern District of Florida has already ruled that it was not the first court to be presented with the Lanham Act claim. Essentially, Ameritox tries to argue both that the Southern District of Florida *is* the first-filed court—and therefore should make the controlling ruling about whether the present case can continue—*and* that the Southern District of Florida *is not* the first-filed court—so that the first-to-file rule is inapplicable and does not preclude this case from proceeding. Ameritox cannot have it both ways. If the first-filed rule is inapplicable because, as the Southern District of Florida viewed the question, it was not the first court to be presented with the Lanham Act claim, then that court is not the proper tribunal to make the call regarding whether this lawsuit should proceed.

### B

Ordinarily, this court, as the court where the second action was filed, would merely assess the potential overlap between the Southern District of Florida case and this suit. *See Cadle Co.,* 174 F.3d at 606 ("The district court [where the second action was filed] ... properly limited its inquiry to the potential overlap between the two cases."). And if "[this court] found that 'the issues might substantially overlap, [generally] the proper course of action [would be] ... to transfer the case to the [Southern District of Florida] to determine which case should, in the interests of sound judicial administration and judicial economy, proceed." *Id.*

Two considerations, however, distinguish this case from the usual one in which the court would simply evaluate for potential substantial overlap and then transfer this case if such overlap were found. First, the Southern District of Florida has already denied Ameritox's Lanham Act claim as untimely; therefore, if this court were to determine that there is substantial overlap and then transfer this case, "this court would in effect have reversed [the Southern District of Florida's] decision to deny [Ameritox's] motion to amend." *Oxbow Energy,* 686 F.Supp. at 282. This is because, despite that court's prior decision denying leave to amend, the very claim that it refused to allow Ameritox to file would be pending before it in another lawsuit that substantially overlaps with the first case. *See id.* Second, the Southern District of Florida has already decided whether this case and the one before it substantially overlap. It held that because the lawsuit in this court "only involves a Lanham Act claim, and does not involve any other claim currently pending before [the Southern District of Florida], *there is no overlapping issue." Ameritox,* slip op. at 3 (emphasis added).

**\*4** This court, then, is faced with a dilemma. The first-to-file rule is designed to prevent, *inter alia,* district courts from trenching on the authority of their sister courts, *see* 🔖 *Cadle Co.,* 174 F.3d at 606, but it, at first blush, is unclear how such an outcome can be avoided here. If this court gives credence to the Southern District of Florida's determination that these lawsuits do not substantially overlap (indeed, do not overlap at all), and, on this basis, denies Aegis' motion to dismiss, then this court will impinge on the Southern District of Florida's authority to deny Ameritox's motion to amend. It will do so by permitting Ameritox to engage in an end-run around that court's denial of leave to amend, thereby avoiding the consequences of its delay. *See* 🔖 *Curtis v. Citibank, N.A.,* 226 F.3d 133, 140 (2d Cir.2000) (holding that where plaintiffs brought untimely claims in new action, it was not an abuse of discretion for district court to prevent plaintiffs from using new action to avoid the consequences of their delay); *Fawcett v. Ditkowsky,* 1992 WL 186065, at \*3– \*4 (N.D.Ill. July 27, 1992) (dismissing plaintiff's complaint as an "end-run around" Rule 15, which permits the amendment of a complaint at district court's

discretion). On the other hand, if this court grants Aegis' motion to dismiss, it will effectively enforce the Southern District of Florida's decision to deny leave to amend, but in doing so it will necessarily find, contra to that court, that *there is* substantial overlap between the two lawsuits.

C

The court need not resolve this dilemma, however, because it can dismiss Ameritox's suit under the rule against claim-splitting, thereby avoiding all the problems that would arise by applying the first-to-file rule and transferring the case to the Southern District of Florida.[3] Although Aegis frames its argument for dismissal in terms of the first-to-file rule and only briefly mentions the related rule against claim-splitting,[4] the rule against claim-splitting clearly supports dismissal.

"Claim-splitting occurs when a single 'cause of action' is split by advancing one part in an initial suit and another part in a later suit." *FDIC v. Nelson,* 19 F.3d 15, 1994 WL 93409, at \*2 n. 5 (5th Cir. Mar.15, 1994) (per curiam) (unpublished table decision). Adopted by the Fifth Circuit in 🔖 *Super Van Inc. v. City of San Antonio,* 92 F.3d 366 (5th Cir.1996), the rule against claim splitting

> prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action. In a claim splitting case, the second suit will be barred if the claim involves the same parties and arises out of the same transaction or series of transactions as the first claim.

🔖 *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 273 Fed. Appx. 256, 265 (4th Cir.2008) (citations and internal quotations omitted); *Nelson,*

Ameritox, Ltd. v. Aegis Sciences Corp., Not Reported in F.Supp.2d (2009)
2009 WL 305874

1994 WL 93409, at *2 n. 5 (holding that Fifth
Circuit applies the "same transaction" test to determine
whether a single claim has been split). "A main
purpose behind the rule ... is to protect the defendant
from being harassed by repetitive actions based on the
same claim." 🔖 *Super Van Inc.,* 92 F.3d at 371.

**\*5** "In dealing with simultaneous actions on related
theories, courts at times express principles of 'claim
splitting' that are similar to claim preclusion, but that
do not require a prior judgment." 18 Charles Alan
Wright, et al., *Federal Practice and Procedure* § 4406,
at 30 (Supp.2008); *see, e.g.,* 🔖 *Sensormatic,* 273 Fed.
Appx. at 265 (affirming dismissal based on claim-
splitting even where there was no final judgment in
earlier action); *Oxbow Energy,* 686 F.Supp. at 282
(holding that even absent a final judgment, a party
cannot split claims); 🔖 *Hartsel Springs Ranch of
Colo., Inc. v. Bluegreen Corp.,* 296 F.3d 982, 987 n. 1
(10th Cir.2002) (noting that motion to dismiss based on
claim-splitting often cannot wait until final judgment
in first-filed action and, therefore, appropriate inquiry
in claim-splitting context is whether, assuming first-
filed suit were already final, second suit could be
precluded pursuant to claim preclusion). "A dismissal
on this [claim-splitting] ground has been viewed
as a matter of docket management, reviewed for
abuse of discretion, even in decisions that with some
exaggeration describe the theory 'as an aspect of res
judicata.'" 18 Wright, et al., *supra, § 4406, at 30.*

### D

Because the false advertising claim that Ameritox
asserts in this court involves one of the same plaintiffs
and the same party-defendant, and arises out of the
same transaction (the representations Aegis made to its
customers regarding the nature and quality of its drug-
testing services) as the false advertising claim that
Ameritox asserts in the Southern District of Florida,
this action is barred by the rule against claim-splitting.
🔖 *See Sensormatic,* 273 Fed. Appx. at 265.

This conclusion is further supported by the fact that
courts often apply the rule against claim-splitting
"to prevent a plaintiff from filing a new lawsuit

after the court in an earlier action has denied the
plaintiff's request for leave to amend to add the
claims later asserted in the second lawsuit." *See,
e.g., id.* (affirming dismissal based on claim-splitting
grounds where "[plaintiff] sought to circumvent the
*Sensormatic I* court's decision to deny [plaintiff's]
motion for leave to file an amended complaint" when it
"asserted the same claim in a new lawsuit, *Sensormatic
II,* the day after the Sensormatic I court denied its
motion for leave"); *Oxbow Energy,* 686 F.Supp. at
282 (dismissing, on claim-splitting grounds, claims
brought in new action after earlier action denied
plaintiff's untimely request to add the claims in an
amended complaint); 🔖 *Friends of the Earth, Inc. v.
Crown Cent. Petroleum Corp.,* 95 F.3d 358, 362 (5th
Cir.1996) ("When a plaintiff files a second complaint
alleging the same cause of action as a prior, pending,
related action, the second complaint may be dismissed.
This rule finds particular application where, as here,
the plaintiff files the second complaint to achieve
procedural advantage by 'circumventing the rules
pertaining to the amendment of complaints.'"). On
the same day Ameritox' s motion for leave to amend
was denied by the Southern District of Florida, it filed
this action asserting the very same Lanham Act claim
that it sought unsuccessfully to add in the Florida
action. Therefore, because it is apparent that Ameritox,
in filing the present lawsuit, sought to circumvent
the Southern District of Florida's decision to deny
its motion for leave to file an amended complaint,
dismissal pursuant to the rule against claim-splitting is
particularly appropriate here.

### IV

**\*6** Ameritox contends that it should be permitted to
litigate its Lanham Act claims because allowing Aegis
to continue its false advertising is dangerous to the
public. The court disagrees.

The immediate cause of this is Ameritox's dilatoriness
in seeking leave to amend in the Southern District
of Florida. And the false advertising issue will
be addressed in the Southern District of Florida.
Therefore, even if Ameritox is precluded from
litigating its Lanham Act claim, Ameritox will still
be able to prevent Aegis from continuing its alleged

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 6 of 131
PageID: 78005
**Ameritox, Ltd. v. Aegis Sciences Corp., Not Reported in F.Supp.2d (2009)**
2009 WL 305874

misrepresentations, although it will have to do so via the FDUTPA, rather than the Lanham Act.

Moreover, if Ameritox still wants to pursue its Lanham Act claim after this action is dismissed, Ameritox will not be without recourse with respect to the case filed in the Southern District of Florida.

> The fact that [the Southern District of Florida] did not allow [Ameritox] to proceed on [its Lanham Act claim] is not a persuasive reason for granting [Ameritox] the right to proceed in a second action .... The proper course for [Ameritox] is to appeal [the Southern District of Florida's] ruling to the Circuit

Court of Appeals once the [Florida action] is concluded.

*Oxbow Energy,* 686 F.Supp. at 282.

\* \* \*

Accordingly, the court grants Aegis' September 25, 2008 motion to dismiss and dismisses this case with prejudice by judgment filed today.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 305874

## Footnotes

1    The caption of the Southern District of Florida's opinion and order shows the defendant as "Aegis Services Corp." rather than "Aegis Sciences Corp.," probably because the plaintiffs originally sued Aegis under that name, and (as is frequently done) the court retained the original case caption when it filed its opinion and order. At least as of plaintiffs' second amended complaint, however, they had corrected Aegis' name, identifying it as "Aegis Sciences Corp." Neither side disputes in the present case that the defendant in each case is the same party.

2    Aegis originally moved to dismiss or transfer based on the first-to-file rule. In a supplemental motion, Aegis withdrew its alternative request to transfer, replacing it with an alternative request to stay, after the Southern District of Florida issued its October 10, 2008 opinion and order deferring to this court the question whether Ameritox's Texas action is barred.

3    If the court were to apply the first-to-file rule, it would hold that the cases substantially overlap. "The [first-to-file] rule does not ... require that cases be identical. The crucial inquiry is one of 'substantial overlap.' " 🔖 *Save Power Ltd.,* 121 F.3d at 950 (quoting 🔖 *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 408 (5th Cir.1971)). In the Southern District of Florida case, Ameritox brings a false advertising claim against Aegis under the FDUTPA, alleging that "Aegis has, and continues to, misrepresent the quality and nature of its services and reports," and that its "misrepresentations are likely to mislead and deceive customers" into using Aegis' services instead of Ameritox. D.App. 49. In the present case, Ameritox asserts a false advertising claim against Aegis under the Lanham Act, alleging that Aegis made statements in commercial advertisements that "are literally false and/or likely to deceive customers about the true nature, characteristics, and qualities" of Aegis' services, and that "Aegis' false and/or misleading statements have already, and will continue, to influence purchasing decisions to the extent that customers choose Aegis' services

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    6

instead of those offered by Ameritox." Compl. ¶¶ 31 and 32. Both the Southern District of Florida action and this case center on the question whether Aegis made misrepresentations about the nature and quality of its drug-testing service "PainComp" that have caused customers to choose Aegis' services over Ameritox's. This question involves several component issues, most notably: (1) what representations did Aegis make to its customers regarding the nature and quality of its drug-testing service, (2) what was the actual nature and quality of its drug-testing service, and (3) did Aegis' representations cause customers to choose Aegis' services over Ameritox's. Therefore, the issues raised by Ameritox in this action substantially overlap with those raised in the Southern District of Florida.

4    Indeed, the first-to-file rule and the rule against claim-splitting are very similar in that they both rest on principles of comity and sound judicial administration. Both rules operate to avoid the waste of duplication, rulings that may trench upon the authority of sister courts, and piecemeal resolution of issues that call for a uniform result. The distinction between the first-to-file rule and the rule against claim-splitting, however, appears to be in what the rules emphasize. The first-to-file rule emphasizes that the court in which an action was first filed should decide what to do with subsequently-filed actions involving "substantially overlapping issues." Once the second court determines that issues *might* substantially overlap, it is up to the first-filed court to determine the *actual* overlap of issues and what should be done about it (i.e., whether the second action should be dismissed because it is identical to the first-filed action, consolidated because it is substantially similar, and so forth). The rule against claim-splitting, on the other hand, emphasizes a plaintiff's obligation to bring into one action any and all theories and grounds for relief that the plaintiff may have based on a single alleged wrong. These different emphases, in turn, suggest different thresholds for dismissal. Under the first-to-file rule, a claim may be dismissed if it *substantially overlaps* with issues raised in the first-filed action. Under the rule against claim-splitting, a claim may be dismissed if it arises out of the *same wrong* (or transaction) as the first-filed claim.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 8188426

2018 WL 8188426
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Edward BAKER and Jack Miller,
on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
SORIN GROUP DUETSCHLAND GMBH
and Sorin Group USA, Inc., Defendants,

1:16-cv-00260
|
Filed 01/02/2018

**Attorneys and Law Firms**

David S. Senoff, Paola Pearson, Sol H. Weiss, Anapol
Weiss, Philadelphia, PA, William M. Audet, Audet &
Partners, LLP, San Francisco, CA, for Plaintiffs.

Adam M. Shienvold, Magda Patitsas, Mark E.
Gebauer, Eckert Seamans Cherin & Mellott, LLC,
Harrisburg, PA, Bridget M. Ahmann, Pro Hac Vice,
Christin Jaye Eaton, Faegre Baker Daniels LLP,
Minneapolis, MN, Jared B. Briant, Faegre Baker
Daniels LLP, Denver, CO, for Defendant Sorin Group
Deutschland GMBH.

Adam M. Shienvold, Magda Patitsas, Mark E.
Gebauer, Eckert Seamans Cherin & Mellott, LLC,
Harrisburg, PA, Bridget M. Ahmann, Pro Hac Vice,
Christin Jaye Eaton, Faegre Baker Daniels LLP,
Minneapolis, MN, Jared B. Briant, Faegre Baker
Daniels LLP, Denver, CO, for Defendant Sorin Group
USA, Inc.

**ORDER**

John E. Jones III, U.S. District Judge

 **\*1** Presently pending before the Court are the
Plaintiffs' Motion for Approval of Proposed Form of
Class Notice and Notice Program ("Notice Motion")
(Doc. 82) and the Defendants' Motion to Stay Class
Notice pending their Rule 23(f) appeal to the Third
Circuit. ("Stay Motion") (Doc. 84). Both Motions have
been fully briefed and are therefore ripe for our review.

On October 23, 2017, we granted the Plaintiffs' motion
for class certification for their medical monitoring and
declaratory judgment claims pursuant to Federal
Rule of Civil Procedure 23(b)(2). (Doc. 79). We
defined the class to include all individuals who
underwent open heart surgery at certain facilities
during certain time periods who are currently
asymptomatic for non-tuberculous mycobacterium.
("NTM"). We ordered Plaintiffs to file a motion for
approval of a proposed form of class notice and
notice program within thirty days. On November 6,
2017, the Defendants filed a petition for leave to
appeal pursuant to Federal Rule of Civil Procedure
23(f). The petition has been briefed, but the Third
Circuit has not yet issued a ruling. In the interim,
Plaintiffs, in conformity with our Order, filed their
Notice Motion seeking to issue notice to all of the
class members. Defendants have opposed the Notice
Motion and filed a Stay Motion seeking a stay of notice
pending resolution of their Rule 23(f) petition for
appeal.

Regarding the Notice Motion, we note that Plaintiffs
have agreed to accept all proposed changes by the
Defendants. (Doc. 88, p. 1). The updated Proposed
Form of Class Notice and Notice Program is reflected
at Exhibit A to the Defendants' brief in opposition
to the Notice Motion. (Doc. 86, Ex. A). Defendants'
only two remaining arguments in opposition to the
Notice Motion are that notice should not be issued
at all and that issuance of class notice is premature
in light of their pending appeal. (Doc. 86). We reject
Defendants' first argument with no comment beyond
noting that we have *already* exercised our discretion
to order class notice in our previous order granting
class certification. The Defendants' second argument
in support of a stay of notice is more fully made in their
Stay Motion and we consider them together.

 Rule 23(f) provides that "[a] court of appeals may
permit an appeal from an order granting or denying
class-action certification under this rule if a petition
for permission to appeal is filed with the circuit clerk
within 14 days after the order is entered. An appeal
does not stay proceedings in the district court unless the
district judge or the court of appeals so orders." Fed.

2018 WL 8188426

R. Civ. P. 23(f). In their petition for appeal, Defendants raise three issues: (1) whether medical monitoring claims are properly certifiable under Rule 23(b)(2); (2) whether the Plaintiffs have Article III standing; and (3) whether it is proper for Plaintiffs to seek a declaration that a medical device is defective.

Both parties cite to the same standard for the Court to apply in considering a motion to stay proceedings pending resolution of a Rule 23(f) appeal. (Doc. 85, p. 5) (Doc. 87, p. 2). In deciding whether to issue a stay, a court considers the same factors as a preliminary injunction, namely: (1) whether the movant has a likelihood of success on the merits; (2) whether the movant will suffer irreparable injury absent a stay; (3) whether granting the stay will result in even greater harm to the nonmoving party; and (4) whether the stay is in the public interest. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* 2015 WL 9244638, at *8 (E.D. Pa. Dec. 17, 2015). "Consistent with the principal that preliminary injunctions are considered to be 'extraordinary relief,' a stay pending appeal under Rule 23(f) should not be granted as a matter of course." *Johnson v. Geico Cas. Co.,* 269 F.R.D. 406, 412 (D. Del. 2010) (internal citation omitted).

**\*2** The first factor weighs in favor of granting a stay. In granting class certification under Rule 23(b)(2), we addressed the novel question of whether a medical monitoring claim seeking a court established fund to provide medical monitoring is predominantly injunctive or monetary relief in light of recent case law. We find it likely that the Third Circuit will grant the petition for appeal, and while we maintain that our legal conclusions were correct, there is a reasonable probability that the Third Circuit may reverse our order granting class certification. The Defendants have therefore established a likelihood of success on the merits.

However, the remaining three factors weigh heavily against a grant of a stay. Beyond their arguments that there is a likelihood of success on the merits, Defendants argue that a stay is warranted for four additional reasons. First, Defendants argue that a stay is necessary to avoid the additional expense of sending an updated notice to the class members in

the event that the Third Circuit reverses or modifies our order granting class certification. (Doc. 85, pp. 4-5). Second, and relatedly, Defendants maintain that a stay is necessary to prevent confusion to the class members that would result if a modified class notice must be sent after the Third Circuit's ruling. (Doc. 85, p. 10). Third, Defendants argue that "[d]elaying notice will also prevent any unnecessary disclosure of absent class members' private contact information," as Plaintiffs have requested the Court to order the hospitals to produce the names and addresses of the potential class members to the claims administrator so that notices can be mailed. (*Id.*). (Doc. 82, att. 2). Finally, Defendants argue that "a delay of class notice pending the resolution of the 23(f) petition will not cause any prejudice to Plaintiffs." (*Id.*).

Conspicuously absent is any argument that the Defendants will suffer harm, much less irreparable harm, if a stay is not granted. The first factor in our consideration of imposing a stay is whether the **movant** will suffer irreparable harm. *See King Drug Co. of Florence, Inc.* 2015 WL 9244638, at *8. Plaintiffs have expressly assumed all expense of notifying the class members, rendering Defendants' arguments concerning the potential for additional expenses from sending out a modified class notice immaterial. There is no indication that dissemination of class notice pending the Defendants' Rule 23(f) petition will harm the Defendants in any way. The first factor therefore weighs heavily against imposition of a stay.

The next factor asks whether a stay would result in even greater harm to the nonmoving party. Plaintiffs point out that class members face a very real threat of developing a NTM infection at any moment; the longer that it takes for this lawsuit to progress, the longer that class members must wait to obtain the court established medical monitoring regime that they seek. Plaintiffs note that at least one class member, Richard Whipkey, was diagnosed with an infection during the pendency of this lawsuit. (Doc. 87, p. 1). Further, Plaintiffs contend that delay of class notice may cause them harm because of the risk that class members may move from their current addresses, making them more difficult to locate. (*Id.*, at p. 13). Having found that the Defendants have not asserted any harm that would result without a stay, these asserted harms by

2018 WL 8188426

Plaintiffs certainly qualify as "even greater harm to the nonmoving party." *King Drug Co. of Florence, Inc.* 2015 WL 9244638, at \*8. The third factor therefore also weighs against imposition of a stay.

Finally, we must consider whether a stay would be in the public interest. *See id.* We recognize as valid the Defendants' concern that class members would be confused if faced with a second, modified class notice after a Third Circuit ruling. (Doc. 85, p. 10). We note, however, that this confusion can be easily abated by the use of clear language in a second class notice, if one is necessary. Further, this class has been certified pursuant to Rule 23(b)(2), which means that class members do not need to exercise any opt-out rights. Fed. R. Civ. P. 23(b)(2). Confusion created by multiple notices would therefore not result in any class member unintentionally forfeiting any rights to which they are entitled. Regarding the Defendants' concern for class member privacy, we do not find that disclosure of names and addresses of class members would be a significant intrusion. As noted in the proposed class notice, the information would be given directly to a third-party claims administrator, and the information sought includes ones names and addresses.

**\*3** Against those relatively small risks of confusion and privacy intrusions is the risk that class members may not be aware of the extent of the alleged product defect and need for medical monitoring. The hospitals sent notices to affected patients to warn of the possibility of NTM infection and the need for medical monitoring, but certain class members may not have taken those warnings seriously. Receipt of class notice that there is a pending lawsuit alleging a design defect and seeking medical monitoring may help to communicate the possibility of infection to class members more reluctant to seek medical attention. This type of communication is certainly in the public interest. Further, we do not know how long it may take the Third Circuit to hear the merits of the Rule 23(f) petition. We find it to be against the public interest to prolong this litigation any further while waiting for a ruling.

The first factor in our consideration weighs in favor of granting a stay because the Third Circuit is likely to grant the Rule 23(f) petition and consider this novel legal issue. However, we find that the Defendants will not suffer any harm without a stay, the Plaintiffs will suffer greater harm than Defendants if a stay is imposed, and a stay is not in the public interest. We shall therefore grant the Notice Motion and enter the proposed class notice, as amended by Defendants at Exhibit A to their brief in opposition. (Doc. 86, Ex. A). In doing so, we deny the Stay Motion.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Defendants' motion to stay (Doc. 84) is **DENIED.**

2. Plaintiffs' motion for approval of proposed form of class notice and notice program (Doc. 82) is **GRANTED:**

   a. The Class Notice to be provided to Class Members shall be in the form of the Notice attached to Defendants' Brief in Opposition at Exhibit A. (Doc. 86, Ex. A).

   b. Within twenty (20) days from the date of this Order, non-parties WellSpan York Hospital and Penn State Milton S. Hershey Medical Center shall provide the names and addresses of all Class Members directly to the Claims Administrator, Angeion Group.

   c. Plaintiffs, at their own expense and through the Claims Administrator, shall mail a copy of the Class Notice to each member of the Class via first class mail within thirty (30) days after the Claims Administrator receives the names and addresses of all persons entitled to receive the Class Notice.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 8188426

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 Neutral
As of: March 13, 2023 2:51 PM Z

## *Baker v. Sorin Grp. Duetschland GMBH*

United States District Court for the Middle District of Pennsylvania

October 23, 2017, Decided; October 23, 2017, Filed

1:16-cv-00260

**Reporter**

2017 U.S. Dist. LEXIS 235430 *

EDWARD BAKER and JACK MILLER, on behalf of themselves and all others similarly situated, Plaintiffs, v. SORIN GROUP DUETSCHLAND GMBH and SORIN GROUP USA, INC., Defendants,

## Core Terms

medical monitoring, surgery, exposure, class certification, class member, cohesiveness, Plaintiffs', monitoring, damages, putative class, certification, patients, infection, injunctive, chimaera, declaratory judgment, injunctive relief, individualized, individual issues, exposed, district court, heater-cooler, open-heart, reasons, merits, warn, class representative, manufactured, predominate, underwent

**Counsel:  [*1]** For Edward Baker, on behalf of themselves and all other similarly situated, Jack Miller, on behalf of themselves and all others similarly situated, Plaintiffs: David S. Senoff, LEAD ATTORNEY, First Law Strategy Group, LL, Philadelphia, PA USA; Paola Pearson, Sol H. Weiss, LEAD ATTORNEYS, Anapol Weiss, Philadelphia, PA USA; William M. Audet, LEAD ATTORNEY, AUDET & PARTNERS, LLP, San Francisco, CA USA.

For Milton S. Hershey Medical Center, Movant: Paula A. Koczan, Pittsburgh, PA USA.

For Sorin Group Deutschland Gmbh, Sorin Group USA, Inc., Defendants: Adam M. Shienvold, LEAD ATTORNEY, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA USA; Bridget M Ahmann, PRO HAC VICE, Faegre Baker Daniels LLP, Minneapolis, MN USA; Christin Jaye Eaton, Faegre Baker Daniels LLP, Minneapolis, MN USA; Jared B. Briant, Faegre Baker Daniels LLP, Denver, CO USA; Magda Patitsas, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA USA; Mark E. Gebauer, Ecker Seamans Cherin & Mellott, LLC, Harrisburg, PA USA.

**Judges:** Hon. John E. Jones III, United States District Judge.

**Opinion by:** John E. Jones III

## Opinion

**[UNDER SEAL]]**

## MEMORANDUM & ORDER

Presently pending before the Court is the Plaintiffs' motion for class certification.[1] (the "Motion") (Doc. **[*2]** 60). Named Plaintiffs Edward Baker and Jack Miller ("Plaintiffs") seek class certification pursuant to *Federal Rule of Civil Procedure 23* and filed the instant Motion on April 4, 2017, along with a brief in support. (Doc. 60, att. 2). Defendants Sorin Group Deutschland GMBH and Sorin Group USA, Inc. (collectively, "Defendants" or "Sorin") filed a brief in opposition on May 8, 2017. (Doc. 67). Plaintiffs filed a brief in reply on May 17, 2017. (Doc. 72, att. 2). The Motion is therefore ripe for our review. For the reasons that follow, the Motion shall be granted.

## I. BACKGROUND

Edward Baker and Jack Miller commenced this action by filing a complaint on February 12, 2016. (Doc. 1). Plaintiffs submitted an Amended Complaint on March 21, 2016, asserting a medical monitoring claim and a declaratory judgment claim against the Sorin Defendants and their holding company. (Doc. 8). On September 29, 2016, we granted the holding company's motion to dismiss for lack of personal jurisdiction. (Doc. 45). We denied the Sorin Defendants' motion to dismiss

for failure to state a claim in its entirety on October 11, 2016. (Doc. 46). Defendants thereafter submitted an answer to the Amended Complaint. (Doc. 49). Now before the Court is Plaintiffs' **[*3]** motion for class certification. (Doc. 60).

Plaintiffs allege that the putative class was exposed to nontuberculous mycobacterium ("NTM") through a Sorin 3T Heater-Cooler System ("3T System") used to regulate their blood temperature during open heart surgeries at WellSpan York Hospital ("WellSpan") and Penn State Milton S. Hershey Medical Center. ("Hershey"). Named Plaintiffs and proposed class representatives both underwent open-heart surgery at WellSpan and received notification letters warning of potential exposure to NTM. (Doc. 60, Ex. C) (Doc. 60, Ex. F, ¶ 9).

Plaintiffs seek class certification for the following group of people:

> All individuals who underwent open heart surgery:
>
> 1. At WellSpan York Hospital between October 1, 2011 and July 24, 2015; or
>
> 2. Penn State Milton S. Hershey Medical Center between November 5, 2011 and November 5, 2015; and
>
> 3. Who are currently asymptomatic for NTM infection.

(Doc. 60, att. 2, pp. 1-2). The purported class excludes any individual who suffered actual injury from an NTM infection from surgery at WellSpan or Hershey, as this

---

[1] Also pending is Defendants' motion for oral argument on the Plaintiffs' motion for class certification. (Doc. 70). As reflected in this memorandum and order, oral argument was unnecessary for this Court to render a decision on the motion for class certification. As such, the motion for oral argument is denied.

action is for medical monitoring and declaratory judgment claims. The following is a brief overview of the facts giving rise [*4] to the claims against the Sorin Defendants.

On October 26, 2015, WellSpan notified approximately 1,300 open-heart surgery patients of possible exposure to NTM during open-heart surgeries performed between October 1, 2011 and July 24, 2015. (Doc. 60, Ex. A). The WellSpan notification indicated that NTM escaped from heater-cooler devices used during open-heart surgery to regulate blood temperature. (*Id.*). On November 10, 2015, Hershey notified approximately 2,300 open-heart surgery patients of possible exposure to the same bacteria from its heater-devices. (Doc. 60, Ex. B).

According to the Pennsylvania Department of Health, NTM are commonly found in soil and water, including tap water. (Doc. 60, Ex. G, p. 1). NTM are usually not harmful, but can cause infections in patients who have had invasive procedures and weakened immune systems. (*Id.*). Patients do not come into direct contact with the water in heater-cooler systems during open-heart surgery, but NTM in the machine can potentially be transmitted through aerosolization of the contaminated water in the device and enter the body through breathing or through the skin. (*Id.*). The Department of Health warned that NTM grows slowly and it [*5] can take several years before people with infections are diagnosed. (Doc. 60, Ex. G, p. 2). In addition, the Department of Health expressed the

importance for potentially exposed individuals to be aware of the symptoms of NTM infection and follow up with their health providers. (*Id.*, at p. 1). The Department of Health stated its belief that all patients who had open heart surgeries requiring cardiopulmonary bypass at WellSpan between October 1, 2011 and July 24, 2015, as well as those at Hershey from November 5, 2011 and November 5, 2015, could have been exposed to NTM. (*Id.*, at pp.2-3).

The Food and Drug Administration ("FDA") issued an advisory on October 13, 2016 regarding NTM and the connection to heater-cooler systems. (Doc. 60, Ex. H). The advisory warned that a specific type of NTM called *M. chimaera* has been associated with Sorin's 3T Heater-Cooler System. (*Id.*). The Sorin 3T System was approved by the FDA on June 6, 2006 as a Class II medical device following the 510(k) process, which allows the FDA to approve a device following a determination that it is equivalent to a device already placed on the market. (Doc. 67, DEF-1). The FDA issued a recommendation for health care facilities [*6] to "[i]mmediately remove from service any heater-cooler devices, accessories, tubing, and connectors that have tested positive for *M. chimaera* or have been associated with known *M. chimaera* patient infections at your facility." (Doc. 60, Ex. H, p. 3).

The FDA issued an update on October 13, 2016 warning that Sorin 3T Systems manufactured prior to September 2014 were at risk for *M. chimaera* exposure. (Doc. 60, Ex. H). The Sorin Defendants followed this

update with their own on October 13, 2016, identifying the serial numbers for the 3T Systems manufactured prior to September 2014. (Doc. 60, Ex. K). WellSpan had three Sorin 3T Systems and Hershey had five. (Doc. 60, Ex. CC). Plaintiffs attached at Exhibit CC a list of United States customers that purchased Sorin 3T Systems, which includes the serial numbers for all eight of the 3T Systems at issue.[2] (*Id.*). The serial numbers for the Hershey and WellSpan 3T Systems fell into the category of devices potentially exposed to *M. chimaera*.

Both parties have submitted copious documentary exhibits regarding the 3T Systems and *M. chimaera* exposure, including research studies, FDA documents, Department of Health Advisories, internal Sorin documents **[*7]** and studies, and scientific literature on the topic.

## II. LEGAL STANDARD

A federal court may only certify a class for litigation if it determines, after a "rigorous analysis," that the party seeking class certification has met all of the prerequisites of *Rule 23*. *In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir.2008)* (citing *Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*; *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615, 117 S. Ct. 2231, 138*

*L. Ed. 2d 689 (1997)*; *Beck v. Maximus, 457 F.3d 291, 297 (3d Cir.2006)*). "Factual determinations necessary to make *Rule 23* findings must be made by a preponderance of the evidence." *Hydrogen Peroxide, 552 F.3d at 320*. Thus, the "requirements set out in *Rule 23* are not mere pleading rules," and the class certification inquiry "requires a thorough examination of the factual and legal allegations." *Id. at 316*; *Newton v. Merrill Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 166 (3d Cir.2001)*. "An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met." *Hydrogen Peroxide, 552 F.3d at 316*.

To obtain class certification under *Rule 23*, Plaintiff must satisfy both the conjunctive requirements of *subpart (a)* and one of the requirements of *subpart (b)*. *Fed. R. Civ. P. 23*; *In re Schering Plough Corp. ERISA Litigation, 589 F.3d 585, 596 (3d Cir.2009)*. The touchstones of subpart (a) are: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation **[*8]** (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods., 521 U.S. at 613, 117 S.Ct. 2231*. Plaintiffs here seek class certification pursuant to *Rule 23(b)(2)*, which requires a showing that "the party opposing the class

---

[2] Hershey had five 3T Systems with the serial numbers 16S10918, 16S11094, 16S11514, 16S11958, and 16S14596. WellSpan had three 3T systems with the serial numbers 16S11621, 16S12831, and 16S12832. (Doc. 60, Ex. CC, pp. 35, 42).

has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Fed. R. Civ. P. 23(b)(2)*.

## III. DISCUSSION

To start, we make explicit that "Plaintiffs' burden is not to prove the elements of their claim, but to show that those elements are capable of proof through evidence that is common to the class." *In re Actiq Sales & Mktg. Practices Litig., 307 F.R.D. 150, 163 (E.D. Pa. 2015)*. We start with this principle because, much like their arguments at the motion to dismiss stage, Defendants spend considerable time arguing the merits of Plaintiffs' claims. There is certainly overlap between issues of class certification and the merits of the claims, but we only consider disputes on the merits to the extent that they inform upon the certification determination. *Hydrogen Peroxide, 552 F.3d at 316*. Having laid the proper foundation, we now will consider each requirement of *Rule 23* that Plaintiffs must satisfy to attain class certification.

## A. Numerosity

*Rule 23* states that numerosity is satisfied when "the class is so numerous **[*9]** that joinder of all members is impracticable." *FED. R. CIV. P. 23(a)(1)*. Defendants offer no argument to dispute that Plaintiffs have satisfied

the numerosity requirement, and with good reason — our Court of Appeals instructs that "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of *Rule 23(a)* has been met." *Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)*. Plaintiffs attach two exhibits to demonstrate that the purported class meets the numerosity requirement of *Rule 23(a)(1)*. The first is an affidavit from Alan L. Breechbill, the Executive Director of Hershey, that states Hershey sent letters to 2,289 patients to warn of exposure to NTM through cardiac procedures. (Doc. 60, Exhibit E). The second is the WellSpan press release that states that approximately 1,300 patients were notified of potential exposure to NTM at their hospital. (Doc. 60, Exhibit A). Considering the large size of the putative class, we find that Plaintiffs have satisfied their burden to meet the first prong of *Rule 23(a)*.

## B. Commonality

"A putative class satisfies *Rule 23(a)*'s commonality requirement if the named plaintiffs share at least one question of fact or law with the **[*10]** grievances of the prospective class." *Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013)* (internal quotation marks omitted). Defendants very reasonably do not offer argument that the putative class fails the commonality requirement of *Rule 23(a)(1)*. Plaintiffs provided a list of "just a few common questions," which we find useful in

demonstrating that the class meets the commonality requirement:

1. Whether the 3T is defective in design and/or manufacture;

2. On defective design, whether reasonable alternative designs existed that would have reduced or eliminated the risk of NTM infections with the 3T;

3. Whether the 3T's IFUs failed to advise users of effective cleaning and disinfection procedures;

4. Whether Defendants failed to timely warn users of the potential for bacterial colonization and aerosolization in 3Ts;

5. Whether the Class was exposed to *M. Chimaera* at greater than normal background levels;

6. Whether *M. Chimaera* is a proven hazardous substance;

7. Whether Defendants negligently caused the Class to be exposed to *M. Chimaera*; and

8. Whether the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

(Doc. 60, att. 2, p. 15). Commonality is plainly satisfied.

## C. Typicality

Typicality requires that **[*11]** "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3)*. The

typicality requirement ensures that "the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009)*. The Third Circuit has offered "three distinct, though related, concerns" to consider in assessing typicality:

(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*Id., at 599*. Defendants argue that Baker and Miller's claims are atypical of the class for two reasons: both underwent surgery at WellSpan and both had surgery in March 2015, after Defendants learned about **[*12]** the risk of *M. chimaera* infections. (Doc. 67, p. 33).

We note that "[c]omplete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence." *In re*

2017 U.S. Dist. LEXIS 235430, *12

*Schering Plough Corp. ERISA Litig., 589 F.3d at 598*. "[F]actual differences between the proposed representative and other members of the class do not render the representative atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members." *Id.* (internal quotation omitted).

Defendants argue that Baker and Miller are inadequate class representatives because they both underwent surgery at WellSpan and "cannot provide the evidence necessary to advance the Hershey plaintiffs' claims." (Doc. 67, p. 33) "For example, Baker could not testify regarding what Hershey patients received from the Hershey NTM clinic." (*Id.*). For support of this contention, Defendants cite two district court cases that are highly distinguishable.[3] Whether Baker and Miller could personally testify about the Hershey claims is immaterial; the typicality requirement asks whether "the incentives [*13] of the plaintiffs are aligned with those of the class." *Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir.1994)*. Baker and Miller's claims arise out of the same alleged course of conduct by the Defendants —

exposure to NTM through a 3T System as a result of the Defendants' negligence. The only pertinent factual difference is the hospital at which Baker and Miller were allegedly exposed: "[t]hat fact may distinguish [them] from other class members, but it does not prejudice [their] ability to protect absent class members' interests." *Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 599 (3d Cir. 2012)*.

Defendants next argue that Baker and Miller cannot satisfy typicality because they had surgery in March 2015; "[t]heir claims are thus not typical of patients who had surgery earlier in the class period when the risk of *M. chimaera* and aerosolization was un-hypothesized, or of patients who had surgery after Defendants issued new cleaning instructions in June 2015." (Doc. 67, p. 33). On its face, this argument presents a colorable issue of typicality because it suggests that there may be different defenses to Baker and Miller's claims than to other class members; as one of the elements of a medical monitoring claim is that the exposure was caused by the Defendants' negligence, Plaintiffs must prove at trial [*14] that the Defendants' actions were unreasonable in light of what Defendants knew regarding the risk of NTM at the time of its alleged actions or omissions. *In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 399 (S.D.N.Y. 2008)*. As such, Defendants argue that the timing of each class members' alleged exposure is highly relevant and negates typicality of Baker and Miller's cases. (Doc. 67, p. 33).

---

[3] Baker and Miller have one factual difference from the Hershey class members — they underwent surgery at WellSpan. Defendants cite to *In re Welding Fume Prods. Liab. Litig., 245 F.R.D. 279, 310 (N.D. Ohio 2007)*, where the court considered "the great variety of products, manufacturers, warnings, employers, and workplaces involved." Defendants also cite to *Martin v. Home Depot U.S.A., Inc., 225 F.R.D. 198, 201 (W.D. Tex. 2004)*, where the case concerned an allegedly defective wood product and "treated wood is not like other consumer products which are essentially interchangeable with respect to their appearance, use and composition." We have no indication that the 3T Systems used at WellSpan and Hershey would vary in that way and thus neither case is persuasive.

However, Defendants do not provide concrete examples of how their defenses would differ for different class members. Plaintiffs, on the other hand, point to evidence to support that the difference in timing of each class members' surgery will *not* present typicality problems. (Doc. 72, att. 1, pp. 13-15). Plaintiffs argue that the legal theory of the class is that "Defendants **have yet to release an _effective_ cleaning protocol for the 3T**," making the timing of each surgery irrelevant because the Defendants were negligent throughout the class period. (*Id.*, at pp. 13-14) (emphasis in original). In support of their theory, Plaintiffs point to studies that conclude Defendants' updated maintenance recommendations were inadequate. (Doc. 60, Ex. T) (study dated October 2016 concludes, "[o]ur findings challenge the effectiveness of the HCU manufacturer's maintenance recommendations **[*15]** . . .") (Doc. 60, Ex. S) ("results following decontamination protocols supplied by the manufacturer showed that these decontamination methods were inadequate.").

While Defendants may intend to present evidence negating negligence during different times, Plaintiffs intend to present common evidence that Defendants were negligent during the entire class period. Considering that the Third Circuit has "set a 'low threshold' for typicality", we find that Plaintiffs have satisfied their burden of demonstrating typicality for the purported class. *In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 428 (3d Cir.)*, as amended (May 2, 2016), cert. denied sub nom.

## D. Adequacy

*Rule 23(a)(4)* requires that plaintiffs must "fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(A)(4)*. "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)*. Defendants do not question the adequacy of Plaintiffs' counsel, but argue that Plaintiffs Baker and Miller are inadequate class representatives for two reasons: first, they "have already received the monitoring they request" and second, neither has sustained **[*16]** any damages. (Doc. 67, p. 34).

Baker testified that he attended an NTM clinic through WellSpan and visits his primary care physician for follow up care. (Doc. 67, DEF-29, 92:5-99:4, 89:12-13). Miller also testified that he attended the WellSpan NTM clinic, and that he receives follow up care from his regular physicians. (Doc. 67, DEF-30, 38:3-15, 83:24-86:6). We fail to understand how these facts render the Plaintiffs inadequate class representatives. That the Plaintiffs have already received some monitoring care does not mean that they will not continue to undergo monitoring for potential NTM infection; the purpose of this action is to place the costs of future monitoring on the Defendants. It is likely that many putative class members will have undergone initial monitoring once

they received their letters from WellSpan and Hershey regarding potential NTM exposure. That Baker and Miller have already received some medical monitoring does not pose any conflict of interest with other class members who have not.[4]

Defendants also argue that Plaintiffs are inadequate because they have not sustained any damages; WellSpan has covered all costs related to their monitoring thus far. (Doc. 67, **[\*17]** p. 35). Again, we fail to see the significance in this argument. The medical monitoring claim seeks to establish a fund to provide future medical monitoring, not to compensate past medical costs. Therefore, lack of damages is immaterial.

We see no reason why Plaintiffs and their counsel would be inadequate representatives of the putative class. As discussed with the typicality requirement, Baker and Miller sit in a substantially similar position as all other putative class members and Defendants have not pointed to any conflict of interest that would suggest they could not fairly and adequately represent the putative class.

---

[4] Defendants cite to *In re Bacol Products Litigation, 218 F.R.D. 197 (D. Minn. 2003)* for the proposition that "[i]n medical monitoring cases, plaintiffs who have already received the requested monitoring are not adequate representatives of those who have not received any medical testing." (Doc. 67, p. 34). This case does not stand for what the Defendants posit. While the court did recognize that the named representatives "already received the tests advocated," the much more pertinent distinction between the representatives and the class was that the representatives alleged actual injury along with medical monitoring. *Baycol, 218 F.R.D. at 211*.

## E. *Rule 23(b)(2)*

Having found that Plaintiffs satisfy each requirement of *Rule 23(a)*, we move next to *Rule 23(b)*. Plaintiffs seek class certification pursuant to *Rule 23(b)(2)*, which provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Fed. R. Civ. P. 23(b)(2)*. "Two showings must therefore be made in order to proceed under *Rule 23(b)(2)*." *Barabin v. Aramark Corp., 210 F.R.D. 152, 160 (E.D. Pa. 2002)*, *aff'd, No. 02-8057, 2003 U.S. App. LEXIS 3532, 2003 WL 355417 (3d Cir. Jan. 24, 2003)*. "First, the complaint must seek relief which is predominantly injunctive or declaratory . . . [and] [s]econd, **[\*18]** plaintiffs must complain that defendants acted or refused to act on grounds generally applicable to the class." *Id.*

Defendants argue that the putative class is inappropriate for certification under *Rule 23(b)(2)* because it does not seek primarily injunctive relief and because the class is not sufficiently cohesive. (Doc. 67, pp. 15, 19). We will address each argument in turn.

## 1. Type of Relief

Plaintiffs argue that their "request for medical monitoring is properly treated as injunctive in nature because rather than compensatory damages, Plaintiffs and the Class seek the establishment of a court-supervised medical

2017 U.S. Dist. LEXIS 235430, *18

monitoring program that provides periodic medical examination to screen for NTM infections." (Doc. 60, att. 2, p. 20). In order to determine whether this type of prayer for relief is appropriate for certification under *Rule 23(b)(2)*, we must analyze the current precedential framework.

Initially, we note that medical monitoring is a claim under Pennsylvania law and the Pennsylvania Supreme Court has endorsed awarding medical monitoring damages as a trust fund, though it did so without addressing class certification. *Redland Soccer Club, Inc. v. Dep't of the Army & Dep't of Def. of the U.S., 548 Pa. 178, 696 A.2d 137, 148 (1997)*. In 1998, the Third Circuit reviewed a case concerning certification of a Pennsylvania [*19] medical monitoring claim seeking damages as a trust fund under *Rule 23(b)(2)* in *Barnes v. Am. Tobacco Co., 161 F.3d 127 (3d Cir. 1998)*. *Barnes* concerned class certification for a medical monitoring claim against major American tobacco companies. *696 A.2d at 130*. The Court ultimately affirmed the district court's decertification of the class due to the multitude of individual issues in the case, and thus did not offer comment or guidance on whether a medical monitoring claim seeking a trust fund could ever qualify as injunctive relief under *Rule 23(b)(2)*. Instead, the Court simply quoted extensive portions of the district court opinion.

The district court held that "it is apparent that relief requested under a medical monitoring claim can be either injunctive or equitable in nature." *Id., at 132*. In reaching this conclusion, the district court cited favorably to Judge Speigel's articulation of the distinction between a medical monitoring claim seeking monetary relief and one seeking injunctive relief in *Day v. NLO, Inc., 144 F.R.D. 330, 335-336 (S.D. Ohio 1992)*, *rev'd on other grounds*, *5 F.3d 154 (6th Cir. 1993)*. Judge Speigel explains:

> Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. [*20] Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice. Neither of these forms of relief constitute injunctive relief as required by *Rule 23(b)(2)*.

> However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced is utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the Court to address issues as they develop during the program administration. Under these circumstances, the relief constitutes injunctive relief as required by *Rule 23(b)(2)*.

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 21 of 131
PageID: 78020

Page 11 of 18
2017 U.S. Dist. LEXIS 235430, *20

*Day, 144 F.R.D. at 335-336*. From this, the district court concluded,

> The dispositive factor that must be assessed to determine whether a medical monitoring claim can be certified as a *Rule 23(b)(2)* class is-what type of relief do plaintiffs actually seek. If plaintiffs seek relief that is a disguised request for compensatory damages, then the medical monitoring claim can only be characterized as a claim for monetary damages. In contrast, if plaintiffs seek the establishment **[*21]** of a court-supervised medical monitoring program through which the class members will receive periodic medical examinations, then plaintiffs' medical monitoring claims can be properly characterized as claim seeking injunctive relief.

*Barnes, 161 F.3d at 132* (citing *Arch v. Am. Tobacco Co., 175 F.R.D. 469, 484 (E.D. Pa. 1997)*. The Court in *Barnes* provided block quotes to each of these references by the district court, but limited its own discussion regarding *Rule 23(b)(2)* to the general requirements that the class be cohesive and that too many individual issues will render a class inappropriate for certification. *Id., at 142-143*.

In 2011, the Supreme Court decided *Wal-Mart Stores, Inc. v. Dukes, et. al, 564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)*, reversing certification of a class alleging Title VII discrimination and seeking awards of backpay under *Rule 23(b)(2)*. *Dukes, 564 U.S. at 342*.

*Dukes* was highly distinguishable from our case, as the Title VII claims involved abundant individual issues, including each relevant employment decision, the reasons for those decisions, and individual calculation of each class member's backpay. *Id. at 352*. The Court did, however, provide relevant dicta in its analysis of certification under *Rule 23(b)(2)*.

> In other words, *Rule 23(b)(2)* applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would **[*22]** be entitled to a different injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Id., at 360*. The Court recognized a Fifth Circuit holding that permitted certification when a class seeks monetary relief that is "incidental to requested injunctive or declaratory relief." *Id., at 365-366* (citing *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)*.The Fifth Circuit defined "incidental relief" as "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Allison, 151 F.3d at 415*. It reasoned that such "incidental damage should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new substantial legal or factual issues, nor entail complex

2017 U.S. Dist. LEXIS 235430, *22

individualized determinations." *Id.* Unfortunately for our purposes, the Supreme Court chose not to pass judgment on the merits of the Fifth Circuit's interpretation because the facts in *Dukes* so clearly did not fit that standard. *Dukes, at 366*.

Following *Dukes*, the Third Circuit questioned whether medical monitoring claims seeking damages through a fund could qualify under *Rule 23(b)(2)*, but likewise **[*23]** did not offer a conclusion. *Gates v. Rohm and Haas Co., 655 F.3d 255 (3d Cir. 2011)*. In *Gates*, the Third Circuit affirmed the district court's denial of class certification in a medical monitoring claim against a chemical company. *Id., at 258*. The Court recognized that "[i]f the plaintiffs prevail, class members' regimes of medical screenings and corresponding cost will vary individual by individual," but chose not to determine whether that variance would remove the claim from the realm of *Rule 23(b)(2)* class certification in light of *Dukes*. *Id., at 263*. The particular case concerned many individual issues regarding exposure levels, risk of disease, and property damage, and thus certification was denied "for reasons apart from the monetary nature of plaintiffs' claims." *Id., at 263*.

These cases leave us with no conclusive guidance on whether a medical monitoring claim seeking a court-supervised fund qualifies as injunctive relief under *Rule 23(b)(2)*. *Barnes*, *Dukes*, and *Gates* all concerned matters that abounded with individualized issues, preventing any dispositive analysis into the damages aspect of the rule. In consideration of all of the dicta

provided in these cases, as well as the Fifth Circuit's persuasive reasoning from *Allison*, we now hold that a medical monitoring claim such as this, where the putative class seeks establishment **[*24]** of a court-supervised fund financed by the defendants to provide future medical monitoring care,[5] is predominantly injunctive in nature and thus is eligible for class certification under *Rule 23(b)(2)*.

Our holding is premised on the unique characteristics of this medical monitoring case and follows the reasoning of Judge Spiegel in *Day, 144 F.R.D. at 335-336*, and the district court in *Arch, 175 F.R.D. at 484*. The relief in a medical monitoring action, and the relief that the putative class seeks here, is provision of future periodic medical examinations to promote early detection a latent disease. Where, as here, the alleged exposure is the same for each class member, this type of relief "can be properly characterized as invoking the court's

_____

[5] Defendants argue that Plaintiffs' claim of seeking a court-supervised fund "contradicts their own complaint" and is a "belated request" that "lacks specificity." (Doc. 67, pp. 16-17). We disagree with Defendants that Plaintiffs' request for a court-supervised fund contradicts their complaint. Plaintiffs' amended complaint contains a list of prayers for relief, including "[a] declaration that the Defendants are financially responsible for implementing and maintaining a fund for the medical monitoring of Plaintiffs and Class Members." (Doc. 8, p. 21). Because of liberal pleading standards, we also disagree with the notion that Plaintiffs would have to include specifics on the formulations of the fund in their complaint. This argument regarding specificity of Plaintiffs' prayer for a fund is premature at this stage. The prayer for relief also includes "[a]n award to Plaintiff and Class Members of damages, costs and disbursements in this action." (Id.). Because *Rule 23(b)(2)* only allows for certification of claims seeking predominantly injunctive relief, we explicitly exclude from the class claims any prayer for individual damages, costs, and disbursements.

equitable powers." *Arch, 175 F.R.D. at 484*. Unlike claims for compensatory damages, the Court need not analyze and compute individual claims for monetary relief in conjunction with liability; instead, one unified order forming a fund financed by the Defendants would provide relief to each class member. As the district court in *Arch* held, we find this to be "paradigmatic request for injunctive relief under a medical monitoring claim." *175 F.R.D. at 484*.

To explain using the Supreme Court's language in *Dukes*, establishment of a court-supervised fund for medical **[*25]** monitoring would be "a single injunction or declaratory judgment [that] would provide relief to each member of the class." *Dukes, 564 U.S. at 360*. It does not create the situation *Dukes* warned about where "each individual class member would be entitled to a different injunction or declaratory judgment" or "an individualized award of monetary damages." *Id., at 360*.

This matter is particularly unique in its lack of individualized issues, discussed further in the next section regarding cohesiveness. Plaintiffs intend to prove exposure for each class member by demonstrating that a defective 3T System was used during their open-heart surgeries. Beyond that, Plaintiffs' evidence to show that NTM is a hazardous substance, that Defendants were negligent, that exposed patients have an increased risk of developing disease, and that medical monitoring is necessary do not concern any individualized issues at all. This is not a case where a class member's use of or exposure to the allegedly defective product varies between individuals, causing each member's risk for infection and need for monitoring to vary as well. While the costs for each class member's medical monitoring may certainly differ depending on that individual's exhibited **[*26]** symptoms and other medical factors, those variances are properly characterized as incidental to the main form of equitable relief.

The Fifth Circuit noted in *Alison* that one way to determine if the relief sought is primarily injunctive in nature is to ask whether the damages are "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *151 F.3d at 415*. Calculation of incidental damages should "not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Id.* Plaintiffs' medical monitoring claim is a quintessential fit for these standards. It would not require any court calculation into individual damages, and would allow for the creation of a fund with objective, class wide standards for the expenditure of medical monitoring procedures. Each individual class member may receive different sized "awards" in the sense that the care required for each person may be different based on physician opinion and individual medical factors, but **[*27]** those variances have no effect on the order of relief as a whole.

For all of these reasons, we find that Plaintiffs' claim for medical monitoring and prayer for a medical monitoring fund financed by the Defendants is certifiable under *Rule 23(b)(2)*. We note that Defendants also offer argument that Plaintiffs' Count Two for declaratory judgment is unfit for certification under *Rule 23(b)(2)*, but only because of its intertwinement with the medical monitoring claim and its prayer for a fund. (Doc. 67, p. 31). Because we find that the medical monitoring claim is appropriately certified as predominately injunctive or declaratory relief under the rule, Defendants argument against certification of Count Two lacks merit. A declaratory judgment claim fits squarely within *Rule 23(b)(2)* and is appropriate for certification.

**2. Cohesion**

A class seeking certification under *Rule 23(b)(2)* "need not meet the additional predominance and superiority requirements of *Rule 23(b)(3)*,*Gates v. Rohm and Haas Co., 655 F.3d 255, 263-264 (3d Cir. 2011)*, but "it is well established that the class claims must be cohesive." *Barnes v. Am. Tobacco Co., 161 F.3d 127, 143 (3d Cir. 1998)*. "Indeed, a (b)(2) class may require more cohesiveness than a (b)(3) class." *Id., at 142*. The cohesion requirement is not wholly separate from the previous inquiry, because "when a court determines whether the defendant has acted or **[*28]** refused to act on grounds generally applicable to the class, the court is perforce examining whether the class is cohesive in nature." *Barnes v. American Tobacco Co., 176 F.R.D.*

479, 488 (E.D.Pa.1997), aff'd, *161 F.3d 127 (3d Cir.1998)*. "Rather, it is merely another way of stating that a class must be cohesive in order for a court to find that a defendant has acted on grounds generally applicable to the proposed class." *Agostino v. Quest Diagnostics Inc., 256 F.R.D. 437, 456 (D.N.J. 2009)*. Thus, our finding that Plaintiffs' claims are primarily injunctive or declaratory under *Rule 23(b)(2)* already supports a finding of sufficient cohesiveness. Because we are forging new ground in our holding that this type of medical monitoring claim is eligible for *Rule 23(b)(2)* certification, however, we will proceed with a rigorous analysis of cohesiveness.

The Third Circuit in *Gates* indicated approval of the district court's method of determining cohesiveness under *Rule 23(b)(2)*, in which the court analyzed cohesiveness in the same manner as a court would consider predominance under *Rule 23(b)(3)*. *Gates, 655 F.3d at 265*. This requires the court to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)*, as amended (Jan. 16, 2009) (internal quotation omitted)." If proof of the essential elements of the cause of action requires individual **[*29]** treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001)*, as amended (Oct. 16, 2001). To prevail on a medical monitoring claim in Pennsylvania, plaintiffs must

prove:

(1) exposure greater than normal background levels;

(2) to a proven hazardous substance;

(3) caused by the defendant's negligence;

(4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;

(5) a monitoring procedure exists that makes the early detection of the disease possible;

(6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Redland Soccer Club, 696 A.2d at 145-46*. Plaintiffs have provided the Court with various examples of the common proof they intend to use to establish each element of the putative class medical monitoring claim. Defendants argue that the "proposed class is not cohesive because the elements of exposure, significant risk increase, negligence, and a different and reasonably necessary medical monitoring program cannot be proved with common evidence." (Doc. 67, p. 20).

We will start first with exposure. Defendants **[*30]** focus their arguments on Plaintiffs' burden to prove actual exposure rather than potential exposure. While this is undoubtedly true, the Court is concerned at this juncture not with whether Plaintiffs *have* proven exposure, but whether the putative class *could* offer "common proof [that] would accurately reflect the exposure of individual members." *Gates, 655 F.3d at 265*. In that vein, this litigation is distinctive because the alleged exposure comes from only one experience shared by every class member — open-heart surgery in the presence of a contaminated 3T System. This requires consideration of individual class members, but only with regard to this one fact. The necessity of proving one threshold fact for each class member is certainly not significant or predominant in light of all of the other factual and legal issues common to the class.

The putative class claim is highly distinguishable from *Gates* where exposure varied based on time, activity level, age, sex, genetic make-up, work, travel, and recreational habits. *655 F.3d at 267*. Even further, the realm of possible 3T Systems used with each class member's surgery is only eight (Doc. 60, Ex. CC), distinguishing this matter from *Barnes* where "[d]efendants manufactured hundreds **[*31]** of different types of cigarettes over the years." *161 F.3d at 135*. We find that the common proof necessary to prove exposure is sufficiently cohesive for class certification.

Relatedly, we find that Plaintiffs have demonstrated that the putative class can offer common proof to demonstrate increased risk of contracting a latent disease. Plaintiffs provide research studies concluding that any patient who underwent surgery in the presence of a 3T System is at risk for infection, evidence of the

2017 U.S. Dist. LEXIS 235430, *31

link between heater-cooler systems and NTM, and expert opinions. (Doc. 72 att. 1, 11-13). Again we reiterate that Plaintiffs are not tasked with proving their claims at this juncture, but with demonstrating that proof common to the class will predominate over individual issues at trial. We find that Plaintiffs have demonstrated their ability to do so by pointing to evidence that will connect an increased risk of NTM infection with all of the WellSpan and Hershey 3T Systems.

Defendants argue that Plaintiffs cannot establish a class-wide need for medical monitoring. (Doc. 67, pp. 26-29). In support, Defendants point to the fact that Plaintiffs' proposed medical monitoring regime requires individual evaluations of **[*32]** the patients. (Doc. 67, p. 28). This argument is illogical. Medical care will, of course, vary between individuals. The question before the Court is whether there is common proof that monitoring *at all* is reasonably necessary for each class member. To this end, Plaintiffs have provided ample research studies, expert opinions, and CDC notices that suggest that *all* patients exposed to the 3T System receive medical monitoring. (Doc. 72, att. 1, pp. 15-16). That particular medical procedures and monitoring will be performed differently on each member due to individualized medical differences is immaterial.

Defendants also argue that Plaintiffs cannot establish through common proof that the medical monitoring proposed is different from that recommended in the absence of exposure. (Doc. 67, pp. 29-30). In support, Defendants argue that some of the medical monitoring

measures are part of ordinary follow-up care for cardiac patients. (*Id.*, at p. 29). It is unclear how this would implicate individual issues to defeat cohesion — the issue addressed in this argument is whether the proposed regime is different from ordinary care, an issue clearly capable of proof by common evidence demonstrating **[*33]** what qualifies as "ordinary care" and what qualifies as the reasonable medical monitoring regime.

Finally, Defendants argue that Plaintiffs' cannot submit common evidence to prove negligence. (Doc. 67, pp. 24-26). In Pennsylvania, "negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Martin v. Evans, 551 Pa. 496, 711 A2d 458, 461 (Pa. 1998)*. To demonstrate negligence, the putative class will have to present evidence of the Defendants' knowledge of the risk of NTM and their reaction to it. Defendants argue that the putative class will be unable to do so with common proof because the class members' surgeries ranged from 2011 to 2015. (Doc. 67, p. 25). Defendants argue that the "science regarding NTM transmission from heater-coolers evolved over this period, along with Defendants' knowledge of the potential risk and their reaction to it." (*Id.*). Rather, Defendants argue, "the evidence and analysis of negligence will differ depending on the date of surgery, the knowledge of the risks at that time, and whether Defendants acted reasonably based on their contemporaneous knowledge. (*Id.*, at pp. 25-26).

We recognize Defendants' argument that their proof in defense of negligence **[*34]** will vary based on whether a class member had surgery at the beginning of the time period or at the end. However, this issue does not defeat cohesiveness for two reasons. First, Plaintiffs have offered proof and indicated their intention to prove that Defendants were negligent throughout the *entire* class period. This weakens the Defendants' claim that the negligence analysis will significantly differ depending on whether the class member underwent surgery before or after they first became aware of the risk of *M. chimaera*. Second, the time period of the putative class member surgeries is limited. It only encompasses a period of roughly four years. In light of all of the other common issues in this matter, the differences that may arise in the negligence analysis within this limited period do not defeat cohesiveness.

We have reviewed the extensive exhibits submitted by both the Plaintiffs and the Defendants and find that common proof will vastly predominate over individual issues in a class claim to establish the elements of medical monitoring. Indeed, this is very likely one of a very small subset of medical monitoring claims that is so lacking in individual issues. The individual member **[*35]** characteristics or actions will have no bearing on the merits of the class claims; the only individualized issues distinguishing member from member is where they received surgery and when. We will therefore grant the Motion and certify the class and Count One pursuant to *Rule 23(b)(2)*.

Regarding Count Two, plaintiffs seek a declaration that the 3T System was defective. Whether Plaintiffs ultimately proceed under a design defect, manufacturing defect, or failure to warn defect theory, the proof of the claim depends on the Defendants' actions and knowledge and the product itself. It does not depend on any individualized evidence concerning each class member. Defendants argue that proof of a negligence-based design defect precludes class cohesiveness because "the science and Defendants' knowledge changed from 2011-2015." (Doc. 67, p. 31). We reject Defendants' argument for the same reasons that we find individualized issues do not preclude cohesion with regard to the negligence element of medical monitoring. Therefore we will also grant the Motion with regards to Count Two.

From a practical standpoint, we note that it will actually be to the Defendants benefit for the class to be certified. Defendants **[*36]** have strongly opposed the Motion for class certification, but in doing so they seem to elevate form over substance. Realistically, presenting one consolidated defense against all medical monitoring claims arising out of the use of the 3T Systems at Hershey and WellSpan will save time and resources for the Defendants. The alternative is to face potentially thousands of individual medical monitoring claims, accumulating significant costs, all for the sake of presenting a virtually identical defense in each case.

**IV. CONCLUSION**

2017 U.S. Dist. LEXIS 235430, *36

In light of the foregoing, we shall grant the motion for class certification. Plaintiffs have demonstrated that the putative class meets all requirements of _Rule 23(a)_ and fits within _Rule 23(b)(2)_. Further, judicial economy is served well by certification of the class. The evidence needed to prove the medical monitoring and declaratory judgment claims against the Defendants would be substantially the same for all putative class members. Class certification allows for both parties to conserve resources and efficiently resolve the factual and legal issues presented by the 3T System and NTM outbreak.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1. Plaintiffs' motion for class certification (Doc. **[*37]** 60) is **GRANTED**.

   a. The class is hereby defined as follows:

   All individuals who underwent open heart surgery at WellSpan York Hospital between October 1, 2011 and July 24, 2015 or at Penn State Milton S. Hershey Medical Center between November 5, 2011 and November 5, 2015 and who are currently asymptomatic for NTM infection.

   b. Count I for medical monitoring is certified as a class claim to the extent that it seeks relief through a common fund financed by the Defendants. It is not certified to the extent that it seeks any individualized damages or costs. Count II for declaratory judgment is also certified as a class claim.

   c. Plaintiffs Edward Baker and Jack Miller are

hereby designated as the class representatives.

   d. Sol H. Weiss, Esq., and David S. Senoff, Esq., of Anapol Weiss and William M. Audet, Esq. of Audet & Partners, LLP are hereby appointed as class counsel.

2. Within thirty (30) days of the date of this Order, Plaintiffs shall file a motion for approval of their proposed forms of class notice and their notice program. ("Notice Motion). If the Notice Motion is opposed by any party, that party shall file a brief in opposition to the Notice Motion no later than fourteen (14) days **[*38]** after the filing of the Notice Motion.

3. Defendants' motion for oral argument (Doc. 70) is **DENIED**.

/s/ John E. Jones III

John E. Jones III

U.S. District Judge

*End of Document*

Boley v. Universal Health Services, Inc., Slip Copy (2021)

2021 WL 2186432

2021 WL 2186432
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Mary K. BOLEY, et al.

v.

UNIVERSAL HEALTH SERVICES, INC., et al.

CIVIL ACTION NO. 20-2644
|
Filed May 27, 2021

**Attorneys and Law Firms**

Kolin Tang, Shepherd Finkelman Miller Shah LLP, Newport Beach, CA, Laurie Rubinow, James E. Miller, Miller Shah LLP, Chester, CT, Alec Berin, James C. Shah, Michael P. Ols, Miller Shah LLP, Philadelphia, PA, Gabrielle P. Kelerchian, Capozzi Adler, P.C., Merion Station, PA, Lisa W. Basial, Mark K. Gyandoh, Donald R. Reavey, Capozzi Adler, P.C., Harrisburg, PA, for Mary K. Boley, Kandie Sutter, Phyllis Johnson.

Brian T. Ortelere, Morgan Lewis & Bockius LLP, Philadelphia, PA, Deborah S. Davidson, Morgan Lewis & Bockius LLP, Chicago, IL, Sean K. McMahan, Stephen K. Dixon, Morgan, Lewis & Bockius LLP, Washington, DC, for Universal Health Services, Inc., The UHS Retirement Plans Investment Committee.

## MEMORANDUM

KEARNEY, District Judge

**\*1** Universal Health Services, Inc. sponsors the Universal Health Services, Inc. Retirement Savings Plan ("Plan"), a defined contribution plan with assets totaling over $1.9 billion and offering over thirty investment options.[1] Former Universal Health employees Mary Boley, Kandie Sutter, and Phyllis Johnson ("Participants"), on behalf of the Plan and a purported class of tens of thousands of similarly situated Plan participants and beneficiaries, sued Universal Health and its Investment Committee (the "Fiduciaries") last June under the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging various breaches of fiduciary duties relating to the Plan's decision-making processes and recordkeeping.[2]

The Fiduciaries, largely relying on the Supreme Court's recent decision in *Thole v. U.S. Bank, N.A.*,[3] moved to partially dismiss the Participants' claims last year arguing they lacked constitutional standing to pursue claims relating to alleged losses in discrete investment options they never selected.[4] We denied the Fiduciaries' motion after finding *Thole* to be of limited relevance in the context of defined contribution plans.[5] We found the Participants plead individualized injury – and therefore standing – with respect to each of their claims.[6]

**\*2** We then met with counsel to discuss discovery and trial scheduling. We entered a detailed schedule on November 19, 2020 setting dates for close of discovery by July 19, 2021, followed by dispositive motions and counsel attached for trial beginning October 18, 2021.[7]

The parties proceeded into discovery including deposing the three lead Participants. Following an initial discovery phase consistent with our November 19, 2020 Order, the Participants timely moved for class certification under Federal Rule of Civil Procedure 23(a) and 23(b)(1).[8] We certified a defined class after detailed findings the Participants established each of the Rule's requirements by a preponderance of the evidence.[9]

The parties then proceeded into the remaining discovery consistent with our November 19, 2020 Order on the issues necessary to present final expert disclosures, summary judgment motions, final pre-trial motions, and trial set for October 18, 2021. The parties confirmed they need to complete approximately eight depositions lasting no more than seven hours now set for June 8 through June 17, 2021.[10] The parties also confirmed they do not anticipate further discovery. The Participants confirmed they are today prepared to meet our expert disclosures deadline. The Fiduciaries concede the expert reports are derived from the depositions but may need to be revised depending on the Court of Appeals' analysis.

2021 WL 2186432

The Fiduciaries proceeded in discovery while petitioning our Court of Appeals for permission to appeal our class certification Order under Federal Rule 23(f). [11] The Fiduciaries raised, among other issues, the potential impact of *Thole* on class certification analysis. [12] We are not aware of authority from our Court of Appeals on this issue as yet. Our Court of Appeals granted the petition on May 18, 2021. [13] The court has not set a briefing schedule yet. Both parties suggest resolving the Rule 23(f) appeal may take over a year based on the Court of Appeals' treatment of similar appeals.

**I. Analysis**

The Fiduciaries now move to stay all proceedings pending our Court of Appeals resolving the Rule 23(f) appeal. [14] We held oral argument. The Fiduciaries argue a stay is warranted, in part, because it would protect the parties and the Court from expending time and resources on discovery and trial which may prove unnecessary based on our Court of Appeals' ruling. [15] The Participants oppose a stay, arguing in part that discovery should continue because the Participants would seek the same discovery regardless of the outcome of the appeal. [16]

Federal Rule 23(f) provides "[a] court of appeals may permit an appeal from an order granting or denying class-action certification under this rule ... An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders." [17] Our Court of Appeals has not yet established the standard district courts should apply when deciding motions to stay proceedings pending Rule 23(f) appeals. [18] The parties agree consideration of the four-factor test outlined by the Supreme Court in *Nken v. Holder* [19] is appropriate. [20] These factors include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." [21] A stay is an exercise of judicial discretion and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion. [22]

***Novel issues presented for appellate review warrant a trial stay.***

**\*3** The first factor of demonstrating success on the merits of an appeal weighs in favor of staying a final trial resolution. A movant need only demonstrate "a reasonable chance" of success on the merits to be granted relief. [23] Our Court of Appeals granted the Fiduciaries' Rule 23(f) petition. Our Court of Appeals explained it may grant a Rule 23(f) petition if it would allow the court to address "(1) the possible case-ending effect of an imprudent class certification decision (the decision is likely dispositive of the litigation); (2) an erroneous ruling; or (3) facilitate development of the law on class certification." [24] We recognize the Fiduciaries' appeal raises the novel issue of the impact of the Supreme Court's decision in *Thole* on class certification and on defined-contribution plans generally. We are confident in our thorough analysis of these issues but should not substitute our judgment for the Court of Appeals after it granted the Fiduciaries' Rule 23(f) petition. The Court of Appeals' grant of the Rule 23(f) review, as well as the developing analysis of these issues affecting tens of thousands of Participants, distinguishes our analysis from Judge Leeson's thoughtful analysis in *Huffman v. Prudential Insurance Company of America*, in which the defendant's Rule 23(f) petition – which did not present novel questions of law – had not yet been granted. [25]

We conclude the Fiduciaries demonstrate a reasonable chance of success on the merits and weigh this factor in favor of deferring final dispositive motions and trial.

***Mitigating harm from the interlocutory appeal.***

As to the second factor regarding irreparable harm to the Fiduciaries in continuing to trial during the appeal, the Fiduciaries contend "[a]llowing the case

*Boley v. Universal Health Services, Inc.*, Slip Copy (2021)
2021 WL 2186432

to proceed could result in wasted time and money litigating issues – like the propriety of offering investment options [the Participants] did not select – that may be excluded from this case."[26] The Fiduciaries argue the evidence and motions practice related to the thirty investment options the Participants did not select will not substantially overlap with that of the seven investment options they did select.[27] The Fiduciaries' counsel argued the two levels of analysis the Fiduciaries' expert would need to engage in as to each of the Plan's investment offerings and how this analysis would depend, at least in part, on deposition testimony.

The Participants counter a stay is unnecessary because the eight, seven-hour depositions noticed for next month – of members and former members of the Plan's fiduciary committee and representatives of the Plan's third-party investment advisor – and their expert's analysis will be the same (or at least substantially similar) regardless of the outcome of the appeal.[28] Even in the absence of class certification, the Participants contend they may still proceed in a representative capacity under section 502(a)(2).[29] They argue continuing discovery will not waste resources because the primary focus of the depositions and the expert report will largely be on the Plan's overall decision-making processes rather than on individual investment options.[30]

*4 We agree with both parties in part. We do not see harm issue in allowing the Participants to complete their depositions and submit their expert report as originally scheduled. The Participants have stated – both in their briefing and during the teleconference – they are ready to move forward with this discovery as planned.[31] They further represent they will not need additional discovery beyond these depositions. The Participants will be able to proceed on their breach of fiduciary duty claims irrespective of our Court of Appeals' decision on class certification and this discovery will therefore not prove to be a waste of the parties' resources.[32] This is especially true considering the focus of these depositions and the expert report will be on the Plan's decision-making processes and other Plan-wide issues such as recordkeeping.

While we decline to stay discovery as to these scheduled depositions and the submission of the Participants' expert report, we stay all other obligations under our November 19, 2020 Order, remaining cognizant of the complex issues and the need for our Court of Appeals' guidance to proceed further, including as to the Fiduciaries' expert report, summary judgment, and trial.

### Balancing the equities and public interest warrants staying final trial steps.

Issuing a stay along these lines is consistent with our consideration of the third and fourth *Nken* factors. We appreciate the Participants prepared for the upcoming depositions of the noticed eight witnesses consisting of the Plan's fiduciary committee members and investment advisor representatives. Both parties recognize these depositions will proceed regardless of our Court of Appeals' analysis. The Participants are willing to invest the time and funds to depose these noticed witnesses now. We see the value in preserving testimony at this stage closer to the challenged conduct than possibly over a year later. We do not, however, see significant prejudice or harm resulting from staying the Fiduciaries' expert disclosures, expert depositions, summary judgment, pre-trial motions, and trial. This case is distinguishable from cases like *King Drug* as the Participants sued less than a year ago and, as such, a stay would not have a significant prejudicial and injurious impact on the class representatives and the public interest.

### II. Conclusion

We deny the Fiduciaries' Motion to stay all proceedings as stated. We allow the parties to complete fact discovery under our November 19, 2020 Order and provide additional time for Participants' expert disclosures on issues where they have the burden of proof. We vacate the parties' obligations in our November 19, 2020 Order regarding the Fiduciaries' expert disclosures, expert depositions, summary judgment, decertification, and *Daubert* motions, pre-trial submissions, and an attached trial date pending our Court of Appeals' final Order disposing of the  Rule 23(f) appeal.

**All Citations**

Slip Copy, 2021 WL 2186432

## Footnotes

1    ECF Doc. No. 4 ¶¶ 1, 5.

2    *See generally id.*

3    ⚑ 140 S. Ct. 1615 (2020). The Court in *Thole* held participants in a defined-benefit plan lacked standing to assert ERISA breach of fiduciary duty claims regarding the alleged mismanagement of the plan. *See* ⚑ *id.* at 1619. The Court explained the participants lacked a concrete stake in the outcome of the case because, regardless of whether the participants won or lost, their future benefit payments would remain the same. *Id.* The Court emphasized it was "[o]f decisive importance" that the case involved a defined-benefit plan rather than a defined-contribution plan. ⚑ *Id.* at 1618.

     We followed our Court of Appeals' guidance on standing in the defined-contribution context in ⚑ *Sweda v. University of Pennsylvania*, 923 F.3d 320 (3d Cir. 2019), which the court decided before *Thole*. In *Sweda*, our Court of Appeals held participants in a defined-contribution plan demonstrated injury-in-fact – and Article III standing – to bring ERISA breach of fiduciary duty claims by alleging "one or more of the named Plaintiffs ... (1) invested in underperforming options including the CREF Stock and TIAA Real Estate accounts." ⚑ 923 F.3d at 334 n.10. Our Court of Appeals explained this allegation "links the named plaintiffs with the underperforming investment options and is sufficient to show individual injuries." *Id.*

     We found certifying a class of Participants with standing in this same defined-contribution context challenging Plan-wide processes and record keeping concerns regardless of the particular fund held by the three lead Participants is consistent with our Court of Appeals' guidance in *Sweda* and the Supreme Court's analysis in *Thone* is inapposite as it addressed a defined-benefit plan.

4    *See* ECF Doc. No. 20-1.

5    ⚑ *Boley v. Universal Health Services, Inc.*, 498 F. Supp. 3d 715, 724 (E.D. Pa. 2020).

6    *Id.* at 723-25.

7    ECF Doc. No. 43.

8    ECF Doc. No. 52.

9    ECF Doc. No. 56.

10   ECF Doc. No. 72-2.

11    Petition for Permission to Appeal, *Boley v. Universal Health Services*, No. 21-8014 (3d Cir. Mar. 22, 2021) (ECF Doc. No. 1-1).

12    *See id.* at 9-10.

13    ECF Doc. No. 69.

14    ECF Doc. No. 72.

15    ECF Doc. No. 72-1 at 7-10.

16    ECF Doc. No. 74 at 14-17.

17    🚩 Fed. R. Civ. P. 23(f).

18    *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, Nos. 06-1797, 06-1833, 06-2768, 2015 WL 9244638, at *3 (E.D. Pa. Dec. 17, 2015).

19    🚩 556 U.S. 418, 427 (2009).

20    ECF Doc. No. 72-1 at 6; ECF Doc. No. 74 at 11.

21    🚩 *Nken*, 556 U.S. at 434.

22    *Id.* at 433-34.

23    *King Drug*, 2015 WL 9244638 at *4 (quoting 🚩 *Singer Mgmt. Consultants, Inc. v. Milgran*, 650 F.3d 223, 229 (3d Cir. 2011))

24    🚩 *Newton v. Merill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001).

25    No. 10-5135, 2018 WL 1281901, at *2 (E.D. Pa. Mar. 12, 2018).

26    ECF Doc. No. 72-1 at 8.

27    *Id.*

28    ECF Doc. No. 74 at 14-15; ECF Doc. No. 72-2.

29    *Id.* at 16.

30    *Id.*

31    ECF Doc. No. 74 at 14-17.

32    *See King Drug*, 2015 WL 9244638 at *6 (concluding the second *Nken* factor weighed in favor of denying a motion to stay because "[t]he issues raised in the 🚩 Rule 23(f) appeal, which by definition are confined to class certification, have no bearing on ... the Individual Plaintiffs").

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Bordeaux v. LTD Financial Services, L.P., Not Reported in Fed. Supp. (2018)

2018 WL 1251633

2018 WL 1251633
Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

Roberta BORDEAUX, on behalf of herself
and those similarly situated, Plaintiff,

v.

LTD FINANCIAL SERVICES, L.P., Advantage
Assets II, Inc, and John Does 1 to 10, Defendants.

Civil No. 2:16–0243 (KSH) (CLW)

|

Signed 03/09/2018

**Attorneys and Law Firms**

Andrew T. Thomasson, Philip D. Stern, Stern
Thomasson LLP, Springfield, NJ, Yongmoon Kim,
Kim Law Firm LLC, Hackensack, NJ, for Plaintiff.

Richard J. Perr, Monica M. Littman, Fineman,
Krekstein & Harris, PC, Philadelphia, PA, for
Defendants.

**OPINION**

Katharine S. Hayden, U.S.D.J.

**\*1** This issue comes before the Court on a cross-
motion to stay the proceedings. On December 28,
2017, this Court granted class certification for plaintiff
Roberta Bordeaux in an action alleging abusive debt
collection practices in violation of the Federal Debt
Collection Practices Act (FDCPA). (D.E. 102.) On
January 12, 2018, Bordeaux moved for an order
approving the form and method of notice to class
members. (D.E. 104.) On January 22, 2018, LTD
Financial responded seeking to stay all action pending
resolution of its Rule 23(f) appeal to the Third Circuit.
(D.E. 105.)

**Standard**

Rule 23(f) provides that an appeal of an order granting
or denying class-action certification "does not stay
proceedings in the district court unless the district

judge or the court of appeals so order." Fed. R.
Civ. P. 23(f). But as to the circumstances compelling
such an order, decisions agree that the Third Circuit
has not given trial courts direct guidance. *See, e.g.,*
Johnson v. Geico Cas. Co., 269 F.R.D. 406, 411
(D. Del. 2010); *King Drug Company of Florence, Inc.,
v. Cephalon, Inc.,* Nos. 06–1797, 06–1833, 06–2768,
2015 WL 9244638, at \*3 (E.D. Pa. Dec. 17, 2015).

Some courts have suggested applying a preliminary
injunction standard in considering whether to grant
a stay. *See, e.g.* In Re Sumitomo Copper Litig. v.
Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 140 (2d
Cir. 2001); Blair v. Equifax Check Serv., Inc., 181
F.3d 832, 835 (7th Cir. 1999); In re Lorazepam &
Clorazepate Antitrust Litig., 208 F.R.D. 1, 3 (D.D.C.
2002). Were this Court to adopt that approach and
apply Third Circuit jurisprudence, defendants would
have to establish that their appeal "(1) is likely to
succeed on the merits, (2) that they are likely to suffer
irreparable harm in the absence of [a stay], (3) that
the balance of equities tips in their favor, and (4)
that [a stay] is in the public interest." HR Staffing
Consultants LLC v. Butts, 627 Fed.Appx. 168, 171 (3d
Cir. 2015).

Both parties have presented their arguments under
the rubric of the preliminary injunction standard.
As the Seventh Circuit observed, the heart of the
analysis is whether "the probability of error in the class
certification decision is high enough that the costs of
pressing ahead in the district court exceed the costs of
waiting." Blair, 181 F.3d at 835.

**Discussion**

**I. Is it Likely LTD Financial's Appeal of this
Court's Decision Will be Successful?**

In deciding a request for a stay, the district court
"must predict both the likelihood that the Third Circuit
will grant Defendants' Petition, and the likelihood that
the Third Circuit will agree with Defendants on the
substantive merits." Johnson, 269 F.R.D. at 412.
In deciding whether to grant an interlocutory appeal

2018 WL 1251633

under Rule 23(f), the Third Circuit looks at "(1) the possible case-ending effect of an imprudent class certification decision (the decision is likely dispositive of the litigation); (2) an erroneous ruling; or (3) [if an immediate appeal would] facilitate development of the law on class certification." *Newton v. Merrill Lynch, Pierce, Fener & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001). [1]

**\*2** LTD Financial focuses on the second prong, arguing that this Court erred in two respects. First, LTD Financial argues that the Court applied the incorrect standard for ascertainability because there is no way to know if the recipients of the collection letter were consumer or business debtors as defined by the FDCPA. (D.E. 106; LTD Financial's Br. to Stay Proceedings; 9–12.) However, in addition to the ample evidence in the record indicating that LTD Financial has records that identify whether debts were consumer or business based, Bordeaux points to the testimony of David John, the President and CEO of LTD Financial. (D.E. 107; Bordeaux's Reply Br.; 18.) John testified that he was able to search for people in New Jersey to whom LTD Financial sent collection letters in attempts to collect a *consumer* debt owed. (*Id.* at 19; *see also* D.E. 52–3, PageID 634–45) (emphasis added).) Based on his search, the class number was set at 1,994. The Court stands by its finding of ascertainability.

Second, LTD Financial argues the Court failed to address the merits. (D.E. 106; LTD Financial's Br. to Stay Proceedings; 9, 12.) The Supreme Court has held that a "probe behind the pleadings" is often necessary in class certification questions because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 (S.Ct. 1426, 185 L.Ed.2d 515 2013) (internal quotations omitted). The Third Circuit has advised district courts that a "rigorous analysis *may* include a 'preliminary inquiry into the merits.' " *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, (3d Cir. 2008) (quoting *Newton v. Merrill Lynch, Pierce, Fener & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) (emphasis added). This Court did probe behind Bordeaux's pleading in its decision, and found, as have other district court judges in this

circuit, that there is merit to the position that the tax clause in the collection letter could be misleading to the least sophisticated debtor. *See Balon v. Enhanced Recovery Co.*, 190 F.Supp.3d 385, 391 (M.D. Pa. 2016); *Velez v. Enhanced Recovery Co.*, No. 16–164, 2016 WL 1730721, 2016 U.S. Dist. LEXIS 57832 (E.D. Pa. May 2, 2016) (the letter "could mislead or deceive the least sophisticated debtor" because the language "suggests the possibility that the cancelled debt could be reported" to the IRS).

Additionally, the Third Circuit recently reversed a district court's decision to dismiss a FDCPA lawsuit that was based on a collection letter seeking to collect on a time-barred debt. *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 430 (3rd Cir. 2018). The court held that the reference in the letter to "settlement of the debt" could mislead the least-sophisticated debtor into thinking it "referred to the creditor's ability to enforce the debt in court rather than a mere invitation to settle the account." *Id.* at \*5. The *Tatis* letter has different language, but what counts is the Third Circuit's instruction that the FDCPA be construed "broadly, so as to effect its purpose." *Id.* at 2, quoting *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir. 2006). The Court is satisfied that its merits analysis was sufficient for this stage in litigation.

Based on the foregoing, this Court does not find that the probability of error in its class certification decision is high enough to warrant a stay. *See Blair*, 181 F.3d at 835.

## II. Will LTD Financial Suffer Irreparable Harm in the Absence of Stay?

LTD Financial argues it will suffer irreparable harm expending resources for class notice and dispositive motions. (D.E. 106; LTD Financial's Br. to Stay Proceedings; 16.) Litigation costs will generally not rise to the level of irreparable harm. *Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 2:14-CV-1455, 2016 WL 5107173, \*2 (W.D. Pa. June 8, 2016) ("In every case, a party may have to expend money on discovery that could later be deemed unnecessary if the case is reversed on appeal, but that

fact does not transform such expenses into irreparable harm.") Additionally, "merely [ ] rewording [ ] defendant's merits arguments" in terms of irreparable harm will not suffice. 🚩 *Id.*

**\*3** Further weakening LTD Financial's argument is the fact that plaintiffs bear the cost of notifying the class; indeed, the stay request arose *in response* to Bordeaux's efforts to begin notification of the class. The Court finds that LTD Financial will not be irreparably harmed absent a stay.

### III. Balance of Equities and Public Interest

Based on the foregoing, when the right of potential class members to be notified and allowing time to opt out is balanced against the alleged financial harm to LTD Financial, the Court is satisfied that moving forward is the proper course. Bordeaux should be able to continue her case, notify the class, and allow the potential class members the necessary time to opt out. As mentioned above, LTD Financial will not be irreparably harmed in continuing to litigate while the appeal is pending. The Court finds that the balance of equities favors Bordeaux and the class. In addition to the public interest in prompt resolution of cases, the Court finds the public interest will also be served by prompt notification to class members of a certified class.

### Conclusion

The Court denies LTD Financial's cross-motion to stay the proceedings while its 🚩 Rule 23(f) petition is pending. An appropriate order will follow.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1251633

## Footnotes

1      That said, a district court has opined, in the context of determining whether the circuit court will grant a 🚩 Rule 23(f) petition, that "[i]t is a fool's errand to try to predict what the court of appeals is likely to do before it acts." 🚩 *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 286 F.R.D. 88, 93 (D.D.C. 2012).

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by    Ambrosio v. Cogent Communications, Inc.,
N.D.Cal., February 29, 2016

2012 WL 5818300
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Nisha BROWN and Kathy Williamson,
individually and on behalf of all
others similarly situated, Plaintiffs,
v.
WAL–MART STORES, INC., and
Does 1–50, inclusive, Defendant.

No. 5:09–CV–03339–EJD.
|
Nov. 15, 2012.

**Attorneys and Law Firms**

Charles Aubrey Jones, Kevin J. McInerney,
McInerney & Jones, Reno, NV, James F. Clapp,
Zachariah Paul Dostart, Dostart Clapp & Coveney,
LLP, San Diego, CA, Matthew Righetti, Righetti
Glugoski, P.C., San Francisco, CA, for Plaintiffs.

Catherine A. Conway, Jesse A. Cripps, Jr., Theodore
J. Boutrous, Jr., Gibson, Dunn & Crutcher LLP,
Los Angeles, CA, Rachel S. Brass, Gibson Dunn &
Crutcher LLP, San Francisco, CA, Amber Jene Sayle,
Brian Lee Duffy, Naomi Beer, Greenberg Traurig LLP,
Denver, CO, James Milton Nelson, Greenberg Traurig
LLP, Sacramento, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION
TO STAY; DENYING PLAINTIFF'S MOTION
TO FACILITATE CLASS NOTICE AS MOOT**

EDWARD J. DAVILA, District Judge.

**\*1** Plaintiffs Nisha Brown and Kathy Williamson
bring this case on behalf of themselves and all
others similarly situated against Defendant Wal–Mart
Stores, Inc. ("Defendant") and Does 1–50, under
the California Private Attorney General Act of 2004
("PAGA") (Cal. Labor Code § 2689, et seq.) alleging

violations of California's suitable seating laws. The
complaint alleges that Defendant has failed to provide
stools at its cash registers in violation of Wage Order
7–2001, § 14 and California Labor Code § 1198.
Presently before the court are Defendant's Motion to
Stay the case pending resolution of its Rule 23(f)
petition and, if granted, its appeal to the Ninth Circuit,
and Plaintiff's Motion to Facilitate Class Notice. For
the reasons set forth below, the court GRANTS
Defendant's motion, and DENIES Plaintiff's motion as
moot.

**I. BACKGROUND**

On August 24, 2012, this court certified a class of
current and former Wal-Mart cashiers to pursue a
claim for violation of Wage Order 7–2001 Section 14
against Defendant, and appointed Kathy Williamson
("Plaintiff") as the class representative. Order Granting
Class Certification, Dkt. No. 110. In certifying the
class, this court rejected Defendant's argument that
the discretion afforded the court by Section 14 in
awarding damages should defeat class certification
because it was clear that Defendant's liability could
be determined by facts common to all members of
the class. *Id.* at 12:12–21. To address Defendant's
concern, this court noted that "the issue of damages
can be resolved after the common issue of liability is
resolved." *Id.* at 12:21–22. In so ruling, this court cited
to, *inter alia,* two cases which approved the use of
statistical sampling to determine damages: *Hilao v.
Estate of Marcos,* 103 F.3d 767, 782 (9th Cir.1996) and
*Garvey v. Kmart Corp.,* No. 11–CV–02575, 2012
WL 2945473, at \*4 (N.D.Cal. July 18, 2012).

Defendant has filed a Rule 23(f) petition with the Ninth
Circuit seeking permission to appeal this court's class
certification. Particularly, Defendant asks the Ninth
Circuit to consider whether this court

> erred in certifying a class of
> Wal–Mart employees seeking
> penalties under the California
> Private Attorney General
> Act, notwithstanding the
> statutory requirement that such
> penalties be assessed on an

2012 WL 5818300

employee-by-employee basis, by relying on a statistical sampling approach to replace the requisite individualized inquiries with a class-wide penalty determination.

Defendant then filed the instant motion to stay proceedings in this court until resolution of its Rule 23(f) petition.

## II. LEGAL STANDARDS

A petition for permission to appeal a class certification "does not stay proceedings in the district court unless the district judge or the court of appeals so orders." Fed.R.Civ.P. 23(f). To prevail on its motion to stay, Defendant must show that (1) it is likely to succeed on the merits of the appeal; (2) it will be irreparably injured in the absence of a stay; (3) issuance of a stay will not substantially injure Plaintiff; and (4) the stay is in the public interest. *Leiva–Perez v. Holder,* 640 F.3d 962, 964–70 (9th Cir.2011); *Gray v. Golden Gate Nat'l Recreational Area,* No. 08–CV–00722, 2011 WL 6934433 at *2 (N.D.Cal. Dec. 29, 2011)* (applying this four-factor test to a motion to stay pending the resolution of a Rule 23(f) petition).

 **\*2** The Ninth Circuit has held that these four factors should be examined on a flexible "continuum," which is "essentially the same as the 'sliding scale' approach" applied to requests for preliminary injunctions. *Leiva–Perez,* 640 F.3d at 964–66. Under this approach, "the elements ... are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 964.

## III. DISCUSSION

## a. LIKELIHOOD OF SUCCESS ON THE MERITS

The first prong of the stay analysis requires the court to determine whether Defendant has demonstrated a likelihood of success on the merits. *See Leiva–Perez,* 640 F.3d at 966. On a motion to stay pending

the resolution of a Rule 23(f) petition, the movant need not demonstrate that it is more likely than not that it will win on the merits. *Id.* Instead "serious legal questions" raised in the petition can satisfy this first prong. *Id.* at 967–68. When relying on "serious legal questions," the movant must not only show that a serious legal question exists, but also that the hardship balance tips sharply towards the movant. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir.2011); *see Leiva–Perez,* 640 F.3d at 966 (applying the "serious questions" approach to a stay).

Defendant first argues that the fact that appellate courts have not considered California's suitable seating law or the propriety of certifying suitable seating classes under Rule 23 is in and of itself sufficient to raise a "serious legal question." A Rule 23(f) petition that presents an unsettled question of law constitutes a "serious legal question" sufficient to satisfy this first prong of the stay analysis. *Gray,* 2011 WL 6934433 at *2. Plaintiff does not dispute that Defendant's Rule 23(f) petition presents a case of first impression to the Ninth Circuit. This fact alone could support a finding that the first factor weighs in favor of a stay.

Defendant also contends that the effect of the Supreme Court's ruling in *Wal–Mart Stores v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), constitutes a "serious legal question" because the district courts have split as to the use of statistical sampling. The Court in *Dukes* held that in order to gain class certification, class members' claims "must depend upon a common contention ... that is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. The Court also found that statistical sampling à la *Hilao* could not be used as a substitute for determining back-pay owed to individual employees under Title VII, and that consequently, class certification under Federal Rule of Civil Procedure 23(b)(2) was not possible in that case. *Id.* at 2561. Under *Dukes,* Defendant argues, a class cannot

2012 WL 5818300

be certified when a statutory scheme provides for individualized consideration of damages or penalties.

**\*3** In the year and a half following the *Dukes* decision, the district courts of the Ninth Circuit have split on the issue of utilizing statistical sampling. In *Cruz v. Dollar Tree Stores, Inc.,* a court in this district decertified a class based in part on the Supreme Court's ruling in *Dukes* regarding statistical sampling. Nos. 07–CV–2050 and 07–CV–4012, 2011 WL 2682967, at \*6 (N .D.Cal. July 8, 2011). Additionally courts in both the Central District and the Southern District of California have rejected statistical sampling. *See* Pryor v. Aerotek Scientific, LLC, 278 F.R.D. 516, 536 (C.D.Cal.2011) (finding that even if statistical sampling were permitted, it would not be useful in determining liability); Stone v. Advance Am., 278 F.R.D. 562, 566 n. 1 (S.D.Cal.2011) (acknowledging in dicta that "the Supreme Court's disapproval of the *Hilao* method largely eliminates a 'trial by formula' approach to use statistics to extrapolate average damages for an entire class, at least when the statute contains an individualized defense"). During the same period, both this court in this action and another court in this district have certified classes where liability can be proven by facts common to all class members, and in doing so suggested that statistical sampling may potentially be used to address damages. *See* Garvey, 2012 WL 2945473 at \*5 (citing, *inter alia, Hilao* to support its certification of a suitable-seating class because while individualized damages may need to be proven, the defendant's liability could be resolved by facts common to all class members).

Plaintiff disputes Defendant's contention that a split in district court authority exists. Because several of the cases cited above fail to address whether statistical sampling can be used to address the issue of penalties in a case brought under PAGA § 2699 based on an alleged violation of Wage Order § 14(a), Plaintiff argues, the district courts have not truly split. While the cases mentioned above have not precisely addressed the use of statistical sampling in the context of PAGA or California's suitable seating law, they certainly suggest a disagreement as to the appropriateness of statistical sampling in class actions post-*Dukes*. The

question Defendant raises in its Rule 23(f) petition is therefore not "clear cut," and guidance from the Ninth Circuit would "materially advance the ultimate termination of this litigation." Antonelli v. Finish Line, Inc., No. 5:11–CV–03874, 2012 WL 2499930, at \*2 (N.D.Cal. June 27, 2012); *see* Richards v. Ernst & Young LLP, No. 08–CV–04988, 2012 WL 92738, at \*2 (N.D.Cal. Jan. 11, 2012).

Because the Ninth Circuit has not considered the propriety of certifying a class under California's suitable seating laws, and because the district courts have varied in their application of *Dukes,* the court finds that Defendant has presented a "serious legal question" in its Rule 23(f) petition and the first factor thus weighs in favor of a stay.

**b. BALANCE OF HARDSHIPS**
**\*4** The second and third prongs of the stay analysis require the court to consider, respectively, the likelihood of irreparable harm to the Defendant if the court denies a stay, and injury to other parties should the court grant a stay. In cases such as this where the movant relies on a "serious legal question" to satisfy the first prong of the stay analysis, the movant must show that the balance of harm tips sharply in its favor. Alliance for the Wild Rockies, 632 F.3d at 1132 (9th Cir.2011). Therefore the court will consider the second and third prongs together.

Defendant argues that if this court denies a stay, it will be irreparably harmed by a premature dissemination of class notice and by considerable litigation costs and fees. The class notice issue will be discussed below. Courts evaluate whether litigation expenses constitute irreparable harm based on the specific circumstances of each case. *See* Richards, 2012 WL 92738 at \*3. The certified class in this case is estimated to encompass over 22,000 individuals. The sheer size of the class makes it likely that Defendant will incur significant discovery and other litigation expenses while its appeal to the Ninth Circuit is pending. Moreover, the Ninth Circuit may alter or overturn this court's class certification, which would render some or all of the discovery previously conducted irrelevant. Forcing Defendant to incur potentially substantial

Brown v. Wal-Mart Stores, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 5818300

fees and engage in discovery that may ultimately be unnecessary constitutes at least some harm to Defendant.

Plaintiff contends that she would be injured by a stay because Defendant may continue to violate the suitable seating law during the stay period and because it would delay her from recovering penalties. That Defendant may perpetrate a continuing violation during the stay period does not constitute prejudice to Plaintiff in this case. Plaintiff's complaint seeks penalties and fees, but does not seek an injunction requiring Defendant to provide seats or otherwise comply with the suitable seating law. As such, this suit is not so much aimed at preventing continuing or future violations as it is at collecting damages for past harms. The potential delay in Plaintiff's ability to recover penalties also does not constitute a substantial injury. Plaintiff has not demonstrated that time is of the essence in collecting these penalties. Any penalties owed to Plaintiff and the class members will continue to accrue during the stay. Should Plaintiff ultimately prevail, she and the class members will be able to recover any penalties due to them under the statute. Therefore, Plaintiff and the putative class members do not stand to suffer substantial injury should this court issue a stay.

Though the putative class members do not stand to be substantially injured by a stay, they do face a likelihood of harm should a stay not issue. First, the parties risk generating confusion among class members. Plaintiff seeks to disseminate class notice in the near future. Should the Ninth Circuit take Defendant's appeal, there is a likelihood that the court will have to modify or decertify the class after class notice has issued. Such a result would require the issuance of a second curative notice to the class, perhaps many months or more after the initial class notice was disseminated. Considering the class in this case is estimated to exceed 22,000 individuals, a curative notice would not be sufficient to stem the confusion that would arise in the event of a change to the class definition or decertification of the class altogether. Second, class members' privacy interests are implicated. Plaintiff has already requested that Defendant produce contact information and social security numbers for all putative class members. Pl. Mot. to Facilitate Class Notice at 7, Dkt. 115. Disclosing this sensitive personal information before resolution of Defendant's ⚑ Rule 23(f) petition and

possible appeal unnecessarily risks the intrusion of individuals' privacy who may not ultimately belong to the class, if any class remains.

**\*5** Having considered the hardship to the Defendant, the lack of substantial injury to the Plaintiff, and the potential harm to class members, the court finds that the balance of hardships tips sharply toward a stay in this action.

### c. PUBLIC INTEREST

Plaintiff argues that "the public interest lies in the robust enforcement of the requirements of California's Wage Orders." While the public certainly has an interest in enforcing California's health and safety regulations, it also has an interest in the efficient use of judicial resources. A stay in this case will not prevent the "robust enforcement" of the suitable seating law. Rather, it will help to ensure the "proper resolution of the important issues raised in this case" by preventing potentially wasteful work on the part of the court and the parties while the Ninth Circuit considers the serious legal question raised by Defendant's ⚑ Rule 23(f) petition. *See* ⚑ *Gray,* 2011 WL 6934433 at \*3. The court finds that the public interest weighs in favor of a stay.

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for a stay of this case.

This action is STAYED in its entirety pending resolution of Defendant's ⚑ Rule 23(f) petition, and if the petition is granted, Defendant's Ninth Circuit appeal.

The parties shall provide notice to the court within one week of any disposition of Defendant's ⚑ Rule 23(f) petition.

If the petition is granted, the parties shall also provide notice to the court within one week of any disposition of Defendant's Ninth Circuit appeal.

Plaintiff's Motion to Facilitate Class Notice is DENIED as moot.

The Clerk shall ADMINISTRATIVELY CLOSE this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5818300

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1546439

2020 WL 1546439
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Anthony CHARLOT, Alan Remache,
Jose Tejada, Gregory Germuska, Garwyn
Richmond, Matt Riggs, Christopher
Hendley, and Kristoffer Wright, Plaintiffs,

v.

ECOLAB, INC., Defendant.

Civ. No. 18-10528 (KM) (MAH)
|
Signed 04/01/2020

**Attorneys and Law Firms**

Glen D. Savits, Green Savits, LLC, Florham Park, NJ, for Plaintiffs.

Jennifer Ivy Fischer, Kelley Drye & Warren LLP, Parsippany, NJ, Lindsay Michelle Sorin, Newark, NJ, for Defendant.

**OPINION and ORDER**

Hon. Kevin McNulty, United States District Judge

**\*1** This matter comes before the Court on a motion to stay proceedings pending appeal. On December 17, 2019, this Court granted class certification for plaintiffs Alan Remache and Kristoffer Wright in an action concerning the outside-sales exemption of New Jersey's Wage and Hour Law ("NJWHL"). (DE 402 & 403). [1] On January 14, 2020, defendant, Ecolab, Inc., moved to stay proceedings in this lawsuit, pending resolution of its Rule 23(f) appeal of that class certification order to the Third Circuit. (DE 406).

For the following reasons, the motion is **DENIED**. I write for the parties and do not repeat my prior analysis; familiarity with the matter is assumed.

**I. STANDARD OF REVIEW**

Rule 23(f) provides that an appeal of an order granting or denying class-action certification "does not stay proceedings in the district court unless the district

judge or the court of appeals so order." Fed. R. Civ. P. 23(f). As to the circumstances compelling such an order, decisions agree that the Third Circuit has not promulgated any rigid rule, instead leaving it the district courts' discretion. *See, e.g.,* Johnson v. Geico Cas. Co., 269 F.R.D. 406, 411 (D. Del. 2010); *King Drug Company of Florence, Inc., v. Cephalon, Inc.*, Nos. 06–1797, 06–1833, 06–2768, 2015 WL 9244638 at \*3 (E.D. Pa. Dec. 17, 2015). [2]

Some courts have suggested applying a preliminary injunction standard in considering whether to grant a stay. *See, e.g.,* In Re Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 140 (2d Cir. 2001); Blair v. Equifax Check Serv., Inc., 181 F.3d 832, 835 (7th Cir. 1999); In re Lorazepam & Clorazepate Antitrust Litig., 208 F.R.D. 1, 3 (D.D.C. 2002). Were this Court to adopt that approach and apply Third Circuit jurisprudence, defendants would have to establish that their appeal "(1) is likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of [a stay], (3) that the balance of equities tips in their favor, and (4) that [a stay] is in the public interest." *HR Staffing Consultants LLC v. Butts*, 627 Fed. Appx. 168, 171 (3d Cir. 2015).

Both parties have presented their arguments under the rubric of the preliminary injunction standard. That standard, however, must be applied in a context-sensitive manner. As the Seventh Circuit has observed, the heart of the analysis is whether "the probability of error in the class certification decision is high enough that the costs of pressing ahead in the district court exceed the costs of waiting." *Blair*, 181 F.3d at 835. I find the preliminary injunction factors helpful and will apply them, as the parties suggest. [3]

**II. DISCUSSION**

**A. Likelihood of Success**

**\*2** In deciding a request for a stay, the district court "must predict both the likelihood that the Third Circuit will grant Defendants' Petition, and the likelihood that the Third Circuit will agree with Defendants on the

Charlot v. Ecolab, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 1546439

substantive merits." *Johnson,* 269 F.R.D. at 412. In deciding whether to grant an interlocutory appeal under Rule 23(f), the Third Circuit looks at "(1) the possible case-ending effect of an imprudent class certification decision (the decision is likely dispositive of the litigation); (2) an erroneous ruling; or (3) [if an immediate appeal would] facilitate development of the law on class certification." *Newton v. Merrill Lynch, Pierce, Fener & Smith, Inc.,* 259 F.3d 154, 165 (3d Cir. 2001).

One week after this Court certified the class against Ecolab, the Third Circuit issued a decision in *Ferreras v. American Airlines, Inc.,* a putative class action brought under the NJWHL by the airline's employees at Newark Liberty International Airport. 946 F.3d 178 (3d Cir. 2019). That decision is the basis of Ecolab's argument that it will succeed on the merits of its appeal:

> Just as in *Ferreras,* Plaintiffs' "claims are, at bottom, that they were not paid overtime compensation for hours worked" under the NJWHL. *Ferreras,* [946 F.3d at 185]; *see* [DE 265] at ¶¶ 62–71, 121–154, 175–181. Whether any plaintiff(s) is (are) owed overtime requires answering individualized questions about their actual duties performed. Consequently, the fact that Ecolab classifies its Route Sales Managers (RSMs) as exempt in its job descriptions and corporate policies does not, by itself, "generate common *answers*" that predominate over the RSM-by-RSM factual questions that would arise at trial. *Wal-Mart* [*Stores, Inc. v. Dukes*], 564 U.S. [338,] 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 [(2011)] (emphasis in original).

(DE 406 at 3).

This case, too, is at bottom, an overtime-wage dispute, but the questions posed by the RM class are different in critical ways from the ones at issue in *Ferreras.*

The proposed class in *Ferreras* consisted of all non-exempt hourly American Airlines employees at Newark Airport. 946 F.3d at 180. The complaint alleged that it was American Airlines' policy not to pay its employees for all time worked because the

company's timekeeping system defaulted to paying employees based on their work schedules rather than on the time they actually spent working. *Id.* The court noted two questions common to the class:

> first, whether hourly-paid American employees at Newark airport are not being compensated for all hours worked, and second, whether American has a policy that discourages employees from seeking exceptions for work done outside of their shifts.

*Id.* at 185. Neither question, the court found, lent itself to a common resolution:

> The first question cannot be answered by common evidence about the timekeeping system because a yes or no answer tells us nothing about actual common work habits, if there are any. The plaintiffs will still need to go through the process of proving that each individual employee worked overtime and is thus entitled to additional compensation, regardless of any common evidence about American's timekeeping system.

> Similarly, the second question cannot drive resolution of the plaintiffs' case because, again, their claims are, at bottom, that they were not paid overtime compensation for hours worked, not that American's overarching policy regarding exceptions has deprived anyone in particular of compensation to which he or she was entitled. [ 4 ].

*Id.* at 185–86.

**\*3** *Ferreras* binds this court and its reasoning is well worthy of consideration, but I do not believe it applies very directly here. The common issue here is *not* whether, on a case-by-case basis, a particular RM was eligible for overtime, and, but for Ecolab's misclassification, would have received it. Instead, the question common to this class—and the one that could be resolved on a classwide basis—is "whether Ecolab misclassified the RMs as exempt from overtime

*Chariot v. Ecolab, Inc.*, Not Reported in Fed. Supp. (2020)
2020 WL 1546439

eligibility." (DE 402 at 21). By contrast with *Ferreras*, no individual issues here that require resolution before a factfinder can determine if Ecolab's wage-and-hour policy violates the NJWHL.

The Third Circuit in *Ferreras* also noted that the district court did not satisfy 🔖 Rule 23's commonality (and predominance) requirement because an airline employee would still have to put forth individualized proof to show that he or she was actually working during the time periods at issue. 946 F.3d at 129. Issues of individualized proof are not at issue here, because the question is whether the RMs are entitled to overtime pay in the first place.

Without overstepping my role any more than this stay motion requires me to do, I will hazard a prediction that *Ferreras* will not determine the outcome of Ecolab's appeal. Accordingly, Ecolab has not shown a likelihood of success on the merits.[5]

### B. Irreparable Harm

Ecolab insists that it will suffer irreparable harm if a stay is not entered because (1) it will pressured to settle with "a class that there are substantial good-faith reasons to think cannot exist under 🔖 Rule 23's text, Supreme Court and Third Circuit precedent, and the facts of this case;" and (2) distributing class notice and conducting discovery will be needlessly expensive. (DE 406 at 4).

The first point is essentially a recasting of Ecolab's argument with respect to its likelihood of success on the merits. That is, Ecolab argues, because the Third Circuit will likely overturn the class certification order, it is unfair to allow discovery, and the attendant pressures to settle, to continue. I have already rejected that argument, because I do not believe the Third Circuit's *Ferreras* decision resolves this dispute.

Ecolab's second point is similarly unconvincing. Litigation costs as such generally not rise to the level of irreparable harm. *Bordeaux v. LTD Financial Services, L.P.*, No. 16-243, 2018 WL 1251633 at *2 (D.N.J. March 9, 2018) (citing 🔖 *Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 14-1455, 2016 WL 5107173 at *2 (W.D. Pa. June 8, 2016) ("In every case, a party

may have to expend money on discovery that could later be deemed unnecessary if the case is reversed on appeal, but that fact does not transform such expenses into irreparable harm.")). Additionally, "merely [ ] rewording [ ] defendant's merits arguments" in terms of irreparable harm will not suffice. *Id.*[6]

**\*4** Ecolab will not suffer irreparable harm if a stay is not entered.

### C. Balance of the Equities and the Public Interest

Ecolab argues that Plaintiffs will not be harmed by the stay and that because judges in the Northern District of Illinois and the Eastern District of New York did not certify classes of RMs in their suits against Ecolab, the public interest favors a stay. I do not agree, however. Plaintiffs filed this lawsuit over seven years ago, and a stay would only further delay their case. The NJWHL is a remedial statute, the purpose of which is to ensure a fair distribution of earned wages. Further delays of an adjudication in this case will hinder Plaintiffs' ability to prove their claims and could prejudice their ability to adequately represent their interests. *See* 🔖 *Wyeth v. Abbott Laboratories*, No. 9-4850, 2011 WL 380902 at *2 (D.N.J. Feb. 1, 2011)

It is also not true that "inconsistent rulings" here incentivize forum shopping. The federal courts in Illinois and New York did not address the NJWHL claims at issue here, and it is doubtful that NJWHL claims would be adjudicable in those fora in the first place. Indeed, this case was, on Plaintiffs' motion, transferred to this court from the Eastern District of New York. (DE 337). In any event, adjudicating NJWHL claims expeditiously serves the public interest by ensuring that the statute meets its goal of protecting wage earners.

On balance, the factors weigh in favor of Plaintiffs' position not to stay the proceedings.

### ORDER

Accordingly, for the reasons set forth above,

**IT IS** this 1st day of April 2020,

Charlot v. Ecolab, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 1546439

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 45 of 131
PageID: 78044

**ORDERED** that the motion of defendant Ecolab, Inc. to stay proceedings pending resolution of its 🚩Rule 23(f) petition (DE 406) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1546439

## Footnotes

1    "DE __" refers to the docket entry number in this case.

2    Indeed, further specificity would perhaps be superfluous, because an appellate remedy is immediately at hand. The Federal Rules contemplate that a motion for a stay in the district court is ordinarily a prerequisite, but that the Court of Appeals may then take up the matter on its own. *See* Fed. R. App. P. 8(a).

3    I leave open the possibility, however, that other equitable considerations might affect a court's decision in a particular case. For example, a court might find that certain matters, such as discovery as to individual claims, could profitably continue irrespective of the Court of Appeals' disposition of class certification.

4    The Third Circuit also noted that the district court had certified subclasses and that even if one subclass was affected, the answer would not drive the resolution of the litigation on a classwide basis. 🚩*Ferreras*, 946 F.3d at 186 (citing *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 129 (3d Cir. 2018)). Because this case did not certify subclasses, that concern is not relevant here.

5    Ecolab also argues that by omitting mention of 🚩*Charlot v. Ecolab, Inc.*, 136 F. Supp. 3d 433 (E.D.N.Y. 2015), and 🚩*Schneider v. Ecolab, Inc.*, No. 14-C-1044, 2016 WL 7840218 (N.D. Ill. Sept. 3, 2016), the opinion certifying the class "has left the indelible impression that [the Court] failed to consider Ecolab's arguments or to resolve them in a way that reassures the litigants and the public that its decision to certify this class of RMs was truly the result of rigorous analysis." (DE 416 at 6). The assumption underlying this argument is incorrect. In fact, those decisions emanated from courts in other circuits, concerned different classes, and featured different factual records. Notwithstanding the fact that those decisions do not bind this Court, even the Eastern District's summary judgment opinion in the earlier days of this dispute reserved issues for this Court to resolve. There, Judge Matsumoto declined to fully address the outside-sales exemption of the state-law issues at stake here. *See* 🚩*Charlot*, 136 F. Supp. 3d at 471 n.11. The opinion thus does not bind the case in its current posture, because resolution of the outside-sales-exemption issue is the classwide question now presented by the RMs.

6    Ecolab's argument is further undercut by the fact that Plaintiffs will bear the cost of notifying class members. I do not overlook, however, that either side's sunk costs tend to increase the cost, and potentially reduce the likelihood, of settlement.

---

Cruson v. Jackson National Life Insurance Company, Not Reported in Fed. Supp. (2018)

2018 WL 2937471

2018 WL 2937471
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Sherman Division.

David CRUSON and John Denman

v.

JACKSON NATIONAL LIFE
INSURANCE COMPANY

Civil Action No. 4:16-CV-00912
|
Signed 06/12/2018

**Attorneys and Law Firms**

Gary Dean Corley, Corley Law Firm, Sherman, TX,
Rudolph Fink, IV, Lewis T. LeClair, McKool Smith
PC, Dallas, TX, Samuel Franklin Baxter, McKool
Smith, Marshall, TX, for David Cruson and John
Denman.

David Jack Levy, Adam Auchter Allgood, Jason Faris
Muriby, Thomas R. Davis, Morgan Lewis & Bockius,
LLP, Houston, TX, Scott T. Schutte, Morgan, Lewis &
Bockius LLP, Chicago, IL, for Jackson National Life
Insurance Company.

## MEMORANDUM OPINION AND ORDER

AMOS L. MAZZANT, UNITED STATES DISTRICT
JUDGE

 **\*1** Pending before the Court is the Defendant Jackson
National Life Insurance Company's Emergency
Motion to Stay Pending Interlocutory Appeal (Dkt.
#101). After reviewing the relevant pleadings, the
Court finds that the motion should be granted in part.

## BACKGROUND

Plaintiffs David Cruson and John Denman
("Plaintiffs") bring this proposed nationwide class
action on behalf of themselves and others who
purchased variable annuity investment products
from Defendant Jackson National Life Insurance
Company ("Jackson"). In so doing, Plaintiffs aim

to wrest and remedy harm resulting from Jackson's
systemic contractual misrepresentation and breach
when assessing certain fees—surrender charges—on
those products.

Jackson nationally markets variable annuities
through a network of individual sales agents,
marketing organizations, third-party marketing
organizations, brokerage firms, and financial
institutions. Jackson sells variable annuities through
four distribution channels—independent broker/
dealers, regional broker/dealers, financial institutions,
and individual sales agents ("affiliated agents"). To
support its affiliated sales agents, Jackson prepares,
approves, and disseminates account service forms,
brochures, marketing, and sales materials. Affiliated
agents use these materials to market and sell annuities
to customers, many of whom are senior citizens.
Jackson primarily markets variable annuities to older
customers and senior citizens in the Eastern District of
Texas and nationwide. When marketing its annuities,
Jackson touts their guaranteed safety of principal,
lifetime income streams, and opportunities for market
growth.

A deferred annuity can either be fixed or variable.
Fixed annuities appreciate at a guaranteed fixed
interest rate. The issuer of a fixed annuity pays the
purchaser a guaranteed interest rate—similar to a debt
instrument. Variable annuities, on the other hand,
invest in equity portfolios and do not appreciate at a
guaranteed fixed rate. As equity markets shift in value,
so does the return on the annuity.

Fees significantly shape variable annuity performance.
One fee—the surrender charge—generates substantial
revenue for issuers like Jackson. Such surrender
charges include withdrawal charges and recapture
charges (collectively, "surrender charge(s)"). From
2009-2013, Jackson published the following surrender
charges—2009: $25,432,934; 2010: $31,960,116;
2011: $37,748,144; 2012: $40,792,400; 2013:
$52,189,880. (Dkt. #10 at pp. 11, 12). In 2014, Jackson
stopped publicly reporting surrender charges. Given
this burgeoning trend of annual surrender charges,
however, Plaintiffs presume that Jackson earned over
$50 million in surrender charges in 2014 and 2015.

2018 WL 2937471

Plaintiffs claim that Jackson assesses surrender charges on withdrawals from annuities and again on the surrender charges themselves. In doing so, Plaintiffs aver that Jackson breaches the plain language of its contract and contravenes Securities and Exchange Commission annuity consumer protection guidelines. Plaintiffs aim to stop this practice and compensate current contract holders who paid excess surrender charges.

 **\*2**  On May 9, 2018, the Court granted in part and denied in part Plaintiffs' Opposed Motion for Class Certification and Appointment of Class Counsel (the "Certification Order") (Dkt. #96). It its Certification Order, the Court certified Plaintiffs' proposed class under 🚩 Federal Rule of Civil Procedure 23(b)(3), and the class consists of:

> All persons who, within the applicable statute of limitations, purchased a Perspective series, Elite Access series, or Retirement Latitudes series of variable annuity products from Jackson National Life Insurance Company or its affiliates, and incurred a Surrender Charge during their ownership of such product but excluding the judge and staff to whom this case is assigned and any member of the judge's immediate family.

(Dkt. #96 at p. 35).

Following the Certification Order, Jackson filed a Notice of Filing 🚩 Rule 23(f) Petition, indicating that Jackson requested permission to appeal the Certification Order to the United States Court of Appeals for the Fifth Circuit (Dkt. #102). On May 23, 2018, Jackson filed an Emergency Motion to Stay Pending Interlocutory Appeal (Dkt. #101). On May 31, 2018, Plaintiffs filed a response (Dkt. #105). On June 4, 2018, Jackson filed a reply (Dkt. #107).

On May 29, 2018, the parties filed a Joint Motion to Amend Scheduling Order, requesting a 70-day continuance of the all scheduling deadlines and to move the mediation deadline to four weeks after the Fifth Circuit rules on Jackson's 🚩 Rule 23(f) petition (Dkt. #104). On June 4, 2018, the Court granted the parties' request (Dkt. #106).

## LEGAL STANDARD

Under Fifth Circuit law, the stay of a case pending appeal constitutes "extraordinary relief." 🚩 *Reading & Bates Petroleum Co. v. Musslewhite*, 14 F.3d 271, 275 (5th Cir. 1994). The decision whether to stay a case lies within the sound discretion of the district court. *Weingarten Realty Inv'rs v. Miller*, 611 F.3d 904, 910 (5th Cir. 2011). District courts have the inherent power to stay proceedings pending before them, but this power is "incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *In re M.J. Beebe*, No. 95-20244, 1995 WL 337666, at \*2 (5th Cir. May 15, 1995) (quoting 🚩 *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ). Courts determining whether to issue a stay pending appeal may consider factors such as (1) whether the movant is likely to succeed on the merits; (2) whether the movant would suffer irreparable harm absent a stay; (3) whether granting the stay would substantially harm the other parties; and (4) whether granting the stay would serve the public interest. 🚩 *In re First S. Sav. Ass'n*, 820 F.2d 700, 704 (5th Cir. 1987). 🚩 *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks and citation omitted). These traditional four factors "must be fully applied *and* where there is a serious legal question involved and the balance of equities heavily favors a stay; in those situations, the movant only needs to present a substantial case on the merits." 🚩 *Weingarten Realty Investors*, 661 F.3d at 910 (emphasis added).

The movant bears the burden of showing that a stay is warranted. *Id.* Where "there is even a fair possibility that the stay ... will work damage to someone else," the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward."

Cruson v. Jackson National Life Insurance Company, Not Reported in Fed. Supp. (2018)
2018 WL 2937471

*Landis*, 299 U.S. at 255; *see Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) (citation omitted) (" '[A] stay is not a matter of right, even if irreparable injury might result otherwise.' It is instead an exercise of judicial discretion, and the 'party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.' ").

### ANALYSIS

**\*3** Jackson asks the Court to enter a stay of all further proceedings pending their Rule 23(f) interlocutory appeal of the Court's Certification Order, certifying the class action because they can establish all four elements required by law. Plaintiffs contends that the Court should deny the stay because the class will suffer substantial harm. Further, Plaintiffs assert that Jackson cannot satisfy the remaining elements necessary to justify the Court issuing a stay.

#### A. Likelihood of Success on the Merits

In order for the Court to issue a stay, the movant must first demonstrate a likelihood of success on the merits on appeal. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). The Fifth Circuit has stated that "the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting a stay." *Ruiz v. Estelle*, 650 F.2d 555, 565–66 (5th Cir. Unit A June 1981) (citing *Providence Journal v. Fed. Bureau of Investigation*, 595 F.2d 889 (1st Cir. 1979); *Hous. Insulation Contractors Ass'n v. Nat'l Labor Relations Bd.*, 339 F.2d 868, 870 (5th Cir. 1964) ). The Fifth Circuit further explained that "if the balance of equities (i.e. consideration of the other three factors) is not heavily tilted in the movant's favor, the movant must then make a more substantial showing of likelihood of success on the merits." *Id.* The Court acknowledges that there are serious legal questions involved in the case, and as such, if Jackson demonstrate a substantial case on the merits, then this element is met.

Jackson asserts that it has presented a substantial case on the merits based on the Court's resolution of the jurisdictional issue and the Court's class certification analysis under Rule 23(b). First, Jackson asserts that under the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of Ca., San Francisco Cty.*, 137 S. Ct. 1773, 1775, 198 L.Ed. 2d 395 (2017), the Court's exercise of specific personal jurisdiction over Jackson for out-of-state named plaintiffs is improper (Dkt. #101 at p. 5). Jackson also argues that the Court erred in finding that Jackson waived its objection to personal jurisdiction because before the Court certified the class, there were no out-of-state named plaintiffs to object to (Dkt. #101 at p. 5) ("Given the procedural posture of this case, and because there were no out-of-state named plaintiffs, Jackson ... did not waive its objection [to personal jurisdiction.]") (*See also* Dkt. #107 at p. 4). [1]

**\*4** Jackson additionally attacks the Court's conclusion that common questions of law or fact predominate over individual questions required by Rule 23(b) (Dkt. #101 at p. 5). *See* FED. R. CIV. P. 23(b). Jackson asserts that the "Court incorrectly disregarded the individualized inquiry [and proof] needed for each plaintiff's breach of contract claim", including Jackson's affirmative defenses of ratification and waiver (Dkt. #101 at p. 6). Lastly, Jackson argues that certification was inappropriate because Plaintiffs have failed to present a workable damages model (Dkt. #101 at p. 6).

The Fifth Circuit recognizes that a party presents a substantial case on the merits when there is a lack of precedent to clarify the issues at bar. [2] Given the novelty of this matter and significant lack of precedent regarding the application of *Bristol-Myers*, the Court finds that Jackson has made a substantial case on the merits. Since Jackson has established that this proceeding involves a serious legal question presenting a substantial case on the merits, the Court asks whether the balance of equities favors granting a stay. *Ruiz*, 650 F.2d at 565–66.

#### B. Balancing the Equitable Factors

Cruson v. Jackson National Life Insurance Company, Not Reported in Fed. Supp. (2018)
2018 WL 2937471

When determining whether to grant a stay, the Court must also weigh the following equitable factors: (1) whether the movant will suffer irreparable harm absent a stay; (2) whether the non-movant will suffer injury if the stay is granted; and (3) whether a stay serves the public interest. *See* In re First S. Sav. Ass'n, 820 F.2d at 704.

"[A]n 'injury is "irreparable" only if it cannot be undone through monetary remedies.' " Burgess v. Fed. Deposit Ins. Corp., 871 F.3d 297, 304 (5th Cir. 2017) (quoting Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464 F.2d 464, 472 (5th Cir. 1985) ) (quoting Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) ). " 'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.' " Sampson v. Murray, 415 U.S. 61, 90 (1974) (quoting Va. Petrol. Jobbers Ass'n v. Fed. Power Comm'n, 259 F.3d 921, 925 (D.C. Cir. 1958) ). [3]

 *5 Jackson asserts that absent a stay, it will endure extensive discovery and substantial motions practice that could be rendered unnecessary if the Fifth Circuit finds that the Court lacks sufficient jurisdiction over it (Dkt. #101 at pp. 6–7). Courts have recognized that the cost of pretrial litigation and discovery for defending a class action lawsuit with numerous plaintiffs can amount to irreparable hardship. Pena v. Taylor Farms Pacific, Inc., 2015 WL 5103157 at *5 (E.D. Cal. Aug. 31, 2015) (class size: "several thousand" members); Risinger v. SOC LLC, 2015 WL 7573191 at *2–3 (D. Nev. Nov. 24, 2015) (class size: 4,000 plaintiffs); Brown v. Wal-Mart Stores, Inc., 2012 WL 5818300, at *4 (N.D. Cal. Nov. 15, 2012) (class size: 22,000 plaintiffs). The class in this matter numbers in the thousands or tens of thousands, and the Court appreciates the pretrial burdens that accompany a large class of plaintiffs. The Court also finds that Plaintiffs will shoulder no pretrial litigation costs if the case is stayed during the pendency of the appeal.

Lastly, the Court's most recent Fourth Amended Scheduling Order (Dkt. #106) extended all deadlines until the Fifth Circuit likely rules on the Certification Order. Thus, any urgency or timeliness concerns Plaintiffs may have are also alleviated by the Fourth Amended Scheduling Order.

Therefore, although the Court recognizes that pretrial litigation and discovery for defending a class action lawsuit can constitute irreparable harm, the Court declines to find that such harm in this case reaches an irreparable level. However, the Court does find that the third factor—whether issuance of the stay will substantially injure other parties interested in the proceeding—weighs in favor issuing a stay.

Lastly, Jackson maintains that issuing a stay of the Certification Order until the Fifth Circuit can resolve the complex and important issues in this case favors the public interest. The Court finds that the public policy of efficient allocation of judicial resources should be considered because Jackson has shown a serious legal question on appeal and all deadlines have been extended until the likely resolution of the appeal. Thus, there is "reason to invoke the general public policy of preserving judicial resources from the risk of reversal." Weingarten Realty Inv'rs, 661 F.3d at 913 ("Such a policy might favor staying district court proceedings where a difficult question is presented on appeal, because the district court's order could be overturned.").

Jackson has demonstrated that Plaintiffs would suffer no substantial harm due to a stay and that a stay would serve the public interest. Thus, the balance of equities supports granting a stay pending appeal. However, the Court exempts ruling on Jackson's motion for summary judgment (Dkt. #59) from the stay. The motion is currently ripe and the Court has already heard oral argument from counsel at the hearing held on June 5, 2018. Furthermore, the motion is unaffected by the Fifth Circuit's ruling on the jurisdictional issue—it is uncontested that the Court has jurisdiction over the Texas residents claims against Jackson (Dkt. #99 at p. 4)—and certification issue—if reversed, individual breach of contract claims against Jackson will still exist.

Cruson v. Jackson National Life Insurance Company, Not Reported in Fed. Supp. (2018)

2018 WL 2937471

**CONCLUSION**

It is therefore **ORDERED** that Defendant Jackson National Life Insurance Company's Emergency Motion to Stay Pending Interlocutory Appeal (Dkt. #101) is hereby **GRANTED in part**. Accordingly, the case is stayed pending the outcome of the appeal to the Fifth Circuit with the exception of the Court ruling on Jackson's motion for summary judgment.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2937471

---

**Footnotes**

1    The Court did not address this argument in the Certification Order because Jackson first raised the argument in its Sur-Reply in Response to Plaintiffs' Opposed Motion for Class Certification and Appointment of Class Counsel (Dkt. #81 at pp. 9–10). (*See* Dkt. #57 at pp. 23–25). *See Branch v. CEMEX, Inc.*, No. H-11-1953, 2012 WL 2357280, at *9 (S.D. Tex. June 20, 2012) ("Legal arguments raised for the first time in a sur-reply, like arguments raised for the first time in a reply, are waived."); *Miles Bramwell USA, LLC v. Weight Watchers Intern., Inc.*, No. 4:12-cv-292, 2013 WL 1797031, at *4 (March 27, 2013), *adopted by* 2013 WL 1793934 (E.D. Tex. April 26, 2013). However, Jackson filed a Rule 12(b)(2) Motion to Dismiss Certain Claims (Dkt. #99) for lack of specific personal jurisdiction after the Court granted class certification. If necessary, the Court will address Jackson's motion to dismiss following the Fifth Circuit's ruling on the appeal of the Certification Order.

2    In *Ruiz*, the Fifth Circuit looked to case law to find a constitutional mandate for the disputed legal issue. 650 F.2d at 568. The Fifth Circuit found that there was no "constitutionally mandated square footage requirement" for prison cells based on its reading of *Rhodes v. Chapman*, 101 S. Ct. 2392, 2395–2396 (1981), *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), and *William v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977). *Id.* at 568. The Fifth Circuit subsequently found that "we know of no constitutional mandate for correctional units to be situated within 50 miles of a major metropolitan area in order to ensure adequate staffing. Therefore, we conclude that the State has made a substantial case on the merits...." *Id.* at 574.

3    When evaluating claimed irreparable harm for a motion to stay proceedings, the Fifth Circuit applies criteria that is very similar to that it uses to assess irreparable harm in a motion for preliminary injunction. *Burgess*, 871 F.3d at 304. Under such criteria, alleged irreparable harm cannot be speculative. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21–22 (2008) (emphasis added) (finding that a movant must show that "he is *likely* to suffer irreparable harm...."); *see also United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant ... *A presently existing actual threat must be shown.*") (emphasis in original).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Ewing Industries Corporation v. Bob Wines Nursery, Inc., Not Reported in Fed. Supp....

2015 WL 12979096

KeyCite Yellow Flag - Negative Treatment

Distinguished by M.B. v. Corsi, W.D.Mo., October 29, 2018

2015 WL 12979096
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Jacksonville Division.

EWING INDUSTRIES CORPORATION,
a Florida Corporation, Individually
and as the Representative of a Class of
Similarly-situated Persons, Plaintiff,

v.

BOB WINES NURSERY, INC.
and Robert L. Wines, Defendants.

Case No: 3:13–cv–931–J–39JBT
|
Signed 02/05/2015

**Attorneys and Law Firms**

Phillip Bock, Bock & Hatch, LLC, Chicago, IL, Ryan
M. Kelly, Anderson & Wanca, Rolling Meadows, IL,
for Plaintiff.

Eric L. Samore, Yesha Sutaria, Smith Amundsen, LLC,
Chicago, IL, Russell W. LaPeer, Landt, Wiechens,
LaPeer & Ayres, Ocala, FL, for Defendant.

## ORDER

BRIAN J. DAVIS, United States District Judge

**\*1 THIS CAUSE** is before the Court on Plaintiff's
Motion to Stay [Doc. 55; Motion], filed January 15,
2015. [1] In the Motion, Plaintiff requests an Order
from the Court staying this case and all associated
deadlines, settings, and requirements, until the United
States Court of Appeals for the Eleventh Circuit
renders a decision on Plaintiff's petition pursuant to
Federal Rule of Civil Procedure 23(f). [2] Defendants
filed a Response in Opposition to Plaintiff's Motion
to Stay [Doc. 61; Response], on January 30, 2015.
Accordingly, this matter is ripe for judicial review.

Under Federal Rule of Civil Procedure 23(f), "[a]n
appeal does not stay proceedings in the district court
unless the district judge or the court of appeals
so orders." Fed. R. Civ. P. 23(f). While the
Eleventh Circuit has not yet articulated the standard
for evaluating requests for a stay in connection with a
petition for interlocutory review pursuant to Rule
23(f), other courts have passed on the question. See,
e.g., Nieberding v. Barrette Outdoor Living, Inc., No.
12–2353–DDC–TJJ, 2014 WL 5817323, at \*2 (D.
Kan. Nov. 10, 2014); Rosen v. J.M. Auto Inc., No.
07–61234–CIV, 2009 WL 7113827, at \*1 (S.D. Fla.
May 20, 2009); In re Lorazepam & Clorazepate
Antitrust Litig., 208 F.R.D. 1, 3 (D.D.C. 2002). Those
courts have generally concluded that whether a stay
should be granted in the context of a pending Rule
23(f) petition is a "discretionary matter to be informed
by a flexible application of the well-established, four-
factor balancing test employed to consider preliminary
injunctive relief and other stays pending appeal." In
re Lorazepam & Clorazepate Antitrust Litig., 208
F.R.D. at 3. Those factors are as follows:

(1) whether the stay applicant
has made a strong showing
that he is likely to succeed
on the merits; (2) whether the
applicant will be irreparably
injured absent a stay; (3)
whether issuance of the stay
will substantially injure the
other parties interested in the
proceeding; and (4) where the
public interest lies.

**\*2** Nieberding, 2014 WL 5817323, at \*1–2; see
Lorazepam & Clorazepate Antitrust Litig., 208
F.R.D. at 3. Indeed, in the Eleventh Circuit, this
four-factor test governs stays pending appeal in other
contexts. See Ruiz v. Estelle, 650 F.2d 555, 565
(5th Cir. 1981) (determining whether the district
court's injunction should be stayed pending complete
review); [3] see also In re Dale Mabry Properties, Ltd.,

Ewing Industries Corporation v. Bob Wines Nursery, Inc., Not Reported in Fed. Supp....

2015 WL 12979096

149 B.R. 209, 210 (M.D. Fla. 1992) (applying the four-factor test when a debtor requested a stay of a Bankruptcy Court's order); United States v. Blackburn, 538 F. Supp. 1385, 1386 (M.D. Fla. 1982) ("The parties agree that in the event a stay does not issue as a matter of right, the four-prong test ... must be satisfied before the Court should issue the stay."). While Defendants' principal argument is that the matter before the Eleventh Circuit is irrelevant to Defendants' pending Motion for Summary Judgment [Doc. 51], Defendants have not suggested that a different standard applies. Indeed, Defendants have devoted a substantial portion of their argument to the four-factor test cited above. See (Response, Doc. 61 at 6–7). Accordingly, the Court will consider the four factors cited above to guide its determination of whether to stay further proceedings until the Eleventh Circuit resolves Plaintiff's 23(f) petition.

Defendants' primary argument is that Plaintiff's individual claim is wholly unrelated to the proceedings before the Eleventh Circuit, which concern whether the putative class claims are timely. (id. at 1). Defendants argue that their pending motion for summary judgment "is based on a separate defect in Plaintiff's individual claim that entitles Defendants to judgment as a matter of law." (Id.) (emphasis in original). Thus, Defendants reason that, because a named Plaintiff must have a valid cause of action, addressing Defendants' pending motion for summary judgment at this juncture would save the parties'—as well as the Court's—resources. This argument assumes its conclusion. If the Court were to deny Defendants' pending Motion for Summary Judgment—as opposed to grant the motion—Plaintiff's case would proceed to trial as an individual claim, all the while the Eleventh Circuit considers whether the class allegations were properly stricken as time barred. See Nieberding, 2014 WL 5817323, at *4 ("The Court concludes that Defendants have shown that they will be harmed if they are required to incur significant costs in proceedings that may result in duplicative and wasteful litigation if the Tenth Circuit decertifies or alters the class."). Defendants argue that "[t]his Court is obligated to resolve Defendants' motion [for summary judgment] ... regardless of whether its decision to strike the class allegations is affirmed." (Response, Doc. 61 at 4). While it is true that the issues presented in Defendants' Motion for Summary Judgment must be resolved, it

is not true that they must be resolved now. Indeed, as already explained, in the event that Defendants' Motion for Summary Judgment is denied,[4] this case would proceed to trial on Plaintiff's individual claim with the looming uncertainty of whether Plaintiff can maintain its action as a class representative. Even further, if the Eleventh Circuit were to reverse, Plaintiff would no doubt seek class certification and approval to issue class notice. Denying a stay does not save resources—in fact, it may squander them.

In the context of a request to stay pending a Rule 23(f) appeal, some courts have found that the inquiry regarding a substantial likelihood for success on the merits has two sub-parts. See Nieberding, 2014 WL 5817323, at *2; In re Lorazepam & Clorazepate Antitrust Litiq., 208 F.R.D. at 4. The first inquiry is whether the moving party will obtain permission to appeal, and the second inquiry is whether, if permission is granted, the moving party will prevail on the merits. Nieberding, 2014 WL 5817323, at *2. Here, Plaintiff has already been granted permission to appeal. The appeal is fully briefed and the parties await a date for oral argument or a decision from the Court of Appeals. While the Court is confident that it correctly applied the law, it acknowledges that the issue presented to the Eleventh Circuit concerns a "discrete question of class action law." Rosen, 2009 WL 7113827, at *1 ("While the Court is confident that it has correctly applied the law to the issues of this case, we acknowledge that the Court of Appeals may reverse our ruling.").

*3 Additionally, the Court has already concluded that allowing this case to proceed as an individual action while the Eleventh Circuit considers whether the class allegations were properly stricken as time barred has the potential to waste the resources of the parties and the Court. It is true that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." Renegotiation Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974); see Triangle Const. & Maint. Corp. v. Our Virgin Islands Labor Union, 425 F.3d 938, 947, 947 n.8 (11th Cir. 2005) ("Triangle concedes on appeal that the expense of participating in an arbitration proceeding would not constitute irreparable injury. We agree."). However, courts balancing the factors in the

Ewing Industries Corporation v. Bob Wines Nursery, Inc., Not Reported in Fed. Supp....

2015 WL 12979096

contexts of stays during the pendency of 🚩Rule 23(f) petitions have found that wasteful, unrecoverable, and possibly duplicative costs are proper considerations. See Nieberding, 2014 WL 5817323, at *4 (concluding that the second element was established when the defendants demonstrated that they would be harmed if required to incur significant costs in proceedings that may result in wasteful litigation); 🚩In re Lorazepam & Clorazepate Antitrust Litig., 208 F.R.D. at 6 ("[A] flexible balancing of the factors considered above reveals that while the denial of a stay at this juncture would cause no irreparable harm as a matter of law, proceeding headlong with ... other matters before this Court has the very real potential of unnecessarily wasting significant resources of all parties (potentially even those of absent class members) and the Court.").

Furthermore, Defendants will not suffer harm if a stay is granted. Defendants concede that Plaintiff's 🚩Rule 23(f) petition is fully briefed before the Eleventh Circuit and the parties await a chance for oral argument or a final decision. See (USCA Briefs, Doc. 61–2). Staying these proceedings would merely maintain the status quo while the parties await a decision from the Eleventh Circuit that could possibly reshape this litigation. Any harm from a brief stay while the Court of Appeals considers a decision "when juxtaposed to the potential magnitude of a decision by the Court of Appeals on the issues before it, is simply de minimis." 🚩In re Lorazepam & Clorazepate Antitrust Litig., 208 F.R.D. at 6. Defendants argue that "[i]mmediate resolution of Defendants' Motion for Summary Judgment—and the merits of Plaintiff's individual claims—will result in cost-saving and promote judicial efficiency." (Response, Doc. 61 at 6). Again, that is only true in the event that the Court were to grant Defendants' Motion for Summary Judgment, not if it were to be denied. Further, it is not altogether clear how "granting the requested stay will require the parties, and this Court, to expend additional resources ... awaiting" a decision from the Eleventh Circuit. (🚩Id. at 6–7) (emphasis added).

Finally, a stay appears to be in the public interest. First, Defendants re-hash their arguments that granting a stay would waste this Court's time and resources, which the Court has already rejected. Next, Defendants

cite DL v. D.C., 6 F. Supp. 3d 133, 136 (D.D.C. 2014) for the proposition that there is a strong public interest in the "prompt and proper" resolution of litigation. (Response, Doc. 61 at 7). The Court in DL denied a motion to stay pending a 🚩Rule 23(f) petition and noted that the litigation in that case had "been pending for more than eight years." Id. Such considerations are not at issue here. Indeed, Plaintiff's 🚩Rule 23(f) petition is already fully briefed. (USCA Briefs, Doc. 61–2). A short stay to ensure the "proper" resolution of this action, without needless expenditure, is appropriate. 🚩In re Lorazepam & Clorazepate Antitrust Litig., 208 F.R.D. at 6 ("A short stay of all matters pending a decision from the Court of Appeals therefore is warranted.").

In sum, a flexible balancing of the four factors mentioned above reveals that a stay of these proceedings is warranted while the Eleventh Circuit considers whether the class allegations were properly stricken as time barred. While the Court notes Defendants' argument that the current appeal would have no impact on Defendants' Motion for Summary Judgment, hastily proceeding with the other matters before this Court has the very real potential to waste significant resources of the parties and the Court.

**\*4** Accordingly, after due consideration, it is

**ORDERED:**

1. Plaintiff's Motion to Stay [Doc. 55] is **GRANTED.**

2. This case and all associated deadlines, settings, and requirements are hereby **STAYED** pending further Order of this Court.

3. This case is **REMOVED** from the Court's trial docket, and the Court will set a new trial date upon resolution of the pending appeal.

4. The Clerk of the Court is **DIRECTED** to terminate any pending motions and to administratively close this case.

5. The parties shall promptly inform this Court of any ruling from the United States Court of Appeals for the Eleventh Circuit, provided,

Ewing Industries Corporation v. Bob Wines Nursery, Inc., Not Reported in Fed. Supp....

2015 WL 12979096

however, that a party need not file such a notice if another party has already done so.

6. Upon a ruling by the United States Court of Appeals for the Eleventh Circuit, the parties shall re-file any motions pending at this time, as well as any responses thereto, that they deem necessary.

**DONE** and **ORDERED** in Jacksonville, Florida this 5th day of February, 2015.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 12979096

## Footnotes

1    As a separate document, Plaintiff filed a Memorandum in Support of Plaintiff's Motion to Stay. See (Memorandum in Support, Doc. 56). In pertinent part, Local Rule 3.01, United States District Court, Middle District of Florida, states as follows: "the movant shall include a concise statement of the precise relief requested, a statement of the basis for the request, and a memorandum of legal authority in support of the request, all of which the movant shall include in a single document." M.D. Fla. R. 3.01(a) (emphasis added). In the future, Plaintiff should file its motions and memorandums of law in support as a single document.

2    While the Eleventh Circuit has stated that it will "use restraint in accepting  Rule 23(f) petitions, and [that] these interlocutory petitions will not be accepted as a matter of course,"  Prado–Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1277 (11th Cir. 2000), the Eleventh Circuit granted Plaintiff's petition on August 29, 2014. See (USCA Order, Doc. 43 at 1).

3    In  Bonner v. City of Prichard, Ala., 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

4    The Court expresses no opinion as to the merits of Defendants' Motion for Summary Judgment at this time.

---

End of Document                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5405696
United States District Court,
S.D. New York.

Eric GLATT, et al., Plaintiffs,
v.
FOX SEARCHLIGHT PICTURES
INC., et ano., Defendants.

No. 11 Civ. 6784(WHP).
|
Sept. 17, 2013.

**Attorneys and Law Firms**

Adam T. Klein, Esq., Rachel M. Bien, Esq., Jennifer L. Liu, Esq., Juno E. Turner, Esq., Sally J. Abrahamson, Esq., Justin M. Swartz, Esq., Outten & Golden, LLP, New York, NY, for Plaintiffs.

Elise M. Bloom, Esq., Amy F. Melican, Esq., Proskauer Rose LLP, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge.

 *1 Defendants move to certify this Court's June 11, 2013 order for immediate appeal and to stay the action. For the following reasons, Defendants' motion to certify for immediate appeal is granted and Defendants' motion to stay is denied.

I. *Background*

Plaintiffs are former unpaid interns who bring this action on behalf of themselves and a class of former interns alleging violations of the Fair Labor Standards Act (FLSA) and New York Labor Law (N.Y.LL). On June 11, 2013, this Court granted summary judgment on liability for Plaintiffs Alexander Glatt and Eric Footman, certified a class under Rule 23 alleging NYLL violations, and conditionally certified an FLSA collective action. In doing so, this Court adopted the Department of Labor's (DOL) six-factor test for determining whether workers were "trainees" exempt from the FLSA and NYLL and rejected Defendants' proposed "primary beneficiary" test. This Court also

applied the three-factor test established in *Torres v. Gristede's Operating Corp.,* 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006), for conditionally certifying an FLSA collective action after discovery.

This Court's decision conflicts with *Wang v. Hearst Corp.,* —— F.R.D. ——, 2013 WL 1903787 (S.D.N.Y. May 8, 2013) ("*Wang I*"). There, Judge Baer concluded that the determination of whether interns are "employees" under the FLSA and NYLL is not limited to the six DOL factors but depends on the "totality of the circumstances," including "who is the primary recipient of benefits from the relationship." *Wang I,* 2013 WL 1903787, at *4–5 (quoting *Velez v. Sanchez,* 693 F.3d 308, 326, 330 (2d Cir.2012)). Judge Baer certified that decision for immediate appeal. *Wang v. Hearst Corp.,* 2013 WL 3326650 (S.D.N.Y. June 27, 2013) ("*Wang II*"). The Second Circuit has yet to decide whether to take the appeal.

II. *Immediate Appeal*

A. *Legal Standard*

28 U.S.C. § 1292(b) provides that:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that [1] such order involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

"The criteria are conjunctive, not disjunctive. The federal scheme does not provide for an immediate appeal solely on the ground that such an appeal may advance the proceedings in the district court."

Glatt v. Fox Searchlight Pictures Inc., Not Reported in F.Supp.2d (2013)
2013 WL 5405696, 21 Wage & Hour Cas.2d (BNA) 557

*Williston v. Eggleston,* 410 F.Supp.2d 274, 276 (S.D.N.Y.2006) (internal quotation marks omitted) (quoting *Ahrenholz v. Bd. of Trs. of Univ. of Ill.,* 219 F.3d 674, 676 (7th Cir.2000)).

"Interlocutory appeals are strongly disfavored in federal practice. Movants cannot invoke the appellate process as a vehicle to provide early review of difficult rulings in hard cases. Only exceptional circumstances will justify a departure from the basic policy of avoiding appellate review until a final decision on the merits." *In re Ambac Fin. Grp., Inc. Sec. Litis.,* 693 F.Supp.2d 241, 282 (S.D.N.Y.2010) (internal quotations omitted). "Congress passed 28 U.S.C. § 1292(b) primarily to ensure that the courts of appeals would be able to 'rule on ... ephemeral question[s] of law that m[ight] disappear in the light of a complete and final record.' Congress also sought to assure the prompt resolution of knotty legal problems." *Weber v. United States,* 484 F.3d 154, 159 (2d Cir.2007) (quoting *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 864 (2d Cir.1996)) (alterations and omission in original).

### B. *The Standard for Determining Whether an Intern is an Employee Covered by the FLSA and NYLL*

#### 1. Controlling Question of Law

**\*2** "In determining whether a controlling question of law exists the district court should consider whether: reversal of the district court's opinion could result in dismissal of the action; reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action; or, the certified issue has precedential value for a large number of cases." *Primavera Familienstiftung v. Askin,* 139 F.Supp.2d 567, 570 (S.D.N.Y.2001). The standard for determining whether an unpaid intern is an "employee" covered by the FLSA and the NYLL is a controlling question of law because application of a standard different from the one adopted by this Court could result in the reversal of a final judgment. It is the primary issue in determining Defendants' liability. And application of a different standard, "even though not resulting in dismissal, could significantly affect the conduct of the action." *Ret. Bd. of Policemen's Annuity*

*Fund & Benefit Fund v. Bank of N.Y. Mellon,* 2013 WL 593766, at \*5 (S.D.N.Y. Feb. 14, 2013) (quoting *Primavera,* 139 F.Supp.2d at 570). The standard permeates the case, affecting liability as well as the propriety of certifying a class action and an FLSA collective action.

And though an issue need not affect a large number of cases to be "controlling," "the impact that an appeal will have on other cases is a factor that we may take into account" in deciding the issue. *Klinghoffer v. S.N.C. Achile Lauro,* 921 F.2d 21, 24 (2d Cir.1990). Several intern cases have been filed in the Southern District of New York since this Court's June 11 order, and this issue affects all of them. Judge Baer also recently found this to be a controlling question of law suitable for certification. *Wang II,* 2013 WL 3326650, at \*2.

#### 2. Substantial Ground for Difference of Opinion
The Second Circuit has not spoken on this issue. Judge Baer found there was substantial ground for difference of opinion, because "[d]espite careful analysis" in both *Glatt* and *Wang,* "the District Courts reached very different results." *Wang II,* 2013 WL 3326650, at \*2. A number of other circuits have adopted the "primary benefit" test Defendants advocated here. *See, e.g., Solis v. Laurelbrook Sanitarium & Sch., Inc.,* 642 F.3d 518, 525 (6th Cir.2011); *Blair v. Wills,* 420 F.3d 823, 829 (8th Cir.2005); *McLaughlin v. Ensley,* 877 F.2d 1207, 1209 (4th Cir.1989). Another circuit has found the DOL factors to be relevant but not conclusive. *Reich v. Parker Fire Protection Dist .,* 992 F.2d 1023, 1025–26 (10th Cir.1993).

Certification is appropriate where the "issues impact a large number of cases, and they present substantial grounds for difference of opinion." *Geron v. Robinson & Cole LLP,* 476 B.R. 732, 745 (S.D.N.Y.2012). The intra-district split and decisions from other circuits clearly show a substantial basis exists for difference of opinion.

#### 3. Advancement of the Ultimate Termination of the Litigation

Glatt v. Fox Searchlight Pictures Inc., Not Reported in F.Supp.2d (2013)

2013 WL 5405696, 21 Wage & Hour Cas.2d (BNA) 557

**\*3** The appropriate standard affects class certification; certification of the FLSA collective action; summary judgment granted in favor of Glatt and Footman; and anticipated summary judgment motions for additional plaintiffs, the NYLL class, and the FLSA collective. Use of a different standard may obviate some of these steps, require decertification of the class or collective action, or simplify the issues for trial. Resolving this question now also avoids the possibility that a post-trial appeal would require a new trial applying a different standard. An immediate appeal therefore is likely to advance the ultimate termination of the litigation.

### C. *The Standard for Conditional Certification of an FLSA Collective Action After Discovery*

In conditionally certifying an FLSA collective action, this Court looked to the factors adopted in *Torres,* 2006 WL 2819730, at \*9. Defendants argue the Plaintiffs had to meet a higher standard, noting that the Third Circuit has required those factors to be shown by a preponderance of the evidence, *Zavala v. Wal–Mart Stores Inc.,* 691 F.3d 527, 537 (3d Cir.2012), and that the Seventh Circuit has held that FLSA certification is akin to Rule 23 certification. *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, 771–72 (7th Cir.2013). [1]

However, application of a higher standard for conditional certification is not likely to advance the ultimate termination of this litigation. This Court found that Plaintiffs met the higher standard for Rule 23 certification of their NYLL claims. Defendants argue that the formation of Rule 23 classes and FLSA collective actions are completely distinct, but the cases cited refer to procedural differences between the two, primarily that a Rule 23 class is an opt-out class while plaintiffs must opt in to an FLSA collective action. *See Kern v. Siemens Corp.,* 393 F.3d 120, 128 (2d Cir.2004); *Hoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 263 (S.D.N.Y.1997). Rule 23 classes therefore have heightened procedural requirements to protect absent class members. *Hoffman,* 982 F.Supp. at 263 n. 17. Otherwise, both turn on similar considerations concerning the feasibility of plaintiffs proceeding collectively. The relevant provisions of the

NYLL and FLSA are the same. Because Plaintiffs meet the standard for certifying a Rule 23 class alleging NYLL violations, they would also meet a higher FLSA collective action certification standard. Therefore resolution of the appropriate FLSA post-discovery certification standard would not advance the ultimate termination of the litigation.

### III. *Stay*

The decision as to whether to stay proceedings pending interlocutory appeal is akin to a decision to enter a preliminary injunction. *See In re Lorazepam & Clorazepate Antitrust Litis.,* 208 F.R.D. 1, 3 (D.D.C.2002). "In deciding whether to grant a stay pending appeal, a court should consider: '(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected.' " *Daniels v. City of N.Y.,* 138 F.Supp.2d 562, 564 (S.D.N.Y.2001) (quoting *LaRouche v. Kezer,* 20 F.3d 68, 72 (2d Cir.1994)).

**\*4** A stay is inappropriate here because the only "irreparable harm" identified by Defendants is the cost of continuing to litigate this action. However, it is well established that "litigation costs do not rise to the level of irreparable injury." *Daniels,* 138 F.Supp.2d at 564 (quoting *Hammerman v. Peacock .* 623 F.Supp. 719, 721 (D.D.C.1985)); *see also Sampson v. Murray,* 415 U.S. 61, 90 (1974). Defendants also argue that issuing notice to the class or collective that may later require revision may confuse class and collective action members. But this is not an injury to the Defendants. Even if Defendants made a showing that notice should be deferred, it does not warrant the more drastic step of a total stay of the proceeding.

Moreover, a stay would not be in the public interest. Defendants argue a stay would free up this Court's resources, but that is true of every case. And it would do so at the expense of delaying Plaintiffs' rights to pursue this action. Defendants also argue a stay is in the public interest because of uncertainty over the lawfulness of unpaid internship programs. But

Glatt v. Fox Searchlight Pictures Inc., Not Reported in F.Supp.2d (2013)

2013 WL 5405696, 21 Wage & Hour Cas.2d (BNA) 557

that is precisely why this action should proceed. A stay is against the public interest where "[p]laintiffs are litigating a controversial matter of serious public concern." *Daniels,* 138 F.Supp.2d at 565. Should the Second Circuit decide to hear Defendants' appeals, a stay would not resolve those appeals any sooner. And if the Second Circuit declines the appeals, a stay will only have delayed the time until Defendants have a final judgment they can appeal.

**CONCLUSION**

This Court's June 11, 2013 order is certified for immediate appeal under 28 U.S.C. § 1292(b). Defendants' motion to stay is denied. The Clerk of Court is directed to terminate the motions pending at Docket Nos. 178 and 181.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5405696, 21 Wage & Hour Cas.2d (BNA) 557

**Footnotes**

1    Defendants also note that one district court in this circuit declined to follow *Torres. See Gortat v. Capal Bros., Inc.,* 2010 WL 1423018, at *9 n. 12 (E.D.N.Y. Apr. 9, 2010). However, the court there endorsed a more lenient standard, finding that heightened scrutiny is only appropriate after both discovery and the opt-in period are complete. *Gortat,* 2010 WL 1423018, at *9–10.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Grider v. Keystone Health Plan Central, Inc., Not Reported in Fed. Supp. (2007)

2007 WL 9734118

2007 WL 9734118
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Natalie M. GRIDER, M.D. and Kutztown
Family Medicine, P.C., Plaintiffs
v.
KEYSTONE HEALTH PLAN
CENTRAL, INC., Highmark, Inc., John
S. Brouse, Capital Blue Cross, James
M. Mead and Joseph Pfister, Defendants

Civil Action No. 2001-CV-05641
|
Filed 01/22/2007

**Attorneys and Law Firms**

Joseph A. O'Keefe, O'Keefe, Miller & Thielen, P.C., Fleetwood, PA, Kenneth A. Jacobsen, Jacobsen Law Offices LLC, Louis C. Bechtle, Fox Rothschild LLP, Michael J. Willner, Cafferty Faucher LLP, Philadelphia, PA, Timothy M. Fraser, FL Office of the Attorney General, Tallahassee, FL, for Plaintiffs.

Barbara W. Mather, Pepper Hamilton LLP, Matthew J. Siembieda, Morgan Lewis & Bockius LLP, Timothy D. Katsiff, Ballard Spahr LLP, Sandra A. Girifalco, Stradley Ronon Stevens & Young LLP, Kenneth A. Jacobsen, Jacobsen Law Offices LLC, Patrick J. O'Connor, Matthew J. Siegel, Cozen and O'Connor, Thomas B. Fiddler, White & Williams, LLP, Lawrence J. Fox, Drinker Biddle & Reath LLP, Philadelphia, PA, Daniel T. Campbell, Kathleen Taylor Sooy, Michael L. Martinez, Tracy A. Roman, Crowell & Moring LLP, Justin P. Murphy, U.S. Dept. of Justice Antitrust DIV, Washington, DC, Kimberly G. Krupka, Malcolm J. Gross, Errol C. Deans, Jr., Gross, McGinley, LLP, Edward N. Cahn, Blank Rome, LLP, William M. McSwain, U.S. Attorney, Allentown, PA, Norman E. Greenspan, Starfield & Smith PC, Ft. Washington, PA, Daniel I. Booker, Reed Smith LLP, Dianna E. Wyrick, Reed Smith Shaw & McClay, Pittsburgh, PA, Davidson, NC, Joseph A. O'Keefe, O'Keefe, Miller & Thielen, P.C., Fleetwood, PA, William T. Mandia, Stradley, Ronon, Stevens & Young, Cherry Hill, NJ, David J. Wagner, Drinker Biddle & Reath, Princeton, NJ, Elizabeth Y. McCuskey, Thomas Jefferson School of Law, San Diego, CA, Christopher J. Huber, United

States Attorney's Office, Atlanta, GA, Susan Elizabeth Antonioni Royster, Fitzpatrick, Lentz & Bubba, Center Valley, PA, for Defendants.

Francis J. Farina, Davidson, NC.

ORDER

James Knoll Gardner, United States District Judge

**\*1** NOW, this 19th day of January, 2007, upon consideration of the Capital and Keystone Defendants' Motion to Stay Proceedings Pending Resolution of Rule 23(f) Appeal, which motion was filed January 10, 2007; upon consideration of Plaintiffs' Answer and Opposition to the Capital and Keystone Defendants' Motion to Stay Proceedings Pending Resolution of Rule 23(f) Appeal filed January 12, 2007; upon consideration of the Response of Highmark, Inc. and John S. Brouse to Capital and Keystone Defendants' Motion to Stay Proceedings Pending Resolution of Rule 23(f) Appeal filed January 11, 2007; upon consideration of the briefs of the parties,

IT IS ORDERED that defendants' motion for stay is granted in part and denied in part. [1]

**\*2**  IT IS FURTHER ORDERED that defendant's motion for stay of all class notice deadlines established by the December 20, 2006 Order of the undersigned is granted for a period of four months.

IT IS FURTHER ORDERED that all class notice deadlines established by the December 20, 2006 Order of the undersigned are stricken.

IT IS FURTHER ORDERED that on or before May 18, 2007 defendant Keystone Health Plan Central, Inc., shall provide plaintiffs' counsel with the name and last known address of every physician having a contract with Keystone during the class period.

IT IS FURTHER ORDERED that on or before May 25, 2007 class counsel shall present to counsel for defendants and the undersigned a proposed class notice [2] and a specific proposal for service of the class notice upon all class members in accordance with the

2007 WL 9734118

requirements of 🚩 Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that defendants shall have until on or before June 6, 2007 to object to plaintiffs' proposed class notice and service proposal.

IT IS FURTHER ORDERED that a Rule 16 Status Conference shall be conducted on the record by the undersigned on June 20, 2007 at 10:00 o'clock a.m. in Courtroom B at the Edward N. Cahn United States Courthouse, 504 Hamilton Street, Allentown, Pennsylvania, or at such other time, place and location designated by the undersigned, to resolve any objections to plaintiffs' proposed class notice and service proposal, and to approve the class notice.

IT IS FURTHER ORDERED that on or before June 29, 2007 plaintiffs shall serve the approved class notice upon all class members in the manner approved by

the undersigned pursuant to 🚩 Federal Rule of Civil Procedure 23(c)(2)(B).

IT IS FURTHER ORDERED that on or before July 10, 2007 plaintiffs shall file a copy of the Notice provided to class members and a certification by class counsel detailing the method of service, identifying those members to whom individual notice was provided, the reasons why any members of the class could not be identified through reasonable effort, and the proposed method by which notice will be provided to members who could not be identified through reasonable effort.

IT IS FURTHER ORDERED that, in all other respects, defendants' motion for a stay is denied.

**All Citations**

Not Reported in Fed. Supp., 2007 WL 9734118

---

## Footnotes

1    In their within joint motion, defendants Capital Blue Cross ("Capital") and Keystone Health Plan Central, Inc. ("Keystone") seek to stay all proceedings in this class action pending resolution of their petition to the United States Court of Appeals for the Third Circuit for permission to appeal my December 20, 2006 Order and Opinion granting class certification. In their response, defendants Highmark, Inc., and John S. Brouse request that any relief granted to defendants Capital and Keystone also be granted to them.

Plaintiffs oppose only a portion of defendants' motion. Specifically, plaintiffs are unopposed to a stay of the class notice deadlines established by my December 20, 2006 Order. However, plaintiffs oppose a complete stay of the entire case.

For the following reasons, I grant a four-month stay of the class-notice deadlines and deny any other stay of the case. 🚩 Rule 23(f) of the Federal Rules of Civil Procedure provides:

A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

Incidental to a court's power to schedule and dispose of the cases on its docket, is the power to stay the proceedings before it when it promotes the fair and efficient adjudication of a case.

🚩 United States of America v. Breyer, 41 F.3d 884, 893 (3d Cir. 1994). The power to stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."

2007 WL 9734118

*Landis v. North American Co.,* 299 U.S. 248, 254-255, 57 S.Ct. 163, 158, 81 L.Ed. 153, 166 (1936). The party seeking a stay must "demonstrate a clear case of hardship or inequity, if there is even a fair possibility that the stay would work damage on another party." *Gold v. Johns-Manville Sales Corporation,* 723 F.2d 1068, 1075-1076 (3d Cir. 1983). (Citation omitted.)

Defendants fail to allege a clear case of hardship or inequity that would require the court to exercise its discretion in favor of staying these proceedings. Moreover, the reasons proffered by defendants for the stay are without merit. In particular, Lead Counsel for moving defendants Capital and Keystone, Michael L. Martinez, asserts that an important reason to stay the entire case is because "it would be a waste of this Court's and the parties' resources to conduct costly and burdensome merits discovery when the Third Circuit may well reverse or remand all or part of the Certification Order and thereby obviate the need for all or some of this discovery." Memorandum in Support of Capital and Keystone Defendants' Motion for Stay Proceedings Pending Resolution of Rule 23(f) Appeal at pages 2-3.

It is a bit presumptuous for defendants to conclude that the Third Circuit "may well reverse or remand all or part" of my class certification Order. That decision, of course, as well as the preliminary decision whether or not to grant permission to appeal, rests entirely with the sound discretion of the Third Circuit.

Defendants' assertion that there is additional costly and burdensome discovery which still needs to be conducted is belied by the repeated statements made on November 15, 2006 by Attorney Martinez to Special Discovery Master Karolyn Vreeland Blume that Capital and Keystone have fully complied with all outstanding discovery requests in this case. (See Transcript of Proceedings conducted before Special Discovery Master Karolyn Vreeland Blume on November 15, 2006 at pages 200, 202, 212, 216-218, attached as Exhibit A to Plaintiff's Answer and Opposition to the Capital and Keystone Defendants' Motion to Stay Proceedings pending Resolution of Rule 223(f) Appeal filed January 12, 2007.)

Because plaintiffs do not oppose a stay of the class notice deadlines established in my December 20, 2006 Order, and because that is the one portion of this case which may be directly affected by a decision of the Third Circuit favorable to defendants, I grant defendants motion for stay of all class notice deadlines established in my December 20, 2006 Order for a period of four months to permit the Third Circuit to rule on defendant's request for permission to appeal.

A sanctions hearing is scheduled to commence on January 22, 2007 on two separate motions for sanctions filed by plaintiffs against defendants and their counsel and former counsel for alleged discovery abuses and violations of court Orders and Rule 11 of the Federal Rules of Civil Procedure. I delayed scheduling these matters until after completion of the class certification issues. However, further delay may prejudice plaintiffs' rights to an expeditious adjudication of these matters.

This case has been in litigation for more than five years. Approximately three and one-half years have been devoted to pretrial discovery resulting in the production and review by counsel and the court of more than 118,000 pages of documents and exhibits.

Because of concerted efforts by the Special Discovery Master, the court and the court staff, the case is now on a path where ultimate resolution is in sight, although much work remains to be

2007 WL 9734118

done to get this matter ready for trial. This includes resolution of plaintiffs' request for sanctions and completion of any outstanding discovery matters.

In my view, it would be unwise, unnecessary, inefficient and unfair to the litigants to interrupt this process and risk losing the momentum. Accordingly, I conclude that the fair and efficient adjudication of this matter is best served by continuing to move this case along.

Thus, I deny defendants' motion for a complete stay of all proceedings. Unless the Third Circuit directs otherwise, I intend to continue to move this case towards its ultimate resolution.

2    The official commentary to 🚩Fed.R.Civ.P. 23 notes that: "The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms." 🚩Fed.R.Civ.P. 23 Advisory Committee Notes 2003.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Report and Recommendation Adopted as Modified by   Heinzl v.
Cracker Barrel Old Country Store, Inc.,   W.D.Pa.,   July 8, 2016

2016 WL 5107173
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Sarah HEINZL, individually and on behalf
of all others similarly situated, Plaintiff,

v.

CRACKER BARREL OLD
COUNTRY STORE, INC., Defendant.

Civil Action No. 2:14-cv-1455
|
Signed 06/08/2016

**Attorneys and Law Firms**

R. Bruce Carlson, Benjamin J. Sweet, Stephanie K.
Goldin, Carlson Lynch Sweet & Kilpela, LLP, Edwin
J. Kilpela, Carlson Lynch Ltd., Pittsburgh, PA, for
Plaintiff.

Nancy A. Walker, Media, PA, Elizabeth M. Rodriguez,
FordHarrison LLP, Miami, FL, John E. Duvall, Ford
Harrison LLP, Jacksonville, FL, Todd S. Aidman, Ford
& Harrison LLP, Tampa, FL, for Defendant.

ORDER

ROBERT C. MITCHELL, United States Magistrate
Judge

I. Recommendation

 **\*1**  It is respectfully recommended that the Motion to
Stay Proceedings Pending Resolution of Defendant's
Rule 23(f) Petition and, if the Petition is Granted,
During Consideration of the Appeal to the Third
Circuit filed by Defendant (ECF No. 131) be denied.

II. Report
On April 29, 2016, the Court entered an order (ECF
No. 126) which denied the motion for summary
judgment filed by Defendant, Cracker Barrel Old
Country Store, Inc., (ECF No. 64) and granted the

motion to certify class filed by Plaintiff, Sarah Heinzl
(ECF No. 103). The order adopted a Report and
Recommendation filed on January 27, 2016 (ECF No.
113).

On May 12, 2016 (unbeknownst to this Court),
Defendant petitioned the Court of Appeals for the
Third Circuit under  Federal Rule of Civil Procedure
23(f) to request review of the Court's class certification
order. On May 17, 2016, Defendant filed a Motion to
Stay Proceedings Pending Resolution of Defendant's
Rule 23(f) Petition and, if the Petition is Granted,
During Consideration of the Appeal to the Third
Circuit (ECF No. 131). A status conference took place
on May 23, 2016, at which this motion was discussed
and expert depositions were scheduled to be completed
by September 15, 2016 (ECF No. 133). However,
no formal order has been entered with respect to the
motion to stay.

As summarized by a district court:

Under  Rule 23(f) of the Federal Rules of
Civil Procedure, "[a] court of appeals may permit
an appeal from an order granting or denying
class certification," but "[a]n appeal does not
stay proceedings in the district court unless the
district judge or the court of appeals so orders."
Fed.R.Civ.P. 23(f). Although any stay in district
court proceedings pending appeal of a class
certification order should be sought first from the
district court,  Newton v. Merrill Lynch, Pierce,
Fenner & Smith, Inc., 259 F.3d 154, 165 n. 6 (3d
Cir. 2001), the Third Circuit has not yet articulated
a standard which district courts should follow in
ruling on a motion to stay pending appeal under
Rule 23(f). Cases from other Circuits and district
courts which have addressed this issue suggest that
in determining whether to stay proceedings pending
appeal under  Rule 23(f), a court should consider
factors similar to those examined in the context
of a preliminary injunction motion. See  Blair v.
Equifax Check Serv., Inc., 181 F.3d 832, 835 (7th
Cir. 1999)(noting in dicta that "a stay would depend
on a demonstration that the probability of error in
the class certification decision is high enough that

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 64 of 131
PageID: 78063

Heinz v. Cracker Barrel Old Country Store, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5107173

the costs of pressing ahead in the district court exceed the costs of waiting. (This is the same kind of question that a court asks when deciding whether to issue a preliminary injunction or a stay of an administrative decision.)") (citations omitted); In re Lorazepam & Clorazepate Antitrust Litig., 208 F.R.D. 1, 3 (D.D.C. 2002)(noting that a decision to stay pending a Rule 23(f) petition is discretionary and should be informed by a flexible application of the factors used to consider preliminary injunctive relief); see also In re Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 140 (2nd Cir. 2001) ("[W]e hold that a stay will not issue unless the likelihood of error on the part of the district court tips the balance of hardships in favor of the party seeking the stay."). Accordingly, the Court will consider the same factors which generally guide the determination of whether a preliminary injunction should issue in the Third Circuit: "(1) a likelihood of success on the merits; (2) that [the moving party] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). Consistent with the principal that preliminary injunctions are considered to be "extraordinary relief," see id., a stay pending appeal under Rule 23(f) should not be granted as a matter of course. See Prado–Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1273 n. 8 (11th Cir. 2000)("Rule 23(f) contemplates that in most cases discovery (at the very least, merits discovery) will continue notwithstanding the pendency of an appeal of the class certification order."); Blair, 181 F.3d at 835 (stating that interlocutory appeals under Rule 23(f) should not unduly retard the pace of litigation because "stays will be infrequent").

**\*2** Johnson v. Geico Cas. Co., 269 F.R.D. 406, 411-12 (D. Del. 2010).

As explained in detail in the Report and Recommendation, which was adopted as the opinion of the Court, Plaintiff met the requirements of obtaining class certification. Thus, there is no basis upon which this Court could declare that Defendant has a likelihood of success on the merits of having the class certification reversed. Defendant contends that this Court's decision conflicts with the Memorandum Opinion and Order denying class certification by Judge Eddy in Mielo v. Bob Evans Farms, Inc., 2015 WL 1299815 (W.D. Pa. Mar. 23, 2015). However, the Court has already explained why the Mielo case was distinguishable. Defendant's remaining arguments (the certification represents an intrusion into Defendant's ADA compliance policy, Plaintiff fails to meet the class representative requirements of Rule 23) have been addressed by the Court in denying its motion for summary judgment and granting Plaintiff's motion for class certification.

Defendant also argues that it will suffer irreparable harm in the absence of a stay, contending that it will incur substantial expenses in connection with class discovery, which will be for naught if the Court of Appeals agrees with its position that the certification order imposes a duty that is not authorized by Title III of the ADA. This is merely a rewording of Defendant's merits argument and, as noted above, the Court has already addressed why Defendant's position should be rejected. In every case, a party may have to expend money on discovery that could later be deemed unnecessary if the case is reversed on appeal, but that fact does not transform such expenses into irreparable harm.

If the Court of Appeals grants the Rule 23(f) petition and has the parties submit briefs on an appeal, then Defendant would have a more compelling argument for the Court to stay class discovery until such time as the Court of Appeals issues a ruling on the appeal. In the meantime, Defendant has not demonstrated that its Rule 23(f) petition represents the "infrequent" case meriting a stay and the motion should be denied.

Therefore, it is recommended that the Motion to Stay Proceedings Pending Resolution of Defendant's

🚩 Rule 23(f) Petition and, if the Petition is Granted, During Consideration of the Appeal to the Third Circuit filed by Defendant (ECF No. 131) be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by June 22, 2016. Any party opposing the objections shall file a response by July 6, 2016. Failure to file timely objections will waive the right of appeal.

Dated: June 8, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5107173

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Schuylkill Valley Sports, Inc. v. Corporate
Images Co.,  E.D.Pa.,  June 15, 2020

627 Fed.Appx. 168
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals, Third Circuit.

HR STAFFING CONSULTANTS LLC; Upstream
Healthcare Management of New Jersey LLC

v.

Richard BUTTS, Appellant.

No. 15–2357
|
Argued Sept. 16, 2015.
|
Filed: Sept. 30, 2015.

**Synopsis**
**Background:** Former employer, a staffing agency,
brought action seeking to enforce covenant not
to compete after employee was offered direct
employment by one of staffing agency's clients. The
United States District Court for the District of New
Jersey, Kevin McNulty, J., 2015 WL 3492609, granted
former employer's motion for preliminary injunction.
Former employee appealed.

**Holdings:** The Court of Appeals, Shwartz, Circuit
Judge, held that:

[1] employer was likely to succeed on merits of claim;

[2] covenant protected employer's legitimate interests;

[3] employer was likely to suffer irreparable harm;

[4] balance of equities favored enforcement; and

[5] public interest supported grant of injunction.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for
Preliminary Injunction.

West Headnotes (8)

[1]    **Injunction** 🔑 Non-competition and
       non-solicitation issues

       Staffing agency seeking to enforce
       covenant not to compete against employee
       who went to work for staffing agency
       client was likely to succeed on the
       merits of its claim that the covenant was
       enforceable, as required for preliminary
       injunction enforcing covenant.

       3 Cases that cite this headnote

[2]    **Contracts** 🔑 Restriction necessary for
       protection

       **Contracts** 🔑 Preventing disclosure of
       trade secrets or confidential information

       A covenant not to compete for 12 months
       protected staffing agency's legitimate
       interests, and thus was enforceable
       as reasonable under New Jersey law;
       covenant prevented staffing agency's
       clients from offering direct employment
       to staffing agency employees, and
       prevented disclosure of confidential
       information regarding staffing agency's
       plans to offer more services to a client's
       competitors.

       5 Cases that cite this headnote

[3]    **Contracts** 🔑 Nature of business to
       which contract relates

       Under New Jersey law, enforcement of
       covenant not to compete for 12 months did
       not impose undue hardship on employee,
       as required element for enforceability,
       where company that sought to hire
       employee had created a position for him

outside of the geographic area governed by the covenant, and employee went to work for company knowing that former employer had refused to waive covenant.

3 Cases that cite this headnote

[4]    **Contracts** 🔑 Nature of business to which contract relates

Under New Jersey law, covenant not to compete for employee working in healthcare field in a prescribed geographic area for 12 months was not injurious to the public, as required element for enforceability; enforcement of agreement would not adversely affect patient care, and there was no indication that other's could not perform employee's duties.

2 Cases that cite this headnote

[5]    **Contracts** 🔑 Waiver

Under New Jersey law, former employer, a staffing agency, did not waive right to enforce covenant not to compete with employee, notwithstanding that it had permitted other employees to be hired directly by its clients.

3 Cases that cite this headnote

[6]    **Injunction** 🔑 Non-competition and non-solicitation issues

Former employer, a staffing agency, was likely to suffer irreparable harm absent preliminary injunction enforcing covenant not to compete for 12 months with employee who left to work for one of staffing agency's clients; staffing agency needed to protect its role as an intermediary finding skilled workers for its clients, and employee possessed confidential information about staffing agency's plans to offer services to client's competitors.

13 Cases that cite this headnote

[7]    **Injunction** 🔑 Non-competition and non-solicitation issues

Balance of equities favored preliminary injunction enforcing employer's covenant not to compete with employee for 12 months; enforcement protected employer's business model as a staffing agency by prohibiting clients from hiring directly, and did not interfere with employee's prospects for alternative employment with the provider in a region outside of the geographic area governed by the covenant.

1 Case that cites this headnote

[8]    **Injunction** 🔑 Non-competition and non-solicitation issues

Public interest supported grant of preliminary injunction enforcing employer's covenant not to compete with employee for 12 months after employee attempted left employer, a staffing agency, to work for one of its clients; public at large would benefit from enforcement of non-competition agreements making it possible for staffing agencies to provide services.

5 Cases that cite this headnote

**\*169  \*170** Appeal from the United States District Court for the District of New Jersey (D.C. No. 2–15–cv–03155), District Judge: Hon. Kevin McNulty.

**Attorneys and Law Firms**

George P. Barbatsuly, Esq., Anthony P. La Rocco, Esq., [Argued], Mark D. Marino, Esq., K & L Gates, Newark, NJ, Counsel for Appellant.

Anthony Argiropoulos, Esq., [Argued], Thomas Kane, Esq., Epstein Becker & Green, Newark, NJ, Counsel for Appellee.

Before: FISHER, JORDAN, and SHWARTZ, Circuit Judges.

OPINION [*]

SHWARTZ, Circuit Judge.

Richard Butts appeals the District Court's order granting HR Staffing Consultants, LLC and Upstream Healthcare Management of New Jersey, LLC (collectively, "HR Staffing") a preliminary injunction preventing Butts from violating the non-compete and confidentiality provisions of his employment agreement with HR Staffing. For the following reasons, we will affirm.

I

HR Staffing is a healthcare staffing company that recruited, trained, and placed both per diem and long term permanent ("LTP") staff at CarePoint, a New Jersey hospital system. For LTP staff, such as Butts, CarePoint approved an annual salary for each position and paid HR Staffing the employee's salary plus 15%. HR Staffing in turn paid the employees' salaries and benefits. In the event CarePoint subsequently hired LTP staff, CarePoint was also required to pay HR Staffing a "placement fee" equal to 10% of the employee's salary.

Butts was hired by HR Staffing in 2011 and placed at CarePoint as an LTP staff member, rising to Vice President of Cardiovascular Services. Butts signed an employment agreement with HR Staffing that contained a covenant not to compete (the "non-compete") stating:

> [T]hroughout the term of this Agreement and during the twelve (12) month period immediately following the expiration, termination or non-renewal of this Agreement ... Employee shall not, except with Company's prior written consent, ... engage in the furnishing of any aspect of the Services as contemplated under

this agreement and/or provide or enter into any contractual relationship relating to any aspect of such Services with any Client, hospital, health care facility, medical group, or other party or entity to provide consulting, management and/or other directorship services to, or participate in the management, operation or development of, any medical practice, hospital or other health care facility that provides such professional medical services, at any health care facility or other location (e.g., hospital, health care facility, medical office, etc.) anywhere within Hudson County and the surrounding counties (Bergen, Passaic, Union, and Essex Counties) in which Employee provided Services during the term of the Agreement at least twenty (20) percent of the time.

App. 306. [1]

Thereafter, CarePoint and HR Staffing entered into a preferential staffing services agreement ("PSSA") that gave HR Staffing priority over other staffing agencies **\*171** in providing CarePoint with new staff. The PSSA also provided that "[u]pon notice by CarePoint, [specific] Existing LTP Staff [could] be hired directly by CarePoint without payment of a placement fee." App. 337. Butts was included on the list of "Existing LTP Staff."

CarePoint offered Butts direct employment. He informed CarePoint that he was subject to a non-compete, and it instructed him to seek a written waiver. [2] Butts asked HR Staffing for such a waiver, but it refused.

By this time, HR Staffing had sued CarePoint in New Jersey state court for breach of the PSSA and other contracts. At around the same time, HR Staffing

entered talks with several of CarePoint's competitors about possible business opportunities, and planned to move Butts to operate the cardiovascular service line at one of these competitors. Butts was aware of these opportunities, primarily because he was copied on emails concerning them.

On May 1, 2015, Butts resigned from HR Staffing to work for CarePoint. Butts claims that he felt compelled to leave because he was being asked to aid HR Staffing's efforts to disrupt CarePoint's operations "in retaliation for conduct alleged by HR Staffing in an ongoing lawsuit between the companies." App. 371.

Three days later, HR Staffing filed this action against Butts alleging, among other things, breach of his employment agreement. After expedited discovery and an evidentiary hearing, the District Court granted HR Staffing's motion for a preliminary injunction, preventing Butts from being employed for one year by CarePoint within the five New Jersey counties listed in his non-compete or disclosing any of HR Staffing's confidential information to CarePoint. Butts appeals.

## II [3]

"A plaintiff seeking a preliminary injunction must establish [ (1) ] that he is likely to succeed on the merits, [ (2) ] that he is likely to suffer irreparable harm in the absence of preliminary relief, [ (3) ] that the balance of equities tips in his favor, and [ (4) ] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The District Court correctly concluded that HR Staffing met the *Winter* test.

## A

[1]   The District Court held that the non-compete is enforceable and that HR Staffing is likely to succeed on the merits of its claim that the non-compete was breached. Under New Jersey law, a non-compete will be enforced "where it [ (1) ] simply protects the legitimate interests of the employer, [ (2) ] imposes no undue hardship on the employee, and [ (3) ] is

not injurious to the public." *Solari Indus., Inc., v. Malady,* 55 N.J. 571, 264 A.2d 53, 56 (1970). These factors support enforcing the non-compete here.

**\*172** [2]   First, the non-compete protects two legitimate business interests of HR Staffing: preventing disintermediation (the ability of customers or employees to cut out HR Staffing as a middleman), and protecting confidential information. With respect to preventing disintermediation, "middlemen exist because they provide a useful and highly-valued service," *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.,* 720 F.2d 1553, 1558 (11th Cir.1983), of locating employees who fit employers' special needs. Without non-competes, employees searching for placements and clients seeking specialized personnel "could get the benefit of [a staffing company's] services without paying the full price of those services" by entering into a direct relationship with each other as soon as employees had been placed. *Id.* at 1559. Protecting HR Staffing's role in the placement process and thereby ensuring it receives the fees for the only service it provides, is a "legitimate interest," [4] *id.,* and, because the non-compete helps prevent disintermediation, enforcing it is reasonable. [5] *Borg–Warner Protective Servs. Corp. v. Guardsmark, Inc.,* 946 F.Supp. 495, 502 (E.D.Ky.1996).

HR Staffing also has a legitimate interest in preventing the disclosure of confidential information. *Ingersoll–Rand Co. v. Ciavatta,* 110 N.J. 609, 542 A.2d 879, 888 (1988). Butts was privy to confidential information about HR Staffing's initiatives to build relationships with CarePoint's competitors. The fact that these plans were in an early stage of development does not eliminate the harm from disclosure, as interfering with one of the deals could injure HR Staffing, particularly given its then deteriorating relationship with its primary client, CarePoint. The conclusion that Butts "would be in a position to inform CarePoint of ... HR Staffing's plans and undermine these plans for CarePoint's benefit," App. 17, was therefore not clearly erroneous, and enforcing Butts' non-compete protects HR Staffing's interest in safeguarding confidential information.

HR Staffing Consultants LLC v. Butts, 627 Fed.Appx. 168 (2015)

2015 IER Cases 318,672

**[3]** Second, enforcing the clause imposes no undue hardship on Butts. Courts considering the hardship prong assess "the likelihood of the employee finding work in his field elsewhere ... [and] the reason for the termination of the relationship between the parties to the employment contract." *Karlin v. Weinberg,* 77 N.J. 408, 390 A.2d 1161, 1169 (1978). In this case, CarePoint created a position for Butts outside of the geographic area covered by the non-compete and thus he has not faced a significant hardship as a result of its enforcement. Moreover, Butts left HR Staffing and joined CarePoint knowing that he was subject to a non-compete agreement that HR Staffing refused to waive. Hence, to the extent this placement **\*173** has caused "hardship," he "brought any hardship upon himself."

*Cmty. Hosp. Grp., Inc. v. More,* 183 N.J. 36, 869 A.2d 884, 895 (2005).

**[4]** Third, enforcement of Butts's non-compete is "not injurious to the public." *Karlin,* 390 A.2d at 1166. In assessing this prong, courts consider "the demand for the services rendered by the employee and the likelihood that those services could be provided by other [employees] already practicing in the area." *Id.* at 1169–70. The public interest in access to medical care can weigh against enforcement of an otherwise reasonable non-compete where the employee has special skills used to provide direct patient care. *See Cmty. Hosp. Grp.,* 869 A.2d at 899–900. Here, however, there is no evidence that enforcement of Butts's non-compete will adversely affect patient care or that others could not perform his duties, and the District Court's findings on these points were not clearly erroneous.

**[5]** Butts argues that even if the clause is enforceable, HR Staffing's willingness to allow "[e]xisting LTP Staff [to] be hired directly by CarePoint without payment of a placement fee," App 337, constituted "prior written consent" to waive the non-compete, App 306. Waiver of a right can be implicit rather than explicit, but "[s]uch a waiver must be done 'clearly, unequivocally, and decisively.' " *Cole v. Jersey City Med. Ctr.,* 215 N.J. 265, 72 A.3d 224, 231 (2013) (quoting *Knorr v. Smeal,* 178 N.J. 169, 836 A.2d 794, 798 (2003)). We agree with the District Court that

HR Staffing did not waive its right to enforce Butts's non-compete. As the District Court points out, the PSSA does not "purport to settle the rights of Butts and HR Staffing vis-à-vis each other," App. 27, but only CarePoint's pre-existing obligation to pay HR Staffing placement fees for a select group of employees. [6]

For these reasons, the District Court did not err in concluding the non-compete was enforceable and that HR Staffing is likely to succeed on the merits of its breach of contract claim. [7]

B

**[6]** The District Court also did not err in holding that HR Staffing demonstrated a likelihood of irreparable harm if it were not granted an injunction and correctly concluded that such harm was "likely," not merely a "possibility," *Winter,* 555 U.S. at 22, 129 S.Ct. 365, "imminent," "not ... a remote future injury," *Cont'l Grp., Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 359 (3d Cir.1980) (internal quotation marks and citations omitted); *Acierno v. New Castle Cnty.,* 40 F.3d 645, 655 (3d Cir.1994), and that money damages are insufficient to remediate the injury. *Id.* at 653.

HR Staffing's ability to protect its role as an intermediary through the non-compete is essential to its very existence, and money will not remediate the injury if its **\*174** business model is destroyed. [8] *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 802 (3d Cir.1989). In addition, Butts received information about HR Staffing's strategic plans, and the risk of misuse of this information could lead to lost business opportunities and thereby harm HR Staffing. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998) ("Grounds for irreparable injury include ... loss of trade...."); *Cont'l Grp.,* 614 F.2d at 358–59; *see also Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.,* 219 N.J.Super. 158, 530 A.2d 31, 33 (N.J.Super.App.Div.1987) (once a "competitor has obtained the secrets[,] [t]he cat is out of the bag and

HR Staffing Consultants LLC v. Butts, 627 Fed.Appx. 168 (2015)
2015 IER Cases 318,672

there is no way of knowing to what extent their use has caused damage or loss").

Butts argues that there was no evidence that he imminently planned to disclose confidential information, and that he could have done so even before he left HR Staffing. Appellant Br. at 28. "[I]n the context of determining whether a threat of disclosure exists ... [c]ourts are frequently called upon to ... decide or predict the likely consequences arising from a given set of facts and to grant legal remedies on that basis."

🚩 *Nat'l Starch*, 530 A.2d at 33 (internal quotation marks and citations omitted). Here, Butts left HR Staffing and "transferred his loyalties" to CarePoint, App. 24, and could be willing to disclose damaging information or, at the very least, allow the information to influence his actions at CarePoint to the detriment of HR Staffing, especially considering his belief that HR Staffing was using him as a pawn in its dispute with CarePoint. Thus, the District Court did not err in finding a concrete risk that HR Staffing's confidential information might be used in a fashion that could cause it irreparable harm.

For these reasons, we conclude that the District Court appropriately found that the threat to HR Staffing's existence and the risk of disclosure of confidential information absent an injunction present a likelihood of irreparable harm.

### C

**[7]** Turning to the balance of the equities, HR Staffing's interest in obtaining the injunction outweighs the harm it may cause to Butts. As discussed above, enforcing the non-compete protects HR Staffing's business model and confidential information and has not interfered with Butts's prospects for alternative employment with CarePoint. Furthermore, where, as here, the employee "willfully breach[ed] a valid restrictive covenant, the harm to [him] is a predictable consequence of [his] willful breach and ...

is not the type of harm from which we seek to protect [him]." 🚩 *Laidlaw, Inc. v. Student Transp. of Am., Inc.,* 20 F.Supp.2d 727, 768 (D.N.J.1998) (internal quotation marks and citations omitted). Thus, the District Court exercised sound discretion in concluding that the equities tip in favor of HR Staffing.

### D

**[8]** The District Court's conclusion that the public interest does not weigh against enforcement of the non-compete is also correct. While the public interest factor is **\*175** not satisfied simply because enforcement of a contract provision is generally a good thing, see

🚩 *Cont'l Grp.*, 614 F.2d at 358 ("If the interest in the enforcement of contractual obligations were the equivalent of the public interest factor in deciding whether or not to grant a preliminary injunction, it would be no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits"), we nevertheless agree that "the public at large can be expected to gain from the enforcement" of non-competes that make it possible for staffing agencies to continue performing their services for both employees and employers.

🚩 *Consultants & Designers,* 720 F.2d at 1560, 1558. Moreover, Butts has failed to show that patient care would in any way suffer as a result of its enforcement. Thus, the public interest does not weigh against an injunction.

### III

For the foregoing reasons, we will affirm the District Court's order granting a preliminary injunction.

**All Citations**

627 Fed.Appx. 168, 2015 IER Cases 318,672

### Footnotes

2015 IER Cases 318,672

\*  This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

1  No party challenges the reasonableness of the non-compete's one-year duration and five-county geographic scope.

2  Butts also signed a "Notice of Meeting with CarePoint" at HR Staffing's request, which contained a "remind[er]" that he was subject to a non-compete that HR Staffing reserved the right to enforce. App. 320.

3  The District Court had jurisdiction pursuant to ⚑ 28 U.S.C. § 1332(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). "We employ a tripartite standard of review for ... preliminary injunctions. We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." ⚑ *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,* 710 F.3d 99, 105 (3d Cir.2013) (internal quotation marks omitted).

4  Protecting against disintermediation via a noncompete is consistent with New Jersey law. The New Jersey Supreme Court has recognized that employers have legitimate interests in protecting, among other things, "customer relations." *Ingersoll–Rand Co. v. Ciavatta,* 110 N.J. 609, 542 A.2d 879, 887 (1988). As the District Court aptly noted, disintermediation could be categorized as interference with customer relations, because Butts being employed by CarePoint instead of HR Staffing, in essence, "divert[s] ... [HR Staffing's] business." ⚑ *Volt Servs. Grp., Div. of Volt Mgmt. Corp. v. Adecco Emp't Servs., Inc.,* 178 Or.App. 121, 35 P.3d 329, 334 (2001). The non-compete protects against such diversion and thus its enforcement advances a protectable interest.

5  HR Staffing's decision to forego its placement fee for a group of employees placed with CarePoint under the PSSA does not eliminate its interest in preventing disintermediation as HR Staffing continues to have an interest in incentivizing clients and employees to keep their contracts with it. ⚑ *Columbus Med. Servs., LLC v. Thomas,* 308 S.W.3d 368, 390 (Tenn.Ct.App.2009).

6  In addition, HR Staffing, CarePoint, and Butts all acted with the understanding that a written waiver of the noncompetes for the employees on the "Existing LTP Staff" list, such as Butts, was necessary. For example, Butts signed a document acknowledging that he was subject to a non-compete and CarePoint advised him to seek a written waiver of it. For this additional reason, the District Court properly concluded that HR Staffing did not waive Butts's non-compete.

7  Butts also argues that a preliminary injunction was improper because there are material disputes of fact. Butts is incorrect. The District Court held an evidentiary hearing and engaged in the careful fact-finding that is squarely within its responsibility when deciding a preliminary injunction motion. *See* ⚑ *A.T. & T. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994).

8  Butts's employment agreement stated that a breach could cause irreparable harm for which damages would not be adequate compensation and the parties to the agreement agreed "not to assert adequacy of money damages as a defense." App. 300. We recognize that such a clause does not bind a court to conclude that irreparable harm is likely but note that it reflects the parties' acknowledgement that money may be insufficient to compensate the non-breaching party.

**HR Staffing Consultants LLC v. Butts, 627 Fed.Appx. 168 (2015)**

2015 IER Cases 318,672

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2018 WL 1281901, 2018 Employee Benefits Cas. 84,420

2018 WL 1281901
United States District Court, E.D. Pennsylvania.

Clark R. HUFFMAN; Patricia L. Grantham;
Linda M. Pace; and Brandi K. Winters,
individually and on behalf of a class of
all others similarly situated, Plaintiffs,

v.

The PRUDENTIAL INSURANCE
COMPANY OF AMERICA, Defendant.

No. 2:10-cv-05135
|
Filed 03/12/2018

**Attorneys and Law Firms**

Cary L. Flitter, Andrew M. Milz, Flitter Milz, P.C.,
Narberth, PA, John C. Bell, Jr., Lee W. Brigham, Bell
& Brigham, Augusta, GA, M. Scott Barrett, Barrett
Wylie, LLC., Bloomington, IN, Stuart T. Rossman,
National Consumer Law Center, Boston, MA, for
Plaintiffs.

Donald E. Wieand, Jr., Stevens & Lee, Bethlehem,
PA, Edwin G. Schallert, Maeve O'Connor, Debevoise
& Plimpton LLP, Jordan D. Weiss, Goodwin Procter
LLP, New York, NY, Martin C. Bryce, Jr., Ballard
Spahr Andrews and Ingersoll, L.L.P., Philadelphia,
PA, Alison V. Douglass, James O. Fleckner, David
Rosenberg, Goodwin, Procter & Hoar, LLP, Boston,
MA, Michael K. Isenman, Goodwin Proctor, LLP,
Washington, DC, for Defendant.

**OPINION AND ORDER**

**Defendant's Motion to Stay Proceedings
Pending Resolution of Rule 23(f)
Interlocutory Appeal, ECF No. 176—Denied**

**Defendant's Motion in Limine to Preclude
the Opinions and Testimony of Plaintiffs'
Expert Chad Staller, ECF No. 166—Denied**

JOSEPH F. LEESON, JR., United States District Judge

**\*1** On January 29, 2018, this Court granted in
part Plaintiffs' motion to alter or amend the Court's
previous denials of class certification and certified a
class for purposes of this ERISA action. [1] ECF No.
175. On February 12, 2018, Defendant The Prudential
Insurance Company of America submitted a petition
under Federal Rule of Civil Procedure 23(f) to the
United States Court of Appeals for the Third Circuit
seeking interlocutory review of this Court's decision
to certify the class. *See* Ex. A to Prudential's Motion
to Stay ("Mot. Stay"), ECF No. 176-1. Prudential
then moved to stay further proceedings in this Court
pending the Third Circuit's decision with respect to
the Rule 23(f) petition. ECF No. 176. Plaintiffs
filed a response ("Pls.' Resp."), ECF No. 177, and
a subsequent notice of supplemental authority, ECF
No. 178, advising this Court that the United States
Court of Appeals for the Eleventh Circuit denied a
Rule 23(f) petition to appeal class certification in
*Owens v. Metro Life Ins. Co.*, a factually similar case
pending in another district court. 2017 WL 6302384
(N.D. Ga. Sept. 29, 2017), *leave to appeal denied*,
(11th Cir. Feb. 28, 2018). Prudential filed a reply in
support of its motion. ECF No. 179. For the reasons
discussed below, this Court denies Prudential's motion
and will not stay proceedings. Additionally, because
the previously-scheduled trial of the named Plaintiffs'
claims has been postponed indefinitely following class
certification, this Court denies Prudential's pending
motion in limine, ECF No. 166, as not yet ripe, without
prejudice to renew the motion at a later date.

**I. Motion for Stay**

Under Rule 23(f) of the Federal Rules of Civil
Procedure, "[a] court of appeals may permit an appeal
from an order granting or denying class certification,"
but "[a]n appeal does not stay proceedings in the
district court unless the district judge or the court of
appeals so orders." Fed. R. Civ. P. 23(f). The Third
Circuit has not yet adopted a standard to guide district
courts ruling on motions to stay pending appeals under
Rule 23(f). *Johnson v. Geico Cas. Co.*, 269
F.R.D. 406, 411 (D. Del. 2010); *see also King Drug Co.
of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797,
2015 WL 9244638, at \*3 (E.D. Pa. Dec. 17, 2015)
("As best as I can tell, the Third Circuit has not yet

articulated what standard district courts should apply when deciding motions to stay proceedings pending Rule 23(f) appeals."). Courts analyzing requests for stays pending Rule 23(f) petitions generally balance the same four factors they use to determine whether to issue a preliminary injunction: (1) the likelihood of the movant's success on the merits of the Rule 23(f) petition; (2) whether the movant will suffer irreparable harm if the stay is denied; (3) whether granting a stay will result in even greater harm to the nonmoving party; and (4) whether the public interest favors a stay. *Johnson*, 269 F.R.D. at 412 (citing *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). Like preliminary injunctions, which courts regard as "extraordinary relief," stays pending appeals under Rule 23(f) are not granted as a matter of course. *Id.* (citing *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1273 n.8 (11th Cir. 2000)).

**\*2** To establish the first factor, the likelihood of success on the merits, a movant must demonstrate both the likelihood that the Court of Appeals will grant the Rule 23(f) petition and allow interlocutory appeal and the likelihood that the Court of Appeals will agree with the movant on the substantive merits. *Id.* As Plaintiffs point out, the Eleventh Circuit's recent decision not to grant the Rule 23(f) petition and allow interlocutory appeal in *Owens*, a case this Court has consistently recognized as factually similar to this case, suggests that Prudential will not succeed on the merits before the Third Circuit. This prediction finds further support in the Third Circuit's own standards for granting Rule 23(f) petitions. The Third Circuit considers a Rule 23(f) petition appropriate in three situations: (1) to address the "possible case-ending effect of an imprudent class certification decision," *i.e.*, where the decision is likely dispositive of the litigation; (2) to correct an erroneous ruling; or (3) where immediate appeal would "facilitate development of the law on class certification." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001). This case presents none of these three situations. Prudential's interlocutory appeal will not dispose of this litigation: even if the Third Circuit were to reverse this Court's decision to certify a class, the named Plaintiffs' claims would proceed. Prudential has not shown that this Court's ruling on class certification was erroneous, but instead shows only that it disagrees with that ruling, which does not establish likelihood of success on the merits. *See Johnson*, 269 F.R.D. at 413 (holding that movant's disagreement with the decision to certify a class did not establish likelihood of success on the merits). Nor does Prudential's petition present a novel question of law that facilitates the development of the law on class certification. The alleged "issues of first impression" that Prudential identifies [2] pertain to this Court's decision to grant summary judgment—not the decision to certify a class. But a Court of Appeals reviewing a Rule 23(f) petition considers only whether the certification order was proper and not any other order, "even where that order has some impact on another portion of Rule 23." *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 390 (3d Cir. 2002) (rejecting argument that "would have us stretch the limits of Rule 23(f) beyond Rule 23 certification questions"). Prudential raises no novel legal issues with respect to this Court's decision to certify the class. Prudential is unlikely to succeed on the merits, so the first factor weighs against granting a stay. [3]

Prudential argues that it can establish the second factor, irreparable harm, because without a stay, Prudential will incur the significant costs of conducting class discovery that would become moot if the Third Circuit reversed the decision to certify the class. Prudential suggests that class discovery will require reviewing more than a thousand beneficiary forms, claim files, written correspondence, and potentially audio files, as well as possibly deposing various beneficiaries. Mot. Stay 11. Courts appear split over whether litigation costs alone establish irreparable harm; [4] most, however, seem to find that "wasteful, unrecoverable, and possibly duplicative costs are proper considerations" to be balanced among others. *Ewing Indus. Corp. v. Bob Wines Nursery, Inc.*, No. 3:13-CV-931-J-39JBT, 2015 WL 12979096, at \*3 (M.D. Fla. Feb. 5, 2015) (citing *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974), for the proposition that "[m]ere litigation expense, even

2018 WL 1281901, 2018 Employee Benefits Cas. 84,420

substantial and unrecoupable cost, does not constitute irreparable injury."); *see also* 🚩 *Gray v. Golden Gate Nat. Recreational Area*, No. C 08-00722 EDL, 2011 WL 6934433, at \*3 (N.D. Cal. Dec. 29, 2011) ("Although monetary losses incurred in litigation are generally not considered irreparable harm, '[i]f defendants are forced to incur the expense of litigation before their appeal is heard, the appeal will be moot, and their right to appeal would be meaningless.' ") (quoting 🚩 *C.B.S. Employees Federal Credit Union v. Donaldson, Lufkin & Jenrette*, 716 F. Supp. 307, 310 (W.D. Tenn. 1989)). Class discovery in this case may impose substantial costs; however, all the potential class members are beneficiaries of Prudential plans, so Prudential should already possess all the required records and be able to identify the class members easily. The second factor therefore weighs moderately in Prudential's favor.

**\*3** The third factor, potential harm to the nonmovant, weighs in favor of Plaintiffs. Granting a stay would prejudice the named Plaintiffs because it would further delay resolution of their claims, which have been pending for over seven years now. *See* 🚩 *Johnson*, 269 F.R.D. at 413 (finding that stay would prejudice plaintiffs whose case had been pending for four years). Additionally, no decision by the Third Circuit will resolve the named Plaintiffs' claims: even if the Third Circuit reversed the decision to certify the class, the named Plaintiffs' claims would proceed to trial as previously planned before this Court granted class certification. *See id.* (finding risk of "substantial" prejudice to plaintiffs who would maintain individual causes of action even if certification reversed).

The fourth factor, the public interest, is neutral. On one hand, public interest favors the prompt resolution of Plaintiffs' claims in this over-seven-year-old litigation. But on the other, the public interest favors the *proper* resolution of this case, which might benefit from rulings by the Third Circuit. *See* 🚩 *In re Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1, 6 (D.D.C. 2002) (finding the public interest factor "unhelpful" where public interest favored both prompt resolution of litigation and proper resolution of issues that could be affected by decision of Court of Appeals).

In summary, a flexible balancing of the factors considered above reveals that denial of a stay would not impose irreparable harm as a matter of law and that the balance of harms favors neither side strongly in this case. Given that granting a stay pending an interlocutory appeal under 🚩 Rule 23(f) is an extraordinary remedy, and that Prudential has not demonstrated a strong likelihood of success on the merits before the Third Circuit, this Court concludes that a stay is not warranted at this time. Prudential's motion to stay proceedings is denied.

## II. Prudential's Motion in Limine

Before this Court certified the subclass and in anticipation of trial, Prudential filed a motion to preclude the testimony of Chad L. Staller at trial. Because Prudential has submitted a pending 23(f) petition to the Third Circuit, the parties are just beginning discovery with respect to the certified class, and trial in this case is postponed indefinitely, Prudential's motion is not yet ripe, and this Court will deny it without prejudice and with leave to renew it when trial is rescheduled, in the event the parties cannot resolve the issues underlying the motion. *See* 🚩 *Weintraub v. Bd. of Educ. of City of New York*, 489 F. Supp. 2d 209, 222 (E.D.N.Y. 2007) (denying motions in limine as not yet ripe where trial had to be postponed indefinitely pending interlocutory appeal of district court order), *aff'd sub nom.* 🚩 *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196 (2d Cir. 2010).

## III. Order

**ACCORDINGLY**, for the reasons stated above, **IT IS ORDERED THAT:**

1. Prudential's Motion to Stay Proceedings Pending Resolution of 🚩 Rule 23(f) Interlocutory Appeal, ECF No. 176, is **DENIED**.

2. Prudential's Motion in Limine to Preclude the Opinions and Testimony of Plaintiffs' Expert Chad Staller, ECF No. 166, is **DENIED without prejudice**.

Huffman v. Prudential Insurance Company of America, Not Reported in Fed. Supp. (2018)

2018 WL 1281901, 2018 Employee Benefits Cas. 84,420

3. The parties shall submit class notice for approval by this Court **within fifteen (15) days** of the date of this Order.

4. Prudential shall produce the class list **within thirty (30) days** of the submission of the class notice for approval.

5. Plaintiffs shall mail notice to the class **within thirty (30) days** of this Court's approval of the notice.

6. All potential class members who wish to opt out shall do so **within forty-five (45) days** of the mailing of class notice.

 **\*4** 7. The parties shall complete any class-wide discovery **within one hundred twenty (120) days** of the date of this Order.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1281901, 2018 Employee Benefits Cas. 84,420

---

## Footnotes

1    Because it writes for the parties, this Court assumes familiarity with the underlying facts of this case.

2    Prudential highlights two questions as issues of first impression: (1) the interpretation of a provision in an ERISA plan stating that benefits would "normally" be paid in "one sum," where the plan sponsor directed settlement by retained asset account and understood settlement by retained asset account to satisfy the "one sum" provision, and (2) consideration of whether an insurer was a fiduciary, and breached any fiduciary duty, where a plan sponsor or beneficiary directed settlement by retained asset account. Mot Stay 4. This Court resolved both of these issues on summary judgment, not in its certification order.

3    Previous courts in the Third Circuit have considered data submitted by the parties showing the statistical likelihood of the Third Circuit granting a ⚑ Rule 23(f) petition. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2015 WL 9244638, at \*4 (E.D. Pa. Dec. 17, 2015) (considering statistical evidence submitted by parties). Prudential and the Plaintiffs both cite a study presenting similar evidence. John H. Beisner et al., *Study Reveals US Courts of Appeal Are Less Receptive to Reviewing Class Certification Rulings* (Apr. 29, 2014), http://www.skadden.com/insights/publications/2014/study-reveals-us-courts-of-appeal-are-less-recepti, Ex. 2 to Pls.' Resp., ECF No. 177-2. The data cited suggest that Prudential is not likely to prevail on the merits, because the Third Circuit likely will deny Prudential's ⚑ Rule 23(f) petition: although the Third Circuit is the second-most receptive to granting ⚑ Rule 23(f) petitions among the Courts of Appeals, from 2006 to 2013 it granted only 35.8 percent of ⚑ Rule 23(f) petitions filed, a decrease from 86 percent from 1998 to 2006. *Id.*

4    *Compare* ⚑ *In re Lorazepam & Clorazepate Antitrust Litig.*, 208 F.R.D. 1, 6 (D.D.C. 2002) ("Defendants do not claim any cognizable prejudice from having to proceed with discovery; litigation expenses alone do not necessarily qualify as irreparable harm.") *with Nieberding v. Barrette Outdoor Living, Inc.*, No. 12-2353-DDC-TJJ, 2014 WL 5817323, at \*4 (D. Kan. Nov. 10, 2014) ("Monetary losses that are not recoverable can constitute irreparable harm."). In almost any case with a pending interlocutory appeal, denying a stay and continuing with district court

Huffman v. Prudential Insurance Company of America, Not Reported in Fed. Supp. (2018)

2018 WL 1281901, 2018 Employee Benefits Cas. 84,420

proceedings will present a risk of additional unrecoverable litigation costs; nevertheless, courts do not grant stays as a matter of course in the 🗁 Rule 23(f) context. Therefore, this Court finds cases like *In re Lorazepam* persuasive and hesitates to find irreparable injury based on costs alone.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In re Diet Drugs (Phentermine, Fenfluramine,...., Not Reported in...

1999 WL 673066

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Paige v. Philadelphia Housing Authority,
E.D.Pa.,   August 18, 2003

1999 WL 673066
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

In re DIET DRUGS (PHENTERMINE,
FENFLURAMINE, DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION.
Barbara JEFFERS and Johnna Day, on behalf
of themselves and all others similarly situated
v.
AMERICAN HOME
PRODUCTS CORPORATION.
THIS DOCUMENT RELATES
TO ALL ACTIONS.

No. CIV. A. 98–20626.
|
Aug. 26, 1999.

*MEMORANDUM AND
PRETRIAL ORDER NO. 865*

LOUIS C. BECHTLE, J.

**\*1  END OF FRONT MATTER**

Presently before the court are plaintiffs Barbara Jeffers' ("Jeffers") and Johnna Day's ("Day") (collectively "Plaintiffs") Motions for Class Certification Pursuant to  Federal Rule of Civil Procedure 23(b)(2) and Motion to Amend the Complaint and defendant American Home Products Corporation's ("AHP") responses thereto. For the reasons set forth below, the court will conditionally certify a medical monitoring class as follows.

**I. *BACKGROUND***

First, the court will review the history of the pharmaceutical products that are the subject of this civil action. Second, the court will review the history of the Diet Drug Litigation [1] and MDL No. 1203

generally. Third, the court will review the procedural history of the *Jeffers* civil action.

**A. *The Diet Drugs***

The Diet Drug Litigation involves three prescription pharmaceutical products—phentermine, fenfluramine and dexfenfluramine (collectively, the "Diet Drugs") —which were approved by the Food and Drug Administration ("FDA") for use as appetite suppressants. (Stip. 1/5/99 ¶ 1.) Phentermine was approved by the FDA in 1959. [2] (Pls.' Mot. for Cert. at 7 n.2.) Fenfluramine was approved for use in 1973 and, between December 1989 and September 15, 1997, AHP, directly and/or through its subsidiaries, labeled and sold fenfluramine under the brand name Pondimin. (Pls.' Mot. for Cert. at 7; Stip. 1/5/99 ¶¶ 2 & 5.) Dexfenfluramine was approved in 1996 and, between June 1996 and September 15, 1997, AHP, directly and/or through its subsidiaries, promoted, marketed, labeled and sold dexfenfluramine under the brand name Redux. (Pls.' Mot. for Cert. at 8; Stip. 1/5/99 ¶¶ 3 & 5.) Fenfluramine and dexfenfluramine are chemically related. (Pls.' Mot. for Cert. at 7.) Estimates set the number of persons ingesting Pondimin at four million and the number of persons ingesting Redux at two million. (Stip. 1/5/99 ¶ 6; Pls.' Mot. for Cert. at 8–9 & Ex. 3; Tr. 3/17/99 at 9.)

Plaintiffs allege that sales of Redux and Pondimin increased dramatically between 1992 and 1996, following a study published in May 1992 that analyzed the use of Pondimin in combination with phentermine and concluded that the combination of drugs, commonly called "Fen/Phen," facilitated weight loss. (Pls.' Mot. for Cert. at 7.) However, subsequent studies linked the use of the Diet Drugs to a number of health problems. For example, a study published in August 1996 in the New England Journal of Medicine concluded that the ingestion of fenfluramine and dexfenfluramine increased the incidence of Primary Pulmonary Hypertension ("PPH"), a rare and often fatal disease. (Stip. 1/5/99 ¶ 8, Ex. A.) Another study published in July 1997, also in the New England Journal of Medicine, concluded that the ingestion of fenfluramine and phentermine in combination increased the incidence of valvular heart disease. (Stip. 1/5/99 ¶ 9, Ex. B.) On September 15, 1997, AHP

In re Diet Drugs (Phentermine, Fenfluramine,..., Not Reported in...
1999 WL 673066

removed both Pondimin and Redux from the market pursuant to a request by the FDA. (Stip. 1/5/99 ¶¶ 6, 7.)

### B. *MDL No. 1203 and the Diet Drug Litigation*
**\*2** After Pondimin and Redux were withdrawn from the market, thousands of civil actions were filed in federal and state courts nationwide on behalf of Diet Drug users. The claims in individual Diet Drug Litigation actions vary, but they principally allege state law claims including product liability, negligence, misrepresentation and breach of warranty. Some of the cases request punitive damages. The plaintiffs in these actions allege that their ingestion of the Diet Drugs caused various illnesses, including, but not limited to PPH and valvular heart disease. In addition, many actions brought by plaintiffs without prior injury request legal or equitable relief in the form of medical monitoring or refunds of purchase prices.

On December 12, 1997, this court received an order from the Judicial Panel on Multidistrict Litigation transferring a number of federal Diet Drug civil actions from other districts to the Eastern District of Pennsylvania for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Since that time, the court has received over one thousand actions as part of MDL No. 1203. There are over seventeen pending motions for class certification in MDL No. 1203 actions, not including the instant motion.

In order to facilitate the administration of MDL No. 1203, the court has appointed a number of attorneys to serve on the Plaintiffs' Management Committee (the "PMC"). Pretrial Order No. 6. The defendants in the Diet Drug cases, including AHP, Interneuron Pharmaceuticals, Inc., Les Laboratories Servier, over two dozen phentermine manufacturers and distributors, health care providers, weight-loss centers, pharmacies and intermediaries, are represented by individual counsel and selected liaison counsel. The court has also appointed a Special Discovery Master to assist the court in facilitating discovery matters. Pretrial Order No. 36. The parties, the Special Master and the court continue to work toward completion of case-specific and MDL-wide discovery and to resolve related pretrial issues to facilitate the timely remand of individual civil actions to their respective transferor courts. *See* Lexecon Inc. v. Milberg Weiss Bershad

Hynes & Lerach, 523 U.S. 26, 40, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (holding cases not disposed of during MDL process must be remanded to transferor courts at or before conclusion of pretrial proceedings). Presently, there are two blocks of cases involving plaintiffs that have a serious, diagnosed medical condition which have been designated for priority in the suggestion of remand process. The first group is scheduled for suggestion of remand on September 1, 1999 and the second group is scheduled for October 1, 1999. The PMC has completed the majority of its MDL-wide expert discovery. Individual plaintiffs have not yet completed case-specific causation expert discovery and defendants have not yet completed their expert discovery, although this discovery is on schedule in accordance with various pre-trial orders and is expected to be completed by the fall of this year.

**\*3** In addition to the federal cases, the court is aware of many civil actions presently in state courts throughout the nation. Some states, including Pennsylvania, New York, New Jersey and California, have consolidated the Diet Drug Litigation in their respective state courts, through processes similar to MDL No. 1203. The court is aware of only a limited number of state civil actions which have proceeded to trial as of this date and is aware of only one case in which a jury verdict has been returned. The court is also aware of six states which have certified some form of medical monitoring class action. Those states include, in chronological order of certification, Texas, Washington, Illinois, New Jersey, West Virginia and Pennsylvania.[3]

### C. *Procedural History of the Jeffers Civil Action*
The court will now set forth the basic background of the *Jeffers* civil action. On September 14, 1998, Plaintiffs filed their original class action Complaint, naming only AHP as a defendant. Plaintiffs allege that they ingested Pondimin and Redux. (Compl. ¶¶ 4 & 5.)[4] They both allege that, due to such ingestion, they are "at risk for developing valvular heart disease, cardiopulmonary dysfunction and/or primary pulmonary hypertension." *Id.* In their original Complaint, Plaintiffs seek to represent a "nationwide class of persons who were prescribed and who have taken the drugs Redux and/or Pondimin which were manufactured, marketed, sold, distributed and/

or placed in interstate commerce by defendant and who either lack health coverage or who have been denied health coverage for medical monitoring and medical diagnostic procedures and testing that are necessary and appropriate." (Compl. ¶ 42.) Plaintiffs allege claims under theories of: (a) strict product liability (failure to warn); (b) strict product liability; (c) negligence; and (d) breach of implied warranty. They request injunctive relief in the form of a "court approved medical monitoring program" which would include "echocardiograms, electrocardiograms, chest x-rays and perfusion lung scans." *Id.* at 78.

**\*4** On October 27, 1998, AHP filed its Answer. On November 6, 1998, AHP filed a Third–Party Complaint against a number of phentermine manufacturers and distributors ("Phentermine Defendants"). [5] Subsequently, Plaintiffs and a number of Phentermine Defendants filed motions to dismiss or sever the Third–Party Complaint. On February 10, 1999, the court stayed AHP's Third–Party Complaint pending the resolution of the motion for class certification. Pretrial Order No. 461. On March 3, 1999, AHP filed its opposition to Plaintiffs' Motion for Class Certification. On March 15, 1999, Plaintiffs filed their Motion for Medical Monitoring Class Certification under ⚑ Federal Rule of Civil Procedure 23(b)(2). On March 17, 1999 the court held a hearing on class certification issues.

On June 24, 1999, Plaintiffs filed a Motion to Amend the Complaint together with a second motion for class certification. The Motion to Amend seeks to modify the original Complaint in a number of ways. First, the proposed Amended Complaint would limit the proposed class to those persons who have taken Pondimin or Redux "for at least thirty cumulative days during the period between May 1, 1992 and September 15, 1997 and who have not filed a claim for personal injuries." (Pls.' Mot. Am. Compl., Ex. A ¶ 1.) Second, it would include in the class those persons with health insurance as well as those without. *Id.* Third, it specifies in greater detail the equitable relief sought, including:

> (a) creating a medical "registry" for class members

in which relevant demographic, medical and scientific information concerning class members is recorded; (b) performing state-of-the-art echocardiograms for each class member; (c) performing full cardiopulmonary examinations including a chest x-ray and electrocardiogram for each class member; (d) gathering and analyzing relevant medical demographic information from class members including but not limited to the results of echocardiograms and cardiopulmonary examinations performed on class members; (e) conducting medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of diet drug induced valvular heart disease; and (f) publishing and otherwise disseminating such information to members of the class and their physicians.

**\*5** *Id.* at ¶ 49. On July 12, 1999, AHP filed its opposition to the Motion to Amend the Complaint and for Class Certification.

## II. *DISCUSSION*

First, the court will discuss whether the court has jurisdiction. Second, the court will analyze Plaintiffs' claims under ⚑ Federal Rule of Civil Procedure 23(b) (2). Third, the court will define the scope of the class it will conditionally certify.

### A. *Jurisdiction*

This court has subject matter jurisdiction over these proceedings pursuant to ⚑ 28 U.S.C. § 1332. [6] Diversity of citizenship is present between the named class representative and the defendant. ⚑ *In re School Asbestos Litig.,* 921 F.2d 1310, 1317 (3d Cir.1990)

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 82 of 131
PageID: 78081
In re Diet Drugs (Phentermine, Fenfluramine,..., Not Reported in...
1999 WL 673066

(requiring complete diversity between named class representatives and defendants to support diversity jurisdiction). Jeffers is a citizen of the state of Pennsylvania and Day is a citizen of the state of Kentucky. (Compl. ¶¶ 4 & 5.) AHP is a Delaware corporation whose principal place of business is located in Madison, New Jersey. (Stip. 1/5/99 ¶ 4.) Thus, the court finds that the parties are citizens of different states.

The $75,000 jurisdictional amount is also met in this action. When a claim primarily seeks equitable or injunctive relief, "it is well established that the amount in controversy is measured by the object of the litigation." *Hunt v. Washington State Apple Adver. Comm'n.,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In addition, the "longstanding rule in [the United States Court of Appeals for the Third Circuit] is that, for purposes of determining the amount in controversy, the value of the equitable relief must be determined from the viewpoint of the plaintiff rather than the defendant." *Pierson v. Source Perrier, S.A.,* 848 F.Supp. 1186, 1188 (E.D.Pa.1994). Also, in a diversity based class action, "[i]t is well settled that ... members of the class may not aggregate their claims in order to reach the requisite amount in controversy." *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1044–45 (3d Cir.1993) (citing *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)).

**\*6** Here, Plaintiffs seek a comprehensive medical monitoring program that:

a. Notifies individuals who use or used Redux and/ or Pondimin of the potential harm from Redux and/ or Pondimin;

b. Aides them in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Redux and Pondimin;

c. Provides for state-of-the-art echocardiograms for all members of the class;

d. Provides for [complete] cardiopulmonary examinations including a chest x-ray and electrocardiogram for all members of the class;

e. Provides for accumulation and analysis of relevant medical and demographic information from class members including, but not limited to the results of echocardiograms performed on class members;

f. Provides for the creation, maintenance, and operation of a "registry" in which relevant demographic and medical information concerning all class members is gathered, maintained, and analyzed;

g. Provides for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of diet drug induced valvular heart disease; and

f.[sic] Publishes and otherwise disseminates all such information to members of the class and their physicians.

(Pls.' Mot. Am. Compl., Ex. A ¶ 82.) Such request for relief in this action is equitable in nature. *See Barnes v. American Tobacco Co.,* 161 F.3d 127, 132 (3d Cir.1998) (stating that plaintiffs seeking establishment of court-supervised program through which class members would undergo periodic medical examinations in order to promote early detection of diseases caused by smoking was "paradigmatic request for injunctive relief"), *cert. denied,* 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); *Katz v. Warner–Lambert Co.,* 9 F.Supp.2d 363, 364 (S.D.N.Y.1998) (stating that "a claim for a medical monitoring and research fund is injunctive in nature"); *Gibbs v. E.I. DuPont de Nemours & Co.,* 876 F.Supp. 475, 479 (W.D.N.Y.1995) (stating that relief in form of common, court-supervised fund which would provide medical monitoring was injunctive in nature). [7]

**\*7** In addition, the value of the litigation to each class member in obtaining the benefits of diagnostic testing and medical research is reasonably likely to exceed $75,000. In *Katz,* the court held that class action claims for a medical monitoring and research fund met the jurisdictional amount. *Katz,* 9 F.Supp.2d at 364. *Katz* involved litigation over the health risks associated with Rezulin, a drug used for treating diabetes. *Id.*

In re Diet Drugs (Phentermine, Fenfluramine,..., Not Reported in...
1999 WL 673066

The court found that the class request for a medical monitoring and research fund was injunctive in nature. *Id.* Next, the court proceeded to determine the value of the object of the litigation from the plaintiffs' viewpoint. *Id.* In holding that the class's request for medical research satisfied the jurisdictional amount, the court stated:

> But what is the value to an individual user of Rezulin of the medical monitoring and research fund that is the object of this litigation? In one sense, it is speculative, because no one knows how much ultimate benefit any given Rezulin user will derive from such a fund. But in another sense it is appropriately measurable as the cost to defendant of creating such a fund, or at least the research portion of it, for without such research expenditure, no plaintiff would be likely to receive any research benefit. Put another way, in order to receive the putative benefits of the contemplated medical research, a plaintiff would either have to fund the research herself or to prevail in this lawsuit.

> This reasoning is applicable not only to the individually named plaintiff ... but also to each member of the rest of putative class. Whatever may be the case as to the proposed monitoring, as to the research component of the proposed relief there is no question of dividing the cost by the number of plaintiffs in the putative class to determine the value to each plaintiff, because ... the full amount of the research, rather than some fraction of it, must be funded to benefit any single member of the contemplated class. Indeed, plaintiff demands that the full amount of research be undertaken regardless of the number of members of the class because each and every member is entitled ... to the protection against Rezulin's hazards that only fully funded future research can hope to achieve.

*Id.* at 364–65. Here, Plaintiffs request similar medical monitoring relief, including a research fund. The court agrees with and adopts the reasoning in *Katz* and finds that it has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.

**B. *Class Action Certification***

**\*8** To qualify for class treatment, an action must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and must fit into one of the three subsections of Rule 23(b). *Barnes,* 161 F.3d at 140. The court will review Plaintiffs' claims under Rule 23(a) and (b) in order.

### 1. Requirements of Federal Rule of Civil Procedure 23(a)

Under Rule 23(a) the court must find that:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Thus, Rule 23(a) requires numerosity, commonality, typicality and adequacy of representation.

The first two conditions, numerosity and commonality, are clearly satisfied in the *Jeffers* action. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). As discussed above, millions of prescriptions for Redux and Pondimin were written. Joinder of hundreds of thousands, if not millions, of claimants would certainly qualify as impracticable. Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2); *see Lake v. First Nationwide Bank,* 156 F.R.D. 615, 624 (E.D.Pa.1994)

In re Diet Drugs (Phentermine, Fenfluramine,..., Not Reported in...

1999 WL 673066

(noting that "a single common question is sufficient to satisfy 🚩 Rule 23(a)(2)"). There are a number of common issues among class members, including the chemical composition and biological effects of Pondimin and Redux, the labeling and warnings included with the drugs and AHP's knowledge of the alleged side effects. Thus, the court finds the requirements of numerosity and commonality are satisfied.

🚩 Rule 23(a) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." 🚩 Fed.R.Civ.P. 23(a)(3); *see* 🚩 *Barnes,* 161 F.3d at 141 (stating that "typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals"). The class members have a strong common interest in establishing the fund at issue. Both of the named class representatives and the class as a whole will benefit from the relief requested here. The class members allege that they all ingested Pondimin or Redux and that those drugs increased their risk of contracting PPH or valvular injury. They request medical monitoring in the form of diagnostic testing and the collection and research of medical data for all members. Thus, it can be said that the class representatives' interests are aligned with those of the entire class and that the representatives will work to benefit the entire class.

**\*9** Lastly, 🚩 Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." 🚩 Fed.R.Civ.P. 23(a)(4). This requirement has two components, one which requires an inquiry into whether class counsel is qualified and will advance the interests of the entire class and a second which asks whether the named class representatives' interests are "sufficiently aligned with those of the absentees". 🚩 *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 630 (3d Cir.1996), *aff'd sub nom.,* 🚩 *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also* 🚩 *Barnes,* 161 F.3d at 141 (stating 🚩 Rule 23(a)(4) "serves to uncover conflicts of interest between

named parties and the class they seek to represent"). The class counsel in this action are also members of the PMC. *See* Pretrial Order No. 6. These attorneys are both experienced and qualified in handling mass tort cases such as this. The court finds that class counsel is both able and competent to represent the class. Additionally, the named representatives' interests are sufficiently aligned with those of the class members such that there is no conflict of interest between them. As discussed, the class representatives have a strong individual interest in obtaining the requested diagnostic testing and that interest is sufficiently aligned with the common interests of the absentee class members. Moreover, the class as a whole has a strong common interest in the collection of medical data and research into the cause and treatment of the illnesses alleged to be caused by the ingestion of fenfluramine and dexfenfluramine. The court finds no conflict of interest which would render Plaintiffs inadequate representatives of the class. To the extent that AHP asserts that there are differences between the factual and legal claims of the class members, the court will address such differences under its 🚩 Rule 23(b)(2) analysis below. The court finds that the 🚩 Rule 23(a) requirements of numerosity, commonality, typicality and adequacy of representation are satisfied in this case.

### 2. 🚩 Federal Rule of Civil Procedure 23(b)(2)

🚩 Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." 🚩 Fed.R.Civ.P. 23(b)(2). Thus, there are two elements implicit in 🚩 Rule 23(b)(2), first that the defendant is alleged to have acted in some uniform way toward the class that would make relief appropriate and, second, that the injunctive relief requested is applicable to the entire class. Unlike the requirements of 🚩 Rule 23(b)(3), there is no "superiority" or "predominance" requirement for 🚩 Rule 23(b)(2) classes. *Compare* 🚩 Fed.R.Civ.P. 23(b)(2), *with* 🚩 Fed.R.Civ.P. 23(b)

(3) (requiring "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy"). However, because a 23(b)(2) class is dependent on the uniformity of both the defendant's actions toward the class and the injunctive relief applicable to the class, an analysis of whether individual issues exist among class members which would destroy the "cohesive nature" of the class claims is required. In *Barnes,* the Third Circuit stated the reasoning for requiring such cohesion:

> **\*10** Because of the cohesive nature of the class, 🚩 Rule 23(c)(3) contemplates that all members of the class will be bound. Any resultant unfairness to the members of the class was thought to be outweighed by the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation.

🚩 *Barnes,* 161 F.3d at 143 (quoting 🚩 *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 248–49 (3d Cir.1975)). Furthermore, the non-opt out nature of a 🚩 Rule 23(b)(2) class further requires that there be cohesiveness of the class members' claims. *Id.* at 142 (stating that "a (b)(2) class may require more cohesiveness than a (b)(3) class"). Thus, the court must determine whether the class claims alleged in *Jeffers* are cohesive.

Plaintiffs assert that the claims in this action are cohesive. They note that several published studies have linked the use of fenfluramine and dexfenfluramine to unusually high incidences of PPH and heart valve injury and they proffer expert discovery to support this conclusion. (Pls.' Proposed Findings of Fact App. I, Decl. of John Farquhar, M.D. at 9.) (concluding

that "it appears that significant heart valve damage emerges even with a relatively brief exposure to these drugs" and that "the possibility that even minor valve damage may progress over time after cessation of diet drug use has not been excluded"); (Pls.' Proposed Findings of Fact App. IV. A, Expert Report of John Farquhar, M.D. at 2.) (stating that "[b]rief exposures of one month or more are probably sufficient to cause harm"). Thus, Plaintiffs assert that the proposed class members have all been placed at an increased risk of contracting PPH and heart valve damage. They also set forth expert discovery which supports their assertion that the relief requested applies to the class as a whole. (Pls.' Proposed Findings of Fact App. I, Decl. of Dean Karalis, M.D. at 7.) (stating that "based on the recommendations of the [Department of Health and Human Services, the American College of Cardiology and the American Heart Association,] the standard of care for evaluating patients exposed to Dexfenfluramine and Fenfluramine includes a thorough history and physical exam" and that "echocardiography should be performed in all patients exposed to these diet drugs"). They further assert that AHP is liable to the entire class under theories of strict product liability, negligence and breach of implied warranty. Specifically, Plaintiffs allege that AHP had knowledge of these side effects prior to the withdrawal of the drugs and failed to warn the proposed class of those dangers or take other appropriate action. (Pls.' Proposed Findings of Fact App. IV. F, Decl. James Oury, M.D. at 11.) (concluding that AHP failed to conduct appropriate review of clinical data concerning persons ingesting fenfluramine and dexfenfluramine and that labeling failed to contain warnings regarding PPH and heart valve injury at appropriate times). Based on Plaintiffs' allegations that AHP acted in such a way as to create liability to the class as a whole and that injunctive relief is applicable to the class as a whole, the court finds that the class claims are cohesive.

**\*11** However, AHP asserts that the claims are incapable of 🚩 Rule 23(b)(2) class treatment. First, AHP asserts that there are factual issues that differ from class member to class member that destroy cohesiveness. Second, AHP argues that the state law applicable to each class member varies to such a degree that class treatment is inappropriate. The court will address these issues and will also address a third

issue, which is that a number of state courts have already certified medical monitoring classes applicable to residents of their states.

### a. Individual Factual Issues

As noted above, Rule 23(b)(2) contains two components, one which requires the defendant to have acted in some uniform way toward the class so as to require relief and a second which requires the class be entitled to the same relief. AHP argues that there are a number of factual issues which vary from class member to class member. AHP believes that these individual issues make class treatment inappropriate under Rule 23(b)(2).

The primary individual issues AHP raises include: (1) differences in the class members' duration of, amounts of and combinations of the drugs ingested; (2) AHP's varying knowledge of alleged side effects and the changing contents of warning labels over the times of ingestion; (3) differences in the prescribing physicians' knowledge, conditions and warnings under which the drugs were prescribed; (4) differences in class members' actual need for the form of monitoring requested; (5) differences among class members involving pre-existing injuries or non-Diet Drug related conditions that already require the monitoring requested; and (6) differences in affirmative defenses available to AHP against individual class members. (AHP Mem. Opp. at 68.) AHP believes that these issues will present grounds for it to challenge, on an individual basis, either liability or the need for the equitable relief requested and that class treatment would prevent AHP from having the opportunity to make such challenges.

The court agrees with AHP's assertion that these individual issues may present some difficulty in treating the claims in a single class, particularly as to the affirmative defenses AHP may seek to assert. However, the court is presently of the view that these difficulties are not insurmountable and could be dealt with through either the development of subclasses or through exclusions to the class. For example, the issue of the duration of ingestion has already been corrected for in the proposed Amended Complaint in that persons

who ingested the drugs for less than thirty cumulative days will be excluded from the class. (Pls.' Mot. Am. Compl., Ex. A ¶ 1.) This comports with the Plaintiffs' position, supported by expert discovery, that exposure to the drugs for one month or more may cause harm and that anyone ingesting the drugs for that period of time is at an increased risk of contracting PPH or valvular damage. (Pls.' Proposed Findings of Fact App. IV. A, Expert Report of John Farquhar, M.D. at 2.)

**\*12**  Also, AHP alleges that some of the proposed class members have ingested phentermine in combination with Pondimin or Redux, while others have not. (AHP's Mem. Opp. at 47.) If AHP can demonstrate through expert evidence that the use of phentermine in combination with Pondimin or Redux alters the liability analysis or the applicable relief to the class, a subclass mechanism could be utilized to address those factual differences between class members.

In addition, AHP asserts that the directions for Pondimin stated that the drug should only be taken for a few weeks. *Id.* at 49. Presumably, AHP could attempt to raise a defense of misuse or contributory negligence against those persons who ingested the drug for longer periods of time. As the litigation develops, should this issue warrant it, the class could be divided into subclasses based upon the particular drug ingested and the duration of such ingestion. Such a subclass would allow AHP to assert such a defense against those persons ingesting Pondimin.

AHP also asserts that the warning labels on Pondimin varied as to PPH over time, creating individual issues of when the drug was prescribed and ingested. *Id.* at 51–52. Again, if necessary, subclasses based on these differences would be appropriate to preserve this defense.

AHP claims that some class members may have non-Diet Drug related reasons for the diagnostic monitoring requested and, thus, should not be granted that relief. *Id.* at 55. If it appears that this issue does become one which AHP will assert, AHP's position could be preserved by excluding those persons from the diagnostic portion of the overall equitable relief requested.

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 87 of 131
PageID: 78086
In re Diet Drugs (Phentermine, Fenfluramine,..., Not Reported in...
1999 WL 673066

In sum, the factual issues that AHP raises should be further explored and, to the extent that they alter the liability analysis or the applicable relief to the class, subclasses or exclusions should be applied accordingly. Because many of the issues would apply across potential subclasses, it cannot be said that each individual issue will spawn its own distinct subclass. The court finds that, at this time, these individual issues do not present insurmountable difficulties which would destroy cohesion.

Along these lines, AHP further argues that the Third Circuit's holding in *Barnes* forecloses the possibility of class treatment here. (AHP's Mem. Opp. at 43.) In *Barnes,* the Third Circuit affirmed the District Court in decertifying a medical monitoring fund of tobacco smokers. The court stated that "[w]e believe that addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification."

*Barnes,* 161 F.3d at 143. However, a comparison with the class at hand and that in the *Barnes* tobacco litigation reveals some significant differences. *Barnes* involved numerous defendants who, in turn, manufactured hundreds of brands of cigarettes, many of which contained different ingredients at different times. *Id.* at 135. Plaintiffs asserted that the levels of nicotine and other "toxic substances" were altered to induce addiction, which they claimed caused their exposure to the tobacco products. *Id.* at 144–45. Thus, nicotine addiction and levels of nicotine in cigarettes constituted individual issues which destroyed cohesion in the class. In the Diet Drug Litigation, there are only two related chemical compounds, fenfluramine and dexfenfluramine, which were sold as only two brands, Pondimin and Redux, which Plaintiffs allege cause the illnesses for which they request monitoring. Plaintiffs do not allege that the chemical compounds of these pharmaceutical products were altered in any way during the course of the products' market lives. Also, there are no claims of addiction in the *Jeffers* action as there were in *Barnes*. The court finds that the claims of the proposed *Jeffers* class are far more cohesive claims than those found in *Barnes*.

 **\*13** Furthermore, the individual issues which AHP raises, including duration of use and combination of drugs, are more susceptible to subclass treatment than

the claims relating to tobacco use or, to take another example of recent mass tort class litigation, claims stemming from asbestos exposure. In those cases, exposure is often difficult to quantify and confirm as the exposure levels could vary greatly from claimant to claimant and, in many cases, exposure extended over decades. In the case of asbestos, there are several possible forms of exposure with varying degrees of danger and, notably, there could be persons who are not aware if they have been exposed. Conversely, the class members' ingestion of the Diet Drugs is discrete and ascertainable. The dates, duration and amounts of ingestion and the combination of drugs ingested can be confirmed through the use of fact sheets and medical records. If individual issues in the Diet Drug Litigation arise and subclasses are created, the members of those subclasses which do not qualify for the monitoring requested will be readily identifiable from the registration forms and the supporting documentation which will be required. The court finds that the proposed class here is more cohesive than those which would generally be found in tobacco or asbestos cases.

If and when AHP asserts its challenges or affirmative defenses to liability based on the individual issues discussed above, the court will evaluate them. If the issues alter the liability analysis or the applicable relief to the class, the court could utilize subclass mechanisms to allow the defenses to be properly raised at trial. However, at this point, evaluating the merits of the defenses AHP claims it could make is premature. For instance, in its Answer, AHP raises thirty-nine affirmative defenses to the *Jeffers* Complaint. (Answer at 14–22.) Experience has demonstrated that defendants do not raise every affirmative defense asserted in their Answer at trial. It is unlikely that AHP will raise every one of these defenses at trial, just as it is unlikely that every conceivable factual distinction between the class members will alter the liability analysis or the appropriate relief. Many of these defenses could be asserted against the class as a whole and cohesion would not be diminished.

If the individual issues, as a whole, destroy cohesion or deprive the parties of their constitutional right to due process, then the court will exclude parts of the class or decertify the class in its entirety accordingly. However, it would be premature for the

court at this point to delve into the merits of AHP's potential defenses to liability and the applicability of the equitable relief on these sorts of issues before they are fully raised and challenged. For instance, the court expects that AHP will not raise those defenses which are unsupported by the still developing expert evidence. Also, Plaintiffs may move to strike any of the defenses which are raised. Many of the above issues necessarily involve competing expert evidence regarding both the alleged side effects of Pondimin and Redux, as well as the diagnostic techniques to evaluate whether those side effects are present in individual class members and the scope and necessity of ongoing medical monitoring. The court will hear and evaluate such evidence when the parties set forth a briefing and hearing schedule as is contemplated in the accompanying Order. At present time, the court finds that Plaintiffs' claims are sufficiently cohesive to warrant conditional certification.

### b. Variance of State Law

 **\*14** AHP points out that not all states have explicitly recognized an asymptomatic plaintiff's claim for medical monitoring and that those states which recognize such a cause of action have varying legal elements. (AHP's Mem. Opp. at 84 & 88.) AHP also argues that some states have rejected asymptomatic plaintiffs' claims under medical monitoring theories. *Id.* at 89–90. AHP argues that the variance of state law makes the class claims unmanageable. Plaintiffs asserts that the law of Pennsylvania should be applied to the class as a whole because Pennsylvania has the greatest interest in applying its law to the claims at issue.

First, the Rules Enabling Act presents an obstacle to Plaintiff's proposed method of adjudicating these claims. The Rules Enabling Act states that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b); *see also* Ortiz v. Fibreboard Corp., 527 U.S. 815, ——, 119 S.Ct. 2295, 2314, 144 L.Ed.2d 715, —— (1999) (citing Guaranty Trust Co. v. York, 326 U.S. 99, 105, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), for proposition that " '[i]n giving federal courts 'cognizance' of equity suits in cases of diversity

jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law' "). Essentially, Plaintiffs request that Federal Rule of Civil Procedure 23 act as the conduit through which Pennsylvania's medical monitoring cause of action extend to all class members, regardless of whether a given class member's claim arises in a jurisdiction which does not recognize such a legal theory absent injury. Such an action would violate the Rules Enabling Act.

Furthermore, Plaintiffs' view contradicts the choice of law principles in Pennsylvania. [8] Pennsylvania choice of law rules require a determination of whether there is a false conflict in the law of the states at issue. *LeJeune,* 85 F.3d at 1071. Where the laws of two states are in opposition and the jurisdictions have a governmental interest in applying their respective laws, there is not a false conflict. *See id.* (stating "[a] false conflict exists where 'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law.' ") (quoting Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir.1991)). If a false conflict does not exist, the court must make a second determination of which state has the greater interest in the application of its law. *Id.*

 **\*15** Those states which recognize a medical monitoring claim have a governmental interest in protecting its citizens from exposure to toxic substances. *See,* e.g., Redland Soccer Club, Inc. v. Department of the Army and Dep't of Defense of the U.S., 548 Pa. 178, 696 A.2d 137, 145 (Pa.1997) (setting forth "several important reasons to recognize claims for medical monitoring"). Conversely, those states which do not recognize a claim for medical monitoring also have a governmental interest for doing so, whether it be to encourage the development of new pharmaceutical products or to avoid the burden of increased litigation state courts would face in abandoning the traditional tort requirement that plaintiffs demonstrate a physical injury. For example, on July 9, 1999 the Louisiana Legislature enacted a modification to the Louisiana civil code regarding tort damages, to prevent asymptomatic plaintiffs from recovering for medical monitoring claims. 1999 La. Sess. Law Serv. 989 (West) (modifying statute to

include language that "[d]amages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease") (amending *La. Civ.Code Ann. art. 2315 (West 1999)*). In doing so, the Legislature explicitly overruled the Louisiana Supreme Court's holding in *Bourgeois v. A.P. Green Indus.,* 716 So.2d 355, 361 (La.1998). Thus, the court finds that no false conflict exists, at least in those jurisdictions that do not recognize medical monitoring claims absent injury or in those with medical monitoring claim elements significantly different than Pennsylvania's.

Next, the court must determine whether Pennsylvania has a greater interest in the application of its law over the interests of the states in which class members were prescribed and ingested the Diet Drugs. The ingestion and prescription of these Diet Drugs occurred on a nationwide basis. Most of the proposed class members have no ties whatsoever with Pennsylvania. Although AHP's subsidiary, Wyeth–Ayerst Laboratories Division, has its principal offices in St. David's Pennsylvania and many of AHP's activities regarding the drugs at issue occurred in Pennsylvania, AHP conducted its FDA contacts and various marketing efforts in other jurisdictions as well. In light of all the circumstances, the court finds that the jurisdictions in which each class member was prescribed and ingested the Diet Drugs have a strong interest in applying their applicable law to the sale, prescription and ingestion of pharmaceuticals within its borders, which is the conduct which gave rise to the class members' claims. See *LeJeune,* 85 F.3d at 1072 (stating that "[w]here the site of an accident is not fortuitous, the place of injury assumes much greater importance, and in some instances may be determinative") (quotation omitted); *see also Petrokehagias v. Sky Climber, Inc.,* No. 96–6965, 1998 WL 227236, at *7 (E.D.Pa. May 4, 1998) (holding in product liability suit that Massachusetts law applies where plaintiffs were residents of Pennsylvania and New Jersey and product at issue was leased from defendant situated in New Jersey, but plaintiffs' injuries occurred in Massachusetts). Thus, the court will apply the law of the state in which each class member's claim

arose rather than apply Pennsylvania substantive law to all class members.

**\*16** In addition to requiring a review of the state law regarding medical monitoring, the court will also need to analyze the law of any underlying cause of action, for example negligence or strict liability, which is required under the applicable state law to succeed on a claim for medical monitoring. See, e.g., *Redland Soccer Club, Inc. v. Department of the Army and Dept. of Defense of the U.S.,* 548 Pa. 178, 696 A.2d 137, 145 (Pa.1997) (requiring that exposure to toxic substances be "caused by the defendant's negligence" as element of medical monitoring); *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 979 (Utah 1993) (requiring that "exposure was caused by the defendant's negligence"); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 822 (Cal.1993) (requiring that "liability [be] established under traditional tort theories of recovery").

The court finds that the application of the laws of the states does not necessarily render class treatment unmanageable. Nor does it destroy cohesion of the class claims. Rather, it requires the establishment of subclasses dependent on whether the elements of medical monitoring or the underlying legal action significantly differ. While some states recognize a claim for medical monitoring absent injury, other states require some injury for a tort claim to proceed. *See, e.g., Wood v. Wyeth–Ayerst Labs.,* No. 97–CI–5873, slip op. at 2–4 (Ky. Cir. Ct. June 17, 1999) (granting AHP's motion for judgment on pleadings in class action for medical monitoring in state Diet Drug Litigation because "cause of action cannot be maintained, absent an allegation of physical injury or harm"); 1999 La. Sess. Law Serv. 989 (West) (requiring that claim for medical monitoring be "directly related to a manifest physical or mental injury or disease"). The class which the Plaintiffs seek to certify is not comprised only of persons who ingested Pondimin or Redux who have no present injury. Rather, Plaintiffs bring this litigation on behalf of those persons "who have not filed a claim for personal injuries." (Pls.' Mot. Am. Compl., Ex. A ¶ 1.) Thus, some persons in the class may have some injury which is unknown at present time, which is

precisely why they request diagnostic testing. Others may have some known injury but have simply not filed suit, whether it be because their injuries were minor and not likely to be worth the expense of individual litigation or for other reasons. If those with known injury demonstrate that monitoring relief is appropriate, such as to determine if their condition worsens, then subclass treatment may be appropriate. Such a subclass would permit recovery for medical monitoring in those states requiring some injury, such as Louisiana and Kentucky. [9] *See, e.g.,* In re Telectronics Pacing Sys., Inc., 172 F.R.D. 271, 287 (S.D.Ohio 1997) (stating in Rule 23(b)(3) class action that "[i]n some states, medical monitoring is only recoverable if the plaintiff shows physical injury" and dividing the class into subclasses based on state law accordingly). Thus, the conditional class will include a subclass of persons with known injury who have not filed a personal injury claim. However, class members who are asymptomatic and whose claims arise in jurisdictions that adhere to the traditional requirement of an injury for a tort action to proceed would have to be excluded from the class entirely.

**\*17** Because Plaintiffs have been proceeding under the view that Pennsylvania law would apply to the entire class, they have not had opportunity to brief the issue of varying state law, nor has AHP fully addressed the issue. The court will require such briefing within thirty days from this conditional certification and will then modify the class as required. The court expects that it will create a number of subclasses based upon the variance of both medical monitoring law and variances in the underlying claims of strict liability, negligence and breach of warranty. Furthermore, to the extent that a different legal standard may apply to certain members of the class, the factfinder at trial could make alternate findings in accordance with those standards. Thus, the court finds that the variance in state law does not render the class claims non-cohesive.

### c. Existing Class Actions

As noted above, a number of state courts have certified statewide medical monitoring classes in the Diet Drug Litigation. These states include Texas, Washington, Illinois, New Jersey, West Virginia and Pennsylvania. Plaintiffs request that this court certify a nationwide class action despite the fact that these state courts have already certified similar classes. (Pl.'s Reply Mem. at 5 n.7.)

The civil actions in MDL No. 1203 are before the court on diversity jurisdiction and so there is overlapping jurisdiction over the Diet Drug Litigation. Furthermore, the court has in the past and will in the future conduct MDL No. 1203 in a manner that encourages coordination between state and federal courts, rather than in a manner which results in conflicting deadlines and discovery requirements for parties. In this light, the court will exclude from the conditional class those persons who are, on the date of this Order, class members of a certified class action in a state court for medical monitoring and they shall remain excluded for as long as they are members of such class. *See, e.g.,* Manual for Complex Litigation 3d § 30.15, at 221 (1995) (stating that "to the extent a state court class action has progressed further than the federal action, the court may want to consider an appropriate definition to exclude the members of that class").

### C. *Conditional Certification of Class*

Having found that the elements of Rule 23(a) are satisfied and that the medical monitoring claims are proper for class treatment under Rule 23(b)(2), the court will now undertake to define the scope of the class. The court begins with the proposition that in defining the class structure the class is subject to modifications through further inclusion, exclusion and subclass treatment of class members.

*See* Fed.R.Civ.P. 23(c)(1) (stating that an order certifying a class "under this subdivision may be conditional, and may be altered or amended before the decision on the merits"); *Barnes,* 161 F.3d at 140 (stating that "District Courts are required to reassess their class rulings as the case develops"). However, the court also notes that in certifying a class, the court should take care to certify the class as close as reasonably possible to that which satisfies Rule 23. *See, e.g.,* Manual for Complex Litigation 3d § 30.11, at 215 (1995) (stating that "[u]ndesirable

consequences may follow when an expansive class, formed on insufficient information, is later decertified or redefined"). Thus, the court will define the class as close as reasonably possible to what is required by ⚑ Rule 23 under its present understanding of the nature of this litigation.

**\*18** Plaintiffs' motion to amend the Complaint alters the scope of the proposed class in several key aspects. AHP, in its opposition memorandum, notes that the proposed amendments were made long after the deadlines established by this court regarding motions for class certifications and significantly after the issue was briefed and argued. However, the court itself is under a duty to modify any class it conditionally certifies as the case develops. ⚑ *Barnes,* 161 F.3d at 140. Thus, the closer the scope of the conditionally certified class is to what the final class certified class will be, the better for the court, the parties and the class members. The court will grant Plaintiffs' motion to amend and will conditionally certify the class in accordance with the proposed amendments and the preceding discussion as they best represent the court's understanding of the case as it presently stands. Furthermore, the court will expect further briefing, in which AHP and the Plaintiffs may make such objections to the class definition as it sees fit.

With these concerns in mind, the court outlines the scope of the class as follows: first, the conditional class will consist of all persons who were prescribed and ingested either fenfluramine or dexfenfluramine for at least thirty cumulative days during the period between May 1, 1992 and September 15, 1997 and who have not filed a claim for personal injuries in a court of competent jurisdiction. Second, the conditional class will exclude persons who are, and for so long as they continue to be, class members of a certified state class action for medical monitoring. Third, the conditional class will exclude those class members who are asymptomatic and whose claims arose under the law of a state which does not recognize claims for medical monitoring absent injury**.**

Furthermore, the court envisions a number of subclasses which would assist the court in its management of the class and the resolution of the claims therein. The court will invite additional briefing

regarding the creation of subclasses or redefinitions of the class to address the factual and legal issues which may vary within the class and a discussion of proposed representatives for such subclasses as may be appropriate. This would necessarily include a breakdown of state law regarding medical monitoring and the underlying causes of action on strict liability, negligence and breach of implied warranty as it stands in the various states in which the class members' claims arise.

### D. *Summary*

The class members' claims are such that individual ligation would not result in achieving the appropriate relief for the class members. Absent class treatment, the class members will be unable to obtain the benefit of collection and research of medical data and thereby better understand issues such as latency periods and techniques of diagnosis of the diseases which the class believes are caused by the ingestion of the drugs. While Plaintiffs will ultimately have to prove that they and the class are, in fact, at a risk of contracting these diseases, the court notes that there is sufficient medical study and research at this time to warrant conditional certification. There exist individual issues which will be a challenge to the court and the parties in resolving the class claims, including individual factual issues and variance of applicable state law. Rather than turn its back on these challenges, the court will conditionally certify the class as outlined above and will continue to review the class and redefine it as necessary until it can be said with some certainty that class treatment is unacceptable under *Barnes,* ⚑ Rule 23 or the parties' constitutional rights.

**\*19** As the accompanying Order directs, the court will expect the parties to further brief and present to the court their views on issues of developing scientific studies, potential class structures to address variance of state law and individual issues. However, the court finds that certification is appropriate at this juncture as it has found the requirements of ⚑ Rule 23(a) and (b) are met under Plaintiffs' theory that the class members are entitled to uniform, equitable relief. That theory is founded on such scientific studies and findings which would at least present a triable issue of fact for a factfinder. Thus, in the interests of granting the equitable relief requested and noting that the class

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 92 of 131
PageID: 78091
In re Diet Drugs (Phentermine, Fenfluramine,..., Not Reported in...
1999 WL 673066

itself is unable to perform those equitable tasks on an individual basis, the court certifies a conditional medical monitoring class as outlined above.

### III. CONCLUSION

For the foregoing reasons, the court will grant the motion for class certification as discussed above.

An appropriate Order follows.

### PRETRIAL ORDER NO. 865

AND NOW, TO WIT, this 26th day of August, 1999, upon consideration of plaintiffs Barbara Jeffers' and Johnna Day's Motions for Class Certification Pursuant to Federal Rule of Civil Procedure 23(b)(2) and Motion to Amend the Complaint and defendant American Home Products Corporation's responses thereto, IT IS ORDERED that:

1. the plaintiffs' Motion for Class Certification filed March 15, 1999 (Document # 200709) is DENIED AS MOOT;

2. the plaintiffs' Motion to Amend the Complaint (Document # 200940) is GRANTED;

3. the plaintiffs' Motion for Class Certification filed June 24, 1999 (Document # 200940) is GRANTED as stated in the accompanying Memorandum and below;

4. the plaintiffs shall, within ten (10) days from the date of this Order, submit to the court a proposed form of notice to the class;

5. the plaintiffs and defendant American Home Products Corporation shall, within seven (7) days from the date of this Order, submit to the court a proposed briefing schedule to resolve the outstanding issues discussed in the accompanying memorandum, with such schedule to conclude preliminary briefing within thirty (30) days from the date of this Order; and

6. the court will, upon approval of the briefing schedule, conduct a hearing on the above issues to follow shortly after the close of briefing.

IT IS FURTHER ORDERED THAT the court hereby CONDITIONALLY CERTIFIES a class under Federal Rule of Civil Procedure 23(b)(2) consisting of all persons who were prescribed and ingested either fenfluramine (marketed under the brand name Pondimin) or dexfenfluramine (marketed under the brand name Redux) for at least thirty cumulative days during the period between May 1, 1992 and September 15, 1997 and who have not filed a claim for personal injuries in a court of competent jurisdiction.

**\*20** IT IS FURTHER ORDERED that the above conditional class shall exclude all persons who are, and for so long as they continue to be, class members of a certified state class action for medical monitoring.

IT IS FURTHER ORDERED that the above conditional class will exclude those class members who are asymptomatic and whose claims arise under the law of a state which does not recognize claims for medical monitoring absent injury**.**

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 673066

### Footnotes

1    The court will use the term "MDL No. 1203" to refer to the consolidated federal cases before it, captioned as *In re: Diet Drugs (phentermine, fenfluramine, dexfenfluramine) Products Liability Litigation.* The court will use the term "Diet Drug Litigation" when referring to the federal and state cases collectively.

2    Phentermine continues to have FDA approval and is currently sold as a "generic" drug by a number of manufacturers.

3    *Earthman v. American Home Prods. Corp.,* No. 97–10–03790–CV, slip op. at 2 (Tex.Dist.Ct. Oct. 14, 1998); *St. John v. American Home Prods. Corp.,* No. 97–2–06368–4, slip op. at 4–5 (Wash.Super.Ct. Dec. 4, 1998); *Rhyne v. American Home Prods. Corp.,* No. 98–CH–04099, slip op. at 1 (Ill.Cir.Ct. Jan. 26, 1999); *Vadino v. American Home Prods. Corp.,* No. MID–L–425–98, slip op. at 31 (N.J.Super.Ct. Jan. 26, 1999); *Burch v. American Home Prods. Corp.,* No. 97–C–204[1–11], slip op. at 35–38 (W.Va.Cir.Ct. Feb. 11, 1999); *In re Pa. Diet Drugs Litig.,* Master Docket No. 9709–3162, slip op. at 39 (Pa.Super.Ct. Mar. 12, 1999).

4    In the Complaint, Plaintiffs allege that they both ingested "dexfenfluramine, and/or fenfluramine." *Id.* In her deposition, Day stated that she ingested Pondimin, but never ingested Redux. (AHP Mot. Opp. Ex. LL–18.) Jeffers stated in her deposition that she ingested a combination of Pondimin and phentermine and then ingested Redux for a short period. (AHP Mot. Opp. Ex. LL–18.)

5    These Third–Party Defendants include Camall Company, which is presently in Chapter 11 Bankruptcy, Century Pharmaceuticals, Duramed Pharmaceuticals, Eon Laboratories Manufacturers, Fisons Corporation, Gate Pharmaceuticals, Geneva Pharmaceuticals, H.L. Moore Drug, Ion Laboratories, Incorporated, Jones Medical Industries, King Pharmaceuticals, Harvard Drug Group, Medeva Pharmaceuticals, Parmed Pharmaceuticals, Pennwalt Corporation, Qualitest Products, Rd–Rx Pharmaceuticals, Rexar Pharmacal Corporation, Richwood Pharmaceuticals, Shire Richwood, Incorporated, Roberts Pharmaceuticals, Rosemont Pharmaceuticals, Rugby Laboratories, Seatrace, Incorporated, Smithkline Beecham, United Research Laboratories and Zenith Goldline Incorporated.

6    That statute states: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States." 28 U.S.C. § 1332(a)(1).

7    Plaintiffs' request for medical monitoring is truly equitable in nature and, thus, differs from those situations in which courts reject attempts to turn "what is essentially a legal claim into an equitable one merely by demanding an injunction requiring the payment of money." *Packard,* 994 F.2d at 1050 (citations omitted). *Packard* was a class action involving "sweep fees" charged to bank trust accounts. Sweep fees are charged by banks for the service of looking daily for idle cash and investing it in interest-bearing vehicles until the cash is either invested long-term or distributed to the beneficiary. *Id.* at 1043. In *Packard,* the Third Circuit held that the plaintiffs could not meet the jurisdictional amount. The Third Circuit stated: "[h]ere, virtually all the relief sought is remediable by money damages. The only truly equitable relief sought in this case is an order requiring [the defendant] to provide adequate notice of its sweep fees to trust beneficiaries and to tie future sweep fees to the cost of providing the service." *Id.* at 1050. Thus, the relief requested in *Packard* is distinguishable from the claim for relief in *Jeffers* which includes ongoing medical studies.

8    The Third Circuit has stated: "[i]n choosing which law applies, a federal court sitting in diversity must apply the choice-of-law rules of the forum state." *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996). As this action originated in the United States District Court for the Eastern District of Pennsylvania, Pennsylvania's choice of law rules apply.

1999 WL 673066

9    AHP also contends that Oregon and North Carolina have rejected medical monitoring for asymptomatic plaintiffs. (AHP Mem. Opp. at 89–90.) It also contends that Maryland, Mississippi and Vermont have not yet reached the issue. *Id.* at 91.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2745231
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

IN RE: PACKAGED SEAFOOD
PRODUCTS ANTITRUST LITIGATION
This Document Relates to: All Actions

Case No.: 15-MD-2670 JLS (MDD)

|

Signed 05/26/2020

|

Filed 05/27/2020

ORDER DENYING DEFENDANTS'
MOTION TO STAY PENDING APPEAL

(ECF No. 2264)

Janis L. Sammartino, United States District Judge

**\*1** Pending before the Court in this multidistrict litigation is Defendants' motion to stay pending appeal of the Order Granting Motions for Class Certification. Plaintiffs oppose. The motion was taken under submission without oral argument. *See* Civ. Loc. R. 7.1.d.1. For the reasons discussed below, Defendants' motion is denied.

### I. Background

Plaintiffs initiated this action in 2015, alleging an antitrust conspiracy by Defendants to fix and maintain packaged tuna prices above competitive levels in violation of state and federal antitrust laws. Related to the same allegations, Defendants were prosecuted by the United States Department of Justice. The three main Defendants admitted their guilt with respect to the antitrust conspiracy.

On December 9, 2015, various parallel civil actions relating to the conspiracy were consolidated in a multidistrict litigation for pretrial proceedings before this Court. The Court divided Plaintiffs into four tracks: (1) Direct Action Plaintiffs ("DAPs"), who are direct purchasers proceeding individually against Defendants; (2) Direct Purchaser Plaintiffs (DPPs), who are proceeding on behalf of a putative class; (3)

Commercial Food Preparer Plaintiffs ("CFPs"), who are indirect purchasers proceeding on behalf of a putative class; and (4) End Payer Plaintiffs ("EPPs"), who are consumers proceeding on behalf of a putative class (together, Plaintiffs; DPPs, CFPs and EPPs together are referred to as "Class Plaintiffs"). Defendants are the three largest domestic producers of packaged tuna products—Tri-Union Seafoods LLC d/b/a Chicken of the Sea International and Thai Union Group PCL (together, "COSI"); [1] Bumble Bee Foods LLC, [2] Lion Capital LLP, Lion Capital (Americas), Inc. and Big Catch Cayman LP (together, "Bumble Bee"); [3] as well as StarKist Company and Dongwon Enterprises Co. Ltd. (together, "StarKist").

On July 30, 2019, the Court granted Class Plaintiffs' motions for class certification. (Order Granting Mots. for Class Certif. ("Class Certif. Order"), ECF No. 1931.) On August 13, 2019, Defendants petitioned the Ninth Circuit Court of Appeals for permission to appeal the Class Certification Order pursuant to Federal Rule of Civil Procedure 23(f). (ECF No. 1935; *see also Olean Wholesale Grocery Coop v. Bumble Bee Foods, LLC,* Case no. 19-80108 (9th Cir.), Pet. for Permission to Appeal Class Certif. Decision Pursuant to Fed. R. Civ. Proc. 23(f) ("Pet. to Appeal"), ECF No. 1.) The petition was granted on December 20, 2019. (*See* ECF No. 2247.) Numerous summary judgment motions and motions to exclude expert witness testimony were filed and opposed after Defendants' Petition to Appeal was filed. On January 3, 2020, Defendants informed the Court for the first time of their intent to move for a stay pending appeal. (*See* Defs' Proposed Agenda, ECF No. 2252.) Shortly after this motion was filed, and based on the pending appeal, the Court denied as premature DPPs' and EPPs' motions related to their respective class notices. (*See* ECF Nos. 2271, 2272.) Accordingly, all case activity related directly to class certification has already been stayed pending appeal.

**\*2** Defendants' motion is more encompassing, however. They contend that "[a] broad stay of all summary judgment and *Daubert* motions is the only prudent solution." (Mem. of P. & A. in Supp. of Defs' Mot. to Stay Certain Proceedings ("Stay Mot.") 14, ECF No. 2264-1 (footnote omitted).) When their motion was filed, fact discovery had closed. (Reply Mem. of P. & A. in Supp. of Defs' Mot. to Stay Certain Proceedings ("Reply") 1 n.1, ECF No. 2280.) Fourteen summary judgment motions and six related *Daubert* motions

had been fully briefed. (Stay Mot. 1, 4.) Arguing that all these motions are interrelated among each as well with issues raised on appeal, Defendants seek to stay all of them, whether they were filed or opposed by the parties to the appeal or not. Accordingly, two groups of Plaintiffs oppose the stay—Class Plaintiffs, the prevailing parties in the Class Certification Order which is on appeal, and DAPs, who are not parties to any of the class actions or the appeal.

## II. Discussion

An appeal pursuant to Federal Rule of Civil Procedure 23(f) "does not stay proceedings in the district court unless the district judge or the court of appeals so orders." Fed. R. Civ. Proc. 23(f). This provision was included to avoid unnecessary disruption and delay in district court proceedings. *Microsoft Corp. v. Baker*, —— U.S. ——; —— U.S. ——, 137 S. Ct. 1702, 1713 n.9, 198 L.Ed.2d 132 (2017).

"The Ninth Circuit has not articulated a specific standard for evaluating a proposed stay pending decision of a Rule 23(f) appeal. Most district courts in this circuit apply the standard articulated in *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), and *Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)." *Romero v. Securus Technols, Inc.*, 383 F.Supp.3d 1069, 1072-73 (S.D. Cal. 2019).[4] The parties do not dispute the applicable standard. (*See* Stay Mot. 7; Pl. Classes Opp'n to Defs' Mot. to Stay Certain Proceedings ("Class Opp'n") 4-5, ECF No. 2276.)

The need for a stay pending appeal may arise because "[i]t takes time to decide a case on appeal. ... [I]f the court takes the time it needs, the court's decision may in some cases come too late for the party seeking review." *Nken*, 556 U.S. at 421, 129 S.Ct. 1749; *see also id.* at 427, 129 S.Ct. 1749. However, "[a] stay is also an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* at 427, 129 S.Ct. 1749; *see also id.* at 433, 129 S.Ct. 1749. Instead, it is "an exercise of judicial discretion and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* at 433, 129 S.Ct. 1749. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34, 129 S.Ct. 1749.

Under the traditional standard for a stay,

> a court considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 426, 129 S.Ct. 1749; *see also id.* at 434, 129 S.Ct. 1749.

### A. Irreparable Harm to Defendants

Because irreparable harm to the appellant is a "bedrock requirement," *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011), the Court turns to this factor first. "[S]tays must be denied to all petitioners who [do] not meet the applicable irreparable harm threshold, regardless of their showing on the other stay factors." *Id.* To clear the threshold, Defendants must show "that an irreparable injury is the more probable or likely outcome." *Id.* at 968. "[S]imply showing some possibility of irreparable injury" is not enough. *Nken*, 556 U.S. at 434-35, 129 S.Ct. 1749.

#### 1. One-Way Intervention

Defendants claim they will suffer irreparable harm in the absence of stay because they will be "forced to bear the risk of litigating summary judgment motions without the ability to bind absent class members." (Reply 3-6.) They argue a stay is consistent with case law relating to what they refer to as the "one-way intervention rule." (Stay Mot. 1.)

**\*3** The potential for the "so-called one-way intervention" was first discussed in the context of the pre-1966 version of Rule 23. *Am. Pipe & Construction Co. v. Utah*, 414 U.S. 538,

*In re Packaged Seafood Products Antitrust Litigation, Slip Copy (2020)*

547, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Under that version of Rule 23, there was

> no mechanism for determining at any point in advance of final judgment which ... potential members of the class claimed in the complaint were actual members and would be bound by the judgment. Rather, when a suit was brought by or against such a class, it was merely an invitation to joinder—an invitation to become a fellow traveler in the litigation, which might or might not be accepted. A recurrent source of abuse under the former Rule lay in the potential that members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests. If the evidence at the trial made their prospective position as actual class members appear weak, or if a judgment precluded the possibility of a favorable determination, such putative members of the class who chose not to intervene or join as parties would not be bound by the judgment. This situation— the potential for so-called "one-way intervention"—aroused considerable criticism upon the ground that it was unfair to allow members of a class to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one.

*Id.* at 545-47.

In 1966, Rule 23 was amended to remedy the unfairness. It provided for class certification "as soon as practicable after the commencement of the action." *Am. Pipe,* 414 U.S. at 547 & n.11, 94 S.Ct. 756. The class membership was

determined before final judgment by sending notice of class certification with the option for absent class members to exclude themselves. *Id.* at 547-48, 94 S.Ct. 756. All class members who did not request exclusion were bound by the final judgment. *Id.* at 548-49, 94 S.Ct. 756. The same framework is included in Rule 23(c) today.

Defendants cite to no binding authority in the post-1966 class action practice to articulate a one-way intervention "rule." Instead, one-way intervention is used to describe an argument under the amended Rule 23. The argument is often raised when the parties disagree whether a summary judgment motion should be decided before or after class certification.

The one-way-intervention argument was considered in *Wright v. Shock,* 742 F.2d 541 (9th Cir. 1984). There, with the defendants' acquiescence, the district court granted a defense summary judgment motion and dismissed some of the defendants before deciding whether to certify a class action. *Id.* at 542-43. The court certified the summary judgment ruling as a partial final judgment to allow an immediate appeal. The plaintiffs appealed seeking to vacate the summary judgment ruling. Citing Rule 23(c)(1), which directed the district court to decide class certification "[a]s soon as practicable after the commencement" of the action, the plaintiffs argued on appeal that it was not "proper for the district court to order summary judgment on the liability question without first ruling on class certification." *Id.* at 543; *see also id.* at 542.

**\*4** The court noted this was an issue of first impression in the Ninth Circuit. *Wright,* 742 F.2d at 543. It started its analysis by observing that Rule 23(c)(1) does not require district courts to take up class certification before making any rulings on the merits, but instead "deliberately avoids a mechanical approach and calls upon judges to weigh the particular circumstances of particular cases ...." *Id.*

> [T]he timing of Rule 23 is not absolute. Under the proper circumstances— where it is more practicable to do so and where the parties will not suffer significant prejudice—the district court has discretion to rule on a

*In re Packaged Seafood Products Antitrust Litigation, Slip Copy (2020)*

motion for summary judgment before it decides the certification issue.

*Id.* at 543-44.

Next, *Wright* discussed a split among the circuits. While some circuits affirmed pre-class certification summary judgment rulings, others held, based on one-way-intervention considerations, that "no decision on the merits of a class action can precede a determination on class certification." *Wright,* 742 F.2d at 543-44. Some of the latter circuits, however, recognized an exception if a defendant "waive[d] the protection afforded by an early ruling on class certification." *Id.* at 544. The district court in *Wright* did not abuse its discretion under either line of authority. *Id.* [5]

Based on the foregoing, and acknowledging that the outcome may be influenced by prejudice to either the defendants or the plaintiffs, *id.* at 544, 545, the appellate court was persuaded by the defendants' acquiescence and limited its holding to the facts of the case:

> Neither Fed.R.Civ.P. 23 nor due process necessarily requires that the district court rule on class certification before granting or denying a motion for summary judgment. Rule 23 clearly favors early determination of the class issue, but where considerations of fairness and economy dictate otherwise, and where the defendant consents to the procedure, it is within the discretion of the district court to decide the motion for summary judgment first. Under the facts of the present case, the district court did not abuse its discretion.

*Id.* at 545-46.

Similarly, *Schwartzchild v. Tse,* 69 F.3d 293 (9th Cir. 1995), rejected the defendants' one-way-intervention argument and reached the same conclusion. It held that "[b]y obtaining

summary judgment before notice had been sent to the class, the defendants waived their right to have such notice given and to obtain a judgment that was binding upon the class." *Id.* at 297. [6]

**\*5** Defendants here seize on the out-of-circuit authority discussed in *Wright* and *Schwartzchild.* As here, the parties there argued the disadvantage which may result if summary judgment is granted for the defense before class certification and notice. The judgment in favor of the dismissed defendants is not res judicata as to anyone other than the named plaintiffs and the absent class members remain free to assert their claims against the dismissed defendants subject to the stare decisis effect of the prior summary judgment ruling. *Wright,* 742 F.2d at 544, 545; *Schwartzchild,* 96 F.3d at 295-96; *see also id.* at 297. To avoid this outcome, some circuits prohibit, at least in the absence of waiver, a decision on the merits before class certification. *Wright,* 742 F.2d at 544; *Schwartzchild* at 297,. Because the defendants in *Wright* and *Schwartzchild* had waived the protection afforded by early class certification, neither court had a reason to adopt this approach. Defendants argue this Court should.

The course Defendants advocate would be contrary to the interpretation of Rule 23(c)(1) in *Wright*:

> According to Fed.R.Civ.P. 23(c)(1), the district court must rule on the issue of class certification "[a]s soon as practicable after the commencement of an action brought as a class action[.]" The Wrights contend that this language requires the district court to decide the class certification issue before making any rulings on the merits. The history of Rule 23, however, shows that its framers considered and rejected a provision imposing just such a requirement. The key word of section (c)(1) in its final form is "practicable," a term that deliberately avoids a mechanical approach and calls upon judges to weigh the particular circumstances of particular cases and decide concretely what will work[.] In short, the language of section (c)(1) leaves much room for discretion.

*Wright,* 742 F.2d at 543 (brackets added).

Defendants' argument is also contrary to the holdings of subsequent appellate opinions. *See, e.g., Corbin v. TWEAN,* 821 F.3d 1069, 1084-85 (9th Cir. 2016) (applying *Wright* [7] and affirming summary judgment on class representative's

*In re Packaged Seafood Products Antitrust Litigation, Slip Copy (2020)*

claim entered before deciding motion to reconsider class certification); *Saeger v. Pac. Life Ins. Co.*, 305 Fed. Appx. 492, 493 (9th Cir. 2008) (citing *Wright* [8] and affirming denial as moot of class certification motion based on a prior summary judgment ruling). The Federal Judicial Center's guidance to the judiciary is consistent with the interpretation of Rule 23(c)(1) in *Wright* and its progeny: "The amended rule allows [ruling] on motions ... for summary judgment before ruling on class certification." *Managing Class Action Litigation: A Pocket Guide for Judges* (Third) 9 (2010). To the extent Defendants retreat from their position in the reply by reframing it to argue that the sequence of summary judgment and class certification rulings "may be flipped in rare circumstances" (Reply 5 n.7), the position is equally unsupported. *See id.* ("Given the flexibility of the rules, the most efficient practice is to rule on motions to dismiss and motions for summary judgment *before* ruling on class certification." (emphasis added)).

**\*6** Furthermore, Defendants urge this Court to extend consideration of the one-way-intervention argument beyond its established context to a stay pending a Rule 23(f) appeal. Courts evaluate the one-way-intervention argument by considering practical case management issues and prejudice to the parties. *See Wright*, 742 F.2d at 543; *see also id.* at 544, 545. On the other hand, to meet the standard for stay pending appeal, Defendants are faced with a heavier burden. They must show probability of irreparable harm. *Leiva-Perez*, 640 F.3d at 968. If Defendants do not meet this standard, "a stay may not issue, regardless of the [moving party's] proof regarding the other stay factors" such as prejudice to the opposing party. *Id.* at 965. Defendants have cited no binding authority holding that one-way intervention constitutes sufficient irreparable harm [9] to stay proceedings pending appeal, or that it constitutes irreparable harm at all. [10] This Court is aware of none.

Finally, Defendants seek to apply the one-way-intervention argument to pending third-party actions which are not on appeal, such as DAP actions here. Defendants have cited no binding authority, and the Court is aware of none, supporting the argument that the possibility of one-way intervention is a valid reason to stay merits proceedings in a third-party action.

For the foregoing reasons, the possibility of one-way intervention does not meet Defendants' burden of showing they will suffer irreparable harm.

2. Unnecessary Legal Fees

Defendants next contend they will suffer irreparable harm of incurring unnecessary legal fees if they have to "litigat[e] potentially unnecessary motions." (Stay Mot. 10.) They do not explain why incurring legal fees would constitute irreparable harm. Monetary injury alone "is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019).

Moreover, the potential harm Defendants protest is entirely of their own doing. On July 25, 2019, they requested the Court to extend the due date for all parties to file dispositive motions. (ECF No. 1926.) On July 30, 2019, the Court issued the Class Certification Order. On August 9, 2019, it granted Defendants' request for extension of time and moved the due date for substantive motions to September 19, 2019. On August 13, 2019, Defendants petitioned the Ninth Circuit Court of Appeals for permission to appeal the Class Certification Order. Knowing that the dispositive motion due date was approaching, Defendants did not move to continue it until the ruling on their Petition to Appeal and did not put anyone on notice that they will seek to stay the motions should their petition be granted. Together with all other parties, Defendants filed their dispositive motions on September 19, 2019. Collectively, the parties filed fourteen summary judgment motions and six related *Daubert* motions. (Stay Mot. 1, 4.) Defendants let these motions be briefed in full before making their intention known that they would move to stay them pending appeal as unnecessary.

**\*7** Aside from the fact that Defendants could easily have avoided any unnecessary motion briefing by timely disclosing their intentions, they have not established that deciding the pending motions during appeal would be unnecessary or wasteful. They concede that "questions raised in summary judgment motions are not identical to questions presented in Rule 23(f) appeals, *which are necessarily confined to class certification.*" (Reply 6 n.10 (emphasis added).) Nevertheless, they claim the pending motions are "potentially unnecessary," may become moot, or "have to be re-litigated

entirely" if the classes are modified or decertified on appeal. (*See, e.g.,* Stay Mot. 10, 11; Reply 6, 7.) The Court is not persuaded.

On appeal Defendants argue that the law regarding use of representative evidence in establishing class-wide impact, and the District Court's role in determining this issue at the class certification stage, are unsettled. (*See* Pet. to Appeal.) [11] Specifically, they argue "whether plaintiffs can satisfy [Rule 23(b)(3)]'s predominance requirement by relying on a statistical methodology that assumes that all class members have suffered the same impact from a defendant's alleged misconduct," and "whether a district court is required to determine [before certifying the class] if the fact or extent of uninjured members in the class defeats predominance." (Stay Mot. 3-4 (citing Pet. to Appeal).)

Defendants claim the Court of Appeals could "rule in a way that changes who, what products, and what time periods are covered by the classes"—issues raised in the pending motions. (Reply 1; Stay Mot. 1, 10; *see also id.* at 5.) However, they offer only vague generalities, and do not explain how a decision on the issues they raise on appeal could moot an intervening ruling on any of the pending motions.

Defendants' own examples (Stay Mot. 11-14) underscore this point:

1.  Defendants' summary judgment motions directed at Class Plaintiffs and DAPs (ECF Nos. 2007, 2010): The motions seek to delay the commencement date of Plaintiffs' claims by two months, from June 1, 2011 to August 3, 2011, by arguing that Plaintiffs had sufficient knowledge for the statute of limitations to accrue at an earlier time, and that the injury rule, rather than discovery rule, applies to Plaintiffs' claims.

2.  Class Plaintiffs' and DAPs' motions against StarKist Company (ECF Nos. 1993, 2035): The motions seek a finding that the guilty plea in the criminal antitrust case satisfies each of the elements of civil antitrust liability, and that the agreement to fix prices is established for the period before and after the guilty plea.

3.  Defendants' motions arguing that DAPs do not have sufficient evidence to support their claims for the period prior to 2011. (ECF Nos. 2023, 2025.)

4.  DAPs' motion to exclude the opinions of Del Monte's expert Dr. Kevin Murphy. (ECF No. 2034.)

The issues Defendants raise on appeal do not intersect with the pending motions.

This is particularly evident with respect to Defendants' motions regarding pre-2011 liability (example 3), because the classes are certified for a period starting in July 2011. (Class Cert. Order 5, 26, 46, 58.) Not surprisingly, Class Plaintiffs did not oppose these motions, as the motions implicate only DAPs, who are not parties to any of the class actions. Similarly, Class Plaintiffs are not implicated in DAPs' *Daubert* motion (example 4), directed at an expert opinion not presented in relation class certification.

**\*8** Next, Defendants do not explain how Plaintiffs' arguments that the StarKist guilty plea established each of the elements of civil antitrust liability (example 2) can be disposed of in the pending appeal. Implicit in Defendants' argument is the premise that the appeal will entail an extensive merits inquiry. Although class certification may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), "[m]erits questions may be considered ... only to the extent[ ]that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *See Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 568 U.S. 455, 466, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). Defendants concede this. (Reply 6 n.10.) The mere fact that the pending summary judgment motions touch on the causes of action which were certified for class treatment is not a sufficient basis to find that the summary judgment motions will be mooted or would have to be re-litigated if they are decided pending appeal.

Defendants' motions to delay the statute of limitations accrual to August 3, 2011 (example 1), and a part of Plaintiffs' motions arguing that the StarKist guilty plea establishes the price-fixing agreement for a period after the plea (example 2), may reach into the class period. However, Defendants do not

explain how these issues could be decided on appeal, as they are not included in their Petition to Appeal.

Even if the class certification appeal results in a change in the class period, none of the pending motions will become moot. The statute of limitations issues Defendants raise against DAPs and Class Plaintiffs (example 1), the effect of guilty plea DAPs and Class Plaintiffs raise against StarKist (example 2), as well as the issues raised in other pending motions, will have to be decided as to the DAPs, who are not parties to any of the class actions, and the Class Plaintiffs individually regardless of the outcome of the appeal.

Finally, Defendants fear that they may be disadvantaged by any unfavorable rulings in this Court during the pendency of their appeal. One example they cite is the possibility that this Court could grant DAPs' motion regarding the effect of the StarKist guilty plea (example 2). (Stay Mot. 13; *see also id.* 13-14 (example 3 raising a similar argument); Reply 7 (same).) Defendants maintain that if this happens, and the classes are decertified or modified on appeal, and the Court then takes up the Class Plaintiffs' motion regarding the same guilty plea issues, the Class Plaintiffs will have the benefit of the prior ruling on the DAPs' motion. (Stay Mot. 13.) This argument does not establish irreparable harm, but merely identifies a possible loss of litigation advantage stemming from the sequence in which the Court takes up the pending summary judgment motions. [12]

In the context of the pending appeal, the alleged harm is Defendants' own doing, as they allowed extensive motion briefing to proceed without putting anyone on notice that they will seek to stay the motions as "unnecessary." Moreover, the argument is speculative, as it requires several conditions, all uncertain at this time, before the claimed prejudice occurs. Defendants' argument falls short of showing harm, that the harm would be irreparable, or that the harm is not merely "possible," *Nken*, 556 U.S. at 434-35, 129 S.Ct. 1749, but "the more probable or likely outcome," *Leiva-Perez*, 640 F.3d at 968.

### B. Likelihood of Success on the Merits

Although Defendants "need not demonstrate that it is more likely than not that they will win on the merits" of the appeal,

*Leiva-Perez*, 640 F.3d at 966, they must show at least " 'a reasonable probability' or 'fair prospect' of success." *F.T.C. v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019). "It is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434, 129 S.Ct. 1749.

**\*9** Defendants successfully petitioned the Court of Appeals to hear their appeal. Granting a Rule 23(f) petition is "the exception rather than the rule." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). To decide whether to hear the appeal, the courts have developed guidelines. *Id.* at 960.

> Review of class certification decisions will be most appropriate when: (1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous.

*Id.* at 959.

In their Petition to Appeal Defendants argued that the law regarding the use of representative evidence in establishing class-wide impact, and the District Court's role in determining this issue at the class certification stage, are unsettled and that the Court's resolution of the unsettled issues was in error. (*See* Pet. to Appeal.) Citing *Chamberlan,* the order granting Defendants' petition does not evaluate their likelihood of success. (*See* ECF No. 2247.) Nevertheless, the fact a petition is granted raises a "fair prospect" of success. *See Leiva-Perez*, 640 F.3d at 967 (discussing *O'Brien v. O'Laughlin*, 557 U.S. 1301, 130 S.Ct. 5, 174 L.Ed.2d 602 (2009), which noted that for purposes of stay pending appeal, the fact a certiorari

petition was granted raises a "fair prospect" of success on the merits of the appeal). Accordingly, Defendants have met the minimum necessary to show likelihood of success on the merits. *See* Leiva-Perez, 640 F.3d at 967-68.

### C. Substantial Harm to Other
### Parties Interested in the Proceeding

This multidistrict proceeding has been pending four and a half years. Fact discovery has closed, and summary judgment motions have been fully briefed.

Plaintiffs argue they will be harmed by the delay resulting from the extensive stay Defendants request because many events related to the price fixing conspiracy occurred almost ten years ago. This presents the risk of lost memories and testimony. One key witness has already passed away. (Class Opp'n 3; Jan. 7, 2020 Status Hearing, Tr. of Proceedings ("Tr."), 13, 34, ECF No. 2255.)

The prejudice from the delay is aggravated for DAPs. They comprise primarily of grocery wholesalers and retailers, including large chains such as the Kroger Co., Publix Super Markets, Inc., Winn-Dixie Stores, Inc., and Associated Wholesale Grocers, Inc. Collectively, their damage claims exceed the damage claims of each of the three class actions. (*See* DAPs' Opp'n to Defs' Mot. to Stay Proceedings 1 n.1, ECF No. 2274; *see also* Tr. 13.) Each DAP has decided to pursue its claims on an individual basis. Although included in this multidistrict litigation, DAPs are not parties to any of the class actions or the pending appeal.

Defendants counter Plaintiffs will not be prejudiced by the delay because witness testimony is preserved through two hundred videotaped depositions. (Stay Mot. 17.) They also argue that DAPs are implicated in the stay because the summary judgment motions are intertwined. (Reply 10.)

 **\*10** This does not assist any Plaintiffs who intend to rely on certain witnesses within the subpoena power of the Court and will therefore not be able to rely on the deposition transcripts or videos. (Tr. 34.) Moreover, the effectiveness and importance of live witness testimony at trial cannot be overstated. "The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The

opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition." Fed. R. Civ. Proc. 43, Adv. Comm. Notes to 1996 Amendment of Rule 43(a). Neither the tendency of memory to fade, nor the inability of unavailable witnesses to attend trial can be fully compensated by reliance on videotaped deposition testimony.

Defendants seek to pre-empt Plaintiffs' substantial harm arguments by arguing the stay is necessary to preserve the rights of absent class members, who also have an interest in this proceeding. Specifically, they claim Class Plaintiffs "risk losing the possibility of certifying any future classes" and "[a]bsent class members could, in turn, be effectively prohibited from recovering through the class mechanism," if they obtain favorable summary judgment rulings during the pendency of the appeal and the Court of Appeals decertifies the classes in whole or in part. (Stay Mot. 15.)

Defendants' argument is based on *Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016), which does not support it. There, the defendant filed a summary judgment motion, and the plaintiffs later filed motions for class certification and partial summary judgment. *Id.* at 1048-49. The court issued one order denying the defense summary judgment motion, denying the class certification motion, and granting the plaintiffs' partial summary judgment motion. *Id.* at 1049. On interlocutory appeal of the denial of class certification, the defendant argued that class certification was precluded by "the rule against one-way intervention." *Id.* at 1057. The court disagreed and held class certification was not precluded because the district court ruled on class certification before ruing on the plaintiffs' summary judgment motion. *Id.* at 1058. The denial of class certification was reversed, and the case remanded. *Id.* at 1048.

On remand, the denial of the defense summary judgment motion remained undisturbed as was the grant of the plaintiffs' partial summary judgment motion. *See* Costello, 810 F.3d at 1061; *see also id.* at 1049. The appellate court opinion did not preclude class certification or distribution of class notice, which could at that point occur only *after* summary judgment motions had been decided.

Defendants here seize on *dicta.* The Court of Appeals commented that had the district court ruled on the plaintiffs' summary judgment motion first, "the rule against one-way intervention may have precluded certification." Costello, 810

*In re Packaged Seafood Products Antitrust Litigation, Slip Copy (2020)*

F.3d at 1058. This comment does not address Defendants' scenario where class certification is reversed on interlocutory appeal and summary judgment motions are decided after class certification but pending appeal. It also does not address Defendants' dire prediction for absent class members. Accordingly, Defendants' argument that stay is required to protect the absent class members is rejected.

### D. Public Interest

Public interest cautions against granting the sweeping stay Defendants request. The public has an interest in the efficient prosecution of antitrust actions and seeking to hold alleged corporate wrongdoers accountable, especially in the area of consumer products. Defendants' liability has already largely been established in criminal proceedings through Defendants' own guilty pleas for the same wrongdoing. A stay would delay compensating the victims. It would also harm competition in the consumer products market, which harms the public interest. The stay would unnecessarily delay final resolution of these proceedings without much prospect of any judicial efficiencies to be gained from waiting.

### E. Analysis

**\*11**  The Ninth Circuit applies a sliding scale approach "to balance the various stay factors once they are established." *Leiva-Perez*, 640 F.3d at 965. The factors "are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 964. Accordingly, the moving party must show

> that irreparable harm is probable and either: (a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor. As has long been the case, these standards represent the outer extremes of a continuum,

> with the relative hardships to the parties providing the critical element in determining at what point on the continuum a stay pending review is justified.

*Id.* at 970. "The first two factors [likelihood of success on the merits and irreparable harm to the appellant] are the most critical." *Nken*, 556 U.S. at 434, 129 S.Ct. 1749. "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Id.* at 435, 129 S.Ct. 1749.

Defendants have not made the requisite showing that they will suffer irreparable harm. In the absence of such showing, "a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Leiva-Perez*, 640 F.3d at 965. This alone is sufficient to deny their motion.

Alternatively, even had Defendants met the required minimum showing of irreparable harm ("an irreparable injury is the more probable or likely outcome," *Leiva-Perez*, 640 F.3d at 968), they also made only the minimum showing of likelihood of success on the merits (" 'fair prospect' of success," *Qualcomm*, 935 F.3d at 755). Accordingly, to prevail on their motion, they also have to show "that the balance of hardships tips sharply in [their] favor." *Leiva-Perez*, 640 F.3d at 970. Given Defendants' weak showing on the irreparable harm factor and strong probability that the stay would cause substantial harm to Plaintiffs, Defendants have not met their burden. Finally, the public interest counsels against a stay.

### III. Conclusion

Defendants' motion to stay pending Rule 23(f) appeal is denied. This order is stayed for twenty-one (21) days from the date it is issued to allow Defendants to petition the Court of Appeals.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 2745231

## Footnotes

1   On May 24, 2019, CFPs filed a motion for preliminary approval of settlement with COSI, which included a stipulated certification of a settlement class. (ECF No. 1910.) The settlement and related class certification are not included in Defendants' pending appeal. (Defs' Notice Pursuant to Para. 5 of Ct.'s Order Following Jan. 7, 2020 Status Conference, ECF No. 2257.) On January 17, 2020, the Court denied without prejudice CFPs' motion for preliminary approval of settlement as well as their related motion to approve notice plan. (ECF Nos. 2263 and 2044, respectively.)

2   On November 21, 2019, Bumble Bee Foods LLC filed for bankruptcy protection. *See In re: Bumble Bee Parent, Inc. et al.,* Case No. 19-12502-LSS (Bankr. D. Del.). Proceedings against Bumble Bee Foods LLC in this Court are stayed pursuant to 11 U.S.C. § 362.

3   Lion Capital LLP and Big Catch Cayman LP have been dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Order Granting Defs' Mot. to Dismiss, ECF No. 2270.) A motion for reconsideration is pending. (ECF No. 2285.)

4   Unless otherwise noted, internal quotation marks, citations, and footnotes are omitted throughout.

5   As to the former line of authority, *Wright* concluded that under the circumstances of that case, "we cannot say that the course chosen by the district court manifested an abuse of discretion," and as to the latter line of authority that "[w]here the defendant assumes the risk that summary judgment in his favor will have only stare decisis effect on the members of the putative class, it is within the discretion of the district court to rule on the summary judgment motion first." 742 F.2d at 544.

6   If Defendants here did not waive the right to raise the one-way-intervention argument, as Plaintiffs argue (Class Opp'n 16-18), they surely came close by filing summary judgment motions before the Court ruled on the then-pending motions to approve class notice.

7   *Wright* "affirm[ed] a district court's decision to decline to rule on a class certification motion after granting summary judgment to defendants 'where considerations of fairness and economy [so] dictate.' " *Corbin,* 821 F.3d at 1085 (quoting *Wright,* 742 F.2d at 545-46) (brackets added in *Corbin*).

8   "We have previously held that, '[u]nder proper circumstances—where it is more practicable to do so and where the parties will not suffer significant prejudice—the district court has discretion to rule on a motion for summary judgment before it decides the certification issue.' " *Saeger,* 305 Fed. Appx. 492 (quoting *Wright,* 742 F.2d at 543-44) (brackets added in *Saeger*).

9   Defendants have not shown that one-way intervention is "the more probable or likely outcome." *Leiva-Perez,* 640 F.3d at 968. It is a possibility only if the Class Certification Order is affirmed *and* Defendants secure a favorable outcome on the pending summary judgment motions. Only if both conditions are met do Defendants have a reason to ensure that the favorable motion rulings pending appeal bind the entire classes when the absent class members can no longer opt out. If Defendants are successful on appeal and the Class Certification Order is reversed, their one-way-intervention argument becomes moot. In that case, nothing keeps absent class members from pursuing their individual claims against Defendants because without a class action any judgment will bind only named plaintiffs no matter when the summary judgment motions are decided.

In re Packaged Seafood Products Antitrust Litigation, Slip Copy (2020)

10    One-way intervention is always a possibility. For example, if a class certification ruling is modified or set aside under Rule 23(c)(1)(C) after ruling on liability issues or it is reversed on appeal after judgment on the merits, the absent class members may learn the outcome before deciding whether to participate or sue the defendant individually. *See Rodriguez v. Banco Central,* 790 F.2d 172 (1st Cir. 1986).

11    Defendants' opening brief on appeal has not been made available as of this writing. (*See Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC,* Case no. 19-56514 (9th Cir.).)

12    The parties extensively aired this issue at the status conference held on January 7, 2020. (*See* ECF Nos. 2250-56.)

---

**End of Document** <span style="float:right">© 2023 Thomson Reuters. No claim to original U.S. Government Works.</span>

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 106 of 131
PageID: 78105
In re Urethane Antitrust Litigation, Not Reported in F.Supp.2d (2006)
2006 WL 3021126

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Rosen v. J.M. Auto Inc.,   S.D.Fla.,   May 20,
2009

2006 WL 3021126
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

In re URETHANE ANTITRUST LITIGATION.
This Order Relates to the Polyester Polyol Cases.

No. 04–MD–1616–JWL.
|
Oct. 23, 2006.

**Attorneys and Law Firms**

George A. Hanson, Norman E. Siegel, Stueve Siegel
Hanson Woody LLP, Kansas City, MO, Rex A.
Sharp, Gunderson Sharp & Walke, L.L.P., Prairie
Village, KS, Roy Morrow Bell, Jason S. Hartley,
Timothy P. Irving, Ross, Dixon & Bell, LLP, San
Diego, CA, Steven A. Kanner, Douglas A. Millen,
William H. London, Much Shelist Freed Denenberg
Ament & Rubenstein PC, Gary Specks, Kaplan
Fox, Mary Jane Edelstein Fait, Wolf Haldenstein
Adler Freeman & Herz LLP, Chicago, IL, Susan G.
Kupfer, Glancy Binkow & Goldberg LLP, Eric B.
Fastiff, Joseph R. Saveri, Michele Chickerell Jackson,
Lieff, Cabraser, Heimann & Berstein, LLP, Cadio
Zirpoli, Geoffrey C. Rushing, Guido Saveri, Richard
Alexander Saveri, Saveri & Saveri, Inc., Craig C.
Corbitt, Francis O. Scarpulla, Judith A. Shimm, Zelle,
Hofmann, Voelbel, Mason & Gette, LLP, Joseph M.
Patane, Law Office of Joseph M. Patane, Mario
Nunzio Alioto, Trump Alioto Trump & Prescott LLP,
Ronald D. Foreman, Foreman & Brasso, Diana K.
Kim, Joseph M. Barton, Steven O. Sidener, Paul
F. Bennett, Gold, Bennett, Cera & Sidener, LLP,
Michael P. Lehmann, Thomas Patrick Dove, Alex C.
Turan, Frederick P. Furth, Julio Ramos, The Furth
Firm LLP, San Francisco, CA, W. Joseph Bruckner,
Yvonne M. Flaherty, Lockridge Grindal Nauen, PLLP,
Daniel E. Gustafson, Jason S. Kilene, Gustafson
Gluek PLLC, Minneapolis, MN, Joshua H. Grabar,
Anthony J. Bolognese, Bolognese & Associates, LLC,
Steven J. Greenfogel, Meredith, Cohen Greenfogel
& Skirnick, P.C., David H. Weinstein, Steven A.
Asher, Weinstein Kitchenoff & Asher LLC, Howard J.

Sedran, Levin, Fishbein, Sedran & Berman, Andrew
B. Sacks, John K. Weston, Sacks & Weston, LLC,
Ira Neil Richards, Trujillo Rodriguez & Richards
LLC, Allen D. Black, Gerard A. Dever, Roberta D.
Liebenberg, Fine, Kaplan and Black, RPC, Stewart
L. Cohen, William D. Marvin, Cohen, Placitella &
Roth PC, Philadelphia, PA, Marc H. Edelson, Hoffman
& Edelson, Doylestown, PA, Myroslaw Smorodsky,
Law Offices of Myroslaw Smorodsky, Rutherford,
NY, Daniel R. Karon, Weinstein Kitchenoff Scarlato
Karon Goldman, Cleveland, OH, Jason A. Zweig,
Richard J. Kilsheimer, Robert N. Kaplan, Kaplan
Fox & Kilsheimer, LLP, Fred Taylor Isquith,
Wolf Haldensteinadler Freeman & Herz LLP, New
York, NY, William J. Pinilis, Pinilis Halpern, LLP,
Morristown, NJ, Angela K. Drake, Lowther Johnson,
Attorneys at Law, LLC, Springfield, MO, Peter D.
St. Phillip, Jr., Lowey, Dannenberg, Bemporad &
Selinger, PC, White Plains, NY, James Belford Brown,
Herum Crabtree Brown, Stockton, CA, James V.
Demera, III, Mullen Sullivan & Newton, LLP, Lodi,
CA, Clinton D. Walker, Roger M. Schrimp, Damrell,
Nelson, Schrimp, Pallios, Pache, Modesto, CA, Lionel
Z. Glancy, Michael M. Goldberg, Peter A. Binkow,
Glancy Binkow & Goldberg LLP, Los Angeles, CA,
Anne White, White & Goldstein, LLC, Ann D. White,
Ann D. White Law Offices, PC, Jenkintown, PA,
Dianne M. Nast, Michael G. Nast, Rodanast, P.C.,
Lancaster, PA, Krishna Narine, Schiffrin & Barroway
LLC, Radnor, PA, Donna Siegel Moffa, Lisa J.
Rodriguez, Trujillo Rodriguez & Richards LLP, John
J. McGrath, McKissock & Hoffman, PC, Haddonfield,
NJ, Garrett D. Blanchfield, Jr., Reinhardt Wendorf &
Blanchfield, St. Paul, MN, Allyn Z. Lite, Bruce D.
Greenberg, Joseph J. Depalma, Michael E. Patunas,
Lite, Depalma, Greenberg & Rivas LLC, Newark, NJ,
Arthur N. Bailey, Arthur N. Bailey & Associates,
Jamestown, NY, Christopher J. Cormier, Justine J.
Kaiser, Michael D. Hausfeld, Stewart M. Weltman,
Cohen, Milstein, Hausfeld & Toll, PLLC, Washington,
DC, Lisa J. Rodriguez, Trujillo Rodriguez & Richards
LLP, Haddonfield, NJ, Isaac L. Diel, Law Offices of
Isaac L. Diel, Bonner Springs, KS, Henry J. Handzel,
Jr., Jonathon P. Axelrod, Dewitt Ross & Stevens S.C.,
Madison, WI, Joseph Goldberg, Freedman, Boyd,
Daniels, Hollander & Goldberg, PA, Albuquerque,
NM, Robert W. Coykendall, Tim J. Moore, Robert W.
Coykendall, Morris, Laing, Evans, Brock & Kennedy,
Chtd., Wichita, KS, Roger N. Walter, Morris, Laing,

Evans, Brock & Kennedy, Chtd., Topeka, KS, for Plaintiffs.

Andrew Stanley Marovitz, Terri A. Mazur, Mayer, Brown, Rowe & Maw LLP, Joan M. Meyers, Mark V. Chester, Johnson & Colmar, Chicago, IL, Floyd R. Finch, Jr., Shelley A. Runion, Blackwell Sanders Peper Martin LLP, James R. Eiszner, Joseph G. Matye, Shook, Hardy & Bacon L.L.P., W. Joseph Hatley, Spencer Fane Britt & Browne, Brian R. Markley, Stinson Morrison Hecker LLP, Charles W. German, Matthew P. Hamner, Phillip G. Greenfield, Rouse Hendricks German May PC, Kansas City, MO, Caroline N. Mitchell, Jones Day, Michael F. Tubach, O'Melveny & Myers, LLP, San Francisco, CA, J. Andrew Read, Jones Day, Benjamin G. Bradshaw, Ian Simmons, O'Melveny & Myers, LLP, G. Hamilton Loeb, Jeremy P. Evans, Paul, Hastings, Janofsky & Walker, LLP, Erica Mueller, Jennifer Quinn–Barabanov, Robert Fleishman, Steptoe & Johnson LLP, Jeffrey N. Luthi, Clerk of the MDL Panel, Washington, DC, James S. Jardine, John W. Mackey, Justin T. Togh, Ray, Quinney & Nebeker, Salt Lake City, UT, William C. Cagney, Windels, Marx, Lane & Mittendorf, LLP, New Brunswick, NJ, for Defendants.

David F. Oliver, Berkowitz Oliver Williams Shaw & Eisenbrandt, LLP, Kansas City, MO.

Jason Brett Fliegel, Mayer, Brown, Rowe & Maw LLP, Chicago, IL.

## MEMORANDUM AND ORDER

JOHN W. LUNGSTRUM, District Judge.

*1 In this multidistrict litigation proceeding plaintiffs allege that defendants engaged in a price-fixing conspiracy with respect to polyester polyols and related polyurethane systems in violation of federal antitrust laws. On August 16, 2006, the court entered an order certifying a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and directing the parties to begin the process of giving class notice pursuant to Rule 23(c). On August 31, 2006, the Chemtura defendants filed a petition with the Tenth Circuit Court of Appeals seeking permission to appeal the court's class certification order pursuant

to 28 U.S.C. § 1292(b) and Rule 23(f). This matter is presently before the court on the Chemtura Defendants' Motion to Stay Pending Resolution of 23(f) Appeal (doc. # 435). By way of this motion, the Chemtura defendants ask the court to stay the publication of class notice in this action pending the Tenth Circuit's determination of Chemtura's petition for leave to appeal and, if that petition is granted, pending determination of the appeal. For the reasons explained below, Chemtura's motion to stay is granted in part and denied in part. Specifically, the parties are directed to proceed with preparing the class notice for publication and mailing, but the court will not order the actual dissemination of class notice until the Tenth Circuit resolves Chemtura's motion for leave to appeal. If the Circuit denies Chemtura's request, then notice can be issued promptly. If the Circuit takes the appeal, the court will entertain a renewed motion to stay at that time.

Rule 23(f) of the Federal Rules of Civil Procedure permits interlocutory appeals of district court orders granting or denying class certification. Carpenter v. Boeing Co., 456 F.3d 1183, 1189 (10th Cir.2006). A petition for such an appeal does not automatically stay proceedings in the district court. Rather, it stays proceedings in the district court only if "the district judge or the court of appeals so orders." Fed.R.Civ.P. 23(f). In determining whether such a stay is warranted, district courts generally employ an analysis similar to that used in motions for preliminary injunctions or stays pending appeals of final judgments. See Beattie v. CenturyTel, Inc., Case No. 02–10277–BC, 2006 WL 1722207, at *2 (E.D. Mich. June 20, 2006) (collecting case law); In re Lorazepam & Clorazepate Antitrust Litig., 208 F.R.D. 1, 3 (D.D.C.2002) (reasoning it is "a discretionary matter to be informed by a flexible application of the well-established, four-factor balancing test employed to consider preliminary injunctive relief and other stays pending appeal"). In the Tenth Circuit, such relief is warranted if the moving party establishes (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable harm without the relief sought, (3) threatened injury that outweighs any harm the relief would cause the opposing party, and (4) that the relief would not be contrary to the public interest.

*Wyandotte Nation v. Sebelius,* 443 F.3d 1247, 1254–55 (10th Cir.2006).

**\*2** At this time, the court does not believe Chemtura's appeal has a substantial likelihood of success on the merits. The Tenth Circuit has discretion whether to grant the appeal, and generally such an appeal will not be granted in the absence of " 'appeal-worthy certification issues.' " *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1189 (10th Cir.2006) (quoting the advisory committee notes to the 1998 amendments to Rule 23). Thus, interlocutory review of a class certification order typically will not be granted unless one or more of the following factors is evident: (1) the certification order represents the death knell of the litigation for one of the parties (e.g., for the defendant, who may be compelled to settle); (2) the certification decision shows a substantial weakness, amounting to an abuse of discretion; or (3) an interlocutory appeal will resolve an unsettled legal issue. Manual for Complex Litigation § 21.28, at 283 (4th ed.2004). Here, the court's order certifying a class in the Polyester Polyol Cases did not seem to involve any such compelling concerns. The court carefully considered Chemtura's arguments in opposition to plaintiffs' motion for class certification and, ultimately, the court concluded that this case was not at all atypical of many other similar antitrust class action lawsuits. Thus, the court doubts that this case involves the type of concerns for which the Tenth Circuit would be likely to grant Chemtura's petition for an interlocutory appeal.

Turning to considerations of irreparable harm, Chemtura contends that, in the absence of a stay, it will have to expend time and resources associated with resolving the issues related to notice, that significant confusion will likely result if the Tenth Circuit vacates or modifies the class certification order after notice has already been disseminated to class members, and that dissemination of class notice will disrupt its business relations with its customers. By comparison, the threatened injury to plaintiffs that might outweigh that harm is the fact that granting the stay would delay the process of disseminating notice to a class which the court has already certified, thus unduly protracting this litigation. The court does not believe the burden to be placed on Chemtura to deal with notice related issues

is undue and it also believes that any such burden does not outweigh the hardship of delaying resolution of the litigation. But, the court is persuaded that the potential confusion that could result if the Tenth Circuit were to vacate or modify the class certification order after notice has already been disseminated to class members counsels against proceeding to issue notice at least until the Circuit has resolved the request to take the appeal. In cases involving a Rule 23(f) appeal the court should ordinarily stay the dissemination of class notice to avoid the confusion and substantial expense of renotification that may result from appellate reversal or modification. Manual for Complex Litigation § 21.28, at 284.

**\*3** Lastly, the court believes that the public interest is best served by moving forward in anticipation that the Tenth Circuit will reject Chemtura's petition for an interlocutory appeal, and thus delay would be avoided, but also by withholding dissemination of notice until the petition is resolved, and thus avoiding confusion. Interlocutory appeals are generally disfavored because they disrupt and delay the proceedings below. *Carpenter,* 456 F.3d at 1189. The public interest would not be served by any undue delay.

On balance, then, these factors weigh in favor of denying Chemtura's motion to stay, with the exception of the actual publication and mailing of class notice. That way, the parties should be prepared to proceed with disseminating class notice immediately if the Tenth Circuit denies Chemtura's petition to appeal. Accordingly, the parties are directed to proceed with preparing to disseminate class notice. To that end, on or before **November 9, 2006,** Chemtura shall provide to plaintiffs the names, addresses, and telephone numbers of all customers who are potential members of the class. The parties shall meet and confer in an attempt to reach agreement on a proposed order approving the form of class notice and, to the extent they reach agreement on the proposed order, they shall submit that proposed order to the court on or before **November 9, 2006.** On or before that same date, they shall file submissions outlining their disputes, if any, to the extent they are unable to reach agreement as to particular issues relating to class notice.

In re Urethane Antitrust Litigation, Not Reported in F.Supp.2d (2006)
2006 WL 3021126

**IT IS THEREFORE ORDERED BY THE COURT**
that the Chemtura Defendants' Motion to Stay Pending
Resolution of 23(f) Appeal (doc. # 434) is granted in
part and denied in part as set forth above.

**IT IS SO ORDERED** this 23rd day of October, 2006.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3021126

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 110 of 131
PageID: 78109

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9244638, 2015-2 Trade Cases P 79,436

2015 WL 9244638
United States District Court, E.D. Pennsylvania.

KING DRUG COMPANY OF
FLORENCE, INC., et al., Plaintiffs,
v.
CEPHALON, INC., et al., Defendants.
Vista Healthplan, Inc., et al., Plaintiffs,
v.
Cephalon, Inc., et al., Defendants.
Apotex, Inc., Plaintiff,
v.
Cephalon, Inc., et al., Defendants.

CIVIL ACTION Nos. 2:06-
cv-1797, 2:06-cv-1833, 2:06-cv-2768
|
Signed 12/17/2015

**Attorneys and Law Firms**

Andrew William Kelly, Stuart E. De Sroches, Chris Letter, Odom & Des Roches LLP, New Orleans, LA, Bruce E. Gerstein, Dan Litvin, Joseph Opper, Noah Silverman, Kimberly Hennings, Garwin Gerstein and Fisher L.L.P., Linda P. Nussbaum, Nussbaum Law Group PC, Richard J. Kilsheimer, Kaplan Fox & Kilsheimer LLP, New York, NY, David C. Raphael, Jr., David P. Smith, Susan C. Segura, Brian D. Brooks, Smith Segura & Raphael LLP, Alexandria, LA, Dianne M. Nast, Erin C. Burns, Nastlaw LLC, Daniel C. Simons, David F. Sorensen, Daniel Berger, Berger and Montague P.C., Allen D. Black, Fine, Kaplan & Black, Krishna B. Narine, Meredith & Narine, Barry L. Refsin, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, Douglas R. Wilson, Heim Payne & Chorush LLP, Austin, TX, Miranda Y. Jones, Russell A. Chorush, Heim Payne & Chorush LLP, Houston, TX, Neill Wilson Clark, Faruqi & Faruqi LLP, Jenkintown, PA, Scott E. Perwin, Richard A. Arnold, Kenny Nachwalter, P.A., Miami, FL, David P. Germaine, John Paul Bjork, Joseph M. Vanek, Vanek Vickers & Masini PC, Chicago, IL, Monica L. Rebuck, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, PA, Gordon Ball, Ball & Scott, Knoxville, TN, for Plaintiffs.

Kevin Vanwart Kirkland & Ellis LLP Chicago, IL Emily R. Whelan Wilmer Hale Gregory P. Teran, James C. Burling, Mark A. Ford, Michelle D. Miller, Peter J. Kolovos, Peter A. Spaeth, Yin Zhou, Wilmer Cutler Pickering Hale & Dorr LLP, Laurence Schoen, Mintz Levin Cohn Ferris Glovsky & Popeo PC, Boston, MA, Frank R. Emmerich, Jr., John A. Guernsey, Nancy J. Gellman, Conrad O'Brien, David L. Comerford, Katherine M. Katchen, Akin Gump Strauss Hauer & Feld LLP, Anthony S. Volpe, John J. O'Malley, Volpe & Koenig PC, Brett Alan Kratz, Neill C. Kling, Harkins Cunningham LLP, Erin C. Dougherty, Montgomery McCracken Walker & Rhoads, LLP, Andrew W. Grindrod, Kirkland & Ellis LLP, Philadelphia, PA, Gregory L. Skidmore, Kirkland Ellis LLP, J. Douglas Baldridge, Christopher K. Diamond, Danielle R. Foley, Lisa Jose Fales, Molly Geissenhainer, Vincent E. Verrocchio, Sarah Choi, Venable LLP, C. Fairley Spillman, Catherine E. Creely, Paul B. Hewitt, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Melinda Meador, Winchester Sellers Foster & Steele PC, Knoxville, TN, Robert J. Gunther, Jr., Wilmer Cutler Pickering Hale Dorr LLP, Daniel P. Margolskee, David R. Marriott, Evan R. Chesler, Rowan D. Wilson, Lindsay J. Timlin, Cravath Swaine & Moore LLP, William H. Rooney, Jeffrey B. Korn, Willkie Farr Gallagher LLP, New York, NY, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, Paul T. McGurkin, Jr., Lewis Brisbois Bisgaard Smith, LLP, Wayne, PA, Joseph E. Wolfson, Stevens & Lee, King of Prussia, PA, for Defendants.

## MEMORANDUM OPINION

Goldberg, District Judge

**\*1** This antitrust case involves four Hatch-Waxman reverse-payment settlement agreements. These settlement agreements were entered into by Cephalon, Inc., the manufacturer of the brand-name pharmaceutical Provigil and four generic drug companies. [1] Plaintiffs, the Direct Purchasers of Provigil (including the Individual Plaintiffs [2] ), the End Payors of Provigil, and a generic competitor, Apotex, Inc. ("Apotex"), have brought claims against Cephalon and the four Generic Defendants for violations of the Sherman Act and related state laws.

Litigation in this case has been ongoing for approximately nine years. The dockets in these matters contain approximately 2,400 entries. Significant portions of the case have been resolved. A trial involving those parties that have not settled is scheduled for February 2, 2016.

After I issued an Order certifying the Direct Purchaser Litigation Class, Mylan and Ranbaxy were successful in obtaining 🚩 Federal Rule of Civil Procedure 23(f) review of this Order from the United States Court of Appeals for the Third Circuit. Mylan and Ranbaxy have now requested that I stay all proceedings before me pending the Third Circuit's interlocutory review of the Order certifying the Direct Purchaser Litigation Class. For the reasons that follow, I conclude that Mylan and Ranbaxy have failed to demonstrate that a stay is warranted. Therefore, the trial will commence on February 2, 2016 as scheduled. [3]

## I. PROCEDURAL HISTORY
The procedural history relevant to the motion to stay is set forth below:

On July 27, 2015, I issued an Opinion and Order granting the Direct Purchaser Plaintiffs' motion for class certification. In that Opinion, I found that the Direct Purchaser Plaintiffs had satisfied the predominance requirement as to both antitrust liability and damages. Regarding numerosity, I found that the Direct Purchaser Plaintiffs had demonstrated that the parties were sufficiently numerous so as to make joinder impracticable. 🚩 King Drug Co. of Florence, Inc. v. Cephalon, Inc., 309 F.R.D. 195 (E.D. Pa. 2015).

 *2 On August 5, 2015, the Direct Purchaser Plaintiffs filed a motion for approval of the form and manner of notice to be sent to the class members. On August 11, 2015, I issued an Order scheduling the liability phase of trial in all matters for February 2, 2016.

On August 12, 2015, Mylan and Ranbaxy filed a petition with the Third Circuit seeking permission to appeal the July 27, 2015 class certification Order. The petition was filed pursuant to 🚩 Federal Rule of Civil Procedure 23(f) which provides:

A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

Mylan and Ranbaxy raised the following two issues in their 🚩 Rule 23(f) petition:

(1) Whether the district court contravened Comcast Corp. v. Behrend, when it certified a class whose theory of antitrust injury no longer corresponded to its theory of liability following the district court's grant of summary judgment eliminating all claims of concerted action among Mylan, Ranbaxy and other Generic Defendants.

(2) Whether the district court erred in concluding that the putative class of 22 members satisfied 🚩 Rule 23's numerosity requirement. [4]

(Defs.' 🚩 Rule 23(f) Pet. pp. 1-2.)

Also on August 12, 2015, Mylan and Ranbaxy filed a response in opposition to the Direct Purchaser Plaintiffs' motion for approval of notice, arguing that the parties had not met and conferred, and that the Direct Purchaser Plaintiffs had included improper information in their proposed notice. On the same day, Mylan and Ranbaxy moved to stay class notice pending a decision from the Third Circuit on their 🚩 Rule 23(f) petition.

On August 13, 2015, I denied the Direct Purchaser Plaintiffs' motion for approval of the form and manner of notice without prejudice and ordered the parties to meet and confer to attempt to resolve the issues in dispute. The Direct Purchaser Plaintiffs were directed

2015 WL 9244638, 2015-2 Trade Cases P 79,436

to refile their motion if the parties could not reach an agreement. Mylan and Ranbaxy's motion to stay notice pending the Third Circuit's decision was also denied.

On August 24, 2015, after the parties were apparently unable to reach an agreement, the Direct Purchaser Plaintiffs filed a motion to amend and clarify the July 27, 2015 class certification Order. In the motion to amend the certification Order, the Direct Purchaser Plaintiffs, over Mylan and Ranbaxy's objections, sought to add two issues to the list of issues common to the class. These issues pertained to damages and a theory of per se liability based on the Generic Defendants' alleged knowledge of Cephalon's fraudulent patent.[5] That motion also sought the Court's approval of the proposed form and manner of notice. On September 10, 2015, Mylan and Ranbaxy filed their opposition to the motion to amend the class certification Order and for approval of notice.

**\*3** On October 9, 2015, the Third Circuit granted Mylan and Ranbaxy's Rule 23(f) petition, and agreed to hear the appeal of the Order certifying the Direct Purchaser Litigation Class.

On October 16, 2015, Mylan and Ranbaxy filed the instant motion to stay all related proceedings (i.e. King Drug, Vista Healthplan, and Apotex) pending the Third Circuit's decision on the Rule 23(f) appeal of the Order certifying the Direct Purchaser Litigation Class. As of the writing of this opinion, the Third Circuit has not yet issued a briefing schedule in the Rule 23(f) appeal. According to Mylan and Ranbaxy, the Third Circuit typically takes sixteen months to issue a decision after granting a Rule 23(f) petition.

## II. LEGAL STANDARD

As best as I can tell, the Third Circuit has not yet articulated what standard district courts should apply when deciding motions to stay proceedings pending Rule 23(f) appeals. See Johnson v. Geico Cas. Co., 269 F.R.D. 406, 411 (D. Del. 2010). In the absence of binding precedent, the parties disagree on what standard should govern Mylan and Ranbaxy's motion.

Mylan and Ranbaxy argue that a district court considering a motion to stay proceedings pending resolution of a Rule 23(f) appeal should apply the factors set forth in Nken v. Holder, 556 U.S. 418 (2009). These factors are similar to those examined in the context of a motion for a preliminary injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Id. at 434.

On the other hand, all Plaintiffs agree that application of the Nken factors is inappropriate because that standard only governs motions to stay an order, not all proceedings. Plaintiffs stress that Mylan and Ranbaxy are not just seeking to stay the class certification Order on appeal but, rather, have asked that all proceedings in these consolidated cases be stayed, including the cases involving Apotex and the Individual Plaintiffs. Plaintiffs point out that the issues raised in the Rule 23(f) appeal have no bearing on these other proceedings and, therefore, a different standard should govern the broad stay request.

Plaintiffs cite to Akishev v. Kapustin, 23 F. Supp. 3d 440 (D.N.J. 2014) as the correct standard for a stay of all proceedings pending resolution of a Rule 23(f) appeal. Akishev instructs that courts should look to the following factors in deciding whether to grant such a stay: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether denial of the stay would create a clear case of hardship or inequity for the moving party; (3) whether a stay would simplify the issues and the trial of the case; and (4) whether discovery is complete and/or a trial date has been set." Id. at 446. Akishev also notes that "[w]here a stay is sought pending resolution of purportedly related litigation,...courts consider whether resolution of the related litigation would substantially impact or otherwise render moot the present action." Id. (citing Bechtel Corp. v. Local 215, Laborers' Int'l Union, 544 F.2d 1207, 1215 (3d Cir. 1976)).

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9244638, 2015-2 Trade Cases P 79,436

**\*4** In certain respects, the Nken and Akishev standards seem to overlap. That said, I am not entirely persuaded that the less stringent Nken test should govern where the motion, like the one before me, seeks a broad stay of all proceedings, including matters which are not directly implicated by an appeal filed in a separate but related case. However, out of deference to Mylan and Ranbaxy, who have successfully obtained 23(f) review and now seek a stay, I will apply the less stringent standard set forth in Nken. In any event, regardless of whether I apply the Nken or Akishev standards, I would still conclude Mylan and Ranbaxy have not met their burden of demonstrating that a stay is appropriate.

### III. DISCUSSION

For the following reasons, I conclude that the Nken factors weigh in favor of denying Mylan and Ranbaxy's motion to stay the proceedings.

1. Likelihood of Success on the Merits

As to the first factor, a movant "need[ ] only show a likelihood of success on the merits (that is, a reasonable chance, or probability of winning) to be granted relief. A 'likelihood' does not mean more likely than not." Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011) (emphasis in original). The Third Circuit has observed that granting a Rule 23(f) petition is appropriate to address: "(1) the possible case-ending effect of an imprudent class certification decision (the decision is likely dispositive of the litigation); (2) an erroneous ruling; or (3) [immediate appeal would] facilitate development of the law on class certification." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 165 (3d Cir. 2001).

Mylan and Ranbaxy assert that the Third Circuit's grant of their 23(f) petition alone strongly suggests that they have a likelihood of succeeding on the merits of their appeal. Without any in-depth discussion about the types of cases accepted or the issues reviewed, Mylan and Ranbaxy cite statistics that purportedly demonstrate that the Third Circuit denies eighty to eighty-five percent of Rule 23(f) petitions. And,

where the defendant filed the appeal, more than eighty percent of the petitions that are granted ultimately end in a reversal of the district court's certification order.

Mylan and Ranbaxy also cite to a number of cases from other district courts outside of this Circuit which have held that the grant of a Rule 23(f) petition, where complicated issues of first impression are being considered, weighs in favor of the party seeking a stay. See In re Lorazepam & Clorezepate Antitrust Litig., 208 F.R.D. 1, 5-6 (D.D.C. 2001) (concluding presence of two issues of first impression in Rule 23(f) petition weighed in favor of a stay); Gray v. Golden Gate Nat'l Recreational Area, 2011 WL 6934433, at \*2 (N.D. Cal. Dec. 29, 2011) (finding that matters of first impression raised in the Rule 23(f) appeal relating to Supreme Court precedent weighed in favor of a stay); IBEW Local 98 Pension Fund v. Best Buy Co., 2014 WL 4540228, at \*2 (D. Minn. Sept. 11, 2014) (finding likelihood of success on the merits prong weighed in favor of stay where "the question of certification in this action was difficult and involved evolving and novel questions of law").

Plaintiffs vigorously dispute Mylan and Ranbaxy's assertion that the mere acceptance of the Rule 23(f) petition weighs in favor of a stay and argue that the statistics cited by Mylan and Ranbaxy are incomplete and misleading as they omit notable cases, such as In re K-Dur Antitrust Litigation, 686 F.3d 197, 220-21 (3d Cir. 2012). Plaintiffs urge that the standard is not whether statistically a Rule 23(f) appeal has a reasonable chance of success on the merits but, rather, the question is whether this particular Rule 23(f) has a reasonable chance of success on the merits, which Plaintiffs strongly contend it does not.

**\*5** Although I carefully considered the issues raised in the 23(f) petition and remain convinced that certification of the Direct Purchaser Litigation Class was correct, I conclude that the first Nken factor weighs slightly in favor of granting the stay. On one hand, Plaintiffs raise valid points undermining the value of Mylan and Ranbaxy's statistical evidence regarding the Third Circuit's Rule 23(f) practices.

On the other hand, Mylan and Ranbaxy's appeal of the Direct Purchaser Litigation Class certification Order raises an arguably novel question of law concerning Supreme Court precedent – i.e. "the Comcast issue."[6] However, while the "Comcast issue" may be novel, as discussed extensively infra, I do not believe that Mylan and Ranbaxy's argument is correct as a matter of law or fact.

While it is close, on balance, I find that Mylan and Ranbaxy have made a sufficient showing regarding the likelihood of success on the merits prong.

### 2. Irreparable Injury to the Moving Parties Absent a Stay

Regarding the second factor, Mylan and Ranbaxy assert that, absent a stay, they will suffer irreparable harm because "the trial as scheduled poses a very substantial risk of the need to vacate any adverse judgment and re-litigate some portion of the case." (Defs.' Mot. to Stay p. 6.) Mylan and Ranbaxy explain that should the Third Circuit reverse the Direct Purchaser Litigation Class certification Order, "the entire trial will have been a waste of the parties' resources and the Court's time," and additional discovery would likely be required. (Id.)

The Direct Purchaser Plaintiffs respond that Mylan and Ranbaxy provide no precedent for the proposition that a waste of the moving parties' resources and the Court's time constitutes an irreparable injury. In fact, the Direct Purchaser Plaintiffs cite to precedent holding that an alleged waste of resources does not constitute irreparable harm unless the amount of loss would be so significant as to force the moving party out business entirely. (Direct Purchasers' Resp. p. 11 (citing Minard Run Oil Co. v. U.S. Forest Serv., 670 F.3d 236, 255 (3d Cir. 2011)) (citations omitted) ("a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement...but an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business.")) 

Additionally, Plaintiffs point out that Mylan and Ranbaxy cannot be injured by a denial of a stay because the class certification issues on appeal have no effect on Apotex or the Individual Plaintiffs' claims.

Accordingly, Plaintiffs persuasively argue that the trial will, therefore, move forward with Mylan and Ranbaxy, as participants, irrespective of the Third Circuit's resolution of the class certification issues. Therefore, according to Plaintiffs "neither the parties' resources nor the Court's time will be wasted by holding a trial that has to be held anyway." (Direct Purchasers' Resp. p. 12 (emphasis in original).)

**\*6** I agree with Plaintiffs that the second Nken factor weighs in favor of denying the motion to stay all proceedings. The issues raised in the Rule 23(f) appeal, which by definition are confined to class certification, have no bearing on Apotex or the Individual Plaintiffs. Mylan and Ranbaxy provide no convincing explanation as to how the Third Circuit's resolution of whether the Direct Purchaser Litigation Class was properly certified could impact a trial involving non-class claims brought by Apotex or the Individual Plaintiffs. Put another way, even if I were to agree to stay the trial regarding the Direct Purchaser Plaintiffs, Mylan and Ranbaxy would still be ordered to participate in a trial involving parties who have no involvement in the Rule 23(f) appeal. As such, Mylan and Ranbaxy's inability to show any irreparable harm weighs heavily against the granting of a stay.

Furthermore, the trial scheduled for February 2, 2016 will only involve issues pertaining to antitrust liability not damages. The issues raised in the Rule 23(f) appeal will not impact what the Direct Purchaser Plaintiffs have to prove at the liability trial. Mylan and Ranbaxy disagree and urge that the Third Circuit's decision on the issues raised in their Rule 23(f) petition will provide guidance to this Court and the parties on "issues of antitrust impact, causation and damages." (Defs.' Mot. to Stay p. 5.)

Although styled as a single question presented in their Rule 23(f) petition, Mylan and Ranbaxy argue that my predominance finding was incorrect for two separate reasons. Both arguments are premised on the impact that my summary judgment ruling in favor of Defendants on Plaintiffs' claims for an overall conspiracy had on the ability of the Direct Purchaser Litigation Class to satisfy the predominance requirement. See King Drug Co. of Florence, Inc.

v. Cephalon, Inc., 2014 WL 2813312, at *14 (E.D. Pa. June 23, 2014) (granting summary judgment to Defendants, as evidence in the record did not support an inference of an overall agreement encompassing Cephalon and the four Generic Defendants).

In the first predominance sub-issue raised in the Rule 23(f) petition, Mylan and Ranbaxy contend that, in light of the dismissal of the overall conspiracy claims, each individual Direct Purchaser Plaintiff must now prove, as part of their liability case, which Generic Defendant they would have purchased generic Provigil from in the but-for-world. According to Mylan and Ranbaxy, "[w]ith the demise of Plaintiffs' claim of an overall conspiracy, a class member who would not have purchased generic modafinil from, e.g., Mylan in the but-for world cannot show antitrust injury resulting from the Mylan-Cephalon agreement." (Defs.' 23(f) Petition p. 9.) As each prospective class member may have purchased generic Provigil from a different Generic Defendant in the but-for world, Mylan and Ranbaxy contend that individualized inquiries predominate, rendering class treatment inappropriate.

Mylan and Ranbaxy cite to Mid-West Paper Products Company v. Continental Group, Inc., 596 F.2d 573 (3d Cir. 1979) in support of this argument. I previously rejected the applicability of this case in my opinion certifying the Direct Purchaser Litigation Class. See King Drug Co. of Florence, Inc. v. Cephalon, Inc., 309 F.R.D. 195, 210-12 (E.D. Pa. 2015). Upon further review of this issue, I stand by that decision.

In Mid-West Paper, manufacturers of paper bags were accused of price fixing in violation of the antitrust laws. 596 F.2d at 575. One of the plaintiffs had not purchased paper bags from any defendant, but instead had purchased paper bags from the defendants' competitors who had allegedly taken advantage of the price fixing by raising their own prices. Id. at 580-81. The Third Circuit held that the plaintiff lacked standing to pursue an antitrust violation because the plaintiff did not have a direct relationship with the defendants nor had the defendants secured an illegal benefit at the plaintiff's expense. Id. at 583.

*7 As I explained in the class certification ruling, the scenario before me is entirely distinguishable from the facts in Mid-West Paper. Here, members of the Direct Purchaser Litigation Class all purchased Provigil directly from Defendant Cephalon, a signatory to each of the four settlement agreements, including the agreements with Mylan and Ranbaxy. Unlike Mid-West Paper, this establishes a direct relationship with one of the Defendants.

Mylan and Ranbaxy's Mid-West Paper argument is also inconsistent with Federal Trade Commission v. Actavis, Inc., 133 S. Ct. 2223 (2013). Here, Mylan or Ranbaxy contributed to the antitrust injury if either received a large and unjustified payment from Cephalon and that payment, funded by the monopoly profits that Cephalon obtained from all Plaintiffs, induced either Generic Defendant to keep its generic product off of the market. Under Actavis, such a "payment may [ ] provide strong evidence that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market." Id. at 2235. Therefore, if the Mylan-Cephalon agreement and the Ranbaxy-Cephalon agreements are found to be unreasonable restraints on competition, by accepting large and unjustified payments, both of those Generic Defendants would have secured an illegal benefit at Plaintiffs' expense, regardless of whether any particular Plaintiff would have purchased generic Provigil directly from Mylan or Ranbaxy. For these reasons, I previously concluded and continue to conclude that individualized inquiry into which Generic Defendant each class member would have favored in the but-for-world is unnecessary and not mandated by Mid-West Paper.

Mylan and Ranbaxy's insistence that the Third Circuit's resolution of their Mid-West Paper argument will significantly impact the liability portion of trial is also not supported by pre-Actavis antitrust precedent. Indeed, both the Third Circuit and Supreme Court have made it clear that in order to establish antitrust injury Plaintiffs need only prove that they were overcharged for Provigil because an anticompetitive agreement prevented lower-priced competition from entering the market. See In re K-Dur Antitrust Litig., 686 F.3d 197, 220-21 (3d Cir. 2012) (holding

2015 WL 9244638, 2015-2 Trade Cases P 79,436

that direct purchasers in a reverse-payment settlement antitrust case can establish antitrust injury with class-wide evidence of overcharges)[7] ; Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968) (plaintiff suffers an antitrust injury when it is overcharged for a product). The Direct Purchaser Plaintiffs can possibly establish antitrust injury with class-wide evidence of overcharges. Nothing more is required.

Mylan and Ranbaxy's Mid-West Paper argument would also essentially foreclose the possibility of any Actavis antitrust class-action involving more than one reverse-payment settlement agreement. If Mylan and Ranbaxy are correct and plaintiffs in such cases are required to prove which of the generic defendants they would have favored in the but-for world, individualized inquires would likely always predominate in such cases, rendering class treatment inappropriate.

Furthermore, if taken to its logical conclusion, Mylan and Ranbaxy's theory would prohibit a Plaintiff from recovering overcharges if it would have purchased generic Provigil from a competitor of Mylan and Ranbaxy in the but-for world, even though that competitor was allegedly kept off of the market due to the reverse-payment settlements.

**\*8** In the second sub-issue raised in the Rule 23(f) petition, Mylan and Ranbaxy argue that I contravened Comcast in certifying the Direct Purchaser Litigation Class. Mylan and Ranbaxy challenge my determination that the Direct Purchaser Plaintiffs' damages model matched their theory of liability even though Plaintiffs did not revise their damages calculations after I granted Defendants' motion for summary judgment on Plaintiffs' claims of an overall conspiracy. A more detailed exploration of Comcast is necessary to fully understand how that case does not impact the motion before me.

In Comcast, the district court certified the class but only accepted one of plaintiffs' four theories of antitrust impact as capable of class-wide proof. Comcast, 133 S.Ct. at 1431. The damages model the plaintiffs' expert had used to calculate damages for the class included damages from all of the

theories of antitrust impact, including the three not certified for class treatment. Id. The Supreme Court concluded that the class was improperly certified because plaintiffs had not shown that damages were capable of measurement on a class-wide basis, a necessary requirement of predominance. Id. at 1433. In short, Comcast instructs that a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation[,]" in order for class treatment to be appropriate. Id. (emphasis added). In other words, Comcast simply reaffirms the basic Rule 23 predominance requirement that damages must be provable on a class-wide basis. In reaffirming this basic requirement, the Comcast Court offered the uncontroversial conclusion that the damages model offered by a class must fit the theory of antitrust liability offered by that class. See Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 375 (3d Cir. 2015).

Mylan and Ranbaxy's argument under Comcast relates solely to the damages portion of the Direct Purchaser Plaintiffs' case. Even if the Third Circuit were to determine that the Direct Purchaser Plaintiffs' damages model ran afoul of Comcast, Mylan and Ranbaxy have not adequately explained how that finding would affect the liability portion of the pending trial. As such, the fact that the Third Circuit may review Plaintiffs' damages model under Comcast does not weigh in favor of a stay of the liability trial.

For the reasons set forth above, I am not persuaded by Mylan and Ranbaxy's argument that the scheduled liability trial would be a waste of time amounting to irreparable injury. This is so even if the Third Circuit eventually concludes that the Direct Purchaser Litigation Class was improperly certified. Mylan and Ranbaxy's concerns that they will be held jointly and severally liable for overcharges stemming from other agreements relates to the quantum of damages, not fact of injury. As such, I do not believe that a ruling from the Third Circuit will affect the liability portion of trial, as Defendants' argument is more properly characterized as a damages issue. For the foregoing reasons, I find that Mylan and Ranbaxy have offered minimal evidence that they would be irreparably harmed by proceeding to trial.

King Drug Company of Florence, Inc. v. Cephalon, Inc., Not Reported in Fed. Supp. (2015)
2015 WL 9244638, 2015-2 Trade Cases P 79,436

### 3. Whether a Stay Will Substantially Injure the Other Parties

Regarding the third Nken factor, Mylan and Ranbaxy argue that all parties will be injured absent a stay because "the parties will proceed to trial without knowing with certainty which plaintiffs are proper parties to the case, will not know the scope of any final judgment, will not be able to measure Defendants' damages exposure, and will be deprived of the benefit of interlocutory review that the Third Circuit granted." (Defs.' Mot. to Stay p. 7.) According to Mylan and Ranbaxy, if a stay is granted, "Plaintiffs will still be able to prepare for trial and no evidence will be lost over time." (Id. at 8.)

*9 The initial complaints in this consolidated matter were filed almost a decade ago. Since those filings, several unavoidable delays in this litigation have occurred. The first delay was due to two trials over Cephalon's patent and subsequent litigation in the Federal Circuit. The second delay was attributable to the Supreme Court's grant of certiorari in Actavis. Plaintiffs properly note that, since this case was first filed, key witnesses have moved away, one fact witness – Cephalon's former CEO – and one expert witness has passed away, and memories continue to fade. As Mylan and Ranbaxy acknowledge, the ⚑ Rule 23(f) appeal will likely not be resolved for at least another year which means that, if I were to grant the motion to stay, a trial would likely not occur until early 2017. This is a conservative estimate, particularly in light of the fact that the Third Circuit has not yet issued a briefing schedule. Mylan and Ranbaxy's assertion that "no evidence will be lost over time" ignores these realities.

Additionally, Plaintiffs have expended substantial amounts of time and resources preparing for the February 2nd trial and have continued to do so during the pendency of the instant motion. Preparing for a trial of this magnitude requires Plaintiffs' attorneys to acquire a fluency with the many factual issues in this case. Such an undertaking is significant and a delay of over a year would require duplication of these considerable efforts. This time consuming and costly preparation would largely be for naught if any or all of the cases are stayed pending the Third Circuit's review.

In light of the foregoing considerations, I conclude that the substantial harm a stay would cause to Plaintiffs outweighs the harm that Mylan and Ranbaxy claim they would face absent a stay of all proceedings. Therefore, the third Nken factor strongly favors denying the motion to stay.

### 4. The Public Interest

Mylan and Ranbaxy assert that the public interest favors a stay for two reasons: (1) a stay is necessary to give effect to the Third Circuit's determination that this appeal should be decided on an interlocutory basis; and (2) a stay is necessary to prevent confusion to the class. Plaintiffs respond that this case has been pending for nearly ten years and the public has a compelling interest in antitrust actions being resolved swiftly.

I conclude that the public interest in prompt resolution of this antitrust matter outweighs the two concerns identified by Mylan and Ranbaxy. While the Third Circuit did grant the ⚑ Rule 23(f) petition, proceeding to trial will not interfere with ⚑ Rule 23(f)'s purpose of providing interlocutory guidance on class certification issues prior to a final judgment. As explained above, I view the so-called "Comcast Issue" raised in the ⚑ Rule 23(f) appeal as a damages issue that pertains to Direct Purchaser Plaintiffs only. The trial set for February 2, 2016 is limited to liability and the damages portion of trial for Direct Purchaser Plaintiffs can be scheduled after the ⚑ Rule 23(f) appeal is resolved.

In their second argument, Mylan and Ranbaxy urge that there will be serious confusion about how the case will be tried unless the case is stayed or the Court decides the Direct Purchaser Plaintiff's motion to amend the class certification Order. Mylan and Ranbaxy contend that until that motion is resolved it will be unclear whether Plaintiffs can include a theory of per se liability in the class notice premised on the Generic Defendants' alleged knowledge of Cephalon's fraudulent patent. However, I recently concluded that such a theory is contrary to Actavis. (See Order and Op. denying Mot. to Strike, Dec. 14, 2015.) This ruling provides clarity to the theories of liability that Plaintiffs may pursue at trial and moots Mylan and Ranbaxy concerns regarding this issue.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 9244638, 2015-2 Trade Cases P 79,436

In light of the foregoing, I find that the public interest in resolution of this antitrust matter significantly outweighs the countervailing public interests identified by Mylan and Ranbaxy. As such, the fourth <u>Nken</u> factor favors denying the motion to stay and proceeding to trial.

**\*10** In conclusion, upon weighing Mylan and Ranbaxy's likelihood of success on the merits, the comparably modest harm Mylan and Ranbaxy would suffer if the matters are to proceed, the significant harm that Plaintiffs would suffer if all proceedings were to be stayed, and the strong public interest in resolution of this nearly decade old antitrust matter, I conclude that the motion to stay should be denied and trial should proceed as scheduled. This case is simply too complicated, with too many competing interests to satisfy each parties' views regarding trial structure and scheduling. After nine years, Plaintiffs are entitled to their day in court. Having carefully considered all of the moving parts of this case and how each party would be impacted by a stay, I am convinced that the fairest and most efficient course, in terms of time and resources, is to hold a single trial resolving all claims raised by Apotex, the Individual Plaintiffs and the Direct Purchaser Plaintiffs.

### IV. This Court's Jurisdiction to Proceed with Notice and Try the Claims of the Direct Purchaser Litigation Class

Mylan and Ranbaxy also argue that the Rule 23(f) appeal divests this Court of jurisdiction to "authorize notice to the Direct Purchaser class members or to try the claims of the class or of its representatives."[8] (Defs.' Reply p. 9.)

It is true that as "a general rule, the timely filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction on a Court of Appeals and divesting the district court of its control over those aspects of the case involved in the appeal." <u>Venen v. Sweet,</u> 758 F.2d 117, 120 (3d Cir. 1985). "This judge-made rule has the salutary purpose of preventing the confusion and inefficiency which would necessarily result were two courts to be considering the same issue or issues simultaneously."

<u>Id.</u> at 121. "[J]urisdictional requirements may not be disregarded for convenience sake." <u>Id.</u> at 123.

Drawing on this general principle, Mylan and Ranbaxy urge that the matters being considered by the Third Circuit are "directly relevant to their theory of liability" and that "any trial of those claims will necessarily involve aspects of the case involved in the appeal." (Defs.' Reply pp. 9-10.) Thus, according to Mylan and Ranbaxy, this Court lacks jurisdiction to hold a trial as to the Direct Purchaser Plaintiffs. Mylan and Ranbaxy cite only one case to support this position, <u>Jama v. Esmor Correctional Services, Inc.,</u> 2005 WL 2901899 (D.N.J. Nov. 1, 2005).

<u>Jama,</u> a civil rights action concerning conditions in an immigrant detention facility, involved three related actions—two actions brought by individual plaintiffs and one certified class action. The three actions were consolidated for purposes of discovery only. <u>Id.</u> at *1. The district court set a deadline for class members to opt-out, but the plaintiffs in the individual actions never filed opt-out forms and, as a result, became members of the class. Subsequently, the individual plaintiffs sought an additional opportunity to opt out, which the court granted. <u>Id.</u>

Thereafter, the court denied the defendants' motion for summary judgment filed in the actions brought by the individual plaintiffs, finding that the defendants were not entitled to qualified immunity. <u>Id.</u> at *1. The class action then settled, and the court approved the class action settlement. Following entry of final judgment in the class action, the defendants appealed a number of issues, including the denial of qualified immunity and the additional opportunity to opt-out afforded to certain plaintiffs.[9] While the appeal was pending in the Third Circuit, the district court entered an order scheduling trial in the remaining individual plaintiff cases. <u>Id.</u> at *2. However, the district court ultimately concluded that it did not have jurisdiction to proceed with the trial until the appeal was resolved. The district court reasoned that the Third Circuit's review of both the denial of qualified immunity and the grant of the individual plaintiffs' motion to belatedly opt out of the class had the potential to substantially affect the trial (or completely end the case). <u>Id.</u> at *5.

2015 WL 9244638, 2015-2 Trade Cases P 79,436

*11 Jama is distinguishable on several fundamental grounds. In Jama, had the Third Circuit determined that the defendants were entitled to qualified immunity, or that the individual plaintiffs should not have been afforded an extended opportunity to opt-out of the class action, there would have been no need for a trial and the case would have been effectively over.

That is not the situation here. The Third Circuit is presently considering whether the Direct Purchaser Litigation Class was properly certified. Even if the class is decertified, that ruling would not conclusively mean that the case is over for all members of the Direct Purchaser Litigation Class (i.e. the named plaintiffs). More specifically, if the Third Circuit agrees with Mylan and Ranbaxy that the Direct Purchaser Plaintiffs must establish from which Generic Defendant they would have purchased generic Provigil in the but-for world, that issue was never raised in a motion for summary judgment or other dispositive motion. Therefore, such a ruling from the Third Circuit would not effectively end the case.

Furthermore, even assuming that the Third Circuit does agree with Mylan and Ranbaxy that the Direct Purchaser Plaintiffs must offer this type of evidence, such a ruling would not impact Apotex's ability to establish liability because Apotex is a competitor, not a purchaser of the Generic Defendants' products.

Lastly, Rule 23(f) seems to contemplate that a district court does not lose jurisdiction to proceed with trial simply because a Rule 23(f) petition has been granted. The rule specifically provides that "[a]n appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders." Fed. R. Civ. P. 23(f). Therefore, I conclude that the Rule 23(f) appeal does not divest this Court of jurisdiction to issue notice or move forward with trial.

## V. CONCLUSION

For all of the reasons set forth above, Mylan and Ranbaxy's motion to stay is denied with respect to the Direct Purchaser Litigation Class, the Individual Plaintiffs, and Apotex. In light of the agreement between the parties, the motion is granted with respect to the End Payor Plaintiffs.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9244638, 2015-2 Trade Cases P 79,436

## Footnotes

1    These companies are Barr Pharmaceuticals, Inc.; Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc. (collectively "Mylan"); Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc.; and Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. (collectively "Ranbaxy").

2    The Individual Plaintiffs are owners and operators of retail pharmacies who have filed their own separate actions and are excluded from the definition of the Direct Purchaser Litigation Class.

3    The End-Payor Plaintiffs filed a response in opposition to Mylan and Ranbaxy's motion to stay. However, during a telephone conference held on December 2, 2015, counsel for the End-Payor Plaintiffs advised that they had reversed their position and indicated that they no longer wished to proceed with the trial. Instead, the End-Payor Plaintiffs requested that their case be stayed pending a decision from the Third Circuit on their Rule 23(f) petition filed in connection with the Order denying certification of the End-Payor Litigation Class. In light of the agreement between the End-Payor Plaintiffs, Mylan and Ranbaxy, I will enter an Order staying the proceedings in the

End-Payor Plaintiffs' case only. To date, the Third Circuit has not taken any action on the End Payor Plaintiffs' ⚑ Rule 23(f) petition.

4     Except for a single passing reference, none of the arguments raised by Mylan and Ranbaxy in support of their motion to stay pertain to my numerosity findings.

5     Defendants have renewed their objection to such a cause of action and moved to strike its inclusion in Plaintiffs' pretrial memorandum. I recently granted Defendants' motion to strike. (See Order and Op. denying Mot. to Strike, Dec. 14, 2015).

6     The "Comcast issue" raised in Mylan and Ranbaxy's petition challenges my determination that the Direct Purchaser Plaintiffs' damages model matched their liability theory even though Plaintiffs did not revise their damages calculations after I granted Defendants' motion for summary judgment on Plaintiffs' claims for an overall conspiracy. I issued this summary judgment opinion on June 23, 2014.

       Mylan and Ranbaxy raised the "Comcast issue" for the first time at oral argument on March 26, 2015 – nine months after the grant of summary judgment. (See Class Cert. Hearing Tr. Mar. 26, 2015 pp. 70:6-73:22.) When questioned about the delay in pursuing this issue, counsel were unable to provide a satisfactory explanation beyond the fact that there had been a change in representation. The belated nature of Mylan and Ranbaxy's Comcast argument undermines their position that they have a likelihood of success on the merits.

7     K-Dur was vacated on other grounds. See Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co., Inc., 133 S. Ct. 2849 (2013).

8     Mylan and Ranbaxy also argued that the ⚑ Rule 23(f) proceedings divested this Court of jurisdiction to grant the Direct Purchaser Plaintiffs' motion to amend the class certification Order. As noted above, the motion to amend was mooted by my December 14, 2015 ruling on the motion to strike. As such, I need not consider the parties' arguments with respect to the jurisdiction of this court to grant the motion to amend.

9     While the procedural history is complicated, it appears that the defendants appealed the denial of qualified immunity in the individual plaintiff actions on an interlocutory basis pursuant to ⚑ Mitchell v. Forsyth, 472 U.S. 511, 530 (U.S. 1985) ("a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of ⚑ 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.") After final judgment had been entered in the class action, the Third Circuit considered, in a separate appeal, the district court's decision to afford certain plaintiffs a second opportunity to opt-out of the class action.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3542295
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anne de LACOUR, Andrea Wright, and
Loree Moran individually and on behalf
of all others similarly situated, Plaintiffs,

v.

COLGATE-PALMOLIVE CO., and
Tom's of Maine Inc., Defendants.

16-CV-8364 (KMW)
|
Signed 08/10/2021

**Attorneys and Law Firms**

Frederick John Klorczyk, Yitzchak Kopel, Joshua David Arisohn, Bursor & Fisher, P.A., New York, NY, Neal Jamison Deckant, Bursor & Fisher, P.A., Walnut Creek, CA, Sarah Westcott, Bursor & Fisher P.A., Miami, FL, for Plaintiffs.

Blake Thomas Denton, Latham & Watkins LLP, New York, NY, David Callahan, Latham & Watkins LLP, Kathleen Lally, Carlson Lynch, LLP, Chicago, IL, for Defendants.

## ORDER

KIMBA M. WOOD, United States District Judge:

*1 On April 23, 2021, Plaintiffs' motion for class certification was granted in part and denied in part. (*See* ECF No. 146 (the "April 23 Opinion").) On June 25, Defendants filed a motion to stay the litigation, pending resolution of Defendants' petition for permission to appeal the order on class certification. (ECF No. 152.) Plaintiffs oppose the motion. (ECF No. 156.) For the reasons set forth below, Defendants' motion is DENIED.

## DISCUSSION

The background of this case is set forth in the April 23 Opinion and need not be repeated. (*See* Apr. 23 Op. at 2-6.) On April 23, 2021, the Court certified

three classes, consisting of consumers of Tom's of Maine deodorant and/or toothpaste products in each of California, Florida, and New York. (*See id.* at 32.) Pursuant to that certification order, Plaintiffs have since submitted a proposed notice plan, and the parties have set forth their respective proposals regarding other case management issues, including fact and expert discovery. (*See* ECF Nos. 149, 150, 155.)

On May 7, 2021, Defendants filed a petition, pursuant to Federal Rule 23(f), for permission to appeal the order on class certification. (*See* Dkt. No. 1, Case No. 21-1234 (the "Petition").) The Petition raises two questions, one relating to the preclusive effect of the settlement agreement in *Gay v. Tom's of Maine, Inc.*, No. 14-CV-60604 (S.D. Fla. July 24, 2015) (the "*Gay* Settlement"), the other relating to class standing. (*See* Defs. Mem. at 3, ECF No. 153.)

Because a decision by the Second Circuit may affect the scope of this litigation going forward, Defendants also filed a motion, on June 25, 2021, to stay the litigation in this Court, pending the Second Circuit's resolution of the Petition. (*See id.* at 4.) Plaintiffs filed an opposition on July 9. Defendants did not file a reply.

When considering whether to issue a stay, courts consider four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see Struogo v. Barclays PLC*, 194 F. Supp. 230, 232 (S.D.N.Y. 2016) (Marrero, J.) (considering these factors in connection with a motion to stay, pending resolution of a Rule 23(f) petition); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571 (S.D.N.Y. 2014) (Rakoff, J.) (same). The first two factors are the most important. *See Nken*, 556 U.S. at 434. [1]

*2 With respect to the first factor, Defendants' motion does not address the likelihood that the Second Circuit will grant the Petition, which remains pending. *See In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d

Cir. 2001) ("[T]he standards of Rule 23(f) will rarely be met."). In addition, Defendants have not made an adequate showing that they ultimately will succeed on the merits. As Plaintiffs point out, Defendants make two arguments—in their Petition, but not in the instant motion—challenging the April 23 Opinion. First, Defendants argue that the *Gay* Settlement bars Plaintiffs from litigating their claims. As the Court determined, however, Plaintiffs' present claims do not share an "identical factual predicate" with the claims at issue in *Gay*, and Defendants have not made the requisite showing that such a "unique defense" is applicable to the named Plaintiffs. (*See* Opp'n at 7-8; Apr. 23 Op. at 16-17.) Second, Defendants argue that Plaintiffs do not have class standing to represent purchasers of toothpaste, because the alleged misrepresentations on Tom's of Maine toothpaste products do not implicate "the same set of concerns" as the corresponding representations on deodorant products. As the Court determined, however, the fact that there are differences in the ingredients that make up toothpaste and deodorant is not dispositive, because (among other factors) the alleged misrepresentation that Defendants' products are "natural" is the same across all products at issue, and those statements were made by the same defendants. (*See* Opp'n at 8-10; Apr. 23 Op. at 8-11.) Accordingly, this factor weighs against granting a stay.

With respect to the second factor, Defendants do not allege that they will suffer irreparable harm if a stay is not granted. Defendants do raise a reasonable concern that, absent a stay, both parties will undertake significant discovery costs that may—depending on the Second Circuit's resolution of the Petition—be rendered moot. (*See* Mot. at 6.) Litigation costs, however, do not constitute irreparable harm. *See In re Bogdanovich*, 2000 WL 1708163, at *6 (S.D.N.Y. Nov. 14, 2000) (Koeltl, J.) (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)) ("[I]t

is well established that '[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'"). As a result, this factor weighs against granting a stay.

As for the third and fourth factors, neither weighs heavily in either direction. As Defendants point out, any stay may not be particularly lengthy, and each individual class member seeks only modest individual damages. (Mot. at 6.) But, as Plaintiffs correctly assert, it is nevertheless in the consumers' interests and the public interest to resolve the claims at issue efficiently and, if damages are owed, to compensate consumers for any losses they may have suffered. (Opp'n at 10-11.)

In sum, because the first two factors—which are the most critical—weigh against granting a stay, and because the third and fourth factors do not significantly impact the Court's analysis, Defendants' motion is denied.

As noted above, Plaintiffs have submitted a proposed notice plan, and the parties each have made proposals regarding case management. Because a stay will not be issued, these submissions will be addressed in separate, forthcoming orders.

## CONCLUSION

For the reasons set forth above, Defendants' motion to stay is DENIED.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 3542295

## Footnotes

1    Defendants set forth a different standard but, as their own citations demonstrate, that test has been applied when courts determine "whether to enter a stay pending an appeal *in a related case.*" *Est. of Heiser v. Deutsche Bank Tr. Co. Americas*, 2012 WL 2865485, at *3 (S.D.N.Y.

LaCour v. Colgate-Palmolive Co., Slip Copy (2021)

2021 WL 3542295

July 10, 2012) (Dolinger, M.J.), *aff'd*, 2012 WL 5039065 (S.D.N.Y. Oct. 17, 2012) (Nathan, J.) (emphasis added). Nevertheless, the Court considers Defendants' arguments as they apply to the factors set forth in *Nken.*

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Hospital Authortiy of Metopolitan
Government of Nashville and Davidson County, Tennessee v.
Momenta Pharmaceuticals, Inc., M.D.Tenn., October 21, 2019

2016 WL 917893
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Bradley WILLCOX, Frank Dominick,
and Michele Sherie Dominick, Plaintiffs,

v.

LLOYDS TSB BANK, PLC
and Does 1-15, Defendants.

Civ. No. 13-00508 ACK-RLP
|
Signed March 7, 2016

**Attorneys and Law Firms**

Gary Lombardo, Morgan Hector, Steptoe & Johnson
LLP, Stephen A. Fennell, Washington, DC, Paul
Alston, Glenn T. Melchinger, Alston Hunt Floyd &
Ing, Honolulu, HI, for Plaintiffs.

Amy L. Woodward, Christian K. Adams, Jacob L.
Matson, Carlsmith Ball LLP, Honolulu, HI, Martha S.
Sullivan, Rebecca W. Haverstick, Sean L. McGrane,
Squire Patton Boggs (US) LLP, Cleveland, OH, for
Defendants.

**ORDER GRANTING DEFENDANT'S
MOTION TO STAY PROCEEDINGS PENDING
RESOLUTION OF DISPOSITIVE MOTIONS,
RULE 23(F) PETITION, AND ANY RESULTING
APPEAL AND VACATING TRIAL DATE**

Alan C. Kay, Sr. United States District Judge

**\*1** For the reasons set forth below, the Court
GRANTS Defendant Lloyds TSB Bank PLC's Motion
to Stay Proceedings Pending Resolution of Dispositive
Motions, Rule 23(f) Petition, and Any Resulting
Appeal ("Motion to Stay"). ECF No. 402. Further, the
Court vacates the trial date.

**PROCEDURAL BACKGROUND**

The Court and parties are familiar with the extensive
factual and procedural history of this case, and the
Court will not repeat it here except as necessary.

On March 27, 2015, Plaintiffs filed the operative Third
Amended Complaint ("TAC"). ECF No. 100. The TAC
names Frank Dominick, Michele Sherie Dominick,
and Bradley Willcox (collectively, "Plaintiffs") as
class representatives and brings claims against Lloyds
TSB Bank, PLC, now known as Lloyds Bank PLC
("Lloyds" or "Defendant") for Breach of Contract
(Count I) and Breach of an Implied Term Limiting
Lloyds' Discretion to Change the Interest Rate (Count
II). Id. ¶¶ 6-8, 55-72.

Trial in this case was earlier set to commence on May
17, 2016. ECF No. 178.

**I. Class Certification and Rule 23(f) Petition**
On July 15, 2015, Plaintiffs filed a Motion for Class
Certification pursuant to Federal Rule of Civil
Procedure 23. ECF No. 156. After briefing and oral
argument from the parties, Magistrate Judge Puglisi
issued his Findings and Recommendation to Grant
in Part and Deny in Part Plaintiffs' Motion for Class
Certification ("F&R") on November 12, 2015. ECF
No. 317. The F&R recommended: (1) certifying the
instant case as a class action, (2) appointing Willcox
(but not the Dominicks) as class representative, (3)
appointing Alston Hunt Floyd & Ing and Steptoe &
Johnson LLP as class counsel, (4) directing the parties
to meet and confer regarding notice to class members,
(5) denying any remaining relief requested in Plaintiffs'
class certification motion, and (6) defining the certified
class as:

> All persons and entities who
> entered prior to August 2009
> into an IMS [International
> Mortgage System] loan with
> Lloyds that contained a Hong
> Kong choice-of-law provision
> and an interest rate provision
> based upon Cost of Funds and

Case 1:19-md-02875-RMB-SAK    Document 2283-1    Filed 03/13/23    Page 125 of 131
PageID: 78124

Wilcox v. Lloyds TSB Bank, PLC, Not Reported in Fed. Supp. (2016)

2016 WL 917893

who are, or were at any time during entering into such an IMS loan, residents or citizens of the State of Hawaii, or owners of property in Hawaii that was mortgaged to secure any such IMS loan.

*Id.* at 31-32. Lloyds filed objections to the F&R on November 25, 2015, ECF No. 332, to which Plaintiffs filed a Response on December 9, 2015, ECF No. 335. The parties also submitted supplemental Reply and Sur-Reply briefs on December 17, 2015 and December 28, 2015, respectively. ECF Nos. 337, 340.

On January 8, 2016, the Court issued an Order Adopting in Part, Rejecting in Part, and Modifying in Part the Findings and Recommendations to Grant in Part and Deny in Part Plaintiffs' Motion for Class Certification ("Class Certification Order"). ECF No. 366. For the reasons explained therein, the Court adopted the F&R over Lloyds' objections, except as to the class definition, which the Court modified to include only plaintiffs of U.S. and Canadian citizenship.

**\*2** On January 22, 2016, pursuant to 🚩Federal Rule of Civil Procedure 23(f), Lloyds filed with the Ninth Circuit a Petition for Permission to Appeal the class certification Order ("🚩Rule 23(f) Petition"). ECF No. 397. Plaintiffs filed an Opposition to the 🚩Rule 23(f) Petition on February 1, 2016, 9th Cir., No. 16-80009 ("Pls.' 🚩Rule 23(f) Opp."), ECF No. 4, and an Emergency Motion to Expedite Review of the 🚩Rule 23(f) Petition ("Emergency Motion") on February 18, 2016, 9th Cir., No. 16-80009, ECF No. 7. On February 29, 2016, Lloyds filed an Opposition to Plaintiffs' Emergency Motion. 9th Cir., No. 16-80009, ECF No. 8.

### II. Summary Judgment

Meanwhile, on October 16, 2015, Plaintiffs and Lloyds filed cross-motions for summary judgment. Lloyds moved for summary judgment as to both of Plaintiffs' Counts I and II. *See* Def. Lloyds' Mot. for Summ.

J. at 4, ECF No. 249. Plaintiffs moved for summary judgment only as to their Count I and requested "immediate declaratory relief" as to that claim. Pls.' Mot. for Partial Summ. J. on Their and the Putative Class's Claim for Breach of Contract at 1, ECF No. 251.

On December 29, 2015, the parties filed their Oppositions to the respective cross-motions for summary judgment. *See* Pls.' Opp'n to Def.s' MSJ, ECF No. 347; Def. Lloyds' Mem. of Law in Opp'n to Pls.' Mot. for Partial Summ. J., ECF No. 348. On January 5, 2016, each party filed a Reply in support of its summary judgment motion. *See* Reply in Supp. of Pls.' MSJ, ECF No. 358; Def. Lloyds' Reply Mem. of Law in Supp. of Lloyds' Mot. for Summ. J., ECF No. 360.

The Court held a two-day hearing regarding the cross-motions for summary judgment on January 19-20, 2016. On February 11, 2016, the Court issued an Order Denying Plaintiffs' Motion for Partial Summary Judgment on Their and the Putative Class's Claim for Breach of Contract on Count I, Denying Plaintiffs' Request for Declaratory Relief, Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, and *Sua Sponte* Granting Partial Summary Judgment to Plaintiffs on Count II ("Summary Judgment Order"). ECF No. 419.

### III. Lloyds' Motion to Stay and Plaintiffs' Motion to Modify the Court's Rule 16 Scheduling Order

On February 3, 2016, Lloyds filed with this Court a Motion to Stay. ECF No. 402. Magistrate Judge Puglisi thereafter suspended the parties' obligations to meet and confer regarding notice to potential class members and to submit to the Court a proposed class notice and distribution plan until the Court issues a decision on the pending Motion to Stay. ECF No. 405.

On February 23, 2016, Plaintiffs filed an Opposition to Lloyds' Motion to Stay ("Pls.' Opp."). ECF No. 425. Lloyds filed a Reply in support of its Motion ("Def.'s Reply") on March 1, 2016. ECF No. 428. Pursuant to Local Rule 7.2(e), the Court elected to consider Lloyds' Motion to Stay without a hearing. ECF No. 406.

Separately, on February 16, 2016, Plaintiffs filed a Fourth *Ex Parte* Motion to Modify the Court's Rule

2016 WL 917893

16 Scheduling Order ("Pls.' Mot."). ECF No. 422. In their Motion, Plaintiffs seek to extend the non-dispositive motions deadline until at least three weeks after resolution of Lloyds' ⚑Rule 23(f) Petition, as well as schedule a settlement conference, for which the current Rule 16 Scheduling Order does not provide. [1] Pls.' Mot. at 1. Plaintiffs' Motion is set to be decided by Magistrate Judge Puglisi. ECF No. 424.

## BRIEF SUMMARY OF
## FACTUAL BACKGROUND

**\*3** The instant case involves the issuance by Lloyds of certain dual currency loans (also referred to as International Mortgage System ("IMS") loans). Dual currency loans are mortgage loans with a currency switching feature that allows borrowers to switch the currency of their loans between United States dollars and other currencies. See TAC ¶¶ 1-3, ECF No. 100.

Lloyds is organized under the laws of the United Kingdom but maintains branches throughout the world, including a Hong Kong branch from which it issued IMS loans to Plaintiffs. See id. ¶¶ 1-3, 9. Lloyds is a wholly-owned subsidiary of Lloyds Banking Group, PLC ("LBG"). Id. ¶ 9.

### I. The "Cost of Funds" Provision in Lloyds'
### IMS Loans

The IMS loans at issue in this case were made from approximately 2005-2009 and secured by mortgages on real property in Hawaii and California. Id. ¶¶ 15, 21-22, 28-30. The loans have an interest rate that is set at 1.5% above Lloyds' "Cost of Funds," with the interest rate fixed for successive three-month periods. Id. ¶¶ 2, 16. The "Cost of Funds" is defined (with immaterial differences) in the loan documents as:

> [T]he cost (calculated to include the costs of complying with liquidity and reserve asset requirements) in respect of any currency expressed as a percentage rate of funding for maintaining the Advance or

> Advances in that currency as conclusively nominated by the Bank from time to time.

Id. ¶ 2. Interest payments on the loans are due, and the interest rate recalculated, at the end of each three-month period. Id. ¶ 16. Plaintiffs' claims for breach of contract (Count I) and breach of an implied contractual term (Count II) allege that Lloyds impermissibly included in its Cost of Funds calculation a charge that constituted neither an actual cost to Lloyds in funding the loans nor a liquidity requirement. Id. ¶¶ 55-72.

### II. Allegations Regarding Lloyds' Cost of Funds

Plaintiffs claim that, in or around 2009, Lloyds added several new basis points to its Cost of Funds calculation in order to reflect the imposition by its parent company, LBG, of a "liquidity transfer pricing" ("LTP") charge. Id. ¶ 5.

According to Plaintiffs, the LTP charge added to the Cost of Funds an amount "based not on the actual cost of funds for the Loans, but for Lloyds' parent's significantly longer-term set of obligations." Id. Plaintiffs argue that this represented Lloyds' attempt to pass on to borrowers "the cost of funding Lloyds' parent's overhead and operations as a whole, not just the cost of funding their own IMS Loans." Id. (emphasis in original omitted). Plaintiffs further observe that, during the period when Lloyds was increasing its Cost of Funds, standard interest rate indices such as the London Inter-Bank Offered Rate ("LIBOR") decreased. Id. ¶ 4.

As noted above, Plaintiffs filed their operative TAC on March 27, 2015. They allege that Lloyds' inclusion of the LTP charge in its Cost of Funds constitutes a breach of the express terms of Plaintiffs' loan agreements and a breach of an implied term limiting Lloyds' discretion to change Plaintiffs' interest rates. See id. ¶¶ 55-72.

## STANDARD

⚑Federal Rule of Civil Procedure 23(f) permits a party to "appeal from an order granting or denying class-action certification ... if a petition for permission

Wilcox v. Lloyds TSB Bank, PLC, Not Reported in Fed. Supp. (2016)

2016 WL 917893

to appeal is filed with the circuit clerk within 14 days after the order is entered." However, a petition for permission to appeal a class certification order "does not stay proceedings in the district court unless the district judge or the court of appeals so orders." Id.

**\*4** In considering a motion to stay pursuant to Rule 23(f), a district court will apply the traditional four-prong test laid out by the Supreme Court: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776 (1987); Leiva-Perez v. Holder, 640 F.3d 962, 964 (9th Cir. 2011); Gray v. Golden Gate Nat'l Recreational Area, No. 08-CV-00722, 2011 WL 6934433, at \*1 (N.D. Cal. Dec. 29, 2011) (applying the four-prong test in the context of a Rule 23(f) petition).

The Ninth Circuit has held that in the stay context, like the preliminary injunction context, these factors should be examined on a flexible "continuum," which is "essentially the same as the 'sliding scale' approach." Leiva-Perez, 640 F.3d at 964. Under this approach, "a stronger showing of one element may offset a weaker showing of another." Id. "If anything, a flexible approach is even *more* appropriate in the stay context." Id. at 966 (emphasis in original). "Whereas the extraordinary remedy of injunction is the means by which a court directs the conduct of a party ... with the backing of its full coercive powers, a stay operates only upon the judicial proceeding itself ... either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." Id. (internal quotation marks omitted).

## DISCUSSION

As a preliminary matter, the Court notes that to the extent Lloyds' Motion to Stay relies on the resolution of dispositive motions, that issue is now moot because the Court issued its Summary Judgment Order on

February 11, 2016. ECF No. 419. Thus, the Court considers Lloyds' Motion solely with respect to the Rule 23(f) Petition and any resulting appeal.

### I. Likelihood of Success on the Merits

The first factor the Court must consider is whether Lloyds makes a "strong showing that [it] is likely to succeed on the merits." Id. However, Lloyds need not demonstrate that it is "more likely than not" that it will win on the merits. Id. Rather, it will be enough if Lloyds can show that it has raised a "serious legal question" in its Rule 23(f) Petition. Id. at 967-68. When relying on a serious legal question to satisfy the first prong, a movant must also show that the balance of hardships tips sharply in its favor. Brown v. Wal-Mart Stores, Inc., No. 5:09-CV-03339-EJD, 2012 WL 5818300, at \*2 (N.D. Cal. Nov. 15, 2012) (citing Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011)).

Lloyds argues that its Rule 23(f) Petition raises serious legal questions the Ninth Circuit has yet to consider, namely, "whether superiority can be met by a proposed class whose significant overseas connections would permit them to relitigate in one or more foreign jurisdictions, none of which would more likely than not apply *res judicata* to this Court's rulings." Motion to Stay at 12; Rule 23(f) Petition at 1. In its Rule 23(f) Petition, Lloyds argues that approximately two thirds of the loans subject to the proposed class contain "significant non-U.S. indicia." Rule 23(f) Petition at 5-6. Lloyds defines these as loans that contain non-U.S. "(1) borrower residency at the time of loan application; (2) last reported borrower residency; (3) last reported borrower nationality; and/or (4) subject property." Id. at 6. Notably, as required by the Class Certification Order, each of the borrowers in the putative class is either a U.S. or Canadian citizen. Class Certification Order at 38.

**\*5** Lloyds maintains that the proposed class, which contains a significant number of loans with these "non-U.S. indicia," reflects an increasing trend of class actions involving members with access to foreign jurisdictions—an issue Lloyds contends the Ninth

*Wilcox v. Lloyds TSB Bank, PLC, Not Reported in Fed. Supp. (2016)*

2016 WL 917893

Circuit has yet to address. 🚩 Rule 23(f) Petition at 14-16. Lloyds cites to a string of Second Circuit and Southern District of New York cases as evidence of courts' growing concern regarding the *res judicata* effects of these class actions. See, e.g., 🚩 Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 997 (2d Cir. 1975); ⚠️ In re Vivendi Universal, S.A., 242 F.R.D. 76, 105-06, 109 (S.D.N.Y. 2007).

Plaintiffs counter that Lloyds' 🚩 Rule 23(f) Petition fails to present an unsettled, serious legal question, and that "no court has rejected participation by U.S. citizens as class members simply because they live abroad, based on the defendant's speculation that they may not be bound by *res judicata* if they were to sue in the other country." Pls.' 🚩 Rule 23(f) Opp. at 1. To underscore their point, Plaintiffs note that none of the decisions Lloyds cites excluded U.S. citizens from a proposed class on the basis that they lived abroad. Id. at 7. Instead, Plaintiffs argue, the term "non-U.S. indicia" is a new, overly broad standard Lloyds' counsel has attempted to create. Id. at 1, 4.

Furthermore, Plaintiffs emphasize that the Ninth Circuit only grants 🚩 Rule 23(f) Petitions in rare circumstances. Id. at 5-6; 🚩 Chamberlan v. Ford Motor Co., 402 F.3d 952, 955 (9th Cir. 2005) ("We begin with the premise that 🚩 Rule 23(f) review should be a rare occurrence."). They argue that interlocutory appeals such as this one are time-consuming and disruptive to the case, and that "[a]ny novel theories of class action law Lloyds wishes to pursue will not evade review in any appeal from the final judgment, and those theories therefore cannot justify an immediate 🚩 Rule 23(f) appeal." Pls.' 🚩 Rule 23(f) Opp. at 1, 6.

The Court notes that much of the case law and commentary Lloyds cites in support of its 🚩 Rule 23(f) Petition fails to support a position that goes as far as Lloyds' "non-U.S. indicia" concept. Instead, most of the discourse Lloyds references seems to focus on the threat posed by foreign citizens involved in U.S. class actions, without expressing similar concerns regarding U.S. citizens that live abroad. See

🚩 Rule 23(f) Petition at 14-16 (citing 🚩 Bersch, 519 F.2d at 992, 997 (excluding from the class "all purchasers other than persons who were residents or citizens of the United States," where such United States citizens lived both in the United States and abroad); ⚠️ In re Vivendi, 242 F.R.D. at 105-06, 109 (certifying a class that excluded German and Austrian citizens, but that included citizens from the United States, France, England, and the Netherlands and provided no distinction between American citizens resident in the United States and those living abroad); Rhonda Wasserman, Transnational Class Actions and Interjurisdictional Preclusion, 86 NOTRE DAME L. REV. 313, 313 (2011) (discussing the ramifications of U.S. class actions involving "foreign *citizens* or ... foreign defendants," but neglecting to specifically consider the consequences of class actions comprised of American citizens living abroad) (emphasis added)).

Nevertheless, the Court also notes that this argument implicitly recognizes that this is a novel area of law, even if the Ninth Circuit, should it accept the 🚩 Rule 23(f) Petition, eventually agrees with Plaintiffs that Lloyds' position is "extreme." See Pls.' 🚩 Rule 23(f) Opp. at 1. The numerous sources to which Lloyds cites discussing the increasing prevalence of multinational class actions certainly reinforce the likelihood that courts will eventually address the legal issue Lloyds raises in its Petition. See 🚩 Rule 23(f) Petition at 14-15.

**\*6** The Court therefore finds that Lloyds has raised a serious legal question in its 🚩 Rule 23(f) Petition. The first factor therefore weighs in favor of granting a stay.

### II. Balance of Hardships (Including Whether Lloyds Will Be Irreparably Injured Absent a Stay and Whether Issuance of a Stay Will Substantially Injure Plaintiffs)

The Court next considers whether Lloyds will be irreparably injured absent a stay, as well as whether granting a stay will substantially injure Plaintiffs. Because Lloyds relied on a "serious legal question" in satisfying the first prong, the balance of hardships must tip strongly in favor of Lloyds. 🚩 Brown, 2012 WL 5818300 at \*2.

Lloyds contends that without a stay it will be forced to spend a significant amount of time and resources preparing for a trial only two and a half months out from now. Motion to Stay at 16-17. Furthermore, Lloyds emphasizes that preparing for a trial against the proposed class is an entirely different exercise from trial preparation involving a much smaller class or individual plaintiffs, meaning that the Ninth Circuit's decision on the 🚩 Rule 23(f) Petition could "rearrange this case from the ground up." Id. at 17.

Plaintiffs, on the other hand, argue that the claims are the same whether the action involves individuals or a certified class, and that Lloyds cannot credibly argue it would prepare for trial in a materially different manner depending on how the Ninth Circuit rules. Pls.' 🚩 Rule 23(f) Opp. at 16. Lloyds counters that while Plaintiffs' burden for presenting proof may be the same regardless of class size, the size of the class determines the stakes of this case for Lloyds. Def.'s Reply at 9-10. Lloyds contends that class size could therefore change everything from trial strategy to settlement negotiations. Id. at 10.

In the 🚩 Rule 23(f) context, courts have found irreparable injury where failure to issue a stay would result in "substantial time and resources being spent on the litigation." 🚩 Gray, 2011 WL 6934433 at *3; 🚩 Brown, 2012 WL 5818300 at *4 (finding irreparable harm to defendant due to "potentially substantial fees" and unnecessary discovery in the absence of a stay). But see 🚩 Monaco v. Bear Stearns Companies, Inc., Case No. CV 09-05438 SJO, 2012 WL 12506860, at *4 (C.D. Cal. 2012) ("[L]itigation costs in and [of] themselves generally do not constitute irreparable injury.").

The Court finds persuasive Lloyds' contention regarding the interrelatedness of its trial preparations and the size of the class. Because a decision by the Ninth Circuit to modify or decertify the putative class could require Lloyds to overhaul its trial strategy, failure to issue a stay could result in a significant waste of litigation costs and resources. The Court therefore finds the potential for irreparable harm to Lloyds weighs in favor of a stay.

Lloyds also argues that issuance of class notice at this juncture could irreparably harm the bank by "seriously damaging goodwill." Id. at 18. Plaintiffs counter that the borrowers on the 121 loans subject to the proposed class have known about the LTP increases for years, by virtue of the changes to interest rates they were required to pay on their loans. See Pls.' Br. at 14-15. Therefore, they argue, Lloyds will not suffer an irreparable reputational injury upon any premature issuance of class notice. Id.

*7 The Court agrees with Lloyds that premature issuance of class notice could certainly damage Lloyds' reputation. First, it is not clear whether each member of the putative class is aware of the pending litigation regarding Lloyds' IMS loan products. Second, even if a member is aware of the litigation, that member's receipt of notice that purports to involve him in such a lawsuit increases that individual's personal investment in the case. Aside from the heightened emotion and awareness of the lawsuit that notice would bring, such notice could also cause potential class members to hire attorneys to assist them in making a decision whether or not to opt out of the class; whereas the Ninth Circuit ultimately might rule they should not be included in the class. The Court therefore finds that the irreparable reputational injury Lloyds could face upon premature issuance of class notice weighs in favor of a stay.

Next, the only harm that Plaintiffs claim is that a stay "would create prejudice for Plaintiffs and the class as the parties would lose at least two months of pretrial work and trial will almost certainly be even further delayed." Id. at 2. Yet in the same breath Plaintiffs contend that "[c]ontinuing with trial preparation will not be in vain regardless of the Circuit's ruling on the 23(f) Petition." Id. at 1-2. Thus, if it is Plaintiffs' contention that continuing with trial preparation will not be in vain notwithstanding the possibility that the Ninth Circuit may accept the appeal—an event that could delay trial for many months—then it makes little sense to say that a decision by this Court to briefly stay proceedings while the Ninth Circuit considers the 🚩 Rule 23(f) Petition will cause prejudice.

In fact, should the Ninth Circuit consider the 🚩 Rule 23(f) Petition on an expedited basis in light of

Wilcox v. Lloyds TSB Bank, PLC, Not Reported in Fed. Supp. (2016)
2016 WL 917893

Plaintiffs' Emergency Motion and ultimately decline the appeal, any delay in trial will be minimal. If anything, a decision not to stay the case could cause harm to Plaintiffs in the same way that it does Lloyds, by forcing Plaintiffs to expend time and resources preparing for an impending trial that may look vastly different depending on the outcome of the Ninth Circuit's ⚑Rule 23(f) decision. The Court therefore finds that issuance of a stay will not substantially injure Plaintiffs.

Third, Lloyds also argues that failure to issue a stay could cause harm to the putative class members should the Ninth Circuit modify or decertify the proposed class. Def.'s Br. at 21. Specifically, if the parties are obligated to disseminate class notice prior to such a decision, significant confusion could result to potential class members who would be uncertain whether they needed to opt out of the class or whether they were still included in the class action at all. Id.; ⚑Brown, 2012 WL 5818300 at *4. In fact, Plaintiffs agree that the parties should not disseminate class notice until resolution of Lloyds' ⚑Rule 23(f) Petition, though they do claim that the Court can delay notice without granting a stay. Pls.' Opp. at 1, 15.

In light of the harm to Lloyds if a stay is not issued, the lack of harm to Plaintiffs if it is, and the potential harm to the putative class absent a stay, the Court finds that the balance of hardships tips sharply in favor of Lloyds. See ⚑Brown, 2012 WL 5818300 at *5 (finding that the balance of hardships tipped sharply in favor of the moving party where there was "at least some harm" to that party, a lack of substantial injury to the non-moving party, and potential harm to class members).

### III. Public Interest

The Court finds that a brief stay in proceedings would better ensure the efficient use of both judicial and party resources while the Ninth Circuit decides whether to accept the serious legal question raised in the ⚑Rule 23(f) Petition. See ⚑Brown, 2012 WL 5818300 at *5 (stating that the public has an interest in "the efficient use of judicial resources" and finding a stay would "help to ensure the proper resolution of the important issues raised in this case by preventing potentially wasteful work on the part of the court and the parties while the Ninth Circuit considers the serious legal question raised") (internal quotation marks omitted). Thus, the public interest weighs in favor of a stay.

**\*8** Upon considering the four factors a court must analyze when deciding whether or not to grant a stay, the Court finds that a stay in this circumstance is appropriate. Specifically, Lloyds has raised a serious legal question in its ⚑Rule 23(f) Petition to the Ninth Circuit; Lloyds is at risk of irreparable financial and reputational injury absent a stay; issuance of a stay will not substantially injure Plaintiffs, and in fact, failure to issue a stay could actually be harmful to both Plaintiffs and potential class members; and a stay will better ensure the efficient use of judicial resources, which is in the public interest.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Lloyds' Motion to Stay, and this case is STAYED as to all matters until the Ninth Circuit rules on Lloyds' ⚑Rule 23(f) Petition. Accordingly, the Court VACATES the currently scheduled trial date. In the event the Ninth Circuit denies the Petition, the Court will issue an order setting forth dates for the trial and final pretrial conference, and other deadlines. Should the Ninth Circuit grant the Petition, the case will be stayed until further ruling by the Ninth Circuit regarding the merits of the composition of the class.

The Court notes that it appears at a minimum that the trial date will have to be moved to May 31, 2016; although at this point the Court does not know how long trial will take, and that is a concern. Further, a final pretrial conference will need to be held at least two weeks prior to the trial date, given the numerous motions in limine and issues regarding jury instructions the Court anticipates. The Court also notes that Plaintiffs have requested an extension of the non-dispositive motions deadline until three weeks after the Ninth Circuit rules on the ⚑Rule 23(f) Petition, which could present further scheduling issues. Pls.' Mot. at 1.

Finally, there is also the issue of class notice. The parties still need to agree on the type of notice, with

**Wilcox v. Lloyds TSB Bank, PLC, Not Reported in Fed. Supp. (2016)**
2016 WL 917893

that determination dependent on further action by the Ninth Circuit. Assuming the Ninth Circuit decides the 🚩 Rule 23(f) Petition 21 days from the date of Plaintiffs' Emergency Motion, it should be making a decision by March 10, 2016. If the parties take two weeks to agree on class notice and give putative class members 50 days from the date notices are mailed to opt out of the class, [2] the earliest date a pretrial conference could take place is Monday, May 16, 2016.

All of that said, there has been no indication whether the Ninth Circuit is considering Lloyds' Petition as an emergency matter pursuant to Plaintiffs' Emergency Motion, considering Lloyds filed an Opposition to the Motion. It is therefore uncertain whether the Ninth Circuit will decide the Petition by March 10, 2016 or sometime in April. [3]

In light of this Order, Plaintiffs' Fourth *Ex Parte* Motion to Modify the Court's Rule 16 Scheduling Order before Magistrate Judge Puglisi should be stayed until the Ninth Circuit rules on Lloyds' 🚩 Rule 23(f) Petition and, depending on the Ninth Circuit's ruling, this Court either sets a new trial date (and final pretrial conference date and other deadlines) or stays the case pending the Ninth Circuit's further consideration of the merits of Lloyds' Petition regarding the appropriate constitution of the class.

**\*9** IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 917893

## Footnotes

1    In Lloyds' Reply in support of its Motion to Stay, Lloyds argues that problems will arise if Plaintiffs' "piecemeal stay" is granted. Def.'s Reply at 8. Plaintiffs want to file non-dispositive motions up to three weeks after the Ninth Circuit rules on Lloyds' 🚩 Rule 23(f) Petition. Pls.' Mot. at 1.

In addition to the potential problems that could arise in this context, the Court is also concerned with problems that have arisen regarding the lack of discovery in this case. The Court made a finding in its Summary Judgment Order that the LTP charge represented an actual cost to Lloyds, but that a question remained as to whether it was appropriate to pass that cost on to Plaintiffs as an actual cost of funding the IMS loans. Summary Judgment Order at 36. The Court also noted that Lloyds' parent, LBG, the organization most knowledgeable regarding this and other questions the Court raised, has not been joined as a party to this lawsuit, nor has adequate discovery been obtained from LBG regarding the composition of the LTP. Id. at 36 n.16.

2    The Court assumes an opt-out period of 50 days because this was the amount of time Lloyds and the named plaintiffs in Dugan gave to prospective class members. Dugan v. Lloyds TSB Bank, Civ. No. 3:12-cv-02549-WHA (N.D. Cal.), ECF No. 425-11.

3    The Court appreciates that these uncertainties impose scheduling and other difficulties with parties, their representatives, witnesses, and counsel, who are situated from Hong Kong to London.

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.