# EXHIBIT 2

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT.
                DISTRICT OF NEW JERSEY

2

   IN RE:  VALSARTAN, LOSARTAN,
3  AND IRBESARTAN PRODUCTS
   LIABILITY LITIGATION            MDL NO. 2875
4                                  HON. ROBERT B. KUGLER

   THIS DOCUMENT RELATES TO:
5  In Re: Valsartan, Losartan and
   Irbesartan Products Liability
6  Litigation,
   Case No. 1:19-md-2875-RBK
7  --------------------------------x

8

9

10    *HIGHLY CONFIDENTIAL REMOTE VIDEOTAPED DEPOSITION*
11                 OF SUSAN BAIN
12              TUESDAY, JANUARY 31, 2023
13               6:45 a.m. Pacific Time
14

                   Witness' Location:
15                 Walnut, California
16         TRANSCRIPT of the stenographic notes of the
17  proceedings in the above-entitled matter as taken by
18  and before DAVID LEVY, a Certified Court Reporter and
19  Notary Public of the State of New Jersey, held
20  remotely over the Internet, on Thursday, January 12,
21  2023, commencing approximately 6:45 in the forenoon,
22  Pacific Time, pursuant to Notice.
23

24

25

HIGHLY CONFIDENTIAL

Page 2

1 A P P E A R A N C E S :
2    (All appearances are remote via Zoom conference.)
3
    ON BEHALF OF THE PLAINTIFFS:
4    ADAM M. SLATER, ESQ.
    CHRISTOPHER GEDDIS, ESQ.
5    MAZIE SLATER KATZ & FREEMAN, LLC
        103 Eisenhower Parkway
6        Roseland, New Jersey 07068
        973-228-9898
7        aslater@mazieslater.com
        cgeddis@mazieslater.com
8
    ON BEHALF OF THE PLAINTIFFS
9    ZALMAN KASS, ESQ.
        RIVERO MESTRE LLP
10        2525 Ponce de Leon Boulevard, Suite 1000
        Coral Gables, Florida 33134
11        305-445-2500
12    ON BEHALF OF THE PLAINTIFFS
    BRETT VAUGHN, ESQ.
13        THE HOLLIS LAW FIRM
        8101 College Boulevard, Suite 250
14        Overland Park, Kansas 66210
        913-385-9400
15
    ON BEHALF OF THE PLAINTIFFS
16    RUBEN HONIK, ESQ.
        HONIK LLC
17    1515 Market Street, Suite 1100
        Philadelphia, Pennsylvania 19102
18    267-435-1300
19
    ON BEHALF OF THE DEFENDANTS HETERO LABS AND HETERO
20    DRUGS:
        WILLIAM MURTHA, ESQ.
21    JOHN C. BOBBER, JR.
        HILL WALLACK, LLP
22        21 Roszel Road
        Princeton, New Jersey 08540
23        609-924-0808
        wmurtha@hillwallack.com
24        jbobber@hillwallack.com
25

Page 3

1 A P P E A R A N C E S (Cont'd.):
2 ON BEHALF OF THE DEFENDANT TEVA
    PHARMACEUTICALS USA, INC.
3    BRIAN RUBENSTEIN, ESQ.
    GREENBERG TRAURIG, LLP
4        1717 Arch Street, Suite 400
        Philadelphia, Pennsylvania 19103
5        678-553-7392
        rubensteinb@gtlaw.com
6
7 ON BEHALF OF DEFENDANT ZHP
    JESSICA D. MILLER, ESQ.
8    NINA R. ROSE, ESQ.
    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
9        1440 New York Avenue, N.W.
        Washington, D.C. 20005
10        212-371-7134
        jessica.miller@skadden.com
11        nina.rose@skadden.com
12
    ON BEHALF OF THE DEFENDANT MYLAN N.V.
13    FRANK H. STOY, ESQ.
    PIETRAGALLO, GORDON, ALFANO, BOSICK & RASPANTI, LLP
14        301 Grant Street, 38th Floor
        Pittsburgh, Pennsylvania 15219
15        412-263-4397
        fhs@pietragallo.com
16        mbcatello@pietragallo.com
17
    FOR THE DEFENDANT TORRENT PHARMACEUTICALS
18    BRITTNEY NAGLE, ESQ.
    KIRKLAND & ELLIS, LLP
19        601 Lexington Avenue
        New York, New York 10022
20        212-909-3344
        brittney.nagle@kirkland.com
21
22
23
24
25

Page 4

1 A P P E A R A N C E S (Cont'd.):
2 FOR THE DEFENDANT HUMANA
    KIRSTIN B. IVES, ESQ.
3    FALKENBERG IVES, LLP
        230 West Monroe, Suite 2220
4    Chicago, Illinois 60606
        312-566-4801
5    kbi@falkenbergives.com
6
7 FOR THE DEFENDANT ALBERTSON'S LLC
    CHRISTOPHER B. HENRY, ESQ.
8 BUCHANAN INGERSOLL & ROONEY, P.C.
        Carillon Tower
9        227 West Trade Street, Suite 600
        Charlotte, North Carolina 28202-2601
10        704-444-3300
11
12 ALSO PRESENT:
13    JUSTIN BILY, Videographer-Concierge
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1 ------------------------INDEX--------------------
2    WITNESS            EXAMINATION        PAGE
3 SUSAN BAIN        MS. MILLER            7
4            MR. RUBENSTEIN        227
5            MR. SLATER        231
6            MS. MILLER        246
7
8 DIRECTIONS (DI)                PAGE
9 DI                48
10 DI                49
11 DI                63
12 DI                63
13 DI                63
14 DI                94
15 DI                107
16
17 SUSAN BAIN EXHIBITS            FOR IDENT.
18 Exhibit 1  Expert report of Susan Bain,    13
19        DRSc, dated 10/31/22, 109
20        pages
21
22 Exhibit 2  Document entitled,        95
23        "Supplemental List of
24        Documents Reviewed," dated
25        1/29/23

HIGHLY CONFIDENTIAL

Page 6

1    -------------------------INDEX-------------------
2    SUSAN BAIN EXHIBITS (Cont'd.)       FOR IDENT.
3    Exhibit 3  FDA press release dated        98
4          8/30/18
5
6    Exhibit 4  Article draft by Long, Meek,    133
7          et al, "N,N-DIMETHYLFORMAMIDE"
8
9    Exhibit 5  Transcript of deposition of    150
10         Eric Gu, Ph.D., held 4/5/21
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1         ^VIDEOGRAPHER:  We are going on the
2    record at 6:45 a.m. on January 31st, 2023.  This is
3    media unit number 1 of the video recorded deposition
4    of Dr. Susan Bain, regarding the Valsartan
5    litigation.  My name is Justin Bily, representing
6    Veritext, and I'm the videographer.  The court
7    reporter is David Levy from the same firm.  All
8    counsel will be noted on the stenographic record.
9         Would the court reporter please swear in
10   the witness and then we can begin.
11   S U S A N    B A I N, having been duly sworn by the
12        Notary Public, was examined and testified as
13        follows:
14        MS. MILLER:  Are we ready to begin?
15   Before we begin the deposition, I just wanted to note
16   for the record that I woke up ill today, and I've
17   lost my voice, and I'm going to try to go as long as
18   I can.  But I explained to Plaintiff's counsel
19   beforehand that I do not know how long my voice will
20   last today.  I apologize for the inconvenience, but
21   these things happen.
22   EXAMINATION BY
23   MS. MILLER:
24        Q.   Can you please state your full name for
25   the record.

Page 8

1        A.   Susan K. Bain.
2        Q.   Where are you today?
3        A.   I'm at my home.
4        Q.   Is anyone there with you?
5        A.   Um -- I have one roommate, not in the
6    same room.
7        Q.   All right.  And where is your home?
8        A.   Walnut, California.
9        Q.   You understand that you're under oath
10   today as though you were in a courtroom, correct?
11       A.   Yes, I do.
12       Q.   Have you ever been deposed before?
13       A.   No, I have not.
14       Q.   The main rule is that we shouldn't talk
15   over each other.  I'm going to ask questions, you're
16   going to answer them.  It's not rocket science.  If
17   you need a break, let me know.
18            Are you in front of a computer right
19   now?
20       A.   Yes, I am.
21       Q.   And do you have any programs up on that
22   computer?
23       A.   No.
24       Q.   Okay.  Adam mentioned that you have a
25   lot of documents in front of you.  Can you tell me

Page 9

1    what those are?
2        A.   Those are -- these are documents that
3    they provided to me, and Adam's people provided to me
4    related to this case.
5        Q.   Okay.  And when you say you have them in
6    front of you, are they hard copies or do you have
7    them on the computer?
8        A.   I have several binders and I have all of
9    them on the computer.  Electronically.
10       Q.   Okay.  If you at any point in this
11   deposition look on your computer at a document,
12   please let me know.
13       A.   Okay.
14       Q.   And who prepared the binders?
15       A.   Adam's people.
16       Q.   All right.  And you don't have e-mail or
17   messaging apps up on your computer?
18       A.   No, I do not.
19       Q.   Can you hear me okay despite my weak
20   voice?
21       A.   Yes, I can.
22       Q.   And you're able to give full and
23   complete testimony today?
24       A.   Yes, I am.
25       Q.   How many binders do you have with you

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1 today, can you show them to me? Is there a way to
2 show them?
3    A.    I can --
4    Q.    You're --
5    A.    -- spread about here, the largest one,
6 deviation investigations. Well, I don't know what --
7 you can't see it, probably.
8    Q.    No. You've just -- your hand is --
9    A.    I don't know how to get it to you. Do I
10 go out, maybe? I'm not sure how to get you to see
11 it.
12    Q.    That's so strange.
13    A.    It is strange, right?
14    Q.    Yes. So you have --
15    A.    Message --
16    A.    Now I can see it.
17    A.    Okay, there we go.
18    Q.    How many of those binders do you have
19 about that size?
20    A.    Oh, this is the largest one.
21    Q.    Okay. And have you taken notes in those
22 binders?
23    A.    No.
24    Q.    Are the documents highlighted?
25    A.    No, they are not.

Page 11

1    Q.    Okay. Have you read the complaint in
2 this case?
3    A.    I'm sorry?
4    Q.    Have you read the complaint in this
5 case?
6    A.    Yes.
7    Q.    When did you read it?
8    A.    I want to make one correction, please.
9 I have a binder that also has my report.
10    Q.    Okay.
11    A.    And in this binder I do have tabs.
12    Q.    And what are the tabs --
13    A.    I'm sorry?
14    Q.    Tabs but not writing, you said?
15    A.    Correct.
16    Q.    And what do the tabs signify?
17    A.    Different sections within my report,
18 different names of people who've testified. So
19 mostly sections.
20    Q.    Okay. We were talking about the
21 complaint in this matter, and I was asking when you
22 read it.
23    A.    I can't give you an exact date but very
24 early on when I was retained.
25    Q.    Do you know who the Plaintiff is in this

Page 12

1 matter right now?
2    A.    Yes.
3    Q.    And who is the Plaintiff?
4    A.    ZHP.
5    Q.    Do you know what a Plaintiff is?
6    A.    Yes.
7    Q.    What is a Plaintiff?
8    A.    The party bringing suit against the
9 Defendant.
10    Q.    And who is bringing the suit?
11    A.    The name that I know of is Adam's law
12 firm.
13    Q.    So you don't know who the actual
14 Plaintiff is?
15    A.    I'm just saying, the people, but I mean
16 if you're asking me a law firm name that's working
17 on, I don't know, other than Adam's law firm.
18    Q.    When did you first get contacted to
19 participate as an expert in this litigation?
20    A.    I don't know the exact date. But it was
21 in the late April, early May time frame in 2022.
22    Q.    And who contacted you?
23    A.    Chris Geddis.
24    Q.    Do you know how Chris identified you?
25    A.    No, I do not.

Page 13

1    Q.    Had you ever spoken to Chris before?
2    A.    No, I hadn't.
3    Q.    Have you ever worked on litigation
4 before?
5    A.    No, I haven't.
6    Q.    This is the first time you're serving as
7 an expert in litigation?
8    A.    Yes.
9          MS. MILLER: Let's mark Susan Bain's
10 report as Exhibit 1.
11 EXH       (Susan Bain Exhibit 1, expert report of
12 Susan Bain, DRSc, dated 10/31/22, 109 pages, marked
13 for identification, as of this date.)
14    Q.    If we could turn to page 2 of your
15 report, your background and qualifications.
16    A.    Um-hum.
17    Q.    It says that you spent several years
18 working at the FDA as a Consumer Safety
19 Officer/Investigator.
20          Do you see that?
21    A.    Can you pointing to me exactly --
22          MS. MILLER: Alex?
23    A.    Yes.
24    Q.    Do you see it, several --
25    A.    Yes.

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1    Q.    Is that accurate?
2    A.    Definition of "several." I began in
3 early 2002 and ended my time there in, toward the end
4 of 2003.
5    Q.    So you worked there for a
6 year-and-a-half?
7    A.    A little over.
8    Q.    Is that several years?
9    A.    Again, the definition of "several." To
10 me it's close.
11    Q.    Did you write that sentence?
12    A.    Yes.
13        MR. SLATER: Please don't ask any
14 questions about the writing of the report. That's
15 off limits under the Federal Rules of Civil
16 Procedure.
17    Q.    What's a Consumer Safety
18 Officer/Investigator?
19    A.    I'm sorry, what was the question?
20    Q.    What is a Consumer Safety
21 Officer/Investigator?
22    A.    The Consumer Safety Officer/Investigator
23 is a person who routinely performs audits of firms
24 that are under the U.S. FDA jurisdiction.
25    Q.    Did you do any work involving drugs?

Page 15

1    A.    I did no work in the area of drugs. The
2 work I did was in veterinary drugs.
3    Q.    Was most of your focus on veterinary
4 drugs or on devices?
5    A.    Most of my focus was on medical devices.
6    Q.    What percentage of your work in the
7 year-and-a-half you were at the FDA was on medical
8 devices?
9    A.    I guess I would have to ask you, are you
10 talking about number of days that I spent on devices
11 versus vet drugs, or number of actual inspections?
12    Q.    Either one.
13    A.    I would say approximately, and again, it
14 depends on your definition. Most of my time was on
15 the medical device side. So if that's 60 percent, 70
16 percent? I can't say for sure sitting here. That
17 was, you know, years back. But most of my time was
18 on the medical device side, and less than fifty
19 percent of my time was on the vet drug side.
20    Q.    You said that was several years back.
21 How many years ago was that?
22    A.    I left in 2003.
23    Q.    So you haven't worked at the FDA in two
24 decades, correct?
25    A.    Approximately, yes.

Page 16

1    Q.    And to the extent you worked on drugs,
2 you said it was veterinary drugs?
3    A.    Yes, it was.
4    Q.    Did you ever review the Drug Master
5 File?
6    A.    No, I didn't.
7    Q.    Did you ever review an ANDA?
8    A.    No, I did not.
9    Q.    Did you ever conduct an inspection at an
10 API manufacturer?
11    A.    No, I did not.
12    Q.    In your time at the FDA, your brief time
13 at the FDA, did you find your colleagues to be
14 professional and dedicated?
15    A.    Yes, absolutely.
16    Q.    And the FDA is charged with protecting
17 public health by ensuring that pharmaceutical
18 products are safe and effective, correct?
19    A.    Yes.
20    Q.    And why did you leave?
21    A.    I really enjoy working in industry. And
22 I had spent a number of years in the industry prior
23 to going to the FDA. And I truly missed working in
24 industry. So I went back to industry.
25    Q.    And what did your work with respect to

Page 17

1 medical devices entail at the FDA?
2    A.    Doing inspections.
3    Q.    What were you inspecting?
4    A.    Manufacturing sites.
5    Q.    And did you have a supervisor who
6 supervised that, the inspection?
7    A.    Absolutely.
8    Q.    And what was that person's title?
9    A.    Supervisor.
10    Q.    Were you a junior person in the ranks
11 there?
12    A.    Yes, I was.
13    Q.    Have you ever worked for an API
14 manufacturer?
15    A.    I worked for Watson Pharmaceuticals, a
16 generics company.
17    Q.    When was that?
18    A.    When I left the FDA, it was -- I began
19 in 2003, at the end of 2003 -- the end of 2003. I
20 continued there until early 2005.
21    Q.    And what was your job at Watson?
22    A.    I was one year in regulatory affairs. I
23 was the regulatory affairs manager, and then I moved
24 back to quality, which was -- it's my passion. And I
25 was a quality assurance -- I'm sorry, I believe it --

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1 I don't remember the exact title, honestly. Quality
2 assurance manager. It might have been possibly
3 corporate quality assurance manager. I don't
4 remember for sure.
5      Q.    Were you involved in any inspections by
6 the FDA of Watson, on the Watson side?
7      A.    No, I was not.
8      Q.    Were you involved in any recalls?
9      A.    Yes.
10     Q.    Which recall?
11     A.    At the time, Watson was undergoing a
12 number of recalls on various products.
13     Q.    I'm asking what those products were.
14     A.    Oh, my goodness. I honestly -- I
15 couldn't tell you at this point. I honestly don't
16 remember what exact products were being recalled
17 during that one year.
18     Q.    What was your role with respect -- do
19 you not recall because there were multiple recalls?
20     A.    Yes, that is true. I was in charge of
21 the coordination of the recalls.
22     Q.    Were there warning letters will in
23 conjunction with any of those recalls?
24     A.    Watson was under a consent decree at
25 that time.

Page 19

1      Q.    What kind of consent decree?
2      A.    For GMP violations.
3      Q.    Do you recall what the GMP violations
4 were?
5      A.    No, I don't.
6      Q.    And did you have a role in responding to
7 any FDA inquiries regarding the GMP violations?
8      A.    No, I did not.
9      Q.    Do you know if Watson received any 483
10 letters during your time there?
11     A.    I do not know.
12     Q.    Do you know whether Watson received any
13 warning letters during your time there?
14     A.    I don't know. I wasn't part of that.
15     Q.    Was your job solely to handle the
16 logistics of recalls?
17     A.    Yes.
18     Q.    Do you recall whether any of the
19 products that were being recalled during your tenure
20 at Watson were recalled because they posed a risk to
21 patient safety?
22     A.    I don't recall what the reasons were for
23 the recalls. I was in charge of, actually, as you
24 said, logistics and confirming that product was
25 returned from the field.

Page 20

1      Q.    So you don't know sitting here today
2 whether any of those products posed any sort of risk
3 to patient safety or health.
4      A.    I would assume they did because they
5 were recalled.
6      Q.    And do you know whether, typically when
7 there is a product recall, it results in a warning
8 letter?
9      A.    Not necessarily.
10     Q.    Do you know what percentage of recalls
11 result in warning letters?
12     A.    I do not.
13     Q.    Were you responsible for communicating
14 with the FDA about the product recalls?
15     A.    No.
16     Q.    Have you ever had a role in any company
17 in which you were responsible for communicating with
18 the FDA about product recalls?
19     A.    No.
20     Q.    Have you ever had any employment
21 position where you were responsible for responding to
22 a 483? And I assume you know what a 483 is.
23     A.    Yes, I know what a 483 is. Where I was
24 responsible for -- position title, position
25 responsibility, if we had received a 483, yes, we

Page 21

1 would have been responsible for responding to those
2 parts in the 483 that pertained to my department.
3            However, communication directly with the
4 FDA would go through regulatory affairs.
5      Q.    And which job are you talking about
6 right now?
7      A.    Multiple positions.
8      Q.    Do you recall any company that you
9 worked for receiving a 483?
10     A.    While I was employed with the company?
11     Q.    Yes.
12     A.    Sorry, I have to think for a second.
13     Q.    No problem.
14            (A pause in the proceedings.)
15     A.    I don't recall working at a company at
16 the time they received the 483.
17     Q.    Do you recall working at any company at
18 the time they received a warning letter?
19     A.    No, I did not work any place that
20 received a warning letter during my tenure.
21     Q.    Do you recall working at any company
22 other than Watson that had a recall during your
23 tenure there?
24     A.    Yes.
25     Q.    Which company is that?

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1    A.    At the time, the name of the company was
2  Technicoone, T-e-c-h-n-i-c-o-o-n-e.
3    Q.    And you worked there 1996 to 1999?
4    A.    Yes.
5    Q.    And what was recalled?
6    A.    We had a product that was in clinical
7  trials and we ended up having to recall it.
8    Q.    What was the product?
9    A.    I -- I don't know what the exact name
10  was.  Again, it was under clinical trial, and we -- I
11  can only tell you what we referred to it as.
12    Q.    Okay.
13    A.    Because it never went to market.
14    Q.    So what did you refer to it as?
15    A.    LYM-1.  L-Y-M-1.
16    Q.    And why did it have to be recalled?
17    A.    Because of a raw material that was in --
18  that we had used in the product that was discrepant.
19    Q.    That was what?
20    A.    Discrepant.  It was a bad raw material
21  that was in the product.
22    Q.    Was anyone in the clinical trial
23  injured?
24    A.    No.
25    Q.    Have you ever worked for a company that

Page 23

1  received an LAI from the FDA?
2    A.    During my tenure?
3    Q.    At any time that you're aware of.
4    A.    I haven't reviewed the warning letters
5  for companies I've worked at prior to my arriving.
6  So anything I would say would only be an assumption.
7    Q.    Did you hesitate to join Watson in light
8  of the fact that they were under a consent decree?
9    A.    No.
10    Q.    And why not?
11    A.    It was my understanding at the time that
12  they were working with the FDA under their consent
13  decree and remedying their issues.
14    Q.    So you felt comfortable working with a
15  company that had been subject to regulatory issues as
16  long as they were working on fixing whatever the
17  problem was?
18    A.    Yes.
19    Q.    Did Baxter have a recall while you were
20  there?
21    A.    There was a recall going on during my
22  tenure there that I'm aware of.
23    Q.    Do you remember what it had to do with?
24    A.    No.  I don't -- I don't recall.
25    Q.    Do you recall whether patients were

Page 24

1  becoming infected with hepatitis C from a Baxter
2  product?
3    A.    No, I don't recall.
4    Q.    Do you remember having any concerns
5  about working for a company that was conducting a
6  recall involving infection of patients with hepatitis
7  C?
8    A.    I'm sorry, can you restate?
9    Q.    Do you recall having any concerns about
10  working for a company that was conducting a recall
11  because patients had been infected with hepatitis C?
12    A.    No, I did not have any concerns.
13    Q.    Would you be concerned about working for
14  a company that has sold a product that led to
15  infecting patients with hepatitis C?
16    A.    Not as long as it wasn't done
17  intentionally.
18    Q.    Do you know whether Baxter received a
19  warning letter in conjunction with a hepatitis C
20  issue?
21    A.    I don't know.
22    Q.    Now that I've refreshed your
23  recollection, do you remember the hepatitis C issue?
24    A.    I've heard about it but I don't know if
25  that recall, if that specific reason for recall went

Page 25

1  on during my tenure.
2    Q.    You were there in July 1994, correct?
3    A.    Yes.
4    Q.    And do you recall what Watson's CGMP
5  violations were?
6    A.    No.
7    Q.    Have you ever taught a course in organic
8  chemistry?
9    A.    No, I have not.
10    Q.    Have you ever taken a course in organic
11  chemistry?
12    A.    During my undergrad -- let me refresh --
13  I believe I took a course in -- in introductory
14  organic chemistry in...
15    Q.    What year would that have been?
16    A.    Oh, my goodness.
17    Q.    Sorry to age us.
18    A.    Maybe, again, I'm not sure.
19    Q.    That would have been in the 1970s,
20  correct?
21    A.    Yeah, 1975, '76, something in that area.
22    Q.    So fifty years ago.
23    A.    Yes.
24    Q.    And do you recall learning anything
25  about nitrosamines there?

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1    A.    No.
2    Q.    What's Alpha Therapeutic?
3    A.    A biologics manufacturing company.
4    Q.    And what did you do there?
5    A.    I had several positions there. The
6 first position was as a quality engineer. And then I
7 became manager of raw material receipt. And then I
8 was quality manager of operations.
9    Q.    Did you represent Alpha Therapeutic
10 before the FDA with respect to any inspections or
11 warning letters?
12    A.    No, I did not.
13    Q.    Did you have any interaction with the
14 FDA while at Alpha Therapeutic?
15    A.    No, I did not.
16    Q.    Did you have any interaction with FDA at
17 Watson?
18    A.    No, I did not.
19    Q.    Did you have any interaction with the
20 FDA at Baxter?
21    A.    No, I did not.
22    Q.    Do you recall whether Alpha Therapeutic
23 had a recall while you were working for them?
24    A.    Not to my knowledge.
25    Q.    Were you there in 1990?

Page 27

1    A.    No -- yes, I was there.
2    Q.    You have no recollection of a recall at
3 Alpha Therapeutic in 1990 --
4    A.    No.
5    Q.    -- I was in the middle of my sentence.
6 It involved antihemophilic factor prophylate SD, and
7 the recipients of the product were experiencing
8 fever, chilled, nausea and vomiting. Does that ring
9 a bell?
10    A.    No.
11    Q.    So you had no involvement with that
12 recall.
13    A.    No, I did not.
14    Q.    Have you had communications with the FDA
15 in any of your positions? I might short-circuit my
16 questions.
17    A.    I'm trying to recollect whether or not I
18 had any involvement. So I did have involvement when
19 I was at Technicoone with an inspection that they
20 performed at our facility.
21    Q.    And what was that interaction you had
22 with the FDA at Technicoone?
23    A.    It would have been related to our
24 quality system.
25    Q.    So what was the nature of your contact

Page 28

1 with the FDA?
2    A.    If they asked to review the customer
3 complaints or any quality metrics that we might be
4 keeping with deviations or nonconformances. And we
5 would pull those records.
6    Q.    Any other interactions with the FDA
7 during your career?
8    A.    I don't recall any others.
9    Q.    And you don't recall that, while you
10 were at Watson, the company received a warning letter
11 about CGMP violations with respect to antibiotics?
12    A.    No, I don't.
13    Q.    Do you recall that one of the issues
14 raised by the FDA with respect to CGMP violations at
15 Watson involved contamination of antibiotics?
16    A.    No, I don't.
17    Q.    Are you surprised to hear that?
18    A.    Rather.
19    Q.    And why are you surprised if you knew
20 that they were under a consent decree?
21    A.    I -- I didn't know what the specific
22 violations were.
23    Q.    You knew that there were CGMP violations
24 but not what the CGMP violations were?
25    A.    That's correct.

Page 29

1    Q.    What does it take to get to the stage
2 where you've got a consent decree with the FDA?
3    A.    Generally, my understanding is that it's
4 a stepwise process where inspections take place at
5 the firm. If there's observations during the
6 inspection, they are noted on a 483. The firm is
7 given the opportunity to respond and correct. Then
8 FDA will come out and perform a reinspection.
9        If the firm continues to have GMP
10 violations, and/or does not correct the violations or
11 observations that they previously cited, it may
12 result in a warning letter. Then FDA continues to
13 perform inspections by at various intervals.
14        If companies continue to have issues,
15 the warning letter process can escalate to a consent
16 decree.
17    Q.    So a consent decree is a higher step in
18 terms of violations and -- is a consent decree a
19 final agency action?
20    A.    It's my understanding it could go
21 further. There could be other judicial actions.
22 Whether those are worse or if they are encore, I'm
23 not sure.
24    Q.    Is a warning letter considered a final
25 agency action?

HIGHLY CONFIDENTIAL

Page 30

1    A.    Is it -- I'm sorry?
2    Q.    Is a warning letter considered a final
3  agency action?
4    A.    Final agency action?  No.
5    Q.    Why not?
6    A.    Because you could escalate beyond that
7  to a consent decree.
8    Q.    So what is the purpose of a warning
9  letter in that case?
10   A.    The purpose of a warning letter in that
11 case?
12   Q.    What is the purpose of a warning letter?
13   A.    To solicit voluntary compliance.
14   Q.    When you were with the FDA, did you work
15 with the FDA in D.C.?
16   A.    No.
17   Q.    Where did you work for the FDA?
18   A.    The office was located in Irvine,
19 California.
20   Q.    So it was like an outpost?
21   A.    At the time, it was called a district
22 office.
23   Q.    Does FDA still have those?
24   A.    My understanding is, there's been some
25 restructuring, renaming, and they don't identify them

Page 31

1  any longer as district offices.
2    Q.    Have you ever been to FDA headquarters?
3    A.    No, I have not.
4    Q.    Is it fair to say that since leaving the
5  FDA in 2003, you've had no communications or
6  interactions with FDA?
7    A.    Could you please clarify what you mean
8  by "interactions with FDA"?
9    Q.    Have you had any interactions with FDA
10 since 2003?
11   A.    Are you speaking about submissions that
12 might go into the FDA, or a product, or are you
13 talking about direct phone calls?  I'm not sure.
14   Q.    Let's take it one at a time.  Have you
15 had any phone calls with anyone at the FDA since
16 2003?
17   A.    Yes.
18   Q.    And when was that?
19   A.    Within the last two years.
20   Q.    And who was your phone call with?
21   A.    I don't recall the person's name.
22 Functionally, he was a person who answers questions
23 for small business companies.
24   Q.    How many times did you speak to him?
25   A.    Once.

Page 32

1    Q.    How long was that call?
2    A.    Less than ten minutes.
3    Q.    Have you had any other conversations
4  with anyone from the FDA since 2003?
5    A.    Yes.
6    Q.    What were those?
7    A.    I spoke to a reviewer regarding a
8  submission that the company I was working with had
9  put in.
10   Q.    When was that?
11   A.    When?  That was within this last year.
12 2022.
13   Q.    Do you remember that person's name?
14   A.    Sean, S-e-a-n, Miller, M-i-l-l-e-r.
15   Q.    And how long did that call last?
16   A.    I believe we had two calls and each one
17 was less than ten minutes.
18   Q.    Okay.  Any other calls with the FDA
19 since 2003?
20   A.    No.
21   Q.    So three calls all total less than 30
22 minutes; is that fair?
23   A.    I believe that's fair.
24   Q.    And have you had any meetings at the FDA
25 since 2003?

Page 33

1    A.    No.
2    Q.    Has anyone from FDA called you since
3  2003?
4    A.    No.
5    Q.    Has anyone from FDA asked you to speak
6  or present on any topic, ever?
7    A.    No.  I would like to clarify.  When you
8  said "interact with people from the FDA," I have
9  been -- had a few interactions with people who work
10 at the FDA and have presented talks through an
11 organization I belong to.
12   Q.    So like you were at a conference and you
13 chatted with someone from the FDA?
14   A.    Yeah.  I was on the board for the
15 organization and we asked them if they would please
16 examine and do a presentation for us on a specific
17 topic.
18   Q.    And what was the name of that group that
19 you were involved in?
20   A.    Orange County Regulatory Association.
21   Q.    And so did someone come and speak in
22 Orange County from Washington, D.C.?
23   A.    It was via Zoom.
24   Q.    It was via Zoom.  When was that?
25   A.    2021.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1    Q.    Figured it was post-2020 when you said
2 Zoom.
3    A.    Yes.  And I -- and again, I'm going off
4 memory, we may have also had someone speak in 2020,
5 but that would also be via Zoom.
6    Q.    Do you remember who those people were?
7    A.    I don't recollect at this moment, but
8 I'll think of it and it may come to me a little bit
9 later.
10    Q.    Are you aware that while you were at
11 Watson, the active ingredient for Trazodone was
12 accidentally used in the production of antibiotics?
13    A.    Can you repeat the name of that drug,
14 please?
15    Q.    Trazodone.
16    A.    No.
17    Q.    Do you know what Trazodone is?
18    A.    No.
19    Q.    Do you know what Clindamycin is?
20    A.    I don't know for sure what it is.
21    Q.    Are you aware that Watson was accused of
22 improperly cleaning its equipment?
23    A.    No.
24    Q.    Did you review the consent decrees or
25 warning letters before agreeing to go work at Watson?

Page 35

1    A.    No, I did not.
2    Q.    Did you review any warning letters or
3 consent decrees while at Watson?
4    A.    No, I did not.
5    Q.    Why did you leave Watson?
6    A.    I was presented with an opportunity to
7 go to a startup company and that was appealing to me
8 at the time.
9    Q.    And was that startup company Spine-Worx?
10    A.    It was.
11    Q.    And what were they starting up?
12    A.    We designed and developed spinal
13 implants.
14    Q.    When you say "we," were you involved in
15 the design and development of spinal implants?
16    A.    Yes, from the quality side.
17    Q.    What was your job?
18    A.    I was head of regulatory and quality.
19    Q.    And what did that involve doing?
20    A.    Setting up their quality systems.
21    Q.    Did they have inspections while you were
22 there from the FDA?
23    A.    I was just thinking about that.  We had
24 one inspection, as I recollect.
25    Q.    Do you know how that inspection went?

Page 36

1    A.    Yes, it went well.  It was -- we did not
2 receive a 483.
3    Q.    Have you ever been fired from a job, or
4 terminated?
5    A.    Very early on in my career.
6    Q.    Which job was that?
7    A.    That was the position at Calmar,
8 C-a-l-m-a-r.
9    Q.    What year was that?
10    A.    It was approximately 1985.
11    Q.    What did they do?
12    A.    At the time, they did injection molded
13 plastics for closure containers.
14    Q.    And why were you terminated?
15    A.    Let me think back.
16        (A pause in the proceedings.)
17    A.    I do not remember the reason.
18    Q.    You were fired from one job in your life
19 and you don't remember the reason why?
20        MR. SLATER:  One second, Dr. Bain.
21 Objection, it's argumentative.  Let's be respectful
22 and reasonable in how we question a witness.  Thank
23 you.
24    Q.    You can answer.
25    A.    I do not remember.  I don't remember.

Page 37

1    Q.    And did you include that job on your
2 resume?
3    A.    No.  I don't believe it's on there.
4    Q.    Why?
5    A.    My resume covers my professional work
6 since I moved into the pharmaceutical industry.
7    Q.    When did you move into the
8 pharmaceutical industry?
9    A.    In 1988.
10    Q.    Did you have any jobs between the Calmar
11 job from which you were terminated and the Alpha
12 Therapeutic Corporation job?
13    A.    Yes.
14    Q.    What did you do in between?
15    A.    I worked at a company that manufactured
16 helicopter blades.
17    Q.    And why did you leave that job?
18    A.    I decided I'd like to work in the
19 pharmaceutical industry because I had a degree in
20 biology and I was interested in the field.
21    Q.    And your first job in the pharmaceutical
22 industry was at Alpha Therapeutical Corporation?
23    A.    Yes.
24    Q.    Was that a manufacturer?
25    A.    Yes.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    Q.    What did they manufacture?
2    A.    Rigid plasmapheresis, so plasma-related
3 drugs.
4    Q.    And what was your job there?
5    A.    That's where I had three different
6 positions. I started as a quality engineer, went to
7 a manager of quality receiving raw materials, and
8 then I was promoted to quality manager of operations.
9    Q.    And you don't recall any of the recalls
10 that occurred while you were there?
11    A.    No.
12    Q.    You wouldn't have been involved in
13 recalls while you were at --
14    A.    Not in my position, no.
15    Q.    So the quality position in a pharma
16 company, a person in the quality position isn't
17 involved if a product is recalled for lack of
18 quality?
19    A.    It depends what your job description and
20 function is within the quality unit. So I was --
21    Q.    So other colleagues of yours would have
22 been involved in a recall?
23    A.    I -- I'm not sure. But I would
24 assume -- I'm not sure. I was, honestly, I was
25 focused on my job and what I was doing.

Page 39

1    Q.    And do you remember any FDA inspections
2 while you were at Alpha Therapeutic Corporation?
3    A.    I don't remember if FDA came to audit
4 us. I do know we were audited by the French
5 regulatory authorities. But that's the only audit I
6 recall at this time.
7    Q.    Just to be clear, you don't recall any
8 on-site FDA inspections when you were at Alpha
9 Therapeutic.
10    A.    No.
11    Q.    When you were at Technicoone, were you
12 responsible for reporting adverse events to the FDA?
13    A.    No.
14    Q.    When you were at Watson, did you have
15 FDA contact?
16    A.    No, I did not.
17    Q.    When you were at Spine-Worx, did you
18 interface with the FDA?
19    A.    Only during the inspection.
20    Q.    And it was only one time?
21    A.    Yes.
22    Q.    Okay.
23        MS. MILLER: We've been going about an
24 hour, I need to take a water break. So let's go off
25 the record.

Page 40

1        VIDEOGRAPHER: The time is 7:38. This
2 ends media unit 1. We're going off the record.
3        (Recess taken.)
4        VIDEOGRAPHER: The time is 7:52. This
5 begins media unit number 2. We're back on the
6 record.
7 EXAMINATION (Cont'd.)
8 BY MS. MILLER:
9    Q.    Do you recall what month it was when you
10 started at FDA?
11    A.    I believe it was March.
12    Q.    And do you recall what month it was when
13 you ended at FDA?
14    A.    It was either very late November or
15 early December. I don't recall for sure.
16    Q.    Are you at U.S.C. today?
17    A.    Yes, I am. Oh, you mean physically or
18 working?
19    Q.    Physically.
20    A.    Physically I'm at home.
21    Q.    And have you told your employers at
22 U.S.C. that you are testifying today in litigation?
23    A.    I told my department chair I had a
24 deposition.
25    Q.    And did you ask your department chair

Page 41

1 whether it would be okay to use the U.S.C. backdrop
2 for your Zoom for litigation?
3    A.    No, I did not.
4    Q.    Are you here on behalf of U.S.C.?
5    A.    I am not.
6    Q.    Did you ask U.S.C. for permission to
7 serve as an expert in litigation?
8    A.    No, I did not.
9    Q.    Do you know whether U.S.C. allows
10 professors who serve as experts in litigation to use
11 U.S.C. as the backdrop for ear Zooms?
12    A.    I don't know. This is a backdrop from
13 my teaching --
14    Q.    Understood.
15    A.    -- lectures online. So...
16    Q.    Understood. Do you mostly teach online?
17    A.    No, mostly on site.
18    Q.    Do you have tenure at U.S.C.?
19    A.    I'm not in a tenure track position.
20    Q.    Were you in a tenure track position at
21 Claremont?
22    A.    No.
23    Q.    What does it mean to be in a non-tenure
24 track position?
25    A.    It means that you're -- in my case, I'm

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1 a full-time employee as, in my position, an assistant
2 professor, but not in a tenure track. Our department
3 doesn't have tenure tracks.
4    Q.    And why is that?
5    A.    I don't know. I don't know why.
6    Q.    And what is your salary at U.S.C.?
7    A.    Approximately 150,000, I think. I'm not
8 honestly sure.
9    Q.    And that's considered a full-time job?
10    A.    Yes.
11    Q.    And do you go to the campus every day?
12    A.    No.
13    Q.    How many times a week do you go to the
14 campus?
15    A.    That depends.
16    Q.    On average.
17    A.    I always go a minimum of two days a week
18 during the week. And our particular program in our
19 department is a program that was designed for working
20 professionals, so our classes are held on the
21 weekend.
22    Q.    So let me understand that. You go in on
23 the weekends to teach live?
24    A.    I do.
25    Q.    Saturday and Sunday?

Page 43

1    A.    Yes.
2    Q.    And --
3    A.    Not every weekend.
4    Q.    And Monday through Friday you don't go
5 to U.S.C.?
6    A.    I go in two days a week.
7    Q.    So you go in two days a week between
8 Monday and Friday plus Saturdays and Sundays?
9    A.    Some Saturdays and Sundays -- or
10 Sundays.
11    Q.    And you also have a company called
12 InCompliance?
13    A.    I do.
14    Q.    And how many hours a week do you work in
15 that company?
16    A.    That depends. It's a consulting company
17 of myself. So it very much depends on, you know,
18 what -- what, you know, clients and how many clients
19 I might have.
20         On average -- own average, it's hard to
21 say. On average ten hours a week.
22    Q.    And U.S.C. knows about it?
23    A.    Yes.
24    Q.    Do you need to get permission for
25 outside work?

Page 44

1    A.    Yes.
2    Q.    Do you need to get permission for
3 litigation consulting?
4    A.    Not to my knowledge. It's not really a
5 permission, per se. It's more just a notification
6 that I do consulting for the pharmaceutical industry.
7    Q.    Did you ask for approval or seek
8 approval to testify in litigation?
9    A.    I did not. I only made my chair, the
10 chair of our department, aware.
11    Q.    And is the chair of your department
12 tenured?
13    A.    No, not a tenured position, to my
14 knowledge.
15    Q.    And who are your clients at
16 InCompliance?
17    A.    Who are they? I mean, what are you
18 asking?
19    Q.    Can you tell me, can you list your
20 clients?
21         MR. SLATER: One question, or one point.
22 If there's a confidentiality to any extent of the
23 work you did, and you're not allowed to disclose
24 something for a confidentiality provision, you cannot
25 violate that position.

Page 45

1         THE WITNESS: Okay, thank you.
2    A.    Are you talking about clients I have
3 right this minute, or what specifically?
4    Q.    To the best of your recollection, can
5 you list all the clients you had in that job?
6    A.    Oh, my goodness. I can't -- I cannot
7 list, you know, every client that I've had. And some
8 of my consulting work is with a consulting company.
9    Q.    What do you mean by that?
10    A.    They are a company who hires consultants
11 to perform work for them.
12    Q.    What's that company called?
13    A.    Pharmatech Associates,
14 P-h-a-r-m-a-t-e-c-h Associates.
15    Q.    So you're saying you do work for
16 Pharmatech?
17    A.    Yes.
18    Q.    And Pharmatech hooks you up with
19 companies?
20    A.    Pharmatech actually gets the contract
21 with the firm, and then, depending on what kind of
22 work the firm needs done, they contact a consultant
23 to go out and do that work.
24    Q.    You don't have Pharmatech on your
25 resume.

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1    A.    No, because it's -- they are a client of
2 mine.
3    Q.    Okay.  So through Pharmatech, what
4 companies have you worked with?
5    A.    Through Pharmatech -- oh, my gosh --
6 I've worked with a company called Tissue-Teks.  I've
7 spent quite a bit of time with that.  I did some work
8 with -- I did an audit of a facility in San Diego
9 called AccuLab.  That was -- that was recent.  I'm
10 trying to -- I'm trying to remember the names.  I
11 don't know, if it's really important, I can -- I can
12 look up some of the names when we're on a break and
13 tell you the names.
14    Q.    We can go back to this after a break,
15 but the two companies you're remembering right now
16 are Tissue-Tek and AccuLab?
17    A.    Yes.
18    Q.    What does Tissue-Tek do?  I assume they
19 don't make tissues.
20    A.    No, they are a company who does tissue
21 processing.
22    Q.    What percentage of your work at
23 InCompliance comes through Pharmatech?
24    A.    That very much depends, because, you
25 know, obviously during the pandemic, there were a lot

Page 47

1 of companies who, either they didn't -- didn't do
2 audits or have outside audits performed, or
3 Pharmatech did not use consultants who lived outside
4 of that state, because of the restrictions.  Some
5 states, when you flew in, you would have to go into
6 quarantine for a week or something like that before
7 you could then go out, and so they just had a
8 practice that they had you do work within your state.
9 So that went on for a while during the pandemic.
10    Q.    What about 2022, what percentage of your
11 work came from Pharmatech?
12    A.    About -- or InCompliance?
13    Q.    Um-hum.
14    A.    I would say maybe 75 percent.
15    Q.    And does InCompliance have any employees
16 other than you?
17    A.    No.
18    Q.    Is it an LLC?
19    A.    No.
20    Q.    What is it?
21    A.    I just -- just my own sole proprietor.
22    Q.    Is it incorporated?
23    A.    No.
24    Q.    And what would you say -- what would you
25 estimate the income was of InCompliance in 2022?

Page 48

1    A.    Oh, my goodness.  I don't know for sure.
2 We're just starting to get 1099s.  Um --
3        MR. SLATER:  I have an objection.  Why
4 is this relevant?  This is confidential financial
5 information of her business.  I was slow on the draw
6 in you asking her salary, but I don't see why this is
7 something that she would need to answer, how much
8 money she makes in her private business.
9    Q.    Please go ahead and answer.
10 DI        MR. SLATER:  No, I'm asking her not to
11 answer.  If you want to explain to me why that's a
12 proper question, I'll certainly listen to you.  But I
13 don't know that you are allowed to ask somebody
14 all --
15        MS. MILLER:  You're instructing her not
16 to answer?
17        MR. SLATER:  For the time being unless
18 you want to explain to me what I'm missing.
19        MS. MILLER:  She's working in the pharma
20 industry.  This is a pharma case, Adam.  It's totally
21 an appropriate question.  You can't object on
22 relevancy, you can only object on privilege.
23        MR. SLATER:  I can actually object on,
24 it's her confidential financial information, which I
25 don't think you have a right to, so I'm going to

Page 49

1 direct her not to answer.  Please go to the next
2 question.
3        I don't have any idea how this is
4 something that relates to the issues in the case.
5 You can ask her what she gets paid as an expert
6 witness, and we're going to mark confidential what
7 her salary is, because that's nobody's business.
8    Q.    Do you know whether you earn more from
9 InCompliance than you do from U.S.C. or list?
10    A.    I'm sorry, can you repeat?
11    Q.    Do you know whether you earn more from
12 InCompliance per year than you do from U.S.C., or
13 less?
14 DI        MR. SLATER:  Don't answer the question.
15 It's the same issue.
16        MS. MILLER:  We'll have to take it up
17 with the court.  If you don't answer today, then
18 we'll have to likely come back, and --
19        MR. SLATER:  Jessica, you don't need to
20 threaten us.  Just please proceed with the
21 deposition.
22        MS. MILLER:  I am proceeding with the
23 deposition, Adam, thanks.
24    Q.    Is your company based in your house?
25    A.    Yes, it is.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1    Q.    How many hours did you spend on your
2 work with Tissue-Tek in 2022?
3    A.    I have no way of knowing without looking
4 back at all my invoices.
5    Q.    Approximately.
6    A.    Again, I could not -- I could not but
7 begin to guess, even venture a guess on that.
8    Q.    Is it more time or less time than you
9 spend at U.S.C.?
10    A.    Less time.
11    Q.    Is it about half as much?
12    A.    I, again, it's -- I'm going to say it's
13 less than half. But again, you know, I do this work
14 on the weekends, in the evenings. Not during work
15 hours. So it's -- it's really difficult to say.
16    Q.    If you don't do it during work hours,
17 how do you visit sites?
18    A.    I take vacation time or as I said, I
19 only go into the office two days a week. And because
20 we work on the weekends, we have a couple of days
21 each week that are our discretionary. So --
22    Q.    I understand that. I just, you had
23 said, I thought a minute ago that you only do this on
24 weekends and evenings, so I was confused.
25    A.    Well, if there's travel involved, if I

Page 51

1 have to go to the firm and if they are not working on
2 the weekend, then I'm going during the week. And as
3 I say, I can use vacation time or I use our -- my
4 weekend, which ends up being weekdays.
5    Q.    And approximately how many clients did
6 you have in 2022?
7    A.    I'm going to say that it was only two
8 because Pharmatech was the major.
9    Q.    Pharmatech and what's the other one?
10    A.    Oak Tree Engineering.
11    Q.    How many different companies is your
12 estimate that you worked for through Pharmatech in
13 2022?
14    A.    I'm going to say three or four.
15    Q.    Do you know -- and two of those you
16 mentioned the names and the other two you can't
17 recall the names sitting here today?
18    A.    I didn't -- I didn't use -- Tissue-Tek
19 was not in 2022.
20    Q.    Oh, I see. So in 2022, do you recall
21 the names of any pharmaceutical companies that you
22 conducted work with through Pharmatech? I think you
23 said you were getting 1099s, so that might help you
24 remember.
25    A.    I haven't gotten a 1099 or looked at a

Page 52

1 1099 yet from them. And that -- my 1099s from them
2 just give you a total -- a total amount anyway. But
3 one of the firms is located in Canada, and they are
4 involved in managing clinical trials. So not a
5 pharmaceutical company, per se. I audited them.
6    Q.    Do you know the name?
7    A.    Again, I can look it up.
8    Q.    Okay.
9    A.    And I'll do that, that's fine. And then
10 I audited a firm in Italy. Again, I'll look it up.
11    Q.    What do they do?
12    A.    They manufacture drugs and biologics.
13    Q.    And when you say you audited them, what
14 did that entail?
15    A.    Performed a GMP audit.
16    Q.    And the purpose was to determine if they
17 had any violations?
18    A.    I would say I -- violations, well, we
19 don't refer to them as violations. What -- and I say
20 "we" because there was another gentleman who went on
21 the audit as well. But we actually produced a report
22 to them on our findings that would, you know, be
23 areas that they could work on improving.
24    Q.    Do you recall what some of those areas
25 were?

Page 53

1        MR. SLATER:  If this is confidential
2 then --
3    A.    I cannot -- yes, that is confidential.
4    Q.    Okay. And what are the third and fourth
5 companies?
6    A.    So one was AccuLab -- and I said I need
7 to look up the facility in Canada that manages
8 clinical trials. There is the company in Italy, and
9 then Oak Tree.
10    Q.    You said Oak Tree was separate from --
11    A.    Oak Tree is separate --
12    Q.    Right. I'm sorry, you said there were
13 three to four companies through Pharmatech, and I've
14 got the Canadian one which you don't remember the
15 name, the Italian one you don't remember the name,
16 AccuLab, and do you remember the fourth name?
17    A.    I don't know that there was a fourth.
18 It was three or four.
19    Q.    Okay. And did you go to Italy to
20 conduct audits?
21    A.    I did.
22    Q.    Oh, that's fun. And do you remember
23 what kind of drugs they make, or biologics?
24    A.    Again, I need to look it up because they
25 make a number of drugs. Not all are prescriptions.

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1 Some are O/T, over-the-counter.
2        The biologic area was an area that is
3 new for them, and that's why they wanted some outside
4 assessment.
5    Q.    What types of biologics?
6    A.    I honestly don't know. It was a product
7 that they were developing. So they just wanted some
8 input. And I don't know if it's -- if that product
9 is even on the market. I don't know.
10    Q.    And you said you went to the audit with
11 someone else?
12    A.    Yes.
13    Q.    And why are there two of you?
14    A.    Because of the amount of information and
15 it was a drug and a biologic. And it was best use of
16 time. It was for an inspection, and it's expensive.
17 So we just divide the audit and each take an area.
18    Q.    When you say you each take an area, do
19 you mean a physical area or like a substantive area?
20    A.    Substantive.
21    Q.    And what's your area?
22    A.    For that particular audit, um -- what
23 did I look at? Again, you know, you have to give me
24 time to go back and look, because we ultimately merge
25 a report and we're involved with each other's

Page 55

1 information all the way through. So I would have to
2 go back and look at my notes to see what particular
3 area I audited. Because sometimes there is a bit of
4 crossover.
5    Q.    What part of 2022 was that?
6    A.    I went to Italy in June, I believe.
7    Q.    And you don't recall from June what was
8 your portion of the audit?
9    A.    I don't remember which area specifically
10 I audited for sure, no.
11    Q.    And what did you do for Oak Tree
12 Engineering?
13    A.    I wrote a 510(k) submission.
14    Q.    For what kind of a product?
15    A.    A spinal implant.
16    Q.    Did they get clearance?
17    A.    I'm sorry?
18    Q.    Did they get clearance?
19    A.    Yes.
20    Q.    When was that?
21    A.    We got final clearance in December, I
22 believe it was.
23    Q.    When did you work for Tissue-Tek?
24    A.    What year?
25    Q.    Um-hum?

Page 56

1    A.    It was before the pandemic. I'm not
2 sure exactly. Maybe 2019, possibly. I'm not sure.
3    Q.    And were you doing --
4    A.    I'm sorry?
5    Q.    -- and what were you doing for them?
6    A.    The same thing. Went and did a gap
7 assessment audit. And then helped them write some
8 procedures.
9    Q.    Do you know if they subsequently had a
10 recall?
11    A.    No, I don't.
12    Q.    Did your work involve the biologic
13 corneal bandage?
14    A.    We assess the overall quality system.
15    Q.    The quality system of what?
16    A.    Of the manufacturing site.
17    Q.    And where is the manufacturing site?
18    A.    In Florida.
19    Q.    Have they ever been found to have CGMP
20 violations?
21    A.    I'm not sure. I did not look up their
22 history.
23    Q.    Do you generally look up the history of
24 a company's FDA interactions, warning letters, 483s,
25 etc., before agreeing to take that company on as a

Page 57

1 client?
2    A.    No.
3    Q.    Okay. Did lawyers help write your
4 resume?
5    A.    No.
6    Q.    In any of your roles prior to this
7 litigation, have you worked with, in anything
8 involving nitrosamines?
9    A.    No.
10    Q.    Have you done any work prior to this
11 litigation with respect to Valsartan?
12    A.    No.
13    Q.    Is that a Master's degree in public
14 product quality?
15    A.    The MS degree that we have at U.S.C.?
16    Q.    Um-hum.
17    A.    It's medical product quality, yes.
18    Q.    And so you're responsible for the
19 students who have courses seeking MS in that topic?
20    A.    I'm responsible for the program, or the
21 Master's degree program overall.
22    Q.    And is that mostly a weekend program?
23    A.    Yes.
24    Q.    Weekends and nights?
25    A.    Yes, weekends, yes.

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1    Q.    Is your whole program involving people
2 who are working?
3    A.    We have -- I don't know.  I want to say
4 possibly more because we have some that
5 are working professionals.
6    Q.    Um-hum.
7    A.    Possibly more because we have some that
8 are working on internships.  So that would drive the
9 number even higher.  But the program was originally
10 designed for working professionals, yes.
11   Q.    Have you ever been disciplined in the
12 job?
13   A.    At U.S.C.?
14   Q.    Ever.
15   A.    Only the time we talked about in
16 1985-ish.
17   Q.    Were you disciplined before you were
18 terminated?
19   A.    No.
20   Q.    Have you ever filed a lawsuit?
21   A.    Um -- I went to Small Claims Court.
22 That's not a lawsuit, right?  I don't guess.
23   Q.    What did that involve?
24   A.    It involved a company that I left and
25 they paid me electronically and then they took it

Page 59

1 back after I resigned.
2    Q.    What company was that?
3    A.    MedCell Biologics.  MedCell Biologics.
4    Q.    When was that?
5    A.    It was before I was at the FDA.  It was
6 very short-term.  It was -- the reason left was
7 because the drive was -- it was down in San Diego.  I
8 was only there a couple of months -- excuse me, that
9 is not true.  That is not the name of the company,
10 that is not true.  That was another time I worked in
11 San Diego.  It was MedCell.  When I was there
12 previously was -- oh, my goodness, again only a
13 couple of months for the same reason.  And that I
14 would say was 1993-ish for couple of months.  Yeah,
15 something like that.
16       The name of the company -- I'll look it
17 up during the break.  I don't recall the name of the
18 company.  It was just a couple of months.  So not on
19 my radar.
20   Q.    I'm totally confused.  You worked at
21 Medcell, but that's not the company that you sued?
22   A.    No.  No, it is not the company.
23   Q.    When did you work at Medcell?  'Cause
24 it's that not on your resume --
25   A.    Yeah, you know, I honestly don't have it

Page 60

1 on my resume, because it was only a very few months
2 because as I say the drive was too much.
3    Q.    But that's not the company you sued?
4    A.    No.
5    Q.    So what's the company you sued?
6    A.    That's what I'm trying to recollect
7 their name.  That was in -- that was -- again, I'm
8 going -- I'll look it up.  I've got it somewhere.
9    Q.    Is the company that you sued on your
10 resume?
11   A.    No.
12   Q.    How long did you work at the company you
13 sued?
14   A.    Less than three months.
15   Q.    So you have two jobs you worked less
16 than a year, Medcell and this company you sued?
17   A.    Um-hum, yes.
18   Q.    And you left Medcell because of the
19 commute.  Why did you leave this other company?
20   A.    This same reason.
21   Q.    They both had long commutes?
22   A.    They were both in San Diego.
23   Q.    Which one did you work at first?
24   A.    The one I can't remember the name.
25   Q.    So you left there because it was a long

Page 61

1 commute and then you took another job in San Diego?
2    A.    I did.
3    Q.    And it's your understanding that if
4 you're at a job less than a year it doesn't need to
5 go on your resume?
6       MR. SLATER:  Objection, argumentative.
7 Is there some standard you're quoting?  I'm not sure
8 what you're asking.
9    Q.    Go ahead.
10   A.    You're asking me?  What did you ask me?
11   Q.    What's the minimum time job that you
12 believe has to go on a resume?
13   A.    I've never really considered that.
14   Q.    So other than MedCell Biologics, the
15 company that you don't recall the name of, and the
16 company that terminated you, are there any other jobs
17 you've had that aren't on your resume?
18   A.    Not that I recall.
19   Q.    Are you on social media?
20   A.    I have a Facebook page.
21   Q.    For professional purposes?
22   A.    I'm sorry?
23   Q.    Do you use that for professional
24 purposes or only personal?
25   A.    Personal.  I do also have a LinkedIn

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1 profile.
2    Q.    What's your name on LinkedIn?
3    A.    Susan Bain.
4    Q.    And how about on phase book?
5    A.    Susan Bain.
6    Q.    You said you were first contacted about
7 this litigation, I think you said April or May 2022
8 by Chris Geddis, is that correct?
9    A.    Yes, to my recollection.
10    Q.    And when did you agree to serve as an
11 expert, or did you agree right away?
12    A.    In that same time frame.
13    Q.    Was it one call in which you agreed or
14 was it later?
15    A.    I believe correspondence was via e-mail.
16    A.    Um-hum.
17    A.    So we had several e-mails back and
18 forth.
19    Q.    So it was approximately a week or --
20 approximately how much time between when you were
21 first contacted and when you agreed to serve as an
22 expert?
23    A.    Maybe one to two weeks.
24    Q.    Okay.  And did you review any materials
25 during that one to two weeks --

Page 63

1    A.    No.
2    Q.    -- before agreeing to serve as an
3 expert?
4    A.    No, I did not.
5    Q.    Your expert report has a lot of
6 deposition summaries in it, correct?
7    A.    Yes.
8    Q.    Did you write those?
9 DI        MR. SLATER:  Objection, don't answer the
10 question.  Next question.
11    Q.    Did anyone other than your lawyers help
12 you write your report?
13 DI        MR. SLATER:  Objection to the way the
14 question was framed.  Can you reask the question,
15 please?  I wouldn't object if you say, "Did anybody
16 other than an attorney."  "Putting aside attorney,
17 did anybody who is not an attorney assist you with
18 writing your report?"  That question I will not
19 object to.
20    Q.    How did you decide what information to
21 include in your report from depositions?
22 DI        MR. SLATER:  Objection.  You're asking
23 the same question in different ways.
24        MS. MILLER:  It's a really different
25 question.

Page 64

1        MR. SLATER:  It's not, though, because
2 it a goes to decisionmaking and drafting of the
3 report and that's not an area that you're supposed to
4 ask about, just like it's not an area that we're
5 going to ask your experts about because we're going
6 to respect the rules as well.
7        MS. MILLER:  I'm asking the expert how
8 she decided what information include and what
9 information to exclude.  Goes to her methodology,
10 Adam.  It's an appropriate question.
11    Q.    Can you tell me how you decided which
12 information from the depositions to include in your
13 report?
14        MR. SLATER:  All right, I'll let you
15 answer that, go ahead.
16        MS. MILLER:  That was the same question.
17        MR. SLATER:  I'm sorry, are you
18 laughing?  Was something funny?  I missed the joke.
19        MS. MILLER:  Adam, Adam.
20        THE WITNESS:  Can you repeat, please?
21        MS. MILLER:  Sure.  Court reporter, can
22 you repeat the question.
23        (Record read.)
24    A.    So I included information that I felt
25 was germane to the topic at hand.

Page 65

1    Q.    The topic at hand being what?
2    A.    GMP violations.
3    Q.    Did you include all information that was
4 relevant to whether or not there were GMP violations?
5    A.    No, I did not.
6    Q.    So was there some information or
7 testimony in the depositions related to whether there
8 were CGMP violations that you did not include in your
9 summaries?
10    A.    Yes.
11    Q.    How long did it take you to read and
12 summarize each deposition?
13    A.    Well, the -- that's hard to say.  The
14 depositions were different lengths.
15    Q.    Um-hum.  So I'm --
16    A.    Some depositions had, you know, more
17 information that I felt was germane.  So
18 approximately how long?  Three or four hours?  Some
19 more, I mean, some of the depositions were quite
20 voluminous, as you saw, hundreds of pages, so those
21 obviously took longer.
22    Q.    When did you first speak with Adam
23 Slater?
24    A.    Oh, my goodness.  I would say very early
25 on, mid-May, early May, mid-May.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q.    Have you met any of the Plaintiffs'
2  lawyers in person?
3    A.    No.
4    Q.    Approximately how many times since April
5  have you spoken with Plaintiffs' counsel?
6    A.    Oh, my goodness.  I -- I don't know that
7  I could answer that.  Are you saying verbally or via
8  e-mail?
9    Q.    That was verbally.
10   A.    Verbally.  I don't know.
11       MR. SLATER:  You're allowed to estimate
12 or approximate.
13   A.    Approximate, oh, fifty times, less, you
14 know, 30, 40 times.
15   Q.    Were you familiar with Valsartan at the
16 time that you were contacted by Plaintiffs' counsel?
17   A.    Yes.
18   Q.    What was your basis of familiarity?
19   A.    I took Valsartan.
20   Q.    Did you take Valsartan during the period
21 at issue in this litigation?
22   A.    Yes.
23   Q.    What did you do at the time of the
24 recall?
25   A.    Nothing, honestly.

Page 67

1    Q.    What do you mean by that?
2    A.    I kept taking medication and I was never
3  contacted by my pharmacist to tell me that I was
4  taking product that was under a recall.
5    Q.    Did you see it on the TV or something?
6    A.    The recall?  I honestly don't know where
7  I saw it.  I don't -- because I receive recall
8  notices because of my work at school.  I receive
9  recall notices from, you know, various professional
10 organizations that I belong to that, you know, they
11 will forward them and, you know, things of that
12 nature.
13       So I can't say if I read it or I saw it
14 on TV.  As a matter of fact, I didn't even know -- as
15 I sit here, I don't know that it was on TV.  But I
16 would have become aware via reading it most likely.
17   Q.    How soon after the recall did you become
18 aware of it?
19   A.    I, again, don't know.
20   Q.    Did you finish the Valsartan bottle you
21 had in your home?
22   A.    I took the Valsartan that I had.  I --
23 as I said, I was never notified that I actually had
24 anything that was under recall.
25   Q.    And once Valsartan was recalled, did you

Page 68

1  switch to another medication?
2    A.    No.
3    Q.    You were able to get Valsartan all the
4  way through?
5    A.    Yes.
6    Q.    Have you ever asked a physician or
7  pharmacist whether you had taken Valsartan that was
8  recalled?
9    A.    No.
10   Q.    Have you ever asked your doctor about
11 any potential risk from having taken Valsartan?
12   A.    No.
13   Q.    Were you familiar with ZHP as a company
14 at the time you were contacted by Plaintiffs'
15 counsel?
16   A.    No.
17   Q.    You had never heard of ZHP?
18   A.    No, I had not.
19   Q.    Had you heard of Prinston or --
20   A.    No.
21   Q.    -- Solco?
22   A.    No.
23   Q.    Prior for this litigation, did you ever
24 do any consulting work involving Valsartan or
25 nitrosamines?

Page 69

1    A.    No, I did not.
2    Q.    Do you know whether NDMA or NDEA has
3  ever been found in Valsartan or Exforge?
4    A.    To my knowledge, there's never been a
5  confirmation that it's been found in either Exforge
6  or Diovan.
7    Q.    And what do you mean by, there's never
8  been confirmation?
9    A.    My understanding is that at one time,
10 there was a claim made that there was some NDMA in
11 the product, the Diovan product.  However, it to my
12 knowledge was not confirmed.
13   Q.    When you say some claim, who made that
14 claim?
15   A.    I don't -- I don't recall.
16   Q.    Did you revise your resume in advance of
17 this litigation or did you just provide a prior
18 resume?
19   A.    Provided a prior resume.
20   Q.    Would any of your opinions change if it
21 were confirmed that NDMA was found in Diovan or
22 Exforge?
23   A.    That's awfully hypothetical.
24   Q.    Correct.  We ask hypotheticals at
25 depositions.

18 (Pages 66 - 69)

Page 70

1     A.   I think it would depend on the facts. I
2 would really honestly need to see the -- the testing
3 and the overall, the work that was done at the
4 manufacturer to really understand. I don't know that
5 I could understand without seeing it and -- that's a
6 hypothetical that's really outside of what I -- what
7 I have considered.
8     Q.   I'm asking you to consider it now. Can
9 you think of any opinions that you've offered in this
10 litigation that would be changed if the RLD -- you
11 know, that means Reference Listed Drug, I assume --
12 were found to have contained NDMA or NDEA?
13         MR. SLATER:  Are you asking if it was
14 found on testing or are you saying if it was part of
15 the formulation and the specifications as being part
16 of the formula?
17         MS. MILLER:  Adam, I asked my question.
18 Lets have the witness answer it.
19         MR. SLATER:  I object to the question.
20         You can answer.
21         MS. MILLER:  Do you need the question
22 repeated to you?
23         THE WITNESS:  No, I don't need the
24 question repeated.
25         MS. MILLER:  Okay.

Page 71

1     Q.   So go ahead.
2     A.   Are you asking if the RLD was approved
3 with an impurity, being NDMA?
4     Q.   I'm asking whether, if it is confirmed
5 that Diovan or Exforge was tested and found to have
6 NDMA, would that change any of your opinions that
7 you're offering in your report?
8         MR. SLATER:  Objection. The question
9 is -- lacks foundation.
10         MS. MILLER:  It's a hypothetical.
11         MR. SLATER:  I understand.  It still
12 lacks foundation. It's very imprecise and ambiguous.
13 You didn't answer her question when she sought to
14 clarify what you're actually asking, which you're
15 refusing to tell her what your question actually
16 means, on top the inadequacies of the question to
17 begin with. I object.
18         I'm not going to stop her from
19 answering, but there are serious problems with the
20 question that I've placed on the record. I'm not
21 sure why she's smiling but it's okay.
22     Q.   Please go ahead.
23     A.   My opinions would not change.
24     Q.   What did you know about NDMA and NDEA
25 before agreeing to serve as an expert in this

Page 72

1 litigation?
2     A.   I didn't know anything about it other
3 than what I had heard about the recall of Valsartan.
4     Q.   Did you know anything about DMF --
5     A.   No.
6     Q.   -- before agreeing to serve in this
7 litigation?
8     A.   No.
9         MR. SLATER:  You're talking about the
10 solvent, not DMF, the regulatory document, right?
11         MS. MILLER:  I think we understood each
12 other, right?
13         MR. SLATER:  I don't understand why you
14 can't answer.  It's just being polite.
15         MS. MILLER:  I don't think it's your job
16 here to ask questions.  I think it's my job to ask
17 questions, so I'm going to ask the question --
18         MR. SLATER:  All right, thank you for
19 your politeness. I appreciate it.
20     Q.   Have you ever done any consulting work
21 in connection with a product that contained NDMA or
22 NDEA?
23     A.   No, I haven't.
24     Q.   Have you ever advised a client on any
25 risks related to NDMA or NDEA?

Page 73

1     A.   No, I haven't.
2     Q.   Do you know how many different types of
3 nitrosamines there are?
4     A.   No.
5     Q.   Do you know how many types of
6 nitrosamines can be found as impurities in
7 pharmaceuticals?
8     A.   No, I don't.
9     Q.   Do you know how often nitrosamines have
10 been found in pharmaceuticals?
11     A.   No.
12     Q.   Have you ever worked with the solvent,
13 DMF?
14     A.   No, I have not.
15     Q.   When did you first hear the term DMF as
16 a solvent?
17     A.   As part of this litigation.
18     Q.   Do you know whether any of the companies
19 that you've ever worked with used DMF?
20     A.   I can't say definitively, but not that I
21 recall.
22     Q.   Do you know whether any of the companies
23 that you have done work with have used a testing
24 method known as GCFID?
25     A.   Companies I've worked with?

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1    Q.    Or consulted for.
2    A.    They've had GC, but I don't know if it
3 was FID.
4    Q.    When you say you don't know if it was
5 FID, can you explain?
6    A.    When I would do an audit of the lab,
7 they would just say, "This is our GC machine,
8 instrument." So whether they -- anything beyond
9 that, I don't know.
10    Q.    Have you ever advised a client or
11 company on whether GCFID testing was appropriate for
12 their operations?
13    A.    No, I haven't.
14    Q.    Prior to being contacted to serve as an
15 expert in this litigation, did you know whether the
16 TA manufacturing process could lead to the formation
17 of NDEA?
18    A.    No, I did not.
19    Q.    Before you were contacted by Plaintiffs
20 to serve in this litigations, did you ever make any
21 public statements about whether Valsartan
22 adulterated?
23    A.    No.
24    Q.    Prior to being contacted about serving
25 as an expert in this litigation, did you have any

Page 75

1 opinions about whether the manufacturing process for
2 Valsartan could lead to the formation of NDMA?
3    A.    Could you please repeat?
4         MS. MILLER: Court reporter, did you get
5 it? Why don't you repeat it. I always worry, if I
6 repeat it, I'll change a word or something.
7         (Record read.)
8    A.    No.
9    Q.    Do you have any research assistants?
10    A.    No, I do not.
11    Q.    Did you perform any literature searches
12 to prepare your report?
13    A.    I've reviewed literature, yes.
14    Q.    Was that literature provided to you by
15 Plaintiffs' counsel?
16    A.    Yes.
17    Q.    Did you review any literature that was
18 not provided to you by Plaintiffs' counsel?
19    A.    I did some research on the manufacturing
20 practices and some of the GMP foundations.
21    Q.    Can you explain what that research
22 entailed?
23    A.    I just went back into the FDA website
24 and looked at definitions like for, you know,
25 adulteration and a few other things. I reviewed the

Page 76

1 ICH guidelines, I reviewed the some of the FDA
2 guidance documents. That's all I recall.
3    Q.    Everything else that you reviewed was
4 provided by Plaintiffs' counsel?
5    A.    I believe so.
6    Q.    You wrote in your report that you
7 reviewed corporate documents, including e-mails,
8 reports, SMPs and similar internal protocols. Fair
9 to say you got those from Plaintiffs' counsel?
10    A.    Yes.
11    Q.    And did you select those documents from
12 a database or were they just provided to you?
13    A.    They were provided to me.
14    Q.    Do you know how many documents were
15 produced in this litigation?
16    A.    To me or the overall litigation?
17    Q.    Do you know how many documents ZHP has
18 produced in this litigation?
19    A.    I have no idea.
20    Q.    Do you know what percentage of documents
21 proceeded by ZHP in the litigation you've reviewed?
22    A.    I have no idea.
23    Q.    Your reliance list cites 2023 ZHP
24 documents on it. Were those all selected for your
25 review by Plaintiffs' counsel?

Page 77

1         MR. SLATER: Objection, lack of
2 foundation.
3         You can answer. Just so you understand
4 the objection, Dr. Bain, I'm just saying I'm not sure
5 that the number she counted is correct because
6 there's a supplemental list or whatever, but that was
7 my only issue.
8    A.    No, they were not -- yes, everything
9 that's on that list was provided to me by counsel.
10    Q.    Do you know whether you received all of
11 the ZHP SMPs and internal protocols?
12    A.    I do not know.
13    Q.    Did you take notes while reviewing those
14 materials?
15    A.    I just had, you know, some general
16 highlights and some personal thoughts. But other
17 than that, no.
18    Q.    Do you still have the documents with the
19 general highlights and personal thoughts on them?
20    A.    No.
21    Q.    What happened to them?
22    A.    I deleted.
23    Q.    Why did you delete them?
24    A.    I didn't need them any longer.
25    Q.    Do you read Chinese?

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1    A.    I'm sorry?
2    Q.    Do you read Chinese?
3    A.    No.
4    Q.    When did you delete those documents?
5    A.    After I wrote my report, I believe.
6    Q.    And were your notes with pen or were
7 they highlighted on the laptop?
8    A.    Highlighted on the laptop.
9    Q.    Did someone instruct you to delete them?
10    A.    No.
11    Q.    Did you review any scientific
12 literature?
13    A.    Just the scientific literature that was
14 provided.
15    Q.    Provided by whom?
16    A.    Counsel.
17    Q.    Did you take any notes on those before
18 deleting them?
19    A.    No.
20        MR. SLATER:  Objection, lack of
21 foundation.
22    Q.    How did you identify which employee
23 depositions to review?
24    A.    I was provided the depositions.
25    Q.    Do you know if you were provided all the

Page 79

1 depositions?
2    A.    No, I do not.
3    Q.    Did you speak to anyone at the FDA in
4 the course of preparing your report?
5    A.    No.
6    Q.    Did you review drafts of the Hecht or
7 Plunkett reports?
8    A.    I don't remember reviewing a Plunkett
9 report.  Drafts, I don't believe I read any draft
10 reports.
11    Q.    Do you think you're qualified to offer
12 an opinion on how nitrosamines form?
13        MR. SLATER:  Objection, argumentative.
14        You can answer.
15    A.    I'm not an organic chemist.  So if
16 you're asking about chemistry, no.  I'm not an expert
17 in that area.
18    Q.    There is some discussion of chemistry in
19 your report, correct?
20    A.    Correct.
21    Q.    Is that all based on Dr. Hecht's report?
22    A.    Dr. Hecht's report and some of the
23 literature that was cited.
24    Q.    When you state that the foreseeable
25 chemical reactions in the process were well

Page 80

1 understood by organic chemists in the scientific
2 community, are you relying on Dr. Hecht for that?
3    A.    Dr. Hecht's report, and Dr. Najafi, and
4 some of the literature that I looked at, the IARC
5 monograph where it states that it's -- the formation
6 of NDMA has been known since 1865.
7    Q.    Does the IARC monograph address the same
8 circumstances in which Valsartan was manufactured?
9        MR. SLATER:  Objection.  You can answer.
10    A.    It talks about the formation of
11 nitrosamines.
12    Q.    Are you offering an opinion that the
13 IARC monograph should have put ZHP on notice that its
14 manufacturing processes would have led to the
15 formation of nitrosamines?
16    A.    No.
17    Q.    And when you say "the scientific
18 literature," are you simply referring to scientific
19 literature that was provided to you by Plaintiffs'
20 counsel?
21    A.    Yes.
22    Q.    Do you feel qualified to determine,
23 based on those two scientific articles, I think one
24 was an excerpt from a textbook and one was an
25 article, as to whether ZHP should have been on notice

Page 81

1 that its manufacturing process would lead to the
2 formation of nitrosamines?
3        MR. SLATER:  Objection, lack of
4 foundation, mischaracterization of the record.
5        You can answer.
6    A.    That was awfully long, could you please
7 read that back?
8        MS. MILLER:  Sure.  David, go ahead.
9        (Record read.)
10    A.    I'm sorry, on notice by whom?
11    Q.    I think my question was whether it would
12 have put ZHP on notice.  ZHP is the Defendant.
13    A.    So based on the literature having been
14 put on notice, who would put them on notice?  I guess
15 I'm not understanding the question.
16    Q.    Is it your opinion that ZHP should have
17 known based on those two articles, one is an article,
18 and one is a textbook excerpt provided to you by
19 Plaintiff's counsel, that those two documents should
20 have led ZHP to know that the manufacturing process
21 it was using could have led the formation of
22 nitrosamines?
23        MR. SLATER:  Same objection, lack of
24 foundation, mischaracterization of the record.
25        You can answer.

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1    A.   Based on the reports of Dr. --
2 Drs. Hecht and Najafi, it's my feeling that this
3 reaction is something that is covered or well
4 understood in the organic chemistry field. So if
5 you're asking whether I think ZHP should have known,
6 I would say yes.
7    Q.   Did you personally test Dr. Najafi and
8 Dr. Hecht's opinions or did you simply assume they
9 were correct?
10    MR. SLATER:   Objection, you can answer.
11    A.   I did not test their opinions. I merely
12 read the literature citings.
13    Q.   If Dr. Hecht and Najafi are wrong, would
14 that affect your opinions in this litigation?
15    MR. SLATER:   Objection.
16    You can answer.
17    A.   If their opinions are wrong, that would
18 also go to the literature they cited as being wrong
19 as well.
20    Q.   Did the literature they cite discuss the
21 same manufacturing process used by ZHP?
22    MR. SLATER:   Objection.
23    You can answer.
24    A.   That's my understanding.
25    Q.   Was DMF heated to the boiling point

Page 83

1 during the ZHP manufacturing process?
2    A.   I remember reading the temperature that
3 it was heated to. I also remember reading boiling
4 point. But I don't know the boiling point of that
5 particular process without -- if I could be pointed
6 to that -- to that area of a document that talks
7 about the manufacturing.
8    Q.   Was it known in 2011 that DMF could
9 degrade if it wasn't heated to boiling point?
10    MR. SLATER:   Objection.
11    You can answer.
12    A.   Yes. That would -- as I understand,
13 yes.
14    Q.   And can you tell me sitting here what
15 scientific literature you would cite for the
16 proposition that DMF -- that it was known to the
17 scientific community in 2011 that DMF could degrade
18 if it wasn't heated to boiling point?
19    A.   Can I speak for the whole scientific
20 community? I can speak to what literature was out
21 there.
22    Q.   Let me ask my question different --
23    MR. SLATER:   I'm sorry, were you still
24 answering the question?
25    MS. MILLER:   I think she misunderstood

Page 84

1 the question --
2    MR. SLATER:   The point is, I'm trying to
3 ask if she has finished speaking. I thought she
4 might have been interrupted. If I misunderstood,
5 it's okay. I just want to make sure that we don't
6 interrupt an answer in the middles.
7    THE WITNESS:   I was finished.
8    Q.   Let me try and ask the question
9 differently. What are you relying on, what
10 scientific literature are you relying on for the
11 belief that it was known in the scientific community
12 in 2011 that DMF could degrade below the boiling
13 point?
14    A.   Dr. Hecht and Najafi's reports, the IARC
15 monographs. I'm not sure if, you know, again, the
16 whole scientific community, who reads what documents
17 or what literature. This I'm not sure.
18    Q.   Does the IARC monograph discuss whether
19 DMF can degrade below the boiling point?
20    A.   I would need to pull it up and look at
21 it.
22    Q.   Do you recall reading any scientific
23 literature that said DMF could degrade below the
24 boiling point?
25    A.   I don't remember.

Page 85

1    Q.   Is it your opinion that it was well
2 understood by organic chemists in the scientific
3 community in 2011 that DMF could degrade below the
4 boiling point?
5    A.   This was my understanding, yes.
6    Q.   And is that understanding based on your
7 own investigation or is that understanding based on
8 Dr. Hecht and Dr. Najafi?
9    A.   It is based on Dr. Hecht and Dr. Najafi.
10    Q.   If Dr. Hecht and Dr. Najafi are wrong
11 and it wasn't well understood in the scientific
12 community that DMF could degrade below the boiling
13 point in 2011, would that change any of your opinions
14 in this litigation?
15    A.   No.
16    Q.   Can you explain to me how the zinc
17 chloride process used by ZHP resulted in the
18 formation of NDMA?
19    A.   I'm sorry, you're asking for chemical
20 reactions?
21    Q.   Do you know how that happened?
22    A.   The -- I can only tell you the basics
23 because, again, I'm not an organic chemist. But DMF
24 decomposes to DMA. Then that's -- that reacts
25 with -- in the -- with sodium nitrite to form the

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 NDMA.

2    Q.    Have you read Dr. Xue's report, X-u-e?

3    A.    I don't recall.

4    Q.    Do you recall reading a report by a

5 professor of organic chemistry in the University of

6 Maryland?

7    A.    I don't recall.

8        MS. MILLER:  I must take a five-minute

9 break to get a drink so let's go off the record.

10        VIDEOGRAPHER:  The time is 9:01. We're

11 going off the record.

12        (Recess taken.)

13        VIDEOGRAPHER:  The time is 9:21. This

14 begins media number 3.  We're back on the record.

15 EXAMINATION (Cont'd.)

16 BY MS. MILLER:

17    Q.    Did you talk to your counsel during the

18 break?

19        MR. SLATER:  I'm going to tell you I'm

20 objecting to discussions with the experts between

21 breaks.  I assume you don't want us asking your

22 experts whether they discussed anything with you

23 during breaks, either.  I never ask those questions,

24 I've never seen the questions asked except in this

25 litigation, so I'm not really sure what you're

Page 87

1 getting into, but I would assume everybody should be

2 not asking those questions.  And I think it's work

3 product.

4        MS. MILLER:  I was not asking what you

5 discussed.  What you discussed would be work product.

6 Whether you had a discussion is not.

7        MR. SLATER:  I agree with that.

8        MS. MILLER:  That's what I asked.

9        MR. SLATER:  Okay, I figured you were

10 going to the next place.

11        MS. MILLER:  I'm sorry, you were

12 objecting to the next question I haven't asked?

13    Q.    I was just asking if you spoke with your

14 counsel during the break?

15    A.    Yes, I did.

16    Q.    For how many minutes?

17    A.    Five minutes, approximately.

18    Q.    Before we went on the break -- and I

19 apologize, my throat is really starting to go -- but

20 before we went on the break, we were talking about

21 your report.

22        You also state in your report that the

23 technical means to test and determine whether

24 nitrosamines were formed during the Valsartan

25 manufacturing process were readily available in 2011.

Page 88

1 Do you recall that?

2    A.    Yes.

3    Q.    And is that also based on statements by

4 Plaintiffs' experts?

5    A.    Yes.

6    Q.    Do you personally have the knowledge to

7 know whether the technical means to test and

8 determine whether nitrosamines were formed in the

9 manufacturing process for ZHP were readily available

10 in 2011?

11    A.    I believe it was Dr. Li's testimony.  He

12 said that they -- he -- excuse me.  He had used the

13 GCMS methodology to test nitrosamines back as early

14 as, I believe it was 2008, that time frame.

15    Q.    So is this opinion based solely on the

16 opinions of Dr. Li?

17    A.    As well as the reports of Dr. Hecht and

18 Najafi.

19    Q.    Did the FDA believe that the technical

20 means to test and detect whether nitrosamines had

21 formed was readily available in 2011?

22    A.    All I could point to there is the

23 warning letter where they said that ZHP was in

24 violation.

25    Q.    Do you know whether the FDA believed

Page 89

1 that the technical means to test and determine

2 whether nitrosamines were formed were readily

3 available in 2011?

4    A.    Their inspections were -- I don't know

5 about inspections performed prior, in that time

6 frame.  In 2018, they did feel the technology was

7 available.

8    Q.    When did the FDA begin to develop a test

9 to detect and quantify NDMA in Valsartan?

10    A.    I don't know that.

11    Q.    Did the FDA believe that NDMA's

12 properties make it difficult to find?

13        MR. SLATER:  Objection.

14        You can answer.

15    A.    The FDA, in their warning letter in

16 2018, stated that ZHP was responsible for the

17 finished quality product -- finished quality, I'm

18 sorry.

19    Q.    That doesn't really answer my question.

20 My question was, do you know whether the FDA believed

21 that NDMA's properties make it difficult to find?

22        MR. SLATER:  Objection.

23        You can answer.

24    A.    Whether FDA thinks that?  The only

25 reference that I am aware of was in their press

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1 release. And other than that, I have no way of
2 knowing.
3      Q.    Did the FDA state in this press release
4 that NDMA's properties make it difficult to find?
5      A.    You know, can we pull that up, please?
6      Q.    We're going to pull it up in a minute.
7 I just want to know whether the FDA said that.
8           MR. SLATER: She's asked to see the
9 document. I'm not sure --
10          MS. MILLER: -- I'm just -- minus the
11 e-mail, sitting here today --
12          MR. SLATER: But she's said she needs to
13 see the document to answer the question. So can we
14 please get the document.
15     Q.    Do you know whether the FDA has said
16 that NDMA's properties make it difficult to find?
17          MR. SLATER: I'm sorry, you can't just
18 bulldoze. The witness asked to see the document.
19          MS. MILLER: I will show this
20 document --
21          MR. SLATER: So show it.
22          MS. MILLER: -- the witness knows --
23          MR. SLATER: She asked to see the
24 document.
25     Q.    Has the FDA ever said that NDMA's

Page 91

1 properties make it difficult to find?
2          MR. SLATER: Same objection.
3           You can answer as best you can, or do
4 whatever you need to do to answer.
5      A.    There was a statement similar to that.
6 And again, without seeing the document, I don't know
7 the statement verbatim. But there was a statement to
8 that effect, but again, I'd like to see the document
9 to see the exact verbiage used.
10     Q.    Is the FDA responsible for protecting
11 the public health by assuring the safety, efficacy
12 and security of human and veterinary drugs,
13 biological products, medical devices, our nations's
14 food supply, cosmetics and products that emit
15 radiation?
16     A.    Yes.
17     Q.    Do you agree that the FDA is considered
18 to be the most advanced regulatory system around the
19 world with a staff of approximately fifteen thousand
20 employees and an annual budget of $5.1 billion?
21          MR. SLATER: Objection.
22           You can answer.
23     A.    Yes.
24     Q.    You mentioned a press release a moment
25 ago from the FDA.

Page 92

1      A.    Yes.
2      Q.    Was that included in your original
3 reliance list?
4      A.    I would have to go back and look.
5      Q.    Are you aware that your counsel produced
6 a supplemental list of documents reviewed earlier
7 this week?
8      A.    Yes.
9      Q.    Are you aware that the FDA press release
10 was included there and not on your original reliance
11 list?
12     A.    Again, I'd have to go back and look. It
13 was quite an extensive list.
14     Q.    Do you know why the FDA press release
15 was not included on your original reliance list?
16     A.    I don't know that answer.
17     Q.    When did you read the FDA press release?
18     A.    Again, I can't tell you when I first saw
19 this press release.
20     Q.    Did you read the press release before
21 you wrote your report?
22     A.    I'm not sure.
23     Q.    Did you read the press release for the
24 first time last week?
25     A.    No.

Page 93

1      Q.    Did you first see the press release
2 after submitting your report?
3      A.    I don't remember at what point I saw the
4 press release.
5      Q.    If it wasn't cited in your report, and
6 it wasn't in your original reliance list, does that
7 mean you didn't see it before you wrote your report?
8      A.    Not necessarily.
9      Q.    Are there materials that you reviewed
10 and considered that were not included in your
11 original list of materials considered?
12     A.    Yes.
13     Q.    What materials are those?
14     A.    I can't tell you off the top of my head.
15 You know, we'd have to go back, collect one by one
16 and look.
17     Q.    But sitting here today, you don't know
18 whether you read the press release before you wrote
19 your report or after you wrote your report; that's
20 your testimony?
21     A.    That is my testimony.
22     Q.    And what about the two FDA statements
23 that the FDA released, you're aware that the FDA
24 released two statements between July 2018 and January
25 2019 about the discovery of nitrosamines in

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1 Valsartan, correct?
2        MR. SLATER: Objection, foundation. Are
3 we saying the press release is different than the
4 statements? I just, I need to understand for
5 purposes of understanding the question because I
6 thought we were talking about the same thing.
7        THE WITNESS: As do I.
8    Q.    You added to your supplemental reliance
9 list a press release and two statements by the FDA,
10 correct?
11   A.    Can I see the list, please?
12   Q.    Did you put together your
13 supplemental --
14       MR. SLATER: Sorry, this is the second
15 time she's asked to see a document. I'm not sure why
16 it is that you won't show the document.
17       And, Doctor, you're allowed to consult
18 it. If you have it, you can go look for it if you
19 need to answer the question. They can't stop you
20 from looking at something.
21   Q.    Did you put together your supplemental
22 reliance list?
23 DI     MR. SLATER: Objection, don't answer the
24 question. It's work product. Come on.
25   Q.    Are you refusing to answer whether you

Page 95

1 wrote your supplemental --
2        MR. SLATER: She's taking my instruction
3 not to answer, because it's work product. It's part
4 of the report. It's a supplemental part of her
5 report. It was covered, okay?
6    Q.    Do you recall at the beginning of the
7 deposition I asked you, if you're looking at
8 materials on your computer, to let me know?
9    A.    Yes.
10   Q.    Okay. So if you're looking at materials
11 on your computer, you need to let me know. You can't
12 just look at materials without telling me. That's
13 part of the rules of the deposition, all right?
14   A.    Okay.
15       MR. SLATER: Objection, let's not be
16 argumentative.
17       (A pause in the proceedings.)
18       MS. MILLER: I'm marking as Exhibit 2 a
19 document entitled -- scroll up to the top, Alex, so I
20 can read it -- "Supplemental List of Documents
21 Reviewed," dated January 29, 2023.
22 EXH      (Susan Bain Exhibit 2, document
23 entitled, "Supplemental List of Documents Reviewed,"
24 dated 1/29/23, marked for identification, as of this
25 date.)

Page 96

1    Q.    Have you seen this document before?
2    A.    Yes.
3    Q.    When did you see it?
4    A.    January 29th.
5    Q.    That was earlier this week, correct?
6    A.    Yes.
7    Q.    All right. Did you read any of the
8 documents on this list before you wrote your report?
9    A.    This is the entire list?
10   Q.    Alex will scroll down.
11       (A pause in the proceedings.)
12       MR. PERRY: Is it okay to keep going?
13 Okay. I wasn't sure if you had the whole thing
14 there.
15       THE WITNESS: Would you scroll back up,
16 please.
17       (A pause in the proceedings.)
18   Q.    Do you remember the pending question?
19   A.    I don't recall seeing them before I
20 wrote my report. I can't guarantee one hundred
21 percent. For example, regulatory documents, you
22 know, FDA ANDA's impurities and drug substances, I
23 may have seen in an earlier time.
24   Q.    Do you know when you first saw the
25 documents that are 2, 3 and 4 underneath "Regulatory

Page 97

1 Documents"?
2    A.    I can't tell you when I saw those.
3    Q.    How did you obtain them?
4    A.    From counsel.
5    Q.    Do you know when counsel sent them to
6 you?
7    A.    No, I don't.
8    Q.    Did counsel send them to you in the last
9 two weeks?
10   A.    Again, I -- I don't remember.
11   Q.    Did you ask counsel for these additional
12 materials or were they sent to you without requesting
13 them?
14   A.    I honestly don't -- don't remember. 2,
15 3 and 4, I don't remember.
16   Q.    Did you consider these three materials
17 in forming your opinions that are listed in your
18 report?
19   A.    I'm sorry, can you repeat that?
20   Q.    Did you consider these three documents
21 in forming the opinions that are set forth in your
22 report?
23   A.    You know, if we can, I'd like to pull
24 those up because, just by the titles that are on
25 here, I don't remember the content of each one of

25 (Pages 94 - 97)

Page 98

1 those.
2    Q.    Understood.  But I'm just trying to
3 determine when you read them.
4    A.    Again, I -- I don't remember.  I --
5 there were a number of documents that covered the
6 same types of topics, so I can't tell you exactly
7 when I read these documents.
8    Q.    And you don't know when you received the
9 press release from Plaintiffs' counsel?
10    A.    No.
11        MS. MILLER:  Let's pull up tab 8.  We're
12 going to mark as Exhibit 3, FDA press release dated
13 August 30th, 2018.
14 EXH       (Susan Bain Exhibit 3, FDA press release
15 dated 8/30/18, marked for identification, as of this
16 date.)
17    Q.    Does this refresh your recollection as
18 to when you first saw this document?
19    A.    No, I don't remember when I first saw
20 this document.
21    Q.    And you still don't remember whether you
22 first saw it before you wrote your report or after
23 you wrote your report?
24    A.    I do not remember.
25    Q.    Does the fact that it was on your

Page 99

1 supplemental reliance list and not your original
2 reliance list suggest to you that you did not see it
3 before you wrote your report?
4    A.    Not necessarily.
5    Q.    Okay.  Does the FDA maintain the most
6 advanced pharmaceutical laboratory of any regulatory
7 agency in the world in St. Louis?
8    A.    I have no way of knowing that.
9    Q.    Do you know whether this is the document
10 in which the FDA stated that NDMA's properties make
11 it difficult to find?
12    A.    Give me a moment to read it, please.
13    Q.    We can show you where that is.
14        MS. MILLER:  Can you highlight it?
15        MR. SLATER:  What page is that on?
16 Because I just happen to have the document here.
17 It's too small.  Is it possible to make the documents
18 bigger?
19        MS. MILLER:  Alex has graciously
20 enlarged and highlighted that sentence, can I --
21        MR. SLATER:  What page are you on --
22        MS. MILLER:  It's right here up on the
23 screen, Adam.
24        MR. SLATER:  You know, I'm sorry, do you
25 have to be so impatient with me?  I'm really not

Page 100

1 doing anything other than asking if this is on
2 page -- is this 2?  Is this on page 1, 2 -- I'm
3 looking at the hard copy, that's why I'm just asking
4 what page it's on.  So you could just say, "Page 2."
5        I found it though.  I found it.  Page 2,
6 thank you.
7    Q.    Ms. Bain, did I read that correctly?
8    A.    I believe you did.
9    Q.    Do you disagree with the FDA that NDMA's
10 properties make it difficult to find?
11        MR. SLATER:  Objection, you can answer.
12    A.    I believe, given the instrumentation
13 available, that it is easy to find.
14    Q.    So you're disagreeing with the
15 statement.
16    A.    Yes.
17    Q.    And when did the FDA, based this
18 paragraph, develop a testing method to find NDMA in
19 Valsartan?  Was it before or after 2011?
20    A.    The next sentence --
21    Q.    Um-hum.
22    A.    -- says that senior scientists have now
23 developed a GCMS method.
24    Q.    So that method was developed after the
25 recall, correct?

Page 101

1        MR. SLATER:  Objection.
2        You can answer.
3    A.    The way this is worded, that's what I
4 would assume.
5    Q.    And that's several years after you say
6 that the technical means to test and determine
7 whether nitrosamines had formed were readily
8 available, correct?
9    A.    Yes.
10    Q.    Do you know whether ZHP ever used GCMS
11 to test for nitrosamines?
12    A.    Yes, them.
13    Q.    And when ZHP used GCMS to test for
14 nitrosamines, did they find nitrosamines?
15    A.    They had unidentified peaks.
16    Q.    Did ZHP use GCMS to determine what those
17 peaks might be?
18    A.    In what time frame?
19    Q.    2018.
20    A.    In 2018, they did.
21    Q.    And did they find NDMA?
22    A.    Yes, they did.
23    Q.    Was there a time when ZHP used GCMS and
24 did not find NDMA or NDEA?
25    A.    I can't answer that question.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1    Q.    Do you know whether GCMS testing can
2 find NDMA, regardless of what solvent is used?
3    A.    I can't answer that question.
4    Q.    Do you consider yourself to be an expert
5 on GCMS testing?
6    A.    No, I'm not.
7    Q.    When you say NDMA's properties make it
8 easy to find, are you solely relying on other experts
9 in this litigation?
10    A.    I'm relying on Dr. Hecht's and Najafi's
11 reports, as well as the literature cited.
12    Q.    The literature cited by them?
13    A.    Yes, and in my report.
14    Q.    Do they cite literature for the
15 proposition that NDMA's properties make it easy to
16 find?
17    A.    I would have to go back to their reports
18 and see if they actually said that it was -- the --
19 used the words, "Easy to find."
20    Q.    Well, you used those words, so I'm just
21 trying to understand, is the basis their reports or
22 is the basis actual literature?
23    A.    The basis is the fact that it's able to
24 be found.
25    Q.    What do you mean?

Page 103

1    A.    You run the test, you get the peak, it's
2 there.
3    Q.    Which test?
4    A.    GCMS.
5    Q.    Can it be found with GCFID?
6    A.    I don't know what to answer.
7    Q.    Do you know whether GCFID was an
8 accepted form of testing API between 2010 and 2018?
9    A.    I don't know that answer.
10    Q.    What's the difference between GCMS and
11 GCFID?
12    A.    I don't know.
13    Q.    Can GCFID find NDMA?
14         MR. SLATER:  Objection.
15         You can answer.
16    A.    As I understand it, GCMS is the most
17 accepted way to find NDMA.
18    Q.    Do you know why GCFID is not always
19 adequate to find NDMA?
20    A.    No, I don't.
21    Q.    If we can go further down to page 3,
22 does the FDA employ organic chemists?
23    A.    I don't know.
24    Q.    Does the FDA have a department of
25 chemistry?

Page 104

1    A.    I don't know.
2    Q.    Do organic chemists review Drug Master
3 Files in connection with NDA applications?
4    A.    I don't know who performs the reviews of
5 DMFs.
6    Q.    Do you know how many organic chemists
7 work at the FDA?
8    A.    I don't know.
9    Q.    Have you ever heard of the FDA
10 department of chemistry?
11    A.    No, I haven't.
12    Q.    If we could go to the bottom paragraph
13 that's on the screen starting with the sentence,
14 "Because," could you read that sentence that begins
15 "because"?  Alex will highlight and enlarge it.
16         (A pause in the proceedings.)
17    Q.    Can you read it aloud?
18    A.    "Because it was not anticipated that
19 NDMA would occur at these levels in manufacturing of
20 the Valsartan API, manufacturers would not have been
21 testing for it."
22    Q.    Do you disagree with the FDA that it was
23 not anticipated that NDMA would occur at these levels
24 in the manufacture of the Valsartan API?
25         MR. SLATER:  Objection.

Page 105

1         You can answer.
2    A.    I disagree with the FDA.
3    Q.    And why do you disagree with the FDA?
4    A.    They said in their warning letter that
5 ZHP should have been testing for NDMA and that
6 industry practice is not always consistent with GMP.
7    Q.    If the FDA were correct that it was not
8 anticipated that NDMA would occur at these levels in
9 the manufacture of Valsartan API, would that affect
10 your opinions?
11         MR. SLATER:  Objection.
12         You can answer.
13    A.    No.
14    Q.    Why not?
15    A.    Pharmaceutical companies are required to
16 perform risk analysis during development and through
17 the entire life cycle of the product, and assess for
18 any kind of genotoxic or carcinogenic --
19    Q.    When was the last time you --
20         MR. SLATER:  Sorry, had you finished
21 your answer?
22         THE WITNESS:  No, I was going to say
23 "impurities."
24    Q.    When was the last time you looked at
25 this press release?

27 (Pages 102 - 105)

Page 106

1    A.    Yesterday.
2    Q.    Did you read it in full yesterday?
3    A.    Yes.
4        MS. MILLER:  Can we go to the top of the
5  page.  Top of page 3.
6    Q.    Under the "Agency's Longstanding
7  Policies," that paragraph.  Can you read the last
8  sentence of this paragraph.
9    A.    "We employ robust teams of organic
10  chemists as part of our newly-established Office of
11  Pharmaceutical Quality to review applications and
12  referenced information, to look for steps and
13  manufacturing changes where these risks could be
14  introduced."
15    Q.    Does this refresh your recollection as
16  to whether the FDA has organic chemists?
17    A.    It says so in the press release, so I
18  would have to testify that when this press release
19  was written, they must have had a team of organic
20  chemists.
21    Q.    Did those organic chemists ever raise
22  concern that they believed that the Valsartan
23  manufacturing process could lead to the degradation
24  of DMF and ultimately the formation of NDMA prior to
25  the recall?

Page 107

1        MR. SLATER:  Objection.  Just to
2  clarify, are you talking about chemists in the
3  newly-established Office of Pharmaceutical Quality,
4  or other chemists, and during what time frame?  It's
5  very unclear.
6    Q.    Please go ahead and answer.
7    A.    I don't have any knowledge of the
8  organic chemists at that time raising any question or
9  any concerns regarding NDMA formation.
10    Q.    Do you agree with the FDA that risk to
11  the patients who took Valsartan with nitrosamine
12  impurities is very low?
13        MR. SLATER:  Objection.
14        Answer.
15    A.    I have no way of knowing.
16    Q.    Are you concerned about your health as a
17  result of taking Valsartan?
18 DI    MR. SLATER:  Objection, don't answer the
19  question.  You're not going to ask her about her
20  personal medical condition.  You can go to the judge
21  if you want on that.
22        Next question.
23    Q.    Do you recall whether in any of these
24  statements from the FDA, they quantified the level of
25  potential risks from using Valsartan that had NDMA or

Page 108

1  NDEA impurities?
2        MR. SLATER:  I just have an objection to
3  ask how this is part of this deposition.  That sounds
4  like general causation testimony.  I'm being serious.
5  I mean, it sounds like a general causation
6  questioning and I don't think that's part of this
7  deposition.  Just curious how it's part of this.
8        I withdraw the objection.  You can
9  answer.
10        Actually, I'm going to stand the
11  objection, but you can answer.  I'm going to keep the
12  objection, but you can answer.
13    A.    Could you repeat the question now?
14        MS. MILLER:  Court reporter, please go
15  ahead.
16        (Record read.)
17    A.    Are you talking about, when you say,
18  "Statements," are you referring to the press release?
19    Q.    I'm referring to items 3 -- I think it
20  was 3, 4 and 5 on your supplemental reliance list
21  that we were just talking about, those three
22  statements from the FDA.  One is called a press
23  release, and two are called statements.  I'm just
24  using the FDA's terminology.
25    A.    I'd like to look at them because I don't

Page 109

1  recall if there's anything in those that specifically
2  say at what level Valsartan is going to affect
3  someone's health.
4    Q.    At any time prior to 2018, did the FDA
5  ever state that manufacturers should be using GCMS to
6  test medications for nitrosamines?
7    A.    I'm unaware that FDA ever told industry
8  what instrumentation or test methods to use for
9  identification of NDMA.
10    Q.    Prior to 2018, did the FDA ever tell any
11  API manufacturers that they should not be using GCFID
12  testing?
13    A.    I have no way of knowing what FDA told
14  individual manufacturers regarding test methods.
15    Q.    Are you aware of any statements by the
16  FDA prior to 2018 raising concerns about the use of
17  GCFID testing?
18    A.    Not that I recall.
19    Q.    Do NDMA's properties make it hard to
20  detect with standard laboratory testing?
21        MR. SLATER:  Objection.  You can answer.
22    A.    Could you repeat the question?
23        MS. MILLER:  Go ahead, David.
24        (Record read.)
25    A.    How do you define "standard laboratory

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1 testing"? GCMS was available, was in use. And it's
2 detectable.
3     Q.    Did the FDA ever state that NDMA's
4 properties make it hard to find, to detect, in
5 standard laboratory testing?
6     A.    I believe we just covered that.
7     Q.    No, we didn't. This is a different
8 question.
9     A.    Can you repeat the question, then?
10    Q.    Did the FDA ever state that NDMA's
11 properties make it hard to detect in standard
12 laboratory testing?
13          MR. SLATER: I'm sorry, could you read
14 that question back? It went so fast, I couldn't
15 honestly hear it. If somebody could read it back,
16 please. It sounded like the same question so I must
17 be missing something. It's different.
18          (Record read.)
19          MR. SLATER: Objection. I thought this
20 was answered already. You can answer again.
21    A.    I don't recall if they made that
22 statement to, that includes the words "standard
23 laboratory testing."
24    Q.    If the FDA stated in January 2019 that
25 NDMA's properties make it hard to detect in standard

Page 111

1 laboratory testing, would you disagree with that
2 statement?
3     A.    Yes.
4          MR. SLATER: You can answer.
5     Q.    Do you know whether any organic chemists
6 at the FDA reviewed ZHP's Drug Master Files?
7     A.    I don't know who reviewed their files.
8     Q.    Are Drug Master Files reviewed in
9 connection with ANDAs?
10    A.    Yes, to my knowledge.
11    Q.    And who reviews them?
12    A.    My understanding, the FDA reviewers.
13    Q.    And do you know whether the people who
14 review DMFs, and this time I mean Drug Master Files,
15 in connection with ANDAs are organic chemists?
16    A.    I don't know what their positions are.
17    Q.    Do you believe that you are more
18 qualified to address the potential for DMF
19 degradation than organic chemists of the FDA?
20          MR. SLATER: Objection.
21          You can answer.
22    A.    I'm relying on the expert testimony of
23 Drs. Hecht and Najafi.
24    Q.    Do you agree with the FDA that it
25 generally needs to be recognized that there's a risk

Page 112

1 of an impurity occurring as a result of a
2 manufacturing process, to know the impurity should be
3 tested for?
4          MR. SLATER: Objection, you can answer.
5          THE WITNESS: I'm so sorry, can I please
6 have that read back?
7          MS. MILLER: Yes. David, did you get it
8 or to you want me to do it?
9          (Record read.)
10         MS. MILLER: Thanks, David.
11    A.    Yes.
12    Q.    Do you agree with the FDA that in order
13 to implement a risk assessment for any genotoxic
14 impurity, there must be recognition that can occur in
15 a product's manufacturing?
16         MR. SLATER: Objection. You can answer.
17         THE WITNESS: I'm so sorry, can you
18 repeat again?
19         (Record read.)
20         MR. SLATER: Objection, you can answer.
21    A.    It's incumbent upon the firm to do the
22 research to identify the potentiality for that
23 impurity to occur.
24    Q.    Are you saying you disagree with the FDA
25 on this as well?

Page 113

1     A.    I do. I do disagree, if I'm
2 understanding correctly.
3     Q.    You disagree with the FDA that the risk
4 to patients based on the maximum possible exposure
5 appears to be small?
6          MR. SLATER: Objection. Same objection
7 as before. You can answer again.
8     A.    I -- I have no way of knowing.
9     Q.    When you were at the FDA, were you
10 responsible for evaluating CGMPs compliance?
11    A.    Yes.
12    Q.    How did you do that?
13    A.    Auditing the firms.
14    Q.    And what did those audits involve?
15    A.    Reviewing their documentation, their
16 SOPs or constructions, anything related to the
17 manufacture of the product -- um -- a visit to the
18 firm usually to confirm that they were actually
19 following their procedures.
20    Q.    In the year-and-a-half at the FDA, you
21 did not evaluate CGMP compliance by any API
22 manufacturer for human drugs, correct?
23    A.    It was more than a year-and-a-half. But
24 no, I did not do any inspections of API
25 manufacturers.

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1    Q.    And when you say it was more than a
2  year-and-a-half, you mean it was a year and nine
3  months?
4    A.    Yes.
5    Q.    In your year and nine months at the FDA,
6  did you ever evaluate CGMP compliance by
7  manufacturers of finished drug products for humans?
8    A.    No.
9    Q.    Do you teach any courses on API
10  manufacturing?
11        MR. SLATER:  Objection.
12        You can answer.
13    A.    I do not teach anything related to the
14  actual manufacturing process of APIs.
15    Q.    Can you tell me what courses you've
16  taught for the last two years?
17    A.    I've taught drug and biologics quality,
18  I've taught medical device quality, medical device
19  regulations, quality systems in medical products,
20  I've taught a validations course, I've taught an
21  emerging technologies course; um -- I co-instructed
22  on a auditing course.
23        Let me say on the validation course,
24  that is also a co-instruction.  And I believe
25  that's -- that's -- I believe that's a complete list.

Page 115

1    Q.    What do you teach in your drug and
2  biologics quality course?
3    A.    We teach the regulations that are --
4  that they are required to meet in manufacturing at a
5  broad level.  We teach about auditing and the kinds
6  of audits that they might receive.  I'm thinking
7  about the curriculum here for a minute.
8        We teach about CAPAs and deviations,
9  non-conformances -- CAPA, C-A-P-A, Corrective and
10  Preventive Actions.  So broadly -- broadly, those
11  are -- those are major topics we're covering.
12    Q.    What is a CAPA?
13    A.    Corrective And Preventive Action.
14    Q.    What does that require?
15    A.    When a firm receives information from an
16  audit that they need to make a correction, there are
17  several instances that a CAPA can be opened.  That's
18  one of them.  We can open a CAPA if we are finding
19  repeat issues with the process.  A CAPA might be
20  opened if there's a problem with the test method.  A
21  CAPA can be opened if -- with a customer complaint.
22        So there's -- there's many times which
23  CAPAs can be opened.
24    Q.    What's the relationship between CAPAs
25  and warning letters?

Page 116

1    A.    So if FDA issues a warning letter, firms
2  usually will open a CAPA to address the issue cited
3  in the warning letter.
4    Q.    In your opinion, would any failure by an
5  API manufacturer to detect an unknown genotoxic
6  impurity constitute a CGMP violation?
7    A.    Yes.
8    Q.    Is there ever a circumstance where an
9  API manufacturer would fail to detect an unknown
10  impurity that would not be a CGMP violation?
11        MR. SLATER:  Objection, you can answer.
12    A.    Not to my knowledge.
13    Q.    Are pharmaceutical manufacturers
14  required to test for every possible impurity?
15        MR. SLATER:  Objection, you can answer.
16    A.    They are required to test for every
17  impurity that becomes suspected or known as a result
18  of their risk analysis.
19    Q.    And where is that requirement set forth?
20    A.    To open a CAPA or to do an
21  investigation?
22    Q.    I think we were talking about
23  impurities, right?
24    A.    We were.
25        MS. MILLER:  Can you repeat the

Page 117

1  question?
2        (Record read.)
3        MS. MILLER:  She mentioned a requirement
4  and I'm asking, where is the requirement set forth
5  fully?
6        THE WITNESS:  Can we refresh a bit back,
7  because I don't remember which requirement we're
8  talking about.
9    Q.    We were talking about the requirement
10  to --
11        MR. SLATER:  She asked for the prior
12  testimony to be read back so she'd have a context for
13  that last question.  So can --
14        MS. MILLER:  I was telling --
15        MR. SLATER:  David, could you read back,
16  please, the prior question and answer before the last
17  question?
18        MS. MILLER:  Adam, could you try not
19  to interrupt?  Thanks.
20        MR. SLATER:  I'm not interrupting.  I'm
21  asking him to do what she asked to do.  And you're
22  not going to bull -- hang on, David -- you're not
23  going to bulldoze over me, Jessica.  I'm not going to
24  be bulldozed.  If the witness asks to have the
25  testimony read back, you're not allowed to block her

30 (Pages 114 - 117)

Page 118

1 from hearing it in order to answer the question.
2         So she asked to have the prior testimony
3 back, so I'm asking our court reporter to read back
4 the prior question and answer, then the question just
5 asked, so she can hear what she asked to hear.
6         (Record read.)
7     Q.    All right, go ahead and answer.
8     A.    So in ICH Q9, there is verbiage
9 requiring a risk assessment be done.  In ICH M7,
10 you -- the document has verbiage that states the
11 company has to assess the mutagenic or carcinogenic
12 impurities it might find.  There are other guidance
13 documents that are also speaking to the same
14 requirement.
15    Q.    Do you agree that if a pharmaceutical
16 manufacturer has no knowledge that a potential
17 impurity may form, it is not required to test for
18 that impurity?
19    A.    No, I do not.
20    Q.    Are all pharmaceutical companies
21 presently required to test their drug substances for
22 NDMA and NDEA?
23          MR. SLATER:  Objection.
24          You can answer.
25    A.    Only if they have done a risk assessment

Page 119

1 and suspect NDMA or NDEA can be formed.
2     Q.    If a manufacturer does a risk assessment
3 and does not suspect an NDMA or NDEA could be formed,
4 is it required to test for those impurities?
5          MR. SLATER:  Objection, you can answer.
6     A.    If they perform a risk assessment and
7 they don't have a reason to suspect NDMA or NDEA
8 could be formed, then they wouldn't need to test for
9 it.  However, if they did a risk assessment and it
10 was a poor risk assessment and they missed the fact
11 that NDMA or NDEA could be formed, then that's
12 incumbent upon the firm, they need to -- and would be
13 expected to have done that analysis.
14    Q.    Are you qualified to determine whether
15 an API risk assessment was adequate or not?
16    A.    When we went out to do inspections, and
17 if it involved a laboratory method or procedure, then
18 an expert from headquarters would accompany the
19 investigator on the audit and make that assessment.
20    Q.    That doesn't really answer my question,
21 which is simply, do you believe that you are
22 qualified to determine whether an API manufacturer's
23 risk assessment is adequate or not?
24          MR. SLATER:  Objection.
25          You can answer.

Page 120

1     A.    For NDMA?  If their risk assessment was
2 adequate for NDMA?
3     Q.    Just generally.  Do you have the
4 expertise to review a risk assessment for API and
5 determine whether or not it was adequate?
6          MR. SLATER:  Objection.
7          You can answer.
8     A.    My expertise is not in the area of API.
9 Yes, I can -- I assess risk assessments for medical
10 devices but again, I did not inspect and I was not
11 trained on APIs.
12    Q.    What expertise is required to determine
13 whether a manufacturer's risk assessment or a change
14 in an API process is adequate?
15    A.    Are you asking from FDA's perspective?
16    Q.    I'm asking from your perspective.  What
17 expertise would be required to determine whether a
18 manufacturer's risk assessment for a change in a
19 manufacturing process was adequate?
20    A.    Anyone that's reviewing and approving
21 that risk assessment should have education and
22 experience in that area and be qualified to make that
23 assessment and sign off on that document.
24    Q.    So that would be a chemist, for example?
25          MR. SLATER:  Objection.

Page 121

1          You can answer.
2     A.    In the case of an API, in this specific
3 instance, I would expect it would be someone with
4 chemistry background.
5     Q.    So that's not you; right?
6     A.    That is right.
7          MR. SLATER:  You can answer.
8     A.    Yes, that's right.
9     Q.    Did Novartis find NDMA in Valsartan API?
10    A.    Yes, using a third-party laboratory.
11    Q.    Did Novartis do its own testing?
12    A.    They did.
13    Q.    And did that own testing find NDMA?
14    A.    Yes.
15    Q.    So Novartis both did its own testing and
16 had a third-party test?
17    A.    That's my understanding.
18    Q.    If Novartis found NDMA, why did it go to
19 a third party?
20    A.    My recollection is, they went, they had
21 the unknown peaks and they went to a third party lab
22 and then subsequently, they tested themselves.
23    Q.    You're saying they tested after they
24 went to the third-party lab, not before?
25    A.    I don't remember that Novartis

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1 identified NDMA specifically. They were asking for
2 ZHP to identify the unknown peaks. And they went to
3 a third-party lab and the third-party lab identified
4 the peak as NDMA.
5      Q.   Is it your opinion that the use of GCFID
6 to test Valsartan API was a CGMP violation?
7           MR. SLATER:  Objection.
8           You can answer.
9      A.   Unto itself, not a GMP violation. Are
10 you asking if they --
11          MR. SLATER:  Why don't you wait for the
12 next question.
13     Q.   You can go ahead. What were you saying?
14     A.   I'm good. I'm done.
15     Q.   If ZHP had used GCMS to test Valsartan
16 API but did not identify the NDMA using that method
17 because other expected impurities peaked at the same
18 time on the chromatogram, would that have violated
19 CGMP?
20     A.   Yes.
21          MR. SLATER:  Lack of foundation. You
22 can answer.
23          You've got to let me object. You've got
24 to pause.
25     A.   Yes, that's a violation.

Page 123

1      Q.   And why do you say that?
2      A.   Because any peaks that are found need to
3 be identified.
4      Q.   Do you know if ZHP ever used GCMS to
5 test Valsartan prior to the recall?
6      A.   It's my understanding from Dr. Li's
7 testimony that they had used GCMS.
8      Q.   And do you know why that GCMS did not
9 reveal the presence of NDMA?
10          MR. SLATER:  Objection.
11          You can answer.
12     A.   I don't know that it didn't reveal NDMA,
13 but I don't know the ZHP would not have identified
14 and then immediately gone to the FDA and notified.
15     Q.   Do you know whether Novartis used GCFID
16 or GCMS to test Valsartan as of April 2018?
17     A.   I don't know.
18     Q.   If Novartis used GCFID to test Valsartan
19 as of April 2018, was Novartis in CGMP violations?
20     A.   They are not the manufacturers of the
21 API. So I don't know exactly what you're asking.
22     Q.   If the manufacturer of the finished dose
23 product used GCFID instead of GCMS, was that
24 manufacturer of the finished dose product in
25 violation of CGMPs?

Page 124

1           MR. SLATER:  Objection. Foundation.
2           You can answer.
3      A.   That issue is the API, and they --
4 Novartis is not aware of the processing that the API
5 manufacturer would have used in the manufacture of
6 the API.
7      Q.   Have you ever tested a product using
8 GCFID or GCMS?
9      A.   No, I have not.
10     Q.   Do you know whether GCFID or GCMS was
11 the industry standard for evaluating pharmaceutical
12 impurities in 2013?
13     A.   It was available in 2013. Whether or
14 not the words "industry standard" could be used, I
15 can't answer. But it was certainly available.
16     Q.   I think maybe I didn't ask my question
17 clearly. But do you know whether --
18          MS. MILLER:  -- I'm sorry. Can we just
19 go off the record?
20          VIDEOGRAPHER:  The time is 10:26. This
21 ends media unit number 3. We're going off the
22 record.
23          (Discussion off the record.)
24          (Recess taken.)
25          VIDEOGRAPHER:  The time is 10:43. This

Page 125

1 begins media unit number 4. We're back on the
2 record.
3 EXAMINATION (Cont'd.)
4 BY MS. MILLER:
5      Q.   I wanted to ask you what the basis is
6 for your opinions with respect to GCMS and GCFID. Is
7 that relying on Hecht and Najafi reports or do you
8 have any other basis for those opinions?
9      A.   Primarily Hecht and Najafi's reports.
10 But, I've, you know, read some of the literature as
11 well.
12     Q.   When you say you read some of the
13 literature, what do you mean?
14     A.   That was cited in my report.
15     Q.   Literature cited in your report about
16 GCFID versus GCMS?
17     A.   No, I don't believe I spoke about -- we
18 could go to the report but specifically about GCMS
19 versus GCFID.
20     Q.   My understanding from your testimony,
21 maybe I misunderstood, is that you're offering an
22 opinion that the use of GCFID testing by ZHP was
23 improper, correct?
24          MR. SLATER:  Objection.
25          You can answer.

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1    A.    My opinion is that GCMS was available
2  and at the time they were doing this work, they
3  should have used GCMS.
4    Q.    Correct. And so I'm asking, do you have
5  any basis for that point other than the opinions of
6  two other experts?
7    A.    And the literature that says that that
8  technology was available.
9    Q.    What literature are you relying on with
10  respect to GCMS and GCFID, that's what I'm trying to
11  get at?
12    A.    I need to go back to my report --
13    Q.    Okay.
14    A.    -- and see.
15        MR. SLATER: You're allowed to access
16  the report itself. If you don't need someone else to
17  put it up, it's better if you just access it
18  yourself.
19        MS. MILLER: I believe we introduced the
20  report as Exhibit 1.
21        MR. SLATER: But she can use her own
22  copy of it.
23        MS. MILLER: I wasn't suggesting that, I
24  was just saying that's introduced here as Exhibit 1.
25    Q.    Where would I look in your report to see

Page 127

1  what literature you relied on with respect to GCFID
2  versus GCMS testing?
3        MR. SLATER: Objection.
4        You can answer.
5    A.    It's going to take me a bit to go
6  through.
7        (A pause in the proceedings.)
8    A.    Are you asking for verbiage that
9  compares the two methods?
10    Q.    I'm asking whether there are any
11  materials you're relying on for your opinions
12  regarding GCFID and GCMS besides these two expert
13  reports.
14        MR. SLATER: Objection. The question is
15  very, very vague and overbroad.
16    A.    I agree. I really would feed you to be
17  more specific.
18    Q.    Okay. Adam is objecting for the record,
19  but you still need to answer my question.
20        Are you relying on any literature or any
21  other documents besides the two expert reports that
22  you have cited for your opinions regarding GCMS and
23  GCFID?
24        MR. SLATER: Objection, again. The
25  witness just told you the question is unclear to her.

Page 128

1  So -- it's okay, you don't have to rephrase it, but I
2  think she's allowed to say "I can't answer the
3  question, I don't understand it," which is what she
4  just --
5        MS. MILLER: Don't coach the witness. I
6  did rephrase it.
7        MR. SLATER: I'm not coaching the
8  witness. What you did is, you bulldozed over her
9  request as to what you're asking, and asked the same
10  question again.
11    A.    I am still unable to answer that
12  question.
13    Q.    You're unable to let me know whether you
14  cited any literature to support your opinions on
15  GCFID or GCMS besides the two expert reports?
16        MR. SLATER: Objection.
17        You can answer. Same objection.
18    A.    Now you seem to have rephrased it, and
19  you put "or" in there. Did I -- it's -- are you
20  asking for a specific citation in my report?
21    Q.    Can you cite any literature anywhere in
22  your report that relates to either GCFID testing or
23  GCMS testing? Let's start there.
24        (A pause in the proceedings.)
25    A.    GCFID testing is only referenced, that I

Page 129

1  find, in expert witness testimony.
2    Q.    You testified earlier that your opinions
3  about GCFID testing and GCMS testing are based both
4  on expert reports, and on literature.
5        I'm just trying to identify what that
6  literature is that you were referring to.
7        MR. SLATER: Objection. Continued
8  objection. Argumentative.
9    A.    Now, I just can't answer that. I'm
10  sorry.
11    Q.    You cannot answer whether you cite any
12  literature related to GCFID or GCMS testing in your
13  report?
14        MR. SLATER: Objection.
15  Argumentative --
16    A.    I did not cite any literature on GCFID.
17  I will look now to see if I cited it for GCMS.
18        (A pause in the proceedings.)
19    Q.    If you're going to be reading your
20  report for more than a few minutes, the form in this
21  litigation is, we go off the record, so let me know.
22    A.    I do not see any literature citings in
23  my report other than citing to Dr. Hecht and
24  Dr. Najafi's reports.
25    Q.    When you said earlier that you were

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1 relying on their reports and literature for your
2 testing opinions, do you know what literature you
3 were referring to when you made that at that moment?
4      MR. SLATER: Objection. One second,
5 Dr. Bain. Objection. Lack of foundation.
6      You can answer. And also to the form of
7 the question.
8      You can answer.
9 A.   I would have to go back to each of their
10 reports. I do not remember at this moment the names
11 of the literature that was cited in their reports.
12 Q.   So to the extent you say you're relying
13 on literature, it would just be literature cited by
14 other experts?
15      MR. SLATER: Objection, you can answer.
16 A.   Yes. It would have also been literature
17 I reviewed after seeing it in their reports.
18 Q.   Are you aware of any scientific
19 literature stating that DMF can degrade into
20 diethylamine in conditions present in ZHP's
21 manufacturing process?
22      MR. SLATER: Objection.
23      You can answer.
24 A.   Literature on the degradation?
25 Q.   Can you point to any literature stating

Page 131

1 that DMF can degrade into diethylamine in the same
2 conditions that are present in ZHP's manufacturing
3 process for Valsartan?
4 A.   In the 1978 IARC monograph.
5 Q.   Does the 1978 IARC monograph say that
6 DMF can degrade into diethylamine in the same
7 conditions that are present in ZHP's manufacturing
8 process?
9 A.   To the best of my recollection, yes. I
10 would need to go back and read the exact verbiage.
11 But it does discuss the degradation.
12 Q.   Do you know what the boiling point is
13 for DMF?
14 A.   No, I don't.
15 Q.   Do you know what the highest temperature
16 was that occurred for DMF in the zinc chloride
17 manufacturing process for Valsartan?
18 A.   No. I don't.
19 Q.   Had you heard of Tetrahedron Letters
20 before becoming part of this litigation?
21 A.   No, I had not.
22 Q.   What is Tetrahedron Letters?
23 A.   It was an article which, again, if I
24 could pull it up I could tell you the title, that
25 discussed the formation of the nitrosamines.

Page 132

1 Q.   But what is Tetrahedron Letters?
2 A.   I don't know specifically.
3 Q.   And it's your recollection that the IARC
4 monograph addresses DMF degrading into diethylamine?
5 A.   Yes.
6 Q.   Can we go back to the supplemental
7 reliance list which is Exhibit 2.
8      Take a look at the scientific materials.
9 You added two scientific materials here. Do you
10 recall why you added these to your supplemental
11 reliance list? The Juillard article, I don't know
12 how to pronounce it, and the Long article?
13 A.   I would have to go back and look at the
14 articles themselves to see exactly what I pulled out
15 from that article that is pertinent to my opinion.
16 Q.   When did you read these two articles?
17 A.   Within the last few weeks.
18 Q.   And how did you come to learn of them?
19 A.   From counsel.
20 Q.   You didn't perform the literature search
21 that identified these two articles?
22 A.   No, I did not.
23 Q.   They were e-mailed to you by counsel?
24 A.   Yes.
25 Q.   Do you know who Long and Meek are?

Page 133

1 A.   No.
2 Q.   Do you know where they work?
3 A.   No, I don't.
4 Q.   Do you know what WHO stands for in the
5 second article?
6 A.   World Health Organization.
7 Q.   Did you rely on this article?
8 A.   Yes.
9 Q.   What did you rely on this article for?
10 A.   If we could pull the article up, then I
11 could -- I could see.
12 Q.   You did not read the article before you
13 wrote your report?
14 A.   No.
15 Q.   Okay. Let's pull up the Long article.
16 We're going to mark the Long article as Exhibit 4.
17 EXH      (Susan Bain Exhibit 4, article draft by
18 Long, Meek, et al, "N,N-DIMETHYLFORMAMIDE", marked
19 for identification, as of this date.)
20 Q.   If you could turn to page 6. WHO is the
21 World Health Organization, correct?
22 A.   Yes.
23 Q.   And what do you know about the World
24 Health Organization?
25 A.   Can you be a little more specific?

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1    Q.    Is it a reputable body?
2    A.    I'm not sure I could assess that. They
3 are a very, very large organization, as I understand
4 it. And I couldn't comment on all of their
5 interactions.
6    Q.    Did you include this article on your
7 reliance list because you thought it was a reputable
8 article?
9    A.    Yes.
10    Q.    And what made you think that?
11    A.    I found their article to be scientific
12 and reasonable as far as I could assess. Yes, World
13 Health Organization generally has a good reputation,
14 but again, I can't speak for everything they do all
15 over the world.
16    Q.    Do you know which of your opinions does
17 this article support?
18    A.    Again, I'd have to go back through the
19 article, and see.
20    MS. MILLER: All right, let's go off the
21 record, look at the article for two minutes, and --
22 David, I know I said 2 o'clock. Lunch will probably
23 be more like 2:15 because I want to finish
24 questioning on this article.
25    So if we could go off the record while

Page 135

1 you are you review this article, and if you could let
2 me know, which --
3    THE WITNESS: I need to be able to
4 scroll.
5    VIDEOGRAPHER: The time is 11:03, we're
6 going off the record.
7    (Discussion off the record.)
8    VIDEOGRAPHER: The time is 11:05, we're
9 back on the record.
10    Q.    Are you able to tell me without spending
11 half an hour reading this 60-page article, why you
12 cited it in your reliance list?
13    A.    I would need some time to read through
14 this article.
15    Q.    Your supplemental reliance list was
16 submitted on Sunday, right?
17    MR. SLATER: This is getting to be
18 argumentative. Let's just ask questions, please.
19    MS. MILLER: That is my question.
20    Q.    Was your supplemental reliance list
21 submitted on Sunday?
22    A.    That's -- yes.
23    Q.    Do you recall why you included this
24 article in that supplemental reliance list?
25    A.    I do not remember off the top of my

Page 136

1 head, no, without reviewing it.
2    Q.    Can we turn to page 6. Can you read the
3 sentence that begins "Temperatures"?
4    A.    What I'm looking at. I need to -- I'm
5 sorry, could I read what?
6    Q.    The sentence that begins with the word
7 "Temperatures."
8    A.    On page 6? "Temperatures in excess of
9 350 degrees C are required for dimethylamine."
10    Q.    What happened? You stopped mid
11 sentence.
12    A.    I'm sorry. Temperatures --
13 "Temperatures in excess of 350 degrees C are required
14 for DMF to decompose into carbon monoxide and
15 dimethylamine."
16    Q.    Do you have any reason to doubt the
17 statement?
18    A.    No.
19    Q.    Do you know what the highest temperature
20 was in ZHP's manufacturing process?
21    A.    I do not.
22    Q.    Do you know if it reached 350 degrees
23 Celsius?
24    MR. SLATER: Objection. You can answer.
25    A.    I don't recollect without looking.

Page 137

1    Q.    Did you cite this article in your
2 reliance list because it addresses the decomposition
3 of DMF?
4    A.    Again, I need to read a little before
5 and after to get some more context.
6    Q.    I'm just asking if you cited it in your
7 expert report because of this statement.
8    A.    Not just because of this statement, no.
9    Q.    Was this one of the statements for which
10 you were citing this article in your supplemental
11 report -- in your supplemental reliance list, I
12 apologize?
13    A.    Not specifically, from my recollection.
14    Q.    Do you recall reading this sentence?
15    A.    Yes.
16    Q.    Does it support your opinions?
17    A.    My opinion doesn't change as a result of
18 this sentence.
19    Q.    Does the sentence support your opinion
20 about what was known in the scientific community in
21 2011 to 2013 about the circumstances required for the
22 degradation of DMF?
23    A.    Can you repeat that?
24    MS. MILLER: David, go ahead.
25    (Record read.)

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1     A.    It doesn't directly support my opinion
2  because in, I believe it was Dr. Hecht's report, he
3  addressed the temperatures and how the longevity of
4  the actual process could affect the formation of the
5  NDMA.
6     Q.    So are you saying that this article is
7  contrary to what Dr. Hecht said in his report?
8         MR. SLATER:  Objection.
9         You can answer.
10    A.    Not necessarily, no.
11    Q.    In what ways is it not contrary to what
12  he said?
13    A.    The article says that temperatures in
14  excess of 350 degrees C are required.  However,
15  Dr. Hecht's testimony was that the length of time of
16  the reaction or of the process could also affect the
17  formation of NDMA.
18         (Continued on following page.)
19
20
21
22
23
24
25

Page 139

1     Q.    Did Dr. Hecht write in his report that
2  temperatures in excess of 350 degrees are required
3  for DMF to decompose into dimethylamine?
4         MR. SLATER:  Objection.  You can answer.
5     A.    I would have to go to his report to see
6  if that exact verbiage is that.
7         MS. MILLER:  Okay.  Let's go off the
8  record.  Poor David is hungry.
9         VIDEOGRAPHER:  The time is 11:11.  We're
10  going off the record.
11         (Discussion off the record.)
12         (Luncheon recess:  11:11 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1     A F T E R N O O N   S E S S I O N
2         (11:55 a.m.)
3  S U S A N   B A I N ,   having been previously
4     sworn, resumed the stand and testified further
5     as follows:
6         VIDEOGRAPHER:  The time is 11:55.  We're
7  back on the record.
8  EXAMINATION (Cont'd.)
9  BY MS. MILLER:
10    Q.    Are you offering any opinions in this
11  litigation with respect to Teva or Torrent?
12    A.    No, I'm not.
13    Q.    When did you first form the opinion that
14  ZHP had violated CGMPs?
15    A.    After reviewing the information that was
16  provided to me by counsel.
17    Q.    Did you agree to serve as an expert
18  before you reached that conclusion or after?
19    A.    Before.
20    Q.    Does CGMPs evolve as technology and
21  scientific or medical knowledge is gained?
22    A.    I'm sorry, I didn't get the last word of
23  what you said.
24    Q.    Did CGMPs evolve along with
25  technological and scientific developments?

Page 141

1         MR. SLATER:  Objection.
2         You can answer.
3     A.    Are you asking if CGMPs are modified?
4     Q.    Do CGMPs change as technology and
5  science evolve?
6         MR. SLATER:  Same objection.
7     A.    In my experience, not to a great extent.
8  The C in front of GMP is there because it's current.
9     Q.    Is it your opinion that ZHP committed
10  the same CGMP violations with respect to the zinc
11  chloride process as it did with respect to the
12  quenching, TA with quenching process?
13    A.    Yes.
14    Q.    And why is that?
15    A.    Because in both cases, it was a failure
16  for identify the peaks, unknown peaks.
17    Q.    If a manufacturer tries to identify
18  unknown peaks and fails, is that a CGMP violation?
19         MR. SLATER:  Objection.
20         You can answer.
21    A.    Incumbent upon the manufacturer to
22  identify the unknown peaks because, just as in this
23  case, they could be genotoxic.
24    Q.    So if a manufacturer attempts to
25  identify unknown peaks and fails, is that a CGMP

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1 violation?
2       MR. SLATER: Objection.
3       You can answer.
4    A.   If they introduce the product into
5 interstate commerce, it is.
6    Q.   You wrote in your report that ZHP
7 violated CGMPs because it failed to comply with
8 210(a) and 211(b), do you recall that?
9    A.   Yes.
10   Q.   Did 210(a) and 211(b) apply to API
11 manufacturers?
12   A.   Yes.
13   Q.   This actually said that 21 C.F.R. Parts
14 210 and 211 apply to API?
15   A.   I'd have to go back and look at the
16 preamble. But ICH Q7 tells us that APIs have to be
17 manufactured under CGMPs.
18   Q.   Is ICH Q7 binding or advisory?
19   A.   It's not legally binding; however, it is
20 the guidance that FDA expects you to follow and if
21 you're not following it, you must be prepared to
22 explain to FDA in writing why you're not following
23 the guidance document.
24   Q.   Is there a guidance document produced by
25 the FDA that says if you suspect sodium nitrite is

Page 143

1 part of your drug manufacturing process, then you
2 have to test for nitrosamines?
3    A.   There's an ICH guidance document that
4 talks about impurities in your drug substances.
5 There's also an ICH guidance document that talks
6 about assessing impurities.
7    Q.   If a manufacturer suspects that sodium
8 nitrite is part of a drug manufacturing possess, is
9 it obligated to test that product for nitrosamines?
10      MR. SLATER: Objection. You can answer.
11 Incomplete hypothetical.
12   A.   The firm is required to do a risk
13 assessment and determine if there's a potential for
14 any impurities to be formed and, if there are, to
15 pursue identification.
16   Q.   Did they do a risk assessment?
17      MR. SLATER: I lost the first part of
18 the sentence.
19      MS. MILLER: Did ZHP do a risk
20 assessment.
21   A.   Yes.
22   Q.   Do you know how many pharmaceutical
23 products there are that use sodium nitrite?
24   A.   No, I do not.
25   Q.   Do you know whether there were other

Page 144

1 pharmaceutical products that use sodium nitrite at
2 the time that ZHP was using the zinc chloride
3 process?
4    A.   No, I don't.
5    Q.   If none of those manufacturers tested
6 for nitrosamines, were they all in violation of
7 CGMPs?
8       MR. SLATER: Objection, lack of
9 foundation, incomplete hypothetical.
10      You can answer.
11   A.   It would depend on their manufacturing
12 process.
13   Q.   Do you know how many pharmaceuticals
14 have a manufacturing process that involves a nitrite
15 and a secondary amine?
16   A.   I do not.
17   Q.   If a pharmaceutical company has a
18 manufacturing process that involves a nitrite and a
19 secondary amine, is that manufacturer required to use
20 CGMS testing to test for nitrosamines?
21   A.   The firm is required to do a risk
22 assessment and, if the risk assessment shows that
23 there's a chance for the impurities to form, then
24 they are obligated to go through and identify the
25 impurity.

Page 145

1    Q.   Is it your position that any violation
2 or failure to comply with an ICH provision is a CGMP
3 violation?
4    A.   Yes.
5    Q.   So even though ICH guidelines are not
6 binding, if you don't follow an ICH guideline, it's
7 your opinion that there is a CGMP violation?
8       MR. SLATER: Objection.
9       You can answer.
10   A.   Yes.
11   Q.   And what's that based on?
12   A.   I'm sorry?
13   Q.   What's that opinion based on?
14   A.   FDA recognizes ICH guidance documents
15 and has adopted them. And they are used in the
16 assessment of compliance.
17   Q.   Is there a statement somewhere by FDA
18 that if you don't comply with an ICH provision you're
19 engaged in a CGMP violation?
20      MR. SLATER: Objection.
21      You can answer.
22      (A pause in the proceedings.)
23      MR. SLATER: Objection, you can answer.
24   A.   I'm sorry. I'm sorry, I would have to
25 go to the specific verbiage on FDA's website where

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1 they talk about use of ICH guidance documents under
2 FDA's pursue.
3      Q.   Do you teach courses on CGMP?
4      A.   I teach courses on quality --
5      Q.   Just, do you teach your students that,
6 according to the FDA, if you don't follow guidance,
7 it's a CGMP violation?
8           MR. SLATER:  Objection.  You could
9 answer.  Foundation.
10      A.   If you don't follow a guidance document,
11 you must be prepared to explain to anyone why you're
12 not following that guidance document.  That -- that
13 practice needs to be in writing and if it's
14 applicable, it has to be validated.
15      Q.   And where does FDA say that?
16      A.   Again, I would have to look that up.
17 But there is verbiage that talks about enforcement of
18 guidance documents.
19      Q.   Does the FDA talk about enforcement of
20 guidance documents even though they are only
21 guidance?
22      A.   Yes.
23      Q.   Does the FDA use the word "enforcement"
24 with respect to guidance documents?
25      A.   Again, I would have to go to the FDA

Page 147

1 website and check if the word "enforcement"
2 specifically is used.
3      Q.   Okay.  I thought you were testifying
4 that the FDA uses the word "enforcement" with respect
5 to guidance documents.  I may have misunderstood.
6      A.   They do -- again, guidance documents are
7 considered by the FDA as the most current thinking on
8 the agency's part.  And you must follow those
9 guidance documents unless you have a reason and can
10 justify why you are not following them, and that
11 justification must be in writing.
12      Q.   But you don't know where that
13 requirement is set forth.
14      A.   Not right off the top of my head.
15      Q.   Do you agree with the statement that
16 guidance documents do not establish legally
17 enforceable rights or responsibilities?
18           MR. SLATER:  Objection.
19      Q.   Go ahead.
20      A.   That is -- yes, I agree with that
21 verbiage.
22      Q.   You do agree that guidance documents do
23 not establish legally enforceable rights or
24 responsibilities?
25           MR. SLATER:  Objection.

Page 148

1           You can answer.
2      A.   I was saying that the FDA, that, again,
3 you must follow the guidance documents unless you're
4 unable, and if for some reason you are unable, then
5 it must be documented and if that's not done, you
6 will be cited on a FDA form 483.
7      Q.   So are you saying you disagree with the
8 statement that guidance documents do not establish
9 legally enforceable rights or responsibilities?
10           MR. SLATER:  Objection.
11           You can answer.
12      A.   With the exception that I told you.  If
13 you can't follow it, that you've justified and
14 presented that.
15      Q.   As a general matter, do you know that
16 guidance documents establish legally enforceable
17 rights or responsibilities?
18      A.   Yes.
19      Q.   So as a general matter, do you disagree
20 with the statement, "Guidance documents do not
21 establish legally enforceable rights or
22 responsibilities"?
23           MR. SLATER:  Objection.
24           You can answer.
25      A.   I'm thinking about the double negative.

Page 149

1 Can you read back?
2      Q.   As a general matter, do you disagree
3 with the statement, "Guidance documents do not
4 establish legally enforceable rights or
5 responsibilities"?
6      A.   I disagree.
7      Q.   Okay.  Let's turn to page 29 of your
8 report.
9      A.   Got it.
10      Q.   Are we there?
11      A.   Yes.
12      Q.   Okay.  Do you see where it says here at
13 the bottom that, "Mr. Gu was also asked about the
14 finding by the" --
15      A.   Yes.
16      Q.   -- "European Medicines Agency that,
17 contrary to what the company stated in their
18 retrospective analysis of the process change, the
19 core principles of ICH Q8, Q9, and Q10 were not
20 considered, and potential impurity profiles and
21 associated risks were not addressed by the R&D
22 laboratory"?  Do you see that language?
23      A.   Yes, I do.
24      Q.   And you see that when asked if he agreed
25 with that finding, Mr. Gu said yes?

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1    A.    Yes.

2        MR. SLATER:  It says more than that,
3  just for the record.  The sentence doesn't stop with
4  "yes."

5    Q.    Turn to Mr. Gu's testimony.

6        MS. MILLER:  I'm going to introduce his
7  deposition as Exhibit 5.

8  EXH    (Susan Bain Exhibit 5, transcript of
9  deposition of Eric Gu, Ph.D., held 4/5/21, marked for
10  identification, as of this date.)

11        MS. MILLER:  Sorry, we have a technical
12  problem.  Alex is putting up the 4/5/21 Gu deposition
13  which we're going to mark as Exhibit 5.

14        (A pause in the proceedings.)

15        MS. MILLER:  Are we there, Alex?

16        MR. PERRY:  Yes.

17    Q.    Can we turn to page 245.  I wanted to
18  read to you from page 245, line 13 -- well, let's go
19  to 74, 16 to 75, 4.  That's what I wanted.

20        MR. SLATER:  Which page did you say?
21  Could someone please tell me which page we're going
22  to?  I did not hear.

23        MS. MILLER:  It's right up on the
24  screen, Adam.  It's page 73 to 76.  If you just look
25  on the screen it shows you the page numbers.

Page 151

1        MR. SLATER:  Well, could you tell me
2  what page and lines you are actually focused on, as
3  opposed to the four pages that only two of them are
4  actually visible?  I don't know why it's so hard to
5  say, "I'm going to this page and line."  I don't
6  understand.  It's just to be polite, please.

7        MS. MILLER:  Adam, you haven't even
8  given me a minute.  I was going to ask the witness to
9  read a page and line.  Just have a little patience.

10    Q.    Can you please read 74 line 16, 'till
11  75, line 4, out loud.

12    A.    I can't see 75.

13    Q.    Well, you'll see it when he -- he made
14  it bigger to make it easier for you to read.  Why
15  don't we start with a question.  "Question."  Go
16  ahead.

17    A.    What line would you want to start at?

18    Q.    Sixteen.

19    A.    Sixteen.

20        "Question:  I'll ask it differently.
21  When Syncores was helping to develop the zinc
22  chloride process, did it identify NDMA as a potential
23  impurity that had to be tested for?

24        "Answer:  As I said, okay, at 2011, we
25  did the process development based on the ICH

Page 152

1  guidelines.  And at that time, okay, we followed the
2  GMP protocols, and we didn't know the NDMA was the
3  potential impurity in the process, and the industry
4  didn't know.  The FDA doesn't know.  And nobody knows
5  at that time."

6    Q.    Did you quote that in your report, that
7  entire section?

8    A.    What was the question?

9    Q.    Did you quote any of that in your
10  report?

11    A.    Can you scroll to 74 again, please?  I'd
12  have to go through Mr. Gu's entire testimony.

13    Q.    You can't tell us today whether you
14  quoted any of that in your report?

15    A.    I don't know whether I quoted any of
16  those exact sections.

17    Q.    And if we could turn to 169, 24 to 170,
18  10.  169, 24.  And could you read 169, 24, to 170,
19  line 10.  Question and then answer.

20    A.    (Reading):

21        "Question:  Then I guess we'll come back
22  to where I originally was.  I'm asking about ZHP and
23  what ZHP did.

24        "Answer:  ZHP did whatever possible to
25  improve the process to make sure that we make better

Page 153

1  or equal quality product, to follow all the ICH
2  guidelines, to follow the CGMP guidelines, to gain
3  approval from the FDA and EDQM for the Valsartan
4  product.  That's for this case.  That's what's been
5  done."

6    Q.    Do you recall if you quoted that in your
7  report?

8    A.    I do not believe I quoted that in my
9  report.  Again, I would have to look specifically.

10    Q.    How did you select which parts of
11  Dr. Gu's testimony you included in your report?

12    A.    I selected sections that I felt were
13  germane to GMP compliance and specifically where he
14  noted, it was noted, I guess by the EMA that they
15  were discussing that ZHP had followed ICH Q8, 9 and
16  10.  And they were -- I'm sorry, that they were not
17  considered.

18    Q.    Was it relevant to your opinion that
19  Dr. Gu believed that ZHP did whatever possible to
20  improve the possess to make sure that they made a
21  better or equal quality, to follow all ICH guidelines
22  and to follow the CGMP guidelines, was that relevant
23  to your report?

24    A.    I took it into consideration.  However,
25  the company stated that they didn't consider ICH Q8,

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1  9 and 10, and the potential impurity profiles and
2  associated risks. That's important.
3    Q.   If you considered the two passages that
4  we just read together in assessing your opinions and
5  in writing your report, is there a reason why you
6  didn't include them in your summary of Dr. Gu's
7  deposition?
8    A.   I included what I felt showed that they
9  were in violation to CGMP.
10   Q.   Did you try to be balanced and include
11 also testimony that suggested that ZHP was trying to
12 comply with CGMP and ICH guidelines?
13   A.   I took it into consideration. However,
14 what I was most interested in was the fact that they
15 did not follow ICH Q8, 9 and 10.
16   Q.   Why were you more interested in that
17 than in their testimony that they attempted, did
18 whatever possible to make sure that they followed all
19 ICH guidelines?
20   A.   Because it leads to the violation
21 against GMPs.
22   Q.   Are a company's efforts to comply with
23 ICH guidelines and CGMP guidelines relevant?
24   A.   Yes.
25   Q.   When you represent companies, do you

Page 155

1  consider their efforts to follow ICH guidelines and
2  CGMP guidelines to be relevant?
3    A.   Yes.
4    Q.   Were ZHP's efforts to follow CGMP
5  guidelines and follow all the ICH guidelines as set
6  forth in Dr. Gu's deposition testimony relevant to
7  your opinions in this case?
8    A.   I'm sorry, relevant to?
9    Q.   Your opinions in this case.
10   A.   I'm sorry, could you read that question
11 back again?
12   Q.   Sure. David will do it.
13       (Record read.)
14   A.   I took them under consideration. But I
15 looked as a whole.
16   Q.   Would I be able to find discussion of
17 the testimony that we just went over in your report?
18   A.   I don't believe I addressed this
19 particular section in my report, but again, I would
20 have to look to make sure.
21   Q.   Are you surprised to hear that I could
22 not find a discussion of either of these passages in
23 the deposition, in your report?
24   A.   No.
25   Q.   Why not?

Page 156

1    A.   Because my report focused only CGMP
2  violations.
3    Q.   Are efforts to follow the CGMP
4  guidelines relevant to an analysis of a particular
5  company's efforts with regard to CGMP regulations?
6        MR. SLATER: Objection. That was
7  already asked and answered.
8        You can answer again.
9    A.   Can you tell me the question again?
10       (Record read.)
11       (A pause in the proceedings.)
12   Q.   Are you answering?
13   A.   Sorry, was there a question?
14   Q.   Yes. David repeated the question.
15       MR. SLATER: Do you want to have it
16 asked again?
17       THE WITNESS: I do want to have it asked
18 again. I'm sorry, I didn't know that I was being
19 asked -- go ahead.
20       (Record read.)
21       MR. SLATER: Objection, asked and
22 answered.
23       You can answer again.
24   A.   So, you can consider their efforts, but
25 it doesn't negate the requirement to meet and follow

Page 157

1  the CGMP requirements.
2    Q.   ICH 8 covers what information should be
3  included in an NDA or an ANDA, right?
4        MR. SLATER: Which one did you say,
5  Q-what?
6        MS. MILLER: Eight.
7        MR. SLATER: Eight? Can we pull that
8  up --
9        THE WITNESS: Yes, please.
10   Q.   Do you know, without looking at the ICH
11 Q8 document, what it covers?
12   A.   Generally, but not specifically. But I
13 don't know whether it specifically tells someone
14 exactly what needs to be in a DMF.
15   Q.   What does ICH Q8 generally cover?
16   A.   Pharmaceutical development.
17   Q.   Does ICH Q8 apply to API product
18 development?
19       MR. SLATER: To what?
20   Q.   Does ICH Q8 apply to API development?
21   A.   It more broadly discusses product
22 development but ICH Q7 specifically dresses the GMPs
23 or APIs.
24   Q.   I said Q8, right?
25   A.   Yes.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1    Q.    You have something in your report about
2 ICH Q8, and ZHP allegedly not complying with ICH Q8.
3 So I'm trying to understand, does ICH Q8 apply to
4 development of APIs?
5    A.    Yes.
6    Q.    It's your understanding that ICH Q8
7 applies to API?
8    A.    Yes.
9    Q.    And what is that based on?
10    A.    My background and training.
11    Q.    And is it your opinion that ICH Q9
12 creates any expectations beyond regulatory
13 requirements?
14        MR. SLATER:  Objection.
15        You can answer.
16    A.    It's my understanding it does not have
17 any requirements beyond regulatory requirements.
18    Q.    So what's the purpose OF ICH Q9?
19        MR. SLATER:  Objection to form.
20    A.    Risk assessment.
21    Q.    Does ICH Q9 say that the rules of
22 informal risk management process such as empirical
23 tools and/or procedures can be considered acceptable?
24    A.    I would have to pull the guideline and
25 look specifically.

Page 159

1        MR. SLATER:  You're allowed to pull the
2 guideline right now while you're being asked about
3 it.
4    Q.    Do you consider yourself to be a CGMP
5 expert?
6    A.    Yes.
7    Q.    As a CGMP expert, do you know whether
8 ICH Q9 addresses formal risk assessments versus
9 informal risk assessments?
10    A.    I would, again, have to go back to Q9
11 and read it specifically.
12        MR. SLATER:  And by the way, objection
13 to the terminology, and lack of foundation.
14    Q.    What does ICH Q9 address?
15    A.    Quality systems.
16    Q.    Do you have any opinions regarding ZHP's
17 quality systems?
18    A.    I believe they established a quality
19 system but it was deficient in some cases, especially
20 in areas of complying with some of their internal
21 SMPs.
22    Q.    Are you offering an opinion that ICH Q8
23 was not followed by ZHP?
24    A.    Yes.
25    Q.    And what is your basis for that opinion?

Page 160

1    A.    Again I go back to the warning letter.
2 The issues that were cited were not considering the
3 impurities, the complaints that were not
4 investigated, the fact that it is -- quality is ZHP's
5 responsibility.
6    Q.    Other than the warning letter, do you
7 have any other basis for your opinion that ZHP did
8 not comply with Q8?
9    A.    Only Q8?
10    Q.    And Q3.  We'll get to the rest later.
11    A.    But again, I would like to pull up Q8
12 and --
13    Q.    I understand.  I'm asking what your
14 opinions are in this litigation.
15    A.    I understand.  But I need to read Q8 to
16 make sure I understand the parameters.
17    Q.    So you're unable without reading Q8 to
18 tell me the basis for your opinion that ZHP violated
19 ICH Q8?
20        MR. SLATER:  Objection, counselor.  It's
21 very argumentative and there's a serious foundational
22 issues to these questions, ignoring her report.  But
23 you can go ahead.
24    A.    Again, if you'd permit me time to pull
25 up Q8, I could better answer your question.

Page 161

1    Q.    What is your basis for your opinion that
2 ZHP violated ICH Q10?
3    A.    ICH -- I'm sorry, ZHP was required,
4 again, to identify the peaks, the unknown peaks.
5    Q.    Did ZHP attempt to identify unknown
6 peaks?
7    A.    Not until pressed.
8    Q.    What do you mean by "pressed"?
9    A.    Customer complaints.
10    Q.    Did ZHP identify unknown peaks that it
11 failed to follow up on?
12    A.    Are you talking about all peaks that
13 could --
14    Q.    Any unknown peaks.  I'm trying to
15 understand the basis for your opinions.  Are you
16 offering an opinion that ZHP identified unknown peaks
17 and then failed to follow up and try to figure out
18 what they were?
19    A.    It's my understanding that ZHP knew of
20 the peaks since as early as 2014, and did not
21 identify the NDMA peaks.
22    Q.    Did ZHP follow up whenever a customer
23 identified an unknown peak to try to determine what
24 it was?
25    A.    There were responses to the customer

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

1 complaints.

2      Q.    And did those responses reflect efforts
3 by ZHP to test the unknown peaks and determine what
4 they were?

5      A.    From what I read, there were
6 investigations performed but there was no
7 identification of the NDMA peaks.

8      Q.    And why were there no identifications of
9 the NDMA peaks?

10      A.    I don't know that.

11      Q.    Are you qualified to opine on the
12 adequacy of ZHP's testing of unknown peaks?

13           MR. SLATER:  Objection.  Qualifications
14 is a legal question.  It's a totally inappropriate
15 question.

16           You can answer.

17      A.    As to whether or not -- can you please
18 read the question again now?

19      Q.    Do you consider yourself to be qualified
20 to testify, to offer an opinion on whether ZHP's
21 testing of unknown peaks was adequate?

22      A.    Yes.

23      Q.    And what is your qualification to
24 evaluate an API manufacturer's testing of unknown
25 peaks?

1           MR. SLATER:  Objection.  This is a legal
2 conclusion and a legal argument.  You have her
3 background and her qualifications.  Do you have a
4 specific question you want to ask?

5      Q.    Do you need David to repeat the
6 question?

7      A.    Yes, please.

8           MS. MILLER:  David, please go ahead.

9           (Record read.)

10      A.    I would say my background and training
11 in auditing and in the ICH and FDA guidelines that
12 address risk assessment.

13      Q.    Have you ever done a risk assessment for
14 unknown impurities in a product?

15      A.    I personally have not performed a risk
16 assessment for unknown impurities.

17      Q.    Have you ever been retained by a client
18 to look at their risk assessment and determine
19 whether it was adequate in terms of how it was
20 testing for unknown impurities?

21      A.    Not specifically for unknown impurities.

22      Q.    Is that a task that would be more
23 appropriately accomplished by a chemist?

24           MR. SLATER:  Objection.

25           You can answer.

1      A.    In the normal course, what would happen
2 is, I would do an assessment and if we got to a point
3 where the organic chemist as an SME subject matter
4 expert would need to give input, I would pull an SME
5 in for his or her advisement.

6           But I would do the overall risk
7 assessment.

8      Q.    How can a non-chemist determine whether
9 a risk assessment for unknown impurities is adequate?

10           MR. SLATER:  Objection.

11           You can answer.

12      A.    I would rely on the guidance documents.
13 We know that it, the guidance documents require the
14 firms to test for unknown impurities.  And I would
15 simply ask, have you addressed the unknown impurities
16 as required in the various guidance documents?

17      Q.    Is the manufacturer under the guidance
18 required to identify unknown impurities below a
19 certain threshold?

20           MR. SLATER:  Objection.

21           You can answer.

22      A.    Companies are required to investigate
23 all unknown peaks.

24      Q.    And where does it say that?

25      A.    It says that in the ICH M7.  The -- Q3,

1 "Impurities in new drug substances."

2      Q.    Can you tell me what you're reading
3 from?

4      A.    I'm not reading from anything.

5      Q.    Oh, you just turned to the side like you
6 were reading from something.

7      A.    No, I was thinking.  I'm sorry, I was
8 thinking.

9      Q.    Okay.  So continue with my question.

10           MR. SLATER:  I'm sorry, she was in the
11 middle of an answer, then you asked her why she was
12 looking at the side.  Just for the record, you cut
13 her answer off.  I'm just making it clear for the
14 record.

15           MS. MILLER:  Happy for her to continue.

16           MR. SLATER:  After you cut her off, and
17 completely cut the entire train of thought, but
18 that's okay.

19      Q.    Would you like to continue?

20      A.    I've lost my train of thought now.

21      Q.    So let's start with the question again.

22           MS. MILLER:  David, do you want to
23 repeat the question?

24           (Record read.)

25           MR. SLATER:  Could you read back her

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

1 answer please, up to the point where it was
2 interrupted so she can hear what she said, please?
3         (Record read.)
4     Q.   So it's your testimony that ICH M7 and
5 Q3 require a company to show --
6         MR. SLATER: I'm sorry, what are we
7 doing? She hadn't finished her answer. Now she had
8 it read back to continue answering. Now you don't
9 want her to do that anymore, now you're on to a new
10 question? Just confirming what we're doing. You're
11 now on to a new question after cutting off her last
12 answer.
13         MS. MILLER: As David read back, she
14 testified that ICH M7 and Q3 require a manufacturer
15 to address all unknown peaks.
16    Q.   Are there any other documents that you
17 believe require manufacturers to address all unknown
18 peaks?
19    A.   ZHP has their own internal SOP, and
20 regarding impurities, and the need to evaluate those
21 impurities.
22    Q.   Is a manufacturer required to
23 investigate the identity of an impurity that is below
24 a certain threshold?
25    A.   Yes.

Page 167

1    Q.   Is there a threshold below which a
2 manufacturer does not have to identify unknown
3 impurities?
4    A.   No.
5    Q.   Does ICH Q3 apply to manufacturing
6 changes or only to new drug substances?
7    A.   Changes as well.
8    Q.   Does ICH Q3(a) state that there's no
9 need for a new drug applicant to test for impurities
10 under a certain level?
11         MR. SLATER: Objection, lack of
12 foundation. You can answer.
13         If you want to show her a specific
14 question and ask her what that means, that would be a
15 fair question as opposed to this memory test you're
16 doing. But you can ask the question, and whether you
17 can use them or not, it's fine, but I think it's --
18 and I have a serious issue with lack of foundation
19 and mischaracterization, something I'm looking at.
20    Q.   Do you know whether ICH Q3(a) recognizes
21 that there's no need for a new drug applicant to test
22 for trace level impurities under a certain level?
23         MR. SLATER: Objection, lack of
24 foundation. Same objection.
25         You can answer.

Page 168

1    A.   I would have to look at ICH Q3.
2    Q.   Do you agree that when evaluating a
3 compound for toxicity, it's important to know whether
4 the compound has been shown to be harmful in humans?
5         MR. SLATER: Objection.
6         You can answer.
7         THE WITNESS: Can you read that question
8 back? I'm sorry.
9    Q.   Do you agree that when evaluating a
10 compound for toxicity, it's important to know whether
11 the compound has been shown to be harmful in humans?
12         MR. SLATER: Objection.
13         You can answer.
14    A.   It does not matter whether it's been
15 found to be harmful in humans.
16    Q.   Did ZHP perform a science-based
17 assessment of its processes?
18         MR. SLATER: Objection. Massive
19 vagueness, lack of foundation. Lack of necessary
20 terms to ask a question that can be intelligibly
21 answered.
22         Subject to those objections, you can
23 answer.
24    A.   Whether or not they did a literature
25 search --

Page 169

1    Q.   Did ZHP perform a science-based
2 assessment of its processes for manufacturing
3 Valsartan?
4         MR. SLATER: Same objection.
5    A.   Whatever analysis was done was
6 inadequate.
7    Q.   So is it your opinion that they
8 performed a science-based assessment but it was not
9 adequate because it did not find NDMA?
10         MR. SLATER: Objection.
11         You can answer.
12    A.   Yes.
13    Q.   Does compliance with CGMPs turn on what
14 is reasonably known at the time the product is being
15 manufactured?
16         MR. SLATER: Objection, lack of
17 foundation. Vague. Ambiguous.
18         You can answer.
19    A.   I'm sorry, I cut out right in the
20 middle, can you please --
21    Q.   Sure. Does compliance with CGMPs turn
22 on what is reasonably known at the time the product
23 is being manufactured?
24    A.   I missed one word in the middle, it
25 sounded like "turn."

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

1    Q.    Um-hum.
2    A.    Does manufacturing -- I'm sorry, just
3  read it to me again, now --
4    Q.    Does compliance with CGMPs turn on what
5  is reasonably known at the time the product is being
6  manufactured?
7    A.    I'm sorry, I don't understand what you
8  mean by "turn."
9    Q.    Does the manufacturer's compliance with
10  CGMPs -- is a manufacturer's compliance with CGMPs
11  based on what is reasonably known at the time the
12  product is being manufactured?
13    A.    Yes, and all prior scientific knowledge.
14    Q.    Did the FDA ever ask ZHP to use separate
15  workshops for different manufacturing processes?
16    A.    I don't know that answer.
17    Q.    Is using the same workshop for different
18  manufacturing processes a CGMP violation?
19        MR. SLATER: Objection. Incomplete
20  hypothetical, lack of foundation.
21        You can answer.
22    A.    It is acceptable to use the same
23  facility to manufacture different products as long as
24  there's adequate validation or cleaning and
25  segregation.

Page 171

1    Q.    And where is that written?
2    A.    That's GMP. It's just, all processes
3  must be validated and all processes have to be -- I'm
4  sorry, all cleaning processes have to be validated.
5    Q.    While you were at the FDA, did you ever
6  investigate whether cross-contamination occurred at a
7  manufacturing facility?
8    A.    No.
9    Q.    In the course of your work in the
10  private sector, have you ever made a determination
11  that manufacturing lines were cross-contaminated?
12    A.    No.
13    Q.    In the course of your consulting, have
14  you ever advised a client on cross-contamination?
15    A.    I've advised on the potential for
16  cross-contamination.
17    Q.    Do you consider yourself to be an expert
18  on the questions and issues of cross-contamination in
19  pharmaceuticals?
20        MR. SLATER: Objection, same reasons I
21  objected to questions about qualification before.
22        But you can answer, Dr. Bain.
23    A.    Yes.
24    Q.    And what is the basis for that
25  expertise?

Page 172

1    A.    I've been involved with validation of
2  cleaning processes.
3    Q.    What do you mean by that?
4    A.    I had quality engineers working for me
5  that wrote validation protocols and validation
6  reports with regards to cleaning validation.
7    Q.    Did the FDA inspect manufacturing
8  facilities for API?
9    A.    Yes.
10    Q.    Do you know how many times the FDA
11  inspected ZHP's facilities between 2010 and 2018?
12    A.    No, I don't.
13    Q.    Did you review the results of the FDA's
14  inspections of ZHP facilities between 2010 and 2018?
15    A.    I did review some. I don't know if that
16  entailed all. That was done at all their facilities.
17    Q.    Do you know whether the FDA's
18  inspections of ZHP facilities between 2010 and 2018
19  resulted in any official regulatory actions?
20    A.    They put -- FDA put ZHP under an import
21  alert and they issued -- FDA form 483s, and they
22  issued a warning letter.
23    Q.    Prior to the recall of Valsartan, do you
24  know how many inspections there were of ZHP
25  manufacturing facilities by the FDA?

Page 173

1    A.    I do not know off the top of my head,
2  no.
3    Q.    Between 2010 and the recall, do you know
4  whether any FDA investigation of a ZHP facility
5  resulted in official regulatory action?
6    A.    The dates again, please?
7    Q.    Between 2010 and the date of the recall,
8  do you know whether any FDA inspections of ZHP
9  manufacturing facilities resulted in official
10  regulatory action?
11    A.    Yes.
12    Q.    Is it your testimony that there was
13  official regulatory action between 2010 and the time
14  of the recall?
15    A.    I would need to go back and look at the
16  dates.
17    Q.    When you said yes, what were you
18  referring to?
19    A.    I was referring to the inspections that
20  took place in the 2018 time frame.
21    Q.    Right, but I'm asking prior to the
22  recall, were there any inspections of ZHP
23  manufacturing facilities that resulted in official
24  regulatory action?
25    A.    I would have to go back and look.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1    Q.    Did the warning letter and import alert
2 occur before or after the recall?
3    A.    Import alert and warning letter. Now
4 you're asking specific dates. I would have to go
5 back and look at the specific dates of the actual --
6 first recall, and the date of the warning letter and
7 the date of the import alert.
8    Q.    Would it surprise you to know that there
9 were ten inspections of ZHP's facilities between 2010
10 and the date of the recall and that none of them
11 resulted in official regulatory action?
12        MR. SLATER: Objection, foundation.
13        You can answer.
14    A.    It wouldn't surprise me necessarily.
15    Q.    If there was no official regulatory
16 action taken at any ZHP facility between 2010 and the
17 time of the recall, what does that mean, that the
18 FDA -- does that mean that the FDA did not find any
19 objectionable conditions or practices that justified
20 regulatory action?
21        MR. SLATER: Objection. Lack of
22 foundation. Incomplete hypothetical.
23        You can answer.
24    A.    It means when they performed the
25 inspection, they -- the inspection areas they

Page 175

1 covered, they were not -- they did not find anything
2 objectionable.
3    Q.    Aside from the FDA, do you know whether
4 any other regulatory authorities inspected ZHP
5 facilities between 2010 and the time of the recall?
6    A.    I would have to look at the date of the
7 EMA inspection.
8    Q.    Are you aware of any other inspections
9 that occurred?
10    A.    No, I'm not.
11    Q.    Are you aware of what BGV is?
12    A.    No, I'm not.
13    Q.    Did ZHP's customers also conduct on-site
14 audits of ZHP?
15    A.    I'm not aware of any.
16    Q.    Do you know how many customer audits
17 occurred between 2016 and 2018 at the ZHP
18 manufacturing facilities?
19    A.    No, I don't.
20    Q.    Do you address that in your report?
21    A.    No.
22    Q.    Are you aware that Teva routinely
23 audited ZHP facilities?
24    A.    No, I'm not aware of that.
25    Q.    Did you address that in your report?

Page 176

1    A.    No, I did not.
2    Q.    If you're not aware of the audit, I take
3 it you're not aware of what the results were of
4 Teva's audits or the audits of other customers
5 between 2010 and 2018, is that correct?
6    A.    Yes, that's correct.
7    Q.    And are you aware that Novartis
8 inspected ZHP approximately 13 times between 2010 and
9 the date of the recall in 2018?
10    A.    No, I was not aware.
11    Q.    Do you know whether ZHP passed those
12 audits?
13    A.    No, I don't.
14    Q.    And was that addressed in your report?
15    A.    No, it was not.
16    Q.    Are audits by customers relevant to your
17 opinions in this case?
18        MR. SLATER: Objection.
19        You can answer.
20    A.    I'm sorry, are they relative to what?
21    Q.    Relevant to your opinions.
22        MR. SLATER: Objection, lack of
23 foundation, incomplete hypothetical.
24        You can answer.
25    A.    Can you please read the question back?

Page 177

1        MS. MILLER: Go ahead, David.
2        (Record read.)
3    A.    No.
4    Q.    Why not?
5    A.    Because I was evaluating their
6 compliance to CGMPs.
7    Q.    Are you aware that Novartis stated in
8 one of its audit reports in 2017 that ZHP has a
9 sufficiently good quality system to manufacture
10 non-sterile APIs according to ICH Q7?
11        MR. SLATER: Objection, you can answer.
12    A.    No, I wasn't.
13    Q.    And you did not review any discussion of
14 any audits of ZHP's manufacturing processes including
15 any references in those audit reports to ICH
16 compliance during the period 2010 to 2018, correct?
17        MR. SLATER: Objection.
18        You can answer.
19    A.    You're speaking of the customer audits?
20    Q.    Correct.
21    A.    I did not discuss anything related to
22 customer audits.
23    Q.    And therefore, you don't know whether
24 the customer audits addressed ZHP's compliance with
25 ICH standards, correct?

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1    A.    That's correct.
2    Q.    And the same would go for Eli Lily's
3 audits of ZHP's manufacturing facility, correct?
4         MR. SLATER:  Objection.
5         You can answer.
6    A.    Yes, that's correct.
7    Q.    What steps should ZHP have taken in its
8 risk assessment that it did not take?
9         MR. SLATER:  Objection.
10        You can answer.
11   A.    They didn't fully assess the potential
12 reaction that led to the formation of the NDMA.
13   Q.    What should they have done that they
14 didn't do?
15        MR. SLATER:  Objection, form.
16   A.    They should have addressed the
17 chemistry.  If they did see unknown peaks during
18 development, those should have been assessed as well.
19   Q.    Do you know whether ZHP conducted a risk
20 assessment that looked at the chemistry?
21   A.    Not to my knowledge.
22   Q.    Do you know whether ZHP looked at
23 unknown peaks as part of its risk assessment?
24   A.    Not to my knowledge.
25   Q.    Do you know what ZHP did in its risk

Page 179

1 assessment?
2    A.    Not completely.
3    Q.    Would it be relevant to your opinion to
4 understand what ZHP did in its risk assessment?
5    A.    No.
6    Q.    All right.
7         MS. MILLER:  I need a break.  Let's go
8 off the record.  My throat is killing.
9         VIDEOGRAPHER:  The time is 1:05.  This
10 ends media unit number 4.  We're going off the
11 record.
12        (Recess taken.)
13        VIDEOGRAPHER:  The time is 1:24.  This
14 begins media unit number 5.  We're back on the
15 record.
16 EXAMINATION (Cont'd.)
17 BY MS. MILLER:
18   Q.    You say in your report that ZHP failed
19 to implement and adequately apply its own internal
20 SMPs, correct?
21   A.    Yes.
22   Q.    What internal SMPs did ZHP fail to
23 implement and adequately apply?
24   A.    Okay to me to answer now?
25   Q.    Yeah, we're waiting.

Page 180

1    A.    Oh.
2         MR. SLATER:  You can answer.
3    A.    Okay.  ZHP has an internal SOP on
4 genotoxic impurity evaluation.  That was not
5 followed.
6    Q.    In what way did ZHP not follow its
7 internal SMP on that?
8    A.    They were to identify unknown
9 impurities.  Additionally, they didn't do an adequate
10 job on their risk assessment to identify the
11 potential for NDMA to be formed.
12   Q.    You're saying that ZHP's risk assessment
13 violated its own SMPs?
14   A.    They didn't do an adequate job.  They
15 didn't find it.  They didn't adequately assess the
16 scientific literature that was available.
17   Q.    Would any risk assessment that failed to
18 find the NDMA and NDEA have been inadequate?
19   A.    Yes.
20   Q.    What scientific literature did they not
21 follow?
22   A.    Various --
23        MR. SLATER:  Objection to the form of
24 the question.
25        You can answer.

Page 181

1    A.    As discussed in my report, there were
2 several instances of testimony where the person being
3 deposed said that they did not assess scientific
4 literature.
5    Q.    You're saying that ZHP witnesses
6 testified that they did not assess scientific
7 literature?
8    A.    Yes.
9    Q.    They said they did not assess any
10 scientific literature, or they said they didn't
11 assess the two articles that counsel provided to you?
12        MR. SLATER:  Objection regarding the two
13 articles, lack of foundation, mischaracterization.
14        You can answer.
15   A.    I think we need to go back to those
16 portions of the report.  They didn't say the specific
17 articles or documents.  They didn't assess.  They
18 merely said they didn't do a good scientific
19 assessment.  They did not assess the literature.
20   Q.    You're saying that ZHP witnesses said
21 they did not do a good scientific assessment?
22   A.    Again, let's -- you know, if we want to
23 go to the report, we can go to the report and find
24 the specific areas where they discussed their
25 assessment.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1    Q.    Do you recall which witnesses you're
2  talking about?
3    A.    Not without going back and looking at
4  the report.
5    Q.    Did you review ZHP's process change
6  request?
7    A.    Yes.
8    Q.    Was it adequate?
9    A.    No.
10    Q.    What was inadequate about ZHP's process
11  change request?
12    A.    They didn't address the unknown peaks.
13    Q.    When you say they didn't address the
14  unknown peaks, what do you mean?
15    A.    When there's a process change, it has to
16  be a full risk assessment done and this assessment
17  should have included the analysis that would have led
18  to the knowledge of the NDMA formation.  And that was
19  not addressed in their change request.
20        Also not addressed in their change
21  request was that they were making the change to save
22  money.
23    Q.    What change was made to save money?
24    A.    The zinc chloride, I believe.
25    Q.    Is that the only reason that change was

Page 183

1  made?
2    A.    I can't say that that was the only
3  reason.  But we have testimony about one person
4  telling the FDA during an inspection that the change
5  was made so they could manufacture more product and
6  dominate the world market.
7    Q.    Is manufacturing more product the same
8  thing as saving money?
9    A.    It is not the same thing as saving
10  money.
11    Q.    I thought you said --
12    A.    I'm sorry, go ahead.
13    Q.    Go ahead.  I thought you were done.
14    A.    My recollection, it was both, but the
15  person -- the person, and I believe it was Mr. Du, we
16  can again go back to the report and confirm that, who
17  told the FDA investigator that the main reason for
18  the change in the manufacturing process was to
19  increase yield and dominate the world market.
20    Q.    Was that the zinc chloride process or
21  the TA process?
22    A.    I'm sorry?
23    Q.    Is that the zinc chloride process or the
24  TA process with quenching?
25    A.    The zinc chloride.

Page 184

1    Q.    So it's your testimony that the zinc
2  chloride process was implemented to increase yield
3  and also to reduce cost?
4    A.    I'm telling you what the gentleman said
5  to the FDA.
6    Q.    Is it your testimony that it had both
7  those purposes?
8    A.    I'm sorry, is it my testimony that?
9    Q.    It had both of those purposes, the two
10  purposes you said?
11    A.    I'm only telling you, and again, we can
12  go to my report, because I have it in there, it's
13  cited, that he said increasing yield and dominating
14  the world market.
15    Q.    A few minutes ago you testified about
16  lowering costs.  I'm trying to understand where that
17  comes from.
18    A.    I may have misspoken on the lowering
19  costs.  Again, I have to go back to my report.
20  There's a lot of information in there and we can go
21  back and look.
22    Q.    Do you know why the TA process was
23  implemented, the TA with quenching?
24    A.    I believe that had to do with addressing
25  some environmental concerns.  But again, we could go

Page 185

1  back to the report.
2    Q.    Did FDA use the term "critical change"?
3    A.    The FDA -- again, I need to go back to
4  FDA's website specifically.  They generally
5  categorize changes as major, moderate and minor.
6    Q.    ZHP submitted Drug Master File
7  amendments with respect to the two changes at issue
8  in this litigation, correct?
9    A.    Yes.
10    Q.    Oh, by the way, do you know how the TA
11  with quenching process led to the formation of NDEA?
12    A.    Look at the DMF degradation to DMA, and
13  then sodium nitrite, the quenching then NDEA
14  formation.
15    Q.    Is that the zinc chloride process or the
16  TA process?
17    A.    Again, I have to go back and look to
18  make sure.
19    Q.    Would any ANDA submissions that were
20  made for generic Valsartan after ZHP submitted its
21  master files have incorporated those Drug Master
22  Files?
23    A.    Could you repeat that?
24    Q.    Does the FDA review Drug Master Files in
25  connection with ANDAs?

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1    A.    Yes.
2    Q.    And was ZHP's Drug Master Files
3 subsequently incorporated into ANDAs?
4    A.    Yes.
5    Q.    Did you review ZHP's Drug Master File
6 amendments?
7    A.    Yes, briefly.
8    Q.    Did they include assessments of the
9 risks of each process?
10    A.    Not adequately.
11    Q.    Did they address any assessment of the
12 risks of each process?
13    A.    Yes.
14    Q.    Did they include results of
15 chromatography testing documenting impurities that
16 resulted from each process?
17    A.    I'd have to go back and look.
18    Q.    Do you know sitting here today whether
19 the Drug Master Files included the results of
20 chromatography testing that documented impurities?
21    A.    Again, I'd need to go back to the DMFs
22 themselves just to see if the chromatography charts
23 were there.
24    Q.    Is there any evidence that FDA chemists
25 expressed concerns about the TA with quenching

Page 187

1 process or the zinc chloride process prior to ZHP's
2 June 2018 self report of the findings?
3    A.    Not to my knowledge --
4        MR. SLATER:  Objection -- one second --
5 objection, lack of foundation.
6        You can answer.
7    Q.    Did any FDA chemist ever come to ZHP and
8 say, "Hey, DMF degrades and we're worried about your
9 use of DMF as a solvent"?
10    A.    Not to my knowledge.
11    Q.    Did anybody from FDA ever express
12 concern to the ZHP that it was using TA with
13 quenching?
14    A.    I have no way of knowing that.
15    Q.    Did you review ZHP's risk assessment for
16 the DMF amendment with respect to zinc chloride
17 process?
18    A.    Yes.
19    Q.    Other than the failure to identify NDMA,
20 was there something about that risk assessment that
21 you found to be inadequate?
22        MR. SLATER:  Objection.
23        You can answer.
24    A.    Other than they didn't do an adequate
25 risk assessment, that would be the major thing that

Page 188

1 came out to me.
2    Q.    And when you say it wasn't an adequate
3 risk assessment, that's solely because NDMA was not
4 identified, correct?
5    A.    Correct.
6        MR. SLATER:  Objection.
7        You could answer.
8    Q.    Did ZHP's risk assessment include
9 evaluating process changes?
10    A.    Yes.
11    Q.    Did ZHP consider the suitability of
12 specifications and analytical substance evaluation?
13    A.    They said -- I believe they said they
14 did.
15    Q.    Did ZHP evaluate the manufacturing
16 equipment?
17    A.    Yes.
18    Q.    Did ZHP compare the use and quantity
19 change of raw materials, synthetic roots, process
20 description and critical process parameters between
21 the two processes?
22        MR. SLATER:  Objection.
23        You can answer.
24    A.    They didn't address the critical process
25 that led to the NDMA formation.

Page 189

1    Q.    What's a critical process?
2    A.    A process which could affect final
3 container product -- I'm sorry, final container
4 product quality.
5    Q.    What did ZHP's risk assessment state
6 with respect to impurities?
7    A.    Again, if we can pull it up, that would
8 be great.
9    Q.    Do you recall what ZHP concluded with
10 respect to impurities?
11    A.    They didn't see any impurities that were
12 cause for concern.
13    Q.    Did ZHP identify the -- quantify the
14 level of unknown impurities in the product?
15        MR. SLATER:  Objection.
16        You can answer.
17    A.    I don't remember.
18    Q.    Did ZHP confirm that the quantity of
19 unknown impurities was below a certain threshold?
20        MR. SLATER:  Objection.
21        You can answer.
22    A.    I believe they did but again, to say for
23 sure, we should pull it up.
24    Q.    Did ZHP conduct the change committee
25 assessment and a QA final approval?

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1    A.   Yes.
2    Q.   Did ZHP state that it was making these
3  changes to improve its manufacturing process?
4    A.   I honestly don't remember what the exact
5  verbiage was in the change control.
6    Q.   At any time prior to 2018, did the FDA
7  tell manufacturers that they should be looking for
8  NDEA and NDEA?
9         MR. SLATER:  Objection.
10        You can answer.
11   A.   The FDA expects industry to at all times
12  assess for genotoxic and carcinogenic impurities.
13   Q.   Did the FDA, prior to 2018, ever
14  specifically call NDMA and NDEA as things that
15  manufacturers should be looking for?
16   A.   I don't know of all the correspondence
17  or all their interactions with all firms.  There's no
18  way I can answer that.
19   Q.   Did the FDA, subsequent to the recall in
20  2018, issue guidance on levels for NDMA and NDEA in
21  drug products?
22   A.   Yes.
23   Q.   And what is the current requirement
24  issued by the FDA with respect to NDMA or NDEA in
25  drug products?

Page 191

1    A.   We could go to the source and verify.
2  But I believe it's 0.3 ppm of NDMA, and NDEA is
3  something at .08; but again we should go and pull
4  the -- the guidance document and view the actual
5  numbers.
6    Q.   Are you offering an opinion in your
7  report that ZHP did not conduct a scale-up process
8  from lab scales for pilot scale to commercial scale?
9    A.   Yes.
10   Q.   Does the FDA require a manufacturer to
11  have a pilot scale?
12   A.   Yes.
13   Q.   Where does the FDA state that a
14  manufacturer must have a pilot scale and can't test
15  its product at the commercial scale?
16   A.   I would have to go to the ICH guidance
17  documents, but I believe in the -- let me think
18  first -- I believe that ICH Q8 -- but again, we need
19  to pull these ICH documents up, you know, I -- I
20  can't remember verbatim which statement is in which
21  document.
22   Q.   Is it your opinion that there is an ICH
23  document that states that a manufacturer has to use
24  the pilot scale for -- as its technical batch, as
25  opposed to using commercial scale as its technical

Page 192

1  batch?
2    A.   There is in some guidance, but again, we
3  can pull them up one by one and go through them.  But
4  FDA does expect that you do a stepwise process as
5  you're developing your product and scaling it up.
6  Doing your risk assessments, I'm sorry.
7    Q.   If you use the commercial scales instead
8  of the pilot scale as your technical batch, what's
9  the downside of that?
10   A.   Then you're asking if you skipped all
11  the other scale-ups in between?
12   Q.   If you just skipped the pilot scale --
13  your testimony is that ZHP skipped the pilot scale.
14  And I'm asking you, what's the consequence of
15  skipping the pilot scale and using the commercial
16  scale as your technical batch?
17   A.   You haven't had a chance to adequately
18  assess risks and -- excuse me, of the product and as
19  a manufacturer of the process.
20   Q.   The commercial scale just means you've
21  made more of it, right?
22        MR. SLATER:  Objection.
23        You can answer.
24   A.   Means you've made a larger batch size.
25  So...

Page 193

1    Q.   So if you end up testing on the
2  commercial batch instead of the pilot batch, the only
3  outcome is you may have more to throw away, right?
4         MR. SLATER:  Objection.
5         You can answer.
6    A.   No, as I said, you are missing the
7  opportunity to perform risk assessments on your test
8  methods, on your processing capabilities, on your
9  actual final container specification.  So there's a
10  number of areas that that would be impacted by that.
11   Q.   Does ZHP not perform those assessments,
12  or to they just perform those assessments on the
13  commercial batch?
14   A.   Not perform those assessments why?
15   Q.   You just said a bunch of things that you
16  said you'd be skipping.  And I'm asking you, did ZHP
17  not perform those assessments, or did they just
18  perform those assessments at the commercial scale?
19   A.   I don't know what else they did during
20  their development.  Their bench scale, I don't know
21  what they did at that point.
22   Q.   Was there testimony from ZHP that they
23  were able to use the commercial scale as the
24  technical batch to replace the pilot scale?
25   A.   Yes, I do believe I read that.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1    Q.    And is it your opinion that that
2  violates CGMP?
3    A.    When you say "commercial batch," to me,
4  I need a definition of what you mean by "commercial
5  batch." To me, commercial batch is, it's approved
6  and it's something that you're already putting out on
7  the market. It's in interstate commerce.
8    Q.    So when you refer to the Gu deposition
9  and he testified that ZHP uses the commercial scale
10  as the technical batch to replace the pilot scale,
11  it's your understanding that it wasn't tested before
12  it was sold or it's your understanding that they just
13  tested it using a larger scale?
14    A.    I don't know what the scale was of that
15  batch.
16    Q.    But are you nonetheless offering an
17  opinion that this was a CGMP violation?
18    A.    That they used a technical -- what they
19  define a technical batch? I'm sorry, I don't know
20  what a technical batch is. I'm not familiar with
21  that.
22    Q.    You stated in your report, citing
23  Dr. Gu, that they used a scale-up process that was
24  improper.
25        I'm asking if you're offering the

Page 195

1  opinion that ZHP engaged in CGMP violations with
2  respect to the way it scaled.
3        MR. SLATER: By the way, objection. One
4  second. Objection to the foundation with the very
5  inaccurate paraphrase of the summary of the testimony
6  of Mr. Gu in the report.
7        You can answer the question.
8        MS. MILLER: Actually, I used a quote,
9  but go ahead.
10        MR. SLATER: No, I don't think you did,
11  actually.
12        MS. MILLER: Okay, go ahead.
13        MR. SLATER: Not from the report, you
14  didn't.
15    A.    So the report that was generated from
16  Syncores regarding the development of the zinc
17  chloride process stated that ZHP needed to do a pilot
18  batch.
19    Q.    Dr. Gu testified that ZHP was able to
20  use the commercial scale as the technical batch to
21  replace the pilot scale. That was his testimony.
22  I'm asking you if that violated CGMP principles.
23  That's all I'm asking.
24        MR. SLATER: Objection to the
25  foundation, but you can answer the question.

Page 196

1    A.    Again, what -- please tell me what a
2  technical batch, so --
3    Q.    I'm reading his testimony. That's a
4  direct quote.
5        MR. SLATER: I'm sorry, what testimony
6  are you reading? Do you want to share it, please,
7  because I don't think it's appropriate to read the
8  testimony without showing it --
9        MS. MILLER: I just want to --
10        MR. SLATER: -- no, no. I'm objecting
11  and your interrupting me. We're doing -- what you're
12  doing is inappropriate. I'm asking you, if you want
13  to talk about testimony, tell us the pages and lines
14  from the transcript. Let her have it.
15        And I think that you're misrepresenting
16  what's in her report, too, in terms of what's cited
17  in her report. I think that the questioning has been
18  very confusing and unfair and you can't just rattle
19  off, "He said this, he said that." We have the right
20  to know what part of the deposition you're referring
21  to, if you're going for refer to his deposition.
22        So please either tell us where you're
23  reading from so we can look at it, or move on to
24  another question, please.
25    Q.    Are you offering an opinion that ZHP

Page 197

1  violated CGMP principles and regulations with respect
2  to the scale-up process?
3        MR. SLATER: That's already been asked
4  and answered.
5        MS. MILLER: Hasn't been answered.
6        MR. SLATER: Okay, you can answer it
7  again, Dr. Bain.
8    A.    Yes.
9    Q.    Are you aware of any customer complaints
10  between 2014 and 2018 involving unknown peaks that
11  ZHP did not follow up on?
12    A.    I'm aware of customer complaints that
13  did have follow-up. I am not aware of all of their
14  customer complaints or whether I reviewed all of
15  their customer complaints. I didn't receive a
16  customer complaint log listing all of their
17  complaints.
18    Q.    Did you ask Plaintiffs' counsel to
19  provide you with all the complaints that were
20  submitted to ZHP?
21    A.    All the complaints that were?
22    Q.    Submitted to ZHP from customers.
23        MR. SLATER: Objection.
24        You can answer.
25    A.    I did not ask for every complaint that

HIGHLY CONFIDENTIAL

Page 198

1 every customer made to ZHP.

2    Q.    Do you recall seeing any customer
3 complaint that ZHP did not follow up on?

4    A.    When you say follow-up, are you talking
5 about respond?

6    Q.    Respond and conduct testing.

7    A.    The complaints I saw did have a response
8 from ZHP.

9    Q.    Are you offering an opinion that
10 Valsartan APR was adulterated?

11    A.    Yes.

12    Q.    When did you first form that opinion?

13    A.    When I heard about it through reading or
14 the news.

15    Q.    So you formed that opinion that
16 Valsartan was adulterated before you were approached
17 to be a witness?

18    A.    Yes, because it was recalled.

19    Q.    Is it your opinion that every recalled
20 drawing is adulterated?

21    A.    No.

22    Q.    So what was the basis of your opinion
23 that Valsartan API was adulterated prior to being
24 retained as an expert in this litigation?

25    A.    It was because in the news it was stated

Page 199

1 that it was being recalled for contamination with
2 NDMA.

3    Q.    Is it your opinion that any
4 pharmaceutical drug that is recalled based on an
5 impurity is adulterated?

6        MR. SLATER:  Objection.
7        You can answer.

8    A.    If a drug contains material that has not
9 been identified or is not on the labeling, then yes,
10 it would be adulterated.

11    Q.    So any drug that contains an impurity
12 that's not identified on the labeling is adulterated?

13    A.    Not necessarily on the labeling.  It has
14 not been addressed properly and assessed to insure
15 that there's no effect on finished product quality.

16    Q.    So any drug with an unknown impurity
17 that has not been assessed you would consider to be
18 adulterated?

19    A.    Yes.

20    Q.    And what is that based on?  Is that
21 based on a regulation or guidance or what?

22    A.    Definition of "adulterated."

23    Q.    Do you understand the definition of
24 "adulterated" to mean any drug with an unknown
25 impurity that has not been investigated?

Page 200

1    A.    Adulterated --

2        MR. SLATER:  Will you let her look at
3 the regulation?

4        MS. MILLER:  She's in the middle of
5 answering the question.

6        MR. SLATER:  This whole deposition, I'm
7 just making an observation, she's allowed to consult
8 the documents.

9        MS. MILLER:  You can show her all the
10 documents you want on direct.

11        MR. SLATER:  Thank you --

12    Q.    Do you know what "adulterated" means
13 without looking at the FDA regulations?

14    A.    When a drug or a product, let's say,
15 does not meet quality, purity, identity or strength
16 that it's purported to have.

17    Q.    And would a product that has an unknown
18 impurity of any level be adulterated?

19        MR. SLATER:  Objection.  Hopelessly
20 vague question.  Lack of foundation.

21        You can go ahead and try to answer it.

22    A.    If a product has an unknown impurity and
23 the firm has not investigated that impurity to see
24 whether it has an effect on final product quality,
25 then yes, it would be adulterated.

Page 201

1    Q.    So if Diovan had NDMA or NDEA impurity,
2 would it be adulterated?

3        MR. SLATER:  Objection.  Incomplete
4 hypothetical.

5        You can answer.

6    A.    Diovan as it was approved did not have
7 NDMA in it.  So if it did have NDMA in it, it
8 wouldn't be Diovan.

9    Q.    If Diovan was sold with NDMA impurities,
10 was it adulterated?

11        MR. SLATER:  Did you say "if"?

12        MS. MILLER:  I did.

13        MR. SLATER:  You can answer the
14 question.

15    A.    Yes.

16    Q.    Is your sole basis for believing that
17 Valsartan was adulterated the fact that it contained
18 NDMA and NDEA?

19    A.    Well, there were other issues as well
20 but it was adulterated because it contained NDMA and
21 NDEA.

22    Q.    And what reports led you to that
23 conclusion?

24    A.    As I said in earlier testimony, I don't
25 know where I read or heard about the original recall

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

1  and the contamination with NDMA and NDEA.
2      Q.    Is contamination the same thing as an
3  impurity?
4      A.    No.
5      Q.    Was Valsartan contaminated with NDMA or
6  did it have an NDMA impurity?
7      A.    Impurities.
8      Q.    If SOMEONE used the word
9  "contamination," was that erroneous?
10     A.    Impurities are contaminants, but
11 contaminants are not all impurities. You might have
12 a contaminant in a drug that's a piece of glass from
13 a vial, and it would be contaminated. But it didn't
14 have the drug -- the drug itself didn't have an
15 impurity.
16     Q.    Was Valsartan contaminated with NDMA or
17 did it have an NDMA impurity?
18     A.    It had an NDMA impurity.
19     Q.    Is it your opinion that any time a
20 generic drug has an impurity that's not present in
21 the RLD, that there is a CGMP violation?
22         MR. SLATER: Objection.
23         You can answer. Complete lack of
24 foundation, incomplete hypothetical.
25     Q.    Do you need the question repeated?

Page 203

1      A.    No, I'm thinking.
2      Q.    Okay.
3      A.    You're asking if a generic has an
4  impurity, was there a GMP violation?
5      Q.    That's not present in the RLD, I think I
6  said.
7      A.    That's not in the RLD. Yes.
8      Q.    And if every time a generic drug has an
9  impurity that's not present in the RLD, is that
10 generic drug adulterated?
11     A.    Yes.
12         MR. SLATER: Objection, asked and
13 answered. You can answer again. You said yes?
14 Okay.
15         THE WITNESS: Yes, I said yes.
16     Q.    Are all drugs that use API from a
17 facility that's out of compliance with CGMP
18 adulterated?
19         MR. SLATER: Objection, incomplete
20 hypothetical, lack of foundation.
21         You can answer.
22     A.    Could you repeat that question?
23     Q.    Are all drugs that use API from a
24 facility that's out of compliance with CGMP
25 adulterated?

Page 204

1      A.    Not necessarily.
2      Q.    Does the impact of CGMP violations
3  affect whether or not -- hold on, let me put that
4  differently. Does the severity of CGMP violations
5  affect whether a drug is adulterated?
6      A.    No.
7      Q.    Does the frequency of CGMP violations
8  affect whether a drug is adulterated?
9      A.    No.
10     Q.    Is an adulterated drug necessarily
11 unsafe?
12     A.    No.
13     Q.    When was Valsartan first adulterated?
14     A.    Are you asking for a date?
15     Q.    Um-hum.
16     A.    I'm sorry, I'd have to go back and look
17 at the dates that they introduced the product into
18 interstate commerce. I don't know that off the top
19 of my head. Somewhere in the -- I don't know, 2015
20 range.
21     Q.    Is it your opinion that subsequent to
22 that time, every lot of Valsartan API was
23 adulterated?
24     A.    Yes.
25     Q.    Has the FDA ever stated that warning

Page 205

1  letters are not appropriate in certain situations?
2          MR. SLATER: Objection.
3      A.    I'm sorry, that's very vague.
4      Q.    Does the FDA -- do the FDA's regulations
5  state that warning letters are inappropriate when a
6  violation is intentional or flagrant?
7          MR. SLATER: Objection.
8          You can answer.
9      A.    I have not seen that written.
10     Q.    Has FDA ever stated that warning letters
11 are not appropriate when the violation presents a
12 reasonable possibility of injury or death?
13     A.    Not to my knowledge.
14     Q.    Has FDA ever stated that warning letters
15 aren't appropriate when there's a history of repeated
16 or continual conduct of a similar or substantially
17 similar nature?
18     A.    Not to my knowledge.
19     Q.    If a company takes corrective action,
20 what does the FDA do with respect to the warning
21 letter?
22     A.    If the company takes corrective action,
23 generally, they will notify the FDA that they have
24 taken the corrective action and are ready for a
25 reinspection. FDA will go out and reinspect and

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1 assess whether the corrective action was adequate.
2    Q.    And what happens if the corrective
3 action was adequate?
4    A.    They will close the warning letter.
5    Q.    Was the warning letter at issue here
6 closed?
7    A.    Yes.
8    Q.    Are you offering an opinion that
9 Valsartan API did not meet USP requirements?
10    A.    Yes.
11    Q.    What is that based on?
12    A.    The fact that it was contaminated with
13 NDMA and NDEA.
14    Q.    Did we just establish a few minutes ago
15 that "contaminated" isn't the right word there?
16        MR. SLATER: Argumentative. Objection.
17    You can answer.
18    A.    As I said, contaminated -- sorry, all
19 impurities would render a drug contaminated, but a
20 contaminated drug does not necessarily contain an
21 impurity. So in other words, I'm saying,
22 contaminated in a general sense.
23    Q.    Did Valsartan API comply with the
24 compendial description of the drug?
25    A.    When it was manufactured using the TIN

Page 207

1 process.
2    Q.    Did the USP compendium reference unknown
3 impurities?
4    A.    The USP reference --
5    Q.    To Valsartan standard.
6    A.    Not to my knowledge.
7    Q.    Did you review the USP Valsartan
8 standard?
9    A.    Yes.
10    Q.    And does that standard reference unknown
11 impurities?
12    A.    Can we pull that up, please?
13    Q.    Is it your opinion that any impurities
14 in Valsartan would have failed to satisfy the USP
15 Valsartan standard?
16    A.    Again, I'd like to take a look at the
17 standard.
18    Q.    Okay. But are you offering an opinion
19 in this litigation that any Valsartan with impurities
20 would not have complied with the Valsartan standard?
21        MR. SLATER: Objection, form.
22    A.    I'm saying -- I'm saying Valsartan with
23 NDMA would not meet USP.
24    Q.    And why wouldn't Valsartan with NDMA
25 meet USP?

Page 208

1    A.    Because Diovan was approved, the RLD was
2 approved without NDMA.
3    Q.    So if Valsartan had any impurities at
4 any level whatsoever, that were not found in Diovan,
5 is it your opinion that it wouldn't have satisfied
6 the Valsartan USP?
7        MR. SLATER: Objection, lack of
8 foundation, hopelessly vague and ambiguous,
9 overbroad, and incomplete hypothetical.
10    Q.    Do you need --
11        MR. SLATER: You can answer that
12 question if you'd like.
13        MS. MILLER: Do you want me have David
14 read that question back.
15        THE WITNESS: I would like that.
16        MS. MILLER: Okay, David, could you
17 please read back the question.
18        (Record read.)
19        MS. MILLER: USP standard.
20    A.    If Valsartan had impurities that Diovan
21 did not have, it would not meet Diovan USP.
22    Q.    Are you aware that Section 5.60.10 of
23 USP 35 states a manufacturer need not identify and
24 include on its label any impurity, provided that the
25 impurity is less than 0.1 percent of the content of

Page 209

1 the drug substance?
2        MR. SLATER: Objection. You want to
3 show it to us? Object, lack of foundation. Ask that
4 you actually show the section that you're talking
5 about. It's the whole thing.
6    Q.    Are you aware of any statement in the
7 USP 35 that a manufacturer does not need to identify
8 and include on its label any impurity that's less
9 than 0.1 percent of the content of the drug
10 substance?
11        MR. SLATER: Same objection.
12    A.    If you pull up the USP we'll take a
13 look.
14    Q.    I'm asking whether you know, as an
15 expert sitting here today, do you know whether USP
16 states that a manufacturer doesn't have to identify
17 an impurity that's less than 0.1 percent.
18        MR. SLATER: Objection, counsel --
19    Q.    Do you know or not?
20        MR. SLATER: I'm sorry, you're not going
21 to let me talk? She heard --
22        MS. MILLER: You interrupted me.
23        MR. SLATER: Well, you interrupted my
24 interruption of your interruption.
25        MS. MILLER: Excuse me, I was in the

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

1 middle of asking a question.
2        MR. SLATER:  And she has said now twice
3 she'd like to see the section --
4        MS. MILLER:  I heard her, and I'm asking
5 my own question, which I'll ask again.
6     Q.   Without looking at any USP documents, do
7 you know whether USP states that a manufacturer
8 doesn't need to identify and include on its label an
9 impurity that's less than 0.1 percent of the content
10 of the drug substance?
11    A.   Without looking at the USP, I do not
12 know.
13    Q.   Okay.  Do you know whether any Valsartan
14 had NDMA or NDEA at a level of 0.1 percent or more?
15    A.   Yes.
16    Q.   Did any single batch of Valsartan API
17 contain NDMA or NDEA at a level of 0.1 percent or
18 more of its content?
19    A.   Can we please pull up?  There's data
20 showing the testing that was done in the DIL.  If we
21 could look at that, we could verify the numbers.
22    Q.   So I don't know what you're referring
23 to, but I'm just asking, do you know sitting here
24 today whether any Valsartan contained NDMA or NDEA at
25 a level of more than 0.1 percent?

Page 211

1     A.   Again, yes, it did.
2     Q.   And was that NDMA or NDEA?
3     A.   Again, can we pull up the data?  The
4 tests were done and as I sit here, I don't know if it
5 was NDMA, NDEA but again, if we could refresh with
6 the data, it would be quick to see.
7     Q.   Under the USP, do you know what the
8 maximum level is for combined impurities?
9     A.   No --
10       MR. SLATER:  One second.  Are you
11 talking about combined genotoxic, cohort of concern
12 impurities, or all impurities in the world?  Can you
13 refine your question, please?  It's hopelessly
14 vague --
15       MS. MILLER:  Thank you for your
16 testimony.
17       MR. SLATER:  It's not testimony.  I'm
18 just asking you at some point to ask a
19 straightforward question.
20    Q.   Do you know if UPS states that unknown
21 impurities cannot exceed in combination a specific
22 threshold?
23    A.   I don't know if that's specifically
24 stated in USP.
25    Q.   Thank you.  Is there any USP monograph

Page 212

1 to your knowledge that mentions nitrosamine
2 impurities7?
3     A.   Not to my knowledge.
4     Q.   Does every generic drug have an
5 identical impurity profile to its RLD?
6     A.   To my knowledge, they do.
7       MR. SLATER:  Can I have that last
8 question and answer read back to me, please?
9       MS. MILLER:  David.
10      (Record read.)
11      MR. SLATER:  Thank you.
12      MS. MILLER:  Let's go off the record.  I
13 think I have about an hour left and I want to figure
14 out where to go from here in terms of finishing up on
15 time.
16      VIDEOGRAPHER:  The time is 2:19.  This
17 ends media unit number 5.  We're going off the
18 record.
19      (Discussion off the record.)
20      (Recess taken.)
21      VIDEOGRAPHER:  The time is 2:41.  This
22 begins media unit number 6.  We're back on the
23 record.
24      (Continued on following page.)
25 EXAMINATION (Cont'd.)

Page 213

1 BY MS. MILLER:
2     Q.   Are there acceptable limits for NDMA
3 impurities in Valsartan currently?
4     A.   NDMA is one of the cohort of concern
5 where there is no threshold for NDMA; however, FDA
6 has instituted a level of concern -- I'm sorry, a
7 level of acceptance.
8     Q.   If Valsartan is sold with NDMA below
9 that level, is it adulterated?
10    A.   The FDA has determined that they will
11 allow Valsartan to be sold if their NDMA level is
12 below that very minimal threshold.
13    Q.   If the NDMA level is below that
14 threshold, but the NDMA is not contained in the RLD,
15 would the generic be adulterated?
16      MR. SLATER:  Objection.
17      You could answer.
18    A.   It is still adulterated.
19    Q.   When you use the phrase "cohort of
20 concern," what is that phrase from?
21    A.   That's in the guidance document that
22 where -- I don't -- the name is -- talks about
23 assessing genotoxic and carcinogenic impurities.
24    Q.   I'm sorry, what is that?
25    A.   We can pull them up.  Um -- I'd like to

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1 look at them, 7, ICH M7. I believe it's in M7, if we
2 could pull that up.
3     Q.    I just was asking what document it's in.
4 We don't have time really to reread the document
5 right now.
6         Are you offering an opinion that ZHP
7 intentionally sold Valsartan with NDMA or NDEA
8 impurities?
9     A.    I'm not testifying that they did it
10 intentionally.
11     Q.    Do you know why ZHP did not find NDMA
12 when it tested Valsartan using GCMS?
13     A.    No, I don't know why.
14         MR. SLATER: Objection, lack of
15 foundation.
16     Q.    Are you offering an opinion that ZHP
17 violated EMA guidelines?
18     A.    I'm sorry, can you tell me what specific
19 guideline you're speaking of?
20     Q.    Are you familiar with EMEA guidelines?
21     A.    Some.
22     Q.    Are you offering an opinion that ZHP
23 violated them?
24     A.    Again, which guideline specifically are
25 we talking about?

Page 215

1     Q.    Are you offering an opinion that ZHP
2 violated any EMEA guidelines?
3     A.    Yes.
4     Q.    Which ones?
5     A.    There's an EMEA guideline of a -- excuse
6 me -- that covers or discusses the limits of
7 genotoxic impurities.
8     Q.    Is that guideline still in force?
9     A.    To my knowledge.
10     Q.    Is there any other EMEA guideline that
11 you believe ZHP violated?
12     A.    Not off the top of my head.
13     Q.    If we could go back to Exhibit 2.
14         MR. SLATER: What's Exhibit 2?
15         MS. MILLER: The supplemental reliance
16 list.
17         MR. SLATER: Got it.
18     Q.    It states here that you read the expert
19 report of Ali Afnan.
20     A.    Yes.
21     Q.    Who is Ali Afnan?
22     A.    He's an expert in the field of
23 nitrosamines.
24     Q.    Were you familiar with him before this
25 litigation?

Page 216

1     A.    No.
2     Q.    Do you know what his background is?
3     A.    No.
4     Q.    Do you know what opinions he offered?
5     A.    Only the opinions that were in his
6 report.
7     Q.    Do you recall any of them?
8     A.    Again, we can go to my report and look
9 at the various places that I've referenced his
10 report.
11     Q.    Did you reference Ali Afnan's report in
12 your report?
13     A.    Again, let's go see. I'd be more than
14 happy to do a quick scan.
15     Q.    Do you know without looking at your
16 report whether you referenced Ali Afnan's report in
17 your report?
18     A.    I don't know without looking.
19     Q.    Okay. Moving down, there are six ZHP
20 documents mentioned here. Do you see that?
21     A.    Yes.
22     Q.    Did you look at these six ZHP documents
23 before you wrote your report or after?
24     A.    I believe some of them prior to writing
25 my report.

Page 217

1     Q.    Which ones? Sorry.
2     A.    And again, it's difficult for me to know
3 when -- it's just the Prinston number and
4 investigation regarding -- I'd be able to more
5 specifically look up what that document is.
6     Q.    Do you recall when you received the six
7 documents on the supplemental reliance list that are
8 from ZHP?
9     A.    I don't know for sure when I got each of
10 these.
11     Q.    Do you know why they weren't on your
12 original list of materials consulted?
13     A.    Again, I'm not sure what some of those
14 are. So could we --
15     Q.    Are you saying you don't know what these
16 documents are that are listed on your supplemental --
17     A.    I don't know them by the Prinston
18 numbers.
19     Q.    They have titles afterwards, right?
20         MR. SLATER: Objection, argumentative.
21 She's asked to see them to be able to answer your
22 questions. You obviously don't want to show them to
23 her. You can continue with this.
24     Q.    They have titled on them. I'm just
25 trying to understand if you know why they were not

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1  included on your original reliance list.
2      A.    No. I don't know.
3      Q.    Do you know why the two scientific
4  articles were not included on your original reliance
5  list?
6      A.    You're talking about the two articles
7  under the heading, "Scientific Materials"?
8      Q.    Correct.
9          MR. SLATER: Your question is limited to
10 that? Okay.
11         You can answer.
12     A.    I don't believe I read those materials
13 prior to my report.
14     Q.    How about the five documents under
15 "Regulatory Documents." Do you know why those were
16 not included in your original reliance list?
17     A.    No, I don't.
18     Q.    Did you review the complete testimony of
19 Dr. Najafi from January 18 and 24?
20     A.    Yes.
21     Q.    Let's turn to the next page. Did you
22 review Dr. Hecht's deposition and all of these
23 exhibits?
24     A.    Yes.
25     Q.    Did any of these exhibits to Dr. Hecht's

Page 219

1  deposition affect your opinions in this case?
2          MR. SLATER: Objection.
3          You can answer.
4      A.    No, my opinion was not affected.
5      Q.    Over the course of drafting your report,
6  did you ever go to Plaintiff's counsel and ask for
7  additional documents?
8      A.    I believe I did.
9      Q.    What documents were those?
10     A.    That was -- that's a voluminous number
11 of documents. I cannot recall, you know, we're
12 talking three or four or five months ago that I was
13 writing this report. I don't remember which exact
14 documents I requested.
15     Q.    Did Plaintiffs' counsel provide you with
16 the regulatory documents that you cite in your
17 reliance list, or did you identify them on your own?
18     A.    Can you go back up to the regulatory
19 documents, please?
20         They supplied them to me.
21     Q.    How about the ICH documents, did
22 Plaintiffs' counsel supply those to you as well?
23     A.    Yes.
24     Q.    When did you first become aware that the
25 TA with quenching process could lead to the formation

Page 220

1  of NDMA?
2      A.    After I was retained in this case.
3      Q.    How many hours did you spend preparing
4  your report and reviewing documents?
5      A.    Oh, my goodness. I would need to go
6  back to my invoice. I would say somewhere around a
7  the hundred-hour range, hundred-plus hours.
8      Q.    How much time did you spend preparing
9  for your deposition?
10     A.    I don't have an exact number. I haven't
11 added it up. But it's somewhere in the 30 to 40-hour
12 range.
13     Q.    Did you meet with Plaintiffs' counsel to
14 prepare for your deposition?
15     A.    Yes.
16     Q.    Was that via Zoom?
17     A.    Yes.
18     Q.    How many times?
19     A.    Again, I don't remember exact number.
20     Q.    How many times this week did you meet
21 with Plaintiffs' counsel, in the last week?
22     A.    In the last week? I would say four to
23 five times, I guess.
24     Q.    Did you review any defense expert
25 reports in preparing for your deposition?

Page 221

1          MR. SLATER: Objection, asked and
2  answered.
3      Q.    Have you provided an answer?
4          THE WITNESS: Would you repeat the
5  question, please?
6          MS. MILLER: David, go ahead.
7          (Record read.)
8      A.    Yes.
9      Q.    Which ones?
10     A.    David Chesney.
11     Q.    When did you review that?
12     A.    Prior to writing my report.
13     Q.    My question was preparing for your
14 deposition.
15     A.    Oh, in preparation for my deposition?
16     Q.    Yes.
17     A.    Can you please repeat the question then?
18     Q.    Did you review any defense expert
19 reports in the process of preparing for your
20 deposition?
21     A.    Not that I can recall at the moment.
22     Q.    Have you heard of a company called MSP?
23     A.    MSP? No.
24     Q.    You said that during the break you'd be
25 able to come up with a more complete list of your

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

1 InCompliance Solutions clients. Did you do that?
2     A.    No, I haven't had a chance to do that.
3          MS. MILLER: Can we take a break now for
4 you to do that?
5          MR. SLATER: What's the question that
6 you want to take a break for? I missed it. Is it
7 something about her clients, you want --
8          MS. MILLER: A list of her InCompliance
9 clients.
10         MR. SLATER: First of all, to the extent
11 her clients may be confidential, she's not going to
12 produce that, obviously.
13         MS. MILLER: You've already said that.
14         MR. SLATER: Well, if you want her to do
15 that, we're not going to do it off the record. So if
16 you want her to hunt and do research for you, it's
17 going to be on your time.
18         MS. MILLER: No, we're going to go off
19 the record.
20         MR. SLATER: I'm not agreeing to that.
21 I'm telling you right now if you want her to go do a
22 hunt for the names of her clients, just like with any
23 other witness. You've asked her. She's told you
24 what she recalls.
25         The idea that you would let me make one

Page 223

1 of your experts go and search for documents or
2 information on their time and hold the deposition,
3 there's no way in the world I would ask that. There
4 is no way you would allow it. I'm not agreeing, so
5 please, you can hold that one for Judge Vanaskie,
6 because I'm not going to agree to stop the clock and
7 send Dr. Bain on a treasure hunt.
8          MS. MILLER: Are you finished, Adam?
9     Q.    Do you recall the name of your Canadian
10 client?
11    A.    I do not remember the name of the
12 Canadian client.
13    Q.    Do you recall the name of your Italian
14 client?
15    A.    I don't. I do not and, can I please
16 clarify, the audit that I did of the Canadian company
17 who manages clinical trials did not retain me. I was
18 retained the company that uses their services.
19    Q.    Okay. Through Pharmatech?
20    A.    No.
21    Q.    Was the Canadian manager Pharmatech?
22    A.    Pharmatech had nothing to do with this
23 audit.
24    Q.    Did Pharmatech have anything to do with
25 the Italy audit?

Page 224

1     A.    Yes.
2     Q.    How about AccuLab?
3     A.    Yes.
4     Q.    Can you recall any of your other
5 Pharmatech clients?
6     A.    In what time frame?
7     Q.    Any time frame.
8          MR. SLATER: Only if your contracts or
9 relationships with them are not confidential. You
10 should not violate a confidentiality agreement to
11 answer this question.
12         MS. MILLER: Adam, you've repeated
13 that multiple times.
14         MR. SLATER: I'm sorry, did it bother
15 you that I said it to remind her of that? I'm trying
16 to keep her from violating a confidentiality
17 provision. I'm sorry, if that -- if that -- you felt
18 like that was inappropriate. I thought it was smart
19 to tell her because it's her first deposition.
20    A.    The other thing is, Adam's right. The
21 firm that retained me to do their audit in Canada, I
22 would not want to discuss their name.
23    Q.    Are there any other clients you've had,
24 whether through Pharmatech or generally, through
25 InCompliance, whose names you recall and can

Page 225

1 identify?
2     A.    I had a client that was -- the client
3 was called L-3. And they are, again, a company that
4 hires consultants to do work for them.
5     Q.    What do you mean by that?
6     A.    The company comes to L-3 and says, "Hey,
7 can you please hire a consultant to come out and do
8 an audit for us."
9     Q.    And when was that?
10    A.    That was around the time frame mid-late
11 '20-'21 to mid-early -- you know, early-mid '20-22.
12    Q.    And were any of those companies API
13 manufacturers --
14    A.    No.
15    Q.    -- that set you up with -- and do you
16 recall the names of any of those companies?
17    A.    Symmetric. It was medical devices, it
18 was not drug-related.
19    Q.    What percentage of the work you do for
20 InCompliance involves medical devices?
21    A.    That depends on the time frame you're
22 talking about.
23    Q.    Over time.
24    A.    Again, I -- hard to quantify. Because
25 some of the jobs are quite short, right? Only two

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

1 weeks. Some stretch for six to eight months. So
2 difficult for me to say. And, you know, and they may
3 overlap with something else.
4    Q. How about if we asked the question a
5 little differently to make it easier for you to
6 respond. What percentage of your clients that you've
7 had for InCompliance Solutions, including clients
8 that you got through Pharmatech and L-3, would you
9 say are medical device companies?
10    A. Fifty percent.
11    Q. And what were the other fifty percent?
12 How would you break that down?
13    A. Again, because one client can last a
14 very long time, right? So if you're talking eight
15 clients, or are you talking number of hours?
16    Q. I clarified my question. I said the
17 types of clients you have. And you said about fifty
18 percent of your clients are medical device
19 manufacturers. How would you classify the other
20 fifty percent of your clients?
21    A. Addressing it as you said now, I'm sorry
22 if I misspoke previously, about 70 percent of my
23 clients have been medical device and probably around
24 30 percent have been drugs or biologics.
25    Q. And those clients are drug or biologic

Page 227

1 manufacturers?
2    A. Yes.
3    Q. And none of them are API manufacturers?
4    A. No.
5    Q. And do you know what percentage of your
6 clients have received warning letters from FDA?
7    A. I have no idea.
8    Q. Okay.
9      MS. MILLER: I'm going to reserve the
10 rest of my time for, to go after Adam -- wait,
11 before -- before you go, Adam, I think we should
12 check to see if Teva or Torrent have any questions.
13      MR. RUBENSTEIN: This is Brian
14 Rubenstein from Greenberg Traurig representing the
15 Teva defendants. I have just a few questions for
16 Dr. Bain.
17 EXAMINATION BY
18 MR. RUBENSTEIN:
19    Q. Good evening, Dr. Bain. My name is
20 Brian Rubenstein and I'm with the law firm Greenberg
21 Traurig, and I represent the Teva defendants. I will
22 do my best to keep this brief. I think I only have a
23 few questions for you.
24      Are you familiar with the Teva
25 defendants and their role in this case?

Page 228

1    A. Familiar with them in what context?
2    Q. In the context of this case.
3    A. I know that Teva is involved in this
4 case.
5    Q. Is it your understanding that Teva is
6 involved in this case as a finished dose manufacturer
7 of Valsartan?
8    A. Yes.
9    Q. Earlier, I believe you testified that
10 you worked for Watson from 2003 to 2005, is that
11 right?
12    A. Yes.
13    Q. And are you aware that Watson is now a
14 part of Teva?
15    A. Yes.
16    Q. And you testified that while you were
17 with Watson, it was under a consent decree and a
18 warning letter for CGMP violations during the time
19 you worked there; is that right?
20    A. Yes.
21    Q. And to your knowledge, were any of those
22 CGMP violations that were the subject of the warning
23 letter or the consent decree related to Valsartan?
24    A. I do not know.
25    Q. To your knowledge, were any of the GMP

Page 229

1 violations that were subject of the warning letter
2 and the subsequent decree related to its
3 manufacturing facility located in Malta?
4    A. You're asking about the consent decree
5 and the warning letter? I don't know. I didn't look
6 into the consent decree or warning letter.
7    Q. Okay. And I know that Ms. Miller asked
8 you this earlier, but I just want to be clear. You
9 don't offer any opinions or criticisms of Defendants
10 Teva or Torrent in your report, do you?
11    A. No, I don't.
12    Q. And if called to testify at trial in
13 this matter, you don't intend to offer any criticisms
14 or opinions of Defendants Teva or Torrent, right?
15      MR. SLATER: Objection. She'll answer
16 whatever questions are asked of her.
17      You can answer the question.
18    A. That would depend on the question.
19    Q. But as you sit here today, there are no
20 criticisms of Teva or Torrent in your report that you
21 submitted.
22    A. I did not have any criticisms of Teva or
23 torrent in my report, that's correct.
24    Q. Have you seen any documents from the FDA
25 or any other regulatory agency deeming any of Teva's

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

1 finished dose Valsartan products adulterated?
2      A.    I don't remember specifically seeing
3 Teva's parts or lots being adulterated.  I don't
4 remember seeing.
5      Q.    Okay.
6           MR. RUBENSTEIN:  That's all the question
7 I have.
8           THE WITNESS:  I need to turn a light on
9 in my room here, it's getting dark.
10          (A pause in the proceedings.)
11          MS. MILLER:  Adam?
12          MR. SLATER:  Does anyone else have
13 questions?  Torrent?
14          A VOICE:  Nothing from Torrent, thank
15 you.
16          MR. SLATER:  All right, we'll take ten
17 and come back.
18          VIDEOGRAPHER:  The time is 3:10 p.m.
19 We're off the record.
20          (Recess taken.)
21          VIDEOGRAPHER:  The time is 3:32.  We're
22 back on the record.
23          (Continued on following page.)
24
25

Page 231

1 EXAMINATION BY
2 MR. SLATER:
3      Q.    Dr. Bain, I'm just going to go over a
4 couple of things with you.  And let me just figure
5 out my first question.
6           Do you have your report handy?
7      A.    Yes, I do.
8      Q.    Would you go to page 37, please.  The
9 very bottom.
10     A.    Okay.
11     Q.    This is a part of the report where you
12 talk about Dr. -- let me start over.  Looking at page
13 37 of your report, this is the part where you're
14 talking about testimony Peng Dong gave on behalf of
15 the company, correct?
16     A.    Yes.
17     Q.    Actually, the first thing that I want to
18 do is actually go to the top of page 37.  And do you
19 see where you summarize some testimony from Peng
20 Dong, and he confirmed that, in the context of the
21 DMF amendment to the zinc chloride process which
22 refers to applicable "laws and regulations" that
23 included the January 1, 2007 EMEA CHMP, which is the
24 European regulators' guideline applicable to
25 genotoxic impurities, and required "the risk

Page 232

1 assessment on genotoxic impurities"?
2      A.    Yes.
3      Q.    And you were asked some questions about
4 whether guidances and ICH, etc., were legally binding
5 and, in this context, when the company actually
6 applied those guidances and ICH guidelines, etc., at
7 that point, are they obligated as a matter of CGMP to
8 actually comply with them and fulfill the obligations
9 in those guidelines?
10     A.    Yes, they are.
11     Q.    And the failure to do so would be a GMP
12 violation, correct?
13     A.    Yes, it would.
14     Q.    And you can see in that same paragraph,
15 the last four lines, you agreed that the EMA
16 guideline also provided that "as low as reasonably
17 practical guidelines" would not apply to a structure
18 of very high concern, for example, N-Nitroso
19 compounds, and he could not say that the person
20 responsible for the risk assessment actually "paid
21 attention" to this provision, in terms of not having
22 thresholds for N-nitroso compounds.  You were aware
23 of that testimony, too, right?
24     A.    Yes, I was.
25     Q.    And then you look a little further down

Page 233

1 in the third paragraph on that page, you see where
2 Mr. Dong's testimony is summarized and he agreed that
3 the risk assessments performed by ZHP were also
4 governed by the FDA draft guideline, "Genotoxic and
5 Carcinogenic Impurities in Drug Substances and
6 Products:  Recommended Approaches."  So he had
7 confirmed that in his testimony as well?
8      A.    Yes.
9      Q.    And you can see at the end of that
10 paragraph, that he did confirm that ZHP was required
11 to reference scientific literature in performing the
12 risk assessment, do you see that?
13     A.    Yes, I do.
14     Q.    And if you hold that page and go back to
15 page 5, if -- not page 5, let me find it -- page 9,
16 you actually reproduced the stipulation that ZHP
17 entered into in this litigation on page 9 and 10 and
18 11, correct?
19     A.    Correct.
20     Q.    If we go to page 10, 3(a), it says in 3,
21 "ZHP states it was required to perform a risk
22 assessment in connection with the process change to
23 the zinc chloride process.  ZHP further states the
24 following."  And then in 3(a), "ZHP states that the
25 scientific research relied on to use DMF as part of

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

1 the zinc chloride process did not include scientific
2 research into the potential decomposition products of
3 DMF under the conditions of the zinc chloride
4 process."
5         Do you see that?
6     A.    Yes, I do.
7     Q.    And when you put that together with
8 Mr. Dong's confirmation that ZHP was required to
9 reference scientific literature in performing the
10 risk assessment, is it your opinion that ZHP violated
11 CGMP by failing to actually do the scientific
12 research into the potential decomposition products of
13 DMF under the conditions of the zinc chloride
14 process?
15    A.    Yes.
16    Q.    Let's go back to page 37.  And at the
17 very bottom, it states in your report that "Mr. Dong
18 testified to the varied NDMA levels seen
19 in the Valsartan API produced in the east and west
20 zones and Chuannan," that's C-h-u-a-n-n-a-n, "and
21 addressed the discussion in the TEA deviation
22 investigation report as to the factors impacting the
23 NDMA levels," and it goes on, do you see that?
24    A.    Yes, I do.
25    Q.    If you go to the next page at the top of

Page 235

1 the page, I just want to read a little more of that
2 paragraph.  In the second line it says, "Further, ZHP
3 confirmed that there was a 'lack of default
4 description in the production processes.'  Due to the
5 inaccurate description of some of the parameters in
6 the process, there might be likelihood of fluctuation
7 between different workshops or different batches
8 manufactured in the same workshop, which eventually
9 led to the difference in amount of residual
10 impurities...the residual amounts of NDMA in
11 Valsartan API batches."
12        Do you see that?
13    A.    Yes, I do.
14    Q.    So first of all, as you stated, you
15 found that this is in violation of GMP because there
16 was a failure to have consistent repeatable
17 manufacturing, correct?  That's your opinion?
18    A.    That's correct.
19    Q.    And also the fact that they were not
20 actually having consistent production conditions,
21 that raises questions as to the temperature applied.
22 Counsel asked you a lot of questions about
23 temperature but ZHP confirmed they didn't
24 consistently manage the production conditions which
25 would likely include the temperature and the time for

Page 236

1 which the process, different stages of the process
2 are carried forth, etc.  Right?
3     A.    That's right.
4     Q.    And in that context, you were asked
5 about Exhibit 4, which you don't have to pull up.  It
6 was the World Health Organization document from 2001
7 entitled, N,N-Dimethylformamide.  Remember you were
8 asked some questions about that?
9     A.    Yes, I remember.
10    Q.    And counsel asked you about parts.  I'm
11 going to ask you about page 15, under section 2.  I'm
12 just going to read this to you in the interests of
13 time.
14    A.    Okay.
15    Q.    It says, on page 5, at the bottom right,
16 under section 2, titled, "Identity and
17 Physical/Chemical Properties," the second half of the
18 first full paragraph, "DMF sold commercially contains
19 trace amounts of methanol, water, formic acid and
20 dimethylamine," do you see that?
21    A.    Yes, I remember seeing that.
22    Q.    And you saw that Dr. Hecht talked about
23 that in his deposition as well, correct?
24    A.    Yes, I saw that.
25    Q.    And did you see any indication that ZHP

Page 237

1 ever documented, either at the time or in their
2 deviation investigation reports, that they evaluated
3 the DMF they were buying to see if it came in with
4 dimethylamine already as an impurity of the DMF?
5     A.    I did not see any evidence of that.
6     Q.    So in your opinion, based on this
7 information, and all the information available to
8 you, should ZHP have been aware that the DMF could
9 come through the door with dimethylamine on it, and
10 wouldn't even need to be formed through degradation?
11    A.    That's correct.
12    Q.    You were asked a few questions about
13 whether you were qualified to provide certain
14 opinions.  Are you an expert on the legal standard
15 for being qualified to testify as an expert in this
16 case?
17    A.    No.
18    Q.    Okay in terms of what you did here and
19 what you documented in detail in your report, was the
20 evaluation and the methodology you applied in
21 performing that evaluation fully consistent with the
22 approaches that you take in your professional work
23 outside of this expert assignment, and fully within
24 your knowledge and expertise with regard to subjects
25 of quality, quality assurance, risk assessment, the

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1 points that you talk about in your report and you've
2 offered the opinions on?
3      A.   Yes, they are the same.
4      Q.   Can we go to page 5 of your report,
5 please.  Looking at the paragraph in the middle of
6 the page, a little more than halfway down that
7 paragraph, you write, "Guidance documents do not
8 establish legally enforceable rights or
9 responsibilities.  However, in practice, the guidance
10 is adopted by manufacturers and considered to be
11 binding.  21 CFR section 10.115(d)(2) states, "You
12 may choose to use an approach other than the one set
13 forth in the guidance document.  However, your
14 alternative approach must comply with the relevant
15 statutes and regulations.  FDA is willing to discuss
16 as alternative approach with you to ensure that it
17 complies with the relevant statutes and regulations."
18      Do you see that?
19      A.   Yes, I do.
20      Q.   So when you were asked during the
21 deposition the specific regulation that says what you
22 had testified to, that those guidelines may not be
23 legally enforceable at the outset, but once they are
24 applied, they become legally enforceable, is that the
25 section you were talking about in the CFR?

Page 239

1      A.   Yes, that is.
2      Q.   Okay.  And in terms of this, in this
3 context, just to give a few examples -- bear with me
4 for one second -- let's go to page 37.  That might
5 not be the page I wanted to go to.  Bear with me one
6 second.
7      (A pause in the proceedings.)
8      Q.   Ah, page 25, I apologize.  On page 25 of
9 this, of your report, you're talking about the
10 modules that are part of the DMF amendment that was
11 dated November 10, 2013, do you see that's the first
12 full paragraph?
13      A.   Yes, I do.
14      Q.   And was this the module that is titled,
15 "Impurities," where the DMF actually provides
16 information about the evaluation of impurities with
17 this zinc chloride process, correct?
18      A.   Yes, that's correct.
19      Q.   And you state in your report that this
20 module indicates on page 147 of 172 that the
21 application of the FDA draft guideline, "Genotoxic
22 and Carcinogenic Impurities in Drug Substances and
23 Products:  Recommended Approaches," is applicable to
24 the applications for existing active substances.  And
25 the module unequivocally states, on pages 148 to 149,

Page 240

1 that, "All the potential impurities were evaluated.
2 No high-potency genotoxic N-Nitroso compounds are
3 among the impurities and the impurities pose no
4 genotoxic risk in Valsartan."
5      Do you see that?
6      A.   Yes, I do.
7      Q.   First of all, this is confirming that
8 once again, in the DMF, that ZHP actually confirmed
9 that they applied and were obligated to conform to
10 that FDA draft guidance, correct?
11      MS. MILLER:  I'm going to object on the
12 ground that I thought Dr. Bain was the expert, not
13 Adam, and Adam has just provided about 15 minutes of
14 testimony.
15      MR. SLATER:  Thank you.
16      Q.   Looking at this as well, where it says
17 that all potential impurities were evaluated and no
18 high potency genotoxic N-Nitroso compounds are among
19 the impurities, and the impurities pose no genotoxic
20 risk in Valsartan, was that an accurate statement by
21 ZHP in its DMF that there were no N-Nitroso
22 compounds?
23      A.   It is not a true statement.
24      Q.   And in your opinion, is that the result
25 of the inadequate risk assessment that was performed

Page 241

1 up front and then on a continuing basis?
2      A.   Yes.
3      Q.   And then I'm not going to read the whole
4 thing but the next paragraph, does it have the same
5 language with respect to the TEA with sodium nitrite
6 quenching, DFM amendment 5, January 20, 2012?
7      A.   Yes, it does.
8      Q.   And are the opinions the same with
9 regard to the statements in that DMF module?
10      A.   Yes, they are.
11      Q.   Let's go to page 30 of your report,
12 please.  In the middle of the page where you're
13 talking about some testimony from Eric Gu, the third
14 paragraph says, "Mr. Gu was also asked about ICH
15 Q3(a) which was in effect as of 2006, and confirmed
16 that the ICH guidelines provided 'very important
17 principles that guided the development process.'  He
18 confirmed that section 3.1 required ZHP to summarize
19 the actual and potential impurities.  This summary
20 should be based on sound scientific appraisal of the
21 chemical reactions involved in the synthesis," etc.,
22 "impurities associated with raw materials that can
23 contribute to the impurity profile of the new drug
24 substance and possible degradation products."
25      And he agreed that dimethylamine was a

61 (Pages 238 - 241)

Page 242

1 possible degradation product of DMF as used in the
2 zinc chloride process, do you see that?
3    A.    Yes.
4    Q.    So first of all, did Mr. Gu, speaking
5 for the company, confirm that ICH Q3 applied to the
6 zinc chloride process?
7    A.    Yes, he -- he did agree.
8    Q.    And that would -- would that also apply
9 to the TEA with sodium nitrite process as well?
10    A.    Yes, it would.
11    Q.    And again, I'm picking out some
12 examples, did you take all this into account in
13 forming your opinions?
14    A.    Yes, I absolutely did.
15    Q.    And were you asked by counsel to list
16 every single ICH or guidance or any other source of
17 authority that you're relying on?  Do you have those
18 listed in the report?
19    A.    They are throughout the report.
20    Q.    When you were asked about whether the
21 risk assessment was adequate or not, and talked about
22 whether or not -- let me rephrase.  Let go to page
23 51.
24        Let me know when you're there.
25    A.    I'm there.

Page 243

1    Q.    At the bottom of page 51, the last
2 paragraph, you state, "In this connection, Mr. Du was
3 shown a draft of the deviation investigation report
4 which stated, 'Due to insufficient extent and depth
5 of process research at the early stage, as well as
6 insufficient study and understanding of potential
7 genotoxic impurities, only side reaction products and
8 degradation products were studied,' and was unaware
9 of the further reaction between degradation products
10 and raw material," do you see that?
11    A.    Yes, I do.
12    Q.    So this language didn't make it into the
13 final report, right?
14    A.    That's right.
15    Q.    But do you agree that ZHP conducted an
16 insufficient extent and depth of process research --
17    A.    I agree --
18    Q.    -- stage, as well as insufficient study
19 and understanding of potential genotoxic impurities?
20    A.    I do agree.
21        MS. MILLER:  Objection, again, Adam, to
22 your ongoing testimony.
23        MR. SLATER:  Thank you.
24    Q.    You were asked about whether or not the
25 NDMA or NDEA in the Valsartan was above or below a

Page 244

1 threshold percentage.  I think counsel quoted .1
2 percent, remember these questions?
3    A.    Yes.
4    Q.    When you offered your opinions in this
5 case, and is it actually discussed in your report,
6 that NDMA and NDEA are cohort of concern substances
7 that would not be subject to a threshold?
8    A.    Yes, I discussed it in my report.
9    Q.    You were asked about whether or not ZHP
10 intentionally sold their Valsartan with NDMA and NDEA
11 towards the end of defense counsel's questioning, do
12 you remember that?
13    A.    Yes.
14    Q.    Are you familiar with the July 27, 2017
15 e-mail that was testified about by Min Li when he
16 testified on behalf of the company?
17    A.    Yes.  I'm aware of that.
18    Q.    And according to Min Li's testimony,
19 where he was reading the e-mail and agreed that it
20 said that there was NDMA in Valsartan and it was
21 caused by the sodium nitrite quenching, you see that?
22    A.    Yes, see that.
23    Q.    At that point, once it was known to ZHP,
24 could there be any justification whatsoever for them
25 to consider to -- to continue to sell that Valsartan

Page 245

1 knowing there was NDMA in it and knowing how it was
2 being created through the sodium nitrite quenching?
3        MS. MILLER:  Objection, mischaracterizes
4 the document, mischaracterizes testimony.  Also, Adam
5 is continuing to testify.
6    Q.    You can answer.  Was there any
7 justification for ZHP to sell that Valsartan once
8 they knew that there was NDMA in the Valsartan and it
9 was caused by the sodium nitrite quenching?
10        MS. MILLER:  Objection.
11    Q.    You can answer.
12    A.    There was no justification for them to
13 sell Valsartan once they became aware of the
14 impurity.
15    Q.    And when Dr. Lin, who wrote the e-mail
16 of July 27, 2017, said that if a similar substance
17 was found in Irbesartan, that would be a serious CGMP
18 problem, you agree with that, right?
19    A.    I do agree with that.
20        MR. SLATER:  One second, stay on the
21 record.
22        (A pause in the proceedings.)
23        MR. SLATER:  I have no other questions.
24        MS. MILLER:  I need ten minutes.  Off
25 the record.

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

1        VIDEOGRAPHER:  Time is 3:55.  We're
2  going off the record.
3        (Recess taken.)
4        VIDEOGRAPHER:  The time is 4:20, we are
5  back on the record.
6  FURTHER EXAMINATION
7  BY MS. MILLER:
8      Q.    Mr. Slater spoke briefly about
9  temperature.  Are you aware of any evidence that DMF
10 ever reached the boiling point during the
11 manufacturing process for Valsartan?
12     A.    I'd have to go back and research that.
13 I don't know off the top of my head.
14     Q.    Are you aware of any evidence that ZHP
15 did not know the temperature of DMF during the
16 manufacturing process?
17     A.    I only know that there was testimony
18 saying that their processes were not in control.
19     Q.    Are you aware of any evidence that the
20 manufacturing took place at a temperature different
21 or higher than ▇▇ degrees?
22     A.    I haven't seen anything.
23     Q.    Are you aware of any evidence that the
24 DMF used in the manufacturing process by ZHP
25 contained dimethylamine when it was received from

Page 247

1  suppliers?
2      A.    I'm not aware.  I don't know that it was
3  tested for.
4      Q.    Did you ask Plaintiffs' counsel to
5  document to determine what ZHP did to confirm the
6  purity of the ingredients it received from suppliers?
7        MR. SLATER:  Objection, lack of
8  foundation.
9        You can answer.
10     A.    I did not ask for any documentation.
11     Q.    Did you ask Plaintiffs' counsel for any
12 certificates ZHP received from its DMF suppliers?
13     A.    No, I did not.
14     Q.    Have you ever worked with DMF as a
15 solvent?
16     A.    Not that I can recall.
17     Q.    Do you know whether a reasonable chemist
18 would test DMF provided by a supplier for
19 dimethylamine?
20     A.    I have no idea what a reasonable chemist
21 would do.
22     Q.    Adam read some portions of your report
23 to you, many portions of your report, but I'm just
24 going to focus on one that uses the term, "High
25 potency genotoxic."  Do you recall that?

Page 248

1      A.    Can you tell me what page --
2      Q.    I don't recall the page it was, but I
3  just wanted to know if you could tell me what the
4  term "high potency genotoxic" means.
5        MR. SLATER:  Objection.  That's actually
6  lack of foundation.  The phrase was -- that's not
7  complete.  You're not actually reading the complete
8  phrase.
9      Q.    Do you know what the phrase "high
10 potency genotoxic" means?
11       MR. SLATER:  Objection.  Same reason.
12     Q.    Is there a definition that you're
13 aware --
14       MR. SLATER:  I'm sorry, are you
15 withdrawing the prior question now and --
16       MS. MILLER:  Back to the same question,
17 Adam --
18       MR. SLATER:  So why while she's looking
19 for -- I'm sorry, while she's trying to work to
20 answer the question, badgering her with follow-up
21 questions is very confusing.
22       MS. MILLER:  When you say she's working
23 to answer the question, we had an agreement at the
24 beginning of this deposition that, if the witness was
25 going to look at any documents, she would tell me in

Page 249

1  advance.
2      Q.    So if you're currently looking at
3  documents, I need to know which ones they are.
4        MR. SLATER:  How would I know if she's
5  looking at documents?
6      Q.    -- when I asked you before if you were
7  looking at documents, you said no.  Are you currently
8  looking at a document?
9      A.    The only document I have up is my
10 report.
11     Q.    Okay.  And are you currently looking at
12 your report?
13     A.    My report is up but it's overlaid with
14 the gallery picture we have here.
15     Q.    Got it.  It looked like you were reading
16 something.
17     A.    No.
18     Q.    And seemed to suggest that you were
19 reading something.  And so my question to you was,
20 just to go back to it, are you aware of any
21 definitions of the term "high potency genotoxic?
22       MR. SLATER:  Objection, again.  It's a
23 partial phrase.  I'm not sure why you're not able to
24 ask the question with the actual phrase that I read.
25 I'm not understanding why you're asking half a phrase

Veritext Legal Solutions
800-227-8440                                                    973-410-4040

HIGHLY CONFIDENTIAL

Page 250

1 but I guess you can do it if you want.
2     A.    I am not aware of a specific location
3 for the definition of "high potency genotoxic."
4     Q.    Have you ever used those words before?
5     A.    During what time frame?
6     Q.    Ever.
7           MR. SLATER:  Doctor, you're allowed to
8 use your report.  Just because counsel is trying to
9 intimidate you into not doing it, I'm instructing
10 you, you're allowed to do it.  Please.
11          He's not the witness here, but I'd
12 appreciate if you would answer my question.
13          MR. SLATER:  What I'd appreciate is if
14 you didn't try to intimidate Dr. Bain from looking at
15 her report to find the words you're asking for, so
16 she can actually answer the questions in a reasonable
17 way.
18          MS. MILLER:  I'm so intimidating, Adam.
19          MR. SLATER:  When you ask questions with
20 partial phrases that are deliberately confusing, it's
21 not practically --
22          MS. MILLER:  Okay.  I thought you said
23 you wanted to finish up quickly.
24     Q.    Are you familiar --
25          MR. SLATER:  I didn't say that.

Page 251

1     Q.    -- with the term "high potency
2 genotoxic"?
3           MR. SLATER:  Objection, again.
4     A.    Am I familiar with that phrase?  Yes.
5     Q.    And what does it mean to you?
6     A.    A substance that could cause cancers.
7     Q.    Is there a difference between a
8 substance that's genotoxic and a substance that's
9 high potency genotoxic?
10    A.    I'm not -- I don't know the
11 differentiation between the two.  I mean...
12    Q.    Adam mentioned a 2017 e-mail in his
13 questioning, do you recall that?
14    A.    Yes.
15    Q.    And you're familiar with that e-mail?
16    A.    Yes.
17    Q.    Are you aware that e-mail is written in
18 Chinese?
19    A.    Yes.
20    Q.    Did you do anything -- did you read it
21 in Chinese or English?
22    A.    English.
23    Q.    And what was the e-mail about?
24    A.    Can we pull the e-mail up, please?
25    Q.    Well, Adam asked you questions about it

Page 252

1 without you having to pull it up and I'd just like
2 to --
3           MR. SLATER:  Argumentative.  Memory
4 test.  Completely inappropriate question.
5           I'm going to instruct you, Dr. Bain, if
6 you want to find it in your report where it's
7 discussed, you're allowed to do that to answer the
8 question even though counsel keeps interrupting you.
9 You're allowed to do that.
10    Q.    I haven't interrupted you a single time
11 today.  I'm asking you if you recall sitting here
12 today what the gist of the entire e-mail was about.
13    A.    The e-mail discussed the nitrosamine
14 formation, the potential -- again, I -- I would like
15 to pull up the e-mail so I get the verbiage correct.
16 And we could reference it in my report as well if you
17 can tell me the section where you're --
18          MR. SLATER:  Doctor, are you able to
19 search your report on your computer for words?
20          MS. MILLER:  Adam, you're interrupting
21 the witness and --
22          MR. SLATER:  I'm sorry, I'm talking.
23          MS. MILLER:  -- yes, you interrupted the
24 witness in the middle of a sentence.  It's highly
25 inappropriate and you know that.

Page 253

1           MR. SLATER:  She's asking --
2           MS. MILLER:  Please wait until she's
3 done answering and then you can talk.
4     Q.    You were in the middle of answering my
5 question.  I'd like to you continue your answer.
6 What were you saying?
7     A.    I'd like to look at the e-mail or have
8 you point to me in my report where you're discussing
9 this.
10    Q.    Do you recall whether the e-mail
11 references Irbesartan?
12    A.    Yes, it does.
13    Q.    Do you know what Irbesartan is?
14    A.    It's another drug.
15    Q.    Is Irbesartan the same molecule as
16 Valsartan or a different molecule?
17    A.    I don't know that answer.
18    Q.    Do you know -- do you recall whether the
19 e-mail references deacylated Valsartan?
20    A.    I don't recall.
21    Q.    Do you know what deacylated Valsartan
22 is?
23    A.    No, I don't.
24    Q.    Do you recall whether there was a patent
25 attached to the e-mail?

64 (Pages 250 - 253)

Page 254

1    A.    Patent attached?
2    Q.    Um-hum.
3    A.    I did not see a patent.
4    Q.    Did the e-mail reference an attached
5 patent?
6    A.    Again, if I could see the e-mail --
7    Q.    Do you recall?
8        MR. SLATER:  Before you ask the next
9 question, hold on, don't ask another question.  I'm
10 going to say something --
11    Q.    -- whether the e-mail --
12        MR. SLATER:  -- I'm sorry, Ms. Miller,
13 I'm trying to talk, and -- say something to the
14 witness before you ask another question.
15        Dr. Bain --
16        MS. MILLER:  You're -- what you call
17 instructing the witness is referred to generally as
18 coaching the witness.
19        MR. SLATER:  It's really not, because
20 she keeps asking to see the document and you keep
21 telling her, asking questions and blowing over --
22 Dr. Bain, if you want to see the document, find it
23 yourself, pull up your report, search within it and
24 find what you want and stop acting like she's in
25 charge of telling you what you're allowed to do.

Page 255

1 Please.
2    Q.    Do you recall whether there was a patent
3 attached to the e-mail?
4    A.    I don't remember.
5    Q.    Okay.  And do you recall whether there
6 was any reference to Impurity K in either the e-mail
7 or any attachment?
8    A.    I don't remember.  But I am going to --
9 you asked me to tell you when I'm going to pull
10 something else up, and I'm going to pull up that
11 e-mail.
12    Q.    Have you ever heard of Impurity K?
13        MR. SLATER:  I'm sorry, she said she's
14 going to pull up the e-mail so could you wait until
15 she's --
16        MS. MILLER:  My question doesn't
17 relate to that.  My question --
18        MR. SLATER:  She's busy pulling up the
19 document, so I don't want her to have to answer a
20 question while she's looking for a document.
21        MS. MILLER:  There's no pending question
22 about the e-mail itself.
23    Q.    I'm asking if you've ever heard of a
24 substance called Impurity K.
25        MR. SLATER:  Counsel, that's a

Page 256

1 completely misleading statement you just made.  You
2 know what you're doing.  She's allowed to look for
3 the document to answer further questions along this
4 line and you can't stop her like you're doing and
5 talking over her.
6        MS. MILLER:  I'm not talking over --
7 actually, Adam, the only person in the last ten hours
8 who has talked over anybody is you.
9    Q.    Do you know what Impurity K is?
10        MR. SLATER:  Doctor, first of all,
11 object to how you're proceeding.  If you need to look
12 at the document, you're allowed to.  And you don't
13 have to wait for permission and you don't have to
14 answer the question until you find what you want to
15 reference.  You're allowed to do that.
16        I'm not coaching the witness, I'm
17 letting her know what her rights are as a witness in
18 a deposition.  Every time she asks to see a document,
19 you bulldoze over her and you don't let her do it.
20        THE WITNESS:  I asked to be guided in my
21 report to the section you were speaking about.
22    Q.    I'm not speaking about any section of
23 your report so there's nothing I can point you to.
24 I'm just asking if you know what Impurity K is.
25    A.    I do not know what Impurity K is.

Page 257

1    Q.    Did you conduct any investigation of the
2 circumstances that led to this e-mail?
3    A.    No, I did not.
4    Q.    Did you do any research about the
5 chemical formulations that were included in the
6 e-mail?
7    A.    No, I did not.
8    Q.    Did you take any steps to evaluate the
9 chemical formulas that are that are set forth in the
10 e-mail?
11    A.    No, I did not.
12    Q.    Do you know whether the chemical
13 formulas set forth in the e-mail bear any
14 relationship to how NDMA was formed in Valsartan?
15    A.    No, I do not.
16    Q.    Did you ask to speak to anybody at ZHP
17 to understand the circumstances that led to the
18 e-mail?
19    A.    No, I did not.
20    Q.    Did you take any steps to determine
21 whether the translation you read of the e-mail was
22 accurate?
23    A.    No, I did not.
24    Q.    Did you take any steps that we didn't
25 discuss thus far to understand the e-mail?

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

1        MR. SLATER: Objection.
2        You could answer.
3    A.    Did I take -- the question was did I
4 take any other steps to understand the e-mail?
5    Q.    Understand the context of the e-mail.
6    A.    I discussed it with counsel.
7    Q.    Did you ever ask counsel for the patent
8 that was attached to the e-mail?
9    A.    No, I did not.
10    Q.    Do you recall whether Jucai Ge testified
11 in 2022 about the meaning of the e-mail?
12    A.    Can you spell the name, please?
13    Q.    J-u-c-a-i, G-e.
14    A.    Want to give me a chance to look through
15 my report?
16        (A pause in the proceedings.)
17    A.    I'm sorry, you said the spelling was
18 J-u-c-a-i, correct?
19    Q.    Um-hum, G-e.
20    A.    What specifically did you --
21    Q.    Do you recall whether she testified in
22 2022 about the interpretation of the e-mail?
23    A.    I'd have to read this testimony that she
24 gave in its entirety, if you'll give me time to do
25 that.

Page 259

1    Q.    I'm just asking if you recall whether or
2 not she testified about interpretation of that e-mail
3 in her 2022 deposition.
4    A.    I don't recall without, again, going
5 through my report.
6    Q.    Does your report quote or reference
7 Jucai Ge's 2022 deposition in which she describes
8 what her understanding of the e-mail is?
9    A.    Again, I'd have to go through my whole
10 report and look to see if I have a reference to that.
11    Q.    Would you have to go through your whole
12 report, or would you just have to go through the
13 portion of your that refers to Jucai Ge's deposition?
14    A.    I'd have to go through my whole report
15 to ensure that I hadn't discussed it in some other
16 area other than under her testimony.
17    Q.    So short of reading all 76 pages of your
18 report, you can't tell me right now whether Jucai Ge
19 testified in 2022 about her understanding of this
20 e-mail?
21    A.    I don't remember, no.
22    Q.    Okay.
23        MS. MILLER: I'm going to reserve the
24 rest of my time in the event Adam has further
25 questions.

Page 260

1        Justin, how much time do we have?
2        VIDEOGRAPHER: Just off the record to
3 add it all up --
4        MS. MILLER: Let's go off the record.
5        VIDEOGRAPHER: Time is 4:37, we're off
6 the record.
7        (Discussion off the record.)
8        MR. SLATER: I have no other questions.
9 We're done.
10        MS. MILLER: I have one final question.
11        MR. SLATER: I thought you had just
12 closed your record. We're done.
13        MS. MILLER: I have one final question.
14        VIDEOGRAPHER: The time is 4:38, we're
15 back on the record.
16 BY MS. MILLER:
17    Q.    How many computer screens do you have
18 before you today?
19    A.    Two.
20    Q.    What's on the other screen?
21    A.    I have, one screen has up my report, the
22 other screen has up my list of folders.
23    Q.    And were there times today when you
24 turned to that other screen and read materials from
25 it without telling me?

Page 261

1    A.    No. I only have the list of folders.
2 There was nothing to read.
3    Q.    The other screen that you have, next to
4 that screen, the one that you're looking at right
5 now?
6    A.    Has my report.
7    Q.    Did you look at that screen at all
8 today?
9    A.    Did I ever look at it? I looked at the
10 screen today, of course.
11    Q.    Could you identify for me the times when
12 you looked at your other computer screen?
13    A.    I'm going to tell you I've moved my
14 report back and forth, because there's times
15 you're -- because I have a gallery view, sometimes
16 you are in one place, sometimes you're in another
17 place. And so I have to move the display so that I
18 could see you.
19    Q.    At the beginning of your deposition, did
20 you tell me that you had two monitors in front of you
21 today?
22    A.    I wasn't asked.
23    Q.    When I asked you at the beginning of the
24 deposition what was in front of you, you said there
25 was just one screen with the deposition on it.

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

1          MR. SLATER: Objection, lack of
2   foundation. Mischaracterization. Come on. Is this
3   really what we're doing now? Go ahead, you do it,
4   Jessica. Go ahead.
5          A.   I do not remember testifying that there
6   was only one screen in front of me, ever.
7          Q.   On your second screen that I didn't know
8   about until two minutes ago --
9          MR. SLATER: Objection.
10         Q.   -- can you --
11         MR. SLATER: Really out of line.
12         Q.   -- can you let me know everything that
13  was on that second screen today?
14         A.   Yes.
15         MR. SLATER: One second. Objection,
16  lack of foundation, mischaracterization.
17         You can answer, Dr. Bain.
18         A.   I will say there was one other thing
19  that was up earlier and that was the company who
20  pulls up documents for us. I've had that screen up
21  during the time that we were using the -- their
22  services -- their services.
23         Q.   There was a point in the deposition when
24  you looked toward your second screen and I asked if
25  you were reading a document and you said you weren't.

Page 263

1   What were you doing at that point when you were
2   looking over at your second screen?
3          MR. SLATER: Objection. Come on.
4   Argumentative, harassing.
5          You can answer, Dr. Bain. You can
6   answer the accusation from counsel.
7          A.   I was not looking at any documents. I
8   had no other documents open. I had my report and I
9   had two screens as I said. One has the report. The
10  other has my list of files and for most of the time,
11  it also had up the company's documents system, when
12  you were going to display documents. I don't
13  remember what their name is, Novak or something.
14         (Continued on following page.)
15
16
17
18
19
20
21
22
23
24
25

Page 264

1          Q.   So is it your testimony that, when you
2   were looking at your second screen earlier today, and
3   I asked if you were reading anything, that you were
4   not actually reading anything?
5          A.   I was not actually reading anything.
6          MS. MILLER: I'm finished. Have a good
7   evening.
8          MR. SLATER: You have a good evening,
9   too, Jessica. Have a nice night. 'Bye, everybody.
10  We're out.
11         VIDEOGRAPHER: The time is 4:41. We're
12  off the record.
13         (Time noted: 4:42 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 265

1          C E R T I F I C A T E.
2          I, DAVID LEVY, a certified court
3   reporter and notary public of the State of New
4   Jersey, certify that the foregoing is a true and
5   accurate transcript of the stenographic notes of the
6   deposition of said witness who was first duly sworn
7   by me, on the date and place as hereinbefore set
8   forth.
9          I FURTHER CERTIFY that I am neither
10  attorney, nor counsel for, nor related to or employed
11  by, any of the parties to the action in which this
12  deposition was taken, and further that I am not a
13  relative or employee of any attorney or counsel in
14  this place, nor am I financially interested in this
15  case.
16         IN WITNESS WHEREOF, I have hereunto
17  set my hand this 2nd day of February 2023.
18
19
20
21
22  DAVID LEVY, CRR, RPR, CLR
23  LICENSE NO. 30X100234000
24
25

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

Page 266

```
 1        J U R A T / E R R A T A
 2  I have read my testimony in the foregoing transcript
 3  and believe it to be true and correct with the
 4  following changes:
 5  PAGE  LINE      FROM         TO
 6  ____|____|_____|_____
 7  ____|____|_____|_____
 8  ____|____|_____|_____
 9  ____|____|_____|_____
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20  _____  _____
21  WITNESS SIGNATURE          DATE
22  Subscribed and sworn to before me
23  this _____ day of _____, 20_____
24
    Notary Public of the
25  State of_____.
```

68 (Page 266)

HIGHLY CONFIDENTIAL

**[& - 2018]**                                                          Page 1

| & | | |
|---|---|---|
| **&** 2:5 3:8,13,18 4:8 | | |

| 0 | | |
|---|---|---|
| **0.1** 208:25 209:9,17 210:9 210:14,17,25 | | |
| **0.3** 191:2 | | |
| **07068** 2:6 | | |
| **08** 191:3 | | |
| **08540** 2:22 | | |

| 1 | | |
|---|---|---|
| **1** 5:18 7:3 13:10,11 22:15 22:15 40:2 100:2 126:20 126:24 231:23 244:1 | | |
| **1/29/23** 5:25 95:24 | | |
| **10** 152:18,19 153:16 154:1 154:15 233:17 233:20 239:11 | | |
| **10.115** 238:11 | | |
| **10/31/22** 5:19 13:12 | | |
| **1000** 2:10 | | |
| **10022** 3:19 | | |
| **103** 2:5 | | |
| **107** 5:15 | | |
| **109** 5:19 13:12 | | |
| **1099** 51:25 52:1 | | |

**1099s** 48:2
51:23 52:1
**10:26** 124:20
**10:43** 124:25
**11** 233:18
**1100** 2:17
**11:03** 135:5
**11:05** 135:8
**11:11** 139:9,12
**11:55** 140:2,6
**12** 1:20
**13** 5:18 150:18
176:8
**133** 6:6
█████████
**1440** 3:9
**147** 239:20
**148** 239:25
**149** 239:25
**15** 236:11
240:13
**150** 6:9
**150,000** 42:7
**1515** 2:17
**15219** 3:14
**16** 150:19
151:10
**169** 152:17,18
152:18
**170** 152:17,18
**1717** 3:4
**172** 239:20
**18** 218:19
**1865** 80:6

**19102** 2:17
**19103** 3:4
**1970s** 25:19
**1975** 25:21
**1978** 131:4,5
**1985** 36:10
58:16
**1988** 37:9
**1990** 26:25
27:3
**1993** 59:14
**1994** 25:2
**1996** 22:3
**1999** 22:3
**1:05** 179:9
**1:19** 1:6
**1:24** 179:13

| 2 | | |
|---|---|---|
| **2** 5:22 13:14 40:5 95:18,22 96:25 97:14 100:2,2,4,5 132:7 134:22 215:13,14 236:11,16 238:11 | | |
| **20** 225:11 241:6 266:23 | | |
| **20-22** 225:11 | | |
| **20005** 3:9 | | |
| **2001** 236:6 | | |
| **2002** 14:3 | | |
| **2003** 14:4 15:22 17:19,19 17:19 31:5,10 | | |

31:16 32:4,19
32:25 33:3
228:10
**2005** 17:20
228:10
**2006** 241:15
**2007** 231:23
**2008** 88:14
**2010** 103:8
172:11,14,18
173:3,7,13
174:9,16 175:5
176:5,8 177:16
**2011** 83:8,17
84:12 85:3,13
87:25 88:10,21
89:3 100:19
137:21 151:24
**2012** 241:6
**2013** 124:12,13
137:21 239:11
**2014** 161:20
197:10
**2015** 204:19
**2016** 175:17
**2017** 177:8
244:14 245:16
251:12
**2018** 89:6,16
93:24 98:13
101:19,20
103:8 109:4,10
109:16 123:16
123:19 172:11
172:14,18

[2018 - 678-553-7392]                                                                 Page 2

173:20 175:17
176:5,9 177:16
187:2 190:6,13
190:20 197:10
**2019**  56:2
93:25 110:24
**2020**  34:1,4
**2021**  33:25
**2022**  12:21
32:12 47:10,25
50:2 51:6,13
51:19,20 55:5
62:7 258:11,22
259:3,7,19
**2023**  1:12,21
7:2 76:23
95:21 265:17
**21**  2:22 142:13
225:11 238:11
**210**  142:8,10,14
**211**  142:8,10,14
**212-371-7134**
3:10
**212-909-3344**
3:20
**2220**  4:3
**227**  4:9 5:4
**230**  4:3
**231**  5:5
**24**  152:17,18,18
218:19
**245**  150:17,18
**246**  5:6
**25**  239:8,8

**250**  2:13
**2525**  2:10
**267-435-1300**
2:18
**27**  244:14
245:16
**28202-2601**  4:9
**2875**  1:3,6
**29**  95:21 149:7
**29th**  96:4
**2:15**  134:23
**2:19**  212:16
**2:41**  212:21
**2nd**  265:17

| 3 |
|---|

**3**  6:3 86:14
96:25 97:15
98:12,14
103:21 106:5
108:19,20
124:21 225:3,6
226:8 233:20
233:20,24
**3.1**  241:18
**30**  32:21 58:4
66:14 220:11
226:24 241:11
**301**  3:14
**305-445-2500**
2:11
**30th**  98:13
**30x100234000**
265:23
**31**  1:12

**312-566-4801**
4:4
**31st**  7:2
**33134**  2:10
**35**  208:23
209:7
**350**  136:9,13,22
138:14 139:2
**37**  231:8,13,18
234:16 239:4
**38th**  3:14
**3:10**  230:18
**3:32**  230:21
**3:55**  246:1

| 4 |
|---|

**4**  6:6 96:25
97:15 108:20
125:1 133:16
133:17 150:19
151:11 179:10
236:5
**4/5/21**  6:10
150:9,12
**40**  66:14
220:11
**400**  3:4
**412-263-4397**
3:15
**48**  5:9
**483**  19:9 20:22
20:22,23,25
21:2,9,16 29:6
36:2 148:6
**483s**  56:24
172:21

**4883**  265:21
**49**  5:10
**4:20**  246:4
**4:37**  260:5
**4:38**  260:14
**4:41**  264:11
**4:42**  264:13

| 5 |
|---|

**5**  6:9 108:20
150:7,8,13
179:14 212:17
233:15,15
236:15 238:4
241:6
**5.1**  91:20
**5.60.10**  208:22
**50**  58:4
**51**  242:23
243:1
**510**  55:13

| 6 |
|---|

**6**  133:20 136:2
136:8 212:22
**60**  15:15
135:11
**600**  4:9
**601**  3:19
**60606**  4:4
**609-924-0808**
2:23
**63**  5:11,12,13
**66210**  2:14
**678-553-7392**
3:5

**6:45** 1:13,21
7:2

**7**

**7** 5:3 214:1
**70** 15:15
226:22
**704-444-3300**
4:10
**73** 150:24
**74** 150:19
151:10 152:11
**75** 47:14
150:19 151:11
151:12
**76** 25:21
150:24 259:17
**7:38** 40:1
**7:52** 40:4

**8**

**8** 98:11 157:2
**8/30/18** 6:4
98:15
**8101** 2:13

**9**

**9** 153:15 154:1
154:15 233:15
233:17
**913-385-9400**
2:14
**94** 5:14
**95** 5:22
**973-228-9898**
2:6

**98** 6:3
**9:01** 86:10
**9:21** 86:13

**a**

**a.m.** 1:13 7:2
139:12 140:2
**able** 9:22 68:3
102:23 135:3
135:10 155:16
193:23 195:19
217:4,21
221:25 249:23
252:18
**above** 1:17
243:25
**absolutely**
16:15 17:7
242:14
**acceptable**
158:23 170:22
213:2
**acceptance**
213:7
**accepted** 103:8
103:17
**access** 126:15
126:17
**accidentally**
34:12
**accompany**
119:18
**accomplished**
163:23
**account** 242:12

**acculab** 46:9,16
53:6,16 224:2
**accurate** 14:1
240:20 257:22
265:5
**accusation**
263:6
**accused** 34:21
**acid** 236:19
**acting** 254:24
**action** 29:19,25
30:3,4 115:13
173:5,10,13,24
174:11,16,20
205:19,22,24
206:1,3 265:11
**actions** 29:21
115:10 172:19
**active** 34:11
239:24
**actual** 12:13
15:11 102:22
114:14 138:4
174:5 191:4
193:9 241:19
249:24
**actually** 19:23
45:20 48:23
52:21 67:23
71:14,15
102:18 108:10
113:18 142:13
151:2,4 195:8
195:11 209:4
231:17,18

232:5,8,20
233:16 234:11
235:20 239:15
240:8 244:5
248:5,7 250:16
256:7 264:4,5
**adam** 2:4 8:24
48:20 49:23
64:10,19,19
65:22 70:17
99:23 117:18
127:18 150:24
151:7 223:8
224:12 227:10
227:11 230:11
240:13,13
243:21 245:4
247:22 248:17
250:18 251:12
251:25 252:20
256:7 259:24
**adam's** 9:3,15
12:11,17
224:20
**add** 260:3
**added** 94:8
132:9,10
220:11
**additional**
97:11 219:7
**additionally**
180:9
**address** 80:7
111:18 116:2
159:14 163:12

[address - allowed]                                                    Page 4

| | | | |
|---|---|---|---|
| 166:15,17 | **adulterated** | **afnan** 215:19 | **agreement** |
| 175:20,25 | 74:22 198:10 | 215:21 | 224:10 248:23 |
| 182:12,13 | 198:16,20,23 | **afnan's** 216:11 | **ah** 239:8 |
| 186:11 188:24 | 199:5,10,12,18 | 216:16 | **ahead** 48:9 |
| **addressed** | 199:22,24 | **age** 25:17 | 61:9 64:15 |
| 138:3 149:21 | 200:1,12,18,25 | **agency** 29:19 | 71:1,22 81:8 |
| 155:18 164:15 | 201:2,10,17,20 | 29:25 30:3,4 | 107:6 108:15 |
| 176:14 177:24 | 203:10,18,25 | 99:7 149:16 | 109:23 118:7 |
| 178:16 182:19 | 204:5,8,10,13 | 229:25 | 122:13 137:24 |
| 182:20 199:14 | 204:23 213:9 | **agency's** 106:6 | 147:19 151:16 |
| 234:21 | 213:15,18 | 147:8 | 156:19 160:23 |
| **addresses** | 230:1,3 | **ago** 15:21 | 163:8 177:1 |
| 132:4 137:2 | **adulteration** | 25:22 50:23 | 183:12,13 |
| 159:8 | 75:25 | 91:25 184:15 | 195:9,12 |
| **addressing** | **advance** 69:16 | 206:14 219:12 | 200:21 221:6 |
| 184:24 226:21 | 249:1 | 262:8 | 262:3,4 |
| **adequacy** | **advanced** | **agree** 62:10,11 | **al** 6:7 133:18 |
| 162:12 | 91:18 99:6 | 87:7 91:17 | **albertson's** 4:7 |
| **adequate** | **adverse** 39:12 | 107:10 111:24 | **alert** 172:21 |
| 103:19 119:15 | **advised** 72:24 | 112:12 118:15 | 174:1,3,7 |
| 119:23 120:2,5 | 74:10 171:14 | 127:16 140:17 | **alex** 13:22 |
| 120:14,19 | 171:15 | 147:15,20,22 | 95:19 96:10 |
| 162:21 163:19 | **advisement** | 168:2,9 223:6 | 99:19 104:15 |
| 164:9 169:9 | 164:5 | 242:7 243:15 | 150:12,15 |
| 170:24 180:9 | **advisory** | 243:17,20 | **alfano** 3:13 |
| 180:14 182:8 | 142:18 | 245:18,19 | **ali** 215:19,21 |
| 187:24 188:2 | **affairs** 17:22 | **agreed** 62:13 | 216:11,16 |
| 206:1,3 242:21 | 17:23 21:4 | 62:21 149:24 | **allegedly** 158:2 |
| **adequately** | **affect** 82:14 | 232:15 233:2 | **allow** 213:11 |
| 179:19,23 | 105:9 109:2 | 241:25 244:19 | 223:4 |
| 180:15 186:10 | 138:4,16 189:2 | **agreeing** 34:25 | **allowed** 44:23 |
| 192:17 | 204:3,5,8 | 56:25 63:2 | 48:13 66:11 |
| **adopted** 145:15 | 219:1 | 71:25 72:6 | 94:17 117:25 |
| 238:10 | **affected** 219:4 | 222:20 223:4 | 126:15 128:2 |
| | | | 159:1 200:7 |

**[allowed - antihemophilic]**                                             Page 5

250:7,10 252:7
252:9 254:25
256:2,12,15
**allows** 41:9
**aloud** 104:17
**alpha** 26:2,9,14
26:22 27:3
37:11,22 39:2
39:8
**alternative**
238:14,16
**ambiguous**
71:12 169:17
208:8
**amendment**
187:16 231:21
239:10 241:6
**amendments**
185:7 186:6
**amine** 144:15
144:19
**amount** 52:2
54:14 235:9
**amounts**
235:10 236:19
**analysis** 105:16
116:18 119:13
149:18 156:4
169:5 182:17
**analytical**
188:12
**anda** 16:7
157:3 185:19
**anda's** 96:22

**andas** 111:9,15
185:25 186:3
**annual** 91:20
**answer** 8:16
36:24 48:7,9
48:11,16 49:1
49:14,17 63:9
64:15 66:7
70:18,20 71:13
72:14 77:3
79:14 80:9
81:5,25 82:10
82:16,23 83:11
84:6 89:14,19
89:23 90:13
91:3,4,22
92:16 94:19,23
94:25 95:3
100:11 101:2
101:25 102:3
103:6,9,15
105:1,12,21
107:6,14,18
108:9,11,12
109:21 110:20
111:4,21 112:4
112:16,20
113:7 114:12
116:11,15
117:16 118:1,4
118:7,24 119:5
119:20,25
120:7 121:1,7
122:8,22
123:11 124:2

124:15 125:25
127:4,19 128:2
128:11,17
129:9,11 130:6
130:8,15,23
136:24 138:9
139:4 141:2,20
142:3 143:10
144:10 145:9
145:21,23
146:9 148:1,11
148:24 151:24
152:19,24
156:8,23
158:15 160:25
162:16 163:25
164:11,21
165:11,13
166:1,7,12
167:12,25
168:6,13,23
169:11,18
170:16,21
171:22 174:13
174:23 176:19
176:24 177:11
177:18 178:5
178:10 179:24
180:2,25
181:14 187:6
187:23 188:7
188:23 189:16
189:21 190:10
190:18 192:23
193:5 195:7,25

197:6,24 199:7
200:21 201:5
201:13 202:23
203:13,21
205:8 206:17
208:11 212:8
213:17 217:21
218:11 219:3
221:3 224:11
229:15,17
245:6,11 247:9
248:20,23
250:12,16
252:7 253:5,17
255:19 256:3
256:14 258:2
262:17 263:5,6
**answered**
110:20 156:7
156:22 168:21
197:4,5 203:13
221:2
**answering**
71:19 83:24
156:12 166:8
200:5 253:3,4
**answers** 31:22
**antibiotics**
28:11,15 34:12
**anticipated**
104:18,23
105:8
**antihemophilic**
27:6

**anybody**  63:15
  63:17 187:11
  256:8 257:16
**anymore**  166:9
**anyway**  52:2
**api**  16:10 17:13
  103:8 104:20
  104:24 105:9
  109:11 113:21
  113:24 114:9
  116:5,9 119:15
  119:22 120:4,8
  120:14 121:2,9
  122:6,16
  123:21 124:3,4
  124:6 142:10
  142:14 157:17
  157:20 158:7
  162:24 172:8
  198:23 203:16
  203:23 204:22
  206:9,23
  210:16 225:12
  227:3 234:19
  235:11
**apis**  114:14
  120:11 142:16
  157:23 158:4
  177:10
**apologize**  7:20
  87:19 137:12
  239:8
**appealing**  35:7
**appearances**
  2:2

**appears**  113:5
**applicable**
  146:14 231:22
  231:24 239:23
**applicant**  167:9
  167:21
**application**
  239:21
**applications**
  104:3 106:11
  239:24
**applied**  232:6
  235:21 237:20
  238:24 240:9
  242:5
**applies**  158:7
**apply**  142:10
  142:14 157:17
  157:20 158:3
  167:5 179:19
  179:23 232:17
  242:8
**appraisal**
  241:20
**appreciate**
  72:19 250:12
  250:13
**approach**
  238:12,14,16
**approached**
  198:16
**approaches**
  233:6 237:22
  239:23

**appropriate**
  48:21 64:10
  74:11 196:7
  205:1,11,15
**appropriately**
  163:23
**approval**  44:7
  44:8 153:3
  189:25
**approved**  71:2
  194:5 201:6
  208:1,2
**approving**
  120:20
**approximate**
  66:12,13
**approximately**
  1:21 15:13,25
  36:10 42:7
  50:5 51:5
  62:19,20 65:18
  66:4 87:17
  91:19 176:8
**apps**  9:17
**apr**  198:10
**april**  12:21
  62:7 66:4
  123:16,19
**arch**  3:4
**area**  15:1 25:21
  54:2,2,17,18,19
  54:19,21 55:3
  55:9 64:3,4
  79:17 83:6
  120:8,22

  259:16
**areas**  52:23,24
  159:20 174:25
  181:24 193:10
**argument**
  163:2
**argumentative**
  36:21 61:6
  79:13 95:16
  129:8,15
  135:18 160:21
  206:16 217:20
  252:3 263:4
**arps**  3:8
**arriving**  23:5
**article**  6:6
  80:25 81:17
  131:23 132:11
  132:12,15
  133:5,7,9,10,12
  133:15,16,17
  134:6,8,11,17
  134:19,21,24
  135:1,11,14,24
  137:1,10 138:6
  138:13
**articles**  80:23
  81:17 132:14
  132:16,21
  181:11,13,17
  218:4,6
**aside**  63:16
  175:3
**asked**  28:2 33:5
  33:15 68:6,10

70:17 86:24
87:8,12 90:8
90:18,23 94:15
95:7 117:11,21
118:2,5,5
128:9 149:13
149:24 156:7
156:16,17,19
156:21 159:2
165:11 197:3
203:12 217:21
221:1 222:23
226:4 229:7,16
232:3 235:22
236:4,8,10
237:12 238:20
241:14 242:15
242:20 243:24
244:9 249:6
251:25 255:9
256:20 261:22
261:23 262:24
264:3
**asking**  11:21
12:16 18:13
44:18 48:6,10
61:8,10 63:22
64:7 70:8,13
71:2,4,14
79:16 82:5
85:19 86:21
87:2,4,13
100:1,3 117:4
117:21 118:3
120:15,16

122:1,10
123:21 126:4
127:8,10 128:9
128:20 137:6
141:3 152:22
160:13 173:21
174:4 192:10
192:14 193:16
194:25 195:22
195:23 196:12
203:3 204:14
209:14 210:1,4
210:23 211:18
214:3 229:4
249:25 250:15
252:11 253:1
254:20,21
255:23 256:24
259:1
**asks**  117:24
256:18
**aslater**  2:7
**assess**  56:14
105:17 118:11
120:9 134:2,12
178:11 180:15
181:3,6,9,11,17
181:19 190:12
192:18 206:1
**assessed**  178:18
199:14,17
**assessing**  143:6
154:4 213:23
**assessment**
54:4 56:7

112:13 118:9
118:25 119:2,6
119:9,10,15,19
119:23 120:1,4
120:13,18,21
120:23 143:13
143:16,20
144:22,22
145:16 158:20
163:12,13,16
163:18 164:2,7
164:9 168:17
169:2,8 178:8
178:20,23
179:1,4 180:10
180:12,17
181:19,21,25
182:16,16
186:11 187:15
187:20,25
188:3,8 189:5
189:25 232:1
232:20 233:12
233:22 234:10
237:25 240:25
242:21
**assessments**
120:9 159:8,9
186:8 192:6
193:7,11,12,14
193:17,18
233:3
**assignment**
237:23

**assist**  63:17
**assistant**  42:1
**assistants**  75:9
**associated**
149:21 154:2
241:22
**associates**
45:13,14
**association**
33:20
**assume**  20:4,22
38:24 46:18
70:11 82:8
86:21 87:1
101:4
**assumption**
23:6
**assurance**
17:25 18:2,3
237:25
**assuring**  91:11
**attached**
253:25 254:1,4
255:3 258:8
**attachment**
255:7
**attempt**  161:5
**attempted**
154:17
**attempts**
141:24
**attention**
232:21
**attorney**  63:16
63:16,17

[attorney - based]                                                                    Page 8

265:10,13
**audit**  39:3,5
  46:8 52:15,21
  54:10,17,22
  55:8 56:7 74:6
  115:16 119:19
  176:2 177:8,15
  223:16,23,25
  224:21 225:8
**audited**  39:4
  52:5,10,13
  55:3,10 175:23
**auditing**
  113:13 114:22
  115:5 163:11
**audits**  14:23
  47:2,2 53:20
  113:14 115:6
  175:14,16
  176:4,4,12,16
  177:14,19,22
  177:24 178:3
**august**  98:13
**authorities**
  39:5 175:4
**authority**
  242:17
**available**  87:25
  88:9,21 89:3,7
  100:13 101:8
  110:1 124:13
  124:15 126:1,8
  180:16 237:7
**avenue**  3:9,19

**average**  42:16
  43:20,20,21
**aware**  23:3,22
  34:10,21 44:10
  67:16,18 89:25
  92:5,9 93:23
  109:15 124:4
  130:18 175:8
  175:11,15,22
  175:24 176:2,3
  176:7,10 177:7
  197:9,12,13
  208:22 209:6
  219:24 228:13
  232:22 237:8
  244:17 245:13
  246:9,14,19,23
  247:2 248:13
  249:20 250:2
  251:17
**awfully**  69:23
  81:6

### b

**b**  1:4 4:2,7 7:11
  140:3 142:8,10
**back**  15:17,20
  16:24 17:24
  36:15 40:5
  46:14 49:18
  50:4 54:24
  55:2 59:1
  62:17 75:23
  81:7 86:14
  88:13 92:4,12
  93:15 96:15

102:17 110:14
110:15 112:6
117:6,12,15,25
118:3,3 125:1
126:12 130:9
131:10 132:6
132:13 134:18
135:9 140:7
142:15 149:1
152:21 155:11
159:10 160:1
165:25 166:8
166:13 168:8
173:15,25
174:5 176:25
179:14 181:15
182:3 183:16
184:19,21
185:1,3,17
186:17,21
204:16 208:14
208:17 212:8
212:22 215:13
219:18 220:6
230:17,22
233:14 234:16
246:5,12
248:16 249:20
260:15 261:14
**backdrop**  41:1
41:11,12
**background**
  13:15 121:4
  158:10 163:3
  163:10 216:2

**bad**  22:20
**badgering**
  248:20
**bain**  1:11 5:3
  5:17,18 6:2 7:4
  8:1 13:11,12
  36:20 62:3,5
  77:4 95:22
  98:14 100:7
  130:5 133:17
  150:8 171:22
  197:7 223:7
  227:16,19
  231:3 240:12
  250:14 252:5
  254:15,22
  262:17 263:5
**bain's**  13:9
**balanced**
  154:10
**bandage**  56:13
**based**  49:24
  79:21 80:23
  81:13,17 82:1
  85:6,7,9 88:3
  88:15 100:17
  113:4 129:3
  145:11,13
  151:25 158:9
  168:16 169:1,8
  170:11 199:4
  199:20,21
  206:11 237:6
  241:20

**[basics - briefly]**                                                       Page 9

| | | | |
|---|---|---|---|
| **basics** 85:22 | 3:12 41:4 | **best** 45:4 54:15 | **block** 117:25 |
| **basis** 66:18 | 231:14 244:16 | 91:3 131:9 | **blowing** 254:21 |
| 102:21,22,23 | **belief** 84:11 | 227:22 | **board** 33:14 |
| 125:5,8 126:5 | **believe** 17:25 | **better** 126:17 | **bobber** 2:21 |
| 159:25 160:7 | 25:13 32:16,23 | 152:25 153:21 | **body** 134:1 |
| 160:18 161:1 | 37:3 40:11 | 160:25 | **boiling** 82:25 |
| 161:15 171:24 | 55:6,22 61:12 | **beyond** 30:6 | 83:3,4,9,18 |
| 198:22 201:16 | 62:15 76:5 | 74:8 158:12,17 | 84:12,19,24 |
| 241:1 | 78:5 79:9 | **bgv** 175:11 | 85:4,12 131:12 |
| **batch** 191:24 | 88:11,14,19 | **bigger** 99:18 | 246:10 |
| 192:1,8,16,24 | 89:11 100:8,12 | 151:14 | **book** 62:4 |
| 193:2,2,13,24 | 110:6 111:17 | **billion** 91:20 | **bosick** 3:13 |
| 194:3,5,5,10,15 | 114:24,25 | **bily** 4:13 7:5 | **bother** 224:14 |
| 194:19,20 | 119:21 125:17 | **binder** 11:9,11 | **bottle** 67:20 |
| 195:18,20 | 126:19 138:2 | **binders** 9:8,14 | **bottom** 104:12 |
| 196:2 210:16 | 153:8 155:18 | 9:25 10:18,22 | 149:13 231:9 |
| **batches** 235:7 | 159:18 166:17 | **binding** 142:18 | 234:17 236:15 |
| 235:11 | 182:24 183:15 | 142:19 145:6 | 243:1 |
| **baxter** 23:19 | 184:24 188:13 | 232:4 238:11 | **boulevard** 2:10 |
| 24:1,18 26:20 | 189:22 191:2 | **biologic** 54:2 | 2:13 |
| **bear** 239:3,5 | 191:17,18 | 54:15 56:12 | **break** 8:17 |
| 257:13 | 193:25 214:1 | 226:25 | 39:24 46:12,14 |
| **becoming** 24:1 | 215:11 216:24 | **biological** | 59:17 86:9,18 |
| 131:20 | 218:12 219:8 | 91:13 | 87:14,18,20 |
| **began** 14:2 | 228:9 266:3 | **biologics** 26:3 | 179:7 221:24 |
| 17:18 | **believed** 88:25 | 52:12 53:23 | 222:3,6 226:12 |
| **beginning** 95:6 | 89:20 106:22 | 54:5 59:3,3 | **breaks** 86:21 |
| 248:24 261:19 | 153:19 | 61:14 114:17 | 86:23 |
| 261:23 | **believing** | 115:2 226:24 | **brett** 2:12 |
| **begins** 40:5 | 201:16 | **biology** 37:20 | **brian** 3:3 |
| 86:14 104:14 | **bell** 27:9 | **bit** 34:8 46:7 | 227:13,20 |
| 125:1 136:3,6 | **belong** 33:11 | 55:3 117:6 | **brief** 16:12 |
| 179:14 212:22 | 67:10 | 127:5 | 227:22 |
| **behalf** 2:3,8,12 | **bench** 193:20 | **blades** 37:16 | **briefly** 186:7 |
| 2:15,19 3:2,7 | | | 246:8 |

**bringing**  12:8
12:10
**brittney**  3:18
**brittney.nagle**
3:20
**broad**  115:5
**broadly**  115:10
115:10 157:21
**buchanan**  4:8
**budget**  91:20
**bull**  117:22
**bulldoze**  90:18
117:23 256:19
**bulldozed**
117:24 128:8
**bunch**  193:15
**business**  31:23
48:5,8 49:7
**busy**  255:18
**buying**  237:3
**bye**  264:9

**c**

**c**  2:1,21 3:1 4:1
22:2,2 24:1,7
24:11,15,19,23
36:8 45:14
115:9 136:9,13
138:14 141:8
234:20 258:13
258:18 265:1,1
**c.f.r.**  142:13
**california**  1:15
8:8 30:19
**call**  31:20 32:1
32:15 62:13

190:14 254:16
**called**  30:21
33:2 43:11
45:12 46:6,9
108:22,23
221:22 225:3
229:12 255:24
**calls**  31:13,15
32:16,18,21
**calmar**  36:7
37:10
**campus**  42:11
42:14
**canada**  52:3
53:7 224:21
**canadian**  53:14
223:9,12,16,21
**cancers**  251:6
**capa**  115:9,12
115:17,18,19
115:21 116:2
116:20
**capabilities**
193:8
**capas**  115:8,23
115:24
**carbon**  136:14
**carcinogenic**
105:18 118:11
190:12 213:23
233:5 239:22
**career**  28:7
36:5
**carillon**  4:8

**carolina**  4:9
**carried**  236:2
**case**  1:6 9:4
11:2,5 30:9,11
41:25 48:20
49:4 121:2
141:23 153:4
155:7,9 176:17
219:1 220:2
227:25 228:2,4
228:6 237:16
244:5 265:15
**cases**  141:15
159:19
**categorize**
185:5
**causation**
108:4,5
**cause**  59:23
189:12 251:6
**caused**  244:21
245:9
**celsius**  136:23
**certain**  164:19
166:24 167:10
167:22 189:19
205:1 237:13
**certainly**  48:12
124:15
**certificates**
247:12
**certified**  1:18
265:2
**certify**  265:4,9

**cfr**  238:11,25
**cgeddis**  2:7
**cgmp**  25:4
28:11,14,23,24
56:19 65:8
113:21 114:6
116:6,10 122:6
122:19 123:19
141:10,18,25
145:2,7,19
146:3,7 153:2
153:22 154:9
154:12,23
155:2,4 156:1
156:3,5 157:1
159:4,7 170:18
194:2,17 195:1
195:22 197:1
202:21 203:17
203:24 204:2,4
204:7 228:18
228:22 232:7
234:11 245:17
**cgmps**  113:10
123:25 140:14
140:20,24
141:3,4 142:7
142:17 144:7
169:13,21
170:4,10,10
177:6
**cgms**  144:20
**chair**  40:23,25
44:9,10,11

HIGHLY CONFIDENTIAL

[chance - clients]                                                    Page 11

chance  144:23
192:17 222:2
258:14
change  69:20
71:6,23 75:6
85:13 120:13
120:18 137:17
141:4 149:18
182:5,11,15,19
182:20,21,23
182:25 183:4
183:18 185:2
188:19 189:24
190:5 233:22
changed  70:10
changes  106:13
167:6,7 185:5
185:7 188:9
190:3 266:4
charge  18:20
19:23 254:25
charged  16:16
charlotte  4:9
charts  186:22
chatted  33:13
check  147:1
227:12
chemical  79:25
85:19 236:17
241:21 257:5,9
257:12
chemist  79:15
85:23 120:24
163:23 164:3,8
187:7 247:17

247:20
chemistry  25:8
25:11,14 79:16
79:18 82:4
86:5 103:25
104:10 121:4
178:17,20
chemists  80:1
85:2 103:22
104:2,6 106:10
106:16,20,21
107:2,4,8
111:5,15,19
186:24
chesney  221:10
chicago  4:4
chilled  27:8
chinese  77:25
78:2 251:18,21
chloride  85:17
131:16 141:11
144:2 151:22
182:24 183:20
183:23,25
184:2 185:15
187:1,16
195:17 231:21
233:23 234:1,3
234:13 239:17
242:2,6
chmp  231:23
choose  238:12
chris  12:23,24
13:1 62:8

christopher  2:4
4:7
chromatogram
122:18
chromatogra...
186:15,20,22
chuannan
234:20
circuit  27:15
circumstance
116:8
circumstances
80:8 137:21
257:2,17
citation  128:20
cite  82:20 83:15
102:14 128:21
129:11,16
137:1 219:16
cited  29:11
79:23 82:18
93:5 102:11,12
116:2 125:14
125:15 127:22
128:14 129:17
130:11,13
135:12 137:6
148:6 160:2
184:13 196:16
cites  76:23
citing  129:23
137:10 194:22
citings  82:12
129:22

civil  14:15
claim  69:10,13
69:14
claims  58:21
claremont
41:21
clarified
226:16
clarify  31:7
33:7 71:14
107:2 223:16
classes  42:20
classify  226:19
cleaning  34:22
170:24 171:4
172:2,6
clear  39:7
165:13 229:8
clearance
55:16,18,21
clearly  124:17
client  45:7 46:1
57:1 72:24
74:10 163:17
171:14 223:10
223:12,14
225:2,2 226:13
clients  43:18,18
44:15,20 45:2
45:5 51:5
222:1,7,9,11,22
224:5,23 226:6
226:7,15,17,18
226:20,23,25
227:6

**[clindamycin - compliance]**                                  Page 12

**clindamycin**
  34:19
**clinical** 22:6,10
  22:22 52:4
  53:8 223:17
**clock** 223:6
**close** 14:10
  206:4
**closed** 206:6
  260:12
**closure** 36:13
**clr** 265:22
**coach** 128:5
**coaching** 128:7
  254:18 256:16
**cohort** 211:11
  213:4,19 244:6
**colleagues**
  16:13 38:21
**collect** 93:15
**college** 2:13
**combination**
  211:21
**combined**
  211:8,11
**come** 29:8
  33:21 34:8
  49:18 94:24
  132:18 152:21
  187:7 221:25
  225:7 230:17
  237:9 262:2
  263:3
**comes** 46:23
  184:17 225:6

**comfortable**
  23:14
**commencing**
  1:21
**comment** 134:4
**commerce**
  142:5 194:7
  204:18
**commercial**
  191:8,15,25
  192:7,15,20
  193:2,13,18,23
  194:3,4,5,9
  195:20
**commercially**
  236:18
**committed**
  141:9
**committee**
  189:24
**communicating**
  20:13,17
**communication**
  21:3
**communicati...**
  27:14 31:5
**community**
  80:2 83:17,20
  84:11,16 85:3
  85:12 137:20
**commute** 60:19
  61:1
**commutes**
  60:21

**companies** 23:5
  29:14 31:23
  45:19 46:4,15
  47:1 51:11,21
  53:5,13 73:18
  73:22,25
  105:15 118:20
  154:25 164:22
  225:12,16
  226:9
**company** 17:16
  20:16 21:8,10
  21:15,17,21,25
  22:1,25 23:15
  24:5,10,14
  26:3 28:10
  32:8 35:7,9
  37:15 38:16
  43:11,15,16
  45:8,10,12
  46:6,20 49:24
  52:5 53:8
  56:25 58:24
  59:2,9,16,18,21
  59:22 60:3,5,9
  60:12,16,19
  61:15,16 68:13
  74:11 118:11
  144:17 149:17
  153:25 166:5
  205:19,22
  221:22 223:16
  223:18 225:3,6
  231:15 232:5
  242:5 244:16

  262:19
**company's**
  56:24 154:22
  156:5 263:11
**compare**
  188:18
**compares**
  127:9
**compendial**
  206:24
**compendium**
  207:2
**complaint** 11:1
  11:4,21 115:21
  197:16,25
  198:3
**complaints**
  28:3 160:3
  161:9 162:1
  197:9,12,14,15
  197:17,19,21
  198:7
**complete** 9:23
  114:25 202:23
  218:18 221:25
  248:7,7
**completely**
  165:17 179:2
  252:4 256:1
**compliance**
  30:13 113:10
  113:21 114:6
  145:16 153:13
  169:13,21
  170:4,9,10

[compliance - consultants]                                      Page 13

177:6,16,24
203:17,24
**complied**
207:20
**complies**
238:17
**comply**  142:7
145:2,18
154:12,22
160:8 206:23
232:8 238:14
**complying**
158:2 159:20
**compound**
168:3,4,10,11
**compounds**
232:19,22
240:2,18,22
**computer**  8:18
8:22 9:7,9,11
9:17 95:8,11
252:19 260:17
261:12
**concern**  106:22
187:12 189:12
211:11 213:4,6
213:20 232:18
244:6
**concerned**
24:13 107:16
**concerns**  24:4,9
24:12 107:9
109:16 184:25
186:25

**concierge**  4:13
**concluded**
189:9
**conclusion**
140:18 163:2
201:23
**condition**
107:20
**conditions**
130:20 131:2,7
174:19 234:3
234:13 235:20
235:24
**conduct**  16:9
53:20 175:13
189:24 191:7
198:6 205:16
257:1
**conducted**
51:22 178:19
243:15
**conducting**
24:5,10
**conference**  2:2
33:12
**confidential**
1:10 48:4,24
49:6 53:1,3
222:11 224:9
**confidentiality**
44:22,24
224:10,16
**confirm**  113:18
183:16 189:18
233:10 242:5

247:5
**confirmation**
69:5,8 234:8
**confirmed**
69:12,21 71:4
231:20 233:7
235:3,23 240:8
241:15,18
**confirming**
19:24 166:10
240:7
**conform**  240:9
**conformances**
115:9
**confused**  50:24
59:20
**confusing**
196:18 248:21
250:20
**conjunction**
18:23 24:19
**connection**
72:21 104:3
111:9,15
185:25 233:22
243:2
**consent**  18:24
19:1 23:8,12
28:20 29:2,15
29:17,18 30:7
34:24 35:3
228:17,23
229:4,6
**consequence**
192:14

**consider**  70:8
97:16,20 102:4
153:25 155:1
156:24 159:4
162:19 171:17
188:11 199:17
244:25
**consideration**
153:24 154:13
155:14
**considered**
29:24 30:2
42:9 61:13
70:7 91:17
93:10,11 147:7
149:20 153:17
154:3 158:23
238:10
**considering**
160:2
**consistent**
105:6 235:16
235:20 237:21
**consistently**
235:24
**constitute**
116:6
**constructions**
113:16
**consult**  94:17
200:7
**consultant**
45:22 225:7
**consultants**
45:10 47:3

225:4
consulted  74:1
  217:12
consulting
  43:16 44:3,6
  45:8,8 68:24
  72:20 171:13
consumer
  13:18 14:17,20
  14:22
cont'd  3:1 4:1
  6:2 40:7 86:15
  125:3 140:8
  179:16 212:25
contact  27:25
  39:15 45:22
contacted
  12:18,22 62:6
  62:21 66:16
  67:3 68:14
  74:14,19,24
contain  206:20
  210:17
contained
  70:12 72:21
  201:17,20
  210:24 213:14
  246:25
container
  189:3,3 193:9
containers
  36:13
contains  199:8
  199:11 236:18

contaminant
  202:12
contaminants
  202:10,11
contaminated
  171:11 202:5
  202:13,16
  206:12,15,18
  206:19,20,22
contamination
  28:15 171:6,14
  171:16,18
  199:1 202:1,2
  202:9
content  97:25
  208:25 209:9
  210:9,18
context  117:12
  137:5 228:1,2
  231:20 232:5
  236:4 239:3
  258:5
continual
  205:16
continue  29:14
  165:9,15,19
  166:8 217:23
  244:25 253:5
continued
  17:20 129:7
  138:18 212:24
  230:23 263:14
continues  29:9
  29:12

continuing
  241:1 245:5
contract  45:20
contracts  224:8
contrary  138:7
  138:11 149:17
contribute
  241:23
control  190:5
  246:18
conversations
  32:3
coordination
  18:21
copies  9:6
copy  100:3
  126:22
coral  2:10
core  149:19
corneal  56:13
corporate  18:3
  76:7
corporation
  37:12,22 39:2
correct  8:10
  11:15 15:24
  16:18 25:2,20
  28:25 29:7,10
  62:8 63:6
  69:24 77:5
  79:19,20 82:9
  94:1,10 96:5
  100:25 101:8
  105:7 113:22
  125:23 126:4

133:21 176:5,6
  177:16,20,25
  178:1,3,6
  179:20 185:8
  188:4,5 218:8
  229:23 231:15
  232:12 233:18
  233:19 235:17
  235:18 236:23
  237:11 239:17
  239:18 240:10
  252:15 258:18
  266:3
correction  11:8
  115:16
corrective
  115:9,13
  205:19,22,24
  206:1,2
correctly  100:7
  113:2
corresponden...
  62:15 190:16
cosmetics  91:14
cost  184:3
costs  184:16,19
counsel  7:8,18
  66:5,16 68:15
  75:15,18 76:4
  76:9,25 77:9
  78:16 80:20
  81:19 86:17
  87:14 92:5
  97:4,5,8,11
  98:9 132:19,23

[counsel - decree]                                                      Page 15

140:16 181:11
197:18 209:18
219:6,15,22
220:13,21
235:22 236:10
242:15 244:1
247:4,11 250:8
252:8 255:25
258:6,7 263:6
265:10,13
**counsel's**
244:11
**counselor**
160:20
**counted** 77:5
**counter** 54:1
**county** 33:20
33:22
**couple** 50:20
59:8,13,14,18
231:4
**course** 25:7,10
25:13 79:4
114:20,21,22
114:23 115:2
164:1 171:9,13
219:5 261:10
**courses** 57:19
114:9,15 146:3
146:4
**court** 1:1,18
7:6,9 49:17
58:21 64:21
75:4 108:14
118:3 265:2

**courtroom** 8:10
**cover** 157:15
**covered** 82:3
95:5 98:5
110:6 175:1
**covering**
115:11
**covers** 37:5
157:2,11 215:6
**created** 245:2
**creates** 158:12
**critical** 185:2
188:20,24
189:1
**criticisms**
229:9,13,20,22
**cross** 171:6,11
171:14,16,18
**crossover** 55:4
**crr** 265:22
**curious** 108:7
**current** 141:8
147:7 190:23
**currently** 213:3
249:2,7,11
**curriculum**
115:7
**customer** 28:2
115:21 161:9
161:22,25
175:16 177:19
177:22,24
197:9,12,14,15
197:16 198:1,2

**customers**
175:13 176:4
176:16 197:22
**cut** 165:12,16
165:17 169:19
**cutting** 166:11
**cycle** 105:17

**d**

**d** 3:7 238:11
**d.c.** 3:9 30:15
33:22
**dark** 230:9
**data** 210:19
211:3,6
**database** 76:12
**date** 11:23
12:20 13:13
95:25 98:16
133:19 150:10
173:7 174:6,7
174:10 175:6
176:9 204:14
265:7 266:21
**dated** 5:19,24
6:3 13:12
95:21,24 98:12
98:15 239:11
**dates** 173:6,16
174:4,5 204:17
**david** 1:18 7:7
81:8 109:23
112:7,10
117:15,22
134:22 137:24
139:8 155:12

156:14 163:5,8
165:22 166:13
177:1 208:13
208:16 212:9
221:6,10 265:2
265:22
**day** 42:11
265:17 266:23
**days** 15:10
42:17 43:6,7
50:19,20
**de** 2:10
**deacylated**
253:19,21
**death** 205:12
**decades** 15:24
**december**
40:15 55:21
**decide** 63:20
**decided** 37:18
64:8,11
**decisionmaki...**
64:2
**decompose**
136:14 139:3
**decomposes**
85:24
**decomposition**
137:2 234:2,12
**decree** 18:24
19:1 23:8,13
28:20 29:2,16
29:17,18 30:7
228:17,23
229:2,4,6

**decrees** 34:24
35:3
**dedicated**
16:14
**deeming**
229:25
**default** 235:3
**defendant** 3:2,7
3:12,17 4:2,7
12:9 81:12
**defendants**
2:19 227:15,21
227:25 229:9
229:14
**defense** 220:24
221:18 244:11
**deficient**
159:19
**define** 109:25
194:19
**definition** 14:2
14:9 15:14
194:4 199:22
199:23 248:12
250:3
**definitions**
75:24 249:21
**definitively**
73:20
**degradation**
106:23 111:19
130:24 131:11
137:22 185:12
237:10 241:24
242:1 243:8,9

**degrade** 83:9
83:17 84:12,19
84:23 85:3,12
130:19 131:1,6
**degrades** 187:8
**degrading**
132:4
**degree** 37:19
57:13,15,21
**degrees** 136:9
136:13,22
138:14 139:2
246:21
**delete** 77:23
78:4,9
**deleted** 77:22
**deleting** 78:18
**deliberately**
250:20
**department**
21:2 40:23,25
42:2,19 44:10
44:11 103:24
104:10
**depend** 70:1
144:11 229:18
**depending**
45:21
**depends** 15:14
38:19 42:15
43:16,17 46:24
225:21
**deposed** 8:12
181:3

**deposition** 1:10
6:9 7:3,15 9:11
40:24 49:21,23
63:6 65:12
95:7,13 108:3
108:7 150:7,9
150:12 154:7
155:6,23 194:8
196:20,21
200:6 218:22
219:1 220:9,14
220:25 221:14
221:15,20
223:2 224:19
236:23 238:21
248:24 256:18
259:3,7,13
261:19,24,25
262:23 265:6
265:12
**depositions**
63:21 64:12
65:7,14,16,19
69:25 78:23,24
79:1
**depth** 243:4,16
**describes** 259:7
**description**
38:19 188:20
206:24 235:4,5
**design** 35:15
**designed** 35:12
42:19 58:10
**despite** 9:19

**detail** 237:19
**detect** 88:20
89:9 109:20
110:4,11,25
116:5,9
**detectable**
110:2
**determination**
171:10
**determine**
52:16 80:22
87:23 88:8
89:1 98:3
101:6,16
119:14,22
120:5,12,17
143:13 161:23
162:3 163:18
164:8 247:5
257:20
**determined**
213:10
**develop** 89:8
100:18 151:21
**developed**
35:12 100:23
100:24
**developing**
54:7 192:5
**development**
35:15 105:16
151:25 157:16
157:18,20,22
158:4 178:18
193:20 195:16

[development - doctor]                                                    Page 17

241:17
**developments**
140:25
**deviation** 10:6
234:21 237:2
243:3
**deviations** 28:4
115:8
**device** 15:15,18
114:18,18
226:9,18,23
**devices** 15:4,5
15:8,10 17:1
91:13 120:10
225:17,20
**dfm** 241:6
**di** 5:8,9,10,11
5:12,13,14,15
48:10 49:14
63:9,13,22
94:23 107:18
**diego** 46:8 59:7
59:11 60:22
61:1
**diethylamine**
130:20 131:1,6
132:4
**difference**
103:10 235:9
251:7
**different** 11:17
11:18 38:5
51:11 63:23,24
65:14 73:2
83:22 94:3

110:7,17
170:15,17,23
235:7,7 236:1
246:20 253:16
**differentiation**
251:11
**differently** 84:9
151:20 204:4
226:5
**difficult** 50:15
89:12,21 90:4
90:16 91:1
99:11 100:10
217:2 226:2
**dil** 210:20
**dimethylamine**
136:9,15 139:3
236:20 237:4,9
241:25 246:25
247:19
**dimethylfor...**
6:7 133:18
236:7
**diovan** 69:6,11
69:21 71:5
201:1,6,8,9
208:1,4,20,21
**direct** 31:13
49:1 196:4
200:10
**directions** 5:8
**directly** 21:3
138:1
**disagree** 100:9
104:22 105:2,3

111:1 112:24
113:1,3 148:7
148:19 149:2,6
**disagreeing**
100:14
**disciplined**
58:11,17
**disclose** 44:23
**discovery**
93:25
**discrepant**
22:18,20
**discretionary**
50:21
**discuss** 82:20
84:18 131:11
177:21 224:22
238:15 257:25
**discussed** 86:22
87:5,5 131:25
181:1,24 244:5
244:8 252:7,13
258:6 259:15
**discusses**
157:21 215:6
**discussing**
153:15 253:8
**discussion**
79:18 87:6
124:23 135:7
139:11 155:16
155:22 177:13
212:19 234:21
260:7

**discussions**
86:20
**display** 261:17
263:12
**district** 1:1,1
30:21 31:1
**divide** 54:17
**dma** 85:24
185:12
**dmf** 72:4,10
73:13,15,19
82:25 83:8,16
83:17 84:12,19
84:23 85:3,12
85:23 106:24
111:18 130:19
131:1,6,13,16
132:4 136:14
137:3,22 139:3
157:14 185:12
187:8,9,16
231:21 233:25
234:3,13
236:18 237:3,4
237:8 239:10
239:15 240:8
240:21 241:9
242:1 246:9,15
246:24 247:12
247:14,18
**dmfs** 104:5
111:14 186:21
**doctor** 68:10
94:17 250:7
252:18 256:10

**[document - drug]**                                                       Page 18

| | | | |
|---|---|---|---|
| **document**  1:4 | 84:16 92:6 | **dominating** | **draft**  6:6 79:9 |
| 5:22 9:11 | 95:20,23 96:8 | 184:13 | 133:17 233:4 |
| 72:10 83:6 | 96:21,25 97:1 | **dong**  231:14,20 | 239:21 240:10 |
| 90:9,13,14,18 | 97:20 98:5,7 | 234:17 | 243:3 |
| 90:20,24 91:6 | 99:17 118:13 | **dong's**  233:2 | **drafting**  64:2 |
| 91:8 94:15,16 | 127:21 145:14 | 234:8 | 219:5 |
| 95:19,22 96:1 | 146:1,18,20,24 | **door**  237:9 | **drafts**  79:6,9 |
| 98:18,20 99:9 | 147:5,6,9,16,22 | **dose**  123:22,24 | **draw**  48:5 |
| 99:16 118:10 | 148:3,8,16,20 | 228:6 230:1 | **drawing** |
| 120:23 142:23 | 149:3 164:12 | **double**  148:25 | 198:20 |
| 142:24 143:3,5 | 164:13,16 | **doubt**  136:16 | **dresses**  157:22 |
| 146:10,12 | 166:16 181:17 | **downside**  192:9 | **drink**  86:9 |
| 157:11 191:4 | 191:17,19 | **dr**  7:4 36:20 | **drive**  58:8 59:7 |
| 191:21,23 | 200:8,10 210:6 | 77:4 79:21,22 | 60:2 |
| 213:21 214:3,4 | 216:20,22 | 80:2,3,3 82:1,7 | **drs**  82:2 111:23 |
| 217:5 236:6 | 217:7,16 | 82:8,13 84:14 | **drsc**  5:19 13:12 |
| 238:13 245:4 | 218:14,15 | 85:8,8,9,9,10 | **drug**  15:19 |
| 247:5 249:8,9 | 219:7,9,11,14 | 85:10 86:2 | 16:4 34:13 |
| 254:20,22 | 219:16,19,21 | 88:11,16,17 | 54:15 70:11 |
| 255:19,20 | 220:4 223:1 | 102:10 123:6 | 96:22 104:2 |
| 256:3,12,18 | 229:24 238:7 | 129:23,24 | 111:6,8,14 |
| 262:25 | 248:25 249:3,5 | 130:5 138:2,7 | 114:7,17 115:1 |
| **documentation** | 249:7 262:20 | 138:15 139:1 | 118:21 143:1,4 |
| 113:15 247:10 | 263:7,8,11,12 | 153:11,19 | 143:8 165:1 |
| **documented** | **doing**  17:2 | 154:6 155:6 | 167:6,9,21 |
| 148:5 186:20 | 35:19 38:25 | 171:22 194:23 | 185:6,21,24 |
| 237:1,19 | 56:3,5 100:1 | 195:19 197:7 | 186:2,5,19 |
| **documenting** | 126:2 166:7,10 | 218:19,22,25 | 190:21,25 |
| 186:15 | 167:16 192:6 | 223:7 227:16 | 199:4,8,11,16 |
| **documents** | 196:11,12 | 227:19 231:3 | 199:24 200:14 |
| 5:24 8:25 9:2 | 250:9 256:2,4 | 231:12 236:22 | 202:12,14,14 |
| 10:24 76:2,7 | 262:3 263:1 | 240:12 245:15 | 202:20 203:8 |
| 76:11,14,17,20 | **dominate**  183:6 | 250:14 252:5 | 203:10 204:5,8 |
| 76:24 77:18 | 183:19 | 254:15,22 | 204:10 206:19 |
| 78:4 81:19 | | 262:17 263:5 | 206:20,24 |

HIGHLY CONFIDENTIAL

**[drug - entail]**                                           Page 19

209:1,9 210:10
212:4 225:18
226:25 233:5
239:22 241:23
253:14
**drugs** 2:20
14:25 15:1,2,4
15:11 16:1,2
38:3 52:12
53:23,25 91:12
113:22 203:16
203:23 226:24
**du** 183:15
243:2
**due** 235:4
243:4
**duly** 7:11 265:6

**e**

**e** 2:1,1 3:1,1 4:1
4:1 9:16 22:2,2
32:14,14 45:14
62:15,17 66:8
76:7 86:2
90:11 132:23
140:1,1 244:15
244:19 245:15
251:12,15,17
251:23,24
252:12,13,15
253:7,10,19,25
254:4,6,11
255:3,6,11,14
255:22 257:2,6
257:10,13,18
257:21,25

258:4,5,8,11,13
258:19,22
259:2,8,20
265:1,1 266:1
**ear** 41:11
**earlier** 92:6
96:5,23 129:2
129:25 201:24
228:9 229:8
262:19 264:2
**early** 11:24
12:21 14:3
17:20 36:5
40:15 65:24,25
88:13 161:20
225:11,11
243:5
**earn** 49:8,11
**easier** 151:14
226:5
**east** 234:19
**easy** 100:13
102:8,15,19
**edqm** 153:3
**education**
120:21
**effect** 91:8
199:15 200:24
241:15
**effective** 16:18
**efficacy** 91:11
**efforts** 154:22
155:1,4 156:3
156:5,24 162:2

**eight** 157:6,7
226:1,14
**eisenhower** 2:5
**either** 15:12
40:14 47:1
69:5 86:23
128:22 155:22
196:22 237:1
255:6
**electronically**
9:9 58:25
**eli** 178:2
**ellis** 3:18
**ema** 153:14
175:7 214:17
232:15
**emea** 214:20
215:2,5,10
231:23
**emerging**
114:21
**emit** 91:14
**empirical**
158:22
**employ** 103:22
106:9
**employed**
21:10 265:10
**employee** 42:1
78:22 265:13
**employees**
47:15 91:20
**employers**
40:21

**employment**
20:20
**encore** 29:22
**ended** 14:3
22:7 40:13
**ends** 40:2 51:4
124:21 179:10
212:17
**enforceable**
147:17,23
148:9,16,21
149:4 238:8,23
238:24
**enforcement**
146:17,19,23
147:1,4
**engaged** 145:19
195:1
**engineer** 26:6
38:6
**engineering**
51:10 55:12
**engineers**
172:4
**english** 251:21
251:22
**enjoy** 16:21
**enlarge** 104:15
**enlarged** 99:20
**ensure** 199:14
238:16 259:15
**ensuring** 16:17
**entail** 17:1
52:14

| | | | |
|---|---|---|---|
| **entailed** 75:22 172:16 | **estimate** 47:25 51:12 66:11 | **exact** 11:23 12:20 18:1,16 | **exforge** 69:3,5 69:22 71:5 |
| **entered** 233:17 | **et** 6:7 133:18 | 22:9 91:9 | **exh** 13:11 |
| **entire** 96:9 | **european** | 131:10 139:6 | 95:22 98:14 |
| 105:17 152:7 | 149:16 231:24 | 152:16 190:4 | 133:17 150:8 |
| 152:12 165:17 | **evaluate** | 219:13 220:10 | **exhibit** 5:18,22 |
| 252:12 | 113:21 114:6 | 220:19 | 6:3,6,9 13:10 |
| **entirety** 258:24 | 162:24 166:20 | **exactly** 13:21 | 13:11 95:18,22 |
| **entitled** 1:17 | 188:15 257:8 | 56:2 98:6 | 98:12,14 |
| 5:22 95:19,23 | **evaluated** | 123:21 132:14 | 126:20,24 |
| 236:7 | 237:2 240:1,17 | 157:14 | 132:7 133:16 |
| **environmental** | **evaluating** | **examination** | 133:17 150:7,8 |
| 184:25 | 113:10 124:11 | 5:2 7:22 40:7 | 150:13 215:13 |
| **equal** 153:1,21 | 168:2,9 177:5 | 86:15 125:3 | 215:14 236:5 |
| **equipment** | 188:9 | 140:8 179:16 | **exhibits** 5:17 |
| 34:22 188:16 | **evaluation** | 212:25 227:17 | 6:2 218:23,25 |
| **eric** 6:10 150:9 | 180:4 188:12 | 231:1 246:6 | **existing** 239:24 |
| 241:13 | 237:20,21 | **examine** 33:16 | **expect** 121:3 |
| **erroneous** | 239:16 | **examined** 7:12 | 192:4 |
| 202:9 | **evening** 227:19 | **example** 96:21 | **expectations** |
| **escalate** 29:15 | 264:7,8 | 120:24 232:18 | 158:12 |
| 30:6 | **evenings** 50:14 | **examples** 239:3 | **expected** |
| **especially** | 50:24 | 242:12 | 119:13 122:17 |
| 159:19 | **event** 259:24 | **exceed** 211:21 | **expects** 142:20 |
| **esq** 2:4,4,9,12 | **events** 39:12 | **except** 86:24 | 190:11 |
| 2:16,20 3:3,7,8 | **eventually** | **exception** | **expensive** |
| 3:13,18 4:2,7 | 235:8 | 148:12 | 54:16 |
| **establish** | **everybody** 87:1 | **excerpt** 80:24 | **experience** |
| 147:16,23 | 264:9 | 81:18 | 120:22 141:7 |
| 148:8,16,21 | **evidence** | **excess** 136:8,13 | **experiencing** |
| 149:4 206:14 | 186:24 237:5 | 138:14 139:2 | 27:7 |
| 238:8 | 246:9,14,19,23 | **exclude** 64:9 | **expert** 5:18 |
| **established** | **evolve** 140:20 | **excuse** 59:8 | 12:19 13:7,11 |
| 106:10 107:3 | 140:24 141:5 | 88:12 192:18 | 41:7 49:5 |
| 159:18 | | 209:25 215:5 | 62:11,22 63:3 |

**[expert - fda]**                                                   Page 21

63:5 64:7
71:25 74:15,25
79:16 102:4
111:22 119:18
127:12,21
128:15 129:1,4
137:7 140:17
159:5,7 164:4
171:17 198:24
209:15 215:18
215:22 220:24
221:18 237:14
237:15,23
240:12
**expertise** 120:4
120:8,12,17
171:25 237:24
**experts** 41:10
64:5 86:20,22
88:4 102:8
126:6 130:14
223:1
**explain** 48:11
48:18 74:5
75:21 85:16
142:22 146:11
**explained** 7:18
**exposure** 113:4
**express** 187:11
**expressed**
186:25
**extensive** 92:13
**extent** 16:1
44:22 130:12
141:7 222:10

243:4,16

**f**

**f** 140:1 265:1
**facebook** 61:20
**facilities** 172:8
172:11,14,16
172:18,25
173:9,23 174:9
175:5,18,23
**facility** 27:20
46:8 53:7
170:23 171:7
173:4 174:16
178:3 203:17
203:24 229:3
**fact** 23:8 67:14
98:25 102:23
119:10 154:14
160:4 201:17
206:12 235:19
**factor** 27:6
**factors** 234:22
**facts** 70:1
**fail** 116:9
179:22
**failed** 142:7
161:11,17
179:18 180:17
207:14
**failing** 234:11
**fails** 141:18,25
**failure** 116:4
141:15 145:2
187:19 232:11
235:16

**fair** 31:4 32:22
32:23 76:8
167:15
**falkenberg** 4:3
**falkenbergiv...**
4:5
**familiar** 66:15
68:13 194:20
214:20 215:24
227:24 228:1
244:14 250:24
251:4,15
**familiarity**
66:18
**far** 134:12
257:25
**fast** 110:14
**fda** 6:3 13:18
14:24 15:7,23
16:12,13,16,23
17:1,18 18:6
19:7 20:14,18
21:4 23:1,12
26:10,14,16,20
27:14,22 28:1
28:6,14 29:2,8
29:12 30:14,15
30:17,23 31:2
31:5,6,8,9,12
31:15 32:4,18
32:24 33:2,5,8
33:10,13 35:22
39:1,3,8,12,15
39:18 40:10,13
56:24 59:5

75:23 76:1
79:3 88:19,25
89:8,11,15,20
89:24 90:3,7
90:15,25 91:10
91:17,25 92:9
92:14,17 93:22
93:23,23 94:9
96:22 98:12,14
99:5,10 100:9
100:17 103:22
103:24 104:7,9
104:22 105:2,3
105:7 106:16
107:10,24
108:22 109:4,7
109:10,13,16
110:3,10,24
111:6,12,19,24
112:12,24
113:3,9,20
114:5 116:1
123:14 142:20
142:22,25
145:14,17
146:6,11,15,19
146:23,25
147:4,7 148:2
148:6 152:4
153:3 163:11
170:14 171:5
172:7,10,20,21
172:25 173:4,8
174:18,18
175:3 183:4,17

**[fda - focus]**                                                                    Page 22

184:5 185:2,3
185:24 186:24
187:7,11 190:6
190:11,13,19
190:24 191:10
191:13 192:4
200:13 204:25
205:4,10,14,20
205:23,25
213:5,10 227:6
229:24 233:4
238:15 239:21
240:10

**fda's**  108:24
120:15 145:25
146:2 172:13
172:17 185:4
205:4

**february**
265:17

**federal**  14:15
**feed**  127:16
**feel**  80:22 89:6
**feeling**  82:2
**felt**  23:14 64:24
65:17 153:12
154:8 224:17

**fever**  27:8
**fhs**  3:15
**fid**  74:3,5
**field**  19:25
37:20 82:4
215:22

**fifteen**  91:19

**fifty**  15:18
25:22 66:13
226:10,11,17
226:20

**figure**  161:17
212:13 231:4

**figured**  34:1
87:9

**file**  16:5 185:6
186:5

**filed**  58:20
**files**  104:3
111:6,7,8,14
185:21,22,24
186:2,19
263:10

**final**  29:19,24
30:2,4 55:21
189:2,3,25
193:9 200:24
243:13 260:10
260:13

**financial**  48:4
48:24

**financially**
265:14

**find**  16:13
89:12,21 90:4
90:16 91:1
99:11 100:10
100:13,18
101:14,21,24
102:2,8,16,19
103:13,17,19
110:4 118:12

121:9,13 129:1
155:16,22
169:9 174:18
175:1 180:15
180:18 181:23
214:11 233:15
250:15 252:6
254:22,24
256:14

**finding**  115:18
149:14,25

**findings**  52:22
187:2

**fine**  52:9
167:17

**finish**  67:20
134:23 250:23

**finished**  84:3,7
89:17,17
105:20 114:7
123:22,24
166:7 199:15
223:8 228:6
230:1 264:6

**finishing**
212:14

**fired**  36:3,18
**firm**  2:13 7:7
12:12,16,17
29:5,6,9 45:21
45:22 51:1
52:10 112:21
113:18 115:15
119:12 143:12
144:21 200:23

224:21 227:20
**firms**  14:23
52:3 113:13
116:1 164:14
190:17

**first**  12:18 13:6
26:6 37:21
60:23 62:6,21
65:22 73:15
92:18,24 93:1
96:24 98:18,19
98:22 140:13
143:17 174:6
191:18 198:12
204:13 219:24
222:10 224:19
231:5,17
235:14 236:18
239:11 240:7
242:4 256:10
265:6

**five**  86:8 87:17
218:14 219:12
220:23

**fixing**  23:16
**flagrant**  205:6
**flew**  47:5
**flom**  3:8
**floor**  3:14
**florida**  2:10
56:18

**fluctuation**
235:6

**focus**  15:3,5
247:24

focused 38:25
151:2 156:1
folders 260:22
261:1
follow 142:20
145:6 146:6,10
147:8 148:3,13
153:1,2,21,22
154:15 155:1,4
155:5 156:3,25
161:11,17,22
180:6,21
197:11,13
198:3,4 248:20
followed 152:1
153:15 154:18
159:23 180:5
following 113:19 138:18
142:21,22
146:12 147:10
212:24 230:23
233:24 263:14
266:4
follows 7:13
140:5
food 91:14
force 215:8
foregoing
265:4 266:2
forenoon 1:21
foreseeable
79:24
form 79:12
85:25 103:8

118:17 129:20
130:6 140:13
144:23 148:6
158:19 172:21
178:15 180:23
198:12 207:21
formal 159:8
formation
74:16 75:2
80:5,10,15
81:2,21 85:18
106:24 107:9
131:25 138:4
138:17 178:12
182:18 185:11
185:14 188:25
219:25 252:14
formed 87:24
88:8,21 89:2
101:7 119:1,3
119:8,11
143:14 180:11
198:15 237:10
257:14
formic 236:19
forming 97:17
97:21 242:13
formula 70:16
formulas 257:9
257:13
formulation
70:15
formulations
257:5

forth 62:18
97:21 116:19
117:4 147:13
155:6 236:2
238:13 257:9
257:13 261:14
265:8
forward 67:11
found 56:19
69:3,5,21
70:12,14 71:5
73:6,10 100:5
100:5 102:24
103:5 121:18
123:2 134:11
168:15 187:21
208:4 235:15
245:17
foundation
71:9,12 77:2
78:21 81:4,24
94:2 122:21
124:1 130:5
144:9 146:9
159:13 167:12
167:18,24
168:19 169:17
170:20 174:12
174:22 176:23
181:13 187:5
195:4,25
200:20 202:24
203:20 208:8
209:3 214:15
247:8 248:6

262:2,16
foundational
160:21
foundations
75:20
four 51:14
53:13,18 65:18
151:3 219:12
220:22 232:15
fourth 53:4,16
53:17
frame 12:21
62:12 88:14
89:6 101:18
107:4 173:20
224:6,7 225:10
225:21 250:5
framed 63:14
frank 3:13
freeman 2:5
french 39:4
frequency
204:7
friday 43:4,8
front 8:18,25
9:6 141:8
241:1 261:20
261:24 262:6
fulfill 232:8
full 7:24 9:22
42:1,9 106:2
182:16 236:18
239:12
fully 117:5
178:11 237:21

237:23

**fun** 53:22

**function** 38:20

**functionally**
31:22

**funny** 64:18

**further** 29:21
103:21 140:4
232:25 233:23
235:2 243:9
246:6 256:3
259:24 265:9
265:12

**g**

**g** 258:13,19

**gables** 2:10

**gain** 153:2

**gained** 140:21

**gallery** 249:14
261:15

**gap** 56:6

**gc** 74:2,7

**gcfid** 73:24
74:11 103:5,7
103:11,13,18
109:11,17
122:5 123:15
123:18,23
124:8,10 125:6
125:16,19,22
126:10 127:1
127:12,23
128:15,22,25
129:3,12,16

**gcms** 88:13
100:23 101:10
101:13,16,23
102:1,5 103:4
103:10,16
109:5 110:1
122:15 123:4,7
123:8,16,23
124:8,10 125:6
125:16,18
126:1,3,10
127:2,12,22
128:15,23
129:3,12,17
214:12

**ge** 258:10
259:18

**ge's** 259:7,13

**geddis** 2:4
12:23 62:8

**general** 77:15
77:19 108:4,5
148:15,19
149:2 206:22

**generally** 29:3
56:23 111:25
120:3 134:13
157:12,15
185:4 205:23
224:24 254:17

**generated**
195:15

**generic** 185:20
202:20 203:3,8
203:10 212:4

213:15

**generics** 17:16

**genotoxic**
105:18 112:13
116:5 141:23
180:4 190:12
211:11 213:23
215:7 231:25
232:1 233:4
239:21 240:2,4
240:18,19
243:7,19
247:25 248:4
248:10 249:21
250:3 251:2,8
251:9

**gentleman**
52:20 184:4

**germane** 64:25
65:17 153:13

**getting** 51:23
87:1 135:17
230:9

**gist** 252:12

**give** 9:22 11:23
52:2 54:23
99:12 164:4
239:3 258:14
258:24

**given** 29:7
100:12 151:8

**glass** 202:12

**gmp** 19:2,3,7
29:9 52:15
65:2,4 75:20

105:6 122:9
141:8 152:2
153:13 171:2
203:4 228:25
232:11 235:15

**gmps** 154:21
157:22

**go** 7:17 10:10
10:17 21:4
29:20 31:12
34:25 35:7
39:24 42:11,13
42:17,22 43:4
43:6,7 45:23
46:14 47:5,7
48:9 49:1
50:19 51:1
53:19 54:24
55:2 61:5,9,12
64:15 71:1,22
81:8 82:18
86:9 87:19
92:4,12 93:15
94:18 102:17
103:21 104:12
106:4 107:6,20
108:14 109:23
118:7 121:18
122:13 124:19
125:18 126:12
127:5 129:21
130:9 131:10
132:6,13
134:18,20,25
137:24 139:5,7

**[go - guidelines]**                                                    Page 25

| | | | |
|---|---|---|---|
| 142:15 144:24 | **going** 7:1,17 | 181:18,21 | 153:14 220:23 |
| 145:25 146:25 | 8:15,16 16:23 | 227:19 264:6,8 | 250:1 |
| 147:19 150:18 | 23:21 34:3 | **goodness** 18:14 | **guidance** 76:2 |
| 151:15 152:12 | 39:23 40:2 | 25:16 45:6 | 118:12 142:20 |
| 156:19 159:10 | 48:25 49:6 | 48:1 59:12 | 142:23,24 |
| 160:1,23 163:8 | 50:12 51:2,7 | 65:24 66:6 | 143:3,5 145:14 |
| 173:15,25 | 51:14 60:8 | 220:5 | 146:1,6,10,12 |
| 174:4 177:1 | 64:5,5 71:18 | **gordon** 3:13 | 146:18,20,21 |
| 178:2 179:7 | 72:17 86:11,19 | **gosh** 46:5 | 146:24 147:5,6 |
| 181:15,23,23 | 87:10 90:6 | **gotten** 51:25 | 147:9,16,22 |
| 183:12,13,16 | 96:12 98:12 | **governed** 233:4 | 148:3,8,16,20 |
| 184:12,19,20 | 105:22 107:19 | **graciously** | 149:3 164:12 |
| 184:25 185:3 | 108:10,11 | 99:19 | 164:13,16,17 |
| 185:17 186:17 | 109:2 117:22 | **grant** 3:14 | 190:20 191:4 |
| 186:21 191:1,3 | 117:23,23 | **great** 141:7 | 191:16 192:2 |
| 191:16 192:3 | 124:21 127:5 | 189:8 | 199:21 213:21 |
| 195:9,12 | 129:19 133:16 | **greenberg** 3:3 | 238:7,9,13 |
| 200:21 204:16 | 135:6 139:10 | 227:14,20 | 240:10 242:16 |
| 205:25 212:12 | 150:6,13,21 | **ground** 240:12 | **guidances** |
| 212:14 215:13 | 151:5,8 179:10 | **group** 33:18 | 232:4,6 |
| 216:8,13 219:6 | 182:3 196:21 | **gtlaw.com** 3:5 | **guided** 241:17 |
| 219:18 220:5 | 209:20 212:17 | **gu** 6:10 149:13 | 256:20 |
| 221:6 222:18 | 222:11,15,17 | 149:25 150:9 | **guideline** 145:6 |
| 222:21 223:1 | 222:18 223:6 | 150:12 153:19 | 158:24 159:2 |
| 227:10,11 | 227:9 231:3 | 194:8,23 195:6 | 214:19,24 |
| 231:3,8,18 | 236:11,12 | 195:19 241:13 | 215:5,8,10 |
| 233:14,20 | 240:11 241:3 | 241:14 242:4 | 231:24 232:16 |
| 234:16,25 | 246:2 247:24 | **gu's** 150:5 | 233:4 239:21 |
| 238:4 239:4,5 | 248:25 252:5 | 152:12 153:11 | **guidelines** 76:1 |
| 241:11 242:22 | 254:10 255:8,9 | 154:6 155:6 | 145:5 152:1 |
| 246:12 249:20 | 255:10,14 | **guarantee** | 153:2,2,21,22 |
| 259:9,11,12,14 | 259:4,23 | 96:20 | 154:12,19,23 |
| 260:4 262:3,4 | 261:13 263:12 | **guess** 15:9 50:7 | 154:23 155:1,2 |
| **goes** 64:2,9 | **good** 122:14 | 50:7 58:22 | 155:5,5 156:4 |
| 234:23 | 134:13 177:9 | 81:14 152:21 | 163:11 214:17 |

**[guidelines - hopelessly]**                    Page 26

214:20 215:2
232:6,9,17
238:22 241:16

**h**

**h**  3:13 22:2
45:14,14
234:20
**half**  14:6 15:7
50:11,13
113:20,23
114:2 135:11
236:17 249:25
**halfway**  238:6
**hand**  10:8
64:25 65:1
265:17
**handle**  19:15
**handy**  231:6
**hang**  117:22
**happen**  7:21
99:16 164:1
**happened**
77:21 85:21
136:10
**happens**  206:2
**happy**  165:15
216:14
**harassing**
263:4
**hard**  9:6 43:20
65:13 100:3
109:19 110:4
110:11,25
151:4 225:24

**harmful**  168:4
168:11,15
**head**  35:18
93:14 136:1
147:14 173:1
204:19 215:12
246:13
**heading**  218:7
**headquarters**
31:2 119:18
**health**  16:17
20:3 91:11
107:16 109:3
133:6,21,24
134:13 236:6
**hear**  9:19 28:17
73:15 110:15
118:5,5 150:22
155:21 166:2
**heard**  24:24
68:17,19 72:3
104:9 131:19
198:13 201:25
209:21 210:4
221:22 255:12
255:23
**hearing**  118:1
**heated**  82:25
83:3,9,18
**hecht**  79:6 80:2
82:2,13 84:14
85:8,9,10
88:17 111:23
125:7,9 129:23
138:7 139:1

236:22
**hecht's**  79:21
79:22 80:3
82:8 102:10
138:2,15
218:22,25
**held**  1:19 6:10
42:20 150:9
**helicopter**
37:16
**help**  51:23 57:3
63:11
**helped**  56:7
**helping**  151:21
**henry**  4:7
**hepatitis**  24:1,6
24:11,15,19,23
**hereinbefore**
265:7
**hereunto**
265:16
**hesitate**  23:7
**hetero**  2:19,19
**hey**  187:8
225:6
**high**  232:18
240:2,18
247:24 248:4,9
249:21 250:3
251:1,9
**higher**  29:17
58:9 246:21
**highest**  131:15
136:19

**highlight**  99:14
104:15
**highlighted**
10:24 78:7,8
99:20
**highlights**
77:16,19
**highly**  1:10
252:24
**hill**  2:21
**hillwallack.c...**
2:23,24
**hire**  225:7
**hires**  45:10
225:4
**history**  56:22
56:23 205:15
**hold**  204:3
223:2,5 233:14
254:9
**hollis**  2:13
**home**  8:3,7
40:20 67:21
**hon**  1:4
**honestly**  18:1
18:14,15 38:24
42:8 54:6
59:25 66:25
67:6 70:2
97:14 110:15
190:4
**honik**  2:16,16
**hooks**  45:18
**hopelessly**
200:19 208:8

211:13
**hour** 39:24
135:11 212:13
220:7,11
**hours** 43:14,21
50:1,15,16
65:18 220:3,7
226:15 256:7
**house** 49:24
**hum** 13:16
47:13 55:25
57:16 58:6
60:17 62:16
65:15 100:21
170:1 204:15
254:2 258:19
**human** 91:12
113:22
**humana** 4:2
**humans** 114:7
168:4,11,15
**hundred** 96:20
220:7,7
**hundreds**
65:20
**hungry** 139:8
**hunt** 222:16,22
223:7
**hypothetical**
69:23 70:6
71:10 143:11
144:9 170:20
174:22 176:23
201:4 202:24
203:20 208:9

**hypotheticals**
69:24

**i**

**iarc** 80:4,7,13
84:14,18 131:4
131:5 132:3
**ich** 76:1 118:8
118:9 142:16
142:18 143:3,5
145:2,5,6,14,18
146:1 149:19
151:25 153:1
153:15,21,25
154:12,15,19
154:23 155:1,5
157:2,10,15,17
157:20,22
158:2,2,3,6,11
158:18,21
159:8,14,22
160:19 161:2,3
163:11 164:25
166:4,14 167:5
167:8,20 168:1
177:10,15,25
191:16,18,19
191:22 214:1
219:21 232:4,6
241:14,16
242:5,16
**idea** 49:3 76:19
76:22 222:25
227:7 247:20
**ident** 5:17 6:2

**identical** 212:5
**identification**
13:13 95:24
98:15 109:9
133:19 143:15
150:10 162:7
**identifications**
162:8
**identified**
12:24 122:1,3
123:3,13
132:21 161:16
161:23 188:4
199:9,12
**identify** 30:25
78:22 112:22
122:2,16 129:5
141:16,17,22
141:25 144:24
151:22 161:4,5
161:10,21
164:18 167:2
180:8,10
187:19 189:13
208:23 209:7
209:16 210:8
219:17 225:1
261:11
**identity** 166:23
200:15 236:16
**ignoring**
160:22
**illinois** 4:4
**immediately**
123:14

**impact** 204:2
**impacted**
193:10
**impacting**
234:22
**impatient**
99:25
**implant** 55:15
**implants** 35:13
35:15
**implement**
112:13 179:19
179:23
**implemented**
184:2,23
**import** 172:20
174:1,3,7
**important**
46:11 154:2
168:3,10
241:16
**imprecise**
71:12
**improper**
125:23 194:24
**improperly**
34:22
**improve**
152:25 153:20
190:3
**improving**
52:23
**impurities** 73:6
96:22 105:23
107:12 108:1

**[impurities - ingredients]**                                      Page 28

116:23 118:12
119:4 122:17
124:12 143:4,6
143:14 144:23
160:3 163:14
163:16,20,21
164:9,14,15,18
165:1 166:20
166:21 167:3,9
167:22 180:9
186:15,20
189:6,10,11,14
189:19 190:12
201:9 202:7,10
202:11 206:19
207:3,11,13,19
208:3,20 211:8
211:12,12,21
213:3,23 214:8
215:7 231:25
232:1 233:5
235:10 239:15
239:16,22
240:1,3,3,17,19
240:19 241:19
241:22 243:7
243:19
**impurities7**
212:2
**impurity**  71:3
112:1,2,14,23
116:6,10,14,17
118:17,18
144:25 149:20
151:23 152:3

154:1 166:23
180:4 199:5,11
199:16,25
200:18,22,23
201:1 202:3,6
202:15,17,18
202:20 203:4,9
206:21 208:24
208:25 209:8
209:17 210:9
212:5 237:4
241:23 245:14
255:6,12,24
256:9,24,25
**inaccurate**
195:5 235:5
**inadequacies**
71:16
**inadequate**
169:6 180:18
182:10 187:21
240:25
**inappropriate**
162:14 196:12
205:5 224:18
252:4,25
**include**  37:1
63:21 64:8,12
65:3,8 134:6
154:6,10 186:8
186:14 188:8
208:24 209:8
210:8 234:1
235:25

**included**  64:24
92:2,10,15
93:10 135:23
153:11 154:8
157:3 182:17
186:19 218:1,4
218:16 231:23
257:5
**includes**  110:22
**including**  76:7
177:14 226:7
**income**  47:25
**incomplete**
143:11 144:9
170:19 174:22
176:23 201:3
202:24 203:19
208:9
**incompliance**
43:12 44:16
46:23 47:12,15
47:25 49:9,12
222:1,8 224:25
225:20 226:7
**inconvenience**
7:20
**incorporated**
47:22 185:21
186:3
**increase**  183:19
184:2
**increasing**
184:13
**incumbent**
112:21 119:12

141:21
**index**  5:1 6:1
**indicates**
239:20
**indication**
236:25
**individual**
109:14
**industry**  16:21
16:22,24,24
37:6,8,19,22
44:6 48:20
105:6 109:7
124:11,14
152:3 190:11
**infected**  24:1
24:11
**infecting**  24:15
**infection**  24:6
**informal**
158:22 159:9
**information**
48:5,24 54:14
55:1 63:20
64:8,9,12,24
65:3,6,17
106:12 115:15
140:15 157:2
184:20 223:2
237:7,7 239:16
**ingersoll**  4:8
**ingredient**
34:11
**ingredients**
247:6

[injection - involvement]                                      Page 29

injection  36:12
injured  22:23
injury  205:12
input  54:8
  164:4
inquiries  19:7
inspect  120:10
  172:7
inspected
  172:11 175:4
  176:8
inspecting  17:3
inspection  16:9
  17:6 27:19
  29:6 35:24,25
  39:19 54:16
  174:25,25
  175:7 183:4
inspections
  15:11 17:2
  18:5 26:10
  29:4,13 35:21
  39:1,8 89:4,5
  113:24 119:16
  172:14,18,24
  173:8,19,22
  174:9 175:8
instance  121:3
instances
  115:17 181:2
instituted
  213:6
instruct  78:9
  252:5

instructed
  114:21
instructing
  48:15 250:9
  254:17
instruction
  95:2 114:24
instrument
  74:8
instrumentati...
  100:12 109:8
insufficient
  243:4,6,16,18
intelligibly
  168:20
intend  229:13
intentional
  205:6
intentionally
  24:17 214:7,10
  244:10
interact  33:8
interaction
  26:13,16,19
  27:21
interactions
  28:6 31:6,8,9
  33:9 56:24
  134:5 190:17
interested
  37:20 154:14
  154:16 265:14
interests
  236:12

interface  39:18
internal  76:8
  77:11 159:20
  166:19 179:19
  179:22 180:3,7
internet  1:20
internships
  58:8
interpretation
  258:22 259:2
interrupt  84:6
  117:19
interrupted
  84:4 166:2
  209:22,23
  252:10,23
interrupting
  117:20 196:11
  252:8,20
interruption
  209:24,24
interstate
  142:5 194:7
  204:18
intervals  29:13
intimidate
  250:9,14
intimidating
  250:18
introduce
  142:4 150:6
introduced
  106:14 126:19
  126:24 204:17

introductory
  25:13
investigate
  164:22 166:23
  171:6
investigated
  160:4 199:25
  200:23
investigation
  85:7 116:21
  173:4 217:4
  234:22 237:2
  243:3 257:1
investigations
  10:6 162:6
investigator
  13:19 14:18,21
  14:22 119:19
  183:17
invoice  220:6
invoices  50:4
involve  35:19
  56:12 58:23
  113:14
involved  18:5,8
  27:6 28:15
  33:19 35:14
  38:12,17,22
  50:25 52:4
  54:25 58:24
  119:17 172:1
  228:3,6 241:21
involvement
  27:11,18,18

[involves - know]                                                    Page 30

**involves** 144:14
144:18 225:20
**involving** 14:25
24:6 57:8 58:1
68:24 197:10
**irbesartan** 1:3
1:5 245:17
253:11,13,15
**irvine** 30:18
**ish** 58:16 59:14
**issue** 24:20,23
49:15 66:21
77:7 116:2
124:3 167:18
185:7 190:20
206:5
**issued** 172:21
172:22 190:24
**issues** 23:13,15
28:13 29:14
49:4 115:19
116:1 160:2,22
171:18 201:19
**italian** 53:15
223:13
**italy** 52:10 53:8
53:19 55:6
223:25
**items** 108:19
**ives** 4:2,3

**j**

**j** 258:13,18
266:1
**january** 1:12
1:20 7:2 93:24

95:21 96:4
110:24 218:19
231:23 241:6
**jbobber** 2:24
**jersey** 1:1,19
2:6,22 265:4
**jessica** 3:7
49:19 117:23
262:4 264:9
**jessica.miller**
3:10
**job** 17:21 19:15
21:5 35:17
36:3,6,18 37:1
37:11,12,17,21
38:4,19,25
42:9 45:5
58:12 61:1,4
61:11 72:15,16
180:10,14
**jobs** 37:10
60:15 61:16
225:25
**john** 2:21
**join** 23:7
**joke** 64:18
**jr** 2:21
**jucai** 258:10
259:7,13,18
**judge** 107:20
223:5
**judicial** 29:21
**juillard** 132:11
**july** 25:2 93:24
244:14 245:16

**june** 55:6,7
187:2
**junior** 17:10
**jurisdiction**
14:24
**justification**
147:11 244:24
245:7,12
**justified** 148:13
174:19
**justify** 147:10
**justin** 4:13 7:5
260:1

**k**

**k** 8:1 55:13
255:6,12,24
256:9,24,25
**kansas** 2:14
**kass** 2:9
**katz** 2:5
**kbi** 4:5
**keep** 96:12
108:11 224:16
227:22 254:20
**keeping** 28:4
**keeps** 252:8
254:20
**kept** 67:2
**killing** 179:8
**kind** 19:1 45:21
53:23 55:14
105:18
**kinds** 115:5
**kirkland** 3:18

**kirkland.com**
3:20
**kirstin** 4:2
**knew** 28:19,23
161:19 245:8
**know** 7:19 8:17
9:12 10:6,9
11:25 12:5,11
12:13,17,20,24
15:17 19:9,11
19:12,14 20:1
20:6,10,22,23
22:9 24:18,21
24:24 28:21
34:17,19,20
35:25 39:4
41:9,12 42:5,5
43:17,18 45:7
46:11,25 48:1
48:13 49:8,11
50:13 51:15
52:6,22 53:17
54:6,8,9,23
56:9 58:3
59:25 65:16
66:6,10,14
67:6,9,10,11,14
67:15,19 69:2
70:4,11 71:24
72:2,4 73:2,5,9
73:18,22 74:2
74:4,9,15
75:24 76:14,17
76:20 77:10,12
77:15 78:25

81:20 83:4
84:15 85:21
88:7,25 89:4
89:10,20 90:5
90:7,15 91:6
92:14,16 93:15
93:17 95:8,11
96:22,24 97:5
97:23 98:8
99:9,24 101:10
102:1 103:6,7
103:9,12,18,23
104:1,4,6,8
111:5,7,13,16
112:2 123:4,8
123:12,13,15
123:17,21
124:10,17
125:10 128:13
129:21 130:2
131:12,15
132:2,11,25
133:2,4,23
134:16,22
135:2 136:19
136:22 143:22
143:25 144:13
147:12 148:15
151:4 152:2,4
152:4,15
156:18 157:10
157:13 159:7
162:10 164:13
167:20 168:3
168:10 170:16

172:10,15,17
172:24 173:1,3
173:8 174:8
175:3,16
176:11 177:23
178:19,22,25
181:22 184:22
185:10 186:18
190:16 191:19
193:19,20
194:14,19
196:20 200:12
201:25 204:18
204:19 209:14
209:15,19
210:7,12,13,22
210:23 211:4,7
211:20,23
214:11,13
216:2,4,15,18
217:2,9,11,15
217:17,25
218:2,3,15
219:11 225:11
226:2 227:5
228:3,24 229:5
229:7 242:24
246:13,15,17
247:2,17 248:3
248:9 249:3,4
251:10 252:25
253:13,17,18
253:21 256:2,9
256:17,24,25
257:12 262:7

262:12
**knowing** 50:3
  90:2 99:8
  107:15 109:13
  113:8 187:14
  245:1,1
**knowledge**
  26:24 44:4,14
  69:4,12 88:6
  107:7 111:10
  116:12 118:16
  140:21 170:13
  178:21,24
  182:18 187:3
  187:10 205:13
  205:18 207:6
  212:1,3,6
  215:9 228:21
  228:25 237:24
**known** 73:24
  80:6 81:17
  82:5 83:8,16
  84:11 116:17
  137:20 169:14
  169:22 170:5
  170:11 244:23
**knows** 43:22
  90:22 152:4
**kugler** 1:4

**l**

**l** 22:15 32:14
  32:14 36:8
  225:3,6 226:8
**lab** 74:6 121:21
  121:24 122:3,3

191:8
**label** 208:24
  209:8 210:8
**labeling** 199:9
  199:12,13
**laboratory**
  99:6 109:20,25
  110:5,12,23
  111:1 119:17
  121:10 149:22
**labs** 2:19
**lack** 38:17 77:1
  78:20 81:3,23
  122:21 130:5
  144:8 159:13
  167:11,18,23
  168:19,19
  169:16 170:20
  174:21 176:22
  181:13 187:5
  200:20 202:23
  203:20 208:7
  209:3 214:14
  235:3 247:7
  248:6 262:1,16
**lacks** 71:9,12
**lai** 23:1
**language**
  149:22 241:5
  243:12
**laptop** 78:7,8
**large** 134:3
**larger** 192:24
  194:13

**largest** 10:5,20
**late** 12:21
    40:14 225:10
**laughing** 64:18
**law** 2:13 12:11
    12:16,17
    227:20
**laws** 231:22
**lawsuit** 58:20
    58:22
**lawyers** 57:3
    63:11 66:2
**lead** 74:16 75:2
    81:1 106:23
    219:25
**leads** 154:20
**learn** 132:18
**learning** 25:24
**leave** 16:20
    35:5 37:17
    60:19
**leaving** 31:4
**lectures** 41:15
**led** 24:14 80:14
    81:20,21
    178:12 182:17
    185:11 188:25
    201:22 235:9
    257:2,17
**left** 15:22 17:18
    58:24 59:6
    60:18,25
    212:13
**legal** 162:14
    163:1,2 237:14

**legally** 142:19
    147:16,23
    148:9,16,21
    149:4 232:4
    238:8,23,24
**length** 138:15
**lengths** 65:14
**leon** 2:10
**letter** 20:8
    21:18,20 24:19
    28:10 29:12,15
    29:24 30:2,9
    30:10,12 88:23
    89:15 105:4
    116:1,3 160:1
    160:6 172:22
    174:1,3,6
    205:21 206:4,5
    228:18,23
    229:1,5,6
**letters** 18:22
    19:10,13 20:11
    23:4 26:11
    34:25 35:2
    56:24 115:25
    131:19,22
    132:1 205:1,5
    205:10,14
    227:6
**letting** 256:17
**level** 107:24
    109:2 115:5
    167:10,22,22
    189:14 200:18
    208:4 210:14

    210:17,25
    211:8 213:6,7
    213:9,11,13
**levels** 104:19
    104:23 105:8
    190:20 234:18
    234:23
**levy** 1:18 7:7
    265:2,22
**lexington** 3:19
**li** 88:16 244:15
**li's** 88:11 123:6
    244:18
**liability** 1:3,5
**license** 265:23
**life** 36:18
    105:17
**light** 23:7 230:8
**likelihood**
    235:6
**likely** 49:18
    67:16 235:25
**lily's** 178:2
**limited** 218:9
**limits** 14:15
    213:2 215:6
**lin** 245:15
**line** 150:18
    151:5,9,10,11
    151:17 152:19
    235:2 256:4
    262:11 266:5
**lines** 151:2
    171:11 196:13
    232:15

**linkedin** 61:25
    62:2
**list** 5:23 44:19
    45:5,7 49:9
    76:23 77:6,9
    92:3,6,11,13,15
    93:6,11 94:9
    94:11,22 95:20
    95:23 96:8,9
    99:1,2 108:20
    114:25 132:7
    132:11 134:7
    135:12,15,20
    135:24 137:2
    137:11 215:16
    217:7,12 218:1
    218:5,16
    219:17 221:25
    222:8 242:15
    260:22 261:1
    263:10
**listed** 70:11
    97:17 217:16
    242:18
**listen** 48:12
**listing** 197:16
**literature**
    75:11,13,14,17
    78:12,13 79:23
    80:4,18,19
    81:13 82:12,18
    82:20 83:15,20
    84:10,17,23
    102:11,12,14
    102:22 125:10

125:13,15
126:7,9 127:1
127:20 128:14
128:21 129:4,6
129:12,16,22
130:1,2,11,13
130:13,16,19
130:24,25
132:20 168:24
180:16,20
181:4,7,10,19
233:11 234:9
**litigation** 1:3,6
7:5 12:19 13:3
13:7 40:22
41:2,7,10 44:3
44:8 57:7,11
62:7 66:21
68:23 69:17
70:10 72:1,7
73:17 74:15,25
76:15,16,18,21
82:14 85:14
86:25 102:9
129:21 131:20
140:11 160:14
185:8 198:24
207:19 215:25
233:17
**litigations**
74:20
**little** 14:7 34:8
133:25 137:4
151:9 226:5
232:25 235:1

238:6
**live** 42:23
**lived** 47:3
**llc** 2:5,16 4:7
47:18
**llp** 2:9,21 3:3,8
3:13,18 4:3
**located** 30:18
52:3 229:3
**location** 1:14
250:2
**log** 197:16
**logistics** 19:16
19:24
**long** 6:6 7:17
7:19 23:16
24:16 32:1,15
60:12,21,25
65:11,18 81:6
132:12,25
133:15,16,18
170:23 226:14
**longer** 31:1
65:21 77:24
**longevity** 138:3
**longstanding**
106:6
**look** 9:11 46:12
52:7,10 53:7
53:24 54:23,24
55:2 56:21,23
59:16 60:8
84:20 92:4,12
93:16 94:18
95:12 106:12

108:25 126:25
129:17 132:8
132:13 134:21
142:15 146:16
150:24 153:9
155:20 158:25
163:18 168:1
173:15,25
174:5 175:6
184:21 185:12
185:17 186:17
196:23 200:2
204:16 207:16
209:13 210:21
214:1 216:8,22
217:5 229:5
232:25 248:25
253:7 256:2,11
258:14 259:10
261:7,9
**looked** 51:25
75:24 80:4
105:24 155:15
178:20,22
249:15 261:9
261:12 262:24
**looking** 50:3
94:20 95:7,10
100:3 136:4,25
157:10 165:12
167:19 182:3
190:7,15
200:13 210:6
210:11 216:15
216:18 231:12

238:5 240:16
248:18 249:2,5
249:7,8,11
250:14 255:20
261:4 263:2,7
264:2
**losartan** 1:2,5
**lost** 7:17
143:17 165:20
**lot** 8:25 46:25
63:5 184:20
204:22 235:22
**lots** 230:3
**loud** 151:11
**louis** 99:7
**low** 107:12
232:16
**lowering**
184:16,18
**lunch** 134:22
**luncheon**
139:12
**lym** 22:15

| m |
|---|

**m** 2:4 22:15
32:14 36:8
45:14
**m7** 118:9
164:25 166:4
166:14 214:1,1
**machine** 74:7
**made** 44:9
69:10,13
110:21 130:3
134:10 151:13

**[made - maryland]**                                                          Page 34

| | | | |
|---|---|---|---|
| 153:20 171:10 | 100:10 102:7 | 235:8 | 83:1,7 87:25 |
| 182:23 183:1,5 | 102:15 109:19 | **manufacturer** | 88:9 104:19 |
| 185:20 192:21 | 110:4,11,25 | 16:10 17:14 | 106:13,23 |
| 192:24 198:1 | 115:16 119:19 | 37:24 70:4 | 112:2,15 |
| 256:1 | 120:22 151:14 | 113:22 116:5,9 | 114:10,14 |
| **mail** 9:16 62:15 | 152:25,25 | 118:16 119:2 | 115:4 120:19 |
| 66:8 90:11 | 153:20 154:18 | 123:22,24 | 130:21 131:2,7 |
| 244:15,19 | 155:20 160:16 | 124:5 141:17 | 131:17 136:20 |
| 245:15 251:12 | 185:18 222:25 | 141:21,24 | 143:1,8 144:11 |
| 251:15,17,23 | 226:5 243:12 | 143:7 144:19 | 144:14,18 |
| 251:24 252:12 | **makes** 48:8 | 164:17 166:14 | 167:5 169:2 |
| 252:13,15 | **making** 165:13 | 166:22 167:2 | 170:2,15,18 |
| 253:7,10,19,25 | 182:21 190:2 | 191:10,14,23 | 171:7,11 172:7 |
| 254:4,6,11 | 200:7 | 192:19 208:23 | 172:25 173:9 |
| 255:3,6,11,14 | **malta** 229:3 | 209:7,16 210:7 | 173:23 175:18 |
| 255:22 257:2,6 | **manage** 235:24 | 228:6 | 177:14 178:3 |
| 257:10,13,18 | **management** | **manufacturer's** | 183:7,18 |
| 257:21,25 | 158:22 | 119:22 120:13 | 188:15 190:3 |
| 258:4,5,8,11,22 | **manager** 17:23 | 120:18 162:24 | 229:3 235:17 |
| 259:2,8,20 | 18:2,3 26:7,8 | 170:9,10 | 246:11,16,20 |
| **mailed** 132:23 | 38:7,8 223:21 | **manufacturers** | 246:24 |
| **mails** 62:17 | **manages** 53:7 | 104:20 109:5 | **march** 40:11 |
| 76:7 | 223:17 | 109:11,14 | **mark** 13:9 49:6 |
| **main** 8:14 | **managing** 52:4 | 113:25 114:7 | 98:12 133:16 |
| 183:17 | **manufacture** | 116:13 123:20 | 150:13 |
| **maintain** 99:5 | 38:1 52:12 | 142:11 144:5 | **marked** 13:12 |
| **major** 51:8 | 104:24 105:9 | 166:17 190:7 | 95:24 98:15 |
| 115:11 185:5 | 113:17 124:5 | 190:15 225:13 | 133:18 150:9 |
| 187:25 | 170:23 177:9 | 226:19 227:1,3 | **market** 2:17 |
| **make** 11:8 | 183:5 | 238:10 | 22:13 54:9 |
| 46:19 53:23,25 | **manufactured** | **manufacturing** | 183:6,19 |
| 74:20 84:5 | 37:15 80:8 | 17:4 26:3 | 184:14 194:7 |
| 89:12,21 90:4 | 142:17 169:15 | 56:16,17 74:16 | **marking** 95:18 |
| 90:16 91:1 | 169:23 170:6 | 75:1,19 80:14 | **maryland** 86:6 |
| 99:10,17 | 170:12 206:25 | 81:1,20 82:21 | |

HIGHLY CONFIDENTIAL

[massive - miller]                                                    Page 35

| | | | |
|---|---|---|---|
| **massive** 168:18 | **meagher** 3:8 | **medical** 15:5,7 | **mestre** 2:9 |
| **master** 16:4 | **mean** 12:15 | 15:15,18 17:1 | **met** 66:1 |
| 104:2 111:6,8 | 31:7 40:17 | 57:17 91:13 | **methanol** |
| 111:14 185:6 | 41:23 44:17 | 107:20 114:18 | 236:19 |
| 185:21,21,24 | 45:9 54:19 | 114:18,19 | **method** 73:24 |
| 186:2,5,19 | 65:19 67:1 | 120:9 140:21 | 100:18,23,24 |
| **master's** 57:13 | 69:7 93:7 | 225:17,20 | 115:20 119:17 |
| 57:21 | 102:25 108:5 | 226:9,18,23 | 122:16 |
| **material** 22:17 | 111:14 114:2 | **medication** | **methodology** |
| 22:20 26:7 | 125:13 161:8 | 67:2 68:1 | 64:9 88:13 |
| 199:8 243:10 | 170:8 172:3 | **medications** | 237:20 |
| **materials** 38:7 | 174:17,18 | 109:6 | **methods** 109:8 |
| 62:24 77:14 | 182:14 194:4 | **medicines** | 109:14 127:9 |
| 93:9,11,13 | 199:24 225:5 | 149:16 | 193:8 |
| 95:8,10,12 | 251:5,11 | **meek** 6:6 | **metrics** 28:3 |
| 97:12,16 | **meaning** | 132:25 133:18 | **mid** 65:25,25 |
| 127:11 132:8,9 | 258:11 | **meet** 115:4 | 136:10 225:10 |
| 188:19 217:12 | **means** 41:25 | 156:25 200:15 | 225:11,11 |
| 218:7,12 | 70:11 71:16 | 206:9 207:23 | **middle** 27:5 |
| 241:22 260:24 | 87:23 88:7,20 | 207:25 208:21 | 165:11 169:20 |
| **matter** 1:17 | 89:1 101:6 | 220:13,20 | 169:24 200:4 |
| 11:21 12:1 | 167:14 174:24 | **meetings** 32:24 | 210:1 238:5 |
| 67:14 148:15 | 192:20,24 | **memory** 34:4 | 241:12 252:24 |
| 148:19 149:2 | 200:12 248:4 | 167:15 252:3 | 253:4 |
| 164:3 168:14 | 248:10 | **mentioned** 8:24 | **middles** 84:6 |
| 229:13 232:7 | **medcell** 59:3,3 | 51:16 91:24 | **miller** 3:7 5:3,6 |
| **maximum** | 59:11,21,23 | 117:3 216:20 | 7:14,23 13:9 |
| 113:4 211:8 | 60:16,18 61:14 | 251:12 | 13:22 32:14 |
| **mazie** 2:5 | **media** 7:3 40:2 | **mentions** 212:1 | 39:23 40:8 |
| **mazieslater.c...** | 40:5 61:19 | **merely** 82:11 | 48:15,19 49:16 |
| 2:7,7 | 86:14 124:21 | 181:18 | 49:22 63:24 |
| **mbcatello** 3:16 | 125:1 179:10 | **merge** 54:24 | 64:7,16,19,21 |
| **md** 1:6 | 179:14 212:17 | **message** 10:15 | 70:17,21,25 |
| **mdl** 1:3 | 212:22 | **messaging** 9:17 | 71:10 72:11,15 |
| | | | 75:4 81:8 |

**[miller - n.v.]**                                                                      Page 36

83:25 86:8,16
87:4,8,11
90:10,19,22
95:18 98:11
99:14,19,22
106:4 108:14
109:23 112:7
112:10 116:25
117:3,14,18
124:18 125:4
126:19,23
128:5 134:20
135:19 137:24
139:7 140:9
143:19 150:6
150:11,15,23
151:7 157:6
163:8 165:15
165:22 166:13
177:1 179:7,17
195:8,12 196:9
197:5 200:4,9
201:12 208:13
208:16,19
209:22,25
210:4 211:15
212:9,12 213:1
215:15 221:6
222:3,8,13,18
223:8 224:12
227:9 229:7
230:11 240:11
243:21 245:3
245:10,24
246:7 248:16

248:22 250:18
250:22 252:20
252:23 253:2
254:12,16
255:16,21
256:6 259:23
260:4,10,13,16
264:6
**min** 244:15,18
**mine** 46:2
**minimal** 213:12
**minimum**
    42:17 61:11
**minor** 185:5
**minus** 90:10
**minute** 45:3
    50:23 86:8
    90:6 115:7
    151:8
**minutes** 32:2
    32:17,22 87:16
    87:17 129:20
    134:21 184:15
    206:14 240:13
    245:24 262:8
**mischaracteri...**
    81:4,24 167:19
    181:13 262:2
    262:16
**mischaracteri...**
    245:3,4
**misleading**
    256:1
**misrepresenti...**
    196:15

**missed** 16:23
    64:18 119:10
    169:24 222:6
**missing** 48:18
    110:17 193:6
**misspoke**
    226:22
**misspoken**
    184:18
**misunderstood**
    83:25 84:4
    125:21 147:5
**moderate** 185:5
**modified** 141:3
**module** 239:14
    239:20,25
    241:9
**modules**
    239:10
**molded** 36:12
**molecule**
    253:15,16
**moment** 34:7
    91:24 99:12
    130:3,10
    221:21
**monday** 43:4,8
**money** 48:8
    182:22,23
    183:8,10
**monitors**
    261:20
**monograph**
    80:5,7,13
    84:18 131:4,5

132:4 211:25
**monographs**
    84:15
**monoxide**
    136:14
**monroe** 4:3
**month** 40:9,12
**months** 59:8,13
    59:14,18 60:1
    60:14 114:3,5
    219:12 226:1
**move** 37:7
    196:23 261:17
**moved** 17:23
    37:6 261:13
**moving** 216:19
**msp** 221:22,23
**multiple** 18:19
    21:7 224:13
**murtha** 2:20
**mutagenic**
    118:11
**mylan** 3:12

|        n        |
|:---------------:|

**n** 2:1 3:1 4:1
    6:7,7 7:11,11
    22:2,2 32:14
    133:18,18
    140:1,1,1,3,3
    232:18,22
    234:20,20,20
    236:7,7 240:2
    240:18,21
**n.v.** 3:12

**n.w.** 3:9
**nagle** 3:18
**najafi** 80:3
 82:2,7,13 85:8
 85:9,10 88:18
 111:23 125:7
 218:19
**najafi's** 84:14
 102:10 125:9
 129:24
**name** 7:5,24
 12:11,16 22:1
 22:9 31:21
 32:13 33:18
 34:13 52:6
 53:15,15,16
 59:9,16,17
 60:7,24 61:15
 62:2 213:22
 223:9,11,13
 224:22 227:19
 258:12 263:13
**names** 11:18
 46:10,12,13
 51:16,17,21
 130:10 222:22
 224:25 225:16
**nations's** 91:13
**nature** 27:25
 67:12 205:17
**nausea** 27:8
**nda** 104:3
 157:3
**ndea** 69:2
 70:12 71:24

72:22,25 74:17
101:24 108:1
118:22 119:1,3
119:7,11
180:18 185:11
185:13 190:8
190:14,20,24
191:2 201:1,18
201:21 202:1
206:13 210:14
210:17,24
211:2,5 214:7
243:25 244:6
244:10
**ndma** 69:2,10
69:21 70:12
71:3,6,24
72:21,25 75:2
80:6 85:18
86:1 89:9
100:18 101:21
101:24 102:2
103:13,17,19
104:19,23
105:5,8 106:24
107:9,25 109:9
118:22 119:1,3
119:7,11 120:1
120:2 121:9,13
121:18 122:1,4
122:16 123:9
123:12 138:5
138:17 151:22
152:2 161:21
162:7,9 169:9

178:12 180:11
180:18 182:18
187:19 188:3
188:25 190:8
190:14,20,24
191:2 199:2
201:1,7,7,9,18
201:20 202:1,5
202:6,16,17,18
206:13 207:23
207:24 208:2
210:14,17,24
211:2,5 213:2
213:4,5,8,11,13
213:14 214:7
214:11 220:1
234:18,23
235:10 243:25
244:6,10,20
245:1,8 257:14
**ndma's** 89:11
89:21 90:4,16
90:25 99:10
100:9 102:7,15
109:19 110:3
110:10,25
**necessarily**
20:9 93:8 99:4
138:10 174:14
199:13 204:1
204:10 206:20
**necessary**
168:19
**need** 8:17 39:24
43:24 44:2

48:7 49:19
53:6,24 61:4
70:2,21,23
77:24 84:20
91:4 94:4,19
95:11 115:16
119:8,12 123:2
126:12,16
127:19 131:10
135:3,13 136:4
137:4 160:15
163:5 164:4
166:20 167:9
167:21 173:15
179:7 181:15
185:3 186:21
191:18 194:4
202:25 208:10
208:23 209:7
210:8 220:5
230:8 237:10
245:24 249:3
256:11
**needed** 195:17
**needs** 45:22
90:12 111:25
146:13 157:14
**negate** 156:25
**negative**
148:25
**neither** 265:9
**never** 22:13
61:13 67:2,23
68:17 69:4,7
86:23,24

**[new - objection]**                                              Page 38

**new**  1:1,19 2:6
  2:22 3:9,19,19
  54:3 165:1
  166:9,11 167:6
  167:9,21
  241:23 265:3
**newly**  106:10
  107:3
**news**  198:14,25
**nice**  264:9
**night**  264:9
**nights**  57:24
**nina**  3:8
**nina.rose**  3:11
**nine**  114:2,5
**nitrite**  85:25
  142:25 143:8
  143:23 144:1
  144:14,18
  185:13 241:5
  242:9 244:21
  245:2,9
**nitrosamine**
  107:11 212:1
  252:13
**nitrosamines**
  25:25 57:8
  68:25 73:3,6,9
  79:12 80:11,15
  81:2,22 87:24
  88:8,13,20
  89:2 93:25
  101:7,11,14,14
  109:6 131:25
  143:2,9 144:6

144:20 215:23
**nitroso**  232:18
  232:22 240:2
  240:18,21
**nobody's**  49:7
**non**  41:23
  115:9 164:8
  177:10
**nonconforma...**
  28:4
**normal**  164:1
**north**  4:9
**notary**  1:19
  7:12 265:3
  266:24
**note**  7:15
**noted**  7:8 29:6
  153:14,14
  264:13
**notes**  1:16
  10:21 55:2
  77:13 78:6,17
  265:5
**notice**  1:22
  80:13,25 81:10
  81:12,14,14
**notices**  67:8,9
**notification**
  44:5
**notified**  67:23
  123:14
**notify**  205:23
**novak**  263:13
**novartis**  121:9
  121:11,15,18

121:25 123:15
  123:18,19
  124:4 176:7
  177:7
**november**
  40:14 239:11
**number**  7:3
  15:10,11 16:22
  18:12 40:5
  53:25 58:9
  77:5 86:14
  98:5 124:21
  125:1 179:10
  179:14 193:10
  212:17,22
  217:3 219:10
  220:10,19
  226:15
**numbers**
  150:25 191:5
  210:21 217:18

**o**

**o**  22:2,2 54:1
  140:1,1,1
**o'clock**  134:22
**oak**  51:10 53:9
  53:10,11 55:11
**oath**  8:9
**object**  48:21,22
  48:23 63:15,19
  70:19 71:17
  122:23 209:3
  240:11 256:11
**objected**
  171:21

**objecting**  86:20
  87:12 127:18
  196:10
**objection**  36:21
  48:3 61:6 63:9
  63:13,22 71:8
  77:1,4 78:20
  79:13 80:9
  81:3,23 82:10
  82:15,22 83:10
  89:13,22 91:2
  91:21 94:2,23
  95:15 100:11
  101:1 103:14
  104:25 105:11
  107:1,13,18
  108:2,8,11,12
  109:21 110:19
  111:20 112:4
  112:16,20
  113:6,6 114:11
  116:11,15
  118:23 119:5
  119:24 120:6
  120:25 122:7
  123:10 124:1
  125:24 127:3
  127:14,24
  128:16,17
  129:7,8,14
  130:4,5,15,22
  136:24 138:8
  139:4 141:1,6
  141:19 142:2
  143:10 144:8

[objection - opened]                                                    Page 39

145:8,20,23
146:8 147:18
147:25 148:10
148:23 156:6
156:21 158:14
158:19 159:12
160:20 162:13
163:1,24
164:10,20
167:11,23,24
168:5,12,18
169:4,10,16
170:19 171:20
174:12,21
176:18,22
177:11,17
178:4,9,15
180:23 181:12
187:4,5,22
188:6,22
189:15,20
190:9 192:22
193:4 195:3,4
195:24 197:23
199:6 200:19
201:3 202:22
203:12,19
205:2,7 206:16
207:21 208:7
209:2,11,18
213:16 214:14
217:20 219:2
221:1 229:15
243:21 245:3
245:10 247:7

248:5,11
249:22 251:3
258:1 262:1,9
262:15 263:3
**objectionable**
174:19 175:2
**objections**
168:22
**obligated** 143:9
144:24 232:7
240:9
**obligations**
232:8
**observation**
200:7
**observations**
29:5,11
**obtain** 97:3
**obviously**
46:25 65:21
217:22 222:12
**occur** 104:19
104:23 105:8
112:14,23
174:2
**occurred** 38:10
131:16 171:6
175:9,17
**occurring**
112:1
**offer** 79:11
162:20 229:9
229:13
**offered** 70:9
216:4 238:2

244:4
**offering** 71:7
80:12 125:21
140:10 159:22
161:16 191:6
194:16,25
196:25 198:9
206:8 207:18
214:6,16,22
215:1
**office** 30:18,22
50:19 106:10
107:3
**officer** 13:19
14:18,21,22
**offices** 31:1
**official** 172:19
173:5,9,13,23
174:11,15
**oh** 10:20 18:14
25:16 40:17
45:6 46:5 48:1
51:20 53:22
59:12 65:24
66:6,13 165:5
180:1 185:10
220:5 221:15
**okay** 8:24 9:5
9:10,13,19
10:17,21 11:1
11:10,20 22:12
32:18 39:22
41:1 45:1 46:3
52:8 53:4,19
57:3 62:24

70:25 71:21
84:5 87:9 95:5
95:10,14 96:12
96:13 99:5
126:13 127:18
128:1 133:15
139:7 147:3
149:7,12
151:24 152:1
165:9,18
179:24 180:3
195:12 197:6
203:2,14
207:18 208:16
210:13 216:19
218:10 223:19
227:8 229:7
230:5 231:10
236:14 237:18
239:2 249:11
250:22 255:5
259:22
**once** 31:25
67:25 238:23
240:8 244:23
245:7,13
**ones** 215:4
217:1 221:9
249:3
**ongoing** 243:22
**online** 41:15,16
**open** 115:18
116:2,20 263:8
**opened** 115:17
115:20,21,23

**operations** 26:8
38:8 74:12
**opine** 162:11
**opinion** 79:12
80:12 81:16
85:1 88:15
116:4 122:5
125:22 126:1
132:15 137:17
137:19 138:1
140:13 141:9
145:7,13
153:18 158:11
159:22,25
160:7,18 161:1
161:16 162:20
169:7 179:3
191:6,22 194:1
194:17 195:1
196:25 198:9
198:12,15,19
198:22 199:3
202:19 204:21
206:8 207:13
207:18 208:5
214:6,16,22
215:1 219:4
234:10 235:17
237:6 240:24
**opinions** 69:20
70:9 71:6,23
75:1 82:8,11
82:14,17 85:13
88:16 97:17,21
105:10 125:6,8

126:5 127:11
127:22 128:14
129:2 130:2
134:16 137:16
140:10 154:4
155:7,9 159:16
160:14 161:15
176:17,21
216:4,5 219:1
229:9,14
237:14 238:2
241:8 242:13
244:4
**opportunity**
29:7 35:6
193:7
**opposed** 151:3
167:15 191:25
**orange** 33:20
33:22
**order** 112:12
118:1
**organic** 25:7,10
25:14 79:15
80:1 82:4 85:2
85:23 86:5
103:22 104:2,6
106:9,16,19,21
107:8 111:5,15
111:19 164:3
**organization**
33:11,15 133:6
133:21,24
134:3,13 236:6

**organizations**
67:10
**original** 92:2
92:10,15 93:6
93:11 99:1
201:25 217:12
218:1,4,16
**originally** 58:9
152:22
**outcome** 193:3
**outpost** 30:20
**outset** 238:23
**outside** 43:25
47:2,3 54:3
70:6 237:23
**overall** 56:14
57:21 70:3
76:16 164:6
**overbroad**
127:15 208:9
**overlaid** 249:13
**overland** 2:14
**overlap** 226:3
**own** 43:20
47:21 85:7
121:11,13,15
126:21 166:19
179:19 180:13
210:5 219:17

**p**

**p** 2:1,1 3:1,1
4:1,1 45:14
115:9
**p.c.** 4:8

**p.m.** 230:18
264:13
**pacific** 1:13,22
**page** 5:2,8
13:14 61:20
99:15,21 100:2
100:2,4,4,5
103:21 106:5,5
133:20 135:11
136:2,8 138:18
149:7 150:17
150:18,20,21
150:24,25
151:2,5,9
212:24 218:21
230:23 231:8
231:12,18
233:1,14,15,15
233:15,17,20
234:16,25
235:1 236:11
236:15 238:4,6
239:4,5,8,8,20
241:11,12
242:22 243:1
248:1,2 263:14
266:5
**pages** 5:20
13:12 65:20
151:3 196:13
239:25 259:17
**paid** 49:5 58:25
232:20
**pandemic**
46:25 47:9

56:1
**paragraph**
100:18 104:12
106:7,8 232:14
233:1,10 235:2
236:18 238:5,7
239:12 241:4
241:14 243:2
**parameters**
160:16 188:20
235:5
**paraphrase**
195:5
**park** 2:14
**parkway** 2:5
**part** 19:14 55:5
70:14,15 73:17
95:3,4,13
106:10 108:3,6
108:7 131:20
143:1,8,17
147:8 178:23
196:20 228:14
231:11,13
233:25 239:10
**partial** 249:23
250:20
**participate**
12:19
**particular**
42:18 54:22
55:2 83:5
155:19 156:4
**parties** 265:11

**parts** 21:2
142:13 153:10
230:3 236:10
**party** 12:8
121:10,16,19
121:21,24
122:3,3
**passages** 154:3
155:22
**passed** 176:11
**passion** 17:24
**patent** 253:24
254:1,3,5
255:2 258:7
**patience** 151:9
**patient** 19:21
20:3
**patients** 23:25
24:6,11,15
107:11 113:4
**pause** 21:14
36:16 95:17
96:11,17
104:16 122:24
127:7 128:24
129:18 145:22
150:14 156:11
230:10 239:7
245:22 258:16
**peak** 103:1
122:4 161:23
**peaked** 122:17
**peaks** 101:15
101:17 121:21
122:2 123:2

141:16,16,18
141:22,25
161:4,4,6,10,12
161:14,16,20
161:21 162:3,7
162:9,12,21,25
164:23 166:15
166:18 178:17
178:23 182:12
182:14 197:10
**pen** 78:6
**pending** 96:18
255:21
**peng** 231:14,19
**pennsylvania**
2:17 3:4,14
**people** 9:3,15
11:18 12:15
33:8,9 34:6
58:1 111:13
**percent** 15:15
15:16,19 47:14
58:4 96:21
208:25 209:9
209:17 210:9
210:14,17,25
226:10,11,18
226:20,22,24
244:2
**percentage**
15:6 20:10
46:22 47:10
76:20 225:19
226:6 227:5
244:1

**perform** 29:8
29:13 45:11
75:11 105:16
119:6 132:20
168:16 169:1
193:7,11,12,14
193:17,18
233:21
**performed**
27:20 47:2
52:15 89:5
162:6 163:15
169:8 174:24
233:3 240:25
**performing**
233:11 234:9
237:21
**performs** 14:23
104:4
**period** 66:20
177:16
**permission**
41:6 43:24
44:2,5 256:13
**permit** 160:24
**perry** 96:12
150:16
**person** 14:23
17:10 31:22
38:16 66:2
181:2 183:3,15
183:15 232:19
256:7
**person's** 17:8
31:21 32:13

**personal** 61:24
61:25 77:16,19
107:20
**personally** 82:7
88:6 163:15
**perspective**
120:15,16
**pertained** 21:2
**pertinent**
132:15
**ph.d.** 6:10
150:9
**pharma** 38:15
48:19,20
**pharmaceutical**
16:17 37:6,8
37:19,21 44:6
51:21 52:5
99:6 105:15
106:11 107:3
116:13 118:15
118:20 124:11
143:22 144:1
144:17 157:16
199:4
**pharmaceutic...**
3:2,17 17:15
73:7,10 144:13
171:19
**pharmacist**
67:3 68:7
**pharmatech**
45:13,16,18,20
45:24 46:3,5
46:23 47:3,11

51:8,9,12,22
53:13 223:19
223:21,22,24
224:5,24 226:8
**phase** 62:4
**philadelphia**
2:17 3:4
**phone** 31:13,15
31:20
**phrase** 213:19
213:20 248:6,8
248:9 249:23
249:24,25
251:4
**phrases** 250:20
**physical** 54:19
236:17
**physically**
40:17,19,20
**physician** 68:6
**picking** 242:11
**picture** 249:14
**piece** 202:12
**pietragallo**
3:13
**pietragallo.co...**
3:15,16
**pilot** 191:8,11
191:14,24
192:8,12,13,15
193:2,24
194:10 195:17
195:21
**pittsburgh** 3:14

**place** 21:19
29:4 87:10
173:20 246:20
261:16,17
265:7,14
**placed** 71:20
**places** 216:9
**plaintiff** 11:25
12:3,5,7,14
**plaintiff's** 7:18
81:19 219:6
**plaintiffs** 2:3,8
2:12,15 66:1,5
66:16 68:14
74:19 75:15,18
76:4,9,25
80:19 88:4
98:9 197:18
219:15,22
220:13,21
247:4,11
**plasma** 38:2
**plasmapheresis**
38:2
**plastics** 36:13
**please** 7:9,24
9:12 11:8
14:13 31:7
33:15 34:14
48:9 49:1,20
63:15 64:20
71:22 75:3
81:6 90:5,14
94:11 96:16
99:12 107:6

108:14 110:16
112:5 117:16
135:18 150:21
151:6,10
152:11 157:9
162:17 163:7,8
166:1,2 169:20
173:6 176:25
196:1,6,22,24
207:12 208:17
210:19 211:13
212:8 219:19
221:5,17 223:5
223:15 225:7
231:8 238:5
241:12 250:10
251:24 253:2
255:1 258:12
**plunkett** 79:7,8
**plus** 43:8 220:7
**point** 9:10
18:15 44:21
82:25 83:4,4,9
83:18 84:2,13
84:19,24 85:4
85:13 88:22
93:3 126:5
130:25 131:12
164:2 166:1
193:21 211:18
232:7 244:23
246:10 253:8
256:23 262:23
263:1

pointed 83:5
pointing 13:21
points 238:1
policies 106:7
polite 72:14
  151:6
politeness
  72:19
ponce 2:10
poor 119:10
  139:8
portion 55:8
  259:13
portions
  181:16 247:22
  247:23
pose 240:3,19
posed 19:20
  20:2
position 20:21
  20:24,24 26:6
  36:7 38:14,15
  38:16 41:19,20
  41:24 42:1
  44:13,25 145:1
positions 21:7
  26:5 27:15
  38:6 111:16
possess 143:8
  153:20
possibility
  205:12
possible 99:17
  113:4 116:14
  152:24 153:19

154:18 241:24
242:1
possibly 18:2
  56:2 58:4,7
post 34:1
potency 240:2
  240:18 247:25
  248:4,10
  249:21 250:3
  251:1,9
potential 68:11
  107:25 111:18
  118:16 143:13
  149:20 151:22
  152:3 154:1
  171:15 178:11
  180:11 234:2
  234:12 240:1
  240:17 241:19
  243:6,19
  252:14
potentiality
  112:22
ppm 191:2
practical
  232:17
practically
  250:21
practice 47:8
  105:6 146:13
  238:9
practices 75:20
  174:19
preamble
  142:16

preparation
  221:15
prepare 75:12
  220:14
prepared 9:14
  142:21 146:11
preparing 79:4
  220:3,8,25
  221:13,19
prescriptions
  53:25
presence 123:9
present 4:12
  33:6 130:20
  131:2,7 202:20
  203:5,9
presentation
  33:16
presented
  33:10 35:6
  148:14
presently
  118:21
presents
  205:11
press 6:3 89:25
  90:3 91:24
  92:9,14,17,19
  92:20,23 93:1
  93:4,18 94:3,9
  98:9,12,14
  105:25 106:17
  106:18 108:18
  108:22

pressed 161:7,8
preventive
  115:10,13
previously
  29:11 59:12
  140:3 226:22
primarily
  125:9
princeton 2:22
principles
  149:19 195:22
  197:1 241:17
prinston 68:19
  217:3,17
prior 16:22
  23:5 57:6,10
  68:23 69:17,19
  74:14,24 89:5
  106:24 109:4
  109:10,16
  117:11,16
  118:2,4 123:5
  170:13 172:23
  173:21 187:1
  190:6,13
  198:23 216:24
  218:13 221:12
  248:15
private 48:8
  171:10
privilege 48:22
probably 10:7
  134:22 226:23
problem 21:13
  23:17 115:20

**[problem - properly]**                                    Page 44

150:12 245:18

**problems** 71:19

**procedure**
14:16 119:17

**procedures**
56:8 113:19
158:23

**proceed** 49:20

**proceeded**
76:21

**proceeding**
49:22 256:11

**proceedings**
1:17 21:14
36:16 95:17
96:11,17
104:16 127:7
128:24 129:18
145:22 150:14
156:11 230:10
239:7 245:22
258:16

**process** 29:4,15
74:16 75:1
79:25 81:1,20
82:21 83:1,5
85:17 87:25
88:9 106:23
112:2 114:14
115:19 120:14
120:19 130:21
131:3,8,17
136:20 138:4
138:16 141:11
141:12 143:1

144:3,12,14,18
149:18 151:22
151:25 152:3
152:25 158:22
182:5,10,15
183:18,20,21
183:23,24
184:2,22
185:11,15,16
186:9,12,16
187:1,1,17
188:9,19,20,24
189:1,2 190:3
191:7 192:4,19
194:23 195:17
197:2 207:1
219:25 221:19
231:21 233:22
233:23 234:1,4
234:14 235:6
236:1,1 239:17
241:17 242:2,6
242:9 243:5,16
246:11,16,24

**processes** 80:14
168:17 169:2
170:15,18
171:2,3,4
172:2 177:14
188:21 235:4
246:18

**processing**
46:21 124:4
193:8

**produce** 222:12

**produced**
52:21 76:15,18
92:5 142:24
234:19

**product** 19:24
20:7,14,18
22:6,8,18,21
24:2,14 27:7
31:12 38:17
54:6,8 55:14
57:14,17 67:4
69:11,11 72:21
87:3,5 89:17
94:24 95:3
105:17 113:17
123:23,24
124:7 142:4
143:9 153:1,4
157:17,21
163:14 169:14
169:22 170:5
170:12 183:5,7
189:3,4,14
191:15 192:5
192:18 199:15
200:14,17,22
200:24 204:17
242:1

**product's**
112:15

**production**
34:12 235:4,20
235:24

**products** 1:3,5
16:18 18:12,13
18:16 19:19
20:2 91:13,14
114:7,19
143:23 144:1
170:23 190:21
190:25 230:1
233:6 234:2,12
239:23 241:24
243:7,8,9

**professional**
16:14 37:5
61:21,23 67:9
237:22

**professionals**
42:20 58:5,10

**professor** 42:2
86:5

**professors**
41:10

**profile** 62:1
212:5 241:23

**profiles** 149:20
154:1

**program** 42:18
42:19 57:20,21
57:22 58:1,9

**programs** 8:21

**promoted** 38:8

**pronounce**
132:12

**proper** 48:12

**properly**
199:14

**properties**
89:12,21 90:4
90:16 91:1
99:10 100:10
102:7,15
109:19 110:4
110:11,25
236:17
**prophylate**
27:6
**proposition**
83:16 102:15
**proprietor**
47:21
**protecting**
16:16 91:10
**protocols** 76:8
77:11 152:2
172:5
**provide** 69:17
197:19 219:15
237:13
**provided** 9:3,3
69:19 75:14,18
76:4,12,13
77:9 78:14,15
78:24,25 80:19
81:18 140:16
181:11 208:24
221:3 232:16
240:13 241:16
247:18
**provides**
239:15

**provision** 44:24
145:2,18
224:17 232:21
**public** 1:19
7:12 16:17
57:13 74:21
91:11 265:3
266:24
**pull** 28:5 84:20
90:5,6 97:23
98:11 131:24
133:10,15
157:7 158:24
159:1 160:11
160:24 164:4
189:7,23 191:3
191:19 192:3
207:12 209:12
210:19 211:3
213:25 214:2
236:5 251:24
252:1,15
254:23 255:9
255:10,14
**pulled** 132:14
**pulling** 255:18
**pulls** 262:20
**purity** 200:15
247:6
**purported**
200:16
**purpose** 30:8
30:10,12 52:16
158:18

**purposes** 61:21
61:24 94:5
184:7,9,10
**pursuant** 1:22
**pursue** 143:15
146:2
**put** 32:9 80:13
81:12,14,14
94:12,21
126:17 128:19
172:20,20
204:3 234:7
**putting** 63:16
150:12 194:6

**q**

**q10** 149:19
161:2
**q3** 160:10
164:25 166:5
166:14 167:5,8
167:20 168:1
241:15 242:5
**q7** 142:16,18
157:22 177:10
**q8** 149:19
153:15,25
154:15 157:11
157:15,17,20
157:24 158:2,2
158:3,6 159:22
160:8,9,11,15
160:17,19,25
191:18
**q9** 118:8
149:19 158:11

158:18,21
159:8,10,14
**qa** 189:25
**qualification**
162:23 171:21
**qualifications**
13:15 162:13
163:3
**qualified** 79:11
80:22 111:18
119:14,22
120:22 162:11
162:19 237:13
237:15
**quality** 17:24
17:25 18:1,3
26:6,8 27:24
28:3 35:16,18
35:20 38:6,7,8
38:15,16,18,20
56:14,15 57:14
57:17 89:17,17
106:11 107:3
114:17,18,19
115:2 146:4
153:1,21
159:15,17,18
160:4 172:4
177:9 189:4
199:15 200:15
200:24 237:25
237:25
**quantified**
107:24

**quantify** 89:9
189:13 225:24
**quantity**
188:18 189:18
**quarantine**
47:6
**quenching**
141:12,12
183:24 184:23
185:11,13
186:25 187:13
219:25 241:6
244:21 245:2,9
**question** 14:19
36:22 44:21
48:12,21 49:2
49:14 63:10,10
63:14,14,18,23
63:25 64:10,16
64:22 70:17,19
70:21,24 71:8
71:13,15,16,20
72:17 81:11,15
83:22,24 84:1
84:8 87:12
89:19,20 90:13
94:5,19,24
96:18 101:25
102:3 107:8,19
107:22 108:13
109:22 110:8,9
110:14,16
117:1,13,16,17
118:1,4,4
119:20 122:12

124:16 127:14
127:19,25
128:3,10,12
130:7 135:19
151:15,15,20
152:8,19,21
155:10 156:9
156:13,14
160:25 162:14
162:15,18
163:4,6 165:9
165:21,23
166:10,11
167:14,15,16
168:7,20
176:25 180:24
195:7,25
196:24 200:5
200:20 201:14
202:25 203:22
208:12,14,17
210:1,5 211:13
211:19 212:8
218:9 221:5,13
221:17 222:5
224:11 226:4
226:16 229:17
229:18 230:6
231:5 248:15
248:16,20,23
249:19,24
250:12 252:4,8
253:5 254:9,9
254:14 255:16
255:17,20,21

256:14 258:3
260:10,13
**questioning**
108:6 134:24
196:17 244:11
251:13
**questions** 8:15
14:14 27:16
31:22 72:16,17
86:23,24 87:2
135:18 160:22
171:18,21
217:22 227:12
227:15,23
229:16 230:13
232:3 235:21
235:22 236:8
237:12 244:2
245:23 248:21
250:16,19
251:25 254:21
256:3 259:25
260:8
**quick** 211:6
216:14
**quickly** 250:23
**quite** 46:7
65:19 92:13
225:25
**quote** 152:6,9
195:8 196:4
259:6
**quoted** 152:14
152:15 153:6,8
244:1

**quoting** 61:7

**r**

**r** 2:1 3:1,8 4:1
32:14 36:8
45:14 140:1
265:1 266:1,1
266:1
**r&d** 149:21
**radar** 59:19
**radiation** 91:15
**raise** 106:21
**raised** 28:14
**raises** 235:21
**raising** 107:8
109:16
**range** 204:20
220:7,12
**ranks** 17:10
**raspanti** 3:13
**rather** 28:18
**rattle** 196:18
**raw** 22:17,20
26:7 38:7
188:19 241:22
243:10
**rbk** 1:6
**reached** 136:22
140:18 246:10
**reaction** 82:3
138:16 178:12
243:7,9
**reactions** 79:25
85:20 241:21
**reacts** 85:24

**[read - recalled]**

| | | | |
|---|---|---|---|
| **read** 11:1,4,7 | 212:8,10 | **reask** 63:14 | 67:4,6,7,9,17 |
| 11:22 64:23 | 215:18 218:12 | **reason** 24:25 | 67:24 69:15 |
| 65:11 67:13 | 221:7 235:1 | 36:17,19 59:6 | 72:3 73:21 |
| 75:7 77:25 | 236:12 241:3 | 59:13 60:20 | 76:2 84:22 |
| 78:2 79:9 81:7 | 247:22 249:24 | 119:7 136:16 | 86:3,4,7 88:1 |
| 81:9 82:12 | 251:20 257:21 | 147:9 148:4 | 95:6 96:19 |
| 86:2 92:17,20 | 258:23 260:24 | 154:5 182:25 | 100:25 106:25 |
| 92:23 93:7,18 | 261:2 266:2 | 183:3,17 | 107:23 109:1 |
| 95:20 96:7 | **readily** 87:25 | 248:11 | 109:18 110:21 |
| 98:3,7 99:12 | 88:9,21 89:2 | **reasonable** | 123:5 132:10 |
| 100:7 104:14 | 101:7 | 36:22 134:12 | 135:23 137:14 |
| 104:17 106:2,7 | **reading** 67:16 | 205:12 247:17 | 142:8 153:6 |
| 108:16 109:24 | 83:2,3 84:22 | 247:20 250:16 | 172:23 173:3,7 |
| 110:13,15,18 | 86:4 129:19 | **reasonably** | 173:14,22 |
| 112:6,9,19 | 135:11 137:14 | 169:14,22 | 174:2,6,10,17 |
| 117:2,12,15,25 | 152:20 160:17 | 170:5,11 | 175:5 176:9 |
| 118:3,6 125:10 | 165:2,4,6 | 232:16 | 182:1 189:9 |
| 125:12 131:10 | 196:3,6,23 | **reasons** 19:22 | 190:19 198:2 |
| 132:16 133:12 | 198:13 244:19 | 171:20 | 201:25 216:7 |
| 135:13 136:2,5 | 248:7 249:15 | **recall** 18:10,19 | 217:6 219:11 |
| 137:4,25 149:1 | 249:19 259:17 | 19:3,18,22 | 221:21 223:9 |
| 150:18 151:9 | 262:25 264:3,4 | 20:7 21:8,15 | 223:13 224:4 |
| 151:10,14 | 264:5 | 21:17,21,22 | 224:25 225:16 |
| 152:18 154:4 | **reads** 84:16 | 22:7 23:19,21 | 247:16,25 |
| 155:10,13 | **ready** 7:14 | 23:24,25 24:3 | 248:2 251:13 |
| 156:10,20 | 205:24 | 24:6,9,10,25,25 | 252:11 253:10 |
| 159:11 160:15 | **really** 16:21 | 25:4,24 26:22 | 253:18,20,24 |
| 162:5,18 163:9 | 44:4 46:11 | 26:23 27:2,12 | 254:7 255:2,5 |
| 165:24,25 | 50:15 61:13 | 28:8,9,13 | 258:10,21 |
| 166:3,8,13 | 63:24 70:2,4,6 | 31:21 38:9,22 | 259:1,4 |
| 168:7 170:3 | 86:25 87:19 | 39:6,7 40:9,12 | **recalled** 18:16 |
| 176:25 177:2 | 89:19 99:25 | 40:15 51:17,20 | 19:19,20 20:5 |
| 193:25 196:7 | 119:20 127:16 | 52:24 55:7 | 22:5,16 38:17 |
| 201:25 208:14 | 214:4 254:19 | 56:10 59:17 | 67:25 68:8 |
| 208:17,18 | 262:3,11 | 61:15,18 66:24 | 198:18,19 |

HIGHLY CONFIDENTIAL

**[recalled - regulators]**                                    Page 48

| | | | |
|---|---|---|---|
| 199:1,4 | **recollect** 27:17 | 212:12,18,19 | **refers** 231:22 |
| **recalls** 18:8,12 | 34:7 35:24 | 212:23 221:7 | 259:13 |
| 18:19,21,23 | 60:6 136:25 | 222:15,19 | **refine** 211:13 |
| 19:16,23 20:10 | **recollection** | 230:19,22 | **reflect** 162:2 |
| 20:14,18 38:9 | 24:23 27:2 | 245:21,25 | **refresh** 25:12 |
| 38:13 222:24 | 45:4 62:9 | 246:2,5 260:2 | 98:17 106:15 |
| **receipt** 26:7 | 98:17 106:15 | 260:4,6,7,12,15 | 117:6 211:5 |
| **receive** 36:2 | 121:20 131:9 | 264:12 | **refreshed** |
| 67:7,8 115:6 | 132:3 137:13 | **recorded** 7:3 | 24:22 |
| 197:15 | 183:14 | **records** 28:5 | **refusing** 71:15 |
| **received** 19:9 | **recommended** | **reduce** 184:3 | 94:25 |
| 19:12 20:25 | 233:6 239:23 | **refer** 22:14 | **regard** 156:5 |
| 21:16,18,20 | **record** 7:2,8,16 | 52:19 194:8 | 234:18 237:24 |
| 23:1 24:18 | 7:25 39:25 | 196:21 | 241:9 |
| 28:10 77:10 | 40:2,6 64:23 | **reference** 70:11 | **regarding** 7:4 |
| 98:8 217:6 | 71:20 75:7 | 89:25 207:2,4 | 19:7 32:7 |
| 227:6 246:25 | 81:4,9,24 86:9 | 207:10 216:11 | 107:9 109:14 |
| 247:6,12 | 86:11,14 | 233:11 234:9 | 127:12,22 |
| **receives** 115:15 | 108:16 109:24 | 252:16 254:4 | 159:16 166:20 |
| **receiving** 21:9 | 110:18 112:9 | 255:6 256:15 | 181:12 195:16 |
| 38:7 | 112:19 117:2 | 259:6,10 | 217:4 |
| **recent** 46:9 | 118:6 124:19 | **referenced** | **regardless** |
| **recess** 40:3 | 124:22,23 | 106:12 128:25 | 102:2 |
| 86:12 124:24 | 125:2 127:18 | 216:9,16 | **regards** 172:6 |
| 139:12 179:12 | 129:21 134:21 | **references** | **regulation** |
| 212:20 230:20 | 134:25 135:6,7 | 177:15 253:11 | 199:21 200:3 |
| 246:3 | 135:9 137:25 | 253:19 | 238:21 |
| **recipients** 27:7 | 139:8,10,11 | **referred** 22:11 | **regulations** |
| **recognition** | 140:7 150:3 | 254:17 | 114:19 115:3 |
| 112:14 | 155:13 156:10 | **referring** 80:18 | 156:5 197:1 |
| **recognized** | 156:20 163:9 | 108:18,19 | 200:13 205:4 |
| 111:25 | 165:12,14,24 | 129:6 130:3 | 231:22 238:15 |
| **recognizes** | 166:3 177:2 | 173:18,19 | 238:17 |
| 145:14 167:20 | 179:8,11,15 | 196:20 210:22 | **regulators** |
| | 208:18 212:10 | | 231:24 |

HIGHLY CONFIDENTIAL

**[regulatory - report]**                                                    Page 49

| | | | |
|---|---|---|---|
| **regulatory** | 92:9,14,17,19 | 125:7 126:9 | **renaming** |
| 17:22,23 21:4 | 92:20,23 93:1 | 127:11,20 | 30:25 |
| 23:15 33:20 | 93:4,18 94:3,9 | 130:1,12 | **render**  206:19 |
| 35:18 39:5 | 98:9,12,14 | 242:17 | **repeat**  34:13 |
| 72:10 91:18 | 105:25 106:17 | **remedying** | 49:10 64:20,22 |
| 96:21,25 99:6 | 106:18 108:18 | 23:13 | 75:3,5,6 97:19 |
| 158:12,17 | 108:23 | **remember**  18:1 | 108:13 109:22 |
| 172:19 173:5 | **released**  93:23 | 18:4,16 23:23 | 110:9 112:18 |
| 173:10,13,24 | 93:24 | 24:4,23 32:13 | 115:19 116:25 |
| 174:11,15,20 | **relevancy** | 34:6 36:17,19 | 137:23 163:5 |
| 175:4 218:15 | 48:22 | 36:25,25 39:1 | 165:23 185:23 |
| 219:16,18 | **relevant**  48:4 | 39:3 46:10 | 203:22 221:4 |
| 229:25 | 65:4 153:18,22 | 51:24 53:14,15 | 221:17 |
| **reinspect** | 154:23 155:2,6 | 53:16,22 55:9 | **repeatable** |
| 205:25 | 155:8 156:4 | 60:24 79:8 | 235:16 |
| **reinspection** | 176:16,21 | 83:2,3 84:25 | **repeated**  70:22 |
| 29:8 205:25 | 179:3 238:14 | 93:3 96:18 | 70:24 156:14 |
| **relate**  255:17 | 238:17 | 97:10,14,15,25 | 202:25 205:15 |
| **related**  9:4 | **reliance**  76:23 | 98:4,19,21,24 | 224:12 |
| 27:23 38:2 | 92:3,10,15 | 117:7 121:25 | **rephrase**  128:1 |
| 65:7 72:25 | 93:6 94:8,22 | 130:10 135:25 | 128:6 242:22 |
| 113:16 114:13 | 99:1,2 108:20 | 189:17 190:4 | **rephrased** |
| 129:12 177:21 | 132:7,11 134:7 | 191:20 219:13 | 128:18 |
| 225:18 228:23 | 135:12,15,20 | 220:19 223:11 | **replace**  193:24 |
| 229:2 265:10 | 135:24 137:2 | 230:2,4 236:7 | 194:10 195:21 |
| **relates**  1:4 49:4 | 137:11 215:15 | 236:9,21 244:2 | **report**  5:18 |
| 128:22 | 217:7 218:1,4 | 244:12 255:4,8 | 11:9,17 13:10 |
| **relationship** | 218:16 219:17 | 259:21 262:5 | 13:11,15 14:14 |
| 115:24 257:14 | **relied**  127:1 | 263:13 | 52:21 54:25 |
| **relationships** | 233:25 | **remembering** | 63:5,12,18,21 |
| 224:9 | **rely**  133:7,9 | 46:15 | 64:3,13 71:7 |
| **relative**  176:20 | 164:12 | **remind**  224:15 | 75:12 76:6 |
| 265:13 | **relying**  80:2 | **remote**  1:10 2:2 | 78:5 79:4,9,19 |
| **release**  6:3 90:1 | 84:9,10 102:8 | **remotely**  1:20 | 79:21,22 80:3 |
| 90:3 91:24 | 102:10 111:22 | | 86:2,4 87:21 |

**[report - respect]**                                                              Page 50

| | | | |
|---|---|---|---|
| 87:22 92:21 | 219:13 220:4 | 172:6 177:8,15 | 233:10,21 |
| 93:2,5,7,19,19 | 221:12 229:10 | 201:22 220:25 | 234:8 241:18 |
| 95:4,5 96:8,20 | 229:20,23 | 221:19 237:2 | **requirement** |
| 97:18,22 98:22 | 231:6,11,13 | **represent**  26:9 | 116:19 117:3,4 |
| 98:23 99:3 | 234:17,22 | 154:25 227:21 | 117:7,9 118:14 |
| 102:13 125:14 | 237:19 238:1,4 | **representing** | 147:13 156:25 |
| 125:15,18 | 239:9,19 | 7:5 227:14 | 190:23 |
| 126:12,16,20 | 241:11 242:18 | **reproduced** | **requirements** |
| 126:25 128:20 | 242:19 243:3 | 233:16 | 157:1 158:13 |
| 128:22 129:13 | 243:13 244:5,8 | **reputable** | 158:17,17 |
| 129:20,23 | 247:22,23 | 134:1,7 | 206:9 |
| 133:13 137:7 | 249:10,12,13 | **reputation** | **requiring** |
| 137:11 138:2,7 | 250:8,15 252:6 | 134:13 | 118:9 |
| 139:1,5 142:6 | 252:16,19 | **request**  128:9 | **reread**  214:4 |
| 149:8 152:6,10 | 253:8 254:23 | 182:6,11,19,21 | **research**  75:9 |
| 152:14 153:7,9 | 256:21,23 | **requested** | 75:19,21 |
| 153:11,23 | 258:15 259:5,6 | 219:14 | 112:22 222:16 |
| 154:5 155:17 | 259:10,12,14 | **requesting** | 233:25 234:2 |
| 155:19,23 | 259:18 260:21 | 97:12 | 234:12 243:5 |
| 156:1 158:1 | 261:6,14 263:8 | **require**  115:14 | 243:16 246:12 |
| 160:22 175:20 | 263:9 | 164:13 166:5 | 257:4 |
| 175:25 176:14 | **reporter**  1:18 | 166:14,17 | **reserve**  227:9 |
| 179:18 181:1 | 7:7,9 64:21 | 191:10 | 259:23 |
| 181:16,23,23 | 75:4 108:14 | **required** | **residual**  235:9 |
| 182:4 183:16 | 118:3 265:3 | 105:15 115:4 | 235:10 |
| 184:12,19 | **reporting** | 116:14,16 | **resigned**  59:1 |
| 185:1 187:2 | 39:12 | 118:17,21 | **respect**  16:25 |
| 191:7 194:22 | **reports**  76:8 | 119:4 120:12 | 18:18 26:10 |
| 195:6,13,15 | 79:7,10 82:1 | 120:17 136:9 | 28:11,14 57:11 |
| 196:16,17 | 84:14 88:17 | 136:13 137:21 | 64:6 125:6 |
| 215:19 216:6,8 | 102:11,17,21 | 138:14 139:2 | 126:10 127:1 |
| 216:10,11,12 | 125:7,9 127:13 | 143:12 144:19 | 140:11 141:10 |
| 216:16,16,17 | 127:21 128:15 | 144:21 161:3 | 141:11 146:24 |
| 216:23,25 | 129:4,24 130:1 | 164:16,18,22 | 147:4 185:7 |
| 218:13 219:5 | 130:10,11,17 | 166:22 231:25 | 187:16 189:6 |

189:10 190:24
195:2 197:1
205:20 241:5
**respectful**
36:21
**respond** 29:7
198:5,6 226:6
**responding**
19:6 20:21
21:1
**response** 198:7
**responses**
161:25 162:2
**responsibilities**
147:17,24
148:9,17,22
149:5 238:9
**responsibility**
20:25 160:5
**responsible**
20:13,17,21,24
21:1 39:12
57:18,20 89:16
91:10 113:10
232:20
**rest** 160:10
227:10 259:24
**restate** 24:8
**restrictions**
47:4
**restructuring**
30:25
**result** 20:11
29:12 107:17
112:1 116:17

137:17 240:24
**resulted** 85:17
172:19 173:5,9
173:23 174:11
186:16
**results** 20:7
172:13 176:3
186:14,19
**resume** 37:2,5
45:25 57:4
59:24 60:1,10
61:5,12,17
69:16,18,19
**resumed** 140:4
**retain** 223:17
**retained** 11:24
163:17 198:24
220:2 223:18
224:21
**retrospective**
149:18
**returned** 19:25
**reveal** 123:9,12
**review** 16:4,7
28:2 34:24
35:2 62:24
75:17 76:25
78:11,23 79:6
104:2 106:11
111:14 120:4
135:1 172:13
172:15 177:13
182:5 185:24
186:5 187:15
207:7 218:18

218:22 220:24
221:11,18
**reviewed** 5:24
23:4 75:13,25
76:1,3,7,21
92:6 93:9
95:21,23 111:6
111:7,8 130:17
197:14
**reviewer** 32:7
**reviewers**
111:12
**reviewing**
77:13 79:8
113:15 120:20
136:1 140:15
220:4
**reviews** 104:4
111:11
**revise** 69:16
**right** 8:7,18
9:16 10:13
12:1 21:6 45:3
46:15 48:25
53:12 58:22
62:11 64:14
72:10,12,18
95:13 96:7
99:22 116:23
118:7 121:5,6
121:8 134:20
135:16 147:14
150:23 157:3
157:24 159:2
169:19 173:21

179:6 192:21
193:3 196:19
206:15 214:5
217:19 222:21
224:20 225:25
226:14 228:11
228:19 229:14
230:16 232:23
236:2,3,15
243:13,14
245:18 259:18
261:4
**rights** 147:17
147:23 148:9
148:17,21
149:4 238:8
256:17
**rigid** 38:2
**ring** 27:8
**risk** 19:20 20:2
68:11 105:16
107:10 111:25
112:13 113:3
116:18 118:9
118:25 119:2,6
119:9,10,15,23
120:1,4,9,13,18
120:21 143:12
143:16,19
144:21,22
158:20,22
159:8,9 163:12
163:13,15,18
164:6,9 178:8
178:19,23,25

**[risk - screen]**                                                    Page 52

179:4 180:10
180:12,17
182:16 187:15
187:20,25
188:3,8 189:5
192:6 193:7
231:25 232:20
233:3,12,21
234:10 237:25
240:4,20,25
242:21
**risks**  72:25
106:13 107:25
149:21 154:2
186:9,12
192:18
**rivero**  2:9
**rld**  70:10 71:2
202:21 203:5,7
203:9 208:1
212:5 213:14
**road**  2:22
**robert**  1:4
**robust**  106:9
**rocket**  8:16
**role**  18:18 19:6
20:16 227:25
**roles**  57:6
**room**  8:6 230:9
**roommate**  8:5
**rooney**  4:8
**roots**  188:19
**rose**  3:8
**roseland**  2:6

**roszel**  2:22
**routinely**  14:23
175:22
**rpr**  265:22
**ruben**  2:16
**rubenstein**  3:3
5:4 227:13,14
227:18,20
230:6
**rubensteinb**
3:5
**rule**  8:14
**rules**  14:15
64:6 95:13
158:21
**run**  103:1

| s |
|---|

**s**  2:1 3:1 4:1
7:11,11 32:14
140:1,1,1,3,3
**safe**  16:18
**safety**  13:18
14:17,20,22
19:21 20:3
91:11
**salary**  42:6
48:6 49:7
**san**  46:8 59:7
59:11 60:22
61:1
**satisfied**  208:5
**satisfy**  207:14
**saturday**  42:25
**saturdays**  43:8
43:9

**save**  182:21,23
**saving**  183:8,9
**saw**  65:20 67:7
67:13 92:18
93:3 96:24
97:2 98:18,19
98:22 198:7
236:22,24
**saying**  12:15
45:15 66:7
70:14 77:4
94:3 112:24
121:23 122:13
126:24 138:6
148:2,7 180:12
181:5,20
206:21 207:22
207:22 217:15
246:18 253:6
**says**  13:17
100:22 106:17
126:7 138:13
142:25 149:12
150:2 164:25
225:6 233:20
235:2 236:15
238:21 240:16
241:14
**scale**  191:7,8,8
191:11,14,15
191:24,25
192:8,11,12,13
192:15,16,20
193:18,20,23
193:24 194:9

194:10,13,14
194:23 195:20
195:21 197:2
**scaled**  195:2
**scales**  191:8
192:7
**scaling**  192:5
**scan**  216:14
**school**  67:8
**science**  8:16
141:5 168:16
169:1,8
**scientific**  78:11
78:13 80:1,17
80:18,23 83:15
83:17,19 84:10
84:11,16,22
85:2,11 130:18
132:8,9 134:11
137:20 140:21
140:25 170:13
180:16,20
181:3,6,10,18
181:21 218:3,7
233:11,25
234:1,9,11
241:20
**scientists**
100:22
**screen**  99:23
104:13 150:24
150:25 260:20
260:21,22,24
261:3,4,7,10,12
261:25 262:6,7

**[screen - show]**                                                    Page 53

262:13,20,24
263:2 264:2
**screens**  260:17
263:9
**scroll**  95:19
96:10,15 135:4
152:11
**sd**  27:6
**se**  44:5 52:5
**sean**  32:14
**search**  132:20
168:25 223:1
252:19 254:23
**searches**  75:11
**second**  21:12
36:20 94:14
130:4 133:5
187:4 195:4
211:10 235:2
236:17 239:4,6
245:20 262:7
262:13,15,24
263:2 264:2
**secondary**
144:15,19
**section**  152:7
155:19 208:22
209:4 210:3
236:11,16
238:11,25
241:18 252:17
256:21,22
**sections**  11:17
11:19 152:16
153:12

**sector**  171:10
**security**  91:12
**see**  10:7,10,16
13:20,24 48:6
51:20 55:2
67:5 70:2 90:8
90:13,18,23
91:8,9 93:1
94:11,15 96:3
99:2 102:18
126:14,25
129:17,22
132:14 133:11
134:19 139:5
149:12,22,24
151:12,13
178:17 186:22
189:11 200:23
210:3 211:6
216:13,20
217:21 227:12
231:19 232:14
233:1,9,12
234:5,23
235:12 236:20
236:25 237:3,5
238:18 239:11
240:5 242:2
243:10 244:21
244:22 254:3,6
254:20,22
256:18 259:10
261:18
**seeing**  70:5
91:6 96:19

130:17 198:2
230:2,4 236:21
**seek**  44:7
**seeking**  57:19
**seem**  128:18
**seemed**  249:18
**seen**  86:24 96:1
96:23 205:9
229:24 234:18
246:22
**segregation**
170:25
**select**  76:11
153:10
**selected**  76:24
153:12
**self**  187:2
**sell**  244:25
245:7,13
**send**  97:8 223:7
**senior**  100:22
**sense**  206:22
**sent**  97:5,12
**sentence**  14:11
27:5 99:20
100:20 104:13
104:14 106:8
136:3,6,11
137:14,18,19
143:18 150:3
252:24
**separate**  53:10
53:11 170:14
**serious**  71:19
108:4 160:21

167:18 245:17
**serve**  41:7,10
62:10,21 63:2
71:25 72:6
74:14,20
140:17
**services**  223:18
262:22,22
**serving**  13:6
74:24
**set**  97:21
116:19 117:4
147:13 155:5
225:15 238:12
257:9,13 265:7
265:17
**setting**  35:20
**several**  9:8
13:17,24 14:2
14:8,9 15:20
26:5 62:17
101:5 115:17
181:2
**severity**  204:4
**share**  196:6
**she'd**  117:12
210:3
**she'll**  229:15
**short**  27:15
59:6 225:25
259:17
**show**  10:1,2
90:19,21 94:16
99:13 166:5
167:13 200:9

**[show - slater]**                                                    Page 54

| | | | |
|---|---|---|---|
| 209:3,4 217:22 | 252:11 | 91:2,21 94:2 | 150:20 151:1 |
| **showed** 154:8 | **situations** | 94:14,23 95:2 | 156:6,15,21 |
| **showing** 196:8 | 205:1 | 95:15 99:15,21 | 157:4,7,19 |
| 210:20 | **six** 216:19,22 | 99:24 100:11 | 158:14,19 |
| **shown** 168:4,11 | 217:6 226:1 | 101:1 103:14 | 159:1,12 |
| 243:3 | **sixteen** 151:18 | 104:25 105:11 | 160:20 162:13 |
| **shows** 144:22 | 151:19 | 105:20 107:1 | 163:1,24 |
| 150:25 | **size** 10:19 | 107:13,18 | 164:10,20 |
| **side** 15:15,18 | 192:24 | 108:2 109:21 | 165:10,16,25 |
| 15:19 18:6 | **skadden** 3:8 | 110:13,19 | 166:6 167:11 |
| 35:16 165:5,12 | **skadden.com** | 111:4,20 112:4 | 167:23 168:5 |
| 243:7 | 3:10,11 | 112:16,20 | 168:12,18 |
| **sign** 120:23 | **skipped** 192:10 | 113:6 114:11 | 169:4,10,16 |
| **signature** | 192:12,13 | 116:11,15 | 170:19 171:20 |
| 265:21 266:21 | **skipping** | 117:11,15,20 | 174:12,21 |
| **signify** 11:16 | 192:15 193:16 | 118:23 119:5 | 176:18,22 |
| **similar** 76:8 | **slate** 3:8 | 119:24 120:6 | 177:11,17 |
| 91:5 205:16,17 | **slater** 2:4,5 5:5 | 120:25 121:7 | 178:4,9,15 |
| 245:16 | 14:13 36:20 | 122:7,11,21 | 180:2,23 |
| **simply** 80:18 | 44:21 48:3,10 | 123:10 124:1 | 181:12 187:4 |
| 82:8 119:21 | 48:17,23 49:14 | 125:24 126:15 | 187:22 188:6 |
| 164:15 | 49:19 53:1 | 126:21 127:3 | 188:22 189:15 |
| **single** 210:16 | 61:6 63:9,13 | 127:14,24 | 189:20 190:9 |
| 242:16 252:10 | 63:22 64:1,14 | 128:7,16 129:7 | 192:22 193:4 |
| **sit** 67:15 211:4 | 64:17 65:23 | 129:14 130:4 | 195:3,10,13,24 |
| 229:19 | 66:11 70:13,19 | 130:15,22 | 196:5,10 197:3 |
| **site** 39:8 41:17 | 71:8,11 72:9 | 135:17 136:24 | 197:6,23 199:6 |
| 56:16,17 | 72:13,18 77:1 | 138:8 139:4 | 200:2,6,11,19 |
| 175:13 | 78:20 79:13 | 141:1,6,19 | 201:3,11,13 |
| **sites** 17:4 50:17 | 80:9 81:3,23 | 142:2 143:10 | 202:22 203:12 |
| **sitting** 15:16 | 82:10,15,22 | 143:17 144:8 | 203:19 205:2,7 |
| 20:1 51:17 | 83:10,23 84:2 | 145:8,20,23 | 206:16 207:21 |
| 83:14 90:11 | 86:19 87:7,9 | 146:8 147:18 | 208:7,11 209:2 |
| 93:17 186:18 | 89:13,22 90:8 | 147:25 148:10 | 209:11,18,20 |
| 209:15 210:23 | 90:12,17,21,23 | 148:23 150:2 | 209:23 210:2 |

211:10,17
212:7,11
213:16 214:14
215:14,17
217:20 218:9
219:2 221:1
222:5,10,14,20
224:8,14
229:15 230:12
230:16 231:2
240:15 243:23
245:20,23
246:8 247:7
248:5,11,14,18
249:4,22 250:7
250:13,19,25
251:3 252:3,18
252:22 253:1
254:8,12,19
255:13,18,25
256:10 258:1
260:8,11 262:1
262:9,11,15
263:3 264:8
**slow** 48:5
**small** 31:23
58:21 99:17
113:5
**smart** 224:18
**sme** 164:3,4
**smiling** 71:21
**smp** 180:7
**smps** 76:8
77:11 159:21
179:20,22

180:13
**social** 61:19
**sodium** 85:25
142:25 143:7
143:23 144:1
185:13 241:5
242:9 244:21
245:2,9
**solco** 68:21
**sold** 24:14
194:12 201:9
213:8,11 214:7
236:18 244:10
**sole** 47:21
201:16
**solely** 19:15
88:15 102:8
188:3
**solicit** 30:13
**solutions** 222:1
226:7
**solvent** 72:10
73:12,16 102:2
187:9 247:15
**somebody**
48:13 110:15
**someone's**
109:3
**soon** 67:17
**sop** 166:19
180:3
**sops** 113:16
**sorry** 11:3,13
14:19 17:25
21:12 24:8

25:17 30:1
49:10 53:12
55:17 56:4
61:22 64:17
78:1 81:10
83:23 85:19
87:11 89:18
90:17 94:14
97:19 99:24
105:20 110:13
112:5,17
124:18 129:10
136:5,12
140:22 145:12
145:24,24
150:11 153:16
155:8,10
156:13,18
161:3 165:7,10
166:6 168:8
169:19 170:2,7
171:4 176:20
183:12,22
184:8 189:3
192:6 194:19
196:5 204:16
205:3 206:18
209:20 213:6
213:24 214:18
217:1 224:14
224:17 226:21
248:14,19
252:22 254:12
255:13 258:17

**sort** 20:2
**sought** 71:13
**sound** 241:20
**sounded**
110:16 169:25
**sounds** 108:3,5
**source** 191:1
242:16
**speak** 31:24
33:5,21 34:4
65:22 79:3
83:19,20
134:14 257:16
**speaking** 31:11
84:3 118:13
177:19 214:19
242:4 256:21
256:22
**specific** 24:25
28:21 33:16
121:2 127:17
128:20 133:25
145:25 163:4
167:13 174:4,5
181:16,24
211:21 214:18
238:21 250:2
**specifically**
45:3 55:9
109:1 122:1
125:18 132:2
137:13 147:2
153:9,13
157:12,13,22
158:25 159:11

163:21 185:4
190:14 211:23
214:24 217:5
230:2 258:20
**specification**
193:9
**specifications**
70:15 188:12
**spell** 258:12
**spelling** 258:17
**spend** 50:1,9
220:3,8
**spending**
135:10
**spent** 13:17
15:10 16:22
46:7
**spinal** 35:12,15
55:15
**spine** 35:9
39:17
**spoke** 32:7
87:13 125:17
246:8
**spoken** 13:1
66:5
**spread** 10:5
**st** 99:7
**staff** 91:19
**stage** 29:1
243:5,18
**stages** 236:1
**stand** 108:10
140:4

**standard** 61:7
109:20,25
110:5,11,22,25
124:11,14
207:5,8,10,15
207:17,20
208:19 237:14
**standards**
177:25
**stands** 133:4
**start** 128:23
151:15,17
165:21 231:12
**started** 38:6
40:10
**starting** 35:11
48:2 87:19
104:13
**startup** 35:7,9
**state** 1:19 7:24
47:4,8 79:24
87:22 90:3
109:5 110:3,10
167:8 189:5
190:2 191:13
205:5 239:19
243:2 265:3
266:25
**stated** 89:16
99:10 110:24
149:17 153:25
177:7 194:22
195:17 198:25
204:25 205:10
205:14 211:24

235:14 243:4
**statement** 91:5
91:7,7 100:15
110:22 111:2
136:17 137:7,8
145:17 147:15
148:8,20 149:3
191:20 209:6
240:20,23
256:1
**statements**
74:21 88:3
93:22,24 94:4
94:9 107:24
108:18,22,23
109:15 137:9
241:9
**states** 1:1 47:5
80:5 118:10
191:23 208:23
209:16 210:7
211:20 215:18
233:21,23,24
234:17 238:11
239:25
**stating** 130:19
130:25
**statutes** 238:15
238:17
**stay** 245:20
**stenographic**
1:16 7:8 265:5
**step** 29:17
**steps** 106:12
178:7 257:8,20

257:24 258:4
**stepwise** 29:4
192:4
**sterile** 177:10
**stipulation**
233:16
**stop** 71:18
94:19 150:3
223:6 254:24
256:4
**stopped** 136:10
**stoy** 3:13
**straightforward**
211:19
**strange** 10:12
10:13
**street** 2:17 3:4
3:14 4:9
**strength**
200:15
**stretch** 226:1
**structure**
232:17
**students** 57:19
58:4 146:5
**studied** 243:8
**study** 243:6,18
**subject** 23:15
164:3 168:22
228:22 229:1
244:7
**subjects** 237:24
**submission**
32:8 55:13

HIGHLY CONFIDENTIAL

**[submissions - system]**                                             Page 57

| | | | |
|---|---|---|---|
| **submissions** | **sufficiently** | 132:6,10 | 249:23 |
| 31:11 185:19 | 177:9 | 135:15,20,24 | **surprise** 174:8 |
| **submitted** | **suggest** 99:2 | 137:10,11 | 174:14 |
| 135:16,21 | 249:18 | 215:15 217:7 | **surprised** |
| 185:6,20 | **suggested** | 217:16 | 28:17,19 |
| 197:20,22 | 154:11 | **supplied** | 155:21 |
| 229:21 | **suggesting** | 219:20 | **susan** 1:11 5:3 |
| **submitting** | 126:23 | **supplier** 247:18 | 5:17,18 6:2 7:4 |
| 93:2 | **suit** 12:8,10 | **suppliers** 247:1 | 8:1 13:9,11,12 |
| **subscribed** | **suitability** | 247:6,12 | 62:3,5 95:22 |
| 266:22 | 188:11 | **supply** 91:14 | 98:14 133:17 |
| **subsequent** | **suite** 2:10,13,17 | 219:22 | 150:8 |
| 190:19 204:21 | 3:4 4:3,9 | **support** 128:14 | **suspect** 119:1,3 |
| 229:2 | **summaries** | 134:17 137:16 | 119:7 142:25 |
| **subsequently** | 63:6 65:9 | 137:19 138:1 | **suspected** |
| 56:9 121:22 | **summarize** | **supposed** 64:3 | 116:17 |
| 186:3 | 65:12 231:19 | **sure** 10:10 | **suspects** 143:7 |
| **substance** | 241:18 | 15:16 18:4 | **swear** 7:9 |
| 188:12 209:1 | **summarized** | 25:18 29:23 | **switch** 68:1 |
| 209:10 210:10 | 233:2 | 31:13 34:20 | **sworn** 7:11 |
| 241:24 245:16 | **summary** 154:6 | 38:23,24 40:15 | 140:4 265:6 |
| 251:6,8,8 | 195:5 241:19 | 42:8 48:1 | 266:22 |
| 255:24 | **sunday** 42:25 | 55:10 56:2,2 | **symmetric** |
| **substances** | 135:16,21 | 56:21 61:7 | 225:17 |
| 96:22 118:21 | **sundays** 43:8,9 | 64:21 71:21 | **syncores** |
| 143:4 165:1 | 43:10 | 77:4 81:8 84:5 | 151:21 195:16 |
| 167:6 233:5 | **supervised** | 84:15,17 86:25 | **synthesis** |
| 239:22,24 | 17:6 | 90:9 92:22 | 241:21 |
| 244:6 | **supervisor** 17:5 | 94:15 96:13 | **synthetic** |
| **substantially** | 17:9 | 134:2 152:25 | 188:19 |
| 205:16 | **supplemental** | 153:20 154:18 | **system** 27:24 |
| **substantive** | 5:23 77:6 92:6 | 155:12,20 | 56:14,15 91:18 |
| 54:19,20 | 94:8,13,21 | 160:16 169:21 | 159:19 177:9 |
| **sued** 59:21 60:3 | 95:1,4,20,23 | 185:18 189:23 | 263:11 |
| 60:5,9,13,16 | 99:1 108:20 | 217:9,13 | |

**[systems - temperatures]** Page 58

| | | | |
|---|---|---|---|
| **systems** 35:20 | 174:16 178:7 | **taught** 25:7 | **tell** 8:25 18:15 |
| 114:19 159:15 | 179:12 205:24 | 114:16,17,18 | 22:11 44:19 |
| 159:17 | 212:20 230:20 | 114:20,20 | 46:13 64:11 |
| **t** | 246:3 265:12 | **tea** 234:21 | 67:3 71:15 |
| | **takes** 205:19,22 | 241:5 242:9 | 83:14 85:22 |
| **t** 22:2 45:14 | **talk** 8:14 86:17 | **teach** 41:16 | 86:19 92:18 |
| 54:1 140:1 | 146:1,19 | 42:23 114:9,13 | 93:14 97:2 |
| 265:1,1 266:1 | 196:13 209:21 | 115:1,3,5,8 | 98:6 109:10 |
| 266:1 | 231:12 238:1 | 146:3,4,5 | 114:15 131:24 |
| **ta** 74:16 141:12 | 253:3 254:13 | **teaching** 41:13 | 135:10 150:21 |
| 183:21,24 | **talked** 58:15 | **team** 106:19 | 151:1 152:13 |
| 184:22,23 | 236:22 242:21 | **teams** 106:9 | 156:9 160:18 |
| 185:10,16 | 256:8 | **technical** 87:23 | 165:2 190:7 |
| 186:25 187:12 | **talking** 11:20 | 88:7,19 89:1 | 196:1,13,22 |
| 219:25 | 15:10 21:5 | 101:6 150:11 | 214:18 224:19 |
| **tab** 98:11 | 31:13 45:2 | 191:24,25 | 248:1,3,25 |
| **tabs** 11:11,12 | 72:9 87:20 | 192:8,16 | 252:17 255:9 |
| 11:14,16 | 94:6 107:2 | 193:24 194:10 | 259:18 261:13 |
| **take** 29:1,4 | 108:17,21 | 194:18,19,20 | 261:20 |
| 31:14 39:24 | 116:22 117:8,9 | 195:20 196:2 | **telling** 95:12 |
| 49:16 50:18 | 161:12 182:2 | **technicoone** | 117:14 183:4 |
| 54:17,18 56:25 | 198:4 209:4 | 22:2 27:19,22 | 184:4,11 |
| 65:11 66:20 | 211:11 214:25 | 39:11 | 222:21 254:21 |
| 77:13 78:17 | 218:6 219:12 | **technological** | 254:25 260:25 |
| 86:8 127:5 | 225:22 226:14 | 140:25 | **tells** 142:16 |
| 132:8 176:2 | 226:15 231:14 | **technologies** | 157:13 |
| 178:8 207:16 | 238:25 239:9 | 114:21 | **temperature** |
| 209:12 222:3,6 | 241:13 252:22 | **technology** | 83:2 131:15 |
| 230:16 237:22 | 256:5,6 | 89:6 126:8 | 136:19 235:21 |
| 242:12 257:8 | **talks** 33:10 | 140:20 141:4 | 235:23,25 |
| 257:20,24 | 80:10 83:6 | **tek** 46:16,18 | 246:9,15,20 |
| 258:3,4 | 143:4,5 146:17 | 50:2 51:18 | **temperatures** |
| **taken** 1:17 | 213:22 | 55:23 | 136:3,7,8,12,13 |
| 10:21 25:10 | **task** 163:22 | **teks** 46:6 | 138:3,13 139:2 |
| 40:3 68:7,11 | | | |
| 86:12 124:24 | | | |

**ten** 32:2,17
43:21 174:9
230:16 245:24
256:7
**tenure** 19:19
21:20,23 23:2
23:22 25:1
41:18,19,20,23
42:2,3
**tenured** 44:12
44:13
**term** 59:6
73:15 185:2
247:24 248:4
249:21 251:1
**terminated**
36:4,14 37:11
58:18 61:16
**terminology**
108:24 159:13
**terms** 29:18
163:19 168:20
196:16 212:14
232:21 237:18
239:2
**test** 82:7,11
87:23 88:7,13
88:20 89:1,8
101:6,11,13
103:1,3 109:6
109:8,14
115:20 116:14
116:16 118:17
118:21 119:4,8
121:16 122:6

122:15 123:5
123:16,18
143:2,9 144:20
162:3 164:14
167:9,15,21
191:14 193:7
247:18 252:4
**tested** 71:5
112:3 121:22
121:23 124:7
144:5 151:23
194:11,13
214:12 247:3
**testified** 7:12
11:18 129:2
140:4 166:14
181:6 184:15
194:9 195:19
228:9,16
234:18 238:22
244:15,16
258:10,21
259:2,19
**testify** 44:8
106:18 162:20
229:12 237:15
245:5
**testifying** 40:22
147:3 214:9
262:5
**testimony** 9:23
65:7 88:11
93:20,21 108:4
111:22 117:12
117:25 118:2

123:7 125:20
129:1 138:15
150:5 152:12
153:11 154:11
154:17 155:6
155:17 166:4
173:12 181:2
183:3 184:1,6
184:8 192:13
193:22 195:5
195:21 196:3,5
196:8,13
201:24 211:16
211:17 218:18
231:14,19
232:23 233:2,7
240:14 241:13
243:22 244:18
245:4 246:17
258:23 259:16
264:1 266:2
**testing** 70:2,14
73:23 74:11
100:18 102:1,5
103:8 104:21
105:5 109:12
109:17,20
110:1,5,12,23
111:1 121:11
121:13,15
125:22 127:2
128:22,23,25
129:3,3,12
130:2 144:20
162:12,21,24

163:20 186:15
186:20 193:1
198:6 210:20
**tests** 211:4
**tetrahedron**
131:19,22
132:1
**teva** 3:2 140:11
175:22 227:12
227:15,21,24
228:3,5,14
229:10,14,20
229:22
**teva's** 176:4
229:25 230:3
**textbook** 80:24
81:18
**thank** 36:22
45:1 72:18
100:6 200:11
211:15,25
212:11 230:14
240:15 243:23
**thanks** 49:23
112:10 117:19
**therapeutic**
26:2,9,14,22
27:3 37:12
39:2,9
**therapeutical**
37:22
**thing** 56:6 94:6
96:13 183:8,9
187:25 202:2
209:5 224:20

231:17 241:4
262:18
**things** 7:21
67:11 75:25
190:14 193:15
231:4
**think** 21:12
34:8 36:15
42:7 48:25
51:22 62:7
70:1,9 72:11
72:15,16 79:11
80:23 81:11
82:5 83:25
87:2 108:6,19
116:22 124:16
128:2 134:10
167:17 181:15
191:17 195:10
196:7,15,17
203:5 212:13
227:11,22
244:1
**thinking** 35:23
115:6 147:7
148:25 165:7,8
203:1
**thinks** 89:24
**third** 53:4
121:10,16,19
121:21,24
122:3,3 233:1
241:13
**thought** 50:23
84:3 94:6

110:19 134:7
147:3 165:17
165:20 183:11
183:13 224:18
240:12 250:22
260:11
**thoughts** 77:16
77:19
**thousand** 91:19
**threaten** 49:20
**three** 32:21
38:5 51:14
53:13,18 60:14
65:18 97:16,20
108:21 219:12
**threshold**
164:19 166:24
167:1 189:19
211:22 213:5
213:12,14
244:1,7
**thresholds**
232:22
**throat** 87:19
179:8
**throw** 193:3
**thursday** 1:20
**till** 151:10
**time** 1:13,22
12:21 13:6
14:3 15:14,17
15:19 16:12,12
18:11,25 19:10
19:13 21:16,18
22:1 23:3,11

30:21 31:14
35:8 36:12
39:6,20 40:1,4
42:1,9 46:7
48:17 50:8,8
50:10,18 51:3
54:16,24 58:15
59:10 61:11
62:12,20 66:16
66:23 68:14
69:9 86:10,13
88:14 89:5
92:24 94:15
96:23 101:18
101:23 105:19
105:24 107:4,8
109:4 111:14
122:18 124:20
124:25 126:2
135:5,8,13
138:15 139:9
140:6 144:2
152:1,5 160:24
169:14,22
170:5,11
173:13,20
174:17 175:5
179:9,13 190:6
202:19 203:8
204:22 212:15
212:16,21
214:4 220:8
222:17 223:2
224:6,7 225:10
225:21,23

226:14 227:10
228:18 230:18
230:21 235:25
236:13 237:1
246:1,4 250:5
252:10 256:18
258:24 259:24
260:1,5,14
262:21 263:10
264:11,13
**times** 31:24
42:13 66:4,13
66:14 115:22
172:10 176:8
190:11 220:18
220:20,23
224:13 260:23
261:11,14
**tin** 206:25
**tissue** 46:6,16
46:18,20 50:2
51:18 55:23
**tissues** 46:19
**title** 17:8 18:1
20:24 131:24
**titled** 217:24
236:16 239:14
**titles** 97:24
217:19
**today** 7:16,20
8:2,10 9:23
10:1 20:1
40:16,22 49:17
51:17 90:11
93:17 152:13

186:18 209:15
210:24 229:19
252:11,12
260:18,23
261:8,10,21
262:13 264:2
**together** 94:12
94:21 154:4
234:7
**told** 40:21,23
109:7,13
127:25 148:12
183:17 222:23
**took** 25:13
58:25 61:1
65:21 66:19
67:22 107:11
153:24 154:13
155:14 173:20
246:20
**tools** 158:23
**top** 71:16 93:14
95:19 106:4,5
135:25 147:14
173:1 204:18
215:12 231:18
234:25 246:13
**topic** 33:6,17
57:19 64:25
65:1
**topics** 98:6
115:11
**torrent** 3:17
140:11 227:12
229:10,14,20

229:23 230:13
230:14
**total** 32:21 52:2
52:2
**totally** 48:20
59:20 162:14
**toward** 14:3
262:24
**towards** 244:11
**tower** 4:8
**toxicity** 168:3
168:10
**trace** 167:22
236:19
**track** 41:19,20
41:24 42:2
**tracks** 42:3
**trade** 4:9
**train** 165:17,20
**trained** 120:11
**training** 158:10
163:10
**transcript** 1:16
6:9 150:8
196:14 265:5
266:2
**translation**
257:21
**traurig** 3:3
227:14,21
**travel** 50:25
**trazodone**
34:11,15,17
**treasure** 223:7

**tree** 51:10 53:9
53:10,11 55:11
**trial** 22:10,22
229:12
**trials** 22:7 52:4
53:8 223:17
**tries** 141:17
**true** 18:20 59:9
59:10 240:23
265:4 266:3
**truly** 16:23
**try** 7:17 84:8
117:18 154:10
161:17,23
200:21 250:14
**trying** 27:17
46:10,10 60:6
84:2 98:2
102:21 126:10
129:5 154:11
158:3 161:14
184:16 217:25
224:15 248:19
250:8 254:13
**tuesday** 1:12
**turn** 13:14
133:20 136:2
149:7 150:5,17
152:17 169:13
169:21,25
170:4,8 218:21
230:8
**turned** 165:5
260:24

**tv** 67:5,14,15
**twice** 210:2
**two** 15:23
31:19 32:16
42:17 43:6,7
46:15 50:19
51:7,15,16
54:13 60:15
62:23,25 80:23
81:17,19 93:22
93:24 94:9
97:9 108:23
114:16 126:6
127:9,12,21
128:15 132:9
132:16,21
134:21 151:3
154:3 181:11
181:12 184:9
185:7 188:21
218:3,6 225:25
251:11 260:19
261:20 262:8
263:9
**types** 54:5 73:2
73:5 98:6
226:17
**typically** 20:6

| u |
| --- |

**u** 7:11 86:2
140:3 234:20
258:13,18
266:1
**u.s.** 14:24

HIGHLY CONFIDENTIAL

**u.s.c.** 40:16,22
41:1,4,6,9,11
41:18 42:6
43:5,22 49:9
49:12 50:9
57:15 58:13
**ultimately**
54:24 106:24
**um** 8:5 13:16
47:13 48:2
54:22 55:25
57:16 58:6,21
60:17 62:16
65:15 100:21
113:17 114:21
170:1 204:15
213:25 254:2
258:19
**unable** 128:11
128:13 148:4,4
160:17
**unaware** 109:7
243:8
**unclear** 107:5
127:25
**under** 8:9
14:15,24 18:24
22:10 23:8,12
28:20 67:4,24
106:6 142:17
146:1 155:14
164:17 167:10
167:22 172:20
211:7 218:7,14
228:17 234:3

234:13 236:11
236:16 259:16
**undergoing**
18:11
**undergrad**
25:12
**underneath**
96:25
**understand** 8:9
42:22 50:22
70:4,5 71:11
72:13 77:3
83:12 94:4
102:21 103:16
128:3 134:3
151:6 158:3
160:13,15,16
161:15 170:7
179:4 184:16
199:23 217:25
257:17,25
258:4,5
**understanding**
23:11 29:3,20
30:24 61:3
69:9 81:15
82:24 85:5,6,7
94:5 111:12
113:2 121:17
123:6 125:20
158:6,16
161:19 194:11
194:12 228:5
243:6,19
249:25 259:8

259:19
**understood**
41:14,16 72:11
80:1 82:4 85:2
85:11 98:2
**unequivocally**
239:25
**unfair** 196:18
**unidentified**
101:15
**unit** 7:3 38:20
40:2,5 124:21
125:1 179:10
179:14 212:17
212:22
**united** 1:1
**university** 86:5
**unknown** 116:5
116:9 121:21
122:2 141:16
141:18,22,25
161:4,5,10,14
161:16,23
162:3,12,21,24
163:14,16,20
163:21 164:9
164:14,15,18
164:23 166:15
166:17 167:2
178:17,23
180:8 182:12
182:14 189:14
189:19 197:10
199:16,24
200:17,22

207:2,10
211:20
**unsafe** 204:11
**ups** 192:11
211:20
**usa** 3:2
**use** 41:1,10
47:3 51:3,3,18
54:15 61:23
101:16 109:8
109:16 110:1
122:5 125:22
126:21 143:23
144:1,19 146:1
146:23 167:17
170:14,22
185:2 187:9
188:18 191:23
192:7 193:23
195:20 203:16
203:23 213:19
233:25 238:12
250:8
**used** 22:18
34:12 73:19,23
82:21 85:17
88:12 91:9
101:10,13,23
102:2,19,20
122:15 123:4,7
123:15,18,23
124:5,14 126:3
145:15 147:2
194:18,23
195:8 202:8

HIGHLY CONFIDENTIAL

**[used - violation]**                                                                                       Page 63

242:1 246:24
250:4
**uses**  147:4
194:9 223:18
247:24
**using**  81:21
107:25 108:24
109:5,11
121:10 122:16
124:7 144:2
170:17 187:12
191:25 192:15
194:13 206:25
214:12 262:21
**usp**  206:9
207:2,4,7,14,23
207:25 208:6
208:19,21,23
209:7,12,15
210:6,7,11
211:7,24,25
**usually**  113:18
116:2

**v**

**vacation**  50:18
51:3
**vague**  127:15
169:17 200:20
205:3 208:8
211:14
**vagueness**
168:19
**validated**
146:14 171:3,4

**validation**
114:23 170:24
172:1,5,5,6
**validations**
114:20
**valsartan**  1:2,5
7:4 57:11
66:15,19,20
67:20,22,25
68:3,7,11,24
69:3 72:3
74:21 75:2
80:8 87:24
89:9 94:1
100:19 104:20
104:24 105:9
106:22 107:11
107:17,25
109:2 121:9
122:6,15 123:5
123:16,18
131:3,17 153:3
169:3 172:23
185:20 198:10
198:16,23
201:17 202:5
202:16 204:13
204:22 206:9
206:23 207:5,7
207:14,15,19
207:20,22,24
208:3,6,20
210:13,16,24
213:3,8,11
214:7,12 228:7

228:23 230:1
234:19 235:11
240:4,20
243:25 244:10
244:20,25
245:7,8,13
246:11 253:16
253:19,21
257:14
**vanaskie**  223:5
**varied**  234:18
**various**  18:12
29:13 67:9
164:16 180:22
216:9
**vaughn**  2:12
**venture**  50:7
**verbally**  66:7,9
66:10
**verbatim**  91:7
191:20
**verbiage**  91:9
118:8,10 127:8
131:10 139:6
145:25 146:17
147:21 190:5
252:15
**verify**  191:1
210:21
**veritext**  7:6
**versus**  15:11
125:16,19
127:2 159:8
**vet**  15:11,19

**veterinary**  15:2
15:3 16:2
91:12
**vial**  202:13
**video**  7:3
**videographer**
4:13 7:1,6 40:1
40:4 86:10,13
124:20,25
135:5,8 139:9
140:6 179:9,13
212:16,21
230:18,21
246:1,4 260:2
260:5,14
264:11
**videotaped**
1:10
**view**  191:4
261:15
**violate**  44:25
224:10
**violated**  122:18
140:14 142:7
160:18 161:2
180:13 195:22
197:1 214:17
214:23 215:2
215:11 234:10
**violates**  194:2
**violating**
224:16
**violation**  88:24
116:6,10 122:6
122:9,25

HIGHLY CONFIDENTIAL

**[violation - went]**                                    Page 64

| | | | |
|---|---|---|---|
| 123:25 141:18 | **waiting**  179:25 | 35:2 56:24 | **ways**  63:23 |
| 142:1 144:6 | **wallack**  2:21 | 88:23 89:15 | 138:11 |
| 145:1,3,7,19 | **walnut**  1:15 8:8 | 105:4 115:25 | **we've**  39:23 |
| 146:7 154:9,20 | **want**  11:8 | 116:1,3 160:1 | **weak**  9:19 |
| 170:18 194:17 | 48:11,18 58:3 | 160:6 172:22 | **website**  75:23 |
| 202:21 203:4 | 84:5 86:21 | 174:1,3,6 | 145:25 147:1 |
| 205:6,11 | 90:7 107:21 | 204:25 205:5 | 185:4 |
| 232:12 235:15 | 112:8 134:23 | 205:10,14,20 | **week**  42:13,17 |
| **violations**  19:2 | 151:17 156:15 | 206:4,5 227:6 | 42:18 43:6,7 |
| 19:3,7 25:5 | 156:17 163:4 | 228:18,22 | 43:14,21 47:6 |
| 28:11,14,22,23 | 165:22 166:9 | 229:1,5,6 | 50:19,21 51:2 |
| 28:24 29:10,10 | 167:13 181:22 | **washington**  3:9 | 62:19 92:7,24 |
| 29:18 52:17,18 | 196:6,9,12 | 33:22 | 96:5 220:20,21 |
| 52:19 56:20 | 200:10 208:13 | **water**  39:24 | 220:22 |
| 65:2,4,8 | 209:2 212:13 | 236:19 | **weekdays**  51:4 |
| 123:19 141:10 | 217:22 222:6,7 | **watson**  17:15 | **weekend**  42:21 |
| 156:2 195:1 | 222:14,16,21 | 17:21 18:6,6 | 43:3 51:2,4 |
| 204:2,4,7 | 224:22 229:8 | 18:11,24 19:9 | 57:22 |
| 228:18,22 | 231:17 235:1 | 19:12,20 21:22 | **weekends** |
| 229:1 | 250:1 252:6 | 23:7 26:17 | 42:23 50:14,20 |
| **visible**  151:4 | 254:22,24 | 28:10,15 34:11 | 50:24 57:24,25 |
| **visit**  50:17 | 255:19 256:14 | 34:21,25 35:3 | **weeks**  62:23,25 |
| 113:17 | 258:14 | 35:5 39:14 | 97:9 132:17 |
| **voice**  7:17,19 | **wanted**  7:15 | 228:10,13,17 | 226:1 |
| 9:20 230:14 | 54:3,7 125:5 | **watson's**  25:4 | **went**  16:24 |
| **voluminous** | 150:17,19 | **way**  10:1 50:3 | 22:13 24:25 |
| 65:20 219:10 | 239:5 248:3 | 55:1 63:13 | 35:25 36:1 |
| **voluntary** | 250:23 | 68:4 90:1 99:8 | 38:6 47:9 |
| 30:13 | **warning**  18:22 | 101:3 103:17 | 52:20 54:10 |
| **vomiting**  27:8 | 19:13 20:7,11 | 107:15 109:13 | 55:6 56:6 |
| **w** | 21:18,20 23:4 | 113:8 159:12 | 58:21 75:23 |
| | 24:19 26:11 | 180:6 185:10 | 87:18,20 |
| **wait**  122:11 | 28:10 29:12,15 | 187:14 190:18 | 110:14 119:16 |
| 227:10 253:2 | 29:24 30:2,8 | 195:2,3 223:3 | 121:20,21,24 |
| 255:14 256:13 | 30:10,12 34:25 | 223:4 250:17 | 122:2 155:17 |

HIGHLY CONFIDENTIAL

**[west - yeah]**                                                    Page 65

| | | | |
|---|---|---|---|
| **west**  4:3,9 | **witnesses**  181:5 | 237:22 248:19 | **worse**  29:22 |
| 234:19 | 181:20 182:1 | **worked**  13:3 | **worx**  35:9 |
| **whatsoever** | **wmurtha**  2:23 | 14:5 15:23 | 39:17 |
| 208:4 244:24 | **woke**  7:16 | 16:1 17:13,15 | **write**  14:11 |
| **whereof**  265:16 | **word**  75:6 | 21:9 22:3,25 | 56:7 57:3 63:8 |
| **who've**  11:18 | 136:6 140:22 | 23:5 37:15 | 63:12 139:1 |
| **william**  2:20 | 146:23 147:1,4 | 46:4,6 51:12 | 238:7 |
| **willing**  238:15 | 169:24 202:8 | 57:7 59:10,20 | **writing**  11:14 |
| **withdraw** | 206:15 | 60:15 73:12,19 | 14:14 63:18 |
| 108:8 | **worded**  101:3 | 73:25 228:10 | 142:22 146:13 |
| **withdrawing** | **words**  102:19 | 228:19 247:14 | 147:11 154:5 |
| 248:15 | 102:20 110:22 | **working**  12:16 | 216:24 219:13 |
| **witness**  1:14 | 124:14 206:21 | 13:18 16:21,23 | 221:12 |
| 5:2 7:10 36:22 | 250:4,15 | 21:15,17,21 | **written**  106:19 |
| 45:1 49:6 | 252:19 | 23:12,14,16 | 171:1 205:9 |
| 64:20 70:18,23 | **work**  14:25 | 24:5,10,13 | 251:17 |
| 84:7 90:18,22 | 15:1,2,6 16:25 | 26:23 32:8 | **wrong**  82:13,17 |
| 94:7 96:15 | 21:19 30:14,17 | 40:18 42:19 | 82:18 85:10 |
| 105:22 112:5 | 33:9 34:25 | 48:19 51:1 | **wrote**  55:13 |
| 112:17 117:6 | 37:5,18 43:14 | 58:2,5,8,10 | 76:6 78:5 |
| 117:24 127:25 | 43:25 44:23 | 172:4 248:22 | 92:21 93:7,18 |
| 128:5,8 129:1 | 45:8,11,15,22 | **workshop** | 93:19 95:1 |
| 135:3 151:8 | 45:23 46:7,22 | 170:17 235:8 | 96:8,20 98:22 |
| 156:17 157:9 | 47:8,11 50:2 | **workshops** | 98:23 99:3 |
| 168:7 198:17 | 50:13,14,16,20 | 170:15 235:7 | 133:13 142:6 |
| 203:15 208:15 | 51:22 52:23 | **world**  91:19 | 172:5 216:23 |
| 221:4 222:23 | 55:23 56:12 | 99:7 133:6,21 | 245:15 |
| 230:8 248:24 | 57:10 59:23 | 133:23 134:12 | **x** |
| 250:11 252:21 | 60:12,23 67:8 | 134:15 183:6 | **x**  1:7 86:2 |
| 252:24 254:14 | 68:24 70:3 | 183:19 184:14 | **xue's**  86:2 |
| 254:17,18 | 72:20 73:23 | 211:12 223:3 | **y** |
| 256:16,17,20 | 87:2,5 94:24 | 236:6 | **y**  22:15 |
| 265:6,16 | 95:3 104:7 | **worried**  187:8 | **yeah**  25:21 |
| 266:21 | 126:2 133:2 | **worry**  75:5 | 33:14 59:14,25 |
| | 171:9 225:4,19 | | |

HIGHLY CONFIDENTIAL

**[yeah - zooms]**                                                        Page 66

| | | | |
|---|---|---|---|
| 179:25 | 153:15,19 | 235:23 236:25 | **zooms** 41:11 |
| **year** 14:6 15:7 | 154:11 158:2 | 237:8 240:8,21 | |
| 17:22 18:17 | 159:23 160:7 | 241:18 243:15 | |
| 25:15 32:11 | 160:18 161:2,3 | 244:9,23 245:7 | |
| 36:9 49:12 | 161:5,10,16,19 | 246:14,24 | |
| 55:24 60:16 | 161:22 162:3 | 247:5,12 | |
| 61:4 113:20,23 | 166:19 168:16 | 257:16 | |
| 114:2,2,5 | 169:1 170:14 | **zhp's** 111:6 | |
| **years** 13:17 | 172:14,18,20 | 130:20 131:2,7 | |
| 14:8 15:17,20 | 172:24 173:4,8 | 136:20 155:4 | |
| 15:21 16:22 | 173:22 174:16 | 159:16 160:4 | |
| 25:22 31:19 | 175:4,14,17,23 | 162:12,20 | |
| 101:5 114:16 | 176:8,11 177:8 | 172:11 174:9 | |
| **yesterday** | 178:7,19,22,25 | 175:13 177:14 | |
| 106:1,2 | 179:4,18,22 | 177:24 178:3 | |
| **yield** 183:19 | 180:3,6 181:5 | 180:12 182:5 | |
| 184:2,13 | 181:20 185:6 | 182:10 186:2,5 | |
| **york** 3:9,19,19 | 185:20 187:7 | 187:1,15 188:8 | |
| **z** | 187:12 188:11 | 189:5 | |
| **zalman** 2:9 | 188:15,18 | **zinc** 85:16 | |
| **zhp** 3:7 12:4 | 189:9,13,18,24 | 131:16 141:10 | |
| 68:13,17 76:17 | 190:2 191:7 | 144:2 151:21 | |
| 76:21,23 77:11 | 192:13 193:11 | 182:24 183:20 | |
| 80:13,25 81:12 | 193:16,22 | 183:23,25 | |
| 81:12,16,20 | 194:9 195:1,17 | 184:1 185:15 | |
| 82:5,21 83:1 | 195:19 196:25 | 187:1,16 | |
| 85:17 88:9,23 | 197:11,20,22 | 195:16 231:21 | |
| 89:16 101:10 | 198:1,3,8 | 233:23 234:1,3 | |
| 101:13,16,23 | 214:6,11,16,22 | 234:13 239:17 | |
| 105:5 122:2,15 | 215:1,11 | 242:2,6 | |
| 123:4,13 | 216:19,22 | **zones** 234:20 | |
| 125:22 140:14 | 217:8 233:3,10 | **zoom** 2:2 33:23 | |
| 141:9 142:6 | 233:16,21,23 | 33:24 34:2,5 | |
| 143:19 144:2 | 233:24 234:8 | 41:2 220:16 | |
| 152:22,23,24 | 234:10 235:2 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.