# EXHIBIT 2

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT.
                 DISTRICT OF NEW JERSEY

2

   IN RE:  VALSARTAN, LOSARTAN,
3  AND IRBESARTAN PRODUCTS
   LIABILITY LITIGATION              MDL NO. 2875
4                                    HON. ROBERT B. KUGLER

   THIS DOCUMENT RELATES TO:
5  In Re: Valsartan, Losartan and
   Irbesartan Products Liability
6  Litigation,
   Case No. 1:19-md-2875-RBK
7  --------------------------------x

8

9

10    *HIGHLY CONFIDENTIAL REMOTE VIDEOTAPED DEPOSITION*
11                 OF LAURa PLUNKETT
12              THURSDAY, JANUARY 12, 2023
13                    9:29 a.m.

14

                    Witness' Location:
15                    Houston, Texas
16         TRANSCRIPT of the stenographic notes of the
17  proceedings in the above-entitled matter as taken by
18  and before DAVID LEVY, a Certified Court Reporter and
19  Notary Public of the State of New Jersey, held
20  remotely over the Internet, on Thursday, January 12,
21  2023, commencing approximately 9:29 in the forenoon,
22  pursuant to Notice.

23

24

25

HIGHLY CONFIDENTIAL

Page 2

1 A P P E A R A N C E S :
2  (All appearances are remote via Zoom conference.)
3
   ON BEHALF OF THE PLAINTIFFS:
4  ADAM M. SLATER, ESQ.
   MAZIE SLATER KATZ & FREEMAN, LLC
5    103 Eisenhower Parkway
     Roseland, New Jersey 07068
6    973-228-9898
     aslater@mazieslater.com
7
   ON BEHALF OF THE PLAINTIFFS
8  BRETT VAUGHN, ESQ.
   MELISHA VELEZ, ESQ.
9  THE HOLLIS LAW FIRM
     8101 College Boulevard, Suite 250
10   Overland Park, Kansas 66210
     913-385-9400
11
   ON BEHALF OF THE PLAINTIFFS:
12 STEVE LEVIN, ESQ.
   DANIEL NIGH, ESQ.
13 LEVIN PAPANTONIO RAFFERTY PROCTOR BUCHANAN O'BRIEN
   BARR MONGEY P.A.
14   316 South Baylen Street
     Pensacola, Florida 32502
15   850-435-7003
     slevin@levinlaw.com
16   dnigh@levinlaw.com
17 ON BEHALF OF DEFENDANT SCIEGEN PHARMACEUTICALS, INC.
   KATHLEEN E. KELLY, ESQ.
18 HINSHAW & CULBERTSON LLP
     53 State Street, 27th Floor
19   Boston, Massachusetts 02109
     617-213-7047
20   kekelly@hinshawlaw.com
21
22
23
24
25

Page 4

1 A P P E A R A N C E S (Cont.d):
2 ON BEHALF OF THE DEFENDANT MYLAN N.V.
   FRANK H. STOY, ESQ.
3 PIETRAGALLO, GORDON, ALFANO, BOSICK & RASPANTI, LLP
     301 Grant Street, 38th Floor
4    Pittsburgh, Pennsylvania 15219
     412-263-4397
5    fhs@pietragallo.com
     mbcatello@pietragallo.com
6
7 FOR THE DEFENDANT TORRENT PHARMACEUTICALS
   BRITTNEY NAGLE, ESQ.
8 KIRKLAND & ELLIS, LLP
     601 Lexington Avenue
9    New York, New York 10022
     212-909-3344
10   brittney.nagle@kirkland.com
11
   FOR THE DEFENDANT HUMANA
12 MEGAN A. ZMICK, ESQ.
   FALKENBERG IVES, LLP
13 230 West Monroe, Suite 2220
   Chicago, Illinois 60606
14 312-566-4801
   maz@falkenbergives.com
15
16 FOR THE DEFENDANT ALBERTSON'S LLC
   CHRISTOPHER B. HENRY, ESQ.
17 BUCHANAN INGERSOLL & ROONEY, P.C.
     Carillon Tower
18   227 West Trade Street, Suite 600
     Charlotte, North Carolina 28202-2601
19   704-444-3300
20
21 ALSO PRESENT:
22 LEE BOWRY, Videographer
23 GREGG HOLDERMAN, Concierge
24
25

Page 3

1 A P P E A R A N C E S (Cont'd):
2 ON BEHALF OF THE DEFENDANTS HETERO LABS AND HETERO
   DRUGS:
3 ERIC ABRAHAM, ESQ.
   JOHN C. BOBBER, JR.
4 HILL WALLACK, LLP
     21 Roszel Road
5    Princeton, New Jersey 08540
     609-924-0808
6    eabraham@hillwallack.com
     jbobber@hillwallack.com
7
8 ON BEHALF OF THE DEFENDANT TEVA
   PHARMACEUTICALS USA, INC.
9 STEVEN M. HARKINS, ESQ.
   VICTORIA DAVIS LOCKARD, ESQ.
10 GREENBERG TRAURIG, LLP
     3333 Piedmont Road NE, Suite 2500
11   Atlanta, Georgia 30305
     678-553-7392
12   harkinss@gtlaw.com
     lockardv@gtlaw.com
13   -and-
   CHRISTINE I. GANNON, ESQ.
14 WALSH PIZZI O'REILLY FALANGA LLP
     Three Gateway Center
15   One Mulberry Street, 15th Floor
     Newark, New Jersey 07102
16
17 ON BEHALF OF DEFENDANT ZHP
   JESSICA D. MILLER, ESQ.
18 ANNA BRIER, ESQ.
   TARA KOHLI, ESQ.
19 SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     1440 New York Avenue, N.W.
20   Washington, D.C. 20005
     212-371-7134
21   anna.brier@skadden.com
     tara.kohli@skadden.com
22   jessica.miller@skadden.com
     -and-
23 BRIAN BAGGETTA, ESQ.
   SKADDEN ARPS SLATE MEAGHER & FLOM LLP
24   One Manhattan West
     New York, New York 10001
25   202-371-7209
     brian.baggetta@skadden.com

Page 5

1 --------------------------INDEX--------------------
2    WITNESS          EXAMINATION          PAGE
3 LAURA M. PLUNKETT  MS. MILLER      9
4          MR. HARKINS        284
5          MS. NAGLE      321
6          MR. VAUGHN        323
7          MS. MILLER        325
8
9 PLUNKETT EXHIBITS                FOR IDENT.
10 Exhibit 1  Expert report of Laura M.    53
11          Plunkett, Ph.D., DABT, dated
12          10/31/22
13 Exhibit 2  FDA press release dated    69
14          7/13/18
15
16 Exhibit 3  FDA statement dated 8/30/18    72
17
18 Exhibit 4  FDA statement dated 1/5/19    83
19          from Scott Gottlieb, M.D.
20
21 Exhibit 5  Boerner article from Chemical  94
22          and Engineering News dated
23          4/20/20
24
25          (Continued on following page.)

2 (Pages 2 - 5)

Page 6

----------------------INDEX-------------------

1
2  PLUNKETT EXHIBITS (Cont'd.)        FOR IDENT.
3  Exhibit 6  E-Mail chain Bates numbered    180
4         ZHP00492652 through 92659
5
6  Exhibit 7  E-Mail chain Bates numbered    187
7         ZHP02118712 through 8731
8
9  Exhibit 8  E-Mail chain Bates numbered    190
10        ZHP02118681 through 8711
11
12 Exhibit 9  Transcript of deposition of    197
13        Min Li, Ph.D.
14
15
16        (Continued on following page.)
17
18
19
20
21
22
23
24
25

Page 7

----------------------INDEX-------------------

1
2  PLUNKETT EXHIBITS (Cont'd.)        FOR IDENT.
3  Exhibit 10  Invoice dated December 2022    266
4         on BioPolicy Solutions
5         letterhead, addressed to
6         Pendley, Baudin & Coffin
7
8  Exhibit 11  Plaintiffs' Objections and    287
9         Responses to Defendants'
10        Notice of Deposition of Laura
11        Plunkett
12
13 Exhibit 12  Transcript of deposition of    313
14        Phillip Russ
15
16
17
18
19
20
21
22
23
24
25

Page 8

1         VIDEOGRAPHER:  Stand by, everyone.
2  We'll be underway in about ten seconds.
3         Good morning.  We are going on the
4  record at 9:29 a.m. on January 12, 2023.  Please note
5  that this deposition is being conducted virtually.
6  Quality of recording depends on the quality of camera
7  and about the connection of participants.  What is
8  spoken from the witness and heard on screen is what
9  will be recorded.  Audio and video recording will
10 continue to take place unless all parties agree to go
11 off the record.
12         This is media unit 1 of the video
13 recorded deposition of Dr. Laura M. Plunkett in the
14 matter of in re, Valsartan, Losartan and Irbesartan
15 products liability litigation filed in the United
16 States District Court for the District of New Jersey,
17 Camden vicinage, MDL number 2875.
18         My name is Lee Bowery, representing
19 Veritext New Jersey.  I am the videographer.  The
20 court reporter is David Levy, and the concierge is
21 Gregg Holderman, both also with Veritext.
22         I am not related to any party in this
23 action, nor am I financially interested in the
24 outcome.  If there are any objections to proceeding,
25 please state them at this time.

Page 9

1         Having heard none, counsel attending
2  remotely will be noted on the stenographic record.
3  Will the court reporter please swear in the witness
4  and then counsel may proceed.
5  L A U R A   M.   P L U N K E T T , having been
6         duly sworn by the Notary Public, was examined
7         and testified as follows:
8         MS. MILLER:  May I proceed?
9  EXAMINATION BY
10 MS. MILLER:
11     Q.    Good morning, Dr. Plunkett.  Thank you
12 for your patience this morning.  Can you just please
13 state your full name for the record.
14     A.    Laura Massey Plunkett.
15     Q.    Great.  I know you've been deposed many
16 teams, and so given especially that we have lost a
17 little time this morning, I am going to forego
18 providing you with the rules of depositions.  I think
19 we all know them, and I'm just going to get straight
20 into the matters we're here to discuss today.  Does
21 that sound good?
22     A.    That's fine.
23     Q.    Great.  You understand that I'm here to
24 discuss opinions you're rendering as an expert for
25 Plaintiffs in the MSP Valsartan case, correct?

HIGHLY CONFIDENTIAL

Page 10

1    A.    Yes.
2    Q.    And do you know who MSP is?
3    A.    No.
4    Q.    Do you know who the Plaintiff is in this
5  matter?
6    A.    The names of the Plaintiffs, no.
7    Q.    What's your understanding of your role
8  in this litigation?
9    A.    I was engaged to provide opinions
10  related to -- it's in my report, related to the
11  toxicology or genotoxicology of the impurities found
12  in Valsartan that are known generally as
13  nitrosamines.  And in this particular deposition, two
14  specific ones.  MDMA and NDEA.  I'm just going to
15  abbreviate them.
16        I was also asked to provide general
17  regulatory opinions related to the way that these are
18  generic drug products, the way the generic products
19  are regulated generally by the FDA, the role and
20  responsibilities of manufacturers of both active
21  pharmaceutical ingredients, and if we can agree, I'll
22  call them APIs, and then what I call finished dose
23  products, so that would be the products that are
24  actually the subject of the, what I call Abbreviated
25  New Drug Applications, or ANDAs, in this case.

Page 11

1    Q.    Are you offering a causation opinion?
2    A.    No, I'm not.  I'm not a causation expert
3  as it relates to injuries, if that's what you mean by
4  causation.
5    Q.    Are you offering an opinion that the use
6  of Valsartan contaminated with NDMA can cause cancer?
7    A.    I believe I did have that on my report
8  as it relates to what was known or is known and has
9  been known over the decades about the risks posed by
10  Valsartan.  I have a couple of paragraphs where I
11  talk about sort of the -- both the general
12  toxicologic community believes is true or knows is
13  true about the risks, the cancer risks posed by
14  exposure to the impurities of Valsartan.
15    Q.    Are you offering an opinion that the
16  levels of NDMA contained in Valsartan can cause
17  cancer?
18        MR. VAUGHN:  Object to form.
19    A.    I don't believe I have that specific
20  opinion, no.  But I certainly do have opinions in the
21  report, if you've read it, that I talk about the fact
22  that is presence of the impurities increases the risk
23  for cancer generally, and that the poses a hazard and
24  puts patient safety at risk.
25    Q.    Have you quantified how much you believe

Page 12

1  the presence of impurities increases the risk of
2  cancer for Valsartan users?
3        MR. VAUGHN:  Object to form.
4    A.    Are you asking me have I done an
5  independent risk calculation or done a risk
6  assessment to come up with a level of cancer risk, is
7  that what you're asking?
8    Q.    Let me put it more simply.  I believe
9  you testified that the presence of impurities in
10  Valsartan increases the risk of cancer, right?
11    A.    Yes.
12    Q.    Do you have an opinion on how much it
13  increases the risk of cancer?
14        MR. VAUGHN:  Object to form.
15    A.    I don't have a -- I haven't done --
16  that's why I asked the question that I did.  I mean,
17  too answer that question, I would typically say, have
18  I calculated a -- a risk value independently, and I
19  have not done that.  I think that's what you're
20  asking me.  That's how I would describe what you're
21  asking for.  And so I have not done that.  I'm aware
22  that there have been others.  If you go to the
23  toxicology literature and even to different documents
24  off the -- produced by different regulatory
25  authorities, the issue of increased risk can be a

Page 13

1  specific issue for a specific exposure pattern.  And
2  I'm not specific causation, so I haven't done those
3  kinds of calculations.
4    Q.    So if you haven't calculated the risk
5  and value, how do you know there is actually an
6  increase in risk?
7        MR. VAUGHN:  Object to form.
8    A.    Because of the -- what is understood
9  about cancer and these particular compounds.  Do you
10  want me to explain?
11    Q.    Have you determined whether the dose of
12  NDMA and NDEA in Valsartan was sufficient to increase
13  the risk of cancer?
14        MR. VAUGHN:  Object to form.
15    A.    The answer -- a you're asking a question
16  that has to do with specific -- a specific situation
17  for specific person maybe taking Valsartan at a
18  specific dose over a period of time.  That's the best
19  way to answer that question.  Or that's actually the
20  scientifically defensible way to answer the question.
21  Do you want me to explain a little bit why I am
22  answering that way?  I'm happy to give you a little
23  background on risk assessment and how it applies.
24    Q.    No, because my question really is, how
25  much Valsartan would a person have to take to

HIGHLY CONFIDENTIAL

Page 14

1 increase their risk of cancer?
2          MR. VAUGHN: Object to form.
3      A.   Well, it's not the Valsartan. It's
4 taking in the impurities of the Valsartan. So the
5 Valsartan itself, by itself, if you were to have a
6 hundred percent pure Valsartan, that's not the
7 compound that I'm referring to that will increase
8 risk of cancer; however, it's the impurities in the
9 Valsartan, and nitrosamines, specifically NDMA and
10 NDEA, that are in the compound; and we assume when
11 you take Valsartan in this case, the evidence in the
12 date that has shown you're taking in those
13 impurities. It's the presence of those impurities
14 that are increasing the risk of cancer. If they made
15 Valsartan without those impurities, the cancer risk
16 is not there.
17     Q.   Understood. But my question is, if
18 somebody took one Valsartan pill during the class
19 period that had these impurities, did that person
20 have any increased risk of cancer?
21         MR. VAUGHN: Object to form.
22     A.   That's beyond the scope of what I did,
23 thank you. I did not do calculations based on
24 exposure assessments. It's my understanding that
25 there are other experts in this litigation that are

Page 15

1 either what I call risk assessors or specific
2 causation experts that are doing those types of
3 assessments. And that was beyond the scope of what I
4 did. I think if you read my report, I hope you
5 understand what it is that I've done, based upon my
6 description of the facts and the other information.
7      Q.   You did say you're testifying that the
8 presence of impurities in Valsartan increases the
9 risk of cancer. And I'm asking what is the minimal
10 doses at which that happens?
11     A.   And again, I'm answering it to you, I
12 already have, in the literature -- this is where I
13 need to explain. I'm not trying to be nonresponsive,
14 but let me just step back a second and state that if
15 you remember, you understand as I said that I believe
16 that NDMA and NDEA have been identified by
17 authoritative bodies as carcinogens, probable human
18 carcinogens, based on the data that's there. If
19 you -- with that in mind, and looking at what this
20 drug, what the FDA has said and what other, how you
21 would approach risk assessment for these kinds of
22 products in the context of pharmaceutical risk
23 assessment or risks are looked at in the context of
24 benefits, in this case, you're talking about how does
25 the risk of cancer balance against what is going on

Page 16

1 with the drug. And as a result of that work, I'm
2 saying to you that it's very clear as a toxicologist,
3 pharmacologist, risk assessor, someone who works in
4 regulatory affairs, that the presence of this
5 ingredient in Valsartan, where there is no known safe
6 dose generally of these impurities, that it applies
7 to any particular individual, because you have to do
8 this on an individual basis based upon their exposure
9 assessment; but generally the statement is that it
10 increases the risk of cancer. It increases the risk
11 in that particular person that you may want to
12 consider that they would have an outcome of cancer.
13         And then from that, the role of the
14 specific causation expert or the risk assessors in
15 the litigation would be to talk about the specific
16 level of exposure. So that's why I'm saying that's
17 beyond what I did. I looked at this from the aspect
18 of the regulatory expert, as a toxicologist, that I
19 do know, and I know that these were probable human
20 carcinogens. They are not supposed to be in the
21 Valsartan, or the presence of them as very potent
22 genotoxins increases the risk of cancer.
23     Q.   Your risk opinion is completely
24 untethered to any dose?
25         MR. VAUGHN: Object to form.

Page 17

1      A.   What do you mean by "untethered to
2 dose"? Are you asking --
3      Q.   Are you saying --
4      A.   -- whether it would change depending
5 upon whether it was detectable or not detectable?
6      Q.   No. I'm asking, are you testifying that
7 that the impurities increase the risk of cancer
8 regardless of the dose of Valsartan with the
9 impurities that a person took?
10         MR. VAUGHN: Object to form.
11     A.   The way you're asking the question is
12 what I'm having trouble with. So there's -- my
13 opinions relate to whether or not, in the population
14 of people that could be -- that were exposed to
15 Valsartan, there an increased risk of cancer. It's a
16 population-dependent -- just like FDA does, when they
17 do assessments for drugs and look at risks, they look
18 at it across generally the population of people
19 taking the drug. So that's what I'm stating to you
20 about risk, increased risk.
21         Then, where you're going, when you're
22 talking about the dose, then you have to look at what
23 different exposure patterns were for individuals.
24 FDA has said, if you read their different statements
25 about the presence of these impurities in Valsartan,

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1 that these particular impurities are ones that are
2 known to be associated with the risk of cancer, and
3 that's what I'm saying. These increase the risk of
4 cancer if you take them. They are associated with
5 that risk. And then from there, for any one
6 individual person, which is beyond the scope of what
7 I did, others are doing that, they can tell you for
8 that individual at what that risk might be in terms
9 of quantifying. Because I think that's what you're
10 asking. I think you're asking to quantify.
11    Q.    Do you have an opinion as to whether
12 someone who took one Valsartan pill during the period
13 when it contained an impurity, whether that person is
14 at an increased risk of cancer?
15    MR. VAUGHN: Object to form.
16    A.    That is not the opinion I've stated in
17 my report, or addressed, because that was beyond the
18 scope of what I was asked to do. Again, it's my
19 understanding that others in the litigation are
20 handling the issues related to daily doses of
21 Valsartan and the doses of the impurities and how
22 those relate to individual injuries.
23    Q.    Do you consider yourself to be an FDA
24 expert?
25    A.    I consider myself to be an expert in the

Page 19

1 FDA regulations as they apply to products that are
2 currently regulated by the U.S. FDA, yes.
3    Q.    Have you ever described yourself as an
4 FDA expert?
5    A.    It's possible. I don't know if I've
6 used those exact words, if that's what you're asking
7 me. I think in my report, I talk about being an
8 expert at FDA regulated products or the regulation of
9 products.
10    Q.    Do you recall sitting here whether
11 you've ever described yourself as an FDA expert?
12    A.    Are you asking me if I ever used just
13 those words? I don't know, it's possible I did.
14    Q.    Have you ever worked at FDA?
15    A.    I've never been an employee of the FDA,
16 no.
17    Q.    Have you ever been a consultant for the
18 FDA?
19    A.    A hired consultant, no. I've
20 represented clients before FDA before. And I
21 interface with them. But I am not an employee, I've
22 never been an employee, and I've never been hired as
23 a consultant, no.
24    Q.    When were you first contacted about
25 potentially serving as an expert in this litigation?

Page 20

1    A.    I don't have an exact date. If you look
2 at my billing, that -- I don't have bills in front of
3 me but I know you've been provided those. Those give
4 you an idea of the dates that are involved with my
5 work on the case and I would have been contacted or
6 hired sometime before that, sometime probably a year
7 before the first work was done.
8    Q.    A year before?
9    A.    Sometime during the year before the
10 first work was done. I can't give you an exact date.
11    Q.    So you don't recall when you -- whether
12 it was 2022, when you were first contacted?
13    A.    Oh, it was not 2022, no. It would have
14 been before that, during COVID, so in fact, again, I
15 don't have an exact recollection but my -- I have a
16 lot of cases like this one, that have been long
17 delayed from the typical time period because of the
18 issues related to the pandemic and the way courts
19 have moved much more slowly during that time.
20    Q.    Do you recall when you agreed to serve
21 as an expert?
22    A.    If you have the -- I believe I signed a
23 confidentiality for documents, so that would be right
24 around the time or right before the time -- right
25 after the time that I agreed to serve, yes.

Page 21

1    Q.    And --
2    A.    And I don't have that in front of me
3 this morning. You should have that in your files, I
4 would think.
5    Q.    Between being asked to serve as an
6 expert and agreeing to serve as an expert, did you do
7 research on Valsartan?
8    A.    No, because I had already done it
9 years before that. I was -- to explain that, I was
10 well aware of what was going on with Valsartan from
11 the time that it first appeared in what I called the
12 trade press back in 2018, and there was first
13 knowledge -- I was aware of the fact that there had
14 been recalls, that the FDA was addressing the issue
15 and it's -- the reason I was aware of it is because
16 I'm a cardiovascular pharmacologist as part of my
17 expertise, and I have an interest in following drugs
18 in the classes that are part of my very specific
19 training and experience.
20    Q.    Have you ever published any articles
21 about Valsartan?
22    A.    No, I have not. Although I have
23 published articles related to the role of the
24 angiotensin system in control of the autonomic
25 nervous system included blood pressure.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1    Q.    Have you ever published any articles
2    about nitrosamines?
3    A.    No, I have not.
4    Q.    Have you ever given any speeches about
5    Valsartan?
6    A.    No, I have not.
7    Q.    Have you ever give any speeches about
8    nitrosamines?
9    A.    I've never given a speech that was only
10   on nitrosamines, but certainly nitrosamines are
11   compounds that I may have had mentioned in speeches
12   where I talk about cancer, cancer risk assessment.
13   Q.    Have you ever consulted in connection
14   with a product that contained NDMA or NDEA prior to
15   this litigation?
16   A.    I don't believe it was related to
17   product, no.
18   Q.    What do you mean by that?
19   A.    So NDMA and NDEA, I've looked at the
20   issues that cancer was developed from nitrosamines in
21   the past, and I've looked at the animal data in the
22   past, back when some of those studies first appeared
23   I think in the '90s, to early 2000s.  So I have
24   looked at the data related to these compounds before,
25   it's my understanding that, you know, I mean, my

Page 23

1    knowledge that these are kind of prototypical
2    carcinogens.  If you want a positive control animal
3    study, NDMA for example would be a good positive
4    control to use when you're testing for cancer.
5    Q.    Have you ever advised a company on the
6    risks associated with NDMA and NDEA?
7    A.    No, I don't -- I've never had a client
8    who had those detected in their products.
9    Q.    Have you ever worked with a solvent,
10   DMF, dimethylformamide?
11   A.    Formamide.  Can you please be more
12   specific?  I think you said work.  Did you say
13   "work"?  What do you mean by "work," have I ever come
14   across it, have I ever given it to an animal, what
15   are you asking?
16   Q.    Have you ever done any professional work
17   involving that solvent?
18   A.    Well, it's still a really broad
19   question, I would argue, but certainly it is a
20   compound I've heard of before in my work but it isn't
21   that I've ever, like, drafted a toxicology profile or
22   done any specific testing where I've -- that's been
23   involved with that particular compound, no.
24   Q.    Have you ever done any lobbying
25   involving a product that contains DMF?

Page 24

1    A.    I don't -- I'm not a lobbyist.  What do
2    you mean by lobbying?
3    Q.    Have you ever done any lobbying?
4    A.    I'm not a lobbyist.  So are you asking
5    me have I ever -- ever argued or had a meeting where
6    I've taken a position one way or the other, is that
7    what you mean, as a scientist?  Because I have not,
8    no.
9    Q.    Have you ever worked with a company that
10   manufactured a product using DMF?
11   A.    I have no idea.
12   Q.    Have you ever advised any companies
13   about the risks of degradation of DMF?
14   A.    Not that I can recall, no.
15   Q.    When did you first have knowledge that
16   DMF can degrade into diethylamine?
17        MR. VAUGHN:  Objection, foundation.
18   A.    So, I don't know that I can answer this
19   with any clarity, not knowing, not being able to say
20   whether or not in the past I've ever reviewed
21   information on that.  It's very possible I have in
22   the past, but it's never been something that's been
23   top of my head.  Certainly I'm aware of it based upon
24   the reports I've read on -- from Dr. Hecht in this
25   case, and also from the top deposition testimony of

Page 25

1    some of the people, the witnesses for ZHP in the
2    case.
3    Q.    Prior to being contacted about serving
4    as an expert in this litigation, did you personally
5    have knowledge that DMF could degrade into
6    diethylamine?
7        MR. VAUGHN:  Object to form.
8    A.    I don't recall ever having that as
9    something that I could say that I was asked about.
10   So, I mean, I -- that's the best I can answer it for
11   you.  It's not been a focus of any work that I can
12   recall in the past.
13   Q.    Have you ever been, prior to being
14   contacted about serving as an expert in this
15   litigation, did you ever have knowledge that the TEA
16   process used by ZHP could lead to the formation of
17   NDEA?
18        MR. VAUGHN:  Object to form.
19   A.    No, because I wasn't aware of ZHP's TEA
20   process until discovery documents in this case became
21   available.  That's when I became aware of what it was
22   that they had been done in terms of understanding how
23   they produced thee product.
24   Q.    Prior to being contacted about serving
25   as an expert in this case, did you personally have

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1 knowledge about how any chemical process could lead
2 to the formation of NDEA?
3       MR. VAUGHN:  Object to form.
4    A.   NDEA?  Um -- yes.  I mean, I have
5 reviewed the toxicology literature over the years
6 related to these types of impurities and actually, in
7 the EPA projects I've worked on, on the carbon
8 contaminants in that particular case, which is a
9 little different than the FDA world.  But yes, I have
10 reviewed the formation.
11    I have some -- in fact, the structures
12 that I put into my report come from one of my
13 textbooks, and I've reviewed that section and that
14 chapter of the textbooks several times in the past,
15 so I have that awareness.  But I've never worked -- I
16 had not, you know, I have not developed a report
17 before for anyone, none of my clients ever approached
18 me to put together a tox profile on NDEA
19 specifically.  So it's more general of understanding
20 and training based upon the toxicology training I've
21 had.
22    Q.   Can NDEA be formed with tertiary amines,
23 or amines?
24       MR. VAUGHN:  Objection, form,
25 foundation.

Page 27

1    A.   So that's beyond the scope of what I --
2 what I have done in terms of coming and being able to
3 understand or describe all of the ways it can be
4 formed.  Certainly, I'll refer you to Dr. Hecht or
5 all the other experts, chemists in the litigation to
6 describe those kinds of details.  There was an
7 understanding in this case based upon what processes
8 are described; and so if you want me to pull all
9 those documents, we can go back and look at what was
10 described in the particular documents related to this
11 case.
12    Q.   Prior to reviewing the documents in this
13 case, did you have an understanding as to what sort
14 of amines were necessary and what alkyl groups were
15 necessary to form NDMA and NDEA?
16       MR. VAUGHN:  Object to form and
17 foundation.
18    A.   I can't say that I would have been able
19 to describe those for you in any detail before
20 looking at these documents, no.  But I can tell you
21 that certainly, it is -- it was something that was
22 known in this literature, and I agree with that
23 because I went back and I looked at some of the
24 exhibits that were used in the depositions that talk
25 about the foreseeability, I've read Dr. Hecht's

Page 28

1 report and his description of some of these reports.
2    Q.   When you talk about the exhibits used in
3 depositions, you're talking about the textbook that
4 you cite and the Tetrahedron article you cite?
5       MR. VAUGHN:  Object to form.
6    A.   That I mention in my report, yes.  Those
7 are the two that I saw, they were described in the --
8 by Dr. Hecht.  But they have also described, they are
9 asked about within the deposition of one of the
10 witnesses or several of the witnesses for ZHP, the
11 depositions I read.
12    Q.   Have you seen the Australian textbook
13 before serving as a expert in this litigation?
14    A.   That was not one I had in my files, no.
15    Q.   And had you seen the Tetrahedron article
16 before serving as an expert in this litigation?
17    A.   I don't recall, but I don't know, based
18 on the number of years it's been since I've been
19 asked specifically these kinds of questions before by
20 any client.
21    Q.   Are you a regular reader of the
22 Tetrahedron Journal?
23       MR. VAUGHN:  Object to form.
24    A.   What do you mean by "regular reader," do
25 you mean do I subscribe?  Is that what you're asking?

Page 29

1    Q.   Sure.
2    A.   It's not one I subscribe to, no.  But it
3 certainly is a journal that comes up routinely when I
4 do searches for projects I've worked on.  Tetrahedron
5 is one that publishes chemistry articles,
6 specifically those that deal with any toxic
7 compounds.
8    Q.   Sitting here today, can you identify any
9 literature besides the Australian textbook and the
10 Tetrahedron article that addresses whether and when
11 DMF can degrade into diethylamine?
12       MR. VAUGHN:  Object to form.
13    A.   That was beyond the scope of what I did.
14 I didn't do that search.  I could but I haven't done
15 that.  I didn't feel I needed to do that in order to
16 provide the opinions I did in this case, because
17 there is a chemist that's doing that kind of work.
18    Q.   You do provide an opinion that it was
19 known in 2012 that DMF could degrade into
20 diethylamine, right?
21    A.   Yes, based on that -- I think if you
22 read my report I talked about the fact that when a
23 company is doing a risk assessment, part of that
24 would be search of the published literature to make
25 sure there is something that is out there that they

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1 may not be aware of. So certainly, that's why I have
2 formed those opinions. If I was to do a risk
3 assessment for looking at something about the process
4 that's being used, I could look at what the potential
5 byproducts or degradation products or pathways that
6 could be affected by using this particular chemical
7 process. And so that's why those articles are
8 important, because it shows what was known at
9 different points of time and, most importantly, what
10 was known before the issues arose in this case about
11 the breakdown of -- or the use of the chemical
12 process that led to the presence of the NDMA and NDEA
13 in the Valsartan API.
14     Q.    The only published literature you cite
15 on those topics is published literature that was used
16 by Plaintiff counsel in depositions, correct?
17     A.    Yes. And again, that's because that was
18 beyond the scope of what I was asked to do. I was
19 not asked to be the chemist to address that specific
20 question in a complete and expansive manner.
21     Q.    So your opinion of this was widely
22 known, is based on documents that you obtained
23 through this litigation, correct?
24         MR. VAUGHN: Object to norm.
25     A.    Well, depends. I also have -- I also --

Page 31

1 well, not entirely -- are you asking me specifically
2 just about the issue of breakdown or the formation of
3 DMF for example, that's what you're asking me?
4     Q.    Correct.
5     A.    That would be true that -- because
6 again, that was beyond the scope of what I did
7 independently, but it's evidence that's important to
8 me in my opinions because one of the issues that you
9 have as a regulatory expert is understanding what a
10 company could or should have done if they had been
11 following all the regulations and been complying
12 fully with what they are required to do in the
13 literature to produce a human prescription drug
14 product.
15     Q.    I understand, but my question is really
16 simple. Your opinions of what the company could and
17 should have known are based on documents you obtained
18 in this litigation, correct?
19         MR. VAUGHN: Objection.
20     A.    That and their own deposition testimony.
21 So the company -- ZHP company witnesses also agreed
22 to that issue, that these are things that could have
23 been known. They had not done a rigorous assessment.
24     Q.    What ZHP witness said that they did
25 not do a complete risk assessment?

Page 32

1     A.    So there's a stipulation document that's
2 in the paragraph, paragraph 45 in my report, where I
3 say that the lack of full evaluation of chemical
4 processes have been stipulated to by Defendants. So
5 evaluation -- full evaluation is what I'm talking
6 about in terms of the risk assessment.
7     Q.    Before you were contacted by Plaintiffs
8 in this litigation to serve as a paid expert, did you
9 do anything to warn the public about the use of
10 Valsartan that contained nitrosamine impurities?
11         MR. VAUGHN: Object to form.
12     A.    So that's a really broad question. Are
13 you asking me a specific action that I took to maybe
14 write an article or are you asking me about
15 conversations? What are you asking me about?
16     Q.    I'm asking about it all.
17     A.    Well, I did have conversations with some
18 of my acquaintances, my colleagues, my family members
19 who were taking these drugs, who asked me questions
20 about it, when they saw the information in the
21 popular press.
22         But I did not reach out to FDA, for
23 example. FDA was already aware, and I know this
24 because they were taking actions. I did not reach
25 out in any manner to any other type of -- other

Page 33

1 company or -- but I certainly did have conversations
2 with individuals that reached out to me.
3     Q.    Did any family or friends ask you
4 whether they should continue taking their Valsartan
5 until there was -- until, you know, the market has
6 sufficient availability of alternatives?
7         MR. VAUGHN: Object to form.
8     A.    That's not the question they asked,
9 because I'm not a physician. They asked me what did
10 I think about the issues and whether or not there was
11 a risk.
12     Q.    And what did you tell them?
13     A.    I told them I did believe there was a
14 risk based upon the fact that it is something that
15 wasn't meant to be in the products, and most
16 importantly, it increases the risk -- it's a potent
17 genotoxin and is known to increase the risk of
18 cancer; so in my opinion as a toxicologist, I would
19 not want to be taking a product that had these
20 impurities in it.
21     Q.    I've always heard the expression that
22 when it comes to toxicology, one of the major tenets
23 is that the dose is in the poison, or the poison is
24 in the dose. Is that a true -- an expression that's
25 used in toxicology?

9 (Pages 30 - 33)

Page 34

1          MR. VAUGHN: Object to form.
2     A.   It is a term that's used. But there's a
3 different -- there's a different sort of methodology
4 or way for assessing risk and dose issues with cancer
5 versus non-cancer. So that's absolutely the issue of
6 threshold mechanism or a threshold existing for
7 things that are doing, actively to produce effects
8 that are not cancer.
9          You can typically find a threshold if
10 you do enough studies or do enough looking. However,
11 for cancer risk assessment, if the assumption is that
12 there is no threshold, so as a result, the dose makes
13 the poison can apply, but it's not to the same extent
14 or level as it does when you're talking non-cancer
15 endpoints.
16     Q.   When you describe something as a potent
17 genotoxin, in order to determine when it's a potent
18 genotoxin, do you need to know what dose the person
19 is exposed to?
20     A.   I'm not talking about as a person, I'm
21 talking about based upon scientific evidence. And by
22 "potent genotoxin," I'm describing the fact that the
23 studies that have been done, genotoxicity studies are
24 typically done in vitro. There are some in vivo
25 studies but most of it's done in vitro. And in those

Page 35

1 studies, when you compare, again when you look at
2 cross-compounds, NDMA is often a positive control
3 compound. It's used to make sure your assay is
4 working correctly.
5          So in other words, it is reliably going
6 to produce a genotoxic insult when you expose cells
7 to it, and the potency has to do with the fact that
8 you can get those kinds of DNA changes or changing
9 mutations at very low exposure levels.
10     Q.   When your family members or friends came
11 to you and asked if they were at an increased risk of
12 cancer, did you tell them it depended on how much
13 Valsartan, how much DMA they had consumed?
14          MR. VAUGHN: Object to form, foundation.
15     A.   No one asked me to do that for them.
16 They were more interested generally with the issue
17 should they have a conversation with their doctor and
18 consider whether or not they should be changing to a
19 different drug. They didn't ask me, should they
20 change; but my advice was, I mean, "Talk to your
21 doctor, but if it was me, I would be talking to my
22 doctor about switching to a drug that did not have
23 that impurity, those impurities in them."
24          Again, the FDA in themselves state that
25 the NDMA and the NDEA in these nitrosamine impurities

Page 36

1 are unacceptable and are not supposed to be in the
2 product.
3     Q.   Okay. When you said you advise them to
4 switch to a drug that doesn't have those impurities,
5 at that point, Valsartan had already been recalled
6 and off the market, correct?
7          MR. VAUGHN: Objection, form,
8 foundation.
9     A.   So when the individuals, or an
10 individual approaches me about asking these
11 questions, this is something that has gone on for a
12 while, that is true. But it's also my understanding
13 that even though there had been recalls, there was a
14 continually finding an issue with the presence of
15 these impurities in the drug.
16          And also, the other thing that I talked
17 to individuals about is the fact that the presence of
18 these impurities from my understanding and reading
19 what FDA's investigations showed had to do with
20 problems at the companies related to their
21 manufacturing policy. So those kinds of
22 conversations were had.
23          It's more than just -- the questions I
24 was asked was more as friends and people that I know
25 coming to me and saying, "As a toxicologist,

Page 37

1 this be something that you would want to be exposed
2 to, should I worry about this?" And I said, "I would
3 worry about it. It's something that you don't want
4 to take, it's not supposed to be there, there are
5 potentially alternatives, but you have to talk to
6 your doctor because I'm not a physician."
7          So I didn't say, "Please change to this,
8 or please change to that."
9     Q.   Right. But by the time they came to
10 you, they could no longer purchase Valsartan because
11 it had been recalled, correct?
12          MR. VAUGHN: Object to form, foundation.
13     A.   Well, I can't tell you whether or not
14 anybody still had it in their possession. If
15 somebody had been on Valsartan for a while they may
16 have still had the drug in their -- that's beyond the
17 scope of conversations that I've had --
18     Q.   How many of these individuals were there
19 who came to you with these questions?
20     A.   At least three or four people that I
21 know.
22     Q.   And some were family and some were
23 friends?
24     A.   Yes.
25     Q.   And when they asked you, "Am I at risk,"

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1 you did not ask them, "What is your dose of
2 medication," correct?
3           MR. VAUGHN: Objection, misstates prior
4 testimony.
5      A.   That -- I did not do a risk assessment
6 for any individual. What I did was, people came and
7 asked me whether this is something they should worry
8 about, what did I think about the -- about these
9 particular impurities in the product. And my answer
10 is, they can increase their risk of cancer, they are
11 known genotoxins. I wouldn't be taking a drug with
12 those, if I -- if it was me, I would talk to your
13 doctor.
14      Q.   Have you ever done a study that was
15 funded by Plaintiffs' lawyers?
16      A.   I don't believe so. Other than the --
17 by "study," you mean a test or a clinical study or an
18 animal study, I have not. No.
19      Q.   Do you intend to publish any of your
20 theories related to this litigation in the
21 peer-reviewed literature?
22      A.   I have not done so, and I don't right
23 now have a plan to do so. Typically I wouldn't do so
24 without understanding what limits or constraints
25 there may be in terms of confidentiality agreements

Page 39

1 that I've signed in terms of the documents I've
2 reviewed.
3      Q.   Have you ever advised any pharmaceutical
4 companies on medications?
5           MR. VAUGHN: Object to form.
6      A.   You need to be more specific by -- what
7 do you mean, "Advise pharmaceutical companies on
8 medications"? That's a really broad question.
9      Q.   I'd like to know the names of all
10 medications for which you have provided consulting
11 services to pharmaceutical companies.
12           MR. VAUGHN: Doctor, to the extent that
13 you are not under a confidentiality agreement, you
14 may answer the question.
15      A.   So most of the work that I do, have done
16 over the years with companies is considered
17 confidential. I don't even share names. Companies
18 typically that I'm currently working for, because
19 that's part of my business terms and part of the
20 agreements that I'm asked to enter into by companies.
21 I have testified before that in my, other than
22 my 30-plus years experience, I have worked on
23 projects related to many of the largest drug
24 companies around, and many small companies as well.
25 But I don't feel that it's something that I could do

Page 40

1 to divulge the specifics of a project without asking
2 a company to do that, if I could do that or not.
3           I assume you're limiting that to
4 regulatory consulting. You're not asking about the
5 litigation work, because that you could find, when
6 you -- if you look at my trial work.
7      Q.   Have you over done any litigation work
8 on behalf of a pharmaceutical manufacturer?
9      A.   Yes. I did litigation work on behalf of
10 pharmaceutical manufacturers when I was working with
11 Environ between 1989 and 1997. They only worked for
12 industry in litigation. And there is a most recent
13 time would have been, probably about ten years ago, I
14 worked for a company, a Japanese company on an issue
15 that was being litigated. A Japanese drug company.
16      Q.   What was the drug?
17      A.   Oh, gosh, I don't remember the name off
18 the top of my head. A blood pressure medicine, but I
19 don't remember the name off the top of my head.
20      Q.   Do you know if that blood pressure
21 medicine was ever found to have NDMA or NDEA?
22      A.   Those were not the issues that I am
23 remembering from my work on the case, so I can't tell
24 you if it did. I just, that was not what we were
25 addressing or I was addressing.

Page 41

1      Q.   Did you advise that company about the
2 potential risk in development of NDMA or NDEA in
3 blood pressure medication?
4      A.   Already said it was not the issue of the
5 case. There were no issues about nitrosamines or
6 NDMA or NDEA in that particular case.
7      Q.   I understand that. I'm just asking if
8 you happened to mention that issue to the company.
9           MR. VAUGHN: Objection, asked and
10 answered.
11      A.   No, it was ten years ago. I don't think
12 I would have, no.
13      Q.   And in the last ten years, have you done
14 any litigation work on behalf of a Defendant
15 pharmaceutical company?
16      A.   Defendants, yeah. For pharmaceutical
17 companies, no. Not in litigation. I have consulted
18 with companies, but not litigation.
19      Q.   Do you know of any medications besides
20 Valsartan that have had issues with NDMA or NDEA?
21           MR. VAUGHN: Object to form.
22      A.   There certainly is -- have been -- have
23 been drugs mentioned on the FDA website and the trade
24 press, yes.
25      Q.   Which other --

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1    A.    Other sartans. Losartan I think is one,
2 Metformin is one I've seen, I don't know. To get the
3 complete risk, I'd refer you to the FDA site.
4    Q.    Understood. I'm just asking which ones
5 you know about.
6    A.    Off the top of my head, those are ones
7 that I can recall.
8    Q.    Just the sartans and Metformin?
9    A.    Yes. There's others. I just don't
10 remember the names off the top of my head.
11    Q.    Are you serving as an expert in any
12 other nitrosamine litigation right now?
13    A.    No.
14    Q.    Have you ever served as an expert in any
15 other nitrosamine litigation?
16    A.    No, I have not.
17    Q.    When did you first form the opinion that
18 Valsartan that contained NDMA and/or NDEA impurities
19 was adulterated?
20        MR. VAUGHN: Object to foundation.
21    A.    The opinions that I've expressed in my
22 report, where I talk about the products that would be
23 deemed adulterated, would have been developed at the
24 time I wrote the report so then before the date of
25 the report, October 31st, would have been sometime

Page 43

1 earlier in 2022. I can't give you an exact date.
2 And I would state that the -- and those opinions were
3 developed based on a review of findings of FDA along
4 those lines, where they actually sent a warning
5 letter related to that.
6    Q.    When did the FDA send a warning
7 letter -- when did the FDA first send a warning
8 letter with the word "adulterated" in it?
9        MR. VAUGHN: Object to form.
10    A.    I want to say that there's a warning
11 letter that I'm aware of in 2019. I don't know if
12 there were other warning letters that existed. I
13 don't know and the one I'm thinking about is one that
14 went to ZHP.
15    Q.    Do you hold the opinion that Valsartan
16 was adulterated before that -- before 2019?
17    A.    It's my opinion that it would have been
18 deemed adulterated based on what was -- what the
19 evidence in the case appears to show, yes.
20    Q.    What --
21    A.    Based on --
22    Q.    -- I didn't mean to interrupt you. So
23 sorry.
24    A.    No, go ahead and follow up, because I
25 think you were going to ask it of me, right? If

Page 44

1 that's what I mean by that. I mean that -- if the
2 facts and evidence in this case show that at least at
3 the time that Novartis identified -- I described this
4 in my report in 2018 to ZHP -- the presence where
5 they had found it, the presence when it's found
6 indicates that it's adulterated because it is not
7 something that was meant to be there, and it is a
8 potent genotoxin, and that's been known from well
9 before that time period.
10        In this particular case, there's also
11 facts and evidence to indicate that as early as the
12 2014 time frame, the company, being ZHP, was making
13 product where there were unidentified peaks that they
14 were not pursuing. So the presence of those
15 impurities, the fact that for a time raises questions
16 about the quality of the product, even though they
17 had not identified those particular ones at that
18 particular time as being, for example, NDMA.
19        However, if they had done, if the
20 company had done the proper risk assessment, chemical
21 process assessment at the time that they changed from
22 the TIN process to the other process they were using,
23 I believe, it's my opinion that the risk assessment
24 would have gone led to, potentially, some knowledge
25 about this issue and that I think is also the opinion

Page 45

1 of Dr. Hecht and others in this case. He addresses
2 that more directly than I do.
3        I happen to rely on what I see described
4 in the documents and facts as they present it, and I
5 describe in my report.
6    Q.    What specific things should ZHP have
7 done in its risk assessment that it didn't do, like
8 what specific tasks?
9        MR. VAUGHN: Object to form.
10    A.    I don't think I could -- I don't think I
11 have laid out a set of specific tasks in my report,
12 but I would tell you that in my report, as I
13 describe, the risk assessment process is
14 understanding breakdown byproducts, degradation
15 products that could occur and with -- as Dr. Hecht
16 has explained, I'd refer you to him to talk about the
17 details of the process and what it was that, from the
18 chemist's point of view, was so critical.
19        But certainly, from the what the
20 evidence in this case shows, the company themselves
21 understood that they weren't looking at a full
22 evaluation. That's what needs to be done. If you
23 don't do a full evaluation, then you never know.
24    Q.    Is it your opinion that any risk
25 assessment that did not identify NDMA would have been

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

1 inadequate?

2    A.    I don't think I said that, no.  I think
3 what I said is, by not conducting an adequate risk
4 assessment or a full risk assessment of their
5 chemical process, that they have put patient health
6 at risk because of their lack of understanding of
7 what could occur and what impurities are in it now.

8    Q.    What didn't they do, like what should
9 they have done more that would have made it adequate,
10 like what actual things?

11        MR. VAUGHN:  Object to form.

12    A.    I think I've already tried to answer
13 that.  I said it's my opinion they should have
14 understood the potential for the different changes in
15 their process where they went from a TIN process to
16 the other, to introduce the nitrosamines, based upon
17 doing a chemical process review.  However, Dr. Hecht
18 and the chemists in the case are the ones to talk to
19 if you want to understand the chemistry and what was
20 so important about this step or that step.

21        If you're asking me about a step in
22 terms of a process they could have used, it's just
23 understanding every input and every output and what
24 are potential chemical reactions that could occur.

25    Q.    You are offering an opinion that the

Page 47

1 risk assessment was not adequate, so I'm trying to
2 understand what other things you believe, criticize
3 Dr. Hecht, what you believe ZHP should have done to
4 have at quality risk assessment?

5    A.    I think my opinion has been that the
6 risk assessment wasn't adequate.  It's based first on
7 admissions by the company, when they say they didn't
8 do a full review of their chemical process.  That
9 right there indicates to me that the risk assessment
10 was not adequate.  They are stipulating to that.
11 Because part of that exchange, when you change a
12 chemical process based upon the guidance from FDA and
13 what in my experience companies do when they make a
14 change to a chemical process, that they look at those
15 potential reaction pathways.

16        I'm not an organic chemist by expertise.
17 I have training in organic chemistry but I
18 particularly am not doing organic chemistry in this
19 case.  That's the person that can describe for you
20 the details in terms of how they should have looked
21 at each of the inputs.  It's not that there's a
22 prescribed set of things people do, it's not like I
23 can say to you that, "Go to this particular document
24 and it will lay out from a regulatory perspective ten
25 steps that must be done."

Page 48

1        Instead, what the guidance says is, you
2 must understand, and understand the risks and look at
3 your chemical process to identify things such as
4 potential degradation products, potential byproducts.
5 The fact that the company stipulates, the company
6 being ZHP in this case, stipulates that they didn't
7 do that, that's important to my opinion.

8        It's also important in this case, that
9 companies like Teva/Torrent, and I describe this in
10 my report as well, don't appear to have known what
11 they should have done in terms of checking on what
12 the ZHP was indeed telling them that they did or
13 didn't do.

14        So regardless of whether or not ZHP has
15 a duty, Torrent/Teva also have duties to make sure
16 that they have validated their API suppliers, and
17 understand that their API supplier is doing all the
18 things they need to do in order to produce a quality
19 product.

20    Q.    Is it your opinion, every drug that
21 contains an impurity is adulterated?

22        MR. VAUGHN:  Object to form.

23    A.    Depends.  I can't say yes or no.  It
24 depends.  It depends on the situation.  So there are
25 certain types of impurities that are allowed based

Page 49

1 upon the USP compendium.  There are ones that have
2 been identified and ones that are post-identification
3 or accepted to be present in a product, and those
4 evaluations are, you know -- know what those are.
5 Right?  We know what it is, impurity A, impurity B,
6 impurity C, we see that occurring based upon the
7 evaluation of regulatory agencies.  Those are allowed
8 or, based on the development of the product, and in
9 the monogram, those are allowed.

10        But it just depends.  If this is a new
11 impurity, and an unknown impurity, something that the
12 company gets because it's -- they have changed the
13 process, then in those cases I would argue that you
14 won't go -- those are the present impurities that
15 could very well make it adulterated, but you have to
16 figure it out.  You have to know it's there to
17 classify whether or not it is a genotoxin, for
18 example.

19    Q.    Can generic drug contain an
20 impurity that's not contained in the RLD?  And I
21 think we can agree what the term "RLD" means,
22 correct?

23    A.    Reference Listed Drug, yes.

24    Q.    If a generic drug contains an impurity
25 that's not present in the RLD, is that generic drug

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1 adulterated?

2    A.    Depends, same thing. Depends upon what
3 it is, and what work that the company -- at the
4 companies that are making the generic drug did in
5 order to identify and understand their process. So
6 it could be, yes.

7    Q.    Is there an objective standard to know
8 when a generic drug that contains an impurity not
9 present in RLD is adulterated?

10        MR. VAUGHN: Object to form.

11    A.    I don't think I understand your
12 question, because are you asking me --

13    Q.    Well, like you said it depends, so I'm
14 trying to understand, is there like an objective
15 standard that I can apply to know when a generic drug
16 has an impurity, it's not in the RLD, what's the
17 standard to determine whether it's adulterated in
18 your opinion or not?

19    A.    The standard of what is, is -- standard
20 is what it is. For example, is it a genotoxin or
21 not, is it a potent toxin or not? Understanding what
22 the impurity is.

23        Are you asking me is there some level of
24 impurity that -- well, USP monographs indicate
25 potentially? Yes, some monographs will say that this

Page 51

1 impurity at this level is allowable. Is that what
2 you're asking me? I can't tell you any particular
3 one but you can go to the monogram for different
4 drugs and they do list that.

5    Q.    Are you talking about the USP monograph?
6 At the time that these products were on the market,
7 impurities under .1 did not have to be identified, is
8 that correct?

9        MR. VAUGHN: Object to form.

10    A.    As long as they are -- as long there was
11 an understanding that they were not potent toxicants,
12 or potent genotoxicants, yes, that is a standard that
13 could have been applied, depending upon your process.

14        But again, this comes back to whether or
15 not what you're doing is the process that's in the
16 monograph. So when you change that process, which is
17 what happened here, the RLD process was the TIN
18 process, right? That's the one that Diovan, the RLD,
19 was produced under, and that's what the monograph was
20 set around.

21        In this particular case, the companies
22 are using a different process to produce their
23 product so just pointing back to the monograph and
24 saying, "That is adequate," isn't adequate unless you
25 know it's adequate, which means you need to

Page 52

1 understand your processes and what can potentially be
2 produced.

3    Q.    What is the difference between a
4 genotoxin and a potent genotoxin? You've used both
5 terms and I want to make sure I understand how you're
6 differentiating them.

7    A.    So "genotoxin" just means generally that
8 the product, the chemical or the compound, or
9 impurity, has the potential to damage or affect gene
10 expression or cause mutations. There's a variety of
11 types of endpoints. Genotoxicity just means that
12 something produces an adverse effect through a
13 mechanism related to DNA damage of some type.

14        A potent genotoxin, the reason I'm using
15 it here, is because these compounds are that. These
16 are ones that are known to be some of the most potent
17 in terms of the propensity to, or their ability to
18 product DNA damage.

19    Q.    And is there literature that references
20 to NDMA as a potent genotoxin? Where can I find that
21 term in the literature?

22    A.    I don't know if I cited that term. Let
23 me see if I cited that in my report, to use that.

24        MS. MILLER: While you're looking, let's
25 just mark Dr. Plunkett's report as Exhibit 1.

Page 53

1 EXH        (Plunkett Exhibit 1, expert report of
2 Laura M. Plunkett, Ph.D., DABT, dated 10/31/22,
3 marked for identification, as of this date.)

4        (A pause in the proceedings.)

5    A.    So my paragraph 43 is where I call them
6 potent carcinogens. So potent carcinogens, I would
7 argue, could also apply to potent genotoxins as well,
8 could also be a potent genotoxin because we know
9 that's the mechanism by which these compounds appear
10 to act to produce cancer.

11        It's my statement and I think it's
12 consistent with my review of the literature, so
13 that's about the only thing I could answer for you
14 right now based upon my report.

15    Q.    You can't actually point to any
16 literature that uses the word "potent genotoxin" with
17 respect to either NDMA or NDEA?

18    A.    I know I've seen it before but I'd have
19 to go back and find it because I don't cite to that
20 in my report. So I can't answer that without going
21 back and looking at my library of textbooks and other
22 types of monographs and information. I believe you
23 might see that described that way within either the
24 IARC document, or within the WHO or the NCP or EPA
25 documents that talk about the -- to find it, that I'd

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1  have to go look for you. I would argue that I don't
2  believe there's any controversy that most
3  toxicologists would call them potent genotoxins based
4  on any data that exists.
5      Q.   I can tell you that I've not seen that
6  term --
7          MR. VAUGHN: Object, argumentative.
8      Q.   -- I'm wondering if you have actually
9  seen that term anywhere in the literature.
10     A.    I believe I have. But again, regardless
11 of whether I have or not, as a toxicologist, the
12 behavior of NDMA and NDEA in particular, in animal
13 studies, for example, and also in in vitro studies
14 for genotoxicity indicate that it's a potent compound
15 to produce the effects that it does.
16         And so I'm calling it either a potent
17 carcinogen, I would call it potent toxicant, I would
18 also call it a potent genotoxin because it is one
19 that reliably, over and over again, in fact, with the
20 animal studies, what's interesting as I described in
21 paragraph 43, there's actually a study showing that
22 single doses prenatally have been shown to be
23 carcinogenic in animals once they are born, a pretty
24 potent effect.
25     Q.   Can you give me an example of a

Page 55

1  genotoxin that's not potent?
2      A.    Lead is an example of something that's
3  not a potent genotoxin. It has genotoxicity effects
4  in some assays but not in all. "Potent" in
5  genotoxicity, typically as a toxicologist, I would
6  use that word because regardless of the assay you
7  test it in and how many times you test it over and
8  over again, it produces genotoxic effect across the
9  range of exposure levels in cells with and without
10 activation.
11     Q.   Do you have an opinion as to what dose
12 of NDMA or NDEA is necessary to render those -- to
13 render them carcinogenic?
14         MR. VAUGHN: Object to form.
15     A.    That's beyond the scope of what I did.
16 I told you that earlier. However, there are others
17 who have addressed that. And in this litigation, and
18 I would also say there are potentially, you can go
19 back and look at the IARC monograph where it goes
20 through all the studies and exposure levels and what
21 the extrapolated cancer risk would be based on
22 different exposure levels in animal studies. So that
23 you can get to.
24         You can get to where this -- what
25 exposure level increases cancer above the one in a

Page 56

1  million or one in a hundred thousand risk level. You
2  can do that based on animal data.
3      Q.   Are NDMA and NDEA found in foods?
4      A.    Are you asking me are they found in any
5  food at all? They can be. Depends on the conditions
6  under which the, for example, maybe the food is
7  cooked, that has some effect on that but there is in
8  background level of exposure, yes.
9      Q.   Have those foods been banned by the FDA?
10         MR. VAUGHN: Object to form.
11     A.    That's beyond the scope of the work that
12 I did, to look to see if that's true for any -- so I
13 would say to you, I don't have an opinion one way or
14 the other. I'm not aware of some of those foods
15 being banned, no, I'm not aware of that. But it's a
16 very different thing to talk about something that can
17 be controlled and something that can't be controlled.
18 So talking about exposures in food that may be there
19 and are things that it's very difficult to control,
20 whereas we know that this drug can be made without
21 it.
22         So there's a different calculus when you
23 talk about looking at risks posed by food versus risk
24 posed by a drug where we know you can make it without
25 them there.

Page 57

1      Q.   If a family member had come to you and
2  said, "I just found out there's NDMA in one of the
3  foods I like, herring, I like herring and there's
4  NDMA in herring," would you have told them to stop
5  eating herring?
6          MR. VAUGHN: Object to form.
7      A.    I don't think I would have. I would
8  have told them that I'd have to do an investigation
9  because it really depends on what people are eating,
10 how their foods are prepared, those are all important
11 for potence of that. Foods can have things in them
12 that are harmful, but typically the things that foods
13 have in them that are harmful are not at the levels
14 that we're talking about in this case, for this
15 particular impurities. That could have occurred at
16 many, many orders of magnitude higher than the levels
17 that may be found in food.
18     Q.   Have you told any members of your family
19 or any friends to stop eating cured meats because
20 they contain nitrosamines?
21     A.    No, I've never been asked that.
22     Q.   Have you told any members of your family
23 or any friends to stop eating bacon because it
24 contains nitrosamines?
25         MR. VAUGHN: Objection, foundation.

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1    A.    No.  I've told people that they can be
2 harmful in terms of heart disease issues.  People
3 have asked me that before.  So for example, myself, I
4 try to eat less red meat but it just has to do with,
5 I'm in my 60s, I don't know, I'd like to remain
6 healthier as I go forward.
7    Q.    Have you ever suggested to any family or
8 friends that they stop eating any fermented foods
9 because they contain nitrosamines?
10       MR. VAUGHN:  Objection, foundation.
11    A.    No one has ever asked me that question.
12 So --
13    Q.    Have you ever offered, unsolicited, sua
14 sponte, suggested to any of your loved ones to stop
15 having cured meat or bacon, or fermented foods
16 because of the nitrosamine content?
17       MR. VAUGHN:  Objection, foundation.
18    A.    Not solely based on that, no, as I
19 already answered.  Typically the issue is whether or
20 not certain kinds of foods that you're talking about,
21 like cured meats, things like that, my issue is, as I
22 do believe that it's the higher -- meat generally is
23 better for you to some extent, but that's just
24 because of me and I have family risk factors for high
25 cholesterol levels and things like that.

Page 59

1    So it's -- it's more complex than just
2 talking about -- and no one has ever asked me that
3 question so I haven't --
4    Q.    Are the nitrosamines in cured meat,
5 bacon, and fermented foods potent genotoxins?
6       MR. VAUGHN:  Objection, foundation.
7    A.    Well, I'm not sure which ones you're
8 referring to, because there's a variety of
9 nitrosamines.  Some are more potent than others.  So
10 NDMA and NDEA are some of the more potent ones.  So
11 the issue, this is the issue for food.
12    So food can have many different
13 N-nitroso compounds potentially in them, some of
14 which actually have been shown to carry a different
15 level of risk than others.  And at issue in this
16 case, these particular ones, NDMA and NDEA, are ones
17 that are labeled as probably human carcinogens,
18 specifically because the data has been so consistent
19 showing that they are indeed able to, or have been
20 associated with, I guess, in the animal studies,
21 cancer repeatedly over and over again.
22    There is a mechanism that has been
23 linked to genotoxicity.  And again, the exposure
24 levels have been across the exposure levels.  It's
25 not like you have to have a very high level of

Page 60

1 exposure producing cytotoxicity before you get a
2 cancer or a genotoxic effect.
3    Those are kind of the kinds of
4 assessments that you can do in order to use
5 adjectives like "potent" or "not potent" when you're
6 talking about a compound.
7    Q.    Fair enough, so let's just focus on
8 NDMA.  Is the NDMA that's found in cured meat a
9 potent genotoxin?
10       MR. VAUGHN:  Objection, foundation.
11    A.    NDMA is a potent genotoxin by itself.
12 That's the opinion that I have.  So regardless of
13 where you find it, it's a potent genotoxin.  However,
14 like anything else that you talk about, you have to
15 consider whether or not, when you have a situation
16 where you can't control for it, or you can control
17 for it, that weighs into your calculation over how
18 you would handle and respond to the situation.
19    So in this case, we know we can make the
20 compound without the NDMA.  That's really important.
21 And that's why in this particular case, I have formed
22 the opinions I have related to the responsibility of
23 the company, what should or shouldn't be done.  This
24 thing can be made without it, it should be made
25 without it.  It is not meant to be there.

Page 61

1    Q.    Is cured meat containing NDMA a potent
2 genotoxin?
3    A.    It's not the cured meat.  I already
4 answered this question.  You talk about what a
5 compound is and then from there, you have to do an
6 assessment of where it is, how it got there, should
7 it be there, can it be controlled or not.
8    I'm not arguing with you, but I'm aware
9 that nitrosamines can occur in food.  I've already
10 answered that question.  It can.  But there's an
11 important contextual discussion that's different for
12 the risk in food versus the risk in these products,
13 and so I would argue to you, based on my experience
14 and training, that when you have a compound like
15 this, a potent genotoxin in a drug product and you
16 can make that drug without it, just as FDA has said,
17 you should be making it without it.  You should
18 prevent it or remove it.  It's unacceptable for it to
19 be there.
20    And that's a different assessment than
21 you would do if you were talking and considering
22 issues related to food safety.
23    Q.    Is cured meat with NDMA carcinogenic?
24    A.    It's the same answer.  I wouldn't answer
25 that cured meat is carcinogenic, I would tell you

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

1 that NDMA is carcinogenic and as a result of that,
2 you would look at the safety of the food as it would
3 or wouldn't exist related to the presence of things
4 such as nitrosamines in it. And it really -- it's --
5 I'm not trying to be a maven, I'm just telling you
6 it's different -- you're talking apples and oranges
7 when you talk about food safety assessment versus
8 prescription drug assessment for presence of an
9 impurity.
10    Q.    Do you believe that cured meat with NDMA
11 should be banned?
12    A.    I have -- that's beyond the scope of any
13 opinion. I haven't formed that opinion, no.
14    Q.    How about smoked and salted fish that
15 contains NDMA, do you think it should be banned?
16       MR. VAUGHN: Objection, foundation,
17 scope, relevancy.
18    A.    I have not formed opinions about banning
19 any particular food that would or wouldn't contain
20 any nitrosamines at this point in time.
21    Q.    Would you advise a family member or
22 friend to stop eating smoked salmon if that smoked
23 salmon contains NDMA?
24       MR. VAUGHN: Objection, relevance.
25    A.    I don't know. It depends upon the

Page 63

1 situation what you're talking about. What
2 nitrosamines -- what -- what are you talking about?
3 Was it something that has -- that could be controlled
4 for, they eat it once a week, they eat it every day?
5 I mean, there's all kinds of things.
6       Again, food safety assessment is
7 different than what we're doing here. I have not
8 done those assessments and I have not advised anyone
9 based upon that other than generally, like I told
10 you, that I think red meat can be a problem for heart
11 disease, so I choose to eat less of that.
12    Q.    We we're talking about fish right now,
13 not red meat, right?
14       MR. VAUGHN: Objection, argumentative.
15    Q.    My example was smoked salmon. So my
16 question for you is, you said it depends if they eat
17 it once a week or not. Is that because the dose of a
18 carcinogen is relevant to safety?
19       MR. VAUGHN: Object to form.
20    A.    For food safety, it's not the dose, it's
21 exposure level. So the exposure level is relevant to
22 food safety assessment. It's understanding what are
23 the ranges of a -- what is the range of levels that
24 could or couldn't occur in food, but you do look at,
25 you make for a population assessment -- which is what

Page 64

1 you're asking me, I think, that's the only thing that
2 makes sense -- a population of people that are eating
3 salted fish or smoked fish. And we know that there
4 are certain kinds of background levels and certain
5 kinds of compounds that are in those particular
6 products. Is there a level at which it could be
7 adjusted and said to be safe? I have not done those
8 assessments. And I think it would be highly
9 dependent upon a lot of things. What particular
10 nitrosamines you're detecting, how many of them,
11 whether or not they occur at all times, whether it's
12 something that could be also controlled by the way
13 you smoke the meat, for example, or smoke the fish.
14 Those are all relevant to that.
15       I'm not aware of any -- of FDA banning,
16 for example, smoked fish. I'm not aware of those
17 kind of things happening, for those kind of products.
18 But that doesn't mean, like anything else, that you
19 can't go to the FDA website, which I know you can,
20 where they have discussions of nitrosamines in food.
21 So you can see that there are discussions about
22 certain kinds of foods having higher levels than
23 others in those kinds of things.
24    Q.    Does your level of exposure to NDMA
25 affect whether it increases your risk of cancer?

Page 65

1    A.    As a regulatory consultant, I am not
2 making an -- the opinion of a specific increased risk
3 level, no. So in my report based on my role in this
4 litigation, no, I have not formed that opinion, it
5 has to be at a certain level or not. What my opinion
6 is, as I've already told you, is that it's an
7 impurity that is not acceptable, not supposed to be
8 there, so any NDMA makes this product unacceptable
9 and increases your risk.
10    Q.    At the beginning of your deposition you
11 said you were here both as a toxicologist and as a
12 regulatory expert. I'm asking this question as a
13 toxicologist. My question as a toxicologist is, does
14 the level which you're exposed to NDMA affect whether
15 or not it increases your risk of cancer?
16       MR. VAUGHN: Objection, scope.
17    A.    It's beyond what I was asked to do in
18 this case. So from a general -- from a general
19 discussion of toxicology, I've already described for
20 you that in the terms of cancer risk assessment for
21 these kinds of compounds, the assumption is that
22 there is no safe level. In other words -- and then
23 what you have to do instead is balance what you
24 assume was exposure would be and talk about what is*
25 that increased cancer risk level, are you willing to

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1 accept one cancer in a million or one in a hundred
2 thousand or one in ten thousand, and those are
3 decisions that are made by regulatory bodies or
4 scientists in order to describe the risk.
5        But that's why cancer is not described
6 as an ADI. It's not like you can go and say, "This
7 level of exposure, if you're exposed to this level
8 there is absolutely no risk." That doesn't exist for
9 these kinds of compounds.
10    Q.    Based on a safe level exposure to NDMA,
11 would that apply to foods as well as medications?
12        MR. VAUGHN: Objection, scope.
13    A.    The issue of -- the issue of NDMA
14 generally, and doing a risk assessment would be that
15 there is an understanding that there -- that
16 cancer -- cancer risk and safety assessment is done
17 differently than it is for a non-cancer event.
18        As a result, if you're going to do a
19 food safety assessment, if you're going to do a drug
20 safety assessment in this case, or a risk assessment,
21 you have to somehow go through the process of
22 determining how -- what level of risk is acceptable
23 to you as a regulator. And that's what the regulator
24 would do, or you as a toxicologist.
25        It was beyond the scope of what I did to

Page 67

1 do any specific assessments for any specific
2 individuals in this particular case based on any
3 particular exposure pattern.
4        Instead, what I'm telling you as a
5 toxicologist is, maybe the best way to describe it
6 is, there's two ways toxicology can describe cancer.
7 It can describe it based on whether or not something
8 it poses a hazard of cancer. If there's an increased
9 risk, does it exist or not?
10        Yes, I'm saying it does exist, and then
11 after that, in order to qualify the risk, you as a
12 toxicologist could look for the specific set of
13 facts. That was beyond the scope of what I did but
14 there are others in this litigation who are doing
15 that.
16    Q.    I don't really think that answered my
17 question. It was actually much simpler. My simple
18 question was, you said there's no safe level of
19 exposure to NDMA in medication. Is there a safe
20 level of exposure to NDMA in food?
21        MR. VAUGHN: Objection --
22    A.    I don't think that is what I said. I'd
23 have to go back and look at the record to see what
24 you're saying I said. What I'm saying to you is,
25 NDMA is carcinogenic based upon the methods that we

Page 68

1 use as toxicologists to look at cancer risk. That
2 methodology, it is premised only the basis of what is
3 the risk that would be acceptable or not acceptable.
4 So you would set an exposure level which you're
5 willing to live with, based upon whether you are okay
6 with one in ten thousand, one in a hundred thousand,
7 one in a million increase in cancer risk.
8        However, on -- that's for population.
9 For any one individual, the answer could be very
10 different. And that's because each individual you
11 might look at might have other susceptibilities,
12 other types of risk factors that would tell you that
13 you would want to have a different paradigm or a
14 different metric for determining whether or not it's
15 likely that cancer would develop because, don't
16 forget, that's a lot of what we're doing here.
17        And what I was explaining to you is, to
18 try to give you an understanding, it's very different
19 than the way we look at non-cancer risk assessment,
20 where we can identify or we assume we can identify a
21 level with no risk.
22        MS. MILLER: Let's take a break.
23        VIDEOGRAPHER: Going off the record.
24 The time is 10:49 a.m. This is the end of media unit
25 1.

Page 69

1        (Recess taken.)
2        VIDEOGRAPHER: We're back on the record.
3 The time is 11:08 a.m. This is the beginning of
4 media unit 2.
5        MS. MILLER: Thank you. I'm going to
6 mark as Exhibit 2 a July 13, 2018 FDA press release.
7 EXH        (Plunkett Exhibit 2, FDA press release
8 dated 7/13/18, marked for identification, as of this
9 date.)
10        THE WITNESS: Are you putting these in
11 the Exhibit Share file or -- because I know that if I
12 need to look at more than you put on the screen I can
13 do that?
14        MS. MILLER: I think we can give you
15 control, right?
16        MR. VAUGHN: As the defending attorney,
17 I need to be able to view the full exhibit.
18        THE WITNESS: So you're putting it in
19 the share?
20        MS. MILLER: We're doing both. We're
21 putting it on the screen and at the same time Alex is
22 putting it into whatever the appropriate protocol is.
23 EXAMINATION (Cont'd.)
24 BY MS. MILLER:
25    Q.    Dr. Plunkett, are you familiar with this

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1 press release?
2     A.    Yes, it's been a while since I've looked
3 at this one but yes, I am familiar with it.
4     Q.    If we can look at the bottom sentence on
5 the screen, it says the presence of NDMA was
6 unexpected, do you see that?
7     A.    I do.
8     Q.    Do you agree with the FDA that the
9 presence of NDMA was unexpected?
10     A.    If by "unexpected," you were defining
11 that as something that was not part of the monograph
12 for the drug and also was something that they had not
13 seen before, that unexpected I would agree with. But
14 I don't believe if you're going to use the -- a
15 definition that it couldn't have been known, I
16 disagree with that.
17     Q.    Do you know what the FDA meant when it
18 said the presence of NDMA was unexpected?
19     A.    I can only read that based upon the
20 general English understanding of "unexpected" --
21     Q.    And what is the general English
22 understanding of the the word "unexpected"?
23     A.    Something -- I would say something that
24 you had not seen before.
25     Q.    Is that a dictionary definition of

Page 71

1 "unexpected," something you had not seen before?
2     A.    I don't know.
3     MR. VAUGHN:  Object to form.
4     A.    I mean, there's multiple definitions,
5 I'm sure in the general dictionary.  As a regulatory
6 expert, that's how I define the word "unexpected"
7 based on the general imagery.
8     Q.    Is "unexpected" a regulatory term?
9     A.    Well, I've seen it used in regulatory --
10 this is a regulatory document.  It's something, FDA,
11 the regulatory agency, was writing it, so that's how
12 I am defining it based upon my experience.
13     Q.    And in your experience, does the term
14 "unexpected" have a different meaning in the
15 regulatory context from the regular speech casual way
16 in which the term is used?
17     MR. VAUGHN:  Object to form.
18     A.    Highly dependent upon the speaker, in
19 the context of a sentence and the information there.
20 But in my view, "Unexpected" here is telling me that
21 the presence of NDMA is something that they did not
22 know was there, "They" being the FDA.  It wasn't part
23 of the monograph, it wasn't something that they had
24 been told by somebody.
25     Q.    Is it your understanding that the word

Page 72

1 "unexpected" here is used in a regulatory context
2 rather than in the general understanding of the word
3 "unexpected"?  That's my question.
4     MR. VAUGHN:  Object to form.
5     A.    I would say, since this was written by a
6 regulatory agency, that they are calling it as a
7 general English meaning of "unexpected" because this
8 is a press release, that for consumers to view as
9 well, but also understanding that as a regulatory
10 agency, they will choose their words based upon their
11 role, their duty and their responsibility.
12     Q.    Let's move on to Exhibit 3.  I'm marking
13 as Exhibit 3, an August 30, 2018 FDA statement.
14 EXH        (Plunkett Exhibit 3, FDA statement dated
15 8/30/18, marked for identification, as of this date.)
16     MR. VAUGHN:  Jessica, I'm not seeing the
17 exhibits in the share folder.
18     MS. MILLER:  Alex is going to figure
19 that out.  Why don't we go off the record and figure
20 out for a minute, just to figure out how to make this
21 exhibit process more efficient.
22     VIDEOGRAPHER:  Okay, going off the
23 record.  The time is 11:14 a.m.
24     (Discussion off the record.)
25     VIDEOGRAPHER:  We're back on the record.

Page 73

1 The time is 11:20 a.m.
2 EXAMINATION (Cont'd.)
3 BY MS. MILLER:
4     Q.    I think we were at Exhibit 3, and Alex
5 is putting it on the screen and it's an August 30th,
6 2018 FDA statement.  Oh, just a moment, just to go
7 back to Exhibit 2, the July 13th, 2018 press release,
8 do you recall, Dr. Plunkett, if you mentioned that
9 press release and the statement about the presence of
10 NDMA being unexpected in your report?
11     A.    Oh, the press release is the only -- I
12 listed the entire, all of the FDA statements, all
13 there.  I don't know that I mentioned that
14 specifically, so I can't -- I don't believe I did,
15 probably.
16     Q.    Okay.  Let's move on to this Exhibit 3.
17     Exhibit 3 again, as I said, is the
18 August 30th, 2018 statement.  This is called an FDA
19 statement, not a press release.  Dr. Plunkett, do you
20 recall if you quoted this document in your report?
21     A.    All my reliance material, I know I
22 quoted the follow-up, which was an update, in 2019.
23 But I don't know if this one is there.  You want me
24 to look?  I can look real quick.
25     Q.    If you don't know, I don't want to take

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1  the time for you to look.
2          MR. VAUGHN:  Dr. Plunkett, take time to
3  scroll through the document, so you know if you
4  actually quoted it or not.
5          (A pause in the proceedings.)
6      Q.   If we could turn to page 3 of this
7  document, if you could look at the third paragraph
8  that begins, "In St. Louis"?
9      A.   Yes, could you make it a little bit
10 bigger?  Just a little bit bigger, not a lot maybe.
11 There you go, sorry.  Are you talking about the
12 highlighted box --
13     Q.   No, I don't know why those are
14 highlighted.  Those were not done by us.
15     A.   Okay.  So starting --
16         MR. VAUGHN:  Was that highlighted on the
17 FDA's website?
18         MS. MILLER:  I don't think these are
19 highlights.
20         MR. VAUGHN:  Were these boxes on the FDA
21 website?
22         MS. MILLER:  This is how it printed.  If
23 you look, every time it's highlighted there's a
24 hyperlink, Brett.  We didn't manipulate the document
25 in any way, if that is what you're asking.

Page 75

1          MR. VAUGHN:  Okay.
2      Q.   Okay.  So my question is, if you read
3  the third paragraph it states, "In St. Louis, FDA
4  maintains the most advanced pharmaceutical laboratory
5  of any regulatory agency in the world.  As soon as we
6  were aware of the NDMA impurity in certain valsartan
7  drugs, we began collecting samples of all valsartan
8  API and products marketed in the U.S.  At the same
9  time, our scientists began developing a test to
10 detect and and quantify NDMA in Valsartan API.
11 NDMA's properties make it difficult to find."
12         Do you see that?
13     A.   I see that text, yes.
14     Q.   So the FDA here is stating that it has
15 one of the most, or almost most advanced
16 pharmaceutical laboratory of any regulatory agency in
17 the world, correct?
18     A.   That is what they claim, yes.
19     Q.   And they state that they had a challenge
20 in developing a test of quantifying DMA, correct?
21         MR. VAUGHN:  Object to form.
22     A.   No, I don't think they had a challenge.
23 I think they pointed out that NDMA itself has
24 properties that can make it difficult to find, but
25 didn't say that it was necessarily a huge challenge

Page 76

1  that was unsurmountable --
2      Q.   Does FDA say NDMA's properties can make
3  it difficult to find, or does it say NDMA's
4  properties make it difficult to find?
5      A.   The text says, "NDMA's properties make
6  it difficult to find."
7      Q.   Do you agree with that statement?
8      A.   I'm not a chemist so that would -- I
9  would defer that to Dr. Hecht.
10     Q.   Do you know why NDMA's properties make
11 it difficult to find?
12     A.   The same answer.  It's my understanding
13 others can answer these questions for you as
14 chemists, and I'm not the chemist in the case so I
15 would defer to Dr. Hecht.
16     Q.   Okay.  And if we could continue, if FDA
17 says, "CDER scientists have now developed" -- I'm
18 sorry, let me begin at the beginning of the sentence,
19 "To determine if" --
20     A.   Could you -- stop.
21         MS. MILLER:  -- stop moving it around.
22 You're just making us dizzy.
23     Q.   It says, "To determine if Valsartan
24 products do contain this impurity, CDER's scientists
25 have now developed the gas chromatography mass

Page 77

1  spectrometry headspace testing method."  Do you see
2  that sentence?
3      A.   I see that sentence.
4      Q.   So the FDA had to develop a new test in
5  order to determine whether the Valsartan products
6  contained NDMA?
7          MR. VAUGHN:  Objection, form, scope.
8  Foundation.
9      A.   So that's beyond the opinions that I
10 have developed.  Again, I know that this is talked
11 about in the other reports by other experts in this
12 case.  They did state that they developed a method,
13 yes.  That I agree, that's stated in the sentence.
14 It has nothing to do with, in my view, any kind of
15 judgement about the difficulty or the -- or the fact
16 that they often develop tests.  I mean, FDA develops
17 tests all the time, and --
18     Q.   Do you know why FDA had to develop a new
19 test?
20         MR. VAUGHN:  Object to form.
21     A.   I can't get into FDA's mind to know
22 that.  I can't tell you.  I wasn't there to have a
23 discussion with any particular chemist on why they
24 did it.  I know that the overall issue in the case,
25 why it was needed, was because there were these

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1  impurities being found and they didn't understand the
2  extent of the problem.
3      Q.    Do you know whether FDA had any prior
4  tests that would have identified NDMA?
5      A.    That's beyond the scope of what I did.
6  I would defer you to the other experts in the case
7  that are handling this area.
8      Q.    If we could move on to page 4, first
9  paragraph. "We believe that these risks are
10 introduced through a specific sequence of steps in
11 the manufacturing process, where certain chemical
12 reactions are needed to form the active ingredient."
13 Do you see that?
14     A.    I see that, yes.
15     Q.    And the next sentence says, "Before we
16 undertook this analysis, neither regulators nor
17 industry fully understood how NDMA could form during
18 this process," do you see this sentence?
19     A.    I see that sentence.
20     Q.    Did you fully understand in 2018 how
21 NDMA could form during the process through which
22 Valsartan was manufactured?
23          MR. VAUGHN:  Object to form.
24     A.    Well, that wasn't my job.  That was the
25 job of the companies making the product, to fully

Page 79

1  understand the chemical process.
2      Q.    Do you disagree with FDA's statement
3  that neither regulators nor industry fully understood
4  how NDMA could form?
5          MR. VAUGHN:  Object to form.
6      A.    I neither agree nor disagree with that
7  statement.  It is a statement, is what it is.  But I
8  would point to the fact that it's the job of the
9  industry to fully understand their chemical processes
10 and the ways that potentially harmful compounds can
11 be formed during those processes, and this is what
12 the company has stipulated they did not do.
13     Q.    Is it possible for a company to perform
14 an adequate risk assessment and still not identify
15 certain risks that are hard to find?
16          MR. VAUGHN:  Object to form.
17     A.    I don't know, that's a -- it's would
18 highly depend on the situation, the specific
19 compounds, specific process, so I don't think there's
20 a yes or no answer to that.
21     Q.    Did you discuss this statement in your
22 report?
23          MR. VAUGHN:  Object to form.
24     A.    I don't cite this statement, but I do
25 discuss the issue of the need to understand the

Page 80

1  process, and whose responsibility it was.  Again,
2  it's not FDA's responsibility to understand.  It's
3  the company's responsibility to understand, and then
4  provide that information to the regulatory agency.
5      Q.    I just was asking if you used this quote
6  in your report.
7      A.    I started -- I usually start, like I
8  did, I start out I said, I didn't cite this but, and
9  then I gave you an explanation.  So I do believe I
10 answered your question in the first part of my
11 answer.
12     Q.    Turning now to page 5.  In the middle of
13 paragraph 2, the FDA states, "Was not anticipated
14 that NDMA would occur at these levels in the
15 manufacturing of the Valsartan API."  Do you see
16 that?
17     A.    The sentence that started with,
18 "Because," that's where you are?
19     Q.    Correct.
20     A.    I see that clause, yes.
21     Q.    Do you agree with the FDA that it was
22 not anticipated that NDMA would occur at these levels
23 in the manufacturing of the Valsartan API?
24     A.    I haven't formed an opinion on that one
25 way or the other.  That was beyond the scope of my

Page 81

1  work.
2      Q.    And then FDA says, "Because it was not
3  anticipated that NDMA would occur at these levels in
4  the manufacturing of Valsartan API, manufacturers
5  would not have been testing for it."
6          Do you agree that manufacturers would
7  not have been testing for NDMA because it was not
8  anticipated that it would occur at these levels in
9  the manufacture of Valsartan API?
10          MR. VAUGHN:  Object to form, foundation.
11     A.    So the same answer.  I don't agree or
12 disagree.  This is beyond the scope of my work.
13     Q.    Is it beyond the scope of your opinions
14 whether it was anticipated that NDMA would occur at
15 these levels in the manufacture of Valsartan API?
16          MR. VAUGHN:  Object to form.
17     A.    It's beyond the scope of my work from
18 the aspect of the chemistry of the reactions or the
19 description of the foreseeability based upon an
20 analysis of chemical process, which is what the
21 chemist has done in this particular case.
22          But it is my opinion that, based upon
23 the company's own admission that they didn't do a
24 full analysis, that that's a -- that's a particularly
25 important fact in this case.  So in other words, if

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1 you don't do something, there's no way you'll ever be
2 able to figure out whether it could or couldn't be
3 there. So it would be the issue of not doing the
4 full chemical analysis is the important first step.
5     Q.   Do you consider yourself to have the
6 expertise to review the risk analysis undertaken by
7 ZHP, and independently determine whether or not it
8 was adequate?
9         MR. VAUGHN: Object to form.
10     A.   I haven't done that full analysis of all
11 the chemical reactions, no. That was beyond the
12 scope of what the chemist did. However, my opinion
13 where I say that the risk assessment was inadequate
14 was based upon the company's own admissions that they
15 didn't do a full chemical analysis in their process,
16 which is what is required in order to ensure that
17 your product meets GMPs consistent with the GMP
18 process, and also can be -- you could have some level
19 of certainty that you have attempted to address all
20 the safety issues that could be raised by the
21 product.
22     Q.   Did you quote the sentence in your
23 report that it was not anticipated that NDMA would
24 occur at these levels in the manufacture of Valsartan
25 API -- it's the same sentence. Did you quote this

Page 83

1 sentence that we've been discussing in your report?
2     A.   I'm looking because I thought I called
3 it -- some of language is very similar to language
4 that shows up in a later document that I do quote
5 from. I'm looking to see.
6         I quote Dr. Gottlieb. This is
7 Dr. Gottlieb's statement. He had one, an update and
8 he used some of the same language, and I'm looking to
9 see what I quoted, so just give me a second.
10         MR. VAUGHN: Take your time,
11 Dr. Plunkett.
12         (A pause in the proceedings.)
13     A.   I don't quote that specific sentence,
14 no. But I certainly cite to a document that has this
15 and many other sentences in it.
16     Q.   Moving on to Exhibit 4.
17 EXH     (Plunkett Exhibit 4, FDA statement dated
18 1/5/19 from Scott Gottlieb, M.D., marked for
19 identification, as of this date.)
20         MS. MILLER: Exhibit 4 is a January 5,
21 2019 FDA statement by Dr. Gottlieb.
22     Q.   I'm guessing that's the other Gottlieb
23 statement you were referring to.
24         MS. MILLER: Alex, do you have that up
25 on the screens?

Page 84

1     Q.   Let's go to page 4. Page 4 of this --
2     A.   One second, could you go to the front
3 page again for me, the first page? Yes, this is the
4 one that I think I had some of the same language as
5 the document they sent over that has other issues,
6 that it discusses as well.
7     Q.   If we could turn to page 4, Dr. Gottlieb
8 states, "One challenge we've faced is that NDMA's
9 properties make it hard to detect with standard
10 laboratory testing," do you see that? It's the first
11 sentence of the second paragraph.
12         MR. VAUGHN: Object to foundation.
13     Q.   "One challenge we've faced is that
14 NDMA's properties make it hard to detect in standard
15 laboratory testing"?
16     A.   Well, you have to read the rest of the
17 sentence because he's describing what he means by
18 "standard lab testing," the kind of testing results
19 that were reviewed during the surveilling section.
20     Q.   Do you agree with that statement?
21     A.   I don't, just as I said before, I
22 wouldn't say I agree or disagree. It is FDA's
23 statement and again, this issue is beyond the scope
24 of my work. I would defer to the chemists in the
25 case who address these specific issues.

Page 85

1     Q.   And when you say it's beyond the scope
2 of your work, is that because you're not -- you don't
3 have the credentials and expertise to assess the
4 adequacy on your own of laboratory testing for
5 chemical compounds?
6         MR. VAUGHN: Object to form.
7     A.   No. That's not the necessarily true.
8 There are cases that I -- there are things I have
9 done in my training and experience in the laboratory
10 where I've developed testing methods. I'm just
11 saying to you that this is is not something I have
12 done in this case, and others have.
13         So again, I am not providing testimony
14 on this particular specific issue about standard
15 laboratory testing and the difficulty with it, or
16 whether it was or wasn't standard. I would argue
17 that GCMS is a standard test that I see used every
18 day in laboratories around the world. So if the
19 issue is, is GCMS a standard lab test, it is.
20         However, there's a separate issue here
21 which is that they are then saying the kind of
22 testing that they reviewed during their surveillance
23 inspection were the kind of testing that the company
24 who sent in the ANDA, or the Drug Master File, may
25 have described.

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1    Q.    Do you have a degree in organic
2 chemistry?
3    A.    No, but I have training in organic
4 chemistry as part of my pharmacology and toxicology
5 background.  I took four different courses in organic
6 chemistry over the years.
7    Q.    How many years ago was that?
8    A.    In my training, so the last course that
9 I took would have been in the 1980s.
10    Q.    So that's forty years ago?
11    A.    You're making me sound really old, but
12 that's true, yes.  That's right.
13    Q.    Have you ever conducted testing for
14 nitrosamines?
15    A.    I don't know.  I'd have to go back and
16 think about it.  It's possible in my laboratory
17 days I did, but I don't recall that.
18    Q.    When would that have been?
19    A.    Before 1989.
20    Q.    So in the last forty years have you
21 conducted any testing for nitrosamines?
22    A.    Last thirty years I would say no, I have
23 not.  I don't know about forty yet.  The last thirty
24 I have not.  But I can't recall.
25    Q.    Have you ever developed any laboratory

Page 87

1 testing that was intended to identify the presence of
2 nitrosamines?
3    A.    I can't answer that without going back
4 to looking at the kind of work -- I did develop
5 different kinds of methods where it's possible that
6 the N-nitroso group was a way to test this part of
7 the separation procedure.  But off the top of my
8 head, I can't think of a project where that was the
9 target of my work or the focus of my work, no.
10    Q.    Do you know sitting here today whether
11 it is easy or hard to develop laboratory testing to
12 detect NDMA?
13        MR. VAUGHN:  Object to form.
14    A.    I haven't formed an opinion one way or
15 the other.  And I would say that statement would
16 probably be highly dependent upon one person's
17 opinion based upon what they think is hard and what
18 they think is easy, so -- but I have not formed an
19 opinion on that issue one way or the other.
20    Q.    Do you know how the FDA was using the
21 term "hard" in this sentence that we've been
22 discussing?
23    A.    I can only define it based upon standard
24 English as "hard"; in other words, it required some
25 effort.

Page 88

1    Q.    How much effort?
2    A.    That's subjective.  That's subjective,
3 and I think you'd have to -- you'd have to ask each
4 individual, which is why I would defer you to the
5 chemists.  The chemist can speak with experience
6 based on their work in developing methods that are
7 similar, whether or not it's hard or easy.
8        I would say to you, GCMS is the standard
9 laboratory tool and if that's the method they used, I
10 wouldn't have expected it to be "hard" in terms of
11 the use of a method.  But whether or not they had
12 other things they did, I would defer to the chemists.
13    Q.    As a regulatory expert, are you
14 questioning FDA's use of the word "hard" here?
15    A.    No, I haven't questioned their use of
16 the word "hard."  This is FDA's statement.
17    Q.    Are you offering an opinion that FDA's
18 statement that it was hard is erroneous?
19    A.    I have not developed that opinion at
20 this point in time, no.
21    Q.    Does FDA employ chemists?
22    A.    Yes.  Well, again, the duty for all of
23 this is not FDA's.  The duty of this is the company
24 making the product.
25    Q.    I understand.  But my question is, does

Page 89

1 FDA employ organic chemists?
2    A.    I answered that and said yes, and then I
3 said yes.
4    Q.    My first question was chemists.  My
5 second question was organic chemists.
6        MR. VAUGHN:  Asked and answered.
7    A.    I apologize.  I assumed that chemists
8 included in -- "chemists" in my view, when I'm
9 answering that question, is encompassing chemists of
10 all different kinds.
11    Q.    Based on your understanding of how the
12 FDA works, would there have been organic chemists
13 involved in the efforts to create this testing that
14 the FDA define as hard?
15        MR. VAUGHN:  Objection, speculation.
16    A.    I don't know.  I'd have to go back and
17 see if I could find the names of the individuals and
18 what their background was.  So I can't answer that
19 without looking.  I don't know.
20    Q.    Do you know whether the FDA employs
21 organic chemists in St. Louis in the most advanced
22 pharmaceutical laboratory of any regulatory agency in
23 the world?
24        MR. VAUGHN:  Objection, form.
25    A.    I can't answer that without looking.  I

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1  would assume they do, but I don't know.
2      Q.   Do you know whether the FDA has a
3  division of chemistry that reviews drug master files?
4      A.   They have a division of chemistry and
5  one of the things they can do is review drug master
6  files.  But they don't do it except in certain
7  circumstances.
8      Q.   Do you know whether anyone from the FDA
9  division of chemistry ever reviewed any of ZHP's drug
10 master files?
11     A.   I don't know that I can answer that
12 without looking at documents.  I don't recall if
13 there's a document that indicates that.  So I can't
14 answer that off the top of my head.
15     Q.   Okay.
16          MS. MILLER:  Let's go off the record.
17          (Discussion off the record.)
18          VIDEOGRAPHER:  Going off the record.
19 The time is 11:42 a.m.
20          (Discussion off the record.)
21          (Recess taken.)
22          VIDEOGRAPHER:  We are back on the
23 record.  The time is 12:01 p.m.
24          (Continued on following page.)
25

Page 91

1  EXAMINATION (Cont'd.)
2  BY MS. MILLER:
3      Q.   Earlier today we marked your expert
4  report, Dr. Plunkett, as Exhibit 1.  I'm guessing you
5  have a copy of it in front of you, is that correct?
6      A.   I do.
7      Q.   Do you have anything else in front of
8  you today?
9      A.   I have only the notice of deposition
10 document, and I printed out the 2019 letter just
11 because I had looked at that yesterday, and I have
12 two other documents I printed out just because they
13 are in my report.  One was the '99 "Guidance For
14 Industry on Purity," because I cite that in my
15 report, and I also printed out something I cited in
16 my report from the NDMA website, "Q&A on CGMP
17 Practice."
18     Q.   Sounds good.  And I assume you don't
19 have any other programs open on your computer?
20     A.   No.  -- well, I was going to ask this
21 question.  So now that you're sharing the screen, if
22 I want to go look at a document, I don't know how to
23 do that because you take up all my screen.  So if it
24 gets to that, I'm going to have to ask if I want to
25 look at it separately.  But this one I have.  I have

Page 92

1  your -- my report, if you want to talk about that.
2      Q.   I'm not using a lot of documents today,
3  so that will be okay.  Dr. Plunkett, can you please
4  turn to page 28 of your report.  Do you see these
5  images here?
6      A.   Yes, I do.
7      Q.   Where did you get these images from?
8      A.   These came from Casarett images --
9  actually, here, I have footnotes.  Images -- I have
10 footnote 35, tells you there.  So they are from the
11 web.  The Internet, you can search the Internet for
12 chemical structures, rather than drawing them
13 yourself, so that's what I did.
14     Q.   And what is this website?
15     A.   Well, I -- you need to go to it, it's a
16 website that had -- when I Googled structures,
17 chemical structure, NDMA, NDEA, nitrosamines, this is
18 the website that came up and I checked those,
19 obviously.  I'm aware of the general structure of the
20 nitrosamine, the first core structure.  You can
21 actually find that in Casarett & Doull as well, which
22 is -- which is a textbook that I cite for, and then
23 these others came from the same site, but I -- I'm
24 aware of what N-dimethyl -- N-dimethyl looks like,
25 and -- and N-diethyl looks like, so, yeah, I'm enough

Page 93

1  of a chemist that I could tell you these are correct.
2      Q.   What is shionogi-ph.co?
3      A.   That's the website.  It's probably a
4  chemical manufacturer website.  And you want me to go
5  look, I'd have to go look and I can't do that with
6  you having the screen taking up my entire -- but you
7  should be able to do that.
8      Q.   I'm just asking if you know what it is.
9      A.   It's a website that I believe has
10 chemical structure information, and it may be a
11 chemical manufacturer, someone who sells these
12 compounds, but I'm not sure.  I'd have to go back and
13 look.
14     Q.   Okay.  And then what is footnote 36
15 representing?  In other words, did these images come
16 from footnote 35 or footnote 36?
17     A.   Oh, okay.  The core structure comes from
18 36 and NDMA and NDEA come from 35.
19     Q.   Okay, that was not clear.  And do you
20 know what "eurofins" --
21     A.   Yes, Eurofins is a testing laboratory
22 that has international -- offices around the world,
23 they also do regulatory consulting.  I use them with
24 my clients in different regulatory space to handle
25 work and develop analytical methods at times.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

1    Q.    And why do both of these websites end in
2  .jp?
3          MR. VAUGHN:  Object to form.  Calls for
4  speculation.
5    A.    I don't know.  I can't answer.
6    Q.    Okay.
7  EXH      (Plunkett Exhibit 5, Boerner article
8  from Chemical and Engineering News dated 4/20/20,
9  marked for identification, as of this date.)
10          MS. MILLER:  I'd like to introduce as
11  Exhibit 5 an article by -- I'm really just butchering
12  her name -- Leigh Kreitsch Boerner.  We're going to
13  show you the spelling.  Alex is putting it up on the
14  screen right now.
15          This is an article from Chemical and
16  Engineering News.  Have you ever heard of Chemical
17  and Engineering News before --
18          MR. VAUGHN:  Give me just one second,
19  Jessica, unless you're finally --
20    Q.    Before we introduce the document, while
21  he's looking for it, I'm just asking if you have
22  heard --
23          MR. VAUGHN:  Understood --
24          MS. MILLER:  I won't ask anything about
25  the document, obviously.

1          MR. VAUGHN:  Fine.
2    A.    If the question is have I ever heard of
3  it, yes.  They are a trade press type publication.
4    Q.    And do you regularly read this
5  publication?
6          MR. VAUGHN:  Object to form.
7    A.    I don't reg -- I don't seek it out on a
8  monthly basis, but I have read it before when I have
9  had an issue.  Sometimes it's referred to in other
10  places that I'm reviewing.  So for example, I might
11  be looking at an article that's put out by RAPS on
12  their website, the Regulatory Affairs Professional
13  Society, and then might refer back, so just depends.
14    Q.    And have you seen this article before?
15    A.    No, I have not seen this article.  So if
16  you're going to ask me specific questions, I would
17  need to read through it.
18    Q.    Okay.  I am going to ask you specific
19  questions.  My understanding is that under the CMO in
20  this case, if you're going to read an article, we're
21  allowed to go off the record.  So let's go off the
22  record for you to read it.
23    A.    So before you go -- I need to know how
24  to get to it, because I don't seem to be able to get
25  to my screen.

1          MS. MILLER:  Let's figure that out once
2  we go off the record.
3          VIDEOGRAPHER:  Okay, going off the
4  record.  The time is 12:07 p.m.
5          (Discussion off the record.)
6          VIDEOGRAPHER:  We're back on the record.
7  The time is 12:18 p.m.
8  EXAMINATION (Cont'd.)
9  BY MS. MILLER:
10    Q.    Dr. Plunkett, are you familiar with an
11  organization called Health Canada?
12    A.    Yes.
13    Q.    What is Health Canada?
14    A.    Health Canada is essentially the paid
15  equivalent of the FDA but it's not exactly the same.
16  Health Canada actually does assessments, health
17  assessments for products outside of some of the FDA
18  regulated products as well.
19    Q.    Have you ever relied on Health Canada in
20  forming your opinions in any litigation?
21    A.    Typically, I'm not allowed to in the
22  U.S.  They will mention the U.S. regulatory agencies,
23  but I have generally in my work relied on Health
24  Canada and certainly, I have done work for clients
25  related to submissions of Health Canada.

1    Q.    Have you relied on Health Canada in
2  forming any of your opinions in the talc litigation?
3    A.    Yes, because there was a separate report
4  for Canada healthcare, so I'm working on the talc
5  litigation that is related to claims in Canada and
6  Health Canada.
7    Q.    And did you give credence in that
8  litigation to the Health Canada report?
9    A.    I don't know how you define "credence,"
10  but the if you mean did I refer to it?  Yes.  And I
11  certainly did rely upon some of the documents and the
12  reviews that Health Canada did, yes.
13          And I'm sorry, Ms. Miller, you were
14  asking me about the talc litigation, correct?
15    Q.    Correct.
16    A.    Yes.  So the answer to the last question
17  about reliance had to do with the talc litigation.
18    Q.    Okay.
19    A.    That's fine.
20    Q.    And do you consider Health Canada to be
21  a reputable organization?
22          MR. VAUGHN:  Object to form.
23    A.    Well, it certainly -- I would say it's
24  one of the regulatory bodies that I have seen applies
25  good standard scientific practice, yes.  But they

HIGHLY CONFIDENTIAL

Page 98

1 have different regulations so the context of the work
2 they do is a bit different from the FDA. And so
3 that's important to recognize when you look at what
4 Health Canada does and why they make certain
5 decisions. They have different laws, in other words.
6     Q.    If you turn to page 3 of this article --
7 I'm sorry, of this -- yeah, so if we could turn to
8 page 3 of this article, who publishes Chemical and
9 Engineering News?
10     A.    I don't know who. I just know it as a
11 trade press journal that I have seen before.
12     Q.    Have you heard of the American Chemical
13 Society?
14     A.    Yes, I have.
15     Q.    What is that?
16     A.    It's a scientific organization that's
17 related to the chemical industry and chemists.
18     Q.    Does the American Chemical Society
19 publish this journal?
20     A.    I said I didn't know. I'd have to look.
21 I don't know.
22     Q.    Do you know whether the reporters and
23 editors in this journal have advanced degrees in
24 chemistry?
25        MR. VAUGHN: Objection, foundation.

Page 99

1     A.    Same answer. I'd have to look. I don't
2 know.
3     Q.    If you could turn to page 3, this
4 article says, "NDMA is all around us. We're exposed
5 to it in many ways but the main sources tend to be
6 tobacco, cured meats such as bacon, fermented foods
7 such as beer and cheese, shampoo and cleansers and
8 detergents and pesticides." Do you know what that --
9     A.    I think you said "posed," and I think
10 it's "exposed." So we're exposed.
11     Q.    Oh.
12     A.    I do know that there is exposure through
13 sources in our diet and our environment, yes. I
14 don't know if that's entirely accurate based upon any
15 particular product. Certainly I think generally, it
16 is found in other products.
17     Q.    Do you know whether any of these
18 products can be manufactured in a way that doesn't
19 result in NDMA formation?
20     A.    I've not done an assessment of that, so
21 I can't answer that for you. I'd have to go, I'd
22 have to look at individual products. It would be a
23 product, not a category-by-category necessarily, but
24 a product-by-product assessment.
25     Q.    Is there any literature that says a risk

Page 100

1 assessment turns on whether the exposure can be
2 controlled?
3        MR. VAUGHN: Objection to form.
4     A.    I don't understand your form.
5     Q.    You testified you are aware that a risk
6 assessment can turn on whether this exposure can be
7 controlled; for example, you said sometimes you can't
8 exclude NDMA from a product. And I'm wondering if
9 there's anything in the literature that says that a
10 risk assessment should -- should assess whether or
11 not the exposure can be controlled.
12        MR. VAUGHN: Objection, form, misstates
13 prior testimony.
14     A.    I don't think I used the word "turn,"
15 but I may have used a similar word. But here's my
16 answer for this:
17        In my experience and training and all of
18 my work for regulatory agencies, in a variety of
19 contexts, not just at FDA, risk assessments that are
20 done for products often are affected by decisions
21 that are made about whether there is exposure or not.
22 So if exposure can be controlled, such as that it
23 does not occur, then a product may be able to remain
24 on the market.
25        So for example, if a product -- if the

Page 101

1 issue is a -- something within a product or some
2 aspect of a product that potentially could pose a
3 cancer risk by inhalation, but you're not inhaling
4 this particular product or compound in this product,
5 it's not going to happen, then you can control for
6 the exposure even though it may have something in it
7 that could pose a risk by inhalation.
8        So all risk assessments that I'm aware
9 of, that I'm involved in, were for products that are
10 regulated in the U.S., have an exposure component to
11 them considering the likelihood for exposure, ways
12 that you can be exposed, and that goes into the risk
13 assessment.
14        It's kind of like the second step.
15 First you do the hazard, then you do the exposure,
16 Andy you do the dose response if you can, and then
17 you do the -- you characterize the risk based on the
18 exposure and hazard.
19     Q.    Did you do all four of those steps here?
20     A.    I did not do a dose/response assessment,
21 which is what would be the specific cause issue to
22 do. And I did not do individual causation exposure
23 assessments for anybody in the case. But certainly I
24 looked at what the regulatory bodies did and the
25 companies did or didn't do in this area.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1    Exposure, for example, is going to
2 happen in terms of taking something orally. So we
3 know that these are pills that are meant to be taken.
4 So this is not like the issue of can they inhale.
5 They are ingesting it, you know that's the case.
6    We know that nitrosamines from the
7 general literature are indeed able to be absorbed
8 once ingested. So those things I know just generally
9 occur. So I didn't, you know, consider that as part
10 of my training and experience.
11    But I did not do individual assessments
12 for how people, individuals might take the drug,
13 daily, weekly, those kinds of things.
14    Q.    Did you do all of the steps in a risk
15 assessment methodology in this matter?
16    MR. VAUGHN: Object to form.
17    A.    I was not asked to do the full risk
18 assessment for individuals, so I did not go to all
19 the details of that. That was correct. I used
20 the -- I used the methodology that I typically use
21 when I'm developing regulatory opinions. And then in
22 toxicology, I did a -- a hazard assessment and
23 whether or not there was evidence to indicate whether
24 or not this was a compound that would pose a risk
25 only at a particular level. That's what we talked

Page 103

1 about already. I told you that because of it being a
2 genotoxin and acting as a carcinogen. There is no
3 threshold of no risk.
4    Q.    Did you apply a weight-of-the-evidence
5 methodology?
6    MR. VAUGHN: Objection to form.
7    A.    Based on the doc --
8    THE WITNESS: I'm sorry, Brett --
9    MR. VAUGHN: You're fine.
10    A.    Based on the documents I reviewed, yes,
11 I did. I looked across the evidence in the case for
12 certain opinions. Not every opinion would make sense
13 to use weight-of-the-evidence.
14    Weight-of-the-evidence is typically
15 used, for example, when I have my section where I
16 talk about the toxicology and the potency of NDMA and
17 NDEA, or nitrosamines, that's a weight-of-the-
18 evidence form.
19    When I talk about the weight of the
20 evidence in terms of what did I see that the company
21 knew and didn't know, I -- there I am looking at
22 information that is coming from all the available
23 sources, so I'm weighing that together to tell a
24 story or to see what story is told.
25    I also looked at, for example, defense

Page 104

1 expert reports that -- in this case, actually were
2 available before my deposition. Sometimes those
3 aren't. So I did look at the defense expert reports
4 that dealt with my area, and just like I looked at
5 some of the Plaintiffs' expert reports.
6    Q.    What methodology did you apply to
7 determine that there's an increased risk of cancer?
8    A.    That would be my training and experience
9 and the issues related to weighing the evidence and
10 the issues based upon statements and information
11 that's available. Is this something that's taught in
12 textbooks, that you give a weight to that kind of
13 evidence? Is it something that you only have one or
14 two papers and then you have to determine whether or
15 not those papers are reliable enough to make the
16 determination? When authoritative bodies have
17 reviewed this for the last fifty years, that's
18 important weight in the evidence.
19    So in those opinions, yes, I did, I
20 weighed the evidence and the sources and the -- in my
21 experience, the reliability of those particular types
22 of sources.
23    Q.    Do you identify in your report all the
24 evidence that you weighed in determining that there's
25 an increased risk of cancer?

Page 105

1    A.    In my reliance materials, it shows you
2 all of the information that I have reviewed and
3 weighed, yes. So you have to -- you can't just look
4 at the report, you have to look at my appendix C as
5 well, depending on the question you're asking.
6    Q.    Does the report itself set forth how you
7 conducted a weight-of-the-evidence analysis, what
8 evidence you reviewed, and what conclusion you
9 reached based on that evidence with respect to
10 increased risk?
11    MR. VAUGHN: Object to form.
12    A.    I believe that the totality of my
13 report, which includes all my appendices, do, yes.
14    Q.    In the actual language of the report,
15 excluding your appendices, can you point to me to
16 where you set forth which evidence you reviewed in
17 determining, and which evidence you weighed in
18 determining that there's an increased risk of cancer?
19    MR. VAUGHN: Object to form.
20    A.    I think I tell you that. So -- hold on,
21 let me look.
22    (A pause in the proceedings.)
23    A.    Trying to find the right section. Hold
24 on.
25    (A pause in the proceedings.)

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

1      A.    In section 6 in my report, if that's the
2  one you're asking, that question, I think that's
3  where this question would come, the answer to your
4  question would come from.
5          So I set forth the textbooks, the
6  authoritative bodies that I have reviewed and relied
7  upon, and I think some -- I usually in here will make
8  a comment about my training an experience, but I
9  think I did that up front. Up front I tell you that
10 when I -- the opinions here were developed based on
11 not just the documents, but my training and
12 experience as well.
13     Q.    My question -- that's not my question.
14 My question is, where can I see evidence that you
15 weighed and how you weighed it in your report?
16     A.    I'm telling you, the evidence that I
17 have weighed and reviewed and relied upon are found
18 cited in this section on toxicology of nitrosamines
19 and then there may be additional materials that are
20 listed in appendix C as well. In my depositions,
21 typically -- typically that's the opportunity for you
22 to ask me this question and I will tell you what it
23 is that I have -- that I have reviewed and relied
24 upon, in addition to how I describe it in my report.
25         And I'm telling you, it's my training,

1  my experience, my prior knowledge of these compounds,
2  what the authoritative bodies and the textbooks have
3  said about it, what FDA has said about it, what the
4  companies themselves in their own internal e-mails
5  have said about the product.
6          The NTP document and the IARC document
7  that I cite to are weight-of-the-evidence documents
8  and so I have relied upon those, and I have reviewed,
9  for example, I've reviewed the entire section of the
10 IARC document that talks about all the different
11 animal studies and human evidence and whatnot that
12 dealt with nitrosamines, and specifically the NDMA
13 and NDEA. So that accomplishes this section that I'm
14 talking about.
15     Q.    Dr. Plunkett, you're not really
16 answering my question, which was very simple: Is
17 there a place in your report where I can see how you
18 weighed each piece of evidence? How you --
19         MR. VAUGHN: Object.
20     Q.    -- your methodology --
21         MR. VAUGHN: Object to form, asked and
22 answered. I objected to form, asked and answered.
23 Move on.
24         MS. MILLER: Come on, Brett, let her
25 answer it.

1      Q.    Is there a place in your report where I
2  can see how you weighed the evidence --
3          MR. VAUGHN: Objection.
4      Q.    -- which evidence you gave more weight
5  to, which evidence you gave less weight to, the
6  actual methodology; not your expertise, but see the
7  methodology. Can you point to paragraphs in your
8  report that do that?
9      A.    So I -- what you're asking me doesn't
10 make sense for a compound like this, where I do tell
11 you the documents I relied upon and I cite to those
12 specifically. And those are themselves
13 weight-of-the-evidence reviews and dissertations.
14         I tell you in my methodology, it's
15 there, that the way I do weight-of-the-evidence is
16 consistent with the way bodies around the world may
17 do it. I mean, I don't understand what you're asking
18 me.
19         I didn't -- there was no need for me to
20 perform another IARC review of all of the studies
21 when IARC is a body that is relied upon by FDA,
22 Health Canada, and toxicologists generally and I have
23 reviewed that and made my -- my assessment that their
24 review covers the breadth and the scope and uses the
25 methodology that's consistent with how a toxicologist

1  would look across the literature.
2          So I don't quite -- I mean, your
3  question would make sense if you were asking me about
4  a compound that no one else had made ever, but this
5  is not the case here.
6      Q.    So is it fair to say you're relying on
7  other people's weight of the evidence and --
8      A.    No. I performed my own
9  weight-of-the-evidence assessment based upon the
10 sources I have cited for you, and I'm just trying to
11 explain to you the reason why I don't lay out each
12 individual study is because that was done very
13 thoroughly and very well in the documents that I cite
14 to you.
15         So do I rely on the fact that they are
16 complete assessments? I do rely on those documents
17 but it's also something that I have done in the past.
18 I'm very familiar with the IARC assessment of
19 nitrosamines and MDNA. I have used it, reviewed it a
20 number of times over the years, and it is a reliable
21 document and a good assessment that goes through
22 strengths, limitations, weaknesses, all of those
23 things.
24         I have reviewed that. I agree with
25 their assessment in terms of what I also know is

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1  consistent with every other regulatory body that I've
2  ever seen that has assessed the carcinogenity --
3  carcinogenic potential of NDMA and NDEA. FDA talks
4  about that specifically as well. And I have relied
5  on that when looking at FDA's conclusions about what
6  they say about these compounds.
7      Q.    Did you review animal studies related to
8  NDMA?
9      A.    As they were cited in the NTP document,
10  yes, because very specific and detailed data table
11  there, so I did.
12     Q.    Did you go back to the original studies
13  or did you just rely on what NTP said about them?
14     A.    I answered that for you. I said IARC
15  first off, but also NTP, they both do it. I have
16  seen the reviews of -- by both of those -- those
17  bodies, and I've seen the references, I've looked at
18  the summary of the information, but I did not redo
19  their analysis. There is no need to. Again, there's
20  no controversy in my view. I challenge you to tell
21  me there's a controversy that NDMA does not increase
22  the risk of cancer, because it does.
23     Q.    Do you know whether the dose of NDMA
24  addressed in the animal studies is similar to the
25  dose that has been found in Valsartan?

Page 111

1          MR. VAUGHN: Object to form.
2      A.    So that's a different question. So as
3  all animal studies are done, there has to be an
4  exaggeration of dose because animals don't have the
5  same susceptibilities or sensitivities that humans
6  do. It's a general principle of toxicology, when you
7  design a cancer bioassay in animals, that you will
8  use dose ranges that start out, you always have a
9  zero and then you have a level that may or may not be
10  similar to what humans may be exposed, but you
11  exaggerate it because the idea is, you want to be
12  able to show that you have tested the system of the
13  animal to such an extent that you can rule out, if
14  possible, that the product is or is not a carcinogen.
15  So you can make that determination.
16          So you need to see your -- you're hoping
17  to see some type of pathology that would indicate yes
18  or no, there's a carcinogenic result.
19          You also start in cancer risk assessment
20  bioassay development and dose collection with results
21  from the genotoxicity evaluations that are done, and
22  you use those to also help set your doses, but they
23  are not the same. The human exposure doses could be
24  very different, depending upon the situation you talk
25  about.

Page 112

1      Q.    So you're saying that the animal studies
2  had doses of NDMA that were higher than the doses
3  that Valsartan users are exposed to?
4      A.    I can't tell you that that's the case
5  for every Valsartan user because I don't know what
6  every Valsartan user took. But I can tell you that
7  the doses that were used in the animal studies were
8  chosen based on sound scientific principles and
9  clearly show every study, regardless of the dosage
10  use and the route of exposure, even a single dose in
11  a prenatal study showed that NDMA was carcinogenic
12  and by definition, it's something that's carcinogenic
13  and if you're exposed to it as a human, you're
14  increasing your risk of cancer.
15     Q.    If something is carcinogenic and you're
16  exposed to it as a human, you're increasing your risk
17  of cancer regardless of dosage?
18     A.    You're -- increasing the risk is not the
19  same as identifying a dose. Increasing the risk of
20  cancer is a statement about hazard. It is telling
21  you that when you're exposed to this, the properties
22  of this chemical have the ability to be carcinogenic.
23  And so you increase your risk. There is no safe dose
24  of NDMA that's been defined. There's -- there is
25  instead a -- you can make a determination whether

Page 113

1  it's acceptable to increase cancer risk more than one
2  in a million or not. That's the decision. And those
3  decisions for regulators are in a different context.
4  But as a scientist, that's what you do, you calculate
5  the slope of the dose/response curve and you
6  extrapolate to zero because there is no "threshold"
7  for cancer.
8      Q.    So is it your opinion that any exposure
9  to NDMA increases the risk of cancer?
10     A.    I have not -- I haven't formed an
11  opinion of any specific dose but exposure to NDMA
12  generally, that's exactly right, increases your risk
13  of cancer.
14          Now, you say "any exposure," you need to
15  explain to me what you mean by that because, could I
16  come up with an exposure that may be -- it's
17  possible. But in terms of these products in this
18  case where you're orally ingesting these products,
19  that is my opinion, purely and simply, that the
20  exposure to Valsartan products containing these
21  impurities increased -- increases the risk of cancer
22  in people who take the drug. And then, there you
23  have to go and talk about individuals and that's not
24  what I have done. There's an indication to do that.
25     Q.    Would any exposure to NDMA through

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

1 Valsartan increase the risk of cancer?
2          MR. VAUGHN:  Objection, vague as to
3 "exposure."
4     A.    I answered that.  I said I believe that
5 in this case, based upon what I know is occurring,
6 that your risk is increased with your exposure to the
7 impurities in Valsartan.  It increases your risk
8 because of the issue that there is no threshold or
9 safe dose that's been identified for a cancer-causing
10 ingredient.
11          But there's another concept, which is
12 what the regulator applies, and that is making a, in
13 this case, making a risk/benefit decision based on --
14 actually it's a risk/risk decision, not a
15 risk/benefit -- they are looking at whether or not
16 the exposure -- the FDA is -- whether or not the
17 exposure to impurities in Valsartan is riskier than
18 someone who doesn't take the drug, and those are
19 things that regulators do.
20          That is not what I'm doing.  I'm telling
21 you as a scientist that this particular drug with
22 these impurities present, if those impurities are
23 present, you're increasing the risk of cancer in
24 individuals who take the drug.
25     Q.    If we could go to the third paragraph on

Page 115

1 this document, on the screen, Exhibit 5, first
2 sentence says, "According to Health Canada, the
3 average" --
4     A.    Hold on a second, I need to find it --
5 okay, I see it NOW.  Okay.
6          MR. VAUGHN:  Are you on page 3?
7          MS. MILLER:  Yep.
8     Q.    "According to Health Canada, the average
9 levels of NDMA found in these pharmaceuticals are not
10 expected to pose a significant increase in cancer
11 risk."
12          Do you disagree with that statement?
13     A.    I don't -- I haven't done that
14 assessment so I can't agree or disagree with that,
15 because I haven't looked at a specific population of
16 numbers of levels to make that assessment.  That's a
17 different assessment.
18          But I point you to the fact, you'll
19 notice they don't say there's no risk, and that's the
20 point I'm making to you, that no one is saying
21 there's no risk.
22     Q.    Do you have an opinion as to whether the
23 average levels of NDMA found in these pharmaceuticals
24 is expected to pose a significant increase in cancer
25 risk?

Page 116

1          MR. VAUGHN:  Objection, form, vague as
2 to "these pharmaceuticals."
3     A.    I don't believe I've formed opinion on a
4 specific level at this point in time in Valsartan, if
5 that's what you're asking me.  So if you're talking
6 about Valsartan, at the levels that may have been
7 detected in any one pill, at any one particular point
8 in time, that was beyond the scope of what I did,
9 but -- but, I would point you to the fact that the
10 regulatory agencies are not saying there was no risk.
11          They are making a judgement based upon a
12 situation they are in which is balancing drug
13 shortages, they are balancing people stopping to take
14 the drug, there's a lot of things they are balancing,
15 and why they all concluded that this stuff shouldn't
16 be there and it needs to come out.
17     Q.    Let's look at the next sentence from
18 there.  "A person taking a drug that contains NDMA at
19 or below the acceptable intake every day for 70 years
20 is not expected to have increased risk of cancer."
21 Do you see that?
22     A.    I see that.
23     Q.    Do you agree with that statement?
24     A.    I don't agree with that statement as
25 specified because there's more to it, if you actually

Page 117

1 look at what FDA and Health Canada say.  They
2 actually put it in the context of the number of
3 cancers that you would expect to see over a lifetime
4 and it wasn't zero.
5          So again, I would -- I would disagree
6 that you would not expect -- you have an increased
7 risk.  The question is, how -- what is that increase,
8 and how do you weigh that as a regulatory agency in
9 terms of making decisions on drug availability.
10          Regardless of that, however, again, both
11 of these regulatory agencies are on the record saying
12 that the NDMA should not be there, and they want it
13 gone.
14     Q.    According to this article, a
15 representative from Health Canada stated that a
16 person taking a drug that contains NDMA at or below
17 the acceptable intake every day for 70 years is not
18 expected to have an increased risk of cancer.
19          Do you agree with the Health Canada
20 statement there or not?
21          MR. VAUGHN:  Objection, foundation.
22     A.    I don't know what else was in the e-mail
23 so I haven't formed an opinion.  I wouldn't form an
24 opinion I agree or disagree with this statement taken
25 by itself.  But I would tell you I have seen other

HIGHLY CONFIDENTIAL

Page 118

1  descriptions from the regulatory agencies where they
2  are -- they are not saying that there is no increase
3  in risk, which would be the -- which would be what
4  you would be taking from this if that was -- if that
5  was the case.
6      Q.  Have you seen a statement from Health
7  Canada saying that it believes there is an increased
8  risk?
9      A.  I'd have to go back and look at the
10  Health Canada website again.  But what I have read
11  from Health Canada is consistent with them also
12  understanding that there's an increased risk of
13  cancer with exposure to NDMA, and that it is
14  something that they do not want in the drug supply.
15     Q.  Is it your testimony sitting here today
16  that Health Canada has stated that taking Valsartan
17  that had NDMA or NDEA impurities would increase a
18  patient's risk of cancer?
19     A.  If you're going to ask me that specific
20  question, I'll have to go back to the Health Canada
21  website to look.  I'm just telling you my
22  interpretation or my take-away from looking at the
23  positions of both bodies is that this is something
24  that isn't supposed to be there.  The companies can
25  make -- ZHP can make the product without this

Page 119

1  contaminant, or this impurity, I'm sorry, different
2  regulatory term, contaminant.  They can make it
3  without it, and if they can make it without it,
4  that's what the agencies want to happen.
5      Q.  I understand that, but has Health Canada
6  stated that somebody who took Valsartan with NDMA
7  impurities was at an increased risk of cancer?
8          MR. VAUGHN:  Objection, asked and
9  answered.
10     A.  That same answer.  To find a specific
11  statement I'd have to go look, but that would not be
12  consistent with the overall methods or the overall
13  conclusions I have seen the agencies make.
14     Q.  Sitting here today, do you recall any
15  statements by Health Canada that taking Valsartan
16  with NMDA or NDEA impurities would increase a
17  person's risk of cancer?
18         MR. VAUGHN:  Objection, asked and
19  answered.
20     A.  Same question -- same answer.  I
21  would go back and look at the website and scour it
22  again.  But when I looked at the website, I wasn't
23  looking for a particular sentence.  So I can't answer
24  that at this point in time without looking.
25         But again, I would point to the fact

Page 120

1  that in both cases, the agency is aware that there is
2  a way to make the drug without the contaminant, or
3  without the impurity, and that's what's important.
4  If you can make it without it, then there is no risk
5  because it's not there.
6      Q.  Do you believe that a person who took
7  Valsartan for 70 years that contained NDMA would have
8  had an increased risk of cancer?
9          MR. VAUGHN:  Objection to form.
10     A.  I answered that for you already.  I told
11  you I have not done a calculation in that way, so I
12  can't answer that.  That's somewhat, other people are
13  doing that, and I would refer you to the other
14  experts who are doing these kinds of risk assessment
15  coverage.
16     Q.  So you do not have an opinion as to
17  whether somebody who took Valsartan for 70 years that
18  contained NDMA would be expected to have an increased
19  risk of cancer?
20     A.  I have not formed that exact opinion,
21  but I have formed the opinion that the presence of
22  NDMA and NDEA and other nitrosamines like those that
23  are potent genotoxins in Valsartan drug products
24  increases the consumer or the patient's risk of
25  cancer.  That's my opinion, and I think that's

Page 121

1  consistent were what I've said in my report.
2      Q.  So you have an opinion that it increases
3  the risk of cancer generally, but you don't have an
4  opinion whether it increases the risk of cancer if
5  you take it for 70 years?
6      A.  Because I have not done that
7  calculation.  When you're asking me that question,
8  that was beyond the scope of what I did.  So again, I
9  don't know what else to tell you, but I know there
10  are other experts in the litigation who are doing
11  these calculations, and I'm sure they'd be happy to
12  answer the question, because they've all done those
13  calculations.
14     Q.  Are you offering an opinion in this
15  litigation as to whether Health Canada was correct or
16  incorrect in making this statement that we just read?
17         MR. VAUGHN:  Object to form, foundation.
18     A.  I have not formed an opinion like you're
19  describing at this point in time.  And typically I
20  would not because all of this that you're talking
21  about, the issue is the duty -- what is the duty of
22  the company; and it's the company's responsibility to
23  make sure that their products are safe for use,
24  regardless of what Health Canada says or FDA says.
25     Q.  We're not talking about obligations and

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1  duties right now.  I'm asking you whether or not you
2  agree with Health Canada that a person taking a drug
3  that contains NDMA at or below the acceptable intake
4  every day for 70 years is not expected to have an
5  increased risk of cancer.
6          MR. VAUGHN:  Object to form, foundation.
7  There's no evidence that Health Canada made the
8  statement.
9      A.   I've answered this question I think for
10  you five times already, and I'm not changing my
11  answer.  You know, again, I have not done a
12  quantitative risk assessment.  I have not -- which is
13  what you would be doing here.  I have done an
14  assessment based on the hazard that is posed, which
15  is an appropriate standard in terms of the regulatory
16  world when you're looking at the statements these
17  agencies make about -- about this situation, that
18  it's unacceptable for this to be there.
19          And then they acknowledge that you can
20  make the compound without it.  Diovan with the TIN
21  process apparently was made without it.  So again,
22  I -- I'm not trying to evade your question, I'm just
23  telling you that's all important context here.  When
24  you ask these questions, do I agree or disagree with
25  the regulatory agency, it's not as simple as that,

Page 123

1  and I have not formed an opinion that I agree or
2  disagree with any particular one sentence from
3  regulatory agency.
4      Q.   Are you offering an opinion as to
5  whether Diovan contained NDMA or NDEA?
6      A.   I have an opinion related to that later
7  in my report, where I talk about the evidence that I
8  have seen indicates that it is not present in Diovan,
9  and I have not seen evidence to indicate that the --
10  the opposite.  Do you need me to tell you where I say
11  this or --
12      Q.   No, I don't.  If Diovan, if some of the
13  Diovan manufactured by Novartis had trace amounts of
14  NDMA or NDEA, would that change your opinion that
15  ZHP's Valsartan is adulterated?
16          MR. VAUGHN:  Objection.
17      A.   I don't think it would change my opinion
18  that I would deem them adulterated because the
19  presence of those particular compounds, as the FDA
20  concluded, was that they were adulterated.  And the
21  fact that they were being produced outside of good
22  GMP on top of the presence of those impurities would,
23  by the definitions, the regulatory definitions, deem
24  them adulterated.  That's in my report as well.
25      Q.   Did you undertake any investigation as

Page 124

1  to whether any Diovan ever had trace amounts of NDMA
2  or NDEA?
3      A.   I looked for information in the files or
4  the documents that I had access to, and I also
5  looked, I saw a document, the one I cite to, I think
6  I tell you, let me look for it...
7          (A pause in the proceedings.)
8      A.   The analyses, I've seen an analysis by
9  Health Canada of Diovan samples and I cite you to the
10  source for that.  The Diovan was listed there as it
11  not being defective.  And again, if you look at all
12  of the things that are said, other evidence in this
13  case where these different changes in the process are
14  discussed, the company themselves recognizes that
15  there's a difference between the TIN process that is
16  used for Diovan versus their process in terms of the
17  potential for the formation of nitrosamines.
18      Q.   Is it your opinion that because Health
19  Canada did not find nitrosamines in the Diovan it
20  tested, that means that no Diovan ever had
21  nitrosamine impurities?
22      A.   No, my opinion is that the testing of
23  Diovan demonstrates that this particular drug had
24  been manufactured without nitrosamine impurities.
25  That's my paragraph 61.

Page 125

1          MR. VAUGHN:  Hey, Jessica -- sorry,
2  Dr. Plunkett.
3      A.   I'm citing to the Health Canada.  I have
4  seen no document that indicates that Diovan had the
5  same problem as the API that was made by ZHP, sold
6  under ANDAs by ZHP companies for Teva or Torrent.
7          MR. VAUGHN:  Jessica, I know you're on a
8  schedule.  What time do you want to do lunch?
9          MS. MILLER:  1 o'clock, four minutes.
10      Q.   Dr. Plunkett, in preparing your report,
11  did you speak to anyone who worked at ZHP?
12      A.   No, I've read deposition testimony but
13  did not speak.
14      Q.   Did you speak to anybody at the FDA?
15      A.   No, I've not -- well, I've not spoken to
16  anyone at the FDA.  I think what you mean is, having
17  to do with this particular project, no, I have not.
18      Q.   In preparing your report, did you speak
19  to anybody who consulted with ZHP?
20      A.   I don't believe, no.  Some of the people
21  that I know wrote reports.  I've not spoken to any of
22  them.
23      Q.   And you did not speak to any organic
24  chemists in preparing your report either, did you?
25      A.   No.

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1     Q.    Who put together the documents that you
2  reviewed in this litigation?
3     A.    Oh, I do, as I typically do, I ask for
4  documents.  Once we had a discussion of what areas
5  the attorneys were looking for me to address, which
6  is general toxicology and general regulatory
7  responsibilities, I then asked for certain kinds of
8  documents.
9         I also asked them to send me certain
10  kinds of deposition testimony that might be related
11  to my opinions and then I asked for the expert report
12  of the chemist in the case.  That was provided.
13  Plaintiff's expert.  And then, as I always say to
14  them, "Certainly, please send me, if you get them,
15  defense experts that cover the same area for you."  That
16  didn't come, however, until after my report was
17  drafted.  Those were made available to my around the
18  23rd of December or 21st of December or something
19  like that.
20     Q.    Do you have confidence that you reviewed
21  all the documents that are relevant to your opinion?
22         MR. VAUGHN:  Object to form.
23     A.    I have confidence that I have reviewed
24  sufficient evidence to form and reach the con -- all
25  my opinions and reach the conclusions I have drawn.

Page 127

1     Q.    Do you read Chinese?
2     A.    No, I do not.
3     Q.    Were all the documents in this
4  litigation written in English?
5     A.    No.  But the documents that I have
6  reviewed and relied upon that were not in English had
7  English translations that were provided to me that,
8  as is typical in litigation.  This isn't the first
9  litigation I've worked in that has had translated
10  documents.
11     Q.    Do you know whether all the documents
12  that were important to you forming your opinion have
13  been translated into English?
14         MR. VAUGHN:  Object to form.
15     A.    Any document that I've ever reviewed and
16  relied upon I had an English translation for.  So
17  that's the only way I can that question.  And I would
18  also indicate, I actually, when -- one thing I did
19  do, this is not in my report obviously because it was
20  after, one of the things I did do was, I looked at
21  what may or may not have been described within
22  reports of other experts in the case to -- but I
23  didn't see anything that would have changed my
24  opinion.
25     Q.    Have you prepared supplemental reliance

Page 128

1  listings to include all the documents reviewed after
2  submitting your report?
3     A.    The attorney -- Mr. Vaughn, I asked him
4  to provide that as part of your notice of deposition.
5  He did do that.
6     Q.    Did you go into any databases on your
7  own to search to documents that might be relevant to
8  your opinions?
9     A.    Are you asking for confidential
10  documents or for publicly-available documents?
11  Publicly available, certainly I did.  I did my own
12  literature searches and I looked at the FDA website.
13  I looked at the FDA website for any type of
14  information that I could -- I could get to that was
15  related to my opinion.
16         (Continued on following page.)
17
18
19
20
21
22
23
24
25

Page 129

1         You're asking about confidential
2  documents, I asked those to be provided to me in
3  certain areas, but I did not search the database on
4  my own, no.  It's apparently very, very large, from
5  what I understand.
6         MR. VAUGHN:  Ready for a break, Jessica?
7         MS. MILLER:  Sure.
8         MR. VAUGHN:  Great.
9         VIDEOGRAPHER:  Going off the record.
10  The time is 1:00 p.m.  This is the end of media unit
11  2.
12         (Luncheon recess:  1:00 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1       A F T E R N O O N   S E S S I O N
2            (1:43 p.m.)
3  L A U R A   P L U N K E T T ,  having been
4       previously sworn, resumed the stand and
5       testified further as follows:
6            VIDEOGRAPHER:  We're back on the
7  record.  The time is 1:43 p.m. Eastern Time.  This is
8  the beginning of media unit 3.
9  EXAMINATION (Cont'd.)
10 BY MS. MILLER:
11      Q.   Dr. Plunkett, does a generic drug have
12 to have the same exact impurity profile as the
13 reference listed drug?
14      A.   It has to have the same impurity profile
15 per the monograph, which would be the Reference
16 Listed Drug, yes.  You would expect it to have the
17 same impurity profile as listed in the compendium.
18      Q.   When you say the monograph, do you mean
19 the USP?
20      A.   Yes, exactly.
21      Q.   And did the USP monograph for Valsartan
22 require the identification of impurities over .1
23 percent?
24      A.   At the time that the ANDAs were approved
25 in this case, no, but there's a separate issue in

Page 131

1  which it has to do with, you would need to identify
2  things that were below .1 percent, based on your
3  chemical process assessment, if they were potent
4  toxicants or genotoxic.
5       Q.   So where does it say that?
6       A.   That is in the guidance information that
7  I cite in my report where I talk about the -- want me
8  to try to find it for you?  Or, it's in my report, I
9  know I discussed this.
10      Q.   You said it's in the guidance document,
11 right?
12      A.   Yes, that's correct.
13      Q.   What's a guidance document?
14      A.   Guidance document is a document with
15 a -- depending on who it is.  So let's say, either
16 USP or FDA, because FDA adopts USP standards and
17 guidance in many cases.  It's a document that sets
18 forth the current thinking of the regulatory
19 authority on what standards or rules should be
20 applied in a particular situation, and also sets
21 forth and tries to answer often questions that have
22 been raised in their experience to give examples and
23 nor specific information, because the regulations are
24 often broad, not specific, right?  The regulation is
25 broad to, for example, GMP for all human prescription

Page 132

1  drugs, but there may be in the guidance documents a
2  need to understand that some drugs may have different
3  issues addressed and the guidance will help you with
4  that.
5       Q.   Do FDA guidance documents establish
6  legally enforceable responsibilities?
7       A.   I'm not a lawyer, but based upon the
8  discussion in the documents themselves, there's
9  always a disclaimer statement, I guess, on the front
10 of most FDA guidance documents where they talk about
11 things not being legally binding; however, when you
12 read the documents, they also talk about some of the
13 guidance statements having directions such as "shall"
14 versus "can," and so there are some statements in the
15 guidance documents that are expectations in terms of
16 what would be complied with.
17           So in my experience, guidance documents,
18 since regulations are a minimum set of standards,
19 guidance set out some additional standards that the
20 FDA expects to be used when developing quality
21 systems our compliance programs within companies.
22      Q.   Has the FDA stated that guidance
23 documents shall only be viewed as recommendations?
24      A.   That's what I just told you.  There's a
25 disclaimer in the front that, if you read further

Page 133

1  into almost every guidance document in the
2  introduction section, it also talks about, besides
3  that disclaimer, it also talks about the language
4  that may be chosen to be used in the guidance
5  document.
6           I'll also point out, based on my
7  experience and training, that one of the reasons that
8  guidance documents may not become final rules or
9  actually be set into regulations is because of the
10 recognition of how long it takes to get those things
11 there.  So many times, guidance documents are issued
12 because it's FDA's quickest and fastest way to get
13 their thinking out to industry on what they would
14 like to see.
15      Q.   Has the FDA stated that the use of the
16 word "should" in agency guidance means that something
17 is suggested, recommended, not that it is required?
18      A.   That could be the -- I don't know if
19 it's exact language, but there's something similar to
20 that, yes, in there, yes.  And -- well, not in -- I
21 don't know about every guidance document, but in many
22 of the ones that are issued here, yes, that's
23 correct.
24      Q.   So do you agree that when the FDA uses
25 the term "should," that's not establishing a duty,

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1 it's just establishing a recommendation?
2     A.    It's different.  So I would agree with
3 you that it's establishing a recommendation, but duty
4 is different.  So manufacturers have a duty to insure
5 at all times during the life cycle of their product
6 that it's safe and effective for the use as
7 indicated.  As a result, the manufacturers have a
8 duty to do what they need to do to make sure that's
9 the case.
10     So I wouldn't use "duty" in that
11 language.  I would say, I would agree with you that
12 they -- that you made a comment about it being a
13 recommendation, but earlier on you told me you were
14 not talking about responsibilities or duties.
15     Well, the guidance documents set forth a
16 little more than the minimum, but there is a separate
17 duty that each manufacturer has, things they need to
18 do and it's industry practice in my view, and the
19 companies I've worked with, is, they typically do
20 what is in the guidance documents when specific
21 guidance is given on an issue.
22     Q.    Just to make sure I understand, because
23 I'm not sure I understand your testimony, is it your
24 testimony that the FDA guidance imposes duties on
25 manufacturers?

Page 135

1     A.    The guidance impose -- no, I said the
2 guidance imposes a -- it's FDA's thinking or their
3 recommendations.  Now, if they use the word "shall"
4 in a document, that's different.  That's something
5 they are saying will be done, right?  But when they
6 use the word "should," you're exactly right, it's
7 part of the recommendations.
8     But then I said to you, based on my
9 training and experience, working with industry and
10 complying with guidance documents, industry,
11 responsible manufacturers will take that information
12 and use it as their standards that they will apply --
13 more specific standards they will apply as part of
14 compliance with the general regulation in that area,
15 if it relates to them.  I mean, there may be a
16 guidance issue that doesn't relate to that particular
17 company and if it does, it's my experience that they
18 would use that guidance and attempt to comply with
19 it, if they can.
20     Q.    Are you using the term "duty"
21 differently from "legally enforceable
22 responsibility"?
23     A.    I'm using "duty" -- I'm not a lawyer so
24 I'm using "duty" -- their duty as a responsible
25 manufacturer based on my training and experience, so

Page 136

1 that's how I'm using that word.  So they have a duty.
2     Now, the law, you're right, the law has
3 some very specific duties that are laid out, and one
4 of those is the one I started with, which is, it's
5 the duty of the manufacturer to ensure that the
6 product is, remains safe and effective throughout its
7 life cycle for its intended use.  It's not FDA's
8 responsibility or duty, it's theirs.
9     So the company, those regulations and
10 the standards and all of the things that we're
11 talking about are things that the company needs to be
12 doing, because it's not -- FDA isn't the one that is
13 manufacturing the drug.  FDA is not the one that's
14 selling the drug.  FDA is not the one that's making
15 the profits off the drug.  It's the company.  So they
16 have a set of duties because of that role that they
17 play.
18     Q.    Where is that duty codified?
19     A.    That's looking at every responsibility
20 set forth in the FDA regulations.  If you go back to
21 Section 200 throughout, 300, 400, sections, it's
22 21 CFR, and look at what is the responsibility of a
23 manufacturer.  A manufacturer is the one that has to
24 do this.  The manufacturer is the one that has to do
25 that.  And then if you go to some of the general

Page 137

1 statements at FDA's website, and if you need to
2 explore a specific site I'll have to go find it,
3 but there's general statements on what is the
4 responsibility of a drug manufacturer, and they talk
5 about those specific things that they must do.  It's
6 their responsibility to do testing, it's their
7 responsibility to put together the application.  It's
8 their responsibility to have post-market surveillance
9 in place, it's their responsible to have a quality
10 management system in place.  All of those things are
11 in the regulations linked with the manufacturer, not
12 with the FDA.
13     Q.    Have you read the MSP complaint?
14     A.    I don't know what you're referring to.
15     Q.    Have you read the complaint in this
16 case?
17     A.    If it was on my reliance materials, I
18 may have looked at it, I'm not sure.  Can you tell
19 me -- let me look, I have my appendix C.  Hold on.
20 If I have, it's been a while, I don't know.
21     Q.    Do you remember reading the complaint in
22 this case?
23     A.    I have no specific memory.  I often do,
24 though, that's why I'm saying that.  So let me look
25 and see if you want -- if you want a specific answer,

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1  if it's in my reliance list, I have.
2      Q.    Okay.  So your reliance list, maybe this
3  will be helpful, your reliance list is appendix C,
4  and it's one, two, three, four, it's four-and-a-half
5  pages, double columns.
6          Did you read every single document
7  that's listed there?
8      A.    Yes, I have looked at every single
9  document that's in here, yes, at some point in time.
10  That's why it's listed.  Many of -- let me just say,
11  many of these documents are -- were Bates-numbered
12  exhibits to deposition testimony as well.
13      Q.    And what's the difference between
14  "looked" and "read"?  I just want to make sure I
15  understand.  I asked, did you read, and you said, "I
16  have looked."
17      A.    I have -- look, every document here has
18  been opened up, I may have read it, I may have
19  skimmed and read some more thoroughly, it depends.
20  For example, on some of the deposition testimony, I
21  may not have read every word but I certainly skimmed
22  through the entire deposition and I compared the
23  exhibits, to look at the exhibits, to see if they are
24  relevant to my area of expertise because there were
25  some depositions that some of the information that

Page 139

1  was being discussed was beyond the scope of the
2  opinions I was forming.  But I would -- all of these
3  documents would be fair game if you want to go and
4  look at one, and I can tell you my opinion, how it
5  does or doesn't support my opinion, or what it was --
6  what it is or is not relevant to.
7      Q.    Are you offering an opinion in this case
8  as to the conditions that are necessary for DMF to
9  degrade?
10      A.    No.  I believe that's what the chemist
11  is doing.  I cite to the fact that -- I think I talk
12  about what the different processes were, and I point
13  out some of the observations about what the agency,
14  FDA even identified was there, or the company was
15  aware of was there, based on deposition testimony.
16  But I have not done an independent analysis.  That
17  would be what the chemist has done in terms of
18  foreseeability.
19      Q.    Does ZHP have Quality Management Systems
20  in place, QMS?
21      A.    Well, they supposedly did, based upon
22  the documents I've seen, but this is one of the
23  things that they got cited for in terms of their FDA
24  warning letter on the inadequacies of some of their
25  Quality Management System issues.  So you could have

Page 140

1  a Quality Management System that isn't adequate, and
2  you can have a Quality Management System that is
3  robust.
4      Q.    Are you offering an opinion that the
5  Quality Management System was not adequate?
6      A.    That was beyond the scope.  Dr. Bain, I
7  believe, is addressing those specific issues in terms
8  of the case.  Maybe also someone else, but I've read
9  Dr. Bain's report and I know she addresses that to
10  some extent.
11      Q.    Did you speak to Dr. Bain?
12      A.    No, I haven't spoken to any of the -- to
13  short-circuit it, I haven't spoken to any of the
14  experts on either side much this case.
15      Q.    Were you familiar with Dr. Bain before
16  you got involved in this litigation?
17      A.    No I was not familiar with her.
18      Q.    Were you familiar with Dr. Hecht before
19  you got involved in this litigation?
20      A.    No, I was not.
21      Q.    You mentioned the warning letters,
22  correct?
23      A.    Yes, I have.
24      Q.    What's a warning letter?
25      A.    A warning letter is a administrative

Page 141

1  action that can be taken.  It's a tool that the FDA
2  uses once they have had an inspection, typically for
3  example, of a facility.  And if the inspection has
4  identified regulatory compliance issues that are
5  significant, the FDA will send a warning letter.
6  Sometimes the warning letter doesn't come
7  immediately, sometimes they have a -- a untitled
8  letter or a discussion that they have with the
9  company to try to achieve compliance or solve
10  compliance concerns.  And if -- but if those things
11  don't happen, then another warning letter can follow
12  as well around the things that weren't resolved.
13          But it is an action that must be
14  responded to, so I think it's 15 days, basically 15
15  days after receiving a warning letter to respond to
16  the agency with something, saying that, you know,
17  what they are planning on doing or -- they -- I've
18  helped companies in the past respond to warning
19  letters.
20          For example, sometimes the response is,
21  "We have engaged with a consultant who is going to be
22  coming to our facility on XYZ," or, "We've engaged an
23  attorney that will be assisting us with changing or
24  revisiting some of these issues and then we'll get
25  back to you," and then the FDA expects a follow-up.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1    Q.    Has the FDA stated that warning letters
2  are informal and advisory?
3    A.    Yes.  They -- well, I know they are
4  informal, but to me an entitled letter is what I
5  would call informal.  It's possible that FDA said
6  that, but when I talk with my clients, I talk about a
7  warning letter as being something that's serious and
8  has to be addressed, because there's a time issue
9  with it.
10        But there's advisories.  They are
11 telling the company what problems exist that need to
12 be addressed, so in that case, yes.  And in that
13 case, it's not an enforcement action such as a recall
14 or a banning or a criminal, you know initiation of
15 criminal procedures, a lot of different things that
16 could happen.  It's not an import alert, which is a
17 more formal action that should be taken.
18    Q.    Are you familiar with the FDA regulation
19 or procedures manual?
20    A.    Yes generally, yes.  Some sections more
21 familiar than others.
22    Q.    Do you know whether that manual refers
23 to warning letters as informal and advisory?
24    A.    I'd have to go back and look.  I don't
25 recall any of the specific language in it.

Page 143

1    Q.    Is a warning letter considered final
2  agency action?
3    A.    No.  Again, it requires a response.  So
4  that could lead to formal -- typically in my
5  experience, a warning letter gets responded to and
6  then the agency, the FDA will respond to your
7  response with a closure of an action or, you know,
8  indicate that additional -- additional work may be
9  needed.
10    Q.    The FDA expressly has stated that
11 warning letters are not final and binding, right?
12    A.    Well, obviously they are not final
13 because follow-up is expected.  I don't know what you
14 mean by "binding."  If what -- by binding, what they
15 are meaning is that you can make an alternative
16 argument and they will consider it, that is true.  In
17 other words, what the findings are in a warning
18 letter may change or the opinion of the agency could
19 change depending on the information and arguments
20 presented by the affected party, if that's what
21 they're saying.
22    Q.    Fair to say --
23    A.    Again, if you're referring to the
24 regulatory procedure manual, then I'd have to look, I
25 don't know, that is fair.

Page 144

1    Q.    Is it fair to say that a warning letter
2  is issued to achieve voluntary compliance?
3    A.    Yes, that's the -- FDA is always using a
4  carrot rather than a stick first, unless there is
5  something very, very serious that has risen to a
6  level of criminal, in which case the stick may come
7  right out.
8    Q.    And if you undertake corrective action,
9  the FDA can close out a warning letter, right?
10    A.    Yes, that's what it said, that's typical
11 of the actions that can happen, so that would mean a
12 finalization of the process for that particular issue
13 raised in that warning letter.
14    Q.    Do you know if the FDA closes out a
15 warning letter, what does it mean?
16    A.    It means that for the issues raised in
17 that warning letter, there has been some action or
18 information provided to -- that makes that warning
19 letter issue either moot or has been resolved.  So
20 for example, you could make the issue in the warning
21 letter moot if you said, "I'm just going to stop
22 making the drug."  You may, however, say, "We're
23 going to put these processes in place, we're going to
24 be putting in testing," to ensure, for example, like
25 in this case, companies are expected to show that

Page 145

1  will there is no NDMA or NDEA or nitrosamines present
2  before they release product, those kind of things.
3    Q.    Are you offering an opinion that ZHP's
4  QMS was inadequate?
5    A.    You already asked me that, and I said
6  that was beyond the scope.  That's something that
7  Dr. Bain, I believe, is addressing.
8    Q.    So if that's the case, if it's beyond
9  the scope, why do you mention QMS in your report?
10    A.    To give context to why, what companies
11 are required to do, because I talk about
12 responsibilities, overall responsibilities of what a
13 drug manufacturer is supposed to do, and I also talk
14 about limitations of the FDA.  And those are both
15 important context opinions or -- not opinions,
16 context to give when I talk about different issues in
17 the case.
18        And I was asked in this case to provide
19 a general overview of some of the important
20 regulatory issues that the company would need to
21 address, things they have to have in place, or things
22 they should be doing in order to be manufacturing the
23 drugs in compliance with, generally with FDA
24 regulation.
25    Q.    Other than the fact that you have

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1 testified already today that ZHP did not conduct, in
2 your opinion, an adequate risk assessment, do you
3 have any other opinions as to things that you believe
4 ZHP did that were contrary to FDA regulation?
5      A.    Well, several times in my report I say
6 that they put patient health at risk because of the
7 actions they took.  They are not doing -- not doing
8 the risk assessment, for example, to understand that
9 they were selling a product, or marketing a product
10 that had these toxic contaminants -- toxic
11 impurities, carcinogens in them.  I'll look, I mean,
12 I have a couple of -- I have a summary -- I have a
13 summary opinion --
14      Q.    No, no.
15      A.    -- at page --
16      Q.    I don't think you're understanding my
17 question.  Other than the risk assessment
18 requirement, are there any specific FDA regulations
19 that you are saying ZHP did not comply with?
20      A.    I don't think I state my opinion the way
21 you're stating it.  But I certainly do think some of
22 my opinions are relevant to the question you're
23 asking.  I don't know how else to answer it.  So
24 you'll notice in my report, I think you'll notice in
25 my report that you don't see a number of statements

Page 147

1 that say, "They violated this regulation," or, "They
2 violated that regulation."  Because that analysis was
3 being done by, in my -- the information was given in
4 the reports I've seen by other experts.
5           Instead, what I have provided, I
6 believe, in my report, is, I have talked about what
7 are the responsibilities of a manufacturer under the
8 regulations, what regulations apply to them, and what
9 issues I see.
10          And I see issues with the improper risk
11 assessment, for example, which leads to them
12 producing a product that I believe would be deemed
13 adulterated.  So I guess what I'm saying, it's being
14 deemed adulterated, that's a violation of the -- of
15 the regulations that deal with adulteration of
16 products under the -- under both the law itself,
17 section 351 CFR; and also other parts of the -- the
18 quality regulations that talks about the need to
19 produce a product that is -- that is not adulterated.
20      Q.    Are there any other regulations sitting
21 here today that you believe ZHP violated?
22      A.    I believe they sold -- they sold a
23 product that I believe was not pharmaceutically
24 equivalent.  So part of the regulations -- I mean, I
25 give you sections -- I pull out certain sections and

Page 148

1 quotations, and some of those are out of regulations,
2 some of those are out of the statute itself, so I
3 know I address that as well, the issue of the fact
4 that the drugs, the Valsartan products that contain
5 NDEA and NDMA would be deemed adulterated; and as a
6 result of that, they would not be pharmaceutically
7 equivalent, and by the definition of "bioequivalent
8 drugs," which have to be therapeutically equivalent
9 and pharmaceutically equivalent, that would be an
10 issue that I'm raising in terms of the regulations.
11          But it's -- I don't know how else to
12 answer for you.  I'd say that I was very -- I was
13 very -- "careful" is not the right word, but I tried
14 to be very specific and direct in my language I use
15 so you understand what I am saying, and if I -- I
16 typically, since Dr. Bain is the one, and others,
17 that are doing GMP compliance, many of the regulatory
18 issues that you would point to from these standards
19 or parts of the 21 CFR that they are handling, and I
20 did not do that.
21      Q.    Is there a place in FDA regulations
22 where it says bioequivalence means that you have the
23 exact same impurity profile?
24      A.    Well, let me -- there is a statement
25 about purity.  So hold on.

Page 149

1          (A pause in the proceedings.)
2      A.    So paragraph 21, under the definitions
3 of what is a pharmaceutical equivalent, and that
4 comes from FDA's own regulations, "Pharmaceutical
5 Equivalence," and goes on, goes up halfway down, and
6 it says, "And meet the identical compendial or other
7 applicable standard of identity, strength, quality
8 and purity," and the purity is the issue, as it
9 states here.
10          They were making Valsartan in ZHP, and I
11 don't have any evidence to indicate their Valsartan
12 tablets weren't of the claimed strength, but I have
13 evidence to indicate that the Valsartan tablets had a
14 different purity profile than the Reference Listed
15 Drug, in the presence of the NDMA and the NDEA, and
16 the lack of investigation they did to understand the
17 chemical process.
18      Q.    Does this sentence say that the two
19 drugs have to have the same purity or does it say
20 that the drawing must meet the identical compendial
21 on other applicable standard of identity?
22          MR. VAUGHN:  What page were you on of
23 her report?  I'm sorry.
24          MS. MILLER:  We're on paragraph 21.
25          THE WITNESS:  She had read the language

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1 to me.
2        MR. VAUGHN: I got lost.
3     A.   Go back to the original question,
4 though, because I thought what I was answering for
5 you was what you were asking. So what is your
6 question now? Say your question again, because maybe
7 I misheard your question. I thought I was pointing
8 to this because I thought this answered your question
9 directly.
10    Q.   Does a generic drug have to have the
11 exact same impurity profile as the RLD?
12        MR. VAUGHN: Objection, vague.
13    A.   So that was why I went here. So in
14 order to be a generic -- in order for a generic drug
15 to be legally marketed, it has to be bioequivalent.
16 And "bioequivalent" includes two parts. It's the
17 therapeutic equivalence; but it's also, as set forth
18 here, the pharmaceutical equivalent. And I'm saying
19 to you that if they are comparing themselves, which
20 they are, they -- when I say "they," ZHP is making a
21 product where their RLD is supposedly Diovan, and
22 they use the monograph as a standard for that, and
23 then they change the process, that they don't believe
24 that that process is making any "significant changes"
25 such that they would expect something different, but

Page 151

1 yet they don't investigate it. The fact that they
2 then signed that they are making NDEA and NDMA, makes
3 the purity of their drug different from the Reference
4 Listed Drug, and I don't know how, more specific way
5 to say it. I have it there, and I have other --
6 paragraph 22 I talk about it as well.
7     Q.   You're not answering my question. My
8 question is, what was the compendial and/or other
9 applicable standard of identity?
10    A.   You have to go to the USP monograph for
11 Diovan for the Record Listed Drug, and we've already
12 discussed this --
13        MR. VAUGHN: Let her finish her answer.
14    A.   -- and we already discussed this,
15 because you're asking specific questions about the
16 compendial standard, and I think you mentioned .1
17 percent, .1 percent are the compendial standards,
18 don't mention NDMA and NDEA. However, it doesn't
19 mean that you ignore what you're supposed to do in
20 order to make sure that what you're doing is making a
21 product that doesn't have something that is not
22 listed.
23        So for example, if the monograph had
24 been approved such that NDMA was going to be allowed
25 as a potent toxicant or genotoxicant, I would expect

Page 152

1 there to be a listing for that in the monograph and
2 it's not there. Instead, what happens is, that drug
3 in the monograph, made by the TIN process, was not
4 anticipated or expected to make NDMA or NDEA.
5        When they changed the process, this is
6 when ZHP becomes responsible for making sure that
7 their changes to the process don't change the profile
8 as they compare it back to the standard, and I'm
9 saying to you, that's the problem here. They
10 didn't -- because of not doing their, as they admit
11 in their deposition testimony that they didn't do,
12 and there are stipulations that they made that they
13 didn't do a complete review of their process, and yet
14 there's also discussion among -- of the fact that ZHP
15 employees were aware that, in 2017, at least, that
16 their process could produce genotoxins like NDMA. So
17 that's what I'm pointing to. That's the evidence I'm
18 pointing to, the paragraphs that describe it.
19        There's additional description of that
20 issue I was bringing up about what the company knew
21 in other parts of my report, and I can find it for
22 you if you need me to.
23    Q.   Where can I find everything you just
24 said in the USP monograph?
25    A.   Everything I just said is -- I don't

Page 153

1 understand. Some of what I just said to you is my
2 opinion based on the evidence that exists. Are you
3 asking me -- what are you asking me? What,
4 everything that I just said? Because I did say a
5 lot, I apologize.
6     Q.   The USP monograph simply says not more
7 than 0.1 percent of any other individual impurity,
8 correct?
9     A.   Yes, but there's also -- there is also
10 the understanding with these monographs, when you go
11 to the USP website and also to the ICH guidance that
12 goes along with all of these issues, that that
13 statement for .1 percent does not apply to potent
14 toxicants or genotoxins.
15    Q.   Can you show me where it says that?
16    A.   In my report --
17    Q.   No, not in your report. Where it says
18 that in USP. Where does it say in USP that the term
19 "any other individual impurity" does not actually
20 mean "any other individual impurity"?
21    A.   I don't understand your question. I'm
22 telling you --
23    Q.   It says here, "Any other individual
24 impurity," that's the language in USP, and you're
25 saying that's not what it actually means. Where can

39 (Pages 150 - 153)

Page 154

1 I go to USP to see that actually the term "any other
2 individual impurity" has a caveat, the caveat you
3 just referenced?
4      A.    It would be the information that goes
5 along with the implementation of the monograph.  So
6 it would be going back to the general -- there's
7 general procedures, or general chapters USP cites
8 that talk about impurities.  So you go there, and you
9 look at what they describe as far as impurities, and
10 then you go to the ICH documents that talk about the
11 monographs and the development of impurities.  So
12 that you can't look at just the USP monograph, you
13 shouldn't be looking at the USP monograph in
14 isolation from the other information that talks about
15 how to use that monograph, is what I'm telling you.
16      The company in this case,
17 "company" being ZHP, and then also Teva and Torrent,
18 because they accepted what ZHP supposedly did, the
19 issue is that they were making a product where they
20 didn't have control of their process, and by not
21 having control in terms of knowing what their process
22 was doing, they were making something that had a
23 genotoxin in it, and as a result that .1 percent any
24 other impurity, based upon the complete evidence of
25 how these monographs are developed and used, is

Page 155

1 inconsistent, and that's what I'm telling you --
2      Q.    You keep answering questions I'm not
3 asking.  My question is very simple.  Where in USP,
4 where, what book in USP can I go to, to find a
5 statement that "any other individual impurity" does
6 not apply in this circumstance?
7      A.    I thought I just tried to tell you that.
8 I said to go through the general chapters on
9 impurities where they discuss impurities.  And then I
10 also told you to go to the guidance documents put up
11 by ICH which talk about implementation of some of
12 these things.
13      Q.    And that's --
14      A.    I don't know what else to tell you.  I
15 mean, I'm trying to answer your question consistent
16 with my experience but also, I mean, in my report, I
17 lay this out.  Maybe let's go to my report, tell me
18 what it is that you don't agree with and I'll try to
19 explain it to you.  Obviously you disagree with
20 something I've said in my report.
21      Q.    Is it your opinion that ZHP withheld any
22 safety information from FDA that it was aware of?
23      A.    Yes, it withheld the fact that it never
24 did a full evaluation of its chemical process.
25 That's important to patient safety.  So they

Page 156

1 stipulate that they didn't do it, and I don't -- I
2 have no evidence to show that they ever told FDA,
3 "Oh, by the way, we didn't do that."  In fact -- in
4 fact, what they did tell FDA and the people they
5 supplied to, they actually say that there were no
6 genotoxic byproducts or degradants in the process,
7 and yet they had never done the work to figure out
8 whether they actually could be there.
9      Q.    Are you of the opinion that the FDA's
10 limitation of resources somehow affected patient
11 safety here?
12      A.    I don't think I form the opinion that at
13 any particular case it's effected patient safety.
14 But the limitations of the FDA are an important
15 context for why it is that it's the company that is
16 responsible for doing all the work, what you were
17 rating out that the FDA may have called "hard."  It's
18 not hard work if you do the work, and that's the
19 point.
20      You have to do the work, take the time,
21 go through the process, understand your process, and
22 make sure that what you're selling is going to be
23 safe and will not put patient health at risk.
24      Q.    Do you know how many times the FDA
25 inspected the ZHP facility during the time period at

Page 157

1 issue in this litigation?
2      MR. VAUGHN:  Objection, foundation.
3      A.    Well, I don't even know all of the time
4 period.  Can you tell me your time period?  Maybe I
5 can tell you if you tell me what time period is at
6 issue.
7      Q.    Well, do you have an opinion as to what
8 the time period was when Valsartan was -- had
9 impurities of NDMA and NDEA?
10      A.    Well, we don't know the exact time
11 period.  I would argue, based on the evidence that
12 I've seen, it goes back at least as far to 2014 in
13 terms of having a process that was in place that,
14 where they were seeing unidentified impurities.  But
15 certainly whenever they started using either the --
16 whenever they started using a process other than the
17 TIN process without doing the full evaluation of
18 their chemical process, that raises the issue of
19 potential contaminants that are nitrosamines.
20      Q.    Beginning at that point until the
21 product was recalled, how many times did the FDA
22 inspect ZHP facilities?
23      A.    I have -- don't have a count off the top
24 of my head.  I can't tell you that.  If you need to
25 know that, I imagine the number -- I could find that

HIGHLY CONFIDENTIAL

Page 158

1 in Dr. Bain's report, because I think she goes over
2 the inspections, or maybe it was not Dr. Bain, it may
3 have been Dr. Russ, maybe, I have to go look.
4     Q.    Do you know how many of those
5 inspections resulted in regulatory action?
6     A.    Again, I'd have to go look.  That was
7 beyond the scope.  I wasn't trying to count up how
8 many times.
9     Q.    In fact, there were multiple FDA
10 inspections during that period, none of which
11 resulted in official regulatory action, isn't that
12 right?
13     A.    Do you mean a warning letter, or are you
14 talking about a recall, what are you talking about?
15     Q.    Any official regulatory action?
16     A.    Well, they had more than one warning
17 letter during that period of time.  And I did do a
18 search of the FDA website for that, looking for
19 warning letters.  There's more than the one that came
20 out in 2019.  But I can't give you an exact number.
21 I'd have to go back and look again at the rather
22 large database.
23     Q.    Can you identify any warning letter
24 other than the 2019 warning letter that had to do
25 with Valsartan?

Page 159

1     A.    Well, warning letters that deal with
2 failure of quality systems or violations of CGMPs,
3 and the best one I'm thinking of, there was an older
4 letter that I believe they cited ZHP for a violation
5 of GMPs, that they were looking at the production of
6 a different drug, but if -- other than Valsartan, but
7 if you look at the way that the FDA writes the
8 letters, and I'd have to pull the letter back out,
9 but I believe that the statement they make is not
10 just, "You violated CGMPs for Valsartan or for
11 Losartan," or whatever drug, "You violated CGMPs and
12 you're making adulterated drug products."
13     Q.    FDA never used the word "adulterated"
14 with respect to Valsartan until 2019, correct?
15     A.    It did not deem it adulterated until
16 2019, that is true.  However, if you read my report,
17 I talk a little bit about this.
18     Q.    I read your report several times,
19 Doctor.
20         MS. MILLER:  Do you want to take a
21 break?
22         THE WITNESS:  I'm fine going forward,
23 it's up to you.
24         MR. VAUGHN:  Going for like fifty
25 minutes, is it --

Page 160

1         MS. MILLER:  I know, but I need to take
2 a break.
3         MR. VAUGHN:  I thought you were asking
4 us.
5         MS. MILLER:  Thanks.
6         VIDEOGRAPHER:  All right, going off the
7 record, the time is 2:23 p.m. Eastern Time, this is
8 the end of media unit 3.
9         (Recess taken.)
10         VIDEOGRAPHER:  We're back on the record.
11 The time is 2:40 p.m. Eastern Time, this is the
12 beginning of media unit 4.
13 EXAMINATION (Cont'd.)
14 BY MS. MILLER:
15     Q.    Dr. Plunkett, are you aware of any
16 monograph that references nitrosamine impurities?
17     A.    In terms of an acceptable impurity, is
18 that what you're asking me?
19     Q.    Are you aware of any USP monograph that
20 references nitrosamine impurities in any capacity
21 whatsoever?
22     A.    I'm not aware of one where they are
23 considered an acceptable part of the specification in
24 the compendium, no.  And in fact, if you go to the
25 USP website, they have, now, they have a section on

Page 161

1 nitrosamines and pages that talk about how those are
2 unacceptable contaminants and -- or impurities and
3 have been problematic in the industry.
4     Q.    Are you offering an opinion that
5 bioequivalence was lacking here because of the
6 preference of NDMA and NDEA impurities in the
7 Valsartan ZHP API?
8     A.    Not exactly.  Want me to explain what my
9 opinion is?
10     Q.    That is not your opinion?
11     A.    That's not the exact opinion.  You're
12 not stating it quite as I would.  Would you like me
13 to explain?  It's in my report.  Actually, I talked
14 about the issue of, bioequivalent means two things:
15 Therapeutically equivalent, and pharmaceutically
16 equivalent.  And the pharmaceutically equivalent
17 piece that I believe the presence of the NDMA and the
18 NDEA affect the status of the drug as being
19 "bioequivalent," and FDA stated they are adulterated.
20         By being adulterated, they are not going
21 to be deemed to be bioequivalent, at least that lot,
22 even though the ANDA still exists, and then
23 bioequivalence -- bioequivalence termination has not
24 been rescinded by FDA.
25     Q.    How is that different from what I just

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1 said?
2      A.   Well, I mean, I'm being more precise and
3 exacting.  That's what I'm telling you.  The
4 bioequivalent -- the reason I'm doing this is because
5 I have seen documents where people focus on
6 bioequivalent as only on the therapeutic equivalence
7 piece of the puzzle, and it's both.
8      Q.   Are you offering an opinion that
9 pharmaceutical equivalence was lacking merely because
10 the Valsartan API had NDMA and NDEA impurities?
11           MR. VAUGHN:  Object to form.
12      A.   Well, it's not merely because, it's an
13 important -- it's important impurities.  It is my
14 opinion that they were not pharmaceutically
15 equivalent when the process used to make them were
16 being -- resulting in the presence of NDMA and NDEA,
17 yes, that's correct, because those are the types of
18 impurities that would not fit at the .1 percent based
19 upon the USP.
20      Q.   Did Valsartan ever have NDMA or NDEA
21 over 0.1 percent?
22      A.   I haven't done that evaluation.  I can't
23 answer that.  But the .1 percent doesn't apply to
24 genotoxins, so NDMA and NDEA would have a different
25 issue to be -- that they would have to content with.

Page 163

1 If you wanted to make them listed impurities, that's
2 a different issue.
3      Q.   If an impurity of less than 0.1 doesn't
4 have to be identified, how is it possible that it
5 doesn't apply to genotoxins?  Is it your opinion that
6 no unidentified impurity in any medication under 0.1
7 percent is a genotoxin?
8           MR. VAUGHN:  Object to form.
9      A.   No.  That's not at all what I'm saying.
10 You're conflating things.  So the issue here is,
11 because the process was changed and the chemical
12 analysis or the -- analysis of the chemical process
13 did not look for the potential for genotoxic
14 impurities to result, when those genotoxic impurities
15 do result, that makes that particular product no
16 longer pharmaceutically equivalent.
17           The Diovan RLD process with the TIN had
18 been shown to be able to be used to manufacture
19 Diovan without the presence of NDMA or NDEA based on
20 the Health Canada results, for example.
21      Q.   But you have not been able to point me
22 to a page in the USP -- in any USP manual or document
23 that says .1 or less of any other individual impurity
24 excludes potential genotoxins, correct?
25           MR. VAUGHN:  Object for form.

Page 164

1      A.   Well, they wouldn't have that statement
2 this there.  I doesn't make any sense.  That's what
3 I'm trying to tell you.  I'm trying to tell you that
4 the -- well, if you go for the general -- if you open
5 the general chapter -- general chapters, and I don't
6 know, 5.6, something like that, it's called
7 "Impurities," "Substance Impurities," something like
8 that in the general chapters, and it talks about what
9 to do, and it talks about when you view the process
10 that is not -- was not part of the original process
11 by which the RLD was developed, that you have to look
12 for and understand what impurities are possible.  And
13 then that, combined with the fact that genotoxic
14 impurities are a separate issue in terms of how they
15 are handled, that's what I'm pointing to.
16           So there are potent toxicants,
17 genotoxicants, there can be toxicants that weren't
18 genotoxic that were potent enough that apply the .1
19 percent standard.
20      Q.   Is there a page in any USP document that
21 says when you are dealing with a potentially
22 genotoxic impurity, you cannot have even less than .1
23 percent of that impurity in your medication?
24           MR. VAUGHN:  Object to form.
25      A.   I can't tell you if that sentence that

Page 165

1 you're reading is there, but I can tell you that if
2 you read the general chapters of the USP, in
3 combination with the guidance that exists, genotoxic
4 impurities are segregated out as a special group or a
5 special class that are considered differently, where
6 the .1 percent may not be adequate in terms of
7 protecting and making sure that the drug is safe.
8      Q.   All right.  So now you're saying there's
9 a place in USP that says .1 percent may not be
10 adequate?
11      A.   The guidance documents talk about where
12 these impurity standards come from, and that's where
13 I'm trying to point you to.  If you need me to, let
14 me go into my documents real quick here, and on my
15 computer, and I'll -- but I mean, they are cited.
16 Let me look at my report -- actually, you know what?
17 I think I cite to these in my report.  Hold on, just
18 a second.
19      Q.   Hold on a minute, we are short on time
20 and unless you're citing to something that says that
21 genotoxicity somehow cancels out 0.1 percent limit,
22 that's not responsive to my question so I'd like to
23 move on.
24      A.   Well, if you want me to answer the
25 question, I need to look at my report because I do

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

1 have something that I believe is on point or at least
2 relevant to the question you're asking. So if you
3 don't want me to look, I won't. But I do believe
4 that I address this general issue in my report. Want
5 me to look --
6     Q.    You address -- do you address it with a
7 citation?
8     A.    I believe I point to either the guidance
9 documents or to the general chapter, yes. Do you
10 want me to look?
11    Q.    Yes, please.
12          (A pause in the proceedings.)
13    A.    Okay, so this part of the relevant
14 information that I would point you to is not an
15 actual USP document, but it is the information that
16 is in the Drug Master File from ZHP. And this would
17 be paragraph 54 and I'm -- let me look further.
18          (A pause in the proceedings.)
19    A.    Well, I'd also refer you to paragraphs
20 37 through 49 where the company is talking --
21 "company" being ZHP -- was talking about their
22 recognition of not being compliant with GMP with the
23 presence of nitrosamines and then in addition to
24 that, there's information in -- further on pages
25 33-34, they talk about this issue of the fact that

Page 167

1 nitrosamines are not to be present in these products,
2 so that's recognition that the monograph is not
3 covering nitrosamines. But if you're asking me for
4 the exact language you're asking me, I don't know,
5 I'd have to go look to see whether the USP had the
6 exact statement that you're asking.
7          But there are several elements in this
8 case to show that at issue here is the presence of
9 NDMA and NDEA at levels that may be below .1 percent,
10 but they are still a -- an issue with respect to the
11 product being pharmaceutically equivalent to the
12 Reference Listed Product. Different purity.
13    Q.    You did not just point me to any USP
14 cite that says 0.1 percent clearly does not apply to
15 impurities that are potentially genotoxic, correct?
16          MR. VAUGHN: Objection, argumentative.
17    A.    I told you, for that I would go to the
18 general chapters of the USP where they talk about
19 impurities. I don't have it cited, language out of
20 my report, but those are part of my --
21    Q.    The question I asked --
22    A.    -- if you would like me to pull them
23 out, we could look to that.
24    Q.    That was --
25    A.    But I believe there is something similar

Page 168

1 to that.
2     Q.    But that was the question I asked you
3 when you went to look at your report.
4          MR. VAUGHN: Objection, argumentative.
5     A.    I understand, and I was looking to see
6 if I had pulled that language out and I had not
7 pulled it out specifically as a quote. But I do know
8 that the general chapters address that issue you're
9 raising.
10    Q.    Let's go back to Exhibit 3 for a moment.
11    A.    Exhibit 3, which one is that?
12    Q.    It will pop up on the screen.
13    A.    Oh, well, I might want to look at it,
14 that's --
15    Q.    It's the August 30, 2018 statement from
16 FDA.
17          MR. VAUGHN: In that share file
18 Dr. Plunkett, it's listed as Exhibit 3 for you also.
19    A.    I was wondering whether it was an FDA
20 document or it was that article, that's why I was
21 asking.
22          (A pause in the proceedings.)
23          MS. MILLER: Are we still on page 2?
24 Okay, I have the wrong page number in my outline.
25    Q.    If you could turn to page 3 here, I

Page 169

1 wanted to point you to this sentence that says, "We
2 estimated that if eight thousand people took the
3 highest Valsartan does, 320 milligrams, from
4 NDMA-affected medicines daily for four years, the
5 amount of time we believe the affected products had
6 been on the U.S. market, there may be one additional
7 case of cancer over the lifetimes of these eight
8 thousand people beyond the average cancer rate among
9 Americans."
10          Do you see that?
11    A.    I do.
12    Q.    Do you disagree with that statement?
13    A.    I don't agree -- I haven't formed an
14 opinion one way or the other to agree or disagree.
15 This is what you and I spent a lot of time talking
16 about earlier today, where I said that there's an
17 issue -- there's two different issues to consider;
18 there is the issue of an increased risk and there's
19 the issue of whether or not you attempt to calculate,
20 and I have not done that, for individuals what that
21 increase risk will be.
22          There is risk, regardless of -- even
23 here, they are saying there is risk. There is an
24 additional cancer. So the question is then, how do
25 you handle that as a regulatory agency? They have

HIGHLY CONFIDENTIAL

Page 170

1 duties, I mean, go to that if you want, but I
2 won't -- I won't draw that all back in, but I talked
3 a good bit about the issue of the context of what the
4 regulatory bodies would do versus what a toxicologist
5 would do when we talk about increased risk.
6        (A pause in the proceedings.)
7    Q.    Let's move to Exhibit 4.  If you look at
8 the third paragraph, it says, "Our analysis of NDMA
9 found that the risk to patients based on the maximum
10 possible exposure appears to be small."
11       Do you disagree with that statement?
12   A.    I don't agree or disagree with it.  I
13 haven't formed an opinion one way or the other.  I
14 agree the statement is there, and what FDA has put
15 forward, but I'll -- it doesn't say that there is no
16 risk.
17   Q.    Understood.  Are you offering an opinion
18 as to whether or not the risk to patients from the
19 NDMA impurities in Valsartan was small?
20       MR. VAUGHN:  Object to form.
21   A.    I'm sorry, it's beyond the scope of what
22 I was asked to do.  But is something I believe other
23 experts are handling in terms of quantifying the
24 risk.  I believe there is a risk.  I believe there's
25 an increased risk compared to when the product is

Page 171

1 made without it, and that's what's really important.
2 The point is, it's not supposed to be there.  FDA
3 says that it's unacceptable, you need to take it out,
4 you need to make it -- you can make it, we know it
5 can be made without it, and that's what the
6 important -- the important finding is.
7        FDA only has to deal with these things
8 on, with an ongoing kind of a crisis in terms of drug
9 shortages and different things and so it's adapting
10 and learning and it's making statements over time.
11   Q.    All right.  I appreciate that speech,
12 but really I just want to know whether you think the
13 risk is small or --
14       MR. VAUGHN:  Oh, don't be argumentative
15 with her.  And -- you made the comment you made.
16       MS. MILLER:  Brett, do not interrupt --
17       MR. VAUGHN:  Jessica --
18       MS. MILLER:  -- no, Brett, you cannot
19 interrupt my questions, that's rude.
20       MR. VAUGHN:  Okay, don't interrupt her
21 either.
22       MS. MILLER:  I didn't interrupt her.
23   Q.    Dr. Plunkett, you have no opinion on
24 whether or not this risk is small?
25       MR. VAUGHN:  Object to form.

Page 172

1    A.    I have not quantified the risk.
2    Q.    Okay.
3    A.    As a result of that, as a result of
4 that, that's how I would make a judgement over small
5 or large.
6        However, I do believe that there is an
7 increased risk for any individual who would have
8 taken these drugs with NDMA and NDEA, based on the
9 fact that there is no level identified without risk.
10   Q.    And that opinion applies even if the
11 person only took one pill, correct?
12       MR. VAUGHN:  Objection.
13   A.    It could apply, yes.  It depends on the
14 person and the situation.  But certainly, the issue
15 is, I'm not doing case-specific individual exposure
16 assessment.  I'm talking about this in the context of
17 whether or not these products generally posed a
18 hazard to the persons who were taking it, and
19 whether or not there was something that could have
20 been done about it.
21       And certainly we know that the product
22 could be made without these impurities.
23   Q.    If we could turn to page 19 of your
24 report, Exhibit 1?
25   A.    Were you in paragraph 30?

Page 173

1    Q.    I am.  Do you see the language in bold
2 italics?
3    A.    Yes, that I highlight, which is the
4 quote, yes?
5    Q.    Can you read that sentence?
6    A.    "However, identification should be
7 attempted for those potential impurities that are
8 expected to be unusually potent, producing toxic or
9 pharmacologic effect at a level lower than .1
10 percent."
11   Q.    Do you know whether NDMA or NDEA
12 produces toxic or pharmacological effects at a level
13 lower than 0.1 percent?
14   A.    Yes, based on the cancer risk assessment
15 that you would do, where there is no safe level of
16 exposure.  So the issue would be, NDMA and NDEA would
17 be identified as carcinogens, as carcinogens and
18 genotoxins.  They are compound where you can't
19 identify a no-risk level.
20   Q.    And is -- are you saying that "can't
21 identify a no-risk level" is the same thing as
22 "expected to produce toxic or pharmacologic effects
23 at a level lower than 0.1 percent"?
24   A.    Yes, when you're talking about a
25 carcinogenic agent.  Because carcinogenic agents, you

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1 couldn't tend to regulate based like you do
2 non-cancer agents. Carcinogenic agents generally,
3 when, as FDA has said, they shouldn't be there, it's
4 unacceptable, it needs to come out, and that's the
5 issue.
6      Q.   Have you done the work necessary to
7 determine whether NDMA or NDEA can produce toxic or
8 pharmacological effects at a level lower than 0.1
9 percent?
10         MR. VAUGHN:  Object to form.
11     A.   Are you -- I don't quite understand what
12 your asking.  Are you asking me -- let me ask a
13 question.  Are you asking me, did I do a quantitative
14 risk assessment?  I've already told you I did not.
15 Others in -- other experts in the litigation are
16 doing that.
17         But regardless of whether it's at a
18 level lower than .1 percent, agents that are
19 genotoxicants, or carcinogens, are considered to pose
20 a hazard, increase the risk, have the ability to, in
21 some individuals, produce a toxic effect at a level
22 lower than that because you can't extrapolate to a
23 level that is "without risk."
24     Q.   Can you point me to a single piece of
25 literature that states that NDMA or NDEA can produce

Page 175

1 toxic or pharmacological effects at a level lower
2 than 0.1 percent?
3         MR. VAUGHN:  Objection, vague as to what
4 0.1 percent is referencing.
5         MS. MILLER:  It's in this quote.
6     A.   I would read this as .1 percent, which
7 would be a thousand parts per million.  So can I find
8 a study?  Possibly.  Have I looked for it?  No,
9 because when you talk about carcinogens, you don't
10 try to identify a threshold.  That's what I'm trying
11 to tell you.
12         Now, if you're going to talk about, is
13 there a toxic effect that might occur at a level,
14 only a level higher?  It's possible.  But the issue
15 is, the overriding concern in terms of the safety of
16 exposure to NDMA and NDEA, is the carcinogenic and
17 genotoxic potential, not other types of toxicity
18 which might occur at higher levels.  I point you to
19 the discussion of this in the NTP, ROC document that
20 I cite to, and also all of the studies that are gone
21 through as part of the IARC evaluation as well.
22     Q.   But you don't know whether any of those
23 studies actually found a toxic or pharmacological
24 effect at a level lower that 0.1 percent?
25         MR. VAUGHN:  Objection vague.

Page 176

1     A.   If you defined .1 percent in parts per
2 million, I'm sure you do.  But I can't point to it,
3 because I -- I'm telling you, if you want me to do
4 that, it's beyond the scope of what I did, trying to
5 do a dose/response, quantitative risk assessment for
6 things other than cancer, or even a specific dose or
7 specific exposure pattern that would lead to an
8 increased risk of one in a hundred thousand versus
9 one in ten thousand versus one in a million.  I have
10 not done that.  Others in the litigation are doing
11 it, and they would be able to provide you that answer
12 to that question.
13         But I'm telling you, I'm sure you can
14 find this information in -- in some of the recent
15 sources that I have cited, but it was beyond the
16 scope of what I did.
17     Q.   Do you know whether DMF reached a
18 boiling point during the manufacture of Valsartan?
19         MR. VAUGHN:  Objection, foundation.
20     A.   That was beyond any scope.  I don't
21 recall, but that may be able to be found in the
22 chemist's report.  I just don't recall.
23     Q.   Do you know whether DMF has ever been
24 described to decompose in the circumstances in which
25 it decomposed in Valsartan?

Page 177

1         MR. VAUGHN:  Objection, vague,
2 foundation.
3         MS. MILLER:  I can ask the question
4 differently if you don't understand it.
5     A.   Well, I'm not the chemist so the
6 question you're asking I think is beyond the scope of
7 the opinions that I have formed.  But I would -- I
8 would -- maybe we should be careful to make sure that
9 when you're saying DMF, you mean the chemical, not
10 the drug master file.  For the purposes of the court
11 reporter, there's that abbreviation is used two
12 different ways.
13     Q.   I don't think any Drug Master File is
14 decomposed here, so I think we are all understanding
15 what we're talking about.
16         You say it's beyond the scope of your
17 opinions, but you do offer the opinion that it has
18 been known, right?
19         MR. VAUGHN:  Objection, norm.
20     Q.   If you offer the opinion that it has
21 been known that DMF can decompose in certain
22 circumstances, right, is that one of your opinions?
23     A.   It's -- it's my -- it's my opinion that
24 it was known before this product was -- you had this
25 issue with this product, but if they had done a

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1 chemical risk assessment, they would have been able
2 to understand the potential for formation of
3 genotoxic impurities like the nitrosamines. I,
4 however, did not attempt to do an analysis or root
5 cause analysis or even a full chemical analysis of
6 their processes.
7          Again, that was what the chemist has
8 done in this case. That was beyond my scope.
9     Q.   Since you do offer an opinion that it
10 was known that DMF could decompose in certain
11 circumstances, can you tell me what those
12 circumstances are?
13    A.   That was beyond the scope of what I did.
14 I'm pointing to the literature. I think you're
15 taking that from the literature when I talk about the
16 literature section, I believe. And those papers
17 would speak for themselves, I believe. And I'm
18 citing to the issue of, there was evidence to
19 show that before 2012, there was chemical information
20 that the company, ZHP, could have identified if they
21 had done a literature search and attempted to look,
22 if they didn't understand that process, could have
23 gone to the literature to figure out if there was
24 something about their intermediates or -- or process
25 ingredients that would pose a risk of genotoxic

Page 179

1 impurities.
2     Q.   For that opinion you cite an Australian
3 textbook which you found in prior depositions in this
4 litigation, correct?
5     A.   It was something that was cited and
6 testified to in deposition testimony in the
7 litigation, that is correct.
8     Q.   Have you ever seen that Australian
9 textbook before this litigation?
10    A.   You already asked me that and I said I
11 had not, I said I had not seen that textbook, it's
12 not one that I have in my library.
13    Q.   You testified earlier today that ZHP did
14 not pursue complaints about potential peaks, is that
15 correct?
16    A.   I don't think that's exactly what I
17 said. I think I said, I think what I said is
18 consistent with what's in my report, where I talked
19 about the fact that they had, were on notice or had
20 reports of impurities that they apparently did not
21 resolve, in other words, if you look at the
22 testimony. So am I going to find that in my report
23 for you?
24    Q.   Where did you use that language, "Did
25 not pursue," is that still your opinion this

Page 180

1 afternoon?
2     A.   If you define "did not pursue" in terms
3 of "did not resolve," that is true. I had no
4 evidence in this case to show that they attempted to
5 identify what those impurities were.
6     Q.   Let's turn to --
7          MS. MILLER: -- Alex, what exhibit are
8 we up to? I think six or seven.
9     Q.   Okay, let's go to tab 43 and mark it as
10 Exhibit 6.
11 EXH        (Plunkett Exhibit 6, e-mail chain Bates
12 numbered ZHP00492652 through 92659, marked for
13 identification, as of this date.)
14    Q.   Dr. Plunkett, this is an e-mail train
15 from September 2017. Have you seen it before?
16          MR. VAUGHN: Would you let me know what
17 this is --
18          MS. MILLER: I'm just asking if she's
19 seen it before, then I'll let her read it, obviously.
20          (A pause in the proceedings.)
21    A.   I need to see the -- further into the
22 e-mail, you know, because -- is it up where I can
23 take a look real quick, tell you if I've seen it?
24          MS. MILLER: Why don't we follow that
25 procedure of going off the record --

Page 181

1     A.   I don't necessarily need to read it
2 carefully. I just need to look at the whole document
3 to tell you whether I --
4     Q.   I'm going to ask you some questions
5 about it. I thought I could --
6          MR. VAUGHN: Can you guys just put it
7 into the share file the procedure is so she can
8 look to see if she's seen it --
9          MS. MILLER: We did. We did, Brett.
10          MR. VAUGHN: I just asked if you guys
11 would tell me when you have. I'm refreshing it and I
12 don't -- okay.
13          THE WITNESS: I didn't see --
14          MR. VAUGHN: It just went in.
15          MS. MILLER: Alex is doing it as quickly
16 as he can.
17          MR. VAUGHN: Sorry, Alex.
18    A.   I need to be able to look at it so I
19 need you to stop share, I don't know how to get to it
20 otherwise.
21    Q.   Okay.
22          MS. MILLER: We're going to go off the
23 record because it's eight pages for you to read it,
24 and then just let me know when you're done.
25          VIDEOGRAPHER: Going off the record.

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1 The time is 3:13 p.m.
2     (Discussion off the record.)
3     (A pause in the proceedings.)
4     VIDEOGRAPHER:  We're back on the record.
5 The time is 3:17 p.m.
6     Q.    Dr. Plunkett, now that you've read this
7 e-mail chain, have you seen it before?
8     A.    I didn't recall this one, but within a
9 time period where I had seen some, and I went back
10 and compared it with my reliance material list,
11 unless it has a different Bates number than you have
12 on the bottom, I don't know if I've seen this.
13          Now if it was an exhibit to a depo I've
14 read, then I just may not remember it.
15     Q.    This is an e-mail exchange between ZHP
16 and Aurobindo, correct?
17     A.    Yes.  That's correct -- well, yes,
18 that's correct.
19     Q.    Is it correct that Aurobindo is raising
20 questions about unknown peaks?
21     A.    Can you just show me where it is you're
22 referring to?  I assume it's in the later pages of
23 the document.
24          (A pause in the proceedings.)
25     Q.    If you look at page 2656, paragraph 2.

Page 183

1     A.    And as it relates to the residual
2 solvents they are asking some questions, yes.
3     Q.    Based on this e-mail chain, does it
4 appear that ZHP pursued these unknown peaks to
5 determine what they are?
6     A.    I -- I don't recall whether -- the
7 testimony around this to know whether that is true
8 for all the peaks, but certainly, there is a
9 discussion in this part of the e-mail that they were
10 answering some questions, that is true.
11     Q.    In fact, if you look at page 2654, each
12 of the peaks is listed, right?  And then it says,
13 "HH." Right?
14     A.    Again, I don't recall this document so
15 if you want me to confirm that it is a complete
16 discussion or -- I would need to see accompanying
17 information with it.  I don't recall this document,
18 so --
19     Q.    I understand.  But I'm asking you
20 reading it now, do you see the "HH:"?
21     A.    I don't see "HH."  Where are you
22 referring to?  Okay.
23     Q.    So ZHP is saying here, "We did a study
24 and we identified unknown peaks and here is the
25 explanations," is that correct?

Page 184

1     MR. VAUGHN:  Objection, that is not what
2 it says, it says "identified some unknown peaks."
3     A.    So they didn't identify everything.  And
4 in fact, they mention -- I was going to say they
5 mention that the peak at 13 they say they didn't see,
6 but I -- I don't disagree with you, this is an e-mail
7 discussing some questions from Aurobindo.
8     Q.    Does this e-mail suggest that ZHP did
9 pursue unknown peaks?
10     MR. VAUGHN:  Objection, form.
11     A.    Well, there is other testimony that
12 indicates they did not always pursue unknown peak
13 questions from their -- their customers, or the
14 people they were supplying to.
15     Q.    In this instance, did ZHP pursue these
16 unknown peaks?
17     MR. VAUGHN:  Object to form.
18     A.    I can't tell you the complete level of
19 what their pursuit was, but I don't disagree with you
20 that they are describing some results for some peaks
21 in a question that was raised by Aurobindo in that
22 case, that is correct.
23     Q.    I mean, if you look at the next page,
24 2653, because with e-mail chains, you go up, not
25 down, they say, "Regarding R214.5, we need little

Page 185

1 more time to do further tests."  Correct?
2     A.    You have read that correctly, yes.  By
3 "MS," yes, that's the --
4     Q.    And it suggests that ZHP was doing
5 testing to understand these unknown peaks, correct?
6     MR. VAUGHN:  Objection, form,
7 foundation.
8     A.    Again, not having seen the context
9 around this, I can only tell you what the e-mail says
10 and I would agree with you this particular e-mail is
11 showing that at this particular point in time from
12 Aurobindo, they were investigating some unknown
13 peaks.
14     Q.    In preparing --
15     A.    And use the residual solvent methods.
16     Q.    -- in preparing your report, did you ask
17 to see all occasions in which ZHP followed up to
18 pursue claims of unknown peaks?
19     MR. VAUGHN:  Object to form.
20     A.    I don't think I did, no.
21     Q.    Why not?
22     A.    I thought that was beyond the scope of
23 what I was doing in terms of an analysis -- I wasn't
24 doing a GMP compliance analysis, in the way other
25 experts were doing.  So it was my understanding that

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1 other experts were following up on many of these
2 interactions with other companies.
3     Q.    But you're offering an opinion that ZHP
4 did in the pursue claims of unknown peaks, correct?
5     A.    There certainly is evidence that they
6 did not always pursue, that is correct, based on
7 other documents that I have seen.
8     Q.    Is this document relevant to your
9 opinions?
10     A.    Well, it would provide an evidence that
11 in this particular case, for this particular
12 question, they were following up, but they weren't
13 following up based upon some of the other information
14 that I have seen.
15     Q.    And what is that other information?
16         (A pause in the proceedings.)
17     A.    So it's the deposition testimony of
18 Dr. Li that I discuss in paragraph 48.
19     Q.    Paragraph?
20     A.    Forty-eight. In my report.
21     Q.    Okay.
22     A.    So I'd have to pull this out.
23     Q.    Okay.
24     A.    What I'm citing to you what I would be
25 relying upon for that opinion, or that statement

Page 187

1 actually.
2     Q.    So that statement just relies on
3 Dr. Li's testimony, correct?
4     A.    Well, the documents that accompany it,
5 too, yes.
6     Q.    Are there documents accompanying those
7 pages of testimony? It's only one page, right?
8     A.    261 to 265, page 268, it's the
9 discussion that's going on through here. So I'd have
10 to go pull it back out, but...
11     Q.    Okay. And let's turn to tab 46, which
12 would be Exhibit 7. Okay, we're going to mark
13 Exhibit 7.
14         MS. MILLER: Don't worry, Brett, you're
15 going to get it.
16         MS. VAUGHN: Thank you, Jessica.
17         MS. MILLER: Forty-six.
18 EXH        (Plunkett Exhibit 7, e-mail chain Bates
19 numbered ZHP02118712 through 8731, marked for
20 identification, as of this date.)
21     Q.    Dr. Plunkett, do you know if you've seen
22 this e-mail chain before?
23     A.    I'd need to compare it with the Bates
24 number, can you put that up for me?
25     Q.    Okay. So this is another long one, so

Page 188

1 why don't we go off the record for you to read it
2 because I will have some questions about it.
3         VIDEOGRAPHER: All right, going off the
4 record. The time is 3:26 p.m.
5         (Recess taken.)
6         VIDEOGRAPHER: Stand by, just a few
7 moments. We are back on the record. The time is
8 3:31 p.m.
9 EXAMINATION (Cont'd.)
10 BY MS. MILLER:
11     Q.    Dr. Plunkett, having had some time to
12 take a look at this, do you recall whether you read
13 it before?
14     A.    It is on my reliance list. I don't
15 recall reading it. And a lot of what's covered in
16 here, a lot of it would have been something that I
17 felt would be beyond the scope of what I was doing
18 but were more relevant to the GMP expert and the
19 potentially the chemists, because it deals with the
20 issue of validation. But it does talk about unknown
21 peaks in the very top e-mail. It indicates that the
22 customer is asking some questions about things that
23 haven't been resolved yet.
24     Q.    What's going on?
25     A.    The customer, based on what I'm saying

Page 189

1 about again, this is not a document I cited to in my
2 report, so I'd have is to go back and look at the
3 deposition testimony around this as well.
4     Q.    In this document, is Glenmark asking ZHP
5 to identify certain unknown peaks?
6     A.    It's -- Glenmark is -- in the top
7 e-mail, it's a series of e-mails about impurities and
8 peaks and then at the top e-mail, Francis Dsouza from
9 Glenmark is asking whether or not -- these are some
10 things that haven't been resolved, so they are sore
11 points.
12     Q.    Um-hum. And if you look --
13     A.    That's all I can tell you because I
14 don't recall this document's discussion in any of
15 the -- in the depositions, I'd have to go back and
16 look.
17     Q.    If you look to page ZHP02118713, which
18 is the second page of the document, it's an e-mail
19 from ZHP in which he says, "Dear Francis, we
20 investigating the same on our side," correct?
21     A.    Yes, you've read that correctly. But
22 this is, you -- that's all I can tell you. Because I
23 haven't -- I'd have to go look at the deposition
24 testimony for the context for this one.
25     Q.    Based on this document, does it appear

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

1 that ZHP was following up on this issue?
2    A.    Well, they hadn't totally followed up by
3 the last e-mail in the chain, but they certainly were
4 doing some work, that is true.
5    Q.    And what's the date of this e-mail
6 chain?
7    A.    I think it's 2016, December.  I don't
8 know when the first one starts, whether it was in
9 November, but it certainly is December.
10    Q.    All right.  And now let's look at tab
11 48, which we're going to mark as Exhibit 8.
12 EXH        (Plunkett Exhibit 8, e-mail chain Bates
13 numbered ZHP02118681 through 8711, marked for
14 identification, as of this date.)
15    Q.    And this is dated April 2017, correct?
16    A.    I don't know, I don't have it yet.
17    Q.    Tab 48 is an e-mail chain, and the top
18 e-mail is dated April 20137, correct?
19    A.    I'm waiting for you to upload it so you
20 can look at it.
21    Q.    Can you see on the computer screen that
22 it's dated April 2017?
23    A.    Yes, April 20th, the first page I see
24 that.
25    Q.    And the -- and at the top of the page,

Page 191

1 in terms of the "re" line, it says, "Valsartan from
2 Huahai -- Impurities and Unknown Peaks," correct?
3    A.    That's the title, yes.
4    Q.    And it's the same title as the last
5 e-mail chain we were looking at, correct?
6    A.    I don't remember, but I think it --
7 well, it looks like it's involving Glenmark, so my
8 guess is it's somewhat related.  I don't know for
9 sure, I'd have to compare them.
10    Q.    And do you recall whether you reviewed
11 this e-mail chain and its attachment in preparing
12 your report?
13    A.    I don't recall it, but I can look and
14 see where it's listed, so if you want me to look in
15 my appendix C.
16    Q.    I did not find it there, for what it's
17 worth.
18    A.    So if it's not in appendix C, then it's
19 not what that I recall, no.
20    Q.    Would you like to read it before you
21 answer questions about it?
22    A.    Surely, absolutely, because I don't --
23 the question -- this one is 29 pages long.
24        MS. MILLER:  Lets go off the record
25 again.  I'm so sorry, court reporter, for all the

Page 192

1 on-and-off.
2        VIDEOGRAPHER:  Going off the record.
3 The time is 3:35 p.m.
4        (Recess taken.)
5        VIDEOGRAPHER:  We are back on the
6 record.  The time is 3:39 p.m.
7 EXAMINATION (Cont'd.)
8 BY MS. MILLER:
9    Q.    Just is to reorient us, we're looking at
10 Exhibit 8.  Exhibit 8 is an e-mail chain between
11 Glenmark and Huahai.  Are you familiar with what
12 Glenmark is, Dr. Plunkett, is that company familiar?
13    A.    You asked me that, and it looks like
14 they are a pharmaceutical company.  But I don't know
15 what their relationship is with ZHP other than they
16 are asking questions about materials used, they are
17 actually talking about raw materials used in the
18 manufacture of Valsartan.
19    Q.    But this is a follow-up on the e-mail
20 chain we looked at earlier regarding unknown peaks,
21 correct?
22    A.    Yes, but this one actually gives more
23 context which is a little helpful.  So, you know, the
24 first ten pages or whatever were the same, if you go
25 to the very first page of this exhibit, and the

Page 193

1 second page of the exhibit, and down to page 685, you
2 get, the last three numbers, you get a little bit of
3 context of what was going on.
4    Q.    There is an attachment to this document,
5 in which ZHP has set forth the identification of each
6 impurity, correct?
7        MR. VAUGHN:  Objection, form.
8    A.    I don't know what you're talking about.
9 They indicated that there were certain things they
10 have not resolved.  This is raw material issues
11 carryover.
12    Q.    If you look at the last three pages of
13 the document, there is an attachment to the document
14 that's a table and for each impurity, there is a
15 column that says, "Origin of impurity," correct?
16    A.    I can't see it on the screen.  If you
17 would go to the last three pages, I can maybe answer
18 your questions.
19        MS. MILLER:  709.
20        (A pause in the proceedings.)
21    Q.    Well, you can't look at it in your
22 shared file?
23    A.    If you stop sharing screen so I can have
24 access to my screen.
25    Q.    One second.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1    A.    So you want me to look at my screen?

2    Q.    Hold on, Alex is dealing with the

3 technological problem.

4        (A pause in the proceedings.)

5        MS. MILLER:  Alex is having a technical

6 difficulty, we're going to go off the record for two

7 minutes.

8        MR. VAUGHN:  It's just two minutes,

9 let's just -- are we really --

10        MS. MILLER:  What if it turns into four

11 and my time is waiting, so yes, please.

12        VIDEOGRAPHER:  Mr. Vaughn, you're

13 agreeing?

14        MR. VAUGHN:  That's fine.

15        VIDEOGRAPHER:  Okay, going off the

16 record, the time is 3:42 p.m.

17        (Recess taken.)

18        VIDEOGRAPHER:  We're back on the record.

19 The time is 3:57 p.m. Eastern Time.  This is the

20 beginning of media unit 5.

21 EXAMINATION (Cont'd.)

22 BY MS. MILLER:

23    Q.    Great.  Dr. Plunkett, sorry about the

24 technical difficulties, that seems to be the theme of

25 the day.  We have now fixed Exhibit 8, so we are

Page 195

1 reintroducing Exhibit 8 which is an e-mail chain that

2 says at the top, "Re, re, Valsartan from Huahai,

3 Impurities and Unknown Peaks."

4        The last-in-time e-mail, which is on the

5 first page, is April 20, 2017, and there is an

6 attachment to the e-mail which is the last two pages

7 right here.  Those highlights are not -- we did not

8 make those highlights, that's how we received the

9 document.  Just to be clear.

10        And before we went off the record, I was

11 asking you whether the attachment to the document

12 includes an explanation for each of the impurities

13 identified by Glenmark.

14    A.    Did I see the second -- if there's two

15 pages, may I see the second page?

16    Q.    Of course.

17        (A pause in the proceedings.)

18    A.    I can't confirm about looking back at

19 the rest of the e-mail whether there were only ten

20 peaks in question, but I would agree that for at

21 least ten of these, they are giving information.

22    Q.    And there's a third page, I apologize.

23    A.    So, okay.

24    Q.    And that goes to twelve peaks.

25    A.    So same answer, that I would say twelve;

Page 196

1 in other words, I would need to confirm that there

2 were only twelve peaks being raised but I agree with

3 you that there is a table that is talking about

4 twelve peaks.

5    Q.    So you would agree that in this

6 instance, ZHP pursued the origin of twelve peaks

7 identified by a customer, is that fair to say?

8        MR. VAUGHN:  Object to form.

9    A.    Go back up, please, to the next page.

10 Next page, please.  I'm trying to read what the

11 origin says.

12    Q.    Um-hum.

13    A.    So state your question again, please,

14 I'm sorry, I don't mean to be rude, please.

15    Q.    Based on this e-mail chain, did ZHP

16 follow up in an attempt to determine the origins of

17 the impurities identified by Glenmark?

18    A.    In reading the entire, not just this --

19 reading the entire e-mail, which isn't just this

20 table, it's clear that there were questions being

21 raised by Glenmark about -- about the Valsartan

22 product materials.  They did do some investigation.

23 It's not clear to me, however, that they answered all

24 questions at all times.  But certainly, in here, they

25 are answering some questions.

Page 197

1        However, this entire thing that we see

2 here, if you go to page ending in 685 on this e-mail

3 string, it's interesting that ZHP is admitting that

4 they didn't always follow the same types of

5 procedures because FDA wasn't so picky.  I thought

6 that was practically interesting.  In other words,

7 it's clear that not necessarily over the years has

8 ZHP always done the same thing.

9    Q.    Now, in your expert report, I believe

10 you said you cite the Li deposition on pages 261 to

11 267 for your opinion that ZHP did not follow up on

12 unknown peaks, correct?

13    A.    I say that ZHP had received complaints

14 from customers beginning in 2014 of unknown peaks

15 identified through chromatography that ZHP failed to

16 investigate, yes, that's what it says.

17    Q.    And your basis for "ZHP failed to

18 investigate" is the testimony of Li?

19    A.    Yes, there was a company, a corporate

20 witness brought in to answer questions about their

21 procedures and process.

22    Q.    Okay.

23        MS. MILLER:  So let's introduce as

24 Exhibit 9, Min Li's deposition.

25 EXH        (Plunkett Exhibit 9, transcript of

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

1 deposition of Min Li, Ph.D., marked for
2 identification, as of this date.)
3      Q.    Do you have a hard copy of that with you
4 today or not?
5      A.    No, I didn't, it's too much to print
6 out, so saving some trees.
7      Q.    I think you said you were looking at
8 pages 261 to 267, correct?
9      A.    Lets see.
10          MR. VAUGHN:  Objection, misstates the
11 record --
12     A.    When I read to 261 to 265, and then 268
13 as well.
14     Q.    Okay, great.  Can you show me where Min
15 Li says, "We didn't follow up on complaints about
16 unknown peaks"?
17     A.    So it would -- could you -- well, I'm
18 going to need to scroll through, so do you want to
19 put this up so I can really quickly look?  It won't
20 take but a minute, or is this an exhibit that you're
21 marking or not?
22     Q.    We already marked it.
23     A.    So let me go, if you let me out, it
24 would take but a minute.  I don't think I need to
25 stop the clock.

1      Q.    If it's just a minute, that's fine.  I
2 only try to stop the clock when it's more than five
3 to ten.
4          (A pause in the proceedings.)
5      A.    So starting on page 261, you have
6 that -- you had it up at line 17, where he's, that's
7 where the initial question comes.  So then you have
8 to scroll through.  And he says, "Yeah, for some, you
9 now, during the later stage of the investigation, you
10 know, yeah," and he talks about Novartis, Sun Pharma
11 at the time, keep going --
12     Q.    I'm just asking where does he say that
13 they didn't pursue or follow up on the complaints?
14     A.    I think that's the answer to the
15 question, it starts on page 261.
16     Q.    What are the words, can you just show me
17 the words where he says, "We didn't follow up"?
18     A.    He's asked that question, and he
19 responds, "Yes."  So when the question is being
20 asked -- go to the question.  "You're aware that
21 starting in 2014, complaints came in on a regular
22 basis asking for answers, you do know that there were
23 multiple complaints and requests for information."
24 So that's the acknowledged to, yes, he's aware that
25 were complaints in 2014.

1      Q.    That's not my question.
2      A.    No, but I need to go further, okay?  So
3 that's the first part of the statement.  All right.
4 So now I need to -- let me go back and look for the
5 second part.  I'll need to be able to get back to the
6 document again, please.  Thank you.
7          (A pause in the proceedings.)
8      A.    Unfortunately, you have to read through
9 all of these pages, he's answering questions about --
10 and he qualifies them at different times where some
11 of those questions were treated like technicals, some
12 of them, they couldn't figure out, they didn't know
13 what they were, they didn't identify them.
14          So this is the basis, the testimony that
15 I'm pointing to is throughout this entire exchange
16 and unfortunately, because it is English as a second
17 language, sometimes it's a little stilted to read.
18     Q.    If we could turn to page 266, lines 16
19 through 20, can you read that to me?
20     A.    I think -- you're starting with "I
21 think"?
22     Q.    Um-hum.
23     A.    "I think, you know, in the end, you
24 know, we -- for all the concerned peaks, you know, I
25 think, you know, we were able to find the identity or

1 the potential sources."
2      Q.    Do you quote that in your report?
3      A.    These four lines, no.  But again, if you
4 read his deposition, and the -- and the questions
5 that were coming in, it's clear that he's talking
6 about -- about not having followed up on everything,
7 but he is saying that they did identify potential
8 sources, which would be, I'm not saying that they
9 didn't ever identify potential sources, I just know
10 that they didn't follow up and they never went
11 through the process to determine whether or not their
12 process was producing something that they should be
13 looking for.
14     Q.    He says, "For all of the concerned peaks
15 we were able to find the identity."  Correct?
16     A.    Well, "Concerned peaks," yes, but that
17 doesn't mean every peak.
18     Q.    All the ones that people expressed
19 concerns about, right?
20     A.    Again, I don't know what to tell you but
21 when I read this section, to me this section is
22 telling me that they were acknowledging that they had
23 received complaints of unknown peaks; and it's my
24 opinion, based upon all the documents I reviewed,
25 that they indeed failed to investigate all of those.

HIGHLY CONFIDENTIAL

Page 202

1    Q.    Is there a single sentence here in which
2 Min Li says, "We did not follow up or pursue claims
3 of unknown peaks"?
4    A.    On these pages we're looking at, I don't
5 see that language.  That is your quoting it.
6    Q.    But those are the pages that you cite
7 for the opinion that ZHP did not follow up on unknown
8 peaks, correct?
9    A.    Yes, that's correct.
10    Q.    And sitting here today, you can't
11 actually find that language, correct?
12    A.    The language as a quote, no.  But again,
13 if you read his deposition, and look at his
14 discussion here of what they are or aren't doing, he
15 talks about not necessarily having it; but go back up
16 further, in the -- in the -- he says, "I don't
17 know" -- okay.  Unknown peaks, he says, "That's a
18 correct statement," right?  He says, "Okay, as I
19 indicated, no, it was not informed, you know
20 initially, and some of this conversation, you know, I
21 said I was being consulted or I was trying to help
22 them and find out the identity."
23    Q.    Does that say ZHP did not follow up?
24    A.    I'm saying to you that it's my opinion,
25 based on this testimony plus other documents in the

Page 203

1 case that they did not follow up on all of the
2 unknown peaks, that's --
3    Q.    Well --
4    A.    For no other reason, you know, you have
5 the Novartis issue and Novartis raised questions
6 where Novartis had to do work to identify the peak.
7 Instead what the company did is, said, "It's not a
8 problem," and Novartis found the peak.
9    Q.    When you say "plus other documents in
10 the case," are there other documents in which ZHP has
11 testified, an ZHP witness has testified that ZHP did
12 not follow up on unknown peaks?
13    A.    Let me look.
14    Q.    I only cite --
15    A.    I know, but let me look at other -- at
16 some of the other things that I cite to.
17    So the -- I'll point you to the second
18 half of paragraph 48 for sure, where that was what I
19 was just talking about, was the idea of the -- that's
20 the discussion of the NDMA from Novartis, that
21 Novartis identified, and if you read the documents
22 around that time period, when Novartis was asking
23 questions, it's clear that they were not getting a
24 response from -- ZHP was not responding, and -- and
25 Novartis was the one who was being forced to

Page 204

1 determine what that that peak was.
2    Q.    But that's not what we're talking about,
3 right?  We're talking about that ZHP received
4 complaints from customers beginning in 2014 of
5 unknown peaks identified through chromatography, that
6 ZHP failed to investigate.  And what you cite for
7 that is Dr. Li's deposition, correct?
8    MR. VAUGHN:  Object to the colloquy.
9    A.    I cite to his deposition and then if you
10 go on and read through the paragraph --
11    Q.    I'm just --
12    MR. VAUGHN:  Do not interrupt my expert.
13 This is twice.  Want to ask your question again?
14    A.    No, if she'll let me finish, I'll go
15 ahead.  And what I was going to say is, further in
16 this -- this wasn't Dr. Li's written but further in
17 this paragraph, I am discussing the evidence in the
18 case which is discussed in Dr. Li's deposition, about
19 the NDMA with Valsartan, and the documents that in
20 that -- that surround that, and I'd have to pull this
21 Prinston document out.
22    But there's other documents that have
23 the back-and-forth and it's clear that Novartis is
24 the one that was having to push the company and then
25 it gives up and goes and does the identity, and then

Page 205

1 lets the company know that it had identified NDMA,
2 and "the company" being ZHP.  So Novartis was doing
3 an investigation, a full investigation to find the
4 peak and not giving up even if it had to do
5 additional types of testing to determine what it was.
6    Q.    When you say ZHP failed to investigate,
7 you cite on pages 261 to 265 of Dr. Li's deposition
8 in that sentence, correct?
9    A.    At the end of that sentence, that's what
10 I cite, that's right.
11    Q.    And you do not cite page 266,
12 where Dr. Li says, "I think you know in the end, you
13 know, for all the concerned peaks, you know, I think
14 you know we were able to find the identity of the
15 potential sources."  You didn't cite that, right?
16    MR. VAUGHN:  This is getting quite
17 argumentative, especially with your tone.
18    A.    I did not cite specifically the last
19 page, that is correct.  But again, if you read the
20 rest of my paragraph in this section of my report, I
21 am referring to the entirety of the evidence in this
22 case, which includes what went on with the questions
23 raised by Novartis, as well, which is also one of its
24 customers.
25    Q.    You testified earlier about a 2017

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1 e-mail from Jinsheng Lin, correct?
2     A.    I said I have one discussed in my
3 report, yes.  Is that what you're referring to?
4     Q.    You testified about it earlier and you
5 said there was a 2017 e-mail.
6     A.    Yes, that's in paragraph 47.
7     Q.    Do you know whether that e-mail is
8 written in English or Chinese?
9     A.    There's an English translation that was
10 provided as part of the deposition testimony which is
11 where I -- it's -- that's the version of the document
12 that I reviewed and relied upon.  They had a Chinese
13 version and then they had a translated version.
14     Q.    Are you aware that there are multiple
15 translations of that document?
16     A.    I am aware of the version that was used
17 as part of the deposition, which typically in my
18 experience is a version that I can rely on as being
19 an accurate reflection of what the e-mail says.
20     Q.    Did you read on the report of ZHP's
21 chemist expert, Fengtian Xue?
22     A.    Is this the report of this individual?
23     Q.    Um-hum.
24     A.    Yes, I have read that.
25     Q.    You read Dr. Xue's fluent in Chinese?

Page 207

1     A.    I don't know him.  I know he states that
2 he is, that's correct.
3     Q.    Are you aware that he lived in China for
4 the first 25 years of his life?
5     A.    I don't know.  I don't recall what his
6 CV showed, but my answer to this line of questioning
7 would be, in the deposition, when the document is
8 used with the employees of ZHP, nowhere does anyone
9 correct the translation around that document, that's
10 all I can say.  I rely on the translations as part of
11 the exhibits to depositions all the time.
12     Q.    How did Dr. Xue translate the e-mail?
13     A.    I don't recall, I'd have to pull his
14 report back out.  They certainly didn't retranslate
15 all of these sections that I have looked at, I don't
16 believe.
17     Q.    Do you recall an e-mail in which
18 Novartis commented that ZHP support throughout the
19 process of identifying NDMA had been exceptional?
20     A.    Would you show me what you're referring
21 to?  I don't recall that.  If you'll show me the
22 e-mail, I'll let you know if I've seen it.
23     Q.    Do you recall whether you cited in your
24 report an e-mail in which Novartis stated to ZHP that
25 its support had been exceptional during the process

Page 208

1 of identifying the --
2     A.    I don't cite to it, I don't think.  It
3 may be in my reliance material.  If you could tell me
4 whether it is or not, or show it to me and I'll
5 confirm if it's there or not.
6     Q.    I'm just asking --
7     A.    I already answered, I said I don't
8 recall.  It's possible it's one that I just don't
9 recall.
10     Q.    Are you offering any opinions about
11 ZHP's handling of the recall?
12     A.    No, that was beyond the scope of what I
13 did.  However -- however, I do have opinions in my
14 report where I talk about the issues that led up to
15 the recall, which is having to do with the fact that
16 in is something that shouldn't have -- shouldn't have
17 occurred if ZHP had done its work to start with.
18     Q.    Are you offering any opinions about any
19 of ZHP's conduct from the time of the recall forward?
20     A.    I don't believe in my report I'm
21 addressing that, no.  Although I would say that the
22 one thing I do address after that time period has to
23 do with the 2019 letter from FDA where they actually
24 are letting ZHP know that indeed, their product was
25 adulterated.

Page 209

1     Q.    Are you offering any opinions of ZHP's
2 responses or conduct in the face of the FDA's warning
3 letter?
4         MR. VAUGHN:  Object to form.
5     A.    So that was beyond the scope, I believe,
6 of what I did; so, no.  I don't think you'll find
7 that in my report.
8     Q.    Are you offering an opinion as to
9 whether ZHP's corrective actions were adequate?
10         MR. VAUGHN:  Object to form.
11     A.    So be more specific what you mean by
12 "corrective action."
13     Q.    The corrective action ZHP took in
14 response to the 2018 warning letter.
15     A.    So to answer that fully, I'd have to
16 pull out whatever letter it is that you're saying
17 that they did.
18     Q.    I'm asking you if you're offering an
19 opinion in this litigation about ZHP's corrective
20 actions in response to the November 20189 warning
21 letter.
22     A.    In order to answer that fully, I need to
23 see the letter you're referring to in order to see
24 whether or not anything in that letter is directly
25 addressed by the opinions I have expressed, that's

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

1 all I'm saying to you. I don't recall citing to that
2 letter but some of things that I discuss may indeed
3 be relevant to what is in that letter.
4        Q. Well, I'm just asking if you have any
5 opinions in this litigation regarding the corrective
6 actions that ZHP took after November 2018 in response
7 to the FDA warning letter that we've discussed
8 earlier today?
9        MR. VAUGHN: Objection, asked and
10 answered.
11       A. Again, in order to answer that question
12 fully, I need to see the letter, which I don't
13 recall, and whether or not any of the opinions in the
14 paragraphs are expressed where I talk about the
15 responsibility of the company and those kinds of
16 things and what they were required to do, whether
17 there was any -- anything there that would answer
18 your question. And I can't do that without looking
19 at the letter. So if you put up an exhibit, I can
20 take a quick look.
21       Q. Did you just say you don't recall the
22 November 18 warning letter?
23       A. I don't recall what response. You asked
24 me about the corrective actions in response but I
25 don't recall that. I'd have to pull that up.

Page 211

1        Q. If a company engages in CGMP violations,
2 does that mean that its products are adulterated?
3        A. The definition that is provided within
4 the regulations, CGMP violations lead to adulterated
5 products, yes.
6        Q. Does it matter --
7        A. There's different types of standards for
8 what is adulterated; but certainly, that could be,
9 yes.
10       Q. Do all CGMP violations result in a
11 product being adulterated?
12       A. I just said to you it depends. Again,
13 it's consistent with the definitions. In fact, the
14 letters that are -- have been issued in this case,
15 that talk about adulteration or being adulterated,
16 are linked to CGMP violations, but certainly there
17 are different types of CGMP violations that may or
18 may not result in a finding of -- issuing of a
19 warning letter that deems a product adulterated.
20       So it depends, that's what I'm saying to
21 you. It just depends. I'd have to look at each
22 situation. In this case, yes, the CGMP violations
23 are what is cited by FDA, as a basis for its finding
24 of adulteration and it points specifically to the
25 presence of the NDMA and NDEA impurities in the

Page 212

1 product.
2        Q. Which types of CGMP violations do you
3 believe lead to adulteration?
4        A. Things that have to do with the purity,
5 identity, strength of the the product, violations
6 that lead to -- when I say "identity," they are
7 adulterated products that may end up having something
8 in them that isn't supposed to be there, not an
9 impurity, but an active ingredient that carry a --
10 another active ingredient along, like having Fentanyl
11 in a morphine tablet would be an adulterated product
12 because of the issue of the potency and the danger
13 that's posed there.
14       Certain kinds of GMP violations,
15 however, such as recordkeeping violations, or minor
16 ones, may not lead to a warning letter and a finding
17 of adulteration. It may -- instead, they may be
18 written up in a 483, without a warning letter. So a
19 483 would be issued, and it may or may not be
20 accompanied by a warning letter that would deem the
21 products adulterated because of GMPs.
22       Q. Is it your opinion that any time a
23 generic drug has an impurity that the manufacturer
24 did not identify through its risk assessment, that
25 there was a CGMP violation?

Page 213

1        A. I think that depends on the situation.
2 What type of impurity it was, is it a potent toxicant
3 or a genotoxicant, it's -- let's say, that's a
4 case-by-case question that you would need to answer
5 based on the situation in hand.
6        In this situation, indeed, that was an
7 issue.
8        Q. And when you say these are case-by-case
9 situations, is there some sort of FDA document that
10 sets out what the standards are and what the criteria
11 are for -- in other words, are your opinions based on
12 any sort of document, are they based on specific FDA
13 standards? What are your opinions based on that your
14 offering me right now?
15       MR. VAUGHN: Object to form.
16       A. Repeat your question again. But not the
17 question you just asked, the first question, I'm
18 sorry.
19       Q. I'm not sure what you mean by "repeat
20 your first question," I --
21       A. You asked me a question, and I thought I
22 answered it, and then you asked a clarifying
23 question. So go back to the original question, and
24 let me make sure I am clear, I am certainly --
25 because I think you're misunderstanding me because I

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1 absolutely am saying that there are certain
2 standards. The question is, are there certain FDA
3 standards in terms of GMP violations where they talk
4 about the issues of seriousness and non-seriousness
5 of violations? There's a question-and-answer
6 document that's out there and a guidance document
7 talks about that, is that what you're asking me?
8     Q.    I'm asking, is there a place I can go
9 for FDA regulations to understand your views about
10 when a CGMP violation results in adulteration?
11         MR. VAUGHN: Object to form.
12     A.    You can go to my report and the actual
13 specific language and the definition of what's an
14 adulterated product, where it mentions that. So
15 that's on page --
16     Q.    That's not what I'm asking.
17     A.    Yes, it is. You asked me for where you
18 go to, and time telling you, I lift it right out of
19 the definitional language of FDA for what's an
20 adulterated product, and it pounds on language around
21 good manufacturing practice. So that would be part
22 of my answer to you, and I'm looking for the section
23 of my report where I note that.
24         There, on page 25, I go to the law
25 itself, it's 21 U.S.C. 351, that talks about the U.S.

Page 215

1 drug law that addresses what makes a drug
2 adulterated, and gives the definitions for it right
3 there. And I've highlighted some of it that I
4 thought was particularly -- at issue in this
5 particular case. It talks about conformity with good
6 manufacturing practice to ensure that the drug meets
7 the requirements as to safety and has the identity,
8 strength and meets the quality and purity
9 characteristics.
10     Q.    Is this all the FDA documents that
11 you're relying on with respect to your opinion that
12 some CGMP violations lead to adulteration and some
13 don't?
14     A.    No, there's warning letters on the FDA
15 database, when you do a search for adulteration, that
16 you'll find that the majority of the time, they are
17 citing to CGMP violations. There is -- there are the
18 guidance documents that talk about GMPs and what
19 particular parts of the GMPs exhibit and why. I
20 think there was a question-and-answer document. Yes,
21 there's a question-and-answer document that I cite in
22 my report called, "Questions and Answers on Current
23 Good Manufacturing Practice Requirements." And there
24 is a -- there are sections there that talk about
25 that, questions back and forth.

Page 216

1         So I don't know what else to tell you,
2 and I think I actually, I've tried to give you a good
3 basis. The law is the founding for all regulations,
4 because the regulations are the codification of the
5 law. So that's why I started with the law, because
6 it's basic definition that links GMPs and
7 adulteration.
8     Q.    Is it your opinion that every single
9 Valsartan pill manufactured with ZHP's API, after the
10 process change that we discussed earlier today, was
11 adulterated?
12         MR. VAUGHN: Object to form.
13     A.    Has the potential to be adulterated,
14 yes. Unfortunately ZHP did not -- did not do
15 investigations and understand what was happening.
16 It's my opinion, however, as I state in my report,
17 that the presence of NDMA and NDEA could deem the
18 product adulterated. So therefore, any API or any
19 finished dose product containing those would indeed
20 be adulterated. So the fact that the process changed
21 was the result -- was what resulted in those
22 impurities. It makes all of those potential
23 adulterated product.
24     Q.    Did FDA send any warning letters to ZHP
25 with respect to its CGMP practices regarding the

Page 217

1 manufacture of Valsartan before 2018?
2     A.    You said a warning letter? Is that what
3 you're asking? I don't believe a warning letter on
4 that issued before then, no. But they certainly
5 had -- the company had information before the FDA
6 warning letter came out about this problem.
7     Q.    You testified that you did a hazard
8 assessment in this litigation, correct?
9     A.    That's where I started, with the terms
10 of -- in terms of NDMA and NDEA.
11     Q.    How many hours did the hazard assessment
12 take you?
13     A.    Only five or six hours. I already had
14 knowledge of where to go to look in terms of sources
15 and resources, 'cause again I'm familiar with
16 nitrosamines and NDMA. So it wasn't difficult for me
17 to collect the -- I already had textbooks, for
18 example, that talk about the impurities, those
19 particular compounds, and their risks and their
20 hazards.
21         I also already had in my possession the
22 tox -- IARC document that I had from I don't know
23 which project several years back, but I had looked at
24 NDMA as an issue, not in a pharmaceutical case, but
25 in other contexts, so five to six hours to go through

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1 those documents based on the fact that this was
2 something I had looked at before and I was very
3 familiar with what NDMA is, and what NDEA is.
4       Q.    And you conducted a
5 weight-of-the-evidence methodology here, you
6 testified. How long did you spend on that?
7             MR. VAUGHN: Object to form. Misstates
8 prior testimony.
9       A.    So I told you that, based upon my review
10 of the monographs, the authoritative sources, the
11 text books, I didn't go through every piece -- didn't
12 pull every piece of literature, but I used those as a
13 resource for my evaluation of hazard. So that
14 evaluation of hazard was weighing the information
15 that existed out there and the consistency of the
16 information is incredibly good.
17            There are no authoritative bodies that
18 say that they are not carcinogens. And no textbooks
19 that say they are not carcinogens, NDMA and NDEA.
20      Q.    I think my question was just how many
21 hours did you spend on your weight-of-the-evidence
22 analysis?
23      A.    That's something I can't give you an
24 exact time. I mean, the entire time I wrote my
25 report, I am weighing evidence based upon what I see,

Page 219

1 what's available, what -- what evidence says on both
2 sides, either answer to my questions -- I don't come
3 in to the evaluation with a decision already made
4 about what my report is going to say, and my report
5 evolves as I review the information.
6             So weight of the evidence is, all of the
7 information is being weighed in terms of the -- the
8 evaluation of my report.
9             In regulatory, in the regulatory world,
10 when I am developing my regulatory opinions, the
11 process there is not the same. It's applying the
12 training, experience and understanding of the the
13 regulatory language, the guidance documents, the
14 things that there are, and whether or not what is
15 there is consistent with what the evidence tells you
16 in the case; statements by the company, warning
17 letters, official actions, what the labeling may say,
18 if it's a labeling issue. So that's a little
19 different.
20      Q.    But you aren't able to tell me how much
21 time you spent in your weight-of-the-evidence
22 assessment?
23      A.    I can't give you an exact number, no.
24 It's not like I sit and write down, "This day, we're
25 giving these documents," I applied only a

Page 220

1 weight-of-the-evidence approach to what I was looking
2 at. I'm trying to explain to you that in two
3 different parts of my report, there's different
4 methodologies that you may use. Weight of the
5 evidence is used for typically weighing scientific
6 information to come to some understanding of what
7 that scientific information says about the
8 relationship or the finding.
9             In this case, that was my five to six
10 hours I spent going through the authoritative
11 documents, looking at whether anything had changed
12 since the last time I looked at it in terms of the
13 cancer hazard, and whether or not NDMA and NDEA were
14 still identified as compounds that increase the risk
15 of cancer in humans, so that's what I told you was
16 five to six hours.
17            After that, the majority of the time on
18 this case was spent with reviewing evidence in the
19 case, going back to the regulatory language, the
20 guidance documents, and providing that discussion and
21 analysis.
22      Q.    You said the last time you looked at it.
23 When was the last time you looked at NDMA and NDEA?
24      A.    Before this case, probably about four
25 years ago.

Page 221

1       Q.    And in what context were you looking at
2 that?
3       A.    The context of an environmental
4 contamination issue.
5       Q.    Can you explain?
6       A.    It's a confidential project for a
7 client. So, no. I can't give you any more than
8 that.
9       Q.    What were you doing for this client,
10 without identifying the client?
11      A.    I was doing a hazard evaluation. The
12 presence of NDMA particularly, in the environment.
13      Q.    And it's for litigation?
14      A.    No, it's a consult project.
15      Q.    Was it a pharmaceutical company?
16      A.    No, it was not a pharmaceutical company,
17 the one I'm thinking about.
18      Q.    Did you find any changes in the science
19 with respect to NDMA and NDEA between then and now?
20            MR. VAUGHN: Object to form.
21      A.    Not with respect to the cancer hazard,
22 no.
23      Q.    When you were doing that other project,
24 did you quantify any risk with respect to a dose of
25 NMDA?

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

1    A.    No, this was another situation where the
2 issue was whether or not there was an -- an overall
3 risk associated with the presence of the contaminant.
4 And I'm going to call it "contaminant" here because
5 this is not a drug product.
6    Q.    If you could turn to paragraphs 11 and
7 12 of your report.
8    A.    Yes.
9    Q.    Have you ever used these two paragraphs
10 in another expert report?
11    A.    I'm thinking, only because I haven't
12 done that much generic drug work, so I'm thinking. I
13 might have used some of the information in -- in
14 paragraph -- the paragraph that's -- 24 for a project
15 that I worked on for a generic drug, yes, but it was
16 years ago. I haven't done a generic drug case in
17 quite, maybe six, seven years.
18    Q.    I'm sorry, I was asking about paragraphs
19 11 and 12.
20    A.    I thought you said pages 11 and 12, I'm
21 sorry.
22    Q.    Okay.
23    A.    Okay, we're talking past each other. I
24 have used very similar language to 11 and 12 in other
25 reports, yes, because I am often asked -- I have done

Page 223

1 many cases like this, where I'm asked to serve as a
2 regulatory expert or a toxicologist. And so the
3 methodology that I use is the same, whether it's a
4 consulting project, or a litigation project, for
5 example, with risk assessment.
6       And then I also am giving in paragraph
7 12 why it is that risk assessment is a methodology, a
8 weight-of-the-evidence as well, that makes sense to
9 use for answering questions in my area.
10    Q.    So these two paragraphs were cut and
11 pasted from another expert report, correct?
12    A.    I don't know about word for word, but
13 they are very similar, yes, because again, this -- I
14 get asked the kinds of questions I'm addressing here
15 in other cases in the past, yeah.
16       MS. MILLER: All right, let's go off the
17 record and take a break.
18       VIDEOGRAPHER: Going off the record, the
19 time is 4:39 p.m. Eastern Time. This is the end of
20 media unit 5.
21       (Recess taken.)
22       VIDEOGRAPHER: We're back on the record.
23 The time is 5:02 p.m. Eastern Time. This is the
24 beginning of media unit 6.
25       (Continued on following page.)

Page 224

1 EXAMINATION (Cont'd.)
2 BY MS. MILLER:
3    Q.    Dr. Plunkett, have you ever advocated
4 before a public agency on behalf of a company that
5 manufactured a product with genotoxic properties?
6       MR. VAUGHN: Object to form.
7    A.    In California, is that what you're
8 asking? There's a California pesticide issue I
9 worked on, but I don't know that that compound -- it
10 wasn't NDMA, and it wasn't quite the same kind of
11 compound, but the issue was whether or not there was
12 a threshold for cancer there, based on it acting
13 through non-genotoxic methods. Is that what you're
14 asking me?
15    Q.    I'm just asking you --
16    A.    Well, I did. I worked on a project for
17 a pesticide that was in California -- in California,
18 they ave a -- the California agency that regulates
19 pesticides, outside of BPA, has under Part 65, has a
20 panel you can go before. There was a particular
21 pesticide that was acting -- wasn't a clear genotoxin
22 that was acting through potentially threshold
23 methods, and whether or not there was a cancer risk
24 that should allow the product to have to carry a
25 Part 65 warning, even though the product was marketed

Page 225

1 in the U.S. legally as a pesticide under EPA.
2    Q.    Was that product genotoxic?
3    A.    I'm just telling you now, it's operating
4 through a non-genotoxic mechanism. So there's
5 compounds that we understand, instead of causing
6 direct damage to DNA, may cause changes, for example,
7 in proteins that -- or signaling pathways that
8 control cell proliferation. And some of those
9 compounds at certain high doses, you can identify
10 that the signaling pathways overwhelm the normal
11 machinery of the cell such that you get uncontrolled
12 proliferation, so these are considered non-genotoxic
13 carcinogens.
14       And so in this case, that's not what
15 we're talking about, we're talking through genotoxins
16 that are acting through direct DNA damage, but not
17 genotoxic carcinogens, can be -- they have risks and
18 how they can be assayed differently based on the
19 mechanism and the mode of action.
20    Q.    Have you ever done consulting work for a
21 company with respect to a product that was genotoxic?
22    A.    At Environ it's possible, yes. There
23 might have been a product that had genotoxicity, an
24 industrial chemical project or -- not in the aspects
25 of the pharmaceuticals, no. Or -- you can assume --

57 (Pages 222 - 225)

Page 226

1 even a consumer product other than a pesticide now,
2 that I can think of.
3     Q.    Have you ever advised a company to stop
4 manufacturing a product because you thought it was
5 genotoxic?
6     A.    I wouldn't have done it based upon just
7 genotoxic.  We did advise companies, I had, when I
8 worked at Environ in particular, we advised companies
9 about cancer hazards for different kinds of products
10 and we would give them the advice that the product
11 had a hazard that either needed to be considered or
12 would affect the regulation of the product.
13     But I can't think of one where I gave
14 advice just on genotoxicity because typically, for
15 products, you look beyond that and you look for a
16 genotoxic data backed up by animal data or some other
17 in vivo data, which is why this product, with these
18 products it's so important, because you have the
19 whole picture, you have the -- you have the in vivo
20 data to show that indeed, you can get beyond
21 genotoxicity to actual cancer.
22     Q.    Is it your opinion that every
23 genotoxic -- every product that contains genotoxins
24 should be removed from the market?
25     A.    I don't think I've formed that opinion,

Page 227

1 no.  Because it's very case-specific and
2 exposure-specific, and exposure-potential-specific.
3     But certainly, there are cases of human
4 drug products, either prescription or over-the-
5 counter, the presence of genotoxicity as a hazard is
6 acceptable for things like cancer drugs, because of
7 the issue of the benefits so outweigh the risk.  Many
8 cancer drugs actually have potential to initiate
9 cancer later in life if you're on them long enough.
10 But generally, no.  That would not be the case for
11 drugs or products you would want those drugs or
12 products to be not probable carcinogens, for example.
13     Q.    Dr. Plunkett, are you familiar with the
14 chemistry behind the TEA process and how that led to
15 the formation of NDEA?
16     A.    Only from some documents I've seen
17 describe it but again, that was beyond the scope of
18 my work.  It was my understanding that the chemists
19 in the case would be handling the details on the
20 process and the -- and the steps in the process that
21 were readily identifying as posing a risk.
22     Q.    Can you explain for dummies how the NDEA
23 was formed?
24     MR. VAUGHN:  Object to form.
25     A.    So I have in my report the explanation

Page 228

1 for dummies so let me go there, where I describe the
2 two processes.  Let me find it.
3     On paragraph -- long paragraph, I
4 apologize for that -- starts on page 16, paragraph
5 28.  And I go through the understanding and the
6 explanation about the -- about the TEA and the
7 process, and this actually deals with, in 2019 what
8 ZHP found with respect to the cause, and it -- and I
9 don't want to go into the detail, but essentially I
10 think those things are described there.
11     Do you want me to read to the record or
12 just refer you to that paragraph?  Because it talks
13 about the TEA process, it also talks about, I
14 believe, the zinc chloride process as well.
15     Q.    I'm sorry, what page are you on?  I
16 don't see what you're referring to.
17     A.    Paragraph 28, the easiest way for me to
18 send you there.  It starts on page 16, it goes
19 over -- I apologize, this is like a very unusual
20 paragraph for me.  It goes on for two-and-a-half
21 pages, over to page 18.
22     Q.    Can you just point me to where it
23 describing how the NDEA was formed?
24     A.    So for the TEA, it comes on the
25 second -- the third page, 18.  And it starts to the

Page 229

1 the top of the page, "N-Nitrosodiethylamine is
2 potential process-related impurity which has a
3 similar formulation mechanism as NDMA.  It is most
4 likely generated in terminated TEA process with" --
5 this is -- it's an acronym, "NaNO2," which is sodium
6 nitrate, "quenching, in which TEA-HCl (containing
7 potential impurity of diethylamine) and nitrous acid,
8 exist simultaneously to render the nitrosation
9 reaction to proceed."
10     Want to keep reading?  I mean, this is
11 the paragraph I'm talking about.
12     Q.    What is this quoting from?
13     A.    Quoting from, starting back on page 17,
14 starts within 2019, this was ZHP's statements
15 regarding their investigation.  So I'm referring to a
16 ZHP document, pointing to pages 932 to 933, last page
17 Bates.
18     Q.    Is it your opinion that it was known in
19 20123 that TEA could transform into diethyline under
20 conditions similar to those involved in the
21 manufacturing of Valsartan API, and that that could
22 then react to sodium nitrate and hydrochloric acid to
23 the quenching step to create NDEA?
24     A.    I don't think I ever formed the opinion
25 that all those specifics were taught in the

58 (Pages 226 - 229)

Page 230

1 scientific literature. Instead, if you look at my
2 opinion or statements in my report about 2012, it's
3 teaching that N-nitrosamines, generally, are
4 potential products that can be produced during the
5 different processes. Again, for details on this,
6 Dr. Hecht, the chemist, has many pages in his report
7 where he discusses the -- these issues about the
8 chemical reactions and the foreseeability.
9     Q.    As I recall, the literature you cited
10 was about the degradation of DMF. Did you cite any
11 literature identifying that TEA could transform into
12 diethyline that could react with sodium nitrate and
13 hydrochloric acid and that could lead to NDEA?
14         MR. VAUGHN: Objection to form.
15     A.    I think I -- I don't believe -- I don't
16 believe I've cited in my report a specific document
17 that gives all those details. However, and that's
18 why I then pointed you to, first to Dr. Hecht, who
19 gives a very detailed description of it, and then
20 also the two sources of information that -- excuse
21 me -- were brought out in depositions.
22     Q.    Were those two sources of information
23 related to DMF and NDMA? I'm asking about the TEA
24 process. Have you cited any literature that you
25 believe shows the foreseeability of NDEA developing

Page 231

1 as part of the TEA quenching process?
2         MR. VAUGHN: Object to form.
3 Argumentative.
4     A.    So I would point you to the report of
5 Dr. Hecht, discusses the foreseeability issue with
6 these particular -- these particular processes.
7 Again, it -- that was not -- scope of my work did not
8 include doing what Dr. Hecht did.
9     Q.    Are you familiar with M7?
10         MR. VAUGHN: Object to form.
11     A.    As far as if -- by M7 you're talking
12 about the amendment to the ICH, is that what you're
13 talking about?
14     Q.    "M7, Assessment and Control of DNA
15 Reactive Mutagenic Impurities in Pharmaceuticals to
16 Limit Potential Carcinogenic Risk, Guidance For
17 Industry," are you familiar with that document?
18     A.    Yes, that's what I was referring to,
19 because it's tied to the ICH.
20     Q.    It's about a hundred-page document, does
21 that sound about right?
22     A.    I have no idea how many pages it is.
23     Q.    Does the top of every single page say,
24 "Contains non-binding recommendations"?
25     A.    I'd have to look, I don't know. Again,

Page 232

1 it is a guidance document so it doesn't surprise me
2 if it does, but as -- I think I covered this earlier
3 in the day with you in some detail. How, what
4 guidance means, and in my experience, what guidance
5 means to the industry that I have worked for.
6     Q.    I think you said earlier, I believe you
7 said earlier today that there's language in the
8 introduction to these documents about them being only
9 guidance, but I don't believe you testified that
10 every single page has a header that says, "Containing
11 non-binding recommendations."
12     A.    I don't think you asked that question.
13 So you know, I don't know if every single page does,
14 it's possible that they do, but regardless of whether
15 they are labeled on the document as nonbinding, they
16 are still very important documents in terms of what
17 industry should be considering and using in terms of
18 guidance as they develop their processes to ensure
19 that they have full compliance in terms of GMPs, but
20 have a adequate quality system as well for their
21 drugs.
22     Q.    Just the term "nonbinding."
23     A.    I think you asked me that before and I
24 think -- I think we agreed to the word
25 "recommendation," but I told you also that in my

Page 233

1 experience, with guidance and similar documents like
2 the M7, that those indeed are guidance or
3 recommendations that industry implements in order to
4 comply with certain parts of their -- of the FDA
5 regulations or the need for produce a quality
6 product.
7     Q.    You refer in your report to "ICH core
8 principles." Do you recall using that term?
9     A.    I may have. I don't know. Possible I
10 did.
11     Q.    Is there a document or literature that
12 lists what the ICH core principles are?
13     A.    If I used the word, I should have had a
14 citation for it, so I need to look. Where are you
15 looking in my report?
16     Q.    Well, you use it multiple times, but if
17 you look it -- at the top of page 31 you say, "ICH
18 core principles." And I just -- I just want to
19 know --
20         MR. VAUGHN: Dr. Plunkett, take your
21 time to read the entire paragraph from your expert
22 report, starting on the page before.
23         MS. MILLER: I was not suggesting she
24 not do that, Brett.
25         MR. VAUGHN: I didn't say that you

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

1 suggested it, I was just --
2        MS. MILLER: Okay. She asked me where
3 she used the --
4        MR. VAUGHN: You saw on the page before,
5 and tell her the next one. I'm telling her to read
6 the whole paragraph.
7        A.    So core principles would relate to the
8 specific steps or criteria that are set out in the
9 ICH guidelines, and that is indeed how I described
10 them, bottom of page 30, I say -- I actually have the
11 opinion that what Dr. Gu testified to, and I say,
12 "Failed to apply core principles of the ICH
13 guidelines related to identification of impurities."
14        So for example, in the ICH guidelines,
15 there's different things that are described in terms
16 of quality, and one of them has to do with
17 identification of impurities. There's other core
18 principles that are also described and I'd have to
19 pull the guidance documents out in order to list them
20 all for you.
21        Q.    Do ICH documents have a section called
22 "Core Principles"?
23        A.    I don't know. I don't recall. I'd have
24 to go look.
25        Q.    How do I know in reading an ICH document

Page 235

1 what you mean when you say "core principles"?
2        A.    The things that -- what they outline as
3 being important to compliance for quality. So they
4 have certain things that they describe. The easiest
5 way would be to pull the document up, if you want to
6 do that. And you can see different sections or
7 different discussion points. And impurities,
8 identification of impurities in -- is one of those
9 "core principles."
10        I'm using the word "core principle"
11 based upon my experience with, you know, referring to
12 those. In terms of describing what they are. It's
13 just like the regulations, the 21 CFR Section 210 and
14 211, set out the core principles for CGMP, one for
15 finished dose manufacturers on 211, and general
16 principles or core principles also within
17 Section 210. I'm not giving it any -- I'm not
18 meaning to give it any special magical meaning, if
19 that's what you're asking me.
20        Q.    Is the term "core principle" ever used
21 by ICH or by the FDA?
22        A.    I have no idea. It's something that in
23 the industry, and in my experience, I've heard people
24 use many times. I've heard FDA people give lectures
25 talking about the core principles of GMPs, core

Page 236

1 principles of labeling regulations. I mean,
2 there's -- I think it's a common term used when
3 you're talking about compliance and regulations.
4        Q.    Can you identify someone whom you've
5 heard use that term?
6        A.    My business partner, Dr. Rudenko, who
7 used to work for FDA, one of my other contractors in
8 my business, Dr. Merker, who used to work at
9 CFSAN.
10        Q.    I thought you said FDA speeches.
11 That's --
12        A.    Well, she's -- she's given slide talks
13 and presentations and I've seen her -- Larissa and I
14 had a business relationship off and I since 1989.
15 We've worked together three times. She went to FDA
16 for 15 years, and while she was there, I used to hear
17 her talks, go to her seminars, I've heard her do
18 that.
19        Dr. Merker recently retired. He still
20 uses FDA lingo all the time. He talked about core
21 principles of food safety assessment.
22        So again, I think this is kind of an
23 odd -- an odd argument we're having if it's an
24 argument. I mean, to me, core principles has a
25 special English language meaning. It's things that

Page 237

1 are inherent to the system, be it a regulatory system
2 that controls food safety, the regulatory system that
3 controls all the drugs that must be adhered to.
4        Q.    When you talk about ICH core principles
5 at the top of page 31, you mention, you write,
6 "(e.g. ICH Q3A)".
7        ICH Q3A provides guidance about
8 impurities in new drug substances, correct?
9        A.    I'd have to pull it up, but I think it
10 does.
11        Q.    Does ICH Q3A apply to changes in
12 already -- to manufacturing changes to existing API
13 products?
14        MR. VAUGHN: Object to form.
15        A.    I would say that it does but I would
16 neat to look to see if they exclude that. I don't
17 recall that being excluded in the discussions of
18 these types of principles. Regardless of whether
19 you're making a change to an existing ANDA, it's a
20 new process for making the drug. So certainly, those
21 same principles or recommendations or guidelines
22 would apply.
23        Q.    Are you familiar with any literature
24 that you can cite to me saying that ICH Q3A would
25 apply to manufacturing changes to existing API?

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1    MR. VAUGHN: Object to form.
2    A.   I haven't look for that, so I can't
3 answer that. I'd have to look, but also that
4 question that I raised as I was doing my -- writing
5 my report.
6    Q.   When did the FDA adopt ICH M7 as
7 guidance?
8    MR. VAUGHN: Objection, foundation.
9    A.   I believe it was in my report. I'm
10 going to say 2016, but it was put forth publicly in
11 2014.
12    Q.   Was ICH M7 adopted by the FDA before or
13 after process changes at issue here?
14    MR. VAUGHN: Objection, form.
15    A.   So I believe at least with one of the
16 process changes it would have been after, but it
17 doesn't matter because the M7 recommendations or
18 guidelines or statements are essentially consistent
19 with the 1999 ANDA guidance document by FDA -- that
20 FDA put out when it talks about considering the issue
21 of potent toxicants, or toxic compounds.
22    Those are always part of the -- of
23 the -- of the equation and impurities have been
24 recognized as a potential issue to be addressed for
25 compound -- for drug products for a very long time.

Page 239

1 The language is a bit different, but that doesn't
2 mean that there was no recognition of the need to
3 know the potency or the toxicity of potential
4 impurities.
5    Q.   You write in your report that ZHP's
6 change to utilizing chloride and dimethylformamide
7 was internally classified as a critical change, is
8 that correct, do you recall that?
9    A.   There is a paragraph where I quote from
10 either a document or a deposition, yes. And I -- if
11 you show me where you are, and then I'll clear it
12 somewhere else, but I do know that, yes.
13    Q.   Does the FDA use the term "critical
14 change"?
15    MR. VAUGHN: Object to form.
16    A.   In terms of their guidance on when to
17 submit a supplement, is that what you're asking me?
18 They use different language.
19    Q.   What languages does FDA use?
20    A.   It uses, the issues would be major
21 versus minor, minor versus major changes. But
22 regardless of that, FDA's warning letter points this
23 out, I think that's where there discussion is, if the
24 NDMA themselves points out to the company that you
25 said something was minor, you said something was

Page 240

1 minor in your DMF or in your submissions to us, but
2 yet you called it critical. Based on that, it's an
3 important concern as well, the FDA, did.
4    Q.   Do you know what ZHP meant when it said
5 "critical"?
6    MR. VAUGHN: Object to form.
7    A.   I have no information to indicate that
8 they meant anything other than important. "Critical"
9 usually means important.
10    Q.   Do you have any reason to believe that
11 ZHP's internal use of the word "critical" was
12 intended to mean major under the FDA's --
13    MR. VAUGHN: Object to form.
14    A.   If it's meant to mean major, to me, the
15 important thing was not exactly how they classified
16 it, even though FDA points to that issue. The issue
17 for me is they made changes, didn't do a full
18 assessment on the impact of those changes, even
19 though those things indeed had important implications
20 for the impurity profile of the drug.
21    Again, this issue of major-minor
22 critical changes, other experts in the litigation
23 have a lot more to say about it than I do. I point
24 to it mainly because of my opinions related to the
25 fact that the product, FDA was recognizing that the

Page 241

1 company had serious concerns with GMPs and product
2 quality. And one of the reasons -- one of the things
3 I cite to was the fact that the company didn't share
4 with FDA their exact descriptions of those process
5 changes when they -- when they made them to the DMF.
6    Q.   Which description of the process change
7 did ZHP not share with FDA?
8    A.   They didn't call it a critical change
9 which would -- which were a different implication
10 than a minor change.
11    Q.   But we just agreed that
12 "critical change" is not an FDA terminology, right?
13    MR. VAUGHN: Object to form.
14    A.   But "minor change" is. And if the
15 company is distinguishing critical versus minor,
16 which, if you read the deposition testimony, they
17 indeed are, and then if you look at the FDA letter to
18 the company, they indeed see that as an issue within
19 the company as well.
20    I'm just saying that, to me, that's
21 evidence to show that FDA is recognizing that that
22 was a consideration in terms of their decisions
23 regarding the warning letter they issued and their
24 decisions or their judgments regarding the lack of
25 GMP compliance.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1    Q.    I may have misunderstood your testimony
2  but I thought you testified that they didn't provide
3  the FDA with a complete description of the process
4  change.
5          Do you have reason to believe that ZHP
6  failed to provide the FDA with a full description of
7  what the process change was?  Object to form?
8    A.    That's not what I said.  I said that
9  they didn't use the same language in their
10 description with FDA.  They called it a minor change,
11 not a major change or a critical change, which is the
12 language they are using internally.
13   Q.    Are there any internal --
14   A.    So --
15   Q.    -- are there any internal communications
16 where ZHP uses the term "major change"?
17   A.    To FDA, ever?  I didn't --
18   Q.    I said internal.  I said are there any
19 internal documents where ZHP has referred to this
20 changes as a major change?
21         MR. VAUGHN:  Object to form.
22   A.    I didn't look for that, so I can't
23 answer that.  I don't know.  I think my mention of
24 this has to do -- that this issue in my report has to
25 do strictly with the discussion of the FDA findings

Page 243

1  in the warning letter.  The FDA themselves talks
2  about it.  Other than, I do talk about the background
3  on what types of, how you classify certain changes
4  and whether you have to put in a pre-amendment
5  supplement, or whether you can put this in as a CBE,
6  or whether you can simply submit it as part of an
7  annual report.
8    Q.    Do you compare ZHP's definition of
9  "critical change" with the FDA's definition of "major
10 change"?
11   A.    Well, I lay that out on my report, no.
12 Again, that's something -- I've seen reports where
13 other experts in the litigation are doing some of
14 that.
15   Q.    Do you know whether ZHP's internal
16 definition of "critical change" is the same as the
17 FDA's definition of major change?
18         MR. VAUGHN:  Object to form.
19   A.    I can't answer that without looking.  I
20 don't know.  I discuss this so if you need to see
21 what I said, I discuss this on pages -- in paragraph
22 27, paragraphs 14, 15, and then I talk about the
23 comment from FDA at paragraph -- right before
24 paragraph 28 on page 16.  Rather a long paragraph, I
25 apologize.

Page 244

1    Q.    Do you know what MSP is alleging in this
2  case?
3          MR. VAUGHN:  Object to form.
4    A.    No, I don't know what MSP -- I already
5  told you, you asked me questions and I haven't seen
6  the complaint, so if I haven't seen the complaint I
7  can't answer that.  I guess maybe what I should tell
8  you to add to this answer, though, is that, I am
9  aware that the cases I'm working on, that there --
10 that the Plaintiffs are alleging injuries of cancer
11 or fear of cancer related to their exposure to
12 Valsartan drug products.  That I am aware of.  But I
13 don't know what's in -- it's in the MSP complaint,
14 where that's even the same complaint, I can't answer
15 that.
16   Q.    Were you retained for one specific case
17 or were you retained in the Valsartan litigation
18 generally?
19   A.    I'd have to look at my confidentiality
20 agreement.  I don't have a retainer or a contract.
21 I, right now I'm aware of a case, a Valsartan case,
22 that's this particular case that I'm working on, and
23 the issues that I'm addressing have to do with, it's
24 my understanding there are more than one Valsartan
25 case.  But dealing with the toxicology, the hazard,

Page 245

1  the increased risk and then -- as I say in any
2  report, the general regulatory overview
3  responsibilities of a manufacturer and then my
4  analysis of what the evidence in the case says as it
5  relates to the regulatory requirements of a generic
6  drug company making either an API or a finished dose.
7          MS. MILLER:  I think I'm close to the
8  end of my questioning.  I need a break to confirm
9  that.  So let's take five to ten minutes.  Lee, could
10 you tell me how much time --
11         VIDEOGRAPHER:  Could we go off the
12 record, counsel?  Going off the record.  The time is
13 5:36 p.m.
14         (Recess taken.)
15         VIDEOGRAPHER:  We are back on the
16 record.  The time is 6:02 p.m.
17         MR. VAUGHN:  Real quick, I just want the
18 record to reflect that we've had multiple breaks on
19 our own, and now we've been back for over ten minutes
20 waiting for it to start.  Go ahead, Jessica.
21 EXAMINATION (Cont'd.)
22 BY MS. MILLER:
23   Q.    Dr. Plunkett, you used to have a company
24 called Integrative BioStrategies, correct?
25   A.    Yes.

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

1    Q.    What happened to that company?
2    A.    When I took on my new business partner
3  in January of 2020, in June of 2020, we decided to
4  form a partnership and change the structure of the
5  company so we were equal partners.  So the ID was a
6  company where I am -- I was the owner and my husband
7  was an employee and Larissa originally, Larissa was
8  working as an employee, but she and I are equal in
9  terms of our business development.
10        So we -- we formed a new company and, by
11  doing that, we gave it a new name because we also
12  started to have some new focuses to our business.
13    Q.    Does the new company have different
14  employees from the old company?
15    A.    Yes.
16    Q.    Who has left and who has joined?
17    A.    So it's joining, so myself, I'm an
18  employee, my husband is an employee still, he's still
19  our -- administrative assistant, business manager;
20  Larissa and I are joint partners in the company,
21  fifty-fifty now, and her husband, who is also a Ph.D.
22  physiology biochemist and also an employee of the
23  company.
24    Q.    Were Larissa and her husband evolved in
25  Integrative BioStrategies?

Page 247

1    A.    Her husband no.  Her husband is new,
2  he's only been around about two years.  Initially, if
3  you've ever read my depositions, in 2001, I joined
4  Larissa, who was the original owner of Integrative
5  Biostrategies, so she and I worked together from '01
6  to '03.  She left, went to FDA, and then I became the
7  sole owner when she left.
8    Q.    The only new person that you haven't
9  worked with before is her husband?
10    A.    Yes, that's correct.
11    Q.    And what's his name?
12    A.    His name is Austin Mirchelof.
13    Q.    Merchant, like the Merchant of Venice?
14    A.    No, M-i-r-c-h-e-l-o-f.  He's a -- oh,
15  gosh what's his background?  It's like some kind of
16  an Eastern European name, and I forget, I apologize,
17  I've forgotten what it is.
18    Q.    And where is BioPolicy Solutions based,
19  do you have an office?
20    A.    We have two offices, one in Houston,
21  Texas here for me.  We chose to have -- especially
22  when we started the company in two 2020, it was
23  advantageous.  Her office is located in Ventura,
24  California.  We both have home-based offices.  This
25  company is incorporated in Texas because the -- the

Page 248

1  laws are more favorable to businesses here than they
2  are in California.
3    Q.    Are you currently in your office?
4    A.    Yes.
5    Q.    And is your office in your home?
6    A.    Yes, it is.
7    Q.    When you --
8    A.    And hers is also in her home.
9    Q.    What's more favorable about Texas over
10  California?
11        MR. VAUGHN:  Object to form.
12    A.    Taxes, regulation, and all the things
13  you have to do in terms of businesses.  That was the
14  advice of our accountant, to incorporate in Texas
15  instead of California.
16    Q.    Do you have a Twitter account?
17    A.    No.  I do not like Twitter.
18    Q.    Has FDA ever asked you for your views on
19  nitrosamines?
20    A.    No, not in the context of these issues.
21  And I don't believe I've ever had a conversation
22  where they have asked for it even, or ever over the
23  years where I have worked in projects where FDA and I
24  have interacted.
25    Q.    What percentage of your income last year

Page 249

1  came from litigation?
2    A.    Last year, about fifteen percent of my
3  income.  My -- our new company has had a real focus
4  on regulatory, strategic planning, due diligence, and
5  regulatory problem-solving for emerging companies
6  using emerging technology.
7        And during COVID, obviously, litigation
8  slowed down a whole lot.  Many of the cases I'm
9  working on or have worked on are still pending,
10  there's been a promise of trial for the last three
11  years, nothing has happened.  So...
12    Q.    How many hours would you say you spent
13  in 2020 on litigation?
14    A.    I don't know.  I'd have to go back and
15  look at my records.  I don't know.  In 2020, it was
16  very few.
17    Q.    I'm sorry, did I say 2020?  I meant '22.
18  But in 2022, 15 percent of your income was from
19  litigation?
20    A.    Yes.  About -- and it was actually about
21  15 percent of my time because, unlike the old
22  company, our rates for projects are the same
23  regardless of whether it's a regulatory project or a
24  litigation project.  It's all charged at $400 an
25  hour.

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 250

1    Q.    So can you estimate for me about how
2  much money you made from litigation last year?
3    A.    I haven't done my taxes yet, so no, I
4  can't do that.  Ask me in a couple of months, and I
5  maybe can tell.
6    Q.    You said it was 15 percent.  Don't yet
7  know about how much you earned last year?
8    A.    Well, my personal income, and then there
9  is the income for the company, are you talking about
10  my personal income?
11    Q.    Yes.
12    A.    That 15 percent may not apply.  I can
13  tell you much I make a year, I draw $170,000 a year
14  salary.  But the 15 percent number I'm giving you
15  would be the business billables overall in that
16  practice area, and some of that may have been Larissa
17  and some me.
18    Q.    When you say you draw $170,000, do you
19  also draw profits?
20    A.    I can at the end of the year if there's
21  any money not distributed.  We have more overhead now
22  because both Austin -- Dr. Mirchelof and my husband
23  are non-revenue-generating employees.  They assist on
24  projects and we may charge Austin's time out, but
25  it's at a much lower rate.

Page 251

1    Q.    Do you know how much you personally
2  earned from -- do you know how much you personally
3  billed plaintiffs' lawyers for litigation in 2022?
4        MR. VAUGHN:  Object to form.
5    A.    I can't answer that, because it's too
6  early.  Again, if you ask me that question in --
7  after the tax season, I might be able to tell you.
8    Q.    Do you know approximately how many
9  different cases you worked on in 2022?
10    A.    You have my trial list.  That tells you
11  how many depositions that I've been involved in.  And
12  as far as cases, I'd have to look at my trial list to
13  see whether is it or isn't there.  I mean, I have
14  maybe four active litigation areas.  And then I have
15  two or three that are dormant.  That I don't know
16  what's going to happen.  But the top litigation is in
17  Bankruptcy Court, so who knows if that's going to
18  come back --
19    Q.    I'm a lawyer.
20    A.    Okay, there you go.  I have -- I've
21  still -- I still believe there's unresolved cases in
22  the IVC filter litigation, but I haven't been
23  approached with anything new in that in the last
24  eight to -- I would say the last year, actually.
25    Q.    When you say you have four active

Page 252

1  litigations, what are those?
2        MR. VAUGHN:  Object to form.
3        Dr. Plunkett, slow down just a little
4  bit so I can get the objections out.
5        THE WITNESS:  I'm sorry.
6        MR. VAUGHN:  Okay.
7    A.    Active litigations would be this, this
8  litigation area, I'm active in the -- Valsartan, what
9  the other, oh, Taxotere, but theres' not a lot going
10  on there.  I am getting ready for the Preservation
11  deposition, that litigation, some time in the spring.
12  I'm working in the -- one of the Ethicon Mesh
13  cases --
14        MR. VAUGHN:  I'm going to caution you to
15  not disclose any confidential information,
16  Dr. Plunkett.
17    A.    Okay, all right.  The other two things
18  I'm working on, I have not produced reports in yet,
19  so I guess that would be something I should wait
20  until I have produced a report.  I assume that I will
21  be, you know, those will come to fruition but right
22  now, as far as active depositions or trials would be
23  Taxotere, and then this deposition here.
24    Q.    So the other two are things that you
25  have not been disclosed as an expert yet?

Page 253

1        MR. VAUGHN:  Object to form.
2    A.    That's correct -- I'm sorry, that's
3  correct.  Well, as far as I know, because the reports
4  haven't been -- I'm working on reports, but they have
5  not been completed.
6    Q.    Who contacted you to request that you
7  serve as an expert in this litigation?
8    A.    I don't know whether I first heard from
9  Mr. Vaughn or first heard from Mr. Nigh, both of whom
10  I, you know, encountered before.
11    Q.    Where did you encounter Mr. Vaughn
12  before?
13    A.    In a medical device litigation.  It
14  sounds like maybe I shouldn't say.
15        MR. VAUGHN:  You can answer which
16  medical device litigation, just don't comment on the
17  status of the litigation, please.
18    A.    Oh, okay.  In the hernia mesh
19  litigation, and then in the -- Mr. Nigh -- he and I
20  have crossed paths but I'm trying to think, I can't
21  think of the exact -- he's not been presenting
22  attorney with me, but he's been involved in different
23  cases I've worked on and I'd have to go back and look
24  at see where Levin Papantonio, the firm he was with,
25  was listed.  It's possible that there was -- he was

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

1 listed in the talc litigation with me but I'm not
2 sure.
3    Q.    Have you worked with Mr. Slater before?
4        MR. VAUGHN: Doctor, real quick, I also
5 want to caution you, do not disclose any
6 litigations in which you have not yet disclosed an
7 expert report.
8        MS. MILLER: She said she wasn't going
9 to --
10       MR. VAUGHN: I'm sorry, she was going
11 kind of quick. I must have missed it.
12   Q.    Have you come across Mr. Slater before?
13   A.    In this litigation, I have.
14   Q.    Is this the first litigation in which
15 you worked with Mr. Slater?
16   A.    That I can recall.
17       THE WITNESS: And Mr. Slater, apologize
18 ahead of time if there've been other interactions.
19   Q.    Nobody forgets Mr. Slater. Do you have
20 any other litigations you're working on with
21 Mr. Vaughn, other than medical device, hernia mesh,
22 and this one?
23   A.    No, I don't believe so.
24   Q.    Okay. You testified that only 15
25 percent of the revenues, I think, of BioPolicy

Page 255

1 Solutions come from Plaintiffs' lawyers. What kinds
2 of clients constitute that other 85 percent?
3        MR. VAUGHN: Object to form.
4    A.    Currently, in 2022, and 2021 as well, a
5 majority of them were either -- are either companies
6 that manufacture or make products or ingredients for
7 either the food industry, pharmaceutical industry, or
8 industrial industry as well as, because we work with
9 some enzyme manufacturers, and then we -- we also
10 work with -- do due diligence with investors at times
11 for review of technologies in the space of emerging
12 technologies, new ways to manufacture products that
13 haven't been implemented before.
14       And then the other work is, I still do
15 some patent work, putting together, doing
16 patentability evaluations, and strategy for taking an
17 invention for market with university-based inventors.
18   Q.    Some invoices we saw, you've billed
19 about 150 hours since litigation, does that sound
20 right to you?
21       MR. VAUGHN: Object to form.
22   A.    All in all, and throughout the work,
23 it's possible. I don't know, I didn't count it up.
24 I apologize. I probably should have done that but I
25 didn't.

Page 256

1    Q.    Do you have additional unbilled time?
2    A.    Just for this time in January getting
3 ready for the deposition. So no additional time on
4 reports. Obviously, you have my report, and this
5 time at deposition.
6    Q.    How much time did you spend getting
7 ready for the deposition?
8    A.    It's a guess, I haven't added it up for
9 January, I haven't done my billing, so I would say
10 another twelve, 15 hours, maybe. Twelve hours.
11   Q.    And how much of that time was spent with
12 Plaintiff's counsel?
13   A.    Probably half the time with Plaintiff's
14 counsel, and the other half on my own getting ready.
15   Q.    Over the course of writing the report,
16 did you request additional documents from Plaintiff's
17 counsel that you hadn't received previously?
18   A.    I requested additional documents when I
19 saw, for example, in deposition testimony, certain
20 area that I asked if there were additional documents
21 that might relate to that, yes.
22       I asked for, at one point, right towards
23 the end of the time I was preparing my report, I
24 asked if any of the other experts in the case for
25 Plaintiffs had reports ready. First Dr. Hecht did.

Page 257

1 I did see Dr. Bain's report, and Dr. Russ' report as
2 well, but those were all right before my report was
3 due. And then I -- I did ask them after I submit my
4 report, but I would obviously assume I would like to
5 see defense expert reports that overlapped my area if
6 they were in before my depo, and I was lucky enough
7 that a few of them were.
8        Unfortunately for me, they came in right
9 before Christmas, so it wasn't a whole lot of fun
10 working on them over Christmas, but I did review the
11 ones provided.
12   Q.    Did you review drafts of the Bain or
13 Hecht reports before they were finalized and served?
14   A.    No. I asked for final reports. I can't
15 tell you that I didn't see them at the same time they
16 were being served, the same day, but or -- but I
17 certainly saw what I consider final reports.
18   Q.    Were they signed when you saw them?
19   A.    Yes, they were.
20   Q.    Are you relying on Dr. Bain -- I don't
21 know if she's a doctor. Are you relying on the Bain
22 or Hecht report ares in your opinions?
23       MR. VAUGHN: Object to form.
24   A.    So I cite to Dr. Hecht as part of the
25 evidence for "foreseeability." I defer to him. But

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

1 I'm not relying on him for any of the opinions
2 related to responsibility of the manufacturers or the
3 other general opinions in the regulatory area.
4        I also am not relying on him in terms of
5 my increased risk opinions, either. Those are
6 independent of, actually all of the other experts
7 that I've seen. I'm not relying on Dr. Bain,
8 although I have seen her report. And I did -- I
9 think I said to you a couple of times during the
10 deposition today that that's why I mentioned her.
11 Some of the questions you asked me are things that I
12 know are covered in those other expert reports. And
13 they were beyond the scope of some of the things that
14 I developed or was asked to do.
15      Q.    Do you have an opinion as to whether
16 Dr. Hecht is more credible than ZHP's chemistry
17 expert, Dr. Xue?
18           MR. VAUGHN: Object to form.
19      A.    I haven't formed an opinion comparing
20 them head to head in that way, no, I believe
21 Dr. Hecht, based on having seen his, I guess his CV
22 or resume that was attached to his report, and having
23 read his report, he certainly appears to be a
24 credible, competent, well-trained chemist. That's
25 all I can say. I mean, I don't try to compare the

Page 259

1 quality of one expert versus the other.
2      Q.    You have similar opinions with respect
3 to Dr. Xue?
4           MR. VAUGHN: Object to form.
5      Q.    Have you read his CV report?
6           MR. VAUGHN: Object to form.
7      A.    Can you spell that name that you gave
8 me?
9      Q.    X-u-e. You said you had read his
10 report. We talked about it earlier.
11      A.    A Defendants' expert or a ZHP witness?
12      Q.    He's a chemist and you said earlier that
13 you had read his report. He's an organic chemistry
14 professor at the University of Maryland.
15      A.    Oh, as -- that's what I'm asking you, as
16 an expert report? Is that what you're asking me?
17 Yes, I did. That's on my list of ones I had
18 reviewed.
19      Q.    Correct. You testified that based on
20 Dr. Hecht's report and CV, you thought that he was a
21 credible chemist and I'm asking, did you reach the
22 same impression with respect to Dr. Xue?
23           MR. VAUGHN: Object to form.
24      A.    Certainly, Dr. Xue has chemistry
25 credentials. I don't know what else to say, I mean,

Page 260

1 it's -- again, I don't -- I don't -- I did not
2 consider his report when I developed my report, and
3 since I defer to Dr. Hecht, I paid a little more
4 attention to looking across his credentials and what
5 he was saying.
6      Q.    You testified earlier that you have
7 represented companies before the FDA, is that
8 correct?
9      A.    Yes, I've worked as a consultant to
10 companies and we've had meetings or I've helped them
11 respond to regulatory issues to the FDA. With the
12 FDA, yes.
13      Q.    So on behalf of those companies, you've
14 had meetings with the FDA?
15      A.    Yes.
16      Q.    When was the last time you had a meeting
17 with the FDA?
18      A.    Two months ago.
19      Q.    And what was that with regard to?
20      A.    It was with regard to safety assessment
21 for a new type of food produced by novel methods.
22 That's all I can say.
23      Q.    Were you at the FDA for that meeting?
24      A.    No, they were still doing virtual
25 meetings. I haven't -- I don't believe FDA has

Page 261

1 resumed in-person meetings for normal interactions
2 yet. At least that was my understanding based upon
3 the last meeting we had.
4      Q.    Have you had meetings at the FDA prior
5 to COVID?
6      A.    Yes, I have.
7      Q.    When was the last meeting you had at the
8 FDA itself?
9      A.    It was not -- not over the phone. I'd
10 have to go back and look, I don't know.
11      Q.    Which FDA office would that have been
12 in?
13      A.    That one would have been -- oh, I know
14 which one it was, it was -- actually, the most
15 recent, I keep forgetting about this, the most recent
16 one would have been a meeting that FDA convened in
17 2020, right before the shutdown, on talc at the FDA
18 headquarters. That was the last in-person meeting I
19 went to. Before that, I'd have to go back and look,
20 it would have been probably six or seven years before
21 that easily.
22      Q.    Were you invited by the FDA to that
23 meeting or was it open to the public generally?
24           MR. VAUGHN: Object to form.
25      A.    It was a public meeting but you had to

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

1 request an opportunity to speak, which I did. And I
2 was accepted as a speaker at the meeting.
3    Q.    And what did you speak about?
4    A.    I spoke about the risks posed by talc
5 particles and specifically issues related to
6 elongated mineral particles, and the need to
7 understand, as FDA at this meeting was trying to do,
8 more about the toxicity of those particles as they
9 related to the difference between different chemical
10 makeups.
11        So the issue is, the issue FDA was
12 trying to address was, the chemistry may be different
13 in terms of, say, fibrous talc versus asbestos
14 fibers, but both fibers, depending on their shape and
15 their physical form, pose a health risk.
16    Q.    Has FDA ever invited you to speak on a
17 panel?
18    A.    No, not without being introduced through
19 a client, no. Well, it was not -- when I've gone to
20 speak to FDA, it's been being invited by the client
21 to come and talk to the agency about an issue or a
22 concern.
23    Q.    Do you have a template document you use
24 to create litigation reports?
25    A.    Not a template, per se. I have certain

Page 263

1 parts of my expert reports that may look very similar
2 from report to report, because, say for example if
3 you look at the first few pages where I lay out my
4 training and experience, I update that as I need to,
5 but that would be very similar across different
6 reports I prepare.
7    Q.    And so do you have one main document
8 from which you cut and paste, or do you just cut and
9 paste that from your most recent litigation report?
10        MR. VAUGHN: Object to form.
11    A.    I've done different things depending
12 upon the report that I'm dealing with, so not all my
13 reports are set out with the same format. There are
14 cases I work on where an attorney may ask me to use a
15 format differently than I typically would. So for
16 example, I don't always have a summary of opinions
17 section or I don't always have large chapters, but I
18 break my report up into opinion statements and go
19 through them that way.
20        So it's been different formats depending
21 upon the need of the case or the desires of the
22 client I'm working with, or my desire to teach a
23 topic in a certain way.
24        And I usually start, that's the one
25 thing I usually do, I usually start my reports out,

Page 264

1 my background, what I was asked to do, and then I
2 teach first, "Here's basic information," and then
3 sometimes opinions are broken there, and sometimes
4 they are set apart towards the end.
5    Q.    You talked earlier today about
6 paragraphs 11 and 12. Do you remember what document
7 you cut and pasted those from?
8        MR. VAUGHN: Object to form.
9    A.    I didn't necessarily cut and paste them.
10 Those are two paragraphs that I've had for a long
11 time. I can't tell you when they would have last
12 been used before I put them into this report. I'm
13 trying to think what the last report before that
14 would have been, and I don't know. I'd have to go
15 back and look.
16    Q.    When you say you cut and paste them, do
17 you type them in from scratch or did you copy them
18 from another document?
19        MR. VAUGHN: Object to form.
20    A.    Part of them are copied in, and then
21 they are often rewritten a bit or edited a bit,
22 depending on whether I'm doing a drug case or a
23 device case, for example, or doing a cosmetic case,
24 or doing -- they could be even different if I'm
25 working on an environmental issue, so -- but those

Page 265

1 basic parts, 11 and 12, where I lay out methodology
2 or descriptions, that's something that I would expect
3 to see in an expert's report. And I -- and so as a
4 result, I typically include them.
5    Q.    I understand. I'm just asking where you
6 copied it from.
7        MR. VAUGHN: Object to form,
8 argumentative.
9    A.    I told you, I don't know. Because I
10 don't know what the last time I -- it's possible it
11 was the last time I had written a report before this
12 report or it may not be then. I don't know. I can't
13 tell you that off the top of my head.
14        Each report I write is a living
15 document, so I don't do multiple drafts. I have a
16 draft, it becomes a final report over the evolution
17 of the document and I take notes when I'm writing,
18 when I'm reading a document and that that evolves
19 into a written paragraph.
20    Q.    Do you know whether Mr. Vaughn has ever
21 referred you to other Plaintiffs' lawyers?
22    A.    I have not asked him that. I don't
23 know. I assume he may have. I don't know.
24    Q.    Do you often get referrals from one
25 Plaintiff's lawyer to another?

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

Page 266

1    A.    Well, I often do.  And that's because
2  I'm very selective over the attorneys that I work
3  with.  I don't take all the cases that come to me.
4  And I typically will not work for attorneys that I
5  don't know.  So if it's a reference, that gives me
6  some comfort if the person who is referring is
7  somebody that I trust.  It's really important to me
8  that I worked with attorneys that respect me, but
9  also they are going to respect my standards and the
10 way that I believe the work needs to be done.
11    Q.    Okay.  I'm going to mark Exhibit 10.
12 EXH        (Plunkett Exhibit 10, invoice dated
13 December 2022 on BioPolicy Solutions letterhead,
14 addressed to Pendley, Baudin & Coffin, marked for
15 identification, as of this date.)
16        MS. MILLER:  What page is that?  I'll
17 just -- we are just running short on time.
18        We're going to introduce as Exhibit 10
19 your invoices.  Alex, are they on one document?
20        A VOICE:  Yes.
21        MS. MILLER:  Okay.  I think all your
22 invoices are on one document that Alex is going to
23 put in the share drive that Adam doesn't like, so we
24 can also put them up on the screen.
25    Q.    Do you recall when you submitted your

Page 267

1  report in this case?
2    A.    October 31st, I believe, 2022.
3    Q.    Do you know why your December invoice
4  says, "Review of documents and report preparation"?
5    A.    No.  It shouldn't.  That's a mistake.
6  Certainly, I was reviewing documents and that should
7  be deposition preparation.
8    Q.    So did you begin --
9        MR. VAUGHN:  Are you still putting this
10 up into the share file?  I'm not able to access this
11 one yet.  Can -- I need to have a document if I'm
12 going to defend.
13        MS. MILLER:  I know but I'm not talking
14 about the document just yet.  I'm just asking general
15 questions.
16    Q.    Were you preparing for your deposition
17 in December?
18    A.    Yes, I started preparation for my
19 deposition in December because the date was set in
20 December, I believe.  I don't know which day it was
21 set, but certainly there were -- so for example, also
22 when I say review of documents here, part of this
23 time in 27th, 28th and 29th, that would have been
24 reviewing of defense expert reports as well, because
25 that's the time period where I had those in my

Page 268

1  possession.  I don't know that the 19th, that's
2  possible, that I had some defense expert reports
3  then.  I don't recall what date those were sent over.
4    Q.    So that's just an error, you're saying,
5  the part that says "report preparation."
6        MR. VAUGHN:  Object to form.
7    A.    Yes.  Because my report was filed the
8  date of it, I believe, I can check again but I'm
9  pretty sure it's October 31st, yes.  I haven't -- I
10 have not produced -- if you're asking me have I
11 prepared an additional report, no, I've not.
12    Q.    Okay.  We also have this invoice that
13 just says six hundred dollars with no itemization, do
14 you know what it's for?
15    A.    It's for time that I spent working on
16 the project.  I don't know.
17    Q.    Was that sent --
18        MR. VAUGHN:  I'm sorry, could I hear
19 that question?
20    Q.    Was that for the MSP matter?
21    A.    I have to go back and look at -- I have
22 to go look for additional detail.  If this is what it
23 says, this is, I believe this may have been an
24 invoice that was lost in the shuffle.  What was the
25 invoice before this one, can you show me?  'Cause I

Page 269

1  don't have this file.  The invoice before was August
2  of 2022.
3    Q.    No, this was 2021, right.  Is than an
4  early invoice from 2021?  This is the only invoice we
5  got from 2021?
6    A.    You got every invoice that I have sent
7  in litigation, so this would have been additional --
8  this would have been additional work having
9  conversations with attorneys at the start of my
10 engagement.  So it's -- this would have been, I would
11 assume the time when I would have been first provided
12 and agreed to be engaged in the project, so probably
13 phone calls.  But -- which would have been maybe -- I
14 don't know whether it was an hour -- just a second,
15 let me check something for you.
16        (A pause in the proceedings.)
17    Q.    Just to make sure I understand, from
18 February 2021 'till May 2022, you didn't do anything
19 in this case?
20    A.    Nothing that I charged for, that's
21 correct.  You have everything that I charged for.
22 And I was awaiting some materials, I do know that.
23 But that's all I can tell you.
24    Q.    Stanley Baudin?
25    A.    He is at the law firm -- PBC law, and I

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

Page 270

1 was told that was -- PBC law firm, again, I don't
2 know the -- Mr. Baudin, I don't know the -- what the
3 initials stand for, but this is where I was told to
4 send billing.
5     Q.    Have you worked with him before?
6     A.    I've been on a phone call where he's
7 been on before, but my principle contacts in the
8 litigation were Mr. Vaughn and Mr. Nigh, and then
9 Mr. Slater was on some of the phone calls as well.
10     Q.    Have you worked with Mr. Vaughn in prior
11 litigation?
12     A.    I don't believe -- well, I don't recall
13 the name from prior litigation, no.  And again,
14 Mr. Vaughn is on the phone, I apologize if I'm
15 misremembering.
16     Q.    Do you remember applying to serve on a
17 hydraulic fracture advisory panel in 2012?
18        MR. VAUGHN:  Object to form.
19     A.    No, not a hydraulic fracturing advisory
20 panel, no.  I don't recall that.
21     Q.    Do you recall giving a presentation on
22 September 23rd, 2022 entitled "Expert Witness
23 Testimony and Ethics, Science Over Advocacy"?
24     A.    In September?
25     Q.    Um-hum.

Page 271

1     A.    Oh, yes, yes, yes, I'm sorry.  I am so
2 sorry, it's getting late.  Yes, I participated in a
3 webinar that was put on by the Society of Toxicology,
4 a special section called Ethical, Legal -- "Ethical
5 Legal Societal Issues," and it's a special section
6 that brings together people with interest in science
7 ethics, in legal issues, and also in issues
8 related to societal change that are potentially
9 impacted by the regulations that are developed for
10 different kinds of products that have toxic effects.
11 So --
12     Q.    Were there any attorneys at this
13 presentation, at that webinar?
14        MR. VAUGHN:  Objects to form.
15     A.    Well, I do not know.  It was an SOT.  It
16 was an internal seminar for the Society of Toxicology
17 in cooperation with -- cosponsored by the -- another
18 specialty section called Sustainable Chemicals, so I
19 would be surprised if there was anybody from outside
20 SOT.
21        I can't tell you that there weren't
22 lawyers on the call because some SOT members have law
23 degrees as well.
24     Q.    Do you recall saying in that
25 presentation that it's important to address the

Page 272

1 limitations of your work?
2     A.    Yes.
3        MR. VAUGHN:  Objection to form.
4     A.    I probably did.
5        THE WITNESS:  I'm sorry, Brett.
6        MR. VAUGHN:  Slow down a little bit.
7     A.    I probably did.  I'd have to go back --
8 I mean, I might still have the slides for that.  I'd
9 have to go back and look at what I said.
10     Q.    What would that mean?
11        MR. VAUGHN:  Object to form.
12     A.    Well, as a scientist, any time you're
13 working, be it in the legal arena, or the regulatory
14 arena, or just as an academic scientist, when you are
15 developing -- you're studying something or your
16 testing something or developing an opinion or a
17 conclusion or you're drawing conclusions about a body
18 of science, you need to consider the information that
19 you're looking at and whether or not there's any
20 limitations to that information as it was gathered
21 that would affect conclusions you might draw.
22        So for example, in the legal space, the
23 limitations that you would look at, for example, if
24 you were doing causation assessment, would be whether
25 or not, for example, you have been able to draw

Page 273

1 conclusions based on a full array of data, human
2 experience, animal studies, in vitro study, and to be
3 able to look at not only just at the link that may
4 have been shown by epidemiology or observational
5 experience or clinical trials, but whether or not
6 there is a mechanism or a biologic link that you can
7 understand so you know why it is that the -- these
8 two things may be associated, this injury or this
9 effect with this particular exposure.
10        A lot of what, in this case, is within
11 the IARC document, is a good discussion of the
12 limitations of the different bodies of evidence and
13 the individual studies.  So that's the kind of thing
14 you do as a scientist, you look at what's reported,
15 but also any of the strength and weaknesses of the
16 potential pieces of information that you apply.
17     Q.    Do you anywhere -- is there any place in
18 your expert report here where you list what the
19 limitations are of your opinions?
20        MR. VAUGHN:  Object to form.
21     A.    I don't discuss specifically the
22 limitations on my opinions, but certainly, the
23 limitations on my opinions are based upon what it is
24 that I say and what I don't say.  And then in
25 addition to that, based upon the type of evidence

Veritext Legal Solutions
800-227-8440                                                    973-410-4040

HIGHLY CONFIDENTIAL

Page 274

1 that I cite to, in order to support those opinions.

2          In the regulatory world, it's a little

3 different than in the basic science world in terms of

4 how you would discuss limitations.  When I described

5 to you a few minutes ago, when you talked about IARC,

6 that's kind of a traditional application of

7 discussion and limitations that are applied to the

8 individual pieces of science.

9          In the regulatory world, the issue that

10 you would come to on limitations is whether or not

11 you have training and experience and/or whether or

12 not you have been able to identify specific

13 regulations or specific standards that you could

14 apply to answering questions that you're trying to

15 answer or opinions that you're going to reach about

16 conduct, responsibility, and what the data says.

17          It's not quite the same as the

18 discussion of limitations that I would have presented

19 in that seminar.

20     Q.    Your seminar was about being an expert

21 in litigation, right?

22          MR. VAUGHN:  Are you done with this

23 exhibit yet?  In so, can we take it down?

24          MS. MILLER:  Sure.

25          MR. VAUGHN:  Thank you.

Page 275

1     Q.    Your seminar was about being an expert

2 in litigation, correct?

3          MR. VAUGHN:  Object to form.

4     A.    It was talking about an expert in

5 litigation, and so that's a different area.  So --

6 that I didn't touch on that I can described for you.

7 So in that seminar, we talked a little bit about

8 staying in your lane, and that's what I was

9 describing in my regulatory opinions.

10          It's the idea you need to understand

11 what your training, experience, and the science can

12 allow you to do in terms of providing expert

13 opinions, and especially with the specific of

14 training and experience.  So for example, what it

15 is -- what can you say or what can you analyze based

16 on that training and experience?  Is it sufficient to

17 allow you to draw conclusions?

18          And so that's one of the things I spend

19 a lot of time considering when I agree to take a

20 case, looking at what are the issues, how could I fit

21 in, are there things that are being addressed in this

22 case that fit my training and experience, or not.

23          And that's how I would approach, and I

24 talked to you a little about bit about that in the

25 seminar, stay in your lane, making sure not to

Page 276

1 overreach based upon the -- for example, if you're

2 looking at a scientific article, making sure that you

3 have considered evidence on both sides; are there

4 papers that teach one thing, and papers that teach

5 the other.  So that's what I was talking about, being

6 aware of your limitations.  Not everybody can do

7 everything.

8     Q.    I just wanted to know if there's

9 anyplace in your report where you list limitations.

10          MR. VAUGHN:  Objection, asked and

11 answered.

12     A.    I answered that at the very beginning,

13 and then you asked me so some additional questions,

14 so I apologize.  I did start, I believe, by answering

15 that question.

16     Q.    Somehow I missed the answer in your

17 colloquy, but can you just tell me, is there anyplace

18 in your report where I can go and see what the

19 limitations are?

20          MR. VAUGHN:  Objection, asked and

21 answered.

22     A.    I started out by telling you that there

23 is not a specific section on limitations in that way.

24 However, when I was describing where you can find

25 my -- where I set forth my methodology, my training

Page 277

1 and experience, and that is a description of what --

2 why it is I believe I can opine on certain areas.

3 And then of course those judgments would be made, I

4 understand the courts will make certain judgments

5 based upon, you know, what that training and

6 experience and analysis is.

7     Q.    You also stated in your presentation

8 that it's important to acknowledge your biases, do

9 you recall saying that?

10          MR. VAUGHN:  Objection, lack of

11 foundation.

12     A.    I possibly did.  I don't remember the

13 context but I possibly did, yes.

14     Q.    Does this sound familiar, "You also need

15 to acknowledge your biases.  We all know that we have

16 biases.  I have biases as a scientist."  Do you

17 recall saying that?

18          MR. VAUGHN:  Lack of foundation.

19     A.    I don't recall that but certainly yes,

20 I --

21     Q.    What are your biases?

22     A.    So --

23          MR. VAUGHN:  Object to form.  Slow down

24 just a little bit.

25          Sorry, Dr. Plunkett.

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL

Page 278

1      A.   So bias is that everybody, everybody,
2  based on your background and your experience in life,
3  has -- you see things a certain way.  So for me, I
4  may, people may consider that I have a bias when I
5  read a paper if I had funding from industry.  So
6  acknowledging bias in publications would be
7  acknowledging any potential conflicts or sources of
8  funding for your work, and that can -- because that
9  can indeed be seen as a potential bias.
10      If all you ever do is work for industry,
11 there may be certain biases you have because you've
12 never seen things, for example, from the regulatory
13 side, or from the academic side or some other way to
14 look at an issue.
15      I've been very lucky, I believe, in my
16 training and experience, that I started out at
17 Environ and I was introduced to litigation solely
18 from the defense side.  I went out on my own.  I did
19 some work in both areas, and now I do a lot of work
20 in drugs and FDA-regulated products from the
21 Plaintiff's perspective.
22      But I believe that, based upon that
23 training and experience I had at Environ, that I can
24 see things from both sides.  It's one of the reasons
25 I still work as a regulatory consultant, because I

Page 279

1  think it's really important to be able to keep your
2  experience and your interactions in a way that you're
3  never seen as just doing this one thing or that one
4  thing.  So that's -- that's one of the areas of bias.
5      The other bias that sometimes comes into
6  play is whether or not, when you design studies, so
7  this comes about, this comes about when you actually
8  talk about putting together say, a clinical trial, or
9  an animal study, there's -- may be bias in the way
10 the study is designed.
11      So as a scientist, you need to consider
12 that because we may not want to design a study to
13 answer a question -- we should always design a study
14 in the best way to answer the question, rather than
15 being prevented from answering the question.
16      And I believe that that was a question that
17 came up during the seminar when we talked about study
18 design.
19      Q.   Okay.  You just gave me examples of
20 theoretical biases and biases you don't have.  But my
21 question was, what are your biases, do you believe
22 you have any biases?
23      MR. VAUGHN:  Object to form, asked and
24 answered.
25      A.   I believe that everybody has a bias

Page 280

1  solely based on what their experience is, and I was
2  telling you that I believe I've been fortunate in
3  that I've been able to have experience in more than
4  one world.  So I've had academic experience, I've had
5  government research experience, I've had consulting
6  solely with industry, and I've had experience working
7  for nonprofit, as well as working in the litigation
8  area for injured parties.
9      So that, to me, I think, gives me a
10 different view than someone who only ever does the
11 same thing.  But certainly, when I said everybody has
12 biases, I mean, I have a bias probably in that I've
13 never been homeless, I've never had to worry about
14 where my next paycheck is coming from; so, if you
15 were to have a conversation and approach me, I might
16 have a bias that's related to that.
17      I may have a bias because of being a
18 wife and an American woman.  There's biases that come
19 into play with that.  There is gender bias, there's
20 all kinds of sources of bias.  And to me it's just
21 recognizing that bias is a potential issue you need
22 to consider.
23      So when I approach problems, and I
24 approach a case, one of the ways I try to avoid bias
25 in a litigation world is, I try to approach this, a

Page 281

1  case in the litigation world, just the way I approach
2  a case when I give advice to my regulatory clients.
3      Q.   You said at your presentation that your
4  bias is as a scientist.  Were you referring to
5  as a white female, to bias as never having been
6  homeless, or were you referring to other types of
7  biases?
8      MR. VAUGHN:  Objection to form,
9  argumentative, lack of foundation.  You may go ahead,
10 Dr. Plunkett.
11      A.   So I don't recall the detail, but I'd
12 have to look at my slides.  But certainly, a bias as
13 a scientist works would be, a scientist has a certain
14 way of looking at something, right?  I have training,
15 I'm a pharmacologist and toxicologist, so I
16 approached my problem that way.  I'm not a social
17 scientist, so I may have a bias towards expecting to
18 see certain kinds of information, statistical
19 analysis, where somebody else might come at the
20 problem and not feel those things are so important.
21      So I don't recall -- I mean, if you have
22 the slides in front of you, we can talk about it.  I
23 just don't recall the details of the talk.  I really
24 don't.
25      Q.   Do you ever have preconceived notions

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

1 about litigation when you're asked to -- when you are
2 being retained by a Plaintiff's lawyer, do you ever
3 have preconceived notions or ideas about litigation
4 before you accept a retention?
5          MR. VAUGHN: Object to form.
6     A.   I certainly attempt to not bring any
7 information that I may or may not be aware of to the
8 table when I make that decision. Decisions I make on
9 whether to work in the litigation area have more to
10 do, not with the preconceived notion but with the
11 information that I know is available that I believe I
12 can or can't support.
13          But certainly, for example, in a case
14 like this, I was aware already of NDMA, so for
15 example, I certainly had an opinion that NMDA is a
16 carcinogen, before the -- before I entered this
17 litigation. However, that doesn't mean that I didn't
18 revisit that opinion by looking across, as I told
19 you, looking across what authoritative bodies and
20 textbooks have shed over the years, how far back in
21 time that went.
22          So that was a new analysis that I did
23 that wasn't just related to the fact that I was aware
24 that NDMA was a prototypical positive control used in
25 animal studies for cancer, which is something that

Page 283

1 I've been aware of since I was in academics in the
2 '80s.
3     Q.   Do you ever accept a legal case because
4 you have preconceived notions about the substance of
5 litigation?
6          MR. VAUGHN: Object to form.
7     A.   Not in a brand new area, no. Certainly
8 if I was approached by a lawyer that had a case
9 related to ovarian cancer and talc, I've done so much
10 work and analysis in that area that certainly I have
11 very strong opinions about the risks, but also what
12 the labeling for the product should have been over
13 time.
14          So I would bring that same view, unless
15 new information came about to change it, I certainly
16 would look for that, so even though I already have
17 that opinion, but that's -- that's a little
18 different. That's -- preconceived notions to me
19 would be more about the issue of the first time you
20 think about a problem, not the same problem that's
21 being presented to you again in the same way.
22     Q.   Okay.
23          MS. MILLER: I don't have any further
24 questions.
25          (Continued on following page.)

Page 284

1 EXAMINATION BY
2 MR. HARKINS:
3     Q.   Hi, Dr. Plunkett, this is Steve Harkins
4 with Greenberg Traurig for the Teva defendants, can
5 you hear me?
6     A.   I can. Nice to meet you.
7     Q.   Nice to meet you, too. You've been
8 going for a little bit. I'm happy to just continue.
9 I just wanted to check and make sure you don't need a
10 second for a break or anything, right?
11     A.   Let's Keep going.
12          MR. VAUGHN: Thanks, Steve.
13     Q.   All right. So Dr. Plunkett, I represent
14 Teva and obviously you're familiar with Teva and
15 their role in this case as a finished dose
16 manufacturer, right?
17     A.   Yes.
18     Q.   And because we don't have a lot of time
19 left, I just want to be clear, what I'm focused on
20 and what I'm going to be asking you questions about
21 is whether you have or have not formed opinions about
22 the conduct of the finished dose manufacturers in
23 this case, okay?
24     A.   Okay.
25     Q.   It appears that your report is pretty

Page 285

1 focused on ZHP and while there are citations to Teva
2 documents, there are not a whole lot of references
3 directly in the narrative to Teva or Torrent, is that
4 fair?
5     A.   That's probably true.
6          MR. VAUGHN: Object to form.
7     A.   It's probably true that there aren't
8 many citations to just Torrent, many citations to
9 just Torrent, for example, or just Teva documents,
10 that's true. And the majority, if not all of the
11 company testimony, were ZHP employees, I believe,
12 that I've looked at so far. Maybe there was a Teva
13 or a Torrent person; but the majority of them --
14 because the facts in this case, you -- Teva, not you,
15 but Teva as a company was using API manufactured from
16 ZHP, so a lot of the information, and I think I
17 mentioned them a couple of times today, in terms of
18 the responsibilities.
19     Q.   Understood, and we'll talk through that.
20 Generally speaking, were you asked to render opinions
21 about the conduct of the finished dose manufacturers
22 in preparing your report in this case?
23     A.   I was asked to address the API and
24 finished dose manufacturers as it relates to my area.
25 So that's different than the expansive to all areas,

72 (Pages 282 - 285)

Page 286

1 so for example, it's my understanding that other
2 experts are going to handle some of the issues
3 related to Teva and Torrent with regulatory -- some
4 other regulatory compliance issues. But I have
5 considered them as their role the people who were
6 buying and using the API from ZHP.
7    Q.    And what I'm going to attempt to clarify
8 is whether your references to the finished dose
9 manufacturers, and specifically Teva, are intended to
10 either be factual information that's important for
11 your report, or in its contents, talking generally
12 about obligations that would apply to any finished
13 dose manufacture, or if they are criticisms about the
14 specifics about the finished dose manufacturers in
15 this case. And I'll get more specific, but that's
16 generally what I'm trying to figure out, okay?
17    A.    Sure.
18    Q.    You mentioned that there are other
19 experts who have worked on different areas. You've
20 talked about chemistry and CGMPs. Are you aware that
21 there are other experts who are directly addressing
22 the conduct of the finished dose manufacturers?
23    A.    Yes, I believe so. And I'm also aware
24 of, I believe I've read at least one report from one
25 of Teva's experts that's on my list, that was in the

Page 287

1 list that Mr. Vaughn sent around, hopefully you
2 received that, in response to the notice of
3 deposition.
4        MR. HARKINS: And I'll go ahead, I don't
5 believe the objection responses of the notice have
6 been marked as an exhibit, and if that's the case I'm
7 going to go ahead and mark this and I believe this is
8 now Exhibit 11, is that right?
9        MR. VAUGHN: I think you're right,
10 Steve.
11 EXH        (Plunkett Exhibit 11, Plaintiffs'
12 Objections and Responses to Defendants' Notice of
13 Deposition of Laura Plunkett, marked for
14 identification, as of this date.)
15        MR. HARKINS: We'll introduce that. And
16 because you mentioned it, are we using a prefix to
17 that or do I just add it?
18        MR. HARKINS: Can we get a time check as
19 we're getting the exhibit up and loaded?
20        VIDEOGRAPHER: Sure, stand by for that.
21        MR. VAUGHN: Thank you.
22        (A pause in the proceedings.)
23    Q.    All right, Dr. Plunkett, the exhibit has
24 been introduced with your objections and responses
25 and if you would like to pull that up there or I can

Page 288

1 screen-share it for you if that would be more
2 convenient. You just let me know.
3    A.    On that one I've seen it before, so if
4 you want to just screen-share it, that's fine.
5        VIDEOGRAPHER: We're at six hours, 16
6 minutes.
7        MR. HARKINS: Thank you. And thanks for
8 the option on the exhibit, Steve.
9    Q.    Doctor, let me know when you can
10 hopefully see the document, I'll go up to the top
11 just to confirm, is this the Plaintiff's objections
12 and responses to the notice of videotaped deposition
13 for you?
14    A.    Yes, that's correct. And I -- I went
15 over this and assisted in terms of responding to the
16 notice of deposition, and I saw this document after
17 it was filed.
18    Q.    All right, and specifically I'm going to
19 go down, I'm interested in just confirming the part
20 that you brought up where you mentioned that you have
21 reviewed a number of additional expert reports
22 including the ones at the end of this paragraph, at
23 the top of page 11 for defense expert reports of
24 Dr. Steven Baertschi, Dr. Roger Lea Williams, and
25 Mr. Timothy Anderson, do you see that?

Page 289

1    A.    Yes.
2    Q.    And those are Teva experts, do you
3 recall seeing in those reports?
4    A.    Yes, and Dr. Baertschi is one I
5 certainly recall was, and I believe Dr. Williams as
6 well. Dr. -- Mr. Anderson, I don't recall his in any
7 detail, but -- the ones I remember are ones that may
8 have actually mentioned my name, so I spent more time
9 with those.
10    Q.    Are there any other Teva depositions,
11 reports, or corporate documents that you reviewed in
12 between the time that you completed your report and
13 the deposition today?
14    A.    No. I don't believe so.
15        MR. HARKINS: I'll go ahead and stop
16 sharing that.
17    Q.    I'd like to go and just talk
18 specifically about the times that you do discuss Teva
19 in your report, and then some other times where
20 you're referring to finished dose manufacturers more
21 generally. Before I go to that, do you feel that you
22 have reviewed sufficient material to form opinions
23 about every aspect of the Teva Defendants' conduct in
24 this case?
25        MR. VAUGHN: Object to form.

HIGHLY CONFIDENTIAL

Page 290

1    A.    I don't know what you mean by every
2  aspect, but I would -- so what I would say to you is
3  I believe I have reviewed sufficient information to
4  form the opinions I have that apply to finished dose
5  manufacturers including Teva, as I -- as I have put
6  them forth.  And again, there are other experts I
7  know that are going into much more detail on some of
8  the other -- the issues that I don't cover.  So that
9  may be issue -- you know, may be issues for Teva.
10    Q.    And if there are other experts who are
11  covering this in more detail for Plaintiffs, you
12  would defer to their opinions on those subjects?
13    A.    Well, I just don't go there.  That's
14  beyond my opinions, beyond the scope.  As far as
15  whether I defer to anybody else, I don't typically
16  defer to somebody, I just say that's something that
17  I'm not doing, unless I mention them specifically in
18  my report and say that, you know, I concur in -- like
19  Dr. Hecht, I felt that his report and his, discussion
20  based on my understanding of the chemistry and his
21  discussion of the literature, was such that I wanted
22  to describe it.
23    Q.    Okay.  Well, I'd like just to quickly
24  walk through and make sure that I understand where
25  you have referred to Teva.  Do you have a copy of

Page 291

1  your report with you?
2    A.    I do, yeah, if you want to tell me where
3  you want to go.
4    Q.    Sure, and I think most of these should
5  be pretty straightforward.  If you can go ahead and
6  look on page 35, there is a footnote.
7    A.    Um-hum, yes.
8    Q.    And that reference to Teva, that's just
9  factual information as to their status in the case as
10  a Defendant, right?
11    A.    Yes, and I would say also, on page 4,
12  where a footnote, "Valsartan containing products," I
13  understand Teva makes some of those products, even
14  though I don't necessarily link one specifically to
15  Teva.
16        MR. VAUGHN:  Steve, are you on this
17  screen-share for video purposes or are you okay with
18  it not being on video?
19        MR. HARKINS:  I think it's fine if we're
20  not on video.
21    Q.    But, Doctor, if you could use fuller --
22        MR. HARKINS:  -- or if anybody else
23  needs to see it, let me know.  But we're just going
24  to walk through some sections of her report quickly.
25        MR. VAUGHN:  Understood.

Page 292

1    Q.    Doctor, turning to paragraph 45 of your
2  report, which I believe is the next referenced
3  directly to Teva --
4    A.    I'm there, yes.
5    Q.    -- and there are two sentences at the
6  end.  One says, "It should be noted that all ANDA
7  holders have a responsibility to either perform such
8  risk assessments or to ensure that such risk
9  assessments have been performed in any API they may
10  incorporate into their finished drug products," do
11  you see that?
12    A.    Yes.
13    Q.    And the question I have about that is,
14  is that a statement by you generally that ANDA
15  holders have a responsibility to insure certain
16  things about the API they have incorporated in their
17  finished dose drug products, or is that intended as a
18  criticism of Teva's steps taken to perform risk
19  assessments to insure the quality of their API?
20        MR. VAUGHN:  Object to form.
21    A.    To -- this is as written, a general
22  section of the report, which is here as a general
23  statement about ANDA holders which would apply at
24  Teva, because they are finished dose manufacturers.
25  But if I meant, if I was referring to a specific

Page 293

1  document related to Teva or Torrent, I would cite it
2  and I have not.
3        In the next sentence I say, "This duty
4  would assure the purity applies to them."  So I am
5  saying that they had a duty to ensure purity.  And so
6  my criticism obviously would be that they sold
7  product that contained the impurity 'cause those
8  products were recalled as well.
9        So as a result of that, that would fall
10  as a failure to insure the purity before the products
11  were distributed.
12    Q.    And do you feel that you've reviewed
13  sufficient documents and material to comment and
14  provide opinions on the risk assessments performed by
15  Teva related to the ZHP API?
16        MR. VAUGHN:  Object to form.
17    A.    So I have not done a lot of -- I have
18  done as much investigation as the other experts that
19  are dealing with some of these GMP issues have done
20  into the Teva and Torrent files.
21        What I will tell you is, the evidence I
22  have seen is that I don't see Teva and Torrent in the
23  documents, because I actually asked for some of these
24  documents, that I haven't seen the evidence, and I
25  haven't seen it discussed in the ZHP documents,

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL

Page 294

1 either, whether they are the kind of conversations or
2 questions from Teva and Torrent that you saw from
3 either Novartis, when they discovered the problem in
4 2018, when they were looking at qualifying of ZHP for
5 use as an API for finished dose products, or for
6 things that were gone over this morning by -- that I
7 had not reviewed before, by -- gosh, Ms. Miller,
8 Jessica, about the interactions that other companies
9 were having in terms of going back and forth with
10 ZHP. So I haven't seen that evidence. If it exists,
11 you're going to show it to me, I can consider it, but
12 I have not seen that.
13      Q.   Well, Doctor, I'm not interested in
14 things that you didn't review. I'm asking if you
15 feel like, in rendering your opinions, you have
16 reviewed sufficient information, not just to make the
17 general statement that there was a duty for these
18 finished dose manufacturers to perform risk
19 assessments, but have you reviewed sufficient
20 documents to come in and offer opinions in your
21 report and then eventually at trial about whether the
22 finished dose manufacturers, including Teva,
23 adequately performed their risk assessments, have you
24 reviewed those risk assessments?
25           MR. VAUGHN: Object to form. Asked and

Page 295

1 answered.
2      A.   I have -- the documents that I have seen
3 at this point in time, I feel comfortable allow me to
4 say what I say in my report. So if you're asking me
5 for, is there an opinion that is not expressed in my
6 report, or when I use the word "ANDA holders," if I'm
7 using the general word "ANDA holders," however I'm
8 stating that opinion, that would encompass Teva and
9 Torrent. But my language is very carefully chosen
10 based upon the information and evidence that I have
11 reviewed.
12           So you were correct in stating that this
13 first sentence you've read was a general statement
14 about what the responsibilities of ANDA holders are.
15           The second sentence that you didn't read
16 in, where I say in this case, I'm letting you know
17 that it's my opinion that that duty goes to them,
18 too, Teva and Torrent, because those -- and Prinston
19 and ZHP because four of those actually made a
20 finished dose, so it's not just a ZHP opinion.
21           And then earlier today I made some
22 statements to you that I think if you get to it, back
23 of the back, I do have some specific opinions about
24 adulteration, and as the finished dose being
25 adulterated if it contained an adulterated API. I

Page 296

1 think those are the main areas that I covered that
2 would be Teva and Torrent specific.
3           Did that help you? I'm just trying to
4 summarize it to get it going, but --
5      Q.   Sure. Let me go ahead and point you,
6 and I'm happy to screen-share if we'd like here, to
7 the appendix that you list the materials that you did
8 consider prior to providing your report in this case.
9      A.   I have it. I have my appendix C, so you
10 want to just tell me which page?
11      Q.   Okay. The first page of the appendix,
12 it's following 47 but unnumbered, listing number of
13 depositions here. Do you see that?
14      A.   Yes.
15      Q.   Now, I'll represent to you that none of
16 these are depositions of Teva corporate employees.
17 If you disagree with that, let me know and I'm happy
18 to explain the identity of any of these individuals.
19           Do you think that you reviewed any Teva
20 depositions?
21      A.   I reviewed depositions where Teva was
22 in, was at the deposition and may have been even
23 asked for questions; but no, in these depositions,
24 you're correct. These were employees of ZHP and Teva
25 relied on ZHP to produce their API.

Page 297

1      Q.   But my question is, you did not review
2 any depositions of any Teva corporate witness,
3 correct?
4      A.   That is correct. If it's not listed
5 here, this is all I have reviewed in terms of
6 corporate witnesses.
7      Q.   And you identified thee reports that
8 were provided last month that you've also not
9 reviewed the depositions of any Teva expert witnesses
10 that have already taken place, correct?
11      A.   I didn't know that any expert witness
12 depositions had taken place. Usually the defense
13 experts don't go until after the Plaintiffs's
14 exhibits go; but if I'm mistaken, I have not. I
15 would actually expect to potentially review that
16 information.
17      Q.   Turning to the next page, there is a
18 section that begins to list the Teva corporate
19 documents that you reviewed. Do you see that,
20 towards the bottom in the right-hand column?
21      A.   Yes.
22      Q.   There are a number of documents here
23 that have "(ECTD)" in parentheses after the
24 description, do you see those?
25      A.   Yes.

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1    Q.    Those are the ANDA files in ECTD format,
2  is that correct?
3    A.    That's correct.
4    Q.    Then there are a handful, one, two,
5  three, four, five, six, seven, eight additional Teva
6  documents on the next page.
7    A.    Yes, that's correct.  And it's also some
8  non-ECT documents on the bottom of the second page as
9  well.
10    Q.    Correct.  These are all the Teva
11  documents that you reviewed in preparing to render
12  your report in this case, correct?
13    A.    These are all the documents with the
14  Teva Bates but I assume that means, in my experience,
15  they came from Teva's files, that is true.  But there
16  are a number of documents in the ZHP discovery that
17  are discussing or may be or would be relevant to
18  Teva.  But you're correct, as far as what was in
19  Teva's discovery, these are the only ones that I
20  have.
21    Q.    So for example, in connection with the
22  opinion that you, I believe, have said you intend to
23  offer about the risk assessments performed by Teva
24  and their evaluation of their supplier, you did not
25  review the risk assessment that they performed on ZHP

Page 299

1  and ZHP's process in connection with the process
2  change, did you?
3    MR. VAUGHN:  Objection, form, lack of
4  foundation.
5    A.    If it's not one of these documents, no,
6  I would have not have reviewed it.  So you have to
7  tell me, because I don't recall what each of these
8  documents was --
9    Q.    I'll certainly represent to you it is
10  not one of these documents.  You did not review that
11  document in preparing to render your own opinion,
12  correct?
13    MR. VAUGHN:  Object to form.
14    A.    I did not, but don't forget the issue
15  that you have here, and maybe this is something I
16  talked about this morning, is that as an ANDA holder,
17  Teva has a responsibility to ensure that their
18  supplier has done all the right things.  And given
19  that the supplier didn't do the right things, I
20  haven't seen a document to indicate that Teva
21  questioned them about that.  And I did ask about that
22  from the attorneys, and I don't have any documents
23  that I have reviewed at this point in time.
24    Some of these requests and things came
25  right before my report was filed.  But I didn't --

Page 300

1  wasn't given anything.
2    Q.    You didn't feel that Teva's risk
3  assessment evaluating and obtaining information about
4  their supplier's process control change was relevant
5  to whether Teva appropriately evaluated their
6  supplier's process control change?
7    MR. VAUGHN:  Object to form.
8    A.    Given that ZH -- no, I think my opinion
9  is, given that ZHP's risk assessment was ineffective,
10  and in the DMF, which is what Teva and Torrent don't
11  have access to, right, and then not seeing an
12  agreement between Teva and Torrent, and I did look
13  for this, whether or not there was a -- I asked this
14  question, was there a confidentiality or a
15  non-disclosure agreement where Teva and Torrent asked
16  to review the DMF, and it's my understanding that was
17  not the case.  So those are the kinds of questions I
18  asked.
19    So the issue is, if you never reviewed
20  the details of their DMF, then obviously, you can't
21  correct any deficiencies as an ANDA manufacturer that
22  existed.  The deficiency started with ZHP but by not
23  having access to those details, and instead relying
24  on representations made by ZHP, where we know that
25  some of those representations were not adequate in

Page 301

1  terms of the work they did, it falls to --
2    Q.    Doctor, during this session, I'm never
3  asking you about the conduct of ZHP and I'm never
4  going to be asking for a response that details the
5  conduct of ZHP.  And we have very limited time for
6  the two remaining Defendants, and I am strictly
7  focused on your opinions about Teva's conduct and, by
8  extension, whether you evaluated that conduct for the
9  finished dose manufacturers, okay?
10    A.    Yeah, and that's why I mentioned the
11  ANDA, the nondisclosure because --
12    Q.    You --
13    A.    -- go ahead -- I'm very familiar with
14  NDAs in licensing agreements, when I do due diligence
15  and people are looking at files to understand what's
16  going on.  And that's -- that's the reason, so that
17  may be a separate opinion that isn't what you're
18  asking.  And I apologize, but I did --
19    Q.    I am certainly not asking about that
20  opinion.  I'm just asking about your opinion about
21  Teva's risk assessment and evaluation of their
22  supplier, not to do with ZHP documents.  And I just
23  want to confirm, you did not review any of the Teva
24  risk assessments of their supplier, ZHP, correct?
25    MR. VAUGHN:  Object to form.

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL

Page 302

1    A.    If it's not one of ones listed, I did
2 not, that is true. And we started there, and you
3 represented and I'll take your representation.
4    Q.    I will represent to you that there was a
5 change control instance report that documented a
6 whole series of steps that Teva took in connection
7 with evaluating the change to the process that
8 eventually generated the impurity. This is not on
9 your list of materials considered, that is also not
10 something that you considered in rendering your
11 opinions about Teva's conduct in evaluating their
12 supplier, correct?
13        MR. VAUGHN: Object to form, lack of
14 foundation. You may answer.
15    A.    If it's not in my list, I didn't review
16 although I would argue that that area is one that I
17 understand is being covered by other experts in terms
18 of looking at the change control documents and those
19 documents which have to do with GMP compliance,
20 obviously, for the finished dose manufacturer.
21 Because they have separate responsibilities from --
22 as well.
23    Q.    And you're familiar with the closed
24 portion of the DMF that is not available and visible
25 to the finished dose manufacturer in the course of

Page 303

1 getting an ANDA approved, etc., right?
2        MR. VAUGHN: Object to form.
3    A.    I am aware that Drug Master Files are
4 typically closed unless companies come to an
5 agreement to share information. That's why I
6 mentioned getting -- I don't know what you call it, a
7 confidentiality agreement, a nondisclosure agreement
8 of information, and that's why I asked, did those
9 exist, and I was told that there was no indication
10 they did in the discovery documents.
11    Q.    Is your criticism of Teva that they
12 failed to seek access to the closed portion of ZHP's
13 DMF?
14        MR. VAUGHN: Object to form.
15    A.    Yes, given that -- give the situation
16 that existed here, that's exactly right. I mean,
17 again, this is advice I've given to clients before,
18 when they are talking about having responsibility for
19 something else, that another company does that, it's
20 not within their purview. In fact, if you look at --
21 I know you have limited time, sorry, but in a --- I
22 cite to a document in my reliance materials that is a
23 presentation put on by the FDA about Drug Master
24 Files, and it makes it very clear that you're right,
25 they are closed. But it also indicates the companies

Page 304

1 can make their own arrangements. So it isn't that
2 they couldn't do that, it's just that I don't think
3 it was done based on the evidence I have.
4    Q.    Doctor, are you aware of any indication
5 or evidence that you can point to, and I'm talking
6 specifically about Teva here, are you aware of any
7 piece of information or document that, according to
8 your opinion, should have led Teva to seek access to
9 the closed portion of ZHP's DMF?
10        MR. VAUGHN: Object to form.
11    A.    I would say that the information that
12 I'm aware of would be the fact that they were
13 referring to the Drug Master Files in their ANDA from
14 ZHP; so in other words, they were referring to the
15 Drug Master File. It's my.
16        Understanding they didn't have access to
17 it. It would be my advice to take a look so you have
18 an understanding, particularly when the DMF you're
19 referring to was not the one that is -- is not the
20 process that related to Diovan, which was the
21 Reference Listed Drug.
22    Q.    You've not seen any document or evidence
23 whatsoever that Teva was aware of the presence of
24 NDMA or NDEA in Valsartan prior to June 2018, have
25 you?

Page 305

1        MR. VAUGHN: Object to form.
2    Q.    Teva specifically.
3    A.    I don't believe so, no.
4    Q.    There was a statement during the course
5 of your deposition earlier today where you said Teva
6 and Torrent also have duties to evaluate their API
7 suppliers and insure they produce a quality product.
8 Is that effectively a restatement of the opinion that
9 we've been talking about here?
10        MR. VAUGHN: Object to form.
11    A.    Yes, well -- it's a different way of
12 saying what we already read into the record, that's
13 exactly right. And the reason I stated it this
14 morning was, I wanted to make sure that, since you
15 were going to ask questions, that you knew I
16 wasn't -- if you haven't seen that part of my report,
17 which I assume you had, that I do put a
18 responsibility here in terms of that relationship,
19 that Teva and Torrent have a responsibility for the
20 API as well, because they are a finished dose
21 manufacturer using that.
22    Q.    Turning to paragraph 52 of your
23 report --
24    A.    Yes.
25    Q.    -- I believe here you're referring to

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL

Page 306

1 ANDA holders in the second full sentence where it
2 says, "Yet neither ZHP or any of the other ANDA
3 holders performed the necessary risk assessment for
4 degradation products from ZHP's Valsartan processes.
5 Such risk assessments, if adequately performed,
6 should have led to identification of the potential
7 and actual presence of nitrosamine impurities in
8 ZHP's Valsartan product," you see that there, right?
9     A.   I do.
10     Q.   This situation where you are referring
11 to ANDA holders including Teva and stating an opinion
12 that they should have performed necessary risk
13 assessments for degradation products that -- is that
14 your opinion here?
15         MR. VAUGHN:  Object to form.
16     A.   My opinion is, as I stated, and if
17 you're an ANDA holder that was using ZHP's process
18 and product, yes, I would refer to Teva and Torrent.
19     Q.   As we have already established, you did
20 not review the risk assessment that Teva performed in
21 connection with ZHP's process in forming this
22 opinion, correct?
23         MR. VAUGHN:  Asked and answered.
24     A.   That's correct.  The document that
25 you're referring to that I haven't seen, yes, I have

Page 307

1 not -- referring to the change control, what you call
2 the change control document, is that what you called
3 it?
4     Q.   That's another document that you didn't
5 review.  The actual risk assessment for the ZHP
6 process which you did not review, you didn't feel
7 that it was important to review that document in
8 coming to your opinion that Teva's risk assessment
9 related to this product was insufficient?
10         MR. VAUGHN:  Object to form.
11     A.   Well, there certainly would be other
12 documents I would consider, but I don't think it
13 would change my opinion based on the facts in this
14 case, which is that I did ask was there some type of
15 a sharing of confidential documents, such as that you
16 could do -- in order to -- in order for you as Teva
17 or -- not you, but in order for Teva as a company or
18 Torrent as a company in my opinion to be able to do a
19 proper risk assessment, they would need to see the
20 details in the DMF.
21         It's my understanding they did not ask
22 for that access so, as a result of that, they are in
23 a position in relying on the adequacy of risk
24 assessment from ZHP.
25         Obviously, based on the facts in this

Page 308

1 case, as we know, the ZHP API contained impurities of
2 NDMA and NDEA that are tied to the changes in the
3 process.  And based upon, as we talked a lot this
4 morning, based upon what was -- should have been
5 known -- could have been known based on the chemical
6 literature, and then of course looking what Dr. Hecht
7 had said about the foreseeability, that lack of a
8 full assessment in my view was very important to why
9 we got to where we were, which was adulterated
10 products.
11         But you're correct, I am not seeing the
12 document that you're referring to.  I've seen much
13 more information related to ZHP than I have you --
14 have Teva -- I don't mean you personally, I
15 apologize, than I have for Teva.
16     Q.   And the fact that you've not evaluated
17 Teva's own, not ZHP's, Teva's own risk assessment, or
18 their change control, or the policies that they have
19 put in place around this change, doesn't, you feel,
20 impact your ability to provide an opinion on Teva's
21 conduct related to the risk assessment?
22         MR. VAUGHN:  Object to form.  Lack of
23 foundation.
24     A.   I don't believe it does, based on the
25 opinion that I'm providing.  But you'll notice that

Page 309

1 I'm only going so far.  And as a result, there are
2 other experts that were handling much more detailed
3 reviews and statements about the compliance with GMP
4 or lack of compliance for all of the different
5 parties involved.
6     Q.   I'd like to turn to paragraph 54 of your
7 report.
8     A.   I'm there, yes.
9     Q.   In the second paragraph below where you
10 have quoted?
11     A.   Starting with "For the materials," or
12 starting with "Regarding," or starting with "The
13 Valsartan"?
14     Q.   Below, starting with, "The Valsartan."
15     A.   Yes, I'm there.
16     Q.   The last sentence that starts on that
17 page indicates, "None of the Valsartan ANDAs or
18 supplements disclosed NDMA or NDEA as an impurity."
19 Correct?
20     A.   Oh, yeah, you skipped down, I see where
21 you are.  Yes.  Yes, that's my statement.  You've
22 read that.  You didn't read the whole sentence
23 before, but you read the sentence at the end, I see
24 that, yes.
25     Q.   Do you agree, I believe we've already

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 310

1 discussed that you've not identified anything to
2 indicate that Teva was aware of the presence of NDMA
3 or NDEA in Valsartan prior to June 2018, correct?
4    A.   Based on the documents I've seen, that's
5 my understanding, that they had not gained that
6 knowledge until then, that's correct.  But they still
7 have responsibilities which I've tried to lay out in
8 my report.
9    Q.   And, Doctor, I'm being very specific to
10 the actual information that was contained in the ANDA
11 because your final statement in this paragraph is,
12 "The Valsartan finished doses that contained NDMA or
13 NDEA did not comply with the specifications with the
14 ANDAs."  I believe that's "within the ANDAs," is that
15 right?
16    A.   Right, because it doesn't mention the
17 presence of the genotoxic impurity.
18    Q.   It's your opinion that the product which
19 met all then-existing specifications for the
20 Valsartan product contained in the ANDA, nonetheless
21 violated those specifications?
22        MR. VAUGHN:  Objection, form, misstates
23 facts in evidence.
24    A.   If the finished dose contained, as I
25 say, Valsartan finished doses that contained NDMA or

Page 311

1 NDEA did not comply with the specifications of
2 the ANDAs, on this part of that description of the
3 specification for the ANDAs is described by, in a
4 text above, where there was a -- a -- what were you
5 go to call -- a warranty given by ZHP that there was
6 no genotoxic potential, and also, as a result, the
7 specifications don't list as potential genotoxins,
8 even though we know that the -- from the -- the
9 evidence in the case that developed that indeed those
10 processes had the potential to produce NDEA and NDMA;
11 so all I'm trying to say is, it ties in later with
12 this issue of, would the products indeed be deemed
13 adulterated.
14        And my point is, regardless of whether
15 you're an ANDA holder or you're the API manufacturer,
16 if the finished dose of Valsartan had these genotoxic
17 impurities in them, they would be deemed adulterated,
18 because you can't separate the two.
19        You can't -- the API is proposing to the
20 finished dose form, unless Teva or Torrent did
21 further purification, which I've seen no evidence
22 that they did, as described in the expert reports of
23 others as well, and no description in the defense
24 expert reports that they did that --
25    Q.   Doctor, I'm not asking about your

Page 312

1 adulteration opinion.  I understand that you would
2 like to talk about that.  I'm asking about whether
3 it's your opinion that it violates the specifications
4 in the then-existing ANDAs.  Have you reviewed the
5 report of Plaintiffs' other expert, Philip Russ?
6        MR. VAUGHN:  Objection to form.
7    A.   Dr. Russ, yes, I've review his report,
8 yes.
9    Q.   Did you review his deposition that he
10 last week, his transcript?
11    A.   No, I wouldn't have had time to review
12 that last week, but I did not.  That's the one that
13 you're saying has been available?  No, I haven't seen
14 that.
15    Q.   Is it your understanding that Dr. Russ
16 is opining on the conduct of the Teva Defendants, the
17 Torrent Defendants, the specifically the finished
18 does manufacturers in this case?
19    A.   That he has opinions about that?  Yes.
20    Q.   Are you aware that Dr. Russ said he
21 would stipulate that the specifications for the
22 then-existing ANDAs were not violated on the record
23 during his deposition?
24        MR. VAUGHN:  Object to form, lack of
25 foundation.

Page 313

1    A.   I'm not aware of anything specific he
2 said because I haven't read his deposition.  So all I
3 can say is, I would be happy to review his deposition
4 at some point in time, but I have not had a chance to
5 do so.  I have seen his report, and I don't recall
6 that language in his report.
7        MR. HARKINS:  I'm going to go and
8 introduce the deposition of Plaintiff's expert Philip
9 Russ as the next exhibit.
10 EXH       (Plunkett Exhibit 12, transcript of
11 deposition of Phillip Russ, marked for
12 identification, as of this date.)
13        MR. VAUGHN:  Can I get another time
14 check while we're getting the exhibit up?
15        VIDEOGRAPHER:  Certainly, stand by.
16        (A pause in the proceedings.)
17    Q.   And Dr. Plunkett, to move this along,
18 I'm going to go ahead and screen-share.
19        VIDEOGRAPHER:  We're at six hours and 49
20 minutes.
21        MR. VAUGHN:  Dr. Plunkett, go ahead and
22 download it still so you can see it in context, if
23 you want to see the pages before and after.
24    Q.   Let me know when you're able to see the
25 Exhibit Share.

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL

Page 314

1    A.   I can see it, yes.
2    Q.   Starting at the top, the question, "Are
3  you aware that, even at the highest levels of
4  impurities reported in ZHP API anywhere in world the
5  testing showed, according these standards in the
6  compendial specifications, that the impurities were
7  below the reporting thresholds, correct?"
8         There's an objection.  Do you see that
9  question?
10    A.   Yes, I do.
11    Q.   And his response, "I'll stipulate to
12  that, yes.  I mean, my concern again isn't about the
13  meeting of specifications."
14         Do you see that?
15    A.   I do.
16         MR. VAUGHN:  Object to form, incomplete
17  document.
18    A.   I do see that, but going back up to the
19  question that's being asked there, I don't know.  I
20  haven't read this entire depo and I haven't talked to
21  Dr. Russ.  But when you're using the words,
22  "below" -- "The impurities below reporting
23  thresholds," when you're pointing to the .1 percent
24  and that's how he is -- he is reading that, that's a
25  different question than, and a different opinion than

Page 315

1  what I'm expressing.
2         I'm expressing the opinion that when the
3  finished dose product contains NDMA or NDEA, it does
4  not comply with specifications in the ANDAs which are
5  not to contain levels of potent genotoxins at any
6  level, up to even above or below .1 percent.  That's
7  not part of the specification that it's okay for
8  there to be a genotoxin at a level less than .1
9  percent.
10         I don't argue with you that part of the
11  issues here relate to the inadequate work that ZHP
12  may have done.  But again, as a finished dose
13  manufacturer, referring to their Drug Master File,
14  and relying on them for their work, there is
15  responsibility that comes with that.  And so to me,
16  the lack -- when I make the point that they don't
17  comply, it has to do with just that issue.
18         So I don't know that Dr. Russ and I are
19  totally in disagreement here, but I'd have to read
20  his deposition to know more about that.
21         MR. VAUGHN:  Is that Exhibit 12, Steve?
22         MR. HARKINS:  Yes.
23    Q.   Doctor, turning to paragraph 55 of your
24  report --
25    A.   Yes?

Page 316

1    Q.   -- very last sentence says, "Quality
2  agreements do not absolve finished dose manufacturers
3  from their responsibilities regarding drug quality."
4  Did I read that correctly?
5    A.   I'm looking for where you are.  The
6  first sentence doesn't say that.
7    Q.   Very last sentence in paragraph 55.
8    A.   Oh, I'm sorry.  Got to go to the next
9  page, okay.  Apologize.
10         Yes, I agree that's what it stated.
11    Q.   Is this a general statement or did you
12  evaluate and have an opinion as to the adequacy of
13  the quality agreements in place for the finished dose
14  manufacturers in this case?
15    A.   It's first a general statement, although
16  I did look at the quality agreements I cited, which
17  some of those, I believe at least one of those,
18  several of those are Teva documents.  So -- and the
19  top of paragraph 55, I'm referring to those documents
20  and my review of those documents.
21    Q.   And I understand you reviewed them.  I
22  guess my question is, do you have an opinion that is
23  critical of the quality agreements in place for the
24  finished dose manufacturers that you intend to offer
25  in this case?

Page 317

1         MR. VAUGHN:  Object to form.
2    A.   Are you asking -- let me ask a
3  clarifying question.  Are you asking me, do I have a
4  criticism of specific language or specific
5  responsibilities that were shared with ZHP, why they
6  did that?  No.  What I'm saying to you is, however,
7  that --
8    Q.   Are --
9    A.   -- what I'm saying is, because you have
10  a quality agreement, that doesn't mean you can run
11  away from your responsibility to ensure that your
12  product is safe for use, doesn't put patients at
13  risk, and indeed is not adulterated.
14    Q.   Understood.  You've already answered the
15  question.  We can move on to paragraph 57.
16         Here, in the third sentence you state,
17  "In this case, there is no evidence to show that any
18  of the ANDA holders took actions on their own to warn
19  physicians and their patients about the presence of
20  impurities in Valsartan drug products that were
21  carcinogens."  Are you there?
22    A.   Yes.
23    Q.   I'm right in interpreting that as a
24  criticism of the actions taken by the finished dose
25  manufacturers, including Teva?

80 (Pages 314 - 317)

HIGHLY CONFIDENTIAL

Page 318

1    A.   Yes.  Earlier in my report, I referred
2 to, there's the ability for manufacturers to do -- to
3 do healthcare provider letters or direct
4 communication, and I did not see that having been
5 done.
6    Q.   I understand that you didn't see it.
7 You didn't review in forming this opinion any of the
8 recall notices which were sent by Teva, did you?
9        MR. VAUGHN:  Objection to form.
10    A.   Nor am I aware that such existed.  I am
11 aware of recall notices existing, yes, but this is a
12 different issue.
13    Q.   Did you review any of the patient-level
14 recall notices that Teva sent in connection with the
15 recall?  You didn't review any of those, did you?
16        MR. VAUGHN:  Objection.
17    A.   If they are not in my reliance material,
18 obviously I have not.  So you can represent for me
19 that they are there or they are not there.
20    Q.   Did you review any of the information
21 surrounding Teva placing a hold on all products
22 containing ZHP API as of June 21st, 2018, in forming
23 this opinion?
24        MR. VAUGHN:  Object to form.
25    A.   If it was at the FDA website, I -- I may

Page 319

1 have seen things that were specific to them.  But if
2 it's not a publicly-available document of the FDA
3 website and it's not listed in my reliance list C,
4 no.  And I don't remember ever that I saw at the FDA
5 website.  There's a lot there.  And there is
6 information in the -- there's a database where you
7 can look at recalled products.
8    Q.   In forming this opinion that the ANDA
9 holders, including Teva, didn't take action to warn
10 physicians and their patients, you did not review any
11 of the documents demonstrating information that Teva
12 communicated to physicians and patients and steps
13 they took to remove product from the market in
14 connection with the recall?
15        MR. VAUGHN:  Objection to form.
16    A.   If they were public documents, I would
17 have.  But if not, if they were not public documents,
18 I would not, that's correct.  So if you're referring
19 to things that were only in your discovery, then no,
20 and I haven't cited them and I would not have
21 reviewed those.
22        This also an area that I know that other
23 experts are covering in terms of actions related to
24 the recall itself, but I'm talking about something a
25 little bit more broad than that, than just a recall.

Page 320

1 So I'm talking about specific information about the
2 risks associated with exposure to NDMA and NDEA.
3    Q.   This is not directed at the conduct of
4 the finish dose manufacturers here.
5        MR. VAUGHN:  Object to form.
6    A.   I'm referring -- I'm referring to
7 communication that they could have done directly
8 related to the safety concerns raised that I did not
9 see in their healthcare provider letters, for
10 example.
11        I'm not disputing that you sent recall
12 notices.  You're required to do that, especially
13 since you were doing patient-level recall.
14        MR. HARKINS:  Those are all the
15 questions I have for you, Doctor.  I believe that
16 there may be counsel for Torrent who would like to
17 follow up as well.
18        MR. VAUGHN:  Can we get another time
19 check then, because I think we're down to four
20 minutes.
21        VIDEOGRAPHER:  Three minutes left.
22        MS. NAGLE:  I'm going just go ask that
23 we take a five-minute break.
24        THE WITNESS:  That's fine with me, is
25 that fine with you --

Page 321

1        MR. VAUGHN:  That's fine.  We're going
2 to have two-and-a-half minutes left when we come
3 back.
4        VIDEOGRAPHER:  Going off the record, the
5 time is 7:39 p.m., Eastern Time.  This is the end of
6 media unit 6.
7        (Recess taken.)
8        VIDEOGRAPHER:  We're back on the record.
9 The time is 8:03 p.m. Eastern Time, this is the
10 beginning of media unit 7.
11 EXAMINATION BY
12 MS. NAGLE:
13    Q.   Hi, Dr. Plunkett.  My name is Brittney
14 Nagle and I represent the Torrent Defendants in this
15 action.  I have just a quick cleanup point for you.
16 So do you recall a couple of minutes ago before the
17 break, Mr. Harkins was asking you about paragraph 57
18 of your report?
19    A.   Yes.
20    Q.   Okay.
21    A.   I don't remember the question but I
22 remember we were talking about it.
23    Q.   Do you recall that he asked you whether
24 or not you had reviewed any of the recall notices or
25 the documentation on the holds that Teva had issued

81 (Pages 318 - 321)

HIGHLY CONFIDENTIAL

Page 322

1 with respect to its Valsartan?
2    A.    No.
3    Q.    And I believe that to summarize the
4 answer you gave, you said that you reviewed
5 everything that's listed on Exhibit C in your report,
6 things that were publicly available to be the FDA's
7 website, and that if it was not public, and it's not
8 listed, you did not review it.
9    A.    In that area, that is correct.
10    Q.    Is the same true for Torrent, with
11 respect to their recall notices and other
12 communications about the Valsartan?
13    A.    Yes, it would be the same answer. It's
14 not one of those listed -- I don't know whether you
15 want to represent, but it's not, if it's not there,
16 no, I did not.
17        MS. NAGLE:  That's the only questions
18 that I have for you. Thank you.
19        MR. VAUGHN:  All right, Dr. Plunkett, I
20 have just a few questions. I think we can go without
21 a break, right?
22        THE WITNESS:  Right, that's fine, let's
23 get it done.
24        (Continued on following page.)
25

Page 323

1 EXAMINATION BY
2 MR. VAUGHN:
3    Q.    Do you believe that Teva should have
4 obtained access to ZHP's Drug Master File?
5    A.    Yes, I do.
6    Q.    Do you believe that Torrent should have
7 obtained access to ZHP's Drug Master File?
8    A.    Yes, I do.
9    Q.    Why should the finished dose
10 manufacturers have obtained access to ZHP's Drug
11 Master File?
12    A.    It's the -- only way that they would
13 be able to assure themselves that the API company, in
14 this case, ZHP, had done a complete and proper risk
15 assessment, especially given that the processes had
16 changed from the TIN process that was part of the
17 Diovan RLD monograph.
18    Q.    In your opinion, could Teva detected
19 have the nitrosamine impurities in ZHP's Valsartan
20 without access to ZHP's Drug Master File?
21    A.    Yes, if they did what Novartis did,
22 because Novartis did that. I have no information
23 that Novartis had access to that.
24    Q.    In your opinion, could Torrent have
25 detected the nitrosamine impurities in ZHP's

Page 324

1 Valsartan without access to ZHP's Drug Master File?
2    A.    The same answer. Based upon what
3 Novartis was able to do, yes, they should have been
4 able to do that.
5    Q.    At any point in time, if Valsartan
6 contained NDMA, would it be deemed adulterated?
7    A.    Yes.
8    Q.    At any point in time, if Valsartan
9 contained NDEA, would it be deemed adulterated?
10    A.    Yes, absolutely.
11        MR. VAUGHN:  I have no further
12 questions.
13        MS. MILLER:  I will have one or two
14 follow-up questions. I promise this break will just
15 be three minutes.
16        MR. VAUGHN:  As long as it's just one or
17 two, because I think, are we at seven hours on the
18 record?
19        MS. MILLER:  We are at seven hours. We
20 have a very long-winded witness --
21        MR. VAUGHN:  I said it's fine.
22        VIDEOGRAPHER:  All right, going off the
23 report. The time is 8:07 p.m.
24        (Recess taken.)
25        VIDEOGRAPHER:  We're back on the record.

Page 325

1 The time is 8:13 p.m. Eastern Time.
2        MR. VAUGHN:  Before you start, real
3 quick, let the record reflect there is one minute
4 remaining on the record, and we're allowing you two
5 questions. Go ahead, Jessica.
6        MS. MILLER:  It may be three questions,
7 Brett.
8        MR. VAUGHN:  It's over a minute, then.
9 FURTHER EXAMINATION
10 BY MS. MILLER:
11    Q.    Dr. Plunkett, I believe Mr. Vaughn just
12 asked you whether at any point in time this Valsartan
13 contained NDMA and and NDEA, would it be deemed
14 adulterated, do you recall that question?
15    A.    Yes.
16    Q.    And your answer is yes, correct?
17    A.    Yes.
18    Q.    What do you mean by "deemed"?
19    A.    That's the regulatory language. When
20 you talk about looking at the actual definition of
21 "adulterated." I may be long-winded, telling you,
22 but essentially in my report, I used that specific
23 language.
24    Q.    Are you saying that the FDA would have
25 deemed it adulterated, or that anyone would have

HIGHLY CONFIDENTIAL

Page 326

1 deemed it adulterated?
2     A.     That I would deem adulterated consistent
3 with FDA's actions that they took and their decisions
4 that they made in 2019 when they sent the warning
5 letter and made that statement.  There is no
6 difference in the facts then than there would have
7 been if they looked at that issue a year earlier.
8     Q.     Are you offering --
9           MR. VAUGHN:  All right, that's a
10 minute-and-a-half.  The deposition is done.
11           MS. MILLER:  That's ridiculous, Brett.
12           MR. VAUGHN:  It's not ridiculous --
13           MS. MILLER:  -- the witness, I have a
14 couple of more questions --
15           MR. VAUGHN:  You've asked and answered
16 the same questions over and over.  You've asked
17 irrelevant questions about presentations.  No.  We
18 started this at eight a.m.  We've been going for
19 eleven-and-a-half hours.  You guys have taken massive
20 breaks throughout the day.  We're done.
21           MS. MILLER:  Are you really not going to
22 let me finish asking these questions?  Are we going
23 to have to go to the Special Master to ask him to ask
24 five --
25           MR. VAUGHN:  Five -- you said you -- no,

Page 327

1 we done.
2           MS. MILLER:  I'm sorry, it was a few
3 more than two questions, it was a few minutes.  Are
4 you really going to --
5           MR. VAUGHN:  Yes, you should have used
6 your time a lot better throughout the day.
7           MS. MILLER:  Excuse me, Brett?
8           MR. VAUGHN:  Do you want me to repeat --
9           MS. MILLER:  You've been taking multiple
10 expert depositions in this matter that have gone
11 slightly over.  In fact, more than slightly over, is
12 my understanding.  Are you, as part of the
13 professional courtesy, not going to let me finish my
14 questioning?  Am I going --
15           MR. VAUGHN:  You're just going to keep
16 going on and on, yeah.
17           MS. MILLER:  Am I going to have to go to
18 Vanaskie?
19           MR. VAUGHN:  You should have reserved
20 time.
21           MS. MILLER:  Brett, we have --
22           MR. HARKINS:  For the record, finished
23 does manufacturers have one question in follow-up to
24 an opinion that is not contained in the expert's
25 report and was raised for the first time on redirect.

Page 328

1 We have one question.  I just want to be clear on the
2 record.
3           MR. VAUGHN:  You guys should have
4 reserved some time before spending all of it on your
5 initial questions.
6           MS. MILLER:  Brett, we have a couple of
7 follow-up questions, both from ZHP and from Teva on
8 your redirect.  Are you going to let us ask them or
9 are we going to go to Vanaskie and come back another
10 day?  It's up to you.
11           MR. VAUGHN:  It's up to you, if you want
12 to go to the Master.  But you're not going to ask
13 more questions today.
14           MS. LOCKARD:  That's fine, we'll go to
15 the court.  The court has already ruled that when
16 there are multiple defendants, we have an opportunity
17 to spend more than seven hours.  There's a ruling on
18 that already.  I guess it's our mistake for not
19 clarifying that previously, but we'll file a motion
20 with Vanaskie tomorrow.
21           MR. VAUGHN:  Thank you, Victoria.
22           MR. NIGH:  I want to make it clear, it's
23 Daniel Nigh for the record, that Defendants said that
24 they had two questions before we went on a break
25 where they said it would be a three-minute break,

Page 329

1 ended up being a ten-minute break.  And it's getting
2 late in the day, and at this point, two questions is
3 now, I heard many more than two.  So that agreement
4 that the Defendants set or proffered to set, that
5 they had two more questions, doesn't sound like they
6 were being honest with that "two more questions."
7           MS. MILLER:  Yes, Daniel, I was being
8 dishonest.  Are you actually accusing me of
9 dishonesty now?  Because seriously, Dr. Plunkett --
10           MR. NIGH:  Well, sounds like you were
11 inaccurate.  Let's go ahead and read -- read --
12 inaccurate about your two minutes, two questions.
13 That was the agreement.  Can you not interrupt me,
14 please?
15           MS. MILLER:  Could you please not accuse
16 me --
17           MR. NIGH:  Don't get into the whole
18 dishonesty.  I didn't say dishonest.  I didn't -- I
19 didn't accuse you of dishonesty, I said it wasn't
20 honest.  There's a difference between the two -- no,
21 no I didn't.
22           MS. MILLER:  You accused me of being
23 dishonest --
24           MR. NIGH:  I said it wasn't an honest
25 statement --

83 (Pages 326 - 329)

Veritext Legal Solutions

Page 330

1          MS. MILLER: I did not know --
2          MR. NIGHT: I said it was not an honest
3  statement. To make it clear -- you keep interrupting
4  me.
5          MS. MILLER: Wait a minute, no. Because
6  I -- accused of dishonesty and that is not
7  acceptable. First of all, my first question --
8  excuse me, you can talk after I'm done.
9          MR. NIGH: No, no, no. No, to make it
10  clear -- can you stop interrupting me?
11          MS. MILLER: You're interrupting me now.
12  My first question --
13          MR. NIGH: To make it clear, I will
14  change my statement to "inaccurate statement."
15          MS. MILLER: My first question was, "Do
16  you recall him asking you this question." Are you
17  counting that as one of my two questions? Seriously?
18  I was making sure that Dr. Plunkett knew where we
19  were. That was not a question. I was completely
20  honest and based on her answer, I had to complete the
21  line of questioning. I had about three minutes left,
22  at most. And you guys have decided to turn this into
23  a world war, and that's fine. We'll go to Vanaskie,
24  but --
25          MR. NIGH: It's not a world war.

Page 331

1          MS. MILLER: It is 8:18 and I would have
2  been done by 8:21. And if you're not going to let us
3  do that, that's fine. We'll go to Vanaskie, but I
4  would like to be clear for the record that
5  assuming -- oh, now you're interrupting me? Assuming
6  that Dr. Plunkett did not give one of her long-winded
7  responses, I would have been done by 8:21.
8          MR. VAUGHN: You've asked the same
9  question over and over again. You would have done
10  that, too.
11          MS. MILLER: Thank you very much for
12  your assessment of my questions.
13          MR. NIGH: Let me reiterate what I said,
14  I will reiterate what I said before we went to the
15  break. Defense counsel said that they would have two
16  questions. Defense counsel clearly had more than two
17  questions, so it was an inaccurate statement. We
18  allowed you to go forward based on your
19  representation that you had two more questions, and
20  the record is clear that there were clearly more than
21  two questions. And that's when Mr. Vaughn shut down
22  the deposition. Thank you.
23          MS. MILLER: Everything you just said
24  was inaccurate, and that's fine. Because I've now
25  been accused of dishonesty. You are now telling me

Page 332

1  that one of my two questions was, "Do you recall
2  Mr. Vaughn asking you that question," which was
3  obviously a setup to my questioning. That was not a
4  question. I am not -- are you guys going to require
5  us to go to Vanaskie or not? Just let us know, or
6  would you like to go three more minutes and be done?
7          MR. NIGH: Even if you don't include
8  that question or the question after it, you still
9  would have asked two questions.
10          MS. MILLER: Are you -- would you like
11  to go three more minutes and be done, or go
12  to Vanaskie? I'm asking you which you prefer.
13          MR. NIGH: I think Mr. Vaughn has
14  already been clear on that.
15          MS. MILLER: Mr. Vaughn, would you like
16  to go three more minutes and be done or do we need to
17  go to Vanaskie?
18          MR. VAUGHN: I think we're done. We
19  don't compromise compromises.
20          MS. MILLER: And you're going to deny
21  Steve's ability to ask his questions as well?
22          MR. NIGH: I think what we did, and
23  Mr. Vaughn was just clear, he said you could ask two
24  more questions based on your representation that
25  defendants had two more questions. Period. No more

Page 333

1  than --
2          MR. HARKINS: I represented that we had
3  one question based on an opinion which was not
4  offered in the witness' report or at any time during
5  her direct testimony. It is one literal question. I
6  understand that you were saying we will not be able
7  to ask that, so we'll file a motion tomorrow.
8          MS. MILLER: All right, have a good
9  night.
10          VIDEOGRAPHER: All right, we are off the
11  record at 8:21 p.m. Pacific time and this -- I'm
12  sorry, Eastern Time, and this concludes today's
13  testimony given by Dr. Laura M. Plunkett. The total
14  number of media used was seven and will be retained
15  by Veritext.
16          (Time noted: 8:21 p.m.)

84 (Pages 330 - 333)

HIGHLY CONFIDENTIAL

Page 334

1        C E R T I F I C A T E.
2        I, DAVID LEVY, a certified court
3  reporter and notary public of the State of New
4  Jersey, certify that the foregoing is a true and
5  accurate transcript of the stenographic notes of the
6  deposition of said witness who was first duly sworn
7  by me, on the date and place as hereinbefore set
8  forth.
9        I FURTHER CERTIFY that I am neither
10 attorney, nor counsel for, nor related to or employed
11 by, any of the parties to the action in which this
12 deposition was taken, and further that I am not a
13 relative or employee of any attorney or counsel in
14 this place, nor am I financially interested in this
15 case.
16      IN WITNESS WHEREOF, I have hereunto
17 set my hand this 17th day of January 2023.
18
19
20
21
22      DAVID LEVY, CRR, RPR, CLR
23      LICENSE NO. 30X100234000
24
25

Page 335

1        J U R A T / E R R A T A
2  I have read my testimony in the foregoing transcript
3  and believe it to be true and correct with the
4  following changes:
5  PAGE  LINE      FROM          TO
6  ____|____|_____|_____
7  ____|____|_____|_____
8  ____|____|_____|_____
9  ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 _____  _____
21 WITNESS SIGNATURE          DATE
22 Subscribed and sworn to before me
23 this ____ day of _____, 20____
24
   Notary Public of the
25 State of_____.

**[& - 2019]**                                                                 Page 1

| **&** |
|---|

**&**   2:4,18 3:19
3:23 4:3,8,17
7:6 92:21
266:14

| **0** |
|---|

**0.1**   153:7
162:21 163:3,6
165:21 167:14
173:13,23
174:8 175:2,4
175:24
**01**   247:5
**02109**   2:19
**03**   247:6
**07068**   2:5
**07102**   3:15
**08540**   3:5

| **1** |
|---|

**1**   5:10 8:12
51:7 52:25
53:1 68:25
91:4 125:9
130:22 131:2
151:16,17
153:13 154:23
162:18,23
163:23 164:18
164:22 165:6,9
167:9 172:24
173:9 174:18
175:6 176:1
314:23 315:6,8

**1/5/19**   5:18
83:18
**10**   7:3 266:11
266:12,18
**10/31/22**   5:12
53:2
**10001**   3:24
**10022**   4:9
**103**   2:5
**10:49**   68:24
**11**   7:8 222:6,19
222:20,24
264:6 265:1
287:8,11
288:23
**11:08**   69:3
**11:14**   72:23
**11:20**   73:1
**11:42**   90:19
**12**   1:12,20 7:13
8:4 222:7,19
222:20,24
223:7 264:6
265:1 313:10
315:21
**12:01**   90:23
**12:07**   96:4
**12:18**   96:7
**13**   69:6 184:5
**13th**   73:7
**14**   243:22
**1440**   3:19
**15**   141:14,14
236:16 243:22
249:18,21

250:6,12,14
254:24 256:10
**150**   255:19
**15219**   4:4
**15th**   3:15
**16**   200:18
228:4,18
243:24 288:5
**17**   199:6
229:13
**170,000**   250:13
250:18
**17th**   334:17
**18**   210:22
228:21,25
**180**   6:3
**187**   6:6
**19**   172:23
**190**   6:9
**197**   6:12
**1980s**   86:9
**1989**   40:11
86:19 236:14
**1997**   40:11
**1999**   238:19
**19th**   268:1
**1:00**   129:10,12
**1:19**   1:6
**1:43**   130:2,7

| **2** |
|---|

**2**   5:13 69:4,6,7
73:7 80:13
129:11 168:23
182:25

**20**   195:5
200:19 335:23
**200**   136:21
**20005**   3:20
**2000s**   22:23
**2001**   247:3
**2012**   29:19
178:19 230:2
270:17
**20123**   229:19
**20137**   190:18
**2014**   44:12
157:12 197:14
199:21,25
204:4 238:11
**2016**   190:7
238:10
**2017**   152:15
180:15 190:15
190:22 195:5
205:25 206:5
**2018**   21:12
44:4 69:6
72:13 73:6,7
73:18 78:20
168:15 209:14
210:6 217:1
294:4 304:24
310:3 318:22
**20189**   209:20
**2019**   43:11,16
73:22 83:21
91:10 158:20
158:24 159:14
159:16 208:23

HIGHLY CONFIDENTIAL

**[2019 - 46]**                                                                 Page 2

228:7 229:14
326:4
**202-371-7209**
3:25
**2020**  246:3,3
247:22 249:13
249:15,17
261:17
**2021**  255:4
269:3,4,5,18
**2022**  7:3 20:12
20:13 43:1
249:18 251:3,9
255:4 266:13
267:2 269:2,18
270:22
**2023**  1:12,21
8:4 334:17
**20th**  190:23
**21**  3:4 136:22
148:19 149:2
149:24 214:25
235:13
**210**  235:13,17
**211**  235:14,15
**212-371-7134**
3:20
**212-909-3344**
4:9
**21st**  126:18
318:22
**22**  151:6
249:17
**2220**  4:13

**227**  4:18
**230**  4:13
**23rd**  126:18
270:22
**24**  222:14
**25**  207:4
214:24
**250**  2:9
**2500**  3:10
**261**  187:8
197:10 198:8
198:12 199:5
199:15 205:7
**265**  187:8
198:12 205:7
**2653**  184:24
**2654**  183:11
**2656**  182:25
**266**  7:3 200:18
205:11
**267**  197:11
198:8
**268**  187:8
198:12
**27**  243:22
**27th**  2:18
267:23
**28**  92:4 228:5
228:17 243:24
**28202-2601**
4:18
**284**  5:4
**287**  7:8
**2875**  1:3,6 8:17

**28th**  267:23
**29**  191:23
**29th**  267:23
**2:23**  160:7
**2:40**  160:11

**3**

**3**  5:16 72:12,13
72:14 73:4,16
73:17 74:6
98:6,8 99:3
115:6 130:8
160:8 168:10
168:11,18,25
**30**  39:22 72:13
168:15 172:25
234:10
**300**  136:21
**301**  4:3
**30305**  3:11
**30th**  73:5,18
**30x100234000**
334:23
**31**  233:17
237:5
**312-566-4801**
4:14
**313**  7:13
**316**  2:14
**31st**  42:25
267:2 268:9
**320**  169:3
**321**  5:5
**323**  5:6
**325**  5:7

**32502**  2:14
**33-34**  166:25
**3333**  3:10
**35**  92:10 93:16
93:18 291:6
**351**  147:17
214:25
**36**  93:14,16,18
**37**  166:20
**38th**  4:3
**3:13**  182:1
**3:17**  182:5
**3:26**  188:4
**3:31**  188:8
**3:35**  192:3
**3:39**  192:6
**3:42**  194:16
**3:57**  194:19

**4**

**4**  5:18 78:8
83:16,17,20
84:1,1,7
160:12 170:7
291:11
**4/20/20**  5:23
94:8
**400**  136:21
249:24
**412-263-4397**
4:4
**43**  53:5 54:21
180:9
**45**  32:2 292:1
**46**  187:11

HIGHLY CONFIDENTIAL

**[47 - above]**                                                    Page 3

| | | | |
|---|---|---|---|
| **47** 206:6 | **609-924-0808** | **80s** 283:2 | **a** |
| 296:12 | 3:5 | **8101** 2:9 | **a.m.** 1:13 8:4 |
| **48** 186:18 | **60s** 58:5 | **83** 5:18 | 68:24 69:3 |
| 190:11,17 | **61** 124:25 | **85** 255:2 | 72:23 73:1 |
| 203:18 | **617-213-7047** | **850-435-7003** | 90:19 326:18 |
| **483** 212:18,19 | 2:19 | 2:15 | **abbreviate** |
| **4883** 334:21 | **65** 224:19,25 | **8711** 6:10 | 10:15 |
| **49** 166:20 | **66210** 2:10 | 190:13 | **abbreviated** |
| 313:19 | **678-553-7392** | **8731** 6:7 | 10:24 |
| **4:39** 223:19 | 3:11 | 187:19 | **abbreviation** |

**5**

| | | | |
|---|---|---|---|
| **5** 5:21 80:12 | **685** 193:1 | **8:03** 321:9 | 177:11 |
| 83:20 94:7,11 | 197:2 | **8:07** 324:23 | **ability** 52:17 |
| 115:1 194:20 | **69** 5:13 | **8:13** 325:1 | 112:22 174:20 |
| 223:20 | **6:02** 245:16 | **8:18** 331:1 | 308:20 318:2 |
| **5.6** 164:6 | | **8:21** 331:2,7 | 332:21 |

**7**

| | | | |
|---|---|---|---|
| **52** 305:22 | **7** 6:6 187:12,13 | 333:11,16 | **able** 24:19 27:2 |
| **53** 2:18 5:10 | 187:18 321:10 | | 27:18 59:19 |
| **54** 166:17 | | **9** | 69:17 82:2 |
| 309:6 | **7/13/18** 5:14 | **9** 5:3 6:12 | 93:7 95:24 |
| **55** 315:23 | 69:8 | 197:24,25 | 100:23 102:7 |
| 316:7,19 | **70** 116:19 | **90s** 22:23 | 111:12 163:18 |
| **57** 317:15 | 117:17 120:7 | **913-385-9400** | 163:21 176:11 |
| 321:17 | 120:17 121:5 | 2:10 | 176:21 178:1 |
| **5:02** 223:23 | 122:4 | **92659** 6:4 | 181:18 200:5 |
| **5:36** 245:13 | **704-444-3300** | 180:12 | 200:25 201:15 |

**6**

| | | | |
|---|---|---|---|
| | 4:19 | **932** 229:16 | 205:14 219:20 |
| **6** 6:3 106:1 | **709** 193:19 | **933** 229:16 | 251:7 267:10 |
| 180:10,11 | **72** 5:16 | **94** 5:21 | 272:25 273:3 |
| 223:24 321:6 | **7:39** 321:5 | **973-228-9898** | 274:12 279:1 |

**8**

| | | | |
|---|---|---|---|
| **600** 4:18 | | 2:6 | 280:3 307:18 |
| **601** 4:8 | **8** 6:9 190:11,12 | **99** 91:13 | 313:24 323:13 |
| **60606** 4:13 | 192:10,10 | **9:29** 1:13,21 | 324:3,4 333:6 |
| | 194:25 195:1 | 8:4 | **above** 1:17 |
| | **8/30/18** 5:16 | | 55:25 311:4 |
| | 72:15 | | 315:6 |

HIGHLY CONFIDENTIAL

**[abraham - address]**                                                    Page 4

| | | | |
|---|---|---|---|
| **abraham** 3:3 | **accomplishes** | 158:11,15 | 175:23 187:1 |
| **absolutely** 34:5 | 107:13 | 209:12,13 | 192:17,22 |
| 66:8 191:22 | **account** 248:16 | 225:19 319:9 | 202:11 208:23 |
| 214:1 324:10 | **accountant** | 321:15 334:11 | 216:2 227:8 |
| **absolve** 316:2 | 248:14 | **actions** 32:24 | 228:7 234:10 |
| **absorbed** 102:7 | **accurate** 99:14 | 144:11 146:7 | 249:20 251:24 |
| **academic** | 206:19 334:5 | 209:9,20 210:6 | 258:6 261:14 |
| 272:14 278:13 | **accuse** 329:15 | 210:24 219:17 | 279:7 289:8 |
| 280:4 | 329:19 | 317:18,24 | 293:23 295:19 |
| **academics** | **accused** 329:22 | 319:23 326:3 | 297:15 329:8 |
| 283:1 | 330:6 331:25 | **activation** | **adam** 2:4 |
| **accept** 66:1 | **accusing** 329:8 | 55:10 | 266:23 |
| 282:4 283:3 | **achieve** 141:9 | **active** 10:20 | **adapting** 171:9 |
| **acceptable** 65:7 | 144:2 | 78:12 212:9,10 | **add** 244:8 |
| 66:22 68:3,3 | **acid** 229:7,22 | 251:14,25 | 287:17 |
| 113:1 116:19 | 230:13 | 252:7,8,22 | **added** 256:8 |
| 117:17 122:3 | **acknowledge** | **actively** 34:7 | **addition** |
| 160:17,23 | 122:19 277:8 | **actual** 46:10 | 106:24 166:23 |
| 227:6 330:7 | 277:15 | 105:14 108:6 | 273:25 |
| **accepted** 49:3 | **acknowledged** | 166:15 214:12 | **additional** |
| 154:18 262:2 | 199:24 | 226:21 306:7 | 106:19 132:19 |
| **access** 124:4 | **acknowledging** | 307:5 310:10 | 143:8,8 152:19 |
| 193:24 267:10 | 201:22 278:6,7 | 325:20 | 169:6,24 205:5 |
| 300:11,23 | **acquaintances** | **actually** 10:24 | 256:1,3,16,18 |
| 303:12 304:8 | 32:18 | 13:5,19 26:6 | 256:20 268:11 |
| 304:16 307:22 | **acronym** 229:5 | 43:4 53:15 | 268:22 269:7,8 |
| 323:4,7,10,20 | **act** 53:10 | 54:8,21 59:14 | 276:13 288:21 |
| 323:23 324:1 | **acting** 103:2 | 67:17 74:4 | 298:5 |
| **accompanied** | 224:12,21,22 | 92:9,21 96:16 | **address** 30:19 |
| 212:20 | 225:16 | 104:1 114:14 | 82:19 84:25 |
| **accompany** | **action** 8:23 | 116:25 117:2 | 126:5 145:21 |
| 187:4 | 32:13 141:1,13 | 127:18 133:9 | 148:3 166:4,6 |
| **accompanying** | 142:13,17 | 153:19,25 | 166:6 168:8 |
| 183:16 187:6 | 143:2,7 144:8 | 154:1 156:5,8 | 208:22 262:12 |
| | 144:17 158:5 | 161:13 165:16 | 271:25 285:23 |

| | | | |
|---|---|---|---|
| **addressed** 7:5 | **admit** 152:10 | 312:1 | **afternoon** |
| 18:17 55:17 | **admitting** | **advanced** 75:4 | 180:1 |
| 110:24 132:3 | 197:3 | 75:15 89:21 | **agencies** 49:7 |
| 142:8,12 | **adopt** 238:6 | 98:23 | 96:22 100:18 |
| 209:25 238:24 | **adopted** 238:12 | **advantageous** | 116:10 117:11 |
| 266:14 275:21 | **adopts** 131:16 | 247:23 | 118:1 119:4,13 |
| **addresses** | **adulterated** | **adverse** 52:12 | 122:17 |
| 29:10 45:1 | 42:19,23 43:8 | **advice** 35:20 | **agency** 71:11 |
| 140:9 215:1 | 43:16,18 44:6 | 226:10,14 | 72:6,10 75:5 |
| **addressing** | 48:21 49:15 | 248:14 281:2 | 75:16 80:4 |
| 21:14 40:25,25 | 50:1,9,17 | 303:17 304:17 | 89:22 117:8 |
| 140:7 145:7 | 123:15,18,20 | **advise** 36:3 | 120:1 122:25 |
| 208:21 223:14 | 123:24 147:13 | 39:7 41:1 | 123:3 133:16 |
| 244:23 286:21 | 147:14,19 | 62:21 226:7 | 139:13 141:16 |
| **adequacy** 85:4 | 148:5 159:12 | **advised** 23:5 | 143:2,6,18 |
| 307:23 316:12 | 159:13,15 | 24:12 39:3 | 169:25 224:4 |
| **adequate** 46:3 | 161:19,20 | 63:8 226:3,8 | 224:18 262:21 |
| 46:9 47:1,6,10 | 208:25 211:2,4 | **advisories** | **agent** 173:25 |
| 51:24,24,25 | 211:8,11,15,19 | 142:10 | **agents** 173:25 |
| 79:14 82:8 | 212:7,11,21 | **advisory** 142:2 | 174:2,2,18 |
| 140:1,5 146:2 | 214:14,20 | 142:23 270:17 | **ago** 40:13 |
| 165:6,10 209:9 | 215:2 216:11 | 270:19 | 41:11 86:7,10 |
| 232:20 300:25 | 216:13,18,20 | **advocacy** | 220:25 222:16 |
| **adequately** | 216:23 295:25 | 270:23 | 260:18 274:5 |
| 294:23 306:5 | 295:25 308:9 | **advocated** | 321:16 |
| **adhered** 237:3 | 311:13,17 | 224:3 | **agree** 8:10 |
| **adi** 66:6 | 317:13 324:6,9 | **affairs** 16:4 | 10:21 27:22 |
| **adjectives** 60:5 | 325:14,21,25 | 95:12 | 49:21 70:8,13 |
| **adjusted** 64:7 | 326:1,2 | **affect** 52:9 | 76:7 77:13 |
| **administrative** | **adulteration** | 64:25 65:14 | 79:6 80:21 |
| 140:25 246:19 | 147:15 211:15 | 161:18 226:12 | 81:6,11 84:20 |
| **admission** | 211:24 212:3 | 272:21 | 84:22 109:24 |
| 81:23 | 212:17 214:10 | **affected** 30:6 | 115:14 116:23 |
| **admissions** | 215:12,15 | 100:20 143:20 | 116:24 117:19 |
| 47:7 82:14 | 216:7 295:24 | 156:10 169:4,5 | 117:24 122:2 |

HIGHLY CONFIDENTIAL

**[agree - answer]**                                        Page 6

| | | | |
|---|---|---|---|
| 122:24 123:1 | **alert** 142:16 | **analyses** 124:8 | **anderson** |
| 133:24 134:2 | **alex** 69:21 | **analysis** 78:16 | 288:25 289:6 |
| 134:11 155:18 | 72:18 73:4 | 81:20,24 82:4 | **andy** 101:16 |
| 169:13,14 | 83:24 94:13 | 82:6,10,15 | **angiotensin** |
| 170:12,14 | 180:7 181:15 | 105:7 110:19 | 21:24 |
| 185:10 195:20 | 181:17 194:2,5 | 124:8 139:16 | **animal** 22:21 |
| 196:2,5 275:19 | 266:19,22 | 147:2 163:12 | 23:2,14 38:18 |
| 309:25 316:10 | **alfano** 4:3 | 163:12 170:8 | 54:12,20 55:22 |
| **agreed** 20:20 | **alkyl** 27:14 | 178:4,5,5 | 56:2 59:20 |
| 20:25 31:21 | **alleging** 244:1 | 185:23,24 | 107:11 110:7 |
| 232:24 241:11 | 244:10 | 218:22 220:21 | 110:24 111:3 |
| 269:12 | **allow** 224:24 | 245:4 277:6 | 111:13 112:1,7 |
| **agreeing** 21:6 | 275:12,17 | 281:19 282:22 | 226:16 273:2 |
| 194:13 | 295:3 | 283:10 | 279:9 282:25 |
| **agreement** | **allowable** 51:1 | **analytical** | **animals** 54:23 |
| 39:13 244:20 | **allowed** 48:25 | 93:25 | 111:4,7 |
| 300:12,15 | 49:7,9 95:21 | **analyze** 275:15 | **anna** 3:18 |
| 303:5,7,7 | 96:21 151:24 | **anda** 85:24 | **anna.brier** 3:21 |
| 317:10 329:3 | 331:18 | 161:22 237:19 | **annual** 243:7 |
| 329:13 | **allowing** 325:4 | 238:19 292:6 | **answer** 12:17 |
| **agreements** | **alternative** | 292:14,23 | 13:15,19,20 |
| 38:25 39:20 | 143:15 | 295:6,7,14 | 24:18 25:10 |
| 301:14 316:2 | **alternatives** | 298:1 299:16 | 38:9 39:14 |
| 316:13,16,23 | 33:6 37:5 | 300:21 301:11 | 46:12 53:13,20 |
| **ahead** 43:24 | **amendment** | 303:1 304:13 | 61:24,24 68:9 |
| 204:15 245:20 | 231:12 243:4 | 306:1,2,11,17 | 76:12,13 79:20 |
| 254:18 281:9 | **american** 98:12 | 310:10,20 | 80:11 81:11 |
| 287:4,7 289:15 | 98:18 280:18 | 311:15 317:18 | 87:3 89:18,25 |
| 291:5 296:5 | **americans** | 319:8 | 90:11,14 94:5 |
| 301:13 313:18 | 169:9 | **andas** 10:25 | 97:16 99:1,21 |
| 313:21 325:5 | **amines** 26:22 | 125:6 130:24 | 100:16 106:3 |
| 329:11 | 26:23 27:14 | 309:17 310:14 | 107:25 119:10 |
| **albertson's** | **amount** 169:5 | 310:14 311:2,3 | 119:20,23 |
| 4:16 | **amounts** | 312:4,22 315:4 | 120:12 121:12 |
| | 123:13 124:1 | | 122:11 131:21 |

137:25 146:23
148:12 151:13
155:15 162:23
165:24 176:11
191:21 193:17
195:25 197:20
199:14 207:6
209:15,22
210:11,17
213:4 214:5,22
215:20,21
219:2 238:3
242:23 243:19
244:7,8,14
251:5 253:15
274:15 276:16
279:13,14
302:14 322:4
322:13 324:2
325:16 330:20
**answered**
41:10 58:19
61:4,10 67:16
80:10 89:2,6
107:22,22
110:14 114:4
119:9,19
120:10 122:9
150:8 196:23
208:7 210:10
213:22 276:11
276:12,21
279:24 295:1
306:23 317:14
326:15

**answering**
13:22 15:11
89:9 107:16
150:4 151:7
155:2 183:10
196:25 200:9
223:9 274:14
276:14 279:15
**answers**  199:22
215:22
**anticipated**
80:13,22 81:3
81:8,14 82:23
152:4
**anybody**  37:14
101:23 125:14
125:19 271:19
290:15 291:22
**anyplace**  276:9
276:17
**apart**  264:4
**api**  30:13 48:16
48:17 75:8,10
80:15,23 81:4
81:9,15 82:25
125:5 161:7
162:10 216:9
216:18 229:21
237:12,25
245:6 285:15
285:23 286:6
292:9,16,19
293:15 294:5
295:25 296:25
305:6,20 308:1

311:15,19
314:4 318:22
323:13
**apis**  10:22
**apologize**  89:7
153:5 195:22
228:4,19
243:25 247:16
254:17 255:24
270:14 276:14
301:18 308:15
316:9
**apparently**
122:21 129:4
179:20
**appear**  48:10
53:9 183:4
189:25
**appearances**
2:2
**appeared**  21:11
22:22
**appears**  43:19
170:10 258:23
284:25
**appendices**
105:13,15
**appendix**  105:4
106:20 137:19
138:3 191:15
191:18 296:7,9
296:11
**apples**  62:6
**applicable**
149:7,21 151:9

**application**
137:7 274:6
**applications**
10:25
**applied**  51:13
131:20 219:25
274:7
**applies**  13:23
16:6 97:24
114:12 172:10
293:4
**apply**  19:1
34:13 50:15
53:7 66:11
103:4 104:6
135:12,13
147:8 153:13
155:6 162:23
163:5 164:18
167:14 172:13
234:12 237:11
237:22,25
250:12 273:16
274:14 286:12
290:4 292:23
**applying**
219:11 270:16
**appreciate**
171:11
**approach**
15:21 220:1
275:23 280:15
280:23,24,25
281:1

**[approached - asking]** Page 8

| approached | ares 257:22 | asbestos 262:13 | 293:23 294:25 |
|---|---|---|---|
| 26:17 251:23 | argue 23:19 | asked 10:16 | 296:23 300:13 |
| 281:16 283:8 | 49:13 53:7 | 12:16 18:18 | 300:15,18 |
| approaches | 54:1 61:13 | 21:5 25:9 28:9 | 303:8 306:23 |
| 36:10 | 85:16 157:11 | 28:19 30:18,19 | 314:19 321:23 |
| appropriate | 302:16 315:10 | 32:19 33:8,9 | 325:12 326:15 |
| 69:22 122:15 | argued 24:5 | 35:11,15 36:24 | 326:16 331:8 |
| appropriately | arguing 61:8 | 37:25 38:7 | 332:9 |
| 300:5 | argument | 39:20 41:9 | asking 12:4,7 |
| approved | 143:16 236:23 | 57:21 58:3,11 | 12:20,21 13:15 |
| 130:24 151:24 | 236:24 | 59:2 65:17 | 15:9 17:2,6,11 |
| 303:1 | argumentative | 89:6 102:17 | 18:10,10 19:6 |
| approximately | 54:7 63:14 | 107:21,22 | 19:12 23:15 |
| 1:21 251:8 | 167:16 168:4 | 119:8,18 126:7 | 24:4 28:25 |
| april 190:15,18 | 171:14 205:17 | 126:9,11 128:3 | 31:1,3 32:13 |
| 190:22,23 | 231:3 265:8 | 129:2 138:15 | 32:14,15,16 |
| 195:5 | 281:9 | 145:5,18 | 36:10 40:1,4 |
| area 78:7 | arguments | 167:21 168:2 | 41:7 42:4 |
| 101:25 104:4 | 143:19 | 170:22 179:10 | 46:21 50:12,23 |
| 126:15 135:14 | arose 30:10 | 181:10 192:13 | 51:2 56:4 64:1 |
| 138:24 223:9 | arps 3:19,23 | 199:18,20 | 65:12 74:25 |
| 250:16 252:8 | arrangements | 210:9,23 | 80:5 93:8 |
| 256:20 257:5 | 304:1 | 213:17,21,22 | 94:21 97:14 |
| 258:3 275:5 | array 273:1 | 214:17 222:25 | 105:5 106:2 |
| 280:8 282:9 | article 5:21 | 223:1,14 | 108:9,17 109:3 |
| 283:7,10 | 28:4,15 29:10 | 232:12,23 | 116:5 121:7 |
| 285:24 302:16 | 32:14 94:7,11 | 234:2 244:5 | 122:1 128:9 |
| 319:22 322:9 | 94:15 95:11,14 | 248:18,22 | 129:1 146:23 |
| areas 126:4 | 95:15,20 98:6 | 256:20,22,24 | 150:5 151:15 |
| 129:3 251:14 | 98:8 99:4 | 257:14 258:11 | 153:3,3 155:3 |
| 277:2 278:19 | 117:14 168:20 | 258:14 264:1 | 160:3,18 166:2 |
| 279:4 285:25 | 276:2 | 265:22 276:10 | 167:3,4,6 |
| 286:19 296:1 | articles 21:20 | 276:13,20 | 168:21 174:12 |
| arena 272:13 | 21:23 22:1 | 279:23 282:1 | 174:12,13 |
| 272:14 | 29:5 30:7 | 285:20,23 | 177:6 180:18 |

183:2,19
188:22 189:4,9
192:16 195:11
199:12,22
203:22 208:6
209:18 210:4
214:7,8,16
217:3 222:18
224:8,14,15
230:23 235:19
239:17 259:15
259:16,21
265:5 267:14
268:10 284:20
294:14 295:4
301:3,4,18,19
301:20 311:25
312:2 317:2,3
321:17 326:22
330:16 332:2
332:12
**aslater** 2:6
**aspect** 16:17
  81:18 101:2
  289:23 290:2
**aspects** 225:24
**assay** 35:3 55:6
**assayed** 225:18
**assays** 55:4
**assess** 85:3
  100:10
**assessed** 110:2
**assessing** 34:4
**assessment**
  12:6 13:23

15:21,23 16:9
22:12 29:23
30:3 31:23,25
32:6 34:11
38:5 44:20,21
44:23 45:7,13
45:25 46:4,4
47:1,4,6,9 61:6
61:20 62:7,8
63:6,22,25
65:20 66:14,16
66:19,20,20
68:19 79:14
82:13 99:20,24
100:1,6,10
101:13,20
102:15,18,22
108:23 109:9
109:18,21,25
111:19 115:14
115:16,17
120:14 122:12
122:14 131:3
146:2,8,17
147:11 172:16
173:14 174:14
176:5 178:1
212:24 217:8
217:11 219:22
223:5,7 231:14
236:21 240:18
260:20 272:24
298:25 300:3,9
301:21 306:3
306:20 307:5,8

307:19,24
308:8,17,21
323:15 331:12
**assessments**
  14:24 15:3
  17:17 60:4
  63:8 64:8 67:1
  96:16,17
  100:19 101:8
  101:23 102:11
  109:16 292:8,9
  292:19 293:14
  294:19,23,24
  298:23 301:24
  306:5,13
**assessor** 16:3
**assessors** 15:1
  16:14
**assist** 250:23
**assistant**
  246:19
**assisted** 288:15
**assisting**
  141:23
**associated** 18:2
  18:4 23:6
  59:20 222:3
  273:8 320:2
**assume** 14:10
  40:3 65:24
  68:20 90:1
  91:18 182:22
  225:25 252:20
  257:4 265:23
  269:11 298:14

305:17
**assumed** 89:7
**assuming** 331:5
  331:5
**assumption**
  34:11 65:21
**assure** 293:4
  323:13
**atlanta** 3:11
**attached**
  258:22
**attachment**
  191:11 193:4
  193:13 195:6
  195:11
**attempt** 135:18
  169:19 178:4
  196:16 282:6
  286:7
**attempted**
  82:19 173:7
  178:21 180:4
**attending** 9:1
**attention** 260:4
**attorney** 69:16
  128:3 141:23
  253:22 263:14
  334:10,13
**attorneys** 126:5
  266:2,4,8
  269:9 271:12
  299:22
**audio** 8:9
**august** 72:13
  73:5,18 168:15

269:1

**aurobindo**
182:16,19
184:7,21
185:12

**austin** 247:12
250:22

**austin's** 250:24

**australian**
28:12 29:9
179:2,8

**authoritative**
15:17 104:16
106:6 107:2
218:10,17
220:10 282:19

**authorities**
12:25

**authority**
131:19

**autonomic**
21:24

**availability**
33:6 117:9

**available** 25:21
103:22 104:2
104:11 126:17
128:10,11
219:1 282:11
302:24 312:13
319:2 322:6

**ave** 224:18

**avenue** 3:19 4:8

**average** 115:3
115:8,23 169:8

**avoid** 280:24

**awaiting**
269:22

**aware** 12:21
21:10,13,15
24:23 25:19,21
30:1 32:23
43:11 56:14,15
61:8 64:15,16
75:6 92:19,24
100:5 101:8
120:1 139:15
152:15 155:22
160:15,19,22
199:20,24
206:14,16
207:3 244:9,12
244:21 276:6
282:7,14,23
283:1 286:20
286:23 303:3
304:4,6,12,23
310:2 312:20
313:1 314:3
318:10,11

**awareness**
26:15

**b**

**b** 1:4 4:16 49:5

**back** 15:14
21:12 22:22
27:9,23 51:14
51:23 53:19,21
55:19 67:23
69:2 72:25

73:7 86:15
87:3 89:16
90:22 93:12
95:13 96:6
110:12 118:9
118:20 119:21
130:6 136:20
141:25 142:24
150:3 152:8
154:6 157:12
158:21 159:8
160:10 168:10
170:2 182:4,9
187:10 188:7
189:2,15 192:5
194:18 195:18
196:9 200:4,5
202:15 204:23
207:14 213:23
215:25 217:23
220:19 223:22
229:13 245:15
245:19 249:14
251:18 253:23
261:10,19
264:15 268:21
272:7,9 282:20
294:9 295:22
295:23 314:18
321:3,8 324:25
328:9

**backed** 226:16

**background**
13:23 56:8
64:4 86:5

89:18 243:2
247:15 264:1
278:2

**bacon** 57:23
58:15 59:5
99:6

**baertschi**
288:24 289:4

**baggetta** 3:23

**bain** 140:6,11
140:15 145:7
148:16 158:2
257:12,20,21
258:7

**bain's** 140:9
158:1 257:1

**balance** 15:25
65:23

**balancing**
116:12,13,14

**bankruptcy**
251:17

**banned** 56:9,15
62:11,15

**banning** 62:18
64:15 142:14

**barr** 2:13

**based** 14:23
15:5,18 16:8
24:23 26:20
27:7 28:17
29:21 30:22
31:17 33:14
34:21 43:3,18
43:21 46:16

HIGHLY CONFIDENTIAL

**[based - best]**                                                    Page 11

47:6,12 48:25
49:6,8 53:14
54:3 55:21
56:2 58:18
61:13 63:9
65:3 66:10
67:2,7,25 68:5
70:19 71:7,12
72:10 81:19,22
82:14 87:17,23
88:6 89:11
99:14 101:17
103:7,10
104:10 105:9
106:10 109:9
112:8 114:5,13
116:11 122:14
131:2 132:7
133:6 135:8,25
139:15,21
153:2 154:24
157:11 162:18
163:19 170:9
172:8 173:14
174:1 183:3
186:6,13
188:25 189:25
196:15 201:24
202:25 213:5
213:11,12,13
218:1,9,25
224:12 225:18
226:6 235:11
240:2 247:18
247:24 255:17

258:21 259:19
261:2 273:1,23
273:25 275:15
276:1 277:5
278:2,22 280:1
290:20 295:10
304:3 307:13
307:25 308:3,4
308:5,24 310:4
324:2 330:20
331:18 332:24
333:3
**basic**  216:6
264:2 265:1
274:3
**basically**
141:14
**basis**  16:8 68:2
95:8 197:17
199:22 200:14
211:23 216:3
**bates**  6:3,6,9
138:11 180:11
182:11 187:18
187:23 190:12
229:17 298:14
**baudin**  7:6
266:14 269:24
270:2
**baylen**  2:14
**beer**  99:7
**began**  75:7,9
**beginning**
65:10 69:3
76:18 130:8

157:20 160:12
194:20 197:14
204:4 223:24
276:12 321:10
**begins**  74:8
297:18
**behalf**  2:3,7,11
2:17 3:2,8,17
4:2 40:8,9
41:14 224:4
260:13
**behavior**  54:12
**believe**  11:7,19
11:25 12:8
15:15 20:22
22:16 33:13
38:16 44:23
47:2,3 53:22
54:2,10 58:22
62:10 70:14
73:14 78:9
80:9 93:9
105:12 114:4
116:3 120:6
125:20 139:10
140:7 145:7
146:3 147:6,12
147:21,22,23
150:23 159:4,9
161:17 166:1,3
166:8 167:25
169:5 170:22
170:24,24
172:6 178:16
178:17 197:9

207:16 208:20
209:5 212:3
217:3 228:14
230:15,16,25
232:6,9 238:9
238:15 240:10
242:5 248:21
251:21 254:23
258:20 260:25
266:10 267:2
267:20 268:8
268:23 270:12
276:14 277:2
278:15,22
279:16,21,25
280:2 282:11
285:11 286:23
286:24 287:5,7
289:5,14 290:3
292:2 298:22
305:3,25
308:24 309:25
310:14 316:17
320:15 322:3
323:3,6 325:11
335:3
**believes**  11:12
118:7
**benefit**  114:13
114:15
**benefits**  15:24
227:7
**best**  13:18
25:10 67:5
159:3 279:14

**better** 58:23
327:6
**beyond** 14:22
15:3 16:17
18:6,17 27:1
29:13 30:18
31:6 37:16
55:15 56:11
62:12 65:17
66:25 67:13
77:9 78:5
80:25 81:12,13
81:17 82:11
84:23 85:1
116:8 121:8
139:1 140:6
145:6,8 158:7
169:8 170:21
176:4,15,20
177:6,16 178:8
178:13 185:22
188:17 208:12
209:5 226:15
226:20 227:17
258:13 290:14
290:14
**bias** 278:1,4,6,9
279:4,5,9,25
280:12,16,17
280:19,20,21
280:24 281:4,4
281:5,12,17
**biases** 277:8,15
277:16,16,21
278:11 279:20

279:20,21,22
280:12,18
281:7
**bigger** 74:10,10
**billables**
250:15
**billed** 251:3
255:18
**billing** 20:2
256:9 270:4
**bills** 20:2
**binding** 132:11
143:11,14,14
231:24 232:11
**bioassay** 111:7
111:20
**biochemist**
246:22
**bioequivalence**
148:22 161:5
161:23,23
**bioequivalent**
148:7 150:15
150:16 161:14
161:19,21
162:4,6
**biologic** 273:6
**biopolicy** 7:4
247:18 254:25
266:13
**biostrategies**
245:24 246:25
247:5
**bit** 13:21 74:9
74:10 98:2

159:17 170:3
193:2 239:1
252:4 264:21
264:21 272:6
275:7,24
277:24 284:8
319:25
**blood** 21:25
40:18,20 41:3
**bobber** 3:3
**bodies** 15:17
66:3 97:24
101:24 104:16
106:6 107:2
108:16 110:17
118:23 170:4
218:17 273:12
282:19
**body** 108:21
110:1 272:17
**boerner** 5:21
94:7,12
**boiling** 176:18
**bold** 173:1
**book** 155:4
**books** 218:11
**born** 54:23
**bosick** 4:3
**boston** 2:19
**bottom** 70:4
182:12 234:10
297:20 298:8
**boulevard** 2:9
**bowery** 8:18

**bowry** 4:22
**box** 74:12
**boxes** 74:20
**bpa** 224:19
**brand** 283:7
**breadth** 108:24
**break** 68:22
129:6 159:21
160:2 223:17
245:8 263:18
284:10 320:23
321:17 322:21
324:14 328:24
328:25 329:1
331:15
**breakdown**
30:11 31:2
45:14
**breaks** 245:18
326:20
**brett** 2:8 74:24
103:8 107:24
171:16,18
181:9 187:14
233:24 272:5
325:7 326:11
327:7,21 328:6
**brian** 3:23
**brian.baggetta**
3:25
**brier** 3:18
**bring** 282:6
283:14
**bringing**
152:20

**[brings - carcinogenic]**    Page 13

| | | | |
|---|---|---|---|
| **brings** 271:6 | **calculate** 113:4 | **camera** 8:6 | 105:18 110:22 |
| **brittney** 4:7 | 169:19 | **canada** 96:11 | 111:7,19 |
| 321:13 | **calculated** | 96:13,14,16,19 | 112:14,17,20 |
| **brittney.nagle** | 12:18 13:4 | 96:24,25 97:1 | 113:1,7,9,13,21 |
| 4:10 | **calculation** | 97:4,5,6,8,12 | 114:1,9,23 |
| **broad** 23:18 | 12:5 60:17 | 97:20 98:4 | 115:10,24 |
| 32:12 39:8 | 120:11 121:7 | 108:22 115:2,8 | 116:20 117:18 |
| 131:24,25 | **calculations** | 117:1,15,19 | 118:13,18 |
| 319:25 | 13:3 14:23 | 118:7,10,11,16 | 119:7,17 120:8 |
| **broken** 264:3 | 121:11,13 | 118:20 119:5 | 120:19,25 |
| **brought** 197:20 | **calculus** 56:22 | 119:15 121:15 | 121:3,4 122:5 |
| 230:21 288:20 | **california** | 121:24 122:2,7 | 169:7,8,24 |
| **buchanan** 2:13 | 224:7,8,17,17 | 124:9,19 125:3 | 173:14 174:2 |
| 4:17 | 224:18 247:24 | 163:20 | 176:6 220:13 |
| **business** 39:19 | 248:2,10,15 | **cancels** 165:21 | 220:15 221:21 |
| 236:6,8,14 | **call** 10:22,22,24 | **cancer** 11:6,13 | 224:12,23 |
| 246:2,9,12,19 | 15:1 53:5 54:3 | 11:17,23 12:2 | 226:9,21 227:6 |
| 250:15 | 54:17,18 142:5 | 12:6,10,13 | 227:8,9 244:10 |
| **businesses** | 222:4 241:8 | 13:9,13 14:1,8 | 244:11 282:25 |
| 248:1,13 | 270:6 271:22 | 14:14,15,20 | 283:9 |
| **butchering** | 303:6 307:1 | 15:9,25 16:10 | **cancers** 117:3 |
| 94:11 | 311:5 | 16:12,22 17:7 | **capacity** |
| **buying** 286:6 | **called** 21:11 | 17:15 18:2,4 | 160:20 |
| **byproducts** | 73:18 83:2 | 18:14 22:12,12 | **carbon** 26:7 |
| 30:5 45:14 | 96:11 156:17 | 22:20 23:4 | **carcinogen** |
| 48:4 156:6 | 164:6 215:22 | 33:18 34:4,5,8 | 54:17 63:18 |
| | 234:21 240:2 | 34:11,14 35:12 | 103:2 111:14 |
| **c** | 242:10 245:24 | 38:10 53:10 | 282:16 |
| | 271:4,18 307:2 | 55:21,25 59:21 | **carcinogenic** |
| **c** 2:1 3:1,3 4:1 | **calling** 54:16 | 60:2 64:25 | 54:23 55:13 |
| 49:6 105:4 | 72:6 | 65:15,20,25 | 61:23,25 62:1 |
| 106:20 137:19 | **calls** 94:3 | 66:1,5,16,16,17 | 67:25 110:3 |
| 138:3 191:15 | 269:13 270:9 | 67:6,8 68:1,7 | 111:18 112:11 |
| 191:18 247:14 | **camden** 8:17 | 68:15,19 101:3 | 112:12,15,22 |
| 296:9 319:3 | | 104:7,25 | 173:25,25 |
| 322:5 334:1,1 | | | |

[carcinogenic - certain]                                    Page 14

174:2 175:16
231:16
**carcinogenity**
110:2
**carcinogens**
15:17,18 16:20
23:2 53:6,6
59:17 146:11
173:17,17
174:19 175:9
218:18,19
225:13,17
227:12 317:21
**cardiovascular**
21:16
**careful**   148:13
177:8
**carefully**   181:2
295:9
**carillon**   4:17
**carolina**   4:18
**carrot**   144:4
**carry**   59:14
212:9 224:24
**carryover**
193:11
**casarett**   92:8
92:21
**case**   1:6 9:25
10:25 14:11
15:24 20:5
24:25 25:2,20
25:25 26:8
27:7,11,13
29:16 30:10

40:23 41:5,6
43:19 44:2,10
45:1,20 46:18
47:19 48:6,8
51:21 57:14
59:16 60:19,21
65:18 66:20
67:2 76:14
77:12,24 78:6
81:21,25 84:25
85:12 95:20
101:23 102:5
103:11 104:1
109:5 112:4
113:18 114:5
114:13 118:5
124:13 126:12
127:22 130:25
134:9 137:16
137:22 139:7
140:8,14
142:12,13
144:6,25 145:8
145:17,18
154:16 156:13
167:8 169:7
172:15 178:8
180:4 184:22
186:11 203:1
203:10 204:18
205:22 211:14
211:22 213:4,4
213:8,8 215:5
217:24 219:16
220:9,18,19,24

222:16 225:14
227:1,10,19
244:2,16,21,21
244:22,25
245:4 256:24
263:21 264:22
264:23,23
267:1 269:19
273:10 275:20
275:22 280:24
281:1,2 282:13
283:3,8 284:15
284:23 285:14
285:22 286:15
287:6 289:24
291:9 295:16
296:8 298:12
300:17 307:14
308:1 311:9
312:18 316:14
316:25 317:17
323:14 334:15
**cases**   20:16
49:13 85:8
120:1 131:17
223:1,15 227:3
244:9 249:8
251:9,12,21
252:13 253:23
263:14 266:3
**casual**   71:15
**category**   99:23
99:23
**causation**   11:1
11:2,4 13:2

15:2 16:14
101:22 272:24
**cause**   11:6,16
52:10 101:21
178:5 217:15
225:6 228:8
268:25 293:7
**causing**   114:9
225:5
**caution**   252:14
254:5
**caveat**   154:2,2
**cbe**   243:5
**cder**   76:17
**cder's**   76:24
**cell**   225:8,11
**cells**   35:6 55:9
**center**   3:14
**certain**   48:25
58:20 64:4,4
64:22 65:5
75:6 78:11
79:15 90:6
98:4 103:12
126:7,9 129:3
147:25 177:21
178:10 189:5
193:9 212:14
214:1,2 225:9
233:4 235:4
243:3 256:19
262:25 263:23
277:2,4 278:3
278:11 281:13
281:18 292:15

**[certainly - chemicals]**                                      Page 15

| | | | |
|---|---|---|---|
| **certainly** 11:20 | **cgmp** 91:16 | 246:4 271:8 | **characterize** |
| 22:10 23:19 | 211:1,4,10,16 | 283:15 299:2 | 101:17 |
| 24:23 27:4,21 | 211:17,22 | 300:4,6 302:5 | **charge** 250:24 |
| 29:3 30:1 33:1 | 212:2,25 | 302:7,18 307:1 | **charged** 249:24 |
| 41:22 45:19 | 214:10 215:12 | 307:2,13 | 269:20,21 |
| 83:14 96:24 | 215:17 216:25 | 308:18,19 | **charlotte** 4:18 |
| 97:11,23 99:15 | 235:14 | 330:14 | **check** 268:8 |
| 101:23 126:14 | **cgmps** 159:2,10 | **changed** 44:21 | 269:15 284:9 |
| 128:11 138:21 | 159:11 286:20 | 49:12 127:23 | 287:18 313:14 |
| 146:21 157:15 | **chain** 6:3,6,9 | 152:5 163:11 | 320:19 |
| 172:14,21 | 180:11 182:7 | 216:20 220:11 | **checked** 92:18 |
| 183:8 186:5 | 183:3 187:18 | 323:16 | **checking** 48:11 |
| 190:3,9 196:24 | 187:22 190:3,6 | **changes** 35:8 | **cheese** 99:7 |
| 207:14 211:8 | 190:12,17 | 46:14 124:13 | **chemical** 5:21 |
| 211:16 213:24 | 191:5,11 | 150:24 152:7 | 26:1 30:6,11 |
| 217:4 227:3 | 192:10,20 | 221:18 225:6 | 32:3 44:20 |
| 237:20 257:17 | 195:1 196:15 | 237:11,12,25 | 46:5,17,24 |
| 258:23 259:24 | **chains** 184:24 | 238:13,16 | 47:8,12,14 |
| 267:6,21 | **challenge** 75:19 | 239:21 240:17 | 48:3 52:8 |
| 273:22 277:19 | 75:22,25 84:8 | 240:18,22 | 78:11 79:1,9 |
| 280:11 281:12 | 84:13 110:20 | 241:5 242:20 | 81:20 82:4,11 |
| 282:6,13,15 | **chance** 313:4 | 243:3 308:2 | 82:15 85:5 |
| 283:7,10,15 | **change** 17:4 | 335:4 | 92:12,17 93:4 |
| 289:5 299:9 | 35:20 37:7,8 | **changing** 35:8 | 93:10,11 94:8 |
| 301:19 307:11 | 47:11,14 51:16 | 35:18 122:10 | 94:15,16 98:8 |
| 313:15 | 123:14,17 | 141:23 | 98:12,17,18 |
| **certainty** 82:19 | 143:18,19 | **chapter** 26:14 | 112:22 131:3 |
| **certified** 1:18 | 150:23 152:7 | 164:5 166:9 | 149:17 155:24 |
| 334:2 | 216:10 237:19 | **chapters** 154:7 | 157:18 163:11 |
| **certify** 334:4,9 | 239:6,7,14 | 155:8 164:5,8 | 163:12 177:9 |
| **cfr** 136:22 | 241:6,8,10,12 | 165:2 167:18 | 178:1,5,19 |
| 147:17 148:19 | 241:14 242:4,7 | 168:8 263:17 | 225:24 230:8 |
| 235:13 | 242:10,11,11 | **characteristics** | 262:9 308:5 |
| **cfsan** 236:9 | 242:16,20 | 215:9 | **chemicals** |
| | 243:9,10,16,17 | | 271:18 |

**chemist** 29:17
30:19 47:16
76:8,14 77:23
81:21 82:12
88:5 93:1
126:12 139:10
139:17 177:5
178:7 206:21
230:6 258:24
259:12,21
**chemist's** 45:18
176:22
**chemistry** 29:5
46:19 47:17,18
81:18 86:2,4,6
90:3,4,9 98:24
227:14 258:16
259:13,24
262:12 286:20
290:20
**chemists** 27:5
46:18 76:14
84:24 88:5,12
88:21 89:1,4,5
89:7,8,9,12,21
98:17 125:24
188:19 227:18
**chicago** 4:13
**china** 207:3
**chinese** 127:1
206:8,12,25
**chloride** 228:14
239:6
**cholesterol**
58:25

**choose** 63:11
72:10
**chose** 247:21
**chosen** 112:8
133:4 295:9
**christine** 3:13
**christmas**
257:9,10
**christopher**
4:16
**chromatogra...**
76:25 197:15
204:5
**circuit** 140:13
**circumstance**
155:6
**circumstances**
90:7 176:24
177:22 178:11
178:12
**citation** 166:7
233:14
**citations** 285:1
285:8,8
**cite** 28:4,4
30:14 53:19
79:24 80:8
83:14 91:14
92:22 107:7
108:11 109:13
124:5,9 131:7
139:11 165:17
167:14 175:20
179:2 197:10
202:6 203:14

203:16 204:6,9
205:7,10,11,15
205:18 208:2
215:21 230:10
237:24 241:3
257:24 274:1
293:1 303:22
**cited** 52:22,23
91:15 106:18
109:10 110:9
139:23 159:4
165:15 167:19
176:15 179:5
189:1 207:23
211:23 230:9
230:16,24
316:16 319:20
**cites** 154:7
**citing** 125:3
165:20 178:18
186:24 210:1
215:17
**claim** 75:18
**claimed** 149:12
**claims** 97:5
185:18 186:4
202:2
**clarify** 286:7
**clarifying**
213:22 317:3
328:19
**clarity** 24:19
**class** 14:18
165:5

**classes** 21:18
**classified** 239:7
240:15
**classify** 49:17
243:3
**clause** 80:20
**cleansers** 99:7
**cleanup** 321:15
**clear** 16:2
93:19 195:9
196:20,23
197:7 201:5
203:23 204:23
213:24 224:21
239:11 284:19
303:24 328:1
328:22 330:3
330:10,13
331:4,20
332:14,23
**clearly** 112:9
167:14 331:16
331:20
**client** 23:7
28:20 221:7,9
221:10 262:19
262:20 263:22
**clients** 19:20
26:17 93:24
96:24 142:6
255:2 281:2
303:17
**clinical** 38:17
273:5 279:8

**[clock - compared]**                                                                Page 17

| | | | |
|---|---|---|---|
| **clock** 198:25 | 106:3,4 107:24 | **communication** | 136:9,11,15 |
| 199:2 | 113:16 116:16 | 318:4 320:7 | 139:14 141:9 |
| **close** 144:9 | 126:16 141:6 | **communicati...** | 142:11 145:20 |
| 245:7 | 144:6 165:12 | 242:15 322:12 | 152:20 154:16 |
| **closed** 302:23 | 174:4 219:2 | **community** | 154:17 156:15 |
| 303:4,12,25 | 220:6 251:18 | 11:12 | 166:20,21 |
| 304:9 | 252:21 254:12 | **companies** | 178:20 192:12 |
| **closes** 144:14 | 255:1 262:21 | 24:12 36:20 | 192:14 197:19 |
| **closure** 143:7 | 266:3 274:10 | 39:4,7,11,16,17 | 203:7 204:24 |
| **clr** 334:22 | 280:18 281:19 | 39:20,24,24 | 205:1,2 210:15 |
| **cmo** 95:19 | 294:20 303:4 | 41:17,18 47:13 | 211:1 217:5 |
| **codification** | 321:2 328:9 | 48:9 50:4 | 219:16 221:15 |
| 216:4 | **comes** 29:3 | 51:21 78:25 | 221:16 224:4 |
| **codified** 136:18 | 33:22 51:14 | 101:25 107:4 | 225:21 226:3 |
| **coffin** 7:6 | 93:17 149:4 | 118:24 125:6 | 239:24 241:1,3 |
| 266:14 | 199:7 228:24 | 132:21 134:19 | 241:15,18,19 |
| **colleagues** | 279:5,7 315:15 | 141:18 144:25 | 245:6,23 246:1 |
| 32:18 | **comfort** 266:6 | 145:10 186:2 | 246:5,6,10,13 |
| **collect** 217:17 | **comfortable** | 226:7,8 249:5 | 246:14,20,23 |
| **collecting** 75:7 | 295:3 | 255:5 260:7,10 | 247:22,25 |
| **collection** | **coming** 27:2 | 260:13 294:8 | 249:3,22 250:9 |
| 111:20 | 36:25 103:22 | 303:4,25 | 285:11,15 |
| **college** 2:9 | 141:22 201:5 | **company** 23:5 | 303:19 307:17 |
| **colloquy** 204:8 | 280:14 307:8 | 24:9 29:23 | 307:18 323:13 |
| 276:17 | **commencing** | 31:10,16,21,21 | **company's** |
| **column** 193:15 | 1:21 | 33:1 40:2,14 | 80:3 81:23 |
| 297:20 | **comment** 106:8 | 40:14,15 41:1 | 82:14 121:22 |
| **columns** 138:5 | 134:12 171:15 | 41:8,15 44:12 | **compare** 35:1 |
| **combination** | 243:23 253:16 | 44:20 45:20 | 152:8 187:23 |
| 165:3 | 293:13 | 47:7 48:5,5 | 191:9 243:8 |
| **combined** | **commented** | 49:12 50:3 | 258:25 |
| 164:13 | 207:18 | 60:23 79:12,13 | **compared** |
| **come** 12:6 | **common** 236:2 | 85:23 88:23 | 138:22 170:25 |
| 23:13 26:12 | **communicated** | 103:20 121:22 | 182:10 |
| 57:1 93:15,18 | 319:12 | 124:14 135:17 | |

comparing
150:19 258:19
compendial
149:6,20 151:8
151:16,17
314:6
compendium
49:1 130:17
160:24
competent
258:24
complaint
137:13,15,21
244:6,6,13,14
complaints
179:14 197:13
198:15 199:13
199:21,23,25
201:23 204:4
complete   30:20
31:25 42:3
109:16 152:13
154:24 183:15
184:18 242:3
323:14 330:20
completed
253:5 289:12
completely
16:23 330:19
complex   59:1
compliance
132:21 135:14
141:4,9,10
144:2 145:23
148:17 185:24

232:19 235:3
236:3 241:25
286:4 302:19
309:3,4
compliant
166:22
complied
132:16
comply   135:18
146:19 233:4
310:13 311:1
315:4,17
complying
31:11 135:10
component
101:10
compound   14:7
14:10 23:20,23
35:3 52:8
54:14 60:6,20
61:5,14 101:4
102:24 108:10
109:4 122:20
173:18 224:9
224:11 238:25
compounds
13:9 22:11,24
29:7 35:2
52:15 53:9
59:13 64:5
65:21 66:9
79:10,19 85:5
93:12 107:1
110:6 123:19
217:19 220:14

225:5,9 238:21
compromise
332:19
compromises
332:19
computer
91:19 165:15
190:21
con   126:24
concept   114:11
concern   175:15
240:3 262:22
314:12
concerned
200:24 201:14
201:16 205:13
concerns
141:10 201:19
241:1 320:8
concierge   4:23
8:20
concluded
116:15 123:20
concludes
333:12
conclusion
105:8 272:17
conclusions
110:5 119:13
126:25 272:17
272:21 273:1
275:17
concur   290:18
conditions   56:5
139:8 229:20

conduct   146:1
208:19 209:2
274:16 284:22
285:21 286:22
289:23 301:3,5
301:7,8 302:11
308:21 312:16
320:3
conducted   8:5
86:13,21 105:7
218:4
conducting
46:3
conference   2:2
confidence
126:20,23
confidential
1:10 39:17
128:9 129:1
221:6 252:15
307:15
confidentiality
20:23 38:25
39:13 244:19
300:14 303:7
confirm   183:15
195:18 196:1
208:5 245:8
288:11 301:23
confirming
288:19
conflating
163:10
conflicts   278:7

**[conformity - continued]**                                          Page 19

| | | | |
|---|---|---|---|
| **conformity** | 118:11 119:12 | **contacted** | **contaminants** |
| 215:5 | 121:1 155:15 | 19:24 20:5,12 | 26:8 146:10 |
| **connection**  8:7 | 179:18 211:13 | 25:3,14,24 | 157:19 161:2 |
| 22:13 298:21 | 219:15 238:18 | 32:7 253:6 | **contaminated** |
| 299:1 302:6 | 326:2 | **contacts**  270:7 | 11:6 |
| 306:21 318:14 | **constitute** | **contain**  49:19 | **contamination** |
| 319:14 | 255:2 | 57:20 58:9 | 221:4 |
| **consider**  16:12 | **constraints** | 62:19 76:24 | **content**  58:16 |
| 18:23,25 35:18 | 38:24 | 148:4 315:5 | 162:25 |
| 60:15 82:5 | **consult**  221:14 | **contained** | **contents** |
| 97:20 102:9 | **consultant** | 11:16 18:13 | 286:11 |
| 143:16 169:17 | 19:17,19,23 | 22:14 32:10 | **context**  15:22 |
| 257:17 260:2 | 65:1 141:21 | 42:18 49:20 | 15:23 71:15,19 |
| 272:18 278:4 | 260:9 278:25 | 77:6 120:7,18 | 72:1 98:1 |
| 279:11 280:22 | **consulted** | 123:5 293:7 | 113:3 117:2 |
| 294:11 296:8 | 22:13 41:17 | 295:25 308:1 | 122:23 145:10 |
| 307:12 | 125:19 202:21 | 310:10,12,20 | 145:15,16 |
| **consideration** | **consulting** | 310:24,25 | 156:15 170:3 |
| 241:22 | 39:10 40:4 | 324:6,9 325:13 | 172:16 185:8 |
| **considered** | 93:23 223:4 | 327:24 | 189:24 192:23 |
| 39:16 143:1 | 225:20 280:5 | **containing**  61:1 | 193:3 221:1,3 |
| 160:23 165:5 | **consumed** | 113:20 216:19 | 248:20 277:13 |
| 174:19 225:12 | 35:13 | 229:6 232:10 | 313:22 |
| 226:11 276:3 | **consumer** | 291:12 318:22 | **contexts**  100:19 |
| 286:5 302:9,10 | 120:24 226:1 | **contains**  23:25 | 217:25 |
| **considering** | **consumers**  72:8 | 48:21 49:24 | **contextual** |
| 61:21 101:11 | **cont'd**  3:1 6:2 | 50:8 57:24 | 61:11 |
| 232:17 238:20 | 7:2 69:23 73:2 | 62:15,23 | **continually** |
| 275:19 | 91:1 96:8 | 116:18 117:16 | 36:14 |
| **consistency** | 130:9 160:13 | 122:3 226:23 | **continue**  8:10 |
| 218:15 | 188:9 192:7 | 231:24 315:3 | 33:4 76:16 |
| **consistent** | 194:21 224:1 | **contaminant** | 284:8 |
| 53:12 59:18 | 245:21 | 119:1,2 120:2 | **continued**  5:25 |
| 82:17 108:16 | **cont.d**  4:1 | 222:3,4 | 6:16 90:24 |
| 108:25 110:1 | | | 128:16 223:25 |

[continued - courts]                                              Page 20

283:25 322:24
**contract**
  244:20
**contractors**
  236:7
**contrary** 146:4
**control** 21:24
  23:2,4 35:2
  56:19 60:16,16
  69:15 101:5
  154:20,21
  225:8 231:14
  282:24 300:4,6
  302:5,18 307:1
  307:2 308:18
**controlled**
  56:17,17 61:7
  63:3 64:12
  100:2,7,11,22
**controls** 237:2
  237:3
**controversy**
  54:2 110:20,21
**convened**
  261:16
**convenient**
  288:2
**conversation**
  35:17 202:20
  248:21 280:15
**conversations**
  32:15,17 33:1
  36:22 37:17
  269:9 294:1

**cooked** 56:7
**cooperation**
  271:17
**copied** 264:20
  265:6
**copy** 91:5
  198:3 264:17
  290:25
**core** 92:20
  93:17 233:7,12
  233:18 234:7
  234:12,17,22
  235:1,9,10,14
  235:16,20,25
  235:25 236:20
  236:24 237:4
**corporate**
  197:19 289:11
  296:16 297:2,6
  297:18
**correct** 9:25
  30:16,23 31:4
  31:18 36:6
  37:11 38:2
  49:22 51:8
  75:17,20 80:19
  91:5 93:1
  97:14,15
  102:19 121:15
  131:12 133:23
  140:22 153:8
  159:14 162:17
  163:24 167:15
  172:11 179:4,7
  179:15 182:16

182:17,18,19
183:25 184:22
185:1,5 186:4
186:6 187:3
189:20 190:15
190:18 191:2,5
192:21 193:6
193:15 197:12
198:8 201:15
202:8,9,11,18
204:7 205:8,19
206:1 207:2,9
217:8 223:11
237:8 239:8
245:24 247:10
253:2,3 259:19
260:8 269:21
275:2 288:14
295:12 296:24
297:3,4,10
298:2,3,7,10,12
298:18 299:12
300:21 301:24
302:12 306:22
306:24 308:11
309:19 310:3,6
314:7 319:18
322:9 325:16
335:3
**corrective**
  144:8 209:9,12
  209:13,19
  210:5,24
**correctly** 185:2
  189:21 316:4

**cosmetic**
  264:23
**cosponsored**
  271:17
**counsel** 9:1,4
  30:16 245:12
  256:12,14,17
  320:16 331:15
  331:16 334:10
  334:13
**count** 157:23
  158:7 255:23
**counter** 227:5
**counting**
  330:17
**couple** 11:10
  146:12 250:4
  258:9 285:17
  321:16 326:14
  328:6
**course** 86:8
  195:16 256:15
  277:3 302:25
  305:4 308:6
**courses** 86:5
**court** 1:1,18
  8:16,20 9:3
  177:10 191:25
  251:17 328:15
  328:15 334:2
**courtesy**
  327:13
**courts** 20:18
  277:4

**cover** 126:15
  290:8
**coverage**
  120:15
**covered** 188:15
  232:2 258:12
  296:1 302:17
**covering** 167:3
  290:11 319:23
**covers** 108:24
**covid** 20:14
  249:7 261:5
**create** 89:13
  229:23 262:24
**credence** 97:7,9
**credentials**
  85:3 259:25
  260:4
**credible** 258:16
  258:24 259:21
**criminal**
  142:14,15
  144:6
**crisis** 171:8
**criteria** 213:10
  234:8
**critical** 45:18
  239:7,13 240:2
  240:5,8,11,22
  241:8,12,15
  242:11 243:9
  243:16 316:23
**criticism**
  292:18 293:6
  303:11 317:4

317:24
**criticisms**
  286:13
**criticize** 47:2
**cross** 35:2
**crossed** 253:20
**crr** 334:22
**culbertson** 2:18
**cured** 57:19
  58:15,21 59:4
  60:8 61:1,3,23
  61:25 62:10
  99:6
**current** 131:18
  215:22
**currently** 19:2
  39:18 248:3
  255:4
**curve** 113:5
**customer**
  188:22,25
  196:7
**customers**
  184:13 197:14
  204:4 205:24
**cut** 223:10
  263:8,8 264:7
  264:9,16
**cv** 207:6 258:21
  259:5,20
**cycle** 134:5
  136:7
**cytotoxicity**
  60:1

**d**

**d** 3:17
**d.c.** 3:20
**dabt** 5:11 53:2
**daily** 18:20
  102:13 169:4
**damage** 52:9
  52:13,18 225:6
  225:16
**danger** 212:12
**daniel** 2:12
  328:23 329:7
**data** 15:18
  22:21,24 54:4
  56:2 59:18
  110:10 226:16
  226:16,17,20
  273:1 274:16
**database** 129:3
  158:22 215:15
  319:6
**databases**
  128:6
**date** 14:12 20:1
  20:10 42:24
  43:1 53:3 69:9
  72:15 83:19
  94:9 180:13
  187:20 190:5
  190:14 198:2
  266:15 267:19
  268:3,8 287:14
  313:12 334:7
  335:21

**dated** 5:11,13
  5:16,18,22 7:3
  53:2 69:8
  72:14 83:17
  94:8 190:15,18
  190:22 266:12
**dates** 20:4
**david** 1:18 8:20
  334:2,22
**davis** 3:9
**day** 63:4 85:18
  116:19 117:17
  122:4 194:25
  219:24 232:3
  257:16 267:20
  326:20 327:6
  328:10 329:2
  334:17 335:23
**days** 86:17
  141:14,15
**deal** 29:6
  147:15 159:1
  171:7
**dealing** 164:21
  194:2 244:25
  263:12 293:19
**deals** 188:19
  228:7
**dealt** 104:4
  107:12
**dear** 189:19
**decades** 11:9
**december** 7:3
  126:18,18
  190:7,9 266:13

[december - deposition]                                          Page 22

267:3,17,19,20
**decided**  246:3
  330:22
**decision**  113:2
  114:13,14
  219:3 282:8
**decisions**  66:3
  98:5 100:20
  113:3 117:9
  241:22,24
  282:8 326:3
**decompose**
  176:24 177:21
  178:10
**decomposed**
  176:25 177:14
**deem**  123:18,23
  159:15 212:20
  216:17 326:2
**deemed**  42:23
  43:18 147:12
  147:14 148:5
  161:21 311:12
  311:17 324:6,9
  325:13,18,25
  326:1
**deems**  211:19
**defective**
  124:11
**defend**  267:12
**defendant**  2:17
  3:8,17 4:2,7,11
  4:16 41:14
  291:10

**defendants**  3:2
  7:9 32:4 41:16
  259:11 284:4
  287:12 289:23
  301:6 312:16
  312:17 321:14
  328:16,23
  329:4 332:25
**defending**
  69:16
**defense**  103:25
  104:3 126:15
  257:5 267:24
  268:2 278:18
  288:23 297:12
  311:23 331:15
  331:16
**defensible**
  13:20
**defer**  76:9,15
  78:6 84:24
  88:4,12 257:25
  260:3 290:12
  290:15,16
**deficiencies**
  300:21
**deficiency**
  300:22
**define**  71:6
  87:23 89:14
  97:9 180:2
**defined**  112:24
  176:1
**defining**  70:10
  71:12

**definition**
  70:15,25
  112:12 148:7
  211:3 214:13
  216:6 243:8,9
  243:16,17
  325:20
**definitional**
  214:19
**definitions**  71:4
  123:23,23
  149:2 211:13
  215:2
**degradants**
  156:6
**degradation**
  24:13 30:5
  45:14 48:4
  230:10 306:4
  306:13
**degrade**  24:16
  25:5 29:11,19
  139:9
**degree**  86:1
**degrees**  98:23
  271:23
**delayed**  20:17
**demonstrates**
  124:23
**demonstrating**
  319:11
**deny**  332:20
**depend**  79:18
**depended**
  35:12

**dependent**
  17:16 64:9
  71:18 87:16
**depending**  17:4
  51:13 105:5
  111:24 131:15
  143:19 262:14
  263:11,20
  264:22
**depends**  8:6
  30:25 48:23,24
  48:24 49:10
  50:2,2,13 56:5
  57:9 62:25
  63:16 95:13
  138:19 172:13
  211:12,20,21
  213:1
**depo**  182:13
  257:6 314:20
**deposed**  9:15
**deposition**  1:10
  6:12 7:10,13
  8:5,13 10:13
  24:25 28:9
  31:20 65:10
  91:9 104:2
  125:12 126:10
  128:4 138:12
  138:20,22
  139:15 152:11
  179:6 186:17
  189:3,23
  197:10,24
  198:1 201:4

HIGHLY CONFIDENTIAL

**[deposition - diet]** Page 23

202:13 204:7,9
204:18 205:7
206:10,17
207:7 239:10
241:16 252:11
252:23 256:3,5
256:7,19
258:10 267:7
267:16,19
287:3,13
288:12,16
289:13 296:22
305:5 312:9,23
313:2,3,8,11
315:20 326:10
331:22 334:6
334:12
**depositions**
9:18 27:24
28:3,11 30:16
106:20 138:25
179:3 189:15
207:11 230:21
247:3 251:11
252:22 289:10
296:13,16,20
296:21,23
297:2,9,12
327:10
**describe**   12:20
27:3,6,19
34:16 45:5,13
47:19 48:9
66:4 67:5,6,7
106:24 152:18

154:9 227:17
228:1 235:4
290:22
**described**   19:3
19:11 27:8,10
28:7,8 44:3
45:3 53:23
54:20 65:19
66:5 85:25
127:21 176:24
228:10 234:9
234:15,18
274:4 275:6
311:3,22
**describing**
34:22 84:17
121:19 184:20
228:23 235:12
275:9 276:24
**description**
15:6 28:1
81:19 152:19
230:19 241:6
242:3,6,10
277:1 297:24
311:2,23
**descriptions**
118:1 241:4
265:2
**design**   111:7
279:6,12,13,18
**designed**
279:10
**desire**   263:22

**desires**   263:21
**detail**   27:19
228:9 232:3
268:22 281:11
289:7 290:7,11
**detailed**   110:10
230:19 309:2
**details**   27:6
45:17 47:20
102:19 227:19
230:5,17
281:23 300:20
300:23 301:4
307:20
**detect**   75:10
84:9,14 87:12
**detectable**   17:5
17:5
**detected**   23:8
116:7 323:18
323:25
**detecting**   64:10
**detergents**   99:8
**determination**
104:16 111:15
112:25
**determine**
34:17 50:17
76:19,23 77:5
82:7 104:7,14
174:7 183:5
196:16 201:11
204:1 205:5
**determined**
13:11

**determining**
66:22 68:14
104:24 105:17
105:18
**develop**   68:15
77:4,16,18
87:4,11 93:25
232:18
**developed**
22:20 26:16
42:23 43:3
76:17,25 77:10
77:12 85:10
86:25 88:19
106:10 154:25
164:11 258:14
260:2 271:9
311:9
**developing**
75:9,20 88:6
102:21 132:20
219:10 230:25
272:15,16
**development**
41:2 49:8
111:20 154:11
246:9
**develops**   77:16
**device**   253:13
253:16 254:21
264:23
**dictionary**
70:25 71:5
**diet**   99:13

**diethyl** 92:25
**diethylamine**
  24:16 25:6
  29:11,20 229:7
**diethyline**
  229:19 230:12
**difference** 52:3
  124:15 138:13
  262:9 326:6
  329:20
**different** 12:23
  12:24 17:23,24
  26:9 30:9 34:3
  34:3 35:19
  46:14 51:3,22
  55:22 56:16,22
  59:12,14 61:11
  61:20 62:6
  63:7 68:10,13
  68:14,18 71:14
  86:5 87:5
  89:10 93:24
  98:1,2,5
  107:10 111:2
  111:24 113:3
  115:17 119:1
  124:13 132:2
  134:2,4 135:4
  139:12 142:15
  145:16 149:14
  150:25 151:3
  159:6 161:25
  162:24 163:2
  167:12 169:17
  171:9 177:12

182:11 200:10
211:7,17
219:19 220:3,3
226:9 230:5
234:15 235:6,7
239:1,18 241:9
246:13 251:9
253:22 262:9
262:12 263:5
263:11,20
264:24 271:10
273:12 274:3
275:5 280:10
283:18 285:25
286:19 305:11
309:4 314:25
314:25 318:12
**differentiating**
  52:6
**differently**
  66:17 135:21
  165:5 177:4
  225:18 263:15
**difficult** 56:19
  75:11,24 76:3
  76:4,6,11
  217:16
**difficulties**
  194:24
**difficulty** 77:15
  85:15 194:6
**diligence** 249:4
  255:10 301:14
**dimethyl** 92:24
  92:24

**dimethylfor...**
  23:10 239:6
**diovan** 51:18
  122:20 123:5,8
  123:12,13
  124:1,9,10,16
  124:19,20,23
  125:4 150:21
  151:11 163:17
  163:19 304:20
  323:17
**direct** 148:14
  225:6,16 318:3
  333:5
**directed** 320:3
**directions**
  132:13
**directly** 45:2
  150:9 209:24
  285:3 286:21
  292:3 320:7
**disagree** 70:16
  79:2,6 81:12
  84:22 115:12
  115:14 117:5
  117:24 122:24
  123:2 155:19
  169:12,14
  170:11,12
  184:6,19
  296:17
**disagreement**
  315:19
**disclaimer**
  132:9,25 133:3

**disclose** 252:15
  254:5
**disclosed**
  252:25 254:6
  309:18
**disclosure**
  300:15
**discovered**
  294:3
**discovery**
  25:20 298:16
  298:19 303:10
  319:19
**discuss** 9:20,24
  79:21,25 155:9
  186:18 210:2
  243:20,21
  273:21 274:4
  289:18
**discussed**
  124:14 131:9
  139:1 151:12
  151:14 204:18
  206:2 210:7
  216:10 293:25
  310:1
**discusses** 84:6
  230:7 231:5
**discussing** 83:1
  87:22 184:7
  204:17 298:17
**discussion**
  61:11 65:19
  72:24 77:23
  90:17,20 96:5

[discussion - documents]                                    Page 25

126:4 132:8
141:8 152:14
175:19 182:2
183:9,16 187:9
189:14 202:14
203:20 220:20
235:7 239:23
242:25 273:11
274:7,18
290:19,21
**discussions**
64:20,21
237:17
**disease**   58:2
63:11
**dishonest**   329:8
329:18,23
**dishonesty**
329:9,18,19
330:6 331:25
**disputing**
320:11
**dissertations**
108:13
**distinguishing**
241:15
**distributed**
250:21 293:11
**district**   1:1,1
8:16,16
**division**   90:3,4
90:9
**divulge**   40:1
**dizzy**   76:22

**dma**   35:13
75:20
**dmf**   23:10,25
24:10,13,16
25:5 29:11,19
31:3 139:8
176:17,23
177:9,21
178:10 230:10
230:23 240:1
241:5 300:10
300:16,20
302:24 303:13
304:9,18
307:20
**dna**   35:8 52:13
52:18 225:6,16
231:14
**dnigh**   2:16
**doc**   103:7
**doctor**   35:17,21
35:22 37:6
38:13 39:12
159:19 254:4
257:21 288:9
291:21 292:1
294:13 301:2
304:4 310:9
311:25 315:23
320:15
**document**   1:4
32:1 47:23
53:24 71:10
73:20 74:3,7
74:24 83:4,14

84:5 90:13
91:10,22 94:20
94:25 107:6,6
107:10 109:21
110:9 115:1
124:5 125:4
127:15 131:10
131:13,14,14
131:17 133:1,5
133:21 135:4
138:6,9,17
163:22 164:20
166:15 168:20
175:19 181:2
182:23 183:14
183:17 186:8
189:1,4,18,25
193:4,13,13
195:9,11 200:6
204:21 206:11
206:15 207:7,9
213:9,12 214:6
214:6 215:20
215:21 217:22
229:16 230:16
231:17,20
232:1,15
233:11 234:25
235:5 238:19
239:10 262:23
263:7 264:6,18
265:15,17,18
266:19,22
267:11,14
273:11 288:10

288:16 293:1
299:11,20
303:22 304:7
304:22 306:24
307:2,4,7
308:12 314:17
319:2
**document's**
189:14
**documentation**
321:25
**documented**
302:5
**documents**
12:23 20:23
25:20 27:9,10
27:12,20 30:22
31:17 39:1
45:4 53:25
90:12 91:12
92:2 97:11
103:10 106:11
107:7 108:11
109:13,16
124:4 126:1,4
126:8,21 127:3
127:5,10,11
128:1,7,10,10
129:2 132:1,5
132:8,10,12,15
132:17,23
133:8,11
134:15,20
135:10 138:11
139:3,22

HIGHLY CONFIDENTIAL

**[documents - dr]**                                                    Page 26

154:10 155:10
162:5 165:11
165:14 166:9
186:7 187:4,6
201:24 202:25
203:9,10,21
204:19,22
215:10,18
218:1 219:13
219:25 220:11
220:20 227:16
232:8,16 233:1
234:19,21
242:19 256:16
256:18,20
267:4,6,22
285:2,9 289:11
293:13,23,24
293:25 294:20
295:2 297:19
297:22 298:6,8
298:11,13,16
299:5,8,10,22
301:22 302:18
302:19 303:10
307:12,15
310:4 316:18
316:19,20
319:11,16,17
**doing**  15:2 18:7
29:17,23 34:7
46:17 47:18
48:17 51:15
63:7 66:14
67:14 68:16

69:20 82:3
114:20 120:13
120:14 121:10
122:13 136:12
139:11 141:17
145:22 146:7,7
148:17 151:20
152:10 154:22
156:16 157:17
162:4 172:15
174:16 176:10
181:15 185:4
185:23,24,25
188:17 190:4
202:14 205:2
221:9,11,23
231:8 238:4
243:13 246:11
255:15 260:24
264:22,23,24
272:24 279:3
290:17 320:13
**dollars**  268:13
**dormant**
251:15
**dosage**  112:9
112:17
**dose**  10:22
13:11,18 16:6
16:24 17:2,8
17:22 33:23,24
34:4,12,18
38:1 55:11
63:17,20
101:16,20

110:23,25
111:4,8,20
112:10,19,23
113:5,11 114:9
176:5,6 216:19
221:24 235:15
245:6 284:15
284:22 285:21
285:24 286:8
286:13,14,22
289:20 290:4
292:17,24
294:5,18,22
295:20,24
301:9 302:20
302:25 305:20
310:24 311:16
311:20 315:3
315:12 316:2
316:13,24
317:24 320:4
323:9
**doses**  15:10
18:20,21 54:22
111:22,23
112:2,2,7
225:9 310:12
310:25
**double**  138:5
**doull**  92:21
**download**
313:22
**dr**  8:13 9:11
24:24 27:4,25
28:8 45:1,15

46:17 47:3
52:25 69:25
73:8,19 74:2
76:9,15 83:6,7
83:11,21 84:7
91:4 92:3
96:10 107:15
125:2,10
130:11 140:6,9
140:11,15,18
145:7 148:16
158:1,2,3
160:15 168:18
171:23 180:14
182:6 186:18
187:3,21
188:11 192:12
194:23 204:7
204:16,18
205:7,12
206:25 207:12
224:3 227:13
230:6,18 231:5
231:8 233:20
234:11 236:6,8
236:19 245:23
250:22 252:3
252:16 256:25
257:1,1,20,24
258:7,16,17,21
259:3,20,22,24
260:3 277:25
281:10 284:3
284:13 287:23
288:24,24

HIGHLY CONFIDENTIAL

**[dr - earned]**                                                              Page 27

289:4,5,6
290:19 308:6
312:7,15,20
313:17,21
314:21 315:18
321:13 322:19
325:11 329:9
330:18 331:6
333:13
**draft** 265:16
**drafted** 23:21
126:17
**drafts** 257:12
265:15
**draw** 170:2
250:13,18,19
272:21,25
275:17
**drawing** 92:12
149:20 272:17
**drawn** 126:25
**drive** 266:23
**drug** 10:18,25
15:20 16:1
17:19 31:13
35:19,22 36:4
36:15 37:16
38:11 39:23
40:15,16 48:20
49:19,23,24,25
50:4,8,15
56:20,24 61:15
61:16 62:8
66:19 70:12
85:24 90:3,5,9

102:12 113:22
114:18,21,24
116:12,14,18
117:9,16
118:14 120:2
120:23 122:2
124:23 130:11
130:13,16
136:13,14,15
137:4 144:22
145:13 149:15
150:10,14
151:3,4,11
152:2 159:6,11
159:12 161:18
165:7 166:16
171:8 177:10
177:13 212:23
215:1,1,6
222:5,12,15,16
227:4 237:8,20
238:25 240:20
244:12 245:6
264:22 292:10
292:17 303:3
303:23 304:13
304:15,21
315:13 316:3
317:20 323:4,7
323:10,20
324:1
**drugs** 3:2 17:17
21:17 32:19
41:23 51:4
75:7 132:1,2

145:23 148:4,8
149:19 172:8
227:6,8,11,11
232:21 237:3
278:20
**dsouza** 189:8
**due** 249:4
255:10 257:3
301:14
**duly** 9:6 334:6
**dummies**
227:22 228:1
**duties** 48:15
122:1 134:14
134:24 136:3
136:16 170:1
305:6
**duty** 48:15
72:11 88:22,23
121:21,21
133:25 134:3,4
134:8,10,17
135:20,23,24
135:24 136:1,5
136:8,18 293:3
293:5 294:17
295:17

| e |
| --- |

**e** 2:1,1,17 3:1,1
4:1,1 6:3,6,9
9:5 107:4
117:22 130:1,1
130:3 180:11
180:14,22
182:7,15 183:3

183:9 184:6,8
184:24 185:9
185:10 187:18
187:22 188:21
189:7,7,8,18
190:3,5,12,17
190:18 191:5
191:11 192:10
192:19 195:1,4
195:6,19
196:15,19
197:2 206:1,5
206:7,19
207:12,17,22
207:24 247:14
259:9 334:1,1
335:1
**e.g.** 237:6
**eabraham** 3:6
**earlier** 43:1
55:16 91:3
134:13 169:16
179:13 192:20
205:25 206:4
210:8 216:10
232:2,6,7
259:10,12
260:6 264:5
295:21 305:5
318:1 326:7
**early** 22:23
44:11 251:6
269:4
**earned** 250:7
251:2

**[easiest - equal]**                                              Page 28

| | | | |
|---|---|---|---|
| **easiest** 228:17 235:4 | 174:8 175:1 271:10 | 246:8,18,18,22 334:13 | 127:7,13,16 200:16 206:8,9 236:25 |
| **easily** 261:21 | **efficient** 72:21 | **employees** | **ensure** 82:16 |
| **eastern** 130:7 160:7,11 194:19 223:19 223:23 247:16 321:5,9 325:1 333:12 | **effort** 87:25 88:1 | 152:15 207:8 246:14 250:23 285:11 296:16 296:24 | 136:5 144:24 215:6 232:18 292:8 293:5 299:17 317:11 |
| | **efforts** 89:13 | **employs** 89:20 | **enter** 39:20 |
| | **eight** 169:2,7 181:23 186:20 251:24 298:5 326:18 | **encompass** 295:8 | **entered** 282:16 |
| **easy** 87:11,18 88:7 | | **encompassing** 89:9 | **entire** 73:12 93:6 107:9 138:22 196:18 196:19 197:1 200:15 218:24 233:21 314:20 |
| **eat** 58:4 63:4,4 63:11,16 | **eisenhower** 2:5 | **encounter** 253:11 | |
| **eating** 57:5,9 57:19,23 58:8 62:22 64:2 | **either** 15:1 53:17,23 54:16 125:24 131:15 140:14 144:19 157:15 166:8 171:21 219:2 226:11 227:4 239:10 245:6 255:5,5,7 258:5 286:10 292:7 294:1,3 | **encountered** 253:10 | |
| | | **ended** 329:1 | **entirely** 31:1 99:14 |
| **ect** 298:8 | | **endpoints** 34:15 52:11 | **entirety** 205:21 |
| **ectd** 297:23 298:1 | | **enforceable** 132:6 135:21 | **entitled** 1:17 142:4 270:22 |
| **edited** 264:21 | | **enforcement** 142:13 | **environ** 40:11 225:22 226:8 278:17,23 |
| **editors** 98:23 | **elements** 167:7 | **engaged** 10:9 141:21,22 269:12 | |
| **effect** 52:12 54:24 55:8 56:7 60:2 173:9 174:21 175:13,24 273:9 | **eleven** 326:19 | | |
| | **ellis** 4:8 | | **environment** 99:13 221:12 |
| | **elongated** 262:6 | **engagement** 269:10 | **environmental** 221:3 264:25 |
| **effected** 156:13 | **emerging** 249:5 249:6 255:11 | **engages** 211:1 | **enzyme** 255:9 |
| **effective** 134:6 136:6 | **employ** 88:21 89:1 | **engineering** 5:22 94:8,16 94:17 98:9 | **epa** 26:7 53:24 225:1 |
| **effectively** 305:8 | **employed** 334:10 | **english** 70:20 70:21 72:7 87:24 127:4,6 | **epidemiology** 273:4 |
| **effects** 34:7 54:15 55:3 173:12,22 | **employee** 19:15 19:21,22 246:7 | | **equal** 246:5,8 |

[equation - example]                                                    Page 29

| | | | |
|---|---|---|---|
| **equation** | **estimated** | **evidence** 14:11 | **evolved** 246:24 |
| 238:23 | 169:2 | 31:7 34:21 | **evolves** 219:5 |
| **equivalence** | **ethical** 271:4,4 | 43:19 44:2,11 | 265:18 |
| 149:5 150:17 | **ethicon** 252:12 | 45:20 102:23 | **exact** 19:6 20:1 |
| 162:6,9 | **ethics** 270:23 | 103:4,11,13,14 | 20:10,15 43:1 |
| **equivalent** | 271:7 | 103:18,20 | 120:20 130:12 |
| 96:15 147:24 | **eurofins** 93:20 | 104:9,13,18,20 | 133:19 148:23 |
| 148:7,8,9 | 93:21 | 104:24 105:7,8 | 150:11 157:10 |
| 149:3 150:18 | **european** | 105:9,16,17 | 158:20 161:11 |
| 161:15,16,16 | 247:16 | 106:14,16 | 167:4,6 218:24 |
| 162:15 163:16 | **evade** 122:22 | 107:7,11,18 | 219:23 241:4 |
| 167:11 | **evaluate** 305:6 | 108:2,4,5,13,15 | 253:21 |
| **eric** 3:3 | 316:12 | 109:7,9 122:7 | **exacting** 162:3 |
| **erroneous** | **evaluated** | 123:7,9 124:12 | **exactly** 96:15 |
| 88:18 | 300:5 301:8 | 126:24 149:11 | 113:12 130:20 |
| **error** 268:4 | 308:16 | 149:13 152:17 | 135:6 161:8 |
| **especially** 9:16 | **evaluating** | 153:2 154:24 | 179:16 240:15 |
| 205:17 247:21 | 300:3 302:7,11 | 156:2 157:11 | 303:16 305:13 |
| 275:13 320:12 | **evaluation** 32:3 | 178:18 180:4 | **exaggerate** |
| 323:15 | 32:5,5 45:22 | 186:5,10 | 111:11 |
| **esq** 2:4,8,8,12 | 45:23 49:7 | 204:17 205:21 | **exaggeration** |
| 2:12,17 3:3,9,9 | 155:24 157:17 | 218:5,21,25 | 111:4 |
| 3:13,17,18,18 | 162:22 175:21 | 219:1,6,15,21 | **examination** |
| 3:23 4:2,7,12 | 218:13,14 | 220:1,5,18 | 5:2 9:9 69:23 |
| 4:16 | 219:3,8 221:11 | 223:8 241:21 | 73:2 91:1 96:8 |
| **essentially** | 298:24 301:21 | 245:4 257:25 | 130:9 160:13 |
| 96:14 228:9 | **evaluations** | 273:12,25 | 188:9 192:7 |
| 238:18 325:22 | 49:4 111:21 | 276:3 293:21 | 194:21 224:1 |
| **establish** 132:5 | 255:16 | 293:24 294:10 | 245:21 284:1 |
| **established** | **event** 66:17 | 295:10 304:3,5 | 321:11 323:1 |
| 306:19 | **eventually** | 304:22 310:23 | 325:9 |
| **establishing** | 294:21 302:8 | 311:9,21 | **examined** 9:6 |
| 133:25 134:1,3 | **everybody** | 317:17 | **example** 23:3 |
| **estimate** 250:1 | 276:6 278:1,1 | **evolution** | 31:3 32:23 |
| | 279:25 280:11 | 265:16 | 44:18 49:18 |

HIGHLY CONFIDENTIAL

**[example - expert]** Page 30

| | | | |
|---|---|---|---|
| 50:20 54:13,25 | **excluding** | 288:8 313:9,10 | **expecting** |
| 55:2 56:6 58:3 | 105:15 | 313:14,25 | 281:17 |
| 63:15 64:13,16 | **excuse** 230:20 | 315:21 322:5 | **expects** 132:20 |
| 95:10 100:7,25 | 327:7 330:8 | **exhibits** 5:9 6:2 | 141:25 |
| 102:1 103:15 | **exh** 53:1 69:7 | 7:2 27:24 28:2 | **experience** |
| 103:25 107:9 | 72:14 83:17 | 72:17 138:12 | 21:19 39:22 |
| 131:25 138:20 | 94:7 180:11 | 138:23,23 | 47:13 61:13 |
| 141:3,20 | 187:18 190:12 | 207:11 297:14 | 71:12,13 85:9 |
| 144:20,24 | 197:25 266:12 | **exist** 62:3 66:8 | 88:5 100:17 |
| 146:8 147:11 | 287:11 313:10 | 67:9,10 142:11 | 102:10 104:8 |
| 151:23 163:20 | **exhibit** 5:10,13 | 229:8 303:9 | 104:21 106:8 |
| 217:18 223:5 | 5:16,18,21 6:3 | **existed** 43:12 | 106:12 107:1 |
| 225:6 227:12 | 6:6,9,12 7:3,8 | 218:15 300:22 | 131:22 132:17 |
| 234:14 256:19 | 7:13 52:25 | 303:16 318:10 | 133:7 135:9,17 |
| 263:2,16 | 53:1 69:6,7,11 | **existing** 34:6 | 135:25 143:5 |
| 264:23 267:21 | 69:17 72:12,13 | 237:12,19,25 | 155:16 206:18 |
| 272:22,23,25 | 72:14,21 73:4 | 310:19 312:4 | 219:12 232:4 |
| 275:14 276:1 | 73:7,16,17 | 312:22 318:11 | 233:1 235:11 |
| 278:12 282:13 | 83:16,17,20 | **exists** 54:4 | 235:23 263:4 |
| 282:15 285:9 | 91:4 94:7,11 | 153:2 161:22 | 273:2,5 274:11 |
| 286:1 298:21 | 115:1 168:10 | 165:3 294:10 | 275:11,14,16 |
| 320:10 | 168:11,18 | **expansive** | 275:22 277:1,6 |
| **examples** | 170:7 172:24 | 30:20 285:25 | 278:2,16,23 |
| 131:22 279:19 | 180:7,10,11 | **expect** 117:3,6 | 279:2 280:1,3 |
| **except** 90:6 | 182:13 187:12 | 130:16 150:25 | 280:4,5,6 |
| **exceptional** | 187:13,18 | 151:25 265:2 | 298:14 |
| 207:19,25 | 190:11,12 | 297:15 | **expert** 5:10 |
| **exchange** 47:11 | 192:10,10,25 | **expectations** | 9:24 11:2 |
| 182:15 200:15 | 193:1 194:25 | 132:15 | 16:14,18 18:24 |
| **exclude** 100:8 | 195:1 197:24 | **expected** 88:10 | 18:25 19:4,8 |
| 237:16 | 197:25 198:20 | 115:10,24 | 19:11,25 20:21 |
| **excluded** | 210:19 215:19 | 116:20 117:18 | 21:6,6 25:4,14 |
| 237:17 | 266:11,12,18 | 120:18 122:4 | 25:25 28:13,16 |
| **excludes** | 274:23 287:6,8 | 143:13 144:25 | 31:9 32:8 |
| 163:24 | 287:11,19,23 | 152:4 173:8,22 | 42:11,14 53:1 |

[expert - fact]                                                    Page 31

65:12 71:6
88:13 91:3
104:1,3,5
126:11,13
188:18 197:9
204:12 206:21
222:10 223:2
223:11 233:21
252:25 253:7
254:7 257:5
258:12,17
259:1,11,16
263:1 267:24
268:2 270:22
273:18 274:20
275:1,4,12
288:21,23
297:9,11
311:22,24
312:5 313:8
327:10
**expert's** 265:3
327:24
**expertise** 21:17
47:16 82:6
85:3 108:6
138:24
**experts** 14:25
15:2 27:5
77:11 78:6
120:14 121:10
126:15 127:22
140:14 147:4
170:23 174:15
185:25 186:1

240:22 243:13
256:24 258:6
286:2,19,21,25
289:2 290:6,10
293:18 297:13
302:17 309:2
319:23
**explain** 13:10
13:21 15:13
21:9 109:11
113:15 155:19
161:8,13 220:2
221:5 227:22
296:18
**explained**
45:16
**explaining**
68:17
**explanation**
80:9 195:12
227:25 228:6
**explanations**
183:25
**explore** 137:2
**expose** 35:6
**exposed** 17:14
34:19 37:1
65:14 66:7
99:4,10,10
101:12 111:10
112:3,13,16,21
**exposure** 11:14
13:1 14:24
16:8,16 17:23
35:9 55:9,20

55:22,25 56:8
59:23,24 60:1
63:21,21 64:24
65:24 66:7,10
67:3,19,20
68:4 99:12
100:1,6,11,21
100:22 101:6
101:10,11,15
101:18,22
102:1 111:23
112:10 113:8
113:11,14,16
113:20,25
114:3,6,16,17
118:13 170:10
172:15 173:16
175:16 176:7
227:2,2 244:11
273:9 320:2
**exposures**
56:18
**expressed**
42:21 201:18
209:25 210:14
295:5
**expressing**
315:1,2
**expression**
33:21,24 52:10
**expressly**
143:10
**extension** 301:8
**extent** 34:13
39:12 58:23

78:2 111:13
140:10
**extrapolate**
113:6 174:22
**extrapolated**
55:21

**f**

**f** 130:1 247:14
334:1
**face** 209:2
**faced** 84:8,13
**facilities**
157:22
**facility** 141:3
141:22 156:25
**fact** 11:21
20:14 21:13
26:11 29:22
33:14 34:22
35:7 36:17
44:15 48:5
54:19 77:15
79:8 81:25
109:15 115:18
116:9 119:25
123:21 139:11
145:25 148:3
151:1 152:14
155:23 156:3,4
158:9 160:24
164:13 166:25
172:9 179:19
183:11 184:4
208:15 211:13
216:20 218:1

| | | | |
|---|---|---|---|
| 240:25 241:3 | 142:18,21 | 73:18 74:20 | 168:19 170:14 |
| 282:23 303:20 | 192:11,12 | 75:3,14 76:2 | 171:2,7 174:3 |
| 304:12 308:16 | 217:15 218:3 | 76:16 77:4,16 | 197:5 208:23 |
| 327:11 | 227:13 231:9 | 77:18 78:3 | 210:7 211:23 |
| **factors** 58:24 | 231:17 237:23 | 80:13,21 81:2 | 213:9,12 214:2 |
| 68:12 | 277:14 284:14 | 83:17,21 87:20 | 214:9,19 |
| **facts** 15:6 44:2 | 301:13 302:23 | 88:21 89:1,12 | 215:10,14 |
| 44:11 45:4 | **family** 32:18 | 89:14,20 90:2 | 216:24 217:5 |
| 67:13 285:14 | 33:3 35:10 | 90:8 96:15,17 | 233:4 235:21 |
| 307:13,25 | 37:22 57:1,18 | 98:2 100:19 | 235:24 236:7 |
| 310:23 326:6 | 57:22 58:7,24 | 107:3 108:21 | 236:10,15,20 |
| **factual** 286:10 | 62:21 | 110:3 114:16 | 238:6,12,19,20 |
| 291:9 | **far** 154:9 | 117:1 121:24 | 239:13,19 |
| **failed** 197:15 | 157:12 231:11 | 123:19 125:14 | 240:3,16,25 |
| 197:17 201:25 | 251:12 252:22 | 125:16 128:12 | 241:4,7,12,17 |
| 204:6 205:6 | 253:3 282:20 | 128:13 131:16 | 241:21 242:3,6 |
| 234:12 242:6 | 285:12 290:14 | 131:16 132:5 | 242:10,17,25 |
| 303:12 | 298:18 309:1 | 132:10,20,22 | 243:1,23 247:6 |
| **failure** 159:2 | **fastest** 133:12 | 133:15,24 | 248:18,23 |
| 293:10 | **favorable** | 134:24 136:12 | 260:7,11,12,14 |
| **fair** 60:7 109:6 | 248:1,9 | 136:13,14,20 | 260:17,23,25 |
| 139:3 143:22 | **fda** 5:13,16,18 | 137:12 139:14 | 261:4,8,11,16 |
| 143:25 144:1 | 10:19 15:20 | 139:23 141:1,5 | 261:17,22 |
| 196:7 285:4 | 17:16,24 18:23 | 141:25 142:1,5 | 262:7,11,16,20 |
| **falanga** 3:14 | 19:1,2,4,8,11 | 142:18 143:6 | 278:20 303:23 |
| **falkenberg** | 19:14,15,18,20 | 143:10 144:3,9 | 318:25 319:2,4 |
| 4:12 | 21:14 26:9 | 144:14 145:14 | 325:24 |
| **falkenbergiv...** | 32:22,23 35:24 | 145:23 146:4 | **fda's** 36:19 |
| 4:14 | 41:23 42:3 | 146:18 148:21 | 74:17 77:21 |
| **fall** 293:9 | 43:3,6,7 47:12 | 155:22 156:2,4 | 79:2 80:2 |
| **falls** 301:1 | 56:9 61:16 | 156:14,17,24 | 84:22 88:14,16 |
| **familiar** 69:25 | 64:15,19 69:6 | 157:21 158:9 | 88:17,23 110:5 |
| 70:3 96:10 | 69:7 70:8,17 | 158:18 159:7 | 133:12 135:2 |
| 109:18 140:15 | 71:10,22 72:13 | 159:13 161:19 | 136:7 137:1 |
| 140:17,18 | 72:14 73:6,12 | 161:24 168:16 | 149:4 156:9 |

209:2 239:22
240:12 243:9
243:17 322:6
326:3
**fear** 244:11
**february**
269:18
**feel** 29:15 39:25
281:20 289:21
293:12 294:15
295:3 300:2
307:6 308:19
**felt** 188:17
290:19
**female** 281:5
**fengtian** 206:21
**fentanyl** 212:10
**fermented** 58:8
58:15 59:5
99:6
**fhs** 4:5
**fibers** 262:14
262:14
**fibrous** 262:13
**fifteen** 249:2
**fifty** 104:17
159:24 246:21
246:21
**figure** 49:16
72:18,19,20
82:2 96:1
156:7 178:23
200:12 286:16
**file** 69:11 85:24
166:16 168:17

177:10,13
181:7 193:22
267:10 269:1
304:15 315:13
323:4,7,11,20
324:1 328:19
333:7
**filed** 8:15 268:7
288:17 299:25
**files** 21:3 28:14
90:3,6,10
124:3 293:20
298:1,15
301:15 303:3
303:24 304:13
**filter** 251:22
**final** 133:8
143:1,11,12
257:14,17
265:16 310:11
**finalization**
144:12
**finalized**
257:13
**finally** 94:19
**financially** 8:23
334:14
**find** 34:9 40:5
52:20 53:19,25
60:13 75:11,24
76:3,4,6,11
79:15 89:17
92:21 105:23
115:4 119:10
124:19 131:8

137:2 152:21
152:23 155:4
157:25 175:7
176:14 179:22
191:16 200:25
201:15 202:11
202:22 205:3
205:14 209:6
215:16 221:18
228:2 276:24
**finding** 36:14
171:6 211:18
211:23 212:16
220:8
**findings** 43:3
143:17 242:25
**fine** 9:22 95:1
97:19 103:9
159:22 194:14
199:1 288:4
291:19 320:24
320:25 321:1
322:22 324:21
328:14 330:23
331:3,24
**finish** 151:13
204:14 320:4
326:22 327:13
**finished** 10:22
216:19 235:15
245:6 284:15
284:22 285:21
285:24 286:8
286:12,14,22
289:20 290:4

292:10,17,24
294:5,18,22
295:20,24
301:9 302:20
302:25 305:20
310:12,24,25
311:16,20
312:17 315:3
315:12 316:2
316:13,24
317:24 323:9
327:22
**firm** 2:9 253:24
269:25 270:1
**first** 19:24 20:7
20:10,12 21:11
21:12 22:22
24:15 42:17
43:7 47:6 78:8
80:10 82:4
84:3,10 89:4
92:20 101:15
110:15 115:1
127:8 144:4
190:8,23
192:24,25
195:5 200:3
207:4 213:17
213:20 230:18
253:8,9 254:14
256:25 263:3
264:2 269:11
283:19 295:13
296:11 316:6
316:15 327:25

HIGHLY CONFIDENTIAL

**[first - form]**                                                      Page 34

330:7,7,12,15
334:6
**fish**   62:14
63:12 64:3,3
64:13,16
**fit**   162:18
275:20,22
**five**   122:10
199:2 217:13
217:25 220:9
220:16 245:9
298:5 320:23
326:24,25
**fixed**   194:25
**flom**   3:19,23
**floor**   2:18 3:15
4:3
**florida**   2:14
**fluent**   206:25
**focus**   25:11
60:7 87:9
162:5 249:3
**focused**   284:19
285:1 301:7
**focuses**   246:12
**folder**   72:17
**follow**   43:24
73:22 141:11
141:25 143:13
180:24 192:19
196:16 197:4
197:11 198:15
199:13,17
201:10 202:2,7
202:23 203:1

203:12 320:17
324:14 327:23
328:7
**followed**
185:17 190:2
201:6
**following**   5:25
6:16 21:17
31:11 90:24
128:16 186:1
186:12,13
190:1 223:25
283:25 296:12
322:24 335:4
**follows**   9:7
130:5
**food**   56:5,6,18
56:23 57:17
59:11,12 61:9
61:12,22 62:2
62:7,19 63:6
63:20,22,24
64:20 66:19
67:20 236:21
237:2 255:7
260:21
**foods**   56:3,9,14
57:3,10,11,12
58:8,15,20
59:5 64:22
66:11 99:6
**footnote**   92:10
93:14,16,16
291:6,12

**footnotes**   92:9
**forced**   203:25
**forego**   9:17
**foregoing**
334:4 335:2
**forenoon**   1:21
**foreseeability**
27:25 81:19
139:18 230:8
230:25 231:5
257:25 308:7
**forget**   68:16
247:16 299:14
**forgets**   254:19
**forgetting**
261:15
**forgotten**
247:17
**form**   11:18
12:3,14 13:7
13:14 14:2,21
16:25 17:10
18:15 25:7,18
26:3,24 27:15
27:16 28:5,23
29:12 32:11
33:7 34:1
35:14 36:7
37:12 39:5
41:21 42:17
43:9 45:9
46:11 48:22
50:10 51:9
55:14 56:10
57:6 63:19

71:3,17 72:4
75:21 77:7,20
78:12,17,21,23
79:4,5,16,23
81:10,16 82:9
85:6 87:13
89:24 94:3
95:6 97:22
100:3,4,12
102:16 103:6
103:18 105:11
105:19 107:21
107:22 111:1
116:1 117:23
120:9 121:17
122:6 126:22
126:24 127:14
156:12 162:11
163:8,25
164:24 170:20
171:25 174:10
184:10,17
185:6,19 193:7
196:8 209:4,10
213:15 214:11
216:12 218:7
221:20 224:6
227:24 230:14
231:2,10
237:14 238:1
238:14 239:15
240:6,13
241:13 242:7
242:21 243:18
244:3 246:4

HIGHLY CONFIDENTIAL

**[form - full]**                                               Page 35

| | | | |
|---|---|---|---|
| 248:11 251:4 | **formation** | **fortunate** 280:2 | **founding** 216:3 |
| 252:2 253:1 | 25:16 26:2,10 | **forty** 86:10,20 | **four** 37:20 86:5 |
| 255:3,21 | 31:2 99:19 | 86:23 186:20 | 101:19 125:9 |
| 257:23 258:18 | 124:17 178:2 | 187:17 | 138:4,4 169:4 |
| 259:4,6,23 | 227:15 | **forward** 58:6 | 194:10 201:3 |
| 261:24 262:15 | **formats** 263:20 | 159:22 170:15 | 220:24 251:14 |
| 263:10 264:8 | **formed** 26:22 | 208:19 331:18 | 251:25 295:19 |
| 264:19 265:7 | 27:4 30:2 | **found** 10:11 | 298:5 320:19 |
| 268:6 270:18 | 60:21 62:13,18 | 40:21 44:5,5 | **fracture** 270:17 |
| 271:14 272:3 | 65:4 79:11 | 56:3,4 57:2,17 | **fracturing** |
| 272:11 273:20 | 80:24 87:14,18 | 60:8 78:1 | 270:19 |
| 275:3 277:23 | 113:10 116:3 | 99:16 106:17 | **frame** 44:12 |
| 279:23 281:8 | 117:23 120:20 | 110:25 115:9 | **francis** 189:8 |
| 282:5 283:6 | 120:21 121:18 | 115:23 170:9 | 189:19 |
| 285:6 289:22 | 123:1 169:13 | 175:23 176:21 | **frank** 4:2 |
| 289:25 290:4 | 170:13 177:7 | 179:3 203:8 | **freeman** 2:4 |
| 292:20 293:16 | 226:25 227:23 | 228:8 | **friend** 62:22 |
| 294:25 299:3 | 228:23 229:24 | **foundation** | **friends** 33:3 |
| 299:13 300:7 | 246:10 258:19 | 24:17 26:25 | 35:10 36:24 |
| 301:25 302:13 | 284:21 | 27:17 35:14 | 37:23 57:19,23 |
| 303:2,14 | **forming** 96:20 | 36:8 37:12 | 58:8 |
| 304:10 305:1 | 97:2 127:12 | 42:20 57:25 | **front** 20:2 21:2 |
| 305:10 306:15 | 139:2 306:21 | 58:10,17 59:6 | 84:2 91:5,7 |
| 307:10 308:22 | 318:7,22 319:8 | 60:10 62:16 | 106:9,9 132:9 |
| 310:22 311:20 | **formulation** | 77:8 81:10 | 132:25 281:22 |
| 312:6,24 | 229:3 | 84:12 98:25 | **fruition** 252:21 |
| 314:16 317:1 | **forth** 105:6,16 | 117:21 121:17 | **full** 9:13 32:3,5 |
| 318:9,24 | 106:5 131:18 | 122:6 157:2 | 45:21,23 46:4 |
| 319:15 320:5 | 131:21 134:15 | 176:19 177:2 | 47:8 69:17 |
| **formal** 142:17 | 136:20 150:17 | 185:7 238:8 | 81:24 82:4,10 |
| 143:4 | 193:5 204:23 | 277:11,18 | 82:15 102:17 |
| **formamide** | 215:25 238:10 | 281:9 299:4 | 155:24 157:17 |
| 23:11 | 276:25 290:6 | 302:14 308:23 | 178:5 205:3 |
| **format** 263:13 | 294:9 334:8 | 312:25 | 232:19 240:17 |
| 263:15 298:1 | | | 242:6 273:1 |

[full - give]                                                          Page 36

306:1 308:8
**fuller** 291:21
**fully** 31:12
78:17,20,25
79:3,9 209:15
209:22 210:12
**fun** 257:9
**funded** 38:15
**funding** 278:5
278:8
**further** 130:5
132:25 166:17
166:24 180:21
185:1 200:2
202:16 204:15
204:16 283:23
311:21 324:11
325:9 334:9,12

**g**

**gained** 310:5
**game** 139:3
**gannon** 3:13
**gas** 76:25
**gateway** 3:14
**gathered**
272:20
**gcms** 85:17,19
88:8
**gender** 280:19
**gene** 52:9
**general** 10:16
11:11 26:19
65:18,18 70:20
70:21 71:5,7
72:2,7 92:19

102:7 111:6
126:6,6 135:14
136:25 137:3
145:19 154:6,7
154:7 155:8
164:4,5,5,8
165:2 166:4,9
167:18 168:8
235:15 245:2
258:3 267:14
292:21,22
294:17 295:7
295:13 316:11
316:15
**generally** 10:12
10:19 11:23
16:6,9 17:18
35:16 52:7
58:22 63:9
66:14 67:7
96:23 99:15
102:8 108:22
113:12 121:3
142:20 145:23
172:17 174:2
227:10 230:3
244:18 261:23
285:20 286:11
286:16 289:21
292:14
**generated**
229:4 302:8
**generating**
250:23

**generic** 10:18
10:18 49:19,24
49:25 50:4,8
50:15 130:11
150:10,14,14
212:23 222:12
222:15,16
245:5
**genotoxic** 35:6
55:8 60:2
131:4 156:6
163:13,14
164:13,18,22
165:3 167:15
175:17 178:3
178:25 224:5
224:13 225:2,4
225:12,17,21
226:5,7,16,23
310:17 311:6
311:16
**genotoxicant**
151:25 213:3
**genotoxicants**
51:12 164:17
174:19
**genotoxicity**
34:23 52:11
54:14 55:3,5
59:23 111:21
165:21 225:23
226:14,21
227:5
**genotoxicolo...**
10:11

**genotoxin**
33:17 34:17,18
34:22 44:8
49:17 50:20
52:4,4,7,14,20
53:8,16 54:18
55:1,3 60:9,11
60:13 61:2,15
103:2 154:23
163:7 224:21
315:8
**genotoxins**
16:22 38:11
53:7 54:3 59:5
120:23 152:16
153:14 162:24
163:5,24
173:18 225:15
226:23 311:7
315:5
**georgia** 3:11
**getting** 203:23
205:16 252:10
256:2,6,14
271:2 287:19
303:1,6 313:14
329:1
**give** 13:22 20:3
20:10 22:7
43:1 54:25
68:18 69:14
83:9 94:18
97:7 104:12
131:22 145:10
145:16 147:25

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 158:20 216:2 | **gmps** 82:17 | 180:9 181:22 | 331:3,18 332:5 |
| 218:23 219:23 | 159:5 212:21 | 184:24 187:10 | 332:6,11,11,16 |
| 221:7 226:10 | 215:18,19 | 188:1 189:2,15 | 332:17 |
| 235:18,24 | 216:6 232:19 | 189:23 191:24 | **goes** 55:19 |
| 281:2 303:15 | 235:25 241:1 | 192:24 193:17 | 101:12 109:21 |
| 331:6 | **go** 8:10 12:22 | 194:6 196:9 | 149:5,5 153:12 |
| **given** 9:16 22:4 | 27:9 43:24 | 197:2 198:23 | 154:4 157:12 |
| 22:9 23:14 | 47:23 49:14 | 199:20 200:2,4 | 158:1 195:24 |
| 134:21 147:3 | 51:3 53:19 | 202:15 204:10 | 204:25 228:18 |
| 236:12 299:18 | 54:1 55:18 | 204:14 213:23 | 228:20 295:17 |
| 300:1,8,9 | 58:6 64:19 | 214:8,12,18,24 | **going** 8:3 9:17 |
| 303:15,17 | 66:6,21 67:23 | 217:14,25 | 9:19 10:14 |
| 311:5 323:15 | 72:19 73:6 | 218:11 223:16 | 15:25 17:21 |
| 333:13 | 74:11 84:1,2 | 224:20 228:1,5 | 21:10 35:5 |
| **gives** 192:22 | 86:15 89:16 | 228:9 234:24 | 43:25 53:20 |
| 204:25 215:2 | 90:16 91:22 | 236:17 245:11 | 66:18,19 68:23 |
| 230:17,19 | 92:15 93:4,5 | 245:20 249:14 | 69:5 70:14 |
| 266:5 280:9 | 93:12 95:21,21 | 251:20 253:23 | 72:18,22 87:3 |
| **giving** 195:21 | 95:23 96:2 | 261:10,19 | 90:18 91:20,24 |
| 205:4 219:25 | 99:21 102:18 | 263:18 264:14 | 94:12 95:16,18 |
| 223:6 235:17 | 110:12 113:23 | 268:21,22 | 95:20 96:3 |
| 250:14 270:21 | 114:25 118:9 | 272:7,9 276:18 | 101:5 102:1 |
| **glenmark** | 118:20 119:11 | 281:9 287:4,7 | 118:19 129:9 |
| 189:4,6,9 | 119:21 128:6 | 288:10,19 | 141:21 144:21 |
| 191:7 192:11 | 136:20,25 | 289:15,17,21 | 144:23,23 |
| 192:12 195:13 | 137:2 139:3 | 290:13 291:3,5 | 151:24 154:6 |
| 196:17,21 | 142:24 150:3 | 296:5 297:13 | 156:22 159:22 |
| **gmp** 82:17 | 151:10 153:10 | 297:14 301:13 | 159:24 160:6 |
| 123:22 131:25 | 154:1,8,10 | 311:5 313:7,18 | 161:20 175:12 |
| 148:17 166:22 | 155:4,8,10,17 | 313:21 316:8 | 179:22 180:25 |
| 185:24 188:18 | 156:21 158:3,6 | 320:22 322:20 | 181:4,22,25 |
| 212:14 214:3 | 158:21 160:24 | 325:5 326:23 | 184:4 187:9,12 |
| 241:25 293:19 | 164:4 165:14 | 327:17 328:9 | 187:15 188:3 |
| 302:19 309:3 | 167:5,17 | 328:12,14 | 188:24 190:11 |
| | 168:10 170:1 | 329:11 330:23 | 192:2 193:3 |

[going - harkins]                                                          Page 38

194:6,15
198:18 199:11
204:15 219:4
220:10,19
222:4 223:18
238:10 245:12
251:16,17
252:9,14 254:8
254:10 266:9
266:11,18,22
267:12 274:15
284:8,11,20
286:2,7 287:7
288:18 290:7
291:23 294:9
294:11 296:4
301:4,16
305:15 309:1
313:7,18
314:18 320:22
321:1,4 324:22
326:18,21,22
327:4,13,14,15
327:16,17
328:8,9,12
331:2 332:4,20
**good** 8:3 9:11
9:21 23:3
91:18 97:25
109:21 123:21
170:3 214:21
215:5,23 216:2
218:16 273:11
333:8

**googled** 92:16
**gordon** 4:3
**gosh** 40:17
247:15 294:7
**gottlieb** 5:19
83:6,18,21,22
84:7
**gottlieb's** 83:7
**government**
280:5
**grant** 4:3
**great** 9:15,23
129:8 194:23
198:14
**greenberg** 3:10
284:4
**gregg** 4:23 8:21
**group** 87:6
165:4
**groups** 27:14
**gtlaw.com** 3:12
3:12
**gu** 234:11
**guess** 59:20
132:9 147:13
191:8 244:7
252:19 256:8
258:21 316:22
328:18
**guessing** 83:22
91:4
**guidance** 47:12
48:1 91:13
131:6,10,13,14
131:17 132:1,3

132:5,10,13,15
132:17,19,22
133:1,4,8,11,16
133:21 134:15
134:20,21,24
135:1,2,10,16
135:18 153:11
155:10 165:3
165:11 166:8
214:6 215:18
219:13 220:20
231:16 232:1,4
232:4,9,18
233:1,2 234:19
237:7 238:7,19
239:16
**guidelines**
234:9,13,14
237:21 238:18
**guys** 181:6,10
326:19 328:3
330:22 332:4

**h**

**h** 4:2 247:14
**half** 138:4
203:18 228:20
256:13,14
321:2 326:10
326:19
**halfway** 149:5
**hand** 213:5
297:20 334:17
**handful** 298:4
**handle** 60:18
93:24 169:25

286:2
**handled** 164:15
**handling** 18:20
78:7 148:19
170:23 208:11
227:19 309:2
**happen** 45:3
101:5 102:2
119:4 141:11
142:16 144:11
251:16
**happened** 41:8
51:17 246:1
249:11
**happening**
64:17 216:15
**happens** 15:10
152:2
**happy** 13:22
121:11 284:8
296:6,17 313:3
**hard** 79:15
84:9,14 87:11
87:17,21,24
88:7,10,14,16
88:18 89:14
156:17,18
198:3
**harkins** 3:9 5:4
284:2,3 287:4
287:15 288:7
289:15 291:19
291:22 313:7
315:22 320:14
321:17 327:22

333:2
**harkinss** 3:12
**harmful** 57:12
  57:13 58:2
  79:10
**hazard** 11:23
  67:8 101:15,18
  102:22 112:20
  122:14 172:18
  174:20 217:7
  217:11 218:13
  218:14 220:13
  221:11,21
  226:11 227:5
  244:25
**hazards** 217:20
  226:9
**hcl** 229:6
**head** 24:23
  40:18,19 42:6
  42:10 87:8
  90:14 157:24
  258:20,20
  265:13
**header** 232:10
**headquarters**
  261:18
**headspace** 77:1
**health** 46:5
  96:11,13,14,16
  96:16,19,23,25
  97:1,6,8,12,20
  98:4 108:22
  115:2,8 117:1
  117:15,19

118:6,10,11,16
118:20 119:5
119:15 121:15
121:24 122:2,7
124:9,18 125:3
146:6 156:23
163:20 262:15
**healthcare** 97:4
318:3 320:9
**healthier** 58:6
**hear** 236:16
  268:18 284:5
**heard** 8:8 9:1
  23:20 33:21
  94:16,22 95:2
  98:12 235:23
  235:24 236:5
  236:17 253:8,9
  329:3
**heart** 58:2
  63:10
**hecht** 24:24
  27:4 28:8 45:1
  45:15 46:17
  47:3 76:9,15
  140:18 230:6
  230:18 231:5,8
  256:25 257:13
  257:22,24
  258:16,21
  260:3 290:19
  308:6
**hecht's** 27:25
  259:20

**held** 1:19
**help** 111:22
  132:3 202:21
  296:3
**helped** 141:18
  260:10
**helpful** 138:3
  192:23
**henry** 4:16
**hereinbefore**
  334:7
**hereunto**
  334:16
**hernia** 253:18
  254:21
**herring** 57:3,3
  57:4,5
**hetero** 3:2,2
**hey** 125:1
**hh** 183:13,20
  183:21
**hi** 284:3 321:13
**high** 58:24
  59:25 225:9
**higher** 57:16
  58:22 64:22
  112:2 175:14
  175:18
**highest** 169:3
  314:3
**highlight** 173:3
**highlighted**
  74:12,14,16,23
  215:3

**highlights**
  74:19 195:7,8
**highly** 1:10
  64:8 71:18
  79:18 87:16
**hill** 3:4
**hillwallack.c...**
  3:6,6
**hinshaw** 2:18
**hinshawlaw.c...**
  2:20
**hired** 19:19,22
  20:6
**hold** 43:15
  105:20,23
  115:4 137:19
  148:25 165:17
  165:19 194:2
  318:21
**holder** 299:16
  306:17 311:15
**holderman**
  4:23 8:21
**holders** 292:7
  292:15,23
  295:6,7,14
  306:1,3,11
  317:18 319:9
**holds** 321:25
**hollis** 2:9
**home** 247:24
  248:5,8
**homeless**
  280:13 281:6

**hon** 1:4
**honest** 329:6
  329:20,24
  330:2,20
**hope** 15:4
**hopefully** 287:1
  288:10
**hoping** 111:16
**hour** 249:25
  269:14
**hours** 217:11
  217:13,25
  218:21 220:10
  220:16 249:12
  255:19 256:10
  256:10 288:5
  313:19 324:17
  324:19 326:19
  328:17
**houston** 1:15
  247:20
**huahai** 191:2
  192:11 195:2
**huge** 75:25
**hum** 189:12
  196:12 200:22
  206:23 270:25
  291:7
**human** 15:17
  16:19 31:13
  59:17 107:11
  111:23 112:13
  112:16 131:25
  227:3 273:1

**humana** 4:11
**humans** 111:5
  111:10 220:15
**hundred** 14:6
  56:1 66:1 68:6
  176:8 231:20
  268:13
**husband** 246:6
  246:18,21,24
  247:1,1,9
  250:22
**hydraulic**
  270:17,19
**hydrochloric**
  229:22 230:13
**hyperlink**
  74:24

**i**

**iarc** 53:24
  55:19 107:6,10
  108:20,21
  109:18 110:14
  175:21 217:22
  273:11 274:5
**ich** 153:11
  154:10 155:11
  231:12,19
  233:7,12,17
  234:9,12,14,21
  234:25 235:21
  237:4,6,7,11,24
  238:6,12
**idea** 20:4 24:11
  111:11 203:19
  231:22 235:22

  275:10
**ideas** 282:3
**ident** 5:9 6:2
  7:2
**identical** 149:6
  149:20
**identification**
  49:2 53:3 69:8
  72:15 83:19
  94:9 130:22
  173:6 180:13
  187:20 190:14
  193:5 198:2
  234:13,17
  235:8 266:15
  287:14 306:6
  313:12
**identified**
  15:16 44:3,17
  49:2 51:7 78:4
  114:9 139:14
  141:4 163:4
  172:9 173:17
  178:20 183:24
  184:2 195:13
  196:7,17
  197:15 203:21
  204:5 205:1
  220:14 297:7
  310:1
**identify** 29:8
  45:25 48:3
  50:5 68:20,20
  79:14 87:1
  104:23 131:1

  158:23 173:19
  173:21 175:10
  180:5 184:3
  189:5 200:13
  201:7,9 203:6
  212:24 225:9
  236:4 274:12
**identifying**
  112:19 207:19
  208:1 221:10
  227:21 230:11
**identity** 149:7
  149:21 151:9
  200:25 201:15
  202:22 204:25
  205:14 212:5,6
  215:7 296:18
**ignore** 151:19
**illinois** 4:13
**imagery** 71:7
**images** 92:5,7,8
  92:9 93:15
**imagine** 157:25
**immediately**
  141:7
**impact** 240:18
  308:20
**impacted** 271:9
**implementati...**
  154:5 155:11
**implemented**
  255:13
**implements**
  233:3

implication
241:9
implications
240:19
import 142:16
important 30:8
31:7 46:20
48:7,8 57:10
60:20 61:11
81:25 82:4
98:3 104:18
120:3 122:23
127:12 145:15
145:19 155:25
156:14 162:13
162:13 171:1,6
171:6 226:18
232:16 235:3
240:3,8,9,15,19
266:7 271:25
277:8 279:1
281:20 286:10
307:7 308:8
importantly
30:9 33:16
impose 135:1
imposes 134:24
135:2
impression
259:22
improper
147:10
impurities
10:11 11:14,22
12:1,9 14:4,8

14:13,13,15,19
15:8 16:6 17:7
17:9,25 18:1
18:21 26:6
32:10 33:20
35:23,25 36:4
36:15,18 38:9
42:18 44:15
46:7 48:25
49:14 51:7
57:15 78:1
113:21 114:7
114:17,22,22
118:17 119:7
119:16 123:22
124:21,24
130:22 146:11
154:8,9,11
155:9,9 157:9
157:14 160:16
160:20 161:2,6
162:10,13,18
163:1,14,14
164:7,7,12,14
165:4 167:15
167:19 170:19
172:22 173:7
178:3 179:1,20
180:5 189:7
191:2 195:3,12
196:17 211:25
216:22 217:18
231:15 234:13
234:17 235:7,8
237:8 238:23

239:4 306:7
308:1 311:17
314:4,6,22
317:20 323:19
323:25
impurity 18:13
35:23 48:21
49:5,5,6,11,11
49:20,24 50:8
50:16,22,24
51:1 52:9 62:9
65:7 75:6
76:24 119:1
120:3 130:12
130:14,17
148:23 150:11
153:7,19,20,24
154:2,24 155:5
160:17 163:3,6
163:23 164:22
164:23 165:12
193:6,14,15
212:9,23 213:2
229:2,7 240:20
293:7 302:8
309:18 310:17
inaccurate
329:11,12
330:14 331:17
331:24
inadequacies
139:24
inadequate
46:1 82:13
145:4 315:11

include 128:1
231:8 265:4
332:7
included 21:25
89:8
includes 105:13
150:16 195:12
205:22
including
288:22 290:5
294:22 306:11
317:25 319:9
income 248:25
249:3,18 250:8
250:9,10
incomplete
314:16
inconsistent
155:1
incorporate
248:14 292:10
incorporated
247:25 292:16
incorrect
121:16
increase 13:6
13:12 14:1,7
17:7 18:3
33:17 38:10
68:7 110:21
112:23 113:1
114:1 115:10
115:24 117:7
118:2,17
119:16 169:21

174:20 220:14

**increased**
12:25 14:20
17:15,20 18:14
35:11 65:2,25
67:8 104:7,25
105:10,18
113:21 114:6
116:20 117:6
117:18 118:7
118:12 119:7
120:8,18 122:5
169:18 170:5
170:25 172:7
176:8 245:1
258:5

**increases**   11:22
12:1,10,13
15:8 16:10,10
16:22 33:16
55:25 64:25
65:9,15 113:9
113:12,21
114:7 120:24
121:2,4

**increasing**
14:14 112:14
112:16,18,19
114:23

**incredibly**
218:16

**independent**
12:5 139:16
258:6

**independently**
12:18 31:7
82:7

**index**   5:1 6:1
7:1

**indicate**   44:11
50:24 54:14
102:23 111:17
123:9 127:18
143:8 149:11
149:13 240:7
299:20 310:2

**indicated**   134:7
193:9 202:19

**indicates**   44:6
47:9 90:13
123:8 125:4
184:12 188:21
303:25 309:17

**indication**
113:24 303:9
304:4

**individual**   16:7
16:8 18:6,8,22
36:10 38:6
68:9,10 88:4
99:22 101:22
102:11 109:12
153:7,19,20,23
154:2 155:5
163:23 172:7
172:15 206:22
273:13 274:8

**individuals**
17:23 33:2

36:9,17 37:18
67:2 89:17
102:12,18
113:23 114:24
169:20 174:21
296:18

**industrial**
225:24 255:8

**industry**   40:12
78:17 79:3,9
91:14 98:17
133:13 134:18
135:9,10 161:3
231:17 232:5
232:17 233:3
235:23 255:7,7
255:8 278:5,10
280:6

**ineffective**
300:9

**informal**   142:2
142:4,5,23

**information**
15:6 24:21
32:20 53:22
71:19 80:4
93:10 103:22
104:10 105:2
110:18 124:3
128:14 131:6
131:23 135:11
138:25 143:19
144:18 147:3
154:4,14
155:22 166:14

166:15,24
176:14 178:19
183:17 186:13
186:15 195:21
199:23 217:5
218:14,16
219:5,7 220:6
220:7 222:13
230:20,22
240:7 252:15
264:2 272:18
272:20 273:16
281:18 282:7
282:11 283:15
285:16 286:10
290:3 291:9
294:16 295:10
297:16 300:3
303:5,8 304:7
304:11 308:13
310:10 318:20
319:6,11 320:1
323:22

**informed**
202:19

**ingersoll**   4:17

**ingested**   102:8

**ingesting**   102:5
113:18

**ingredient**   16:5
78:12 114:10
212:9,10

**ingredients**
10:21 178:25
255:6

**inhalation**
  101:3,7
**inhale**  102:4
**inhaling**  101:3
**inherent**  237:1
**initial**  199:7
  328:5
**initially**  202:20
  247:2
**initials**  270:3
**initiate**  227:8
**initiation**
  142:14
**injured**  280:8
**injuries**  11:3
  18:22 244:10
**injury**  273:8
**input**  46:23
**inputs**  47:21
**inspect**  157:22
**inspected**
  156:25
**inspection**
  85:23 141:2,3
**inspections**
  158:2,5,10
**instance**  184:15
  196:6 302:5
**insufficient**
  307:9
**insult**  35:6
**insure**  134:4
  292:15,19
  293:10 305:7

**intake**  116:19
  117:17 122:3
**integrative**
  245:24 246:25
  247:4
**intend**  38:19
  298:22 316:24
**intended**  87:1
  136:7 240:12
  286:9 292:17
**interacted**
  248:24
**interactions**
  186:2 254:18
  261:1 279:2
  294:8
**interest**  21:17
  271:6
**interested**  8:23
  35:16 288:19
  294:13 334:14
**interesting**
  54:20 197:3,6
**interface**  19:21
**intermediates**
  178:24
**internal**  107:4
  240:11 242:13
  242:15,18,19
  243:15 271:16
**internally**
  239:7 242:12
**international**
  93:22

**internet**  1:20
  92:11,11
**interpretation**
  118:22
**interpreting**
  317:23
**interrupt**  43:22
  171:16,19,20
  171:22 204:12
  329:13
**interrupting**
  330:3,10,11
  331:5
**introduce**
  46:16 94:10,20
  197:23 266:18
  287:15 313:8
**introduced**
  78:10 262:18
  278:17 287:24
**introduction**
  133:2 232:8
**invention**
  255:17
**inventors**
  255:17
**investigate**
  151:1 197:16
  197:18 201:25
  204:6 205:6
**investigating**
  185:12 189:20
**investigation**
  57:8 123:25
  149:16 196:22

  199:9 205:3,3
  229:15 293:18
**investigations**
  36:19 216:15
**investors**
  255:10
**invited**  261:22
  262:16,20
**invoice**  7:3
  266:12 267:3
  268:12,24,25
  269:1,4,4,6
**invoices**  255:18
  266:19,22
**involved**  20:4
  23:23 89:13
  101:9 140:16
  140:19 229:20
  251:11 253:22
  309:5
**involving**  23:17
  23:25 191:7
**irbesartan**  1:3
  1:5 8:14
**irrelevant**
  326:17
**isolation**
  154:14
**issue**  12:25
  13:1 21:14
  31:2,22 34:5
  35:16 36:14
  40:14 41:4,8
  44:25 58:19,21
  59:11,11,15

66:13,13 77:24
79:25 82:3
84:23 85:14,19
85:20 87:19
95:9 101:1,21
102:4 114:8
121:21 130:25
134:21 135:16
142:8 144:12
144:19,20
148:3,10 149:8
152:20 154:19
157:1,6,18
161:14 162:25
163:2,10
164:14 166:4
166:25 167:8
167:10 168:8
169:17,18,19
170:3 172:14
173:16 174:5
175:14 177:25
178:18 188:20
190:1 203:5
212:12 213:7
215:4 217:24
219:18 221:4
222:2 224:8,11
227:7 231:5
238:13,20,24
240:16,16,21
241:18 242:24
262:11,11,21
264:25 274:9
278:14 280:21

283:19 290:9
299:14 300:19
311:12 315:17
318:12 326:7
**issued** 133:11
133:22 144:2
211:14 212:19
217:4 241:23
321:25
**issues** 18:20
20:18 22:20
30:10 31:8
33:10 34:4
40:22 41:5,20
58:2 61:22
82:20 84:5,25
104:9,10 132:3
139:25 140:7
141:4,24
144:16 145:16
145:20 147:9
147:10 148:18
153:12 169:17
193:10 208:14
214:4 230:7
239:20 244:23
248:20 260:11
262:5 271:5,7
271:7 275:20
286:2,4 290:8
290:9 293:19
315:11
**issuing** 211:18
**italics** 173:2

**itemization**
268:13
**ivc** 251:22
**ives** 4:12

**j**

**j** 335:1
**january** 1:12
1:20 8:4 83:20
246:3 256:2,9
334:17
**japanese** 40:14
40:15
**jbobber** 3:6
**jersey** 1:1,19
2:5 3:5,15 8:16
8:19 334:4
**jessica** 3:17
72:16 94:19
125:1,7 129:6
171:17 187:16
245:20 294:8
325:5
**jessica.miller**
3:22
**jinsheng** 206:1
**job** 78:24,25
79:8
**john** 3:3
**joined** 246:16
247:3
**joining** 246:17
**joint** 246:20
**journal** 28:22
29:3 98:11,19
98:23

**jp** 94:2
**jr** 3:3
**judgement**
77:15 116:11
172:4
**judgments**
241:24 277:3,4
**july** 69:6 73:7
**june** 246:3
304:24 310:3
318:22

**k**

**k** 9:5 130:3
**kansas** 2:10
**kathleen** 2:17
**katz** 2:4
**keep** 155:2
199:11 229:10
261:15 279:1
284:11 327:15
330:3
**kekelly** 2:20
**kelly** 2:17
**kind** 23:1 29:17
60:3 64:17,17
77:14 84:18
85:21,23 87:4
101:14 104:12
145:2 171:8
224:10 236:22
247:15 254:11
273:13 274:6
294:1
**kinds** 13:3
15:21 27:6

HIGHLY CONFIDENTIAL

**[kinds - known]**                                    Page 45

28:19 35:8
36:21 58:20
60:3 63:5 64:4
64:5,22,23
65:21 66:9
87:5 89:10
102:13 120:14
126:7,10
210:15 212:14
223:14 226:9
255:1 271:10
280:20 281:18
300:17
**kirkland** 4:8
**kirkland.com**
4:10
**knew** 103:21
152:20 305:15
330:18
**know** 9:15,19
10:2,4 13:5
16:19,19 19:5
19:13 20:3
22:25 24:18
26:16 28:17
32:23 33:5
34:18 36:24
37:21 39:9
40:20 41:19
42:2,5 43:11
43:13 45:23
49:4,4,5,16
50:7,15 51:25
52:22 53:8,18
56:20,24 58:5

60:19 62:25
64:3,19 69:11
70:17 71:2,22
73:13,21,23,25
74:3,13 76:10
77:10,18,21,24
78:3 79:17
86:15,23 87:10
87:20 89:16,19
89:20 90:1,2,8
90:11 91:22
93:8,20 94:5
95:23 97:9
98:10,10,20,21
98:22 99:2,8
99:12,14,17
102:3,5,6,8,9
103:21 109:25
110:23 112:5
114:5 117:22
121:9,9 122:11
125:7,21
127:11 131:9
133:18,21
137:14,20
140:9 141:16
142:3,14,22
143:7,13,25
144:14 146:23
148:3,11 151:4
155:14 156:24
157:3,10,25
158:4 160:1
164:6 165:16
167:4 168:7

171:4,12
172:21 173:11
175:22 176:17
176:23 180:16
180:22 181:19
181:24 182:12
183:7 187:21
190:8,16 191:8
192:14,23
193:8 199:10
199:22 200:12
200:23,24,24
200:25 201:9
201:20 202:17
202:19,20
203:4,15 205:1
205:12,13,13
205:14 206:7
207:1,1,5,22
208:24 216:1
217:22 223:12
224:9 231:25
232:13,13
233:9,19
234:23,25
235:11 239:3
239:12 240:4
242:23 243:15
243:20 244:1,4
244:13 249:14
249:15 250:7
251:1,2,8,15
252:21 253:3,8
253:10 255:23
257:21 258:12

259:25 261:10
261:13 264:14
265:9,10,12,20
265:23,23
266:5 267:3,13
267:20 268:1
268:14,16
269:14,22
270:2,2 271:15
273:7 276:8
277:5,15
282:11 288:2,9
290:1,7,9,18
291:23 295:16
296:17 297:11
300:24 303:6
303:21 308:1
311:8 313:24
314:19 315:18
315:20 319:22
322:14 330:1
332:5
**knowing** 24:19
154:21
**knowledge**
21:13 23:1
24:15 25:5,15
26:1 44:24
107:1 217:14
310:6
**known** 10:12
11:8,8,9 16:5
18:2 27:22
29:19 30:8,10
30:22 31:17,23

33:17 38:11
44:8 48:10
52:16 70:15
177:18,21,24
178:10 229:18
308:5,5
**knows** 11:12
251:17
**kohli** 3:18
**kreitsch** 94:12
**kugler** 1:4

**l**

**l** 9:5,5 130:3,3
247:14
**lab** 84:18 85:19
**labeled** 59:17
232:15
**labeling** 219:17
219:18 236:1
283:12
**laboratories**
85:18
**laboratory**
75:4,16 84:10
84:15 85:4,9
85:15 86:16,25
87:11 88:9
89:22 93:21
**labs** 3:2
**lack** 32:3 46:6
149:16 241:24
277:10,18
281:9 299:3
302:13 308:7
308:22 309:4

312:24 315:16
**lacking** 161:5
162:9
**laid** 45:11
136:3
**lane** 275:8,25
**language** 83:3
83:3,8 84:4
105:14 133:3
133:19 134:11
142:25 148:14
149:25 153:24
167:4,19 168:6
173:1 179:24
200:17 202:5
202:11,12
214:13,19,20
219:13 220:19
222:24 232:7
236:25 239:1
239:18 242:9
242:12 295:9
313:6 317:4
325:19,23
**languages**
239:19
**large** 129:4
158:22 172:5
263:17
**largest** 39:23
**larissa** 236:13
246:7,7,20,24
247:4 250:16
**late** 271:2
329:2

**laura** 1:11 5:3
5:10 7:10 8:13
9:14 53:2
287:13 333:13
**law** 2:9 136:2,2
147:16 214:24
215:1 216:3,5
216:5 269:25
269:25 270:1
271:22
**laws** 98:5 248:1
**lawyer** 132:7
135:23 251:19
265:25 282:2
283:8
**lawyers** 38:15
251:3 255:1
265:21 271:22
**lay** 47:24
109:11 155:17
243:11 263:3
265:1 310:7
**lea** 288:24
**lead** 25:16 26:1
55:2 143:4
176:7 211:4
212:3,6,16
215:12 230:13
**leads** 147:11
**learning**
171:10
**lectures** 235:24
**led** 30:12 44:24
208:14 227:14
304:8 306:6

**lee** 4:22 8:18
245:9
**left** 246:16
247:6,7 284:19
320:21 321:2
330:21
**legal** 271:4,5,7
272:13,22
283:3
**legally** 132:6
132:11 135:21
150:15 225:1
**leigh** 94:12
**letter** 43:5,7,8
43:11 91:10
139:24 140:24
140:25 141:5,6
141:8,11,15
142:4,7 143:1
143:5,18 144:1
144:9,13,15,17
144:19,21
158:13,17,23
158:24 159:4,8
208:23 209:3
209:14,16,21
209:23,24
210:2,3,7,12,19
210:22 211:19
212:16,18,20
217:2,3,6
239:22 241:17
241:23 243:1
326:5

[letterhead - literature]                                                    Page 47

**letterhead** 7:5
266:13
**letters** 43:12
140:21 141:19
142:1,23
143:11 158:19
159:1,8 211:14
215:14 216:24
219:17 318:3
320:9
**letting** 208:24
295:16
**level** 12:6 16:16
34:14 50:23
51:1 55:25
56:1,8 59:15
59:25 63:21,21
64:6,24 65:3,5
65:14,22,25
66:7,7,10,22
67:18,20 68:4
68:21 82:18
102:25 111:9
116:4 144:6
172:9 173:9,12
173:15,19,21
173:23 174:8
174:18,21,23
175:1,13,14,24
184:18 315:6,8
318:13 320:13
**levels** 11:16
35:9 55:9,20
55:22 57:13,16
58:25 59:24,24

63:23 64:4,22
80:14,22 81:3
81:8,15 82:24
115:9,16,23
116:6 167:9
175:18 314:3
315:5
**levin** 2:12,13
253:24
**levinlaw.com**
2:15,16
**levy** 1:18 8:20
334:2,22
**lexington** 4:8
**li** 6:13 186:18
197:10,18
198:1,15 202:2
205:12
**li's** 187:3
197:24 204:7
204:16,18
205:7
**liability** 1:3,5
8:15
**library** 53:21
179:12
**license** 334:23
**licensing**
301:14
**life** 134:5 136:7
207:4 227:9
278:2
**lifetime** 117:3
**lifetimes** 169:7

**lift** 214:18
**likelihood**
101:11
**likely** 68:15
229:4
**limit** 165:21
231:16
**limitation**
156:10
**limitations**
109:22 145:14
156:14 272:1
272:20,23
273:12,19,22
273:23 274:4,7
274:10,18
276:6,9,19,23
**limited** 301:5
303:21
**limiting** 40:3
**limits** 38:24
**lin** 206:1
**line** 191:1
199:6 207:6
330:21 335:5
**lines** 43:4
200:18 201:3
**lingo** 236:20
**link** 273:3,6
291:14
**linked** 59:23
137:11 211:16
**links** 216:6
**list** 51:4 138:1
138:2,3 182:10

188:14 234:19
251:10,12
259:17 273:18
276:9 286:25
287:1 296:7
297:18 302:9
302:15 311:7
319:3
**listed** 49:23
73:12 106:20
124:10 130:13
130:16,17
138:7,10
149:14 151:4
151:11,22
163:1 167:12
168:18 183:12
191:14 253:25
254:1 297:4
302:1 304:21
319:3 322:5,8
322:14
**listing** 152:1
296:12
**listings** 128:1
**lists** 233:12
**literal** 333:5
**literature**
12:23 15:12
26:5 27:22
29:9,24 30:14
30:15 31:13
38:21 52:19,21
53:12,16 54:9
99:25 100:9

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 102:7 109:1 | 251:3,14,16,22 | **loaded** 287:19 | 105:21 109:1 |
| 128:12 174:25 | 252:8,11 253:7 | **lobbying** 23:24 | 116:17 117:1 |
| 178:14,15,16 | 253:13,16,17 | 24:2,3 | 118:9,21 |
| 178:21,23 | 253:19 254:1 | **lobbyist** 24:1,4 | 119:11,21 |
| 218:12 230:1,9 | 254:13,14 | **located** 247:23 | 124:6,11 |
| 230:11,24 | 255:19 262:24 | **location** 1:14 | 136:22 137:19 |
| 233:11 237:23 | 263:9 269:7 | **lockard** 3:9 | 137:24 138:17 |
| 290:21 308:6 | 270:8,11,13 | 328:14 | 138:23 139:4 |
| **litigated** 40:15 | 274:21 275:2,5 | **lockardv** 3:12 | 142:24 143:24 |
| **litigation** 1:3,6 | 278:17 280:7 | **long** 20:16 | 146:11 154:9 |
| 8:15 10:8 | 280:25 281:1 | 51:10,10 | 154:12 158:3,6 |
| 14:25 16:15 | 282:1,3,9,17 | 133:10 187:25 | 158:21 159:7 |
| 18:19 19:25 | 283:5 | 191:23 218:6 | 163:13 164:11 |
| 22:15 25:4,15 | **litigations** | 227:9 228:3 | 165:16,25 |
| 27:5 28:13,16 | 252:1,7 254:6 | 238:25 243:24 | 166:3,5,10,17 |
| 30:23 31:18 | 254:20 | 264:10 324:16 | 167:5,23 168:3 |
| 32:8 38:20 | **little** 9:17 13:21 | 324:20 325:21 | 168:13 170:7 |
| 40:5,7,9,12 | 13:22 26:9 | 331:6 | 178:21 179:21 |
| 41:14,17,18 | 74:9,10 134:16 | **longer** 37:10 | 180:23 181:2,8 |
| 42:12,15 55:17 | 159:17 184:25 | 163:16 | 181:18 182:25 |
| 65:4 67:14 | 192:23 193:2 | **look** 17:17,17 | 183:11 184:23 |
| 96:20 97:2,5,8 | 200:17 219:18 | 17:22 20:1 | 188:12 189:2 |
| 97:14,17 | 252:3 260:3 | 27:9 30:4 35:1 | 189:12,16,17 |
| 121:10,15 | 272:6 274:2 | 40:6 47:14 | 189:23 190:10 |
| 126:2 127:4,8 | 275:7,24 | 48:2 54:1 | 190:20 191:13 |
| 127:9 140:16 | 277:24 283:17 | 55:19 56:12 | 191:14 193:12 |
| 140:19 157:1 | 284:8 319:25 | 62:2 63:24 | 193:21 194:1 |
| 174:15 176:10 | **live** 68:5 | 67:12,23 68:1 | 198:19 200:4 |
| 179:4,7,9 | **lived** 207:3 | 68:11,19 69:12 | 202:13 203:13 |
| 209:19 210:5 | **living** 265:14 | 70:4 73:24,24 | 203:15 210:20 |
| 217:8 221:13 | **llc** 2:4 4:16 | 74:1,7,23 | 211:21 217:14 |
| 223:4 240:22 | **llp** 2:18 3:4,10 | 91:22,25 93:5 | 226:15,15 |
| 243:13 244:17 | 3:14,19,23 4:3 | 93:5,13 98:3 | 230:1 231:25 |
| 249:1,7,13,19 | 4:8,12 | 98:20 99:1,22 | 233:14,17 |
| 249:24 250:2 | | 104:3 105:3,4 | 234:24 237:16 |

238:2,3 241:17
242:22 244:19
249:15 251:12
253:23 261:10
261:19 263:1,3
264:15 268:21
268:22 272:9
272:23 273:3
273:14 278:14
281:12 283:16
291:6 300:12
303:20 304:17
316:16 319:7
**looked**   15:23
16:17 22:19,21
22:24 27:23
47:20 70:2
91:11 101:24
103:11,25
104:4 110:17
115:15 119:22
124:3,5 127:20
128:12,13
137:18 138:8
138:14,16
175:8 192:20
207:15 217:23
218:2 220:12
220:22,23
285:12 326:7
**looking**   15:19
27:20 30:3
34:10 45:21
52:24 53:21
56:23 83:2,5,8

87:4 89:19,25
90:12 94:21
95:11 103:21
110:5 114:15
118:22 119:23
119:24 122:16
126:5 136:19
154:13 158:18
159:5 168:5
191:5 192:9
195:18 198:7
201:13 202:4
210:18 214:22
220:1,11 221:1
233:15 243:19
260:4 272:19
275:20 276:2
281:14 282:18
282:19 294:4
301:15 302:18
308:6 316:5
325:20
**looks**   92:24,25
191:7 192:13
**losartan**   1:2,5
8:14 42:1
159:11
**lost**   9:16 150:2
268:24
**lot**   20:16 64:9
68:16 74:10
92:2 116:14
142:15 153:5
161:21 169:15
188:15,16

240:23 249:8
252:9 257:9
273:10 275:19
278:19 284:18
285:2,16
293:17 308:3
319:5 327:6
**louis**   74:8 75:3
89:21
**loved**   58:14
**low**   35:9
**lower**   173:9,13
173:23 174:8
174:18,22
175:1,24
250:25
**lucky**   257:6
278:15
**lunch**   125:8
**luncheon**
129:12

| m |
| --- |

**m**   2:4 3:9 5:3
5:10 8:13 9:5
53:2 247:14
333:13
**m.d.**   5:19 83:18
**m7**   231:9,11,14
233:2 238:6,12
238:17
**machinery**
225:11
**made**   14:14
46:9 56:20
60:24,24 66:3

100:21 108:23
109:4 122:7,21
125:5 126:17
134:12 152:3
152:12 171:1,5
171:15,15
172:22 219:3
240:17 241:5
250:2 277:3
295:19,21
300:24 326:4,5
**magical**   235:18
**magnitude**
57:16
**mail**   6:3,6,9
117:22 180:11
180:14,22
182:7,15 183:3
183:9 184:6,8
184:24 185:9
185:10 187:18
187:22 188:21
189:7,8,18
190:3,5,12,17
190:18 191:5
191:11 192:10
192:19 195:1,4
195:6,19
196:15,19
197:2 206:1,5
206:7,19
207:12,17,22
207:24
**mails**   107:4
189:7

**[main - marked]**                                                    Page 50

| | | | |
|---|---|---|---|
| **main**  99:5 | 171:4,4 172:4 | **management** | 305:21 311:15 |
| 263:7 296:1 | 177:8 195:8 | 137:10 139:19 | 315:13 |
| **maintains**  75:4 | 213:24 250:13 | 139:25 140:1,2 | **manufacturers** |
| **major**  33:22 | 255:6 269:17 | 140:5 | 10:20 40:10 |
| 239:20,21 | 277:4 282:8,8 | **manager** | 81:4,6 134:4,7 |
| 240:12,14,21 | 284:9 290:24 | 246:19 | 134:25 135:11 |
| 242:11,16,20 | 294:16 304:1 | **manhattan** | 235:15 255:9 |
| 243:9,17 | 305:14 315:16 | 3:24 | 258:2 284:22 |
| **majority** | 328:22 330:3,9 | **manipulate** | 285:21,24 |
| 215:16 220:17 | 330:13 | 74:24 | 286:9,14,22 |
| 255:5 285:10 | **makes**  34:12 | **manner**  30:20 | 289:20 290:5 |
| 285:13 | 64:2 65:8 | 32:25 | 292:24 294:18 |
| **make**  29:24 | 144:18 151:2 | **manual**  142:19 | 294:22 301:9 |
| 35:3 47:13 | 163:15 215:1 | 142:22 143:24 | 312:18 316:2 |
| 48:15 49:15 | 216:22 223:8 | 163:22 | 316:14,24 |
| 52:5 56:24 | 291:13 303:24 | **manufacture** | 317:25 318:2 |
| 60:19 61:16 | **makeups** | 81:9,15 82:24 | 320:4 323:10 |
| 63:25 72:20 | 262:10 | 163:18 176:18 | 327:23 |
| 74:9 75:11,24 | **making**  44:12 | 192:18 217:1 | **manufacturing** |
| 76:2,4,5,10 | 50:4 61:17 | 255:6,12 | 36:21 78:11 |
| 84:9,14 98:4 | 65:2 76:22 | 286:13 | 80:15,23 81:4 |
| 103:12 104:15 | 78:25 86:11 | **manufactured** | 136:13 145:22 |
| 106:7 108:10 | 88:24 114:12 | 24:10 78:22 | 214:21 215:6 |
| 109:3 111:15 | 114:13 115:20 | 99:18 123:13 | 215:23 226:4 |
| 112:25 115:16 | 116:11 117:9 | 124:24 216:9 | 229:21 237:12 |
| 118:25,25 | 121:16 136:14 | 224:5 285:15 | 237:25 |
| 119:2,3,13 | 144:22 149:10 | **manufacturer** | **mark**  52:25 |
| 120:2,4 121:23 | 150:20,24 | 40:8 93:4,11 | 69:6 180:9 |
| 122:17,20 | 151:2,20 152:6 | 134:17 135:25 | 187:12 190:11 |
| 134:8,22 | 154:19,22 | 136:5,23,23,24 | 266:11 287:7 |
| 138:14 143:15 | 159:12 165:7 | 137:4,11 | **marked**  53:3 |
| 144:20 151:20 | 171:10 237:19 | 145:13 147:7 | 69:8 72:15 |
| 152:4 156:22 | 237:20 245:6 | 212:23 245:3 | 83:18 91:3 |
| 159:9 162:15 | 275:25 276:2 | 284:16 300:21 | 94:9 180:12 |
| 163:1 164:2 | 330:18 | 302:20,25 | 187:19 190:13 |

[marked - medications]                                          Page 51

198:1,22
266:14 287:6
287:13 313:11
**market** 33:5
36:6 51:6
100:24 137:8
169:6 226:24
255:17 319:13
**marketed** 75:8
150:15 224:25
**marketing**
146:9
**marking** 72:12
198:21
**maryland**
259:14
**mass** 76:25
**massachusetts**
2:19
**massey** 9:14
**massive** 326:19
**master** 85:24
90:3,5,10
166:16 177:10
177:13 303:3
303:23 304:13
304:15 315:13
323:4,7,11,20
324:1 326:23
328:12
**material** 73:21
182:10 193:10
208:3 289:22
293:13 318:17

**materials** 105:1
106:19 137:17
192:16,17
196:22 269:22
296:7 302:9
303:22 309:11
**matter** 1:17
8:14 10:5
102:15 211:6
238:17 268:20
327:10
**matters** 9:20
**maven** 62:5
**maximum**
170:9
**maz** 4:14
**mazie** 2:4
**mazieslater.c...**
2:6
**mbcatello** 4:5
**md** 1:6
**mdl** 1:3 8:17
**mdma** 10:14
**mdna** 109:19
**meagher** 3:19
3:23
**mean** 11:3
12:16 17:1
22:18,25 23:13
24:2,7 25:10
26:4 28:24,25
35:20 38:17
39:7 43:22
44:1,1 63:5
64:18 71:4

77:16 97:10
108:17 109:2
113:15 125:16
130:18 135:15
143:14 144:11
144:15 146:11
147:24 151:19
153:20 155:15
155:16 158:13
162:2 165:15
170:1 177:9
184:23 196:14
201:17 209:11
211:2 213:19
218:24 229:10
235:1 236:1,24
239:2 240:12
240:14 251:13
258:25 259:25
272:8,10
280:12 281:21
282:17 290:1
303:16 308:14
314:12 317:10
325:18
**meaning** 71:14
72:7 143:15
235:18,18
236:25
**means** 49:21
51:25 52:7,11
84:17 124:20
133:16 144:16
148:22 153:25
161:14 232:4,5

240:9 298:14
**meant** 33:15
44:7 60:25
70:17 102:3
240:4,8,14
249:17 292:25
**meat** 58:4,15
58:22 59:4
60:8 61:1,3,23
61:25 62:10
63:10,13 64:13
**meats** 57:19
58:21 99:6
**mechanism**
34:6 52:13
53:9 59:22
225:4,19 229:3
273:6
**media** 8:12
68:24 69:4
129:10 130:8
160:8,12
194:20 223:20
223:24 321:6
321:10 333:14
**medical** 253:13
253:16 254:21
**medication**
38:2 41:3
67:19 163:6
164:23
**medications**
39:4,8,10
41:19 66:11

[medicine - minutes]                                                Page 52

medicine  40:18
  40:21
medicines
  169:4
meet  149:6,20
  284:6,7
meeting  24:5
  260:16,23
  261:3,7,16,18
  261:23,25
  262:2,7 314:13
meetings
  260:10,14,25
  261:1,4
meets  82:17
  215:6,8
megan  4:12
melisha  2:8
member  57:1
  62:21
members  32:18
  35:10 57:18,22
  271:22
memory  137:23
mention  28:6
  41:8 96:22
  145:9 151:18
  184:4,5 237:5
  242:23 290:17
  310:16
mentioned
  22:11 41:23
  73:8,13 140:21
  151:16 258:10
  285:17 286:18

287:16 288:20
  289:8 301:10
  303:6
mentions
  214:14
merchant
  247:13,13
merely  162:9
  162:12
merker  236:8
  236:19
mesh  252:12
  253:18 254:21
met  310:19
metformin  42:2
  42:8
method  77:1,12
  88:9,11
methodologies
  220:4
methodology
  34:3 68:2
  102:15,20
  103:5 104:6
  107:20 108:6,7
  108:14,25
  218:5 223:3,7
  265:1 276:25
methods  67:25
  85:10 87:5
  88:6 93:25
  119:12 185:15
  224:13,23
  260:21

metric  68:14
middle  80:12
miller  3:17 5:3
  5:7 9:8,10
  52:24 68:22
  69:5,14,20,24
  72:18 73:3
  74:18,22 76:21
  83:20,24 90:16
  91:2 94:10,24
  96:1,9 97:13
  107:24 115:7
  125:9 129:7
  130:10 149:24
  159:20 160:1,5
  160:14 168:23
  171:16,18,22
  175:5 177:3
  180:7,18,24
  181:9,15,22
  187:14,17
  188:10 191:24
  192:8 193:19
  194:5,10,22
  197:23 223:16
  224:2 233:23
  234:2 245:7,22
  254:8 266:16
  266:21 267:13
  274:24 283:23
  294:7 324:13
  324:19 325:6
  325:10 326:11
  326:13,21
  327:2,7,9,17,21

328:6 329:7,15
  329:22 330:1,5
  330:11,15
  331:1,11,23
  332:10,15,20
  333:8
milligrams
  169:3
million  56:1
  66:1 68:7
  113:2 175:7
  176:2,9
min  6:13
  197:24 198:1
  198:14 202:2
mind  15:19
  77:21
mineral  262:6
minimal  15:9
minimum
  132:18 134:16
minor  212:15
  239:21,21,25
  240:1,21
  241:10,14,15
  242:10
minute  72:20
  165:19 198:20
  198:24 199:1
  320:23 325:3,8
  326:10 328:25
  329:1 330:5
minutes  125:9
  159:25 194:7,8
  245:9,19 274:5

288:6 313:20
320:20,21
321:2,16
324:15 327:3
329:12 330:21
332:6,11,16
**mirchelof**
247:12 250:22
**misheard** 150:7
**misremember...**
270:15
**missed** 254:11
276:16
**misstates** 38:3
100:12 198:10
218:7 310:22
**mistake** 267:5
328:18
**mistaken**
297:14
**misunderstan...**
213:25
**misunderstood**
242:1
**mode** 225:19
**moment** 73:6
168:10
**moments** 188:7
**money** 250:2
250:21
**mongey** 2:13
**monogram**
49:9 51:3
**monograph**
51:5,16,19,23

55:19 70:11
71:23 130:15
130:18,21
150:22 151:10
151:23 152:1,3
152:24 153:6
154:5,12,13,15
160:16,19
167:2 323:17
**monographs**
50:24,25 53:22
153:10 154:11
154:25 218:10
**monroe** 4:13
**month** 297:8
**monthly** 95:8
**months** 250:4
260:18
**moot** 144:19,21
**morning** 8:3
9:11,12,17
21:3 294:6
299:16 305:14
308:4
**morphine**
212:11
**motion** 328:19
333:7
**move** 72:12
73:16 78:8
107:23 165:23
170:7 313:17
317:15
**moved** 20:19

**moving** 76:21
83:16
**msp** 9:25 10:2
137:13 244:1,4
244:13 268:20
**mulberry** 3:15
**multiple** 71:4
158:9 199:23
206:14 233:16
245:18 265:15
327:9 328:16
**mutagenic**
231:15
**mutations** 35:9
52:10
**mylan** 4:2

**n**

**n** 2:1 3:1 4:1
9:5 59:13 87:6
92:24,24,25
130:1,1,1,3
229:1 230:3
**n.v.** 4:2
**n.w.** 3:19
**nagle** 4:7 5:5
320:22 321:12
321:14 322:17
**name** 8:18 9:13
40:17,19 94:12
246:11 247:11
247:12,16
259:7 270:13
289:8 321:13
**names** 10:6
39:9,17 42:10

89:17
**nano2** 229:5
**narrative** 285:3
**ncp** 53:24
**ndas** 301:14
**ndea** 10:14
13:12 14:10
15:16 22:14,19
23:6 25:17
26:2,4,18,22
27:15 30:12
35:25 40:21
41:2,6,20
42:18 53:17
54:12 55:12
56:3 59:10,16
92:17 93:18
103:17 107:13
110:3 118:17
119:16 120:22
123:5,14 124:2
145:1 148:5
149:15 151:2
151:18 152:4
157:9 161:6,18
162:10,16,20
162:24 163:19
167:9 172:8
173:11,16
174:7,25
175:16 211:25
216:17 217:10
218:3,19
220:13,23
221:19 227:15

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 227:22 228:23 | 100:8 103:16 | 310:12,25 | 187:23 196:1 |
| 229:23 230:13 | 107:12 110:3,8 | 311:10 315:3 | 198:18,24 |
| 230:25 304:24 | 110:21,23 | 320:2 324:6 | 200:2,4,5 |
| 308:2 309:18 | 112:2,11,24 | 325:13 | 209:22 210:12 |
| 310:3,13 311:1 | 113:9,11,25 | **ndma's** 75:11 | 213:4 233:5,14 |
| 311:10 315:3 | 115:9,23 | 76:2,3,5,10 | 239:2 243:20 |
| 320:2 324:9 | 116:18 117:12 | 84:8,14 | 245:8 262:6 |
| 325:13 | 117:16 118:13 | **ne** 3:10 | 263:4,21 |
| **ndma** 11:6,16 | 118:17 119:6 | **neat** 237:16 | 267:11 272:18 |
| 13:12 14:9 | 120:7,18,22 | **necessarily** | 275:10 277:14 |
| 15:16 22:14,19 | 122:3 123:5,14 | 75:25 85:7 | 279:11 280:21 |
| 23:3,6 27:15 | 124:1 145:1 | 99:23 181:1 | 284:9 307:19 |
| 30:12 35:2,25 | 148:5 149:15 | 197:7 202:15 | 332:16 |
| 40:21 41:2,6 | 151:2,18,24 | 264:9 291:14 | **needed** 29:15 |
| 41:20 42:18 | 152:4,16 157:9 | **necessary** | 77:25 78:12 |
| 44:18 45:25 | 161:6,17 | 27:14,15 55:12 | 143:9 226:11 |
| 52:20 53:17 | 162:10,16,20 | 139:8 174:6 | **needs** 45:22 |
| 54:12 55:12 | 162:24 163:19 | 306:3,12 | 116:16 136:11 |
| 56:3 57:2,4 | 167:9 169:4 | **need** 15:13 | 174:4 266:10 |
| 59:10,16 60:8 | 170:8,19 172:8 | 34:18 39:6 | 291:23 |
| 60:8,11,20 | 173:11,16 | 48:18 51:25 | **neither** 78:16 |
| 61:1,23 62:1 | 174:7,25 | 69:12,17 79:25 | 79:3,6 306:2 |
| 62:10,15,23 | 175:16 203:20 | 92:15 95:17,23 | 334:9 |
| 64:24 65:8,14 | 204:19 205:1 | 108:19 110:19 | **nervous** 21:25 |
| 66:10,13 67:19 | 207:19 211:25 | 111:16 113:14 | **never** 19:15,22 |
| 67:20,25 70:5 | 216:17 217:10 | 115:4 123:10 | 19:22 22:9 |
| 70:9,18 71:21 | 217:16,24 | 131:1 132:2 | 23:7 24:22 |
| 73:10 75:6,10 | 218:3,19 | 134:8,17 137:1 | 26:15 45:23 |
| 75:23 77:6 | 220:13,23 | 142:11 145:20 | 57:21 155:23 |
| 78:4,17,21 | 221:12,19 | 147:18 152:22 | 156:7 159:13 |
| 79:4 80:14,22 | 224:10 229:3 | 157:24 160:1 | 201:10 278:12 |
| 81:3,7,14 | 230:23 239:24 | 165:13,25 | 279:3 280:13 |
| 82:23 87:12 | 282:14,24 | 171:3,4 180:21 | 280:13 281:5 |
| 91:16 92:17 | 304:24 308:2 | 181:1,2,18,19 | 300:19 301:2,3 |
| 93:18 99:4,19 | 309:18 310:2 | 183:16 184:25 | |

**[new - o]** Page 55

**new** 1:1,19 2:5
3:5,15,19,24,24
4:9,9 8:16,19
10:25 49:10
77:4,18 237:8
237:20 246:2
246:10,11,12
246:13 247:1,8
249:3 251:23
255:12 260:21
282:22 283:7
283:15 334:3
**newark** 3:15
**news** 5:22 94:8
94:16,17 98:9
**nice** 284:6,7
**nigh** 2:12 253:9
253:19 270:8
328:22,23
329:10,17,24
330:9,13,25
331:13 332:7
332:13,22
**night** 330:2
333:9
**nitrate** 229:6
229:22 230:12
**nitrosamine**
32:10 35:25
42:12,15 58:16
92:20 124:21
124:24 160:16
160:20 306:7
323:19,25

**nitrosamines**
10:13 14:9
22:2,8,10,10,20
41:5 46:16
57:20,24 58:9
59:4,9 61:9
62:4,20 63:2
64:10,20 86:14
86:21 87:2
92:17 102:6
103:17 106:18
107:12 109:19
120:22 124:17
124:19 145:1
157:19 161:1
166:23 167:1,3
178:3 217:16
230:3 248:19
**nitrosation**
229:8
**nitroso** 59:13
87:6
**nitrosodiethy...**
229:1
**nitrous** 229:7
**nmda** 119:16
221:25 282:15
**non** 34:5,14
66:17 68:19
174:2 214:4
224:13 225:4
225:12 231:24
232:11 250:23
298:8 300:15

**nonbinding**
232:15,22
**nondisclosure**
301:11 303:7
**nonprofit**
280:7
**nonresponsive**
15:13
**norm** 30:24
177:19
**normal** 225:10
261:1
**north** 4:18
**notary** 1:19 9:6
334:3 335:24
**note** 8:4 214:23
**noted** 9:2 292:6
333:16
**notes** 1:16
265:17 334:5
**notice** 1:22
7:10 91:9
115:19 128:4
146:24,24
179:19 287:2,5
287:12 288:12
288:16 308:25
**notices** 318:8
318:11,14
320:12 321:24
322:11
**notion** 282:10
**notions** 281:25
282:3 283:4,18

**novartis** 44:3
123:13 199:10
203:5,5,6,8,20
203:21,22,25
204:23 205:2
205:23 207:18
207:24 294:3
323:21,22,23
324:3
**novel** 260:21
**november**
190:9 209:20
210:6,22
**ntp** 107:6 110:9
110:13,15
175:19
**number** 8:17
28:18 109:20
117:2 146:25
157:25 158:20
168:24 182:11
187:24 219:23
250:14 288:21
296:12 297:22
298:16 333:14
**numbered** 6:3
6:6,9 138:11
180:12 187:19
190:13
**numbers**
115:16 193:2

**o**

**o** 130:1,1,1
247:14

**[o'brien - occurred]**                                                    Page 56

| | | | |
|---|---|---|---|
| **o'brien** 2:13 | 171:25 174:10 | 320:5 | 288:11 |
| **o'clock** 125:9 | 184:17 185:19 | **objected** | **objective** 50:7 |
| **o'reilly** 3:14 | 196:8 204:8 | 107:22 | 50:14 |
| **object** 11:18 | 209:4,10 | **objection** 24:17 | **objects** 271:14 |
| 12:3,14 13:7 | 213:15 214:11 | 26:24 31:19 | **obligations** |
| 13:14 14:2,21 | 216:12 218:7 | 36:7 38:3 41:9 | 121:25 286:12 |
| 16:25 17:10 | 221:20 224:6 | 57:25 58:10,17 | **observational** |
| 18:15 25:7,18 | 227:24 231:2 | 59:6 60:10 | 273:4 |
| 26:3 27:16 | 231:10 237:14 | 62:16,24 63:14 | **observations** |
| 28:5,23 29:12 | 238:1 239:15 | 65:16 66:12 | 139:13 |
| 30:24 32:11 | 240:6,13 | 67:21 77:7 | **obtained** 30:22 |
| 33:7 34:1 | 241:13 242:7 | 89:15,24 98:25 | 31:17 323:4,7 |
| 35:14 37:12 | 242:21 243:18 | 100:3,12 103:6 | 323:10 |
| 39:5 41:21 | 244:3 248:11 | 108:3 114:2 | **obtaining** |
| 42:20 43:9 | 251:4 252:2 | 116:1 117:21 | 300:3 |
| 45:9 46:11 | 253:1 255:3,21 | 119:8,18 120:9 | **obviously** |
| 48:22 50:10 | 257:23 258:18 | 123:16 150:12 | 92:19 94:25 |
| 51:9 54:7 | 259:4,6,23 | 157:2 167:16 | 127:19 143:12 |
| 55:14 56:10 | 261:24 263:10 | 168:4 172:12 | 155:19 180:19 |
| 57:6 63:19 | 264:8,19 265:7 | 175:3,25 | 249:7 256:4 |
| 71:3,17 72:4 | 268:6 270:18 | 176:19 177:1 | 257:4 284:14 |
| 75:21 77:20 | 272:11 273:20 | 177:19 184:1 | 293:6 300:20 |
| 78:23 79:5,16 | 275:3 277:23 | 184:10 185:6 | 302:20 307:25 |
| 79:23 81:10,16 | 279:23 282:5 | 193:7 198:10 | 318:18 332:3 |
| 82:9 84:12 | 283:6 285:6 | 210:9 230:14 | **occasions** |
| 85:6 87:13 | 289:25 292:20 | 238:8,14 272:3 | 185:17 |
| 94:3 95:6 | 293:16 294:25 | 276:10,20 | **occur** 45:15 |
| 97:22 102:16 | 299:13 300:7 | 277:10 281:8 | 46:7,24 61:9 |
| 105:11,19 | 301:25 302:13 | 287:5 299:3 | 63:24 64:11 |
| 107:19,21 | 303:2,14 | 310:22 312:6 | 80:14,22 81:3 |
| 111:1 121:17 | 304:10 305:1 | 314:8 318:9,16 | 81:8,14 82:24 |
| 122:6 126:22 | 305:10 306:15 | 319:15 | 100:23 102:9 |
| 127:14 162:11 | 307:10 308:22 | **objections** 7:8 | 175:13,18 |
| 163:8,25 | 312:24 314:16 | 8:24 252:4 | **occurred** 57:15 |
| 164:24 170:20 | 317:1 318:24 | 287:12,24 | 208:17 |

| | | | |
|---|---|---|---|
| **occurring** 49:6 | 316:8 331:5 | **once** 54:23 63:4 | 87:14,17,19 |
| 114:5 | **okay** 36:3 68:5 | 63:17 96:1 | 88:17,19 |
| **october** 42:25 | 72:22 73:16 | 102:8 126:4 | 103:12 113:8 |
| 267:2 268:9 | 74:15 75:1,2 | 141:2 | 113:11,19 |
| **odd** 236:23,23 | 76:16 90:15 | **ones** 10:14 18:1 | 115:22 116:3 |
| **offer** 177:17,20 | 92:3 93:14,17 | 42:4,6 44:17 | 117:23,24 |
| 178:9 294:20 | 93:19 94:6 | 46:18 49:1,2 | 120:16,20,21 |
| 298:23 316:24 | 95:18 96:3 | 52:16 58:14 | 120:25 121:2,4 |
| **offered** 58:13 | 97:18 115:5,5 | 59:7,10,16,16 | 121:14,18 |
| 333:4 | 138:2 166:13 | 133:22 201:18 | 123:1,4,6,14,17 |
| **offering** 11:1,5 | 168:24 171:20 | 212:16 257:11 | 124:18,22 |
| 11:15 46:25 | 172:2 180:9 | 259:17 288:22 | 126:21 127:12 |
| 88:17 121:14 | 181:12,21 | 289:7,7 298:19 | 127:24 128:15 |
| 123:4 139:7 | 183:22 186:21 | 302:1 | 139:4,5,7 |
| 140:4 145:3 | 186:23 187:11 | **ongoing** 171:8 | 140:4 143:18 |
| 161:4 162:8 | 187:12,25 | **open** 91:19 | 145:3 146:2,13 |
| 170:17 186:3 | 194:15 195:23 | 164:4 261:23 | 146:20 153:2 |
| 208:10,18 | 197:22 198:14 | **opened** 138:18 | 155:21 156:9 |
| 209:1,8,18 | 200:2 202:17 | **operating** | 156:12 157:7 |
| 213:14 326:8 | 202:18 222:22 | 225:3 | 161:4,9,10,11 |
| **office** 247:19 | 222:23 234:2 | **opine** 277:2 | 162:8,14 163:5 |
| 247:23 248:3,5 | 251:20 252:6 | **opining** 312:16 | 169:14 170:13 |
| 261:11 | 252:17 253:18 | **opinion** 11:1,5 | 170:17 171:23 |
| **offices** 93:22 | 254:24 266:11 | 11:15,20 12:12 | 172:10 177:17 |
| 247:20,24 | 266:21 268:12 | 16:23 18:11,16 | 177:20,23 |
| **official** 158:11 | 279:19 283:22 | 29:18 30:21 | 178:9 179:2,25 |
| 158:15 219:17 | 284:23,24 | 33:18 42:17 | 186:3,25 |
| **oh** 20:13 40:17 | 286:16 290:23 | 43:15,17 44:23 | 197:11 201:24 |
| 73:6,11 93:17 | 291:17 296:11 | 44:25 45:24 | 202:7,24 209:8 |
| 99:11 126:3 | 301:9 315:7 | 46:13,25 47:5 | 209:19 212:22 |
| 156:3 168:13 | 316:9 321:20 | 48:7,20 50:18 | 215:11 216:8 |
| 171:14 247:14 | **old** 86:11 | 55:11 56:13 | 216:16 226:22 |
| 252:9 253:18 | 246:14 249:21 | 60:12 62:13,13 | 226:25 229:18 |
| 259:15 261:13 | **older** 159:3 | 65:2,4,5 80:24 | 229:24 230:2 |
| 271:1 309:20 | | 81:22 82:12 | 234:11 258:15 |

HIGHLY CONFIDENTIAL

**[opinion - p.m.]** Page 58

258:19 263:18
272:16 282:15
282:18 283:17
295:5,8,17,20
298:22 299:11
300:8 301:17
301:20,20
304:8 305:8
306:11,14,16
306:22 307:8
307:13,18
308:20,25
310:18 312:1,3
314:25 315:2
316:12,22
318:7,23 319:8
323:18,24
327:24 333:3
**opinions**  9:24
10:9,17 11:20
17:13 29:16
30:2 31:8,16
42:21 43:2
60:22 62:18
77:9 81:13
96:20 97:2
102:21 103:12
104:19 106:10
126:11,25
128:8 139:2
145:15,15
146:3,22 177:7
177:17,22
186:9 208:10
208:13,18

209:1,25 210:5
210:13 213:11
213:13 219:10
240:24 257:22
258:1,3,5
259:2 263:16
264:3 273:19
273:22,23
274:1,15 275:9
275:13 283:11
284:21 285:20
289:22 290:4
290:12,14
293:14 294:15
294:20 295:23
301:7 302:11
312:19
**opportunity**
106:21 262:1
328:16
**opposite**
123:10
**option**  288:8
**orally**  102:2
113:18
**oranges**  62:6
**order**  29:15
34:17 48:18
50:5 60:4 66:4
67:11 77:5
82:16 145:22
150:14,14
151:20 209:22
209:23 210:11
233:3 234:19

274:1 307:16
307:16,17
**orders**  57:16
**organic**  47:16
47:17,18 86:1
86:3,5 89:1,5
89:12,21
125:23 259:13
**organization**
96:11 97:21
98:16
**origin**  193:15
196:6,11
**original**  110:12
150:3 164:10
213:23 247:4
**originally**
246:7
**origins**  196:16
**outcome**  8:24
16:12
**outline**  168:24
235:2
**output**  46:23
**outside**  96:17
123:21 224:19
271:19
**outweigh**  227:7
**ovarian**  283:9
**overall**  77:24
119:12,12
145:12 222:2
250:15
**overhead**
250:21

**overland**  2:10
**overlapped**
257:5
**overreach**
276:1
**overriding**
175:15
**overview**
145:19 245:2
**overwhelm**
225:10
**own**  31:20
81:23 82:14
85:4 107:4
109:8 128:7,11
129:4 149:4
245:19 256:14
278:18 299:11
304:1 308:17
308:17 317:18
**owner**  246:6
247:4,7

**p**

**p**  2:1,1 3:1,1
4:1,1 9:5 130:3
**p.a.**  2:13
**p.c.**  4:17
**p.m.**  90:23 96:4
96:7 129:10,12
130:2,7 160:7
160:11 182:1,5
188:4,8 192:3
192:6 194:16
194:19 223:19
223:23 245:13

**[p.m. - particular]**                                                    Page 59

245:16 321:5,9
324:23 325:1
333:11,16
**pacific**  333:11
**page**  5:2,25
  6:16 74:6 78:8
  80:12 84:1,1,3
  84:3,7 90:24
  92:4 98:6,8
  99:3 115:6
  128:16 146:15
  149:22 163:22
  164:20 168:23
  168:24,25
  172:23 182:25
  183:11 184:23
  187:7,8 189:17
  189:18 190:23
  190:25 192:25
  193:1,1 195:5
  195:15,22
  196:9,10 197:2
  199:5,15
  200:18 205:11
  205:19 214:15
  214:24 223:25
  228:4,15,18,21
  228:25 229:1
  229:13,16
  231:20,23
  232:10,13
  233:17,22
  234:4,10 237:5
  243:24 266:16
  283:25 288:23

291:6,11
296:10,11
297:17 298:6,8
309:17 316:9
322:24 335:5
**pages**  138:5
  161:1 166:24
  181:23 182:22
  187:7 191:23
  192:24 193:12
  193:17 195:6
  195:15 197:10
  198:8 200:9
  202:4,6 205:7
  222:20 228:21
  229:16 230:6
  231:22 243:21
  263:3 313:23
**paid**  32:8 96:14
  260:3
**pandemic**
  20:18
**panel**  224:20
  262:17 270:17
  270:20
**papantonio**
  2:13 253:24
**paper**  278:5
**papers**  104:14
  104:15 178:16
  276:4,4
**paradigm**
  68:13
**paragraph**
  32:2,2 53:5

54:21 74:7
75:3 78:9
80:13 84:11
114:25 124:25
149:2,24 151:6
166:17 170:8
172:25 182:25
186:18,19
203:18 204:10
204:17 205:20
206:6 222:14
222:14 223:6
228:3,3,4,12,17
228:20 229:11
233:21 234:6
239:9 243:21
243:23,24,24
265:19 288:22
292:1 305:22
309:6,9 310:11
315:23 316:7
316:19 317:15
321:17
**paragraphs**
  11:10 108:7
  152:18 166:19
  210:14 222:6,9
  222:18 223:10
  243:22 264:6
  264:10
**parentheses**
  297:23
**park**  2:10
**parkway**  2:5

**part**  21:16,18
  29:23 39:19,19
  47:11 70:11
  71:22 80:10
  86:4 87:6
  102:9 128:4
  135:7,13
  147:24 160:23
  164:10 166:13
  167:20 175:21
  183:9 200:3,5
  206:10,17
  207:10 214:21
  224:19,25
  231:1 238:22
  243:6 257:24
  264:20 267:22
  268:5 288:19
  305:16 311:2
  315:7,10
  323:16 327:12
**participants**
  8:7
**participated**
  271:2
**particles**  262:5
  262:6,8
**particular**
  10:13 13:9
  16:7,11 18:1
  23:23 26:8
  27:10 30:6
  38:9 41:6
  44:10,17,18
  47:23 51:2,21

HIGHLY CONFIDENTIAL

**[particular - percent]**                                    Page 60

| | | | |
|---|---|---|---|
| 54:12 57:15 | 176:1 215:19 | **pattern** 13:1 | 202:3,8,17 |
| 59:16 60:21 | 220:3 233:4 | 67:3 176:7 | 203:2,12 204:5 |
| 62:19 64:5,9 | 263:1 265:1 | **patterns** 17:23 | 205:13 |
| 67:2,3 77:23 | **party** 8:22 | **pause** 53:4 74:5 | **peer** 38:21 |
| 81:21 85:14 | 143:20 | 83:12 105:22 | **pending** 249:9 |
| 99:15 101:4 | **past** 22:21,22 | 105:25 124:7 | **pendley** 7:6 |
| 102:25 104:21 | 24:20,22 25:12 | 149:1 166:12 | 266:14 |
| 114:21 116:7 | 26:14 109:17 | 166:18 168:22 | **pennsylvania** |
| 119:23 123:2 | 141:18 222:23 | 170:6 180:20 | 4:4 |
| 123:19 124:23 | 223:15 | 182:3,24 | **pensacola** 2:14 |
| 125:17 131:20 | **paste** 263:8,9 | 186:16 193:20 | **people** 17:14,18 |
| 135:16 144:12 | 264:9,16 | 194:4 195:17 | 25:1 36:24 |
| 156:13 163:15 | **pasted** 223:11 | 199:4 200:7 | 37:20 38:6 |
| 185:10,11 | 264:7 | 269:16 287:22 | 47:22 57:9 |
| 186:11,11 | **patent** 255:15 | 313:16 | 58:1,2 64:2 |
| 215:5,19 | **patentability** | **paycheck** | 102:12 113:22 |
| 217:19 224:20 | 255:16 | 280:14 | 116:13 120:12 |
| 226:8 231:6,6 | **pathology** | **pbc** 269:25 | 125:20 156:4 |
| 244:22 273:9 | 111:17 | 270:1 | 162:5 169:2,8 |
| **particularly** | **paths** 253:20 | **peak** 184:5,12 | 184:14 201:18 |
| 47:18 81:24 | **pathways** 30:5 | 201:17 203:6,8 | 235:23,24 |
| 215:4 221:12 | 47:15 225:7,10 | 204:1 205:4 | 271:6 278:4 |
| 304:18 | **patience** 9:12 | **peaks** 44:13 | 286:5 301:15 |
| **parties** 8:10 | **patient** 11:24 | 179:14 182:20 | **people's** 109:7 |
| 280:8 309:5 | 46:5 146:6 | 183:4,8,12,24 | **percent** 14:6 |
| 334:11 | 155:25 156:10 | 184:2,9,16,20 | 130:23 131:2 |
| **partner** 236:6 | 156:13,23 | 185:5,13,18 | 151:17,17 |
| 246:2 | 318:13 320:13 | 186:4 188:21 | 153:7,13 |
| **partners** 246:5 | **patient's** | 189:5,8 191:2 | 154:23 162:18 |
| 246:20 | 118:18 120:24 | 192:20 195:3 | 162:21,23 |
| **partnership** | **patients** 170:9 | 195:20,24 | 163:7 164:19 |
| 246:4 | 170:18 172:18 | 196:2,4,6 | 164:23 165:6,9 |
| **parts** 147:17 | 317:12,19 | 197:12,14 | 165:21 167:9 |
| 148:19 150:16 | 319:10,12 | 198:16 200:24 | 167:14 173:10 |
| 152:21 175:7 | | 201:14,16,23 | 173:13,23 |

**[percent - plaintiffs]**                                                      Page 61

174:9,18 175:2
175:4,6,24
176:1 249:2,18
249:21 250:6
250:12,14
254:25 255:2
314:23 315:6,9
**percentage**
248:25
**perform**  79:13
108:20 292:7
292:18 294:18
**performed**
109:8 292:9
293:14 294:23
298:23,25
306:3,5,12,20
**period**  13:18
14:19 18:12
20:17 44:9
156:25 157:4,4
157:5,8,11
158:10,17
182:9 203:22
208:22 267:25
332:25
**person**  13:17
13:25 14:19
16:11 17:9
18:6,13 34:18
34:20 47:19
116:18 117:16
120:6 122:2
172:11,14
247:8 261:1,18

266:6 285:13
**person's**  87:16
119:17
**personal**  250:8
250:10
**personally**  25:4
25:25 251:1,2
308:14
**perspective**
47:24 278:21
**pesticide**  224:8
224:17,21
225:1 226:1
**pesticides**  99:8
224:19
**ph.co**  93:2
**ph.d.**  5:11 6:13
53:2 198:1
246:21
**pharma**  199:10
**pharmaceutical**
10:21 15:22
39:3,7,11 40:8
40:10 41:15,16
75:4,16 89:22
149:3,4 150:18
162:9 192:14
217:24 221:15
221:16 255:7
**pharmaceutic...**
147:23 148:6,9
161:15,16
162:14 163:16
167:11

**pharmaceutic...**
2:17 3:8 4:7
115:9,23 116:2
225:25 231:15
**pharmacologic**
173:9,22
**pharmacolog...**
173:12 174:8
175:1,23
**pharmacologist**
16:3 21:16
281:15
**pharmacology**
86:4
**philip**  312:5
313:8
**phillip**  7:14
313:11
**phone**  261:9
269:13 270:6,9
270:14
**physical**  262:15
**physician**  33:9
37:6
**physicians**
317:19 319:10
319:12
**physiology**
246:22
**picky**  197:5
**picture**  226:19
**piece**  107:18
161:17 162:7
174:24 218:11
218:12 304:7

**pieces**  273:16
274:8
**piedmont**  3:10
**pietragallo**  4:3
**pietragallo.co...**
4:5,5
**pill**  14:18 18:12
116:7 172:11
216:9
**pills**  102:3
**pittsburgh**  4:4
**pizzi**  3:14
**place**  8:10
107:17 108:1
137:9,10
139:20 144:23
145:21 148:21
157:13 165:9
214:8 273:17
297:10,12
308:19 316:13
316:23 334:7
334:14
**places**  95:10
**placing**  318:21
**plaintiff**  10:4
30:16
**plaintiff's**
126:13 256:12
256:13,16
265:25 278:21
282:2 288:11
313:8
**plaintiffs**  2:3,7
2:11 7:8 9:25

[plaintiffs - potency]                                                    Page 62

| | | | |
|---|---|---|---|
| 10:6 32:7 | 187:21 188:11 | 176:18 185:11 | 178:25 262:15 |
| 38:15 104:5 | 190:12 192:12 | 203:17 228:22 | **posed**  11:9,13 |
| 244:10 251:3 | 194:23 197:25 | 231:4 240:23 | 56:23,24 99:9 |
| 255:1 256:25 | 224:3 227:13 | 256:22 295:3 | 122:14 172:17 |
| 265:21 287:11 | 233:20 245:23 | 296:5 299:23 | 212:13 262:4 |
| 290:11 312:5 | 252:3,16 | 304:5 311:14 | **poses**  11:23 |
| **plaintiffs's** | 266:12 277:25 | 313:4 315:16 | 67:8 |
| 297:13 | 281:10 284:3 | 321:15 324:5,8 | **posing**  227:21 |
| **plan**  38:23 | 284:13 287:11 | 325:12 329:2 | **position**  24:6 |
| **planning** | 287:13,23 | **pointed**  75:23 | 307:23 |
| 141:17 249:4 | 313:10,17,21 | 230:18 | **positions** |
| **play**  136:17 | 321:13 322:19 | **pointing**  51:23 | 118:23 |
| 279:6 280:19 | 325:11 329:9 | 150:7 152:17 | **positive**  23:2,3 |
| **please**  8:4,25 | 330:18 331:6 | 152:18 164:15 | 35:2 282:24 |
| 9:3,12 23:11 | 333:13 | 178:14 200:15 | **possession** |
| 37:7,8 92:3 | **plunkett's** | 229:16 314:23 | 37:14 217:21 |
| 126:14 166:11 | 52:25 | **points**  30:9 | 268:1 |
| 194:11 196:9 | **plus**  39:22 | 189:11 211:24 | **possible**  19:5 |
| 196:10,13,14 | 202:25 203:9 | 235:7 239:22 | 19:13 24:21 |
| 200:6 253:17 | **point**  36:5 | 239:24 240:16 | 79:13 86:16 |
| 329:14,15 | 45:18 53:15 | **poison**  33:23 | 87:5 111:14 |
| **plunkett**  1:11 | 62:20 79:8 | 33:23 34:13 | 113:17 142:5 |
| 5:3,9,11 6:2 | 88:20 105:15 | **policies**  308:18 | 163:4 164:12 |
| 7:2,11 8:13 | 108:7 115:18 | **policy**  36:21 | 170:10 175:14 |
| 9:11,14 53:1,2 | 115:20 116:4,7 | **pop**  168:12 | 208:8 225:22 |
| 69:7,25 72:14 | 116:9 119:24 | **popular**  32:21 | 232:14 233:9 |
| 73:8,19 74:2 | 119:25 121:19 | **population** | 253:25 255:23 |
| 83:11,17 91:4 | 133:6 138:9 | 17:13,16,18 | 265:10 268:2 |
| 92:3 94:7 | 139:12 148:18 | 63:25 64:2 | **possibly**  175:8 |
| 96:10 107:15 | 156:19 157:20 | 68:8 115:15 | 277:12,13 |
| 125:2,10 | 163:21 165:13 | **portion**  302:24 | **post**  49:2 137:8 |
| 130:11 160:15 | 166:1,8,14 | 303:12 304:9 | **potence**  57:11 |
| 168:18 171:23 | 167:13 169:1 | **pose**  101:2,7 | **potency**  35:7 |
| 180:11,14 | 171:2 174:24 | 102:24 115:10 | 103:16 212:12 |
| 182:6 187:18 | 175:18 176:2 | 115:24 174:19 | 239:3 |

**potent**  16:21
33:16 34:16,17
34:22 44:8
50:21 51:11,12
52:4,14,16,20
53:6,6,7,8,16
54:3,14,16,17
54:18,24 55:1
55:3,4 59:5,9
59:10 60:5,5,9
60:11,13 61:1
61:15 120:23
131:3 151:25
153:13 164:16
164:18 173:8
213:2 238:21
315:5
**potential**  30:4
41:2 46:14,24
47:15 48:4,4
52:9 110:3
124:17 157:19
163:13,24
173:7 175:17
178:2 179:14
201:1,7,9
205:15 216:13
216:22 227:2,8
229:2,7 230:4
231:16 238:24
239:3 273:16
278:7,9 280:21
306:6 311:6,7
311:10

**potentially**
19:25 37:5
44:24 50:25
52:1 55:18
59:13 79:10
101:2 164:21
167:15 188:19
224:22 271:8
297:15
**pounds**  214:20
**practically**
197:6
**practice**  91:17
97:25 134:18
214:21 215:6
215:23 250:16
**practices**
216:25
**pre**  243:4
**precise**  162:2
**preconceived**
281:25 282:3
282:10 283:4
283:18
**prefer**  332:12
**preference**
161:6
**prefix**  287:16
**premised**  68:2
**prenatal**
112:11
**prenatally**
54:22
**preparation**
267:4,7,18

268:5
**prepare**  263:6
**prepared**  57:10
127:25 268:11
**preparing**
125:10,18,24
185:14,16
191:11 256:23
267:16 285:22
298:11 299:11
**prescribed**
47:22
**prescription**
31:13 62:8
131:25 227:4
**presence**  11:22
12:1,9 14:13
15:8 16:4,21
17:25 30:12
36:14,17 44:4
44:5,14 62:3,8
70:5,9,18
71:21 73:9
87:1 120:21
123:19,22
149:15 161:17
162:16 163:19
166:23 167:8
211:25 216:17
221:12 222:3
227:5 304:23
306:7 310:2,17
317:19
**present**  4:21
45:4 49:3,14

49:25 50:9
114:22,23
123:8 145:1
167:1
**presentation**
270:21 271:13
271:25 277:7
281:3 303:23
**presentations**
236:13 326:17
**presented**
143:20 274:18
283:21
**presenting**
253:21
**preservation**
252:10
**press**  5:13
21:12 32:21
41:24 69:6,7
70:1 72:8 73:7
73:9,11,19
95:3 98:11
**pressure**  21:25
40:18,20 41:3
**pretty**  54:23
268:9 284:25
291:5
**prevent**  61:18
**prevented**
279:15
**previously**
130:4 256:17
328:19

| | | | |
|---|---|---|---|
| **princeton** 3:5 | 285:5,7 | **process** 25:16 | 231:1 237:20 |
| **principle** 111:6 | **problem** 63:10 | 25:20 26:1 | 238:13,16 |
| 235:10,20 | 78:2 125:5 | 30:3,7,12 | 241:4,6 242:3 |
| 270:7 | 152:9 194:3 | 44:21,22,22 | 242:7 299:1,1 |
| **principles** | 203:8 217:6 | 45:13,17 46:5 | 300:4,6 302:7 |
| 112:8 233:8,12 | 249:5 281:16 | 46:15,15,17,22 | 304:20 306:17 |
| 233:18 234:7 | 281:20 283:20 | 47:8,12,14 | 306:21 307:6 |
| 234:12,18,22 | 283:20 294:3 | 48:3 49:13 | 308:3 323:16 |
| 235:1,9,14,16 | **problematic** | 50:5 51:13,15 | **processes** 27:7 |
| 235:16,25 | 161:3 | 51:16,17,18,22 | 32:4 52:1 79:9 |
| 236:1,21,24 | **problems** 36:20 | 66:21 72:21 | 79:11 139:12 |
| 237:4,18,21 | 142:11 280:23 | 78:11,18,21 | 144:23 178:6 |
| **prinston** | **procedure** 87:7 | 79:1,19 80:1 | 228:2 230:5 |
| 204:21 295:18 | 143:24 180:25 | 81:20 82:15,18 | 231:6 232:18 |
| **print** 198:5 | 181:7 | 122:21 124:13 | 306:4 311:10 |
| **printed** 74:22 | **procedures** | 124:15,16 | 323:15 |
| 91:10,12,15 | 142:15,19 | 131:3 144:12 | **proctor** 2:13 |
| **prior** 22:14 | 154:7 197:5,21 | 149:17 150:23 | **produce** 31:13 |
| 25:3,13,24 | **proceed** 9:4,8 | 150:24 152:3,5 | 34:7 35:6 |
| 27:12 38:3 | 229:9 | 152:7,13,16 | 48:18 51:22 |
| 78:3 100:13 | **proceeding** | 154:20,21 | 53:10 54:15 |
| 107:1 179:3 | 8:24 | 155:24 156:6 | 147:19 152:16 |
| 218:8 261:4 | **proceedings** | 156:21,21 | 173:22 174:7 |
| 270:10,13 | 1:17 53:4 74:5 | 157:13,16,17 | 174:21,25 |
| 296:8 304:24 | 83:12 105:22 | 157:18 162:15 | 233:5 296:25 |
| 310:3 | 105:25 124:7 | 163:11,12,17 | 305:7 311:10 |
| **probable** 15:17 | 149:1 166:12 | 164:9,10 | **produced** |
| 16:19 227:12 | 166:18 168:22 | 178:22,24 | 12:24 25:23 |
| **probably** 20:6 | 170:6 180:20 | 197:21 201:11 | 51:19 52:2 |
| 40:13 59:17 | 182:3,24 | 201:12 207:19 | 123:21 230:4 |
| 73:15 87:16 | 186:16 193:20 | 207:25 216:10 | 252:18,20 |
| 93:3 220:24 | 194:4 195:17 | 216:20 219:11 | 260:21 268:10 |
| 255:24 256:13 | 199:4 200:7 | 227:14,20,20 | **produces** 52:12 |
| 261:20 269:12 | 269:16 287:22 | 228:7,13,14 | 55:8 173:12 |
| 272:4,7 280:12 | 313:16 | 229:2,4 230:24 | |

**producing** 60:1
147:12 173:8
201:12
**product** 22:14
22:17 23:25
24:10 25:23
31:14 33:19
36:2 38:9
44:13,16 48:19
49:3,8 51:23
52:8,18 61:15
65:8 78:25
82:17,21 88:24
99:15,23,24,24
100:8,23,25
101:1,2,4,4
107:5 111:14
118:25 134:5
136:6 145:2
146:9,9 147:12
147:19,23
150:21 151:21
154:19 157:21
163:15 167:11
167:12 170:25
172:21 177:24
177:25 196:22
208:24 211:11
211:19 212:1,5
212:11 214:14
214:20 216:18
216:19,23
222:5 224:5,24
224:25 225:2
225:21,23

226:1,4,10,12
226:17,23
233:6 240:25
241:1 283:12
293:7 305:7
306:8,18 307:9
310:18,20
315:3 317:12
319:13
**production**
159:5
**products** 1:3,5
8:15 10:18,18
10:23,23 15:22
19:1,8,9 23:8
30:5 33:15
42:22 45:15
48:4 51:6
61:12 64:6,17
75:8 76:24
77:5 96:17,18
99:16,18,22
100:20 101:9
113:17,18,20
120:23 121:23
147:16 148:4
159:12 167:1
169:5 172:17
211:2,5 212:7
212:21 226:9
226:15,18
227:4,11,12
230:4 237:13
238:25 244:12
255:6,12

271:10 278:20
291:12,13
292:10,17
293:8,10 294:5
306:4,13
308:10 311:12
317:20 318:21
319:7
**professional**
23:16 95:12
327:13
**professor**
259:14
**proffered**
329:4
**profile** 23:21
26:18 130:12
130:14,17
148:23 149:14
150:11 152:7
240:20
**profits** 136:15
250:19
**programs**
91:19 132:21
**project** 40:1
87:8 125:17
217:23 221:6
221:14,23
222:14 223:4,4
224:16 225:24
249:23,24
268:16 269:12
**projects** 26:7
29:4 39:23

248:23 249:22
250:24
**proliferation**
225:8,12
**promise** 249:10
324:14
**propensity**
52:17
**proper** 44:20
307:19 323:14
**properly** 35:4
**properties**
75:11,24 76:2
76:4,5,10 84:9
84:14 112:21
224:5
**proposing**
311:19
**protecting**
165:7
**proteins** 225:7
**protocol** 69:22
**prototypical**
23:1 282:24
**provide** 10:9,16
29:16,18 80:4
128:4 145:18
176:11 186:10
242:2,6 293:14
308:20
**provided** 20:3
39:10 126:12
127:7 129:2
144:18 147:5
206:10 211:3

**[provided - question]**                                                                 Page 66

257:11 269:11
297:8
**provider**  318:3
320:9
**provides**  237:7
**providing**  9:18
85:13 220:20
275:12 296:8
308:25
**public**  1:19 9:6
32:9 224:4
261:23,25
319:16,17
322:7 334:3
335:24
**publication**
95:3,5
**publications**
278:6
**publicly**  128:10
128:11 238:10
319:2 322:6
**publish**  38:19
98:19
**published**
21:20,23 22:1
29:24 30:14,15
**publishes**  29:5
98:8
**pull**  27:8
147:25 159:8
167:22 186:22
187:10 204:20
207:13 209:16
210:25 218:12

234:19 235:5
237:9 287:25
**pulled**  168:6,7
**purchase**  37:10
**pure**  14:6
**purely**  113:19
**purification**
311:21
**purity**  91:14
148:25 149:8,8
149:14,19
151:3 167:12
212:4 215:8
293:4,5,10
**purposes**
177:10 291:17
**pursuant**  1:22
**pursue**  179:14
179:25 180:2
184:9,12,15
185:18 186:4,6
199:13 202:2
**pursued**  183:4
196:6
**pursuing**  44:14
**pursuit**  184:19
**purview**  303:20
**push**  204:24
**put**  12:8 26:12
26:18 46:5
69:12 95:11
117:2 126:1
137:7 144:23
146:6 155:10
156:23 170:14

181:6 187:24
198:19 210:19
238:10,20
243:4,5 264:12
266:23,24
271:3 290:5
303:23 305:17
308:19 317:12
**puts**  11:24
**putting**  69:10
69:18,21,22
73:5 94:13
144:24 255:15
267:9 279:8
**puzzle**  162:7

**q**

**q&a**  91:16
**q3a**  237:6,7,11
237:24
**qms**  139:20
145:4,9
**qualifies**
200:10
**qualify**  67:11
**qualifying**
294:4
**quality**  8:6,6
44:16 47:4
48:18 132:20
137:9 139:19
139:25 140:1,2
140:5 147:18
149:7 159:2
215:8 232:20
233:5 234:16

235:3 241:2
259:1 292:19
305:7 316:1,3
316:13,16,23
317:10
**quantified**
11:25 172:1
**quantify**  18:10
75:10 221:24
**quantifying**
18:9 75:20
170:23
**quantitative**
122:12 174:13
176:5
**quenching**
229:6,23 231:1
**question**  12:16
12:17 13:15,19
13:20,24 14:17
17:11 23:19
30:20 31:15
32:12 33:8
39:8,14 50:12
58:11 59:3
61:4,10 63:16
65:12,13 67:17
67:18 72:3
75:2 80:10
88:25 89:4,5,9
91:21 95:2
97:16 105:5
106:2,3,4,13,13
106:14,22
107:16 109:3

**[question - raw]**                                              Page 67

| | | | |
|---|---|---|---|
| 111:2 117:7 | 330:15,16,19 | 322:20 324:12 | **quoting** 202:5 |
| 118:20 119:20 | 331:9 332:2,4 | 324:14 325:5,6 | 229:12,13 |
| 121:7,12 122:9 | 332:8,8 333:3 | 326:14,16,17 | **r** |
| 122:22 127:17 | 333:5 | 326:22 327:3 | **r** 2:1 3:1 4:1 9:5 |
| 146:17,22 | **questioned** | 328:5,7,13,24 | 130:1,3 247:14 |
| 150:3,6,6,7,8 | 88:15 299:21 | 329:2,5,6,12 | 334:1 335:1,1 |
| 151:7,8 153:21 | **questioning** | 330:17 331:12 | 335:1 |
| 155:3,15 | 88:14 207:6 | 331:16,17,19 | **r214.5** 184:25 |
| 165:22,25 | 245:8 327:14 | 331:21 332:1,9 | **rafferty** 2:13 |
| 166:2 167:21 | 330:21 332:3 | 332:21,24,25 | **raised** 82:20 |
| 168:2 169:24 | **questions** 28:19 | **quick** 73:24 | 131:22 144:13 |
| 174:13 176:12 | 32:19 36:11,23 | 165:14 180:23 | 144:16 184:21 |
| 177:3,6 184:21 | 37:19 44:15 | 210:20 245:17 | 196:2,21 203:5 |
| 186:12 191:23 | 76:13 95:16,19 | 254:4,11 | 205:23 238:4 |
| 195:20 196:13 | 122:24 131:21 | 321:15 325:3 | 320:8 327:25 |
| 199:7,15,18,19 | 151:15 155:2 | **quickest** | **raises** 44:15 |
| 199:20 200:1 | 171:19 181:4 | 133:12 | 157:18 |
| 204:13 210:11 | 182:20 183:2 | **quickly** 181:15 | **raising** 148:10 |
| 210:18 213:4 | 183:10 184:7 | 198:19 290:23 | 168:9 182:19 |
| 213:16,17,17 | 184:13 188:2 | 291:24 | **range** 55:9 |
| 213:20,21,23 | 188:22 191:21 | **quite** 109:2 | 63:23 |
| 213:23 214:2,5 | 192:16 193:18 | 161:12 174:11 | **ranges** 63:23 |
| 215:20,21 | 196:20,24,25 | 205:16 222:17 | 111:8 |
| 218:20 232:12 | 197:20 200:9 | 224:10 274:17 | **raps** 95:11 |
| 238:4 251:6 | 200:11 201:4 | **quotations** | **raspanti** 4:3 |
| 268:19 276:15 | 203:5,23 | 148:1 | **rate** 169:8 |
| 279:13,14,15 | 205:22 215:22 | **quote** 80:5 | 250:25 |
| 279:16,21 | 215:25 219:2 | 82:22,25 83:4 | **rates** 249:22 |
| 292:13 297:1 | 223:9,14 244:5 | 83:6,13 168:7 | **rather** 72:2 |
| 300:14 314:2,9 | 258:11 267:15 | 173:4 175:5 | 92:12 144:4 |
| 314:19,25 | 274:14 276:13 | 201:2 202:12 | 158:21 243:24 |
| 316:22 317:3 | 283:24 284:20 | 239:9 | 279:14 |
| 317:15 321:21 | 294:2 296:23 | **quoted** 73:20 | **rating** 156:17 |
| 325:14 327:23 | 300:17 305:15 | 73:22 74:4 | **raw** 192:17 |
| 328:1 330:7,12 | 320:15 322:17 | 83:9 309:10 | 193:10 |

**[rbk - recess]**                                                    Page 68

| | | | |
|---|---|---|---|
| **rbk**  1:6 | 200:8,17,19 | 32:12 39:8 | 254:16 266:25 |
| **reach**  32:22,24 | 201:4,21 | 57:9 60:20 | 268:3 270:12 |
| 126:24,25 | 202:13 203:21 | 62:4 67:16 | 270:20,21 |
| 259:21 274:15 | 204:10 205:19 | 86:11 94:11 | 271:24 277:9 |
| **reached**  33:2 | 206:20,24,25 | 107:15 171:1 | 277:17,19 |
| 105:9 176:17 | 228:11 233:21 | 171:12 194:9 | 281:11,21,23 |
| **react**  229:22 | 234:5 241:16 | 198:19 266:7 | 289:3,5,6 |
| 230:12 | 247:3 258:23 | 279:1 281:23 | 299:7 313:5 |
| **reaction**  47:15 | 259:5,9,13 | 326:21 327:4 | 318:8,11,14,15 |
| 229:9 | 278:5 286:24 | **reason**  21:15 | 319:14,24,25 |
| **reactions**  46:24 | 295:13,15 | 52:14 109:11 | 320:11,13 |
| 78:12 81:18 | 305:12 309:22 | 162:4 203:4 | 321:16,23,24 |
| 82:11 230:8 | 309:22,23 | 240:10 242:5 | 322:11 325:14 |
| **reactive**  231:15 | 313:2 314:20 | 301:16 305:13 | 330:16 332:1 |
| **read**  11:21 15:4 | 315:19 316:4 | **reasons**  133:7 | **recalled**  36:5 |
| 17:24 24:24 | 329:11,11 | 241:2 278:24 | 37:11 157:21 |
| 27:25 28:11 | 335:2 | **recall**  19:10 | 293:8 319:7 |
| 29:22 70:19 | **reader**  28:21 | 20:11,20 24:14 | **recalls**  21:14 |
| 75:2 84:16 | 28:24 | 25:8,12 28:17 | 36:13 |
| 95:4,8,17,20,22 | **readily**  227:21 | 42:7 73:8,20 | **received**  195:8 |
| 118:10 121:16 | **reading**  36:18 | 86:17,24 90:12 | 197:13 201:23 |
| 125:12 127:1 | 137:21 165:1 | 119:14 142:13 | 204:3 256:17 |
| 132:12,25 | 183:20 188:15 | 142:25 158:14 | 287:2 |
| 137:13,15 | 196:18,19 | 176:21,22 | **receiving** |
| 138:6,14,15,18 | 229:10 234:25 | 182:8 183:6,14 | 141:15 |
| 138:19,21 | 265:18 314:24 | 183:17 188:12 | **recent**  40:12 |
| 140:8 149:25 | **ready**  129:6 | 188:15 189:14 | 176:14 261:15 |
| 159:16,18 | 252:10 256:3,7 | 191:10,13,19 | 261:15 263:9 |
| 165:2 173:5 | 256:14,25 | 207:5,13,17,21 | **recently**  236:19 |
| 175:6 180:19 | **real**  73:24 | 207:23 208:8,9 | **recess**  69:1 |
| 181:1,23 182:6 | 165:14 180:23 | 208:11,15,19 | 90:21 129:12 |
| 182:14 185:2 | 245:17 249:3 | 210:1,13,21,23 | 160:9 188:5 |
| 188:1,12 | 254:4 325:2 | 210:25 230:9 | 192:4 194:17 |
| 189:21 191:20 | **really**  13:24 | 233:8 234:23 | 223:21 245:14 |
| 196:10 198:12 | 23:18 31:15 | 237:17 239:8 | 321:7 324:24 |

**recognition**
133:10 166:22
167:2 239:2
**recognize** 98:3
**recognized**
238:24
**recognizes**
124:14
**recognizing**
240:25 241:21
280:21
**recollection**
20:15
**recommendat...**
134:1,3,13
232:25
**recommendat...**
132:23 135:3,7
231:24 232:11
233:3 237:21
238:17
**recommended**
133:17
**record** 8:4,11
9:2,13 67:23
68:23 69:2
72:19,23,24,25
90:16,17,18,20
90:23 95:21,22
96:2,4,5,6
117:11 129:9
130:7 151:11
160:7,10
180:25 181:23
181:25 182:2,4

188:1,4,7
191:24 192:2,6
194:6,16,18
195:10 198:11
223:17,18,22
228:11 245:12
245:12,16,18
305:12 312:22
321:4,8 324:18
324:25 325:3,4
327:22 328:2
328:23 331:4
331:20 333:11
**recorded** 8:9
8:13
**recording** 8:6,9
**recordkeeping**
212:15
**records** 249:15
**red** 58:4 63:10
63:13
**redirect** 327:25
328:8
**redo** 110:18
**refer** 27:4 42:3
45:16 95:13
97:10 120:13
166:19 228:12
233:7 306:18
**reference** 49:23
130:13,15
149:14 151:3
167:12 266:5
291:8 304:21

**referenced**
154:3 292:2
**references**
52:19 110:17
160:16,20
285:2 286:8
**referencing**
175:4
**referrals**
265:24
**referred** 95:9
242:19 265:21
290:25 318:1
**referring** 14:7
59:8 83:23
137:14 143:23
182:22 183:22
205:21 206:3
207:20 209:23
228:16 229:15
231:18 235:11
266:6 281:4,6
289:20 292:25
304:13,14,19
305:25 306:10
306:25 307:1
308:12 315:13
316:19 319:18
320:6,6
**refers** 142:22
**reflect** 245:18
325:3
**reflection**
206:19

**refreshing**
181:11
**reg** 95:7
**regard** 260:19
260:20
**regarding**
184:25 192:20
210:5 216:25
229:15 241:23
241:24 309:12
316:3
**regardless** 17:8
48:14 54:10
55:6 60:12
112:9,17
117:10 121:24
169:22 174:17
232:14 237:18
239:22 249:23
311:14
**regular** 28:21
28:24 71:15
199:21
**regularly** 95:4
**regulate** 174:1
**regulated**
10:19 19:2,8
96:18 101:10
278:20
**regulates**
224:18
**regulation** 19:8
131:24 135:14
142:18 145:24
146:4 147:1,2

226:12 248:12
**regulations**
19:1 31:11
98:1 131:23
132:18 133:9
136:9,20
137:11 146:18
147:8,8,15,18
147:20,24
148:1,10,21
149:4 211:4
214:9 216:3,4
233:5 235:13
236:1,3 271:9
274:13
**regulator** 66:23
66:23 114:12
**regulators**
78:16 79:3
113:3 114:19
**regulatory**
10:17 12:24
16:4,18 31:9
40:4 47:24
49:7 65:1,12
66:3 71:5,8,9
71:10,11,15
72:1,6,9 75:5
75:16 80:4
88:13 89:22
93:23,24 95:12
96:22 97:24
100:18 101:24
102:21 110:1
116:10 117:8

117:11 118:1
119:2 122:15
122:25 123:3
123:23 126:6
131:18 141:4
143:24 145:20
148:17 158:5
158:11,15
169:25 170:4
219:9,9,10,13
220:19 223:2
237:1,2 245:2
245:5 249:4,5
249:23 258:3
260:11 272:13
274:2,9 275:9
278:12,25
281:2 286:3,4
325:19
**reintroducing**
195:1
**reiterate**
331:13,14
**relate** 17:13
18:22 135:16
234:7 256:21
315:11
**related** 8:22
10:10,10,17
18:20 20:18
21:23 22:16,24
26:6 27:10
36:20 38:20
39:23 43:5
52:13 60:22

61:22 62:3
96:25 97:5
98:17 104:9
110:7 123:6
126:10 128:15
191:8 229:2
230:23 234:13
240:24 244:11
258:2 262:5,9
271:8 280:16
282:23 283:9
286:3 293:1,15
304:20 307:9
308:13,21
319:23 320:8
334:10
**relates** 1:4 11:3
11:8 135:15
183:1 245:5
285:24
**relationship**
192:15 220:8
236:14 305:18
**relative** 334:13
**release** 5:13
69:6,7 70:1
72:8 73:7,9,11
73:19 145:2
**relevance**
62:24
**relevancy**
62:17
**relevant** 63:18
63:21 64:14
126:21 128:7

138:24 139:6
146:22 166:2
166:13 186:8
188:18 210:3
298:17 300:4
**reliability**
104:21
**reliable** 104:15
109:20
**reliably** 35:5
54:19
**reliance** 73:21
97:17 105:1
127:25 137:17
138:1,2,3
182:10 188:14
208:3 303:22
318:17 319:3
**relied** 96:19,23
97:1 106:6,17
106:23 107:8
108:11,21
110:4 127:6,16
206:12 296:25
**relies** 187:2
**rely** 45:3 97:11
109:15,16
110:13 206:18
207:10
**relying** 109:6
186:25 215:11
257:20,21
258:1,4,7
300:23 307:23
315:14

| | | | |
|---|---|---|---|
| **remain** 58:5 | 15:4 18:17 | 191:12 197:9 | 295:4,6 296:8 |
| 100:23 | 19:7 26:12,16 | 201:2 205:20 | 298:12 299:25 |
| **remaining** | 28:1,6 29:22 | 206:3,20,22 | 302:5 305:16 |
| 301:6 325:4 | 32:2 42:22,24 | 207:14,24 | 305:23 309:7 |
| **remains** 136:6 | 42:25 44:4 | 208:14,20 | 310:8 312:5,7 |
| **remember** | 45:5,11,12 | 209:7 214:12 | 313:5,6 315:24 |
| 15:15 40:17,19 | 48:10 52:23,25 | 214:23 215:22 | 318:1 321:18 |
| 42:10 137:21 | 53:1,14,20 | 216:16 218:25 | 322:5 324:23 |
| 182:14 191:6 | 65:3 73:10,20 | 219:4,4,8 | 325:22 327:25 |
| 264:6 270:16 | 79:22 80:6 | 220:3 222:7,10 | 333:4 |
| 277:12 289:7 | 82:23 83:1 | 223:11 227:25 | **reported** |
| 319:4 321:21 | 91:4,13,15,16 | 230:2,6,16 | 273:14 314:4 |
| 321:22 | 92:1,4 97:3,8 | 231:4 233:7,15 | **reporter** 1:18 |
| **remembering** | 104:23 105:4,6 | 233:22 238:5,9 | 8:20 9:3 |
| 40:23 | 105:13,14 | 239:5 242:24 | 177:11 191:25 |
| **remote** 1:10 2:2 | 106:1,15,24 | 243:7,11 245:2 | 334:3 |
| **remotely** 1:20 | 107:17 108:1,8 | 252:20 254:7 | **reporters** 98:22 |
| 9:2 | 121:1 123:7,24 | 256:4,15,23 | **reporting** |
| **remove** 61:18 | 125:10,18,24 | 257:1,1,2,4,22 | 314:7,22 |
| 319:13 | 126:11,16 | 258:8,22,23 | **reports** 24:24 |
| **removed** | 127:19 128:2 | 259:5,10,13,16 | 28:1 77:11 |
| 226:24 | 131:7,8 140:9 | 259:20 260:2,2 | 104:1,3,5 |
| **render** 55:12 | 145:9 146:5,24 | 263:2,2,9,12,18 | 125:21 127:22 |
| 55:13 229:8 | 146:25 147:6 | 264:12,13 | 147:4 179:20 |
| 285:20 298:11 | 149:23 152:21 | 265:3,11,12,14 | 222:25 243:12 |
| 299:11 | 153:16,17 | 265:16 267:1,4 | 252:18 253:3,4 |
| **rendering** 9:24 | 155:16,17,20 | 268:5,7,11 | 256:4,25 257:5 |
| 294:15 302:10 | 158:1 159:16 | 273:18 276:9 | 257:13,14,17 |
| **reorient** 192:9 | 159:18 161:13 | 276:18 284:25 | 258:12 262:24 |
| **repeat** 213:16 | 165:16,17,25 | 285:22 286:11 | 263:1,6,13,25 |
| 213:19 327:8 | 166:4 167:20 | 286:24 289:12 | 267:24 268:2 |
| **repeatedly** | 168:3 172:24 | 289:19 290:18 | 288:21,23 |
| 59:21 | 176:22 179:18 | 290:19 291:1 | 289:3,11 297:7 |
| **report** 5:10 | 179:22 185:16 | 291:24 292:2 | 311:22,24 |
| 10:10 11:7,21 | 186:20 189:2 | 292:22 294:21 | |

**[represent - retained]**

**represent**
284:13 296:15
299:9 302:4
318:18 321:14
322:15
**representation**
302:3 331:19
332:24
**representations**
300:24,25
**representative**
117:15
**represented**
19:20 260:7
302:3 333:2
**representing**
8:18 93:15
**reputable**
97:21
**request** 253:6
256:16 262:1
**requested**
256:18
**requests**
199:23 299:24
**require** 130:22
332:4
**required** 31:12
82:16 87:24
133:17 145:11
210:16 320:12
**requirement**
146:18
**requirements**
215:7,23 245:5

**requires** 143:3
**rescinded**
161:24
**research** 21:7
280:5
**reserved**
327:19 328:4
**residual** 183:1
185:15
**resolve** 179:21
180:3
**resolved**
141:12 144:19
188:23 189:10
193:10
**resource**
218:13
**resources**
156:10 217:15
**respect** 53:17
53:17 105:9
159:14 167:10
215:11 216:25
221:19,21,24
225:21 228:8
259:2,22 266:8
266:9 322:1,11
**respond** 60:18
141:15,18
143:6 260:11
**responded**
141:14 143:5
**responding**
203:24 288:15

**responds**
199:19
**response**
101:16,20
113:5 141:20
143:3,7 176:5
203:24 209:14
209:20 210:6
210:23,24
287:2 301:4
314:11
**responses** 7:9
209:2 287:5,12
287:24 288:12
331:7
**responsibilities**
10:20 126:7
132:6 134:14
145:12,12
147:7 245:3
285:18 295:14
302:21 310:7
316:3 317:5
**responsibility**
60:22 72:11
80:1,2,3
121:22 135:22
136:8,19,22
137:4,6,7,8
210:15 258:2
274:16 292:7
292:15 299:17
303:18 305:18
305:19 315:15
317:11

**responsible**
135:11,24
137:9 152:6
156:16
**responsive**
165:22
**rest** 84:16
195:19 205:20
**restatement**
305:8
**result** 16:1
34:12 62:1
66:18 99:19
111:18 134:7
148:6 154:23
163:14,15
172:3,3 211:10
211:18 216:21
265:4 293:9
307:22 309:1
311:6
**resulted** 158:5
158:11 216:21
**resulting**
162:16
**results** 84:18
111:20 163:20
184:20 214:10
**resume** 258:22
**resumed** 130:4
261:1
**retained**
244:16,17
282:2 333:14

**retainer**  244:20
**retention**  282:4
**retired**  236:19
**retranslate**
  207:14
**revenue**  250:23
**revenues**
  254:25
**review**  43:3
  46:17 47:8
  53:12 82:6
  90:5 108:20,24
  110:7 152:13
  218:9 219:5
  255:11 257:10
  257:12 267:4
  267:22 294:14
  297:1,15
  298:25 299:10
  300:16 301:23
  302:15 306:20
  307:5,6,7
  312:7,9,11
  313:3 316:20
  318:7,13,15,20
  319:10 322:8
**reviewed**  24:20
  26:5,10,13
  38:21 39:2
  84:19 85:22
  90:9 103:10
  104:17 105:2,8
  105:16 106:6
  106:17,23
  107:8,9 108:23

109:19,24
126:2,20,23
127:6,15 128:1
191:10 201:24
206:12 259:18
288:21 289:11
289:22 290:3
293:12 294:7
294:16,19,24
295:11 296:19
296:21 297:5,9
297:19 298:11
299:6,23
300:19 312:4
316:21 319:21
321:24 322:4
**reviewing**
  27:12 95:10
  220:18 267:6
  267:24
**reviews**  90:3
  97:12 108:13
  110:16 309:3
**revisit**  282:18
**revisiting**
  141:24
**rewritten**
  264:21
**ridiculous**
  326:11,12
**right**  12:10
  20:23,24,24
  29:20 37:9
  38:22 42:12
  43:25 47:9

49:5 51:18
53:14 63:12,13
69:15 86:12
94:14 105:23
113:12 122:1
131:11,24
135:5,6 136:2
143:11 144:7,9
148:13 158:12
160:6 165:8
171:11 177:18
177:22 183:12
183:13 187:7
188:3 190:10
195:7 200:3
201:19 202:18
204:3 205:10
205:15 213:14
214:18 215:2
223:16 231:21
241:12 243:23
244:21 252:17
252:21 255:20
256:22 257:2,8
261:17 269:3
274:21 281:14
284:10,13,16
287:8,9,23
288:18 291:10
297:20 299:18
299:19,25
300:11 303:1
303:16,24
305:13 306:8
310:15,16

317:23 322:19
322:21,22
324:22 326:9
333:8,10
**rigorous**  31:23
**risen**  144:5
**risk**  11:22,24
  12:1,5,5,6,10
  12:13,18,25
  13:4,6,13,23
  14:1,8,14,15,20
  15:1,9,21,22,25
  16:3,10,10,14
  16:22,23 17:7
  17:15,20,20
  18:2,3,5,8,14
  22:12 29:23
  30:2 31:25
  32:6 33:11,14
  33:16,17 34:4
  34:11 35:11
  37:25 38:5,10
  41:2 42:3
  44:20,23 45:7
  45:13,24 46:3
  46:4,6 47:1,4,6
  47:9 55:21
  56:1,23 58:24
  59:15 61:12,12
  64:25 65:2,9
  65:15,20,25
  66:4,8,14,16,20
  66:22 67:9,11
  68:1,3,7,12,19
  68:21 79:14

**[risk - saying]**                                                      Page 74

82:6,13 99:25
100:5,10,19
101:3,7,8,12,17
102:14,17,24
103:3 104:7,25
105:10,18
110:22 111:19
112:14,16,18
112:19,23
113:1,9,12,21
114:1,6,7,13,14
114:14,15,23
115:11,19,21
115:25 116:10
116:20 117:7
117:18 118:3,8
118:12,18
119:7,17 120:4
120:8,14,19,24
121:3,4 122:5
122:12 146:2,6
146:8,17
147:10 156:23
169:18,21,22
169:23 170:5,9
170:16,18,24
170:24,25
171:13,24
172:1,7,9
173:14,19,21
174:14,20,23
176:5,8 178:1
178:25 212:24
220:14 221:24
222:3 223:5,7

224:23 227:7
227:21 231:16
245:1 258:5
262:15 292:8,8
292:18 293:14
294:18,23,24
298:23,25
300:2,9 301:21
301:24 306:3,5
306:12,20
307:5,8,19,23
308:17,21
317:13 323:14
**riskier** 114:17
**risks** 11:9,13
  11:13 15:23
  17:17 23:6
  24:13 48:2
  56:23 78:9
  79:15 217:19
  225:17 262:4
  283:11 320:2
**rld** 49:20,21,25
  50:9,16 51:17
  51:18 150:11
  150:21 163:17
  164:11 323:17
**road** 3:4,10
**robert** 1:4
**robust** 140:3
**roc** 175:19
**roger** 288:24
**role** 10:7,19
  16:13 21:23
  65:3 72:11

136:16 284:15
  286:5
**rooney** 4:17
**root** 178:4
**roseland** 2:5
**roszel** 3:4
**route** 112:10
**routinely** 29:3
**rpr** 334:22
**rude** 171:19
  196:14
**rudenko** 236:6
**rule** 111:13
**ruled** 328:15
**rules** 9:18
  131:19 133:8
**ruling** 328:17
**run** 317:10
**running** 266:17
**russ** 7:14 158:3
  257:1 312:5,7
  312:15,20
  313:9,11
  314:21 315:18

**s**

**s** 2:1 3:1 4:1
  130:1,1,1
**safe** 16:5 64:7
  65:22 66:10
  67:18,19
  112:23 114:9
  121:23 134:6
  136:6 156:23
  165:7 173:15
  317:12

**safety** 11:24
  61:22 62:2,7
  63:6,18,20,22
  66:16,19,20
  82:20 155:22
  155:25 156:11
  156:13 175:15
  215:7 236:21
  237:2 260:20
  320:8
**salary** 250:14
**salmon** 62:22
  62:23 63:15
**salted** 62:14
  64:3
**samples** 75:7
  124:9
**sartans** 42:1,8
**saving** 198:6
**saw** 28:7 32:20
  124:5 234:4
  255:18 256:19
  257:17,18
  288:16 294:2
  319:4
**saying** 16:2,16
  17:3 18:3
  36:25 51:24
  67:10,24,24
  85:11,21 112:1
  115:20 116:10
  117:11 118:2,7
  135:5 137:24
  141:16 143:21
  146:19 147:13

**[saying - sections]**

148:15 150:18
152:9 153:25
163:9 165:8
169:23 173:20
177:9 183:23
188:25 201:7,8
202:24 209:16
210:1 211:20
214:1 237:24
241:20 260:5
268:4 271:24
277:9,17 293:5
305:12 312:13
317:6,9 325:24
333:6
**says** 48:1 70:5
76:5,17,23
78:15 81:2
99:4,25 100:9
115:2 121:24
121:24 148:22
149:6 153:6,15
153:17,23
163:23 164:21
165:9,20
167:14 169:1
170:8 171:3
183:12 184:2,2
185:9 189:19
191:1 193:15
195:2 196:11
197:16 198:15
199:8,17
201:14 202:2
202:16,17,18

205:12 206:19
219:1 220:7
232:10 245:4
267:4 268:5,13
268:23 274:16
292:6 306:2
316:1
**schedule** 125:8
**sciegen** 2:17
**science** 221:18
270:23 271:6
272:18 274:3,8
275:11
**scientific** 34:21
97:25 98:16
112:8 220:5,7
230:1 276:2
**scientifically**
13:20
**scientist** 24:7
113:4 114:21
272:12,14
273:14 277:16
279:11 281:4
281:13,13,17
**scientists** 66:4
75:9 76:17,24
**scope** 14:22
15:3 18:6,18
27:1 29:13
30:18 31:6
37:17 55:15
56:11 62:12,17
65:16 66:12,25
67:13 77:7

78:5 80:25
81:12,13,17
82:12 84:23
85:1 108:24
116:8 121:8
139:1 140:6
145:6,9 158:7
170:21 176:4
176:16,20
177:6,16 178:8
178:13 185:22
188:17 208:12
209:5 227:17
231:7 258:13
290:14
**scott** 5:19
83:18
**scour** 119:21
**scratch** 264:17
**screen** 8:8
69:12,21 70:5
73:5 91:21,23
93:6 94:14
95:25 115:1
168:12 190:21
193:16,23,24
194:1 266:24
288:1,4 291:17
296:6 313:18
**screens** 83:25
**scroll** 74:3
198:18 199:8
**se** 262:25
**search** 29:14,24
92:11 128:7

129:3 158:18
178:21 215:15
**searches** 29:4
128:12
**season** 251:7
**second** 15:14
83:9 84:2,11
89:5 94:18
101:14 115:4
165:18 189:18
193:1,25
195:14,15
200:5,16
203:17 228:25
269:14 284:10
295:15 298:8
306:1 309:9
**seconds** 8:2
**section** 26:13
84:19 103:15
105:23 106:1
106:18 107:9
107:13 133:2
136:21 147:17
160:25 178:16
201:21,21
205:20 214:22
234:21 235:13
235:17 263:17
271:4,5,18
276:23 292:22
297:18
**sections** 136:21
142:20 147:25
147:25 207:15

215:24 235:6
291:24
**see** 45:3 49:6
52:23 53:23
56:12 64:21
67:23 70:6
75:12,13 77:1
77:3 78:13,14
78:18,19 80:15
80:20 83:5,9
84:10 85:17
89:17 92:4
103:20,24
106:14 107:17
108:2,6 111:16
111:17 115:5
116:21,22
117:3 127:23
133:14 137:25
138:23 146:25
147:9,10 154:1
167:5 168:5
169:10 173:1
180:21 181:8
181:13 183:16
183:20,21
184:5 185:17
190:21,23
191:14 193:16
195:14,15
197:1 198:9
202:5 209:23
209:23 210:12
218:25 228:16
235:6 237:16

241:18 243:20
251:13 253:24
257:1,5,15
265:3 276:18
278:3,24
281:18 288:10
288:25 291:23
292:11 293:22
296:13 297:19
297:24 306:8
307:19 309:20
309:23 313:22
313:23,24
314:1,8,14,18
318:4,6 320:9
**seeing** 72:16
157:14 289:3
300:11 308:11
**seek** 95:7
303:12 304:8
**seem** 95:24
**seems** 194:24
**seen** 28:12,15
42:2 53:18
54:5,9 70:13
70:24 71:1,9
95:14,15 97:24
98:11 110:2,16
110:17 117:25
118:6 119:13
123:8,9 124:8
125:4 139:22
147:4 157:12
162:5 179:8,11
180:15,19,23

181:8 182:7,9
182:12 185:8
186:7,14
187:21 207:22
227:16 236:13
243:12 244:5,6
258:7,8,21
278:9,12 279:3
288:3 293:22
293:24,25
294:10,12
295:2 299:20
304:22 305:16
306:25 308:12
310:4 311:21
312:13 313:5
319:1
**segregated**
165:4
**selective** 266:2
**selling** 136:14
146:9 156:22
**sells** 93:11
**seminar** 271:16
274:19,20
275:1,7,25
279:17
**seminars**
236:17
**send** 43:6,7
126:9,14 141:5
216:24 228:18
270:4
**sense** 64:2
103:12 108:10

109:3 164:2
223:8
**sensitivities**
111:5
**sent** 43:4 84:5
85:24 268:3,17
269:6 287:1
318:8,14
320:11 326:4
**sentence** 70:4
71:19 76:18
77:2,3,13
78:15,18,19
80:17 82:22,25
83:1,13 84:11
84:17 87:21
115:2 116:17
119:23 123:2
149:18 164:25
169:1 173:5
202:1 205:8,9
293:3 295:13
295:15 306:1
309:16,22,23
316:1,6,7
317:16
**sentences** 83:15
292:5
**separate** 85:20
97:3 130:25
134:16 164:14
301:17 302:21
311:18
**separately**
91:25

HIGHLY CONFIDENTIAL

separation 87:7
september
  180:15 270:22
  270:24
sequence 78:10
series 189:7
  302:6
serious 142:7
  144:5 241:1
seriously 329:9
  330:17
seriousness
  214:4,4
serve 20:20,25
  21:5,6 32:8
  223:1 253:7
  270:16
served 42:14
  257:13,16
services 39:11
serving 19:25
  25:3,14,24
  28:13,16 42:11
session 301:2
set 45:11 47:22
  51:20 67:12
  68:4 105:6,16
  106:5 111:22
  132:18,19
  133:9 134:15
  136:16,20
  150:17 193:5
  234:8 235:14
  263:13 264:4
  267:19,21

276:25 329:4,4
  334:7,17
sets 131:17,20
  213:10
setup 332:3
seven 180:8
  222:17 261:20
  298:5 324:17
  324:19 328:17
  333:14
several 26:14
  28:10 146:5
  159:18 167:7
  217:23 316:18
shampoo 99:7
shape 262:14
share 39:17
  69:11,19 72:17
  168:17 181:7
  181:19 241:3,7
  266:23 267:10
  288:1,4 291:17
  296:6 303:5
  313:18,25
shared 193:22
  317:5
sharing 91:21
  193:23 289:16
  307:15
she'll 204:14
shed 282:20
shionogi 93:2
short 140:13
  165:19 266:17

shortages
  116:13 171:9
show 43:19
  44:2 94:13
  111:12 112:9
  144:25 153:15
  156:2 167:8
  178:19 180:4
  182:21 198:14
  199:16 207:20
  207:21 208:4
  226:20 239:11
  241:21 268:25
  294:11 317:17
showed 36:19
  112:11 207:6
  314:5
showing 54:21
  59:19 185:11
shown 14:12
  54:22 59:14
  163:18 273:4
shows 30:8
  45:20 83:4
  105:1 230:25
shuffle 268:24
shut 331:21
shutdown
  261:17
side 140:14
  189:20 278:13
  278:13,18
sides 219:2
  276:3 278:24

signaling 225:7
  225:10
signature
  334:21 335:21
signed 20:22
  39:1 151:2
  257:18
significant
  115:10,24
  141:5 150:24
similar 83:3
  88:7 100:15
  110:24 111:10
  133:19 167:25
  222:24 223:13
  229:3,20 233:1
  259:2 263:1,5
simple 31:16
  67:17 107:16
  122:25 155:3
simpler 67:17
simply 12:8
  113:19 153:6
  243:6
simultaneously
  229:8
single 54:22
  112:10 138:6,8
  174:24 202:1
  216:8 231:23
  232:10,13
sit 219:24
site 42:3 92:23
  137:2

sitting 19:10
  29:8 87:10
  118:15 119:14
  147:20 202:10
situation 13:16
  48:24 60:15,18
  63:1 79:18
  111:24 116:12
  122:17 131:20
  172:14 211:22
  213:1,5,6
  222:1 303:15
  306:10
situations
  213:9
six 180:8
  187:17 217:13
  217:25 220:9
  220:16 222:17
  261:20 268:13
  288:5 298:5
  313:19
skadden 3:19
  3:23
skadden.com
  3:21,21,22,25
skimmed
  138:19,21
skipped 309:20
slate 3:19,23
slater 2:4,4
  254:3,12,15,17
  254:19 270:9
slevin 2:15

slide 236:12
slides 272:8
  281:12,22
slightly 327:11
  327:11
slope 113:5
slow 252:3
  272:6 277:23
slowed 249:8
slowly 20:19
small 39:24
  170:10,19
  171:13,24
  172:4
smoke 64:13,13
smoked 62:14
  62:22,22 63:15
  64:3,16
social 281:16
societal 271:5,8
society 95:13
  98:13,18 271:3
  271:16
sodium 229:5
  229:22 230:12
sold 125:5
  147:22,22
  293:6
sole 247:7
solely 58:18
  278:17 280:1,6
solutions 7:4
  247:18 255:1
  266:13

solve 141:9
solvent 23:9,17
  185:15
solvents 183:2
solving 249:5
somebody
  14:18 37:15
  71:24 119:6
  120:17 266:7
  281:19 290:16
somewhat
  120:12 191:8
soon 75:5
sore 189:10
sorry 43:23
  74:11 76:18
  97:13 98:7
  103:8 119:1
  125:1 149:23
  170:21 181:17
  191:25 194:23
  196:14 213:18
  222:18,21
  228:15 249:17
  252:5 253:2
  254:10 268:18
  271:1,2 272:5
  277:25 303:21
  316:8 327:2
  333:12
sort 11:11
  27:13 34:3
  213:9,12
sot 271:15,20
  271:22

sound 9:21
  86:11 112:8
  231:21 255:19
  277:14 329:5
sounds 91:18
  253:14 329:10
source 124:10
sources 99:5,13
  103:23 104:20
  104:22 109:10
  176:15 201:1,8
  201:9 205:15
  217:14 218:10
  230:20,22
  278:7 280:20
south 2:14
space 93:24
  255:11 272:22
speak 88:5
  125:11,13,14
  125:18,23
  140:11 178:17
  262:1,3,16,20
speaker 71:18
  262:2
speaking
  285:20
special 165:4,5
  235:18 236:25
  271:4,5 326:23
specialty
  271:18
specific 10:14
  11:19 13:1,1,2
  13:16,16,17,18

[specific - state]                                                          Page 79

15:1 16:14,15
21:18 23:12,22
30:19 32:13
39:6 45:6,8,11
65:2 67:1,1,12
78:10 79:18,19
83:13 84:25
85:14 95:16,18
101:21 110:10
113:11 115:15
116:4 118:19
119:10 131:23
131:24 134:20
135:13 136:3
137:2,5,23,25
140:7 142:25
146:18 148:14
151:4,15
172:15 176:6,7
209:11 213:12
214:13 227:1,2
227:2 230:16
234:8 244:16
274:12,13
275:13 276:23
286:15 292:25
295:23 296:2
310:9 313:1
317:4,4 319:1
320:1 325:22
**specifically**
14:9 26:19
28:19 29:6
31:1 59:18
73:14 107:12

108:12 110:4
168:7 205:18
211:24 262:5
273:21 286:9
288:18 289:18
290:17 291:14
304:6 305:2
312:17
**specification**
160:23 311:3
315:7
**specifications**
310:13,19,21
311:1,7 312:3
312:21 314:6
314:13 315:4
**specifics**  40:1
229:25 286:14
**specified**
116:25
**spectrometry**
77:1
**speculation**
89:15 94:4
**speech**  22:9
71:15 171:11
**speeches**  22:4,7
22:11 236:10
**spell**  259:7
**spelling**  94:13
**spend**  218:6,21
256:6 275:18
328:17
**spending**  328:4

**spent**  169:15
219:21 220:10
220:18 249:12
256:11 268:15
289:8
**spoke**  262:4
**spoken**  8:8
125:15,21
140:12,13
**sponte**  58:14
**spring**  252:11
**st**  74:8 75:3
89:21
**stage**  199:9
**stand**  8:1 130:4
188:6 270:3
287:20 313:15
**standard**  50:7
50:15,17,19,19
51:12 84:9,14
84:18 85:14,16
85:17,19 87:23
88:8 97:25
122:15 149:7
149:21 150:22
151:9,16 152:8
164:19
**standards**
131:16,19
132:18,19
135:12,13
136:10 148:18
151:17 165:12
211:7 213:10
213:13 214:2,3

266:9 274:13
314:5
**stanley**  269:24
**start**  80:7,8
111:8,19
208:17 245:20
263:24,25
269:9 276:14
325:2
**started**  80:7,17
136:4 157:15
157:16 216:5
217:9 246:12
247:22 267:18
276:22 278:16
300:22 302:2
326:18
**starting**  74:15
199:5,21
200:20 229:13
233:22 309:11
309:12,12,14
314:2
**starts**  190:8
199:15 228:4
228:18,25
229:14 309:16
**state**  1:19 2:18
8:25 9:13
15:14 35:24
43:2 75:19
77:12 146:20
196:13 216:16
317:16 334:3
335:25

**[stated - study]**

**stated** 18:16
77:13 117:15
118:16 119:6
132:22 133:15
142:1 143:10
161:19 207:24
277:7 305:13
306:16 316:10
**statement** 5:16
5:18 16:9
53:11 72:13,14
73:6,9,18,19
76:7 79:2,7,7
79:21,24 83:7
83:17,21,23
84:20,23 87:15
88:16,18
112:20 115:12
116:23,24
117:20,24
118:6 119:11
121:16 122:8
132:9 148:24
153:13 155:5
159:9 164:1
167:6 168:15
169:12 170:11
170:14 186:25
187:2 200:3
202:18 292:14
292:23 294:17
295:13 305:4
309:21 310:11
316:11,15
326:5 329:25

330:3,14,14
331:17
**statements**
17:24 73:12
104:10 119:15
122:16 132:13
132:14 137:1,3
146:25 171:10
219:16 229:14
230:2 238:18
263:18 295:22
309:3
**states** 1:1 8:16
75:3 80:13
84:8 149:9
174:25 207:1
**stating** 17:19
75:14 146:21
161:12 295:8
295:12 306:11
**statistical**
281:18
**status** 161:18
253:17 291:9
**statute** 148:2
**stay** 275:25
**staying** 275:8
**stenographic**
1:16 9:2 334:5
**step** 15:14
46:20,20,21
82:4 101:14
229:23
**steps** 47:25
78:10 101:19

102:14 227:20
234:8 292:18
302:6 319:12
**steve** 2:12
284:3,12
287:10 288:8
291:16 315:21
**steve's** 332:21
**steven** 3:9
288:24
**stick** 144:4,6
**stilted** 200:17
**stipulate** 156:1
312:21 314:11
**stipulated** 32:4
79:12
**stipulates** 48:5
48:6
**stipulating**
47:10
**stipulation**
32:1
**stipulations**
152:12
**stop** 57:4,19,23
58:8,14 62:22
76:20,21
144:21 181:19
193:23 198:25
199:2 226:3
289:15 330:10
**stopping**
116:13
**story** 103:24,24

**stoy** 4:2
**straight** 9:19
**straightforward**
291:5
**strategic** 249:4
**strategy** 255:16
**street** 2:14,18
3:15 4:3,18
**strength** 149:7
149:12 212:5
215:8 273:15
**strengths**
109:22
**strictly** 242:25
301:6
**string** 197:3
**strong** 283:11
**structure** 92:17
92:19,20 93:10
93:17 246:4
**structures**
26:11 92:12,16
**studies** 22:22
34:10,23,23,25
35:1 54:13,13
54:20 55:20,22
59:20 107:11
108:20 110:7
110:12,24
111:3 112:1,7
175:20,23
273:2,13 279:6
282:25
**study** 23:3
38:14,17,17,18

**[study - table]**                                                      Page 81

54:21 109:12
112:9,11 175:8
183:23 273:2
279:9,10,12,13
279:17
**studying**
272:15
**stuff** 116:15
**sua** 58:13
**subject** 10:24
**subjective** 88:2
88:2
**subjects** 290:12
**submissions**
96:25 240:1
**submit** 239:17
243:6 257:3
**submitted**
266:25
**submitting**
128:2
**subscribe**
28:25 29:2
**subscribed**
335:22
**substance**
164:7 283:4
**substances**
237:8
**sufficient** 13:12
33:6 126:24
275:16 289:22
290:3 293:13
294:16,19

**suggest** 184:8
**suggested** 58:7
58:14 133:17
234:1
**suggesting**
233:23
**suggests** 185:4
**suite** 2:9 3:10
4:13,18
**summarize**
296:4 322:3
**summary**
110:18 146:12
146:13 263:16
**sun** 199:10
**supplement**
239:17 243:5
**supplemental**
127:25
**supplements**
309:18
**supplied** 156:5
**supplier** 48:17
298:24 299:18
299:19 301:22
301:24 302:12
**supplier's**
300:4,6
**suppliers** 48:16
305:7
**supply** 118:14
**supplying**
184:14
**support** 139:5
207:18,25

274:1 282:12
**supposed** 16:20
36:1 37:4 65:7
118:24 145:13
151:19 171:2
212:8
**supposedly**
139:21 150:21
154:18
**sure** 29:1,25
35:3 48:15
52:5 59:7 71:5
93:12 121:11
121:23 129:7
134:8,22,23
137:18 138:14
151:20 152:6
156:22 165:7
176:2,13 177:8
191:9 203:18
213:19,24
254:2 268:9
269:17 274:24
275:25 276:2
284:9 286:17
287:20 290:24
291:4 296:5
305:14 330:18
**surely** 191:22
**surprise** 232:1
**surprised**
271:19
**surround**
204:20

**surrounding**
318:21
**surveillance**
85:22 137:8
**surveilling**
84:19
**susceptibilities**
68:11 111:5
**sustainable**
271:18
**swear** 9:3
**switch** 36:4
**switching**
35:22
**sworn** 9:6
130:4 334:6
335:22
**system** 21:24
21:25 111:12
137:10 139:25
140:1,2,5
232:20 237:1,1
237:2
**systems** 132:21
139:19 159:2

**t**

**t** 9:5,5 130:1,3
130:3 334:1,1
335:1,1
**tab** 180:9
187:11 190:10
190:17
**table** 110:10
193:14 196:3
196:20 282:8

**[tablet - teach]**                                              Page 82

| | | | |
|---|---|---|---|
| **tablet**  212:11 | **takes**  133:10 | 285:19 289:17 | 231:13 235:25 |
| **tablets**  149:12 | **talc**  97:2,4,14 | 312:2 325:20 | 236:3 250:9 |
| 149:13 | 97:17 254:1 | 330:8 | 267:13 275:4 |
| **take**  8:10 13:25 | 261:17 262:4 | **talked**  29:22 | 276:5 286:11 |
| 14:11 18:4 | 262:13 283:9 | 36:16 77:10 | 303:18 304:5 |
| 37:4 68:22 | **talk**  11:11,21 | 102:25 147:6 | 305:9 319:24 |
| 73:25 74:2 | 16:15 19:7 | 161:13 170:2 | 320:1 321:22 |
| 83:10 91:23 | 22:12 27:24 | 179:18 236:20 | **talks**  107:10 |
| 102:12 113:22 | 28:2 35:20 | 259:10 264:5 | 110:3 133:2,3 |
| 114:18,24 | 37:5 38:12 | 274:5 275:7,24 | 147:18 154:14 |
| 116:13 118:22 | 42:22 45:16 | 279:17 286:20 | 164:8,9 199:10 |
| 121:5 135:11 | 46:18 53:25 | 299:16 308:3 | 202:15 214:7 |
| 156:20 159:20 | 56:16,23 60:14 | 314:20 | 214:25 215:5 |
| 160:1 171:3 | 61:4 62:7 | **talking**  15:24 | 228:12,13 |
| 180:23 188:12 | 65:24 92:1 | 17:22 28:3 | 236:12,17 |
| 198:20,24 | 103:16,19 | 32:5 34:14,20 | 238:20 243:1 |
| 210:20 217:12 | 111:24 113:23 | 34:21 35:21 | **tara**  3:18 |
| 223:17 233:20 | 123:7 131:7 | 51:5 56:18 | **tara.kohli**  3:21 |
| 245:9 265:17 | 132:10,12 | 57:14 58:20 | **target**  87:9 |
| 266:3 274:23 | 137:4 139:11 | 59:2 60:6 | **tasks**  45:8,11 |
| 275:19 302:3 | 142:6,6 145:11 | 61:21 62:6 | **taught**  104:11 |
| 304:17 319:9 | 145:13,16 | 63:1,2,12 | 229:25 |
| 320:23 | 151:6 154:8,10 | 74:11 107:14 | **tax**  251:7 |
| **taken**  1:17 24:6 | 155:11 159:17 | 116:5 121:20 | **taxes**  248:12 |
| 69:1 90:21 | 161:1 165:11 | 121:25 134:14 | 250:3 |
| 102:3 117:24 | 166:25 167:18 | 136:11 158:14 | **taxotere**  252:9 |
| 141:1 142:17 | 170:5 175:9,12 | 158:14 166:20 | 252:23 |
| 160:9 172:8 | 178:15 188:20 | 166:21 169:15 | **tea**  25:15,19 |
| 188:5 192:4 | 208:14 210:14 | 172:16 173:24 | 227:14 228:6 |
| 194:17 223:21 | 211:15 214:3 | 177:15 192:17 | 228:13,24 |
| 245:14 292:18 | 215:18,24 | 193:8 196:3 | 229:4,6,19 |
| 297:10,12 | 217:18 237:4 | 201:5 203:19 | 230:11,23 |
| 317:24 321:7 | 243:2,22 | 204:2,3 222:23 | 231:1 |
| 324:24 326:19 | 262:21 279:8 | 225:15,15 | **teach**  263:22 |
| 334:12 | 281:22,23 | 229:11 231:11 | 264:2 276:4,4 |

**[teaching - testimony]**                                    Page 83

| | | | |
|---|---|---|---|
| **teaching**  230:3 | 216:1 219:20 | **tenets**  33:22 | 191:1 214:3 |
| **teams**  9:16 | 234:5 244:7 | **term**  34:2 | 217:9,10,14 |
| **technical**  194:5 | 245:10 250:5 | 49:21 52:21,22 | 219:7 220:12 |
| 194:24 | 250:13 251:7 | 54:6,9 71:8,13 | 232:16,17,19 |
| **technicals** | 257:15 264:11 | 71:16 87:21 | 234:15 235:12 |
| 200:11 | 265:13 269:23 | 119:2 133:25 | 239:16 241:22 |
| **technological** | 271:21 276:17 | 135:20 153:18 | 246:9 248:13 |
| 194:3 | 291:2 293:21 | 154:1 232:22 | 258:4 262:13 |
| **technologies** | 296:10 299:7 | 233:8 235:20 | 274:3 275:12 |
| 255:11,12 | **telling**  48:12 | 236:2,5 239:13 | 285:17 288:15 |
| **technology** | 62:5 67:4 | 242:16 | 294:9 297:5 |
| 249:6 | 71:20 106:16 | **terminated** | 301:1 302:17 |
| **tell**  18:7 27:20 | 106:25 112:20 | 229:4 | 305:18 319:23 |
| 33:12 35:12 | 114:20 118:21 | **termination** | **tertiary**  26:22 |
| 37:13 40:23 | 122:23 142:11 | 161:23 | **test**  38:17 55:7 |
| 45:12 51:2 | 153:22 154:15 | **terminology** | 55:7 75:9,20 |
| 54:5 61:25 | 155:1 162:3 | 241:12 | 77:4,19 85:17 |
| 68:12 77:22 | 176:3,13 | **terms**  18:8 | 85:19 87:6 |
| 93:1 103:23 | 201:22 214:18 | 25:22 27:2 | **tested**  111:12 |
| 105:20 106:9 | 225:3 234:5 | 32:6 38:25 | 124:20 |
| 106:22 108:10 | 276:22 280:2 | 39:1,19 46:22 | **testified**  9:7 |
| 108:14 110:20 | 325:21 331:25 | 47:20 48:11 | 12:9 39:21 |
| 112:4,6 117:25 | **tells**  92:10 | 52:5,17 58:2 | 100:5 130:5 |
| 121:9 123:10 | 219:15 251:10 | 65:20 88:10 | 146:1 179:6,13 |
| 124:6 137:18 | **template** | 102:2 103:20 | 203:11,11 |
| 139:4 155:7,14 | 262:23,25 | 109:25 113:17 | 205:25 206:4 |
| 155:17 156:4 | **ten**  8:2 40:13 | 117:9 122:15 | 217:7 218:6 |
| 157:4,5,5,24 | 41:11,13 47:24 | 124:16 132:15 | 232:9 234:11 |
| 164:3,3,25 | 66:2 68:6 | 139:17,23 | 242:2 254:24 |
| 165:1 175:11 | 176:9 192:24 | 140:7 148:10 | 259:19 260:6 |
| 178:11 180:23 | 195:19,21 | 154:21 157:13 | **testifying**  15:7 |
| 181:3,11 | 199:3 245:9,19 | 160:17 164:14 | 17:6 |
| 184:18 185:9 | 329:1 | 165:6 170:23 | **testimony** |
| 189:13,22 | **tend**  99:5 174:1 | 171:8 175:15 | 24:25 31:20 |
| 201:20 208:3 | | 180:2 185:23 | 38:4 85:13 |

100:13 118:15
125:12 126:10
134:23,24
138:12,20
139:15 152:11
179:6,22 183:7
184:11 186:17
187:3,7 189:3
189:24 197:18
200:14 202:25
206:10 218:8
241:16 242:1
256:19 270:23
285:11 333:5
333:13 335:2
**testing** 23:4,22
77:1 81:5,7
84:10,15,18,18
85:4,10,15,22
85:23 86:13,21
87:1,11 89:13
93:21 124:22
137:6 144:24
185:5 205:5
272:16 314:5
**tests** 77:16,17
78:4 185:1
**tetrahedron**
28:4,15,22
29:4,10
**teva** 3:8 48:9
48:15 125:6
154:17 284:4
284:14,14
285:1,3,9,12,14

285:15 286:3,9
289:2,10,18,23
290:5,9,25
291:8,13,15
292:3,24 293:1
293:15,20,22
294:2,22 295:8
295:18 296:2
296:16,19,21
296:24 297:2,9
297:18 298:5
298:10,14,18
298:23 299:17
299:20 300:5
300:10,12,15
301:23 302:6
303:11 304:6,8
304:23 305:2,5
305:19 306:11
306:18,20
307:16,17
308:14,15
310:2 311:20
312:16 316:18
317:25 318:8
318:14,21
319:9,11
321:25 323:3
323:18 328:7
**teva's** 286:25
292:18 298:15
298:19 300:2
301:7,21
302:11 307:8
308:17,17,20

**texas** 1:15
247:21,25
248:9,14
**text** 75:13 76:5
218:11 311:4
**textbook** 28:3
28:12 29:9
92:22 179:3,9
179:11
**textbooks**
26:13,14 53:21
104:12 106:5
107:2 217:17
218:18 282:20
**thank** 9:11
14:23 69:5
187:16 200:6
274:25 287:21
288:7 322:18
328:21 331:11
331:22
**thanks** 160:5
284:12 288:7
**thee** 25:23
297:7
**theirs** 136:8
**theme** 194:24
**theoretical**
279:20
**theories** 38:20
**therapeutic**
150:17 162:6
**therapeutically**
148:8 161:15

**thing** 36:16
50:2 53:13
56:16 60:24
64:1 127:18
173:21 197:1,8
208:22 240:15
263:25 273:13
276:4 279:3,4
280:11
**things** 31:22
34:7 45:6
46:10 47:2,22
48:3,18 56:19
57:11,12 58:21
58:25 62:3
63:5 64:9,17
64:23 85:8
88:12 90:5
102:8,13
109:23 114:19
116:14 124:12
127:20 131:2
132:11 133:10
134:17 136:10
136:11 137:5
137:10 139:23
141:10,12
142:15 145:2
145:21,21
146:3 155:12
161:14 163:10
171:7,9 176:6
188:22 189:10
193:9 203:16
210:2,16 212:4

HIGHLY CONFIDENTIAL

**[things - time]**                                             Page 85

| | | | |
|---|---|---|---|
| 219:14 227:6 | 106:2,7,9 | 291:4,19 | 251:15 298:5 |
| 228:10 234:15 | 120:25 122:9 | 295:22 296:1 | 320:21 324:15 |
| 235:2,4 236:25 | 123:17 124:5 | 296:19 300:8 | 325:6 328:25 |
| 240:19 241:2 | 125:16 139:11 | 304:2 307:12 | 330:21 332:6 |
| 248:12 252:17 | 141:14 146:16 | 320:19 322:20 | 332:11,16 |
| 252:24 258:11 | 146:20,21,24 | 324:17 332:13 | **threshold** 34:6 |
| 258:13 263:11 | 151:16 156:12 | 332:18,22 | 34:6,9,12 |
| 273:8 275:18 | 158:1 165:17 | **thinking** 43:13 | 103:3 113:6 |
| 275:21 278:3 | 171:12 177:6 | 131:18 133:13 | 114:8 175:10 |
| 278:12,24 | 177:13,14 | 135:2 159:3 | 224:12,22 |
| 281:20 292:16 | 178:14 179:16 | 221:17 222:11 | **thresholds** |
| 294:6,14 | 179:17,17 | 222:12 | 314:7,23 |
| 299:18,19,24 | 180:8 185:20 | **third** 74:7 75:3 | **thursday** 1:12 |
| 319:1,19 322:6 | 190:7 191:6 | 114:25 170:8 | 1:20 |
| **think** 9:18 | 198:7,24 | 195:22 228:25 | **tied** 231:19 |
| 12:19 15:4 | 199:14 200:20 | 317:16 | 308:2 |
| 18:9,10 19:7 | 200:21,23,25 | **thirty** 86:22,23 | **ties** 311:11 |
| 21:4 22:23 | 205:12,13 | **thoroughly** | **till** 269:18 |
| 23:12 29:21 | 208:2 209:6 | 109:13 138:19 | **time** 8:25 9:17 |
| 33:10 38:8 | 213:1,25 | **thought** 83:2 | 13:18 20:17,19 |
| 41:11 42:1 | 215:20 216:2 | 150:4,7,8 | 20:24,24,25 |
| 43:25 44:25 | 218:20 226:2 | 155:7 160:3 | 21:11 30:9 |
| 45:10,10 46:2 | 226:13,25 | 181:5 185:22 | 37:9 40:13 |
| 46:2,12 47:5 | 228:10 229:24 | 197:5 213:21 | 42:24 44:3,9 |
| 49:21 50:11 | 230:15 232:2,6 | 215:4 222:20 | 44:12,15,18,21 |
| 53:11 57:7 | 232:12,23,24 | 226:4 236:10 | 51:6 62:20 |
| 62:15 63:10 | 232:24 236:2 | 242:2 259:20 | 68:24 69:3,21 |
| 64:1,8 67:16 | 236:22 237:9 | **thousand** 56:1 | 72:23 73:1 |
| 67:22 69:14 | 239:23 242:23 | 66:2,2 68:6,6 | 74:1,2,23 75:9 |
| 73:4 74:18 | 245:7 253:20 | 169:2,8 175:7 | 77:17 83:10 |
| 75:22,23 79:19 | 253:21 254:25 | 176:8,9 | 88:20 90:19,23 |
| 84:4 86:16 | 258:9 264:13 | **three** 3:14 | 96:4,7 116:4,8 |
| 87:8,17,18 | 266:21 279:1 | 37:20 138:4 | 119:24 121:19 |
| 88:3 99:9,9,15 | 280:9 283:20 | 193:2,12,17 | 125:8 129:10 |
| 100:14 105:20 | 285:16 287:9 | 236:15 249:10 | 130:7,7,24 |

HIGHLY CONFIDENTIAL

**[time - torrent]**                                          Page 86

| | | | |
|---|---|---|---|
| 138:9 142:8 | 283:19 284:18 | 92:2 118:15 | 119:6 120:6,17 |
| 156:20,25 | 287:18 289:8 | 119:14 146:1 | 146:7 169:2 |
| 157:3,4,5,8,10 | 289:12 295:3 | 147:21 169:16 | 172:11 209:13 |
| 158:17 160:7,7 | 299:23 301:5 | 179:13 198:4 | 210:6 246:2 |
| 160:11,11 | 303:21 312:11 | 202:10 210:8 | 302:6 317:18 |
| 165:19 169:5 | 313:4,13 | 216:10 232:7 | 319:13 326:3 |
| 169:15 171:10 | 320:18 321:5,5 | 258:10 264:5 | **tool**  88:9 141:1 |
| 182:1,5,9 | 321:9,9 324:5 | 285:17 289:13 | **top**   24:23,25 |
| 185:1,11 188:4 | 324:8,23 325:1 | 295:21 305:5 | 40:18,19 42:6 |
| 188:7,11 192:3 | 325:1,12 327:6 | 328:13 | 42:10 87:7 |
| 192:6 194:11 | 327:20,25 | **today's**  333:12 | 90:14 123:22 |
| 194:16,19,19 | 328:4 333:4,11 | **together**  26:18 | 157:23 188:21 |
| 195:4 199:11 | 333:12,16 | 103:23 126:1 | 189:6,8 190:17 |
| 203:22 207:11 | **times**  26:14 | 137:7 236:15 | 190:25 195:2 |
| 208:19,22 | 55:7 64:11 | 247:5 255:15 | 229:1 231:23 |
| 212:22 214:18 | 93:25 109:20 | 271:6 279:8 | 233:17 237:5 |
| 215:16 218:24 | 122:10 133:11 | **told**  33:13 | 251:16 265:13 |
| 218:24 219:21 | 134:5 146:5 | 55:16 57:4,8 | 288:10,23 |
| 220:12,17,22 | 156:24 157:21 | 57:18,22 58:1 | 314:2 316:19 |
| 220:23 223:19 | 158:8 159:18 | 63:9 65:6 | **topic**  263:23 |
| 223:19,23,23 | 196:24 200:10 | 71:24 103:1,24 | **topics**  30:15 |
| 233:21 236:20 | 233:16 235:24 | 120:10 132:24 | **torrent**  4:7 |
| 238:25 245:10 | 236:15 255:10 | 134:13 155:10 | 48:9,15 125:6 |
| 245:12,16 | 258:9 285:17 | 156:2 167:17 | 154:17 285:3,8 |
| 249:21 250:24 | 289:18,19 | 174:14 218:9 | 285:9,13 286:3 |
| 252:11 254:18 | **timothy**  288:25 | 220:15 232:25 | 293:1,20,22 |
| 256:1,2,3,5,6 | **tin**  44:22 46:15 | 244:5 265:9 | 294:2 295:9,18 |
| 256:11,13,23 | 51:17 122:20 | 270:1,3 282:18 | 296:2 300:10 |
| 257:15 260:16 | 124:15 152:3 | 303:9 | 300:12,15 |
| 264:11 265:10 | 157:17 163:17 | **tomorrow** | 305:6,19 |
| 265:11 266:17 | 323:16 | 328:20 333:7 | 306:18 307:18 |
| 267:23,25 | **title**  191:3,4 | **tone**  205:17 | 311:20 312:17 |
| 268:15 269:11 | **tobacco**  99:6 | **took**  14:18 17:9 | 320:16 321:14 |
| 272:12 275:19 | **today**  9:20 29:8 | 18:12 32:13 | 322:10 323:6 |
| 282:21 283:13 | 87:10 91:3,8 | 86:5,9 112:6 | 323:24 |

**[total - turn]**                                                      Page 87

| | | | |
|---|---|---|---|
| **total** 333:13 | **toxicologists** | **transcript** 1:16 | 36:12 56:12 |
| **totality** 105:12 | 54:3 68:1 | 6:12 7:13 | 85:7 86:12 |
| **totally** 190:2 | 108:22 | 197:25 312:10 | 143:16 159:16 |
| 315:19 | **toxicology** | 313:10 334:5 | 180:3 183:7,10 |
| **touch** 275:6 | 10:11 12:23 | 335:2 | 190:4 285:5,7 |
| **towards** 256:22 | 23:21 26:5,20 | **transform** | 285:10 298:15 |
| 264:4 281:17 | 33:22,25 65:19 | 229:19 230:11 | 302:2 322:10 |
| 297:20 | 67:6 86:4 | **translate** | 334:4 335:3 |
| **tower** 4:17 | 102:22 103:16 | 207:12 | **trust** 266:7 |
| **tox** 26:18 | 106:18 111:6 | **translated** | **try** 58:4 68:18 |
| 217:22 | 126:6 244:25 | 127:9,13 | 131:8 141:9 |
| **toxic** 29:6 | 271:3,16 | 206:13 | 155:18 175:10 |
| 146:10,10 | **toxin** 50:21 | **translation** | 199:2 258:25 |
| 173:8,12,22 | **trace** 123:13 | 127:16 206:9 | 280:24,25 |
| 174:7,21 175:1 | 124:1 | 207:9 | **trying** 15:13 |
| 175:13,23 | **trade** 4:18 | **translations** | 47:1 50:14 |
| 238:21 271:10 | 21:12 41:23 | 127:7 206:15 | 62:5 105:23 |
| **toxicant** 54:17 | 95:3 98:11 | 207:10 | 109:10 122:22 |
| 151:25 213:2 | **traditional** | **traurig** 3:10 | 155:15 158:7 |
| **toxicants** 51:11 | 274:6 | 284:4 | 164:3,3 165:13 |
| 131:4 153:14 | **train** 180:14 | **treated** 200:11 | 175:10 176:4 |
| 164:16,17 | **trained** 258:24 | **trees** 198:6 | 196:10 202:21 |
| 238:21 | **training** 21:19 | **trial** 40:6 | 220:2 253:20 |
| **toxicity** 175:17 | 26:20,20 47:17 | 249:10 251:10 | 262:7,12 |
| 239:3 262:8 | 61:14 85:9 | 251:12 279:8 | 264:13 274:14 |
| **toxicologic** | 86:3,8 100:17 | 294:21 | 286:16 296:3 |
| 11:12 | 102:10 104:8 | **trials** 252:22 | 311:11 |
| **toxicologist** | 106:8,11,25 | 273:5 | **turn** 74:6 84:7 |
| 16:2,18 33:18 | 133:7 135:9,25 | **tried** 46:12 | 92:4 98:6,7 |
| 36:25 54:11 | 219:12 263:4 | 148:13 155:7 | 99:3 100:6,14 |
| 55:5 65:11,13 | 274:11 275:11 | 216:2 310:7 | 168:25 172:23 |
| 65:13 66:24 | 275:14,16,22 | **tries** 131:21 | 180:6 187:11 |
| 67:5,12 108:25 | 276:25 277:5 | **trouble** 17:12 | 200:18 222:6 |
| 170:4 223:2 | 278:16,23 | **true** 11:12,13 | 309:6 330:22 |
| 281:15 | 281:14 | 31:5 33:24 | |

**[turning - understanding]**                                                Page 88

turning   80:12
  292:1 297:17
  305:22 315:23
turns   100:1
  194:10
twelve   195:24
  195:25 196:2,4
  196:6 256:10
  256:10
twice   204:13
twitter   248:16
  248:17
two   10:13 28:7
  67:6 91:12
  104:14 138:4
  149:18 150:16
  161:14 169:17
  177:11 194:6,8
  195:6,14 220:2
  222:9 223:10
  228:2,20
  230:20,22
  247:2,20,22
  251:15 252:17
  252:24 260:18
  264:10 273:8
  292:5 298:4
  301:6 311:18
  321:2 324:13
  324:17 325:4
  327:3 328:24
  329:2,3,5,6,12
  329:12,20
  330:17 331:15
  331:16,19,21

  332:1,9,23,25
type   32:25
  52:13 95:3
  111:17 128:13
  213:2 260:21
  264:17 273:25
  307:14
types   15:2 26:6
  48:25 52:11
  53:22 68:12
  104:21 162:17
  175:17 197:4
  205:5 211:7,17
  212:2 237:18
  243:3 281:6
typical   20:17
  127:8 144:10
typically   12:17
  34:9,24 38:23
  39:18 55:5
  57:12 58:19
  96:21 102:20
  103:14 106:21
  106:21 121:19
  126:3 134:19
  141:2 143:4
  148:16 206:17
  220:5 226:14
  263:15 265:4
  266:4 290:15
  303:4

**u**

u   9:5,5 130:3,3
  259:9 335:1

u.s.   19:2 75:8
  96:22,22
  101:10 169:6
  214:25 225:1
u.s.c.   214:25
um   26:4 189:12
  196:12 200:22
  206:23 270:25
  291:7
unacceptable
  36:1 61:18
  65:8 122:18
  161:2 171:3
  174:4
unbilled   256:1
uncontrolled
  225:11
under   39:13
  51:7,19 56:6
  95:19 125:6
  147:7,16,16
  149:2 163:6
  224:19 225:1
  229:19 240:12
understand
  9:23 15:5,15
  27:3 31:15
  41:7 46:19
  47:2 48:2,2,17
  50:5,11,14
  52:1,5 78:1,20
  79:1,9,25 80:2
  80:3 88:25
  100:4 108:17
  119:5 129:5

  132:2 134:22
  134:23 138:15
  146:8 148:15
  149:16 153:1
  153:21 156:21
  164:12 168:5
  174:11 177:4
  178:2,22
  183:19 185:5
  214:9 216:15
  225:5 262:7
  265:5 269:17
  273:7 275:10
  277:4 290:24
  291:13 301:15
  302:17 312:1
  316:21 318:6
  333:6
understanding
  10:7 14:24
  18:19 22:25
  25:22 26:19
  27:7,13 31:9
  36:12,18 38:24
  45:14 46:6,23
  50:21 51:11
  63:22 66:15
  68:18 70:20,22
  71:25 72:2,9
  76:12 89:11
  95:19 118:12
  146:16 153:10
  177:14 185:25
  219:12 220:6
  227:18 228:5

**[understanding - using]**                                        Page 89

244:24 261:2
286:1 290:20
300:16 304:16
304:18 307:21
310:5 312:15
327:12
**understood**
13:8 14:17
42:4 45:21
46:14 78:17
79:3 94:23
170:17 285:19
291:25 317:14
**undertake**
123:25 144:8
**undertaken**
82:6
**undertook**
78:16
**underway**  8:2
**unexpected**
70:6,9,10,13,18
70:20,22 71:1
71:6,8,14,20
72:1,3,7 73:10
**unfortunately**
200:8,16
216:14 257:8
**unidentified**
44:13 157:14
163:6
**unit**  8:12 68:24
69:4 129:10
130:8 160:8,12
194:20 223:20

223:24 321:6
321:10
**united**  1:1 8:15
**university**
255:17 259:14
**unknown**  49:11
182:20 183:4
183:24 184:2,9
184:12,16
185:5,12,18
186:4 188:20
189:5 191:2
192:20 195:3
197:12,14
198:16 201:23
202:3,7,17
203:2,12 204:5
**unnumbered**
296:12
**unresolved**
251:21
**unsolicited**
58:13
**unsurmounta...**
76:1
**untethered**
16:24 17:1
**untitled**  141:7
**unusual**  228:19
**unusually**
173:8
**update**  73:22
83:7 263:4
**upload**  190:19

**usa**  3:8
**use**  11:5 23:4
30:11 32:9
52:23 55:6
60:4 68:1
70:14 88:11,14
88:15 93:23
102:20 103:13
111:8,22
112:10 121:23
133:15 134:6
134:10 135:3,6
135:12,18
136:7 148:14
150:22 154:15
179:24 185:15
220:4 223:3,9
233:16 235:24
236:5 239:13
239:18,19
240:11 242:9
262:23 263:14
291:21 294:5
295:6 317:12
**used**  19:6,12
25:16 27:24
28:2 30:4,15
33:25 34:2
35:3 46:22
52:4 71:9,16
72:1 80:5 83:8
85:17 88:9
100:14,15
102:19,20
103:15 109:19

112:7 124:16
132:20 133:4
154:25 159:13
162:15 163:18
177:11 192:16
192:17 206:16
207:8 218:12
220:5 222:9,13
222:24 233:13
234:3 235:20
236:2,7,8,16
245:23 264:12
282:24 325:22
327:5 333:14
**user**  112:5,6
**users**  12:2
112:3
**uses**  53:16
108:24 133:24
141:2 236:20
239:20 242:16
**using**  24:10
30:6 44:22
51:22 52:14
87:20 92:2
135:20,23,24
136:1 144:3
157:15,16
232:17 233:8
235:10 242:12
249:6 285:15
286:6 287:16
295:7 305:21
306:17 314:21

**[usp - vaughn]**                                                    Page 90

| | | | |
|---|---|---|---|
| **usp**  49:1 50:24 | 21:10,21 22:5 | 322:1,12 | 69:16 71:3,17 |
| 51:5 130:19,21 | 30:13 32:10 | 323:19 324:1,5 | 72:4,16 74:2 |
| 131:16,16 | 33:4 35:13 | 324:8 325:12 | 74:16,20 75:1 |
| 151:10 152:24 | 36:5 37:10,15 | **value**  12:18 | 75:21 77:7,20 |
| 153:6,11,18,18 | 41:20 42:18 | 13:5 | 78:23 79:5,16 |
| 153:24 154:1,7 | 43:15 75:6,7 | **vanaskie** | 79:23 81:10,16 |
| 154:12,13 | 75:10 76:23 | 327:18 328:9 | 82:9 83:10 |
| 155:3,4 160:19 | 77:5 78:22 | 328:20 330:23 | 84:12 85:6 |
| 160:25 162:19 | 80:15,23 81:4 | 331:3 332:5,12 | 87:13 89:6,15 |
| 163:22,22 | 81:9,15 82:24 | 332:17 | 89:24 94:3,18 |
| 164:20 165:2,9 | 110:25 112:3,5 | **variety**  52:10 | 94:23 95:1,6 |
| 166:15 167:5 | 112:6 113:20 | 59:8 100:18 | 97:22 98:25 |
| 167:13,18 | 114:1,7,17 | **vaughn**  2:8 5:6 | 100:3,12 |
| **usually**  80:7 | 116:4,6 118:16 | 11:18 12:3,14 | 102:16 103:6,9 |
| 106:7 240:9 | 119:6,15 120:7 | 13:7,14 14:2 | 105:11,19 |
| 263:24,25,25 | 120:17,23 | 14:21 16:25 | 107:19,21 |
| 297:12 | 123:15 130:21 | 17:10 18:15 | 108:3 111:1 |
| **utilizing**  239:6 | 148:4 149:10 | 24:17 25:7,18 | 114:2 115:6 |
| **v** | 149:11,13 | 26:3,24 27:16 | 116:1 117:21 |
| | 157:8 158:25 | 28:5,23 29:12 | 119:8,18 120:9 |
| **vague**  114:2 | 159:6,10,14 | 30:24 31:19 | 121:17 122:6 |
| 116:1 150:12 | 161:7 162:10 | 32:11 33:7 | 123:16 125:1,7 |
| 175:3,25 177:1 | 162:20 169:3 | 34:1 35:14 | 126:22 127:14 |
| **validated**  48:16 | 170:19 176:18 | 36:7 37:12 | 128:3 129:6,8 |
| **validation** | 176:25 191:1 | 38:3 39:5,12 | 149:22 150:2 |
| 188:20 | 192:18 195:2 | 41:9,21 42:20 | 150:12 151:13 |
| **valsartan**  1:2,5 | 196:21 204:19 | 43:9 45:9 | 157:2 159:24 |
| 8:14 9:25 | 216:9 217:1 | 46:11 48:22 | 160:3 162:11 |
| 10:12 11:6,10 | 229:21 244:12 | 50:10 51:9 | 163:8,25 |
| 11:14,16 12:2 | 244:17,21,24 | 54:7 55:14 | 164:24 167:16 |
| 12:10 13:12,17 | 252:8 291:12 | 56:10 57:6,25 | 168:4,17 |
| 13:25 14:3,4,5 | 304:24 306:4,8 | 58:10,17 59:6 | 170:20 171:14 |
| 14:6,9,11,15,18 | 309:13,14,17 | 60:10 62:16,24 | 171:17,20,25 |
| 15:8 16:5,21 | 310:3,12,20,25 | 63:14,19 65:16 | 172:12 174:10 |
| 17:8,15,25 | 311:16 317:20 | 66:12 67:21 | 175:3,25 |
| 18:12,21 21:7 | | | |

**[vaughn - vitro]**                                                      Page 91

| | | | |
|---|---|---|---|
| 176:19 177:1 | 271:14 272:3,6 | **velez** 2:8 | 320:21 321:4,8 |
| 177:19 180:16 | 272:11 273:20 | **venice** 247:13 | 324:22,25 |
| 181:6,10,14,17 | 274:22,25 | **ventura** 247:23 | 333:10 |
| 184:1,10,17 | 275:3 276:10 | **veritext** 8:19,21 | **videotaped** |
| 185:6,19 | 276:20 277:10 | 333:15 | 1:10 288:12 |
| 187:16 193:7 | 277:18,23 | **version** 206:11 | **view** 45:18 |
| 194:8,12,14 | 279:23 281:8 | 206:13,13,16 | 69:17 71:20 |
| 196:8 198:10 | 282:5 283:6 | 206:18 | 72:8 77:14 |
| 204:8,12 | 284:12 285:6 | **versus** 34:5 | 89:8 110:20 |
| 205:16 209:4 | 287:1,9,18,21 | 56:23 61:12 | 134:18 164:9 |
| 209:10 210:9 | 289:25 291:16 | 62:7 124:16 | 280:10 283:14 |
| 213:15 214:11 | 291:25 292:20 | 132:14 170:4 | 308:8 |
| 216:12 218:7 | 293:16 294:25 | 176:8,9 239:21 | **viewed** 132:23 |
| 221:20 224:6 | 299:3,13 300:7 | 239:21 241:15 | **views** 214:9 |
| 227:24 230:14 | 301:25 302:13 | 259:1 262:13 | 248:18 |
| 231:2,10 | 303:2,14 | **vicinage** 8:17 | **violated** 147:1 |
| 233:20,25 | 304:10 305:1 | **victoria** 3:9 | 147:2,21 |
| 234:4 237:14 | 305:10 306:15 | 328:21 | 159:10,11 |
| 238:1,8,14 | 306:23 307:10 | **video** 8:9,12 | 310:21 312:22 |
| 239:15 240:6 | 308:22 310:22 | 291:17,18,20 | **violates** 312:3 |
| 240:13 241:13 | 312:6,24 | **videographer** | **violation** |
| 242:21 243:18 | 313:13,21 | 4:22 8:1,19 | 147:14 159:4 |
| 244:3 245:17 | 314:16 315:21 | 68:23 69:2 | 212:25 214:10 |
| 248:11 251:4 | 317:1 318:9,16 | 72:22,25 90:18 | **violations** |
| 252:2,6,14 | 318:24 319:15 | 90:22 96:3,6 | 159:2 211:1,4 |
| 253:1,9,11,15 | 320:5,18 321:1 | 129:9 130:6 | 211:10,16,17 |
| 254:4,10,21 | 322:19 323:2 | 160:6,10 | 211:22 212:2,5 |
| 255:3,21 | 324:11,16,21 | 181:25 182:4 | 212:14,15 |
| 257:23 258:18 | 325:2,8,11 | 188:3,6 192:2 | 214:3,5 215:12 |
| 259:4,6,23 | 326:9,12,15,25 | 192:5 194:12 | 215:17 |
| 261:24 263:10 | 327:5,8,15,19 | 194:15,18 | **virtual** 260:24 |
| 264:8,19 265:7 | 328:3,11,21 | 223:18,22 | **virtually** 8:5 |
| 265:20 267:9 | 331:8,21 332:2 | 245:11,15 | **visible** 302:24 |
| 268:6,18 270:8 | 332:13,15,18 | 287:20 288:5 | **vitro** 34:24,25 |
| 270:10,14,18 | 332:23 | 313:15,19 | 54:13 273:2 |

HIGHLY CONFIDENTIAL

**[vivo - weighing]**

**vivo** 34:24
226:17,19
**voice** 266:20
**voluntary**
144:2

**w**

**wait** 252:19
330:5
**waiting** 190:19
194:11 245:20
**walk** 290:24
291:24
**wallack** 3:4
**walsh** 3:14
**want** 13:10,21
16:11 23:2
27:8 33:19
37:1,3 43:10
46:19 52:5
68:13 73:23,25
91:22,24 92:1
93:4 111:11
117:12 118:14
119:4 125:8
131:7 137:25
137:25 138:14
139:3 159:20
161:8 165:24
166:3,4,10
168:13 170:1
171:12 176:3
183:15 191:14
194:1 198:18
204:13 227:11
228:9,11

229:10 233:18
235:5 245:17
254:5 279:12
284:19 288:4
291:2,3 296:10
301:23 313:23
322:15 327:8
328:1,11,22
**wanted** 163:1
169:1 276:8
284:9 290:21
305:14
**war** 330:23,25
**warn** 32:9
317:18 319:9
**warning** 43:4,6
43:7,10,12
139:24 140:21
140:24,25
141:5,6,11,15
141:18 142:1,7
142:23 143:1,5
143:11,17
144:1,9,13,15
144:17,18,20
158:13,16,19
158:23,24
159:1 209:2,14
209:20 210:7
210:22 211:19
212:16,18,20
215:14 216:24
217:2,3,6
219:16 224:25
239:22 241:23

243:1 326:4
**warranty** 311:5
**washington**
3:20
**way** 10:17,18
13:19,20,22
17:11 20:18
24:6 34:4
53:23 56:13
64:12 67:5
68:19 71:15
74:25 80:25
82:1 87:6,14
87:19 99:18
108:15,16
120:2,11
127:17 133:12
146:20 151:4
156:3 159:7
169:14 170:13
185:24 228:17
235:5 258:20
263:19,23
266:10 276:23
278:3,13 279:2
279:9,14 281:1
281:14,16
283:21 305:11
323:12
**ways** 27:3 67:6
79:10 99:5
101:11 177:12
255:12 280:24
**we've** 83:1 84:8
84:13 87:21

141:22 151:11
210:7 236:15
245:18,19
260:10 305:9
309:25 326:18
**weaknesses**
109:22 273:15
**web** 92:11
**webinar** 271:3
271:13
**website** 41:23
64:19 74:17,21
91:16 92:14,16
92:18 93:3,4,9
95:12 118:10
118:21 119:21
119:22 128:12
128:13 137:1
153:11 158:18
160:25 318:25
319:3,5 322:7
**websites** 94:1
**week** 63:4,17
312:10,12
**weekly** 102:13
**weigh** 117:8
**weighed** 104:20
104:24 105:3
105:17 106:15
106:15,17
107:18 108:2
219:7
**weighing**
103:23 104:9
218:14,25

HIGHLY CONFIDENTIAL

**[weighing - world]**                                    Page 93

| | | | |
|---|---|---|---|
| 220:5 | **winded** 324:20 | 295:6,7 | 283:10 301:1 |
| **weighs** 60:17 | 325:21 331:6 | **words** 19:6,13 | 315:11,14 |
| **weight** 103:4 | **withheld** | 35:5 65:22 | **worked** 19:14 |
| 103:13,14,17 | 155:21,23 | 72:10 81:25 | 23:9 24:9 26:7 |
| 103:19 104:12 | **witness** 1:14 | 87:24 93:15 | 26:15 29:4 |
| 104:18 105:7 | 5:2 8:8 9:3 | 98:5 143:17 | 39:22 40:11,14 |
| 107:7 108:4,5 | 31:24 69:10,18 | 179:21 196:1 | 125:11 127:9 |
| 108:13,15 | 103:8 149:25 | 197:6 199:16 | 134:19 222:15 |
| 109:7,9 218:5 | 159:22 181:13 | 199:17 213:11 | 224:9,16 226:8 |
| 218:21 219:6 | 197:20 203:11 | 304:14 314:21 | 232:5 236:15 |
| 219:21 220:1,4 | 252:5 254:17 | **work** 16:1 20:5 | 247:5,9 248:23 |
| 223:8 | 259:11 270:22 | 20:7,10 23:12 | 249:9 251:9 |
| **went** 27:23 | 272:5 297:2,11 | 23:13,13,16,20 | 253:23 254:3 |
| 43:14 46:15 | 320:24 322:22 | 25:11 29:17 | 254:15 260:9 |
| 150:13 168:3 | 324:20 326:13 | 39:15 40:5,6,7 | 266:8 270:5,10 |
| 181:14 182:9 | 333:4 334:6,16 | 40:9,23 41:14 | 286:19 |
| 195:10 201:10 | 335:21 | 50:3 56:11 | **working** 35:4 |
| 205:22 236:15 | **witnesses** 25:1 | 81:1,12,17 | 39:18 40:10 |
| 247:6 261:19 | 28:10,10 31:21 | 84:24 85:2 | 97:4 135:9 |
| 278:18 282:21 | 297:6,9 | 87:4,9,9 88:6 | 244:9,22 246:8 |
| 288:14 328:24 | **woman** 280:18 | 93:25 96:23,24 | 249:9 252:12 |
| 331:14 | **wondering** | 98:1 100:18 | 252:18 253:4 |
| **west** 3:24 4:13 | 54:8 100:8 | 143:8 156:7,16 | 254:20 257:10 |
| 4:18 | 168:19 | 156:18,18,20 | 263:22 264:25 |
| **whatnot** 107:11 | **word** 43:8 | 174:6 190:4 | 268:15 272:13 |
| **whatsoever** | 53:16 55:6 | 203:6 208:17 | 280:6,7 |
| 160:21 304:23 | 70:22 71:6,25 | 222:12 225:20 | **works** 16:3 |
| **whereof** 334:16 | 72:2 88:14,16 | 227:18 231:7 | 89:12 281:13 |
| **white** 281:5 | 100:14,15 | 236:7,8 255:8 | **world** 26:9 |
| **widely** 30:21 | 133:16 135:3,6 | 255:10,14,15 | 75:5,17 85:18 |
| **wife** 280:18 | 136:1 138:21 | 255:22 263:14 | 89:23 93:22 |
| **williams** | 148:13 159:13 | 266:2,4,10 | 108:16 122:16 |
| 288:24 289:5 | 223:12,12 | 269:8 272:1 | 219:9 274:2,3 |
| **willing** 65:25 | 232:24 233:13 | 278:8,10,19,19 | 274:9 280:4,25 |
| 68:5 | 235:10 240:11 | 278:25 282:9 | 281:1 314:4 |

HIGHLY CONFIDENTIAL

**[world - zinc]**                                                      Page 94

330:23,25
**worry** 37:2,3
38:7 187:14
280:13
**worth** 191:17
**write** 32:14
219:24 237:5
239:5 265:14
**writes** 159:7
**writing** 71:11
238:4 256:15
265:17
**written** 72:5
127:4 204:16
206:8 212:18
265:11,19
292:21
**wrong** 168:24
**wrote** 42:24
125:21 218:24

---
**x**
---

**x** 1:7 259:9
**xue** 206:21
207:12 258:17
259:3,22,24
**xue's** 206:25
**xyz** 141:22

---
**y**
---

**yeah** 41:16
92:25 98:7
199:8,10
223:15 291:2
301:10 309:20
327:16

**year** 20:6,8,9
248:25 249:2
250:2,7,13,13
250:20 251:24
326:7
**years** 21:9 26:5
28:18 39:16,22
40:13 41:11,13
86:6,7,10,20,22
104:17 109:20
116:19 117:17
120:7,17 121:5
122:4 169:4
197:7 207:4
217:23 220:25
222:16,17
236:16 247:2
248:23 249:11
261:20 282:20
**yep** 115:7
**yesterday**
91:11
**york** 3:19,24,24
4:9,9

---
**z**
---

**zero** 111:9
113:6 117:4
**zh** 300:8
**zhp** 3:17 25:1
25:16 28:10
31:21,24 43:14
44:4,12 45:6
47:3 48:6,12
48:14 82:7
118:25 125:5,6

125:11,19
139:19 146:1,4
146:19 147:21
149:10 150:20
152:6,14
154:17,18
155:21 156:25
157:22 159:4
161:7 166:16
166:21 178:20
179:13 182:15
183:4,23 184:8
184:15 185:4
185:17 186:3
189:4,19 190:1
192:15 193:5
196:6,15 197:3
197:8,11,13,15
197:17 202:7
202:23 203:10
203:11,11,24
204:3,6 205:2
205:6 207:8,18
207:24 208:17
208:24 209:13
210:6 216:14
216:24 228:8
229:16 240:4
241:7 242:5,16
242:19 259:11
285:1,11,16
286:6 293:15
293:25 294:4
294:10 295:19
295:20 296:24

296:25 298:16
298:25 300:22
300:24 301:3,5
301:22,24
304:14 306:2
307:5,24 308:1
308:13 311:5
314:4 315:11
317:5 318:22
323:14 328:7
**zhp's** 25:19
90:9 123:15
145:3 206:20
208:11,19
209:1,9,19
216:9 229:14
239:5 240:11
243:8,15
258:16 299:1
300:9 303:12
304:9 306:4,8
306:17,21
308:17 323:4,7
323:10,19,20
323:25 324:1
**zhp00492652**
6:4 180:12
**zhp02118681**
6:10 190:13
**zhp02118712**
6:7 187:19
**zhp02118713**
189:17
**zinc** 228:14

HIGHLY CONFIDENTIAL

**[zmick - zoom]**                                                                    Page 95

**zmick**   4:12
**zoom**   2:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.