Exhibit B

Page 1

1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF NEW JERSEY

3              MDL No. 2875

4

5    ------------------------------x

6    IN RE:

7    VALSARTAN, LOSARTAN, AND

8    IRBESARTAN PRODUCTS LIABILITY

9    LITIGATION

10   ------------------------------x

11

12          VIDEOTAPE DEPOSITION OF

13             LAURA R. CRAFT

14       VIA ZOOM VIDEOCONFERENCE

15           January 12, 2023

16            8:00 a.m. PST

17

18

19

20

21

22

23   Reported by:

24   Maureen Ratto, RPR, CCR

25

Page 2

1          * * *
2
3      Videotape deposition of LAURA R.
4  CRAFT held virtually via Zoom
5  Teleconference, hosted from Veritext
6  Legal Solutions, pursuant to notice,
7  before Maureen Ratto, Certified Court
8  Reporter, License No. XI01165,
9  Registered Professional Reporter,
10  License No. 817125, and Notary Public.
11
12          * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  A P P E A R A N C E S, continued:
2
3  Counsel for Defendant - Humana
4  Pharmacy, Inc.
5      FALKENBERG IVES, LLP
6      230 West Monroe
7      Chicago, Illinois 60606
8      BY:  MEGAN A. ZMICK, ESQ.
9        maz@falkenbergives.com
10
11  Counsel for Defendant - Torrent Pharma:
12      KIRKLAND & ELLIS, LLP
13      1601 Elm Street
14      Dallas, Texas 75201
15      BY:  ALEXIA RENEE BRANCATO, ESQ.
16        Alexia.brancato@kirkland.com
17
18  Counsel for Defendant - Albertson's,
19  LLC:
20      BUCHANAN INGERSOLL & ROONEY, PC
21      227 W Trade Street Carillon Tower
22      Charlotte, North Carolina 28202
23      BY: JONATHAN D. JANOW, ESQ.
24        jonathan.janow@bipc.com
25

Page 3

1  A P P E A R A N C E S:
2
3  Counsel for the Plaintiff:
4      KANNER & WHITELEY, LLC
5      701 Camp Street
6      New Orleans, Louisiana  70310
7      BY: DAVID J. STANOCH, ESQ.
8        d.stanoch@kanner-law.com
9        CONLEE S. WHITELY, ESQ.
10        c.whitely@kanner-law.com
11
12  Counsel for the Plaintiff:
13      MEYER WILSON CO., LPA
14      900 Camp Street
15      New Orleans, Louisiana
16      BY:  LAYNE HILTON, ESQ.
17        lhilton@meyerhilton.com
18
19  Counsel for the Plaintiff - MSP
20  Recovery Law Firm:
21      RIVERO MESTRE, LLP
22      2525 Ponce de Leon
23      Coral Gables, Florida 33134
24      BY: ZALMAN KASS, ESQ.
25        JORGE MESTRE, ESQ.

Page 5

1  A P P E A R A N C E S, continued:
2
3  Attorneys for Defendant - Mylan N.V.:
4      PIETROGALLO GORDON ALFANO BOSCIK &
5      RASPANTI, LLP
6      301 Grant Street
7      One Oxford Centre
8      Pittsburgh, Pennsylvania 15219
9      BY: FRANK H. STOY, ESQ.
10        fhs@pietrogallo.com
11
12  Attorneys for Defendant - Teva
13  Pharmaceuticals USA:
14      GREENBERG TRAURIG, LLP
15      333 SE 2nd Avenue
16      Miami, Florida 33131
17      BY: TIFFANY M. ANDRAS, ESQ.
18        andrast@gtlaw.com
19
20  Counsel for Defendant - ZHP
21      SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
22      500 Boylston Street
23      Boston, Massachusetts 02116
24      BY:  ZACHARY W. MARTIN, ESQ.
25        zachary.martin@skadden.com

2 (Pages 2 - 5)

Page 6

1    A P P E A R A N C E S, continued:
2
3    Counsel for Defendant - Express
4    Scripts:
5      HUSCH BLACKWELL, LLP
6      4240 Duncan Avenue
7      St. Louis, Missouri 63110
8      BY:  MATTHEW D. KNEPPER, ESQ.
9        matt.knepper@huschblackwell.com
10
11   ALSO PRESENT:
12   JUSTIN BILY, Concierge and Legal Video
13   Specialist
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1              LAURA CRAFT
2         VIDEOGRAPHER:  We are going on
3    the record at 8:02 on January 12th,
4    2023.
5         This is Media Unit 1 of the
6    video-recorded deposition of Laura
7    Craft regarding the Valsartan
8    Litigation.
9         My name is Justin Bily
10   representing Veritext and I'm the
11   videographer. The court reporter is
12   Maureen Ratto, from the same firm.
13        All counsel will be noted on
14   the stenographic record.
15        Will the court reporter please
16   swear in the witness and we can
17   begin.
18              * * *
19   L A U R A  R.  C R A F T,  having been
20   first duly sworn according to law by
21   the Officer, testifies as follows:
22   EXAMINATION BY MS. BRANCATO:
23      Q.   Good morning, Ms. Craft.  My
24   name is Alexia Brancato and I am with
25   Kirkland and I represent the Torrent

Page 8

1              LAURA CRAFT
2    defendants in this case.
3         I'm going to be taking your
4    deposition today on behalf of all the
5    defendants, although certain of them may
6    have additional questions when I'm done
7    with mine.
8         So thank you for doing this
9    today. I really appreciate your time.
10        Before we get started, can you
11   just state your full name for the record,
12   please?
13      A.   Yes. My name is Laura Craft.
14      Q.   I know you've been deposed
15   quite a few times and you know what
16   you're doing but just a few reminders for
17   everyone's purposes today.
18        I would like verbal answers,
19   please, so yes or no and no nodding for
20   the court reporter's sake. Is that okay
21   with you?
22      A.   Yes, of course.
23      Q.   And then also, I'm going to
24   try my best not to talk over you -- oh,
25   we might have just lost Maureen.

Page 9

1              LAURA CRAFT
2         THE REPORTER:  I'm here.
3         MS. BRANCATO:  Okay.  Good.
4    Just checking.
5      Q.   Sorry about that. I'm going to
6    try not to talk over you and if you could
7    try not to talk over me and give Dave a
8    chance to object, all, again, for the
9    court reporter's sake. Does that sound
10   okay?
11      A.   Yes.
12      Q.   And if there is any time that
13   you don't understand my questions, please
14   let me know.
15      A.   Okay.
16      Q.   If you do respond to a
17   question I'm going to assume that you
18   understood it. Is that fair?
19      A.   Yes.
20      Q.   Do you have any documents with
21   you in the room today?
22      A.   Yes, I do. I have one copy of
23   my most recent report in this case
24   unmarked but printed out in front of me.
25      Q.   Perfect. And we'll go ahead

3 (Pages 6 - 9)

LAURA CRAFT

1
2  and get that marked in just a minute.
3          And I assume no one else is in
4  the room with you today; is that right?
5      A.   That's correct.
6      Q.   And since we're conducting
7  this remotely I'll just ask that you turn
8  your phone upsidedown and don't use your
9  computer for any other purposes other
10  than this deposition. Is that fair?
11      A.   Yes, it is.
12      Q.   Okay. Great. All right.
13          Ms. Craft, you've been deposed
14  in this case before, right?
15      A.   Yes, I have.
16      Q.   And that was in connection
17  with the report that you issued on
18  November 10, 2021, right?
19      A.   That's correct.
20      Q.   Since that last deposition,
21  have you been retained in any additional
22  litigation matters?
23      A.   Yes.
24      Q.   Can you tell me about those?
25      A.   So first I would direct your

LAURA CRAFT

1
2  attention to my most recent report which
3  has an updated list of the cases in which
4  I've provided expert testimony. There are
5  additional cases since the date of that
6  report which, as you just mentioned, was
7  October of 2022.
8          Would you like me to list
9  those for you?
10      Q.   Yes. Let's start with the
11  cases that are new since October 2022,
12  please.
13      A.   Okay. Sure. I have filed a
14  report in connection with In Re:
15  Tracleer, or I believe it's Bosentan is
16  the proper titling of the case, Antitrust
17  Litigation; I have filed a report in
18  connection with the In Re: Lipitor
19  Antitrust Litigation; I filed, as an
20  administrative proceeding, a report
21  involving the termination of business of
22  a number of substance abuse disorder
23  clinics in California; I have filed, in
24  addition, two reports since that date in
25  connection with a case entitled Behnke,

LAURA CRAFT

1
2  et al versus Caremark, which is a False
3  Claims Act case.
4      Q.   That first case you mentioned,
5  I'm sorry, I didn't catch the drug name,
6  sounds like Bansantin or something?
7      A.   The generic name of the drug
8  is bosentan, which is spelled
9  b-o-s-e-n-t-a-n. It's branded reference
10  drug is Tracleer, T-r-a-c-l-e-e-r.
11      Q.   Okay. Thank you for that.
12          In that case is your report
13  related to class certification?
14      A.   Yes, it is.
15      Q.   And you haven't sat for a
16  deposition in that case yet; is that
17  right?
18      A.   That's right, I have not.
19      Q.   And the In Re:  Lipitor case
20  that you mentioned, is your report there
21  also related to class certification?
22      A.   Yes, it is.
23      Q.   And you have not yet sat for a
24  deposition in that case; is that right?
25      A.   That's correct.

LAURA CRAFT

1
2      Q.   The case or the administrative
3  matters you mentioned about the
4  terminations related to substance abuse
5  clinics, can you tell me what your report
6  is -- the subject matter of your report
7  for those cases or those administrative
8  matters?
9      A.   It's actually singular. It's
10  multiple organizations but one report and
11  the question had to do with the market
12  for in-patient rehabilitation facilities
13  to address substance abuse disorders and
14  the economic explanations for why two
15  operators of such clinics in Southern
16  California ultimately terminated their
17  operations following damage in the
18  Woolsey fire.
19      Q.   And in that administrative
20  matter who have you been retained by?
21      A.   The operators of those
22  facilities.
23      Q.   Is it one operator in
24  particular or is there multiple
25  operators?

Page 14

LAURA CRAFT

1
2    A.    There is a joint ownership
3    structure. There are two separate
4    corporate entities but they have a joint
5    ownership.
6    Q.    And do you expect to be
7    deposed in that administrative matter?
8    A.    I don't believe depositions
9    ordinarily are allowed in that particular
10   set of proceedings, so the answer would
11   be no.
12   Q.    Do you know if those kinds of
13   proceedings ever go to some kind of trial
14   or hearing?
15   A.    Generally not. I don't know
16   whether there are circumstances where
17   they may, but generally not. That's the
18   purpose of the administrative proceeding,
19   is to be able to reduce the time and cost
20   associated with a resolution.
21   Q.    And you mentioned two reports
22   in Behnke, et al versus Caremark. Can
23   you tell me what the subject matter of
24   those two reports was?
25   A.    Yes. The case involves PBM

Page 15

LAURA CRAFT

1
2    processing and reporting
3    responsibilities.
4    Q.    And was your report focused on
5    class certification or another subject
6    matter?
7    A.    That is not a class action.
8    Q.    And who were you retained by
9    in that case?
10   A.    By the relator, who is the
11   plaintiff or counsel -- I'm sorry -- I
12   should speak more correctly.  By counsel
13   for the relator, who is the plaintiff.
14   Q.    What opinions are you offering
15   in that case related to PBM processes and
16   reporting responsibilities?
17   A.    The opinions relate to
18   appropriate reporting of drug prices on
19   PDE and DIR forms submitted to CMS for
20   Medicare Part D plans.
21   Q.    And is the relator's
22   allegation in that case that Caremark, as
23   a PBM, did not properly report drug
24   prices on those forms submitted to CMS?
25   A.    Yes. To be more precise, that

Page 16

LAURA CRAFT

1
2    Caremark either misreported or caused
3    others to misreport.
4    Q.    As part of your expert report
5    in that case -- let me back up.
6          You mentioned there were two
7    reports in that case; is that right?
8    A.    That's correct.
9    Q.    What does each report -- what
10   is the subject matter of each report,
11   each individual report?
12   A.    The subject matter is the
13   same. This was a schedule in which the
14   court ordered simultaneous filings by
15   both sides followed by a simultaneous
16   filing by both sides again. So the normal
17   reply and rebuttal structure wasn't
18   present.
19   Q.    So is the substance exactly
20   the same or are there different, slightly
21   differences?
22   A.    The latter report addresses
23   the initial reports supplied by
24   Caremark's experts. It's -- we were both
25   filing at once and then we were both

Page 17

LAURA CRAFT

1
2    responding to each other's reports, but
3    the subject matter is exactly the same.
4    Q.    And in that case did you reach
5    an opinion as to whether Caremark did, in
6    fact, itself or cause others to
7    inaccurately report drug prices?
8    A.    I'm going to point out that
9    these reports are filed under seal, that
10   they are confidential, that I'm not at
11   liberty to discuss the contents.
12         I can respond insofar as
13   saying the answer is yes, but I'm not
14   going to provide any further details
15   about those reports while they're under
16   seal.
17         MR. STANOCH:  I'll instruct
18   the witness not to do so.
19   Q.    Ms. Craft, I understand your
20   confidentiality opinions. I want to ask
21   one more question about the opinions
22   related to that last one.  If you can't
23   answer, I understand.
24         Did you reach an opinion as to
25   why Caremark itself or causing others to

5 (Pages 14 - 17)

Page 18

LAURA CRAFT

1 LAURA CRAFT
2 inaccurately report drug prices?
3         MR. STANOCH: Objection. And,
4 again, instruct the witness not to
5 divulge any information subject to
6 a confidentiality order in a
7 different case.
8         A.   And I would point out, I don't
9 think I understand your question,
10 Ms. Brancato.
11         If you mean by "why", what is
12 the motivation for doing so? I don't
13 opine on motivations.
14         Q.   And you haven't yet been
15 deposed in the Caremark case; is that
16 right?
17         A.   That is correct.
18         Q.   Do you expect to be deposed in
19 that one?
20         A.   I imagine I will be.
21         Q.   And do you know if it's been
22 scheduled yet or if there are -- I'm
23 sorry. Go ahead.
24         A.   No date has been set for my
25 deposition.

Page 19

1 LAURA CRAFT
2         Q.   Okay. Going back now to cases
3 that you have been retained for between
4 the last deposition you gave in this case
5 and today -- we talked about a few that
6 have happened since October of 2022.
7         If I'm understanding
8 correctly, and you can correct me if I'm
9 wrong, just trying to compare your two
10 CVs, between the first CV attached to
11 your October 2022 report and the CV
12 attached to your October 2022 report, it
13 looks like the only new case is Zydus
14 Worldwide DMC versus Teva; is that right?
15         A.   I only have in front of me a
16 copy of my most recent report.
17         I will take your word for it
18 that Peter Staley versus Gilead Sciences
19 from 2021 was disclosed on the earlier of
20 my two reports, which would mean that you
21 are correct, that Zydus versus Teva is
22 the other case that appears on my October
23 report but did not appear on my initial
24 report in this case.
25         Q.   Since your last deposition

Page 20

1 LAURA CRAFT
2 have you testified at any trials?
3         A.   No.
4         Q.   And since your last deposition
5 have you been deposed at all?
6         A.   I honestly don't remember what
7 the date of my last deposition was
8 vis-à-vis the dates of depositions that
9 are listed on my current testimony list.
10         I can tell you that of the new
11 cases for which I have filed reports
12 since my October 2022 report, none of
13 those have yet involved depositions.
14         As you can see from the CV
15 that is attached to -- sorry -- the
16 testimony list attached to this October
17 2022 report, I have been deposed in Zydus
18 and I believe that deposition took place
19 after my original deposition in this
20 case, but I can't be confident about the
21 exact date. And the deposition that I
22 gave, as listed on my testimony list in
23 Staley versus Gilead Sciences, I don't
24 know whether that deposition occurred
25 before or after my deposition in this

Page 21

1 LAURA CRAFT
2 valsartan matter. But I was, as listed on
3 the -- as is clear from the testimony
4 list, I was deposed in both of those
5 cases, Zydus and Gilead.
6         Q.   Have you written any articles
7 or publications since your last
8 deposition, which I'll represent to you
9 was February 2022?
10         A.   Okay. Thank you for putting
11 that in time for me. The answer is no.
12         Q.   Ms. Craft, what did you do to
13 prepare for your deposition today?
14         A.   I reviewed the most recent
15 report of Tim Kosty; I reviewed the
16 report that I had submitted in this
17 matter in October of 2022; I had a brief
18 conversation yesterday with counsel,
19 David Stanoch; I looked back at a few of
20 the materials cited in my report, in my
21 most recent report, and that's about it.
22         Q.   Your call yesterday with
23 Mr. Stanoch, was anyone else on besides
24 the two of you?
25         A.   No.

6 (Pages 18 - 21)

Page 22

LAURA CRAFT

1
2    Q.    When you say you looked back
3    at a few of the materials cited in your
4    report, in your own recent report, do you
5    remember what documents those were or
6    what materials those were?
7    A.    I recall that I looked at a
8    number of -- or two depositions from
9    SummaCare and EmblemHealth
10    representatives.  Those are the
11    depositions that had previously been
12    listed as materials that I relied upon
13    but I went back and looked at those and I
14    also looked at the data that I had
15    previously been supplied by plaintiff
16    MSP, and I compared it to a more recent
17    production of such claims data that I
18    believe was made by MSP in roughly mid
19    December of 2022.
20    Q.    When you say you looked at
21    data previously supplied by MSP, do you
22    know approximately when that was
23    provided?
24    MR. STANOCH:  Objection,
25    vague. Do you mean supplied to her?

Page 23

LAURA CRAFT

1
2    Supplied in the litigation?
3    Objection, vague.
4    Q.    So, Ms. Craft, I'm trying to
5    understand.  You mentioned that you
6    looked at claims data that MSP produced
7    or that you received in December 2022,
8    I'm not sure.  So I'm just trying to
9    establish what the earlier MSP claims
10    data, if there is a date range on that?
11    A.    The earlier MSP data is the
12    data discussed in my October 2022 report.
13    In that report I explained how such data
14    is collected and what it represents and I
15    referenced the data that MSP had
16    supplied.
17    It is my understanding that
18    after the date of my report MSP produced
19    this same -- effectively the same claims
20    but more detailed fields for those same
21    claims and, therefore, provided a fuller
22    record for each of the claims that had
23    previously been represented in its data
24    production but with a more limited set of
25    fields supplied.

Page 24

LAURA CRAFT

1
2    I do not know the date on
3    which that production was supplied to
4    counsel in this case. I do know that I
5    received it on December 19 of 2022.
6    Q.    When you say claims data from
7    MSP, do you know if that data comes from
8    their PBM or some other data maintained
9    by MSP alone?
10    A.    The data is ultimately sourced
11    with the PBM of EmblemHealth and
12    SummaCare.  The data was supplied by them
13    pursuant to their claim assignment to
14    MSP.
15    So the data is currently, as I
16    understand it, in the possession and
17    control of MSP and was produced by MSP
18    but it is directly traced back to the
19    PBMs who performed claims adjudication
20    functions contemporaneous with the
21    reported purchases having been made on
22    both of EmblemHealth and SummaCare.
23    Q.    EmblemHealth uses Express
24    Scripts as their PBM; is that right?
25    A.    That is my understanding.

Page 25

LAURA CRAFT

1
2    Q.    And SummaCare uses MedImpact
3    as their PBM; is that correct?
4    A.    That's also my understanding,
5    MedImpact having been acquired by Express
6    Scripts.
7    Q.    You mention you did a
8    comparison between the data referred to
9    in your October 2022 report -- 2022
10    report and the data that you received in
11    December of 2022. And that it looked like
12    the December 2022 data had more fields;
13    is that right?
14    A.    That's correct.
15    Q.    Were there any other
16    differences between the two datasets?
17    A.    No, not that I observed. I
18    believe the date ranges were the same and
19    the -- and the underlying transactions
20    represented were the same. There was
21    simply more detail provided about each of
22    those transactions.
23    Q.    And sitting here today, do you
24    recall what the additional detail was?
25    A.    Yes, I do. Would you like me

7 (Pages 22 - 25)

Page 26

LAURA CRAFT

1  to explain what additional types of
2  information were supplied?
3      Q.   Yes, please.
4      A.   Okay. And first of all, let me
5  make clear that the earlier production
6  that we had received also involved a
7  third entity, ConnectiCare. The updated
8  data pertained to the current plaintiffs
9  and what I understand to be a bellwether
10 proceeding, EmblemHealth and SummaCare.
11     So what I looked at before my
12 deposition here was a comparison of the
13 prior production and most recent
14 production for those Emblem and SummaCare
15 claims. And the additional information
16 supplied included numerous fields. I
17 don't recall precisely, off the top of my
18 head, how many fields were in the
19 original production, but it was a
20 small-ish number, something along the
21 order of seven or eight.
22     There are now many many more
23 fields produced and they include things
24 such as dispensing fee and ingredient

*(Line numbers for Page 26: 1–25)*

Page 27

LAURA CRAFT

1  cost and a decomposition of the
2  consumers' cost share into its three
3  potential components, those being the
4  deductible, co-pay or co-insurance.
5      So those elements are provided
6  now specifically so that one can see each
7  of the pieces that contribute to the
8  overall transaction price.
9      Q.   And can you recall any other
10 fields of information?
11     A.   There are -- some of the
12 fields appear, the same content or same
13 value appears in a couple of different
14 fields with readily identifiable names
15 but they are -- they are slightly
16 different names.
17     For example, there are
18 multiple fields that report the
19 ingredient cost for the product. Some of
20 the expansion of fields is merely
21 reporting the same value in different
22 ways, but some of the fields are
23 specifically new values that were not
24 included in the more summary data

Page 28

LAURA CRAFT

1  previously supplied.
2      Q.   Other than doing this
3  comparison between the older data from
4  October of 2022 and the newer data from
5  December of 2022, did you do anything
6  else with the datasets?
7      A.   I had a health economist in
8  our shop format the data so that it was
9  easier for me to review and that was how
10 I then undertook my review. But, no, it
11 was purely for the purpose of examining
12 the data to determine how it conformed
13 with industry standard practices in terms
14 of data supplied by PBMs and whether it
15 was possible to, using this data, to
16 precisely calculate the amount that had
17 been paid by SummaCare and EmblemHealth
18 for prescriptions of the specific NDCs,
19 so National Drug Code products, that had
20 been manufactured by the defendants who
21 are subject to the current bellwether
22 trial. So, in other words, it was a
23 broader set of data originally produced.
24 But my understanding of the current

Page 29

LAURA CRAFT

1  bellwether trial is that it is limited to
2  products manufactured or supplied by
3  three large-name defendants; so Teva,
4  Torrent and ZHP.  And so the data, when
5  it was cleaned, was made available to me
6  to review, including only the -- those
7  particular NDCs.
8      So the data was segmented in
9  such a way that it included only product
10 that was directly attributable to one of
11 the named defendants in this -- in this
12 bellwether case, and that the ability to
13 do that automatically, simply and
14 programmatically is yet another feature
15 of the type of data that is supplied,
16 recorded and supplied by PBMs in this
17 industry.
18     You always know precisely what
19 product is being sold at the end purchase
20 stage and you always know who made it, so
21 there was no ambiguity about doing that.
22 It's an automatic query.
23     I believe a list of the NDCs
24 that were used in that process is the

Page 30

LAURA CRAFT

1    very list that's attached as Exhibit D to
2    my October 2022 report.
3        Q.   You mentioned earlier that the
4    December 2022 data that you reviewed was
5    sourced specifically from EmblemHealth
6    and SummaCare and that any data related
7    to ConnectiCare was removed; is that
8    right?
9        MR. STANOCH:  Objection. Go
10   ahead.
11       A.   It wasn't removed, no. I'm
12   sorry. That's -- that's not correct. It
13   wasn't removed.
14           It was when I had the data
15   just formatted so I could review it I
16   asked that it be restricted to the data
17   for Emblem and Summa because they are the
18   plaintiffs in this -- in this bellwether
19   proceeding.
20           I believe, although -- yeah, I
21   know that ConnectiCare data was still
22   included in the December 2022 data, but I
23   don't believe it had been updated. Its
24   format was basically the same as it had

Page 31

LAURA CRAFT

1    been, but the EmblemHealth and SummaCare
2    data had specifically been expanded to
3    include these additional fields that I've
4    just described.
5        Q.   You mentioned that you asked
6    that the data be restricted to Emblem and
7    Summa because these are the plaintiffs
8    proceeding in this trial.
9            Who actually did the
10   restricting?
11       A.   A healthcare economist in my
12   shop whose named Kevin Chu.
13       Q.   Do you know how he went about
14   doing the actual restricting?
15       A.   I believe it was a simple
16   query by the payor name which appears in
17   two different fields in the data.
18           So EmblemHealth is there as an
19   acronym in one of the fields, and it
20   appears also in a second field. I don't
21   know which of the two fields he used to
22   identify Emblem and Summa transactions
23   but he could have used either one.
24           As explained in the

Page 32

LAURA CRAFT

1    depositions in this case from Emblem and
2    Summa, representatives or -- or a MSP
3    representative, I don't recall which,
4    it's plainly labeled.
5            So I imagine he wrote a single
6    query that instructed that only those
7    where the Emblem and Summa names were
8    present would be included in the
9    segmented data.
10       Q.   Let's go ahead and look at
11   Exhibit -- tab 1, please, which we'll
12   mark as Exhibit 1.
13           (Exhibit 1, notice of
14   deposition was received and marked
15   on this date for identification.)
16       Q.   Ms. Craft, it's on the screen
17   but you should also have the exhibit
18   link, if you want it.
19       A.   So I was supplied with two --
20   let me see if I update if it will show
21   up. Okay, here we go,
22       Q.   You see you have the file from
23   the share link?
24       A.   I do.

Page 33

LAURA CRAFT

1        Q.   Okay. Great. So Exhibit 1 is
2    the notice of videotape deposition of
3    Laura Craft. Do you see that?
4        A.   I do.
5        Q.   And Ms. Craft, have you seen
6    this document before?
7        A.   I don't recall.
8        Q.   If we go to page 5 of the pdf
9    do you see that on page 5 and the
10   following pages there are some requests?
11       A.   I see those pages. What is
12   your question about them?
13       Q.   Did you personally review
14   these requests?
15       MR. STANOCH:  Objection to
16   form.
17       A.   I don't recall whether I
18   personally reviewed them.
19       Q.   And were you personally
20   involved in making sure that documents
21   responsive to these requests were
22   produced?
23       MR. STANOCH:  Objection to
24   form, misstates the record.

9 (Pages 30 - 33)

Page 34

LAURA CRAFT

1
2     Clearly objections and
3  response is timely served by
4  plaintiffs. But go ahead if you can
5  answer, Ms. Craft.
6     A.   I believe your request or your
7  question had to do with whether I was
8  personally responsible for seeing to it
9  that the items described here were
10  supplied. I believe you've previously
11  been supplied with the content described
12  here.
13     We can go through these items
14  one a time if you would like to do so.
15     Q.   Let me do this another way.
16     Earlier this week your counsel
17  produced to us several, a few documents.
18  Were you involved in collecting those
19  documents to be produced?
20     MR. STANOCH:  Objection to
21  form.
22     A.   You would have to tell me what
23  they were for me to know whether I was
24  involved. I have no idea what production
25  you may be referring to.

Page 35

LAURA CRAFT

1
2     Q.   Let's look at tab 2, please.
3  We're just going to get this marked for
4  the record as Exhibit 2.
5     (Exhibit 2, Expert report of
6     Laura Craft dated November 10, 2021
7     was received and marked on this
8     date for identification.)
9     Q.   Exhibit 2 Ms. Craft, do you
10  see Exhibit 2?
11     A.   I do.
12     Q.   Is this a copy of the report
13  that you issued on November 10th of 2021?
14     A.   Let me just take a second and
15  scroll through it before I answer that.
16     Yes, it does appear to be that
17  report.
18     Q.   And if we can please look at
19  tab 3, which we'll mark as Exhibit 3.
20     (Exhibit 3, expert report of
21     Laura Craft dated October 31, 2022
22     was received and marked on this
23     date for identification.)
24     Q.   Ms. Craft, does Exhibit 3
25  appear to be your report issued October

Page 36

LAURA CRAFT

1
2  31st, 2022?
3     A.   Once again, if you'll just
4  give me a moment, I will scroll through
5  it and just check that it is.
6     Q.   Sure.
7     A.   Yes. I recognize that as my
8  most recent report.
9     Q.   Great. You can feel free to
10  use the electronic version if you want or
11  the paper version in front of you,
12  whichever you prefer, as we go through
13  today.
14     A.   Thank you.
15     Q.   Ms. Craft, do you know
16  approximately when you started working on
17  the report in Exhibit 3?
18     A.   I really don't recall. It
19  obviously would have been in advance of
20  the October 31 filing date. I would be
21  speculating about how much in advance of
22  that date I started work on it.
23     Q.   Let's look at Exhibit E to
24  Exhibit 3.
25     A.   I see that.

Page 37

LAURA CRAFT

1
2     Q.   This is the materials relied
3  upon list for this report, correct?
4     A.   That's right.
5     Q.   And you also mention in your
6  report that you're also incorporating the
7  materials relied upon in your previous
8  report from November 2021; is that right?
9     A.   That's correct.
10     Q.   This materials relied upon
11  list in Exhibit E of Exhibit 3 starts
12  with a FDA announcement about recalls; is
13  that right?
14     A.   Yes.
15     Q.   And in the Bates numbered
16  documents are all, correct me if I'm
17  wrong, contracts with MSP or I should say
18  contracts between MSP's assignors and --
19  strike that. We'll do this later, to be
20  precise.
21     Are there any materials that
22  are not listed here that you considered
23  in forming your opinions?
24     MR. STANOCH:  Objection to
25  form.  And you just referenced her

10 (Pages 34 - 37)

Page 38

LAURA CRAFT

1
2    to her report, but discussed about
3    other things, but go ahead.
4        A.   I don't agree with the
5    characterization that these are all
6    contracts with MSP, but if your question
7    is, did I rely on materials listed --
8    that are not listed here, and not listed
9    on the materials relied upon in my
10   initial report, I'm not aware of any.
11       It certainly was my intention
12   to list everything and I hope I have not
13   failed to do so.
14       Q.   Other than the December 2022
15   MSP data and the report of Mr. Kosty that
16   were recently provided to you, is there
17   anything else that you reviewed that's
18   not listed on this list for purpose of
19   today?
20       MR. STANOCH:  And objection to
21       form. We served objections and
22       responses to the deposition notice
23       which identified additional
24       materials since the October 2022
25       report. But go ahead, Ms. Craft.

