UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | MDL No. 2875 |
| THIS DOCUMENT RELATES TO ALL CASES | HON. ROBERT B. KUGLER CIVIL NO. 19-2875 (RBK) |

## PLAINTIFFS' BRIEF IN SUPPORT OF *DAUBERT* MOTION TO PRECLUDE OPINIONS OF DEFENSE EXPERT STEVEN W. BAERTSCHI, PH.D.

HARDING MAZZOTTI, LLP
*Attorneys for Plaintiffs*
1 Wall Street
PO Box 15141
Albany, New York 12212-5141
Tel: 518-862-1200
Fax: 518-389-6679

On the Brief:
Rosemarie Riddell Bogdan, Esq.
Ronald B. Orlando, Esq.
Email: rosemarie.bogdan@1800law1010.com

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT…………………………………………………...1

STATEMENT OF FACTS…………………………………………………………2

THE *DAUBERT* STANDARD AND RULE 702………………………………...……..6

FRCP 26(a)(2)……………………………………………………………………...7

ARGUMENT………………………………………………………………………8

CONCLUSION………………………………………………………..………30

# TABLE OF AUTHORITIES

PAGE

STATUTES and REGULATIONS:

501(a)(2)(B) of the Federal Food, Drug and Cosmetic Act (FD&C Act),
21 USC 351(a)(2)(B)…………………………………………………………………5

FRCP Rule 702……………………………………………………………………6

FRCP Rule 26(a)(2)………………………………………………………………7

FRCP Rule 26(a)(2)(B)(i) & (ii)……………………………………………….....7,8

21 C. F. R. 22 (a)…………………………………………………………………16

21 C.F.R 210………………………………………………………………………14, 15

21 C.F.R 211…………………………………………………………………....15,16, 19

21 C. F. R. 351……………………………………………………………………16

CASES CITED:

*Braun Corp. v. Vantage Mobility Int'l, LLC*, No. 2:06-CV-50-JVB-PRC,
 2010 U.S. Dist. LEXIS 134182 (N.D. Ind. June 21, 2010)………………….…….29

*Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig*.,
169 F. Supp. 3d 396 at 433 (SDNY, 2016)……………………………………..23

*Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000)…………………………6

*Gen. Elec. Co. v. Joiner*, 522 US 136 (1997)……………………………………..13

*In re Johnson & Johnson Talcum Powder Prods. Mktg. Sales
Practices and Prods. Litig*., 509 F. Supp. 3d 116 (D.N.J., 2020)……………..……7

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.,(Mirena II)*,
341 F. Supp. 3d 213  (SDNY, 2018) (quoting *In re Rezulin Prod. Liab. Litig.*,
309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004))……………………………………..8,13,20

*In re Paoli R.R. Yard PCB Litigation*, 35 F. 3d 717 (3d Cir, 1994)………………...6,7,23

*In re Valsartan, Losartan & Irbesartan Prods. Liab. Litig*., 2023 WL 1818922;
 2023 US Dist. LEXIS 21112 (D.N.J. 2023)……………………………………1,10,22

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.* 858 F. 3d 187
(3d Cir.,2017)………………………………………………………………6,7,26

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)…………………………6

*Lipitor (Atorvastin Calcium) Mktg. v. Pfizer, Inc.,* 892 F. 3d 624
(4th Cir., 2018)……………………………………………………………14

*Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584
 (D.N.J.2002), aff'd, 68 Fed. Appx. 356 (3d Cir. 2003)……………………………7

*Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781
(3d Cir. 2009)………………………………………………………………23

*Meyers v. Nat'l R.R. Pass. Corp. (Amtrak)*, 619 F.3d 729 (7th Cir. 2010)……………..…..8

*Player v. Motiva Enterprises LLC*, No. Civ. 02–3216 (RBK),
2006 WL 166452, (D.N.J. Jan. 20, 2006)………………………………………...8

