# Exhibit H

Page 1

1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2                       CAMDEN VICINAGE

3

4    IN RE: VALSARTAN, LOSARTAN, AND        MDL No. 2875
     IRBESARTAN PRODUCTS LIABILITY
5    LITIGATION

6
     This Document Relates to All Actions
7

8    _____/

9
     VIDEOTAPED
10   DEPOSITION OF:   KALI PANAGOS, PHARM.D., R.PH
11   DATE:           JANUARY 21, 2022
12   TIME:           9:32 a.m. - 5:52 p.m.
13   TAKEN BY:       DEFENDANT
14   PLACE:          RIVERO MESTRE LLP
                     2525 PONCE DE LEON BLVD. SUITE 1000
15                   MIAMI, FL 33134
16   REPORTED BY:    CHELSEA HLAVACH, NOTARY PUBLIC, STATE
                     OF FLORIDA
17

18

19

20

21

22

23

24

25

Page 2

```
 1  A P P E A R A N C E S :
 2
    NILDA ISIDRO, ESQUIRE
 3  OF:  Greenberg Traurig
      One Vanderbilt Avenue
 4    New York, NY 10017
      isidron@gtlaw.com
 5
      Attorney for Teva
 6
    GLENN CERNER, ESQUIRE
 7  OF:  Greenberg Traurig
      One Vanderbilt Avenue
 8    New York, NY 10017
 9    Attorney for Teva
10  JORGE MESTRE, ESQUIRE
      OF:  Rivero Mestre, LLP
11    2525 Ponce de Leon Boulevard, Suite 1000
      Miami, FL 33134
12    jmestre@riveromestre.com
13    Attorney for the Plaintiffs
14  GREGORY HANSEL, ESQUIRE
      OF:  Preti, Flaherty, Beliveau & Pachios, Chartered, LLP
15    One City Center
      Portland, ME 04101
16    ghansel@preti.com
17    Attorney for Maine Automobile Dealers Association
18  CONLEE WHITELEY, ESQUIRE
      OF:  Kanner and Whiteley
19    701 Camp Street
      New Orleans, LA 70130
20
21    Attorney for the Plaintiffs
22  CHARLIE WHARTON, ESQUIRE
      OF:  Rivero Mestre, LLP
      2525 Ponce de Leon Boulevard, Suite 1000
23    Miami, FL 33134
      cwharton@riveromestre.com
24
25    Attorney for the Plaintiffs
```

Page 3

```
 1  ASHER BLOCK, ESQUIRE
      OF:  Lewis Brisbois
 2    550 E. Swedesford Road, Suite 270
      Wayne, PA 19087
 3
      Attorney for Camber Pharmaceuticals appeared via Zoom
 4
    CHRIS HENRY, ESQUIRE
 5  OF:  Buchanan Ingersoll & Rooney PC
      227 West Trade Street, Suite 600
 6    Charlotte, NC  28202
      704 444 3475 (o)
 7    Christopher.henry@bipc.com
 8    Attorney for Albertson™s LLC appeared via Zoom
 9  CHRISTINE GANNON, ESQUIRE
      OF:  Three Gateway Center
10    100 Mulberry Street, 15th Floor
      Newark, New Jersey 07102
11    Lwalsh@walsh.law
      Cgannon@walsh.law
12
      Attorneys for Teva Pharmaceuticals USA, Inc., Teva
13    Pharmaceutical Industries Ltd., Actavis Pharma, Inc.,
      and Actavis, LLC, appeared via Zoom
14
    CHARLES SCHAFFER, ESQUIRE
15  OF:  Walter Haverfield, LLP
      16990 Savage Road
16    Chagrin Falls, OH 44023-4536
      Crs7270@gmail.com
17
      Attorney for Steamfitters Local 300 and Employers and
18    Laborers Local 100 appeared via Zoom
19  DANA KLINGES, ESQUIRE
      OF:  Duane Morris, LLP
20    30 South 17th Street
      Philadelphia, PA 19103-4196
21    dklinges@duanemorris.com
22    Attorney for ZHP appeared via Zoom
23
24
25
```

Page 4

```
 1  DREW DORNER, ESQUIRE
      OF:  Duane Morris, LLP
 2    505 9th Street, N.W., Suite 1000
      Washington, DC 20004-2166
 3    dtdorner@duanemorris.com
 4    Attorney for ZHP, Prinston, Solco, and Huahai U.S.
      appeared via Zoom
 5
    D'LESLI DAVIS, ESQUIRE
 6  OF:  Norton Rose Fulbright US LLP
      2200 Ross Avenue, Suite 3600
 7    Dallas, Texas  75201-7932
      Ellie.norris@nortonrosefulbright.com
 8
      Attorney for McKesson Corporation appeared via Zoom
 9
    FRANK STOY, ESQUIRE
10  OF:  Pietragallo Gordon Alfano Bosick & Raspanti, LLP
      38th Floor, One Oxford Centre
11    Pittsburgh, PA  15219
      FHS@Pietragallo.com
12
      Attorney for Mylan Laboratories Ltd. and Mylan
13    Pharmaceuticals, Inc., appeared via Zoom
14  JASON REEFER, ESQUIRE
      OF:  Pietragallo Gordon Alfano Bosick & Raspanti, LLP
15    38th Floor, One Oxford Centre
      Pittsburgh, PA  15219
16    FHS@Pietragallo.com
17    Attorney for Mylan Laboratories Ltd. and Mylan
      Pharmaceuticals, Inc., appeared via Zoom
18
    GEOFFREY COAN, ESQUIRE
19  OF:  Hinshaw & Culbertson LLP
      53 State Street, 27th Floor, Boston, MA, 02109
20    Tel: 617-213-7045 | Fax: 617-213-7001
      Gcoan@hinshawlaw.com
21
      Attorney for Sciegen Pharmaceuticals appeared via Zoom
22
    GREG COATES, ESQUIRE
23  OF:  Greenberg Traurig
      500 Campus Drive, Suite 400
24    Florham Park, NJ 07932
      Coatesg@gtlaw.com
25
      Attorney appeared via Zoom
```

Page 5

```
 1  JEFF GEOPPINGER, ESQUIRE
      OF:  Ulmer
 2    312 Walnut Street, Suite 1400
      Cincinnati, Ohio 45202-4029
 3    Jgeoppinger@ulmer.com
 4    Attorney appeared via Zoom
 5  JOHN GISLESON, ESQUIRE
      OF:  Morgan Lewis & Bockius, LLP
 6    One Oxford Centre, 32nd Fl.
      Pittsburgh, PA 15219-6401
 7    john.gisleson@morganlewis.com
 8    Attorney for Aurobindo appeared via Zoom
 9  KARA KAPKE, ESQUIRE
      OF:  Barnes & Thornburg, LLP
10    11 South meridian Street
      Indianapolis, IN 46204-3535
11
      Attorney for CVS and Rite Aid appeared via Zoom
12
    KRISTIN IVES, ESQUIRE
13  OF:  Falkenberg Ives LLP
      230 W. Monroe, Suite 2220
14    Chicago, IL  60606
      Kbi@falkenbergives.com
15
      Attorney for Humana Pharmacy, Inc., appeared via Zoom
16
    LAYNE HILTON, ESQUIRE
17  OF:  Kanner & Whiteley, L.L.C.
      701 Camp Street
18    New Orleans, LA  70130
      Www.kanner-law.com
19
      Attorney for Plaintiffs appeared via Zoom
20
    LUKE BRESNAHAN, ESQUIRE
21  OF:  Crowell & Moring
      1001 Pennsylvania Avenue, NW
22    Washington, DC 20004
      lbresnahan@crowell.com
23
      Attorney appeared via Zoom
24
25
```

2 (Pages 2 - 5)

Page 6

1  RUBEN HONIK, ESQUIRE
    OF:  Honik, LLC
2      Mass Torts Made Perfect
       316 South Baylen Street, Number 400
3      Pensacola, FL 32502
       ruben@honiklaw.com
4
       Attorney for the Plaintiffs appeared via Zoom
5
    SARAH ZIMMERMAN, ESQUIRE
6  OF:  Husch Blackwell, LLP
       190 Carondelet Plaza, Suite 600
7      St. Louis, MO 63105-3443
       Sarah.Zimmerman@huschblackwell.com
8
       Attorney for Express Scripts appeared via Zoom
9
    STEVEN HARKINS, ESQUIRE
10 OF:  Greenberg Traurig
       Terminus 200
11     3333 Piedmont Road NE, Suite 2500
       Atlanta, GA 30305
12     Harkinss@gtlaw.com
13     Attorney for Teva appeared via Zoom
14 WILLIAM MURTHA, ESQUIRE
    OF:  William Murtha, Hill Wallack, LLP
15     21 Roszel Road
       Princeton, NJ 08540
16     wmurtha@hillwallack.com
17     Attorney for Hetero Drugs and Hetero Labs appeared via
       zoom
18
    ELLIE NORRIS, ESQUIRE
19 OF:  Norton Rose Fulbright US LLP
       2200 Ross Avenue, Suite 3600
20     Dallas, Texas  75201-7932
       Ellie.norris@nortonrosefulbright.com
21
       Attorney for McKesson Corporation appeared via Zoom
22
23
24
25

Page 7

1  C. BRETT VAUGGN, ESQUIRE
    OF:  Hollis Law Firm
2      8101 College Blvd, Suite 260
       Overland Park, KS 66210
3
4      Attorney appeared via Zoom

    DAN CAMPBELL, ESQUIRE
5  OF  Crowell & Moring
       1001 Pennsylvania Avenue, NW
6      Washington, DC 20004
       lbresnahan@crowell.com
7
       Attorney appeared via Zoom
8
9
    ALSO PRESENT
10
    BEN PELTA-HELLER, Videographer, appeared via Zoom
11 JAVIER ORDONEZ, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          I N D E X
2          * * * * *
3  TESTIMONY OF KALI PANAGOS, PHARM.D., R.PH
4     Direct Examination by Ms. Isidro .............. 13
       Cross-Examination by Mr. Gisleson ............ 154
5     Redirect Examination Mr. Geoppinger ........ 175
       Recross-Examination Ms. Isidro ............... 184
6     Further Direct Examination Mr. Hansel ........ 185
       Further Cross-Examination Mr. Gisleson ........ 189
7     Further Further Direct Examination Mr. Dorner . 194
8
    CERTIFICATE OF OATH ............................... 200
9  CERTIFICATE OF REPORTER ........................... 201
    ERRATA SHEET ........................................ 202
10 NOTIFICATION LETTER ............................... 203
11
12          E X H I B I T S
13          * * * * * *
14
    Exhibit No. 1 ...................................... 16
       (Notice of Deposition)
15 Exhibit No. 2 ...................................... 17
       (CV)
16
    Exhibit No. 3 ...................................... 85
17     (Report)
18 Exhibit No. 4 ...................................... 90
       (Engagement Letter)
19
    Exhibit No. 5 ...................................... 125
20     (ASHP Report)
21
22
23
24
25

Page 9

1
2
3
4
5
6
7
8
9
10
11
12
13          * * * * * *
14          S T I P U L A T I O N S
15     It is hereby stipulated and agreed by and between
16 counsel present for the respective parties, and the
17 deponent, that the reading and signing of the deposition
18 are hereby reserved.
19
20
21
22
23
24
25

3 (Pages 6 - 9)

Page 10

1    P R O C E E D I N G S
2              * * * * *
3        THE VIDEOGRAPHER:  Good morning.  We are going on
4    the record at 9:32 a.m. on January 21st, 2022.
5        This is Media Unit Number 1 of the video recorded
6    deposition of Kali -- Dr. Kali Panagos.  This
7    deposition is being held at 2525 Ponce de Leon
8    Boulevard, Suite 1000, in Miami, Florida.
9        My name is Javier Ordonez and I am the
10   videographer.  The court reporter is Chelsea Hlavach;
11   both from Veritext.  Will the court reporter please
12   swear in the witness?
13       THE COURT REPORTER:  Can we have counsel please
14   state their appearances?
15       THE VIDEOGRAPHER:  Oh, can counsel please state
16   your name and who you're -- I'm sorry.  State your
17   appearance and who you represent.
18       MS. ISIDRO:  Nilda Isidro from Greenberg Traurig
19   on behalf of Teva.
20       MR. KERNER:  Glenn Kerner from Greenberg Traurig
21   also on behalf of Teva.
22       MR. HANSEL:  Greg Hansel from Preti Flaherty on
23   behalf of Maine Automobile Dealers Association.
24       MR. WHARTON:  Hi.  Charlie Wharton on behalf of
25   Plaintiffs.

Page 11

1        MS. WHITELEY:  Conlee Whiteley on behalf of
2    Plaintiffs.
3        MR. HANSEL:  Before we go on the record further,
4    I guess I have a couple of preliminaries.  First,
5    Jorge Mestre is also here, Chelsea, on behalf of the
6    Plaintiffs.
7        And I see I'm being asked on the Zoom to agree
8    that this be recorded on Zoom, and I don't think
9    that's necessary because we have a videographer and a
10   court reporter.  So I would request that the Zoom not
11   be recorded.
12       MS. ISIDRO:  The Zooms, I believe, have been
13   recorded at prior depositions, and in the event anyone
14   on Zoom asks questions, et cetera, that's -- that's
15   part of the purpose of -- of the Zoom recording, is my
16   understanding.
17       MR. HANSEL:  That would also be audible in the
18   room and would be picked up on the video, the
19   videographer, the court -- the official videographer,
20   as well as by the court reporter.
21       Is that really necessary?
22       MR. KERNER:  Well, let me just ask you a quick
23   question.  My understanding is that the prior
24   depositions have all been recorded on Zoom as well,
25   and this is for you folks and anybody actually on Zoom

Page 12

1    right now, have there been any objections to the
2    depositions being recorded on Zoom or has there been
3    any agreement for this litigation to have the
4    depositions recorded on Zoom?  Because that was my
5    understanding, but I'm asking the group.
6        MS. ISIDRO:  And further --
7        MR. COTES:  Glenn, it's Greg -- it's Greg Cotes.
8    I mean, I've been on dozens and dozens of these in the
9    past six months and I get that recording message every
10   single time and no one's ever said a word about that.
11       MS. ISIDRO:  Yeah.  I would also add that
12   Plaintiffs have -- have raised objections to the
13   number of folks in the room in person, and this was
14   something that was discussed at the recent status
15   conference, and that is also part of the reason why
16   there is the Zoom setup, just in light of the pandemic
17   and concerns about safety that have been raised by
18   Plaintiffs, just as much as by anyone else.
19       And so, again, I don't see the -- the problem
20   with recording the Zoom consistent with all of that.
21       MR. HANSEL:  Okay.  All right.  In that case
22   we'll -- we'll allow it.
23       MS. ISIDRO:  Thank you.
24       THE COURT REPORTER:  Okay.  Will you raise your
25   right hand, please?

Page 13

1        Do you swear or affirm the testimony you are
2    about to give in this matter will be the truth, the
3    whole truth, and nothing but the truth?
4        THE WITNESS:  I do.
5        KALI PANAGOS, PHARM.D., R.PH,
6        having been first duly sworn, was examined and
7    testified as follows:
8        DIRECT EXAMINATION
9    BY MS. ISIDRO:
10   Q.  Good morning, Dr. Panagos.
11   A.  Good morning.
12   Q.  My name is Nilda Isidro.  I'm with the law firm
13   of Greenberg Traurig and I represent Defendant, Teva.
14   A.  Uh-huh.
15   Q.  We're just meeting for the first time this
16   morning, correct?
17   A.  Yes, we are.
18   Q.  Can you please state your full name for the
19   record?
20   A.  My full name is Dr. Kali Panagos.
21   Q.  And what is your current professional address?
22   A.  My current professional address is 105 Down
23   Court, Windermere, Florida -- Florida.
24   Q.  Thank you.  Where do you currently reside?
25   A.  New York.

4 (Pages 10 - 13)

Page 14

1    Q.   Have you ever been deposed before?

2    A.   No, I have not.

3    Q.   Okay.  So I'll just go over a few ground rules on

4   how -- on how this works --

5    A.   Sure.

6    Q.   -- since this is your first deposition.

7        As you can see there's a court reporter to your

8   right who's taking down everything that we say.

9    A.   Uh-huh.

10    Q.   So for that reason, it's very important that you

11   answer verbally, meaning yes -- saying yes or no rather

12   than nodding your head or saying --

13    A.   I understand.

14    Q.   -- uh-huh or huh-uh, and for that same reason,

15   it's important that -- that we not talk over each other,

16   right?  So that you wait that -- until I finish my question

17   before you start to answer, and I'll do the same.  I'll try

18   to wait until you finish your answer before I start the

19   next question, just so that the court reporter isn't trying

20   to take both of us -- what both of us are saying down at

21   the same time.  Is that all right?

22    A.   That's right.

23    Q.   Great.  As -- as you've seen this morning, there

24   are some folks who are also on Zoom and so there's that

25   setup as well.  There you may hear -- you may hear

Page 15

1   objections or something coming from Zoom.  You may also

2   later today get questions from folks on -- on -- on the

3   Zoom.

4        If at any time you don't understand my question,

5   please let me know.  If you don't hear my question, please

6   let me know.  If -- however, if you do answer my question,

7   I'm -- I'm going to take that to mean that you understood

8   my questions.  Is that fair?

9    A.   Yes.

10    Q.   Okay.  If at any time you need to take a break,

11   just let me know and -- and we can do that.  I would just

12   ask that if there's a question pending, that that question

13   be answered before we go on a break.

14    A.   Okay.

15    Q.   Do you have any questions about the -- how

16   this -- about how -- the procedures or how this will work

17   today?

18    A.   Not at this time.

19    Q.   Okay.  And as you know you're here to testify

20   under oath.  Is there any reason that you would not -- you

21   would not be able to give truthful and accurate testimony

22   today?

23    A.   No.

24    Q.   You're not on any medications that might

25   interfere with your ability to testify or anything like

Page 16

1   that?

2    A.   No.

3    Q.   Okay.  And do you want to read and sign this

4   deposition?

5    A.   Sure.

6    Q.   Okay.  Now, Doctor, you're appearing here today

7   pursuant to a notice of deposition; is that right?

8    A.   Yes.

9    Q.   Okay.  We're going to go ahead and mark that

10   notice of deposition as Exhibit 1.  And, again, as I

11   mentioned, because of the Zoom, someone's going to be

12   loading these exhibits up on the Zoom as well, so we may

13   just give a little bit of a pause when we mark an exhibit

14   so that they can get caught up as well.

15      (Exhibit No. 1 was marked for identification.)

16        All right.  Doctor, have you seen this document

17   before?

18    A.   No.

19    Q.   Okay.  I'm going to ask you to take a look at

20   Page 6.  There are a number of requests there.  And just if

21   you could take a look at those and let me know, did anyone

22   ask you whether you had any of these documents that are

23   requested here in your possession?

24        MR. HANSEL:  I'm going to object on grounds of

25        work product privilege to any requests for

Page 17

1    communications between counsel and the witness as, you

2    know, we have also responded to this request in

3    writing, as you know.

4        MS. ISIDRO:  I'll rephrase my question.

5   BY MS. ISIDRO:

6    Q.   Prior to the deposition today, did you check

7   whether you had any of the documents that are listed in

8   these requests in your possession?

9    A.   Yes.

10    Q.   Okay.  We're going to go through them one by one.

11    A.   Sure.

12    Q.   And -- we'll talk about each one.  So the

13   first one is your current up-to-date resume or CV.  There

14   was a CV attached as an exhibit to your report, correct?

15    A.   Correct.

16    Q.   Is that your current CV?

17    A.   Yes.

18    Q.   Since -- since producing your report, have --

19   have there been any updates to the information on that CV?

20    A.   No.

21    Q.   Okay.  Let's go ahead and mark that CV as Exhibit

22   Number 2 and then we'll go through later on the rest of the

23   items on this list.

24    (Exhibit No. 2 was marked for identification.)

25        Okay.  Doctor, so it notes on your CV that you

5 (Pages 14 - 17)

Page 18

1 received a bachelor of science from St. John's University
2 in 1997; is that right?
3    A.   Yes.
4    Q.   What was your major?
5    A.   Biology.
6    Q.   Did you have any minors?
7    A.   Computer science.
8    Q.   How long did it take you to complete that
9 bachelor of science?
10    A.   Four years.
11    Q.   And then after that you pursued a second
12 bachelor's degree; is that right?
13    A.   Yes.
14    Q.   That was from St. John's University in 2000?
15    A.   Yes.
16    Q.   What was your major then?
17    A.   Pharmacy.
18    Q.   And did you have any minors at that time?
19    A.   No.
20    Q.   How long did it take you to complete that
21 bachelor's degree?
22    A.   That was completed in 2000.
23    Q.   When did you -- when did you begin pursuing that
24 bachelor's degree?
25    A.   In '97.

Page 19

1    Q.   Okay.  And -- and then you received a doctorate
2 from Shenandoah University in 2006?
3    A.   Yes.
4    Q.   That was also in pharmacy?
5    A.   That was a doctorate in pharmacy, yes.
6    Q.   Okay.  And when did you begin pursuing that
7 doctorate?
8    A.   Two years prior to the graduation date.
9    Q.   Have you had any other formal education beyond
10 those degrees that we've just discussed?
11    A.   No.
12    Q.   Okay.  So in 2002 you joined the Long Island
13 University's faculty; is that right?
14    A.   Yes.
15    Q.   And you were on that faculty until 2009?
16    A.   Yes, I was part of the faculty and administration
17 till 2009.
18    Q.   What -- what was your first role within Long
19 Island University's faculty and administration?
20    A.   Director of pharmacy services.
21    Q.   And how long did you hold that position?
22    A.   I held that until, you know, 2009.
23    Q.   Okay.  What were your roles and responsibilities
24 under that title?
25    A.   My roles and responsibilities were to oversee the

Page 20

1 curriculum of the pharmacy program, the pharmacy advisors
2 reported to me with regards to students -- student
3 advisement for coursework in the pharmacy program, and I
4 also evaluated student progress for remaining and -- within
5 the program as well.
6    Q.   Okay.  And did you have any other titles or roles
7 within the Long Island University?
8    A.   Yes, I served as an adjunct faculty in the
9 department of social sciences.
10    Q.   From --
11    A.   In the pharmacy program.
12    Q.   From what year to what year?
13    A.   2000 and -- jeez.  I was -- 2005 about until
14 2009.
15    Q.   Okay.  Did you teach classes as part of that
16 role?
17    A.   I certainly did.
18    Q.   What classes did you teach?
19    A.   I taught pharmacy orientation, which is an
20 introduction course to pharmacy.  I also taught or was part
21 of the recitation courses, which are laboratory type
22 courses in the social sciences division of pharmacy
23 program.
24    Q.   Okay.  Any other courses that you taught?
25    A.   No.

Page 21

1    Q.   And other than these two roles that we've just
2 discussed, did you have any other roles or titles within
3 the Long Island University?
4    A.   No.
5    Q.   You're currently a registered pharmacist in the
6 State of New York?
7    A.   Yes, I am.
8    Q.   Are you registered or licensed as a pharmacist in
9 any other state?
10    A.   No.
11    Q.   Do you have any other certifications --
12 professional certifications or qualifications?
13    A.   I do.
14    Q.   What are they?
15    A.   I have an immunizer certification; I am certified
16 in first aid or CPR for infant, child, and adults; I am
17 also certified as an MTM pharmacist; and I also have a New
18 York State Department Adjuster License as well.
19    Q.   Okay.  You mentioned an immunizer certification.
20 What does that -- what does that mean?
21    A.   That means I am permitted to administer
22 immunizations to patients.
23    Q.   And what is an MTM pharmacist?
24    A.   Medication therapy management.
25    Q.   What -- what does medication therapy management

6 (Pages 18 - 21)

Page 22

1 entail?
2    A.  It entails being able to counsel patients on
3 their -- the drugs that they're on and their overall
4 profile and provide them guidance for compliance and
5 adherence.
6    Q.  What do you mean by compliance and adherence?
7    A.  So that they know how to properly take their
8 medication, what the medication is for, and review with
9 them the -- their overall drug profile.
10    Q.  And then you also mentioned New York State
11 Department Adjuster.  What does that entail?
12    A.  At this time I don't have any requirements that
13 it -- that I'm required for that, so it's there, but I
14 don't have any requirements for it.
15    Q.  What does a New York State Department Adjuster
16 do?
17    A.  That is used in the managed care field or in the
18 pharmacy management or if you needed to -- it's more on the
19 business side.  So it's not directly patient care.  It's on
20 the business side of the pharmacy.
21    Q.  What does that mean, more on -- more on the
22 business side?  What types of things?
23    A.  The organization I was employed with, Broadreach
24 Medical Resources, it was beneficial to them if I had this
25 adjuster license.

Page 23

1    Q.  In what way was it beneficial?
2    A.  To adhere with requirements by New York State for
3 the -- their type of business.
4    Q.  What responsibilities did you have with that
5 employer as -- as an adjuster?
6    A.  My responsibilities to that employer were in the
7 capacity of a clinical pharmacist and director of clinical
8 operations, as well as client oversight as well.
9    Q.  Okay.  I'm just trying to understand how the --
10 the New York State Department Adjuster certification comes
11 into play.
12    A.  Uh-huh.
13    Q.  What it allows you to do that you wouldn't be
14 able to do if you had -- if you did not have that
15 certification.
16    A.  It allows the organization to adhere with the
17 requirements of New York State by having an adjuster's
18 license -- an employee with an adjuster's license on staff.
19    Q.  Now, you also mentioned certain clinical
20 affiliations in your CV?
21    A.  Yep.
22    Q.  And -- and those -- one of those is with Hospital
23 of Special Surgery, correct?
24    A.  Correct.
25    Q.  You mention in your report that you have a

Page 24

1 clinical affiliation in pain management and anesthesia at
2 the Hospital for Special Surgery, correct?
3    A.  That is correct.
4    Q.  What does that position entail?
5    A.  That position required me to participate and
6 understand the functions of anesthesiology and pain
7 management of patients as it regards to their procedures
8 that they were -- with regards to their procedures that
9 they were having and work closely with the anesthesia team
10 and pain management -- management team for management of
11 that patient while they were in the hospital.
12    Q.  Did you have any sort of patient facing role in
13 that position?
14    A.  The patients were in surgery, so I was in the
15 surgery room with the anesthesiologists and then we would
16 visit the patient in the post-op.
17    Q.  Okay.  You didn't -- you didn't prescribe any
18 medication or anything like that, correct?
19    A.  No, I did not.
20    Q.  Do you have the ability to prescribe medication?
21    A.  No, I do not.
22    Q.  Okay.  And during what time did you have that
23 clinical affiliation?
24    A.  That was during my time at St. John's pursuing
25 the pharmacy -- my bachelor's of pharmacy degree.

Page 25

1    Q.  Okay.  And then you also list a clinical
2 affiliation with Bellevue Medical Center.
3    A.  Yes.
4    Q.  And during what time did you hold that clinical
5 affiliation?
6    A.  That clinical affiliation was done during my time
7 pursuing my doctorate degree in pharmacy.
8    Q.  Okay.  And what was your role with Bellevue
9 Medical Center?
10    A.  My primary role was participation in the lipid
11 and anticoagulation clinics, participation with the medical
12 and pharmacy teams there to manage patients.
13    Q.  And then you've also listed a clinical
14 affiliation with Northwell Health University.
15    A.  Correct.
16    Q.  During what time frame did you hold that clinical
17 affiliation?
18    A.  That affiliation was done during my time at
19 St. John's University pursuing the bachelor's of pharmacy
20 degree.
21    Q.  And what was your role with Northwell Health?
22    A.  That was an internal medicine rotation with a
23 focus on diabetes, participating in medical rounds and with
24 physicians and pharmacists to manage patients with
25 different diagnoses and conditions for which they were in

7 (Pages 22 - 25)

Page 26

1 the hospital.
2    Q.    And, finally, you list as -- under clinical
3 affiliations, advisory panel member, AMGEN for Repatha?
4    A.    Correct.
5    Q.    During what time frame did you hold that
6 position?
7    A.    2019.
8    Q.    And what were your roles and responsibilities as
9 an advisory panel member?
10    A.    I was asked to participate in the advisory panel
11 for evaluation of Repatha and discussion about the use of
12 the drug and -- in all capacities.
13    Q.    What type of drug is Repatha?
14    A.    Repatha is a lipid lowering drug or
15 hypercholesterolemia drug intended for certain populations
16 that meet the criteria for intended use.
17        MR. MESTRE:    If you're taking a pause, I just
18 wanted to make my appearance.  Jorge Mestre on behalf
19 of the Plaintiffs.  And I also wanted to make sure
20 that we're not recording on the Zoom, correct?
21        MR. KERNER:    We are and we had that discussion.
22        MR. MESTRE:    Oh, we did?
23        MS. ISIDRO:    We had that discussion already.
24 Yes.
25        MR. MESTRE:    Okay.  Okay.

Page 27

1        MR. KERNER:    And your co-counsel noted your
2    appearance earlier as well.
3        MR. MESTRE:    Thank you.
4 BY MS. ISIDRO:
5    Q.    Dr. Panagos, you worked as a pharmacist at
6 Walgreens in New York from 2000 to 2015; is that correct?
7    A.    That is correct.
8    Q.    Were you the lead pharmacist during that time?
9    A.    I was a staff pharmacist.
10    Q.    Okay.  Besides staff pharmacist, did you ever
11 have any other roles with Walgreens?
12    A.    No.
13    Q.    What were your duties and responsibilities as a
14 staff pharmacist?
15    A.    To manage the pharmacy, so that's all aspects of
16 the pharmacy at the time where I'm assigned, my hours of
17 work, and so that includes the prescriptions, filling the
18 prescriptions, reviewing, filling, dispensing, and
19 counseling the -- the prescriptions that are coming in and
20 for the patients that are coming in.
21        I also supervise the technicians that are working
22 in the pharmacy during that time.  They fall under my
23 supervision, including the interns that are on shift at the
24 same time as I am.  I'm also responsible that the drug
25 product is the correct drug product is being filled and

Page 28

1 verifying that that is the right medication, the right
2 patient, and ensuring that there aren't any
3 contraindications for the -- for the patient so.
4    Q.    And during part of this same time period you also
5 worked at Broadreach Medical Resources; is that right?
6    A.    Correct.
7    Q.    That was from 2008 to 2018?
8    A.    Correct.
9    Q.    And what was your role at Broadreach?
10    A.    I had several roles -- roles there.  I was a
11 clinical pharmacist and then became the director of
12 clinical operations and also the head of client management
13 as well.
14    Q.    From what year to what year were you a clinical
15 pharmacist at Broadreach?
16    A.    The entire time.
17    Q.    And from what year to what year were you director
18 of clinical operation?
19    A.    As it states in my CV, 2008 through 2018.
20    Q.    So for the full time period?
21    A.    Yes.
22    Q.    Okay.  And from what year to what year were you
23 head of account services and client management?
24    A.    It was a couple years later so 2009 or 2010.
25 Shortly thereafter.

Page 29

1    Q.    Okay.  So within a couple of years of starting at
2 Broadreach through the end of your time there?
3    A.    Correct.
4    Q.    Okay.  What was the split on your time between
5 Broadreach and Walgreens during this time frame?
6    A.    I began my time with Broadreach initially
7 part-time.
8    Q.    Uh-huh.
9    A.    And I was also part-time or per diem -- well,
10 part-time with Walgreens at that time.
11    Q.    What were your duties and responsibilities as a
12 clinical pharmist- -- pharmacist at Broadreach?
13    A.    My duties included review of prior authorization
14 requests, collaboration with prescribers as needed on
15 behalf of those requests, collaboration with -- or outreach
16 to patients as needed on behalf of those requests.  So
17 review of the prior authorization, completing that request,
18 documenting the results or the findings, tracking that, and
19 communicating appropriately.
20    Q.    What were your roles and responsibilities as
21 director of clinical operations at Broadreach?
22    A.    My roles and responsibilities as clinical
23 operations included ensuring that management of the
24 formulary, management of the prior authorizations,
25 management of every clinical aspect with regards to the

8 (Pages 26 - 29)

Page 30

1 prescription benefit was done efficiently in a proper
2 workflow.
3    Q.   And what were your roles and responsibilities as
4 head of client services and account management at
5 Broadreach?
6    A.   My roles and responsibilities included advising
7 patient -- clients on all aspects of their pharmacy
8 program, which includes their formulary, their plan design,
9 drugs covered and not covered, and providing them with
10 guidance on how to best do that.
11    Q.   Your CV states that you developed industry
12 exclusive prescription indemnity/reference based program
13 during your time at Broadreach.  Can you tell us more about
14 that, what that entailed?
15    A.   That is a prescription type program that is --
16 takes a subset of drugs and applies -- creates a -- a plan
17 that clients or employers may choose if it's appropriate
18 for their employees as a prescription drug offering.  It is
19 structured to allow kind of a different option for
20 employers to take for prescription benefits.
21    Q.   And what was your role in developing that
22 program?
23    A.   My role in developing that program included
24 choice of the medications that would be part of the product
25 offering and that includes both brands and generics, and

Page 31

1 how those medications would be structured within that
2 program for tiering or payments, et cetera.
3    Q.   Your CV also states that you designed evidence
4 based market competitive clinical programs with documented
5 ROI.  Can you tell us what that refers to?
6    A.   Sure.  Clinical programs are a part of a pharmacy
7 benefit offering and they are designed based on evidence
8 based guidelines, which are accepted in the healthcare
9 community as how you -- patients would be treated according
10 to the conditions that they have.  So when you create a
11 clinical program, you do so on clinical merit but in the --
12 you structure it on clinical merit, but you also
13 incorporate other components essential to the prescription
14 drug benefit to help clients manage their population
15 and -- and it's linked to the formulary.
16    Q.   You referenced some evidence-based guidelines.
17 Are there specific evidence-based guidelines that you used
18 in putting together those programs?
19    A.   Yes.
20    Q.   Which ones?
21    A.   There were many.
22    Q.   Can you give some examples?
23    A.   Asthma, diabetes, cardiovascular, just to name a
24 few.  There are many.
25    Q.   So when you say asthma, what does that refer to

Page 32

1 in terms of an evidence-based guidelines?
2    A.   The guidelines set forth by the medical community
3 for treatment of a patient with a diagnosis of asthma.
4    Q.   And for the other conditions that you mentioned,
5 is it the same --
6    A.   The same.
7    Q.   Okay.  Your CV also states that you manage
8 integration of data across medical and prescription,
9 including population, health, and enrollment analytics?
10    A.   Correct.
11    Q.   Can you tell us more about what that entailed?
12    A.   Yes.  My role included review and analysis of the
13 data that -- both on the prescription side and where
14 available on the medical side and being able to evaluate
15 that on behalf of our clients.
16    Q.   What do you mean by the data on the prescription
17 side?
18    A.   Claims data.
19    Q.   And what do you mean by the data on the medical
20 side?
21    A.   Likewise.
22    Q.   Where would you get that data?
23    A.   The data would come from the PBM or the medical
24 carrier.
25    Q.   And finally your CV states that you served as

Page 33

1 subject matter expert on all PBM clinical drug and
2 specialty items.
3    A.   That is correct.
4    Q.   What did you mean by served as a subject matter
5 expert on PBMs?
6    A.   So for our clients and -- I was the person who
7 they would come to for questions about determining -- any
8 question on PBM, actually.  So I served as a subject matter
9 expert to advise on PBM and yeah.
10    Q.   And those clients were -- not -- not specific
11 names, but, you know, what -- what type of entities --
12    A.   Self-insured --
13    Q.   -- were those clients?
14    A.   -- clients, self-insured employer groups.
15        MR. HANSEL:  Please remember to let her finish
16    her question before you begin your answer.
17        THE WITNESS:  Okay.  Thank you.
18 BY MS. ISIDRO:
19    Q.   And what do you mean by served as a subject
20 matter expert on clinical, drug, and specialty items?
21    A.   Again, I would provide guidance and advisement on
22 drugs that are -- were on the formulary or even not on the
23 formulary.  I'd provide the -- would answer any questions
24 related to those drugs.
25    Q.   What does the clinical refer to?

9 (Pages 30 - 33)

Page 34

1    A.    The clinical refers to the medication and the use
2    of the medication from my background and experience as a
3    pharmacist of being able to provide that thought process
4    around the discussion of the medication.
5        Q.    And what do you mean by specialty items?
6        A.    Specialty medications are part of a formulary and
7    they are -- there's -- there's no universal accepted
8    definition for specialty but they're -- tend to be for more
9    complex conditions.
10       Q.    Is that what you're referring to when you use
11   that term in your CV?
12       A.    Correct.
13       Q.    Okay.  You also spent it seems like a year or
14   maybe less than a year at Smith Rx in San Francisco; is
15   that right?
16       A.    That is right.
17       Q.    How -- how -- what is the precise amount of time
18   that you spent at Smith Rx?
19       A.    I think it was from February to December.  Yeah.
20       Q.    What was your role or roles within Smith Rx?
21       A.    Director of clinical services.
22       Q.    That was the only role you held there?
23       A.    Yes.
24       Q.    What were your -- your responsibilities under
25   that role?

Page 35

1        A.    To set up the pharmacy benefits with regards to
2    formulary, prior authorization, reviews to ensure that
3    those were done appropriately and manage the formulary.
4        Q.    Why did you leave that position?
5        A.    There are several reasons.  One, distance from my
6    home.
7        Q.    Your home was in New York at that time?
8        A.    Correct.
9        Q.    What were some of the other reasons?
10       A.    Primarily distance from my home.
11       Q.    And you've been on the Council of Strategic
12   Healthcare Advisors since 2018?
13       A.    Yes.
14       Q.    What are your roles and responsibilities there?
15       A.    They call upon my expertise as needed for cases
16   or surveys, clinical related items for which they deem my
17   qualification's appropriate for response.
18       Q.    Who are you advising in that role?
19       A.    Whatever the particular project at that time
20   calls for, who -- whomever that may be.
21       Q.    What -- are these -- are these all different
22   types of business entities?
23       A.    It could be.
24       Q.    What else could it be?
25       A.    It could be other healthcare professionals,

Page 36

1    industry experts, industry colleagues.  Yeah.
2        Q.    You're the founder of AristaRx Wellness; is that
3    right?
4        A.    That is right.
5        Q.    And you began that in 2018 as well?
6        A.    Correct.
7        Q.    What is AristaRx Wellness?
8        A.    AristaRx Wellness is my LLC that I created.
9        Q.    What does -- what services does AristaRx Wellness
10   offer?
11       A.    Pharmacy benefit consulting.
12       Q.    And to whom do you offer that pharmacy benefit
13   consulting?
14       A.    To primarily self-insured employer groups but
15   could be any group that needs pharmacy benefit consulting.
16       Q.    Do you have any employees?
17       A.    No.
18       Q.    Are you the sole member of that LLC?
19       A.    Yes.
20       Q.    And what are your duties and responsibilities
21   within AristaRx Wellness?
22       A.    To provide pharmacy benefit consulting to my
23   clients.
24       Q.    Is that still an active company?
25       A.    Yes.

Page 37

1        Q.    And the business address that you gave earlier
2    here in Florida, is that for AristaRx Wellness?
3        A.    No.
4        Q.    Okay.  What entity was that address for?
5        A.    ARMSRx.
6        Q.    ARMSRx.  And you've been with ARMSRx since 2019?
7        A.    Yes.
8        Q.    What is -- what roles have you held within
9    ARMSRx?
10       A.    Senior vice president and executive vice
11   president.
12       Q.    And during what time frame were you senior vice
13   president?
14       A.    2019 through 2021, as listed on my CV.
15       Q.    And executive vice president during what time
16   frame?
17       A.    2021 till present.
18       Q.    Okay.  What were your roles and responsibilities
19   as senior VP?
20       A.    To provide advice and guidance to our clients
21   with regards to their pharmacy benefit program, all aspects
22   of their pharmacy benefit program.
23       Q.    And what are your roles and responsibilities as
24   executive vice president?
25       A.    To provide advisement and guidance to our clients

Page 38

1 with respect to their pharmacy benefit program, all
2 aspects, and I also oversee or have individuals within our
3 organization who report up to me.
4 Q. Okay. So you didn't have individuals who
5 reported up to you as a senior VP?
6 A. I -- right.
7 Q. Okay.
8 A. They -- they report up to me now.
9 Q. Okay. Was that the only way in which your role
10 changed from senior VP to executive VP?
11 A. Yes.
12 Q. How many people report to you as EVP at ARMSRx?
13 A. Two.
14 Q. And what are their roles?
15 A. They are in account management and PBM
16 operations.
17 Q. Doctor, you mention in your report that you have
18 20 years of experience, half of which has been dedicated to
19 the managed care and pharmacy consulting industry
20 overseeing clinical development, overall PBM operations,
21 and client services/management, working primarily with
22 self-insured clients, third-party administrators, and TPPs;
23 is that right?
24 A. That is right.
25 Q. What is a TPP?

Page 39

1 A. A third-party payer.
2 Q. And can you describe what a third-party payer is
3 or does?
4 A. They are responsible for reimbursement or
5 management of the health care claims, including the
6 prescription benefit.
7 Q. And how, if at all, is a TPP different from a
8 self-insured employer?
9 MR. HANSEL: Object to the form.
10 A. Could you be more specific?
11 BY MS. ISIDRO:
12 Q. Are there any ways in which a TPP differs from a
13 self-insured employer?
14 A. There could be.
15 Q. What are some of the ways in which they could
16 differ?
17 A. Could you be more specific?
18 Q. You said there could be differences, so I'm just
19 asking you to elaborate on that.
20 What are some of the differences that could
21 exist?
22 A. Third-party payers are responsible for the
23 management and reimbursement of the healthcare claims,
24 including the prescription benefit. Self-insured employers
25 would also be responsible in that same capacity but within

Page 40

1 the confines of their organization.
2 Q. Okay. What is a TPA?
3 A. Third-party administrator.
4 Q. What does a third-party administrator do?
5 A. They would administer the benefits, you know, on
6 behalf of an entity or a group.
7 Q. And how does that differ from a TPP, if at all?
8 A. So the third-party payer has ultimate
9 responsibility for -- at risk for those claims. A TPA will
10 manage the claims processing and the functions associated
11 with the benefit but may not have ultimate responsibility
12 or at risk for the claims.
13 Q. Okay. Now, I see you have a few documents in
14 front of you right now. One of them is Exhibit 1, another
15 one is Exhibit 2, but it looks like you might have a few
16 other documents as well; is that right?
17 A. Yes.
18 Q. What are the other documents that you have in
19 front of you?
20 A. My statement, my opinion, my expert report.
21 Q. Okay. Anything else that you have in front of
22 you right now?
23 A. Not document-wise.
24 Q. Okay. And this copy of your expert report is one
25 that you've brought with you today, yourself?

Page 41

1 A. Yes.
2 Q. Okay. What is the nature of your work with TPPs?
3 A. The nature of my work in my role or as a pharmacy
4 benefit consultant -- consultant is to advise on the
5 benefits in all aspects, including formulary, design, and
6 formulary ongoing management, utilization management
7 programs, plan design updates, and -- and all functions
8 related to the pharmacy benefit program.
9 Q. Do you have any experience with P&T committees?
10 A. I do.
11 Q. What is the nature of your experience with P&T
12 committees?
13 A. Throughout my -- my career as a pharmacist, being
14 intimately familiar with P&T committees is -- and
15 understanding what their function is, has been integral in
16 all aspects of my career.
17 I have reviewed countless minutes from P&T
18 committees. I do that on an ongoing basis to keep track
19 of, if you will, what the progress is and what the
20 functions and what -- the ongoing developments of the P&T
21 committee, and so I'm -- you know, I'm very familiar with
22 what they do and I have, you know, visibility into the P&T
23 committees with whom my clients are engaged with, are
24 involved with.
25 Q. How do you obtain these minutes from P&T

11 (Pages 38 - 41)

Page 42

1 committees?
2    A.   I request them.
3    Q.   From whom?
4    A.   Whomever the P&T committee is with.
5    Q.   And what -- what entities have you requested P&T
6 committee's minutes from?
7    A.   PBMs and health plans.
8    Q.   Which specific ones?
9    A.   That's confidential information.
10    Q.   Why is that confidential information?
11    A.   It's tied into the clients that I provide
12 counseling -- consulting for.
13    Q.   In connection with which company or which of your
14 roles?
15    A.   My current role at ARMSRx.
16    Q.   Only at ARMSRx?
17    A.   Yes.
18    Q.   Have you ever been a TPP employee?
19    A.   No.
20    Q.   Have you ever been a member of a P&T committee?
21    A.   No.
22    Q.   Do you consider MSP to be a TPP?
23    A.   No.
24    Q.   And is it possible sometimes for both a TPA and a
25 TPP to be involved in processing a particular claim?

Page 43

1       MR. WHARTON:   Can I hear that question again,
2 please?
3       MS. ISIDRO:   Can you read it back, please?
4       (The requested portion was read back.)
5    A.   TPAs manage the claims.   They are not processing
6 claims.
7 BY MS. ISIDRO:
8    Q.   Who -- who does the pharmacy expect payment from
9 among a TPA or a TPP?
10    A.   It depends on the structure of the arrangement
11 and who's ultimately -- oh -- responsible for the payments.
12    Q.   So sometimes the pharmacy might expect payment
13 from the TPA first, right?
14    A.   Could you be more specific?
15    Q.   You mentioned it depends on the structure of the
16 particular arrangement, correct?
17    A.   Correct.
18    Q.   Are there sometimes arrangements where the
19 pharmacy might expect payment from the TPA first?
20    A.   That wasn't the focus of my opinion that I'm
21 rendering here today, but to answer the question, it could
22 be.
23    Q.   In your experience with claim adjudication
24 platforms, would both the TPA and the TPP be listed in the
25 claims data?

Page 44

1    A.   No.
2    Q.   Which would be listed?
3    A.   Standard industry claims data for prescriptions
4 would list the client as part of, you know, the fields, the
5 client -- whoever the client is.
6    Q.   And would the client -- am I understanding
7 correctly that the client would be either the TPA or the
8 TPP?
9    A.   If you're asking with regards to claims data, the
10 information within the industry claims data extract would
11 include the client that have -- that is receiving the
12 prescription benefit.   So it's tied directly into the
13 client, whoever that entity is.
14    Q.   Okay.   So it may not be possible from that
15 information alone to tell whether the third party in each
16 claim is a TPP or a TPA?
17    A.   From that data alone, no.
18    Q.   Okay.   Dr. Panagos, you also list on your CV
19 certain professional organizations that you're a member of;
20 is that right?
21    A.   Yes.
22    Q.   You're a member of the American College of
23 Healthcare Executives?
24    A.   Yes.
25    Q.   When did you first become a member?

Page 45

1    A.   2019.
2    Q.   And you're still a member currently?
3    A.   Yes.
4    Q.   What is required to become a member of that
5 organization?
6    A.   The requirements are listed on the website.
7 There are certain qualifications and criteria that you must
8 meet, and I don't recall them all at this moment.
9    Q.   Okay.   Do you --
10    A.   But they are listed there.
11    Q.   Do you recall any?
12    A.   Must be a pharmacist in good standing or a
13 healthcare professional in good standing.
14    Q.   Okay.
15    A.   Uh-huh.
16    Q.   And you're also a member of the Academy of
17 Managed Care Pharmacy; is that right?
18    A.   Yes.
19    Q.   When did you become a member of that
20 organization?
21    A.   When I was in pharmacy school.
22    Q.   And you're still a member currently?
23    A.   Yes.
24    Q.   What is required to become a member of that
25 organization?

12 (Pages 42 - 45)

Page 46

1    A.  Again, those requirements are listed on the
2  website and they -- it's a professional license or
3  non- -- non-licensed individuals listed on the website.
4    Q.  Okay.  You're a member of Women Leading
5  Healthcare; is that right?
6    A.  Yes.
7    Q.  When did you become a member of that
8  organization?
9    A.  2020.  Yeah.  More recent.
10    Q.  And what is required to become a member of Women
11  Leading Healthcare?
12    A.  Yes.  That requires an appointment.  You have to
13  be invited to join by a current member.
14    Q.  And whom were you invited by?
15    A.  I was invited by a colleague who worked with me
16  at the time.
17    Q.  Worked with you at which of your --
18    A.  At ARMSRx.
19    Q.  You're also a member of Healthcare
20  Businesswomen's Association?
21    A.  Yes.
22    Q.  When did you become a member?
23    A.  I don't remember exactly the year.
24    Q.  Do you remember approximately?
25    A.  Maybe 2019, around that time.

Page 47

1    Q.  Okay.
2    A.  2019.
3    Q.  So recently, in the last few years?
4    A.  Uh-huh.
5    Q.  Okay.  What is required to become a member of
6  Healthcare Businesswomen's Association?
7    A.  It would be -- again, it's listed on the website,
8  all the criteria, but be in the healthcare field, be a
9  woman in the healthcare field.
10    Q.  You're also a member of the American Association
11  of Consultant Pharmacists?
12    A.  Correct.
13    Q.  When did you become a member?
14    A.  2019 as well.  2018 perhaps.  I don't remember
15  exactly.
16    Q.  Okay.  What is required to become a member of
17  that organization?
18    A.  Again, those requirements are listed on the
19  organization's site and among them include being a
20  pharmacist in good standing.
21    Q.  And, finally, you're a member of the American
22  Society of Health Systems Pharmacists?
23    A.  Correct.
24    Q.  When did you become a member?
25    A.  I initially became a member when I was in

Page 48

1  pharmacy school.
2    Q.  Okay.  And you're still a member today?
3    A.  Correct.
4    Q.  What is required to become a member of that
5  organization?
6    A.  It's listed on the site.  A professional licensed
7  or non-licensed individuals may join and they -- a
8  pharmacist in good standing.
9    Q.  Are you a member of any other professional
10  organization besides the ones we've just discussed?
11    A.  No.
12    Q.  During your professional career, have you been a
13  member of any other professional organization besides the
14  ones we've just discussed?
15    A.  No.
16    Q.  Okay.  And do you know whether there are any
17  protocols, standards, or guidelines relating to the
18  practice of pharmacy that are promulgated by any of these
19  professional organizations?
20    A.  Would you please restate the question?
21    Q.  Sure.  Why don't we start with the American
22  College of Healthcare Executives.  Does the American
23  College of Healthcare Executives have any protocols,
24  standards, or guidelines relating to the practice of
25  pharmacy?

Page 49

1    A.  No.
2    Q.  Does the Academy of Managed Care Pharmacy have
3  any protocols, standards, or guidelines relating to the
4  practice of pharmacy?
5    A.  Could you restate that question?
6    Q.  Do you know whether the Academy of Managed Care
7  Pharmacy has any guidelines relating to the practice of
8  pharmacy?
9    A.  Within the scope of managed care, they may
10  provide recommendations or guidance.
11    Q.  Are there any that -- that you are personally
12  aware of?
13    A.  As part of my role in my -- in my day-to-day
14  functions, I review guidance and literature from these
15  organizations and part of up -- keeping up with industry
16  practice, and so it's always evolving, changing, and
17  there's -- based on what's happening in the pharmacy
18  practice and managed care world.
19    Q.  Does the Women Leading Healthcare organization
20  issue any guidelines, protocols, or standards with respect
21  to the practice of pharmacy?
22    A.  Not that I'm aware of.
23    Q.  How about the Healthcare Businesswomen's
24  Association?
25    A.  Not that I am aware of.

13 (Pages 46 - 49)

Page 50

1    Q.  Does the American Association of Consultant
2  Pharmacists issue any guidelines relating to the practice
3  of pharmacy?
4    A.  No, not guidelines.
5    Q.  Any protocols relating to the practice of
6  pharmacy?
7    A.  No.
8    Q.  Any standards relating to the proto- -- to the
9  practice of pharmacy?
10   A.  No.
11   Q.  Does the American Association of Consultant
12  Pharmacists issue any sort of statements at all with
13  respect to the practice of pharmacy?
14   A.  Yes.  They provide information with regards to
15  consultant -- consulting pharmacy, yeah, so.
16   Q.  What type of information?
17   A.  Relevant to the field of consulting -- consultant
18  pharmacists, and that could be all -- anything related to
19  the pharmacy field.
20   Q.  Is that in the nature of continuing education
21  information?
22   A.  They do have continuing education, yes.
23   Q.  What other types of information?
24   A.  Industry information, clinical information as it
25  regards for consultant pharmacists.  So anything tied into

Page 51

1  the pharmacy practice before consulting is -- could be
2  on -- could be on their site or available.
3    Q.  And does the American Society of Health System
4  Pharmacists issue any protocol, standards, or guidelines
5  relating to the practice of pharmacy?
6    A.  Yes, they could.
7    Q.  Are you personally aware of any protocols,
8  standards, or guidelines that they've issued with respect
9  to the practice of pharmacy?
10   A.  They provide, you know, recommendations with
11  regards to health system pharmacists and function within
12  that capacity.
13   Q.  Are you aware whether any of the professional
14  organizations that you're a member of issue any protocol,
15  standards, or guidelines with respect to litigation
16  consulting?
17   A.  No.
18   Q.  No you're not aware or you know that they don't?
19   A.  No, I'm not aware.
20   Q.  Okay.  And do you know whether any of the
21  professional organizations that you're a member of issue
22  any protocols, standards, or guidelines with respect to
23  providing expert testimony?
24   A.  No, I'm not aware.
25   Q.  Okay.  Have you ever engaged in any academic

Page 52

1  research regarding nitrosamines?
2    A.  No.
3    Q.  Have you ever engaged in any professional
4  research regarding nitrosamines?
5    A.  No.
6    Q.  Have you ever published any articles relating to
7  nitrosamines?
8    A.  No.
9    Q.  Have you ever published any articles addressing
10  warranties?
11   A.  No.
12   Q.  Have you ever published any articles relating to
13  Valsartan or Valsartan-containing drugs?
14   A.  No.
15   Q.  Have you ever published any articles relating to
16  bioequivalence?
17   A.  No.
18   Q.  Have you ever published any articles relating to
19  the FDA regulatory requirements that apply to
20  pharmaceutical products?
21   A.  No.
22   Q.  Have you ever engaged in any academic or
23  professional research relating to Valsartan or
24  Valsartan-containing drugs?
25       MR. HANSEL:  Object to the form.

Page 53

1    A.  Could you restate the question, please?
2  BY MS. ISIDRO:
3    Q.  Sure.  Have you ever engaged in any academic
4  research relating to Valsartan or Valsartan-containing
5  drugs?
6        MR. HANSEL:  Object to the form.
7    A.  No.
8  BY MS. ISIDRO:
9    Q.  Have you ever engaged in any professional
10  research relating to Valsartan or Valsartan-containing
11  drugs?
12       MR. HANSEL:  Object to the form.
13   A.  Could you be more specific?
14  BY MS. ISIDRO:
15   Q.  Have you ever researched Valsartan in connection
16  with your professional responsibilities?
17   A.  Yes.
18   Q.  In what context?
19   A.  Again, I, in my role as a clinical pharmacist and
20  consultant, I am staying, you know, up to date with all
21  clinical information, pharmacy updates, medication updates,
22  new to drug -- new to market generic brands, generic
23  specialty, and so it -- I am knowledgeable on the drug.
24   Q.  So when you say you're knowledgeable on the drug,
25  what are you referring to?

14 (Pages 50 - 53)

Page 54

1    A.  I understand what its intended use is for, what
2  category, therapeutic category it's in, the -- its
3  current -- its standing for inclusion in a formulary, and
4  all components, you know, related to the medication in
5  terms of formulary placement.
6    Q.  Anything else?
7       MR. HANSEL:  Object to the form.
8    A.  Could you be more specific?
9  BY MS. ISIDRO:
10    Q.  Have you conducted any research in Valsartan
11  other -- on Valsartan other than the categories that you
12  just mentioned?
13    A.  No.
14    Q.  Have you ever engaged in any academic or
15  professional research regarding bioequivalence?
16       MR. HANSEL:  Object to the form.
17    A.  My education and my experience are -- involve
18  those -- aspects of bioequivalence, and those are part of
19  the components.
20  BY MS. ISIDRO:
21    Q.  Sorry, part of the components of your
22  education?
23    A.  It's part of the curriculum in some way --
24  throughout the pharmacy program.  So it is -- it's not
25  unfamiliar to me.

Page 55

1    Q.  Did you take any courses on bioequivalence during
2  your pharmacy education?
3    A.  Bioequivalence was incorporated into many courses
4  within the pharmacy program as it relates to the
5  medications we were studying at the time.
6    Q.  So bioequivalence -- bioequivalence is a concept
7  that you're familiar with from your education as a
8  pharmacist, but you haven't taken any courses specifically
9  on bioequivalence; is that correct?
10       MR. HANSEL:  Object to the form.
11    A.  The -- I completed all the coursework required
12  for pharm- -- the pharmacy degree, both the bachelor's
13  degree and the doctor of pharmacy degree and fulfilled all
14  the requirements that those entail.
15  BY MS. ISIDRO:
16    Q.  As you sit here today, you can't specifically
17  recall whether that entailed a course specifically on
18  bioequivalence?
19       MR. HANSEL:  Object to the form.
20    A.  Again, I completed all of the coursework required
21  for a pharmacy degree and I fulfilled all the requirements
22  for both bachelor's and doctorate of pharmacy degree,
23  including licensure in the State of New York   that -- I
24  sufficed all of the academic requirements for all the
25  classwork.

Page 56

1  BY MS. ISIDRO:
2    Q.  As you sit here today, can you recall whether any
3  of those requirements including a course specifically on
4  bioequivalence?
5       MR. HANSEL:  Object to the form.
6    A.  No.
7  BY MS. ISIDRO:
8    Q.  Have you ever authored any publications relating
9  to epidemiology?
10    A.  No.
11    Q.  Have you published any -- withdrawn.  Let me
12  rephrase that.
13       Have you authored any publications in the last
14  ten years?
15    A.  No.
16    Q.  Have you ever authored any publications?
17    A.  No.
18    Q.  Have you ever given any presentations relating to
19  nitrosamines?
20    A.  No.
21    Q.  Have you ever given any presentations relating to
22  product warranties?
23       MR. HANSEL:  Object to the form.
24    A.  I advise my clients on drugs standing -- approval
25  standing, standing, and with regards to helping them with

Page 57

1  the formulary.
2  BY MS. ISIDRO:
3    Q.  And how does that relate to product warranties?
4    A.  That the drug is in good standing and meets the
5  criteria for approval approved by the FDA.
6    Q.  So you've never given a presentation, the focus
7  of which is product warranties?
8       MR. HANSEL:  Object to the form.
9    A.  My professional capacity includes advising my
10  clients and providing them guidance on -- on various drug
11  products, structure of their prescription benefit program,
12  and approvals and drugs in good standing for consideration
13  on the formulary.
14  BY MS. ISIDRO:
15    Q.  Okay.  I'm not asking you though about your
16  responsibilities in your client work.  I'm asking about
17  whether you have ever given a verbal presentation to a
18  group of people with a topic focus on product warranties.
19       MR. HANSEL:  Object to the form.
20    A.  I have given a -- I have spoken to groups of
21  people with regards to the promises that a -- a drug is
22  listed to have or the approval that it has.
23  BY MS. ISIDRO:
24    Q.  How many times have you given that presentation?
25    A.  Many.

15 (Pages 54 - 57)

Page 58

1  Q. To whom?
2  A. To my clients.
3  Q. Your clients in connection with which of your
4  jobs?
5  A. All of them.
6  Q. And do you have Power Points that you use for
7  those presentations?
8  A. I have used Power Points.
9  Q. Do you keep those Power Points?
10  A. I share those with the clients.
11  Q. What have the titles of those presentations been?
12  A. Those are specific to the client and tied into
13  their prescription benefit program.
14  Q. And has any of those presentations been
15  specifically focused on the topic of product warranties?
16  MR. HANSEL: Object to the form.
17  A. Product warranties are the promises that products
18  make for consideration for inclusion on the pharmacy
19  formulary is a component of that discussion.
20  BY MS. ISIDRO:
21  Q. What do you understand by the term product
22  warranties?
23  A. Product warranty is the promise that that product
24  makes that it is safe and effective and meets the criteria
25  for approval, as established by the FDA.

Page 59

1  Q. What is the basis of your understanding as to the
2  meaning of the term product warranties?
3  A. The basis of my understanding pulls in my many
4  years of education, my many years of experience in the
5  pharmacy roles that I've held, and my many years of
6  experience in my consulting role, providing guidance to
7  clients about their prescription benefit program and all
8  aspects related to that.
9  Q. Is it based on anything else or have we just
10  fully discussed your basis for your understanding of that
11  term?
12  A. I've provided you the basis for that.
13  THE WITNESS: May I take a break?
14  MR. HANSEL: Yes.
15  MS. ISIDRO: Sure.
16  THE WITNESS: Thank you.
17  THE VIDEOGRAPHER: The time is 10:49 a.m., and
18  we're going off record.
19  (Break taken.)
20  THE VIDEOGRAPHER: The time is 11:08 a.m., and
21  we're back on the record.
22  BY MS. ISIDRO:
23  Q. Dr. Panagos, outside of your client work, have
24  you ever given any formal presentations on product
25  warranties?

Page 60

1  A. I have given presentations on drug products that
2  are approved for use by the FDA.
3  MS. ISIDRO: Sorry, can you read back my
4  question, please?
5  (The requested portion was read back.)
6  MR. HANSEL: I object to the form of the
7  question. Calls for a legal conclusion; asked and
8  answered.
9  A. I have given presentations with regard to
10  approved drug products for consideration on product
11  formularies, pharmacy benefit programs.
12  BY MS. ISIDRO:
13  Q. So is that a no, outside of your client work
14  you've never given formal presentations on product
15  warranties?
16  MR. HANSEL: Object to the form.
17  A. I have spoken about drug products that are
18  approved for use to individuals and groups outside of my
19  client base as well.
20  BY MS. ISIDRO:
21  Q. And to whom have you given those presentations?
22  A. My patient interactions, as well as my
23  academic work with students.
24  Q. So you consider your patient to patient
25  interactions to be formal presentations?

Page 61

1  A. The patient to patient ones are -- the one on one
2  ones are not formal.
3  Q. Are you --
4  A. But they are a presentation to the patient about
5  their drug.
6  Q. So when you refer to your patient to patient
7  interactions, are you referring to any that are not one on
8  one?
9  A. In that respect it would be members that are part
10  of my client base. So it could be more than one.
11  Q. Sorry. We were talking about outside of your
12  client base?
13  MR. HANSEL: Object to the form.
14  BY MS. ISIDRO:
15  Q. Isn't that right?
16  MR. HANSEL: Object to the form.
17  A. When consulting a patient regarding their
18  medication it is pharmacist to patient.
19  BY MS. ISIDRO:
20  Q. Okay. And that's one on one?
21  A. Yes.
22  Q. Other than that, can you think of any formal
23  presentations that you've given outside of your client work
24  relating to -- to product warranties?
25  MR. HANSEL: Object to the form.

16 (Pages 58 - 61)

Page 62

1    A.   The presentations that I have done are listed in
2  my CV and what I've expressed to you just now.
3  BY MS. ISIDRO:
4    Q.   Okay.  So if it's not listed in your CV, you
5  haven't given a formal presentation on it?
6         MR. HANSEL:  Objection.  That's not what she just
7  said.
8         MS. ISIDRO:  Can you read back the last response,
9  please?
10        (The requested portion was read back.)
11 BY MS. ISIDRO:
12   Q.   So am I understanding correctly that you have not
13 given any formal presentations outside of what is listed in
14 your CV?
15        MR. HANSEL:  Object to the form.
16   A.   No, that's not what I said.  I said what is
17 listed in my CV and what I have just expressed to you in
18 terms of presentations to my clients regarding their drug
19 product or prescription benefit program.
20 BY MS. ISIDRO:
21   Q.   Okay.  And outside of those two categories, there
22 aren't any other formal presentations that you've given?
23        MR. HANSEL:  Object to the form.
24   A.   Formal presentations may include the work I did
25 in academia with my students regarding drug products that

Page 63

1  are approved.
2  BY MS. ISIDRO:
3    Q.   Have you ever taught a course relating to --
4  withdrawn.
5         What are the titles of the courses you've taught?
6    A.   One of the --
7         MR. HANSEL:  Objection:  Asked and answered.
8    A.   Pharmacy orientation is one course.
9  BY MS. ISIDRO:
10   Q.   Any others?
11   A.   The others were recitation courses and the
12 department of social sciences and administrative services
13 within the pharmacy program.
14   Q.   What were the titles of those courses?
15   A.   Those are listed in my CV.
16   Q.   Can -- on which page?
17   A.   Page 2.
18   Q.   Can you show me where it lists the titles of the
19 courses?
20   A.   It lists that I was an adjunct assistant
21 professor of pharmacy in the division of social and
22 administrative sciences.
23   Q.   So it doesn't list the titles of the courses that
24 you taught in that role?
25   A.   Correct.  Those were recitation courses tied into

Page 64

1  the courses that fall under that division so.
2    Q.   And what were the titles of you -- of the courses
3  that you taught in that role?
4    A.   I cannot recall at this time.
5    Q.   Is there anywhere that you would be able to find
6  that information?
7    A.   Yes.
8    Q.   Where?
9    A.   In the records during my time there.  It's
10 information that I've had -- I had with respect to the
11 courses.
12   Q.   You say records of your time there.  Are you
13 referring to your personal records or the organization's
14 records?
15   A.   They would be in both.
16   Q.   Now, looking at Page 3 of your CV, under
17 communication, you state that you were a presenter PBMI
18 Opioid epidemic, Health Underwriters organizations?
19   A.   Correct.
20   Q.   Can you describe what that refers to?
21   A.   PBI (sic) is the Pharmacy Benefit Management
22 Institute and they hold webinars of -- related to the
23 profession and I was a presenter along with my colleague at
24 the time for a presentation on the Opioid epidemic.
25   Q.   When was that presentation?

Page 65

1    A.   2016.
2    Q.   Do you still have the materials from that
3  presentation?
4    A.   No, I do not.
5    Q.   Were you paid to give that presentation?
6    A.   No, I was not.
7    Q.   And was that presentation via webinar you said?
8    A.   Yes.
9    Q.   Do you know how many people attended that
10 presentation?
11   A.   No.
12   Q.   Other than your pharmacy license in New York, do
13 you hold any other professional licenses?
14   A.   No.
15   Q.   Have you ever had your license suspended?
16   A.   No.
17   Q.   Have you ever been punished or sanctioned in any
18 way by a professional board?
19   A.   No.
20   Q.   Have you ever worked or consulted with FDA?
21   A.   No.
22   Q.   Do you hold yourself out as an FDA regulatory
23 expert?
24        MR. HANSEL:  Object to the form of the question.
25   A.   I hold myself as an expert on what the FDA has

17 (Pages 62 - 65)

Page 66

1 approved for drug products, both brand and generics.
2 BY MS. ISIDRO:
3    Q.  Do you hold yourself out as an expert on the
4 process for approval of pharmaceutical products by the FDA?
5        MR. HANSEL:  Object to the form.
6    A.  I understand what the process entails by the FDA.
7 BY MS. ISIDRO:
8    Q.  That wasn't my question.  My question was do you
9 hold yourself out as an expert on the process for approval
10 of pharmaceutical products by the FDA?
11       MR. HANSEL:  Objection.
12   A.  Could you be more specific?
13       MR. HANSEL:  Excuse me.  Asked and answered and
14 that's -- that's getting into a little bit of
15 harassment territory.  She answered the question.
16       MS. ISIDRO:  I take issue with your
17 characterization of that question as harassing.  The
18 witness is consistently failing to answer the question
19 that is asked.  This deposition is going to go for a
20 really long time if that continues.
21       The witness is being asked a question.  If she
22 doesn't understand the question, she can let me know
23 that she doesn't understand the question, but,
24 otherwise, I expect the witness to answer the question
25 that's been asked.

Page 67

1        Can you please read back the last question?
2        MR. HANSEL:  Please also read back the answer
3 when you do that.
4        (The requested portion was read back.)
5    A.  The process for drug approval varies between
6 brand and generics and I have an understanding of the
7 process for -- for both of those drugs to be approved.
8 BY MS. ISIDRO:
9    Q.  Is it your position that having an understanding
10 of the process is all that it takes to be an expert on that
11 process?
12       MR. HANSEL:  Objection.  Calls for a legal
13 conclusion.  Object to the form of the question.
14   A.  I have been asked here today to render an opinion
15 on what TPPs rely on when TPPs rely on or -- or consult
16 when they're making -- with respect -- specifically to
17 generic drugs for formulary decisions, and specific to
18 generic drugs, that process involves an approval by the FDA
19 tied to an ANDA application whereby the manufacturer has to
20 meet the criteria for approval in order for that generic
21 drug to gain their approval.  That's what I've been asked
22 to render an opinion on.
23       Was there something more you were looking for?
24       MS. ISIDRO:  Can you read back the question and
25 the answer, please?

Page 68

1        (The requested portion was read back.)
2 BY MS. ISIDRO:
3    Q.  Dr. Panagos, are you offering any expert opinions
4 in this litigation on the process for approval of
5 pharmaceutical products by the FDA?
6    A.  The process by -- for approval is established by
7 the FDA --
8    Q.  Doctor, I'm going to stop you right there.
9        MR. HANSEL:  Excuse me.  Let her finish her
10 answer.
11 BY MS. ISIDRO:
12   Q.  I'm asking you yes or no questions --
13       MR. HANSEL:  Objection.  No.  You just
14 interrupted the witness.  That's unacceptable.
15       MS. ISIDRO:  I am asking you yes or no questions.
16 You're making speaking objections, which are
17 unacceptable.
18       MR. HONIK:  Let's go off the record.  This is
19 Ruben Honik.  Is the court reporter taking down my
20 comment?
21       THE VIDEOGRAPHER:  The time is 11:24.  We're
22 going off record.
23           (Off the record.)
24       MR. HANSEL:  This is Greg Hansel.  We're going
25 back on the stenographic record.  We are on the record

Page 69

1 stenographically.
2        On behalf of the Plaintiffs, we object pursuant
3 to Federal Rule of Civil Procedure 30(d)(3), motion to
4 terminate or limit which states in part:  A, at any
5 time during a deposition the deponent or a party may
6 move to terminate or limit it on the ground that it is
7 being conducted in bad faith or in a manner that
8 unreasonably annoys, embarrasses, or oppresses the
9 deponent or party.
10       On behalf of the Plaintiffs, Defendants have
11 questioned Dr. Panagos for over two hours or
12 approximately two hours on qualifications only.  In
13 addition to that, Defense counsel has repeatedly
14 re-asked the same question on numerous occasions, in
15 particular a question about whether the witness is
16 qualified as an expert witness under federal procedure
17 in effect.  That question is a legal conclusion, calls
18 for a legal conclusion.  It's a question for the
19 Court.
20       The witness is not an attorney.  The witness does
21 not know standards for acceptance of expert witnesses
22 by federal courts under Daubert and other law.  It is
23 the parties, the Plaintiffs who have offered the
24 expert, and even if the Defendants are not happy with
25 the answer provided by the expert, that is not a

18 (Pages 66 - 69)

Page 70

1  ground to badger the witness, to repeatedly ask the
2  question calling for a legal conclusion, and, in
3  effect, harassing Dr. Panagos.
4      It's discourteous, it's not civil, and the
5  Plaintiffs will not permit it to continue.  We would
6  like to request the Defendants for an offer of proof
7  at this time of how much longer they intend to ask the
8  witness about her qualifications and on which topics
9  of her qualifications they intend to examine the
10  witness.
11     We will consider that, and if it is unacceptable
12  under Rule 30(d)(3), we will terminate the portion of
13  the examination on qualifications to the extent only
14  that we believe it is impermissible.
15     Is there anything else you'd like to add, Conlee,
16  Charlie, Jorge?
17     MS. WHITELEY:  No.
18     MR. HANSEL:  Ruben?  Anyone?  Thank you.
19     MR. KERNER:  The only thing I'd like to say is I
20  would like an opportunity to confer with Defense
21  counsel.
22     MR. HANSEL:  Of course.
23     MR. KERNER:  So we're going to need a couple of
24  minutes.
25     MR. HANSEL:  Sure.  We'll step out.

Page 71

1      MR. KERNER:  Yeah.  I'd appreciate that.
2          (Break taken.)
3      MR. KERNER:  And so we will respond to your
4  statements earlier.
5      MS. ISIDRO:  So, Counsel, I would like to state
6  for the record that I categorically disagree with any
7  suggestion that the questions that have been asked -- that
8  have been asked here today are harassing or designed
9  to embarrasses the witness in any way.
10     Unfortunately, the witness has repeatedly
11  answered the question that she has wanted to answer
12  rather than the question that has been asked.
13     In addition, there has been a pattern of speaking
14  objections from Plaintiff's counsel, culminating in
15  this inappropriate attempt to baselessly terminate or
16  limit this deposition and to interfere with
17  Defendant's rights to thoroughly explore the
18  qualifications, as well as the -- the qualifications
19  of the expert that Plaintiffs are offering, as well as
20  the content and the bases for her opinions that she
21  intends to offer in this litigation.
22     I note that you threatened to suspend the
23  deposition of the witness after she was asked not a
24  question about her qualifications but a question about
25  whether she intended to offer specific opinions in

Page 72

1  this litigation.  A yes or no question about whether
2  she intended to offer specific opinions regarding the
3  FDA process for drug approval in this litigation.
4      So, with that in mind, I would suggest that we
5  continue with the deposition at this time, and as long
6  as the witness answers the questions that have been
7  asked, bearing in mind that you have an opportunity to
8  Redirect after Defendants have asked their
9  questions -- and so as long as she answers the
10  questions that have been asked, I don't see any reason
11  why there should be any problem continuing with the
12  deposition at this time.
13     MS. WHITELEY:  May I ask a question rather
14  than -- do you have an amount of time that you have an
15  idea of how long that you think it will continue on
16  qualifications?
17     MS. ISIDRO:  It should not be much longer,
18  assuming the witness does answer the questions that
19  have been asked.  But if the witness continues to be
20  evasive and, you know, we continue to have to ask the
21  question ten different ways so that the original
22  question can be answered by the witness, then it -- it
23  will need to go much -- it will need to go longer and
24  it's not on me to -- it's not within my power to be
25  able to determine that.  It's -- it's much more within

Page 73

1  the witness's power to determine how she's going to be
2  answering questions.
3      MR. KERNER:  Anybody else on the Defense side
4  have anything that they want to add?
5      MR. GISLESON:  Yeah.  This is John Gisleson from
6  Morgan Lewis on behalf of Aurobindo.
7      We do not believe that the questioning has been
8  in any way inappropriate.  The tone has been fair and
9  balanced, and in our view the witness has been
10  nonresponsive and evasive.
11     MR. KERNER:  Anyone else on the Defense side?
12     The only thing I'll add is our intention is to
13  move forward efficiently, to continue to ask
14  appropriate questions, to continue to ask
15  professionally, as counsel's been doing all morning,
16  and to treat the witness with respect, as counsel has
17  done all morning, and move forward with the deposition
18  and get through it as quickly as we can.
19     There's no intent to keep this witness here one
20  minute longer than necessary.
21     MR. HANSEL:  Anything else from the Defendants?
22     MS. ISIDRO:  Not at this time.
23     MR. HANSEL:  All right.  On behalf of the
24  Plaintiffs, we disagree with your statements that the
25  witness has been nonresponsive or evasive and we stand

19 (Pages 70 - 73)

Page 74

1  by our statements earlier, which I will not repeat.
2      Based on your representations, particularly to
3  Attorney Whiteley's questions, that you intend to
4  reach a conclusion to the questioning about
5  qualifications with reasonable efficiency, we will
6  allow the questioning of Dr. Panagos to continue now,
7  including to a limited extent on qualifications, and
8  I -- I guess if there's one thing I want to reiterate,
9  it's that she is not -- we're not holding her out as
10  an expert on Daubert and on what Federal Court
11  standards are for the acceptance of expert witnesses,
12  which is a legal question for the Court.
13      So, having said that, I will go get Dr. Panagos
14  to -- to get started. Thank you.
15      MS. ISIDRO: Thank you.
16          (Off the record.)
17      THE VIDEOGRAPHER: The time is 12:17 p.m., and we
18  are back on record.
19  BY MS. ISIDRO:
20  Q. Dr. Panagos, are you intending to offer any
21  opinions in this litigation on the process for obtaining
22  approvals from FDA for pharmaceutical products?
23      MR. HANSEL: Object to the form.
24  A. The process has already been established by the
25  FDA for approval of drugs.

Page 75

1      Could you restate the question?
2  BY MS. ISIDRO:
3  Q. Are you intending to offer any opinions in this
4  litigation on the process of obtaining approvals from FDA
5  for generic pharmaceutical products?
6      MR. HANSEL: Object to the form.
7  A. I am rendering an opinion on what TPPs,
8  third-party payers, rely on with respect to generic drugs
9  for consideration to a drug formulary.
10  BY MS. ISIDRO:
11  Q. So you're not intending to offer any opinions on
12  the process for obtaining approvals from FDA for generic
13  pharmaceutical products?
14      MR. HANSEL: Object to the form: Asked and
15  answered, argumentative.
16  A. The process for approval of generic drug products
17  is already established by the FDA.
18  BY MS. ISIDRO:
19  Q. Would you defer to FDA on that process?
20      MR. HANSEL: Object to the form.
21  A. Would you please be more specific?
22  BY MS. ISIDRO:
23  Q. Would you defer to FDA with respect to matters
24  involving the process for obtaining approvals for
25  pharmaceutical products?

Page 76

1      MR. HANSEL: Object to the form.
2  A. As a pharmacist, I understand the process
3  involved for approval of generic drug products as it
4  entails how those decisions are tied into a formulary
5  placement.
6  BY MS. ISIDRO:
7  Q. And will you be offering expert opinions in this
8  litigation involving that process?
9      MR. HANSEL: Object to the form. Her report
10  speaks for itself.
11  A. My expert opinion is what TPPs rely on and
12  consider with respect to generic drugs for placement to the
13  drug formulary.
14  BY MS. ISIDRO:
15  Q. That is the only category of information on which
16  you intend to offer expert opinions in this litigation?
17      MR. HANSEL: Object to the form.
18  A. My expert opinion is on what TPPs rely on when
19  consideration -- for consideration of generic drugs as --
20  for consideration to be placed on the formulary and it --
21  reimburse as part of prescription drug program.
22  BY MS. ISIDRO:
23  Q. That is the only category on which you are -- you
24  will be opining in this litigation?
25      MR. HANSEL: I object to the form of the

Page 77

1  question.
2  BY MS. ISIDRO:
3  Q. You can answer.
4  A. As I understand your question, that is what my
5  opinion will be rendered upon.
6  Q. Have you ever had any formal training in
7  economics?
8  A. What do you mean by formal? Could you define
9  that?
10  Q. Have you ever done any coursework in economics?
11  A. As part of my college degrees, some of the
12  coursework entailed economics.
13  Q. Was that as part of one of your majors?
14  A. Yes.
15  Q. Which ones?
16  A. Biology and as well as pharmacy.
17  Q. Have you ever obtained any certifications in
18  economics?
19  A. No.
20  Q. Have you ever obtained any degrees in economics?
21  A. No.
22  Q. Have you ever had any formal training in business
23  principles?
24  A. Business coursework was also part of my college
25  education.

20 (Pages 74 - 77)

Page 78

1    Q.  In connection with which of your majors or
2  minors?
3    A.  Both biology, computer science, and pharmacy.  So
4  all -- all -- both majors and the minor.
5    Q.  Outside of your college degrees, have you had any
6  other coursework in business?
7    A.  Only as it pertains to my continuing education
8  credits for upholding my pharmacy degree, so business
9  related to pharmacy continuing education.
10   Q.  Have you received any certificates in business?
11   A.  No.
12   Q.  Have you received any degrees in business?
13   A.  No.
14   Q.  You are not a medical doctor, correct?
15   A.  No.
16   Q.  You're not a pharmacologist?
17   A.  No.
18   Q.  And you're not a toxicologist?
19   A.  No.
20   Q.  Aside from this litigation, have you ever been
21  retained as an expert witness or an expert consultant in
22  connection with litigation?
23   A.  No.
24   Q.  And you testified you've never been
25  deposed before.  Have you ever testified at trial

Page 79

1  before?
2    A.  No.
3    Q.  Have you ever done consulting work for any
4  pharmaceutical company?
5    A.  No.
6    Q.  Have you ever done consulting work for any
7  medical device company?
8    A.  No.
9    Q.  What percent of your income is currently derived
10  from expert testimony or expert consulting in connection
11  with litigation?
12   A.  I have not calculated the percentage, but it's
13  only with regards to the case I'm providing an expert
14  report for here.
15   Q.  Okay.  Doctor, if we could turn back to  Exhibit
16  1, which was your notice of deposition.
17   A.  Uh-huh.
18   Q.  You can pass Exhibit 2 back to me, just so you
19  don't have too many papers in front of you.
20      MR. HANSEL:  She may want to refer to the other
21      exhibits.
22      MS. ISIDRO:  Oh, certainly.  If -- if you would
23      like --
24      MR. HANSEL:  If she could keep them there, I
25      would appreciate it.

Page 80

1  BY MS. ISIDRO:
2    Q.  If you'd like to refer back to them at any point,
3  you're welcome to.  I'm happy to take them back if it's too
4  cluttered.
5    A.  It's okay.
6      MR. HANSEL:  Why don't you leave them nearby.
7      THE WITNESS:  I'm fine.
8      MS. ISIDRO:  Okay.
9      THE WITNESS:  I'm good.  Thank you.
10  BY MS. ISIDRO:
11   Q.  Okay.  And you're I believe still on Page 6,
12  correct?
13   A.  Correct.  Uh-huh.
14   Q.  Okay.  Item Number 2 asks for articles,
15  abstracts, studies, reports, et cetera, and am I
16  understanding your testimony correct, you don't have any
17  items responsive to Number 2?
18      MR. HANSEL:  Excuse me.  I'm going to object.  I
19      object to the form of the question because we've
20      provided a written response as well.
21   A.  Everything is included in my expert report, in my
22  CV.  All the materials necessary for this expert opinion
23  that I'm providing are within the report and my CV.
24  BY MS. ISIDRO:
25   Q.  Okay.  But, Doctor, you've never authored any

Page 81

1  articles, correct?
2    A.  Correct.
3      MR. HANSEL:  Object to the form.
4  BY MS. ISIDRO:
5    Q.  And you've never authored or co-authored any
6  abstracts, correct?
7    A.  Correct.
8    Q.  And you've never authored or co-authored any
9  published studies, correct?
10   A.  Correct.
11   Q.  You've never authored or co-authored any
12  published reports, correct?
13   A.  Correct.
14   Q.  You've never authored or co-authored any
15  publications, correct?
16   A.  Right.
17   Q.  Okay.  You've never authored or co-authored any
18  book chapters?
19   A.  No.
20   Q.  Or any books in their entirety, correct?
21   A.  That is correct.
22   Q.  Do you have in your possession, Doctor, any
23  presentations -- withdrawn.  Let me ask a different
24  question.
25      Have you ever given any presentations or speeches

21 (Pages 78 - 81)

Page 82

1 regarding drug safety and cancer risk?
2    A.  That's a broad question but I have spoken about
3 drug safety and the potential for side effects or adverse
4 effects as related to that drug.  Those can include cancer.
5    Q.  And in what context have -- have those speaking
6 engagements been?
7    A.  In every context as my professional -- in my
8 professional career as a pharmacist.  So in my current
9 role, in my academic role, and in my previous roles in
10 my -- with my previous employment.
11    Q.  So has -- have those been specifically with and
12 for your clients?
13       MR. HANSEL:  Object to the form.
14    A.  Primarily for my clients.  But also for, if I was
15 involved in a speaking engagement with my organization, it
16 could have been to an audience that was not my client.
17 BY MS. ISIDRO:
18    Q.  On how many occasions would you have spoken to an
19 audience that went beyond your clients?
20    A.  A few times a year.  A few times a year, once a
21 quarter maybe.
22    Q.  During what time frame?
23    A.  Again, it's been throughout my career.  So I've
24 been doing this work here now for 20 plus years and so it's
25 been throughout my career, sometimes more, sometimes less.

Page 83

1    Q.  What was most recent one?
2    A.  The most recent engagement was to the Chicago
3 Healthcare Underwriters speaking about pharmacy benefit
4 programs.
5    Q.  When was that?
6    A.  That was, goodness, before COVID.  So I'm trying
7 to think of the date.  I can't recall the exact date, but
8 it was before the -- the COVID lockdown.
9    Q.  Okay.  And were you discussing cancer risk in
10 connection with pharmaceutical products during that
11 presentation?
12    A.  We were discussing pharmacy benefit information,
13 drug safety, drug formulary plan designs.
14    Q.  So you don't specifically recall discussing
15 cancer risk?
16    A.  It was not the focus of the presentation.
17    Q.  To the best of your recollection, was it
18 discussed during the presentation?
19    A.  Again, it was not the focus, but whenever you
20 talk about a drug, you bring in I guess a clinical
21 pharmacist for the side effects or adverse effects or any
22 concerns.
23    Q.  So it's possible that you may have discussed it,
24 but you don't specifically recall discussing it; is that
25 correct?

Page 84

1    A.  Right.  That was not the focus of the
2 presentation.
3    Q.  I understand you're saying it's not the focus and
4 I just want to make sure that I'm understanding your
5 answer.
6    A.  Uh-huh.
7    Q.  It was not the focus and you don't specifically
8 recall discussing it, although it's possible you may have
9 discussed it?
10       MR. HANSEL:  Objection.  I object to the form.
11    Asked and answered, repeatedly.
12 BY MS. ISIDRO:
13    Q.  Is that --
14    A.  My --
15    Q.  -- is my understanding correct?
16    A.  My professional responsibility as a pharmacist
17 when speaking about medications includes discussion of any
18 potential concerns with the drug, including cancer, if it's
19 relevant to the discussion.  So I believe I'm answering
20 your question.
21    Q.  Okay.  So I'll take that to mean that my
22 understanding is correct and you may have discussed it but
23 you don't specifically recall discussing it.
24       MR. HANSEL:  Objection and move to strike.
25    Object to the form.

Page 85

1 BY MS. ISIDRO:
2    Q.  And please feel free to correct me if I'm wrong
3 in my interpretation.
4       MR. HANSEL:  Again, object to the form.
5 BY MS. ISIDRO:
6    Q.  Am I correct that your -- that all of the
7 materials that you have relied on in forming your opinions
8 in this case have been listed in the attachments to -- to
9 your report?
10    A.  All the materials have been listed, yes, in the
11 attachment.
12    Q.  Okay.  And let's go ahead and mark a copy of your
13 report and its exhibits as Exhibit Number 3.
14       MS. ISIDRO:  She just needs to mark it first.
15    Sorry.
16       MR. HANSEL:  Can I have a copy?
17       MS. ISIDRO:  Oh, I have it here.  Sorry about
18    that.
19       MR. KERNER:  Yeah.
20       MR. HANSEL:  I'm sorry.
21       (Exhibit No. 3 was marked for identification.)
22 BY MS. ISIDRO:
23    Q.  And, Doctor, if you could turn to exhibit --
24 excuse me, Appendix A --
25    A.  Uh-huh.

22 (Pages 82 - 85)

Page 86

1    Q.  -- attached to your report.  If you could just
2  take a moment to review that and confirm for me that that
3  is a complete list of the materials that you have relied on
4  in forming your opinions in connection with this
5  litigation.
6    A.  This is a list of my materials that I've
7  reviewed.  My expert opinion is based on my experience, my
8  education, my day-to-day upkeep of my profession to stay up
9  to date with what's happening, and -- and the materials
10  that I've reviewed are included here.
11    Q.  Okay.  And as far as the materials that you've
12  reviewed, Appendix B -- excuse me --
13    A.  A.
14    Q.  -- Appendix A to your report is a complete list
15  of the materials you've reviewed in connection with this --
16  with your opinions in this litigation?
17        MR. HANSEL:  Object to the form.
18    A.  My day-to-day responsibilities include reviewing
19  many pharmacy and industry articles, data, and information,
20  but with regards to this expert opinion the materials that
21  I reviewed are listed in Appendix A.
22  BY MS. ISIDRO:
23    Q.  You haven't reviewed any medical records in
24  connection with this litigation, correct?
25        MR. HANSEL:  Object to the form.

Page 87

1    A.  Would you please be more specific than medical
2  records?
3  BY MS. ISIDRO:
4    Q.  Have you -- I'll rephrase the question.
5        Have you reviewed any medical records pertaining
6  to the Plaintiffs in this litigation?
7    A.  No.
8    Q.  Have you spoken to any of the Plaintiffs in this
9  litigation?
10    A.  No.
11    Q.  Have you spoken to any of the other experts that
12  Plaintiffs have disclosed in this litigation?
13    A.  No.
14    Q.  Have you issued any invoices in connection with
15  your work in this litigation?
16    A.  I will -- I have not issued any invoices, but I
17  did receive a retainer at the onset.
18    Q.  And what was the amount of the retainer that you
19  received at -- at the outset?
20    A.  $4,500.
21    Q.  Has that retainer been -- let me rephrase that.
22        Have -- have there been amounts consumed from
23  that retainer?
24    A.  Are you asking if I've used the monies?
25    Q.  No, Doctor.

Page 88

1    A.  I mean, consumed is -- you've used the word
2  consumed.  I'm not --
3    Q.  Doctor, have you been tracking your charges in
4  connection with this litigation?
5    A.  Yes.  I keep a record of my -- the time I spend
6  on this case.  Absolutely.
7    Q.  How do you track the time that you spend on this
8  case?
9    A.  I keep a record of the time I spent in my own
10  personal file.
11    Q.  Are they written notes?  Do you use a program or
12  an app to track your time?  How exactly do you keep those
13  records?
14    A.  It's a combination of written and tracked through
15  an Excel.
16    Q.  An Excel spreadsheet that -- that you populate?
17    A.  That's correct.
18    Q.  Okay.  What is your hourly -- what is the hourly
19  rate at which you are being compensated in connection with
20  this litigation?
21    A.  The hourly rate for non-testifying work is $375
22  an hour and for testifying work it's $400 an hour.
23    Q.  What is your arrangement with respect to the
24  retainer?  And I'll explain what I mean.  Is it -- is it
25  something that's just there to guarantee payment or is it

Page 89

1  something on which you collect your fees as they are
2  incurred up to the extent of the retainer or a different
3  arrangement with respect to the retainer?
4    A.  The retainer was for my expert report.
5    Q.  Okay.  And have you calculated the total amount
6  of fees that you have incurred based on your time spent
7  and -- and your hourly rate, up until today?
8    A.  I have kept a report of the time I've spent for
9  this expert report and case and I have that -- I have that
10  recordkeeping, if you will.
11    Q.  What is the total number of non-testifying hours
12  that you have spent to date on this litigation?
13    A.  Approximately 50 to 60 hours.
14    Q.  I'm sorry?  I didn't hear you.
15    A.  Fifty to -- about approximately fifty hours.
16    Q.  Approximately 50 hours.  So at your
17  non-testifying rate of $375 an hour, that would be
18  approximately $18,750 in fees in connection with your
19  non-testifying work so far; is that right?
20    A.  You calculated it so.
21    Q.  So that exceeds the amount of -- of the retainer,
22  correct?
23    A.  Yes.
24    Q.  Will that retainer remain in place and you will
25  invoice Plaintiffs for the full amount of -- of the fees

23 (Pages 86 - 89)

Page 90

1 that you have incurred so far, or will you reduce the
2 amount that you invoice by the amount of the retainer?
3     A.   I will reduce it by the amount of the retainer.
4     Q.   Okay.  When were you first retained in connection
5 with this litigation?
6     A.   The exact date I'm -- I have to look at the exact
7 date, but it was in October I want to say or maybe late
8 September of '21.
9     Q.   Who first contacted you in connection with this
10 litigation?
11    A.   Greg Hansel.
12    Q.   Did you know Greg Hansel before he contacted you
13 in connection with this litigation?
14    A.   No.
15    Q.   Do you know how you came to be contacted in
16 connection with this litigation?
17    A.   I was told it was through my LinkedIn profile.
18    Q.   When you do issue an invoice in connection with
19 your work in this litigation, who will you be sending that
20 invoice to?
21    A.   Preti Flaherty.
22    Q.   I'm going to go ahead and mark this document as
23 Exhibit 4.
24    (Exhibit No. 4 was marked for identification.)
25        Do you recognize this document, Doctor?

Page 91

1     A.   Yes.
2     Q.   And what is it?
3     A.   It is the engagement letter.
4     Q.   Your engagement letter in connection with this
5 litigation?
6     A.   Yes.
7     Q.   All right.  What materials did you initially
8 review in connection with this litigation?
9     A.   All of the materials I reviewed are in the
10 appendix.
11    Q.   Let me ask my question a different way.
12        Did you review any materials prior to making a
13 determination as to whether or not you would agree to your
14 engagement in connection with this litigation?
15    A.   So, again, my day-to-day functions in my
16 professional role include reviewing pharmacy literature and
17 materials, industry relevant information so that I am aware
18 of -- so I can best advise my clients in -- in my
19 professional capacity so.
20    Q.   In making a decision as to whether or not you
21 would agree to be engaged in connection with this
22 litigation, did you review any materials relating to the
23 litigation itself?
24    A.   No.
25    Q.   Did you review any materials relating to the

Page 92

1 claims at issue in the litigation?
2     A.   No.
3     Q.   Has anyone assisted you in doing research or
4 gathering information in connection with the opinions that
5 you're offering in this litigation?
6     A.   No.
7     Q.   What were you asked to do when you were retained
8 in connection with this litigation?
9     A.   I would ask -- I was asked to render an opinion
10 on what TPPs rely on when -- with respect to generic
11 medications.
12    Q.   Other than Plaintiff's counsel, have you spoken
13 to anyone about this litigation?
14    A.   No.
15        MS. ISIDRO:  Counsel, I'm about to start getting
16 into Dr. Panagos's report.  Should we break for lunch
17 at this time and -- and then come back or should we
18 get started and break at a later time?
19        MR. HANSEL:  Let's break.
20        MS. ISIDRO:  Okay.
21        MR. KERNER:  How long?  What do you think?
22        THE VIDEOGRAPHER:  The time is 12:53 p.m., and we
23 are off record.
24        (Break taken.)
25        THE VIDEOGRAPHER:  The time is 1:56 p.m., and we

Page 93

1 are back on the record.
2 BY MS. ISIDRO:
3     Q.   Good afternoon, Dr. Panagos.  Do you still have
4 in front of you Exhibit Number 3, your report with its
5 Appendixes?
6     A.   I do.
7     Q.   All right.  We're going to spend some time going
8 through your opinions as -- as stated in your report.  So
9 I'm going to have you turn to Page 2, and specifically the
10 fourth section of your report in Paragraph 12, you don't
11 have any opinions that are stated in the earlier parts of
12 your report prior to this paragraph; is that correct?
13    A.   Correct.
14    Q.   In Paragraph 12 you state that in July 2018 the
15 FDA announced a voluntary recall of Valsartan, including
16 Valsartan-containing drugs, due to contaminants NDEA and
17 NDMA.  What is your basis for that statement?
18    A.   That information is found on the FDA website.
19    Q.   What do you understand the term contaminants to
20 mean?
21    A.   These contaminants were found in unacceptable
22 levels and probable human carcinogens and do not belong in
23 the medication.
24    Q.   I want to make sure I understood your answer.
25        MS. ISIDRO:  Can you read back the question and

24 (Pages 90 - 93)

Page 94

1 the answer for me, please?
2      (The requested portion was read back.)
3 BY MS. ISIDRO:
4    Q.   Am I understanding you correctly that you
5 understand the term contaminants to mean any substance that
6 does not belong in the medication?
7      MR. HANSEL:  Object to the form.
8    A.   In the scope of this case, a -- the contaminant
9 is a substance that was -- should not have been in the
10 medication and not consistent with the referenced labeled
11 product.
12 BY MS. ISIDRO:
13   Q.   So that is how you are using the word
14 contaminants in this report?
15     MR. HANSEL:  Object to the form.  Asked and
16     answered.
17   A.   I've answered the question.
18 BY MS. ISIDRO:
19   Q.   I just want to make sure I'm understanding your
20 answer.
21     MR. HANSEL:  Object to form.
22 BY MS. ISIDRO:
23   Q.   Have I stated that correctly?
24     MR. HANSEL:  Object to the form.
25   A.   Please restate so I can be sure I -- I understand

Page 95

1 the way you restated it.
2      MS. ISIDRO:  Can you read it back, please?
3      (The requested portion was read back.)
4 BY MS. ISIDRO:
5    Q.   I just want to understand, Doctor, whether --
6 what you've discussed in that prior response is a
7 description of how you personally are using the term
8 contaminants in your report.
9    A.   Uh-huh.  So a contaminant is any substance that
10 is in the medication that should not have been there, not
11 consistent with the referenced label product, and
12 inconsistent with the safety and efficacy of the referenced
13 labeled product.
14   Q.   Thank you.  What are you relying on for purposes
15 of your definition of contaminants?
16   A.   My industry knowledge, my pharmacy background, my
17 education, studies, and professional scope in my career.
18   Q.   Anything else?
19   A.   No.
20   Q.   You're not relying on any specific FDA
21 regulations for the purpose of that definition?
22   A.   The scope of my career relies -- you know,
23 involves referring to FDA information so.
24   Q.   Are there specific FDA regulations that you are
25 referring to in terms of your understanding of the

Page 96

1 definition of the term contaminants?
2    A.   Specifically, no.
3    Q.   In the next sentence you say these contaminants
4 are probable human carcinogens according to the
5 International Agency for Research on Cancer classification.
6 Are -- so are you relying on IARC's classification in that
7 statement?
8    A.   Yes.
9    Q.   Have you independently assessed the
10 carcinogenicity of NDEA or NDMA?
11   A.   Not independently.
12   Q.   Are you relying on anything other than the IARC
13 classification in making that statement in your report?
14     MR. HANSEL:  Object to the form.
15   A.   The IARC classification is public information
16 which is what I relied on to make that statement.
17 BY MS. ISIDRO:
18   Q.   Okay.  And you didn't rely on anything else for
19 purposes of that statement?
20     MR. HANSEL:  Object to the form.
21   A.   Yes.
22 BY MS. ISIDRO:
23   Q.   Yes.  I'm sorry, yes, that's correct?
24   A.   Yes.
25     MR. HANSEL:  Object to the form.

Page 97

1 BY MS. ISIDRO:
2    Q.   Okay.  Apart from any alleged presence of NDEA or
3 NDMA in Valsartan-containing drugs, are you offering any
4 criticism of Valsartan-containing drugs?
5    A.   Valsartan -- as long as they're being used for
6 their intended FDA labeled use, no.
7    Q.   The next section, Section 5, talks about
8 background on TPP pharmacy benefits and Paragraphs 14
9 through 18 specifically talk about TPPs; is that correct?
10   A.   Yes.
11   Q.   What are you relying on in making the statements
12 that you make in Paragraphs 14 through 18 with respect to
13 TPPs?
14   A.   I'm relying on the information I've listed in
15 Appendix A.
16   Q.   Can we -- can you please look at that appendix
17 and identify for me which of the items listed on Appendix A
18 you're relying on for purposes of paragraphs 14 through 18
19 of your report?
20   A.   Yeah.  So I have listed in the appendix
21 experts -- excerpts, excuse me, of data, MSP data --
22   Q.   That's the one that says Detail Claim Report, HMO
23 fields added, July 6, 2021?
24   A.   Yes.  And the other items would be the
25 coordination of benefits, third-party liability.

25 (Pages 94 - 97)

Page 98

1    Q.  Okay.  That's further up on the list on Page 1 of
2  Appendix A?
3    A.  Yes.
4    Q.  Okay.  Anything else?
5    A.  And then further down where it says MADA claims
6  for the recalled Valsartan.
7    Q.  Okay.  That's the last item on -- on that page,
8  MADA claims data for recalled Valsartan --
9    A.  Yes.
10    Q.  -- four spreadsheets?
11    A.  Yes.  And then on the next page there are
12  additional items referenced, fourth and fifth down.  The
13  recall status of NDCs.
14    Q.  So you mentioned fourth and fifth down.  Is that
15  MADA Third Party Payor Plaintiff's Fact Sheet, and MSP
16  Third Party Payor Plaintiff's Fact Sheet?
17    A.  Yeah.
18    Q.  And then two down from that, was it the recall
19  status of NDCs listed?  Is that the one you referred to?
20    A.  Uh-huh.
21    Q.  Okay.
22    A.  Yes.
23    Q.  Anything else?
24    A.  My own experience from being an expert in this
25  field and consulting and knowing how these entities work.

Page 99

1    Q.  Have we now discussed all of the bases for your
2  statements in Paragraphs 14 through 18 --
3    MR. HANSEL:  Object to the form.
4  BY MS. ISIDRO:
5    Q.  -- of your report?
6    A.  All of my materials reviewed are in the appendix,
7  so for my -- for the entirety of my expert report.  So I've
8  answered your question, you know, to the best of my
9  knowledge at this point, but I have -- I'd have to go back
10  and study each of the items in the appendix very closely to
11  ensure that I haven't missed a point in those sections, but
12  for purposes of our discussion, I have pointed out those
13  that I believe are relevant.
14    Q.  All right.  The next section of your report,
15  Paragraphs 19 and 20, deals with PBMs; is that correct?
16    A.  Right.
17    Q.  And what did you rely on in formulating the
18  statements that you've included on Paragraphs 19 and 20 of
19  your report?
20    A.  My professional experience, my pharmacy knowledge
21  and education, and the materials in Appendix A.
22    Q.  And with respect to the materials in Appendix A,
23  which of the materials listed in Appendix A formed the
24  basis for your statements in Paragraphs 19 and 20 of your
25  report?

Page 100

1    A.  The American Journal of Managed Care, ASHP,
2  Coordination of Benefits, Formulary Development, The
3  Journal of Managed Care, Drug -- Navigating Drug
4  Formularies and Pharmacy Benefit Management, the Orange
5  Book, Principles of a Sound Drug Formulary, and the U.S.
6  Food and Drug Administration Development Approval Process.
7    Q.  The next section of your report, Paragraphs 21
8  through 28, discusses prescription drug formularies; is
9  that right?
10    A.  Yes.
11    Q.  What did you rely on in formulating the
12  statements in paragraphs 21 through 28 of your report?
13    A.  The same ones I gave you for PBM.
14    Q.  Okay.
15    A.  Including my knowledge, experience, and education
16  in my professional capacity.
17    Q.  Okay.  And nothing additional with respect to
18  Paragraphs 21 and 28, is that correct, as compared with
19  Paragraphs 19 and 20?
20    A.  Just whatever falls under the scope of my
21  professional capacity and my day-to-day functions.
22    Q.  And would you consider Paragraphs 14 through 28
23  to be background for your opinions in this litigation?
24    MR. HANSEL:  Object to the form.  Calls for a
25  legal conclusion.

Page 101

1    A.  Please repeat the question?
2    MS. ISIDRO:  Could you read it back, please?
3    (The requested portion was read back.)
4    MR. HANSEL:  Same objection.
5    A.  They can serve as a background or they're
6  information pertinent to the -- the opinion, relevant and
7  pertinent.
8  BY MS. ISIDRO:
9    Q.  In Paragraphs 29 to 32 you make various
10  statements concerning the Orange Book, correct?
11    A.  29 through -- well, it goes beyond 32.
12  BY MS. ISIDRO:
13    Q.  Okay.
14    A.  But yes.
15    Q.  Okay.  You have a Section D in your report titled
16  Orange Book and that goes 29 through 32; is that correct?
17    A.  In Section D, yes.
18    Q.  Okay.  What is the Orange Book?
19    A.  The Orange Book, also known as the Approved Drug
20  Products with Therapeutic Equivalence Evaluation, is a list
21  of FDA approved drug products and they're -- approved for
22  marketing as -- in the United States as they're labeled --
23  as their label indication.
24    Q.  Doctor, as part of what PBMs do, do PBMs develop
25  formularies?

26 (Pages 98 - 101)

Page 102

1    A.  Yes.
2    Q.  In doing so, do TP -- excuse me.  Withdrawn.
3        Do TPPs review and either adopt a formulary as is
4  or do they customize the PBM formulary?
5        MR. HANSEL:  Object to the form.
6    A.  Could you be more specific?
7  BY MS. ISIDRO:
8    Q.  What specificity are you looking for?
9    A.  When you say customize.
10   Q.  Do TPPs make any changes to the formularies that
11  PBMs develop?
12   A.  TPPs, they're prescription -- the prescription
13  benefit design is up to the client and they're -- what's
14  included or excluded in that benefit design can be tied
15  into the formulary.
16   Q.  Is it possible for a TPP to use its own P&T
17  committee?
18   A.  If they have a P&T committee.
19   Q.  In fact, you note in your Footnote 2 of your
20  report that in some cases the development and management of
21  a drug formulary is done in-house where the TPP will use
22  its own P&T committee and might consult with the PPM,
23  correct?
24   A.  If they have their own P&T committee.
25   Q.  And you do state that in Footnote 2 of your

Page 103

1  report, correct?
2    A.  I have agreed.
3    Q.  Do you have any knowledge as to what share of the
4  proposed TPP class members developed their own formularies
5  versus using a formulary developed by a PBM?
6    A.  No, I do not.
7    Q.  Short of making an inquiry into each -- each TPP
8  class members whose formulary included the at issue
9  Valsartan, is there any way to tell whether it was the PBM
10  or the TPP to decided whether Valsartan should be included?
11   A.  No, I will not speculate.
12   Q.  In Paragraph 25 of your report -- it's the bottom
13  of Page 4 and top of Page 5.
14   A.  Uh-huh.
15   Q.  You mention that the P&T committee is required to
16  base formulary decisions on scientific evidence, standards
17  of practice, peer reviewed medical literature, accepted
18  clinical practice guidelines, and other appropriate
19  information.
20       What is other appropriate information?
21   A.  Data specific to the drug they are reviewing.  It
22  could include clinical studies.
23   Q.  Anything else?
24   A.  Yes.  It could include other items.
25   Q.  Such as?

Page 104

1    A.  Drug monographs, product labels, submitted
2  applications for approval, status within the Orange
3  Brook -- Book.
4    Q.  Is cost a factor?
5    A.  P&T committees make their decisions based on
6  clinical merit.
7    Q.  So in your -- the diagram that you include in
8  Paragraph 28 in the fourth tier down --
9    A.  Uh-huh.
10   Q.  -- it's titled P&2 -- P&T review meetings.  Do
11  you see that?
12   A.  Yes.
13   Q.  It lists safety, efficacy, and cost.  What does
14  that refer to, that reference to cost there?
15   A.  P&T committees make their decisions primarily
16  based on clinical efficacy, ensuring that the drug that is
17  going to be considered for placement on the formulary is
18  safe and effective.  Additional functions may include cost
19  as it pertains to reimbursement of the claim.
20   Q.  So that is one of the factors that can be
21  considered via a P&T committee, correct?
22   A.  The primary factors are based on clinical merit
23  and not cost.
24   Q.  So you would not consider cost a primary factor,
25  correct?

Page 105

1    A.  P&T committees are unbiased advisory boards
2  reviewing drug information based on the clinical merit of
3  the -- that's their primary function.  Once that is
4  completed, they can include costs or may -- may or may not
5  include that as part of their discussion.
6    Q.  Okay.  And you did include it as part of the
7  diagram in Paragraph 28?
8    A.  Uh-huh.
9    Q.  Correct?
10   A.  Yes.
11   Q.  At the bottom of that diagram, the very last tier
12  of that diagram, you refer to relevant stakeholders.  Who
13  are those relevant stakeholders?
14   A.  Whoever the entity is deciding on the formulary,
15  whether to adopt that formulary as part of their
16  prescription benefit.
17   Q.  The Orange Book is published by the FDA, correct?
18   A.  Correct.
19   Q.  And the Orange Book lists drug products that are
20  approved by FDA on the basis of safety and effectiveness;
21  is that correct?
22   A.  Correct.
23   Q.  The Orange Book also contains therapeutic
24  equivalence evaluations for approved generic prescription
25  drug products; is that correct?

27 (Pages 102 - 105)

Page 106

1    A.   Yes.
2    Q.   Who makes those therapeutic equivalence
3 evaluations?
4    A.   The FDA.
5    Q.   When a generic drug manufacturer files an ANDA,
6 one of the things that they must demonstrate to FDA in that
7 ANDA is bioequivalence, correct?
8    A.   That was not within the scope of my report, but I
9 understand that to be part of the requirement.
10   Q.   Okay.  So that consideration is -- is outside the
11 scope of your report and your opinions in this litigation,
12 correct?
13       MR. HANSEL:  Object to the form.
14   A.   As I said, it is part of the process for filing
15 an ANDA or applying for ANDA.
16       MS. ISIDRO:  Can you please read back the answer
17   that mentioned outside of the scope of the report?
18       MR. HANSEL:  And the question also.
19       MS. ISIDRO:  Sure.  Please.
20       (The requested portion was read back.)
21 BY MS. ISIDRO:
22   Q.   For Section D of your report, Paragraphs 29
23 through 32, what did you rely on in formulating those
24 paragraphs of your report?
25   A.   FDA information.

Page 107

1    Q.   Which specific FDA information?
2    A.   On ANDA process, on NDA generic drugs.
3    Q.   Would the FDA information that you relied on be
4 listed in Appendix A of your report?
5    A.   I believe it is listed at -- that's Page 2, U.S.
6 Food and Drug Administration Development Approval Process.
7    Q.   Okay.  Anything else?
8    A.   I relied on my knowledge and experience in the
9 industry, knowing how the process works.
10   Q.   Okay.  Did you also rely on the Orange Book
11 preface that's listed in your Appendix A?
12   A.   Yes, I referenced the Orange Book.
13   Q.   I'm sorry, I miss -- I think I misheard you.  I
14 thought the only item that you had mentioned from
15 Appendix A was the U.S. Food and Drug Administration
16 Development Approval process?
17   A.   Clearly the Orange Book is listed in the
18 Appendix A as well, so let me clarify and say that I
19 referenced that in addition.  I think that's --
20   Q.   Okay.
21   A.   -- quite obvious.
22   Q.   So it would be those two items from Appendix A,
23 correct?
24   A.   In addition to my knowledge and experience,
25 understanding how the process works.

Page 108

1    Q.   Okay.  But not any of the other items listed on
2 Appendix A, other --
3    A.   It could have been --
4    Q.   -- than the two that we've discussed?
5    A.   It could have been -- all of the items in the
6 appendix can have played a role in forming the entirety of
7 my discussion and expert opinion.  That's why they're
8 listed there.
9    Q.   Okay.  Did the MADA Third Party Payor Plaintiff's
10 Fact Sheet form the basis for any of your -- any of the
11 information stated in Paragraphs 29 through 32 of your
12 report?
13   A.   Not as it pertains to the explanation of the
14 Orange Book, the description of the Orange Book.
15   Q.   Is there another aspect to Paragraphs 29 through
16 32 that it does touch upon?
17   A.   By it, you mean -- can you be more clear?
18   Q.   The MADA Third Party Payor Plaintiff's Fact
19 Sheet.
20       MR. HANSEL:  Object to the form.
21   A.   Could you please repeat the question?
22       MS. ISIDRO:  Sorry, could you read the question?
23 I think you were asking for the court reporter to read
24   the question back.
25       (The requested portion was read back.)

Page 109

1        MS. ISIDRO:  I'll restate the question.
2 BY MS. ISIDRO:
3    Q.   Does the MADA Third Party Payor Plaintiff's Fact
4 Sheet form the basis of any aspect of your statements in
5 Paragraphs 29 through 32 of your report?
6    A.   No.  Not the basis.
7    Q.   In Paragraphs 33 through 41 of your report, you
8 discuss definitions and significance of therapeutic
9 equivalence code; is that correct?
10   A.   That is correct.
11   Q.   What did you rely on in formulating your
12 Paragraphs 33 through 41 of your report?
13       MR. HANSEL:  Object to the form.
14   A.   The FDA information on the Orange Book.
15 BY MS. ISIDRO:
16   Q.   Uh-huh.
17   A.   And the explanation of therapeutic equivalence
18 codes, public information.
19   Q.   And just to make sure I understand the
20 explanation of therapeutic equivalence codes, do you mean
21 within the Orange Book itself or are you referring to
22 something different?
23   A.   The TE codes or therapeutic equivalence codes are
24 present in the Orange Book.
25   Q.   Okay.  So those are the -- that's what

28 (Pages 106 - 109)

Page 110

1 you're referring to?
2 A. As I understand your question, yes.
3 Q. Okay. In Paragraphs 42 and 43 you discuss
4 criteria for entry into the Orange Book; is that correct?
5 A. Yes.
6 Q. What is the basis for your statements in
7 Paragraphs 42 and 43?
8 A. The FDA process established for drugs seeking
9 approval.
10 Q. Is that the last item listed on Appendix A of
11 your report?
12 MR. HANSEL: Object to the form.
13 A. That has the FDA item on the -- on the appendix,
14 yes, but as I said, all of the items in my appendix
15 could've played a role in my -- all of my -- entirety of my
16 expert opinion.
17 BY MS. ISIDRO:
18 Q. I was asking specifically the response you gave
19 to the prior question.
20 MS. ISIDRO: So could you read it back, that
21 prior question and answer?
22 (The requested portion was read back.)
23 MR. HANSEL: Object to the form.
24 BY MS. ISIDRO:
25 Q. So, Dr. Panagos, in that response when you said

Page 111

1 the FDA process established for drugs seeking approval,
2 were you referring to the last item that's listed in the
3 Appendix A of your report or were you referring to
4 something else?
5 MR. HANSEL: Object to the form. Asked and
6 answered repeatedly.
7 The -- the witness has testified numerous times
8 about things she relied on for the entirety of her
9 report, and this repeated attempt to pigeonhole her is
10 just unfair and it -- could we stipulate that her
11 previous testimony about what she's relied on for her
12 entire report will apply to each question about what
13 she relied on for a particular paragraph?
14 MS. ISIDRO: Let the record reflect that counsel
15 is making an inappropriate speaking objection.
16 Defendants are entitled to explore the basis for the
17 statements and conclusions in Dr. Panagos's report as
18 a proffered expert in this litigation.
19 MR. HANSEL: Will you stipulate?
20 MS. ISIDRO: So -- we will not stipulate to waive
21 our rights to explore the basis for her statements and
22 conclusions in her report.
23 MR. DORNER: Hello. This is Drew Dorner. ZHP
24 will not stipulate either to your proposed
25 stipulation.

Page 112

1 MS. ISIDRO: Could you please read back the last
2 question before the speaking objection, and I don't
3 believe there was an answer, but if there was please
4 read that too.
5 (The requested portion was read back.)
6 MR. HANSEL: Object to the form.
7 A. You're referring to the Orange Book, the process
8 by which a drug can gain approval and list -- to be listed
9 in the Orange Book is public information on brand and
10 generic drugs and the processing must follow as established
11 by the FDA. It's an authoritative source.
12 BY MS. ISIDRO:
13 Q. So, Doctor, in making your statements in
14 Paragraph 42 of your report, I understand your response to
15 be that you have relied on the U.S. Food and Drug
16 Administration Development Approval Process. Am I
17 understanding that to be -- am I correctly understanding
18 that to be one of the bases for your statement in Paragraph
19 42 of your report?
20 A. One of the bases.
21 Q. Okay. What are the other bases for your
22 statement in Paragraph 42 of your report?
23 A. The Orange Book itself, my experience, education,
24 and professional capacity and -- and -- and my day-to-day
25 experience in this field.

Page 113

1 Q. Any other bases that you're relying on for your
2 statements in Paragraph 42 of your report?
3 A. No.
4 Q. And what are you relying on for your statements
5 in Paragraph 43 of your report?
6 A. The same.
7 Q. Okay. You state in Paragraph 44 that a generic
8 drug is a copy of a branded drug in terms of dosage,
9 administration, and performance. What is your basis for
10 that statement?
11 A. My understanding of a generic drug from my
12 education, my experience, and the information on -- in --
13 I've listed in Appendix A.
14 Q. And which of the items listed in Appendix A are
15 you relying on for the statement that a generic drug is a
16 copy of a branded drug in terms of dosage, administration,
17 and performance?
18 A. All of the information except for the claims
19 data.
20 Q. So that includes -- so you are relying for
21 purposes of that statement on the MADA Third Party
22 Player -- Third Party Payor Plaintiff's Fact Sheet?
23 A. No. I include that as part of the claim, so let
24 me clarify.
25 Q. Okay.

29 (Pages 110 - 113)

Page 114

1    A.  Not the Plaintiff Fact Sheet.
2    Q.  Okay.  Because you also have an item called MADA
3  Claims Data for Recalled Valsartan.
4    A.  Those go together.
5    Q.  Okay.  So you did not rely on that?  You did
6  not -- did you rely on the MSP Third Party Payor
7  Plaintiff's Fact Sheet?
8    A.  No.
9    Q.  Okay.  Other than those three items in Appendix A
10  to your report, you relied on all of the other items for
11  purposes of the statement that a generic drug is a copy of
12  a branded drug in terms of dosage, administration, and
13  performance?
14    A.  Including my knowledge, education, all --
15    Q.  Did --
16    A.  -- and -- yeah.
17    Q.  Did you rely on the FIN Declaration for purposes
18  of that statement?
19    A.  No.
20    Q.  Okay.  In Paragraph 44 you go on to say that
21  generic drugs must be bioequivalent to the branded drug,
22  meaning the generic drug will work the same way in the body
23  and be as safe and effective as the brand name drug.
24    A.  That is correct.
25    Q.  What are you relying on in making that statement

Page 115

1  in Paragraph 44?
2      MR. HANSEL:  Object to the form.
3    A.  Relying on my education, my degrees, my licensure
4  as a pharmacist.  It's a critical component to performing
5  my day-to-day functions and understanding that foundational
6  component, what a generic drug is.  So I -- I rely on my
7  education and my experience and the items I've listed in
8  the appendix.
9  BY MS. ISIDRO:
10    Q.  What FDA regulation or regulations define the
11  term bioequivalent?
12    A.  I was not asked to study that, so -- so I'm not
13  going to answer that at this time.  I'd have to study the
14  FDA regulations very closely to be able to give a
15  thoughtful and complete answer to -- to that question.
16    Q.  Paragraph 45 you state that the substitution of
17  generic equivalents, drugs considered bioequivalent by FDA,
18  are encouraged by PBMs to provide the best care at an
19  affordable cost.
20      What is your basis for that statement?
21      MR. HANSEL:  Object to the form.
22    A.  The Orange Book lists drugs that are approved to
23  their referenced listed drug product to be the same and
24  effective and to be considered -- a consideration for the
25  formulary.  Those drugs are considered substitutable

Page 116

1  because they are deemed to be safe and effective.  It is
2  really -- the -- the foundation or the basis that
3  determined whether a generic drug meets the criteria for
4  inclusion on a -- for consideration on a formulary, they
5  are listed in the Orange Book or not.
6  BY MS. ISIDRO:
7    Q.  Is it specifically the FDA's therapeutic
8  equivalence evaluation that -- that determines whether a
9  generic equivalent can be substituted?
10      MR. HANSEL:  Object to the form.
11    A.  They must have an approved ANDA and have a
12  therapeutic equivalence code assigned to the medication
13  that allows them to be considered substitutable.
14  BY MS. ISIDRO:
15    Q.  And which are the codes that allow them to be
16  considered substitutable?
17    A.  AB.
18    Q.  You state in Paragraph 46 that TPPs and P&T
19  committees expressly rely upon the manufacturer's
20  compliance with all applicable standards, obligations, and
21  regulations.
22      What is your basis for that statement in
23  Paragraph 46?
24      MR. HANSEL:  Object to the form.
25    A.  The information presented to the FDA for approval

Page 117

1  by an ANDA application is presented by the manufacturer who
2  is responsible for the information they provide.
3  BY MS. ISIDRO:
4    Q.  And what is your answer based on?
5      MR. HANSEL:  Object to the form.
6    A.  The application is submitted by the manufacturer
7  who is responsible for the information they provide the FDA
8  to be considered for approval.  That includes all aspects
9  related to that application.
10  BY MS. ISIDRO:
11    Q.  What is your support for that response?
12      MR. HANSEL:  Object to the form.
13    A.  Manufacturers are responsible for their
14  medication.  They're responsible for the quality control,
15  ensuring that that medication is safe and effective to --
16  when they're applying for that approval -- seeking approval
17  by the FDA.  It's their responsibility to ensure that it's
18  safe and effective.
19  BY MS. ISIDRO:
20    Q.  Is that your own opinion?
21      MR. HANSEL:  Object to the form.
22    A.  In my professional capacity, that is what I
23  believe to be correct.
24  BY MS. ISIDRO:
25    Q.  Within Paragraph 46 of your report, what are you

30 (Pages 114 - 117)

Page 118

1 relying on in making a representation as to what TPPs
2 expressly rely upon?
3     MR. HANSEL: Object to the form.
4     A. So 46 refers to the P&T committee, which the P&T
5 committee will make the decision whether the drug will be
6 considered for the formulary or not.
7     I don't understand your question if you're asking
8 something else.
9 BY MS. ISIDRO:
10    Q. Sure. There's -- there's a statement in
11 Paragraph 46 of your report that TPPs and P&T committees
12 expressly rely upon the manufacturer's compliance with all
13 applicable standards, obligations, and regulations.
14    A. Correct. Via the NDA. The manufacturer has to
15 provide that information to the FDA via their ANDA
16 application to be considered for approval and that's the
17 information that's relied upon for the approval.
18    Q. Okay. And you say that that information is -- is
19 expressly relied upon by the TPPs and the P&T committees,
20 correct?
21    A. That information is relied upon as it's provided
22 in their application submitted to the FDA for approval.
23    Q. But am I correct in saying that Paragraph 46 of
24 your report states that that information is expressly
25 relied upon by TPPs and P&T committees?

Page 119

1     A. It's relied upon in that it -- it's provided to
2 the applic- -- in the application for approval.
3     Q. Okay. Do you see the word expressly in Paragraph
4 46 of your report?
5     A. Yes.
6     Q. What did you mean by the word expressly in
7 Paragraph 46 of your report?
8     A. That it is -- that it is the responsibility of
9 the manufacturer to provide all the information, in
10 conjunction with their medication, seeking approval by the
11 FDA. It is their responsibility to do that.
12    Q. And Paragraph 46 says that TPPs and P&T
13 committees expressly rely, correct?
14    A. Right. Because the manufacturers are providing
15 that information on their ANDA application seeking approval
16 by the FDA.
17    Q. So am I not understanding your sentence in
18 Paragraph 46 correctly, that the TPPs and the P&Ts are the
19 ones who expressly rely upon the information you're
20 referencing?
21    A. Once that medication is approved, because they
22 have provided that -- the manufacturer has complied with
23 all the requirements needed for approval, that medication
24 is listed in the Orange Book as having complied and so they
25 will -- that suffices the requirement for consideration to

Page 120

1 the formulary.
2     Q. Can you point to any document in which a TPP
3 expressly relies upon the manufacturer's compliance with
4 all applicable standards, obligations and regulations?
5     A. That is done via -- referencing the Orange Book
6 and the approval status of the drugs.
7     Q. So when you say that they expressly rely upon
8 that information, am I understanding correctly that what
9 you mean by that statement is that they --
10    A. It is the responsibility of the manufacturer to
11 provide that information on their drug application, follow
12 the process established by the FDA for their drugs to be
13 considered for approval in the United States and considered
14 for coverage on the drug formulary.
15    MS. ISIDRO: Can you please read back the prior
16 question and answer, not this one.
17    (The requested portion was read back.)
18 BY MS. ISIDRO:
19    Q. Can you point to any document in which a P&T
20 committee expressly relies upon the manufacturer's
21 compliance with all applicable standards, obligations, and
22 regulations?
23    MR. HANSEL: Object to the form.
24    A. The Orange Book is a representation of a list of
25 drugs approved safe and effective for use in the United

Page 121

1 States.
2 BY MS. ISIDRO:
3     Q. Is the Orange Book issued by P&T committees?
4     A. No. It's issued by the FDA.
5     Q. Right. So the P&T committee is not making any
6 express statements in the Orange Book, correct?
7     A. No, they're not.
8     Q. Have you read the ANDA for any
9 Valsartan-containing drug?
10    A. No.
11    Q. You state in Paragraph 47 that the AB rating in
12 the FDA Orange Book based as it is on the generic drug
13 manufacturer's ANDA represents a manufacturer's warranty to
14 TPPs and P&T committees for placement on a prescription
15 drug formulary.
16    What do you mean by the term warranty in
17 Paragraph 47?
18    MR. HANSEL: Objection. Calls for a legal
19 conclusion.
20    MS. ISIDRO: It's a term she's used in her
21 report. I'm entitled to ask her what she means by it
22 when she uses it in her report.
23    Can you please read back the question?
24    MR. HANSEL: Can we stipulate that every time you
25 ask a question about warranty I'm making a continuing

31 (Pages 118 - 121)

Page 122

1 objection that it's -- I object to the form because it
2 is calling for a legal conclusion? Will you stipulate
3 to that continuing objection so I don't have to repeat
4 myself every time you ask a question about warranty.
5        MS. ISIDRO:  No.  I will not stipulate to that
6 unless she will withdraw the use of the term warranty
7 from her report in which case I don't have to ask
8 about it anymore.
9        ZOOM PARTICIPANT:  There's a pending question.
10 Does the witness remember the question?
11        MS. ISIDRO:  I was just going to ask that it be
12 read back, please.
13        THE WITNESS:  Thank you.
14        ZOOM PARTICIPANT:  Ask her if she remembers it
15 and let her answer it.  Do you remember the
16 question?
17        THE WITNESS:  I'd like for it to be read back.
18        ZOOM PARTICIPANT:  Thank you.
19        THE WITNESS:  Thank you.
20        (The requested portion was read back.)
21        MR. HANSEL:  Object to the form.
22        A.  The warranty represents their promise or
23 assurance that their drug is safe and effective and
24 equivalent to the referenced listed drug product; the same
25 as the referenced listed drug product.

Page 123

1 BY MS. ISIDRO:
2        Q.  When you use the term warranty in your report, do
3 you understand that to be a legal term?
4        MR. HANSEL:  Object to the form.
5        A.  No.  It's a term that refers to a promise, an
6 assurance, a guarantee that that manufacturer has set
7 forth.
8 BY MS. ISIDRO:
9        Q.  What are you relying on in making the statements
10 that you've made in Paragraph 47 of your report?
11        MR. HANSEL:  Object to the form.
12        A.  When an ANDA is approved, it means that the
13 manufacturer has fulfilled the requirements, including
14 safety and effectiveness, for their drug to be approved.
15 BY MS. ISIDRO:
16        Q.  You reference -- you reference a document in
17 Footnote 6 at the end of Paragraph 47?
18        A.  Uh-huh.
19        Q.  Is that correct?
20        A.  Yes.
21        Q.  Are you relying on that document for purposes of
22 the statement that you've made in Paragraph 47 of your
23 report?
24        MR. HANSEL:  Object to the form.
25        A.  Not exclusively.

Page 124

1 BY MS. ISIDRO:
2        Q.  But does it form part of what you're relying on
3 in making the statement in Paragraph 47 of your report?
4        A.  It refers -- Footnote 6 refers to P&T committees.
5 What manufacturers represent in their ANDA is -- when the
6 ANDA's approved, it's -- it means that the manufacturer has
7 sufficed and is compliant to receive approval of a
8 medication deemed safe and effective.
9        Q.  Why do you reference -- withdrawn.
10        Why did you include Footnote 6 on Paragraph 47?
11        A.  As a reference for P&T committees.
12        Q.  And what is the purpose of including that in
13 Paragraph 47?
14        MR. HANSEL:  Objection:  Asked and answered.
15        A.  ASHP or the guidelines that they -- or
16 they're -- they're a respected industry organization,
17 pharmacy organization that have credible information.
18 BY MS. ISIDRO:
19        Q.  How does the document that is referenced in
20 Footnote 6 relate to your statement in Paragraph 47 of your
21 report?
22        MR. HANSEL:  Object to the form.  Asked and
23 answered, repeatedly.
24        A.  Again, when a manufacturer's ANDA's approved, it
25 represents that they've met all the requirements needed for

Page 125

1 approval of that drug.  That information is public
2 information, industry accepted among professionals.
3 BY MS. ISIDRO:
4        Q.  Does the document referenced in Footnote 6
5 mention warranties at all?
6        MR. HANSEL:  Object to the form.
7        A.  I don't recall.
8 BY MS. ISIDRO:
9        Q.  Okay.
10        MS. ISIDRO:  Can we mark this as Exhibit 5?
11        (Exhibit No. 5 was marked for identification.)
12        THE WITNESS:  Thank you.
13 BY MS. ISIDRO:
14        Q.  Doctor, you've just been handed Exhibit 5.  Is
15 that the document that's referenced in Footnote 6?
16        A.  Yes.
17        Q.  I'll give you a moment to look it over so that
18 you can refresh your recollection as to whether that
19 document mentions warranties at all.
20        MR. HANSEL:  Objection.  It takes more than a
21 moment to determine whether a 12-paged document with 3
22 columns on each page contains a single word at least
23 once.
24        MS. ISIDRO:  I'll give her as much time as she
25 needs.

32 (Pages 122 - 125)

Page 126

1    MR. HANSEL: Great.
2    THE WITNESS: Okay. What would you like me to
3  answer?
4  BY MS. ISIDRO:
5    Q. Does Exhibit 5 discuss warranties at all?
6    A. Exhibit 5 discusses P&T committee's formulary
7  systems process for the formulary system, which includes
8  safe and effective medications, which safe and effective
9  medications are the responsibility of the manufacturer to
10  uphold as part of their application process in seeking
11  approval, and then for review by a P&T committee and
12  consideration for the formulary. Exhibit 5 speaks to all
13  of that.
14    Q. But it doesn't speak to warranties, does it?
15    A. A warranty is the promise that manufacturer
16  makes to -- to the people, to the world that their drug is
17  safe and effective. It is by that promise that they
18  suffice in doing that, that they obtain approval by the
19  FDA.
20    Q. Can you show me where Exhibit 5 discusses the
21  promise that a manufacturer makes to the world?
22    A. If you're looking for those words verbatim, you
23  would not find them, but --
24    Q. Okay.
25    A. -- if you are a clinical person or someone

Page 127

1  familiar with the ASHP or the formulary process, you would
2  understand the process around brand and generic drug
3  approvals, formulary process, P&T committees, this is what
4  we do, and it is industry practice that the drug must meet
5  safe and effective -- be in compliance in order to gain
6  approval by the FDA. Drugs that are not FDA approved would
7  never be part of a drug formulary.
8    Q. Okay. And even if not in those specific words, a
9  promise that a manufacturer makes to the world, can you
10  show me where in Exhibit 5 that concept is discussed?
11    A. Page 910 talks about evaluating medications for
12  inclusion on the -- in the formulary. That entire section
13  refers to the process by which evidence based data should
14  be used as part of the process.
15    Let me go back over here. The section on P&T
16  committee, the section on managing formulary systems, all
17  of those sections include the process that is accepted for
18  drugs that have -- that can be considered for formulary.
19    Q. Okay. Any other sections of Exhibit 5?
20    A. There is sections on Page 9 on -- Page 911,
21  sorry, generic drugs, formulary exceptions, subformularies,
22  therapeutic --
23    MR. MESTRE: Are you getting close to a moment
24  where you can --
25    A. Yeah. I'll just finish this.

Page 128

1    The entire document is a well constructed
2  document industry accepted by professionals as capturing
3  the process for -- capturing the process for medication
4  strategies, approvals, P&T functions, and placement on the
5  formulary. It really is -- provides a lot of insight that
6  the process is established and followed so that drugs can
7  be considered on the formulary if they have obtained FDA
8  approval by demonstrating that they are safe and effective
9  and it's throughout the document that that can be picked up
10  on.
11  BY MS. ISIDRO:
12    Q. And you cited Exhibit 5 as support for your
13  statement in Paragraph 47 of your report, correct?
14    A. Yes.
15    MR. HANSEL: Take a break?
16    MS. ISIDRO: We can go ahead and take a break
17  now.
18    THE VIDEOGRAPHER: The time is 3:09 p.m., and we
19  are going off record.
20    (Break taken.)
21    THE VIDEOGRAPHER: The time is 3:21 p.m., and we
22  are back on the record.
23  BY MS. ISIDRO:
24    Q. Doctor, in Paragraph 52 of your report, you state
25  that manufacturers are responsible for understanding their

Page 129

1  processes which includes presenting the presence of
2  unacceptable -- of unacceptable and impurities.
3    A. Right.
4    Q. What do you mean by the term impurities in that
5  paragraph?
6    A. Any substance that does not belong in the
7  medication.
8    Q. Do you understand -- let me rephrase that.
9    As you use them in your report, are the terms
10  contaminants and impurities interchangeable?
11    A. They --
12    MR. HANSEL: Object to the form.
13    A. They could be.
14  BY MS. ISIDRO:
15    Q. But I -- I'd like to know, specifically as you've
16  used them in your report, are you using the terms as
17  interchangeable?
18    A. Impurities or contaminants are items or things
19  present that should not be there and potentially dangerous,
20  not safe, and not effective.
21    Q. In your report are you referring to different
22  things when you use the term impurities than when you use
23  the term contaminants?
24    A. Within the scope of this case and this report
25  they can be looked at similar.

33 (Pages 126 - 129)

Page 130

1    Q.   Is there any distinction to you in your use of
2  the term impurities in your report versus your use of the
3  term contaminants in your report?
4    A.   No.
5    Q.   Do you know whether FDA views the terms
6  impurities and contaminants as interchangeable?
7    A.   I do not know if they view them as
8  interchangeable.
9    Q.   Okay.  What is your basis for the statement in
10  Paragraph 52 that manufacturers are responsible for
11  understanding their processes, which includes preventing
12  the presence of unacceptable and impurities?
13    A.   Manufacturers are the ones submitting their
14  application requesting approval; therefore, they are
15  responsible for all the information they provide within
16  that application.
17    Q.   And what are you relying on in stating that
18  conclusion?
19    A.   Manufacturers are submitting an ANDA in this --
20  in this case.  They are requesting that approval.  They are
21  providing the information.
22    Q.   So is that your personal opinion based on the
23  fact that they're the ones submitting the information?
24    A.   They are applying for approval, so they must
25  adhere to the requirements set forth by the FDA in order to

Page 131

1  obtain that approval.  So they must provide all of the
2  information required.  Manufacturers must provide that.
3    Q.   Must provide all of the information required
4  by --
5    A.   Required for consideration for approval of their
6  drug by the FDA, yes.
7    Q.   And that is what you are relying on in stating --
8  let me rephrase.
9        And that is what you are relying on in making
10  your statement in Paragraph 52?
11    A.   I'm relying on the fact that manufacturers submit
12  applications for drug approval.  It's a common, known fact.
13    Q.   Are you relying on any specific FDA regulations
14  in making your statement in Paragraph 52?
15    A.   I don't understand your question.
16    Q.   Are there any specific FDA regulations that
17  you're relying on in making your statement in Paragraph 52
18  of your report?
19    A.   The FDA regulates that if a manufacturer is
20  seeking approval of their drug, they must file -- if it's a
21  generic drug, which we're talking about specifically, they
22  must file an ANDA application and meet the requirements for
23  approval.
24    Q.   And is that a specific FDA regulation that you're
25  referring to or is that your general understanding?

Page 132

1    A.   That is the industry accepted understanding of
2  what -- if a manufacturer is seeking approval of their
3  drug, they must file an application with the FDA.  In the
4  case of a generic drug the application is called an ANDA
5  and that is filed with the FDA by the manufacturer who is
6  seeking approval of their drug.  That application must meet
7  the requirements set forth by the FDA to be compliant,
8  safe, and effective.
9    Q.   In Paragraph 55 you state that P&T committees and
10  TPPs rely on an Orange Book listing that a manufacturer™s
11  compliance means their drugs meet FDA regulations and as
12  such are suitable for formulary placement and reimbursable
13  under a prescription drug benefit plan.
14        What is the basis for this statement in Paragraph
15  55 of your report?
16    MR. HANSEL:  Object to the form.
17    A.   My education, experience, and familiarity with
18  P&T committees.
19  BY MS. ISIDRO:
20    Q.   Anything else?
21    MR. HANSEL:  Object to the form.
22    A.   I've answered the question.
23  BY MS. ISIDRO:
24    Q.   Okay.  So that is -- that is the only thing that
25  you're relying on making your statement in Paragraph 55 of

Page 133

1  your report?
2    MR. HANSEL:  Object to the form.
3    A.   As it pertains to generic drugs, yes.
4  BY MS. ISIDRO:
5    Q.   Okay.  And as it pertains to brand drugs?
6    A.   Brand drugs follow another process by the P&T
7  committee which is not the scope of this opinion.
8    Q.   Okay.  So does Paragraph 55 refer to anything
9  other than generic drugs, any other categories of drugs?
10    A.   Again, the Orange Book lists drugs that are
11  approved in the United States.  That's -- also includes
12  brand drugs as well as their generic approved drug product.
13        So to the extent that I understand your question,
14  P&T committees and TPPs will rely on the information in
15  part listed in the Orange Book that lists the approved
16  medications approved by the FDA for sale in the United
17  States or marketing in the United States.
18    Q.   And are you relying on anything other than your
19  education and experience in making that statement?
20    MR. HANSEL:  Object to the form.
21    A.   My experience with P&T committees.  Again, my
22  day-to-day functions are keeping knowledgeable with the
23  industry practice, functions, drug information.  That's all
24  part of what I do so I'm comfortable with what's required
25  or what components are essential.

34 (Pages 130 - 133)

Page 134

1 BY MS. ISIDRO:
2    Q.  And that is what you are relying on in making
3 your statements in Paragraph 55 of your report and nothing
4 else?
5        MR. HANSEL:  Object to the form.
6    A.  If we're being specific on a generic drug, the --
7 they will -- P&T committees will look to the Orange Book
8 for that substitutability rating.  Once that rating is --
9 once that drug has established that classification, it can
10 be considered for the formulary, if it has -- can -- it has
11 met FDA approval and it, in terms of generic drugs, is
12 really what the reference point is so.
13 BY MS. ISIDRO:
14    Q.  Okay.  And -- what are you basing that answer
15 on?
16        MR. HANSEL:  Object to the form.
17    A.  Understanding how P&T committees work --
18 BY MS. ISIDRO:
19    Q.  Did --
20    A.  -- when -- with regards to generic drugs.
21    Q.  And the basis for that understanding?
22        MR. HANSEL:  Object to the form.
23    A.  My experience with P&T committees.
24 BY MS. ISIDRO:
25    Q.  Anything else?

Page 135

1        MR. HANSEL:  Object to the form.
2    A.  My education, experience, knowledge.
3 BY MS. ISIDRO:
4    Q.  Any specific documents or regulations?
5    A.  I've listed all the documents I've reviewed in
6 Appendix A.
7    Q.  Are there any documents listed in Appendix A that
8 you're relying on for purposes of the statement that you've
9 made in Paragraph 55 of your report?
10    A.  My entire report is based on all of the data and
11 documents in Appendix A and in addition to my education and
12 experience so.
13    Q.  Well, Doctor, I think we've identified specific
14 examples of paragraphs within your report that don't rely
15 on every document listed in Appendix A, correct?
16        MR. HANSEL:  Objection.  Mischaracterizes
17    previous testimony over and over again.  Object to the
18    form.
19 BY MS. ISIDRO:
20    Q.  You can answer the question.
21        MR. HANSEL:  Same objection.
22    A.  Appendix A lists the documents, materials that I
23 reviewed in putting together my expert opinion, a report.
24 I've reviewed all of those documents and taken them into
25 consideration for putting together my expert opinion,

Page 136

1 including my education and 20 plus years of experience
2 within this industry, including familiarity and knowledge
3 on P&T committees.
4 BY MS. ISIDRO:
5    Q.  Paragraph 56 again uses the term warranties.  Is
6 your use of the term warranties in Paragraph 56 referring
7 to the same thing that your use of the term warranty of
8 Paragraph 47 of your report refers to?
9        MR. HANSEL:  Object to the form.
10    A.  Yes.  It refers to the same.
11 BY MS. ISIDRO:
12    Q.  Okay.  What is the basis for your statement in
13 Paragraph 56 of your report?
14        MR. HANSEL:  Objection to form.
15    A.  When a drug is placed on the formulary, it's met
16 the -- it's met the approval criteria approved by the FDA,
17 so it's met that requirement.  It can be considered for
18 placement on the formulary, and based on that consideration
19 or inclusion on the formulary, third-party payors will
20 reimburse that on -- for that drug because it is included
21 on the formulary because it has met FDA approval for being
22 safe and effective.
23 BY MS. ISIDRO:
24    Q.  In Paragraph 57 you state in the case of
25 Valsartan, including VCDs warranties by the manufacturers

Page 137

1 were false.  What time frame are you referring to in that
2 statement?
3    A.  All of the time frame from which contaminants
4 were found in the drug.
5    Q.  And what was that time frame?
6        MR. HANSEL:  Object to the form.  Foundation.
7    Beyond the scope of the report.
8    A.  The time frame is beyond the scope of this report
9 and any of the time that the contaminants were in the drug
10 is -- you know, can be considered.
11 BY MS. ISIDRO:
12    Q.  So in -- in formulating your opinions in this
13 report, you didn't consider the time frame in which the
14 purported contaminants were found; is that correct?
15        MR. HANSEL:  Object to the form.
16    A.  I'm not sure I understand your question.  Could
17 you rephrase that?
18 BY MS. ISIDRO:
19    Q.  I'm just trying to understand your answer that
20 the time frame is outside of the scope of the report.
21    A.  I believe the time frame for the contaminants --
22 it's -- the time frame for the contaminants has been
23 questioned as to when the original contaminants were there,
24 how long they were there, length of time, and so on.  So I
25 cannot comment on -- on that, other than the fact that

35 (Pages 134 - 137)

Page 138

1 there were contaminants within the drug product.
2 Q. Do you know when presence of NDMA in Valsartan or
3 any VCD was first reported?
4 A. When it was first reported? Can you be more
5 specific? Reported by whom?
6 Q. By anyone.
7 A. Again, the time frame on -- I will not speculate
8 on -- on that time frame. You're not being specific enough
9 when you say anyone.
10 Q. When is the first report of NDMA in Valsartan or
11 a VCD that you are aware of?
12 MR. HANSEL: Object to the form.
13 A. In our -- in my professional capacity, we -- the
14 FDA had reported the contaminants to the world basically
15 so.
16 BY MS. ISIDRO:
17 Q. When did that occur?
18 A. I believe it was 2018 or thereabout. I have
19 to -- I'd have to go back and reference the exact date.
20 Q. Is that also the first report that you're aware
21 of with respect to NDEA in Valsartan or VCDs?
22 MR. HANSEL: Object to the form.
23 A. Yeah. I can't speculate on those precise dates
24 of those -- each of those components. I do know that they
25 were present though in the medication.

Page 139

1 BY MS. ISIDRO:
2 Q. My question --
3 A. I believe the dates are irrelevant.
4 Q. Let me clarify my question because my question
5 didn't refer to dates and wasn't calling for dates, so let
6 me restate my question a different way.
7 You referenced a report by FDA to the industry or
8 the world with respect to called contaminants in Valsartan
9 or in VCDs, correct?
10 A. The FDA issued a recall. That's what I mean by
11 report. They issued a recall on those drugs.
12 Q. Is it your understanding that the recall that you
13 reference was initiated by FDA?
14 A. The FDA issued the recall. That's what I am
15 attesting to. Who initiated the recall, again, what
16 matters is the FDA issued the -- the recall.
17 Q. What do you mean by the term issued?
18 A. They provided the guidance that this recall is
19 being set forth.
20 Q. What is your understanding -- or what is the
21 basis for that statement?
22 A. Public information found on the FDA website.
23 Q. And the announcement of a recall was -- is that
24 the first report that you're aware of with respect to
25 presence of NDEA in Valsartan or VCDs?

Page 140

1 A. Yes.
2 Q. Do you know when FDA first set interim limits for
3 nitrosamines?
4 A. No.
5 Q. Do you know when FDA first established guidance
6 on control of nitrosamines?
7 A. Nope. That was not within the scope of my
8 report.
9 Q. Okay. In Paragraph 59 of your report you state
10 that the presence of the contaminant rendered the
11 manufacturer Defendant's versions of VCDs not equivalent to
12 the branded product.
13 What do you mean by the term contaminant in
14 Paragraph 59?
15 MR. HANSEL: Object to the form. That doesn't
16 read the entire sentence.
17 BY MS. ISIDRO:
18 Q. Would you prefer if I read the entire sentence,
19 Dr. Panagos?
20 A. You don't have to.
21 Q. Okay. What did you mean by the term contaminant
22 in Paragraph 59 of your report?
23 A. I referred to item present that should not have
24 been present, not consistent with the reference listed drug
25 product, and in this case unacceptable levels of a probable

Page 141

1 human carcinogen.
2 Q. Is there a specific probable human carcinogen
3 that you are referring to?
4 A. The ones found within the drug that should not
5 have been there.
6 Q. And which ones were those?
7 A. Both of the contaminants that are -- you've
8 referenced.
9 Q. I'm sorry, I didn't reference any specific
10 contaminants in my question.
11 A. You asked me about the contaminants in the
12 previous question where you asked if I -- something about
13 the FDA process around those.
14 So to the extent that I understand your question,
15 I will answer and say that both of the contaminants in the
16 case of these drugs represent a deviation from the
17 reference listed drug product and not equivalent.
18 Q. Do you remember the names of those two
19 contaminants that you're referring to in your response?
20 A. They are listed within my report in Section 4,
21 Number 12. NDA- -- NDEA and NDMA.
22 Q. Okay. In Paragraph 59 of your report -- let me
23 rephrase that.
24 What is the basis for your opinion that the
25 presence of the contaminant rendered the manufacturer

36 (Pages 138 - 141)

1 Defendant's versions of VCDs not equivalent to the branded
2 product?
3     A.   The contaminants were not in the branded product
4 and therefore the generic drug could not have been
5 equivalent to the branded product by the presence of the
6 contaminants within the product, within the medication.
7     Q.   In the first half of 2018 do you know whether the
8 branded product was being tested for NDMA?
9     A.   No.  That was not within the scope of this
10 report.
11    Q.   In the first half of 2018 do you know whether the
12 branded product was being tested for NDEA?
13    A.   No.  That was not within the scope of this
14 report.
15    Q.   At any point prior to 2018 do you know whether
16 the branded product was being tested for NDMA?
17    A.   Same response; not within the scope of this
18 report.
19    Q.   And at any point prior to 2018 do you know
20 whether the branded product was being tested for NDEA?
21    A.   Again, not within the scope of this report.
22    Q.   Section 6 of your report you provide summary of
23 your opinions; is that correct?
24    A.   Yep.
25    Q.   And Item B under this summary of opinions again

1 mentions the term warranty.  Is the term warranty being
2 used in that item 6B in the same way as it is being used in
3 Paragraph 47 of your report.
4     MR. HANSEL:  Object to the form.
5     A.   Yes.
6 BY MS. ISIDRO:
7     Q.   In Item D under Section 6, you state that the
8 generic manufacturer -- that -- excuse me.  You state that
9 if the generic manufacturer of product changes in any way
10 from the original product on the ANDA approval, then this
11 changed product is not the same as the brand name
12 medication.
13        What is your basis for that statement in Item D
14 under Section 6 of your report?
15    MR. HANSEL:  Object to the form.
16    A.   Any changes to a generic drug product should be
17 reported to the FDA.  The ANDA in -- in this case or the
18 medications in this case with the contaminants inconsistent
19 with the ANDA submitted for approval.
20    MS. ISIDRO:  Can you read back that last sentence
21 in the answer?  I didn't hear the whole thing.  I'm
22 sorry.
23    (The requested portion was read back.)
24 BY MS. ISIDRO:
25    Q.   Are ANDA holders permitted to make changes to

1 their original ANDA submissions, if you know?
2     A.   They must be reported to the FDA.  Any changes
3 must be reported to the FDA, submitted to the FDA.
4     Q.   In the second part of Statement D under Section 6
5 of summary opinions, you state that equivalence is nulled
6 and the generic manufacturer may no longer rely on the
7 brand name drug label?
8     A.   Right.
9     Q.   What is the basis for that statement in Section
10 6D of your report?
11    A.   Uh-huh.  The two --
12    MR. HANSEL:  Object to the form.
13    A.   The generic drug label no longer is identical or
14 matches the -- the brand drug label is -- is inaccurate and
15 cannot be deemed equivalent, safe, or effective.
16 BY MS. ISIDRO:
17    Q.   And what is your basis for that statement?
18    MR. HANSEL:  Object to the form.
19    A.   For a substitutability to be applied to a
20 particular drug, they must demonstrate that they are safe
21 and effective.  Deviation from that would thereby not
22 demonstrate that.
23 BY MS. ISIDRO:
24    Q.   In Statement I under Section 6 you state that the
25 warranty from manufacturers for this products -- for these

1 products turned out to false.  Is your use --
2     A.   To be false.  Yes.
3     Q.   So it should say to be false there?
4     A.   Uh-huh.
5     Q.   Okay.  Is your use of the term warranty here in
6 this Statement 6I of your report, are you using that term
7 warranty there in the same way -- let me rephrase that
8 question.
9        Are you using the term warranty in Section 6I of
10 your report in the same way that you're using it in
11 Paragraph 47 of your report?
12    MR. HANSEL:  Object to the form.
13    A.   Yes.
14 BY MS. ISIDRO:
15    Q.   What is your basis for the statement in Paragraph
16 6I of your report that the warranty from manufacturers for
17 these products turned out to be false?
18    MR. HANSEL:  Object to the form.
19    A.   The presence of the contaminants in unacceptable
20 levels of probable human carcinogens, misrepresented with
21 inaccurate -- did not adhere to the promise they made,
22 stating that their drug met the criteria set forth by the
23 FDA for approval, which includes that to be that the drug
24 is safe and effective and identical to the brand drug --
25 reference listed drug.

37 (Pages 142 - 145)

Page 146

1 BY MS. ISIDRO:
2    Q.   You used the phrase unacceptable levels --
3    A.   Uh-huh.
4    Q.   -- in your response.  What do you mean by
5 unacceptable levels?
6    A.   Unacceptable levels is a -- what the FDA
7 referenced in referring to the contaminants, and I will --
8 I adhere to the terms that they use.
9    Q.   And you say what -- what the FDA referenced.
10 Where do you mean --
11    A.   When they --
12    Q.   -- that the FDA referenced that?
13    A.   Sorry.
14    Q.   If you could just let me finish my question.
15 Sorry.
16    A.   Uh-huh.
17    Q.   Where are you referring to that the FDA
18 referenced that?
19    A.   On their website.
20    Q.   In what context?
21    A.   In the context of the recall.
22    Q.   In the context of the recall.  The 2018 recall?
23    A.   The recall of Valsartan.
24    Q.   You also state in Paragraph 6I of your report
25 that TPPs paid for medications that they should not have

Page 147

1 based on the manufacturer's false representation?
2    A.   That is correct.
3    Q.   What is your basis for that statement?
4       MR. HANSEL:  Object to the form.
5    A.   Medication would not have been approved with the
6 contaminant and it would not have been considered for an
7 inclusion on a drug formulary and it would not have been
8 reimbursed in any way by a TPP if it was not approved.
9 BY MS. ISIDRO:
10    Q.   Okay.  Is there anything else that you're basing
11 the statement in Paragraph 6I, that TPPs paid for
12 medications that they should not have based -- should not
13 have based on the manufacturer's false representation?
14       MR. HANSEL:  Object to the form.
15    A.   TPPs should not have paid for contaminated
16 medication.
17 BY MS. ISIDRO:
18    Q.   What is your basis for that statement?
19       MR. HANSEL:  Object to the form.
20    A.   The presence of the contaminants within the
21 medications.
22 BY MS. ISIDRO:
23    Q.   Anything else?
24    A.   My statement I -- is accurate the way it's
25 written.

Page 148

1    Q.   Are you aware that FDA has said patients taking
2 prescription medications with potential nitrosamine
3 impurities should not stop taking their medications?
4       MR. HANSEL:  Object to the form.
5    A.   I am aware.
6 BY MS. ISIDRO:
7    Q.   Do you have any knowledge as to the levels of
8 NDMA or NDEA that were found in any particular lot of
9 Valsartan-containing drugs?
10    A.   That was not within the scope of this report.
11    Q.   So, no, you don't have any knowledge as to those
12 levels?
13       MR. HANSEL:  Object to the form.
14    A.   The specific levels, no.
15 BY MS. ISIDRO:
16    Q.   Do you know whether there were certain lots of
17 recalled Valsartan that did not contain any detectable NDMA
18 or NDEA?
19       MR. HANSEL:  Object to the form.
20    A.   Again, not within the scope of this report.  I
21 cannot speculate.
22 BY MS. ISIDRO:
23    Q.   Okay.  So you don't know one way or the other?
24       MR. HANSEL:  Object to the form.  Assumes facts
25    not in evidence.

Page 149

1    A.   I would have to review.  I cannot speculate to
2 that.
3 BY MS. ISIDRO:
4    Q.   So because you're saying you cannot speculate,
5 that means you don't know for a fact one way or the other,
6 correct?
7       MR. HANSEL:  Object to the form.
8    A.   I'm not sure what you mean by one way or another.
9 Could you clarify?
10 BY MS. ISIDRO:
11    Q.   Do you know one way or another whether there were
12 certain lots of recalled Valsartan that did not contain any
13 detectable NDMA or NDEA?
14    A.   No.
15    Q.   Dr. Panagos, would you agree that the main
16 criterion for the inclusion of any product in the Orange
17 Book is that the product is the subject of an application
18 with an approval that has not been withdrawn for safety or
19 efficacy reasons?
20    A.   Current approval, yes.
21    Q.   And you would agree that FDA determines
22 bioequivalence, correct?
23    A.   It's one of the factors that they look for when
24 evaluating drug applications.
25    Q.   In order to -- in order for a prescription drug

38 (Pages 146 - 149)

Page 150

1 product to be considered bioequivalent to another drug
2 product, FDA has to make that determination, correct?
3    A.  It's part of the --
4        MR. HANSEL:  Objection to form.
5    A.  It's part of their consideration.
6 BY MS. ISIDRO:
7    Q.  Is there any other entity that is tasked with
8 determining bioequivalence for prescription drug products
9 in the United States besides FDA?
10   A.  Not to my knowledge.
11   Q.  And FDA's determination as to bioequivalence is
12 made individually for each manufacturer and each product,
13 correct?
14   A.  For each submitted application, each ANDA is
15 evaluated individually.
16   Q.  Okay.  FDA may change a product's therapeutic
17 equivalence rating if the circumstances giving rise to a
18 violation call into question the agency's assessment of
19 whether a product meets the criteria for therapeutic
20 equivalence, correct?
21   A.  Yes.
22   Q.  During the time frame that -- let me rephrase
23 that.
24       Prior to the Valsartan recall in 2018, FDA did
25 not take any steps that would reflect a determination that

Page 151

1 the products were no longer therapeutically equivalent,
2 correct?
3    A.  Not to my knowledge.
4    Q.  You didn't review bioequivalence studies for any
5 manufacturer Defendant's Valsartan-containing products, did
6 you?
7    A.  No.
8    Q.  Did you consult with any actual P&T committees
9 about the inclusion of Valsartan on a formulary?
10   A.  Could you be more specific?
11   Q.  How do you mean?
12   A.  Valsartan is a generic drug.
13   Q.  Uh-huh.
14   A.  It would meet criteria for inclusion on the
15 formulary if it is approved by the FDA following an ANDA
16 application that meets the criteria for approval set forth
17 by the FDA which -- including safety and effectiveness.
18   Q.  Have you personally consulted with any actual P&T
19 committees about the inclusion of Valsartan on a formulary?
20   A.  I'm going to ask you to specify on time frame.
21   Q.  Ever.
22   A.  Following the recall it is -- the -- P&T
23 committees had to kind of create a strategy around how to
24 move forward with that information as it pertains to their
25 drug formularies, and on behalf of my clients I was -- it

Page 152

1 was important to me to know what their strategy was going
2 to be.
3    Q.  In coming up with your opinions in this
4 litigation, did you consult with any P&T committees about
5 the inclusion of Valsartan on a formulary?
6    A.  No.
7    Q.  And in coming up with your opinions in this
8 litigation, did you consult with any P&T committee about
9 its use of the Orange Book?
10   A.  No.  Because I -- I know that's what they use.
11   Q.  And in coming up with your opinions in this
12 litigation, did you consult with any TPPs about the
13 inclusion of Valsartan on a formulary?
14   A.  No.
15   Q.  In coming up with your opinions in this
16 litigation did you consult with any TPP about its use of
17 the Orange Book?
18       MR. HANSEL:  Object to form.
19   A.  Let me clarify that TPPs and committees, it is
20 industry practice that they refer to the authoritative
21 source known as the Orange Book for substitutability, for a
22 list of drugs that are approved by the FDA marketed in the
23 United States.
24       This is an ongoing, continual process, and in my
25 day-to-day functions in my role as a clinical pharmacist

Page 153

1 and a consultant, those are the responsibilities that are
2 consistent in industry and what are adhered -- are adhered
3 to.
4 BY MS. ISIDRO:
5    Q.  In formulating your opinions in this litigation,
6 did you consult with any TPP about its use of the Orange
7 Book?
8    A.  The use of the Orange Book is an established
9 process that is widely accepted and respected.  It is the
10 source of truth in terms of approved products, approved by
11 the FDA and substitutable.  It is the source of truth.  It
12 is relied upon by P&T committees for their generic
13 medications to be considered for inclusion on the
14 formulary.  That does not change.
15   Q.  Dr. Panagos, at this time I'm not asking you
16 about the basis of your opinions with respect to a TPP's
17 use of the Orange Book in general.  I am asking you
18 whether, in formulating your opinions in this litigation,
19 did you consult with any TPP about its use of the Orange
20 Book?
21   A.  No, I did not need to consult with them because
22 I'm confident that is the process that is adhered to.
23   Q.  Let's -- let's go ahead and take a break.
24       THE VIDEOGRAPHER:  It's 4:10 p.m., and we're
25 going off the record.

39 (Pages 150 - 153)

Page 154

1    (Break taken.)
2    THE VIDEOGRAPHER: It is 4:34 p.m., and we are
3    back on the record.
4    MS. ISIDRO: Dr. Panagos, I may have some further
5    follow-up for you at -- in a little bit, but I don't
6    have any further questions for you right now.
7    As I mentioned previously, there are some folks
8    on Zoom and I'm not sure whether any of them have any
9    questions for you right now.
10    MR. GISLESON: Actually, I do have a few
11    questions. Can you hear me?
12    MR. KERNER: We can.
13    THE WITNESS: Yes.
14    CROSS-EXAMINATION
15    BY MR. GISLESON:
16    Q. Hey, Doctor. My name is John Gisleson. I
17    represent a manufacturer named Aurobindo. Have you heard
18    of Aurobindo before?
19    A. Yes.
20    Q. And are you aware that Aurobindo is a
21    manufacturer of Valsartan and Valsartan-containing drugs?
22    A. Yes, I'm aware.
23    Q. Did you become aware of any public information
24    that certain batches of Aurobindo Valsartan or
25    Valsartan-containing drugs contained nitrosamine?

Page 155

1    A. I was aware that there were contaminants within
2    Valsartan products.
3    Q. Did you learn what those contaminants were?
4    A. The contaminants are referenced within my report,
5    Section 4 --
6    Q. What was the name of the contaminants?
7    A. -- Page -- Section 4, excuse me, Page 2, Number
8    12, NDEA and NDMA.
9    Q. Before this lawsuit and you were hired as an
10    expert, had you ever heard the word nitrosamine before?
11    A. Yes.
12    Q. In what context?
13    A. I am a New York State licensed pharmacist,
14    clinical pharmacist, and in my role, my day-to-day
15    functions, it is my responsibility to understand
16    medications -- FDA medications, approved medications, and
17    any concerns surrounding those medications is part of my
18    responsibility.
19    Q. And how did you learn what nitrosamine are?
20    A. There is a component of toxicology that is
21    included in our pharmacy education; however, that was --
22    that is not within the scope of my report or the opinion
23    that I'm rendering here.
24    With regards --
25    Q. Do you know how nitrosamine perform --

Page 156

1    MR. HANSEL: Excuse me. Excuse me, Mr. Gisleson?
2    MR. GISLESON: Yes?
3    MR. HANSEL: Please let Dr. Panagos finish her
4    answer. This is the second --
5    MR. GISLESON: I'm sorry. I thought she was
6    finished.
7    MR. HANSEL: This is the second time you've
8    interrupted her and perhaps there's a lag. So please
9    give her a moment to make sure -- sometimes she thinks
10    about her answer carefully before she's finished.
11    Thank you.
12    MR. GISLESON: That's helpful. Thanks for
13    letting me know.
14    BY MR. GISLESON:
15    Q. I'm sorry, you can continue.
16    A. I just want to make -- go back the original
17    question.
18    THE WITNESS: Could you please restate his
19    original question?
20    MR. HANSEL: And could you please restate her
21    partial answer. Thank you.
22    (The requested portion was read back.)
23    A. Okay. So any time there is a contaminant or
24    there is an issue with a medication, it is my
25    responsibility to understand that as it pertains to the

Page 157

1    scope of my work and my responsibilities as a pharmacist
2    and as a prescription -- a pharmacy benefit consultant.
3    And so with regards to the generic drugs in this case,
4    those contaminants should not have been there.
5    BY MR. GISLESON:
6    Q. When did you learn of the presence of
7    nitrosamines in Valsartan-containing drugs?
8    A. When the FDA issued the recall.
9    Q. Do you know whether that became publicized in the
10    third-party payor and PBM industries about the recall or
11    voluntary recall of Valsartan-containing drugs?
12    A. Yes.
13    Q. Did you speak with different individuals in the
14    industry about the recall?
15    A. Yes. As it pertains to my clients.
16    Q. Did you, personally, recommend that any of your
17    clients remove a Valsartan-containing drug from their
18    formulary because it was reported to have the presence of
19    nitrosamines?
20    MR. HANSEL: Objection. This gets into a number
21    of areas that I want to comment on. This is
22    confidential and Dr. Panagos appears today in her
23    capacity as an expert witness, not in her capacity as
24    a senior vice president or executive vice president of
25    ARMSRx, and to ask her about her advice to her

40 (Pages 154 - 157)

Page 158

1    confidential clients is outside the permitted scope of
2    this examination.
3 BY MR. GISLESON:
4    Q.  Can you identify any of the clients for whom you
5 work pertaining to formulary issues?
6    A.  I don't think I understand your question.
7       Do you want me to --
8    Q.  Do you consider all of your clients to be
9 confidential?
10    A.  Yes, I do.
11    Q.  Is it correct that you can't identify then any
12 client for whom you have done work concerning a formulary
13 because you consider all of your clients to be
14 confidential?
15    A.  You have to rephrase that question.  It did not
16 make sense.
17    Q.  Do you consider every single one of the clients
18 for whom you have provided counseling on formulary issues
19 to be confidential?
20    A.  My clients that I provide consulting on, that
21 information is confidential, but if you're -- so I'm not
22 sure what you're asking exactly.
23    Q.  Are there any clients that you can identify for
24 whom you have provided consultation or advice concerning
25 inclusion of drugs in a formulary?

Page 159

1       MR. HANSEL:  Object to the form.  Do you mean
2    identify in her mind or --
3       MR. GISLESON:  The names.
4       MR. HANSEL:  -- or testify to because they're
5    confidential -- you know, because they're not
6    confidential?
7       MR. GISLESON:  Correct.
8 BY MR. GISLESON:
9    Q.  Are there any that you can identify that you do
10 not consider to be confidential so that we can have an idea
11 of the kinds of companies that you have counseled on
12 formulary issues?
13       MR. HANSEL:  Just on the confidentiality issue,
14    she can testify about the kinds of companies.
15 BY MR. GISLESON:
16    Q.  Can you identify any third-party payor for who
17 you have -- for whom you have performed work?
18       MR. HANSEL:  Object to the form.
19    A.  My clients include self-insured employers,
20 third-party payers.  I've -- I've indicated those within my
21 expert report.
22 BY MR. GISLESON:
23    Q.  Can you identify any of them by name?
24       MR. HANSEL:  Objection.  Asked and answered.
25    Confidential.

Page 160

1    A.  That information is confidential and does --
2 isn't pertinent to -- or within the scope of this opinion.
3 BY MR. GISLESON:
4    Q.  So you are -- are refusing to identify the names
5 of any third-party payors in any prescription benefit
6 management companies for whom you have done work; is that
7 correct?
8       MR. HANSEL:  Object to the form.  It's not a
9    refusal.  She is bound by client confidentiality, so
10    she is complying with her obligation to maintain
11    client confidentiality.
12       She's not refusing to do anything, Counselor.
13 BY MR. GISLESON:
14    Q.  You will not answer or identify the names of any
15 of the TPPs or PBMs for whom you have done work because, in
16 your view, you're bound by confidentiality agreements that
17 prohibit you from identifying the names of those companies;
18 is that right?
19    A.  Yes.  And I will respect those.
20    Q.  Now, since the time that it became public that
21 certain manufacturers of Valsartan-containing drugs found
22 the presence of nitrosamines in certain batches of their
23 products, are you aware of any TPP anywhere in the country
24 that removed a drug manufacturer from its formulary based
25 on recall?

Page 161

1       MR. HANSEL:  Object to the form.
2    A.  Based on the recall there were strategies put
3 into place, thoughtful, careful strategies put into place
4 with guidance from the FDA.
5 BY MR. GISLESON:
6    Q.  Strategies to do what?
7    A.  How to best manage the recall as it pertains to
8 patients who were taking those drugs and the best way
9 for -- you know, to handle that.
10    Q.  Can you identify any TPP anywhere in the country
11 that removed one of the Defendant's VCDs from their
12 formulary because of the recall?
13    A.  In which time frame?
14    Q.  At any point after the recall was publicized.
15    A.  That was not within the scope of this report.
16 Again, strategies were put into place to efficiently manage
17 the recall, ensure that patients are not hurt by that.
18    Q.  Right.  But this goes to your opinion that the
19 manufacturer warranty for these VCDs was false.  TPPs
20 unjustly paid for medications for which they have not have
21 paid.
22    A.  Right.
23    Q.  My question is:  Can you identify any TPP
24 anywhere in the country, in the United States, that removed
25 one of the Defendant's products from its formulary

41 (Pages 158 - 161)

Page 162

1 following the recall?
2    A.  Following the recall, there were strategies put
3 in place that included those particular NDCs no longer
4 being a part of the formulary.
5    Q.  Were they removed formally from the formularies?
6    A.  I cannot speculate.  They -- they were just
7 not -- they were blocked.
8    Q.  Okay.  So the question's specific.  Can you
9 identify any TPP anywhere in the country that, in fact,
10 removed a manufacturer's VCD from its formulary following
11 the recall?
12    A.  I will go back and say that TPPs or PBMs blocked
13 the -- the drugs that were contaminated.  That time frame
14 is some point after the recall, after sufficient or
15 adequate strategy was put through to -- based on the
16 recommendations and guidance of the FDA.
17    Q.  What do you mean by blocked?
18    A.  The claims were no longer being adjudicated.
19    Q.  What do you mean by no longer adjudicated?
20    A.  If a patient went to the pharmacy with an NDC --
21 with a drug that had an NDC -- for a drug that had an NDC
22 that was a contaminated product, those NDCs would not
23 process -- they would not process on the claim's
24 adjudication so that -- because they were contaminated.
25    Q.  So because the VCDs were blocked, at that point

Page 163

1 the TPP did not pay for any of the VCDs at that point?
2 Strike that.
3       Because the NDC for the BDC was blocked, did that
4 mean that the TPP did not pay for a prescription for that
5 patient?
6    A.  I cannot speculate and that was not within the
7 scope of this report or the opinion that I'm rendering here
8 today.  I do know that the TPPs paid for contaminated
9 products where they should not have because they were not
10 safe and effective.
11       At -- after the FDA issued the recall, there had
12 to be a careful, thoughtful strategy, there was guidance,
13 and so I can't say with certainty that they didn't continue
14 to pay for those claims.
15    Q.  Well, based on your industry expertise, can you
16 identify any TPP who, in fact, paid for a VCD that had the
17 presence of nitrosamine?
18       MR. HANSEL:  Object to the form.  Beyond the
19    scope of the report.  Asked and answered.
20 BY MR. GISLESON:
21    Q.  You can answer.
22    A.  As part of my day-to-day responsibilities, I
23 review claims data that consists of medications and --
24 including possibly these medications with the contaminants.
25    Q.  Can you identify by name any TPP that paid for a

Page 164

1 VCD that had the presence of nitrosamine?
2    A.  If a TPP had the generic drug on their formulary
3 during the time frame for which the contaminants were
4 found, they, in that entirety of that time frame, they
5 essentially paid for something they should not have.
6    Q.  Can you identify any TPP anywhere in the United
7 States that sought a refund from a manufacturer as a result
8 of a beneficiary consuming a VCD that contained a
9 nitrosamine?
10    A.  That's not within the scope of my report or
11 opinion I've been asked to render.
12    Q.  Can you identify any such TPP or PBM anywhere in
13 the country who sought a refund because a patient consumed
14 a VCD that had the presence of nitrosamine?
15    Q.  What do you mean by a refund?
16    Q.  Said that they paid for a VCD for one of their
17 beneficiaries and should not have because it contained
18 nitrosamine?
19       MR. HANSEL:  Objection:  Calls for a legal
20    conclusion.
21    A.  I'll go back and say that TPPs paid for a drug
22 that was placed on the formulary because it had sufficed
23 the criteria for approval as set forth by the FDA, and, as
24 such, paid for the claims for those drugs where they should
25 not have.

Page 165

1 BY MR. GISLESON:
2    Q.  Well, you say they shouldn't have, but my
3 question is are you aware of any TPP anywhere in the United
4 States that sought to be reimbursed from a manufacturer
5 because the manufacturer's VCD contained nitrosamine?
6       MR. HANSEL:  Objection:  Calls for a legal
7    conclusion.
8    A.  It is my understanding that TPPs are -- were,
9 from the economic standpoint, negatively affected by
10 these -- payment of these drugs.
11 BY MR. GISLESON:
12    Q.  Understanding.  How?
13    A.  They paid for the drugs during the time period
14 for which they should not have because they were
15 contaminated.  That information is found within claims
16 data.
17    Q.  Can you identify a single TPP that sought a
18 refund prior to this lawsuit being filed because it paid
19 for a VCD consumed by a beneficiary that contained
20 nitrosamine?  And if you can't, that's fine.  I'm just
21 asking based on your industry experience and contacts if
22 you're aware of any TPP that sought a refund.
23    A.  I believe that information is within the
24 complaint.
25    Q.  And that's the only basis for that information

42 (Pages 162 - 165)

Page 166

1 that you have?  None from your own personal experience?
2     A.   That is correct.
3     Q.   Now, you said that once the recall was announced,
4 it was necessary for TPPs to manage how to respond to the
5 recall; is that right?
6     A.   They needed to understand the recall and then
7 determine a strategy.
8     Q.   Did you have an understanding as to what the
9 strategies were that were implemented by TPPs as a result
10 of the recall?
11     A.   Based on FDA guidance.
12     Q.   What do you mean?
13     A.   The recommendations that FDA made as a response
14 to the recall and the concern about the safety of the drug
15 and how to handle that.
16     Q.   Did you become aware that the FDA issued
17 acceptable intake levels?
18         MR. HANSEL:  Objection.  Beyond the scope.
19     Object to the form.
20 BY MR. GISLESON:
21     Q.   You can answer.
22     A.   The FDA commented that the recall was attributed
23 to unacceptable levels of a probable human carcinogen
24 within the medication.
25     Q.   In your experience, did the third-party payors

Page 167

1 and the PBMs become aware that there were acceptable intake
2 levels of nitrosamine impurities in Valsartan and
3 Valsartan-containing drugs?
4         MR. HANSEL:  Object to the form.  Foundation.
5     Object to the foundation.
6     A.   Are you --
7 BY MR. GISLESON:
8     Q.   Let me start over.
9         You communicate with TPPs, right?
10     A.   Yes.
11     Q.   And on and after the recall of
12 Valsartan-containing drugs, you communicated with TPPs; is
13 that correct?
14     A.   Yes.
15     Q.   Approximately how many different TPPs have you
16 communicated with following the recall of the -- of the
17 VCDs?
18     A.   Not sure.
19     Q.   Can you approximate in any way?
20     A.   I do not wish to do that.
21     Q.   Being conservative, is it more than a hundred?
22     A.   No.
23     Q.   Is it more than fifty?
24     A.   No.
25     Q.   Is it more than ten?

Page 168

1     A.   No.
2     Q.   So following the recall, is it more than --
3 strike that.
4         Is it more than five TPPs with whom you've had
5 contact since the recall of -- of VCDs?
6     A.   Again, my clients can include TPPs, self-insured
7 employer groups.  So I've been in contact -- I was in
8 contact with all of them.  I think the number is
9 irrelevant.
10     Q.   In your experience, you certainly advise all
11 those different clients that there were acceptable intake
12 levels for VCDs containing nitrosamines, right?
13         MR. HANSEL:  Object to the form.
14     A.   I advised the clients what the FDA set forth in
15 terms of the recall, the strategy, their recommendation,
16 and guidance.
17 BY MR. GISLESON:
18     Q.   So understood then that for VCDs that
19 contained nitrosamines within the acceptable intake level,
20 that patients could continue to consume those VCDs,
21 correct?
22         MR. HANSEL:  Object to the form.
23     A.   Those -- that drug is taken for cardiovascular
24 issues, hypertension.  A very serious health condition, one
25 for which a patient has to be closely followed, monitored

Page 169

1 by their prescriber, and it is never advisable to abruptly
2 stop a medication like that because of the critical nature
3 for which it's used.
4         How to carefully mitigate the recall and the
5 issues surrounding the recall at the time were of --
6 paramount of importance to my clients, and that's what I
7 did.
8 BY MR. GISLESON:
9     Q.   So what you're saying is that TPPs wanted to
10 ensure the health and safety of their beneficiaries who
11 needed to take VCDs, right?
12         MR. HANSEL:  Objection.  Mr. Gisleson, I'm going
13     to cut off this line of questioning.
14         I object to the form.  It is outside the scope of
15     her report.  You have asked about this issue 12
16     different Ways.  The witness has attempted to be
17     cooperative, even though testifying that it is outside
18     the scope of her report.
19         The report does not get into this.  You're asking
20     about her professional activities for a company that
21     is not the expert in this case.  Dr. Panagos is
22     appearing individually, not on behalf of her employer
23     for whom she did that work.  The work is also
24     confidential.  So we're going to need to move on to
25     another topic.

43 (Pages 166 - 169)

Page 170

1 BY MR. GISLESON:
2    Q.   You said that the manufacturer warranty for these
3 VCDs was false.  TPPs unjustly paid for medications for
4 which they should not have paid.  Based on your serving as
5 an expert in this case, are you aware that there were TPPs
6 who paid for medications containing nitrosamines because
7 the patients needed those medications for health reasons?
8    A.   I understand that there -- in the strategy, that
9 some strategies that took place were advising patients
10 never to abruptly stop their medication and to consult with
11 their prescriber as to a suitable transition.
12    Q.   Did different patients have different transition
13 periods?
14       MR. HANSEL:  Excuse me.  Mr. Gisleson, I have
15    really tried to accommodate your questioning.  I know
16    you're trying to tie it to the report.  Asking about
17    patients of her clients now is unacceptable.
18       MR. GISLESON:  I'm not asking about her client's
19    patients.
20       MR. HANSEL:  Well, I'm going to instruct the
21    witness not to answer any questions about the patients
22    of her clients of ARMSRx, which is not the testifying
23    entity here.
24       Do not answer any questions about patients of
25    ARMSRx clients.

Page 171

1 BY MR. GISLESON:
2    Q.   Well, Doctor, do you know anything about TPPs and
3 how they managed for the recall who are not your clients?
4    A.   In general TPPs were managing the recall in a --
5 in a way that would allow access.  As I said before, we --
6 not -- access, ensuring that patients can have time frame
7 to transition to a non-contaminated product.
8    Q.   Over what time period did that transition occur,
9 to your knowledge?
10    A.   That's not within the scope of my report and
11 that -- that's very patient specific information on how and
12 when a patient consults with their prescriber and
13 pharmacist in their individual case on how to transition to
14 a non-contaminated FDA approved product.
15    Q.   Do you know what the FDA definition of
16 bioequivalence is?
17       MR. HANSEL:  Objection.  Asked and answered.
18    This was gone over in great detail by Attorney Isidro.
19       MR. GISLESON:  I don't think we got a clear
20    answer to it.
21 BY MR. GISLESON:
22    Q.   Do you know what the FDA definition is of
23 bioequivalence?
24       MR. HANSEL:  Object to the form.
25    A.   Page 6, Section E under 33 has the definition for

Page 172

1 bioequivalent drug products.
2 BY MR. GISLESON:
3    Q.   You looked at that definition before preparing
4 your report?
5       MR. HANSEL:  Object to the form.  It's in the
6    report.
7    A.   I'm not --
8 BY MR. GISLESON:
9    Q.   Did you ever have occasion before being retained
10 as an expert in this case to look at the FDA definition of
11 bioequivalence?
12    A.   It's part of the scope of my profession.
13    Q.   Pardon me?
14    A.   It's within the scope of my profession as a
15 pharmacist that bioequivalent is within that knowledge
16 base.
17    Q.   Right.  But did you read the FDA definition of
18 bioequivalence at any point before you became retained as
19 an expert in this lawsuit?
20    A.   Possibly.  I read many, many data, information,
21 articles, studies, part of what I do day-to-day.  I mean.
22    Q.   Do you have any personal experience with the
23 manufacturing of pharmaceutical products?
24    A.   No.
25    Q.   You said in your report at Paragraph 46 TPPs and

Page 173

1 P&T committees expressly rely upon the manufacturers
2 compliance with all applicable standards, obligations, and
3 regulations.  What actions, in your experience, do TPPs
4 take to determine whether manufacturer's complied with
5 applicable standards, obligations, and regulations?
6    A.   They reference the Orange Book, that if a drug is
7 listed in the Orange Book, it means that it has been
8 assigned FDA approval, been given FDA approval, which means
9 that they had sufficed -- fulfilled the requirements of the
10 ANDA, which includes that their drug is safe and effective.
11    Q.   Anything else?
12    A.   If we're referring to generic drugs, this is the
13 authoritative source.
14    Q.   When did TPPs begin to implement a block on VCDs
15 based on the recall?
16       MR. HANSEL:  Objection.  This is beyond the scope
17    of her report.  I permitted some questions about this.
18    I believe you've beaten this horse pretty thoroughly.
19    It's not part of her report, she's not being proffered
20    as an expert on that issue, and I would just ask you
21    to please move on.
22       MR. GISLESON:  No.  I haven't beaten this horse.
23    I'm still riding it and it's still healthy and in good
24    shape.  This goes directly to her opinion that TPPs
25    unjustly paid for medications which they should not

44 (Pages 170 - 173)

Page 174

1 have paid; if there was a block, they didn't pay.
2 BY MR. GISLESON:
3     Q.   So do you have an understanding as to what period
4 of time TPPs implemented blocks concerning VCDs that were
5 found to have the presence of nitrosamines?
6         MR. HANSEL:  Object to the form.
7     A.   The strategy that TPPs put in place following the
8 recall is not a universal strategy across all TPPs and how
9 they did that and when they did that is very much within
10 that entity and was -- is not within the scope of my
11 report, nor what -- what I was asked to render an opinion
12 on.
13         What I do attest to is that TPPs paid for the
14 drugs that were contaminated, would not have been FDA
15 approved with the contaminant because they would not have
16 been the same as the referenced labeled drug.  So it's
17 really as simple as that.
18 BY MR. GISLESON:
19     Q.   If someone wants to know what strategy a
20 particular TPP followed in response to the recall of VCDs,
21 it's necessary to ask that TPP?
22         MR. HANSEL:  Object to the form.  Again, this is
23     outside the scope of her report.
24 BY MR. GISLESON:
25     Q.   You can answer.

Page 175

1     A.   I don't know that that would be public
2 information, but if you were a member or a -- engaged with
3 a TPP, I would -- that information would be available to
4 you.
5     Q.   Are you aware of any public documents that
6 identify the different strategies that TPPs took in
7 response to the VCD recall?
8     A.   Public information?
9     Q.   Yes.
10     A.   No.  The FDA offered guidance on the recall.
11 That was public information.
12         MR. GISLESON:  Those are the questions I have.
13     Thank you very much for your time.
14         THE WITNESS:  You're welcome.
15         MR. KERNER:  Any other Defendants on the Zoom?
16         MR. GEOPPINGER:  Yes.  Yes.  I just have a couple
17     brief follow-up questions.  I just want to clarify
18     something for the record.
19         REDIRECT EXAMINATION
20 BY MR. GEOPPINGER:
21     Q.   Good afternoon, Doctor.  I know it's getting
22 late, so I'll be brief.  My name's Jeff Geoppinger.  I
23 represent AmeriSourceBergen.
24         Doctor, you would agree with me that the
25 definition of bioequivalent can be found in the Code of

Page 176

1 Federal Regulations, correct?
2         MR. HANSEL:  Object to the form.
3     A.   The FDA, yes, does have a definition for
4 bioequivalence.
5 BY MR. GEOPPINGER:
6     Q.   And the FDA's definition is found in the code of
7 federal regulations, correct?
8     A.   Could you be more specific when you say federal
9 regulations?
10     Q.   The Code of Federal Regulations 21CFR of the FDA
11 promulgates its regulations.
12     A.   I did not review.
13     Q.   Are you aware that the definition of
14 bioequivalence is contained -- the FDA's definition is
15 contained within the Code of Federal Regulations?
16     A.   That was not within the scope of my report and I
17 did not review that document, but it's my understanding
18 though that it should be there but I did not review it.  I
19 cannot speculate.
20     Q.   You did not review that definition prior to
21 preparing your report, correct?
22     A.   No.  I reviewed the definition.  I did not -- if
23 you're referring to a particular document that's not
24 consistent in my report, that's what I'm referring to.
25     Q.   I'm sorry, I don't understand the answer.

Page 177

1         MR. HANSEL:  Do you have a document you can show
2     the witness to ask her if she reviewed it?
3         MR. GEOPPINGER:  No.
4 BY MR. GEOPPINGER:
5     Q.   My question is, Doctor, in a -- in the -- in the
6 process of preparing your report, did you review the
7 definition of bioequivalence contained within the Code of
8 Federal Regulations?
9     A.   Yes.
10     Q.   Okay.  On -- in -- a moment ago you referenced
11 Paragraph 33 of your report when asked about that
12 definition.
13     A.   Uh-huh.
14     Q.   Would you agree with me, Doctor, that the
15 language in Paragraph 33 of your report is not the
16 definition of bioequivalence from the Code of Federal
17 Regulations?
18     A.   No, I don't agree with you.
19     Q.   Is it your testimony that the language in
20 Paragraph 33 of your report is the definition of
21 bioequivalence from the Code of Federal Regulations?
22     A.   To my knowledge.
23     Q.   Okay.  When using the term bioequivalence in your
24 report, did you intend to use it as it is defined by the
25 FDA in the Code of Federal Regulations?

45 (Pages 174 - 177)

Page 178

1    MR. HANSEL: Object to the form. Calls for a
2  legal conclusion. Beyond the scope.
3    A. I believe my definition in my report captures
4  what a bioequivalent drug product -- captures the
5  definition appropriately.
6  BY MR. GEOPPINGER:
7    Q. I will agree that Paragraph 33 of your report
8  cites a therapeutic equivalence code from the Orange Book
9  for bioequivalent drug products. My question is about the
10 term bioequivalence as used in the CFR.
11    When you used the term bioequivalence in your
12 report, are you using it as defined in the Code of Federal
13 Regulations?
14    MR. HANSEL: I -- I object. It has -- there's no
15 foundation.
16    A. Since I'm unclear of your question, I prefer not
17 to answer.
18 BY MR. GEOPPINGER:
19    Q. I'll try to answer -- ask it again and make it
20 more clear. When you used the word bioequivalence in your
21 report, did you -- are you using it as it is defined by the
22 Code of Federal Regulations?
23    MR. HANSEL: I -- I object. Mr. Geoppinger, are
24 you asking the witness to assume that the word
25 bioequivalent is only defined one time in the entire

Page 179

1  Code of Federal Regulations?
2    MR. GEOPPINGER: I'm not asking her to assume. I
3  think she already testified that she's aware that the
4  word is defined in the -- by the FDA in the Code of
5  Federal Regulations.
6    A. I believe my definition captures what a bio- --
7  is accurate as to what a bioequivalent drug product is.
8    If you're asking if I've memorized the Federal
9  Regulation's definition for bioequivalence word for word,
10 that was -- that's -- I don't have that memorized word for
11 word but I'm confident that my definition here captures the
12 appropriate definition for bioequivalent drug product.
13 BY MR. GEOPPINGER:
14    Q. I'm not asking, Doctor, I'm not asking you if
15 you've memorized it and I'm not asking about the -- the
16 term bioequivalent drug products. That's not what I'm
17 asking about.
18    I'm asking about the word bioequivalence.
19    MR. MESTRE: Can we get an update on the time,
20 please?
21 BY MR. GEOPPINGER:
22    Q. Doctor, when you use the --
23    MR. HANSEL: Just a minute, Mr. Geoppinger.
24 We're just doing a time check here.
25    MR. KERNER: You're also doing it while the

Page 180

1  question is pending.
2    MR. MESTRE: I just want to know the time, so we
3  don't go over.
4    MR. GEOPPINGER: I'm sorry. I'm in the middle of
5  my questions. Why do we need a time check?
6    MR. HANSEL: Well, not if the time's almost up.
7    MR. MESTRE: I just don't know.
8    MR. KERNER: Until she answers the questions
9  rather than interrupting him in the middle of his
10 examination.
11    MR. GEOPPINGER: Excuse me. I have a question
12 pending. Is we -- are we still on the record?
13    MS. ISIDRO: We are.
14    MR. KERNER: Yes, we are.
15    MR. GEOPPINGER: Okay. Thank you.
16 BY MR. GEOPPINGER:
17    Q. Doctor, my -- my question -- I just want to
18 clarify because I think we're missing each other here.
19    My question is about the term bioequivalence, not
20 the term bioequivalent drug products.
21    MR. HANSEL: Excuse me, did you say bioequivalence
22 with a T or bioequivalence with a C-E?
23    MR. GEOPPINGER: I'm talking about the word used
24 on -- in Paragraph 59, the last word of that
25 paragraph: B-I-O-E-Q-U-I-V-A-L-E-N-C-E,

Page 181

1  bioequivalence.
2  BY MR. GEOPPINGER:
3    Q. When you used that word, Doctor, in Paragraph 59,
4  are you using it in the sense that it is defined in the --
5  in the Code of Federal Regulations?
6    MR. HANSEL: Object to the form. Foundation.
7  You have not told her how it's defined in the Code of
8  Federal Regulations. You have not shown her her
9  purported definition in the vast Code of Federal
10 Regulations to which you are alluding.
11    I object to the form of the question.
12    MR. GEOPPINGER: Counsel, I -- she's already
13 testified she -- she's aware of the definition in the
14 Code of Federal Regulations. Additionally --
15    MR. HANSEL: Well, you have represented that the
16 definition that she used from the FDA Orange Book of
17 bioequivalent drug products is not in the Code of
18 Federal Regulations. There's no foundation here.
19    But please go ahead and answer, if you can.
20    THE WITNESS: Okay.
21    MR. KERNER: Now that you're done coaching the
22 witness.
23    MR. GEOPPINGER: Yeah. Counsel, there's a
24 deposition protocol, Counsel, and the Plaintiffs in
25 this case have taken great issue with speaking

46 (Pages 178 - 181)

Page 182

1    objections. So I caution you that you should probably
2    review that protocol and understand what the scope of
3    your objections can be because that was way outside of
4    the protocol here.
5        MR. HANSEL: I'm glad you brought that up. Part
6    of the --
7        MR. KERNER: Why don't we let her answer this
8    question?
9        MR. HANSEL: Part of the guidelines in this court
10   are that follow-up questions such as yours,
11   Mr. Geoppinger, are limited to questions not covered
12   earlier or questions specific to a Defendant.
13   Attorney Isidro covered bioequivalence extensively in
14   her -- her examination and so I don't believe your
15   questioning is within the permitted scope.
16       So please, please wrap it up.
17 BY MR. GEOPPINGER:
18   Q.  Doctor, I'll ask the question hopefully for the
19   last time.
20   A.  Okay.
21   Q.  When you use the word bioequivalence as it is
22   written in -- as the last word of Paragraph 59 of your
23   report, are you using that word as it is defined in the
24   Code of Federal Regulations?
25   A.  I am using that word in the context of sameness,

Page 183

1    that the generic drug was the same as the reference listed
2    drug product for safety and effectiveness.
3        MR. MESTRE: So hold on. This should not be
4    controversial now. There's no pending question. It's
5    5:30 in the afternoon. I'd like to know the amount of
6    time that's left.
7        THE COURT REPORTER: Five hours seven minutes.
8        MR. MESTRE: Thank you.
9 BY MR. GEOPPINGER:
10   Q.  Doctor, that's your definition of bioequivalence?
11   A.  You asked me how I used it in the context of the
12   sentence in Number 59 where it says the presence of the
13   contaminant rendered the Manufacturer Defendants' versions
14   of VCDs not equivalent to the branded product as included
15   in the Orange Book which serves as the source of truth for
16   bioequivalence and permits substitutability of the generic
17   drug when it meets those -- that criteria.
18       The drug did -- that we're -- so it did not meet
19   the criteria by presence of the contaminants, was not the
20   same as the branded drug, would not have met FDA approval
21   for bioequivalence, and not the same as the referenced
22   listed product, would not have been listed in the Orange
23   Book.
24   Q.  Doctor, have you now told me how you've defined
25   bioequivalence in your report?

Page 184

1        MR. HANSEL: Object to the form.
2    A.  As it pertains to Number 59 which you
3    specifically asked me about, I have answered your question.
4        MR. GEOPPINGER: Thank you, Doctor. I don't have
5    any more questions.
6        MR. KERNER: Any other Defendants on the -- the
7    Zoom have questions?
8        MR. HANSEL: Hearing none, it's -- do the
9    Defendants have any further questions?
10       MS. ISIDRO: I have just a couple more questions.
11           RECROSS-EXAMINATION
12 BY MS. ISIDRO:
13   Q.  Without identifying any names, are any of the
14   TPPs who are involved in this litigation current clients of
15   yours?
16   A.  No.
17   Q.  Without identifying any names, are any of the
18   TPPs involved in this litigation former clients of yours?
19   A.  No.
20   Q.  And have you ever worked for any of the entities
21   who are Defendants in this litigation?
22   A.  No.
23       MS. ISIDRO: Any questions?
24       MR. HANSEL: Yes. Yes, I do. Are you finished?
25       MS. ISIDRO: For the moment, yes. I may have

Page 185

1    some follow-up after you.
2        MR. HANSEL: Okay. Thank you.
3        FURTHER DIRECT EXAMINATION
4 BY MR. HANSEL:
5    Q.  Dr. Panagos, thank you for your patience on a
6    long day. I have a few questions for you on behalf of the
7    Plaintiffs.
8        You may recall that Mr. Gisleson asked you some
9    questions regarding whether you were aware of any
10   third-party payors in particular who -- who paid for
11   contaminated Valsartan and who were seeking a refund.
12   Before he asked you about that after the lawsuit was filed,
13   he asked you about it in general.
14       Are you aware that Plaintiffs Maine Automobile
15   Dealers Association Insurance Trust and MSP Recovery Series
16   allege in the complaint that they or their assignors in the
17   case of MSP paid for contaminated Valsartan?
18       MS. ISIDRO: Objection.
19   A.  Yes. That's within the complaint.
20 BY MR. HANSEL:
21   Q.  And in your report in Appendix A you list various
22   materials you reviewed for your report, right?
23   A.  Yes.
24   Q.  And among those materials are four categories of
25   materials that contain data showing payments by MADA and

Page 186

1 MSP and those are the MADA Third Party Payor Plaintiff's
2 Fact Sheet, the MSP Third Party Payor Plaintiff's Facts
3 Sheet --
4      MS. ISIDRO: Objection.
5 BY MR. HANSEL:
6   Q.  -- the --
7      MR. KERNER: Objection. Leading.
8      MR. HANSEL: I'm not finished.
9 BY MR. HANSEL:
10  Q.  -- the MADA claims data for recalled Valsartan,
11 and excerpts from MSP data July 6th, 2021.
12     Did you -- did you review that data?
13     MS. ISIDRO: Objection.
14  A.  Yes.
15 BY MR. HANSEL:
16  Q.  Is that the type of data that you ordinarily
17 review in the course of your professional career?
18  A.  Yes, it is.
19     MR. KERNER: Hang on a second. There seems to be
20  a bit of echo in the room now. If somebody who is on
21  the Zoom could mute themselves, that would be helpful.
22 BY MR. HANSEL:
23  Q.  Did that data show in the case of MADA that --
24 that it paid for contaminated lots of Valsartan that were
25 subject to the contamination alleged in the complaint?

Page 187

1      ZOOM PARTICIPANT: Objection: Foundation.
2  A.  The data showed that the claims -- there were
3 paid claims.
4 BY MR. HANSEL:
5  Q.  And did the -- did the MSP data show paid claims
6 of MSP's assignors?
7  A.  Yes.
8  Q.  Do you understand that MSP's assignors are
9 third-party payors?
10  A.  Yes.
11  Q.  Do you understand that MSP is an -- is an
12 assignee of third-party payors for Valsartan?
13  A.  Yes, I do.
14  Q.  Do you understand that MSP is suing in its
15 capacity as a holder of valid assignments of those -- of
16 the claims of its assignors?
17     MS. ISIDRO: Objection.
18     ZOOM PARTICIPANT: Objection. Legal conclusion
19 and leading.
20  A.  Yes.
21 BY MR. HANSEL:
22  Q.  And do you understand that MSP alleges in the
23 complaint that it stands in the shoes in effect of its
24 assignor TPPs?
25     MS. ISIDRO: Objection.

Page 188

1  A.  Yes.
2 BY MR. HANSEL:
3  Q.  Do you understand that the proposed third-party
4 payor class consists of third-party payors as defined in
5 Paragraph 14 of your report?
6  A.  Yes.
7  Q.  Specifically all third-party payors in the United
8 States and its territories and possessions that, since at
9 least January 1, 2012, to the present, paid any amount of
10 money for Valsartan-containing drug, intended for personal
11 or household use, that was manufactured, distributed, or
12 sold by any Active Pharmaceutical Ingredient, Finished
13 Dose, Wholesaler, or Repackager/Relabeler Defendant.
14     MS. ISIDRO: Objection.
15 BY MR. HANSEL:
16  Q.  Is that your understanding?
17  A.  Yes.
18  Q.  Do you understand that the proposed class so
19 defined is in effect, at least in part, suing for a refund,
20 the word used by Attorney Gisleson, suing for a refund, at
21 least in part in this lawsuit?
22  A.  Yes.
23  Q.  Today you've heard a lot of questions and
24 objections about whether certain topics were within the
25 scope of your report. Do you remember that?

Page 189

1  A.  Yes.
2  Q.  Does your report set forth the scope of your
3 report accurately?
4  A.  Yes.
5     MS. ISIDRO: Objection.
6     MR. HANSEL: Let me take a short break and see if
7  I have any more questions.
8     MR. KERNER: How long --
9     MR. HANSEL: Under five minutes.
10     THE VIDEOGRAPHER: The time is 5:33, and we're
11 going off record.
12     (Break taken.)
13     THE VIDEOGRAPHER: The time is 5:38 p.m., and
14 we're back on record.
15     MR. HANSEL: No further questions.
16     Thank you, Dr. Panagos.
17     THE WITNESS: You're welcome.
18     MR. KERNER: Anybody else on the phone?
19     MR. GISLESON: Yeah. Just a brief follow-up.
20 This is John Gisleson again for Aurobindo.
21     FURTHER CROSS-EXAMINATION
22 BY MR. GISLESON:
23  Q.  You were asked about the MADA, M-A-D-A, claims
24 data. Do you have any understanding as to how MADA managed
25 its beneficiaries' prescriptions following the VCD recall?

48 (Pages 186 - 189)

Page 190

1    A.  The claims data demonstrates -- shows claims that
2  were paid for.
3    Q.  Do you know what strategy MADA followed in
4  response to the VCD recall?
5    A.  That was not within the scope of my review.
6    Q.  Did you do any investigation to determine how
7  MADA managed its patients, its beneficiaries' prescriptions
8  following the VCD recall in connection with your review of
9  the claims data?
10    A.  I reviewed the claims data which showed that the
11  claims were paid for.  That's it.
12    Q.  Did you seek to learn how MADA managed the recall
13  of VCDs?
14    A.  That's not within the scope of my -- of the
15  opinion I was asked to render.
16    Q.  So you didn't do it?
17    A.  I do not wish to comment or speculate on the
18  strategy that they took.  I reviewed the claims data which
19  showed that they paid for claims for those drugs.
20    Q.  Do you know whether MADA at any point implemented
21  a block concerning NDCs or VCDs that contained nitrosamine
22  impurities?
23    A.  I do not know.
24    Q.  Pardon me?
25    A.  I do not know.

Page 191

1    Q.  And as to MSP's assignors, do you know whether --
2  strike that.
3        Did you do any investigation to determine how any
4  of MSP's assignors managed the VCD recall -- recalls
5  following the identification of nitrosamine impurities?
6    A.  That was not within the scope of my report.  I
7  reviewed the claims data that -- that showed that they paid
8  for the claims.
9    Q.  So as a result of the work that you did in this
10  case, you have no understanding as to how MSP's assignors
11  managed the VCD recall following the discovery of
12  nitrosamine impurities, correct?
13        MR. HANSEL:  Object to the form.  Outside the
14    scope.  Asked and answered.
15        MR. GISLESON:  It hasn't been answered.
16  BY MR. GISLESON:
17    Q.  You can answer the question, please.
18        MR. HANSEL:  Same objection.
19    A.  They were assigned claims data.  I did not review
20  any further assignments or agreements.
21  BY MR. GISLESON:
22    Q.  Including any strategies that any of those
23  assignors followed to manage the recalls, correct?
24    A.  That was not in the scope of my review.  I
25  reviewed the claims data that shows that those claims were

Page 192

1  paid for.
2    Q.  Did you do any investigation to determine whether
3  any of MSP's assignors, assignor TPPs, implemented blocks
4  at any point concerning VCDs containing nitrosamine
5  impurities?
6        MR. HANSEL:  Asked and answered.
7    A.  I was not asked to review their strategies.  I
8  reviewed the claims data.
9  BY MR. GISLESON:
10    Q.  And as a result, you have no knowledge as to what
11  those strategies were, correct?
12        MR. HANSEL:  Objection.
13    A.  That was not --
14        MR. HANSEL:  Asked and answered.  Object to the
15    form.  Repetitive.
16        MR. GISLESON:  I'm just looking for a direct
17    answer to a clear question.
18        MR. HANSEL:  Your question assumes that whatever
19    payment data she already told you she reviewed can be
20    completely divorced from whatever their strategy is,
21    since you brought it up.
22  BY MR. GISLESON:
23    Q.  You can answer the question.
24    A.  If and when they had a strategy, I was not a
25  participant or have knowledge of what that was.  I have

Page 193

1  reviewed the claims data that shows that the claims were
2  paid for.
3    Q.  Any other information than claims data?
4        MR. HANSEL:  Objection.  Asked and answered.
5    A.  Could you be more specific?
6  BY MR. GISLESON:
7    Q.  Sure.  What was the information in the claims
8  data that was important to you?
9    A.  Claims data demonstrated that the plan paid a
10  portion of the medication and the member paid a portion.
11    Q.  Anything else?
12    A.  Indicating that that was re- -- medication was
13  reimbursed or plan paid for.
14    Q.  Anything else?
15        MR. HANSEL:  Object to the form.
16    A.  I -- the claims data followed a standard claims
17  data format, typical of what we see in the industry when
18  you're reviewing claims.
19  BY MR. GISLESON:
20    Q.  Did the claims data identify specific
21  individual -- the names of specific individuals?
22    A.  If you're asking in general if claims data can
23  include those fields, those fields -- can you be more
24  specific as to how you're asking the question and with
25  which --

49 (Pages 190 - 193)

Page 194

1    Q.  Sure.  Did the claims data that you reviewed
2  identify the names of the patients who consumed the VCDs?
3    A.  Not that I recall, no.
4    Q.  I'm sorry, no?
5        MR. HANSEL:  Would you like the court reporter to
6  read back the answer?
7        MR. GISLESON:  I couldn't hear.
8        MR. HANSEL:  Would the court reporter please read
9  back the answer?
10       (The requested portion was read back.)
11       MR. GISLESON:  Thank you very much.
12       Those are all the questions I have.  Thank you
13  for your time and your patience.
14       THE WITNESS:  All right.  Thank you.
15       MR. DORNER:  I have questions within the scope of
16  that.
17       FURTHER FURTHER DIRECT EXAMINATION
18  BY MR. DORNER:
19    Q.  Doctor, my name is Drew Dorner.  I'm here on
20  behalf of CHP.
21       The claims data that you just referred to would
22  only reflect costs associated with the transaction at the
23  time of the adjudication of the claim; is that right?
24       MR. HANSEL:  Object to the form.  Lack of
25  foundation.

Page 195

1        Mr. Dorner, do you have an exhibit?
2        MR. DORNER:  The witness has seen the exhibits,
3  the claims data that she's referring to that she's
4  reviewed.
5        MR. HANSEL:  Well, it's not an exhibit to this
6  deposition.
7        MR. DORNER:  I'm not making it an exhibit.  I'd
8  like an answer to my question.
9    A.  I will answer generally that claims data that has
10  a plan paid amount or claims data that it's at the point of
11  adjudication.
12  BY MR. DORNER:
13    Q.  Okay.  And that only reflects some -- some of --
14  some amount of money that exchanges at the time of that
15  adjudication, but not, for example, any payments that might
16  be made to a TPP well before the adjudication or any
17  payments that might be made to a TPP after the
18  adjudication; is that accurate?
19       MR. HANSEL:  Object to the form.  Lack of
20  foundation.
21    A.  I'm not sure what you're asking.
22  BY MR. DORNER:
23    Q.  Sure.  If a member of a TPP makes a claim for a
24  medication, it's your testimony that there is claims data
25  associated with that that would be reflected in the TPP's

Page 196

1  records.  Am I understanding that correctly?
2    A.  Yes.
3    Q.  Okay.  Where the claims data reflect that
4  particular claim, any amount of money associated with that
5  transaction is -- it reflects only money exchanged at the
6  time of that transaction, right?
7    A.  It reflects the plan paid and any member paid
8  amounts at the date of service.
9    Q.  Okay.  I understand.  And so if either prior to
10  or subsequent to the date of service some amount of money
11  was also exchanged that is related to the -- indirectly or
12  directly related to the claim, that would not be reflected
13  in the particular set of claims data that you were
14  referring to when you were talking with Mr. Gisleson; is
15  that right?
16       MR. HANSEL:  I object to the form of the
17       question.  Lack of foundation.
18  BY MR. DORNER:
19    Q.  You can answer.
20    A.  Could you be more specific when you say exchange
21  of money before or following outside of a claims data?
22    Q.  Sure.  And let me give an example.  In -- in some
23  cases a PBM or a TPP might benefit from a rebate, for
24  example, from a drug manufacturer; is that right?
25       MR. HANSEL:  Objection.  Objection.  This is

Page 197

1  beyond the scope of her report.
2        MR. DORNER:  Hold on.  This is -- no.  No.  We're
3  not getting into speaking objections.  She asked for a
4  specific example.  I'm giving her one.  All right.
5  You can object to the form.
6        THE WITNESS:  Okay.
7        MR. HANSEL:  I object to the form.  It's beyond
8  the scope of her report.  It has nothing to do with
9  her report.  Other experts are addressing this issue.
10  BY MR. DORNER:
11    Q.  You can answer the question, ma'am.
12    A.  The claims data reflects what the plan paid.
13    Q.  On the date of service, right?
14    A.  On the date of service.
15    Q.  It would not reflect in the example that I gave
16  something like a refund; is that right?
17       MR. HANSEL:  Object to the form.
18    A.  Are you referring -- your question is unclear.
19  Are you referring to refund?  You said rebate.  I think
20  you're --
21  BY MR. DORNER:
22    Q.  Yeah.  I -- I -- I caught the same error.  So the
23  example I gave was a rebate.  I apologize.  It wouldn't
24  reflect a -- a rebate subsequent to the date of
25  adjudication; is that right?

50 (Pages 194 - 197)

Page 198

1    MR. HANSEL:  Objection:  Beyond the scope.
2    A.  I've answered that the claims data represents
3  what the plan paid at the date of service.  That amount is
4  found clearly within the claims data.
5  BY MR. DORNER:
6    Q.  Well, I appreciate your answer, but I would like
7  an answer to my question.  My question was:  The -- a
8  subsequent rebate would not be reflected in the type of
9  claims data that you were referring to in your prior
10  testimony to Mr. Gisleson; is that accurate?
11    MR. HANSEL:  Object to the form.  Calls for
12    speculation, beyond the scope, asked and answered, no
13    foundation.
14  BY MR. DORNER:
15    Q.  You can answer.
16    A.  To the best of my knowledge, if a rebate applied
17  to these type of drugs, it would not be within the claims
18  data.
19    Q.  And if there were similar payments, not
20  necessarily rebates but things like governmental subsidies
21  that might also be paid well after the date of
22  adjudication, that also wouldn't be reflected in the claims
23  data you were referring to; is that accurate?
24    MR. HANSEL:  Object to the form.  Lack of
25    foundation, calls for speculation, beyond the scope of

Page 199

1  the report, asked and answered.
2    You need to wrap this up, Mr. Dorner.  It has
3  nothing to do with Dr. Panagos's report.
4  BY MR. DORNER:
5    Q.  You can answer.
6    A.  I don't know.
7    MR. DORNER:  Okay.  I have no further questions.
8    MR. KERNER:  Anybody else on the Zoom?
9    MR. HANSEL:  Anyone else in the room?
10    MS. ISIDRO:  Nothing from me, no.
11    MR. HANSEL:  We will read and sign.
12    Thank you very much, Dr. Panagos, and Chelsea,
13  videographer, thanks very much, and for your
14  hospitality, Jorge, thank you.
15    THE VIDEOGRAPHER:  That concludes today's
16  deposition.  The time is 5:52 p.m., and we're going
17  off record.
18    (The deposition concluded at 5:52 p.m.)
19
20
21
22
23
24
25

Page 200

1    CERTIFICATE OF OATH
2
  STATE OF FLORIDA
3  COUNTY OF MIAMI-DADE
4
5
6    I, CHELSEA HLAVACH, shorthand reporter and Notary
7  Public, State of Florida, certify that KALI PANAGOS,
8  PHARM.D., R.PH, appeared before me and was duly
9  sworn/affirmed Witness my hand and official seal this 21st
10  day of January, 2022.
11
12    Witness my hand and official seal this 1st day of
13  February, 2022.
14
15
16
17    Chelsea Hlavach, Notary Public
18    State of Florida, My Commission:
      GG352672, Expires: August 11, 2023
19
20
21
22
23
24
25

Page 201

1    CERTIFICATE OF REPORTER
2
  STATE OF FLORIDA
3  COUNTY OF MIAMI-DADE
4
5    I, CHELSEA HLAVACH, Shorthand Reporter and Notary
6  Public, State of Florida, HEREBY CERTIFY that I was
7  authorized to and did stenographically report the
8  deposition of KALI PANAGOS, PHARM.D., R.PH; that a review
9  of the transcript was requested; and the foregoing
10  transcript, pages 10 through 199, inclusive, is a true and
11  accurate record of my stenographic notes.
12    I FURTHER CERTIFY that I am not a relative,
13  employee, attorney, or counsel to any of the parties, nor
14  am I a relative or employee of any of the parties' attorney
15  or counsel connected with the action, nor am I financially
16  interested in the action.
17    Dated this 21st day of January, 2022.
18
19
20
21
22    Chelsea Hlavach, Notary Public,
23    State of Florida at Large
24
25

51 (Pages 198 - 201)

Page 202

1  GREGORY HANSEL, ESQUIRE
2  ghansel@preti.com
3          February 4, 2022
4  RE:   In Re: Valsartan, Losartan, Et Al
5    1/21/2022, Kali Panagos, Pharm.D (#5024986)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17    Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 203

1  In Re: Valsartan, Losartan, Et Al
2  Kali Panagos, Pharm.D (#5024986)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Kali Panagos, Pharm.D              Date
25

Page 204

1  In Re: Valsartan, Losartan, Et Al
2  Kali Panagos, Pharm.D (#5024986)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Kali Panagos, Pharm.D, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Kali Panagos, Pharm.D        Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19  NOTARY PUBLIC
20
21
22
23
24
25

52 (Pages 202 - 204)

**[& - 33]**    Page 1

**&**

**&**   2:14 3:5 4:10
   4:14,19 5:5,9,17
   5:21 7:5

**0**

**02109**   4:19
**04101**   2:15
**07102**   3:10
**07932**   4:24
**08540**   6:15

**1**

**1**   8:13 10:5 16:10
   16:15 40:14
   79:16 98:1 188:9
**1/21/2022**   202:5
**10**   201:10
**100**   3:10,18
**1000**   1:14 2:11
   2:22 4:2 10:8
**1001**   5:21 7:5
**10017**   2:4,8
**105**   13:22
**10:49**   59:17
**11**   5:10 200:18
**11:08**   59:20
**11:24**   68:21
**12**   93:10,14
   125:21 141:21
   155:8 169:15
**125**   8:19
**12:17**   74:17
**12:53**   92:22
**13**   8:4
**14**   97:8,12,18
   99:2 100:22
   188:5

**1400**   5:2
**15219**   4:11,15
**15219-6401**   5:6
**154**   8:4
**15th**   3:10
**16**   8:13
**16990**   3:15
**17**   8:15
**175**   8:5
**17th**   3:20
**18**   97:9,12,18
   99:2
**18,750**   89:18
**184**   8:5
**185**   8:6
**189**   8:6
**19**   99:15,18,24
   100:19
**190**   6:6
**19087**   3:2
**19103-4196**   3:20
**194**   8:7
**199**   201:10
**1997**   18:2
**1:56**   92:25
**1st**   200:12

**2**

**2**   8:15 17:22,24
   40:15 63:17
   79:18 80:14,17
   93:9 102:19,25
   107:5 155:7
**20**   38:18 82:24
   99:15,18,24
   100:19 136:1
   204:15
**200**   6:10 8:8

**2000**   18:14,22
   20:13 27:6
**20004**   5:22 7:6
**20004-2166**   4:2
**2002**   19:12
**2005**   20:13
**2006**   19:2
**2008**   28:7,19
**2009**   19:15,17,22
   20:14 28:24
**201**   8:9
**2010**   28:24
**2012**   188:9
**2015**   27:6
**2016**   65:1
**2018**   28:7,19
   35:12 36:5 47:14
   93:14 138:18
   142:7,11,15,19
   146:22 150:24
**2019**   26:7 37:6
   37:14 45:1 46:25
   47:2,14
**202**   8:9
**2020**   46:9
**2021**   37:14,17
   97:23 186:11
**2022**   1:11 10:4
   200:10,13
   201:17 202:3
**2023**   200:18
**203**   8:10
**21**   1:11 6:15 90:8
   100:7,12,18
**21cfr**   176:10
**21st**   10:4 200:9
   201:17

**2200**   4:6 6:19
**2220**   5:13
**22695**   200:16
   201:22
**227**   3:5
**230**   5:13
**25**   103:12
**2500**   6:11
**2525**   1:14 2:11
   2:22 10:7
**260**   7:2
**270**   3:2
**27th**   4:19
**28**   100:8,12,18
   100:22 104:8
   105:7
**28202**   3:6
**2875**   1:4
**29**   101:9,11,16
   106:22 108:11
   108:15 109:5

**3**

**3**   8:16 64:16 69:3
   70:12 85:13,21
   93:4 125:21
**30**   3:20 69:3
   70:12 202:17
**300**   3:17
**30305**   6:11
**312**   5:2
**316**   6:2
**32**   101:9,11,16
   106:23 108:11
   108:16 109:5
**32502**   6:3
**32nd**   5:6
**33**   109:7,12
   171:25 177:11

[33 - accuracy]    Page 2

177:15,20 178:7
**33134** 1:15 2:11
2:23
**3333** 6:11
**3475** 3:6
**3600** 4:6 6:19
**375** 88:21 89:17
**38th** 4:10,15
**3:09** 128:18
**3:21** 128:21

**4**

**4** 8:18 90:23,24
103:13 141:20
155:5,7 202:3
**4,500** 87:20
**400** 4:23 6:2
88:22
**41** 109:7,12
**42** 110:3,7
112:14,19,22
113:2
**43** 110:3,7 113:5
**44** 113:7 114:20
115:1
**44023-4536** 3:16
**444** 3:6
**45** 115:16
**45202-4029** 5:2
**46** 116:18,23
117:25 118:4,11
118:23 119:4,7
119:12,18
172:25
**46204-3535** 5:10
**47** 121:11,17
123:10,17,22
124:3,10,13,20
128:13 136:8

143:3 145:11
**4:10** 153:24
**4:34** 154:2

**5**

**5** 8:19 97:7
103:13 125:10
125:11,14 126:5
126:6,12,20
127:10,19
128:12
**50** 89:13,16
**500** 4:23
**5024986** 202:5
203:2 204:2
**505** 4:2
**52** 128:24 130:10
131:10,14,17
**53** 4:19
**55** 132:9,15,25
133:8 134:3
135:9
**550** 3:2
**56** 136:5,6,13
**57** 136:24
**59** 140:9,14,22
141:22 180:24
181:3 182:22
183:12 184:2
**5:30** 183:5
**5:33** 189:10
**5:38** 189:13
**5:52** 1:12 199:16
199:18

**6**

**6** 16:20 80:11
97:23 123:17
124:4,10,20

125:4,15 142:22
143:7,14 144:4
144:24 171:25
**60** 89:13
**600** 3:5 6:6
**60606** 5:14
**617-213-7001**
4:20
**617-213-7045**
4:20
**63105-3443** 6:7
**66210** 7:2
**6b** 143:2
**6d** 144:10
**6i** 145:6,9,16
146:24 147:11
**6th** 186:11

**7**

**701** 2:19 5:17
**70130** 2:19 5:18
**704** 3:6
**75201-7932** 4:7
6:20

**8**

**8101** 7:2
**85** 8:16

**9**

**9** 127:20
**90** 8:18
**910** 127:11
**911** 127:20
**97** 18:25
**9:32** 1:12 10:4
**9th** 4:2

**a**

**a.m.** 1:12 10:4
59:17,20
**ab** 116:17 121:11
**ability** 15:25
24:20
**able** 15:21 22:2
23:14 32:14 34:3
64:5 72:25
115:14
**abruptly** 169:1
170:10
**absolutely** 88:6
**abstracts** 80:15
81:6
**academia** 62:25
**academic** 51:25
52:22 53:3 54:14
55:24 60:23 82:9
**academy** 45:16
49:2,6
**acceptable**
166:17 167:1
168:11,19
**acceptance**
69:21 74:11
**accepted** 31:8
34:7 103:17
125:2 127:17
128:2 132:1
153:9
**access** 171:5,6
**accommodate**
170:15
**account** 28:23
30:4 38:15
**accuracy** 202:9

[accurate - anda]                                                                        Page 3

| | | | |
|---|---|---|---|
| **accurate** 15:21 | **adherence** 22:5 | 168:10 | **aid** 5:11 21:16 |
| 147:24 179:7 | 22:6 | **advised** 168:14 | **al** 202:4 203:1 |
| 195:18 198:10 | **adjudicated** | **advisement** 20:3 | 204:1 |
| 198:23 201:11 | 162:18,19 | 33:21 37:25 | **albertson** 3:8 |
| **accurately** 189:3 | **adjudication** | **advising** 30:6 | **alfano** 4:10,14 |
| **acknowledge...** | 43:23 162:24 | 35:18 57:9 170:9 | **allege** 185:16 |
| 204:3 | 194:23 195:11 | **advisors** 20:1 | **alleged** 97:2 |
| **acknowledgm...** | 195:15,16,18 | 35:12 | 186:25 |
| 202:12 | 197:25 198:22 | **advisory** 26:3,9 | **alleges** 187:22 |
| **actavis** 3:13,13 | **adjunct** 20:8 | 26:10 105:1 | **allotted** 202:20 |
| **action** 201:15,16 | 63:20 | **affiliation** 24:1 | **allow** 12:22 |
| **actions** 1:6 173:3 | **adjuster** 21:18 | 24:23 25:2,5,6 | 30:19 74:6 |
| **active** 36:24 | 22:11,15,25 23:5 | 25:14,17,18 | 116:15 171:5 |
| 188:12 | 23:10 | **affiliations** 23:20 | **allows** 23:13,16 |
| **activities** 169:20 | **adjuster's** 23:17 | 26:3 | 116:13 |
| **actual** 151:8,18 | 23:18 | **affirm** 13:1 | **alluding** 181:10 |
| **add** 12:11 70:15 | **administer** | **affirmed** 200:9 | **american** 44:22 |
| 73:4,12 | 21:21 40:5 | **affordable** | 47:10,21 48:21 |
| **added** 97:23 | **administration** | 115:19 | 48:22 50:1,11 |
| **addition** 69:13 | 19:16,19 100:6 | **afternoon** 93:3 | 51:3 100:1 |
| 71:13 107:19,24 | 107:6,15 112:16 | 175:21 183:5 | **amerisourcebe...** |
| 135:11 | 113:9,16 114:12 | **agency** 96:5 | 175:23 |
| **additional** 98:12 | **administrative** | **agency's** 150:18 | **amgen** 26:3 |
| 100:17 104:18 | 63:12,22 | **ago** 177:10 | **amount** 34:17 |
| **additionally** | **administrator** | **agree** 11:7 91:13 | 72:14 87:18 89:5 |
| 181:14 | 40:3,4 | 91:21 149:15,21 | 89:21,25 90:2,2 |
| **additions** 204:6 | **administrators** | 175:24 177:14 | 90:3 183:5 188:9 |
| **address** 13:21,22 | 38:22 | 177:18 178:7 | 195:10,14 196:4 |
| 37:1,4 | **adopt** 102:3 | **agreed** 9:15 | 196:10 198:3 |
| **addressing** 52:9 | 105:15 | 103:2 | **amounts** 87:22 |
| 197:9 | **adults** 21:16 | **agreement** 12:3 | 196:8 |
| **adequate** 162:15 | **adverse** 82:3 | **agreements** | **analysis** 32:12 |
| **adhere** 23:2,16 | 83:21 | 160:16 191:20 | **analytics** 32:9 |
| 130:25 145:21 | **advice** 37:20 | **ahead** 16:9 17:21 | **anda** 67:19 |
| 146:8 | 157:25 158:24 | 85:12 90:22 | 106:5,7,15,15 |
| **adhered** 153:2,2 | **advisable** 169:1 | 128:16 153:23 | 107:2 116:11 |
| 153:22 | **advise** 33:9 41:4 | 181:19 | 117:1 118:15 |
| | 56:24 91:18 | | 119:15 121:8,13 |

[anda - approval]                                                        Page 4

123:12 124:5
130:19 131:22
132:4 143:10,17
143:19,25 144:1
150:14 151:15
173:10
**anda's** 124:6,24
**anesthesia** 24:1
24:9
**anesthesiologi...**
24:15
**anesthesiology**
24:6
**announced**
93:15 166:3
**announcement**
139:23
**annoys** 69:8
**answer** 14:11,17
14:18 15:6 33:16
33:23 43:21
66:18,24 67:2,25
68:10 69:25
71:11 72:18 77:3
84:5 93:24 94:1
94:20 106:16
110:21 112:3
115:13,15 117:4
120:16 122:15
126:3 134:14
135:20 137:19
141:15 143:21
156:4,10,21
160:14 163:21
166:21 170:21
170:24 171:20
174:25 176:25
178:17,19

181:19 182:7
191:17 192:17
192:23 194:6,9
195:8,9 196:19
197:11 198:6,7
198:15 199:5
**answered** 15:13
60:8 63:7 66:13
66:15 71:11
72:22 75:15
84:11 94:16,17
99:8 111:6
124:14,23
132:22 159:24
163:19 171:17
184:3 191:14,15
192:6,14 193:4
198:2,12 199:1
**answering** 73:2
84:19
**answers** 72:6,9
180:8
**anticoagulation**
25:11
**anybody** 11:25
73:3 189:18
199:8
**anymore** 122:8
**apart** 97:2
**apologize** 197:23
**app** 88:12
**appearance**
10:17 26:18 27:2
**appearances**
10:14
**appeared** 3:3,8
3:13,18,22 4:4,8
4:13,17,21,25

5:4,8,11,15,19
5:23 6:4,8,13,17
6:21 7:3,7,10
200:8
**appearing** 16:6
169:22
**appears** 157:22
**appended** 204:7
**appendix** 85:24
86:12,14,21
91:10 97:15,16
97:17,20 98:2
99:6,10,21,22,23
107:4,11,15,18
107:22 108:2,6
110:10,13,14
111:3 113:13,14
114:9 115:8
135:6,7,11,15,22
185:21
**appendixes** 93:5
**applic** 119:2
**applicable**
116:20 118:13
120:4,21 173:2,5
202:8
**application**
67:19 117:1,6,9
118:16,22 119:2
119:15 120:11
126:10 130:14
130:16 131:22
132:3,4,6 149:17
150:14 151:16
**applications**
104:2 131:12
149:24

**applied** 144:19
198:16
**applies** 30:16
**apply** 52:19
111:12
**applying** 106:15
117:16 130:24
**appointment**
46:12
**appreciate** 71:1
79:25 198:6
**appropriate**
30:17 35:17
73:14 103:18,20
179:12
**appropriately**
29:19 35:3 178:5
**approval** 56:24
57:5,22 58:25
66:4,9 67:5,18
67:20,21 68:4,6
72:3 74:25 75:16
76:3 100:6 104:2
107:6,16 110:9
111:1 112:8,16
116:25 117:8,16
117:16 118:16
118:17,22 119:2
119:10,15,23
120:6,13 124:7
125:1 126:11,18
127:6 128:8
130:14,20,24
131:1,5,12,20,23
132:2,6 134:11
136:16,21
143:10,19
145:23 149:18

**[approval - attorneys]**                                                    Page 5

149:20 151:16
164:23 173:8,8
183:20
**approvals** 57:12
74:22 75:4,12,24
127:3 128:4
**approved** 57:5
60:2,10,18 63:1
66:1 67:7 101:19
101:21,21
105:20,24
115:22 116:11
119:21 120:25
123:12,14 124:6
124:24 127:6
133:11,12,15,16
136:16 147:5,8
151:15 152:22
153:10,10
155:16 171:14
174:15
**approximate**
167:19
**approximately**
46:24 69:12
89:13,15,16,18
167:15
**areas** 157:21
**argumentative**
75:15
**aristarx** 36:2,7,8
36:9,21 37:2
**armsrx** 37:5,6,6
37:9 38:12 42:15
42:16 46:18
157:25 170:22
170:25

**arrangement**
43:10,16 88:23
89:3
**arrangements**
43:18
**articles** 52:6,9,12
52:15,18 80:14
81:1 86:19
172:21
**asher** 3:1
**ashp** 8:20 100:1
124:15 127:1
**aside** 78:20
**asked** 11:7 26:10
60:7 63:7 66:13
66:19,21,25
67:14,21 69:14
71:8,12,23 72:7
72:8,10,19 75:14
84:11 92:7,9
94:15 111:5
115:12 124:14
124:22 141:11
141:12 159:24
163:19 164:11
169:15 171:17
174:11 177:11
183:11 184:3
185:8,12,13
189:23 190:15
191:14 192:6,7
192:14 193:4
197:3 198:12
199:1
**asking** 12:5
39:19 44:9 57:15
57:16 68:12,15
87:24 108:23

110:18 118:7
153:15,17
158:22 165:21
169:19 170:16
170:18 178:24
179:2,8,14,14,15
179:17,18
193:22,24
195:21
**asks** 11:14 80:14
**aspect** 29:25
108:15 109:4
**aspects** 27:15
30:7 37:21 38:2
41:5,16 54:18
59:8 117:8
**assessed** 96:9
**assessment**
150:18
**assigned** 27:16
116:12 173:8
191:19
**assignee** 187:12
**assignments**
187:15 191:20
**assignor** 187:24
192:3
**assignors** 185:16
187:6,8,16 191:1
191:4,10,23
192:3
**assistant** 63:20
**assisted** 92:3
**associated** 40:10
194:22 195:25
196:4
**association** 2:17
10:23 46:20 47:6

47:10 49:24 50:1
50:11 185:15
**assume** 178:24
179:2
**assumes** 148:24
192:18
**assuming** 72:18
**assurance**
122:23 123:6
**asthma** 31:23,25
32:3
**atlanta** 6:11
**attached** 17:14
86:1 202:11
**attachment**
85:11
**attachments**
85:8
**attempt** 71:15
111:9
**attempted**
169:16
**attended** 65:9
**attest** 174:13
**attesting** 139:15
**attorney** 2:5,9
2:13,17,20,24
3:3,8,17,22 4:4,8
4:12,17,21,25
5:4,8,11,15,19
5:23 6:4,8,13,17
6:21 7:3,7 69:20
74:3 171:18
182:13 188:20
201:13,14
202:13
**attorneys** 3:12

**attributed**
166:22
**audible** 11:17
**audience** 82:16
82:19
**august** 200:18
**aurobindo** 5:8
73:6 154:17,18
154:20,24
189:20
**authored** 56:8
56:13,16 80:25
81:5,5,8,8,11,11
81:14,14,17,17
**authoritative**
112:11 152:20
173:13
**authorization**
29:13,17 35:2
**authorizations**
29:24
**authorized** 201:7
**automobile** 2:17
10:23 185:14
**available** 32:14
51:2 175:3 202:6
**avenue** 2:3,7 4:6
5:21 6:19 7:5
**aware** 49:12,22
49:25 51:7,13,18
51:19,24 91:17
138:11,20
139:24 148:1,5
154:20,22,23
155:1 160:23
165:3,22 166:16
167:1 170:5
175:5 176:13

179:3 181:13
185:9,14

**b**

**b** 8:11 86:12
142:25 180:25
**bachelor** 18:1,9
**bachelor's** 18:12
18:21,24 24:25
25:19 55:12,22
**back** 43:3,4
59:21 60:3,5
62:8,10 67:1,2,4
67:24 68:1,25
74:18 79:15,18
80:2,3 92:17
93:1,25 94:2
95:2,3 99:9
101:2,3 106:16
106:20 108:24
108:25 110:20
110:22 112:1,5
120:15,17
121:23 122:12
122:17,20
127:15 128:22
138:19 143:20
143:23 154:3
156:16,22
162:12 164:21
189:14 194:6,9
194:10
**background**
34:2 95:16 97:8
100:23 101:5
**bad** 69:7
**badger** 70:1
**balanced** 73:9

**barnes** 5:9
**base** 60:19 61:10
61:12 103:16
172:16
**based** 30:12 31:4
31:7,8,16,17
32:1 49:17 59:9
74:2 86:7 89:6
104:5,16,22
105:2 117:4
121:12 127:13
130:22 135:10
136:18 147:1,12
147:13 160:24
161:2 162:15
163:15 165:21
166:11 170:4
173:15
**baselessly** 71:15
**bases** 71:20 99:1
112:18,20,21
113:1
**basically** 138:14
**basing** 134:14
147:10
**basis** 41:18 59:1
59:3,10,12 93:17
99:24 105:20
108:10 109:4,6
110:6 111:16,21
113:9 115:20
116:2,22 130:9
132:14 134:21
136:12 139:21
141:24 143:13
144:9,17 145:15
147:3,18 153:16
165:25

**batches** 154:24
160:22
**baylen** 6:2
**bdc** 163:3
**bearing** 72:7
**beaten** 173:18,22
**began** 29:6 36:5
**behalf** 10:19,21
10:23,24 11:1,5
26:18 29:15,16
32:15 40:6 69:2
69:10 73:6,23
151:25 169:22
185:6 194:20
**believe** 11:12
70:14 73:7 80:11
84:19 99:13
107:5 112:3
117:23 137:21
138:18 139:3
165:23 173:18
178:3 179:6
182:14
**beliveau** 2:14
**belleveue** 25:2,8
**belong** 93:22
94:6 129:6
**ben** 7:10
**beneficial** 22:24
23:1
**beneficiaries**
164:17 169:10
189:25 190:7
**beneficiary**
164:8 165:19
**benefit** 30:1 31:7
31:14 36:11,12
36:15,22 37:21

37:22 38:1 39:6
39:24 40:11 41:4
41:8 44:12 57:11
58:13 59:7 60:11
62:19 64:21 83:3
83:12 100:4
102:13,14
105:16 132:13
157:2 160:5
196:23
**benefits** 30:20
35:1 40:5 41:5
97:8,25 100:2
**best** 30:10 83:17
91:18 99:8
115:18 161:7,8
198:16
**beyond** 19:9
82:19 101:11
137:7,8 163:18
166:18 173:16
178:2 197:1,7
198:1,12,25
**bio** 179:6
**bioequivalence**
52:16 54:15,18
55:1,3,6,6,9,18
56:4 106:7
149:22 150:8,11
151:4 171:16,23
172:11,18 176:4
176:14 177:16
177:21,23
178:10,11,20
179:9,18 180:19
180:22 181:1
182:13,21
183:10,16,21,25

**bioequivalent**
114:21 115:11
115:17 150:1
172:1,15 175:25
177:7 178:4,9,25
179:7,12,16
180:20,21
181:17
**biology** 18:5
77:16 78:3
**bipc.com** 3:7
**bit** 16:13 66:14
154:5 186:20
**blackwell** 6:6
**block** 3:1 173:14
174:1 190:21
**blocked** 162:7,12
162:17,25 163:3
**blocks** 174:4
192:3
**blvd** 1:14 7:2
**board** 65:18
**boards** 105:1
**bockius** 5:5
**body** 114:22
**book** 81:18
100:5 101:10,16
101:18,19 104:3
105:17,19,23
107:10,12,17
108:14,14
109:14,21,24
110:4 112:7,9,23
115:22 116:5
119:24 120:5,24
121:3,6,12
132:10 133:10
133:15 134:7

149:17 152:9,17
152:21 153:7,8
153:17,20 173:6
173:7 178:8
181:16 183:15
183:23
**books** 81:20
**bosick** 4:10,14
**boston** 4:19
**bottom** 103:12
105:11
**boulevard** 2:11
2:22 10:8
**bound** 160:9,16
**brand** 66:1 67:6
112:9 114:23
127:2 133:5,6,12
143:11 144:7,14
145:24
**branded** 113:8
113:16 114:12
114:21 140:12
142:1,3,5,8,12
142:16,20
183:14,20
**brands** 30:25
53:22
**break** 15:10,13
59:13,19 71:2
92:16,18,19,24
128:15,16,20
153:23 154:1
189:6,12
**bresnahan** 5:20
**brett** 7:1
**brief** 175:17,22
189:19

**bring** 83:20
**brisbois** 3:1
**broad** 82:2
**broadreach**
22:23 28:5,9,15
29:2,5,6,12,21
30:5,13
**brook** 104:3
**brought** 40:25
182:5 192:21
**buchanan** 3:5
**business** 22:19
22:20,22 23:3
35:22 37:1 77:22
77:24 78:6,8,10
78:12
**businesswome...**
46:20 47:6 49:23

**c**

**c** 2:1 7:1 10:1
180:22,25
**calculated** 79:12
89:5,20
**call** 35:15 150:18
**called** 114:2
132:4 139:8
**calling** 70:2
122:2 139:5
**calls** 35:20 60:7
67:12 69:17
100:24 121:18
164:19 165:6
178:1 198:11,25
**camber** 3:3
**camden** 1:2
**camp** 2:19 5:17
**campbell** 7:4

campus 4:23
cancer 82:1,4
  83:9,15 84:18
  96:5
capacities 26:12
capacity 23:7
  39:25 51:12 57:9
  91:19 100:16,21
  112:24 117:22
  138:13 157:23
  157:23 187:15
captures 178:3,4
  179:6,11
capturing 128:2
  128:3
carcinogen
  141:1,2 166:23
carcinogenicity
  96:10
carcinogens
  93:22 96:4
  145:20
cardiovascular
  31:23 168:23
care 22:17,19
  38:19 39:5 45:17
  49:2,6,9,18
  100:1,3 115:18
career 41:13,16
  48:12 82:8,23,25
  95:17,22 186:17
careful 161:3
  163:12
carefully 156:10
  169:4
carondelet 6:6
carrier 32:24

case 12:21 79:13
  85:8 88:6,8 89:9
  94:8 122:7
  129:24 130:20
  132:4 136:24
  140:25 141:16
  143:17,18 157:3
  169:21 170:5
  171:13 172:10
  181:25 185:17
  186:23 191:10
cases 35:15
  102:20 196:23
categorically
  71:6
categories 54:11
  62:21 133:9
  185:24
category 54:2,2
  76:15,23
caught 16:14
  197:22
caution 182:1
center 2:15 3:9
  25:2,9
centre 4:10,15
  5:6
cerner 2:6
certain 23:19
  26:15 44:19 45:7
  148:16 149:12
  154:24 160:21
  160:22 188:24
certainly 20:17
  79:22 168:10
certainty 163:13
certificate 8:8,9
  200:1 201:1

certificates
  78:10
certification
  21:15,19 23:10
  23:15
certifications
  21:11,12 77:17
certified 21:15
  21:17
certify 200:7
  201:6,12
cetera 11:14
  31:2 80:15
cfr 178:10
cgannon 3:11
chagrin 3:16
change 150:16
  153:14 203:4,7
  203:10,13,16,19
changed 38:10
  143:11
changes 102:10
  143:9,16,25
  144:2 202:10
  204:6
changing 49:16
chapters 81:18
characterization
  66:17
charges 88:3
charles 3:14
charlie 2:21
  10:24 70:16
charlotte 3:6
chartered 2:14
check 17:6
  179:24 180:5

chelsea 1:16
  10:10 11:5
  199:12 200:6,17
  201:5,22
chicago 5:14
  83:2
child 21:16
choice 30:24
choose 30:17
chp 194:20
chris 3:4
christine 3:9
christopher.he...
  3:7
cincinnati 5:2
circumstances
  150:17
cited 128:12
cites 178:8
city 2:15
civil 69:3 70:4
claim 42:25
  43:23 44:16
  97:22 104:19
  113:23 194:23
  195:23 196:4,12
claim's 162:23
claims 32:18
  39:5,23 40:9,10
  40:12 43:5,6,25
  44:3,9,10 92:1
  98:5,8 113:18
  114:3 162:18
  163:14,23
  164:24 165:15
  186:10 187:2,3,5
  187:16 189:23
  190:1,1,9,10,11

190:18,19 191:7
191:8,19,25,25
192:8 193:1,1,3
193:7,9,16,16,18
193:20,22 194:1
194:21 195:3,9
195:10,24 196:3
196:13,21
197:12 198:2,4,9
198:17,22
**clarify** 107:18
113:24 139:4
149:9 152:19
175:17 180:18
**class** 103:4,8
188:4,18
**classes** 20:15,18
**classification**
96:5,6,13,15
134:9
**classwork** 55:25
**clear** 108:17
171:19 178:20
192:17
**clearly** 107:17
198:4
**client** 23:8 28:12
28:23 30:4 38:21
44:4,5,5,6,7,11
44:13 57:16
58:12 59:23
60:13,19 61:10
61:12,23 82:16
102:13 158:12
160:9,11
**client's** 170:18
**clients** 30:7,17
31:14 32:15 33:6

33:10,13,14
36:23 37:20,25
38:22 41:23
42:11 56:24
57:10 58:2,3,10
59:7 62:18 82:12
82:14,19 91:18
151:25 157:15
157:17 158:1,4,8
158:13,17,20,23
159:19 168:6,11
168:14 169:6
170:17,22,25
171:3 184:14,18
**clinical** 23:7,7,19
24:1,23 25:1,4,6
25:13,16 26:2
28:11,12,14,18
29:12,21,22,25
31:4,6,11,11,12
33:1,20,25 34:1
34:21 35:16
38:20 50:24
53:19,21 83:20
103:18,22 104:6
104:16,22 105:2
126:25 152:25
155:14
**clinics** 25:11
**close** 127:23
**closely** 24:9
99:10 115:14
168:25
**cluttered** 80:4
**coaching** 181:21
**coan** 4:18
**coates** 4:22

**coatesg** 4:24
**code** 109:9
116:12 175:25
176:6,10,15
177:7,16,21,25
178:8,12,22
179:1,4 181:5,7
181:9,14,17
182:24
**codes** 109:18,20
109:23,23
116:15
**collaboration**
29:14,15
**colleague** 46:15
64:23
**colleagues** 36:1
**collect** 89:1
**college** 7:2 44:22
48:22,23 77:11
77:24 78:5
**columns** 125:22
**combination**
88:14
**come** 32:23 33:7
92:17
**comes** 23:10
**comfortable**
133:24
**coming** 15:1
27:19,20 152:3,7
152:11,15
**comment** 68:20
137:25 157:21
190:17
**commented**
166:22

**commission**
200:17
**committee** 41:21
42:4,20 102:17
102:18,22,24
103:15 104:21
118:4,5 120:20
121:5 126:11
127:16 133:7
152:8
**committee's** 42:6
126:6
**committees** 41:9
41:12,14,18,23
42:1 104:5,15
105:1 116:19
118:11,19,25
119:13 121:3,14
124:4,11 127:3
132:9,18 133:14
133:21 134:7,17
134:23 136:3
151:8,19,23
152:4,19 153:12
173:1
**common** 131:12
**communicate**
167:9
**communicated**
167:12,16
**communicating**
29:19
**communication**
64:17
**communications**
17:1
**community** 31:9
32:2

[companies - consultation]                                                Page 10

**companies**
159:11,14 160:6
160:17
**company**  36:24
42:13 79:4,7
169:20
**compared**
100:18
**compensated**
88:19
**competitive**  31:4
**complaint**
165:24 185:16
185:19 186:25
187:23
**complete**  18:8,20
86:3,14 115:15
204:8
**completed**  18:22
55:11,20 105:4
202:17
**completely**
192:20
**completing**
29:17
**complex**  34:9
**compliance**  22:4
22:6 116:20
118:12 120:3,21
127:5 132:11
173:2
**compliant**  124:7
132:7
**complied**  119:22
119:24 173:4
**complying**
160:10

**component**
58:19 115:4,6
155:20
**components**
31:13 54:4,19,21
133:25 138:24
**computer**  18:7
78:3
**concept**  55:6
127:10
**concern**  166:14
**concerning**
101:10 158:12
158:24 174:4
190:21 192:4
**concerns**  12:17
83:22 84:18
155:17
**concluded**
199:18
**concludes**
199:15
**conclusion**  60:7
67:13 69:17,18
70:2 74:4 100:25
121:19 122:2
130:18 164:20
165:7 178:2
187:18
**conclusions**
111:17,22
**condition**  168:24
**conditions**  25:25
31:10 32:4 34:9
**conducted**  54:10
69:7
**confer**  70:20

**conference**  12:15
**confident**  153:22
179:11
**confidential**  42:9
42:10 157:22
158:1,9,14,19,21
159:5,6,10,25
160:1 169:24
**confidentiality**
159:13 160:9,11
160:16
**confines**  40:1
**confirm**  86:2
**conjunction**
119:10
**conlee**  2:18 11:1
70:15
**connected**
201:15
**connection**
42:13 53:15 58:3
78:1,22 79:10
83:10 86:4,15,24
87:14 88:4,19
89:18 90:4,9,13
90:16,18 91:4,8
91:14,21 92:4,8
190:8
**conservative**
167:21
**consider**  42:22
60:24 70:11
76:12 100:22
104:24 137:13
158:8,13,17
159:10
**consideration**
57:12 58:18

60:10 75:9 76:19
76:19,20 106:10
115:24 116:4
119:25 126:12
131:5 135:25
136:18 150:5
**considered**
104:17,21
115:17,24,25
116:13,16 117:8
118:6,16 120:13
120:13 127:18
128:7 134:10
136:17 137:10
147:6 150:1
153:13
**consistent**  12:20
94:10 95:11
140:24 153:2
176:24
**consistently**
66:18
**consists**  163:23
188:4
**constructed**
128:1
**consult**  67:15
102:22 151:8
152:4,8,12,16
153:6,19,21
170:10
**consultant**  41:4
41:4 47:11 50:1
50:11,15,17,25
53:20 78:21
153:1 157:2
**consultation**
158:24

**consulted** 65:20
151:18
**consulting** 36:11
36:13,15,22
38:19 42:12
50:15,17 51:1,16
59:6 61:17 79:3
79:6,10 98:25
158:20
**consults** 171:12
**consume** 168:20
**consumed** 87:22
88:1,2 164:13
165:19 194:2
**consuming**
164:8
**contact** 168:5,7
168:8
**contacted** 90:9
90:12,15
**contacts** 165:21
**contain** 148:17
149:12 185:25
**contained**
154:25 164:8,17
165:5,19 168:19
176:14,15 177:7
190:21
**containing** 52:13
52:24 53:4,10
93:16 97:3,4
121:9 148:9
151:5 154:21,25
157:7,11,17
160:21 167:3,12
168:12 170:6
188:10 192:4

**contains** 105:23
125:22
**contaminant**
94:8 95:9 140:10
140:13,21
141:25 147:6
156:23 174:15
183:13
**contaminants**
93:16,19,21 94:5
94:14 95:8,15
96:1,3 129:10,18
129:23 130:3,6
137:3,9,14,21,22
137:23 138:1,14
139:8 141:7,10
141:11,15,19
142:3,6 143:18
145:19 146:7
147:20 155:1,3,4
155:6 157:4
163:24 164:3
183:19
**contaminated**
147:15 162:13
162:22,24 163:8
165:15 171:7,14
174:14 185:11
185:17 186:24
**contamination**
186:25
**content** 71:20
**context** 53:18
82:5,7 146:20,21
146:22 155:12
182:25 183:11
**continual** 152:24

**continue** 70:5
72:5,15,20 73:13
73:14 74:6
156:15 163:13
168:20
**continues** 66:20
72:19
**continuing** 50:20
50:22 72:11 78:7
78:9 121:25
122:3
**contraindicatio...**
28:3
**control** 117:14
140:6
**controversial**
183:4
**cooperative**
169:17
**coordination**
97:25 100:2
**copies** 202:14
**copy** 40:24 85:12
85:16 113:8,16
114:11
**corporation** 4:8
6:21
**correct** 13:16
17:14,15 23:23
23:24 24:2,3,18
25:15 26:4,20
27:6,7,25 28:6,8
29:3 32:10 33:3
34:12 35:8 36:6
43:16,17 47:12
47:23 48:3 55:9
63:25 64:19
78:14 80:12,13

80:16 81:1,2,6,7
81:9,10,12,13,15
81:20,21 83:25
84:15,22 85:2,6
86:24 88:17
89:22 93:12,13
96:23 97:9 99:15
100:18 101:10
101:16 102:23
103:1 104:21,25
105:9,17,18,21
105:22,25 106:7
106:12 107:23
109:9,10 110:4
114:24 117:23
118:14,20,23
119:13 121:6
123:19 128:13
135:15 137:14
139:9 142:23
147:2 149:6,22
150:2,13,20
151:2 158:11
159:7 160:7
166:2 167:13
168:21 176:1,7
176:21 191:12
191:23 192:11
204:8
**corrections**
204:6
**correctly** 44:7
62:12 94:4,23
112:17 119:18
120:8 196:1
**cost** 104:4,13,14
104:18,23,24
115:19

costs 105:4
  194:22
cotes 12:7,7
could've 110:15
council 35:11
counsel 9:16
  10:13,15 17:1
  22:2 27:1 69:13
  70:21 71:5,14
  73:16 92:12,15
  111:14 181:12
  181:23,24
  201:13,15
  202:14
counsel's 73:15
counseled
  159:11
counseling 27:19
  42:12 158:18
counselor
  160:12
countless 41:17
country 160:23
  161:10,24 162:9
  164:13
county 200:3
  201:3
couple 11:4
  28:24 29:1 70:23
  175:16 184:10
course 20:20
  55:17 56:3 63:3
  63:8 70:22
  186:17
courses 20:21,22
  20:24 55:1,3,8
  63:5,11,14,19,23
  63:25 64:1,2,11

coursework 20:3
  55:11,20 77:10
  77:12,24 78:6
court 1:1 10:10
  10:11,13 11:10
  11:19,20 12:24
  13:23 14:7,19
  68:19 69:19
  74:10,12 108:23
  182:9 183:7
  194:5,8
courts 69:22
coverage 120:14
covered 30:9,9
  182:11,13
covid 83:6,8
cpr 21:16
create 31:10
  151:23
created 36:8
creates 30:16
credible 124:17
credits 78:8
criteria 26:16
  45:7 47:8 57:5
  58:24 67:20
  110:4 116:3
  136:16 145:22
  150:19 151:14
  151:16 164:23
  183:17,19
criterion 149:16
critical 115:4
  169:2
criticism 97:4
cross 8:4,6
  154:14 189:21

crowell 5:21 7:5
crowell.com
  5:22 7:6
crs7270 3:16
cs 202:15
culbertson 4:19
culminating
  71:14
current 13:21,22
  17:13,16 42:15
  46:13 54:3 82:8
  149:20 184:14
currently 13:24
  21:5 45:2,22
  79:9
curriculum 20:1
  54:23
customize 102:4
  102:9
cut 169:13
cv 8:15 17:13,14
  17:16,19,21,25
  23:20 28:19
  30:11 31:3 32:7
  32:25 34:11
  37:14 44:18 62:2
  62:4,14,17 63:15
  64:16 80:22,23
cvs 5:11
cwhorton 2:23

d

d 8:1 10:1 69:3
  70:12 101:15,17
  106:22 143:7,13
  144:4 189:23
d'lesli 4:5
dade 200:3 201:3

dallas 4:7 6:20
dan 7:4
dana 3:19
dangerous
  129:19
data 32:8,13,16
  32:18,19,22,23
  43:25 44:3,9,10
  44:17 86:19
  97:21,21 98:8
  103:21 113:19
  114:3 127:13
  135:10 163:23
  165:16 172:20
  185:25 186:10
  186:11,12,16,23
  187:2,5 189:24
  190:1,9,10,18
  191:7,19,25
  192:8,19 193:1,3
  193:8,9,16,17,20
  193:22 194:1,21
  195:3,9,10,24
  196:3,13,21
  197:12 198:2,4,9
  198:18,23
date 1:11 17:13
  19:8 53:20 83:7
  83:7 86:9 89:12
  90:6,7 138:19
  196:8,10 197:13
  197:14,24 198:3
  198:21 203:24
  204:12
dated 201:17
dates 138:23
  139:3,5,5

**daubert** 69:22
74:10
**davis** 4:5
**day** 49:13,13
86:8,8,18,18
91:15,15 100:21
100:21 112:24
112:24 115:5,5
133:22,22
152:25,25
155:14,14
163:22,22
172:21,21 185:6
200:10,12
201:17 204:15
**days** 202:17
**dc** 4:2 5:22 7:6
**de** 1:14 2:11,22
10:7
**dealers** 2:17
10:23 185:15
**deals** 99:15
**december** 34:19
**decided** 103:10
**deciding** 105:14
**decision** 91:20
118:5
**decisions** 67:17
76:4 103:16
104:5,15
**declaration**
114:17
**declare** 204:4
**dedicated** 38:18
**deem** 35:16
**deemed** 116:1
124:8 144:15
204:6

**defendant** 1:13
13:13 182:12
188:13
**defendant's**
71:17 140:11
142:1 151:5
161:11,25
**defendants**
69:10,24 70:6
72:8 73:21
111:16 175:15
183:13 184:6,9
184:21
**defense** 69:13
70:20 73:3,11
**defer** 75:19,23
**define** 77:8
115:10
**defined** 177:24
178:12,21,25
179:4 181:4,7
182:23 183:24
188:4,19
**definition** 34:8
95:15,21 96:1
171:15,22,25
172:3,10,17
175:25 176:3,6
176:13,14,20,22
177:7,12,16,20
178:3,5 179:6,9
179:11,12 181:9
181:13,16
183:10
**definitions** 109:8
**degree** 18:12,21
18:24 24:25 25:7
25:20 55:12,13

55:13,21,22 78:8
**degrees** 19:10
77:11,20 78:5,12
115:3
**demonstrate**
106:6 144:20,22
**demonstrated**
193:9
**demonstrates**
190:1
**demonstrating**
128:8
**department** 20:9
21:18 22:11,15
23:10 63:12
**depends** 43:10
43:15
**deponent** 9:17
69:5,9 202:13
204:3
**deposed** 14:1
78:25
**deposing** 202:13
**deposition** 1:10
8:14 9:17 10:6,7
14:6 16:4,7,10
17:6 66:19 69:5
71:16,23 72:5,12
73:17 79:16
181:24 195:6
199:16,18 201:8
**depositions**
11:13,24 12:2,4
**derived** 79:9
**describe** 39:2
64:20
**description** 95:7
108:14

**design** 30:8 41:5
41:7 102:13,14
**designed** 31:3,7
71:8
**designs** 83:13
**detail** 97:22
171:18
**detectable**
148:17 149:13
**determination**
91:13 150:2,11
150:25
**determine** 72:25
73:1 125:21
166:7 173:4
190:6 191:3
192:2
**determined**
116:3
**determines**
116:8 149:21
**determining**
33:7 150:8
**develop** 101:24
102:11
**developed** 30:11
103:4,5
**developing**
30:21,23
**development**
38:20 100:2,6
102:20 107:6,16
112:16
**developments**
41:20
**deviation** 141:16
144:21

**[device - drug]**                                    Page 14

**device**  79:7
**diabetes**  25:23
  31:23
**diagnoses**  25:25
**diagnosis**  32:3
**diagram**  104:7
  105:7,11,12
**diem**  29:9
**differ**  39:16 40:7
**differences**
  39:18,20
**different**  25:25
  30:19 35:21 39:7
  72:21 81:23 89:2
  91:11 109:22
  129:21 139:6
  157:13 167:15
  168:11 169:16
  170:12,12 175:6
**differs**  39:12
**direct**  8:4,6,7
  13:8 185:3
  192:16 194:17
**directly**  22:19
  44:12 173:24
  196:12
**director**  19:20
  23:7 28:11,17
  29:21 34:21
**disagree**  71:6
  73:24
**disclosed**  87:12
**discourteous**
  70:4
**discovery**  191:11
**discuss**  109:8
  110:3 126:5

**discussed**  12:14
  19:10 21:2 48:10
  48:14 59:10
  83:18,23 84:9,22
  95:6 99:1 108:4
  127:10
**discusses**  100:8
  126:6,20
**discussing**  83:9
  83:12,14,24 84:8
  84:23
**discussion**  26:11
  26:21,23 34:4
  58:19 84:17,19
  99:12 105:5
  108:7
**dispensing**  27:18
**distance**  35:5,10
**distinction**  130:1
**distributed**
  188:11
**district**  1:1,1
**division**  20:22
  63:21 64:1
**divorced**  192:20
**dklinges**  3:21
**doctor**  16:6,16
  17:25 38:17
  55:13 68:8 78:14
  79:15 80:25
  81:22 85:23
  87:25 88:3 90:25
  95:5 101:24
  112:13 125:14
  128:24 135:13
  154:16 171:2
  175:21,24 177:5
  177:14 179:14

  179:22 180:17
  181:3 182:18
  183:10,24 184:4
  194:19
**doctorate**  19:1,5
  19:7 25:7 55:22
**document**  1:6
  16:16 40:23
  90:22,25 120:2
  120:19 123:16
  123:21 124:19
  125:4,15,19,21
  128:1,2,9 135:15
  176:17,23 177:1
**documented**
  31:4
**documenting**
  29:18
**documents**
  16:22 17:7 40:13
  40:16,18 135:4,5
  135:7,11,22,24
  175:5
**doing**  73:15
  82:24 92:3 102:2
  126:18 179:24
  179:25
**dorner**  4:1 8:7
  111:23,23
  194:15,18,19
  195:1,2,7,12,22
  196:18 197:2,10
  197:21 198:5,14
  199:2,4,7
**dosage**  113:8,16
  114:12
**dose**  188:13

**dozens**  12:8,8
**dr**  10:6 13:10,20
  27:5 44:18 59:23
  68:3 69:11 70:3
  74:6,13,20 92:16
  93:3 110:25
  111:17 140:19
  149:15 153:15
  154:4 156:3
  157:22 169:21
  185:5 189:16
  199:3,12
**drew**  4:1 111:23
  194:19
**drive**  4:23
**drug**  22:9 26:12
  26:13,14,15
  27:24,25 30:18
  31:14 33:1,20
  53:22,23,24 57:4
  57:10,21 60:1,10
  60:17 61:5 62:18
  62:25 66:1 67:5
  67:21 72:3 75:9
  75:16 76:3,13,21
  82:1,3,4 83:13
  83:13,20 84:18
  100:3,3,5,6,8
  101:19,21
  102:21 103:21
  104:1,16 105:2
  105:19,25 106:5
  107:6,15 112:8
  112:15 113:8,8
  113:11,15,16
  114:11,12,21,22
  114:23 115:6,23
  116:3 118:5

120:11,14 121:9
121:12,15
122:23,24,25
123:14 125:1
126:16 127:2,4,7
131:6,12,20,21
132:3,4,6,13
133:12,23 134:6
134:9 136:15,20
137:4,9 138:1
140:24 141:4,17
142:4 143:16
144:7,13,14,20
145:22,23,24,25
147:7 149:24,25
150:1,8 151:12
151:25 157:17
160:24 162:21
162:21 164:2,21
166:14 168:23
172:1 173:6,10
174:16 178:4,9
179:7,12,16
180:20 181:17
183:1,2,17,18,20
188:10 196:24
**drugs** 6:17 22:3
30:9,16 33:22,24
52:13,24 53:5,11
56:24 57:12 67:7
67:17,18 74:25
75:8 76:12,19
93:16 97:3,4
107:2 110:8
111:1 112:10
114:21 115:17
115:22,25 120:6
120:12,25 127:6

127:18,21 128:6
132:11 133:3,5,6
133:9,9,10,12
134:11,20
139:11 141:16
148:9 152:22
154:21,25 157:3
157:7,11 158:25
160:21 161:8
162:13 164:24
165:10,13 167:3
167:12 173:12
174:14 190:19
198:17
**dtdorner** 4:3
**duane** 3:19 4:1
**duanemorris.c...**
3:21 4:3
**due** 93:16
**duly** 13:6 200:8
**duties** 27:13
29:11,13 36:20

**e**

**e** 2:1,1 3:2 8:1,11
10:1,1 171:25
180:22,25,25,25
203:3,3,3
**earlier** 27:2 37:1
71:4 74:1 93:11
182:12
**echo** 186:20
**economic** 165:9
**economics** 77:7
77:10,12,18,20
**education** 19:9
50:20,22 54:17
54:22 55:2,7
59:4 77:25 78:7

78:9 86:8 95:17
99:21 100:15
112:23 113:12
114:14 115:3,7
132:17 133:19
135:2,11 136:1
155:21
**effect** 69:17 70:3
187:23 188:19
**effective** 58:24
104:18 114:23
115:24 116:1
117:15,18
120:25 122:23
124:8 126:8,8,17
127:5 128:8
129:20 132:8
136:22 144:15
144:21 145:24
163:10 173:10
**effectiveness**
105:20 123:14
151:17 183:2
**effects** 82:3,4
83:21,21
**efficacy** 95:12
104:13,16
149:19
**efficiency** 74:5
**efficiently** 30:1
73:13 161:16
**either** 44:7 102:3
111:24 196:9
**elaborate** 39:19
**ellie** 6:18
**ellie.norris** 4:7
6:20

**embarrasses**
69:8 71:9
**employed** 22:23
**employee** 23:18
42:18 201:13,14
**employees** 30:18
36:16
**employer** 23:5,6
33:14 36:14 39:8
39:13 168:7
169:22
**employers** 3:17
30:17,20 39:24
159:19
**employment**
82:10
**encouraged**
115:18
**engaged** 41:23
51:25 52:3,22
53:3,9 54:14
91:21 175:2
**engagement** 8:18
82:15 83:2 91:3
91:4,14
**engagements**
82:6
**enrollment** 32:9
**ensure** 35:2
99:11 117:17
161:17 169:10
**ensuring** 28:2
29:23 104:16
117:15 171:6
**entail** 22:1,11
24:4 55:14
**entailed** 30:14
32:11 55:17

[entailed - experience]                                                    Page 16

77:12
**entails** 22:2 66:6
76:4
**entire** 28:16
111:12 127:12
128:1 135:10
140:16,18
178:25
**entirety** 81:20
99:7 108:6
110:15 111:8
164:4
**entities** 33:11
35:22 42:5 98:25
184:20
**entitled** 111:16
121:21
**entity** 37:4 40:6
44:13 105:14
150:7 170:23
174:10
**entry** 110:4
**epidemic** 64:18
64:24
**epidemiology**
56:9
**equivalence**
101:20 105:24
106:2 109:9,17
109:20,23 116:8
116:12 144:5
150:17,20 178:8
**equivalent** 116:9
122:24 140:11
141:17 142:1,5
144:15 151:1
183:14

**equivalents**
115:17
**errata** 8:9
202:11,13,17
**erratas** 202:15
**error** 197:22
**esquire** 2:2,6,10
2:14,18,21 3:1,4
3:9,14,19 4:1,5,9
4:14,18,22 5:1,5
5:9,12,16,20 6:1
6:5,9,14,18 7:1,4
202:1
**essential** 31:13
133:25
**essentially** 164:5
**established**
58:25 68:6 74:24
75:17 110:8
111:1 112:10
120:12 128:6
134:9 140:5
153:8
**et** 11:14 31:2
80:15 202:4
203:1 204:1
**evaluate** 32:14
**evaluated** 20:4
150:15
**evaluating**
127:11 149:24
**evaluation** 26:11
101:20 116:8
**evaluations**
105:24 106:3
**evasive** 72:20
73:10,25

**event** 11:13
**evidence** 31:3,7
31:16,17 32:1
103:16 127:13
148:25
**evolving** 49:16
**evp** 38:12
**exact** 83:7 90:6,6
138:19
**exactly** 46:23
47:15 88:12
158:22
**examination** 8:4
8:4,5,5,6,6,7
13:8 70:13
154:14 158:2
175:19 180:10
182:14 184:11
185:3 189:21
194:17
**examine** 70:9
**examined** 13:6
**example** 195:15
196:22,24 197:4
197:15,23
**examples** 31:22
135:14
**exceeds** 89:21
**excel** 88:15,16
**exceptions**
127:21
**excerpts** 97:21
186:11
**exchange** 196:20
**exchanged** 196:5
196:11
**exchanges**
195:14

**excluded** 102:14
**exclusive** 30:12
**exclusively**
123:25
**excuse** 66:13
68:9 80:18 85:24
86:12 97:21
102:2 143:8
155:7 156:1,1
170:14 180:11
180:21
**executive** 37:10
37:15,24 38:10
157:24
**executives** 44:23
48:22,23
**exhibit** 8:13,15
8:16,18,19 16:10
16:13,15 17:14
17:21,24 40:14
40:15 79:15,18
85:13,21,23
90:23,24 93:4
125:10,11,14
126:5,6,12,20
127:10,19
128:12 195:1,5,7
**exhibits** 16:12
79:21 85:13
195:2
**exist** 39:21
**expect** 43:8,12
43:19 66:24
**experience** 34:2
38:18 41:9,11
43:23 54:17 59:4
59:6 86:7 98:24
99:20 100:15

107:8,24 112:23
112:25 113:12
115:7 132:17
133:19,21
134:23 135:2,12
136:1 165:21
166:1,25 168:10
172:22 173:3
**expert** 33:1,5,9
33:20 40:20,24
51:23 65:23,25
66:3,9 67:10
68:3 69:16,21,24
69:25 71:19
74:10,11 76:7,11
76:16,18 78:21
78:21 79:10,10
79:13 80:21,22
86:7,20 89:4,9
98:24 99:7 108:7
110:16 111:18
135:23,25
155:10 157:23
159:21 169:21
170:5 172:10,19
173:20
**expertise** 35:15
163:15
**experts** 36:1
87:11 97:21
197:9
**expires** 200:18
**explain** 88:24
**explanation**
108:13 109:17
109:20
**explore** 71:17
111:16,21

**express** 6:8
121:6
**expressed** 62:2
62:17
**expressly** 116:19
118:2,12,19,24
119:3,6,13,19
120:3,7,20 173:1
**extensively**
182:13
**extent** 70:13
74:7 89:2 133:13
141:14
**extract** 44:10

**f**

**facing** 24:12
**fact** 98:15,16
102:19 108:10
108:18 109:3
113:22 114:1,7
130:23 131:11
131:12 137:25
149:5 162:9
163:16 186:2
**factor** 104:4,24
**factors** 104:20
104:22 149:23
**facts** 148:24
186:2
**faculty** 19:13,15
19:16,19 20:8
**failing** 66:18
**fails** 202:19
**fair** 15:8 73:8
**faith** 69:7
**falkenberg** 5:13
**falkenbergives...**
5:14

**fall** 27:22 64:1
**falls** 3:16 100:20
**false** 137:1 145:1
145:2,3,17 147:1
147:13 161:19
170:3
**familiar** 41:14
41:21 55:7 127:1
**familiarity**
132:17 136:2
**far** 86:11 89:19
90:1
**fax** 4:20
**fda** 52:19 57:5
58:25 60:2 65:20
65:22,25 66:4,6
66:10 67:18 68:5
68:7 72:3 74:22
74:25 75:4,12,17
75:19,23 93:15
93:18 95:20,23
95:24 97:6
101:21 105:17
105:20 106:4,6
106:25 107:1,3
109:14 110:8,13
111:1 112:11
115:10,14,17
116:25 117:7,17
118:15,22
119:11,16
120:12 121:4,12
126:19 127:6,6
128:7 130:5,25
131:6,13,16,19
131:24 132:3,5,7
132:11 133:16
134:11 136:16

136:21 138:14
139:7,10,13,14
139:16,22 140:2
140:5 141:13
143:17 144:2,3,3
145:23 146:6,9
146:12,17 148:1
149:21 150:2,9
150:16,24
151:15,17
152:22 153:11
155:16 157:8
161:4 162:16
163:11 164:23
166:11,13,16,22
168:14 171:14
171:15,22
172:10,17 173:8
173:8 174:14
175:10 176:3,10
177:25 179:4
181:16 183:20
**fda's** 116:7
150:11 176:6,14
**february** 34:19
200:13 202:3
**federal** 69:3,16
69:22 74:10
176:1,7,8,10,15
177:8,16,21,25
178:12,22 179:1
179:5,8 181:5,8
181:9,14,18
182:24
**feel** 85:2
**fees** 89:1,6,18,25
**fhs** 4:11,16

[field - formulary]                                                                    Page 18

**field**  22:17 47:8
  47:9 50:17,19
  98:25 112:25
**fields**  44:4 97:23
  193:23,23
**fifth**  98:12,14
**fifty**  89:15,15
  167:23
**file**  88:10 131:20
  131:22 132:3
**filed**  132:5
  165:18 185:12
**files**  106:5
**filing**  106:14
**filled**  27:25
**filling**  27:17,18
**fin**  114:17
**finally**  26:2
  32:25 47:21
**financially**
  201:15
**find**  64:5 126:23
**findings**  29:18
**fine**  80:7 165:20
**finish**  14:16,18
  33:15 68:9
  127:25 146:14
  156:3
**finished**  156:6
  156:10 184:24
  186:8 188:12
**firm**  7:1 13:12
**first**  11:4 13:6,15
  14:6 17:13 19:18
  21:16 43:13,19
  44:25 85:14 90:4
  90:9 138:3,4,10
  138:20 139:24

140:2,5 142:7,11
**five**  168:4 183:7
  189:9
**fl**  1:15 2:11,23
  5:6 6:3
**flaherty**  2:14
  10:22 90:21
**floor**  3:10 4:10
  4:15,19
**florham**  4:24
**florida**  1:16 10:8
  13:23,23 37:2
  200:2,7,17 201:2
  201:6,23
**focus**  25:23
  43:20 57:6,18
  83:16,19 84:1,3
  84:7
**focused**  58:15
**folks**  11:25 12:13
  14:24 15:2 154:7
**follow**  112:10
  120:11 133:6
  154:5 175:17
  182:10 185:1
  189:19
**followed**  128:6
  168:25 174:20
  190:3 191:23
  193:16
**following**  151:15
  151:22 162:1,2
  162:10 167:16
  168:2 174:7
  189:25 190:8
  191:5,11 196:21
**follows**  13:7

**food**  100:6 107:6
  107:15 112:15
**footnote**  102:19
  102:25 123:17
  124:4,10,20
  125:4,15
**foregoing**  201:9
  204:5
**form**  39:9 52:25
  53:6,12 54:7,16
  55:10,19 56:5,23
  57:8,19 58:16
  60:6,16 61:13,16
  61:25 62:15,23
  65:24 66:5 67:13
  74:23 75:6,14,20
  76:1,9,17,25
  80:19 81:3 82:13
  84:10,25 85:4
  86:17,25 94:7,15
  94:21,24 96:14
  96:20,25 99:3
  100:24 102:5
  106:13 108:10
  108:20 109:4,13
  110:12,23 111:5
  112:6 115:2,21
  116:10,24 117:5
  117:12,21 118:3
  120:23 122:1,21
  123:4,11,24
  124:2,22 125:6
  129:12 132:16
  132:21 133:2,20
  134:5,16,22
  135:1,18 136:9
  136:14 137:6,15
  138:12,22

140:15 143:4,15
  144:12,18
  145:12,18 147:4
  147:14,19 148:4
  148:13,19,24
  149:7 150:4
  152:18 159:1,18
  160:8 161:1
  163:18 166:19
  167:4 168:13,22
  169:14 171:24
  172:5 174:6,22
  176:2 178:1
  181:6,11 184:1
  191:13 192:15
  193:15 194:24
  195:19 196:16
  197:5,7,17
  198:11,24
**formal**  19:9
  59:24 60:14,25
  61:2,22 62:5,13
  62:22,24 77:6,8
  77:22
**formally**  162:5
**format**  193:17
**formed**  99:23
**former**  184:18
**forming**  85:7
  86:4 108:6
**formularies**
  60:11 100:4,8
  101:25 102:10
  103:4 151:25
  162:5
**formulary**  29:24
  30:8 31:15 33:22
  33:23 34:6 35:2

35:3 41:5,6 54:3
54:5 57:1,13
58:19 67:17 75:9
76:4,13,20 83:13
100:2,5 102:3,4
102:15,21 103:5
103:8,16 104:17
105:14,15
115:25 116:4
118:6 120:1,14
121:15 126:6,7
126:12 127:1,3,7
127:12,16,18,21
128:5,7 132:12
134:10 136:15
136:18,19,21
147:7 151:9,15
151:19 152:5,13
153:14 157:18
158:5,12,18,25
159:12 160:24
161:12,25 162:4
162:10 164:2,22
**formulating**
99:17 100:11
106:23 109:11
137:12 153:5,18
**forth** 32:2 123:7
130:25 132:7
139:19 145:22
151:16 164:23
168:14 189:2
**forward** 73:13
73:17 151:24
**found** 93:18,21
137:4,14 139:22
141:4 148:8
160:21 164:4

165:15 174:5
175:25 176:6
198:4
**foundation**
116:2 137:6
167:4,5 178:15
181:6,18 187:1
194:25 195:20
196:17 198:13
198:25
**foundational**
115:5
**founder** 36:2
**four** 18:10 98:10
185:24
**fourth** 93:10
98:12,14 104:8
**frame** 25:16 26:5
29:5 37:12,16
82:22 137:1,3,5
137:8,13,20,21
137:22 138:7,8
150:22 151:20
161:13 162:13
164:3,4 171:6
**francisco** 34:14
**frank** 4:9
**free** 85:2
**front** 40:14,19
40:21 79:19 93:4
**fulbright** 4:6
6:19
**fulfilled** 55:13,21
123:13 173:9
**full** 13:18,20
28:20 89:25
**fully** 59:10

**function** 41:15
51:11 105:3
**functions** 24:6
40:10 41:7,20
49:14 91:15
100:21 104:18
115:5 128:4
133:22,23
152:25 155:15
**further** 8:6,6,7,7
11:3 12:6 98:1,5
154:4,6 184:9
185:3 189:15,21
191:20 194:17
194:17 199:7
201:12

## g

**g** 10:1
**ga** 6:11
**gain** 67:21 112:8
127:5
**gannon** 3:9
**gateway** 3:9
**gathering** 92:4
**gcoan** 4:20
**general** 131:25
153:17 171:4
185:13 193:22
**generally** 195:9
**generic** 53:22,22
67:17,18,20 75:5
75:8,12,16 76:3
76:12,19 92:10
105:24 106:5
107:2 112:10
113:7,11,15
114:11,21,22
115:6,17 116:3,9

121:12 127:2,21
131:21 132:4
133:3,9,12 134:6
134:11,20 142:4
143:8,9,16 144:6
144:13 151:12
153:12 157:3
164:2 173:12
183:1,16
**generics** 30:25
66:1 67:6
**geoffrey** 4:18
**geoppinger** 5:1
8:5 175:16,20,22
176:5 177:3,4
178:6,18,23
179:2,13,21,23
180:4,11,15,16
180:23 181:2,12
181:23 182:11
182:17 183:9
184:4
**getting** 66:14
92:15 127:23
175:21 197:3
**gg352672** 200:18
**ghansel** 2:16
202:2
**gisleson** 5:5 8:4
8:6 73:5,5
154:10,15,16
156:1,2,5,12,14
157:5 158:3
159:3,7,8,15,22
160:3,13 161:5
163:20 165:1,11
166:20 167:7
168:17 169:8,12

170:1,14,18
171:1,19,21
172:2,8 173:22
174:2,18,24
175:12 185:8
188:20 189:19
189:20,22
191:15,16,21
192:9,16,22
193:6,19 194:7
194:11 196:14
198:10
**give** 13:2 15:21
16:13 31:22 65:5
115:14 125:17
125:24 156:9
196:22
**given** 56:18,21
57:6,17,20,24
59:24 60:1,9,14
60:21 61:23 62:5
62:13,22 81:25
173:8 204:9
**giving** 150:17
197:4
**glad** 182:5
**glenn** 2:6 10:20
12:7
**gmail.com** 3:16
**go** 11:3 14:3
15:13 16:9 17:10
17:21,22 66:19
68:18 72:23,23
74:13 85:12
90:22 99:9 114:4
114:20 127:15
128:16 138:19
153:23 156:16

162:12 164:21
180:3 181:19
**goes** 101:11,16
161:18 173:24
**going** 10:3 15:7
16:9,11,19,24
17:10 59:18
66:19 68:8,22,24
70:23 73:1 80:18
90:22 93:7,7,9
104:17 115:13
122:11 128:19
151:20 152:1
153:25 169:12
169:24 170:20
189:11 199:16
**good** 10:3 13:10
13:11 45:12,13
47:20 48:8 57:4
57:12 80:9 93:3
173:23 175:21
**goodness** 83:6
**gordon** 4:10,14
**governmental**
198:20
**graduation** 19:8
**great** 14:23
126:1 171:18
181:25
**greenberg** 2:3,7
4:23 6:10 10:18
10:20 13:13
**greg** 4:22 10:22
12:7,7 68:24
90:11,12
**gregory** 2:14
202:1

**ground** 14:3
69:6 70:1
**grounds** 16:24
**group** 12:5 36:15
40:6 57:18
**groups** 33:14
36:14 57:20
60:18 168:7
**gtlaw.com** 2:4
4:24 6:12
**guarantee** 88:25
123:6
**guess** 11:4 74:8
83:20
**guidance** 22:4
30:10 33:21
37:20,25 49:10
49:14 57:10 59:6
139:18 140:5
161:4 162:16
163:12 166:11
168:16 175:10
**guidelines** 31:8
31:16,17 32:1,2
48:17,24 49:3,7
49:20 50:2,4
51:4,8,15,22
103:18 124:15
182:9

**h**

**h** 8:11 203:3
**half** 38:18 142:7
142:11
**hand** 12:25
200:9,12
**handed** 125:14
**handle** 161:9
166:15

**hang** 186:19
**hansel** 2:14 8:6
10:22,22 11:3,17
12:21 16:24
33:15 39:9 52:25
53:6,12 54:7,16
55:10,19 56:5,23
57:8,19 58:16
59:14 60:6,16
61:13,16,25 62:6
62:15,23 63:7
65:24 66:5,11,13
67:2,12 68:9,13
68:24,24 70:18
70:22,25 73:21
73:23 74:23 75:6
75:14,20 76:1,9
76:17,25 79:20
79:24 80:6,18
81:3 82:13 84:10
84:24 85:4,16,20
86:17,25 90:11
90:12 92:19 94:7
94:15,21,24
96:14,20,25 99:3
100:24 101:4
102:5 106:13,18
108:20 109:13
110:12,23 111:5
111:19 112:6
115:2,21 116:10
116:24 117:5,12
117:21 118:3
120:23 121:18
121:24 122:21
123:4,11,24
124:14,22 125:6
125:20 126:1

[hansel - hypercholesterolemia]                                                    Page 21

| | | | |
|---|---|---|---|
| 128:15 129:12 | 196:16,25 197:7 | **heller** 7:10 | **horse** 173:18,22 |
| 132:16,21 133:2 | 197:17 198:1,11 | **hello** 111:23 | **hospital** 23:22 |
| 133:20 134:5,16 | 198:24 199:9,11 | **help** 31:14 | 24:2,11 26:1 |
| 134:22 135:1,16 | 202:1 | **helpful** 156:12 | **hospitality** |
| 135:21 136:9,14 | **happening** 49:17 | 186:21 | 199:14 |
| 137:6,15 138:12 | 86:9 | **helping** 56:25 | **hour** 88:22,22 |
| 138:22 140:15 | **happy** 69:24 | **henry** 3:4 | 89:17 |
| 143:4,15 144:12 | 80:3 | **hereto** 204:7 | **hourly** 88:18,18 |
| 144:18 145:12 | **harassing** 66:17 | **hetero** 6:17,17 | 88:21 89:7 |
| 145:18 147:4,14 | 70:3 71:8 | **hey** 154:16 | **hours** 27:16 |
| 147:19 148:4,13 | **harassment** | **hi** 10:24 | 69:11,12 89:11 |
| 148:19,24 149:7 | 66:15 | **hill** 6:14 | 89:13,15,16 |
| 150:4 152:18 | **harkins** 6:9 | **hillwallack.com** | 183:7 |
| 156:1,3,7,20 | **harkinss** 6:12 | 6:16 | **house** 102:21 |
| 157:20 159:1,4 | **haverfield** 3:15 | **hilton** 5:16 | **household** |
| 159:13,18,24 | **head** 14:12 28:12 | **hinshaw** 4:19 | 188:11 |
| 160:8 161:1 | 28:23 30:4 | **hinshawlaw.com** | **huahai** 4:4 |
| 163:18 164:19 | **health** 25:14,21 | 4:20 | **huh** 13:14 14:9 |
| 165:6 166:18 | 32:9 39:5 42:7 | **hired** 155:9 | 14:14,14 23:12 |
| 167:4 168:13,22 | 47:22 51:3,11 | **hlavach** 1:16 | 29:8 45:15 47:4 |
| 169:12 170:14 | 64:18 168:24 | 10:10 200:6,17 | 79:17 80:13 84:6 |
| 170:20 171:17 | 169:10 170:7 | 201:5,22 | 85:25 95:9 98:20 |
| 171:24 172:5 | **healthcare** 31:8 | **hmo** 97:22 | 103:14 104:9 |
| 173:16 174:6,22 | 35:12,25 39:23 | **hold** 19:21 25:4 | 105:8 109:16 |
| 176:2 177:1 | 44:23 45:13 46:5 | 25:16 26:5 64:22 | 123:18 144:11 |
| 178:1,14,23 | 46:11,19 47:6,8 | 65:13,22,25 66:3 | 145:4 146:3,16 |
| 179:23 180:6,21 | 47:9 48:22,23 | 66:9 183:3 197:2 | 151:13 177:13 |
| 181:6,15 182:5,9 | 49:19,23 83:3 | **holder** 187:15 | **human** 93:22 |
| 184:1,8,24 185:2 | **healthy** 173:23 | **holders** 143:25 | 96:4 141:1,2 |
| 185:4,20 186:5,8 | **hear** 14:25,25 | **holding** 74:9 | 145:20 166:23 |
| 186:9,15,22 | 15:5 43:1 89:14 | **hollis** 7:1 | **humana** 5:15 |
| 187:4,21 188:2 | 143:21 154:11 | **home** 35:6,7,10 | **hundred** 167:21 |
| 188:15 189:6,9 | 194:7 | **honik** 6:1,1 | **hurt** 161:17 |
| 189:15 191:13 | **heard** 154:17 | 68:18,19 | **husch** 6:6 |
| 191:18 192:6,12 | 155:10 188:23 | **honiklaw.com** | **huschblackwel...** |
| 192:14,18 193:4 | **hearing** 184:8 | 6:3 | 6:7 |
| 193:15 194:5,8 | **held** 10:7 19:22 | **hopefully** 182:18 | **hypercholester...** |
| 194:24 195:5,19 | 34:22 37:8 59:5 | | 26:15 |

[hypertension - information]                                    Page 22

hypertension
168:24

**i**

iarc  96:12,15
iarc's  96:6
idea  72:15
159:10
identical  144:13
145:24
identification
16:15 17:24
85:21 90:24
125:11 191:5
identified  135:13
identify  97:17
158:4,11,23
159:2,9,16,23
160:4,14 161:10
161:23 162:9
163:16,25 164:6
164:12 165:17
175:6 193:20
194:2
identifying
160:17 184:13
184:17
il  5:14
immunizations
21:22
immunizer
21:15,19
impermissible
70:14
implement
173:14
implemented
166:9 174:4
190:20 192:3

importance
169:6
important  14:10
14:15 152:1
193:8
impurities  129:2
129:4,10,18,22
130:2,6,12 148:3
167:2 190:22
191:5,12 192:5
inaccurate
144:14 145:21
inappropriate
71:15 73:8
111:15
include  44:11
47:19 62:24 82:4
86:18 91:16
103:22,24 104:7
104:18 105:4,5,6
113:23 124:10
127:17 159:19
168:6 193:23
included  29:13
29:23 30:6,23
32:12 80:21
86:10 99:18
102:14 103:8,10
136:20 155:21
162:3
includes  27:17
30:8,25 57:9
84:17 113:20
117:8 126:7
129:1 130:11
133:11 145:23
173:10

including  27:23
32:9 39:5,24
41:5 55:23 56:3
74:7 84:18 93:15
100:15 114:14
123:13 124:12
136:1,2,25
151:17 163:24
191:22
inclusion  54:3
58:18 116:4
127:12 136:19
147:7 149:16
151:9,14,19
152:5,13 153:13
158:25
inclusive  201:10
income  79:9
inconsistent
95:12 143:18
incorporate
31:13
incorporated
55:3
incurred  89:2,6
90:1
indemnity  30:12
independently
96:9,11
indianapolis
5:10
indicated  159:20
183:14
indicating
193:12
indication
101:23

indirectly
196:11
individual
171:13 193:21
individually
150:12,15
169:22
individuals  38:2
38:4 46:3 48:7
60:18 157:13
193:21
industries  3:13
157:10
industry  30:11
36:1,1 38:19
44:3,10 49:15
50:24 86:19
91:17 95:16
107:9 124:16
125:2 127:4
128:2 132:1
133:23 136:2
139:7 152:20
153:2 157:14
163:15 165:21
193:17
infant  21:16
information
17:19 42:9,10
44:10,15 50:14
50:16,21,23,24
50:24 53:21 64:6
64:10 76:15
83:12 86:19
91:17 92:4 93:18
95:23 96:15
97:14 101:6
103:19,20 105:2

106:25 107:1,3
108:11 109:14
109:18 112:9
113:12,18
116:25 117:2,7
118:15,17,18,21
118:24 119:9,15
119:19 120:8,11
124:17 125:1,2
130:15,21,23
131:2,3 133:14
133:23 139:22
151:24 154:23
158:21 160:1
165:15,23,25
171:11 172:20
175:2,3,8,11
193:3,7
**ingersoll** 3:5
**ingredient**
188:12
**initially** 29:6
47:25 91:7
**initiated** 139:13
139:15
**inquiry** 103:7
**insight** 128:5
**institute** 64:22
**instruct** 170:20
**insurance**
185:15
**insured** 33:12,14
36:14 38:22 39:8
39:13,24 159:19
168:6
**intake** 166:17
167:1 168:11,19

**integral** 41:15
**integration** 32:8
**intend** 70:7,9
74:3 76:16
177:24
**intended** 26:15
26:16 54:1 71:25
72:2 97:6 188:10
**intending** 74:20
75:3,11
**intends** 71:21
**intent** 73:19
**intention** 73:12
**interactions**
60:22,25 61:7
**interchangeable**
129:10,17 130:6
130:8
**interested**
201:16
**interfere** 15:25
71:16
**interim** 140:2
**internal** 25:22
**international**
96:5
**interns** 27:23
**interpretation**
85:3
**interrupted**
68:14 156:8
**interrupting**
180:9
**intimately** 41:14
**introduction**
20:20
**investigation**
190:6 191:3

192:2
**invited** 46:13,14
46:15
**invoice** 89:25
90:2,18,20
**invoices** 87:14
87:16
**involve** 54:17
**involved** 41:24
42:25 76:3 82:15
184:14,18
**involves** 67:18
95:23
**involving** 75:24
76:8
**irbesartan** 1:4
**irrelevant** 139:3
168:9
**isidro** 2:2 8:4,5
10:18,18 11:12
12:6,11,23 13:9
13:12 17:4,5
26:23 27:4 33:18
39:11 43:3,7
53:2,8,14 54:9
54:20 55:15 56:1
56:7 57:2,14,23
58:20 59:15,22
60:3,12,20 61:14
61:19 62:3,8,11
62:20 63:2,9
66:2,7,16 67:8
67:24 68:2,11,15
71:5 72:17 73:22
74:15,19 75:2,10
75:18,22 76:6,14
76:22 77:2 79:22
80:1,8,10,24

81:4 82:17 84:12
85:1,5,14,17,22
86:22 87:3 92:15
92:20 93:2,25
94:3,12,18,22
95:2,4 96:17,22
97:1 99:4 101:2
101:8,12 102:7
106:16,19,21
108:22 109:1,2
109:15 110:17
110:20,24
111:14,20 112:1
112:12 115:9
116:6,14 117:3
117:10,19,24
118:9 120:15,18
121:2,20 122:5
122:11 123:1,8
123:15 124:1,18
125:3,8,10,13,24
126:4 128:11,16
128:23 129:14
132:19,23 133:4
134:1,13,18,24
135:3,19 136:4
136:11,23
137:11,18
138:16 139:1
140:17 143:6,20
143:24 144:16
144:23 145:14
146:1 147:9,17
147:22 148:6,15
148:22 149:3,10
150:6 153:4
154:4 171:18
180:13 182:13

184:10,12,23,25
185:18 186:4,13
187:17,25
188:14 189:5
199:10
**isidron** 2:4
**island** 19:12,19
20:7 21:3
**issue** 49:20 50:2
50:12 51:4,14,21
66:16 90:18 92:1
103:8 156:24
159:13 169:15
173:20 181:25
197:9
**issued** 51:8
87:14,16 121:3,4
139:10,11,14,16
139:17 157:8
163:11 166:16
**issues** 158:5,18
159:12 168:24
169:5
**item** 80:14 98:7
107:14 110:10
110:13 111:2
114:2 140:23
142:25 143:2,7
143:13
**items** 17:23 33:2
33:20 34:5 35:16
80:17 97:17,24
98:12 99:10
103:24 107:22
108:1,5 110:14
113:14 114:9,10
115:7 129:18

**ives** 5:12,13

**j**

**january** 1:11
10:4 188:9
200:10 201:17
**jason** 4:14
**javier** 7:11 10:9
**jeez** 20:13
**jeff** 5:1 175:22
**jersey** 1:1 3:10
**jgeoppinger** 5:3
**jmestre** 2:12
**jobs** 58:4
**john** 5:5 73:5
154:16 189:20
**john's** 18:1,14
24:24 25:19
**john.gisleson** 5:7
**join** 46:13 48:7
**joined** 19:12
**jorge** 2:10 11:5
26:18 70:16
199:14
**journal** 100:1,3
**july** 93:14 97:23
186:11

**k**

**kali** 1:10 8:3
10:6,6 13:5,20
200:7 201:8
202:5 203:2,24
204:2,4,12
**kanner** 2:18 5:17
**kapke** 5:9
**kara** 5:9
**kbi** 5:14

**keep** 41:18 58:9
73:19 79:24 88:5
88:9,12
**keeping** 49:15
133:22
**kept** 89:8
**kerner** 10:20,20
11:22 26:21 27:1
70:19,23 71:1,3
73:3,11 85:19
92:21 154:12
175:15 179:25
180:8,14 181:21
182:7 184:6
186:7,19 189:8
189:18 199:8
**kind** 30:19
151:23
**kinds** 159:11,14
**klinges** 3:19
**know** 15:5,6,11
15:19 16:21 17:2
17:3 19:22 22:7
33:11 40:5 41:21
41:22 44:4 48:16
49:6 51:10,18,20
53:20 54:4 65:9
66:22 69:21
72:20 90:12,15
95:22 99:8
129:15 130:5,7
137:10 138:2,24
140:2,5 142:7,11
142:15,19 144:1
148:16,23 149:5
149:11 152:1,10
155:25 156:13
157:9 159:5

161:9 163:8
170:15 171:2,15
171:22 174:19
175:1,21 180:2,7
183:5 190:3,20
190:23,25 191:1
199:6
**knowing** 98:25
107:9
**knowledge** 95:16
99:9,20 100:15
103:3 107:8,24
114:14 135:2
136:2 148:7,11
150:10 151:3
171:9 172:15
177:22 192:10
192:25 198:16
**knowledgeable**
53:23,24 133:22
**known** 101:19
131:12 152:21
**kristin** 5:12
**ks** 7:2

**l**

**l** 9:14 180:25
**l.l.c.** 5:17
**la** 2:19 5:18
**label** 95:11
101:23 144:7,13
144:14
**labeled** 94:10
95:13 97:6
101:22 174:16
**labels** 104:1
**laboratories**
4:12,17

**laboratory** 20:21
**laborers** 3:18
**labs** 6:17
**lack** 194:24
  195:19 196:17
  198:24
**lag** 156:8
**language** 177:15
  177:19
**large** 201:23
**late** 90:7 175:22
**law** 7:1 13:12
  69:22
**law.com** 5:18
**lawsuit** 155:9
  165:18 172:19
  185:12 188:21
**layne** 5:16
**lbresnahan** 5:22
  7:6
**lead** 27:8
**leading** 46:4,11
  49:19 186:7
  187:19
**learn** 155:3,19
  157:6 190:12
**leave** 35:4 80:6
**left** 183:6
**legal** 60:7 67:12
  69:17,18 70:2
  74:12 100:25
  121:18 122:2
  123:3 164:19
  165:6 178:2
  187:18 202:23
**length** 137:24
**leon** 1:14 2:11,22
  10:7

**letter** 8:10,18
  91:3,4
**letting** 156:13
**level** 168:19
**levels** 93:22
  140:25 145:20
  146:2,5,6 148:7
  148:12,14
  166:17,23 167:2
  168:12
**lewis** 3:1 5:5
  73:6
**liability** 1:4
  97:25
**license** 21:18
  22:25 23:18,18
  46:2 65:12,15
**licensed** 21:8
  46:3 48:6,7
  155:13
**licenses** 65:13
**licensure** 55:23
  115:3
**light** 12:16
**likewise** 32:21
**limit** 69:4,6
  71:16
**limited** 74:7
  182:11
**limits** 140:2
**line** 169:13 203:4
  203:7,10,13,16
  203:19
**linked** 31:15
**linkedin** 90:17
**lipid** 25:10 26:14
**list** 17:23 25:1
  26:2 44:4,18

  63:23 86:3,6,14
  98:1 101:20
  112:8 120:24
  152:22 185:21
**listed** 17:7 25:13
  37:14 43:24 44:2
  45:6,10 46:1,3
  47:7,18 48:6
  57:22 62:1,4,13
  62:17 63:15 85:8
  85:10 86:21
  97:14,17,20
  98:19 99:23
  107:4,5,11,17
  108:1,8 110:10
  111:2 112:8
  113:13,14 115:7
  115:23 116:5
  119:24 122:24
  122:25 133:15
  135:5,7,15
  140:24 141:17
  141:20 145:25
  173:7 183:1,22
  183:22
**listing** 132:10
**lists** 63:18,20
  104:13 105:19
  115:22 133:10
  133:15 135:22
**literature** 49:14
  91:16 103:17
**litigation** 1:5
  12:3 51:15 68:4
  71:21 72:1,3
  74:21 75:4 76:8
  76:16,24 78:20
  78:22 79:11 86:5

  86:16,24 87:6,9
  87:12,15 88:4,20
  89:12 90:5,10,13
  90:16,19 91:5,8
  91:14,22,23 92:1
  92:5,8,13 100:23
  106:11 111:18
  152:4,8,12,16
  153:5,18 184:14
  184:18,21
**little** 16:13 66:14
  154:5
**llc** 3:8,13 6:1
  36:8,18
**llp** 1:14 2:10,14
  2:22 3:15,19 4:1
  4:6,10,14,19 5:5
  5:9,13 6:6,14,19
**loading** 16:12
**local** 3:17,18
**lockdown** 83:8
**long** 18:8,20
  19:12,18,21 20:7
  21:3 66:20 72:5
  72:9,15 92:21
  97:5 137:24
  185:6 189:8
**longer** 70:7
  72:17,23 73:20
  144:6,13 151:1
  162:3,18,19
**look** 16:19,21
  90:6 97:16
  125:17 134:7
  149:23 172:10
**looked** 129:25
  172:3

**looking** 64:16
67:23 102:8
126:22 192:16
**looks** 40:15
**losartan** 1:4
202:4 203:1
204:1
**lot** 128:5 148:8
188:23
**lots** 148:16
149:12 186:24
**louis** 6:7
**lowering** 26:14
**luke** 5:20
**lunch** 92:16
**lwalsh** 3:11

**m**

**m** 189:23
**ma** 4:19
**ma'am** 197:11
**mada** 98:5,8,15
108:9,18 109:3
113:21 114:2
185:25 186:1,10
186:23 189:23
189:24 190:3,7
190:12,20
**main** 149:15
**maine** 2:17
10:23 185:14
**maintain** 160:10
**major** 18:4,16
**majors** 77:13
78:1,4
**making** 67:16
68:16 91:12,20
96:13 97:11
103:7 111:15

112:13 114:25
118:1 121:5,25
123:9 124:3
131:9,14,17
132:25 133:19
134:2 195:7
**manage** 25:12,24
27:15 31:14 32:7
35:3 40:10 43:5
161:7,16 166:4
191:23
**managed** 22:17
38:19 45:17 49:2
49:6,9,18 100:1
100:3 171:3
189:24 190:7,12
191:4,11
**management**
21:24,25 22:18
24:1,7,10,10,10
28:12,23 29:23
29:24,25 30:4
38:15,21 39:5,23
41:6,6 64:21
100:4 102:20
160:6
**managing**
127:16 171:4
**manner** 69:7
**manufactured**
188:11
**manufacturer**
67:19 106:5
117:1,6 118:14
119:9,22 120:10
123:6,13 124:6
126:9,15,21
127:9 131:19

132:2,5,10
140:11 141:25
143:8,9 144:6
150:12 151:5
154:17,21
160:24 161:19
164:7 165:4
170:2 183:13
196:24
**manufacturer's**
116:19 118:12
120:3,20 121:13
121:13 124:24
147:1,13 162:10
165:5 173:4
**manufacturers**
117:13 119:14
124:5 128:25
130:10,13,19
131:2,11 136:25
144:25 145:16
160:21 173:1
**manufacturing**
172:23
**mark** 16:9,13
17:21 85:12,14
90:22 125:10
**marked** 16:15
17:24 85:21
90:24 125:11
**market** 31:4
53:22
**marketed** 152:22
**marketing**
101:22 133:17
**mass** 6:2
**matches** 144:14

**materials** 65:2
80:22 85:7,10
86:3,6,9,11,15
86:20 91:7,9,12
91:17,22,25 99:6
99:21,22,23
135:22 185:22
185:24,25
**matter** 13:2 33:1
33:4,8,20
**matters** 75:23
139:16
**mckesson** 4:8
6:21
**mdl** 1:4
**mean** 12:8 15:7
21:20 22:6,21
32:16,19 33:4,19
34:5 77:8 84:21
88:1,24 93:20
94:5 108:17
109:20 119:6
120:9 121:16
129:4 139:10,17
140:13,21 146:4
146:10 149:8
151:11 159:1
162:17,19 163:4
164:15 166:12
172:21
**meaning** 14:11
59:2 114:22
**means** 21:21
121:21 123:12
124:6 132:11
149:5 173:7,8
**media** 10:5

**medical** 22:24
25:2,9,11,23
28:5 32:2,8,14
32:19,23 78:14
79:7 86:23 87:1
87:5 103:17
**medication**
21:24,25 22:8,8
24:18,20 28:1
34:1,2,4 53:21
54:4 61:18 93:23
94:6,10 95:10
116:12 117:14
117:15 119:10
119:21,23 124:8
128:3 129:7
138:25 142:6
143:12 147:5,16
156:24 166:24
169:2 170:10
193:10,12
195:24
**medications**
15:24 30:24 31:1
34:6 55:5 84:17
92:11 126:8,9
127:11 133:16
143:18 146:25
147:12,21 148:2
148:3 153:13
155:16,16,16,17
161:20 163:23
163:24 170:3,6,7
173:25
**medicine** 25:22
**meet** 26:16 45:8
67:20 127:4
131:22 132:6,11

**medical** 151:14 183:18
**meeting** 13:15
**meetings** 104:10
**meets** 57:4 58:24
116:3 150:19
151:16 183:17
**member** 26:3,9
36:18 42:20
44:19,22,25 45:2
45:4,16,19,22,24
46:4,7,10,13,19
46:22 47:5,10,13
47:16,21,24,25
48:2,4,9,13
51:14,21 175:2
193:10 195:23
196:7
**members** 61:9
103:4,8
**memorized**
179:8,10,15
**mention** 23:25
38:17 103:15
125:5
**mentioned** 16:11
21:19 22:10
23:19 32:4 43:15
54:12 98:14
106:17 107:14
154:7
**mentions** 125:19
143:1
**meridian** 5:10
**merit** 31:11,12
104:6,22 105:2
**message** 12:9
**mestre** 1:14 2:10
2:10,22 11:5

26:17,18,22,25
27:3 127:23
179:19 180:2,7
183:3,8
**met** 124:25
134:11 136:15
136:16,17,21
145:22 183:20
**miami** 1:15 2:11
2:23 10:8 200:3
201:3
**middle** 180:4,9
**mind** 72:4,7
159:2
**minor** 78:4
**minors** 18:6,18
78:2
**minute** 73:20
179:23
**minutes** 41:17
41:25 42:6 70:24
183:7 189:9
**mischaracterizes**
135:16
**misheard** 107:13
**misrepresented**
145:20
**missed** 99:11
**missing** 180:18
**mitigate** 169:4
**mo** 6:7
**moment** 45:8
86:2 125:17,21
127:23 156:9
177:10 184:25
**money** 188:10
195:14 196:4,5
196:10,21

**monies** 87:24
**monitored**
168:25
**monographs**
104:1
**monroe** 5:13
**months** 12:9
**morgan** 5:5 73:6
**morganlewis.c...**
5:7
**moring** 5:21 7:5
**morning** 10:3
13:10,11,16
14:23 73:15,17
**morris** 3:19 4:1
**motion** 69:3
**move** 69:6 73:13
73:17 84:24
151:24 169:24
173:21
**msp** 42:22 97:21
98:15 114:6
185:15,17 186:1
186:2,11 187:5
187:11,14,22
**msp's** 187:6,8
191:1,4,10 192:3
**mtm** 21:17,23
**mulberry** 3:10
**murtha** 6:14,14
**mute** 186:21
**mylan** 4:12,12
4:17,17

**n**

**n** 2:1 8:1 9:14
10:1 180:25
**n.w.** 4:2

**name** 10:9,16
13:12,18,20
31:23 114:23
143:11 144:7
154:16 155:6
159:23 163:25
194:19
**name's** 175:22
**named** 154:17
**names** 33:11
141:18 159:3
160:4,14,17
184:13,17
193:21 194:2
**nature** 41:2,3,11
50:20 169:2
**navigating** 100:3
**nc** 3:6
**nda** 107:2
118:14 141:21
**ndc** 162:20,21,21
163:3
**ndcs** 98:13,19
162:3,22 190:21
**ndea** 93:16 96:10
97:2 138:21
139:25 141:21
142:12,20 148:8
148:18 149:13
155:8
**ndma** 93:17
96:10 97:3 138:2
138:10 141:21
142:8,16 148:8
148:17 149:13
155:8
**ne** 6:11

**nearby** 80:6
**necessarily**
198:20
**necessary** 11:9
11:21 73:20
80:22 166:4
174:21 204:6
**need** 15:10 70:23
72:23,23 153:21
169:24 180:5
199:2
**needed** 22:18
29:14,16 35:15
119:23 124:25
166:6 169:11
170:7
**needs** 36:15
85:14 125:25
**negatively** 165:9
**never** 57:6 60:14
78:24 80:25 81:5
81:8,11,14,17
127:7 169:1
170:10
**new** 1:1 2:4,8,19
3:10 5:18 13:25
21:6,17 22:10,15
23:2,10,17 27:6
35:7 53:22,22
55:23 65:12
155:13
**newark** 3:10
**nilda** 2:2 10:18
13:12
**nitrosamine**
148:2 154:25
155:10,19,25
163:17 164:1,9

164:14,18 165:5
165:20 167:2
190:21 191:5,12
192:4
**nitrosamines**
52:1,4,7 56:19
140:3,6 157:7,19
160:22 168:12
168:19 170:6
174:5
**nj** 4:24 6:15
**nodding** 14:12
**non** 46:3,3 48:7
88:21 89:11,17
89:19 171:7,14
**nonresponsive**
73:10,25
**nope** 140:7
**norris** 6:18
**northwell** 25:14
25:21
**norton** 4:6 6:19
**nortonrosefulb...**
4:7 6:20
**notary** 1:16
200:6,17 201:5
201:22 204:13
204:19
**note** 71:22
102:19 202:10
**noted** 27:1 204:7
**notes** 17:25
88:11 201:11
**notice** 8:14 16:7
16:10 79:16
**notification** 8:10
**nulled** 144:5

**number** 6:2 10:5
12:13 16:20
17:22 80:14,17
85:13 89:11 93:4
141:21 155:7
157:20 168:8
183:12 184:2
**numerous** 69:14
111:7
**nw** 5:21 7:5
**ny** 2:4,8

**o**

**o** 3:6 9:14 10:1
180:25
**oath** 8:8 15:20
200:1
**object** 16:24
39:9 52:25 53:6
53:12 54:7,16
55:10,19 56:5,23
57:8,19 58:16
60:6,16 61:13,16
61:25 62:15,23
65:24 66:5 67:13
69:2 74:23 75:6
75:14,20 76:1,9
76:17,25 80:18
80:19 81:3 82:13
84:10,25 85:4
86:17,25 94:7,15
94:21,24 96:14
96:20,25 99:3
100:24 102:5
106:13 108:20
109:13 110:12
110:23 111:5
112:6 115:2,21
116:10,24 117:5

[object - opinion]                                                    Page 29

117:12,21 118:3
120:23 122:1,21
123:4,11,24
124:22 125:6
129:12 132:16
132:21 133:2,20
134:5,16,22
135:1,17 136:9
137:6,15 138:12
138:22 140:15
143:4,15 144:12
144:18 145:12
145:18 147:4,14
147:19 148:4,13
148:19,24 149:7
152:18 159:1,18
160:8 161:1
163:18 166:19
167:4,5 168:13
168:22 169:14
171:24 172:5
174:6,22 176:2
178:1,14,23
181:6,11 184:1
191:13 192:14
193:15 194:24
195:19 196:16
197:5,7,17
198:11,24
**objection** 62:6
63:7 66:11 67:12
68:13 84:10,24
101:4 111:15
112:2 121:18
122:1,3 124:14
125:20 135:16
135:21 136:14
150:4 157:20

159:24 164:19
165:6 166:18
169:12 171:17
173:16 185:18
186:4,7,13 187:1
187:17,18,25
188:14 189:5
191:18 192:12
193:4 196:25,25
198:1
**objections** 12:1
12:12 15:1 68:16
71:14 182:1,3
188:24 197:3
**obligation**
160:10
**obligations**
116:20 118:13
120:4,21 173:2,5
**obtain** 41:25
126:18 131:1
**obtained** 77:17
77:20 128:7
**obtaining** 74:21
75:4,12,24
**obvious** 107:21
**occasion** 172:9
**occasions** 69:14
82:18
**occur** 138:17
171:8
**october** 90:7
**offer** 36:10,12
70:6 71:21,25
72:2 74:20 75:3
75:11 76:16
**offered** 69:23
175:10

**offering** 30:18
30:25 31:7 68:3
71:19 76:7 92:5
97:3
**official** 11:19
200:9,12
**oh** 3:16 10:15
26:22 43:11
79:22 85:17
**ohio** 5:2
**okay** 12:21,24
14:3 15:10,14,19
16:3,6,9,19
17:10,21,25 19:1
19:6,12,23 20:6
20:15,24 21:19
23:9 24:17,22
25:1,8 26:25,25
27:10 28:22 29:1
29:4 32:7 33:17
34:13 37:4,18
38:4,7,9 40:2,13
40:21,24 41:2
44:14,18 45:9,14
46:4 47:1,5,16
48:2,16 51:20,25
57:15 61:20 62:4
62:21 79:15 80:5
80:8,11,14,25
81:17 83:9 84:21
85:12 86:11
88:18 89:5 90:4
92:20 96:18 97:2
98:1,4,7,21
100:14,17
101:13,15,18
105:6 106:10
107:7,10,20

108:1,9 109:25
110:3 112:21
113:7,25 114:2,5
114:9,20 118:18
119:3 125:9
126:2,24 127:8
127:19 130:9
132:24 133:5,8
134:14 136:12
140:9,21 141:22
145:5 147:10
148:23 150:16
156:23 162:8
177:10,23
180:15 181:20
182:20 185:2
195:13 196:3,9
197:6 199:7
**once** 82:20 105:3
119:21 125:23
134:8,9 166:3
**one's** 12:10
**ones** 31:20 42:8
48:10,14 61:1,2
77:15 100:13
119:19 130:13
130:23 141:4,6
**ongoing** 41:6,18
41:20 152:24
**onset** 87:17
**op** 24:16
**operation** 28:18
**operations** 23:8
28:12 29:21,23
38:16,20
**opining** 76:24
**opinion** 40:20
43:20 67:14,22

75:7 76:11,18
77:5 80:22 86:7
86:20 92:9 101:6
108:7 110:16
117:20 130:22
133:7 135:23,25
141:24 155:22
160:2 161:18
163:7 164:11
173:24 174:11
190:15
**opinions** 68:3
71:20,25 72:2
74:21 75:3,11
76:7,16 85:7
86:4,16 92:4
93:8,11 100:23
106:11 137:12
142:23,25 144:5
152:3,7,11,15
153:5,16,18
**opioid** 64:18,24
**opportunity**
70:20 72:7
**oppresses** 69:8
**option** 30:19
**orange** 100:4
101:10,16,18,19
104:2 105:17,19
105:23 107:10
107:12,17
108:14,14
109:14,21,24
110:4 112:7,9,23
115:22 116:5
119:24 120:5,24
121:3,6,12
132:10 133:10

133:15 134:7
149:16 152:9,17
152:21 153:6,8
153:17,19 173:6
173:7 178:8
181:16 183:15
183:22
**order** 67:20
127:5 130:25
149:25,25
**ordinarily**
186:16
**ordonez** 7:11
10:9
**organization**
22:23 23:16 38:3
40:1 45:5,20,25
46:8 47:17 48:5
48:10,13 49:19
82:15 124:16,17
**organization's**
47:19 64:13
**organizations**
44:19 48:19
49:15 51:14,21
64:18
**orientation**
20:19 63:8
**original** 72:21
137:23 143:10
144:1 156:16,19
**orleans** 2:19
5:18
**outreach** 29:15
**outset** 87:19
**outside** 59:23
60:13,18 61:11
61:23 62:13,21

78:5 106:10,17
137:20 158:1
169:14,17
174:23 182:3
191:13 196:21
**overall** 22:3,9
38:20
**overland** 7:2
**oversee** 19:25
38:2
**overseeing** 38:20
**oversight** 23:8
**oxford** 4:10,15
5:6

**p**

**p** 2:1,1 9:14 10:1
**p&2** 104:10
**p&t** 41:9,11,14
41:17,20,22,25
42:4,5,20 102:16
102:18,22,24
103:15 104:5,10
104:15,21 105:1
116:18 118:4,4
118:11,19,25
119:12 120:19
121:3,5,14 124:4
124:11 126:6,11
127:3,15 128:4
132:9,18 133:6
133:14,21 134:7
134:17,23 136:3
151:8,18,22
152:4,8 153:12
173:1
**p&ts** 119:18
**p.m.** 1:12 74:17
92:22,25 128:18

128:21 153:24
154:2 189:13
199:16,18
**pa** 3:2,20 4:11,15
5:6
**pachios** 2:14
**page** 16:20 63:16
63:17 64:16
80:11 93:9 98:1
98:7,11 103:13
103:13 107:5
125:22 127:11
127:20,20 155:7
155:7 171:25
203:4,7,10,13,16
203:19
**paged** 125:21
**pages** 201:10
**paid** 65:5 146:25
147:11,15
161:20,21 163:8
163:16,25 164:5
164:16,21,24
165:13,18 170:3
170:4,6 173:25
174:1,13 185:10
185:17 186:24
187:3,5 188:9
190:2,11,19
191:7 192:1
193:2,9,10,13
195:10 196:7,7
197:12 198:3,21
**pain** 24:1,6,10
**panagos** 1:10 8:3
10:6 13:5,10,20
27:5 44:18 59:23
68:3 69:11 70:3

74:6,13,20 93:3
110:25 140:19
149:15 153:15
154:4 156:3
157:22 169:21
185:5 189:16
199:12 200:7
201:8 202:5
203:2,24 204:2,4
204:12
**panagos's**  92:16
111:17 199:3
**pandemic**  12:16
**panel**  26:3,9,10
**papers**  79:19
**paragraph**  93:10
93:12,14 103:12
104:8 105:7
111:13 112:14
112:18,22 113:2
113:5,7 114:20
115:1,16 116:18
116:23 117:25
118:11,23 119:3
119:7,12,18
121:11,17
123:10,17,22
124:3,10,13,20
128:13,24 129:5
130:10 131:10
131:14,17 132:9
132:14,25 133:8
134:3 135:9
136:5,6,8,13,24
140:9,14,22
141:22 143:3
145:11,15
146:24 147:11

172:25 177:11
177:15,20 178:7
180:24,25 181:3
182:22 188:5
**paragraphs**  97:8
97:12,18 99:2,15
99:18,24 100:7
100:12,18,19,22
101:9 106:22,24
108:11,15 109:5
109:7,12 110:3,7
135:14
**paramount**
169:6
**pardon**  172:13
190:24
**park**  4:24 7:2
**part**  11:15 12:15
19:16 20:15,20
28:4 29:7,9,10
30:24 31:6 34:6
44:4 49:13,15
54:18,21,23 61:9
69:4 76:21 77:11
77:13,24 101:24
105:5,6,15 106:9
106:14 113:23
124:2 126:10
127:7,14 133:15
133:24 144:4
150:3,5 155:17
162:4 163:22
172:12,21
173:19 182:5,9
188:19,21
**partial**  156:21
**participant**
122:9,14,18

187:1,18 192:25
**participate**  24:5
26:10
**participating**
25:23
**participation**
25:10,11
**particular**  35:19
42:25 43:16
69:15 111:13
144:20 148:8
162:3 174:20
176:23 185:10
196:4,13
**particularly**
74:2
**parties**  9:16
69:23 201:13,14
**parts**  93:11
**party**  38:22 39:1
39:2,22 40:3,4,8
44:15 69:5,9
75:8 97:25 98:15
98:16 108:9,18
109:3 113:21,22
114:6 136:19
157:10 159:16
159:20 160:5
166:25 185:10
186:1,2 187:9,12
188:3,4,7
**pass**  79:18
**patience**  185:5
194:13
**patient**  22:19
24:11,12,16 28:2
28:3 30:7 32:3
60:22,22,24,24

61:1,1,4,6,6,17
61:18 162:20
163:5 164:13
168:25 171:11
171:12
**patients**  21:22
22:2 24:7,14
25:12,24 27:20
29:16 31:9 148:1
161:8,17 168:20
170:7,9,12,17,19
170:21,24 171:6
190:7 194:2
**pattern**  71:13
**pause**  16:13
26:17
**pay**  163:1,4,14
174:1
**payer**  39:1,2
40:8
**payers**  39:22
75:8 159:20
**payment**  43:8,12
43:19 88:25
165:10 192:19
**payments**  31:2
43:11 185:25
195:15,17
198:19
**payor**  98:15,16
108:9,18 109:3
113:22 114:6
157:10 159:16
186:1,2 188:4
**payors**  136:19
160:5 166:25
185:10 187:9,12
188:4,7

[pbi - plaintiff's]                                                    Page 32

pbi 64:21
pbm 32:23 33:1
  33:8,9 38:15,20
  100:13 102:4
  103:5,9 157:10
  164:12 196:23
pbmi 64:17
pbms 33:5 42:7
  99:15 101:24,24
  102:11 115:18
  160:15 162:12
  167:1
pc 3:5
peer 103:17
pelta 7:10
pending 15:12
  122:9 180:1,12
  183:4
pennsylvania
  5:21 7:5
pensacola 6:3
people 38:12
  57:18,21 65:9
  126:16
percent 79:9
percentage
  79:12
perfect 6:2
perform 155:25
performance
  113:9,17 114:13
performed
  159:17
performing
  115:4
period 28:4,20
  165:13 171:8
  174:3

periods 170:13
permit 70:5
permits 183:16
permitted 21:21
  143:25 158:1
  173:17 182:15
person 12:13
  33:6 126:25
personal 64:13
  88:10 130:22
  166:1 172:22
  188:10
personally 49:11
  51:7 95:7 151:18
  157:16
pertaining 87:5
  158:5
pertains 78:7
  104:19 108:13
  133:3,5 151:24
  156:25 157:15
  161:7 184:2
pertinent 101:6
  101:7 160:2
pharm 55:12
pharm.d 202:5
  203:2,24 204:2,4
  204:12
pharm.d. 1:10
  8:3 13:5 200:8
  201:8
pharma 3:13
pharmaceutical
  3:13 52:20 66:4
  66:10 68:5 74:22
  75:5,13,25 79:4
  83:10 172:23
  188:12

pharmaceuticals
  3:3,12 4:13,17
  4:21
pharmacist 21:5
  21:8,17,23 23:7
  27:5,8,9,10,14
  28:11,15 29:12
  34:3 41:13 45:12
  47:20 48:8 53:19
  55:8 61:18 76:2
  82:8 83:21 84:16
  115:4 152:25
  155:13,14 157:1
  171:13 172:15
pharmacists
  25:24 47:11,22
  50:2,12,18,25
  51:4,11
pharmacologist
  78:16
pharmacy 5:15
  18:17 19:4,5,20
  20:1,1,3,11,19
  20:20,22 22:18
  22:20 24:25,25
  25:7,12,19 27:15
  27:16,22 30:7
  31:6 35:1 36:11
  36:12,15,22
  37:21,22 38:1,19
  41:3,8 43:8,12
  43:19 45:17,21
  48:1,18,25 49:2
  49:4,7,8,17,21
  50:3,6,9,13,15
  50:19 51:1,5,9
  53:21 54:24 55:2
  55:4,12,13,21,22

58:18 59:5 60:11
  63:8,13,21 64:21
  65:12 77:16 78:3
  78:8,9 83:3,12
  86:19 91:16
  95:16 97:8 99:20
  100:4 124:17
  155:21 157:2
  162:20
pharmist 29:12
philadelphia
  3:20
phone 189:18
phrase 146:2
physicians 25:24
picked 11:18
  128:9
piedmont 6:11
pietragallo 4:10
  4:14
pietragallo.com
  4:11,16
pigeonhole
  111:9
pittsburgh 4:11
  4:15 5:6
place 1:14 89:24
  161:3,3,16 162:3
  170:9 174:7
placed 76:20
  136:15 164:22
placement 54:5
  76:5,12 104:17
  121:14 128:4
  132:12 136:18
plaintiff 114:1
plaintiff's 71:14
  92:12 98:15,16

**[plaintiff's - presented]**                                    Page 33

108:9,18 109:3
113:22 114:7
186:1,2
**plaintiffs** 2:13,20
2:24 5:19 6:4
10:25 11:2,6
12:12,18 26:19
69:2,10,23 70:5
71:19 73:24 87:6
87:8,12 89:25
181:24 185:7,14
**plan** 30:8,16
41:7 83:13
132:13 193:9,13
195:10 196:7
197:12 198:3
**plans** 42:7
**platforms** 43:24
**play** 23:11
**played** 108:6
110:15
**player** 113:22
**plaza** 6:6
**please** 10:11,13
10:15 12:25
13:18 15:5,5
33:15 43:2,3
48:20 53:1 60:4
62:9 67:1,2,25
75:21 85:2 87:1
94:1,25 95:2
97:16 101:1,2
106:16,19
108:21 112:1,3
120:15 121:23
122:12 156:3,8
156:18,20
173:21 179:20

181:19 182:16
182:16 191:17
194:8
**plus** 82:24 136:1
**point** 80:2 99:9
99:11 120:2,19
134:12 142:15
142:19 161:14
162:14,25 163:1
172:18 190:20
192:4 195:10
**pointed** 99:12
**points** 58:6,8,9
**ponce** 1:14 2:11
2:22 10:7
**populate** 88:16
**population**
31:14 32:9
**populations**
26:15
**portion** 43:4
60:5 62:10 67:4
68:1 70:12 94:2
95:3 101:3
106:20 108:25
110:22 112:5
120:17 122:20
143:23 156:22
193:10,10
194:10
**portland** 2:15
**position** 19:21
24:4,5,13 26:6
35:4 67:9
**possession** 16:23
17:8 81:22
**possessions**
188:8

**possible** 42:24
44:14 83:23 84:8
102:16
**possibly** 163:24
172:20
**post** 24:16
**potential** 82:3
84:18 148:2
**potentially**
129:19
**power** 58:6,8,9
72:24 73:1
**ppm** 102:22
**practice** 48:18
48:24 49:4,7,16
49:18,21 50:2,5
50:9,13 51:1,5,9
103:17,18 127:4
133:23 152:20
**precise** 34:17
138:23
**preface** 107:11
**prefer** 140:18
178:16
**preliminaries**
11:4
**preparing** 172:3
176:21 177:6
**prescribe** 24:17
24:20
**prescriber** 169:1
170:11 171:12
**prescribers**
29:14
**prescription**
30:1,12,15,18,20
31:13 32:8,13,16
39:6,24 44:12

57:11 58:13 59:7
62:19 76:21
100:8 102:12,12
105:16,24
121:14 132:13
148:2 149:25
150:8 157:2
160:5 163:4
**prescriptions**
27:17,18,19 44:3
189:25 190:7
**presence** 97:2
129:1 130:12
138:2 139:25
140:10 141:25
142:5 145:19
147:20 157:6,18
160:22 163:17
164:1,14 174:5
183:12,19
**present** 7:9 9:16
37:17 109:24
129:19 138:25
140:23,24 188:9
**presentation**
57:6,17,24 61:4
62:5 64:24,25
65:3,5,7,10
83:11,16,18 84:2
**presentations**
56:18,21 58:7,11
58:14 59:24 60:1
60:9,14,21,25
61:23 62:1,13,18
62:22,24 81:23
81:25
**presented**
116:25 117:1

**[presenter - promulgated]**                                    Page 34

**presenter**  64:17
   64:23
**presenting**  129:1
**president**  37:10
   37:11,13,15,24
   157:24,24
**preti**  2:14 10:22
   90:21
**preti.com**  2:16
   202:2
**pretty**  173:18
**preventing**
   130:11
**previous**  82:9,10
   111:11 135:17
   141:12
**previously**  154:7
**primarily**  35:10
   36:14 38:21
   82:14 104:15
**primary**  25:10
   104:22,24 105:3
**princeton**  6:15
**principles**  77:23
   100:5
**prinston**  4:4
**prior**  11:13,23
   17:6 19:8 29:13
   29:17,24 35:2
   91:12 93:12 95:6
   110:19,21
   120:15 142:15
   142:19 150:24
   165:18 176:20
   196:9 198:9
**privilege**  16:25
**probable**  93:22
   96:4 140:25

141:2 145:20
   166:23
**probably**  182:1
**problem**  12:19
   72:11
**procedure**  69:3
   69:16
**procedures**
   15:16 24:7,8
**process**  34:3
   66:4,6,9 67:5,7
   67:10,11,18 68:4
   68:6 72:3 74:21
   74:24 75:4,12,16
   75:19,24 76:2,8
   100:6 106:14
   107:2,6,9,16,25
   110:8 111:1
   112:7,16 120:12
   126:7,10 127:1,2
   127:3,13,14,17
   128:3,3,6 133:6
   141:13 152:24
   153:9,22 162:23
   162:23 177:6
**processes**  129:1
   130:11
**processing**  40:10
   42:25 43:5
   112:10
**producing**  17:18
**product**  16:25
   27:25,25 30:24
   56:22 57:3,7,18
   58:15,17,21,23
   58:23 59:2,24
   60:10,14 61:24
   62:19 94:11

95:11,13 104:1
   115:23 122:24
   122:25 133:12
   138:1 140:12,25
   141:17 142:2,3,5
   142:6,8,12,16,20
   143:9,10,11,16
   149:16,17 150:1
   150:2,12,19
   162:22 171:7,14
   178:4 179:7,12
   183:2,14,22
**product's**  150:16
**products**  1:4
   52:20 57:11
   58:17 60:1,10,17
   62:25 66:1,4,10
   68:5 74:22 75:5
   75:13,16,25 76:3
   83:10 101:20,21
   105:19,25
   144:25 145:1,17
   150:8 151:1,5
   153:10 155:2
   160:23 161:25
   163:9 172:1,23
   178:9 179:16
   180:20 181:17
**profession**  64:23
   86:8 172:12,14
**professional**
   13:21,22 21:12
   44:19 45:13 46:2
   48:6,9,12,13,19
   51:13,21 52:3,23
   53:9,16 54:15
   57:9 65:13,18
   82:7,8 84:16

91:16,19 95:17
   99:20 100:16,21
   112:24 117:22
   138:13 169:20
   186:17
**professionally**
   73:15
**professionals**
   35:25 125:2
   128:2
**professor**  63:21
**proffered**  111:18
   173:19
**profile**  22:4,9
   90:17
**program**  20:1,3
   20:5,11,23 30:8
   30:12,15,22,23
   31:2,11 37:21,22
   38:1 41:8 54:24
   55:4 57:11 58:13
   59:7 62:19 63:13
   76:21 88:11
**programs**  31:4,6
   31:18 41:7 60:11
   83:4
**progress**  20:4
   41:19
**prohibit**  160:17
**project**  35:19
**promise**  58:23
   122:22 123:5
   126:15,17,21
   127:9 145:21
**promises**  57:21
   58:17
**promulgated**
   48:18

[promulgates - r.ph]                                              Page 35

**promulgates**
176:11
**proof** 70:6
**proper** 30:1
**properly** 22:7
**proposed** 103:4
111:24 188:3,18
**proto** 50:8
**protocol** 51:4,14
181:24 182:2,4
**protocols** 48:17
48:23 49:3,20
50:5 51:7,22
**provide** 22:4
33:21,23 34:3
36:22 37:20,25
42:11 49:10
50:14 51:10
115:18 117:2,7
118:15 119:9
120:11 130:15
131:1,2,3 142:22
158:20
**provided** 59:12
69:25 80:20
118:21 119:1,22
139:18 158:18
158:24
**provides** 128:5
**providing** 30:9
51:23 57:10 59:6
79:13 80:23
119:14 130:21
**public** 1:16
96:15 109:18
112:9 125:1
139:22 154:23
160:20 175:1,5,8

175:11 200:7,17
201:6,22 204:19
**publications**
56:8,13,16 81:15
**publicized** 157:9
161:14
**published** 52:6,9
52:12,15,18
56:11 81:9,12
105:17
**pulls** 59:3
**punished** 65:17
**purported**
137:14 181:9
**purpose** 11:15
95:21 124:12
**purposes** 95:14
96:19 97:18
99:12 113:21
114:11,17
123:21 135:8
**pursuant** 16:7
69:2
**pursued** 18:11
**pursuing** 18:23
19:6 24:24 25:7
25:19
**put** 161:2,3,16
162:2,15 174:7
**putting** 31:18
135:23,25

**q**

**qualification's**
35:17
**qualifications**
21:12 45:7 69:12
70:8,9,13 71:18
71:18,24 72:16

74:5,7
**qualified** 69:16
**quality** 117:14
**quarter** 82:21
**question** 11:23
14:16,19 15:4,5
15:6,12,12 17:4
33:8,16 43:1,21
48:20 49:5 53:1
60:4,7 65:24
66:8,8,15,17,18
66:21,22,23,24
67:1,13,24 69:14
69:15,17,18 70:2
71:11,12,24,24
72:1,13,21,22
74:12 75:1 77:1
77:4 80:19 81:24
82:2 84:20 87:4
91:11 93:25
94:17 99:8 101:1
106:18 108:21
108:22,24 109:1
110:2,19,21
111:12 112:2
115:15 118:7
120:16 121:23
121:25 122:4,9
122:10,16
131:15 132:22
133:13 135:20
137:16 139:2,4,4
139:6 141:10,12
141:14 145:8
146:14 150:18
156:17,19 158:6
158:15 161:23
165:3 177:5

178:9,16 180:1
180:11,17,19
181:11 182:8,18
183:4 184:3
191:17 192:17
192:18,23
193:24 195:8
196:17 197:11
197:18 198:7,7
**question's** 162:8
**questioned**
69:11 137:23
**questioning** 73:7
74:4,6 169:13
170:15 182:15
**questions** 11:14
15:2,8,15 33:7
33:23 68:12,15
71:7 72:6,9,10
72:18 73:2,14
74:3 154:6,9,11
170:21,24
173:17 175:12
175:17 180:5,8
182:10,11,12
184:5,7,9,10,23
185:6,9 188:23
189:7,15 194:12
194:15 199:7
**quick** 11:22
**quickly** 73:18
**quite** 107:21

**r**

**r** 2:1 10:1 203:3
203:3
**r.ph** 1:10 8:3
13:5 200:8 201:8

**raise** 12:24
**raised** 12:12,17
**raspanti** 4:10,14
**rate** 88:19,21
  89:7,17
**rating** 121:11
  134:8,8 150:17
**reach** 74:4
**read** 16:3 43:3,4
  60:3,5 62:8,10
  67:1,2,4,24 68:1
  93:25 94:2 95:2
  95:3 101:2,3
  106:16,20
  108:22,23,25
  110:20,22 112:1
  112:4,5 120:15
  120:17 121:8,23
  122:12,17,20
  140:16,18
  143:20,23
  156:22 172:17
  172:20 194:6,8
  194:10 199:11
  202:9 204:5
**reading** 9:17
**really** 11:21
  66:20 116:2
  128:5 134:12
  170:15 174:17
**reason** 12:15
  14:10,14 15:20
  72:10 202:11
  203:6,9,12,15,18
  203:21
**reasonable** 74:5
**reasons** 35:5,9
  149:19 170:7

**rebate** 196:23
  197:19,23,24
  198:8,16
**rebates** 198:20
**recall** 45:8,11
  55:17 56:2 64:4
  83:7,14,24 84:8
  84:23 93:15
  98:13,18 125:7
  139:10,11,12,14
  139:15,16,18,23
  146:21,22,22,23
  150:24 151:22
  157:8,10,11,14
  160:25 161:2,7
  161:12,14,17
  162:1,2,11,14
  163:11 166:3,5,6
  166:10,14,22
  167:11,16 168:2
  168:5,15 169:4,5
  171:3,4 173:15
  174:8,20 175:7
  175:10 185:8
  189:25 190:4,8
  190:12 191:4,11
  194:3
**recalled** 98:6,8
  114:3 148:17
  149:12 186:10
**recalls** 191:4,23
**receipt** 202:18
**receive** 87:17
  124:7
**received** 18:1
  19:1 78:10,12
  87:19

**receiving** 44:11
**recitation** 20:21
  63:11,25
**recognize** 90:25
**recollection**
  83:17 125:18
**recommend**
  157:16
**recommendation**
  168:15
**recommendati...**
  49:10 51:10
  162:16 166:13
**record** 10:4 11:3
  13:19 59:18,21
  68:18,22,23,25
  68:25 71:6 74:16
  74:18 88:5,9
  92:23 93:1
  111:14 128:19
  128:22 153:25
  154:3 175:18
  180:12 189:11
  189:14 199:17
  201:11
**recorded** 10:5
  11:8,11,13,24
  12:2,4
**recording** 11:15
  12:9,20 26:20
**recordkeeping**
  89:10
**records** 64:9,12
  64:13,14 86:23
  87:2,5 88:13
  196:1
**recovery** 185:15

**recross** 8:5
  184:11
**redirect** 8:5 72:8
  175:19
**reduce** 90:1,3
**reefer** 4:14
**refer** 31:25
  33:25 61:6 79:20
  80:2 104:14
  105:12 133:8
  139:5 152:20
**reference** 30:12
  104:14 123:16
  123:16 124:9,11
  134:12 138:19
  139:13 140:24
  141:9,17 145:25
  173:6 183:1
**referenced** 31:16
  94:10 95:11,12
  98:12 107:12,19
  115:23 122:24
  122:25 124:19
  125:4,15 139:7
  141:8 146:7,9,12
  146:18 155:4
  174:16 177:10
  183:21 202:6
**referencing**
  119:20 120:5
**referred** 98:19
  140:23 194:21
**referring** 34:10
  53:25 61:7 64:13
  95:23,25 109:21
  110:1 111:2,3
  112:7 129:21
  131:25 136:6

137:1 141:3,19
146:7,17 173:12
176:23,24 195:3
196:14 197:18
197:19 198:9,23
**refers** 31:5 34:1
64:20 118:4
123:5 124:4,4
127:13 136:8,10
**reflect** 111:14
150:25 194:22
196:3 197:15,24
**reflected** 195:25
196:12 198:8,22
**reflects** 195:13
196:5,7 197:12
**refresh** 125:18
**refund** 164:7,13
164:15 165:18
165:22 185:11
188:19,20
197:16,19
**refusal** 160:9
**refusing** 160:4
160:12
**regard** 60:9
**regarding** 52:1,4
54:15 61:17
62:18,25 72:2
82:1 185:9
**regards** 20:2
24:7,8 29:25
35:1 37:21 44:9
50:14,25 51:11
56:25 57:21
79:13 86:20
134:20 155:24
157:3

**registered** 21:5,8
**regulates** 131:19
**regulation**
115:10 131:24
**regulation's**
179:9
**regulations**
95:21,24 115:10
115:14 116:21
118:13 120:4,22
131:13,16
132:11 135:4
173:3,5 176:1,7
176:9,10,11,15
177:8,17,21,25
178:13,22 179:1
179:5 181:5,8,10
181:14,18
182:24
**regulatory** 52:19
65:22
**reimbursable**
132:12
**reimburse** 76:21
136:20
**reimbursed**
147:8 165:4
193:13
**reimbursement**
39:4,23 104:19
**reiterate** 74:8
**relabeler** 188:13
**relate** 57:3
124:20
**related** 33:24
35:16 41:8 50:18
54:4 59:8 64:22
78:9 82:4 117:9

196:11,12
**relates** 1:6 55:4
**relating** 48:17,24
49:3,7 50:2,5,8
51:5 52:6,12,15
52:18,23 53:4,10
56:8,18,21 61:24
63:3 91:22,25
**relative** 201:12
201:14
**relevant** 50:17
84:19 91:17
99:13 101:6
105:12,13
**relied** 85:7 86:3
96:16 107:3,8
111:8,11,13
112:15 114:10
118:17,19,21,25
119:1 153:12
**relies** 95:22
120:3,20
**rely** 67:15,15
75:8 76:11,18
92:10 96:18
99:17 100:11
106:23 107:10
109:11 114:5,6
114:17 115:6
116:19 118:2,12
119:13,19 120:7
132:10 133:14
135:14 144:6
173:1
**relying** 95:14,20
96:6,12 97:11,14
97:18 113:1,4,15
113:20 114:25

115:3 118:1
123:9,21 124:2
130:17 131:7,9
131:11,13,17
132:25 133:18
134:2 135:8
**remain** 89:24
**remaining** 20:4
**remember** 33:15
46:23,24 47:14
122:10,15
141:18 188:25
**remembers**
122:14
**remove** 157:17
**removed** 160:24
161:11,24 162:5
162:10
**render** 67:14,22
92:9 164:11
174:11 190:15
**rendered** 77:5
140:10 141:25
183:13
**rendering** 43:21
75:7 155:23
163:7
**repackager**
188:13
**repatha** 26:3,11
26:13,14
**repeat** 74:1
101:1 108:21
122:3
**repeated** 111:9
**repeatedly** 69:13
70:1 71:10 84:11
111:6 124:23

**repetitive**  192:15
**rephrase**  17:4
    56:12 87:4,21
    129:8 131:8
    137:17 141:23
    145:7 150:22
    158:15
**report**  8:17,20
    17:14,18 23:25
    38:3,8,12,17
    40:20,24 76:9
    79:14 80:21,23
    85:9,13 86:1,14
    89:4,8,9 92:16
    93:4,8,10,12
    94:14 95:8 96:13
    97:19,22 99:5,7
    99:14,19,25
    100:7,12 101:15
    102:20 103:1,12
    106:8,11,17,22
    106:24 107:4
    108:12 109:5,7
    109:12 110:11
    111:3,9,12,17,22
    112:14,19,22
    113:2,5 114:10
    117:25 118:11
    118:24 119:4,7
    121:21,22 122:7
    123:2,10,23
    124:3,21 128:13
    128:24 129:9,16
    129:21,24 130:2
    130:3 131:18
    132:15 133:1
    134:3 135:9,10
    135:14,23 136:8

    136:13 137:7,8
    137:13,20
    138:10,20 139:7
    139:11,24 140:8
    140:9,22 141:20
    141:22 142:10
    142:14,18,21,22
    143:3,14 144:10
    145:6,10,11,16
    146:24 148:10
    148:20 155:4,22
    159:21 161:15
    163:7,19 164:10
    169:15,18,19
    170:16 171:10
    172:4,6,25
    173:17,19
    174:11,23
    176:16,21,24
    177:6,11,15,20
    177:24 178:3,7
    178:12,21
    182:23 183:25
    185:21,22 188:5
    188:25 189:2,3
    191:6 197:1,8,9
    199:1,3 201:7
**reported**  1:16
    20:2 38:5 138:3
    138:4,5,14
    143:17 144:2,3
    157:18
**reporter**  8:9
    10:10,11,13
    11:10,20 12:24
    14:7,19 68:19
    108:23 183:7
    194:5,8 200:6

    201:1,5
**reports**  80:15
    81:12
**represent**  10:17
    13:13 124:5
    141:16 154:17
    175:23
**representation**
    118:1 120:24
    147:1,13
**representations**
    74:2
**represented**
    181:15
**represents**
    121:13 122:22
    124:25 198:2
**request**  11:10
    17:2 29:17 42:2
    70:6
**requested**  16:23
    42:5 43:4 60:5
    62:10 67:4 68:1
    94:2 95:3 101:3
    106:20 108:25
    110:22 112:5
    120:17 122:20
    143:23 156:22
    194:10 201:9
**requesting**
    130:14,20
**requests**  16:20
    16:25 17:8 29:14
    29:15,16
**required**  22:13
    24:5 45:4,24
    46:10 47:5,16
    48:4 55:11,20

    103:15 131:2,3,5
    133:24 204:13
**requirement**
    106:9 119:25
    136:17
**requirements**
    22:12,14 23:2,17
    45:6 46:1 47:18
    52:19 55:14,21
    55:24 56:3
    119:23 123:13
    124:25 130:25
    131:22 132:7
    173:9
**requires**  46:12
**research**  52:1,4
    52:23 53:4,10
    54:10,15 92:3
    96:5
**researched**
    53:15
**reserved**  9:18
**reside**  13:24
**resources**  22:24
    28:5
**respect**  38:1
    49:20 50:13 51:8
    51:15,22 61:9
    64:10 67:16
    73:16 75:8,23
    76:12 88:23 89:3
    92:10 97:12
    99:22 100:17
    138:21 139:8,24
    153:16 160:19
**respected**  124:16
    153:9

**respective** 9:16
**respond** 71:3
  166:4
**responded** 17:2
**response** 35:17
  62:8 80:20 95:6
  110:18,25
  112:14 117:11
  141:19 142:17
  146:4 166:13
  174:20 175:7
  190:4
**responsibilities**
  19:23,25 23:4,6
  26:8 27:13 29:11
  29:20,22 30:3,6
  34:24 35:14
  36:20 37:18,23
  53:16 57:16
  86:18 153:1
  157:1 163:22
**responsibility**
  40:9,11 84:16
  117:17 119:8,11
  120:10 126:9
  155:15,18
  156:25
**responsible**
  27:24 39:4,22,25
  43:11 117:2,7,13
  117:14 128:25
  130:10,15
**responsive** 80:17
**rest** 17:22
**restate** 48:20
  49:5 53:1 75:1
  94:25 109:1
  139:6 156:18,20

**restated** 95:1
**result** 164:7
  166:9 191:9
  192:10
**results** 29:18
**resume** 17:13
**retained** 78:21
  90:4 92:7 172:9
  172:18
**retainer** 87:17
  87:18,21,23
  88:24 89:2,3,4
  89:21,24 90:2,3
**return** 202:13,17
**review** 22:8
  29:13,17 32:12
  49:14 86:2 91:8
  91:12,22,25
  102:3 104:10
  126:11 149:1
  151:4 163:23
  176:12,17,18,20
  177:6 182:2
  186:12,17 190:5
  190:8 191:19,24
  192:7 201:8
  202:7
**reviewed** 41:17
  86:7,10,12,15,21
  86:23 87:5 91:9
  99:6 103:17
  135:5,23,24
  176:22 177:2
  185:22 190:10
  190:18 191:7,25
  192:8,19 193:1
  194:1 195:4

**reviewing** 27:18
  86:18 91:16
  103:21 105:2
  193:18
**reviews** 35:2
**riding** 173:23
**right** 12:1,21,25
  14:8,16,21,22
  16:7,16 18:2,12
  19:13 28:1,1,5
  34:15,16 36:3,4
  38:6,23,24 40:14
  40:16,22 43:13
  44:20 45:17 46:5
  61:15 68:8 73:23
  81:16 84:1 89:19
  91:7 93:7 99:14
  99:16 100:9
  119:14 121:5
  129:3 144:8
  154:6,9 160:18
  161:18,22 166:5
  167:9 168:12
  169:11 172:17
  185:22 194:14
  194:23 196:6,15
  196:24 197:4,13
  197:16,25
**rights** 71:17
  111:21
**rise** 150:17
**risk** 40:9,12 82:1
  83:9,15
**rite** 5:11
**rivero** 1:14 2:10
  2:22
**riveromestre.c...**
  2:12,23

**road** 3:2,15 6:11
  6:15
**roi** 31:5
**role** 19:18 20:16
  24:12 25:8,10,21
  28:9 30:21,23
  32:12 34:20,22
  34:25 35:18 38:9
  41:3 42:15 49:13
  53:19 59:6 63:24
  64:3 82:9,9
  91:16 108:6
  110:15 152:25
  155:14
**roles** 19:23,25
  20:6 21:1,2 26:8
  27:11 28:10,10
  29:20,22 30:3,6
  34:20 35:14 37:8
  37:18,23 38:14
  42:14 59:5 82:9
**room** 11:18
  12:13 24:15
  186:20 199:9
**rooney** 3:5
**rose** 4:6 6:19
**ross** 4:6 6:19
**roszel** 6:15
**rotation** 25:22
**rounds** 25:23
**ruben** 6:1,3
  68:19 70:18
**rule** 69:3 70:12
**rules** 14:3
**rx** 34:14,18,20

**[s - show]**                                                                              Page 40

| s | | | |
|---|---|---|---|
| **s** 2:1 3:8 8:11 9:14,14 10:1 132:10 203:3 | sciegen 4:21 | 143:7,14 144:4,9 144:24 145:9 155:5,7 171:25 | serves 183:15 |
| | science 18:1,7,9 78:3 | | service 196:8,10 197:13,14 198:3 |
| safe 58:24 104:18 114:23 116:1 117:15,18 120:25 122:23 124:8 126:8,8,17 127:5 128:8 129:20 132:8 136:22 144:15 144:20 145:24 163:10 173:10 | sciences 20:9,22 63:12,22 | sections 99:11 127:17,19,20 | services 19:20 28:23 30:4 34:21 36:9 38:21 63:12 |
| | scientific 103:16 | see 11:7 12:19 14:7 40:13 72:10 104:11 119:3 189:6 193:17 | serving 170:4 |
| | scope 49:9 94:8 95:17,22 100:20 106:8,11,17 129:24 133:7 137:7,8,20 140:7 142:9,13,17,21 148:10,20 155:22 157:1 158:1 160:2 161:15 163:7,19 164:10 166:18 169:14,18 171:10 172:12 172:14 173:16 174:10,23 176:16 178:2 182:2,15 188:25 189:2 190:5,14 191:6,14,24 194:15 197:1,8 198:1,12,25 | | set 32:2 35:1 123:6 130:25 132:7 139:19 140:2 145:22 151:16 164:23 168:14 189:2 196:13 |
| | | seek 190:12 | |
| | | seeking 110:8 111:1 117:16 119:10,15 126:10 131:20 132:2,6 185:11 | setup 12:16 14:25 |
| safety 12:17 82:1 82:3 83:13 95:12 104:13 105:20 123:14 149:18 151:17 166:14 169:10 183:2 | | | seven 183:7 |
| | | | shape 173:24 |
| | | seen 14:23 16:16 195:2 | share 58:10 103:3 |
| | | self 33:12,14 36:14 38:22 39:8 39:13,24 159:19 168:6 | sheet 8:9 98:15 98:16 108:10,19 109:4 113:22 114:1,7 186:2,3 202:11 |
| sale 133:16 | | | |
| sameness 182:25 | | sending 90:19 | |
| san 34:14 | | senior 37:10,12 37:19 38:5,10 157:24 | shenandoah 19:2 |
| sanctioned 65:17 | | | |
| sarah 6:5 | | | shift 27:23 |
| sarah.zimmer... 6:7 | | sense 158:16 181:4 | shoes 187:23 |
| savage 3:15 | scripts 6:8 | sent 202:14 | short 103:7 189:6 |
| saying 14:11,12 14:20 84:3 118:23 149:4 169:9 | seal 200:9,12 | sentence 96:3 119:17 140:16 140:18 143:20 183:12 | shorthand 200:6 201:5 |
| | second 18:11 144:4 156:4,7 186:19 | | |
| | | | shortly 28:25 |
| says 97:22 98:5 119:12 183:12 | | september 90:8 | show 63:18 126:20 127:10 177:1 186:23 187:5 |
| | section 93:10 97:7,7 99:14 100:7 101:15,17 106:22 127:12 127:15,16 141:20 142:22 | series 185:15 | |
| schaffer 3:14 | | serious 168:24 | |
| school 45:21 48:1 | | serve 101:5 | |
| | | served 20:8 32:25 33:4,8,19 | |

**[showed - started]**                                                    Page 41

showed   187:2
  190:10,19 191:7
showing   185:25
shown   181:8
shows   190:1
  191:25 193:1
sic   64:21
side   22:19,20,22
  32:13,14,17,20
  73:3,11 82:3
  83:21
sign   16:3 199:11
  202:12
signature   200:16
  201:22
signed   202:20
significance
  109:8
signing   9:17
similar   129:25
  198:19
simple   174:17
single   12:10
  125:22 158:17
  165:17
sit   55:16 56:2
site   47:19 48:6
  51:2
six   12:9
smith   34:14,18
  34:20
social   20:9,22
  63:12,21
society   47:22
  51:3
solco   4:4
sold   188:12

sole   36:18
solutions   202:23
somebody
  186:20
someone's   16:11
sorry   10:16
  54:21 60:3 61:11
  85:15,17,20
  89:14 96:23
  107:13 108:22
  127:21 141:9
  143:22 146:13
  146:15 156:5,15
  176:25 180:4
  194:4
sort   24:12 50:12
sought   164:7,13
  165:4,17,22
sound   100:5
source   112:11
  152:21 153:10
  153:11 173:13
  183:15
south   3:20 5:10
  6:2
speak   126:14
  157:13
speaking   68:16
  71:13 82:5,15
  83:3 84:17
  111:15 112:2
  181:25 197:3
speaks   76:10
  126:12
special   23:23
  24:2
specialty   33:2,20
  34:5,6,8 53:23

specific   31:17
  33:10 39:10,17
  42:8 43:14 53:13
  54:8 58:12 66:12
  67:17 71:25 72:2
  75:21 87:1 95:20
  95:24 102:6
  103:21 107:1
  127:8 131:13,16
  131:24 134:6
  135:4,13 138:5,8
  141:2,9 148:14
  151:10 162:8
  171:11 176:8
  182:12 193:5,20
  193:21,24
  196:20 197:4
specifically   55:8
  55:16,17 56:3
  58:15 67:16
  82:11 83:14,24
  84:7,23 93:9
  96:2 97:9 110:18
  116:7 129:15
  131:21 184:3
  188:7
specificity   102:8
specify   151:20
speculate   103:11
  138:7,23 148:21
  149:1,4 162:6
  163:6 176:19
  190:17
speculation
  198:12,25
speeches   81:25
spend   88:5,7
  93:7

spent   34:13,18
  88:9 89:6,8,12
split   29:4
spoken   57:20
  60:17 82:2,18
  87:8,11 92:12
spreadsheet
  88:16
spreadsheets
  98:10
st   6:7 18:1,14
  24:24 25:19
staff   23:18 27:9
  27:10,14
stakeholders
  105:12,13
stand   73:25
standard   44:3
  193:16
standards   48:17
  48:24 49:3,20
  50:8 51:4,8,15
  51:22 69:21
  74:11 103:16
  116:20 118:13
  120:4,21 173:2,5
standing   45:12
  45:13 47:20 48:8
  54:3 56:24,25,25
  57:4,12
standpoint   165:9
stands   187:23
start   14:17,18
  48:21 92:15
  167:8
started   74:14
  92:18

**starting** 29:1
**state** 1:16 4:19
  10:14,15,16
  13:18 21:6,9,18
  22:10,15 23:2,10
  23:17 55:23
  64:17 71:5 93:14
  102:25 113:7
  115:16 116:18
  121:11 128:24
  132:9 136:24
  140:9 143:7,8
  144:5,24 146:24
  155:13 200:2,7
  200:17 201:2,6
  201:23
**stated** 93:8,11
  94:23 108:11
**statement** 40:20
  93:17 96:7,13,16
  96:19 112:18,22
  113:10,15,21
  114:11,18,25
  115:20 116:22
  118:10 120:9
  123:22 124:3,20
  128:13 130:9
  131:10,14,17
  132:14,25
  133:19 135:8
  136:12 137:2
  139:21 143:13
  144:4,9,17,24
  145:6,15 147:3
  147:11,18,24
**statements** 50:12
  71:4 73:24 74:1
  97:11 99:2,18,24

100:12 101:10
109:4 110:6
111:17,21
112:13 113:2,4
121:6 123:9
134:3
**states** 1:1 28:19
  30:11 31:3 32:7
  32:25 69:4
  101:22 118:24
  120:13 121:1
  133:11,17,17
  150:9 152:23
  161:24 164:7
  165:4 188:8
**stating** 130:17
  131:7 145:22
**status** 12:14
  98:13,19 104:2
  120:6
**stay** 86:8
**staying** 53:20
**steamfitters** 3:17
**stenographic**
  68:25 201:11
**stenographically**
  69:1 201:7
**step** 70:25
**steps** 150:25
**steven** 6:9
**stipulate** 111:10
  111:19,20,24
  121:24 122:2,5
**stipulated** 9:15
**stipulation**
  111:25
**stop** 68:8 148:3
  169:2 170:10

**stoy** 4:9
**strategic** 35:11
**strategies** 128:4
  161:2,3,6,16
  162:2 166:9
  170:9 175:6
  191:22 192:7,11
**strategy** 151:23
  152:1 162:15
  163:12 166:7
  168:15 170:8
  174:7,8,19 190:3
  190:18 192:20
  192:24
**street** 2:19 3:5
  3:10,20 4:2,19
  5:2,10,17 6:2
**strike** 84:24
  163:2 168:3
  191:2
**structure** 31:12
  43:10,15 57:11
**structured** 30:19
  31:1
**student** 20:2,4
**students** 20:2
  60:23 62:25
**studies** 80:15
  81:9 95:17
  103:22 151:4
  172:21
**study** 99:10
  115:12,13
**studying** 55:5
**subformularies**
  127:21
**subject** 33:1,4,8
  33:19 149:17

186:25
**submissions**
  144:1
**submit** 131:11
**submitted** 104:1
  117:6 118:22
  143:19 144:3
  150:14
**submitting**
  130:13,19,23
**subscribed**
  204:14
**subsequent**
  196:10 197:24
  198:8
**subset** 30:16
**subsidies** 198:20
**substance** 94:5,9
  95:9 129:6
**substitutability**
  134:8 144:19
  152:21 183:16
**substitutable**
  115:25 116:13
  116:16 153:11
**substituted**
  116:9
**substitution**
  115:16
**suffice** 126:18
**sufficed** 55:24
  124:7 164:22
  173:9
**suffices** 119:25
**sufficient** 162:14
**suggest** 72:4
**suggestion** 71:7

**suing** 187:14
  188:19,20
**suitable** 132:12
  170:11
**suite** 1:14 2:11
  2:22 3:2,5 4:2,6
  4:23 5:2,13 6:6
  6:11,19 7:2 10:8
**summary** 142:22
  142:25 144:5
**supervise** 27:21
**supervision**
  27:23
**support** 117:11
  128:12
**sure** 14:5 16:5
  17:11 26:19 31:6
  48:21 53:3 59:15
  70:25 84:4 93:24
  94:19,25 106:19
  109:19 118:10
  137:16 149:8
  154:8 156:9
  158:22 167:18
  193:7 194:1
  195:21,23
  196:22
**surgery** 23:23
  24:2,14,15
**surrounding**
  155:17 169:5
**surveys** 35:16
**suspend** 71:22
**suspended** 65:15
**swear** 10:12 13:1
**swedesford** 3:2
**sworn** 13:6
  200:9 204:14

**system** 51:3,11
  126:7
**systems** 47:22
  126:7 127:16

**t**

**t** 8:11 9:14,14
  180:22 203:3,3
**take** 14:20 15:7
  15:10 16:19,21
  18:8,20 22:7
  30:20 55:1 59:13
  66:16 80:3 84:21
  86:2 128:15,16
  150:25 153:23
  169:11 173:4
  189:6
**taken** 1:13 55:8
  59:19 71:2 92:24
  128:20 135:24
  154:1 168:23
  181:25 189:12
**takes** 30:16
  67:10 125:20
**talk** 14:15 17:12
  83:20 97:9
**talking** 61:11
  131:21 180:23
  196:14
**talks** 97:7 127:11
**tasked** 150:7
**taught** 20:19,20
  20:24 63:3,5,24
  64:3
**te** 109:23
**teach** 20:15,18
**team** 24:9,10
**teams** 25:12

**technicians**
  27:21
**tel** 4:20
**tell** 30:13 31:5
  32:11 44:15
  103:9
**ten** 56:14 72:21
  167:25
**tend** 34:8
**term** 34:11 58:21
  59:2,11 93:19
  94:5 95:7 96:1
  115:11 121:16
  121:20 122:6
  123:2,3,5 129:4
  129:22,23 130:2
  130:3 136:5,6,7
  139:17 140:13
  140:21 143:1,1
  145:5,6,9 177:23
  178:10,11
  179:16 180:19
  180:20
**terminate** 69:4,6
  70:12 71:15
**terminus** 6:10
**terms** 32:1 54:5
  62:18 95:25
  113:8,16 114:12
  129:9,16 130:5
  134:11 146:8
  153:10 168:15
**territories** 188:8
**territory** 66:15
**tested** 142:8,12
  142:16,20
**testified** 13:7
  78:24,25 111:7

179:3 181:13
**testify** 15:19,25
  159:4,14
**testifying** 88:21
  88:22 89:11,17
  89:19 169:17
  170:22
**testimony** 8:3
  13:1 15:21 51:23
  79:10 80:16
  111:11 135:17
  177:19 195:24
  198:10 202:9,18
  204:8
**teva** 2:5,9 3:12
  3:12 6:13 10:19
  10:21 13:13
**texas** 4:7 6:20
**thank** 12:23
  13:24 27:3 33:17
  59:16 70:18
  74:14,15 80:9
  95:14 122:13,18
  122:19 125:12
  156:11,21
  175:13 180:15
  183:8 184:4
  185:2,5 189:16
  194:11,12,14
  199:12,14
**thanks** 156:12
  199:13
**therapeutic** 54:2
  101:20 105:23
  106:2 109:8,17
  109:20,23 116:7
  116:12 127:22
  150:16,19 178:8

[therapeutically - tpps]                                              Page 44

**therapeutically**
151:1
**therapy** 21:24,25
**thereabout**
138:18
**thing** 70:19
73:12 74:8
132:24 136:7
143:21
**things** 22:22
106:6 111:8
129:18,22
198:20
**think** 11:8 34:19
61:22 72:15 83:7
92:21 107:13,19
108:23 135:13
158:6 168:8
171:19 179:3
180:18 197:19
**thinks** 156:9
**third** 38:22 39:1
39:2,22 40:3,4,8
44:15 75:8 97:25
98:15,16 108:9
108:18 109:3
113:21,22 114:6
136:19 157:10
159:16,20 160:5
166:25 185:10
186:1,2 187:9,12
188:3,4,7
**thornburg** 5:9
**thoroughly**
71:17 173:18
**thought** 34:3
107:14 156:5

**thoughtful**
115:15 161:3
163:12
**threatened** 71:22
**three** 3:9 114:9
**tie** 170:16
**tied** 42:11 44:12
50:25 58:12
63:25 67:19 76:4
102:14
**tier** 104:8 105:11
**tiering** 31:2
**till** 19:17 37:17
**time** 1:12 12:10
13:15 14:21 15:4
15:10,18 18:18
22:12 24:22,24
25:4,6,16,18
26:5 27:8,16,22
27:24 28:4,16,20
29:2,4,5,6,7,9,10
29:10 30:13
34:17 35:7,19
37:12,15 46:16
46:25 55:5 59:17
59:20 64:4,9,12
64:24 66:20
68:21 69:5 70:7
72:5,12,14 73:22
74:17 82:22 88:5
88:7,9,12 89:6,8
92:17,18,22,25
93:7 115:13
121:24 122:4
125:24 128:18
128:21 137:1,3,5
137:8,9,13,20,21
137:22,24 138:7

138:8 150:22
151:20 153:15
156:7,23 160:20
161:13 162:13
164:3,4 165:13
169:5 171:6,8
174:4 175:13
178:25 179:19
179:24 180:2,5
182:19 183:6
189:10,13
194:13,23
195:14 196:6
199:16 202:19
**time's** 180:6
**timeframe** 202:8
**times** 57:24
82:20,20 111:7
**title** 19:24
**titled** 101:15
104:10
**titles** 20:6 21:2
58:11 63:5,14,18
63:23 64:2
**today** 15:2,17,22
16:6 17:6 40:25
43:21 48:2 55:16
56:2 67:14 71:8
89:7 157:22
163:8 188:23
**today's** 199:15
**told** 90:17 181:7
183:24 192:19
**tone** 73:8
**top** 103:13
**topic** 57:18
58:15 169:25

**topics** 70:8
188:24
**torts** 6:2
**total** 89:5,11
**touch** 108:16
**toxicologist**
78:18
**toxicology**
155:20
**tp** 102:2
**tpa** 40:2,9 42:24
43:9,13,19,24
44:7,16
**tpas** 43:5
**tpp** 38:25 39:7
39:12 40:7 42:18
42:22,25 43:9,24
44:8,16 97:8
102:16,21 103:4
103:7,10 120:2
147:8 152:16
153:6,19 160:23
161:10,23 162:9
163:1,4,16,25
164:2,6,12 165:3
165:17,22
174:20,21 175:3
195:16,17,23
196:23
**tpp's** 153:16
195:25
**tpps** 38:22 41:2
67:15,15 75:7
76:11,18 92:10
97:9,13 102:3,10
102:12 116:18
118:1,11,19,25
119:12,18

121:14 132:10
133:14 146:25
147:11,15
152:12,19
160:15 161:19
162:12 163:8
164:21 165:8
166:4,9 167:9,12
167:15 168:4,6
169:9 170:3,5
171:2,4 172:25
173:3,14,24
174:4,7,8,13
175:6 184:14,18
187:24 192:3
**track** 41:18 88:7
  88:12
**tracked** 88:14
**tracking** 29:18
  88:3
**trade** 3:5
**training** 77:6,22
**transaction**
  194:22 196:5,6
**transcript** 201:9
  201:10 202:6,20
  204:5,8
**transition**
  170:11,12 171:7
  171:8,13
**traurig** 2:3,7
  4:23 6:10 10:18
  10:20 13:13
**treat** 73:16
**treated** 31:9
**treatment** 32:3
**trial** 78:25

**tried** 170:15
**true** 201:10
  204:8
**trust** 185:15
**truth** 13:2,3,3
  153:10,11
  183:15
**truthful** 15:21
**try** 14:17 178:19
**trying** 14:19
  23:9 83:6 137:19
  170:16
**turn** 79:15 85:23
  93:9
**turned** 145:1,17
**two** 19:8 21:1
  38:13 62:21
  69:11,12 98:18
  107:22 108:4
  141:18 144:11
**type** 20:21 23:3
  26:13 30:15
  33:11 50:16
  186:16 198:8,17
**types** 22:22
  35:22 50:23
**typical** 193:17

| u |
|---|

**u** 9:14 180:25
**u.s.** 4:4 100:5
  107:5,15 112:15
**uh** 13:14 14:9,14
  14:14 23:12 29:8
  45:15 47:4 79:17
  80:13 84:6 85:25
  95:9 98:20
  103:14 104:9
  105:8 109:16

123:18 144:11
  145:4 146:3,16
  151:13 177:13
**ulmer** 5:1
**ulmer.com** 5:3
**ultimate** 40:8,11
**ultimately** 43:11
**unacceptable**
  68:14,17 70:11
  93:21 129:2,2
  130:12 140:25
  145:19 146:2,5,6
  166:23 170:17
**unbiased** 105:1
**unclear** 178:16
  197:18
**understand**
  14:13 15:4 23:9
  24:6 54:1 58:21
  66:6,22,23 76:2
  77:4 84:3 93:19
  94:5,25 95:5
  106:9 109:19
  110:2 112:14
  118:7 123:3
  127:2 129:8
  131:15 133:13
  137:16,19
  141:14 155:15
  156:25 158:6
  166:6 170:8
  176:25 182:2
  187:8,11,14,22
  188:3,18 196:9
**understanding**
  11:16,23 12:5
  41:15 44:6 59:1
  59:3,10 62:12

67:6,9 80:16
  84:4,15,22 94:4
  94:19 95:25
  107:25 112:17
  112:17 113:11
  115:5 119:17
  120:8 128:25
  130:11 131:25
  132:1 134:17,21
  139:12,20 165:8
  165:12 166:8
  174:3 176:17
  188:16 189:24
  191:10 196:1
**understood** 15:7
  93:24 168:18
**underwriters**
  64:18 83:3
**unfair** 111:10
**unfamiliar** 54:25
**unfortunately**
  71:10
**unit** 10:5
**united** 1:1
  101:22 120:13
  120:25 133:11
  133:16,17 150:9
  152:23 161:24
  164:6 165:3
  188:7
**universal** 34:7
  174:8
**university** 18:1
  18:14 19:2 20:7
  21:3 25:14,19
**university's**
  19:13,19

**unjustly**  161:20
 170:3 173:25
**unreasonably**
 69:8
**update**  179:19
**updates**  17:19
 41:7 53:21,21
**uphold**  126:10
**upholding**  78:8
**upkeep**  86:8
**usa**  3:12
**use**  26:11,16
 34:1,10 54:1
 58:6 60:2,18
 88:11 97:6
 102:16,21
 120:25 122:6
 123:2 129:9,22
 129:22 130:1,2
 136:6,7 145:1,5
 146:8 152:9,10
 152:16 153:6,8
 153:17,19
 177:24 179:22
 181:3 182:21
 188:11
**uses**  121:22
 136:5
**utilization**  41:6

**v**

**v**  180:25
**valid**  187:15
**valsartan**  1:4
 52:13,13,23,24
 53:4,4,10,10,15
 54:10,11 93:15
 93:16 97:3,4,5
 98:6,8 103:9,10

114:3 121:9
 136:25 138:2,10
 138:21 139:8,25
 146:23 148:9,17
 149:12 150:24
 151:5,9,12,19
 152:5,13 154:21
 154:21,24,25
 155:2 157:7,11
 157:17 160:21
 167:2,3,12
 185:11,17
 186:10,24
 187:12 188:10
 202:4 203:1
 204:1
**vanderbilt**  2:3,7
**varies**  67:5
**various**  57:10
 101:9 185:21
**vast**  181:9
**vauggn**  7:1
**vcd**  138:3,11
 162:10 163:16
 164:1,8,14,16
 165:5,19 175:7
 189:25 190:4,8
 191:4,11
**vcds**  136:25
 138:21 139:9,25
 140:11 142:1
 161:11,19
 162:25 163:1
 167:17 168:5,12
 168:18,20
 169:11 170:3
 173:14 174:4,20
 183:14 190:13

190:21 192:4
 194:2
**verbal**  57:17
**verbally**  14:11
**verbatim**  126:22
**verify**  202:9
**verifying**  28:1
**veritext**  10:11
 202:14,23
**veritext.com**
 202:15
**versions**  140:11
 142:1 183:13
**versus**  103:5
 130:2
**vice**  37:10,10,12
 37:15,24 157:24
 157:24
**vicinage**  1:2
**video**  10:5 11:18
**videographer**
 7:10,11 10:3,10
 10:15 11:9,19,19
 59:17,20 68:21
 74:17 92:22,25
 128:18,21
 153:24 154:2
 189:10,13
 199:13,15
**videotaped**  1:9
**view**  73:9 130:7
 160:16
**views**  130:5
**violation**  150:18
**visibility**  41:22
**visit**  24:16
**voluntary**  93:15
 157:11

**vp**  37:19 38:5,10
 38:10

**w**

**w**  5:13
**wait**  14:16,18
**waive**  111:20
**walgreens**  27:6
 27:11 29:5,10
**wallack**  6:14
**walnut**  5:2
**walsh.law**  3:11
 3:11
**walter**  3:15
**want**  16:3 73:4
 74:8 79:20 84:4
 90:7 93:24 94:19
 95:5 156:16
 157:21 158:7
 175:17 180:2,17
**wanted**  26:18,19
 71:11 169:9
**wants**  174:19
**warranties**  52:10
 56:22 57:3,7,18
 58:15,17,22 59:2
 59:25 60:15
 61:24 125:5,19
 126:5,14 136:5,6
 136:25
**warranty**  58:23
 121:13,16,25
 122:4,6,22 123:2
 126:15 136:7
 143:1,1 144:25
 145:5,7,9,16
 161:19 170:2
**washington**  4:2
 5:22 7:6

**[way - york]**                                                                      Page 47

| | | | |
|---|---|---|---|
| **way** 23:1 38:9 | **widely** 153:9 | **woman** 47:9 | **writing** 17:3 |
| 54:23 65:18 71:9 | **william** 6:14,14 | **women** 46:4,10 | **written** 80:20 |
| 73:8 91:11 95:1 | **windermere** | 49:19 | 88:11,14 147:25 |
| 103:9 114:22 | 13:23 | **word** 12:10 88:1 | 182:22 |
| 139:6 143:2,9 | **wise** 40:23 | 94:13 119:3,6 | **wrong** 85:2 |
| 145:7,10 147:8 | **wish** 167:20 | 125:22 155:10 | **www.kanner** |
| 147:24 148:23 | 190:17 | 178:20,24 179:4 | 5:18 |
| 149:5,8,11 161:8 | **withdraw** 122:6 | 179:9,9,10,11,18 | **x** |
| 167:19 171:5 | **withdrawn** | 180:23,24 181:3 | **x** 8:1,11 |
| 182:3 | 56:11 63:4 81:23 | 182:21,22,23,25 | **y** |
| **wayne** 3:2 | 102:2 124:9 | 188:20 | |
| **ways** 39:12,15 | 149:18 | **words** 126:22 | **yeah** 12:11 33:9 |
| 72:21 169:16 | **witness** 10:12 | 127:8 | 34:19 36:1 46:9 |
| **we've** 19:10 21:1 | 13:4 17:1 33:17 | **work** 15:16 | 50:15 71:1 73:5 |
| 48:10,14 80:19 | 59:13,16 66:18 | 16:25 24:9 27:17 | 85:19 97:20 |
| 108:4 135:13 | 66:21,24 68:14 | 41:2,3 57:16 | 98:17 114:16 |
| **webinar** 65:7 | 69:15,16,20,20 | 59:23 60:13,23 | 127:25 138:23 |
| **webinars** 64:22 | 70:1,8,10 71:9 | 61:23 62:24 79:3 | 181:23 189:19 |
| **website** 45:6 | 71:10,23 72:6,18 | 79:6 82:24 87:15 | 197:22 |
| 46:2,3 47:7 | 72:19,22 73:9,16 | 88:21,22 89:19 | **year** 20:12,12 |
| 93:18 139:22 | 73:19,25 78:21 | 90:19 98:25 | 28:14,14,17,17 |
| 146:19 | 80:7,9 111:7 | 114:22 134:17 | 28:22,22 34:13 |
| **welcome** 80:3 | 122:10,13,17,19 | 157:1 158:5,12 | 34:14 46:23 |
| 175:14 189:17 | 125:12 126:2 | 159:17 160:6,15 | 82:20,20 |
| **wellness** 36:2,7,8 | 154:13 156:18 | 169:23,23 191:9 | **years** 18:10 19:8 |
| 36:9,21 37:2 | 157:23 169:16 | **worked** 27:5 | 28:24 29:1 38:18 |
| **went** 82:19 | 170:21 175:14 | 28:5 46:15,17 | 47:3 56:14 59:4 |
| 162:20 | 177:2 178:24 | 65:20 184:20 | 59:4,5 82:24 |
| **west** 3:5 | 181:20,22 | **workflow** 30:2 | 136:1 |
| **wharton** 2:21 | 189:17 194:14 | **working** 27:21 | **yep** 23:21 142:24 |
| 10:24,24 43:1 | 195:2 197:6 | 38:21 | **york** 2:4,8 13:25 |
| **whiteley** 2:18,18 | 200:9,12 202:8 | **works** 14:4 | 21:6,18 22:10,15 |
| 5:17 11:1,1 | 202:10,12,19 | 107:9,25 | 23:2,10,17 27:6 |
| 70:17 72:13 | **witness's** 73:1 | **world** 49:18 | 35:7 55:23 65:12 |
| **whiteley's** 74:3 | **witnesses** 69:21 | 126:16,21 127:9 | 155:13 |
| **wholesaler** | 74:11 | 138:14 139:8 | |
| 188:13 | **wmurtha** 6:16 | **wrap** 182:16 | |
| | | 199:2 | |

**[zhp - zooms]**                                                      Page 48

| z |
|---|
| **zhp**   3:22 4:4 |
|    111:23 |
| **zimmerman**   6:5 |
| **zoom**   3:3,8,13,18 |
|    3:22 4:4,8,13,17 |
|    4:21,25 5:4,8,11 |
|    5:15,19,23 6:4,8 |
|    6:13,17,21 7:3,7 |
|    7:10 11:7,8,10 |
|    11:14,15,24,25 |
|    12:2,4,16,20 |
|    14:24 15:1,3 |
|    16:11,12 26:20 |
|    122:9,14,18 |
|    154:8 175:15 |
|    184:7 186:21 |
|    187:1,18 199:8 |
| **zooms**   11:12 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.