# Exhibit B

Page 1

1                UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF NEW JERSEY

3                     CAMDEN VICINAGE

4

5    IN RE: VALSARTAN, LOSARTAN,)  MDL NO. 2875
                               )
6    AND IRBESARTAN PRODUCTS    )
                               )
7    LIABILITY LITIGATION       )   HONORABLE ROBERT B.
                               )   KUGLER,
8    _____)   DISTRICT COURT JUDGE

9

10

11

12

13

14

15              RULE 30 VIDEOTAPED DEPOSITION

16                  PHILIP JAMES RUSS

17              THURSDAY, JANUARY 5, 2023

18

19

20

21

22

23

24   JOB NO. 5648472

25   REPORTED BY:  DAYNA HESTER, C.S.R. 9970

Page 2

1 VIDEOTAPED DEPOSITION OF PHILIP JAMES RUSS, TAKEN ON BEHALF
2 OF DEFENDANTS, AT 9:20 A.M., THURSDAY, JANUARY 5, 2023, AT
3 GREENBERG TRAURIG LLP, 1840 CENTURY PARK EAST, SUITE 1900,
4 LOS ANGELES, CALIFORNIA, WITH MULTIPLE PARTICIPANTS
5 APPEARING REMOTELY, BEFORE DAYNA HESTER, C.S.R. NO. 9970,
6 PURSUANT TO NOTICE.
7
8 APPEARANCES OF COUNSEL:
9 FOR PLAINTIFF(S):
10   KANNER & WHITELEY, L.L.C.
       BY: DAVID J. STANOCH, ESQ.
11     (PRESENT IN PERSON)
       BY: CONLEE S. WHITELEY, ESQ.
12     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       701 CAMP STREET
13   NEW ORLEANS, LOUISIANA 70130
       (504) 524-5777
14   D.STANOCH@KANNER-LAW.COM
15     -AND-
16   HONIK LLC
       BY: RUBEN HONIK, ESQ.
17     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       1515 MARKET STREET, SUITE 1100
18   PHILADELPHIA, PENNSYLVANIA 19102
       (267) 435-1300
19   RUBEN@HONIKLAW.COM
20     -AND-
21   MAZIE SLATER KATZ & FREEMAN, LLC
       BY: CHRISTOPHER J. GEDDIS, ESQ.
22     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       103 EISENHOWER PARKWAY
23   ROSELAND, NEW JERSEY 07068
       (973) 228-9898
24   CGEDDIS@MAZIESLATER.COM
25     -- APPEARANCES CONTINUED ON NEXT PAGE --

Page 3

1 APPEARANCES OF COUNSEL (CONTINUED):
2 FOR PLAINTIFF(S):
3   HOLLIS LAW FIRM PA
       BY: C. BRETT VAUGHN, ESQ.
4     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       8101 COLLEGE BOULEVARD, SUITE 260
5   OVERLAND PARK, KANSAS 66210
       (913) 385-5400
6   BRETT@HOLLISLAWFIRM.COM
7     -AND-
8   BARTON & BURROWS, LLC
       BY: STACY BURROWS, ESQ.
9     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       5201 JOHNSON DRIVE, SUITE 110
10   MISSION, KANSAS 66205
       (913) 563-6250
11   STACY@GEORGEBARTONLAW.COM
12     -AND-
13   LEVIN PAPANTONIO THOMAS MITCHELL
       RAFFERTY & PROCTOR PA
14   BY: DANIEL NIGH, ESQ.
       (PRESENT VIA ZOOM VIDEOCONFERENCE)
15   BY: MADELINE PENDLEY, ESQ.
       (PRESENT VIA ZOOM VIDEOCONFERENCE)
16   316 SOUTH BAYLEN STREET, SUITE 600
       PENSACOLA, FLORIDA 32501
17   (850) 435-7013
       DNIGH@LEVINLAW.COM
18   MPENDLEY@LEVINLAW.COM
19
20
21
22
23
24
25     -- APPEARANCES CONTINUED ON NEXT PAGE --

Page 4

1 APPEARANCES OF COUNSEL (CONTINUED):
2 FOR PLAINTIFF MSP RECOVERY CLAIMS, SERIES, LLC:
3   RIVERO MESTRE, LLP
       BY: JORGE MESTRE, ESQ.
4     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       BY: ZALMAN KASS, ESQ.
5     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       2525 PONCE DE LEON BOULEVARD, SUITE 1000
6   MIAMI, FLORIDA 33134
       (305) 445-2500
7   JMESTRE@RIVEROMESTRE.COM
       ZKASS@RIVEROMESTRE.COM
8
9 FOR TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL
       INDUSTRIES LTD., ACTAVIS PHARMA, INC., AND ACTAVIS LLC:
10
       GREENBERG TRAURIG, LLP
11   BY: VICTORIA DAVIS LOCKARD, ESQ.
       (PRESENT IN PERSON)
12   BY: STEVEN M. HARKINS, ESQ.
       (PRESENT IN PERSON)
13   TERMINUS 200
       3333 PIEDMONT ROAD NE, SUITE 2500
14   ATLANTA, GEORGIA 30305
       (678) 553-2100
15   LOCKARDV@GTLAW.COM
       HARKINSS@GTLAW.COM
16
       -AND-
17
       MARTIN, HARDING & MAZZOTTI, LLP
18   BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
       (PRESENT VIA ZOOM VIDEOCONFERENCE)
19   P.O. BOX 15141
       ALBANY, NEW YORK 12212
20   (518) 724-2207
       ROSEMARIE.BOGDAN@1800LAW1010.COM
21
22
23
24
25     -- APPEARANCES CONTINUED ON NEXT PAGE --

Page 5

1 APPEARANCES OF COUNSEL (CONTINUED):
2 FOR TORRENT PHARMA INC. & TORRENT PHARMACEUTICALS, LTD.:
3   KIRKLAND & ELLIS, LLP
       BY: ALEXIA R. BRANCATO, ESQ.
4     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       BY: BRITTNEY NAGLE, ESQ.
5     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       601 LEXINGTON AVENUE
6   NEW YORK, NEW YORK 10022
       (212) 390-4210
7   ALEXIA.BRANCATO@KIRKLAND.COM
       BRITTNEY.NAGLE@KIRKLAND.COM
8
9 FOR ZHEJIANG HUAHAI PHARMACEUTICAL, CO., LTD., SOLCO
       HEALTHCARE U.S., LLC, AND PRINSTON PHARMACEUTICAL, INC.,
10 HUAHAI U.S., INC.:
11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       BY: NINA R. ROSE, ESQ.
12     (PRESENT VIA ZOOM VIDEOCONFERENCE)
       1440 NEW YORK AVENUE, N.W.
13   WASHINGTON, D.C. 20005
       (202) 371-7105
14   NINA.ROSE@SKADDEN.COM
15
       FOR HUMANA INC. & HUMANA PHARMACY, INC.:
16
       FALKENBERG IVES, LLP
17   BY: KIRSTIN B. IVES, ESQ.
       (PRESENT VIA ZOOM VIDEOCONFERENCE)
18   230 W. MONROE, SUITE 2220
       CHICAGO, ILLINOIS 60606
19   312-566-4808
       KBI@FALKENBERGIVES.COM
20
21
22
23
24
25     -- APPEARANCES CONTINUED ON NEXT PAGE --

2 (Pages 2 - 5)

Page 6

1 APPEARANCES OF COUNSEL (CONTINUED):
2 FOR H J HARKINS CO., INC.:
3   HINSHAW & CULBERTSON, LLP
      BY:  GEOFFREY M. COAN, ESQ.
4       (PRESENT VIA ZOOM VIDEOCONFERENCE)
      53 STATE STREET, 27TH FLOOR
5   BOSTON, MASSACHUSETTS  02109
      (617) 213-7000
6   GCOAN@HINSHAWLAW.COM
7
   FOR HETERO LABS LTD:
8
   HILL WALLACK, LLP
9   BY:  WILLIAM P. MURTHA, JR., ESQ.
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
10  THE GALLERIA
      2 BRIDGE AVENUE, SUITE 211
11  RED BANK, NEW JERSEY  07701
      (732) 924-8171
12  WMURTHA@HILLWALLACK.COM
13
   FOR ALBERTSONS COMPANIES LLC:
14
   BUCHANAN INGERSOLL & ROONEY PC
15  BY:  CHRISTOPHER B. HENRY, ESQ.
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
16  CARILLON TOWER
      227 WEST TRADE STREET, SUITE 600
17  CHARLOTTE, NORTH CAROLINA  28202
      (704) 444-3475
18  CHRISTOPHER.HENRY@BIPC.COM
19
20
21
22
23
24
25   -- APPEARANCES CONTINUED ON NEXT PAGE --

Page 7

1 APPEARANCES OF COUNSEL (CONTINUED):
2 FOR MYLAN PHARMACEUTICALS INC., AND MYLAN
   LABORATORIES, LTD.:
3
   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
4   BY:  FRANK H. STOY, ESQ.
        (PRESENT VIA ZOOM VIDEOCONFERENCE)
5   ONE OXFORD CENTRE
      301 GRANT STREET, 38TH FLOOR
6   PITTSBURGH, PENNSYLVANIA  15219
      (412) 263-4397
7   FHS@PIETRAGALLO.COM
8
   FOR DEFENDANT AUROBINDO PHARMA LIMITED:
9
   MORGAN LEWIS BOCKIUS
10  BY:  JOHN P. LAVELLE, JR., ESQ.
        (NOT PRESENT)
11  1701 MARKET STREET
      PHILADELPHIA, PENNSYLVANIA  19103-2921
12  (215) 963-4824
      JOHN.LAVELLE@MORGANLEWIS.COM
13
14 ALSO PRESENT:
15  JULIAN ABALOS, VIDEOGRAPHER
      (PRESENT IN PERSON)
16
   JUSTIN BILY, ZOOM CONCIERGE
17  (PRESENT VIA ZOOM VIDEOCONFERENCE)
18
19
20
21
22
23
24
25

Page 8

1         I N D E X
2 DEPONENT      EXAMINATION        PAGE
3 PHILIP JAMES RUSS
4      BY MS. LOCKARD      15
5      BY MS. LOCKARD      150
6      BY MS. BRANCATO      243
7      BY MS. ROSE        306
8      BY MR. STANOCH      314
9      BY MS. LOCKARD      314
10      BY MR. STANOCH      322
11      BY MS. LOCKARD      325
12      BY MS. ROSE        341
13
14
      QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
15
      (NONE.)
16
17
18        E X H I B I T S
19 EXHIBIT NO.   PAGE   DESCRIPTION
20 EXHIBIT 1    18   FILE TITLED "EXHIBIT 0001 - 1 -
         2019.06.26 - 0139 - CONFIDENTIALITY
21       AND PROTECTIVE ORDER - SIGNED.PDF"
22 EXHIBIT 2    20   FILE TITLED "EXHIBIT 0002 - 01 -
         2022.12.15 - 2204 - TEVA'S NOVD OF
23       PHILIP RUSS %5BMDL2875%5D.PDF"
24
25   -- EXHIBITS CONTINUED ON NEXT PAGE --

Page 9

1        E X H I B I T S (CONTINUED)
2 EXHIBIT NO.   PAGE   DESCRIPTION
3 EXHIBIT 3    22   FILE TITLED "EXHIBIT 0003 - RUSS
         LIST OF MATERIALS CONSIDERED.PDF"
4
   EXHIBIT 4    31   FILE TITLED 'EXHIBIT 0004 - 05 -
5       2023.01.02 - OBJS & RESPS TO RUSS
         NOTICE OF DEPOSITION %5BRUSS,
6       PHI%5D.PDF"
7 EXHIBIT 5    35   FILE TITLED "EXHIBIT 0005 - 02 -
         2022.10.31 - CV %BRUSS,
8       PHILIP%D.PDF"
9 EXHIBIT 6    43   FILE TITLED "EXHIBIT 0006 -
         2022.06.16 - ENGAGEMENT LTR.
10      5%BRUSS, PHI%5D.PDF"
11 EXHIBIT 7    63   FILE TITLED "EXHIBIT 0007 - 06 -
         RUSS INVOICES BRUSS, PHI%5D.PDF"
12
   EXHIBIT 8    72   FILE TITLED "EXHIBIT 0008 - 07 -
13      2022.10.31 - P. RUSS EXPERT REPORT
         (WITH EXHIBITS).PDF"
14
   EXHIBIT 9    81   FILE TITLED "EXHIBIT 0009 - FACTS
15      ABOUT THE CURRENT GOOD
         MANUFACTURING PRACTICES (CGMPS) _
16      FDA.PDF"
17 EXHIBIT 10   121   FILE TITLED "EXHIBIT 0010 -
         QUESTIONS AND ANSWERS ON CURRENT
18      GOOD MANUFACTURING PRACTICE
         REQUIREMENTS_CONTROL OF COMPONENTS
19      AND DRUG PRODUCT CONTAINERS AND
         CLOSURES_FDA.PDF"
20
   EXHIBIT 11   155   FILE TITLED "EXHIBIT 0011 -
21      CONTRACT MANUFACTURING ARRANGEMENTS
         FOR DRUGS_ QUALITY AGREEMENTS
22      GUIDANCE FOR INDUSTRY.PDF"
23 EXHIBIT 12   158   FILE TITLED "EXHIBIT 0012 - 33 -
         TEVA-MDL2875-00020212.PDF"
24
25   -- EXHIBITS CONTINUED ON NEXT PAGE --

3 (Pages 6 - 9)

Page 10

```
 1        E X H I B I T S (CONTINUED)
 2  EXHIBIT NO.   PAGE   DESCRIPTION
 3  EXHIBIT 13    159    FILE TITLED "EXHIBIT 0013 - 32 -
                         TEVA-MDL2875-00020279.PDF"
 4
    EXHIBIT 14    161    FILE TITLED "EXHIBIT 0014 - 34 -
 5                       TEVA-MDL2875-00020213.PDF"
 6  EXHIBIT 15    162    FILE TITLED "EXHIBIT 0015 - 31 -
                         QUALITY POLICY SOP CORP 0001.PDF"
 7
    EXHIBIT 16    169    FILE TITLED "EXHIBIT 0016 - 10 -
 8                       VALSARTAN, USP (SUBSTANCE) USP 44
                         LAST ACCESSED 221115.PDF"
 9
    EXHIBIT 17    173    FILE TITLED "EXHIBIT 0017 - 11 -
10                       VALSARTAN TABLETS USP MONOGRAPH USP
                         44 LAST ACCESSED 221115.PDF"
11
    EXHIBIT 18    180    FILE TITLED "EXHIBIT 0018 - 12 -
12                       VALSARTAN AND HYDROCHLOROTHIAZIDE
                         TABLETS USP MONOGRAPH USP 44 LAST
13                       ACCESSED 221117.PDF"
14  EXHIBIT 19    182    FILE TITLED "EXHIBIT 0019 - 15 -
                         Q3A(R)-IMPURITIES-IN-NEW-DRUG-
15                       SUBSTANCES.PDF"
16  EXHIBIT 20    183    FILE TITLED "EXHIBIT 0020 - 16 -
                         2006 - ICH Q3B (R2) IMPURITIES IN
17                       NEW DRUG PRODUCTS.PDF"
18  EXHIBIT 21    185    FILE TITLED "EXHIBIT 0021 - TAB %5B
                         %5D - AUGUST 30, 2018 - STATEMENT
19                       OF S. GOTTLIEB MD (FDA) RE
                         VALSARTAN (HIGHLIGHTED).PDF"
20
    EXHIBIT 22    194    FILE TITLED "EXHIBIT 0022 - TAB %5B
21                       %5D - JANUARY 25, 2019 - STATEMENT
                         OF S. GOTTLIEB MD (FDA) RE
22                       VALSARTAN (HIGHLIGHTED).PDF"
23  EXHIBIT 23    210    FILE TITLED "EXHIBIT 0023 - 38 -
                         TEVA-MDL2875-00950662.PDF"
24
25       -- EXHIBITS CONTINUED ON NEXT PAGE --
```

Page 11

```
 1        E X H I B I T S (CONTINUED)
 2  EXHIBIT NO.   PAGE   DESCRIPTION
 3  EXHIBIT 24    211    FILE TITLED "EXHIBIT 0024
                         -TEVA-MDL2875-00020264_CONFIDENTIAL
 4                       .PDF"
 5  EXHIBIT 25    346    DOCUMET TITLED "EXHIBIT 25 - SIGNED
                         PROTECTIVE ORDER"
 6
    EXHIBIT 26    220    FILE TITLED "EXHIBIT 0026 - 39 -
 7                       TEVA-MDL2875-00950663.PDF"
 8  EXHIBIT 27    220    FILE TITLED "EXHIBIT 0027 -
                         TEVA-MDL2875-00020268_HIGHLY
 9                       CONFIDENTIAL.PDF"
10  EXHIBIT 28    228    FILE TITLED "EXHIBIT 0028 -
                         TEVA-MDL2875-00020257_CONFIDENTIAL.
11                       PDF"
12  EXHIBIT 29    N/A    (NO EXHIBIT DESIGNATED)
13  EXHIBIT 30    247    FILE TITLED "EXHIBIT 0030 -
                         B-2021.06.05-6 SUSHIL JAISWAL,
14                       PH.D. (MINI).PDF"
15  EXHIBIT 31    293    FILE TITLED "EXHIBIT 0031 -
                         B-TORRENT-MDL2875-00010961.PDF"
16
    EXHIBIT 32    297    FILE TITLED "EXHIBIT 0032 -
17                       B-TORRENT-MDL2875-00004362.PDF"
18  EXHIBIT 33    316    DOCUMENT TITLED "EXHIBT 33 - ICH
                         GUIDELINE Q9 ON QUALITY RISK
19                       MANAGEMENT"
20  EXHIBIT 34    318    DOCUMENT TITLED "EXHIBIT 34 -
                         SECITON 351. ADULTERATED DRUGS AND
21                       DEVICES"
22  EXHIBIT 35    323    DOCUMENT TITLED "EXHIBIT 35 -
                         ZHEJIANG HUAHAI PHARMACEUTICAL -
23                       566685 - 11_29_2018 _ FDA"
24
25
```

Page 12

```
 1          LOS ANGELES, CALIFORNIA
 2      THURSDAY, JANUARY 5, 2023; 9:20 A.M.
 3
 4       THE VIDEOGRAPHER:  Good morning.        09:20
 5       We're going on the record at 9:20 a.m. on   09:20
 6  January 5th, 2023.                      09:21
 7       Please note that microphones are sensitive  09:21
 8  and may pick up whispering and private conversations.  09:21
 9       Please mute your phone at this time.    09:21
10       Audio and video recording will continue to  09:21
11  take place unless all parties agree to go off the  09:21
12  record.                                 09:21
13       This is Media Unit 1 of the video-recorded  09:21
14  deposition of Philip Russ taken by counsel for the  09:21
15  defendants in the matter of Valsartan Products   09:21
16  Liability Litigation filed in the U.S. District Court  09:21
17  for the District Court of New Jersey.    09:21
18       The location of this deposition is       09:21
19  1840 Century Park East, 19th Floor, Los Angeles,  09:21
20  California.                             09:21
21       My name is Julian Abalos representing    09:21
22  Veritext Legal Solutions.  I am the videographer.  09:21
23       The court reporter is Dayna Hester from the  09:21
24  firm Veritext Legal Solutions.           09:21
25       I am not related to any party in this    09:21
```

Page 13

```
 1  action, nor am I financially interested in the  09:21
 2  outcome.  If there are any objections to the   09:21
 3  proceeding, please state them at the time of your  09:21
 4  appearance.                             09:21
 5       Counsel in person will now state their   09:21
 6  appearances and affiliations for the record beginning  09:21
 7  with the noticing attorney.              09:21
 8       MS. LOCKARD:  Good morning.          09:21
 9       This is Victoria Lockard from Greenberg  09:22
10  Traurig.  I represent the Teva defendants.   09:22
11       Here with me today is Steve Harkins also  09:22
12  representing the Teva defendants from Greenberg  09:22
13  Traurig.                                09:22
14       MR. STANOCH:  David Stanoch of Kanner &   09:22
15  Whiteley for plaintiffs and the witness.  09:22
16       MS. LOCKARD:  Just for the record, we have a  09:22
17  number of individuals who are representing various  09:22
18  parties on the phone.                    09:22
19       We are going to dispense with their      09:22
20  introductions, and we will have them submit their  09:22
21  appearances in writing to the court reporter at a  09:22
22  break.                                  09:22
23       MR. HARKINS:  One -- one moment before -- I  09:22
24  did receive a request from one of the remote counsel  09:22
25  to get a realtime link.                  09:22
```

4 (Pages 10 - 13)

Page 14

1 Can they request that from someone there, or 09:22
2 do you need to send it to them? 09:22
3 THE REPORTER: Can we go off the record? 09:22
4 MS. LOCKARD: Go off the record. 09:22
5 THE VIDEOGRAPHER: Off record at 9:23 a.m. 09:22
6 (Brief recess.) 09:22
7 THE VIDEOGRAPHER: And we are back on record 09:26
8 at 9:26 a.m. 09:26
9 THE REPORTER: Okay. Hold on one second. 10:08
10 This is a federal case; so I have a read-on. 10:08
11 My name is Dayna Hester. This statement is 10:08
12 to acknowledge my obligations pursuant to Federal 10:08
13 Rules of Civil Procedure. 10:08
14 Rule 30(b), Subsection 5(a). My business 10:08
15 address is 707 Wilshire Boulevard, Los Angeles, 10:08
16 California. The videographer has stated the 10:08
17 additional required information.
18 Rule 30(b), Subsection 5(c). Upon
19 completion of the deposition, if there is a
20 stipulation about the custody of the transcript or
21 other pertinent matters, I will recite such
22 stipulation(s). Additionally, the videographer will
23 read-off when the deposition concludes.
24 So with this being said, I will now swear in
25 the witness.

Page 15

1 Mr. Russ, please raise your right hand.
2 THE WITNESS: [Witness did as requested].
3 THE REPORTER: Do you affirm the testimony
4 you are about to give in the cause now pending will be
5 the truth, the whole truth, and nothing but the truth? 09:27
6 THE WITNESS: Yes. 09:27
7 THE REPORTER: Thank you. 09:27
8
9 PHILIP JAMES RUSS
10 having been first duly sworn, was
11 examined and testified as follows:
12
13 EXAMINATION
14 BY MS. LOCKARD:
15 Q. What is your full name? 09:27
16 A. Philip James Russ. 09:27
17 Q. Where do you live? 09:27
18 A. I live in Palm Springs, California. 09:27
19 Q. What is your address? 09:27
20 A. 2157 Casitas Way, Palm Springs. 09:27
21 Q. Where do you practice or where is your 09:27
22 professional location? 09:27
23 A. My professional location is also at 09:27
24 2157 Casitas Way in Palm Springs. 09:27
25 Q. You don't maintain a separate office? 09:27

Page 16

1 A. I do not. 09:27
2 Q. What do you do for a living? 09:27
3 A. I do management consulting for regulatory 09:27
4 compliance for products that are regulated by the 09:27
5 food and drug administration as well as other 09:27
6 regulatory bodies across the world: 09:27
7 pharmaceuticals, medical devices, biologics. 09:27
8 Q. Any work in the food industry? 09:28
9 A. No. 09:28
10 Q. What about supplements? 09:28
11 A. I'm familiar with supplement regulations, 09:28
12 but up to this point, I have not had any clients for 09:28
13 supplements. 09:28
14 Q. So you don't consider yourself an expert 09:28
15 in the supplement area at this point? 09:28
16 MR. STANOCH: Objection to form. 09:28
17 Go ahead. 09:28
18 THE WITNESS: I wouldn't say I'm not an 09:28
19 expert in that I understand the regulations. But all 09:28
20 I'm saying is I haven't practiced in that area because 09:28
21 I haven't had a client who has a need in that area. 09:28
22 BY MS. LOCKARD:
23 Q. What is your understanding of your role in 09:28
24 this case? 09:28
25 A. I was asked to opine on the 09:28

Page 17

1 Defendants Teva and Torrent's GMP practices as it 09:28
2 relates to the incident of genotoxic impurities in a 09:28
3 Valsartan product from ZHP, a Chinese manufacturer 09:29
4 of that drug substance. 09:29
5 Q. And are you offering opinions today about 09:29
6 any other defendant in this case, other than Torrent 09:29
7 and Teva? 09:29
8 A. No. 09:29
9 Q. Are you under any medications or suffering 09:29
10 from any medical conditions today that would prevent 09:29
11 you from hearing and understanding my questions? 09:29
12 A. No. 09:29
13 Q. In this case, we have a protective order 09:29
14 governing the use and disclosure of confidential 09:29
15 information. 09:29
16 Are you familiar with such protective 09:29
17 orders? 09:29
18 A. Yes. 09:29
19 Q. Have you seen one in this case? 09:29
20 A. I'm not completely sure. I -- it may have 09:29
21 been provided to me in discovery. I would have 09:29
22 to -- along with the production of documentation I 09:29
23 should have. I'm not sure. 09:29
24 Q. Okay. I'll have the confidential and 09:29
25 protective order marked as Exhibit 1, and I'll just 09:29

5 (Pages 14 - 17)

Page 18

1  give you a copy of this.                    09:29
2      (Deposition Exhibit 1 was marked for    09:29
3      identification and is attached hereto.)  09:29
4      THE WITNESS:  Okay.                      09:29
5  BY MS. LOCKARD:                              09:29
6      Q.  We don't have evidence that you have  09:29
7  signed this as an expert.  There is an affidavit or  09:30
8  an exhibit at the back that -- where the order --  09:30
9  the experts who are provided confidential documents  09:30
10 and information are required to sign indicating they  09:30
11 agree to keep the confidential documents and highly  09:30
12 confidential documents as such.              09:30
13      Do you understand that?                 09:30
14     A.  I do most certainly, yes.            09:30
15     Q.  Okay.  And in your business, you are  09:30
16 familiar with such confidential obligations and  09:30
17 requirements for these cases and in your regular  09:30
18 practices; is that right?                    09:30
19     A.  Absolutely.                          09:30
20     Q.  So do you agree to keep any confidential  09:30
21 documents or highly confidential documents that you  09:30
22 have been provided confidential in this case and do  09:30
23 not disclose them beyond the use in the litigation?  09:30
24     A.  Yes.                                 09:30
25     Q.  Okay.  You are welcome to take a look at  09:30

Page 19

1  this agreement over a break if you need to.   09:30
2      MS. LOCKARD:  But we would ask that he sign  09:30
3  the exhibit today at some point.             09:30
4      MR. STANOCH:  We'll provide the signed   09:30
5  version he has, or we'll sign it again at the break,  09:30
6  Counsel.  Not a problem.                     09:30
7      MS. LOCKARD:  Sure.                      09:30
8  BY MS. LOCKARD:                              09:30
9      Q.  Okay.  Mr. Russ, did you bring anything  09:30
10 with you today?                             09:31
11     A.  No.                                  09:31
12     Q.  All right.  Let's -- I'm going to give you  09:31
13 a copy of your -- the notice of videotaped   09:31
14 deposition of Philip Russ.  This will be Exhibit 2.  09:31
15     Have you seen a copy of this?            09:31
16     MR. STANOCH:  Counsel, I'm just asking how  09:31
17 would you like to mark the exhibits for the record.  I  09:31
18 don't care.  Just how you would do it.       09:31
19     MS. LOCKARD:  I want to get a sicker on   09:31
20 them, and we can do that.  I just roll through so  09:31
21 we'll -- when you get chance, you can --     09:31
22     MR. STANOCH:  All right.                 09:31
23     MS. LOCKARD:  We're also -- are we providing  09:31
24 them in the Dropbox?                        09:31
25     MR. HARKINS:  I can, yes.                09:31

Page 20

1      MS. LOCKARD:  Okay.  That may be easier just  09:31
2  to double-check.                            09:31
3      1 for the protective order; and          09:31
4      2 for the notice of video deposition.    09:31
5      (Deposition Exhibit 2 was marked for     09:31
6      identification and is attached hereto.)  09:31
7  BY MS. LOCKARD:                              09:31
8      Q.  All right.  So, Mr. Russ, have you seen a  09:31
9  copy of Exhibit 2?                          09:31
10     A.  I have not.                          09:31
11     Q.  All right.  If you will take a look at it  09:31
12 here with me.  It's the document that relates to   09:32
13 your deposition today in this case.          09:32
14     And on Page 6 of the document, there is a  09:32
15 set of requests that we propounded through    09:32
16 plaintiffs' counsel requesting that you bring  09:32
17 certain items with you to your deposition today.  09:32
18     Do you see those?                        09:32
19     A.  [Witness reviews document].          09:32
20     I do.  Yes.                             09:32
21     Q.  Okay.  My understanding as to what you  09:32
22 provided so far in this case to counsel and that's  09:32
23 been disclosed to us so far includes -- obviously  09:32
24 your report, your CV, your statement of materials  09:32
25 considered, your invoices, and your retention  09:32

Page 21

1  letter.                                     09:32
2      A.  Yes.  That makes sense to me.         09:32
3      Q.  Have you received any other materials   09:33
4  other than those that would be contained in a hard  09:33
5  copy file, paper file?                      09:33
6      A.  You mean have I received documents in   09:33
7  electronic format?                          09:33
8      Q.  In a non-electronic format.  In paper.  09:33
9      A.  No.  I have not received anything in   09:33
10 non-electronic format.                      09:33
11     Q.  Do you keep any hard files, paper files  09:33
12 involving this case and your involvement in it?  09:33
13     A.  No, I don't.                         09:33
14     Q.  So everything you have received would be  09:33
15 reviewed would be in an electronic file somewhere on  09:33
16 a computer of yours?                        09:33
17     A.  Yes.                                 09:33
18     Q.  Okay.  Have you retained everything that  09:33
19 you have been provided in this case by counsel?  09:33
20     A.  I have.  Yes.                        09:33
21     Q.  You have not destroyed or discarded or   09:33
22 deleted any materials you were provided; correct?  09:33
23     A.  No, I have not.                      09:33
24     MS. LOCKARD:  All right.  This is a copy of  09:34
25 the materials considered list, which we'll mark as  09:34

6 (Pages 18 - 21)

Page 22

1  Exhibit 3.                                    09:34
2       (Deposition Exhibit 3 was marked for     09:34
3       identification and is attached hereto.)  09:34
4       MR. STANOCH:  [Attorney indicates document].  09:34
5       THE WITNESS:  Oh.  I am sorry.           09:34
6  BY MS. LOCKARD:                               09:34
7    Q.  Do you recognize that document?         09:34
8    A.  I do.  Yes.                             09:34
9    Q.  Did you prepare this yourself?          09:34
10   A.  Actually, I had help from counsel to    09:34
11 prepare the document.                         09:34
12   Q.  Who typed it up?                        09:34
13   A.  I -- I am not sure.                     09:34
14   Q.  Did you --                              09:34
15   A.  But I -- sorry.                         09:34
16   Q.  Oh.  Go ahead.                          09:34
17   A.  But it was provided for my review.      09:34
18   Q.  Okay.  Did you go through and compare what  09:34
19 is on this list to what is actually in your   09:34
20 electronic files?                             09:34
21   A.  Yes.  I did an audit of that.  I can't say  09:34
22 that I looked at every single document to verify.  09:34
23 But, certainly, I took a look at it against what I  09:34
24 was provided.                                 09:35
25   Q.  I notice there are no -- there are no    09:35

Page 23

1  references to literature publications on this list;  09:35
2  is that correct?                             09:35
3       MR. STANOCH:  Objection.                09:35
4       Go ahead.                              09:35
5       THE WITNESS:  I would have to go through the  09:35
6  list to see if there is a reference to specific  09:35
7  literature or standards in the industry.    09:35
8  BY MS. LOCKARD:                             09:35
9    Q.  Okay.  Go ahead and do that if you need  09:35
10 to.                                          09:35
11   A.  [Witness reviews document].           09:36
12      No, there does not appear to be any    09:36
13 literatures for a specific standard identified in  09:36
14 the list.                                    09:36
15   Q.  Okay.  Did you review any literature   09:36
16 publications or standards in connection with your --  09:36
17 generating your opinions in this case?       09:36
18   A.  Certainly, I used general standards that  09:36
19 are in the industry and would have had considered  09:36
20 those in my normal practice and for this case.  09:36
21   Q.  So would those be like the ICH standards  09:36
22 and --                                       09:36
23   A.  Correct.                              09:36
24   Q.  Okay.  And I understand some of that was  09:36
25 cited in your report; right?                 09:36

Page 24

1    A.  [Witness nods head up and down].       09:36
2    Q.  The standards that you refer to, the    09:36
3  standards in the industry, were any of those  09:36
4  provided to you by plaintiffs' counsel?      09:36
5    A.  No.                                   09:36
6    Q.  Okay.  So all the standards -- industry  09:36
7  standards, FDA rules, regulations, cGMPs      09:37
8  guidances -- those were all things that you found  09:37
9  yourself or were already aware of.           09:37
10      Is that fair?                          09:37
11   A.  Yes.  That is fair.                    09:37
12   Q.  So did counsel at any time say, "Take a  09:37
13 look at this.  Here is a guidance.  Here is a  09:37
14 European guidance.  Here is a, you know, new   09:37
15 standard"?  Anything like that that they actually  09:37
16 provided to you?                             09:37
17   A.  No, ma'am.                            09:37
18   Q.  All right.  If you looked at any        09:37
19 standards -- cGMPs rules, regulations, or     09:37
20 guidances -- in connection with your view of this  09:37
21 case, then they are -- is it true to say they are  09:37
22 cited or referenced in your report?          09:37
23   A.  Yes, ma'am.                           09:37
24   Q.  Did you actually pull a set of those    09:37
25 guidances and rules and cGMPs and look at them, read  09:37

Page 25

1  them; or do you feel like you have a familiarity  09:38
2  enough that you can sort of speak without actually  09:38
3  pulling the document and reading it?         09:38
4    A.  I would pull the document and read it.  09:38
5  Only in that I -- I don't have a memory -- or a  09:38
6  memory of something like that.  Certainly, I use  09:38
7  these documents and standards on a routine basis in  09:38
8  my practice, and I have access to these documents.  09:38
9  I would pull them and read them to make a reference.  09:38
10   Q.  Or if we looked in your file in this case,  09:38
11 would there be copies of those documents in your  09:38
12 electronic file?                             09:38
13   A.  Not for this case.  I keep guidances and  09:38
14 regulations in separate electronic files in -- in my  09:38
15 reference documents.                         09:38
16   Q.  Okay.  On Exhibit 3, just to get some   09:38
17 clarification on this if you want to follow along  09:38
18 with me.                                     09:38
19      And let me ask:  You know, if it's on this  09:39
20 document, does it mean that you actually reviewed it  09:39
21 or does it just mean that it was provided to you by  09:39
22 counsel?                                     09:39
23   A.  It was provided to me by counsel,       09:39
24 certainly, if it's on the list.  And I opened every  09:39
25 document that was provided to me to see what it was.  09:39

7 (Pages 22 - 25)

Page 26

1    The extent to which I used it may differ,    09:39
2    but certainly I opened every document.    09:39
3    Q.  Okay.  Were there things that you asked    09:39
4    for to review from counsel that you did not receive?    09:39
5    A.  Unless it was not provided in the    09:39
6    production, there may have been some things that I    09:39
7    asked for specifically that either I or counsel    09:39
8    could not find in the production.    09:39
9    Q.  Do you recall what those items were?    09:39
10   A.  It would be specifically around raw data    09:39
11   from testing.  And what I mean by "raw data" is not    09:39
12   summaries or certificates of analysis but the actual    09:40
13   raw data and chromatograms.    09:40
14   Q.  Were you requesting chromatograms from ZHP    09:40
15   or from Teva or Torrent or someone else?    09:40
16   A.  All of the above.    09:40
17   Q.  Did you see any chromatograms in your    09:40
18   production?    09:40
19   A.  There were chromatograms that are    09:40
20   associated with method validations, which are tests    09:40
21   to validate whether a method is appropriate.  But I    09:40
22   was -- I didn't see chromatograms for raw testing    09:40
23   batches that came from ZHP.  From either ZHP or --    09:40
24   unless it was referenced in a report, I didn't just    09:40
25   see the raw data for production batches.    09:40

Page 27

1    Q.  So if -- if -- there may have been    09:40
2    references to certain chromatograms that were    09:40
3    included in investigation reports, for example.    09:41
4    You would have seen those?    09:41
5    A.  Yes.  Or a validation report.  Yes.    09:41
6    Q.  Okay.  But you did not see any raw data    09:41
7    containing chromatograms in anything that was    09:41
8    provided to you?    09:41
9    MR. STANOCH:  Objection to form.    09:41
10   Go ahead.    09:41
11   THE WITNESS:  No.    09:41
12   BY MS. LOCKARD:    09:41
13   Q.  So the initial set of materials here are    09:41
14   pleadings.    09:41
15   Did you review these pleadings, the -- the    09:41
16   Complaint?    09:41
17   A.  Yes, ma'am.    09:41
18   Q.  The -- the briefing on the class action?    09:41
19   A.  Yes, ma'am.    09:41
20   Q.  And then we have what is listed as    09:41
21   "Declaration of Numerous Experts."    09:41
22   Now, are you referencing the expert    09:41
23   reports here?    09:41
24   A.  Yeah.  These declarations are expert    09:41
25   reports.    09:41

Page 28

1    Q.  Okay.  There are -- this is a -- this is a    09:41
2    subset of the experts who have been identified in    09:41
3    this case.    09:41
4    Were these just the expert reports that    09:41
5    were provided to you by counsel?    09:42
6    A.  Yes.    09:42
7    Q.  Okay.    09:42
8    And they were germane to what I was    09:42
9    opining on.    09:42
10   Q.  All right.  Do you -- I don't -- some of    09:42
11   these experts have given multiple reports at various    09:42
12   phases in the case.    09:42
13   Can we assume that you -- well, strike    09:42
14   that.    09:42
15   Let me take, for example, so    09:42
16   Dr. Baertschi.  So he gave a report previously in    09:42
17   the case and has given a subsequent report within    09:42
18   the last month at the end of December.    09:42
19   Are you familiar with that?    09:42
20   A.  Yes.    09:42
21   Q.  Okay.  Have you seen Dr. Baertschi's    09:42
22   latest report?    09:42
23   A.  I have.    09:42
24   Q.  Okay.  So there are things that are not on    09:42
25   this list that need to be added.    09:42

Page 29

1    Is it fair?    09:42
2    A.  They were not considered for my expert    09:42
3    report.  I have seen the document, but my expert    09:42
4    report had been generated by that time.  So I didn't    09:42
5    consider those documents when writing my report.    09:43
6    Q.  Sure.    09:43
7    MR. STANOCH:  And I'll state for the record    09:43
8    that, in our objections and responses to the notice of    09:43
9    deposition, we identify the additional materials post    09:43
10   Mr. Russ's report that he was provided with.    09:43
11   MS. LOCKARD:  Yeah.  I have a copy of that.    09:43
12   BY MS. LOCKARD:    09:43
13   Q.  All right.  On the original list there are    09:43
14   numerous deposition transcripts, including company    09:43
15   witnesses from several of the defendants.    09:43
16   Did you review each of these depositions    09:43
17   in total?    09:43
18   A.  I opened the documents, and I would say I    09:43
19   scanned the documents.  They are enormous.  And, no,    09:43
20   I didn't review each and every one in detail,    09:43
21   necessarily.    09:43
22   Q.  Okay.  Do you recall any particular    09:43
23   depositions that you read in full, if any?    09:43
24   A.  Certainly the deposition -- I am sorry.    09:44
25   [Witness reviews document].    09:44

8 (Pages 26 - 29)

Page 30

1 From Mr. Jaiswal from Torrent. Ms. Chitty   09:44
2 from Torrent I read in -- in full. I know those two   09:44
3 I have read in full.   09:44
4 Others I have read excerpts from. I can't   09:44
5 tell you the percentage of each of those that --   09:44
6 that I have read.   09:44
7 Q. Were there any on this list that you   09:44
8 opened and decided they were not relevant for your   09:44
9 purposes and so --   09:44
10 A. Yes.   09:44
11 Q. Which ones were those?   09:44
12 A. I can't recall that right now.   09:44
13 Q. Did you review any depositions of any of   09:44
14 the experts identified in the case?   09:44
15 A. If they are on this list, then they were   09:44
16 provided to me, and I opened them as a minimum.   09:44
17 Q. Okay. I only see declarations for the   09:44
18 experts. I don't see any expert depositions.   09:44
19 So in that case, we can assume you did not   09:45
20 read any of the expert depositions prior to your   09:45
21 report; right?   09:45
22 A. If it's not on this list, then I -- I did   09:45
23 not read it. Yes.   09:45
24 MS. LOCKARD: All right. I'll mark as   09:45
25 Exhibit 4 plaintiffs' counsel's objections and   09:45

Page 31

1 responses to defendants' notice of videotaped   09:45
2 deposition of Philip Russ.   09:45
3 BY MS. LOCKARD:   09:45
4 Q. I'll hand you a copy of that.   09:45
5 (Deposition Exhibit 4 was marked for   09:45
6 identification and is attached hereto.)   09:45
7 BY MS. LOCKARD:   09:45
8 Q. Have you seen this, Mr. Russ?   09:45
9 A. I have not.   09:45
10 MS. LOCKARD: Where is it -- where is it   09:45
11 listed?   09:45
12 Off the record for a second.   09:45
13 THE REPORTER: Off the record?   09:46
14 THE VIDEOGRAPHER: Okay. Going off record   09:46
15 at 9:46 a.m.   09:46
16 (Brief recess.)   09:46
17 THE VIDEOGRAPHER: And we are back on the   09:46
18 record at 9:47 a.m.   09:46
19 BY MS. LOCKARD:   09:46
20 Q. Okay. Mr. Russ, so have you seen this   09:47
21 document that is the objections?   09:47
22 A. No, I have not.   09:47
23 Q. Okay. So Counsel has represented that it   09:47
24 includes a listing of the additional materials you   09:47
25 have reviewed and considered since your report was   09:47

Page 32

1 generated at Page 10, if you'll take a look there.   09:47
2 A. [Witness reviews document].   09:47
3 Yeah. This is correct. I was provided   09:47
4 these reports. But did not consider these reports   09:47
5 when generating my report.   09:47
6 Q. Having reviewed these reports since   09:47
7 generating your report, is there anything that you   09:47
8 need to change about your opinions?   09:47
9 A. No, ma'am.   09:47
10 Q. Okay. So in terms of the expert reports   09:47
11 that were provided here, did you request these or   09:47
12 were these just provided to you by counsel?   09:47
13 A. They were provided to me by counsel for   09:47
14 information purposes.   09:47
15 Q. All right. So in response to this   09:48
16 Number 12, in terms of the plaintiffs' expert   09:48
17 reports, it looks like you reviewed Dr. Hecht's   09:48
18 October report; correct?   09:48
19 A. Yes.   09:48
20 Q. And then the only defendants' reports you   09:48
21 have reviewed since generating your report would be   09:48
22 Dr. Williams, Mr. Anderson, and Dr. Baertschi, and   09:48
23 Dr. Nagaich?   09:48
24 A. Yes, ma'am.   09:48
25 Q. Is that right?   09:48

Page 33

1 Since generating your report, have you   09:48
2 reviewed any additional corporate documents?   09:48
3 A. Yes.   09:48
4 Q. Okay. What have you reviewed since   09:48
5 generating your report?   09:48
6 MR. STANOCH: Objection. Vague. Talk about   09:48
7 new documents that he hasn't reviewed before? Or...   09:48
8 MS. LOCKARD: Yes. Yes. Let's do that.   09:48
9 Let's start there.   09:48
10 MR. STANOCH: Okay.   09:48
11 BY MS. LOCKARD:   09:48
12 Q. Any additional documents that you had not   09:48
13 previously reviewed prior to your report, have you   09:49
14 now reviewed new documents or additional documents?   09:49
15 A. Yes. I was provided some documents that   09:49
16 were referenced in -- in defendant reports that were   09:49
17 not in the original production.   09:49
18 Q. Okay. What were those documents?   09:49
19 A. Some procedures, SOP references, standard   09:49
20 operating procedure references from Mr. -- I   09:49
21 apologize. I'm unable to reference his name -- from   09:49
22 Mr. Nagaich [verbatim].   09:49
23 Q. Okay.   09:49
24 A. Some -- some items were referenced within   09:49
25 his report that had not -- did not have Bates   09:49

9 (Pages 30 - 33)

Page 34

1  numbers that were provided to me for review.    09:49
2      Q.  Any other documents that you had not seen    09:49
3  before generating your report that you have now    09:50
4  since reviewed?    09:50
5      A.  No.    09:50
6      Q.  Have you reviewed, since generating your    09:50
7  report, any literature, any additional standards,    09:50
8  any additional -- extra material that would not be    09:50
9  either listed in your report or on your materials    09:50
10  considered list?    09:50
11      A.  No, ma'am.    09:50
12      Q.  If we look at your file, your electronic    09:50
13  file, is there anything else in it regarding this    09:50
14  case other than what we have already discussed that    09:50
15  is on this exhibit and what has been disclosed as --    09:50
16  in the objections and the documents that you just    09:50
17  described about the SOPs?    09:50
18      A.  No, ma'am.    09:50
19      Q.  Did you take any handwritten notes in your    09:50
20  review of the case?    09:51
21      A.  No, ma'am.    09:51
22      Q.  Did you take any typed notes?  Do you type    09:51
23  up notes?    09:51
24      A.  Actually, no.    09:51
25      Q.  Do you -- when you review the materials,    09:51

Page 35

1  do you annotate or highlight?    09:51
2      A.  Actually, no.    09:51
3      Q.  In connection with your review of the    09:51
4  case, have you spoken with anyone other than counsel    09:51
5  for the plaintiffs?    09:51
6      A.  No, ma'am.    09:51
7      Q.  Have you seen any -- well, strike that.    09:51
8      All right.  Let's get a copy of your CV    09:52
9  marked as an exhibit.    09:52
10      MS. LOCKARD:  This will be 5.    09:52
11      (Deposition Exhibit 5 was marked for    09:52
12      identification and is attached hereto.)    09:52
13  BY MS. LOCKARD:    09:53
14      Q.  All right.  Is that an up-to-date copy of    09:53
15  your CV, Mr. Russ?    09:53
16      A.  It is.    09:53
17      Q.  When is the last time you updated this?    09:53
18      A.  I update my CV probably every four to    09:53
19  six months.    09:53
20      Q.  Do you -- do you have different CVs that    09:53
21  you use for different purposes?    09:53
22      A.  No, I don't.  This is my standard    09:53
23  consulting CV.    09:53
24      Q.  Your -- your education is not on your CV.    09:53
25  Why is that?    09:53

Page 36

1      A.  It's not something I placed on my CV.    09:53
2      Q.  What year did you get your degree?    09:53
3      A.  1995.    09:53
4      Q.  Okay.  And is the -- the BS degree from    09:53
5  1995, is that the only academic degree you hold?    09:54
6      A.  It is.    09:54
7      Q.  Have you ever held any teaching or    09:54
8  academic positions?    09:54
9      A.  No, ma'am.    09:54
10      Q.  So I noticed that your CV doesn't include    09:54
11  any articles, abstracts, or publications authored by    09:54
12  you; correct?    09:54
13      A.  No, it doesn't.    09:54
14      Q.  Have you not authored any publications or    09:54
15  literature in your field?    09:54
16      A.  I have presentations and items like that,    09:54
17  but I don't include that type of information on my    09:54
18  CV.    09:54
19      Q.  Have you -- are you published as an author    09:54
20  in any peer-reviewed literature journal?    09:54
21      A.  No, I'm not.    09:54
22      Q.  In terms of seminar presentations, I    09:54
23  assume you give seminar presentations to potential    09:54
24  clients that you are working with?    09:54
25      A.  Yes.  Or to -- not potential clients, but    09:55

Page 37

1  to clients who have asked for me to provide those    09:55
2  types of presentations.    09:55
3      Q.  Have you ever provided any presentations    09:55
4  to the FDA or any other regulatory body?    09:55
5      A.  I provided presentations in forums where    09:55
6  members of FDA have been present, but not at the    09:55
7  request of -- or the request -- I'm sorry -- of FDA    09:55
8  or any other regulatory body.    09:55
9      Q.  Okay.  In that context, have you provided    09:55
10  professional presentations at professional seminars    09:55
11  where FDA was present?    09:55
12      A.  Yes.    09:55
13      Q.  Okay.  When is the last time you did that?    09:55
14      A.  Quite a few years ago.  I couldn't give    09:55
15  you a year.  I used to be highly affiliated with    09:55
16  what is called the ISP and gave presentations at    09:55
17  that time in -- the same time that I was working for    09:56
18  Abbott Vascular on my CV would be a time that I was    09:56
19  involved with ISP.    09:56
20      But since then I haven't given many    09:56
21  presentations in public forum.    09:56
22      Q.  What does "ISP" stand for?    09:56
23      A.  It's the International Society of    09:56
24  Pharmaceutical Engineers.    09:56
25      Q.  Okay.  You are not an engineer; correct?    09:56

10 (Pages 34 - 37)

Page 38

1  A. No, I'm not. ISP is an organization -- an  09:56
2  industry self-regulation where they provide guidance  09:56
3  and training materials.  09:56
4     Although they are identified as an  09:56
5  engineering group, they do a lot more than  09:56
6  engineering.  09:56
7  Q. Why are you no longer affiliated with  09:56
8  them?  09:56
9  A. It's not that I'm no longer affiliated  09:56
10  with them. I just don't present in their -- in  09:56
11  their forums any longer. I'm no longer a member.  09:56
12     When I worked for Abbott Vascular, I was  09:57
13  required to provide presentations as part of -- just  09:57
14  our presence as -- as a self-regulating company  09:57
15  within the industry.  09:57
16  Q. Okay. So now that you no longer work at  09:57
17  Abbott do you, in your present role, provide  09:57
18  professional presentations as part of professional  09:57
19  seminars?  09:57
20  A. I do most certainly, but I do that for  09:57
21  pay. I do that for compensation.  09:57
22  Q. Okay. You no longer do that as part of  09:57
23  your job for free?  09:57
24  A. Correct.  09:57
25  Q. All right. Are you a member of any  09:57

Page 39

1  professional organizations or bodies that are not  09:57
2  listed on your CV?  09:57
3  A. Not currently, no.  09:57
4  Q. Have you ever given any presentations on  09:57
5  the issues that are central to this case, such as,  09:58
6  you know, the -- the detection of impurities in  09:58
7  pharmaceutical products?  09:58
8  A. No.  09:58
9  Q. Have you ever given any presentations on  09:58
10  issues related to nitrosamines?  09:58
11  A. No.  09:58
12  Q. Have you ever written any papers or  09:58
13  publications about nitrosamines?  09:58
14  A. No.  09:58
15  Q. Have you ever had an occasion to perform  09:58
16  work, either as a consultant or as an employee of a  09:58
17  company, to evaluate raw data chromatograms for  09:58
18  presence of what turned out to be nitrosamines?  09:58
19  A. No, not specifically for nitrosamines, but  09:58
20  I certainly have reviewed chromatograms and raw  09:58
21  data.  09:58
22  Q. So you -- you yourself have never been in  09:58
23  the shoes of someone looking at a chromatogram in  09:59
24  the raw data trying to determine whether that is a  09:59
25  nitrosamine or not a nitrosamine?  09:59

Page 40

1     MR. STANOCH: Objection --  09:59
2     THE WITNESS: No.  09:59
3     MR. STANOCH: -- to form.  09:59
4     Go ahead.  09:59
5  BY MS. LOCKARD:  09:59
6  Q. When did you first learn about the issue  09:59
7  with nitrosamines being present in pharmaceutical  09:59
8  products?  09:59
9     MR. STANOCH: Objection. Vague.  09:59
10     THE WITNESS: Certainly when contacted by  09:59
11  counsel. The only other occasion where I had some  09:59
12  knowledge of that type of contamination was news  09:59
13  reports around Zyrtec [verbatim].  09:59
14  BY MS. LOCKARD:  09:59
15  Q. Okay. Do you mean "Zantac"?  09:59
16  A. Or Zantac. I am sorry. Yes. I get --  09:59
17  Q. Okay. So did you see any publications  09:59
18  from FDA or in the industry related to  09:59
19  Valsartan-containing nitrosamines prior to being  10:00
20  contacted by counsel?  10:00
21  A. I can't say that I did.  10:00
22  Q. You cannot say that you did?  10:00
23  A. I cannot say that I did.  10:00
24     I review an enormous amount of information  10:00
25  that comes from FDA about enforcement actions about  10:00

Page 41

1  what is going on in the industry, but I can't say  10:00
2  that, prior to being contacted by counsel to opine  10:00
3  on this matter, that I can remember a time or date  10:00
4  when I was specifically reading articles around  10:00
5  Valsartan. Unfortunately, I can't retain all of  10:00
6  that information.  10:00
7  Q. Okay. Even in your role as a -- in the  10:00
8  quality assurance departments at your companies, you  10:00
9  never recall hearing or seeing anything about the  10:00
10  potential presence for nitrosamines, did you?  10:00
11     MR. STANOCH: Objection.  10:01
12     Go ahead.  10:01
13     THE WITNESS: As for this matter in -- in  10:01
14  Valsartan? If you can clarify the question.  10:01
15  BY MS. LOCKARD:  10:01
16  Q. In your role in working in the quality  10:01
17  assurance department in your prior employment,  10:01
18  working for drug companies, you never heard or saw  10:01
19  anything about the potential for the presence of  10:01
20  nitrosamines in drug products, did you?  10:01
21     MR. STANOCH: Objection.  10:01
22     Go ahead.  10:01
23     THE WITNESS: I can't say that I -- I can't  10:01
24  recall.  10:01
25  ///

11 (Pages 38 - 41)

Page 42

1  BY MS. LOCKARD:                        10:01
2     Q.  Okay.  You --                   10:01
3     A.  Again, I have been consulting since 2008.  10:01
4  So that's quite a long time ago for me to recall  10:01
5  while I was working for a firm on whether there was  10:01
6  specific concerns around nitrosamines.  10:01
7     Q.  Okay.  But prior to 2008 when you were  10:01
8  working for drug companies, you don't recall ever  10:01
9  hearing anyone discuss the potential for the  10:01
10 presence of nitrosamines in the drug products;  10:01
11 right?                                  10:01
12    A.  I -- I -- in my role did not hear that  10:02
13 specifically that I can recall.  10:02
14    Q.  Since you have been an outside consultant,  10:02
15 have you ever had occasion to provide services to a  10:02
16 firm or a company with respect to investigating the  10:02
17 presence of nitrosamines?  10:02
18    A.  Not specifically nitrosamines but  10:02
19 certainly other types of impurities that would occur  10:02
20 in drug products or drug substances.  10:02
21    Q.  Okay.  And so you would agree in --  10:02
22 drug -- drug impurities are fairly common, and there  10:02
23 is a wide variety of them; correct?  10:02
24    MR. STANOCH:  Objection to form.  10:02
25    THE WITNESS:  Impurities are something that  10:02

Page 43

1  is evaluated in pharmaceuticals and in drug  10:02
2  substances.  When I say "pharmaceuticals," I mean  10:02
3  finished drug products and drug substances.  10:02
4     So certainly impurities are a -- are  10:02
5  something that is evaluated.  And there are some  10:02
6  levels of impurities that are present in -- in  10:02
7  pharmaceutical products and drug substances.  10:03
8  BY MS. LOCKARD:                        10:03
9     Q.  But in your role as a consultant, you have  10:03
10 never been hired by a company to help investigate  10:03
11 the potential for nitrosamine contamination.  10:03
12    Is that fair?                        10:03
13    A.  That is fair.                      10:03
14    Q.  When were you first contacted about this  10:03
15 case?                                   10:03
16    A.  I think in the middle of last year.  I  10:03
17 can't give exact date.  Maybe the retention letter  10:03
18 would give us a better idea.  I think the middle of  10:03
19 last year.  I have quite a few clients.  So...  10:03
20    MS. LOCKARD:  All right.  So we're up to  10:03
21 Exhibit 6.                             10:03
22    So I'm just going to pass it over there to  10:03
23 mark.                                  10:04
24    (Deposition Exhibit 6 was marked for  10:04
25    identification and is attached hereto.)  10:04

Page 44

1     THE WITNESS:  Thank you.               10:04
2  BY MS. LOCKARD:                        10:04
3     Q.  Okay.  You mentioned --             10:04
4     A.  The middle.                        10:04
5     Q.  -- the "retention letter."           10:04
6     Is this what you meant by the "retention  10:04
7  letter"?                               10:04
8     A.  Yes, it is.                        10:04
9     Q.  Okay.  And so the date on this is  10:04
10 June 16th, 2022; right?  10:04
11    A.  Correct.                          10:04
12    Q.  Is that roughly the time around which you  10:04
13 were first contacted about the case?  10:04
14    A.  It is.  Mid-2022.                   10:04
15    Q.  All right.  And the letter itself is -- is  10:04
16 from Conlee Whiteley and Ruben Honik at the -- do  10:04
17 you see that on the signature line?  10:04
18    A.  Yes.                              10:04
19    Q.  Okay.  Prior to being contacted about this  10:04
20 case, had you ever worked with Conlee Whiteley?  10:04
21    A.  No.                               10:04
22    Q.  Okay.  Prior to being contacted about this  10:04
23 case, had you ever worked with Ruben Honik?  10:04
24    A.  No.                               10:04
25    Q.  Okay.  Do you know how they got your name?  10:04

Page 45

1     A.  I am not exactly sure of that as well.  10:04
2     Q.  Do you advertise your expert witnessing  10:04
3  services?                              10:05
4     A.  No.  Not -- not overtly.  It's something  10:05
5  that is a capability that would be on my LinkedIn or  10:05
6  something along those lines.  10:05
7     My practice in general is a  10:05
8  word-of-mouth-type of referral business.  I haven't  10:05
9  had the need to advertise my services.  It's a very  10:05
10 small industry, and there is very small numbers of  10:05
11 people who do the type of work that we do.  10:05
12    Q.  So are you, to your knowledge, on any  10:05
13 databases of experts that lawyers can consult when  10:05
14 they are looking for experts for litigation?  10:05
15    A.  Not that I am aware of.  Not specifically.  10:05
16 I haven't asked to be included on such lists.  10:05
17    Q.  And do you -- you don't pay to be included  10:05
18 on the list?                           10:05
19    A.  No.  I don't pay.                   10:05
20    Q.  Is -- do you -- do you have a website for  10:05
21 your company?                          10:05
22    A.  I have in the past.  It's -- I've shut  10:05
23 this down because I don't receive any business  10:06
24 through it.                             10:06
25    My main vehicle through which strangers,  10:06

12 (Pages 42 - 45)

Page 46

1  if you will, or a client who I have not worked with    10:06
2  in the past or who doesn't have a direct affiliation    10:06
3  or referral is through my LinkedIn.    10:06
4      Q.  I wanted to ask too.  So your company is    10:06
5  IcGXP; correct?    10:06
6      A.  Correct.    10:06
7      Q.  What does that stand for?    10:06
8      A.  It's Innovative consultants GXP.  So the    10:06
9  industry calls the regulations -- the regulations    10:06
10 are called the "Current Good Manufacturing    10:06
11 Practice."  But across there are other practices.    10:06
12 There is "Good Clinical Practice."  There is "Good    10:06
13 Laboratory Practice."  So the "X" stands for that    10:06
14 "Manufacturing, Laboratory, Clinical."  So that's    10:06
15 why the "X" is there.    10:06
16     Really just shows in the name of the    10:07
17 company what my capability or what my expertise is,    10:07
18 which is in GXP matters.    10:07
19     Q.  So how long has that been the name of your    10:07
20 company?    10:07
21     A.  Since its inception --    10:07
22     Q.  2008.    10:07
23     A.  -- in 2008.    10:07
24     Q.  Did you come up with that name yourself?    10:07
25     A.  I did.    10:07

Page 47

1      Q.  Do you have any employees?    10:07
2      A.  No.  I don't have direct employees.  But I    10:07
3  use colleagues who work with me routinely who are    10:07
4  paid on a 1099 basis.    10:07
5      Q.  Okay.  Did you use any of those colleagues    10:07
6  in this case?    10:07
7      A.  I did.    10:07
8      Q.  Okay.  And would any time they spent be    10:07
9  reflected on your invoices?    10:07
10     A.  It is.    10:07
11     Q.  Okay.  So no one else that you paid or    10:07
12 worked with assisted you on your review of this case    10:07
13 other than those reflected in the invoice; right?    10:07
14     A.  Yes.    10:07
15     Q.  Okay.  And you are listed as a principal    10:07
16 consultant for your company; correct?    10:07
17     A.  Yes.    10:07
18     Q.  And you are the principal and the only    10:07
19 consultant for your company; correct?    10:08
20     A.  Correct.    10:08
21     Q.  So in looking back at the exhibit,    10:08
22 when you were first contacted -- let me ask too:    10:08
23     Because Mr. David Stanoch is here    10:08
24 defending your deposition today.  Had you ever    10:08
25 worked with Mr. Stanoch before being contacted about    10:08

Page 48

1  this case?    10:08
2      A.  No.    10:08
3      Q.  Okay.  Do you know any of the other    10:08
4  plaintiffs' lawyers who are involved in this case    10:08
5  other than those three names I have mentioned?    10:08
6      A.  No.    10:08
7      Q.  Okay.  So have you met with anyone, any    10:08
8  plaintiffs' lawyers in this case other than    10:08
9  Mr. Stanoch?    10:08
10     A.  Yes.    10:08
11     Q.  Who else have you met with?    10:08
12     THE WITNESS:  You'll have to help me, David.    10:08
13     Daniel, Mr. --    10:08
14     MR. STANOCH:  Whatever you remember.    10:08
15     THE WITNESS:  Daniel; Madeline, I think.    10:08
16 And that's all I can recall.    10:09
17 BY MS. LOCKARD:    10:09
18     Q.  Okay.  And Madeline is with Daniel's firm;    10:09
19 correct?  Or do you know that?    10:09
20     A.  I am not completely sure the affiliations.    10:09
21     Q.  All right.  When did you -- let's take it    10:09
22 this way:    10:09
23     So we'll start off -- when you were first    10:09
24 contacted, did you get a phone call, LinkedIn    10:09
25 message, or how did you --    10:09

Page 49

1      A.  A phone message that I responded to.    10:09
2      Q.  Who -- who left the message?    10:09
3      A.  I think it was Mr. Hon--- Mr. Honik --    10:09
4      Q.  Okay.    10:09
5      A.  -- was my original contact.    10:09
6      Q.  Okay.  How -- how much time elapsed    10:09
7  between your original contact and this June 16th    10:09
8  letter?    10:09
9      A.  I don't recall the exact number of days.    10:09
10 I would say maybe a week or so.    10:09
11     Q.  Okay.  And so you -- your first contact    10:10
12 was from a phone call from Mr. Honik; correct?    10:10
13     A.  Correct.    10:10
14     Q.  And how long was that phone call?    10:10
15     A.  It wasn't a phone call.  It was a message    10:10
16 that was left on my voicemail.  And then I responded    10:10
17 to that call.    10:10
18     Q.  All right.  And did you call and speak    10:10
19 with Mr. Honik?    10:10
20     A.  I did.    10:10
21     Q.  Okay.  How long was that conversation?    10:10
22     A.  I don't recall.  It was brief.    10:10
23     Q.  Okay.  What did he tell you?    10:10
24     MR. STANOCH:  Object --    10:10
25     THE WITNESS:  I didn't say --    10:10

13 (Pages 46 - 49)

Page 50

1    MR. STANOCH: -- objection.    10:10
2    You are asking for attorney discussions with    10:10
3 an expert. So...    10:10
4 BY MS. LOCKARD:    10:10
5    Q.  Well, I -- I would like to know what did    10:10
6 he present to you about the facts of the case?  How    10:10
7 about that?    10:10
8    MR. STANOCH:  Same objection.    10:10
9    You are asking what Mr. Honik said to our    10:10
10 retained expert.    10:10
11    MS. LOCKARD:  Well, he's not a client.  I    10:10
12 mean, there's not an attorney-client privilege.  I    10:10
13 can't get into work, you know, product.  But --    10:10
14    MR. STANOCH:  Right.  What -- what was said    10:10
15 between counsel and retained expert is work product.    10:10
16 Objection.    10:10
17    MS. LOCKARD:  Well, I disagree with that.    10:11
18 If there was discussion about facts, documents, and    10:11
19 things of that nature that are not reflective of work    10:11
20 product and strategic considerations, I disagree.    10:11
21 But...    10:11
22    MR. STANOCH:  Mr. Russ, if you can discuss    10:11
23 anything you may remember you discussed with Mr. Honik    10:11
24 that does not reveal substance about the potential    10:11
25 opinion you would offer in this case.    10:11

Page 51

1    THE WITNESS:  Okay.    10:11
2    Certainly I had a conversation that "Would    10:11
3 you be interested in a matter that dealt with GMP?    10:11
4    "Yes, sir.  I would be interested in that    10:11
5 matter."    10:11
6    And then retention occurred.    10:11
7    And then they would have disclosed to me    10:11
8 information.    10:11
9    But on initial calls with any client,    10:11
10 whether it be for a legal matter or for anything else,    10:11
11 in the absence of a non-disclosure agreement, I don't    10:11
12 have any discussions on details of the matter.    10:11
13    "Would you be interested?  Do you have time    10:11
14 on your calendar to -- to look at this" is the extent    10:12
15 of those types of conversations.    10:12
16 BY MS. LOCKARD:    10:12
17    Q.  Did he tell you who the defendants were?    10:12
18    A.  No.  I wouldn't have asked such a thing    10:12
19 either.    10:12
20    Q.  Okay.  Did he talk about any of the    10:12
21 defendants being foreign defendants, Chinese    10:12
22 manufacturer, or anything like that?    10:12
23    A.  No.    10:12
24    Q.  What -- on that call, I assume you told    10:12
25 him you would be interested, you had time; correct?    10:12

Page 52

1    A.  Exactly.    10:12
2    Q.  What was the next step?  Did he send you    10:12
3 materials?  You got this letter from Mr. Honik?    10:12
4    A.  To be retained.  Certainly to be retained,    10:12
5 and then any disclosure of documents or any further    10:12
6 information would be all under some non-disclosure.    10:12
7    Certainly I was informed of protective    10:12
8 order whether signed it or not is -- you know, I    10:12
9 have done this type of work before.  I don't work    10:12
10 with any client without a non-disclosure agreement.    10:12
11    Q.  Okay.  And when you say "non-disclosure,"    10:12
12 do you mean one that you generate and send to    10:13
13 counsel?    10:13
14    A.  In legal matters, normally I don't    10:13
15 generate one.    10:13
16    It depends on the clients.  Some clients    10:13
17 have non-disclosure agreements that are in their    10:13
18 corporate or legal format that they want me to sign.    10:13
19    In the absence of that, I do have    10:13
20 non-disclosure agreements -- two-way or one-way    10:13
21 non-disclosure agreements that I will send to a    10:13
22 client.  But I don't work without a non-disclosure    10:13
23 agreement.    10:13
24    Q.  So --    10:13
25    A.  Even -- even prior to signing the    10:13

Page 53

1 retention or with a client -- not necessarily,    10:13
2 again, in the legal side of things, but before an    10:13
3 agreement is put in place or before I can estimate a    10:13
4 job, I'll have a non-disclosure agreement in place.    10:13
5    Q.  Did you sign a non-disclosure in this    10:13
6 case?    10:13
7    A.  No.  As I said, I don't normally do    10:13
8 non-disclosures because there is normally a    10:13
9 protective order or something along those lines in    10:13
10 those matters.    10:13
11    Q.  Okay.  The letter that you have that you    10:13
12 received on June 16th that sets forth your fees    10:14
13 here?    10:14
14    A.  Yes.    10:14
15    Q.  Okay.  And is that -- 350, 400, are those    10:14
16 still the fees that you charge today?    10:14
17    A.  It is.    10:14
18    Q.  Do you charge the same amount for    10:14
19 testimony at trial?    10:14
20    A.  I haven't listed that here.    10:14
21    Q.  Okay.  Have you testified at trial before?    10:14
22    A.  I have not.    10:14
23    Q.  Okay.  What are you charging for your    10:14
24 attendance here today?    10:14
25    A.  400 would be for an in-person deposition    10:14

14 (Pages 50 - 53)

Page 54

1 services.                                10:14
2    Q.  All right.  Now, when you received this   10:14
3 letter, did -- did you also receive the initial set   10:14
4 of materials for review at that time?       10:14
5    A.  This -- no.  After I would have -- after   10:14
6 we would have agreed to this letter, then I would   10:14
7 have received materials.                 10:14
8    Q.  Okay.  Did you receive the materials   10:14
9 listed on your materials considered list all in one   10:14
10 production or did it come in different pieces?   10:15
11    A.  I think the vast majority of it was   10:15
12 provided upfront, but there were other pieces as   10:15
13 well over the period of time.             10:15
14    Q.  And when those materials were sent to you,   10:15
15 were they -- were they sent via email, an email   10:15
16 link?                                    10:15
17    A.  It was done through Dropbox, share file.   10:15
18 I believe it's Dropbox.                  10:15
19    Q.  All right.  So when did you have the   10:15
20 meeting with Mr. Nigh?                   10:15
21    A.  I'm sorry.  Mr. Nigh?             10:15
22    Q.  Daniel Nigh and Madeline?          10:15
23    A.  Oh.  I have had a couple of meetings.   10:15
24 These would be over the last -- since June.  Maybe   10:15
25 twice I have had discussions.  I can't give you the   10:15

Page 55

1 exact dates of those meetings.            10:15
2    Q.  And those were in person or over Zoom?   10:15
3    A.  Over Zoom.                       10:15
4    Q.  All right.  Tell me about the process for   10:16
5 drafting your report.  Did you do that in the   10:16
6 presence of counsel, or did you do that on your own   10:16
7 and then share drafts?                   10:16
8    A.  Completely on my own and then share   10:16
9 drafts.                                  10:16
10    Q.  Okay.  The report that you generated in   10:16
11 this case, is it your work that you actually drafted   10:16
12 and typed?                               10:16
13    A.  Yes.                            10:16
14    Q.  Do you have a template that you use for   10:16
15 your reports?                            10:16
16    A.  No.                             10:16
17    Q.  All right.  Have you met with Mr. Stanoch   10:16
18 prior to this deposition today?           10:16
19    A.  Yes.                            10:16
20    Q.  You met to prepare for your deposition?   10:16
21    A.  Uh, yes.                        10:16
22    Q.  Okay.  How long did you meet with   10:16
23 Mr. Stanoch?                             10:17
24    A.  A couple of hours.                10:17
25    Q.  When was that?                   10:17

Page 56

1    A.  Yesterday.                       10:17
2    Q.  Did you have any phone conversations to   10:17
3 prepare?                                 10:17
4    A.  Previously, yes.  An hour conversation   10:17
5 twice before, previous weeks in December.    10:17
6    Q.  With Mr. Stanoch?                  10:17
7    A.  Correct.                         10:17
8    Q.  What did you do to prepare for your   10:17
9 deposition other than meeting and discussing the   10:17
10 case with counsel?                       10:17
11    A.  I read my own report to refresh my memory.  10:17
12    Q.  When is the last time you read your   10:17
13 report?                                  10:17
14    A.  The 29th of December, I think.       10:17
15    Q.  Okay.  And in reviewing the report, did   10:17
16 you see any changes that you thought needed to be   10:17
17 made?                                    10:17
18    A.  No, ma'am.                       10:17
19    Q.  Okay.  So your report as it is, you stand   10:17
20 by it today?                             10:17
21    A.  I do.                           10:17
22    Q.  Do you anticipate making any changes or   10:17
23 supplements to that prior to trial?         10:17
24    A.  Not at this time.  No.             10:17
25    Q.  Okay.  Other than reading your report,   10:17

Page 57

1 what else did you do to prepare for today?   10:17
2    A.  I had the meetings I have described.   10:18
3    Q.  On your CV, just looking at your -- your   10:18
4 job positions, there's a reference to working at   10:18
5 Watson Laboratories?                     10:18
6    A.  Yes.                            10:18
7    Q.  From October 2000 to 2006; correct?   10:18
8    A.  Yes.                            10:18
9    Q.  What did you do for Watson?          10:18
10    A.  Initially, I had two positions at Watson.   10:18
11       The first was to support the manufacturing   10:18
12 facility in Corona, California, as -- to support the   10:18
13 quality system there.                    10:18
14       So my job was to oversee the GMP   10:18
15 compliance and quality system at the site.   10:19
16       And then subsequently I went to work for   10:19
17 corporate Watson, which was also in Corona,   10:19
18 California, and at that time I had responsibility   10:19
19 for their contract manufacturing organization, the   10:19
20 quality oversight of contract manufacturing and   10:19
21 suppliers for Watson --                  10:19
22    Q.  Why did --                       10:19
23    A.  -- as a -- as a corporation.  I'm sorry.   10:19
24    Q.  Okay.  When you had oversight at the   10:19
25 manufacturing site in Corona, what was manufactured   10:19

15 (Pages 54 - 57)

Page 58

```
 1  there?                                      10:19
 2    A.  They manufactured two main product    10:19
 3  categories: birth control and hydrocodone/APAP  10:19
 4  combinations, which is a pain management, Vicodin,  10:19
 5  generic Vicodin, if you will.                10:19
 6    Q.  Why did you leave Watson?             10:19
 7    A.  I primarily left Watson from a location  10:19
 8  perspective.                                10:20
 9        I lived in Murrieta, California, which is  10:20
10  near Temecula, California.  And just the commute was  10:20
11  very, very long.  And I decided that from a  10:20
12  work-life balance perspective it made more sense for  10:20
13  me to work more local to my home.           10:20
14    Q.  When you were at Watson, it was completely  10:20
15  unaffiliated with Teva at that time; correct?  10:20
16    A.  Correct.                              10:20
17    Q.  And do you have any understanding about  10:20
18  the affiliation between Watson and Actavis and Teva?  10:20
19    A.  Only in that I know about the         10:20
20  acquisitions.  But I was not working with any of  10:20
21  those companies.  So I knew about it from industry  10:20
22  that Watson was taken over by Actavis.  That Actavis  10:20
23  was ultimately absorbed by Teva.  I knew people,  10:20
24  certainly, who worked at Watson or at Actavis.  10:20
25    Q.  To your knowledge, did Watson hold any  10:21
```

Page 59

```
 1  approved ANDAs for Valsartan when you worked there?  10:21
 2    A.  Not for the Corona facility.  No.     10:21
 3    Q.  What about from a corporate perspective?  10:21
 4    A.  Not that I was responsible for.  No.  10:21
 5    Q.  Okay.  Do you have an understanding of  10:21
 6  when Watson submitted the ANDA to FDA for Valsartan?  10:21
 7    A.  It's in my report; so I understand it from  10:21
 8  that perspective.                           10:21
 9    Q.  Without looking at your report, do you  10:21
10  recall the time frame for that?             10:21
11    A.  No.                                   10:21
12    Q.  Okay.  So there's a reference in your  10:21
13  report about the approval of the ANDA.  But the  10:21
14  submission of the ANDA for Watson, I believe, was in  10:21
15  2008.  And then -- and you left Watson in 2006?  10:21
16    A.  Correct.                              10:22
17    Q.  Okay.  So there would -- to your        10:22
18  knowledge, there would not have been -- would not  10:22
19  likely have been any overlap in Watson preparing for  10:22
20  submission of that ANDA in your tenure at Watson.  10:22
21  Is that fair?                               10:22
22    A.  That is -- that is fair.  Yes.  There  10:22
23  would be no overlap.  I also have no responsibility  10:22
24  for the regulatory application submission.  It  10:22
25  wasn't my role.                             10:22
```

Page 60

```
 1    Q.  Okay.  And that's really true for all of  10:22
 2  your employment; correct?  You have never really had  10:22
 3  a role in the preparation and submission of the  10:22
 4  regulatory applications for drugs?          10:22
 5    A.  I would be involved in the preparation of  10:22
 6  what is called the CMC section, the Chemistry,  10:22
 7  Manufacturing, Control Section, but as far as  10:22
 8  management of the application or dates of  10:22
 9  application, that was -- that is done by regulatory  10:22
10  affairs.                                    10:22
11        So I would provide information that would  10:22
12  go into a regulatory application, specifically the  10:22
13  CMC.                                        10:22
14    Q.  But you have never been responsible for  10:22
15  preparing and submitting an ANDA or an NDA yourself?  10:22
16    A.  As a whole, no.                       10:23
17    Q.  Okay.  And the same would be -- you would  10:23
18  not have any role in your prior jobs in preparing a  10:23
19  CBE, or Changes Being Effected, and submitted to  10:23
20  FDA?                                        10:23
21    A.  The submission I wouldn't do.  But the  10:23
22  source information I would provide to regulatory  10:23
23  affairs.                                    10:23
24    Q.  So for any quality source information you  10:23
25  would provide an input on that?             10:23
```

Page 61

```
 1    A.  Quality.  Chemistry.  Yes.            10:23
 2    Q.  Have you ever been terminated from any  10:23
 3  position?                                   10:23
 4    A.  No.                                   10:23
 5    Q.  And I guess I should ask as well.      10:23
 6        But you -- in your role in quality, it   10:23
 7  would not have been your function or role to prepare  10:23
 8  the submission of a DMF?                    10:23
 9    A.  No.  I have not worked for a drug       10:24
10  substance manufacturer directly, where I would have  10:24
11  been involved in submission of the DMF.     10:24
12    Q.  Have you ever served on any committees or  10:24
13  been involved with any bodies that handled the  10:24
14  drafting of standards or guidances in your field?  10:24
15    A.  No.                                   10:24
16    Q.  And I don't see on your CV any particular  10:24
17  awards or accolades in your field; correct?  10:24
18    A.  No.                                   10:24
19    Q.  Is there -- I mean, is there -- you know,  10:24
20  any award or particular professional moment that you  10:24
21  are particularly proud of?                  10:25
22    A.  Not that I can state here.  No.        10:25
23    Q.  Okay.  Is there anything else that -- with  10:25
24  respect to your professional qualifications,  10:25
25  experience, and background that is not on your CV?  10:25
```

16 (Pages 58 - 61)

Page 62

1    A.  No.                          10:25
2    Q.  You are not a toxicologist; correct?    10:25
3    A.  No.                          10:25
4    Q.  Okay.  You are not an expert on the    10:25
5  potential health effects of nitrosamines; correct?    10:25
6    A.  No.                          10:25
7    Q.  And I assume you are not planning to offer    10:25
8  any opinions about whether nitrosamines cause human    10:25
9  cancer in this case?                10:25
10    A.  No.                          10:25
11    Q.  And you are not an expert on          10:25
12  bioequivalency or bioequivalence?          10:25
13    A.  I'm not.                      10:25
14    Q.  In other words, you don't do          10:25
15  bioequivalence testing yourself?            10:26
16    A.  No.                          10:26
17    Q.  And the same for therapeutic equivalence.    10:26
18  You don't consider yourself an expert in therapeutic    10:26
19  equivalence; you don't do testing for therapeutic    10:26
20  equivalence purposes?                10:26
21    A.  No.                          10:26
22    Q.  That's correct?                  10:26
23    A.  That is correct.                10:26
24    Q.  Let's get the -- your invoices marked as    10:27
25  the next exhibit.                  10:27

Page 63

1        MS. LOCKARD:  What are we at?  6?    10:27
2        MR. HARKINS:  7.                10:27
3        (Deposition Exhibit 7 was marked for    10:27
4        identification and is attached hereto.)    10:27
5  BY MS. LOCKARD:                    10:27
6    Q.  Okay.  Mr. Russ, if you'll take a look at    10:27
7  what has been handed to you as Exhibit 7.    10:27
8        Does this appears --            10:27
9        MR. STANOCH:  Do you have a copy, Counsel?    10:27
10        MS. LOCKARD:  Oh.  Yes.  Sorry.    10:27
11        MR. STANOCH:  It's okay.  Thank you.    10:27
12  BY MS. LOCKARD:                    10:27
13    Q.  I assume you have seen these?        10:27
14    A.  Yes.                        10:27
15        MS. LOCKARD:  And Mr. Stanoch has.    10:27
16  BY MS. LOCKARD:                    10:27
17    Q.  So what I was provided in the production    10:27
18  from Mr. Stanoch was that they are -- it looks like    10:28
19  three invoices; correct?              10:28
20    A.  Correct.                      10:28
21    Q.  Okay.  To your knowledge, are these the    10:28
22  only invoices you've issued to date?        10:28
23    A.  It is.  Yes.                  10:28
24    Q.  All right.  So there is a reference in    10:28
25  these invoices to a Sharon Crook?        10:28

Page 64

1    A.  Correct.                      10:28
2    Q.  Who is Sharon Crook?              10:28
3    A.  Sharon Crook is a colleague I used to help    10:28
4  me with sorting of the production.          10:28
5    Q.  What is her background?            10:28
6    A.  Very similar to mine.  As she is -- has a    10:28
7  deeper background in validation engineering, but a    10:28
8  GMP compliance consultant, management consultant.    10:28
9  So very similar to myself.              10:28
10    Q.  Is she -- you pay her as a 1099 for help?    10:28
11    A.  I did.                        10:28
12    Q.  So when you say "sorting the production,"    10:28
13  what do you mean by that?              10:28
14    A.  Pulling the production, opening the    10:29
15  documents, making me aware of what documents are    10:29
16  available within the production.          10:29
17        She helped me to -- sort documents as    10:29
18  they come through.  There are an enormous number of    10:29
19  documents, reports, procedures, emails.  Mostly    10:29
20  initially that type of triage.            10:29
21        Also to review expert reports that were    10:29
22  supplied or declarations -- I'm sorry -- that were    10:29
23  supplied.                        10:29
24    Q.  Did she, to your knowledge, have any    10:29
25  discussions directly with counsel?        10:29

Page 65

1    A.  No.                          10:29
2    Q.  So where it says "Quantity" on the        10:29
3  invoices, that's hours?                10:29
4    A.  Correct.                      10:29
5    Q.  Did Sharon Crook participate in drafting    10:29
6  any portion of your report?              10:29
7    A.  No.                          10:29
8    Q.  Did she review your report and provide    10:29
9  input, edits, feedback?                10:29
10    A.  No.                          10:29
11    Q.  On the first invoice, Page 2, it        10:30
12  references the June 30 and July 12th client        10:30
13  meetings.                        10:30
14        Are those the meetings that you would have    10:30
15  had with Daniel Nigh?                10:30
16    A.  I am -- again, would have to look at the    10:30
17  attendees' list on those meetings.  In July, I -- I    10:30
18  would have to look at the attendees' list.    10:30
19        Again, twice.  I think I have met with    10:30
20  Daniel twice.                    10:30
21    Q.  Okay.  When you say the "attendees' list,"    10:30
22  what do you mean?                  10:30
23    A.  Who was invited to the Zoom.  That's what    10:30
24  I mean by the "attendees' list."            10:30
25    Q.  Like on a calendar invite?          10:30

17 (Pages 62 - 65)

Page 66

1    A.  A calendar invite.                10:30
2    Q.  All right.  So the first invoice itself,    10:31
3  it references the Quick report, the Quick    10:31
4  declaration and exhibits.                10:31
5    A.  Yes.                            10:31
6    Q.  And the Anderson report with exhibits?    10:31
7    A.  Yes.                            10:31
8    Q.  And the Baertschi report with exhibits;    10:31
9      And then the Williams report with    10:31
10  exhibits;                            10:31
11      And then it says "Torrent R. Williams    10:31
12  report" on the last page, last entry.        10:31
13      Was that a Torrent expert report or was    10:31
14  that the report of Kevin's expert, Williams?    10:31
15    A.  It -- Mr. Williams, whoever he was    10:31
16  representing, from a declaration.  This may be a    10:31
17  typo.  I'm not sure.                    10:31
18      This is a timesheet from Sharon.  She may    10:31
19  have made a mistake there.  I'm not sure.    10:32
20    Q.  Okay.  On the second invoice itself -- in    10:32
21  the first invoice it's for $30,800; correct?    10:32
22    A.  Yes.                            10:32
23    Q.  And then the second invoice is dated    10:32
24  September 29th, 2022, and that's for 31,400;    10:32
25  correct?                            10:32

Page 67

1    A.  Correct.                        10:32
2    Q.  And the third invoice is dated        10:32
3  November 1st, 2022, and that's for 16,100; right?    10:32
4    A.  Correct.                        10:32
5    Q.  And so if I do the math insofar in total    10:32
6  it looks like you have billed $78,300?        10:32
7    A.  Yes.                            10:32
8    Q.  All right.  On the second invoice, there's    10:32
9  no, you know, detail -- task detail attached.    10:33
10      Why is that?                    10:33
11    A.  I think I just didn't add timesheets    10:33
12  because I was able to describe what was done    10:33
13  adequately in the description.            10:33
14    Q.  But it says you have 69 hours?        10:33
15    A.  Oh.  I see attached timesheets.        10:33
16    Q.  And there is no accounting for what was    10:33
17  done on the 69 hours.  I wish I could get away with    10:33
18  that with my clients.  But...            10:33
19      MR. STANOCH:  Well, objection.  It's a time    10:33
20  entry describing what was done.  So I'm not sure what    10:33
21  you getting at.                        10:33
22      Objection.                    10:33
23  BY MS. LOCKARD:                        10:33
24    Q.  Okay.  So do you think there are        10:33
25  timesheets that would reflect what was done for this    10:33

Page 68

1  29 hours but they just haven't been produced?    10:33
2    A.  I'm not sure.  I would have to actually    10:33
3  look.  I, again, work with a lot of clients.  The    10:33
4  details of the invoice I would have to go look.  I'm    10:33
5  not sure.                            10:33
6    Q.  Okay.  And the second -- excuse me.    10:34
7  Sorry.  Strike that.                    10:34
8      The third invoice, it's for 46 hours, and    10:34
9  then it does have the timesheet task detail    10:34
10  attached.                            10:34
11    A.  Right.                        10:34
12    Q.  And it describes primarily review of -- of    10:34
13  preparation of the draft report and meeting with the    10:34
14  client.                            10:34
15    A.  Yes.                            10:34
16    Q.  So it appears from this -- it looks like    10:34
17  the bulk of the materials that you would have    10:34
18  reviewed that are listed on your materials    10:35
19  considered list would have been reviewed in the    10:35
20  69-hour time period because they are not listed on    10:35
21  any other invoice.                    10:35
22      MR. STANOCH:  Objection to form.  Every    10:35
23  invoice states "Document Review."  So misrepresents    10:35
24  the documents.                        10:35
25      THE WITNESS:  They all three represent --    10:35

Page 69

1  there was certainly document review across...    10:35
2      "Document review.                10:35
3      "Document review.                10:35
4      "Document review."                10:35
5  BY MS. LOCKARD:                        10:35
6    Q.  How many more hours do you think you have    10:35
7  spent on this case since this third invoice was sent    10:35
8  in November?                        10:35
9    A.  Maybe 25 hours.  30 hours, maybe.        10:35
10    Q.  And have your invoices all been paid to    10:35
11  date?                                10:35
12    A.  I haven't submitted a December invoice.    10:35
13  Only in that the holidays got to me, I think.  And    10:35
14  certainly the deposition has been scheduled this    10:36
15  first week, I figured I would just get all of that    10:36
16  work on one invoice to the client.        10:36
17    Q.  But --                        10:36
18    A.  Including the deposition.            10:36
19    Q.  But -- but you have -- you have had no    10:36
20  problem getting paid for the invoices you sent;    10:36
21  correct?                            10:36
22    A.  Oh, no.  No.  Yes.  I have been paid    10:36
23  timely, certainly.                    10:36
24    Q.  On your CV itself, you reference some of    10:36
25  your clients on Page 1.                10:36

18 (Pages 66 - 69)

Page 70

1    Do you see that?                10:36
2    A.   Yes.                       10:36
3    Q.   And on there I saw reference to Teva.  10:36
4    A.   Yes.                       10:36
5    Q.   Okay.  What have you done in your  10:36
6  consulting role for Teva?         10:36
7    A.   For Teva, I have worked on an audit --  10:37
8  what is called an audit readiness plan for their  10:37
9  parenteral manufacturing facility in Irvine,  10:37
10 California.                       10:37
11   Q.   So that was for the parenteral  10:37
12 manufacturing facility out in Irvine?  10:37
13   A.   Correct.                   10:37
14   Q.   Okay.  How long ago was that?  10:37
15   A.   At least ten years.        10:37
16   Q.   Okay.  Did you work on -- have you worked  10:37
17 on any other projects for Teva?   10:37
18   A.   No.  That's the only project I have worked  10:37
19 on for Teva.                      10:37
20   Q.   And how long did your project for Teva  10:37
21 last for the Irvine plant?        10:37
22   A.   A couple of months, I would say.  10:37
23   Q.   Do you recall who you worked with, who  10:37
24 your contact was?                 10:37
25   A.   A gentleman by the name of Kevin Charrier.  10:37

Page 71

1    Q.   Do you know if he still works at Teva?  10:38
2    A.   Not that I am aware of.    10:38
3    Q.   That facility has shut down, I believe.  10:38
4        Is that your understanding?  10:38
5    A.   It is.  Yeah.             10:38
6    Q.   Okay.  Is that the one and only time you  10:38
7  have been hired by Teva as a consultant that you  10:38
8  recall?                          10:38
9    A.   It is.                    10:38
10   Q.   In looking through the -- the pleadings  10:38
11 and seeing the defendants that are involved in this  10:38
12 case, did you -- did you see any other named  10:38
13 defendants that you have done consulting work for?  10:38
14   A.   No.                       10:38
15   Q.   So you haven't done work for ZHP or  10:38
16 Prinston or Solco?                10:38
17   A.   I have not.               10:38
18   Q.   And you have not done any consulting work  10:38
19 for Torrent?                     10:38
20   A.   No, I have not.           10:38
21   Q.   And no consulting work for Hetero or  10:38
22 Aurobindo?                       10:38
23   A.   No, I have not.           10:38
24   Q.   Okay.  And no consulting for Mylan?  10:38
25   A.   No, I have not.           10:38

Page 72

1    MS. LOCKARD:  Okay.  We have been going  10:39
2  about an hour.  So let's take just a quick break for  10:39
3  everyone and the court reporter.  10:39
4    MR. STANOCH:  Sure.            10:39
5        THE VIDEOGRAPHER:  Okay.  Going off  10:39
record                            10:39
6        10:39 at      a.m.        10:39
7        (Brief recess.)           10:39
8    THE VIDEOGRAPHER:  And we are back on the  10:41
record at      a.m.  Start of  10:52
9  Media Number 4.
10   MS. LOCKARD:  Okay.  Let's get this marked  10:52
11 as Exhibit 8, please.  This will be the report of  10:52
12 Philip Russ.                     10:52
13   (Deposition Exhibit 8 was marked for  10:52
     identification and is attached hereto.)  10:52
14
15   MS. LOCKARD:  Do you need a copy of it?  10:52
16   MR. STANOCH:  I am -- I am good.  I have it.  10:52
17 Thank you, Counsel.               10:52
18   MS. LOCKARD:  Okay.            10:52
19   MR. STANOCH:  Thank you.       10:52
20   MS. LOCKARD:  I'll just give -- I will just  10:52
21 give you your own copy.           10:52
22   Just a second.               10:52
23 BY MS. LOCKARD:                   10:53
24   Q.   All right, Mr. Russ.  So let's talk a  10:53
25 little bit about the report you submitted.  10:53

Page 73

1        This report was submitted with opinions  10:53
2  about Teva and Torrent.  Primarily my focus will be  10:53
3  about Teva.                      10:53
4        You may get questions, and I'm sure you  10:53
5  will, from Torrent's counsel a little bit later  10:53
6  today.  And so those questions will probably focus  10:53
7  on Torrent.                      10:53
8        But to the extent your responses apply  10:53
9  generally to somewhat general questions, certainly  10:53
10 you don't need to be too concerned about -- about  10:54
11 that.                            10:54
12       The one thing that it looks like on your  10:54
13 testimonial history, there was -- I think in the  10:54
14 objections and responses, there was an addition  10:54
15 provided related to a more recent testimony or  10:54
16 expert report you had given in another case.  10:54
17       Does that ring a bell?      10:54
18   A.   I am -- I am sorry.  No.  I don't -- it  10:54
19 doesn't ring a bell.  But what specifically are  10:54
20 you...                           10:54
21   Q.   Well, we'll -- I'll come back to that in a  10:54
22 few minutes.                     10:54
23       Okay.  So going through your report here  10:54
24 it appears to me that your -- your criticisms  10:54
25 against Teva really fall into sort of two  10:54

19 (Pages 70 - 73)

Page 74

1  categories. One relates to the oversight and          10:54
2  management of the supply relationship with ZHP, and   10:54
3  the other seems to relate to the handling of the      10:54
4  recall and the hold and the notification to FDA.      10:55
5      So is that fair if we sort of deal with           10:55
6  them in two buckets?                                  10:55
7      MR. STANOCH: Objection to form.                   10:55
8      But go ahead.                                     10:55
9      THE WITNESS: Yes. That seems fair.                10:55
10 BY MS. LOCKARD:                                       10:55
11     Q. So in -- in terms of the -- there's a lot      10:55
12 of background information in here with respect to     10:55
13 how the drug approval process works and submissions   10:55
14 of ANDAs by generic drug manufacturers and that sort  10:55
15 of thing.                                             10:55
16     And so some of the things I want to go            10:55
17 through with you are just to try to discern whether   10:55
18 they are intended to be criticisms or whether it's    10:55
19 just background information. Okay?                     10:55
20     A. Okay.                                          10:55
21     Q. So there's a reference in Paragraph 14         10:55
22 about -- if you turn with me to Page 3.               10:55
23     [As read:]                                        10:55
24       "FDA approval is also required for             10:55
25       generic drugs, however, generics do not       10:55

Page 75

1        need to include all the preclinical and       10:55
2        clinical research steps to establish          10:56
3        safety the way brand-name products do         10:56
4        for NDAs."                                     10:56
5        That's your statement; right?                 10:56
6     A. It is.                                          10:56
7     Q. Okay. So you are not in any way              10:56
8  criticizing the generics for failing to do a         10:56
9  preclinical or clinical research steps on their own  10:56
10 in this case?                                         10:56
11    A. No.                                             10:56
12    Q. That's perfectly allowable under the rules    10:56
13 and regulations of the FDA; correct?                 10:56
14    A. Absolutely.                                    10:56
15    Q. Okay. So do you have any criticisms of        10:56
16 Teva with respect to the submission of their ANDAs   10:56
17 in this case?                                         10:56
18    A. No.                                             10:56
19    Q. On Paragraph 23 there's a reference to the   10:56
20 reason for the process change at ZHP.                10:57
21    Do you see that?                                  10:57
22    A. I do.                                          10:57
23    Q. And the -- the reason that you provided      10:57
24 here states [as read]:                               10:57
25       "ZHP identified the change would            10:57

Page 76

1        double production scale while at the         10:57
2        same time reducing racemization and          10:57
3        generation of impurity."                      10:57
4        Do you see that?                              10:57
5     A. I do.                                          10:57
6     Q. Okay. On -- there's a citation to          10:57
7  PRINSTON73102, that document?                        10:57
8     A. Yes.                                           10:57
9     MS. LOCKARD: Do we have a copy of that        10:57
10 document?                                            10:57
11 BY MS. LOCKARD:                                      10:57
12    Q. Just in terms of your understanding as to  10:57
13 why that change was made, what -- what is your      10:57
14 understanding of why ZHP made the process change?   10:57
15    A. I just restated what was in -- what they    10:57
16 described in the document.                           10:57
17    Q. All right. Did you find that to be a       10:57
18 reasonable justification for the change?             10:58
19    MR. STANOCH: Objection to form.                 10:58
20    THE WITNESS: I had no feelings on it either   10:58
21 way.                                                 10:58
22 BY MS. LOCKARD:                                      10:58
23    Q. But that -- the justification that is      10:58
24 provided is -- is within the realm of a reasonable  10:58
25 or prudent justification for making process change? 10:58

Page 77

1      MR. STANOCH: Objection to form.               10:58
2      THE WITNESS: Again, that's -- it doesn't     10:58
3  appear to me to be a red flag in some way. But that 10:58
4  would be an evaluation that ZHP would perform. I    10:58
5  didn't have all of the data I would need to determine 10:58
6  whether that was reasonable or appropriate.         10:58
7  BY MS. LOCKARD:                                      10:58
8     Q. In -- in terms of the -- the statement    10:58
9  that is here, the actual statement that is in the    10:58
10 Prinston document itself relates to generation of    10:58
11 impurity A, not just all impurities.                 10:58
12    Do you recall that?                               10:58
13    A. I could look at the document and            10:58
14 acknowledge if that's the case.                      10:59
15    Q. Okay. We may pull that up. We are         10:59
16 looking for it. And I'll -- I'll come back to that.  10:59
17    There was also a reference in the document   10:59
18 to, quote, "EHS concern."                            10:59
19    Do you know what that meant or what that     10:59
20 was in reference to as a -- as another reason for    10:59
21 the change?                                          10:59
22    A. "EHS" is "Environment Health and Safety."  10:59
23 So a safety concern to keep manufacturing operators  10:59
24 more safe in the manufacture of the product. The     10:59
25    Q. Okay. So you understood that one of the   10:59

20 (Pages 74 - 77)

Page 78

1 justifications for the change from ZHP's documents, 10:59
2 at least, was in order to reduce health and safety 10:59
3 concerns for its workers; correct? 10:59
4       MR. STANOCH: Objection to form. 10:59
5       THE WITNESS: If the document states that, 10:59
6 then, yes, I acknowledge that. 10:59
7 BY MS. LOCKARD: 11:00
8    Q. There are some references as well on 11:00
9 Paragraph 24 that relates to Teva's purchase of 11:00
10 Valsartan API for Mylan. 11:00
11       Do you see that? 11:00
12    A. I do. 11:00
13    Q. Why did you include that in this report if 11:00
14 this case is focused on the ZHP product? 11:00
15    A. I included it because it's germane to how 11:00
16 they handled their post-notification investigations. 11:00
17    Q. You understand that in the trial that we 11:00
18 are preparing for in this case and for which your 11:00
19 deposition is being given, the Mylan product, the 11:00
20 Mylan API is not at issue? 11:00
21    A. I understand that. But I added it because 11:00
22 of Teva's handling of the overall investigation for 11:00
23 Valsartan materials that they were using. 11:00
24    Q. Okay. And, in fact, you included a 11:01
25 reservation in your report that -- that you would 11:01

Page 79

1 reserve opinions with respect to Teva and Mylan's 11:01
2 API for a later date; correct? 11:01
3    A. Yes. 11:01
4    Q. All right. I want to give you, I guess, 11:01
5 an opportunity just to tell me just generally what 11:01
6 are -- what are your criticisms of Teva with respect 11:01
7 to their management and supervision of their 11:01
8 supplier ZHP in this case? 11:01
9       MR. STANOCH: Objection to form. 11:01
10       But go ahead. 11:01
11       THE WITNESS: I have many criticisms. Is 11:02
12 there something specific about their supplier and 11:02
13 management that you would like me to respond to? 11:02
14 BY MS. LOCKARD: 11:02
15    Q. Well, we can walk through -- we can walk 11:02
16 through the report if you prefer to do that. But 11:02
17 are you able to give me sort of a broad version of 11:02
18 what, you know, your -- your overarching criticism 11:02
19 is with respect to Teva and their oversight of their 11:02
20 suppliers? 11:02
21       MR. STANOCH: Objection to form. 11:02
22       THE WITNESS: In very general terms, my 11:02
23 concern with Teva's approach to supplier management is 11:02
24 they did not ask appropriate questions of the 11:02
25 supplier. 11:02

Page 80

1       Supplier management is a highly critical 11:02
2 area within GMP, mainly because the manufacturer has 11:02
3 limited control over the material coming in because 11:02
4 it's manufactured by someone else. 11:02
5       So the rigor in oversight is critical to -- 11:03
6 to GMP compliance and to the safety, identity, 11:03
7 strength, purity, quality of drug products that are 11:03
8 going to be manufactured using that drug substance. 11:03
9       So the main criticism is that, although Teva 11:03
10 may have employed some industry vehicles for 11:03
11 monitoring, they didn't appear to use that information 11:03
12 to really risk profile ZHP and to understand and 11:03
13 question ZHP when issues or changes occurred in their 11:03
14 process. 11:03
15 BY MS. LOCKARD: 11:03
16    Q. In Paragraph 24 -- or, excuse me. In 11:03
17 paragraph -- hold on one second. Sorry. I just 11:03
18 lost my notes. 11:04
19       All right. In Paragraph 37, when you are 11:04
20 talking about "the purpose of the Current Good 11:04
21 Manufacturing Practices" -- 11:04
22    A. Yes. 11:04
23    Q. -- you cite to a document that is the 11:04
24 "Facts About Current Good Manufacturing Practices 11:04
25 (CGMPs)"; correct? 11:04

Page 81

1    A. Yes. 11:04
2       MS. LOCKARD: All right. Let's mark this 11:04
3 document as an exhibit, please. This is will be 11:04
4 Exhibit 8 -- 11:04
5       MR. HARKINS: 9. 11:04
6       MS. LOCKARD: -- 9? 11:04
7       (Deposition Exhibit 9 was marked for 11:04
8       identification and is attached hereto.) 11:04
9 BY MS. LOCKARD: 11:05
10    Q. And you quote from this document in your 11:05
11 report, but there was some additional information in 11:05
12 this I wanted to ask you about as well. 11:05
13       If you'll turn with me to Page 2 of this 11:05
14 exhibit. 11:05
15    A. Under what heading? 11:05
16    Q. The last heading. 11:05
17    A. [As read]: 11:05
18       "If manufacturer is not following 11:05
19       GMP [verbatim]..."? 11:05
20    Q. Correct. 11:05
21       And according to the FDA, it says that -- 11:05
22 if you look at page -- sentence two [as read]: 11:05
23       "This kind of adulteration means 11:05
24       that the drug was not manufactured 11:06
25       under conditions that comply with CGMP. 11:06

21 (Pages 78 - 81)

Page 82

1    It does not mean that there is            11:06
2    necessarily something wrong with the      11:06
3    drug."                                    11:06
4    Did I read that correctly?                11:06
5    A.   Yes.                                 11:06
6    Q.   And do you agree with that?          11:06
7        MR. STANOCH:  Objection.  Go ahead.   11:06
8        THE WITNESS:  I recognize what FDA's purpose 11:06
9    is in providing this document to the public.  So they 11:06
10   are -- I agree to the extent that they are trying to 11:06
11   explain to a layman what this means.      11:06
12   BY MS. LOCKARD:                           11:06
13   Q.   So would you agree that, even if a drug is 11:06
14   deemed adulterated by the FDA, it does not mean that 11:06
15   there is necessarily something wrong with the drug, 11:06
16   as FDA says?                              11:06
17       MR. STANOCH:  Objection to form.      11:06
18       THE WITNESS:  I -- first, FDA does not 11:06
19   designate something as being adulterated.  11:06
20   Adulteration is a continuum of risk.  There isn't a 11:06
21   body that says something is adulterated or not within 11:06
22   the industry.                             11:07
23       And what this is saying basically for the 11:07
24   layman, if I translate it into industry-ese, it would 11:07
25   be that just because a product may meet its 11:07

Page 83

1    specifications does not mean that there is some -- 11:07
2    that it wasn't manufactured in a way that would call 11:07
3    that product adulterated.                 11:07
4        So when they are saying here for the layman 11:07
5    that it doesn't mean that there is necessarily 11:07
6    something wrong with the drug, there wouldn't be an 11:07
7    indicator from testing or from specification that the 11:07
8    drug fails or that its therapeutic value is 11:07
9    compromised.                              11:07
10       So they are trying to explain very complex 11:07
11   concepts from the industry for the layman.  That is 11:07
12   the purpose of this document.             11:07
13       This is written not to industry but to the 11:07
14   general public.                           11:07
15   BY MS. LOCKARD:                           11:07
16   Q.   Right.  But you cited this in your report; 11:07
17   correct?                                  11:07
18   A.   I do cite it in my report but not in this 11:08
19   section.                                  11:08
20   Q.   Right.  But you find certain items in this 11:08
21   to be significant for your opinions, such that you 11:08
22   cited it in your report.  So I'm -- for purposes of 11:08
23   completeness, I'm asking you about the other 11:08
24   portions in this.                         11:08
25       Do you understand?                    11:08

Page 84

1    A.   I do understand.                     11:08
2        And I cite it in the report primarily to 11:08
3    translate complex items to a layman reader.  I 11:08
4    recognize the reader of these reports are not a 11:08
5    industry professional that has all the background 11:08
6    and knowledge.                            11:08
7        So this language helps to translate 11:08
8    complex ideas about GMP to a layman.  That's the 11:08
9    reason I add or use this web article.  And that's 11:08
10   the purpose of this web article is to communicate 11:08
11   very complex concepts of GMP to the layman. 11:08
12   Q.   So this provides almost a common sense 11:08
13   approach to the layman about what adulteration 11:08
14   means.                                    11:09
15       Would you agree with that?            11:09
16       MR. STANOCH:  Objection.              11:09
17       THE WITNESS:  "Common sense" is probably not 11:09
18   the right word.                           11:09
19       Again, my viewpoint of this article is to 11:09
20   translate concept -- or complex terms into something 11:09
21   that the general public in America would be able to 11:09
22   understand.                               11:09
23   BY MS. LOCKARD:                           11:09
24   Q.   So you would agree, though, that a product 11:09
25   that may be considered adulterated is not 11:09

Page 85

1    necessarily dangerous?                    11:09
2    A.   I can't speak to the danger of a product. 11:09
3    That is a clinical effect.  I can definitely speak 11:09
4    to whether a product is adulterated based on GMP. 11:09
5    Q.   Okay.  What is your -- your working 11:09
6    definition of what adulterated would mean? 11:09
7    A.   So I use an industry standard to identify 11:09
8    something that would be considered adulteration. 11:09
9    The standard is called ICH Q9.  It's the risk 11:09
10   management ICH guidance.                  11:10
11       Within this guidance, there is a       11:10
12   description of a qualitative/quantitative way to 11:10
13   evaluate risks.  Risks for product adulteration 11:10
14   would be a risk that we would use.  It uses 11:10
15   three categories:  severity, occurrence, and 11:10
16   detection.                                11:10
17       And using those, I can identify something 11:10
18   that would be a high potential for product 11:10
19   adulteration.  Something that may not be as high a 11:10
20   potential for product adulteration.       11:10
21       So an example would be a person in 11:10
22   manufacturing is not wearing a hair net.  Wearing a 11:10
23   hair net to cover their hair, prevent hair from 11:10
24   getting into the product is a GMP requirement. 11:10
25       So how severe is a problem of getting hair 11:10

22 (Pages 82 - 85)

Page 86

1 in a product? Well, it is objectionable. It's    11:10
2 probably not going to kill someone, if you will.    11:10
3 But it is -- it is objectionable.    11:10
4 How often does it occur? Well, if one    11:10
5 time somebody wasn't wearing a hair net, that is a    11:11
6 very low occurrence.    11:11
7 And it's easily detected. I can see    11:11
8 someone not wearing a hair net.    11:11
9 If I were to take that and say, "Hey, they    11:11
10 never wear a hair net. This facility, no one wears    11:11
11 a hair net," well, it's objectionable. It has a    11:11
12 high-level of opportunity or of occurrence, but it    11:11
13 still has a high-level detection. This starts to    11:11
14 rise to the level of product adulteration.    11:11
15 There are other GMP requirements, unlike    11:11
16 something like a hair net. For instance, a product    11:11
17 coming from a supplier, a drug substance. I have --    11:11
18 it's very severe if there is an impurity like    11:11
19 nitrosamine that could be a health or safety issue.    11:11
20 So it's a high severity.    11:11
21 Again, I'm not an expert in clinical    11:11
22 severities, but one can generally look at that as    11:11
23 being a very high severity.    11:11
24 How often would something like that occur?    11:12
25 Well, I use the drug substance every time I make the    11:12

Page 87

1 product. So the occurrence is extremely high.    11:12
2 Then there is the detection. Although it    11:12
3 is not impossible to detect certain impurities or    11:12
4 certain contaminants that may be in a drug substance    11:12
5 using either GMP oversight or testing, but the    11:12
6 detection level may be problematic.    11:12
7 Just like this article states or what I    11:12
8 have quoted is that the general person taking a drug    11:12
9 product won't be able to say, "Oh, the drug    11:12
10 substance that was used here may have some    11:12
11 problems."    11:12
12 So concerns in that GMP area rise to the    11:12
13 level of great probability of product adulteration    11:12
14 if there isn't great GMP control.    11:12
15 And that is my concern in my report. And    11:12
16 my criticism of Torrent and Teva in that they didn't    11:12
17 take the appropriate rigor with this potential    11:12
18 for -- high potential for -- GMP potential for    11:13
19 product adulteration.    11:13
20 So I use the standard to evaluate what --    11:13
21 what adulteration means, and it's discretionary, and    11:13
22 one has to use good scientific judgment there.    11:13
23 Q. So is it your opinion that adulteration    11:13
24 does not have a specific statutory definition in the    11:13
25 FD&C Act?    11:13

Page 88

1 MR. STANOCH: Objection to form.    11:13
2 THE WITNESS: Certainly there is discussion    11:13
3 of adulteration. I think that FDA has not been    11:13
4 explicit that here is a line in GMP where adulteration    11:13
5 occurs.    11:13
6 And, again, I'll restate, as I have stated    11:13
7 previously, that FDA does not determine adulteration.    11:13
8 They may use the word. But they do not have a    11:13
9 specific level or definition of what adulteration is.    11:13
10 This is left to, again, the risk management    11:13
11 that manufacturers use and that FDA promulgates. They    11:13
12 say ICH Q9 are their viewpoint on how to do risk    11:14
13 management for all aspects, including product    11:14
14 adulteration as it relates to GMP.    11:14
15 BY MS. LOCKARD:    11:14
16 Q. Well -- and even under the ICH Q9 and the    11:14
17 FDA rules and regulations, one violation of a cGMP    11:14
18 alone does not render a product adulterated.    11:14
19 You would agree with that; correct?    11:14
20 MR. STANOCH: Objection to form.    11:14
21 THE WITNESS: I would not agree with that.    11:14
22 I would agree that one needs to use the process that I    11:14
23 have just described.    11:14
24 A single instance, if it meets the criteria    11:14
25 of severity and occurrence and the lack of detection,    11:14

Page 89

1 that single instance can be considered a high    11:14
2 potential for product adulteration.    11:14
3 It -- when I say "it depends," it depends on    11:14
4 those categories and a risk assessment for those    11:14
5 categories. It's not a number of violations. It is    11:14
6 about a discretion -- a scientific judgment of the    11:14
7 relative risk of -- of product adulteration based on    11:15
8 the non-compliance.    11:15
9 BY MS. LOCKARD:    11:15
10 Q. Right.    11:15
11 So it's your opinion that whether or not a    11:15
12 product has a high potential for adulteration is    11:15
13 based on circumstances presented; right?    11:15
14 MR. STANOCH: Objection.    11:15
15 Go ahead.    11:15
16 THE WITNESS: It's -- it's -- it's based on    11:15
17 the severity occurrence and detection levels of that    11:15
18 particular GMP compliance concern.    11:15
19 BY MS. LOCKARD:    11:15
20 Q. So whether or not a product has a high    11:15
21 potential for adulteration is based on those    11:15
22 circumstances that you have just described:    11:15
23 severity and...    11:15
24 A. I'm talking -- I'm not talking about    11:15
25 whether a product is adulterated. I am talking    11:15

23 (Pages 86 - 89)

Page 90

1 about whether a GMP compliance concern will lead --     11:15
2 or has the high potential to lead to product     11:16
3 adulteration.     11:16
4     So, again, my example of -- in this     11:16
5 matter -- again, I have all these high     11:16
6 probabilities.     11:16
7     A single occurrence of not -- of not     11:16
8 having great rigor around this process or program     11:16
9 could develop -- could -- could make one state,     11:16
10 "This product is adulterated," as opposed to a much     11:16
11 lower level GMP compliance concern where I can run     11:16
12 it through that same process.     11:16
13     But, again, it's about the risk of a GMP     11:16
14 compliance concern, not about that the product is     11:16
15 adulteration -- you know, I am not saying the     11:16
16 product -- that this says the product doesn't lead     11:16
17 to product adulteration.     11:16
18     You know, it's not about the product.     11:16
19 It's about -- that there is a high potential that     11:16
20 this product is adulterated because of this lack of     11:16
21 assurance and this GMP concern.     11:16
22     Q.  So in this case, you do not intend to     11:17
23 offer any opinions that any defendants' product was     11:17
24 adulterated; correct?     11:17
25     MR. STANOCH:  Objection.     11:17

Page 91

1     Go ahead.     11:17
2     THE WITNESS:  I don't offer an opinion in my     11:17
3 report about the specific adulteration of a product.     11:17
4     I say that the products -- because of the     11:17
5 GMP concerns of the -- the firms, especially around     11:17
6 supplier management, that this leaves the high     11:17
7 potential that the product was adulterated.     11:17
8     I would believe that the product is     11:17
9 adulterated in the absence or lack of these types of     11:17
10 rigorous GMP controls around supplier management.     11:17
11 Again, that's my opinion running through ICH Q9     11:17
12 evaluation.     11:17
13     So, again, there isn't a specific level that     11:17
14 says this product is adulterated because of this.     11:17
15     If I read the law, I would say that every     11:17
16 product where any GMP concerns -- because that's the     11:17
17 way it is written -- is adulterated.  That's not     11:17
18 reasonable.  And that's not the way the industry     11:18
19 practices the evaluation of GMP concerns.     11:18
20     What I have just described to you is how the     11:18
21 industry practices GMP concern evaluation.     11:18
22 BY MS. LOCKARD:     11:18
23     Q.  And so you would acknowledge there are     11:18
24 many instances where GMP issues are identified which     11:18
25 would not cause a product to be adulterated?     11:18

Page 92

1     MR. STANOCH:  Objection to form.     11:18
2     THE WITNESS:  I -- I agree that there are     11:18
3 low-level GMP concerns that would -- when run through     11:18
4 a risk evaluation, would have less probability of     11:18
5 causing a product to be adulterated.     11:18
6 BY MS. LOCKARD:     11:18
7     Q.  Do you believe product manufacturers     11:18
8 determine for themselves whether the product is     11:18
9 adulterated?     11:18
10     A.  I believe they should.  Do they in     11:18
11 practice?  In my experience, not often.  Not often     11:18
12 enough.     11:18
13     So it is their responsibility to determine     11:18
14 if they are in compliance with GMPs and the impact     11:18
15 of their non-compliance on their products.     11:18
16     FDA is a regulator.  They are not     11:19
17 responsible for the quality of products at firms.     11:19
18 The firm is responsible for that.     11:19
19     Q.  But you don't plan to offer an opinion and     11:19
20 you have not offered an opinion in this case that     11:19
21 Teva's product was adulterated; correct?     11:19
22     MR. STANOCH:  Objection.  Asked and     11:19
23 answered.     11:19
24     THE WITNESS:  I haven't stated that their     11:19
25 product is adulterated.  I believe that their GMP     11:19

Page 93

1 practices have a high probability of creating products     11:19
2 that are adulterated.     11:19
3 BY MS. LOCKARD:     11:19
4     Q.  Well, in your opinion, was Teva's product     11:19
5 adulterated or not?     11:19
6     MR. STANOCH:  Objection to form.  Asked and     11:19
7 answered.     11:19
8     MS. LOCKARD:  He hasn't answered my     11:19
9 question.     11:19
10     MR. STANOCH:  Disagree.     11:19
11     Go ahead and try.     11:19
12     THE WITNESS:  I -- I have -- I only can     11:19
13 state that the concerns I have with their supplier     11:19
14 management would, in my opinion and in my risk     11:19
15 evaluation against ICH Q9, rise to the level of     11:19
16 product adulteration.     11:20
17     If I were the quality leader making that     11:20
18 discretionary decision, I would call that product     11:20
19 adulteration.     11:20
20 BY MS. LOCKARD:     11:20
21     Q.  For what product would you call that     11:20
22 adulteration?     11:20
23     A.  Again, these GMP practices and behaviors     11:20
24 were in effect for any supplier management program.     11:20
25     I haven't looked at other products or     11:20

24 (Pages 90 - 93)

Page 94

1 documents related to other products. So at this 11:20
2 point, I can only say this is for Valsartan. 11:20
3      But one would expect that they use similar 11:20
4 practices across all their supply base and that 11:20
5 other products may also -- there also may be 11:20
6 concerns in regard to product adulteration based on 11:20
7 their GMP practice. 11:21
8   Q. But would you say that every product that 11:21
9 was made in the facility would be adulterated just 11:21
10 by virtue of these concerns that you have addressed 11:21
11 with Valsartan? 11:21
12      MR. STANOCH: Objection to form. 11:21
13      THE WITNESS: I am not -- I can't make a 11:21
14 statement on whether each product is adulterated. 11:21
15      Again, the practice has a high probability 11:21
16 of leading to adulterated products. The determination 11:21
17 of a product being adulterated itself is -- is not 11:21
18 something I am opining on in my report. 11:21
19 BY MS. LOCKARD: 11:21
20   Q. Okay. So you are not -- you are not going 11:21
21 to give the opinion that any of the product 11:21
22 manufactured by Teva was adulterated? 11:21
23   A. No, I am not. I am only stating that the 11:21
24 practices they employed for supplier management were 11:21
25 sufficiently deficient that it would have a high 11:21

Page 95

1 probability of leading to product adulteration. 11:21
2   Q. And I understand that. But the words in 11:21
3 this case have meaning and are important. So I want 11:21
4 to make sure I understand how you are applying the 11:22
5 words such as "adulterated," which is an important 11:22
6 one in this instance. 11:22
7      Agreed? 11:22
8   A. Yes. Agreed. 11:22
9   Q. Now -- 11:22
10   A. I understand your concern. 11:22
11   Q. -- are you aware that FDA has never made 11:22
12 any statement that Teva's product was adulterated? 11:22
13   A. I am secondarily aware of that. But, 11:22
14 again, my viewpoint is that FDA doesn't make a 11:22
15 determination if something is adulterated. There 11:22
16 isn't a -- something in regulation that FDA could 11:22
17 use or that industry could use to say, "This is a 11:22
18 product adulteration." It is a discretionary 11:22
19 risk-based evaluation. 11:22
20      Now, FDA may make statements based on 11:22
21 their risk evaluation using the same concepts that 11:22
22 I'm describing for my ICH Q9 that a product is 11:22
23 adulterated. For instance, they make that statement 11:22
24 about ZHP's product. 11:22
25      But, again, the concept of adulteration, 11:23

Page 96

1 as it relates to GMP, is based on risk. And in my 11:23
2 opinion, if I were to run this scenario, what 11:23
3 happened with Teva's oversight and what happened 11:23
4 with this product from ZHP, a drug substance, that 11:23
5 this would rise to a level of adulteration. 11:23
6   Q. But as you said, the comments that FDA 11:23
7 made about ZHP's product being adulterated, they 11:23
8 could have made comments about Teva's product 11:23
9 similarly but they did not; right? 11:23
10   A. They chose not, and I can't comment as to 11:23
11 why that would be the case. 11:23
12      Again, if I as an industry professional or 11:23
13 as if I were standing as the leader at Teva in 11:23
14 evaluation of this, I would describe this as product 11:23
15 adulteration. 11:23
16   Q. Do you agree that, for consumers currently 11:23
17 taking medicines from a company that was not 11:23
18 following cGMPs, FDA usually advises consumers not 11:24
19 to interrupt their drug therapy? 11:24
20      MR. STANOCH: Objection to form. 11:24
21      THE WITNESS: Yes. I have read that in 11:24
22 disclosures from FDA. 11:24
23      The risk of a compliance concern against the 11:24
24 risk of a diseased state by not taking a medication, 11:24
25 that risk profile may be sufficient where it's 11:24

Page 97

1 appropriate to continue therapy because there is a 11:24
2 higher risk of a -- of a clinical outcome that is -- 11:24
3 that is deleterious. 11:24
4      That does not mean that that product should 11:24
5 be on the market or that that product is not 11:24
6 adulterated. 11:24
7 BY MS. LOCKARD: 11:24
8   Q. But adulterated is not the same thing as a 11:24
9 product being unsafe. 11:24
10      You would agree with that; correct? 11:24
11      MR. STANOCH: Objection to form. 11:24
12      Go ahead. 11:24
13      THE WITNESS: A product that is unsafe is 11:24
14 adulterated, in my opinion. 11:24
15 BY MS. LOCKARD: 11:24
16   Q. Well, my question was you would agree that 11:24
17 a product that is adulterated is not necessarily 11:25
18 unsafe. 11:25
19      MR. STANOCH: Objection to form. 11:25
20      THE WITNESS: I think that a product that 11:25
21 has GMP concerns that would lead a product to be 11:25
22 adulterated -- there's a lack of assurance that that 11:25
23 product is safe. 11:25
24 BY MS. LOCKARD: 11:25
25   Q. You're not offering opinions about whether 11:25

25 (Pages 94 - 97)

Page 98

1 the drugs in this case were dangerous or not; right?  11:25
2    A.  No.                                          11:25
3    Q.  And you're not offering opinions in this    11:25
4 case about whether there was a safety concern with  11:25
5 the drugs that were produced?                       11:25
6    A.  No.                                          11:25
7    Q.  And you're not offering opinions about       11:25
8 whether the drugs at issue in this case were, quote,  11:25
9 "unsafe"; right?                                    11:25
10   A.  No.                                          11:25
11   Q.  And one of the reasons that FDA advises       11:25
12 consumers taking medications from a company that may  11:25
13 be found not to be following the cGMPs is because    11:25
14 withholding the drug could have serious implications  11:25
15 for their health.  FDA has stated that.             11:25
16       You have seen that in FDA statements;          11:26
17 correct?                                            11:26
18       MR. STANOCH:  Objection.                       11:26
19       THE WITNESS:  Yes.                              11:26
20 BY MS. LOCKARD:                                     11:26
21   Q.  And, in fact, it's so stated in Exhibit       11:26
22 Number 9 that we were going through?               11:26
23   A.  It is.                                        11:26
24   Q.  And if you follow back with me on the         11:26
25 Exhibit Number 9 in the last paragraph, midway      11:26

Page 99

1 through, the FDA states [as read]:                  11:26
2       "Regulatory actions against                     11:26
3       companies with poor cGMPs are often             11:26
4       intended to prevent the possibility of          11:26
5       unsafe and/or ineffective drugs."              11:26
6       Do you agree with that?                          11:26
7    A.  I -- I do agree with that.  And that is       11:26
8 exactly what I have just stated previously.          11:26
9    Q.  And it is consistent with your opinion in     11:26
10 this case?                                          11:26
11   A.  It is.                                        11:26
12   Q.  FDA goes on to state [as read]:               11:26
13       "In rare cases, FDA regulatory                  11:26
14       action is intended to stop the                 11:26
15       distribution of manufacturing of              11:26
16       violative product."                            11:26
17       Do you see that?                                11:26
18   A.  If you could just give me the heading of       11:27
19 where you are at.  And I apologize.                 11:27
20   Q.  It's the last paragraph.                       11:27
21   A.  If manufactured -- if the manufacturer is     11:27
22 not following.                                      11:27
23       Here.  Okay.                                    11:27
24   Q.  It's the last paragraph.                       11:27
25   A.  Right.                                        11:27

Page 100

1    Q.  Very end of the...                            11:27
2    A.  [As read]:                                    11:27
3       "FDA regulatory action is intended             11:27
4       to stop distribution...."                       11:27
5    Q.  Yeah.                                         11:27
6       [As read]:                                      11:27
7       "In rare cases, FDA regulatory                  11:27
8       action is intended to stop the                 11:27
9       distribution or manufacturing of              11:27
10      violative product."                             11:27
11   A.  Yes.                                          11:27
12   Q.  [As read]:                                    11:27
13      "The impact of cGMP violations                  11:27
14      depends on the nature of those                 11:27
15      violations and on the specific drugs          11:27
16      involved."                                      11:27
17      You agree with that?                             11:27
18   A.  I do.                                         11:27
19   Q.  [As read]:                                    11:27
20      "A drug manufactured in violation of           11:27
21      cGMP may still meet its labeled                11:27
22      specifications, and the risk that the          11:27
23      drug is unsafe or ineffective could be         11:27
24      minimal."                                       11:27
25      You agree with that as well; right?            11:27

Page 101

1    A.  I do.  Yes.                                   11:27
2       This is, again, in -- consistent with the      11:27
3 way I have just described this, that although a       11:28
4 product meets its specification does not mean that    11:28
5 it's not adulterated or that it's safe.              11:28
6       It also states that -- that it's a -- the       11:28
7 idea of adulteration depends on the specific type of  11:28
8 GMP violation, and that that's something that should  11:28
9 be evaluated from a risk perspective.  And, again,    11:28
10 as I described, I use ICH Q9 to do so.              11:28
11   Q.  And the document goes on to say [as read]:    11:28
12      "Thus, FDA's advice will be specific           11:28
13      to the circumstances."                          11:28
14      Do you see that?                                11:28
15   A.  I do.                                         11:28
16   Q.  So if FDA feels that the circumstances of     11:28
17 the violations are frequent or severe, they can take  11:28
18 action to ask that the drug be removed from the      11:28
19 market; correct?                                    11:28
20   A.  They could.                                   11:29
21   Q.  And -- and in that case, FDA says             11:29
22 [as read]:                                          11:29
23      "Health care professionals are best            11:29
24      able to balance the risks and benefits         11:29
25      and make the right decisions for their         11:29

26 (Pages 98 - 101)

Page 102

1    patients."                          11:29
2        MR. STANOCH: Objection to form.    11:29
3        THE WITNESS: That's what the document says.  11:29
4    Yes.                               11:29
5    BY MS. LOCKARD:                      11:29
6    Q.  You agree that observations made during a    11:29
7    regulatory inspection generally relate to cGMPs?    11:29
8        MR. STANOCH: Objection to form.    11:29
9        THE WITNESS: Generally. I agree with that,  11:29
10   yes. Generally.                      11:29
11   BY MS. LOCKARD:                      11:29
12   Q.  And would you agree those observations in    11:29
13   a 483 or an EIR do not necessarily indicate the    11:29
14   product is being manufactured in violation of cGMPs?  11:29
15       MR. STANOCH: Objection to form.    11:29
16       THE WITNESS: No, I don't agree with that.  11:29
17   If -- if FDA has identified an observation, it -- the  11:29
18   product is being manufactured in some deficient way  11:30
19   based on GMP. It's the reason that they are providing  11:30
20   an observation.                      11:30
21   BY MS. LOCKARD:                      11:30
22   Q.  So every observation found in a 483 is a    11:30
23   violation of a cGMP, in your opinion?    11:30
24       MR. STANOCH: Objection to form.    11:30
25       THE WITNESS: Yes. And FDA will routinely  11:30

Page 103

1    provide the reference to the GMP where their company  11:30
2    is violative.                       11:30
3        So, yeah, they're -- the reason they    11:30
4    identify a problem is because of a compliance issue  11:30
5    with GMP.                          11:30
6    BY MS. LOCKARD:                      11:30
7    Q.  Don't they frequently identify issues in a    11:30
8    483 that do not rise to the level of a violation of    11:30
9    a cGMP?                            11:30
10   A.  No.                            11:30
11   Q.  You disagree with that?            11:30
12   A.  I disagree with that. It may not --    11:30
13   again, the relative risk of each observation as it    11:30
14   relates to product or product safety or    11:30
15   adulteration. That is a whole different evaluation.  11:30
16       Every observation that is provided by FDA    11:30
17   to a firm, unless otherwise noted as a    11:31
18   recommendation or an enhancement -- a potential    11:31
19   enhancement, which FDA does not normally provide    11:31
20   firms, is a violation of cGMP.        11:31
21       There may be a discussion or disagreement    11:31
22   between the firm and FDA as to the -- whether it's    11:31
23   truly violative or not. But if -- if it ends up in    11:31
24   a 483, it's a violation of cGMP.      11:31
25   Q.  And in this case, to your knowledge, Teva    11:31

Page 104

1    never received a 483 observation regarding any cGMP  11:31
2    violation with respect to their handling of the    11:31
3    impurity or the recall; correct?    11:31
4        MR. STANOCH: Objection to form.    11:31
5        THE WITNESS: I am -- I can't speak to that  11:31
6    without looking at all of the regulatory history    11:31
7    associated with -- with Teva -- Teva's relationship    11:31
8    with FDA.                          11:31
9        But because FDA did not find something or    11:31
10   give an observation does not mean that there aren't    11:31
11   non-compliances.                    11:31
12       This is a -- an iceberg approach. It's a    11:31
13   point in time. FDA has a very small amount of time to  11:32
14   evaluate a quality system. It's a highly managed    11:32
15   activity, the firm, and as far as managing FDA's work  11:32
16   at their facility for an inspection, highly managed.  11:32
17       So when observations occur from a 483, that  11:32
18   is the tip of the iceberg.          11:32
19       I, in my experience, know that there are    11:32
20   significant other vulnerabilities that were not    11:32
21   identified by FDA.                  11:32
22       So firm's error when they state, "FDA never  11:32
23   cited this." I hear this routinely from clients:    11:32
24   "FDA has never cited me for this. But, Phil, you say  11:32
25   it's non-compliant."                 11:32

Page 105

1        FDA has -- just because FDA didn't cite it  11:32
2    doesn't mean it's not non-compliant.    11:32
3    BY MS. LOCKARD:                      11:32
4    Q.  In this situation, where FDA, you would    11:32
5    agree, spent significant time and resources on the    11:32
6    issue of nitrosamine impurities in drugs --    11:32
7        MR. STANOCH: Objection.            11:32
8    BY MS. LOCKARD:                      11:32
9    Q.  -- correct?                     11:32
10       MR. STANOCH: Objection.            11:32
11       THE WITNESS: To -- to the -- what -- what  11:32
12   is an amount of time? What does that mean? An    11:33
13   excessive amount of time or that they spent a    11:33
14   sufficient amount of time or that they spent, you    11:33
15   know, an amount of time that would cause them to fully  11:33
16   evaluate a specific area?            11:33
17       None of that I can agree with as being true.  11:33
18       FDA is a regulatory body and have limited    11:33
19   resources. Regardless of the issue that may affect    11:33
20   the public health, they have limited amounts of    11:33
21   resources that they can apply to that.    11:33
22       It's the firm's responsibility to apply    11:33
23   those resources internally to their own systems to    11:33
24   evaluate non-compliance and to bring that to the    11:33
25   forefront to correct and to prevent in the future.  11:33

27 (Pages 102 - 105)

Page 106

1    So it's not FDA's role to do any of that    11:33
2 work.                                          11:33
3 BY MS. LOCKARD:                                11:33
4    Q.  So -- but you would agree FDA found the  11:33
5 time and resources to issue 483s to other      11:33
6 manufacturers who were involved in this litigation?  11:34
7    A.  To the extent that they inspected them and  11:34
8 found non-compliance, of course, they would.   11:34
9    Q.  Did you ask counsel or look in -- on the  11:34
10 FDA website to try to determine whether there had  11:34
11 been any action taken against Teva with respect to  11:34
12 their involvement in the impurity issue?       11:34
13    MR. STANOCH:  Objection.                     11:34
14    Go ahead.                                    11:34
15    THE WITNESS:  What I opined on in my report  11:34
16 had nothing to do with FDA's enforcement activity with  11:34
17 Teva.                                          11:34
18    I'm not making a statement within the report  11:34
19 that that was an appropriate level or that FDA did  11:34
20 great enforcement with any of -- whether -- whether  11:34
21 it's Teva or Torrent.  I make no statements about  11:34
22 FDA's enforcement activity with the firms.      11:34
23    My report is purely about deficiencies       11:34
24 within their supplier management program, which they  11:34
25 were responsible for as far as oversight of suppliers.  11:34

Page 107

1 It has nothing to do with FDA's observations.   11:35
2 BY MS. LOCKARD:                                 11:35
3    Q.  So the FDA's observations about Teva and  11:35
4 their handling of the impurity issue has nothing to  11:35
5 do with your opinion.                           11:35
6    Is that your testimony?                       11:35
7    MR. STANOCH:  Objection to form.              11:35
8    THE WITNESS:  I'm not saying it has nothing.  11:35
9 It's a -- it's an indicator or it's an input.    11:35
10    But what I am saying is that observations     11:35
11 from FDA are not the sole input that determines  11:35
12 whether something is non-compliant or whether actions  11:35
13 taken by a firm were appropriate or even whether or  11:35
14 not FDA chooses to enforce or do an enforcement  11:35
15 activity.                                       11:35
16    It's, again, the firm's responsibility to    11:35
17 remain compliant with GMP.  FDA's role in this is  11:35
18 purely as a regulator or a monitor.             11:35
19    So that -- that's my viewpoint.  And that's  11:35
20 what I have described in my report as well.     11:35
21 BY MS. LOCKARD:                                 11:35
22    Q.  Wouldn't it be an important factor in your  11:35
23 review and report to know whether or not FDA had  11:36
24 taken any enforcement action against Teva?      11:36
25    MR. STANOCH:  Objection.                     11:36

Page 108

1    THE WITNESS:  It's important certainly.  I'm  11:36
2 not saying that regulatory history or regulatory  11:36
3 compliance history is not important.  For me it is the  11:36
4 least important input, especially for an international  11:36
5 supplier or for a facility that is outside of the U.S.  11:36
6 in that an inspection from FDA is announced.  They  11:36
7 know FDA is coming, and they can defend themselves.  11:36
8    I know that this is -- the least reliable     11:36
9 indicator of compliance is FDA's 483 or their  11:36
10 observations at a firm.                         11:36
11 BY MS. LOCKARD:                                 11:36
12    Q.  Well, you state in your report on         11:36
13 Page 30 [verbatim] -- and I am quoting [as read]:  11:36
14    "Scientists with varied and                   11:36
15    appropriate backgrounds and expertise        11:36
16    at FDA review all elements of the            11:37
17    submitted product application and           11:37
18    determine if the as-described and           11:37
19    represented product's benefits outweigh     11:37
20    the known risks and side effects.           11:37
21    "If FDA determines that the benefits         11:37
22    do outweigh the clinical risks and that     11:37
23    a high quality product can be               11:37
24    consistently manufactured by the           11:37
25    manufacturer based on the information       11:37

Page 109

1    submitted, the product will gain             11:37
2    approval, meaning it can be legally          11:37
3    marketed and distributed to the             11:37
4    US market."                                 11:37
5    You then state [as read]:                     11:37
6    "The product will continue to be             11:37
7    monitored by the FDA post-approval to       11:37
8    ensure FDA compliance."                      11:37
9    Correct?                                     11:37
10    A.  Yes.  That's what I state there.         11:37
11    Q.  And you include this because this is an  11:37
12 important component of the regulatory system in the  11:37
13 United States, that FDA will continue to monitor  11:37
14 post-approval to ensure compliance with their cGMPs,  11:37
15 right?                                         11:37
16    A.  It is.                                   11:37
17    MR. STANOCH:  Objection.                     11:37
18    THE WITNESS:  It is a input.  I am stating  11:37
19 it is not the most important input.  It is a input.  11:38
20 Certainly the regulator inspects.  And the regulator  11:38
21 provides information to a firm.                 11:38
22    But in my experience -- and I have managed   11:38
23 FDA inspections for many firms and have helped to  11:38
24 support firms in response to FDA for observations --  11:38
25 it's the least important indicator.             11:38

28 (Pages 106 - 109)

Page 110

1    And the Paragraph Number 30 is about what is    11:38
2    called "application compliance." It's about the    11:38
3    compliance that the ANDA, which is different than GMP    11:38
4    compliance. Those are two separate avenues.    11:38
5    BY MS. LOCKARD:    11:38
6    Q.    The -- I agree with you that the paragraph    11:38
7    begins discussing the submission of the ANDA. The    11:38
8    last sentence, though, that says [as read]:    11:38
9        "The product will continue to be    11:38
10       marketed [verbatim] by the FDA    11:38
11       post-approval to ensure FDA    11:38
12       compliance."    11:38
13       That relates not to the submission, that    11:38
14   relates to ongoing compliance?    11:38
15   A.    No. It relates to the submission.    11:38
16       Post-market approval or post-market    11:39
17   monitoring is supplements, CB-30s, PAS [phonetic] --    11:39
18   Q.    Inspections?    11:39
19   A.    -- amount of supplier --    11:39
20       Not inspections. Inspections is the    11:39
21   Office of Compliance. This -- inspections are about    11:39
22   GMP -- cGMP compliance. This is about application    11:39
23   compliance.    11:39
24       So post-approval monitoring is done by FDA    11:39
25   of the application; i.e., submit an annual report    11:39

Page 111

1    every year, identifies the changes that I have made.    11:39
2    That's the monitoring I'm referring to here. Not    11:39
3    cGMP compliance.    11:39
4        Now, the application -- certainly FDA    11:39
5    has -- they have the application, and there are all    11:39
6    kinds of regulations on how I need to maintenance    11:39
7    the application during its lifecycle. That's what    11:39
8    I'm referring to as post-approval changes or    11:39
9    post-approval monitoring by FDA.    11:39
10       These are two different things, just so    11:40
11   I'm clear.    11:40
12   Q.    I am --    11:40
13   A.    I'll --    11:40
14   Q.    I understand your testimony --    11:40
15   A.    Okay.    11:40
16   Q.    -- on that point.    11:40
17       You are -- your statement, though, is that    11:40
18   the FDA's continuing monitoring of compliance with    11:40
19   cGMP is the least important fact in your review?    11:40
20       MR. STANOCH: Objection to form.    11:40
21       THE WITNESS: It's the least important input    11:40
22   to any firm's risk evaluation of their GMP compliance.    11:40
23       And to -- it's -- I have considered it,    11:40
24   certainly. I am concerned as it relates to    11:40
25   observations from FDA, but I'm more concerned in the    11:40

Page 112

1    direct records from Teva or Torrent that identify    11:40
2    their lack of compliance. Whether FDA observed this    11:40
3    condition or not does not relate to their level of    11:40
4    compliance.    11:40
5        So it's an input, I agree. I will    11:40
6    acknowledge that regulatory -- what we call regulatory    11:40
7    surveillance in the industry, understanding what    11:40
8    observations FDA has identified or other regulatory    11:41
9    bodies, it's an input. A singular input.    11:41
10   BY MS. LOCKARD:    11:41
11   Q.    The least important?    11:41
12       MR. STANOCH: Let him finish his question    11:41
13   [verbatim], Counsel.    11:41
14       MS. LOCKARD: Okay. I will, but he is    11:41
15   not --    11:41
16       MR. STANOCH: He answering.    11:41
17       MS. LOCKARD: -- answering. He's --    11:41
18       MR. STANOCH: Let him finish his answer.    11:41
19       MS. LOCKARD: -- just giving a lecture.    11:41
20       MR. STANOCH: Now, you are cutting me off.    11:41
21   Let the witness finish his answer. Then you    11:41
22   can ask your question. You know how -- that's how it    11:41
23   works.    11:41
24   BY MS. LOCKARD:    11:41
25   Q.    What was the question you are answering,    11:41

Page 113

1    by the way?    11:41
2    A.    The question I'm answering, as I    11:41
3    understand it, is if I believe that FDA's    11:41
4    observations are the least important input.    11:41
5        I believe they are a input, but there are    11:41
6    equally important or more important inputs into risk    11:41
7    that evaluation.    11:41
8        So I'm not saying that it is not    11:41
9    important. Certainly if you receive a 483 from FDA,    11:41
10   you are going to respond to it. In actuality, it's    11:41
11   voluntary to respond in the industry to a 483. It's    11:41
12   voluntary. I don't even need to from a statutory    11:42
13   perspective. Most firms do, obviously.    11:42
14       So it's a -- it's a input.    11:42
15       And when I work with clients, a routine    11:42
16   response I get is "FDA never cited me for this, and    11:42
17   it doesn't matter. It's insignificant."    11:42
18       They at a point in time -- they came once    11:42
19   in the last two years for three days. It's -- "You    11:42
20   are here every day, sir. Your auditors are here    11:42
21   every day. I'm more concerned with what you have    11:42
22   found about your own vulnerabilities than what FDA    11:42
23   has found."    11:42
24   Q.    The clients that you do work for, they    11:42
25   certainly would not find a 483 noting observations    11:42

29 (Pages 110 - 113)

Page 114

1 to be insignificant, would they?                11:42
2     A.  From a regulatory perspective or from   11:42
3 their level of GMP compliance?                   11:42
4     Q.  From any perspective.                     11:42
5     A.  It's important because you -- you are    11:42
6 going to placate the regulator.                  11:43
7         I'm saying in practice, in my experience, 11:43
8 the inputs to whether a system is compliant,     11:43
9 observations from FDA is of lower significance   11:43
10 because it's such a small finite inspection that 11:43
11 happens so infrequently, and it's not their role. 11:43
12        They have asked the industry to           11:43
13 self-regulate that is their mantra to us.  "You are 11:43
14 responsible."                                     11:43
15        In most warning letters, it says, "Hey, we 11:43
16 have identified these three significant areas, but 11:43
17 you are responsible to ensure compliance with all 11:43
18 the rest of the GMP."                             11:43
19        So whose input is most important?  The    11:43
20 firm's input.                                     11:43
21     Q.  And so the most important input from your 11:43
22 perspective is whether or not the firm determines 11:43
23 that it was compliant or not?                     11:43
24        MR. STANOCH:  Objection to form.          11:43
25        THE WITNESS:  Whether or not the firm has 11:44

Page 115

1 appropriately, based on industry standard and guidance 11:44
2 and the regulation, applied the GMP, the cGMP through 11:44
3 their quality system.  That's the most important 11:44
4 element.                                          11:44
5 BY MS. LOCKARD:                                   11:44
6     Q.  And so the most important element in your 11:44
7 review is what the manufacturer themselves have -- 11:44
8 has determined about their own compliance?        11:44
9        MR. STANOCH:  Objection to form.  Misstates 11:44
10 testimony.                                        11:44
11        Go ahead.                                  11:44
12        THE WITNESS:  It's what their compliance is 11:44
13 at the firm.  Whether they identify it they -- again, 11:44
14 the industry is chartered to self-regulate.  Many 11:44
15 firms don't do a great job of self-regulation.  I help 11:44
16 firms with self-regulation.  That's what I do for a 11:44
17 living.                                           11:44
18        So do I agree that the firms find everything 11:44
19 or every compliance issue that they have?  No, they 11:44
20 don't.  But at least they have more opportunity to do 11:44
21 so.  They are there every day.  FDA is only there once 11:44
22 every two years.                                  11:45
23 BY MS. LOCKARD:                                   11:45
24     Q.  Well -- so if FDA's judgment as to whether 11:45
25 or not the individual firm is compliant is such an 11:45

Page 116

1 insignificant factor, then the judge of whether or 11:45
2 not the company is compliant or acting as a       11:45
3 reasonable manufacturer has to come from the      11:45
4 manufacturer itself.                              11:45
5        That's what you are saying.                11:45
6     A.  It does --                                11:45
7        MR. STANOCH:  Objection to form.           11:45
8        Go ahead.                                  11:45
9        THE WITNESS:  I'm sorry.                   11:45
10        It does or, in my cases, the firm is no   11:45
11 longer trusted for that purpose.                  11:45
12        And this is -- again, something I do for a 11:45
13 living -- where a third-party will be brought in to 11:45
14 make all of those decisions for them.             11:45
15        In many warning letter activities or in   11:45
16 consent decree activities, FDA enforces.  And what the 11:45
17 firm will do in response is -- because FDA doesn't 11:45
18 trust them any longer to self-regulate, they bring in 11:45
19 a third party.                                    11:45
20        They'll bring in someone like myself to make 11:45
21 those decisions for them.  Because they are no longer 11:46
22 reputable or reliable to make good cGMP decisions. 11:46
23        So, yes, they are responsible for it.  And 11:46
24 in the routine, one can only expect that they make 11:46
25 great GMP decisions.                              11:46

Page 117

1        In enforcement activities and when FDA finds 11:46
2 long-standing problems or problems that are -- with 11:46
3 compliance that, you know, each time they come for an 11:46
4 inspection they find recidivism, same types of    11:46
5 problems not corrected, they are going to stop     11:46
6 trusting that organization.  And the quality unit  11:46
7 within that organization will be set aside and a third 11:46
8 party will come in to do that evaluation.          11:46
9 BY MS. LOCKARD:                                    11:46
10     Q.  Did FDA in this case ever determine that 11:46
11 Teva was a recidivist or no longer trusted?       11:46
12     A.  Not that I am aware of.                   11:46
13     Q.  Did FDA ever make any pronouncement that 11:46
14 Teva was no longer reputable or reliable as a drug 11:46
15 manufacturer?                                      11:47
16     A.  Not that I am aware of.                   11:47
17     Q.  Did FDA or any other body order that a    11:47
18 third party be brought in to make decisions for Teva 11:47
19 and it's quality team?                            11:47
20     A.  Not that I am aware of.  But I'm sure that 11:47
21 Teva did bring in consultants and third parties to 11:47
22 assist them with this issue.                       11:47
23     Q.  How do you know that?                     11:47
24     A.  It would be an industry standard practice 11:47
25 to bring in third parties normally to help with   11:47

30 (Pages 114 - 117)

Page 118

1 issues like this particular issue.    11:47
2     I don't know that that occurred. But it  11:47
3 wouldn't surprise me, I guess, if that occurred.  11:47
4     Q. So now you are speculating about whether  11:47
5 Teva brought in a third party to consult?    11:47
6     A. I --    11:47
7     MR. STANOCH: Objection to form. Misstates  11:47
8 the testimony.    11:47
9     THE WITNESS: I withdraw that. I can't --  11:47
10     MR. STANOCH: Go ahead.    11:47
11 BY MS. LOCKARD:    11:47
12     Q. So based on your hierarchy and the    11:47
13 observations in the FDA 483 related to a supplier --  11:47
14 strike that.    11:47
15     Based on the hierarchy you have described,  11:48
16 observations in a -- in an FDA 483 related a    11:48
17 supplier would be the least important input to a  11:48
18 finished dose manufacturer in evaluating that  11:48
19 supplier?    11:48
20     A. That's not what I said.    11:48
21     MR. STANOCH: Objection to form.    11:48
22     THE WITNESS: What I said was at the firm  11:48
23 itself it's the least -- one of the least important  11:48
24 inputs. It gets -- because they are there every day.  11:48
25     When it relates to a supplier, I am not  11:48

Page 119

1 there any day. Maybe once or twice. Maybe every two  11:48
2 years or three years I may visit them to do    11:48
3 verification.    11:48
4     So, yeah, FDA's input is a major input for a  11:48
5 supplier because I don't have control over the    11:48
6 facility. I have control over my own facility.    11:48
7     Okay. So you are asking me what inputs are  11:48
8 important for a supplier. Well, certainly FDA's  11:48
9 enforcement activity or observations from a 483 have  11:49
10 much more significant importance when it relates to a  11:49
11 supplier in me evaluating the relative risk of that  11:49
12 supplier and use of their drug substance.    11:49
13 BY MS. LOCKARD:    11:49
14     Q. So as a finished dose manufacturer, it's  11:49
15 reasonable to rely on the FDA and their activities  11:49
16 with respect to issuing 483s and inspections for a  11:49
17 supplier?    11:49
18     MR. STANOCH: Objection to --    11:49
19 BY MS. LOCKARD:    11:49
20     Q. Because -- because the manufacturing    11:49
21 finished dose manufacturer is not there every day?  11:49
22     MR. STANOCH: Objection to form.    11:49
23     THE WITNESS: I agree it's an important    11:49
24 input. But it's not the only input.    11:49
25 ///

Page 120

1 BY MS. LOCKARD:    11:49
2     Q. The FDA's --    11:49
3     A. The FDA's observations are an important  11:49
4 input for the finish drug manufacturer to evaluate  11:49
5 as it relates to whether that supplier is high risk  11:49
6 or whether the material is coming from that    11:49
7 supplier -- that I should scrutinize them more    11:49
8 heavily.    11:50
9     There are other systems that are required  11:50
10 by the cGMP that are outside of just the input of  11:50
11 what FDA said about the supplier.    11:50
12     Because, again, the same problems exist as  11:50
13 far as oversight by FDA or the supplier, especially  11:50
14 an overseas supplier. The inspection that is    11:50
15 performed there is done infrequently. It's planned.  11:50
16 So the manufacturer, the supplier has time to plan  11:50
17 and manage FDA's inspection.    11:50
18     So I am going to -- because I have less  11:50
19 control over a supplier, I'm going to probably give  11:50
20 more credence and risk evaluation because it's one  11:50
21 of the few inputs I have about a supplier.    11:50
22     So it's -- but it's not the only input. I  11:50
23 can't make a general evaluation of a supplier purely  11:50
24 based on enforcement activity or on whether or not  11:50
25 an observation was cited by FDA during an    11:50

Page 121

1 inspection.    11:50
2     Q. So then you would agree that FDA    11:50
3 inspections and observations are an important input  11:50
4 to a finished dose manufacturer when evaluating a  11:51
5 supplier because it's one of the few inputs the    11:51
6 supplier has?    11:51
7     MR. STANOCH: Objection to form.    11:51
8     THE WITNESS: I -- I agree with that. Yes.  11:51
9     MS. LOCKARD: So let me introduce another  11:51
10 exhibit here.    11:51
11     And we're up to what?    11:51
12     THE REPORTER: 10.    11:51
13     MR. HARKINS: 10.    11:51
14     MS. LOCKARD: 10.    11:51
15     (Deposition Exhibit 10 was marked for    11:51
16     identification and is attached hereto.)    11:51
17 BY MS. LOCKARD:    11:51
18     Q. This is another document that was cited in  11:51
19 your report, Mr. Russ.    11:51
20     Do you recognize this document?    11:51
21     A. I do.    11:51
22     Q. What is this document?    11:51
23     A. Again, this is a question-and-answers    11:51
24 document helping to describe and helping to answer  11:51
25 general questions for industry and the public as it  11:51

31 (Pages 118 - 121)

Page 122

1 relates to the GMP.                         11:51
2     Q.  And you cited from this document as well  11:51
3 in your report on Page 8 -- correct? -- in     11:51
4 Paragraph 46?                                11:51
5     A.  I do cite from this document.  Let me just  11:52
6 check that.                                  11:52
7     [Witness reviews document].              11:52
8     Yes.                                     11:52
9     Q.  Do you need more time to review?      11:54
10    A.  No.  I am sorry.                      11:54
11 I am familiar with this document.            11:54
12    Q.  Okay.  And you agree that FDA guidance  11:54
13 documents represent FDA's current thinking on a  11:54
14 topic.  It's -- they are not binding on       11:54
15 manufacturers; correct?                      11:54
16    A.  Agreed.  This is not a guidance document.  11:54
17 This is just a Q&A.  Again, this is published just  11:54
18 as general questions.  This is not a guidance  11:54
19 document.                                    11:54
20    Q.  In the hierarchy of rules, regulations,  11:54
21 guidance documents, and so forth, this would be even  11:54
22 less binding or -- or...                     11:54
23    A.  I am just stating it's not a guidance  11:55
24 document.                                    11:55
25    Q.  Okay.                                11:55

Page 123

1     A.  All -- all information, whether it's   11:55
2 industry standard information, literature, guidance,  11:55
3 there's no hierarchy of what is important.    11:55
4     This document along with guidances publish  11:55
5 what FDA's viewpoint is.                      11:55
6     When guidances or other documents say that  11:55
7 this is a mandatory compliance item, it means it's  11:55
8 not in the regulation.                        11:55
9     But, you know, there's certainly been --  11:55
10 the industry knows from -- actually, previous  11:55
11 litigation that guidance, the "C" in "cGMP," the  11:55
12 "Current" in "Good Manufacturing Practice,"    11:55
13 constitutes industry standards, things that FDA  11:55
14 says, presentations, those different items.   11:55
15     There is no hierarchy that something is   11:55
16 less important as it relates to published      11:56
17 information about GMP manufacturing.           11:56
18    Q.  Well, wouldn't you agree that guidance  11:56
19 documents are less important than the cGMP      11:56
20 regulations?                                 11:56
21    A.  No.  No, not in any way.  That they are  11:56
22 less important?                              11:56
23    Q.  Would you agree the guidance documents are  11:56
24 not binding on manufacturers?                 11:56
25    MR. STANOCH:  Objection.  Asked and         11:56

Page 124

1 answered.                                    11:56
2     THE WITNESS:  I agree that a guidance      11:56
3 document states disclaimer that it's not a binding  11:56
4 regulation.  That is in 21 CFR 210 or 211.    11:56
5     But in practice FDA enforces on guidance   11:56
6 documents and industry accepts guidance documents as  11:56
7 regulatory standard.                         11:56
8     If -- if anything from a guidance document  11:56
9 appears in a firm's standard operating procedure, it  11:56
10 becomes enforceable.                         11:56
11    So if I adopt anything from a guidance, it  11:56
12 is now enforceable.                          11:57
13 BY MS. LOCKARD:                              11:57
14    Q.  But you are taking it a step farther,   11:57
15 though.                                      11:57
16    A.  Okay.                                11:57
17    Q.  We're not -- we're not -- we haven't seen  11:57
18 any operating procedures or policies that adopt a  11:57
19 guidance right now.                          11:57
20    A.  Uh-huh.                              11:57
21    Q.  We are talking generally about a guidance  11:57
22 issued by the FDA.                           11:57
23    It -- it does not establish the law that a  11:57
24 company must follow.                         11:57
25    You would agree with that?               11:57

Page 125

1     A.  21 CFR 210/211, Food and Drug Cosmetic  11:57
2 Act.  Yes, those are the laws.               11:57
3     Q.  The laws are the cGMPs?              11:57
4     A.  The laws are the cGMPs.  Agreed.      11:57
5     Q.  The guidance documents do not make the  11:57
6 law.                                         11:57
7     You agree with that?                     11:57
8     A.  I agree that they are identified as    11:57
9 non-binding.                                 11:57
10    But I clarify that in the way that the     11:57
11 industry uses these documents and the way FDA uses  11:57
12 these documents that they are equally as enforceable  11:57
13 as the regulatory standard, you know, 210 and 211.  11:57
14    Q.  Doesn't the FDA actually state that they  11:57
15 allow for alternative of approaches if the company  11:57
16 follows the statute and regs -- alternative   11:58
17 approaches to the guidance document if the company  11:58
18 follows the statute and the regulations?      11:58
19    MR. STANOCH:  Objection to form.          11:58
20    THE WITNESS:  Yes.  That is true as well   11:58
21 that there -- again, this is the idea of      11:58
22 self-regulation.  FDA is not going to instruct you on  11:58
23 everything that you need to do.              11:58
24    You can apply appropriate measures from the  11:58
25 cGMP for your quality system.                11:58

32 (Pages 122 - 125)

Page 126

1      The way industry in general practices is    11:58
2  everyone tries to do the same thing, and normally that  11:58
3  is what is from the guidance document.    11:58
4      It's difficult to look different.  Although,  11:58
5  it's allowed, it's very, very, very rarely employed.  11:58
6  BY MS. LOCKARD:    11:58
7      Q.  Hasn't the FDA stated the use of the word,  11:58
8  quote, "should" in their guidances means that    11:59
9  something is suggested or recommended and not    11:59
10 required?    11:59
11     MR. STANOCH:  Objection.    11:59
12     THE WITNESS:  Agreed.  And, again, in    11:59
13 practice when FDA says "should," most firms will,  11:59
14 shall.    11:59
15 BY MS. LOCKARD:    11:59
16     Q.  Now, this exhibit that we are looking at  11:59
17 here you said is a Q&A for the general public;    11:59
18 right?    11:59
19     A.  This is a Q&A for the public but also  11:59
20 mostly used by industry.  These are specific    11:59
21 questions about the regulation itself.    11:59
22     The previous article that we looked at is  11:59
23 more "This is kind of what the GMP is."    11:59
24     These are specific responses to questions  11:59
25 that FDA has received from industry.  The public  11:59

Page 127

1  probably is not asking these types of questions.  11:59
2      Q.  Okay.  So you -- your position is the  11:59
3  audience for this document, the Q&A, is somewhat  11:59
4  different from the intended audience for the prior  12:00
5  document that you said was meant for the general  12:00
6  public?    12:00
7      A.  It is -- it is.  This document is Q&A.  12:00
8  It's available, obviously, publicly to anyone who  12:00
9  looks it up on the website, but the use of this type  12:00
10 of a document would be industry more than likely.  12:00
11     Q.  Is this the basis for your opinion that  12:00
12 the finished dose manufacturer needs to do its own  12:00
13 independent testing?    12:00
14     MR. STANOCH:  Objection to form.    12:00
15     THE WITNESS:  I have not made a statement or  12:00
16 have expectation that the finished dose manufacturer  12:00
17 needs to do their own testing for drug substances.  12:00
18     The regulation allows for receipt of drug  12:00
19 substances using the supplier's certificate of  12:01
20 analysis.  So I have not used this document or any  12:01
21 other documents to state that all firms must do full  12:01
22 testing, if you will, of drug substances.    12:01
23 BY MS. LOCKARD:    12:01
24     Q.  Okay.  So your opinion is that it's  12:01
25 reasonable and appropriate for a finished dose  12:01

Page 128

1  manufacturer not to do full testing of all API?  12:01
2      MR. STANOCH:  Objection to form.    12:01
3      THE WITNESS:  It is, but they must provide  12:01
4  evaluation to show that the supplier's data is  12:01
5  reliable.    12:01
6      So it's trust but verify.  So the regulation  12:01
7  allows me to receive materials on a certificate of  12:01
8  analysis, but I must do some independent evaluation --  12:01
9  whether that be through testing or audits, data  12:01
10 review -- that would give me assurance about the  12:01
11 reliability of that supplier and of -- and of the data  12:02
12 that they are -- that underlies and supports the  12:02
13 values they have provided me on a certificate of  12:02
14 analysis.    12:02
15 BY MS. LOCKARD:    12:02
16     Q.  So you would agree that a finished dose  12:02
17 manufacturer is not required to test every batch of  12:02
18 API itself, provided that the manufacturer    12:02
19 establishes the reliability of the supplier's    12:02
20 analysis through appropriate validation of their  12:02
21 test results?    12:02
22     MR. STANOCH:  Objection to form.    12:02
23     THE WITNESS:  It's not only appropriate  12:02
24 evaluation of their test results, but they -- there is  12:02
25 other elements of evaluation for a product -- or for  12:02

Page 129

1  reliability.    12:02
2  BY MS. LOCKARD:    12:02
3      Q.  What are the other elements?    12:02
4      A.  Whether or not the supplier is in    12:02
5  compliance with the cGMP or ICH Q7, which would be  12:02
6  for APIs or -- which is active pharmaceutical    12:02
7  ingredients or drug substances.    12:02
8      It could also be evaluation through    12:02
9  changed management.  When a supplier makes a change,  12:03
10 the oversight of those changes.    12:03
11     Our -- does the supplier perform.  Do I  12:03
12 actually receive materials on time.  I mean,    12:03
13 business performances.    12:03
14     There is various elements.  Testing is  12:03
15 only one of those elements.    12:03
16     Q.  But the question I am asking is under what  12:03
17 circumstances is a finished dose manufacturer acting  12:03
18 reasonably in not testing all of the API -- API  12:03
19 batches?    12:03
20     And -- and that doesn't have to do with  12:03
21 whether or not the product is delivered on time.  12:03
22     A.  Understood.    12:03
23     MR. STANOCH:  Objection to form.    12:03
24 BY MS. LOCKARD:    12:03
25     Q.  Okay.    12:03

33 (Pages 126 - 129)

Page 130

1  A. Understood.                                12:03
2      So first and foremost, they have to       12:03
3  perform an identity test. It's an absolute     12:03
4  requirement. So that is one. They can't just not  12:03
5  test anything.                                 12:03
6      Secondarily, you have to qualify the       12:03
7  supplier in some way.                          12:03
8      Normally that qualification is done        12:03
9  through some level of what is called "comparative  12:04
10 testing." So the supplier gives me a certificate of  12:04
11 analysis, and then I will also test the same batches  12:04
12 and do a comparative analysis.                 12:04
13     That comparative analysis is then normally  12:04
14 repeated at periodic intervals to make sure that  12:04
15 they continue to have agreement using the same  12:04
16 methodology. So that is one aspect.            12:04
17     Normally I'll have a technical agreement   12:04
18 or what is called a "quality agreement" that will  12:04
19 identify "This is the way in which I will monitor  12:04
20 you in the future. You have responsibility for  12:04
21 these items."                                  12:04
22     I take assurances about those items, and   12:04
23 then I have the opportunity to have oversight of  12:04
24 that through periodic audits, data review,      12:04
25 evaluation of changes, notification of deviations or  12:04

Page 131

1  reprocessing, various elements that would be   12:04
2  outlined in that type of an agreement.         12:05
3      So all of that body of information         12:05
4  together then is input to a risk evaluation of the  12:05
5  supplier. And that risk evaluation of the supplier  12:05
6  contains other elements that are -- what is the  12:05
7  location of the supplier.                      12:05
8      How much control do I have over the        12:05
9  supplier.                                      12:05
10     Do they have a lot of observations when I  12:05
11 go see them.                                   12:05
12     Are those observations when I run them     12:05
13 through the adulteration risk management approach,  12:05
14 do they rise high, are they mid-level, are they low.  12:05
15     What did FDA say about them.               12:05
16     What did other regulatory bodies say about  12:05
17 them if that information is available.          12:05
18     And then in that -- I can identify a        12:05
19 certain level of risk which will drive how much  12:05
20 scrutiny I use with that particular supplier.   12:05
21     Q. So let's just make sure that we're      12:05
22 understanding you.                             12:05
23     A. Uh-huh.                                 12:05
24     Q. So the inputs that you say -- strike that.  12:06
25     Your opinion is that the inputs that are   12:06

Page 132

1  important to a finished dose manufacturer in   12:06
2  determining whether or not they must do their own  12:06
3  testing versus rely on the testing of their supplier  12:06
4  are these handful of items that you have just  12:06
5  listed.                                        12:06
6      Is that -- just as a premise, is that      12:06
7  fair?                                          12:06
8      A. Those are some of the items that most   12:06
9  manufacturers will employ that I have described. I  12:06
10 wouldn't say it's an exhaustive list.          12:06
11     Q. But those are the most important?       12:06
12     A. Those are the ones that come to mind.    12:06
13     Q. So one is "identity test." What do you  12:06
14 mean by that?                                  12:06
15     A. An ID test is the material comes in and  12:06
16 I -- through some validated testing I can say "This  12:06
17 is Valsartan."                                 12:06
18     Okay. So it's -- it's not an input. It's  12:07
19 a requirement. That comes from the regulation "Thou  12:07
20 shalt do ID testing."                          12:07
21     You may do -- you may use or transcribe    12:07
22 information from the supplier's certificate of  12:07
23 analysis for other tests provided that you have  12:07
24 established the reliability of the supplier but  12:07
25 never for ID. That's just to make sure that the  12:07

Page 133

1  material is actually what it is.               12:07
2      Q. I understand.                           12:07
3      A. From a safety perspective. So an ID test  12:07
4  must be performed.                             12:07
5      Q. And in this case there is -- there's no  12:07
6  concern on your part about whether Teva was doing  12:07
7  the required identity test?                    12:07
8      A. No. I didn't verify that they were doing  12:07
9  identity tests. But I had -- I don't have concerns  12:07
10 that they were not performing ID tests.        12:07
11     Q. Okay. So the second input that you      12:07
12 mentioned was the "comparative analysis."      12:07
13     A. Right.                                  12:07
14     Q. So by that, do you mean essentially taking  12:07
15 the -- the certificate of analysis results that are  12:08
16 provided by the -- by the supplier and then the  12:08
17 manufacturer doing some independent testing of the  12:08
18 same type of tests and then comparing those results  12:08
19 to see if they are the same or similar?         12:08
20     A. At a very high level, yes. That         12:08
21 compare -- comparison occurs often, though, or  12:08
22 frequently.                                    12:08
23     The first time I will have the same lots   12:08
24 and I'll look at their chromatography and my   12:08
25 chromatography. It's not just the result. They got  12:08

Veritext Legal Solutions

800-227-8440                                               973-410-4040

Page 134

1 .1, and I got .1. Well, that agrees.          12:08
2        Does the chromatography agree? Do I -- I    12:08
3 look at the actual graphic or the raw data. It    12:08
4 should look the same. This chromatography should    12:08
5 look similar to my chromatography provided that the    12:08
6 methods are similar. And the methods should be    12:08
7 similar. If they are not, there is a problem there    12:08
8 as well.                    12:08
9        So that comparative analysis is then    12:08
10 performed on some routine basis. What I will then    12:09
11 do after that initial qualification -- it's    12:09
12 normally, like, an initial qualification when I    12:09
13 first start using the supplier. Then each time I    12:09
14 visit the supplier, I am going to do that evaluation    12:09
15 during audit.                12:09
16        I'm going to do -- I'm going to come with    12:09
17 a list of batches I have received, and I'm going to    12:09
18 look at the comparative and see does it match    12:09
19 what I have tested my own -- you know, what I did    12:09
20 initial qualification, has anything changed.    12:09
21        If there is a change that occurs within    12:09
22 that period, I will need to repeat that comparative    12:09
23 analysis because it's a new process.    12:09
24        So it's a very rigorous oversight of data    12:09
25 review.                    12:09

Page 135

1        This is where I find that Teva and Torrent    12:09
2 didn't necessarily within their audits -- when I    12:09
3 read an audit, it doesn't say, "Here are the lots I    12:09
4 reviewed and did comparative analysis." I'm looking    12:09
5 for that.                    12:09
6        It doesn't -- it doesn't state that they    12:10
7 did this work.                12:10
8        So that's a -- not appropriate oversight.    12:10
9        Q. What is the -- you say periodic, but what    12:10
10 is the timetable for that? Is that annually? Is it    12:10
11 just at the audits, or what is the schedule in your    12:10
12 mind that -- that would be reasonable?    12:10
13        A. It's reasonable for a supplier in -- in    12:10
14 whatever frequency has been defined within their    12:10
15 technical agreement.            12:10
16        So there is, again, a regulation that says    12:10
17 every year you'll do comparative analysis. It's    12:10
18 generally done on some periodic basis.    12:10
19        I would say every six months, every year    12:10
20 some evaluation would be performed.    12:10
21        In the technical agreement, I may have the    12:10
22 opportunity to ask for a full data package.    12:10
23        Again, I'm not -- I can't state what    12:10
24 Teva's technical agreement or what the negotiations    12:10
25 were around that specifically. But I have the    12:10

Page 136

1 opportunity -- it's my data, my lot. I received it.    12:11
2 So I -- I also own the data. I can see it.    12:11
3 Normally it's on-site.            12:11
4        Certainly in every change. If you provide    12:11
5 me with a change or a notification of a change, that    12:11
6 should immediately trigger that comparative    12:11
7 analysis. Because I did comparative analysis to a    12:11
8 previous process. There is a new process now. So I    12:11
9 now need to repeat that comparative analysis.    12:11
10        Q. You agree, though, there's no regulation    12:11
11 that requires that this comparative analysis be done    12:11
12 on any interval; right?            12:11
13        MR. STANOCH: Objection.            12:11
14        THE WITNESS: I agree that the    12:11
15 21 CFR 210/211 do not have a detailed regulation that    12:11
16 says you need to do comparative analysis.    12:11
17        However, the industry standard -- and,    12:11
18 again, the "C" or the "Current" in Good Manufacturing    12:11
19 Practice, this is the standard practice that I see in    12:11
20 my experience throughout industry that comparative --    12:12
21 there's no other way to establish the reliability of    12:12
22 test results if I don't look at any of the test    12:12
23 results.                    12:12
24        So that's the standard way -- one of the    12:12
25 inputs. Again, one of the inputs for standard    12:12

Page 137

1 evaluation for reliability.            12:12
2 BY MS. LOCKARD:                12:12
3        Q. And I understand that you are testifying    12:12
4 based on industry standard. I just want to make    12:12
5 sure I'm not missing some cGMP regulation that says    12:12
6 you have to do this.                12:12
7        So there is no cGMP regulation that says    12:12
8 you have to do comparative analysis on some    12:12
9 schedule; right?                12:12
10        MR. STANOCH: Objection. Asked and    12:12
11 answered.                    12:12
12        THE WITNESS: There -- there isn't a cGMP    12:12
13 regulation. But many firms will in their own    12:12
14 procedure base have a requirement to do comparative    12:12
15 analysis, and because they have it in their    12:12
16 procedures, it becomes GMP.            12:12
17 BY MS. LOCKARD:                12:12
18        Q. Do you agree that conducting supplier    12:12
19 audits every three years is within industry    12:12
20 standards?                12:12
21        A. I think it's long, personally. Drug    12:13
22 substance manufacturers are normally two years in    12:13
23 most firms. But, again, this is based on risk.    12:13
24        And the frequency of an audit is not based    12:13
25 on an established guideline but based on routine    12:13

35 (Pages 134 - 137)

Page 138

1 evaluation, yearly evaluation, and annual product    12:13
2 review, which is part of the regulation to evaluate    12:13
3 the supplier's risk and the general trends of what    12:13
4 they are finding for that particular supplier of a    12:13
5 drug substance.    12:13
6     So based on that evaluation that is    12:13
7 required by the regulation on a yearly basis, I will    12:13
8 change the risk profile of a supplier. And I might    12:13
9 have to increase the frequency from three years to    12:13
10 every six months or to every year based on whatever    12:13
11 risk is coming from that supplier. It's a    12:13
12 discretionary decision.    12:13
13     Q.  The frequency of the audit is    12:13
14 discretionary based on the circumstances?    12:13
15     A.  It is.    12:14
16     Q.  The -- the annual product review you    12:14
17 mentioned, did you look at any annual product    12:14
18 reviews for the Teva product?    12:14
19     A.  I did not.    12:14
20     Q.  Were any of those provided to you?    12:14
21     A.  No.    12:14
22     Q.  Did you ask for any of them?    12:14
23     A.  No.    12:14
24     Q.  Wouldn't that be an important input for    12:14
25 you in your assessment of whether or not Teva was    12:14

Page 139

1 appropriately overseeing its supplier?    12:14
2     MR. STANOCH:  Objection to form.    12:14
3     THE WITNESS:  There are elements that were    12:14
4 provided in production that give me the actual    12:14
5 records. The annual product review is just a summary    12:14
6 of the records I looked at.    12:14
7     So it's a summary report of things that I    12:14
8 looked at. The summary report -- I can look at the    12:14
9 actual direct records. That's what I looked at.    12:14
10     Audit reports. So an audit report is going    12:14
11 to tell me -- I'm going to summarize that product in    12:14
12 the annual summary review.    12:15
13     But I'm using the annual product review as a    12:15
14 key point of when, as a minimum, I need to do this    12:15
15 routine evaluation of suppliers.    12:15
16     It's certainly from regulation on an annual    12:15
17 basis.    12:15
18 BY MS. LOCKARD:    12:15
19     Q.  The annual product review is required by    12:15
20 FDA regulation to assess the risk of the supplier    12:15
21 providing that API. That is a -- that is a legal    12:15
22 requirement that must be done; correct?    12:15
23     A.  It's -- it's a statutory requirement. And    12:15
24 it's not necessarily establishing whether the -- it    12:15
25 summarizes the supplier's risk profile.    12:15

Page 140

1     Within supplier management, there should    12:15
2 actually be a risk assessment of some sort for each    12:15
3 individual supplier that has many inputs. Maybe not    12:15
4 just the inputs that are required to be summarized    12:15
5 in an annual product review.    12:15
6     The reason I mention annual product review    12:15
7 is purely because that's the minimum frequency --    12:15
8 because it's required annually -- it's the minimum    12:15
9 frequency where I would re-assess a supplier.    12:16
10     Q.  But the annual product review is the one    12:16
11 document that FDA actually legally requires a    12:16
12 finished dose manufacturer complete for its    12:16
13 suppliers in order to summarize the findings with    12:16
14 respect to the supplier's risk.    12:16
15     A.  It's a required document that will point    12:16
16 them to the records that they need to see.    12:16
17     So FDA will routinely start with an annual    12:16
18 product review because it points them to all the    12:16
19 records for all the quality system elements that    12:16
20 they are interested in, deviations, complaints,    12:16
21 supplier management. Various elements. Validation.    12:16
22     It encompasses many different elements.    12:16
23 So it's a summary document, and it's to assist FDA    12:16
24 in pointing to records that they'll go review.    12:16
25     The records that I speak of in my report    12:17

Page 141

1 are the underlying records for that summary report.    12:17
2 FDA just has an expectation that you are going to at    12:17
3 least annually evaluate the risk of suppliers.    12:17
4     Q.  When an -- when the FDA comes in to    12:17
5 evaluate the finished dose manufacturer, it's your    12:17
6 testimony that the first document they start with is    12:17
7 the annual product review? That's what they look at    12:17
8 first; right?    12:17
9     A.  I --    12:17
10     MR. STANOCH:  Objection to form.    12:17
11     THE WITNESS:  I didn't state that it's the    12:17
12 first document they are going to look at. It's --    12:17
13 it's a document that they use as a guidance to other    12:17
14 records.    12:17
15     In my experience, they do normally initially    12:17
16 request annual product reviews. It's a helpful    12:17
17 document for them.    12:17
18     But, certainly, if they choose not to    12:17
19 approach the audit that way, I can't say specifically    12:17
20 that they are even always going to look at an annual    12:17
21 product review.    12:17
22     But it is a document, because it is a    12:17
23 regulatory requirement, a compliance requirement, that    12:17
24 they would normally review. Most EIRs I read will    12:18
25 identify some annual product review.    12:18

36 (Pages 138 - 141)

Page 142

1    So when I say it's one of the first    12:18
2 documents, it's the best -- one of the best, in my    12:18
3 opinion, summary documents that points to all the    12:18
4 records that they want to see.    12:18
5    They also want to see if you are doing it    12:18
6 because many firms struggle with producing annual    12:18
7 product reviews on time.    12:18
8 BY MS. LOCKARD:    12:18
9    Q.  So just to clarify on the record, you said    12:18
10 so FDA -- [as read]:    12:18
11    "The FDA review will start with an    12:18
12    annual product review because it points    12:18
13    them to all the records for all the    12:18
14    quality system elements they are    12:18
15    interested in, deviations, compliance,    12:18
16    supplier management."    12:18
17    That was your testimony just a few minutes    12:18
18 ago.    12:18
19    A.  And --    12:18
20    MR. STANOCH:  Objection.    12:18
21    THE WITNESS:  I'll restate then that I    12:18
22 apologize for saying it's the first thing.  I can't --    12:18
23 I can't state what every FDA investigator is going to    12:18
24 do for the first document they look at.    12:18
25    What I do find is this -- this is one of the    12:19

Page 143

1 source documents that FDA relies upon for those    12:19
2 records.  So I'll clarify my testimony in that way.    12:19
3 BY MS. LOCKARD:    12:19
4    Q.  You also said [as read]:    12:19
5    "So when I say it's one of the first    12:19
6    documents, it's the best -- one of the    12:19
7    best, in my opinion, summary documents    12:19
8    that points to all the records they    12:19
9    want to see."    12:19
10    That was your testimony just minutes ago;    12:19
11 correct?    12:19
12    A.  I agree with that.    12:19
13    MR. STANOCH:  Objection.    12:19
14 BY MS. LOCKARD:    12:19
15    Q.  And yet even though it is one of the best    12:19
16 documents for FDA to review, you didn't even look at    12:19
17 those documents for Teva --    12:19
18    MR. STANOCH:  Well, objection.    12:19
19 BY MS. LOCKARD:    12:19
20    Q.  -- correct?    12:19
21    MR. STANOCH:  Objection to form.  Misstates    12:19
22 prior testimony.    12:19
23    THE WITNESS:  So I, again, said previously    12:19
24 that I didn't look at annual product reviews because I    12:19
25 am looking at the source records.  I looked at a    12:19

Page 144

1 change control.  I didn't look at the summary of    12:19
2 change controls from the annual product review.  I    12:19
3 have the change control.  I have the direct record.    12:20
4 What is a called a "primary GMP record."    12:20
5    The annual product review is a secondary    12:20
6 report.  It points to primary -- what is called    12:20
7 "statutory records."  There's a change control.  A    12:20
8 change control is a required record.    12:20
9    A batch record is a required record.    12:20
10    The batch record information will get    12:20
11 summarized in an annual product review, while the    12:20
12 batch record may have that information.    12:20
13    Again, for the purposes of this report and    12:20
14 what I opined on here, I am looking at supplier    12:20
15 quality records, change controls, audit reports, the    12:20
16 items that I have listed in my -- my materials    12:20
17 considered.    12:20
18    Annual product reviews are just a summary of    12:20
19 those records.  It wouldn't be -- so I didn't look at    12:20
20 them.  I looked at the actual primary GMP record.    12:20
21 BY MS. LOCKARD:    12:20
22    Q.  Would you expect the annual product    12:20
23 reviews to include information about the frequency    12:20
24 of Teva's testing of the ZHP API?    12:20
25    MR. STANOCH:  Objection to form.    12:21

Page 145

1    THE WITNESS:  No.  Would not be a requisite  12:21
2 section within an APR.    12:21
3 BY MS. LOCKARD:    12:21
4    Q.  Is it your belief that you have reviewed    12:21
5 all of the source documents which would be    12:21
6 summarized in Teva's annual product reports?    12:21
7    A.  No.  No.  Because an annual product report    12:21
8 covers all elements of the manufacturer of a    12:21
9 product.  I have opined on primarily laboratory    12:21
10 controls and the supplier management program.    12:21
11    Q.  You mentioned when we were talking about    12:21
12 the handful of inputs that go into a decision --    12:21
13 making a reasonable decision about the frequency of    12:21
14 testing, the API's supplier products, one of the    12:21
15 things you mentioned was the location of the    12:21
16 supplier.    12:21
17    Do you remember that?    12:21
18    A.  Yes.    12:21
19    Q.  What did you mean by that?    12:21
20    A.  Geographical location is a risk concern in  12:21
21 the industry.  Manufacturers who are abroad are    12:21
22 difficult -- more difficult to manage and to provide    12:22
23 oversight than those that are domestic.    12:22
24    Again, my experience in the industry is    12:22
25 there are more compliance concerns abroad.  So in    12:22

37 (Pages 142 - 145)

Page 146

1 many of the programs that I have promulgated to     12:22
2 clients a key risk category is geography.     12:22
3        Certain geographies are known to have more  12:22
4 compliance issues than others.     12:22
5        Again, this is a discretionary tool. And  12:22
6 it's a tool I recommend to clients is to include     12:22
7 relative geography as that detection indicator in     12:22
8 ICH Q9, "How well can I detect problems coming from  12:22
9 the supplier." It's more difficult with suppliers     12:22
10 that are abroad.     12:22
11   Q.  Are there any FDA guidances or     12:22
12 pronouncements that -- that determine that certain     12:22
13 geographical locations are required -- require     12:23
14 higher surveillance or -- or higher oversights than     12:23
15 others?     12:23
16   A.  No. There are no FDA regulations on that.  12:23
17 It's based on regulatory surveillance.     12:23
18        For my experience going off and looking at  12:23
19 numbers warning letters, types and severity of     12:23
20 issues that are identified by FDA by categories in     12:23
21 different geographies, that there is problems with     12:23
22 data integrity abroad. There is problems with     12:23
23 various understandings of the cGMP and the     12:23
24 underlying concepts of cGMP.     12:23
25        And I work a lot with companies abroad. I  12:23

Page 147

1 have direct experience with Chinese firms, Indian     12:23
2 firms, and their relative compliance.     12:23
3        Again, it's discretionary. So I recommend  12:23
4 that geography be a -- one of the risk inputs     12:23
5 associated with applying that -- or managing     12:24
6 suppliers.     12:24
7   Q.  And I understand your view on that. But     12:24
8 that's not stated anywhere officially by FDA?     12:24
9   A.  No, it's not.     12:24
10   Q.  So you -- you would not, I assume,     12:24
11 recommend to your -- to your clients that they not  12:24
12 use firms that are abroad for API supply?     12:24
13   A.  Absolutely not. No. So there's no     12:24
14 concern of using a supplier who is abroad. Most of  12:24
15 the drug supply chain comes from abroad. So there's  12:24
16 no concern there. And I would never make a     12:24
17 recommendation generally.     12:24
18        But there may be certain manufacturers     12:24
19 that it's higher risk.     12:24
20        And, again, this is from a compliance     12:24
21 perspective -- is an extremely high-risk area. So  12:24
22 how much risk do you want to take.     12:24
23        And then if you are going to take that     12:24
24 high risk, what will be your interim controls and     12:24
25 mitigation plan to reduce that risk as the guidances  12:24

Page 148

1 require on ICH Q9.     12:25
2   Q.  So in Teva's circumstances, if they have     12:25
3 suppliers, one from abroad and one from the U.S., is  12:25
4 it your view that they would need to employ greater     12:25
5 surveillance or oversight over the non-U.S. supplier  12:25
6 than they do the U.S. supplier?     12:25
7        MR. STANOCH: Objection to form. Incomplete  12:25
8 hypothetical.     12:25
9        Go ahead.     12:25
10        THE WITNESS: In my experience, I make that  12:25
11 recommendation to clients based on my experience.     12:25
12 That is purely my experience.     12:25
13 BY MS. LOCKARD:     12:25
14   Q.  Your recommendation to your clients is     12:25
15 more oversight if you have a supplier abroad     12:25
16 compared to suppliers who are domestic?     12:25
17   A.  It is.     12:25
18        MR. STANOCH: Same objection.     12:25
19 BY MS. LOCKARD:     12:25
20   Q.  The quality agreement you mentioned -- let  12:25
21 me just -- there is a...     12:25
22        MR. STANOCH: Counsel, you want to take a     12:26
23 break? It's been a couple of hours anyway. If you     12:26
24 are shifting to a document you need to find...     12:26
25        MS. LOCKARD: I -- I -- if you would like     12:26

Page 149

1 to, I would be happy to.     12:26
2        MR. STANOCH: Mr. Russ?     12:26
3        THE WITNESS: Yes, please.     12:26
4        MR. STANOCH: Okay. Yeah.     12:26
5        THE VIDEOGRAPHER: Okay. Going off record  12:26
6 at 12:27 p.m.     12:26
7        (At the hour of 12:27 p.m. a luncheon
8        recess was taken. The deposition was
9        resumed at 1:36 p.m., the same persons
10        being present.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Pages 146 - 149)

Page 150

1    LOS ANGELES, CALIFORNIA
2    THURSDAY, JANUARY 5, 2023
3        1:36 P.M.
4                            13:36
5    THE VIDEOGRAPHER: And we are back on the    13:36
6 record at 1:36 p.m. Start of Media Number 5.    13:36
7                            13:36
8    EXAMINATION (CONTINUED)                13:36
9 BY MS. LOCKARD:                        13:36
10    Q. Okay. Mr. Russ, we'll get going here.    13:36
11    MS. LOCKARD: Is everybody good on the call? 13:36
12 Okay.                            13:36
13 BY MS. LOCKARD:                        13:36
14    Q. All right. So in your report and in the    13:36
15 materials reviewed, you saw some correspondence    13:36
16 between ZHP and Novartis about Novartis's discovery 13:36
17 of unknown peaks that led to the discovery of the    13:36
18 nitrosamine; correct?                    13:36
19    A. Correct.                    13:36
20    Q. Do you have any understanding who -- what    13:36
21 Novartis's role is just generally in the marketplace 13:37
22 for Valsartan?                        13:37
23    A. I -- I believe that they are the innovator 13:37
24 for Valsartan. So I guess they are the owner of    13:37
25 Diovan.                            13:37

Page 151

1    And I guess they were searching for    13:37
2 additional supply of drug substance from ZHP.    13:37
3    Q. So are you -- you are guessing that they    13:37
4 were searching for additional supply, or did you see 13:37
5 documentation as to why they had obtained it?    13:37
6    A. Yeah. So they are coordinating a    13:37
7 supplier -- a material qualification with ZHP. So    13:37
8 that tells me that they are adding ZHP or --    13:37
9 potentially or considering ZHP as a supplier of    13:37
10 Valsartan.                        13:37
11    Q. Did -- did you see any documentation in    13:37
12 the case anywhere that Novartis was actually    13:37
13 implementing a plan to commercialize Valsartan using 13:37
14 ZHP API?                            13:38
15    A. Not an email or something that directly    13:38
16 says that, that I recall. It may be in the    13:38
17 production. But certainly the correspondence    13:38
18 between ZHP and Novartis indicates that they are    13:38
19 qualifying material. And I assume for    13:38
20 commercialization use.                    13:38
21    Q. In your experience in the industry have    13:38
22 you ever heard of a brand performing analysis or    13:38
23 testing on a competitor's product?            13:38
24    A. Some firms will reverse engineer    13:38
25 another -- another company's products. I have heard 13:38

Page 152

1 of that. Yes.                        13:38
2    Q. So is that one potential as well in terms    13:38
3 of the realms of possibilities as to why ZHP's API    13:38
4 may have been being assessed by Novartis?        13:38
5    MR. STANOCH: Objection to form.        13:39
6    THE WITNESS: I couldn't comment on that.    13:39
7 BY MS. LOCKARD:                        13:39
8    Q. Have you ever spoken to anyone at    13:39
9 Novartis?                            13:39
10    A. No. Not in regard to this matter, no.    13:39
11    Q. Have you seen any of Novartis's quality    13:39
12 documentation?                        13:39
13    A. Not the documentation. Only the email    13:39
14 correspondence or the requests for information    13:39
15 and -- and whatever information was in those    13:39
16 documents.                        13:39
17    Q. Just what was in ZHP's production is what    13:39
18 you reviewed?                        13:39
19    A. Correct.                    13:39
20    Q. You haven't reviewed any documents that    13:39
21 were actually provided by Novartis; correct?    13:39
22    A. I have Novartis documentation -- or    13:39
23 documentation about Novartis. As far as the source, 13:39
24 that I couldn't tell you as well. I would have to    13:39
25 look at the production or someone could tell me from 13:39

Page 153

1 the production whether it came from Novartis or if    13:39
2 it came from ZHP.                        13:39
3    Q. Have you ever seen any documentation in    13:39
4 the case suggesting that Novartis brand drug Diovan 13:39
5 may have been found to contain the presence of the    13:39
6 nitrosamine impurity?                    13:40
7    MR. STANOCH: Objection to form.        13:40
8    THE WITNESS: Again, I couldn't comment    13:40
9 directly that I have in my mind or remember a specific 13:40
10 document that points to Diovan.                13:40
11 BY MS. LOCKARD:                        13:40
12    Q. Did you ever ask the question of counsel    13:40
13 whether the brand drug itself also was found to    13:40
14 contain the impurity?                    13:40
15    MR. STANOCH: Objection to form.        13:40
16    THE WITNESS: I didn't ask. And it wasn't    13:40
17 germane to my report or what I opined on. It had    13:40
18 nothing to do with whether Diovan contained    13:40
19 nitrosamine, nothing to do with what I was -- you    13:40
20 know, asked to do.                    13:40
21 BY MS. LOCKARD:                        13:40
22    Q. So it doesn't change your opinion in any    13:40
23 way if you assume the brand Valsartan also contained 13:40
24 the NDMA impurity?                    13:40
25    A. No, it wouldn't.                13:40

39 (Pages 150 - 153)

Page 154

1  Q. One of the components about Good  13:40
2  Manufacturing Practices that we were talking about  13:41
3  before the break related to quality agreements.  13:41
4      Did you see quality agreements between ZHP  13:41
5  and Teva in your review of the material produced in  13:41
6  the case?  13:41
7  A. Yes.  13:41
8  Q. Okay. Did you have criticisms about  13:41
9  content of those quality agreements?  13:41
10  A. No.  13:41
11  Q. Is there a cGMP reg, statute, or otherwise  13:41
12  that requires a written quality agreement between  13:41
13  the API supplier and a finished dose?  13:41
14  A. No.  13:41
15  MR. STANOCH: Objection to form.  13:41
16  THE WITNESS: Sorry.  13:41
17  MR. STANOCH: It's okay.  13:41
18  THE WITNESS: No. There is guidance  13:41
19  currently on -- from FDA on the benefits and value of  13:41
20  a quality agreement or technical agreement. But  13:41
21  it's -- no. It's not required by a regulation  13:41
22  specifically.  13:41
23  BY MS. LOCKARD:  13:41
24  Q. And is that the guidance that you  13:41
25  referenced in your report?  13:41

Page 155

1  A. It is.  13:41
2  Q. Okay. Let's take a look at that.  13:42
3  MS. LOCKARD: This is going to be Exhibit  13:42
4  Number 11.  13:42
5  (Deposition Exhibit 11 was marked for  13:42
6  identification and is attached hereto.)  13:42
7  BY MS. LOCKARD:  13:42
8  Q. All right. And this is referenced in  13:42
9  Footnote 17 to your report.  13:42
10  A. It is.  13:42
11  Q. So if you turn with me to the  13:42
12  Introduction. Again, being a guidance, the  13:42
13  Introduction states that [as read]:  13:42
14  "This guidance describes FDA's  13:42
15  current thinking on defining,  13:42
16  establishing, and documenting  13:42
17  manufacturing activities of the parties  13:42
18  involved in contract drug manufacturing  13:42
19  subject to current good manufacturing  13:42
20  [...] requirements."  13:42
21  Do you see that?  13:42
22  A. Yes.  13:42
23  Q. This guidance itself, you would agree,  13:43
24  applies to contract manufacturing; right?  13:43
25  A. It does. But it -- it's applied also to  13:43

Page 156

1  the general supply base as well. Technical and  13:43
2  quality agreements are used broadly today in the  13:43
3  industry to define relationships between suppliers  13:43
4  and contract manufacturers.  13:43
5  Q. And I understand that your position is the  13:43
6  industry standard requires a quality agreement, but  13:43
7  this document itself doesn't say anything anywhere  13:43
8  about quality agreements with suppliers, does it?  13:43
9  A. Not specifically. One would expect that  13:43
10  Teva has quality agreements and requires quality  13:43
11  agreements in their procedures.  13:43
12  Q. So on the last paragraph of the  13:43
13  Introduction, it says [as read]:  13:43
14  "In particular, we describe how  13:43
15  parties involved in contract drug  13:43
16  manufacturing can use quality  13:43
17  agreements to delineate their  13:43
18  manufacturing activities to ensure  13:44
19  compliance with CM -- CGMP."  13:44
20  So, again, it's discretionary based on  13:44
21  this guidance. It's not required; right?  13:44
22  MR. STANOCH: Object to the form.  13:44
23  THE WITNESS: You are correct in what the  13:44
24  document says. I'm just stating that the way that  13:44
25  this document is used in the industry is broadly, and  13:44

Page 157

1  that the entire supply base quality agreements are  13:44
2  used broadly across the supply base.  13:44
3  I'm also not, within the report, identifying  13:44
4  any inconsistencies or problems that identified with  13:44
5  the technical agreement.  13:44
6  BY MS. LOCKARD:  13:44
7  Q. On the -- Page 2, last paragraph before  13:44
8  the Section 2.  13:44
9  A. Yes.  13:44
10  Q. And this -- this harkens back to our  13:44
11  discussion earlier, but this document says  13:44
12  [as read]:  13:44
13  "In general FDA's guidance documents  13:44
14  do not establish legally enforceable  13:44
15  responsibilities."  13:44
16  You agree with that?  13:44
17  A. I agree that that's what it says. Yes.  13:44
18  Q. And on the last sentence of that paragraph  13:44
19  [as read]:  13:44
20  "The use of the word should in  13:45
21  Agency guidances means that something  13:45
22  is suggested or recommended, but not  13:45
23  required."  13:45
24  Agree with that?  13:45
25  A. I agree that that's what is being read  13:45

40 (Pages 154 - 157)

Page 158

1 there.                                    13:45
2      But, again, the way industry uses these    13:45
3 documents is different than what that description  13:45
4 is.                                       13:45
5      Q.  So in your review of the -- of the quality  13:45
6 agreements between ZHP and Teva, you did not find  13:45
7 any deficiencies in the content of those; is that  13:45
8 correct?                                  13:45
9      A.  No.  I didn't find any specific deficiency  13:45
10 in the technical agreement itself.          13:45
11     Q.  So just to make sure that we are on the  13:45
12 same page --                              13:45
13         MS. LOCKARD:  So we'll mark this as   13:45
14 Exhibit 12, please.                       13:45
15         (Deposition Exhibit 12 was marked for  13:45
16         identification and is attached hereto.)  13:45
17 BY MS. LOCKARD:                           13:45
18     Q.  You can put that one aside.  This is Bates  13:45
19 Number TEVA -212.                         13:45
20     Is this one of the quality agreements you  13:46
21 reviewed?                                 13:46
22     A.  It appears to be.  It looks like the   13:46
23 quality agreement I reviewed.  Yes.         13:46
24     Q.  Okay.  This appears to be the agreement  13:46
25 between Arrow Pharm and ZHP dated 2011.     13:46

Page 159

1      Do you see that?                     13:46
2      A.  I do.                            13:46
3      Q.  And so this quality agreement would have  13:46
4 been in effect at the time of the change control;  13:46
5 right?                                    13:46
6      A.  Yes.  It appears so.               13:46
7      Q.  And this agreement on Page 4          13:46
8 provides for routine auditing of the supplier;  13:46
9 right?                                    13:46
10     A.  Sorry.  On page -- I have Page 3.  But...  13:46
11     Q.  Oh.  Correct.  On this one it's on Page 3.  13:46
12     A.  Oh.  Okay.                        13:46
13     Q.  It does -- it does have a provision on  13:46
14 Page 3 for routine audits, though.          13:46
15     A.  Yes.                             13:46
16     Q.  And that's what you would expect from a  13:46
17 reasonable and prudent manufacturer; correct?  13:46
18     A.  Yes.  Yeah.                       13:46
19         MR. STANOCH:  Ob- --                13:46
20         THE WITNESS:  That you end up doing audits,  13:46
21 for sure.                                 13:46
22         MS. LOCKARD:  Okay.  This will be Exhibit  13:47
23 Number 13.                                13:47
24         (Deposition Exhibit 13 was marked for  13:47
25         identification and is attached hereto.)  13:47

Page 160

1 BY MS. LOCKARD:                           13:47
2      Q.  This is Bates Number -20279, TEVA.    13:47
3      Have you seen this document before?     13:47
4      A.  Yes.                             13:47
5      Q.  Okay.  This is an agreement between  13:47
6 Actavis and ZHP dated 2016; correct?        13:47
7      A.  I don't see a date -- oh.  Yeah.  The date  13:47
8 of issuance, but if it was approved that date, I  13:47
9 don't see.                                13:47
10     I'll stipulate it is, yes.             13:47
11     Q.  Okay.  And there are signatures on the  13:47
12 back that are dated 2016 if you --          13:47
13     A.  Yes.  Okay.                       13:47
14     Q.  Okay.  So this agreement, you would agree,  13:47
15 would have been in place at the time of the  13:47
16 discovery of the nitrosamine impurity and the  13:47
17 recall?                                   13:47
18     A.  Agreed.                           13:47
19     Q.  And this -- this document also permits  13:47
20 Actavis to audit ZHP routinely; right?      13:47
21     A.  Yes.                             13:48
22     Q.  Okay.  And at one point -- it sounds like  13:48
23 a few minutes ago you referred to a technical  13:48
24 agreement.  And there -- there is also a quality  13:48
25 technical agreement between Actavis and ZHP.  13:48

Page 161

1      Did you see that?                     13:48
2      A.  Yes.  I believe so.  I apologize for  13:48
3 semantics.  Quality agreements, technical      13:48
4 agreements, supply agreement all kind of refer to  13:48
5 the same type of vehicle.                  13:48
6         MS. LOCKARD:  Okay.  So let's mark this one  13:48
7 as Exhibit 13.                            13:48
8         THE REPORTER:  14.                   13:48
9         MS. LOCKARD:  14.                    13:48
10        THE REPORTER:  Yes.                  13:48
11        (Deposition Exhibit 14 was marked for  13:48
12        identification and is attached hereto.)  13:48
13 BY MS. LOCKARD:                           13:48
14     Q.  All right.  And this is Bates -2213 for  13:48
15 Teva.                                     13:48
16     And is this the technical agreement you  13:48
17 reviewed?                                 13:48
18     A.  Yes.  Yes.                        13:48
19     Q.  Okay.  And you don't have any criticisms  13:48
20 of the content of any of these quality or technical  13:49
21 agreements?                               13:49
22     A.  I do not.  No.  They are all standard  13:49
23 tech -- kind of template approaches to delineating  13:49
24 responsibilities.                         13:49
25     Q.  Did you review any of Teva's quality  13:49

Page 162

1  policies in your review of the case?          13:49
2     A.  If they were provided to me.  I can't    13:49
3  recall specifically.  I didn't reference any of    13:49
4  those in my report.  They were provided in the    13:49
5  production.  And I reviewed them, and I opened them    13:49
6  and took a look at them.                          13:49
7        MS. LOCKARD:  Well, let's -- we'll mark this  13:49
8  as...                                             13:49
9        MR. HARKINS:  15.                           13:49
10       MS. LOCKARD:  15.                           13:49
11       (Deposition Exhibit 15 was marked for       13:49
12       identification and is attached hereto.)     13:49
13       MS. LOCKARD:  How come I only have -- I only  13:49
14 have copies of this.  But...                      13:49
15 BY MS. LOCKARD:                                   13:49
16    Q.  So this is -- do you believe you reviewed    13:49
17 this document now that you look at it?            13:49
18    A.  Again, if I have listed it in my --        13:50
19 my considered -- my documents considered, I didn't    13:50
20 use it in the reports.  So I may not.             13:50
21       I certainly had it if it was provided to    13:50
22 me in production and I had it listed on my materials    13:50
23 considered.                                       13:50
24    Q.  Well, I'll represent -- and we can check    13:50
25 it if you want, but I did not see that listed on    13:50

Page 163

1  your reliance list.                              13:50
2     A.  Okay, then.  Then -- this looks like a    13:50
3  very standard policy document.  Again, it doesn't    13:50
4  look extremely familiar to me.                    13:50
5     Q.  Okay.  As part of your review, you have    13:50
6  not generated any criticisms of Teva's policies --    13:50
7  is that fair? -- written policies?               13:50
8        MR. STANOCH:  Objection to form.           13:50
9        Go ahead.                                   13:50
10       THE WITNESS:  No.  And I haven't stated as    13:50
11 such in my report as well.                        13:50
12 BY MS. LOCKARD:                                   13:50
13    Q.  Okay.  And just so I get a clean question.   13:50
14       You know, as you sit here today, you have    13:50
15 not generated any opinions critical of Teva's     13:50
16 written policies with respect to their quality     13:51
17 system; correct?                                  13:51
18       MR. STANOCH:  Objection to form.           13:51
19       THE WITNESS:  No.                           13:51
20 BY MS. LOCKARD:                                   13:51
21    Q.  "No," that is correct?                     13:51
22    A.  No.  Yeah.  No, I haven't criticized the    13:51
23 policies from Teva.                               13:51
24       MR. STANOCH:  Same objection.              13:51
25 ///

Page 164

1  BY MS. LOCKARD:                                   13:51
2     Q.  Okay.  So with respect to their quality    13:51
3  processes in their audit program with ZHP, do you    13:51
4  have criticisms about how the audits were conducted?  13:51
5     A.  I do have criticisms that they don't      13:51
6  appear to list within the summary of audit reports    13:51
7  that they specifically looked at documents one would    13:51
8  expect them to look at, which is the analytical    13:51
9  data -- at least the statistically significant    13:51
10 sample of the analytical data that supports the    13:51
11 batches that they received from ZHP during that time    13:51
12 frame.                                            13:51
13       So that's absent, which is a -- something    13:51
14 they should review while on-site for an audit.    13:52
15 That's the purpose of the audit, actually.  One of    13:52
16 the purposes of the audit.                        13:52
17    Q.  Did you review the audit reports we       13:52
18 produced related to the ZHP audits?              13:52
19       MR. STANOCH:  Objection to form.           13:52
20       THE WITNESS:  Yes.                          13:52
21 BY MS. LOCKARD:                                   13:52
22    Q.  Okay.  And so in reviewing these reports,    13:52
23 you did not find any evidence that -- that the Teva    13:52
24 auditors had reviewed the analytical data and the    13:52
25 chromatograms.                                    13:52

Page 165

1        Is that the basis -- is that the gist of    13:52
2  the opinion?                                      13:52
3        MR. STANOCH:  Objection to form.           13:52
4        THE WITNESS:  I -- I didn't see lists of    13:52
5  documents reviewed that show specific batches of drug    13:52
6  substance that they -- that Teva received that they    13:52
7  reviewed.                                         13:52
8  BY MS. LOCKARD:                                   13:52
9     Q.  Did you have any other concerns or        13:52
10 criticisms about the content of the audit reports?    13:52
11       MR. STANOCH:  Objection to form.           13:52
12       THE WITNESS:  The only other consideration I    13:52
13 would expect to see within the audit reports is that    13:52
14 any declarations that are made by the supplier --    13:52
15 these are declarations of absence of certain types of    13:53
16 deleterious materials or any of those types of       13:53
17 things -- that there is a verification of those    13:53
18 statements during the audit that support for any    13:53
19 general statements that are made by the supplier in    13:53
20 the technical package.                            13:53
21 BY MS. LOCKARD:                                   13:53
22    Q.  So did you not see any certifications from    13:53
23 ZHP in the Teva production indicating that Teva was    13:53
24 certifying the API had no carcinogenic impurities?    13:53
25    A.  Teva was certifying?  Or...               13:53

42 (Pages 162 - 165)

Page 166

1   Q.  Excuse me.  Let me restate that.        13:53
2        Did you not see any certifications by ZHP  13:53
3   contained in the Teva production indicating that the  13:53
4   ZHP API had no carcinogenic impurities?      13:53
5   A.  I didn't see within -- what I am stating  13:53
6   is I didn't see within the audit reports that any  13:53
7   auditor verified any such statements that may have  13:54
8   been made and provided to Teva.              13:54
9   Q.  But you did see in the production,       13:54
10  including in the ANDAs, where the certifications of  13:54
11  the absence of deleterious impurities were provided?  13:54
12       MR. STANOCH:  Objection to form.         13:54
13       THE WITNESS:  Again, if it's within the  13:54
14  materials that were considered, those statements were  13:54
15  there.  These are general -- these statements are  13:54
16  ubiquitous.                                  13:54
17       What I am looking for specifically is that  13:54
18  there is some verification of those statements within  13:54
19  the audit reports.                           13:54
20       You asked me originally did I have concerns  13:54
21  with the audit reports.  That's my concern with the  13:54
22  audit reports.                               13:54
23  BY MS. LOCKARD:                              13:54
24  Q.  Okay.  And so that concern -- in order to  13:54
25  remedy that, what would have to be in that audit  13:54

Page 167

1   report?  An actual certification from ZHP?    13:54
2   A.  No.  Just a reference to the quality     13:54
3   records that were reviewed that support those  13:54
4   statements by the auditor.                   13:55
5        That it would be in a materials           13:55
6   considered -- you know, a list of documents reviewed  13:55
7   during the audit, or that there would be texts  13:55
8   summarizing that their review was complete of those  13:55
9   types of documents that support statements.  13:55
10       Again, statements in applications and    13:55
11  statements provided in technical packages -- again,  13:55
12  trust but verify.  Get a statement from the supplier  13:55
13  upon the audit visit.  I'll verify what quality  13:55
14  records support statements that have been made.  13:55
15  Q.  And did you find the -- the timing -- the  13:55
16  timing of the audits of ZHP by Teva to be within the  13:55
17  reasonable time frame?                       13:55
18  A.  Yes.                                     13:55
19       MR. STANOCH:  Objection.                13:55
20       THE WITNESS:  I'm sorry.                13:55
21       MR. STANOCH:  Objection.                13:55
22       Go ahead.                               13:55
23       THE WITNESS:  They appear to be reasonable.  13:55
24  BY MS. LOCKARD:                              13:55
25  Q.  Okay.  I'm not going to attach all the   13:55

Page 168

1   audit reports if it's not necessary.         13:55
2        So would you -- during those audits of   13:56
3   ZHP, would you expect the auditor to conduct the  13:56
4   type of analysis that led Novartis to identify the  13:56
5   NDMA substance in the Valsartan API?         13:56
6   A.  No.                                      13:56
7   Q.  Turning to your -- your report which -- if  13:56
8   you have before you.                         13:56
9   A.  Uh-huh.                                  13:56
10  Q.  At the top of Page 9 -- and this is a     13:57
11  quotation, I believe, from the NDA guidance.  13:57
12       But you have quoted at the bottom of that  13:57
13  quote [as read]:                             13:57
14       "The finished drug product                13:57
15       manufacturer should also ensure that  13:57
16       compendial-grade APIs comply with    13:57
17       compendial specifications."          13:57
18       Do you see that?                         13:57
19  A.  Yeah.  This is -- I do see that.         13:57
20       This is a statement from the questions and  13:57
21  answers, I believe.  This is not the guidance but  13:57
22  Exhibit 10.                                  13:57
23  Q.  Okay.  So is it your understanding that  13:57
24  the -- that the Valsartan produced by Teva complied  13:58
25  with all the applicable compendial specifications?  13:58

Page 169

1        MR. STANOCH:  Objection.                 13:58
2        THE WITNESS:  The material -- there is a  13:58
3   compendial monograph for Valsartan.  Teva identifies  13:58
4   their -- Valsartan as U.S. -- what is called "USP" or  13:58
5   "United States Pharmacopeia" on the labeling.  It  13:58
6   would be incumbent upon them to assure compliance with  13:58
7   the compendial specifications.               13:58
8   BY MS. LOCKARD:                              13:58
9   Q.  And you haven't seen any evidence in the  13:58
10  documentation that Teva's product did not comply  13:58
11  with the compendial specifications; right?   13:58
12  A.  No.  I don't have issue with Teva's       13:58
13  compliance to compendial specifications for  13:58
14  Valsartan they received.                     13:58
15       MS. LOCKARD:  So let's mark this as      13:58
16  exhibit...                                   13:58
17       THE REPORTER:  16.                       13:59
18       (Deposition Exhibit 16 was marked for    13:59
19       identification and is attached hereto.)  13:59
20  BY MS. LOCKARD:                              13:59
21  Q.  All right.  This is -- what is this?  Do  13:59
22  you recognize this document?                 13:59
23  A.  [Witness reviews document].              13:59
24       Yeah.  This is the USP-NF Online monograph  13:59
25  for Valsartan drug substance.                13:59

43 (Pages 166 - 169)

Page 170

1  Q.  Okay.  And if you go to Page 2 of that    13:59
2  document, you'll see where it has "Acceptance    13:59
3  Criteria"?                     13:59
4     A.  Yes.                    13:59
5     Q.  And it does not include any NDMA or NDEA    13:59
6  nitrosamines; correct?              13:59
7     A.  It does not.                13:59
8     Q.  It says [as read]:             13:59
9        "Any other individual impurity at    13:59
10     .1."                       13:59
11     Is that right?                 13:59
12     A.  That is correct.              13:59
13     Q.  And that means that percentages below    13:59
14  .1 are acceptable?                 13:59
15        MR. STANOCH:  Objection.         13:59
16        THE WITNESS:  It -- it means that    13:59
17  percentages below .1 would not need to -- to be    13:59
18  evaluated against whether or not they meet the    14:00
19  compendial specification or the internal    14:00
20  specification.                 14:00
21        But the presence of peaks, even below    14:00
22  .1 percent that are not expected to be in the    14:00
23  chromatography, should be questioned.    14:00
24  BY MS. LOCKARD:                 14:00
25     Q.  But this doesn't require any -- other than    14:00

Page 171

1  questioning the peaks, this does not require any    14:00
2  further action as long as you are within that limit?    14:00
3        MR. STANOCH:  Objection to form.    14:00
4  BY MS. LOCKARD:                 14:00
5     Q.  Is that right?              14:00
6     A.  It doesn't --             14:00
7        MR. STANOCH:  Same objection.    14:00
8        THE WITNESS:  -- require an investigation to    14:00
9  be immediately opened for out of specification.    14:00
10  There's another type of investigation called an "Out    14:00
11  of Trend."  Something that meets specification but is    14:00
12  odd or different that should be investigated as a    14:00
13  trend.                       14:00
14  BY MS. LOCKARD:                 14:00
15     Q.  Right.                  14:00
16        And in this case, there's no evidence    14:00
17  that -- excuse me -- that Teva noticed anything that    14:01
18  qualified as an Out of Trend that needed to be    14:01
19  further investigated.              14:01
20        MR. STANOCH:  Objection.        14:01
21  BY MS. LOCKARD:                 14:01
22     Q.  Is that right?             14:01
23     A.  They didn't notice it because they didn't    14:01
24  test anything.  So they didn't have any    14:01
25  chromatography.  So if they didn't have any    14:01

Page 172

1  chromatography -- I can't find a penny that I lost    14:01
2  if I don't look for a penny that I lost.    14:01
3     Q.  Okay.  Well, I just want to make sure I    14:01
4  understand your opinions.            14:01
5     A.  No.                     14:01
6     Q.  There is nothing that Teva -- there is no    14:01
7  evidence in Teva's records that there was an Out of    14:01
8  Trend report that they failed to act on; right?    14:01
9        MR. STANOCH:  Objection.         14:01
10        Go ahead.                  14:01
11        THE WITNESS:  What is -- what my concern is,    14:01
12  is that there isn't anything in the record that shows    14:01
13  that Teva evaluated chromatography for the drug    14:01
14  substance they were receiving from ZHP.    14:01
15  BY MS. LOCKARD:                 14:01
16     Q.  I understand your concern being that, from    14:01
17  your review, you don't feel that Teva did an    14:02
18  adequate review of the chromatography.    14:02
19        But my question to you is, based on what    14:02
20  is in the documentation, you found nothing to    14:02
21  suggest Out of Trend results; right?    14:02
22        MR. STANOCH:  Objection.         14:02
23        THE WITNESS:  I didn't find an Out of Trend    14:02
24  investigation around peaks in the chromatography, no.  14:02
25  ///

Page 173

1        MS. LOCKARD:  This we'll mark as the next    14:02
2  exhibit.                     14:02
3        THE REPORTER:  17.             14:02
4        MS. LOCKARD:  17.  This would be --    14:02
5        (Deposition Exhibit 17 was marked for    14:02
6        identification and is attached hereto.)    14:02
7  BY MS. LOCKARD:                 14:02
8     Q.  Well, are you familiar with this document    14:02
9  as well?                      14:02
10     A.  Yeah.  This is the -- this is for the drug    14:02
11  product.                      14:02
12        This is for the drug substance [witness    14:02
13  indicates document].               14:02
14        This is for the drug product [witness    14:02
15  indicates document].               14:02
16     Q.  And, again, on Page 2 it has "Acceptance    14:02
17  Criteria," and that list also does not reference    14:02
18  NDMA or NDEA; correct?             14:02
19        MR. STANOCH:  Objection.         14:02
20        THE WITNESS:  Correct.          14:02
21  BY MS. LOCKARD:                 14:02
22     Q.  And it discusses each individual impurity    14:02
23  with a limit of .2 percent; right?    14:02
24     A.  It appears so.               14:02
25     Q.  And so anything below .2 percent would be    14:02

44 (Pages 170 - 173)

Page 174

1  considered acceptable; correct?                14:03
2        MR. STANOCH: Objection to form.          14:03
3  BY MS. LOCKARD:                                14:03
4        Q.  Correct?              14:03
5        MR. STANOCH: Same objection.             14:03
6        THE WITNESS: Again, you are saying       14:03
7  acceptable. It's -- meets specification does not  14:03
8  necessarily mean that it's acceptable. Should it be  14:03
9  present in the chromatography is the question. Not  14:03
10 whether it meets spec.            14:03
11       MR. STANOCH: And for the record, Counsel, I  14:03
12 assume you highlighted the portion here on Page 2?  14:03
13       MS. LOCKARD: I didn't.            14:03
14       Did you?            14:03
15       MR. HARKINS: I didn't.          14:03
16       MR. STANOCH: Same thing on prior the     14:03
17 exhibit, the highlighting of Footnote C.        14:03
18       MS. LOCKARD: But I'll stipulate that it's  14:03
19 likely not in the original.          14:03
20       MR. STANOCH: That's fine. Thanks, Counsel.  14:03
21 BY MS. LOCKARD:                    14:03
22       Q.  And on this document, in fact, it says,  14:03
23 under "Acceptance Criteria" to [as read]:       14:03
24       "...disregard any peak due to       14:03
25       Valsartan related Compound B and any  14:03

Page 175

1       peaks less than or equal to        14:03
2       .05 percent."            14:03
3       Do you see that?            14:03
4       A.  I do.              14:03
5       Q.  So in terms of the peaks -- assuming that  14:04
6  Teva had evaluated that the chromatographs had found  14:04
7  peaks that are present, do you have opinions about  14:04
8  whether those peaks have to reach a certain size,  14:04
9  shape, width in order to be in the category of  14:04
10 requiring follow-up or questions, as you said?  14:04
11       MR. STANOCH: Objection to form.          14:04
12       Go ahead.              14:04
13       THE WITNESS: I don't have any concerns as  14:04
14 it relates to the drug product. I do have concerns as  14:04
15 it relates to the drug substance, but not the drug  14:04
16 product. No.              14:04
17 BY MS. LOCKARD:                    14:04
18       Q.  Even on the drug substance when looking at  14:04
19 unknown peaks, the presence of an unknown peak is a  14:04
20 common problem; correct?            14:04
21       MR. STANOCH: Objection.          14:04
22       THE WITNESS: No. It's not a common        14:04
23 problem. It's a unique problem.            14:04
24 BY MS. LOCKARD:                    14:05
25       Q.  So you'd disagree with the statement that  14:05

Page 176

1  the presence of an unknown peak is a common problem?  14:05
2        MR. STANOCH: Objection.          14:05
3        THE WITNESS: In my experience, it is not  14:05
4  common.              14:05
5        What is common? Frequently? Once a week?  14:05
6  Twice a week? Once a month? Every batch? There's no  14:05
7  qualifier to that.            14:05
8        Certainly, unknown peaks in chromatography  14:05
9  are very concerning; and, in my experience, they don't  14:05
10 happen frequently. So something that is common    14:05
11 doesn't sound as if that is something I agree to.  14:05
12 BY MS. LOCKARD:                    14:05
13       Q.  Well, if you'll turn to Page 60 [verbatim]  14:05
14 of your report.            14:05
15       A.  What paragraph are you on?          14:05
16       Q.  It's -- excuse me. I'm sorry. Page 11,  14:05
17 Paragraph 60.              14:05
18       A.  I didn't think I had 60 pages.          14:05
19       Q.  Wasn't that long.          14:05
20       Are you there with me at Paragraph 60?    14:05
21       A.  Yes.              14:06
22       Q.  And the -- third sentence of your    14:06
23 report says [as read]:              14:06
24       "While the presence of an unknown      14:06
25       peak is a common problem, it can be    14:06

Page 177

1       caused by many things which can range    14:06
2       from simple sample preparation        14:06
3       contamination all the way to unexpected  14:06
4       and potential genotoxic impurities in    14:06
5       API."              14:06
6       Were those your words?            14:06
7       A.  They are my words, yes.            14:06
8       Q.  Okay. So do you agree with your report  14:06
9  that --              14:06
10       A.  I do agree with my report.          14:06
11       Q.  -- "the presence of an unknown peak is a  14:06
12 common problem"?            14:06
13       MR. STANOCH: Objection. You have the rest  14:06
14 of the sentence.            14:06
15       Go ahead.              14:06
16       THE WITNESS: Yeah. I agree that it's a    14:06
17 problem that we have to deal with. When I meant    14:06
18 "common," I didn't mean frequent. I meant that this  14:06
19 is a problem that the industry needs to deal with.  14:06
20 BY MS. LOCKARD:                    14:06
21       Q.  And you do say --            14:06
22       A.  It's not -- it's not unique in that no one  14:06
23 in the industry has ever dealt with this problem  14:06
24 before.              14:06
25       Q.  You do say that peaks can be caused by  14:06

45 (Pages 174 - 177)

Page 178

1 many things, including simple sample preparation    14:06
2 contamination; right?    14:06
3    A.  Yes.    14:07
4    Q.  And so is -- isn't it reasonable to expect    14:07
5 some unknown peaks to occur from time to time?    14:07
6        MR. STANOCH:  Objection.    14:07
7        THE WITNESS:  It is reasonable.  But each    14:07
8 time they occur, they need to be questioned.  They can    14:07
9 be a small thing.  They can be a large thing.  They    14:07
10 can significantly affect the ability of the method to    14:07
11 quantitate materials of interest that you are trying    14:07
12 to test for.  So when a peak occurs, it's -- it's    14:07
13 important to question what -- what does this peak    14:07
14 represent.    14:07
15 BY MS. LOCKARD:    14:07
16    Q.  So in order to give rise to a question,    14:07
17 does the peak need to reach a certain peak size,    14:07
18 peak distribution, or width or shape in the    14:07
19 substance?    14:07
20    A.  No.  It can be unexpected.  "We haven't    14:07
21 seen this before."    14:07
22        Certainly something that is baseline noise    14:07
23 is one thing.  But there are factors, there are    14:07
24 measures within the chromatography for baseline    14:07
25 noise.  So that's not something of concern.    14:08

Page 179

1        But if you find something that appears or    14:08
2 shouldn't be there, then a question should arise at    14:08
3 that point.    14:08
4    Q.  And when you say "ask questions" or "a    14:08
5 question should arise," what specifically are you    14:08
6 requiring a finished dose manufacturer like Teva to    14:08
7 do in response to a discovery that there are unknown    14:08
8 peaks in the supplier's raw data?    14:08
9    A.  In their raw -- in the supplier's raw    14:08
10 data?    14:08
11    Q.  Well, I believe you told me that Teva    14:08
12 should have been reviewing and comparing the    14:08
13 supplier's raw data with their own; correct?    14:08
14    A.  That is correct.  But Teva would have to    14:08
15 have their own raw data.  As I understand it from    14:09
16 the documents I reviewed, Teva didn't have their own    14:09
17 raw data.    14:09
18    Q.  Assuming Teva has raw data that exists, it    14:09
19 includes unknown peaks, what is your expectation for    14:09
20 what Teva would then be required to do in response?    14:09
21        MR. STANOCH:  Objection.    14:09
22        But go ahead.    14:09
23        THE WITNESS:  Hypothetically, because they    14:09
24 don't have that chromatography, I would expect them to    14:09
25 first investigate is this -- a contaminant from the    14:09

Page 180

1 sample preparation or from the glassware preparation.    14:09
2        In my experience, many times, the sudden    14:09
3 appearance of an unknown peak or something we haven't    14:09
4 seen before may be some extrinsic contaminant.    14:09
5        Glassware needs to be extremely clean when    14:09
6 preparing samples, otherwise, it may carry over, and    14:09
7 something will appear in the chromatography.    14:09
8        That would be the first investigation that    14:10
9 would be -- that I would expect a manufacturer to --    14:10
10 to start with.    14:10
11 BY MS. LOCKARD:    14:10
12    Q.  And is your response the same to the    14:10
13 extent that a finished dose manufacturer sees that    14:10
14 there are unknown peaks in the API manufacturer's    14:10
15 data?    14:10
16    A.  I would expect them to ask the supplier    14:10
17 "What are these peaks?  Did you have problems?  Is    14:10
18 this glass?  This is something we haven't seen    14:10
19 before."  I would ask them to begin to query the    14:10
20 supplier about the presence of unknown peaks.    14:10
21        MS. LOCKARD:  Okay.  Next exhibit.    14:11
22        THE REPORTER:  18.    14:11
23        MS. LOCKARD:  18.    14:11
24        (Deposition Exhibit 18 was marked for    14:11
25        identification and is attached hereto.)    14:11

Page 181

1 BY MS. LOCKARD:    14:11
2    Q.  All right.  Are you familiar with this    14:11
3 document as well?    14:11
4    A.  Yeah.  This appears to be the combination    14:11
5 product Valsartan-HCTZ, USP.    14:11
6    Q.  And this is for the tablets or the drug    14:11
7 product?    14:11
8    A.  The drug product.    14:11
9    Q.  So if you look on Page 3 of this under    14:11
10 "Acceptance Criteria," similarly here you see the    14:11
11 acceptance?    14:11
12    A.  I do.    14:11
13    Q.  Okay.  And, again, are these the    14:11
14 compendial standards that you were referencing    14:11
15 earlier in your report about ensuring compliance    14:11
16 with compendial standards?    14:11
17    A.  The USP standard, it can -- depending upon    14:11
18 the geography, it can also be on the compendial    14:11
19 standards, which exist.  USP is not the only    14:11
20 compendial standard.  But, yes, that is what I am    14:12
21 referring to.    14:12
22    Q.  So is the -- is the ICH Q3A also a    14:12
23 compendial standard?    14:12
24    A.  No.  I would be referencing the European    14:12
25 Pharmacopoeia or the Japanese Pharmacopoeia.    14:12

46 (Pages 178 - 181)

Page 182

1  Depending upon what geographies' products are being    14:12
2  sold, certain compendial requirements apply.    14:12
3        MS. LOCKARD:  All right.  Well, let's --    14:12
4  I'll make this an exhibit as well.    14:12
5        (Deposition Exhibit 19 was marked for    14:12
6        identification and is attached hereto.)    14:12
7  BY MS. LOCKARD:    14:12
8    Q.  Can you identify this document for me?    14:12
9    A.  Yes.  This is the impurity guidance    14:12
10  ICH Q3A.    14:12
11    Q.  And you are familiar with this document as    14:12
12  well?    14:12
13    A.  I am.    14:12
14    Q.  Doesn't this include the reporting    14:12
15  threshold for impurities?    14:12
16    A.  It does.    14:12
17    Q.  In ICH -- and ICH Q3B [verbatim]?    14:12
18    A.  It does.    14:12
19    Q.  Is there a reporting threshold for    14:12
20  impurities in ICH 3- -- Q3B?    14:12
21    A.  Is this -- this is Q3A?    14:13
22    Q.  It is Q3A.  Hold on a second.    14:13
23        We'll come back to that.    14:13
24        MS. LOCKARD:  Okay.  Let's mark Q3B as the    14:13
25  next exhibit.    14:13

Page 183

1        (Deposition Exhibit 20 was marked for    14:13
2        identification and is attached hereto.)    14:13
3  BY MS. LOCKARD:    14:13
4    Q.  Are you familiar with this document?    14:13
5    A.  I am.    14:13
6    Q.  Okay.  And what is this?    14:13
7    A.  This is for drug products.  This is    14:13
8  impurities guidance for drug products Q3B (R2)    14:13
9  [witness indicates documents].    14:13
10        And this is for drug substances Q3A    14:13
11  [witness indicates documents].    14:13
12    Q.  Okay.  And is there a reporting threshold    14:13
13  for impurities in ICH Q3B?    14:13
14    A.  There are some reporting thresholds in    14:14
15  Attachment 2.  Yes.    14:14
16    Q.  And the FDA follows this standard as well,    14:14
17  doesn't it?    14:14
18    A.  The FDA produce the guidance, and they    14:14
19  don't test anything.  So they are not following    14:14
20  these standards, but they are -- they promulgated    14:14
21  these standards.    14:14
22    Q.  So FDA promulgated these standards;    14:14
23  correct?    14:14
24    A.  Yes.    14:14
25        Well, ICH did, but FDA accepts it.    14:14

Page 184

1    Q.  So you don't mention the Q3A or Q3B    14:14
2  standards in your report at all; correct?    14:14
3    A.  No.  My report doesn't -- doesn't    14:14
4  criticize the fact that either the drug substance or    14:14
5  the drug product met any compendial or recommended    14:14
6  thresholds for impurities.    14:14
7        My report purely questions why Teva under    14:14
8  Torrent did not question the presence of potential    14:15
9  unknown peaks in chromatography that have nothing to    14:15
10  do with the specifications.    14:15
11        Specifications are one evaluation    14:15
12  criteria.  The presence of something strange or    14:15
13  something different in chromatography is also an    14:15
14  evaluation criteria.  I don't have any concerns that    14:15
15  products that meet the thresholds or the    14:15
16  specifications that were published.    14:15
17    Q.  Did you review any of the impurity    14:15
18  results, the impurity levels that were produced in    14:15
19  the case related to ZHP's API?    14:15
20    A.  As it relates to expected impurities or...    14:15
21    Q.  The NDMA impurity that was found.  Have    14:15
22  you -- have you assessed the levels of NDMA that    14:15
23  were found in the ZHP API?    14:15
24    A.  I have seen documentation that    14:15
25  demonstrates testing on methodology that was focused    14:15

Page 185

1  at looking at nitrosamines.    14:15
2    Q.  And you are aware that even at the highest    14:16
3  levels of impurities reported in your ZHP API    14:16
4  anywhere in the world, the testing showed, according    14:16
5  to these standards in the compendial specifications,    14:16
6  that the impurities were below the reporting    14:16
7  thresholds; correct?    14:16
8        MR. STANOCH:  Objection.    14:16
9        THE WITNESS:  I'll stipulate to that.  Yes.    14:16
10  I mean, my concern, again, isn't about the meeting of    14:16
11  specifications.  That's why I don't refer to any of    14:16
12  these documents or the specific drug substance or    14:16
13  product or drug product specifications because my    14:16
14  concern is not about whether these products met    14:16
15  specification.    14:16
16        My concern is whether or not firms were    14:16
17  doing adequate monitoring of chromatography coming    14:16
18  from the supplier.  Purely if anything appeared that    14:16
19  should not have been there or had not been there    14:16
20  previously.    14:16
21        MS. LOCKARD:  Okay.  Let me show you --    14:16
22  we'll make this Exhibit 21.    14:17
23        (Deposition Exhibit 21 was marked for    14:17
24        identification and is attached hereto.)    14:17
25  ///

47 (Pages 182 - 185)

Page 186

1  BY MS. LOCKARD:                          14:17
2      Q.  And this is the "FDA Statement on FDA's    14:17
3  ongoing investigation into valsartan impurities and  14:17
4  recalls and an update on FDA's current findings,"   14:17
5  dated August 30th, 2018, from Scott Gottlieb.       14:17
6         Are you familiar with this document?         14:17
7      A.  I'm familiar with the document in that it   14:17
8  exists.                                              14:17
9      Q.  Have you read this or reviewed this?        14:17
10     A.  Not in detail.                              14:17
11     Q.  And this was highlighted by one of the      14:17
12 defense counsel on our team.  So...                 14:17
13        If you'll turn with me to Page 1 -- to 3,    14:17
14 and starting at the bottom where it is highlighted   14:17
15 where it says [as read]:                            14:17
16        "Specifically, a combination of             14:17
17     conditions, which include certain              14:18
18     chemicals, processing conditions and           14:18
19     production steps, could lead to                14:18
20     formation of the NDMA impurity.  We            14:18
21     believe that these risks are introduced        14:18
22     through a specific sequence of steps in        14:18
23     the manufacturing process, where              14:18
24     certain chemical reactions are needed          14:18
25     to form the active ingredient.  Before         14:18

Page 187

1     we undertook this analysis, neither           14:18
2     regulators nor industry fully                 14:18
3     understood how NDMA could form during         14:18
4     this process."                                14:18
5  Do you agree with that statement?                 14:18
6         MR. STANOCH:  Objection to form.           14:18
7         THE WITNESS:  I have no basis to agree or  14:18
8  disagree with it.                                   14:18
9  BY MS. LOCKARD:                                    14:18
10     Q.  Is it a reasonable conclusion to state    14:18
11 that at the time of the discovery of the NDMA      14:18
12 neither the regulatory agency nor the industry     14:18
13 itself understood how NDMA could form in the drug?  14:18
14        MR. STANOCH:  Objection to form.  Misstates 14:18
15 the document.                                       14:18
16        Go ahead.                                   14:19
17        THE WITNESS:  I don't understand whether --  14:19
18 I would have to understand the chemistry that was   14:19
19 associated with this.  It's one thing to say that it's 14:19
20 impossible or to know the chemistry here.          14:19
21        As I understand it from review of ZHP's own 14:19
22 internal evaluation and investigation documentation  14:19
23 that the chemistry was reasonably well-known and that 14:19
24 this chemistry in the formation of the nitrosamines is 14:19
25 a well-known reaction -- type of organic chemistry  14:19

Page 188

1  reaction.  So this seems to be in conflict with that.  14:19
2         But, again, this is not my area of         14:19
3  expertise; so I can't comment on this, on whether it's 14:19
4  valid or not.                                       14:19
5  BY MS. LOCKARD:                                     14:19
6      Q.  Well, in your practice as an industry      14:19
7  consultant, you were not aware or had not considered 14:19
8  the potential for the formation of nitrosamines in  14:19
9  NDMA in the presence of drug substances, had you?  14:19
10        MR. STANOCH:  Objection to form.            14:20
11        THE WITNESS:  I am -- in my report I am not  14:20
12 even looking at how NDMA was formed.  My only concern 14:20
13 and question is that something formed, something    14:20
14 appeared in chromatography, and no one questioned it.  14:20
15        The -- the foregoing identification and then 14:20
16 what chemistry led to that is a future state, and   14:20
17 that's not my concern.                             14:20
18        I was asked to opine on the GMP practices of 14:20
19 Teva and Torrent.  The GMP practice would be to     14:20
20 question an unknown peak.  What happens beyond that  14:20
21 and the reasonableness of the chemistry is not part of 14:20
22 my report, nor is it something I can comment on.    14:20
23 BY MS. LOCKARD:                                    14:20
24     Q.  Okay.  So I understand.                    14:20
25        So your criticism is that the              14:20

Page 189

1  manufacturers did not question the unknown peak,     14:20
2  period; right?                                       14:20
3      A.  Correct.                                    14:21
4         MR. STANOCH:  Objection to form.            14:21
5  BY MS. LOCKARD:                                     14:21
6      Q.  You are not criticizing the manufacturers  14:21
7  because they didn't then interpret the peak to be    14:21
8  the presence of NDMA?                               14:21
9         MR. STANOCH:  Objection to form.            14:21
10        THE WITNESS:  I'm not criticizing -- I'm    14:21
11 criticizing them for not furthering an investigation  14:21
12 that might lead to that identification.            14:21
13 BY MS. LOCKARD:                                    14:21
14     Q.  But in terms of your background,          14:21
15 experience, and education, you are not qualified to  14:21
16 say that through the processes available at the     14:21
17 time, the equipment available at the time, and the  14:21
18 procedures available at the time, that a           14:21
19 manufacturer could have or should have interpreted  14:21
20 those peaks to be, in fact, nitrosamines?          14:21
21        MR. STANOCH:  Objection to form.            14:21
22        THE WITNESS:  I -- I would expect them to   14:21
23 pursue an investigation that would lead them to that  14:21
24 space.                                              14:21
25        Certainly, I understand the technology and  14:21

48 (Pages 186 - 189)

Page 190

1  what they would employ as they went along.    14:21
2      The perfect example is Novartis. They did    14:21
3  exactly what Teva and Torrent should have done. They    14:21
4  questioned the peak. The peak appeared in normal    14:22
5  compendial testing. They asked the question of the    14:22
6  supplier. The supplier failed to provide adequate or    14:22
7  reasonable responses in a reasonable time. And they    14:22
8  then, through investigation, decided to further    14:22
9  characterize those peaks themselves, which is exactly    14:22
10  what any prudent reasonable manufacturer should do.    14:22
11  BY MS. LOCKARD:    14:22
12      Q.  But you are not testifying, then, in this    14:22
13  case that Teva had the ability, the equipment, the    14:22
14  validation -- validated procedures to be able to    14:22
15  interpret the peaks as ultimately being    14:22
16  nitrosamines? I mean, you are not connecting that    14:22
17  dot; correct?    14:22
18      MR. STANOCH: Objection to form. Objection.    14:22
19      Go ahead.    14:22
20  BY MS. LOCKARD:    14:22
21      Q.  Go ahead.    14:22
22      A.  I -- I do connect that dot. I have done    14:22
23  this work myself as a quality professional. In that    14:22
24  something is questioned. There is all kinds of    14:22
25  industry resources. I don't need to have those    14:23

Page 191

1  resources in house. It's available to me.    14:23
2      I can send this material to multiple    14:23
3  contract laboratories that could do an    14:23
4  investigation.    14:23
5      I am not trying to say what the specific    14:23
6  amount is or to validate this method. I'm just    14:23
7  trying to get information in that.    14:23
8      So certainly they had access to all the    14:23
9  technology that would be needed in order to identify    14:23
10  these peaks.    14:23
11  BY MS. LOCKARD:    14:23
12      Q.  What is the methodology that was needed to    14:23
13  identify the peaks?    14:23
14      A.  There could be many different types of    14:23
15  technology that would be employed. All I can state    14:23
16  is that, again, we go back to Novartis. They choose    14:23
17  to use GC mass spec or GC-MS to do an    14:23
18  identification.    14:23
19      GC mass spec is a typical technology.    14:23
20  It's been around for decades. It's available in    14:23
21  almost every characterization lab.    14:23
22      So if Teva in their own laboratories did    14:23
23  not have GC mass spec, they could certainly send it    14:23
24  out for that type of evaluation. But there are    14:24
25  other methods of evaluation as well that they could    14:24

Page 192

1  use.    14:24
2      Again, the chemistry on how they might    14:24
3  want to approach that is for the scientists to    14:24
4  determine.    14:24
5      As the quality professional, I just want    14:24
6  an answer "What is this peak."    14:24
7      Q.  Do you know whether Novartis used a    14:24
8  validated analytical test method to identify the    14:24
9  NDMA?    14:24
10      A.  I -- I don't know if they used an I -- a    14:24
11  validated method. It would be unexpected that they    14:24
12  used a validated method to do an ID.    14:24
13      Q.  On -- returning to the exhibit that is in    14:24
14  front of you, if you look at Page 5 of 7, the    14:24
15  highlighted sentence in the first paragraph says    14:25
16  [as read]:    14:25
17      "Because it was not anticipated that    14:25
18      NDMA would occur at these levels in the    14:25
19      manufacturing of the Valsartan API,    14:25
20      manufacturers would not have been    14:25
21      testing for it."    14:25
22      Do you see that?    14:25
23      A.  I do.    14:25
24      Q.  And that's a statement issued by FDA;    14:25
25  correct?    14:25

Page 193

1      A.  It is.    14:25
2      Q.  Do you disagree with that statement?    14:25
3      A.  I don't disagree with this statement.    14:25
4      It was unexpected. It shouldn't have been    14:25
5  there. They wouldn't have designed testing to look    14:25
6  for it because it's not supposed to be there.    14:25
7      But when something strange appears, it's    14:25
8  incumbent upon them to identify what that is.    14:25
9      And, again, that is my only -- that's all    14:25
10  I have ever opined on in my report is that they    14:25
11  should have asked the question. They didn't ask a    14:25
12  question.    14:25
13      I am not saying that they should have    14:25
14  designed the testing up front to search for NDMA.    14:25
15  It's not expected to be there. They only need to    14:26
16  design testing for what they expect to be there.    14:26
17      But when a peak occurs that is unexpected,    14:26
18  even if it's below the threshold of reporting or    14:26
19  below the specification, a question should be asked.    14:26
20      Q.  But don't you have to know what you are    14:26
21  looking for before you design a test to find it?    14:26
22      A.  No. I can send it to a characterization    14:26
23  laboratory and say "Tell me what this is." I don't    14:26
24  need to know the amount of it. I just want to know    14:26
25  what it is.    14:26

49 (Pages 190 - 193)

Page 194

1    MS. LOCKARD: Here's the next exhibit, which  14:26
2  is Number...                                  14:26
3    THE REPORTER: 22.                            14:26
4    MS. LOCKARD: 22.                             14:26
5    (Deposition Exhibit 22 was marked for        14:26
6    identification and is attached hereto.)      14:26
7  BY MS. LOCKARD:                                14:26
8    Q.  This is the "FDA Statement on the FDA's  14:26
9  ongoing investigation into valsartan and ARB class  14:26
10  impurities and the agency's steps to address the  14:26
11  root causes of the safety issues."            14:26
12    Immediate release was January 25th, 2019,   14:26
13  authored by Scott Gottlieb.                   14:27
14    A.  Okay.                                    14:27
15    Q.  Have you seen this document in your     14:27
16  review?                                        14:27
17    A.  No, I did not look at this document, that  14:27
18  I am aware of.                                 14:27
19    Q.  If you turn to Page 3 of 6, please, the  14:27
20  highlighted portion at the bottom of the page reads  14:27
21  [as read]:                                     14:27
22    "Tests are selected based on               14:27
23    assessments of what impurities may          14:27
24    develop as a result of the                  14:27
25    manufacturing process.  In other words,     14:27

Page 195

1    it generally needs to be recognized         14:27
2    that there's a risk of an impurity           14:27
3    occurring as a result of a                   14:27
4    manufacturing process to know the            14:27
5    impurity should be tested for."              14:27
6    A.  Correct.                                 14:27
7    Q.  Do you see that?                          14:27
8    A.  I do.                                     14:27
9    Q.  Do you agree with that?                   14:27
10    A.  Yes.  Prospectively.  If I'm going to   14:27
11  prospectively design a method to look for an  14:27
12  impurity, then I should have an expectation that  14:27
13  impurity may exist in the product or from the  14:27
14  manufacturing process could arise.            14:27
15    This is a statement about creating          14:27
16  prospective testing.                           14:28
17    If I find something that wasn't a part of   14:28
18  my prospective evaluation, then it's incumbent upon  14:28
19  me to ask a question "What is this?  Did something  14:28
20  change?"  And then to characterize that because,  14:28
21  potentially, I missed something in that prospective  14:28
22  design.                                        14:28
23    Q.  Before we undertook this analysis, neither  14:28
24  regulators nor industry fully understood how NDMA or  14:28
25  NDEA could form during this particular manufacturing  14:28

Page 196

1  process.                                        14:28
2    So this is new information to you?           14:28
3    A.  No.  I would expect that they would not  14:28
4  have anticipated that these would -- prospectively,  14:28
5  when they design methodology would have no   14:28
6  expectation, nor do I opine in my report that they  14:28
7  would have -- that I would have expectation that  14:28
8  they would have designed upfront methodology that  14:28
9  would be sent to FDA for approval to search for NDMA  14:28
10  or NDEA.  Neither of these impurities.  They were  14:28
11  unexpected.                                     14:28
12    Now, ZHP may have known about them, but     14:29
13  didn't supply that in their technical packages to  14:29
14  the customers or whatever it may be.  I don't know  14:29
15  that as well.                                   14:29
16    However, the statements that FDA is giving  14:29
17  here is that should they have designed testing to  14:29
18  look for NDMA.  I agree they -- it wouldn't have  14:29
19  been reasonable for them to do so.             14:29
20    But after finding unknown peaks, did you    14:29
21  ask the question to ask what those peaks are.  14:29
22  That's what I'm opining in my report.          14:29
23    Q.  I understand.                            14:29
24    A.  Uh-huh.                                  14:29
25    Q.  That -- that has come across, I think,  14:29

Page 197

1  fairly clearly.                                 14:29
2    On the next page of this, one challenge we   14:29
3  face is that NDMA's properties make it hard to  14:29
4  detect in standard laboratory testing the kind of  14:29
5  testing results that are reviewed during a     14:29
6  surveillance inspection.                        14:29
7    You have no reason to quarrel with that?     14:29
8    A.  I don't have any reason to quarrel with  14:30
9  that.  But having something -- if something is  14:30
10  difficult, then it's difficult.  If it's too  14:30
11  difficult, you shouldn't be in this business.  14:30
12    Q.  So your opinion now is that, because it's  14:30
13  a difficult business, manufacturers should not be in  14:30
14  it?                                             14:30
15    MR. STANOCH: Objection.  Argumentative.     14:30
16    THE WITNESS: Okay.  I -- I apologize for    14:30
17  that.                                           14:30
18    MS. LOCKARD: Well, the answer,             14:30
19  respectfully, was argumentative.               14:30
20    MR. STANOCH: Well, respectfully, you've     14:30
21  raised that same objection for much less argumentative  14:30
22  things I have said over the years.             14:30
23    So objection stands.  Argumentative.        14:30
24  BY MS. LOCKARD:                                 14:30
25    Q.  Okay.  I think we can move those to the  14:30

Page 198

1 side.                                    14:30
2       Let me ask you this question:        14:30
3       Do you have an opinion about which     14:30
4 specific cGMP was violated by Teva?  Not just the  14:30
5 cGMPs but by regulation number.            14:30
6    A.  21 CFR 211.84(d)(2).               14:30
7    Q.  And -- okay.  Are there any others or is  14:31
8 that the one that really encompasses the core of  14:31
9 your opinions?                            14:31
10   A.  I think that's the main core of my   14:31
11 opinion.  Certainly there are other violations as it  14:31
12 relates to personnel training and various others,  14:31
13 potentially, that relates to Torrent, for the most  14:31
14 part, but this is the main focus.  This particular  14:31
15 regulation is the main focus of my opinion in this  14:31
16 report.                                   14:31
17   Q.  So for purposes of Teva because that -- I  14:31
18 need to know this as to what regulation we are being  14:31
19 accused of violating -- it's 211.84(d)(2)?   14:31
20   A.  Correct.                          14:31
21   Q.  At the end of the report, there -- there's  14:32
22 the discussion about the timeliness of the recall  14:32
23 and removing the hold on the product, and there's  14:32
24 some commentary there about Mylan and the Mylan API.  14:32
25       I know that you said that, you know, this  14:32

Page 199

1 report isn't intended to really address the Mylan  14:32
2 API issues; right?                        14:32
3    A.  It's not.  No.                     14:32
4    Q.  Okay.  Is it your understanding that the  14:32
5 NDEA impurities in the Mylan product were processed  14:32
6 impurities generated by the same route of synthesis  14:32
7 in the ZHP?                               14:32
8       MR. STANOCH:  Objection to form.  He's not  14:32
9 offering opinions on the Mylan API at this stage.  14:32
10      THE WITNESS:  I'm not offering opinions on  14:32
11 Mylan; and, again, I didn't focus on that area.  14:32
12      My -- my main focus of including Mylan in  14:33
13 this is around Teva's failure to extend their  14:33
14 investigation to other suppliers of Valsartan, which  14:33
15 is an expectation of the GMP.              14:33
16 BY MS. LOCKARD:                          14:33
17   Q.  So you just don't know one way or the  14:33
18 other whether the Mylan NDEA issue was caused by the  14:33
19 same route of synthesis or something different?  14:33
20      MR. STANOCH:  Same objection.        14:33
21 He is not opining on the Mylan API at this  14:33
22 stage.                                   14:33
23      THE WITNESS:  I don't have any opinion on  14:33
24 that.                                    14:33
25 ///

Page 200

1 BY MS. LOCKARD:                          14:34
2    Q.  So you are not offering any opinions at  14:34
3 this stage as to whether Teva should have released a  14:34
4 hold on the Mylan product; right?          14:34
5    A.  I am offering opinion that they should not  14:34
6 have released a hold on Mylan product because they  14:34
7 hadn't received appropriate documentation from all  14:34
8 of their suppliers that would give them a high  14:34
9 enough degree of assurance that this problem that  14:34
10 ZHP reported did not exist amongst those suppliers.  14:34
11      The GMP requires an extension or a -- to  14:34
12 throw a larger net to the investigation to all  14:34
13 suppliers who potentially produce -- who produce  14:34
14 Valsartan for you.  That is a standard-industry  14:34
15 practice.                                14:34
16      There is a problem identified, ZHP's.   14:34
17 Valsartan was identified to have a problem.  14:34
18      Before I released any other Valsartan that  14:34
19 I may receive from other suppliers, I need to  14:35
20 solicit -- again, ask questions and solicit  14:35
21 appropriate objective evidence that this problem  14:35
22 doesn't exist within their drug substances.  14:35
23      And it appeared to me from the           14:35
24 documentation and from the emails that I reviewed  14:35
25 that Teva did not have appropriate documentation to  14:35

Page 201

1 release Mylan's material for further processing.  14:35
2    Q.  Did you review documentation of the  14:35
3 communications between Mylan and ZHP that included  14:35
4 questions that ZHP had asked -- excuse me --  14:35
5 included questions that Teva had asked and that  14:35
6 Mylan responded to?                       14:35
7    A.  I reference them in my report.  This is  14:35
8 the documentation that I looked at.        14:35
9    Q.  And the documentation reviewed indicated  14:35
10 that Mylan confirmed it was a different route of  14:35
11 synthesis and would not contain NDMA.       14:35
12      Did you see that in the document?      14:35
13   A.  They stated that, but they -- there's no  14:35
14 objective evidence.  A statement -- a statement of,  14:36
15 you know, a condition by a supplier is not  14:36
16 sufficient.  Again, I trust but verify.     14:36
17      And I have an email listed here where the  14:36
18 person responsible for this is stating "We have not  14:36
19 received objective evidence that supports this  14:36
20 statement," but a decision was made to release  14:36
21 products anyway.                          14:36
22   Q.  So you are critical of Teva's acceptance  14:36
23 of a statement that ultimately turned out to be  14:36
24 accurate?                                14:36
25      MR. STANOCH:  Objection to form.      14:36

51 (Pages 198 - 201)

Page 202

1    THE WITNESS: I am critical of it because    14:36
2  there wasn't objective evidence provided with that    14:36
3  statement. They jumped the gun.    14:36
4  BY MS. LOCKARD:    14:36
5    Q.  Do you have an understanding as to the    14:36
6  reason for releasing the hold on the Mylan product    14:36
7  being a potential concern for shortage in the    14:36
8  market?    14:36
9    A.  Yes. A potential concern for shortage, in    14:36
10 my view, it's probably more a potential concern for    14:37
11 a loss of revenue.    14:37
12   Q.  Well, that's your speculation; correct?    14:37
13    MR. STANOCH: Objection to form.    14:37
14    THE WITNESS: It's based on my experience    14:37
15 sitting in board rooms making this decision or similar    14:37
16 decisions. This appears to be a decision where    14:37
17 marketing was driving what quality decisions need to    14:37
18 be made.    14:37
19    Again, if I'm the quality leader here, I    14:37
20 want objective evidence that demonstrates the other    14:37
21 suppliers -- statements that they have made before I    14:37
22 place them in the investigation are verified. I may    14:37
23 even want to do a for-cause audit or maybe even visit    14:37
24 Mylan before I start releasing Mylan's products. That    14:37
25 would be what I would have done.    14:37

Page 203

1  BY MS. LOCKARD:    14:37
2    Q.  Did you see any documentation about Teva's    14:37
3  request for an audit from Mylan?    14:37
4    A.  Not that I recall off the top of my head.    14:37
5  No.    14:37
6    Q.  Ultimately, though, whatever Teva did with    14:38
7  respect to the Mylan product played no role in    14:38
8  causing any damages or injury to consumers of the    14:38
9  Valsartan provided with ZHP API; right?    14:38
10    MR. STANOCH: Objection to form.    14:38
11    THE WITNESS: I have no statement on that.    14:38
12 I have no opinion on that. My concern -- again, the    14:38
13 reason I wrote this report and what I was requested to    14:38
14 do was to ask whether they follow -- their GMP    14:38
15 behaviors were compliant or consistent with industry    14:38
16 standard and regulation.    14:38
17    I haven't made any statements other than    14:38
18 that within my report.    14:38
19 BY MS. LOCKARD:    14:38
20    Q.  There's also criticism in your report    14:38
21 about Teva's alleged delay in reporting the    14:38
22 impurities to the FDA.    14:38
23    But your own report states that Teva was    14:38
24 informed only of a potential genotoxic impurity by    14:38
25 ZHP on June 20th, not the presence of nitrosamines;    14:39

Page 204

1  correct?    14:39
2    A.  Correct.    14:39
3    Q.  So you understand that -- that ZHP had not    14:39
4  yet reported the presence of a genotoxic impurity    14:39
5  being nitrosamines as of the 20th?    14:39
6    A.  That's what I have stated in the report.    14:39
7    Q.  Is it your position that -- that,    14:39
8  nonetheless, Teva should have then reported to FDA    14:39
9  about an unknown genotoxic impurity that was being    14:39
10 investigated by ZHP?    14:39
11    A.  It is. There is a -- a consistent    14:39
12 disagreement between FDA and industry as it relates    14:39
13 to what is called a "Field Alert Report" or a    14:39
14 "Notification."    14:39
15    FDA's view is that you -- the clock of    14:39
16 three days starts when you are notified of a    14:39
17 potential issue. Industry says that that clock    14:39
18 starts when you confirm the presence of    14:39
19 nitrosamines, let's say, in a field alert.    14:40
20    This is a -- a battle between the    14:40
21 regulator and industry. It's a consistent battle.    14:40
22 To follow what FDA believes is the appropriate    14:40
23 approach is when you are notified.    14:40
24    Q.  So you would agree then, though, that    14:40
25 Teva's approach in reporting was at least consistent    14:40

Page 205

1  with industry standard?    14:40
2    MR. STANOCH: Objection to form.    14:40
3    THE WITNESS: It appears that they had    14:40
4  different views on when they should notify FDA.    14:40
5    Again, I wasn't present during the decision    14:40
6  processes for these. I can only state that, in my    14:40
7  experience, many firms tend to delay in notifying the    14:40
8  regulator about issues that they encounter and that    14:40
9  Teva appeared to not come in full compliance and    14:41
10 alignment with their three-day frequency for field    14:41
11 alert reporting.    14:41
12 BY MS. LOCKARD:    14:41
13    Q.  Your testimony just moments ago was that    14:41
14 industry standard says that the clock starts when    14:41
15 you confirm the presence of nitrosamines.    14:41
16    So the industry standard is that the clock    14:41
17 starts when you confirm the presence of    14:41
18 nitrosamines; correct?    14:41
19    A.  It's not industry standard. It's what    14:41
20 industry believes.    14:41
21    An industry standard is an accepted    14:41
22 practice that industry follows. The accepted    14:41
23 practice around field alerts is it's from    14:41
24 notification.    14:41
25    Industry believes that they need to    14:41

52 (Pages 202 - 205)

Page 206

1 confirm something before that. That is not an                14:41
2 industry standard. That doesn't mean that it              14:41
3 applies or becomes part of current manufacturing         14:41
4 practice. Because an industry standard becomes part 14:42
5 of good manufacturing practice. It's the "C" in          14:42
6 GMP.                                                      14:42
7    Q.  Current Good Manufacturing Practice is           14:42
8 based on federal regulations; correct?                   14:42
9    A.  It is based on regulation. The                    14:42
10 regulations are from the 1970s. So everything the        14:42
11 industry has done in innovation and enhancement also  14:42
12 becomes part of the current good manufacturing          14:42
13 practice.                                                14:42
14    Q.  Isn't industry standard what is reasonably      14:42
15 done by prudent manufacturers in the industry?          14:42
16    A.  It is. I agree with that statement to            14:42
17 some extent.                                             14:42
18    Q.  So if industry standard is what is              14:42
19 reasonably done by prudent manufacturers and prudent 14:42
20 manufacturers routinely say the clock starts when       14:42
21 you confirm the presence of nitrosamines, then          14:42
22 didn't Teva follow the industry standard?               14:42
23       MR. STANOCH:  Objection to form.                  14:43
24       THE WITNESS:  You are assuming that I would      14:43
25 consider Teva in this particular case to be prudent.  14:43

Page 207

1 I don't.                                                  14:43
2       I work with many firms who have a belief          14:43
3 that even proceduralize that they will need to confirm 14:43
4 before they report. This is not, to me, prudent in     14:43
5 any way.                                                 14:43
6 BY MS. LOCKARD:                                          14:43
7    Q.  No. No. My question does not imply             14:43
8 that -- that you think Teva's prudent.                   14:43
9       My question to you is that, if prudent          14:43
10 manufacturers in the industry follow a rule that       14:43
11 says the clock starts ticking when you confirm the     14:43
12 presence of nitrosamines and that's what Teva did,     14:43
13 then Teva complied with the industry standard          14:43
14 followed by prudent manufacturers?                      14:43
15       MR. STANOCH:  Objection to form.                 14:43
16       THE WITNESS:  I am -- I am saying that that     14:43
17 approach is not prudent. It doesn't align with what    14:43
18 the regulator recommends or what the -- the regulator 14:43
19 actually requires.                                      14:43
20       In many cases -- and you can find              14:43
21 observations from FDA that deal with this specific     14:44
22 issue -- that a firm is cited for taking that stance.  14:44
23       So that clearly is not prudent when FDA        14:44
24 cites you in an observation for taking that stance.    14:44
25 That's not prudent in any way, whether it's Teva or   14:44

Page 208

1 any other manufacturer.                                  14:44
2       MS. LOCKARD:  I am getting very close to        14:44
3 being done. I have a set of exhibits that we need to  14:44
4 go through -- that I need to get from the other room  14:44
5 to go through in the deposition.                        14:44
6       I can either take a break, get those, and do   14:44
7 that.                                                    14:44
8       We can let counsel from Torrent ask            14:44
9 questions. I do want to give her an opportunity to    14:44
10 ask because I have taken time.                          14:45
11       But I would like to reserve a little time      14:45
12 after that to be able to ask the remainder of my      14:45
13 questions once I get my exhibits.                       14:45
14       MR. STANOCH:  Well, let's go off the record    14:45
15 either way.                                             14:45
16       MS. LOCKARD:  Off the record.                  14:45
17       THE VIDEOGRAPHER:  Okay. Going off record     14:45
18 at 2:45 p.m.                                            14:45
19       (Brief recess.)                                 15:17
20       THE VIDEOGRAPHER:  And we are back on the     15:17
21 record at 3:18 p.m. Start of Media Number 6.           15:17
22 BY MS. LOCKARD:                                         15:18
23    Q.  Okay. Mr. Russ, are you good?                  15:18
24    A.  Yes.                                            15:18
25    Q.  All right. Turning to your report, I want    15:18

Page 209

1 to focus your attention now on Page 15 --              15:18
2       THE VIDEOGRAPHER:  [Videographer gestures]. 15:18
3 BY MS. LOCKARD:                                         15:18
4    Q.  Mr. Russ, turning to your report, I want      15:18
5 to focus your attention now on Page 15, Paragraph 85 15:18
6 and 86.                                                 15:18
7    A.  Yes.                                            15:18
8    Q.  This is where you are offering opinions       15:18
9 about the change control process once ZHP initiated  15:18
10 their change in November of 2011.                      15:18
11       Are you with me?                                15:18
12    A.  I am. Yes.                                     15:18
13    Q.  Okay. So as you state in Paragraph 86,       15:18
14 [as read]:                                              15:18
15       "It appears Actavis opened a change          15:18
16       control to process this change. ZHP           15:19
17       sent an additional change request            15:19
18       notification to Actavis dated                15:19
19       October 18th, 2012, to add a 3rd             15:19
20       dedicated workshop. It appears Actavis       15:19
21       opened change control to process this        15:19
22       change."                                     15:19
23       Now, the document that you reference is      15:19
24 Bates -50662?                                          15:19
25    A.  Correct.                                      15:19

Page 210

1      MS. LOCKARD:  Let's make that Exhibit 23.  15:19
2      (Deposition Exhibit 23 was marked for      15:19
3      identification and is attached hereto.)    15:19
4  BY MS. LOCKARD:
5      Q.  And in your report, you focus on three  15:19
6  action items or action descriptions that you found  15:19
7  to be relevant to put in your report.         15:19
8      A.  Yes.                                    15:19
9      Q.  And the first was, as you discuss in    15:19
10 Paragraph 87, at the bottom [as read]:          15:20
11     "One of the actions from the change        15:20
12     control stated, to evaluate whether        15:20
13     this change can affect the current         15:20
14     validated method for testing the API,      15:20
15     especially as regards the residual         15:20
16     solvents for the new Valsartan tin-free    15:20
17     with zinc chloride process."               15:20
18     Correct?                                   15:20
19     A.  Correct.                               15:20
20     Q.  All right.  And so if you'll look at    15:20
21 Exhibit 23, that is reflected --               15:20
22     A.  Yeah.  Let's find it.                  15:20
23     Q.  It's on Page 8.                        15:20
24     A.  Okay.  Thank you.                      15:20
25     Yes.                                       15:20

Page 211

1      Q.  And the "Action Status" there is indicated  15:20
2  "Fully complete"; right?                       15:20
3      A.  Yes.                                    15:20
4      MS. LOCKARD:  And let's mark this as        15:20
5  Exhibit 24.  This is the risk assessment for the use  15:20
6  of -- strike that.                             15:21
7      Let's mark this as 24.  And this is         15:21
8  Bates -20264 from Teva's set.                  15:21
9      (Deposition Exhibit 24 was marked for       15:21
10     identification and is attached hereto.)    15:21
11 BY MS. LOCKARD:                                 15:21
12     Q.  And if you look at the first page of the  15:21
13 document, it says "Arrow Pharm Validation       15:21
14 Department."  And the title of the document is  15:21
15 "Analytical Method Validation Report for Valsartan  15:21
16 Raw Material-Residual Solvents."               15:21
17     So isn't it correct that that action        15:21
18 description was completed as is reflected in     15:21
19 Exhibit 24 that I have just provided to you?    15:21
20     A.  Yes.                                    15:21
21     Q.  Okay.  Your only criticism of this      15:21
22 completion of this action item is that you don't  15:21
23 find evidence of testing as part of the validation  15:21
24 process?                                       15:21
25     A.  No.  My -- my concern here is that they  15:21

Page 212

1  didn't -- in the evaluation they have described it  15:22
2  [as read]:                                     15:22
3      "No further validation was required.       15:22
4      The specification parameters are           15:22
5      already covered by previous validations    15:22
6      performed for Valsartan."                  15:22
7      The -- this exhibit that you have shown     15:22
8  me, which is unmarked, is --                   15:22
9      Q.  24.                                     15:22
10     A.  Okay.  This is 24.  It's dated in 2010.  15:22
11     So they said that this particular method    15:22
12 was adequate for residual solvent testing for this  15:22
13 changed product.                               15:22
14     But they never performed any testing of     15:22
15 new product with this method.  They're -- I would  15:22
16 expect that they -- here would also say, "We ran a  15:22
17 sample according to this method and reviewed the  15:22
18 chromatography and it was acceptable."          15:22
19     They just said, "We already have a          15:22
20 validation.  It's good."                       15:22
21     That's my concern.  It's not -- not that    15:22
22 they didn't -- they didn't run this method with the  15:22
23 new material as part of this change control.    15:23
24     Q.  Okay.  So how -- describe for me what you  15:23
25 think the testing is that they actually should have  15:23

Page 213

1  completed in order to perform this action       15:23
2  description?                                   15:23
3      Is there a specific --                      15:23
4      A.  Run a sample using this with the new    15:23
5  method and say, "The chromatography looks the same  15:23
6  as it did previously."  The system suitability, all  15:23
7  the retention times for peaks are appropriate.  15:23
8      There's no report that the validation is    15:23
9  adequate other than "No further validation is    15:23
10 required."                                     15:23
11     Based on what?  Specification parameters    15:23
12 and limits are already covered.  Okay.  It has the  15:23
13 same specs.  But why is it okay for this new     15:24
14 process?  This statement has no basis.          15:24
15     There is no objective evidence that         15:24
16 demonstrates to me this method is adequate for this  15:24
17 purpose.  It may be.  But there is no data that  15:24
18 demonstrates that it's attached to the change    15:24
19 control.                                       15:24
20     Q.  So you would be looking for chromatogy   15:24
21 results that were the same for the old process API  15:24
22 and the new process?                           15:24
23     A.  Well, that is comparative testing.  That's  15:24
24 ideal with -- later down the line when they -- we'll  15:24
25 get to that, I assume.                         15:24

54 (Pages 210 - 213)

Page 214

1    Here I am just expecting that they ran a    15:24
2  sample using this method and did a comparison    15:24
3  chromatography.    15:24
4    That would be the right evaluation to say    15:24
5  that this method is still adequate for the new    15:24
6  process. They didn't do that here. They just said    15:24
7  "it's adequate for the new process" without any    15:24
8  objective evidence to support that.    15:24
9    Q.  The second action item that you point out    15:24
10 is on Page 8 of 12 and the action description is [as    15:24
11 read]:    15:24
12    "Fully test first five batches of    15:25
13    upscale batch size" --    15:25
14 A.  Yes.    15:25
15 Q.  [As read]:    15:25
16    -- "of Valsartan."    15:25
17    Now, as you note in your report, however,    15:25
18 the "Action Status" here says "Fully complete";    15:25
19 correct?    15:25
20 A.  Yes.    15:25
21 Q.  So from this, this documentation leads one    15:25
22 to the conclusion that full -- that the five batches    15:25
23 were tested as indicated here; correct?    15:25
24 A.  No. Because the -- action says that    15:25
25 they are going to plan it for testing, but there    15:25

Page 215

1  is -- they never complete the testing. They close    15:25
2  the action by planning the testing.    15:25
3 Q.  But the action itself is to fully test,    15:25
4 and the action status was fully complete?    15:25
5 A.  Well, the action status is, but the --    15:25
6 Q.  That's what it says here.    15:25
7 A.  -- statement for that action is that they    15:25
8 just planned the testing, not that they completed    15:25
9 the testing.    15:25
10 Q.  Okay. So you don't find it credible    15:25
11 evidence to say that the action --    15:26
12 A.  I only said it's unclear --    15:26
13    MR. STANOCH: Well --    15:26
14    THE WITNESS: -- if this testing ever took    15:26
15 place.    15:26
16 BY MS. LOCKARD:    15:26
17 Q.  Okay.    15:26
18 A.  Because the action doesn't say "Here is    15:26
19 the notebook reference for the testing of the five    15:26
20 batches." That's what I would expect. Tell me    15:26
21 where the testing is or give me the testing as an    15:26
22 attachment to the change control.    15:26
23 Q.  So your criticism is essentially in the    15:26
24 way they documented this?    15:26
25 A.  No. They didn't do the testing.    15:26

Page 216

1 Q.  You don't know that they didn't do the    15:26
2 testing.    15:26
3    MR. STANOCH: Objection.    15:26
4    THE WITNESS: They -- I -- it wasn't    15:26
5 produced as part of the change control. It should    15:26
6 have been.    15:26
7 BY MS. LOCKARD:    15:26
8 Q.  Okay.    15:26
9 A.  It's objective evidence that supports the    15:26
10 closure of this change control.    15:26
11 Q.  Okay. So Mr. Russ doesn't believe when it    15:26
12 says "Fully complete" that that indicates the    15:26
13 testing was fully done?    15:26
14    MR. STANOCH: Objection to form.    15:26
15    THE WITNESS: Can I read what it says?    15:26
16 It says [as read]:    15:26
17    "The 'Record Sheet For Uncertified    15:26
18    Suppliers' was created for items" --    15:26
19    something and something -- "to test the    15:26
20    five batches manufactured in accordance    15:26
21    with..." I guess that's the    15:27
22    specification.    15:27
23    Again, they closed it, and the comment is    15:27
24 "We plan to do this testing." They closed it with    15:27
25 that.    15:27

Page 217

1 BY MS. LOCKARD:    15:27
2 Q.  The comment indicates they initiated the    15:27
3 testing process. The "Action Status" indicates it    15:27
4 was "Fully completed."    15:27
5    MR. STANOCH: Objection.    15:27
6 BY MS. LOCKARD:    15:27
7 Q.  You may disagree with the interpretation,    15:27
8 but that's what it says there; correct?    15:27
9    MR. STANOCH: Objection.    15:27
10    THE WITNESS: It doesn't say that.    15:27
11 [As read]:    15:27
12    "The 'Record Sheet For Uncertified    15:27
13    Suppliers' was created..."    15:27
14    That means they did planning. They    15:27
15 planned the test, but -- and they closed it on a    15:27
16 planned test. Hoping that it would occur.    15:27
17    There's not a comment stated here that "We    15:27
18 tested these five batches, and they met all    15:27
19 specifications. And chromatography was reviewed,    15:27
20 and no anomalies were found."    15:27
21    That's what should be in the "Comment"    15:27
22 section that demonstrates -- if you are not going to    15:27
23 provide the data, that demonstrates to me that this    15:28
24 testing was completed, and the testing wasn't    15:28
25 produced to me.    15:28

55 (Pages 214 - 217)

Page 218

1 BY MS. LOCKARD:                                  15:28
2    Q.  So you would be satisfied if you saw      15:28
3 chromatography results showing that there were   15:28
4 batches tested both before and after?            15:28
5    A.  At least --                               15:28
6        MR. STANOCH:  Objection to form.          15:28
7        THE WITNESS:  -- tell me what batches were 15:28
8 done so I can go look at the data.               15:28
9 BY MS. LOCKARD:                                  15:28
10   Q.  Okay.                                     15:28
11   A.  And what you compared them with.          15:28
12   Q.  Okay.                                     15:28
13   A.  That's the purpose of the five batch      15:28
14 testing based on the risk assessment is to do that 15:28
15 comparative testing that I have described        15:28
16 previously.  They planned it and closed the change 15:28
17 control in the planning.                         15:28
18   Q.  Right.                                    15:28
19       You haven't seen the evidence of the      15:28
20 comparative testing?                            15:28
21   A.  But I also want to state that --          15:28
22   Q.  Was that --                               15:28
23   A.  -- closing a change control action with a 15:28
24 plan doesn't mean GMP requirements.  If you say  15:28
25 "Test five batches," then to close this action, you 15:28

Page 219

1 must show the testing of those five batches to meet 15:28
2 GMP.                                             15:28
3    Q.  Right.                                    15:29
4        So you are looking for documentation that 15:29
5 they tested five batches after -- after the change 15:29
6 was made, and that's compared with the batches  15:29
7 tested previously; right?                        15:29
8        MR. STANOCH:  Objection to form.          15:29
9        THE WITNESS:  Correct.                    15:29
10       THE REPORTER:  Repeat your answer.         15:29
11       THE WITNESS:  I'm sorry.                  15:29
12       Correct.                                  15:29
13 BY MS. LOCKARD:                                  15:29
14   Q.  All right.  So the third item, action item 15:29
15 that you reference in your report is actually on  15:29
16 Page 7 of the change control report, and it was to 15:29
17 [as read]:                                       15:29
18       "Perform risk assessment whether the      15:29
19       new material from the new CEP and 3rd      15:29
20       dedicated workshop (upscaled batch        15:29
21       size) can have any impact on the          15:29
22       process validation of Valsartan          15:29
23       finished product."                        15:29
24       Now, you reference in your report as well 15:29
25 that Teva did actually do a risk assessment;     15:29

Page 220

1 correct?                                         15:29
2    A.  They did.                                 15:29
3        MS. LOCKARD:  And this is -- we'll mark as 15:29
4 Exhibit 26.                                      15:29
5        (Deposition Exhibit 26 was marked for     15:29
6        identification and is attached hereto.)   15:29
7 BY MS. LOCKARD:                                  15:29
8    Q.  And this is the risk assessment that Teva 15:29
9 did that you are referencing; correct?           15:30
10   A.  Yes.                                      15:30
11   Q.  And that item as well was marked as "Fully 15:30
12 complete"?                                       15:30
13   A.  And I agree with that.                    15:30
14   Q.  All right.  We can put those aside for the 15:30
15 moment.                                         15:30
16       MS. LOCKARD:  All right.  Let's get       15:30
17 Exhibit 26 up.                                  15:30
18       Let's go with 27.                         15:30
19       (Deposition Exhibit 27 was marked for     15:30
20       identification and is attached hereto.)   15:30
21 BY MS. LOCKARD:                                  15:30
22   Q.  Okay.  You have stated, I think, multiple 15:30
23 times today you have not seen any documentation that 15:30
24 you reviewed that demonstrated routine           15:31
25 chromatography testing [verbatim] of the incoming 15:31

Page 221

1 API was done before and after the change control; 15:31
2 correct?                                         15:31
3    A.  "Comparative testing."                    15:31
4    Q.  Comparative testing.                      15:31
5        So we'll give you Exhibit 27.             15:31
6        This -- if you can identify for me what   15:31
7 this document appears to be.                     15:31
8    A.  It's an "Annual Product Review."          15:31
9    Q.  Okay.  And you testified earlier you have 15:31
10 not reviewed this; correct?                      15:31
11   A.  Again, I reviewed the source documents    15:31
12 that create -- that are used to create this      15:31
13 document.  The primary records.                 15:31
14   Q.  This is the annual product report for the 15:31
15 Valsartan Hydrochlorothiazide combo product covering 15:31
16 2014 -- January 2014 through December '14; correct? 15:31
17   A.  It is.                                    15:31
18   Q.  All right.  And if you turn to the Page 2 15:32
19 of the document, which is the "Table of Contents," 15:32
20 on the second page, first section is the "Product 15:32
21 Starting Materials Review."                      15:32
22   A.  Okay.                                     15:32
23   Q.  And that's -- that means API; correct?    15:32
24   A.  It does.  And excipients.                 15:32
25   Q.  And if you look at the next page there,   15:32

56 (Pages 218 - 221)

Page 222

1 the chart, both the Valsartan and the            15:32
2 Hydrochlorothiazide product are identified as being   15:32
3 from ZHP.                                          15:32
4    A.   Okay.                                      15:32
5    Q.   And there's an API code associated there,   15:32
6 the Valsartan API code -- there are two API codes    15:32
7 for the Valsartan.                                 15:32
8       Do you see that?                             15:32
9    A.   Yes.                                       15:32
10   Q.   Okay.  And that is because, if you look    15:32
11 down at the paragraph that starts [as read]:       15:32
12       "Eighty one batches...were                  15:32
13       supplied...."                               15:32
14       It indicates that there was a new API code  15:32
15 that was -- that was assigned after the change was   15:33
16 made; right?                                       15:33
17   A.   Correct.                                    15:33
18   Q.   Okay.  So this Annual Product Review        15:33
19 itself covers product manufactured under both the   15:33
20 old and the new API process, then; right?           15:33
21       MR. STANOCH:  Objection.                    15:33
22       Go ahead, if you can.                        15:33
23       THE WITNESS:  It -- it just states that      15:33
24 they in manufacture of the finished product used two   15:33
25 different codes, one that is prior to a change, and   15:33

Page 223

1 one that is after one.  That's all.                15:33
2 BY MS. LOCKARD:                                     15:33
3    Q.   Okay.  And the product code was changed in  15:33
4 order to reflect in Teva's documents which --       15:33
5 testing which references and so forth to the API    15:33
6 related to the prior process versus the new process;   15:34
7 right?  That was the point of changing the API code.  15:34
8    A.   It appears so.  Yes.                        15:34
9       For traceability purposes.                    15:34
10   Q.   All right.  If you look at Page 5, next to   15:34
11 the last paragraph, it says [as read]:             15:34
12       "No events were issued for the APIs          15:34
13       during the review period.                    15:34
14       "API batches were tested as per the          15:34
15       current test methods and specifications      15:34
16       and were released accordingly.  All API      15:34
17       test results were well within the            15:34
18       control specification limits and are         15:34
19       tabulated."                                  15:34
20   A.   Correct.                                     15:34
21   Q.   Then it says [as read]:                     15:34
22       "(Refer to Attachment 1)."                   15:34
23   A.   Right.                                       15:34
24   Q.   Now, it appears that your testimony has     15:34
25 been that, whatever testing they are referring to on   15:34

Page 224

1 this page, your assumption is that it relates to    15:34
2 testing that was done by ZHP and included in the    15:35
3 CO- --- CofA?                                       15:35
4       MR. STANOCH:  Objection to form.             15:35
5 BY MS. LOCKARD:                                     15:35
6    Q.   Is that right?                              15:35
7       MR. STANOCH:  Same objection.                15:35
8       THE WITNESS:  Yes.  The data was transcribed   15:35
9 into their system from the CofA.                    15:35
10 BY MS. LOCKARD:                                     15:35
11   Q.   That Teva transcribed the data provided by   15:35
12 ZHP in their certificate of analysis into Teva's own   15:35
13 system?                                             15:35
14   A.   Yes.                                         15:35
15   Q.   All right.  So if you turn to               15:35
16 Attachment 1, which is --                           15:35
17   A.   Appendix 1.                                  15:35
18   Q.   Excuse me.  Appendix 1.  It's where the     15:35
19 Table 1 indicates "API Parameter Trending" at the   15:35
20 top.                                                15:35
21   A.   I have -- I have Appendix -- is it           15:35
22 attachment or appendix or...                        15:35
23   Q.   Actually, it's Attachment 1.                15:35
24   A.   Let me search.                               15:36
25       MR. HARKINS:  It's the first one on there.   15:36

Page 225

1       MS. LOCKARD:  Table 1 or -- Attachment 1.  I   15:36
2 found it.                                            15:36
3 BY MS. LOCKARD:                                      15:36
4    Q.   And there up at the top there is the code    15:36
5 for VLS001 --                                        15:36
6    A.   Yes.                                         15:36
7    Q.   -- which from the prior section means this   15:36
8 is dated for API manufactured using the old process.   15:36
9    A.   Right.                                       15:36
10   Q.   Can we agree?                                15:36
11   A.   Yes.                                         15:36
12   Q.   Okay.  What -- what information is           15:36
13 included on this table that you can tell?            15:36
14   A.   "Batch Number," "Water" content, "Assay."   15:36
15   Q.   Are these test results?                      15:36
16   A.   These are tests results that were            15:36
17 transcribed from the certificate of analysis from    15:36
18 ZHP.  This is just a reiteration of what was sent to   15:36
19 them from ZHP.                                       15:36
20   Q.   Okay.  Did you ever compare what is on       15:36
21 this table with the actual certificates of analysis   15:36
22 to see how they -- how they do, in fact, compare?   15:36
23   A.   No.                                          15:37
24   Q.   This table -- this includes -- this          15:37
25 reflects chromatography results; right?              15:37

57 (Pages 222 - 225)

Page 226

1   A. This are -- are values from chromatography   15:37
2   results. These are not chromatography results. So   15:37
3   the chromatography is a graphic --   15:37
4       Q. Graph.   15:37
5       A. -- format. Right?   15:37
6       Q. So there would be a graph that went along   15:37
7   with this. But these figures indicate that   15:37
8   chromatography was performed; right?   15:37
9       A. It appears from ZHP. And chromatography   15:37
10  doesn't come with a certificate of analysis.   15:37
11      Again, they would have the opportunity if   15:37
12  an audit to review Batch 246023 and verify these   15:37
13  results.   15:37
14      Q. All right. My -- just my question is that   15:37
15  this test results that are reflected in this table,   15:37
16  these would have come from chromatography testing;   15:37
17  right?   15:37
18      A. From ZHP.   15:37
19      Q. These test results would have come from   15:37
20  some chromatography testing?   15:37
21      A. Not "Water." "Assay" potentially would   15:37
22  have. "Impurity C" would have. The "Individual   15:37
23  Impurities" would have. It depends on the method.   15:38
24      But, yes, they are results from analytical   15:38
25  testing, which would include chromatographic testing   15:38

Page 227

1   that was performed at ZHP.   15:38
2       Q. If you look at the Batch Number, if you   15:38
3   focus on, just to pick one --   15:38
4       A. Uh-huh.   15:38
5       Q. -- the -- near the bottom, Batch 287859.   15:38
6       Do you see that?   15:38
7       A. 287879. Yes.   15:38
8       MR. HARKINS: Is it "59" or "79"?   15:38
9       MS. LOCKARD: I guess I need my reading   15:38
10  glasses.   15:38
11      287859.   15:38
12      THE WITNESS: Oh. I'm sorry. The second to   15:38
13  the last. Yes.   15:38
14  BY MS. LOCKARD:   15:38
15      Q. The second to the last. Okay. So there   15:38
16  is a test for appearance --   15:39
17      A. "Water," "Assay."   15:39
18      MR. STANOCH: Sorry. She can ask.   15:39
19      THE WITNESS: Okay. Sorry.   15:39
20  BY MS. LOCKARD:   15:39
21      Q. Hold on a second. Let me pull it up here.   15:39
22      MS. LOCKARD: All right. Let's -- let's do   15:39
23  this. Let's get -- hold on to that one. Let's get   15:39
24  the next document marked.   15:39
25      The next exhibit, which will be 28.   15:39

Page 228

1       (Deposition Exhibit 28 was marked for   15:39
2       identification and is attached hereto.)   15:39
3   BY MS. LOCKARD:   15:39
4       Q. All right. And on this Arrow lot number   15:39
5   first page -- first of all, what is -- what is this   15:39
6   document that I have just handed you, Exhibit 28?   15:39
7       A. This is an internal certificate analysis   15:40
8   for Valsartan, Code 287- -- or this is that lot that   15:40
9   you have described, 287859.   15:40
10      Q. Okay. So it's the same lot number as the   15:40
11  line item we were just looking at; correct?   15:40
12      A. It is.   15:40
13      Q. All right. So then turning to the third   15:40
14  page, and it shows here there's a test for   15:40
15  "Appearance"?   15:40
16      A. Uh-huh.   15:40
17      Q. "Identification." And it's all -- there   15:40
18  are handwritten responses here; correct?   15:40
19      A. There are.   15:40
20      Q. Okay. And there is an identification test   15:40
21  and the results of that test are performed by Arrow.   15:40
22  They are shown there.   15:40
23      And then you if you turn the page, there   15:40
24  is a test for "Absorbance," "Solubility," "Water,"   15:41
25  and a test for "Sulfated Ash/Residue."   15:41

Page 229

1       Do you see those?   15:41
2       A. I do. Yes.   15:41
3       Q. And then on the next page there is an   15:41
4   "Assay" test that includes two parts, one for the   15:41
5   EU, one for the U.S.; correct?   15:41
6       A. Correct.   15:41
7       Q. And that shows a result of 99.67 reported   15:41
8   by Arrow for this -- for the U.S. test; right?   15:41
9       A. Correct.   15:41
10      Q. And there is a "Related Substance --   15:41
11  Substances" test which was done by HPLC, which is   15:41
12  chromatography; right?   15:41
13      A. Yes. Yes. Yes.   15:41
14      Q. An "Enantiomeric Purity" test?   15:41
15      A. Uh-huh.   15:41
16      Q. Number 11, the "Related Substances -   15:41
17  Test."   15:41
18      12, "Related Substances - Test" again.   15:41
19      Number 13, "Residual Solvents" test.   15:42
20      Finally, Number 14 is a "Particle Size"   15:42
21  test with the results reported by Arrow in   15:42
22  handwriting; correct?   15:42
23      A. Yes.   15:42
24      Q. And so you agree these reflect tests   15:42
25  performed by Arrow in the incoming batch of API?   15:42

58 (Pages 226 - 229)

Page 230

1    A.  I don't agree that's the case.  It's   15:42
2  common for a manufacturer to transcribe various   15:42
3  results to their own certificate of analysis   15:42
4  internal for approval from the certificate analysis   15:42
5  received from the supplier under a reduced testing   15:42
6  program.   15:42
7    Q.  On Page 8 you can see that the date of   15:42
8  manufacturer is listed as August 2, 2014; right?   15:42
9    A.  I -- I am sorry.  On Page 8 of 9?   15:42
10    Q.  Yep.  There is a date of manufacture.   15:42
11  It's handwritten.  It's very light.  "2 August   15:42
12  2014."   15:42
13        Do you see that?   15:43
14    A.  [Witness reviews document].   15:43
15        Oh.  Yes.  Okay.   15:43
16    Q.  And turning past Page 9 of Arrow's testing   15:43
17  results, there is a certificate of analysis from   15:43
18  ZHP.  And that ZHP Batch is listed as C5069-14-023M;   15:43
19  correct?   15:43
20    A.  Correct.   15:43
21    Q.  And if you look at that, that's the first   15:43
22  page -- I mean, that's the same as the batch number   15:43
23  listed on the first page of Arrow's certificate of   15:43
24  analysis testing.   15:43
25    A.  Okay.   15:43

Page 231

1    Q.  Where under ZHP, it's 650969-14-023M.   15:43
2    A.  Uh-huh.   15:43
3    Q.  Do you see that?   15:43
4    A.  I do.   15:43
5    Q.  And it's the same manufacture date for   15:43
6  both of August 2, 2014.   15:44
7    A.  Okay.   15:44
8    Q.  On the certificate -- on the certificate   15:44
9  with test, it shows a number of tests here.  The   15:44
10  first page --   15:44
11        MR. HARKINS:  You are on the second page?   15:44
12        MS. LOCKARD:  Oh.   15:44
13  BY MS. LOCKARD:   15:44
14    Q.  Yeah.  The first page has tests for EU,   15:44
15  and the second shows the tests for the USP product.   15:44
16    A.  Okay.   15:44
17    Q.  So looking at the USP product to focus you   15:44
18  there.   15:44
19        Now, turning back to the "Annual Product   15:44
20  Review" table, second from the bottom you see --   15:44
21    A.  Right.   15:45
22    Q.  -- 287859.   15:45
23        The first column is for "Water"; right?   15:45
24    A.  It is.   15:45
25    Q.  And it says ".70"; right?   15:45

Page 232

1        Do you see that?   15:45
2    A.  Yes.   15:45
3    Q.  What value did ZHP report on its   15:45
4  certificate of analysis for water?   15:45
5    A.  .6 -- or am I on the right certificate?   15:45
6    Q.  Yes.   15:45
7    A.  Okay.   15:45
8    Q.  And those are not the same?   15:45
9    A.  No.   15:45
10    Q.  We agree.   15:45
11    A.  They -- they don't appear to be the same.   15:45
12  No.   15:45
13        Again, there is one significant figure   15:45
14  here, and there is two significant figures here.   15:45
15        .6 is .6.  .64 is .6.  It's about -- it's   15:45
16  something called "significant figures."  So I round   15:45
17  this.  I drop the "4" and it's .6.   15:45
18    Q.  Okay.  So on the -- if you follow along on   15:46
19  the "Assay" test on the chart, it's "99.42."  Yet on   15:46
20  the ZHP certificate what do we have?   15:46
21    A.  It appears to be 99.5.   15:46
22    Q.  Okay.  And those are not the same either;   15:46
23  right?   15:46
24    A.  Assay for U.S. -- it doesn't appear to be   15:46
25  the same.  No.   15:46

Page 233

1    Q.  Looking at the "Related Substances" test   15:46
2  on the right-hand side of the page, there is a   15:46
3  column for "USP Valsartan Related Compound B" and   15:46
4  the figure on the chart is point -- excuse me -- is   15:46
5  "0.016."   15:47
6        Do you see that?   15:47
7    A.  Yes.   15:47
8    Q.  On ZHP's certificate of analysis for   15:47
9  Compound B, what did they report?   15:47
10    A.  Oh.  They reported below the limit of   15:47
11  quantitation.   15:47
12    Q.  So no number at all; right?   15:47
13    A.  Right.   15:47
14    Q.  But Arrow's testing chart did report a   15:47
15  finding for that test; right?   15:47
16    A.  It does.   15:47
17    Q.  In the second-to-last column on the chart,   15:47
18  "Individual Impurities," Arrow reported it as .31   15:48
19  [verbatim].   15:48
20        Do you see that?   15:48
21    A.  Yes.   15:48
22    Q.  And on the certificate of analysis for   15:48
23  ZHP, for Individual Impurities, it's reported as   15:48
24  .03; correct?   15:48
25    A.  I think it's .05.   15:48

59 (Pages 230 - 233)

Page 234

1     MR. STANOCH: Uh-huh.          15:48
2 BY MS. LOCKARD:                   15:48
3   Q.  .05.  Correct.             15:48
4   A.  Uh-huh.                     15:48
5   Q.  In ZHP's certificate of analysis, they   15:48
6 reported to the hundredth decimal place.  Whereas in  15:48
7 Arrow's chart, they reported to the thousandths   15:49
8 decimal place.                   15:49
9   A.  Okay.                       15:49
10    MR. STANOCH: Objection.  Misstates the  15:49
11 document.  I see thousandths place on the ZHP one.  15:49
12 BY MS. LOCKARD:                  15:49
13  Q.  I could go through these, you know, in  15:49
14 individual detail, but the point I'm getting at is  15:49
15 that these numbers that were reported in Arrow's  15:49
16 testing and in the certificate of analysis, which  15:49
17 you say Arrow copied, are not the same numbers?  15:49
18  A.  They are not.               15:49
19  Q.  Does that then lead you to the conclusion  15:49
20 that perhaps Arrow did its own testing?   15:49
21  A.  Perhaps.                    15:49
22  Q.  If the evidence shows that Arrow did its  15:49
23 own testing, does that remove your criticism that  15:49
24 Teva failed to comply with cGMP and industry  15:50
25 standards in not doing its own independent testing  15:50

Page 235

1 related with the process change?   15:50
2   A.  I have already stated that it's acceptable  15:50
3 to be reduced testing or do your own testing.  I  15:50
4 don't have any concern with that.  15:50
5     My concern is did they review the   15:50
6 chromatography for change for unknown peaks.  If  15:50
7 these results were produced by Arrow, then they were  15:50
8 produced by Arrow.  I don't have an issue with that.  15:50
9     I didn't opine that there was a concern  15:50
10 with the regulatory requirement to do testing on  15:50
11 drug substances or not based on reduced testing.  15:50
12    Did you evaluate the chromatography.  15:50
13    So in this case if they did their own  15:50
14 testing, did you review the chromatography?  15:50
15    When you went and did an audit then, did  15:50
16 you take chromatography from this period, you know,  15:50
17 a statistically significant number of batches,   15:51
18 look -- take your chromatography with you to China  15:51
19 and review it against their chromatography?  Raw  15:51
20 data against raw data because that is what you are  15:51
21 supposed to do.                   15:51
22    My issue is not that they did testing or  15:51
23 not.  It appeared to me because I wasn't -- I didn't  15:51
24 see data testing for batches, that they didn't do  15:51
25 testing.  My concern isn't that they didn't do  15:51

Page 236

1 testing.  You are allowed to not do testing.   15:51
2   Q.  Your criticisms all day, sir,   15:51
3 respectfully, have been that Teva did not do its own  15:51
4 testing and referred and -- and copied the results  15:51
5 from the ZHP certificate of analysis.   15:51
6     MR. STANOCH: Objection.       15:51
7 BY MS. LOCKARD:                   15:51
8   Q.  That has been your prior testimony, has it  15:51
9 not?                             15:51
10  A.  It -- it --                 15:51
11    MR. STANOCH: Objection to form.  Misstates  15:51
12 prior testimony.                 15:51
13    Go ahead.                     15:51
14    THE WITNESS: It -- again, my concern isn't  15:51
15 about who did testing.  You are allowed to not do  15:51
16 testing.  My -- I have not opined in my report that  15:51
17 not doing testing is a problem.  Okay.  I haven't said  15:51
18 that.                            15:51
19    The regulation allows you in 21 CFR 84 --  15:52
20 211.84 to not do testing or to do testing.  You are --  15:52
21 it's to your discretion.  You are allowed.  I have  15:52
22 never said that you are not allowed.   15:52
23    I'm saying that they didn't compare   15:52
24 chromatography, the actual physical chromatograms.  15:52
25    If they -- they are supposed to compare it  15:52

Page 237

1 if they don't do testing.  If they do testing, they  15:52
2 are supposed to take those chromatograms with them and  15:52
3 compare it on-site during an audit.  I don't see  15:52
4 either of those things.            15:52
5 BY MS. LOCKARD:                   15:52
6   Q.  Don't -- don't these values demonstrate to  15:52
7 you that Teva reviewed its chromatography in order  15:52
8 to compile this chart?            15:52
9     MR. STANOCH: Objection.        15:52
10    THE WITNESS: These -- these numbers do not  15:52
11 come from a chromatogram.  They come from a   15:52
12 calculation that is based on absorbance from the  15:52
13 chromatogram.  The chromatogram -- you know, you do a  15:52
14 calculation to come up with these numbers.  This  15:52
15 number does not represent what the chromatogram looks  15:52
16 like.                            15:53
17    And in this matter, they found -- you know,  15:53
18 there were peaks in the chromatogram that appeared to  15:53
19 not be -- you know, to not be there or not properly be  15:53
20 there.  That would not be reflected in these numbers.  15:53
21    This trend analysis does not include review  15:53
22 of actual chromatograms.  This is review of results  15:53
23 that have been calculated.         15:53
24 BY MS. LOCKARD:                   15:53
25  Q.  Okay.  Understanding your testimony now --  15:53

60 (Pages 234 - 237)

Page 238

1 now that I have shown you the results of Teva doing    15:53
2 its testing, are there any revisions you would like    15:53
3 to make to your report where you criticize Teva for    15:53
4 not doing its own testing?    15:53
5        MR. STANOCH: Objection.    15:53
6        THE WITNESS: No. There is no revisions.    15:53
7 BY MS. LOCKARD:    15:53
8    Q. Would you like to go through the annual    15:53
9 reports for the subsequent in the prior years in    15:53
10 order to see that Teva was doing its own testing in    15:53
11 each of those according to its annual reports, or    15:53
12 would that be a waste of our time today?    15:53
13        MR. STANOCH: Objection.    15:53
14        THE WITNESS: I do not need to see that.    15:53
15 I'm not saying it's a waste of time, but I do not need    15:53
16 to review the rest of that data.    15:54
17 BY MS. LOCKARD:    15:54
18    Q. Okay. So just so I understand, your    15:54
19 testimony is that performing chromatograms that are    15:54
20 required to generate these results and recording the    15:54
21 results from those tests is not reviewing    15:54
22 chromatograms?    15:54
23        MR. STANOCH: Objection. Asked and    15:54
24 answered.    15:54
25        Go ahead.    15:54

Page 239

1        THE WITNESS: The question doesn't make    15:54
2 sense.    15:54
3        What I'm saying is that these values do not    15:54
4 come from chromatograms [witness indicates document].    15:54
5        The graphic picture --    15:54
6 BY MS. LOCKARD:    15:54
7    Q. They --    15:54
8    A. -- there are absorbances from that picture    15:54
9 that are used in a calculation to come up with this    15:54
10 number. This number does not come from    15:54
11 a chromatogram.    15:54
12    Q. It comes from chromatography testing;    15:54
13 right?    15:54
14    A. It's -- it's a calculation.    15:54
15    Q. Okay. But it comes from chromatography?    15:54
16 The numbers come from the chromatography?    15:54
17    A. Not this number [witness indicates    15:55
18 document]. There is an absorbance that comes from    15:55
19 the chromatography, but this number is not that    15:55
20 number. This is a calculated number [witness    15:55
21 indicates document].    15:55
22    Q. They cannot generate these test results    15:55
23 without performing chromatography; isn't that right?    15:55
24    A. Agreed. They -- hopefully they did not    15:55
25 produce these numbers without actually performing    15:55

Page 240

1 tests.    15:55
2        What I am saying is I expect Teva to    15:55
3 review the chromatography for potential anomalies.    15:55
4 Not whether they pulled the right    15:55
5 absorbance off the chromatogram and did a    15:55
6 calculation and then did trend analysis on those    15:55
7 numbers. This is a secondary level.    15:55
8        My concern in -- and what I opined in the    15:55
9 report is that, if a strange peak or some anomaly    15:55
10 appeared in the graphic chromatography, that's what    15:55
11 they should question.    15:55
12        I never said that they needed to question    15:55
13 numbers that met specification. We have talked    15:55
14 about specifications. I have no concern with the    15:55
15 specifications. My concern is did they review    15:56
16 graphic chromatography, and these numbers do not    15:56
17 reflect that.    15:56
18    Q. Okay. You haven't seen any indication to    15:56
19 indicate whether they did or did not review the    15:56
20 graphic chromatography?    15:56
21        MR. STANOCH: Objection to form.    15:56
22        THE WITNESS: I have not seen -- that is my    15:56
23 concern that I have not seen something that    15:56
24 demonstrates that they did what Novartis did and    15:56
25 reviewed actual chromatography.    15:56

Page 241

1 BY MS. LOCKARD:    15:56
2    Q. You haven't seen anything in the evidence    15:56
3 that indicates they didn't review the    15:56
4 chromatography, the chromatograms?    15:56
5        MR. STANOCH: Objection to form.    15:56
6        THE WITNESS: Again, I would expect there to    15:56
7 be a reference to -- to actual physical review of    15:56
8 chromatography. I don't have evidence that they    15:56
9 didn't review chromatography, but there's certainly no    15:56
10 evidence that they did.    15:56
11        And these numbers do not reflect that    15:56
12 [witness indicates document].    15:56
13 BY MS. LOCKARD:    15:56
14    Q. Well, you also, prior to today, assumed    15:56
15 that Teva did not do its own chromatography testing    15:56
16 and that it just copied the results from ZHP's    15:57
17 certificate of analysis.    15:57
18        So you are making assumptions based on the    15:57
19 lack of evidence either way in this case, aren't    15:57
20 you?    15:57
21    A. No, I'm not.    15:57
22        MR. STANOCH: Objection to form. Misstates    15:57
23 the opinions of his report and testimony.    15:57
24 BY MS. LOCKARD:    15:57
25    Q. You're assuming the negative due to the    15:57

61 (Pages 238 - 241)

Page 242

1  lack of the evidence that you haven't seen?  15:57
2       MR. STANOCH:  Same objection.  15:57
3       THE WITNESS:  No, I'm not.  15:57
4       MS. LOCKARD:  All right.  I think I am done  15:57
5  with the questioning.  I think we have a couple of  15:57
6  folks on the line who want to ask questions.  15:57
7       MR. STANOCH:  Okay.  Who is next?  15:57
8       MS. LOCKARD:  So who is next?  15:57
9       MS. BRANCATO:  This is Alexia Brancato from  15:57
10  Kirkland & Ellis on behalf of Torrent.  15:57
11  Can you hear me okay?  15:57
12       MS. LOCKARD:  Let's turn you up a little bit  15:57
13  because you are a little dim.  15:57
14       MS. BRANCATO:  Thanks for doing that.  15:57
15  While that is going on, do you have  15:57
16  something in front of you where you can see electronic  15:57
17  documents?  15:58
18       THE WITNESS:  No, I don't.  15:58
19       MR. HARKINS:  We should go off the record  15:58
20  for a moment.  15:58
21       MS. BRANCATO:  Why don't we go off the  15:58
22  record, please.  15:58
23       THE VIDEOGRAPHER:  Okay.  Going off record  15:58
24  at 3:58 p.m.  15:58
25       (Brief recess.)  15:58

Page 243

1       THE VIDEOGRAPHER:  And we are back on the  15:59
2  record at 4:00 o'clock p.m.  Start of Media Number 7.  16:00
3       EXAMINATION  16:00
4  BY MS. BRANCATO:  16:00
5  Q.  Mr. Russ, my name is Alexia Brancato.  16:00
6       Like I said, I represent Torrent in this  16:00
7  lawsuit, and I am with the law firm of Kirkland &  16:00
8  Ellis.  Thank you for your time so far today.  I'm  16:00
9  going to try to use my time as expeditiously and  16:00
10  efficiently as possible.  16:00
11       Have you ever heard of Torrent  16:00
12  Pharmaceuticals Limited or Torrent Pharma Inc. prior  16:00
13  to your engagement in this matter?  16:00
14  A.  No.  16:00
15  Q.  And do you understand the distinction  16:00
16  between Torrent Pharmaceuticals and Torrent  16:00
17  Pharma Inc.?  16:00
18  A.  No.  16:00
19  Q.  Okay.  When I refer to "Torrent" today in  16:00
20  my questions, I'm talking about Torrent  16:00
21  Pharmaceuticals Limited, which is the actual  16:00
22  manufacturer of the finished dose Valsartan product.  16:00
23       Do you understand that?  16:00
24  A.  I do.  16:00
25  Q.  Mr. Russ, I want to confirm you have  16:01

Page 244

1  three opinions with regard to Torrent; correct?  16:01
2       MR. STANOCH:  Objection.  16:01
3       THE WITNESS:  What opinions do you believe I  16:01
4  have with Torrent?  16:01
5  BY MS. BRANCATO:  16:01
6  Q.  Sure.  16:01
7       We can look at your report.  I believe  16:01
8  it's Exhibit 8, and we can start on Paragraph 108.  16:01
9       Do you see it says [as read]:  16:01
10       "Torrent's behavior and actions  16:01
11       related to supplier qualification,  16:01
12       monitoring and evaluation of ZHP's  16:01
13       ZnCl2 process change does not comply  16:01
14       with the cGMP requirement to establish  16:01
15       the reliability of their API supplier  16:01
16       as based on [... the CFR]."  16:01
17       Do you see that?  16:01
18  A.  I do, yes.  16:01
19  Q.  This is one opinion you are offering with  16:01
20  regard to Torrent; correct?  16:01
21  A.  It is.  16:01
22  Q.  Let me ask you this question:  16:01
23       How many opinions are you offering with  16:02
24  regard to Torrent?  16:02
25       MR. STANOCH:  Objection.  Vague.  16:02

Page 245

1       THE WITNESS:  We can talk about this  16:02
2  opinion, if you would like, and then move to what  16:02
3  other opinion you think that I'm also offering.  16:02
4  BY MS. BRANCATO:  16:02
5  Q.  No.  I'm just wondering if you know off  16:02
6  the top of your head how many opinions you are  16:02
7  offering with regard to Torrent.  16:02
8  A.  No.  I need to go through the report and  16:02
9  then detail that back to you.  If you have questions  16:02
10  on opinions I have made in the report, I'd be happy  16:02
11  to discuss those with you.  16:02
12  Q.  And off the top of your head, can you list  16:02
13  the opinions that you have with regard to Torrent?  16:02
14  A.  No.  I have already stated that.  16:02
15  Q.  All right.  Let's start with what I  16:02
16  consider to be your second opinion for Torrent.  16:02
17  It's on Page 20 of your report.  16:02
18       Do you see that section is entitled "The  16:02
19  Contamination Went Undetected Because Torrent Never  16:02
20  Tested Any of the Sample Valsartan API Batches It  16:02
21  Received From ZHP"?  16:03
22  A.  Yes.  16:03
23  Q.  That is an opinion that you are making  16:03
24  with regard to Torrent; correct?  16:03
25  A.  It is.  16:03

62 (Pages 242 - 245)

Page 246

1  Q. And, in fact, you say that Torrent never    16:03
2  tested Valsartan API batches at multiple points in    16:03
3  your report; isn't that correct?    16:03
4  A. It is.    16:03
5  Q. You testified earlier today that you had    16:03
6  read Dr. Nagaich's report that Torrent issued in    16:03
7  this case; correct?    16:03
8  A. I have.    16:03
9  Q. And after reading that report, do you have    16:03
10 any changes to make to this opinion that we are    16:03
11 looking at on Page 20?    16:03
12 A. No, I don't. The -- that expert states    16:03
13 that testing was performed but references a couple    16:03
14 of CofAs and a discussion he had with an employee.    16:04
15 There is no reference to his particular review of    16:04
16 data that was tested by Torrent.    16:04
17     So until -- again, that documentation    16:04
18 or -- there's no objective evidence that all this    16:04
19 testing that is proposed in his report was actually    16:04
20 performed.    16:04
21 Q. Are you aware that Dr. Jaiswal testified    16:04
22 in his deposition that Torrent did, in fact, test    16:04
23 every API batch received from ZHP?    16:04
24 A. The testimony -- deposition testimony was    16:04
25 somewhat muddled in their -- it's difficult to    16:04

Page 247

1  follow. So it appeared to me that no testing was    16:04
2  performed.    16:04
3  Q. Okay. Why don't we pull up -- I'm sorry.    16:04
4  MS. BRANCATO: What exhibit did we stop at    16:04
5  if anyone knows over there?    16:04
6  THE REPORTER: This is the reporter. Or one    16:04
7  second.    16:04
8  MR. STANOCH: I trust you.    16:04
9  MS. BRANCATO: I can start with 30 if that's    16:05
10 easier.    16:05
11 THE REPORTER: Yes. That would be great.    16:05
12 MS. BRANCATO: Okay. Perfect. Thanks,    16:05
13 Dayna.    16:05
14     Okay. So why don't we pull up the    16:05
15 deposition transcript that's titled "2021.06.0526,"    16:05
16 please, Justin, and we'll mark that as Exhibit 30.    16:05
17     (Deposition Exhibit 30 was marked for    16:05
18 identification and is attached hereto.)    16:05
19 MS. BRANCATO: And let's look at -- I'll get    16:05
20 you the pdf page in just a second.    16:05
21 Pdf Page 38, please.    16:05
22     And I'm looking at Page 502 to 503 on the    16:05
23 right-hand side.    16:06
24     Specifically Line [verbatim] 502, 24 to 503,    16:06
25 4.    16:06

Page 248

1  BY MS. BRANCATO:    16:06
2  Q. Do you see that in this section    16:06
3  Dr. Jaiswal testifies [as read]:    16:06
4     "ANSWER: And as yesterday also I    16:06
5     indicated, as part of, like, our own    16:06
6     program, every batch was tested. I'm    16:06
7     talking about the API batches being    16:06
8     tested by us."    16:06
9     Do you see that?    16:06
10 A. I understand. Yes, I do see it.    16:06
11 Q. Did you consider Dr. Jaiswal statements    16:06
12 that Torrent tests every API batch in forming your    16:06
13 opinion that Torrent never tests any Valsartan API    16:06
14 batch?    16:06
15 A. Again, as stated in previous testimony    16:06
16 here today is my concern is not so much whether    16:06
17 certain testing was performed but whether    16:06
18 chromatography was reviewed and that comparative    16:06
19 evaluation of chromatography with certificates of    16:07
20 analysis and data associated with ZHP was performed.    16:07
21 Q. So the conversation that you were having    16:07
22 with counsel for Teva, before we switched    16:07
23 questioning over to me, related to chromatography    16:07
24 review and comparing chromatographies between    16:07
25 Torrent -- I am sorry -- between Teva and ZHP    16:07

Page 249

1  applies equally to Torrent, in your opinion;    16:07
2  correct?    16:07
3  A. It does.    16:07
4  Q. Okay. So when your report says that    16:07
5  Torrent never tested any of the sample Valsartan API    16:07
6  batches, it should actually say, "Torrent never did    16:07
7  a chromatography review and compared the results    16:07
8  between what it found and what ZHP found"; is that    16:07
9  right?    16:07
10 MR. STANOCH: Objection to form.    16:07
11 THE WITNESS: No, it's not. You know, a --    16:07
12 again, defense counsel -- defendant -- I'm sorry --    16:07
13 defendant expert witness's report only references a    16:08
14 couple of CofAs and a conversation with an employee at    16:08
15 Torrent to demonstrate that testing was performed.    16:08
16     That is insufficient for me to state that    16:08
17 Torrent did testing.    16:08
18 BY MS. BRANCATO:    16:08
19 Q. When you say "defendants' expert witness,"    16:08
20 I am assume you are talking about Dr. Nagaich;    16:08
21 right?    16:08
22 A. I -- I am. I apologize. The gentleman --    16:08
23 I forget the gentleman's name.    16:08
24 Q. No. I -- I just want to make sure we are    16:08
25 talking about the same guy.    16:08

63 (Pages 246 - 249)

Page 250

```
 1   A.  We are.                        16:08
 2   Q.  And when you say he referenced a couple of   16:08
 3  CoAs, are those Torrent CoAs that you are speaking   16:08
 4  of or the ZHP CoAs?                 16:08
 5   A.  Torrent CoAs.                  16:08
 6   Q.  So, in your opinion, Torrent CoAs are   16:08
 7  insufficient to establish that Torrent was   16:08
 8  preforming any testing on Valsartan API; is that   16:08
 9  right?                             16:08
10       MR. STANOCH:  Objection to form.   16:08
11       THE WITNESS:  It's insufficient to   16:08
12  demonstrate they tested all batches as is being stated   16:08
13  here by Mr. -- by the employee at Torrent.   16:09
14  BY MS. BRANCATO:                   16:09
15   Q.  Your opinion, though, on Page 20 is that   16:09
16  Torrent never tested any Valsartan batches; correct?   16:09
17   A.  It is.                        16:09
18   Q.  And the CoAs that Dr. Nagaich cited -- and   16:09
19  I can pull them up if you want to look at them --   16:09
20  established that Torrent did, in fact, test some   16:09
21  Valsartan API batches; correct?       16:09
22   A.  It doesn't.  It's just a CofA.  It   16:09
23  could -- I need a reference to notebook references   16:09
24  or I would need to see the data.  The data for all   16:09
25  lots.  So it's insufficient as objective evidence   16:09
```

Page 251

```
 1  that testing was performed.           16:09
 2   Q.  Okay.  I just want to make sure I   16:09
 3  understand.                        16:09
 4       Your opinion is that a CofA is   16:09
 5  insufficient to prove that Torrent performed any   16:09
 6  testing on Valsartan API; is that right?   16:09
 7       MR. STANOCH:  Objection.       16:09
 8       THE WITNESS:  Four CofAs that were   16:09
 9  referenced are insufficient.  CofAs alone are summary   16:10
10  documents.  They are -- they don't demonstrate that   16:10
11  testing was actually performed.       16:10
12  BY MS. BRANCATO:                   16:10
13   Q.  In -- in your opinion, it's also   16:10
14  insufficient that the head of Torrent Quality   16:10
15  Assurance Group testified under oath that Torrent   16:10
16  does test every batch of Valsartan API; correct?   16:10
17   A.  Yes --                        16:10
18       MR. STANOCH:  Objection.       16:10
19       THE WITNESS:  -- it's insufficient.   16:10
20  BY MS. BRANCATO:                   16:10
21   Q.  What specific documents do you -- in your   16:10
22  opinion, would be sufficient to establish that   16:10
23  Torrent does test any Valsartan API?   16:10
24   A.  The raw data associated with those tests,   16:10
25  with those CofAs, which would include all of the   16:11
```

Page 252

```
 1  chromatographic data, the raw data from the system,   16:11
 2  test sample numbers, et cetera.       16:11
 3   Q.  The CoAs that were referred to in   16:11
 4  Dr. Nagaich's report, the Torrent CoAs specifically,   16:11
 5  your opinion is that they could reflect testing done   16:11
 6  by some other company, not necessarily Torrent; is   16:11
 7  that right?                        16:11
 8   A.  I don't know that.  It may be CofAs that   16:11
 9  were performed by -- by Torrent themselves or it may   16:11
10  be transcriptions.  Again, it's common for the   16:11
11  industry to transcribe from supplier CofAs on to   16:11
12  their own CofAs.  It's a standard practice.   16:11
13   Q.  Do you have any evidence that Torrent   16:11
14  transcribed ZHP CoAs on to a Torrent CoA in this   16:11
15  case?                             16:12
16   A.  I do not.                     16:12
17   Q.  Did you undertake a review of the ZHP CoAs   16:12
18  and Torrent CoAs and compare the two?   16:12
19   A.  No.  It wasn't germane to my report.   16:12
20   Q.  You are not aware whether the ZHP CoAs and   16:12
21  the Torrent CoAs match exactly or have any   16:12
22  differences; correct?                16:12
23   A.  This -- that wouldn't be the document I   16:12
24  would go to do comparative analysis.  CofAs   16:12
25  comparison is -- is not what I had concerns with.   16:12
```

Page 253

```
 1       As stated previously in my testimony, my   16:12
 2  concern is did Torrent compare physical   16:12
 3  chromatograms from raw data testing with those from   16:12
 4  CHP.  Either on-site or on some routine data review.   16:12
 5   Q.  Okay.  And that's what I am trying to get   16:13
 6  at.  So let me -- let me try it this way:   16:13
 7       Are you going to come to trial and tell   16:13
 8  the jury Torrent never performed any testing of the   16:13
 9  Valsartan API it received from ZHP?   16:13
10       MR. STANOCH:  Objection to form.   16:13
11       Answer if you can.             16:13
12       THE WITNESS:  I would say I don't have   16:13
13  objective evidence of that testing.  The appropriate   16:13
14  primary record is objective evidence of that testing.   16:13
15  BY MS. BRANCATO:                   16:13
16   Q.  And I think I know the answer to this   16:13
17  question.  But have you reviewed the 100,000-plus   16:13
18  documents Torrent produced in this case?   16:13
19   A.  If it's on my list of -- that supports my   16:13
20  report, then I reviewed those documents.   16:13
21   Q.  And that list does not include every   16:13
22  single document Torrent produced in this case;   16:13
23  correct?                           16:13
24   A.  I had sufficient documentation to arrive   16:13
25  at my opinions within my report.      16:13
```

64 (Pages 250 - 253)

Page 254

1  Q.  Okay.  That doesn't answer my question.    16:14
2  The list attached to your report does not include    16:14
3  every single document Torrent produced in this case;    16:14
4  correct?    16:14
5      MR. STANOCH:  Objection.    16:14
6      THE WITNESS:  I don't know if that is the    16:14
7  case.    16:14
8  BY MS. BRANCATO:    16:14
9  Q.  You mentioned earlier that the CoA could    16:14
10  potentially be some kind of summary and it -- it's    16:14
11  not raw data that show actual testing.    16:14
12      What would the CoA be a summary of?    16:14
13  A.  It's not potentially a summary; it is a    16:14
14  summary.  It is values that come from the raw data    16:14
15  calculations that I have talked with counsel about    16:14
16  previously.  It's a summary of that data.    16:15
17  Q.  Let's look at Paragraph 112 of your    16:15
18  report, please.    16:15
19  A.  Yes.    16:15
20  Q.  You state [as read]:    16:15
21      "It appears that Torrent ultimately    16:15
22      employed reduced testing of ZHP's    16:15
23      valsartan API."    16:15
24      Do you see that?    16:15
25  A.  Yes.    16:15

Page 255

1  Q.  What is the basis for that statement?    16:15
2  A.  Because data wasn't provided to me.  So it    16:16
3  appears that Torrent employed a reduced testing    16:16
4  program, which is consistent with industry practice.    16:16
5  There is nothing wrong with that.    16:16
6  Q.  When you say "reduced testing," do you    16:16
7  mean zero testing?  Or what does "reduced testing"    16:16
8  mean here?    16:16
9  A.  Reduced testing program is ideally you    16:16
10  must do an ID test regardless.    16:16
11      You can forego all other tests other than    16:16
12  those that are specifically needed for your    16:16
13  particular product, like, particle size, or if you    16:16
14  have water content specifications that are more    16:16
15  stringent than the supplier's, there may be some    16:16
16  other tests other than ID that you would perform.    16:16
17      But reduced testing is exactly that.  I    16:16
18  don't necessarily do all of the tests that are on    16:16
19  the specification.  I do a reduced number of those.    16:16
20  Q.  So you have seen evidence that Torrent    16:16
21  does a reduced number of specifications at the very    16:17
22  least -- or, I am sorry -- a reduced number of    16:17
23  testing based on the specifications; correct?    16:17
24  A.  No.  My statement here is that it appears    16:17
25  that Torrent ultimately employed reduced testing.  I    16:17

Page 256

1  say "appears" because raw data for testing of lots    16:17
2  received from ZHP wasn't provided to me in the    16:17
3  production.    16:17
4  Q.  Okay.  So you -- you don't actually have    16:17
5  any support for this statement; is that right?    16:17
6      MR. STANOCH:  Objection.    16:17
7      THE WITNESS:  No.  It appears.  I reviewed    16:17
8  and it appears that there's no data.  So they were    16:17
9  using a reduced testing program potentially, which is    16:17
10  required -- you know, which is allowed within an -- an    16:17
11  industry practice.    16:17
12      It's not a -- an incorrect assumption or    16:17
13  something along those lines.  It's normal to do    16:17
14  reduced testing or to not test all the drug substance    16:17
15  received.  It's a standard-industry practice.    16:17
16      I say it appears they are following that    16:18
17  practice because I wasn't provided with any data.    16:18
18  BY MS. BRANCATO:    16:18
19  Q.  Do you have any reason to doubt that    16:18
20  Torrent was at least doing identity testing on the    16:18
21  Valsartan API?    16:18
22  A.  No.  I have no reason to believe they    16:18
23  weren't doing ID.    16:18
24  Q.  And what is your support for that    16:18
25  statement?    16:18

Page 257

1      MR. STANOCH:  That's -- I am sorry.    16:18
2  Objection.  Ambiguous.    16:18
3      THE WITNESS:  ID testing is specifically    16:18
4  required in the regulation.  And most firms do ID    16:18
5  testing upon receipt.    16:18
6  BY MS. BRANCATO:    16:19
7  Q.  Let's look at the second sentence of    16:19
8  Paragraph 112.  You say [as read]:    16:19
9      "...it did not test batches of    16:19
10      valsartan API it received from ZHP for    16:19
11      the purpose of qualifying the    16:19
12      reliability of the supplier when it    16:19
13      added ZHP to its product applications."    16:19
14      Do you see that?    16:19
15  A.  I do.    16:19
16  Q.  There's no citation for this statement, is    16:19
17  there?    16:19
18  A.  There were no comparative testing data    16:19
19  that was provided, nor was there any statement in    16:19
20  any expert report or by any person deposed that they    16:19
21  did comparative testing.    16:19
22  Q.  Okay.  So you are concluding that    16:19
23  something did not happen because you did not see    16:19
24  evidence of it; correct?    16:20
25      MR. STANOCH:  Objection.    16:20

65 (Pages 254 - 257)

Page 258

1   Go ahead.                              16:20
2       THE WITNESS:  If it -- if it's not      16:20
3  documented that it happened, then it didn't happen.  16:20
4  That's a standard industry practice as well.  If it's  16:20
5  not written down, it didn't happen.        16:20
6  BY MS. BRANCATO:                           16:20
7   Q.  Do you see any emails or documents that  16:20
8  say, "Heads-Up.  We are not going to test the  16:20
9  batches of the API for purposes of qualifying the  16:20
10  supplier"?                                16:20
11   A.  No.  I did not see such an email.   16:20
12   Q.  Paragraph 113 says [as read]:       16:20
13       "Torrent also did not monitor CoA   16:20
14       results with its own periodic        16:20
15       testing...and it did not test batches  16:20
16       when the change to ZnCl2 process was  16:20
17       executed."                          16:21
18       Do you see that?                    16:21
19   A.  Yes.                                16:21
20   Q.  And is this similar to what we discussed  16:21
21  earlier that this opinion is based on the fact that  16:21
22  you haven't seen raw testing data?         16:21
23   A.  There's no mention of any comparative  16:21
24  testing in any of the emails associated with the  16:21
25  change for Zinc chloride.                  16:21

Page 259

1   Q.  When you say "comparative testing," what  16:21
2  are you referring to?                      16:21
3   A.  Comparative testing is when I take the  16:21
4  chromatograms from the new process and I review them  16:21
5  against chromatograms from the old process.  That  16:21
6  could either be -- that would be done as part of the  16:21
7  change control qualification of ZHP.       16:21
8       So that is what I am referring to here.  16:21
9  No mention of comparison -- comparative testing  16:21
10  which is support for that change.          16:21
11   Q.  I think where I'm getting confused here is  16:21
12  that your report -- and sometimes in this   16:21
13  deposition -- you use the word "testing" very  16:21
14  broadly without any limitation.  But it sounds like,  16:21
15  based on the testimony you have been giving over the  16:22
16  last hour, what you are mainly focused on is the  16:22
17  lack of comparative chromatogram testing or review;  16:22
18  is that right?                            16:22
19   A.  It is.                             16:22
20       MR. STANOCH:  And objection.  The report  16:22
21  speaks for itself.                        16:22
22       Go ahead.                          16:22
23       MS. BRANCATO:  Someone is not on mute on the  16:22
24  Zoom.  If everyone can mute themselves, that would be  16:22
25  great.                                   16:22

Page 260

1  BY MS. BRANCATO:                           16:22
2   Q.  So in Paragraph 113 -- to make sure I am  16:22
3  super clear on this -- when you say "Torrent did not  16:22
4  test batches when the change to Zn2 -- ZnCl2 process  16:23
5  was executed," you were focused on the fact that  16:23
6  Torrent did not do those chromatogram comparison  16:23
7  testings that you have been talking about; correct?  16:23
8   A.  Correct.                           16:23
9   Q.  And your opinion that Torrent did not do  16:23
10  that chromatogram comparison testing or review is  16:23
11  based on the lack of any evidence showing that they  16:23
12  did so; is that right?                     16:23
13   A.  That is correct.                   16:23
14   Q.  Keeping with Paragraph 113, the next  16:24
15  sentence says [as read]:                   16:24
16       "These practices are industry        16:24
17       standard for monitoring the quality of  16:24
18       API material received from its        16:24
19       supplier."                         16:24
20       And the next sentence [as read]:    16:24
21       "In not performing these actions,    16:24
22       Torrent failed to follow expected cGMP  16:24
23       as required by..." the regulation laid  16:24
24       out there.                         16:24
25       Do you see that?                    16:24

Page 261

1   A.  I do.                              16:24
2   Q.  You stated earlier that the regulation  16:24
3  does not require anything except identity testing;  16:24
4  correct?                                  16:24
5   A.  I did.  And I -- again, I'm not referring  16:24
6  to identity testing or receipt testing.  I'm  16:24
7  referring to comparative testing of chromatograms  16:25
8  for a change.                             16:25
9   Q.  Is there a specific regulation that  16:25
10  requires comparative testing for chromatograms for  16:25
11  changes?                                  16:25
12   A.  No.  There is not.  I detailed the  16:25
13  expected requirements earlier in this report in  16:25
14  Paragraph 48 -- I'm sorry.  I apologize.  I'm sorry.  16:25
15  I would have to search it out in my report.  16:25
16       But I describe -- as part of the --  16:25
17  comparative testing is used as part of initial  16:25
18  qualification and then also when a change occurs.  16:25
19  It normally is three batches of comparative testing.  16:26
20       I make this statement in the report.  16:26
21   Q.  Okay.  I want to make sure I'm         16:26
22  understanding.                            16:26
23       Is there a specific regulation that you  16:26
24  can cite that requires comparative testing for  16:26
25  chromatograms for changes?                 16:26

66 (Pages 258 - 261)

Page 262

1 A. There is no specific regulation. But this 16:26
2 is industry standard, which, again, as I have 16:26
3 described previously, is the little c, the Current 16:26
4 Good Manufacturing Practice, where reasonable, 16:26
5 prudent manufacturers have a certain practice and 16:26
6 it's broadly applied across the industry. It 16:26
7 becomes part of GMP. 16:26
8 So, no, there is not a specific 16:26
9 regulation, but this is a standard practice that 16:26
10 would be applied to all manufacturers and would be 16:26
11 an expectation of regulators and people like myself, 16:26
12 quality individuals within the industry. 16:26
13 Q. Okay. I understand that. I understand 16:26
14 that part of your report is based on industry 16:26
15 practice. 16:26
16 I'm just trying to understand what 16:26
17 specific regulations, if any, I should be looking at 16:27
18 to understand what you say Torrent did or didn't 16:27
19 violate. 16:27
20 A. The -- 16:27
21 Q. So let me ask you this. 16:27
22 A. Okay. 16:27
23 Q. Are the specific regulations that you 16:27
24 believe Torrent violated listed in your report? 16:27
25 A. They are listed in this paragraph. It is 16:27

Page 263

1 listed in this paragraph. 21 CFR 211.84(d)(2). As 16:27
2 an expectation that the manufacturer will establish 16:27
3 the re-- reliability of the supplier. That's the 16:27
4 regulation. 16:27
5 How industry does that is through 16:27
6 comparative testing. That's how they meet this 16:27
7 requirement. So this is the requirement that is 16:27
8 being met. This is the regulation that is being met 16:27
9 by comparative testing. 16:27
10 Q. I understand that. I'm just trying to get 16:28
11 the numbers so I can -- 16:28
12 A. 21 CFR 211.84(d)(2). It's stated in this 16:28
13 paragraph. 16:28
14 Q. Understood. 16:28
15 Are there any other regulations that you 16:28
16 allege that Torrent violated? 16:28
17 A. Not -- 16:28
18 Q. Strike that. 16:28
19 Your report -- I'm trying to make this as 16:28
20 easy as possible for you. 16:28
21 If you think -- if it's your opinion that 16:28
22 Torrent violated certain regulations, are they all 16:28
23 listed in your report? 16:28
24 A. They are. And industry practices. 16:28
25 Q. Let's look at Page -- Paragraph 114, 16:28

Page 264

1 please. 16:29
2 A. Okay. 16:29
3 Q. Do you see that it says [as read]: 16:29
4 "If Torrent had done any testing of 16:29
5 ZHP?s API itself or by an unbiased 16:29
6 third party, they likely would have 16:29
7 been able to detect any unexplained 16:29
8 peaks in the residual solvents testing 16:29
9 chromatograms." 16:29
10 Do you see that? 16:29
11 A. I do. 16:29
12 Q. You use the word "likely." Sitting here 16:29
13 today, you can't say with certainty that, if Torrent 16:29
14 had done a chromatogram comparison that you are 16:29
15 focused on, it would have identified unexplained 16:29
16 peaks. 16:29
17 MR. STANOCH: Objection to form. 16:29
18 THE WITNESS: I -- I don't know that. 16:29
19 BY MS. BRANCATO: 16:29
20 Q. The certificate of analysis that are -- we 16:30
21 have been talking about today from Torrent that are 16:30
22 referenced in Dr. Nagaich's report, do you recall 16:30
23 seeing any unexplained peaks or references to 16:30
24 unexplained peaks in those CoA? 16:30
25 A. No. And they wouldn't be documented 16:30

Page 265

1 there. That's not the -- that's not the place for 16:30
2 something like that. It would be review of the 16:30
3 chromatograms themselves, which is done in a 16:30
4 laboratory by quality compliance individuals in the 16:30
5 laboratory to assure that chromatography is 16:30
6 meeting -- what is called a "standard 16:30
7 chromatograph," which is normally in the method. 16:30
8 This is done in the laboratory. This 16:30
9 is -- it has nothing to do with the CofA. 16:30
10 Q. Let's back up to your first opinions that 16:31
11 we were talking about earlier, which is 16:31
12 Paragraph 108. 16:31
13 You see it says [as read]: 16:31
14 "Torrent's behavior and actions 16:31
15 related to supplier qualification, 16:31
16 monitoring and evaluation of" -- this 16:31
17 again -- "ZnCl2 process does not comply 16:31
18 with the cGMP requirement...." 16:31
19 A. Yes. 16:31
20 Q. What specifically about Torrent's behavior 16:31
21 and action related to supplier qualification does 16:31
22 not comply with the cGMP? 16:31
23 A. They didn't establish the reliability of 16:31
24 the supplier based on other elements that I have 16:31
25 already stated in the report. The report stands for 16:31

Page 266

1 itself on what I expect those requirements to be.    16:31
2 There's no evidence that they performed any of those    16:31
3 types of evaluations or actions.    16:32
4    Q.  Can you point me to where in your report    16:32
5 you list the types of evaluations or actions that    16:32
6 you would have expected a supplier qualification to    16:32
7 have?    16:32
8    A.  It's entire Section D, "Overview of GMP    16:32
9 Requirements for Oversight of API Suppliers."    16:32
10    Q.  Okay.  So it's your -- your opinion is    16:32
11 that Torrent did not undertake any of the actions    16:32
12 listed in your entire Section D; is that right?    16:32
13    A.  I believe that Torrent had a technical    16:32
14 agreement or a supply agreement or a quality    16:32
15 agreement that would be an element.    16:32
16       Other than that, I didn't see that they    16:32
17 had any other supplier management vehicles to assure    16:32
18 the reliability of the supplier.    16:32
19    Q.  Okay.  So let me ask you a few questions    16:33
20 about that.    16:33
21       Have you seen the Torrent quality    16:33
22 agreement with ZHP?    16:33
23    A.  I believe so, yes.    16:33
24    Q.  And do you have any opinions or    16:33
25 qualifications, statements to make about the    16:33

Page 267

1 substance of that agreement with ZHP?    16:33
2    A.  No.  I have no concerns with that.    16:33
3    Q.  Okay.  I'm trying to nail down exactly    16:33
4 what behavior or action you think that Torrent did    16:33
5 not undertake that it should have undertaken in    16:33
6 supplier qualifications.    16:33
7       And what I understand your testimony to    16:33
8 be -- and correct me if I am wrong -- is that    16:33
9 Torrent did not do anything that it should have    16:33
10 done, as you list in Section D, with the exception    16:33
11 of a quality or technical agreement; is that right?    16:33
12    A.  That is my opinion.    16:34
13    Q.  In Paragraph 108, you go on to say that --    16:34
14 talk about monitoring and evaluation of ZHP's ZnCl2    16:34
15 process change.    16:34
16       What behavior and actions should Torrent    16:34
17 have undertaken with regard to ZHP's ZnCl2 process    16:34
18 change to comply with the Valsartan, in your    16:34
19 opinion?    16:34
20    A.  Certainly comparative testing, which is    16:34
21 defined in Paragraph 49.    16:34
22    Q.  Anything else?    16:34
23    A.  Evaluation and input from audits.  As I    16:35
24 understand it, Torrent performed audits of ZHP but    16:35
25 didn't -- didn't do that in an appropriate    16:35

Page 268

1 frequency.    16:35
2    Q.  Anything else?    16:35
3    A.  Not other than what is already listed in    16:35
4 the report.    16:35
5    Q.  I understand that you want to refer back    16:35
6 to your report -- and maybe you can point me to a    16:35
7 specific paragraph -- but I'm asking about 108 and    16:35
8 trying to get a list of what you think Torrent    16:35
9 should have done because it's not clear from this    16:35
10 particular paragraph -- and the rest of the report    16:35
11 goes back and forth between Torrent and Teva, and    16:35
12 I'm not quite sure which applies to which.    16:35
13       So in Paragraph 108, you talk about    16:35
14 monitoring and evaluation that Torrent should have    16:35
15 done on the ZnCl2 process.    16:35
16       And my question is what specific behaviors    16:36
17 or actions should they have taken that would have    16:36
18 complied with the ZHP.  So far you have listed    16:36
19 comparative testing, defined in Paragraph 49, and    16:36
20 more frequent audits.    16:36
21       Is there anything else?    16:36
22       MR. STANOCH:  Objection.    16:36
23       THE WITNESS:  Everything that is listed in    16:36
24 Paragraph D [verbatim].    16:36
25 ///

Page 269

1 BY MS. BRANCATO:    16:36
2    Q.  Section D, is that what you are referring    16:36
3 to?    16:36
4    A.  I'm sorry.  Section D.  Yes.  Forgive me.    16:36
5       This section in any way is not directed at    16:36
6 either Teva or Torrent.  This is the requirements    16:36
7 for oversight of API suppliers.    16:37
8    Q.  Okay.  So your opinion is that Torrent did    16:37
9 not take the actions you prescribe in Section D with    16:37
10 regard to "monitoring and evaluating ZHP's ZnCl2    16:37
11 process change"; correct?    16:37
12       MR. STANOCH:  Objection to form.    16:37
13       THE WITNESS:  It is.  Well, in general, not    16:37
14 just the process change, but in general for the    16:37
15 supplier for ZHP, they didn't follow appropriate    16:37
16 qualification practices.    16:37
17       Again, the only clarification that I have    16:37
18 already stated is that they did have a quality    16:37
19 agreement, which is an element that should be in    16:37
20 place.  And I don't have any concerns with that.    16:37
21 BY MS. BRANCATO:    16:37
22    Q.  Okay.  So is it your opinion that after    16:37
23 the -- the process change that ZHP undertook for the    16:37
24 ZnCl2 process, Torrent should have basically    16:38
25 re-qualified ZHP as a supplier via the steps and the    16:38

68 (Pages 266 - 269)

Page 270

1  things you lay out in Section D?                16:38
2      A.  It is.  That's the standard industry    16:38
3  practice.  That at a change you would re-qualify,    16:38
4  re-evaluate.                                    16:38
5      Q.  And I understand that you are saying it is    16:38
6  a standard industry practice, but is there a    16:38
7  specific detail or regulation that requires that?    16:38
8          MR. STANOCH:  Objection.                16:38
9          Go ahead.                               16:38
10         THE WITNESS:  As I have stated previously,    16:38
11  the way I establish -- there is a direct regulation    16:38
12  21 CFR 211 84(d)(2).                           16:38
13         The way I establish the reliability of a    16:38
14  supplier is through what I have described in Section D  16:38
15  of this report.  That is the standard industry    16:38
16  practice.  This is what most manufacturers or all    16:38
17  manufacturers would be held to at some level by    16:38
18  myself, by themselves as self-regulators.      16:38
19         And FDA has the expectation to see these    16:39
20  items as well.                                 16:39
21  BY MS. BRANCATO:                               16:39
22      Q.  Okay.  Again, I fully understand your    16:39
23  industry practice opinion, and I -- I get that you    16:39
24  are saying that this is something Torrent should    16:39
25  have done based on industry practice.  I just want    16:39

Page 271

1  to make sure I am not missing a piece of the    16:39
2  regulation.                                    16:39
3          Is there a specific detail or regulation    16:39
4  that requires requalification of a supplier after a    16:39
5  process change in manufacturing?               16:39
6          MR. STANOCH:  Objection to form.        16:39
7          THE WITNESS:  There's not a specific    16:39
8  regulation in either 210 or 211.  Again, the way that    16:39
9  the GMP is -- is implemented in the industry is    16:39
10  through Current Good Manufacturing Practice.    16:39
11         These practices that prudent, reasonable    16:39
12  manufacturers employ become the GMP even though they  16:39
13  are not detailed directly in the regulation.    16:39
14  This is in case law as well.                   16:39
15  BY MS. BRANCATO:                               16:39
16      Q.  I understand you are not going to be    16:40
17  testifying about the content of case law in this    16:40
18  lawsuit; correct?                              16:40
19         MR. STANOCH:  Objection to form.        16:40
20         THE WITNESS:  No.  Of course not.  But this  16:40
21  is what drives industry's use of "current" in Current  16:40
22  Good Manufacturing Practice.  Industry standard is    16:40
23  equal to GMP regulation.                       16:40
24  BY MS. BRANCATO:                               16:40
25      Q.  In Paragraph 107 on Page 19 towards the    16:40

Page 272

1  bottom you say that [as read]:                  16:40
2          "...Torrent never received sample       16:40
3          batches...."                           16:40
4          Do you see that?                        16:40
5      A.  107?                                    16:40
6      Q.  Yes.  It's on the screen, if that's     16:40
7  helpful.                                       16:40
8      A.  Oh.                                    16:40
9          [Witness reviews document].             16:40
10         Okay.  I see that.                       16:41
11      Q.  What do you mean by "sample batch"?    16:41
12      A.  Again, samples of the new process prior to    16:41
13  receiving anything.  Those would be samples.    16:41
14         So ZHP or the -- Torrent or a manufacturer    16:41
15  would request samples, not commercial receipts but    16:41
16  samples of the new process material to do         16:41
17  comparative testing.                           16:41
18      Q.  And is it a requirement in the regulation    16:41
19  to get a sample batch or is that a best practice    16:41
20  industry standard?                             16:41
21         MR. STANOCH:  Objection.                16:41
22         THE WITNESS:  Again, without -- I am sorry.  16:41
23         MR. STANOCH:  Objection.                16:41
24         Go ahead.                               16:41
25         THE WITNESS:  Without a sample I can't do    16:41

Page 273

1  testing.  So it's not only an industry practice, it's    16:41
2  required.  I can't do testing without a sample.    16:41
3  BY MS. BRANCATO:                               16:41
4      Q.  I think we might be talking past each    16:42
5  other.                                         16:42
6      A.  Sure.                                  16:42
7      Q.  Does the CFR require that a manufacturer    16:42
8  obtain a sample batch of API after a process change    16:42
9  from its API supplier?                         16:42
10         MR. STANOCH:  Objection to form.  Asked and  16:42
11  answered.  Vague.  Ambiguous.                  16:42
12         Go ahead.                               16:42
13         THE WITNESS:  There's no direct regulation    16:42
14  from 21 CFR 210/211.  I have already described the    16:42
15  concept of industry practice and how that relates to    16:42
16  GMP.                                           16:42
17  BY MS. BRANCATO:                               16:42
18      Q.  So the last sentence of Paragraph 107 says    16:43
19  [as read]:                                     16:43
20         "...Torrent merely relied on the         16:43
21         declaration it received from ZHP         16:43
22         regarding genotoxic impurities."         16:43
23         Do you see that?                        16:43
24      A.  I do.                                  16:43
25      Q.  Is it your opinion that it is never in    16:43

69 (Pages 270 - 273)

Page 274

1  line with cGMP to rely on declarations from    16:43
2  suppliers about genotoxic impurities?    16:43
3        MR. STANOCH:  Objection to form.    16:43
4        THE WITNESS:  No.  It's perfectly normal to  16:43
5  rely upon any certification from a supplier.    16:43
6        However, I trust and verify.    16:43
7        So when I go for an audit, I need to see the  16:43
8  objective records or evidence that supports the    16:44
9  statement, in this case a genotoxic impurity    16:44
10  statement.    16:44
11        When I review audit reports that were    16:44
12  performed by Torrent, there is no mention that the  16:44
13  auditor did any verification of any objective evidence  16:44
14  that supports these statements.    16:44
15  BY MS. BRANCATO:    16:44
16    Q.  Do you know off the top of your head how  16:44
17  many -- strike that.    16:44
18        Do you know whether you reviewed all of  16:44
19  the audit reports that were performed by Torrent on  16:44
20  ZHP?    16:44
21        MR. STANOCH:  Objection.    16:44
22        THE WITNESS:  I reviewed the audit reports  16:44
23  that are referenced in my report.    16:44
24  BY MS. BRANCATO:    16:44
25    Q.  And sitting here today, you don't know    16:44

Page 275

1  whether that is all of the audit reports or just    16:44
2  some of them; is that right?    16:44
3        MR. STANOCH:  Objection.    16:44
4        Go ahead.    16:44
5        THE WITNESS:  I can't at this point say that  16:44
6  it -- there's no evidence that I have, based on any of  16:44
7  that reporting, that I don't have all the audit    16:45
8  reports that were provided.  It was what was provided  16:45
9  to me in production.  I base my opinions off of those  16:45
10  reports.    16:45
11  BY MS. BRANCATO:    16:45
12    Q.  Look at Paragraph 106.    16:45
13        Do you see in the first sentence it says    16:45
14  that [as read]:    16:45
15        "...Torrent could not afford to    16:45
16        challenge or reject ZHP's supply    16:45
17        because ZHP was Torrent's only supplier    16:45
18        of valsartan API."    16:45
19    A.  Yes.    16:45
20    Q.  What is that opinion based on?    16:45
21    A.  That opinion is based on my experience    16:45
22  that a sole source supplier leaves a firm with a    16:45
23  very problematic issue when something occurs with    16:45
24  that supplier and they no longer have material to    16:45
25  make product and support their revenue.    16:45

Page 276

1  I have held these positions of leadership    16:46
2  supporting quality and compliance for many firms,    16:46
3  and I do that also as a third-party consultant.    16:46
4        A sole sourced supplier is a very    16:46
5  problematic area for quality decisions.  It's based  16:46
6  on my opinion and my experience.    16:46
7    Q.  In your experience, what percentage of    16:46
8  finished dose manufacturers have more than one API  16:46
9  supplier that are qualified for a particular drug?  16:46
10    A.  I couldn't possibly give you a percentage,  16:46
11  but certainly the idea -- ideal goal is to assure    16:46
12  that I have alternate suppliers in the event that    16:46
13  there is an issue with a supplier.  That's within --  16:46
14  all of the firms that I have ever worked with, that  16:46
15  is a goal is to have multiple suppliers.    16:46
16    Q.  In all of the firms you have ever worked  16:47
17  with, has every firm achieved that goal to have    16:47
18  multiple suppliers for API for any one particular  16:47
19  drug?    16:47
20    A.  No.  Certainly many -- you know, many    16:47
21  manufacturers are -- have only a single supplier    16:47
22  because that's all that is available to them or    16:47
23  that's all they had developed relationships with.    16:47
24  All I'm stating here is that leaves the firm in a    16:47
25  precarious position when a problem arises at that    16:47

Page 277

1  supplier.    16:47
2    Q.  And a cGMP does not require a finished    16:47
3  dose manufacturer to stockpile multiple API suppliers  16:47
4  for one given drug; correct?    16:47
5        MR. STANOCH:  Objection.    16:47
6        THE WITNESS:  No, it does not.    16:47
7  BY MS. BRANCATO:    16:47
8    Q.  Further on in Paragraph 106, you say that  16:48
9  [as read]:    16:48
10        "Having a sole source of API applies    16:48
11        undue pressures on an organization to    16:48
12        accept lower quality API...."    16:48
13        Do you see that?    16:48
14    A.  I do.    16:48
15    Q.  Is that also based on your experience?    16:48
16    A.  Extremely.  I personally --    16:48
17    Q.  Have you ever seen --    16:48
18    A.  I personally have been in this position on  16:48
19  multiple occasions.    16:48
20    Q.  And in those multiple occasions, does the  16:48
21  company that you worked for have lower quality API?  16:48
22        MR. STANOCH:  Objection to form.    16:49
23        THE WITNESS:  I'm just stating here that I  16:49
24  have been in the position where undue pressure or --  16:49
25  has been presented to the organization because of a  16:49

Veritext Legal Solutions
800-227-8440                                                973-410-4040

Page 278

1 sole supply. Undue pressure to receive material that 16:49
2 doesn't meet all of the GMP requirements that one 16:49
3 would expect. 16:49
4 BY MS. BRANCATO: 16:49
5    Q. And in your experience, do the companies 16:49
6 you work for accept the material that doesn't meet 16:49
7 all of the GMP requirements given that undue 16:49
8 pressure? 16:49
9       MR. STANOCH: Objection to form. 16:49
10      THE WITNESS: Not under my watch. 16:49
11 BY MS. BRANCATO: 16:49
12    Q. Are you offering any opinions about the 16:49
13 quality of ZHP Valsartan API? 16:49
14      MR. STANOCH: Objection to form. Vague. 16:49
15      But go ahead. 16:49
16      THE WITNESS: No. 16:49
17 BY MS. BRANCATO: 16:49
18    Q. Are you offering anything about Torrent's 16:49
19 motivation in accepting ZHP Valsartan API? 16:50
20      MR. STANOCH: Objection to form. 16:50
21      Go ahead. 16:50
22      THE WITNESS: I certainly am in this 16:50
23 paragraph. 16:50
24 BY MS. BRANCATO: 16:50
25    Q. And are you also offering an opinion about 16:50

Page 279

1 the pressures that Torrent faced in accepting the 16:50
2 ZHP Valsartan API? 16:50
3       MR. STANOCH: Objection. 16:50
4       Go ahead. 16:50
5       THE WITNESS: It appeared to me from these 16:50
6 documents and then also from the testimony of 16:50
7 Mr. Jaiswal that this type of pressure existed in 16:50
8 their culture. 16:50
9 BY MS. BRANCATO: 16:50
10    Q. When you say "this type of pressure 16:50
11 existed in their culture," what do you mean? 16:50
12    A. The pressure to potentially accept 16:50
13 products or not to alienate a supplier who sole 16:50
14 sourced, not to -- 16:50
15    Q. When you say "their culture" -- go ahead. 16:50
16 Sorry. 16:50
17    A. Their culture of -- when I -- sorry. 16:50
18       It's -- I refer to the compliance culture, 16:50
19 the culture compliance of the organization, which is 16:50
20 an assessment of the spirit of compliance of how -- 16:50
21 what the priority of quality in compliance is in the 16:51
22 organization. That can be attacked when marketing 16:51
23 concerns are -- pressurize an organization, 16:51
24 especially around a sole sourced supplier. 16:51
25    Q. Okay. I'm going to back up to my 16:51

Page 280

1 question. 16:51
2       So the answer is yes. You are offering an 16:51
3 opinion about the pressures that Torrent faced in 16:51
4 accepting the Valsartan API; is that right? 16:51
5       MR. STANOCH: Objection to form. 16:51
6       Go ahead. 16:51
7       THE WITNESS: My opinion on this is stated 16:51
8 here in Paragraph 106. 16:51
9 BY MS. BRANCATO: 16:51
10    Q. And I'm asking the question because I am 16:51
11 not sure what 106 is trying to tell me. So I am 16:51
12 asking you today. 16:51
13       Are you going to come to trial and offer 16:51
14 an opinion about the pressures that Torrent faced in 16:51
15 accepting ZHP Valsartan API? 16:51
16       MR. STANOCH: Objection to form. 16:51
17       THE WITNESS: I apologize that you don't 16:52
18 understand Paragraph 106. But this is what I would 16:52
19 state at trial. Exactly what is listed here. 16:52
20 BY MS. BRANCATO: 16:52
21    Q. And to make sure I understand what is 16:52
22 listed in 106 combined with the testimony you gave a 16:52
23 minute ago, you do believe that there was undo 16:52
24 pressure in Torrent's compliance culture to accept 16:52
25 ZHP Valsartan API; is that right? 16:52

Page 281

1       MR. STANOCH: Objection to form. Misstates 16:52
2 the opinions. 16:52
3       Go ahead. 16:52
4       THE WITNESS: I am stating that the 16:52
5 documents I reviewed, that are referenced here in this 16:52
6 paragraph, led me to the conclusions I have drawn in 16:52
7 this paragraph. 16:52
8 BY MS. BRANCATO: 16:53
9    Q. If we look at the last sentence of 106. 16:53
10      Do you see that? 16:53
11    A. Yes. 16:53
12    Q. Are you opining that Torrent didn't follow 16:53
13 the cGMP because it only had one API supplier? 16:53
14    A. No. 16:53
15    Q. Are you offering any opinions about why 16:53
16 Torrent, in your opinion, didn't follow cGMPs? 16:53
17      MR. STANOCH: Objection to form. Asked and 16:53
18 answered multiple times. 16:53
19      Go ahead. 16:53
20      THE WITNESS: I'm not sure what GMP you are 16:53
21 referring to, if you could be specific. 16:54
22 BY MS. BRANCATO: 16:54
23    Q. I am referring to all of the cGMPs that 16:54
24 you talk about in your report and in this 16:54
25 deposition. I am just trying to understand if you 16:54

71 (Pages 278 - 281)

Page 282

1  are offering an opinion about why Torrent didn't    16:54
2  follow cGMP.    16:54
3        MR. STANOCH:  Objection.    16:54
4        Go ahead.  If you could --    16:54
5        THE WITNESS:  In general, no.    16:54
6  BY MS. BRANCATO:    16:54
7        Q.  What do you mean when you say "in    16:54
8  general"?    16:54
9        A.  If you are saying why -- what was the    16:54
10  problem in their culture, in their compliance    16:54
11  culture that led them to make poor decisions around    16:54
12  GMP that I have identified in my report, the reason    16:54
13  for that, I have -- I have not opined on that, nor    16:54
14  do I have any further opinion other than what I have    16:54
15  described here in 106.    16:54
16        Q.  At the bottom of 106, you also say    16:54
17  [as read]:    16:54
18          "Questioning ZHP about their    16:55
19          DMF deficiency and other compliance    16:55
20          problems at their facility."    16:55
21        Do you see that?    16:55
22        A.  I don't.    16:55
23        Q.  What DMF deficiency are you referring to?    16:55
24        A.  There was a notified -- as I recall from    16:55
25  the documentation review that I performed, there was    16:55

Page 283

1  a DMA -- or DMF deficiency, a ZHP DMF deficiency    16:55
2  that affected a Torrent application.  And then the    16:55
3  compliance problems are elements identified in their    16:55
4  audit reports.    16:55
5        Q.  Okay.  I'm going to separate those just to    16:55
6  make sure I am understanding.  So the DFM deficiency    16:55
7  was on ZHP's part; correct?    16:55
8        A.  There is -- yeah.  Which affects Torrent's    16:55
9  application because it's referred in their    16:55
10  application.  The DMF --    16:55
11        Q.  And --    16:55
12        A.  -- is a constituent part of the ANDA from    16:56
13  Torrent, even though they don't have control over    16:56
14  it.  It's submitted as a constituent part.    16:56
15        So if there is a deficiency on the DMF, it    16:56
16  affects their application.  And what I am saying    16:56
17  here is this pressure may have caused them not to    16:56
18  pressure ZHP about DMF deficiencies or about    16:56
19  compliance problems at the facility because they    16:56
20  didn't want to agitate their supplier.    16:56
21        Again, a typical problem when you are sole    16:56
22  sourced.    16:56
23        Q.  So are you saying that Torrent didn't    16:56
24  follow up or question ZHP about their DMA -- DMF    16:56
25  deficiency?    16:56

Page 284

1        A.  I haven't given specific reference to    16:56
2  that.  I am stating that it appears that they did    16:56
3  not or that they --    16:56
4        Q.  And that's when you did not?    16:56
5        A.  -- may have not.    16:56
6        Q.  Can you say that last part again?  I    16:57
7  didn't catch it.    16:57
8        A.  Just that these types of sole source    16:57
9  causes one to not follow up necessarily on DMF -- or    16:57
10  deficiencies and on compliance problems in a    16:57
11  facility.    16:57
12        This is, again, an opinion and experience    16:57
13  of mine over the 28 years that I have been    16:57
14  practicing in the -- in the industry.    16:57
15        Q.  Have you seen any evidence that Torrent    16:57
16  did or did not follow up or question ZHP about their    16:57
17  DMF deficiency?    16:57
18        MR. STANOCH:  Objection to form.  Compound.    16:57
19  Confusing.    16:57
20        Go ahead.    16:57
21        THE WITNESS:  I -- I have not -- give a    16:57
22  reference here.  So I don't have a document that I    16:57
23  have referred to.  I, at this point in the deposition,    16:57
24  can't go research that now.    16:57
25  ///

Page 285

1  BY MS. BRANCATO:    16:57
2        Q.  And let's take the second half about    16:57
3  compliance problems at their facility.    16:57
4        Are you referring to ZHP's facility?    16:57
5        A.  Yes.  I am referring to ZHP in the -- in    16:58
6  the sentence.    16:58
7        Q.  What specific compliance problems are you    16:58
8  referring to that Torrent did not follow up with ZHP    16:58
9  about?    16:58
10        A.  Those identified in their audit reports    16:58
11  from a risk perspective.    16:58
12        Q.  Are you talking about all audit reports    16:58
13  that you reviewed from Torrent or a specific audit    16:58
14  report?    16:58
15        A.  I am talking about compliance problems    16:58
16  that were in their audit reports that I referenced    16:58
17  in my report.    16:58
18        Q.  Your report only references one audit,    16:58
19  which we'll come to.    16:58
20        So does this opinion refer back to that    16:58
21  one audit?    16:58
22        MR. STANOCH:  Objection.  Misstates the    16:58
23  report.    16:58
24        Go ahead.    16:58
25        THE WITNESS:  It refers to the observations    16:58

72 (Pages 282 - 285)

Page 286

1 that have been identified in reports that are    16:58
2 referenced in my report. Yes.    16:59
3 BY MS. BRANCATO:    16:59
4     Q.  You are not citing any particular audit    16:59
5 reports in this paragraph at the end of 106;    16:59
6 correct?    16:59
7     A.  No, I am not.    16:59
8     Q.  Back to the top of 106 in the sentence    16:59
9 that says [as read]:    16:59
10      "Torrent sought out a valsartan API    16:59
11      supplier such as ZHP in order to    16:59
12      accomplish its goal of reducing its API    16:59
13      costs...."    16:59
14      Do you see that?    16:59
15     A.  Yes.    16:59
16     Q.  Are you offering an opinion as to why    16:59
17 Torrent purchased Valsartan API from ZHP    16:59
18 specifically?    16:59
19     MR. STANOCH:  Objection to form.    16:59
20     THE WITNESS:  I'm only stating what was    17:00
21 stated in the email that's referenced.    17:00
22 BY MS. BRANCATO:    17:00
23     Q.  Why is the expense of the ZHP Valsartan    17:00
24 API relevant to your opinions about Torrent's    17:00
25 compliance with cGMPs?    17:00

Page 287

1     A.  Because it demonstrates to me that revenue    17:00
2 and pricing concerns are a part of the compliance    17:00
3 decision process at Torrent.  That cost was a major    17:00
4 factor for them.  That was the main goal.  Based on    17:00
5 the email that is referenced here, that's what it    17:00
6 sounds like to me.    17:00
7      And, again, based on my experience, that    17:00
8 exhibits a compliance culture that has problems,    17:00
9 that is deficient when pricing is the most important    17:01
10 element.    17:01
11     Q.  So is it your opinion that any time that    17:01
12 cost is a major factor for a manufacturer the    17:01
13 compliance culture has problems?    17:01
14     MR. STANOCH:  Objection to form.    17:01
15 Mischaracterizes testimony.    17:01
16     Go ahead.    17:01
17     THE WITNESS:  When I see areas of concern as    17:01
18 I have noted throughout the report, along with this    17:01
19 type of a statement in an email, yes, it does give me    17:01
20 pause and concern that there is a problem with the    17:01
21 compliance culture.    17:01
22 BY MS. BRANCATO:    17:01
23     Q.  In your experience when cost is a concern    17:02
24 for a manufacturer, does that automatically result    17:02
25 in cGMP violations of that manufacturer?    17:02

Page 288

1     MR. STANOCH:  Objection to form.    17:02
2     THE WITNESS:  More often than not.    17:02
3 BY MS. BRANCATO:    17:02
4     Q.  Do you have any particular examples from    17:02
5 your experience where cost was a concern with the    17:02
6 company you were working at and that led to cGMP    17:02
7 violations?    17:02
8     MR. STANOCH:  Objection to form.    17:02
9      And I just want to caution the witness not    17:02
10 to divulge any specifics that would be subject to a    17:02
11 non-disclosure or similar agreement.  But if you can,    17:02
12 go ahead.    17:02
13     THE WITNESS:  I was going to say I am not at    17:02
14 liberty to describe anything like that.    17:02
15 BY MS. BRANCATO:    17:02
16     Q.  Let me try to ask it a different way.    17:03
17      In your experience -- strike that.    17:03
18      Let's look at Paragraph 118 of your    17:03
19 report.    17:03
20      Do you see that this is in the section    17:03
21 entitled "Torrent's Inadequate Use of Third-Party    17:03
22 Inspectors to Audit ZHP's Manufacturing    17:03
23 Facilities..."?    17:03
24     A.  Yes.    17:03
25     Q.  Paragraph 118 specifically calls out a    17:03

Page 289

1 third-party auditor, Dr. Jian Yang.    17:03
2      Do you see that?    17:03
3     A.  I do.    17:03
4     Q.  And you also talk about Dr. Yang in    17:04
5 Paragraph 119; correct?    17:04
6     A.  I do.    17:04
7     Q.  And in Paragraph 115 to 120 there are no    17:04
8 references to any other auditors or audit reports    17:04
9 specifically; correct?    17:04
10     A.  Unless otherwise noted there.    17:04
11     Q.  I'm not sure what that means.    17:04
12     A.  If I have --    17:04
13     Q.  In paragraph --    17:04
14     A.  If I haven't referenced it here -- if I    17:04
15 have referenced only one audit, then that's what has    17:04
16 been referenced.    17:04
17     Q.  Are you aware of any other -- strike that.    17:04
18      If there's no other audits or auditors    17:04
19 referenced here, are you not presenting any opinions    17:04
20 on those other audits or auditors that Torrent may    17:04
21 have used?    17:04
22     MR. STANOCH:  Objection to form.  Really    17:04
23 confusing about "here" and "audit" and "auditors" and    17:05
24 this paragraph versus anywhere else.    17:05
25      So objection.  Form.    17:05

73 (Pages 286 - 289)

Page 290

1    THE WITNESS: I only refer to the audit    17:05
2  activity and the auditor that I'm describing here.    17:05
3  BY MS. BRANCATO:    17:05
4    Q.  I just want to make sure I'm understanding    17:05
5  the scope of your report with regard to Torrent's    17:05
6  auditing reports and auditors.    17:05
7    This section focuses on Dr. Yang, and one    17:05
8  audit report that she [verbatim] issued.    17:05
9    Do you expect to come to trial and issue    17:05
10  other opinions with regard to other auditors and    17:05
11  other audit reports that Torrent may have issued for    17:05
12  ZHP?    17:05
13    MR. STANOCH: Objection to form. The "audit    17:05
14  reports" and whether it's one or not.    17:05
15    But go ahead.    17:05
16    THE WITNESS: I would offer opinions on any    17:05
17  audit reports that have been provided to me, whether I    17:06
18  have referenced them in my report or not.    17:06
19  BY MS. BRANCATO:    17:06
20    Q.  Okay.  So you may come to trial and talk    17:06
21  about an auditor that is not listed in Paragraph 115    17:06
22  to 120; correct?    17:06
23    A.  I can't say that today.  I only found it    17:06
24  germane to reference what I have shown here in this    17:06
25  section.    17:06

Page 291

1    Q.  Sitting here today, do you have concerns    17:06
2  about any other auditors that Torrent used for ZHP?    17:06
3    MR. STANOCH: Objection to form.  "Any other    17:06
4  auditors" for any other audits over what time period.    17:06
5  Lacks specificity -- specificity.  Vague.  Ambiguous.    17:06
6    If you can answer, Mr. Russ.    17:06
7    THE WITNESS: Not at this time.  I don't    17:06
8  have any other -- I don't have any other opinions than    17:06
9  what I have placed in the report right now.    17:06
10  BY MS. BRANCATO:    17:07
11    Q.  Sitting here today, are you aware of    17:07
12  whether there are other audits conducted by Dr. Yang    17:07
13  on behalf of Torrent of ZHP?    17:07
14    MR. STANOCH: Objection to form.  Vague.    17:07
15  "Other audits"?  Other than what?    17:07
16    If you can answer, go ahead.    17:07
17    THE WITNESS: Again, what I --    17:07
18  BY MS. BRANCATO:    17:07
19    Q.  I'm just going to ask -- hang on, Dr. --    17:07
20  Mr. Russ.    17:07
21    MS. BRANCATO: The speaking objections are    17:07
22  getting a little bit out of hand right now.  I just    17:07
23  want to wrap this up as much you do.  So I'm trying to    17:07
24  go as quickly as possible.  So if we could keep the    17:07
25  objections just to form, foundation, et cetera,    17:07

Page 292

1  further.    17:07
2    MR. STANOCH: Objection. Lack of foundation    17:07
3  of the number of audits.    17:07
4    Objection.  Vague and ambiguous as to which    17:07
5  audit and other audits.    17:07
6    Objection.  Vague and ambiguous as to time    17:07
7  period.    17:08
8    Mr. Russ, if you can answer, go ahead.    17:08
9    THE WITNESS: Again, I have -- I formed my    17:08
10  opinions on the documents that have been referenced    17:08
11  here in this report for this section.    17:08
12  BY MS. BRANCATO:    17:08
13    Q.  I'm wondering if, sitting here today, you    17:08
14  are aware of any other audits Torrent conducted of    17:08
15  ZHP that were not done by Dr. Yang?    17:08
16    MR. STANOCH: Objection.    17:08
17    Go ahead.    17:08
18    THE WITNESS: Not at this time.  I'm not    17:08
19  aware of audits that were performed other than what I    17:08
20  have referenced here at this moment.    17:08
21  BY MS. BRANCATO:    17:08
22    Q.  This section refers to a Torrent document    17:08
23  that ends in -10961.    17:08
24    Do you see those -- that reference in that    17:08
25  paragraph?    17:08

Page 293

1    A.  I do.    17:08
2    MS. BRANCATO: Can we pull up that document,    17:08
3  please, Justin.  And I think it's Exhibit 31 that    17:09
4  we'll mark it as.    17:09
5    (Deposition Exhibit 31 was marked for    17:09
6    identification and is attached hereto.)    17:09
7  BY MS. BRANCATO:    17:09
8    Q.  Mr. Russ, is this a document that you cite    17:09
9  in your report at Paragraph 116 to 118?    17:09
10    A.  This --    17:09
11    MR. STANOCH: There is no Bates on -- on the    17:09
12  screen, but it may just be small for us.  So that's    17:09
13  all I'm noting for the record.    17:09
14    Okay.  That is helpful.    17:09
15    Can you see it?    17:09
16    THE WITNESS: Yep.  Thank you.    17:09
17    It is.    17:09
18    MS. BRANCATO: And if we could go to    17:09
19  pdf Page 12, please, Justin.    17:09
20  BY MS. BRANCATO:    17:09
21    Q.  Mr. Russ, is this the specific page you    17:09
22  are relying on in the statements you make in 116 to    17:09
23  118 or are there other pages as well?    17:09
24    MR. STANOCH: Objection. Given that he    17:09
25  doesn't have the document in front of him.    17:09

74 (Pages 290 - 293)

Page 294

1 But if you can answer -- and if you need the 17:09
2 copy, that is her bad. 17:09
3 THE WITNESS: I -- I can't state which page. 17:10
4 I reviewed the entire document in consideration for 17:10
5 referencing it. I looked at the entire document. 17:10
6 MS. BRANCATO: Sorry. Justin, I think we 17:10
7 should actually be on Page 13 of the pdf. Apologies. 17:10
8 BY MS. BRANCATO: 17:10
9 Q. Mr. Russ, does this page look familiar? 17:10
10 A. This is Page 11. 17:10
11 Q. Yes. 11 of 35. Does it look familiar to 17:10
12 you? 17:11
13 A. [Witness reviews document]. 17:11
14 If there's a section of it you could 17:11
15 highlight for me. I cannot read it unfortunately. 17:11
16 It's too small. 17:11
17 Q. Sure. 17:11
18 MS. BRANCATO: Why don't we zoom in on the 17:11
19 first paragraph. 17:11
20 THE WITNESS: Is there a specific question 17:11
21 you have on this page that's -- in regard to the 17:11
22 section on Torrent's audit? Is there something 17:11
23 specific here you want to ask me? 17:11
24 MR. STANOCH: She'll ask the questions, 17:11
25 Mr. Russ. It's okay. 17:11

Page 295

1 BY MS. BRANCATO: 17:11
2 Q. I just want to make sure you were familiar 17:11
3 with this page before I ask you my next few 17:11
4 questions. 17:11
5 MR. STANOCH: Objection. No question 17:11
6 pending. 17:11
7 BY MS. BRANCATO: 17:11
8 Q. Or with this paragraph entirely. 17:11
9 A. I have read the paragraph. 17:11
10 MR. STANOCH: Objection. There is no -- 17:11
11 there is no question pending. 17:11
12 BY MS. BRANCATO: 17:11
13 Q. Do you see the observation 1d and the 17:11
14 sentence that precedes it? 17:11
15 A. [Witness reviews document]. 17:11
16 Okay. 17:11
17 Q. In writing your report and citing this 17:12
18 document on Paragraph 116 to 118, is this the 17:12
19 observation you are generally relying -- or 17:12
20 referring to? 17:12
21 A. Can we go to the observation, and I'll 17:12
22 read it and verify it for you. 17:12
23 MS. BRANCATO: Justin, can you go to 17:12
24 pdf Page 29, please. 17:12
25 And then it will be 27 of 35 at the bottom. 17:12

Page 296

1 Perfect. 17:12
2 And if you could zoom in on the second half 17:12
3 of the document. 17:12
4 BY MS. BRANCATO: 17:13
5 Q. Mr. Russ, do you see these observations? 17:13
6 A. [Witness reviews document]. 17:13
7 This is -- isn't about auditors except 17:13
8 that last paragraph in d) [as read]: 17:13
9 "Your Vice President of Quality 17:13
10 stated you did not train third party 17:13
11 vendors to conduct" -- and then I guess 17:13
12 it's on the next page -- "audits." 17:13
13 MS. BRANCATO: Justin, can you do -- that's 17:13
14 perfect. Thank you. 17:13
15 THE WITNESS: "Qualification of audits." 17:13
16 BY MS. BRANCATO: 17:13
17 Q. Do you see observation 1d? 17:13
18 A. Yes. The last statement in 1d. 17:13
19 Q. Is this -- is this the observation you are 17:13
20 relying on when you talk about this document in 116 17:13
21 to 118 of your report? 17:13
22 A. It is. 17:13
23 MS. BRANCATO: Let's look at this document 17:14
24 that ends in -4362, please. And we're going to mark 17:14
25 that as Exhibit 32. 17:14

Page 297

1 (Deposition Exhibit 32 was marked for 17:14
2 identification and is attached hereto.) 17:14
3 BY MS. BRANCATO: 17:14
4 Q. Mr. Russ, do you see this is the 17:14
5 July 18th, 2017, letter from the FDA to Torrent? 17:14
6 A. I acknowledge it's a letter. And on FDA 17:14
7 letterhead. 17:14
8 Q. Do you recall reviewing this document when 17:14
9 you were putting together your report? 17:14
10 A. If it's referenced in my materials 17:14
11 considered. Then I opened the document and reviewed 17:14
12 it. 17:14
13 Q. I'm asking if you recall reviewing it, 17:14
14 sitting here today? 17:15
15 A. Not today. 17:15
16 MR. STANOCH: Objection to that. 17:15
17 But that's fine. 17:15
18 BY MS. BRANCATO: 17:15
19 Q. Let's look at pdf Page 57, please. 17:15
20 MS. BRANCATO: And, Justin, if you could 17:15
21 zoom on "Voluntary Corrections" and everything 17:15
22 underneath there, that would be great. 17:15
23 BY MS. BRANCATO: 17:15
24 Q. Mr. Russ, do you see that this is the 17:15
25 section entitled "Voluntary Corrections" relating to 17:15

75 (Pages 294 - 297)

Page 298

1  an inspection concluded on May 20th, 2016?        17:15
2    A.  Yes.                                          17:15
3    Q.  And is that the same inspection that was    17:15
4  being referenced in Exhibit 31 that we just looked  17:15
5  at, the EIR?                                       17:15
6    A.  It appears to be.                            17:16
7    Q.  And if we look at "Observation 1d," that   17:16
8  would be observation regarding vendor audit        17:16
9  qualifications that we were looking at in          17:16
10 Exhibit 31; correct?                               17:16
11   A.  It is.                                        17:16
12   Q.  The FDA states here in this Exhibit 32      17:16
13 that Torrent requalified as a third-party auditor  17:16
14 Dr. Jian Yang on July 12th, 2016.                  17:16
15      Do you see that?                              17:16
16   A.  I do.                                         17:16
17   Q.  And ultimately FDA concluded that the      17:16
18 auditor, Dr. Yang, was qualified according to the  17:16
19 updated procedure; correct?                        17:16
20   A.  They were trained to the procedure after   17:16
21 they performed audits for Torrent.                 17:16
22      They were still untrained at the time of    17:16
23 the audit.  They were still not qualified as an    17:16
24 auditor at the time of the audit.                  17:16
25      This just demonstrates that going forward,  17:16

Page 299

1  prospectively, post July 12th, 2016, they had been  17:16
2  qualified to the procedure.  That's all this states.  17:17
3    Q.  I understand your position.  I am asking    17:17
4  you specifically the statement that FDA makes in   17:17
5  this document is [as read]:                         17:17
6      "This auditor was qualified                    17:17
7      according to the updated procedure and        17:17
8      had reviewed the audit checklist."            17:17
9    Correct?                                          17:17
10     MR. STANOCH:  Objection.  Not sure of what   17:17
11 the question is.                                    17:17
12     THE WITNESS:  It states that she was trained  17:17
13 to their procedural checklist.  This does not make an  17:17
14 auditor qualified, just that they understand their  17:17
15 procedure.  That's all this is.                    17:17
16 BY MS. BRANCATO:                                    17:17
17   Q.  I understand that you want to interpret     17:17
18 this document, and I understand your position on it.  17:17
19 I am -- just want to make sure that we -- we're both  17:17
20 on the same page about what the FDA says in these  17:17
21 words.                                             17:17
22     It says, quote [as read]:                      17:17
23      "The auditor was qualified according         17:17
24      to the updated procedure and had             17:17
25      reviewed the audit checklist.  No            17:18

Page 300

1    discrepancies were noted."                       17:18
2    Correct?                                          17:18
3      MR. STANOCH:  Objection to form.  Misstates  17:18
4  the document.                                      17:18
5      Go ahead.                                      17:18
6      THE WITNESS:  It states that.  But on --     17:18
7  this is as of 7/12/2016.  So anything done by this  17:18
8  auditor previous to that she would be considered   17:18
9  unqualified.                                        17:18
10 BY MS. BRANCATO:                                    17:18
11   Q.  So last statement you said, "So anything    17:18
12 done by this auditor previous to that, she would be  17:18
13 considered unqualified."                            17:18
14      That's your opinion, not what the FDA is    17:18
15 saying in Exhibit 32; correct?                      17:18
16   A.  FDA is purely verifying that they saw that  17:18
17 training was done as of 7/12/2016.  They make no   17:18
18 statement about her retrospective qualification.  It  17:18
19 just says that she reviewed the procedure and that  17:19
20 there was a training document for it.  That does not  17:19
21 constitute a qualified auditor alone.              17:19
22   Q.  This is --                                    17:19
23   A.  This is a review of the training record.    17:19
24 They are saying, "I reviewed a training record and  17:19
25 no discrepancies were noted."                       17:19

Page 301

1    Q.  Look at Paragraph 119, please, of your     17:19
2  report.                                            17:19
3      Do you see toward the end of this            17:19
4  paragraph you say [as read]:                        17:19
5      "Torrent, appearing to be unfazed by        17:19
6      Dr. Yang's finding in 2015 and did          17:19
7      nothing to follow-up with these             17:19
8      concerns."                                   17:19
9    A.  Yes.                                          17:19
10   Q.  There's no citation at the end of this     17:19
11 sentence or in this paragraph for that statement.  17:19
12      My question is what is the basis for that   17:20
13 statement?                                         17:20
14   A.  That -- in response to the email that this  17:20
15 references, that there was no indication that they  17:20
16 took action based on the reports of issues that are  17:20
17 significant issues reported by their auditor.      17:20
18      There's no response provided or no other    17:20
19 further evaluation that was in the production that  17:20
20 states what follow-up specifically was done based on  17:20
21 these -- this list of information that the auditor  17:20
22 provided to management at Torrent.                 17:20
23   Q.  You said "no other further evaluation that  17:20
24 was in the production," do you mean the documents  17:20
25 that were provided to you and that are referenced in  17:20

Page 302

1 the back of your report?                    17:20
2    A.  Yes.                                 17:21
3    Q.  In your opinion, what follow-up was  17:21
4 required of Torrent to comply with cGMP?    17:21
5       MR. STANOCH:  Objection to form.      17:21
6       THE WITNESS:  What I would expect is that  17:21
7 she's listed multiple items here that there will be  17:21
8 observations in an audit report that would represent  17:21
9 what this meant.  There are no observations that are  17:21
10 specific to this comment.                   17:21
11     So there's no follow-up because there's no  17:21
12 observation.                                17:21
13     So how did Torrent respond to these comments  17:21
14 if they weren't in an audit report.  Because Torrent  17:21
15 may follow up on their observations from an audit  17:21
16 report, but this doesn't appear in the audits that I  17:21
17 reviewed from 2015.  Doesn't appear in the audit.  So  17:21
18 how could Torrent follow up on it?          17:21
19 BY MS. BRANCATO:                            17:21
20    Q.  I see.  I just want to make sure I am  17:22
21 understanding this.                         17:22
22     So your statement is here that these three  17:22
23 statements from Dr. Yang, from an email, did not  17:22
24 appear in an audit report from the doctor; correct?  17:22
25    A.  They --                            17:22

Page 303

1       MR. STANOCH:  Objection to form.      17:22
2 Mischaracterizes the testimony.             17:22
3       Go ahead.                            17:22
4       THE WITNESS:  They -- they don't appear as  17:22
5 an audit observation that would then get follow-up.  17:22
6 These comments are then not documented with objective  17:22
7 evidence that supports the comments in an audit report  17:22
8 so that the firm could address a corrective action and  17:22
9 Torrent would have the opportunity to follow up on  17:22
10 that corrective action.                     17:22
11     It's not in the audit report.  It's a  17:22
12 comment in an email.  So how did Torrent follow-up on  17:22
13 it.  So I am saying they did nothing to follow up on  17:22
14 it.                                         17:22
15 BY MS. BRANCATO:                            17:22
16    Q.  So do you see evidence one way or the  17:22
17 other that Torrent did or did not do anything to  17:22
18 follow up on these concerns?                17:22
19       MR. STANOCH:  Objection to form.  Confusing.  17:22
20 Vague.  Ambiguous.                          17:22
21       Go ahead.                            17:22
22       THE WITNESS:  The vehicle for follow-up with  17:23
23 concerns with the supplier is an audit report,  17:23
24 observations in an audit report.  If an observation  17:23
25 was not issued to the supplier, there's no corrective  17:23

Page 304

1 action and there is no ability to follow up on that.  17:23
2 BY MS. BRANCATO:                            17:23
3    Q.  And you saw no evidence that Torrent did  17:23
4 any kind of follow-up in any way regarding these  17:23
5 three findings from this email; is that right?  17:23
6       MR. STANOCH:  Objection.  Asked and  17:23
7 answered.                                   17:23
8       Go ahead.                            17:23
9       THE WITNESS:  I saw no observation in the  17:23
10 report.  So, therefore, there was no opportunity to  17:23
11 follow up because there's no specific observation  17:23
12 that -- that revolves around these three statements  17:23
13 that were provided to management in email.  17:23
14 BY MS. BRANCATO:                            17:23
15    Q.  Could Torrent management not have taken  17:23
16 follow-up steps based on the email alone?   17:23
17    A.  They certainly could have.  But that's not  17:23
18 a formal GMP vehicle to do follow-up with a  17:23
19 supplier.  It's through observations and an audit  17:23
20 report and corrective actions.  That's how I track  17:24
21 that.  That's the vehicle for GMP.          17:24
22     If they did something to address this, it  17:24
23 was outside of the GMP system because the GMP system  17:24
24 requires observations with corrective actions and  17:24
25 follow-up.                                  17:24

Page 305

1    Q.  If Torrent did something to address these  17:24
2 three concerns from this email, is it still -- have  17:24
3 they still violated GMP because they didn't do  17:24
4 anything via an audit report with observations and  17:24
5 corrective action?                          17:24
6       MR. STANOCH:  Objection to form.  Incomplete  17:24
7 hypothetical.                               17:24
8       Go ahead.                            17:24
9       THE WITNESS:  Yes.  Because the only vehicle  17:24
10 through which I do corrective and preventative action  17:24
11 is through an observation, a corrective action plan,  17:24
12 and a follow-up.  That's the vehicle.  Otherwise, it's  17:24
13 not documented.  It's not tracked in a GMP system.  17:24
14 Audits are GMP systems.  An email is not a  17:24
15 GMP system.                                 17:25
16       MS. BRANCATO:  All right.  Why don't we take  17:25
17 a break.                                    17:25
18       Let's go off the record.             17:25
19       THE VIDEOGRAPHER:  Okay.  Going off record  17:25
20 at 5:25 p.m.                                17:25
21       (Brief recess.)                      17:42
22       THE VIDEOGRAPHER:  And we are back on the  17:42
23 record at 5:52 p.m. [verbatim].             17:42
24 BY MS. BRANCATO:                            17:42
25    Q.  Mr. Russ, I have no further questions at  17:42

77 (Pages 302 - 305)

Page 306

1 this time.                                  17:42
2          THE WITNESS:  Oh.  Thank you.      17:42
3          MR. STANOCH:  Next questioner, I guess.    17:42
4          MS. ROSE:  I take it ZHP is next.    17:42
5          Anybody else?                       17:42
6          MS. LOCKARD:  I think you are the only one.  17:42
7          MR. STANOCH:  I would think -- and there are  17:42
8 only 30 here; right?  So it's just --       17:42
9          MS. ROSE:  Then I'll take over.      17:42
10         MR. STANOCH:  Okay.  Go ahead, Counsel.   17:42
11                                             17:42
12             EXAMINATION                      17:42
13 BY MS. ROSE:                                17:42
14     Q.   Hi, Mr. Russ.  How are you?        17:42
15     A.   Hello.  Thank you.                 17:42
16     Q.   My name is Nina Rose from Skadden, Arps,  17:42
17 and I am here representing the ZHP defendants in  17:42
18 this case.                                  17:42
19          You stated at the beginning of this  17:43
20 deposition that you do not intend to offer any  17:43
21 opinions about -- I am sorry.               17:43
22          You don't intend to offer any opinions at  17:43
23 trial about any defendants in the case other than  17:43
24 Teva and Torrent; correct?                  17:43
25     A.   That is correct.                   17:43

Page 307

1          THE VIDEOGRAPHER:  I am sorry.       17:43
2 BY MS. ROSE:
3     Q.   And what about at facilities that --
4          (Simultaneously speaking.)
5          THE REPORTER:  Wait one second.
6          MS. LOCKARD:  Hold on.
7          MR. STANOCH:  Counsel, wait.
8          MS. LOCKARD:  Nina.
9          MR. STANOCH:  We have a tech issue.   17:43
10         THE VIDEOGRAPHER:  Can we go off the record  17:43
11 for a one moment?                           17:43
12         MR. STANOCH:  Sure.                  17:43
13         MS. ROSE:  How --                    17:43
14         MS. LOCKARD:  We've got --           17:43
15         THE VIDEOGRAPHER:  Off record at 5:43 p.m.  17:43
16         (Brief recess.)                      17:44
17         THE VIDEOGRAPHER:  And we are back on the  17:44
18 record at 5:45 p.m.                         17:45
19         MS. ROSE:  Thanks.                   17:45
20 BY MS. ROSE:                                17:45
21     Q.   Going back to my earlier question and in  17:45
22 light of your previous testimony earlier today, it  17:45
23 appears today that you do not intend to offer any  17:45
24 opinions at trial about ZHP?                17:45
25         MR. STANOCH:  Objection to form.     17:45

Page 308

1          But go ahead.                       17:45
2          THE WITNESS:  That is correct.       17:45
3 BY MS. ROSE:                                17:45
4     Q.   And you are not offering any opinions    17:45
5 regarding ZHP's compliance with cGMP; correct?   17:45
6     A.   No.                                 17:45
7     Q.   I am sorry.  I didn't catch that.    17:45
8     A.   No.                                 17:45
9     Q.   Earlier today you were asked about FDA   17:45
10 statements that it was not known by regulators or   17:45
11 the industry that NDMA could form during the    17:45
12 Valsartan manufacturing process.            17:45
13         And you made a comment that ZHP internal  17:45
14 documents indicated that the chemistry of NDMA    17:46
15 formation in Valsartan was well known.       17:46
16         Do you remember that?                17:46
17     A.   I remember stating that ZHP documentation  17:46
18 about reaction chemistry associated with their    17:46
19 product.  "Well known" I am not sure I stated.   17:46
20     Q.   Okay.  So what documents were you      17:46
21 referring to?                              17:46
22     A.   Their investigation document into how NDMA  17:46
23 or how nitrosamines formed in their product.  I    17:46
24 can't reference the -- the Bates number, but I know  17:46
25 I have seen this document.                  17:46

Page 309

1     Q.   Okay.  Were you referring to a document  17:46
2 that was created by ZHP after the identification of  17:46
3 NDMA in Valsartan in May, June of 2018?       17:46
4     A.   Yes.  This was created after it was    17:46
5 identified and characterized as nitrosamine.     17:46
6     Q.   You haven't done any investigation of    17:47
7 whether the chemistry of NDMA formation in Valsartan  17:47
8 was well known prior to May 2018; is that correct?  17:47
9     A.   No, I have not.  And it's not germane to  17:47
10 my report.                                 17:47
11     Q.   So you don't intend to offer any opinions  17:47
12 at trial regarding whether the chemistry of NDMA   17:47
13 formation in Valsartan was known prior to May 2018?  17:47
14         MR. STANOCH:  Objection to form.     17:47
15         But go ahead.                       17:47
16         THE WITNESS:  No, I don't.           17:47
17 BY MS. ROSE:                                17:47
18     Q.   You made another comment earlier -- and I  17:47
19 hope I'm paraphrasing you correctly -- that ZHP may  17:47
20 have known about the presence of NDMA in Valsartan  17:47
21 prior to its identification by Novartis in May 2018,  17:47
22 but that you don't know if that's true.       17:47
23         Do you recall saying that?           17:47
24         MR. STANOCH:  Objection.  Form.      17:47
25 ///

78 (Pages 306 - 309)

Page 310

1    THE WITNESS: Yes. I do recall saying that. 17:47
2  BY MS. ROSE:                              17:47
3    Q.  Do you intend to offer any opinion at    17:47
4  trial about what ZHP knew about the presence of NDMA  17:47
5  in Valsartan and when?                      17:48
6    MR. STANOCH: Objection to form.          17:48
7    Go ahead.                            17:48
8    THE WITNESS: No, I do not.             17:48
9  BY MS. ROSE:                              17:48
10   Q.  We were talking earlier about          17:48
11 Paragraph 106 of your report --              17:48
12   A.  Yes.                              17:48
13   Q.  -- and specifically the last sentence of  17:48
14 that paragraph.                            17:48
15   A.  Yes.                              17:48
16   Q.  Let me know when you are there.        17:48
17   A.  I'm there.                          17:48
18   MS. ROSE: Thanks, Justin.              17:48
19 BY MS. ROSE:                              17:48
20   Q.  You were being questioned earlier about  17:48
21 the last sentence in this paragraph that discussed  17:48
22 whether Torrent was questioning ZHP about their  17:48
23 DMF deficiency and other compliance problems at  17:48
24 their facility.                            17:48
25   Do you recall that?                     17:48

Page 311

1    A.  Yes.                              17:48
2    Q.  The DMF deficiency that you are referring  17:48
3  to in the last sentence of the paragraph is that the  17:49
4  December 2010 deficiency that is referenced in  17:49
5  Paragraph 105?                            17:49
6    A.  [Witness reviews document].            17:49
7    Yes.                               17:49
8    Q.  Is it correct that that deficiency did not  17:49
9  address Valsartan after the manufacturing process  17:49
10 changes at issue in this litigation?            17:49
11   MR. STANOCH: Objection.                17:49
12   But go ahead.                         17:49
13   THE WITNESS: I need to review the document,  17:49
14 but I don't believe so.                      17:49
15 BY MS. ROSE:                              17:49
16   Q.  Just to be clear, you don't believe that  17:49
17 the deficiency letter had anything to do with the  17:49
18 Valsartan API that was manufactured using the  17:49
19 manufacturing processes at issue in these -- in this  17:49
20 litigation?                              17:49
21   MR. STANOCH: Objection.                17:49
22   Go ahead.                           17:49
23 ///
24 ///
25 ///

Page 312

1    THE WITNESS: Again, I -- without reviewing  17:49
2  the documents, again, I can't verify that, but I don't  17:50
3  believe so.                              17:50
4  BY MS. ROSE:                              17:50
5    Q.  Do you know when the manufacturing process  17:50
6  changes at issue in this litigation took place?    17:50
7    MR. STANOCH: Objection.                17:50
8    THE WITNESS: I -- I would have to go       17:50
9  through the report and pull out a specific date when  17:50
10 they issued the change control. So I don't have that  17:50
11 off the top of my head.                      17:50
12 BY MS. ROSE:                              17:50
13   Q.  But it says December 2010 deficiency was  17:50
14 issued prior to the change control for the       17:50
15 manufacturing process at issue.               17:50
16   You would agree that it would be          17:50
17 irrelevant to this case?                     17:50
18   MR. STANOCH: Objection to form.          17:50
19   Go ahead.                           17:50
20   THE WITNESS: It's not irrelevant to the    17:50
21 case in that -- especially to Paragraph 106, in that  17:50
22 I'm trying to describe here concerns with the      17:50
23 compliance culture at Torrent and their ability to  17:50
24 request information associated with the DMF.      17:50
25   So it's not that it's irrelevant. It's     17:51

Page 313

1  relevant to Torrent's compliance culture. It may be  17:51
2  irrelevant to the change to the Zinc chloride process,  17:51
3  but it's not irrelevant to Torrent's compliance    17:51
4  culture.                                17:51
5  BY MS. ROSE:                              17:51
6    Q.  And going back to that last sentence of   17:51
7  106 when you talk about the compliance problems at  17:51
8  their facility --                          17:51
9    A.  Yes.                              17:51
10   Q.  -- do you intend to offer any opinions    17:51
11 regarding compliance problems that -- at         17:51
12 ZHP facilities?                           17:51
13   MR. STANOCH: Objection to form.          17:51
14   THE WITNESS: I do not.                 17:51
15   MS. ROSE: Okay. That's it. That's all I    17:51
16 have. Thank you.                          17:51
17   THE WITNESS: Thank you.               17:51
18   MR. STANOCH: All right. Let's take a quick  17:51
19 break.                                  17:51
20   THE VIDEOGRAPHER: Okay. Going off record  17:51
21 at 5:52 p.m.                              17:51
22   (Brief recess.)                       17:59
23   THE VIDEOGRAPHER: And we are back on the  17:59
24 record at 5:59 p.m. Start of Media Number 10.     17:59
25                                     17:59

79 (Pages 310 - 313)

Page 314

1          EXAMINATION              17:59
2   BY MR. STANOCH:                 17:59
3    Q.  Good evening, Mr. Russ.    17:59
4    A.  Good evening.              17:59
5    Q.  What is your opinion on whether the   17:59
6   factors establishing adulteration of Teva and   17:59
7   Torrent finished dose Valsartan product existed?   17:59
8          MS. LOCKARD:  Objection.  Vague.   18:00
9          THE WITNESS:  The compliance failure   17:59
10  specifically around supplier quality assurance and   17:59
11  management for Teva and Torrent rose to the level of   17:59
12  product adulteration.            18:00
13         And that the ZHP product was adulterated --   18:00
14  was identified as FDA as adulterated.  And in   18:00
15  subsequent incorporation into Teva and Torrent   18:00
16  finished products, their products would also be   18:00
17  adulterated.                     18:00
18         MR. STANOCH:  I have no further questions.   18:00
19  Thank you.                       18:00
20                                   18:00
21          FURTHER EXAMINATION       18:00
22  BY MS. LOCKARD:                   18:00
23   Q.  Mr. Russ, when you went on a break with   18:00
24  counsel, did you talk about your testimony with   18:00
25  respect to the products being adulterated?   18:00

Page 315

1          MR. STANOCH:  Objection to form.   18:00
2          THE WITNESS:  No.          18:00
3   BY MS. LOCKARD:                   18:00
4    Q.  Didn't you tell us earlier today that you   18:00
5   didn't intend to come to court and testify that the   18:00
6   products were adulterated?        18:00
7          MR. STANOCH:  Objection to form.  Misstates   18:00
8   prior testimony.                  18:00
9          THE WITNESS:  I don't believe I said I   18:00
10  wouldn't say that the products were adulterated.  I   18:00
11  think the products do rise to the level of   18:00
12  adulteration.  I said that it wasn't FDA's role alone   18:00
13  to call a product adulterated.     18:00
14  BY MS. LOCKARD:                   18:00
15   Q.  So what definition are you using in this   18:00
16  case to determine that Teva and Torrent's products   18:01
17  are adulterated?                  18:01
18         MR. STANOCH:  Objection to form.   18:01
19         THE WITNESS:  I described this earlier in   18:01
20  testimony as it relates to ICH Q9:  severity,   18:01
21  occurrence, and detection.        18:01
22         MS. LOCKARD:  Okay.  Let's take a break for   18:01
23  a minute.  I'm going to get that document.  Go off the   18:01
24  record for a second.              18:01
25         THE VIDEOGRAPHER:  Going off record at   18:01

Page 316

1   6:01 p.m.                         18:01
2          (Brief recess.)            18:01
3          THE VIDEOGRAPHER:  And we are back on the   18:06
4   record at 6:07 p.m.  Start of Media Number 11.   18:06
5   BY MS. LOCKARD:                   18:06
6    Q.  All right.  Mr. Russ, so I am going to   18:06
7   mark as an exhibit the ICH guideline Q9 on quality   18:06
8   risk management.  We'll mark this as Exhibit --   18:06
9          THE REPORTER:  Either 25 or 33.   18:07
10         MS. LOCKARD:  Let's go with 33.   18:07
11         (Deposition Exhibit 33 was marked for   18:07
12         identification and is attached hereto.)   18:07
13  BY MS. LOCKARD:                   18:07
14   Q.  Take a look at that.          18:07
15         Is that the ICH guideline that you   18:07
16  referred to just a moment ago?     18:07
17   A.  It's not the format.  This is from   18:07
18  European Medicines Agency.         18:07
19   Q.  Is it --                     18:07
20   A.  This isn't the guidance from -- that FDA   18:07
21  promulgates.  But, yes, this is the ICH guideline   18:07
22  for Q9.                           18:07
23   Q.  Is the content of the guideline    18:07
24  essentially the same whether it comes from the   18:07
25  European Medicines Agency heading or the FDA?   18:07

Page 317

1    A.  I haven't done that verification.  But I   18:07
2   can stipulate that it's -- the concepts are the   18:07
3   same.                             18:07
4    Q.  Okay.  I'll give you a chance to look that   18:07
5   over.                             18:07
6          You are familiar at least with this -- the   18:07
7   European Medicines Agency ICH guideline Q9 enough to   18:07
8   know that it's reasonably similar?   18:08
9    A.  Yes.                         18:08
10   Q.  All right.  Can you find for us there in   18:08
11  that document where the definition of adulteration   18:08
12  is found?                         18:08
13   A.  No.  This document is not meant for that   18:08
14  purpose.  This is a tool.  And it's a tool that   18:08
15  would apply to any risk decision.   18:08
16         And adulteration is a decision of whether   18:08
17  a GMP concern has the risk of producing or creating   18:08
18  product adulteration.             18:08
19         This guideline does not talk about   18:08
20  adulteration, nor does it talk about any other   18:08
21  specific risk event.  It lists tools and how one   18:08
22  uses those tools.                 18:08
23   Q.  Okay.  So the ICH Q9 does not provide the   18:08
24  definition for adulteration that you are applying in   18:09
25  this case; correct?               18:09

Page 318

1    MR. STANOCH: Objection to form.    18:09
2    THE WITNESS: No, it does not. It provides    18:09
3 a tool by which I provide the risk of certain GMP    18:09
4 activities that rise to the level of adulteration.    18:09
5 BY MS. LOCKARD:    18:09
6    Q. Are you familiar with 21 USC Section 351    18:09
7 entitled "Adulterated drugs and devices"?    18:09
8    A. Yes.    18:09
9    Q. Okay. Let's make that the next exhibit.    18:09
10    THE REPORTER: 34.    18:09
11    MS. LOCKARD: 34.    18:09
12    (Deposition Exhibit 34 was marked for    18:09
13    identification and is attached hereto.)    18:09
14 BY MS. LOCKARD:    18:09
15    Q. All right. And this is, in fact, the    18:09
16 United States statute governing -- governing when a    18:09
17 drug or device shall be deemed to be adulterated;    18:09
18 correct?    18:09
19    A. Yes.    18:09
20    Q. Okay. And this is, in fact, the    18:09
21 United States' definition of adulteration for all    18:10
22 intents and purposes under the FDA's application of    18:10
23 the term "adulteration," is it not?    18:10
24    MR. STANOCH: Objection to form.    18:10
25    THE WITNESS: It is.    18:10

Page 319

1 BY MS. LOCKARD:    18:10
2    Q. Okay. And can you explain to me what    18:10
3 provision within USC 351 you believe applies to    18:10
4 Teva's manufacturing operations and quality systems    18:10
5 in this case that would deem them adulterated?    18:10
6    A. Section (B) [as read]:    18:10
7    "If it is a drug and the methods    18:10
8    used in, or the facilities or controls    18:10
9    used for, its manufacture, processing,    18:10
10    packaging, or holding do not conform or    18:10
11    are not operated or administered in    18:10
12    conformity with good manufacturing    18:10
13    practice...."    18:10
14    (a)(B).    18:11
15    Q. You are reading from Section (a) governing    18:11
16 [as read]:    18:11
17    "Poisonous, insanitary...ingredients    18:11
18    and adequate controls in manufacture"?    18:11
19    A. Yes. [As read]:    18:11
20    "If a drug -- if it is a drug and    18:11
21    the methods used in, or the facilities    18:11
22    or controls used for, its manufacture,    18:11
23    processing, packaging, or holding do    18:11
24    not conform to or are not operated or    18:11
25    administered in conformity with good    18:11

Page 320

1 manufacture practice to assure such    18:11
2 drug meets the requirements of this    18:11
3 chapter."    18:11
4    That's the definition of GMP adulteration.    18:11
5    Q. And that's the basis for your opinion?    18:11
6    MR. STANOCH: Objection. Form. Misstates    18:11
7 testimony.    18:11
8 BY MS. LOCKARD:    18:11
9    Q. That's the basis for your opinion that the    18:12
10 Teva drugs are adulterated under 21 USC Section 351?    18:12
11    MR. STANOCH: Objection. Objection.    18:12
12 Misstates testimony.    18:12
13    THE WITNESS: This states that GMP can cause    18:12
14 product adulteration. That's all this states to me.    18:12
15    I use the principles of risk management to    18:12
16 determine the relative risk of certain GMP violations    18:12
17 and how they would rise to product adulteration.    18:12
18    In this particular case -- and I have    18:12
19 already described previously in testimony today that    18:12
20 supplier quality management, as it relates to    18:12
21 oversight of a supplier that Teva and Torrent were    18:12
22 performing for ZHP, is a high-risk quality -- quality    18:12
23 system and GMP compliance aspect, and that failures in    18:12
24 this area, failures I have described in my report    18:12
25 would rise to the level of product adulteration.    18:12

Page 321

1    So it's a combination of these documents    18:13
2 that help me to arrive at that conclusion.    18:13
3 BY MS. LOCKARD:    18:13
4    Q. Mr. Russ, today when you were asked this    18:13
5 question on the record under oath, as you are right    18:13
6 now [as read]:    18:13
7    "QUESTION: Okay. So you are not --    18:13
8    you are not going to give the opinion    18:13
9    that any of the product manufactured by    18:13
10    Teva was adulterated?    18:13
11    "ANSWER: No, I am not. I am not --    18:13
12    I am only stating that the practice    18:13
13    they employed for supplier management    18:13
14    were sufficiently deficient that it    18:13
15    would have a high probability of    18:13
16    leading to product adulteration."    18:13
17    That was your testimony today; correct?    18:13
18    A. That is my testimony, and that is the same    18:13
19 testimony I'm providing now.    18:13
20    Q. Okay. So at trial you intend to testify    18:13
21 that the practices Teva employed for supplier    18:13
22 management were sufficiently deficient that it would    18:13
23 lead to a high probability of leading to product    18:13
24 adulteration? That's your testimony you are giving    18:14
25 today and at trial; correct?    18:14

81 (Pages 318 - 321)

Page 322

1      MR. STANOCH: Objection to form.   18:14
2 Mischaracterizes the testimony and the immediately   18:14
3 prior questioning. Asked and answered.   18:14
4      MS. LOCKARD: I'm not mischaracterizing the   18:14
5 testimony. I am quoting it directly from the   18:14
6 transcript that was given under oath today earlier.   18:14
7      MR. STANOCH: Okay. And you are ignoring   18:14
8 the portions that were under oath two minutes ago,   18:14
9 Counsel.   18:14
10      MS. LOCKARD: I'm ignoring the portion where   18:14
11 the testimony was changed after woodhousing with   18:14
12 counsel.   18:14
13      No. Thank you. I'm done. No further   18:14
14 questions.   18:14
15      MR. STANOCH: Inappropriate.   18:14
16      I'm going to share my screen real quick.   18:14
17 Can I do that?   18:14
18      Stand by.   18:14
19   18:14
20      FURTHER EXAMINATION   18:14
21 BY MR. STANOCH:   18:14
22   Q. Mr. Russ, can you see something on your   18:14
23 screen now?   18:15
24   A. Yes. I see the ZHP warning letter.   18:15
25      MR. STANOCH: And I'll mark this as the next   18:15

Page 323

1 exhibit in print form.   18:15
2      (Deposition Exhibit 35 was marked for   18:15
3      identification and is attached hereto.)   18:15
4 BY MR. STANOCH:   18:15
5   Q. And you are familiar with this FDA letter   18:15
6 to ZHP from November 29th, 2018?   18:15
7   A. I am.   18:15
8   Q. You reviewed it as part of the materials   18:15
9 considered for your opinions; correct?   18:15
10   A. Yes.   18:15
11   Q. When I last questioned you, you mentioned   18:15
12 something to the effect that the FDA had found that   18:15
13 the Valsartan API incorporated into Teva and Torrent   18:15
14 finished dose product met the conditions to   18:15
15 establish adulteration; is that right?   18:15
16   A. It is.   18:15
17   Q. And, in fact, the FDA -- do you recall --   18:15
18 set forth exactly what was the basis for that in   18:15
19 this letter?   18:15
20      Do you see that?   18:15
21   A. Yes.   18:15
22   Q. And could you please read what the FDA   18:15
23 says about that.   18:15
24   A. [As read]:   18:15
25      "This warning letter summarizes   18:15

Page 324

1 significant deviations from current   18:16
2 good manufacturing practice, cGMP, for   18:16
3 active pharmaceutical ingredient API.   18:16
4 Because your methods, facilities, or   18:16
5 controls for manufacture, processing,   18:16
6 packaging, or holding do not conform to   18:16
7 cGMP, your API are adulterated within   18:16
8 the meaning of this   18:16
9 Section 501(a)(2)(b) of the Food, Drug,   18:16
10 and Cosmetic Act 21 USC 351(a)(2)(B)."   18:16
11 Which is what I referenced earlier.   18:16
12   Q. Right.   18:16
13      And am I correct that that statement, as   18:16
14 you have read it here today for us and the members   18:16
15 of the jury and the FDA's letter along with   18:16
16 everything else you have testified to about earlier,   18:16
17 are the bases for your opinion on whether the   18:16
18 factors establishing adulteration of Teva and   18:16
19 Torrent finished dose Valsartan product existed?   18:16
20   A. It is.   18:16
21      MR. STANOCH: Okay. Nothing further.   18:16
22      MS. ROSE: Victoria has a couple more questions,   18:17
23 but, Victoria, I defer to you.   18:17
24      MS. LOCKARD: One moment.   18:17
25   18:17

Page 325

1      FURTHER EXAMINATION   18:17
2 BY MS. LOCKARD:   18:17
3   Q. Okay. Mr. Russ, so now after   18:17
4 Mr. Stanoch's questioning, you are including the   18:17
5 basis for your opinion -- your new opinion in the   18:17
6 last hour that the Teva and Torrent products are   18:17
7 adulterated -- a new basis for that now at 6:17 at   18:17
8 the end of the day of this deposition is the FDA's   18:17
9 letter to ZHP indicating that ZHP's product was   18:17
10 adulterated because ZHP's facilities, methods, and   18:17
11 controls were lacking?   18:18
12      Is that your testimony?   18:18
13      MR. STANOCH: Objection to form.   18:18
14 Mischaracterizes the testimony. It's material   18:18
15 considered. The very first page of his report   18:18
16 discusses this.   18:18
17      Go ahead, Mr. Russ.   18:18
18      THE WITNESS: This just restates -- I do   18:18
19 consider this, and this just restates what the   18:18
20 regulation states. What -- what you just provided me   18:18
21 here states [witness indicates document].   18:18
22      I have also stated within my report   18:18
23 specifically [as read]:   18:18
24      "FDA found ZHP's valsartan API   18:18
25      adulterated (and accordingly Teva and   18:18

Veritext Legal Solutions
800-227-8440       973-410-4040

Page 326

1    Torrent finished dose product          18:18
2    incorporating that API.)"              18:18
3        I have already made this statement in my   18:18
4    expert report.                         18:18
5    BY MS. LOCKARD:                        18:18
6    Q.   So your testimony is that any API that was   18:18
7    made -- strike that.                   18:18
8        Your testimony is that any finished dose   18:18
9    that was made from Valsartan API is adulterated   18:18
10   because the API manufacturer received a letter from   18:18
11   FDA?                                   18:19
12       MR. STANOCH:  Objection to form.   18:19
13   Mischaracterizes the testimony.        18:19
14       THE WITNESS:  Not because they received a   18:19
15   letter, but because the material was adulterated.   18:19
16   BY MS. LOCKARD:                        18:19
17   Q.   According to whom?                 18:19
18   A.   It's not according to whom.  It's   18:19
19   according to the GMP compliance of that particular   18:19
20   material.  It has nothing to do with who identified   18:19
21   that.                                  18:19
22       It's reasonable for an industry       18:19
23   professional like myself to look at what material   18:19
24   was coming out of ZHP, Valsartan material, the   18:19
25   issues that arose, and that that material is   18:19

Page 327

1    adulterated.                           18:19
2        Whether FDA identified it as adulterated   18:19
3    or not would not change my viewpoint on whether that   18:19
4    material was adulterated.  I'm not using FDA's   18:19
5    statements or their letter.            18:19
6        I agree with their statements and their   18:19
7    letter, and I have considered those in my own   18:19
8    opinion.  But that's my own opinion.   18:19
9    Q.   So you are not relying on the letter to   18:19
10   FDA indicating -- excuse me.  Strike that.   18:20
11       You are not relying on the FDA letter to   18:20
12   ZHP indicating their products were deemed   18:20
13   adulterated in forming your opinion that Torrent and   18:20
14   Teva's products were adulterated.      18:20
15       MR. STANOCH:  Objection to form.   18:20
16   Mischaracterizes the testimony.  Misstates the report.   18:20
17   BY MS. LOCKARD:                        18:20
18   Q.   Is -- okay.  I'll rephrase.        18:20
19       Is --                              18:20
20   A.   I -- can I answer the question?    18:20
21       MR. STANOCH:  She --               18:20
22   BY MS. LOCKARD:                        18:20
23   Q.   Go ahead.                         18:20
24       MR. STANOCH:  She withdrew the question.   18:20
25       THE WITNESS:  Okay.                18:20

Page 328

1    BY MS. LOCKARD:                        18:20
2    Q.   I didn't withdraw the question.   18:20
3        MR. STANOCH:  Okay.                18:20
4    BY MS. LOCKARD:                        18:20
5    Q.   Go ahead.                         18:20
6    A.   I just wanted to say --           18:20
7        MR. STANOCH:  Same objections, though.   18:20
8        THE WITNESS:  -- not alone.  I considered   18:20
9    that report, I considered these letters, but it's not   18:20
10   the only consideration.                18:20
11       I have lots of industry experience.  I have   18:20
12   dealt with adulteration issues previously other than   18:20
13   this matter.                           18:20
14       Certainly, in my opinion, the problems with   18:20
15   ZHP material coming out of that facility raise to   18:20
16   level of GMP adulteration.             18:20
17       And the oversight issues that I have   18:20
18   identified in my report also cause -- and the fact   18:20
19   that this material was incorporated into finished   18:20
20   products also causes that to rise to the level of   18:21
21   adulteration.                          18:21
22       I have stated it clearly in my report.   18:21
23   Throughout the testimony I have also described what   18:21
24   methodology I have used in order to make that   18:21
25   determination.                         18:21

Page 329

1    BY MS. LOCKARD:                        18:21
2    Q.   So I want to be very clear about this.   18:21
3        If your opinion is that Teva's product is   18:21
4    adulterated because Teva failed to comply with   18:21
5    cGMPs, that's one thing, and we can talk about it.   18:21
6        If your opinion is that Teva's product is   18:21
7    adulterated because ZHP's supply was adulterated and   18:21
8    not based on any activity of Teva, that is a very   18:21
9    different issue.                       18:21
10       And that is what I am trying to         18:21
11   understand.  Is your opinion based in any way as to   18:21
12   Teva's product being adulterated -- is it based in   18:21
13   any way on the letter to ZHP indicating their   18:21
14   product was adulterated?               18:22
15       MR. STANOCH:  Objection to form.  Asked and   18:22
16   answered.  Mischaracterizes the testimony.   18:22
17       THE WITNESS:  I have considered both of   18:22
18   those things.                          18:22
19       And, again, I have stated in Paragraph 2   18:22
20   that, because FDA identified that, I considered that.   18:22
21   It's not the sole consideration.  I stated it in my   18:22
22   report.  It's right there.  Paragraph 2, last   18:22
23   sentence.                              18:22
24   BY MS. LOCKARD:                        18:22
25   Q.   Paragraph 2 of your report --      18:22

83 (Pages 326 - 329)

Page 330

1   A.  [As read]:                              18:22
2       "As a result of the FDA found ZHP's     18:22
3       valsartan" --                           18:22
4   Q.  Excuse me.  May I finish?               18:22
5   A.  -- "API adulterated...."                18:22
6       Yeah.  Sorry.                           18:22
7   Q.  The last sentence of Paragraph 2 says,  18:22
8  [as read]:                                   18:22
9       "I have also found that these           18:22
10      conditions existed prior -- years prior 18:22
11      to the eventual valsartan recalls       18:22
12      beginning in 2008 [verbatim]" --        18:22
13  A.  I apologize --                          18:22
14  Q.  -- "'18."                               18:22
15  A.  -- the second-to-the-last sentence.     18:22
16  Q.  Okay.  The second-to-the-last sentence --  18:23
17 let's just -- we'll just read from the -- from the  18:23
18 middle.                                      18:23
19  A.  Yeah.                                   18:23
20  Q.  [As read]:                              18:23
21      "As a consequence of the                18:23
22      contamination of ZHP's valsartan API    18:23
23      and the cGMP failures at ZHP, (as well  18:23
24      as Teva's and Torrent's own             18:23
25      cGMP-related failures), Teva's and      18:23

Page 331

1       Torrent's finished dose valsartan       18:23
2       products distributed and sold in the    18:23
3       United States were manufactured in a    18:23
4       way that was not cGMP compliant."       18:23
5   A.  Correct.                                18:23
6   Q.  [As read]:                              18:23
7       "As a result the FDA found ZHP's        18:23
8       valsartan API adulterated (and,         18:23
9       accordingly Teva and Torrent finished   18:23
10      dose product incorporate that API)."    18:23
11      The fact of the matter, though, Dr. -- or  18:24
12 Mr. Russ, is that FDA never found Teva and Torrent's  18:24
13 finished dose product incorporating that API to be  18:24
14 adulterated, did they?                       18:24
15  A.  And, again, I -- they haven't, that I am  18:24
16 aware, of in a statement.                    18:24
17      And, again, I have stated already in    18:24
18 testimony that is that their role to identify  18:24
19 what is adulterated or not.  It is -- that --  18:24
20 because we do not need to wait for FDA to say  18:24
21 something is adulterated to determine that it's  18:24
22 adulterated.                                 18:24
23      It is not FDA's role, in my experience or  18:24
24 opinion, that I need to wait for FDA to make a  18:24
25 statement.                                   18:24

Page 332

1       To me, based on what I have reviewed in  18:24
2 this report, it's clear to me that the --     18:24
3 incorporating this material into Teva and Torrent's  18:24
4 finished product makes that product adulterated.  I  18:24
5 have stated that here as a summary.           18:25
6       And I have stated that it's based on    18:25
7 violations of GMP associated with Torrent and Teva,  18:25
8 and that it's based on FDA statement around ZHP's  18:25
9 material.                                     18:25
10      That's my opinion.  And that is consistent  18:25
11 with how adulteration is identified in the industry.  18:25
12  Q.  You told us earlier today that the FDA   18:25
13 doesn't deem product adulterated.  That it is up to  18:25
14 the manufacturer to make that determination.  18:25
15  A.  Agreed.  It's their -- I am saying it's  18:25
16 not their role.  I don't need to wait on FDA to  18:25
17 determine something is adulterated.           18:25
18  Q.  But when FDA determines ZHP's product is  18:25
19 adulterated, that is burned and branded in this  18:25
20 case.  When FDA decides not to send a similar letter  18:25
21 to Teva, which they easily could have done knowing  18:25
22 all the facts in this case, having investigated this  18:25
23 problem sufficiently to the fact that they sent ZHP  18:25
24 a letter, then it's not FDA's role in that instance?  18:26
25      MR. STANOCH:  Objection to the form.     18:26

Page 333

1 Argumentative.  Incomplete hypothetical.      18:26
2       Go ahead.                               18:26
3       THE WITNESS:  I'll refer to recall then.  18:26
4  BY MS. LOCKARD:                              18:26
5   Q.  Oh.  Well, I don't --                   18:26
6   A.  Recalls -- recalls are voluntary --     18:26
7       MR. STANOCH:  He's answering the question --  18:26
8       THE WITNESS:  Let me answer.            18:26
9       Recalls are voluntary.  Teva and Torrent  18:26
10 decided to recall.  It's a voluntary recall.  They  18:26
11 were not forced through consent decree or through an  18:26
12 act of the court to recall products.  They recalled  18:26
13 products because they agreed that their products  18:26
14 should not be on the market and were adulterated.  18:26
15      When I recall a product voluntarily, that to  18:26
16 me says that there were GMP compliance concerns or  18:26
17 specific SISPQ, strength, identity types of issues  18:26
18 that would cause me to recall a product voluntarily.  18:26
19 That means that I agree that this product is  18:26
20 adulterated.                                 18:26
21  BY MS. LOCKARD:                             18:26
22  Q.  So any product that is voluntarily --   18:26
23 voluntarily recalled in the U.S. is therefore  18:27
24 adulterated?                                 18:27
25      MR. STANOCH:  Objection to form.        18:27

84 (Pages 330 - 333)

Page 334

1 Mischaracterizes testimony.                              18:27
2         THE WITNESS:  If it's being recalled for a   18:27
3 GMP issue, then that GMP issue rose to the level of   18:27
4 product adulteration where I need to remove this      18:27
5 product from the market.                               18:27
6 BY MS. LOCKARD:                                        18:27
7     Q.  Did you see in the FDA notices regarding    18:27
8 their nitrosamine investigation that I showed you    18:27
9 today or in the -- in the recall notices that FDA    18:27
10 issued, where FDA instructed patients to continue    18:27
11 taking their medication?                              18:27
12     A.  I -- I didn't necessarily see that.  And I  18:27
13 don't see how that is germane to my opinion that is  18:27
14 stated here in Paragraph 2.                           18:27
15         This is what I have determined              18:27
16 adulteration in Paragraph 2.  It has nothing to do   18:27
17 alone with what FDA says.  It's an input.  FDA's     18:27
18 consideration is an input for my determination of    18:28
19 whether I believe this to be adulterated.  It's an   18:28
20 input, whether FDA says it or not.                    18:28
21         If FDA did not give a statement to ZHP       18:28
22 about their adulteration, I would still consider      18:28
23 ZHP's material adulterated, and Teva and Torrent's   18:28
24 material adulterated.                                 18:28
25     Q.  But under your theory of this case, FDA      18:28

Page 335

1 told patients in the United States to continue       18:28
2 taking adulterated medication contaminated with      18:28
3 impurities?  That's -- that's consistent with your   18:28
4 opinion.                                              18:28
5         MR. STANOCH:  Objection to form.  Misstates  18:28
6 his opinion, testimony.                               18:28
7         THE WITNESS:  I never made any assertion to  18:28
8 that.  During testimony or in my expert report.      18:28
9 BY MS. LOCKARD:                                       18:28
10     Q.  Well, you know that FDA told the general    18:28
11 public to continue taking Valsartan medication when  18:28
12 the recall was announced.  You saw that, surely, in  18:28
13 the documents you read?                              18:29
14     A.  I, again, don't have any opinion in my      18:29
15 report or in this testimony about the validity of    18:29
16 that comment from the FDA.                            18:29
17         It's not my place to make a statement       18:29
18 there.  I haven't made any statements about any of   18:29
19 that.                                                18:29
20     Q.  You never worked at the FDA, have you?      18:29
21     A.  No, I have not.                              18:29
22     Q.  You have never been hired as a consultant   18:29
23 for the FDA?                                          18:29
24         MR. STANOCH:  Objection.  Beyond the scope  18:29
25 of the recross.                                      18:29

Page 336

1         But go ahead.                                18:29
2         THE WITNESS:  No, I haven't.                 18:29
3         MS. LOCKARD:  He's talking about the         18:29
4 intentions of the FDA and what the FDA does and thinks 18:29
5 when they make announcements, when they, you know,   18:29
6 work with a company and voluntarily recalling a      18:29
7 product, when they deem something to be adulterated, 18:29
8 when they choose not to deem something to be         18:29
9 adulterated.                                          18:29
10         He's stepping into the shoes of the FDA.  I 18:29
11 just want to know what experience he has.            18:29
12         THE WITNESS:  I -- I --                      18:29
13         MR. STANOCH:  Hold on.  Hold on.  Hold on.  18:29
14         Objection to the colloquy.  Objection that  18:30
15 he is doing anything of the sort of saying what FDA  18:30
16 thinks.  Mischaracterizes testimony.                 18:30
17         But if you want the repeat the question, Ms. 18:30
18 Lockard, go ahead.  My objection stands.             18:30
19         THE WITNESS:  I could just state that       18:30
20 this -- this statement --                            18:30
21         MR. STANOCH:  Wait.  Wait until she asks a  18:30
22 question.                                             18:30
23         I think your question was something along   18:30
24 the lines of "Have you consult with the FDA" or      18:30
25 something.                                            18:30

Page 337

1         Right?                                       18:30
2 BY MS. LOCKARD:                                       18:30
3     Q.  You have never been hired as a consultant   18:30
4 for the FDA?                                          18:30
5         MR. STANOCH:  Same objections.               18:30
6         Go ahead.                                    18:30
7         THE WITNESS:  No.                             18:30
8 BY MS. LOCKARD:                                       18:30
9     Q.  You have never been invited to give any     18:30
10 presentations at the FDA or for any FDA committees;  18:30
11 correct?                                              18:30
12     A.  No.                                          18:30
13         MR. STANOCH:  Same objections.               18:30
14 BY MS. LOCKARD:                                       18:30
15     Q.  Have you ever applied for a job at the      18:30
16 FDA?                                                  18:30
17         MR. STANOCH:  Same objections.               18:30
18         THE WITNESS:  No.                             18:30
19 BY MS. LOCKARD:                                       18:30
20     Q.  Have you ever authored any papers in        18:30
21 connection with anyone who works at the FDA?         18:30
22         MR. STANOCH:  Same objections.               18:30
23         THE WITNESS:  No.                             18:30
24         MR. HONIK:  We went through this eight hours 18:30
25 ago.                                                 18:30

85 (Pages 334 - 337)

Page 338

1    MS. LOCKARD: I did not ask that    18:30
2  question eight hours ago. I very specifically did    18:30
3  not.    18:31
4  BY MS. LOCKARD:    18:31
5    Q. Have you ever consulted with anybody from    18:31
6  the FDA about the circumstances or the facts of this    18:31
7  case?    18:31
8    MR. STANOCH: Same objection. Well beyond    18:31
9  the scope of recross. And asked and answered in terms    18:31
10 of experience.    18:31
11    Go ahead.    18:31
12    THE WITNESS: No.    18:31
13 BY MS. LOCKARD:    18:31
14    Q. What is your bases for your opinions today    18:31
15 about what the FDA does, thinks, decides, and why?    18:31
16    MR. STANOCH: Objection. Mischaracterizes    18:31
17 testimony and opinions. Never testified any of those    18:31
18 things.    18:31
19    THE WITNESS: I'll restate it again.    18:31
20    This, in Paragraph 2, is my opinion, and    18:31
21 that input from FDA is considered. I have made no    18:31
22 statements about FDA's behaviors, their actions, or    18:31
23 decisions in my report or in the testimony.    18:31
24 BY MS. LOCKARD:    18:31
25    Q. So you don't intend to testify at trial as    18:31

Page 339

1  to any motivations by FDA or reasons why FDA chose    18:31
2  not to issue a letter to Teva deeming its products    18:31
3  adulterated?    18:32
4    MR. STANOCH: Objection to form. Beyond the    18:32
5  scope of the recross and cross. And also improper    18:32
6  because it's asking this witness what he may testify    18:32
7  to at trial at some indeterminant point in time.    18:32
8    If you can answer, Mr. Russ, go ahead.    18:32
9    MS. LOCKARD: Well, I'll respond to that    18:32
10 objection because we have been told this case is    18:32
11 getting ready for trial in early summer.    18:32
12    MR. STANOCH: What is the date certain,    18:32
13 Counsel?    18:32
14    MS. LOCKARD: I also am here to get the    18:32
15 benefit of this witness's opinions, and today is the    18:32
16 day to understand what he will be testifying to at    18:32
17 trial. That is the point of the deposition.    18:32
18    MR. STANOCH: He doesn't decide what he    18:32
19 testifies to at trial. I do. He's my witness.    18:32
20    You can answer, if you can answer.    18:32
21    MS. LOCKARD: Well, that is certainly true    18:32
22 if you want to feed into the opinions, but I think I'm    18:32
23 entitled to ask him what his opinions are today.    18:32
24    THE WITNESS: My opinion is in Paragraph 2.    18:32
25 That's my opinion. I wrote this. FDA didn't write    18:32

Page 340

1  this. I didn't refer to FDA, necessarily. I used an    18:32
2  input from FDA. I use inputs from FDA when I do all    18:33
3  kinds of evaluations for audits, as it may be.    18:33
4    But I make no statements about regulatory or    18:33
5  enforcement actions of FDA. That is not my role. My    18:33
6  role here is exactly -- my opinion in this case that I    18:33
7  would offer at trial is in Paragraph 2.    18:33
8  BY MS. LOCKARD:    18:33
9    Q. Because it would be outside your expertise    18:33
10 to testify about what the FDA would do or why they    18:33
11 took certain actions in this case; right?    18:33
12    MR. STANOCH: Objection to form.    18:33
13    THE WITNESS: It would be -- yes,    18:33
14 absolutely. And I have made no statements to that    18:33
15 effect.    18:33
16 BY MS. LOCKARD:    18:33
17    Q. Okay. So you will not be offering any    18:33
18 opinion that the reason that FDA didn't issue a    18:33
19 letter determining Teva's product to be adulterated    18:33
20 was because they are too busy; they lack the    18:33
21 resources; they only have, you know, so many hours    18:33
22 in the day; anything like that?    18:33
23    MR. STANOCH: Well --    18:33
24 BY MS. LOCKARD:    18:33
25    Q. You won't be saying anything like that;    18:33

Page 341

1  correct?    18:34
2    MR. STANOCH: Objection to form. Beyond the    18:34
3  scope. Asked and answered from hours ago about    18:34
4  resources and other things, which I know were    18:34
5  discussed. Also vague and ambiguous. And    18:34
6  argumentative.    18:34
7    But go ahead, Mr. Russ.    18:34
8    THE WITNESS: No.    18:34
9    MS. LOCKARD: Thank you. No more questions.    18:34
10    MS. ROSE: ZHP has a couple of questions.    18:34
11
12    FURTHER EXAMINATION    18:34
13 BY MS. ROSE:    18:34
14    Q. Mr. Russ, is -- you testified several    18:34
15 times that you do not intend to offer any opinions    18:34
16 about ZHP or its cGMP compliance; correct?    18:34
17    A. Correct.    18:34
18    Q. Do you intend to offer the opinion at    18:34
19 trial that Valsartan API was adulterated at the time    18:34
20 of sale?    18:34
21    A. I do. It's stated in my report in    18:34
22 Paragraph 2.    18:34
23    Q. And what is -- strike that.    18:34
24    You stated at the deposition that the    18:34
25 relevance standard for adulteration turns on    18:34

86 (Pages 338 - 341)

Page 342

1 conformity with cGMP; correct?    18:34
2     MR. STANOCH: Objection. Form.    18:34
3     Go ahead.    18:34
4     THE WITNESS: It does. It -- it relates to  18:35
5 351 in the statute definitions of adulteration.    18:35
6 BY MS. ROSE:    18:35
7     Q. And you stated that you do not intend to   18:35
8 offer any opinions that ZHP did not comply with    18:35
9 cGMP; correct?    18:35
10     A. I have stated that several times.    18:35
11     Q. Okay. I'm just trying to reconcile how    18:35
12 you intend to offer the opinion that Valsartan API   18:35
13 was adulterated at the time of sale when you are not  18:35
14 offering any opinion regarding ZHP's compliance with  18:35
15 cGMP if adulteration is tied to cGMP violations.    18:35
16     MR. STANOCH: Objection to form. That's   18:35
17 unintelligible.    18:35
18     THE WITNESS: I -- as I have said, I stated  18:35
19 my opinion in Paragraph 2. I don't know how many   18:35
20 other ways I can tell you what I would attest to or   18:35
21 testify to at trial. It's listed there in writing.   18:36
22 BY MS. ROSE:    18:36
23     Q. What is the basis for your opinion that    18:36
24 ZHP's Valsartan API was adulterated at the time of   18:36
25 sale?    18:36

Page 343

1     MR. STANOCH: Objection to form. Misstates  18:36
2 prior testimony.    18:36
3     THE WITNESS: It was identified to have a   18:36
4 genotoxic impurity. For me, that is adulterated   18:36
5 product. Period. End of sentence. No further    18:36
6 discussion or evaluation needed.    18:36
7 BY MS. ROSE:    18:36
8     Q. So the entirety of your opinion is that    18:36
9 Valsartan API manufactured by ZHP was adulterated at  18:36
10 the time of sale because it contained what you call   18:36
11 a genotoxic impurity and that's it? That is the    18:36
12 entire basis of your opinion?    18:36
13     MR. STANOCH: Objection to form. Misstates  18:36
14 the testimony and the report. We have talked now for  18:36
15 15 minutes about Paragraph 2 and et cetera.    18:36
16     But go ahead.    18:37
17     THE WITNESS: Yes.    18:37
18 BY MS. ROSE:    18:37
19     Q. Okay. I just want to be clear because    18:37
20 Paragraph 2 refers to the FDA finding that ZHP    18:37
21 Valsartan API was adulterated, which, as you stated  18:37
22 earlier, was the warning letter to the ZHP which was  18:37
23 issued after May of 2018; correct?    18:37
24     A. Correct.    18:37
25     Q. Beyond that one statement in Paragraph 2,  18:37

Page 344

1 I just want to know where else in your report did    18:37
2 you analyze the adulteration of ZHP's Valsartan API?  18:37
3     A. I do not. It's the only statement.    18:37
4     Q. I'm sorry?    18:37
5     A. I do not. It's the only statement as it    18:37
6 relates to Teva and Torrent's products, which is    18:37
7 what the subject of my report is on.    18:37
8     Q. Okay. And I'm not trying to beat a dead   18:37
9 horse. I really just want to make sure we    18:37
10 understand what your opinions are with respect to    18:38
11 ZHP.    18:38
12     If there is no analysis in your report    18:38
13 regarding the basis for an opinion that ZHP's API    18:38
14 was adulterated at the time of sale beyond the one   18:38
15 statement in Paragraph 2 stating that FDA found    18:38
16 ZHP's Valsartan API adulterated; is that correct?    18:38
17     MR. STANOCH: Objection. Form. Asked an    18:38
18 answered. Mischaracterizes testimony and the report.  18:38
19     Go ahead, if you can.    18:38
20     THE WITNESS: Yes.    18:38
21 BY MS. ROSE:    18:38
22     Q. To be clear, "Yes," that is the entire    18:38
23 basis for that opinion?    18:38
24     MR. STANOCH: Same objections.    18:38
25 ///

Page 345

1     THE WITNESS: It is.    18:38
2 BY MS. ROSE:    18:38
3     Q. And you performed no other analysis of ZHP  18:38
4 or its cGMP compliance?    18:38
5     A. You have already identified that I have   18:38
6 not done so. And, no, I have not.    18:38
7     Q. And you have done no other analysis of    18:38
8 whether ZHP's Valsartan API was adulterated;    18:38
9 correct?    18:38
10     A. Correct.    18:39
11     MS. ROSE: Thank you. No other questions.   18:39
12     MR. STANOCH: Okay. I have nothing. Thank  18:39
13 you, Mr. Russ.    18:39
14     THE WITNESS: Thank you.    18:39
15     THE REPORTER: And that is Exhibit 25?    18:39
16     MS. LOCKARD: Yes.    18:39
17     Before we go off the record --    18:39
18     MR. STANOCH: Yeah. That's fine.    18:39
19     MS. LOCKARD: Just a matter of housekeeping.  18:39
20 So we would like to mark this as Exhibit 25 because   18:39
21 there's a gap.    18:39
22     MR. STANOCH: Fine.    18:39
23     MS. LOCKARD: And this is the    18:39
24 acknowledgement and agreement we bound by the    18:39
25 protective order that is signed by the witness.    18:39

Page 346

1     MR. STANOCH: I'll just state for the record  18:39
2  that Mr. Russ had signed it before, but we didn't have  18:39
3  a physical copy of it; so he graciously resigned it    18:39
4  again today to make the record complete.   18:39
5     Thank you.   18:39
6     MS. LOCKARD: No problem. As long as he   18:39
7  complies.   18:39
8     (Deposition Exhibit 25 was marked for   18:39
9     identification and is attached hereto.)   18:39
10    THE VIDEOGRAPHER: Okay. This will conclude  18:39
11 today's video deposition. The time is approximately  18:39
12 6:40 p.m.   18:39
13    We're off the record.   18:39
14    (The following record was transcribed   18:39
15    stenographically only with no video   18:39
16    recording.)   18:39
17    THE REPORTER: Back on the record.   18:40
18    MR. STANOCH: Yeah. Back on the record.   18:40
19    We will read and sign.   18:40
20    Thank you.   18:40
21    THE REPORTER: Okay.   18:40
22    (Whereupon, at 6:40 p.m., the deposition
23    of PHILIP JAMES RUSS was adjourned.)
24        --- oOo ---
25

Page 347

1  STATE OF CALIFORNIA            )
2  COUNTY OF LOS ANGELES          ) SS.
3
4      I, Dayna Hester, C.S.R. No. 9970, in
5  and for the State of California, do hereby certify:
6      That, prior to being examined, the witness
7  named in the foregoing deposition was by me duly sworn
8  to testify to the truth, the whole truth, and nothing
9  but the truth;
10     That said deposition was taken down by me in
11 shorthand at the time and place therein named and
12 thereafter reduced to typewriting under my direction,
13 and the same is a true, correct, and complete
14 transcript of said proceedings;
15     That if the foregoing pertains to the
16 original transcript of a deposition in a Federal Case,
17 before completion of the proceedings, review of the
18 transcript { } was { } was not required;
19     I further certify that I am not interested
20 in the event of the action.
21     Witness my hand this 10 day of
22 January
23
24     Certified Shorthand Reporter
25     for the State of California

Page 348

1  DAVID J. STANOCH, ESQ.
2  D.STANOCH@KANNER-LAW.COM
3        January 10, 2023
4  RE: In Re: Valsartan, Losartan, Et Al v.
5     1/5/2023, Philip James Russ (#5648472)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com
16
17 Return completed errata within 30 days from
18 receipt of testimony.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 349

1  In Re: Valsartan, Losartan, Et Al v.
2  Philip James Russ (#5648472)
3      E R R A T A  S H E E T
4  PAGE____ LINE____ CHANGE_____
5  _____
6  REASON_____
7  PAGE____ LINE____ CHANGE_____
8  _____
9  REASON_____
10 PAGE____ LINE____ CHANGE_____
11 _____
12 REASON_____
13 PAGE____ LINE____ CHANGE_____
14 _____
15 REASON_____
16 PAGE____ LINE____ CHANGE_____
17 _____
18 REASON_____
19 PAGE____ LINE____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Philip James Russ            Date
25

88 (Pages 346 - 349)

Page 350

1  In Re: Valsartan, Losartan, Et Al v.

2  Philip James Russ (#5648472)

3           ACKNOWLEDGEMENT OF DEPONENT

4    I, Philip James Russ, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____ _____

12  Philip James Russ          Date

13  *If notary is required

14           SUBSCRIBED AND SWORN TO BEFORE ME THIS

15           _____ DAY OF _____, 20___.

16

17

18           _____

19           NOTARY PUBLIC

20

21

22

23

24

25

89 (Page 350)

[& - 155]

| & | | | |
|---|---|---|---|
| **&** 2:10,21 3:8 | **0027** 11:8 | **1000** 4:5 | **118** 288:18,25 |
| 3:13 4:17 5:2,3 | **0028** 11:10 | **10022** 5:6 | 293:9,23 |
| 5:11,15 6:3,14 | **0030** 11:13 | **103** 2:22 | 295:18 296:21 |
| 7:3 9:5 13:14 | **0031** 11:15 | **105** 311:5 | **119** 289:5 301:1 |
| 242:10 243:7 | **0032** 11:16 | **106** 275:12 | **12** 9:23 10:11 |

| 0 | | | |
|---|---|---|---|
| **0.016.** 233:5 | **01** 8:22 | 277:8 280:8,11 | 32:16 72:11 |
| **0001** 8:20 | **0139** 8:20 | 280:18,22 | 158:14,15 |
| **0001.pdf** 10:6 | **02** 9:7 | 281:9 282:15 | 214:10 229:18 |
| **0002** 8:22 | **02109** 6:5 | 282:16 286:5,8 | 293:19 |
| **0003** 9:3 | **03** 233:24 | 310:11 312:21 | **120** 289:7 |
| **0004** 9:4 | **05** 9:4 175:2 | 313:7 | 290:22 |
| **0005** 9:7 | 233:25 234:3 | **107** 271:25 | **121** 9:17 |
| **0006** 9:9 | **06** 9:11 | 272:5 273:18 | **12212** 4:19 |
| **0007** 9:11 | **07** 9:12 | **108** 244:8 | **12:27** 149:6,7 |
| **0008** 9:12 | **07068** 2:23 | 265:12 267:13 | **12th** 65:12 |
| **0009** 9:14 | **07701** 6:11 | 268:7,13 | 298:14 299:1 |

| | 1 | **10961** 292:23 | **13** 10:3 72:12 |
|---|---|---|---|
| **0010** 9:17 | | **1099** 47:4 64:10 | 159:23,24 |
| **0011** 9:20 | **1** 8:20,20 12:13 | **10:41** 72:7 | 161:7 229:19 |
| **0012** 9:23 | 17:25 18:2 | **11** 9:20 10:9 | 294:7 |
| **0013** 10:3 | 20:3 69:25 | 11:23 72:10 | **14** 10:4 72:13 |
| **0014** 10:4 | 72:1 134:1,1 | 155:4,5 176:16 | 74:21 161:8,9 |
| **0015** 10:6 | 170:10,14,17 | 229:16 294:10 | 161:11 221:16 |
| **0016** 10:7 | 170:22 186:13 | 294:11 316:4 | 229:20 |
| **0017** 10:9 | 223:22 224:16 | **110** 3:9 | **1440** 5:12 |
| **0018** 10:11 | 224:17,18,19 | **1100** 2:17 | **15** 8:4 10:6,14 |
| **0019** 10:14 | 224:23 225:1,1 | **112** 254:17 | 72:14 162:9,10 |
| **0020** 10:16 | **1/5/2023** 348:5 | 257:8 | 162:11 209:1,5 |
| **0021** 10:18 | **10** 9:17 10:7 | **113** 258:12 | 343:15 |
| **0022** 10:20 | 32:1 72:9 | 260:2,14 | **150** 8:5 |
| **0023** 10:23 | 121:12,13,14 | **114** 263:25 | **15141** 4:19 |
| **0024** 11:3 | 121:15 168:22 | **115** 289:7 | **1515** 2:17 |
| **0026** 11:6 | 313:24 347:21 | 290:21 | **15219** 7:6 |
| | 348:3 | **116** 293:9,22 | **155** 9:20 |
| | **100,000** 253:17 | 295:18 296:20 | |

**158** 9:23
**159** 10:3
**16** 10:7,16
  72:15 169:17
  169:18
**16,100** 67:3
**161** 10:4
**162** 10:6
**169** 10:7
**16th** 44:10 49:7
  53:12
**17** 10:9 72:16
  155:9 173:3,4,5
**1701** 7:11
**173** 10:9
**18** 8:20 10:11
  72:17 180:22
  180:23,24
  330:14
**180** 10:11
**1800law1010...**
  4:20
**182** 10:14
**183** 10:16
**1840** 2:3 12:19
**185** 10:18
**18516** 347:23
**18th** 209:19
  297:5
**19** 10:14 72:18
  182:5 271:25
**1900** 2:3
**19102** 2:18
**19103-2921**
  7:11

**194** 10:20
**1970s** 206:10
**1995** 36:3,5
**19th** 12:19
**1:36** 149:9
  150:3,6
**1d** 295:13
  296:17,18
  298:7
**1st** 67:3

---

**2**

**2** 6:10 8:22
  19:14 20:4,5,9
  65:11 72:2
  81:13 157:7,8
  170:1 173:16
  173:23,25
  174:12 183:15
  198:6,19
  221:18 230:8
  230:11 231:6
  263:1,12
  270:12 324:9
  324:10 329:19
  329:22,25
  330:7 334:14
  334:16 338:20
  339:24 340:7
  341:22 342:19
  343:15,20,25
  344:15
**20** 8:22 10:16
  72:19 183:1
  245:17 246:11
  250:15 350:15

**200** 4:13
**2000** 57:7
**20005** 5:13
**2006** 10:16 57:7
  59:15
**2008** 42:3,7
  46:22,23 59:15
  330:12
**2010** 212:10
  311:4 312:13
**2011** 158:25
  209:10
**2012** 209:19
**2014** 221:16,16
  230:8,12 231:6
**2015** 301:6
  302:17
**2016** 160:6,12
  298:1,14 299:1
**2017** 297:5
**2018** 10:18
  11:23 186:5
  309:3,8,13,21
  323:6 343:23
**2019** 10:21
  194:12
**2019.06.26** 8:20
**202** 5:13
**2021.06.05-6**
  11:13
**2021.06.0526**
  247:15
**2022** 44:10,14
  66:24 67:3

**2022.06.16** 9:9
**2022.10.31** 9:7
  9:13
**2022.12.15** 8:22
**2023** 1:17 2:2
  12:2,6 150:2
  347:22 348:3
**2023.01.02** 9:5
**20264** 211:8
**20279** 160:2
**20th** 203:25
  204:5 298:1
**21** 10:18 72:20
  124:4 125:1
  136:15 185:22
  185:23 198:6
  236:19 263:1
  263:12 270:12
  273:14 318:6
  320:10 324:10
**210** 10:23 124:4
  125:13 271:8
**210/211** 125:1
  136:15 273:14
**211** 6:10 11:3
  124:4 125:13
  270:12 271:8
**211.84** 198:6,19
  236:20 263:1
  263:12
**212** 5:6 158:19
**213-7000** 6:5
**215** 7:12
**2157** 15:20,24

**[22 - 46]**                                                           Page 3

**22**   9:3 10:20
   72:21 194:3,4,5
**220**   11:6,8
**2204**   8:22
**221115.pdf**
   10:8,10
**221117.pdf**
   10:13
**2213**   161:14
**2220**   5:18
**227**   6:16
**228**   11:10
**228-9898**   2:23
**23**   10:23 72:22
   75:19 210:1,2
   210:21
**230**   5:18
**24**   11:3 72:23
   78:9 80:16
   211:5,7,9,19
   212:9,10
   247:24
**243**   8:6
**246023**   226:12
**247**   11:13
**25**   10:21 11:5,5
   69:9 72:25
   316:9 345:15
   345:20 346:8
**2500**   4:13
**2525**   4:5
**25th**   194:12
**26**   11:6 220:4,5
   220:17

**260**   3:4
**263-4397**   7:6
**267**   2:18
**27**   11:8 220:18
   220:19 221:5
   295:25
**27th**   6:4
**28**   11:10 227:25
   228:1,6 284:13
**28202**   6:17
**287**   228:8
**2875**   1:5
**287859**   227:5
   227:11 228:9
   231:22
**287879**   227:7
**29**   11:12,23
   68:1 295:24
**293**   11:15
**297**   11:16
**29th**   56:14
   66:24 323:6
**2:45**   208:18

**3**

**3**   9:3 22:1,2
   25:16 72:3
   74:22 159:10
   159:11,14
   181:9 182:20
   186:13 194:19
**30**   1:15 10:18
   11:13 14:14,18
   65:12 69:9
   108:13 110:1
   247:9,16,17

   306:8 348:17
**30,800**   66:21
**301**   7:5
**30305**   4:14
**305**   4:6
**306**   8:7
**30s**   110:17
**30th**   186:5
**31**   9:4 10:6
   11:15 233:18
   293:3,5 298:4
   298:10
**31,400**   66:24
**312-566-4808**
   5:19
**314**   8:8,9
**316**   3:16 11:18
**318**   11:20
**32**   10:3 11:16
   296:25 297:1
   298:12 300:15
**322**   8:10
**323**   11:22
**325**   8:11
**32501**   3:16
**33**   9:23 11:18
   11:18 316:9,10
   316:11
**33134**   4:6
**3333**   4:13
**34**   10:4 11:20
   11:20 318:10
   318:11,12
**341**   8:12

**346**   11:5
**35**   9:7 11:22,22
   294:11 295:25
   323:2
**350**   53:15
**351**   11:20 318:6
   319:3 320:10
   324:10 342:5
**37**   80:19
**371-7105**   5:13
**38**   10:23 247:21
**385-5400**   3:5
**38th**   7:5
**39**   11:6
**390-4210**   5:6
**3:18**   208:21
**3:58**   242:24
**3rd**   209:19
   219:19

**4**

**4**   9:4 30:25
   31:5 72:4,9
   159:7 232:17
   247:25
**400**   53:15,25
**412**   7:6
**43**   9:9
**435-1300**   2:18
**435-7013**   3:17
**4362**   296:24
**44**   10:8,10,12
**444-3475**   6:17
**445-2500**   4:6
**46**   68:8 122:4

**48**  261:14
**483**  102:13,22
  103:8,24 104:1
  104:17 108:9
  113:9,11,25
  118:13,16
  119:9
**483s**  106:5
  119:16
**49**  267:21
  268:19
**4:00**  243:2

**5**

**5**  1:17 2:2 9:7
  9:10 12:2
  14:14,18 35:10
  35:11 72:5
  150:2,6 192:14
  223:10
**501**  324:9
**502**  247:22,24
**503**  247:22,24
**504**  2:13
**50662**  209:24
**518**  4:20
**5201**  3:9
**524-5777**  2:13
**53**  6:4
**553-2100**  4:14
**563-6250**  3:10
**5648472**  1:24
  348:5 349:2
  350:2
**566685**  11:23

**57**  297:19
**59**  227:8
**5:25**  305:20
**5:43**  307:15
**5:45**  307:18
**5:52**  305:23
  313:21
**5:59**  313:24
**5b**  10:18,20
**5bmdl2875**
  8:23
**5bruss**  9:5
**5d**  10:18,21
**5d.pdf**  8:23 9:6
  9:10,11
**5th**  12:6

**6**

**6**  9:9 20:14
  43:21,24 63:1
  72:6 194:19
  208:21 232:5
  232:15,15,15
  232:17
**60**  176:13,17,18
  176:20
**600**  3:16 6:16
**601**  5:5
**60606**  5:18
**617**  6:5
**63**  9:11
**64**  232:15
**650969-14-0...**
  231:1
**66205**  3:10

**66210**  3:5
**678**  4:14
**69**  67:14,17
  68:20
**6:01**  316:1
**6:07**  316:4
**6:17**  325:7
**6:40**  346:12,22

**7**

**7**  9:11 63:2,3,7
  72:7 192:14
  219:16 243:2
**7/12/2016**  300:7
  300:17
**70**  231:25
**701**  2:12
**70130**  2:13
**704**  6:17
**707**  14:15
**72**  9:12
**724-2207**  4:20
**732**  6:11
**78,300**  67:6
**79**  227:8

**8**

**8**  9:12 72:7,10
  72:12 81:4
  122:3 210:23
  214:10 230:7,9
  244:8
**81**  9:14
**8101**  3:4
**84**  236:19
  270:12

**85**  209:5
**850**  3:17
**86**  209:6,13
**87**  210:10

**9**

**9**  9:14 72:8
  81:5,6,7 98:22
  98:25 168:10
  230:9,16
**913**  3:5,10
**924-8171**  6:11
**963-4824**  7:12
**973**  2:23
**99.42.**  232:19
**99.5.**  232:21
**99.67**  229:7
**9970**  1:25 2:5
  347:4
**9:23**  14:5
**9:47**  31:18

**a**

**a.m.**  2:2 12:2,5
  14:5,8 31:15,18
  72:6,8
**abalos**  7:15
  12:21
**abbott**  37:18
  38:12,17
**ability**  178:10
  190:13 304:1
  312:23
**able**  67:12
  79:17 84:21
  87:9 101:24

190:14 208:12
264:7
**above** 26:16
348:6 350:7
**abroad** 145:21
145:25 146:10
146:22,25
147:12,14,15
148:3,15
**absence** 51:11
52:19 91:9
165:15 166:11
**absent** 164:13
**absolute** 130:3
**absolutely**
18:19 75:14
147:13 340:14
**absorbance**
228:24 237:12
239:18 240:5
**absorbances**
239:8
**absorbed** 58:23
**abstracts** 36:11
**academic** 36:5
36:8
**accept** 277:12
278:6 279:12
280:24
**acceptable**
170:14 174:1,7
174:8 212:18
235:2
**acceptance**
170:2 173:16

174:23 181:10
181:11 201:22
**accepted**
205:21,22
**accepting**
278:19 279:1
280:4,15
**accepts** 124:6
183:25
**access** 25:8
191:8
**accessed** 10:8
10:10,13
**accolades** 61:17
**accomplish**
286:12
**accordance**
216:20
**accounting**
67:16
**accuracy** 348:9
**accurate**
201:24
**accused** 198:19
**achieved**
276:17
**acknowledge**
14:12 77:14
78:6 91:23
112:6 297:6
**acknowledge...**
345:24 350:3
**acknowledg...**
348:12

**acquisitions**
58:20
**act** 87:25 125:2
172:8 324:10
333:12
**actavis** 4:9,9
58:18,22,22,24
160:6,20,25
209:15,18,20
**acting** 116:2
129:17
**action** 13:1
27:18 99:14
100:3,8 101:18
106:11 107:24
171:2 210:6,6
211:1,17,22
213:1 214:9,10
214:18,24
215:2,3,4,5,7
215:11,18
217:3 218:23
218:25 219:14
265:21 267:4
301:16 303:8
303:10 304:1
305:5,10,11
347:20
**actions** 40:25
99:2 107:12
210:11 244:10
260:21 265:14
266:3,5,11
267:16 268:17
269:9 304:20

304:24 338:22
340:5,11
**active** 129:6
186:25 324:3
**activities**
116:15,16
117:1 119:15
155:17 156:18
318:4
**activity** 104:15
106:16,22
107:15 119:9
120:24 290:2
329:8
**actual** 26:12
77:9 134:3
139:4,9 144:20
167:1 225:21
236:24 237:22
240:25 241:7
243:21 254:11
**actuality**
113:10
**actually** 22:10
22:19 24:15,24
25:2,20 34:24
35:2 55:11
68:2 123:10
125:14 129:12
133:1 140:2,11
151:12 152:21
164:15 207:19
212:25 219:15
219:25 224:23
239:25 246:19

[actually - agree]                                                    Page 6

| | | | |
|---|---|---|---|
| 249:6 251:11 | **administration** | 342:24 343:4,9 | **affect** 105:19 |
| 256:4 294:7 | 16:5 | 343:21 344:14 | 178:10 210:13 |
| **add** 67:11 84:9 | **adopt** 124:11 | 344:16 345:8 | **affected** 283:2 |
| 209:19 | 124:18 | **adulteration** | **affects** 283:8,16 |
| **added** 28:25 | **adulterated** | 81:23 82:20 | **affidavit** 18:7 |
| 78:21 257:13 | 11:20 82:14,19 | 84:13 85:8,13 | **affiliated** 37:15 |
| **adding** 151:8 | 82:21 83:3 | 85:19,20 86:14 | 38:7,9 |
| **addition** 73:14 | 84:25 85:4,6 | 87:13,19,21,23 | **affiliation** 46:2 |
| **additional** | 88:18 89:25 | 88:3,4,7,9,14 | 58:18 |
| 14:17 29:9 | 90:10,20,24 | 89:2,7,12,21 | **affiliations** 13:6 |
| 31:24 33:2,12 | 91:7,9,14,17,25 | 90:3,15,17 91:3 | 48:20 |
| 33:14 34:7,8 | 92:5,9,21,25 | 93:16,19,22 | **affirm** 15:3 |
| 81:11 151:2,4 | 93:2,5 94:9,14 | 94:6 95:1,18,25 | **afford** 275:15 |
| 209:17 | 94:16,17,22 | 96:5,15 101:7 | **agency** 157:21 |
| **additionally** | 95:5,12,15,23 | 103:15 131:13 | 187:12 316:18 |
| 14:22 | 96:7 97:6,8,14 | 314:6,12 | 316:25 317:7 |
| **additions** 350:6 | 97:17,22 101:5 | 315:12 317:11 | **agency's** |
| **address** 14:15 | 314:13,14,17 | 317:16,18,20 | 194:10 |
| 15:19 194:10 | 314:25 315:6 | 317:24 318:4 | **agitate** 283:20 |
| 199:1 303:8 | 315:10,13,17 | 318:21,23 | **ago** 37:14 42:4 |
| 304:22 305:1 | 318:7,17 319:5 | 320:4,14,17,25 | 70:14 142:18 |
| 311:9 | 320:10 321:10 | 321:16,24 | 143:10 160:23 |
| **addressed** | 324:7 325:7,10 | 323:15 324:18 | 205:13 280:23 |
| 94:10 | 325:25 326:9 | 328:12,16,21 | 316:16 322:8 |
| **adequate** | 326:15 327:1,2 | 332:11 334:4 | 337:25 338:2 |
| 172:18 185:17 | 327:4,13,14 | 334:16,22 | 341:3 |
| 190:6 212:12 | 329:4,7,7,12,14 | 341:25 342:5 | **agree** 12:11 |
| 213:9,16 214:5 | 330:5 331:8,14 | 342:15 344:2 | 18:11,20 42:21 |
| 214:7 319:18 | 331:19,21,22 | **advertise** 45:2 | 82:6,10,13 |
| **adequately** | 332:4,13,17,19 | 45:9 | 84:15,24 88:19 |
| 67:13 | 333:14,20,24 | **advice** 101:12 | 88:21,22 92:2 |
| **adjourned** | 334:19,23,24 | **advises** 96:18 | 96:16 97:10,16 |
| 346:23 | 335:2 336:7,9 | 98:11 | 99:6,7 100:17 |
| **administered** | 339:3 340:19 | **affairs** 60:10,23 | 100:25 102:6,9 |
| 319:11,25 | 341:19 342:13 | | 102:12,16 |

[agree - analysis]                                                                 Page 7

105:5,17 106:4
110:6 112:5
115:18 119:23
121:2,8 122:12
123:18,23
124:2,25 125:7
125:8 128:16
134:2 136:10
136:14 137:18
143:12 155:23
157:16,17,24
157:25 160:14
176:11 177:8
177:10,16
187:5,7 195:9
196:18 204:24
206:16 220:13
225:10 229:24
230:1 232:10
312:16 327:6
333:19
**agreed**  54:6
95:7,8 122:16
125:4 126:12
160:18 239:24
332:15 333:13
**agreement**  19:1
51:11 52:10,23
53:3,4 130:15
130:17,18
131:2 135:15
135:21,24
148:20 154:12
154:20,20
156:6 157:5

158:10,23,24
159:3,7 160:5
160:14,24,25
161:4,16
266:14,14,15
266:22 267:1
267:11 269:19
288:11 345:24
**agreements**
9:21 52:17,20
52:21 154:3,4,9
156:2,8,10,11
156:17 157:1
158:6,20 161:3
161:4,21
**agrees**  134:1
**ahead**  16:17
22:16 23:4,9
27:10 40:4
41:12,22 74:8
79:10 82:7
89:15 91:1
93:11 97:12
106:14 115:11
116:8 118:10
148:9 163:9
167:22 172:10
175:12 177:15
179:22 187:16
190:19,21
222:22 236:13
238:25 258:1
259:22 270:9
272:24 273:12
275:4 278:15

278:21 279:4
279:15 280:6
281:3,19 282:4
284:20 285:24
287:16 288:12
290:15 291:16
292:8,17 300:5
303:3,21 304:8
305:8 306:10
308:1 309:15
310:7 311:12
311:22 312:19
325:17 327:23
328:5 333:2
336:1,18 337:6
338:11 339:8
341:7 342:3
343:16 344:19
**al**  348:4 349:1
350:1
**albany**  4:19
**albertsons**  6:13
**alert**  204:13,19
205:11
**alerts**  205:23
**alexia**  5:3 242:9
243:5
**alexia.brancato**
5:7
**alfano**  7:3
**alienate**  279:13
**align**  207:17
**alignment**
205:10

**allege**  263:16
**alleged**  203:21
**allotted**  348:20
**allow**  125:15
**allowable**  75:12
**allowed**  126:5
236:1,15,21,22
256:10
**allows**  127:18
128:7 236:19
**alternate**
276:12
**alternative**
125:15,16
**ambiguous**
257:2 273:11
291:5 292:4,6
303:20 341:5
**america**  84:21
**amount**  40:24
53:18 104:13
105:12,13,14
105:15 110:19
191:6 193:24
**amounts**
105:20
**analysis**  26:12
127:20 128:8
128:14,20
130:11,12,13
132:23 133:12
133:15 134:9
134:23 135:4
135:17 136:7,7
136:9,11,16

[analysis - apologize]                                    Page 8

| | | | |
|---|---|---|---|
| 137:8,15 | **annual**  110:25 | 322:3 329:16 | 229:25 244:15 |
| 151:22 168:4 | 138:1,16,17 | 338:9 341:3 | 245:20 246:2 |
| 187:1 195:23 | 139:5,12,13,16 | 344:18 | 246:23 248:7 |
| 224:12 225:17 | 139:19 140:5,6 | **answering** | 248:12,13 |
| 225:21 226:10 | 140:10,17 | 112:16,17,25 | 249:5 250:8,21 |
| 228:7 230:3,4 | 141:7,16,20,25 | 113:2 333:7 | 251:6,16,23 |
| 230:17,24 | 142:6,12 | **answers**  9:17 | 253:9 254:23 |
| 232:4 233:8,22 | 143:24 144:2,5 | 121:23 168:21 | 256:21 257:10 |
| 234:5,16 236:5 | 144:11,18,22 | **anticipate** | 258:9 260:18 |
| 237:21 240:6 | 145:6,7 221:8 | 56:22 | 264:5 266:9 |
| 241:17 248:20 | 221:14 222:18 | **anticipated** | 273:8,9 275:18 |
| 252:24 264:20 | 231:19 238:8 | 192:17 196:4 | 276:8,18 277:3 |
| 344:12 345:3,7 | 238:11 | **anybody**  306:5 | 277:10,12,21 |
| **analytical** | **annually** | 338:5 | 278:13,19 |
| 164:8,10,24 | 135:10 140:8 | **anyway**  148:23 | 279:2 280:4,15 |
| 192:8 211:15 | 141:3 | 201:21 | 280:25 281:13 |
| 226:24 | **anomalies** | **apap**  58:3 | 286:10,12,17 |
| **analyze**  344:2 | 217:20 240:3 | **api**  78:10,20 | 286:24 311:18 |
| **anda**  59:6,13 | **anomaly**  240:9 | 79:2 128:1,18 | 323:13 324:3,7 |
| 59:14,20 60:15 | **answer**  8:14 | 129:18,18 | 325:24 326:2,6 |
| 110:3,7 283:12 | 112:18,21 | 139:21 144:24 | 326:9,10 330:5 |
| **andas**  59:1 | 121:24 192:6 | 147:12 151:14 | 330:22 331:8 |
| 74:14 75:16 | 197:18 219:10 | 152:3 154:13 | 331:10,13 |
| 166:10 | 248:4 253:11 | 165:24 166:4 | 341:19 342:12 |
| **anderson**  32:22 | 253:16 254:1 | 168:5 177:5 | 342:24 343:9 |
| 66:6 | 280:2 291:6,16 | 180:14 184:19 | 343:21 344:2 |
| **angeles**  2:4 | 292:8 294:1 | 184:23 185:3 | 344:13,16 |
| 12:1,19 14:15 | 321:11 327:20 | 192:19 198:24 | 345:8 |
| 150:1 347:2 | 333:8 339:8,20 | 199:2,9,21 | **api's**  145:14 |
| **annotate**  35:1 | 339:20 | 203:9 210:14 | **apis**  129:6 |
| **announced** | **answered** | 213:21 221:1 | 168:16 223:12 |
| 108:6 335:12 | 92:23 93:7,8 | 221:23 222:5,6 | **apologies**  294:7 |
| **announcements** | 124:1 137:11 | 222:6,14,20 | **apologize**  33:21 |
| 336:5 | 238:24 273:11 | 223:5,7,14,16 | 99:19 142:22 |
| | 281:18 304:7 | 224:19 225:8 | 161:2 197:16 |

249:22 261:14
280:17 330:13
**appear** 23:12
77:3 80:11
164:6 167:23
180:7 232:11
232:24 302:16
302:17,24
303:4
**appearance**
13:4 180:3
227:16 228:15
**appearances**
2:8,25 3:1,25
4:1,25 5:1,25
6:1,25 7:1 13:6
13:21
**appeared**
185:18 188:14
190:4 200:23
205:9 235:23
237:18 240:10
247:1 279:5
**appearing** 2:5
301:5
**appears** 63:8
68:16 73:24
124:9 158:22
158:24 159:6
173:24 179:1
181:4 193:7
202:16 205:3
209:15,20
221:7 223:8,24
226:9 232:21

254:21 255:3
255:24 256:1,7
256:8,16 284:2
298:6 307:23
**appended**
350:7
**appendix**
224:17,18,21
224:22
**applicable**
168:25 348:8
**application**
59:24 60:8,9,12
108:17 110:2
110:22,25
111:4,5,7 283:2
283:9,10,16
318:22
**applications**
60:4 167:10
257:13
**applied** 115:2
155:25 262:6
262:10 337:15
**applies** 155:24
206:3 249:1
268:12 277:10
319:3
**apply** 73:8
105:21,22
125:24 182:2
317:15
**applying** 95:4
147:5 317:24

**approach**
79:23 84:13
104:12 131:13
141:19 192:3
204:23,25
207:17
**approaches**
125:15,17
161:23
**appropriate**
26:21 77:6
79:24 87:17
97:1 106:19
107:13 108:15
125:24 127:25
128:20,23
135:8 200:7,21
200:25 204:22
213:7 253:13
267:25 269:15
**appropriately**
115:1 139:1
**approval** 59:13
74:13,24 109:2
109:7,14
110:11,16,24
111:8,9 196:9
230:4
**approved** 59:1
160:8
**approximately**
346:11
**apr** 145:2
**arb** 194:9

**area** 16:15,20
16:21 80:2
87:12 105:16
147:21 188:2
199:11 276:5
320:24
**areas** 114:16
287:17
**argumentative**
197:15,19,21
197:23 333:1
341:6
**arises** 276:25
**arose** 326:25
**arps** 5:11
306:16
**arrangements**
9:21
**arrive** 253:24
321:2
**arrow** 158:25
211:13 228:4
228:21 229:8
229:21,25
233:18 234:17
234:20,22
235:7,8
**arrow's** 230:16
230:23 233:14
234:7,15
**article** 84:9,10
84:19 87:7
126:22
**articles** 36:11
41:4

ash  228:25
aside  117:7
  158:18 220:14
asked  16:25
  26:3,7 37:1
  45:16 51:18
  92:22 93:6
  114:12 123:25
  137:10 153:20
  166:20 188:18
  190:5 193:11
  193:19 201:4,5
  238:23 273:10
  281:17 304:6
  308:9 321:4
  322:3 329:15
  338:9 341:3
  344:17
asking  19:16
  50:2,9 83:23
  119:7 127:1
  129:16 268:7
  280:10,12
  297:13 299:3
  339:6
asks  336:21
aspect  130:16
  320:23
aspects  88:13
assay  225:14
  226:21 227:17
  229:4 232:19
  232:24
assertion  335:7

assess  139:20
  140:9
assessed  152:4
  184:22
assessment
  89:4 138:25
  140:2 211:5
  218:14 219:18
  219:25 220:8
  279:20
assessments
  194:23
assigned
  222:15
assist  117:22
  140:23
assisted  47:12
associated
  26:20 104:7
  147:5 187:19
  222:5 248:20
  251:24 258:24
  308:18 312:24
  332:7
assume  28:13
  30:19 36:23
  51:24 62:7
  63:13 147:10
  151:19 153:23
  174:12 213:25
  249:20
assumed
  241:14
assuming  175:5
  179:18 206:24

241:25
assumption
  224:1 256:12
assumptions
  241:18
assurance  41:8
  41:17 90:21
  97:22 128:10
  200:9 251:15
  314:10
assurances
  130:22
assure  169:6
  265:5 266:17
  276:11 320:1
atlanta  4:14
attach  167:25
attached  18:3
  20:6 22:3 31:6
  35:12 43:25
  63:4 67:9,15
  68:10 72:13
  81:8 121:16
  155:6 158:16
  159:25 161:12
  162:12 169:19
  173:6 180:25
  182:6 183:2
  185:24 194:6
  210:3 211:10
  213:18 220:6
  220:20 228:2
  247:18 254:2
  293:6 297:2
  316:12 318:13

323:3 346:9
  348:11
attachment
  183:15 215:22
  223:22 224:16
  224:22,23
  225:1
attacked
  279:22
attendance
  53:24
attendees  65:17
  65:18,21,24
attention  209:1
  209:5
attest  342:20
attorney  13:7
  22:4 50:2,12
  348:13
audience  127:3
  127:4
audio  12:10
audit  22:21
  70:7,8 134:15
  135:3 137:24
  138:13 139:10
  139:10 141:19
  144:15 160:20
  164:3,6,14,15
  164:16,17
  165:10,13,18
  166:6,19,21,22
  166:25 167:7
  167:13 168:1
  202:23 203:3

[audit - based]                                                    Page 11

226:12 235:15
237:3 274:7,11
274:19,22
275:1,7 283:4
285:10,12,13
285:16,18,21
286:4 288:22
289:8,15,23
290:1,8,11,13
290:17 292:5
294:22 298:8
298:23,24
299:8,25 302:8
302:14,15,17
302:24 303:5,7
303:11,23,24
304:19 305:4
**auditing**  159:8
 290:6
**auditor**  166:7
 167:4 168:3
 274:13 289:1
 290:2,21
 298:13,18,24
 299:6,14,23
 300:8,12,21
 301:17,21
**auditors**  113:20
 164:24 289:8
 289:18,20,23
 290:6,10 291:2
 291:4 296:7
**audits**  128:9
 130:24 135:2
 135:11 137:19

159:14,20
164:4,18
167:16 168:2
267:23,24
268:20 289:18
289:20 291:4
291:12,15
292:3,5,14,19
296:12,15
298:21 302:16
305:14 340:3
**august**  10:18
 186:5 230:8,11
 231:6
**aurobindo**  7:8
 71:22
**author**  36:19
**authored**  36:11
 36:14 194:13
 337:20
**automatically**
 287:24
**available**  64:16
 127:8 131:17
 189:16,17,18
 191:1,20
 276:22 348:6
**avenue**  5:5,12
 6:10
**avenues**  110:4
**award**  61:20
**awards**  61:17
**aware**  24:9
 45:15 64:15
 71:2 95:11,13

117:12,16,20
185:2 188:7
194:18 246:21
252:20 289:17
291:11 292:14
292:19 331:16

| b |
|---|

**b**  1:7 5:17 6:15
 8:18 9:1 10:1
 11:1,13,15,17
 14:14,18
 174:25 233:3,9
 319:6,14 324:9
 324:10
**back**  14:7 18:8
 31:17 47:21
 72:7 73:21
 77:16 98:24
 150:5 157:10
 160:12 182:23
 191:16 208:20
 231:19 243:1
 245:9 265:10
 268:5,11
 279:25 285:20
 286:8 302:1
 305:22 307:17
 307:21 313:6
 313:23 316:3
 346:17,18
**background**
 61:25 64:5,7
 74:12,19 84:5
 189:14

**backgrounds**
 108:15
**bad**  294:2
**baertschi**  28:16
 32:22 66:8
**baertschi's**
 28:21
**balance**  58:12
 101:24
**bank**  6:11
**barton**  3:8
**base**  94:4
 137:14 156:1
 157:1,2 275:9
**based**  85:4 89:7
 89:13,16,21
 94:6 95:19,20
 96:1 102:19
 108:25 115:1
 118:12,15
 120:24 137:4
 137:23,24,25
 138:6,10,14
 146:17 148:11
 156:20 172:19
 194:22 202:14
 206:8,9 213:11
 218:14 235:11
 237:12 241:18
 244:16 255:23
 258:21 259:15
 260:11 262:14
 265:24 270:25
 275:6,20,21
 276:5 277:15

287:4,7 301:16
301:20 304:16
329:8,11,12
332:1,6,8
**baseline** 178:22
178:24
**bases** 324:17
338:14
**basically** 82:23
269:24
**basis** 25:7 47:4
127:11 134:10
135:18 138:7
139:17 165:1
187:7 213:14
255:1 301:12
320:5,9 323:18
325:5,7 342:23
343:12 344:13
344:23
**batch** 128:17
144:9,10,12
176:6 214:13
218:13 219:20
225:14 226:12
227:2,5 229:25
230:18,22
246:23 248:6
248:12,14
251:16 272:11
272:19 273:8
**batches** 26:23
26:25 129:19
130:11 134:17
164:11 165:5

214:12,22
215:20 216:20
217:18 218:4,7
218:25 219:1,5
219:6 222:12
223:14 235:17
235:24 245:20
246:2 248:7
249:6 250:12
250:16,21
257:9 258:9,15
260:4 261:19
272:3
**bates** 33:25
158:18 160:2
161:14 209:24
211:8 293:11
308:24
**battle** 204:20
204:21
**baylen** 3:16
**beat** 344:8
**beginning** 13:6
306:19 330:12
**begins** 110:7
**behalf** 2:1
242:10 291:13
**behavior**
244:10 265:14
265:20 267:4
267:16
**behaviors**
93:23 203:15
268:16 338:22

**belief** 145:4
207:2
**believe** 54:18
59:14 71:3
91:8 92:7,10,25
113:3,5 150:23
161:2 162:16
168:11,21
179:11 186:21
216:11 244:3,7
256:22 262:24
266:13,23
280:23 311:14
311:16 312:3
315:9 319:3
334:19
**believes** 204:22
205:20,25
**bell** 73:17,19
**benefit** 339:15
**benefits** 101:24
108:19,21
154:19
**best** 101:23
142:2,2 143:6,7
143:15 272:19
**better** 43:18
**beyond** 18:23
188:20 335:24
338:8 339:4
341:2 343:25
344:14
**billed** 67:6
**bily** 7:16

**binding** 122:14
122:22 123:24
124:3 125:9
**bioequivalence**
62:12,15
**bioequivalency**
62:12
**biologics** 16:7
**bipc.com** 6:18
**birth** 58:3
**bit** 72:25 73:5
242:12 291:22
**board** 202:15
**bockius** 7:9
**bodies** 16:6
39:1 61:13
112:9 131:16
**body** 37:4,8
82:21 105:18
117:17 131:3
**bogdan** 4:18
**bosick** 7:3
**boston** 6:5
**bottom** 168:12
186:14 194:20
210:10 227:5
231:20 272:1
282:16 295:25
**boulevard** 3:4
4:5 14:15
**bound** 345:24
**box** 4:19
**brancato** 5:3
8:6 242:9,9,14
242:21 243:4,5

[brancato - case]                                                    Page 13

244:5 245:4
247:4,9,12,19
248:1 249:18
250:14 251:12
251:20 253:15
254:8 256:18
257:6 258:6
259:23 260:1
264:19 269:1
269:21 270:21
271:15,24
273:3,17
274:15,24
275:11 277:7
278:4,11,17,24
279:9 280:9,20
281:8,22 282:6
285:1 286:3,22
287:22 288:3
288:15 290:3
290:19 291:10
291:18,21
292:12,21
293:2,7,18,20
294:6,8,18
295:1,7,12,23
296:4,13,16,23
297:3,18,20,23
299:16 300:10
302:19 303:15
304:2,14
305:16,24
**brand** 75:3
151:22 153:4
153:13,23

**branded**
332:19
**break** 13:22
19:1,5 72:2
148:23 154:3
208:6 305:17
313:19 314:23
315:22
**brett** 3:3,6
**bridge** 6:10
**brief** 14:6
31:16 49:22
72:7 208:19
242:25 305:21
307:16 313:22
316:2
**briefing** 27:18
**bring** 19:9
20:16 105:24
116:18,20
117:21,25
**brittney** 5:4
**brittney.nagle**
5:7
**broad** 79:17
**broadly** 156:2
156:25 157:2
259:14 262:6
**brought** 116:13
117:18 118:5
**bruss** 9:7,10,11
**bs** 36:4
**buchanan** 6:14
**buckets** 74:6

**bulk** 68:17
**burned** 332:19
**burrows** 3:8,8
**business** 14:14
18:15 45:8,23
129:13 197:11
197:13
**busy** 340:20

**c**

**c** 3:3 14:18
123:11 136:18
174:17 206:5
226:22 262:3
**c.s.r.** 1:25 2:5
347:4
**c5069-14-02...**
230:18
**calculated**
237:23 239:20
**calculation**
237:12,14
239:9,14 240:6
**calculations**
254:15
**calendar** 51:14
65:25 66:1
**california** 2:4
12:1,20 14:16
15:18 57:12,18
58:9,10 70:10
150:1 347:1,5
347:25
**call** 48:24 49:12
49:14,15,17,18
51:24 83:2

93:18,21 112:6
150:11 315:13
343:10
**called** 37:16
46:10 60:6
70:8 85:9
110:2 130:9,18
144:4,6 169:4
171:10 204:13
232:16 265:6
**calls** 46:9 51:9
288:25
**camden** 1:3
**camp** 2:12
**cancer** 62:9
**capability** 45:5
46:17
**carcinogenic**
165:24 166:4
**care** 19:18
101:23
**carillon** 6:16
**carolina** 6:17
**carry** 180:6
**case** 14:10
16:24 17:6,13
17:19 18:22
20:13,22 21:12
21:19 23:17,20
24:21 25:10,13
28:3,12,17
30:14,19 34:14
34:20 35:4
39:5 43:15
44:13,20,23

[case - cgmp]                                                              Page 14

47:6,12 48:1,4
48:8 50:6,25
53:6 55:11
56:10 62:9
69:7 71:12
73:16 75:10,17
77:14 78:14,18
79:8 90:22
92:20 95:3
96:11 98:1,4,8
99:10 101:21
103:25 117:10
133:5 151:12
153:4 154:6
162:1 171:16
184:19 190:13
206:25 230:1
235:13 241:19
246:7 252:15
253:18,22
254:3,7 271:14
271:17 274:9
306:18,23
312:17,21
315:16 317:25
319:5 320:18
332:20,22
334:25 338:7
339:10 340:6
340:11 347:16
**cases**  18:17
99:13 100:7
116:10 207:20
**casitas**  15:20
15:24

**catch**  284:7
308:7
**categories**  58:3
74:1 85:15
89:4,5 146:20
**category**  146:2
175:9
**cause**  15:4 62:8
91:25 105:15
202:23 320:13
328:18 333:18
**caused**  177:1
177:25 199:18
283:17
**causes**  194:11
284:9 328:20
**causing**  92:5
203:8
**caution**  288:9
**cb**  110:17
**cbe**  60:19
**central**  39:5
**centre**  7:5
**century**  2:3
12:19
**cep**  219:19
**certain**  20:17
27:2 83:20
87:3,4 131:19
146:3,12
147:18 165:15
175:8 178:17
182:2 186:17
186:24 248:17
262:5 263:22

318:3 320:16
339:12 340:11
**certainly**  18:14
22:23 23:18
25:6,24 26:2
29:24 38:20
39:20 40:10
42:19 43:4
51:2 52:4,7
58:24 69:1,14
69:23 73:9
88:2 108:1
109:20 111:4
111:24 113:9
113:25 119:8
123:9 136:4
139:16 141:18
151:17 162:21
176:8 178:22
189:25 191:8
191:23 198:11
241:9 267:20
276:11,20
278:22 304:17
328:14 339:21
**certainty**
264:13
**certificate**
127:19 128:7
128:13 130:10
132:22 133:15
224:12 225:17
226:10 228:7
230:3,4,17,23
231:8,8 232:4,5

232:20 233:8
233:22 234:5
234:16 236:5
241:17 264:20
**certificates**
26:12 225:21
248:19
**certification**
167:1 274:5
**certifications**
165:22 166:2
166:10
**certified**  347:24
**certify**  347:5,19
**certifying**
165:24,25
**cetera**  252:2
291:25 343:15
**cfr**  124:4 125:1
136:15 198:6
236:19 244:16
263:1,12
270:12 273:7
273:14
**cgeddis**  2:24
**cgmp**  81:25
88:17 100:13
100:21 102:23
103:9,20,24
104:1 110:22
111:3,19 115:2
116:22 120:10
123:11,19
125:25 129:5
137:5,7,12

[cgmp - chromatograms]                                    Page 15

146:23,24
154:11 156:19
198:4 234:24
244:14 260:22
265:18,22
274:1 277:2
281:13 282:2
287:25 288:6
302:4 308:5
324:2,7 330:23
330:25 331:4
341:16 342:1,9
342:15,15
345:4
**cgmps** 9:15
24:7,19,25
80:25 96:18
98:13 99:3
102:7,14
109:14 125:3,4
198:5 281:16
281:23 286:25
329:5
**chain** 147:15
**challenge** 197:2
275:16
**chance** 19:21
317:4
**change** 32:8
75:20,25 76:13
76:14,18,25
77:21 78:1
129:9 134:21
136:4,5,5 138:8
144:1,2,3,7,8

144:15 153:22
159:4 195:20
209:9,10,15,16
209:17,21,22
210:11,13
212:23 213:18
215:22 216:5
216:10 218:16
218:23 219:5
219:16 221:1
222:15,25
235:1,6 244:13
258:16,25
259:7,10 260:4
261:8,18
267:15,18
269:11,14,23
270:3 271:5
273:8 312:10
312:14 313:2
327:3 349:4,7
349:10,13,16
349:19
**changed** 129:9
134:20 212:13
223:3 322:11
**changes** 56:16
56:22 60:19
80:13 111:1,8
129:10 130:25
246:10 261:11
261:25 311:10
312:6 348:10
350:6

**changing** 223:7
**chapter** 320:3
**characterizati...**
191:21 193:22
**characterize**
190:9 195:20
**characterized**
309:5
**charge** 53:16
53:18
**charging** 53:23
**charlotte** 6:17
**charrier** 70:25
**chart** 222:1
232:19 233:4
233:14,17
234:7 237:8
**chartered**
115:14
**check** 20:2
122:6 162:24
**checklist** 299:8
299:13,25
**chemical**
186:24
**chemicals**
186:18
**chemistry** 60:6
61:1 187:18,20
187:23,24,25
188:16,21
192:2 308:14
308:18 309:7
309:12

**chicago** 5:18
**china** 235:18
**chinese** 17:3
51:21 147:1
**chitty** 30:1
**chloride** 210:17
258:25 313:2
**choose** 141:18
191:16 336:8
**chooses** 107:14
**chose** 96:10
339:1
**chp** 253:4
**christopher**
2:21 6:15
**christopher.h...**
6:18
**chromatogram**
39:23 237:11
237:13,13,15
237:18 239:11
240:5 259:17
260:6,10
264:14
**chromatograms**
26:13,14,17,19
26:22 27:2,7
39:17,20
164:25 236:24
237:2,22
238:19,22
239:4 241:4
253:3 259:4,5
261:7,10,25
264:9 265:3

chromatograph
265:7
chromatogra...
226:25 252:1
chromatogra...
248:24
chromatogra...
175:6
chromatogra...
133:24,25
134:2,4,5,18
170:23 171:25
172:1,13,18,24
174:9 176:8
178:24 179:24
180:7 184:9,13
185:17 188:14
212:18 213:5
214:3 217:19
218:3 220:25
225:25 226:1,2
226:3,8,9,16,20
229:12 235:6
235:12,14,16
235:18,19
236:24 237:7
239:12,15,16
239:19,23
240:3,10,16,20
240:25 241:4,8
241:9,15
248:18,19,23
249:7 265:5
chromatology
213:20

circumstances
89:13,22
101:13,16
129:17 138:14
148:2 338:6
citation   76:6
257:16 301:10
cite   80:23 83:18
84:2 105:1
122:5 261:24
293:8
cited   23:25
24:22 83:16,22
104:23,24
113:16 120:25
121:18 122:2
207:22 250:18
cites   207:24
citing   286:4
295:17
civil   14:13
claims   4:2
clarification
25:17 269:17
clarify   41:14
125:10 142:9
143:2
class   27:18
194:9
clean   163:13
180:5
clear   111:11
260:3 268:9
311:16 329:2
332:2 343:19

344:22
clearly   197:1
207:23 328:22
client   16:21
46:1 50:11,12
51:9 52:10,22
53:1 65:12
68:14 69:16
clients   16:12
36:24,25 37:1
43:19 52:16,16
67:18 68:3
69:25 104:23
113:15,24
146:2,6 147:11
148:11,14
clinical   46:12
46:14 75:2,9
85:3 86:21
97:2 108:22
clock   204:15,17
205:14,16
206:20 207:11
close   208:2
215:1 218:25
closed   216:23
216:24 217:15
218:16
closing   218:23
closure   216:10
closures   9:19
cm   156:19
cmc   60:6,13
coa   252:14
254:9,12

258:13 264:24
coan   6:3
coas   250:3,3,4
250:5,6,18
252:3,4,14,17
252:18,20,21
code   222:5,6,14
223:3,7 225:4
228:8
codes   222:6,25
cofa   224:3,9
250:22 251:4
265:9
cofas   246:14
249:14 251:8,9
251:25 252:8
252:11,12,24
colleague   64:3
colleagues   47:3
47:5
college   3:4
colloquy
336:14
column   231:23
233:3,17
combination
181:4 186:16
321:1
combinations
58:4
combined
280:22
combo   221:15
come   46:24
54:10 64:18

[come - completion]                                              Page 17

| | | | |
|---|---|---|---|
| 73:21 77:16 | **commercial** | **company's** | **compendial** |
| 116:3 117:3,8 | 272:15 | 151:25 | 168:16,17,25 |
| 132:12 134:16 | **commercializ...** | **comparative** | 169:3,7,11,13 |
| 162:13 182:23 | 151:20 | 130:9,12,13 | 170:19 181:14 |
| 196:25 205:9 | **commercialize** | 133:12 134:9 | 181:16,18,20 |
| 226:10,16,19 | 151:13 | 134:22 135:4 | 181:23 182:2 |
| 237:11,11,14 | **committees** | 135:17 136:6,7 | 184:5 185:5 |
| 239:4,9,10,16 | 61:12 337:10 | 136:9,11,16,20 | 190:5 |
| 253:7 254:14 | **common**  42:22 | 137:8,14 | **compensation** |
| 280:13 285:19 | 84:12,17 | 213:23 218:15 | 38:21 |
| 290:9,20 315:5 | 175:20,22 | 218:20 221:3,4 | **competitor's** |
| **comes**  40:25 | 176:1,4,5,10,25 | 248:18 252:24 | 151:23 |
| 132:15,19 | 177:12,18 | 257:18,21 | **compile**  237:8 |
| 141:4 147:15 | 230:2 252:10 | 258:23 259:1,3 | **complaint** |
| 239:12,15,18 | **communicate** | 259:9,17 261:7 | 27:16 |
| 316:24 | 84:10 | 261:10,17,19 | **complaints** |
| **coming**  80:3 | **communicati...** | 261:24 263:6,9 | 140:20 |
| 86:17 108:7 | 201:3 | 267:20 268:19 | **complete** |
| 120:6 138:11 | **commute**  58:10 | 272:17 | 140:12 167:8 |
| 146:8 185:17 | **companies**  6:13 | **compare**  22:18 | 211:2 214:18 |
| 326:24 328:15 | 41:8,18 42:8 | 133:21 225:20 | 215:1,4 216:12 |
| **comment**  96:10 | 58:21 99:3 | 225:22 236:23 | 220:12 346:4 |
| 152:6 153:8 | 146:25 278:5 | 236:25 237:3 | 347:13 350:8 |
| 188:3,22 | **company**  29:14 | 252:18 253:2 | **completed** |
| 216:23 217:2 | 38:14 39:17 | **compared** | 211:18 213:1 |
| 217:17,21 | 42:16 43:10 | 148:16 218:11 | 215:8 217:4,24 |
| 302:10 303:12 | 45:21 46:4,17 | 219:6 249:7 | 348:17 |
| 308:13 309:18 | 46:20 47:16,19 | **comparing** | **completely** |
| 335:16 | 96:17 98:12 | 133:18 179:12 | 17:20 48:20 |
| **commentary** | 103:1 116:2 | 248:24 | 55:8 58:14 |
| 198:24 | 124:24 125:15 | **comparison** | **completeness** |
| **comments**  96:6 | 125:17 252:6 | 133:21 214:2 | 83:23 |
| 96:8 302:13 | 277:21 288:6 | 252:25 259:9 | **completion** |
| 303:6,7 | 336:6 | 260:6,10 | 14:19 211:22 |
| | | 264:14 | 347:17 |

[complex - conducted]                                              Page 18

| | | | |
|---|---|---|---|
| **complex**  83:10 | 320:23 326:19 | **concepts**  83:11 | 145:25 165:9 |
| 84:3,8,11,20 | 333:16 341:16 | 84:11 95:21 | 166:20 175:13 |
| **compliance** | 342:14 345:4 | 146:24 317:2 | 175:14 184:14 |
| 16:4 57:15 | **compliances** | **concern**  77:18 | 252:25 267:2 |
| 64:8 80:6 89:8 | 104:11 | 77:23 79:23 | 269:20 279:23 |
| 89:18 90:1,11 | **compliant** | 87:15 89:18 | 287:2 291:1 |
| 90:14 92:14,15 | 104:25 105:2 | 90:1,11,14,21 | 301:8 303:18 |
| 96:23 103:4 | 107:12,17 | 91:21 95:10 | 303:23 305:2 |
| 105:24 106:8 | 114:8,23 | 96:23 98:4 | 312:22 333:16 |
| 108:3,9 109:8 | 115:25 116:2 | 133:6 145:20 | **concierge**  7:16 |
| 109:14 110:2,3 | 203:15 331:4 | 147:14,16 | **conclude** |
| 110:4,12,14,21 | **complied** | 166:21,24 | 346:10 |
| 110:22,23 | 168:24 207:13 | 172:11,16 | **concluded** |
| 111:3,18,22 | 268:18 | 178:25 185:10 | 298:1,17 |
| 112:2,4 114:3 | **complies**  346:7 | 185:14,16 | **concludes** |
| 114:17 115:8 | **comply**  81:25 | 188:12,17 | 14:23 |
| 115:12,19 | 168:16 169:10 | 202:7,9,10 | **concluding** |
| 117:3 123:7 | 234:24 244:13 | 203:12 211:25 | 257:22 |
| 129:5 141:23 | 265:17,22 | 212:21 235:4,5 | **conclusion** |
| 142:15 145:25 | 267:18 302:4 | 235:9,25 | 187:10 214:22 |
| 146:4 147:2,20 | 329:4 342:8 | 236:14 240:8 | 234:19 321:2 |
| 156:19 169:6 | **component** | 240:14,15,23 | **conclusions** |
| 169:13 181:15 | 109:12 | 248:16 253:2 | 281:6 |
| 205:9 265:4 | **components** | 287:17,20,23 | **condition**  112:3 |
| 276:2 279:18 | 9:18 154:1 | 288:5 317:17 | 201:15 |
| 279:19,20,21 | **compound** | **concerned** | **conditions** |
| 280:24 282:10 | 174:25 233:3,9 | 73:10 111:24 | 17:10 81:25 |
| 282:19 283:3 | 284:18 | 111:25 113:21 | 186:17,18 |
| 283:19 284:10 | **compromised** | **concerning** | 323:14 330:10 |
| 285:3,7,15 | 83:9 | 176:9 | **conduct**  168:3 |
| 286:25 287:2,8 | **computer** | **concerns**  42:6 | 296:11 |
| 287:13,21 | 21:16 | 78:3 87:12 | **conducted** |
| 308:5 310:23 | **concept**  84:20 | 91:5,16,19 92:3 | 164:4 291:12 |
| 312:23 313:1,3 | 95:25 273:15 | 93:13 94:6,10 | 292:14 |
| 313:7,11 314:9 | | 97:21 133:9 | |

**[conducting - continue]**                                                    Page 19

| | | | |
|---|---|---|---|
| **conducting** | **connection** | **considered.pdf** | **contact** 49:5,7 |
| 137:18 | 23:16 24:20 | 9:3 | 49:11 70:24 |
| **confidential** | 35:3 337:21 | **considering** | **contacted** |
| 11:3,10 17:14 | **consent** 116:16 | 151:9 | 40:10,20 41:2 |
| 17:24 18:9,11 | 333:11 | **consistent** 99:9 | 43:14 44:13,19 |
| 18:12,16,20,21 | **consequence** | 101:2 203:15 | 44:22 47:22,25 |
| 18:22 | 330:21 | 204:11,21,25 | 48:24 |
| **confidential....** | **consider** 16:14 | 255:4 332:10 | **contain** 153:5 |
| 11:9 | 29:5 32:4 | 335:3 | 153:14 201:11 |
| **confidentiality** | 62:18 206:25 | **consistently** | **contained** 21:4 |
| 8:20 | 245:16 248:11 | 108:24 | 153:18,23 |
| **confirm** 204:18 | 325:19 334:22 | **constituent** | 166:3 343:10 |
| 205:15,17 | **consideration** | 283:12,14 | **containers** 9:19 |
| 206:1,21 207:3 | 165:12 294:4 | **constitute** | **containing** 27:7 |
| 207:11 243:25 | 328:10 329:21 | 300:21 | 40:19 |
| **confirmed** | 334:18 | **constitutes** | **contains** 131:6 |
| 201:10 | **considerations** | 123:13 | **contaminant** |
| **conflict** 188:1 | 50:20 | **consult** 45:13 | 179:25 180:4 |
| **conform** | **considered** | 118:5 336:24 | **contaminants** |
| 319:10,24 | 20:25 21:25 | **consultant** | 87:4 |
| 324:6 | 23:19 29:2 | 39:16 42:14 | **contaminated** |
| **conformity** | 31:25 34:10 | 43:9 47:16,19 | 335:2 |
| 319:12,25 | 54:9 68:19 | 64:8,8 71:7 | **contamination** |
| 342:1 | 84:25 85:8 | 188:7 276:3 | 40:12 43:11 |
| **confused** | 89:1 111:23 | 335:22 337:3 | 177:3 178:2 |
| 259:11 | 144:17 162:19 | **consultants** | 245:19 330:22 |
| **confusing** | 162:19,23 | 46:8 117:21 | **content** 154:9 |
| 284:19 289:23 | 166:14 167:6 | **consulted** 338:5 | 158:7 161:20 |
| 303:19 | 174:1 188:7 | **consulting** 16:3 | 165:10 225:14 |
| **conlee** 2:11 | 297:11 300:8 | 35:23 42:3 | 255:14 271:17 |
| 44:16,20 | 300:13 323:9 | 70:6 71:13,18 | 316:23 |
| **connect** 190:22 | 325:15 327:7 | 71:21,24 | **contents** 221:19 |
| **connecting** | 328:8,9 329:17 | **consumers** | **context** 37:9 |
| 190:16 | 329:20 338:21 | 96:16,18 98:12 | **continue** 12:10 |
| | | 203:8 | 97:1 109:6,13 |

[continue - correct]                                                    Page 20

| | | | |
|---|---|---|---|
| 110:9 130:15 | 324:5 325:11 | 47:16,19,20 | 209:25 210:18 |
| 334:10 335:1 | **conversation** | 48:19 49:12,13 | 210:19 211:17 |
| 335:11 | 49:21 51:2 | 51:25 56:7 | 214:19,23 |
| **continued**  2:25 | 56:4 248:21 | 57:7 58:15,16 | 217:8 219:9,12 |
| 3:1,25 4:1,25 | 249:14 | 59:16 60:2 | 220:1,9 221:2 |
| 5:1,25 6:1,25 | **conversations** | 61:17 62:2,5,22 | 221:10,16,23 |
| 7:1 8:25 9:1,24 | 12:8 51:15 | 62:23 63:19,20 | 222:17 223:20 |
| 10:1,25 11:1 | 56:2 | 64:1 65:4 | 228:11,18 |
| 150:8 | **coordinating** | 66:21,25 67:1,4 | 229:5,6,9,22 |
| **continuing** | 151:6 | 69:21 70:13 | 230:19,20 |
| 111:18 | **copied**  234:17 | 75:13 78:3 | 233:24 234:3 |
| **continuum** | 236:4 241:16 | 79:2 80:25 | 244:1,20 |
| 82:20 | **copies**  25:11 | 81:20 83:17 | 245:24 246:3,7 |
| **contract**  9:21 | 162:14 348:14 | 88:19 90:24 | 249:2 250:16 |
| 57:19,20 | **copy**  18:1 19:13 | 92:21 97:10 | 250:21 251:16 |
| 155:18,24 | 19:15 20:9 | 98:17 101:19 | 252:22 253:23 |
| 156:4,15 191:3 | 21:5,24 29:11 | 104:3 105:9,25 | 254:4 255:23 |
| **control**  9:18 | 31:4 35:8,14 | 109:9 122:3,15 | 257:24 260:7,8 |
| 58:3 60:7 80:3 | 63:9 72:14,20 | 139:22 143:11 | 260:13 261:4 |
| 87:14 119:5,6 | 76:9 294:2 | 143:20 150:18 | 267:8 269:11 |
| 120:19 131:8 | 346:3 | 150:19 152:19 | 271:18 277:4 |
| 144:1,3,7,8 | **core**  198:8,10 | 152:21 156:23 | 282:22 283:7 |
| 159:4 209:9,16 | **corona**  57:12 | 158:8 159:11 | 286:6 289:5,9 |
| 209:21 210:12 | 57:17,25 59:2 | 159:17 160:6 | 290:22 298:10 |
| 212:23 213:19 | **corp**  10:6 | 163:17,21 | 298:19 299:9 |
| 215:22 216:5 | **corporate**  33:2 | 170:6,12 | 300:2,15 |
| 216:10 218:17 | 52:18 57:17 | 173:18,20 | 302:24 306:24 |
| 218:23 219:16 | 59:3 | 174:1,4 175:20 | 306:25 308:2,5 |
| 221:1 223:18 | **corporation** | 179:13,14 | 309:8 311:8 |
| 259:7 283:13 | 57:23 | 183:23 184:2 | 317:25 318:18 |
| 312:10,14 | **correct**  21:22 | 185:7 189:3 | 321:17,25 |
| **controls**  91:10 | 23:2,23 32:3,18 | 190:17 192:25 | 323:9 324:13 |
| 144:2,15 | 36:12 37:25 | 195:6 198:20 | 331:5 337:11 |
| 145:10 147:24 | 38:24 42:23 | 202:12 204:1,2 | 341:1,16,17 |
| 319:8,18,22 | 44:11 46:5,6 | 205:18 206:8 | 342:1,9 343:23 |

343:24 344:16
345:9,10
347:13 350:8
**corrected** 117:5
**corrections**
297:21,25
350:6
**corrective**
303:8,10,25
304:20,24
305:5,10,11
**correctly** 82:4
309:19
**corresponden...**
150:15 151:17
152:14
**cosmetic** 125:1
324:10
**cost** 287:3,12
287:23 288:5
**costs** 286:13
**counsel** 2:8 3:1
4:1 5:1 6:1 7:1
8:14 12:14
13:5,24 19:6,16
20:16,22 21:19
22:10 24:4,12
25:22,23 26:4,7
28:5 31:23
32:12,13 35:4
40:11,20 41:2
50:15 52:13
55:6 56:10
63:9 64:25
72:16 73:5

106:9 112:13
148:22 153:12
174:11,20
186:12 208:8
248:22 249:12
254:15 306:10
307:7 314:24
322:9,12
339:13 348:14
**counsel's** 30:25
**county** 347:2
**couple** 54:23
55:24 70:22
148:23 242:5
246:13 249:14
250:2 324:22
341:10
**course** 106:8
271:20
**court** 1:1,8
12:16,17,23
13:21 72:3
315:5 333:12
**cover** 85:23
**covered** 212:5
213:12
**covering**
221:15
**covers** 145:8
222:19
**create** 221:12
221:12
**created** 216:18
217:13 309:2,4

**creating** 93:1
195:15 317:17
**credence**
120:20
**credible** 215:10
**criteria** 88:24
170:3 173:17
174:23 181:10
184:12,14
**critical** 80:1,5
163:15 201:22
202:1
**criticism** 79:18
80:9 87:16
188:25 203:20
211:21 215:23
234:23
**criticisms**
73:24 74:18
75:15 79:6,11
154:8 161:19
163:6 164:4,5
165:10 236:2
**criticize** 184:4
238:3
**criticized**
163:22
**criticizing** 75:8
189:6,10,11
**crook** 63:25
64:2,3 65:5
**cross** 339:5
**cs** 348:15
**culbertson** 6:3

**culture** 279:8
279:11,15,17
279:18,19
280:24 282:10
282:11 287:8
287:13,21
312:23 313:1,4
**current** 9:15,17
46:10 80:20,24
122:13 123:12
136:18 155:15
155:19 186:4
206:3,7,12
210:13 223:15
262:3 271:10
271:21,21
324:1
**currently** 39:3
96:16 154:19
**custody** 14:20
**customers**
196:14
**cutting** 112:20
**cv** 9:7 20:24
35:8,15,18,23
35:24 36:1,10
36:18 37:18
39:2 57:3
61:16,25 69:24
**cvs** 35:20

**d**

**d** 8:1 198:6,19
263:1,12 266:8
266:12 267:10
268:24 269:2,4

[d - deficiencies]

Page 22

269:9 270:1,12
270:14 296:8
**d.c.** 5:13
**d.pdf** 9:8
**d.stanoch** 2:14
348:2
**damages** 203:8
**danger** 85:2
**dangerous** 85:1
98:1
**daniel** 3:14
48:13,15 54:22
65:15,20
**daniel's** 48:18
**data** 26:10,11
26:13,25 27:6
39:17,21,24
77:5 128:4,9,11
130:24 134:3
134:24 135:22
136:1,2 146:22
164:9,10,24
179:8,10,13,15
179:17,18
180:15 213:17
217:23 218:8
224:8,11
235:20,20,24
238:16 246:16
248:20 250:24
250:24 251:24
252:1,1 253:3,4
254:11,14,16
255:2 256:1,8
256:17 257:18

258:22
**databases**
45:13
**date** 35:14 41:3
43:17 44:9
63:22 69:11
79:2 160:7,7,8
230:7,10 231:5
312:9 339:12
349:24 350:12
**dated** 66:23
67:2 158:25
160:6,12 186:5
209:18 212:10
225:8
**dates** 55:1 60:8
**david** 2:10
13:14 47:23
48:12 348:1
**davis** 4:11
**day** 113:20,21
115:21 118:24
119:1,21
205:10 236:2
325:8 339:16
340:22 347:21
350:15
**dayna** 1:25 2:5
12:23 14:11
247:13 347:4
**days** 49:9
113:19 204:16
348:17
**de** 4:5

**dead** 344:8
**deal** 74:5
177:17,19
207:21
**dealt** 51:3
177:23 328:12
**decades** 191:20
**december**
28:18 56:5,14
69:12 221:16
311:4 312:13
**decide** 339:18
**decided** 30:8
58:11 190:8
333:10
**decides** 332:20
338:15
**decimal** 234:6
234:8
**decision** 93:18
138:12 145:12
145:13 201:20
202:15,16
205:5 287:3
317:15,16
**decisions**
101:25 116:14
116:21,22,25
117:18 202:16
202:17 276:5
282:11 338:23
**declaration**
27:21 66:4,16
273:21

**declarations**
27:24 30:17
64:22 165:14
165:15 274:1
**declare** 350:4
**decree** 116:16
333:11
**dedicated**
209:20 219:20
**deem** 319:5
332:13 336:7,8
**deemed** 82:14
318:17 327:12
350:6
**deeming** 339:2
**deeper** 64:7
**defend** 108:7
**defendant** 7:8
17:6 33:16
249:12,13
**defendants** 2:2
12:15 13:10,12
17:1 29:15
31:1 32:20
51:17,21,21
71:11,13 90:23
249:19 306:17
306:23
**defending**
47:24
**defense** 186:12
249:12
**defer** 324:23
**deficiencies**
106:23 158:7

283:18 284:10
**deficiency**
158:9 282:19
282:23 283:1,1
283:6,15,25
284:17 310:23
311:2,4,8,17
312:13
**deficient** 94:25
102:18 287:9
321:14,22
**define** 156:3
**defined** 135:14
267:21 268:19
**defining** 155:15
**definitely** 85:3
**definition** 85:6
87:24 88:9
315:15 317:11
317:24 318:21
320:4
**definitions**
342:5
**degree** 36:2,4,5
200:9
**delay** 203:21
205:7
**deleted** 21:22
**deleterious**
97:3 165:16
166:11
**delineate**
156:17
**delineating**
161:23

**delivered**
129:21
**demonstrate**
237:6 249:15
250:12 251:10
**demonstrated**
220:24
**demonstrates**
184:25 202:20
213:16,18
217:22,23
240:24 287:1
298:25
**department**
41:17 211:14
**departments**
41:8
**depending**
181:17 182:1
**depends** 52:16
89:3,3 100:14
101:7 226:23
**deponent** 8:2
348:13 350:3
**deposed** 257:20
**deposing**
348:13
**deposition** 1:15
2:1 9:5 12:14
12:18 14:19,23
18:2 19:14
20:4,5,13,17
22:2 29:9,14,24
31:2,5 35:11
43:24 47:24

53:25 55:18,20
56:9 63:3
69:14,18 72:12
78:19 81:7
121:15 149:8
155:5 158:15
159:24 161:11
162:11 169:18
173:5 180:24
182:5 183:1
185:23 194:5
208:5 210:2
211:9 220:5,19
228:1 246:22
246:24 247:15
247:17 259:13
281:25 284:23
293:5 297:1
306:20 316:11
318:12 323:2
325:8 339:17
341:24 346:8
346:11,22
347:7,10,16
**depositions**
29:16,23 30:13
30:18,20
**describe** 67:12
96:14 121:24
156:14 212:24
261:16 288:14
312:22
**described**
34:17 57:2
76:16 88:23

89:22 91:20
101:3,10
107:20 108:18
118:15 132:9
212:1 218:15
228:9 262:3
270:14 273:14
282:15 315:19
320:19,24
328:23
**describes** 68:12
155:14
**describing**
67:20 95:22
290:2
**description**
8:19 9:2 10:2
11:2 67:13
85:12 158:3
211:18 213:2
214:10
**descriptions**
210:6
**design** 193:16
193:21 195:11
195:22 196:5
**designate** 82:19
**designated**
11:12
**designed** 193:5
193:14 196:8
196:17
**destroyed**
21:21

**detail** 29:20
67:9,9 68:9
186:10 234:14
245:9 270:7
271:3
**detailed** 136:15
261:12 271:13
**details** 51:12
68:4
**detect** 87:3
146:8 197:4
264:7
**detected** 86:7
**detection** 39:6
85:16 86:13
87:2,6 88:25
89:17 146:7
315:21
**determination**
94:16 95:15
328:25 332:14
334:18
**determine**
39:24 77:5
88:7 92:8,13
106:10 108:18
117:10 146:12
192:4 315:16
320:16 331:21
332:17
**determined**
115:8 334:15
**determines**
107:11 108:21
114:22 332:18

**determining**
132:2 340:19
**develop** 90:9
194:24
**developed**
276:23
**deviations**
130:25 140:20
142:15 324:1
**device** 318:17
**devices** 11:21
16:7 318:7
**dfm** 283:6
**differ** 26:1
**differences**
252:22
**different** 35:20
35:21 54:10
103:15 110:3
111:10 123:14
126:4 127:4
140:22 146:21
158:3 171:12
184:13 191:14
199:19 201:10
205:4 222:25
288:16 329:9
**difficult** 126:4
145:22,22
146:9 197:10
197:10,11,13
246:25
**dim** 242:13
**diovan** 150:25
153:4,10,18

**direct** 46:2 47:2
112:1 139:9
144:3 147:1
270:11 273:13
**directed** 269:5
**direction**
347:12
**directly** 61:10
64:25 151:15
153:9 271:13
322:5
**disagree** 50:17
50:20 93:10
103:11,12
175:25 187:8
193:2,3 217:7
**disagreement**
103:21 204:12
**discarded**
21:21
**discern** 74:17
**disclaimer**
124:3
**disclose** 18:23
**disclosed** 20:23
34:15 51:7
**disclosure**
17:14 51:11
52:5,6,10,11,17
52:20,21,22
53:4,5 288:11
**disclosures**
53:8 96:22
**discovery** 17:21
150:16,17

160:16 179:7
187:11
**discrepancies**
300:1,25
**discretion** 89:6
236:21
**discretionary**
87:21 93:18
95:18 138:12
138:14 146:5
147:3 156:20
**discuss** 42:9
50:22 210:9
245:11
**discussed** 34:14
50:23 258:20
310:21 341:5
**discusses**
173:22 325:16
**discussing** 56:9
110:7
**discussion**
50:18 88:2
103:21 157:11
198:22 246:14
343:6
**discussions**
50:2 51:12
54:25 64:25
**diseased** 96:24
**dispense** 13:19
**disregard**
174:24
**distinction**
243:15

[distributed - dose]    Page 25

**distributed**
109:3 331:2
**distribution**
99:15 100:4,9
178:18
**district** 1:1,2,8
12:16,17
**divulge** 288:10
**dma** 283:1,24
**dmf** 61:8,11
282:19,23
283:1,1,10,15
283:18,24
284:9,17
310:23 311:2
312:24
**dnigh** 3:17
**doctor** 302:24
**document**
11:18,20,22
20:12,14,19
22:4,7,11,22
23:11 25:3,4,20
25:25 26:2
29:3,25 31:21
32:2 68:23
69:1,2,3,4 76:7
76:10,16 77:10
77:13,17 78:5
80:23 81:3,10
82:9 83:12
101:11 102:3
121:18,20,22
121:24 122:2,5
122:7,11,16,19

122:24 123:4
124:3,8 125:17
126:3 127:3,5,7
127:10,20
140:11,15,23
141:6,12,13,17
141:22 142:24
148:24 153:10
156:7,24,25
157:11 160:3
160:19 162:17
163:3 169:22
169:23 170:2
173:8,13,15
174:22 181:3
182:8,11 183:4
186:6,7 187:15
194:15,17
201:12 209:23
211:13,14
221:7,13,19
227:24 228:6
230:14 234:11
239:4,18,21
241:12 252:23
253:22 254:3
272:9 284:22
292:22 293:2,8
293:25 294:4,5
294:13 295:15
295:18 296:3,6
296:20,23
297:8,11 299:5
299:18 300:4
300:20 308:22

308:25 309:1
311:6,13
315:23 317:11
317:13 325:21
**documentation**
17:22 151:5,11
152:12,13,22
152:23 153:3
169:10 172:20
184:24 187:22
200:7,24,25
201:2,8,9 203:2
214:21 219:4
220:23 246:17
253:24 282:25
308:17
**documented**
215:24 258:3
264:25 303:6
305:13
**documenting**
155:16
**documents**
18:9,11,12,21
18:21 21:6
25:7,8,11,15
29:5,18,19 33:2
33:7,12,14,14
33:15,18 34:2
34:16 50:18
52:5 64:15,15
64:17,19 68:24
78:1 94:1
122:13,21
123:6,19,23

124:6,6 125:5
125:11,12
127:21 142:2,3
143:1,6,7,16,17
145:5 152:16
152:20 157:13
158:3 162:19
164:7 165:5
167:6,9 179:16
183:9,11
185:12 221:11
223:4 242:17
251:10,21
253:18,20
258:7 279:6
281:5 292:10
301:24 308:14
308:20 312:2
321:1 335:13
**documet** 11:5
**doing** 133:6,8
133:17 142:5
159:20 185:17
234:25 236:17
238:1,4,10
242:14 256:20
256:23 336:15
**domestic**
145:23 148:16
**dose** 118:18
119:14,21
121:4 127:12
127:16,25
128:16 129:17
132:1 140:12

**[dose - element]**                                          Page 26

141:5 154:13
179:6 180:13
243:22 276:8
277:3 314:7
323:14 324:19
326:1,8 331:1
331:10,13
**dot** 190:17,22
**double** 20:2
76:1
**doubt** 256:19
**dr** 28:16,21
32:17,22,22,23
246:6,21 248:3
248:11 249:20
250:18 252:4
264:22 289:1,4
290:7 291:12
291:19 292:15
298:14,18
301:6 302:23
331:11
**draft** 68:13
**drafted** 55:11
**drafting** 55:5
61:14 65:5
**drafts** 55:7,9
**drawn** 281:6
**drive** 3:9
131:19
**drives** 271:21
**driving** 202:17
**drop** 232:17
**dropbox** 19:24
54:17,18

**drug** 9:19
10:14,17 16:5
17:4 41:18,20
42:8,10,20,20
42:22,22 43:1,3
43:3,7 61:9
74:13,14 80:7,8
81:24 82:3,13
82:15 83:6,8
86:17,25 87:4,8
87:9 96:4,19
98:14 100:20
100:23 101:18
117:14 119:12
120:4 125:1
127:17,18,22
129:7 137:21
138:5 147:15
151:2 153:4,13
155:18 156:15
165:5 168:14
169:25 172:13
173:10,12,14
175:14,15,15
175:18 181:6,8
183:7,8,10
184:4,5 185:12
185:13 187:13
188:9 200:22
235:11 256:14
276:9,19 277:4
318:17 319:7
319:20,20
320:2 324:9

**drugs** 9:21
11:20 60:4
74:25 98:1,5,8
99:5 100:15
105:6 318:7
320:10
**due** 174:24
241:25
**duly** 15:10
347:7

**e**

**e** 8:1,18 9:1
10:1 11:1
349:3,3,3
**earlier** 157:11
181:15 221:9
246:5 254:9
258:21 261:2
261:13 265:11
307:21,22
308:9 309:18
310:10,20
315:4,19 322:6
324:11,16
332:12 343:22
**early** 339:11
**easier** 20:1
247:10
**easily** 86:7
332:21
**east** 2:3 12:19
**easy** 263:20
**edits** 65:9
**education**
35:24 189:15

**effect** 85:3
93:24 159:4
323:12 340:15
**effected** 60:19
**effects** 62:5
108:20
**efficiently**
243:10
**ehs** 77:18,22
**eight** 337:24
338:2
**eighty** 222:12
**eir** 102:13
298:5
**eirs** 141:24
**eisenhower**
2:22
**either** 26:7,23
34:9 39:16
51:19 76:20
87:5 184:4
208:6,15
232:22 237:4
241:19 253:4
259:6 269:6
271:8 316:9
**elapsed** 49:6
**electronic** 21:7
21:8,10,15
22:20 25:12,14
34:12 242:16
**element** 115:4
115:6 266:15
269:19 287:10

[elements - evaluate]                                                     Page 27

| elements | employment | ensure  109:8 | esq  2:10,11,16 |
|---|---|---|---|
| 108:16 128:25 | 41:17 60:2 | 109:14 110:11 | 2:21 3:3,8,14 |
| 129:3,14,15 | **enantiomeric** | 114:17 156:18 | 3:15 4:3,4,11 |
| 131:1,6 139:3 | 229:14 | 168:15 | 4:12,18 5:3,4 |
| 140:19,21,22 | **encompasses** | **ensuring** | 5:11,17 6:3,9 |
| 142:14 145:8 | 140:22 198:8 | 181:15 | 6:15 7:4,10 |
| 265:24 283:3 | **encounter** | **entire**  157:1 | 348:1 |
| **ellis**  5:3 242:10 | 205:8 | 266:8,12 294:4 | **essentially** |
| 243:8 | **ends**  103:23 | 294:5 343:12 | 133:14 215:23 |
| **email**  54:15,15 | 292:23 296:24 | 344:22 | 316:24 |
| 151:15 152:13 | **enforce**  107:14 | **entirely**  295:8 | **establish**  75:2 |
| 201:17 258:11 | **enforceable** | **entirety**  343:8 | 124:23 136:21 |
| 286:21 287:5 | 124:10,12 | **entitled**  245:18 | 157:14 244:14 |
| 287:19 301:14 | 125:12 157:14 | 288:21 297:25 | 250:7 251:22 |
| 302:23 303:12 | **enforcement** | 318:7 339:23 | 263:2 265:23 |
| 304:5,13,16 | 40:25 106:16 | **entry**  66:12 | 270:11,13 |
| 305:2,14 | 106:20,22 | 67:20 | 323:15 |
| **emails**  64:19 | 107:14,24 | **environment** | **established** |
| 200:24 258:7 | 117:1 119:9 | 77:22 | 132:24 137:25 |
| 258:24 | 120:24 340:5 | **equal**  175:1 | 250:20 |
| **employ**  132:9 | **enforces**  116:16 | 271:23 | **establishes** |
| 148:4 190:1 | 124:5 | **equally**  113:6 | 128:19 |
| 271:12 | **engagement** | 125:12 249:1 | **establishing** |
| **employed** | 9:9 243:13 | **equipment** | 139:24 155:16 |
| 80:10 94:24 | **engineer**  37:25 | 189:17 190:13 | 314:6 324:18 |
| 126:5 191:15 | 151:24 | **equivalence** | **estimate**  53:3 |
| 254:22 255:3 | **engineering** | 62:17,19,20 | **et**  252:2 291:25 |
| 255:25 321:13 | 38:5,6 64:7 | **errata**  348:11 | 343:15 348:4 |
| 321:21 | **engineers**  37:24 | 348:13,17 | 349:1 350:1 |
| **employee**  39:16 | **enhancement** | **error**  104:22 | **eu**  229:5 231:14 |
| 246:14 249:14 | 103:18,19 | **ese**  82:24 | **european**  24:14 |
| 250:13 | 206:11 | **especially**  91:5 | 181:24 316:18 |
| **employees**  47:1 | **enormous** | 108:4 120:13 | 316:25 317:7 |
| 47:2 | 29:19 40:24 | 210:15 279:24 | **evaluate**  39:17 |
| | 64:18 | 312:21 | 85:13 87:20 |

104:14 105:16
105:24 120:4
138:2 141:3,5
210:12 235:12
270:4
**evaluated**  43:1
43:5 101:9
170:18 172:13
175:6
**evaluating**
118:18 119:11
121:4 269:10
**evaluation**  77:4
91:12,19,21
92:4 93:15
95:19,21 96:14
103:15 111:22
113:7 117:8
120:20,23
128:4,8,24,25
129:8 130:25
131:4,5 134:14
135:20 137:1
138:1,1,6
139:15 184:11
184:14 187:22
191:24,25
195:18 212:1
214:4 244:12
248:19 265:16
267:14,23
268:14 301:19
301:23 343:6
**evaluations**
266:3,5 340:3

**evening**  314:3,4
**event**  276:12
317:21 347:20
**events**  223:12
**eventual**
330:11
**everybody**
150:11
**evidence**  18:6
164:23 169:9
171:16 172:7
200:21 201:14
201:19 202:2
202:20 211:23
213:15 214:8
215:11 216:9
218:19 234:22
241:2,8,10,19
242:1 246:18
250:25 252:13
253:13,14
255:20 257:24
260:11 266:2
274:8,13 275:6
284:15 303:7
303:16 304:3
**exact**  43:17
49:9 55:1
**exactly**  45:1
52:1 99:8
190:3,9 252:21
255:17 267:3
280:19 323:18
340:6

**examination**
8:2 15:13
150:8 243:3
306:12 314:1
314:21 322:20
325:1 341:12
**examined**
15:11 347:6
**example**  27:3
28:15 85:21
90:4 190:2
**examples**  288:4
**except**  261:3
296:7
**exception**
267:10
**excerpts**  30:4
**excessive**
105:13
**excipients**
221:24
**excuse**  68:6
80:16 166:1
171:17 176:16
201:4 224:18
233:4 327:10
330:4
**executed**
258:17 260:5
**exhaustive**
132:10
**exhibit**  8:19,20
8:20,22,22 9:2
9:3,3,4,4,7,7,9
9:9,11,11,12,12

9:14,14,17,17
9:20,20,23,23
10:2,3,3,4,4,6,6
10:7,7,9,9,11
10:11,14,14,16
10:16,18,18,20
10:20,23,23
11:2,3,3,5,5,6,6
11:8,8,10,10,12
11:12,13,13,15
11:15,16,16,18
11:20,20,22,22
17:25 18:2,8
19:3,14 20:5,9
22:1,2 25:16
30:25 31:5
34:15 35:9,11
43:21,24 47:21
62:25 63:3,7
72:10,12 81:3,4
81:7,14 98:21
98:25 121:10
121:15 126:16
155:3,5 158:14
158:15 159:22
159:24 161:7
161:11 162:11
168:22 169:16
169:18 173:2,5
174:17 180:21
180:24 182:4,5
182:25 183:1
185:22,23
192:13 194:1,5
210:1,2,21

211:5,9,19
212:7 220:4,5
220:17,19
221:5 227:25
228:1,6 244:8
247:4,16,17
293:3,5 296:25
297:1 298:4,10
298:12 300:15
316:7,8,11
318:9,12 323:1
323:2 345:15
345:20 346:8
**exhibits** 8:25
9:13,24 10:25
19:17 66:4,6,8
66:10 208:3,13
287:8
**exhibt** 11:18
**exist** 120:12
181:19 195:13
200:10,22
**existed** 279:7
279:11 314:7
324:19 330:10
**exists** 179:18
186:8
**expect** 94:3
116:24 144:22
156:9 159:16
164:8 165:13
168:3 178:4
179:24 180:9
180:16 189:22
193:16 196:3

212:16 215:20
240:2 241:6
266:1 278:3
290:9 302:6
**expectation**
127:16 141:2
179:19 195:12
196:6,7 199:15
262:11 263:2
270:19
**expected**
170:22 184:20
193:15 260:22
261:13 266:6
**expecting** 214:1
**expeditiously**
243:9
**expense** 286:23
**experience**
61:25 92:11
104:19 109:22
114:7 136:20
141:15 145:24
146:18 147:1
148:10,11,12
151:21 176:3,9
180:2 189:15
202:14 205:7
275:21 276:6,7
277:15 278:5
284:12 287:7
287:23 288:5
288:17 328:11
331:23 336:11
338:10

**expert** 9:13
16:14,19 18:7
27:22,24 28:4
29:2,3 30:18,20
32:10,16 45:2
50:3,10,15 62:4
62:11,18 64:21
66:13,14 73:16
86:21 246:12
249:13,19
257:20 326:4
335:8
**expertise** 46:17
108:15 188:3
340:9
**experts** 18:9
27:21 28:2,11
30:14,18 45:13
45:14
**explain** 82:11
83:10 319:2
**explicit** 88:4
**extend** 199:13
**extension**
200:11
**extent** 26:1
51:14 73:8
82:10 106:7
180:13 206:17
**extra** 34:8
**extremely** 87:1
147:21 163:4
180:5 277:16
**extrinsic** 180:4

**f**

**face** 197:3
**faced** 279:1
280:3,14
**facilities** 288:23
307:3 313:12
319:8,21 324:4
325:10
**facility** 57:12
59:2 70:9,12
71:3 86:10
94:9 104:16
108:5 119:6,6
282:20 283:19
284:11 285:3,4
310:24 313:8
328:15
**fact** 78:24
98:21 111:19
174:22 184:4
189:20 225:22
246:1,22
250:20 258:21
260:5 318:15
318:20 323:17
328:18 331:11
332:23
**factor** 107:22
116:1 287:4,12
**factors** 178:23
314:6 324:18
**facts** 9:14 50:6
50:18 80:24
332:22 338:6

**failed** 172:8
190:6 234:24
260:22 329:4
**failing** 75:8
**fails** 83:8
348:19
**failure** 199:13
314:9
**failures** 320:23
320:24 330:23
330:25
**fair** 24:10,11
29:1 43:12,13
59:21,22 74:5,9
132:7 163:7
**fairly** 42:22
197:1
**falkenberg**
5:16
**falkenbergiv...**
5:19
**fall** 73:25
**familiar** 16:11
17:16 18:16
28:19 122:11
163:4 173:8
181:2 182:11
183:4 186:6,7
294:9,11 295:2
317:6 318:6
323:5
**familiarity** 25:1
**far** 20:22,23
60:7 104:15
106:25 120:13

152:23 243:8
268:18
**farther** 124:14
**fd&c** 87:25
**fda** 10:19,21
11:23 24:7
37:4,6,7,11
40:18,25 59:6
60:20 74:4,24
75:13 81:21
82:14,16,18
88:3,7,11,17
92:16 95:11,14
95:16,20 96:6
96:18,22 98:11
98:15,16 99:1
99:12,13 100:3
100:7 101:16
101:21 102:17
102:25 103:16
103:19,22
104:8,9,13,21
104:22,24
105:1,1,4,18
106:4,10,19
107:11,14,23
108:6,7,16,21
109:7,8,13,23
109:24 110:10
110:11,24
111:4,9,25
112:2,8 113:9
113:16,22
114:9 115:21
116:16,17

117:1,10,13,17
118:13,16
119:15 120:11
120:13,25
121:2 122:12
123:13 124:5
124:22 125:11
125:14,22
126:7,13,25
131:15 139:20
140:11,17,23
141:2,4 142:10
142:11,23
143:1,16
146:11,16,20
147:8 154:19
183:16,18,22
183:25 186:2
192:24 194:8
196:9,16
203:22 204:8
204:12,22
205:4 207:21
207:23 270:19
297:5,6 298:12
298:17 299:4
299:20 300:14
300:16 308:9
314:14 316:20
316:25 323:5
323:12,17,22
325:24 326:11
327:2,10,11
329:20 330:2
331:7,12,20,24

332:8,12,16,18
332:20 334:7,9
334:10,17,20
334:21,25
335:10,16,20
335:23 336:4,4
336:10,15,24
337:4,10,10,16
337:21 338:6
338:15,21
339:1,1,25
340:1,2,2,5,10
340:18 343:20
344:15
**fda's** 82:8
101:12 104:15
106:1,16,22
107:1,3,17
108:9 111:18
113:3 115:24
119:4,8 120:2,3
120:17 122:13
123:5 155:14
157:13 186:2,4
194:8 204:15
315:12 318:22
324:15 325:8
327:4 331:23
332:24 334:17
338:22
**fda.pdf** 9:16,19
**federal** 14:10
14:12 206:8
347:16

feed  339:22
feedback  65:9
feel  25:1 172:17
feelings  76:20
feels  101:16
fees  53:12,16
fhs  7:7
field  36:15
  61:14,17
  204:13,19
  205:10,23
figure  232:13
  233:4
figured  69:15
figures  226:7
  232:14,16
file  8:20,22 9:3
  9:4,7,9,11,12
  9:14,17,20,23
  10:3,4,6,7,9,11
  10:14,16,18,20
  10:23 11:3,6,8
  11:10,13,15,16
  21:5,5,15 25:10
  25:12 34:12,13
  54:17
filed  12:16
files  21:11,11
  22:20 25:14
finally  229:20
financially  13:1
find  26:8 76:17
  83:20 104:9
  113:25 115:18
  117:4 135:1

142:25 148:24
158:6,9 164:23
167:15 172:1
172:23 179:1
193:21 195:17
207:20 210:22
211:23 215:10
317:10
finding  138:4
  196:20 233:15
  301:6 343:20
findings  140:13
  186:4 304:5
finds  117:1
fine  174:20
  297:17 345:18
  345:22
finish  112:12
  112:18,21
  120:4 330:4
finished  43:3
  118:18 119:14
  119:21 121:4
  127:12,16,25
  128:16 129:17
  132:1 140:12
  141:5 154:13
  168:14 179:6
  180:13 219:23
  222:24 243:22
  276:8 277:2
  314:7,16
  323:14 324:19
  326:1,8 328:19
  331:1,9,13

332:4
finite  114:10
firm  3:3 12:24
  42:5,16 48:18
  92:18 103:17
  103:22 104:15
  107:13 108:10
  109:21 114:22
  114:25 115:13
  115:25 116:10
  116:17 118:22
  207:22 243:7
  275:22 276:17
  276:24 303:8
firm's  104:22
  105:22 107:16
  111:22 114:20
  124:9
firms  91:5
  92:17 103:20
  106:22 109:23
  109:24 113:13
  115:15,16,18
  126:13 127:21
  137:13,23
  142:6 147:1,2
  147:12 151:24
  185:16 205:7
  207:2 257:4
  276:2,14,16
first  15:10 40:6
  43:14 44:13
  47:22 48:23
  49:11 57:11
  65:11 66:2,21

69:15 82:18
130:2 133:23
134:13 141:6,8
141:12 142:1
142:22,24
143:5 179:25
180:8 192:15
210:9 211:12
214:12 221:20
224:25 228:5,5
230:21,23
231:10,14,23
265:10 275:13
294:19 325:15
five  214:12,22
  215:19 216:20
  217:18 218:13
  218:25 219:1,5
flag  77:3
flom  5:11
floor  6:4 7:5
  12:19
florida  3:16 4:6
focus  73:2,6
  198:14,15
  199:11,12
  209:1,5 210:5
  227:3 231:17
focused  78:14
  184:25 259:16
  260:5 264:15
focuses  290:7
folks  242:6
follow  25:17
  98:24 124:24

175:10 203:14
204:22 206:22
207:10 232:18
247:1 260:22
269:15 281:12
281:16 282:2
283:24 284:9
284:16 285:8
301:7,20 302:3
302:11,15,18
303:5,9,12,13
303:18,22
304:1,4,11,16
304:18,25
305:12
**followed**
207:14
**following** 81:18
96:18 98:13
99:22 183:19
256:16 346:14
**follows** 15:11
125:16,18
183:16 205:22
**food** 16:5,8
125:1 324:9
**footnote** 155:9
174:17
**forced** 333:11
**forefront**
105:25
**forego** 255:11
**foregoing**
188:15 347:7
347:15 350:5

**foreign** 51:21
**foremost** 130:2
**forget** 249:23
**forgive** 269:4
**form** 16:16
27:9 40:3
42:24 68:22
74:7 76:19
77:1 78:4 79:9
79:21 82:17
88:1,20 92:1
93:6 94:12
96:20 97:11,19
102:2,8,15,24
104:4 107:7
111:20 114:24
115:9 116:7
118:7,21
119:22 121:7
125:19 127:14
128:2,22
129:23 139:2
141:10 143:21
144:25 148:7
152:5 153:7,15
154:15 156:22
163:8,18
164:19 165:3
165:11 166:12
171:3 174:2
175:11 186:25
187:3,6,13,14
188:10 189:4,9
189:21 190:18
195:25 199:8

201:25 202:13
203:10 205:2
206:23 207:15
216:14 218:6
219:8 224:4
236:11 240:21
241:5,22
249:10 250:10
253:10 264:17
269:12 271:6
271:19 273:10
274:3 277:22
278:9,14,20
280:5,16 281:1
281:17 284:18
286:19 287:14
288:1,8 289:22
289:25 290:13
291:3,14,25
300:3 302:5
303:1,19 305:6
307:25 308:11
309:14,24
310:6 312:18
313:13 315:1,7
315:18 318:1
318:24 320:6
322:1 323:1
325:13 326:12
327:15 329:15
332:25 333:25
335:5 339:4
340:12 341:2
342:2,16 343:1
343:13 344:17

**formal** 304:18
**format** 21:7,8
21:10 52:18
226:5 316:17
**formation**
186:20 187:24
188:8 308:15
309:7,13
**formed** 188:12
188:13 292:9
308:23
**forming** 248:12
327:13
**forth** 53:12
122:21 223:5
268:11 323:18
**forum** 37:21
**forums** 37:5
38:11
**forward** 298:25
**found** 24:8
98:13 102:22
106:4,8 113:22
113:23 153:5
153:13 172:20
175:6 184:21
184:23 210:6
217:20 225:2
237:17 249:8,8
290:23 317:12
323:12 325:24
330:2,9 331:7
331:12 344:15
**foundation**
291:25 292:2

**four** 35:18
251:8
**frame** 59:10
164:12 167:17
**frank** 7:4
**free** 38:23
210:16
**freeman** 2:21
**frequency**
135:14 137:24
138:9,13 140:7
140:9 144:23
145:13 205:10
268:1
**frequent**
101:17 177:18
268:20
**frequently**
103:7 133:22
176:5,10
**front** 192:14
193:14 242:16
293:25
**full** 15:15 29:23
30:2,3 127:21
128:1 135:22
205:9 214:22
**fully** 105:15
187:2 195:24
211:2 214:12
214:18 215:3,4
216:12,13
217:4 220:11
270:22

**function** 61:7
**further** 52:5
171:2,19 190:8
201:1 212:3
213:9 277:8
282:14 292:1
301:19,23
305:25 314:18
314:21 322:13
322:20 324:21
325:1 341:12
343:5 347:19
**furthering**
189:11
**future** 105:25
130:20 188:16

**g**

**gain** 109:1
**galleria** 6:10
**gap** 345:21
**gc** 191:17,17,19
191:23
**gcoan** 6:6
**geddis** 2:21
**general** 23:18
45:7 73:9
79:22 83:14
84:21 87:8
120:23 121:25
122:18 126:1
126:17 127:5
138:3 156:1
157:13 165:19
166:15 269:13
269:14 282:5,8

335:10
**generally** 73:9
79:5 86:22
102:7,9,10
124:21 135:18
147:17 150:21
195:1 295:19
**generate** 52:12
52:15 238:20
239:22
**generated** 29:4
32:1 55:10
163:6,15 199:6
**generating**
23:17 32:5,7,21
33:1,5 34:3,6
**generation** 76:3
77:10
**generic** 58:5
74:14,25
**generics** 74:25
75:8
**genotoxic** 17:2
177:4 203:24
204:4,9 273:22
274:2,9 343:4
343:11
**gentleman**
70:25 249:22
**gentleman's**
249:23
**geoffrey** 6:3
**geographical**
145:20 146:13

**geographies**
146:3,21 182:1
**geography**
146:2,7 147:4
181:18
**georgebarton...**
3:11
**georgia** 4:14
**germane** 28:8
78:15 153:17
252:19 290:24
309:9 334:13
**gestures** 209:2
**getting** 67:21
69:20 85:24,25
208:2 234:14
259:11 291:22
339:11
**gist** 165:1
**give** 15:4 18:1
19:12 36:23
37:14 43:17,18
54:25 72:19,20
79:4,17 94:21
99:18 104:10
120:19 128:10
139:4 178:16
200:8 208:9
215:21 221:5
276:10 284:21
287:19 317:4
321:8 334:21
337:9
**given** 28:11,17
37:20 39:4,9

| | | | |
|---|---|---|---|
| 73:16 78:19 | 206:6 218:24 | 236:13 238:8 | **goes** 99:12 |
| 277:4 278:7 | 219:2 262:7 | 238:25 242:19 | 101:11 268:11 |
| 284:1 293:24 | 266:8 271:9,12 | 242:21 245:8 | **going** 12:5 |
| 322:6 350:9 | 271:23 273:16 | 252:24 258:1 | 13:19 19:12 |
| **gives** 130:10 | 278:2,7 281:20 | 259:22 267:13 | 31:14 41:1 |
| **giving** 112:19 | 282:12 304:18 | 270:9 272:24 | 43:22 72:1,5 |
| 196:16 259:15 | 304:21,23,23 | 273:12 274:7 | 73:23 80:8 |
| 321:24 | 305:3,13,14,15 | 275:4 278:15 | 86:2 94:20 |
| **glass** 180:18 | 317:17 318:3 | 278:21 279:4 | 98:22 113:10 |
| **glasses** 227:10 | 320:4,13,16,23 | 279:15 280:6 | 114:6 117:5 |
| **glassware** | 326:19 328:16 | 281:3,19 282:4 | 120:18,19 |
| 180:1,5 | 332:7 333:16 | 284:20,24 | 125:22 134:14 |
| **gmp** 17:1 51:3 | 334:3,3 | 285:24 287:16 | 134:16,16,17 |
| 57:14 64:8 | **gmps** 92:14 | 288:12 290:15 | 139:10,11 |
| 80:2,6 81:19 | **go** 12:11 14:3,4 | 291:16,24 | 141:2,12,20 |
| 84:8,11 85:4,24 | 16:17 22:16,18 | 292:8,17 | 142:23 146:18 |
| 86:15 87:5,12 | 23:4,5,9 27:10 | 293:18 295:21 | 147:23 149:5 |
| 87:14,18 88:4 | 40:4 41:12,22 | 295:23 300:5 | 150:10 155:3 |
| 88:14 89:18 | 60:12 68:4 | 303:3,21 304:8 | 167:25 195:10 |
| 90:1,11,13,21 | 74:8,16 79:10 | 305:8,18 | 208:17 214:25 |
| 91:5,10,16,19 | 82:7 89:15 | 306:10 307:10 | 217:22 242:15 |
| 91:21,24 92:3 | 91:1 93:11 | 308:1 309:15 | 242:23 243:9 |
| 92:25 93:23 | 97:12 106:14 | 310:7 311:12 | 253:7 258:8 |
| 94:7 96:1 | 115:11 116:8 | 311:22 312:8 | 271:16 279:25 |
| 97:21 101:8 | 118:10 131:11 | 312:19 315:23 | 280:13 283:5 |
| 102:19 103:1,5 | 140:24 145:12 | 316:10 325:17 | 288:13 291:19 |
| 107:17 110:3 | 148:9 163:9 | 327:23 328:5 | 296:24 298:25 |
| 110:22 111:22 | 167:22 170:1 | 333:2 336:1,18 | 305:19 307:21 |
| 114:3,18 115:2 | 172:10 175:12 | 337:6 338:11 | 313:6,20 |
| 116:25 122:1 | 177:15 179:22 | 339:8 341:7 | 315:23,25 |
| 123:17 126:23 | 187:16 190:19 | 342:3 343:16 | 316:6 321:8 |
| 137:16 144:4 | 190:21 191:16 | 344:19 345:17 | 322:16 |
| 144:20 188:18 | 208:4,5,14 | **goal** 276:11,15 | **good** 9:15,18 |
| 188:19 199:15 | 218:8 220:18 | 276:17 286:12 | 12:4 13:8 |
| 200:11 203:14 | 222:22 234:13 | 287:4 | 46:10,12,12 |

72:15 80:20,24
87:22 116:22
123:12 136:18
150:11 154:1
155:19 206:5,7
206:12 208:23
212:20 262:4
271:10,22
314:3,4 319:12
319:25 324:2
**gordon**  7:3
**gottlieb**  10:19
10:21 186:5
194:13
**governing**
17:14 318:16
318:16 319:15
**graciously**
346:3
**grade**  168:16
**grant**  7:5
**graph**  226:4,6
**graphic**  134:3
226:3 239:5
240:10,16,20
**great**  87:13,14
90:8 106:20
115:15 116:25
247:11 259:25
297:22
**greater**  148:4
**greenberg**  2:3
4:10 13:9,12
**group**  38:5
251:15

**gtlaw.com**  4:15
4:15
**guess**  61:5 79:4
118:3 150:24
151:1 216:21
227:9 296:11
306:3
**guessing**  151:3
**guidance**  9:22
24:13,14 38:2
85:10,11 115:1
122:12,16,18
122:21,23
123:2,11,18,23
124:2,5,6,8,11
124:19,21
125:5,17 126:3
141:13 154:18
154:24 155:12
155:14,23
156:21 157:13
168:11,21
182:9 183:8,18
316:20
**guidances**  24:8
24:20,25 25:13
61:14 123:4,6
126:8 146:11
147:25 157:21
**guideline**  11:18
137:25 316:7
316:15,21,23
317:7,19
**gun**  202:3

**guy**  249:25
**gxp**  46:8,18

**h**

**h**  6:2 7:4 8:18
9:1 10:1 11:1
349:3
**hair**  85:22,23
85:23,23,25
86:5,8,10,11,16
**half**  285:2
296:2
**hand**  15:1 31:4
233:2 247:23
291:22 347:21
**handed**  63:7
228:6
**handful**  132:4
145:12
**handled**  61:13
78:16
**handling**  74:3
78:22 104:2
107:4
**handwriting**
229:22
**handwritten**
34:19 228:18
230:11
**hang**  291:19
**happen**  176:10
257:23 258:3,5
**happened**  96:3
96:3 258:3
**happens**
114:11 188:20

**happy**  149:1
245:10
**hard**  21:4,11
197:3
**harding**  4:17
**harkens**  157:10
**harkins**  4:12
6:2 13:11,23
19:25 63:2
81:5 121:13
162:9 174:15
224:25 227:8
231:11 242:19
**harkinss**  4:15
**hctz**  181:5
**head**  24:1
203:4 245:6,12
251:14 274:16
312:11
**heading**  81:15
81:16 99:18
316:25
**heads**  258:8
**health**  62:5
77:22 78:2
86:19 98:15
101:23 105:20
**healthcare**  5:9
**hear**  42:12
104:23 242:11
**heard**  41:18
151:22,25
243:11
**hearing**  17:11
41:9 42:9

| | | | |
|---|---|---|---|
| **heavily** 120:8 | **hester** 1:25 2:5 | **highly** 11:8 | **honiklaw.com** |
| **hecht's** 32:17 | 12:23 14:11 | 18:11,21 37:15 | 2:19 |
| **held** 36:7 | 347:4 | 80:1 104:14,16 | **honorable** 1:7 |
| 270:17 276:1 | **hetero** 6:7 | **hill** 6:8 | **hope** 309:19 |
| **hello** 306:15 | 71:21 | **hillwallack.c...** | **hopefully** |
| **help** 22:10 | **hey** 86:9 114:15 | 6:12 | 239:24 |
| 43:10 48:12 | **hi** 306:14 | **hinshaw** 6:3 | **hoping** 217:16 |
| 64:3,10 115:15 | **hierarchy** | **hinshawlaw....** | **horse** 344:9 |
| 117:25 321:2 | 118:12,15 | 6:6 | **hour** 56:4 |
| **helped** 64:17 | 122:20 123:3 | **hired** 43:10 | 68:20 72:2 |
| 109:23 | 123:15 | 71:7 335:22 | 149:7 259:16 |
| **helpful** 141:16 | **high** 85:18,19 | 337:3 | 325:6 |
| 272:7 293:14 | 86:12,13,20,23 | **history** 73:13 | **hours** 55:24 |
| **helping** 121:24 | 87:1,18 89:1,12 | 104:6 108:2,3 | 65:3 67:14,17 |
| 121:24 | 89:20 90:2,5,19 | **hold** 14:9 36:5 | 68:1,8 69:6,9,9 |
| **helps** 84:7 | 91:6 93:1 | 58:25 74:4 | 148:23 337:24 |
| **henry** 6:15 | 94:15,25 | 80:17 182:22 | 338:2 340:21 |
| **hereto** 18:3 | 108:23 120:5 | 198:23 200:4,6 | 341:3 |
| 20:6 22:3 31:6 | 131:14 133:20 | 202:6 227:21 | **house** 191:1 |
| 35:12 43:25 | 147:21,24 | 227:23 307:6 | **housekeeping** |
| 63:4 72:13 | 200:8 320:22 | 336:13,13,13 | 345:19 |
| 81:8 121:16 | 321:15,23 | **holding** 319:10 | **hplc** 229:11 |
| 155:6 158:16 | **higher** 97:2 | 319:23 324:6 | **huahai** 5:9,10 |
| 159:25 161:12 | 146:14,14 | **holidays** 69:13 | 11:22 |
| 162:12 169:19 | 147:19 | **hollis** 3:3 | **huh** 124:20 |
| 173:6 180:25 | **highest** 185:2 | **hollislawfirm...** | 131:23 168:9 |
| 182:6 183:2 | **highlight** 35:1 | 3:6 | 196:24 227:4 |
| 185:24 194:6 | 294:15 | **home** 58:13 | 228:16 229:15 |
| 210:3 211:10 | **highlighted** | **hon** 49:3 | 231:2 234:1,4 |
| 220:6,20 228:2 | 10:19,22 | **honik** 2:16,16 | **human** 62:8 |
| 247:18 293:6 | 174:12 186:11 | 44:16,23 49:3 | **humana** 5:15 |
| 297:2 316:12 | 186:14 192:15 | 49:12,19 50:9 | 5:15 |
| 318:13 323:3 | 194:20 | 50:23 52:3 | **hundredth** |
| 346:9 350:7 | **highlighting** | 337:24 | 234:6 |
| | 174:17 | | |

[hydrochlorothiazide - impurities]                                    Page 37

**hydrochlorot...**
  10:12 221:15
  222:2
**hydrocodone**
  58:3
**hypothetical**
  148:8 305:7
  333:1
**hypothetically**
  179:23

**i**

**i.e.** 110:25
**iceberg** 104:12
  104:18
**icgxp** 46:5
**ich** 10:16 11:18
  23:21 85:9,10
  88:12,16 91:11
  93:15 95:22
  101:10 129:5
  146:8 148:1
  181:22 182:10
  182:17,17,20
  183:13,25
  315:20 316:7
  316:15,21
  317:7,23
**idea** 43:18
  101:7 125:21
  276:11
**ideal** 213:24
  276:11
**ideally** 255:9
**ideas** 84:8

**identification**
  18:3 20:6 22:3
  31:6 35:12
  43:25 63:4
  72:13 81:8
  121:16 155:6
  158:16 159:25
  161:12 162:12
  169:19 173:6
  180:25 182:6
  183:2 185:24
  188:15 189:12
  191:18 194:6
  210:3 211:10
  220:6,20 228:2
  228:17,20
  247:18 293:6
  297:2 309:2,21
  316:12 318:13
  323:3 346:9
**identified** 23:13
  28:2 30:14
  38:4 75:25
  91:24 102:17
  104:21 112:8
  114:16 125:8
  146:20 157:4
  200:16,17
  222:2 264:15
  282:12 283:3
  285:10 286:1
  309:5 314:14
  326:20 327:2
  328:18 329:20
  332:11 343:3

  345:5
**identifies** 111:1
  169:3
**identify** 29:9
  85:7,17 103:4,7
  112:1 115:13
  130:19 131:18
  141:25 168:4
  182:8 191:9,13
  192:8 193:8
  221:6 331:18
**identifying**
  157:3
**identity** 80:6
  130:3 132:13
  133:7,9 256:20
  261:3,6 333:17
**ignoring** 322:7
  322:10
**illinois** 5:18
**immediate**
  194:12
**immediately**
  136:6 171:9
  322:2
**impact** 92:14
  100:13 219:21
**implemented**
  271:9
**implementing**
  151:13
**implications**
  98:14
**imply** 207:7

**importance**
  119:10
**important** 95:3
  95:5 107:22
  108:1,3,4
  109:12,19,25
  111:19,21
  112:11 113:4,6
  113:6,9 114:5
  114:19,21
  115:3,6 118:17
  118:23 119:8
  119:23 120:3
  121:3 123:3,16
  123:19,22
  132:1,11
  138:24 178:13
  287:9
**impossible** 87:3
  187:20
**improper** 339:5
**impurities**
  10:14,16 17:2
  39:6 42:19,22
  42:25 43:4,6
  77:11 87:3
  105:6 165:24
  166:4,11 177:4
  182:15,20
  183:8,13 184:6
  184:20 185:3,6
  186:3 194:10
  194:23 196:10
  199:5,6 203:22
  226:23 233:18

[impurities - industry] Page 38

233:23 273:22
274:2 335:3
**impurity** 76:3
77:11 86:18
104:3 106:12
107:4 153:6,14
153:24 160:16
170:9 173:22
182:9 184:17
184:18,21
186:20 195:2,5
195:12,13
203:24 204:4,9
226:22 274:9
343:4,11
**inadequate**
288:21
**inappropriate**
322:15
**inception** 46:21
**incident** 17:2
**include** 36:10
36:17 75:1
78:13 109:11
144:23 146:6
170:5 182:14
186:17 226:25
237:21 251:25
253:21 254:2
**included** 27:3
45:16,17 78:15
78:24 201:3,5
224:2 225:13
**includes** 20:23
31:24 179:19

225:24 229:4
**including** 29:14
69:18 88:13
166:10 178:1
199:12 325:4
**incoming**
220:25 229:25
**incomplete**
148:7 305:6
333:1
**inconsistencies**
157:4
**incorporate**
331:10
**incorporated**
323:13 328:19
**incorporating**
326:2 331:13
332:3
**incorporation**
314:15
**incorrect**
256:12
**increase** 138:9
**incumbent**
169:6 193:8
195:18
**independent**
127:13 128:8
133:17 234:25
**indeterminant**
339:7
**indian** 147:1
**indicate** 102:13
226:7 240:19

**indicated** 201:9
211:1 214:23
248:5 308:14
**indicates** 22:4
151:18 173:13
173:15 183:9
183:11 216:12
217:2,3 222:14
224:19 239:4
239:17,21
241:3,12
325:21
**indicating**
18:10 165:23
166:3 325:9
327:10,12
329:13
**indication**
301:15
**indicator** 83:7
107:9 108:9
109:25 146:7
**individual**
115:25 140:3
170:9 173:22
226:22 233:18
233:23 234:14
**individuals**
13:17 262:12
265:4
**industries** 4:9
**industry** 16:8
23:7,19 24:3,6
38:2,15 40:18
41:1 45:10

46:9 58:21
80:10 82:22,24
83:11,13 84:5
85:7 91:18,21
95:17 96:12
112:7 113:11
114:12 115:1
115:14 117:24
121:25 123:2
123:10,13
124:6 125:11
126:1,20,25
127:10 136:17
136:20 137:4
137:19 145:21
145:24 151:21
156:3,6,25
158:2 177:19
177:23 187:2
187:12 188:6
190:25 195:24
200:14 203:15
204:12,17,21
205:1,14,16,19
205:20,21,22
205:25 206:2,4
206:11,14,15
206:18,22
207:10,13
234:24 252:11
255:4 256:11
256:15 258:4
260:16 262:2,6
262:12,14
263:5,24 270:2

270:6,15,23,25
271:9,22
272:20 273:1
273:15 284:14
308:11 326:22
328:11 332:11
**industry's**
271:21
**industry.pdf**
9:22
**ineffective** 99:5
100:23
**information**
14:17 17:15
18:10 32:14
36:17 40:24
41:6 51:8 52:6
60:11,22,24
74:12,19 80:11
81:11 108:25
109:21 123:1,2
123:17 131:3
131:17 132:22
144:10,12,23
152:14,15
191:7 196:2
225:12 301:21
312:24
**informed** 52:7
203:24
**infrequently**
114:11 120:15
**ingersoll** 6:14
**ingredient**
186:25 324:3

**ingredients**
129:7 319:17
**initial** 27:13
51:9 54:3
134:11,12,20
261:17
**initially** 57:10
64:20 141:15
**initiated** 209:9
217:2
**injury** 203:8
**innovation**
206:11
**innovative** 46:8
**innovator**
150:23
**input** 60:25
65:9 107:9,11
108:4 109:18
109:19,19
111:21 112:5,9
112:9 113:4,5
113:14 114:19
114:20,21
118:17 119:4,4
119:24,24
120:4,10,22
121:3 131:4
132:18 133:11
138:24 267:23
334:17,18,20
338:21 340:2
**inputs** 113:6
114:8 118:24
119:7 120:21

121:5 131:24
131:25 136:25
136:25 140:3,4
145:12 147:4
340:2
**insanitary**
319:17
**insignificant**
113:17 114:1
116:1
**insofar** 67:5
**inspected** 106:7
**inspection**
102:7 104:16
108:6 114:10
117:4 120:14
120:17 121:1
197:6 298:1,3
**inspections**
109:23 110:18
110:20,20,21
119:16 121:3
**inspectors**
288:22
**inspects** 109:20
**instance** 86:16
88:24 89:1
95:6,23 332:24
**instances** 91:24
**instruct** 125:22
**instructed** 8:14
334:10
**insufficient**
249:16 250:7
250:11,25

251:5,9,14,19
**integrity**
146:22
**intend** 90:22
306:20,22
307:23 309:11
310:3 313:10
315:5 321:20
338:25 341:15
341:18 342:7
342:12
**intended** 74:18
99:4,14 100:3,8
127:4 199:1
**intentions**
336:4
**intents** 318:22
**interest** 178:11
**interested** 13:1
51:3,4,13,25
140:20 142:15
347:19
**interim** 147:24
**internal** 170:19
187:22 228:7
230:4 308:13
**internally**
105:23
**international**
37:23 108:4
**interpret** 189:7
190:15 299:17
**interpretation**
217:7

interpreted
189:19
interrupt 96:19
interval 136:12
intervals
130:14
introduce
121:9
introduced
186:21
introduction
155:12,13
156:13
introductions
13:20
investigate
43:10 179:25
investigated
171:12,19
204:10 332:22
investigating
42:16
investigation
27:3 78:22
171:8,10
172:24 180:8
186:3 187:22
189:11,23
190:8 191:4
194:9 199:14
200:12 202:22
308:22 309:6
334:8
investigations
78:16

investigator
142:23
invite 65:25
66:1
invited 65:23
337:9
invoice 47:13
65:11 66:2,20
66:21,23 67:2,8
68:4,8,21,23
69:7,12,16
invoices 9:11
20:25 47:9
62:24 63:19,22
63:25 65:3
69:10,20
involved 37:19
48:4 60:5
61:11,13 71:11
100:16 106:6
155:18 156:15
involvement
21:12 106:12
involving 21:12
irbesartan 1:6
irrelevant
312:17,20,25
313:2,3
irvine 70:9,12
70:21
isp 37:16,19,22
38:1
issuance 160:8
issue 40:6
78:20 86:19

98:8 103:4
105:6,19 106:5
106:12 107:4
115:19 117:22
118:1 169:12
199:18 204:17
207:22 235:8
235:22 275:23
276:13 290:9
307:9 311:10
311:19 312:6
312:15 329:9
334:3,3 339:2
340:18
issued 63:22
124:22 192:24
223:12 246:6
290:8,11
303:25 312:10
312:14 334:10
343:23
issues 39:5,10
80:13 91:24
103:7 118:1
146:4,20
194:11 199:2
205:8 301:16
301:17 326:25
328:12,17
333:17
issuing 119:16
item 123:7
211:22 214:9
219:14,14
220:11 228:11

items 20:17
26:9 33:24
36:16 83:20
84:3 123:14
130:21,22
132:4,8 144:16
210:6 216:18
270:20 302:7
ives 5:16,17

j

j 2:10,21 6:2
348:1
jaiswal 11:13
30:1 246:21
248:3,11 279:7
james 1:16 2:1
8:3 15:9,16
346:23 348:5
349:2,24 350:2
350:4,12
january 1:17
2:2 10:21 12:2
12:6 150:2
194:12 221:16
347:22 348:3
japanese
181:25
jersey 1:2 2:23
6:11 12:17
jian 289:1
298:14
jmestre 4:7
job 1:24 38:23
53:4 57:4,14
115:15 337:15

**jobs** 60:18
**john** 7:10
**john.lavelle**
  7:12
**johnson** 3:9
**jorge** 4:3
**journal** 36:20
**jr** 6:9 7:10
**judge** 1:8 116:1
**judgment**
  87:22 89:6
  115:24
**julian** 7:15
  12:21
**july** 65:12,17
  297:5 298:14
  299:1
**jumped** 202:3
**june** 44:10 49:7
  53:12 54:24
  65:12 203:25
  309:3
**jury** 253:8
  324:15
**justification**
  76:18,23,25
**justifications**
  78:1
**justin** 7:16
  247:16 293:3
  293:19 294:6
  295:23 296:13
  297:20 310:18

**k**

**kanner** 2:10,14
  13:14 348:2
**kansas** 3:5,10
**kass** 4:4
**katz** 2:21
**kbi** 5:19
**keep** 18:11,20
  21:11 25:13
  77:23 291:24
**keeping** 260:14
**kevin** 70:25
**kevin's** 66:14
**key** 139:14
  146:2
**kill** 86:2
**kind** 81:23
  126:23 161:4
  161:23 197:4
  254:10 304:4
**kinds** 111:6
  190:24 340:3
**kirkland** 5:3
  242:10 243:7
**kirkland.com**
  5:7,7
**kirstin** 5:17
**knew** 58:21,23
  310:4
**know** 24:14
  25:19 30:2
  39:6 44:25
  48:3,19 50:5,13
  52:8 58:19
  61:19 67:9

71:1 77:19
79:18 90:15,18
104:19 105:15
107:23 108:7,8
112:22 117:3
117:23 118:2
123:9 125:13
134:19 153:20
163:14 167:6
187:20 192:7
192:10 193:20
193:24,24
195:4 196:14
198:18,25,25
199:17 201:15
216:1 234:13
235:16 237:13
237:17,19
245:5 249:11
252:8 253:16
254:6 256:10
264:18 274:16
274:18,25
276:20 308:24
309:22 310:16
312:5 317:8
335:10 336:5
336:11 340:21
341:4 342:19
344:1
**knowing**
  332:21
**knowledge**
  40:12 45:12
  58:25 59:18

63:21 64:24
  84:6 103:25
**known** 108:20
  146:3 187:23
  187:25 196:12
  308:10,15,19
  309:8,13,20
**knows** 123:10
  247:5
**kugler** 1:7

**l**

**l.l.c.** 2:10
**lab** 191:21
**labeled** 100:21
**labeling** 169:5
**laboratories**
  7:2 57:5 191:3
  191:22
**laboratory**
  46:13,14 145:9
  193:23 197:4
  265:4,5,8
**labs** 6:7
**lack** 88:25
  90:20 91:9
  97:22 112:2
  241:19 242:1
  259:17 260:11
  292:2 340:20
**lacking** 325:11
**lacks** 291:5
**laid** 260:23
**language** 84:7
**large** 178:9

[larger - listed]                                                    Page 42

larger 200:12
latest 28:22
lavelle 7:10
law 3:3 91:15
   124:23 125:6
   243:7 271:14
   271:17
law.com 2:14
   348:2
laws 125:2,3,4
lawsuit 243:7
   271:18
lawyers 45:13
   48:4,8
lay 270:1
layman 82:11
   82:24 83:4,11
   84:3,8,11,13
lead 90:1,2,16
   97:21 186:19
   189:12,23
   234:19 321:23
leader 93:17
   96:13 202:19
leadership
   276:1
leading 94:16
   95:1 321:16,23
leads 214:21
learn 40:6
leave 58:6
leaves 91:6
   275:22 276:24
lecture 112:19

led 150:17
   168:4 188:16
   281:6 282:11
   288:6
left 49:2,16
   58:7 59:15
   88:10
legal 12:22,24
   51:10 52:14,18
   53:2 139:21
   348:23
legally 109:2
   140:11 157:14
leon 4:5
letter 21:1
   43:17 44:5,7,15
   49:8 52:3
   53:11 54:3,6
   116:15 297:5,6
   311:17 322:24
   323:5,19,25
   324:15 325:9
   326:10,15
   327:5,7,9,11
   329:13 332:20
   332:24 339:2
   340:19 343:22
letterhead
   297:7
letters 114:15
   146:19 328:9
level 86:12,13
   86:14 87:6,13
   88:9 90:11
   91:13 92:3

93:15 96:5
103:8 106:19
112:3 114:3
130:9 131:14
131:19 133:20
240:7 270:17
314:11 315:11
318:4 320:25
328:16,20
334:3
levels 43:6
   89:17 184:18
   184:22 185:3
   192:18
levin 3:13
levinlaw.com
   3:17,18
lewis 7:9
lexington 5:5
liability 1:7
   12:16
liberty 288:14
life 58:12
lifecycle 111:7
light 230:11
   307:22
likely 59:19
   127:10 174:19
   264:6,12
limit 171:2
   173:23 233:10
limitation
   259:14
limited 7:8 80:3
   105:18,20

243:12,21
limits 213:12
   223:18
line 44:17 88:4
   213:24 228:11
   242:6 247:24
   274:1 349:4,7
   349:10,13,16
   349:19
lines 45:6 53:9
   256:13 336:24
link 13:25
   54:16
linkedin 45:5
   46:3 48:24
list 9:3 21:25
   22:19 23:1,6,14
   25:24 28:25
   29:13 30:7,15
   30:22 34:10
   45:18 54:9
   65:17,18,21,24
   68:19 132:10
   134:17 163:1
   164:6 167:6
   173:17 245:12
   253:19,21
   254:2 266:5
   267:10 268:8
   301:21
listed 27:20
   31:11 34:9
   39:2 47:15
   53:20 54:9
   68:18,20 132:5

144:16 162:18
162:22,25
201:17 230:8
230:18,23
262:24,25
263:1,23
266:12 268:3
268:18,23
280:19,22
290:21 302:7
342:21
**listing** 31:24
**lists** 45:16
165:4 317:21
**literature** 23:1
23:7,15 34:7
36:15,20 123:2
**literatures**
23:13
**litigation** 1:7
12:16 18:23
45:14 106:6
123:11 311:10
311:20 312:6
**little** 72:25 73:5
208:11 242:12
242:13 262:3
291:22
**live** 15:17,18
**lived** 58:9
**living** 16:2
115:17 116:13
**llc** 2:16,21 3:8
4:2,9 5:9 6:13

**llp** 2:3 4:3,10
4:17 5:3,11,16
6:3,8 7:3
**local** 58:13
**location** 12:18
15:22,23 58:7
131:7 145:15
145:20
**locations**
146:13
**lockard** 4:11
8:4,5,9,11 13:8
13:9,16 14:4
15:14 16:22
18:5 19:2,7,8
19:19,23 20:1,7
21:24 22:6
23:8 27:12
29:11,12 30:24
31:3,7,10,19
33:8,11 35:10
35:13 40:5,14
41:15 42:1
43:8,20 44:2
48:17 50:4,11
50:17 51:16
63:1,5,10,12,15
63:16 67:23
69:5 72:1,9,14
72:17,19,22
74:10 76:9,11
76:22 77:7
78:7 79:14
80:15 81:2,6,9
82:12 83:15

84:23 88:15
89:9,19 91:22
92:6 93:3,8,20
94:19 97:7,15
97:24 98:20
102:5,11,21
103:6 105:3,8
106:3 107:2,21
108:11 110:5
112:10,14,17
112:19,24
115:5,23 117:9
118:11 119:13
119:19 120:1
121:9,14,17
124:13 126:6
126:15 127:23
128:15 129:2
129:24 137:2
137:17 139:18
142:8 143:3,14
143:19 144:21
145:3 148:13
148:19,25
150:9,11,13
152:7 153:11
153:21 154:23
155:3,7 157:6
158:13,17
159:22 160:1
161:6,9,13
162:7,10,13,15
163:12,20
164:1,21 165:8
165:21 166:23

167:24 169:8
169:15,20
170:24 171:4
171:14,21
172:15 173:1,4
173:7,21 174:3
174:13,18,21
175:17,24
176:12 177:20
178:15 180:11
180:21,23
181:1 182:3,7
182:24 183:3
185:21 186:1
187:9 188:5,23
189:5,13
190:11,20
191:11 194:1,4
194:7 197:18
197:24 199:16
200:1 202:4
203:1,19
205:12 207:6
208:2,16,22
209:3 210:1,4
211:4,11
215:16 216:7
217:1,6 218:1,9
219:13 220:3,7
220:16,21
223:2 224:5,10
225:1,3 227:9
227:14,20,22
228:3 231:12
231:13 234:2

234:12 236:7
237:5,24 238:7
238:17 239:6
241:1,13,24
242:4,8,12
306:6 307:6,8
307:14 314:8
314:22 315:3
315:14,22
316:5,10,13
318:5,11,14
319:1 320:8
321:3 322:4,10
324:24 325:2
326:5,16
327:17,22
328:1,4 329:1
329:24 333:4
333:21 334:6
335:9 336:3,18
337:2,8,14,19
338:1,4,13,24
339:9,14,21
340:8,16,24
341:9 345:16
345:19,23
346:6
**lockardv** 4:15
**long** 42:4 46:19
49:14,21 55:22
58:11 70:14,20
117:2 137:21
171:2 176:19
346:6

**longer** 38:7,9
38:11,11,16,22
116:11,18,21
117:11,14
275:24
**look** 18:25
20:11 22:23
24:13,25 32:1
34:12 51:14
63:6 65:16,18
68:3,4 77:13
81:22 86:22
106:9 126:4
133:24 134:3,4
134:5,18
136:22 138:17
139:8 141:7,12
141:20 142:24
143:16,24
144:1,19
152:25 155:2
162:6,17 163:4
164:8 172:2
181:9 192:14
193:5 194:17
195:11 196:18
210:20 211:12
218:8 221:25
222:10 223:10
227:2 230:21
235:18 244:7
247:19 250:19
254:17 257:7
263:25 275:12
281:9 288:18

294:9,11
296:23 297:19
298:7 301:1
316:14 317:4
326:23
**looked** 22:22
24:18 25:10
93:25 126:22
139:6,8,9
143:25 144:20
164:7 201:8
294:5 298:4
**looking** 39:23
45:14 47:21
57:3 59:9
71:10 77:16
104:6 126:16
135:4 143:25
144:14 146:18
166:17 175:18
185:1 188:12
193:21 213:20
219:4 228:11
231:17 233:1
246:11 247:22
262:17 298:9
**looks** 32:17
63:18 67:6
68:16 73:12
127:9 158:22
163:2 213:5
237:15
**los** 2:4 12:1,19
14:15 150:1
347:2

**losartan** 1:5
348:4 349:1
350:1
**loss** 202:11
**lost** 80:18 172:1
172:2
**lot** 38:5 68:3
74:11 131:10
136:1 146:25
228:4,8,10
**lots** 133:23
135:3 250:25
256:1 328:11
**louisiana** 2:13
**low** 86:6 92:3
131:14
**lower** 90:11
114:9 277:12
277:21
**ltr** 9:9
**luncheon** 149:7

**m**

**m** 4:12 6:3
**ma'am** 24:17
24:23 27:17,19
32:9,24 34:11
34:18,21 35:6
36:9 56:18
**made** 56:17
58:12 66:19
76:13,14 94:9
95:11 96:7,8
102:6 111:1
127:15 165:14
165:19 166:8

**[made - manufacturing]**                                      Page 45

| | | | |
|---|---|---|---|
| 167:14 201:20 | 239:1 246:10 | 94:24 106:24 | 118:18 119:14 |
| 202:18,21 | 249:24 251:2 | 129:9 131:13 | 119:21 120:4 |
| 203:17 219:6 | 260:2 261:20 | 140:1,21 | 120:16 121:4 |
| 222:16 245:10 | 261:21 263:19 | 142:16 145:10 | 127:12,16 |
| 308:13 309:18 | 266:25 271:1 | 266:17 301:22 | 128:1,17,18 |
| 326:3,7,9 335:7 | 275:25 280:21 | 304:13,15 | 129:17 132:1 |
| 335:18 338:21 | 282:11 283:6 | 314:11 316:8 | 133:17 140:12 |
| 340:14 350:5 | 290:4 293:22 | 320:15,20 | 141:5 145:8 |
| **madeline** 3:15 | 295:2 299:13 | 321:13,22 | 159:17 168:15 |
| 48:15,18 54:22 | 299:19 300:17 | **managing** | 179:6 180:9,13 |
| **main** 45:25 | 302:20 318:9 | 104:15 147:5 | 189:19 190:10 |
| 58:2 80:9 | 328:24 331:24 | **mandatory** | 208:1 230:2,8 |
| 198:10,14,15 | 332:14 335:17 | 123:7 | 243:22 263:2 |
| 199:12 287:4 | 336:5 340:4 | **mantra** 114:13 | 272:14 273:7 |
| **maintain** 15:25 | 344:9 346:4 | **manufacture** | 277:3 287:12 |
| **maintenance** | **makes** 21:2 | 77:24 222:24 | 287:24,25 |
| 111:6 | 129:9 299:4 | 230:10 231:5 | 326:10 332:14 |
| **major** 119:4 | 332:4 | 319:9,18,22 | **manufacturer's** |
| 287:3,12 | **making** 56:22 | 320:1 324:5 | 180:14 |
| **majority** 54:11 | 64:15 76:25 | **manufactured** | **manufacturers** |
| **make** 25:9 | 93:17 106:18 | 57:25 58:2 | 74:14 88:11 |
| 86:25 90:9 | 145:13 202:15 | 80:4,8 81:24 | 92:7 106:6 |
| 94:13 95:4,14 | 241:18 245:23 | 83:2 94:22 | 122:15 123:24 |
| 95:20,23 | **manage** 120:17 | 99:21 100:20 | 132:9 137:22 |
| 101:25 106:21 | 145:22 | 102:14,18 | 145:21 147:18 |
| 116:14,20,22 | **managed** | 108:24 216:20 | 156:4 189:1,6 |
| 116:24 117:13 | 104:14,16 | 222:19 225:8 | 192:20 197:13 |
| 117:18 120:23 | 109:22 | 311:18 321:9 | 206:15,19,20 |
| 125:5 130:14 | **management** | 331:3 343:9 | 207:10,14 |
| 131:21 132:25 | 11:19 16:3 | **manufacturer** | 262:5,10 |
| 137:4 147:16 | 58:4 60:8 64:8 | 17:3 51:22 | 270:16,17 |
| 148:10 158:11 | 74:2 79:7,13,23 | 61:10 80:2 | 271:12 276:8 |
| 172:3 182:4 | 80:1 85:10 | 81:18 99:21 | 276:21 |
| 185:22 197:3 | 88:10,13 91:6 | 108:25 115:7 | **manufacturing** |
| 210:1 238:3 | 91:10 93:14,24 | 116:3,4 117:15 | 9:15,18,21 |

46:10,14 57:11
57:19,20,25
60:7 70:9,12
77:23 80:21,24
85:22 99:15
100:9 119:20
123:12,17
136:18 154:2
155:17,18,19
155:24 156:16
156:18 186:23
192:19 194:25
195:4,14,25
206:3,5,7,12
262:4 271:5,10
271:22 288:22
308:12 311:9
311:19 312:5
312:15 319:4
319:12 324:2

**mark** 19:17
21:25 30:24
43:23 81:2
158:13 161:6
162:7 169:15
173:1 182:24
211:4,7 220:3
247:16 293:4
296:24 316:7,8
322:25 345:20

**marked** 17:25
18:2 20:5 22:2
31:5 35:9,11
43:24 62:24
63:3 72:9,12

81:7 121:15
155:5 158:15
159:24 161:11
162:11 169:18
173:5 180:24
182:5 183:1
185:23 194:5
210:2 211:9
220:5,11,19
227:24 228:1
247:17 293:5
297:1 316:11
318:12 323:2
346:8

**market** 2:17
7:11 97:5
101:19 109:4
110:16,16
202:8 333:14
334:5

**marketed**
109:3 110:10

**marketing**
202:17 279:22

**marketplace**
150:21

**martin** 4:17

**mass** 191:17,19
191:23

**massachusetts**
6:5

**match** 134:18
252:21

**material** 34:8
80:3 120:6

132:15 133:1
151:7,19 154:5
169:2 191:2
201:1 211:16
212:23 219:19
260:18 272:16
275:24 278:1,6
325:14 326:15
326:20,23,24
326:25 327:4
328:15,19
332:3,9 334:23
334:24

**materials** 9:3
20:24 21:3,22
21:25 27:13
29:9 31:24
34:9,25 38:3
52:3 54:4,7,8,9
54:14 68:17,18
78:23 128:7
129:12 144:16
150:15 162:22
165:16 166:14
167:5 178:11
221:21 297:10
323:8

**math** 67:5

**matter** 12:15
41:3,13 51:3,5
51:10,12 90:5
113:17 152:10
237:17 243:13
328:13 331:11
345:19

**matters** 14:21
46:18 52:14
53:10

**mazie** 2:21

**mazieslater.c...**
2:24

**mazzotti** 4:17

**md** 10:19,21

**mdl** 1:5

**mdl2875-000...**
11:17

**mdl2875-000...**
11:15

**mdl2875-000...**
9:23

**mdl2875-000...**
10:5

**mdl2875-000...**
11:10

**mdl2875-000...**
11:3

**mdl2875-000...**
11:8

**mdl2875-000...**
10:3

**mdl2875-009...**
10:23

**mdl2875-009...**
11:7

**meagher** 5:11

**mean** 21:6
25:20,21 26:11
40:15 43:2
50:12 52:12
61:19 64:13

65:22,24 82:1
82:14 83:1,5
85:6 97:4
101:4 104:10
105:2,12
129:12 132:14
133:14 145:19
174:8 177:18
185:10 190:16
206:2 218:24
230:22 255:7,8
272:11 279:11
282:7 301:24
**meaning** 95:3
109:2 324:8
**means** 81:23
82:11 84:14
87:21 123:7
126:8 157:21
170:13,16
217:14 221:23
225:7 289:11
333:19
**meant** 44:6
77:19 127:5
177:17,18
302:9 317:13
**measures**
125:24 178:24
**media** 12:13
72:9 150:6
208:21 243:2
313:24 316:4
**medical** 16:7
17:10

**medication**
96:24 334:11
335:2,11
**medications**
17:9 98:12
**medicines**
96:17 316:18
316:25 317:7
**meet** 55:22
82:25 100:21
170:18 184:15
219:1 263:6
278:2,6
**meeting** 54:20
56:9 68:13
185:10 265:6
**meetings** 54:23
55:1 57:2
65:13,14,17
**meets** 88:24
101:4 171:11
174:7,10 320:2
**member** 38:11
38:25
**members** 37:6
324:14
**memory** 25:5,6
56:11
**mention** 140:6
184:1 258:23
259:9 274:12
**mentioned** 44:3
48:5 133:12
138:17 145:11
145:15 148:20

254:9 323:11
**merely** 273:20
**message** 48:25
49:1,2,15
**mestre** 4:3,3
**met** 48:7,11
55:17,20 65:19
184:5 185:14
217:18 240:13
263:8,8 323:14
**method** 26:20
26:21 178:10
191:6 192:8,11
192:12 195:11
210:14 211:15
212:11,15,17
212:22 213:5
213:16 214:2,5
226:23 265:7
**methodology**
130:16 184:25
191:12 196:5,8
328:24
**methods** 134:6
134:6 191:25
223:15 319:7
319:21 324:4
325:10
**miami** 4:6
**microphones**
12:7
**mid** 44:14
131:14
**middle** 43:16
43:18 44:4

330:18
**midway** 98:25
**mind** 132:12
135:12 153:9
**mine** 64:6
284:13
**mini** 11:14
**minimal** 100:24
**minimum**
30:16 139:14
140:7,8
**minute** 280:23
315:23
**minutes** 73:22
142:17 143:10
160:23 322:8
343:15
**mischaracteri...**
287:15 303:2
322:2 325:14
326:13 327:16
329:16 334:1
336:16 338:16
344:18
**mischaracteri...**
322:4
**misrepresents**
68:23
**missed** 195:21
**missing** 137:5
271:1
**mission** 3:10
**misstates** 115:9
118:7 143:21
187:14 234:10

[misstates - need]                                                      Page 48

236:11 241:22
281:1 285:22
300:3 315:7
320:6,12
327:16 335:5
343:1,13
**mistake** 66:19
**mitchell** 3:13
**mitigation**
147:25
**moment** 13:23
61:20 220:15
242:20 292:20
307:11 316:16
324:24
**moments**
205:13
**monitor** 107:18
109:13 130:19
258:13
**monitored**
109:7
**monitoring**
80:11 110:17
110:24 111:2,9
111:18 185:17
244:12 260:17
265:16 267:14
268:14 269:10
**monograph**
10:10,12 169:3
169:24
**monroe** 5:18
**month** 28:18
176:6

**months** 35:19
70:22 135:19
138:10
**morgan** 7:9
**morganlewis....**
7:12
**morning** 12:4
13:8
**motivation**
278:19
**motivations**
339:1
**mouth** 45:8
**move** 197:25
245:2
**mpendley** 3:18
**msp** 4:2
**muddled**
246:25
**multiple** 2:4
28:11 191:2
220:22 246:2
276:15,18
277:3,19,20
281:18 302:7
**murrieta** 58:9
**murtha** 6:9
**mute** 12:9
259:23,24
**mylan** 7:2,2
71:24 78:10,19
78:20 198:24
198:24 199:1,5
199:9,11,12,18
199:21 200:4,6

201:3,6,10
202:6,24 203:3
203:7
**mylan's** 79:1
201:1 202:24

**n**

**n** 8:1 11:12
**n.w.** 5:12
**nagaich** 32:23
33:22 249:20
250:18
**nagaich's** 246:6
252:4 264:22
**nagle** 5:4
**nail** 267:3
**name** 12:21
14:11 15:15
33:21 44:25
46:16,19,24
70:25 75:3
243:5 249:23
306:16
**named** 71:12
347:7,11
**names** 48:5
**nature** 50:19
100:14
**nda** 60:15
168:11
**ndas** 75:4
**ndea** 170:5
173:18 195:25
196:10 199:5
199:18

**ndma** 153:24
168:5 170:5
173:18 184:21
184:22 186:20
187:3,11,13
188:9,12 189:8
192:9,18
193:14 195:24
196:9,18
201:11 308:11
308:14,22
309:3,7,12,20
310:4
**ndma's** 197:3
**ne** 4:13
**near** 58:10
227:5
**necessarily**
29:21 53:1
82:2,15 83:5
85:1 97:17
102:13 135:2
139:24 174:8
252:6 255:18
284:9 334:12
340:1
**necessary**
168:1 350:6
**need** 14:2 16:21
19:1 23:9
28:25 32:8
45:9 72:14
73:10 75:1
77:5 111:6
113:12 122:9

125:23 134:22
136:9,16
139:14 140:16
148:4,24
170:17 178:8
178:17 190:25
193:15,24
198:18 200:19
202:17 205:25
207:3 208:3,4
227:9 238:14
238:15 245:8
250:23,24
274:7 294:1
311:13 331:20
331:24 332:16
334:4
**needed** 56:16
171:18 186:24
191:9,12
240:12 255:12
343:6
**needs** 88:22
127:12,17
177:19 180:5
195:1
**negative** 241:25
**negotiations**
135:24
**neither** 187:1
187:12 195:23
196:10
**net** 85:22,23
86:5,8,10,11,16
200:12

**never** 39:22
41:9,18 43:10
60:2,14 86:10
95:11 104:1,22
104:24 113:16
132:25 147:16
212:14 215:1
236:22 240:12
245:19 246:1
248:13 249:5,6
250:16 253:8
272:2 273:25
331:12 335:7
335:20,22
337:3,9 338:17
**new** 1:2 2:13,23
4:19 5:6,6,12
6:11 10:14,17
12:17 24:14
33:7,14 134:23
136:8 196:2
210:16 212:15
212:23 213:4
213:13,22
214:5,7 219:19
219:19 222:14
222:20 223:6
259:4 272:12
272:16 325:5,7
**news** 40:12
**nf** 169:24
**nigh** 3:14 54:20
54:21,22 65:15
**nina** 5:11
306:16 307:8

**nina.rose** 5:14
**nitrosamine**
39:25,25 43:11
86:19 105:6
150:18 153:6
153:19 160:16
309:5 334:8
**nitrosamines**
39:10,13,18,19
40:7,19 41:10
41:20 42:6,10
42:17,18 62:5,8
170:6 185:1
187:24 188:8
189:20 190:16
203:25 204:5
204:19 205:15
205:18 206:21
207:12 308:23
**nods** 24:1
**noise** 178:22,25
**non** 21:8,10
51:11 52:6,10
52:11,17,20,21
52:22 53:4,5,8
89:8 92:15
104:11,25
105:2,24 106:8
107:12 125:9
148:5 288:11
**normal** 23:20
190:4 256:13
274:4
**normally** 52:14
53:7,8 103:19

117:25 126:2
130:8,13,17
134:12 136:3
137:22 141:15
141:24 261:19
265:7
**north** 6:17
**notary** 350:13
350:19
**note** 12:7
214:17 348:10
**notebook**
215:19 250:23
**noted** 103:17
287:18 289:10
300:1,25 350:7
**notes** 34:19,22
34:23 80:18
**notice** 2:6 9:5
19:13 20:4
22:25 29:8
31:1 171:23
**noticed** 36:10
171:17
**notices** 334:7,9
**noticing** 13:7
**notification**
74:4 78:16
130:25 136:5
204:14 205:24
209:18
**notified** 204:16
204:23 282:24
**notify** 205:4

**notifying**  205:7
**noting**  113:25
  293:13
**novartis**  150:16
  151:12,18
  152:4,9,21,22
  152:23 153:1,4
  168:4 190:2
  191:16 192:7
  240:24 309:21
**novartis's**
  150:16,21
  152:11
**novd**  8:22
**november**  67:3
  69:8 209:10
  323:6
**number**  13:17
  32:16 49:9
  64:18 72:9
  89:5 98:22,25
  110:1 150:6
  155:4 158:19
  159:23 160:2
  194:2 198:5
  208:21 225:14
  227:2 228:4,10
  229:16,19,20
  230:22 231:9
  233:12 235:17
  237:15 239:10
  239:10,17,19
  239:20,20
  243:2 255:19
  255:21,22

  292:3 308:24
  313:24 316:4
**numbers**  34:1
  45:10 146:19
  234:15,17
  237:10,14,20
  239:16,25
  240:7,13,16
  241:11 252:2
  263:11
**numerous**
  27:21 29:14
**ny**  348:15

**o**

**o'clock**  243:2
**oath**  251:15
  321:5 322:6,8
**ob**  159:19
**object**  49:24
  156:22
**objection**  16:16
  23:3 27:9 33:6
  40:1,9 41:11,21
  42:24 50:1,8,16
  67:19,22 68:22
  74:7 76:19
  77:1 78:4 79:9
  79:21 82:7,17
  84:16 88:1,20
  89:14 90:25
  92:1,22 93:6
  94:12 96:20
  97:11,19 98:18
  102:2,8,15,24
  104:4 105:7,10

  106:13 107:7
  107:25 109:17
  111:20 114:24
  115:9 116:7
  118:7,21
  119:18,22
  121:7 123:25
  125:19 126:11
  127:14 128:2
  128:22 129:23
  136:13 137:10
  139:2 141:10
  142:20 143:13
  143:18,21
  144:25 148:7
  148:18 152:5
  153:7,15
  154:15 163:8
  163:18,24
  164:19 165:3
  165:11 166:12
  167:19,21
  169:1 170:15
  171:3,7,20
  172:9,22
  173:19 174:2,5
  175:11,21
  176:2 177:13
  178:6 179:21
  185:8 187:6,14
  188:10 189:4,9
  189:21 190:18
  190:18 197:15
  197:21,23
  199:8,20

  201:25 202:13
  203:10 205:2
  206:23 207:15
  216:3,14 217:5
  217:9 218:6
  219:8 222:21
  224:4,7 234:10
  236:6,11 237:9
  238:5,13,23
  240:21 241:5
  241:22 242:2
  244:2,25
  249:10 250:10
  251:7,18
  253:10 254:5
  256:6 257:2,25
  259:20 264:17
  268:22 269:12
  270:8 271:6,19
  272:21,23
  273:10 274:3
  274:21 275:3
  277:5,22 278:9
  278:14,20
  279:3 280:5,16
  281:1,17 282:3
  284:18 285:22
  286:19 287:14
  288:1,8 289:22
  289:25 290:13
  291:3,14 292:2
  292:4,6,16
  293:24 295:5
  295:10 297:16
  299:10 300:3

302:5 303:1,19
304:6 305:6
307:25 309:14
309:24 310:6
311:11,21
312:7,18
313:13 314:8
315:1,7,18
318:1,24 320:6
320:11,11
322:1 325:13
326:12 327:15
329:15 332:25
333:25 335:5
335:24 336:14
336:14,18
338:8,16 339:4
339:10 340:12
341:2 342:2,16
343:1,13
344:17
**objectionable**
86:1,3,11
**objections** 13:2
29:8 30:25
31:21 34:16
73:14 291:21
291:25 328:7
337:5,13,17,22
344:24
**objective**
200:21 201:14
201:19 202:2
202:20 213:15
214:8 216:9

246:18 250:25
253:13,14
274:8,13 303:6
**objs** 9:5
**obligations**
14:12 18:16
**observation**
102:17,20,22
103:13,16
104:1,10
120:25 207:24
295:13,19,21
296:17,19
298:7,8 302:12
303:5,24 304:9
304:11 305:11
**observations**
102:6,12
104:17 107:1,3
107:10 108:10
109:24 111:25
112:8 113:4,25
114:9 118:13
118:16 119:9
120:3 121:3
131:10,12
207:21 285:25
296:5 302:8,9
302:15 303:24
304:19,24
305:4
**observed** 112:2
**obtain** 273:8
**obtained** 151:5

**obviously** 20:23
113:13 127:8
**occasion** 39:15
40:11 42:15
**occasions**
277:19,20
**occur** 42:19
86:4,24 104:17
178:5,8 192:18
217:16
**occurred** 51:6
80:13 118:2,3
**occurrence**
85:15 86:6,12
87:1 88:25
89:17 90:7
315:21
**occurring**
195:3
**occurs** 88:5
133:21 134:21
178:12 193:17
261:18 275:23
**october** 32:18
57:7 209:19
**odd** 171:12
**offer** 50:25
62:7 90:23
91:2 92:19
280:13 290:16
306:20,22
307:23 309:11
310:3 313:10
340:7 341:15
341:18 342:8

342:12
**offered** 92:20
**offering** 17:5
97:25 98:3,7
199:9,10 200:2
200:5 209:8
244:19,23
245:3,7 278:12
278:18,25
280:2 281:15
282:1 286:16
308:4 340:17
342:14
**office** 15:25
110:21
**officially** 147:8
**oh** 22:5,16
54:23 63:10
67:15 69:22
87:9 159:11,12
160:7 227:12
230:15 231:12
233:10 272:8
306:2 333:5
**okay** 14:9
17:24 18:4,15
18:25 19:9
20:1,21 21:18
22:18 23:9,15
23:24 24:6
25:16 26:3
27:6 28:1,7,21
28:24 29:22
30:17 31:14,20
31:23 32:10

[okay - opinion]                                                    Page 52

| | | | |
|---|---|---|---|
| 33:4,10,18,23 | 158:24 159:7 | 239:15 240:18 | 209:9 |
| 36:4 37:9,13,25 | 159:12,22 | 242:7,11,23 | **ones**  30:11 |
| 38:16,22 40:15 | 160:5,11,13,14 | 243:19 247:3 | 132:12 |
| 40:17 41:7 | 160:22 161:6 | 247:12,14 | **ongoing**  110:14 |
| 42:2,7,21 44:3 | 161:19 163:2,5 | 249:4 251:2 | 186:3 194:9 |
| 44:9,19,22,25 | 163:13 164:2 | 253:5 254:1 | **online**  169:24 |
| 47:5,8,11,15,21 | 164:22 166:24 | 256:4 257:22 | **ooo**  346:24 |
| 48:3,7,18 49:4 | 167:25 168:23 | 261:21 262:13 | **opened**  25:24 |
| 49:6,11,21,23 | 170:1 172:3 | 262:22 264:2 | 26:2 29:18 |
| 51:1,20 52:11 | 177:8 180:21 | 266:10,19 | 30:8,16 162:5 |
| 53:11,15,21,23 | 181:13 182:24 | 267:3 269:8,22 | 171:9 209:15 |
| 54:8 55:10,22 | 183:6,12 | 270:22 272:10 | 209:21 297:11 |
| 56:15,19,25 | 185:21 188:24 | 279:25 283:5 | **opening**  64:14 |
| 57:24 59:5,12 | 194:14 197:16 | 290:20 293:14 | **operated** |
| 59:17 60:1,17 | 197:25 198:7 | 294:25 295:16 | 319:11,24 |
| 61:23 62:4 | 199:4 208:17 | 305:19 306:10 | **operating** |
| 63:6,11,21 | 208:23 209:13 | 308:20 309:1 | 33:20 124:9,18 |
| 65:21 66:20 | 210:24 211:21 | 313:15,20 | **operations** |
| 67:24 68:6 | 212:10,24 | 315:22 317:4 | 319:4 |
| 70:5,11,14,16 | 213:12,13 | 317:23 318:9 | **operators** |
| 71:6,24 72:1,5 | 215:10,17 | 318:20 319:2 | 77:23 |
| 72:9,17 73:23 | 216:8,11 | 321:7,20 322:7 | **opine**  16:25 |
| 74:19,20 75:7 | 218:10,12 | 324:21 325:3 | 41:2 188:18 |
| 75:15 76:6 | 220:22 221:9 | 327:18,25 | 196:6 235:9 |
| 77:15,25 78:24 | 221:22 222:4 | 328:3 330:16 | **opined**  106:15 |
| 85:5 94:20 | 222:10,18 | 340:17 342:11 | 144:14 145:9 |
| 99:23 111:15 | 223:3 225:12 | 343:19 344:8 | 153:17 193:10 |
| 112:14 119:7 | 225:20 227:15 | 345:12 346:10 | 236:16 240:8 |
| 122:12,25 | 227:19 228:10 | 346:21 | 282:13 |
| 124:16 127:2 | 228:20 230:15 | **old**  213:21 | **opining**  28:9 |
| 127:24 129:25 | 230:25 231:7 | 222:20 225:8 | 94:18 196:22 |
| 132:18 133:11 | 231:16 232:7 | 259:5 | 199:21 281:12 |
| 149:4,5 150:10 | 232:18,22 | **once**  113:18 | **opinion**  50:25 |
| 150:12 154:8 | 234:9 236:17 | 115:21 119:1 | 87:23 89:11 |
| 154:17 155:2 | 237:25 238:18 | 176:5,6 208:13 | 91:2,11 92:19 |

92:20 93:4,14
94:21 96:2
97:14 99:9
102:23 107:5
127:11,24
131:25 142:3
143:7 153:22
165:2 197:12
198:3,11,15
199:23 200:5
203:12 244:19
245:2,3,16,23
246:10 248:13
249:1 250:6,15
251:4,13,22
252:5 258:21
260:9 263:21
266:10 267:12
267:19 269:8
269:22 270:23
273:25 275:20
275:21 276:6
278:25 280:3,7
280:14 281:16
282:1,14
284:12 285:20
286:16 287:11
300:14 302:3
310:3 314:5
320:5,9 321:8
324:17 325:5,5
327:8,8,13
328:14 329:3,6
329:11 331:24
332:10 334:13

335:4,6,14
338:20 339:24
339:25 340:6
340:18 341:18
342:12,14,19
342:23 343:8
343:12 344:13
344:23
**opinions** 17:5
23:17 32:8
62:8 73:1 79:1
83:21 90:23
97:25 98:3,7
163:15 172:4
175:7 198:9
199:9,10 200:2
209:8 241:23
244:1,3,23
245:6,10,13
253:25 265:10
266:24 275:9
278:12 281:2
281:15 286:24
289:19 290:10
290:16 291:8
292:10 306:21
306:22 307:24
308:4 309:11
313:10 323:9
338:14,17
339:15,22,23
341:15 342:8
344:10
**opportunity**
79:5 86:12

115:20 130:23
135:22 136:1
208:9 226:11
303:9 304:10
**opposed** 90:10
**order** 8:21 11:5
17:13,25 18:8
20:3 52:8 53:9
78:2 117:17
140:13 166:24
175:9 178:16
191:9 213:1
223:4 237:7
238:10 286:11
328:24 345:25
**orders** 17:17
**organic** 187:25
**organization**
38:1 57:19
117:6,7 277:11
277:25 279:19
279:22,23
**organizations**
39:1
**original** 29:13
33:17 49:5,7
174:19 347:16
**originally**
166:20
**orleans** 2:13
**outcome** 13:2
97:2
**outlined** 131:2
**outside** 42:14
108:5 120:10

304:23 340:9
**outweigh**
108:19,22
**overall** 78:22
**overarching**
79:18
**overland** 3:5
**overlap** 59:19
59:23
**overseas**
120:14
**oversee** 57:14
**overseeing**
139:1
**oversight** 57:20
57:24 74:1
79:19 80:5
87:5 96:3
106:25 120:13
129:10 130:23
134:24 135:8
145:23 148:5
148:15 266:9
269:7 320:21
328:17
**oversights**
146:14
**overtly** 45:4
**overview** 266:8
**own** 55:6,8
56:11 72:20
75:9 105:23
113:22 115:8
119:6 127:12
127:17 132:2

134:19 136:2
137:13 179:13
179:15,16
187:21 191:22
203:23 224:12
230:3 234:20
234:23,25
235:3,13 236:3
238:4,10
241:15 248:5
252:12 258:14
327:7,8 330:24
**owner**   150:24
**oxford**   7:5

**p**

**p**   6:9 7:10 9:13
**p.m.**   149:6,7,9
150:3,6 208:18
208:21 242:24
243:2 305:20
305:23 307:15
307:18 313:21
313:24 316:1,4
346:12,22
**p.o.**   4:19
**pa**   3:3,13
**package**   135:22
165:20
**packages**
167:11 196:13
**packaging**
319:10,23
324:6
**page**   2:25 3:25
4:25 5:25 6:25

8:2,19,25 9:2
9:24 10:2,25
11:2 20:14
32:1 65:11
66:12 69:25
74:22 81:13,22
108:13 122:3
157:7 158:12
159:7,10,10,11
159:14 168:10
170:1 173:16
174:12 176:13
176:16 181:9
186:13 192:14
194:19,20
197:2 209:1,5
210:23 211:12
214:10 219:16
221:18,20,25
223:10 224:1
228:5,14,23
229:3 230:7,9
230:16,22,23
231:10,11,14
233:2 245:17
246:11 247:20
247:21,22
250:15 263:25
271:25 293:19
293:21 294:3,7
294:9,10,21
295:3,24
296:12 297:19
299:20 325:15
349:4,7,10,13

349:16,19
**pages**   176:18
293:23
**paid**   47:4,11
69:10,20,22
**pain**   58:4
**palm**   15:18,20
15:24
**papantonio**
3:13
**paper**   21:5,8,11
**papers**   39:12
337:20
**paragraph**
74:21 75:19
78:9 80:16,17
80:19 98:25
99:20,24 110:1
110:6 122:4
156:12 157:7
157:18 176:15
176:17,20
192:15 209:5
209:13 210:10
222:11 223:11
244:8 254:17
257:8 258:12
260:2,14
261:14 262:25
263:1,13,25
265:12 267:13
267:21 268:7
268:10,13,19
268:24 271:25
273:18 275:12

277:8 278:23
280:8,18 281:6
281:7 286:5
288:18,25
289:5,7,13,24
290:21 292:25
293:9 294:19
295:8,9,18
296:8 301:1,4
301:11 310:11
310:14,21
311:3,5 312:21
329:19,22,25
330:7 334:14
334:16 338:20
339:24 340:7
341:22 342:19
343:15,20,25
344:15
**parameter**
224:19
**parameters**
212:4 213:11
**paraphrasing**
309:19
**parenteral**   70:9
70:11
**park**   2:3 3:5
12:19
**parkway**   2:22
**part**   38:13,18
38:22 133:6
138:2 163:5
188:21 195:17
198:14 206:3,4

206:12 211:23
212:23 216:5
248:5 259:6
261:16,17
262:7,14 283:7
283:12,14
284:6 287:2
323:8
**participants**
2:4
**participate**
65:5
**particle** 229:20
255:13
**particular**
29:22 61:16,20
89:18 118:1
131:20 138:4
156:14 195:25
198:14 206:25
212:11 246:15
255:13 268:10
276:9,18 286:4
288:4 320:18
326:19
**particularly**
61:21
**parties** 12:11
13:18 117:21
117:25 155:17
156:15
**parts** 229:4
**party** 12:25
116:13,19
117:8,18 118:5

264:6 276:3
288:21 289:1
296:10 298:13
**pas** 110:17
**pass** 43:22
**past** 45:22 46:2
230:16 273:4
**patients** 102:1
334:10 335:1
**pause** 287:20
**pay** 38:21
45:17,19 64:10
**pc** 6:14
**pdf** 9:13 10:19
10:22 11:4,11
11:14 247:20
247:21 293:19
294:7 295:24
297:19
**peak** 174:24
175:19 176:1
176:25 177:11
178:12,13,17
178:17,18
180:3 188:20
189:1,7 190:4,4
192:6 193:17
240:9
**peaks** 150:17
170:21 171:1
172:24 175:1,5
175:7,8,19
176:8 177:25
178:5 179:8,19
180:14,17,20

184:9 189:20
190:9,15
191:10,13
196:20,21
213:7 235:6
237:18 264:8
264:16,23,24
**peer** 36:20
**pending** 15:4
295:6,11
**pendley** 3:15
**pennsylvania**
2:18 7:6,11
**penny** 172:1,2
**pensacola** 3:16
**people** 45:11
58:23 262:11
**percent** 170:22
173:23,25
175:2
**percentage**
30:5 276:7,10
**percentages**
170:13,17
**perfect** 190:2
247:12 296:1
296:14
**perfectly** 75:12
274:4
**perform** 39:15
77:4 129:11
130:3 213:1
219:18 255:16
**performances**
129:13

**performed**
120:15 133:4
134:10 135:20
212:6,14 226:8
227:1 228:21
229:25 246:13
246:20 247:2
248:17,20
249:15 251:1,5
251:11 252:9
253:8 266:2
267:24 274:12
274:19 282:25
292:19 298:21
345:3
**performing**
133:10 151:22
238:19 239:23
239:25 260:21
320:22
**period** 54:13
68:20 134:22
189:2 223:13
235:16 291:4
292:7 343:5
**periodic** 130:14
130:24 135:9
135:18 258:14
**permits** 160:19
**person** 2:11
4:11,12 7:15
13:5 53:25
55:2 85:21
87:8 201:18
257:20

[personally - position]                                                    Page 56

| | | | |
|---|---|---|---|
| **personally** 137:21 277:16 277:18 | **phi** 9:6,10,11 | 312:6 335:17 347:11 | 323:22 |
| **personnel** 198:12 | **phil** 104:24 | **placed** 36:1 291:9 | **plus** 253:17 |
| **persons** 149:9 | **philadelphia** 2:18 7:11 | **plaintiff** 2:9 3:2 4:2 | **point** 16:12,15 19:3 94:2 |
| **perspective** 58:8,12 59:3,8 101:9 113:13 114:2,4,22 133:3 147:21 285:11 | **philip** 1:16 2:1 8:3,23 9:8 12:14 15:9,16 19:14 31:2 72:11 346:23 348:5 349:2,24 350:2,4,12 | **plaintiffs** 13:15 20:16 24:4 30:25 32:16 35:5 48:4,8 | 104:13 111:16 113:18 139:14 140:15 160:22 179:3 191:7 214:9 223:7 233:4 234:14 266:4 268:6 275:5 284:23 339:7,17 |
| **pertains** 347:15 | **phone** 12:9 13:18 48:24 49:1,12,14,15 56:2 | **plan** 70:8 92:19 120:16 147:25 151:13 214:25 216:24 218:24 305:11 | **pointing** 140:24 |
| **pertinent** 14:21 | | | **points** 140:18 142:3,12 143:8 144:6 153:10 246:2 |
| **ph.d.** 11:14 | **phonetic** 110:17 | **planned** 120:15 215:8 217:15 217:16 218:16 | |
| **pharm** 158:25 211:13 | **physical** 236:24 241:7 253:2 346:3 | **planning** 62:7 215:2 217:14 218:17 | **poisonous** 319:17 |
| **pharma** 4:9 5:2 7:8 243:12,17 | **pick** 12:8 227:3 | **plant** 70:21 | **policies** 124:18 162:1 163:6,7 163:16,23 |
| **pharmaceutical** 4:9 5:9,9 11:22 37:24 39:7 40:7 43:7 129:6 324:3 | **picture** 239:5,8 **piece** 271:1 **pieces** 54:10,12 **piedmont** 4:13 | **played** 203:7 **pleadings** 27:14 27:15 71:10 | **policy** 10:6 163:3 |
| **pharmaceutic...** 4:9 5:2 7:2 16:7 43:1,2 243:12,16,21 | **pietragallo** 7:3 **pietragallo.c...** 7:7 | **please** 12:7,9 13:3 15:1 72:10 81:3 149:3 158:14 194:19 242:22 247:16,21 254:18 264:1 293:3,19 295:24 296:24 297:19 301:1 | **ponce** 4:5 **poor** 99:3 282:11 |
| **pharmacopeia** 169:5 | **pittsburgh** 7:6 **placate** 114:6 | | **portion** 65:6 174:12 194:20 322:10 |
| **pharmacopoeia** 181:25,25 | **place** 12:11 53:3,4 160:15 202:22 215:15 234:6,8,11 265:1 269:20 | | **portions** 83:24 322:8 |
| **pharmacy** 5:15 **phases** 28:12 | | | **position** 61:3 127:2 156:5 |

204:7 276:25
277:18,24
299:3,18
**positions** 36:8
57:4,10 276:1
**possibilities**
152:3
**possibility** 99:4
**possible** 243:10
263:20 291:24
**possibly** 276:10
**post** 29:9 78:16
109:7,14
110:11,16,16
110:24 111:8,9
299:1
**potential** 36:23
36:25 41:10,19
42:9 43:11
50:24 62:5
85:18,20 87:17
87:18,18 89:2
89:12,21 90:2
90:19 91:7
103:18 152:2
177:4 184:8
188:8 202:7,9
202:10 203:24
204:17 240:3
**potentially**
151:9 195:21
198:13 200:13
226:21 254:10
254:13 256:9
279:12

**practice** 9:18
15:21 23:20
25:8 45:7
46:11,12,13
92:11 94:7,15
114:7 117:24
123:12 124:5
126:13 136:19
136:19 188:6
188:19 200:15
205:22,23
206:4,5,7,13
252:12 255:4
256:11,15,17
258:4 262:4,5,9
262:15 270:3,6
270:16,23,25
271:10,22
272:19 273:1
273:15 319:13
320:1 321:12
324:2
**practiced** 16:20
**practices** 9:15
17:1 18:18
46:11 80:21,24
91:19,21 93:1
93:23 94:4,24
126:1 154:2
188:18 260:16
263:24 269:16
271:11 321:21
**practicing**
284:14

**precarious**
276:25
**precedes**
295:14
**preclinical** 75:1
75:9
**prefer** 79:16
**preforming**
250:8
**premise** 132:6
**preparation**
60:3,5 68:13
177:2 178:1
180:1,1
**prepare** 22:9
22:11 55:20
56:3,8 57:1
61:7
**preparing**
59:19 60:15,18
78:18 180:6
**prescribe** 269:9
**presence** 38:14
39:18 41:10,19
42:10,17 55:6
153:5 170:21
175:19 176:1
176:24 177:11
180:20 184:8
184:12 188:9
189:8 203:25
204:4,18
205:15,17
206:21 207:12
309:20 310:4

**present** 2:11,12
2:17,22 3:4,9
3:14,15 4:4,5
4:11,12,18 5:4
5:5,12,17 6:4,9
6:15 7:4,10,14
7:15,17 37:6,11
38:10,17 40:7
43:6 50:6
149:10 174:9
175:7 205:5
**presentations**
36:16,22,23
37:2,3,5,10,16
37:21 38:13,18
39:4,9 123:14
337:10
**presented**
89:13 277:25
**presenting**
289:19
**president** 296:9
**pressure**
277:24 278:1,8
279:7,10,12
280:24 283:17
283:18
**pressures**
277:11 279:1
280:3,14
**pressurize**
279:23
**prevent** 17:10
85:23 99:4
105:25

preventative
  305:10
previous  56:5
  123:10 126:22
  136:8 212:5
  248:15 300:8
  300:12 307:22
previously
  28:16 33:13
  56:4 88:7 99:8
  143:23 185:20
  213:6 218:16
  219:7 253:1
  254:16 262:3
  270:10 320:19
  328:12
pricing  287:2,9
primarily  58:7
  68:12 73:2
  84:2 145:9
primary  144:4
  144:6,20
  221:13 253:14
principal  47:15
  47:18
principles
  320:15
prinston  5:9
  71:16 77:10
prinston73102
  76:7
print  323:1
prior  30:20
  33:13 40:19
  41:2,17 42:7

44:19,22 52:25
55:18 56:23
60:18 127:4
143:22 174:16
222:25 223:6
225:7 236:8,12
238:9 241:14
243:12 272:12
309:8,13,21
312:14 315:8
322:3 330:10
330:10 343:2
347:6
priority  279:21
private  12:8
privilege  50:12
probabilities
  90:6
probability
  87:13 92:4
  93:1 94:15
  95:1 321:15,23
probably  35:18
  73:6 84:17
  86:2 120:19
  127:1 202:10
problem  19:6
  69:20 85:25
  103:4 134:7
  175:20,23,23
  176:1,25
  177:12,17,19
  177:23 200:9
  200:16,17,21
  236:17 276:25

282:10 283:21
287:20 332:23
346:6
problematic
  87:6 275:23
  276:5
problems  87:11
  117:2,2,5
  120:12 146:8
  146:21,22
  157:4 180:17
  282:20 283:3
  283:19 284:10
  285:3,7,15
  287:8,13
  310:23 313:7
  313:11 328:14
procedural
  299:13
proceduralize
  207:3
procedure
  14:13 33:20
  124:9 137:14
  298:19,20
  299:2,7,15,24
  300:19
procedures
  33:19 64:19
  124:18 137:16
  156:11 189:18
  190:14
proceeding
  13:3

proceedings
  347:14,17
process  55:4
  74:13 75:20
  76:14,25 80:14
  88:22 90:8,12
  134:23 136:8,8
  186:23 187:4
  194:25 195:4
  195:14 196:1
  209:9,16,21
  210:17 211:24
  213:14,21,22
  214:6,7 217:3
  219:22 222:20
  223:6,6 225:8
  235:1 244:13
  258:16 259:4,5
  260:4 265:17
  267:15,17
  268:15 269:11
  269:14,23,24
  271:5 272:12
  272:16 273:8
  287:3 308:12
  311:9 312:5,15
  313:2
processed
  199:5
processes  164:3
  189:16 205:6
  311:19
processing
  186:18 201:1
  319:9,23 324:5

**proctor** 3:13
**produce** 183:18
  200:13,13
  239:25
**produced** 68:1
  98:5 154:5
  164:18 168:24
  184:18 216:5
  217:25 235:7,8
  253:18,22
  254:3
**producing**
  142:6 317:17
**product** 9:19
  17:3 50:13,15
  50:20 58:2
  77:24 78:14,19
  82:25 83:3
  84:24 85:2,4,13
  85:18,20,24
  86:1,14,16 87:1
  87:9,13,19
  88:13,18 89:2,7
  89:12,20,25
  90:2,10,14,16
  90:16,17,18,20
  90:23 91:3,7,8
  91:14,16,25
  92:5,7,8,21,25
  93:4,16,18,21
  94:6,8,14,17,21
  95:1,12,18,22
  95:24 96:4,7,8
  96:14 97:4,5,9
  97:13,17,20,21

97:23 99:16
100:10 101:4
102:14,18
103:14,14
108:17,23
109:1,6 110:9
128:25 129:21
138:1,16,17,18
139:5,11,13,19
140:5,6,10,18
141:7,16,21,25
142:7,12
143:24 144:2,5
144:11,18,22
145:6,7,9
151:23 168:14
169:10 173:11
173:14 175:14
175:16 181:5,7
181:8 184:5
185:13,13
195:13 198:23
199:5 200:4,6
202:6 203:7
212:13,15
219:23 221:8
221:14,15,20
222:2,18,19,24
223:3 231:15
231:17,19
243:22 255:13
257:13 275:25
308:19,23
314:7,12,13
315:13 317:18

320:14,17,25
321:9,16,23
323:14 324:19
325:9 326:1
329:3,6,12,14
331:10,13
332:4,4,13,18
333:15,18,19
333:22 334:4,5
336:7 340:19
343:5
**product's**
  108:19
**production**
  17:22 26:6,8,18
  26:25 33:17
  54:10 63:17
  64:4,12,14,16
  76:1 139:4
  151:17 152:17
  152:25 153:1
  162:5,22
  165:23 166:3,9
  186:19 256:3
  275:9 301:19
  301:24
**products** 1:6
  12:15 16:4
  39:7 40:8
  41:20 42:10,20
  43:3,7 75:3
  80:7 91:4
  92:15,17 93:1
  93:25 94:1,5,16
  145:14 151:25

182:1 183:7,8
184:15 185:14
201:21 202:24
279:13 314:16
314:16,25
315:6,10,11,16
325:6 327:12
327:14 328:20
331:2 333:12
333:13,13
339:2 344:6
**products.pdf**
  10:17
**professional**
  15:22,23 37:10
  37:10 38:18,18
  39:1 61:20,24
  84:5 96:12
  190:23 192:5
  326:23
**professionals**
  101:23
**profile** 80:12
  96:25 138:8
  139:25
**program** 90:8
  93:24 106:24
  145:10 164:3
  230:6 248:6
  255:4,9 256:9
**programs**
  146:1
**project** 70:18
  70:20

projects 70:17
promulgated
146:1 183:20
183:22
promulgates
88:11 316:21
pronouncement
117:13
pronounceme...
146:12
properly
237:19
properties
197:3
proposed
246:19
propounded
20:15
prospective
195:16,18,21
prospectively
195:10,11
196:4 299:1
protective 8:21
11:5 17:13,16
17:25 20:3
52:7 53:9
345:25
proud 61:21
prove 251:5
provide 19:4
37:1 38:2,13,17
42:15 60:11,22
60:25 65:8
103:1,19 128:3

136:4 145:22
190:6 217:23
317:23 318:3
provided 17:21
18:9,22 20:22
21:19,22 22:17
22:24 24:4,16
25:21,23,25
26:5 27:8 28:5
29:10 30:16
32:3,11,12,13
33:15 34:1
37:3,5,9 54:12
63:17 73:15
75:23 76:24
103:16 128:13
128:18 132:23
133:16 134:5
138:20 139:4
152:21 162:2,4
162:21 166:8
166:11 167:11
202:2 203:9
211:19 224:11
255:2 256:2,17
257:19 275:8,8
290:17 301:18
301:22,25
304:13 325:20
provides 84:12
109:21 159:8
318:2
providing
19:23 82:9
102:19 139:21

321:19
provision
159:13 319:3
prudent 76:25
159:17 190:10
206:15,19,19
206:25 207:4,8
207:9,14,17,23
207:25 262:5
271:11
public 37:21
82:9 83:14
84:21 105:20
121:25 126:17
126:19,25
127:6 335:11
350:19
publications
23:1,16 36:11
36:14 39:13
40:17
publicly 127:8
publish 123:4
published
36:19 122:17
123:16 184:16
pull 24:24 25:4
25:9 77:15
227:21 247:3
247:14 250:19
293:2 312:9
pulled 240:4
pulling 25:3
64:14

purchase 78:9
purchased
286:17
purely 106:23
107:18 120:23
140:7 148:12
184:7 185:18
300:16
purity 80:7
229:14
purpose 80:20
82:8 83:12
84:10 116:11
164:15 213:17
218:13 257:11
317:14
purposes 30:9
32:14 35:21
62:20 83:22
144:13 164:16
198:17 223:9
258:9 318:22
pursuant 2:6
14:12
pursue 189:23
put 53:3 158:18
210:7 220:14
putting 297:9

q

q&a 122:17
126:17,19
127:3,7
q3a 10:14
181:22 182:10
182:21,22

183:10 184:1
**q3b** 10:16
  182:17,20,24
  183:8,13 184:1
**q7** 129:5
**q9** 11:18 85:9
  88:12,16 91:11
  93:15 95:22
  101:10 146:8
  148:1 315:20
  316:7,22 317:7
  317:23
**qualification**
  130:8 134:11
  134:12,20
  151:7 244:11
  259:7 261:18
  265:15,21
  266:6 269:16
  296:15 300:18
**qualifications**
  61:24 266:25
  267:6 298:9
**qualified**
  171:18 189:15
  269:25 276:9
  298:18,23
  299:2,6,14,23
  300:21
**qualifier** 176:7
**qualify** 130:6
  270:3 277:3
**qualifying**
  151:19 257:11
  258:9

**qualitative**
  85:12
**quality** 9:21
  10:6 11:18
  41:8,16 57:13
  57:15,20 60:24
  61:1,6 80:7
  92:17 93:17
  104:14 108:23
  115:3 117:6,19
  125:25 130:18
  140:19 142:14
  144:15 148:20
  152:11 154:3,4
  154:9,12,20
  156:2,6,8,10,10
  156:16 157:1
  158:5,20,23
  159:3 160:24
  161:3,20,25
  163:16 164:2
  167:2,13
  190:23 192:5
  202:17,19
  251:14 260:17
  262:12 265:4
  266:14,21
  267:11 269:18
  276:2,5 277:12
  277:21 278:13
  279:21 296:9
  314:10 316:7
  319:4 320:20
  320:22,22

**quantitate**
  178:11
**quantitation**
  233:11
**quantitative**
  85:12
**quantity** 65:2
**quarrel** 197:7,8
**query** 180:19
**question** 41:14
  80:13 93:9
  97:16 112:12
  112:22,25
  113:2 121:23
  129:16 153:12
  163:13 172:19
  174:9 178:13
  178:16 179:2,5
  184:8 188:13
  188:20 189:1
  190:5 193:11
  193:12,19
  195:19 196:21
  198:2 207:7,9
  226:14 239:1
  240:11,12
  244:22 253:17
  254:1 268:16
  280:1,10
  283:24 284:16
  294:20 295:5
  295:11 299:11
  301:12 307:21
  321:5,7 327:20
  327:24 328:2

333:7 336:17
  336:22,23
  338:2
**questioned**
  170:23 178:8
  188:14 190:4
  190:24 310:20
  323:11
**questioner**
  306:3
**questioning**
  171:1 242:5
  248:23 282:18
  310:22 322:3
  325:4
**questions** 8:14
  9:17 17:11
  73:4,6,9 79:24
  121:25 122:18
  126:21,24
  127:1 168:20
  175:10 179:4
  184:7 200:20
  201:4,5 208:9
  208:13 242:6
  243:20 245:9
  266:19 294:24
  295:4 305:25
  314:18 322:14
  324:22 341:9
  341:10 345:11
**quick** 66:3,3
  72:2 313:18
  322:16

**quickly**  291:24
**quite**  37:14
  42:4 43:19
  268:12
**quotation**
  168:11
**quote**  77:18
  81:10 98:8
  126:8 168:13
  299:22
**quoted**  87:8
  168:12
**quoting**  108:13
  322:5

**r**

**r**  5:3,11 10:14
  66:11 349:3,3
**r2**  10:16 183:8
**racemization**
  76:2
**rafferty**  3:13
**raise**  15:1
  328:15
**raised**  197:21
**ran**  212:16
  214:1
**range**  177:1
**rare**  99:13
  100:7
**rarely**  126:5
**raspanti**  7:3
**raw**  26:10,11
  26:13,22,25
  27:6 39:17,20
  39:24 134:3

179:8,9,9,13,15
179:17,18
211:16 235:19
235:20 251:24
252:1 253:3
254:11,14
256:1 258:22
**reach**  175:8
  178:17
**reaction**  187:25
  188:1 308:18
**reactions**
  186:24
**read**  14:10,23
  24:25 25:4,9
  29:23 30:2,3,4
  30:6,20,23
  56:11,12 74:23
  75:24 81:17,22
  82:4 91:15
  96:21 99:1,12
  100:2,6,12,19
  101:11,22
  108:13 109:5
  110:8 135:3
  141:24 142:10
  143:4 155:13
  156:13 157:12
  157:19,25
  168:13 170:8
  174:23 176:23
  186:9,15
  192:16 194:21
  209:14 210:10
  212:2 214:11

214:15 216:15
216:16 217:11
219:17 222:11
223:11,21
244:9 246:6
248:3 254:20
257:8 258:12
260:15,20
264:3 265:13
272:1 273:19
275:14 277:9
282:17 286:9
294:15 295:9
295:22 296:8
299:5,22 301:4
319:6,16,19
321:6 323:22
323:24 324:14
325:23 330:1,8
330:17,20
331:6 335:13
346:19 348:9
350:5
**reader**  84:3,4
**readiness**  70:8
**reading**  25:3
  41:4 56:25
  227:9 246:9
  319:15
**reads**  194:20
**ready**  339:11
**real**  322:16
**really**  46:16
  60:1,2 73:25
  80:12 198:8

199:1 289:22
  344:9
**realm**  76:24
**realms**  152:3
**realtime**  13:25
**reason**  75:20
  75:23 77:20
  84:9 102:19
  103:3 140:6
  197:7,8 202:6
  203:13 256:19
  256:22 282:12
  340:18 348:11
  349:6,9,12,15
  349:18,21
**reasonable**
  76:18,24 77:6
  91:18 116:3
  119:15 127:25
  135:12,13
  145:13 159:17
  167:17,23
  178:4,7 187:10
  190:7,7,10
  196:19 262:4
  271:11 326:22
**reasonableness**
  188:21
**reasonably**
  129:18 187:23
  206:14,19
  317:8
**reasons**  98:11
  339:1

**recall** 26:9
29:22 30:12
41:9,24 42:4,8
42:13 48:16
49:9,22 59:10
70:23 71:8
74:4 77:12
104:3 151:16
160:17 162:3
198:22 203:4
264:22 282:24
297:8,13
309:23 310:1
310:25 323:17
333:3,10,10,12
333:15,18
334:9 335:12
**recalled** 333:12
333:23 334:2
**recalling** 336:6
**recalls** 186:4
330:11 333:6,6
333:9
**receipt** 127:18
257:5 261:6
348:18
**receipts** 272:15
**receive** 13:24
26:4 45:23
54:3,8 113:9
128:7 129:12
200:19 278:1
**received** 21:3,6
21:9,14 53:12
54:2,7 104:1

126:25 134:17
136:1 164:11
165:6 169:14
200:7 201:19
230:5 245:21
246:23 253:9
256:2,15
257:10 260:18
272:2 273:21
326:10,14
**receiving**
172:14 272:13
**recent** 73:15
**recess** 14:6
31:16 72:7
149:8 208:19
242:25 305:21
307:16 313:22
316:2
**recidivism**
117:4
**recidivist**
117:11
**recite** 14:21
**recognize** 22:7
82:8 84:4
121:20 169:22
**recognized**
195:1
**recommend**
146:6 147:3,11
**recommendat...**
103:18 147:17
148:11,14

**recommended**
126:9 157:22
184:5
**recommends**
207:18
**reconcile**
342:11
**record** 12:5,12
13:6,16 14:3,4
14:5,7 19:17
29:7 31:12,13
31:14,18 72:5,8
142:9 144:3,4,8
144:9,9,10,12
144:20 149:5
150:6 172:12
174:11 208:14
208:16,17,21
216:17 217:12
242:19,22,23
243:2 253:14
293:13 300:23
300:24 305:18
305:19,23
307:10,15,18
313:20,24
315:24,25
316:4 321:5
345:17 346:1,4
346:13,14,17
346:18
**recorded** 12:13
**recording**
12:10 238:20
346:16

**records** 112:1
139:5,6,9
140:16,19,24
140:25 141:1
141:14 142:4
142:13 143:2,8
143:25 144:7
144:15,19
167:3,14 172:7
221:13 274:8
**recovery** 4:2
**recross** 335:25
338:9 339:5
**red** 6:11 77:3
**reduce** 78:2
147:25
**reduced** 230:5
235:3,11
254:22 255:3,6
255:7,9,17,19
255:21,22,25
256:9,14
347:12
**reducing** 76:2
286:12
**refer** 24:2
161:4 185:11
223:22 243:19
268:5 279:18
285:20 290:1
333:3 340:1
**reference** 23:6
25:9,15 33:21
57:4 59:12
63:24 69:24

70:3 74:21
75:19 77:17,20
103:1 162:3
167:2 173:17
201:7 209:23
215:19 219:15
219:24 241:7
246:15 250:23
284:1,22
290:24 292:24
308:24
**referenced**
24:22 26:24
33:16,24
154:25 155:8
250:2 251:9
264:22 274:23
281:5 285:16
286:2,21 287:5
289:14,15,16
289:19 290:18
292:10,20
297:10 298:4
301:25 311:4
324:11 348:6
**references** 23:1
27:2 33:19,20
65:12 66:3
78:8 223:5
246:13 249:13
250:23 264:23
285:18 289:8
301:15
**referencing**
27:22 181:14

181:24 220:9
294:5
**referral** 45:8
46:3
**referred** 160:23
236:4 252:3
283:9 284:23
316:16
**referring** 111:2
111:8 181:21
223:25 259:2,8
261:5,7 269:2
281:21,23
282:23 285:4,5
285:8 295:20
308:21 309:1
311:2
**refers** 285:25
292:22 343:20
**reflect** 67:25
223:4 229:24
240:17 241:11
252:5
**reflected** 47:9
47:13 210:21
211:18 226:15
237:20
**reflective** 50:19
**reflects** 225:25
**refresh** 56:11
**reg** 154:11
**regard** 94:6
152:10 244:1
244:20,24
245:7,13,24

267:17 269:10
290:5,10
294:21
**regarding**
34:13 104:1
273:22 298:8
304:4 308:5
309:12 313:11
334:7 342:14
344:13
**regardless**
105:19 255:10
**regards** 210:15
**regs** 125:16
**regular** 18:17
**regulate** 114:13
115:14 116:18
**regulated** 16:4
**regulating**
38:14
**regulation** 38:2
95:16 115:2,15
115:16 123:8
124:4 125:22
126:21 127:18
128:6 132:19
135:16 136:10
136:15 137:5,7
137:13 138:2,7
139:16,20
154:21 198:5
198:15,18
203:16 206:9
236:19 257:4
260:23 261:2,9

261:23 262:1,9
263:4,8 270:7
270:11 271:2,3
271:8,13,23
272:18 273:13
325:20
**regulations**
16:11,19 24:7
24:19 25:14
46:9,9 75:13
88:17 111:6
122:20 123:20
125:18 146:16
206:8,10
262:17,23
263:15,22
**regulator** 92:16
107:18 109:20
109:20 114:6
204:21 205:8
207:18,18
**regulators**
187:2 195:24
262:11 270:18
308:10
**regulatory** 16:3
16:6 37:4,8
59:24 60:4,9,12
60:22 99:2,13
100:3,7 102:7
104:6 105:18
108:2,2 109:12
112:6,6,8 114:2
124:7 125:13
131:16 141:23

[regulatory - report]                                        Page 65

| | | | |
|---|---|---|---|
| 146:17 187:12 | relating 297:25 | rely 119:15 | 31:25 32:5,7,18 |
| 235:10 340:4 | relationship | 132:3 274:1,5 | 32:21 33:1,5,13 |
| reiteration | 74:2 104:7 | relying 293:22 | 33:25 34:3,7,9 |
| 225:18 | relationships | 295:19 296:20 | 55:5,10 56:11 |
| reject 275:16 | 156:3 276:23 | 327:9,11 | 56:13,15,19,25 |
| relate 74:3 | relative 89:7 | remain 107:17 | 59:7,9,13 65:6 |
| 102:7 112:3 | 103:13 119:11 | remainder | 65:8 66:3,6,8,9 |
| related 12:25 | 146:7 147:2 | 208:12 | 66:12,13,14 |
| 39:10 40:18 | 320:16 | remedy 166:25 | 68:13 72:10,25 |
| 73:15 94:1 | release 194:12 | remember 41:3 | 73:1,16,23 |
| 118:13,16 | 201:1,20 | 48:14 50:23 | 78:13,25 79:16 |
| 154:3 164:18 | released 200:3 | 145:17 153:9 | 81:11 83:16,18 |
| 174:25 184:19 | 200:6,18 | 308:16,17 | 83:22 84:2 |
| 223:6 229:10 | 223:16 | remote 13:24 | 87:15 91:3 |
| 229:16,18 | releasing 202:6 | remotely 2:5 | 94:18 106:15 |
| 233:1,3 235:1 | 202:24 | remove 234:23 | 106:18,23 |
| 244:11 248:23 | relevance | 334:4 | 107:20,23 |
| 265:15,21 | 341:25 | removed | 108:12 110:25 |
| 330:25 | relevant 30:8 | 101:18 | 121:19 122:3 |
| relates 17:2 | 210:7 286:24 | removing | 139:7,8,10 |
| 20:12 74:1 | 313:1 | 198:23 | 140:25 141:1 |
| 77:10 78:9 | reliability | render 88:18 | 144:6,13 145:7 |
| 88:14 96:1 | 128:11,19 | repeat 134:22 | 150:14 153:17 |
| 103:14 110:13 | 129:1 132:24 | 136:9 219:10 | 154:25 155:9 |
| 110:14,15 | 136:21 137:1 | 336:17 | 157:3 162:4 |
| 111:24 118:25 | 244:15 257:12 | repeated | 163:11 167:1 |
| 119:10 120:5 | 263:3 265:23 | 130:14 | 168:7 172:8 |
| 122:1 123:16 | 266:18 270:13 | rephrase | 176:14,23 |
| 175:14,15 | reliable 108:8 | 327:18 | 177:8,10 |
| 184:20 198:12 | 116:22 117:14 | report 9:13 | 181:15 184:2,3 |
| 198:13 204:12 | 128:5 | 20:24 23:25 | 184:7 188:11 |
| 224:1 273:15 | reliance 163:1 | 24:22 26:24 | 188:22 193:10 |
| 315:20 320:20 | relied 273:20 | 27:5 28:16,17 | 196:6,22 |
| 342:4 344:6 | relies 143:1 | 28:22 29:3,4,5 | 198:16,21 |
| | | 29:10 30:21 | 199:1 201:7 |

| | | | |
|---|---|---|---|
| 203:13,18,20 | 302:14,16,24 | 183:12,14 | **reputable** |
| 203:23 204:6 | 303:7,11,23,24 | 185:6 193:18 | 116:22 117:14 |
| 204:13 207:4 | 304:10,20 | 203:21 204:25 | **requalification** |
| 208:25 209:4 | 305:4 309:10 | 205:11 275:7 | 271:4 |
| 210:5,7 211:15 | 310:11 312:9 | **reports** 27:3,23 | **requalified** |
| 213:8 214:17 | 320:24 325:15 | 27:25 28:4,11 | 298:13 |
| 219:15,16,24 | 325:22 326:4 | 32:4,4,6,10,17 | **request** 13:24 |
| 221:14 232:3 | 327:16 328:9 | 32:20 33:16 | 14:1 32:11 |
| 233:9,14 | 328:18,22 | 40:13 55:15 | 37:7,7 141:16 |
| 236:16 238:3 | 329:22,25 | 64:19,21 84:4 | 203:3 209:17 |
| 240:9 241:23 | 332:2 335:8,15 | 139:10 144:15 | 272:15 312:24 |
| 244:7 245:8,10 | 338:23 341:21 | 145:6 162:20 | **requested** 15:2 |
| 245:17 246:3,6 | 343:14 344:1,7 | 164:6,17,22 | 203:13 |
| 246:9,19 249:4 | 344:12,18 | 165:10,13 | **requesting** |
| 249:13 252:4 | **reported** 1:25 | 166:6,19,21,22 | 20:16 26:14 |
| 252:19 253:20 | 185:3 200:10 | 168:1 238:9,11 | **requests** 20:15 |
| 253:25 254:2 | 204:4,8 229:7 | 274:11,19,22 | 152:14 |
| 254:18 257:20 | 229:21 233:10 | 275:1,8,10 | **require** 146:13 |
| 259:12,20 | 233:18,23 | 283:4 285:10 | 148:1 170:25 |
| 261:13,15,20 | 234:6,7,15 | 285:12,16 | 171:1,8 261:3 |
| 262:14,24 | 301:17 | 286:1,5 289:8 | 273:7 277:2 |
| 263:19,23 | **reporter** 12:23 | 290:6,11,14,17 | **required** 14:17 |
| 264:22 265:25 | 13:21 14:3,9 | 301:16 | 18:10 38:13 |
| 265:25 266:4 | 15:3,7 31:13 | **represent** 13:10 | 74:24 120:9 |
| 268:4,6,10 | 72:3 121:12 | 68:25 122:13 | 126:10 128:17 |
| 270:15 274:23 | 161:8,10 | 162:24 178:14 | 133:7 138:7 |
| 281:24 282:12 | 169:17 173:3 | 237:15 243:6 | 139:19 140:4,8 |
| 285:14,17,18 | 180:22 194:3 | 302:8 | 140:15 144:8,9 |
| 285:23 286:2 | 219:10 247:6,6 | **represented** | 146:13 154:21 |
| 287:18 288:19 | 247:11 307:5 | 31:23 108:19 | 156:21 157:23 |
| 290:5,8,18 | 316:9 318:10 | **representing** | 179:20 212:3 |
| 291:9 292:11 | 345:15 346:17 | 12:21 13:12,17 | 213:10 238:20 |
| 293:9 295:17 | 346:21 347:24 | 66:16 306:17 | 256:10 257:4 |
| 296:21 297:9 | **reporting** | **reprocessing** | 260:23 273:2 |
| 301:2 302:1,8 | 182:14,19 | 131:1 | 302:4 347:18 |

350:13
**requirement**
  85:24 130:4
  132:19 137:14
  139:22,23
  141:23,23
  235:10 244:14
  263:7,7 265:18
  272:18
**requirements**
  9:18 18:17
  86:15 155:20
  182:2 218:24
  261:13 266:1,9
  269:6 278:2,7
  320:2
**requires**  136:11
  140:11 154:12
  156:6,10
  200:11 207:19
  261:10,24
  270:7 271:4
  304:24
**requiring**
  175:10 179:6
**requisite**  145:1
**research**  75:2,9
  284:24
**reservation**
  78:25
**reserve**  79:1
  208:11
**residual**  210:15
  211:16 212:12
  229:19 264:8

**residue**  228:25
**resigned**  346:3
**resources**  105:5
  105:19,21,23
  106:5 190:25
  191:1 340:21
  341:4
**respect**  42:16
  61:24 74:12
  75:16 79:1,6,19
  104:2 106:11
  119:16 140:14
  163:16 164:2
  203:7 314:25
  344:10
**respectfully**
  197:19,20
  236:3
**respond**  79:13
  113:10,11
  302:13 339:9
**responded**  49:1
  49:16 201:6
**response**  32:15
  109:24 113:16
  116:17 179:7
  179:20 180:12
  301:14,18
**responses**  29:8
  31:1 73:8,14
  126:24 190:7
  228:18
**responsibilities**
  157:15 161:24

**responsibility**
  57:18 59:23
  92:13 105:22
  107:16 130:20
**responsible**
  59:4 60:14
  92:17,18
  106:25 114:14
  114:17 116:23
  201:18
**resps**  9:5
**rest**  114:18
  177:13 238:16
  268:10
**restate**  88:6
  142:21 166:1
  338:19
**restated**  76:15
**restates**  325:18
  325:19
**result**  133:25
  194:24 195:3
  229:7 287:24
  330:2 331:7
**results**  128:21
  128:24 133:15
  133:18 136:22
  136:23 172:21
  184:18 197:5
  213:21 218:3
  223:17 225:15
  225:16,25
  226:2,2,13,15
  226:19,24
  228:21 229:21

230:3,17 235:7
  236:4 237:22
  238:1,20,21
  239:22 241:16
  249:7 258:14
**resumed**  149:9
**retain**  41:5
**retained**  21:18
  50:10,15 52:4,4
**retention**  20:25
  43:17 44:5,6
  51:6 53:1
  213:7
**retrospective**
  300:18
**return**  348:13
  348:17
**returning**
  192:13
**reveal**  50:24
**revenue**  202:11
  275:25 287:1
**reverse**  151:24
**review**  22:17
  23:15 26:4
  27:15 29:16,20
  30:13 34:1,20
  34:25 35:3
  40:24 47:12
  54:4 64:21
  65:8 68:12,23
  69:1,2,3,4
  107:23 108:16
  111:19 115:7
  122:9 128:10

| | | | |
|---|---|---|---|
| 130:24 134:25 | 39:20 68:18,19 | 311:6 | 171:5,15,22 |
| 138:2,16 139:5 | 135:4 145:4 | **revisions** 238:2 | 172:8,21 |
| 139:12,13,19 | 150:15 152:18 | 238:6 | 173:23 178:2 |
| 140:5,6,10,18 | 152:20 158:21 | **revolves** 304:12 | 181:2 182:3 |
| 140:24 141:7 | 158:23 161:17 | **riddell** 4:18 | 189:2 199:2 |
| 141:21,24,25 | 162:5,16 | **right** 15:1 | 200:4 203:9 |
| 142:11,12 | 164:24 165:5,7 | 18:18 19:12,22 | 208:25 210:20 |
| 143:16 144:2,5 | 167:3,6 179:16 | 20:8,11 21:24 | 211:2 214:4 |
| 144:11 154:5 | 186:9 197:5 | 23:25 24:18 | 218:18 219:3,7 |
| 158:5 161:25 | 200:24 201:9 | 28:10 29:13 | 219:14 220:14 |
| 162:1 163:5 | 212:17 217:19 | 30:12,21,24 | 220:16 221:18 |
| 164:14,17 | 220:24 221:10 | 32:15,25 35:8 | 222:16,20 |
| 167:8 172:17 | 221:11 237:7 | 35:14 38:25 | 223:7,10,23 |
| 172:18 184:17 | 240:25 248:18 | 42:11 43:20 | 224:6,15 225:9 |
| 187:21 194:16 | 253:17,20 | 44:10,15 47:13 | 225:25 226:5,8 |
| 201:2 221:8,21 | 256:7 274:18 | 48:21 49:18 | 226:14,17 |
| 222:18 223:13 | 274:22 281:5 | 50:14 54:2,19 | 227:22 228:4 |
| 226:12 231:20 | 285:13 294:4 | 55:4,17 63:24 | 228:13 229:8 |
| 235:5,14,19 | 297:11 299:8 | 66:2 67:3,8 | 229:12 230:8 |
| 237:21,22 | 299:25 300:19 | 68:11 72:23 | 231:21,23,25 |
| 238:16 240:3 | 300:24 302:17 | 75:5 76:17 | 232:5,23 233:2 |
| 240:15,19 | 323:8 332:1 | 79:4 80:19 | 233:12,13,15 |
| 241:3,7,9 | **reviewing** | 81:2 83:16,20 | 239:13,23 |
| 246:15 248:24 | 56:15 164:22 | 84:18 89:10,13 | 240:4 242:4 |
| 249:7 252:17 | 179:12 238:21 | 96:9 98:1,9 | 245:15 247:23 |
| 253:4 259:4,17 | 297:8,13 312:1 | 99:25 100:25 | 249:9,21 250:9 |
| 260:10 265:2 | **reviews** 20:19 | 101:25 109:15 | 251:6 252:7 |
| 274:11 282:25 | 23:11 29:25 | 124:19 126:18 | 256:5 259:18 |
| 300:23 311:13 | 32:2 122:7 | 133:13 136:12 | 260:12 266:12 |
| 347:17 348:7 | 138:18 141:16 | 137:9 141:8 | 267:11 275:2 |
| **reviewed** 21:15 | 142:7 143:24 | 150:14 155:8 | 280:4,25 291:9 |
| 25:20 31:25 | 144:18,23 | 155:24 156:21 | 291:22 304:5 |
| 32:6,17,21 33:2 | 169:23 230:14 | 159:5,9 160:20 | 305:16 306:8 |
| 33:4,7,13,14 | 272:9 294:13 | 161:14 169:11 | 313:18 316:6 |
| 34:4,6 36:20 | 295:15 296:6 | 169:21 170:11 | 317:10 318:15 |

321:5 323:15
324:12 329:22
337:1 340:11
**rigor** 80:5
87:17 90:8
**rigorous** 91:10
134:24
**ring** 73:17,19
**rise** 86:14
87:12 93:15
96:5 103:8
131:14 178:16
315:11 318:4
320:17,25
328:20
**risk** 11:18
80:12 82:20
85:9,14 88:10
88:12 89:4,7
90:13 92:4
93:14 95:19,21
96:1,23,24,25
97:2 100:22
101:9 103:13
111:22 113:6
119:11 120:5
120:20 131:4,5
131:13,19
137:23 138:3,8
138:11 139:20
139:25 140:2
140:14 141:3
145:20 146:2
147:4,19,21,22
147:24,25

195:2 211:5
218:14 219:18
219:25 220:8
285:11 316:8
317:15,17,21
318:3 320:15
320:16,22
**risks** 85:13,13
101:24 108:20
108:22 186:21
**rivero** 4:3
**riveromestre....**
4:7,7
**road** 4:13
**robert** 1:7
**role** 16:23
38:17 41:7,16
42:12 43:9
59:25 60:3,18
61:6,7 70:6
106:1 107:17
114:11 150:21
203:7 315:12
331:18,23
332:16,24
340:5,6
**roll** 19:20
**room** 208:4
**rooms** 202:15
**rooney** 6:14
**root** 194:11
**rose** 5:11 8:7
8:12 306:4,9,13
306:16 307:2
307:13,19,20

308:3 309:17
310:2,9,18,19
311:15 312:4
312:12 313:5
313:15 314:11
324:22 334:3
341:10,13
342:6,22 343:7
343:18 344:21
345:2,11
**roseland** 2:23
**rosemarie** 4:18
**rosemarie.bo...**
4:20
**roughly** 44:12
**round** 232:16
**route** 199:6,19
201:10
**routine** 25:7
113:15 116:24
134:10 137:25
139:15 159:8
159:14 220:24
253:4
**routinely** 47:3
102:25 104:23
140:17 160:20
206:20
**ruben** 2:16,19
44:16,23
**rule** 1:15 14:14
14:18 207:10
**rules** 14:13
24:7,19,25
75:12 88:17

122:20
**run** 90:11 92:3
96:2 131:12
212:22 213:4
**running** 91:11
**russ** 1:16 2:1
8:3,23 9:3,5,11
9:13 12:14
15:1,9,16 19:9
19:14 20:8
31:2,8,20 35:15
50:22 63:6
72:11,23
121:19 149:2
150:10 208:23
209:4 216:11
243:5,25 291:6
291:20 292:8
293:8,21 294:9
294:25 296:5
297:4,24
305:25 306:14
314:3,23 316:6
321:4 322:22
325:3,17
331:12 339:8
341:7,14
345:13 346:2
346:23 348:5
349:2,24 350:2
350:4,12
**russ's** 29:10

**s**

**s**  2:9,11 3:2
8:18 9:1 10:1
10:19,21 11:1
14:22 264:5
267:14 349:3
**safe**  77:24
97:23 101:5
**safety**  75:3
77:22,23 78:2
80:6 86:19
98:4 103:14
133:3 194:11
**sale**  341:20
342:13,25
343:10 344:14
**sample**  164:10
177:2 178:1
180:1 212:17
213:4 214:2
245:20 249:5
252:2 272:2,11
272:19,25
273:2,8
**samples**  180:6
272:12,13,15
272:16
**satisfied**  218:2
**saw**  41:18 70:3
150:15 218:2
300:16 304:3,9
335:12
**saying**  16:20
82:23 83:4
90:15 107:8,10

108:2 113:8
114:7 116:5
142:22 174:6
193:13 207:16
236:23 238:15
239:3 240:2
270:5,24 282:9
283:16,23
300:15,24
303:13 309:23
310:1 332:15
336:15 340:25
**says**  65:2 66:11
67:14 81:21
82:16,21 90:16
91:14 101:21
102:3 110:8
114:15 123:14
126:13 135:16
136:16 137:5,7
151:16 156:13
156:24 157:11
157:17 170:8
174:22 176:23
186:15 192:15
204:17 205:14
207:11 211:13
214:18,24
215:6 216:12
216:15,16
217:8 223:11
223:21 231:25
244:9 249:4
258:12 260:15
264:3 265:13

273:18 275:13
286:9 299:20
299:22 300:19
312:13 323:23
330:7 333:16
334:17,20
**scale**  76:1
**scanned**  29:19
**scenario**  96:2
**schedule**
135:11 137:9
**scheduled**
69:14
**scientific**  87:22
89:6
**scientists**
108:14 192:3
**scope**  290:5
335:24 338:9
339:5 341:3
**scott**  186:5
194:13
**screen**  272:6
293:12 322:16
322:23
**scrutinize**
120:7
**scrutiny**  131:20
**search**  193:14
196:9 224:24
261:15
**searching**
151:1,4
**seciton**  11:20

**second**  14:9
31:12 66:20,23
67:8 68:6
72:21 80:17
133:11 182:22
214:9 221:20
227:12,15,21
231:11,15,20
233:17 245:16
247:7,20 257:7
285:2 296:2
307:5 315:24
330:15,16
**secondarily**
95:13 130:6
**secondary**
144:5 240:7
**section**  60:6,7
83:19 145:2
157:8 217:22
221:20 225:7
245:18 248:2
266:8,12
267:10 269:2,4
269:5,9 270:1
270:14 288:20
290:7,25
292:11,22
294:14,22
297:25 318:6
319:6,15
320:10 324:9
**see**  20:18 23:6
25:25 26:17,22
26:25 27:6

30:17,18 40:17
44:17 56:16
61:16 67:15
70:1 71:12
75:21 76:4
78:11 86:7
99:17 101:14
131:11 133:19
134:18 136:2
136:19 140:16
142:4,5 143:9
151:4,11 154:4
155:21 159:1
160:7,9 161:1
162:25 165:4
165:13,22
166:2,5,6,9
168:18,19
170:2 175:3
181:10 192:22
195:7 201:12
203:2 222:8
225:22 227:6
229:1 230:7,13
231:3,20 232:1
233:6,20
234:11 235:24
237:3 238:10
238:14 242:16
244:9,17
245:18 248:2,9
248:10 250:24
254:24 257:14
257:23 258:7
258:11,18

260:25 264:3
264:10 265:13
266:16 270:19
272:4,10
273:23 274:7
275:13 277:13
281:10 282:21
286:14 287:17
288:20 289:2
292:24 293:15
295:13 296:5
296:17 297:4
297:24 298:15
301:3 302:20
303:16 322:22
322:24 323:20
334:7,12,13
**seeing** 41:9
71:11 264:23
**seems** 74:3,9
188:1
**seen** 17:19
19:15 20:8
27:4 28:21
29:3 31:8,20
34:2 35:7
63:13 98:16
124:17 152:11
153:3 160:3
169:9 178:21
180:4,18
184:24 194:15
218:19 220:23
240:18,22,23
241:2 242:1

255:20 258:22
266:21 277:17
284:15 308:25
**sees** 180:13
**selected** 194:22
**self** 38:2,14
114:13 115:14
115:15,16
116:18 125:22
270:18
**semantics**
161:3
**seminar** 36:22
36:23
**seminars** 37:10
38:19
**send** 14:2 52:2
52:12,21 191:2
191:23 193:22
332:20
**sense** 21:2
58:12 84:12,17
239:2
**sensitive** 12:7
**sent** 54:14,15
69:7,20 196:9
209:17 225:18
332:23 348:14
**sentence** 81:22
110:8 157:18
176:22 177:14
192:15 257:7
260:15,20
273:18 275:13
281:9 285:6

286:8 295:14
301:11 310:13
310:21 311:3
313:6 329:23
330:7,15,16
343:5
**separate** 15:25
25:14 110:4
283:5
**september**
66:24
**sequence**
186:22
**series** 4:2
**serious** 98:14
**served** 61:12
**services** 42:15
45:3,9 54:1
**set** 20:15 24:24
27:13 54:3
117:7 208:3
211:8 323:18
**sets** 53:12
**several** 29:15
341:14 342:10
**severe** 85:25
86:18 101:17
**severities** 86:22
**severity** 85:15
86:20,23 88:25
89:17,23
146:19 315:20
**shalt** 132:20
**shape** 175:9
178:18

**[share - sorry]**

**share** 54:17
55:7,8 322:16
**sharon** 63:25
64:2,3 65:5
66:18
**she'll** 294:24
**sheet** 216:17
217:12 348:11
**shifting** 148:24
**shoes** 39:23
336:10
**shortage** 202:7
202:9
**shorthand**
347:11,24
**show** 128:4
165:5 185:21
219:1 254:11
**showed** 185:4
334:8
**showing** 218:3
260:11
**shown** 212:7
228:22 238:1
290:24
**shows** 46:16
172:12 228:14
229:7 231:9,15
234:22
**shut** 45:22 71:3
**sicker** 19:19
**side** 53:2
108:20 198:1
233:2 247:23

**sign** 18:10 19:2
19:5 52:18
53:5 346:19
348:12
**signature** 44:17
347:23
**signatures**
160:11
**signed** 11:5
18:7 19:4 52:8
345:25 346:2
348:20
**signed.pdf** 8:21
**significance**
114:9
**significant**
83:21 104:20
105:5 114:16
119:10 164:9
232:13,14,16
235:17 301:17
324:1
**significantly**
178:10
**signing** 52:25
**similar** 64:6,9
94:3 133:19
134:5,6,7
202:15 258:20
288:11 317:8
332:20
**similarly** 96:9
181:10
**simple** 177:2
178:1

**simultaneously**
307:4
**single** 22:22
88:24 89:1
90:7 253:22
254:3 276:21
**singular** 112:9
**sir** 51:4 113:20
236:2
**sispq** 333:17
**sit** 163:14
**site** 57:15,25
136:3 164:14
237:3 253:4
**sitting** 202:15
264:12 274:25
291:1,11
292:13 297:14
**situation** 105:4
**six** 35:19
135:19 138:10
**size** 175:8
178:17 214:13
219:21 229:20
255:13
**skadden** 5:11
306:16
**skadden.com**
5:14
**slate** 5:11
**slater** 2:21
**small** 45:10,10
104:13 114:10
178:9 293:12
294:16

**society** 37:23
**solco** 5:9 71:16
**sold** 182:2
331:2
**sole** 107:11
275:22 276:4
277:10 278:1
279:13,24
283:21 284:8
329:21
**solicit** 200:20
200:20
**solubility**
228:24
**solutions** 12:22
12:24 348:23
**solvent** 212:12
**solvents** 210:16
211:16 229:19
264:8
**somebody** 86:5
**somewhat** 73:9
127:3 246:25
**sop** 10:6 33:19
**sops** 34:17
**sorry** 22:5,15
29:24 37:7
40:16 54:21
57:23 63:10
64:22 68:7
73:18 80:17
116:9 122:10
154:16 159:10
167:20 176:16
219:11 227:12

227:18,19
230:9 247:3
248:25 249:12
255:22 257:1
261:14,14
269:4 272:22
279:16,17
294:6 306:21
307:1 308:7
330:6 344:4
**sort** 25:2 64:17
73:25 74:5,14
79:17 140:2
336:15
**sorting** 64:4,12
**sought** 286:10
**sound** 176:11
**sounds** 160:22
259:14 287:6
**source** 60:22,24
143:1,25 145:5
152:23 221:11
275:22 277:10
284:8
**sourced** 276:4
279:14,24
283:22
**south** 3:16
**space** 189:24
**speak** 25:2
49:18 85:2,3
104:5 140:25
**speaking** 250:3
291:21 307:4

**speaks** 259:21
**spec** 174:10
191:17,19,23
**specific** 23:6,13
42:6 79:12
87:24 88:9
91:3,13 100:15
101:7,12
105:16 126:20
126:24 153:9
158:9 165:5
185:12 186:22
191:5 198:4
207:21 213:3
251:21 261:9
261:23 262:1,8
262:17,23
268:7,16 270:7
271:3,7 281:21
284:1 285:7,13
293:21 294:20
294:23 302:10
304:11 312:9
317:21 333:17
**specifically**
26:7,10 39:19
41:4 42:13,18
45:15 60:12
73:19 135:25
141:19 154:22
156:9 162:3
164:7 166:17
179:5 186:16
247:24 252:4
255:12 257:3

265:20 286:18
288:25 289:9
299:4 301:20
310:13 314:10
325:23 338:2
**specification**
83:7 101:4
170:19,20
171:9,11 174:7
185:15 193:19
212:4 213:11
216:22 223:18
240:13 255:19
**specifications**
83:1 100:22
168:17,25
169:7,11,13
184:10,11,16
185:5,11,13
217:19 223:15
240:14,15
255:14,21,23
**specificity**
291:5,5
**specifics** 288:10
**specs** 213:13
**speculating**
118:4
**speculation**
202:12
**spent** 47:8 69:7
105:5,13,14
**spirit** 279:20
**spoken** 35:4
152:8

**springs** 15:18
15:20,24
**ss** 347:2
**stacy** 3:8,11
**stage** 199:9,22
200:3
**stance** 207:22
207:24
**stand** 37:22
46:7 56:19
322:18
**standard** 23:13
24:15 33:19
35:22 85:7,9
87:20 115:1
117:24 123:2
124:7,9 125:13
136:17,19,24
136:25 137:4
156:6 161:22
163:3 181:17
181:20,23
183:16 197:4
200:14 203:16
205:1,14,16,19
205:21 206:2,4
206:14,18,22
207:13 252:12
256:15 258:4
260:17 262:2,9
265:6 270:2,6
270:15 271:22
272:20 341:25
**standards** 23:7
23:16,18,21

| | | | |
|---|---|---|---|
| 24:2,3,6,7,19 | 102:15,24 | 185:8 187:6,14 | 288:1,8 289:22 |
| 25:7 34:7 | 104:4 105:7,10 | 188:10 189:4,9 | 290:13 291:3 |
| 61:14 123:13 | 106:13 107:7 | 189:21 190:18 | 291:14 292:2 |
| 137:20 181:14 | 107:25 109:17 | 197:15,20 | 292:16 293:11 |
| 181:16,19 | 111:20 112:12 | 199:8,20 | 293:24 294:24 |
| 183:20,21,22 | 112:16,18,20 | 201:25 202:13 | 295:5,10 |
| 184:2 185:5 | 114:24 115:9 | 203:10 205:2 | 297:16 299:10 |
| 234:25 | 116:7 118:7,10 | 206:23 207:15 | 300:3 302:5 |
| **standing** 96:13 | 118:21 119:18 | 208:14 215:13 | 303:1,19 304:6 |
| 117:2 | 119:22 121:7 | 216:3,14 217:5 | 305:6 306:3,7 |
| **stands** 46:13 | 123:25 125:19 | 217:9 218:6 | 306:10 307:7,9 |
| 197:23 265:25 | 126:11 127:14 | 219:8 222:21 | 307:12,25 |
| 336:18 | 128:2,22 | 224:4,7 227:18 | 309:14,24 |
| **stanoch** 2:10 | 129:23 136:13 | 234:1,10 236:6 | 310:6 311:11 |
| 8:8,10 13:14,14 | 137:10 139:2 | 236:11 237:9 | 311:21 312:7 |
| 16:16 19:4,16 | 141:10 142:20 | 238:5,13,23 | 312:18 313:13 |
| 19:22 22:4 | 143:13,18,21 | 240:21 241:5 | 313:18 314:2 |
| 23:3 27:9 29:7 | 144:25 148:7 | 241:22 242:2,7 | 314:18 315:1,7 |
| 33:6,10 40:1,3 | 148:18,22 | 244:2,25 247:8 | 315:18 318:1 |
| 40:9 41:11,21 | 149:2,4 152:5 | 249:10 250:10 | 318:24 320:6 |
| 42:24 47:23,25 | 153:7,15 | 251:7,18 | 320:11 322:1,7 |
| 48:9,14 49:24 | 154:15,17 | 253:10 254:5 | 322:15,21,25 |
| 50:1,8,14,22 | 156:22 159:19 | 256:6 257:1,25 | 323:4 324:21 |
| 55:17,23 56:6 | 163:8,18,24 | 259:20 264:17 | 325:13 326:12 |
| 63:9,11,15,18 | 164:19 165:3 | 268:22 269:12 | 327:15,21,24 |
| 67:19 68:22 | 165:11 166:12 | 270:8 271:6,19 | 328:3,7 329:15 |
| 72:4,15,18 74:7 | 167:19,21 | 272:21,23 | 332:25 333:7 |
| 76:19 77:1 | 169:1 170:15 | 273:10 274:3 | 333:25 335:5 |
| 78:4 79:9,21 | 171:3,7,20 | 274:21 275:3 | 335:24 336:13 |
| 82:7,17 84:16 | 172:9,22 | 277:5,22 278:9 | 336:21 337:5 |
| 88:1,20 89:14 | 173:19 174:2,5 | 278:14,20 | 337:13,17,22 |
| 90:25 92:1,22 | 174:11,16,20 | 279:3 280:5,16 | 338:8,16 339:4 |
| 93:6,10 94:12 | 175:11,21 | 281:1,17 282:3 | 339:12,18 |
| 96:20 97:11,19 | 176:2 177:13 | 284:18 285:22 | 340:12,23 |
| 98:18 102:2,8 | 178:6 179:21 | 286:19 287:14 | 341:2 342:2,16 |

343:1,13
344:17,24
345:12,18,22
346:1,18 348:1
**stanoch's** 325:4
**start** 33:9 48:23
72:8 134:13
140:17 141:6
142:11 150:6
180:10 202:24
208:21 243:2
244:8 245:15
247:9 313:24
316:4
**starting** 186:14
221:21
**starts** 86:13
204:16,18
205:14,17
206:20 207:11
222:11
**state** 6:4 13:3,5
29:7 61:22
90:9 93:13
96:24 99:12
104:22 108:12
109:5,10
125:14 127:21
135:6,23
141:11 142:23
187:10 188:16
191:15 205:6
209:13 218:21
249:16 254:20
280:19 294:3

336:19 346:1
347:1,5,25
**stated** 14:16
88:6 92:24
98:15,21 99:8
126:7 147:8
163:10 201:13
204:6 210:12
217:17 220:22
235:2 245:14
248:15 250:12
253:1 261:2
263:12 265:25
269:18 270:10
280:7 286:21
296:10 306:19
308:19 325:22
328:22 329:19
329:21 331:17
332:5,6 334:14
341:21,24
342:7,10,18
343:21
**statement**
10:18,21 14:11
20:24 75:5
77:8,9 94:14
95:12,23
106:18 111:17
127:15 167:12
168:20 175:25
186:2 187:5
192:24 193:2,3
194:8 195:15
201:14,14,20

201:23 202:3
203:11 206:16
213:14 215:7
255:1,24 256:5
256:25 257:16
257:19 261:20
274:9,10
287:19 296:18
299:4 300:11
300:18 301:11
301:13 302:22
324:13 326:3
331:16,25
332:8 334:21
335:17 336:20
343:25 344:3,5
344:15
**statements**
95:20 98:16
106:21 165:18
165:19 166:7
166:14,15,18
167:4,9,10,11
167:14 196:16
202:21 203:17
248:11 266:25
274:14 293:22
302:23 304:12
308:10 327:5,6
335:18 338:22
340:4,14
**states** 1:1 68:23
75:24 78:5
87:7 99:1
101:6 109:13

124:3 155:13
169:5 203:23
222:23 246:12
298:12 299:2
299:12 300:6
301:20 318:16
318:21 320:13
320:14 325:20
325:21 331:3
335:1
**stating** 94:23
109:18 122:23
156:24 166:5
201:18 276:24
277:23 281:4
284:2 286:20
308:17 321:12
344:15
**statistically**
164:9 235:17
**status** 211:1
214:18 215:4,5
217:3
**statute** 125:16
125:18 154:11
318:16 342:5
**statutory** 87:24
113:12 139:23
144:7
**stenographic...**
346:15
**step** 52:2
124:14
**stepping**
336:10

steps 75:2,9
186:19,22
194:10 269:25
304:16
steve 13:11
steven 4:12
stipulate
160:10 174:18
185:9 317:2
stipulation
14:20,22
stop 99:14
100:4,8 117:5
247:4
stoy 7:4
strange 184:12
193:7 240:9
strangers 45:25
strategic 50:20
street 2:12,17
3:16 6:4,16 7:5
7:11
strength 80:7
333:17
strike 28:13
35:7 68:7
118:14 131:24
211:6 263:18
274:17 288:17
289:17 326:7
327:10 341:23
stringent
255:15
struggle 142:6

subject 155:19
288:10 344:7
submission
59:14,20,24
60:3,21 61:8,11
75:16 110:7,13
110:15
submissions
74:13
submit 13:20
110:25
submitted 59:6
60:19 69:12
72:25 73:1
108:17 109:1
283:14
submitting
60:15
subscribed
350:14
subsection
14:14,18
subsequent
28:17 238:9
314:15
subsequently
57:16
subset 28:2
substance 10:8
17:4 50:24
61:10 80:8
86:17,25 87:4
87:10 96:4
119:12 137:22
138:5 151:2

165:6 168:5
169:25 172:14
173:12 175:15
175:18 178:19
184:4 185:12
229:10 256:14
267:1
substances
42:20 43:2,3,7
127:17,19,22
129:7 183:10
188:9 200:22
229:11,16,18
233:1 235:11
substances.pdf
10:15
sudden 180:2
suffering 17:9
sufficient 96:25
105:14 201:16
251:22 253:24
sufficiently
94:25 321:14
321:22 332:23
suggest 172:21
suggested
126:9 157:22
suggesting
153:4
suitability
213:6
suite 2:3,17 3:4
3:9,16 4:5,13
5:18 6:10,16

sulfated 228:25
summaries
26:12
summarize
139:11 140:13
summarized
140:4 144:11
145:6
summarizes
139:25 323:25
summarizing
167:8
summary 139:5
139:7,8,12
140:23 141:1
142:3 143:7
144:1,18 164:6
251:9 254:10
254:12,13,14
254:16 332:5
summer 339:11
super 260:3
supervision
79:7
supplement
16:11,15
supplements
16:10,13 56:23
110:17
supplied 64:22
64:23 222:13
supplier 79:8
79:12,23,25
80:1 86:17
91:6,10 93:13

[supplier - systems]                                              Page 77

| | | | |
|---|---|---|---|
| 93:24 94:24 | 266:6,17,18 | 157:1,2 161:4 | 281:20 283:6 |
| 106:24 108:5 | 267:6 269:7,15 | 196:13 266:14 | 289:11 290:4 |
| 110:19 118:13 | 269:25 270:14 | 275:16 278:1 | 294:17 295:2 |
| 118:17,19,25 | 271:4 273:9 | 329:7 | 299:10,19 |
| 119:5,8,11,12 | 274:5 275:17 | **support** 57:11 | 302:20 307:12 |
| 119:17 120:5,7 | 275:22,24 | 57:12 109:24 | 308:19 344:9 |
| 120:11,13,14 | 276:4,9,13,21 | 165:18 167:3,9 | **surely** 335:12 |
| 120:16,19,21 | 277:1 279:13 | 167:14 214:8 | **surprise** 118:3 |
| 120:23 121:5,6 | 279:24 281:13 | 256:5,24 | **surveillance** |
| 128:11 129:4,9 | 283:20 286:11 | 259:10 275:25 | 112:7 146:14 |
| 129:11 130:7 | 303:23,25 | **supporting** | 146:17 148:5 |
| 130:10 131:5,5 | 304:19 314:10 | 276:2 | 197:6 |
| 131:7,9,20 | 320:20,21 | **supports** | **sushil** 11:13 |
| 132:3,24 | 321:13,21 | 128:12 164:10 | **swear** 14:24 |
| 133:16 134:13 | **supplier's** | 201:19 216:9 | **switched** |
| 134:14 135:13 | 127:19 128:4 | 253:19 274:8 | 248:22 |
| 137:18 138:4,8 | 128:19 132:22 | 274:14 303:7 | **sworn** 15:10 |
| 138:11 139:1 | 138:3 139:25 | **supposed** 193:6 | 347:7 350:14 |
| 139:20 140:1,3 | 140:14 179:8,9 | 235:21 236:25 | **synthesis** 199:6 |
| 140:9,21 | 179:13 255:15 | 237:2 | 199:19 201:11 |
| 142:16 144:14 | **suppliers** 57:21 | **sure** 17:20,23 | **system** 57:13 |
| 145:10,14,16 | 79:20 106:25 | 19:7 22:13 | 57:15 104:14 |
| 146:9 147:14 | 139:15 140:13 | 29:6 45:1 | 109:12 114:8 |
| 148:5,6,15 | 141:3 146:9 | 48:20 66:17,19 | 115:3 125:25 |
| 151:7,9 154:13 | 147:6 148:3,16 | 67:20 68:2,5 | 140:19 142:14 |
| 159:8 165:14 | 156:3,8 199:14 | 72:4 73:4 95:4 | 163:17 213:6 |
| 165:19 167:12 | 200:8,10,13,19 | 117:20 130:14 | 224:9,13 252:1 |
| 180:16,20 | 202:21 216:18 | 131:21 132:25 | 304:23,23 |
| 185:18 190:6,6 | 217:13 266:9 | 137:5 158:11 | 305:13,15 |
| 201:15 230:5 | 274:2 276:12 | 159:21 172:3 | 320:23 |
| 244:11,15 | 276:15,18 | 244:6 249:24 | **systems** 105:23 |
| 252:11 257:12 | 277:3 | 251:2 260:2 | 120:9 305:14 |
| 258:10 260:19 | **supply** 74:2 | 261:21 268:12 | 319:4 |
| 263:3 265:15 | 94:4 147:12,15 | 271:1 273:6 | |
| 265:21,24 | 151:2,4 156:1 | 280:11,21 | |

**[t - testifies]**

| t |
|---|

**t** 8:18 9:1 10:1
  11:1 349:3,3
**tab** 10:18,20
**table** 221:19
  224:19 225:1
  225:13,21,24
  226:15 231:20
**tablets** 10:10
  10:12 181:6
**tabulated**
  223:19
**take** 12:11
  18:25 20:11
  24:12 28:15
  32:1 34:19,22
  48:21 63:6
  72:2 86:9
  87:17 101:17
  130:22 147:22
  147:23 148:22
  155:2 208:6
  235:16,18
  237:2 259:3
  269:9 285:2
  305:16 306:4,9
  313:18 315:22
  316:14
**taken** 2:1 12:14
  58:22 106:11
  107:13,24
  149:8 208:10
  268:17 304:15
  347:10

**talk** 33:6 51:20
  72:23 245:1
  267:14 268:13
  281:24 289:4
  290:20 296:20
  313:7 314:24
  317:19,20
  329:5
**talked** 240:13
  254:15 343:14
**talking** 80:20
  89:24,24,25
  124:21 145:11
  154:2 243:20
  248:7 249:20
  249:25 260:7
  264:21 265:11
  273:4 285:12
  285:15 310:10
  336:3
**task** 67:9 68:9
**teaching** 36:7
**team** 117:19
  186:12
**tech** 161:23
  307:9
**technical**
  130:17 135:15
  135:21,24
  154:20 156:1
  157:5 158:10
  160:23,25
  161:3,16,20
  165:20 167:11
  196:13 266:13

  267:11
**technology**
  189:25 191:9
  191:15,19
**tell** 30:5 49:23
  51:17 55:4
  79:5 139:11
  152:24,25
  193:23 215:20
  218:7 225:13
  253:7 280:11
  315:4 342:20
**tells** 151:8
**temecula** 58:10
**template** 55:14
  161:23
**ten** 70:15
**tend** 205:7
**tenure** 59:20
**term** 318:23
**terminated**
  61:2
**terminus** 4:13
**terms** 32:10,16
  36:22 74:11
  76:12 77:8
  79:22 84:20
  152:2 175:5
  189:14 338:9
**test** 128:17,21
  128:24 130:3,5
  130:11 132:13
  132:15 133:3,7
  136:22,22
  171:24 178:12

  183:19 192:8
  193:21 214:12
  215:3 216:19
  217:15,16
  218:25 223:15
  223:17 225:15
  226:15,19
  227:16 228:14
  228:20,21,24
  228:25 229:4,8
  229:11,14,17
  229:18,19,21
  231:9 232:19
  233:1,15
  239:22 246:22
  250:20 251:16
  251:23 252:2
  255:10 256:14
  257:9 258:8,15
  260:4
**tested** 134:19
  195:5 214:23
  217:18 218:4
  219:5,7 223:14
  245:20 246:2
  246:16 248:6,8
  249:5 250:12
  250:16
**testified** 15:11
  53:21 221:9
  246:5,21
  251:15 324:16
  338:17 341:14
**testifies** 248:3
  339:19

| | | | |
|---|---|---|---|
| **testify** 315:5 | 336:16 338:17 | 235:3,3,10,11 | 248:12,13 |
| 321:20 338:25 | 338:23 343:2 | 235:14,22,24 | 251:24 255:11 |
| 339:6 340:10 | 343:14 344:18 | 235:25 236:1,1 | 255:16,18 |
| 342:21 347:8 | 348:9,18 350:8 | 236:4,15,16,17 | **teva** 4:9,9 9:23 |
| **testifying** 137:3 | **testing** 26:11 | 236:20,20 | 10:3,5,23 11:3 |
| 190:12 271:17 | 26:22 62:15,19 | 237:1,1 238:2,4 | 11:7,8,10 13:10 |
| 339:16 | 83:7 87:5 | 238:10 239:12 | 13:12 17:1,7 |
| **testimonial** | 127:13,17,22 | 241:15 246:13 | 26:15 58:15,18 |
| 73:13 | 128:1,9 129:14 | 246:19 247:1 | 58:23 70:3,6,7 |
| **testimony** 15:3 | 129:18 130:10 | 248:17 249:15 | 70:17,19,20 |
| 53:19 73:15 | 132:3,3,16,20 | 249:17 250:8 | 71:1,7 73:2,3 |
| 107:6 111:14 | 133:17 144:24 | 251:1,6,11 | 73:25 75:16 |
| 115:10 118:8 | 145:14 151:23 | 252:5 253:3,8 | 79:1,6,19 80:9 |
| 141:6 142:17 | 184:25 185:4 | 253:13,14 | 87:16 94:22 |
| 143:2,10,22 | 190:5 192:21 | 254:11,22 | 96:13 103:25 |
| 205:13 223:24 | 193:5,14,16 | 255:3,6,7,9 | 104:7 106:11 |
| 236:8,12 | 195:16 196:17 | 255:17,23,25 | 106:17,21 |
| 237:25 238:19 | 197:4,5 210:14 | 256:1,9,14,20 | 107:3,24 112:1 |
| 241:23 246:24 | 211:23 212:12 | 257:3,5,18,21 | 117:11,14,18 |
| 246:24 248:15 | 212:14,25 | 258:15,22,24 | 117:21 118:5 |
| 253:1 259:15 | 213:23 214:25 | 259:1,3,9,13,17 | 133:6 135:1 |
| 267:7 279:6 | 215:1,2,8,9,14 | 260:10 261:3,6 | 138:18,25 |
| 280:22 287:15 | 215:19,21,21 | 261:6,7,10,17 | 143:17 154:5 |
| 303:2 307:22 | 215:25 216:2 | 261:19,24 | 156:10 158:6 |
| 314:24 315:8 | 216:13,24 | 263:6,9 264:4,8 | 158:19 160:2 |
| 315:20 320:7 | 217:3,24,24 | 267:20 268:19 | 161:15 163:23 |
| 320:12,19 | 218:14,15,20 | 272:17 273:1,2 | 164:23 165:6 |
| 321:17,18,19 | 219:1 220:25 | **testings** 260:7 | 165:23,23,25 |
| 321:24 322:2,5 | 221:3,4 223:5 | **tests** 26:20 | 166:3,8 167:16 |
| 322:11 325:12 | 223:25 224:2 | 132:23 133:9 | 168:24 169:3 |
| 325:14 326:6,8 | 226:16,20,25 | 133:10,18 | 171:17 172:6 |
| 326:13 327:16 | 226:25 230:5 | 194:22 225:16 | 172:13,17 |
| 328:23 329:16 | 230:16,24 | 229:24 231:9 | 175:6 179:6,11 |
| 331:18 334:1 | 233:14 234:16 | 231:14,15 | 179:14,16,18 |
| 335:6,8,15 | 234:20,23,25 | 238:21 240:1 | 179:20 184:7 |

188:19 190:3
190:13 191:22
198:4,17 200:3
200:25 201:5
203:6,23 204:8
205:9 206:22
206:25 207:12
207:13,25
219:25 220:8
224:11 234:24
236:3 237:7
238:1,3,10
240:2 241:15
248:22,25
268:11 269:6
306:24 314:6
314:11,15
315:16 320:10
320:21 321:10
321:21 323:13
324:18 325:6
325:25 329:4,8
331:9,12 332:3
332:7,21 333:9
334:23 339:2
344:6
**teva's** 8:22 78:9
78:22 79:23
92:21 93:4
95:12 96:3,8
104:7 135:24
144:24 145:6
148:2 161:25
163:6,15
169:10,12

172:7 199:13
201:22 203:2
203:21 204:25
207:8 211:8
223:4 224:12
319:4 327:14
329:3,6,12
330:24,25
340:19
**texts** 167:7
**thank** 15:7 44:1
63:11 72:16,18
210:24 243:8
293:16 296:14
306:2,15
313:16,17
314:19 322:13
341:9 345:11
345:12,14
346:5,20
**thanks** 174:20
242:14 247:12
307:19 310:18
**theory** 334:25
**therapeutic**
62:17,18,19
83:8
**therapy** 96:19
97:1
**thing** 51:18
73:12 74:15
97:8 126:2
142:22 174:16
178:9,9,23
187:19 329:5

**things** 24:8
26:3,6 28:24
50:19 53:2
74:16 111:10
123:13 139:7
145:15 165:17
177:1 178:1
197:22 237:4
270:1 329:18
338:18 341:4
**think** 43:16,18
48:15 49:3
54:11 56:14
65:19 67:11,24
69:6,13 73:13
88:3 97:20
137:21 176:18
196:25 197:25
198:10 207:8
212:25 220:22
233:25 242:4,5
245:3 253:16
259:11 263:21
267:4 268:8
273:4 293:3
294:6 306:6,7
315:11 336:23
339:22
**thinking**
122:13 155:15
**thinks** 336:4,16
338:15
**third** 67:2 68:8
69:7 116:13,19
117:7,18,21,25

118:5 176:22
219:14 228:13
264:6 276:3
288:21 289:1
296:10 298:13
**thomas** 3:13
**thou** 132:19
**thought** 56:16
**thousandths**
234:7,11
**three** 48:5
63:19 68:25
85:15 113:19
114:16 119:2
137:19 138:9
204:16 205:10
210:5 244:1
261:19 302:22
304:5,12 305:2
**threshold**
182:15,19
183:12 193:18
**thresholds**
183:14 184:6
184:15 185:7
**throw** 200:12
**thursday** 1:17
2:2 12:2 150:2
**ticking** 207:11
**tied** 342:15
**time** 12:9 13:3
24:12 29:4
35:17 37:13,17
37:17,18 41:3
42:4 44:12

47:8 49:6
51:13,25 54:4
54:13 56:12,24
57:18 58:15
59:10 67:19
68:20 71:6
76:2 86:5,25
104:13,13
105:5,12,13,14
105:15 106:5
113:18 117:3
120:16 122:9
129:12,21
133:23 134:13
142:7 159:4
160:15 164:11
167:17 178:5,5
178:8 187:11
189:17,17,18
190:7 208:10
208:11 238:12
238:15 243:8,9
287:11 291:4,7
292:6,18
298:22,24
306:1 339:7
341:19 342:13
342:24 343:10
344:14 346:11
347:11 348:19
**timeframe**
348:8
**timeliness**
198:22

**timely** 69:23
**times** 180:2
213:7 220:23
281:18 341:15
342:10
**timesheet** 66:18
68:9
**timesheets**
67:11,15,25
**timetable**
135:10
**timing** 167:15
167:16
**tin** 210:16
**tip** 104:18
**tited** 10:3
**title** 211:14
**titled** 8:20,22
9:3,4,7,9,11,12
9:14,17,20,23
10:4,6,7,9,11
10:14,16,18,20
10:23 11:3,5,6
11:8,10,13,15
11:16,18,20,22
247:15
**today** 13:11
17:5,10 19:3,10
20:13,17 47:24
53:16,24 55:18
56:20 57:1
73:6 156:2
163:14 220:23
238:12 241:14
243:8,19 246:5

248:16 264:13
264:21 274:25
280:12 290:23
291:1,11
292:13 297:14
297:15 307:22
307:23 308:9
315:4 320:19
321:4,17,25
322:6 324:14
332:12 334:9
338:14 339:15
339:23 346:4
**today's** 346:11
**together** 131:4
297:9
**told** 51:24
179:11 332:12
335:1,10
339:10
**took** 22:23
162:6 215:14
301:16 312:6
340:11
**tool** 146:5,6
317:14,14
318:3
**tools** 317:21,22
**top** 168:10
203:4 224:20
225:4 245:6,12
274:16 286:8
312:11
**topic** 122:14

**torrent** 5:2,2
11:15,17 17:6
26:15 30:1,2
66:11,13 71:19
73:2,7 87:16
106:21 112:1
135:1 184:8
188:19 190:3
198:13 208:8
242:10 243:6
243:11,12,16
243:16,19,20
244:1,4,20,24
245:7,13,16,19
245:24 246:1,6
246:16,22
248:12,13,25
249:1,5,6,15,17
250:3,5,6,7,13
250:16,20
251:5,14,15,23
252:4,6,9,13,14
252:18,21
253:2,8,18,22
254:3,21 255:3
255:20,25
256:20 258:13
260:3,6,9,22
262:18,24
263:16,22
264:4,13,21
266:11,13,21
267:4,9,16,24
268:8,11,14
269:6,8,24

270:24 272:2
272:14 273:20
274:12,19
275:15 279:1
280:3,14
281:12,16
282:1 283:2,13
283:23 284:15
285:8,13
286:10,17
287:3 289:20
290:11 291:2
291:13 292:14
292:22 297:5
298:13,21
301:5,22 302:4
302:13,14,18
303:9,12,17
304:3,15 305:1
306:24 310:22
312:23 314:7
314:11,15
320:21 323:13
324:19 325:6
326:1 327:13
331:9 332:7
333:9
**torrent's** 17:1
73:5 244:10
265:14,20
275:17 278:18
280:24 283:8
286:24 288:21
290:5 294:22
313:1,3 315:16

330:24 331:1
331:12 332:3
334:23 344:6
**total** 29:17 67:5
**toward** 301:3
**towards** 271:25
**tower** 6:16
**toxicologist**
62:2
**traceability**
223:9
**track** 304:20
**tracked** 305:13
**trade** 6:16
**train** 296:10
**trained** 298:20
299:12
**training** 38:3
198:12 300:17
300:20,23,24
**transcribe**
132:21 230:2
252:11
**transcribed**
224:8,11
225:17 252:14
346:14
**transcript**
14:20 247:15
322:6 347:14
347:16,18
348:6,20 350:5
350:8
**transcriptions**
252:10

**transcripts**
29:14
**translate** 82:24
84:3,7,20
**traurig** 2:3
4:10 13:10,13
**trend** 171:11
171:13,18
172:8,21,23
237:21 240:6
**trending**
224:19
**trends** 138:3
**triage** 64:20
**trial** 53:19,21
56:23 78:17
253:7 280:13
280:19 290:9
290:20 306:23
307:24 309:12
310:4 321:20
321:25 338:25
339:7,11,17,19
340:7 341:19
342:21
**tries** 126:2
**trigger** 136:6
**true** 24:21 60:1
105:17 125:20
309:22 339:21
347:13 350:8
**truly** 103:23
**trust** 116:18
128:6 167:12
201:16 247:8

274:6
**trusted** 116:11
117:11
**trusting** 117:6
**truth** 15:5,5,5
347:8,8,9
**try** 74:17 93:11
106:10 243:9
253:6 288:16
**trying** 39:24
82:10 83:10
178:11 191:5,7
253:5 262:16
263:10,19
267:3 268:8
280:11 281:25
291:23 312:22
329:10 342:11
344:8
**turn** 74:22
81:13 155:11
176:13 186:13
194:19 221:18
224:15 228:23
242:12
**turned** 39:18
201:23
**turning** 168:7
208:25 209:4
228:13 230:16
231:19
**turns** 341:25
**twice** 54:25
56:5 65:19,20
119:1 176:6

**two**  30:2 52:20
57:10 58:2
73:25 74:6
81:22 110:4
111:10 113:19
115:22 119:1
137:22 222:6
222:24 229:4
232:14 252:18
322:8

**type**  34:22
36:17 40:12
45:8,11 52:9
64:20 101:7
127:9 131:2
133:18 161:5
168:4 171:10
187:25 191:24
279:7,10
287:19

**typed**  22:12
34:22 55:12

**types**  37:2
42:19 51:15
91:9 117:4
127:1 146:19
165:15,16
167:9 191:14
266:3,5 284:8
333:17

**typewriting**
347:12

**typical**  191:19
283:21

**typo**  66:17

**u**

**u.s.**  5:9,10
12:16 108:5
148:3,5,6 169:4
229:5,8 232:24
333:23

**ubiquitous**
166:16

**uh**  55:21
124:20 131:23
168:9 196:24
227:4 228:16
229:15 231:2
234:1,4

**ultimately**
58:23 190:15
201:23 203:6
254:21 255:25
298:17

**unable**  33:21

**unaffiliated**
58:15

**unbiased**  264:5

**uncertified**
216:17 217:12

**unclear**  215:12

**under**  17:9
52:6 75:12
81:15,25 88:16
129:16 174:23
181:9 184:7
222:19 230:5
231:1 251:15
278:10 318:22

320:10 321:5
322:6,8 334:25
347:12

**underlies**
128:12

**underlying**
141:1 146:24

**underneath**
297:22

**understand**
16:19 18:13
23:24 59:7
78:17,21 80:12
83:25 84:1,22
95:2,4,10
111:14 113:3
133:2 137:3
147:7 156:5
172:4,16
179:15 187:17
187:18,21
188:24 189:25
196:23 204:3
238:18 243:15
243:23 248:10
251:3 262:13
262:13,16,18
263:10 267:7
267:24 268:5
270:5,22
271:16 280:18
280:21 281:25
299:3,14,17,18
329:11 339:16
344:10

**understanding**
16:23 17:11
20:21 58:17
59:5 71:4
76:12,14 112:7
131:22 150:20
168:23 199:4
202:5 237:25
261:22 283:6
290:4 302:21

**understandings**
146:23

**understood**
77:25 129:22
130:1 187:3,13
195:24 263:14

**undertake**
252:17 266:11
267:5

**undertaken**
267:5,17

**undertook**
187:1 195:23
269:23

**undetected**
245:19

**undo**  280:23

**undue**  277:11
277:24 278:1,7

**unexpected**
177:3 178:20
192:11 193:4
193:17 196:11

**unexplained**
264:7,15,23,24

**unfazed** 301:5
**unfortunately**
41:5 294:15
**unintelligible**
342:17
**unique** 175:23
177:22
**unit** 12:13
117:6
**united** 1:1
109:13 169:5
318:16,21
331:3 335:1
**unknown**
150:17 175:19
175:19 176:1,8
176:24 177:11
178:5 179:7,19
180:3,14,20
184:9 188:20
189:1 196:20
204:9 235:6
**unmarked**
212:8
**unqualified**
300:9,13
**unsafe** 97:9,13
97:18 98:9
99:5 100:23
**untrained**
298:22
**update** 35:18
186:4
**updated** 35:17
298:19 299:7

299:24
**upfront** 54:12
196:8
**upscale** 214:13
**upscaled**
219:20
**usa** 4:9
**usc** 318:6 319:3
320:10 324:10
**use** 17:14 18:23
25:6 35:21
47:3,5 55:14
80:11 84:9
85:7,14 86:25
87:20,22 88:8
88:11,22 94:3
95:17,17
101:10 119:12
126:7 127:9
131:20 132:21
141:13 147:12
151:20 156:16
157:20 162:20
191:17 192:1
211:5 243:9
259:13 264:12
271:21 288:21
320:15 340:2
**used** 23:18 26:1
37:15 64:3
87:10 126:20
127:20 156:2
156:25 157:2
192:7,10,12
221:12 222:24

239:9 261:17
289:21 291:2
319:8,9,21,22
328:24 340:1
348:20
**uses** 85:14
125:11,11
158:2 317:22
**using** 78:23
80:8 85:17
87:5 95:21
127:19 130:15
134:13 139:13
147:14 151:13
213:4 214:2
225:8 256:9
311:18 315:15
327:4
**usp** 10:8,8,10
10:10,12,12
169:4,24 181:5
181:17,19
231:15,17
233:3
**usually** 96:18

**v**

**v** 348:4 349:1
350:1
**vague** 33:6 40:9
244:25 273:11
278:14 291:5
291:14 292:4,6
303:20 314:8
341:5

**valid** 188:4
**validate** 26:21
191:6
**validated**
132:16 190:14
192:8,11,12
210:14
**validation** 27:5
64:7 128:20
140:21 190:14
211:13,15,23
212:3,20 213:8
213:9 219:22
**validations**
26:20 212:5
**validity** 335:15
**valsartan** 1:5
10:8,10,12,19
10:22 12:15
17:3 40:19
41:5,14 59:1,6
78:10,23 94:2
94:11 132:17
150:22,24
151:10,13
153:23 168:5
168:24 169:3,4
169:14,25
174:25 181:5
186:3 192:19
194:9 199:14
200:14,17,18
203:9 210:16
211:15 212:6
214:16 219:22

221:15 222:1,6
222:7 228:8
233:3 243:22
245:20 246:2
248:13 249:5
250:8,16,21
251:6,16,23
253:9 254:23
256:21 257:10
267:18 275:18
278:13,19
279:2 280:4,15
280:25 286:10
286:17,23
308:12,15
309:3,7,13,20
310:5 311:9,18
314:7 323:13
324:19 325:24
326:9,24 330:3
330:11,22
331:1,8 335:11
341:19 342:12
342:24 343:9
343:21 344:2
344:16 345:8
348:4 349:1
350:1
**value**  83:8
154:19 232:3
**values**  128:13
226:1 237:6
239:3 254:14
**varied**  108:14

**variety**  42:23
**various**  13:17
28:11 129:14
131:1 140:21
146:23 198:12
230:2
**vascular**  37:18
38:12
**vast**  54:11
**vaughn**  3:3
**vehicle**  45:25
161:5 303:22
304:18,21
305:9,12
**vehicles**  80:10
266:17
**vendor**  298:8
**vendors**  296:11
**verbatim**  33:22
40:13 81:19
108:13 110:10
112:13 176:13
182:17 220:25
233:19 247:24
268:24 290:8
305:23 330:12
**verification**
119:3 165:17
166:18 274:13
317:1
**verified**  166:7
202:22
**verify**  22:22
128:6 133:8
167:12,13

201:16 226:12
274:6 295:22
312:2 348:9
**verifying**
300:16
**veritext**  12:22
12:24 348:14
348:23
**veritext.com**
348:15
**version**  19:5
79:17
**versus**  132:3
223:6 289:24
**vice**  296:9
**vicinage**  1:3
**vicodin**  58:4,5
**victoria**  4:11
13:9 324:23
**video**  12:10,13
20:4 346:11,15
**videoconfere...**
2:12,17,22 3:4
3:9,14,15 4:4,5
4:18 5:4,5,12
5:17 6:4,9,15
7:4,17
**videographer**
7:15 12:4,22
14:5,7,16,22
31:14,17 72:5,7
149:5 150:5
208:17,20
209:2,2 242:23
243:1 305:19

305:22 307:1
307:10,15,17
313:20,23
315:25 316:3
346:10
**videotaped**
1:15 2:1 19:13
31:1
**view**  24:20
147:7 148:4
202:10 204:15
**viewpoint**
84:19 88:12
95:14 107:19
123:5 327:3
**views**  205:4
**violate**  262:19
**violated**  198:4
262:24 263:16
263:22 305:3
**violating**
198:19
**violation**  88:17
100:20 101:8
102:14,23
103:8,20,24
104:2
**violations**  89:5
100:13,15
101:17 198:11
287:25 288:7
320:16 332:7
342:15
**violative**  99:16
100:10 103:2

103:23
**virtue** 94:10
**visit** 119:2
134:14 167:13
202:23
**vls001** 225:5
**voicemail** 49:16
**voluntarily**
333:15,18,22
333:23 336:6
**voluntary**
113:11,12
297:21,25
333:6,9,10
**vulnerabilities**
104:20 113:22

**w**

**w** 5:18
**wait** 307:5,7
331:20,24
332:16 336:21
336:21
**walk** 79:15,15
**wallack** 6:8
**want** 19:19
25:17 52:18
74:16 79:4
95:3 137:4
142:4,5 143:9
147:22 148:22
162:25 172:3
192:3,5 193:24
202:20,23
208:9,25 209:4
218:21 242:6

243:25 249:24
250:19 251:2
261:21 268:5
270:25 283:20
288:9 290:4
291:23 294:23
295:2 299:17
299:19 302:20
329:2 336:11
336:17 339:22
343:19 344:1,9
**wanted** 46:4
81:12 328:6
**warning**
114:15 116:15
146:19 322:24
323:25 343:22
**washington**
5:13
**waste** 238:12
238:15
**watch** 278:10
**water** 225:14
226:21 227:17
228:24 231:23
232:4 255:14
**watson** 57:5,9
57:10,17,21
58:6,7,14,18,22
58:24,25 59:6
59:14,15,19,20
**way** 15:20,24
48:22 52:20,20
75:3,7 76:21
77:3 83:2

85:12 91:17,18
101:3 102:18
113:1 123:21
125:10,11
126:1 130:7,19
136:21,24
141:19 143:2
153:23 156:24
158:2 177:3
199:17 207:5
207:25 208:15
215:24 241:19
253:6 269:5
270:11,13
271:8 288:16
303:16 304:4
329:11,13
331:4
**ways** 342:20
**we've** 307:14
**wear** 86:10
**wearing** 85:22
85:22 86:5,8
**wears** 86:10
**web** 84:9,10
**website** 45:20
106:10 127:9
**week** 49:10
69:15 176:5,6
**weeks** 56:5
**welcome** 18:25
**went** 57:16
190:1 226:6
235:15 245:19
314:23 337:24

**west** 6:16
**whispering**
12:8
**whiteley** 2:10
2:11 13:15
44:16,20
**wide** 42:23
**width** 175:9
178:18
**william** 6:9
**williams** 32:22
66:9,11,14,15
**wilshire** 14:15
**wish** 67:17
**withdraw**
118:9 328:2
**withdrew**
327:24
**withholding**
98:14
**witness** 13:15
14:25 15:2,2,6
16:18 18:4
20:19 22:5
23:5,11 24:1
27:11 29:25
32:2 40:2,10
41:13,23 42:25
44:1 48:12,15
49:25 51:1
68:25 74:9
76:20 77:2
78:5 79:11,22
82:8,18 84:17
88:2,21 89:16

| | | | |
|---|---|---|---|
| 91:2 92:2,24 | 183:11 185:9 | 281:4,20 282:5 | **witness's** |
| 93:12 94:13 | 187:7,17 | 284:21 285:25 | 249:13 339:15 |
| 96:21 97:13,20 | 188:11 189:10 | 286:20 287:17 | **witnesses** 29:15 |
| 98:19 102:3,9 | 189:22 197:16 | 288:2,9,13 | **witnessing** 45:2 |
| 102:16,25 | 199:10,23 | 290:1,16 291:7 | **wmurtha** 6:12 |
| 104:5 105:11 | 202:1,14 | 291:17 292:9 | **wondering** |
| 106:15 107:8 | 203:11 205:3 | 292:18 293:16 | 245:5 292:13 |
| 108:1 109:18 | 206:24 207:16 | 294:3,13,20 | **woodhousing** |
| 111:21 112:21 | 215:14 216:4 | 295:15 296:6 | 322:11 |
| 114:25 115:12 | 216:15 217:10 | 296:15 299:12 | **word** 45:8 |
| 116:9 118:9,22 | 218:7 219:9,11 | 300:6 302:6 | 84:18 88:8 |
| 119:23 121:8 | 222:23 224:8 | 303:4,22 304:9 | 126:7 157:20 |
| 122:7 124:2 | 227:12,19 | 305:9 306:2 | 259:13 264:12 |
| 125:20 126:12 | 230:14 236:14 | 308:2 309:16 | **words** 62:14 |
| 127:15 128:3 | 237:10 238:6 | 310:1,8 311:6 | 95:2,5 177:6,7 |
| 128:23 136:14 | 238:14 239:1,4 | 311:13 312:1,8 | 194:25 299:21 |
| 137:12 139:3 | 239:17,20 | 312:20 313:14 | **work** 16:8 |
| 141:11 142:21 | 240:22 241:6 | 313:17 314:9 | 38:16 39:16 |
| 143:23 145:1 | 241:12 242:3 | 315:2,9,19 | 45:11 47:3 |
| 148:10 149:3 | 242:18 244:3 | 318:2,25 | 50:13,15,19 |
| 152:6 153:8,16 | 245:1 249:11 | 320:13 325:18 | 52:9,9,22 55:11 |
| 154:16,18 | 249:19 250:11 | 325:21 326:14 | 57:16 58:12,13 |
| 156:23 159:20 | 251:8,19 | 327:25 328:8 | 68:3 69:16 |
| 163:10,19 | 253:12 254:6 | 329:17 333:3,8 | 70:16 71:13,15 |
| 164:20 165:4 | 256:7 257:3 | 334:2 335:7 | 71:18,21 |
| 165:12 166:13 | 258:2 264:18 | 336:2,12,19 | 104:15 106:2 |
| 167:20,23 | 268:23 269:13 | 337:7,18,23 | 113:15,24 |
| 169:2,23 | 270:10 271:7 | 338:12,19 | 135:7 146:25 |
| 170:16 171:8 | 271:20 272:9 | 339:6,19,24 | 190:23 207:2 |
| 172:11,23 | 272:22,25 | 340:13 341:8 | 278:6 336:6 |
| 173:12,14,20 | 273:13 274:4 | 342:4,18 343:3 | **worked** 38:12 |
| 174:6 175:13 | 274:22 275:5 | 343:17 344:20 | 44:20,23 46:1 |
| 175:22 176:3 | 277:6,23 | 345:1,14,25 | 47:12,25 58:24 |
| 177:16 178:7 | 278:10,16,22 | 347:6,21 348:8 | 59:1 61:9 70:7 |
| 179:23 183:9 | 279:5 280:7,17 | 348:10,12,19 | 70:16,18,23 |

276:14,16
277:21 335:20
**workers** 78:3
**working** 36:24
37:17 41:16,18
42:5,8 57:4
58:20 85:5
288:6
**works** 71:1
74:13 112:23
337:21
**workshop**
209:20 219:20
**world** 16:6
185:4
**wrap** 291:23
**write** 339:25
**writing** 13:21
29:5 295:17
342:21
**written** 39:12
83:13 91:17
154:12 163:7
163:16 258:5
**wrong** 82:2,15
83:6 255:5
267:8
**wrote** 203:13
339:25

**x**

**x** 8:1,18 9:1
10:1 11:1
46:13,15

**y**

**yang** 289:1,4
290:7 291:12
292:15 298:14
298:18 302:23
**yang's** 301:6
**yeah** 27:24
29:11 32:3
71:5 100:5
103:3 119:4
149:4 151:6
159:18 160:7
163:22 168:19
169:24 173:10
177:16 181:4
210:22 231:14
283:8 330:6,19
345:18 346:18
**year** 36:2 37:15
43:16,19 111:1
135:17,19
138:10
**yearly** 138:1,7
**years** 37:14
70:15 113:19
115:22 119:2,2
137:19,22
138:9 197:22
238:9 284:13
330:10
**yep** 230:10
293:16
**yesterday** 56:1
248:4

**york** 4:19 5:6,6
5:12

**z**

**zalman** 4:4
**zantac** 40:15,16
**zero** 255:7
**zhejiang** 5:9
11:22
**zhp** 17:3 26:14
26:23,23 71:15
74:2 75:20,25
76:14 77:4
78:14 79:8
80:12,13 96:4
144:24 150:16
151:2,7,8,9,14
151:18 153:2
154:4 158:6,25
160:6,20,25
164:3,11,18
165:23 166:2,4
167:1,16 168:3
172:14 184:23
185:3 196:12
199:7 200:10
201:3,4 203:9
203:25 204:3
204:10 209:9
209:16 222:3
224:2,12
225:18,19
226:9,18 227:1
230:18,18
231:1 232:3,20
233:23 234:11

236:5 245:21
246:23 248:20
248:25 249:8
250:4 252:14
252:17,20
253:9 256:2
257:10,13
259:7 264:5
266:22 267:1
267:14,24
268:18 269:15
269:23,25
272:14 273:21
274:20 275:17
278:13,19
279:2 280:15
280:25 282:18
283:1,18,24
284:16 285:5,8
286:11,17,23
290:12 291:2
291:13 292:15
306:4,17
307:24 308:13
308:17 309:2
309:19 310:4
310:22 313:12
314:13 320:22
322:24 323:6
324:22 325:9
326:24 327:12
328:15 329:13
330:23 332:23
334:21 341:10
341:16 342:8

**[zhp - zyrtec]**                                    Page 89

343:9,20,22                    65:23 259:24
344:11 345:3                   294:18 296:2
**zhp's**  78:1                297:21
95:24 96:7                     **zyrtec**  40:13
152:3,17
184:19 187:21
200:16 233:8
234:5 241:16
244:12 254:22
267:17 269:10
275:16 283:7
285:4 288:22
308:5 325:9,10
325:24 329:7
330:2,22 331:7
332:8,18
334:23 342:14
342:24 344:2
344:13,16
345:8
**zinc**  210:17
258:25 313:2
**zkass**  4:7
**zn2**  260:4
**zncl2**  244:13
258:16 260:4
265:17 267:14
267:17 268:15
269:10,24
**zoom**  2:12,17
2:22 3:4,9,14
3:15 4:4,5,18
5:4,5,12,17 6:4
6:9,15 7:4,16
7:17 55:2,3

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.