Page 39

LAURA CRAFT

1
2        A.   Well, I think your question is
3    one I've previously answered, unless I am
4    misunderstanding it, which is the
5    additional materials that I considered
6    after the date of my October 31, 2022
7    report and in connection with preparing
8    my -- for my deposition today included
9    the new MSP production of its claims data
10   as well as Mr. Kosty's most recent
11   report. And as I said earlier this
12   morning, those are the only additional
13   materials that I reviewed in connection
14   with preparing for this deposition.
15       Q.   Since you finalized your
16   report in November 2022 are there any
17   changes that you want to make to it at
18   this point?
19       A.   No.
20       Q.   Reviewing Mr. Kosty's report
21   did not change any of your opinions; is
22   that right?
23       A.   That's correct.
24       Q.   Let's look at tab 4, please,
25   which we'll mark as Exhibit 4.

Page 40

LAURA CRAFT

1
2        (Exhibit 4, OnPoint Analytics
3    invoices dated January 1, 2022 to
4    October 31st, 2022 was received and
5    marked on this date for
6    identification.)
7        Q.   Ms. Craft, just let me know
8    when you have that open.
9        A.   Thank you.  Okay. I have it
10   open.
11       Q.   Ms. Craft, do you recognize
12   these as invoices issued by your firm
13   covering January 1, 2022 to October 31st,
14   2022?
15       A.   That's what they appear to be.
16       Q.   And do you know if your firm
17   has sent any additional invoices to
18   plaintiff's counsel since October 31st,
19   2022?
20       MR. STANOCH:  Objection to
21       form. The first page is dated
22       December 13th, 2022.
23       MS. BRANCATO:  Let me
24       rephrase.
25       Q.   Are you aware of whether your

Page 41

LAURA CRAFT

1
2    firm issued any other additional invoices
3    to plaintiff's counsel covering a time
4    after October 31st, 2022?
5        A.   No, I'm not.
6        Q.   Other than the time you spent
7    preparing for this deposition today, have
8    you incurred any other time related to
9    this matter since October 31st, 2022?
10       A.   No.
11       Q.   On the first page of Exhibit 4
12   toward the bottom there is an entry for
13   September 23rd, 2022 LRC emails with new
14   counsel re: New report. Do you see that?
15       A.   I do.
16       Q.   Is this approximately the time
17   when you started working on the October
18   31st report?
19       MR. STANOCH:  Objection to
20       form. Go ahead.
21       A.   It appears to be the time when
22   I had an email with the counsel about it.
23   I don't know that that's when I actually
24   started work.
25       The actual first substantive

11 (Pages 38 - 41)

Page 42

LAURA CRAFT

1
2    entry appears to be October 4, where I'm
3    reviewing something that's been supplied
4    by counsel, so in that vicinity. I don't
5    know how precise we need to be about the
6    date but clearly on September 23rd of
7    2022 I became aware there would be a new
8    report.
9        Q.   If you look at the second
10   page, please, there are a number of
11   entries on this page, starting with
12   October 24th, 2022.  For KC where it
13   says, "Clean MSP and Xponent data,
14   extract relevant statistics, create
15   tables." Do you see that?
16       A.   I do.
17       Q.    And similar entries appear on
18   October 26th, October 27th and 28th. Do
19   you see those?
20       A.   I do.
21       Q.    What was the purpose of that
22   analysis?
23           MR. STANOCH:  Objection to
24       form and just caution the witness
25       not to reveal any attorney work

Page 43

LAURA CRAFT

1
2    product or any attorney
3    communications.
4        A.   I wanted to see what data MSP
5    had produced to determine whether it was
6    consistent with my understanding about
7    the type of data that is generated
8    simultaneously with every prescription
9    dispensing event and to see whether it
10   contained the industry standard fields
11   that are used to record and track how
12   much is paid for every prescription for
13   each NDC code and to allocate that price
14   between the third-party payor.
15           So I was interested in
16   reviewing that data for the purpose of
17   understanding whether it was consistent
18   with my knowledge about how the industry
19   operates and the types of data that are
20   invariably generated and retained.
21       Q.    And was your conclusion from
22   that review that the MSP data was
23   consistent with how the industry operates
24   and the type of data that are invariably
25   generated and retained?

Page 44

LAURA CRAFT

1
2           MR. STANOCH:  Objection to
3       form. Go ahead.
4        A.   Yes, it was. Although, I knew
5    there had to be additional fields to
6    supplement what MSP had been produced and
7    I believe we now see those in the data
8    that I received on December 19 of 2022.
9        Q.    Are you aware whether there
10   are still more fields that could be
11   produced by MSP, more than what you saw
12   in the production from December 19th,
13   2022?
14       A.    Well, when you say are there
15   more fields, the -- of course, there were
16   more fields at the time the claim was
17   adjudicated by the PBM.  PBM data can
18   consist of anywhere from, say, 60 to 90
19   different fields, most of which are
20   irrelevant and get -- to this particular
21   case and get used only for very specific
22   kinds of entries.
23           So there may, for example, be
24   controlled substance codes, where the
25   drug is one that is subject to

Page 45

LAURA CRAFT

1
2    distribution controls. There may be
3    specific fields for injectable drugs,
4    things of that sort. So there are many
5    many fields and PBM data.
6           It is not always the case that
7    payors such as EmblemHealth and SummaCare
8    need or want all of those fields. What
9    they are interested in are the fields
10   that identify the transaction specifics
11   for each purchase by their members of a
12   prescription drug.  So they want to know
13   where the transaction occurred, they want
14   to know when the transaction occurred,
15   they want to know what the pharmacy was,
16   they want to know how much was paid and
17   they want to know how that cost was
18   allocated, they want to know the quantity
19   dispensed.
20           So those are the basic fields
21   that you would expect that an
22   EmblemHealth or SummaCare would likely
23   have in its data and I think we have
24   the -- all of the elements now present in
25   the later MSP production that would be

12 (Pages 42 - 45)

LAURA CRAFT

1
2  relevant to determining damages in this
3  case.
4         Whether there are additional
5  fields not relevant to the determination
6  of damages that Summa or Emblem might
7  have, I simply would be speculating to
8  say that. I am certain there are
9  additional fields that PBMs have because
10 there always are but once again, they are
11 not fields that I would consider to be
12 relevant to the determination of damages.
13    Q.   I just want to make sure I
14 understand. Your opinion is that we do
15 have with the December 2022 production
16 from MSP all of the data fields we need
17 to come up with a damages calculation; is
18 that right?
19       MR. STANOCH:  Objection but go
20 ahead.
21    A.   Yes. For the claims that are
22 involved in this bellwether case.
23    Q.   You mentioned that PBMs may
24 have, in your experience, somewhere
25 between 60 and 90 fields in their claims

LAURA CRAFT

1
2  data; is that right?
3     A.   In their processing data. The
4  term "claims data" is used somewhat
5  loosely and it may mean data that does
6  not include all of those fields because
7  the especially preserved record that is
8  audible and shared with the TPP may not
9  include every one of those fields but I
10 am aware that the data structure and
11 processing capabilities involve 60 to 90
12 or so different fields.
13    Q.   So different PBMs may have a
14 different number of fields in their
15 processing data; is that right?
16       MR. STANOCH:  Objection to
17 form.
18    A.   Not that would be relevant to
19 this case but, yes, they may choose to
20 add fields that are not essential for the
21 operations but that have some value to
22 them or that have no relevance to this
23 particular drug or set of claims. PBMs
24 are free to supplement their data in
25 whatever way they choose.

LAURA CRAFT

1
2     Q.   Let's go back to Exhibit 4,
3  please, which are your invoices, and I'm
4  still on page 2 and we were looking at
5  the entries related to cleaning MSP and
6  Xponent data and extracting relevant
7  statistic and creating tables.
8         What relevant statistics were
9  extracted from the MSP and Xponent data?
10    A.   I don't recall but I am
11 certain it would have included date
12 ranges, identification of fields,
13 probably a matching to the NDCs that were
14 part of the case at that point. I don't
15 recall beyond that.
16    Q.   Did you rely on those
17 statistics in putting together your
18 expert report from -- strike that.
19       Are you relying on those --
20 strike that.
21       Did you rely on those
22 statistics in putting together your
23 October 31st expert report?
24       MR. STANOCH:  Objection to
25 form.

LAURA CRAFT

1
2     A.   I don't think I relied on any
3  statistics. I relied upon what the
4  statistics revealed about the coverage of
5  the data that MSP had supplied, i.e.,
6  that it reported in any usable form the
7  transactions by Emblem and SummaCare in
8  which they had paid for the products that
9  are the subject of this litigation and at
10 the time of that October 22 report, of
11 course the scope was broader, we weren't
12 talking about a narrower universe of
13 bellwether claims involving a smaller
14 universe of products, but I certainly
15 relied upon that kind of information to
16 know the time period over which the
17 claims data had been supplied, the
18 products to which the claims data
19 related, what fields had been supplied
20 for the claims data and how frequently
21 they were populated. This would be pretty
22 much standard procedure to effectively
23 inventory the data to have a good
24 understanding of what it included.
25    Q.   I want to make sure I

Page 50

LAURA CRAFT

1    understand this correctly.
2          You relied upon the
3    conclusions of the statistics in forming
4    the opinions of your report; is that
5    right?
6          MR. STANOCH:  Objection to
7    form, misstates the testimony.
8          A.   I think what I just said was
9    that I didn't rely on the statistics,
10   themselves, but that was one way of just
11   capturing the information that I've
12   described to you.
13         I don't want to put excessive
14   weight on the statistics here. It is, as
15   I mentioned, standard procedure when you
16   are reviewing data to understand its
17   scope and coverage that you tabulate.
18   You might prefer the word tabulate.  That
19   you just look at summaries of number of
20   transactions, number of fields, earliest
21   date end date. I did not directly rely
22   upon any of those numbers in providing my
23   October of 2022 report. They did inform
24   just my general understanding of the

Page 51

LAURA CRAFT

1    scope and adequacy of the data.
2          This is a more efficient way
3    of doing this than having me review all
4    of the data myself, is to have a skilled
5    analyst look at the data and summarize
6    what's there.
7          Q.   There is also a notation in
8    these bills for "create tables". Do you
9    see that?
10         A.   I'm sorry. Your microphone
11   didn't quite catch that.
12         Q.   Sure. I'm looking at the entry
13   for "create tables".  Which appears a few
14   times on page 2. Do you see that?
15         A.   I do see what you've
16   highlighted there. Thank you.
17         Q.   Do you know -- I'm sorry. Go
18   ahead.
19         A.   No. I was just going to say
20   what is the question?
21         Q.   Do you know what tables were
22   created based on these entries?
23         A.   I don't have any specific
24   recall. It's the process that I would

Page 52

LAURA CRAFT

1    have described as just general workflow,
2    work procedure in looking at data.
3          Q.   And did you rely on these
4    tables in putting together the opinions
5    in your October 2022 report?
6          MR. STANOCH:  Objection to the
7    form.
8          A.   I'm afraid I have to give you
9    the same answer that I did a moment ago.
10   Not the tables, per se. These tables
11   would have been created by the economist
12   who was doing the data processing to
13   provide a sense of the coverage of the
14   data, which I describe in my report as
15   having come from the PBMs that processed
16   claims. This is -- this is nothing but an
17   intermediate step between looking at the
18   raw data and reaching a conclusion about
19   the coverage of the data and its adequacy
20   to support a damage calculation. There is
21   nothing magic about these tables. They
22   are a mechanical effort to summarize
23   what's present in the data. That's all.
24         Q.   Do you recall reviewing the

Page 53

LAURA CRAFT

1    tables in putting together your report?
2          MR. STANOCH:  Objection to
3    form.
4          A.   No, I don't.
5          Q.   Okay. We can take Exhibit 4
6    down.
7          Ms. Craft, earlier we were
8    talking about EmblemHealth, SummaCare and
9    ConnectiCare.  Do you recall that?
10         A.   I recall all three had been
11   mentioned. We talked more about Emblem
12   and Summa, but I do remember mentioning
13   ConnectiCare.
14         Q.   What is your understanding of
15   the relationship between ConnectiCare and
16   EmblemHealth?
17         A.   Between Medicare and the
18   EmblemHealth?
19         Q.   No. Between ConnectiCare and
20   EmblemHealth?
21         A.   Oh, okay. Sorry. I believe
22   that ConnectiCare is an affiliate of
23   EmblemHealth that operates in
24   Connecticut, a separate entity, but it

14 (Pages 50 - 53)

Page 54

LAURA CRAFT

1
2  has some sort of affiliation and I don't
3  know what exactly the corporate structure
4  is for that affiliation.
5      Q.   Are you aware of how the PBMs
6  differentiate data between ConnectiCare
7  and EmblemHealth?
8          MR. STANOCH:  Objection to
9  form.
10     A.   I'm sorry. Your question was
11  how they differentiate?
12     Q.   Do you know what PBM
13  ConnectiCare uses?
14     A.   I do not.
15     Q.   You don't know if it's the
16  same PBM as EmblemHealth?
17     A.   I do not. I do want to just
18  expand my answer slightly.
19          When you asked -- I was a bit
20  thrown when you asked how they
21  differentiate. PBMs always differentiate
22  their payor clients.  And as you can see
23  in the data that was previously produced
24  by MSP, ConnectiCare claims are facially
25  completely distinct from EmblemHealth,

Page 55

LAURA CRAFT

1
2  they -- and that distinction appears in
3  the fields that were supplied.
4          So a plan sponsor must be
5  tracked separately and the -- as I'm sure
6  you know -- plan sponsors may -- are
7  required to contract with Medicare and
8  under those contracts are also separately
9  identified.
10     Q.   Are you aware that the parent
11  company of ConnectiCare is EmblemHealth?
12     A.   I'm sorry. I'm just having a
13  little bit of trouble with hearing.
14          That the current company of
15  EmblemHealth -- sorry, of ConnectiCare --
16  repeat your question or read it back if
17  you would, please.
18     Q.   Of course. Are you aware that
19  the parent company of ConnectiCare is
20  EmblemHealth?
21     A.   As I said a moment ago, I'm
22  aware that they're affiliated
23  corporations. Whether it's a direct
24  parent relationship or not, I told you I
25  don't know. I knew they were corporate

Page 56

LAURA CRAFT

1
2  affiliates and I said I don't know the
3  exact corporate structure of that
4  relationship.
5      Q.   But it's your opinion that,
6  regardless of the corporate structure
7  that may exist between EmblemHealth and
8  ConnectiCare, you can clearly separate
9  out claims data between the two; is that
10  right?
11          MR. STANOCH:  Objection to
12  form.
13     A.   Absolutely. Insurance
14  companies, just because they may have
15  parents or subsidiaries, don't cease to
16  be separate entities and for the purpose
17  of tracking business in this highly
18  regulated industry they maintain their
19  separate identities.
20          Insurance companies must
21  report to State regulators in which they
22  operate, they must report to the National
23  Association of Insurance Commissioners.
24  There is a parent-child numbering
25  convention used in reporting to the NAIC

Page 57

LAURA CRAFT

1
2  that takes the individual insurers and
3  rolls them up to a parent level using
4  different numbering systems.
5          The fact of a subsidiary
6  relationship does not obliterate the
7  corporate separateness or individual
8  reporting responsibilities of any
9  insurance company.
10     Q.   I just want to make sure I
11  understand. I'm talking about PBM data
12  specifically and what the PBMs do on
13  their side.
14          Your opinion is that the PBM
15  claims data for ConnectiCare and
16  EmblemHealth are separate and clearly
17  distinctive; is that right?
18          MR. STANOCH:  Objection to
19  form.
20     A.   Clearly distinguishable, yes.
21  When you say separate, they may also be
22  linked by a client ID number or something
23  of the sort, but they are clearly
24  distinguishable.
25     Q.   And they are clearly

15 (Pages 54 - 57)

Page 58

LAURA CRAFT

1    distinguishable by a field or maybe two
2    fields in the PBM data; is that right?
3    distinguishable by a field or maybe two
4        MR. STANOCH: Objection to
5    form.
6        A.   I note that they were
7    distinguished in the data that was
8    produced by MSP through the use of two
9    separate fields, yes.
10       Q.   And is there any way in your
11   experience to verify that the data for
12   EmblemCare is truly just for Emblem care
13   and doesn't include any ConnectiCare
14   data?
15       MR. STANOCH: Objection to
16   form.
17       A.   I suppose one could audit
18   those claim records, including member IDs
19   and assure that, for example, the member
20   was a member of an Emblem versus
21   ConnectiCare claim, but I've not come
22   across that problem ever because the
23   nature of the legally required reporting
24   in this industry would -- would not
25   permit or allow separate entities to

Page 59

LAURA CRAFT

1    simply report as their own claims data
2    that wasn't for their members. You have
3    to be able to track, and indeed in
4    Medicare Part D one must be able to track
5    using PBM data the experience, the
6    precise individual experience of the
7    specific plan for its enrolled members.
8    So it's antithetical to that reporting
9    responsibility that one would commingle
10   claims.
11       Q.   And you have never audited the
12   claim records for any PBM; is that right?
13       MR. STANOCH: Objection to
14   form.
15       A.   I've never performed an audit
16   of PBM records, that is true.
17       Q.   Have you ever performed an
18   audit of TPP records like those from
19   Emblem or SummaCare?
20       A.   Not that I would describe as
21   an audit. I am not an auditor, I have
22   examined hundreds and hundreds sets of
23   such records but not for the purpose of
24   performing an audit.

Page 60

LAURA CRAFT

1        Q.   Let's look again at Exhibit 3,
2    which is your report, your October 2022
3    report, to be clear.
4        Can we look at paragraph 3?
5    Does this paragraph accurately summarize
6    your assignment for this particular
7    report?
8        A.   Yes.
9        Q.   If we look at paragraph 1 of
10   Exhibit 3, there is a clause that starts
11   "alleged to have been contaminated." Do
12   you see that?
13       A.   Yes.
14       Q.   I just want to double check.
15   You're not offering any opinions about
16   the truth of any allegations related to
17   contamination, correct?
18       A.   That's correct.
19       Q.   And one more question on the
20   assignment in paragraph 3. Are there any
21   edits or changes that you have to that
22   assignment paragraph?
23       A.   No. That was the scope of
24   assignment for the October report.

Page 61

LAURA CRAFT

1        Q.   Paragraphs 2 and 3 of your
2    report talk about Exhibit D to the
3    report. Do you see that?
4        A.   Yes, I see now the reference
5    to Exhibit D, yes.
6        Q.   Am I right in understanding
7    that Exhibit D is a list of NDC codes for
8    valsartan-containing drugs manufactured
9    by Teva, Torrent or ZHP for which
10   EmblemHealth or SummaCare made payments
11   on behalf of their members?
12       A.   Yes.
13       Q.   Let's look at Exhibit D to
14   your report, it's toward the back. Thank
15   you.
16       A.   If you don't mind, I'm going
17   to slightly modify -- there may be a
18   slight correction, because the phrase
19   that you just read was "NDCs for which
20   Emblem and SummaCare members made
21   purchases."
22       These are -- what Exhibit D
23   represents, to be clear, is defendant's
24   valsartan-containing drugs, so the

16 (Pages 58 - 61)

Page 62

LAURA CRAFT

1
2  bellwether defendants. These are the NDCs
3  that they marketed during the relevant
4  period that are alleged to have been
5  contaminated.
6        I can't, as I sit here, verify
7  for you that each one of these NDCs was
8  purchased at least once by an Emblem
9  member and SummaCare member. There may be
10  some of these NDCs that did not end up
11  being purchased.
12        As I mentioned earlier this
13  morning, a simple matching of the final
14  column of Exhibit D, the NDC list, to the
15  data provided by MSP representing
16  SummaCare and EmblemHealth transactions,
17  identifies the purchases that were for
18  drugs listed on Exhibit D. But once
19  again, I can't assure you that every one
20  of these NDCs was purchased. I can merely
21  tell you that it is a trivial action to
22  compile a list of all the purchases
23  reported by MSP that are for drugs on
24  Exhibit D.
25     Q.  I see. And I appreciate that

Page 63

LAURA CRAFT

1
2  clarification. So Exhibit D are NDCs that
3  Teva, Torrent or ZHP marketed during the
4  relevant period that are alleged to be
5  contaminated; is that right?
6     A.  Yes. They may not have been
7  the direct marketer. So, for example, you
8  see a manufacturer name for ZHP that may
9  be Solco or AS Medication.  In other
10  words, ZHP may not, itself, have been the
11  marketer.
12     Q.  I understand. So these are
13  NDCs that Teva, Torrent or ZHP
14  manufactured during the relevant time
15  period that are alleged to have been
16  contaminated; is that right?
17     A.  That's correct.
18     Q.  And sitting here today, you
19  don't know which of these NDCs MSP may
20  have paid for -- strike that.
21        You don't know which of these
22  NDCs MSP may have covered payments for
23  its beneficiaries; is that right?
24        MR. STANOCH:  Objection to
25     form. Go ahead.

Page 64

LAURA CRAFT

1
2     A.  I could not go through and
3  highlight this exhibit for you with a
4  "yes" or "no" right now, but that's --
5  that's facially apparent from the data
6  that MSP has produced. Because for every
7  purchase the NDC field is populated, as
8  it must be.
9     Q.  Did you put Exhibit D
10  together?
11     A.  Did I personally put it
12  together? No, I did not.
13     Q.  Did someone at your firm put
14  it together?
15     A.  We were supplied with the
16  original NDC list, which was much
17  broader. It was attached, I believe, to
18  my original report in this case.
19        We then reviewed the original
20  list to determine which of those products
21  were listed as having one of these three
22  entities, it's really more than three
23  entities, but affiliations, Teva, Torrent
24  and ZHP.  And I believe we confirmed the
25  list that you see here as Exhibit D here

Page 65

LAURA CRAFT

1
2  with counsel prior to attaching it to my
3  October 2022 report. And I don't remember
4  whether an initial list was provided to
5  us by counsel or we compiled our own
6  initial list, but it basically is just a
7  selection from the original NDC list
8  attached to my original report to
9  identify those products for which -- oh,
10  and I see the -- yeah, that original
11  list, by the way, also appears as Exhibit
12  C to my October '22 report.
13     Q.  And that was going to be my
14  next question. So Exhibit C is the
15  original list of NDCs; is that right?
16     A.  That's right.
17     Q.  And you don't recall whether
18  this list was provided to you by counsel
19  or whether your firm generated it; is
20  that right?
21     A.  Your question pertains to
22  Exhibit C?
23     Q.  Correct.
24     A.  I believe Exhibit C was
25  provided to us by counsel and I believe

17 (Pages 62 - 65)

Page 66

LAURA CRAFT

1    LAURA CRAFT
2    my earlier report says that.
3        Q.    Ms. Craft, you are not
4    offering any opinion about the quality of
5    the valsartan-containing drugs listed in
6    your Exhibit B, correct?
7        A.    Well, I'm not expressing any
8    opinion about their contamination or the
9    level of any such contamination, but in
10   response to Mr. Kosty's report, which I
11   have, as I said, now reviewed, I can
12   assure you that if the contamination
13   alleged existed, then the quality, as
14   you've just described it in your
15   question, of those products was
16   unacceptable and they would have had --
17   they would not have been allowed to be
18   marketed.
19       Q.    Do you plan on offering that
20   opinion at trial?
21       MR. STANOCH:  Objection to
22   form.
23       A.    I have no control over what I
24   will be asked. I am merely responding to
25   what Mr. Kosty put in his report.  And

Page 67

1    LAURA CRAFT
2    although he didn't use the word
3    "quality", which is the word that you
4    just used in your question, he certainly
5    took the position that these drugs still
6    had value no matter how much
7    cancer-causing contamination they might
8    contain.
9        I strenuously disagree with
10   that opinion. I do not believe anyone, if
11   they were told that these drugs had the
12   potential to induce cancer, would have
13   chosen to purchase them, nor do I believe
14   that that would have been consistent with
15   Federal drug regulation.
16       Q.    You stated that in response to
17   Mr. Kosty's report your opinion is that
18   if the contamination did exist, then the
19   quality would be unacceptable. What does
20   "unacceptable" mean?
21       MR. STANOCH:  Objection to
22   form.
23       A.    I did not use the word
24   quality, you did. And I was specifically
25   careful not to use it because I don't

Page 68

1    LAURA CRAFT
2    know what it means.
3        What Mr. Kosty said is that
4    the product still had value and should be
5    assigned some value and that I had failed
6    to take that into account. And what I'm
7    saying is that I do not believe that
8    contaminated drugs, with the potential to
9    cause a serious condition such as cancer,
10   have value.
11       I think it is simply -- it's
12   just a completely false premise that if
13   you put on the label of a drug that was
14   being dispensed to a consumer a big sign
15   that says contains MDMA, known to cause
16   cancer, that the consumer is going to
17   purchase it or that their prescribers can
18   prescribe it or that the FDA will allow
19   that to go on.
20       So I don't understand
21   Mr. Kosty's argument that you should
22   still credit some value to this just
23   because the products did, in fact, lower
24   high blood pressure.  But I think it's a
25   completely unreal construction of the

Page 69

1    LAURA CRAFT
2    world that is effectively designed to
3    create a get out of jail free card for a
4    manufacturer that knowingly sells
5    adulterated drugs. And I am expressing no
6    opinion about whether the defendants in
7    this case did knowingly sell adulterated
8    drugs.
9        I am saying that if they did
10   so it, to me, is preposterous to argue;
11   okay, yeah, they were adulterated but
12   they still had some beneficial
13   characteristics. That's not the point.
14       Q.    Ms. Craft, you're not an
15   expert in consumer behavior, correct?
16       MR. STANOCH:  Objection to
17   form.
18       A.    Well, I don't know what the
19   field consumer behavior means, but I
20   certainly do know that I have studied
21   over the years responses to black box
22   warnings, and how they affect sales of
23   products. But no, I don't purport to be
24   an expert in consumer behavior. I
25   understand the field of pharmaceutical

18 (Pages 66 - 69)

Page 70

LAURA CRAFT

1            LAURA CRAFT
2 sales and regulation.
3    Q.    And in this case, you have not
4 performed any kind of survey or other
5 analysis to determine whether consumers
6 would continue taking valsartan if they
7 were aware of some kind of alleged
8 contamination?
9    A.   I have conducted no surveys.
10       MS. BRANCATO:  Okay. We've
11    been going about an hour and a half
12    now, so why don't we take a quick
13    five minute break, if that's okay
14    with you guys.
15       THE WITNESS:  Five minutes is
16    fine.
17       MS. BRANCATO:  We can take
18    longer, Ms. Craft, if you want.
19       THE WITNESS:  No, I do not
20    need a longer break. Five minutes
21    will be just fine. Thank you.
22       VIDEOGRAPHER:  Time is 9:32.
23    This ends Media Unit 1. Going off
24    the record.
25       (Recess is taken.)

Page 71

1            LAURA CRAFT
2       VIDEOGRAPHER:  The time is
3    9:42 and this is unit 2 and we are
4    back on the record.
5    Q.   Ms. Craft, the issue of
6 whether the valsartan drugs at issue in
7 this case have value or not is -- does
8 not affect the question of whether the
9 PBM claims data that you looked at is
10 sufficient to identify MSP's potential
11 damages in this case, correct?
12    A.    Well, although the sound was
13 very blurry on your last three words
14 there, the claim damages, as I understand
15 it, are the amounts, in fact, paid by MSP
16 for those products.
17      And you're right, if
18 defendants accept the theory that the
19 damages are comprised of the total amount
20 of those payments then, yes, the data is
21 totally adequate to do that.
22      I only raise the question of a
23 possible alternative value, which I think
24 is an inappropriate approach because it
25 was raised by Mr. Kosty. What the value

Page 72

1            LAURA CRAFT
2 reported in the PBM data is the amount,
3 in fact, paid by Emblem and Summa.
4    Q.    And you don't have any
5 calculations, sitting here today or in
6 your report, about any potential
7 alternative values for damages, correct?
8    A.   I think it's fundamentally
9 wrong to try to calculate an alternative
10 value.
11    Q.   So the answer is no?
12    A.   Yes, you're right.
13    Q.   Ms. Craft, you're not offering
14 any opinions related to the manufacturing
15 of the valsartan drugs on Exhibit D,
16 correct?
17    A.   The manufacturing practices;
18 is that what you're asking?
19    Q.   Anything related to the
20 manufacturing of the valsartan drugs on
21 Exhibit D.
22    A.   Only the fact that the data
23 makes it possible to identify who the
24 manufacturers were.
25    Q.   And the data you're referring

Page 73

1            LAURA CRAFT
2 to is PBM claims data, right?
3    A.   Any data that uses the NDC
4 makes it possible to identify the
5 manufacturer for the reasons explained in
6 my initial report. And my opinion on this
7 subject is limited to observing that the
8 special data requirements and product
9 identification in the pharmaceutical
10 industry are designed very specifically
11 to allow the product to be linked back to
12 its manufacturer.
13    Q.   Ms. Craft, you just mentioned
14 the discussion in your earlier report
15 related to the NDC codes.
16      There are similarities between
17 your October 2022 report and your
18 November 2021 report, correct?
19    A.   Similarities? Yes, because my
20 basic perspective on how data operates in
21 the pharmaceutical industry and for these
22 drugs did not change.
23    Q.   And there are some paragraphs
24 in your October 2022 report that are
25 exactly the same as they were in your

19 (Pages 70 - 73)

Page 74

LAURA CRAFT

1    LAURA CRAFT
2    November 2021 report; is that right?
3        A.   Yes. Because those same
4    subjects are relevant specifically to
5    what are now the bellwether claims and
6    parties.
7        Q.   Let's look as paragraph 9,
8    please, of Exhibit 3 this is discussing
9    NDC codes, correct?
10       A.   Yes. Paragraph 9 does discuss
11   NDC codes.
12       Q.   The NDC code doesn't tell you
13   what lot number a given prescription was
14   filled from, correct?
15       A.   It does not.
16       Q.   And multiple lots of a drug
17   product can have the same NDC code,
18   correct?
19       A.   They not only can, they must.
20   A NDC code pertains to a higher category.
21   A lot is a subdivision based on
22   production dates and locations of that
23   NDC.
24       Q.   Look at paragraph 14 of your
25   report, please. Ms. Craft, in this

Page 75

1    LAURA CRAFT
2    paragraph you list -- you say claims
3    adjudication performs four basic
4    functions, and then you go on to list
5    first, second and third, but I don't see
6    a fourth. So I just wanted to ask you is
7    there a forth and, if so, where is it or
8    should it be that there are three basic
9    functions? I just want to make sure we're
10   not missing anything.
11       A.   Well, that's an embarrassing
12   oversight. Let me expand on this.
13           The truth is you can break
14   this down into lots of subparts. You can
15   break it down into nine or ten functions
16   that are performed.
17           What I was trying to capture
18   here is that the eligibility is
19   determined through claims adjudication,
20   meaning is the consumer covered by the
21   plan. The second -- and that, by the way,
22   means consulting the electronic
23   enrollment records to make sure that the
24   consumer is still a beneficiary of the
25   plan.