## PRELIMINARY STATEMENT

As aptly said by the Court: "The Valsartan MDL arose from an extensive Food and Drug Administration ["FDA"] recall in the U.S. of generic hypertensive, prescription drugs ["Valsartan" or "Valsartan-containing drugs" or "VCD'S"]. To be clear, as used herein, the term "VCD" refers to valsartan-containing drugs that were contaminated with probable genotoxic human carcinogens in the form of nitrosamines, N-nitrosodimethylamine ("NDMA") and N-nitrosodiethylamine ("NDEA")." *In re Valsartan, Losartan & Irbesartan Prods. Liab. Litig.*, 2023 WL 1818922; 2023 US Dist. LEXIS 21112 at 115-116 (D.N.J., Feb. 8, 2023) Class Certification Opinion, 2/8/2023, p. 2. As recognized by this Court: "It is further incontrovertible in the morass of factual and legal arguments here that the contamination resulted from defendants' non-compliance of cGMPs at some level." *Id.* at 149.

Steven W. Baertschi, Ph.D. is a pharmaceutical industry consultant and former in-house Research Fellow/Advisor/Scientist/Chemist for industry. █████████████

 This warrants preclusion as his opinions are not supported by a valid, objective methodology rendering such opinions unreliable.

## STATEMENT OF FACTS















## The *Daubert* Standard and Rule 702 Requirements

The Federal Rules of Evidence 702 governs the admissibility of expert testimony in federal court. The law in this area is well established for the issues on this motion. A party offering a proposed expert has the burden to establish the admissibility of the expert's testimony is based upon reliable methodology and reliable application of that methodology. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig*. 858 F. 3d 187 at 800 (3rd Cir., 2017). Rule 702 requires that an expert have "specialized knowledge" that will assist the fact finder to understand the evidence or determine a fact in issue; and the witness be qualified by knowledge, skill, experience, training or education. An expert witness may testify only if the testimony is based upon sufficient facts or data; the testimony is the product of reliable principles and methods; and the witness has applied these principles and methods reliably to the facts in issue.

The Third Circuit in *In re Paoli R.R. Yard PCB Litigation*, 35 F. 3d 717, 742 (3rd Cir, 1994) stated the well-known standard that an "expert's opinions must be based on the methods and procedures of science, rather than on subjective belief or unsupported speculation." An expert must have "good grounds" for the opinion being offered which includes each step of the expert's analysis. *Paoli* also reviews the Third Circuit reliability factors to be considered which include how and when an expert's methodology is used outside of litigation. *Id*. at 742. Any step of the analysis which renders the expert's analysis to be unreliable renders the expert's testimony inadmissible. "*Daubert*'s gatekeeping requirement .... make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3rd Cir. 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S.

6

137, 152 (1999)); *see also Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 594 (D.N.J. 2002*), aff'd,* 68 Fed. Appx. 356 (3rd Cir. 2003).

The Third Circuit considers the following factors when determining an expert's reliability: (i) whether the expert's proposed testimony grows naturally and directly out of research the expert has conducted independent of the litigation; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and (iii) whether the expert has adequately accounted for alternative explanations. *Magistrini*, 180 F. Supp. 2d at 594–95, internal citations omitted. Using these standards, this Circuit has excluded expert testimony that "failed to consistently apply the scientific methods … articulate[d], … deviated from or downplayed certain well-established principles of [the] field, and … inconsistently applied methods and standards to the data so as to support [an] a priori opinion." *Zoloft*, 858 F.3d at 792.

It is established that to meet the *Daubert* standard, an expert witness must not only have good grounds for their opinion, but it must be based on the "methods and procedures of science rather than on subjective belief or unsupported speculation". *In re Johnson & Johnson Talcum Powder Prods. Mktg. Sales Practices and Prods. Litig.*, 509 F. Supp. 3d 116, at 131 (D.N.J., 2020), citing *In re Paoli*, 35 F. 3d at 742.