Page 76

1    LAURA CRAFT
2            The second, which actually has
3    a couple of components, is determining
4    how the drug is going to be treated and
5    that means specifically what is its tier
6    on a formulary and what is the benefit
7    design of the plan. So the use of co-pays
8    versus co-deductibles, whether the drug,
9    itself, is even covered or whether it is
10   excluded from the plan's formulary.
11           So all of those things are
12   determined using the combination of
13   benefit design data and the formulary for
14   the plan.
15           Then, third, which really
16   should be broken down into two parts,
17   third and fourth, the third, the
18   adjudication process sets the price that
19   will be paid to the pharmacy and it does
20   so by consulting the PBM's electronic
21   records of the negotiated prices with the
22   particular pharmacy where the
23   prescription is being filled, and that
24   sets the ingredient cost that will be
25   charged. It also simultaneously sets the

Page 77

1    LAURA CRAFT
2    dispensing fee that will be paid to that
3    pharmacy.
4            Then, really, the final step
5    of relevance here is that that ingredient
6    cost gets split in this process between
7    the consumer and the third-party payor,
8    Emblem and Summa in this case, gets
9    divided into two parts that, when put
10   together, cover the entire approved
11   ingredient cost and, thereby, creates
12   effectively the payment obligation of the
13   plan sponsor, Emblem or Summa, and the
14   consumer, to pay the pharmacy. It also,
15   of course, creates the electronic record
16   of the plan sponsor's obligation to pay a
17   dispensing fee to the pharmacy for the
18   transaction.
19           So, and as I point out here,
20   this later allocation calculation goes
21   back and takes into account the claim
22   history of the individual consumer by
23   looking at whether they've paid their
24   out-of-pocket deductible, whether there
25   are any caps.

20 (Pages 74 - 77)

LAURA CRAFT

2       And I should add to the
3   purpose of this discussion specifically
4   about Emblem and SummaCare, since they
5   are Medicare Part D plans, also a record
6   of the coverage phase in which the
7   consumer currently sits at the time the
8   prescription is filled. And that coverage
9   phase is determined by the consumer's
10  TrOOP dollar amount, so their true
11  out-of-pocket dollar amount, which is
12  separately tracked for all Medicare Part
13  D plans by the TrOOP facilitator, which
14  during the period we're looking at here,
15  was Relay Health, which operated as a
16  TrOOP facilitator across all Med d plans,
17  to keep track of each individual's
18  out-of-pocket contributions so that it
19  was possible to determine when they
20  progressed from the deductible phase to
21  the initial coverage phase, from the
22  initial coverage phase to the gap phase,
23  from the gap phase, having met the
24  out-of-pocket threshold, to the
25  catastrophic phase.

LAURA CRAFT

2       Q.   Is there anything else that
3   you'd add to paragraph 14.
4       A.   Well, I could supply many more
5   details but I think conceptually those
6   are the moving parts that are relevant
7   for this particular dispute.
8       Q.   The MSP data that you reviewed
9   from December of 2022, does it include
10  information about coverage phase?
11      A.   No, it does not. But that is
12  implicitly used to perform the
13  calculation for which you see the payment
14  obligations reported. In other words,
15  that's an essential precursor to arriving
16  at that split of the drug cost between
17  the consumer and the plan.
18      Q.   Looking at the PBM data -- I'm
19  sorry. Strike that.
20          Looking at the MSP data from
21  December 2022, is there any way to know
22  whether a particular transaction came
23  from a particular customer that was in
24  the catastrophic phase, for example?
25      A.   Inferentially one could

LAURA CRAFT

2   determine that by the extremely low cost
3   share of the consumer, but that would be
4   an inference as opposed to an explicit
5   determination.
6          That explicit determination,
7   based on the up-to-date TrOOP values at
8   the moment that each of these purchases
9   occurred was already made to arrive at
10  those dollar amounts. But no, the field
11  that identifies the phase of coverage in
12  which the consumer sits is not included
13  in this data.
14      Q.   And when you say you could
15  infer it based on extremely low cost, is
16  there a threshold that you would use?
17      A.   So I said cost share, not
18  cost. There is a difference.
19          So the point is that in the
20  catastrophic phase the consumer's portion
21  of the ingredient cost drops dramatically
22  and is typically quite small. I have not
23  attempted to study for these -- for this
24  data and these plans what the consumer
25  shares look like and how they changed, so

LAURA CRAFT

2   I wouldn't want to express any opinion
3   about the ability to reliably identify
4   phase of coverage from each of the
5   additional costs -- from each of the
6   reported cost allocations.
7       Q.   Okay. So sitting here today,
8   you don't have an opinion about the
9   ability to reliably identify phase of
10  coverage from the cost allocations in the
11  PBM -- I'm sorry -- the MSP data; is that
12  right?
13      A.   That's right. It's not a
14  question I've analyzed and I, therefore,
15  can't give you an opinion about that, as
16  we sit here.
17      Q.   Let's look at paragraph 21.
18  Your opinion is that in order to
19  determine damages for EmblemHealth or
20  SummaCare we just have to look at the PBM
21  data; is that right?
22      A.   Yes, I would say that is
23  accurate. The paragraph that you are
24  currently showing me on the screen is a
25  piece of background information that

Page 82

LAURA CRAFT

1  
2  pertains to non-insured consumers. It is
3  not specifically relevant to Emblem or
4  SummaCare.
5          There shouldn't be any need
6  for pharmacy data of any kind for Emblem
7  or SummaCare purchases precisely because
8  they do go through the PBM adjudication
9  process.
10     Q.   Okay. So for determining the
11  amount of EmblemCare -- I'm sorry --
12  EmblemHealth or SummaCare damages, we
13  don't need to look at any pharmacy
14  records; is that right?
15     A.   Yes, I would agree with that.
16     Q.   And we don't really need to
17  look at anything except the PBM claims
18  data; is that right?
19     A.   That is my opinion. And I
20  should say you are repeatedly using,
21  Ms. Brancato, the phrase "the PBM data".
22  I want to be more specific.
23          MSP has produced claims data
24  which was sourced from the PBM data. So I
25  am -- I don't mean in answering your

Page 83

LAURA CRAFT

1  
2  questions to imply that it is necessary
3  to go back to the PBM.
4     Q.   Understood. I appreciate that
5  clarification and I will try to be more
6  precise.
7          Ms. Craft, you mentioned
8  earlier that EmblemHealth and SummaCare
9  are Medicare Part D sponsors, right?
10     A.   That's right.
11     Q.   And as Medicare Part D
12  sponsors, both EmblemHealth and SummaCare
13  have financial arrangements with the
14  Centers For Medicare and Medicaid
15  Services; is that right?
16     A.   Yes, the kind of standard
17  contracting that every insurer offering a
18  Medicare Part D plan is required to
19  execute with CMS.
20     Q.   And part of that standard
21  contracting are special financial
22  arrangements specific to Medicare part D
23  plans, correct?
24     A.   I have no idea what you mean
25  by "special financial arrangements".

Page 84

LAURA CRAFT

1  
2     Q.   You are aware that Medicare
3  Part D sponsors such as Emblem and Summa
4  have financial arrangements with CMC --
5  or CMS? Sorry.
6     A.   Well, let me just be a little
7  more precise, if I may.
8          Medicare Part D plan sponsors
9  have reporting obligations to CMS. They
10  have data retention obligations in their
11  contracts with CMS.
12          With regard to financial
13  arrangements, there are a set of
14  statutory and regulatory structures for
15  computing subsidies that will be paid to
16  plan sponsors through CMS by effectively
17  the Federal government.
18          If what you are referring to
19  are the subsidy arrangements, these are
20  -- these are not individually negotiated
21  contract terms, they're just the
22  structural parameters under which
23  Medicare Part D plans operate.
24          Yes, those arrangements, if
25  you want to use that term, I am hesitant

Page 85

LAURA CRAFT

1  
2  about that because it suggests an
3  individually negotiated set of rules,
4  which these are absolutely not, those
5  structures are referred to in the
6  contracts. And they are, once again,
7  applicable, they exist by virtue of
8  statute and regulation and they are
9  consistent across the plans.
10     Q.   You are aware that
11  EmblemHealth and SummaCare, as Medicare
12  Part D sponsors, receive subsidies from
13  the Federal government, correct?
14     A.   Yes, I believe I just referred
15  to that in my last answer.
16     Q.   And the government subsidies
17  that are paid to Medicare Part D sponsors
18  like Emblem and Summa ultimately impact
19  the net price paid for a particular
20  prescription, correct?
21     A.   I don't know what you mean by
22  "net price".
23          MS. BRANCATO:  Hey, Dave, I
24  saw your mouth move but no
25  objection was noted.  I'm just

22 (Pages 82 - 85)

Page 86

LAURA CRAFT

1
2  worried you might not be connected
3  and I wanted to clarify.
4        MR. STANOCH:  Thank you. I was
5  objecting to form. I actually tried
6  to object to form a couple of
7  earlier ones, but thank you for
8  noting it.
9        THE WITNESS:  I apologize, I
10  didn't see that.
11        MR. STANOCH:  Not your fault,
12  Ms. Craft.
13  Q.    The government subsidies that
14  are paid to Medicare Part D sponsors like
15  Emblem and Summa impact the price that
16  those Medicare Part D sponsors may pay
17  for any given prescription, correct?
18        MR. STANOCH:  Objection to
19  form.
20  A.    The price is the price that is
21  negotiated with the pharmacy and it is
22  required to be accurately and correctly
23  reported to CMS by the plan sponsors. I
24  believe that what your question is trying
25  to get at is the assumption that

Page 87

LAURA CRAFT

1
2  subsidies somehow change that price. That
3  is a position I would not agree with.
4  Q.    And why don't you agree?
5  A.    Because they don't. The way
6  these subsidies are structured is,
7  although the amount of subsidies may be
8  calculated by the summation of prices
9  actually paid across all drugs purchased,
10  paid for or reimbursed by the Medicare
11  Part D sponsors, it is not the case that
12  the subsidy is changing the price that
13  was charged and paid at the time of sale
14  by that drug.
15  Q.    Is the subsidy changing the
16  ultimate cost for by Emblem or Summa?
17        MR. STANOCH:  Objection do
18  form.
19  A.    No. And I think -- I think
20  this is the problem with Mr. Kosty's
21  report, is that it ignores the underlying
22  purpose and function of these subsidies.
23        He refers to how there are
24  four types of subsidies and briefly
25  mentions each of them, but I think he

Page 88

LAURA CRAFT

1
2  mischaracterizes their function and
3  operation in the overall Medicare Part D
4  structure.
5  Q.    What specifically is Mr. Kosty
6  ignoring about the underlying purpose and
7  function of the subsidiaries --
8  subsidies?  You know what I'm saying?
9        MR. STANOCH:  Objection to
10  form. But go ahead, Ms. Craft.
11        (Reporter clarification.)
12  Q.    Let me restart.
13        Ms. Craft, what specifically
14  is Mr. Kosty ignoring about the
15  underlying purpose and function of the
16  subsidies?
17        MR. STANOCH:  Objection to
18  form.
19  A.    Okay. Mr. Kosty assumes that
20  where there is funding, and he uses that
21  term, supplied by the Federal government
22  to Part D sponsors, it is effectively an
23  offset on the price paid for any
24  individual drug. I disagree with that
25  basic construct.

Page 89

LAURA CRAFT

1
2        Every business seeks to fund
3  all of its costs. It is generally the
4  case that businesses do not embark
5  intending to create losses. This is
6  absolutely true for insurance companies.
7        The word "funding" is a word
8  that is generally used in healthcare
9  finance to refer to all of the sources of
10  funds that the business has to use in its
11  operations. So those may include consumer
12  premium, they may include contributions
13  from other sources and Mr. Kosty singles
14  out the Federal contributions to the
15  funds used by these Part D sponsors as
16  though they had some unique and specific
17  characteristic that transforms them into
18  an assumption of liability to pay for a
19  particular purchase price. And there are
20  two reasons why I think that is just
21  fundamentally wrong.
22        The first reason why I think
23  it's fundamentally wrong is that it
24  overlooks the purpose and intent behind
25  the creation of Medicare Part D, which

23 (Pages 86 - 89)

LAURA CRAFT

1
2  became effective -- was enacted in 2003
3  and became effective in 2006.
4       This country was facing a
5  growing crisis over the cost of
6  prescription medications and, more
7  specifically, the ability of those 65 and
8  older, so probably would have been called
9  at the time senior citizens to afford to
10  buy their prescription medications.
11      Insurance was becoming
12  increasingly difficult to find that
13  provided adequate prescription drug
14  coverage for those individuals and as a
15  result many of them did not have drug
16  coverage or were paying extremely high
17  out-of-pocket cost shares.
18      This was recognized to present
19  an enormous public health challenge
20  simply because there was affordable
21  prescription drug coverage that would
22  specifically target this population.
23      The group of individuals that
24  are covered by Part D, consisting of
25  those 65 and older and those are

LAURA CRAFT

1
2  permanently disabled, as determined by
3  two years enrollment in Social Security
4  due to disability status, is that they
5  are high-risk consumers. This is what we
6  call in the field of healthcare
7  insurance, a high-risk pool and they're
8  high risk because they're going to use
9  more medications than the average
10  consumer and across all age ranges and
11  demographics and those drugs are likely
12  also to be more expensive.
13      So the problem was, so given
14  the limited capacity of this population,
15  combined with their high need for
16  prescription drugs, there was no such
17  thing as a plan that would single them
18  out as a group of potential members and
19  would want to cover them, because any
20  price that that insurer would have to
21  charge as premiums would be impossible
22  for the consumers to pay in the aggregate
23  and the plan, itself, would go into what
24  is sometimes described as a death spiral,
25  in which adverse selection plays a role

LAURA CRAFT

1
2  and you end up with only the sickest of
3  the sick choosing to enroll.  They have
4  prices that are higher and higher, the
5  premium has to continue to rise to
6  accommodate them, to cover those costs,
7  and at the end of the day, we have no
8  insurance for this vulnerable population.
9       So what Medicare Part D
10  attempted to do was to substitute some of
11  the costs that would ordinarily be paid
12  by consumer enrollees with a series of --
13  with a number of different kinds of
14  Federal subsidies that would effectively
15  supplant that other revenue source with
16  something else that would allow a
17  commercial insurer to operate profitably
18  in this space.
19      Commercial insurers do not
20  offer insurance plans where they do not
21  believe they can make a profit. They are
22  businesses and it was the specific
23  intention in adopting Medicare Part D
24  that the Federal government develop a
25  program which would be sufficiently

LAURA CRAFT

1
2  attractive to commercial insurers to
3  incent them to offer these plans but
4  would also retain sufficient risk
5  characteristics so that those commercial
6  insurers would act responsibly to control
7  costs in the interest of protecting their
8  own profits. That meant that the program
9  had to have downside and upside for the
10  insurer, just as it always did -- does in
11  commercial insurance and that the
12  subsidies were a way effectively of
13  getting sufficient additional funds into
14  the program to substitute for amounts
15  that the covered members, themselves,
16  simply could not pay.
17      So I think when we look at the
18  overall structure, intent, clear purpose
19  behind Medicare Part D, what those
20  Federal subsidies do is they substitute
21  for amounts that would otherwise in a
22  non-subsidized insurance market be paid
23  by the consumer.
24      So I see no logic behind the
25  argument that because it's Federal Funds

24 (Pages 90 - 93)

Page 94

LAURA CRAFT

1    LAURA CRAFT
2  as opposed to premium that would come in
3  from a consumer or larger co-pays that
4  would come in from a consumer, that these
5  dollars are any different. They are a
6  funding source. And so I do not agree
7  with the basic assumption that anything
8  the Federal government pays is something
9  other than an amount that would have been
10 paid for by consumers in a standard
11 prescription drug plan.
12       And I know this has been a
13 very long answer but it's kind of an
14 important concept and I -- I just want to
15 add one more thing.
16       When we're comparing a
17 Medicare Part D plan to another kind of
18 commercial insurance offering
19 prescription drug coverage, it's
20 important to understand that when the
21 insurers price their plans to consumers
22 when they're not subsidized, they're
23 taking into account all of the projected
24 costs, i.e., costs of drugs that will be
25 purchased by their members just the same

Page 95

1    LAURA CRAFT
2  way that Medicare Part D does. They
3  undertake actuarial exercises where they
4  say, we think we're going to have X
5  number of people with minimal usage of
6  the plan, Y number of people with
7  moderate usage, we're going to have Z
8  number of people who are going to have
9  high claims levels.
10       They do the same kind of
11 targeting and estimation as the Federal
12 government does. There is nothing special
13 about that. That's how premiums are
14 calculated, using actuarial science to
15 cover costs. And I think the fact that
16 Medicare Part D has a more specifically
17 and compartmentalized way of doing that
18 that's very visible to us through the
19 subsidies doesn't change the substance of
20 what's going on.
21       Okay. That was a long answer,
22 but that's the basic paradigm that I
23 think is completely missing from
24 Mr. Kosty's report.
25    Q.   Okay. I'll ask some followup

Page 96

1    LAURA CRAFT
2  questions about that answer but when you
3  first started responding you said that
4  you think there are two reasons why
5  Mr. Kosty is singling out Federal
6  contributions was fundamentally wrong and
7  then you said, number one, the purpose
8  and intent behind Medicare Part D.
9       Is there a number two or what
10 is number two?
11    A.   Yeah. Number two is simply he
12 says repeatedly in his report that these
13 plan sponsors are not at risk. And that
14 is just flatly wrong and it's
15 contradicted by his own report where he
16 only tells you half the story. He talks
17 about the fact that losses may be shared
18 with CMS. He doesn't quite accurately
19 describe how that happens. But it is true
20 that where total drug costs exceed the
21 amount that was budgeted at the beginning
22 of the year by -- where the total drug
23 costs are more than 105% of what was
24 budgeted, that there is a sharing of the
25 resulting losses effectively those costs

Page 97

1    LAURA CRAFT
2  between CMS and the plan sponsor.
3       First of all, that -- that
4  risk-sharing is symmetric. It applies to
5  lower than expected drug costs as well as
6  higher than expected drug costs. The
7  corridor is a 5% difference on either
8  side. In that 10% range, the consequences
9  belong 100% to the plan sponsor. They
10 take the loss, they get the profit.
11 That's how it works. And even outside of
12 that 10% range, the variance from the
13 originally budgeted costs is only shared
14 pursuant to a percentage formula between
15 CMS and the plan sponsor. So any
16 statements that they do not operate at
17 risk are just wrong and very misleading.
18       It makes it sounds as though
19 the plan sponsor is nothing but an
20 administrative agent for the Federal
21 government, and that's not true.
22       CMS has no responsibility to
23 pay the pharmacy. CMS has no
24 responsibility to members under these
25 plans to pay their claims. CMS is not a

25 (Pages 94 - 97)

Page 98

LAURA CRAFT

1   LAURA CRAFT
2   party to these plans that are offered to
3   the market.
4        It agrees to make Federal
5   subsidy funding available to the plan
6   sponsor but it is not a party to that
7   purchase obligation, that purchase
8   transaction, and it has no duties or
9   obligations in connection with that
10  transaction. It is a secondary source of
11  funding to the plan sponsor and nothing
12  more.
13       So I don't think whatever CMS
14  used is relevant to the question; how
15  much did these plans, in fact, pay for
16  drugs that allegedly should not have been
17  sold or made available to their members?
18       Q.   So the bottom line is that,
19  and correct me if I'm wrong, I just want
20  to make sure I'm understanding what your
21  opinion is today, any CMS subsidies,
22  reimbursements, whatever types of phrase
23  you want to use, any amounts that went
24  from CMS to EmblemHealth or SummaCare are
25  irrelevant for purposes of calculating

Page 99

1   LAURA CRAFT
2   the damages that Emblem or SummaCare may
3   have incurred in this case?
4        MR. STANOCH:  Objection to
5   form.
6        A.   But you're correct, that is my
7   opinion. I think what is relevant is the
8   amount that the plans paid the
9   pharmacies, and they did pay those
10  amounts to the pharmacies.
11       Mr. Kosty even -- doesn't even
12  dispute that in his report. He doesn't
13  even dispute that the PBM data correctly
14  reports the amounts that were paid by the
15  plan sponsors to the pharmacies. And I
16  think that is the correct value to look
17  at in damages.
18       Now, I'm not -- I am not the
19  damages expert in this case. I have not
20  been asked and do not expect to express
21  any opinions about damages, but I did
22  need to respond to the fact that I think
23  Mr. Kosty's assumption that just because
24  the plans have a source of funding in
25  lieu of higher charges to their members

Page 100

1   LAURA CRAFT
2   that comes from CMS somehow damages are
3   accused is fundamentally incorrect.
4        Q.   The information you just gave
5   us about the history of Medicare Part D
6   and the purpose behind it is not in your
7   October 2022 report, correct?
8        MR. STANOCH:  Objection. Go
9   ahead.
10       A.   No. Because it is directly
11  responsive to Mr. Kosty's report, which
12  was not filed until I think December 19
13  of this year.
14       Q.   Do you plan on issuing a
15  supplemental report that does address
16  these issues related to Medicare Part D
17  subsidiaries?
18       MR. STANOCH:  Objection to
19  form, calls for speculation.
20       A.   I don't have any idea. I don't
21  know what the court ordered report
22  process is and what may happen. That is
23  not up to me.
24       If asked to issue a report, I
25  will put in writing what I just said to

Page 101

1   LAURA CRAFT
2   you under oath in this deposition.
3        Q.   So right now you don't have
4   any plans or aren't aware of any request
5   to draft a report that says what you just
6   said in this deposition, correct?
7        MR. STANOCH:  Objection.
8        A.   That's correct.
9        Q.   If a consumer pays more for
10  co-pays then a plan sponsor like Emblem
11  ultimately pays less overall to cover
12  that particular consumer, correct?
13       MR. STANOCH:  Objection to
14  form. Unintelligible. Go ahead.
15       A.   Ms. Brancato, is your question
16  that given a fixed ingredient cost if the
17  consumer pays a bigger piece of it the
18  plan pays a smaller piece? Is that what
19  you're asking?
20       Q.   Sure. We can use that example.
21       A.   Yeah.
22       Q.   Is that correct?
23       A.   That's correct. Because what
24  the plan pays is the residual after the
25  consumer's cost share.

26 (Pages 98 - 101)

LAURA CRAFT

1
2     Q.    You mention risk-sharing and
3   the fact that if there are lower than
4   expected costs within that 5% range, that
5   is risk borne by third-party payors or
6   Medicare Part D like Emblem and Summa,
7   right?
8     A.    I think you said lower rather
9   than higher in your question.
10        If the drug costs are lower
11  than expected, then that's more profit
12  and so at that point that profit up to a
13  5% difference between the actual and
14  projected cost is retained by the plan
15  sponsor.
16        It's the other direction,
17  where if the costs are higher than
18  expected, just like any business, if
19  you're running a business and your costs
20  end up being higher than expected, you
21  might put yourself into a loss position.
22  And it is true that because the cost, the
23  fundamental cost of operating a
24  prescription drug plan is paying for the
25  drugs, if those costs are greater than

LAURA CRAFT

1
2   expected, then you may lose money and
3   that risk is borne exclusively by the
4   plan sponsor up to the point of a 5%
5   increase over the projected cost and,
6   thereafter, is shared with the Federal
7   government.
8     Q.    On the flip side that you
9   started talking about at the beginning of
10  your answer, if drug costs are lower than
11  expected, then that's more profit to the
12  plan sponsor up to a 5% difference, what
13  happens after that point?
14    A.    There is a sharing on a
15  percentage basis of those differences
16  between CMS and the plan sponsor and it
17  depends on magnitude of the difference.
18  So there are brackets. It's -- the
19  greater the difference from the original
20  budget, the greater the share that is
21  allocated to CMS.
22    Q.    So essentially a Medicare Part
23  D sponsor like Emblem or Summa would have
24  to share its profits with CMS; is that
25  right?

LAURA CRAFT

1
2       MR. STANOCH: Objection to
3    form. Go ahead.
4     A.    If the drug costs are less
5   than 95% of originally budgeted, then a
6   portion of that cost savings, a portion,
7   never all, a portion of that cost savings
8   would be shared with CMS.
9     Q.    And in the same way it's your
10  opinion that we shouldn't take into
11  account any payments from CMS to Summa or
12  Emblem as a result of prescription costs
13  going over the original budget, I assume
14  it's also your opinion that we also
15  shouldn't take into account any portion
16  of the -- all or any portion of the
17  profit sharing that happens with CMS if
18  prescription amounts are lower than the
19  budget, correct?
20        MR. STANOCH: Objection to
21    form.
22    A.    Yes. I would agree with your
23  statement. And I would point out that
24  this would be literally dancing on the
25  head of a pin to say that the amounts

LAURA CRAFT

1
2   paid for valsartan should somehow be
3   adjusted or offset by any risk corridor
4   payments either direction for literally
5   tens of thousands of drugs made over the
6   course of an entire year by a plan
7   sponsor. I simply do not understand the
8   logic for saying that that somehow alters
9   the price that Emblem or Summa paid for
10  those drugs.
11    Q.    Have you ever attempted to do
12  any kind of tracing from price or the
13  cost paid by Emblem or Summa for a
14  particular prescription or a set of
15  prescriptions to the subsidies received
16  from CMS?
17        MR. STANOCH: Objection to
18    form.
19    A.    No.
20    Q.    And so sitting here today,
21  you're not sure whether or not it's even
22  possible to trace an individual
23  prescription price back to subsidies that
24  Emblem or Summa may have received from
25  CMS?

27 (Pages 102 - 105)

Page 106

LAURA CRAFT

1
2    A.   I did not --
3         MR. STANOCH:  Objection --
4    A.   -- say that.
5         MR. STANOCH:  Objection to
6    form.
7    Q.   Do you believe it's possible
8    to trace an individual prescription or a
9    set of prescriptions -- strike that. Let
10   me rephrase.
11        Do you believe it's possible
12   to trace the impact of a subsidy paid by
13   CMS to Emblem or Summa down through a
14   particular cost or price paid for a
15   prescription?
16        MR. STANOCH:  Objection to
17   form.
18   A.   I need you to be specific
19   about what subsidy you're talking about.
20   That is a compound and very difficult
21   question as is framed.
22   Q.   I'm asking for all subsidies
23   right now.
24        Do you have a general opinion
25   about whether or not you can trace any

Page 107

LAURA CRAFT

1
2    particular subsidy amount from CMS to
3    Emblem or Summa down through to the
4    particular cost of price paid for a
5    prescription?
6         MR. STANOCH:  Objection to
7    form, lacks foundation, vague and
8    ambiguous.  Go ahead.  Incomplete
9    hypothetical.
10   A.   Okay. I think you're asking me
11   to break out the various subsidies and
12   discuss them independently.  And the
13   direct subsidy, which is paid every month
14   on a prospective basis, is never adjusted
15   based on actual purchases. It is a number
16   that is constructed in the bidding
17   process based on historical experience
18   and demographic characteristics of the
19   population that's being insured by the
20   particular plan and you don't get to
21   jigger it based on what actually happens.
22   So I would say that it is not traced to
23   the actual -- a valsartan purchased by
24   EmblemHealth during a particular plan
25   year.