**FRCP 26(a)(2)**

Federal Rule of Civil Procedure 26(a)(2) governs the disclosure of expert testimony and specifically the contents of an expert report. This Rule states the following: "The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them …." Fed. R. Civ. P. 26(a)(2)(B)(i) & (ii). A failure to submit an expert report that

7

complies with Rule 26 is an independent basis for the exclusion of the expert's testimony. *See, e.g., Meyers v. Nat'l R.R. Pass. Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010) ("The consequence of non-compliance with Rule 26(a)(2)(B) is exclusion of an expert's testimony[.]" (internal quotations and citations omitted)).

## **ARGUMENT**

███████████████████████████████████████████
██████████████████████

█████████████████████████████████████████████
███████████████████████████

When an expert fails to consider important facts without satisfactory explanation, preclusion is warranted for failing to satisfy the reliability requirement. *Player v. Motiva Enterprises LLC*, No. Civ. 02–3216 (RBK), 2006 WL 166452, at *6-7 (D.N.J. Jan. 20, 2006). Similarly, in *Mirena*, the Court held when an expert ignores evidence that is highly relevant to his [or her] conclusion, contrary to his [or her] own stated methodology, exclusion of the expert's testimony is warranted." *Mirena II*, 341 F. Supp. 3d at 242 (quoting *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004)).  Here, Dr. Baertschi failed to contend with contradictory facts, and numerous directly applicable standards. As in *Player* and *Mirena*, Dr. Baertschi's testimony should be precluded.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████  This language directly conflicts with the requirements of FRCP 26(a)(2) which requires an expert report to contain a complete statement of all opinions the

witness will express and the basis and reasons for them along with the facts or data considered by the witness in forming them.

9



Reading, analyzing, assembling documents and drafting is not an objective scientific method. To be objective, one must evaluate favorable and contradictory evidence in a deliberate, consistent and objective manner.

This is similar to the situation this Court found itself in its recent Class decision considering the reliability of defense experts such as Dr. Keller. *In re Valsartan, Losartan & Irbesartan Prods. Liab. Litig.*, 2023 WL 1818922; 2023 US Dist. LEXIS 21112 at 244-245 (D.N.J., Feb. 8, 2023). In that decision, this Court precluded Dr. Keller noting she stated scientific principles (she was presumably familiar with) and applied them without proof of their representativeness, and cited no contradictory literature, principles, estimates, or critiques of the accuracy of her presentiments. This Court aptly noted acceptable scientific methodology does not rest on an expert's say-so, and since Dr. Keller's methodology was only her say-so, Dr. Keller's opinions were precluded. *Id*. at 245.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ Acceptable scientific methodology requires more than an

expert's one-sided view of the evidence designed to support his belief.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

11





"In instances like this, where an expert ignores evidence that is highly relevant to his [or her] conclusion, contrary to his [or her] own stated methodology, exclusion of the expert's testimony is warranted." *Mirena II*, 341 F. Supp. 3d at 242 (quoting *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004)). Because when evidence is ignored and "opinion evidence [] is connected to existing data only by the *ipse dixit* of the expert, courts may conclude there is simply too great an analytical gap between the data and opinion offered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (quoting *Daubert*, 509 U.S. at 595).

2. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

████████████████████████████████



This is purely a results-driven analysis. Cherry-picking is the classic application of methodology applied in an unreliable manner and fails the "good grounds" test. Courts have excluded expert testimony that only "cherry-picks" relevant information in order to reach a pre-destined result for litigation. *Lipitor (Atorvastin Calcium) Mktg. v. Pfizer*, Inc., 892 F. 3d 624 at 634 (4th Cir., 2018).