Page 108

LAURA CRAFT

1
2         So let's start with that one.
3    And once again, I want to add, you know,
4    this is explicitly a substitute for
5    premium from the member. But so it's like
6    the plan has expected that its base drug
7    experience -- and by base, I mean what is
8    described as the out-of-pocket threshold
9    -- is going to cost about X for all drugs
10   regardless what the moving parts are in
11   that.
12        The subsidy on which I think
13   Mr. Kosty placed -- places most weight is
14   what's described as the reinsurance
15   subsidy. And the name is telling. It's
16   important to recognize what that is. It's
17   reinsurance. It's recognizing that claims
18   experience, in aggregate, for certain
19   individuals is unusually high. Their
20   medical needs have caused expenses for
21   them to be above that out-of-pocket
22   threshold. And what happens is that CMS
23   steps in and contributes an amount that
24   is designed to represent plan
25   expenditures above for members in that

Page 109

LAURA CRAFT

1
2    catastrophic phase, i.e., whose purchases
3    have exceeded the out-of-pocket
4    threshold.
5         The payments that are made by
6    CMS in this phase are unquestionably
7    calculated from and dependent upon the
8    true and accurate reporting of the prices
9    that were actually paid to pharmacies for
10   those purchases.
11        So yes, those subsidies are --
12   the reinsurance subsidy is computed using
13   actual price reporting for those
14   transactions that -- those drugs that
15   have been purchased above the
16   out-of-pocket threshold during the plan
17   year, and then formulas are applied that
18   allocate a portion of those catastrophic
19   phase expenditures to -- that identify a
20   portion of those expenditures for which
21   CMS will then pay the reinsurance subsidy
22   to the plan sponsor.
23        A portion of those
24   expenditures are left with the plan
25   sponsor, itself, and a portion, a small

28 (Pages 106 - 109)

Page 110

LAURA CRAFT

1    LAURA CRAFT
2    portion is retained by the consumer as
3    its co-pay during this coverage phase.
4    Q.   Ms. Craft, have you personally
5    ever -- strike that.
6        Would you consider yourself an
7    expert in healthcare or actuary science?
8        MR. STANOCH:  Objection to
9    form.
10   A.   No.
11   Q.   The PBM data -- strike that.
12       The data that you looked at
13   from MSP from December of 2020 does not
14   provide any information about subsidies
15   that Emblem or Summa may have received,
16   correct?
17       MR. STANOCH:  Objection to
18   form.
19   A.   One correction, I believe you
20   referred just now to data received in
21   2020 and I think you meant December 2022.
22   Q.   I did. Let me restart.
23       The data that you looked at
24   from MSP from December of 2022 does not
25   provide any information about subsidies

Page 111

1    LAURA CRAFT
2    that Emblem or Summa may have received,
3    correct?
4        MR. STANOCH:  Objection.
5    A.   That's correct.  Nor would it
6    because these are an entirely separate
7    set of funding transactions that do not
8    play a part in the payments to the
9    pharmacy that are reported in the PBM
10   data.
11   Q.   Ms. Craft, the data that you
12   reviewed from MSP from December of 2020
13   also does not include any kind of
14   information about rebates or refunds,
15   correct?
16       MR. STANOCH:  Objection to
17   form.
18   A.   Yeah, I think you said 2020
19   again, but I'm going to take it as 2022.
20   And your question is, does it include
21   data on rebates or refunds?
22       So rebates are typically a
23   product of branded drugs, not generic
24   drugs, and this case involves generic
25   drugs. It is true there is no data

Page 112

1    LAURA CRAFT
2    regarding rebates provided, but I suspect
3    there are also no rebates provided.
4        When you say refunds, I don't
5    know what you mean by refunds.
6    Q.   What does the word refund mean
7    to you?
8    A.   It means different things in
9    different contexts.
10       So, for example, functionally
11   we might think of refund as you get your
12   money back and the truth is that
13   pharmaceutical data generated by PBMs
14   contains large numbers of claim
15   reversals.
16       A charge is recorded as
17   payable, a transaction is going to have
18   to result in money being transferred to
19   the pharmacy. It is then subsequently
20   reversed through an offsetting negative
21   entry. I don't think that's a refund, but
22   some might think of it as one because
23   there is an electronic processing of a
24   charge followed by an electronic
25   processing of an exactly offsetting

Page 113

1    LAURA CRAFT
2    transaction with negative values that is
3    designed to wipe them out.
4        If I went to the department
5    store and used my credit card to make a
6    purchase and turned around before I got
7    to my car and decided to take the
8    merchandise back, there would be a very
9    similar set of positive and negative
10   offsetting transactions. The store would
11   probably tell me there's your refund
12   being shown on your card. I don't think
13   those are refunds, but they could,
14   depending on how you are defining the
15   term, I suppose one might use that
16   construction.
17   Q.   In the MSP data that you
18   reviewed from December of 2022 did you
19   see any reversals?
20   A.   No, for the very reason that
21   when the PBM supply data to their TPP
22   clients, they typically report only what
23   are called final paid claims, which is to
24   say, the ones that didn't get reversed. I
25   mention this because reversals are very

29 (Pages 110 - 113)

Page 114

LAURA CRAFT

1    common. You know, they may constitute 20,
2    25% of the rows of data that you see in
3    PBM processing records and that's simply
4    because if there is something that's
5    erroneous, that doesn't connect with the
6    particular plan structure that has to be
7    corrected, the transaction is then
8    reversed or cancelled and it typically is
9    then reprocessed correctly.
10   Q.   So no, in the MSP data you
11   reviewed from December of 2022 you didn't
12   see any reversals?
13        MR. STANOCH:  Objection to
14   form. Go ahead.
15   A.   No, nor would I expect to.
16   Q.   If we use the word refund in
17   the sense of someone buys a prescription
18   and they want to take it back for that
19   prescription from a pharmacy, did you see
20   any of those kinds of refunds in the MSP
21   data from December of 2022?
22   A.   No, I did not.
23   Q.   Do you know how generally a
24   PBM would track those kinds of refunds?

Page 115

LAURA CRAFT

1        MR. STANOCH:  Objection to
2    form.
3    A.   Those kinds of refunds,
4    meaning a consumer brings the drug
5    product they purchased back to the
6    pharmacy and asks for their money back?
7    Q.   Correct.
8    A.   No, I do not.
9    Q.   Ms. Craft, your report states
10   that you've reviewed the contracts
11   between Emblem and Express Scripts and
12   SummaCare and MedImpact, correct?
13   A.   Yes.
14   Q.   Just to confirm, you're not
15   offering any legal opinions about those
16   contracts, correct?
17   A.   That's right. I'm not offering
18   legal opinions about anything.
19   Q.   Did you estimate about how
20   many contracts between PBMs and
21   third-party payors like Summa and Emblem
22   you've reviewed in the course of your
23   career?
24        MR. STANOCH:  Objection to

Page 116

LAURA CRAFT

1    form.
2    A.   I can't provide you with a
3    good estimate. I can tell you it
4    certainly exceeds a hundred but I don't
5    know how many more than that.
6    Q.   Have you ever drafted a
7    contract between a PBM and a third-party
8    payor?
9    A.   No.
10   Q.   Have you ever been able to --
11   strike that.
12        Have you ever been asked to
13   review a contract between a PBM and a
14   third-party payor in your capacity as an
15   attorney?
16   A.   No. I should make clear, I
17   don't practice as an attorney.
18   Q.   Looking at paragraph 23 from
19   your report you state that, "The
20   provision of these contracts are also
21   consistent with the general practices of
22   using only one PBM at a time often for
23   many years." Do you see that?
24   A.   I do.

Page 117

LAURA CRAFT

1    Q.   And is that opinion based on
2    your industry experience or something
3    else?
4    A.   It's based on my industry
5    experience, my review of contracts, my
6    understanding about why and how it's
7    efficient to use a single PBM.
8        It would be a considerably
9    less efficient process if a given plan
10   sponsor which would divide up its claims
11   activity between two PBMs. You could do
12   it based on line of business, for
13   example, your Medicare business with one
14   PBM, your commercial business with
15   another, but the efficiencies all arise
16   around combining that work with a given
17   PBM. It allows the PBMs to generate
18   analytic reports across all plans and
19   otherwise to provide a broader range of
20   services.
21   Q.   And in your experience, how
22   often do payors use just one PBM --
23   strike that.
24        In your experience what

30 (Pages 114 - 117)

Page 118

LAURA CRAFT

1    percentage of payors use just one PBM?
2        A.    And can you define "payor" for
3    me here?
4        Q.    Sure.
5        A.    Do you mean a plan sponsor or
6    do you mean a large insurance company
7    that has many plans that it's sponsoring?
8    What concept are you trying to get at
9    here?
10       Q.    Let's go with health plan
11   sponsor.
12           In your experience, how often
13   do sponsors, like Summa and Emblem, use
14   just one PBM?
15           MR. STANOCH:  Objection to
16       form.
17       A.    So the distinction I'm trying
18   to make here that for a single health
19   plan I have never seen and cannot
20   conceive of a sponsor using more than one
21   PBM. So my answer would be always one,
22   never more at a point in time, at a point
23   in time. I should be clear.
24       Q.    And if we use the word payor

Page 119

LAURA CRAFT

1    to mean a large insurance company that
2    has many plans, how often do those large
3    insurance companies with many plans use
4    just one PBM at any given time?
5            MR. STANOCH:  Objection to
6        form.
7        A.    It's the general rule. But as
8    I mentioned a moment ago, in some cases a
9    large insurer might conceivably use one
10   PBM, for example, for its Medicare Part D
11   business and another for its other, for
12   its other standard commercial business.
13   There could be a split like that on a
14   line of business basis.
15           In general, insurers use one
16   PBM across their line of business, but
17   it's not invariably the case. You could
18   have a split of the type I just
19   described.
20       Q.    Looking at paragraph 24 of
21   your report you state that, "The
22   EmblemHealth contract requires Express
23   Scripts to deliver a formatted paid
24   claims tape to client, EmblemHealth, or a

Page 120

LAURA CRAFT

1    designated vendor, with such tape to be
2    formatted in the standard NCPDP claims
3    file format or in a mutually agreed upon
4    format." Do you see that?
5        A.    Yes.
6        Q.    Is claims tape the same as
7    claims data?
8        A.    No. Tape refers to the medium
9    on which the data is delivered, not to
10   the nature of the data itself. The tape
11   is just talking about how that's
12   delivered.
13       Q.    And when it says "tapes" does
14   it mean literally like an old school
15   tape?
16       A.    I don't know. I'd have to go
17   back and look at the contract to see if
18   there is further explanation.
19           What this means substantively
20   in terms of what's being delivered is the
21   claims data is -- the individualized
22   claims data is being delivered by the PBM
23   to -- the PBM MedImpact to SummaCare.
24       Q.    And the last clause is about

Page 121

LAURA CRAFT

1    being either a NCPDP or a mutually agreed
2    upon format.
3            Do you know whether the claims
4    data from Express Scripts for
5    EmblemHealth is a NCPDP format or in some
6    other format?
7        A.    So it certainly conforms to
8    NCPDP standards for the fields that I
9    reviewed in the MSP production and which
10   are germane to the calculation of damages
11   in this case. I can't speak to any other
12   fields that I haven't examined.
13           I do want to correct my last
14   answer. The quote you were reading to me
15   had to do with Emblem, Emblem's contract
16   with Express Scripts not SummaCare. So if
17   you substitute the word Emblem for
18   SummaCare in my last answer, that would
19   be correct.
20       Q.    Ms. Craft, I want to look at
21   some of the contracts between the TPP --
22   or the MSP TPPs and their PBMs that you
23   refer to in your report.
24       A.    Okay.

31 (Pages 118 - 121)

Page 122

LAURA CRAFT

1
2   Q.   Can we pull up tab 5, please,
3   which I think is going to be Exhibit 5?
4        (Exhibit 5, Express Scripts
5        PBM Agreement, Bates
6        MSP-EMBLEM-000445 was received and
7        marked on this date for
8        identification.)
9   Q.   Just let me know when you've
10  got it, Ms. Craft.
11  A.   Okay. I have that document up.
12  Q.   For the record, Exhibit 5 is
13  Bates stamped MSP-EMBLEM-000445.
14       Ms. Craft, do you recognize
15  this as one of the contracts that you
16  reviewed in putting together your report?
17  A.   Yes, I do.
18  Q.   If we look at footnote 7 in
19  your report, which I believe is on page
20  4., do you see that this footnote says
21  "The agreements between EmblemHealth and
22  SummaCare and their respective PBMs
23  include automatic renewal at the end of
24  the contract", and then cites to a number
25  of contracts, right?

Page 123

LAURA CRAFT

1
2   A.   I do see that.
3   Q.   And this EMBLEM-445 document
4   that we're looking at in Exhibit 5 is one
5   of those, correct?
6   A.   Yes, it is.
7   Q.   All right. So looking back at
8   Exhibit 5, the contract, itself, do you
9   see that in the preamble, the first
10  paragraph, it says that this contract is
11  entered into by and between Express
12  Scripts and Health Insurance Plan of
13  Greater New York, ConnectiCare and HIP
14  Insurance Company of New York?
15  A.   Yes.
16  Q.   It does not list EmblemHealth
17  there, correct?
18  A.   You are correct, I don't see
19  the name Emblem Healthcare there.
20  Q.   So are you able to tell me how
21  this particular contract between HIPIC
22  and ConnectiCare relates to Emblem?
23  A.   So I was aware at the time of
24  drafting my report that ConnectiCare was
25  affiliated, or as you said in your

Page 124

LAURA CRAFT

1
2   questions earlier this morning, a
3   subsidiary of Emblem, I probably should
4   have said more correctly in my report
5   that this was a contract entered into
6   with HIP and ConnectiCare rather than
7   identifying it to Emblem.
8        The provisions that I describe
9   in my report from these two contracts
10  that are cited are there merely to
11  explain that there was nothing unusual
12  about these PBM relationships. They look
13  just like they ordinarily do in this
14  industry. And that's the place I'm
15  referring to them, automatic renewals,
16  long-term relationships, agreements to
17  provide data to the plan sponsors,
18  reflecting each of the individual claims
19  and so on.
20       MR. STANOCH: For the record,
21       THE footnote 7 that counsel was
22       asking about moments earlier does
23       say -- identify -- it says, "The
24       agreement between Express Scripts,
25       Health Insurance Plan of Greater

Page 125

LAURA CRAFT

1
2   New York, ConnectiCare and HIP
3   Insurance Company of New York
4   effective January 1, 2017 through
5   December 31, 2019."
6   Q.   Ms. Craft, how does this
7   contract at tab 5 bind Emblem?
8        MR. STANOCH: Counsel, are you
9   representing that Emblem is not
10  HIP?
11       MS. BRANCATO: I'm trying to
12  understand if this contract is
13  supposed to be between Emblem and
14  Express Scripts or at least bind
15  Emblem to a PBM agreement with
16  Express Scripts, what is the
17  relationship between Express
18  Scripts, ConnectiCare, HIP, HIPIC
19  and all these other entities, and
20  if Ms. Craft understands that.
21       MR. STANOCH: Restate your
22  question.
23  Q.   Ms. Craft, do you understand
24  one way or another whether Emblem is also
25  known as HIP?

32 (Pages 122 - 125)

LAURA CRAFT

1               LAURA CRAFT
2     A.  I do not.
3     Q.  And are you aware, one way or
4  another, of how this particular contract
5  in Exhibit 5 binds Emblem to an PBM
6  agreement with Express Scripts?
7        MR. STANOCH:  Objection to
8    form.
9     A.  No, but I can assure you it
10  contains standard provisions which make
11  exactly the points that I've described in
12  my report, about the relationship between
13  the PBM and a plan sponsor.
14     Q.  I understand that. And we're
15  going to get to the provisions in a
16  minute. I'm just trying to make sure
17  we're all on the same page about who
18  those contracts are for.
19       So are you aware of any
20  contract directly between Express Scripts
21  where it says this contract is between
22  Express Scripts and EmblemHealth?
23        MR. STANOCH:  Objection and
24    mischaracterizes the record.
25       Again, you're misstating and

1               LAURA CRAFT
2  misrepresenting the relationship
3  and entity names of the entities
4  reflected in the agreement.
5       You can answer if you'd like
6  or if you can.
7     A.  Well, I would simply say that
8  the contracts that I've cited in my
9  report are the PBM contracts that I have
10  seen in this matter. They are the ones
11  that were provided to me. So if you are
12  asking me; do I have some other different
13  ones, the answer is no.
14     Q.  Can we go to page 29 of
15  Exhibit 5 -- sorry -- it's 29 of the pdf,
16  Justin, and 27 of the actual document.
17       Ms. Craft, just let me know
18  when you're there.
19     A.  Yes, I'm there.
20     Q.  Do you see that this is marked
21  Exhibit A at the top and it lists some
22  sub-exhibits under Exhibit A?
23     A.  Yes, I do see that.
24     Q.  So if we flip to the next
25  page, which is Exhibit A-1, do you see

1               LAURA CRAFT
2  that this is titled Pharmacy
3  Reimbursement Rates?
4     A.  Yes.
5     Q.  And this page says "redacted",
6  correct?
7     A.  That's correct. It says
8  redacted.
9     Q.  And was this redaction applied
10  before it was provided to you? Let me
11  strike that.
12       When this document was
13  provided to you was it already redacted?
14     A.  Yes.
15     Q.  Do you know who redacted it?
16     A.  No.
17     Q.  In your experience, would
18  Exhibit 1-A be a list of pharmacy
19  reimbursement rates for specific drug
20  products?
21        MR. STANOCH:  Objection to
22    form. Go ahead, if you can.
23     A.  Generally it would describe
24  pharmacy reimbursement rates by category
25  as opposed to by individual product and

1               LAURA CRAFT
2  it would prescribe the procedure by which
3  those rates are to be determined at the
4  time a transaction takes place.
5       For example, will they be
6  based upon MAC, maximum allow cost rates
7  set by the PBM or will they, in the case
8  of brand, possibly be set using the
9  average wholesale price with a specified
10  discount, under what circumstances will
11  drugs be reimbursed to the pharmacy at
12  the pharmacy's own usual and customary
13  rate and that sort of thing.
14       I would not expect to see a
15  list of specific dollar amount prices for
16  individual drugs here. Those prices
17  typically are adjusted throughout the
18  year under pharmacy reimbursement
19  contracts using one of the benchmarks I
20  just described, which is to say, either
21  it's a MAC price or an AWP price. So it
22  is not normally the case that one can fix
23  the dollar amount in a contract of this
24  sort.
25       However, it's very standard

LAURA CRAFT

1  LAURA CRAFT
2  for PBMs to want these terms redacted
3  when they -- when their contracts are
4  produced because it's proprietary
5  information about how they set their
6  pharmacy price.
7      Q.  If are there other redactions
8  applied throughout this document, is it
9  safe to assume you didn't apply any of
10  those?
11      A.  That is correct. I did not
12  alter the document in any way.
13      Q.  And you're not offering an
14  opinion about whether the document is
15  properly redacted based on proprietary or
16  not proprietary information, correct?
17      MR. STANOCH:  Objection to
18  form. The document was produced in
19  this litigation pursuant to an
20  agreed upon Protective Order
21  negotiated with defendants at their
22  insistence on additional provisions
23  over the original Protective Order.
24  And one of the counterparties to
25  this agreement, Express Scripts, is

1  LAURA CRAFT
2  a party defendant and represented
3  on this call right now by
4  Mr. Knepper.
5      So objection. And I -- I take
6  issue with the insinuations about
7  who did what redactions and how it
8  was redacted in this case.
9      MS. BRANCATO:  I'm entitled to
10  ask the expert if she redacted this
11  or if it was received by her in
12  this form.
13      MR. KNEPPER:  Wait. This is
14  Matt Knepper. I just want to
15  clarify I am on this call.
16      Express Scripts is not a
17  defendant to the third-party payor
18  cases.  So, Mr. Stanoch, I don't
19  know if you meant it that way, but
20  I just wanted to clarify that for
21  the record so everyone is clear.
22      MR. STANOCH:  I agree,
23  Mr. Knepper, that your client is
24  not a defendant as to the
25  third-party payors. Your client I

1  LAURA CRAFT
2  meant is obviously a defendant in
3  the overall multidistrict
4  litigation.
5      MS. BRANCATO:  I'm only asking
6  about proprietary information
7  because Ms. Craft mentioned it. And
8  so I just want to make sure she's
9  not going to come to trial and talk
10  about whether something is or isn't
11  proprietary to Express Scripts or
12  anybody else.
13      MR. STANOCH:  Why don't you
14  ask your question, Ms. Craft?
15      Q.  Ms. Craft, sitting here today,
16  are you offering an opinion about whether
17  or not the information in Exhibit 5 is
18  proprietary to anyone?
19      MR. STANOCH:  Same objections.
20      A.  Well, I shouldn't use the word
21  "proprietary". What I meant is this is
22  routinely considered to be sensitive and
23  confidential information by PBMs.
24      And let me, again, stress that
25  in my answer to your question; wouldn't

1  LAURA CRAFT
2  you see lists of prices here, my answer
3  was no. And that I don't understand this
4  field would have any relevance whatsoever
5  to this litigation.
6      It talks about, ordinarily
7  this exhibit would discuss the methods by
8  which pharmacy reimbursement prices will
9  be determined, and that has absolutely
10  nothing to do with the issue here, which
11  is, okay, what amount were they actually
12  paying? And we don't have to wonder about
13  that. We don't need Exhibit A-1 to tell
14  us that. The data tells us for every
15  prescription what they were paid.
16      So I don't understand the --
17  why the pricing methodology with which
18  Express Scripts negotiated those prices
19  would have anything whatsoever to do with
20  this case.
21      Q.  Ms. Craft, I'm asking
22  questions about the document because you
23  cited it in your report and I just want
24  to make sure that you and I are on the
25  same page about what's actually in this

Page 134

1         LAURA CRAFT
2    contract.
3         I understand your position
4    that what's in this contract, the pricing
5    terms are irrelevant to the bottom line
6    that was paid by Emblem and SummaCare,
7    but that isn't what I'm focused on right
8    now.
9         MR. STANOCH:  Is there a
10    question?
11         MS. BRANCATO:  Not yet.
12         MR. STANOCH:  Okay. Just
13    making sure. Objection to the
14    statement without a question.
15    Q.   Let's look at tab 6, please
16    which we're going to mark as Exhibit 6.
17    For the record, this Bates stamped
18    MSP-EMBLEM-0000541.
19         (Exhibit 6, Express Scripts
20    Senior Care MPS agreement, Bates
21    MSP-EMBLEM-0000541 was received and
22    marked on this date for
23    identification.)
24    Q.   Ms. Craft, do you recognize
25    this document as something you reviewed

Page 135

1         LAURA CRAFT
2    in putting together your report?
3    A.   Yes.
4    Q.   If we look at page 33 of the
5    pdf do you see the signature pages here?
6    A.   I do.
7    Q.   Ms. Craft, are you aware of
8    whether or not Exhibit 6 is a duplicate
9    of other contracts listed in your
10    materials relied upon?
11    A.   You are asking whether this
12    contract appears more than once listed in
13    my materials relied upon?
14    Q.   Yes. Do you know that?
15    A.   I don't recall.
16    Q.   If this same contract is, in
17    fact, at three different Bate stamps on
18    your materials relied upon list, would
19    that have been a mistake?
20         MR. STANOCH:  Objection to
21    form.
22    A.   No. No. It might have been
23    overinclusive, perhaps a little more
24    thorough than was warranted, but it's not
25    a mistake.

Page 136

1         LAURA CRAFT
2    Q.   So there aren't any contracts
3    missing that you had meant to include in
4    your materials relied upon that
5    accidently included multiples of this; is
6    that right?
7         MR. STANOCH:  Same objection.
8    Objection.
9    A.   Not that I'm aware of.
10    Q.   We can take that down.
11         Let's look at paragraph 26 of
12    your report.
13         Do you see that you mention
14    that Express Scripts processes
15    approximately 23% of U.S. prescriptions
16    in 2018?
17    A.   I do see that.
18    Q.   Is that 23% specific to
19    valsartan prescriptions?
20    A.   No.
21    Q.   And later on in that same
22    paragraph you mention that MedImpact is
23    smaller but is the primary processor for
24    approximately 2.87 of VCD purchases. Do
25    you see that?

Page 137

1         LAURA CRAFT
2    A.   Yes.
3    Q.   When you say "primary
4    processor", what do you mean?
5    A.   I mean it's the first
6    processor in the sequence. A claim may be
7    processed by multiple entities because
8    you may have multiple payors on a single
9    purchase and the primary is the place the
10    data goes first through processing.
11         So Xponent lists -- the
12    Xponent product supplied by IQVIA lists
13    the first processor when it identifies
14    PBM or processor. And this statement is
15    derived from the Xponent data, which was
16    supplied in this case and simply reports
17    the share of those transactions that in
18    the Xponent data are linked to the name
19    MedImpact as the processor or PBM.
20    Q.   And how did you decide on the
21    time period from January 2012 to October
22    of 2020?
23    A.   I honestly don't recall if
24    that was the scope of the data that was
25    supplied by IQVIA in the Xponent reports.

35 (Pages 134 - 137)

Page 138

LAURA CRAFT

1    LAURA CRAFT
2  That may be the date range in the data. I
3  don't recall.
4      Q.   In paragraph 26 the conclusion
5  is that there is no reason to question
6  the accuracy of the claims data supplied
7  to Emblem or Summa by their PBMs. Do you
8  see that?
9      A.   Yes, I do.
10     Q.   Did you do an analysis of the
11  accuracy of the claims data supplied to
12  Emblem and Summa by their PBMs?
13     A.   I certainly reviewed the
14  fields to see that the values reported
15  appeared to be complete and to represent
16  the elements that are routinely reported
17  throughout this industry. I don't know
18  what you would expect anyone to do to try
19  to find an error in the PBM data.
20         Such errors would be extremely
21  improbable, and, no, I did not attempt to
22  audit these records. But you have chosen
23  not to highlight the last part of that
24  sentence, which is the key.
25         Everybody in the industry goes

Page 139

1    LAURA CRAFT
2  back to the PBM data as the source of the
3  authoritative transaction reporting. And
4  I note that Mr. Kosty, himself, does not
5  contest that fact or challenge the
6  accuracy the PBM data in his report.
7  This is how the entire industry operates.
8      Q.   Ms. Craft, you testified
9  earlier about a case that you are
10  currently retained in against Caremark
11  related to their misrepresentation or
12  causing others to misrepresent inaccurate
13  or inaccurately reporting the PBM data.
14     A.   Through CMS. That's not what
15  this is. You understand the data we're
16  talking about here, I've given you a
17  lengthy explanation for why I think CMS
18  reporting is not relevant to this case
19  and to the exercise that's being
20  undertaken here.
21         What I'm talking about in this
22  paragraph is PBM claims data, and that
23  PBM claims data is a separate dataset and
24  it is that which is described here in
25  paragraph 26. It is not CMS reporting

Page 140

1    LAURA CRAFT
2  data.
3      Q.   You haven't undertaken any
4  exercise to verify whether or not there
5  are any inaccuracies or misstatements of
6  the PBM claims data for EmblemHealth or
7  SummaCare, correct?
8         MR. STANOCH:  Objection to
9  form.
10     A.   I have not.
11     Q.   Ms. Craft, let's look at
12  paragraph 27 of your report, please.
13     A.   Okay. I'm there.
14     Q.   You note that
15  EmblemHealth has assigned claims during
16  the six-year period beginning September
17  29th, 2011 and ending September 29th,
18  2017, correct?
19     A.   Yes.
20     Q.   And SummaCare has assigned
21  claims between January 1st, 2009 and May
22  12th, 2017, correct?
23     A.   Yes. They may have assigned
24  additional claims. I'm saying the
25  documents I saw specifically identified

Page 141

1    LAURA CRAFT
2  those date ranges.
3      Q.   And your point that they may
4  have assigned additional claims is what
5  I'd like to talk about.
6      A.   Okay.
7      Q.   Sitting here today, have you
8  seen any assignment of claims from
9  SummaCare or Emblem more recent than
10  2017?
11     A.   If what you mean is have I
12  seen an assignment that governs
13  specifically claims incurred later than
14  2017? No, I have not seen such a
15  document. I am aware that data was, in
16  fact, produced by MSP covering claims
17  experienced after 2017.
18     Q.   But you're not aware of
19  whether SummaCare and Emblem have
20  formally assigned claims occurring after
21  2017 to MSP, correct?
22         MR. STANOCH:  Objection to
23  form.
24     A.   I haven't seen such an
25  assignment but I do see that MSP has, and

36 (Pages 138 - 141)

Page 142

1    LAURA CRAFT
2  has produced in this litigation, the data
3  pertaining to such claims. I am not sure
4  why it would have that data if they were
5  not assigned.
6     Q.   So in paragraph 27 you say "it
7  is my understanding that there may be
8  additional assignments that extend that
9  period." Do you see that?
10    A.   Yes.
11    Q.   And is that statement based on
12 the fact that MSP did produce data for
13 claims beyond 2017?
14    A.   Yes.
15    Q.   It's not based on any other
16 assumptions or representations from
17 counsel?
18    A.   No.
19    Q.   The very last sentence of that
20 paragraph says, "As explained above, this
21 data includes information sufficient", do
22 you see that?
23    A.   Yes.
24    Q.   And I just want to triple
25 check. When you say "this data" you mean

Page 143

1    LAURA CRAFT
2  the data that MSP produced in December of
3  2022, correct?
4     MR. STANOCH:  Objection to
5     form.
6     A.   It wasn't what I meant when I
7  wrote this because this was written
8  before December 2022, but it is now.
9     Q.   And when you wrote this
10 originally in October of 2021, that
11 opinion was based on the data that MSP
12 had produced previously with fewer
13 fields, correct?
14    A.   That's correct.
15    Q.   So is it your opinion that
16 even with fewer fields in the MSP data we
17 can still calculate the cost of the
18 potential damages to Emblem and
19 SummaCare?
20    MR. STANOCH:  Objection to
21    form.
22    A.   Yes, but we can calculate it
23 more precisely now, because rather than
24 just having the amount that the plan
25 paid, it's broken out into its ingredient

Page 144

1    LAURA CRAFT
2  cost and dispensing fee components.
3     Q.   And that's the specific data
4  that enables you to calculate it more
5  precisely; is that right?
6     A.   So I don't know what the
7  damage methodology will be in this case.
8  Whether, for example, the dispensing fee
9  will be part of the damage claim or not,
10 that's not up to me.  I'm not expressing
11 opinions about damages.
12    What I'm saying is that the
13 more recent data production, should it be
14 relevant, enables one to separate out the
15 dispensing fee.
16    MS. BRANCATO: Okay. We've been
17    going almost another hour and a
18    half. Why don't we take another
19    break?
20    VIDEOGRAPHER:  Time is 11:25.
21    This ends Media Unit 2. We're going
22    off the record.
23    (Recess is taken.)
24    VIDEOGRAPHER:  The time is
25    11:40. This begins Media Unit 3.