By way of background, FDA ensures the quality of drug products by carefully monitoring drug manufacturers' compliance with its Current Good Manufacturing Practice (cGMP) regulations. The cGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug product. The regulations make sure that a product is safe for use, and that it has the ingredients and strength it claims to have. FDA's portion of the *CFR* is in Title 21. The

pharmaceutical or drug quality-related regulations appear in several parts of Title 21 including Part 210 which require pharmaceutical companies to follow current good manufacturing practices (cGMP) and Part 211. These requirements enable a common understanding of the regulatory process by describing the requirements to be followed by drug manufacturers, applicants, and FDA.[22]  Compliance with cGMPs is mandatory to assure that such drug meets the requirements of the act as to safety and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess. 21 CFR 210.1(a).

Written standard operating procedures (SOPs) are mandated by the FDA "for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 CFR 211.100(a).

Despite the CFRs and mandated compliance with cGMPs, ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

---

[22] https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations





███████ NDMA and NDEA are not listed on the USP Monograph for valsartan as they are not an expected or accepted part of the approved formulation of valsartan. The USP Monograph was based on the brand name drug Diovan made with the tin process which was not expected to form NDMA or NDEA since triethylamine, dimethylamine or other materials that might introduce secondary amines are not used, trimethylamine and dimethylamine are not potential degradation products of the substances used, and sodium nitrite is not used to quench.[24] Health Canada's testing of name brand Diovan confirmed that it contained no NDMA and NDEA.[25]

    The USP specifically states that "any substance known to be toxic shall not be listed under the "Other Impurities" section of the Monograph,[26]

---

[23] See USP Valsartan Monograph **attached as Exhibit AA**

[25] https://www.canada.ca/en/health-canada/services/drugs-health-products/compliance-enforcement/information-health-product/drugs/angiotensin-receptor-blocker html#a3

████████████ USP General Notices and Requirements Section 5.60.10 **attached as Exhibit CC**

███████████████████████████████████████████████████

████████████████████████████████

   The USP recognizes additional impurity testing may be required beyond the testing listed on the monograph when there is a change in manufacturing processes. Specifically, the USP General Requirements state that "nonmonograph tests and acceptance criteria suitable for detecting and controlling impurities that may result from a change in processing methods" should be employed in addition to the tests provided on the individual monograph, where the presence of the impurity is inconsistent with applicable good manufacturing practices or good pharmaceutical practice." [27] This section recognizes the need for additional testing for mutagenic impurities like NDMA and NDEA especially when manufacturing process risk assessment is predicative of possible nitrosamine formation. ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ The USP standard specifically states that acceptance criteria may need to be modified to control impurities that may result from a change in processing methods, and the default "Other Impurities" cannot be used for genotoxins like NDMA and NDEA. ████████████████████████████████

---

[27] ██████████████████ USP General Notices and Requirements Section 5.60 **attached as Exhibit CC**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████ There
is no dispute that written SOPs are the means by which pharmaceutical manufacturers
guide and ensure application of cGMPs. 21 CFR 211.100(a). ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████. Where an expert ignores evidence that

---

[28]The ICH Q3A and Q3B Guidelines dated 2006 highlight the industry awareness need to identify and control genotoxins, like NDMA and NDEA), and provide for an exception to the impurity reporting threshold of 0.05%, identification threshold of 0.10% and qualification threshold of 0.15% for impurities that are unusually toxic like NDMA and NDEA. (See ICH Q3A(R2), p 8 Attachment 1, Footnote 3 **attached as Exhibit DD)** ████████████████████████████████
████████████████████████████████████████████████████████

is highly relevant to his [or her] conclusion, contrary to his [or her] own stated methodology, exclusion of the expert's testimony is warranted." *Mirena II*, 341 F. Supp. 3d at 242 (quoting *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004)). ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ His

opinion becomes simply *ipse dixit* without consideration of ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

3.  ██████████████████████████████████████████████
    ████████████████████████

Using an unreliable, non-scientific methodology, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