Page 145

1    LAURA CRAFT
2  We're back on the record.
3     Q.   Ms. Craft, have you ever
4  worked for a Medicare Part D sponsor,
5  like Summa or Emblem?
6     A.   By "worked for", do you mean
7  an employee of?
8     Q.   Yes.
9     A.   No.
10    Q.   And have you ever helped
11 prepare a CMS bid on behalf of a Medicare
12 Part D sponsor?
13    A.   I'm sorry. Have I ever helped
14 prepare a CMS on behalf of a Medicare
15 Part D sponsor?
16    Q.   A CMS bid.
17    A.   Oh, a bid. No.
18    Q.   And have you ever reviewed the
19 legislative history surrounding Medicare
20 Part D?
21    A.   Yes.
22    Q.   And when was the last time you
23 reviewed it?
24    A.   The last time? I mean, it's
25 something with which I'm generally

37 (Pages 142 - 145)

Page 146

LAURA CRAFT

1
2    familiar in my work, that I have paid
3    attention to and studied in the course of
4    my graduate education about healthcare
5    finance. The last time I looked at a
6    Medicare Part D reg was probably weeks
7    ago, or legislative history for a
8    Medicare Part D reg.
9        Q.    So the last time you looked at
10   the legislative history for a particular
11   piece of a Medicare Part D regulation was
12   a few weeks ago?
13       A.   Yes, that's probably right.
14       Q.    And have you ever submitted an
15   expert report on the legislative history
16   of Medicare Part D?
17       A.   No, not a report specific to
18   legislative history.
19       Q.    Have you ever submitted an
20   expert report on the purpose of Medicare
21   Part D?
22       A.   Not specifically, no, no. I
23   think the answer is no.
24           MS. BRANCATO:  Okay. Ms.
25       Craft, I have no further questions

Page 147

LAURA CRAFT

1
2    at this time subject to other
3    questions that other defense
4    counsel may have.
5            MR. STANOCH:  Any other
6        defendants?
7            MS. BRANCATO:  Going once.
8            MR. STANOCH:  Hearing nothing,
9        I've got a brief redirect.
10   REDIRECT EXAMINATION BY MR. STANOCH:
11       Q.    Hello, Ms. Craft. How are
12   you?
13       A.   Fine. Thank you.
14       Q.    Do you recall questions
15   earlier by Ms. Brancato about Exhibits, I
16   believe, 5 and 6, which were PBM
17   contracts with certain entities related
18   to EmblemHealth?
19       A.   I do.
20       Q.    Okay. And are you aware,
21   generally, that from time to time
22   corporate entities may effectuate a name
23   change?
24       A.   Yes, it does happen.
25           (Exhibit 7, document entitled

Page 148

LAURA CRAFT

1
2        GHI and HIPIC Renamed EmblemHealth,
3        dated June 15, 2021 was received
4        and marked on this date for
5        identification.)
6        Q.    Okay. And I'd like to share my
7    screen. We'll mark it as an exhibit
8    afterwards.
9            Can you see my screen, Ms.
10   Craft?
11       A.   Yes, I can. Thank you.
12       Q.    Okay. And what is the title of
13   this?
14       A.   GHI and HIPIC, H-I-P-I-C,
15   renamed EmblemHealth, and it's dated June
16   15, 2021.
17       Q.    Could you take a moment to
18   read this? And I can scroll down as
19   necessary. It's not that long. Tell me
20   when you're done.
21       A.   Okay. I've read everything on
22   the screen.
23       Q.    Have you had a chance to
24   review this exhibit?
25       A.   I have.

Page 149

LAURA CRAFT

1
2        Q.    And what is this exhibit
3    saying about the renaming of Group Health
4    Incorporated and HIP Insurance Company of
5    New York?
6        A.   That both of them are being or
7    have been renamed as EmblemHealth.
8            In the former case, GHI, as
9    EmblemHealth Plan, Inc., and in the
10   latter, HIP or HIPIC, has been renamed
11   Emblem Health Insurance Company.
12       Q.    And this document you noted is
13   dated from June of 2021?
14       A.   Yes.
15       Q.    All right. Do you recall
16   whether that is after the date of the two
17   PBM contracts that we looked at earlier?
18       A.   Oh, yes, quite a bit after. So
19   these contracts would have had the
20   earlier name, not the Emblem name, but
21   representing the same entities.
22       Q.    Right. And you recall, we can
23   pull them up if you like, but the two PBM
24   contracts that you looked at earlier and
25   that you cite in your report make

Page 150

LAURA CRAFT

1  reference to the same names referenced
2  here in this exhibit, Group Health
3  Incorporated and HIP Insurance Company of
4  New York, right?
5          MS. BRANCATO:  Objection to
6      form.
7      A.   That is correct.
8      Q.   And does this refresh your
9  recollection as to whether there was any
10 name change involving GHI and HIPIC?
11     A.   It certainly does and I
12 apologize for not having remembered this
13 earlier.  I knew those contracts applied
14 to Emblem and I just didn't recall that
15 the name change was what had taken place
16 and explains that.
17     Q.   And with the benefit of now
18 having your memory refreshed with this
19 exhibit, what, if anything, would you
20 change in your report about the
21 discussion of those two contracts that
22 you testified today as to Emblem?
23     A.   Sounds as though I should have
24 added a parenthetical that says, "Now

Page 151

LAURA CRAFT

1  renamed as EmblemHealth plan".  That
2  would have been helpful.
3      Q.   But other than that, any other
4  changes?
5      A.   No, nothing of substance.
6          MR. STANOCH:  That's all I
7      have.  Thank you, Ms. Craft.
8          MS. BRANCATO:  I have no
9      further questions at this time.
10         MR. STANOCH:  I think we're
11     done.  We will read and sign.
12         VIDEOGRAPHER:  The time is
13     11:47.  This ends today's
14     deposition.
15         (The proceedings were
16     adjourned at 11:47 p.m.)

Page 152

C E R T I F I C A T E

1      I, MAUREEN M. RATTO, a
2  Registered Professional Reporter, do
3  hereby certify that prior to the
4  commencement of the examination, LAURA
5  R.  CRAFT was sworn by me to testify
6  the truth, the whole truth and nothing
7  but the truth.
8      I DO FURTHER CERTIFY that the
9  foregoing is a true and accurate
10 transcript of the proceedings as taken
11 stenographically by and before me at
12 the time, place and on the date
13 hereinbefore set forth.
14     I DO FURTHER CERTIFY that I am
15 neither a relative nor employee nor
16 attorney nor counsel of any of the
17 parties to this action, and that I am
18 neither a relative nor employee of such
19 attorney or counsel, and that I am not
20 financially interested in this action.

*Maureen Ratto*

MAUREEN M. RATTO, RPR
License No. 817125

Page 153

I N D E X

WITNESS:  LAURA R. CRAFT          7
EXAMINATION BY MS. BRANCATO       7
REDIRECT EXAMINATION BY          147
MR. STANOCH

E X H I B I T S

Exhibit 1, notice of deposition  32
Exhibit 2, Expert report of      35
Laura Craft dated November 10,
2021
Exhibit 3, expert report of      35
Laura Craft dated October 31,
2022
Exhibit 4, OnPoint Analytics     40
invoices dated January 1, 2022
to October 31st, 2022
Exhibit 5, Express Scripts PBM   122
Agreement, Bates
MSP-EMBLEM-000445
Exhibit 6, Express Scripts        134
Senior Care MPS agreement, Bates
MSP-EMBLEM-0000541
Exhibit 7, document entitled GHI 147
and HIPIC Renamed EmblemHealth,
dated June 15, 2021

39 (Pages 150 - 153)

Page 154

1  DAVID J. STANOCH, ESQ.
2  d.stanoch@kanner-law.com
3          January 16, 2023
4  RE:   In Re: Valsartan, Losartan, Et Al v.
5      1/12/2023, Laura R. Craft (#5659784)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 155

1  In Re: Valsartan, Losartan, Et Al v.
2  Laura R. Craft (#5659784)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Laura R. Craft              Date
25

Page 156

1  In Re: Valsartan, Losartan, Et Al v.
2  Laura R. Craft (#5659784)
3      ACKNOWLEDGEMENT OF DEPONENT
4    I, Laura R. Craft, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Laura R. Craft              Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

40 (Pages 154 - 156)

| & | | | |
|---|---|---|---|

**&** 3:4 4:12,20
5:4,21

**0**

**0000541** 134:18
134:21 153:22
**000445** 122:6
122:13 153:19
**02116** 5:23

**1**

**1** 7:5 32:12,13
32:14 33:2
40:3,13 60:10
70:23 125:4
127:25 128:18
133:13 153:7
153:15
**1/12/2023** 154:5
**10** 10:18 35:6
97:8,12 153:9
**100** 97:9
**105** 96:23
**10th** 35:13
**11:25** 144:20
**11:40** 144:25
**11:47** 151:14
151:17
**12** 1:15
**122** 153:17
**12th** 7:3 140:22
**134** 153:20
**13th** 40:22
**14** 74:24 79:3

**147** 153:4,23
**15** 148:3,16
153:25
**15219** 5:8
**16** 154:3
**1601** 4:13
**17425** 152:24
**19** 24:5 44:8
100:12
**19th** 44:12
**1st** 140:21

**2**

**2** 35:2,4,5,9,10
48:4 51:15
61:2 71:3
144:21 153:8
**2.87** 136:24
**20** 114:2 156:15
**2003** 90:2
**2006** 90:3
**2009** 140:21
**2011** 140:17
**2012** 137:21
**2017** 125:4
140:18,22
141:10,14,17
141:21 142:13
**2018** 136:16
**2019** 125:5
**2020** 110:13,21
111:12,18
137:22
**2021** 10:18
19:19 35:6,13
37:8 73:18

**74:2** 143:10
148:3,16
149:13 153:10
153:25
**2022** 11:7,11
19:6,11,12
20:12,17 21:9
21:17 22:19
23:7,12 24:5
25:9,9,11,12
28:5,6 30:3,5
30:23 35:21
36:2 38:14,24
39:6,16 40:3,4
40:13,14,19,22
41:4,9,13 42:7
42:12 44:8,13
46:15 50:24
52:6 60:3 65:3
73:17,24 79:9
79:21 100:7
110:21,24
111:19 113:18
114:12,22
143:3,8 153:13
153:15,16
**2023** 1:15 7:4
154:3
**21** 81:17
**22** 49:10 65:12
**227** 4:21
**23** 116:19
136:15,18
**230** 4:6

**23rd** 41:13 42:6
**24** 119:21
**24th** 42:12
**25** 114:3
**2525** 3:22
**26** 136:11 138:4
139:25
**26th** 42:18
**27** 127:16
140:12 142:6
**27th** 42:18
**28202** 4:22
**2875** 1:3
**28th** 42:18
**29** 127:14,15
**29th** 140:17,17
**2nd** 5:15

**3**

**3** 35:19,19,20
35:24 36:17,24
37:11 60:2,5,11
60:21 61:2
74:8 144:25
153:11
**30** 154:17
**301** 5:6
**31** 35:21 36:20
39:6 125:5
153:12
**31st** 36:2 40:4
40:13,18 41:4,9
41:18 48:23
153:16
**32** 153:7

[33 - adjourned]                                              Page 2

**33** 135:4
**33131** 5:16
**33134** 3:23
**333** 5:15
**35** 153:8,11

**4**

**4** 39:24,25 40:2
   41:11 42:2
   48:2 53:6
   122:20 153:14
**40** 153:14
**4240** 6:6
**445** 123:3

**5**

**5** 33:9,10 97:7
   102:4,13 103:4
   103:12 122:2,3
   122:4,12 123:4
   123:8 125:7
   126:5 127:15
   132:17 147:16
   153:17
**500** 5:22
**5659784** 154:5
   155:2 156:2

**6**

**6** 134:15,16,19
   135:8 147:16
   153:20
**60** 44:18 46:25
   47:11
**60606** 4:7
**63110** 6:7

**65** 90:7,25

**7**

**7** 122:18 124:21
   147:25 153:2,3
   153:23
**701** 3:5
**70310** 3:6
**75201** 4:14

**8**

**817125** 2:10
   152:25
**8:00** 1:16
**8:02** 7:3

**9**

**9** 74:7,10
**90** 44:18 46:25
   47:11
**900** 3:14
**95** 104:5
**9:32** 70:22
**9:42** 71:3

**a**

**a.m.** 1:16
**ability** 29:13
   81:3,9 90:7
**able** 14:19 59:4
   59:5 116:11
   123:20
**above** 108:21
   108:25 109:15
   142:20 154:6
   156:7
**absolutely**
   56:13 85:4

89:6 133:9
**abuse** 11:22
   13:4,13
**accept** 71:18
**accidently**
   136:5
**accommodate**
   92:6
**account** 68:6
   77:21 94:23
   104:11,15
**accuracy** 138:6
   138:11 139:6
   154:9
**accurate** 81:23
   109:8 152:10
**accurately** 60:6
   86:22 96:18
**accused** 100:3
**acknowledge...**
   156:3
**acknowledg...**
   154:12
**acquired** 25:5
**acronym** 31:20
**act** 12:3 93:6
**action** 15:7
   62:21 152:18
   152:21
**activity** 117:12
**actual** 31:15
   41:25 102:13
   107:15,23
   109:13 127:16

**actually** 13:9
   31:10 41:23
   76:2 86:5 87:9
   107:21 109:9
   133:11,25
**actuarial** 95:3
   95:14
**actuary** 110:7
**add** 47:20 78:2
   79:3 94:15
   108:3
**added** 150:25
**addition** 11:24
**additional** 8:6
   10:21 11:5
   25:24 26:2,16
   31:4 38:23
   39:5,12 40:17
   41:2 44:5 46:4
   46:9 81:5
   93:13 130:22
   140:24 141:4
   142:8
**additions** 156:6
**address** 13:13
   100:15
**addresses**
   16:22
**adequacy** 51:2
   52:20
**adequate** 71:21
   90:13
**adjourned**
   151:17

**adjudicated**
  44:17
**adjudication**
  24:19 75:3,19
  76:18 82:8
**adjusted** 105:3
  107:14 129:17
**administrative**
  11:20 13:2,7,19
  14:7,18 97:20
**adopting** 92:23
**adulterated**
  69:5,7,11
**advance** 36:19
  36:21
**adverse** 91:25
**affect** 69:22
  71:8
**affiliate** 53:23
**affiliated** 55:22
  123:25
**affiliates** 56:2
**affiliation** 54:2
  54:4
**affiliations**
  64:23
**afford** 90:9
**affordable**
  90:20
**afraid** 52:9
**age** 91:10
**agent** 97:20
**aggregate**
  91:22 108:18

**ago** 52:10 55:21
  119:9 146:7,12
**agree** 38:4
  82:15 87:3,4
  94:6 104:22
  131:22
**agreed** 120:4
  121:2 130:20
**agreement**
  122:5 124:24
  125:15 126:6
  127:4 130:25
  134:20 153:18
  153:21
**agreements**
  122:21 124:16
**agrees** 98:4
**ahead** 9:25
  18:23 30:11
  32:11 34:4
  38:3,25 41:20
  44:3 46:20
  51:19 63:25
  88:10 100:9
  101:14 104:3
  107:8 114:15
  128:22
**al** 12:2 14:22
  154:4 155:1
  156:1
**albertson's**
  4:18
**alexia** 4:15 7:24
**alexia.brancato**
  4:16

**alfano** 5:4
**allegation**
  15:22
**allegations**
  60:17
**alleged** 60:12
  62:4 63:4,15
  66:13 70:7
**allegedly** 98:16
**allocate** 43:13
  109:18
**allocated** 45:18
  103:21
**allocation**
  77:20
**allocations** 81:6
  81:10
**allotted** 154:20
**allow** 58:25
  68:18 73:11
  92:16 129:6
**allowed** 14:9
  66:17
**allows** 117:18
**alter** 130:12
**alternative**
  71:23 72:7,9
**alters** 105:8
**ambiguity**
  29:22
**ambiguous**
  107:8
**amount** 28:17
  71:19 72:2
  78:10,11 82:11

87:7 94:9
  96:21 99:8
  107:2 108:23
  129:15,23
  133:11 143:24
**amounts** 71:15
  80:10 93:14,21
  98:23 99:10,14
  104:18,25
**analysis** 42:22
  70:5 138:10
**analyst** 51:6
**analytic** 117:19
**analytics** 40:2
  153:14
**analyzed** 81:14
**andras** 5:17
**andrast** 5:18
**announcement**
  37:12
**answer** 14:10
  17:13,23 21:11
  34:5 35:15
  52:10 54:18
  72:11 85:15
  94:13 95:21
  96:2 103:10
  118:22 121:15
  121:19 127:5
  127:13 132:25
  133:2 146:23
**answered** 39:3
**answering**
  82:25

**answers** 8:18
**antithetical** 59:9
**antitrust** 11:16 11:19
**anybody** 132:12
**apologize** 86:9 150:13
**apparent** 64:5
**appear** 19:23 27:13 35:16,25 40:15 42:17
**appeared** 138:15
**appears** 19:22 27:14 31:17,21 41:21 42:2 51:14 55:2 65:11 135:12
**appended** 156:7
**applicable** 85:7 154:8
**applied** 109:17 128:9 130:8 150:14
**applies** 97:4
**apply** 130:9
**appreciate** 8:9 62:25 83:4
**approach** 71:24
**appropriate** 15:18

**approved** 77:10
**approximately** 22:22 36:16 41:16 136:15 136:24
**argue** 69:10
**argument** 68:21 93:25
**arps** 5:21
**arrangements** 83:13,22,25 84:4,13,19,24
**arrive** 80:9
**arriving** 79:15
**articles** 21:6
**asked** 30:17 31:6 54:19,20 66:24 99:20 100:24 116:13
**asking** 72:18 101:19 106:22 107:10 124:22 127:12 132:5 133:21 135:11
**asks** 115:7
**assigned** 68:5 140:15,20,23 141:4,20 142:5
**assignment** 24:13 60:7,21 60:23,25 141:8 141:12,25
**assignments** 142:8

**assignors** 37:18
**associated** 14:20
**association** 56:23
**assume** 9:17 10:3 104:13 130:9
**assumes** 88:19
**assumption** 86:25 89:18 94:7 99:23
**assumptions** 142:16
**assure** 58:19 62:19 66:12 126:9
**attached** 19:10 19:12 20:15,16 30:2 64:17 65:8 154:11
**attaching** 65:2
**attempt** 138:21
**attempted** 80:23 92:10 105:11
**attention** 11:2 146:3
**attorney** 42:25 43:2 116:16,18 152:17,20 154:13
**attorneys** 5:3 5:12

**attractive** 93:2
**attributable** 29:11
**audible** 47:8
**audit** 58:17 59:16,19,22,25 138:22
**audited** 59:12
**auditor** 59:22
**authoritative** 139:3
**automatic** 29:23 122:23 124:15
**automatically** 29:14
**available** 29:6 98:5,17 154:6
**avenue** 5:15 6:6
**average** 91:9 129:9
**aware** 38:10 40:25 42:7 44:9 47:10 54:5 55:10,18 55:22 70:7 84:2 85:10 101:4 123:23 126:3,19 135:7 136:9 141:15 141:18 147:20
**awp** 129:21

**b**

**b** 12:9 66:6
153:6
**back** 16:5 19:2
21:19 22:2,13
24:18 48:2
55:16 61:15
71:4 73:11
77:21 83:3
105:23 112:12
113:8 114:19
115:6,7 120:18
123:7 139:2
145:2
**background**
81:25
**bansantin** 12:6
**base** 108:6,7
**based** 51:23
74:21 80:7,15
107:15,17,21
117:2,5,13
129:6 130:15
142:11,15
143:11
**basic** 45:20
73:20 75:3,8
88:25 94:7
95:22
**basically** 30:25
65:6
**basis** 103:15
107:14 119:15
**bate** 135:17

**bates** 37:15
122:5,13
134:17,20
153:18,21
**becoming**
90:11
**beginning**
96:21 103:9
140:16
**begins** 144:25
**behalf** 8:4
61:12 145:11
145:14
**behavior** 69:15
69:19,24
**behnke** 11:25
14:22
**believe** 11:15
14:8 20:18
22:18 25:18
29:24 30:21,24
31:16 34:6,10
44:7 53:22
64:17,24 65:24
65:25 67:10,13
68:7 85:14
86:24 92:21
106:7,11
110:19 122:19
147:16
**bellwether**
26:10 28:22
29:2,13 30:19
46:22 49:13
62:2 74:5

**belong** 97:9
**benchmarks**
129:19
**beneficial**
69:12
**beneficiaries**
63:23
**beneficiary**
75:24
**benefit** 76:6,13
150:18
**best** 8:24
**beyond** 48:15
142:13
**bid** 145:11,16
145:17
**bidding** 107:16
**big** 68:14
**bigger** 101:17
**bills** 51:9
**bily** 6:12 7:9
**bind** 125:7,14
**binds** 126:5
**bipc.com** 4:24
**bit** 54:19 55:13
149:18
**black** 69:21
**blackwell** 6:5
**blood** 68:24
**blurry** 71:13
**borne** 102:5
103:3
**boscik** 5:4
**bosentan** 11:15
12:8

**boston** 5:23
**bottom** 41:12
98:18 134:5
**box** 69:21
**boylston** 5:22
**brackets**
103:18
**brancato** 4:15
7:22,24 9:3
18:10 40:23
70:10,17 82:21
85:23 101:15
125:11 131:9
132:5 134:11
144:16 146:24
147:7,15 150:6
151:9 153:3
**brand** 129:8
**branded** 12:9
111:23
**break** 70:13,20
75:13,15
107:11 144:19
**brief** 21:17
147:9
**briefly** 87:24
**brings** 115:5
**broader** 28:24
49:11 64:17
117:20
**broken** 76:16
143:25
**buchanan** 4:20
**budget** 103:20
104:13,19

**budgeted** 96:21
96:24 97:13
104:5
**business** 11:21
56:17 89:2,10
102:18,19
117:13,14,15
119:12,13,15
119:17
**businesses** 89:4
92:22
**buy** 90:10
**buys** 114:18

**c**

**c** 3:1 4:1 5:1 6:1
7:19 12:10
65:12,14,22,24
148:14 152:1,1
**c.whitely** 3:10
**calculate** 28:17
72:9 143:17,22
144:4
**calculated** 87:8
95:14 109:7
**calculating**
98:25
**calculation**
46:17 52:21
77:20 79:13
121:11
**calculations**
72:5
**california**
11:23 13:16

**call** 21:22 91:6
131:3,15
**called** 90:8
113:23
**calls** 100:19
**camp** 3:5,14
**cancelled** 114:9
**cancer** 67:7,12
68:9,16
**capabilities**
47:11
**capacity** 91:14
116:15
**caps** 77:25
**capture** 75:17
**capturing**
50:12
**car** 113:7
**card** 69:3 113:5
113:12
**care** 58:12
134:20 153:21
**career** 115:24
**careful** 67:25
**caremark** 12:2
14:22 15:22
16:2 17:5,25
18:15 139:10
**caremark's**
16:24
**carillon** 4:21
**carolina** 4:22
**case** 8:2 9:23
10:14 11:16,25
12:3,4,12,16,19

12:24 13:2
14:25 15:9,15
15:22 16:5,7
17:4 18:7,15
19:4,13,22,24
20:20 24:4
29:13 32:2
44:21 45:6
46:3,22 47:19
48:14 64:18
69:7 70:3 71:7
71:11 77:8
87:11 89:4
99:3,19 111:24
119:18 121:12
129:7,22 131:8
133:20 137:16
139:9,18 144:7
149:8
**cases** 11:3,5,11
13:7 19:2
20:11 21:5
119:9 131:18
**catastrophic**
78:25 79:24
80:20 109:2,18
**catch** 12:5
51:12
**category** 74:20
128:24
**cause** 17:6 68:9
68:15
**caused** 16:2
108:20

**causing** 17:25
67:7 139:12
**caution** 42:24
**ccr** 1:24
**cease** 56:15
**centers** 83:14
**centre** 5:7
**certain** 8:5 46:8
48:11 108:18
147:17
**certainly** 38:11
49:14 67:4
69:20 116:5
121:8 138:13
150:12
**certification**
12:13,21 15:5
**certified** 2:7
**certify** 152:4,9
152:15
**challenge** 90:19
139:5
**chance** 9:8
148:23
**change** 39:21
73:22 87:2
95:19 147:23
150:11,16,21
155:4,7,10,13
155:16,19
**changed** 80:25
**changes** 39:17
60:22 151:5
154:10 156:6

**changing** 87:12
87:15
**characteristic**
89:17
**characteristics**
69:13 93:5
107:18
**characterizati...**
38:5
**charge** 91:21
112:16,24
**charged** 76:25
87:13
**charges** 99:25
**charlotte** 4:22
**check** 36:5
60:15 142:25
**checking** 9:4
**chicago** 4:7
**child** 56:24
**choose** 47:19
47:25
**choosing** 92:3
**chosen** 67:13
138:22
**chu** 31:13
**circumstances**
14:16 129:10
**cite** 149:25
**cited** 21:20
22:3 124:10
127:8 133:23
**cites** 122:24
**citizens** 90:9

**claim** 24:13
44:16 58:18,21
59:13 71:14
77:21 112:14
137:6 144:9
**claims** 12:3
22:17 23:6,9,19
23:21,22 24:6
24:19 26:16
39:9 46:21,25
47:4,23 49:13
49:17,18,20
52:17 54:24
56:9 57:15
59:2,11 71:9
73:2 74:5 75:2
75:19 82:17,23
95:9 97:25
108:17 113:23
117:11 119:25
120:3,7,8,22,23
121:4 124:18
138:6,11
139:22,23
140:6,15,21,24
141:4,8,13,16
141:20 142:3
142:13
**clarification**
63:2 83:5
88:11
**clarify** 86:3
131:15,20
**class** 12:13,21
15:5,7

**clause** 60:11
120:25
**clean** 42:13
**cleaned** 29:6
**cleaning** 48:5
**clear** 21:3 26:6
60:4 61:24
93:18 116:17
118:24 131:21
**clearly** 34:2
42:6 56:8
57:16,20,23,25
**client** 57:22
119:25 131:23
131:25
**clients** 54:22
113:22
**clinics** 11:23
13:5,15
**cmc** 84:4
**cms** 15:19,24
83:19 84:5,9,11
84:16 86:23
96:18 97:2,15
97:22,23,25
98:13,21,24
100:2 103:16
103:21,24
104:8,11,17
105:16,25
106:13 107:2
108:22 109:6
109:21 139:14
139:17,25
145:11,14,16

**code** 28:20
43:13 74:12,17
74:20
**codes** 44:24
61:8 73:15
74:9,11
**collected** 23:14
**collecting** 34:18
**column** 62:14
**combination**
76:12
**combined**
91:15
**combining**
117:17
**come** 46:17
52:16 58:21
94:2,4 132:9
**comes** 24:7
100:2
**commencem...**
152:5
**commercial**
92:17,19 93:2,5
93:11 94:18
117:15 119:13
**commingle**
59:10
**commissioners**
56:23
**common** 114:2
**communicati...**
43:3
**companies**
56:14,20 89:6

**[companies - contamination]**                                    Page 8

119:4
**company** 55:11
55:14,19 57:9
118:7 119:2
123:14 125:3
149:4,11 150:4
**compare** 19:9
**compared**
22:16
**comparing**
94:16
**comparison**
25:8 26:13
28:4
**compartment...**
95:17
**compile** 62:22
**compiled** 65:5
**complete**
138:15 156:8
**completed**
154:17
**completely**
54:25 68:12,25
95:23
**components**
27:4 76:3
144:2
**compound**
106:20
**comprised**
71:19
**computed**
109:12

**computer** 10:9
**computing**
84:15
**conceivably**
119:10
**conceive**
118:21
**concept** 94:14
118:9
**conceptually**
79:5
**concierge** 6:12
**conclusion**
43:21 52:19
138:4
**conclusions**
50:4
**condition** 68:9
**conducted** 70:9
**conducting**
10:6
**confident** 20:20
**confidential**
17:10 132:23
**confidentiality**
17:20 18:6
**confirm** 115:15
**confirmed**
64:24
**conformed**
28:13
**conforms** 121:8
**conlee** 3:9
**connect** 114:6

**connected** 86:2
**connecticare**
26:8 30:8,22
53:10,14,16,20
53:23 54:6,13
54:24 55:11,15
55:19 56:8
57:15 58:13,21
123:13,22,24
124:6 125:2,18
**connecticut**
53:25
**connection**
10:16 11:14,18
11:25 39:7,13
98:9
**consequences**
97:8
**consider** 46:11
110:6
**considerably**
117:9
**considered**
37:22 39:5
132:22
**consist** 44:18
**consistent** 43:6
43:17,23 67:14
85:9 116:22
**consisting**
90:24
**constitute**
114:2
**construct** 88:25

**constructed**
107:16
**construction**
68:25 113:16
**consulting**
75:22 76:20
**consumer**
68:14,16 69:15
69:19,24 75:20
75:24 77:7,14
77:22 78:7
79:17 80:3,12
80:24 89:11
91:10 92:12
93:23 94:3,4
101:9,12,17
110:2 115:5
**consumer's**
78:9 80:20
101:25
**consumers** 27:3
70:5 82:2 91:5
91:22 94:10,21
**contain** 67:8
**contained**
43:10
**containing** 61:9
61:25 66:5
**contains** 68:15
112:14 126:10
**contaminated**
60:12 62:5
63:5,16 68:8
**contamination**
60:18 66:8,9,12

[contamination - couple]    Page 9

67:7,18 70:8
**contemporan...**
24:20
**content** 27:13
34:11
**contents** 17:11
**contest** 139:5
**contexts** 112:9
**continue** 70:6
92:5
**continued** 4:1
5:1 6:1
**contract** 55:7
84:21 116:8,14
119:23 120:18
121:16 122:24
123:8,10,21
124:5 125:7,12
126:4,20,21
129:23 134:2,4
135:12,16
**contracting**
83:17,21
**contracts** 37:17
37:18 38:6
55:8 84:11
85:6 115:11,17
115:21 116:21
117:6 121:22
122:15,25
124:9 126:18
127:8,9 129:19
130:3 135:9
136:2 147:17
149:17,19,24

150:14,22
**contradicted**
96:15
**contribute** 27:8
**contributes**
108:23
**contributions**
78:18 89:12,14
96:6
**control** 24:17
66:23 93:6
**controlled**
44:24
**controls** 45:2
**convention**
56:25
**conversation**
21:18
**copies** 154:14
**copy** 9:22 19:16
35:12
**coral** 3:23
**corporate** 14:4
54:3 55:25
56:3,6 57:7
147:22
**corporations**
55:23
**correct** 10:5,19
12:25 16:8
18:17 19:8,21
25:3,14 30:13
37:3,9,16 39:23
60:18,19 63:17
65:23 66:6