This Court in its Class Certification decision dealt with this issue in precluding another defense expert, Dr. Jason Clevenger, who the Court found opined, "Having found no valsartan USP monographs specifically dictate that valsartan API must be tested for nitrosamine impurities, Dr. Clevenger concluded the absence of any mention of

nitrosamines in valsartan USP monographs must mean logically that the VCDs at issue are the same as the identical compendial standard…". This Court rightly held: "Constituting neither proper scientific deduction, nor inductive research nor testing to conclusion, nor full scientific literature review, Dr. Clevenger's approach – to rely on an untested absence of evidence to aver the presence of a physical identically – is sheer sophistry. And to the point, to opine that the absence of evidence demonstrates the presence of a physical property without checking other relevant information and data is a well-known error in logic and belies a reliable method." *In re Valsartan, Losartan & Irbesartan Prods. Liab. Litig.*, 2023 WL 1818922; 2023 US Dist. LEXIS 21112 at 239-240 (D.N.J., Feb. 8, 2023).

4.



Opinions that deal in "possibilities" are not sufficient to support admissibility of expert testimony. *Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 at 433 (S.D.N.Y, 2016).

*In re Paoli*, 35 F. 3d at 742. Opinions that rest on "assumptions and conclusions that are not supported by the factual record" have been excluded on the basis that they would not "aid the jury in resolving a factual dispute" because they do not "fit under the facts of the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3rd Cir. 2009) (internal citations and quotations omitted). Exclusion is the appropriate remedy here.



24



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████     *See In re Zoloft Products Liability
Litigation,* 26 F. Supp. 3d 449, 460-61 (E.D. Pa. 2014) citing *In re Rezulin Products
Liability Litigation,* 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) ("[I]f the relevant scientific
literature contains evidence tending to refute the expert's theory and the expert does not
acknowledge or account for that evidence, the expert's opinion is unreliable.")

     5.   ██████████████████████████████
█████████████████████████████████

Residual solvent testing is a routine specification test performed on valsartan API to
ensure solvents used in the manufacturing process are non-existent, or if present, are under
certain permissible levels. ████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████

    █████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████ █ ██████████████████████████
██████████████████████████████████████████████████

────────────────────
██████████████████████████████
██████████████████████████████████████████████████







This is similar to the factual scenario presented to the Court in *Braun Corp. v. Vantage Mobility Int'l, LLC, No. 2:06-CV-50-JVB-PRC, 2010 U.S. Dist. LEXIS 134182 (N.D. Ind. June 21, 2010)* wherein defendants' expert relied on a summary of customer survey data compiled by defendants which they presented to their expert in the form of a histogram. The expert testified at his deposition "that he did not review the underlying surveys, as Defendant did not provide this material to him." (*Id. at \*4)* Plaintiff sought to exclude portions of the expert report and to preclude him from testifying about any opinions based on the histogram. Plaintiff argued the expert's opinion was "unreliable as he never saw the underlying surveys upon which the data is based, is unfamiliar with the questions in the surveys, and is unfamiliar with how the data was collected. Plaintiff argued that the histogram is unreliable as it does not indicate the number of survey responses associated with each reported height or the total number of survey responses used to create the graph. The Court agreed, finding Mr. Cook's opinion relying on the histogram unreliable and he was precluded from testifying as to any opinions based on the histogram. *(Braun Corp. v.*

*Vantage Mobility Int'l, LLC, No. 2:06-CV-50 JVB, 2010 U.S. Dist. LEXIS 134175, at \*5-6 (N.D. Ind. Dec. 17, 2010))*



## **CONCLUSION**

For the foregoing reasons, Steven Baertschi, Ph.D. should be precluded from offering his opinions related to liability in this case.

Respectfully submitted,

By: /s/ Rosemarie Riddell Bogdan
Rosemarie Riddell Bogdan
Partner
HARDING MAZZOTTI, LLP
1 Wall Street
PO Box 15141
Albany, New York 12212-5141
Tel.: 518-862-1200
Fax: 518-389-6679
rosemarie.bogdan@1800law1010.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.


*/s/ Rosemarie Riddell Bogdan*

Rosemarie Riddell Bogdan