69:15 71:11
72:7,16 73:18
74:9,14,18
83:23 85:13,20
86:17 98:19
99:6,16 100:7
101:6,8,12,22
101:23 104:19
110:16 111:3,5
111:15 115:8
115:13,17
121:14,20
123:5,17,18
128:6,7 130:11
130:16 140:7
140:18,22
141:21 143:3
143:13,14
150:8 156:8
**corrected** 114:8
**correction**
61:19 110:19
**corrections**
156:6
**correctly** 15:12
19:8 50:2
86:22 99:13
114:10 124:4
**corridor** 97:7
105:3
**cost** 14:19 27:2
27:3,20 45:17
76:24 77:6,11
79:16 80:2,15
80:17,18,21

81:6,10 87:16
90:5,17 101:16
101:25 102:14
102:22,23
103:5 104:6,7
105:13 106:14
107:4 108:9
129:6 143:17
144:2
**costs** 81:5 89:3
92:6,11 93:7
94:24,24 95:15
96:20,23,25
97:5,6,13 102:4
102:10,17,19
102:25 103:10
104:4,12
**counsel** 3:3,12
3:19 4:3,11,18
5:20 6:3 7:13
15:11,12 21:18
24:4 34:16
40:18 41:3,14
41:22 42:4
65:2,5,18,25
124:21 125:8
142:17 147:4
152:17,20
154:14
**counterparties**
130:24
**country** 90:4
**couple** 27:14
76:3 86:6

**course** 8:22
44:15 49:11
55:18 77:15
105:6 115:23
146:3
**court** 1:1 2:7
7:11,15 8:20
9:9 16:14
100:21
**cover** 77:10
91:19 92:6
95:15 101:11
**coverage** 49:4
50:18 52:14,20
78:6,8,21,22
79:10 80:11
81:4,10 90:14
90:16,21 94:19
110:3
**covered** 63:22
75:20 76:9
90:24 93:15
**covering** 40:13
41:3 141:16
**craft** 1:13 2:4
7:1,7,23 8:1,13
9:1 10:1,13
11:1 12:1 13:1
14:1 15:1 16:1
17:1,19 18:1
19:1 20:1 21:1
21:12 22:1
23:1,4 24:1
25:1 26:1 27:1
28:1 29:1 30:1

31:1 32:1,17
33:1,4,6 34:1,5
35:1,6,9,21,24
36:1,15 37:1
38:1,25 39:1
40:1,7,11 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
53:8 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1,3
67:1 68:1 69:1
69:14 70:1,18
71:1,5 72:1,13
73:1,13 74:1,25
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
83:7 84:1 85:1
86:1,12 87:1
88:1,10,13 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1,4
111:1,11 112:1

113:1 114:1
115:1,10 116:1
117:1 118:1
119:1 120:1
121:1,21 122:1
122:10,14
123:1 124:1
125:1,6,20,23
126:1 127:1,17
128:1 129:1
130:1 131:1
132:1,7,14,15
133:1,21 134:1
134:24 135:1,7
136:1 137:1
138:1 139:1,8
140:1,11 141:1
142:1 143:1
144:1 145:1,3
146:1,25 147:1
147:11 148:1
148:10 149:1
150:1 151:1,8
152:6 153:2,9
153:12 154:5
155:2,24 156:2
156:4,12
**create** 42:14
51:9,14 69:3
89:5
**created** 51:23
52:12
**creates** 77:11
77:15

**creating** 48:7
**creation** 89:25
**credit** 68:22
113:5
**crisis** 90:5
**cs** 154:15
**current** 20:9
26:9 28:22,25
55:14
**currently** 24:15
78:7 81:24
139:10
**customary**
129:12
**customer** 79:23
**cv** 19:10,11
20:14
**cvs** 19:10

**d**

**d** 4:23 6:8
15:20 30:2
59:5 61:3,6,8
61:14,23 62:14
62:18,24 63:2
64:9,25 72:15
72:21 78:5,13
78:16 83:9,11
83:18,22 84:3,8
84:23 85:12,17
86:14,16 87:11
88:3,22 89:15
89:25 90:24
92:9,23 93:19
94:17 95:2,16
96:8 100:5,16

**[d - delivered]**

102:6 103:23
119:11 145:4
145:12,15,20
146:6,8,11,16
146:21 153:1

**d.stanoch** 3:8
154:2

**dallas** 4:14

**damage** 13:17
52:21 144:7,9

**damages** 46:2,6
46:12,17 71:11
71:14,19 72:7
81:19 82:12
99:2,17,19,21
100:2 121:11
143:18 144:11

**dancing** 104:24

**data** 22:14,17
22:21 23:6,10
23:11,12,13,15
23:23 24:6,7,8
24:10,12,15
25:8,10,12 26:9
27:25 28:4,5,9
28:13,15,16,24
29:5,9,16 30:5
30:7,15,17,22
30:23 31:3,7,18
32:10 38:15
39:9 42:13
43:4,7,16,19,22
43:24 44:7,17
45:5,23 46:16
47:2,3,4,5,10

47:15,24 48:6,9
49:5,17,18,20
49:23 50:17
51:2,5,6 52:3
52:13,15,19,20
52:24 54:6,23
56:9 57:11,15
58:3,7,11,14
59:2,6 62:15
64:5 71:9,20
72:2,22,25 73:2
73:3,8,20 76:13
79:8,18,20
80:13,24 81:11
81:21 82:6,18
82:21,23,24
84:10 99:13
110:11,12,20
110:23 111:10
111:11,21,25
112:13 113:17
113:21 114:3
114:11,22
120:8,10,11,22
120:23 121:5
124:17 133:14
137:10,15,18
137:24 138:2,6
138:11,19
139:2,6,13,15
139:22,23
140:2,6 141:15
142:2,4,12,21
142:25 143:2
143:11,16

144:3,13

**dataset** 139:23

**datasets** 25:16
28:7

**date** 11:5,24
18:24 20:7,21
23:10,18 24:2
25:18 32:16
35:8,23 36:20
36:22 39:6
40:5 42:6
48:11 50:22,22
80:7 122:7
134:22 138:2
141:2 148:4
149:16 152:13
155:24 156:12

**dated** 35:6,21
40:3,21 148:3
148:15 149:13
153:9,12,15,25

**dates** 20:8
74:22

**dave** 9:7 85:23

**david** 3:7 21:19
154:1

**day** 92:7
156:15

**days** 154:17

**de** 3:22

**death** 91:24

**december**
22:19 23:7
24:5 25:11,12
28:6 30:5,23

38:14 40:22
44:8,12 46:15
79:9,21 100:12
110:13,21,24
111:12 113:18
114:12,22
125:5 143:2,8

**decide** 137:20

**decided** 113:7

**declare** 156:4

**decomposition**
27:2

**deductible** 27:5
77:24 78:20

**deductibles**
76:8

**deemed** 156:6

**defendant** 4:3
4:11,18 5:3,12
5:20 6:3 131:2
131:17,24
132:2

**defendant's**
61:24

**defendants** 8:2
8:5 28:21 29:4
29:12 62:2
69:6 71:18
130:21 147:6

**defense** 147:3

**define** 118:3

**defining** 113:14

**deliver** 119:24

**delivered**
120:10,13,21

[delivered - divide]                                                    Page 12

120:23
**demographic**
107:18
**demographics**
91:11
**department**
113:4
**dependent**
109:7
**depending**
113:14
**depends** 103:17
**deponent**
154:13 156:3
**deposed** 8:14
10:13 14:7
18:15,18 20:5
20:17 21:4
**deposing**
154:13
**deposition** 1:12
2:3 7:6 8:4
10:10,20 12:16
12:24 18:25
19:4,25 20:4,7
20:18,19,21,24
20:25 21:8,13
26:13 32:15
33:3 38:22
39:8,14 41:7
101:2,6 151:15
153:7
**depositions**
14:8 20:8,13
22:8,11 32:2

**derived** 137:15
**describe** 52:15
59:21 96:19
124:8 128:23
**described** 31:5
34:9,11 50:13
52:2 66:14
91:24 108:8,14
119:20 126:11
129:20 139:24
**design** 76:7,13
**designated**
120:2
**designed** 69:2
73:10 108:24
113:3
**detail** 25:21,24
**detailed** 23:20
**details** 17:14
79:5
**determination**
46:5,12 80:5,6
**determine**
28:13 43:5
64:20 70:5
78:19 80:2
81:19
**determined**
75:19 76:12
78:9 91:2
129:3 133:9
**determining**
46:2 76:3
82:10

**develop** 92:24
**difference**
80:18 97:7
102:13 103:12
103:17,19
**differences**
16:21 25:16
103:15
**different** 16:20
18:7 27:14,17
27:22 31:18
44:19 47:12,13
47:14 57:4
92:13 94:5
112:8,9 127:12
135:17
**differentiate**
54:6,11,21,21
**difficult** 90:12
106:20
**dir** 15:19
**direct** 10:25
55:23 63:7
107:13
**direction**
102:16 105:4
**directly** 24:18
29:11 50:22
100:10 126:20
**disability** 91:4
**disabled** 91:2
**disagree** 67:9
88:24
**disclosed** 19:19

**discount**
129:10
**discuss** 17:11
74:10 107:12
133:7
**discussed** 23:12
38:2
**discussing** 74:8
**discussion**
73:14 78:3
150:22
**disorder** 11:22
**disorders** 13:13
**dispensed**
45:19 68:14
**dispensing**
26:25 43:9
77:2,17 144:2,8
144:15
**dispute** 79:7
99:12,13
**distinct** 54:25
**distinction** 55:2
118:18
**distinctive**
57:17
**distinguishable**
57:20,24 58:2
**distinguished**
58:7
**distribution**
45:2
**district** 1:1,2
**divide** 117:11

**[divided - emblem]**                                                    Page 13

| | | | |
|---|---|---|---|
| **divided** 77:9 | 47:23 67:15 | **earlier** 19:19 | **either** 16:2 |
| **divulge** 18:5 | 68:13 74:16 | 23:9,11 26:6 | 31:24 97:7 |
| **dmc** 19:14 | 76:4,8 79:16 | 30:4 34:16 | 105:4 121:2 |
| **document** 33:7 | 87:14 88:24 | 39:11 53:8 | 129:20 |
| 122:11 123:3 | 90:13,15,21 | 62:12 66:2 | **electronic** |
| 127:16 128:12 | 94:11,19 96:20 | 73:14 83:8 | 36:10 75:22 |
| 130:8,12,14,18 | 96:22 97:5,6 | 86:7 124:2,22 | 76:20 77:15 |
| 133:22 134:25 | 102:10,24 | 139:9 147:15 | 112:23,24 |
| 141:15 147:25 | 103:10 104:4 | 149:17,20,24 | **elements** 27:6 |
| 149:12 153:23 | 108:6 115:5 | 150:14 | 45:24 138:16 |
| **documents** | 128:19 | **earliest** 50:21 | **eligibility** 75:18 |
| 9:20 22:5 | **drugs** 45:3 61:9 | **easier** 28:10 | **ellis** 4:12 |
| 33:21 34:17,19 | 61:25 62:18,23 | **economic** 13:14 | **elm** 4:13 |
| 37:16 140:25 | 66:5 67:5,11 | **economist** 28:8 | **email** 41:22 |
| **doing** 8:8,16 | 68:8 69:5,8 | 31:12 52:12 | **emails** 41:13 |
| 18:12 28:3 | 71:6 72:15,20 | **edits** 60:22 | **embark** 89:4 |
| 29:22 31:15 | 73:22 87:9 | **education** | **embarrassing** |
| 51:4 52:13 | 91:11,16 94:24 | 146:4 | 75:11 |
| 95:17 | 98:16 102:25 | **effective** 90:2,3 | **emblem** 26:15 |
| **dollar** 78:10,11 | 105:5,10 108:9 | 125:4 | 30:18 31:7,23 |
| 80:10 129:15 | 109:14 111:23 | **effectively** | 32:2,8 46:6 |
| 129:23 | 111:24,25 | 23:19 49:22 | 49:7 53:12 |
| **dollars** 94:5 | 129:11,16 | 69:2 77:12 | 58:12,20 59:20 |
| **double** 60:15 | **due** 91:4 | 84:16 88:22 | 61:21 62:8 |
| **downside** 93:9 | **duly** 7:20 | 92:14 93:12 | 72:3 77:8,13 |
| **draft** 101:5 | **duncan** 6:6 | 96:25 | 78:4 82:3,6 |
| **drafted** 116:7 | **duplicate** 135:8 | **effectuate** | 84:3 85:18 |
| **drafting** 123:24 | **duties** 98:8 | 147:22 | 86:15 87:16 |
| **dramatically** | | **efficiencies** | 99:2 101:10 |
| 80:21 | **e** | 117:16 | 102:6 103:23 |
| **drops** 80:21 | **e** 3:1,1 4:1,1 5:1 | **efficient** 51:3 | 104:12 105:9 |
| **drug** 12:5,7,10 | 5:1 6:1,1 12:9 | 117:8,10 | 105:13,24 |
| 15:18,23 17:7 | 12:10,10 36:23 | **effort** 52:23 | 106:13 107:3 |
| 18:2 28:20 | 37:11 152:1,1 | **eight** 26:22 | 110:15 111:2 |
| 44:25 45:12 | 153:1,6 155:3,3 | | 115:12,22 |
| | 155:3 | | |

**[emblem - exhibit]**  Page 14

118:14 121:16
121:18 122:6
122:13 123:3
123:19,22
124:3,7 125:7,9
125:13,15,24
126:5 134:6,18
134:21 138:7
138:12 141:9
141:19 143:18
145:5 149:11
149:20 150:15
150:23 153:19
153:22
**emblem's**
121:16
**emblemcare**
58:12 82:11
**emblemhealth**
22:9 24:11,22
24:23 26:11
28:18 30:6
31:2,19 45:7,22
53:9,17,19,21
53:24 54:7,16
54:25 55:11,15
55:20 56:7
57:16 61:11
62:16 81:19
82:12 83:8,12
85:11 98:24
107:24 119:23
119:25 121:6
122:21 123:16
126:22 140:6

140:15 147:18
148:2,15 149:7
149:9 151:2
153:24
**employee** 145:7
152:16,19
**enables** 144:4
144:14
**enacted** 90:2
**ends** 70:23
144:21 151:14
**enormous**
90:19
**enroll** 92:3
**enrolled** 59:8
**enrollees** 92:12
**enrollment**
75:23 91:3
**entered** 123:11
124:5
**entire** 77:10
105:6 139:7
**entirely** 111:6
**entities** 14:4
56:16 58:25
64:22,23
125:19 127:3
137:7 147:17
147:22 149:21
**entitled** 11:25
131:9 147:25
153:23
**entity** 26:8
53:25 127:3

**entries** 42:11
42:17 44:22
48:5 51:23
**entry** 41:12
42:2 51:13
112:21
**errata** 154:11
154:13,17
**erroneous**
114:6
**error** 138:19
**errors** 138:20
**especially** 47:7
**esq** 3:7,9,16,24
3:25 4:8,15,23
5:9,17,24 6:8
154:1
**essential** 47:20
79:15
**essentially**
103:22
**establish** 23:9
**estimate** 115:20
116:4
**estimation**
95:11
**et** 12:2 14:22
154:4 155:1
156:1
**event** 43:9
**everybody**
138:25
**everyone's** 8:17
**exact** 20:21
56:3

**exactly** 16:19
17:3 54:3
73:25 112:25
126:11
**examination**
7:22 147:10
152:5 153:3,4
**examined**
59:23 121:13
**examining**
28:12
**example** 27:18
44:23 58:19
63:7 79:24
101:20 112:10
117:14 119:11
129:5 144:8
**exceed** 96:20
**exceeded** 109:3
**exceeds** 116:5
**except** 82:17
**excessive** 50:14
**excluded** 76:10
**exclusively**
103:3
**execute** 83:19
**exercise** 139:19
140:4
**exercises** 95:3
**exhibit** 30:2
32:12,13,14,18
33:2 35:4,5,9
35:10,19,20,24
36:17,23,24
37:11,11 39:25

40:2 41:11
48:2 53:6 60:2
60:11 61:3,6,8
61:14,23 62:14
62:18,24 63:2
64:3,9,25 65:11
65:14,22,24
66:6 72:15,21
74:8 122:3,4,12
123:4,8 126:5
127:15,21,22
127:25 128:18
132:17 133:7
133:13 134:16
134:19 135:8
147:25 148:7
148:24 149:2
150:3,20 153:7
153:8,11,14,17
153:20,23
**exhibits**  127:22
147:15
**exist**  56:7 67:18
85:7
**existed**  66:13
**expand**  54:18
75:12
**expanded**  31:3
**expansion**
27:21
**expect**  14:6
18:18 45:21
99:20 114:16
129:14 138:18

**expected**  97:5,6
102:4,11,18,20
103:2,11 108:6
**expenditures**
108:25 109:19
109:20,24
**expenses**
108:20
**expensive**
91:12
**experience**
46:24 58:11
59:6,7 107:17
108:7,18 117:3
117:6,22,25
118:13 128:17
**experienced**
141:17
**expert**  11:4
16:4 35:5,20
48:18,23 69:15
69:24 99:19
110:7 131:10
146:15,20
153:8,11
**experts**  16:24
**explain**  26:2
124:11
**explained**
23:13 31:25
73:5 142:20
**explains**  150:17
**explanation**
120:19 139:17

**explanations**
13:14
**explicit**  80:4,6
**explicitly**  108:4
**express**  6:3
24:23 25:5
81:2 99:20
115:12 119:23
121:5,17 122:4
123:11 124:24
125:14,16,17
126:6,20,22
130:25 131:16
132:11 133:18
134:19 136:14
153:17,20
**expressing**  66:7
69:5 144:10
**extend**  142:8
**extract**  42:14
**extracted**  48:9
**extracting**  48:6
**extremely**  80:2
80:15 90:16
138:20

**f**

**f**  7:19 152:1
**facially**  54:24
64:5
**facilitator**
78:13,16
**facilities**  13:12
13:22
**facing**  90:4

**fact**  17:6 57:5
68:23 71:15
72:3,22 95:15
96:17 98:15
99:22 102:3
135:17 139:5
141:16 142:12
**failed**  38:13
68:5
**fails**  154:19
**fair**  9:18 10:10
**falkenberg**  4:5
**falkenbergiv...**
4:9
**false**  12:2 68:12
**familiar**  146:2
**fault**  86:11
**fda**  37:12 68:18
**feature**  29:15
**february**  21:9
**federal**  67:15
84:17 85:13
88:21 89:14
92:14,24 93:20
93:25 94:8
95:11 96:5
97:20 98:4
103:6
**fee**  26:25 77:2
77:17 144:2,8
144:15
**feel**  36:9
**fewer**  143:12
143:16

fhs 5:10
field 31:21 58:2
  64:7 69:19,25
  80:10 91:6
  133:4
fields 23:20,25
  25:12 26:17,19
  26:24 27:11,13
  27:15,19,21,23
  31:4,18,20,22
  43:10 44:5,10
  44:15,16,19
  45:3,5,8,9,20
  46:5,9,11,16,25
  47:6,9,12,14,20
  48:12 49:19
  50:21 55:3
  58:3,9 121:9,13
  138:14 143:13
  143:16
file 32:23 120:4
filed 11:13,17
  11:19,23 17:9
  20:11 100:12
filing 16:16,25
  36:20
filings 16:14
filled 74:14
  76:23 78:8
final 62:13 77:4
  113:23
finalized 39:15
finance 89:9
  146:5

financial 83:13
  83:21,25 84:4
  84:12
financially
  152:21
find 90:12
  138:19
fine 70:16,21
  147:13
fire 13:18
firm 3:20 7:12
  40:12,16 41:2
  64:13 65:19
first 7:20 10:25
  12:4 19:10
  26:5 40:21
  41:11,25 75:5
  89:22 96:3
  97:3 123:9
  137:5,10,13
five 70:13,15
  70:20
fix 129:22
fixed 101:16
flatly 96:14
flip 103:8
  127:24
flom 5:21
florida 3:23
  5:16
focused 15:4
  134:7
followed 16:15
  112:24

following 13:17
  33:11
follows 7:21
followup 95:25
footnote 122:18
  122:20 124:21
foregoing
  152:10 156:5
form 33:17,25
  34:21 37:25
  38:21 40:21
  41:20 42:24
  44:3 47:17
  48:25 49:6
  50:8 52:8 53:4
  54:9 56:12
  57:19 58:5,16
  59:15 63:25
  66:22 67:22
  69:17 86:5,6,19
  87:18 88:10,18
  99:5 100:19
  101:14 104:3
  104:21 105:18
  106:6,17 107:7
  110:9,18
  111:17 114:15
  115:3 116:2
  118:17 119:7
  126:8 128:22
  130:18 131:12
  135:21 140:9
  141:23 143:5
  143:21 150:7

formally
  141:20
format 28:9
  30:25 120:4,5
  121:3,6,7
formatted
  30:16 119:24
  120:3
former 149:8
forming 37:23
  50:4
forms 15:19,24
formula 97:14
formulary 76:6
  76:10,13
formulas
  109:17
forth 75:7
  152:14
foundation
  107:7
four 75:3 87:24
fourth 75:6
  76:17
framed 106:21
frank 5:9
free 36:9 47:24
  69:3
frequently
  49:20
front 9:24
  19:15 36:11
full 8:11
fuller 23:21

**function** 87:22
88:2,7,15
**functionally**
112:10
**functions** 24:20
75:4,9,15
**fund** 89:2
**fundamental**
102:23
**fundamentally**
72:8 89:21,23
96:6 100:3
**funding** 88:20
89:7 94:6 98:5
98:11 99:24
111:7
**funds** 89:10,15
93:13,25
**further** 17:14
120:19 146:25
151:10 152:9
152:15

**g**

**gables** 3:23
**gap** 78:22,23
**general** 50:25
52:2 106:24
116:22 119:8
119:16
**generally** 14:15
14:17 89:3,8
114:24 128:23
145:25 147:21
**generate**
117:18

**generated** 43:7
43:20,25 65:19
112:13
**generic** 12:7
111:23,24
**germane**
121:11
**getting** 93:13
**ghi** 148:2,14
149:8 150:11
153:23
**gilead** 19:18
20:23 21:5
**give** 9:7 36:4
52:9 81:15
**given** 74:13
86:17 91:13
101:16 117:10
117:17 119:5
139:16 156:9
**go** 9:25 14:13
18:23 30:10
32:11,22 33:9
34:4,13 36:12
38:3,25 41:20
44:3 46:19
48:2 51:18
63:25 64:2
68:19 75:4
82:8 83:3
88:10 91:23
100:8 101:14
104:3 107:8
114:15 118:11
120:17 127:14

128:22
**goes** 77:20
137:10 138:25
**going** 7:2 8:3
8:23 9:5,17
17:8,14 19:2
35:3 51:20
61:17 65:13
68:16 70:11,23
76:4 91:8 95:4
95:7,8,20
104:13 108:9
111:19 112:17
122:3 126:15
132:9 134:16
144:17,21
147:7
**good** 7:23 9:3
49:23 116:4
**gordon** 5:4
**government**
84:17 85:13,16
86:13 88:21
92:24 94:8
95:12 97:21
103:7
**governs** 141:12
**graduate** 146:4
**grant** 5:6
**great** 10:12
33:2 36:9
**greater** 102:25
103:19,20
123:13 124:25

**greenberg** 5:14
**group** 90:23
91:18 149:3
150:3
**growing** 90:5
**gtlaw.com** 5:18
**guys** 70:14

**h**

**h** 5:9 148:14
153:6 155:3
**half** 70:11
96:16 144:18
**happen** 100:22
147:24
**happened** 19:6
**happens** 96:19
103:13 104:17
107:21 108:22
**head** 26:19
104:25
**health** 28:8
78:15 90:19
118:11,19
123:12 124:25
149:3,11 150:3
**healthcare**
31:12 89:8
91:6 110:7
123:19 146:4
**hearing** 14:14
55:13 147:8
**held** 2:4
**hello** 147:11
**helped** 145:10
145:13

**helpful** 151:3
**hereinbefore**
152:14
**hereto** 156:7
**hesitant** 84:25
**hey** 85:23
**high** 68:24
90:16 91:5,7,8
91:15 95:9
108:19
**higher** 74:20
92:4,4 97:6
99:25 102:9,17
102:20
**highlight** 64:3
138:23
**highlighted**
51:17
**highly** 56:17
**hilton** 3:16
**hip** 123:13
124:6 125:2,10
125:18,25
149:4,10 150:4
**hipic** 123:21
125:18 148:2
148:14 149:10
150:11 153:24
**historical**
107:17
**history** 77:22
100:5 145:19
146:7,10,15,18
**honestly** 20:6
137:23

**hope** 38:12
**hosted** 2:5
**hour** 70:11
144:17
**humana** 4:3
**hundred** 116:5
**hundreds**
59:23,23
**husch** 6:5
**huschblackw...**
6:9
**hypothetical**
107:9

**i**

**i.e.** 49:5 94:24
109:2
**idea** 34:24
83:24 100:20
**identifiable**
27:15
**identification**
32:16 35:8,23
40:6 48:12
73:9 122:8
134:23 148:5
**identified** 38:23
55:9 140:25
**identifies** 62:17
80:11 137:13
**identify** 31:23
45:10 65:9
71:10 72:23
73:4 81:3,9
109:19 124:23

**identifying**
124:7
**identities** 56:19
**ids** 58:18
**ignores** 87:21
**ignoring** 88:6
88:14
**illinois** 4:7
**imagine** 18:20
32:6
**impact** 85:18
86:15 106:12
**implicitly** 79:12
**imply** 83:2
**important**
94:14,20
108:16
**impossible**
91:21
**improbable**
138:21
**inaccuracies**
140:5
**inaccurate**
139:12
**inaccurately**
17:7 18:2
139:13
**inappropriate**
71:24
**incent** 93:3
**include** 26:24
31:4 47:6,9
58:13 79:9
89:11,12

111:13,20
122:23 136:3
**included** 26:17
27:25 29:10
30:23 32:9
39:8 48:11
49:24 80:12
136:5
**includes** 142:21
**including** 29:7
58:18
**incomplete**
107:8
**incorporated**
149:4 150:4
**incorporating**
37:6
**incorrect** 100:3
**increase** 103:5
**increasingly**
90:12
**incurred** 41:8
99:3 141:13
**independently**
107:12
**individual**
16:11 57:2,7
59:7 77:22
88:24 105:22
106:8 124:18
128:25 129:16
**individual's**
78:17
**individualized**
120:22

**individually**
  84:20 85:3
**individuals**
  90:14,23
  108:19
**induce** 67:12
**industry** 28:14
  29:18 43:10,18
  43:23 56:18
  58:24 73:10,21
  117:3,5 124:14
  138:17,25
  139:7
**infer** 80:15
**inference** 80:4
**inferentially**
  79:25
**inform** 50:24
**information**
  18:5 26:3,16
  27:11 49:15
  50:12 79:10
  81:25 100:4
  110:14,25
  111:14 130:5
  130:16 132:6
  132:17,23
  142:21
**ingersoll** 4:20
**ingredient**
  26:25 27:20
  76:24 77:5,11
  80:21 101:16
  143:25

**initial** 16:23
  19:23 38:10
  65:4,6 73:6
  78:21,22
**injectable** 45:3
**insinuations**
  131:6
**insistence**
  130:22
**insofar** 17:12
**instruct** 17:17
  18:4
**instructed** 32:7
**insurance** 27:5
  56:13,20,23
  57:9 89:6
  90:11 91:7
  92:8,20 93:11
  93:22 94:18
  118:7 119:2,4
  123:12,14
  124:25 125:3
  149:4,11 150:4
**insured** 82:2
  107:19
**insurer** 83:17
  91:20 92:17
  93:10 119:10
**insurers** 57:2
  92:19 93:2,6
  94:21 119:16
**intending** 89:5
**intent** 89:24
  93:18 96:8

**intention** 38:11
  92:23
**interest** 93:7
**interested**
  43:15 45:9
  152:21
**intermediate**
  52:18
**invariably**
  43:20,24
  119:18
**inventory**
  49:23
**invoices** 40:3
  40:12,17 41:2
  48:3 153:15
**involve** 47:11
**involved** 20:13
  26:7 33:21
  34:18,24 46:22
**involves** 14:25
  111:24
**involving** 11:21
  49:13 150:11
**iqvia** 137:12,25
**irbesartan** 1:8
**irrelevant**
  44:20 98:25
  134:5
**ish** 26:21
**issue** 71:5,6
  100:24 131:6
  133:10
**issued** 10:17
  35:13,25 40:12

  41:2
**issues** 100:16
**issuing** 100:14
**items** 34:9,13
**ives** 4:5

**j**

**j** 3:7 154:1
**jail** 69:3
**janow** 4:23
**january** 1:15
  7:3 40:3,13
  125:4 137:21
  140:21 153:15
  154:3
**jersey** 1:2
**jigger** 107:21
**joint** 14:2,4
**jonathan** 4:23
**jonathan.janow**
  4:24
**jorge** 3:25
**june** 148:3,15
  149:13 153:25
**justin** 6:12 7:9
  127:16

**k**

**kanner** 3:4,8
  3:10 154:2
**kass** 3:24
**kc** 42:12
**keep** 78:17
**kevin** 31:13
**key** 138:24

**[kind - legal]**                                              Page 20

**kind**  14:13
  49:15 70:4,7
  82:6 83:16
  94:13,17 95:10
  105:12 111:13
**kinds**  14:12
  44:22 92:13
  114:21,25
  115:4
**kirkland**  4:12
  7:25
**kirkland.com**
  4:16
**knepper**  6:8
  131:4,13,14,23
**knew**  44:4
  55:25 150:14
**know**  8:14,15
  9:14 14:12,15
  18:21 20:24
  22:22 24:2,4,7
  29:19,21 30:22
  31:14,22 34:23
  36:15 40:7,16
  41:23 42:5
  45:12,14,15,16
  45:17,18 49:16
  51:18,22 54:3
  54:12,15 55:6
  55:25 56:2
  63:19,21 68:2
  69:18,20 79:21
  85:21 88:8
  94:12 100:21
  108:3 112:5

  114:2,24 116:6
  120:17 121:4
  122:9 127:17
  128:15 131:19
  135:14 138:17
  144:6
**knowingly**  69:4
  69:7
**knowledge**
  43:18
**known**  68:15
  125:25
**kosty**  21:15
  38:15 66:25
  68:3 71:25
  88:5,14,19
  89:13 96:5
  99:11 108:13
  139:4
**kosty's**  39:10
  39:20 66:10
  67:17 68:21
  87:20 95:24
  99:23 100:11

---

**l**

**l**  7:19 12:10
**label**  68:13
**labeled**  32:5
**lacks**  107:7
**large**  29:4
  112:14 118:7
  119:2,3,10
**larger**  94:3
**laura**  1:13 2:3
  7:1,6 8:1,13

9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1,4 34:1
35:1,6,21 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1

108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:5 153:2,9
153:12 154:5
155:2,24 156:2
156:4,12
**law**  3:20 7:20
**law.com**  3:8,10
  154:2
**layne**  3:16
**left**  109:24
**legal**  2:6 6:12
  115:16,19
  154:23

[legally - make]    Page 21

**legally** 58:23
**legislative**
  145:19 146:7
  146:10,15,18
**lengthy** 139:17
**leon** 3:22
**level** 57:3 66:9
**levels** 95:9
**lhilton** 3:17
**liability** 1:8
  89:18
**liberty** 17:11
**license** 2:8,10
  152:25
**lieu** 99:25
**likely** 45:22
  91:11
**limited** 23:24
  29:2 73:7
  91:14
**line** 98:18
  117:13 119:15
  119:17 134:5
  155:4,7,10,13
  155:16,19
**link** 32:19,24
**linked** 57:22
  73:11 137:18
**lipitor** 11:18
  12:19
**list** 11:3,8 20:9
  20:16,22 21:4
  29:24 30:2
  37:3,11 38:12
  38:18 61:8

62:14,22 64:16
64:20,25 65:4,6
65:7,11,15,18
75:2,4 123:16
128:18 129:15
135:18
**listed** 20:9,22
  21:2 22:12
  37:22 38:7,8,8
  38:18 62:18
  64:21 66:5
  135:9,12
**lists** 127:21
  133:2 137:11
  137:12
**literally** 104:24
  105:4 120:15
**litigation** 1:9
  7:8 10:22
  11:17,19 23:2
  49:9 130:19
  132:4 133:5
  142:2
**little** 55:13 84:6
  135:23
**llc** 3:4 4:19
**llp** 3:21 4:5,12
  5:5,14,21 6:5
**locations** 74:22
**logic** 93:24
  105:8
**long** 94:13
  95:21 124:16
  148:19

**longer** 70:18,20
**look** 32:11 35:2
  35:18 36:23
  39:24 42:9
  50:20 51:6
  60:2,5,10 61:14
  74:7,24 80:25
  81:17,20 82:13
  82:17 93:17
  99:16 120:18
  121:21 122:18
  124:12 134:15
  135:4 136:11
  140:11
**looked** 21:19
  22:2,7,13,14,20
  23:6 25:11
  26:12 71:9
  110:12,23
  146:5,9 149:17
  149:24
**looking** 48:4
  51:13 52:3,18
  77:23 78:14
  79:18,20
  116:19 119:21
  123:4,7
**looks** 19:13
**loosely** 47:5
**losartan** 1:7
  154:4 155:1
  156:1
**lose** 103:2
**loss** 97:10
  102:21

**losses** 89:5
  96:17,25
**lost** 8:25
**lot** 74:13,21
**lots** 74:16 75:14
**louis** 6:7
**louisiana** 3:6
  3:15
**low** 80:2,15
**lower** 68:23
  97:5 102:3,8,10
  103:10 104:18
**lpa** 3:13
**lrc** 41:13

m

**m** 5:17 152:2
  152:24
**mac** 129:6,21
**made** 22:18
  24:21 29:6,21
  61:11,21 80:9
  98:17 105:5
  109:5 156:5
**magic** 52:22
**magnitude**
  103:17
**maintain** 56:18
**maintained**
  24:8
**make** 26:6
  39:17 46:13
  49:25 57:10
  75:9,23 92:21
  98:4,20 113:5
  116:17 118:19

**[make - mentioned]**                                                                    Page 22

126:10,16
132:8 133:24
149:25
**makes** 72:23
73:4 97:18
**making** 33:21
134:13
**manufactured**
28:21 29:3
61:9 63:14
**manufacturer**
63:8 69:4 73:5
73:12
**manufacturers**
72:24
**manufacturing**
72:14,17,20
**mark** 32:13
35:19 39:25
134:16 148:7
**marked** 10:2
32:15 35:3,7,22
40:5 122:7
127:20 134:22
148:4
**market** 13:11
93:22 98:3
**marketed** 62:3
63:3 66:18
**marketer** 63:7
63:11
**martin** 5:24
**massachusetts**
5:23

**matching** 48:13
62:13
**materials** 21:20
22:3,6,12 37:2
37:7,10,21 38:7
38:9,24 39:5,13
135:10,13,18
136:4
**matt** 131:14
**matt.knepper**
6:9
**matter** 13:6,20
14:7,23 15:6
16:10,12 17:3
21:2,17 41:9
67:6 127:10
**matters** 10:22
13:3,8
**matthew** 6:8
**maureen** 1:24
2:7 7:12 8:25
152:2,24
**maximum**
129:6
**maz** 4:9
**mdl** 1:3
**mdma** 68:15
**meagher** 5:21
**mean** 18:11
19:20 22:25
47:5 67:20
82:25 83:24
85:21 108:7
112:5,6 118:6,7
119:2 120:15

137:4,5 141:11
142:25 145:6
145:24
**meaning** 75:20
115:5
**means** 68:2
69:19 75:22
76:5 112:8
120:20
**meant** 93:8
110:21 131:19
132:2,21 136:3
143:6
**mechanical**
52:23
**med** 78:16
**media** 7:5
70:23 144:21
144:25
**medicaid** 83:14
**medical** 108:20
**medicare** 15:20
53:18 55:7
59:5 78:5,12
83:9,11,14,18
83:22 84:2,8,23
85:11,17 86:14
86:16 87:10
88:3 89:25
92:9,23 93:19
94:17 95:2,16
96:8 100:5,16
102:6 103:22
117:14 119:11
145:4,11,14,19

146:6,8,11,16
146:20
**medication**
63:9
**medications**
90:6,10 91:9
**medimpact**
25:2,5 115:13
120:24 136:22
137:19
**medium** 120:9
**megan** 4:8
**member** 58:18
58:19,20 62:9,9
108:5
**members** 45:11
59:3,8 61:12,21
91:18 93:15
94:25 97:24
98:17 99:25
108:25
**memory** 150:19
**mention** 25:7
37:5 102:2
113:25 136:13
136:22
**mentioned** 11:6
12:4,20 13:3
14:21 16:6
23:5 30:4 31:6
46:23 50:16
53:12 62:12
73:13 83:7
119:9 132:7

**mentioning**
53:13
**mentions** 87:25
**merchandise**
113:8
**merely** 27:21
62:20 66:24
124:10
**mestre** 3:21,25
**met** 78:23
**methodology**
133:17 144:7
**methods** 133:7
**meyer** 3:13
**meyerhilton....**
3:17
**miami** 5:16
**microphone**
51:11
**mid** 22:18
**mind** 61:17
**mine** 8:7
**minimal** 95:5
**minute** 10:2
70:13 126:16
**minutes** 70:15
70:20
**mischaracteri...**
88:2 126:24
**misleading**
97:17
**misreport** 16:3
**misreported**
16:2

**misrepresent**
139:12
**misrepresent...**
139:11
**misrepresenti...**
127:2
**missing** 75:10
95:23 136:3
**missouri** 6:7
**misstatements**
140:5
**misstates** 33:25
50:8
**misstating**
126:25
**mistake** 135:19
135:25
**misunderstan...**
39:4
**moderate** 95:7
**modify** 61:18
**moment** 36:4
52:10 55:21
80:8 119:9
148:17
**moments**
124:22
**money** 103:2
112:12,18
115:7
**monroe** 4:6
**month** 107:13
**morning** 7:23
39:12 62:13
124:2

**motivation**
18:12
**motivations**
18:13
**mouth** 85:24
**move** 85:24
**moving** 79:6
108:10
**mps** 134:20
153:21
**msp** 3:19 22:16
22:18,21 23:6,9
23:11,15,18
24:7,9,14,17,17
32:3 37:17
38:6,15 39:9
42:13 43:4,22
44:6,11 45:25
46:16 48:5,9
49:5 54:24
58:8 62:15,23
63:19,22 64:6
71:15 79:8,20
81:11 82:23
110:13,24
111:12 113:17
114:11,21
121:10,23
122:6,13
134:18,21
141:16,21,25
142:12 143:2
143:11,16
153:19,22

**msp's** 37:18
71:10
**multidistrict**
132:3
**multiple** 13:10
13:24 27:19
74:16 137:7,8
**multiples** 136:5
**mutually** 120:4
121:2
**mylan** 5:3

---

**n**

**n** 3:1 4:1 5:1
6:1 12:9,9
153:1
**n.v.** 5:3
**naic** 56:25
**name** 7:9,24
8:11,13 12:5,7
29:4 31:17
63:8 108:15
123:19 137:18
147:22 149:20
149:20 150:11
150:16
**named** 29:12
31:13
**names** 27:15,17
32:8 127:3
150:2
**narrower**
49:12
**national** 28:20
56:22

| | | | |
|---|---|---|---|
| **nature** 58:23 | **new** 1:2 3:6,15 | 50:20,21 57:22 | 100:8,18 101:7 |
| 120:11 | 11:11 19:13 | 74:13 92:13 | 101:13 104:2 |
| **ncpdp** 120:3 | 20:10 27:24 | 95:5,6,8 96:7,9 | 104:20 105:17 |
| 121:2,6,9 | 39:9 41:13,14 | 96:10,11 | 106:3,5,16 |
| **ndc** 43:13 61:8 | 42:7 123:13,14 | 107:15 122:24 | 107:6 110:8,17 |
| 62:14 64:7,16 | 125:2,3 149:5 | **numbered** | 111:4,16 |
| 65:7 73:3,15 | 150:5 | 37:15 | 114:14 115:2 |
| 74:9,11,12,17 | **newer** 28:5 | **numbering** | 115:25 118:16 |
| 74:20,23 | **nine** 75:15 | 56:24 57:4 | 119:6 126:7,23 |
| **ndcs** 28:19 29:8 | **nodding** 8:19 | **numbers** 50:23 | 128:21 130:17 |
| 29:24 48:13 | **non** 82:2 93:22 | 112:14 | 131:5 134:13 |
| 61:20 62:2,7,10 | **normal** 16:16 | **numerous** | 135:20 136:7,8 |
| 62:20 63:2,13 | **normally** | 26:17 | 140:8 141:22 |
| 63:19,22 65:15 | 129:22 | **ny** 154:15 | 143:4,20 150:6 |
| **necessary** 83:2 | **north** 4:22 | | **objections** 34:2 |
| 148:19 156:6 | **notary** 2:10 | **o** | 38:21 132:19 |
| **need** 42:5 45:8 | 156:13,19 | **o** 12:9 | **obligation** |
| 46:16 70:20 | **notation** 51:8 | **oath** 101:2 | 77:12,16 98:7 |
| 82:5,13,16 | **note** 58:6 139:4 | **object** 9:8 86:6 | **obligations** |
| 91:15 99:22 | 140:14 154:10 | **objecting** 86:5 | 79:14 84:9,10 |
| 106:18 133:13 | **noted** 7:13 | **objection** 18:3 | 98:9 |
| **needs** 108:20 | 85:25 149:12 | 22:24 23:3 | **obliterate** 57:6 |
| **negative** 112:20 | 156:7 | 30:10 33:16,24 | **observed** 25:17 |
| 113:2,9 | **notice** 2:6 | 34:20 37:24 | **observing** 73:7 |
| **negotiated** | 32:14 33:3 | 38:20 40:20 | **obviously** 36:19 |
| 76:21 84:20 | 38:22 153:7 | 41:19 42:23 | 132:2 |
| 85:3 86:21 | **noting** 86:8 | 44:2 46:19 | **occurred** 20:24 |
| 130:21 133:18 | **november** | 47:16 48:24 | 45:13,14 80:9 |
| **neither** 152:16 | 10:18 35:6,13 | 50:7 52:7 53:3 | **occurring** |
| 152:19 | 37:8 39:16 | 54:8 56:11 | 141:20 |
| **net** 85:19,22 | 73:18 74:2 | 57:18 58:4,15 | **october** 11:7,11 |
| **never** 59:12,16 | 153:9 | 59:14 63:24 | 19:6,11,12,22 |
| 104:7 107:14 | **number** 11:22 | 66:21 67:21 | 20:12,16 21:17 |
| 118:20,23 | 22:8 26:21 | 69:16 85:25 | 23:12 25:9 |
| | 42:10 47:14 | 86:18 87:17 | 28:5 30:3 |
| | | 88:9,17 99:4 | |

[october - page]                                                    Page 25

35:21,25 36:20
38:24 39:6
40:4,13,18 41:4
41:9,17 42:2,12
42:18,18 48:23
49:10 50:24
52:6 60:3,25
65:3,12 73:17
73:24 100:7
137:21 143:10
153:12,16
**offer** 92:20
93:3
**offered** 98:2
**offering** 15:14
60:16 66:4,19
72:13 83:17
94:18 115:16
115:18 130:13
132:16
**officer** 7:21
**offset** 88:23
105:3
**offsetting**
112:20,25
113:10
**oh** 8:24 53:22
65:9 145:17
149:18
**okay** 8:20 9:3
9:10,15 10:12
11:13 12:11
19:2 21:10
26:5 32:22
33:2 40:9 53:6

53:22 69:11
70:10,13 81:7
82:10 88:19
95:21,25
107:10 121:25
122:11 133:11
134:12 140:13
141:6 144:16
146:24 147:20
148:6,12,21
**old** 120:15
**older** 28:4 90:8
90:25
**once** 16:25 36:3
46:10 62:8,18
85:6 108:3
135:12 147:7
**ones** 86:7
113:24 127:10
127:13
**onpoint** 40:2
153:14
**open** 40:8,10
**operate** 56:22
84:23 92:17
97:16
**operated** 78:15
**operates** 43:19
43:23 53:24
73:20 139:7
**operating**
102:23
**operation** 88:3
**operations**
13:17 47:21

89:11
**operator** 13:23
**operators**
13:15,21,25
**opine** 18:13
**opinion** 17:5,24
46:14 56:5
57:14 66:4,8,20
67:10,17 69:6
73:6 81:2,8,15
81:18 82:19
98:21 99:7
104:10,14
106:24 117:2
130:14 132:16
143:11,15
**opinions** 15:14
15:17 17:20,21
37:23 39:21
50:5 52:5
60:16 72:14
99:21 115:16
115:19 144:11
**opposed** 80:4
94:2 128:25
**order** 18:6
26:22 81:18
130:20,23
**ordered** 16:14
100:21
**ordinarily** 14:9
92:11 124:13
133:6
**organizations**
13:10

**original** 20:19
26:20 64:16,18
64:19 65:7,8,10
65:15 103:19
104:13 130:23
**originally**
28:24 97:13
104:5 143:10
**orleans** 3:6,15
**outside** 97:11
**overall** 27:9
88:3 93:18
101:11 132:3
**overinclusive**
135:23
**overlooks**
89:24
**oversight** 75:12
**own** 22:4 59:2
65:5 93:8
96:15 129:12
**ownership** 14:2
14:5
**oxford** 5:7

**p**

**p** 3:1,1 4:1,1
5:1,1 6:1,1
148:14
**p.m.** 151:17
**page** 33:9,10
40:21 41:11
42:10,11 48:4
51:15 122:19
126:17 127:14
127:25 128:5

133:25 135:4
155:4,7,10,13
155:16,19
**pages** 33:11,12
135:5
**paid** 28:18
43:12 45:16
49:8 63:20
71:15 72:3
76:19 77:2,23
84:15 85:17,19
86:14 87:9,10
87:13 88:23
92:11 93:22
94:10 99:8,14
105:2,9,13
106:12,14
107:4,13 109:9
113:23 119:24
133:15 134:6
143:25 146:2
**paper** 36:11
**paradigm**
95:22
**paragraph**
60:5,6,10,21,23
74:7,10,24 75:2
79:3 81:17,23
116:19 119:21
123:10 136:11
136:22 138:4
139:22,25
140:12 142:6
142:20

**paragraphs**
61:2 73:23
**parameters**
84:22
**parent** 55:10
55:19,24 56:24
57:3
**parenthetical**
150:25
**parents** 56:15
**part** 15:20 16:4
48:14 59:5
78:5,12 83:9,11
83:18,20,22
84:3,8,23 85:12
85:17 86:14,16
87:11 88:3,22
89:15,25 90:24
92:9,23 93:19
94:17 95:2,16
96:8 100:5,16
102:6 103:22
111:8 119:11
138:23 144:9
145:4,12,15,20
146:6,8,11,16
146:21
**particular**
13:24 14:9
29:8 44:20
47:23 60:7
76:22 79:7,22
79:23 85:19
89:19 101:12
105:14 106:14

107:2,4,20,24
114:7 123:21
126:4 146:10
**parties** 74:6
152:18
**parts** 76:16
77:9 79:6
108:10
**party** 43:14
77:7 98:2,6
102:5 115:22
116:8,15 131:2
131:17,25
**patient** 13:12
**pay** 27:5 77:14
77:16 86:16
89:18 91:22
93:16 97:23,25
98:15 99:9
109:21 110:3
**payable** 112:17
**paying** 90:16
102:24 133:12
**payment** 77:12
79:13
**payments**
61:11 63:22
71:20 104:11
105:4 109:5
111:8
**payor** 31:17
43:14 54:22
77:7 116:9,15
118:3,25
131:17

**payors** 45:7
102:5 115:22
117:23 118:2
131:25 137:8
**pays** 76:7 94:3
94:8 101:9,10
101:11,17,18
101:24
**pbm** 14:25
15:15,23 24:8
24:11,24 25:3
44:17,17 45:5
54:12,16 57:11
57:14 58:3
59:6,13,17 71:9
72:2 73:2
79:18 81:11,20
82:8,17,21,24
83:3 99:13
110:11 111:9
113:21 114:4
114:25 116:8
116:14,23
117:8,15,18,23
118:2,15,22
119:5,11,17
120:23,24
122:5 124:12
125:15 126:5
126:13 127:9
129:7 137:14
137:19 138:19
139:2,6,13,22
139:23 140:6
147:16 149:17

149:23 153:17
pbm's 76:20
pbms 24:19
28:15 29:17
46:9,23 47:13
47:23 52:16
54:5,21 57:12
112:13 115:21
117:12,18
121:23 122:22
130:2 132:23
138:7,12
pc 4:20
pde 15:19
pdf 33:9 127:15
135:5
pennsylvania
5:8
people 95:5,6,8
percentage
97:14 103:15
118:2
perfect 9:25
perform 79:12
performed
24:19 59:16,18
70:4 75:16
performing
59:25
performs 75:3
period 49:16
62:4 63:4,15
78:14 137:21
140:16 142:9

permanently
91:2
permit 58:25
personally
33:14,19,20
34:8 64:11
110:4
perspective
73:20
pertained 26:9
pertaining
142:3
pertains 65:21
74:20 82:2
peter 19:18
pharma 4:11
pharmaceutical
69:25 73:9,21
112:13
pharmaceutic...
5:13
pharmacies
99:9,10,15
109:9
pharmacy 4:4
45:15 76:19,22
77:3,14,17 82:6
82:13 86:21
97:23 111:9
112:19 114:20
115:7 128:2,18
128:24 129:11
129:18 130:6
133:8

pharmacy's
129:12
phase 78:6,9,20
78:21,22,22,23
78:25 79:10,24
80:11,20 81:4,9
109:2,6,19
110:3
phone 10:8
phrase 61:19
82:21 98:22
piece 81:25
101:17,18
146:11
pieces 27:8
pietrogallo 5:4
pietrogallo.c...
5:10
pin 104:25
pittsburgh 5:8
place 20:18
124:14 129:4
137:9 150:16
152:13
placed 108:13
places 108:13
plainly 32:5
plaintiff 3:3,12
3:19 15:11,13
22:15
plaintiff's
40:18 41:3
plaintiffs 26:9
30:19 31:8
34:4

plan 55:4,6
59:8 66:19
75:21,25 76:7
76:14 77:13,16
79:17 83:18
84:8,16 86:23
91:17,23 94:11
94:17 95:6
96:13 97:2,9,15
97:19 98:5,11
99:15 100:14
101:10,18,24
102:14,24
103:4,12,16
105:6 107:20
107:24 108:6
108:24 109:16
109:22,24
114:7 117:10
118:6,11,20
123:12 124:17
124:25 126:13
143:24 149:9
151:2
plan's 76:10
plans 15:20
78:5,13,16
80:24 83:23
84:23 85:9
92:20 93:3
94:21 97:25
98:2,15 99:8,24
101:4 117:19
118:8 119:3,4

play  111:8
plays  91:25
please  7:15
  8:12,19 9:13
  11:12 26:4
  32:12 35:2,18
  39:24 42:10
  48:3 55:17
  74:8,25 122:2
  134:15 140:12
pocket  77:24
  78:11,18,24
  90:17 108:8,21
  109:3,16
point  17:8 18:8
  39:18 48:14
  69:13 77:19
  80:19 102:12
  103:4,13
  104:23 118:23
  118:23 141:3
points  126:11
ponce  3:22
pool  91:7
populated
  49:21 64:7
population
  90:22 91:14
  92:8 107:19
portion  80:20
  104:6,6,7,15,16
  109:18,20,23
  109:25 110:2
position  67:5
  87:3 102:21

134:3
positive  113:9
possession
  24:16
possible  28:16
  71:23 72:23
  73:4 78:19
  105:22 106:7
  106:11
possibly  129:8
potential  27:4
  67:12 68:8
  71:10 72:6
  91:18 143:18
practice  116:18
practices  28:14
  72:17 116:22
preamble  123:9
precise  15:25
  37:20 42:5
  59:7 83:6 84:7
precisely  26:18
  28:17 29:19
  82:7 143:23
  144:5
precursor
  79:15
prefer  36:12
  50:19
premise  68:12
premium  89:12
  92:5 94:2
  108:5
premiums
  91:21 95:13

prepare  21:13
  145:11,14
preparing  39:7
  39:14 41:7
preposterous
  69:10
prescribe  68:18
  129:2
prescribers
  68:17
prescription
  43:8,12 45:12
  74:13 76:23
  78:8 85:20
  86:17 90:6,10
  90:13,21 91:16
  94:11,19
  102:24 104:12
  104:18 105:14
  105:23 106:8
  106:15 107:5
  114:18,20
  133:15
prescriptions
  28:19 105:15
  106:9 136:15
  136:19
present  6:11
  16:18 32:9
  45:24 52:24
  90:18
preserved  47:7
pressure  68:24
pretty  49:21

previous  37:7
previously
  22:11,15,21
  23:23 28:2
  34:10 39:3
  54:23 143:12
price  27:9
  43:13 76:18
  85:19,22 86:15
  86:20,20 87:2
  87:12 88:23
  89:19 91:20
  94:21 105:9,12
  105:23 106:14
  107:4 109:13
  129:9,21,21
  130:6
prices  15:18,24
  17:7 18:2
  76:21 87:8
  92:4 109:8
  129:15,16
  133:2,8,18
pricing  133:17
  134:4
primary  136:23
  137:3,9
printed  9:24
prior  26:14
  65:2 152:4
probably  48:13
  90:8 113:11
  124:3 146:6,13
problem  58:22
  87:20 91:13

**procedure**
49:22 50:16
52:3 129:2
**proceeding**
11:20 14:18
26:11 30:20
31:9
**proceedings**
14:10,13
151:16 152:11
**process** 29:25
51:25 76:18
77:6 82:9
100:22 107:17
117:10
**processed**
52:16 137:7
**processes** 15:15
136:14
**processing** 15:2
47:3,11,15
52:13 112:23
112:25 114:4
137:10
**processor**
136:23 137:4,6
137:13,14,19
**produce** 142:12
**produced** 23:6
23:18 24:17
26:24 28:24
33:23 34:17,19
43:5 44:6,11
54:23 58:8
64:6 82:23

130:4,18
141:16 142:2
143:2,12
**product** 27:20
29:10,20 43:2
68:4 73:8,11
74:17 111:23
115:6 128:25
137:12
**production**
22:17 23:24
24:3 26:6,14,15
26:20 34:24
39:9 44:12
45:25 46:15
74:22 121:10
144:13
**products** 1:8
28:20 29:3
49:8,14,18
64:20 65:9
66:15 68:23
69:23 71:16
128:20
**professional**
2:9 152:3
**profit** 92:21
97:10 102:11
102:12 103:11
104:17
**profitably**
92:17
**profits** 93:8
103:24

**program** 92:25
93:8,14
**programmati...**
29:15
**progressed**
78:20
**projected** 94:23
102:14 103:5
**proper** 11:16
**properly** 15:23
130:15
**proprietary**
130:4,15,16
132:6,11,18,21
**prospective**
107:14
**protecting** 93:7
**protective**
130:20,23
**provide** 17:14
52:14 110:14
110:25 116:3
117:20 124:17
**provided** 11:4
22:23 23:21
25:21 27:6
38:16 62:15
65:4,18,25
90:13 112:2,3
127:11 128:10
128:13
**providing**
50:23
**provision**
116:21

**provisions**
124:8 126:10
126:15 130:22
**pst** 1:16
**public** 2:10
90:19 156:19
**publications**
21:7
**pull** 122:2
149:23
**purchase** 29:20
45:11 64:7
67:13 68:17
89:19 98:7,7
113:6 137:9
**purchased** 62:8
62:11,20 87:9
94:25 107:23
109:15 115:6
**purchases**
24:21 61:22
62:17,22 80:8
82:7 107:15
109:2,10
136:24
**purely** 28:12
**purport** 69:23
**purpose** 14:18
28:12 38:18
42:21 43:16
56:16 59:24
78:3 87:22
88:6,15 89:24
93:18 96:7
100:6 146:20

**[purposes - record]**    Page 30

| | | | |
|---|---|---|---|
| **purposes** 8:17 | **questions** 8:6 | **raw** 52:19 | **receipt** 154:18 |
| 10:9 98:25 | 9:13 83:2 96:2 | **reach** 17:4,24 | **receive** 85:12 |
| **pursuant** 2:6 | 124:2 133:22 | **reaching** 52:19 | **received** 23:7 |
| 24:13 97:14 | 146:25 147:3 | **read** 55:16 | 24:5 25:10 |
| 130:19 | 147:14 151:10 | 61:20 148:18 | 26:7 32:15 |
| **put** 50:14 64:9 | **quick** 70:12 | 148:21 151:12 | 35:7,22 40:4 |
| 64:11,13 66:25 | **quite** 8:15 | 154:9 156:5 | 44:8 105:15,24 |
| 68:13 77:9 | 51:12 80:22 | **readily** 27:15 | 110:15,20 |
| 100:25 102:21 | 96:18 149:18 | **reading** 121:15 | 111:2 122:6 |
| **putting** 21:10 | **quote** 121:15 | **really** 8:9 36:18 | 131:11 134:21 |
| 48:17,22 52:5 | | 64:22 76:15 | 148:3 |
| 53:2 122:16 | **r** | 77:4 82:16 | **recent** 9:23 |
| 135:2 | | **reason** 89:22 | 11:2 19:16 |
| | **r** 1:13 2:3 3:1 | 113:20 138:5 | 21:14,21 22:4 |
| **q** | 4:1 5:1 6:1 | 154:11 155:6,9 | 22:16 26:14 |
| | 7:19,19,19 | 155:12,15,18 | 36:8 39:10 |
| **quality** 66:4,13 | 12:10,10 152:1 | 155:21 | 141:9 144:13 |
| 67:3,19,24 | 152:6 153:2 | **reasons** 73:5 | **recently** 38:16 |
| **quantity** 45:18 | 154:5 155:2,3,3 | 89:20 96:4 | **recess** 70:25 |
| **query** 29:23 | 155:24 156:2,4 | **rebates** 111:14 | 144:23 |
| 31:17 32:7 | 156:12 | 111:21,22 | **recognize** 36:7 |
| **question** 9:17 | **raise** 71:22 | 112:2,3 | 40:11 108:16 |
| 13:11 17:21 | **raised** 71:25 | **rebuttal** 16:17 | 122:14 134:24 |
| 18:9 33:13 | **range** 23:10 | **recall** 22:7 | **recognized** |
| 34:7 38:6 39:2 | 97:8,12 102:4 | 25:24 26:18 | 90:18 |
| 51:21 54:10 | 117:20 138:2 | 27:10 32:4 | **recognizing** |
| 55:16 60:20 | **ranges** 25:18 | 33:8,18 36:18 | 108:17 |
| 65:14,21 66:15 | 48:12 91:10 | 48:10,15 51:25 | **recollection** |
| 67:4 71:8,22 | 141:2 | 52:25 53:10,11 | 150:10 |
| 81:14 86:24 | **raspanti** 5:5 | 65:17 135:15 | **record** 7:3,14 |
| 98:14 101:15 | **rate** 129:13 | 137:23 138:3 | 8:11 23:22 |
| 102:9 106:21 | **rates** 128:3,19 | 147:14 149:15 | 33:25 35:4 |
| 111:20 125:22 | 128:24 129:3,6 | 149:22 150:15 | 43:11 47:7 |
| 132:14,25 | **rather** 102:8 | **recalls** 37:12 | 70:24 71:4 |
| 134:10,14 | 124:6 143:23 | | 77:15 78:5 |
| 138:5 | **ratto** 1:24 2:7 | | |
| | 7:12 152:2,24 | | |

**[record - renewals]**                                                      Page 31

122:12 124:20
126:24 131:21
134:17 144:22
145:2
**recorded** 7:6
29:17 112:16
**records** 58:18
59:13,17,19,24
75:23 76:21
82:14 114:4
138:22
**recovery** 3:20
**redacted** 128:5
128:8,13,15
130:2,15 131:8
131:10
**redaction** 128:9
**redactions**
130:7 131:7
**redirect** 147:9
147:10 153:4
**reduce** 14:19
**refer** 89:9
121:24
**reference** 12:9
61:5 150:2
**referenced**
23:15 37:25
150:2 154:6
**referred** 25:8
85:5,14 110:20
**referring** 34:25
72:25 84:18
124:15

**refers** 87:23
120:9
**reflected** 127:4
**reflecting**
124:18
**refresh** 150:9
**refreshed**
150:19
**refund** 112:6
112:11,21
113:11 114:17
**refunds** 111:14
111:21 112:4,5
113:13 114:21
114:25 115:4
**reg** 146:6,8
**regard** 84:12
**regarding** 7:7
112:2
**regardless** 56:6
108:10
**registered** 2:9
152:3
**regulated** 56:18
**regulation**
67:15 70:2
85:8 146:11
**regulators**
56:21
**regulatory**
84:14
**rehabilitation**
13:12
**reimbursed**
87:10 129:11

**reimbursement**
128:3,19,24
129:18 133:8
**reimburseme...**
98:22
**reinsurance**
108:14,17
109:12,21
**relate** 15:17
**related** 12:13
12:21 13:4
15:15 17:22
30:7 41:8 48:5
49:19 60:17
72:14,19 73:15
100:16 139:11
147:17
**relates** 123:22
**relationship**
53:16 55:24
56:4 57:6
125:17 126:12
127:2
**relationships**
124:12,16
**relative** 152:16
152:19
**relator** 15:10
15:13
**relator's** 15:21
**relay** 78:15
**relevance** 47:22
77:5 133:4
**relevant** 42:14
46:2,5,12 47:18

48:6,8 62:3
63:4,14 74:4
79:6 82:3
98:14 99:7
139:18 144:14
**reliably** 81:3,9
**relied** 22:12
37:2,7,10 38:9
49:2,3,15 50:3
135:10,13,18
136:4
**rely** 38:7 48:16
48:21 50:10,22
52:4
**relying** 48:19
**remember** 20:6
22:5 53:13
65:3
**remembered**
150:13
**reminders** 8:16
**remotely** 10:7
**removed** 30:8
30:12,14
**renamed** 148:2
148:15 149:7
149:10 151:2
153:24
**renaming**
149:3
**renee** 4:15
**renewal** 122:23
**renewals**
124:15

repeat 55:16
repeatedly
    82:20 96:12
rephrase 40:24
    106:10
reply 16:17
report 9:23
    10:17 11:2,6,14
    11:17,20 12:12
    12:20 13:5,6,10
    15:4,23 16:4,9
    16:10,11,22
    17:7 18:2
    19:11,12,16,23
    19:24 20:12,17
    21:15,16,20,21
    22:4,4 23:12,13
    23:18 25:9,10
    27:19 30:3
    35:5,12,17,20
    35:25 36:8,17
    37:3,6,8 38:2
    38:10,15,25
    39:7,11,16,20
    41:14,18 42:8
    48:18,23 49:10
    50:5,24 52:6,15
    53:2 56:21,22
    59:2 60:3,4,8
    60:25 61:3,4,15
    64:18 65:3,8,12
    66:2,10,25
    67:17 72:6
    73:6,14,17,18
    73:24 74:2,25

87:21 95:24
96:12,15 99:12
100:7,11,15,21
100:24 101:5
113:22 115:10
116:20 119:22
121:24 122:16
122:19 123:24
124:4,9 126:12
127:9 133:23
135:2 136:12
139:6 140:12
146:15,17,20
149:25 150:21
153:8,11
reported 1:23
    24:21 49:6
    62:23 72:2
    79:14 81:6
    86:23 111:9
    138:14,16
reporter 2:8,9
    7:11,15 9:2
    88:11 152:3
reporter's 8:20
    9:9
reporting 15:2
    15:16,18 27:22
    56:25 57:8
    58:23 59:9
    84:9 109:8,13
    139:3,13,18,25
reports 11:24
    14:21,24 16:7
    16:23 17:2,9,15

19:20 20:11
99:14 117:19
137:16,25
represent 7:25
    21:8 108:24
    138:15
representations
    142:16
representative
    32:4
representatives
    22:10 32:3
represented
    23:23 25:20
    131:2
representing
    7:10 62:15
    125:9 149:21
represents
    23:14 61:24
reprocessed
    114:10
request 34:6
    101:4
requests 33:11
    33:15,22
required 55:7
    58:23 83:18
    86:22 156:13
requirements
    73:8
requires 119:23
residual 101:24
resolution
    14:20

respective
    122:22
respond 9:16
    17:12 99:22
responding
    17:2 66:24
    96:3
response 34:3
    66:10 67:16
responses
    38:22 69:21
responsibilities
    15:3,16 57:8
responsibility
    59:10 97:22,24
responsible
    34:8
responsibly
    93:6
responsive
    33:22 100:11
restart 88:12
    110:22
restate 125:21
restricted
    30:17 31:7
restricting
    31:11,15
result 90:15
    104:12 112:18
resulting 96:25
retain 93:4
retained 10:21
    13:20 15:8
    19:3 43:20,25

[retained - see]                                                    Page 33

102:14 110:2
139:10
**retention** 84:10
**return** 154:13
154:17
**reveal** 42:25
**revealed** 49:4
**revenue** 92:15
**reversals**
112:15 113:19
113:25 114:13
**reversed**
112:20 113:24
114:9
**review** 28:10
28:11 29:7
30:16 33:14
43:22 51:4
116:14 117:6
148:24 154:7
**reviewed** 21:14
21:15 30:5
33:19 38:17
39:13 64:19
66:11 79:8
111:12 113:18
114:12 115:11
115:23 121:10
122:16 134:25
138:13 145:18
145:23
**reviewing**
39:20 42:3
43:16 50:17
52:25

**right** 10:4,12
10:14,18 12:17
12:18,24 16:7
18:16 19:14
24:24 25:13
30:9 37:4,8,13
39:22 46:18
47:2,15 50:6
56:10 57:17
58:3 59:13
61:7 63:5,16,23
64:4 65:15,16
65:20 71:17
72:12 73:2
74:2 81:12,13
81:21 82:14,18
83:9,10,15
101:3 102:7
103:25 106:23
115:18 122:25
123:7 131:3
134:7 136:6
144:5 146:13
149:15,22
150:5
**rise** 92:5
**risk** 91:5,7,8
93:4 96:13
97:4,17 102:2,5
103:3 105:3
**rivero** 3:21
**role** 91:25
**rolls** 57:3
**room** 9:21 10:4

**rooney** 4:20
**roughly** 22:18
**routinely**
132:22 138:16
**rows** 114:3
**rpr** 1:24 152:24
**rule** 119:8
**rules** 85:3
**running** 102:19

**s**

**s** 3:1,9 4:1 5:1
6:1 12:9 153:6
155:3
**safe** 130:9
**sake** 8:20 9:9
**sale** 87:13
**sales** 69:22 70:2
**sat** 12:15,23
**savings** 104:6,7
**saw** 44:11
85:24 140:25
**saying** 17:13
68:7 69:9 88:8
105:8 140:24
144:12 149:3
**says** 42:13 66:2
68:15 96:12
101:5 120:14
122:20 123:10
124:23 126:21
128:5,7 142:20
150:25
**schedule** 16:13
**scheduled**
18:22

**school** 120:15
**science** 95:14
110:7
**sciences** 19:18
20:23
**scope** 49:11
50:18 51:2
60:24 137:24
**screen** 32:17
81:24 148:7,9
148:22
**scripts** 6:4
24:24 25:6
115:12 119:24
121:5,17 122:4
123:12 124:24
125:14,16,18
126:6,20,22
130:25 131:16
132:11 133:18
134:19 136:14
153:17,20
**scroll** 35:15
36:4 148:18
**se** 5:15 52:11
**seal** 17:9,16
**second** 31:21
35:14 42:9
75:5,21 76:2
**secondary**
98:10
**security** 91:3
**see** 20:14 27:7
32:21,23 33:4
33:10,12 35:10

| | | | |
|---|---|---|---|
| 36:25 41:14 | **sense** 52:14 | **sets** 59:23 | **similarities** |
| 42:15,19 43:4,9 | 114:18 | 76:18,24,25 | 73:16,19 |
| 44:7 51:10,15 | **sensitive** | **seven** 26:22 | **simple** 31:16 |
| 51:16 54:22 | 132:22 | **several** 34:17 | 62:13 |
| 60:13 61:4,5 | **sent** 40:17 | **share** 27:3 | **simply** 25:21 |
| 62:25 63:8 | 154:14 | 32:24 80:3,17 | 29:14 46:7 |
| 64:25 65:10 | **sentence** | 101:25 103:20 | 59:2 68:11 |
| 75:5 79:13 | 138:24 142:19 | 103:24 137:17 | 90:20 93:16 |
| 86:10 93:24 | **separate** 14:3 | 148:6 | 96:11 105:7 |
| 113:19 114:3 | 53:25 56:8,16 | **shared** 47:8 | 114:4 127:7 |
| 114:13,20 | 56:19 57:16,21 | 96:17 97:13 | 137:16 |
| 116:24 120:5 | 58:9,25 111:6 | 103:6 104:8 | **simultaneous** |
| 120:18 122:20 | 139:23 144:14 | **shares** 80:25 | 16:14,15 |
| 123:2,9,18 | **separately** 55:5 | 90:17 | **simultaneously** |
| 127:20,23,25 | 55:8 78:12 | **sharing** 96:24 | 43:8 76:25 |
| 129:14 133:2 | **separateness** | 97:4 102:2 | **single** 32:6 |
| 135:5 136:13 | 57:7 | 103:14 104:17 | 91:17 117:8 |
| 136:17,25 | **september** | **sheet** 154:11 | 118:19 137:8 |
| 138:8,14 | 41:13 42:6 | **shop** 28:9 31:13 | **singles** 89:13 |
| 141:25 142:9 | 140:16,17 | **show** 32:21 | **singling** 96:5 |
| 142:22 148:9 | **sequence** 137:6 | **showing** 81:24 | **singular** 13:9 |
| **seeing** 34:8 | **series** 92:12 | **shown** 113:12 | **sit** 62:6 81:16 |
| **seeks** 89:2 | **serious** 68:9 | **sick** 92:3 | **sits** 78:7 80:12 |
| **seen** 33:6 | **served** 34:3 | **sickest** 92:2 | **sitting** 25:23 |
| 118:20 127:10 | 38:21 | **side** 57:13 97:8 | 63:18 72:5 |
| 141:8,12,14,24 | **services** 83:15 | 103:8 | 81:7 105:20 |
| **segmented** 29:9 | 117:21 | **sides** 16:15,16 | 132:15 141:7 |
| 32:10 | **set** 14:10 18:24 | **sign** 68:14 | **six** 140:16 |
| **selection** 65:7 | 23:24 28:24 | 151:12 154:12 | **skadden** 5:21 |
| 91:25 | 47:23 84:13 | **signature** 135:5 | **skadden.com** |
| **sell** 69:7 | 85:3 105:14 | 152:24 | 5:25 |
| **sells** 69:4 | 106:9 111:7 | **signed** 154:20 | **skilled** 51:5 |
| **senior** 90:9 | 113:9 129:7,8 | **similar** 42:17 | **slate** 5:21 |
| 134:20 153:21 | 130:5 152:14 | 113:9 | **slight** 61:19 |

| | | | |
|---|---|---|---|
| **slightly** 16:20 | **sources** 89:9,13 | **split** 77:6 79:16 | 129:25 |
| 27:16 54:18 | **southern** 13:15 | 119:14,19 | **standards** |
| 61:18 | **space** 92:18 | **sponsor** 55:4 | 121:9 |
| **small** 26:21 | **speak** 15:12 | 77:13 97:2,9,15 | **stanoch** 3:7 |
| 80:22 109:25 | 121:12 | 97:19 98:6,11 | 17:17 18:3 |
| **smaller** 49:13 | **special** 73:8 | 101:10 102:15 | 21:19,23 22:24 |
| 101:18 136:23 | 83:21,25 95:12 | 103:4,12,16,23 | 30:10 33:16,24 |
| **social** 91:3 | **specialist** 6:13 | 105:7 109:22 | 34:20 37:24 |
| **solco** 63:9 | **specific** 28:19 | 109:25 117:11 | 38:20 40:20 |
| **sold** 29:20 | 44:21 45:3 | 118:6,12,21 | 41:19 42:23 |
| 98:17 | 51:24 59:8 | 126:13 145:4 | 44:2 46:19 |
| **solutions** 2:6 | 82:22 83:22 | 145:12,15 | 47:16 48:24 |
| 154:23 | 89:16 92:22 | **sponsor's** 77:16 | 50:7 52:7 53:3 |
| **somewhat** 47:4 | 106:18 128:19 | **sponsoring** | 54:8 56:11 |
| **sorry** 9:5 12:5 | 129:15 136:18 | 118:8 | 57:18 58:4,15 |
| 15:11 18:23 | 144:3 146:17 | **sponsors** 55:6 | 59:14 63:24 |
| 20:15 30:13 | **specifically** | 83:9,12 84:3,8 | 66:21 67:21 |
| 51:11,18 53:22 | 27:7,24 30:6 | 84:16 85:12,17 | 69:16 86:4,11 |
| 54:10 55:12,15 | 31:3 57:12 | 86:14,16,23 | 86:18 87:17 |
| 79:19 81:11 | 67:24 73:10 | 87:11 88:22 | 88:9,17 99:4 |
| 82:11 84:5 | 74:4 76:5 78:3 | 89:15 96:13 | 100:8,18 101:7 |
| 127:15 145:13 | 82:3 88:5,13 | 99:15 118:14 | 101:13 104:2 |
| **sort** 45:4 54:2 | 90:7,22 95:16 | 124:17 | 104:20 105:17 |
| 57:23 129:13 | 140:25 141:13 | **st** 6:7 | 106:3,5,16 |
| 129:24 | 146:22 | **stage** 29:21 | 107:6 110:8,17 |
| **sound** 9:9 | **specifics** 45:10 | **staley** 19:18 | 111:4,16 |
| 71:12 | **specified** 129:9 | 20:23 | 114:14 115:2 |
| **sounds** 12:6 | **speculating** | **stamped** | 115:25 118:16 |
| 97:18 150:24 | 36:21 46:7 | 122:13 134:17 | 119:6 124:20 |
| **source** 92:15 | **speculation** | **stamps** 135:17 | 125:8,21 126:7 |
| 94:6 98:10 | 100:19 | **standard** 28:14 | 126:23 128:21 |
| 99:24 139:2 | **spelled** 12:8 | 43:10 49:22 | 130:17 131:18 |
| **sourced** 24:10 | **spent** 41:6 | 50:16 83:16,20 | 131:22 132:13 |
| 30:6 82:24 | **spiral** 91:24 | 94:10 119:13 | 132:19 134:9 |
| | | 120:3 126:10 | 134:12 135:20 |

136:7 140:8
141:22 143:4
143:20 147:5,8
147:10 151:7
151:11 153:5
154:1
**start**  11:10
108:2
**started**  8:10
36:16,22 41:17
41:24 96:3
103:9
**starting**  42:11
**starts**  37:11
60:11
**state**  8:11 56:21
116:20 119:22
**stated**  67:16
**statement**
104:23 134:14
137:14 142:11
**statements**
97:16
**states**  1:1
115:10
**statistic**  48:7
**statistics**  42:14
48:8,17,22 49:3
49:4 50:4,10,15
**status**  91:4
**statute**  85:8
**statutory**  84:14
**stenographic**
7:14

**stenographic...**
152:12
**step**  52:18 77:4
**steps**  108:23
**store**  113:5,10
**story**  96:16
**stoy**  5:9
**street**  3:5,14
4:13,21 5:6,22
**strenuously**
67:9
**stress**  132:24
**strike**  37:19
48:18,20 63:20
79:19 106:9
110:5,11
116:12 117:24
128:11
**structural**
84:22
**structure**  14:3
16:17 47:10
54:3 56:3,6
88:4 93:18
114:7
**structured**  87:6
**structures**
84:14 85:5
**studied**  69:20
146:3
**study**  80:23
**sub**  127:22
**subdivision**
74:21

**subject**  13:6
14:23 15:5
16:10,12 17:3
18:5 28:22
44:25 49:9
73:7 147:2
**subjects**  74:4
**submitted**
15:19,24 21:16
146:14,19
**subparts**  75:14
**subscribed**
156:14
**subsequently**
112:19
**subsidiaries**
56:15 88:7
100:17
**subsidiary**  57:5
124:3
**subsidies**  84:15
85:12,16 86:13
87:2,6,7,22,24
88:8,16 92:14
93:12,20 95:19
98:21 105:15
105:23 106:22
107:11 109:11
110:14,25
**subsidized**
93:22 94:22
**subsidy**  84:19
87:12,15 98:5
106:12,19
107:2,13

108:12,15
109:12,21
**substance**
11:22 13:4,13
16:19 44:24
95:19 151:6
**substantive**
41:25
**substantively**
120:20
**substitute**
92:10 93:14,20
108:4 121:18
**sufficient**  71:10
93:4,13 142:21
**sufficiently**
92:25
**suggests**  85:2
**summa**  30:18
31:8,23 32:3,8
46:6 53:13
72:3 77:8,13
84:3 85:18
86:15 87:16
102:6 103:23
104:11 105:9
105:13,24
106:13 107:3
110:15 111:2
115:22 118:14
138:7,12 145:5
**summacare**
22:9 24:12,22
25:2 26:11,15
28:18 30:7

31:2 45:7,22
49:7 53:9
59:20 61:11,21
62:9,16 78:4
81:20 82:4,7,12
83:8,12 85:11
98:24 99:2
115:13 120:24
121:17,19
122:22 134:6
140:7,20 141:9
141:19 143:19
**summaries**
50:20
**summarize**
51:6 52:23
60:6
**summary** 27:25
**summation**
87:8
**supplant** 92:15
**supplement**
44:6 47:24
**supplemental**
100:15
**supplied** 16:23
22:15,21,25
23:2,16,25 24:3
24:12 26:3,17
28:2,15 29:3,16
29:17 32:20
34:10,11 42:3
49:5,17,19 55:3
64:15 88:21
137:12,16,25

138:6,11
**supply** 79:4
113:21
**support** 52:21
**suppose** 58:17
113:15
**supposed**
125:13
**sure** 11:13 23:8
33:21 36:6
46:13 49:25
51:13 55:5
57:10 75:9,23
98:20 101:20
105:21 118:5
126:16 132:8
133:24 134:13
142:3
**surrounding**
145:19
**survey** 70:4
**surveys** 70:9
**suspect** 112:2
**swear** 7:16
**sworn** 7:20
152:6 156:14
**symmetric** 97:4
**systems** 57:4

**t**

**t** 7:19 12:9,10
152:1,1 153:6
155:3,3
**tab** 32:12 35:2
35:19 39:24
122:2 125:7

134:15
**tables** 42:15
48:7 51:9,14,22
52:5,11,11,22
53:2
**tabulate** 50:18
50:19
**take** 19:17
35:14 53:6
68:6 70:12,17
97:10 104:10
104:15 111:19
113:7 114:19
131:5 136:10
144:18 148:17
**taken** 70:25
144:23 150:16
152:11
**takes** 57:2
77:21 129:4
**talk** 8:24 9:6,7
61:3 132:9
141:5
**talked** 19:5
53:12
**talking** 49:12
53:9 57:11
103:9 106:19
120:12 139:16
139:21
**talks** 96:16
133:6
**tape** 119:25
120:2,7,9,11,16

**tapes** 120:14
**target** 90:22
**targeting** 95:11
**teleconference**
2:5
**tell** 10:24 13:5
14:23 20:10
34:22 62:21
74:12 113:11
116:4 123:20
133:13 148:19
**telling** 108:15
**tells** 96:16
133:14
**ten** 75:15
**tens** 105:5
**term** 47:4
84:25 88:21
113:15 124:16
**terminated**
13:16
**termination**
11:21
**terminations**
13:4
**terms** 28:14
84:21 120:21
130:2 134:5
**testified** 20:2
139:8 150:23
**testifies** 7:21
**testify** 152:6
**testimony** 11:4
20:9,16,22 21:3
50:8 154:9,18

156:8

**teva**  5:12 19:14
  19:21 29:4
  61:10 63:3,13
  64:23

**texas**  4:14

**thank**  8:8 12:11
  21:10 36:14
  40:9 51:17
  61:15 70:21
  86:4,7 147:13
  148:11 151:8

**theory**  71:18

**thing**  91:17
  94:15 129:13

**things**  26:24
  38:3 45:4
  76:11 112:8

**think**  18:9 39:2
  45:23 49:2
  50:9 68:11,24
  71:23 72:8
  79:5 87:19,19
  87:25 89:20,22
  93:17 95:4,15
  95:23 96:4
  98:13 99:7,16
  99:22 100:12
  102:8 107:10
  108:12 110:21
  111:18 112:11
  112:21,22
  113:12 122:3
  139:17 146:23
  151:11

**third**  26:8
  43:14 75:5
  76:15,17,17
  77:7 102:5
  115:22 116:8
  116:15 131:17
  131:25

**thorough**
  135:24

**thousands**
  105:5

**three**  27:3 29:4
  53:11 64:21,22
  71:13 75:8
  135:17

**threshold**  78:24
  80:16 108:8,22
  109:4,16

**thrown**  54:20

**tier**  76:5

**tiffany**  5:17

**tim**  21:15

**time**  8:9 9:12
  14:19 21:11
  34:14 41:3,6,8
  41:16,21 44:16
  49:10,16 63:14
  70:22 71:2
  78:7 87:13
  90:9 116:23
  118:23,24
  119:5 123:23
  129:4 137:21
  144:20,24
  145:22,24

146:5,9 147:2
  147:21,21
  151:10,13
  152:13 154:19

**timeframe**
  154:8

**timely**  34:3

**times**  8:15
  51:15

**title**  148:12

**titled**  128:2

**titling**  11:16

**today**  8:4,9,17
  9:21 10:4 19:5
  21:13 25:23
  36:13 38:19
  39:8 41:7
  63:18 72:5
  81:7 98:21
  105:20 132:15
  141:7 150:23

**today's**  151:14

**together**  48:17
  48:22 52:5
  53:2 64:10,12
  64:14 77:10
  122:16 135:2

**told**  55:24
  67:11

**took**  20:18 67:5

**top**  26:18
  127:21

**torrent**  4:11
  7:25 29:5
  61:10 63:3,13

64:23

**total**  71:19
  96:20,22

**totally**  71:21

**toward**  41:12
  61:15

**tower**  4:21

**tpp**  47:8 59:19
  113:21 121:22

**tpps**  121:23

**trace**  105:22
  106:8,12,25

**traced**  24:18
  107:22

**tracing**  105:12

**track**  43:11
  59:4,5 78:17
  114:25

**tracked**  55:5
  78:12

**tracking**  56:17

**tracleer**  11:15
  12:10

**trade**  4:21

**transaction**
  27:9 45:10,13
  45:14 77:18
  79:22 98:8,10
  112:17 113:2
  114:8 129:4
  139:3

**transactions**
  25:19,22 31:23
  49:7 50:21
  62:16 109:14

[transactions - use]                                                    Page 39

111:7 113:10
137:17
**transcript**
152:11 154:6
154:20 156:5,8
**transferred**
112:18
**transforms**
89:17
**traurig** 5:14
**treated** 76:4
**trial** 14:13
28:23 29:2
31:9 66:20
132:9
**trials** 20:2
**tried** 86:5
**triple** 142:24
**trivial** 62:21
**troop** 78:10,13
78:16 80:7
**trouble** 55:13
**true** 59:17
78:10 89:6
96:19 97:21
102:22 109:8
111:25 152:10
156:8
**truly** 58:12
**truth** 60:17
75:13 112:12
152:7,7,8
**try** 8:24 9:6,7
72:9 83:5
138:18

**trying** 19:9
23:4,8 75:17
86:24 118:9,18
125:11 126:16
**turn** 10:7
**turned** 113:6
**two** 11:24
13:14 14:3,21
14:24 16:6
19:9,20 21:24
22:8 25:16
31:18,22 32:20
56:9 58:2,8
76:16 77:9
89:20 91:3
96:4,9,10,11
117:12 124:9
149:16,23
150:22
**type** 29:16 43:7
43:24 119:19
**types** 26:2
43:19 87:24
98:22
**typically** 80:22
111:22 113:22
114:9 129:17

**u**

**u** 7:19
**u.s.** 136:15
**ultimate** 87:16
**ultimately**
13:16 24:10
85:18 101:11

**unacceptable**
66:16 67:19,20
**under** 17:9,15
55:8 84:22
97:24 101:2
127:22 129:10
129:18
**underlying**
25:19 87:21
88:6,15
**understand**
9:13 17:19,23
18:9 23:5
24:16 26:10
46:14 50:2,17
57:11 63:12
68:20 69:25
71:14 94:20
105:7 125:12
125:23 126:14
133:3,16 134:3
139:15
**understanding**
19:7 23:17
24:25 25:4
28:25 43:6,17
49:24 50:25
53:15 61:7
98:20 117:7
142:7
**understands**
125:20
**understood**
9:18 83:4

**undertake** 95:3
**undertaken**
139:20 140:3
**undertook**
28:11
**unintelligible**
101:14
**unique** 89:16
**unit** 7:5 70:23
71:3 144:21,25
**united** 1:1
**universe** 49:12
49:14
**unmarked** 9:24
**unquestionably**
109:6
**unreal** 68:25
**unusual** 124:11
**unusually**
108:19
**update** 32:21
**updated** 11:3
26:8 30:24
**upside** 93:9
**upsidedown**
10:8
**usa** 5:13
**usable** 49:6
**usage** 95:5,7
**use** 10:8 36:10
58:8 67:2,23,25
76:7 80:16
84:25 89:10
91:8 98:23
101:20 113:15

114:17 117:8
117:23 118:2
118:14,25
119:4,10,16
132:20
**used** 29:25
31:22,24 43:11
44:21 47:4
56:25 67:4
79:12 89:8,15
98:14 113:5
154:20
**uses** 24:23 25:2
54:13 73:3
88:20
**using** 28:16
57:3 59:6
76:12 82:20
95:14 109:12
116:23 118:21
129:8,19
**usual** 129:12

**v**

**v** 154:4 155:1
156:1
**vague** 22:25
23:3 107:7
**valsartan** 1:7
7:7 21:2 61:9
61:25 66:5
70:6 71:6
72:15,20 105:2
107:23 136:19
154:4 155:1
156:1

**value** 27:14,22
47:21 67:6
68:4,5,10,22
71:7,23,25
72:10 99:16
**values** 27:24
72:7 80:7
113:2 138:14
**variance** 97:12
**various** 107:11
**vcd** 136:24
**vendor** 120:2
**verbal** 8:18
**verify** 58:11
62:6 140:4
154:9
**veritext** 2:5
7:10 154:14,23
**veritext.com**
154:15
**version** 36:10
36:11
**versus** 12:2
14:22 19:14,18
19:21 20:23
58:20 76:8
**vicinity** 42:4
**video** 6:12 7:6
**videoconfere...**
1:14
**videographer**
7:2,11 70:22
71:2 144:20,24
151:13

**videotape** 1:12
2:3 33:3
**virtually** 2:4
**virtue** 85:7
**vis** 20:8,8
**visible** 95:18
**vulnerable** 92:8

**w**

**w** 4:21 5:24
**wait** 131:13
**want** 17:20
32:19 36:10
39:17 45:8,12
45:13,15,16,17
45:18 46:13
49:25 50:14
54:17 57:10
60:15 70:18
75:9 81:2
82:22 84:25
91:19 94:14
98:19,23 108:3
114:19 121:14
121:21 130:2
131:14 132:8
133:23 142:24
**wanted** 43:4
75:6 86:3
131:20
**warnings** 69:22
**warranted**
135:24
**way** 29:10
34:15 47:25
50:11 51:3

58:10 65:11
75:21 79:21
87:5 93:12
95:2,17 104:9
125:24 126:3
130:12 131:19
**ways** 27:23
**we've** 70:10
144:16
**week** 34:16
**weeks** 146:6,12
**weight** 50:15
108:13
**went** 22:13
31:14 98:23
113:4
**west** 4:6
**whatsoever**
133:4,19
**whichever**
36:12
**whiteley** 3:4
**whitely** 3:9
**wholesale**
129:9
**wilson** 3:13
**wipe** 113:3
**witness** 7:16
17:18 18:4
42:24 70:15,19
86:9 153:2
154:8,10,12,19
**wonder** 133:12
**woolsey** 13:18

| | | |
|---|---|---|
| **word**  19:17 | **xi01165**  2:8 | **zydus**  19:13,21 |
| 50:19 67:2,3,23 | **xponent**  42:13 | 20:17 21:5 |
| 89:7,7 112:6 | 48:6,9 137:11 | **à** |
| 114:17 118:25 | 137:12,15,18 | **à**  20:8 |
| 121:18 132:20 | 137:25 | |
| **words**  28:23 | **y** | |
| 63:10 71:13 | **y**  95:6 | |
| 79:14 | **yeah**  30:21 | |
| **work**  36:22 | 65:10 69:11 | |
| 41:24 42:25 | 96:11 101:21 | |
| 52:3 117:17 | 111:18 | |
| 146:2 | **year**  96:22 | |
| **worked**  145:4,6 | 100:13 105:6 | |
| **workflow**  52:2 | 107:25 109:17 | |
| **working**  36:16 | 129:18 140:16 | |
| 41:17 | **years**  69:21 | |
| **works**  97:11 | 91:3 116:24 | |
| **world**  69:2 | **yesterday** | |
| **worldwide** | 21:18,22 | |
| 19:14 | **york**  123:13,14 | |
| **worried**  86:2 | 125:2,3 149:5 | |
| **writing**  100:25 | 150:5 | |
| **written**  21:6 | **z** | |
| 143:7 | **z**  95:7 | |
| **wrong**  19:9 | **zachary**  5:24 | |
| 37:17 72:9 | **zachary.martin** | |
| 89:21,23 96:6 | 5:25 | |
| 96:14 97:17 | **zalman**  3:24 | |
| 98:19 | **zhp**  5:20 29:5 | |
| **wrote**  32:6 | 61:10 63:3,8,10 | |
| 143:7,9 | 63:13 64:24 | |
| **x** | **zmick**  4:8 | |
| **x**  1:5,10 95:4 | **zoom**  1:14 2:4 | |
| 108:9 153:1,6 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.