Exhibit 40



**Journal of Liquid Chromatography & Related Technologies®**

ISSN: 1082-6076 (Print) 1520-572X (Online) Journal homepage: https://www.tandfonline.com/loi/ljlc20

# Identification and Control of Impurities for Drug Substance Development using LC/MS and GC/MS

**Heewon Lee , Sherry Shen & Nelu Grinberg**

**To cite this article:** Heewon Lee , Sherry Shen & Nelu Grinberg (2008) Identification and Control of Impurities for Drug Substance Development using LC/MS and GC/MS, Journal of Liquid Chromatography & Related Technologies®, 31:15, 2235-2252, DOI: 10.1080/10826070802279426

**To link to this article:** https://doi.org/10.1080/10826070802279426



Published online: 07 Aug 2008.

Submit your article to this journal 🗗

Article views: 299

View related articles 🗗

Citing articles: 2 View citing articles 🗗

Exhibit
0028
Hecht

*Journal of Liquid Chromatography & Related Technologies*®, 31: 2235–2252, 2008
Copyright © Taylor & Francis Group, LLC
ISSN: 1082-6076 print/1520-572X online
DOI: 10.1080/10826070802279426

# Identification and Control of Impurities for Drug Substance Development using LC/MS and GC/MS

**Heewon Lee, Sherry Shen, and Nelu Grinberg**

Chemical Development Department, Boehringer Ingelheim
Pharmaceuticals, Inc., Ridgefield, Connecticut, USA

**Abstract:** Identification and control of impurities for drug substances is a critical task in pharmaceutical process development for quality and safety. The most commonly used analytical technique for impurity analysis in drug substances and drug products is undoubtedly a chromatographic method, namely high performance liquid chromatography (HPLC). Impurity profiling is typically performed by HPLC and impurities are further tested for identification and confirmation by other techniques. Several case studies are presented in this paper to report the identification of unknown impurities employing chromatographic techniques interfaced with mass spectrometry. The task of unknown identification was facilitated by complementary methodologies including tandem mass spectrometry (MS/MS), high resolution mass spectrometry (HRMS), preparative HPLC and NMR. Upon identification of the impurity, the impurity formation was monitored and controlled throughout the synthesis. Three case studies are described where unknown process impurities were analyzed for identification using LC/MS and GC/MS methodologies. It is demonstrated that identification of the unknown impurity enabled chemists to pinpoint the chemical step of impurity generation, aiding the effort to reduce or even eliminate the impurity in the drug substances.

**Keywords:** Control of impurities, Drug development, GC/MS, LC/MS

Correspondence: Heewon Lee, Chemical Development Department, Boehringer Ingelheim Pharmaceuticals, Inc., 900 Ridgebury Road, Ridgefield, CT 06877, USA. E-mail: heewon.lee@boehringer-ingelheim.com

2236                                                                          H. Lee et al.

## INTRODUCTION

Impurity profiling is one of the most critical analytical tasks during the development of drug substances (also known as active pharmaceutical ingredients, API). The level of impurities is tightly controlled by regulatory agencies for toxicological assessment and clinical studies. ICH guideline Q3A(R) requires that organic impurities at or above 0.1% (or 1.0 mg total daily intake, whichever is lower) should be identified for drug substance with maximum daily dose of less than 2 g/day.[1] The most established analytical method for impurity profiling is indisputably high performance liquid chromatography (HPLC) with UV detection. The organic impurities are usually determined by HPLC/UV first and further analyzed by other analytical techniques including LC/MS, MS/MS, HRMS, preparative LC, and NMR (nuclear magnetic resonance). With the advent of atmospheric pressure ionization methods such as electrospray ionization (ESI) and atmospheric pressure chemical ionization (APCI) enabling a smooth transition of samples from the liquid phase (HPLC) to the gas phase (MS), LC/MS has become a prominent analytical technique for both quantitative and qualitative purposes in pharmaceutical research and development.[2]

Identification and tracking of organic impurities using LC/MS related technologies for drug substance[3–12] and drug product[13–16] development is well documented in the literature. Most of the reported cases employed multi-disciplinary approaches in order to elucidate the impurity structures, namely, tandem mass spectrometry (MS$^n$), high resolution mass spectrometry (HRMS), LC/UV, LC/MS, LC/NMR, NMR and preparative LC. Quadrupole-based mass spectrometers (single quadrupole and triple quadrupole MS) are by far the most widely used MS types. Single quadrupole MS can provide molecular ion information and in certain cases fragmentation data through in-source collision induced dissociation (CID). In comparison, triple quadrupole MS is useful for acquisition of MS$^2$ tandem mass spectral data. It has been reported that trace level impurities were identified using ion trap multistage tandem mass spectrometry followed by preparative LC for confirmation by NMR.[3,10] Ion trap-based mass spectrometry provides MS$^n$ fragmentation pathways, compared to quadrupole-based mass spectrometry which offers MS$^2$ stages, rendering in-depth structural information for impurity identification.[2] High resolution mass spectral data can add another dimension to the analytical information for the determination of impurity by providing elemental compositions.[11,14,15] The combination of the multistage tandem mass spectrometry and accurate mass measurement gives an extremely powerful analytical tool, FT-ICR-MS (Fourier Transform Ion Cyclotron Resonance Mass Spectrometry). This device

**Identification and Control of Impurities**                                    **2237**

is capable of providing elemental compositions of the molecular and fragment ions for the n-th order of tandem mass spectral data. Several groups reported the use of FT-ICR-MS for the identification and confirmation of unknown impurities.[8–10] The process impurities are expected to have structural similarity to the drug substance. Therefore, the mass spectral fragmentation pattern of the process impurities were compared to that of the drug substance, and impurity structures were postulated in the reports. The identity was subsequently confirmed by NMR experiments on isolated impurities, or in certain cases the postulated compound was synthesized for unequivocal confirmation.

Isolation of the impurity via column chromatography or preparative HPLC is a labor-intensive and time-consuming task, and therefore it is avoided whenever possible. However, there were reported cases where the unexpected toxicity and color of the drug substance made the fractionation of the impurity inevitable. The impurity responsible for the unexpected color of the drug substance was much less than 0.1%, but the impurity had to be identified to understand the origin of formation and to reduce or eliminate the impurity.[4] An unexpected toxic response during an animal toxicological study from a drug substance batch was observed, and the batch was fractionated to pinpoint the impurity, though the level of the impurity was lower than 0.1%.[11] In both cases, preparative HPLC was used to fractionate and enrich the impurities.

Most drug substances are too polar or thermally labile to be subject to a gas chromatographic analysis, which requires vaporization of the samples into the gas phase. However, for analysis of raw material and intermediates, gas chromatography offers several advantages including high separation efficiency, wide dynamic range, and various compatible detectors such as FID (flame ionization detection), ECD (electron capture detection), TCD (thermal conductivity detection), and MS. Especially GC/MS is a powerful analytical technique for identification of unknowns due to the availability of vast and accessible spectral libraries.

In this report, three case studies of unknown process impurities are presented. The impurities were first detected by HPLC/UV and GC/FID, and they were subject to LC/MS and GC/MS analyses to obtain molecular ion information. Further analyses such as MS/MS, HRMS, preparative HPLC, NMR, and synthesis of the authentic compound were performed to elucidate the impurity structures. The knowledge obtained helped to understand impurity formation and was used to improve the quality of the drug substances.

## EXPERIMENTAL

### Reagents

HPLC grade water and acetonitrile were obtained from EMD Chemicals (San Diego, CA, USA). Formic acid was purchased from Fluka (St. Louis, MO, USA), and perchloric acid was obtained from Sigma Aldrich (St. Louis, MO, USA). All reagents were used as received.

### Instrumentation

Agilent (Santa Clara, CA, USA) 1100 HPLC systems with ChemStation software were employed for liquid chromatography work. A typical HPLC system consisted of a degasser, a binary pump, an autosampler, an ALS thermostat, a column compartment, and a diode array detector (DAD). GC/FID and GC/MS data were obtained using Agilent G6890N with FID (flame ionization detection) or MSD (mass selective detection) with ChemStation software. A Micromass/Waters (Milford, MA, USA) Quattro Ultima triple quadrupole mass spectrometer with MassLynx control was used for tandem mass spectrometric data generation. An ionization mode of positive electrospray was used with the following parameters: capillary voltage 3.5 kV, cone voltage 20–35 V, drying gas nitrogen, collision gas argon, and collision cell pressure $1.0 \times 10^{-3}$ mbar. High resolution mass spectral data were obtained using an Agilent LC/MSD TOF mass spectrometer in a positive electrospray ionization mode with the following parameters: capillary voltage 3.0 kV, drying nitrogen gas temperature 350°C, and fragmentor 70–150 V. The samples were introduced to the mass spectrometer via flow injection without a chromatographic separation. Impurity purification by preparative LC was performed using a Shimadzu (Kyoto, Japan) system consisting of a SIL-10AP auto-injector, two LC-8A pumps, SPD-10A VP UV-VIS, SCL-10A VP system controller, and FRC-10A fraction collectors with Discovery VP software.

### Case Study A

Analytical HPLC Conditions

The column used for analytical HPLC experiments was an Agilent Zorbax SB-CN 4.6 mm × 150 mm, with particle size of 3.5 um. Mobile phase *A* was water with 0.5% (v/v) perchloric acid, and mobile phase *B* was acetonitrile. The flow rate was 1.5 mL/min with the column

temperature maintained at 25°C. Gradient elution profile was to hold at 0%B for 3 min, linear gradient to 40%B at 4 min, hold at 40%B until 12 min, linear gradient to 60%B at 17 min, to 100%B at 18 min, and hold at 100%B until 20 min. The sample diluent was methanol and injection volume was 5 μL. UV detection wavelength was 220 nm. The perchloric acid used in the mobile phase was replaced with formic acid for acquisition of mass spectral data.

Preparative HPLC Conditions

For preparative purification of the impurity, a Waters XBridge Prep C18 OBD (19 mm ID × 150 mm L, with 5 μm particle size) was used. The mobile phase *A* was water and the mobile phase *B* was acetonitrile without any modifier. The use of modifier in the preparative LC was intentionally avoided whenever possible to prevent any decomposition of the collected samples, even though it meant a slight loss in the chromatographic resolution and peak shape. The acidic or basic modifier used in the LC mobile phase could become concentrated during the solvent evaporation step, and cause decomposition of the collected fractions.[5] The flow rate was 10 mL/min with a gradient elution profile from 10%B to 37%B in 20 min, and constant at 37%B until 50 minutes. The UV wavelength was at 220 nm and the column was held at an ambient temperature. The sample diluent used was methanol. The solvents were evaporated from the fractions using a rotary evaporator.

GC/FID Conditions to Monitor the Intermediate B

The GC column used was DB1701, 30 m length, 320 μm ID, with film thickness of 1.0 μm. The carrier gas was helium with a constant flow rate of 1.5 mL/min. The inlet temperature was 250°C with a split of 30:1. The oven temperature profile was to hold at 80°C for 0.5 min, to ramp to 220°C at a rate of 15°C/min, and to hold at 220°C for 1 minute. The FID temperature was 300°C.

**Case Study B**

A Waters XBridge C18 column (4.6 mm × 75 mm, with 2.5 μm particle size) was used and water (mobile phase *A*) and acetonitrile (mobile phase *B*) with 0.1% formic acid were employed as mobile phases. The flow rate was 2.0 mL/min with a gradient of 20%B to 90%B in 10 minutes. The column temperature was kept at 40°C.

### Case Study C

The GC column was Agilent DB1701, 30 m × 0.32 mm ID, with 1 μm film thickness. Inlet temperature was at 200°C with helium as a carrier gas, constant pressure at 10 psi, and split of 25:1. The GC oven temperature profile was to hold at 35°C for 7 minutes, ramp to 80°C at 7°C/min, ramp to 180°C at 15°C/min, then hold at 180°C for 2 minutes. The FID temperature was 250°C.

Additional experimental conditions are described as needed in the Results and Discussion section for each example discussed.

## RESULTS AND DISCUSSION

### Case Study A

An HPLC method was developed for reaction monitoring of a fixed synthetic route for a development compound. Figure 1(a) shows an



(a)

(b)

*Figure 1.* Case Study A: (a) Chromatographic separation of starting materials (SM), reagents (R), intermediates (Int), and API. (b) The HPLC chromatogram showing the impurity contained in the first batch of the drug substance.

Identification and Control of Impurities                                2241

HPLC chromatogram of the starting materials, reagents, intermediates, and the drug substance (i.e., API). This chromatogram was obtained from an artificial mixture of the involved compounds in order to illustrate the chromatographic separation. The intermediates and API were indicated on the chromatogram. This HPLC method was successfully utilized during the synthetic steps. The synthetic route involved a linear synthesis (intermediates A → B → C → D → E) for the production of API. This method was employed to profile impurities in the first batch of the drug substance. The batch did not have any detectible amount of intermediates, but there was an impurity in the level of 0.6% eluting right before the product shown in Figure 1(b).

In order to identify this unknown impurity, LC/MS experiments were performed. The experimental conditions of the HPLC method were transferred to LC/MS, except for the mobile phase composition. The 0.5% perchloric acid in the mobile phase A of the original HPLC method was substituted with 0.1% formic acid for LC/MS experiments for modifier volatility. This substitution did not affect the selectivity of the impurity from the drug substance considerably.

Figure 2(a) shows the total ion chromatograms (TIC) of the drug substance and the crystallization mother liquor. The retention time of the drug substance was 7.8 minutes and that of the impurity was 7.5 minutes. The mass spectra show the molecular ion for the drug substance and the impurity in Figure 2(b). The molecular ion of the desired product was observed at m/z 396, and the impurity showed an ion at m/z 378 with a mass difference of 18 amu. For tandem mass spectrometric experiments the mother liquor obtained from crystallization was utilized in order to obtain stronger signal intensity of the impurity.

One of the most widely used tandem mass spectrometric techniques using a triple quadrupole MS is the daughter ion (also known as fragment ion) scan. In this scan mode, the first quadrupole is set to pass only the ion of interest, usually the molecular ion. The second quadrupole is used as a collision cell with a controlled amount of collision gas, typically argon. The selected ion from the first quadrupole undergoes collision induced dissociation (CID) in the second quadrupole. The fragment (daughter) ions generated in the second quadrupole are then mass-resolved in the third quadrupole, generating structure-specific fragmentation information.

The MS/MS experiments were performed to obtain daughter ion spectra of the drug substance molecular ion at m/z 396. The fragmentation spectra were acquired at different collision energies (10, 20, 30, 40, 50 and 60 V) in order to cover various fragmentation patterns. The two representative spectra at different collision energies are shown in Figure 3(a). As expected, the molecular ion was still present and a few fragment ions were observed at low collision energies; and at

**2242**                                                                  **H. Lee et al.**



*Figure 2.* Case Study A: (a) Total ion chromatogram (TIC) of the drug
substance (above) and the mother liquor (below). The retention time of the drug
substance is 7.8 minutes and that of the impurity is 7.5 minutes. (b) The mass
spectra show the molecular ion of the impurity at m/z 378 (above) and the drug
substance at m/z 396 (below).

high collision energies the molecular ion disappeared and more extensive
and smaller fragment ions were observed. The daughter ion scan of the
impurity at m/z 378 showed a similar trend in Figure 3(b).

The illustrative structure of the drug substance is shown below with
the key fragments observed in the daughter ion scan data. The mass

**Identification and Control of Impurities**    2243



*Figure 3.* Case Study A: Fragment ion mass spectra at two difference collision energies are shown for the drug substance at m/z 396 (a) and for the impurity at m/z 378 (b).

difference of 18 between the drug substance and the impurity could be the loss of hydroxyl group (–H$_2$O) or the loss of the fluorine atom replaced with a hydrogen (−19 amu for fluorine +1 amu for hydrogen = −18 amu). Both the drug substance and the impurity had the fragment

ions at m/z 133 and m/z 230, indicating that the right hand side of the
molecule was intact including hydroxyl functional group. However, the
fragment ion at m/z 151 was present only in the drug substance daughter
ion scan, noticeably absent in the daughter ion spectra of the impurity.
Therefore, the difference between the drug substance and the impurity
must have occurred in the left hand side of the molecule. Based on the
data, the impurity was tentatively identified as the des-F (loss or removal
of fluorine) of the drug substance. The ion corresponding to the m/z 151
of the des-F impurity would be m/z 133 (m/z 151–18) that happened to
coincide with the m/z 133 from the right hand side of the molecule.



Structure of the drug substance with observed fragments for Case Study A.

The impurity was isolated using a Shimadzu preparative LC system
in order to confirm the identity. The retention time of the impurity was
44 minutes and that of the drug substance was 47 minutes under the
experimental conditions. The fractions collected were subject to high
resolution mass spectrometry (HRMS) using an Agilent 1100 LC and
an Agilent TOF (time-of-flight) mass spectrometer. The HRMS data
showed the correct elemental formula for the drug substance with an
error of 0.1212 ppm. The elemental formula based on the HRMS data of
the impurity fraction matched that of the des-F impurity with an error
of 2.3104 ppm.

The proposed des-F impurity was synthesized to confirm the identity
unequivocally. The NMR data were acquired for both the impurity
collected by preparative LC and the synthesized des-F API, and the
NMR experiments confirmed that they were identical. In an effort to
control the des-F impurity in the drug substance, corresponding des-
F compounds for intermediates A, B, C, and D along the synthetic
route were synthesized. The des-F intermediates A, C, and D were
separated under the existing HPLC conditions as shown in Figure 4(a).
The separation of intermediate B and des-F intermediate B was not ideal

**Identification and Control of Impurities**                    **2245**



*Figure 4.* Case Study A: (a) HPLC chromatographic separation of the des-F intermediates A, C, and D from the corresponding intermediates for impurity control. (b) GC/FID method showing the separation of the des-F intermediate B from the intermediate B for impurity control.

in HPLC conditions, thus a GC/FID method was developed to follow the intermediate B as shown in Figure 4(b).

The HPLC/UV and GC/FID methods shown in Figure 4 were employed to carefully monitor the formation of des-F impurities along the synthetic pathway. It was found that the des-F impurity was formed from the chemical step of the intermediate A to the intermediate B, where an equimolar amount of lithium diisopropylamide (LDA) was employed. The formation of the des-F impurity was eliminated by slightly undercharging LDA.

In this case study, the structure of the unknown process impurity was proposed through LC/MS/MS and HRMS. The proposed structure was confirmed by preparative LC, synthesis of proposed compound, and NMR experiments. The origin of the impurity formation was pinpointed, and analytical methods were developed to follow and control the impurity formation throughout the synthesis. We were able to optimize the chemical synthesis so that the process did not generate the impurity.

2246                                                                    H. Lee et al.

## Case Study B

The drug substance for this project was prepared as a free acid, and
subsequently converted to a potassium salt. During the salt formation
step a new impurity with an area percent of 2.4% was observed.
The molecular ion $[M + H]^+$ for the drug substance was at m/z 642
(Figure 5), with one chlorine indicated by the isotope pattern. The
molecular ion of the impurity was at m/z 638, four amu less than the
API, clearly missing the isotope pattern of chlorine. As can be seen in
the LC/MS data, molecular ions for both the drug substance and the
impurity underwent significant in-source collision induced dissociation
(CID) generating abundant fragmentation. The major fragment ions
observed for the API were m/z 435, 338 and 267, with all three ions
showing the pattern of one chlorine. The major fragment ions observed
for the impurity were m/z 431, 334, and 263. Interestingly, all three ions
were four amu less than the corresponding fragments in the API, and
they lacked the chlorine isotope pattern.

In-source CID provided useful fragmentation data for these
molecules without the need of a triple quadrupole mass spectrometer.
The LC/MS/MS experiments were performed to obtain more detailed
fragment ion spectra with a reduced noise level providing higher



*Figure 5.* Case Study B: LC/MS spectra of the drug substance (below) and the
impurity (above).

**Identification and Control of Impurities**                                    **2247**

confidence. The daughter ion scan was carried out at different collision energies (10, 20, 30, 40, 50, and 60 V) in order to encompass a wide range of fragmentation. Two representative mass spectra at different collision energies are shown in Figure 6(a) for the API and in Figure 6(b) for the impurity. The major ions obtained with LC/MS experiments were still



***Figure 6.*** Case Study B: Fragment ion mass spectra at two different collision energies (a) for the drug substance at m/z 642 and (b) for the impurity at m/z 638.

the major fragments in the LC/MS/MS data including m/z 435, 338 and
267 for the API; m/z 431, 334, and 263 for the impurity. As the first
quadrupole was set at the nominal mass resolution for the LC/MS/MS
experiments, the chlorine isotope was filtered out, therefore, missing the
isotope pattern information. The structure of the API with key fragments
observed is shown below.



Structure of the drug substance with observed fragments for Case Study B.

There were two obvious pieces of information from the LC/MS
and LC/MS/MS data. The first information was that the impurity was
missing the chlorine, inferred from the molecular ion as well as the
fragment ion isotope patterns. The second information was that all
three major corresponding fragments of the impurity were four amu
less than that of the API, indicating that the modification occurred
on the right hand side of the molecule within the fragment structure
of m/z 310. Since the molecule had to lose the chlorine, the most
straightforward speculation was that "something" replaced the chlorine
on the API. The nominal mass of the major isotope of chlorine is
35, therefore, in order to make the impurity to be 4 amu less than
the API, "something" had to weigh 31 amu. The proposed impurity
structure based on the information was that the chlorine was replaced
with a methoxy ($-OCH_3$, 31 amu = 16 amu for O + 15 amu for $CH_3$)
group. This made perfect sense as the salt formation was carried out
with methanol as the solvent. The proposed impurity structure was
further supported by HRMS experiments with an error of 2.5237 ppm.
The salt formation step was successfully optimized with regard to the
temperature, reagent addition rate, and reagent addition time in order to
reduce the impurity formation.

Identification and Control of Impurities                    **2249**

### Case Study C

Residual solvent analysis by GC is a routine analytical test performed
for manufacturing of intermediates and drug substances. A GC/FID
method including commonly used solvents was developed for this
purpose and the conditions are described in the experimental section.
One of the process intermediates was analyzed to quantify the residual
amount of tetrahydrofuran (THF). The GC/FID data in Figure 7(a)
showed a peak corresponding to THF at 6.9 minutes. There was a
significant amount of an unexpected impurity present in the intermediate
at a retention time of 13.4 minutes. GC/MS experiments were
performed to acquire mass spectral data for the impurity. The ionization
mode was positive electron impact (EI) ionization at 70 eV. Unlike
electrospray ionization (ESI) which generally produces $[M + H]^+$ ions,
electron impact (EI) ionization produces $M^{+\cdot}$ radical ions. Electron
impact ionization is a "hard" ionization method producing significant



***Figure 7.*** Case Study C: (a) GC/FID chromatogram showing the unknown
impurity. (b) The EI-MS spectrum of the impurity obtained from GC/MS
experiments.

fragmentation of the molecular ions, whereas electrospray ionization is known to be a "soft" ionization technique.[13,17,18] It is relatively easy to compare EI-MS sample data to the library data set and search, mainly due to the following two facts. First, the EI MS data are acquired and cataloged into commercially available libraries at the standardized 70 eV, thus the mass spectra are relatively consistent regardless of differences in manufacturers and instrumentations. Secondly, since it is a hard ionization technique EI-MS yields fragmentation spectra characteristic of the compound.

The mass spectrum acquired for the unknown impurity is shown in Figure 7(b). The library search of the mass spectrum returned diisopropyl ethyl amine (DIEA, also known as Hunig's base) with the highest score. The structure is shown below. The MS spectrum was generated by EI, therefore, the molecular ion observed was at $m/z$ 129, the molecular weight of DIEA. The ion at $m/z$ 114 showed a loss of a methyl group, and the ion at $m/z$ 72 was the result of methyl and isopropyl group loss from the molecular ion. A sample of Hunig's base was analyzed as a standard and the retention time and mass spectral data confirmed the identity of the impurity. Subsequently, appropriate washes were implemented to remove Hunig's base for the preparation of this intermediate.



$C_8H_{19}N$
Exact Mass: 129.15
Mol. Wt.: 129.24

Structure of diisopropyl ethyl amine (DIEA).

## CONCLUSION

Three case studies of impurity identification and control during the drug substance development were presented. It involved use of several analytical techniques complementing each other, including HPLC/UV, HPLC/MS, tandem mass spectrometry, preparative LC, HRMS, NMR, GC/FID and GC/MS.

Impurity identification of the case study A required a multidisciplinary approach, namely, generation of molecular ion and daughter ions using a range of MS/MS conditions, followed by preparative LC and reference synthesis by synthetic chemists, and

confirmation by HRMS and NMR. Subsequently, analytical methods
were developed to follow the impurity throughout the synthetic pathway.
In the case study B, the impurity proposed based on the tandem mass
spectrometric data was immediately valuable and helped to improve
process parameters. The availability of EI MS library for GC/MS made
the impurity identification straightforward in the case study C.

It was demonstrated that by identifying the structure of the impurity,
the origin of the impurity was pinpointed making elimination/reduction
of the impurity achievable. Understanding of the impurity formation
expands the knowledge of the process chemistry and enables control of
the impurities.

## ACKNOWLEDGMENT

Authors would like to thank Drs. Jeff Song, Jonathan Reeves, Bruce Lu,
and Larry Nummy for their discussion and collaboration.

## REFERENCES

1. Impurities in New Drug Substances Q3A(R), International Conference
   on Harmonisation of Technical Requirements for Registration of
   Pharmaceuticals for Human Use, 2002.
2. Lee, H. Pharmaceutical applications of liquid chromatography coupled with
   mass spectrometry (LC/MS). J. Liq. Chromatogr. & Rel. Technol. **2005**, *28*,
   1161–1202.
3. Li, N.; Yang, J.; Qin, F.; Li, F.; Gong, P. Isolation and identification of a
   major impurity in a new bulk drug candidate by preparative LC, ESI-MS[n],
   LC-MS-MS, and NMR. J. Chromatogr. Sci. **2007**, *45*, 45–49.
4. Wang, P.; Shi, Y.; Helmy, R.; Reamer, R.; Vailaya, A. Identification
   of a trace colored impurity in drug substance by preparative liquid
   chromatography and mass spectrometry. Rapid Comm. Mass Spectrom.
   **2005**, *19*, 3749–3754.
5. Alsante, K.M.; Boutros, P.; Couturier, M.A.; Friedmann, R.C.; Harwood,
   J.W.; Horank, G.J.; Jensen, A.J.; Liu, Q.; Lohr, L.L.; Morris, R.;
   Raggon, J.W.; Reid, G.L.; Santafianos, D.P.; Sharp, T.R.; Tucker J.L.;
   Wilcox, G.E. Pharmaceutical impurity identification: A case study using a
   multidisciplinary approach. J. Pharm. Sci. **2004**, *93*(9), 2296–2309.
6. Novak, T.J.; Helmy, R.; Santos, I. Liquid chromatography-mass
   spectrometry using the hydrogen/deuterium exchange reaction as a
   tool for impurity identification in pharmaceutical process development.
   J. Chromatogr. B **2005**, *825*, 161–168.
7. Zhou, L.; Mao, B.; Reamer, R.; Novak, T.; Ge, Z. Impurity profile tracking
   for active pharmaceutical ingredients: Case reports. J. Pharm. Biomed. Anal.
   **2007**, *44*, 421–429.

8. Xu, H.; Wang, D.; Sun, C.; Pan, Y.; Zhou, M. Identification of an unknown trace-level impurity in bulk drug of seroquel by high-performance liquid chromatography combined with mass spectrometry. J. Pharm. Biomed. Anal. **2007**, *44*, 414–420.

9. Zhou, H.; Zheng, Z.; Wu, S.; Tai, Y.; Cao, X.; Pan, Y. Separation and characterization of clindamycin and related impurities in bulk drug by high-performance liquid chromatography-electrospray tandem mass spectrometry. J. Pharm. Biomed. Anal. **2006**, *41*, 1116–1123.

10. Sun, C.; Xu, H.; Pan, Y.; Shen, Z.; Wang. D. Characterization of the trace-level impurities in the bulk drug citalopram by high-performance liquid chromatography/tandem multistage mass spectrometry. Rapid Comm. Mass Spectrom. **2007**, *21*, 2889–2894.

11. Sigvardson, K.W.; Adams, S.P.; Barnes, T.B.; Blom, K.F.; Fortunak, J.M.; Haas, M.J.; Reilly, K.L.; Repta A.J.; Nemeth, G.A. The isolation and identification of a toxic impurity in XP315 drug substance. J. Pharm. Biomed. Anal. **2002**, *27*, 327–334.

12. Lehr, G.J.; Barry, T.L.; Franolic, J.D.; Petzinger, G.; Scheiner, P. LC determination of impurities in methoxsalen drug substance: isolation and identification of isopimpinellin as a major impurity by atmospheric pressure chemical ionization LC/MS and NMR. J. Pharm. Biomed. Anal. **2003**, *33*, 627–637.

13. Smyth, W.F. Recent studies on the electrospray ionization mass spectrometric behavior of selected nitrogen-containing drug molecules and its application to drug analysis using liquid chromatography-electrospray ionization mass spectrometry. J. Chromatogr. B **2005**, *824*, 1–20.

14. Busacca, C.A.; Campbell, S.; Saha, A.; Lorenz, J.C.; Grozinger, K.; Jones, P.J.; Grinberg, N.; Shen, S.; Lee, H.; Qiu, F.; Granger, A.; Yuabova, Z.; Norwood, D.; Senanayake, C.H. Structure elucidation and total synthesis of a unique group of trace impurities in Tipranavir drug product. Mag. Res. Chem. **2005**, *43*, 1032–1039.

15. Freed, A.L.; Kale, U.; Ando, H.; Rossi, D.T.; Kingsmill, C.A. Improving the detection of degradants and impurities in pharmaceutical drug products by applying mass spectral and chromatographic searching. J. Pharm. Biomed. Anal. **2004**, *35*, 727–738.

16. Qiu, F.; Norwood, D.L. Identification of pharmaceutical impurities. J. Liq. Chromatogr. & Rel. Tech. **2007**, *30*, 877–935.

17. McLafferty, F.W.; Turecek, F. *Interpretation of Mass Spectra*; Fourth Ed.; University Science Books, 1993.

18. Laniewski, K.; Wannman, T.; Hagman, G. Gas chromatography with mass spectrometric, atomic emission and Fourier transform infrared spectroscopic detection as complementary analytical techniques for the identification of unknown impurities in pharmaceutical analysis. J. Chromatogr. A **2003**, *985*, 275–282.

Manuscript 6312C

Exhibit 44



**Masonic Cancer Center**
UNIVERSITY OF MINNESOTA
Comprehensive Cancer Center designated by the National Cancer Institute

*2231 6th Street SE*
*Room 2-148 CCRB*
*Minneapolis, MN 55455*
*Phone: (612) 624-7607*
*Fax: (612) 624-3869*
*hecht002@umn.edu*

July 6, 2021

Adam M. Slater
Mazie Slater Katz & Freeman
103 Eisenhower Parkway
Roseland, New Jersey 07068

Dear Mr. Slater:

At your request I have reviewed scientific literature, corporate documents, deposition testimony, and regulatory documents and standards, as set forth in this report and the attached Exhibits, and applied my education, training, and knowledge to provide opinions related to the contamination of valsartan manufactured by API manufacturers including ZHP, Hetero, Mylan, and Aurobindo with nitrosamines, and in particular NDMA and NDEA (the "contaminated valsartan"), and then incorporated into finished dose form by the same manufacturers, as well as finished dose manufacturers Teva and Torrent, who purchased the API from the API manufacturers (Teva from ZHP and Mylan, Torrent from ZHP) and incorporated the contaminated valsartan into their finished doses.

As set forth in detail herein, it is my opinion that the NDMA and NDEA levels found in the contaminated valsartan were completely avoidable and therefore are and were unreasonably dangerous, causing an increased risk for the development of cancer for those people ingesting the contaminated valsartan. All opinions set forth herein are held to a reasonable degree of scientific certainty, and have been formed based upon application of scientifically validated methodologies that I utilize in my own scientific work. My background and credentials are set forth in my curriculum vitae, which is attached hereto as Exhibit 1. The list of documents reviewed as part of my analysis is attached hereto as Exhibit 2. The list of scientific literature references specifically relied on for my opinions is attached hereto as Exhibit 3, with the caveat that the scientific literature relevant to the issues addressed is vast, and my familiarity with that literature certainly informs my knowledge in this field, as does all of my experience, even if not specifically listed.

*Stephen S. Hecht*

Stephen S. Hecht, Ph.D.
Wallin Professor of Cancer Prevention
American Cancer Society Professor
American Chemical Society Fellow



## I. Professional Background

I will first provide an overview of my professional background.  I received my B.S. degree in chemistry (with honors) from Duke University in 1964 and my Ph.D. in organic chemistry from the Massachusetts Institute of Technology (MIT) in 1968. From 1968-69, I held a postdoctoral fellowship position at MIT in the laboratory of Professor Klaus Biemann, a pioneer in the application of mass spectrometry to organic chemical analysis.  My research helped lay the groundwork for analysis of samples to be returned by NASA astronauts from the moon, and analyzed for trace organic molecules using mass spectrometry.  I was an assistant professor of chemistry at Haverford College from 1969-1971, and a National Research Council Fellow at the U.S. Department of Agriculture from 1971-1973, carrying out research on practical applications for utilizing excess animal fat.  My research career on nitrosamines began when I joined the American Health Foundation in 1973, initially as Head of the Section of Organic Chemistry in the Division of Environmental Carcinogenesis (1973-1980), then as Head of the Division of Chemical Carcinogenesis (1980-1996), and concurrently as Director of Research for the Foundation (1987-1996).  The American Health Foundation was a private research institute founded by the eminent epidemiologist Ernst L. Wynder.  I will discuss my research in more detail later, but I note here that I have carried out research related to nitrosamines continually since 1973.  I have been continually funded for this research by the U.S. National Cancer Institute since 1975.  Among a number of highly important contributions to the nitrosamine research field, my colleagues and I were the first to characterize "tobacco-specific nitrosamines" in tobacco products. These nitrosamines, among which are the powerful cancer causing agents NNK (Nicotine-derived nitrosamine ketone) and NNN ($N$-Nitrosonornicotine), considered "carcinogenic to humans" by the International Agency for Research on Cancer, are widely viewed as some of the main cancer causing agents in tobacco products.  Our research paper in the 1978 Journal of the National Cancer Institute, describing these compounds, has been cited by the American Association for Cancer Research as a "Landmark in Cancer Research."  In 1996, I relocated to the University of Minnesota where I hold my current position as Wallin Professor of Cancer Prevention, a "Land Grant Endowed Chair" in cancer prevention research.  My academic appointment is in the Department of Laboratory Medicine and Pathology, in the University of Minnesota Medical School.  I am also a member of the Medicinal Chemistry and Pharmacology graduate programs.  From 1998-2014, I was the founding Head of the Carcinogenesis and Chemoprevention Program of the Masonic Cancer Center, University of Minnesota, a National Cancer Institute designated Comprehensive Cancer Center.  I currently lead a research group of 10-15 scientists with B.S., M.S., or Ph.D. degrees in the chemical and biological sciences.  Our research, which focuses on mechanisms and prevention of cancer induced by tobacco products and environmental agents, is fully funded by grants from the U.S. National Cancer Institute and the National Institute of Environmental Health Sciences.  I am the principal investigator of three R01 grants and a program project (P01) grant, from the National Cancer Institute and co-investigator on a number of other grant and cooperative agreement awards from the National Institutes of Health and the Food

and Drug Administration.  I have been awarded a Merit Award (10 years of funding) and an Outstanding Investigator Grant (14 years of funding) from the National Cancer Institute.  My research has been recognized by a number of prestigious awards, including election as a Fellow of the American Association for the Advancement of Science, a Fellow of the American Chemical Society, and a Research Professor of the American Cancer Society.  To the best of my knowledge, I am the only scientist who has ever held the latter two awards from the American Chemical Society and the American Cancer Society simultaneously.  I received the American Association for Cancer Research/Cancer Research and Prevention Foundation Award for Excellence in Cancer Prevention Research in 2006 and the Founders Award from the Division of Chemical Toxicology, American Chemical Society, in 2009.  I received the Joseph Cullen Award from the American Society of Preventive Oncology in 2012.  I received the William Cahan Distinguished Professor Award from the Flight Attendant Medical Research Institute in 2002 and the Alton Ochsner Award Relating Smoking and Health in 2001.  I received the Minnesota Award from the Minnesota Section of the American Chemical Society in 2017.  I am a member of the Academy for Excellence in Health Research and the Academy for Excellence in Team Science at the University of Minnesota.  My publication entitled "Tobacco Smoke Carcinogens and Lung Cancer", published in the Journal of the National Cancer Institute in 1999, can be found on the University of Minnesota Medical School "Wall of Scholarship" because it was cited more than 1,000 times in the peer-reviewed literature.  I served as Editor-in-Chief of the American Chemical Society journal *Chemical Research in Toxicology* from 2013-2017 and as an Associate Editor of the *Journal of Medicinal Chemistry* from 2004-2012.

Respected researchers are invited by the National Institutes of Health as well as private foundations to serve on peer review groups for evaluation of research proposals submitted by scientists from the U.S. and abroad.  I was chair of the "Chemo-Dietary Prevention Study Section" of the NIH from 2006-2009, and served on the "Chemical Pathology Study Section" from 1981-1985.  I was on the Board of Scientific Counselors of the National Cancer Institute from 2001-2004.  I served on the "Carcinogenesis, Nutrition, and the Environment Study Section" of the American Cancer Society from 1998-2001, and as its Chair in 2001.  I served on the American Cancer Society "Council for Extramural Grants" from 2010-2014.  I served on the "Grants Review Panel" for the American Institute for Cancer Research from 1984-1987.  I currently serve, since 2011, on the National Cancer Institute "PREVENT Study Section."  I continue to be in demand as an ad hoc member of multiple other peer review panels.

Numerous other service activities to the scientific research community are listed in my Curriculum Vitae.  I note some of the more important ones here.  I have served on multiple writing groups for the International Agency for Research on Cancer Monographs on the Evaluation of Carcinogenic Risks to Humans.  This important and prestigious series reviews and evaluates specific exposures and chemicals for evidence of carcinogenicity.  Each committee member reviews a significant aspect of the literature and prepares a lengthy and detailed written

document.  These documents are reviewed and discussed in a 10 day meeting in Lyon, France resulting in an evaluation of carcinogenic activity to humans and ultimately the publication of a monograph.  The series is currently in Volume 127.  I served on the Monograph Committees on "Tobacco Habits Other than Smoking," Volume 37, 1985; "Tobacco Smoke and Involuntary Smoking", Volume 83, 2002; "Betel Quid and Areca Nut," Volume 85, 2003, as committee Chair; "Smokeless Tobacco and Some Related Nitrosamines," Volume 89, 2004, and "A Review of Human Carcinogens; Lifestyle Factors," Volume 100E, 2009.  I was a member of the National Toxicology Program Board of Scientific Counselors from 1997-2001 and the Science Advisory Board for the National Center for Toxicological Research from 1998-2002.  I was on the Board of Scientific Counselors for the Division of Cancer Etiology of the National Cancer Institute from 1989-1995.  I was Chair of the Division of Chemical Toxicology of the American Chemical Society from 1999-2000. I served on the Health Research Committee of the Health Effects Institute from 1992-1996.  I have also served on numerous advisory groups for academic research centers specializing in toxicology and cancer research.

I am in demand as a speaker on topics pertinent to cancer prevention research, with particular emphasis on tobacco and cancer including basic, applied, and epidemiologic studies on nitrosamines.  I have given formal invited lectures worldwide averaging about five per year since 2002 in almost every state of the U.S. and at scientific conferences and universities in Europe, Asia, and South America.

I have published over 880 original manuscripts, book chapters, reviews, and other peer reviewed documents in the scientific literature.  This includes more than 600 original research articles in peer-reviewed journals.  More than half of these original research articles are concerned with nitrosamines, including nitrosodimethylamine (NDMA), also known as dimethylnitrosamine (DMN).  My H-index is 91, and my articles have been cited more than 35,000 times.

My first publication on nitrosamines was in 1974 when my colleagues and I discovered *N'*-nitrosonornicotine (NNN) in smokeless tobacco.  This was the first example of a carcinogenic nitrosamine in unburned tobacco; in fact, the first example of any carcinogen in unburned tobacco.  This paper was published in *Science*, and revolutionized the characterization and carcinogenicity assessment of tobacco products.

In the 1970s when my research on nitrosamines began, there was great interest in these compounds as potential carcinogenic constituents of food, drugs, tobacco products, and other consumer products.  In 1956, Magee and Barnes had published their groundbreaking study demonstrating that NDMA caused liver cancer in rats.  This was remarkable because NDMA is a water-soluble compound with only 11 atoms, and it had been supposed at the time, based on studies of polycyclic aromatic hydrocarbons, that carcinogenic agents were typically larger fat soluble compounds.  The Magee and Barnes study stimulated an explosion of research on nitrosamines including extensive carcinogenicity testing and analysis

4

projects. Beginning in the 1970s, the U.S. Food and Drug Administration held regular meetings to address critical issues such as the contamination of bacon with *N*-nitrosopyrrolidine and related volatile nitrosamines including NDMA. Numerous analytical methods were developed for volatile nitrosamines such as NDMA in particular. The challenge was to be able to quantify relatively low levels of nitrosamine contaminants in common food and drug products. This was before the development and common use of highly sensitive mass spectrometers which are the current instruments of choice for the routine analysis of nitrosamines. Various methods were developed, but the one that was ultimately widely used was "Thermal Energy Analysis," in which the nitrosamine molecule was split and the released NO detected. This method was developed by a small company - Thermo Electron Corporation - now the huge instrument and scientific products corporation Thermo Fisher Scientific. The Thermal Energy Analyzer method was applied to numerous products and NDMA contamination was found in products such as beer, cured meats, and others. There was sufficient interest in nitrosamines in the period 1973-1996 that the International Agency for Research on Cancer sponsored biennial meetings for presentation of research on nitrosamines. These meetings were typically attended by 200-300 participants. Ultimately, the levels of common volatile nitrosamines such as DMN in most consumer products were decreased by process modifications and their concentrations rarely exceeded 5-10 ppb (0.005-0.01 ppm).

        Our research on carcinogens in tobacco products fit very well into this framework of international interest, and we pursued it aggressively. Using my skills in analytical organic chemistry and mass spectrometry, and working together with an outstanding interdisciplinary team at the American Health Foundation, we carried out studies on the analysis of nitrosamines in tobacco products, the formation and synthesis of tobacco-specific nitrosamines, and the carcinogenicity of nitrosamines including tobacco-specific nitrosamines, cyclic nitrosamines, and other nitrosamines found in consumer products. We then extended our studies to investigate the metabolism of nitrosamines in laboratory animals and humans, and based on these studies developed biomarkers of nitrosamine exposure by quantifying nitrosamine metabolites in human urine. This research led to further investigations of human exposure to nitrosamines, particularly tobacco-specific nitrosamines. In a series of studies with significant policy implications, we demonstrated consistent exposure of non-smokers to carcinogenic tobacco-specific nitrosamines such as NNK via secondhand tobacco smoke in the home and a variety of commercial settings. These studies analyzed urinary NNAL, a metabolite of the lung carcinogen NNK, and contributed significantly to research supporting the clean air acts that have virtually eliminated indoor smoking, a known cause of lung cancer in non-smokers. Our studies on nitrosamine metabolism led logically to research on the interaction of their metabolites with DNA, the critical step in cancer induction by nitrosamines and other carcinogens. Our group characterized most of the DNA adducts formed by tobacco-specific nitrosamines and related cyclic nitrosamines. This research took advantage of my strong background in organic chemistry and analytical chemistry, particularly with the application of mass spectrometry.

Thus, as a result of more than 45 years of research in chemical and tobacco carcinogenesis, much of it focused on nitrosamines, I am thoroughly familiar with the state of the art in the formation, quantitative analysis, chemistry, biochemistry, metabolism, carcinogenicity, human exposure biomarkers, and DNA damage by nitrosamines. I currently serve on the European Food Safety Authority panel evaluating nitrosamines in food. I also served on the expert panel for the FDA Workshop entitled "Nitrosamines as Impurities in Drugs: Health Risk Assessment and Mitigation Public Workshop," March 29, 2021.

II.  Nitrosamines

## 1. Chemical structures.

Nitrosamines are simple organic compounds formed by the attachment of an N=O group to an amino nitrogen.

## 2. Formation of nitrosamines

The formation of nitrosamines from secondary amines is textbook organic chemistry, a reaction familiar to all students in their first encounter with organic chemical reactions.[1,2]  The nitrosation of secondary amines occurs so easily that it was once widely used in qualitative organic analysis as a test for the presence of a secondary amine, but after the discovery of nitrosamine carcinogenesis, this was eventually discontinued.  Secondary amines such as dimethylamine and diethylamine are easily nitrosated by the agent nitrous anhydride ($N_2O_3$), which is formed from 2 molecules of nitrous acid ($HNO_2$), the conjugate acid of sodium nitrite ($NaNO_2$).[3]  $N_2O_3$ reacts rapidly with a secondary amine such as dimethylamine or diethylamine to form the corresponding nitrosamine, in this case NDMA or *N*-nitrosodiethylamine (NDEA), respectively.  The optimal pH for this sequence of reactions is 3.4, but it occurs over a wide range of pH values including at a pH 7 (neutral) with varying rates as expressed by the equation:

Rate = k [amine][nitrite]$^2$.

Tertiary amines can also be nitrosated to form dialkylnitrosamines such as NDMA.[4]  Nitrosation of nicotine to produce NNK and NNN is a well-known example of tertiary amine nitrosation.[5]  Nitrosation reactions can occur at neutral and basic pH with catalysis by formaldehyde[6] and can be inhibited by ascorbic acid.[7]  Regarding the formation of NNK and NNN, we applied the known nitrosation chemistry to demonstrate that nicotine could be converted to 3 nitrosamines - NNK, NNN, and NNA.

This groundbreaking research established the chemical basis of nicotine nitrosation that eventually led to the identification of NNK in tobacco and tobacco smoke.[8,9]  The identification of NNK in tobacco products then led to its testing for

carcinogenicity, which showed that it is a potent lung carcinogen in multiple animal species, independent of the route of administration, inducing mainly adenocarcinoma of the lung, now the major type of tumor seen in cigarette smokers.[10]

### 3. Analysis of nitrosamines

A great deal of effort has been devoted to the analysis of nitrosamines in various settings including food, drinking water, tobacco products, beer, medicines, and other consumer products. The rationale for these detailed and extensive studies derives from the powerful carcinogenicity of these compounds, for which the scientific community has consistently raised concerns about human exposure. Highly reliable analytical methods for determination of trace amounts of nitrosamines have existed for decades – first the nitrosamine specific "Thermal Energy Analysis" noted above and in more recent years sophisticated and sensitive mass spectrometric methods. All of these methods have been extensively validated for accuracy, precision, sensitivity, and overall reliability, and all existed prior to and during the development of the manufacturing processes at issue. The earlier analyses of preformed nitrosamines in food and beverages have been reviewed. In a representative summary, levels of "volatile nitrosamines" such as NDMA and NDEA in at least 60 different food types were recapitulated, typically being found in the 0-10 parts per billion range (micrograms per kilogram, or micrograms per liter), with occasional exceptions often involving foods preserved by smoking or related techniques. Levels of volatile nitrosamines in food are now generally lower in part because of regulations regarding the amount of nitrite that can be used.[11] A recent review has summarized current analytical data on human exposure to preformed nitrosamines.[12,] Nitrosamine levels in tobacco, food and beverages, drinking water, and personal care products were presented. The highest average levels were found in tobacco products (16,100 ng/g), followed by personal care products (1500 ng/g), while the lowest amounts were found in food and beverages (6.7 ng/g). Maximum average exposure to nitrosamines was estimated at about 25 µg per day, driven mainly by use of tobacco products.

### 4. Carcinogenicity of nitrosamines and NDMA in particular

In a landmark publication, Magee and Barnes first demonstrated the carcinogenicity of NDMA.[13] The substance was administered in the diet of rats (10 male and 10 female) at a concentration of 50 ppm. Between the 26th and 40th week, 19 of the treated animals developed primary hepatic tumors, with metastases in 7 cases. This remarkable finding initiated an entire branch of research ultimately resulting in the discovery of nitrosamines that readily and specifically induced tumors in virtually all major organs. High doses of NDMA are lethal; a median lethal dose in rodents of 20-40 mg/kg body weight has been reported.[14] The principal mechanism of death is severe hemorrhagic necrosis of the liver.[15] Consistent with this, cases of human poisoning by NDMA have been reported when large amounts of

the compound were used without precautions or when NDMA was used in deliberate attempted murders.[16]

The carcinogenicity of NDMA was demonstrated in several different strains of rats. Long-term administration of non-lethal doses of NDMA, typically about 4 mg/kg bw/day, consistently produced high incidences of hepatocellular carcinomas and cholangiocellular tumors. Short term administration of high doses of NDMA typically produced kidney tumors in multiple studies. The carcinogenicity of NDMA was significantly reduced by substitution of its methyl hydrogens with deuterium; the resulting deuterium isotope effect retarded its metabolic activation.[17] An extensive dose-response study of NDMA and NDEA on 4,080 rats demonstrated that a dose of 1 ppm of NDMA or NDEA in the drinking water caused about 25% of the rats to develop a liver neoplasm, a dose of 0.1 ppm caused about 2.5% to do so, and a dose of 0.01 ppm caused about 0.25% to do so, etc., with no indication of a "threshold."[18] In a study carried out by our group, the carcinogenic activities of NDMA and the tobacco-specific lung carcinogen NNK were compared.[19] Groups of 30 male F-344 rats were given 60 s.c. injections of 0.0055 mmol/kg of either NNK or NDMA over a 20 week period (total dose, 0.33 mmol/kg) and the experiment was terminated after 104 weeks. NDMA induced liver tumors in 6 of 30 rats; NNK induced a similar number of liver tumors but also a high incidence of lung adenocarcinoma and nasal cavity tumors.

The carcinogenicity of NDMA has been demonstrated in multiple species.[20] In Syrian golden hamsters, it induced various types of liver tumors when given by gavage or in the drinking water. Chinese hamsters and European hamsters also developed liver tumors when administered NDMA by injection. Guinea pigs developed liver tumors when given NDMA in the diet. Rabbits given NDMA in the diet developed liver carcinomas with lung metastases. Rainbow trout given NDMA in the diet developed hepatocellular tumors. Various strains of mice injected with NDMA developed liver and lung tumors. Liver tumors were also observed in mastomys administered NDMA by subcutaneous injection. Guppies and frogs exposed to NDMA in aquarium water resulted in the development of liver tumors. Rabbit, mink, blue fox, and duck are additional species in which NDMA induced liver tumors.

The pharmacokinetics and DNA binding of NDMA have been studied in detail in a range of species including mice, rats, rabbits, hamsters, dogs, pigs, and monkeys. Consistently, these studies have demonstrated high systemic clearance and high oral bioavailability of NDMA. In one study, NDMA was rapidly excreted into the saliva after i.v. and p.o. administration to dogs.[21] A consistent and linear pharmacokinetic and metabolic pattern emerged in these studies resulting in the conclusion that extrapolation to humans of conclusions obtained in studies using laboratory animals was justified.[22,23,24,25]

Similarly, the carcinogenicity of NDEA, which is more potent than NDMA, has been demonstrated in multiple species including in various different strains of rat,

mouse, and hamster as well as guinea pigs, chickens, rabbits, cats, dogs, pigs, monkeys, gerbils, snakes, hedgehogs, grass frogs, birds, and fish.[26] Dr. Lance Molnar, Ph.D., Mylan's Senior Director, Global Pharmacology and Toxicology, testified in his deposition that both NDMA and NDEA "are genotoxic carcinogens ... in every experimental animal that they've been evaluated in" and are "demonstrated to produce tumors."[27]

In summary, NDMA and NDEA have been extensively tested in multiple species and at extremely low doses. Very few, if any, other chemicals have been so thoroughly tested for carcinogenicity, producing uniformly positive results. These data leave no doubt as to the high potency of NDMA and NDEA to induce tumors in laboratory animals and likely in humans. The lethality of NDMA at high doses has been observed in both laboratory animals and humans.

It is worth noting that both NDMA and a structurally related compound, dimethyl sulfate, are classified by IARC as belonging to Group 2A, "probably carcinogenic to humans."[28,29] According to the IARC Monographs preamble, this category is used when there is limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in experimental animals. Of importance, IARC classification does not consider or indicate the strength of carcinogenicity. Thus, while NDMA is a far more potent carcinogen than dimethyl sulfate, both are classified as Group 2A. In an interesting exchange between Min Li of ZHP and ZHP's consulting toxicologist, Charles Wang, Ph.D., Dr. Wang advised that NDMA should actually be classified as Class 1B, stating: "Looks like IARC does consider NDMA as a Class 2A agent. However, according to the definition of Class 2 in ICH M7(R1) guideline, the Class 2 compound should be a 'Known mutagens with unknown carcinogenic potential (bacterial mutagenicity positive*, no rodent carcinogenicity data)'. There are plenty rodent carcinogenicity data for NDMA (see revised report in the attached, page 4). In Fisher MSDS, NDMA has been classified as Class 1B for carcinogenicity (attached)."[30] In addition, NDMA is not classified in Group 1, "carcinogenic to humans", as there is no instance, other than the poisoning murder incidents noted above, in which humans have been exposed exclusively to relatively low doses of NDMA in the absence of other potentially carcinogenic exposures; exposure to nitrosamines always occurs in mixtures. The exception to this IARC classification is the tobacco-specific nitrosamines NNK and NNN, to which human exposure also occurs as mixtures with other tobacco constituents (their carcinogenic activities and concentrations in tobacco products, particularly smokeless tobacco, along with sufficient metabolic data, lead to the higher classification).[31] Carcinogenicity data for dimethyl sulfate were summarized in the IARC Monographs.[32] Of course, as recognized below, it would be unethical to perform studies on the effects of NDMA and NDEA on humans due to their potency, consistent with the routine use of nitrosamines to cause cancer in laboratory animals.

More than 200 nitrosamines of different chemical structures (e.g., different R groups attached to the N-N=O group) have been tested for carcinogenicity and at

least 199 of them cause tumors in laboratory animals.[33]  Nitrosamines are frequently organospecific in these studies, meaning that, depending on the structure of the nitrosamine, specific organs or tissues may be affected.  Thus, for NDMA, the main target tissues demonstrated in animal studies are the liver and kidney, independent of the route of administration and species in which the test is performed.  NDEA also targets these tissues in addition to causing tumors of the esophagus.  In contrast, di-*n*-butylnitrosamine causes mainly tumors of the urinary bladder in several different animal species, while methylbenzyl nitrosamine specifically causes esophageal tumors in rats.  These organospecific characteristics of nitrosamine carcinogenesis have been linked to their metabolism in specific tissues.  Metabolism is absolutely required for the carcinogenicity of nitrosamines and it has been established that α-hydroxylation (replacement of the hydrogen atom adjacent to the N-N=O group by a hydroxyl group) catalyzed by specific cytochrome P450 enzymes present in the liver and other tissues, is the major pathway of metabolism leading to carcinogenesis.  Multiple human tissues contain these enzymes and can metabolize nitrosamines; therefore, it is likely that when exposed to nitrosamines, humans are susceptible to developing a wider spectrum of cancers targeting additional organs.  There are some instances of concordance between target tissues of nitrosamine carcinogenesis in laboratory animals and in humans.  One example is the tobacco-specific nitrosamine NNN, mentioned above.  NNN causes esophageal and oral tumors in rats.  A prospective epidemiology study carried out in male cigarette smokers in Shanghai demonstrated a strong relationship between NNN exposure (as determined by NNN in urine) and esophageal cancer in the study subjects.  NNN is also the only strong oral carcinogen in smokeless tobacco, a known cause of oral cancer in humans.

## 5. Carcinogenicity of nitrosamines in humans

Exposure to nitrosamines, including NDMA and NDEA, is a likely cause of cancer in humans.  For example, there are examples of human poisoning by NDMA which coincide with toxicity studies in rats, as noted above.  Human metabolism of NDMA, NDEA, and other nitrosamines by the pathways known to lead to DNA damage - identical to that seen in rats that developed tumors upon treatment with these nitrosamines - has been demonstrated in numerous studies using various experimental systems.  These included human liver slices, human liver subcellular fractions such as microsomes (with activity just as high as rat liver microsomes), and explant cultures of various human tissues including bronchus, esophagus, bladder, and colon.[34]  These results are consistent with the known activities of human hepatic cytochrome P450 enzymes such as P450s 2E1 and 2A6, which efficiently metabolize NDMA and NDEA.[35]  DNA adducts known to result from NDMA and NDEA such as 7-methylguanine and $O^6$-methylguanine have been detected in human tissues.[36,37,38]

Thus, pathways of metabolism and DNA damage observed in humans clearly replicate those in laboratory animals that developed tumors upon treatment with NDMA.  There is no reason to doubt that humans are susceptible to carcinogenesis

by NDMA and NDEA, considering their powerful carcinogenicity and the immense amount of supporting biochemical and toxicological data which are available.  For example, among all nitrosamines, the tobacco-specific nitrosamines NNN and NNK are widely recognized as human carcinogens because of the high levels of human exposure.[39,40,41]  In a study of exposures to British workers in the rubber industry, it was concluded that, "Consistent with previous studies, *N*-nitrosamines exposures in the rubber industry, were associated with mortality from cancers of the bladder, lung, stomach, leukaemia, multiple myeloma, oesophasus, prostate, pancreas and liver."[42]

Collectively, these observations support the human carcinogenicity of nitrosamines in general, which are potent mutagenic carcinogens.  There is no reason to expect that humans would differ from laboratory animals with respect to the existence of nitrosamine carcinogenesis.  All of the main metabolic activation pathways of nitrosamines that occur in laboratory animals treated with these compounds also occur in human tissues.  The DNA adducts that are formed are identical.  For example, treatment of laboratory animals with NDMA causes the formation of 7-methylguanine and $O^6$-methylguanine in DNA; the latter is known to cause mutations, specifically G to A mutations.[43]  The exact same DNA adducts and mutations are found in human tissues exposed to NDMA in vitro.  Given sufficient exposure to NDMA and NDEA, as with the levels found in the contaminated valsartan (see below), the formation of these DNA adducts would be sufficient to cause mutations and cancer in exposed humans.

The World Health Organization published a peer reviewed analysis of the carcinogenicity of NDMA in 2002.[44]  The findings include: "Based upon laboratory studies in which tumours have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic and clastogenic. ....  Qualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure."[45]  In the Effects Evaluation, with regard to Carcinogenicity, the study states:  "The weight of evidence of the carcinogenicity of NDMA in mammalian species is consistent and convincing.  Moreover, the pattern of tumour development is characteristic of that for a mode of action of carcinogenesis involving direct interaction with genetic material.  In available studies, NDMA has induced tumours in all species examined (mice, rats, hamsters), at relatively low doses in some cases, irrespective of the route of exposure (oral, inhalation); tumours were induced in a wide range of tissues, including the liver, Leydig cells, lungs, kidney, and nasal cavity, in the absence of significant non-neoplastic effects, in the limited number of studies in which these were well examined. ....  NDMA has been consistently mutagenic and clastogenic in human and rodent cells exposed *in vitro*. ....  DNA adducts (in particular, O6-methylguanine) formed by the methyldiazonium ion generated during metabolism likely play a critical role in NDMA carcinogenicity. ....  Putative pathways for the metabolism of NDMA are similar in rodents and humans, and indeed the formation of O6-methylguanine has been detected in human tissues exposed to NDMA.  Therefore, owing to the

11

considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumour formation, and the apparent lack of qualitative species-specific differences in the metabolism of this substance, NDMA is highly likely to be carcinogenic to humans."[46]

ZHP cited to the WHO article in its Deviation Investigation Reports, and Min Li, Ph.D., Vice-President for Analytical Operations for ZHP, confirmed that this was because the article was considered to be scientifically reliable.[47] Dr. Li, who holds a Ph.D. in Organic Chemistry from Johns Hopkins University, also confirmed that ZHP stated in its own Deviation Investigation Report that NDMA is, "a probable, you know, carcinogenic to human."[48] ZHP also stated in the Deviation Investigation Report for the TEA process that "NDEA is considered as a probably human carcinogen based on projection from the animal studies." ZHP cited to Pharmol. Ther., 1996, Vol. 71, Nos. 1/2, pp. 57-81 for this. ZHP also cited to Int. J. Biol. Sci. 2013, Vol. 9, No. 3, pp.237-245 for the observation that NDEA "is one of the most potent chemical hepatocarcinogens of this class, which can induce a variety of liver lesions in rodents."[49] Min Li also confirmed that there are no studies deliberately performed on humans with regard to the carcinogenicity of nitrosamines because it would be unethical to knowingly give NDMA to humans, as a result of the risk of cancer. More to the point, Min Li confirmed that it would be unethical "to give humans NDMA in the levels that were found in the valsartan pills."[50]

Min Li also testified with regard to information provided to ZHP by ZHP's consulting toxicologist, Charles Wang, Ph.D. Dr. Wang advised ZHP regarding the risk associated with the NDMA and NDEA in the valsartan, and his analysis was the basis for the toxicological assessment found in the Deviation Investigation Reports.[51] Min Li confirmed that Dr. Wang was consulted because he was deemed an expert who would be trusted to provide "reliable information."[52] Among other things, Dr. Wang advised ZHP that the classification of NDMA as a Class 2A agent was incorrect, and should instead be designated as Class 1B, since, "There are plenty rodent carcinogenicity data for NDMA."[53] In addition, Dr. Wang consulted what he termed, "a carcinogenicity expert consultant to perform the analysis who knows risk assessment of carcinogen and kept updated in regulatory guideline and standards in this field." In an email dated July 6, 2018, this expert, James McDonald, Ph.D., advised Dr. Wang – who relayed this information to Min Li - that, "the body of evidence on this suggests pretty clearly that this is a likely human carcinogen at sufficient exposures. The argument that the company would have to make to keep this product on the market will be very difficult with this profile. I'm not exactly sure where one would begin given the very high levels [his understanding was 30 ppm per a prior email from Dr. Wang] you think they are seeing. .... I expect this is not what they would want to hear but, unless there is a compelling reason to leave this product on the market (e.g.: only product available to treat a serious, life-threatening disease), I would expect the FDA would ask for a recall."[54]

Bandaru Venkata Ramarao, Vice President of Quality Control for Hetero Unit 5 (the finished dose manufacturing division of Hetero) also testified to the

12

significant carcinogenic risk presented by the NDMA contamination of Hetero's valsartan. In discussing the FMEA (Failure Modes and Effects Analysis) risk evaluation performed by Hetero, Mr. Ramarao testified that the severity of the hazard presented by the NDMA impurity, "was at the highest level because of the level of NDMA and because it's a probable carcinogen. . ." The Health Hazard was described in the FMEA as "Identified impurity is carcinogenic in nature," and he agreed this meant, "this is something that can cause cancer. . ." Finally, he confirmed that the overall risk priority number, or RPN, was the maximum possible score of 125, meaning it was deemed, "intolerable."[55] Mr. Ramarao was also asked about the 2002 WHO publication discussed above, and agreed that, "Because of these health effects that we are talking about and the risk of cancer, it would never be acceptable to knowingly sell valsartan containing NDMA... ....[T]hat's the reason why the valsartan that was sold by Unit 5 with the levels of NDMA that were seen, that never would have knowingly been done if you had known the NDMA was there because of that health risk."[56] Mr. Ramarao agreed that due to the GMP failures that resulted in the NDMA contamination, "the result of that was that NDMA ended up in the valsartan, which is something that causes cancer," and the risk, "was assessed at the highest level because people ingesting NDMA at the levels that were found in these pills is something that will increase their risk for cancer...."[57]

The likely carcinogenicity of NDMA (and NDEA) in humans is also demonstrated by regulatory guidelines. For example, the 2013 ICH M7 Draft Consensus Guideline, and 2015 ICH M7 Guidance for Industry, titled Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk, include *N*-nitroso compounds in the "cohort of concern" of "high potency mutagenic carcinogens" that are excepted from the acceptable intake levels set forth for DNA reactive substances.[58] The same is found in the December 2008 FDA Draft Guidance for Industry titled Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches: "However, there are some compounds containing certain structural groups (aflatoxin-like-, *N*-nitroso-, and azoxy-structures) that have extremely high carcinogenic potency and are excluded from the threshold approach."[59] The EMA takes the same approach. In discussing a group of "high potency genotoxic carcinogens" including nitrosamines, the "Guidelines on the Limits of Genotoxic Impurities" in effect from January 2007 to January 2018, states in part: "Some structural groups were identified to be of such high potency that intakes even below the TTC would be associated with a high probability of a significant carcinogenic risk."[60]

Lance Molnar, Ph.D., Mylan's Senior Director, Global Pharmacology and Toxicology,, agreed in his deposition that nitrosamines are treated as non-threshold by "the EMA, FDA, ICH ... regulatory bodies in general" and that "non-threshold effect would mean that a single molecule could be detrimental."[61] Accordingly, Mylan's Toxicology report stated that "[t]his potential for carcinogenic activity is considered the critical effect of these compounds (*N*-nitrosamines) as it can theoretically occur at doses far lower than those required to produce alternative

13

toxicities after either acute or repeated exposures."[62]  Similarly, Mylan's Medical Risk Assessment stated the following: "the potential risk associated with potential exposure to NDEA above the defined specification is significant and [risk of harm to patients] cannot be excluded."[63]

Studies published in the dietary literature are of course quite significant to this analysis.  One study concluded, "our results suggested that there was a positive association between NDMA intake and gastrointestinal cancer risk, specifically of rectal cancer."[64]  Another study recognized "challenges to nutritional epidemiological research on the relationship between dietary nitrosamines and cancer occurrence," but found "an increased risk of colorectal cancer among individuals with a high intake of NDMA."[65]  The authors of yet another study concluded in part, "According to our study, processed meat intake was positively associated with cancers of the oesophagus, stomach, colon, rectum, larynx, lung, breast, prostate, and urinary bladder.  Therefore, processed meat could be said to act as a multi-organ carcinogen among humans."  The authors pointed to nitrosamines as a potential causative agent.[66]

This body of literature also includes studies cited and analyzed in the 2002 WHO article discussed above, which includes Risch, H.A., Jain, M., Choi, N.W., Fodor, J.G., Pfeiffer, C.J., Howe, G.R., Harrison, L.W., Craib, K.J., and Miller, A.B. (1985) Dietary factors and the incidence of cancer of the stomach, *Am J Epidemiol. 122*, 947-59; González, C.A., Riboli, E., Badosa J., Batiste, E., Cardona, T., Pita, S., Sanz, J.M., Torrent, M., and Agudo A. (1994) *Nutritional factors and gastric cancer in Spain, Am J Epidemiol. 139*, 466-73; La Vecchia, C., D'Avanzo, B., Airoldi, L., Braga, C., and Decarli, A. (1995) Nitrosamine intake and gastric cancer risk, *Eur. J. Cancer Prev. 4*, 469-74; Pobel, D., Riboli, E., Cornée J., Hémon, B., and Guyader, M. (1995) Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France, *Eur J Epidemiol. 11*, 67-73; Rogers, M.A., Vaughan, T.L., Davis, S., Thomas, D.B. (1995) Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cancer, *Cancer Epidemiol Biomarkers Prev. 4*, 29-36; Goodman, M.T., Hankin, J.H., Wilkens, L.R., and Kolonel, L.N. (1992) High-fat foods and the risk of lung cancer, *Epidemiology 3*, 288-99; De Stefani, E., Deneo-Pellegrini, H., Carzoglio, J.C., Ronco, A., Mendilaharsu, M. (1996) Dietary nitrosodimethylamine and the risk of lung cancer: a case-control study from Uruguay, *Cancer Epidemiol Biomarkers Prev. 5*, 679-82.  In La Vecchia, et al., 1995, at 471, the authors concluded, "This study found a moderate but significant association between exogenous NDMA intake and gastric cancer risk.  The association was consistently observed across strata of sex and age."  In Gonzalez, et al., 1994, at 469, the authors commented on the association with gastric cancer, stating that they, "observed an increased risk associated with an elevated consumption of exogenous nitrosamines in both intestinal and diffuse types."  In De Stefani, et al., 1996, at 681, the authors concluded, "In summary, NDMA intake was associated in this particular population with an increased risk of lung cancer."  In Pobel, et al., 1995, at 70-71, the authors found: "In the present study we assess the risk of gastric cancer in relation to estimated dietary intake of nitrate, nitrite, and NDMA.  The most important feature

14

revealed by this investigation is the increased risk associated with increasing intake of exogenous NDMA." In recognizing the complexity of the analysis, the authors concluded, "However, the findings presented here are consistent with the biological hypothesis and provide support for an association between nitrosamines and gastric cancer." In Goodman, et al., 1992, at 296, the authors concluded in part, "*N*-Nitroso compounds have been shown to be mutagens and important carcinogens for a number of target organs, such as the liver, stomach, brain, and lung. In this analysis, we found a strong relation between consumption of nitrite in men, and dimethylnitrosamines in men and women, and the risk of lung cancer." In Rogers, et al., 1995, at 33, the authors concluded in part that, "consumption of foods high in NDMA resulted in an elevated risk of cancer," in the "upper aero-digestive tract." In Risch et al., 1985, at 956, the authors concluded: "In summary, our data strongly suggest, in consonance with several previous studies, that nitrite intake is associated with risk of stomach cancer occurrence. Whether this relationship is mediated through the conversion of nitrite to *N*-nitroso compounds is unclear, although some protection appears to be afforded by consumption of citrus fruit."

To the extent these or other studies do not find a significant association, or raise questions, this can be explained by small or relatively small sample size, inadequate follow up period to capture all cancers, bias/inadequate dose quantification, potentially mitigating dietary factors such as vitamin C intake, and others.

Anticipating potential responses regarding proof of a cause and effect relationship, aside from the fact that a study cannot be ethically constructed to deliberately administer NDMA or NDEA to humans, this has been addressed. For example, in one article published in 1984 the authors noted the impediments to definitively proving cause and effect, "due to the insensitivity of the epidemiological instruments available today and to the lack of truly unexposed populations that could be used as controls." The authors stated in part, "Although a causal association between nitrosamine exposure and human cancer has not yet been rigorously established, the recognized association between exposure to nitrosamines in unburned tobacco products such as smokeless tobacco and oral cancer in humans is as close as one is likely to get in epidemiological studies of this class of carcinogens. In addition, biochemical, pathological, and experimental data provide little evidence that humans are resistant to the carcinogenic action of NOC [*N*-Nitroso compounds], from either preformed or endogenous sources... Although quantitative differences exist between rodents and humans in repair of DNA alkylation damage, the mechanisms of repair of this damage appear to be the same. Recently, malignant transformation of human pancreatic epithelial cells by NDMA has been reported."[67] A meta-analysis that noted varied results in studies that were reviewed, and the strengths and limitations of the study at hand, primarily based on difficulties in studying the effects of food intake, concluded in part that the risk of gastric cancer could be increased by "high consumption" of NDMA. The authors specifically noted: "When daily NDMA intake reached 0.12 ug, the harmful effect to human became more obvious."[68] For perspective, 0.12 ug (micrograms) is

15

equivalent to 120 ng (nanograms), and in a 320 mg dose of valsartan would equate to 0.375 ppm. These levels are in line with the levels established by the FDA, and were exceeded by the vast majority of the valsartan tested for nitrosamine contamination.

The EMA evaluated the valsartan contamination and concluded that the levels of NDMA and NDEA should be reduced to the maximum extent possible, but set thresholds consistent with the FDA's thresholds, factoring in the potential for nitrosamines to exist due to background levels for example in water. The statement firmly recognizes that there is no technically safe level, and the establishment of the thresholds is the product of a risk benefit analysis. Even though the EMA concluded that the risk is relatively low, that is also a finding of a real risk that is unacceptably dangerous, hence the establishment of the threshold levels.[69] Of interest as well, the EMA statement cites to and discusses a study performed in Denmark regarding the risk posed by the valsartan contamination, and found an increased risk for colorectal cancer and uterine cancer.[70] The EMA commented that the 4.6 year follow up interval was likely too short, and that the number of people studied too small, to draw any firm conclusions based on the data.[71]

A recently published study utilized data from a German health insurance database.[72] The cohort included those who filled at least one prescription of potentially contaminated valsartan from 2012 to 2017. The article refers to the establishment of whether or not the valsartan was manufactured utilizing API from ZHP, but without analysis of which manufacturing process was used. Thus, there is a concerning lack of data as to the extent to which those consuming potentially contaminated valsartan actually consumed contaminated valsartan. The endpoint was a cancer diagnosis. A statistically significant association for liver cancer was identified, but no association was identified for the overall risk of cancer or for other specific cancers. The authors pointed out that "molecular mechanisms known for NDMA in the pathogenesis of liver cancer in experimental animals support an association with NDMA exposure in humans. It may be that NDMA exposure promotes cancer development in already existing, as yet undiagnosed early stages and thus hastens clinical manifestation." They also recognized that, "The immediate recall of all potentially NDMA-contaminated valsartan drug products by regulatory authorities world wide was necessary in order to protect the public health." Thus, even with the limitations set forth in the study and discussed below, the study supports the conclusion that the contaminated valsartan increases the risk of cancer.

The study actually contrasts itself with Pottegard, discussed above in the context of the EMA statement, and points out the small number of people (5,150) evaluated in that study, and the small number of cancers in that study, and thus an inadequate sample size, by contrast to the large number of people studied in this study (780,871), which is a strength of the study. However, the study does recognize some significant limitations, including lack of information regarding the

16

NDMA content of the valsartan taken by those studied, and the short three year follow up.

Min Li, Ph.D. of ZHP testified with regard to a recent study published by Yoon et al. from South Korea.[73] Dr. Li testified suggested that this study supported the notion that NDMA would not increase the risk of cancer in a human.[74] The study addresses multiple limitations on its face and also suffers from a significant flaw that led the authors to retract the article. Yoon relied on a 2016 study by Zeng which found that "NDMA excreted in urine after ranitidine intake was 95.6 ng/mL, which was a 430-fold increase than before ranitidine use."[75] Yoon relied on those figures, and further added that "[a]ctual systemic NDMA exposure is likely much higher than that eliminated in urine."

The Zeng study collected urine samples of ranitidine users and tested the urine for NDMA. However, Zeng utilized GC-IT-MS for its analysis of urine samples. That test utilizes heat, and has been shown to cause residual ranitidine in the urine to form NDMA. Zeng was retracted on May 4, 2021 at the request of the authors: "[r]ecent research (1) has identified the potential for an analytical artefact associated with the use of gas chromatography that could have contributed to the levels of N-nitrosodimethylamine (NDMA) measured in urine samples containing ranitidine in this study. Given this artefact, the authors have informed the journal that their NDMA measurements are not reliable."[76]

On September 13, 2019, the FDA recommended the use of liquid chromatography with high resolution mass spectrometer (LC-HRMS) to measure levels of NDMA in ranitidine drug products, because gas chromatography (GC) based methods had been observed to elevate NDMA levels in tested materials.[77] On October 2, 2019, the FDA released a statement indicating that testing by LC-HRMS has shown the presence of much lower levels of NDMA in ranitidine.[78,79] On November 1, 2019, the FDA issued "Statement on new testing results, including low levels of impurities in ranitidine drugs." The statement indicated, "we have found levels of NDMA in ranitidine that are similar to the levels you would expect to be exposed to if you ate common foods like grilled or smoked meats. We also conducted tests that simulate what happens to ranitidine after it has been exposed to acid in the stomach with a normal diet and results of these test indicate that NDMA is not formed through this process. Similarly, if ranitidine is exposed to a simulated small intestine environment, NDMA is not formed." The FDA also stated that "[a]lthough many of these levels of NDMA observed through FDA testing are much lower than the levels some third-party scientists first claimed, some levels still exceed what the FDA considers acceptable for these medicines [96 nanograms of NDMA]."[80] The FDA tested various doses of ranitidine from eleven companies, three of which did not exceed 96 nanograms of NDMA.[81] None exceeded 1 microgram.[82] Thus, the study population included an unknown number of people who took uncontaminated valsartan. The Yoon study does not provide a compelling case to conclude that NDMA does not increase a human's risk of cancer when ingested at the levels seen with the contaminated valsartan.

17

III.  Formation of Nitrosamines in the Valsartan API

As noted above, the formation of nitrosamines from secondary amines in the presence of nitrite and acid is absolutely basic organic chemistry.  Any chemist who has taken even a basic organic chemistry course should know this.  The test for a secondary amine was reaction with nitrite: a yellow oil, the nitrosamine, would be observed.  A primary amine would produce bubbling due to the release of nitrogen from an unstable primary nitrosamine which rearranges to an unstable diazonium compound; a tertiary amine would not react (later shown to be not completely correct).  Decades of research and volumes of published material clearly demonstrate that nitrite can react *easily* with amines to produce carcinogenic nitrosamines.  The International Agency for Research on Cancer held international symposia on this issue every 2 – 3 years from the 1970s through the 1990s.  The proceedings of these symposia are all available on the IARC website and describe hundreds of experiments demonstrating the ease of formation of carcinogenic nitrosamines in various settings including in chemical and drug manufacturing.  For example, "It has been known since 1865 that the reaction of dimethylamine hydrochloride with sodium nitrite at an acidic pH yields *N*-nitrosodimethylamine."[83] Furthermore, the formation of nitrosamines in food cured with nitrite such as hot dogs and lunch meats has been extensively studied and documented.  The U.S. Food and Drug Administration held regular meetings and symposia on this topic resulting eventually in significant decreases in the amounts of nitrite added to foods as a preservative.  Volumes of research on nitrosamine contamination of various foods and tobacco products have been published.  As set forth above, the FDA, ICH, and the EMA have all recognized the potential for nitrosamine impurities to exist in pharmaceuticals and the attendant risks.  A qualified organic chemist in industry would be aware of this literature.

**1.  Nitrosamines in the ZHP API**

I discuss the ZHP contamination in detail here to illustrate the root cause and the easy avoidability of the contamination.  Ultimately, the manufacturers ignored basic chemistry principles, whether the root cause was reactions in the manufacturing process and/or cross-contamination due to solvent recovery or inadequate cleaning of equipment.  The introduction of NDMA and NDEA into ZHP's Valsartan API was easily foreseeable.  The Change Request Form for the Process Change for Valsartan Process II prepared on May 19, 2011, with an effective date of June 15, 2011[84] described the chemical processes, which included the addition of the solvent DMF, which was well known to decompose/degrade forming dimethylamine.  "DMF decomposes slightly at its boiling point to afford dimethylamine and carbon monoxide, this reaction occurring even at room temperature in the presence of some acidic or basic materials."[85]  "DMF ... Decomposes slightly at its normal boiling point to give small amounts of dimethylamine."[86]

18

There are multiple references in the Change Request Form to the need for process and method validation, and a reference to the need for testing including, "The residue of ZnCl2, and residue of solvents used in the process need to be tested for quality review." (Section 3). Unfortunately, from an organic chemistry perspective, ZHP failed to adequately evaluate the chemical processes, and failed to account for the risk of nitrosamine contamination. As a result, their risk assessment was inaccurate, i.e. "After evaluation, this change has a lower risk in terms of quality and safety,"[87] and "Synthetic route, intermediates remain the same and no adverse change in qualitative and quantitative impurity profile."[88] From the perspective of organic chemistry, as discussed herein and as recognized in ZHP's own root cause investigation (See ZHP Deviation Investigation Reports, ZHP00007221, PRINSTON0073443, PRINSTON0075797, PRINSTON0076100), a scientifically reasonable assessment of the Process Change would have identified the risk of formation of nitrosamine impurities, would have presumably led to testing for nitrosamines, and would have confirmed the formation was occurring. In addition, from an organic chemistry perspective this Change met the definition of a "Critical Change – A change which has direct or potential impact on product identity, strength, quality, purity and regulation, or have impact on validated Procedure, method, qualification or equipment."[89] This was a critical change because the process change had the foreseeable capacity to create, and resulted in, dangerous NDMA contamination. This analysis applies as well to the change from the TIN process to the TEA process with sodium nitrite quenching, which resulted in the formation of NDEA and NDMA. In light of the known potential results of the chemical processes, identification of the clearly foreseeable NDMA and NDEA impurity contamination could have been easily accomplished.

ZHP was certainly aware of the presence and significance of impurities in Valsartan API from the early days of their development of the original manufacturing process for Valsartan. For example, ZHP's knowledge of the significance of potential impurities was documented in the peer reviewed medical literature in 2006.[90] The article begins with a statement of the fundamental principle at the core of this litigation, that "The quality and safety of pharmaceuticals can be significantly affected by the presence of impurities. Consequently, the testing and establishment of limits for impurities in active pharmaceutical ingredients have become important initiatives by government and the pharmaceutical industry." The article, which included a co-author identified as an employee of ZHP, discussed available technologies for the detection and identification of impurities in API, in this instance Valsartan API.

Once the presence of NDMA was discovered, it was not difficult to determine the root cause. A July 27, 2017 email within ZHP refers to the root cause, specifically the fact that NDMA was known to occur in valsartan as a result of the use of sodium nitrite in the sodium azide quenching process, and that there was a need for, "the optimization of the valsartan sodium azide quenching process."[91] Dr. Li also confirmed that this was known to be a "common problem in the production and synthesis of Sartan APIs."[92] ZHP similarly concluded in a June 2018 document

19

summarizing the purported first detection of, and establishment of the root cause of the NDMA contamination, "this impurity is most likely generated during the 'azide quenching' by nitrous acid of the API manufacturing process."[93]  The use of nitrite to decompose the azide reactant in the Valsartan synthesis process was a significant error due to the risk of nitrosamine formation, which should have been recognized.  The use of nitrite should have raised a gigantic ***RED FLAG*** that nitrosamines could be present in the API.  The same applies to the TEA process with sodium nitrite quenching.

Analysis of the Valsartan batches manufactured by ZHP with the zinc chloride process showed the presence of an unknown peak eluting just after toluene in the GC-MS analysis.  On June 6, 2018, ZHP customer Novartis, which had contracted for further analysis of this API, notified ZHP that the unknown peak had been identified as NDMA.  ZHP noted its failure to account for nitrosamines: "By looking into our CEP documents, it shows that NDMA is **not part of the controls in the current approved specifications** of the drug substance," and "Due to the fact that NDMA is a recently found **unexpected impurity** with the nature of probable carcinogen, and in order to understand the root cause for the occurrence of this impurity, ZHP has initiated root cause investigation."[94]  It is important to note that ZHP's repeated statements that the NDMA was not known until June 2018 are contradicted by the July 27, 2017 email discussed herein, which not only references the fact that there was NDMA in the valsartan, but also the root cause tied to the sodium nitrite quenching.

The documents from ZHP clearly demonstrate how the formation of NDMA could have been avoided.  They identified three critical factors: 1) use of dimethyl formamide in the tetrazole formation step, and the dimethyl formamide may have contained trace amounts of dimethylamine or the dimethylamine was formed during the process; 2) quenching of azide using nitrous acid (formed from nitrite under acidic conditions); and 3) quenching takes place in the presence of the product.  ZHP concluded that NDMA was formed only when all 3 factors were present, based on extensive analysis by ZHP.  Factor 2 should have raised a ***RED FLAG*** for the potential formation of nitrosamines.  The contamination of dimethyl formamide with dimethylamine or the formation of dimethylamine during the process was foreseeable, and should have been evaluated.  Factor 3 was shown to be critical to the problem; when the extraction of the product was performed prior to the addition of nitrite to quench the azide, no NDMA was observed, whereas in their original process, all samples were contaminated with NDMA.  The results of the three factor analysis are perfectly clear and demonstrate a massive disregard for potential nitrosamine formation.  Extraction prior to quenching would have been a simple remedy for the problem and should have been pursued.  In their analyses of the product, they would not have identified NDMA in the chromatograms unless they were specifically looking for it, because the peaks would be too small.  *But that is not a legitimate scientific excuse:  ZHP should have been actively looking for nitrosamines based on the discussion above.*  They could have used nitrosamine-selective methods such as combined gas chromatography-mass spectrometry for

20

this analysis.  Using this or related methods, the detection of NDMA would have been straightforward.[95]

Prior to the process change from the "Process II" process to the Zinc Chloride process, which replaced Triethylamine with Zinc Chloride for the Tetrazole Ring Formation, and also replaced the original reaction solvent Toluene, with DMF (Dimethylformamide) and MTBE (Methyl tert-butyl ether), NDEA was similarly formed when 3 factors were present: 1) trimethylamine used as a catalyst for tetrazole formation; 2) nitrite used for decomposition of excess sodium azide; and 3) both factors 1 and 2 are together with the crude product.  Lower amounts of NDEA were also formed due to trace amounts of diethylamine present in the trimethylamine used as a catalyst in the tetrazole formation step, and/or by direct nitrosation of trimethylamine.  All of this was foreseeable, and if considered and tested for, the NDEA contamination would have been detected.

In the FDA inspection of ZHP,[96] numerous deficiencies were found, including 1)inadequate change control system; 2)inadequate validation program; 3)insufficient investigation of critical deviations; 4) the quality unit does not always fulfill the responsibilities of the quality unit; 5)cleaning procedures do not have sufficient detail; 6) equipment is not always of appropriate design;7)preventive maintenance procedures are not always adequate; 8) lubricants, heating fluids and coolants are not always food grade lubricants and oils; 9) sampling plans are not always scientifically sound; 10) stability studies are not always adequate; and 11) production deviations are not always thoroughly investigated. These deficiencies indicate a general disregard for potential problems in the manufacturing process, including the formation of nitrosamines.  The report notes that while there is a procedure for investigating "out of specification/out of trend" deviations in the analysis of the product, it apparently is inconsistently applied.

In the specific investigation here, a peak eluting after the solvent toluene was ultimately definitively identified by an outside laboratory, using combined gas chromatography-mass spectrometry (GC-MS), as NDMA.  The initial investigations disclosed by ZHP did not detect this peak due to errors in the headspace analysis process by its contractor, Zhejiang Haotian Testing and Technology Service, in which the vial was improperly crimped leading to non-detection of NDMA and any other peak.[97]  This is apart from ZHP's confirmed knowledge at least as of July 2017 that there was NDMA in the valsartan.[98]  The 5290 batches manufactured between 2016-2018 were reported to have contained an average of 57-64 parts per million of NDMA.

**ZHP NDMA AND NDEA LEVELS:**

The NDMA contamination levels confirmed in ZHP's contaminated valsartan were reported to range from 3.4 to 120 ppm, with variation between the East Zone and West Zone of the manufacturing facility, likely based on variations in the

production processes.[99]  Additional documents establish even higher contamination levels.

In a document titled: Response to DMF Information Request Letter, ZHP provided the FDA with NDMA test results on residual solvents from three validation batches, as well as the NDMA Test Results for Batches Manufactured Using the ZnCl2 Process, presented as a chart of the results of testing of 783 batches manufactured between 12-28-2011 and 5-23-2018, with NDMA levels as high as 188.1 ppm.[100] These levels could have been established, for example using GC-MS, throughout the time that ZHP manufactured the valsartan API.  This is demonstrated by the ease with which Novartis was able to identify NDMA.  The same applies to the triethylamine manufacturing process with sodium nitrite quenching.  In the Response to DMF Information Request Letter, ZHP reported NDMA levels for 55 batches that had been tested as of September 1, 2018, as high as 73.9 ppm.[101]

A separate spreadsheet provided by Solco to the FDA also documented the test results for the ZHP valsartan API batches manufactured with the zinc chloride process which were used to manufacture ZHP's finished dose for sale to Solco to be distributed in the United States, as well as the levels established by ZHP for the finished dose.  There are a small number of batches with results in the single digits, with the lowest at 3.4 ppm, and the majority of the remaining batches have levels up to 188.1 ppm.[102]  For context, 3.4 ppm translates to 1088 ng in a 320 mg pill, and 188.1 ppm translates to 60,192 ng in a 320 mg pill.

The ZHP Deviation Investigation Report dated November 11, 2018, titled Investigation regarding unknown impurity (genotoxic impurity) of Valsartan API (TEA process), provides NDEA levels for the TEA process valsartan API.[103]  Testing of six validation batches established NDEA results of 0.03, 5.33, 12.77, 13.60, 18.83, and 13.51 ppm.[104]  A separate table in that Report provides ranges and averages for the testing of 85 batches manufactured with the TEA process, documenting a range of 0.03-42.14, and average of 13.46, presumably in ppm.  That table also sets forth NDEA levels in 111 batches manufactured with the zinc chloride process, documenting a range of 0-4.23 and average of 0.18, presumably in ppm.[105]  As stated, since these impurities resulted from the manufacturing processes, all batches should be assumed to have been similarly contaminated, including those not tested.

Since we know that all batches of valsartan API manufactured with the zinc chloride process were contaminated with NDMA, the NDEA contamination would be additive and therefore further increase the risk of cancer for each pill manufactured from those batches.  The TEA Deviation Investigation Report indicates that the likely cause of the NDEA contamination in the valsartan API manufactured with the zinc chloride process was cross-contamination due to shared equipment and solvent recovery.[106]

The aforesaid contamination of ZHP's valsartan API with nitrosamines including NDMA and NDEA, which are potent mutagenic carcinogens, resulted in an

22

unacceptable increased risk of cancer for those taking the medication.  Thereafter, when aberrant peaks demonstrated unaccounted for impurities, the nitrosamine contamination could have been easily discovered based on knowledge of the potential chemical reactions and application of GC-MS to identify potential NDMA/NDEA.  This was identified by Novartis even without the full information available to ZHP.[107]  These failures and the consequent contamination of the Valsartan API resulted in the dangerous and unreasonable risk of causing or increasing the risk of causing cancer for those who ingested the contaminated valsartan with the reported levels of NDMA and NDEA.

No level of NDMA or NDEA in a pharmaceutical drug is "safe," in the sense that every exposure increases the risk to some incremental extent that one will develop cancer.  The FDA set limits once the valsartan contamination was disclosed, and the aforesaid levels exceed the 96 nanogram/0.3 parts per million daily limit (based on 320 mg tablets) applied by the FDA to NDMA, and the 26.5 nanogram/.083 parts per million daily limit (based on 320 mg tablets) applied by the FDA to NDEA.[108]  Those who ingested the contaminated valsartan above those levels sustained the unreasonably dangerous and unacceptable risk that this would cause or substantially contribute to causing cancer as a result of the NDMA and NDEA contamination.

It is important to note that the FDA's short term decision to delay the recall of the contaminated valsartan for a very brief period of time was not an endorsement of the safety of the medication.[109]  Instead, this was the result of concern over the availability of the medication due to the widespread contamination, and a balancing of the risk of cancer against the more immediate risk of heart attack, stroke, or other life threatening results of a person abruptly ceasing the use of their hypertension medication.

## 2.  Nitrosamines in the Hetero API

Hetero utilized a zinc chloride/DMF/sodium nitrite quenching process that was materially the same as ZHP's zinc chloride process, and the root cause of the NDMA impurity contamination of Hetero's valsartan was the same.[110]  The reason for this occurring was the same as with ZHP.  Mr. Ramarao confirmed this when he agreed with the following: "the most important problem" was that Hetero Unit 1 (API manufacturer) and Unit 5 (finished dose manufacturer) "never even realized the possibility that NDMA could form, so it was never actually looked for.  That's the fundamental problem, correct?"[111]

The NDMA levels found on testing of Hetero's valsartan API manufactured with the zinc chloride process were confirmed in deposition testimony to range from 0.83 ppm to 7.78 ppm.  This data was based on the testing of six batches, and was confirmed to be "representative of the contamination levels across the API – the Valsartan API that was sold from Unit 1 to Unit 5 and then sold in the United States."[112]  As stated, since these impurities resulted from the manufacturing

process, all batches should be assumed to have been similarly contaminated, including those not tested.

These contamination levels caused an unreasonably dangerous and unacceptable risk of causing or substantially contributing to the causation of cancer for those ingesting the valsartan manufactured by ZHP.

### 3. Nitrosamines in the Aurobindo API

Aurobindo manufactured valsartan API for sale in the United States using a process referred to as the Toluene route, according to deposition testimony from Sanjay Singh, Associate President of North American Technical Operations.[113]  The nitrosamine contamination of Aurobindo's valsartan API resulted from cross-contamination caused by a solvent vendor, Lantech.[114]  The root causes of this cross-contamination included (1) a contaminated plate in a vertical heat exchanger that was shared between Aurobindo and Mylan, among others,[115] and caused residue to build up and carry over from batch to batch, causing NDEA contamination in the tri-*n*-butyl tin chloride[116] (Aurobindo's Chief Quality Officer analogized this to a dirty microwave),[117] (2) shared tanks (between Aurobindo, Mylan, and others) that were used to store the tri-*n*-butyl tin chloride resulting in NDEA contamination,[118] and (3) Lantech supplied the fresh solvent ethyl acetate which contained TEA,[119] and during the manufacturing process the TEA reacted with nitrosyl chloride, a byproduct of Aurobindo's API manufacturing process, resulting in NDEA contamination.[120]

Both NDMA and NDEA were detected in the valsartan API utilized by Aurobindo.  The reported levels of NDEA ranged from 0.028 ppm to 1.508 ppm.[121] The levels of NDMA ranged from below .1 ppm to .129 ppm, and were additive to the NDEA levels, where present.[122]  Assuming the same solvent related practices were utilized with both the tested and untested batches, all batches should be assumed to have been similarly contaminated, including those not tested.

These contamination levels caused an unreasonably dangerous and unacceptable risk of causing or substantially contributing to the causation of cancer for those ingesting the valsartan manufactured by ZHP.

### 4. Nitrosamines in the Mylan API

Mylan was vertically integrated and supplied valsartan API to Mylan's finished dose manufacturing facilities, and also supplied valsartan API to its sole external United States finished dose customer, Teva.[123]  Mylan's root cause investigation found that NDEA was created in the solvent recovery process for o-xylene, the recovery layer of which contained traces of diethylamine and triethylamine, when it was recovered with nitrous acid, and carried over to the final API.[124]  Mylan acknowledged that it was warned by its supplier as early as 2014 to

"avoid … nitrosating agents" with TEA due to the "possibility of formation of nitrosamines with nitrites or other nitrosating agents."[125]

Mylan confirmed that NDEA was present in every single API batch.[126] Mylan's API testing confirmed NDEA contamination in every API batch released to the US market, with levels between 0.1 ppm to 1.57 ppm.[127]  Dr. Walt Owens, current Head of Global Regulatory Affairs and former Head of Global Quality, testified that "the API and finished dosage form [nitrosamine testing] results were essentially the same, you would be able to test the API alone."[128]  Mylan's testing also showed that the valsartan API contained sporadic levels of NDMA contamination, in addition to the NDEA, including BQL, BDL, and from 0.01 ppm to 0.09 ppm.[129]Assuming the same solvent related practices were utilized with both the tested and untested batches, all batches should be assumed to have been similarly contaminated, including those not tested.

These contamination levels caused an unreasonably dangerous and unacceptable risk of causing or substantially contributing to the causation of cancer for those ingesting the valsartan manufactured by ZHP.

## 5. Nitrosamines in the Finished Dose Formulations

The NDMA and NDEA levels would be expected to be the same or nearly so in the finished dose formulations incorporating the contaminated valsartan API.  This was addressed and confirmed in the deposition of Hai Wang, the President of Solco, ZHP's wholly owned distributor in the United States.  Hai Wang confirmed that this was determined by ZHP and that data was provided to the FDA.[130]  Both ZHP and Hetero were vertically integrated thus the above discussion of the causes and levels of the nitrosamine contamination of the API addresses the NDMA and NDEA contamination in their finished dose formulations as well.

Finished dose manufacturers Teva and Torrent obtained valsartan API from API manufacturers and then incorporated it into their finished dose formulations.

## 6. Nitrosamines in the Teva Finished Dose Formulation.

Teva manufactured and sold finished dose valsartan utilizing ZHP manufactured valsartan API, and Mylan manufactured valsartan API, labeled either as Teva or Actavis.[131]  The valsartan finished dose labeled as Actavis and sold in the United States initially was manufactured using ZHP TEA process with sodium nitrite quenching valsartan API, and then ZHP zinc chloride process valsartan API beginning in late-2014.[132]  The valsartan finished dose labeled as Teva was manufactured using Mylan valsartan API.[133]

ZHP reported NDMA levels to Teva between 0.8 ppm and 240.1 ppm.[134]  Teva also tested 83 batches of ZHP valsartan API with NDMA levels of 30.01 ppm to 221.63 ppm.[135]  In addition, Teva tested six batches of its finished dose valsartan

manufactured with ZHP valsartan API with NDMA levels of 14.8 ppm to 31.3 ppm.[136] It was confirmed that all ZHP valsartan API sold to Teva contained NDMA in excess of 0.3 ppm.[137] Daniel Barreto, Teva's former Senior Vice President Global Quality Compliance, testified that the finished dose product would have the same levels of NDMA as tested in the API and Teva "extrapolate[d] the nitrosamine test results of the API to the valsartan finished dose." [138]

Teva also tested for NDEA. Teva initially tested eleven batches of Mylan valsartan API and ten of the eleven batches had NDEA levels above 0.08 ppm, from 0.09 ppm to 0.50 ppm.[139] Teva tested 26 additional batches of Mylan valsartan API and twenty-four of the twenty-six batches tested above .08 ppm for NDEA, with results ranging from 0.08 ppm to 0.42 ppm.[140] Since the contamination occurred at the level of the API suppliers, the untested batches would be expected to have the same or very similar contamination levels as the tested batches, as discussed above.

These contamination levels caused an unreasonably dangerous and unacceptable risk of causing or substantially contributing to the causation of cancer for those ingesting the valsartan sold by Teva.

### 7. Nitrosamines in the Torrent Finished Dose Formulation.

Torrent purchased valsartan API from ZHP that was manufactured using the TEA with sodium nitrite quenching process. This was the only manufacturing process for ZHP valsartan API that was documented as being sold in the United States by Torrent.[141]

On August, 3, 2018, ZHP notified Torrent of "trace" amounts of NDMA in the Valsartan API sold to Torrent, which was the API manufactured using the ZHP TEA process with sodium nitrite quenching (as discussed above).[142] On Sept 7, 2018, ZHP notified Torrent that what ZHP described as, "another contaminant, NDEA, has been detected in the finished dose batches of valsartan."[143]

The levels of NDMA found on testing of the valsartan API purchased by Torrent from ZHP and then incorporated in its finished dose formulation sold in the United States were reported to range from 0.37 parts per million to 125.15 parts per million.[144] The levels of NDEA were found to range from 0.23 ppm to 16.93 ppm, with several batches found to be BDL and BQL range (Below Detection Limit and Below Quantification Limit).[145] All batches had NDMA and the majority had both NDMA and NDEA, which would increase the cancer risk. Since the contamination occurred at the level of the API supplier, ZHP, the untested batches would be expected to have the same or very similar contamination levels as the tested batches, as discussed above.

These contamination levels caused an unreasonably dangerous and unacceptable risk of causing or substantially contributing to the causation of cancer for those ingesting the valsartan sold by Torrent.

26

## IV. Conclusion

The contamination of the valsartan API, and consequent contamination of the valsartan finished dose, as described above, caused an unreasonably dangerous and unacceptable risk of causing or substantially contributing to the causation of cancer for those ingesting the valsartan. As described above, a range of cancers have been associated with intake of NDMA (and NDEA by extension). In general, the increased risk would likely be commensurate with the contamination levels, dosages, and periods of use. Therefore, people who ingested the valsartan with higher contamination levels and larger doses, over longer periods of time, would likely have a more substantial increased risk as opposed to those who ingested valsartan with lower contamination levels and lower doses, and for shorter periods of use. However, even those lower levels, lower dosages, and shorter periods of use present an unreasonable danger and risk, a risk to which one would not knowingly or deliberately expose a person.[146]

---

## REFERENCES

[1] Sun, Z., Liu Y.D., and Zhong, R.G. (2010) Theoretical Investigation of *N*-Nitrosodimethylamine Formation from Nitrosation of Trimethylamine, *J. Phys. Chem. A*. 114, 455-465; 29.

[2] International Agency for Research on Cancer (1978) Some *N*-nitroso compounds, In *IARC Monogr. Eval. Carcinog. Risk Chem. Hum.* pp 83-175, IARC, Lyon, FR.

[3] Mirvish, S. S. (1975) Formation of *N*-nitroso compounds: chemistry, kinetics, and in vivo occurrence. *Toxicol. Appl. Pharmacol 31*, 325-351.

[4] Smith, P. A. S., and Loeppky, R. N. (1967) Nitrosative cleavage of tertiary amines. *J. Am. Chem. Soc 89*, 1148-1152.

[5] Hecht, S. S., Chen, C. B., Ornaf, R. M., Jacobs, E., Adams, J. D., and Hoffmann, D. (1978) Reaction of nicotine and sodium nitrite: Formation of nitrosamines and fragmentation of the pyrrolidine ring. *J. Org. Chem 43*, 72-76.

[6] Keefer, L. K., and Roller, P. P. (1973) *N*-Nitrosation by Nitrite Ion in Neutral and Basic Medium. *Science 181*, 1245-1247.

[7] Mirvish, S. S., and Shubik, P. (1974) Ascorbic acid and nitrosamines. *Nature 252*, 179.

[8] See note 5.

[9] Hoffmann, D., Adams, J. D., Brunnemann, K. D., and Hecht, S. S. (1979) Assessment of tobacco-specific *N*-nitrosamines in tobacco products. *Cancer Res 39*, 2505-2509.

[10] Hecht, S. S. (1998) Biochemistry, biology, and carcinogenicity of tobacco-specific  N -nitrosamines, *Chem.Res.Toxicol. 11*, 559-603.

[11] Hotchkiss, J. H. (1989) Preformed *N*-nitroso compounds in foods and beverages, *Cancer Surv. 8*, 295-321.

[12] Gushgari, A. J., and Halden, R. U. (2018) Critical review of major sources of human exposure to *N*-nitrosamines, *Chemosphere 210*, 1124-1136.

[13] Magee, P. N., and Barnes, J. M. (1956) The production of malignant primary hepatic tumors in the rat by feeding dimethylnitrosamine, *Brit J Cancer 10*, 114-122.

[14] Magee, P. N. (1989) The experimental basis for the role of nitroso compounds in human cancer, *Cancer Surv 8*, 207-239.

[15] *Ibid.*

[16] https://en.wikipedia.org/wiki/N-Nitrosodimethylamine.

[17] International Agency for Research on Cancer (1978) Some *N*-nitroso compounds, In *IARC Monogr. Eval. Carcinog. Risk Chem. Hum.* pp 83-175, IARC, Lyon, FR.

[18] Peto, R., Gray, R., Brantom, P., and Grasso, P. (1991) Effects on 4080 rats of chronic ingestion of *N*-nitrosodiethylamine or *N*-nitrosodimethylamine: a detailed dose-response study, *Cancer Res 51*, 6415-6451.

[19] Hecht, S. S., Trushin, N., Castonguay, A., and Rivenson, A. (1986) Comparative tumorigenicity and DNA methylation in F344 rats by 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone and N -nitrosodimethylamine, *Cancer Res. 46*, 498-502.

[20] Preussmann, R., and Stewart, B. W. (1984) *N*-Nitroso Carcinogens, In *Chemical Carcinogens, Second Edition, ACS Monograph 182* (Searle, C. E., Ed.) pp 643-828, American Chemical Society, Washington, DC.

[21] Hino, K., Karaki, Y., Hatanaka, T., Sakamoto, T., and Tsukada, K. (2000) Salivary excretion of *N*-nitrosodimethylamine in dogs, *Eur. J Cancer Prev 9*, 271-276.

[22] Gombar, C. T., Harrington, G. W., Pylypiw, H. M., Jr., Anderson, L. M., Palmer, A. E., Rice, J. M., Magee, P. N., and Burak, E. S. (1990) Interspecies scaling of the pharmacokinetics of *N*-nitrosodimethylamine, *Cancer Res 50*, 4366-4370.

[23] Gombar, C. T., Harrington, G. W., Pylypiw, H. M., Jr., Bevill, R. F., Thurmon, J. C., Nelson, D. R., and Magee, P. N. (1988) Pharmacokinetics of *N*-nitrosodimethylamine in swine, *Carcinogenesis 9*, 1351-1354.

[24] Gombar, C. T., Pylypiw, H. M., Jr., and Harrington, G. W. (1987) Pharmacokinetics of *N*-nitrosodimethylamine in beagles, *Cancer Res 47*, 343-347.

[25] Anderson, L. M., Souliotis, V. L., Chhabra, S. K., Moskal, T. J., Harbaugh, S. D., and Kyrtopoulos, S. A. (1996) *N*-nitrosodimethylamine-derived O6-methylguanosine in DNA of monkey gastrointestinal and urogenital organs and enhancement by ethanol, *Int. J. Cancer 66*, 130-134.

[26] See note 20.

[27] Lance R. Molnar Dep. Tr. 5/7/2021, 137:16-138:6; 141:17-22.

[28] See 17.

[29] International Agency for Research on Cancer (1974) Some Aromatic Amines, Hydrazine and Related Substances, *N*-nitroso Compounds and Miscellaneous Alkylating Agents, In *IARC Monogr. Eval. Carcinog. Risk Chem. Hum.* pp 97-111, IARC, Lyon, FR.

[30] CHARLESWANGO00289 (ZHP 316).

[31] International Agency for Research on Cancer (2007) *Smokeless tobacco and some tobacco-specific N-nitrosamines*, IARC, Lyon, FR.

[32] See note 29.

[33] See note 20.

[34] Archer, M. C. (1989) Mechanisms of action of *N*-nitroso compounds, [Review], *Cancer Surv 8*, 241-250.

[35] Yamazaki, H., Inui, Y., Yun, C. H., Guengerich, F. P., and Shimada, T. (1992) Cytochrome P450 2E1 and 2A6 enzymes as major catalysts for metabolic activation of *N*-nitrosodialkylamines and tobacco-related nitrosamines in human liver microsomes, *Carcinogenesis 13*, 1789-1794.

[36] See note 34.

[37] Hecht, S. S. (2017) Oral cell DNA adducts as potential biomarkers for lung cancer susceptibility in cigarette smokers, *Chem Res Toxicol 30*, 367-375.

[38] Tricker, A. R. (1997) *N*-nitroso compounds and man: sources of exposure, endogenous formation and occurrence in body fluids, *Eur. J. Cancer Prev 6*, 226-268.

[39] See note 31.

[40] Hecht, S. S., Stepanov, I., and Carmella, S. G. (2016) Exposure and metabolic activation biomarkers of carcinogenic tobacco-specific nitrosamines, *Acc. Chem. Res. 49*, 106-114.

[41] Stepanov, I., Sebero, E., Wang, R., Gao, Y. T., Hecht, S. S., and Yuan, J. M. (2014) Tobacco-specific  N -nitrosamine exposures and cancer risk in the Shanghai Cohort Study: remarkable coherence with rat tumor sites, *Int J.Cancer 134*, 2278-2283.

[42] Hidajat, M., McElvenny, D.M., Ritchie, P., Darnton, A., Mueller, W., van Tongeren, M., Agius, R.M., Cherrie, J.W., and de Vocht, F. (2019) Healthy-worker effects explain differences internal and external comparisons in a rubber industry cohort study, *Occup Environ Med 76*, 250-258, at 257.

[43] Wang, M., Cheng, G., Villalta, P.W., and Hecht, S.S. (2007) Development of Liquid Chromatography Electrospray Ionization Tandem Mass Spectrometry Methods for Analysis of DNA Adducts of Formaldehyde and Their Application to Rats Treated with *N*-Nitrosodimethylamine or 4-(Methylnitrosamino)-1-(3-pyridyl)-1-butanone, *Chem. Res. Toxicol. 20*, 1141-1148.

[44] Liteplo, R.G., Meek, M.G., and Windle, W. (2002) Concise International Chemical Assessment Document 38, World Health Organization, Geneva, CH., ZHP 321.

[45] *Ibid.*, 4.

[46] *Ibid.*, 23.

[47] Min Li Dep. Tr. 4/22/21, 657:18-662:10.

[48] *Ibid.*, 683:4-9.

[49] PRINSTON0075850.

[50] Min Li Dep. Tr. 4/22/21, 685:11-687:4.

[51] *Ibid.*, 661:6-9.

[52] *Ibid.*, 551:15-552:16.

[53] *Ibid.*, 565:14-566:18.

[54] *Ibid.*, 573:7-574:9, 622:3-648:5; CHARLESWANGO00289 (ZHP 316); CHARLESWANGO000447 (ZHP 319) (emails discussed in cited testimony).

[55] B.V. Ramarao Dep. Tr. 4/29/21, 259:20-268:4.

[56] B.V. Ramarao Dep. Tr. 4/30/21, 342:14-343:19.

[57] B.V. Ramarao Dep. Tr. 4/29/21, 377:5-20.

[58] (ZHP-310, p. 2).

[59] (ZHP-208, p. 8).

[60] (ZHP-206, p. 6).

[61] Lance Molnar Dep. Tr. 5/07/2021, 125-2-6; 121:22-23.

[62] (Pl-Molnar 5, at 2.).

[63] MYLAN-MDL2875-00304294 (Pl-Molnar 6, at 7).

[64] Loh, Y.H., Jakszyn, P., Luben, R.N., Mulligan, A.A., Mitrou, P.N., and Khaw, K.T. (2011) *N*-nitroso compounds and cancer incidence:  the European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study, *Am J Clin Nutr 93*, 1053-61, at 1060.

[65] Knekt, P., Järvinen, R., Dich, J., and Hakulinen, T. (1999) Risk Of Colorectal Cancer And Other Gastro-Intestinal Cancers After Exposure to Nitrate, Nitrite and *N*-Nitroso Compounds:  A Follow-Up Study, *Int. J. Cancer 80*, 852-856, at 855.

[66] De Stefani, E., Boffetta, P., Ronco, A.L., Deneo-Pellegrini, H., Correa, P., Acosta, G., Mendilaharsu, M., Luaces, M.E., and Silva, C. (2012) Processed meat consumption and risk of cancer:  a multisite case-control study in Uruguay, *British Journal of Cancer 107*, 1584-1588, at 1586.

[67] Bartsch, H. and Montesano, R. (1984) Relevance of nitrosamines in human cancer, *Carcinogenesis 5*, 1381-1393, at 1388.

[68] Song, P., Wu, L., and Guan, W. (2015) Dietary Nitrates, Nitrites, and Nitrosamines Intake and the Risk of Gastric Cancer: A Meta-Analysis, *Nutrients 7*, 9872-95, at 9892-9893.

[69] European Medicines Agency, Assessment report, angiotensin-II-receptor antagonists (sartans) containing a tetrazole group (Feb. 14, 2019), https://www.ema.europa.eu/en/documents/variation-report/angiotensin-ii-receptor-antagonists-sartans-article-31-referral-chmp-assessment-report_en.pdf.

[70] Pottegård, A., Kristensen, K.B., Ernst, M.T., Johansen, N.B., Quartarolo, P., Hallas, J. (2018) Use of N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of cancer: Danish nationwide cohort study, *B.M.J.*, 362.

[71] See note 69, at 29-30.

[72] Gomm, W., Röthlein, C., Schüssel, K., Brückner, G., Schröder, H., Hess, S., Frötschl, R., Broich, K., Haenisch, B. (2021) N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer—A Longitudinal Cohort Study Based on German Health Insurance Data, *Dtsch Arztebl Int.*, 118 (Forthcoming).

[73] Yoon, H.J., Kim, J.H., Seo, G.H., Park, H. (2021) Risk of Cancer Following the Use of N-Nitrosodimethylamine (NDMA) Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea, *J. Clin. Med.*, 153.

[74] Min Li Dep. Tr. 4/21/21, 334:18-339:4.

[75] Zheng, T. and Mitch, W. (2016) Oral intake of ranitidine increases urinary excretion of *N*-nitrosodimethylamine, *Carcinogenesis 37*, 625–34.

[76] Zheng, T. and Mitch, W. (2021) Retracted: Oral intake of ranitidine increases urinary excretion of *N*-nitrosodimethylamine, *Carcinogenesis*, gbab029.

[77] U.S. Food & Drug Administration, Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product (Sept. 13, 2019).

[78] U.S. Food & Drug Administration, FDA Updates and Press Announcements on NDMA in Zantac (ranitidine), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (last accessed Apr. 16, 2021; webpage has since changed and the cited language is no longer present).

[79] US FDA recommends LC-LC-HRMS for testing ranitidine products, *Reactions 1774*, p. 6 (Oct. 2019).

[80] U.S. Food & Drug Administration, Statement on new testing results, including low levels of impurities in ranitidine drugs (Nov. 1, 2019), https://www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs.

[81] Strides Shasun Ltd Ranitidine 300mg: 0-30ng NDMA; Pharma Associates Ranitidine 150mg Syrup: 4-12ng NDMA; Ajanta Pharma USA Inc Ranitidine 300mg: 70ng NDMA; Sanofi Pharmaceutical Ranitidine 75mg: 10-40ng NDMA.

[82] Sanofi Pharmaceutical Ranitidine 150mg: 10-360ng NDMA; Cardinal Health Ranitidine 150mg: 150ng NDMA; Dr Reddy's Ranitidine 300mg: 200ng NDMA; Sandoz Ranitidine 300mg: 250ng NDMA; Aurobindo Ranitidine 300mg: 560ng NDMA; Silarx Pharma Ranitidine 150mg Syrup: 200ng NDMA; Novitium Ranitidine 300mg: 860ng NDMA.

[83] See note 17, at 36.

[84] .ZHP01843066.

[85] Muzart, J. (2009) *N,N*-Dimentylformamide: much more than a solvent, *Tetrahedron 65*, 8313-8323, at 8315 (ZHP197).

[86] Armarego, W.L.F., and Perrin, D.D. (1996) Purification of Laboratory Chemicals, at 192 (ZHP 311).

[87] ZHP01843099.

[88] ZHP01843163.

[89] ZHP00469139, p. 11 (ZHP 196).

[90] Nie, J., Xiang, B., Feng, Y. and Wang, D. (2006) Isolation and Identification of Process Impurities in Crude Valsartan by HPLC, Mass Spectrometry, and Nuclear Magnetic Resonance Spectroscopy, *J. of Liquid Chromatography & Related Tech. 29*, 553-568 (ZHP 433).

[91] Min Li Dep. Tr. 4/20/21, 82:14-90:2.

[92] *Ibid.*, 92:11-20.

[93] ZHP00007227.

[94] ZHP00007225.

[95] Parr, M. K., and Joseph, J. F. (2019) NDMA impurity in valsartan and other pharmaceutical products: Analytical methods for the determination of *N*-nitrosamines, *J. Pharm. Biomed. Anal. 164*, 536-549.

[96] PRINSTON00155822; PRINSTON00162349 (ZHP 312).

[97] ZHP00177912.

[98] Min Li Dep. Tr. 4/20/21, 82:11-107:14.

[99] ZHP00007239.

[100] ZHP00079913-45, at 9920-9928.

[101] *Ibid.*, 9939-9940.

[102] Hai Wang Dep. Tr., 3/10/2021, 112:2-118:17; SOLCO00028261 (ZHP 118)).

[103] PRINSTON0075797.

[104] PRINSTON0075846.

[105] PRINSTON0075858.

[106] PRINSTON0075928-75937.

[107] ZHP00079913-45, at 9933-9938.

[108] U.S. Food & Drug Administration, FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan),

https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

[109] U.S. Food & Drug Administration, FDA announces voluntary recall of several medicines containing valsartan following detection of an impurity (July 13, 2018), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity.

[110] B.V. Ramarao Dep. Tr. 4/30/21, 372:15-373:23, 392:22-393:16.

[111] *Ibid.*, 425:16-24.

[112] *Ibid.*, 390:17-392:16.

[113] Sanjay Singh Dep. Tr. 5/20/2021, 32:24-33:9, 83:17-24.

[114] *Ibid.*, 390:15-391:8.

[115] *Ibid.*, 2021, 305:3-12.

[116] *Ibid.*, 180:4-181:7.

[117] *Ibid.*, 181:11-23.

[118] *Ibid.*, 204:10-24.

[119] *Ibid.*, 379:5-24.

[120] *Ibid.*, 380:1-18.

[121] For levels, see Auro-MDL-2875-0093561 (contains AuroLife batches); Auro-MDL-2875-0104586; Sanjay Singh Dep. Tr. 5/21/2021, 594:14-631:20.

[122] Auro-MDL-2875-0093561 (contains AuroLife batches); Auro-MDL-2875-0104586; Sanjay Singh Dep. Tr. 5/21/2021, 594:14-631:20.

[123] Derek GloverDep. Tr. 4/16/2021, 721:7-9; MYLAN-MDL2875-00429120, at 15.

[124] Daniel Snider Dep Tr., 3/31/ 2021, 237:12-238:1, 260:16-262:14; Derek Glover, Dep Tr. 3/12/2021, 439:1-440:7.

[125] MYLAN-MDL2875-00257214 (Pl-Glover 8); (PL-Glover 9); Derek Glover Dep Tr. 3/09/2021, 100:6-101:3; Daniel Snider Dep. Tr. 3/31/2021, 128:14-17.

[126] Antony Gomas Dep Tr. 4/09/2021, 54:13-55:7; Daniel Snider Dep Tr. 3/31/2021, 196:6-22.

[127] (Pl-Gomas 5); Antony Gomas Dep Tr. 4/09/2021, 100:10-106:5 (confirming that Pl-Gomas 5 reflects the most comprehensive nitrosamine testing results for Mylan API and FD), 111:15-112:8 (plain valsartan), 112:19-113:15 (valsartan HCTZ), 114:4-12 (amlodipine valsartan); Daniel Snider Dep Tr. March 31, 2021, 196:6-22.

[128] Walt Owens Dep Tr. 4/21/2021, 79:15-81:2.

[129] (Pl-Gomas 5); Antony Gomas Dep Tr. 4/09/2021, 100:10-106:5 (see above); Snider Dep. 264:9-16 (stating that Mylan believed that dimethylamine present in the triethylamine yielded NDMA that carried over into the final API and FD).

[130] Hai Wang Dep. Tr. 3/10/21, 116:3-118:23, 144:15-147:1.

[131] Teva 230; Michelle Osmian Dep. Tr. 5/06/2021, 33:2-236:24; 239:7-240:2.

[132] TEVA-MDL2875-00001886 (Sept. 9, 2014 Actavis Ltr. to FDA re CBE notice for ZHP manufacturing process change relating to ANDA 091519); TEVA-MDL2875-00013107 (Jan. 9, 2015 Actavis Ltr. to FDA re CBE notice for ZHP manufacturing process change relating to ANDA 090642); Daniel Barreto Dep. Tr. 4/14/2021, 106:23-108:16.

[133] TEVA-MDL2875-00320639-673, at -639.

[134] TEVA-MDL2875-00546489.

[135] *Ibid.*

[136] *Ibid.*

[137] Claire Lyons Dep. Tr. 4/27/2021, 130:3-132:2.

[138] Daniel Barreto Dep. Tr. 4/14/2021, 201:23-202:9; 275:9-276:5; 367:9-368:2.

[139] TEVA-MDL2875-00048605, at 61 of 61.

[140] *Ibid.*, 58-59.

[141] TORRENT-MDL2875-00072650; Sushil Jaiswal Dep. Tr. 6/04/20211, 67:21-24, 68:1-7.

[142] TORRENT-MDL2875-00131255; Reddy Neravetla Dep. Tr. 5/26/2021, 102:2-21.

[143] TORRENT-MDL2875-00504834; Jocelyn Rivera Dep. Tr. 02/22/2021, 438:5-24; Dawn Chitty Dep. Tr. 5/13/2021, 349:13-24, 350:1-4.

[144] TORRENT-MDL2875-00366172; Sushil Jaiswal Dep. Tr. 6/04/2021, 64:5-22, 65:7-24, 71:7-23, 86:17-24, 87:1-19.

[145] TORRENT-MDL2875-00135398; Dawn Chitty Dep. Tr. 5/13/2021, 59:15-24, 61:14-18.

[146] As recognized above, the FDA allowed contaminated valsartan to remain available for a short time in order to ensure there would not a shortage of this blood pressure medication in the short term.  This decision was not an indication that the ingestion of the contaminated valsartan was considered to be safe or desirable.

Exhibit 45

**Masonic Cancer Center**
UNIVERSITY OF MINNESOTA
Comprehensive Cancer Center designated by the National Cancer Institute

2231 6th Street SE
Room 2-148 CCRB
Minneapolis, MN 55455
Phone: (612) 624-7607
Fax: (612) 624-3869
hecht002@umn.edu

October 31, 2022

Adam M. Slater
Mazie Slater Katz & Freeman
103 Eisenhower Parkway
Roseland, New Jersey 07068

Dear Mr. Slater:

This report is a supplement to my report dated July 6, 2021, providing further discussion of the failure by ZHP to conduct a reasonable risk assessment of chemical reactions and necessary testing with regard to the TEA with sodium nitrite quenching process, and Zinc Chloride process, resulting in the manufacture and sale of valsartan API and finished dose contaminated with NDMA and NDEA. All opinions are stated to a reasonable degree of scientific certainty.

In summary, ZHP (and its subsidiary Shanghai Syncores that developed the zinc chloride process in the laboratory) could have and should have identified the risk of formation of nitrosamines including NDMA and NDEA, and utilized that information to test for and identify, and then prevent the nitrosamine impurities in the valsartan API and finished dose sold by ZHP. This could have and should have been done during and after development of the processes, and throughout the time that ZHP manufactured and sold the contaminated valsartan with those processes.

As stated in my July 6, 2021 report, the processes were flawed from the outset because of the inclusion of chemical reactions that could foreseeably create nitrosamines in the API. Specifically, quenching the sodium azide with sodium nitrite (nitrous acid) in the presence of the product, which led to a reaction between foreseeably created secondary amines and the nitrous acid to create NDMA/NDEA. For example, the 1978 IARC Monograph on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, established that the reactions forming nitrosamines including NDMA and the use of mass spectrometry to identify nitrosamines were well known. In this connection, Min Li confirmed that the reaction described in the IARC monograph, "the reaction of dimethylamine hydrochloride with sodium nitrite at an acidic pH yields NDMA," is what occurred in the zinc chloride process, and this chemical reaction was known since 1865. (Min Li 4/21/21 Dep. Tr. 458:13-465:11).



In addition, ZHP has acknowledged the likely occurrence of cross-contamination of valsartan API manufactured with the zinc chloride and TEA with sodium nitrite quenching processes on shared production lines.  "During the period when multiple processes co-existed in Workshop 2 and Workshop W02, equipment were cleaned as per corresponding cleaning procedure to control the residue of active substance from the previous batch when switch from one process to another.  However, the residual NDMA and NDEA in the equipment after cleaning for process switch were not analyzed…Based on the analysis of the NDMA and NDEA data, the original equipment cleaning procedure applied might not be able to get rid of the NDMA and NDEA residue on the equipment completely." The Report also states that there was a risk of cross-contamination due to solvent recovery for the same reason: ZHP was not looking for NDMA or NDEA because they failed to perform a straightforward assessment of the chemistry. (ZHP Deviation Investigation Report dated November 5, 2018 (DC-18003, PRINSTON0075797, at 126-130).  Min Li of ZHP confirmed: "the DEA [diethylamine] is a typical process impurity of TEA, so DEA would also, yeah, would react with the nitrous acid to perform NDEA."  With regard to NDMA, "in some of the TEA raw material it may contain a trace amount of, you know, of dimethylamine, okay, so that's one root cause…for some of the, you know, product, they were manufactured, you know, using the share line, you know, with the zinc chloride valsartan."  (Min Li 4/20/21 Dep. Tr. 77:8-80:16).  Varied NDMA levels were found in the valsartan API produced in the East and West zones at Chuannan, per the TEA process DIR.  ZHP identified factors that would impact the NDMA levels.  This includes, "number 1, temperature when adding sodium nitrite; number 2, charging speed of hydrochloride acid; number 3, ph control at the end; and number 4, aqueous phased separation time during quenching."  In this connection, ZHP recognized that there was "a lack of detailed description in the production processes."  ZHP further stated, "Due to the inaccurate description of some of the parameters in the process, there might be likelihood of fluctuation between different workshops or different batches manufactured in the same workshop, which eventually led to the difference in the amount of residual impurities…the residual amounts of NDMA in valsartan API batches." (Peng Dong 4/2/21 Dep. Tr., 536:7-543:2).  Assessment and understanding of the potential chemical reactions in each process would have required testing for NDMA and NDEA of each batch of drug product manufactured with both processes, whether due to the process or cross-contamination, and would have shown the presence of NDMA and NDEA in each batch, as applicable.

The readily available scientific knowledge and testing should have been applied to identify the NDMA and NDEA even after the processes were adopted. This should have been apparent to any organic chemist involved in the development or assessment of these processes.  Once ZHP went forward with the processes after having failed to detect and prevent the nitrosamine contamination during the development of the processes, ZHP could have and should have identified the nitrosamine impurities before selling the API or finished dose with NDMA/NDEA impurities.  The same scientific knowledge and principles I have discussed with regard to the development of the processes was equally available and could and should have been applied when the product was manufactured for sale.  This would have been as easy as adding appropriate testing for NDMA and NDEA to the specifications, and

2

testing each batch of API and finished dose accordingly.  The result would have been detection of the nitrosamines.

ZHP has stated that the detection of the nitrosamines was not possible since they had no knowledge of the potential or actual presence of the nitrosamines and did not possess the technological ability to identify these impurities.  I disagree.  The deposition testimony provides context for this issue. For example:

Jun Du testified with regard to the August 26, 2018 letter written by ZHP (and signed by him) to the FDA, stating in part that, "it is not the residual DMF that reacts with nitrous acid of the next step, but rather it is the trace amount of dimethylamine, an impurity/degradant of DMF that reacts with nitrous acid to form NDMA, which adds a further dimension over the current thinking, logic and strategy for the evaluation of potential genotoxic impurities.  It is this extra dimension over the current industry practice that obscured us from foreseeing this impurity during the process change from triethylamine process to zinc chloride process."  (Jun Du 5/28/21 Dep. Tr. 232:18-234:6).

In the November 28, 2018 FDA Warning Letter to ZHP, the FDA explicitly, and correctly disagreed with ZHP's position that this could not be known, "You also failed to evaluate the need for additional analytical methods to ensure that unanticipated impurities were appropriately detected and controlled in your valsartan API before you approved the process change….Your response states that predicting NDMA formation during the valsartan manufacturing process required an extra dimension over current industry practice, and that your process development study was adequate.  We disagree.  We remind you that common industry practice may not always be consistent with cGMP requirements and that you are responsible for the quality of drugs you produce."  (ZHP01344159 (ZHP 213)).  Dr. Li and Mr. Du agreed with the FDA that ZHP was "responsible for the quality of the drugs" produced by ZHP.  (Min Li 4/21/21 Dep. Tr., 426:8-427:5, 430:11-434:10) (Jun Du 5/28/21 Dep. Tr. 247:17-250:22).

The FDA also stated in the Warning Letter, "You are responsible for developing and using suitable methods to detect impurities when developing, and making changes to your manufacturing processes.  If new or higher levels of impurities are detected, you should fully evaluate the impurities and take action to ensure the drug is safe for patients." (Jun Du 5/28/21 Dep. Tr. 237:18-243:20).  As stated in my prior report, the knowledge, technology, and methods to identify the NDMA and NDEA were readily available and should have been applied to identify the contamination, and this could and should have been done during development of the processes, and then again once ZHP began to manufacture valsartan with those processes for sale.

In this context, a draft of ZHP's deviation investigation report titled "Investigation Regarding an Unknown Impurity (Genotoxic Impurity)" stated that, "Due to insufficient extent and depth of process research at the early stage, as well as insufficient study and understanding of potential genotoxic impurities, only side reaction product and degradation

3

products were studied, and was unaware of the further reaction between degradation products and raw material." (Min Li 4/22/21 Dep. Tr. 528:5-531:4). This accurately describes the inadequate scientific risk assessment performed by ZHP, since the chemical reactions and means to test for the foreseeable creation of nitrosamines were well known and available. Scientifically reasonable process research, study and understanding of potential genotoxic impurities, would have resulted in recognition of the risk of creating the nitrosamine impurities, and testing that would have demonstrated the presence of these impurities. I know this from my own personal experience utilizing mass spectrometry to identify nitrosamines including NDMA beginning long before development of these processes in 2011, and the scientific literature including what is identified here and in my prior report, as well as in questioning of ZHP witnesses.

The focus on nitrosamines as potential human carcinogens began after the first demonstration of the carcinogenicity of dimethylnitrosamine in 1956 as outlined in my previous reports. The first report of nitrosamine contamination of food was published in 1968, and the first definitive evidence for the presence of dimethylnitrosamine in meat products in 1972.[1] This stimulated the development of reliable analytical methods for nitrosamines, layered on the existing knowledge base. A review published in 1976 notes the initial development of methods for the analysis of trace amounts of nitrosamines: "there is now no doubt that these compounds do occur in trace amounts in various environmental situations."[2] It goes on: "Recently a better standardization of the methodology, using gas-liquid chromatography and mass spectrometry, has yielded more reliable identification of the nitrosamines."

Fine et al reported the development of a highly sensitive and reliable nitrosamine-selective detector (the Thermal Energy Analyser, or TEA) in 1975.[3] Coupling of TEA to gas chromatography (GC-TEA) became the standard method for analysis of ultra-trace levels of nitrosamines. Thousands of products including pharmaceuticals were reliably analyzed and shown to contain trace amounts of nitrosamines (reviewed in Forman, D. and Shuker, D. Nitrate, nitrite and nitroso compounds in human cancer, *Cancer Surveys* 8: 205-487 (1989)), leading to international concern, further analyses, and mitigation efforts. Ultimately with the development of improved gas chromatography-mass spectrometry (GC-MS) methods and the wide availability of this instrumentation by the early 1980s, GC-TEA gave way to GC-MS which was even more reliable because of its ability to directly determine structural information from fragmentation patterns, information that was not available by GC-TEA. A review published in 1989 summarizes hundreds of analyses of nitrosamines in food.[4]

Thus, there is no doubt that the necessary technology and highly reliable methods for the analysis of nitrosamines in various settings were available from the 1970s. More recent analyses have confirmed the earlier data.

The international concern about the presence of these carcinogens in various settings gave rise to the widely attended and recognized International Agency for Research on Cancer conferences on nitrosamines which were held at various locations in the world from 1976-

1991.  These meetings produced a series of books describing the research discussed at the meetings.[5]

In summary, nitrosamine contamination of food, drugs, and other products, and the reliable analytical methods to detect nitrosamines, have been known since the 1970s.  Routes of formation of nitrosamines under various conditions have been extensively described in numerous publications and textbooks.  Chemists using processes which involve the presence of nitrite and secondary amines should absolutely be aware of this huge body of literature, and utilize the widely available technology and methods to identify the nitrosamines resulting from these processes.

ZHP's witnesses acknowledged in their depositions that the chemical reactions were known and that mass spectrometry was available to identify nitrosamines starting before these processes were even developed.  Dr. Li ultimately agreed that "the technology and the methodology was clearly available to identify the NDMA," as long as you "know what to look for" based on a risk assessment – which he confirmed is an ongoing process for the lifecycle of the drug.  (Min Li 4/20/21 Dep. Tr., 230:9-19, 233:10-18).

Eric Gu also confirmed in his deposition that the 1978 IARC Monograph on the Evaluation of the Carcinogenic Risk of Chemicals to Humans" stated in part: "It has been known since 1865 that the reaction of dimethylamine hydrochloride with sodium nitrite at an acidic pH yields NDMA."  (Eric Gu 4/5/21 Dep. Tr., 65:3-65:24).  Mr. Gu was shown a 2009 article published in the scientific journal Tetrahedron Letters, titled: DMF, Much More Than a Solvent.  The article states that "DMF decomposes slightly at its boiling point to afford dimethylamine and carbon monoxide, this reaction occurring even at room temperature in the presence of acidic or basic materials..."  He agreed that DMF could decompose to yield dimethylamine, and this was known in the scientific community. (Eric Gu 4/5/21 Dep. Tr., 172:13-174:9, 183:12-21).

Min Li was shown scientific literature identifying the risk of formation of nitrosamines during his deposition.  This includes a textbook first published in 1996 titled, Purification of Laboratory Chemicals, which stated that DMF could decompose at its boiling point to yield dimethylamine.  (Min Li 4/21/21 Dep. Tr. 391:13-395:5).  Another 2009 scientific article titled "N.N-Dimethylformamide:  much more than a solvent," also stated that DMF could decompose to produce dimethylamine, and this article cited a textbook published in 1966. (Min Li 4/21/21 Dep. Tr. 411:19-413:22).  In addition, an article published in 2010 by a group from Beijing University of Technology in the Journal of Physical Chemistry titled "Theoretical Investigation of N-Nitrosdimethylamine Formation from Nitrosation of Triethylamine," described the formation of NDMA from the reaction of dimethylamine and nitrous acid.  This is what occurred here with the zinc chloride process.  (Min Li 4/21/21 Dep. Tr. 414:2-416:12). Dr. Li also stated that this was the reaction that occurred in the zinc chloride process: "the zinc chloride process for the formation of NDMA, you know, was also under the acidic, you know, pH.  So, yes, so from that perspective, yeah, they are consistent."  He also confirmed that in 2011, "scientists would be aware of and have available to them" this information, as well as

the known availability and use of mass spectrometry to test for potential nitrosamines, as stated in the 1978 Monograph, "The principal techniques employed for the analysis of volatile N-nitrosamines [including NDMA] have been described in a recent publication…The relative merits of high- and low-resolution mass spectrometry are discussed, since use of mass spectrometry as a confirmatory technique is particularly important." (Min Li 4/21/21 Dep. Tr. 458:13-465:11). The literature discussed with the ZHP witnesses provides useful examples and is representative of information that was well known in the scientific literature and scientific community prior to and after the 2011 development of these processes.

The identification of the NDMA and NDEA would have been straightforward to anyone who was familiar with the chemical reactions in the manufacturing process, utilizing mass spectrometry. The location of the NDMA peak found on the chromatograms for the zinc chloride process has been identified by ZHP. For example, Min Li testified that there was a "little peak after the toluene peak" and stated, "And then in the sample injection, this peak turns out, if I remember correctly, to be n-butyl acetate, okay? So that's the peak - - that's the peak, you know, eluting after the toluene peak. Okay. So NDMA would elute on the shoulder, or sometimes may even completely co-elute with this peak." (Min Li 4/20/21 Dep. Tr. 25:16-28:22.). In addition, Qiangming Li confirmed that "[w]hen we used GC-FID for the testing, regarding the peak that appeared after toluene, the response of NDMA was pretty low." (Qiangming Li 4/14/2021 Dep. Tr. 168:17-20). The point is that taking into account the potential creation of nitrosamines should have led to the use of the GC-MS technology to identify the NDMA and NDEA.

A series of customer complaints was received by ZHP with regard to the unknown, or aberrant peaks on the chromatography. This included:

1. Ranbaxy/SunPharma on September 30, 2014 (Qiangming Li 4/14/2021 Dep. Tr. 130:7-170:11; ZHP01748896 (ZHP 260)).

2. Shanghai Pharmtech on November 20, 2014 (*Id.* at 177:22-199:20; ZHP01748905 (ZHP 264)).

3. SunPharma on November 17, 2016 (Qiangming Li 4/15/2021 Dep. Tr. 290:16-318:10; ZHP00405069 (ZHP 277); ZHP01313866 (ZHP 278)).

4. Vertex on December 21, 2016 (Qiangming Li 4/14/2021 Dep. Tr. 204:11-214:17; ZHP02630924 (ZHP 265); ZHP02630926 (ZHP 266).

5. Glenmark on December 29, 2016 (Qiangming Li 4/15/2021 Dep. Tr. 254:22-290:4; ZHP00496153 (ZHP 271); ZHP00496155 (ZHP 272); ZHP02118712 (ZHP 273)).

6. Aurobindo on August 23, 2017 (*Id.* at 343:21-372:9; ZHP02094739 (ZHP 281)).

6

7.  Novartis on May 22, 2018 (*Id.* at 386:17-466:17; ZHP00405021 (ZHP 284)).

Testing with the available technology would have identified the NDMA and NDEA at every point during the period when these processes were used to manufacture the valsartan. Novartis did what ZHP should have done.  Novartis investigated the unknown peaks to determine what was causing them, and identified the NDMA in ZHP API manufactured with the Zinc Chloride process.  Of note, Novartis inquired of ZHP as to whether DMF was utilized in the zinc chloride process on June 7, 2018, as part of its investigation.  (ZHP01390017).  This was relevant information to be taken into account by anyone assessing the cause of the unknown peaks since dimethylamine was the degradation/decomposition product of DMF that then reacted with the nitrous acid to form NDMA.  ZHP simply ignored or didn't understand this basic chemistry.  ZHP failed to perform the same analysis despite knowing the details of the manufacturing process, and this illustrates the inadequacy of ZHP's risk assessment from the perspective of organic chemistry.

I have reviewed chromatograms for the zinc chloride process.  The NDMA peak would not have been identifiable as NDMA on the gas chromatography alone, but as stated above if ZHP had been diligent and conducted a scientifically reasonable assessment, they would have recognized the need to test for NDMA, and they could have used the available technology to identify the NDMA peak.  We have examples of the results that would have been obtained in the documentation of the testing performed after the disclosure of the NDMA in June, 2018.  The September 1, 2018 ZHP Response to DMF Information Request Letter provides a series of chromatograms showing the methods used, and the identification of the NDMA peak.  (ZHP00079913).  There was nothing complex or difficult about what was done once they were looking for the NDMA (and ultimately NDEA). In another example, the July 20, 2018 Deviation Investigation Report titled: Investigation regarding a Suspected Genotoxic Impurity of Valsartan (ZHP00004363) contains images of the June 6, 2018 email and attachments from Kevin O'Mahony to Xavier and others at ZHP.  The chromatograms show the NDMA peak, and the method used to identify the peak, (ZHP00004399-4402).  This should have been identified from the outset and at every other point moving forward, including when Novartis and other customers submitted complaints and inquiries regarding unknown peaks, as listed above.  In this context, the European authority documented that Novartis had shared its analytical method with ZHP in July, 2017, in rebutting ZHP's argument that it did not have that information until June 2018.  (ZHP01862681 (ZHP 232)). Of note, and perhaps not a coincidence, the July 27, 2017 email written by Jinsheng Lin, Ph.D. confirming that there was NDMA in ZHP's valsartan API, caused by the quenching with sodium nitrite, was written during the same month.

The same analysis applies to the NDEA in the valsartan. For example, August, 2018 testing performed by ZHP shows the NDEA peak identified.  (ZHP02733180).

When asked why Novartis discovered that an unknown peak was due to NDMA before ZHP, he acknowledged that ZHP was required to investigate the peak, but could not give an explanation, "it was not so easy to detect" and "it's quite a challenging work."  (Eric Gu 4/5/21

Dep. Tr., 210:24-219:5, 236:24-237:8).  As set forth above, identification was quite feasible and should have been accomplished from the start of development of these processes, through the entire time that the drug products were manufactured and sold.  This could have been done at any point, and seeming to contradict ZHP's position that it did not know, the July 27, 2017 email accurately describes the presence of the NDMA and the root cause of quenching with sodium nitrite.

Mr. Gu was questioned about the aberrant/unknown peaks. He had no reasonable explanation for why, despite every batch demonstrating the "NDMA peak just after the Toluene peak on the chromatograms. . .  nobody at ZHP realized that it needed to be tested and identified." Mr. Gu admitted that ZHP was aware of these peaks and "did whatever they can," however, "They are struggling, I guess, in the past." (Eric Gu 4/6/21 Dep. Tr., 333:21-335:19).  Mr. Gu was not aware that ZHP customer Sun Pharmaceuticals complained of unknown peaks in November 2016, and was not aware that, according to the European Medicines Agency, ZHP did not directly compare the unknown peaks observed by Novartis to ZHP's own gas chromatography.  Nor was he aware that Novartis had shared its GC-FID method for evaluating chromatogram peaks with ZHP in July 2017.  (Eric Gu 4/5/21 Dep. Tr., 240:3-243:18).

To be clear, the pathway to identification of the NDMA and NDEA impurities continued to be straightforward after the valsartan containing NDMA and NDEA began to be marketed.  ZHP could have and should have taken the steps described above from the time they began to sell the valsartan containing NDMA and NDEA until it was discovered by Novartis, with the aid of an outside laboratory in June 2018.  The necessary information and technology was readily available the entire time.

In addition to the ease in detecting the NDMA and NDEA with available testing, if ZHP still determined to go forward with these processes, the simple step of extracting the product prior to the quenching could have been taken to prevent the NDMA (and NDEA in the TEA with sodium nitrite process) formed in the zinc chloride process during quenching of the sodium azide from contaminating the drug product.  ZHP stated in one document that, "any formation of NDMA will not be carried over into the product," and, "This approach can be done without any change of manufacturing process."  July 1, 2018 Investigation of the Source of this Impurity (NDMA) (ZHP01495188).  ZHP also provided a detailed analysis at pages 29-35 of 236 of the November 5, 2018 Deviation Investigation Report (PRINSTON0075797), indicating: "After optimization, the ROS remains the same, the product in Valsartan Crude Step (Step 4) is separated before the addition of NaNO2 (and the subsequent addition of Hcl)...Therefore, the product in the organic phase has no chance to be contaminated by NDMA."  This would not have changed the manufacturing process for the drug product or route of synthesis as recognized by ZHP, and would not have negatively impacted or introduced any risk to the identity, quality, purity, strength, or stability of the drug products, since the drug product would have been separated from and not been exposed to contamination by the genotoxic impurities created during the quenching step.  The same could have been done with the TEA with sodium nitrite quenching process.  In the alternative,

8

ZHP could simply have gone back to the original process that did not involve sodium nitrite quenching, as "no NDMA or NDEA will be formed in Tin process." (November 5, 2018 Deviation Investigation Report, at 68 of 236, PRINSTON0075870).

Eric Gu confirmed that ZHP modified the zinc chloride manufacturing process after the FDA became aware of the NDMA, and agreed that ZHP's, "solution was to quench the azide separate from the product so it wouldn't become contaminated with the NDMA," and, "GC-MS would be used to evaluate all peaks to make sure that they were not genotoxic impurities that needed to be controlled out of the product." (Eric Gu 4/6/21 Dep. Tr., 455:1-458:15). If the solvents presenting the risk of secondary amines and sodium nitrite quenching were to be used, this would have prevented contamination of the drug product, and this testing would have confirmed the lack of NDMA or NDEA; this was absolutely feasible and could and should have been done from development through the entire course of the manufacturing of the drug product if the same solvents and chemicals were to be used in the process.

### The ZHP API and Finished Dose Nitrosamine Levels
### Are Materially the Same and All Exceed the FDA Levels

Minli Zhang—ZHP's Director of Finished Dose Formulation Quality—testified that ZHP determined its APIs' nitrosamines carried over to the finished dose. (3/26/2021 Minli Zhang Dep. Tr. 509:15-17, 518:18-519:3). Ms. Zhang explained:

> In our investigation report, we compared the NDMA level in the API and the NDMA level in the finished dose products, and we found the results basically matched each other. Therefore, we decided not to test the NDMA level in the finished dose products anymore.
>
> We could simply calculate based on the NDMA level in the API, as well as the amount of API used, to come up with a probable level of NDMA in the finished dose products.

(*Id.* at 521:8-19). This is the chart from the deviation investigation report:

In order to qualify the impurity relationship between the dosage form and API, some batches of API and corresponding dosage form were choose at random to test this impurity by Quality Research Department (QR), the testing result is as below:

表 1：制剂成品及对应 API 批次检测结果列表

Table 1: testing result between dosage form batches and corresponding API

| 序号 SN | 产品名称 Product Name | 产品批号 Batch No. | 产品规格 Strength (mg) | API厂家批号 Vendor batch No. Of API | API结果 Result for API NDMA 含量(ppm) Assay of NDMA (ppm) | 制剂结果 Result for dosage form |
|---|---|---|---|---|---|---|
| 1. | 缬沙坦片 USP Valsartan Tablets USP | 341A18007 | 40 | C5523-17-382 | 81.4 | 83.1 |
| 2. | 缬沙坦片 USP Valsartan Tablets USP | 342B17012 | 80 | C5523-17-190 | 101.9 | 101.0 |
| | | | | C5523-17-191 | 101.7 | |
| 3. | 缬沙坦片 USP Valsartan Tablets USP | 343G17002 | 160 | C5355-17-132 | 120.0 | 110.3 |
| | | | | C5355-17-133 | 104.5 | |
| 4. | 缬沙坦片 USP Valsartan Tablets USP | 344B17071 | 320 | C5355-17-131 | 119.3 | 123.2 |
| | | | | C5355-17-132 | 120.0 | |
| 5. | 缬沙坦氢氯噻嗪片 USP Valsartan HCTZ Tablets USP | 609B18003 | 80/25 | D5191-16-133 | 3.4 | 2.9 |
| 6. | 缬沙坦氢氯噻嗪片 USP Valsartan HCTZ Tablets USP | 611B17003 | 320/25 | D5191-16-027 | 27.7 | 31.3 |
| 7. | 缬沙坦氢氯噻嗪片 USP Valsartan HCTZ Tablets USP | 611B17007 | 320/25 | D5191-15-149 | 7.9 | 6.4 |

从上表数据分析，制剂产品与 API 的检测结果的差值接近(0.5~9.7ppm)。

Based on analysis above, the testing difference value of API and dosage form is almost the same (0.5-9.7ppm)

(ZHP00683571, 683578). As a result, ZHP stopped testing FD and blended the API levels to get the FD ones. (*Id.* at 520:22-523:19, 525:12-22 (discussing ZHP 189)). Hai Wang—the President of Solco—confirmed that the API and FD contained the same levels of nitrosamines. (3/10/2021 Hai Wang Dep. Tr., 116:3-118:23, 144:15-147:1). Prinston explicitly informed the FDA that "[i]t is confirmed that NDMA has been present in Valsartan drug substance (API) batches and carried to the drug product Valsartan," relying on the same test results as shown in the above chart. (PRINSTON0249966, 249967; ZHP00099424, 99441-42). ZHP concluded this analysis applied to NDEA as well. (PRINSTON0075797, 75977 (stating: "According to the previous raw material investigation, i.e. presence of diethylamine impurities in triethylamine hydrochloride, combined with the formation mechanism of NDEA, it should be the nitrosation of diethylamine impurities (in triethylamine hydrochloride) by nitrite to produce NDEA impurities, which is carried over into crude products, and finally remain in valsartan finished products.")).

As set forth in my July 6, 2021 report, testing by Teva and Torrent of its finished dose products manufactured using the ZHP contaminated valsartan API also established that the

10

levels of NDMA and NDEA all exceeded the limits set by the FDA. (TEVA-MDL2875-00546489 (TEVA 155); TORRENT-MDL2875-00005092; TORRENT-MDL2875-00369262; TORRENT-MDL2875-00072916; TORRENT-MDL2875-00366172).

## Conclusion

The unreasonably dangerous contamination of valsartan drug products with NDMA and NDEA was easily avoidable, based on prevailing scientific knowledge and technology that existed before, during, and after the development and then commercial use of the zinc chloride and TEA with sodium nitrite quenching processes. The available knowledge and technology should have been applied to add straightforward testing for NDMA and NDEA of each batch of API and finished dose manufactured using the API manufactured with these processes, which would have revealed the presence of the NDMA and NDEA. The contamination of the drug product could have been prevented by extracting the product before quenching the sodium azide.

*Stephen S. Hecht*

Stephen S. Hecht, Ph.D.
Wallin Professor of Cancer Prevention
American Cancer Society Professor
American Chemical Society Fellow

---

[1] Sakshaug, J., Sognen, E., Hansen, M. A. & Koppang, N. Dimethylnitrosamine; its hepatotoxic effect in sheep and its occurrence in toxic batches of herring meal. *Nature* **206**, 1261-1262, doi:10.1038/2061261b0 (1965); Ender, F. & Ceh, L. Occurrence of nitrosamines in foodstuffs for human and animal consumption. Food Cosmet. Toxicol. 6, 569-571, doi:10.1016/0015-6264(68)90292-7 (1968); Ender, F. Ceh, L. Occurrence of nitrosamines in foodstuffs for human and animal consumption.  Food Cosmet. Toxicol 6: 569-71 (1968).

[2] Magee, P. N., Montesano, R. & Preussmann, R. in *Chemical Carcinogens. ACS monograph 173* (ed Charles E. Searle)  491-625 (American Chemical Society, 1976).

[3] Fine, D. H. & Rounbehler, D. P. Trace analysis of volatile *N*-nitroso compounds by combined gas chromatography and thermal energy analysis. *J. Chromatog* **109**, 271-279 (1975).

[4] Hotchkiss, J. H. Preformed *N*-nitroso compounds in foods and beverages. *Cancer Surv* **8**, 295-321 (1989).

[5] International Agency for Research on Cancer (IARC) Books on Nitrosamine Research (each book, about 500 pages). IARC is a branch of WHO. *Environmental N-Nitroso Compounds: Analysis and Formation*, Vol. 1. (E.A. Walker, P. Bogovski, and L. Griciute, eds.), IARC Scientific Publications, No. 14, Lyon, France: International Agency for Research on Cancer, **1976**; *Environmental Aspects of N-Nitroso Compounds*, Vol. 1. (E.A. Walker, M. Castegnaro, L. Griciute, and R.E. Lyle, eds.), IARC Scientific Publications, No. 19, Lyon, France: International Agency for Research on Cancer, **1978**; *N-Nitroso Compounds: Analysis, Formation and Occurrence*. (E.A.

Walker, M. Castegnaro, L. Griciute, and M. Borzsonyi, eds.), IARC Scientific Publications, No. 31, Lyon, France: International Agency for Research on Cancer, **1980**; *N-Nitroso Compounds: Occurrence and Biological Effects.* (H. Bartsch, I.K. O'Neill, M. Castegnaro, M. Okada, and W. Davis, eds.), IARC Scientific Publications, No. 41, Lyon, France: International Agency for Research on Cancer, **1982**; *N-Nitroso Compounds: Occurrence, Biological Effects and Relevance to Human Cancer.* (I.K. O'Neill, R.C. Von Borstel, C.T. Miller, J. Long, and H. Bartsch, eds.) IARC Scientific Publications, No. 57, Lyon, France: International Agency for Research on Cancer, **1984**; *The Relevance of N-Nitroso Compounds to Human Cancer: Exposures and Mechanisms*, Vol. 84. (H. Bartsch, I.K. O'Neill, and R. Schulte-Hermann, eds.), Lyon, France: IARC, **1987**; *Relevance to Human Cancer of N-Nitroso Compounds, Tobacco and Mycotoxins.* (I.K. O'Neill, J. Chen, and H. Bartsch, eds.), IARC Scientific Publication, No. 105, Lyon, France: IARC, **1991**.

**Masonic Cancer Center**
**UNIVERSITY OF MINNESOTA**
Comprehensive Cancer Center designated by the National Cancer Institute

Stephen S. Hecht, Ph.D.
2231 6th Street SE
Room 2-148 CCRB
Minneapolis, MN 55455
Phone: (612) 624-7607
Fax: (612) 624-3869
hecht002@umn.edu

## EXHIBIT A
## Supplemental List of Materials Reviewed

**ZHP Documents**

1. PRINSTON00249966, August 27, 2018 Letter from Prinston to the FDA regarding ANDA 206083.
2. ZHP02326538 (ZHP 189).
3. ZHP00662283, Draft Investigation regarding an unknown impurity (Genotoxic Impurity) (ZHO 212).
4. ZHP01862672, Final GMP Inspection Report (ZHP 232).
5. ZHP01748896, Email Chain between ZHP and Ranbaxy (ZHP 260).
6. ZHP01748905, Email Chain between ZHP and Shanghai Pharmttech Co. Ltd. (ZHP 264).
7. ZHP02630924, Email Chain regarding Vertex (ZHP 265).
8. ZHP02630926, Chronology regarding Vertex (ZHP 266),
9. ZHP00496153, Email Chain regarding Glenmark (ZHP 271).
10. ZHP00496155, Chronology regarding Glenmark (ZHP 272).
11. ZHP02118712, Email Chain between ZHP and Glenmark (ZHP 273).
12. ZHP00405069, Email Chain between ZHP and Sun Pharmaceutical Industries Ltd. (ZHP 277).
13. ZHP01313866, Chromatograms from Sun Pharmaceutical Industries Ltd. (ZHP 278).
14. ZHP02094739, Email Chain between ZHP and Aurobindo (ZHP 281).
15. ZHP00405021, Email Chain between ZHP and Novartis (ZHP 284).
16. ZHP00099424, Meeting Information Package from Prinston regarding ANDA 204821.
17. ZHP01390017, Email Chain Between ZHP and Novartis.
18. ZHP01495187, Investigation of the Source of this Impurity (NDMA).
19. ZHP01344159, November 29, 2018 Warning Letter from the FDA to ZHP (ZHP 213).
20. ZHP01495186, July 1, 2018 Email Enclosing ZHP01495187, Investigation of the Source of this Impurity (NDMA).
21. ZHP02733180, Chromatogram and Results for NDEA in ZHP's valsartan
22. PRINSTON00002249, 1-2 Annex-3 NDMA for TEA Process by GC-MS
23. ZHP02365339, Valsartan Chromatograms
24. ZHP02364173, NDMA and NDEA test results for all batches of Valsartan in USDMF grade
25. ZHP00011368, Certificate of analysis for D5191-14-157M
26. ZHP00344175, Summary of Unspecified Peaks in Residual Solvents Method of Valsartan
27. ZHP00476862, Valsartan Impurities Profile Analysis Report (ZHP 220)

**NCI**
**Designated Comprehensive Cancer Center**

28. ZHP00021455, Study Report of Unknown Peak in Residual Solvent of Valsartan
29. ZHP01870977, Study Report of Unknown Peak in Residual Solvent of Valsartan
30. ZHP02214602-71, Novartis Documents
31. ZHP02633528-ZHP02633538
32. ZHP00405024-ZHP00405068
33. ZHP00380568-ZHP00380591
34. ZHP01748896-ZHP01748899-ZHP1748899 (ZHP 260)
35. ZHP00405069-ZHP00405070 (ZHP 277)
36. ZHP01320376-ZHP01320392 (ZHP 280)
37. ZHP00405021-ZHP00405023 (ZHP 284)
38. ZHP00359796-ZHP00359822 (ZHP 288)
39. ZHP02135008-ZHP02135025 (ZHP 289)
40. ZHP02173090-ZHP00371269 (ZHP 290)

**Torrent Documents**

1. TORRENT-MDL2875-00072916, Details of Finished good batches (USA market) manufactured at indrad with Huahai API having old ROS.
2. TORRENT-MDL2875-00366172, Valsartan: Impact assessment of NDMA.
3. TORRENT-MDL2875-00369262, Test Results
4. TORRENT-MDL2875-00005092, Details of Finished good batches manufactured at indrad with Huahai API having old ROS.

**Deposition Testimony**

1. Minli Zhang Deposition Transcript for March 22-26, 2021.
2. Eric Gu Deposition Transcript for April 5-6, 2021.
3. Qiangming Li Deposition Transcript for April 13-16, 2021.
4. Jun Du Deposition Transcript for May 27,-28, 2021.

**Literature**

1. Sakshaug, J., Sognen, E., Hansen, M. A. & Koppang, N. Dimethylnitrosamine; its hepatotoxic effect in sheep and its occurrence in toxic batches of herring meal. *Nature* **206**, 1261-1262, doi:10.1038/2061261b0 (1965).
2. Ender, F. & Ceh, L. Occurrence of nitrosamines in foodstuffs for human and animal consumption. Food Cosmet. Toxicol. 6, 569-571, doi:10.1016/0015-6264(68)90292-7 (1968);
3. Ender, F. Ceh, L. Occurrence of nitrosamines in foodstuffs for human and animal consumption.  Food Cosmet. Toxicol 6: 569-71 (1968).
4. Magee, P. N., Montesano, R. & Preussmann, R. in *Chemical Carcinogens. ACS monograph 173* (ed Charles E. Searle) 491-625 (American Chemical Society, 1976).
5. Fine, D. H. & Rounbehler, D. P. Trace analysis of volatile *N*-nitroso compounds by combined gas chromatography and thermal energy analysis. *J. Chromatog* **109**, 271-279 (1975).

6.  Hotchkiss, J. H. Preformed *N*-nitroso compounds in foods and beverages. *Cancer Surv* **8**, 295-321 (1989).

7.  *Environmental N-Nitroso Compounds: Analysis and Formation*, Vol. 1. (E.A. Walker, P. Bogovski, and L. Griciute, eds.), IARC Scientific Publications, No. 14, Lyon, France: International Agency for Research on Cancer, **1976**.

8.  *Environmental Aspects of N-Nitroso Compounds*, Vol. 1. (E.A. Walker, M. Castegnaro, L. Griciute, and R.E. Lyle, eds.), IARC Scientific Publications, No. 19, Lyon, France: International Agency for Research on Cancer, **1978**.

9.  *N-Nitroso Compounds: Analysis, Formation and Occurrence.* (E.A. Walker, M. Castegnaro, L. Griciute, and M. Borzsonyi, eds.), IARC Scientific Publications, No. 31, Lyon, France: International Agency for Research on Cancer, **1980**.

10. *N-Nitroso Compounds: Occurrence and Biological Effects.* (H. Bartsch, I.K. O'Neill, M. Castegnaro, M. Okada, and W. Davis, eds.), IARC Scientific Publications, No. 41, Lyon, France: International Agency for Research on Cancer, **1982**.

11. *N-Nitroso Compounds: Occurrence, Biological Effects and Relevance to Human Cancer.* (I.K. O'Neill, R.C. Von Borstel, C.T. Miller, J. Long, and H. Bartsch, eds.) IARC Scientific Publications, No. 57, Lyon, France: International Agency for Research on Cancer, **1984**.

12. *The Relevance of N-Nitroso Compounds to Human Cancer: Exposures and Mechanisms*, Vol. 84. (H. Bartsch, I.K. O'Neill, and R. Schulte-Hermann, eds.), Lyon, France: IARC, **1987**.

13. *Relevance to Human Cancer of N-Nitroso Compounds, Tobacco and Mycotoxins.* (I.K. O'Neill, J. Chen, and H. Bartsch, eds.), IARC Scientific Publication, No. 105, Lyon, France: IARC, **1991**.

Exhibit 49

INTERNATIONAL CONFERENCE ON HARMONISATION OF TECHNICAL
REQUIREMENTS FOR REGISTRATION OF PHARMACEUTICALS FOR HUMAN USE

### ICH HARMONISED TRIPARTITE GUIDELINE

# PHARMACEUTICAL DEVELOPMENT
## Q8(R2)

Current *Step 4* version
dated August 2009

*This Guideline has been developed by the appropriate ICH Expert Working Group
and has been subject to consultation by the regulatory parties, in accordance with the
ICH Process. At Step 4 of the Process the final draft is recommended for adoption to
the regulatory bodies of the European Union, Japan and USA.*

**Q8(R2)**
**Document History**

| First Codification | History | Date |
|---|---|---|

### Parent Guideline: Pharmaceutical Development

| First Codification | History | Date |
|---|---|---|
| Q8 | Approval of the Guideline by the Steering Committee under *Step 2* and release for public consultation. | 18 November 2004 |
| Q8 | Approval of the Guideline by the Steering Committee under *Step 4* and recommendation for adoption to the three ICH regulatory bodies. | 10 November 2005 |

### Annex to the Parent Guideline: Pharmaceutical Development

| First Codification | History | Date |
|---|---|---|
| Annex to Q8 | Approval of the Annex by the Steering Committee under *Step 2* and release for public consultation. | 1 November 2007 |
| Annex to Q8 | Approval of the Annex by the Steering Committee under *Step 4* and recommendation for adoption to the three ICH regulatory bodies. | 13 November 2008 |

### Addition of Annex to the Parent Guideline

| First Codification | History | Date |
|---|---|---|
| Q8(R1) | The parent guideline "Pharmaceutical Development" was recoded Q8(R1) following the addition of the Annex to the parent guideline. | November 2008 |

### Current *Step 4* version

| First Codification | History | Date |
|---|---|---|
| Q8(R2) | Corrigendum to titles of "Figure 2a" and "Figure 2b" of "Example 2" on page 23. | August 2009 |

# PHARMACEUTICAL DEVELOPMENT

## ICH Harmonised Tripartite Guideline

# TABLE OF CONTENTS

**PART I:**

**PHARMACEUTICAL DEVELOPMENT**

**1.    INTRODUCTION** .................................................................................... **1**

1.1    Objective of the Guideline ......................................................................... 1

1.2    Scope ........................................................................................................... 1

**2.    PHARMACEUTICAL DEVELOPMENT** ............................................. **1**

2.1    Components of the Drug Product ............................................................... 3

    *2.1.1  Drug Substance* ................................................................................. *3*

    *2.1.2  Excipients* .......................................................................................... *3*

2.2    Drug Product ............................................................................................. 3

    *2.2.1  Formulation Development* ............................................................... *3*

    *2.2.2  Overages* ........................................................................................... *4*

    *2.2.3  Physicochemical and Biological Properties* ................................. *4*

2.3    Manufacturing Process Development ........................................................ 5

2.4    Container Closure System .......................................................................... 6

2.5    Microbiological Attributes ......................................................................... 6

2.6    Compatibility .............................................................................................. 7

**3.    GLOSSARY** .......................................................................................... **7**


**PART II:**

**ANNEX TO PHARMACEUTICAL DEVELOPMENT**

**1.    INTRODUCTION** ................................................................................. **9**

**2.    ELEMENTS OF PHARMACEUTICAL DEVELOPMENT** ........................... **10**

2.1    Quality Target Product Profile .............................................................. 10

2.2    Critical Quality Attributes ..................................................................... 11

2.3    Risk Assessment: Linking Material Attributes and Process Parameters to Drug Product CQAs .................................................................................. 11

2.4    Design Space..................................................................................................12

    2.4.1    *Selection of Variables* ..................................................................12

    2.4.2    *Describing a Design Space in a Submission*............................12

    2.4.3    *Unit Operation Design Space(s)*...............................................12

    2.4.4    *Relationship of Design Space to Scale and Equipment*............12

    2.4.5    *Design Space Versus Proven Acceptable Ranges* .....................13

    2.4.6    *Design Space and Edge of Failure* ............................................13

2.5    Control Strategy ............................................................................................13

2.6    Product Lifecycle Management and Continual Improvement.............................14

**3.    SUBMISSION OF PHARMACEUTICAL DEVELOPMENT AND RELATED
INFORMATION IN COMMON TECHNICAL DOCUMENTS (CTD)
FORMAT .................................................................................................... 14**

3.1    Quality Risk Management and Product and Process Development.....................15

3.2    Design Space....................................................................................................15

3.3    Control Strategy ..............................................................................................15

3.4    Drug Substance Related Information .................................................................15

**4.    GLOSSARY .................................................................................................. 16**

**Appendix 1.** Differing Approaches to Pharmaceutical Development ..................................18

**Appendix 2.** Illustrative Examples......................................................................................19

PART I:

# PHARMACEUTICAL DEVELOPMENT

### ICH Harmonised Tripartite Guideline

Having reached *Step 4* of the ICH Process at the ICH Steering Committee meeting
on 10 November 2005, this guideline is recommended for
adoption to the three regulatory parties to ICH

## 1.    INTRODUCTION

### 1.1    Objective of the Guideline

This guideline describes the suggested contents for the 3.2.P.2 (Pharmaceutical
Development) section of a regulatory submission in the ICH M4 Common Technical
Document (CTD) format.

The Pharmaceutical Development section provides an opportunity to present the
knowledge gained through the application of scientific approaches and quality risk
management (for definition, see ICH Q9) to the development of a product and its
manufacturing process. It is first produced for the original marketing application and
can be updated to support new knowledge gained over the lifecycle* of a product. The
Pharmaceutical Development section is intended to provide a comprehensive
understanding of the product and manufacturing process for reviewers and
inspectors. The guideline also indicates areas where the demonstration of greater
understanding of pharmaceutical and manufacturing sciences can create a basis for
flexible regulatory approaches. The degree of regulatory flexibility is predicated on
the level of relevant scientific knowledge provided.

### 1.2    Scope

This guideline is intended to provide guidance on the contents of Section 3.2.P.2
(Pharmaceutical Development) for drug products as defined in the scope of Module 3
of the Common Technical Document (ICH guideline M4). The guideline does not apply
to contents of submissions for drug products during the clinical research stages of
drug development. However, the principles in this guideline are important to consider
during those stages as well. This guideline might also be appropriate for other types
of products. To determine the applicability of this guideline to a particular type of
product, applicants can consult with the appropriate regulatory authorities.

## 2.    PHARMACEUTICAL DEVELOPMENT

The aim of pharmaceutical development is to design a quality product and its
manufacturing process to consistently deliver the intended performance of the
product. The information and knowledge gained from pharmaceutical development
studies and manufacturing experience provide scientific understanding to support the
establishment of the design space*, specifications, and manufacturing controls.

Information from pharmaceutical development studies can be a basis for quality risk
management. It is important to recognize that quality* cannot be tested into products;

---

* See Glossary for definition

1

*Pharmaceutical Development*

i.e., quality should be built in by design. Changes in formulation and manufacturing processes during development and lifecycle management should be looked upon as opportunities to gain additional knowledge and further support establishment of the design space. Similarly, inclusion of relevant knowledge gained from experiments giving unexpected results can also be useful. Design space is proposed by the applicant and is subject to regulatory assessment and approval. Working within the design space is not considered as a change. Movement out of the design space is considered to be a change and would normally initiate a regulatory post approval change process.

The Pharmaceutical Development section should describe the knowledge that establishes that the type of dosage form selected and the formulation proposed are suitable for the intended use. This section should include sufficient information in each part to provide an understanding of the development of the drug product and its manufacturing process. Summary tables and graphs are encouraged where they add clarity and facilitate review.

At a minimum, those aspects of drug substances, excipients, container closure systems, and manufacturing processes that are critical to product quality should be determined and control strategies justified. Critical formulation attributes and process parameters are generally identified through an assessment of the extent to which their variation can have impact on the quality of the drug product.

In addition, the applicant can choose to conduct pharmaceutical development studies that can lead to an enhanced knowledge of product performance over a wider range of material attributes, processing options and process parameters. Inclusion of this additional information in this section provides an opportunity to demonstrate a higher degree of understanding of material attributes, manufacturing processes and their controls. This scientific understanding facilitates establishment of an expanded design space. In these situations, opportunities exist to develop more flexible regulatory approaches, for example, to facilitate:

- risk-based regulatory decisions (reviews and inspections);

- manufacturing process improvements, within the approved design space described in the dossier, without further regulatory review;

- reduction of post-approval submissions;

- real-time quality control, leading to a reduction of end-product release testing.

To realise this flexibility, the applicant should demonstrate an enhanced knowledge of product performance over a range of material attributes, manufacturing process options and process parameters. This understanding can be gained by application of, for example, formal experimental designs*, process analytical technology (PAT)*, and/or prior knowledge. Appropriate use of quality risk management principles can be helpful in prioritising the additional pharmaceutical development studies to collect such knowledge.

The design and conduct of pharmaceutical development studies should be consistent with their intended scientific purpose. It should be recognized that the level of

---

* See Glossary for definition

2

knowledge gained, and not the volume of data, provides the basis for science-based submissions and their regulatory evaluation.

## 2.1    Components of the Drug Product

### 2.1.1    *Drug Substance*

The physicochemical and biological properties of the drug substance that can influence the performance of the drug product and its manufacturability, or were specifically designed into the drug substance (e.g., solid state properties), should be identified and discussed. Examples of physicochemical and biological properties that might need to be examined include solubility, water content, particle size, crystal properties, biological activity, and permeability. These properties could be inter-related and might need to be considered in combination.

To evaluate the potential effect of drug substance physicochemical properties on the performance of the drug product, studies on drug product might be warranted. For example, the ICH *Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances* describes some of the circumstances in which drug product studies are recommended (e.g., Decision Tree #3 and #4 (Part 2)). This approach applies equally for the ICH *Q6B Specifications: Test Procedures and Acceptance Criteria for Biotechnology/Biological Products*. The knowledge gained from the studies investigating the potential effect of drug substance properties on drug product performance can be used, as appropriate, to justify elements of the drug substance specification (3.2.S.4.5).

The compatibility of the drug substance with excipients listed in 3.2.P.1 should be evaluated. For products that contain more than one drug substance, the compatibility of the drug substances with each other should also be evaluated.

### 2.1.2    *Excipients*

The excipients chosen, their concentration, and the characteristics that can influence the drug product performance (e.g., stability, bioavailability) or manufacturability should be discussed relative to the respective function of each excipient. This should include all substances used in the manufacture of the drug product, whether they appear in the finished product or not (e.g., processing aids). Compatibility of excipients with other excipients, where relevant (for example, combination of preservatives in a dual preservative system), should be established. The ability of excipients (e.g., antioxidants, penetration enhancers, disintegrants, release controlling agents) to provide their intended functionality, and to perform throughout the intended drug product shelf life, should also be demonstrated. The information on excipient performance can be used, as appropriate, to justify the choice and quality attributes of the excipient, and to support the justification of the drug product specification (3.2.P.5.6).

Information to support the safety of excipients, when appropriate, should be cross-referenced (3.2.P.4.6).

## 2.2    Drug Product

### 2.2.1    *Formulation Development*

A summary should be provided describing the development of the formulation, including identification of those attributes that are critical to the quality of the drug

*Pharmaceutical Development*

product, taking into consideration intended usage and route of administration. Information from formal experimental designs can be useful in identifying critical or interacting variables that might be important to ensure the quality of the drug product.

The summary should highlight the evolution of the formulation design from initial concept up to the final design. This summary should also take into consideration the choice of drug product components (e.g., the properties of the drug substance, excipients, container closure system, any relevant dosing device), the manufacturing process, and, if appropriate, knowledge gained from the development of similar drug product(s).

Any excipient ranges included in the batch formula (3.2.P.3.2) should be justified in this section of the application; this justification can often be based on the experience gained during development or manufacture.

A summary of formulations used in clinical safety and efficacy and in any relevant bioavailability or bioequivalence studies should be provided. Any changes between the proposed commercial formulation and those formulations used in pivotal clinical batches and primary stability batches should be clearly described and the rationale for the changes provided.

Information from comparative in vitro studies (e.g., dissolution) or comparative in vivo studies (e.g., bioequivalence) that links clinical formulations to the proposed commercial formulation described in 3.2.P.1 should be summarized and a cross-reference to the studies (with study numbers) should be provided. Where attempts have been made to establish an in vitro/in vivo correlation, the results of those studies, and a cross-reference to the studies (with study numbers), should be provided in this section. A successful correlation can assist in the selection of appropriate dissolution acceptance criteria, and can potentially reduce the need for further bioequivalence studies following changes to the product or its manufacturing process.

Any special design features of the drug product (e.g., tablet score line, overfill, anti-counterfeiting measure as it affects the drug product) should be identified and a rationale provided for their use.

### 2.2.2   *Overages*

In general, use of an overage of a drug substance to compensate for degradation during manufacture or a product's shelf life, or to extend shelf life, is discouraged.

Any overages in the manufacture of the drug product, whether they appear in the final formulated product or not, should be justified considering the safety and efficacy of the product. Information should be provided on the 1) amount of overage, 2) reason for the overage (e.g., to compensate for expected and documented manufacturing losses), and 3) justification for the amount of overage. The overage should be included in the amount of drug substance listed in the batch formula (3.2.P.3.2).

### 2.2.3   *Physicochemical and Biological Properties*

The physicochemical and biological properties relevant to the safety, performance or manufacturability of the drug product should be identified and discussed. This includes the physiological implications of drug substance and formulation attributes. Studies could include, for example, the development of a test for respirable fraction of an inhaled product. Similarly, information supporting the selection of dissolution vs.

*Pharmaceutical Development*

disintegration testing, or other means to assure drug release, and the development and suitability of the chosen test, could be provided in this section. See also ICH *Q6A Specifications: Test Procedures And Acceptance Criteria For New Drug Substances And New Drug Products: Chemical Substances*; Decision Tree #4 (Part 3) and Decision Tree #7 (Part 1) or ICH *Q6B Specifications: Test Procedures and Acceptance Criteria for Biotechnology/Biological Products.* The discussion should cross-reference any relevant stability data in 3.2.P.8.3.

## 2.3     Manufacturing Process Development

The selection, the control, and any improvement of the manufacturing process described in 3.2.P.3.3 (i.e., intended for commercial production batches) should be explained. It is important to consider the critical formulation attributes, together with the available manufacturing process options, in order to address the selection of the manufacturing process and confirm the appropriateness of the components. Appropriateness of the equipment used for the intended products should be discussed. Process development studies should provide the basis for process improvement, process validation, continuous process verification[*] (where applicable), and any process control requirements. Where appropriate, such studies should address microbiological as well as physical and chemical attributes. The knowledge gained from process development studies can be used, as appropriate, to justify the drug product specification (3.2.P.5.6).

The manufacturing process development programme or process improvement programme should identify any critical process parameters that should be monitored or controlled (e.g., granulation end point) to ensure that the product is of the desired quality.

For those products intended to be sterile an appropriate method of sterilization for the drug product and primary packaging material should be chosen and the choice justified.

Significant differences between the manufacturing processes used to produce batches for pivotal clinical trials (safety, efficacy, bioavailability, bioequivalence) or primary stability studies and the process described in 3.2.P.3.3 should be discussed. The discussion should summarise the influence of the differences on the performance, manufacturability and quality of the product. The information should be presented in a way that facilitates comparison of the processes and the corresponding batch analyses information (3.2.P.5.4). The information should include, for example, (1) the identity (e.g., batch number) and use of the batches produced (e.g., bioequivalence study batch number), (2) the manufacturing site, (3) the batch size, and (4) any significant equipment differences (e.g., different design, operating principle, size).

In order to provide flexibility for future process improvement, when describing the development of the manufacturing process, it is useful to describe measurement systems that allow monitoring of critical attributes or process end-points. Collection of process monitoring data during the development of the manufacturing process can provide useful information to enhance process understanding. The process control strategies that provide process adjustment capabilities to ensure control of all critical attributes should be described.

---

[*] See Glossary for definition

5

*Pharmaceutical Development*

An assessment of the ability of the process to reliably produce a product of the intended quality (e.g., the performance of the manufacturing process under different operating conditions, at different scales, or with different equipment) can be provided. An understanding of process robustness* can be useful in risk assessment and risk reduction (see ICH *Q9 Quality Risk Management* glossary for definition) and to support future manufacturing and process improvement, especially in conjunction with the use of risk management tools (see ICH *Q9 Quality Risk Management*).

## 2.4    Container Closure System

The choice and rationale for selection of the container closure system for the commercial product (described in 3.2.P.7) should be discussed. Consideration should be given to the intended use of the drug product and the suitability of the container closure system for storage and transportation (shipping), including the storage and shipping container for bulk drug product, where appropriate.

The choice of materials for primary packaging should be justified. The discussion should describe studies performed to demonstrate the integrity of the container and closure. A possible interaction between product and container or label should be considered.

The choice of primary packaging materials should consider, e.g., choice of materials, protection from moisture and light, compatibility of the materials of construction with the dosage form (including sorption to container and leaching), and safety of materials of construction. Justification for secondary packaging materials should be included, when relevant.

If a dosing device is used (e.g., dropper pipette, pen injection device, dry powder inhaler), it is important to demonstrate that a reproducible and accurate dose of the product is delivered under testing conditions which, as far as possible, simulate the use of the product.

## 2.5    Microbiological Attributes

Where appropriate, the microbiological attributes of the drug product should be discussed in this section (3.2.P.2.5). The discussion should include, for example:

- The rationale for performing or not performing microbial limits testing for non sterile drug products (e.g., Decision Tree #8 in ICH *Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances* and ICH *Q6B Specifications: Test Procedures and Acceptance Criteria for Biotechnology/Biological Products)*;

- The selection and effectiveness of preservative systems in products containing antimicrobial preservative or the antimicrobial effectiveness of products that are inherently antimicrobial;

- For sterile products, the integrity of the container closure system as it relates to preventing microbial contamination.

Although chemical testing for preservative content is the attribute normally included in the drug product specification, antimicrobial preservative effectiveness should be demonstrated during development. The lowest specified concentration of antimicrobial preservative should be demonstrated to be effective in controlling micro-

---

* See Glossary for definition

organisms by using an antimicrobial preservative effectiveness test. The concentration used should be justified in terms of efficacy and safety, such that the minimum concentration of preservative that gives the required level of efficacy throughout the intended shelf life of the product is used. Where relevant, microbial challenge testing under testing conditions that, as far as possible, simulate patient use should be performed during development and documented in this section.

## 2.6    Compatibility

The compatibility of the drug product with reconstitution diluents (e.g., precipitation, stability) should be addressed to provide appropriate and supportive information for the labelling. This information should cover the recommended in-use shelf life, at the recommended storage temperature and at the likely extremes of concentration. Similarly, admixture or dilution of products prior to administration (e.g., product added to large volume infusion containers) might need to be addressed.

## 3.    GLOSSARY

**Continuous Process Verification:**
An alternative approach to process validation in which manufacturing process performance is continuously monitored and evaluated.

**Design Space:**
The multidimensional combination and interaction of input variables (e.g., material attributes) and process parameters that have been demonstrated to provide assurance of quality. Working within the design space is not considered as a change. Movement out of the design space is considered to be a change and would normally initiate a regulatory post approval change process. Design space is proposed by the applicant and is subject to regulatory assessment and approval.

**Formal Experimental Design:**
A structured, organized method for determining the relationship between factors affecting a process and the output of that process. Also known as "Design of Experiments".

**Lifecycle:**
All phases in the life of a product from the initial development through marketing until the product's discontinuation.

**Process Analytical Technology (PAT):**
A system for designing, analyzing, and controlling manufacturing through timely measurements (i.e., during processing) of critical quality and performance attributes of raw and in-process materials and processes with the goal of ensuring final product quality.

**Process Robustness:**
Ability of a process to tolerate variability of materials and changes of the process and equipment without negative impact on quality.

*Pharmaceutical Development*

---

**Quality:**

The suitability of either a drug substance or drug product for its intended use. This term includes such attributes as the identity, strength, and purity (from ICH *Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances*).

# PART II:

## PHARMACEUTICAL DEVELOPMENT - ANNEX

### ICH Harmonised Tripartite Guideline

Having reached *Step 4* of the ICH Process at the ICH Steering Committee meeting
on 13 November 2008, this guideline is recommended for
adoption to the three regulatory parties to ICH

## 1.    INTRODUCTION

This guideline is an annex to ICH Q8 Pharmaceutical Development and provides
further clarification of key concepts outlined in the core guideline. In addition, this
annex describes the principles of quality by design[1] (QbD). The annex is not intended
to establish new standards or to introduce new regulatory requirements; however, it
shows how concepts and tools (e.g., design space[1]) outlined in the parent Q8 document
could be put into practice by the applicant for all dosage forms. Where a company
chooses to apply quality by design and quality risk management (ICH Q9, Quality
Risk Management), linked to an appropriate pharmaceutical quality system,
opportunities arise to enhance science- and risk-based regulatory approaches (see ICH
Q10, Pharmaceutical Quality System).

Approaches to Pharmaceutical Development
In all cases, the product should be designed to meet patients' needs and the intended
product performance. Strategies for product development vary from company to
company and from product to product. The approach to, and extent of, development
can also vary and should be outlined in the submission. An applicant might choose
either an empirical approach or a more systematic approach to product development,
or a combination of both. An illustration of the potential contrasts of these approaches
is shown in Appendix 1. A more systematic approach to development (also defined as
quality by design) can include, for example, incorporation of prior knowledge, results
of studies using design of experiments, use of quality risk management, and use of
knowledge management (see ICH Q10) throughout the lifecycle[1] of the product. Such
a systematic approach can enhance achieving the desired quality of the product and
help the regulators to better understand a company's strategy. Product and process
understanding can be updated with the knowledge gained over the product lifecycle.

A greater understanding of the product and its manufacturing process can create a
basis for more flexible regulatory approaches. The degree of regulatory flexibility is
predicated on the level of relevant scientific knowledge provided in the registration
application. It is the knowledge gained and submitted to the authorities, and not the
volume of data collected, that forms the basis for science- and risk-based submissions
and regulatory evaluations. Nevertheless, appropriate data demonstrating that this
knowledge is based on sound scientific principles should be presented with each
application.

Pharmaceutical development should include, at a minimum, the following elements:

---

[1] See glossary

*Pharmaceutical Development*

- Defining the quality target product profile[1] (QTPP) as it relates to quality, safety and efficacy, considering e.g., the route of administration, dosage form, bioavailability, strength, and stability;

- Identifying potential critical quality attributes[1] (CQAs) of the drug product, so that those product characteristics having an impact on product quality can be studied and controlled;

- Determining the critical quality attributes of the drug substance, excipients etc., and selecting the type and amount of excipients to deliver drug product of the desired quality[1];

- Selecting an appropriate manufacturing process ;

- Defining a control strategy[1].

An enhanced, quality by design approach to product development would additionally include the following elements:

- A systematic evaluation, understanding and refining of the formulation and manufacturing process, including;

  o Identifying, through e.g., prior knowledge, experimentation, and risk assessment, the material attributes and process parameters that can have an effect on product CQAs;

  o Determining the functional relationships that link material attributes and process parameters to product CQAs;

- Using the enhanced product and process understanding in combination with quality risk management to establish an appropriate control strategy which can, for example, include a proposal for a design space(s) and/or real-time release testing[1].

As a result, this more systematic approach could facilitate continual improvement and innovation throughout the product lifecycle (See ICH Q10).

## 2.    ELEMENTS OF PHARMACEUTICAL DEVELOPMENT

The section that follows elaborates on possible approaches to gaining a more systematic, enhanced understanding of the product and process under development. The examples given are purely illustrative and are not intended to create new regulatory requirements.

### 2.1    Quality Target Product Profile

The quality target product profile forms the basis of design for the development of the product. Considerations for the quality target product profile could include:

- Intended use in clinical setting, route of administration, dosage form, delivery systems;

- Dosage strength(s);

- Container closure system;

---

[1] See glossary

- Therapeutic moiety release or delivery and attributes affecting pharmacokinetic characteristics (e.g., dissolution, aerodynamic performance) appropriate to the drug product dosage form being developed;

- Drug product quality criteria (e.g., sterility, purity, stability and drug release) appropriate for the intended marketed product.

## 2.2    Critical Quality Attributes

A CQA is a physical, chemical, biological, or microbiological property or characteristic that should be within an appropriate limit, range, or distribution to ensure the desired product quality.   CQAs are generally associated with the drug substance, excipients, intermediates (in-process materials) and drug product.

CQAs of solid oral dosage forms are typically those aspects affecting product purity, strength, drug release and stability. CQAs for other delivery systems can additionally include more product specific aspects, such as aerodynamic properties for inhaled products, sterility for parenterals, and adhesion properties for transdermal patches. For drug substances, raw materials and intermediates, the CQAs can additionally include those properties (e.g., particle size distribution, bulk density) that affect drug product CQAs.

Potential drug product CQAs derived from the quality target product profile and/or prior knowledge are used to guide the product and process development. The list of potential CQAs can be modified when the formulation and manufacturing process is selected and as product knowledge and process understanding increase.   Quality risk management can be used to prioritize the list of potential CQAs for subsequent evaluation.   Relevant CQAs can be identified by an iterative process of quality risk management and experimentation that assesses the extent to which their variation can have an impact on the quality of the drug product.

## 2.3    Risk Assessment: Linking Material Attributes and Process Parameters to Drug Product CQAs

Risk assessment is a valuable science-based process used in quality risk management (see ICH Q9) that can aid in identifying which material attributes and process parameters potentially have an effect on product CQAs. Risk assessment is typically performed early in the pharmaceutical development process and is repeated as more information becomes available and greater knowledge is obtained.

Risk assessment tools can be used to identify and rank parameters (e.g., process, equipment, input materials) with potential to have an impact on product quality, based on prior knowledge and initial experimental data. For an illustrative example, see Appendix 2. The initial list of potential parameters can be quite extensive, but can be modified and prioritized by further studies (e.g., through a combination of design of experiments, mechanistic models). The list can be refined further through experimentation to determine the significance of individual variables and potential interactions.   Once the significant parameters are identified, they can be further studied (e.g., through a combination of design of experiments, mathematical models, or studies that lead to mechanistic understanding) to achieve a higher level of process understanding.

*Pharmaceutical Development*

## 2.4    Design Space

The relationship between the process inputs (material attributes and process parameters) and the critical quality attributes can be described in the design space (see examples in Appendix 2).

### 2.4.1    Selection of Variables

The risk assessment and process development experiments described in Section 2.3 can lead to an understanding of the linkage and effect of process parameters and material attributes on product CQAs, and also help identify the variables and their ranges within which consistent quality can be achieved. These process parameters and material attributes can thus be selected for inclusion in the design space.

A description should be provided in the application of the process parameters and material attributes considered for the design space, those that were included, and their effect on product quality. The rationale for inclusion in the design space should be presented. In some cases it is helpful to provide also the rationale as to why some parameters were excluded. Knowledge gained from studies should be described in the submission. Process parameters and material attributes that were not varied through development should be highlighted.

### 2.4.2    Describing a Design Space in a Submission

A design space can be described in terms of ranges of material attributes and process parameters, or through more complex mathematical relationships. It is possible to describe a design space as a time dependent function (e.g., temperature and pressure cycle of a lyophilisation cycle), or as a combination of variables such as components of a multivariate model. Scaling factors can also be included if the design space is intended to span multiple operational scales. Analysis of historical data can contribute to the establishment of a design space. Regardless of how a design space is developed, it is expected that operation within the design space will result in a product meeting the defined quality.

Examples of different potential approaches to presentation of a design space are presented in Appendix 2.

### 2.4.3    Unit Operation Design Space(s)

The applicant can choose to establish independent design spaces for one or more unit operations, or to establish a single design space that spans multiple operations. While a separate design space for each unit operation is often simpler to develop, a design space that spans the entire process can provide more operational flexibility. For example, in the case of a drug product that undergoes degradation in solution before lyophilisation, the design space to control the extent of degradation (e.g., concentration, time, temperature) could be expressed for each unit operation or as a sum over all unit operations.

### 2.4.4    Relationship of Design Space to Scale and Equipment

When describing a design space, the applicant should consider the type of operational flexibility desired. A design space can be developed at any scale. The applicant should justify the relevance of a design space developed at small or pilot scale to the proposed production scale manufacturing process and discuss the potential risks in the scale-up operation.

If the applicant proposes the design space to be applicable to multiple operational scales, the design space should be described in terms of relevant scale-independent parameters. For example, if a product was determined to be shear sensitive in a mixing operation, the design space could include shear rate, rather than agitation rate. Dimensionless numbers and/or models for scaling can be included as part of the design space description.

### 2.4.5  Design Space Versus Proven Acceptable Ranges

A combination of proven acceptable ranges[1] does not constitute a design space. However, proven acceptable ranges based on univariate experimentation can provide useful knowledge about the process.

### 2.4.6  Design Space and Edge of Failure

It can be helpful to determine the edge of failure for process parameters or material attributes, beyond which the relevant quality attributes cannot be met. However, determining the edge of failure or demonstrating failure modes are not essential parts of establishing a design space.

## 2.5    Control Strategy

A control strategy is designed to ensure that a product of required quality will be produced consistently. The elements of the control strategy discussed in Section P.2 of the dossier should describe and justify how in-process controls and the controls of input materials (drug substance and excipients), intermediates (in-process materials), container closure system, and drug products contribute to the final product quality. These controls should be based on product, formulation and process understanding and should include, at a minimum, control of the critical process parameters[1] and material attributes.

A comprehensive pharmaceutical development approach will generate process and product understanding and identify sources of variability. Sources of variability that can impact product quality should be identified, appropriately understood, and subsequently controlled. Understanding sources of variability and their impact on downstream processes or processing, in-process materials, and drug product quality can provide an opportunity to shift controls upstream and minimise the need for end product testing. Product and process understanding, in combination with quality risk management (see ICH Q9), will support the control of the process such that the variability (e.g., of raw materials) can be compensated for in an adaptable manner to deliver consistent product quality.

This process understanding can enable an alternative manufacturing paradigm where the variability of input materials could be less tightly constrained. Instead it can be possible to design an adaptive process step (a step that is responsive to the input materials) with appropriate process control to ensure consistent product quality.

Enhanced understanding of product performance can justify the use of alternative approaches to determine that the material is meeting its quality attributes. The use of such alternatives could support real time release testing. For example, disintegration could serve as a surrogate for dissolution for fast-disintegrating solid forms with highly soluble drug substances. Unit dose uniformity performed in-process (e.g., using

---

[1] See glossary

*Pharmaceutical Development*

weight variation coupled with near infrared (NIR) assay) can enable real time release testing and provide an increased level of quality assurance compared to the traditional end-product testing using compendial content uniformity standards. Real time release testing can replace end product testing, but does not replace the review and quality control steps called for under GMP to release the batch.

A control strategy can include, but is not limited to, the following:

- Control of input material attributes (e.g., drug substance, excipients, primary packaging materials) based on an understanding of their impact on processability or product quality;

- Product specification(s);

- Controls for unit operations that have an impact on downstream processing or product quality (e.g., the impact of drying on degradation, particle size distribution of the granulate on dissolution);

- In-process or real-time release testing in lieu of end-product testing (e.g. measurement and control of CQAs during processing);

- A monitoring program (e.g., full product testing at regular intervals) for verifying multivariate prediction models.

A control strategy can include different elements. For example, one element of the control strategy could rely on end-product testing, whereas another could depend on real-time release testing. The rationale for using these alternative approaches should be described in the submission.

Adoption of the principles in this guideline can support the justification of alternative approaches to the setting of specification attributes and acceptance criteria as described in Q6A and Q6B.

## 2.6  Product Lifecycle Management and Continual Improvement

Throughout the product lifecycle, companies have opportunities to evaluate innovative approaches to improve product quality (see ICH Q10).

Process performance can be monitored to ensure that it is working as anticipated to deliver product quality attributes as predicted by the design space. This monitoring could include trend analysis of the manufacturing process as additional experience is gained during routine manufacture. For certain design spaces using mathematical models, periodic maintenance could be useful to ensure the model's performance. The model maintenance is an example of activity that can be managed within a company's own internal quality system provided the design space is unchanged.

Expansion, reduction or redefinition of the design space could be desired upon gaining additional process knowledge. Change of design space is subject to regional requirements.

## 3.   SUBMISSION OF PHARMACEUTICAL DEVELOPMENT AND RELATED INFORMATION IN COMMON TECHNICAL DOCUMENTS (CTD) FORMAT

Pharmaceutical development information is submitted in Section P.2 of the CTD. Other information resulting from pharmaceutical development studies could be accommodated by the CTD format in a number of different ways and some specific

*Pharmaceutical Development*

suggestions are provided below. However, the applicant should clearly indicate where the different information is located. In addition to what is submitted in the application, certain aspects (e.g., product lifecycle management, continual improvement) of this guideline are handled under the applicant's pharmaceutical quality system (see ICH Q10).

### 3.1    Quality Risk Management and Product and Process Development

Quality risk management can be used at different stages during product and process development and manufacturing implementation. The assessments used to guide and justify development decisions can be included in the relevant sections of P.2. For example, risk analyses and functional relationships linking material attributes and process parameters to product CQAs can be included in P.2.1, P.2.2, and P.2.3. Risk analyses linking the design of the manufacturing process to product quality can be included in P.2.3.

### 3.2    Design Space

As an element of the proposed manufacturing process, the design space(s) can be described in the section of the application that includes the description of the manufacturing process and process controls (P.3.3). If appropriate, additional information can be provided in the section of the application that addresses the controls of critical steps and intermediates (P.3.4). The product and manufacturing process development sections of the application (P.2.1, P.2.2, and P.2.3) are appropriate places to summarise and describe product and process development studies that provide the basis for the design space(s). The relationship of the design space(s) to the overall control strategy can be discussed in the section of the application that includes the justification of the drug product specification (P.5.6).

### 3.3    Control Strategy

The section of the application that includes the justification of the drug product specification (P.5.6) is a good place to summarise the overall drug product control strategy. However, detailed information about input material controls and process controls should still be provided in the appropriate CTD format sections (e.g., drug substance section (S), control of excipients (P.4), description of manufacturing process and process controls (P.3.3), controls of critical steps and intermediates (P.3.4)).

### 3.4    Drug Substance Related Information

If drug substance CQAs have the potential to affect the CQAs or manufacturing process of the drug product, some discussion of drug substance CQAs can be appropriate in the pharmaceutical development section of the application (e.g., P.2.1).

15

*Pharmaceutical Development*

## 4.    GLOSSARY

**Control Strategy:**

A planned set of controls, derived from current product and process understanding that ensures process performance and product quality. The controls can include parameters and attributes related to drug substance and drug product materials and components, facility and equipment operating conditions, in-process controls, finished product specifications, and the associated methods and frequency of monitoring and control. (ICH Q10)

**Critical Process Parameter (CPP):**

A process parameter whose variability has an impact on a critical quality attribute and therefore should be monitored or controlled to ensure the process produces the desired quality.

**Critical Quality Attribute (CQA):**

A physical, chemical, biological or microbiological property or characteristic that should be within an appropriate limit, range, or distribution to ensure the desired product quality.

**Design Space:**

The multidimensional combination and interaction of input variables (e.g., material attributes) and process parameters that have been demonstrated to provide assurance of quality. Working within the design space is not considered as a change. Movement out of the design space is considered to be a change and would normally initiate a regulatory post approval change process. Design space is proposed by the applicant and is subject to regulatory assessment and approval (ICH Q8).

**Lifecycle:**

All phases in the life of a product from the initial development through marketing until the product's discontinuation (ICH Q8).

**Proven Acceptable Range:**

A characterised range of a process parameter for which operation within this range, while keeping other parameters constant, will result in producing a material meeting relevant quality criteria.

**Quality:**

The suitability of either a drug substance or a drug product for its intended use. This term includes such attributes as the identity, strength, and purity (ICH Q6A).

**Quality by Design (QbD):**

A systematic approach to development that begins with predefined objectives and emphasizes product and process understanding and process control, based on sound science and quality risk management.

**Quality Target Product Profile (QTPP):**

A prospective summary of the quality characteristics of a drug product that ideally will be achieved to ensure the desired quality, taking into account safety and efficacy of the drug product.

**Real Time Release Testing:**
The ability to evaluate and ensure the quality of in-process and/or final product based on process data, which typically include a valid combination of measured material attributes and process controls.

## Appendix 1. Differing Approaches to Pharmaceutical Development

The following table has been developed to illustrate some potential contrasts between what might be considered a minimal approach and an enhanced, quality by design approach regarding different aspects of pharmaceutical development and lifecycle management. The comparisons are shown merely to aid in the understanding of a range of potential approaches to pharmaceutical development and should not be considered to be all-encompassing. The table is not intended to specifically define the only approach a company could choose to follow. In the enhanced approach, establishing a design space or using real time release testing is not necesserily expected. Current practices in the pharmaceutical industry vary and typically lie between the two approaches presented in the table.

| Aspect | Minimal Approaches | Enhanced, Quality by Design Approaches |
|---|---|---|
| **Overall Pharmaceutical Development** | • Mainly empirical<br><br>• Developmental research often conducted one variable at a time | • Systematic, relating mechanistic understanding of material attributes and process parameters to drug product CQAs<br><br>• Multivariate experiments to understand product and process<br><br>• Establishment of design space<br><br>• PAT tools utilised |
| **Manufacturing Process** | • Fixed<br><br>• Validation primarily based on initial full-scale batches<br><br>• Focus on optimisation and reproducibility | • Adjustable within design space<br><br>• Lifecycle approach to validation and, ideally, continuous process verification<br><br>• Focus on control strategy and robustness<br><br>• Use of statistical process control methods |
| **Process Controls** | • In-process tests primarily for go/no go decisions<br><br>• Off-line analysis | • PAT tools utilised with appropriate feed forward and feedback controls<br><br>• Process operations tracked and trended to support continual improvement efforts post-approval |
| **Product Specifications** | • Primary means of control<br><br>• Based on batch data available at time of registration | • Part of the overall quality control strategy<br><br>• Based on desired product performance with relevant supportive data |
| **Control Strategy** | • Drug product quality controlled primarily by intermediates (in-process materials) and end product testing | • Drug product quality ensured by risk-based control strategy for well understood product and process<br><br>• Quality controls shifted upstream, with the possibility of real-time release testing or reduced end-product testing |
| **Lifecycle Management** | • Reactive (i.e., problem solving and corrective action) | • Preventive action<br><br>• Continual improvement facilitated |

*Pharmaceutical Development*

## Appendix 2. Illustrative Examples

### A. Use of a risk assessment tool.

For example, a cross-functional team of experts could work together to develop an Ishikawa (fishbone) diagram that identifies potential variables which can have an impact on the desired quality attribute. The team could then rank the variables based on probability, severity, and detectability using failure mode effects analysis (FMEA) or similar tools based on prior knowledge and initial experimental data. Design of experiments or other experimental approaches could then be used to evaluate the impact of the higher ranked variables, to gain greater understanding of the process, and to develop a proper control strategy.

Ishikawa Diagram



*Pharmaceutical Development*

## B. Depiction of interactions

The figure below depicts the presence or absence of interactions among three process parameters on the level of degradation product Y. The figure shows a series of two-dimensional plots showing the effect of interactions among three process parameters (initial moisture content, temperature, mean particle size) of the drying operation of a granulate (drug product intermediate) on degradation product Y. The relative slopes of the lines or curves within a plot indicate if interaction is present. In this example, initial moisture content and temperature are interacting; but initial moisture content and mean particle size are not, nor are temperature and mean particle size.



*Pharmaceutical Development*

C. Presentations of design space

**Example 1:** Response graphs for dissolution are depicted as a surface plot (Figure 1a) and a contour plot (Figure 1b). Parameters 1 and 2 are factors of a granulation operation that affect the dissolution rate of a tablet (e.g., excipient attribute, water amount, granule size.)




Figure 1a: Response surface plot of dissolution as a function of two parameters of a granulation operation. Dissolution above 80% is desired.

Figure 1b: Contour plot of dissolution from example 1a.




Figure 1c: Design space for granulation parameters, defined by a non-linear combination of their ranges, that delivers satisfactory dissolution (i.e., >80%).

Figure 1d: Design space for granulation parameters, defined by a linear combination of their ranges, that delivers satisfactory dissolution (i.e., >80%).

Two examples are given of potential design spaces. In Figure 1c, the design space is defined by a non-linear combination of parameter ranges that delivers the dissolution critical quality attribute. In this example, the design space is expressed by the response surface equation resolved at the limit for satisfactory response (i.e.,80% dissolution). The acceptable range of one parameter is dependent on the value of the other. For example:

- *If Parameter 1 has a value of 46, then Parameter 2 has a range of 0 and 1.5*
- *If Parameter 2 has a value of 0.8, then Parameter 1 has a range of 43 and 54*

*Pharmaceutical Development*

The approach in Figure 1c allows the maximum range of operation to achieve the desired dissolution rate. In Figure 1d, the design space is defined as a smaller range, based on a linear combination of parameters.

- *Parameter 1 has a range of 44 and 53*
- *Parameter 2 has a range of 0 and 1.1*

While the approach in Figure 1d is more limiting, the applicant may prefer it for operational simplicity.

This example discusses only two parameters and thus can readily be presented graphically. When multiple parameters are involved, the design space can be presented for two parameters, in a manner similar to the examples shown above, at different values (e.g., high, middle, low) within the range of the third parameter, the fourth parameter, and so on. Alternatively, the design space can be explained mathematically through equations describing relationships between parameters for successful operation.

*Pharmaceutical Development*

**Example 2**: Design space determined from the common region of successful operating ranges for multiple CQAs. The relations of two CQAs, i.e., tablet friability and dissolution, to two process parameters of a granulation operation are shown in Figures 2a and 2b. Parameters 1 and 2 are factors of a granulation operation that affect the dissolution rate of a tablet (e.g., excipient attribute, water amount, granule size). Figure 2c shows the overlap of these regions and the maximum ranges of the proposed design space. The applicant can elect to use the entire region as the design space, or some subset thereof.

 

Figure 2a: Contour plot of dissolution as a function of Parameters 1 and 2.

Figure 2b: Contour plot of friability as a function of Parameters 1 and 2.



Figure 2c: Proposed design space, comprised of the overlap region of ranges for friability and or dissolution.

23

*Pharmaceutical Development*

**Example 3:**  The design space for a drying operation that is dependent upon the path of temperature and/or pressure over time.  The end point for moisture content is 1-2%.  Operating above the upper limit of the design space can cause excessive impurity formation, while operating below the lower limit of the design space can result in excessive particle attrition.



Exhibit 50

INTERNATIONAL CONFERENCE ON HARMONISATION OF TECHNICAL REQUIREMENTS FOR REGISTRATION OF PHARMACEUTICALS FOR HUMAN USE

ICH HARMONISED TRIPARTITE GUIDELINE

# QUALITY RISK MANAGEMENT
# Q9

Current *Step 4* version
dated 9 November 2005

*This Guideline has been developed by the appropriate ICH Expert Working Group and has been subject to consultation by the regulatory parties, in accordance with the ICH Process.  At Step 4 of the Process the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan and USA.*

**Q9**
**Document History**

| First Codification | History | Date | New Codification **November 2005** |
|---|---|---|---|
| Q9 | Approval by the Steering Committee under *Step 2* and release for public consultation. | 22 March 2005 | Q9 |
| Q9 | Approval by the Steering Committee of *Post Step 2* correction | 15 June 2005 | Q9 |

**Current *Step 4* version**

| Q9 | Approval by the Steering Committee under *Step 4* and recommendation for adoption to the three ICH regulatory bodies. | 9 November 2005 | Q9 |
|---|---|---|---|

# QUALITY RISK MANAGEMENT

**ICH Harmonised Tripartite Guideline**

Having reached *Step 4* of the ICH Process at the ICH Steering Committee meeting
on 9 November 2005, this guideline is recommended for
adoption to the three regulatory parties to ICH

# TABLE OF CONTENTS

1.    INTRODUCTION ...................................................................................... 1

2.    SCOPE ....................................................................................................... 2

3.    PRINCIPLES OF QUALITY RISK MANAGEMENT ............................. 2

4.    GENERAL QUALITY RISK MANAGEMENT PROCESS ........................ 2

4.1   Responsibilities ......................................................................... 3

4.2   Initiating a Quality Risk Management Process ......................... 3

4.3   Risk Assessment ........................................................................ 3

4.4   Risk Control .............................................................................. 4

4.5   Risk Communication .................................................................. 5

4.6   Risk Review ............................................................................... 5

5.    RISK MANAGEMENT METHODOLOGY ............................................... 5

6.    INTEGRATION OF QUALITY RISK MANAGEMENT INTO INDUSTRY
      AND REGULATORY OPERATIONS ...................................................... 6

7.    DEFINITIONS ......................................................................................... 7

8.    REFERENCES ........................................................................................ 9

Annex I: Risk Management Methods and Tools .......................................... 11

I.1   Basic Risk Management Facilitation Methods ........................... 11

I.2   Failure Mode Effects Analysis (FMEA) ................................... 11

I.3   Failure Mode, Effects and Criticality Analysis (FMECA) ........ 11

I.4   Fault Tree Analysis (FTA) ......................................................... 12

I.5   Hazard Analysis and Critical Control Points (HACCP) ............ 12

I.6   Hazard Operability Analysis (HAZOP) ..................................... 13

I.7   Preliminary Hazard Analysis (PHA) ......................................... 13

i

*Quality Risk Management*

I.8    Risk Ranking and Filtering ........................................................................ 13

I.9    Supporting Statistical Tools ..................................................................... 14

**Annex II: Potential Applications for Quality Risk Management ................... 15**

II.1    Quality Risk Management as Part of Integrated Quality Management .................... 15

II.2    Quality Risk Management as Part of Regulatory Operations ..................................... 16

II.3    Quality Risk Management as Part of development ..................................................... 16

II.4    Quality Risk Management for Facilities, Equipment and Utilities ............................ 17

II.5    Quality Risk Management as Part of Materials Management ..................................... 18

II.6    Quality Risk Management as Part of Production ....................................................... 19

II.7    Quality Risk Management as Part of Laboratory Control and Stability Studies ....... 19

II.8    Quality Risk Management as Part of Packaging and Labelling .................................. 19

# QUALITY RISK MANAGEMENT

## 1.     INTRODUCTION

*Risk management* principles are effectively utilized in many areas of business and government including finance, insurance, occupational safety, public health, pharmacovigilance, and by agencies regulating these industries. Although there are some examples of the use of *quality risk management* in the pharmaceutical industry today, they are limited and do not represent the full contributions that risk management has to offer. In addition, the importance of *quality systems* has been recognized in the pharmaceutical industry and it is becoming evident that quality risk management is a valuable component of an effective quality system.

It is commonly understood that *risk* is defined as the combination of the probability of occurrence of *harm* and the *severity* of that harm. However, achieving a shared understanding of the application of risk management among diverse *stakeholders* is difficult because each stakeholder might perceive different potential harms, place a different probability on each harm occurring and attribute different severities to each harm. In relation to pharmaceuticals, although there are a variety of stakeholders, including patients and medical practitioners as well as government and industry, the protection of the patient by managing the risk to quality should be considered of prime importance.

The manufacturing and use of a drug (medicinal) product, including its components, necessarily entail some degree of risk. The risk to its quality is just one component of the overall risk. It is important to understand that product *quality* should be maintained throughout the *product lifecycle* such that the attributes that are important to the quality of the drug (medicinal) product remain consistent with those used in the clinical studies. An effective quality risk management approach can further ensure the high quality of the drug (medicinal) product to the patient by providing a proactive means to identify and control potential quality issues during development and manufacturing. Additionally, use of quality risk management can improve the decision making if a quality problem arises. Effective quality risk management can facilitate better and more informed decisions, can provide regulators with greater assurance of a company's ability to deal with potential risks and can beneficially affect the extent and level of direct regulatory oversight.

The purpose of this document is to offer a systematic approach to quality risk management. It serves as a foundation or resource document that is independent of, yet supports, other ICH Quality documents and complements existing quality practices, requirements, standards, and guidelines within the pharmaceutical industry and regulatory environment. It specifically provides guidance on the principles and some of the tools of quality risk management that can enable more effective and consistent risk based decisions, both by regulators and industry, regarding the quality of drug substances and drug (medicinal) products across the product lifecycle. It is not intended to create any new expectations beyond the current regulatory requirements.

It is neither always appropriate nor always necessary to use a formal risk management process (using recognized tools and/ or internal procedures e.g., standard operating procedures). The use of informal risk management processes (using empirical tools and/ or internal procedures) can also be considered acceptable. Appropriate use of quality risk management can facilitate but does not obviate

1

*Quality Risk Management*

industry's obligation to comply with regulatory requirements and does not replace appropriate communications between industry and regulators.

## 2.    SCOPE

This guideline provides principles and examples of tools for quality risk management that can be applied to different aspects of pharmaceutical quality. These aspects include development, manufacturing, distribution, and the inspection and submission/review processes throughout the lifecycle of drug substances, drug (medicinal) products, biological and biotechnological products (including the use of raw materials, solvents, excipients, packaging and labeling materials in drug (medicinal) products, biological and biotechnological products).

## 3.    PRINCIPLES OF QUALITY RISK MANAGEMENT

Two primary principles of quality risk management are:

- The evaluation of the risk to quality should be based on scientific knowledge and ultimately link to the protection of the patient; and

- The level of effort, formality and documentation of the quality risk management process should be commensurate with the level of risk.

## 4.    GENERAL QUALITY RISK MANAGEMENT PROCESS

Quality risk management is a systematic process for the assessment, control, communication and review of risks to the quality of the drug (medicinal) product across the product lifecycle. A model for quality risk management is outlined in the diagram (Figure 1). Other models could be used. The emphasis on each component of the framework might differ from case to case but a robust process will incorporate consideration of all the elements at a level of detail that is commensurate with the specific risk.

Figure 1: Overview of a typical quality risk management process



2

Decision nodes are not shown in the diagram above because decisions can occur at any point in the process. These decisions might be to return to the previous step and seek further information, to adjust the risk models or even to terminate the risk management process based upon information that supports such a decision. Note: "unacceptable" in the flowchart does not only refer to statutory, legislative or regulatory requirements, but also to the need to revisit the risk assessment process.

## 4.1    Responsibilities

Quality risk management activities are usually, but not always, undertaken by interdisciplinary teams. When teams are formed, they should include experts from the appropriate areas (e.g., quality unit, business development, engineering, regulatory affairs, production operations, sales and marketing, legal, statistics and clinical) in addition to individuals who are knowledgeable about the quality risk management process.

*Decision makers* should

- take responsibility for coordinating quality risk management across various functions and departments of their organization; and

- assure that a quality risk management process is defined, deployed and reviewed and that adequate resources are available.

## 4.2    Initiating a Quality Risk Management Process

Quality risk management should include systematic processes designed to coordinate, facilitate and improve science-based decision making with respect to risk. Possible steps used to initiate and plan a quality risk management process might include the following:

- Define the problem and/or risk question, including pertinent assumptions identifying the potential for risk;

- Assemble background information and/ or data on the potential hazard, harm or human health impact relevant to the risk assessment;

- Identify a leader and necessary resources;

- Specify a timeline, deliverables and appropriate level of decision making for the risk management process.

## 4.3    Risk Assessment

*Risk assessment* consists of the identification of hazards and the analysis and evaluation of risks associated with exposure to those hazards (as defined below). Quality risk assessments begin with a well-defined problem description or risk question. When the risk in question is well defined, an appropriate risk management tool (see examples in section 5) and the types of information needed to address the risk question will be more readily identifiable. As an aid to clearly defining the risk(s) for risk assessment purposes, three fundamental questions are often helpful:

1. What might go wrong?

2. What is the likelihood (probability) it will go wrong?

3. What are the consequences (severity)?

*Quality Risk Management*

***Risk identification*** is a systematic use of information to identify hazards referring to the risk question or problem description. Information can include historical data, theoretical analysis, informed opinions, and the concerns of stakeholders. Risk identification addresses the "What might go wrong?" question, including identifying the possible consequences. This provides the basis for further steps in the quality risk management process.

***Risk analysis*** is the estimation of the risk associated with the identified hazards. It is the qualitative or quantitative process of linking the likelihood of occurrence and severity of harms. In some risk management tools, the ability to detect the harm (detectability) also factors in the estimation of risk.

***Risk evaluation*** compares the identified and analyzed risk against given risk criteria. Risk evaluations consider the strength of evidence for all three of the fundamental questions.

In doing an effective risk assessment, the robustness of the data set is important because it determines the quality of the output. Revealing assumptions and reasonable sources of uncertainty will enhance confidence in this output and/or help identify its limitations. Uncertainty is due to combination of incomplete knowledge about a process and its expected or unexpected variability. Typical sources of uncertainty include gaps in knowledge gaps in pharmaceutical science and process understanding, sources of harm (e.g., failure modes of a process, sources of variability), and probability of detection of problems.

The output of a risk assessment is either a quantitative estimate of risk or a qualitative description of a range of risk. When risk is expressed quantitatively, a numerical probability is used. Alternatively, risk can be expressed using qualitative descriptors, such as "high", "medium", or "low", which should be defined in as much detail as possible. Sometimes a "risk score" is used to further define descriptors in risk ranking. In quantitative risk assessments, a risk estimate provides the likelihood of a specific consequence, given a set of risk-generating circumstances. Thus, quantitative risk estimation is useful for one particular consequence at a time. Alternatively, some risk management tools use a relative risk measure to combine multiple levels of severity and probability into an overall estimate of relative risk. The intermediate steps within a scoring process can sometimes employ quantitative risk estimation.

## 4.4    Risk Control

***Risk control*** includes decision making to reduce and/or accept risks. The purpose of risk control is to reduce the risk to an acceptable level. The amount of effort used for risk control should be proportional to the significance of the risk. Decision makers might use different processes, including benefit-cost analysis, for understanding the optimal level of risk control.

Risk control might focus on the following questions:

- Is the risk above an acceptable level?
- What can be done to reduce or eliminate risks?
- What is the appropriate balance among benefits, risks and resources?
- Are new risks introduced as a result of the identified risks being controlled?

4

*Quality Risk Management*

***Risk reduction*** focuses on processes for mitigation or avoidance of quality risk when it exceeds a specified (acceptable) level (see Fig. 1). Risk reduction might include actions taken to mitigate the severity and probability of harm. Processes that improve the detectability of hazards and quality risks might also be used as part of a risk control strategy. The implementation of risk reduction measures can introduce new risks into the system or increase the significance of other existing risks. Hence, it might be appropriate to revisit the risk assessment to identify and evaluate any possible change in risk after implementing a risk reduction process.

***Risk acceptance*** is a decision to accept risk. Risk acceptance can be a formal decision to accept the residual risk or it can be a passive decision in which residual risks are not specified. For some types of harms, even the best quality risk management practices might not entirely eliminate risk. In these circumstances, it might be agreed that an appropriate quality risk management strategy has been applied and that quality risk is reduced to a specified (acceptable) level. This (specified) acceptable level will depend on many parameters and should be decided on a case-by-case basis.

### 4.5    Risk Communication

***Risk communication*** is the sharing of information about risk and risk management between the decision makers and others. Parties can communicate at any stage of the risk management process (see Fig. 1: dashed arrows). The output/result of the quality risk management process should be appropriately communicated and documented (see Fig. 1: solid arrows). Communications might include those among interested parties; e.g., regulators and industry, industry and the patient, within a company, industry or regulatory authority, etc. The included information might relate to the existence, nature, form, probability, severity, acceptability, control, treatment, detectability or other aspects of risks to quality. Communication need not be carried out for each and every risk acceptance. Between the industry and regulatory authorities, communication concerning quality risk management decisions might be effected through existing channels as specified in regulations and guidances.

### 4.6    Risk Review

Risk management should be an ongoing part of the quality management process. A mechanism to review or monitor events should be implemented.

The output/results of the risk management process should be reviewed to take into account new knowledge and experience. Once a quality risk management process has been initiated, that process should continue to be utilized for events that might impact the original quality risk management decision, whether these events are planned (e.g., results of product review, inspections, audits, change control) or unplanned (e.g., root cause from failure investigations, recall). The frequency of any review should be based upon the level of risk. Risk review might include reconsideration of risk acceptance decisions (section 4.4).

### 5.    RISK MANAGEMENT METHODOLOGY

Quality risk management supports a scientific and practical approach to decision-making. It provides documented, transparent and reproducible methods to accomplish steps of the quality risk management process based on current knowledge about assessing the probability, severity and sometimes detectability of the risk.

Traditionally, risks to quality have been assessed and managed in a variety of informal ways (empirical and/ or internal procedures) based on, for example, compilation of observations, trends and other information. Such approaches continue to provide useful information that might support topics such as handling of complaints, quality defects, deviations and allocation of resources.

Additionally, the pharmaceutical industry and regulators can assess and manage risk using recognized risk management tools and/ or internal procedures (e.g., standard operating procedures). Below is a non-exhaustive list of some of these tools (further details in Annex 1 and chapter 8):

- Basic risk management facilitation methods (flowcharts, check sheets etc.);

- Failure Mode Effects Analysis (FMEA);

- Failure Mode, Effects and Criticality Analysis (FMECA);

- Fault Tree Analysis (FTA);

- Hazard Analysis and Critical Control Points (HACCP);

- Hazard Operability Analysis (HAZOP);

- Preliminary Hazard Analysis (PHA);

- Risk ranking and filtering;

- Supporting statistical tools.

It might be appropriate to adapt these tools for use in specific areas pertaining to drug substance and drug (medicinal) product quality. Quality risk management methods and the supporting statistical tools can be used in combination (e.g., Probabilistic Risk Assessment). Combined use provides flexibility that can facilitate the application of quality risk management principles.

The degree of rigor and formality of quality risk management should reflect available knowledge and be commensurate with the complexity and/ or criticality of the issue to be addressed.

## 6.    INTEGRATION OF QUALITY RISK MANAGEMENT INTO INDUSTRY AND REGULATORY OPERATIONS

Quality risk management is a process that supports science-based and practical decisions when integrated into quality systems (see Annex II). As outlined in the introduction, appropriate use of quality risk management does not obviate industry's obligation to comply with regulatory requirements. However, effective quality risk management can facilitate better and more informed decisions, can provide regulators with greater assurance of a company's ability to deal with potential risks, and might affect the extent and level of direct regulatory oversight. In addition, quality risk management can facilitate better use of resources by all parties.

Training of both industry and regulatory personnel in quality risk management processes provides for greater understanding of decision-making processes and builds confidence in quality risk management outcomes.

Quality risk management should be integrated into existing operations and documented appropriately. Annex II provides examples of situations in which the use of the quality risk management process might provide information that could then be

*Quality Risk Management*

used in a variety of pharmaceutical operations. These examples are provided for illustrative purposes only and should not be considered a definitive or exhaustive list. These examples are not intended to create any new expectations beyond the requirements laid out in the current regulations.

Examples for industry and regulatory operations (see Annex II):

- Quality management.

Examples for industry operations and activities (see Annex II):

- Development;
- Facility, equipment and utilities;
- Materials management;
- Production;
- Laboratory control and stability testing;
- Packaging and labeling.

Examples for regulatory operations (see Annex II):

- Inspection and assessment activities.

While regulatory decisions will continue to be taken on a regional basis, a common understanding and application of quality risk management principles could facilitate mutual confidence and promote more consistent decisions among regulators on the basis of the same information. This collaboration could be important in the development of policies and guidelines that integrate and support quality risk management practices.

## 7.    DEFINITIONS

**Decision Maker(s):**
Person(s) with the competence and authority to make appropriate and timely quality risk management decisions.

**Detectability:**
The ability to discover or determine the existence, presence, or fact of a hazard.

**Harm:**
Damage to health, including the damage that can occur from loss of product quality or availability.

**Hazard:**
The potential source of harm (ISO/IEC Guide 51).

**Product Lifecycle:**
All phases in the life of the product from the initial development through marketing until the product's discontinuation.

**Quality:**

The degree to which a set of inherent properties of a product, system or process fulfills requirements (see ICH Q6A definition specifically for "quality" of drug substance and drug (medicinal) products.)

**Quality Risk Management:**

A systematic process for the assessment, control, communication and review of risks to the quality of the drug (medicinal) product across the product lifecycle.

**Quality System:**

The sum of all aspects of a system that implements quality policy and ensures that quality objectives are met.

**Requirements:**

The explicit or implicit needs or expectations of the patients or their surrogates (e.g., health care professionals, regulators and legislators). In this document, "requirements" refers not only to statutory, legislative, or regulatory requirements, but also to such needs and expectations.

**Risk:**

The combination of the probability of occurrence of harm and the severity of that harm (ISO/IEC Guide 51).

**Risk Acceptance:**

The decision to accept risk (ISO Guide 73).

**Risk Analysis:**

The estimation of the risk associated with the identified hazards.

**Risk Assessment:**

A systematic process of organizing information to support a risk decision to be made within a risk management process. It consists of the identification of hazards and the analysis and evaluation of risks associated with exposure to those hazards.

**Risk Communication:**

The sharing of information about risk and risk management between the decision maker and other stakeholders.

**Risk Control:**

Actions implementing risk management decisions (ISO Guide 73).

**Risk Evaluation:**

The comparison of the estimated risk to given risk criteria using a quantitative or qualitative scale to determine the significance of the risk.

**Risk Identification:**

The systematic use of information to identify potential sources of harm (hazards) referring to the risk question or problem description.

**Risk Management:**

The systematic application of quality management policies, procedures, and practices to the tasks of assessing, controlling, communicating and reviewing risk.

**Risk Reduction:**

Actions taken to lessen the probability of occurrence of harm and the severity of that harm.

**Risk Review:**

Review or monitoring of output/results of the risk management process considering (if appropriate) new knowledge and experience about the risk.

**Severity:**

A measure of the possible consequences of a hazard.

**Stakeholder:**

Any individual, group or organization that can affect, be affected by, or perceive itself to be affected by a risk. Decision makers might also be stakeholders. For the purposes of this guideline, the primary stakeholders are the patient, healthcare professional, regulatory authority, and industry.

**Trend:**

A statistical term referring to the direction or rate of change of a variable(s).

**8.    REFERENCES**

ICH Q8 Pharmaceutical Development.

ISO/IEC Guide 73:2002 - Risk Management - Vocabulary - Guidelines for use in Standards.

ISO/IEC Guide 51:1999 - Safety Aspects - Guideline for their inclusion in standards.

*Process Mapping by the American Productivity & Quality Center*, 2002, ISBN 1928593739.

IEC 61025 - Fault Tree Analysis (FTA).

IEC 60812 Analysis Techniques for system reliability—Procedures for failure mode and effects analysis (FMEA).

*Failure Mode and Effect Analysis, FMEA from Theory to Execution*, 2nd Edition 2003, D. H. Stamatis, ISBN 0873895983.

*Guidelines for Failure Modes and Effects Analysis (FMEA) for Medical Devices*, 2003 Dyadem Press, ISBN 0849319102.

*The Basics of FMEA*, Robin McDermott, Raymond J. Mikulak, Michael R. Beauregard 1996, ISBN 0527763209.

WHO Technical Report Series No 908, 2003, Annex 7 *Application of Hazard Analysis and Critical Control Point (HACCP) methodology to pharmaceuticals*.

IEC 61882 - Hazard Operability Analysis (HAZOP).

ISO 14971:2000 - Application of Risk Management to Medical Devices.

ISO 7870:1993 - Control Charts.

9

*Quality Risk Management*

ISO 7871:1997 - Cumulative Sum Charts.

ISO 7966:1993 - Acceptance Control Charts.

ISO 8258:1991 - Shewhart Control Charts.

*What is Total Quality Control?; The Japanese Way,* Kaoru Ishikawa (Translated by David J. Liu), 1985, ISBN 0139524339.

*Quality Risk Management*

**Annex I: Risk Management Methods and Tools**

The purpose of this annex is to provide a general overview of and references for some of the primary tools that might be used in quality risk management by industry and regulators. The references are included as an aid to gain more knowledge and detail about the particular tool. This is not an exhaustive list. It is important to note that no one tool or set of tools is applicable to every situation in which a quality risk management procedure is used.

**I.1    Basic Risk Management Facilitation Methods**

Some of the simple techniques that are commonly used to structure risk management by organizing data and facilitating decision-making are:

- Flowcharts;
- Check Sheets;
- Process Mapping;
- Cause and Effect Diagrams (also called an Ishikawa diagram or fish bone diagram).

**I.2    Failure Mode Effects Analysis (FMEA)**

FMEA (see IEC 60812) provides for an evaluation of potential failure modes for processes and their likely effect on outcomes and/or product performance. Once failure modes are established, risk reduction can be used to eliminate, contain, reduce or control the potential failures. FMEA relies on product and process understanding. FMEA methodically breaks down the analysis of complex processes into manageable steps. It is a powerful tool for summarizing the important modes of failure, factors causing these failures and the likely effects of these failures.

**Potential Areas of Use(s)**

FMEA can be used to prioritize risks and monitor the effectiveness of risk control activities.

FMEA can be applied to equipment and facilities and might be used to analyze a manufacturing operation and its effect on product or process. It identifies elements/operations within the system that render it vulnerable. The output/ results of FMEA can be used as a basis for design or further analysis or to guide resource deployment.

**I.3    Failure Mode, Effects and Criticality Analysis (FMECA)**

FMEA might be extended to incorporate an investigation of the degree of severity of the consequences, their respective probabilities of occurrence, and their detectability, thereby becoming a Failure Mode Effect and Criticality Analysis (FMECA; see IEC 60812). In order for such an analysis to be performed, the product or process specifications should be established. FMECA can identify places where additional preventive actions might be appropriate to minimize risks.

**Potential Areas of Use(s)**

FMECA application in the pharmaceutical industry should mostly be utilized for failures and risks associated with manufacturing processes; however, it is not limited

11

to this application. The output of an FMECA is a relative risk "score" for each failure mode, which is used to rank the modes on a relative risk basis.

### I.4    Fault Tree Analysis (FTA)

The FTA tool (see IEC 61025) is an approach that assumes failure of the functionality of a product or process. This tool evaluates system (or sub-system) failures one at a time but can combine multiple causes of failure by identifying causal chains. The results are represented pictorially in the form of a tree of fault modes. At each level in the tree, combinations of fault modes are described with logical operators (AND, OR, etc.). FTA relies on the experts' process understanding to identify causal factors.

**Potential Areas of Use(s)**

FTA can be used to establish the pathway to the root cause of the failure. FTA can be used to investigate complaints or deviations in order to fully understand their root cause and to ensure that intended improvements will fully resolve the issue and not lead to other issues (i.e. solve one problem yet cause a different problem). Fault Tree Analysis is an effective tool for evaluating how multiple factors affect a given issue. The output of an FTA includes a visual representation of failure modes. It is useful both for risk assessment and in developing monitoring programs.

### I.5    Hazard Analysis and Critical Control Points (HACCP)

HACCP is a systematic, proactive, and preventive tool for assuring product quality, reliability, and safety (see WHO Technical Report Series No 908, 2003 Annex 7). It is a structured approach that applies technical and scientific principles to analyze, evaluate, prevent, and control the risk or adverse consequence(s) of hazard(s) due to the design, development, production, and use of products.

HACCP consists of the following seven steps:

(1) conduct a hazard analysis and identify preventive measures for each step of the process;

(2) determine the critical control points;

(3) establish critical limits;

(4) establish a system to monitor the critical control points;

(5) establish the corrective action to be taken when monitoring indicates that the critical control points are not in a state of control;

(6) establish system to verify that the HACCP system is working effectively;

(7) establish a record-keeping system.

**Potential Areas of Use(s)**

HACCP might be used to identify and manage risks associated with physical, chemical and biological hazards (including microbiological contamination). HACCP is most useful when product and process understanding is sufficiently comprehensive to support identification of critical control points. The output of a HACCP analysis is risk management information that facilitates monitoring of critical points not only in the manufacturing process but also in other life cycle phases.

## I.6    Hazard Operability Analysis (HAZOP)

HAZOP (see IEC 61882) is based on a theory that assumes that risk events are caused by deviations from the design or operating intentions. It is a systematic brainstorming technique for identifying hazards using so-called "guide-words". "Guide-words" (e.g., No, More, Other Than, Part of, etc.) are applied to relevant parameters (e.g., contamination, temperature) to help identify potential deviations from normal use or design intentions. It often uses a team of people with expertise covering the design of the process or product and its application.

### Potential Areas of Use(s)

HAZOP can be applied to manufacturing processes, including outsourced production and formulation as well as the upstream suppliers, equipment and facilities for drug substances and drug (medicinal) products. It has also been used primarily in the pharmaceutical industry for evaluating process safety hazards. As is the case with HACCP, the output of a HAZOP analysis is a list of critical operations for risk management. This facilitates regular monitoring of critical points in the manufacturing process.

## I.7    Preliminary Hazard Analysis (PHA)

PHA is a tool of analysis based on applying prior experience or knowledge of a hazard or failure to identify future hazards, hazardous situations and events that might cause harm, as well as to estimate their probability of occurrence for a given activity, facility, product or system. The tool consists of: 1) the identification of the possibilities that the risk event happens, 2) the qualitative evaluation of the extent of possible injury or damage to health that could result and 3) a relative ranking of the hazard using a combination of severity and likelihood of occurrence, and 4) the identification of possible remedial measures.

### Potential Areas of Use(s)

PHA might be useful when analyzing existing systems or prioritizing hazards where circumstances prevent a more extensive technique from being used. It can be used for product, process and facility design as well as to evaluate the types of hazards for the general product type, then the product class, and finally the specific product. PHA is most commonly used early in the development of a project when there is little information on design details or operating procedures; thus, it will often be a precursor to further studies. Typically, hazards identified in the PHA are further assessed with other risk management tools such as those in this section.

## I.8    Risk Ranking and Filtering

Risk ranking and filtering is a tool for comparing and ranking risks. Risk ranking of complex systems typically requires evaluation of multiple diverse quantitative and qualitative factors for each risk. The tool involves breaking down a basic risk question into as many components as needed to capture factors involved in the risk. These factors are combined into a single relative risk score that can then be used for ranking risks. "Filters," in the form of weighting factors or cut-offs for risk scores, can be used to scale or fit the risk ranking to management or policy objectives.

13

*Quality Risk Management*

---

**Potential Areas of Use(s)**

Risk ranking and filtering can be used to prioritize manufacturing sites for inspection/audit by regulators or industry. Risk ranking methods are particularly helpful in situations in which the portfolio of risks and the underlying consequences to be managed are diverse and difficult to compare using a single tool. Risk ranking is useful when management needs to evaluate both quantitatively-assessed and qualitatively-assessed risks within the same organizational framework.

**I.9     Supporting Statistical Tools**

Statistical tools can support and facilitate quality risk management. They can enable effective data assessment, aid in determining the significance of the data set(s), and facilitate more reliable decision making. A listing of some of the principal statistical tools commonly used in the pharmaceutical industry is provided:

- Control Charts, for example:
    - Acceptance Control Charts (see ISO 7966);
    - Control Charts with Arithmetic Average and Warning Limits (see ISO 7873);
    - Cumulative Sum Charts (see ISO 7871);
    - Shewhart Control Charts (see ISO 8258);
    - Weighted Moving Average.
- Design of Experiments (DOE);
- Histograms;
- Pareto Charts;
- Process Capability Analysis.

*Quality Risk Management*

## Annex II: Potential Applications for Quality Risk Management

This Annex is intended to identify potential uses of quality risk management principles and tools by industry and regulators. However, the selection of particular risk management tools is completely dependent upon specific facts and circumstances.

These examples are provided for illustrative purposes and only suggest potential uses of quality risk management. This Annex is not intended to create any new expectations beyond the current regulatory requirements.

## II.1    Quality Risk Management as Part of Integrated Quality Management

### Documentation

To review current interpretations and application of regulatory expectations;

To determine the desirability of and/or develop the content for SOPs, guidelines, etc.

### Training and education

To determine the appropriateness of initial and/or ongoing training sessions based on education, experience and working habits of staff, as well as on a periodic assessment of previous training (e.g., its effectiveness);

To identify the training, experience, qualifications and physical abilities that allow personnel to perform an operation reliably and with no adverse impact on the quality of the product.

### Quality defects

To provide the basis for identifying, evaluating, and communicating the potential quality impact of a suspected quality defect, complaint, trend, deviation, investigation, out of specification result, etc;

To facilitate risk communications and determine appropriate action to address significant product defects, in conjunction with regulatory authorities (e.g., recall).

### Auditing/Inspection

To define the frequency and scope of audits, both internal and external, taking into account factors such as:

- Existing legal requirements;
- Overall compliance status and history of the company or facility;
- Robustness of a company's quality risk management activities;
- Complexity of the site;
- Complexity of the manufacturing process;
- Complexity of the product and its therapeutic significance;
- Number and significance of quality defects (e.g., recall);
- Results of previous audits/inspections;
- Major changes of building, equipment, processes, key personnel;
- Experience with manufacturing of a product (e.g., frequency, volume, number of batches);

15

- Test results of official control laboratories.

**Periodic review**

To select, evaluate and interpret trend results of data within the product quality review;

To interpret monitoring data (e.g., to support an assessment of the appropriateness of revalidation or changes in sampling).

**Change management / change control**

To manage changes based on knowledge and information accumulated in pharmaceutical development and during manufacturing;

To evaluate the impact of the changes on the availability of the final product;

To evaluate the impact on product quality of changes to the facility, equipment, material, manufacturing process or technical transfers;

To determine appropriate actions preceding the implementation of a change, e.g., additional testing, (re)qualification, (re)validation or communication with regulators.

**Continual improvement**

To facilitate continual improvement in processes throughout the product lifecycle.

**II.2    Quality Risk Management as Part of Regulatory Operations**

**Inspection and assessment activities**

To assist with resource allocation including, for example, inspection planning and frequency, and inspection and assessment intensity (see "Auditing" section in Annex II.1);

To evaluate the significance of, for example, quality defects, potential recalls and inspectional findings;

To determine the appropriateness and type of post-inspection regulatory follow-up;

To evaluate information submitted by industry including pharmaceutical development information;

To evaluate impact of proposed variations or changes;

To identify risks which should be communicated between inspectors and assessors to facilitate better understanding of how risks can be or are controlled (e.g., parametric release, Process Analytical Technology (PAT)).

**II.3    Quality Risk Management as Part of development**

To design a quality product and its manufacturing process to consistently deliver the intended performance of the product (see ICH Q8);

To enhance knowledge of product performance over a wide range of material attributes (e.g., particle size distribution, moisture content, flow properties), processing options and process parameters;

To assess the critical attributes of raw materials, solvents, Active Pharmaceutical Ingredient (API) starting materials, APIs, excipients, or packaging materials;

*Quality Risk Management*

To establish appropriate specifications, identify critical process parameters and establish manufacturing controls (e.g., using information from pharmaceutical development studies regarding the clinical significance of quality attributes and the ability to control them during processing);

To decrease variability of quality attributes:

- reduce product and material defects;
- reduce manufacturing defects.

To assess the need for additional studies (e.g., bioequivalence, stability) relating to scale up and technology transfer;

To make use of the "design space" concept (see ICH Q8).

### II.4    Quality Risk Management for Facilities, Equipment and Utilities

**Design of facility / equipment**

To determine appropriate zones when designing buildings and facilities, e.g.,

- flow of material and personnel;
- minimize contamination;
- pest control measures;
- prevention of mix-ups;
- open versus closed equipment;
- clean rooms versus isolator technologies;
- dedicated or segregated facilities / equipment.

To determine appropriate product contact materials for equipment and containers (e.g., selection of stainless steel grade, gaskets, lubricants);

To determine appropriate utilities (e.g., steam, gases, power source, compressed air, heating, ventilation and air conditioning (HVAC), water);

To determine appropriate preventive maintenance for associated equipment (e.g., inventory of necessary spare parts).

**Hygiene aspects in facilities**

To protect the product from environmental hazards, including chemical, microbiological, and physical hazards (e.g., determining appropriate clothing and gowning, hygiene concerns);

To protect the environment (e.g., personnel, potential for cross-contamination) from hazards related to the product being manufactured.

**Qualification of facility/equipment/utilities**

To determine the scope and extent of qualification of facilities, buildings, and production equipment and/or laboratory instruments (including proper calibration methods).

*Quality Risk Management*

**Cleaning of equipment and environmental control**

To differentiate efforts and decisions based on the intended use (e.g., multi- versus single-purpose, batch versus continuous production);

To determine acceptable (specified) cleaning validation limits.

**Calibration/preventive maintenance**

To set appropriate calibration and maintenance schedules.

**Computer systems and computer controlled equipment**

To select the design of computer hardware and software (e.g., modular, structured, fault tolerance);

To determine the extent of validation, e.g.,

- identification of critical performance parameters;
- selection of the requirements and design;
- code review;
- the extent of testing and test methods;
- reliability of electronic records and signatures.

**II.5    Quality Risk Management as Part of Materials Management**

**Assessment and evaluation of suppliers and contract manufacturers**

To provide a comprehensive evaluation of suppliers and contract manufacturers (e.g., auditing, supplier quality agreements).

**Starting material**

To assess differences and possible quality risks associated with variability in starting materials (e.g., age, route of synthesis).

**Use of materials**

To determine whether it is appropriate to use material under quarantine (e.g., for further internal processing);

To determine appropriateness of reprocessing, reworking, use of returned goods.

**Storage, logistics and distribution conditions**

To assess the adequacy of arrangements to ensure maintenance of appropriate storage and transport conditions (e.g., temperature, humidity, container design);

To determine the effect on product quality of discrepancies in storage or transport conditions (e.g., cold chain management) in conjunction with other ICH guidelines;

To maintain infrastructure (e.g., capacity to ensure proper shipping conditions, interim storage, handling of hazardous materials and controlled substances, customs clearance);

To provide information for ensuring the availability of pharmaceuticals (e.g., ranking risks to the supply chain).

## II.6    Quality Risk Management as Part of Production

**Validation**

To identify the scope and extent of verification, qualification and validation activities (e.g., analytical methods, processes, equipment and cleaning methods;

To determine the extent for follow-up activities (e.g., sampling, monitoring and re-validation);

To distinguish between critical and non-critical process steps to facilitate design of a validation study.

**In-process sampling & testing**

To evaluate the frequency and extent of in-process control testing (e.g., to justify reduced testing under conditions of proven control);

To evaluate and justify the use of process analytical technologies (PAT) in conjunction with parametric and real time release.

**Production planning**

To determine appropriate production planning (e.g., dedicated, campaign and concurrent production process sequences).

## II.7    Quality Risk Management as Part of Laboratory Control and Stability Studies

**Out of specification results**

To identify potential root causes and corrective actions during the investigation of out of specification results.

**Retest period / expiration date**

To evaluate adequacy of storage and testing of intermediates, excipients and starting materials.

## II.8    Quality Risk Management as Part of Packaging and Labelling

**Design of packages**

To design the secondary package for the protection of primary packaged product (e.g., to ensure product authenticity, label legibility).

**Selection of container closure system**

To determine the critical parameters of the container closure system.

**Label controls**

To design label control procedures based on the potential for mix-ups involving different product labels, including different versions of the same label.

Exhibit 51

INTERNATIONAL CONFERENCE ON HARMONISATION OF TECHNICAL
REQUIREMENTS FOR REGISTRATION OF PHARMACEUTICALS FOR HUMAN
USE

## ICH HARMONISED TRIPARTITE GUIDELINE

# IMPURITIES IN NEW DRUG SUBSTANCES
# Q3A(R2)

Current *Step 4* version

dated 25 October 2006

*This Guideline has been developed by the appropriate ICH Expert Working Group and has been subject to consultation by the regulatory parties, in accordance with the ICH Process.  At Step 4 of the Process the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan and USA.*

---

**Q3A(R2)**
**Document History**

| First Codification | History | Date | New Codification **November 2005** |
|---|---|---|---|
| Q3 | Approval by the Steering Committee under *Step 2* and release for public consultation. | 15 March 1994 | Q3A |
| Q3A | Approval by the Steering Committee under *Step 4* and recommendation for adoption to the three ICH regulatory bodies. Q3 was renamed Q3A. | 30 March 1995 | Q3A |
| Q3A(R) | Approval by the Steering Committee of the first Revision under *Step 2* and release for public consultation. | 7 October 1999 | Q3A(R1) |
| Q3A(R) | Approval by the Steering Committee of the first Revision under *Step 4* and recommendation for adoption to the three ICH regulatory bodies. | 6 February 2002 | Q3A(R1) |

**Current *Step 4* version**

| Q3A(R2) | Approval by the Steering Committee of the revision of the Attachment 2 directly under *Step 4* without further public consultation. | 25 October 2006 | Q3A(R2) |
|---|---|---|---|

# IMPURITIES IN NEW DRUG SUBSTANCES

**ICH Harmonised Tripartite Guideline**

Having reached *Step 4* of the ICH Process at the ICH Steering Committee meeting
on 7 February 2002, this guideline is recommended for
adoption to the three regulatory parties to ICH.

Attachment 2 has been revised on 25 October 2006.

# TABLE OF CONTENTS

1.  PREAMBLE ................................................................................................ 1

2.  CLASSIFICATION OF IMPURITIES ................................................................ 1

3.  RATIONALE FOR THE REPORTING AND CONTROL
    OF IMPURITIES ........................................................................................ 2

    3.1 Organic Impurities ............................................................................... 2

    3.2 Inorganic Impurities ............................................................................ 2

    3.3 Solvents ............................................................................................... 3

4.  ANALYTICAL PROCEDURES ....................................................................... 3

5.  REPORTING IMPURITY CONTENT OF BATCHES ......................................... 3

6.  LISTING OF IMPURITIES IN SPECIFICATIONS ........................................... 4

7.  QUALIFICATION OF IMPURITIES ............................................................... 5

8.  GLOSSARY ................................................................................................. 6

ATTACHMENT 1 .............................................................................................. 8

ATTACHMENT 2 .............................................................................................. 9

ATTACHMENT 3 ............................................................................................ 10

# IMPURITIES IN NEW DRUG SUBSTANCES

## 1.    PREAMBLE

This document is intended to provide guidance for registration applications on the content and qualification of impurities in new drug substances produced by chemical syntheses and not previously registered in a region or member state. It is not intended to apply to new drug substances used during the clinical research stage of development. The following types of drug substances are not covered in this guideline: biological/biotechnological, peptide, oligonucleotide, radiopharmaceutical, fermentation product and semi-synthetic products derived therefrom, herbal products, and crude products of animal or plant origin.

Impurities in new drug substances are addressed from two perspectives:

> *Chemistry Aspects* include classification and identification of impurities, report generation, listing of impurities in specifications, and a brief discussion of analytical procedures; and

> *Safety Aspects* include specific guidance for qualifying those impurities that were not present, or were present at substantially lower levels, in batches of a new drug substance used in safety and clinical studies.

## 2.    CLASSIFICATION OF IMPURITIES

Impurities can be classified into the following categories:

- Organic impurities (process- and drug-related)
- Inorganic impurities
- Residual solvents

Organic impurities can arise during the manufacturing process and/or storage of the new drug substance. They can be identified or unidentified, volatile or non-volatile, and include:

- Starting materials
- By-products
- Intermediates
- Degradation products
- Reagents, ligands and catalysts

Inorganic impurities can result from the manufacturing process. They are normally known and identified and include:

- Reagents, ligands and catalysts
- Heavy metals or other residual metals
- Inorganic salts
- Other materials (e.g., filter aids, charcoal)

Solvents are inorganic or organic liquids used as vehicles for the preparation of solutions or suspensions in the synthesis of a new drug substance. Since these are

1

*Impurities in New Drug Substances*

generally of known toxicity, the selection of appropriate controls is easily accomplished (see ICH Guideline Q3C on Residual Solvents).

Excluded from this document are: (1) extraneous contaminants that should not occur in new drug substances and are more appropriately addressed as Good Manufacturing Practice (GMP) issues, (2) polymorphic forms, and (3) enantiomeric impurities.

## 3.    RATIONALE FOR THE REPORTING AND CONTROL OF IMPURITIES

### 3.1    Organic Impurities

The applicant should summarise the actual and potential impurities most likely to arise during the synthesis, purification, and storage of the new drug substance. This summary should be based on sound scientific appraisal of the chemical reactions involved in the synthesis, impurities associated with raw materials that could contribute to the impurity profile of the new drug substance, and possible degradation products. This discussion can be limited to those impurities that might reasonably be expected based on knowledge of the chemical reactions and conditions involved.

In addition, the applicant should summarise the laboratory studies conducted to detect impurities in the new drug substance. This summary should include test results of batches manufactured during the development process and batches from the proposed commercial process, as well as the results of stress testing (see ICH Guideline Q1A on Stability) used to identify potential impurities arising during storage. The impurity profile of the drug substance batches intended for marketing should be compared with those used in development, and any differences discussed.

The studies conducted to characterise the structure of actual impurities present in the new drug substance at a level greater than (>) the identification threshold given in Attachment 1 (e.g., calculated using the response factor of the drug substance) should be described. Note that any impurity at a level greater than (>) the identification threshold in any batch manufactured by the proposed commercial process should be identified. In addition, any degradation product observed in stability studies at recommended storage conditions at a level greater than (>) the identification threshold should be identified. When identification of an impurity is not feasible, a summary of the laboratory studies demonstrating the unsuccessful effort should be included in the application. Where attempts have been made to identify impurities present at levels of not more than (≤) the identification thresholds, it is useful also to report the results of these studies.

Identification of impurities present at an apparent level of not more than (≤) the identification threshold is generally not considered necessary. However, analytical procedures should be developed for those potential impurities that are expected to be unusually potent, producing toxic or pharmacological effects at a level not more than (≤) the identification threshold. All impurities should be qualified as described later in this guideline.

### 3.2    Inorganic Impurities

Inorganic impurities are normally detected and quantified using pharmacopoeial or other appropriate procedures. Carry-over of catalysts to the new drug substance should be evaluated during development. The need for inclusion or exclusion of

2

inorganic impurities in the new drug substance specification should be discussed. Acceptance criteria should be based on pharmacopoeial standards or known safety data.

### 3.3    Solvents

The control of residues of the solvents used in the manufacturing process for the new drug substance should be discussed and presented according to the ICH Q3C Guideline for Residual Solvents.

### 4.    ANALYTICAL PROCEDURES

The registration application should include documented evidence that the analytical procedures are validated and suitable for the detection and quantification of impurities (see ICH Q2A and Q2B Guidelines for Analytical Validation). Technical factors (e.g., manufacturing capability and control methodology) can be considered as part of the justification for selection of alternative thresholds based on manufacturing experience with the proposed commercial process. The use of two decimal places for thresholds (See Attachment 1) does not necessarily reflect the precision of the analytical procedure used for routine quality control purposes. Thus, the use of lower precision techniques (e.g., thin-layer chromatography) can be acceptable where justified and appropriately validated. Differences in the analytical procedures used during development and those proposed for the commercial product should be discussed in the registration application.

The quantitation limit for the analytical procedure should be not more than ($\leq$) the reporting threshold.

Organic impurity levels can be measured by a variety of techniques, including those that compare an analytical response for an impurity to that of an appropriate reference standard or to the response of the new drug substance itself. Reference standards used in the analytical procedures for control of impurities should be evaluated and characterised according to their intended uses. The drug substance can be used as a standard to estimate the levels of impurities. In cases where the response factors of the drug substance and the relevant impurity are not close, this practice can still be appropriate, provided a correction factor is applied or the impurities are, in fact, being overestimated. Acceptance criteria and analytical procedures used to estimate identified or unidentified impurities can be based on analytical assumptions (e.g., equivalent detector response). These assumptions should be discussed in the registration application.

### 5.    REPORTING IMPURITY CONTENT OF BATCHES

Analytical results should be provided in the application for all batches of the new drug substance used for clinical, safety, and stability testing, as well as for batches representative of the proposed commercial process. Quantitative results should be presented numerically, and not in general terms such as "complies", "meets limit" etc. Any impurity at a level greater than (>) the reporting threshold (see Attachment 1) and total impurities observed in these batches of the new drug substance should be reported with the analytical procedures indicated. Below 1.0%, the results should be reported to two decimal places (e.g., 0.06%, 0.13%); at and above 1.0%, the results should be reported to one decimal place (e.g., 1.3%). Results should be rounded using conventional rules (see Attachment 2). A tabulation (e.g., spreadsheet) of the data is recommended. Impurities should be designated by code number or by an appropriate

*Impurities in New Drug Substances*

descriptor, e.g., retention time. If a higher reporting threshold is proposed, it should be fully justified. All impurities at a level greater than (>) the reporting threshold should be summed and reported as total impurities.

When analytical procedures change during development, reported results should be linked to the procedure used, with appropriate validation information provided. Representative chromatograms should be provided. Chromatograms of representative batches from analytical validation studies showing separation and detectability of impurities (e.g., on spiked samples), along with any other impurity tests routinely performed, can serve as the representative impurity profiles. The applicant should ensure that complete impurity profiles (e.g., chromatograms) of individual batches are available, if requested.

A tabulation should be provided that links the specific new drug substance batch to each safety study and each clinical study in which the new drug substance has been used.

For each batch of the new drug substance, the report should include:

- Batch identity and size
- Date of manufacture
- Site of manufacture
- Manufacturing process
- Impurity content, individual and total
- Use of batches
- Reference to analytical procedure used

## 6.    LISTING OF IMPURITIES IN SPECIFICATIONS

The specification for a new drug substance should include a list of impurities. Stability studies, chemical development studies, and routine batch analyses can be used to predict those impurities likely to occur in the commercial product. The selection of impurities in the new drug substance specification should be based on the impurities found in batches manufactured by the proposed commercial process. Those individual impurities with specific acceptance criteria included in the specification for the new drug substance are referred to as "specified impurities" in this guideline. Specified impurities can be identified or unidentified.

A rationale for the inclusion or exclusion of impurities in the specification should be presented. This rationale should include a discussion of the impurity profiles observed in the safety and clinical development batches, together with a consideration of the impurity profile of batches manufactured by the proposed commercial process. Specified identified impurities should be included along with specified unidentified impurities estimated to be present at a level greater than (>) the identification threshold given in Attachment 1. For impurities known to be unusually potent or to produce toxic or unexpected pharmacological effects, the quantitation/detection limit of the analytical procedures should be commensurate with the level at which the impurities should be controlled. For unidentified impurities, the procedure used and assumptions made in establishing the level of the impurity should be clearly stated. Specified, unidentified impurities should be referred to by an appropriate qualitative analytical descriptive label (e.g., "unidentified A", "unidentified with relative retention of 0.9"). A general acceptance

4

criterion of not more than (≤) the identification threshold (Attachment 1) for any unspecified impurity and an acceptance criterion for total impurities should be included.

Acceptance criteria should be set no higher than the level that can be justified by safety data, and should be consistent with the level achievable by the manufacturing process and the analytical capability. Where there is no safety concern, impurity acceptance criteria should be based on data generated on batches of the new drug substance manufactured by the proposed commercial process, allowing sufficient latitude to deal with normal manufacturing and analytical variation and the stability characteristics of the new drug substance. Although normal manufacturing variations are expected, significant variation in batch-to-batch impurity levels can indicate that the manufacturing process of the new drug substance is not adequately controlled and validated (see ICH Q6A Guideline on Specifications, Decision Tree #1, for establishing an acceptance criterion for a specified impurity in a new drug substance). The use of two decimal places for thresholds (See Attachment 1) does not necessarily indicate the precision of the acceptance criteria for specified impurities and total impurities.

In summary, the new drug substance specification should include, where applicable, the following list of impurities:

*Organic Impurities*

- Each specified identified impurity
- Each specified unidentified impurity
- Any unspecified impurity with an acceptance criterion of not more than (≤) the identification threshold
- Total impurities

*Residual Solvents*

*Inorganic Impurities*

## 7. QUALIFICATION OF IMPURITIES

Qualification is the process of acquiring and evaluating data that establishes the biological safety of an individual impurity or a given impurity profile at the level(s) specified. The applicant should provide a rationale for establishing impurity acceptance criteria that includes safety considerations. The level of any impurity present in a new drug substance that has been adequately tested in safety and/or clinical studies would be considered qualified. Impurities that are also significant metabolites present in animal and/or human studies are generally considered qualified. A level of a qualified impurity higher than that present in a new drug substance can also be justified based on an analysis of the actual amount of impurity administered in previous relevant safety studies.

If data are unavailable to qualify the proposed acceptance criterion of an impurity, studies to obtain such data can be appropriate when the usual qualification thresholds given in Attachment 1 are exceeded.

Higher or lower thresholds for qualification of impurities can be appropriate for some individual drugs based on scientific rationale and level of concern, including drug class effects and clinical experience. For example, qualification can be especially

5

*Impurities in New Drug Substances*

important when there is evidence that such impurities in certain drugs or therapeutic classes have previously been associated with adverse reactions in patients. In these instances, a lower qualification threshold can be appropriate. Conversely, a higher qualification threshold can be appropriate for individual drugs when the level of concern for safety is less than usual based on similar considerations (e.g., patient population, drug class effects, clinical considerations). Proposals for alternative thresholds would be considered on a case-by-case basis.

The "Decision Tree for Identification and Qualification" (Attachment 3) describes considerations for the qualification of impurities when thresholds are exceeded. In some cases, decreasing the level of impurity to not more than the threshold can be simpler than providing safety data. Alternatively, adequate data could be available in the scientific literature to qualify an impurity. If neither is the case, additional safety testing should be considered. The studies considered appropriate to qualify an impurity will depend on a number of factors, including the patient population, daily dose, and route and duration of drug administration. Such studies can be conducted on the new drug substance containing the impurities to be controlled, although studies using isolated impurities can sometimes be appropriate.

Although this guideline is not intended to apply during the clinical research stage of development, in the later stages of development the thresholds in this guideline can be useful in evaluating new impurities observed in drug substance batches prepared by the proposed commercial process. Any new impurity observed in later stages of development should be identified if its level is greater than (>) the identification threshold given in Attachment 1 (see the "Decision Tree for Identification and Qualification" in Attachment 3). Similarly, the qualification of the impurity should be considered if its level is greater than (>) the qualification threshold given in Attachment 1. Safety assessment studies to qualify an impurity should compare the new drug substance containing a representative amount of the new impurity with previously qualified material. Safety assessment studies using a sample of the isolated impurity can also be considered.

## 8.    GLOSSARY

**Chemical Development Studies**: Studies conducted to scale-up, optimise, and validate the manufacturing process for a new drug substance.

**Enantiomeric Impurity**: A compound with the same molecular formula as the drug substance that differs in the spatial arrangement of atoms within the molecule and is a non-superimposable mirror image.

**Extraneous Contaminant**: An impurity arising from any source extraneous to the manufacturing process.

**Herbal Products**: Medicinal products containing, exclusively, plant material and/or vegetable drug preparations as active ingredients. In some traditions, materials of inorganic or animal origin can also be present.

**Identified Impurity**: An impurity for which a structural characterisation has been achieved.

**Identification Threshold**: A limit above (>) which an impurity should be identified.

**Impurity**:  Any component of the new drug substance that is not the chemical entity defined as the new drug substance.

**Impurity Profile**:  A description of the identified and unidentified impurities present in a new drug substance.

**Intermediate**:  A material produced during steps of the synthesis of a new drug substance that undergoes further chemical transformation before it becomes a new drug substance.

**Ligand**:  An agent with a strong affinity to a metal ion.

**New Drug Substance**:  The designated therapeutic moiety that has not been previously registered in a region or member state (also referred to as a new molecular entity or new chemical entity). It can be a complex, simple ester, or salt of a previously approved drug substance.

**Polymorphic Forms**:  Different crystalline forms of the same drug substance. These can include solvation or hydration products (also known as pseudo-polymorphs) and amorphous forms.

**Potential Impurity**:  An impurity that theoretically can arise during manufacture or storage. It may or may not actually appear in the new drug substance.

**Qualification**:  The process of acquiring and evaluating data that establishes the biological safety of an individual impurity or a given impurity profile at the level(s) specified.

**Qualification Threshold**: A limit above (>) which an impurity should be qualified.

**Reagent**:  A substance other than a starting material, intermediate, or solvent that is used in the manufacture of a new drug substance.

**Reporting Threshold:** A limit above (>) which an impurity should be reported. Reporting threshold is the same as reporting level in Q2B.

**Solvent:**  An inorganic or an organic liquid used as a vehicle for the preparation of solutions or suspensions in the synthesis of a new drug substance.

**Specified Impurity**:  An impurity that is individually listed and limited with a specific acceptance criterion in the new drug substance specification. A specified impurity can be either identified or unidentified.

**Starting Material**: A material used in the synthesis of a new drug substance that is incorporated as an element into the structure of an intermediate and/or of the new drug substance. Starting materials are normally commercially available and of defined chemical and physical properties and structure.

**Unidentified Impurity**:  An impurity for which a structural characterisation has not been achieved and that is defined solely by qualitative analytical properties (e.g., chromatographic retention time).

**Unspecified impurity**: An impurity that is limited by a general acceptance criterion, but not individually listed with its own specific acceptance criterion, in the new drug substance specification.

*Impurities in New Drug Substances*

**ATTACHMENT 1**
**Thresholds**

| Maximum Daily Dose[1] | Reporting Threshold[2,3] | Identification Threshold[3] | Qualification Threshold[3] |
|---|---|---|---|
| ≤ 2g/day | 0.05% | 0.10% or 1.0 mg per day intake (whichever is lower) | 0.15% or 1.0 mg per day intake (whichever is lower) |
| > 2g/day | 0.03% | 0.05% | 0.05% |

---

[1] The amount of drug substance administered per day

[2] Higher reporting thresholds should be scientifically justified

[3] Lower thresholds can be appropriate if the impurity is unusually toxic

*Impurities in New Drug Substances*

**ATTACHMENT 2**

**Illustration of Reporting Impurity Results for Identification and Qualification in an Application**

The attachment is only illustrative and is not intended to serve as template how results on impurities should be presented in an application file. Normally raw data are not presented.

**Example 1:    0.5 g Maximum Daily Dose**

Reporting threshold = 0.05%
Identification threshold = 0.10%
Qualification threshold = 0.15%

| "Raw" Result (%) | Reported Result (%) Reporting threshold =0.05% | Calculated Total Daily Intake (TDI) (mg) of the impurity (rounded result in mg) | Action | |
|---|---|---|---|---|
| | | | Identification (Threshold 0.10% exceeded?) | Qualification (Threshold 0.15% exceeded?) |
| 0.044 | Not reported | 0.2 | None | None |
| 0.0963 | 0.10 | 0.5 | None | None |
| 0.12 | 0.12[1] | 0.6 | Yes | None[1] |
| 0.1649 | 0.16[1] | 0.8 | Yes | Yes[1] |

**Example 2:    0.8 g Maximum Daily Dose**

Reporting threshold = 0.05%
Identification threshold = 0.10%
Qualification threshold = 1.0 mg TDI

| "Raw" Result (%) | Reported Result (%) Reporting threshold =0.05% | Calculated Total Daily Intake (TDI) (mg) of the impurity (rounded result in mg) | Action | |
|---|---|---|---|---|
| | | | Identification (Threshold 0.10% exceeded?) | Qualification (Threshold 1.0 mg TDI exceeded?) |
| 0.066 | 0.07 | 0.6 | None | None |
| 0.124 | 0.12 | 1.0 | yes | None[1][2] |
| 0.143 | 0.14 | 1.1 | yes | Yes[1] |

1) After identification, if the response factor is determined to differ significantly from the original assumptions, it may be appropriate to re-measure the actual amount of the impurity present and re-evaluate against the qualification threshold (see Attachment 1).

2) To verify if a threshold is exceeded, a reported result has to be evaluated against the thresholds as follows: when the threshold is described in %, the reported result rounded to the same decimal place as the threshold should be compared directly to the threshold. When the threshold is described in TDI, the reported result should be converted to TDI, rounded to the same decimal place as the threshold and compared to the threshold. For example the amount of impurity at 0.12% level corresponds to a TDI of 0.96 mg (absolute amount) which is then rounded up to 1.0 mg; so the qualification threshold expressed in TDI (1.0 mg) is not exceeded.

*Impurities in New Drug Substances*

ATTACHMENT 3

**Decision Tree for Identification and Qualification**



*Impurities in New Drug Substances*

**Notes on Attachment 3**

a)  If considered desirable, a minimum screen (e.g., genotoxic potential), should be conducted.
A study to detect point mutations and one to detect chromosomal aberrations, both in vitro, are considered an appropriate minimum screen.

b)  If general toxicity studies are desirable, one or more studies should be designed to allow comparison of unqualified to qualified material.  The study duration should be based on available relevant information and performed in the species most likely to maximise the potential to detect the toxicity of an impurity. On a case-by-case basis, single-dose studies can be appropriate, especially for single-dose drugs. In general, a minimum duration of 14 days and a maximum duration of 90 days would be considered appropriate.

c)  Lower thresholds can be appropriate if the impurity is unusually toxic.

d)  For example, do known safety data for this impurity or its structural class preclude human exposure at the concentration present?

Exhibit 53

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 2875 |

# EXPERT REPORT OF DAVID L. CHESNEY, MSJ

**RESTRICTED CONFIDENTIAL**

done to minimize the potential for undue influence or conflict of interest in Quality Unit decision-making, preserving the integrity of the unit's final authority contemplated in 21 CFR § 211.22. Even though the regulations are not prescriptive on this point, organizational independence of the Quality Unit is a widely followed practice in the pharmaceutical industry.

### E. GMP as Applied to Active Pharmaceutical Ingredients (API)

API meet the definition of a "drug" in the FDCA[21], which does not distinguish between API and finished drug products. Therefore, the requirement to comply with GMP applies to API at the statutory level[22]. However, the GMP regulations at 21 CFR Part 211 are binding only for finished drug products. There are currently no FDA regulations specifying what constitutes GMP for API.

In Compliance Program 7356.002F, "Active Pharmaceutical Ingredient (API) Process Inspection"[23], FDA states in part:

> APIs are subject to the adulteration provisions of Section 501(a)(2)(B) of the Act, which requires all drugs to be manufactured in conformance with CGMP. No distinction is made between an API and a finished pharmaceutical in the Act and the failure of either to comply with CGMP constitutes a violation of the Act. FDA has not promulgated CGMP regulations specifically for APIs or drug components (as we have for finished pharmaceuticals). Thus, the use of "CGMP" in this document refers to the requirements of the Act rather than the requirements of 21 CFR Parts 210 and 211 regulations for finished pharmaceuticals.

> FDA has long recognized that the CGMP requirements in the good manufacturing practice regulations for finished pharmaceuticals (21 CFR Parts 210 and 211) are valid and applicable **in concept** to Active Pharmaceutical Ingredient (API) manufacturing. These concepts include, among others, building quality into the drug by using suitable equipment and employing appropriately qualified and trained personnel, establishing adequate written procedures and controls designed to assure manufacturing processes and controls

---

[21] 21 USC § 321(g).
[22] 21 USC § 351(a)(2)(B).
[23] Current version dated September 11, 2015.

are valid, establishing a system of in-process material and final drug tests, and ensuring stability of drugs for their intended period of use. In 2001, FDA adopted an internationally harmonized guidance to industry on API CGMPs in conjunction with regulatory partners in the International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH). This guidance is ICH Q7A[24], Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients. ICH Q7A represents the Food and Drug Administration's (FDA's) current thinking on CGMPs for API's. Thus, API and related manufacturing and testing facilities that follow this guidance generally will be considered to comply with the statutory CGMP requirement. However, **alternate approaches may be used** if such approaches satisfy the requirements of Section 501(a)(2)(B) of the Act as long as the approach ensure that the API meets its purported or represented purity, identity, and quality characteristics. (emphasis supplied)

The lack of a binding regulation increases the need for the FDA to carefully balance scientific, legal and policy factors in each case in order to reach a defensible position about the significance of GMP inspection observations that arise in an API manufacturing context.

## V.    GMP Compliance Status of Zhejiang Huahai Pharmaceutical Co. Ltd.

The opinions expressed herein are based solely upon review of documents as listed in Exhibit B of this declaration.  At no time did I personally visit any ZHP location, nor did I interview any ZHP staff.   The time period to which the opinions expressed herein apply are from approximately August of 2013 until October of 2019 unless otherwise stated.

At the conclusion of an FDA inspection, the FDA-483 is issued to top management (if there are observations).  Subsequently, the FDA employee(s) conducting the inspection prepare an Establishment Inspection Report (EIR) expanding upon the findings on the 483, and supporting those findings with evidence obtained during the inspection.  Other sections of the EIR develop evidence of individual (personal) responsibility for the observations, and include other ancillary

---

[24] Renumbered as "Q7" since the issue date of this FDA reference.

Exhibit 54

Confidential Information - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2                   CAMDEN VICINAGE
3
     *****************************
4    IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
     AND IRBESARTAN PRODUCTS
5    LIABILITY LITIGATION
6    **************************  HON ROBERT B.
     THIS DOCUMENT APPLIES TO ALL  KUGLER
7    CASES
8    **************************
9
              - CONFIDENTIAL INFORMATION -
10            SUBJECT TO PROTECTIVE ORDER
11
12
13         Remote Videotaped Deposition of
14   DAVID L. CHESNEY, commencing at 9:40 a.m., on
15   the 21st of March, 2022, before Maureen
16   O'Connor Pollard, Registered Diplomate
17   Reporter, Realtime Systems Administrator,
18   Certified Shorthand Reporter.
19
20                  - - -
21
           GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24

Confidential - Information Subject to Protective Order

Page 2

1
2  REMOTE APPEARANCES:

3  MAZIE SLATER KATZ & FREEMAN, LLC
   BY:  ADAM SLATER, ESQ.
   BY:  JULIA S. SLATER, ESQ.
4  BY:  CHRISTOPHER GEDDIS, ESQ.
5     103 Eisenhower Parkway
      Roseland, New Jersey 07068
6     973-228-9898
      aslater@mazieslater.com
7     cgeddis@mazieslater.com
8     Representing the Plaintiffs

9  RIVERO MESTRE LLP
   BY:  JORGE MESTRE, ESQ.
   BY:  ZALMAN KASS, ESQ.
10    2525 Ponce De Leon Boulevard
      Miami, Florida 33134
11    305-445-2500
12    Representing the Plaintiffs

13 GREENBERG TRAURIG LLP
   BY:  KATE M. WITTLAKE, ESQ.
14    4 Embarcadero Center, Suite 3000
      San Francisco, California 94111
15    415-655-1285
      wittlakek@gtlaw.com
16    Representing the Defendants Teva
      Pharmaceutical Industries, Ltd., Teva
17    Pharmaceuticals SA, Inc., Actavis LLC,
      and Actavis Pharma, Inc.
18

19 GREENBERG TRAURIG, LLP
   BY:  STEVEN M. HARKINS, ESQ.
20    Terminus 200
      3333 Piedmont Road NE
21    Suite 2500
      Atlanta, Georgia 30305
22    678-553-2100
      harkinss@gtlaw.com
23    Representing the Defendants Teva
      Pharmaceutical Industries, Ltd., Teva
24    Pharmaceuticals SA, Inc., Actavis LLC,

Page 3

1  APPEARANCES (Continued):
2  WALSH PIZZI O'REILLY LLP
   BY:  CHRISTINE I. GANNON, ESQ.
3  By:  LIZA WALSH, ESQ.
4     Three Gateway Center
      100 Mulberry Street, 15th Floor
      Newark, New Jersey 07102
5     973-757-1017
      Representing the Defendants Teva
6     Pharmaceutical Industries, Ltd., Teva
      Pharmaceuticals SA, Inc., Actavis LLC,
7     and Actavis Pharma, Inc.
8
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
9  BY:  THOMAS E. FOX, ESQ.
10    One Manhattan West
      New York, New York 10001-8602
11    212-735-2165
      thomas.fox@skadden.com
12    Representing the Defendants Zhejiang
      Huahai Pharmaceutical Co., Ltd.,
13    Prinston Pharmaceutical Inc., Huahai
      U.S., Inc., and Solco Healthcare US,
14    LLC
15 HINSHAW & CULBERTSON, LLP
   BY:  GEOFFREY M. COAN, ESEQ.
16    53 State Street
      Boston, Massachusetts 02109
17    617-213-7047
      gcoan@hinshawlaw.com
18    Representing the Defendant SciGen
      Pharmaceuticals
19
20 BARNES & THORNBURG, LLP
   BY:  MITCHELL CHARCHALIS, ESQ.
21    2029 Century Park E, Suite 300
      Los Angeles, California 90067
22    310-284-3896
      mcharchalis@btlaw.com
23    Representing the Defendants CVS
      Pharmacy, Inc., and Rite Aid
24    Corporation

Page 4

1
2  APPEARANCES (Continued):

3  FALKENBERG IVES, LLP
   BY:  MEGAN A. ZMICK, ESQ.
4     230 W. Monroe Street, Suite 2220
      Chicago, Illinois 60606
5     312-566-4808
      maz@falkenbergives.com
6     Representing the Defendant Humana

7  BUCHANAN INGERSOLL & ROONEY PC
   BY:  ASHLEY D.N. JONES, ESQ.
8  BY:  DEBORAH HOPE, ESQ.
9     1700 K Street NW, Suite 300
      Washington, DC 20006-3807
10    202-452-7318
      ashley.jones@bipc.com
11    Representing the Defendant Albertsons
      LLC
12

13 Videographer:  David Stone
14
15
16
17
18
19
20
21
22
23
24

Page 5

1
2  INDEX
   EXAMINATION                      PAGE
3  DAVID L. CHESNEY
4  BY MR. SLATER                      10
5
6  BY MR. FOX                        276
7  BY MR. SLATER                     311
8  BY MR. FOX                        348

9
10
11 NO.       E X H I B I T S
             DESCRIPTION             PAGE
12 1         Notice to Take
13           Videotaped Deposition.....  13

           2         ZHP Defendants' Response
14                   and Objections to Notice
                     to Take Videotaped Oral
15                   Deposition of David
                     Chesney..................  14
16
           3         DL Chesney Consulting,
17                   LLC Invoices..............  15
18         4         Expert Report of David
                     L. Chesney, MSJ...........  24
19
           5         IARC Monographs on the
20                   Evaluation of the
                     Carcinogenic Risk of
21                   Chemicals to Humans, May
                     1978......................  116
22
           6         Document titled
23                   Purification of
                     Laboratory Chemicals......  122
24

Page 6

7    Article in Tetrahedron,
     N,N-Dimethylformamide:
     Much more than a solvent..    128

8    Sun, et al. Theoretical
     Investigation of
     N-Nitrosodimethylamine
     Formation from
     Nitrosation of
     Trimethylamine..........    131

9    PowerPoint titled
     Advanced analytical
     Technology Center
     (CEmat) Introduction......    201

10   E-mail titled Notice on
     the Results of the
     Report of the
     Preliminary
     Investigation on the
     Formation of Unknown
     Impurities Resulting
     from the Sodium Azide
     Quenching in Crude
     Irbesartan, Bates
     ZHP00190573 and 574.......    207

11   PowerPoint titled
     Quality Management
     Essentials, Expert
     Advice on Building a
     Compliant System:.........    233

12   Deviation Report Form,
     Bates ZHP00004352
     through 4471..............    266

13   November 29, 2018
     Warning Letter, Bates
     ZHP01344159 through 4164..    320

14   Investigation Report,
     Bates ZHP00662283
     through 2309..............    336

Page 7

15   August 26, 2018 Response
     to FDA Inspection on
     July 23 - August 3,
     2018, Bates ZHP02115600
     through 5603..............    338

16   Establishment Inspection
     Report, Bates
     PRINSTON00162349 through
     2406.....................    344

Defendant 1    January 25, 2019 FDA
               Statement on the FDA's
               ongoing investigation
               into valsartan and ARB
               class impurities and the
               agency's steps to
               address the root causes
               of the safety issues......    291

Defendant 2    August 30, 2018 FDA
               Statement on FDA's
               ongoing investigation
               into valsartan
               impurities and recalls
               and an update on FDA's
               current findings..........    297

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE  LINE
None.

Request for Production of Documents
PAGE  LINE
None.

Stipulations
PAGE  LINE
None.

Questions Marked Highly Confidential
PAGE  LINE
None.

Page 9

P R O C E E D I N G S

        THE VIDEOGRAPHER:  We are now
recording and on the record.  My name
is David Stone.  I'm a legal video
specialist on behalf of Golkow
Litigation Services.
        Today's date is March 21st, and
the time is 9:40 a.m.
        This is the deposition of David
Chesney in the matter of In Re:
Valsartan, Losartan, and Irbesartan
Products Liability Litigation,
plaintiffs, versus -- in the United
States District Court, District of New
Jersey, Case Number, MDL Number 2875.
        This deposition is being taken
via remote recording on behalf of the
plaintiffs.
        The court reporter is Maureen
Pollard.
        Counsel will state their
appearances, and the court reporter
will administer the oath.

Confidential Information Subject to Protective Order

---

Page 10

1    MR. SLATER:  Adam Slater, Chris
2    Gaddis, Julia Slater for plaintiffs.
3        MR. FOX:  Thomas Fox, Skadden,
4    Arps, for the ZHP defendants.
5            ///
6        DAVID L. CHESNEY,
7    having been duly remotely identified and
8    sworn, was examined and testified as follows:
9            EXAMINATION
10   BY MR. SLATER:
11   Q.   Good morning, Mr. Chesney.
12   A.   Good morning.
13       MR. FOX:  Adam, I just want to
14   make clear, this is being taken
15   pursuant to the remote deposition
16   protocol in the case?
17       MR. SLATER:  I think that we
18   have a remote deposition protocol.
19       MR. FOX:  Yes.
20       MR. SLATER:  Why are you asking
21   me that?
22       MR. FOX:  I just wanted to make
23   sure, that's all.
24       MR. SLATER:  I just have never

Page 11

1    been asked that question before in one
2    of depositions we were doing remotely.
3    I thought it was a trick question.  I
4    think so.
5    BY MR. SLATER:
6    Q.   Okay.  Good morning,
7    Mr. Chesney.
8    A.   Good morning.
9    Q.   We're going to take your
10   deposition now.  You understand that, right?
11   A.   I do.
12   Q.   Have you been deposed before?
13   A.   Yes.
14   Q.   How many times?
15   A.   Let's see.  Four or five times,
16   I guess.
17   Q.   You understand you're under
18   oath and must tell the truth, right?
19   A.   Yes.
20   Q.   If I ask you a question that
21   for some reason you don't feel you can answer
22   truthfully and completely, for any reason,
23   just tell me.  It may be that I mispronounce
24   a word, or ask you a question that

Page 12

1    technically doesn't make sense to you because
2    I don't understand something either from a
3    regulatory perspective or legal perspective,
4    whatever it may be, for any reason you're not
5    clear on my question or don't feel like you
6    can answer it, just tell me and we'll try to
7    figure out what I need to clarify, and I'll
8    try to do that.  Okay?
9    A.   Okay.
10   Q.   Counsel may object.  I think it
11   would be unlikely he won't object during the
12   course of the deposition.  That's routine.
13   It's never to signal an answer or how to
14   answer, it's just preserving rights -- or at
15   least it should never be to signal an answer,
16   and I doubt it would be today, and I would
17   expect it wouldn't be.
18       In any event, let your counsel
19   object, and then answer the question, unless
20   he tells you not to.  Okay?
21   A.   Yes, sir.
22       MR. SLATER:  Chris, let's put
23   up the deposition notice as Exhibit 1.
24           ///

Page 13

1        (Whereupon, Chesney Exhibit
2    Number 1 was marked for
3    identification.)
4    BY MR. SLATER:
5    Q.   Mr. Chesney, this is the
6    deposition notice we served for your
7    deposition.
8        Have you seen this document
9    before?
10   A.   Yes.
11   Q.   Did you read it and go through
12   all the requests?
13   A.   Yes.
14   Q.   Did you provide any documents
15   to the lawyers that retained you in this case
16   to be provided to us pursuant to this
17   deposition notice?
18   A.   Before I received the notice I
19   did, yes.
20   Q.   Okay.  Once you got the notice,
21   was there anything else that you identified
22   and provided to counsel?
23   A.   I don't recall that I did, no.
24   Q.   When you say you don't recall,

Confidential Information Subject to Protective Order

Page 14

1  you don't recall if that happened, or you
2  don't -- I'm unclear on your answer.
3      A.    We had a discussion.  The list
4  of requests was quite broad, and I had
5  difficulty interpreting the scope of some of
6  the requests, and we discussed that.
7          At the end of that discussion,
8  I believe counsel was going to submit a
9  response, and I never heard anything further
10  after that.
11      Q.    At the end of that discussion
12  when counsel worked through what the
13  deposition notice was asking, was there
14  any information or documents that you
15  provided to counsel to be provided to us?
16      A.    No.
17          MR. SLATER:  Okay.  Let's take
18      that document down, and put up as
19      Exhibit 2 the response to the
20      deposition notice, please.
21          (Whereupon, Chesney Exhibit
22      Number 2 was marked for
23      identification.)
24          ///

Page 15

1  BY MR. SLATER:
2      Q.    On the screen as Exhibit 2 is
3  what we were provided as the response to our
4  deposition notice.  Have you seen that
5  document?
6      A.    No.
7      Q.    One of the things we requested
8  from you was the invoices in this matter.
9          MR. SLATER:  And I guess,
10      Chris, let's go to the invoices as
11      Exhibit 3, and then we'll come back to
12      the dep notice after, if that's
13      possible.
14          (Whereupon, Chesney Exhibit
15      Number 3 was marked for
16      identification.)
17          MR. SLATER:  Perfect.  Thank
18      you.
19  BY MR. SLATER:
20      Q.    On the screen as Exhibit 3 are
21  the invoices we were provided, and it shows
22  that you began to work in this matter in June
23  of 2021, is that correct?
24      A.    That's correct.

Page 16

1      Q.    Who contacted you and asked you
2  to get involved in this case?
3      A.    Frederick Ball of Duane Morris.
4      Q.    Did you know Mr. Ball before he
5  contacted you in June of 2021?
6      A.    No.
7      Q.    You'd never met him before?
8      A.    I had not.
9      Q.    Do you know how it was that he
10  came to contact you?  Did he tell you why he
11  contacted you?
12      A.    I don't recall.  He probably
13  told me at the time, but I don't recall now
14  where he got my name.
15      Q.    The response to the deposition
16  notice, which we don't have to pull up, says
17  that the invoices that were provided were in
18  connection with the preparation of your
19  expert report and your related testimony in
20  this litigation.  Is that what these invoices
21  represent?
22      A.    Yes.  The majority of the time
23  was the preparation of the expert report and
24  the work I did researching information in

Page 17

1  that preparation.
2      Q.    Other than writing this report
3  and preparing for this deposition, have you
4  done any other work for ZHP or any of its
5  subsidiaries in connection with the
6  nitrosamine contamination of its valsartan?
7      A.    No.
8      Q.    Have you been asked to consult
9  or provide any opinions with regard to any
10  disputes that ZHP may be having with any of
11  its customers?
12      A.    No.
13      Q.    Okay.  I added up these
14  invoices which are dated between June 2021
15  and January of 2022 at $51,000.
16          Does that sound correct?
17      A.    I think it's a little on the
18  low side.  I had added them up, and I think I
19  came up with around 56.
20      Q.    Okay.  These invoices are up
21  through January of 2022, the last one being
22  $13,000.
23          MR. SLATER:  Maybe we can go to
24      that one, Chris, the last page.

Confidential Information Subject to Protective Order

Page 18

1    Perfect.
2    Q.    Looking at the last page of
3  this group of invoices, this is from January
4  of 2022, $13,000, correct?
5    A.    Yes.
6    Q.    What amount of time have you
7  spent since January up until today in
8  connection with this matter?
9    A.    I have that information on my
10  time sheet records, but I don't have it with
11  me. It's approximately 25 hours, more or
12  less.
13    Q.    Does that include your
14  preparation right up until the point when we
15  started the deposition?
16    A.    I don't believe it includes the
17  hours I spent this weekend looking over my
18  report, but it's pretty close. It might be
19  between 25 and 30.
20    Q.    So 25 hours approximately
21  before the weekend, and then maybe another
22  five or so hours over the weekend before
23  today's deposition?
24    A.    Approximately, yes.

Page 19

1    Q.    Okay. Thank you.
2        MR. SLATER: All right, Chris,
3    let's go back to the deposition
4    notice, if we could, please. Not the
5    notice, I'm sorry, I meant the
6    response. My bad. Thank you.
7    Q.    I'm not going to go through all
8  these requests, and you haven't read the
9  responses, so I'm not going to go through
10  that with you today in great detail. But
11  what I would like to ask you is --
12        MR. SLATER: Let's go to
13    request number 8. That's the -- go to
14    the responses and objections to the
15    requests, number 8. Perfect. Thanks,
16    Chris.
17    Q.    Looking at number 8, which we
18  asked for any documentation of any research
19  that you had performed with regard to the
20  FDA's regulation of API and finished drug
21  products, FDA inspections, current good
22  manufacturing processes, and the risks and
23  benefits of any angiotensin II receptor
24  blockers or nitrosamines, we were told that

Page 20

1  you had worked at the FDA for 23 years, and
2  have had an FDA-related consulting practice
3  for more than a quarter of a century, and in
4  those roles you'd informally researched
5  countless issues over the course of your
6  career, and that you have already submitted a
7  list of your publications, and not conducted
8  academic research regarding the list of
9  topics. That was the response we were given.
10  You can see that there.
11        Do you see that?
12    A.    Yes.
13    Q.    I just want to know talking to
14  you now, have you in connection with this
15  work -- well, rephrase.
16        Have you ever done any research
17  regarding nitrosamines?
18    A.    No.
19    Q.    And that's true right up until
20  right now?
21    A.    Other than just briefing myself
22  on the general issue and rereading some of
23  the press that was out when it was made
24  public and that sort of thing. No, no

Page 21

1  technical research.
2    Q.    I think I saw in a few places
3  in your report where you said you'd defer to
4  scientific or to others with scientific
5  expertise.
6        Is this one of the areas where
7  you would defer to others with scientific
8  expertise, meaning the nitrosamines and the
9  risks posed by nitrosamines?
10    A.    Yes.
11        MR. FOX: Objection to form.
12        Just make sure you slow down,
13    David, so you give me an opportunity
14    to make an objection on the record.
15  BY MR. SLATER:
16    Q.    I'll just ask it again just
17  because counsel objected, it may be that I
18  talked too much in my question, happens from
19  time to time.
20        Am I correct that you'd defer
21  to other experts regarding the risks posed by
22  nitrosamines as relevant in this case?
23    A.    Yes.
24    Q.    When I asked you if you'd defer

Confidential Information - Subject to Protective Order

Page 22

1   to others, I didn't see you specifically cite
2   any of their expert reports, you're just
3   saying in general you would defer to others
4   who have that expertise, is that correct?
5              MR. FOX:  Objection to the
6        form.
7        A.    Yes.
8   BY MR. SLATER:
9        Q.    Am I correct that in your
10  experience both with the FDA and as a
11  consultant following the time you left the
12  FDA, you've never been involved in a matter
13  that involved potential nitrosamine
14  impurities in either an API or a finished
15  dose product?
16       A.    That's correct.
17       Q.    Is this the first time in your
18  career you've been involved in a matter where
19  nitrosamines were a relevant factor in the
20  analysis you were providing, meaning one of
21  the constituent variables in the case was
22  nitrosamines?
23             MR. FOX:  Objection to form.
24       A.    Yes.

Page 23

1   BY MR. SLATER:
2        Q.    Before you were retained in
3   this case, had you ever heard of NDMA?
4        A.    Yes.
5        Q.    And how did you know what NDMA
6   was?
7        A.    There were press reports
8   involving the occurrence of NDMA in a variety
9   of products, some gastrointestinal products
10  as well as the valsartan-irbesartan family,
11  and I read those press reports in the
12  literature.
13       Q.    Other than seeing press reports
14  regarding the recent discovery of NDMA in
15  various drug products, had you ever had any
16  occasion to know what NDMA was before that?
17       A.    No.
18             MR. FOX:  Objection to form.
19        Slow down, David.
20  BY MR. SLATER:
21       Q.    I didn't see any discussion of
22  NDEA in your report.  Is that something you
23  did not address at all in your report?
24       A.    I did not address it.

Page 24

1        Q.    I also saw no discussion of the
2   TEA process for manufacture of valsartan API
3   at ZHP.  Am I also correct that is not
4   something that you addressed at all in your
5   report?
6        A.    You're correct.
7              MR. SLATER:  Let's take those
8        down and go to Mr. Chesney's report.
9        We'll mark that as Exhibit 3, along
10       with the attached Exhibits A and B.
11             (Whereupon, Chesney Exhibit
12       Number 4 was marked for
13       identification.)
14  BY MR. SLATER:
15       Q.    Mr. Chesney, you have in front
16  of you on the screen your report which we've
17  marked as Exhibit 3.  I understand you're not
18  scrolling right through it, but does that
19  look like the first page of your report?
20       A.    Yes.
21       Q.    And I can tell you --
22             MR. GEDDIS:  Adam, for the
23       record it's Exhibit 4.
24             MR. SLATER:  Did I say 3?  I

Page 25

1   meant 4.  Sorry about that.  Let me
2   rephrase.
3   BY MR. SLATER:
4        Q.    Mr. Chesney, on the screen as
5   Exhibit 4 we have your report.  Does that
6   look like your report right there?
7        A.    Yes.
8        Q.    And I have it as 59 pages, and
9   then there's a digital signature for you on,
10  it looks like, January 12, 2022.  Is that
11  when you put your signature on it and stamped
12  this as a final report?
13       A.    I'm not looking at it, but that
14  sounds right.
15       Q.    Do you have your report there
16  in hard copy?
17       A.    I do.  I was just trying to
18  flip to that page.
19       Q.    Go ahead, take a look, and
20  we'll just make sure we're on the same page
21  of that.
22             MR. SLATER:  You don't have to
23       scroll to that, I don't think, Chris,
24       because he has it.

Confidential Information - Subject to Protective Order

Page 26

1    A.    Yes, it was digitally signed on
2 January 12th, that's correct.
3    Q.    And that was the day when you
4 finalized and confirmed your opinions in this
5 case?
6    A.    Yes.
7    Q.    Does this report contain each
8 of the opinions you formed in this matter?
9    A.    Yes.
10    Q.    You went through a number of
11 facts and discussed a number of facts in the
12 course of your report.  Were those the facts
13 that you felt were most important to you in
14 supporting or formulating your opinions?
15    A.    Yes.
16        MR. FOX:  Objection to form.
17 BY MR. SLATER:
18    Q.    I'm just going to digress for a
19 second.  We can leave that on the screen.  I
20 just want to ask you a few background
21 questions.
22        Can you tell me how many times
23 you've been retained as an expert witness in
24 civil litigation?

Page 27

1    A.    Four or five times.
2    Q.    What is the bulk of the work
3 you have done as a consultant since you left
4 the FDA?  It sounds like it's not
5 litigation-based, so I'm curious what it is
6 that you generally do.
7    A.    I provide advice to clients on
8 compliance strategy.  I help them respond to
9 FDA findings when they have inspections.  I
10 help them prepare for and manage FDA
11 inspections.  I conduct audits from time to
12 time, some of which are general audits for
13 compliance purposes, others of which are
14 intended as mock FDA inspections to help them
15 prepare for the real event.  Any of a variety
16 of other ad hoc issues that arise with
17 clients that involve FDA compliance matters.
18    Q.    Have you ever done any work in
19 the past for ZHP, Prinston, Solco, or Huahai
20 US?
21    A.    No.
22    Q.    Have you done any work for any
23 of the other manufacturers or parties to this
24 litigation, to your knowledge?

Page 28

1    A.    The only two I recall seeing
2 the names of are Teva and Mylan, and the
3 answer in both cases is no.
4    Q.    How about Aurobindo?
5    A.    No.
6    Q.    Hetero?
7    A.    No.
8    Q.    How about Torrent?
9    A.    No.
10    Q.    When you were an FDA
11 investigator -- rephrase.
12        When you worked at the FDA, did
13 your responsibilities include evaluation of
14 manufacturers to determine whether there were
15 GMP violations in the manufacture of API?
16    A.    Yes.
17    Q.    Same question with regard to
18 manufacture of finished dose products.
19    A.    Yes.
20    Q.    In your work at the FDA, how
21 much of your work was focused on that area,
22 evaluation of potential GMP violations in the
23 manufacture of API or finished dose?
24    A.    I can't quantitate that

Page 29

1 precisely for you.
2    Q.    Can you give me some idea of
3 how many matters you investigated where that
4 was the question?
5        MR. FOX:  Objection to form.
6    A.    Almost impossible, sir.  I
7 began my FDA career in 1972.  Between that
8 and my consulting career, I've spent nearly
9 50 years.  It's very difficult to say how
10 many of these issues I've dealt with over an
11 extensive period of time like that.
12 BY MR. SLATER:
13    Q.    So -- and I'm not going to push
14 it.  If you're not able to estimate the
15 number of times that you addressed that issue
16 at the FDA, I'll let it go if you tell me
17 that.
18    A.    I could not give you an
19 estimate I would be confident about.
20    Q.    Looking at your report, let me
21 just find a good jumping off point.
22        MR. SLATER:  Let's go to
23    page 11, if we could, please, Chris.
24    Q.    I was curious, on page 11 --

Confidential Information Subject to Protective Order

**Page 30**

1 rephrase.
2       On page 11 there's a heading
3 "FDA Awards and Recognition" --
4       A.   Yes.
5       Q.   -- that says, "In 1990, I
6 received the FDA Award of Merit, the FDA's
7 highest award for individual achievement, for
8 my work coordinating a major investigation
9 involving deliberate contamination of
10 imported produce sent to the United States."
11       When you say "deliberate
12 contamination," what was that referring to?
13 What happened?
14       A.   Injection of grapes from a
15 country of Chile with cyanide residues.
16       Q.   I suppose you would agree with
17 me that the deliberate contamination of a
18 product regulated by the FDA would be a
19 significant violation?
20       MR. FOX:  Objection to form.
21       A.   Yes.
22 BY MR. SLATER:
23       Q.   Would you agree that the
24 deliberate contamination of a product

**Page 31**

1 regulated by the FDA would be a GMP
2 violation?
3       MR. FOX:  Objection to form.
4       A.   It depends.
5 BY MR. SLATER:
6       Q.   Well, in this case where
7 somebody injected cyanide into grapes, was
8 that a GMP violation?
9       A.   No.
10       Q.   What was it a violation of?
11       A.   Title 18 US Code Section 1365
12 of the Federal Anti-Tampering Act.
13       Q.   If the grapes had been injected
14 by somebody unrelated to the seller who was
15 ultimately the target of your investigation,
16 but the seller knew that they had been
17 injected and still went ahead and shipped the
18 grapes, would that be a violation?
19       MR. FOX:  Objection to the
20 form.
21       A.   Yes, of course.
22 BY MR. SLATER:
23       Q.   What would that be a violation
24 of?

**Page 32**

1       A.   Well, that could be a violation
2 of the Food, Drug and Cosmetic Act if they
3 knowingly shipped a product that they knew to
4 be contaminated.
5       Q.   If ZHP knowingly sold valsartan
6 and knew that it had NDMA in it, would that
7 be a violation of the -- of any regulations
8 or laws?
9       MR. FOX:  Objection to form.
10 No foundation.
11       A.   That depends.
12 BY MR. SLATER:
13       Q.   If before FDA dis -- rephrase.
14       If before ZHP disclosed to the
15 FDA that there was NDMA in its valsartan, if
16 ZHP had been selling the valsartan for a
17 period of time knowing that anyway and it
18 still sold the product, would that have been
19 a violation?
20       MR. FOX:  Objection to form.
21 No foundation.
22       A.   It depends.
23 BY MR. SLATER:
24       Q.   Depends on what?

**Page 33**

1       A.   Depends on the levels of NDMA,
2 what was known about it, whether they posed a
3 hazard to people who might ingest the
4 product.  A variety of factors.
5       Q.   So you're not able to form an
6 opinion based on my question?
7       A.   Not based on your question.
8       Q.   Okay.  If we go to page 12 of
9 your report, the last matter listed is
10 October 2021 and continuing, a "Contractual
11 dispute between two pharmaceutical companies
12 over cost recovery from a recall alleged to
13 have been necessitated by GMP deviations at
14 the contractor."
15       Can you tell me the name of
16 that matter?
17       MR. FOX:  It's subject to a
18 confidentiality order.  But, David,
19 you can tell him the name of the
20 matter.
21       THE WITNESS:  Okay.
22

Confidential Information Subject to Protective Order

Page 34

Page 35

```
6    Q.    Good manufacturing practices
7  requires a manufacturer to recognize
8  potential creation of impurities so that they
9  can be assessed, correct?
10        MR. FOX:  Objection to form.
11   A.   If information comes to light
12  that raises that suspicion, GMP would require
13  that it be looked into.
14        MR. SLATER:  Chris, go to
15  Exhibit A of Mr. Chesney's report,
16  please.
17   Q.   Mr. Chesney, Exhibit A to your
18  report is your CV.  Is that your up-to-date
19  CV?
20   A.   It is.
21   Q.   Have you ever given any
22  presentations as a consultant -- rephrase.
23        After you left the FDA, did you
24  ever give any presentations regarding the
```

Page 36

```
1  application of GMP to the manufacture of API
2  or finished dose?
3    A.    Not as the sole subject in the
4  presentation.
5    Q.    But that's something that's
6  come up as part of some presentations?
7    A.    Yes.
8    Q.    Do you have those presentations
9  still?
10   A.    Some.
11   Q.    Have you given any
12  presentations -- rephrase.
13         Since the time you left the
14  FDA, have you given any presentations
15  regarding what a GMP-compliant risk
16  assessment for a drug manufacturing process,
17  whether API or finished dose, would involve?
18         MR. FOX:  Objection to form.
19   A.    Not as the sole subject of a
20  presentation.
21  BY MR. SLATER:
22   Q.    But again, something that's
23  come up in the course of some presentations?
24   A.    Yes.
```

Page 37

```
1    Q.    Are those presentations you
2  still have?
3    A.    Some.
4    Q.    When you were at the FDA, did
5  you give any presentations regarding what GMP
6  required in terms of a risk assessment in
7  connection with the manufacturing process for
8  API or finished drug?
9    A.    No.
10   Q.    When you were at the FDA, did
11  you ever write any reports or sign off on any
12  reports addressing whether or not there was a
13  GMP violation in connection with the risk
14  assessment for a manufacturing process for
15  either API or finished drug?
16         MR. FOX:  Objection to form.
17   A.    Not specifically, no.
18  BY MR. SLATER:
19   Q.    When you say "not
20  specifically," does that mean -- what does
21  that mean?
22   A.    I reviewed and signed off on
23  many reports involving API manufacturing.
24  But in the era when I was working for the
```

Confidential Information Subject to Protective Order

Page 38

¹ FDA, the requirements and expectations for
² documentation of risk assessment were not as
³ detailed or well understood as they are
⁴ today.
⁵            MR. SLATER:  Let's go, Chris,
⁶    if we could, to Exhibit B, please.
⁷    Q.    And, Mr. Chesney, you're
⁸ welcome to look at your hard copy report as
⁹ well as I ask you questions if it's easier,
¹⁰ whatever you think -- whatever is easiest for
¹¹ you.  Okay?
¹² A.    Thank you.  I have it open
¹³ here.  I'll try to work off the screen.  If I
¹⁴ need to stop, I'll let you know.
¹⁵ Q.    Fair enough.
¹⁶            Exhibit B is titled
¹⁷ "References," and it's my understanding those
¹⁸ are the materials that -- well, actually let
¹⁹ me rephrase it.
²⁰            Exhibit B is titled
²¹ "References," and there's a list of
²² 129 items.  Did you read all of those items?
²³ A.    I, at minimum, read them
²⁴ cursorily, but I didn't necessarily read

Page 39

¹ every word in every item, no.
² Q.    With regard to the -- let me
³ start over.
⁴            The first reference is the
⁵ Expert Declaration of John Quick.  Did you
⁶ read that?
⁷ A.    Yes.
⁸ Q.    Number 2 is the Expert
⁹ Declaration of Rena Conti.  Did you read
¹⁰ that?
¹¹ A.    I did.
¹² Q.    Did you find that to be
¹³ relevant to the work you were doing?
¹⁴            MR. FOX:  Object to form.
¹⁵ A.    Mr. Quick's declaration, yes.
¹⁶            Dr. Conti's was helpful from a
¹⁷ contextual standpoint, but I don't believe I
¹⁸ relied on it to any great extent.
¹⁹ BY MR. SLATER:
²⁰ Q.    She is an economist.  You
²¹ didn't provide any opinions regarding
²² economics or economic damages, right?
²³ A.    No, I did not.
²⁴ Q.    Number 3 is the Plaintiffs'

Page 40

¹ Memorandum of Law in Support of their Motion
² for Class Certification of Consumer Economic
³ Loss Claims.  Did you read that?
⁴ A.    Cursorily.
⁵ Q.    And I didn't see any opinions
⁶ in your report regarding whether or not this
⁷ matter was suitable or not for class
⁸ certification.  Am I correct that's not an
⁹ issue you addressed?
¹⁰ A.    That is not an issue --
¹¹            MR. FOX:  Objection to form.
¹²            David, you have to slow up.
¹³            THE WITNESS:  Sorry.
¹⁴            MR. FOX:  Objection to the
¹⁵    form.
¹⁶            You can answer.
¹⁷ A.    That is not within my area of
¹⁸ expertise, and I did not address it, no.
¹⁹ BY MR. SLATER:
²⁰ Q.    And I -- rephrase.  The second
²¹ -- rephrase.
²²            The next reference is reference
²³ 4, Memorandum of Law in Support of the
²⁴ Medical Monitoring Plaintiffs' Motion for

Page 41

¹ Class Certification.  Did you read that?
² A.    Again, cursorily.
³ Q.    What, if anything, about your
⁴ cursory reading of those two memorandums of
⁵ law was of any significance or use to you;
⁶ anything?
⁷            MR. FOX:  Objection to the
⁸    form.
⁹ A.    It was of use to me in
¹⁰ understanding the context and the background,
¹¹ but not the details of fulfilling my remit in
¹² this matter.
¹³ BY MR. SLATER:
¹⁴ Q.    Was there anything you read
¹⁵ about in those briefs, those memorandum of
¹⁶ laws -- memorandums of law that you said,
¹⁷ Well, that's interesting, I should probably
¹⁸ look at that, so -- and did you ask the
¹⁹ lawyers, Hey, can you get me this document or
²⁰ that document, or this testimony or that
²¹ testimony that you read about in the briefs?
²² Did that happen at all?
²³ A.    I don't recall it happening.
²⁴ It was months ago.

Confidential Information - Subject to Protective Order

Page 42

1    Q.    With regard to the materials
2  here, I can assure you we're not going to go
3  through every single one of them because that
4  would take a while, I want to ask you a few
5  general questions about the references here.
6        Did you ask for any specific
7  materials when you were engaged in this
8  matter where you said, Look, this is what you
9  have to provide me so I can formulate an
10  opinion?
11    A.    I may have asked for one or two
12  items.  I was provided with a great volume of
13  material.  The first thing I did was try to
14  organize it, sort it out, see what was there.
15        And then as I got into the
16  details of some of the items, there were
17  things that I wanted to see that had not been
18  provided.
19    Q.    What, if anything, did you ask
20  for that had not been provided to you in the
21  course of your work in this matter?
22    A.    One I recall was that when ZHP
23  initiated the recall of their product, it is
24  FDA's common practice to send what's called a

Page 43

1  recall classification letter.  It's a
2  template letter that says the agency agrees
3  with the decision, and informs the recalling
4  company of the class FDA has assigned to the
5  recall.
6        I don't believe that was in the
7  initial package, and I did ask for that
8  document.
9    Q.    Anything else that you
10  requested?
11    A.    I remember that one
12  specifically.  There may well have been
13  others.  This was a very voluminous document
14  set, and as I went through it, if I found
15  there was something I either could not find
16  or felt I needed, then I would request it.
17        But I didn't keep a list of
18  what I asked for separately from what was
19  volunteered to me at the outset.
20    Q.    You told me earlier that those
21  facts that you found to be important to you
22  in formulating your opinions were discussed
23  in your report.
24        So can I trust that to the

Page 44

1  extent you read these materials and saw
2  something that you felt to be of significance
3  you related it in your report?
4    A.    Yes.
5    Q.    Item number 5 on the reference
6  list is the Third Party Payors' Brief in
7  Support of Motion to Certify Class.  Did you
8  read that?
9    A.    I glanced at it.
10    Q.    Is there anything of
11  significance about that that you can point to
12  now?
13    A.    No.
14        MR. FOX:  Object to the form.
15  BY MR. SLATER:
16    Q.    Item number 11 is the Prinston
17  Pharmaceuticals Audit Report, dated
18  January 31, 2012, for inspection dates
19  January 31, 2012.  Did you read that?
20    A.    Yes.
21    Q.    I don't think I saw it
22  referenced at all in your report in any
23  specificity, is that correct?
24    A.    I suppose.  I don't recall

Page 45

1  referencing it.  And there are several
2  similar reports.  I -- at this point by
3  memory I can't distinguish one from the
4  other.
5    Q.    Do you know if you read each of
6  the audit reports or not?
7    A.    I looked at all of the listed
8  reports, yes.
9    Q.    And because they were not
10  discussed in any -- at all in the report, can
11  I assume that you didn't find anything to be
12  of any real significance in those reported
13  reports?
14        MR. FOX:  Objection to form.
15    A.    Not for the purpose I was asked
16  to fulfill.
17  BY MR. SLATER:
18    Q.    What did you have an
19  understanding -- rephrase.
20        What was your understanding of
21  your role?  What were you asked to opine on?
22    A.    I was asked to opine on what
23  the documents in this matter caused me to
24  think of the GMP compliance status of ZHP

Confidential Information - Subject to Protective Order

Page 46

1  facilities.
2      Q.    Am I correct that your opinions
3  regarding GMP were confined to ZHP and its
4  manufacturing of the API?
5      A.    Yes.
6      Q.    I didn't see any discussion or
7  opinions regarding Prinston, Solco, or Huahai
8  US.  Am I correct you gave no opinions
9  regarding their actions or their compliance
10 or noncompliance with GMP?
11     A.    That's correct.
12     Q.    I also saw no discussion of
13 ZHP's manufacturing of the finished dose
14 products.  Am I correct that's not an issue
15 you addressed in your report?
16         MR. FOX:  Objection to form.
17     A.    At least one of the FDA
18 inspections touched on that, and I may have
19 summarized some of the findings from that
20 inspection.  But I did not focus greatly on
21 the finished dose for manufacturing issues.
22 BY MR. SLATER:
23     Q.    I didn't see any opinions
24 regarding ZHP's manufacture of finished dose

Page 47

1  product.  Is that correct, you didn't
2  actually offer any opinions specific to that
3  issue?
4      A.    Not that I can recall.
5          MR. SLATER:  Chris, can you go
6  down to item number 19, please?
7      Q.    Number 19 on this list is ZHP
8  Genotoxicity Statement, dated July 6, 2016,
9  and it has a Torrent Bates number.
10         Do you see that item?
11     A.    I do.
12     Q.    Is that something you read?
13     A.    If it's on the list I did, yes.
14     Q.    And I can tell you, and you can
15 tell me if this comports with your
16 recollection, that the genotoxicity statement
17 is a representation that there were no
18 genotoxic impurities in the valsartan API
19 being sold by ZHP.  Is that your
20 understanding?
21         MR. FOX:  Objection to form.
22     A.    That is my recollection.
23 BY MR. SLATER:
24     Q.    Did cGMP at that time in July

Page 48

1  of 2016 require that such a statement be
2  accurate?
3          MR. FOX:  Objection to form.
4      A.    All GMP statements are required
5  to be accurate.
6  BY MR. SLATER:
7      Q.    And this would be a GMP
8  statement, correct?
9          MR. FOX:  Objection to form.
10     A.    It's a statement as to the
11 presence or absence or impact if it is
12 present of toxic compounds in the product.
13 It's not really a GMP statement per se.
14 BY MR. SLATER:
15     Q.    The genotoxicity statement
16 whereby ZHP represented that no genotoxic
17 impurities are present in the substance was
18 certainly required to be a true statement if
19 that's what they were saying, right?
20         MR. FOX:  Objection to form.
21     A.    Yes, any such statement
22 submitted to the FDA would be required to be
23 true, yes.
24         ///

Page 49

1  BY MR. SLATER:
2      Q.    What would be the regulatory
3  framework within which such a statement would
4  be evaluated, if it turned out it wasn't
5  true?
6          MR. FOX:  Objection to form.
7      A.    I'm not sure I understand your
8  question.
9  BY MR. SLATER:
10     Q.    You said that such a
11 statement -- rephrase.
12         You agree with me that the
13 statement that no genotoxic impurities are
14 present in the substance was required to be
15 true, right?
16     A.    Yes.
17     Q.    If that statement was false,
18 what would be the regulatory or other
19 framework within which that would be
20 evaluated?
21         MR. FOX:  Objection to form.
22     A.    That would depend on the
23 purpose for the submission of the statement.
24         ///

Confidential Information - Subject to Protective Order

Page 50

1  BY MR. SLATER:
2      Q.    If the statement was made to
3  allow a downstream purchaser of ZHP's API to
4  be confident that the API did not contain
5  genotoxic impurities, what would be the
6  framework for evaluating that statement?
7          MR. FOX:  Objection to form.
8      A.    First of all, whether or not it
9  was true and accurate.  And it would not be a
10 GMP statement per se.  If it were submitted
11 to the FDA directly because the agency
12 requested it or in connection with a pending
13 application or something of that sort, then
14 it would come under the regulations for new
15 drug applications or abbreviated new drug
16 applications.
17 BY MR. SLATER:
18     Q.    Any time that ZHP made a
19 representation to the FDA as to whether or
20 not there were genotoxic impurities in the
21 valsartan API, that would come within the
22 ANDA regulations, is that correct?
23         MR. FOX:  Objection to form.
24     A.    It depends on the context, but

Page 51

1  much of the time, yes.
2  BY MR. SLATER:
3      Q.    Any statements ZHP made to the
4  FDA about whether or not there were genotoxic
5  impurities in the valsartan API was required
6  to be a true and accurate statement, correct?
7      A.    Yes.
8          MR. FOX:  Objection to form.
9  BY MR. SLATER:
10     Q.    You told me a few moments ago
11 that your task in this matter was to review
12 the documents provided to you and to evaluate
13 the GMP compliance status of the ZHP
14 manufacturing facility based upon your review
15 of those documents, correct?
16     A.    Yes.
17         MR. FOX:  Objection to form.
18 BY MR. SLATER:
19     Q.    Did you rely on the attorneys
20 who provided those documents to you to make
21 sure that you had all of the documents
22 relevant to forming such an opinion?
23     A.    Between the initial information
24 they provided and responding to subsequent

Page 52

1  requests that I may have made, yes.
2      Q.    You would agree with me that if
3  there were material documents, meaning
4  material -- rephrase.
5          You would agree with me that to
6  the extent there were documents that would be
7  material to your formation of that opinion
8  that were not provided to you, that could
9  potentially be problematic, correct?
10         MR. FOX:  Objection to form.
11 Calls for speculation.
12     A.    I'm not aware that there were
13 any such documents.  And if I felt something
14 was needed and I didn't have it, I requested
15 it.
16 BY MR. SLATER:
17     Q.    You told me about the one
18 document you requested regarding the recall.
19 Is there any other document you can recall
20 that you asked for?
21         MR. FOX:  Objection.  Asked and
22 answered.
23     A.    I did a little independent
24 research as well, looking at publicly

Page 53

1  available data on the FDA's website regarding
2  the compliance history of ZHP.  That was not
3  supplied by the attorneys.
4  BY MR. SLATER:
5      Q.    Ultimately your opinion is
6  dependent on the materials you reviewed,
7  correct?
8          MR. FOX:  Objection to form.
9      A.    Yes.
10 BY MR. SLATER:
11     Q.    If I were to be able to show
12 you documents during the course of this
13 deposition where you would say, You know,
14 that's a document that would have been
15 material to me so I would have to look at
16 that document and reevaluate my opinion, that
17 would -- if that were to happen, that would
18 place your opinion in question until you'd
19 have the chance to review that document and
20 determine whether it affected your opinion,
21 right?
22         MR. FOX:  Objection.  Calls for
23 speculation.
24     A.    I have no way of knowing that

Confidential Information Subject to Protective Order

Page 54

¹ without seeing the specifics.
² BY MR. SLATER:
³    Q.    Let me talk to you -- and let
⁴ me be specific in what I'm asking you.
⁵            In terms of your approach to
⁶ this case, your methodology, you've already
⁷ told me that you relied on the documents that
⁸ you reviewed to form your opinion.  We've
⁹ already gone over that.
¹⁰           What I'm getting at is, if I
¹¹ were to show you a document or ask you about
¹² a type of document and you said, Well, I
¹³ didn't see that, and if that existed that
¹⁴ would be important to me, something I would
¹⁵ have needed to take into account in order to
¹⁶ form my opinion in this case, if that were to
¹⁷ happen, would you agree with me that you
¹⁸ would then want to review that document and
¹⁹ then offer an opinion based on everything you
²⁰ had seen inclusive of that document?
²¹           MR. FOX:  Objection to form.
²²    A.    It would depend on the
²³ specifics.
²⁴           ///

Page 55

¹ BY MR. SLATER:
²    Q.    One of the things that you
³ talked about in your report were internal
⁴ standard operating procedures which you
⁵ mention can go by various nomenclatures;
⁶ standard operating procedures, standard
⁷ management procedures, they can have various
⁸ titles, but you talked about that concept in
⁹ your report, right?
¹⁰   A.    Yes.
¹¹   Q.    And I think -- you can correct
¹² me if I'm wrong, I think what you said was
¹³ those internal -- and I'm going to call them
¹⁴ generically standard operating procedures or
¹⁵ SOPs, okay?
¹⁶   A.    That's fine.
¹⁷   Q.    I think you said in your report
¹⁸ that to the extent a company actually adopts
¹⁹ such SOPs as part of their GMP processes,
²⁰ they're required to comply with those SOPs.
²¹           Did I understand that
²² correctly?
²³   A.    Yes.
²⁴   Q.    So if ZHP had internal SOPs

Page 56

¹ relevant to the issues that you looked at,
² you would have expected to be provided those
³ so you could take those into account in
⁴ forming your opinion, correct?
⁵            MR. FOX:  Objection to form.
⁶    A.    Yes.
⁷ BY MR. SLATER:
⁸    Q.    So for example, with regard
⁹ to -- well, withdraw that.
¹⁰           If, in fact, there were
¹¹ internal SOPs from ZHP that you were not
¹² provided that relate, for example, to the
¹³ change control process or the change control
¹⁴ that was -- rephrase.
¹⁵           If there was a -- rephrase.
¹⁶           If there was an internal
¹⁷ standard operating procedure from ZHP
¹⁸ addressing the change in manufacturing
¹⁹ process, you would have wanted to see that,
²⁰ right?
²¹           MR. FOX:  Objection to form.
²²    A.    I did see one related to that.
²³ BY MR. SLATER:
²⁴    Q.    Is it listed on your list of

Page 57

¹ references?
²    A.    No.
³    Q.    Is it listed in your report in
⁴ a footnote?
⁵    A.    Yes.
⁶    Q.    Is that 18.01?
⁷    A.    That's a typographical error.
⁸ I've discovered it should be 18.08.
⁹            The reason it may not be listed
¹⁰ in the references is it was an attachment to
¹¹ the warning letter response that ZHP sent in,
¹² so it was included in another item that is
¹³ referenced.
¹⁴   Q.    Why are you saying that 18.08
¹⁵ should have been listed as opposed to 18.01?
¹⁶   A.    Because I looked at it over the
¹⁷ weekend and double-checked it against the
¹⁸ footnote in my report, and found the report
¹⁹ has a typo in that number.
²⁰   Q.    So the S -- it's actually an
²¹ SMP.
²²   A.    Yes.
²³   Q.    Okay.  So the SMP that you saw
²⁴ was 18.08?

Confidential Information - Subject to Protective Order

Page 58

1    A.    Yes.
2    Q.    You did not see any of the
3  other iterations of SMP 18, correct?
4    A.    I did not, but the .08 version
5  has a complete revision history, so I was
6  able to tell from that what changes had been
7  made over time.
8    Q.    As you sit here now, do you
9  know what the form of that SMP was when the
10  manufacturing change process was being
11  evaluated by ZHP?
12        MR. FOX:  Objection to form.
13    A.    I'm sorry, you said the form?
14  I don't follow your question.
15  BY MR. SLATER:
16    Q.    Let me ask you this.  Did you
17  ask to be shown the SMP that was actually in
18  effect when ZHP was going through the change
19  control process?
20    A.    By retrospectively looking at
21  the revision history, I believe it was
22  version 5 or version 6, I don't recall as I
23  sit here.  But I was able to see what changes
24  had been made since then in '08, and use that

Page 59

1  to determine what would have been there in
2  that earlier iteration.
3    Q.    Did you discuss that at all in
4  your report?
5    A.    No.
6    Q.    Is this just an issue that you
7  became aware of this weekend, as you said?
8    A.    Oh, just the incorrect citation
9  of the number I became aware of, yes.
10    Q.    The wording of the SMP that
11  governed the change control for the
12  manufacturing process is an important
13  document in this case, correct?
14        MR. FOX:  Objection to form.
15    A.    It's an important document,
16  yes.
17  BY MR. SLATER:
18    Q.    And the version that would be
19  most significant would be the version that
20  was in effect in 2011 when the manufacturing
21  process change was being evaluated at ZHP,
22  correct?
23        MR. FOX:  Objection to form.
24    A.    Yes, that would be important.

Page 60

1  Whether it would be most important or not is
2  -- I'm not prepared to say, but it certainly
3  would be important.
4  BY MR. SLATER:
5    Q.    Well, in terms of whether or
6  not ZHP complied with the SMP governing
7  change control, the version that was in
8  effect when ZHP conducted that change control
9  review would be the one that you would want
10  to look to to determine whether or not it was
11  complied with, right?
12        MR. FOX:  Objection to form.
13    A.    I was able to use the revision
14  history to see what changes had been made
15  since that time, and as I sit here now, I
16  can't explain that in detail because I don't
17  have the document in front of me.  But I
18  concluded I had enough information there to
19  establish that they did have a procedure for
20  that.
21  BY MR. SLATER:
22    Q.    Is the answer to my question
23  yes, that the version that was in effect when
24  the change was being evaluated, that would be

Page 61

1  the one that would be most significant
2  because that would have been the one in
3  effect at the time?
4        MR. FOX:  Objection to form.
5    A.    That would have been the one in
6  effect at the time, and that would be the one
7  that GMP would require them to follow, yes.
8  BY MR. SLATER:
9    Q.    And you testified that you
10  believed that version 5 or 6 would be the one
11  that was in effect at the time of the change,
12  and that's the one that would be most
13  significant, that's your understanding?
14        MR. FOX:  Objection to form.
15    A.    I can't be positive without
16  looking at the version history in the actual
17  attachment that's referenced here, but from
18  memory, I think it was in that vicinity.  It
19  was either 5 or 6.  I'd have to look again to
20  be sure.
21  BY MR. SLATER:
22    Q.    If ZHP failed to comply with
23  the SMP 18 version that was in effect when it
24  did its change control review, then it

Confidential Information - Subject to Protective Order

Page 62

¹ violated GMP, correct?
²          MR. FOX:  Objection.  Form.
³      A.    That would be a deviation from
⁴ GMP, yes.
⁵ BY MR. SLATER:
⁶      Q.    I'm not going to pull them out
⁷ right now, but there were also some ICH
⁸ documents that you referenced in your report
⁹ as well, correct?
¹⁰      A.    Yes.
¹¹      Q.    For example, ICH Q7A and Q7,
¹² that's the good manufacturing practice
¹³ guidance for active pharmaceutical
¹⁴ ingredients, that's an important document in
¹⁵ this case, right?
¹⁶          MR. FOX:  Objection to form.
¹⁷      A.    The correct nomenclature is Q7.
¹⁸ They dropped the A off of it a few years ago.
¹⁹ BY MR. SLATER:
²⁰      Q.    In the 2001 version it said
²¹ Q7A, and then in 2016 they dropped the A.
²²          Does that sound right?
²³      A.    Yes.
²⁴      Q.    So for our discussion today, we

Page 63

¹ can just call it the Q7?
²      A.    Yes.
³      Q.    Was ZHP required to comply with
⁴ Q7 at the time that it was evaluating the
⁵ change in the manufacturing process as a
⁶ matter of GMP?
⁷          MR. FOX:  Objection to form.
⁸      A.    In the US regulatory hierarchy,
⁹ Q7 stands as nonbinding guidance, not as a
¹⁰ regulation.
¹¹ BY MR. SLATER:
¹²      Q.    Well, if it's a nonbinding
¹³ guidance, why does anybody look at it if it
¹⁴ has no impact on anything that anyone is
¹⁵ actually going to have to do?
¹⁶      A.    Because there is no binding
¹⁷ regulation for GMP for API, only a broad
¹⁸ statutory requirement.
¹⁹      Q.    In terms of how the broad
²⁰ statutory requirement to comply with GMP is
²¹ interpreted, Q7 is actually a significant
²² source, correct?
²³      A.    Yes.
²⁴          MR. FOX:  Objection to form.

Page 64

¹ BY MR. SLATER:
²      Q.    And in your industry, it's
³ accepted that a violation -- rephrase.
⁴          And in your industry, it's
⁵ accepted that a failure to comply with Q7
⁶ would amount to a GMP violation, correct?
⁷          MR. FOX:  Objection to form.
⁸      A.    Not exactly.
⁹ BY MR. SLATER:
¹⁰      Q.    Are there circumstances where
¹¹ the failure to comply with Q7 constitutes a
¹² violation of GMP?
¹³      A.    Are there circumstances --
¹⁴ pardon me.  Say again?  Are there
¹⁵ circumstances when it does?
¹⁶      Q.    Yes.
¹⁷          MR. FOX:  Objection to form.
¹⁸      A.    Yes.
¹⁹ BY MR. SLATER:
²⁰      Q.    I'm saying in and of itself
²¹ where somebody would say, Well, because you
²² didn't comply with this aspect of Q7, that
²³ constitutes a violation of GMP.
²⁴          MR. FOX:  Objection to form.

Page 65

¹          Incomplete hypothetical.
²      A.    That involves the application
³ of judgment.  It is not a linear correlation.
⁴ If you deviate from a guideline, you're
⁵ expected to have a justified reason why what
⁶ you are doing to comply is as good as or
⁷ better than what the guideline prescribes.
⁸          So there may be times you don't
⁹ meet the guideline literally, but what you're
¹⁰ doing is perfectly adequate.
¹¹ BY MR. SLATER:
¹²      Q.    I think what you're saying is
¹³ if you're going to deviate from the Q7
¹⁴ guideline, you need to be able to explain why
¹⁵ the alternative approach you took was
¹⁶ acceptable?
¹⁷      A.    That's correct.
¹⁸      Q.    And acceptable would mean that
¹⁹ it -- well, let me rephrase.
²⁰          And acceptable would mean that
²¹ your own process or your own approach
²² accomplished the same thing that Q7 sought to
²³ approach, correct?
²⁴          MR. FOX:  Objection to form.

Confidential Information - Subject to Protective Order

Page 66

1    A.    Yes.
2  BY MR. SLATER:
3    Q.    So, for example, if the issue
4  was a -- the Q7 requirement that a thorough
5  scientifically based risk assessment be
6  performed in order to identify potential
7  genotoxic impurities that may result from a
8  change in manufacturing process, if ZHP
9  failed to actually identify that potential
10  impurity, ZHP would need to show why its
11  approach either -- it would need to show why
12  its approach which deviated from Q7 -- let me
13  rephrase, because I think that I actually
14  answered my own question.
15        MR. FOX:  I'm going to object
16  to it anyway, Adam.
17        MR. SLATER:  I took it back.
18  You can't object to the take-back.
19  BY MR. SLATER:
20    Q.    If ZHP did not apply Q7 to its
21  risk assessment for the manufacturing change
22  to the zinc chloride process, ZHP would need
23  to justify why it took an alternative
24  approach, correct?

Page 67

1        MR. FOX:  Objection to form.
2    A.    Mr. Slater, your question
3  assumes that that level of detail is in Q7,
4  which it is not.  If memory serves,
5  Section 2.22 of Q7, line item 4 is one
6  sentence that simply says that when
7  deviations occur they must be investigated.
8  It doesn't mention genotoxic impurities or
9  anywhere near the level of specificity that
10  was embodied in your question.
11  BY MR. SLATER:
12    Q.    Can we agree when ZHP performed
13  its risk assessment in connection with the
14  manufacturing process change to the zinc
15  chloride process that ZHP was required to
16  apply current scientific knowledge?
17        MR. FOX:  Objection to form.
18    A.    Yes.
19  BY MR. SLATER:
20    Q.    You said something earlier
21  about from what you saw there was a process
22  that ZHP had, and that's part of GMP, is that
23  you have to have a process to follow, right?
24    A.    Yes.

Page 68

1    Q.    GMP also requires that the
2  process be followed thoroughly and correctly,
3  right?
4        MR. FOX:  Objection to form.
5    A.    Yes.
6  BY MR. SLATER:
7    Q.    So going through the motions
8  and saying, Well, we checked the boxes and we
9  technically did a risk assessment, that's not
10  enough; you have to actually actively perform
11  the risk assessment and apply the available
12  scientific knowledge in evaluating that
13  process, right?
14        MR. FOX:  Objection to form.
15    A.    I don't -- I fail to understand
16  the difference between saying you did a risk
17  assessment and doing a risk assessment, which
18  is what your question implied to me, sir.
19  BY MR. SLATER:
20    Q.    Well, what I'm saying is, is it
21  enough to just go through the motions and not
22  apply the scientific knowledge that's
23  available and just check the boxes and then
24  you're okay?

Page 69

1        MR. FOX:  Objection to form.
2    A.    I fail to understand the thrust
3  of your question.  I really don't follow you.
4  BY MR. SLATER:
5    Q.    Okay.  I understand that you
6  have told us you don't have the scientific
7  expertise to determine whether or not --
8  well, rephrase.  Let me ask you this, if I'm
9  right.
10        Am I correct that you have told
11  us in your report you do not have the
12  scientific expertise to evaluate whether or
13  not ZHP adequately took into account the
14  scientific knowledge at the time of the
15  manufacturing process change such that you
16  can't offer an opinion as to whether or not
17  ZHP met or did not meet current good
18  manufacturing practices?
19        MR. FOX:  Objection to form.
20    A.    I am not a subject matter
21  expert in process chemistry or pharmaceutical
22  chemistry, nor was I when I was at the FDA.
23        The way things were done there
24  and the way I do them in my consulting

Confidential Information - Subject to Protective Order

Page 70

1 practice is in a multidisciplinary
2 collaborative sense where I call on the
3 knowledge and expertise of other subject
4 matter experts to assist in areas where I
5 don't feel I have all the knowledge and
6 experience necessary.
7         That's the way these things are
8 worked out both in the agency and in the
9 consulting work that I do.
10 BY MR. SLATER:
11     Q.    In response to my question, "am
12 I correct," is the answer yes?
13         MR. FOX:  Objection to form.
14     A.    I don't -- I am not a subject
15 matter expert in process chemistry or
16 pharmaceutical chemistry, so there are
17 limitations for how far I could take that
18 analysis, yes.
19 BY MR. SLATER:
20     Q.    And am I correct that because
21 you do not offer any opinions regarding the
22 scientific adequacy of the risk assessment,
23 you're not offering an opinion at this time
24 as to whether or not ZHP met its GMP

Page 71

1 obligations?
2         MR. FOX:  Objection to the
3     form.  Misstates testimony.
4 BY MR. SLATER:
5     Q.    Am I correct?
6     A.    In my report I indicate those
7 areas where I must defer to appropriate --
8 people with appropriate scientific expertise.
9     Q.    And that's one of those areas,
10 right?
11         MR. FOX:  Objection to form.
12     A.    It may be.  As I recall it is,
13 but I'm not looking at that part of the
14 report at the moment.
15 BY MR. SLATER:
16     Q.    Well, I'm asking you as you sit
17 here right now, am I correct that because
18 you're not able to offer an opinion as to
19 whether or not ZHP's risk assessment was
20 adequate from a scientific perspective,
21 you're not in a position to offer an opinion
22 as to whether ZHP's risk assessment was
23 adequate from a GMP perspective --
24         MR. FOX:  Objection to the

Page 72

1 form.
2         Sorry, Adam.
3 BY MR. SLATER:
4     Q.    -- am I correct that you cannot
5 do so because of your lack of scientific
6 expertise?
7         MR. FOX:  Objection to the
8     form.  Misstates testimony, no
9     foundation.
10     A.    I would require the assistance
11 of scientific subject matter experts to have
12 a fully formed opinion of that, that's
13 correct.
14 BY MR. SLATER:
15     Q.    Well, when you say to have a
16 fully formed opinion, I just want to make
17 sure before we get off this point that we're
18 both clear.
19         You don't have an opinion as
20 you sit here right now as to whether ZHP
21 satisfied good manufacturing practices when
22 it made the manufacturing process change
23 because you're not able to evaluate the
24 scientific adequacy of that risk assessment,

Page 73

1 is that correct?
2         MR. FOX:  Objection to form.
3     A.    I'm not able to determine
4 independently whether it was feasible for
5 them to have brought the scientific
6 principles to bear beyond what they did,
7 because I am not a pharmaceutical chemist or
8 a process scientist, and not aware of what
9 the state of the art may have been at that
10 point in time.  That's what I would need help
11 on.  I can't evaluate other aspects of the
12 risk assessment.
13         And assuming the science is
14 sound, I can then offer an opinion that if
15 that is true, then the effort complies with
16 GMP.  But it's subject to validation by
17 appropriate scientific expertise.
18 BY MR. SLATER:
19     Q.    At this point you don't have an
20 opinion as to whether ZHP met or did not meet
21 GMP because you do not at this time have a
22 basis to evaluate the scientific adequacy of
23 the risk assessment.  Is that a correct
24 statement?

Page 74

1          MR. FOX:  Objection to form.
2     Misstates testimony and his report.
3          A.    Assuming the science is
4     supportable I can form an opinion, but I
5     would need additional input in order to be
6     confident.
7     BY MR. SLATER:
8          Q.    I understand what you could do
9     if certain information were provided at a
10    later date.
11          But as you sit here now, you're
12    not able to form that opinion because you
13    don't have that information one way or the
14    other, correct?
15          A.    That's correct.
16          MR. FOX:  Objection to form.
17    BY MR. SLATER:
18          Q.    I'm sorry, over the objection
19    you said "that's correct," right?
20          A.    Yes.
21          Q.    You said that -- I think you
22    used words to the effect of -- rephrase.
23          When you were talking a few
24    moments ago you referred to the feasibility

Page 75

1     of having certain scientific knowledge, or
2     something to that effect.  I know I'm not
3     directly quoting you.  But I think you said
4     something to that effect.
5          Did I hear you right?
6          A.    Yes.
7          MR. FOX:  Objection to form.
8     BY MR. SLATER:
9          Q.    If it was feasible for ZHP to
10    be aware of the scientific processes that led
11    to the creation of the NDMA impurity at the
12    time it did its risk assessment, then it
13    violated GMP by failing to identify that
14    potential impurity, correct?
15          MR. FOX:  Objection to the
16    form.  Misstates testimony, no
17    foundation.
18          A.    If it was feasible for them to
19    apply appropriate science at that point in
20    time and they failed to do so, it would raise
21    certain questions and would require further
22    study on my part and collaboration with the
23    appropriate scientific experts so that I
24    could fully understand the details before I

Page 76

1     would be able to reach a conclusion I would
2     be confident in.  It would require study and
3     discussion.
4     BY MR. SLATER:
5          Q.    Well, I would like you to
6     assume that it was feasible for ZHP to know
7     at the time that it was performing its risk
8     assessment on the zinc chloride process that
9     under those manufacturing conditions DMF
10    could degrade and create dimethylamine, and
11    that it was also feasible to know that under
12    those manufacturing conditions that
13    dimethylamine could react with the nitrous
14    acid that resulted from the sodium nitrate at
15    the quenching stage, and that that reaction
16    could form NDMA or other nitrosamines, I'd
17    like you to assume that that was feasible for
18    them to know at the time, and they did not --
19    as we know, they did not identify that
20    potential impurity and that potential
21    reaction, we know that.
22          So if my hypothetical is
23    correct, ZHP violated GMP in its risk
24    assessment, correct?

Page 77

1          MR. SLATER:  Objection to form.
2     Incomplete hypothetical.
3          A.    Part of a proper vetting of
4     that position would require understanding
5     whether analytical methodology existed that
6     could detect NDMA at whatever level it might
7     or might not be present, and how much
8     reliability could be placed in that
9     analytical methodology.
10          So that's another example of
11    the sort of thing I would need the help of
12    pharmaceutical chemistry expertise to better
13    understand.
14    BY MR. SLATER:
15          Q.    The analytical methodology
16    would be GC-MS, gas chromatography-mass
17    spectrometry, right?
18          MR. FOX:  Objection to form.
19          A.    That's one of, I believe, three
20    methods that are out there now that were not
21    at the time in question.
22    BY MR. SLATER:
23          Q.    I'd like to expand my
24    hypothetical to address the comment you just

Page 78

1  made, and I'd like you to assume that it was
2  feasible based on technology available in
3  2011 for ZHP to have identified the NDMA if
4  they were looking for it as a potential
5  impurity. I'd like you to assume that
6  technology was available.
7          Having expanded my hypothetical
8  accordingly, you would agree that under those
9  circumstances ZHP would have violated GMP in
10 its risk assessment, correct?
11         MR. FOX: Objection to form.
12     A.    Well, you're asking me to make
13 a lot of assumptions, which I do not know
14 whether they're true or not, and I frankly
15 struggle with that. I'm not sure I can agree
16 to that hypothetical.
17 BY MR. SLATER:
18     Q.    We'll come back to it.
19         You said you normally work with
20 a multidisciplinary team to form your GMP
21 opinions in this type of a context?
22     A.    I said that I did that when I
23 was at the FDA, and that in consulting I
24 still do that to this day.

Page 79

1      Q.    That did not occur here, right?
2      A.    It did not, because my
3  retention was under a particular agreement,
4  and I didn't have the benefit of being able
5  to call upon colleagues and share details
6  with them due to confidentiality.
7      Q.    You did not rely on the
8  opinions of any subject matter experts
9  regarding the scientific questions here in
10 forming your opinions. That has not
11 occurred, right?
12         MR. FOX: Objection to the
13     form. Misstates his report and
14     references.
15 BY MR. SLATER:
16     Q.    I'm correct, right?
17     A.    I took what was available from
18 the FDA communications and the record that I
19 had in front of me and based my opinion on
20 that.
21     Q.    I didn't see any discussion in
22 your report of you relying on any particular
23 subject matter experts regarding the science
24 to form your opinions. That's not something

Page 80

1  you did in your report, right?
2      A.    That's right.
3          MR. FOX: Objection to form.
4      Misstates testimony.
5      A.    What I did was I mentioned
6  specifically in the report the areas where I
7  was unable to carry my opinion beyond the
8  point it's at because I would need to defer
9  to others with appropriate scientific
10 expertise. Those areas are highlighted.
11 BY MR. SLATER:
12     Q.    I want to come back now to my
13 hypothetical. And it's no secret I'm asking
14 you these questions as a hypothetical because
15 I think I can prove every single aspect of it
16 very easily. So this is not some -- I'm just
17 telling you this is no farfetched
18 hypothetical. So let me -- having said that,
19 let me rephrase.
20         Were you provided the report of
21 Dr. Steven Hecht?
22     A.    No.
23     Q.    Do you know who he is?
24     A.    No.

Page 81

1      Q.    Were you -- rephrase.
2          Were you provided, other than
3  Mr. Quick's declaration and Ms. Conti's
4  declaration, any other plaintiff expert
5  reports or declarations?
6      A.    No.
7      Q.    I'm going to try this one more
8  time, but I'm going to try to do it more
9  coherently.
10         Let me ask you this before I go
11 on. Actually let me do this, actually, the
12 way that I want to.
13         All right. I'm going to try to
14 ask you the hypothetical in a little more
15 condensed fashion now also addressing the
16 analytical methodology issue that you
17 questioned me on so I can put it all together
18 in one question, and then we'll see if, maybe
19 by me doing that, if you'll be able to answer
20 that question, okay?
21     A.    Sure.
22     Q.    I'd like you to assume that at
23 the time -- rephrase.
24         I would like you to assume that

Confidential Information - Subject to Protective Order

Page 82

1 at the time ZHP was performing its risk
2 assessment on the zinc chloride manufacturing
3 process that it was scientifically feasible
4 for ZHP to know that, under the manufacturing
5 process conditions that were proposed, that
6 the DMF that they had added to the process
7 could degrade, and that one of the degradings
8 from that could be dimethylamine, and that
9 under the proposed manufacturing conditions
10 that dimethylamine could react with the
11 nitrous acid that would be present during the
12 quenching phase due to the presence of sodium
13 nitrate, and that that reaction could yield
14 NDMA.
15         I'd like you also to assume
16 that at the time it would have been
17 scientifically feasible to apply testing to
18 see if there was NDMA there if one were
19 looking for it. I'd like you to assume those
20 facts.
21         If those facts are true, you
22 would agree with me that ZHP's failure to
23 take into consideration what I just asked you
24 about would have violated current good

Page 83

1 manufacturing practices at the time?
2         MR. FOX: Objection to the
3     form. Incomplete hypothetical, calls
4     for speculation.
5     A.    If I understand your question
6 correctly, Mr. Slater, if all those things
7 were feasible and were known to ZHP, they
8 should have taken them into consideration.
9 BY MR. SLATER:
10     Q.    We know they did not, because
11 you've seen their documentation, so we know
12 ZHP never took into account the potential
13 chemical reactions I went through with you,
14 correct?
15         MR. FOX: Objection to form.
16     A.    I can't reach that conclusion.
17 ZHP submitted a tremendous amount of very
18 detailed scientific analysis, a lot of
19 structural chemistry diagrams and other
20 things, and this is where my expertise drops
21 off, and I would need others to look at that
22 and determine whether they, in fact,
23 understood the principles you've just
24 outlined or not. I cannot reach that

Page 84

1 conclusion by reviewing the information they
2 submitted.
3 BY MR. SLATER:
4     Q.    If ZHP did not take into
5 account the chemical reactions that I just
6 described to you in my hypothetical, then
7 they violated good manufacturing practices,
8 correct?
9         MR. FOX: Objection to the
10     form. Misstates testimony, calls for
11     speculation.
12     A.    What I -- I'm sorry? I heard
13 an echo there, I guess. I thought someone
14 was asking another question.
15 BY MR. SLATER:
16     Q.    No, no one said anything. But
17 let me just be clear on my question before
18 you answer.
19         I'm going back to my original
20 question, which is, assuming the accuracy of
21 that hypothetical, assuming that it was
22 scientifically feasible for ZHP to know those
23 things, and assuming they did not take them
24 into account, they violated good

Page 85

1 manufacturing practices in that risk
2 assessment, correct?
3         MR. FOX: Objection to form.
4     No foundation, misstates testimony,
5     and calls for speculation.
6     A.    The GMP requirement is very
7 high level, it's for a thorough
8 investigation. Nowhere does it specify what
9 the elements of a thorough investigation are;
10 it leaves that up to judgment.
11         And certainly if there is
12 material information that was either not
13 considered, omitted, whatever, then that risk
14 assessment would be less than it should be
15 based upon those facts.
16 BY MR. SLATER:
17     Q.    When you say "less than it
18 should be," that would mean not compliant
19 with GMP, correct?
20         MR. FOX: Objection to form.
21     A.    That calls for a conclusion
22 that I'm not prepared to reach. It would be
23 less than I would hope to see certainly.
24         But it's difficult sometimes to

Page 86

1 discern when you're talking about something
2 would simply improve an otherwise compliant
3 practice or make the difference between
4 compliance and noncompliance.
5 BY MR. SLATER:
6      Q.    Are you aware that there was --
7 well, let's jump forward a little bit,
8 actually, since we're cruising along here.
9 Just find a paperclip.  We'll come back to
10 this a little bit.
11           Let me ask you this:  On your
12 Exhibit B, did you actually review the change
13 request form which laid out the evaluation
14 that ZHP did of its change in manufacturing
15 process to the zinc chloride process?
16 Because I didn't see that referenced on your
17 reliance list -- reference list, I should
18 say.
19      A.    I think it was incorporated in
20 another document that is on that list, but it
21 would take me some time to check back and
22 find it.  I do recall seeing that form, but I
23 don't remember much about it as I sit here.
24      Q.    I didn't see the change request

Page 87

1 form referenced anywhere in your report.  Did
2 I miss that, or am I correct that it's not
3 referenced?
4           MR. FOX:  Objection.  Asked and
5      answered.
6      A.    It may not have been referenced
7 by that name.  I think it was a part of
8 another document set that I reviewed and
9 relied upon.  And if memory serves, I believe
10 it was the response to the warning letter,
11 but I would have to go back and check through
12 these references to determine that for
13 certain.
14 BY MR. SLATER:
15      Q.    The documentation of the risk
16 assessment for the change in manufacturing
17 process, that documentation would have been
18 very important to you in forming your opinion
19 here, correct?
20           MR. FOX:  Objection to form.
21      A.    Yes.
22 BY MR. SLATER:
23      Q.    Yet there's no place in your
24 report where you actually discuss that

Page 88

1 document at all, correct?
2      A.    What do you mean by "that
3 document"?  Which document are you referring
4 to?
5
6
7
8
9 anywhere in your report or discussed at all
10 in your report.  Am I correct?
11      A.    I don't recall specifically
12 citing it.  I do recall seeing it.
13      Q.    The change request form
14 documenting what was done and what was
15 considered would be a critical document to
16 you in forming an opinion as to whether or
17 not ZHP met its GMP obligations, right?
18           MR. FOX:  Objection to form.
19      Argumentative, and misstates prior
20      testimony.  Asked and answered.
21      A.    Subject to input regarding the
22 rigor of the science, yes.
23           MR. SLATER:  Counsel, you keep
24      saying that I'm misstating testimony.

Page 89

1      I don't understand why you keep saying
2      that.  I'm not stating his testimony.
3           I mean, I think we have to at
4      some point -- I would ask you politely
5      if we can just limit the objections to
6      legitimate objections, please.
7           MR. FOX:  It was a legitimate
8      objection, Adam.  You previously asked
9      him whether it was important, now
10      you're asking him whether it's
11      critical.  You were changing the
12      question on him, and you had already
13      asked about that.
14 BY MR. SLATER:
15



Confidential Information - Subject to Protective Order

Page 90



Page 91

1    Q.    As a matter of ICH guidance, if
2 something is deemed a critical change, it
3 requires a higher degree of scientific rigor
4 in performing the risk assessment, right?
5         MR. FOX:  Objection to form.
6    A.    Generally speaking, yes.
7 BY MR. SLATER:
8    Q.    Do you know whether or not --
9 well, rephrase.
10        You said you think that you saw
11 the change request form as an attachment to
12 another document.  Did you ever ask counsel,
13 Is this the complete change request form with
14 all attachments?
15   A.    I don't recall ever asking that
16 question, no.
17   Q.    Do you have any knowledge as to
18 whether or not the change request form that
19 you think you saw attached to another
20 document was the complete change request form
21 with all attachments?  As you sit here now,
22 do you have any idea?
23   A.    I do not as I sit here now.
24   Q.    And without seeing the complete

Page 92

1 document and comparing it to what you did
2 have, you don't know whether there's material
3 information that you didn't have available to
4 you, right, by definition?
5    A.    I'm not sure I understand your
6 question, sir.
7    Q.    Well, you don't know what you
8 don't know, and since you don't know if you
9 saw the complete document you don't know if
10 you were missing material information from
11 the change request form and its attachments,
12 right?
13        MR. FOX:  Objection to form.
14   A.    If there was material
15 information that was not made available to
16 me, I'm not aware of that, and yes, it would
17 be of concern.
18 BY MR. SLATER:
19 
23   A.    I don't recall.
24   Q.    Would that be an important

Page 93

1 consideration in forming an opinion as to
2 whether ZHP complied with GMP?
3        MR. FOX:  Objection to form.
4    A.    That's another example of
5 something that I would ask for help from a
6 pharmaceutical chemistry expert to evaluate,
7 but yes, the outcome of that discussion would
8 be important.
9 BY MR. SLATER:
10   Q.    Were you curious when you were
11 writing your report as to what impurities ZHP
12 considered -- let me rephrase.
13        When you were writing your
14 report, were you curious as to what potential
15 impurities ZHP considered as part of its risk
16 assessment for the zinc chloride process?
17 Were you curious as to what they looked at?
18   A.    I'm not sure I understand what
19 you mean by was I curious.  I reviewed the
20 record, I saw what they did consider, I saw
21 how they documented it, I stated, I think
22 fairly clearly, where my limitations were in
23 my ability to evaluate the science.
24        Was I curious as to whether

Confidential Information Subject to Protective Order

Page 94

1   they looked for certain other things that
2   they might have had no reason to believe
3   there?  No.  GMP does not require that you
4   look for things you have no basis to believe
5   are present.
6   ████████  ████████████████████████████
    ███████████████████████████████████████
    ██████████████████████████████
    ████████████████████████████████████████
    ██████████████████████████████████
13  BY MR. SLATER:
14      Q.    As you sit here now, did you
15  say anything about that in your report?
16      A.    Again, I'd have to go through
17  the report to be certain.
18  ███  ███████████████████████
    ████████████████████████████████
21  Are you saying it might be in the report and
22  you'd need to check your report to see if
23  that's in there?
24      A.    I don't recall that it's there,

Page 95

1   but I wouldn't be prepared to say that
2   definitively without going through the
3   report.
4       Q.    And as you sit here now, are
5   you able to tell me one way or another
6   whether or not -- well, let me ask you this.
7           As you sit here now, do you
8   have an assumption as to whether or not ZHP
9   considered the potential formation of NDMA or
10  any other nitrosamines as part of the zinc
11  chloride manufacturing process when it
12  performed its risk assessment?  Do you have
13  an assumption one way or the other as to
14  whether that was considered?
15      A.    My assumption would be that
16  they did, absent information to the contrary.
17  But I don't recall what those documents said
18  without going back and looking at them again.
19  This was an incredibly voluminous data set,
20  and I don't carry it all around in my head.
21      Q.    What's the basis for that
22  assumption that they did consider the
23  potential formation of NDMA or other
24  nitrosamines as part of the risk assessment?

Page 96

1       A.    It's the impression I got of
2   the thoroughness and completeness of the
3   documents that I reviewed from ZHP, the
4   interactions between them and the FDA staff,
5   the FDA questions that came back to them, the
6   entire dialogue that took place there.
7           Ultimately they did, of course,
8   find those residues in certain batches, and
9   they did the responsible thing and conducted
10  a recall, so at some point in time they did
11  make that identification.  I believe that was
12  in 2018.
13      Q.    When you say "they did the
14  responsible thing," do you mean telling their
15  customers and the FDA that there was NDMA in
16  the valsartan?
17      A.    Once they knew that, yes.
18      Q.    When you say that's the
19  responsible thing, it's not only the
20  responsible thing, it was the legally
21  required thing to do, right?
22      A.    Yes.
23          MR. FOX:  Objection to form.
24          ///

Page 97

1   BY MR. SLATER:
2       Q.    As soon as ZHP knew that there
3   was NDMA in its valsartan, it was legally
4   obligated to inform all of its customers and
5   the FDA, correct?
6           MR. FOX:  Objection to form.
7           Calls for a legal conclusion.
8       A.    The regulatory requirement is
9   for them to report that to the FDA in the
10  form of a report called a field alert report.
11  BY MR. SLATER:
12      Q.    And it's your testimony based
13  on the materials you saw that you understand
14  that ZHP complied with that field alert
15  report regulation in June of 2018?
16      A.    They notified the FDA.
17      Q.    It's your understanding that
18  ZHP notified its customers and the FDA
19  immediately upon learning that there was NDMA
20  in its valsartan?  Is that your understanding
21  from what you reviewed?
22          MR. FOX:  Objection to form.
23      A.    The word "immediately" is one I
24  have difficulty with.  They did it very soon

Confidential Information - Subject to Protective Order

Page 98

1  thereafter.  I don't know what you mean by
2  "immediate," but it was in very close
3  proximity time-wise to that, yes.
4  BY MR. SLATER:
5      Q.    The field alert report
6  regulation provides three business days to
7  provide that information to the FDA, right?
8      A.    Yes.
9      Q.    Is it your understanding that
10 ZHP reported that there was NDMA in its
11 valsartan within three days -- business days
12 of learning of that?
13          MR. FOX:  Objection to form.
14     A.    The difficulty with that is
15 it's very difficult to determine in many
16 cases when the clock starts.
17          I believe they did the
18 responsible thing by reporting it.  Once they
19 had certainty as to that information they
20 told the FDA about it, and they did conduct a
21 recall on a voluntary basis.
22 BY MR. SLATER:
23     Q.    Was the notification of the
24 presence of NDMA in the valsartan to

Page 99

1  customers and the FDA required by good
2  manufacturing practices?
3      A.    No.
4          MR. FOX:  Objection to form.
5  BY MR. SLATER:
6      Q.    Did good manufacturing
7  practices require that -- well, rephrase.
8  I'll get back to it.
9          Coming back to what ZHP did as
10 part of its risk assessment -- well,
11 rephrase.
12         I was asking you before about
13 whether ZHP considered the potential
14 formation of nitrosamine impurities including
15 NDMA, and you said your assumption was that
16 they did consider that, right?
17         MR. FOX:  Can you repeat that,
18 Adam?  I missed that.
19         MR. SLATER:  Sure.
20 BY MR. SLATER:
21     Q.    You told me a moment ago that
22 you assumed that ZHP did as part of its risk
23 assessment take into account the potential
24 formation of nitrosamines as part of the zinc

Page 100

1  chloride process during its risk assessment.
2  You told me that you assumed they took that
3  into account, right?
4      A.    It would appear that they did
5  from the depth of the scientific information
6  they submitted.  But again, that's one of
7  those areas where I would turn to the subject
8  matter expertise -- or a person with
9  appropriate subject matter expertise to help
10 me understand how far they carried things and
11 whether that was sufficient to achieve those
12 ends.  I didn't --
13     Q.    Go ahead, I'm sorry.
14     A.    I was going to say I made no
15 attempt to evaluate the science
16 independently.
17     Q.    Whether or not ZHP considered
18 the potential formation of nitrosamines as
19 part of the zinc chloride process is an
20 important fact you would want to know, right?
21         MR. FOX:  Objection to form.
22     A.    Along with whether or not it
23 was even reasonable for them to consider that
24 at that point in time.  I think that's the

Page 101

1  other aspect of this.  There's nothing in GMP
2  that requires you to look for things you
3  would have no basis to believe were there.
4  And that's why the state of the art of the
5  science at that moment in time is important
6  for me to understand in tandem with the other
7  information.
8  BY MR. SLATER:
9      Q.    Well, my first question is
10 this.  One important fact for you to consider
11 in this matter would be whether or not ZHP
12 considered the potential formation of
13 nitrosamine impurities as part of the
14 proposed zinc chloride process when it
15 performed its risk assessment.
16         Would you agree with that
17 statement?
18     A.    It would be helpful to
19 understand that, yes.
20     Q.    Did you ask the lawyers who
21 retained you if there's any information
22 available to answer that question one way or
23 another?
24     A.    I don't recall asking that

Confidential Information - Subject to Protective Order



Page 102

1  question.
2      Q.    That's my question.  I want to
3  know if you asked them for that.  Okay.
4      A.    No.

Page 104

1  would you like to have been provided that
2  deposition testimony?
3      A.    Yes.
4      Q.    If such testimony exists one
5  way or another, you would actually expect
6  that that would have been provided to you so
7  that you could perform your function here,
8  right?
9      A.    It would have been helpful.
10     Q.    Can you think of any legitimate
11 reason why the lawyers who hired you would
12 not have provided you that deposition
13 testimony if, in fact, it exists?
14         MR. FOX:  Objection.
15     Argumentative.
16     A.    I don't know what the basis was
17 for the document set that I was provided.  I
18 can't speculate about what might have been in
19 their minds as to what I would need or what I
20 wouldn't.
21 BY MR. SLATER:
22     Q.    If there was a feasible
23 scientific basis for ZHP to know that
24 nitrosamines could potentially be formed by

Page 103

Page 105

1  the zinc chloride manufacturing process that
2  was being proposed, if that was feasible to
3  know, and if the technology existed for ZHP
4  to feasibly test to see if a nitrosamine was
5  being created by this new manufacturing
6  process, then ZHP would have been required to
7  carry out such testing to see if nitrosamines
8  were being created as part of its risk
9  assessment, correct?
10         MR. FOX:  Objection to form.
11     A.    That would have been the right
12 thing for them to do.  The requirements don't
13 speak to that level of detail, but that would
14 have been a reasonable thing for them to do,
15 yes.
16 BY MR. SLATER:
17

15         MR. FOX:  Is this a good time
16     for a break, Adam?
17         MR. SLATER:  I need a couple
18     more minutes.  I'd like to continue.
19     I don't want to just arbitrarily take
20     a break now.
21 BY MR. SLATER:
22     Q.    If there was deposition
23 testimony from corporate representatives of
24 ZHP that definitively answered that question,

Confidential Information - Subject to Protective Order

Page 106

1 ████████████████████████████

2 ████████████████████████████

3 ██ ████████████████████████

4 ██ ████████████████████████████

5 ██ ██████████████████████

6 BY MR. SLATER:

7     Q.    But you, as somebody who holds

8 themself out as an expert on GMP, would look

9 at what the company actually put in force in

10 its own internal SOPs to address its own

11 business, and based on what you've seen you

12 would agree GMP as applied by ZHP would have

13 required that to be done, right?

14         MR. FOX:  Objection to form.

15     A.    If their procedure called for

16 identification or quantitation of known

17 potential impurity risk and they failed to do

18 so, then yes, that would be a failure to

19 follow their own procedure, which by

20 extension is a failure to follow GMP.

21 BY MR. SLATER:

22     Q.    And you would certainly expect

23 that ZHP or any similar manufacturer would

24 have an internal SOP that would require it to

Page 107

1 identify new impurity risks if they were

2 going to change a manufacturing process,

3 right?

4     A.    That's something they should be

5 considering, yes.

6     Q.    That would be required by GMP

7 under those circumstances, right?

8         MR. FOX:  Objection to form.

9     A.    Broadly, yes, but not

10 specifically.

11 BY MR. SLATER:

12     Q.    Well, if you were brought in by

13 ZHP or a similar company and asked, We're

14 changing our manufacturing process for this

15 API, would GMP require that that evaluation

16 that we're going to perform evaluate whether

17 any new impurities are being formed, you

18 would say yes, right?

19     A.    Yes.

20     Q.    If you want to take a break --

21 I'm happy to keep going, Mr. Chesney, your

22 counsel asked if we need a break, I don't

23 need one.  I'm happy to keep going because

24 I'm hoping to get done in the afternoon, but

Page 108

1 it's completely up to you.  If you want to

2 keep going, I'll keep going.

3         MR. FOX:  We've been --

4         THE WITNESS:  Go ahead, Tom.

5         MR. FOX:  What did you say,

6 David?

7         THE WITNESS:  I was just going

8 to say I could use about ten minutes

9 at this point.

10         MR. SLATER:  All right.  Let's

11 take ten minutes.

12         THE VIDEOGRAPHER:  The time is

13 11:25 a.m.  We are off the record.

14         (Whereupon, a recess was

15 taken.)

16         THE VIDEOGRAPHER:  The time is

17 11:36 a.m.  We are back on the record.

18 BY MR. SLATER:

19     Q.    I want to talk a little bit

20 about the significance of the risk assessment

21 for a couple minutes with you.

22         The risk assessment

23 performed -- rephrase.

24         The risk assessment that was

Page 109

1 required to be performed by ZHP has

2 significance for process validation in the

3 sense that you have to identify potential

4 impurities so that you know to test for them.

5         Is that a true statement?

6     A.    Generally speaking, yes.

7     Q.    So identification of the

8 potential impurities from a new manufacturing

9 process is really a very important threshold

10 step pursuant to GMP, correct?

11         MR. FOX:  Objection to form.

12     A.    To the extent that it's

13 feasible to do so and you know what to

14 expect, yes.

15 BY MR. SLATER:

16     Q.    When you say you know what to

17 expect, meaning you know that this is a

18 potential impurity so you know that you need

19 to test for it?

20     A.    Yes.  You don't need to conjure

21 up things that there's no rational basis to

22 believe what happened.

23     Q.    And this risk assessment is not

24 supposed to be based on guesswork, it's

Confidential Information - Subject to Protective Order

Page 110

1  supposed to be based on scientific analysis,
2  right?
3       A.    Yes.
4            MR. FOX:  Objection to form.
5  BY MR. SLATER:
6       Q.    For example, in a situation
7  like this, a company like ZHP would be
8  expected by GMP to have process chemists
9  evaluating the proposed chemical reactions,
10 and to bring their scientific knowledge to
11 bear to identify the potential impurities
12 that could result, right?
13      A.    Yes.
14      Q.    And they would -- rephrase.
15           And these process chemists
16 would be expected to not only bring to bear
17 their own knowledge that's in their mind, but
18 also to, to the extent they don't know the
19 answer, to research available medical
20 literature, right?
21           Let me rephrase because I went
22 all over the place.  I meant to say
23 scientific.
24           And those process chemists

Page 111

1  would be expected to not only employ their
2  own personal knowledge, but also to research
3  scientific literature as well to the extent
4  that it existed, right?
5            MR. FOX:  Objection to form.
6       A.    Any literature reports they're
7  aware of, they should be taken into
8  consideration if they're relevant.
9  BY MR. SLATER:
10      Q.    And this should be an active
11 process of research and evaluation, right?
12 They should be actively looking to make sure
13 that they turn over the stones that can be
14 turned so they don't miss something, right?
15           MR. FOX:  Objection to form.
16      A.    Well, yes.  Within reasonable
17 limits.  You don't have to stay in search
18 mode forever.  There comes a point in time
19 when you've consulted appropriate reference
20 materials and feel that you have enough to go
21 on.  That's a matter of judgment.
22 BY MR. SLATER:
23      Q.    One of the other important
24 reasons why potential impurities need to be

Page 112

1  identified during the risk assessment is so
2  that not only the process validation can be
3  thorough, but also so that ultimately the
4  specifications for what needs to be tested
5  and what the levels that should be tested for
6  so that those can be set as well, right?
7       A.    Yes.
8       Q.    And I guess the specifications
9  is sort of the other side of the coin from
10 the process validation.  Is that a fair
11 assumption?  The process validation is
12 when -- it actually doesn't make sense.  You
13 don't have to answer that.  You roll your
14 eyes, I know I move on.
15           If there was a GMP violation in
16 the risk assessment, as I have proposed to
17 you through my hypothetical, and ultimately
18 ZHP should have but failed to evaluate the
19 potential nitrosamine impurities that could
20 have resulted from the zinc chloride process,
21 if that's so, and then they went ahead and
22 used that manufacturing process, that process
23 would not be cGMP compliant based on the GMP
24 violation in the risk assessment, correct?

Page 113

1            MR. FOX:  Objection to form.
2       A.    That would require me to accept
3  a lot of the assumptions that you're building
4  into your hypothesis.
5  BY MR. SLATER:
6       Q.    I'm asking you to accept those
7  assumptions.
8            If those assumptions are -- if
9  the answer is yes, if you accept them, am I
10 correct that the manufacturing process itself
11 would not be GMP compliant?
12           MR. FOX:  Objection to form.
13 Incomplete hypothetical.
14      A.    Well, that's not the way I
15 would put it, Mr. Slater, that the GMP -- or
16 that the manufacturing process would not be
17 GMP compliant.  I would simply say there was
18 material information about the risks inherent
19 in that process that had not been identified.
20           The point in time when this
21 took place, if I remember correctly, was
22 2011, 2012, something like that.  Again,
23 without referring to the references, I can't
24 be sure.  But I think the FDA in their public

Confidential Information - Subject to Protective Order

---

Page 114

1  statements later on indicated the general
2  awareness of these risks wasn't really known
3  in the industry or even to the regulators
4  until much later.  So that's why I'm a little
5  concerned about the validity of some of these
6  assumptions.
7  BY MR. SLATER:
8      Q.    And I'm going to go through
9  that with you a little more.  But let me ask
10  you this.  I want to go back to what I was
11  asking.
12          If you make the assumptions
13  that I've asked you to make as to the
14  inadequacy of the risk assessment, and if you
15  make those assumptions, which you can assume
16  those things are hypothetical as an expert as
17  you know, and the risk assessment violated
18  GMP, would it also be a violation of GMP to
19  then manufacture with that manufacturing
20  process which is creating NDMA?
21          MR. FOX:  Objection to form.
22      A.    Well, if we can be clear that
23  I'm not accepting the assumptions, just
24  viewing them purely as hypotheticals, then my

Page 115

1  answer would be yes.  But I'm really not
2  clear that the underlying assumptions are
3  accurate at this point.
4  BY MR. SLATER:
5      Q.    At the time ZHP developed the
6  zinc chloride process, to your knowledge was
7  any other API manufacturer for valsartan, or
8  any other sartan for that matter, using the
9  zinc chloride process in the world?
10      A.    I don't know.
11      Q.    Are you aware of whether or not
12  there was any potential risk of the creation
13  of nitrosamines with the original
14  manufacturing process for valsartan, for the
15  branded form of the drug, did you ever look
16  to see whether or not that manufacturing
17  process had a similar risk?
18      A.    I did not because that would
19  get into process chemistry, which is outside
20  my area of expertise.
21      Q.    Give me one second.
22          Sorry, I'm just digging through
23  a pile because my goal in life is to not make
24  the deposition last longer than necessary.

Page 116

1  Okay.
2      A.    That's appreciated, sir.
3      Q.    There's no reason to go longer
4  than necessary.
5          MR. SLATER:  Okay.  Let's go,
6  Chris, if you can do this, I want to
7  go to what I think was marked
8  Exhibit 209 previously, the IARC
9  monograph from May of 1978.
10          (Whereupon, Chesney Exhibit
11  Number 5 was marked for
12  identification.)
13  BY MR. SLATER:
14      Q.    It's probably going to take a
15  moment because I just pulled something out of
16  order.  Look at that.
17          Okay.  Mr. Chesney, have you
18  ever seen -- and Chris could scroll up for
19  you to show you what this is.
20          MR. SLATER:  Maybe you could
21  scroll up a little bit, show the
22  bottom half also, or maybe make it fit
23  the screen a little better.  There we
24  go.

Page 117

1      Q.    And we can blow it up as you
2  need, Mr. Chesney, whatever you need.
3          My first question is, have you
4  seen this document, the IARC Monographs on
5  the Evaluation of the Carcinogenic Risk of
6  Chemicals to Humans, Some N-Nitroso
7  Compounds, Volume 17, dated in May of 1978?
8  That's the date in the bottom left.  Is this
9  something you've seen?
10      A.    No.
11      Q.    And you can see it's marked
12  with an exhibit sticker, Peng Dong ZHP 209.
13          Do you know who Peng Dong is?
14      A.    The name is vaguely familiar,
15  but I don't recall.
16      Q.    Okay.  I assume you're familiar
17  with IARC?
18      A.    I've heard of them.  I'm not
19  terribly familiar with them.
20      Q.    The International Agency for
21  Research on Cancer.  That doesn't -- you're
22  just generally familiar that they exist?
23      A.    That's about it.  I haven't had
24  much to do with that agency over the years.

Confidential Information Subject to Protective Order

1    Q.    You see that this is a
2  component of -- at the top you can see the
3  "World Health Organization."  I assume you've
4  heard of the World Health Organization?
5    A.    Oh, of course, yes.
6    Q.    And what I'm going to do, if we
7  could, is go to page 36.
8         MR. SLATER:  And let's blow up
9    the third full paragraph.  Good job.
10   Thank you.  Maybe a little smaller.
11   Perfect.
12   Q.    Can you see that okay,
13 Mr. Chesney?
14   A.    Yes, sir, that's fine.
15   Q.    Okay.  We're looking here on
16 page 36 of this IARC monograph, the third
17 full paragraph, it says, "It has been known
18 since 1865 that the reaction of dimethylamine
19 hydrochloride with sodium nitrate at an
20 acidic pH yields N-nitrosodimethylamine,"
21 which is NDMA.
22        Do you see that?
23   A.    Yes.
24   Q.    Is this the type of feasible

1  scientific information you're talking about
2  in terms of the ability of ZHP to have known
3  that this reaction between the DMA that would
4  be a degradant product of the DMF could react
5  with the nitrous acid from the sodium nitrate
6  and form NDMA?  Is this the type of feasible
7  scientific information you're talking about?
8         MR. FOX:  Objection to the
9    form.  Beyond the scope of his report
10   and the scope of his expertise, as
11   he's testified to.
12   A.    It's the sort of thing I would
13 expect scientific experts with whom I would
14 collaborate to take into consideration.  By
15 itself it is what it is, but it doesn't -- it
16 doesn't go beyond what it says on its face.
17 This tendency was identified a long time ago.
18        But it says nothing with
19 respect to the process itself.  I'd have to
20 have somebody make that connection for me.
21 BY MR. SLATER:
22   Q.    I understand.  And I have a few
23 different pieces to the puzzle that I'm
24 planning to probably show you over the next

1  few minutes.
2         As far as what I just showed
3  you, this shows that IARC, an arm of the
4  World Health Organization, published as of
5  1978 that it's been known since 1865 that the
6  reaction that ultimately created the NDMA has
7  been known to scientists.  That's what this
8  shows, right?
9         MR. FOX:  Objection to form.
10   Calls for speculation.
11   A.    That's what the sentence says.
12        MR. SLATER:  Okay.  Let's go
13   now, if we could, to page 40.  And
14   we'll blow up that last paragraph.
15   Perfect.
16 BY MR. SLATER:
17   Q.    This says in part, "Most of the
18 chemical and physical properties of the
19 nitrosamines described in these monographs
20 were taken from Druckrey et al," and cites to
21 a 1967 publication.  Then it says, and this
22 is the part I wanted to really focus on with
23 you, "The principal techniques employed for
24 the analysis of volatile N-nitrosamines have

1  been described in a recent publication
2  (Preussmann et al, 1978).  The relative
3  merits of high- and low-resolution mass
4  spectrometry are discussed, since use of mass
5  spectrometry as a confirmatory technique is
6  particularly important."
7         Do you see what I just read?
8    A.    Yes.
9    Q.    So again, this is addressing
10 the issue of whether or not analytical
11 methods were available to actually detect the
12 NDMA in 2011, 2012, and this is showing that
13 as of 1978, it was being discussed in the
14 World Health Organization publication that
15 mass spectrometry was one available method.
16        Do you see that?
17        MR. FOX:  Objection to the
18   form, and incomplete recitation of the
19   document.
20 BY MR. SLATER:
21   Q.    Okay.  You see that, right,
22 Mr. Chesney?
23   A.    I do.
24   Q.    Okay.  And again, this is the

Confidential Information - Subject to Protective Order

Page 122

1 type of feasibly available scientific
2 information that you were talking about
3 earlier that you would expect ZHP's
4 scientists to be aware of when they were
5 doing their risk assessment, right?
6         MR. FOX:  Objection to form.
7     A.    It could constitute an
8 informative data point, but it's by no means
9 the entire picture.
10        MR. SLATER:  Okay.  Take that
11    document down.  Let's go now, Chris,
12    if we could, to Exhibit 311, which is
13    the publication Purification of
14    Laboratory Chemicals.
15        Let me see if this has page
16    numbers.
17        (Whereupon, Chesney Exhibit
18    Number 6 was marked for
19    identification.)
20 BY MR. SLATER:
21    Q.    Okay.  I've put on the screen a
22 document titled Purification of Laboratory
23 Chemicals, and you can see that it was marked
24 as Exhibit 311 during the deposition of Min

Page 123

1 Li.
2         Do you see that on the screen?
3     A.    I do.
4     Q.    Do you know who Min Li is?
5     A.    The name is familiar from ZHP
6 documents, but I couldn't tell you what
7 position she has, so that she --
8     Q.    Or he?
9     A.    -- as the case may be, occupies
10 in the company.
11    Q.    Okay.  And just to be clear,
12 you weren't provided the depositions of Peng
13 Dong or Min Li as part of the materials you
14 were provided, right?
15    A.    I don't recall either of those,
16 sir, no.
17    Q.    Okay.  And, for example, the
18 IARC monograph I just showed you, that's not
19 something you were provided, correct?
20    A.    I was not.
21    Q.    And this publication, the
22 Purification of Laboratory Chemicals, which
23 was used as a deposition exhibit with Min Li,
24 that's not something you were provided

Page 124

1 either, correct?
2     A.    I have not seen this document.
3         MR. SLATER:  Chris, let's go to
4    page 192 of this -- actually, stop
5    don't go there yet.  Let's go to the
6    second page which has the publication
7    dates.  I just want to establish that.
8     Q.    We can see that this has a
9 first publication date of 1996 and reprinted
10 in 1998, '99, and 2000.
11        Do you see that?
12    A.    I do.
13        MR. SLATER:  Let's go now to
14    page 192.  Perfect.  There you go.
15    You've got it, Chris.  If you can blow
16    up that bottom paragraph, and just
17    read the first beginning.  Just a tiny
18    bit less because we're cutting off --
19    my picture cuts off.  All right.
20    Perfect.  Thank you.
21    Q.    You see that this references
22 N-N-dimethylformamide, which is DMF.
23        Do you see that?
24    A.    Yes.

Page 125

1     Q.    And you understand that one of
2 the changes to the manufacturing process when
3 the zinc chloride process was created was to
4 begin to utilize DMF.  You're aware of that,
5 right?
6     A.    Yes.
7     Q.    And this scientific
8 publication, which we know was originally
9 published in 1996 and reprinted up
10 through 2000 on this copy that I am showing
11 you, states that DMF "decomposes slightly at
12 its normal boiling point to give small
13 amounts of dimethylamine and carbon
14 monoxide."
15        Do you see that?
16    A.    Yes.
17    Q.    And again, this would be the
18 type of feasibly available scientific
19 information you would expect the people at
20 ZHP to have been aware of when they were
21 performing the risk assessment with regard to
22 their decision to add DMF to the
23 manufacturing process, correct?
24        MR. FOX:  Objection to form.

Confidential Information - Subject to Protective Order

Page 126

1    A.    It would be another data point
2 that would have to be evaluated for its
3 significance and context and understood
4 fully, yes.
5 BY MR. SLATER:
6    Q.    The fact that it was known in
7 the scientific community that DMF could
8 decompose to give off small amounts of
9 dimethylamine is certainly something you
10 would have expected the people at ZHP to be
11 aware of when they were formulating and then
12 performing a risk assessment on the zinc
13 chloride process.  You could agree with that,
14 correct?
15    MR. FOX:  Objection to form.
16 Beyond the scope.
17    A.    I would have no ability to form
18 an independent expectation of that.  That's
19 the kind of thing I would ask the scientific
20 expert, Is this something they ought to have
21 known about, is this peer-reviewed research,
22 was it -- did it have credibility, was it
23 widely circulated.  Those are all things that
24 I would want to take into account to decide

Page 127

1 whether it's something that the ZHP folks
2 ought to have known about.
3        It stands here as a single
4 reference in an otherwise very lengthy
5 document.  I don't know who prominence it had
6 in the industry at that time.
7    MR. SLATER:  Okay.  Chris,
8 let's go to Exhibit 197, please.
9    MR. GEDDIS:  Is there another
10 exhibit number for that that you had
11 too?
12    MR. SLATER:  Possibly 14, it's
13 the "N-N-dimethylformamide: much more
14 than a solvent" in Tetrahedron.
15    MR. FOX:  You're going to a
16 different exhibit, Adam?
17    MR. SLATER:  I am.  The problem
18 is Chris moved so quickly before, that
19 now when he doesn't do something
20 instantaneously we all say, What's
21 going on?
22    MR. GEDDIS:  What was it you
23 said, 214?
24    MR. SLATER:  14, 1-4.  It was

Page 128

1 definitely Exhibit 197 marked during
2 Min Li's deposition.
3    MR. GEDDIS:  197.  Found it.
4    (Whereupon, Chesney Exhibit
5 Number 7 was marked for
6 identification.)
7 BY MR. SLATER:
8    Q.    On the screen we have an
9 exhibit that was marked Exhibit 197 actually
10 in the deposition of Peng Dong originally, I
11 can tell you we also showed it to Min Li, and
12 it's published in the medical journal
13 Tetrahedron, or scientific journal I should
14 say, and the title of this article is
15 "N-N-Dimethylformamide: much more than a
16 solvent?"
17        Do you see that?
18    A.    Yes.
19    Q.    And this is dated in 2009.  You
20 can see it at the very top.  Even though it's
21 very small letters, it says "Tetrahedron,"
22 and the year is 2009.
23    A.    Yes, I can see it.
24    Q.    Great.

Page 129

1    MR. SLATER:  Let's go now to
2 the third page of this article, which
3 is page 8315, please.
4    Q.    It says in part, paragraph
5 number 3, "Source of carbon monoxide.  DMF
6 decomposes slightly at its boiling point to
7 afford dimethylamine and carbon monoxide,
8 this reaction occurring even at room
9 temperature in the presence of some acidic or
10 basic materials.  This observation has led to
11 the use of DMF as a carbonylating agent."
12        Do you see that?
13    A.    I do.
14    Q.    Taken together with the
15 textbook I showed you, and now I'm showing
16 you a medical -- in a scientific journal, can
17 you agree that, based on what I've shown you,
18 it was at least scientifically feasible
19 for -- and expected for ZHP to know that DMF
20 could decompose or degrade and give off
21 dimethylamine as part of this manufacturing
22 process, that they at least had to take into
23 account the possibility that that would
24 occur?

Confidential Information – Subject to Protective Order

Page 130

```
 1        MR. FOX:  Objection to the
 2    form.  Argumentative, incomplete
 3    hypothetical.
 4        A.    I can agree that, from what
 5    you've shown me, that there are references in
 6    the scientific literature that are
 7    potentially useful data points that should be
 8    taken into account and considered in the
 9    overall scheme of things.  But I'm not
10    capable of judging them on the merits
11    independently, so I don't know what relevance
12    they really have.
13    BY MR. SLATER:
14        Q.    What I'm just asking is, we can
15    agree that the potential decomposition of DMF
16    to give off dimethylamine, based on what I'm
17    showing you, was something that you would
18    expect ZHP to have at least been aware of as
19    a potential chemical reaction as part of the
20    zinc chloride process and take into account
21    however they chose to?
22        MR. FOX:  Objection to form.
23        MR. SLATER:  Let me rephrase.
24    I lost, because I was trying to finish
```

Page 131

```
 1    the question and you objected.  I'm
 2    not criticizing because I paused, but
 3    let me just ask again.
 4    BY MR. SLATER:
 5        Q.    You would agree with me that
 6    you would expect that ZHP would have at least
 7    been aware of the potential degradation or
 8    decomposition of the DMF to give off
 9    dimethylamine, and to take that into account
10    as something that could potentially occur
11    during the zinc chloride process.  Just
12    limiting it to that, would you agree with me?
13        MR. FOX:  Objection to the
14    form.  Asked and answered.
15        A.    It's information that's out
16    there in the scientific literature.  It would
17    have been appropriate for them to take a look
18    at it and give it consideration.
19        MR. SLATER:  Let's take that
20    down now and go to Exhibit 211.
21        (Whereupon, Chesney Exhibit
22    Number 8 was marked for
23    identification.)
24        ///
```

Page 132

```
 1    BY MR. SLATER:
 2        Q.    Okay.  We have on the screen an
 3    article titled Theoretical Investigation of
 4    N-Nitrosodimethylamine Formation from
 5    Nitrosation of Trimethylamine.
 6        Do you see that?
 7        A.    Yes.
 8        Q.    And at the bottom of the first
 9    page of the article there's an exhibit
10    sticker, Peng Dong ZHP 211.  Again, I'm
11    representing to you this was utilized in Peng
12    Dong's deposition as well as Min Li's
13    deposition, which we've already established
14    you have not seen those transcripts, correct?
15        A.    Correct.
16        Q.    And the articles that I've
17    shown you, these scientific articles that
18    were used in those depositions, you haven't
19    seen any of these, right?
20        A.    No.
21        Q.    Okay.  Meaning I'm correct?
22        A.    Yes.
23        Q.    I wasn't trying to be picky,
24    it's just sometimes the negatives on the
```

Page 133

```
 1    double negatives won't be clear.
 2        A.    No, I have not seen this
 3    article before.
 4        MR. SLATER:  Okay.  Let's,
 5    Chris, if you could just blow up the
 6    Introduction, that left column, that
 7    would be great.
 8        Q.    Okay.  And let's just start out
 9    at the beginning.  It says, "It is well known
10    that N-nitrosamines are a class of undesired
11    industrial and environmental pollutants, many
12    of which are carcinogenic, mutagenic, and
13    teratogenic.  In particular,
14    N-nitrosodimethylamine (NDMA), which is the
15    simplest dialkylnitrosamine, has been
16    demonstrated to be a potent carcinogen to
17    various organs in animals, including liver,
18    lung, and kidney."  And I just want to stop
19    there.
20        Does this comport with at least
21    what you've learned about NDMA since you were
22    retained in this matter, or from the
23    literature, from the media reports you had
24    seen before?  I'm just curious if you're
```

Confidential Information Subject to Protective Order

Page 134

1  familiar with at least these types of
2  information about NDMA.
3      A.    The carcinogenic potential,
4  yes.  The detail involving the specific organ
5  systems that might be at risk, no, I haven't
6  seen much in the way of specific reference to
7  that before.
8      Q.    And I neglected to ask about
9  this, but maybe I can do it real quick.
10      The importance of detecting
11  genotoxic impurities as potential
12  manufacturing process impurities, that was
13  not a novel concept in 2011, ZHP would have
14  known at that point that that was something
15  they had to be on the lookout for, right?
16      MR. FOX:  Objection to form.
17      A.    Be on the lookout for what?
18  BY MR. SLATER:
19      Q.    For genotoxic process
20  impurities as a part of any manufacturing
21  process?
22      A.    There's long been a general
23  awareness that unidentified impurities need
24  to be characterized so you know what you're

Page 135

1  dealing with, and then back up and look and
2  see what the implications are of those
3  materials present in your product as a result
4  of your process, and to the extent feasible
5  to quantitate them.
6      Q.    And with regard to genotoxic
7  impurities which could potentially lead to
8  cancer, it's been understood that those need
9  to be focused on and they need to be
10  identified and addressed, correct?
11      MR. FOX:  Objection to form.
12      A.    Well, if you identify either
13  the potential or the actual occurrence of
14  this type of impurity, then certainly it's
15  important to understand it.
16  BY MR. SLATER:
17      Q.    Looking now at the second
18  paragraph under the Introduction, it says,
19  "because dialkylnitrosamines are of great
20  interest in carcinogenesis, much attention
21  have been focused on their formation
22  mechanism, especially from secondary amines.
23  Consequently, NDMA is generally believed to
24  be formed from the reactions of dimethylamine

Page 136

1  (DMA) and nitrosating agents, such as N2O3,
2  N2O4 and ONCl."
3      And I can represent to you that
4  N2O3 would be nitrous acid, I believe.
5  Actually I just screwed up the whole question
6  so I've got to ask it again.
7      This says, "Because
8  dialkylnitrosamines are of great interest in
9  carcinogenesis, much attention has been
10  focused on their formation mechanism,
11  especially from secondary amines.
12  Consequently, NDMA is generally believed to
13  be formed from the reactions of dimethylamine
14  (DMA) and nitrosating agents, such as N2O3,
15  N2O4, and ONCl.
16      Do you see what I just read?
17      A.    Yes.
18      MR. SLATER:  And let's just
19  scroll up a little bit just to the
20  authors of the article again.  I want
21  to just show -- there we go.
22      Q.    This article was published by
23  three authors at the College of Life Science
24  & Bioengineering at Beijing University of

Page 137

1  Technology in Beijing, China, and it shows
2  that it was -- in 2009 it was received, and
3  published in 2010.
4      Do you see that?
5      A.    Yes.  Okay.  I was just looking
6  for publication date.  Yes, I see that.
7      Q.    Would you agree with me that
8  this demonstrates that it was certainly
9  feasible and expected for ZHP to be aware
10  that the potential DMA that could be produced
11  during the manufacturing process could react
12  with the nitrous acid to form NDMA?  Would
13  you agree that this demonstrates that it's
14  certainly something that they needed to be
15  aware of and take into account in their risk
16  assessment?
17      MR. FOX:  Objection to the
18  form.  It's beyond the scope of his
19  expertise, as he has testified
20  repeatedly that he's not a scientific
21  expert.
22      MR. SLATER:  Counsel, do you
23  want to testify?
24      MR. FOX:  If you'd like me.

Confidential Information - Subject to Protective Order

---

Page 138

1    MR. SLATER:  We'll do that
2  later.  We do the lawyer testimony
3  later.
4    A.    This is another example of the
5  kind of information I would need input from
6  somebody with the appropriate expertise to
7  fully take into consideration.  I can only
8  judge this on the merits.
9  BY MR. SLATER:
10 [REDACTED]
21    MR. FOX:  Objection to the
22  form.
23    MR. SLATER:  Okay.  I think we
24  can take that one down.

---

Page 139

1  BY MR. SLATER:
2    Q.    I'd like to ask you to assume
3  that ZHP's corporate representative witnesses
4  testified that they did not take into
5  consideration the potential degradation or
6  decomposition of DMF to yield DMA, nor did
7  they take into consideration the potential
8  reaction between DMA and nitrous acid, that
9  they didn't even take that into consideration
10  at all, they didn't think about it, they
11  didn't look at the issue, they completely
12  didn't think about that.
13    If my hypothetical is true,
14  would you agree with me that that
15  demonstrates a lack of rigor in violation of
16  GMP based on them not even taking it into
17  consideration and thinking about it?
18    MR. FOX:  Objection to form.
19    A.    I would not go that far until I
20  had the opportunity to ask them a simple
21  question, Why did you not, and hear what
22  their justification is.
23  BY MR. SLATER:
24    Q.    What if their justification was

---

Page 140

1  nobody knew -- rephrase.
2    What if their justification
3  was, Nobody could have known that these
4  chemical reactions could have occurred?  In
5  the face of what I've just shown you, would
6  you agree that that would show that their
7  evaluation fell below good manufacturing
8  practices?
9    MR. FOX:  Object to the form.
10  Incomplete hypothetical.
11    A.    I would then ask them why they
12  took that position and what there is that's
13  different about the chemistry of their
14  process that leads them to conclude that.
15  BY MR. SLATER:
16    Q.    What if they -- well, are you
17  saying you would ask them why is it that
18  you're concluding that nobody could have
19  known about these potential chemical
20  reactions in the face of publicly available
21  scientific literature, including from
22  scientists in Beijing, that you would not
23  have known what other people had readily
24  available to them?

---

Page 141

1    MR. FOX:  Objection to the
2  form.
3  BY MR. SLATER:
4    Q.    I don't understand -- I'm just
5  trying to understand why you would ask them
6  that question in the face of what I've shown
7  you.
8    A.    I would -- no, I would expect
9  them to know that that information was out
10  there.  But why they excluded it from
11  consideration in their particular product
12  would be what I'd like to hear their
13  explanation of.  I don't know if they would
14  have such an explanation or not, but I would
15  certainly ask them, Is there anything about
16  your particular process that led you to
17  believe that information such as this would
18  not be relevant.
19    But a lack of awareness that it
20  exists or even to rule it out as important,
21  no, I would expect them to go that far at
22  least.
23    Q.    As a matter of GMP, right?
24    MR. FOX:  Objection to form.

---

Confidential Information - Subject to Protective Order

Page 142

1    A.    Yes.
2  BY MR. SLATER:
3    Q.    What if their answer to your
4  question was, We didn't exclude it, we never
5  even thought about it --
6         MR. FOX:  Objection to form.
7  BY MR. SLATER:
8    Q.    -- would that fall below GMP
9  then?
10        MR. FOX:  Objection to form.
11        Misstates -- or incomplete
12        hypothetical.
13    A.    They certainly should be
14  looking at the relevant literature to see if
15  there's anything about what they're proposing
16  to do in their process that poses a potential
17  risk.  So yeah, I would expect them to at
18  least be aware of the existence of this
19  information.
20  BY MR. SLATER:
21    Q.    And if their -- rephrase.
22        If their response to your
23  question, which I think you said your
24  question would be, Well, why did you exclude

Page 143

1  this information from consideration, if their
2  response was, We didn't even actively exclude
3  it and say we're not going to consider it, we
4  didn't even know it, because we didn't even
5  do a research, a literature -- rephrase.  Let
6  me try to ask it clean.
7         If you were to ask them, Why
8  did you decide this information didn't need
9  to be taken into account, and they said, We
10  didn't even make a decision about whether to
11  take it into account, we just never even
12  knew --
13        MR. FOX:  Is that a question?
14  BY MR. SLATER:
15    Q.    -- would I be correct that you
16  would say, Well, your risk assessment fell
17  below GMP because you at least should have
18  known this information was available and made
19  a reasoned decision as to how you were going
20  to take it into account?
21        MR. FOX:  Objection.  Misstates
22        testimony.  It's also beyond the scope
23        of his expertise, given that he's not
24        a scientific expert.

Page 144

1  BY MR. SLATER:
2    Q.    You can answer.
3    A.    It's a concern I would have,
4  but I would ask that the scientific experts I
5  was working with resolve it on a peer-to-peer
6  basis and give me their insight and their
7  opinion.
8    Q.    Well, coming back to my
9  question, though, since you've already agreed
10  with me that they were required to at least
11  know about these potential chemical reactions
12  that could occur during the process, if you
13  then asked them, Well, why did you not
14  perform an actual risk assessment on whether
15  or not these reactions were going to occur or
16  were occurring, and they said, We never even
17  took it into account, we didn't even think
18  about this, we never even thought about these
19  potential reactions, if that were to be their
20  response, would you agree that that would
21  show that their -- the fundamental parts of
22  their risk assessment fell below GMP because
23  they never even made themselves aware of
24  these potential reactions to begin with?

Page 145

1         MR. FOX:  Objection.  Beyond
2         the scope, incomplete hypothetical,
3         and misstates his prior testimony.
4    A.    I'm sorry, I lost -- in all of
5  that I lost the thread of the question.  Can
6  you restate it?  I had to ask you to restate
7  it, but please do.
8         MR. SLATER:  Just so that I
9         don't misstate it a little differently
10         and get another objection that might
11         distract you, Maureen, could you read
12         that question back, please?
13         I'll ask the court reporter to
14         read it back, and if I need to reask
15         it I will again, but maybe this will
16         be the quicker way to go.
17         (Whereupon, the reporter read
18         back the following:
19         QUESTION:  Well, coming back to
20         my question, though, since you've
21         already agreed with me that they were
22         required to at least know about these
23         potential chemical reactions that
24         could occur during the process, if you

Confidential Information Subject to Protective Order

Page 146

1  then asked them, Well, why did you not
2  perform an actual risk assessment on
3  whether or not these reactions were
4  going to occur or were occurring, and
5  they said, We never even took it into
6  account, we didn't even think about
7  this, we never even thought about
8  these potential reactions, if that
9  were to be their response, would you
10  agree that that would show that
11  their -- the fundamental parts of
12  their risk assessment fell below GMP
13  because they never even made
14  themselves aware of these potential
15  reactions to begin with.)
16        MR. FOX:  Same objection.
17        A.    I would agree that the risk
18  assessment would have been better had they
19  taken that into account for sure.
20  BY MR. SLATER:
21        Q.    Well, if they told you they
22  never took it into account, that would
23  violate GMP.  You've already told me they
24  were required to know about this scientific

Page 147

1  information, so if they didn't even consider
2  it that would violate GMP, right?
3        MR. FOX:  Objection to form.
4        Misstates testimony.
5        A.    I think that's taking the
6  concept a bit far.  But they certainly -- the
7  risk assessment would certainly be improved
8  by a thorough literature search, and if they
9  missed something like this that was publicly
10  available and directly involved the type of
11  reaction that was involved in their process,
12  then yes, it should have been taken into
13  account.  And if it wasn't, that would be a
14  gap in the overall risk assessment.
15  BY MR. SLATER:
16        Q.    It would be a gap in violation
17  of GMP, correct?
18        MR. FOX:  Objection to form.
19        A.    Whether or not it's a violation
20  of GMP I'm not been prepared to say without a
21  more rigorous understanding of the scientific
22  considerations here.
23        When you look at information
24  like this in the literature, it may not have

Page 148

1  been created in an environment that
2  duplicates adequately the environment that
3  exists with respect to the process chemistry
4  that you're dealing with, and there could be
5  mitigating factors or things that would
6  influence the production of NDMA in some way
7  as to negate the risk.  All that has to be
8  taken into consideration before you can
9  conclude what the impact of the lack of that
10  information really was.
11  BY MR. SLATER:
12        Q.    And what you just went through
13  in terms of the types of questions that you
14  might ask, you would expect that pursuant to
15  GMP that people at ZHP would have asked
16  themselves the same questions back at the
17  time in 2011, right?
18        A.    Yes.
19        MR. FOX:  Objection to form.
20        A.    That I can agree to.  The
21  question is whether in 2011 the technology
22  was adequate to make that identification, and
23  whether there was reasonable probability that
24  they would even find anything if they looked.

Page 149

1  Those are the two basic questions that I
2  would need the scientific support to answer.
3  BY MR. SLATER:
4        Q.    Assuming the answer to both of
5  those assumptions is yes, as I've asked you
6  to assume in the hypothetical, if they didn't
7  ask themselves those questions that you just
8  recited for me about how you would take into
9  account -- how to take this into account in
10  their risk assessment, they didn't even go
11  through that exercise, that would fall below
12  GMP, right?
13        MR. FOX:  Objection to form.
14        Misstates testimony.
15        A.    That would be a flaw in the
16  overall risk assessment for sure, yes.
17  BY MR. SLATER:
18        Q.    In violation of GMP, right?
19        MR. FOX:  Objection to form.
20        A.    I'm not prepared to go that
21  far.  That requires a multifaceted
22  consideration really as to what the risk is
23  that's presented.
24        If I may, GMP conceptually does

Page 150

1  not expect everything to be done perfectly.
2  In fact, the regulations, the finished dose
3  form regulations actually anticipate that
4  imperfections will occur, and what it calls
5  for is a thorough investigation when those
6  imperfections do occur, not that everything
7  be absolutely perfect every time.
8          If that were the case, no
9  pharmaceutical products would be produced
10 because nobody is ever 100 percent perfect.
11 That's been my experience.
12         So the question really is not
13 whether or not the risk assessment could have
14 been better, the question is was it
15 sufficiently flawed to violate GMP.  And it's
16 difficult for me to take it to that level.
17         I can certainly agree that this
18 information you've highlighted would have
19 been helpful, even should have been taken
20 into consideration.  But whether the fact
21 that it was not, if the testimony indeed
22 states that, constitutes a violation of GMP
23 as a further analysis, that I would not be
24 prepared to make based on this level of

Page 151

1  information.
2  BY MR. SLATER:
3      Q.    If you were to assume that
4  considering that information could have
5  feasibly led to testing to see if
6  nitrosamines were being formed, if you assume
7  that, and that that testing would have shown
8  NDMA was being formed, then the failure to
9  take this into consideration in 2011 would be
10 a GMP violation, correct?
11         MR. FOX:  Objection to form.
12     A.    If all that was true, yes.  The
13 problem is I've seen other information that
14 suggests that, at least from the FDA's public
15 statements, that suggests that that
16 information was not -- or that technology was
17 not up to speed until much later.  Neither
18 the regulators nor the industry at large
19 really had that awareness.
20         So I question whether it was
21 feasible in 2011.  I don't know, and I would
22 require the help of someone with the right
23 scientific expertise to convince me of that.
24         If I could be convinced of that

Page 152

1  then, sure, I could get to the point of
2  agreeing it was a violation of GMP, but not
3  based upon bits and pieces of the total
4  story.
5  BY MR. SLATER:
6      Q.    When you were reading the
7  information from the FDA, were you aware that
8  the reason why nobody had been looking for
9  NDMA before was because the manufacturing
10 processes for valsartan hadn't created NDMA
11 to the FDA's knowledge before the zinc
12 chloride process was put into effect, and
13 that that's how this issue came to the FDA's
14 attention?
15         MR. FOX:  Objection to form.
16 BY MR. SLATER:
17     Q.    Were you aware of that?
18     A.    Public statements allude to the
19 timeline on this, and the reasons why it
20 eventually did come to light.
21         What I remember from that as I
22 sit here now is that full awareness and
23 understanding didn't really occur until
24 sometime in the middle of 2018.  So I

Page 153

1  question whether it would have been something
2  the company could have anticipated or known
3  about in 2011.
4      Q.    I read something in your report
5  which indicated along the lines of what
6  you've been telling me, that the FDA doesn't
7  prescribe a one size fits all GMP approach to
8  the manufacture of each product.  I think
9  you've been telling me that, right?
10     A.    Yes, that's true.
11     Q.    And I read a couple of things
12 in your report, and I'm just going to run
13 through them.  One of the things you said is
14 that the cGMP regulations describe what is to
15 be accomplished, not necessarily how.
16         I think that's the same point,
17 right?
18     A.    Yes.
19     Q.    And another thing you said is
20 any reasonable format that achieves the
21 desired results.
22         Again, that's another way of
23 saying the same thing, right?
24     A.    Yes.

Page 154

1    Q.    And I think another place you
2 said -- rephrasing.
3        Another part of your report on
4 page 51 you said, As long as the approach
5 ensures that the API meets its purported or
6 represented purity and quality.  That was
7 another way of you saying you have to come up
8 with an approach, it might not be the same
9 approach someone else will have, but that's
10 the outcome that you need to achieve, right?
11    MR. FOX:  Objection to form.
12    A.    Yes, I think in that -- sorry,
13 Tom.
14    MR. FOX:  Go ahead.
15    A.    I believe in that case I was
16 actually quoting an FDA compliance program to
17 illustrate that point.
18 BY MR. SLATER:
19    Q.    And that point would apply to
20 what ZHP was doing in 2011 as part of its
21 risk assessment, that its approach was
22 required to ensure that the API met the
23 purported or represented purity and quality
24 of the API, correct?

Page 155

1    A.    Yes.
2    Q.    We know in retrospect that the
3 risk assessment failed to do so, and that the
4 API did not satisfy the represented purity
5 and quality because it was -- it contained
6 NDMA, correct?
7    MR. FOX:  Objection to form.
8    Calls for speculation.
9    A.    I don't believe there was any
10 specification established for NDMA at that
11 point in time because there was no
12 anticipation that it would be there.
13 BY MR. SLATER:
14    Q.    That was due to the failure of
15 the risk assessment to identify the potential
16 creation of nitrosamines, correct?
17    MR. FOX:  Objection to form.
18    A.    In part.
19 BY MR. SLATER:
20    Q.    When the valsartan was sold by
21 ZHP, it was representing that it had a
22 certain level of quality and purity, and
23 listed what the ingredients and components
24 were that were in those pills, right?

Page 156

1    A.    I've never seen the labeling
2 for how it was sold, nor any representations
3 that were made to purchasers, but implicitly
4 it would be required to comply with the law,
5 certainly.
6    Q.    Have you looked at the USP
7 entries for the valsartan?
8    A.    The monographs and the USP?
9    Q.    Yes.
10    A.    I don't recall that I looked at
11 the monographs.  I do have one USP citation
12 in my list of references, but I don't think
13 that was the valsartan monograph.
14    Q.    You mentioned specifications
15 before, and I think we can agree that,
16 because we talked about it earlier, that one
17 of the important parts of the risk assessment
18 is to identify what are the impurities that
19 need to be specified so that you can test to
20 make sure they're below certain levels,
21 right?
22    A.    Yes.
23    Q.    So if the risk assessment
24 failed -- well, rephrase.

Page 157

1        We know the risk assessment
2 failed to identify the potential NDMA
3 impurity, we know that, that's why it was
4 never part of the process validation testing,
5 and that's why there was never any even
6 attempt to set a specification for NDMA,
7 right?
8    MR. FOX:  Objection to form.
9    A.    I think -- my understanding is
10 that that's not the only reason.
11        The other reason is there were
12 not available analytical methods that were
13 sensitive enough at the levels that
14 apparently this material was occurring to
15 enable detection at that point.
16 BY MR. SLATER:
17    Q.    And I think you said earlier
18 you haven't seen Dr. Hecht's report, so
19 you're not aware of the fact that one of the
20 world's foremost experts regarding
21 nitrosamines and the use of mass spectrometry
22 has written in his report that the technical
23 ability to identify the NDMA was absolutely
24 available in 2011, that's not something that

Page 158

1 you're aware of, right?
2        MR. FOX:  Objection to form.
3    Lacks foundation, argumentative.
4    A.   I'm not aware of it, no.
5 BY MR. SLATER:
6    Q.   If I am correct that it was
7 technically feasible for ZHP to have employed
8 technology to test for NDMA and identify the
9 NDMA in 2011, you would agree with me based
10 on all the information I've shown you that
11 they should have performed that test and they
12 should have detected the NDMA before ever
13 marketing this product, right?
14        MR. FOX:  Objection to form.
15    Asked and answered, misstates
16    testimony.
17    A.   That would require a series of
18 steps; that the risk analysis would recognize
19 that as a potential problem, that they had
20 the available technology or acquired it or
21 found someone to contract with to do the
22 testing, did the testing, and identified the
23 NDMA at the levels in which it was occurring.
24        And even then, you would have

Page 159

1 to take that quantitative information and
2 determine whether or not that was a health
3 risk, and if so, how severe, and to whom, and
4 all the rest of it.
5 BY MR. SLATER:
6    Q.   Well, we know what happened
7 when the world found out there was NDMA in
8 the valsartan, we found out that the levels
9 that ZHP had created in its valsartan were so
10 high that the pills couldn't be sold any
11 longer, right?
12        MR. FOX:  Objection to the
13    form.
14    A.   The levels were such that the
15 FDA classified the recall as Class 2, which
16 is minimal risk to health, and actually
17 issued public advice to patients taking those
18 tablets or capsules to continue to take the
19 medication until they either had an
20 alternative available, or their physician had
21 switched their medication.
22        So the FDA's official advice on
23 this was keep taking your medication until
24 you have an alternative.

Page 160

1 BY MR. SLATER:
2    Q.   Are you aware that the reason
3 the FDA said that is because they figured
4 it's better not to have a heart attack or
5 stroke in the next couple weeks while you go
6 to your doctor and get a new drug rather than
7 stopping the pill?
8        MR. FOX:  Objection to form.
9 BY MR. SLATER:
10    Q.   Let me reask.
11        Are you aware that the reason
12 the FDA said that people should keep taking
13 the pills until they can meet with their
14 doctor is because there was a concern that
15 people could suffer strokes or cardiovascular
16 episodes and die, or have massive medical
17 harm, and that they weighed that against the
18 risk of taking the pills for another couple
19 weeks while they get new medication?
20        You understand that's why the
21 FDA said that, right?
22        MR. FOX:  Objection to form.
23    A.   A couple weeks or however long
24 it takes.

Page 161

1 BY MR. SLATER:
2    Q.   Well, I mean, the FDA was
3 making a decision, We don't want a bunch of
4 people having strokes and dropping dead all
5 over the place because they stopped taking
6 their blood pressure medications while we get
7 them onto other medications, and then the FDA
8 -- shortly after that, this stuff was
9 completely off the market, right?
10        MR. FOX:  Objection to form.
11    A.   It was off the market after the
12 recall was conducted, yes.
13 BY MR. SLATER:
14    Q.   Certainly the FDA telling
15 people to keep taking the pills until they
16 get an alternative blood pressure medication
17 was not an endorsement of the safety of the
18 valsartan, was it?
19        MR. FOX:  Objection to form.
20    A.   Safety is a relative concept in
21 pharmacology.  So it was a statement by the
22 FDA that the greater good was served by
23 patients continuing it until they could get
24 an alternative medication.

Page 162

BY MR. SLATER:

Q.    Was the FDA also concerned that because ZHP had such a massive part in the market that there could be a bunch of people left with no blood pressure drugs if they stopped taking it, and there could be a lot of people getting very, very sick and dying if they all stopped taking it right away?

MR. FOX:  Objection to form.

BY MR. SLATER:

Q.    Just asking if you know.

A.    I don't know if they raised supply chain concerns or created a potential shortage.

Q.    Let me go back to a question about the testing that you've talked about, of whether it was feasible to test.

If ZHP had actually taken into consideration the potential chemical reactions and realized that the creation of nitrosamines including NDMA was possible, and if it wasn't feasible to test for the NDMA or other nitrosamines back in 2011, wouldn't the proper thing to do at that point be to say,

Page 163

We can't move forward until we can test and confirm that these genotoxic impurities are not in this pill?  Wouldn't that be what would be required if the testing didn't exist at the time?

MR. FOX:  Objection to form. Argumentative, beyond the scope.

A.    If there was a concern about a substantial risk that they didn't have the feasibility to address through analytical procedures due to a lack of equipment or knowledge of the method or whatever, the usual approach is to try to find someone who can assist with that line of inquiry.

BY MR. SLATER:

Q.    And I'm just going to play out what you've questioned me about to the end.

Let's assume that they -- there was no technology available to test for NDMA or other nitrosamines at that point, even though they knew this manufacturing process very well could be creating these genotoxic impurities, if that were the case -- I'm taking your hypothetical -- if that were the

Page 164

case, then they would not be able to manufacture by that process, they would have to come up with a different way to manufacture it where there wouldn't be the potential creation of a genotoxic impurity that you couldn't test for, correct?

MR. FOX:  Objection to form.

A.    That's a possible outcome.

BY MR. SLATER:

Q.    That would be the -- I'm sorry, I missed your answer because I think you might have broken up.

A.    I'm sorry, just waiting for Tom.

That -- yes, that would be a possible outcome.  They could elect to hold off on the process change until that question could be answered, yes.

Q.    I mean, that would be -- rephrase.  That would be required -- rephrase.

At the very least, they couldn't go forward and institute that manufacturing process until they could answer

Page 165

the question of whether or not this genotoxic impurity was in the pill, right?

MR. FOX:  Objection to form. Incomplete hypothetical.

A.    They should have taken that into consideration, and that's a decision that would have to be made in light of all the facts, and with the appropriate scientific expertise coming to bear.

But yes, that's a possible decision that they could have taken at that time, to not go forward.

BY MR. SLATER:

Q.    It would not have been -- rephrase.

Taking your hypothetical that there was no test in existence that could have told you whether or not this genotoxic impurity was there or not, if that was the fact, it would not have been acceptable to go forward with the manufacturing process while not knowing if there was going to be this genotoxic impurity.  That would not have been permitted, correct?

Confidential Information - Subject to Protective Order

Page 166

1        MR. FOX:  Objection to form.
2    Beyond the expertise, incomplete
3    hypothetical.
4        A.    Again, I would agree if and
5    only if the weight of the science argued that
6    there was a significant risk of formation of
7    NDMA.  There are literature references which
8    you've shown me that showed in a laboratory
9    setting people that identified this as a
10   potential risk that's of concern, they should
11   consider that.
12       But it would take a more
13   wholistic assessment to understand whether
14   that was a real risk, and decide accordingly
15   whether to proceed with that process change
16   at that time.
17   BY MR. SLATER:
18       Q.    In retrospect you would agree
19   with me it was a real risk because it
20   happened, right?
21       MR. FOX:  Objection to form.
22   Argumentative.
23       A.    Well, I agree with you that it
24   happened.

Page 167

1    BY MR. SLATER:
2        Q.    Okay.  I wanted to just
3    establish that.  If we -- if you'll assume
4    for the moment that a reasonable scientific
5    expert in this field would say, Yes, this
6    would be considered a real risk that this
7    manufacturing process could create NDMA or
8    other genotoxic impurities, if that were the
9    fact, and if your hypothetical was correct
10   that no test existed that could have measured
11   whether or not this genotoxic impurity was
12   actually being created, under those
13   circumstances you could not go forward and
14   manufacture with this process, you'd have to
15   come up with a different way to do it, right?
16       MR. FOX:  Objection to form.
17       A.    You should not go forward
18   unless there's a persuasive reason to believe
19   that the formation of these impurities would
20   be at such a low level that it would not
21   present a risk to human health.
22       MR. FOX:  Break, Adam?
23       MR. SLATER:  Sure.  I was
24   losing track of the time.  It's fine.

Page 168

1    BY MR. SLATER:
2        Q.    Do you want to -- I don't know
3    what you want to do, Mr. Chesney, if you want
4    to take a little longer, you want to eat
5    because it's almost 1:00 o'clock, whatever
6    you want?
7        A.    Well, maybe a little bit longer
8    and just grab something quick.  I'm certainly
9    not one who takes a big lunch anyway.
10       Q.    All right.  Well, you tell me,
11   how long would you like?  I'm just on my
12   second bite of my apple so far, so I'm going
13   to eat an entire apple for the next eight
14   hours.
15       A.    Okay.  Well, it's about
16   20 minutes of 1:00, why don't we say, I don't
17   know --
18       Q.    I'm not trying to rush you.
19   Make sure you give yourself a comfortable
20   amount of time.
21       A.    Ten minutes past 1:00 sound
22   okay to you?
23       Q.    That sounds really good.  We'll
24   shoot for that.

Page 169

1        A.    All right.  Fine.
2        THE VIDEOGRAPHER:  The time is
3    12:38 p.m.  We are off the record.
4        (Whereupon, a luncheon recess
5    was taken.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential Information - Subject to Protective Order

Page 170

1  AFTERNOON SESSION

2

3       THE VIDEOGRAPHER:  The time is
4  1:24 p.m.  We are back on the record.
5  BY MR. SLATER:
6    Q.   Okay.  We are ready to resume,
7  Mr. Chesney.
8       Question, I read your
9  discussion of adulteration in your report,
10  which I hope not to have a long, drawn-out
11  discussion about it, I think I understand
12  your points, but we may have to come back to
13  it a little bit.  But let me ask you one
14  question maybe to help to avoid a lot of
15  that.  So here's the question.
16       If the zinc chloride process
17  violated cGMP as we've discussed, if that's
18  the case, then the valsartan API manufactured
19  with that process would be adulterated,
20  correct?
21       MR. FOX:  Objection to form.
22    A.   If it is determined that there
23  is a GMP violation that is sufficient to
24  establish adulteration under the FDCA.

Page 171

1  That's a big if.
2  BY MR. SLATER:
3    Q.   I understand.  Nobody is saying
4  that you've agreed to all aspects of the
5  hypothetical I gave you, but I just wanted to
6  understand if that's the case what the
7  consequences were, or what the implications
8  were.
9       And sort of -- okay.  What I'm
10  doing is looking at my outline to see if I
11  can cut through a few things.  Okay.
12       We talked a little bit about
13  earlier about what ZHP did when they learned
14  about the NDMA in the valsartan.  I want to
15  talk a little more about that with you, okay?
16    A.   Okay.
17    Q.   Let me just find in your
18  report.
19       One of the things that you said
20  in your report is the actions taken -- well,
21  let me start over.
22       With regard to what ZHP did
23  when it learned that there was NDMA in the
24  valsartan, you say -- this is on page 40 of

Page 172

1  your report, "The actions taken are, in my
2  opinion, responsible steps that the FDA would
3  expect of any company who had discovered and
4  self-disclosed an issue with a distributed
5  product."
6       I want to ask you a couple
7  questions about that statement, okay?
8    A.   Sure.  That's on page 40.  Can
9  you tell me, I've got page 40 open on my hard
10  copy, whereabouts are you in that?
11    Q.   The third line from the top.
12    A.   Oh, okay.  All right.  I see
13  it, yes.
14    Q.   When you say that those were
15  responsible steps that the FDA would expect
16  of any company in that situation, those steps
17  were legally required of ZHP, correct?
18       MR. FOX:  Objection to form.
19  Calls for a legal conclusion.
20  BY MR. SLATER:
21    Q.   I'll ask the question
22  differently.
23       Based on your understanding of
24  the applicable FDA regulations and statutes,

Page 173

1  is it your opinion that those steps that ZHP
2  took in June of 2018 were legally required of
3  ZHP?
4       MR. FOX:  Same objection.
5    A.   No.  These are not things that
6  are covered by any specific FDA regulation or
7  statutory requirement; they're just
8  reasonable and proper things to do when a
9  company has information of this sort.
10       But there's nothing that I'm
11  aware of that's an affirmative duty for ZHP
12  to have done any of these based on a specific
13  FDA regulation or statutory requirement.
14  BY MR. SLATER:
15    Q.   One of the things you told me,
16  and it's stated in your report, is that
17  pursuant to 21 CFR 314.81(b)(1), ZHP was
18  required to submit a field alert report
19  within three business days to the FDA once it
20  had learned that there was NDMA in the
21  valsartan, correct?
22    A.   But that's not one of the five
23  elements that I cite here.  It begins on
24  page 39 at the bottom.

Page 174

1    Q.    Okay.  So let's go through the
2  five elements.  Well, going back to -- I'll
3  ask you a different question and then we'll
4  come back to where you were.
5         ZHP was legally required
6  pursuant to 21 CFR 314.81(b)(1) to submit a
7  field alert report to the FDA within three
8  business days of learning there was NDMA in
9  its valsartan, correct?
10   A.    Yes, with one slight
11 modification, and that being that because
12 this is under an abbreviated new drug
13 application, the regulation that directly
14 covers it is 314.98, but it reflects back to
15 314.81 for the content.  So in effect, yes.
16   Q.    Bottom line was ZHP was
17 required to notify the FDA that there was
18 NDMA in its valsartan within three business
19 days of learning that, correct?
20   A.    Yes.
21   Q.    Once ZHP knew that the zinc
22 chloride manufacturing process was creating
23 NDMA as an impurity, was ZHP required to stop
24 using that manufacturing process as a matter

Page 175

1  of GMP pending further evaluation?
2         MR. FOX:  Objection to form.
3    A.    Once again, no specific
4  requirement for that, but that would be the
5  reasonable thing to do.
6  BY MR. SLATER:
7    Q.    Well, it's my understanding
8  that at all times that ZHP was manufacturing
9  valsartan with the zinc chloride process,
10 that if it knew that NDMA was an impurity in
11 that valsartan API, that ZHP would have had
12 to address that situation pursuant to GMP,
13 correct?
14        MR. FOX:  Objection to form.
15 BY MR. SLATER:
16   Q.    Starting broad right now.
17   A.    What do you mean by "address
18 that situation"?
19   Q.    Well, let me ask you this
20 question.
21        When ZHP first learned that
22 there was NDMA in its valsartan API and that
23 it was a process impurity, did GMP require
24 that ZHP take any steps?

Page 176

1         MR. FOX:  Objection to form.
2  No foundation.
3    A.    It would require that they
4  conduct a thorough investigation to determine
5  where that was coming from, and how to
6  control it going forward, and what to do
7  about it in the interim.
8  BY MR. SLATER:
9    Q.    When you say how to control it
10 in the interim, what do you mean by that?
11   A.    Well, the steps that they took,
12 for example, placing existing inventory on
13 hold until the investigation was complete and
14 the decision could be made as to what to do.
15 Ultimately, of course, they conducted a
16 recall, notifying customers to place a hold
17 on valsartan API, those kinds of interim
18 controls, while the investigation is ongoing
19 and coming to its ultimate conclusion.  Those
20 are reasonable things to do.
21        None of those are prescribed
22 specifically by GMP, but they certainly are
23 the kinds of things that responsible
24 companies do when in this situation.

Page 177

1    Q.    Well, what I'm trying to
2  understand is what GMP required based on the
3  documents you reviewed, based on -- to the
4  extent you have any knowledge of any internal
5  SOPs, I'm trying to get a idea of what GMP
6  required when ZHP first learned that there
7  was NDMA in its valsartan API.
8         I think the first thing you
9  said is it needed to do a thorough
10 investigation to figure out why, where it's
11 coming from, correct?
12   A.    And also the risk.  And then --
13   Q.    I'm sorry, I wanted to go one
14 step at a time just because --
15   A.    Sure.
16   Q.    I'll start over.  We'll do it
17 in small steps.
18   A.    Okay.
19   Q.    When ZHP first learned that
20 there was NDMA in its valsartan API, GMP
21 would have required ZHP to do an
22 investigation to determine why is it there,
23 where is it coming from, correct?
24   A.    Yes, and the associated risk.

Confidential Information Subject to Protective Order

Page 178

1    Q.    And to evaluate the associated
2  risk?
3    A.    Yes.
4    Q.    Once ZHP understood that this
5  was coming from the process, the
6  manufacturing process itself, and understood
7  that this was a genotoxic impurity that was
8  considered to be a probable human carcinogen,
9  what did GMP require ZHP to do once it knew
10  that information?
11        MR. FOX:  Objection to form.
12    A.    If feasible, quantify the
13  levels of the compound that were present as a
14  result of its formation during the process,
15  and include a health hazard assessment as to
16  what the implications are of that level of
17  material, once they had a clear understanding
18  of what the levels were that were occurring,
19  whether they were just trace levels that
20  would perhaps have a negligible or no effect,
21  or whether they were at levels of concern.
22  That would be the next step.
23  BY MR. SLATER:
24    Q.    You would agree with me that

Page 179

1  knowing what you know now, the levels were at
2  levels that would be of concern, correct?
3    A.    Right.  And they agreed as
4  well, that's why they conducted the recall.
5    Q.    And again, I'm sticking with
6  GMP right now, so I want to just make sure
7  we're on the same page that once ZHP
8  understood there was NDMA in the valsartan
9  API, it needed to do a thorough
10  investigation, determine what was the root
11  cause, also to evaluate the potential health
12  hazard, quantify the levels.
13        And then what else would have
14  been required by GMP?
15        MR. FOX:  Objection to form.
16    A.    Exactly what they did here,
17  which is for the quality unit to take
18  appropriate action with respect to the
19  material in their possession, and would have
20  to evaluate whether a recall was necessary,
21  which they did.  And they placed the material
22  on hold and notified their customers.  They
23  also notified the FDA.
24        ///

Page 180

1  BY MR. SLATER:
2    Q.    Would that also have required
3  that they stop manufacturing for the time
4  being?
5    A.    It wouldn't have required that.
6  Some companies in a situation like this where
7  information is still developing and they're
8  not sure where it's going to come out, if
9  there's sufficient demand they may continue
10  to manufacture at risk, but put any new lots
11  manufactured also on hold.
12        Other companies will look at
13  that and say no, the risk is too high, we
14  don't want to make that investment in the
15  cost of goods, and they'll simply cease
16  manufacturing until they sort the matter out.
17        So if they continue to
18  manufacture, they should certainly -- they
19  would certainly not be wise to distribute any
20  additional product made, but rather to put
21  that on hold with the rest of it.
22    Q.    Would there have been anything
23  else that GMP would have required of ZHP?
24        MR. FOX:  Objection to form.

Page 181

1    A.    Once a final conclusion is made
2  that the product is not in a saleable
3  condition, then the final thing would be for
4  the quality unit to reject the material that
5  they still had control over and any returns
6  they get back as a result of the recall.
7        Some companies in a recall
8  situation will authorize the destruction by
9  their consignees rather than have it all
10  returned.
11  BY MR. SLATER:
12    Q.    And your understanding is that
13  from all the things you've seen, that ZHP
14  first learned that there was NDMA in its
15  valsartan in June of 2018, is that correct?
16    A.    That's when the investigation
17  was in its final or latter stages, and they
18  had done some quantification, yes.
19    Q.    Did you come to an
20  understanding of how -- well, rephrase.  Did
21  you have an -- rephrase.
22        Did you review materials having
23  to do with the interactions between Novartis
24  and ZHP regarding the NDMA impurity in the

Confidential Information Subject to Protective Order



Page 182

1  valsartan which led to the disclosure?
2        MR. FOX:  Objection to form.
3     A.    I do recall reviewing some of
4  the original reports, or an original report
5  from Novartis that they had detected an
6  unidentified impurity.
7  BY MR. SLATER:
8     Q.    Did you notice that it was
9  Novartis and a third party lab that Novartis
10  retained that identified the NDMA before ZHP
11  did?
12     A.    I don't recall specific
13  details.  It's possible that I did, yes.
14

Page 183

1
in

Page 184

1  your report.  That was not something you
2  actually addressed in your report, correct?
3     A.    I don't recall addressing it.
4     Q.    Do you have any opinions as to
5  whether -- rephrase.
6        I didn't see any opinions in
7
8
9
10
11  opined on, correct?
12     A.    I don't believe I dealt with
13  that specifically in my report.
14     Q.    You would agree that when ZHP
15  was receiving complaints from its customers
16  of unknown peaks on chromatography that ZHP
17  had certain GMP obligations in response to
18  those complaints?  We'll get to what those
19  responsibilities were, but you would agree
20  that that would trigger certain GMP
21  responsibilities, correct?
22        MR. FOX:  Objection to form.
23  Foundation.
24     A.    Yes, they should investigate

Page 185

1  those complaints for sure.
2  BY MR. SLATER:
3     Q.    They would have been required
4  by GMP to conduct a risk assessment with
5  regard to those peaks in an effort to --
6  well, let me ask it differently.  Maybe I
7  won't use the word risk assessment, and
8  you'll tell me, it could be something else
9  closely akin.
10        When ZHP was -- rephrase.
11        When ZHP received the customer
12  complaints of these unknown peaks in the
13  valsartan API, GMP required ZHP to analyze
14  and try to determine what those unknown peaks
15  represented, correct?
16        MR. FOX:  Objection to form.
17     A.    When you use the word "analyze"
18  there, can you be more specific?
19  BY MR. SLATER:
20     Q.    Well, sure.
21        ZHP would have been required to
22  try to learn the reason why those unknown
23  peaks were appearing, correct?
24     A.    Yes.  And that could be through

Page 186

1 dialogue with the complainant, review of
2 information submitted by the complainant,
3 review of production records, a variety of
4 ways, sometimes including laboratory analysis
5 of retained samples if that's appropriate.
6 All of that has to be taken into
7 consideration based on the details of the
8 complaint.
9      Q.    One of the things ZHP would
10 have been expected to do would have been to
11 evaluate the manufacturing process to
12 determine whether there was the potential
13 creation of impurities that could explain
14 those unknown peaks, correct?
15      MR. FOX:  Objection to form.
16 Calls for speculation.
17      A.    Once the manufacturing process
18 is established and being followed, there's no
19 requirement that they go back and reconsider
20 something like that.
21      What they would need to do
22 instead is to make sure the batch records
23 reflect that the manufacturing process that
24 was used for the batch that was the subject

Page 187

1 of the complaint was followed as required by
2 the master form of the record.
3 BY MR. SLATER:
4      Q.    In terms of deciding what
5 testing to -- rephrase.
6      One of the things ZHP had to do
7 was determine what type of testing to perform
8 to try to determine the explanation for those
9 unknown peaks; that would have been part of
10 what they should have done, correct?
11      MR. FOX:  Objection to form.
12      A.    They should have determined
13 whether testing was even feasible or
14 necessary, because sometimes the information
15 that comes in from the complainant is not
16 that you don't really need to go to testing,
17 other times it's helpful.  So it depends on
18 the details.
19 BY MR. SLATER:
20      Q.    Well, in retrospect we know
21 that there were unknown peaks attributable to
22 NDMA, and that certain testing would have
23 disclosed the presence of NDMA.  We know that
24 in retrospect, right?

Page 188

1      MR. FOX:  Objection to form.
2      A.    I'm not sure that I know that
3 at all.  First of all --
4 BY MR. SLATER:
5      Q.    Was it in the materials you
6 reviewed?
7      A.    From the public statements by
8 the FDA, those analytical procedures were not
9 fully robust until a later date for one
10 thing, you know.  So I don't know what was
11 available at the time.  We've talked about
12 these literature references and so on.
13      But again, this is something I
14 would ask a subject matter expert, Was there
15 analytical technology available that should
16 have been used, could have been used under
17 these circumstances to shed some light on
18 this.
19      But the ordinary approach with
20 unknown peaks is to attempt to identify them
21 qualitatively, and then once you know that,
22 quantitate them if that's possible with
23 existing technology.
24      Q.    When you say "qualitatively,"

Page 189

1 you're talking about figuring out what they
2 are?
3      A.    Yeah, what is it.  And then
4 quantitatively is okay, how much is it, how
5 much is there present, what level is it at.
6      Q.    Well, one of the things that
7 ZHP would have had to question was, Is there
8 a test we can perform to identify the source
9 of those unknown peaks.  They would at least
10 have been expected by GMP to ask themselves
11 that question, right?
12      MR. FOX:  Objection to form.
13      A.    What I have seen the scientists
14 do is look at the unknown peaks, look where
15 they're alluding, evaluate the size and
16 occurrence of them, and attempt to infer from
17 that what might be going on.
18      If additional testing is
19 necessary, then they do that, but I'm not the
20 one to make that call.
21 BY MR. SLATER:
22      Q.    I read somewhere, and I don't
23 remember if it was in your report or in some
24 of the ICH documents, that risk assessment is

Confidential Information - Subject to Protective Order

Page 190

1  not a static process, it's a process that
2  continues through the lifecycle of the drug's
3  production and manufacture, is that correct?
4      A.   I would agree with that
5  statement, yes.
6      Q.   So when the unknown peaks were
7  brought to the attention of ZHP, one of the
8  things that would have been prudent for them
9  to do would have been to go back to their
10 risk assessment to determine whether it was
11 adequate to make sure they hadn't missed
12 something that could explain those unknown
13 peaks.  That would have been a prudent step,
14 right?
15         MR. FOX:  Objection to form.
16     Calls for speculation.
17     A.   I don't know if they did that
18 or not, but they certainly could have.
19 BY MR. SLATER:
20     Q.   It would have been prudent for
21 them to do so, correct?
22         MR. FOX:  Objection to form.
23     A.   Yes.
24         ///

Page 191

1  BY MR. SLATER:
2      Q.   And if it was scientifically
3  feasible for ZHP to have evaluated the
4  manufacturing process, gone through the
5  chemical reactions that could have been
6  occurring, and identify that potentially
7  nitrosamines were being created, and if it
8  was technically feasible to perform a test
9  like mass spectrometry to determine whether
10 these were nitrosamines causing these unknown
11 peaks, if both of those ifs -- if the answer
12 is yes to both of those, then that would have
13 been expected by ZHP, that would have been
14 expected by GMP, correct?
15         MR. FOX:  Objection to form.
16     Incomplete hypothetical.
17     A.   That's the sort of question I
18 would turn to a subject matter expert to help
19 formulate.
20 BY MR. SLATER:
21     Q.   I'm asking you to assume the
22 answer is yes, it would have been
23 scientifically feasible to figure out that
24 these reactions could have led to the

Page 192

1  creation of nitrosamines, and I'm asking you
2  to assume that testing, including mass
3  spectrometry, was available to test to see if
4  this was a nitrosamine peak, if the answer to
5  both of those is yes, then GMP would have
6  required ZHP to do so when those unknown
7  peaks were reported, correct?
8          MR. FOX:  Objection to form.
9      A.   There's a lot of ifs in that
10 hypothetical.
11 BY MR. SLATER:
12     Q.   Is the answer yes?
13     A.   The answer would be yes, if the
14 answer to all the ifs you just posed was also
15 yes.
16     Q.   So again, this comes back to
17 the importance of identification of the
18 potential impurity being the trigger to many
19 of these cGMP functions, correct?
20         MR. FOX:  Objection to form.
21     A.   Yes.
22 BY MR. SLATER:
23     Q.   Would you agree that as soon as
24 ZHP had internally determined that those

Page 193

1  unknown peaks could be due to the formation
2  of a nitrosamine as a result of the
3  manufacturing process, that ZHP was obligated
4  to tell the complaining customers that based
5  on their analysis of the manufacturing
6  process, one explanation could be
7  nitrosamines?
8          MR. FOX:  Objection to form.
9      Calls for speculation, incomplete
10     hypothetical.
11     A.   There's no requirement for them
12 to notify the complainant at that stage of
13 the game.  They're in the middle of an
14 investigation.  They have a hypothesis
15 formed, as you've described it, they're
16 putting a hypothesis to the test, so their
17 main investigation, that would probably be a
18 premature point at the time.
19 BY MR. SLATER:
20     Q.   Once ZHP actually tested its
21 hypothesis and confirmed that there was NDMA
22 forming in the valsartan as a result of the
23 manufacturing process, at that point was ZHP
24 required to notify its customers?

Confidential Information - Subject to Protective Order

1    MR. FOX:  Objection to form.
2    A.    Required, no.  Prudent, yes.
3  BY MR. SLATER:
4    Q.    How about a customer that had
5  complained and said, Please tell us what
6  these unknown peaks represent, was ZHP
7  required to tell those complaining customers
8  once ZHP knew it was NDMA, that yes, those
9  peaks were due to NDMA?
10    MR. FOX:  Objection to form.
11    No foundation.
12    A.    Not required by GMP, but again,
13  the sort of thing that prudent companies do,
14  and in fact ZHP did in June of 2018.
15  BY MR. SLATER:
16    Q.    If ZHP knew that there was NDMA
17  in its valsartan API and continued to sell
18  the API and didn't tell any of its customers
19  and didn't tell the FDA, that would be
20  inexcusable, correct?
21    MR. FOX:  Objection to form.
22    No foundation, argumentative, beyond
23    the scope.
24    A.    Use of the word "inexcusable"

1  is a little inflammatory.  I think if they
2  had knowledge that a product posed a danger
3  to health and didn't do anything about it,
4  that would certainly be inappropriate, and
5  they could potentially be in violation of the
6  Act for other reasons other than GMP as well.
7  BY MR. SLATER:
8    Q.    What could they potentially be
9  in violation of under the Act, aside from
10  GMP?
11    A.    If --
12    MR. FOX:  Objection to the
13    form.  Calls for a legal conclusion.
14  BY MR. SLATER:
15    Q.    You can answer.
16    A.    Okay.  If they are aware that a
17  product contains a contaminant that poses an
18  actual or potential danger to health, and
19  tell no one and continue to ship it anyway,
20  that could be construed later, after
21  evaluation of all the facts, as having
22  shipped a contaminated and, therefore,
23  adulterated product in interstate commerce.
24    Q.    What are the consequences for

1  that?
2    MR. FOX:  Objection to form.
3    Calls for speculation.
4    A.    Well, any of a number of
5  consequences.  It would depend on a variety
6  of factors.
7    A product can be seized.  If
8  it's domestic US channels of distribution,
9  FDA can move for that.
10    FDA can seek an injunction to
11  cause a company to cease and desist violative
12  conduct.
13    They can deal with it as they
14  did in this case with a warning letter, which
15  is a lesser way of handling it.
16    There are a number of other
17  possibilities, depending on the
18  circumstances.  And whether it's in domestic
19  commerce or coming in from abroad would
20  change the equation as well.
21  BY MR. SLATER:
22    Q.    Well, here we're talking about
23  API that was coming in from China.
24    A.    Right.

1    Q.    If it turned out that ZHP knew
2  that its zinc chloride manufacturing process
3  was creating NDMA in the API, and ZHP despite
4  that knowledge continued to sell the API and
5  not inform any of its customers or any
6  regulatory authorities and kept that
7  knowledge secret and did so for months, that
8  would be a violation, I would assume, of the
9  Food, Drug, Cosmetic Act, correct?
10    MR. FOX:  Objection.
11    Hypothetical, no foundation.
12    MR. SLATER:  You know what,
13    Counsel, you can have your -- you have
14    your standing objection, because you
15    give it to every question, I'm not
16    going to make you keep saying it.  I
17    want to just get through this.
18    MR. FOX:  It's beyond the scope
19    of his opinion.
20    MR. SLATER:  I'm not so sure it
21    is.
22    A.    Okay.  Once again let's be
23  clear on what the question is, Mr. Slater.
24    MR. SLATER:  I'm going to ask

Page 198

Maureen, if you could read it back.
It worked well the first time, so try
the second time.
          (Whereupon, the reporter read
back the following:
          QUESTION:  If it turned out
that ZHP knew that its zinc chloride
manufacturing process was creating
NDMA in the API, and ZHP despite that
knowledge continued to sell the API
and not inform any of its customers or
any regulatory authorities and kept
that knowledge secret and did so for
months, that would be a violation, I
would assume, of the Food, Drug,
Cosmetic Act, correct.)
     A.    One thing that's missing from
the fact set that you put forth is how much
of the NDMA is present, whether it's at
miniscule trace amounts or amounts that could
potentially pose a hazard to health, and that
would be necessary for me to give an opinion.
          I would also need to know once
the amounts were quantified what the medical

Page 199

opinion is in terms of the health hazard that
would be necessary.  Because if something is
present at very minuscule trace amounts that
pose no risk whatsoever, then that could
result in a different answer.
BY MR. SLATER:
     Q.    Do you know the amounts that
were found in ZHP's API?  Did you have a
chance to see that?
     A.    I have.
     Q.    Those amounts.
          MR. FOX:  Object to form.
     A.    Yeah, those amounts are
concerning.  And again, there are a lot -- a
string of ifs in a row here.  If this was
going on, if they were fully aware of it, if
they didn't notify the FDA, if they didn't
notify their customers, if they continued to
sell it, and so on, then yes, that could be
construed as a violation of the Food, Drug &
Cosmetic Act.  I don't want to give a legal
opinion here.
          The fact is, as my report
relates, that's not what they did in 2018.

Page 200

BY MR. SLATER:
     Q.    When you say that could be a
violation of the Food, Drug, Cosmetic Act,
could that be something that could rise to
the level of being criminal?
          MR. FOX:  Objection to the
form.  You're asking him for a legal
opinion.
          MR. SLATER: He's your expert
who cited to regulations all over the
report.  I think he's competent to
talk about the legal implications of
the conduct of your client.
          MR. FOX:  And I think he did
that in the report.  You have my
objection.
          MR. SLATER:  I appreciate it.
BY MR. SLATER:
     Q.    You can answer.
     A.    Any decision to go forward with
a criminal prosecution would go even beyond
the scientific multidisciplinary process that
I mentioned.  This is hence my reluctance.

Page 201





Page 202

Page 203

Page 204

8  Q.    Okay.
9      MR. SLATER:  Let's go to the
next page, please, Chris.
11     MR. FOX:  Is there a date on
12 this, Adam?
13     MR. SLATER:  Is there a date on
14 this.  I believe I can get that for
15 you.  I don't remember that off the
16 top of my head.
17     MR. FOX:  Okay.
18     MR. SLATER:  But we can get
19 that and we'll certainly make a record
20 of it.  It was used in a prior
21 deposition, so it's certainly been
22 identified in the metadata.
23 BY MR. SLATER:
24

Page 205

Confidential Information Subject to Protective Order



**Page 206**

**Page 207**

4  another exhibit which will be, I believe,
5  296.
6      (Whereupon, Chesney Exhibit
7  Number 10 was marked for
8  identification.)
9      MR. SLATER:  Chris, I want the
10 translated version of this, not the
11 Chinese version of the e-mail.
12     A.    Can we pause on that PowerPoint
13 for just a moment?
14 BY MR. SLATER:
15     Q.    Sure, we can go back to it.
16     A.    I just have a question.
17

**Page 208**

9      A.    From my experience when you go
10 from Chinese to English, sometimes things
11 don't come across quite the same way.
12     Q.    Fair enough.
13     A.    I've dealt with Chinese
14 companies in the past, and sometimes things
15 are a little hard to follow in the translated
16 version.
17     Q.    No problem.
18         Let's go back to Exhibit 296
19 now.
20         Now, I'm showing you an e-mail
21 marked as ZHP 296 which was sent by Jinsheng
22 Lin, Ph.D who we just read about in that
23 CEMAT PowerPoint.  And do you see his name
24 there at the top?

**Page 209**

1      A.    Yes.
2      Q.    And it was sent to a number of
3  people, Jucai Ge, Tianpei Huang, Wangwei
4  Chen, Wenquan Zhu, Wenbin Chen, Mr. Li, Peng
5  Dong, Lihong Lin, Yanfeng Liu, Peng Wang, and
6  Wenling Zhang.
7          Do you see that?
8      A.    I do.
9      Q.    And the date of this e-mail is
10 July 27, 2017.  Do you see that towards the
11 top of the e-mail?
12     A.    Yes.
13     Q.    And what I want to do is go
14 through first, this is -- the first person
15 it's sent -- rephrase.
16         It's addressed to Ms. Ge.  As
17 you can see, it says, "Ms. Ge:  According to
18 the results of our telephone communication
19 with the Technology Department at Chuannan
20 Plant today," and then it talks about "the
21 incomplete quenching of sodium azide caused
22 by the separate treatment of irbesartan
23 sodium azide wastewater," and it goes into
24 that area, it discusses that.

Confidential Information - Subject to Protective Order

Page 210

1    Do you see that?
2    A.    Yes.
3    Q.    Okay.  What I would like now to
4  do is go to -- now, looking at the bottom of
5  that paragraph, Dr. Lin points out, "However,
6  after the improvement, there is an unknown
7  impurity of about 0.544 percent at 26 minutes
8  in the crude irbesartan, and it is the
9  largest impurity in the irbesartan crude
10  product."
11    Do you see that?
12    A.    Yes.
13
22    MR. SLATER:  Let's go now to
23  the next page, please, Chris, the top
24  of the second page.

Page 211

1    Q.    At the top of the next page
2  Dr. Lin states, "Through the secondary mass
3  spectrometry analysis, it can be inferred
4  that the extra NO substituent is in the
5  cyclic compound fragment, and it is very
6  likely that it is an N-NO" -- which would be
7  an N-nitroso -- "compound; it is similar to
8  the N-nitrosodimethylamine that occurs in
9  valsartan when quenched with sodium nitrite,
10  and its structure is very toxic."  Then it
11  says, "Its possible formation route is shown
12  as follows:"
13    Do you see what I just read?
14    A.    Yes.
15    Q.    Were you aware before right now
16  that at least as of July 27, 2017, ZHP knew
17  internally that there was NDMA in valsartan,
18  and that the mechanism that was creating it
19  occurred when the valsartan was quenched with
20  sodium nitrite during the manufacturing
21  process?
22    MR. FOX:  Objection to the
23  form.  Misstates the document.
24    A.    I can't conclude that based on

Page 212

1  what you've read up to this point in time.
2  BY MR. SLATER:
3    Q.    Okay.  This e-mail is dated
4  July 27, 2017.
5    A.    No, the date is not in
6  question.  But I can't conclude from what
7  I've heard so far that this suggests that
8  this material is actually in finished
9  valsartan.
10    It talks about being in crude
11  irbesartan, and at some stage of production
12  in valsartan.  I have no idea how much more
13  synthesis or purification either of those
14  compounds are supposed to go through as
15  they're being manufactured and whether that
16  would remediate this or not.
17    That's exactly the kind of
18  scientific analysis that I would defer to
19  others and would require collaboration on.
20    Q.    Okay.  I hadn't asked a
21  question at that point, but I appreciate you
22  telling me where you wanted to take this.
23  But let me go back now to what I want to ask
24  you.

Page 213

1    This e-mail is dated July 27,
2  2017.  It's written by Jinsheng Lin, who we
3
8  We went through that just a few moments ago,
9  correct?
10    A.    Yes.
11

Page 214

1 ▮▮▮▮▮
▮ ▮▮▮▮▮
▮ ▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮
▮ ▮▮▮▮
▮ ▮▮▮▮▮▮
▮ ▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮
▮ ▮▮▮.

12    Q.    What I'm asking you is -- so
13 we've established that.  Now let's go to my
14 next question.
15        In this e-mail Dr. Lin, whose
16 responsible was to understand and discover
17 such root causes, states that what was being
18 seen in the irbesartan "is similar to the
19 NDMA that occurs in valsartan when it's
20 quenched with sodium nitrite."
21        Do you see that?  Just asking
22 if you see those words.
23    A.    I do.
24 ▮ ▮▮▮▮▮▮

Page 215

1 ▮▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮
▮ ▮▮▮▮▮
▮ ▮▮▮▮▮▮▮
▮ ▮▮▮▮▮▮
▮ ▮▮▮▮▮

12    Q.    And in this e-mail, Dr. Lin
13 compares what is being seen in this
14 irbesartan that they're experimenting with
15 and says that what they're seeing is similar
16 to the NDMA that occurs in valsartan when
17 quenched with sodium nitrite.  He's stating a
18 comparison to what -- according to the words
19 on this page -- what he knows to occur in the
20 valsartan when it's quenched with sodium
21 nitrite, which you'll agree with me is a true
22 statement because that was the ultimate root
23 cause ultimately disclosed to the world,
24 correct?

Page 216

1        MR. FOX:  Objection to form.
2    The document speaks for itself.
3    A.    I'm still not certain about the
4 timeline here, but I mean, it says what it
5 says.  So certainly I'm not quarreling with
6 the fact that the words are there.
7        But whether that aligns to what
8 the other documents I reviewed say in terms
9 of when that determination was made, my
10 memory is the final determination that they
11 based the recall on was not made until 2018,
12 which would have been approximately a year
13 more or less after this was done.
14        So I'm not sure when the
15 gentleman makes this statement whether he's
16 basing that on a final conclusion, a
17 speculation, a work in progress, or what that
18 is.  It says what it says.
19        But beyond that, I don't know.
20 BY MR. SLATER:
21    Q.    Well, you know from the
22 materials you were provided that what he says
23 here is the root cause for the creation of
24 NDMA.

Page 217

1    A.    Was eventually determined to
2 be.
3    Q.    Okay.  And he was speaking to
4 the root cause in July of 2017.  That's what
5 it says right here, right?
6        MR. FOX:  Objection to form.
7    The document speaks for itself.  Stop
8    trying to put words in his mouth.
9 BY MR. SLATER:
10    Q.    That's correct, right,
11 Mr. Chesney?
12    A.    It says what it says.
13    Q.    You were not shown this
14 document or told about this e-mail by the
15 people who retained you, is that correct?
16    A.    This is the first time I've
17 seen it.
18    Q.    And you saw the list of people
19 on the first page that this was sent to.  So
20 this was not one person hoarding this
21 information; it was shared with multiple
22 people within the company.  I showed you
23 that, correct?
24    A.    You showed me the list that it

Confidential Information - Subject to Protective Order

Page 218

1  was supposedly sent to, yes.
2     Q.    If ZHP knew, as reflected in
3  this document, that there was NDMA in
4  valsartan as of July 2017, all the things
5  that you said that ZHP was required to do in
6  June of 2018, you would say all those things
7  were required to be done as of July 2017 when
8  ZHP knew this, correct?
9        MR. FOX:  Objection to the
10  form.  Calls for speculation.
11     A.    What we have in this document
12  is a side statement in one sentence to this
13  information.  I don't know what's behind
14  that, what the writer meant, particularly in
15  Chinese -- I assume this was originally
16  written in Chinese -- when he crafted this
17  statement, what -- how deep his knowledge or
18  understanding of that was or whether that was
19  a speculative or off-the-cuff remark.
20        It's really very difficult to
21  make any definitive conclusion from this
22  about what the company actually knew and how
23  many people knew it in 2017.
24        He's making an -- I guess you'd

Page 219

1  call it at minimum an allegation, or a
2  suggestion maybe is a better way to put it,
3  that this is the case.  What the facts are
4  behind that and how well-known they are, I
5  have no idea.
6  BY MR. SLATER:
7     Q.    With all due respect, that's
8  not what I asked you, to give me every reason
9  that you could come up with why someone might
10  want to try to undercut the statement.
11  That's not what I asked you.  So let's go
12  back to my question.
13        If, as stated in this document,
14  ZHP knew that there was NDMA in the valsartan
15  and it was a process impurity that was being
16  created when the sodium nitrite quenching
17  step occurred as part of the zinc chloride
18  process, then everything you said ZHP was
19  required to do in June of 2018 would be
20  transferred back to July of 2017, or whenever
21  earlier date they knew this, and all those
22  things would have been required at that time,
23  correct?
24        MR. FOX:  Objection to the

Page 220

1  form.  Lack of foundation, incomplete
2  hypothetical, calls for speculation.
3     A.    If they knew it, yes.
4  BY MR. SLATER:
5     Q.    If they knew as of at least
6  July 27th -- rephrase.
7        If ZHP knew at least as of July
8  27, 2017 that there was NDMA in the
9  valsartan, and kept that secret and didn't
10  tell any customers or any regulators until
11  Novartis came to them and forced them to
12  disclose this information in June of 2018,
13  that would be a violation of the Food, Drug
14  and Cosmetic Act, correct?
15        MR. FOX:  Objection to form.
16     A.    It would if it was offered for
17  importation into the United States, yes.
18  BY MR. SLATER:
19     Q.    We know that ZHP was selling
20  its valsartan with NDMA in it right through
21  until the recall occurred in June or July of
22  2018, right?
23        MR. FOX:  Objection to the
24  form.

Page 221

1     A.    I haven't looked at their sales
2  and distribution records.  I know only that
3  they had product on the market when they
4  conducted the recall, or there wouldn't have
5  been anything to recall.
6        MR. FOX:  Adam, is there a
7  reason why you're not appearing on any
8  of these screens?
9        MR. SLATER:  Is there a reason
10  I'm not appearing?  I'm looking right
11  at myself.
12        MR. FOX:  Okay.
13        MR. SLATER:  I'm right below
14  Mr. Chesney, where I belong.
15        THE WITNESS:  I can see him.
16        MR. SLATER:  He's sitting right
17  on my -- he's got his feet right on my
18  shoulders right now.
19     A.    Actually you're at the bottom
20  on my list, but I can see you.
21        MR. SLATER:  I'm in here.
22        MR. FOX:  Okay.  I found you.
23  BY MR. SLATER:
24     Q.    Okay.  If, in fact, ZHP knew at

1 least as of July 27, 2017 that there was NDMA
2 in the valsartan and didn't tell its
3 customers and didn't tell any regulatory
4 authorities and just continued to sell the
5 product, that would be a very serious
6 violation of the Food, Drug and Cosmetic Act,
7 correct?
8         MR. FOX:  Objection to form.
9     Argumentative, lacks foundation.
10     A.    It would be of great concern if
11 indeed that's true, but I don't know that it
12 is.
13 BY MR. SLATER:
14     Q.    In terms of your ability to
15 form an opinion in this case, this is the
16 type of information you would have expected
17 to have been provided when you were provided
18 materials by counsel, correct?
19         MR. FOX:  Objection to the
20     form.
21     A.    If I had been provided this
22 information, it would have raised certain
23 questions in my mind.  I would have referred
24 those to scientific subject matter experts,

1 but I would have taken note of it.
2 BY MR. SLATER:
3     Q.    Let's go down a little further
4 in this e-mail.
5         After the pictures of the
6 potential formation route of the nitrosamine
7 impurity in the irbesartan, the second
8 paragraph under that says, "If it is
9 confirmed as the above speculated structure,
10 then its toxicity will be very strong, and
11 there will be an extremely high GMP risk.
12 This is a common problem in the production
13 and synthesis of sartan APIs.  It is
14 recommended to improve other quenching
15 processes (such as NaCIO) along with the
16 optimization of the valsartan sodium azide
17 quenching process."
18         Do you see that?
19     A.    I do.
20     Q.    So this provides further
21 information about the depth of understanding
22 by ZHP as of July 2017, because this shows
23 that they knew that this is a common problem
24 in the production and synthesis of sartan

1 APIs.  That's additional important
2 information, right?
3         MR. FOX:  Objection to the
4     form.
5     A.    It also characterizes the
6 findings up above as not confirmed and
7 speculative.
8 BY MR. SLATER:
9     Q.    The speculated structure is
10 talking about what was being seen in the
11 irbesartan, which was something they were
12 working on to try to work on that process to
13 manufacture it.  They're not speculating
14 about there being NDMA in valsartan; that's
15 not stated as speculative at all, correct?
16         MR. FOX:  Objection to form.
17     The document speaks for itself.
18         MR. SLATER:  Counsel, you have
19     to stop, with all due respect, making
20     a document speaks for itself
21     objection.  I would appreciate it if
22     it would stop.  I know you're new to
23     this litigation, but the Special
24     Master has instructed that that

1 objection should not be made.
2         You don't have to take my word
3     for it, I'm just trying to help.
4 BY MR. SLATER:
5     Q.    Can you answer the question,
6 please?
7     A.    I'm just taking a minute to
8 read it here.
9         (Witness reviewing document.)
10     A.    I'm having trouble from these
11 isolated paragraphs here making a link back
12 to valsartan, frankly.  I hear what you're
13 saying, but I'm not able to get there based
14 on what it says right here.
15     Q.    I'll ask you a different
16 question then.
17         You see the sentence that says,
18 "This is a common problem in the production
19 and synthesis of sartan APIs"?  Do you see
20 that sentence?
21     A.    I do.
22     Q.    That's not phrased as something
23 he's speculating about; that's being stated
24 as fact in this e-mail.  That's how it reads,

Page 226

1 right?
2 A.    Yes.
3         MR. FOX:  Objection to the
4 form.
5 BY MR. SLATER:
6 Q.    Did you say yes?
7 A.    Yes.
8 Q.    And we know in retrospect that
9 this was a common problem in the production
10 and synthesis of sartan APIs, which is why
11 ultimately it turned out that other
12 manufacturing processes were implicated in
13 irbesartan and losartan, that there were
14 recalls of those drugs as well.  That was
15 ultimately learned, correct?
16        MR. FOX:  Objection to form.
17 A.    Yes.
18 BY MR. SLATER:
19 Q.    And in fact, Dr. Lin makes the
20 responsible recommendation to improve the
21 other quenching processes along with the
22 optimization of the valsartan sodium azide
23 quenching process.  That's the responsible
24 thing to say when you realize that your

Page 227

1 manufacturing process is creating a genotoxic
2 impurity, in this case NDMA, correct?
3         MR. FOX:  Objection to the
4 form.
5 A.    You're talking about the last
6 paragraph here.
7         Okay.  I'm sorry, but I was
8 catching up with you by reading this in a
9 little more depth, could you either repeat
10 the question or have it read back to me,
11 please?
12 BY MR. SLATER:
13 Q.    Sure.
14        It was responsible for Dr. Lin
15 to state, as he did, that he was recommending
16 that they improve the other quenching
17 processes such as NaCIO, along with the
18 optimization of the valsartan sodium azide
19 quenching process, because of the fact that,
20 as he stated, this is a common problem in the
21 production and synthesis of sartan APIs.
22 That's a responsible recommendation, right?
23 A.    Yes, it is.
24 Q.    In the last paragraph he

Page 228

1 states, "I've also attached a patent of a
2 2013 sodium azide NaCIO quenching method by
3 Zhejiang Second Pharma Co., Limited.  They
4 proposed that the use of NaNO2 quenching will
5 result in the formation of N-NO impurities,"
6 which is N-nitroso impurities.  "At the same
7 time, they used ZHP's crude Valsartan in
8 their LC-MS test" -- that would be liquid
9 chromatography-mass spectrometry -- "and
10 detected this impurity.  This indicates that
11 other companies have paid attention to the
12 quality problem very early on.  So leaders
13 please pay attention to this issue."
14        Do you see that paragraph I
15 just read?
16 A.    Yes.
17 Q.    Dr. Lin's statement to these
18 other executives -- rephrase.
19        Dr. Lin's statement that other
20 companies are aware of this quality problem,
21 and giving an example going back to 2013,
22 that's significant, isn't it?
23        MR. FOX:  Objection to form.
24 A.    It's my understanding that at

Page 229

1 that point in time other companies had not
2 conducted recalls or taken any market action
3 with respect to the issue, so it sounds to me
4 like it was something the industry was in the
5 process of coming to an understanding of at
6 that time.
7 BY MR. SLATER:
8 Q.    Most important -- rephrase.
9        At the very end he says, "So
10 leaders please pay attention to this issue."
11 That is a very responsible thing to say in
12 this e-mail, alerting the others that receive
13 this e-mail of this situation with the
14 creation of NDMA and the fact that it's a
15 common problem in the production and
16 synthesis of sartan APIs.  It's responsible
17 for him to tell the leaders in his company to
18 take note of this situation, right?
19 A.    Yes.
20        MR. FOX:  Objection to form.
21 BY MR. SLATER:
22 Q.    And in fact, the leaders of the
23 company, right up to the highest executive,
24 would have the ultimate responsibility for

Confidential Information Subject to Protective Order

Page 230

1  this quality problem, right?
2          MR. FOX:  Objection to form.
3      A.    Yes.
4  BY MR. SLATER:
5      Q.    And you've actually written on
6  that subject and published on that subject,
7  correct?
8      A.    Yes.
9      Q.    You would agree with me as a
10  matter of GMP that the information in this
11  e-mail could not be ignored; it needed to be
12  aggressively evaluated by the so-called,
13  quote-unquote, leaders as soon as it was
14  brought to their attention, right?
15          MR. FOX:  Objection to form.
16      A.    Yes.
17  BY MR. SLATER:
18      Q.    And we know in retrospect that
19  what Dr. Lin said about the valsartan
20  quenching creating the NDMA and this being a
21  common problem in the production and
22  synthesis of sartan APIs, we know in
23  retrospect he was 100 percent correct about
24  those statements.  You've seen that in the

Page 231

1  materials you've reviewed for this case,
2  right?
3          MR. FOX:  Objection to form.
4      Argumentative.
5      A.    Ultimately that information was
6  developed, yes.
7  BY MR. SLATER:
8      Q.    Are you stunned to see this
9  e-mail, and to see that this information was
10  being circulated within ZHP as of July 2017?
11  Because you said it's the first time you've
12  become aware of that.
13          MR. FOX:  Objection to form.
14  BY MR. SLATER:
15      Q.    Are you stunned, shocked,
16  surprised?  What word would you put on it?
17      A.    I wouldn't say stunned.  It
18  sounds to me like an appropriate notification
19  based on some information that is outlined in
20  the e-mail.
21          It's a few months before --
22  actually about -- let's see here, about 10 or
23  11 months before the recall, and these things
24  are -- complex scientific issues like this

Page 232

1  don't get resolved overnight.
2          I don't know what was done
3  about this, whether this was a triggering
4  point for further work that culminated in the
5  notification to FDA and the recall, or what.
6          But it certainly is responsible
7  for Dr. Lin to have made this notification,
8  and it looks like he made it to the right
9  people.
10      Q.    We know, again in retrospect,
11  that what Dr. Lin said is accurate, and we
12  know that he must have had a way to know it
13  because -- well, rephrase.
14          You're certainly not taking the
15  position that he just came up with this out
16  ████████████████████████████████
17  ██████████████████████████
18  ████████████████████████████████
19  ██████████████████████████████████
20  ████████████████████████████████████
21  ████████████████████████████
22  ██████  ██████  ████
23          MR. FOX:  Objection.
24          MR. SLATER:  Chris, let's go to

Page 233

1  the article in the Quality Management
2  Essentials publication that I just
3  mentioned a moment ago indirectly,
4  please.
5          And I'm not sure what exhibit
6  number would this be for the record,
7  if anybody knows.
8          MR. GEDDIS:  That would be
9  Exhibit 5.
10          (Whereupon, Chesney Exhibit
11  Number 11 was marked for
12  identification.)
13          MR. FOX:  Which exhibit is this
14  on the screen?
15          MR. SLATER:  I think I was just
16  told Exhibit 5.
17          MR. FOX:  So this has not been
18  used before.
19          MR. SLATER:  This has not been
20  used before.
21  BY MR. SLATER:
22      Q.    And you recognize this
23  publication, Quality Management Essentials,
24  Expert Advice on Building a Compliant System?

Confidential Information Subject to Protective Order

Page 234

1  You recognize this publication from 2018,
2  correct?
3      A.    I don't recognize the artwork,
4  but I recognize the title, yes.
5      Q.    And if we go to the third page,
6  the Table of Contents, we can see that you
7  actually wrote an article that was included
8  in this publication titled Executive
9  Responsibility for Quality, correct?
10     A.    Yes, that's correct.
11     Q.    Let's go to your article which
12 comes right after that.  And this is
13 titled -- rephrase.
14         Your article is titled
15 Executive Responsibility for Quality, and I
16 want to go to the section titled Importance
17 of Quality just below that.
18         MR. SLATER:  Chris, could you
19     make it a little bigger, please?
20     Perfect.
21     A.    That's fine.
22     Q.    This says, "Importance of
23 Quality.
24         "Executive commitment to

Page 235

1  quality in the pharmaceutical industry is
2  critical, not only to ensure continuing
3  profitability of the company, but also for
4  the safety and well-being of patients and to
5  meet the needs of healthcare providers who
6  prescribe and use pharmaceutical products
7  every day."
8         That's what you wrote, correct?
9      A.    Yes.
10     Q.    The primary concern has to
11 always be the safety and well-being of
12 patients, right?
13     A.    Yes.
14     Q.    It would never be acceptable
15 for ZHP or any other company to place profits
16 over safety, right?
17         MR. FOX:  Objection to form.
18     A.    I agree with that.
19 BY MR. SLATER:
20     Q.    For example, if it turned out
21 that ZHP was making so much money with the
22 zinc chloride process to manufacture
23 valsartan API that they chose to keep secret
24 from its customers and the regulatory

Page 236

1  authorities that they knew there was NDMA in
2  the valsartan because they were so enamored
3  with the profits they were making and put
4  that ahead of the safety of people using
5  those pills, that would be reprehensible,
6  right?
7         MR. FOX:  Objection to the
8     form.  Argumentative, no foundation,
9     beyond the scope of his expertise.
10     A.    It would be of great concern,
11 yes.
12 BY MR. SLATER:
13     Q.    It would be reprehensible,
14 right?
15         MR. FOX:  Objection.  Same
16     objection.
17     A.    That's a value judgment word.
18 I prefer more precise terminology.  But it
19 would not be a good thing.
20 BY MR. SLATER:
21     Q.    Going down a little further to
22 the fourth full paragraph under Importance of
23 Quality, there's a paragraph that says, "For
24 these reasons, quality assurance (QA) and GMP

Page 237

1  compliance may be viewed differently in the
2  pharmaceutical industry than in those
3  industries where a reputation for high
4  quality drives sales.  Quality assurance may
5  be viewed as a 'cost of doing business' or an
6  internal 'police department' issuing
7  directives that delay or prevent product
8  release.  That viewpoint can result in a low
9  priority being assigned to quality operations
10 and resourcing, which can lead in turn to
11 quality problems, regulatory difficulties,
12 unnecessary expense, adverse publicity,
13 lawsuits and investor disappointment.  All
14 these consequences are preventable if
15 executive managers understand the importance
16 of the quality assurance function and treat
17 it as a critical business operation just like
18 other critical areas, such as strategic
19 planning, financial management and others."
20         That's what you wrote because
21 you believed it to be true, correct?
22     A.    Yes, sir.
23     Q.    Let's go now to the next page.
24 There's a heading that says Regulatory

Page 238

1  Considerations.  And you wrote, "In addition
2  to the business benefits, health regulatory
3  agencies around the world both require and
4  expect top management to support a strong
5  quality assurance function for their
6  companies."
7           Top management would include,
8  for example, the chairman of ZHP, Mr. Baohua
9  Chen; he would fall within the context of top
10  management, right?
11      A.    Yes.
12           MR. FOX:  Objection.
13           I'm sorry, Adam, I didn't hear
14      the name that you mentioned.
15           MR. SLATER:  I said Baohua
16      Chen.  Mr. Baohua Chen.
17  BY MR. SLATER:
18      Q.    You then go through, after
19  introducing this section, a couple of cases
20  from the US Supreme Court that addressed the
21  executive responsibility for certain
22  regulatory violations, correct?
23      A.    Yes.
24      Q.    The first case you talk about

Page 239

1  is US versus Dotterweich where you say that
2  "Mr. Dotterweich's company, Buffalo
3  Pharmacal, was inspected by the FDA,
4  resulting in direct adulteration and
5  misbranding findings.  The FDA criminally
6  prosecuted Mr. Dotterweich and the company,
7  charging that as president, he was ultimately
8  responsible for the company's actions and
9  therefore should be found guilty of violating
10  the law."
11           And you put that in the article
12  because you found that to be a significant
13  case and a significant cautionary tale,
14  correct?
15      A.    Yes.
16      Q.    You said, "Following a District
17  Court case and subsequent appeal, the Supreme
18  Court ruled on his case and concluded that as
19  president, he could be held responsible for
20  the acts of the corporation even though he
21  did not know of the violations and did not
22  intend for them to occur.  This has become
23  known in the US as the Doctrine of Strict
24  Liability, or 'Responsible Corporate Officer'

Page 240

1  doctrine.  It applies to those who, in the
2  words of the Court, '...stand in a
3  responsible relationship to the acts of the
4  corporation.'"
5           And again, you stated this
6  because you're cautioning the executives in
7  pharmaceutical companies to take their
8  quality obligations very seriously, right?
9      A.    Yes.
10      Q.    You then talk about the Park
11  case, US v. Park, and you say in part, "Like
12  Mr. Dotterweich, Mr. Park defended himself by
13  claiming that he was not involved in the
14  conduct that violated the law and that he had
15  delegated authority to 'dependable
16  subordinates' he trusted to do the right
17  thing."
18           And a little further down you
19  actually quote from the majority opinion from
20  the Supreme Court stating, "The Act imposes
21  not only a positive duty to seek out and
22  remedy violations when they occur but also,
23  and primarily, a duty to implement measures
24  that will ensure that violations will not

Page 241

1  occur.
2           "The requirements of foresight
3  and vigilance imposed on responsible
4  corporate agents are beyond question
5  demanding and even onerous, but they are no
6  more stringent than the public has the right
7  to expect.  We are satisfied that the Act
8  imposes the highest standard of care and
9  permits conviction of responsible corporate
10  officials, who in light of this standard of
11  care, have the power to prevent or correct
12  violations."
13           And you quoted that language
14  because you felt it to be, again, not only a
15  cautionary tale, but right on point to get
16  the attention of executives, correct?
17      A.    That's right.
18      Q.    When you talk about demanding
19  and even onerous obligations and the highest
20  standard of care, those statements would
21  apply to ZHP, too, right, and their
22  executives, correct?
23           MR. FOX:  Objection to form.
24      Calls for conclusion.

Confidential Information - Subject to Protective Order

Page 242

1    A.   In my opinion they apply to
2 anyone in the FDA-regulated industries.
3 BY MR. SLATER:
4    Q.   Looking now on page 5, if you
5 could.  Towards the bottom, you provide at
6 the bottom, you say, "some general
7 suggestions that apply to all companies in
8 this industry, regardless of size or
9 complexity."
10    And number 1, you say,
11 "Executive managers must recognize the
12 criticality of a strong quality assurance
13 organization and quality system to patient
14 safety and to the company's business
15 success."
16    And that's an important
17 foundational point, right, that QA has to be
18 prioritized?  Right?
19    A.   Yes.
20    Q.   Looking at number 2, "Quality
21 management must be seen as similar to other
22 critical business management activities
23 executives participate in, such as strategic
24 planning, budget management, succession

Page 243

1 planning and other areas."
2    And then number 3, you say,
3 "Executive management teams must support
4 their QA organization with authority and
5 resources that are equal to the
6 responsibility they have."
7    And then you say a little
8 further down that the structures within the
9 company "must assure that the quality unit
10 can make decisions without undue influence
11 from other organizational components and
12 avoid conflict of interest."
13    Again, these are all what you
14 believe to be very important points for any
15 responsible company to follow, correct?
16    A.   Yes, that's correct.
17    Q.   Number 4, you wrote, "Executive
18 management must establish a strong quality
19 policy that makes it clear the company is
20 committed to consistently producing
21 high-quality products that perform clinically
22 as intended.  Day-to-day statements and
23 actions of top level executives must
24 demonstrate that this commitment is real, not

Page 244

1 just words on paper."
2    I wanted to ask you about the
3 "words on paper" part, because that jumped
4 out to me when I read this.
5    That's an important point to
6 you, that it's not enough just to put these
7 policies in writing, but you actually have to
8 be committed to following through with them
9 and taking these obligations seriously,
10 right?
11    MR. FOX:  Objection to form.
12    A.   Yes.
13 BY MR. SLATER:
14    Q.   Number 5, you say, "As with
15 other management responsibilities, executive
16 teams must be kept aware of the performance
17 of the quality system and of any emerging
18 problems that are being dealt with."
19    MR. FOX:  Is that a question?
20 BY MR. SLATER:
21    Q.   That's another important point
22 that you felt needed to be communicated to
23 executive management in pharmaceutical
24 companies, correct?

Page 245

1    A.   Yes.
2    Q.   And I think overall what I'm
3 hearing here is that the top level management
4 has to essentially make very clear to
5 everyone in the company that quality is very
6 important, safety is very important, and it
7 should never be minimized and never be put
8 aside for considerations of profit, correct?
9    MR. FOX:  Objection to form.
10    A.   Yes, correct.
11 BY MR. SLATER:
12    Q.   Did you read in the FDA
13 documents where Jung Du told the FDA
14 investigator that the zinc chloride process
15 allowed them to increase their yield and
16 lower their cost, and to thus dominate the
17 world market for valsartan?
18    Did you see that statement?
19    A.   Yes, I did.
20    Q.   That's a concerning statement
21 to you, isn't it?
22    MR. FOX:  Objection to form.
23 Calls for speculation.
24    A.   Well, it's a statement that's

Page 246

1 not unreasonable to make if there are
2 benefits to -- you know, enhancing the
3 process for those reasons, that's fine, as
4 long as these other principles we've been
5 discussing are given proper consideration.
6 There's nothing wrong with improving a
7 process, there's nothing wrong with being
8 profitable for that matter, provided that
9 these other principles are respected.
10 BY MR. SLATER:
11     Q.    With regard to the e-mail I
12 showed you from July of 2017, matched up
13 against what Jung Du told the FDA
14 investigator, does that cause you some
15 concern about whether or not ZHP kept secret
16 its knowledge that there was NDMA in their
17 valsartan because they were making so much
18 money?
19        MR. FOX:  Objection.  Calls for
20 speculation.
21     A.    I don't see any connection on
22 the surface of it.  I think that e-mail by
23 itself certainly is the type of upward
24 communication that I'm talking about here

Page 247

1 that should be made on a regular basis.  But
2 there are many questions about what was then
3 done about it, how complete and accurate its
4 foundation was and all that.
5        But that's exactly the sort of
6 thing that should be -- questions that should
7 be asked when someone like Dr. Lin raises
8 that kind of an issue to upper management.
9 BY MR. SLATER:
10     Q.    If a decision was made not to
11 investigate in any detail this issue and not
12 to disclose it in any reports or to anybody
13 because of the profits that were being made
14 with this valsartan API, that would be a
15 very, very serious problem, right?
16        MR. FOX:  Objection to form.
17 Calls for speculation, argumentative.
18     A.    I've certainly seen no evidence
19 that that was the case.  But if it was the
20 case, then yes, it would be of concern.
21 BY MR. SLATER:
22     Q.    Going now to the Summary at
23 the -- one second actually.
24        Looking at the next section, it

Page 248

1 says, "Common Mistakes Executive Teams Make,"
2 number 3 you wrote, "Emphasizing production
3 quotas and market demands to the extent that
4 quality problems are overlooked or regarded
5 as unimportant - worst case, deliberate
6 coverup of known quality problems through
7 falsification of records."  I'm going to stop
8 there.
9        When you say, "worst case,
10 deliberate coverup of known quality problems
11 through falsification of records," you're
12 saying that would be as bad as it gets pretty
13 much, right?
14     A.    Yes.
15     Q.    Are you aware that -- well,
16 rephrase.
17        To the extent that ZHP knew
18 there was NDMA in its valsartan as of July
19 2017 or earlier, yet continued to represent
20 to customers and regulators and the world
21 that what they were selling was valsartan of
22 the expected quality and the expected purity
23 and didn't disclose the NDMA deliberately,
24 that would be as bad as it gets, right?

Page 249

1        MR. FOX:  Objection to form.
2 BY MR. SLATER:
3     Q.    If that happened, that's as bad
4 as it gets, right?
5        MR. FOX:  Objection to form.
6 Lacks foundation, calls for
7 speculation.
8     A.    I don't see enough in the
9 July 2017 e-mail to enable me to conclude
10 with finality that the premise of your
11 question is accurate.
12        There certainly are some
13 concerns expressed there that are appropriate
14 to express, they're being expressed to the
15 right people.  But full background and all
16 the facts would have to be delved into with
17 considerable effort in order to reach a
18 conclusion that would have that much impact.
19 BY MR. SLATER:
20     Q.    If the conclusion that I
21 postulated were the facts, you would agree
22 that that would be about as bad as it gets,
23 right?
24        MR. FOX:  Objection to the

Confidential Information - Subject to Protective Order

Page 250

1    form.  Calls for -- it's
2    argumentative.
3        A.    Once again, if after a complete
4    investigation considered all the facts, if it
5    was established and proven based on objective
6    evidence that information existed that was
7    known was deliberately covered up or anything
8    was falsified, then that would be a very
9    serious violation, yes.
10   BY MR. SLATER:
11       Q.    Looking now at the Summary, you
12   talked about the fact that there is a
13   "growing consensus about the most critical
14   quality management concepts."  And you say,
15   "First among those is that executive
16   management teams are the key to a company's
17   ability to successfully meet quality
18   standards on a consistent basis.  Doing so is
19   critical to proper clinical performance of
20   the products of this industry and therefore,
21   ultimately, to global public health."
22           And you would apply those --
23   that point to ZHP?  Those points would apply
24   to ZHP, right?

Page 251

1        A.    I'm sorry, Adam, can you just
2    have that repeated?  It got garbled.
3        Q.    This would apply to ZHP,
4    correct?
5            MR. FOX:  I'll object to the
6        form because I didn't hear it.
7    BY MR. SLATER:
8        Q.    I read the -- I'll do it again.
9            You say in the Summary that
10   certain -- rephrase.
11           You say in the Summary that
12   there's a "growing consensus about the most
13   critical quality management concepts.  First
14   among those is that executive management
15   teams are the key to a company's ability to
16   successfully meet quality standards on a
17   consistent basis.  Doing so is critical to
18   proper clinical performance of the products
19   of this industry and therefore, ultimately,
20   to global public health."
21           And you would agree that within
22   ZHP, the ultimate responsibility lies with
23   the executive management team, correct?
24           MR. FOX:  Objection to form.

Page 252

1        A.    Yes, I would agree it applies
2    to ZHP and everybody else in the industry.
3    BY MR. SLATER:
4        Q.    Let's go to the last page,
5    please.  It's there already, sorry.
6            The last paragraph of this
7    article says, "Prudent management teams
8    recognize this and support their quality
9    units both philosophically and materially,
10   with strong policies backed up by consistent
11   actions, authority and resources.  Failure to
12   do so may have both serious business
13   consequences for the company and potentially
14   even personal consequences for individual
15   executives."
16           Again, that's a statement that
17   you believe would hold true for ZHP and any
18   company in this industry, right?
19       A.    Yes, any company in this
20   industry.
21       Q.    Going back to the events of
22   2017, if ZHP knew that there was NDMA in its
23   valsartan as of at least July 2017, yet
24   continued to manufacture that valsartan with

Page 253

1    the zinc chloride process, didn't change
2    anything, didn't tell anybody, every pill
3    manufactured with that process would be
4    adulterated, right?
5            MR. FOX:  Objection to form.
6        A.    I'm sorry, I'm giving some
7    thought to the way you phrased that, not the
8    concept, but just the phraseology.
9            If there was proven evidence
10   that the process was contributing NDMA at
11   harmful levels, and they allowed that to
12   continue and continued to sell the product,
13   and particularly if there was any deliberate
14   effort to conceal that, then yes, that would
15   be very serious.
16           MR. SLATER:  If you guys need a
17       break, this would be a good point
18       because I'm going to shift to
19       something else.  But if you don't need
20       a break, I can do it.
21           MR. FOX:  Let's take a break,
22       Adam, because I have to take care of
23       something else for a few minutes, too.
24       A.    I need a couple minutes.

Confidential Information - Subject to Protective Order

Page 254

1    How much time do you want to
2  take here?
3            MR. FOX:  About 3:15?
4            THE WITNESS:  Okay.  What time
5  is it now?
6            MR. SLATER:  That's fine.
7            THE WITNESS:  Okay.  3:15 is
8  good.
9            MR. SLATER:  Thank you.
10           THE VIDEOGRAPHER:  The time is
11  2:54 p.m.  We are off the record.
12           (Whereupon, a recess was
13  taken.)
14           THE VIDEOGRAPHER:  The time is
15  3:23 p.m.  We are back on the record.
16  BY MR. SLATER:
17     Q.    Mr. Chesney, have you seen any
18  indication in anything you've seen that ZHP
19  has ever notified the FDA about the contents
20  of the July 2017 e-mail we discussed earlier?
21           MR. FOX:  Objection to form.
22     A.    The existence of the e-mail
23  itself?
24           ///

Page 255

1  BY MR. SLATER:
2     Q.    Well, the contents we've been
3  talking about, including that there was NDMA
4  in valsartan --
5     A.    Well, the --
6     Q.    -- how it was being created at
7  the quenching of the sodium azide, the sodium
8  nitrite, and that it was a common problem
9  with sartan APIs?
10           MR. FOX:  Objection to form.
11           Argumentative, lacks foundation.
12     A.    There was extensive back and
13  forth with the FDA.  ZHP submitted a
14  tremendous amount of scientific data.  FDA
15  asked questions, ZHP responded.  I've seen a
16  lot of that.  Some of it may have contained
17  information that was foundational to that
18  July of '17 e-mail or may not.
19           But the existence of the e-mail
20  itself, I haven't seen reference.  It's just
21  the information that it refers to may have
22  been wrapped up and included in some other
23  discussions that were held with the FDA.
24           ///

Page 256

1  BY MR. SLATER:
2     Q.    I understand you're saying
3  maybe it was, but nothing you can recall
4  seeing as you sit here now, right?
5     A.    No, and nothing specific about
6  that particular e-mail.
7     Q.    Did you see any indication in
8  anything you reviewed where ZHP suggested to
9  the FDA or anybody else that it was known
10  internally that there was NDMA in valsartan,
11  and that this was caused by the quenching of
12  the sodium azide with the sodium nitrite,
13  that that was known before June of 2018?
14  Have you seen anything indicating they ever
15  told that to anybody?
16           MR. FOX:  Objection to form.
17           Lacks foundation, argumentative.
18     A.    Again, I would have to look at
19  the correspondence back and forth to refresh
20  my memory as to what happened when and what
21  they told the FDA about the timeline.  But as
22  I sit here, I can't recall anything.
23  BY MR. SLATER:
24     Q.    I'm going to jump through a

Page 257

1  couple of things with you.
2            One of the things I noticed in
3  your report was that you said that the time
4  period that you focused on was August 2013 to
5  October 2019, other than, I think, one
6  complaint from 2010 that you found on the FDA
7  website.
8            Do I understand that correctly?
9     A.    Not exactly.  That wasn't a
10  complaint on the FDA website.  It was a
11  record of a prior inspection.  And there
12  was -- you know, that was not within that
13  bracketed time period.
14           But the majority of the
15  documents I reviewed were within that
16  bracketed time period.
17     Q.    Do you have any
18  understanding -- rephrase.
19           Why would the time period you
20  were looking at beginning 2013 when the
21  manufacturing process change was vetted and
22  evaluated in 2011?
23     A.    Well, the primary remit I was
24  given was to opine on what the record showed



Page 258

1  for ZHP's GMP compliance status, and most of
2  the records that I was supplied, the vast
3  majority of them, began in 2013 and ran up
4  until that latter date.
5            I was able to extract from the
6  FDA website a couple earlier references, and
7  at least one later one when the warning
8  letter was closed out formally by the agency.
9  But most of it was in that time period.
10

Page 260

23  BY MR. SLATER:
24      Q.    You talked a lot about the

Page 259

1

Page 261

1  events after the 483s, the warning letter,
2  and the establishment inspection report.  You
3  talked a lot about what happened after that,
4  and talked about the fact that, well,
5  eventually they got a closeout letter, and
6  eventually they got the import alert over
7  three years later.  You talked about that in
8  your report, right?
9      A.    Yes.
10      Q.    The point is that there were
11  violations the FDA found, and then those
12  violations had to be remedied on a going
13  forward basis.  And that's what you're
14  talking about would happen on a going forward
15  basis; you're not saying that these
16  violations didn't exist before, right?
17            MR. FOX:  Objection to the
18      form.  Assumes facts not established.
19      A.    One of the contributing factors
20  I'm sure in that three-year delay you alluded
21  to was the COVID pandemic.  FDA's action in
22  closing out the warning letter probably could
23  have been done much more promptly had it not
24  been for that.  That slowed down a lot of

Confidential Information Subject to Protective Order

Page 262

1  things at the FDA.  In fact, they're still
2  dealing with the backlog caused by that, so
3  that may have been one contributing factor.
4        You know, that whole process of
5  bringing the warning letter to the fore,
6  issuing that, taking the import alert action
7  and clearing all those things up, those
8  things happen very slowly in normal times,
9  and with the intervention of the pandemic,
10  I'm sure it slowed it even further.
11  BY MR. SLATER:
12      Q.    Aside from the timing of how
13  long it took, the fact of the matter is that
14  the FDA found some violations, and then ZHP
15  had to take steps to remedy those situations
16  before it could get a closeout letter and get
17  off the import alert, correct?
18      A.    With respect to the warning
19  letter, the FDA's formal position is that
20  that's an advisory action, not a final agency
21  determination of noncompliance.
22        And what they characterized
23  those items in the warning letter as
24  internally is observations of regulatory

Page 263

1  significance.  They don't term them to be
2  violations because they've not truly been
3  adjudicated at that point in time.
4      Q.    I did some reading, and my
5  understanding is that the warning letter is
6  actually a very serious document because the
7  assumption is it's going to get the attention
8  of the company and get the company to fix the
9  situation so that the FDA doesn't have to
10  escalate to direct legal action in court.
11      A.    That's correct.  I didn't say
12  it wasn't a serious event.  It is a serious
13  event.  It's just that the agency's official
14  position is that it is an advisory
15  notification intended to stimulate, bring
16  about voluntary corrective action, and also
17  to serve as prior notice in the event they do
18  have to escalate, then they can make showing
19  that they gave the company the opportunity to
20  correct things voluntarily.
21      Q.    For the companies, for example,
22  that you consult on -- rephrase.
23        For the companies you consult
24  with, when they get a warning letter, you

Page 264

1  take that very seriously and you make it
2  clear to those companies to take them very
3  seriously, right?
4      A.    Without question, yes.
5      Q.    I mean, a warning letter is not
6  something that happens every day, and it's a
7  big event in a company's lifecycle that they
8  have to really focus on and deal with very,
9  very seriously, right?
10      A.    A warning letter is not
11  something that happens every day to a
12  company, but it's something that happens
13  every day at the FDA.  They're not uncommon
14  events.
15      Q.    I guess really, I think we've
16  talked about through, but I got the sense
17  that maybe there was a suggestion that a
18  warning letter, because it's not a binding
19  legal action, that it somehow has some kind
20  of minimal significance.  That's not what
21  you're saying?
22      A.    Oh, no, not at all.  I'm sorry
23  if I conveyed that impression.  That was not
24  what I intended.

Page 265

1      Q.    We're going to digress into
2  something really random right now, which is
3  to clear something up actually.
4        MR. SLATER:  Chris, do you have
5  the Exhibit B addendum to the reliance
6  list?  I just realized I never marked
7  it as an exhibit.  The addendum we got
8  the other day.
9        MR. FOX:  What is this?
10        MR. SLATER:  I'm sorry, what?
11        MR. FOX:  Okay.
12        MR. SLATER:  I think, Chris,
13  this is Exhibit 12 now, right?
14        MR. GEDDIS:  Yes.
15        MR. SLATER:  Okay.  Just for
16  everybody to know, we had talked about
17  what exhibit numbers there were.  The
18  exhibits have been getting marked
19  sequentially in the deposition.  Even
20  though a lot of them had numbers from
21  prior depositions, we've marked them
22  for purposes of this deposition as
23  well so that we know which ones were
24  actually used here, so they're marked

Confidential Information - Subject to Protective Order

Page 266

1    specific to this deposition as well.
2    So this is Exhibit 12.
3            (Whereupon, Chesney Exhibit
4    Number 12 was marked for
5    identification.)
6    BY MR. SLATER:
7    Q.    Mr. Chesney, we were provided
8    this the other day, a list of additional
9    references as an addendum to Exhibit B.
10           Are these materials that you
11   have read?
12   A.    Not in their entirety.  At the
13   onset of this engagement I accessed a number
14   of things that were publicly available just
15   to get some context and bring myself a little
16   bit more up to speed on what was going on
17   with the nitrosamine issue.
18           So these are things that I've
19   pulled from various sources, took a look at,
20   took what I could get from them, more for
21   orientation and contextual purposes and not
22   for specific reliance during the formation of
23   the opinion I submitted in this matter.
24   Q.    Were these materials that you

Page 267

1    had available -- rephrase.
2            Are these materials that you
3    had at least looked at before you signed your
4    report --
5    A.    Yes.
6    Q.    -- or things you looked at
7    after?
8    A.    Yes.  I looked at them, most of
9    them, at the very beginning of this
10   engagement back, whatever it was, in June of
11   2021 when I first started doing the work,
12   just to get a sense of the issues and what
13   some of the guidance documents were that FDA
14   and others have come out with on this topic.
15   Q.    Okay.  In terms of the
16   methodology that you followed here -- well,
17   rephrase.
18           In terms of your normal
19   methodology, if I understood before, normally
20   what you would do when you're evaluating the
21   GMP compliance status for a particular
22   manufacturer would be to evaluate the
23   relevant documents that are available, the
24   internal standard operating procedures that

Page 268

1    would apply, and I think also you said you
2    would do this in a multidisciplinary way
3    where you would rely on subject matter
4    experts with regard to the scientific
5    questions to give input that you could then
6    rely on to give an objective opinion.
7            I don't mean to oversimplify,
8    so if you want to tell me a little more you
9    can, but that was generally my understanding
10   of your methodology for evaluating GMP
11   compliance status.
12   A.    Well, let me expand that
13   thought a little bit, if you may.
14           If I'm doing this for a client
15   in the sense of either an audit or any other
16   type of consultative activity, then my
17   approach would be more or less the way I
18   mentioned, looking at standard operating
19   procedures perhaps, looking at the actual
20   facility, watching operations, looking at
21   investigations they've done, and things of
22   that sort.
23           For this engagement what I was
24   provided was a lot of FDA documentation,

Page 269

1    communication from the company and so on.
2            So the way I approached it was
3    first to try to get myself a little bit of a
4    briefing on the general issues.  I had read,
5    as I mentioned before, about the NDMA issues,
6    I thought it would help if I understood a
7    little more depth about what was going on
8    here, so I accessed some of these documents
9    for that purpose.  It was just for
10   orientation.
11           Then when I got into the
12   documents themselves, I looked at them
13   through the same eyes I would have looked at
14   when I was reviewing identical kinds of
15   documents at the FDA, which I did for many,
16   many years.  And I relied to a large extent
17   on FDA's published methodology for doing the
18   same thing, which appears for the most part
19   in their compliance program guidance manual
20   which gives -- all of those programs in part
21   Roman Numeral V, gives instructions to
22   reviewers for what kinds of observations
23   should be considered significant and what
24   regulatory pathways are appropriate in

Confidential Information - Subject to Protective Order

Page 270

1  different fact situations.
2           So I apply the FDA's own
3  published methodology to determine whether
4  the establishment inspection reports were
5  appropriately classified by the agency based
6  on their own criteria.
7           I also read the establishment
8  inspection reports to determine if the
9  investigators followed the compliance program
10 requirements, collected the correct
11 information, whether their statements are
12 objective or conclusionary, whether they're
13 substantiated with appended evidence.  I have
14 a number of factors that I apply that are
15 really the same that I applied when I was
16 reviewing those reports for many years in the
17 FDA.
18      Q.    So ultimately, if I understand
19 correctly, when you were evaluating the GMP
20 compliance status, you were doing it through
21 the prism of the back and forth with the FDA
22 and the FDA documents for the most part?
23      A.    Largely, yes.
24      Q.    And I think that with regard to

Page 271

1  the -- rephrase.
2           We've talked quite a bit about
3  this, so I'm not going to go back into it in
4  any detail, but with regard to scientific
5  issues, that's an area where you've told us
6  you would defer.  And since you don't have
7  that at this point you didn't offer opinions
8  in your report as to whether or not there
9  were GMP violations because you would need
10 that input before you could form that
11 opinion, correct?
12      A.    Yes, that's correct.  And
13 furthermore, the law firm I started working
14 with on this matter, we discussed that angle,
15 and I told him what my limitations were.
16 When we entered into my retention in this
17 matter, I told him there were certain
18 scientific issues that were going to come up
19 that I would not be the best expert to
20 address.
21           And they understood that, said
22 that they had other people that they were
23 working with that could provide that
24 perspective, and not for me to be concerned

Page 272

1  about that, but just to indicate in my report
2  any areas where I was, in fact, deferring to
3  others.  And I attempted to do that as I
4  wrote the report.  I think you've seen that.
5      Q.    Got it.
6      A.    Some other documents I relied
7  upon that are referenced in part in the
8  report include the FDA regulatory procedures
9  manual, and certain other publicly available
10 guidance documents that the agency has out
11 there.
12      Q.    And at this point we've also
13 talked about some documents and some
14 information you hadn't seen yet.  Ultimately
15 if you were to form an opinion, you would
16 want to be able to be assured that you had
17 the relevant documents in doing so, right?
18      A.    Well, yes.  But I believed I
19 had sufficient information there to make
20 general conclusions and form an opinion as to
21 what the overall compliance status of the
22 facility was.
23      Q.    The overall compliance status
24 as we talked about from 2013 to 2019,

Page 273

1  correct?
2      A.    That was the major focus, yes,
3  with some excursion back to as early as 2010.
4      Q.    That excursion was to one
5  investigation, or one inspection?
6      A.    Yes, that's right.  I think
7  there was also -- well, no, I guess that
8  would be within the time frame that I
9  bracketed.
10          I think there was another
11 inspection that -- in one of the
12 establishment inspection reports, the FDA
13 person made a statement that the prior
14 inspection was of a certain date, and when I
15 looked at the record, the public record on
16 the FDA data dashboard, there was an
17 inspection that they weren't aware of that
18 they omitted from their text.
19          So there were a few little gaps
20 like that.
21      Q.    And overall, for you to be able
22 to form an opinion as to whether GMP was met
23 or not, if you were to do your full-blown
24 methodology, you would want to -- you would

Page 274

1  need to have the full relevant documents.
2  And as you've seen today, you didn't
3  necessarily have all those, the necessary
4  testimony to be able to understand what would
5  actually happen, you would need all that in
6  order to form such an opinion, correct?
7          MR. FOX: Object to the form.
8      A.    If there are material
9  omissions, or if there were material
10 omissions in what I was given to review, I
11 was certainly unaware of that at the time.
12         And, you know, of course, if
13 things like that come to light, I become
14 aware of them, it's something I would want to
15 see.
16 BY MR. SLATER:
17     Q.    And you would need to see to be
18 able to form an opinion ultimately if it
19 exists, right?
20         MR. FOX: Objection to form.
21     A.    Yes.  But I don't generally
22 speculate that there's something that is not
23 being provided to me.  Unless I'm trying to
24 reach a conclusion and don't have adequate

Page 275

1  information, I would not presume to ask a
2  question such as, Is there anything you're
3  deliberately withholding from me for any
4  reason, because I wouldn't assume that to be
5  the case.
6  BY MR. SLATER:
7      Q.    You assumed you were provided
8  all of the relevant documents, correct?
9          MR. FOX: Objection to form.
10     A.    I did.  And that assumption was
11 bolstered to some extent by my comfort that I
12 had quite a bit of information from which to
13 draw an appropriate conclusion.
14         MR. SLATER: Why don't we go
15     off the record for five minutes.  I
16     may be done, I just want to
17     double-check my notes and then we
18     can -- then I can hand it off to
19     Mr. Fox if he has questions too.
20         THE VIDEOGRAPHER: The time is
21     3:44 p.m.  We are off the record.
22         (Whereupon, a recess was
23     taken.)
24         THE VIDEOGRAPHER: The time is

Page 276

1  3:47 p.m.  We are back on the record.
2          MR. SLATER: Mr. Chesney, thank
3      you.  I don't have any other questions
4      for you, unless counsel questions you,
5      in which case I may follow up on his
6      questioning.
7          MR. FOX: I have a few
8      questions, Mr. Chesney.
9          EXAMINATION
10 BY MR. FOX:
11     Q.    Do you recall that counsel
12 showed you an e-mail from July 27, 2017,
13 ZHP 296?
14     A.    Yes.
15     Q.    And does that e-mail involve
16 scientific information of the type that
17 you're not an expert to decipher?
18     A.    Yes.
19         MR. SLATER: Objection.
20         You can answer.
21 BY MR. FOX:
22     Q.    I'm sorry, did you answer?
23     A.    Yes, it does.
24     Q.    Now, according to --

Page 277

1  plaintiffs' counsel indicated that there had
2  been testimony taken on that document.  Are
3  you aware that there will be additional
4  testimony about that document?
5          MR. SLATER: Objection.
6          You can answer.
7      A.    No, I wasn't aware of that.
8  BY MR. FOX:
9      Q.    Have you spoken to the author
10 of that document?
11     A.    No, I have not.
12     Q.    From the substance of the
13 document that was shown to you and that you
14 read, can you determine definitively what was
15 going on in that document?
16         MR. SLATER: Objection.
17         You can answer.
18     A.    No.  As I said when Mr. Slater
19 asked the question earlier, there are some
20 issues there that are being brought to the
21 attention of upper management, and that
22 seemed to me an appropriate thing to do.  But
23 I cannot independently judge fully the
24 significance of the issues.

Page 278

BY MR. FOX:

Q.    Based on your review, did that document indicate that NDMA was in valsartan API?

A.    It alludes to that at one point. But there's -- you know, again, I can't determine how reliable that statement is or how well substantiated it is. Those are the kinds of questions the leadership team should be asking, and others. Once they get that notification, they should ask for a more complete briefing.

Q.    Is it your normal practice to opine on company documents?

A.    I'm sorry, Mr. Fox?

Q.    Is it your normal practice to offer opinions on company documents?

A.    Yes, some. If a client asks me to and it's within my expertise, yes.

Q.    Okay. Was the document dated July 27, 2017 within your expertise?

A.    No.

MR. SLATER:  Objection.

You can answer.

Page 279

BY MR. FOX:

Q.    You were asked questions earlier by plaintiffs' counsel about unknown peaks, correct?

A.    Yes.

Q.    Do you remember that testimony?

A.    I remember the topic, yes.

Q.    And did that topic come up in connection with an FDA inspection in May 15th to May 19th of 2017 --

MR. SLATER:  Objection.

BY MR. FOX:

Q.    -- at the Chuannan plant?

MR. SLATER:  Objection. Lack of foundation.

A.    I would have to either look at the inspection report or my report to see if there's any mention of that. My recollection is not precise on that.

BY MR. FOX:

Q.    Okay. I'm going to ask you to turn to page 35 of your report.

A.    Okay. Got it.

MR. SLATER:  I'm sorry, what

Page 280

page did you say in the report?

MR. FOX:  35.

MR. SLATER:  Give me one second. Okay.

BY MR. FOX:

Q.    Do you see at the bottom of the paragraph it discusses an analysis of peaks?

A.    Sorry, the bottom of the third paragraph, or...

Q.    The bottom -- at the bottom of the page, the last six lines of the page.

A.    Bottom of the page.

Yes, uh-huh, I have that.

Q.    So is the issue of peaks a part of that inspection?

A.    Apparently was, yes.

Q.    And did ZHP respond to the issue raised with regard to the peaks?

A.    Yes, they did.

Q.    How did they respond to it?

A.    Well, in at least one instance they said -- they characterized it as a, quote-unquote, "ghost peak with no product quality impact."

Page 281

Q.    Do you understand why they referred to it as a ghost peak?

A.    I have a general understanding. Again, I'm not an analytical chemist, I don't do these tests myself, but I have heard that reference made many, many times by pharmaceutical analysts, including those that were in my line of command at the FDA. So I have a general understanding of what it means.

Q.    And you reported -- you stated in here that there was a report that in the entire year of 2016, there were nine occurrences out of nearly 95,000 batches.

Do you see that?

A.    Yes.

Q.    In looking at peaks, is the first step to analyze whether they're real or not?

A.    Yes, usually it is.

Q.    And is it a possibility that there could be aberrations in the test results?

MR. SLATER:  Objection.

Confidential Information - Subject to Protective Order

Page 282

1    You can answer.
2    A.    It certainly is.  That can come
3  from a number of different sources, including
4  dirty glassware, contaminated solutions,
5  laboratory error.  There a whole host of
6  possible ways that these kinds of ghost peaks
7  can appear, and that needs to be investigated
8  and resolved as one of the possible sources.
9  BY MR. FOX:
10    Q.    Did the FDA accept that nine
11  occurrences out of nearly 95,000 batches was
12  an aberration?
13        MR. SLATER:  Objection.
14        You can answer.
15    A.    I don't know what the FDA's
16  opinion about that was.
17  BY MR. FOX:
18    Q.    Well, does your report indicate
19  that the FDA's action was consistent with the
20  view that the agency accepted the scientific
21  rationale offered by ZHP?
22        MR. SLATER:  Objection.
23        You can answer.
24    A.    Let me look and see what --

Page 283

1  just let me back up for a moment here,
2  Mr. Fox.
3        Yes, this -- the classification
4  of this inspection reflects that the FDA
5  would have deemed the compliance status of
6  the facility minimally acceptable.  That's
7  their official term for that.  That generally
8  means there are a few observations, they are
9  minor and not of regulatory significance.
10        So yes, that's a fair
11  conclusion that they concurred that this did
12  not indicate anything serious.
13  BY MR. FOX:
14    Q.    And did it indicate, in your
15  opinion, that the facility at that time was
16  operating in compliance with GMP?
17        MR. SLATER:  Objection.
18        You can answer.
19    A.    Well, I base my opinion on more
20  than just this, but certainly this didn't
21  cause me to hold an opinion that they were
22  not in compliance with GMP.
23  BY MR. FOX:
24    Q.    I believe your testimony is

Page 284

1  that you don't have the scientific background
2  to make an independent judgment with regard
3  to the scientific chemistry issues raised,
4  but you're capable of understanding what the
5  FDA's perception of that scientific evidence
6  was?
7    A.    Yes.  My capabilities are
8  sufficient that if a subject matter expert
9  offers me a technical explanation, I can
10  usually follow most of it.
11        And if I have questions of
12  areas that I don't understand, then I ask
13  further followup questions.  Usually we can
14  reach accord to where they can explain it
15  adequately to my satisfaction, and I can
16  understand what they're telling me.
17        So in other words, I have a
18  modicum of understanding of these things, but
19  I am not an independent subject matter
20  expert.
21    Q.    The fact that a company
22  experiences ghost peaks that are viewed to be
23  an aberration, can a company still be
24  compliant with GMP?

Page 285

1        MR. SLATER:  Objection.
2        You can answer.
3    A.    Yes, they can.  In fact, in my
4  personal experience, this happens frequently
5  in pharmaceutical testing laboratories.
6        And my last job in the FDA when
7  I was district director for San Francisco, I
8  had a staff of approximately 50 analysts, of
9  whom 10 or 15 were pharmaceutical chemists.
10  And I know that even in the lab that was in
11  my line of command and control, this issue
12  was not infrequent.
13        So the FDA itself runs into
14  ghost peaks, they resolve them ad hoc as they
15  come up.
16  BY MR. FOX:
17    Q.    And during your -- counsel's
18  questioning of you, he showed you a couple
19  sentences here and there in a couple of
20  scientific publications, correct?
21    A.    Yes.
22        MR. SLATER:  Objection.
23        You can answer.
24        ///

Page 286

BY MR. FOX:
1
2    Q.    Is it outside of your
3 scientific expertise, or lack thereof, to be
4 able to make judgments concerning what was
5 known in the scientific literature and the
6 quality of that knowledge, given the
7 sentences that plaintiffs' counsel showed you
8 today?
9         MR. SLATER:  Objection for
10    multiple reasons, including it's
11    argumentative.
12        You can answer.
13    A.    I can't evaluate the technical
14 sufficiency of those articles.  There are
15 some portions of it that I frankly don't even
16 independently understand, although I might
17 understand a good deal of it.
18 BY MR. FOX:
19    Q.    Given the fact that you told
20 counsel who retained you of your limited
21 expertise when it comes to scientific issues,
22 does it surprise you that you would not be
23 provided all of the scientific data that may
24 be involved in this case?

Page 287

1         MR. SLATER:  Objection.
2         You can answer.
3    A.    No, it doesn't surprise me,
4 because one of the things -- this was one of
5 the concerns I expressed is, Please don't
6 expect me to be able to opine on the
7 scientific questions.  When they come up, I
8 will have to say that I need to defer to
9 people with appropriate expertise, and I was
10 informed that those people would be retained
11 separately and would take those issues up as
12 they arose.
13 BY MR. FOX:
14    Q.    In connection with the e-mail
15 of July 27, 2017 that were shown you,
16 ZHP 296, would you defer to other people for
17 the correct interpretation of that document?
18    A.    Yes, I would.
19         MR. SLATER:  Objection.
20         You can answer.
21    A.    Yes, I would.
22 BY MR. FOX:
23    Q.    Earlier in the day plaintiffs'
24 counsel asked you about the 2011 risk

Page 288

1 assessment.
2    A.    Yes.
3    Q.    And that was conducted in
4 connection with the change in the
5 manufacturing process?
6    A.    Yes.
7    Q.    Am I correct that you testified
8 that you assumed that nitrosamines was a part
9 of that risk assessment in 2011?
10    A.    I don't think I understood the
11 question if I said that.  I was -- what I had
12 in mind was the risk assessment that was done
13 in four stages in 2018 and reported out in
14 the response to the warning letter.  That's
15 really what I thought we were talking about,
16 and I may have become a little confused as to
17 the timing.
18    Q.    Okay.  So you never -- you
19 never made the assumption that nitrosamines
20 was part of 2011 risk assessment, did you?
21         MR. SLATER:  Objection.
22         You can answer.
23    A.    No, I did not.
24         ///

Page 289

1 BY MR. FOX:
2    Q.    Is there any reason why you
3 would not make that assumption with regard to
4 the 2011 risk assessment?
5         MR. SLATER:  Objection.
6         You can answer.
7    A.    The totality of the information
8 that I had before me suggested that the
9 industry at large was not really aware of
10 this problem, nor had they developed robust
11 tests to look for it until much later than
12 that.
13         This appeared in the two public
14 communications on that topic from the FDA;
15 one I believe in the latter part of 2018, and
16 one in January, I think it was, of 2019 where
17 they repeatedly stated that there was not an
18 awareness of this problem in the industry nor
19 by regulators on a worldwide basis.
20         So based upon that, I would not
21 have assumed that there was knowledge at ZHP
22 or anywhere else in 2011.
23    Q.    So you're aware of statements
24 by the FDA that indicated that it was not

Page 290

1   part of GMP to look for nitrosamines in this
2   process in 2018?
3          MR. SLATER:  Objection.
4       A.    Yes, I'm aware of those
5   statements.  And in those statements, the FDA
6   said it really wasn't feasible for them to
7   even look for that or evaluate it during
8   inspections because there wouldn't be any
9   records that they would be able to review
10  that would reflect that type of analysis had
11  taken place.
12  BY MR. FOX:
13      Q.    Are you aware of the FDA ever
14  stating that they were still not sure of the
15  root cause of the NDMA impurity in the
16  valsartan API?
17         MR. SLATER:  Objection.
18         You can answer.
19      A.    There's a statement that's
20  still being worked on, I believe, in the 2019
21  pronouncement.  The specifics escape me.  I'm
22  not looking at it right at the moment.  But
23  they did make a statement to that effect.  I
24  believe it was 2019 January statement.

Page 291

1          MR. FOX:  Why don't we put up
2   the -- why don't I put up a document
3   here.  Can we go off the record for a
4   second until I get the technology
5   down?
6          THE VIDEOGRAPHER:  The time is
7   4:02 p.m.  We are off the record.
8       (Off the record.)
9          THE VIDEOGRAPHER:  The time is
10  4:04 p.m.  We are back on the record.
11      (Whereupon, Chesney Exhibit
12  Number Defendant 1, was marked for
13  identification.)
14  BY MR. FOX:
15      Q.    Mr. Chesney, I'm showing you a
16  document of an FDA public statement made on
17  January 25, 2019.
18         Do you see that?
19      A.    Yes.
20      Q.    And this is reference 91 in
21  your report?
22      A.    I'm not looking at the
23  reference numbering list, but give me a
24  moment, I will.

Page 292

1          Yes, that's it.
2       Q.    And if I bring you down to the
3   last paragraph of this page, and I'll just
4   read it to you, it says, "Today, we want to
5   provide an update on this ongoing
6   investigation and outline the steps we've
7   taken to identify the root causes of the
8   nitrosamine impurities and to prevent a
9   recurrence of this episode in the future."
10         Do you see that sentence?
11      A.    I'm sorry, no, I don't.  What
12  I'm looking at starts "last summer."
13         Oh, there.  Okay.  "Today, we
14  want to provide an update."  Now I see it,
15  yes.
16      Q.    And so this was an update of an
17  earlier statement that the FDA made in August
18  of 2018?
19      A.    Yes.
20      Q.    And does this indicate to you
21  that they're still identifying -- trying to
22  identify the root causes of the nitrosamine
23  impurities of valsartan?
24         MR. SLATER:  Objection.

Page 293

1       A.    Yes, it says it "continues to
2   be an exhaustive effort led my a
3   multidisciplinary team," which is the point
4   I've been trying to make here today, that
5   that's typically the way things are done at
6   FDA.  So I'm not surprised by that.  A number
7   of people in collaboration with global
8   regulators.
9          And they go on to say, "While
10  we're still investigating the root causes of
11  the impurities, our ongoing effort has
12  determined that the impurities may be
13  generated when specific chemicals and
14  reaction conditions are present."
15         So they're saying the
16  investigation is ongoing, they have what
17  sounds like a hypothesis in their sights, but
18  it appears to be not yet concluded.
19  BY MR. FOX:
20      Q.    If we go to the next page, do
21  you see where it says in the beginning of the
22  page, "To implement a risk assessment for any
23  genotoxic impurity"?
24      A.    I haven't found it yet.  Sorry.

Confidential Information Subject to Protective Order

Page 294

Oh, there, "To implement a risk assessment."
All right.  I've got it.
    Q.    And doesn't that last sentence
of the paragraph indicate that the FDA had
now just uncovered the risk of nitrosamine
impurities in the manufacturing steps
involved in ARBs?
        MR. SLATER:  Objection.
        You can answer.
    A.    I'm sorry, I was still reading
the sentence, Mr. Fox.  Could you repeat the
question for me?
BY MR. FOX:
    Q.    Doesn't the FDA state in
January 2019, quote, "Now that we've
uncovered the risk of nitrosamine impurities
in the manufacturing steps involved in ARBs,
we'll incorporate the findings into ongoing
policy development"?
    A.    Yes, they say exactly that.
    Q.    It says here -- do you see the
sentence where it says, "Tests are selected
based on assessments of what impurities may
develop as a result of the manufacturing

Page 295

process.  In other words, it generally needs
to be recognized that there's a risk of an
impurity occurring as a result of a
manufacturing process to know the impurity
should be tested for."
        Do you see that?
    A.    Yes, I do.
    Q.    Can you read the next sentence
into the record, "Our investigation"?
    A.    "Our investigation into ZHP's
process identified that a change made to the
manufacturing process likely led to this
impurity, and that the impurity went
undetected by global regulators, including
the FDA, for a period of time."
    Q.    Can you read the next sentence?
    A.    Yes.  Do you want me to read
the whole paragraph?
    Q.    Sure, that would be fine.
    A.    "Before we undertook this
analysis, neither regulators nor industry
fully understood how NDMA or NDEA could form
during this particular manufacturing process.
This is troubling to us and we know it's

Page 296

troubling to the public.  This concern is
appropriate.  Among other steps, we need to
take actions that would prevent a similar
situation from occurring.  We are making
important strides at understanding how these
impurities occurred, mitigating the risk to
patients and learning what steps need to be
taken to prevent this from occurring again in
the future."
    Q.    Does this indicate -- have
implications for when GMP would have been
implicated in connection with nitrosamines?
        MR. SLATER:  Objection.
        You can answer.
    A.    I'm sorry?  Was someone going
to interject there?
        MR. SLATER:  I just objected to
the form.  You can answer.
        THE WITNESS:  Okay.
        Yes, it indicates to me that
certainly prior -- or as of the time
of this transmittal to the public,
there was enough understanding that
companies should be pretty well aware.

Page 297

        Prior to that time, the
statement seems to say that there was
not general recognition that this was
a risk, and that, therefore, GMP would
not require testing for something that
no one had awareness could constitute
a risk.
BY MR. FOX:
    Q.    If we go to the next page, can
you read the first line of the paragraph
beginning "During this time"?
    A.    Sure.  "During this time, our
scientists have developed and refined novel
and sophisticated testing methods
specifically designed to detect and quantify
the NDMA and NDEA in all ARB medicines."
    Q.    And this is something that
occurred between 2018 and 2019?
    A.    Yes, because this was not the
case in the earlier 2018 public statement,
but here we have it showing us January 25,
2019.
        (Whereupon, Chesney Exhibit
Number Defendant 2 was marked for

Confidential Information - Subject to Protective Order

Page 298

1    identification.)
2    BY MR. FOX:
3        Q.    I'm showing you now the earlier
4    statement of the FDA that was referred to.
5    Can you see that?  Do I need to lower it?
6        A.    You're going to need to shrink
7    it a little bit, because the panel with all
8    our pictures is overlapping.
9              There, now I've got it.  That's
10   fine right there.
11       Q.    This is the FDA statement of
12   August 30, 2018.
13             Do you see that?
14       A.    Yes.
15       Q.    And this describes the FDA's
16   actions after learning about the impurity in
17   the valsartan, correct?
18       A.    Yes.
19       Q.    If we go to the second page of
20   it, maybe the third page, do you see the
21   paragraph that says, "Based on information"?
22       A.    Yes.
23       Q.    Can you read that into the
24   record, please?

Page 299

1        A.    The whole paragraph?
2        Q.    Yes, please.
3        A.    Sure.  "Based on information
4    provided regarding ZHP's manufacturing
5    processes, we believed (but did not have
6    proof) that the impurity resulted from
7    changes that ZHP made to the manufacturing
8    process for its API.  We needed to identify
9    the root cause of the problem and evaluate
10   ZHP's explanation.  After assessing
11   information about ZHP's manufacturing
12   processes and the changes ZHP made over time,
13   we identified how its processes could have
14   led to the presence of NDMA in their API."
15       Q.    Can you continue with the next
16   paragraph?
17       A.    "Specifically, a combination of
18   conditions, which include certain chemicals,
19   processing conditions and production steps,
20   could lead to formation of the NDMA impurity.
21   We believe that these risks are introduced
22   through a specific sequence of steps in the
23   manufacturing process, where certain chemical
24   reactions are needed to form the active

Page 300

1    ingredient.  Before we undertook this
2    analysis, neither regulators nor industry
3    fully understood how NDMA could form during
4    this process."
5        Q.    Let me just stop you there for
6    a second.
7        A.    Okay.
8        Q.    Is that an important fact in
9    connection with judging cGMP with regard to
10   nitrosamines?
11             MR. SLATER:  Objection.
12             You can answer.
13       A.    Yes, it is, because it speaks
14   to the feasibility of doing this and the
15   general awareness in the industry of it.
16   BY MR. FOX:
17       Q.    Given this extensive -- you
18   would say the FDA's investigation was
19   extensive, correct?
20             MR. SLATER:  Objection.
21             You can answer.
22       A.    I've only reviewed the records
23   on ZHP, but their track record is pretty
24   extensive there.  I'm not sure what they did

Page 301

1    with the other manufacturers.
2    BY MR. FOX:
3        Q.    Okay.  But certainly this
4    public statement is reflecting an extensive
5    investigation that the FDA undertook of this
6    matter?
7        A.    Yes, it --
8             MR. SLATER:  Objection.  Form.
9        A.    It infers that.  It doesn't
10   describe the full scope of the investigation
11   with specifics, but it's implicit, yes.
12   BY MR. FOX:
13       Q.    Now, if you continue with the
14   paragraph that says "We are still."
15       A.    "We are still not 100 percent
16   sure that this is the root cause of the
17   problem.  Full understanding will require
18   correlation of multiple test results from
19   valsartan APIs made by different processes
20   with the various process steps used by
21   different manufacturers or at different
22   times.  We need to determine how NDMA can be
23   formed and why it is not separated from the
24   API during purification."

Page 302

1    Q.    Those statements by the FDA, is
2  that important information for you in
3  rendering an opinion with regard to
4  compliance with cGMP by ZHP?
5    A.    Yes, it is.
6    Q.    Can you read the next
7  paragraph, please?
8    A.    "Once we understand the way or
9  ways that the NDMA impurity can occur as a
10  by-product of the manufacturing process, we
11  will make sure" that these -- "make sure
12  these conditions are evaluated in API
13  synthetic processes so that, in the future,
14  testing for this impurity would be required
15  if there was a risk of NDMA formation."
16    Q.    And again, is that an important
17  factor in rendering an opinion with regard to
18  ZHP's compliance with cGMP with regard to
19  nitrosamines?
20    MR. SLATER:  Objection.
21    You can answer.
22    A.    Yes, because it lays out a
23  two-pronged test to determine if something --
24  if this is GMP or not.  One is, is there a

Page 303

1  risk of NDMA formation; and two, if so, what
2  is does the testing show.
3  BY MR. FOX:
4    Q.    Okay.  If you go down a little
5  bit further, do you see the sentence that
6  begins "We employ"?
7    A.    Yes.
8    Q.    Can you read that into the
9  record, please?
10    A.    "We employ robust teams of
11  organic chemists, as part of our newly
12  established Office of Pharmaceutical Quality,
13  to review applications and referenced
14  information to look for steps - and
15  manufacturing changes - where these risks
16  could be introduced."
17    Q.    And if you look at the last
18  sentence on the page, can you read that into
19  the record?
20    A.    "In other words, it needs to be
21  recognized that the risk of an impurity can
22  occur in order to know that it should be
23  tested for."
24    Q.    Is it fair to say that prior to

Page 304

1  this date, the FDA did not understand there
2  to be a risk of an impurity in this
3  manufacturing process?
4    MR. SLATER:  Objection.
5    You can answer.
6    A.    It is.  That's what the agency
7  states in this public statement.
8  BY MR. FOX:
9    Q.    Let's see.  I lost my place.
10    Okay.  If we go to the next
11  page here, do you see -- can you read into
12  the record the sentence beginning with the
13  word "Because" in this top paragraph?
14    A.    Yes.  Do you want me to read
15  that?
16    Q.    Please.
17    A.    Okay.  "Because it was not
18  anticipated that NDMA would occur at these
19  levels in the manufacturing of the valsartan
20  API, manufacturers would not have been
21  testing for it.  They would not have records
22  that help identify this issue during an
23  inspection.  So this particular risk would
24  not have been identified on an inspection.

Page 305

1  As we develop a better understanding of the
2  root cause of NDMA formation, and develop a
3  way to detect NDMA in valsartan or other
4  ARBs, we can ensure that appropriate testing
5  is performed in the future."
6    Q.    Again, is this an important
7  fact in determining whether or not GMP was
8  compliant in connection with nitrosamines in
9  2018?
10    A.    Yes.
11    MR. SLATER:  Objection.
12    You can answer.
13    A.    Yes.
14  BY MR. FOX:
15    Q.    And before 2018, correct?
16    A.    Yes.
17    Q.    And is it true that the FDA is
18  again stating that they're still seeking to
19  better understand the root cause of the
20  formation of this impurity?  Is that right?
21    MR. SLATER:  Objection.
22    You can answer.
23    A.    Yes.
24    ///

Confidential Information Subject to Protective Order

Page 306

BY MR. FOX:

Q.    And it's also saying in August of 2018 that they need to find better ways to detect it.

MR. SLATER:  Objection.

You can answer.

A.    Yes.

BY MR. FOX:

Q.    Is it your testimony that the compliance record of ZHP was in accord with or even better than much of the industry during the period that you reviewed?

MR. SLATER:  Objection.

You can answer.

A.    Yes.  But they had many inspections that led to no observations at all, and most others, while they might have had a small number of observations, they were classified by the agency as voluntary action indicated, which is a mid-level classification that does not reflect a serious state of noncompliance.

BY MR. FOX:

Q.    Did the FDA ever determine that

Page 307

the nitrosamine or NDMA present in the valsartan was the result of a violation of GMP?

MR. SLATER:  Objection.

You can answer.

A.    I don't -- I've never seen them make that specific correlation.  In the warning letter they raised certain concerns, but I don't believe they ever came right out and made that connection.

BY MR. FOX:

Q.    So as far as you understand, the FDA never made a determination that the impurity existed in the valsartan as a result of a failure to comply with GMP?

MR. SLATER:  Objection.

You can answer.

A.    I never saw anything that connected those two issues directly.

BY MR. FOX:

Q.    Are you aware of any GMP violation that would render all of the products of ZHP adulterated?

MR. SLATER:  Objection.

Page 308

You can answer.

A.    Well, hypothetically I suppose you could use your imagination and come up with something that would be so global in scope that it would cause that.

But usually when that is the case, and all the products at a given facility come under that kind of cloud, it's not just because of any one GMP deviation, it's because there are multiple ones of a systemic and repeated nature across all of what FDA calls product classes in that particular -- profile classes, pardon me, in that particular facility.

BY MR. FOX:

Q.    And you have not seen that in connection with ZHP here, have you?

A.    No.

MR. SLATER:  Objection.

You can answer.

A.    No, I haven't.

BY MR. FOX:

Q.    And did the FDA ever make a final determination of a GMP violation by

Page 309

ZHP?

MR. SLATER:  Objection.

You can answer.

A.    I believe the import alert that they were placed on, along with many, many, many other companies, was primarily predicated upon GMP issues.  But again, there was no specific linkage to the occurrence of NDMA.

BY MR. FOX:

Q.    So was the alert due to the potential of an impurity being in the drug?

MR. SLATER:  Objection.

You can answer.

A.    The alert is very nonspecific. It gives a general statement with respect to GMP compliance, I believe it's one sentence, and then there's a list of dozens and dozens and dozens of companies that follow that are on the import alert for that reason.  So it's very hard to tell anything specific from the import alert.

BY MR. FOX:

Q.    And the language that you're

Confidential Information - Subject to Protective Order

Page 310

1  referring to, that's template language at the
2  top of the document?
3       A.    It is.
4            MR. SLATER:  Objection.
5            You can answer.
6       A.    It is.
7            And I might add that the
8  standard that FDA applies by statute to bring
9  an import alert action is one of an
10  appearance of a violation, not even a
11  preponderance of the evidence, let alone
12  beyond a reasonable doubt.  The standard is
13  very, very low.
14           And I'm getting that directly
15  out of the Food, Drug and Cosmetic Act
16  Section 801.  If it appears to be in
17  violation, that's sufficient to take an
18  import alert action.  It's a very low
19  standard.
20  BY MR. FOX:
21       Q.    Did the FDA ever make a finding
22  that the NDMA contamination was due to a cGMP
23  violation?
24       A.    I've never seen them connect --

Page 311

1            MR. SLATER:  Objection.
2            You can answer.
3       A.    I've never seen them connect
4  those two issues directly in anything they've
5  said in writing.
6  BY MR. FOX:
7       Q.    With regard to ZHP?
8       A.    With regard to ZHP.
9            MR. FOX:  I think that's it for
10  me, Adam.
11           MR. SLATER:  I'm going to
12  continue now, Mr. Chesney.
13           FURTHER EXAMINATION
14  BY MR. SLATER:
15       Q.    Did you read the deviation
16  investigation reports that ZHP created and
17  submitted to the FDA?
18       A.    You know, I read an awful lot
19  of information.  And to answer your question
20  whether I did or did not look at those, I
21  would have to go back and look at them again
22  just to be sure.  But I believe that I did.
23       Q.    I didn't see any discussion of
24  them in your report.

Page 312

1       A.    I read a lot of their
2  investigation information, particularly what
3  was in the response to the 483 of the 2018
4  inspection which raised most of these issues,
5  and also the warning letter that followed.
6  There was a tremendous amount of highly
7  detailed information.  One of those
8  transmittals alone was 230 pages.
9            So to the extent that
10  constituted in whole or in part the deviation
11  investigations, I can't say from memory.  It
12  was very extensive.
13       Q.    All right.  Well, I didn't ask
14  you about all that stuff.
15           I asked you if you saw the
16  deviation investigation reports, and did you
17  talk about them in your report.  I don't see
18  any discussion of them at all in your report.
19  Is there something in the report I've
20  overlooked?
21       A.    Well, I doubt that there's
22  anything in the report you've overlooked.
23           What I'm saying is what
24  constituted a deviation investigation report

Page 313

1  may well have been the information in the
2  warning letter response and other documents
3  that I reviewed.  They also included a number
4  of attachments.
5       Q.    Are you just speculating as you
6  go right now?
7       A.    No.  I'm trying to say that I
8  can't answer your question with definity
9  because I don't know what you mean when you
10  say "a deviation investigation," and I'm not
11  sure whether it was included or not included
12  in any of the materials that I did review.
13           MR. SLATER:  Okay.  Chris,
14       let's go to exhibit -- let's take down
15       whatever this is, if you could, Tom.
16           MR. FOX:  Sorry.
17           MR. SLATER:  That's okay.
18           Chris, this might take a
19  second, but could you put up
20  Exhibit 204, please, the deviation
21  investigation report prepared July 20,
22  2018?  That's 20 -- oh, you know what,
23  you have the -- that's what I want.
24              ///

Confidential Information Subject to Protective Order

Page 314

1  BY MR. SLATER:
2      Q.    Does this document look
3  familiar to you?  It's Exhibit 204 from a
4  prior deposition.
5      A.    I don't recognize it
6  immediately.
7      Q.    All right.  Because you were
8  saying something about some generic deviation
9  investigation report, and you said you didn't
10  know what it was.  I'm showing you, that's
11  the actual title of a document.
12      A.    I understand that.
13      Q.    It's very simple.  Hang on.
14      A.    No, it's not that simple.  I
15  reviewed other documents that contained
16  attachments such as standard management
17  procedures and things like that.
18          And when you asked me the
19  question before, I didn't know whether this
20  was one that might have been included in one
21  of those other packages, or I may have seen
22  it but just not as a standalone document.
23      Q.    I saw no discussion of this
24  document at all in your report.  Is there

Page 315

1  something in there that I may have
2  overlooked, or am I correct that you didn't
3  discuss this document at all?
4      A.    Not as a standalone document,
5  no.  And the data --
6      Q.    That's all I asked you, though,
7  so I don't need an explanation beyond that,
8  okay?
9      A.    Okay.
10          MR. SLATER:  Let's go to ZHP,
11  the last four digits are 4386, Chris.
12  It's 22 of 33.
13      A.    Is this the same report, or is
14  this something different?
15      Q.    It's the same report.
16          MR. SLATER:  Can you blow up
17  the bottom part, Chris, under
18  Section 3.8 with that heading?
19  Perfect.
20



Page 318

1 ████████████████████

2 BY MR. SLATER:

3     Q.    Now, you were asked some

4 questions about ghost peaks.  Do you know

5 what a ghost peak is?  Do you know how that's

6 defined?

7     A.    I know that they occur

8 frequently.  And as I said before, this is

9 not something I do for a living.  I've just

10 heard the term used very often to describe

11 unidentified peaks, they're usually not very

12 large in terms of quantity that may arise

13 from any of a number of different factors and

14 require some investigation to resolve.

15     Q.    Do you know the difference

16 between a ghost peak and an aberrant peak?

17     A.    No.

18     Q.    Do you know if all unknown

19 peaks are ghost peaks?

20     A.    No, I think when -- you call

21 something a ghost peak when it's not possible

22 to define with specificity what's causing it,

23 and there are a number of different possible

24 contributing factors that requires an

Page 319

1 investigation to try to iron that out.

2     Q.    You're guessing at the

3 definition when you just said that, right?

4 You don't know if you're right?

5     A.    I'm telling you what my

6 understanding is.  If my understanding is

7 incorrect, then so be it.  But that term has

8 been used to me for a number of years, and

9 the context has usually been that.

10     Q.    I'm not going to go through

11 those FDA statements that counsel had you

12 read, but I want to ask you a question.

13         There was a point where the FDA

14 was explaining why they didn't find the

15 problem with the NDMA in the valsartan on

16 their inspections.

17         Do you remember you were

18 reading that part?

19     A.    Yes.

20     Q.    You understand we're not suing

21 the FDA here; we're suing ZHP, right?

22     A.    Of course.

23     Q.    Okay.  And if -- rephrase.  And

24 if the manufacturer -- rephrase.

Page 320

1         You said in your report that

2 the FDA primarily relies upon drug

3 manufacturers to voluntarily follow the law,

4 right?

5     A.    Yes.

6     Q.    That's how the system works, is

7 the companies are supposed to follow the

8 regulations and follow their SOPs so that

9 things like this don't happen, right?

10         MR. FOX:  Object to the form.

11 Argumentative.

12     A.    Yes.

13         MR. SLATER:  Chris, let's go,

14 if we could, to the Warning Letter,

15 ZHP 213, the November 29, 2018 Warning

16 Letter.  Thank you.

17         (Whereupon, Chesney Exhibit

18 Number 13 was marked for

19 identification.)

20 BY MR. SLATER:

21     Q.    You've seen this document,

22 correct?

23     A.    I have.

24     Q.    And right there on the first

Page 321

1 page in the second sentence it says, "This

2 warning letter summarizes significant

3 deviations from current good manufacturing

4 practice (CGMP) for active pharmaceutical

5 ingredients (API)," right?

6     A.    Yes.

7     Q.    And then the next paragraph

8 says, "Because your methods, facilities, or

9 controls for manufacturing, processing,

10 packing, or holding do not conform to CGMP,

11 your API are adulterated within the meaning

12 of section 501(a)(2)(B) of the Federal Food,

13 Drug and Cosmetic Act, 21 USC 351(a)(2)(B),"

14 right?

15     A.    Yes.

16     Q.    And then the FDA says that they

17 reviewed the August 26, 2018 response from

18 ZHP to the 483s, and acknowledged receipt of

19 your subsequent correspondence, right?

20     A.    That's right.

21     Q.    Let's go through number 1 a

22 little bit.  "Failure of your quality unit to

23 ensure that quality-related complaints are

24 investigated and resolved."  It says,

Confidential Information - Subject to Protective Order

Page 322

1  "Valsartan API."
2        You've read this paragraph,
3  right?
4      A.    I have.  And I've also read
5  ZHP's response to all this to get some
6  balance to the situation.
7      Q.    Did I ask you about ZHP's
8  response?
9      A.    No, you didn't.
10     Q.    Okay.  By the way, to the
11 extent that ZHP withheld information from the
12 FDA as part of its investigation, that would
13 be unlawful, correct, if that information was
14 material to the investigation?
15         MR. FOX:  Objection to the
16 form.  Calls for a legal conclusion.
17     A.    That's not an area that I get
18 myself into as a rule.  Whether there's been
19 a material misrepresentation or not is --
20 that's usually a legal conclusion.
21 BY MR. SLATER:
22     Q.    Okay.  This says under number
23 1, "Your firm received a complaint from a
24 customer on June 6, 2018, after an unknown

Page 323

1  peak was detected during residual solvents
2  testing for valsartan API manufactured at
3  your facility.  The unknown peak was
4  identified as the probable human carcinogen
5  N-nitrosodimethylamine (NDMA).  Your
6  investigation (DCE-18001)" -- and I'll tell
7  you for the record that's the deviation
8  investigation report I just showed you.  If
9  you need me to show it to you again I'll show
10 you and show you the number matches up.
11     A.    No, that's all right.  I take
12 your word for it.
13     Q.    -- "determined that the
14 presence of NDMA was caused by the
15 convergence of three process-related factors,
16 one factor being the use of the solvent
17 dimethylformamide (DMF).  Your investigation
18 concluded that only one valsartan
19 manufacturing process (referred to as the
20 zinc chloride process in your investigation)
21 was impacted by the presence of NDMA.
22         "However, FDA analyses of
23 samples of your API, and finished drug
24 product manufactured with your API,

Page 324

1  identified NDMA in multiple batches
2  manufactured with a different process, namely
3  the trimethylamine process, which did not use
4  the solvent DMF.  These data demonstrate that
5  your investigation was inadequate and failed
6  to resolve the control and presence of NDMA
7  in valsartan API distributed to customers."
8         Do you see what I just read?
9      A.    Yes.
10     Q.    You've told me you didn't
11 evaluate the TEA process, the triethylamine
12 process, and you didn't talk about it in your
13 report at all, right?
14     A.    That's correct.



20 not something you addressed at all in your
21 report, right?
22     A.    That was something that falls
23 in the area of process chemistry, and I again
24 would defer to people with the appropriate

Page 325

1  expertise to evaluate that.

7         MR. FOX:  Objection to form.
8  BY MR. SLATER:
9      Q.    Wondering if you know that.
10     A.    No, I haven't seen that
11 information.
12     Q.    Going back to the document now,
13 the warning letter, it says, "Your
14 investigation also failed:", the first bullet
15 point, "To include other factors that may
16 have contributed to the presence of NDMA."
17         Second bullet point, "To assess
18 factors that could put your API at risk for
19 NDMA cross-contamination.
20         And then the third bullet
21 point, "To evaluate the potential for other
22 mutagenic impurities to form in your
23 products."
24         Do you see that?

Confidential Information - Subject to Protective Order

Page 326

1    A.    Yes, I do.
2    Q.    Then the next paragraph, "Our
3   investigation also noted other examples of
4   your firm's inadequate investigation of
5   unknown peaks observed in chromatograms."
6        Do you see that?
7    A.    Yes.
8    Q.    If you go to the next
9   paragraph, it says, "Your response states
10  that NDMA was difficult to detect.  However,
11  if you had investigated further, you may have
12  found indicators in your residual solvent
13  chromatograms alerting you to the presence of
14  NDMA.  For example, you told our
15  investigators you were aware of a peak that
16  eluted after the toluene peak in valsartan
17  API residual solvent chromatograms where the
18  presence of NDMA was expected to elute.  At
19  the time of testing, you considered this
20  unidentified peak to be noise and
21  investigated no further."
22        And then it goes through the
23  API validation batches, and they indicate
24  that these "show at least one unidentified

Page 327

1   peak eluting after the toluene peak in the
2   area where the presence of NDMA was suspected
3   to elute."
4        So I read that as a preview to
5   this question, which is the FDA didn't
6   think -- you would agree with me the FDA
7   didn't think that ZHP did a good job in
8   evaluating unknown peaks, right?
9        MR. FOX:  Objection to form.
10   A.    That's what the warning letter
11  alleges, yes.
12  BY MR. SLATER:
13   Q.    And then if you go to the next
14  paragraph at the bottom of this page, page 2
15  of this warning letter, in the middle of it,
16  it says, "FDA has grave concerns about the
17  potential presence of mutagenic impurities in
18  all intermediates and API manufactured at
19  your facility, both because of the data
20  indicating the presence of impurities in API
21  manufactured by multiple processes, and
22  because of the significant inadequacies in
23  your investigation."
24        So again, there's some what the

Page 328

1   FDA termed grave concerns about what was
2   going on in ZHP's facilities, right?
3    A.    That's correct.
4        MR. SLATER:  Now let's go to
5    the page number 4, please, Chris.
6    Q.    Heading number 2, "Failure to
7   evaluate the potential effect that changes in
8   the manufacturing process may have on the
9   quality of your API."
10        That's relating to the risk
11  assessment, correct?
12   A.    Yes.
13   Q.    It says, "In November 2011 you
14  approved a valsartan API process change that
15  included the use of the solvent DMF.  Your
16  intention was to improve the manufacturing
17  process, increase product yield, and lower
18  production costs.  However, you failed to
19  adequately assess the potential formation of
20  mutagenic impurities when you implemented the
21  new process.  Specifically, you did not
22  consider the potential for mutagenic or other
23  toxic impurities to form from DMF degradants,
24  including the primary DMF degradant,

Page 329

1   dimethylamine.  According to your ongoing
2   investigation, dimethylamine is required for
3   the probable human carcinogen NDMA to form
4   during the valsartan API manufacturing
5   process.  NDMA was identified in valsartan
6   API manufactured at your facility."
7        Do you see what I just read?
8    A.    Yes.
9    Q.    The failure to adequately
10  assess the potential formation of mutagenic
11  impurities when ZHP implemented the new
12  process, that would be a cGMP violation,
13  correct?
14        MR. FOX:  Objection to form.
15   A.    I think you used the word
16  "potential."  That's not what it says, but...
17  BY MR. SLATER:
18   Q.    It says "potential formation."
19  It says, "However, you failed to adequately
20  assess the potential formation of mutagenic
21  impurities when you implemented the new
22  process."
23        And my question to you is, the
24  failure to adequately assess the potential

Confidential Information - Subject to Protective Order

Page 330

1  formation of the mutagenic impurities, that's
2  a violation of cGMP, right?
3        MR. FOX:  Objection to form.
4  BY MR. SLATER:
5     Q.    If that's what happened, it's a
6  violation, correct?
7        MR. FOX:  Objection to form.
8     A.    I'm sorry, I lost you as you
9  were reading.  You must have skipped ahead
10 somewhere and I was reading the wrong
11 sentence.
12       Can you direct me where you're
13 reading?
14 BY MR. SLATER:
15    Q.    I'm in the first paragraph
16 under number 2, the third line.
17    A.    Oh, okay.
18    Q.    It says, "However, you failed
19 to adequately assess" --
20    A.    Okay.  I'm sorry.  I skipped
21 ahead to far.
22    Q.    No problem.
23       You see it says, "However, you
24 failed to adequately assess the potential

Page 331

1  formation of mutagenic impurities when you
2  implemented the new process"?
3     A.    Yes.
4     Q.    That would be a cGMP violation,
5  right?
6        MR. FOX:  Objection to form.
7        THE WITNESS:  I'm sorry, what
8  did you say?
9        MR. FOX:  I objected to the
10 form.
11       What was the answer?
12       MR. SLATER:  You talked over
13 it, that's why I'm asking him.
14 BY MR. SLATER:
15    Q.    Is that correct?
16    A.    Yes, that's correct.
17    Q.    Going now to the second
18 paragraph under section -- the heading
19 section 2, "You also failed to evaluate the
20 need for additional analytical methods to
21 ensure that unanticipated impurities were
22 appropriately detected and controlled in your
23 valsartan API before you approved the process
24 change."

Page 332

1        Stopping right there, that's a
2  cGMP violation, correct?
3        MR. FOX:  Objection to the
4  form.
5     A.    That should be done, yes.
6  BY MR. SLATER:
7     Q.    It says further, I'm going to
8  continue to read, "You are responsible for
9  developing and using suitable methods to
10 detect impurities when developing, and making
11 changes to, your manufacturing processes.  If
12 new or higher levels of impurities are
13 detected, you should fully evaluate the
14 impurities and take action to ensure the drug
15 is safe for patients."
16       You agree with that statement,
17 that was an obligation of ZHP, right?
18       MR. FOX:  Objection to the
19 form.
20    A.    I agree that's a correct
21 statement.
22 BY MR. SLATER:
23    Q.    Go to the next paragraph.
24       It says, "Your response" -- now

Page 333

1  they're talking about that response that you
2  were telling me about before, that you got
3  that long response from ZHP and you read it.
4  Remember you told me that?
5     A.    Wait.  There are two responses.
6  The one they're referring to here is a
7  response to the 483.
8        There's also a response to this
9  warning letter where they take issue with a
10 number of these points, provide additional
11 data, and a considerable level of detail.
12       So this letter by itself makes
13 certain assertions, but it's not the complete
14 story.
15    Q.    Looking now at the third
16 paragraph, the FDA says, "Your response
17 states that predicting NDMA formation during
18 the valsartan manufacturing process required
19 an extra dimension over current industry
20 practice, and that your process development
21 study was adequate.  We disagree."
22       MR. FOX:  Adam, let me object.
23       Where are you, Adam?
24       MR. SLATER:  Third paragraph

Confidential Information Subject to Protective Order

---

Page 334

1 under number 2. I wasn't planning to
2 do any of this, you brought it up, so
3 I'm just going to hammer the nail.
4 BY MR. SLATER:
5 Q. Third paragraph under number 2,
6 I'll go back to it again. "Your response" --
7 rephrase.
8 The third paragraph under
9 number 2 says, "Your response states that
10 predicting NDMA formation during the
11 valsartan manufacturing process required an
12 extra dimension over current industry
13 practice, and that your process development
14 study was adequate. We disagree."
15 Do you see that?
16 A. I do.
17 Q. So the FDA felt that the
18 process development study was inadequate and
19 there was a violation of cGMP, correct?
20 MR. FOX: Objection to form.
21 A. They -- I don't agree with your
22 statement there, and it's inconsistent with
23 their public statements both before and after
24 this warning letter. But that's what they

---

Page 335

1 say.
2 BY MR. SLATER:
3 Q. Coming back to my question, the
4 FDA disagreed with ZHP that they couldn't
5 have known about the potential formation of
6 the NDMA, right?
7 MR. FOX: Objection to form.
8 A. They disagreed that it required
9 an extra dimension over current industry
10 practice. That's what the reference is to.
11 BY MR. SLATER:
12 Q. The next sentence says, "We
13 remind you that common industry practice may
14 not always be consistent with CGMP
15 requirements and that you are responsible for
16 the quality of drugs you produce."
17 You agree with that statement,
18 right?
19 A. I do.
20 Q. So when ZHP decided to develop
21 this zinc chloride process that had not been
22 used before, they were responsible for the
23 quality of the drugs that would be
24 manufactured with that new process, right?

---

Page 336

1 MR. FOX: Objection to form.
2 A. Yes, they were responsible.
3 BY MR. SLATER:
4 Q. And the fact that nobody else
5 had been manufacturing by that process
6 previously doesn't change the fact or excuse
7 the fact that they failed to evaluate fully
8 the risks from that new process?
9 MR. FOX: Objection to form.
10 A. The fact that nobody else was
11 using the process does not relieve them of
12 the necessity to evaluate it fully.
13 MR. SLATER: Okay. Let's take
14 that down. Let's go, Chris, if we
15 could, to Exhibit 212.
16 (Whereupon, Chesney Exhibit
17 Number 14 was marked for
18 identification.)
19 BY MR. SLATER:
20 Q. This was previously marked as
21 Exhibit 212 at a deposition of Peng Dong. I
22 assume you haven't seen this. It's a draft
23 of a deviation investigation report.
24 A. From the cover page I couldn't

---

Page 337

1 tell you.
2 And could you make it a little
3 bit larger? It's a little small on my
4 screen.
5 Q. No problem.
6 A. The cover page I don't
7 recognize, but I don't know.
8 Q. Well, I'm going to represent to
9 █████████████████████████████
10 █████████████████████████████
11 █████████████████████
12 ████████████████████
13 ████████████████████████████
14 █████████████████████████████
15 ████████████████████
16 █████████████████████████████
17 ████████████████████████████
18 ████████████████████████████
19 ████████████████████████████
20 █████████████████████████████
21 █████████████████████████████
22 ████████████████████████████
23 ███████████████████████████
24 Do you see what I just read?

---

Confidential Information – Subject to Protective Order

---

Page 338

1    A.   Yes.
2    Q.   And if that's what happened,
3  that was a violation of cGMP, as we've gone
4  through earlier, correct?
5    MR. FOX:  Objection to form.
6    A.   Again, I can't characterize an
7  individual occurrence like that as a
8  violation or not a violation.  That requires
9  a lot more consideration.
10    But it's concerning and
11  certainly worthy of everyone's attention,
12  including those at the company that received
13  this report.
14    MR. SLATER:  Take that down.
15  The next thing I'd like to go
16  to, if we could, is -- I believe it
17  was Exhibit 430.  It's the August 26,
18  2018 response to the 483 letter.
19    (Whereupon, Chesney Exhibit
20  Number 15 was marked for
21  identification.)
22    MR. SLATER:  Signed by Jun Du.
23    MR. GEDDIS:  Give me a second.
24    THE VIDEOGRAPHER:  Excuse me,

---

Page 339

1  Attorney Slater?
2    MR. SLATER:  Yes.
3    THE VIDEOGRAPHER:  May we go
4  off the record for a moment?  I have
5  approximately ten minutes left on this
6  backup media recording.
7    MR. SLATER:  No, I want to
8  continue.  We'll be done in ten
9  minutes.  I'm also through.
10    THE VIDEOGRAPHER:  Okay, sir.
11    MR. SLATER:  Don't worry about
12  it.  If I start to run into it and get
13  to two minute, let me know.
14    THE VIDEOGRAPHER:  The Zoom is
15  going, just the backup.
16    MR. SLATER:  Are we okay?
17    THE VIDEOGRAPHER:  The Zoom is
18  recording, yes.  The backup media had
19  approximately ten minutes left.
20    MR. SLATER:  Okay.  Just let me
21  know if we get to two minutes.
22    THE VIDEOGRAPHER:  Okay, sir.
23    MR. SLATER:  While Chris is
24  looking for that, you might as well --

---

Page 340

1  okay.  He got it.
2  BY MR. SLATER:
3    Q.   Okay.  This is the August 26,
4  2018 letter from Jun Du of ZHP to the FDA.
5    You've seen this, correct?
6    A.   Yes, I have.
7    Q.   Let's go to page 3 of 4,
8  please.
9    MR. SLATER:  And let's blow up
10  that middle paragraph, if we could,
11  just so we can all see it.  Okay.
12  Perfect.

[redacted]

23    MR. FOX:  Objection to the
24  form.

---

Page 341

1    A.   You showed me a document that
2  had a suggestion of that.  But as I
3  indicated, it's got some technical aspects
4  that I'm not comfortable evaluating, and
5  would trigger a lot more questions in my mind
6  before I would be prepared to make a
7  definitive statement about it.
8  BY MR. SLATER:
9    Q.   The July 2017 e-mail doesn't
10  make any suggestion, it states definitively
11  that there's NDMA in valsartan, the root
12  cause is the quenching of the sodium azide in
13  the presence of sodium nitrite, and says it's
14  a problem with all the sartans, across
15  sartans.  That's what it says.  It doesn't
16  speculate about it; it makes those factual
17  statements, right?
18    MR. FOX:  Objection.  Object to
19  the form.  Argumentative.
20    A.   It presents the information in
21  that way, yes.
22  BY MR. SLATER:
23    Q.   All of which you can tell me
24  sitting right now is accurate because we know

---

Confidential Information Subject to Protective Order

Page 342

1  historically that was all proven true, those
2  factual statements, right?
3          MR. FOX:  Objection to the
4  fact -- objection to the form.
5      A.    Most of that proved to be
6  correct.  But again, putting myself in the
7  position of having received that at that
8  point in time, I would have had a host of
9  more questions.
10 BY MR. SLATER:
11     Q.    It's not some of it has been
12 proven correct, all of those three things
13 have been proven correct, right?
14         MR. FOX:  Objection to the
15 form.  Argumentative.
16     A.    I, at this point, am not sure
17 specifically what we're talking about in
18 terms of all of them.
19 BY MR. SLATER:
20     Q.    There's NDMA in valsartan, it's
21 caused when they quench the sodium azide with
22 sodium nitrite, and it's a problem with
23 multiple sartans.  That's been proven true,
24 right?

Page 343

1          MR. FOX:  Objection to the
2  form.
3      A.    Yes.  At a high level, yes,
4  that's true.
5  BY MR. SLATER:
6      Q.    And just to be clear, Jun Du
7  represented that this wasn't learned until
8  June of 2018.  That's what he represented to
9  the FDA, right?
10         MR. FOX:  Objection to form.
11 Argumentative, document speaks for
12 itself.
13         MR. SLATER:  All right.  Look,
14 I'll ask it again.
15 BY MR. SLATER:
16     Q.    It's a fact that ZHP has always
17 represented to the FDA that those facts
18 weren't learned until June 2018, right?
19         MR. FOX:  Well, ask the
20 question.
21 BY MR. SLATER:
22     Q.    Can you answer that?  That's
23 correct, right?
24     A.    I'm sorry, I heard two people

Page 344

1  talking there.  I wasn't sure where we were
2  with this.
3          Could you restate the question,
4  because I heard multiple people.
5      Q.    Sure.
6          ZHP has always told the FDA it
7  did not learn of what we just talked about
8  until June of 2018 at the earliest, right?
9      A.    That's when they reached the
10 final conclusion, yes.  That's what they told
11 the FDA.
12     Q.    Well, they claimed that they
13 didn't even know there was NDMA in the
14 valsartan until June of 2018, right?
15         MR. FOX:  Objection to form.
16     A.    That they -- they wouldn't have
17 said they knew it until they were sure of it.
18         MR. SLATER:  Let's take that
19 down and go to Exhibit 312, the
20 establishment inspection report.
21         (Whereupon, Chesney Exhibit
22 Number 16 was marked for
23 identification.)
24         MR. SLATER:  Do we have at

Page 345

1  least another five minutes left on
2  that backup?  Okay.
3  BY MR. SLATER:
4      Q.    Here on the screen we have the
5  Establishment Inspection Report, Exhibit 312.
6          Do you see that?
7      A.    Yes.
8      Q.    And I just want to go to
9  page 20 of 58.  Looking at the paragraph that
10 says, "During the opening presentation."
11         MR. SLATER:  Let's blow that up
12 a little bit.  Perfect.
13     Q.    This states, "During the
14 opening presentation on July 23, 2018, Mr. Du
15 explained how the firm came to know Valsartan
16 manufactured by the firm could contain the
17 genotoxic impurity NDMA.  Mr. Du stated
18 Novartis placed an order with the firm for
19 45 Metric Tons of valsartan."  And then he
20 goes through it and talks about how it was
21 Novartis that told ZHP of this issue, right?
22     A.    Let me read the paragraph here.
23         (Witness reviewing document.)
24     A.    Okay.  So okay, I've read the

Confidential Information - Subject to Protective Order

Page 346

1  paragraph. Now, what was the question again?
2      Q.    This is reciting what Jun Du
3  told the FDA at the time of the inspection of
4  July 23, 2018, right?
5      A.    Yes.
6      Q.    Based on the content of the
7  e-mail from July of 2017 showing that ZHP
8  already knew there was NDMA in the valsartan
9  and why it was occurring, when Mr. Du spoke
10 to the FDA that day, he lied to the FDA,
11 correct?
12         MR. FOX: Objection. Calls for
13     conclusion, speculation.
14     A.    I can't conclude that based on
15 what I see here.
16 BY MR. SLATER:
17     Q.    What Jun Du told the FDA was
18 untrue in comparison to what that July 2017
19 e-mail shows, correct?
20         MR. FOX: Objection to form.
21     Beyond his expert report, calls for a
22     legal conclusion.
23     A.    Again, I am still not confident
24 of the state of the firm's awareness,

Page 347

1  notwithstanding Dr. Lin's statement in his
2  July 17th e-mail. For me to accept that as
3  fact, I would need to see considerably more
4  backup information that that statement is
5  based upon and have it evaluated by
6  scientific experts to be sure it's right.
7          Because an allegation such as
8  that that he was not being truthful is very
9  serious and needs to be vetted in
10 considerable detail, and I think FDA would
11 approach it the same way.
12 BY MR. SLATER:
13     Q.    If ZHP wasn't truthful with the
14 FDA as to when they learned there was NDMA in
15 the valsartan and how it was occurring, if
16 that occurred, that's a very, very serious
17 violation, right?
18         MR. FOX: Objection. Asked and
19     answered.
20     A.    Yes, that would be a
21 significant violation, yes.
22         MR. SLATER: I don't have any
23     other questions unless your counsel
24     wants to ask you more.

Page 348

1             FURTHER EXAMINATION
2  BY MR. FOX:
3      Q.    Mr. Chesney, can something that
4  occurred in this instance with impurity found
5  in valsartan, could that have occurred even
6  though everyone followed the law?
7          MR. SLATER: Objection.
8      A.    Yes.
9  BY MR. FOX:
10     Q.    In regard to GMP and cGMP, what
11 does the "C" stand for?
12     A.    Current.
13     Q.    Does cGMP change over time?
14     A.    Yes.
15     Q.    Did cGMP change with regard to
16 nitrosamines in the 2019 time frame as far as
17 the FDA is concerned?
18         MR. SLATER: Objection.
19     A.    I would draw that conclusion
20 from the public statements that we looked at
21 earlier, 2018 and 2019, that as information
22 was developed and better understood, the
23 expectations rose and were still, in fact,
24 rising at the time of the January 25, 2019

Page 349

1  statement.
2  BY MR. FOX:
3      Q.    And when cGMP changes, does the
4  FDA typically apply it retroactively to the
5  industry?
6          MR. SLATER: Objection.
7      You can answer.
8      A.    No.
9  BY MR. FOX:
10     Q.    That would be unfair, wouldn't
11 it?
12         MR. SLATER: Objection.
13     You can answer.
14     A.    Yes, it would be unfair, and
15 that has not been the practice, to my
16 knowledge.
17         MR. FOX: No further questions.
18         MR. SLATER: I don't have any
19     other questions.
20         MR. FOX: Thank you,
21     Mr. Chesney.
22         Thank you, Adam.
23         MR. SLATER: Thank you very
24     much.

Confidential Information Subject to Protective Order

Page 350

1         THE WITNESS:  Thank you,
2    Mr. Slater.
3         MR. SLATER:  It was nice to
4    meet you.  I hope everybody has a nice
5    evening.
6         THE WITNESS:  Thank you.  Same
7    to you, sir.
8         THE VIDEOGRAPHER:  The time is
9    5:03 p.m.  We're off the record.  This
10   concludes today's deposition.
11        (Whereupon, the deposition was
12   concluded.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 352

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8         After doing so, please sign the
9    errata sheet and date it.  It will be
10   attached to your deposition.
11        It is imperative that you return
12   the original errata sheet to the deposing
13   attorney within thirty (30) days of receipt
14   of the deposition transcript by you.  If you
15   fail to do so, the deposition transcript may
16   be deemed to be accurate and may be used in
17   court.
18
19
20
21
22
23
24

Page 351

1         CERTIFICATE
2         I, MAUREEN O'CONNOR
3    POLLARD, Registered Diplomate
     Reporter, Realtime Systems
4    Administrator, and Certified Shorthand
     Reporter, do hereby certify that prior
5    to the commencement of the
     examination, DAVID L. CHESNEY, was
6    remotely duly identified and sworn by
     me to testify to the truth, the whole
7    truth, and nothing but the truth.
8         I DO FURTHER CERTIFY that
     the foregoing is a verbatim transcript
9    of the testimony as taken
     stenographically by and before me at
10   the time, place, and on the date
     hereinbefore set forth, to the best of
11   my ability.
12        I DO FURTHER CERTIFY that
     I am neither a relative nor employee
13   nor attorney nor counsel of any of the
     parties to this action, and that I am
14   neither a relative nor employee of
     such attorney or counsel, and that I
15   am not financially interested in the
     action.
16
17
18   _____
19   MAUREEN O'CONNOR POLLARD
     NCRA Registered Diplomate Reporter
20   Realtime Systems Administrator
     Certified Shorthand Reporter
21   Notary Public
22   Dated:  March 24, 2022
23
24

Page 353

1         - - - - - -
          E R R A T A
2         - - - - - -
3    PAGE LINE CHANGE
4    ___ ___ _____
5        REASON: _____
6    ___ ___ _____
7        REASON: _____
8    ___ ___ _____
9        REASON: _____
10   ___ ___ _____
11       REASON: _____
12   ___ ___ _____
13       REASON: _____
14   ___ ___ _____
15       REASON: _____
16   ___ ___ _____
17       REASON: _____
18   ___ ___ _____
19       REASON: _____
20   ___ ___ _____
21       REASON: _____
22   ___ ___ _____
23
24

Confidential Information - Subject to Protective Order

Page 354

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4      I, _____, do
Hereby certify that I have read the foregoing
5    pages, and that the same is a correct
transcription of the answers given by me to
6    the questions therein propounded, except for
the corrections or changes in form or
7    substance, if any, noted in the attached
Errata Sheet.
8
9

_____
10  DAVID L. CHESNEY          DATE
11
12
13
14
15
16

Subscribed and sworn
17  To before me this
_____ day of _____, 20____.
18
My commission expires: _____
19
20  _____
Notary Public
21
22
23
24

Page 355

1        LAWYER'S NOTES
2  PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Exhibit 55

# General Notices and Requirements

## Applying to Standards, Tests, Assays, and Other Specifications of the United States Pharmacopeia

**1. Title and Revision** . . . . . . . . . . . . . . . . . . . . . . . .3

**2. Official Status and Legal Recognition** . . . . . . . .3
2.10. Official Text . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
2.20. Official Articles . . . . . . . . . . . . . . . . . . . . . . . . . . .3
2.30. Legal Recognition . . . . . . . . . . . . . . . . . . . . . . . .3

**3. Conformance and Standards** . . . . . . . . . . . . . . . .3
3.10. Applicability of Standards . . . . . . . . . . . . . . . . .3
3.20. Indicating Conformance . . . . . . . . . . . . . . . . . . .4

**4. Monographs and General Chapters** . . . . . . . . . .4
4.10. Monographs . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
4.20. General Chapters . . . . . . . . . . . . . . . . . . . . . . . .4

**5. Monograph Components** . . . . . . . . . . . . . . . . . . .4
5.10. Molecular Formula . . . . . . . . . . . . . . . . . . . . . . .4
5.20. Added Substances, Excipients, and Ingredients . . . . . .4
5.30. Description and Solubility . . . . . . . . . . . . . . . . .5
5.40. Identification Test . . . . . . . . . . . . . . . . . . . . . . . .5
5.50. Assay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
5.60. Impurities and Foreign Substances . . . . . . . . . . . . . .5
5.70. Performance Tests . . . . . . . . . . . . . . . . . . . . . . . .6
5.80. USP Reference Standards . . . . . . . . . . . . . . . . . .6

**6. Testing Practices and Procedures** . . . . . . . . . . .6
6.10. Safe Laboratory Practices . . . . . . . . . . . . . . . . .6
6.20. Automated Procedures . . . . . . . . . . . . . . . . . . . .6
6.30. Alternative and Harmonized Methods and
          Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
6.40. Dried, Anhydrous, Ignited, or Solvent-Free Basis . . . . .6
6.50. Preparation of Solutions . . . . . . . . . . . . . . . . . . .6
6.60. Units Necessary to Complete a Test . . . . . . . . . . . . .7
6.70. Reagents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
6.80. Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

**7. Test Results** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
7.10. Interpretation of Requirements . . . . . . . . . . . . . . . . .7
7.20. Rounding Rules . . . . . . . . . . . . . . . . . . . . . . . . . .7

**8. Terms and Definitions** . . . . . . . . . . . . . . . . . . . . .8
8.10.   Abbreviations . . . . . . . . . . . . . . . . . . . . . . . . .8
8.20.   About . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.30.   Alcohol Content . . . . . . . . . . . . . . . . . . . . . . .8
8.40.   Atomic Weights . . . . . . . . . . . . . . . . . . . . . . .8
8.50.   Blank Determinations . . . . . . . . . . . . . . . . . .8
8.60.   Concomitantly . . . . . . . . . . . . . . . . . . . . . . . .8
8.70.   Desiccator . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.80.   Logarithms . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.90.   Microbial Strain . . . . . . . . . . . . . . . . . . . . . . .8
8.100. Negligible . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.110. NLT/NMT . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.120. Odor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.130. Percent . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.140. Percentage Concentrations . . . . . . . . . . . . . . . . . .8
8.150. Pressure . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.160. Reaction Time . . . . . . . . . . . . . . . . . . . . . . . .8
8.170. Specific Gravity . . . . . . . . . . . . . . . . . . . . . . .8
8.180. Temperatures . . . . . . . . . . . . . . . . . . . . . . . . .8
8.190. Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.200. Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.210. Vacuum . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.220. Vacuum Desiccator . . . . . . . . . . . . . . . . . . . . . . .8
8.230. Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
8.240. Weights and Measures . . . . . . . . . . . . . . . . . . . . .9

**9. Prescribing and Dispensing** . . . . . . . . . . . . . . . .9
9.10 Use of Metric Units . . . . . . . . . . . . . . . . . . . . . . . .9
9.20 Changes in Volume . . . . . . . . . . . . . . . . . . . . . . . .9

**10. Preservation, Packaging, Storage
       and Labeling** . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
10.10. Storage Under Nonspecific
          Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

2   *General Notices*                                                                                          *USP 32*

10.20. Containers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
10.30. Storage Temperature and Humidity . . . . . . . . . . . . 10
10.40. Labeling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10.50. Guidelines for Packaging and Storage
      Statements in *USP–NF* Monographs . . . . . . . . . . 12

# General Notices and Requirements

*Change to read:*

˙ The *General Notices and Requirements* section (the *General Notices*) presents the basic assumptions, definitions, and default conditions for the interpretation and application of the *United States Pharmacopeia* (*USP*) and the *National Formulary* (*NF*).

Requirements stated in these *General Notices* apply to all articles recognized in the *USP* and *NF* (the "compendia") and to all general chapters unless specifically stated otherwise. Where the requirements of an individual monograph differ from the *General Notices* or a general chapter, the monograph requirements apply and supersede the requirements of the *General Notices* or the general chapter, whether or not the monograph explicitly states the difference.

## 1. TITLE AND REVISION

The full title of this publication (consisting of three volumes and including its *Supplements*), is *The Pharmacopeia of the United States of America*, Thirty-Second Revision and the *National Formulary*, Twenty-Seventh Edition. These titles may be abbreviated to *United States Pharmacopeia*, Thirty-Second Revision (or to *USP 32*), to *NF 27*, and to *USP 32–NF 27*. The *United States Pharmacopeia*, Thirty-Second Revision, and the *National Formulary*, Twenty-Seventh Edition, supersede all earlier revisions. Where the terms "*USP*," "*NF*," or "*USP–NF*" are used without further qualification during the period in which these compendia are official, they refer only to *USP 32, NF 27*, and any *Supplement(s)* thereto. The same titles, with no further distinction, apply equally to print or electronic presentation of these contents. Although *USP* and *NF* are published under one cover and share these *General Notices*, they are separate compendia.

This revision is official beginning May 1, 2009, unless otherwise indicated in specific text.

*Supplements* to *USP* and *NF* are published periodically.

*Interim Revision Announcements* are revisions to *USP* and *NF* that are published in *Pharmacopeial Forum*. *Interim Revision Announcements* contain official revisions and their effective dates, announcements of the availability of new USP Reference Standards, and announcements of tests or procedures that are held in abeyance pending availability of required USP Reference Standards.

*Revision Bulletins* are revisions to official text or postponements that require expedited publication. They are published on the USP website and generally are official immediately unless otherwise specified in the *Revision Bulletin*.

*Errata* are corrections to items erroneously published that have not received the approval of the Council of Experts and that do not reflect the official requirements. *Errata* are effective upon publication.

## 2. OFFICIAL STATUS AND LEGAL RECOGNITION

### 2.10. Official Text

*Official text* is text contained in *USP* and *NF,* including monographs, general chapters, and these *General Notices*. Revisions to official text are provided in *Supplements, Interim Revision Announcements,* and *Revision Bulletins*. General chapters numbered from 1000 to 1999 are considered interpretive and are intended to provide information on, give definition to, or describe a particular subject. They contain no mandatory requirements applicable to any official article unless specifically referenced in these *General Notices,* a monograph, or a general chapter numbered below 1000. General chapters numbered above 2000 apply only to articles that are intended for use as dietary ingredients and dietary supplements.

### 2.20. Official Articles

An *official article* is an article that is recognized in *USP* or *NF*. An article is deemed to be recognized and included in a compen-

dium when a monograph for the article is published in the compendium and an official date is generally or specifically assigned to the monograph.

The title specified in a monograph is the *official title* for such article. Other names considered to be synonyms of the official titles may not be used as substitutes for official titles.

*Official articles* include both *official substances* and *official products*. An *official substance* is a drug substance, excipient, dietary ingredient, other ingredient, or component of a finished device for which the monograph title includes no indication of the nature of the finished form.

An *official product* is a drug product, dietary supplement, compounded preparation, or finished device for which a monograph is provided.

### 2.30. Legal Recognition

The *USP* and *NF* are recognized in the laws and regulations of many countries throughout the world. Regulatory authorities may enforce the standards presented in the *USP* and *NF*, but because recognition of the *USP* and *NF* may vary by country, users should understand applicable laws and regulations. More information about the legal status of the *USP* and *NF* is provided in the *Mission and Preface*.

## 3. CONFORMANCE TO STANDARDS

### 3.10. Applicability of Standards

Standards for an article recognized in a USP compendium are expressed in the article's monograph, applicable general chapters, and these *General Notices*. Unless specifically exempted elsewhere in a compendium, the identity, strength, quality, and purity of an article are determined by the official tests, procedures, and acceptance criteria, whether incorporated in the monograph itself, in the *General Notices*, or in the applicable general chapters.

The standards in the relevant monograph, general chapter(s), and *General Notices* apply at any time in the life of the article from production to expiration. The manufacturer's specifications, and good manufacturing practices generally, are developed and followed to ensure that the article will comply with compendial standards until its expiration date, when stored as directed. Thus, any official article tested as directed in the relevant monograph shall comply.

At times, compendial standards take on the character of statistical procedures, with multiple units involved and perhaps a sequential procedural design to allow the user to determine that the tested article meets or does not meet the standard. The similarity to statistical procedures may seem to suggest an intent to make inference to some larger group of units, but in all cases, statements about whether the compendial standard is met apply only to the units tested. Repeats, replicates, statistical rejection of outliers, or extrapolations of results to larger populations, as well as the necessity and appropriate frequency of batch testing, are neither specified nor proscribed by the compendia. First-party (manufacturer), second-party (buyer), or third-party (regulator) compliance testing may or may not require examination of additional specimens, in accordance with predetermined guidelines or sampling strategies.

Official products other than dietary supplements are prepared from ingredients that meet *USP* or *NF* standards, where standards for such ingredients exist.

Official substances are prepared according to recognized principles of good manufacturing practice and from ingredients complying with specifications designed to ensure that the resultant substances meet the requirements of the compendial monographs.

**3.10.10. Applicability of Standards to Drug Products, Drug Substances, and Excipients**

The applicable *USP* or *NF* standard applies to any article marketed in the United States that (1) is recognized in the compendium and (2) is intended or labeled for use as a drug or as an ingredient in a drug. The applicable standard applies to such articles whether or not the added designation "USP" or "NF" is used. The standards apply equally to articles bearing the official titles or names derived by transposition of the definitive words of official titles or transposition in the order of the names of two or more active ingredients in official titles.

**3.10.20. Applicability of Standards to Medical Devices, Dietary Supplements, and Their Components and Ingredients**

An article recognized in *USP* or *NF* shall comply with the compendial standards if the article is a medical device, component intended for a medical device, dietary supplement, dietary ingredient, or other ingredient that is intended for incorporation into a dietary supplement, and is labeled as conforming to the *USP* or *NF*.

Generally, dietary supplements are prepared from ingredients that meet *USP, NF,* or *Food Chemicals Codex* standards. Where such standards do not exist, substances may be used in dietary supplements if they have been shown to be of acceptable food grade quality using other suitable procedures.

**3.20. Indicating Conformance**

A drug product, drug substance, or excipient may use the designation "USP" or "NF" in conjunction with its official title or elsewhere on the label only when (1) a monograph is provided in the specified compendium and (2) the article complies with the identity prescribed in the specified compendium.

When a drug product, drug substance, or excipient differs from the relevant *USP* or *NF* standard of strength, quality, or purity, as determined by the application of the tests, procedures, and acceptance criteria set forth in the relevant compendium, its difference shall be plainly stated on its label.

When a drug product, drug substance, or excipient fails to comply with the identity prescribed in *USP* or *NF* or contains an added substance that interferes with the prescribed tests and procedures, the article shall be designated by a name that is clearly distinguishing and differentiating from any name recognized in *USP* or *NF*.

A medical device, dietary supplement, or ingredient or component of a medical device or dietary supplement may use the designation "USP" or "NF" in conjunction with its official title or elsewhere on the label only when (1) a monograph is provided in the specified compendium and (2) the article complies with the monograph standards and other applicable standards in the compendium.

The designation "USP" or "NF" on the label may not and does not constitute an endorsement by USP and does not represent assurance by USP that the article is known to comply with the relevant standards. USP may seek legal redress if an article purports to be or is represented as an official article in one of USP's compendia and such claim is determined by USP not to be made in good faith.

The designation "*USP–NF*" may be used on the label of an article provided that the label also bears a statement such as "Meets *NF* standards as published by USP," indicating the particular compendium to which the article purports to apply.

When the letters "USP," "NF," or "USP–NF" are used on the label of an article to indicate compliance with compendial standards, the letters shall appear in conjunction with the official title of the article. The letters are not to be enclosed in any symbol such as a circle, square, etc., and shall appear in capital letters.

If a dietary supplement does not comply with all applicable compendial requirements but contains one or more dietary ingredients or other ingredients that are recognized in *USP* or *NF*, the individual ingredient(s) may be designated as complying with *USP* or *NF* standards or being of *USP* or *NF* quality provided that the designation is limited to the individual ingredient(s) and does not suggest that the dietary supplement complies with *USP* standards.

**4. MONOGRAPHS AND GENERAL CHAPTERS**

**4.10. Monographs**

Monographs set forth the article's name, definition, specification, and other requirements related to packaging, storage, and labeling. The specification consists of tests, procedures, and acceptance criteria that help ensure the identity, strength, and purity of the article. For general requirements relating to specific monograph sections, see section 5, *Monograph Components.*

Because monographs may not provide standards for all relevant characteristics, some official substances may conform to the *USP* or *NF* standard but differ with regard to nonstandardized properties that are relevant to their use in specific preparations. To assure interchangeability in such instances, users may wish to ascertain functional equivalence or determine such characteristics before use.

**4.10.10. Applicability of Test Procedures**

A single monograph may include several different tests, procedures, and/or acceptance criteria that reflect attributes of different manufacturers' articles. Such alternatives may be presented for different polymorphic forms, impurities, hydrates, and dissolution cases. Monographs indicate the tests, procedures, and/or acceptance criteria to be used and the required labeling.

**4.10.20. Acceptance Criteria**

The acceptance criteria allow for analytical error, for unavoidable variations in manufacturing and compounding, and for deterioration to an extent considered acceptable under practical conditions. The existence of compendial acceptance criteria does not constitute a basis for a claim that an official substance that more nearly approaches 100 percent purity "exceeds" compendial quality. Similarly, the fact that an article has been prepared to tighter criteria than those specified in the monograph does not constitute a basis for a claim that the article "exceeds" the compendial requirements.

An official product shall be formulated with the intent to provide 100 percent of the quantity of each ingredient declared on the label. Where the minimum amount of a substance present in a dietary supplement is required by law to be higher than the lower acceptance criterion allowed for in the monograph, the upper acceptance criterion contained in the monograph may be increased by a corresponding amount.

The acceptance criteria specified in individual monographs and in the general chapters for compounded preparations are based on such attributes of quality as might be expected to characterize an article compounded from suitable bulk drug substances and ingredients, using the procedures provided or recognized principles of good compounding practice, as described in these compendia.

**4.20. General Chapters**

Each general chapter is assigned a number that appears in angle brackets adjacent to the chapter name (e.g., *Chromatography* ⟨621⟩). General chapters may contain the following:

- Descriptions of tests and procedures for application through individual monographs,
- Descriptions and specifications of conditions and practices for pharmaceutical compounding,
- General information for the interpretation of the compendial requirements,
- Descriptions of general pharmaceutical storage, dispensing, and packaging practices, or
- General guidance to manufacturers of official substances or official products.

When a general chapter is referenced in a monograph, acceptance criteria may be presented after a colon.

Some chapters may serve as introductory overviews of a test or of analytical techniques. They may reference other general chapters that contain techniques, details of the procedures, and, at times, acceptance criteria.

**5. MONOGRAPH COMPONENTS**

**5.10. Molecular Formula**

The use of the molecular formula for the active ingredient(s) named in defining the required strength of a compendial article is intended to designate the chemical entity or entities, as given in the complete chemical name of the article, having absolute (100 percent) purity.

**5.20. Added Substances, Excipients, and Ingredients**

Substances are regarded as unsuitable for inclusion in an official article and therefore prohibited unless: (1) they do not exceed the minimum quantity required for providing their intended effect; (2) their presence does not impair the bioavailability, therapeutic efficacy, or safety of the official article; and (3) they do not interfere with the assays and tests prescribed for determining compliance with the compendial standards.

The air in a container of an official article may, where appropriate, be evacuated or be replaced by carbon dioxide, helium, argon, or nitrogen, or by a mixture of these gases. The use of such gas need not be declared in the labeling.

**5.20.10. Added Substances, Excipients, and Ingredients in Official Substances**

Official substances may contain only the specific added substances that are permitted by the individual monograph. Where such addition is permitted, the label shall indicate the name(s) and amount(s) of any added substance(s).

**5.20.20. Added Substances, Excipients, and Ingredients in Official Products**

Suitable substances and excipients such as antimicrobial agents, pharmaceutical bases, carriers, coatings, flavors, preservatives, stabilizers, and vehicles may be added to an official product to enhance its stability, usefulness, or elegance, or to facilitate its preparation, unless otherwise specified in the individual monograph.

Added substances and excipients employed solely to impart color may be incorporated into official products other than those intended for parenteral or ophthalmic use, in accordance with the regulations pertaining to the use of colors issued by the U.S. Food and Drug Administration (FDA), provided such added substances or excipients are otherwise appropriate in all respects. (See also *Added Substances* under *Injections* ⟨1⟩.)

The proportions of the substances constituting the base in ointment and suppository products and preparations may be varied to maintain a suitable consistency under different climatic conditions, provided that the concentrations of active ingredients are not varied and provided that the bioavailability, therapeutic efficacy, and safety of the preparation are not impaired.

**5.20.20.1. In Compounded Preparations**

Compounded preparations for which a complete composition is given shall contain only the ingredients named in the formulas unless specifically exempted herein or in the individual monograph. Deviation from the specified processes or methods of compounding, although not from the ingredients or proportions thereof, may occur provided that the finished preparation conforms to the relevant standards and to preparations produced by following the specified process.

Where a monograph for a compounded preparation calls for an ingredient in an amount expressed on the dried basis, the ingredient need not be dried before use if due allowance is made for the water or other volatile substances present in the quantity taken.

Specially denatured alcohol formulas are available for use in accordance with federal statutes and regulations of the Internal Revenue Service. A suitable formula of specially denatured alcohol may be substituted for Alcohol in the manufacture of official preparations intended for internal or topical use, provided that the denaturant is volatile and does not remain in the finished product. A preparation that is intended for topical application to the skin may contain specially denatured alcohol, provided that the denaturant is either a usual ingredient in the preparation or a permissible added substance; in either case the denaturant shall be identified on the label of the topical preparation. Where a process is given in the individual monograph, any preparation compounded using denatured alcohol shall be identical to that prepared by the monograph process.

**5.20.20.2. In Dietary Supplements**

Additional ingredients may be added to dietary supplement products provided that the additional ingredients: (1) comply with applicable regulatory requirements; and (2) do not interfere with the assays and tests prescribed for determining compliance with compendial standards.

**5.30. Description and Solubility**

Only where a quantitative solubility test is given in a monograph and is designated as such is it a test for purity.

A monograph may include information regarding the article's description. Information about an article's "description and solubility" also is provided in the reference table *Description and Relative Solubility of USP and NF Articles*. The reference table merely denotes the properties of articles that comply with monograph standards. The reference table is intended primarily for those who use, prepare, and dispense drugs and/or related articles. Although the information provided in monographs and the information in the reference table may indirectly assist in the preliminary evaluation of an article, it is not intended to serve as a standard or test for purity.

The approximate solubility of a compendial substance is indicated by one of the following descriptive terms:

| Descriptive Term | Parts of Solvent Required for 1 Part of Solute |
| --- | --- |
| Very soluble | Less than 1 |
| Freely soluble | From 1 to 10 |
| Soluble | From 10 to 30 |
| Sparingly soluble | From 30 to 100 |
| Slightly soluble | From 100 to 1,000 |
| Very slightly soluble | From 1,000 to 10,000 |
| Practically insoluble, or Insoluble | Greater than or equal to 10,000 |

**5.40. Identification Test**

The compendial test titled *Identification* is provided as an aid in verifying the identity of articles as they are purported to be, e.g., those taken from labeled containers. Tests presented in the *Identification* section shall be used to assist in establishing the identity of the substance but are not necessarily sufficient to establish proof of identity. Other tests and specifications in the monograph often are necessary to establish or confirm the identity of an article. Failure of an article to meet the requirements of a prescribed *Identification* test may indicate that the article is mislabeled.

**5.50. Assay**

Assay tests for compounded preparations are not intended for evaluating a compounded preparation before dispensing, but instead are intended to serve as the official test in the event of a question or dispute regarding the preparation's conformance to official standards.

**5.50.10. Units of Potency (Biological)**

For substances that cannot be completely characterized by chemical and physical means, it may be necessary to express quantities of activity in biological units of potency, each defined by an authoritative, designated reference standard.

Units of biological potency defined by the World Health Organization (WHO) for International Biological Standards and International Biological Reference Preparations are termed International Units (IU). Monographs refer to the units defined by USP Reference Standards as "USP Units." For biological products, units of potency are defined by the corresponding U.S. Standard established by FDA, whether or not International Units or USP Units have been defined (see *Biologics* ⟨1041⟩).

**5.60. Impurities and Foreign Substances**

Tests for the presence of impurities and foreign substances are provided to limit such substances to amounts that are unobjectionable under conditions in which the article is customarily employed (see also *Impurities in Official Articles* ⟨1086⟩).

Nonmonograph tests and acceptance criteria suitable for detecting and controlling impurities that may result from a change in the processing methods or that may be introduced from external sources should be employed in addition to the tests provided in the individual monograph, where the presence of the impurity is inconsistent with applicable good manufacturing practices or good pharmaceutical practice.

**5.60.10. Other Impurities in *USP* and *NF* Articles**

If a *USP* or *NF* monograph includes an assay or organic impurity test based on chromatography, other than a test for residual solvents, and that monograph procedure does not detect an impurity present in the substance, the amount and identity of the impurity, where both are known, shall be stated in the labeling (certificate of analysis) of the official substance, under the heading *Other Impurity(ies)*.

The presence of any unlabeled other impurity in an official substance is a variance from the standard if the content is 0.1% or greater. The sum of all *Other Impurities* combined with the monograph-detected impurities may not exceed 2.0% (see *Ordinary Impurities* ⟨466⟩), unless otherwise stated in the monograph.

The following categories of drug substances are excluded from *Other Impurities* requirements:

- fermentation products and semi-synthetics derived therefrom,
- radiopharmaceuticals,
- biologics,
- biotechnology-derived products,
- peptides,
- herbals, and
- crude products of animal or plant origin.

Any substance known to be toxic shall not be listed under *Other Impurities.*

### 5.60.20. Residual Solvents in *USP* and *NF* Articles

All *USP* and *NF* articles are subject to relevant control of residual solvents, even when no test is specified in the individual monograph. If solvents are used during production, they must be of suitable quality. In addition, the toxicity and residual level of each solvent shall be taken into consideration, and the solvents limited according to the principles defined and the requirements specified in *Residual Solvents* ⟨467⟩, using the general methods presented therein or other suitable methods.

### 5.70. Performance Tests

Where content uniformity determinations have been made using the same analytical methodology specified in the *Assay*, with appropriate allowances made for differences in sample preparation, the average of all of the individual content uniformity determinations may be used as the *Assay* value.

### 5.80. USP Reference Standards

USP Reference Standards are authentic specimens that have been approved by the USP Reference Standards Expert Committee as suitable for use as comparison standards in *USP* or *NF* tests and assays. (See *USP Reference Standards* ⟨11⟩.) Current official lots of USP Reference Standards are published in the *USP Reference Standards Catalog.* Where a procedure calls for the use of a compendial article rather than for a USP Reference Standard as a material standard of reference, a substance meeting all of the compendial monograph requirements for that article shall be used. No new *USP* or *NF* standard or procedure requiring the use of a new USP Reference Standard shall be official until the specified USP Reference Standard is available.

Unless a reference standard label bears a specific potency or content, assume the reference standard is 100.0% pure in the official application. Unless otherwise directed in the procedure in the individual monograph or in a general chapter, USP Reference Standards are to be used in accordance with the instructions on the label of the Reference Standard.

## 6. TESTING PRACTICES AND PROCEDURES

### 6.10. Safe Laboratory Practices

In performing compendial procedures, safe laboratory practices shall be followed, including precautionary measures, protective equipment, and work practices consistent with the chemicals and procedures used. Before undertaking any procedure described in the compendia, the analyst should be aware of the hazards associated with the chemicals and the techniques and means of protecting against them. These compendia are not designed to describe such hazards or protective measures.

### 6.20. Automated Procedures

Automated and manual procedures employing the same basic chemistry are considered equivalent.

### 6.30. Alternative and Harmonized Methods and Procedures

Alternative methods and/or procedures may be used if they provide advantages in terms of accuracy, sensitivity, precision, selectivity, or adaptability to automation or computerized data reduction, or in other special circumstances. Such alternative procedures and methods shall be validated as described in the general chapter *Validation of Compendial Procedures* ⟨1225⟩ and must be shown to give equivalent or better results. Only those results obtained by the methods and procedures given in the compendium are conclusive.

Alternative procedures should be submitted to USP for evaluation as a potential replacement for or addition to the standard (see section 4.10, *Monographs*).

Certain general chapters contain a statement that the text in question is harmonized with the corresponding text of the *European Pharmacopoeia* and/or the *Japanese Pharmacopoeia* and that these texts are interchangeable. Therefore, if a substance or preparation is found to comply with a requirement using an interchangeable method or procedure from one of these pharmacopoeias, it should comply with the requirements of the *USP.* When a difference appears, or in the event of dispute, only the result obtained by the method and/or procedure given in the *USP* is conclusive.

### 6.40. Dried, Anhydrous, Ignited, or Solvent-Free Basis

All calculations in the compendia assume an "as-is" basis unless otherwise specified.

Test procedures may be performed on the undried or unignited substance and the results calculated on the dried, anhydrous, or ignited basis, provided a test for *Loss on drying,* or *Water,* or *Loss on ignition,* respectively, is given in the monograph. Where the presence of moisture or other volatile material may interfere with the procedure, previous drying of the substance is specified in the individual monograph and is obligatory.

The term "solvent-free" signifies that the calculation shall be corrected for the presence of known solvents as determined using the methods described in *Residual Solvents* ⟨467⟩ unless a test for limit of organic solvents is provided in the monograph.

The term "previously dried" without qualification signifies that the substance shall be dried as directed under *Loss on Drying* ⟨731⟩ or *Water Determination* ⟨921⟩ (gravimetric determination).

Where drying in vacuum over a desiccant is directed, a vacuum desiccator, a vacuum drying pistol, or other suitable vacuum drying apparatus shall be used.

### 6.40.10. Ignite To Constant Weight

"Ignite to constant weight" means that ignition shall be continued at $800 \pm 25°$, unless otherwise indicated, until two consecutive weighings, the second of which is taken after an additional period appropriate to the nature and quantity of the residue, do not differ by more than 0.50 mg per g of substance taken.

### 6.40.20. Dried To Constant Weight

"Dried to constant weight" means that drying shall be continued until two consecutive weighings, the second of which is taken after an additional drying period appropriate to the nature and quantity of the residue, do not differ by more than 0.50 mg per g of substance taken.

### 6.50. Preparation of Solutions

### 6.50.10. Filtration

Where a procedure gives direction to "filter" without further qualification, the liquid shall be passed through suitable filter paper or equivalent device until the filtrate is clear. Due to the possibility of filter effects, the initial volumes of a filtrate may be discarded.

### 6.50.20. Solutions

Unless otherwise specified, all solutions shall be prepared with Purified Water. Solutions for quantitative measures shall be prepared using accurately weighed or accurately measured analytes (see section 8.20, *About*).

An expression such as "(1 in 10)" means that 1 part *by volume* of a liquid shall be diluted with, or 1 part *by weight* of a solid shall be dissolved in, a sufficient quantity of the diluent or solvent to make the volume of the finished solution 10 parts *by volume.* An expression such as "(20 : 5 : 2)" means that the respective numbers of parts, by volume, of the designated liquids shall be mixed, unless otherwise indicated.

### 6.50.20.1. Adjustments to Solutions

When a specified concentration is called for in a procedure, a solution of other normality or molarity may be used, provided that allowance is made for the difference in concentration and that the change does not increase the error of measurement.

Unless otherwise indicated, analyte concentrations shall be prepared to within ten percent (10%) of the indicated value. In the special case in which a procedure is adapted to the working range of an instrument, solution concentrations may differ from the indicated value by more than ten percent (10%), with appropriate changes in associated calculations. Any changes that shall fall within the validated range of the instrument.

When adjustment of pH is indicated with either an acid or base and the concentration is not indicated, appropriate concentrations of that acid or base may be used.

### 6.50.20.2. Test Solutions

Information on Test Solutions (TS) is provided in the *Test Solutions* portion of the *Reagents, Indicators, and Solutions* section of

the *USP–NF*. Use of an alternative Test Solution or a change in the Test Solution used may require validation.

**6.50.20.3. Indicator Solutions**

Where a procedure specifies the use of an indicator TS, approximately 0.2 mL, or 3 drops, of the solution shall be added unless otherwise directed.

**6.60. Units Necessary to Complete a Test**

Unless otherwise specified, a sufficient number of units to ensure a suitable analytical result shall be taken.

**6.60.10. Tablets**

Where the procedure of a Tablet monograph directs to weigh and finely powder not fewer than a given number of Tablets, a counted number of Tablets shall be weighed and reduced to a powder. The portion of the powdered Tablets taken shall be representative of the whole Tablets and shall, in turn, be weighed accurately.

**6.60.20. Capsules**

Where the procedure of a Capsule monograph gives direction to remove, as completely as possible, the contents of not fewer than a given number of the Capsules, a counted number of Capsules shall be carefully opened and the contents quantitatively removed, combined, mixed, and weighed accurately. The portion of mixed Capsules contents taken shall be representative of the contents of the Capsules and shall, in turn, be weighed accurately.

**6.70. Reagents**

The proper conduct of the compendial procedures and the reliability of the results depend, in part, upon the quality of the reagents used in the performance of the procedures. Unless otherwise specified, reagents conforming to the specifications set forth in the current edition of *Reagent Chemicals* published by the American Chemical Society (ACS) shall be used. Where such ACS reagent specifications are not available or where the required purity differs, compendial specifications for reagents of acceptable quality are provided (see the *Reagents, Indicators, and Solutions* section of the *USP–NF*). Reagents not covered by any of these specifications should be of a grade suitable to the proper performance of the method of assay or test involved.

Listing of these reagents, including the indicators and solutions employed as reagents, in no way implies that they have therapeutic utility; furthermore, any reference to *USP* or *NF* in their labeling shall include also the term "reagent" or "reagent grade." USP may supply reagents if they otherwise may not be generally commercially available.

**6.80. Equipment**

Unless otherwise specified, a specification for a definite size or type of container or apparatus in a procedure is given solely as a recommendation. Other dimensions or types may be used if they are suitable for the intended use.

**6.80.10. Apparatus for Measurement**

Where volumetric flasks or other exact measuring, weighing, or sorting devices are specified, this or other equipment of at least equivalent accuracy shall be employed.

**6.80.10.1. Pipet**

Where a pipet is specified, a suitable buret may be substituted. Where a "to contain" pipet is specified, a suitable volumetric flask may be substituted.

**6.80.10.2. Light Protection**

Where low-actinic or light-resistant containers are specified, either containers specially treated to protect contents from light or clear containers that have been rendered opaque by application of a suitable coating or wrapping may be used.

**6.80.20. Instrumental Apparatus**

An instrument may be substituted for the specified instrument if the substitute uses the same fundamental principles of operation and is of equivalent or greater sensitivity and accuracy. These characteristics shall be qualified as appropriate. Where a particular brand or source of a material, instrument, or piece of equipment, or the name and address of a manufacturer or distributor, is mentioned (ordinarily in a footnote), this identification is furnished solely for informational purposes as a matter of convenience, without implication of approval, endorsement, or certification.

**6.80.20.1. Chromatographic Tubes and Columns**

The term "diameter" refers to internal diameter (ID).

**6.80.20.2. Tubing**

The term "diameter" refers to outside diameter (OD).

**6.80.20.3. Steam Bath**

Where use of a steam bath is directed, use actively flowing steam or another regulated heat source controlled at an equivalent temperature.

**6.80.20.4. Water Bath**

A water bath requires vigorously boiling water unless otherwise specified.

**7. TEST RESULTS**

**7.10. Interpretation of Requirements**

Analytical results observed in the laboratory (or calculated from experimental measurements) are compared with stated acceptance criteria to determine whether the article conforms to compendial requirements.

The reportable value, which often is a summary value for several individual determinations, is compared with the acceptance criteria. The reportable value is the end result of a completed measurement procedure, as documented.

Where acceptance criteria are expressed numerically herein through specification of an upper and/or lower limit, permitted values include the specified values themselves, but no values outside the limit(s). Acceptance criteria are considered significant to the last digit shown.

**7.10.10. Equivalence Statements in Titrimetric Procedures**

The directions for titrimetric procedures conclude with a statement of the weight of the analyte that is equivalent to each mL of the standardized titrant. In such an equivalence statement, the number of significant figures in the concentration of the titrant should be understood to correspond to the number of significant figures in the weight of the analyte. Corrections to calculations based on the blank determination are to be made for all titrimetric assays where appropriate (see *Titrimetry* ⟨541⟩).

**7.20. Rounding Rules**

The observed or calculated values shall be rounded off to the number of decimal places that is in agreement with the limit expression. Numbers should not be rounded until the final calculations for the reportable value have been completed. Intermediate calculations (e.g., slope for linearity) may be rounded for reporting purposes, but the original (not rounded) value should be used for any additional required calculations. Acceptance criteria are fixed numbers and are not rounded.

When rounding is required, consider only one digit in the decimal place to the right of the last place in the limit expression. If this digit is smaller than 5, it is eliminated and the preceding digit is unchanged. If this digit is equal to or greater than 5, it is eliminated and the preceding digit is increased by 1.

| Illustration of Rounding Numerical Values for Comparison with Requirements | | | |
|---|---|---|---|
| Compendial Requirement | Unrounded Value | Rounded Result | Conforms |
| Assay limit ≥98.0% | 97.96% | 98.0% | Yes |
| | 97.92% | 97.9% | No |
| | 97.95% | 98.0% | Yes |
| Assay limit ≤101.5% | 101.55% | 101.6% | No |
| | 101.46% | 101.5% | Yes |
| | 101.45% | 101.5% | Yes |

| Illustration of Rounding Numerical Values for Comparison with Requirements | | | |
|---|---|---|---|
| Compendial Requirement | Unrounded Value | Rounded Result | Conforms |
| Limit test ≤0.02% | 0.025% | 0.03% | No |
| | 0.015% | 0.02% | Yes |
| | 0.027% | 0.03% | No |
| Limit test ≤3 ppm | 3.5 ppm | 4 ppm | No |
| | 3.4 ppm | 3 ppm | Yes |
| | 2.5 ppm | 3 ppm | Yes |

## 8. TERMS AND DEFINITIONS

### 8.10. Abbreviations
- RS refers to a USP Reference Standard.
- CS refers to a Colorimetric Solution.
- TS refers to a Test Solution.
- VS refers to a Volumetric Solution that is standardized in accordance with directions given in the individual monograph or in the *Reagents, Indicators, and Solutions* section of *USP–NF*.

### 8.20. About
"About" indicates a quantity within 10%.

If the measurement is stated to be "accurately measured" or "accurately weighed," follow the statements in the general chapters *Volumetric Apparatus* ⟨31⟩ and *Weights and Balances* ⟨41⟩, respectively.

### 8.30. Alcohol Content
Percentages of alcohol, such as those under the heading *Alcohol content,* refer to percentage by volume of $C_2H_5OH$ at $15.56°$. Where a formula, test, or assay calls for alcohol, ethyl alcohol, or ethanol, the *USP* monograph article Alcohol shall be used. Where reference is made to "$C_2H_5OH$," absolute (100 percent) ethanol is intended. Where a procedure calls for dehydrated alcohol, alcohol absolute, or anhydrous alcohol, the *USP* monograph article Dehydrated Alcohol shall be used.

### 8.40. Atomic Weights
Atomic weights used in computing molecular weights and the factors in the assays and elsewhere are those established by the IUPAC Commission on Atomic Weights and Isotopic Abundances.

### 8.50. Blank Determinations
Where it is directed that "any necessary correction" be made by a blank determination, the determination shall be conducted using the same quantities of the same reagents treated in the same manner as the solution or mixture containing the portion of the substance under assay or test, but with the substance itself omitted.

### 8.60. Concomitantly
"Concomitantly" denotes that the determinations or measurements are to be performed in immediate succession.

### 8.70. Desiccator
The instruction "in a desiccator" indicates use of a tightly closed container of suitable size and design that maintains an atmosphere of low moisture content by means of a suitable desiccant such as anhydrous calcium chloride, magnesium perchlorate, phosphorus pentoxide, or silica gel. See also section 8.220, *Vacuum Desiccator*.

### 8.80. Logarithms
Logarithms are to the base 10.

### 8.90. Microbial Strain
A microbial strain cited and identified by its ATCC catalog number shall be used directly or, if subcultured, shall be used not more than five passages removed from the original strain.

### 8.100. Negligible
"Negligible" indicates a quantity not exceeding 0.50 mg.

### 8.110. NLT/NMT
"NLT" means "not less than." "NMT" means "not more than."

### 8.120. Odor
"Odorless," "practically odorless," "a faint characteristic odor," and variations thereof indicate evaluation of a suitable quantity of freshly opened material after exposure to the air for 15 minutes. An odor designation is descriptive only and should not be regarded as a standard of purity for a particular lot of an article.

### 8.130. Percent
"Percent" used without qualification means:
- For mixtures of solids and semisolids, percent weight in weight;
- For solutions or suspensions of solids in liquids, percent weight in volume;
- For solutions of liquids in liquids, percent volume in volume;
- For solutions of gases in liquids, percent weight in volume.

For example, a 1 percent solution is prepared by dissolving 1 g of a solid or semisolid, or 1 mL of a liquid, in sufficient solvent to make 100 mL of the solution.

### 8.140. Percentage Concentrations
Percentage concentrations are expressed as follows:
- *Percent Weight in Weight* (w/w) is defined as the number of g of a solute in 100 g of solution.
- *Percent Weight in Volume* (w/v) is defined as number of g of a solute in 100 mL of solution.
- *Percent Volume in Volume* (v/v) is defined as the number of mL of a solute in 100 mL of solution.

### 8.150. Pressure
Pressure is determined by use of a suitable manometer or barometer calibrated in terms of the pressure exerted by a column of mercury of the stated height.

### 8.160. Reaction Time
Reaction time is 5 minutes unless otherwise specified.

### 8.170. Specific Gravity
Specific gravity is the weight of a substance in air at $25°$ divided by the weight of an equal volume of water at the same temperature.

### 8.180. Temperatures
Temperatures are expressed in centigrade (Celsius) degrees, and all measurements are made at $25°$ unless otherwise indicated. Where moderate heat is specified, any temperature not higher than $45°(113°$ F) is indicated.

### 8.190. Time
Unless otherwise specified, rounding rules, as described in section 7.20, *Rounding Rules*, apply to any time specified.

### 8.200. Transfer
"Transfer" indicates a quantitative manipulation.

### 8.210. Vacuum
"Vacuum" denotes exposure to a pressure of less than 20 mm of mercury (2.67 kPas), unless otherwise indicated.

### 8.220. Vacuum Desiccator
"Vacuum desiccator" indicates a desiccator that maintains a low-moisture atmosphere at a reduced pressure of not more than 20 mm of mercury (2.67 kPas) or at the pressure designated in the individual monograph.

### 8.230. Water

### 8.230.10. Water as an Ingredient in an Official Product
As an ingredient in an official product, water meets the requirements of the appropriate water monograph in *USP* or *NF*.

### 8.230.20. Water in the Manufacture of Official Substances
When used in the manufacture of official substances, water may meet the requirements for drinking water as set forth in the regulations of the U.S. Environmental Protection Agency (potable water).

**8.230.30. Water in a Compendial Procedure**

When water is called for in a compendial procedure, the *USP* article Purified Water shall be used unless otherwise specified. Definitions for *High-Purity Water* and *Carbon Dioxide–Free Water* are provided in *Containers—Glass* ⟨660⟩. Definitions of other types of water are provided in *Water for Pharmaceutical Purposes* ⟨1231⟩.

**8.240. Weights and Measures**

In general, weights and measures are expressed in the International System of Units (SI) as established and revised by the *Conférence générale des poids et mesures*. For compendial purposes, the term "weight" is considered to be synonymous with "mass."

Molality is designated by the symbol $m$ preceded by a number that represents the number of moles of the designated solute contained in 1 kilogram of the designated solvent.

Molarity is designated by the symbol M preceded by a number that represents the number of moles of the designated solute contained in an amount of the designated solvent that is sufficient to prepare 1 liter of solution.

Normality is designated by the symbol N preceded by a number that represents the number of equivalents of the designated solute contained in an amount of the designated solvent that is sufficient to prepare 1 liter of solution.

Symbols commonly employed for SI metric units and other units are as follows:

| | |
|---|---|
| Bq = becquerel | dL = deciliter |
| kBq = kilobecquerel | L = liter |
| MBq = megabecquerel | mL = milliliter[c] |
| GBq = gigabecquerel | µL = microliter |
| Ci = curie | Eq = gram-equivalent weight |
| mCi = millicurie | mEq = milliequivalent |
| µCi = microcurie | mol = gram-molecular weight (mole) |
| nCi = nanocurie | Da = dalton (relative molecular mass) |
| Gy = gray | mmol = millimole |
| mGy = milligray | Osmol = osmole |
| m = meter | mOsmol = milliosmole |
| dm = decimeter | Hz = hertz |
| cm = centimeter | kHz = kilohertz |
| mm = millimeter | MHz = megahertz |
| µm = micrometer (0.001mm) | V = volts |
| nm = nanometer[a] | MeV = million electron volts |
| kg = kilogram | keV = kilo-electron volt |
| g = gram | mV = millivolt |
| mg = milligram | psi = pounds per square inch |
| µg; mcg = microgram[b] | Pa = pascal |
| ng = nanogram | kPa = kilopascal |
| pg = pictogram | g = gravity (in centrifugation) |
| fg = femtogram | |

[a] Previously the symbol mµ (for millimicron) was used.

[b] One milliliter (mL) is used herein as the equivalent of one cubic centimeter (cc).

[c] The symbol µg is used in the *USP* and *NF* to represent micrograms, but micrograms may be represented as "mcg" for labeling and prescribing purposes. The term "gamma," symbolized by γ, frequently is used to represent micrograms in biochemical literature.

# 9. PRESCRIBING AND DISPENSING

**9.10 Use of Metric Units**

Prescriptions for compendial articles shall be written to state the quantity and/or strength desired in metric units unless otherwise indicated in the individual monograph (see also *Units of Potency,* section 5.50.10 above). If an amount is prescribed by any other system of measurement, only an amount that is the metric equivalent of the prescribed amount shall be dispensed. Apothecary unit designations on labels and labeling shall not be used.

**9.20 Changes in Volume**

In the dispensing of prescription medications, slight changes in volume owing to variations in room temperatures may be disregarded.

# 10. PRESERVATION, PACKAGING, STORAGE, AND LABELING

**10.10. Storage Under Nonspecific Conditions**

If no specific directions or limitations are provided in the *Packaging and Storage* section of an individual *USP* monograph or in the labeling of an article recognized in *USP,* the conditions of storage shall include storage at controlled room temperature, protection from moisture, and, where necessary, protection from light. Such articles shall be protected from moisture, freezing, and excessive heat, and, where necessary, from light during shipping and distribution. Drug substances are exempt from the requirements in this paragraph.

Regardless of quantity, where no specific storage directions or limitations are provided in an individual *NF* monograph or stated in the labeling of an article recognized in *NF,* the conditions of storage and distribution shall include protection from moisture, freezing, excessive heat, and, where necessary, from light.

**10.20. Containers**

The container is that which holds the article and is or may be in direct contact with the article. The immediate container is that which is in contact with the article at all times. The closure is a part of the container.

Before being filled, the container should be clean. Special precautions and cleaning procedures may be necessary to ensure that each container is clean and that extraneous matter is not introduced into or onto the article.

The container does not interact physically or chemically with the article placed in it so as to alter the strength, quality, or purity of the article beyond the official requirements.

The compendial requirements for the use of specified containers apply also to articles as packaged by the pharmacist or other dispenser, unless otherwise indicated in the individual monograph.

**10.20.10. Tamper-Evident Packaging**

The container or individual carton of a sterile article intended for ophthalmic or otic use, except where extemporaneously compounded for immediate dispensing on prescription, shall be so sealed that the contents cannot be used without obvious destruction of the seal.

Articles intended for sale without prescription are also required to comply with the tamper-evident packaging and labeling requirements of the FDA where applicable.

Preferably, the immediate container and/or the outer container or protective packaging used by a manufacturer or distributor for all dosage forms that are not specifically exempt is designed so as to show evidence of any tampering with the contents.

**10.20.20. Light-Resistant Container**

A light-resistant container (see *Light Transmission Test* under *Containers—Performance Testing* ⟨671⟩) protects the contents from the effects of light by virtue of the specific properties of the material of which it is composed, including any coating applied to it. Alternatively, a clear and colorless or a translucent container may be made light-resistant by means of an opaque covering, in which case the label of the container bears a statement that the opaque covering is needed until the contents are to be used or administered. Where it is directed to "protect from light" in an individual monograph, preservation in a light-resistant container is intended.

Where an article is required to be packaged in a light-resistant container, and if the container is made light-resistant by means of an opaque covering, a single-use, unit-dose container or mnemonic pack for dispensing may not be removed from the outer opaque covering before dispensing.

**10.20.30. Well-Closed Container**

A well-closed container protects the contents from extraneous solids and from loss of the article under the ordinary or customary conditions of handling, shipment, storage, and distribution.

**10.20.40. Tight Container**

A tight container protects the contents from contamination by extraneous liquids, solids, or vapors; from loss of the article; and from efflorescence, deliquescence, or evaporation under the ordinary or

customary conditions of handling, shipment, storage, and distribution; and is capable of tight reclosure. Where a tight container is specified, it may be replaced by a hermetic container for a single dose of an article.

A gas cylinder is a metallic container designed to hold a gas under pressure. As a safety measure, for carbon dioxide, cyclopropane, helium, nitrous oxide, and oxygen, the Pin-Index Safety System of matched fittings is recommended for cylinders of Size E or smaller.

[NOTE—Where packaging and storage in a *tight container* or a *well-closed container* is specified in the individual monograph, the container used for an article when dispensed on prescription meets the requirements under *Containers—Performance Testing* ⟨671⟩.]

### 10.20.50. Hermetic Container

A hermetic container is impervious to air or any other gas under the ordinary or customary conditions of handling, shipment, storage, and distribution.

### 10.20.60. Single-Unit Container

A single-unit container is one that is designed to hold a quantity of drug product intended for administration as a single dose or a single finished device intended for use promptly after the container is opened. Preferably, the immediate container and/or the outer container or protective packaging shall be so designed as to show evidence of any tampering with the contents. Each single-unit container shall be labeled to indicate the identity, quantity and/or strength, name of the manufacturer, lot number, and expiration date of the article.

### 10.20.70. Single-Dose Container

A single-dose container is a single-unit container for articles intended for parenteral administration only. A single-dose container is labeled as such. Examples of single-dose containers include prefilled syringes, cartridges, fusion-sealed containers, and closure-sealed containers when so labeled. (See also *Containers for Injections* under *Injections* ⟨1⟩.)

### 10.20.80. Unit-Dose Container

A unit-dose container is a single-unit container for articles intended for administration by other than the parenteral route as a single dose, direct from the container.

### 10.20.90. Unit-of-Use Container

A unit-of-use container is one that contains a specific quantity of a drug product and that is intended to be dispensed as such without further modification except for the addition of appropriate labeling. A unit-of-use container is labeled as such.

### 10.20.100. Multiple-Unit Container

A multiple-unit container is a container that permits withdrawal of successive portions of the contents without changing the strength, quality, or purity of the remaining portion.

### 10.20.110. Multiple-Dose Container

A multiple-dose container is a multiple-unit container for articles intended for parenteral administration only. (See also *Containers for Injections* under *Injections* ⟨1⟩).

### 10.20.120. Requirements under the Poison Prevention Packaging Act (PPPA)

This act (see the website, www.cpsc.gov/businfo/pppa.html) requires special packaging of most human oral prescription drugs, oral controlled drugs, certain non-oral prescription drugs, certain dietary supplements, and many over-the-counter (OTC) drug preparations in order to protect the public from personal injury or illness from misuse of these preparations (16 CFR § 1700.14).

The immediate packaging of substances regulated under the PPPA shall comply with the special packaging standards (16 CFR § 1700.15 and 16 CFR § 1700.20). The PPPA regulations for special packaging apply to all packaging types including reclosable, nonclosable, and unit-dose types.

Special packaging is not required for drugs dispensed within a hospital setting for inpatient administration. Manufacturers and packagers of bulk-packaged prescription drugs do not have to use special packaging if the drug will be repackaged by the pharmacist. PPPA-regulated prescription drugs may be dispensed in non–child-resistant packaging upon the request of the purchaser or when directed in a legitimate prescription (15 U.S.C. § 1473).

Manufacturers or packagers of PPPA-regulated OTC preparations are allowed to package one size in non–child-resistant packaging as long as popular-size, special packages are also supplied. The non–child-resistant package requires special labeling (16 CFR § 1700.5).

Various types of child-resistant packages are covered in ASTM International Standard D-3475, Standard Classification of Child-Resistant Packaging. Examples are included as an aid in the understanding and comprehension of each type of classification.

### 10.30. Storage Temperature and Humidity

Specific directions are stated in some monographs with respect to the temperatures and humidity at which official articles shall be stored and distributed (including the shipment of articles to the consumer) when stability data indicate that storage and distribution at a lower or a higher temperature and a higher humidity produce undesirable results. Such directions apply except where the label on an article states a different storage temperature on the basis of stability studies of that particular formulation. Where no specific storage directions or limitations are provided in the individual monograph, but the label of an article states a storage temperature that is based on stability studies of that particular formulation, such labeled storage directions apply. (See also *Pharmaceutical Stability* ⟨1150⟩.) The conditions are defined by the following terms.

### 10.30.10. Freezer

"Freezer" indicates a place in which the temperature is maintained thermostatically between −25° and −10° (−13° and 14°F).

### 10.30.20. Cold

Any temperature not exceeding 8° (46°F) is "cold." A "refrigerator" is a cold place in which the temperature is maintained thermostatically between 2° and 8° (36° and 46°F).

### 10.30.30. Cool

Any temperature between 8° and 15° (46° and 59°F) is "cool." An article for which storage in a *cool place* is directed may, alternatively, be stored and distributed in a *refrigerator,* unless otherwise specified in the individual monograph.

### 10.30.40. Controlled Cold Temperature

"Controlled cold temperature" is defined as temperature maintained thermostatically between 2° and 8° (36° and 46° F), that allows for excursions in temperature between 0° and 15° (32° and 59° F) that may be experienced during storage, shipping, and distribution such that the allowable calculated mean kinetic temperature is not more than 8° (46° F). Transient spikes up to 25° (77° F) may be permitted if the manufacturer so instructs and provided that such spikes do not exceed 24 hours unless supported by stability data or the manufacturer instructs otherwise.

### 10.30.50. Room Temperature

"Room temperature" indicates the temperature prevailing in a working area.

### 10.30.60. Controlled Room Temperature

"Controlled room temperature" indicates a temperature maintained thermostatically that encompasses the usual and customary working environment of 20° to 25° (68° to 77°F); that results in a mean kinetic temperature calculated to be not more than 25°; and that allows for excursions between 15° and 30° (59° and 86°F) that are experienced in pharmacies, hospitals, and warehouses. Provided the mean kinetic temperature remains in the allowed range, transient spikes up to 40° are permitted as long as they do not exceed 24 hours. Spikes above 40° may be permitted if the manufacturer so instructs. Articles may be labeled for storage at "controlled room temperature" or at "up to 25°", or other wording based on the same mean kinetic temperature. The mean kinetic temperature is a calculated value that may be used as an isothermal storage temperature that simulates the nonisothermal effects of storage temperature variations. (See also *Pharmaceutical Stability* ⟨1150⟩.)

An article for which storage at *controlled room temperature* is directed may, alternatively, be stored and distributed in a *cool place,* unless otherwise specified in the individual monograph or on the label.

### 10.30.70. Warm

Any temperature between 30° and 40° (86° and 104°F) is "warm."

### 10.30.80. Excessive Heat

"Excessive heat" means any temperature above 40° (104°F).

**10.30.90. Protection From Freezing**

Where, in addition to the risk of breakage of the container, freezing subjects an article to loss of strength or potency, or to destructive alteration of its characteristics, the container label bears an appropriate instruction to protect the article from freezing.

**10.30.100. Dry Place**

The term "dry place" denotes a place that does not exceed 40% average relative humidity at *Controlled Room Temperature* or the equivalent water vapor pressure at other temperatures. The determination may be made by direct measurement at the place or may be based on reported climatic conditions. Determination is based on not less than 12 equally spaced measurements that encompass either a season, a year, or, where recorded data demonstrate, the storage period of the article. There may be values of up to 45% relative humidity provided that the average value is 40% relative humidity.

Storage in a container validated to protect the article from moisture vapor, including storage in bulk, is considered storage in a dry place.

**10.40. Labeling**

The term "labeling" designates all labels and other written, printed, or graphic matter upon an immediate container of an article or upon, or in, any package or wrapper in which it is enclosed, except any outer shipping container. The term "label" designates that part of the labeling upon the immediate container.

A shipping container containing a single article, unless such container is also essentially the immediate container or the outside of the consumer package, is labeled with a minimum of product identification (except for controlled articles), lot number, expiration date, and conditions for storage and distribution.

Articles in these compendia are subject to compliance with such labeling requirements as may be promulgated by governmental bodies in addition to the compendial requirements set forth for the articles.

**10.40.10. Amount of Ingredient Per Dosage Unit**

The strength of a drug product is expressed on the container label in terms of micrograms or milligrams or grams or percentage of the therapeutically active moiety or drug substance, whichever form is used in the title, unless otherwise indicated in an individual monograph. Both the active moiety and drug substance names and their equivalent amounts are then provided in the labeling.

Official articles in capsule, tablet, or other unit dosage form shall be labeled to express the quantity of each active ingredient or recognized nutrient contained in each such unit; except that, in the case of unit-dose oral solutions or suspensions, whether supplied as liquid preparations or as liquid preparations that are constituted from solids upon addition of a designated volume of a specific diluent, the label shall express the quantity of each active ingredient or recognized nutrient delivered under the conditions prescribed in *Deliverable Volume* ⟨698⟩. Official drug products not in unit dosage form shall be labeled to express the quantity of each active ingredient in each milliliter or in each gram, or to express the percentage of each such ingredient (see ⟨8.140⟩, *Percentage Concentrations*), except that oral liquids or solids intended to be constituted to yield oral liquids may, alternatively, be labeled in terms of each 5-mL portion of the liquid or resulting liquid. Unless otherwise indicated in a monograph or chapter, such declarations of strength or quantity shall be stated only in metric units. See also 5.50.10., *Units of Potency (Biological)*.

**10.40.20. Use of Leading and Terminal Zeros**

To help minimize the possibility of errors in the dispensing and administration of drugs, the quantity of active ingredient when expressed in whole numbers shall be shown without a decimal point that is followed by a terminal zero (e.g., express as 4 mg [not 4.0 mg]). The quantity of active ingredient when expressed as a decimal number smaller than 1 shall be shown with a zero preceding the decimal point (e.g., express as 0.2 mg [not .2 mg]).

**10.40.30. Labeling of Salts of Drugs**

It is an established principle that official articles shall have only one official title. For purposes of saving space on labels, and because chemical symbols for the most common inorganic salts of drugs are well known to practitioners as synonymous with the written forms, the following alternatives are permitted in labeling official articles that are salts: HCl for hydrochloride; HBr for hydrobromide; Na for sodium; and K for potassium. The symbols

Na and K are intended for use in abbreviating names of the salts of organic acids, but these symbols are not used where the word Sodium or Potassium appears at the beginning of an official title (e.g., Phenobarbital Na is acceptable, but Na Salicylate is not to be written).

**10.40.40. Labeling Vitamin-Containing Products**

The vitamin content of an official drug product shall be stated on the label in metric units per dosage unit. The amounts of vitamins A, D, and E may be stated also in USP Units. Quantities of vitamin A declared in metric units refer to the equivalent amounts of retinol (vitamin A alcohol). The label of a nutritional supplement shall bear an identifying lot number, control number, or batch number.

**10.40.50. Labeling Botanical-Containing Products**

The label of an herb or other botanical intended for use as a dietary supplement bears the statement, "If you are pregnant or nursing a baby, seek the advice of a health professional before using this product."

**10.40.60. Labeling Parenteral And Topical Preparations**

The label of a preparation intended for parenteral or topical use states the names of all added substances (see 5.20., *Added Substances, Excipients, and Ingredients* and see *Labeling* under *Injections* ⟨1⟩), and, in the case of parenteral preparations, also their amounts or proportions, except that for substances added for adjustment of pH or to achieve isotonicity, the label may indicate only their presence and the reason for their addition.

**10.40.70. Labeling Electrolytes**

The concentration and dosage of electrolytes for replacement therapy (e.g., sodium chloride or potassium chloride) shall be stated on the label in milliequivalents (mEq). The label of the product shall indicate also the quantity of ingredient(s) in terms of weight or percentage concentration.

**10.40.80. Labeling Alcohol**

The content of alcohol in a liquid preparation shall be stated on the label as a percentage (v/v) of $C_2H_5OH$.

**10.40.90. Special Capsules and Tablets**

The label of any form of Capsule or Tablet intended for administration other than by swallowing intact bears a prominent indication of the manner in which it shall be used.

**10.40.100. Expiration Date and Beyond-Use Date**

The label of an official drug product or nutritional or dietary supplement product shall bear an expiration date. All articles shall display the expiration date so that it can be read by an ordinary individual under customary conditions of purchase and use. The expiration date shall be prominently displayed in high contrast to the background or sharply embossed, and easily understood (e.g., "EXP 6/08," "Exp. June 08," or "Expires 6/08"). [NOTE—For additional information and guidance, refer to the Consumer Healthcare Products Association's *Voluntary Codes and Guidelines of the Self-Medication Industry.*]

The monographs for some preparations state how the expiration date that shall appear on the label shall be determined. In the absence of a specific requirement in the individual monograph for a drug product or nutritional supplement, the label shall bear an expiration date assigned for the particular formulation and package of the article, with the following exception: the label need not show an expiration date in the case of a drug product or nutritional supplement packaged in a container that is intended for sale without prescription and the labeling of which states no dosage limitations, and which is stable for not less than 3 years when stored under the prescribed conditions.

Where an official article is required to bear an expiration date, such article shall be dispensed solely in, or from, a container labeled with an expiration date, and the date on which the article is dispensed shall be within the labeled expiry period. The expiration date identifies the time during which the article may be expected to meet the requirements of the compendial monograph, provided it is kept under the prescribed storage conditions. The expiration date limits the time during which the article may be dispensed or used. Where an expiration date is stated only in terms of the month and the year, it is a representation that the intended expiration date is the last day of the stated month. The beyond-use date is the date after which an article shall not be used. The dispenser shall place on the label of the prescription container a suitable beyond-use date to

limit the patient's use of the article based on any information supplied by the manufacturer and the *General Notices*. The beyond-use date placed on the label shall not be later than the expiration date on the manufacturer's container.

For articles requiring constitution before use, a suitable beyond-use date for the constituted product shall be identified in the labeling.

For all other dosage forms, in determining an appropriate period of time during which a prescription drug may be retained by a patient after its dispensing, the dispenser shall take into account, in addition to any other relevant factors, the nature of the drug; the container in which it was packaged by the manufacturer and the expiration date thereon; the characteristics of the patient's container, if the article is repackaged for dispensing; the expected storage conditions to which the article may be exposed; any unusual storage conditions to which the article may be exposed; and the expected length of time of the course of therapy. The dispenser shall, on taking into account the foregoing, place on the label of a multiple-unit container a suitable beyond-use date to limit the patient's use of the article. Unless otherwise specified in the individual monograph, or in the absence of stability data to the contrary, such beyond-use date shall be not later than (a) the expiration date on the manufacturer's container, or (b) 1 year from the date the drug is dispensed, whichever is earlier. For nonsterile solid and liquid dosage forms that are packaged in single-unit and unit-dose containers, the beyond-use date shall be 1 year from the date the drug is packaged into the single-unit or unit-dose container or the expiration date on the manufacturer's container, whichever is earlier, unless stability data or the manufacturer's labeling indicates otherwise.

The dispenser shall maintain the facility where the dosage forms are packaged and stored, at a temperature such that the mean kinetic temperature is not greater than 25°. The plastic material used in packaging the dosage forms shall afford better protection than polyvinyl chloride, which does not provide adequate protection against moisture permeation. Records shall be kept of the temperature of the facility where the dosage forms are stored, and of the plastic materials used in packaging.

**10.40.100.1. Compounded Preparations**

The label on the container or package of an official compounded preparation shall bear a beyond-use date. The beyond-use date is the date after which a compounded preparation is not to be used. Because compounded preparations are intended for administration immediately or following short-term storage, their beyond-use dates may be assigned based on criteria different from those applied to assigning expiration dates to manufactured drug products.

The monograph for an official compounded preparation typically includes a beyond-use requirement that states the time period following the date of compounding during which the preparation, properly stored, may be used. In the absence of stability information that is applicable to a specific drug and preparation, recommendations for maximum beyond-use dates have been devised for nonsterile compounded drug preparations that are packaged in tight, light-resistant containers and stored at controlled room temperature unless otherwise indicated (see *Stability Criteria and Beyond-Use Dating* under *Stability of Compounded Preparations* in the general test chapter *Pharmaceutical Compounding—Nonsterile Preparations* ⟨795⟩).

**10.50. Guidelines for Packaging and Storage Statements in *USP–NF* Monographs**

In order to provide users of the *USP* and *NF* with proper guidance on how to package and store official articles, every monograph in the *USP* and *NF* shall have a packaging and storage specification.

For the packaging portion of the statement, the choice of containers is given in this section 10, *Preservation, Packaging, Storage, and Labeling,* and includes *Light-Resistant Container, Well-Closed Container, Tight Container, Hermetic Container, Single-Unit Container, Single-Dose Container, Unit-Dose Container,* and *Unit-of-Use Container.* For most preparations, the choice is determined by the container in which it shall be dispensed (e.g., tight, well-closed, hermetic, unit-of-use, etc.). For drug substances, the choice would appear to be tight, well-closed, or, where needed, a light-resistant container. For excipients, given their typical nature as large-volume commodity items, with containers ranging from drums to tank cars, a well-closed container is an appropriate default. Therefore, in the absence of data indicating a need for a more protective class of container, the phrase "Preserve in well-closed containers" should be used as a default for excipients.▪*USP32*

Exhibit 56

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

2006 WL 166452
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Jeff PLAYER, et al., Plaintiffs,
v.
MOTIVA ENTERPRISES LLC, a successor
in interest to Star Enterprises, Defendant.

No. Civ. 02–3216(RBK).
|
Jan. 20, 2006.

**Attorneys and Law Firms**

Keith A. McKenna, McKenna, Mulcahy & McKenna,
Montclair, NJ, for Plaintiffs.

Jeffrey W. Moryan, Connell Foley LLP, Roseland, NJ, for
Defendant.

OPINION

KUGLER, United States District Judge:

 **\*1**  This matter comes before the Court upon motions
by Defendant Motiva Enterprises, LLC, ("Defendant" or
"Motiva") for summary judgment of the claims of Plaintiffs
Jeff Player, et al. ("Plaintiffs"), and to exclude Plaintiffs'
experts Michael Gochfeld, M.D., Ph.D. ("Gochfeld"), R.
Brian Ellwood, Ph.D. ("Ellwood"), Bruce M. Gallo ("Gallo"),
and Daniel McDonald ("McDonald"). For the reasons set
forth below, Defendant's motions will be granted in part and
denied in part.

I. Background [1]
This environmental contamination suit is brought by the
current and former owners of twenty-seven parcels of
residential property located in the Spring Hollow Subdivision
in Gloucester Township, New Jersey. [2] Plaintiffs allege
that emissions from Defendant's nearby Texaco gasoline
service station contaminated their property and the Kirkwood
Cohansey Aquifer, the underground water source for their
potable wells.

Contamination of the aquifer was first detected on April
5, 2000, when significant concentrations of the gasoline-
related compound methyl tertiary butyl ether ("MTBE")
was discovered in a drinking fountain at Camden County
Community College. New Jersey Consumers Water Company
("Consumers"), the entity responsible for providing water
to the college, conducted sampling of some of its wells
and discovered significant amounts of gasoline-related
compounds in municipal supply well number 8 ("CW–8").
Consumers took the well offline on April 10.

While investigating the contamination, the New Jersey
Department of Environmental Protection ("NJDEP")
detected a discharge of volatile organic compounds ("VOCs")
from Defendant's service station, located at 585 Berlin Cross
Keys Road ("Motiva site" or "contamination site"). [3] The
NJDEP issued a Field Directive on April 12, 2000, requiring
Motiva to investigate the source and extent of the discharge,
to implement an interim treatment system, and to submit a
remedial action work plan to the NJDEP. Defendant installed
an interim recovery system and twenty-five monitoring and
recovery wells between April and June 2000.

The NJDEP issued a second directive on May 5, 2000,
ordering Defendant to cease gasoline retail operations and
provide treatment or an alternate source of water to replace
CW–8. Defendant replaced the interim system with a
permanent ground water recovery and treatment system in
June 2000, and installed forty-one additional monitoring
wells from June 2000 to present. As further required by the
NJDEP, Defendant regularly sampled potable wells located
on approximately forty residential properties in the vicinity of
the Motiva site. Defendant detected small amounts of MTBE
in thirteen of the residential wells it sampled. [4]

Per the NJDEP directive, Motiva submitted a Remedial
Investigation Work Plan/Remedial Investigation report on
July 2000 and a Remedial Action Workplan ("RAW") on
November 14, 2000. In its RAW, Defendant requested
permission to cease sampling of the residential wells,
contending that the MTBE detected in those wells could not
have come from the Motiva site since the wells are located
upgradient [5] or sidegradient from the site, and no emissions
were detected in most of the monitoring wells between the
Motiva site and the potable wells. [6] Motiva also claimed that
recent literature indicated that traces of MTBE in groundwater
could likely result from "non-point sources." (March 2001
Directive at 2.)

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**\*2** Plaintiffs' expert, R. Brian Ellwood, Ph.D ("Ellwood"), submitted a response to the RAW on January 17, 2001. In his report, Ellwood notes that as of January 17, 2001, "[c]ontrol of contamination at depth beneath the site, control of offsite contamination, and possibly control of contamination at the northern site boundary, has not been established." (Preliminary Report Sicklerville Road Groundwater Contamination ("Ellwood Report"), McKenna Cert. in Opp. to Def.'s Mot. Summ. J., filed Oct. 12, 2005 ("McKenna Cert."), Ex. F, at 2.) Ellwood also offered possible theories to demonstrate the plausibility of Defendant's responsibility for the MTBE in spite of Motiva's arguments to the contrary.

The NJDEP ultimately rejected Defendant's request to cease sampling of the residential wells in its March 2001 Directive on the basis that "there is insufficient evidence for Equiva to conclude that the MTBE detected in the 13 potable wells in the area did not originate from the Cross Keys Texaco site" and "that regardless of the source of the MTBE in these wells, which is obviously debatable, ongoing sampling of these wells is required *primarily due to their proximity to the site."* (March 2001 Directive at 2) (emphasis in original).

Also in the March 2001 Directive, the NJDEP approved a Classification Exemption Area ("CEA") for the site that excluded all but 1/10 of an acre of 583 Berlin Cross Keys Road (the Wallace Property). The CEA establishes the boundaries of a ground water plume where VOCs exceed the GWQS. [7]

Through summer 2004, the NJDEP regularly reduced the testing requirements. By August 18, 2003, the NJDEP required only:

> annual sampling of the wells at 4, 7, 11, 13 and 14 Donna Marie Court; 2, 4, 6, and 8 Latham Way; 12 and 20 Spring Hollow Drive, and; 937 and 948 Sicklerville Road. For all the sampling events of the aforementioned potable wells conducted April 2002, the Department notes that all wells continue to exhibit no gasoline related contamination in

> excess of the Department's Drinking Water Quality Standards.

(NJDEP Directive, Aug. 18, 2003, McKenna Cert., Ex. D.)

The NJDEP approved shut down of the recovery and treatment system on April 30, 2004. (NJDEP Correspondence, Aug. 9, 2004, Mairo Cert., Ex. S., at 2.) Finally, on August 9, 2004, the NJDEP determined that "Defendant's Remedial Action Progress Reports "meet the conditions of the March 21, 2001 Remedial Action Workplan (RAW) approval. Shell Oil Products U.S. (Shell OPUS) is, therefore, in compliance with N.J.A.C. 7:14B–6." (Aug. 9, 2004, NJDEP Correspondence, Mairo Cert., Ex. S., at 1.)

**B. The Residential Properties**
Plaintiffs own twenty-seven respective residential properties near Defendant's gasoline station. [8] Twenty-six of the twenty-seven properties-all but 583 Berlin Cross Keys Road ("the Wallace property")-contain potable wells located in the Kirkwood Cohansey Aquifer. Because Plaintiffs' properties are north/northeast of the contamination site, (Undisputed Facts ¶ 38), they are considered upgradient or sidegradient of the contamination site, depending on whether CW–8 is pumping. [9]

**\*3** Consistent with the requirements of the NJDEP directives, Defendant tested the Plaintiffs' residential wells for six gasoline-related compounds: benzene, toluene, ethylbenzene, xylenes, MTBE, and TBA. No testing detected any gasoline-related compound on eighteen of the properties. [10] Detection of compounds on the remaining eight properties was as follows:

• A single detection of 0.79 ppb toluene and ten detections of MTBE (highest at 15.5 ppb) at 4 Latham Way,

  • Three detections of MTBE (highest at 0.76 ppb) at 14 Donna Marie Court,

  • Three detections of MTBE (highest at 1.4 ppb) at 6 Latham Way,

  • A single detection of 1.4 ppb toluene at 850 Sicklerville Road,

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

- A single detection of 0.4 ppb MTBE at 4 Donna Marie Court,

- A single detection of 0.3 ppb MTBE at 12 Donna Marie Court,

- A single detection of 1.2 ppb MTBE at 8 Latham Way, and

- A single detection of 0.3 ppb MTBE at 20 Spring Hollow Road.

The GWQS for toluene is 1,000 ppb and the GWQS for MTBE is 70 ppb. No gasoline-related compound was detected on any Plaintiff's property after April 2001. According to the Certification of Julian Davies, a Project Manager for EnviroTrac, Ltd., an environmental consulting firm retained by Defendant to remediate the Motiva site, the NJDEP never restricted the consumption of water from Plaintiffs' potable wells, and never required Defendant to treat the water, provide Plaintiffs with an alternate source of water, or collect soil samples from the residential properties. [11] (Julian Davies Cert., Mairo Cert., Ex. R, at 2.)

Since the fact of the contamination became known, several Plaintiffs have sold their property. Maria and John Wallace sold 583 Berlin Cross Keys Road for $350,000.00 in September 2001, Plaintiffs Thomas and Tina Stankiewicz sold 9 Spring Hollow Drive in July 2002 for $143,000.00, Barbara Tanner sold 17 Spring Hollow Drive for $134,000.00 in February 2002, Daniel and Maria Rodriguez sold 18 Spring Hollow Drive for $138,000.00 in July 2003, David Lodi sold 5 Donna Marie Court for $104,000.00 in September 2001, 13 Donna Marie Court was sold for $109,900.00 in July 2000, and 19 Spring Hollow Drive was sold for $133,900.00 in May 2001.

Defendant filed motions for summary judgment and to exclude experts on June 24, 2005, after requesting and receiving permission from this Court to extend by one week the date for the filing of dispositive and *in limine* motions. Briefs in opposition were due July 22, 2005, however, Plaintiffs instead filed an untimely request for an extension on August 2, 2005, and a second request on September 6, 2005, moving the deadline to September 30, 2005. On October 5, 2005, Plaintiffs filed another untimely request for an extension, and ultimately did not submit a complete Opposition until October 14, 2005. Nevertheless, because a district court should not grant a motion for summary judgment without examining the merits, *Stackhouse v. Mazurkiewicz,* 951 F.2d 29, 30 (3d Cir.1991) (citing *Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168 (3d Cir.1990)), this Court will exercise its discretion to consider Plaintiffs' Opposition, even though it is untimely. Local Civ. R. 7.1(d)(5).

II. Standard

**\*4** Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex,* 477 U.S. at 322); *Heffron v. Adamar of N.J., Inc.,* 270 F.Supp.2d 562, 568–69 (D.N.J.2003). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court must enter summary judgment in favor of the moving party."

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

*Heffron*, 270 F.Supp.2d at 69 (citing 🚩 *Anderson, 477 U.S. at 249–50).*

**III. Motion to Exclude Expert Daniel McDonald**

Defendant moves to exclude the testimony of Plaintiffs' expert Daniel McDonald ("McDonald") on the grounds that he is unqualified and his report is unreliable. [12] Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the United States Supreme Court's decision in 🚩 *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). [13] In the Third Circuit, the admissibility of expert testimony is contingent on the "qualifications" of the expert and the "reliability" of his methodology. 🚩 *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) (interpreting *Daubert* ); *see also* 🚩 *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000).

A. *In Limine* Hearing

In certain instances, courts are obligated to provide *in limine* hearings before applying *Daubert* to exclude expert testimony. 🚩 *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412 (3d Cir.1999). A hearing is required, for example, where the court excludes an expert's conclusions on the grounds that they are "insufficiently explained and the reasons and foundations for them inadequately and perhaps confusingly explicated." *Id.* In other words, where a report is "conclusory and did not adequately explain the basis for [the expert's] opinion or the methodology employed in reaching his conclusions," the "plaintiff needs an 'opportunity to be heard' on the critical issues of scientific reliability and validity." 🚩 *Oddi,* 234 F.3d 136, 152 (3d Cir.2000) (holding that the district court did not err "in granting summary judgment here without an *in limine* hearing") (quoting 🚩 *Padillas,* 186 F.3d at 417). Where the evidentiary record is substantial, however, or the court has before it the information necessary to determine that the expert lacks "good grounds" for his conclusions, an *in limine* hearing may be unnecessary. 🚩 *Id.* at 153.

*5 The evidence before this Court clearly establishes the process by which McDonald "arrived at his conclusions," 🚩 *Oddi,* 234 F.3d at 152, and McDonald's report and deposition details the methodology underlying his determinations. As discussed below, this Court will exclude

McDonald's testimony on the grounds that his analysis and methodology are baseless and inconclusive, not because his report is insufficiently explained. Additionally, Defendant's motion for summary judgment alerted Plaintiffs to the *Daubert* challenge, yet Plaintiffs neither requested a hearing nor offered any affidavit or evidence in support of McDonald. Accordingly, an *in limine* hearing is unnecessary.

B. Qualifications

The Third Circuit instructs courts to "liberally" evaluate an expert's qualifications. 🚩 *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000). In particular, the Circuit has "eschewed overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." 🚩 *In re Paoli,* 35 F.3d at 741 (citing 🚩 *Hammond v. International Harvester Co.,* 691 F.2d 646, 652–53 (3d Cir.1982) and 🚩 *Knight v. Otis Elevator Co.,* 596 F.2d 84, 87–88 (3d Cir.1979)). This liberal treatment extends to the expert's substantive qualifications as well as his formal qualifications. *Id.*

Nevertheless, the Third Circuit has "also set a floor with respect to an expert witness's qualifications." 🚩 *Elcock v. Kmart Corp.,* 233 F.3d 734, 742 (3d Cir.2000). To demonstrate when an expert would not be qualified under Rule 702, the *Elcock* Court offered the pre-*Daubert* case, 🚩 *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110 (3d Cir.1987), which held a tractor salesperson unqualified to testify as an expert about the cause of a tractor fire. 🚩 *Elcock,* 233 F.3d at 742 (citing 🚩 *Aloe Coal,* 816 F.2d 110).

In *Elcock* itself, the Court determined with "misgivings" that the district court had not abused its discretion by concluding that a psychologist with experience in obtaining employment for disabled individuals was qualified to testify to the possibility for vocational rehabilitation of the injured plaintiff. However, the Court acknowledged that it also would have upheld a decision to exclude the expert since "he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level regarding the number of jobs in the national or local economy that the disabled individual is able to perform." [14] 🚩 *Elcock,* 233 F.3d at 744. Taken together, *Elcock* and *Aloe Coal* indicate that where a proposed expert's area of experience is

Case 1:19-md-02875-RMB-SAK    Document 2325-6    Filed 04/11/23    Page 253 of 264
PageID: 83968
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

adjacent to, but not actually encompassing, the subject matter of his testimony, he may be deemed unqualified.

McDonald has worked as a licensed appraiser in New Jersey for approximately twenty-two years. Defendant argues that McDonald is nevertheless unqualified to testify to the diminution in value of Plaintiffs' properties because McDonald has no experience in appraising contaminated property. Defendant notes that McDonald has never appraised property allegedly contaminated by emissions from a gasoline station and has never acted as an expert in a situation involving contamination of the groundwater or allegations of a leaking underground storage tank. (Daniel McDonald Dep. ("McDonald Dep."), Mairo Cert. in Supp. Def.'s Mot. to Exclude Plaintiffs' Expert Daniel McDonald, Ex. C, at 23–24.) Defendant also points out that McDonald did not entirely understand the Ellwood and Gallo reports upon which he relied, including the charts indicating the presence and degree of contaminating agents on the property. (McDonald Dep. at 55–56.)

**\*6** This case lies squarely between *Aloe Coal* and *Elcock*. Although McDonald is an experienced appraiser, no evidence indicates that he has any experience appraising contaminated properties or is qualified to value the effects of stigma on property values. Just as a psychologist experienced in assisting individuals to find work may be unqualified to testify about the general availability of jobs in the economy, an individual able to appraise an uncontaminated property may have no grounds for appreciating the devaluation of the same property under unique conditions of contamination or stigma. Because nothing in McDonald's experience indicates knowledge or expertise in issues of contamination, he is unqualified to testify to the loss of value to Plaintiffs' properties arising from the alleged contamination.

**C. Reliability**
Because expert testimony has the potential to bear considerable weight with a jury, the district court functions as a gatekeeper responsible for assuring "that the scientific methodology upon which the expert opinion is founded is reliable" and that "the expert's conclusion is based on good grounds." *In re Paoli,* 35 F.3d at 732–33. To ascertain "reliability," the court must examine a number of factors, both those established in *Daubert* and those previously enumerated by the Third Circuit in *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985). *Oddi,* 234 F.3d 145 (citing *Paoli II,* 35 F.3d at 742). In particular, the court must consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli II,* 35 F.3d at 742 n. 8; *see also Elcock,* 233 F.3d at 746 (noting that "each factor need not be applied in every case"). The party wishing to introduce the testimony bears the burden of establishing "by a preponderance of the evidence that their opinions are reliable." *Paoli,* 35 F.3d at 744.

Of course, an expert's opinion need not be "perfect," and judges may not substitute their opinions for those of an expert. *Paoli,* 35 F.3d at 744; *see also Crowley v. Chait,* 322 F.Supp.2d 530, 536 (D.N.J.2004). However, courts also need not admit mere conclusions or "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 608 (D.N.J.2002) (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 145–46, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

**\*7** Mere assumptions, without causal evidence or methodological analysis may be inadmissible. *In re TMI Litig.,* 193 F.3d 613, 667–68 (3d Cir.1999). Conclusions based only on the expert's experience, *Oddi,* 234 F.3d at 140–41, and testimony founded on methods that are not

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

generally accepted or lack testable hypotheses may also fail to surmount the *Daubert* standard, 🔖 *Elcock,* 233 F.3d at 746. Furthermore, conclusions based on analogies that are too dissimilar to the subject of the testimony may also merit exclusion. 🔖 *General Elec.,* 522 U.S. at 144 (rejecting expert testimony that plaintiff's cancer was due to exposure to PCBs when the testimony was based on animal studies of infant mice that had developed cancer after exposure to PCBs).

In response to Defendant's motion to exclude McDonald's testimony, Plaintiffs argue that "Mr. McDonald's opinions are based upon credible facts, NJDEP records, the reports of Plaintiffs' liability experts and individual appraisal reports prepared for each residential property." (Pls.' Opp. Def.'s Mot. Summ. J. ("Opp."), filed Oct. 12, 2005, at 30.) However, McDonald testified in his deposition that he relied only on the Gallo and Ellwood Reports, and he specifically testifies that he did *not* "review any correspondence from the NJDEP related to this site." (McDonald Dep. at 15.) [15]

In spite of Plaintiffs' arguments to the contrary, this Court cannot avoid the conclusion that McDonald's methodology is entirely unreliable. In his report, McDonald determines that the value of Plaintiffs' properties with no evidence of contamination should be discounted 35% percent and property with onsite contamination should be discounted by 66%. (McDonald Report ("McDonald Report"), Mairo Cert. in Support of Def.'s Mot. Exclude Pls.' Expert Daniel McDonald, Ex. B., at 31, 33.) McDonald reached the 35% and 66% figures without discussing, or even recognizing, the extent to which the property was actually contaminated. As demonstrated by his ignorance of the "ND"/Not Detected signifier in the Gallo and Ellwood Reports, McDonald did not know how to read the charts denoting the levels of contamination. (McDonald Dep. at 56.) Nor had McDonald ever conducted any physical inspection of or visit to the properties prior to writing the report. [16] (McDonald Dep. at 15–16.)

Furthermore, to quantify the stigma attached to Plaintiffs' properties, McDonald relies upon a highly misleading analogy with a site of profoundly contaminated residential properties in Dover Township. (McDonald Report at 27.) Specifically, McDonald compares Plaintiffs' properties with "an area of Dover Township that had ground water contamination from Union Carbide and ... Ciba Geigy that resulted in what was commonly known as a cancer cluster among children," meaning "an inordinate number of children

with cancer." (McDonald Dep. at 158–59.) McDonald selected the Dover site not because of its comparability, but because McDonald "didn't know of any other cases that, where the data was as readily available." (McDonald Dep. at 159.)

**\*8** Employing the Dover analogy, McDonald determined that the property in the Dover site is in the final stages of recovery and continues to suffer a stigma loss of 13%. Because McDonald considered Plaintiffs' properties in the early stages of recovery, McDonald determined that they must bear a stigma discount of at least two or three times that of the Dover site, resulting in a discount of 35%. [17] However, the severity of the contamination and resulting illness among Dover residents undercuts any grounds for comparison with Plaintiffs' properties where there were few detections of contaminants and no reported physiological effects.

The methodology employed to reach the 66% figure is equally unreliable. To assess the value of properties with some evidence of contamination, McDonald sent an email to thirteen financial lenders to determine whether they would "lend on a property that has known contamination, or the stigma of contamination, to the ground water." (McDonald Report at 32.) Of the thirteen lenders, six replied. One of those refused to comment, and one said that it would loan given certain circumstances. The other four lenders stated that they would not lend on a property that is contaminated, but the content of their brief responses suggested that they understood the email hypothetical to denote property that was actually contaminated and out of compliance with state requirements. [18]

From the results of the email test, McDonald concludes that there would be no buyers other than those who could pay cash. [19] McDonald then assessed the discount in value given cash-only buyers, extrapolating from this a discount of 66%. (McDonald Report at 33.) However, the reliability of the 66% figure is entirely invalidated by the overemphasis placed on the four responses to the email hypothetical, the misleading implication in the email hypothetical, suggesting a much greater contamination of the property than actually present, and the unclear calculations and assumptions underlying McDonald's arrival at 66%.

Ultimately, McDonald's report does not fulfil any of the reliability factors. His method is untestable and arbitrary, without a generally accepted, established, or peer reviewed methodology, and his evaluation was conducted without any

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

real standards. Because McDonald is unqualified and his evaluation is unreliable, Defendant's motion *in limine* to exclude his testimony will be granted.

IV. Plaintiffs' Claims

A. Negligence and Gross Negligence

To surmount a motion for summary judgment of a negligence claim, Plaintiffs must provide evidence such that a reasonable jury could find "breach of a duty of care and actual damages sustained as a proximate cause of the breach." *Muise v. GPU, Inc.,* 371 N.J.Super. 13, 35, 851 A.2d 799 (App.Div.2004) (citing 🚩 *Weinberg v. Dinger,* 106 N.J. 469, 484, 524 A.2d 366 (1987)); 🚩 *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 45, 477 A.2d 1224 (1984) ("[T]he plaintiff must show a breach of duty and resulting damage to prevail in a negligence action."). Motiva argues that Plaintiffs have failed to establish damages and causation and requests summary judgment of Plaintiffs' gross negligence claim on the same basis. [20]

*9  The absence of an injury will preclude a negligence claim, even where a clear breach of duty is present. 🚩 *Rocci v. MacDonald–Cartier,* 323 N.J.Super. 18, 24–25, 731 A.2d 1205 (App.Div.1999) (affirming summary judgment for insufficient evidence of damages in defamation case and noting that "a plaintiff must present proof of a material question of fact as to both liability and damages") (citing *Norwood Easthill Assoc. v. Norwood Easthill Watch,* 222 N.J.Super. 378, 384, 536 A.2d 1317 (App.Div.1988) (affirming summary judgment of malicious interference claim on basis that "plaintiff has suffered no injury or damage")). At the summary judgment stage, Plaintiffs must provide actual evidence of injury and cannot simply rely upon "unsubstantiated allegations." 🚩 *Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992) (reversing district court's denial of summary judgment). Just as "a residential customer not in residence during a power loss, or a commercial customer whose store was closed, might have no damages except the inconvenience of resetting clocks," *Muise,* 371 N.J.Super. at 49, 851 A.2d 799, the release of contaminants into the groundwater aquifer does not itself generate damages, unless Plaintiffs can show that they suffered harm.

Plaintiffs concede that they "have not presented and will not present claims for the present manifested bodily injury." (Undisputed Facts ¶ 67.) However, they argue that they have adequately established damages for medical monitoring and property damage. They do not address their claim for emotional distress. [21]

1. Medical Monitoring

Damages for medical monitoring are appropriate where a plaintiff exhibits no physical injury, but nevertheless requires medical testing as a proximate result of a defendant's negligent conduct. 🚩 *Ayers v. Jackson Twp.,* 106 N.J. 557, 600, 525 A.2d 287 (1987). The risk of injury need not be quantified to merit medical surveillance damages; however, the plaintiff must establish that the risk of serious disease is "significant." 🚩 *Id.* at 599–600, 525 A.2d 287; *Campo v. Tama,* 133 N.J. 123, 131, 627 A.2d 135 (1993) (awarding medical monitoring damages to a plaintiff with a "fifty-to seventy-five-percent chance of suffering a recurrence of cancer" due to the delay resulting from defendant doctor's malpractice). In the case of toxic exposure, "medical-surveillance damages may be awarded only if a plaintiff reasonably shows that medical surveillance is required because the exposure caused a distinctive increased risk of future injury." 🚩 *Theer v. Philip Carey Co.,* 133 N.J. 610, 627, 628 A.2d 724 (1993). Such damages are "not available for plaintiffs who have not experienced direct and hence discrete exposure to a toxic substance and who have not suffered an injury or condition resulting from that exposure." 🚩 *Id.* at 628, 628 A.2d 724.

Low level contamination, "that is, contamination below the minimum level set by DEP for water remediation," typically is insufficient to establish injurious toxic exposure. 🚩 *Muralo Co., Inc. v. Employers Ins. of Wausau,* 334 N.J.Super. 282, 290–291, 759 A.2d 348 (App.Div.2000) ("[S]ince it is clear that no untreated groundwater is ever entirely pure, we are satisfied that DEP standards are the most reliable guide for determining whether contamination causing damage ... has occurred."). Here, contaminants have been detected in only eight of Plaintiffs' wells, and no detection has been even close to the GWQS. The NJDEP never restricted Plaintiffs' use of water from their potable wells, nor required Defendant to treat Plaintiffs' wells or to provide Plaintiffs with an alternate water source.

*10  Plaintiffs rely on the testimony of Dr. Michael Gochfeld, Ph.D. ("Gochfeld"), to establish the significant health risks

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

and necessity of medical surveillance following the alleged contamination of Plaintiffs' property. However, nothing in Gochfeld's report concludes that the individual Plaintiffs themselves require medical monitoring under the circumstances. Rather, Gochfeld's report creates a medical monitoring program for a hypothetical target population without taking into consideration the actual exposure of any plaintiff. [22] (Gochfeld Dep. at 26–29.) Gochfeld prepared his report under the assumption that "there were known or actual or potential exposure to a variety of constituents of gasoline." (Gochfeld Dep. at 12.) He states in deposition that he had "no specific factual knowledge of the actual exposures in this case," and he confirms that he has never examined the individual Plaintiffs. (Gochfeld Dep. at 10, 29.)

Gochfeld himself notes that "[w]hether a person exposed to MTBE requires medical monitoring depends in large measure on the level of exposure and the time over which it occurred" and notes that "clearly people that are exposed to MTBE casually would not require one." (Gochfeld Dep. at 24.) Furthermore, Gochfeld stated that he "probably would not" recommend medical monitoring for the minor and often single detections of MTBE on Plaintiffs' properties. [23] (Gochfeld Dep. at 46–50.) Consequently, Gochfeld's report does not establish that Plaintiffs require medical monitoring.

Plaintiffs also appear to argue that their wells may have been more contaminated prior to the initiation of Defendant's testing in July 2000. (Opp. at 20.) However, Plaintiffs provide no evidence suggesting that such exposure actually occurred or that any exposure prior to July 2000 was more than minimal. Plaintiffs also argue for the first time in their Opposition that they may have ingested water from contaminated sources besides the potable wells on their property. (Opp. at 20.) However, Plaintiffs offer no evidence that any Plaintiff actually consumed water from CW–8. Without any evidence supporting their theories, Plaintiffs cannot establish a claim for medical monitoring sufficient to survive summary judgment.

Because Plaintiffs have provided no evidence of a "distinctive increased risk of future injury" from the exposure, Plaintiffs are not entitled to damages for medical monitoring.

2. Property Damage
Defendant requests summary judgment of Plaintiffs' claims of property damage on the grounds that the contamination caused no actual damage to Plaintiffs' properties. [24] Instead of

claiming that their property was physically harmed, Plaintiffs contend that the news of the contamination stigmatized their property, reducing its value in the minds of potential buyers.

In support of their claim for stigma damages, Plaintiffs offer the expert testimony of Daniel McDonald. However, as discussed previously, McDonald's testimony must be excluded as unreliable. Plaintiffs also argue that the testimony of individual Plaintiffs establishes a stigma discount to their property:

> **\*11** Plaintiff Marie Wallace has submitted sworn Interrogatory statements documenting a $150,000.00 loss on the sale of her property. See Exhibit 0 to McKenna Certification. Other Plaintiffs have similarly provided certified answers to Interrogatories and Deposition testimony as to the loss in value through sales transactions, which occurred from the discharge. See Exhibit N–R to the McKenna Certification.

(Opp. at 20–21.)

This evidence fails to establish an injury. Exhibits N–R consist of contracts for sale and unexecuted contracts for sale of three of Plaintiffs' properties, including the Wallace property, leaving it to the Court's imagination to ascertain how these contracts demonstrate a loss in value. Wallace's testimony also fails to establish a stigma injury to the property.

Specifically, Wallace claims that she received a verbal offer for her asking price of $500,000.00 from a man named "Amin," whose last name she cannot recall. (Marie Wallace Dep., McKenna Cert., Ex. 0, M.) Wallace claims that he reneged from the agreement after she told him about the release, however, the alleged offeror never gave Wallace the offer in writing and she has no evidence of the offer or "Amin's" motive for withdrawing, aside from her own testimony. Consequently, even construing this evidence in the light most favorable to Plaintiffs, no reasonable jury could find that Plaintiffs' properties were stigmatized on the basis of this evidence alone.

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

3. Emotional Distress

Defendant also moves for summary judgment of Plaintiffs' claim for emotional distress. Plaintiffs do not respond to this argument in their Opposition, and Defendant is entitled to summary judgment of Plaintiffs' emotional distress claim for Plaintiffs' failure to present evidence of significant distress or physical injury.

A claim for emotional distress cannot succeed absent evidence of physical injury or "severe and substantial" emotional distress, even where a person has a reasonable concern of an enhanced risk of future disease. *Ironbound Health Rights Advisory Com'n v. Diamond Shamrock Chem. Co.,* 243 N.J.Super. 170, 174–75, 578 A.2d 1248 (App.Div.1990) (noting that "[i]n the absence of physical injury, damages are allowed where the resultant emotional distress is severe and substantial" and listing cases). Without some physical injury, mere exposure to toxic chemicals does not give rise to a claim for emotional distress damages. *Id.* (holding plaintiffs unable to sustain emotional distress claim for exposure to chemicals manufactured at plant near their residences); *see also Mauro v. Raymark Indus., Inc.,* 116 N.J. 126, 137, 561 A.2d 257 (1989); *Troum v. Newark Beth Israel Med. Ctr.,* 338 N.J.Super. 1, 17, 768 A.2d 177 (App.Div.2001). Because Plaintiffs provided no evidence of significant emotional distress or physical injury, Defendant's motion for summary judgment will be granted.

B. Trespass

Defendant moves for summary judgment of Plaintiffs' claim for trespass. Plaintiffs argue that Defendant's "intentional refusal" to remove the contamination from their property and failure to install remediation equipment amounts to an intentional trespass.[25] (Opp. at 25.)

**\*12**  The Restatement (Second) of Torts defines intentional trespass as:

One who intentionally and without a consensual or other privilege

(a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or

(b) remains thereon, or

(c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner

stated in §§ 160 and 161, is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.

Rest. (2d) Torts § 158.

As Defendant argues, New Jersey has moved away from "such common law claims as trespass and nuisance" in environmental pollution cases. *Mayor and Council of Borough of Rockaway v. Klockner & Klockner,* 811 F.Supp. 1039, 1053 (D.N.J.1993); *Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 256, 497 A.2d 1310 (1985) ("There is no need for us ... to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned."). Regardless of the continuing viability of trespass claims in the environmental context, however, Plaintiffs have failed to come forward with any evidence supporting their claim and cannot survive summary judgment.

Plaintiffs note that they are "not arguing that Defendants intentionally caused the contamination of their property," but rather are claiming that "defendants have repeatedly refused to perform the horizontal and vertical delineation of the soil and groundwater contamination in the area of the residential properties." (Opp. at 25.) However, no evidence suggests that such measures were necessary to remove contaminants from Plaintiffs' properties. Rather, the record indicates that Defendant consistently complied with NJDEP requirements, including the installation and maintenance of a groundwater recovery system to rehabilitate the aquifer, and the NJDEP never required Defendant to install any sort of remediation equipment on any of the residences. Given that there has been no detection of a gasoline-related contaminant in any Plaintiff's potable well since April 2001, the argument that Defendant permitted contamination to remain on Plaintiffs' properties lacks any viable evidentiary foundation. Defendant's motion for summary judgment of Plaintiffs' trespass claim will be granted.

C. Strict Liability

Plaintiffs originally claimed a cause of action for strict liability under the theory that the handling, storage, or use of gasoline constitutes an abnormally dangerous activity. However, Plaintiffs voluntarily dismissed this claim in their Opposition. (Pl.'s Opp. at 3.) Accordingly, the Court will not address the merits of Plaintiffs' strict liability claim.

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

D. Environmental Statutes

1. New Jersey Environmental Rights Act
Plaintiffs allege a right to recover under the New Jersey
Environmental Rights Act ("ERA"), N.J.S.A. 2A:35A–
1 et seq. Defendant requests summary judgment on the
grounds that Plaintiffs have not satisfied the ERA's notice
provision, N.J.S.A. 2A:35A–11, and that an ERA claim is not
actionable where the NJDEP has acted to institute and oversee
remediation of the contamination.

 *13 Section 4(a) of the ERA, permits "any person" to
"maintain an action in a court of competent jurisdiction
against any other person to enforce, or to restrain the violation
of, any statute, regulation or ordinance which is designed to
prevent or minimize pollution, impairment or destruction of
the environment." N.J.S.A. 2A:35A–4(a). Although the ERA
itself does not create substantive rights, it confers standing
on private persons to enforce other environmental statutes,
including the New Jersey Spill Compensation and Control
Act ("Spill Act"). 🚩 Rockaway, 811 F.Supp. at 1054; Allied
Corp. v. Frola, 701 F.Supp. 1084, 1091 (D.N.J.1988).

The NJDEP is "entrusted initially with the right to determine
the primary course of action to be taken." Howell Township
v. Waste Disposal, Inc., 207 N.J.Super. 80, 95, 504 A.2d 19
(App.Div.1986) ("In order to be effective, [the NJDEP] must
normally be free to determine what solution will best resolve
a problem on a state or regional basis given its expertise
and ability to view those problems and solutions broadly.").
Consequently, the right of private parties to sue under the
EPA is "an alternative to inaction by the government which
retains primary prosecutorial responsibility." 🚩 Superior Air
Prod. Co. v. NL Indus., Inc., 216 N.J.Super. 46, 58, 522 A.2d
1025 (App.Div.1987); 🚩 Rockaway, 811 F.Supp. at 1054
("[T]he primary goal of the ERA is to limit lawsuits by private
litigants to those instances where the government has not
acted.").

A private ERA suit may be permitted even in the absence
of complete government inaction if the NJDEP has "failed
in its mission ... failed or neglected to act in the best
interest of the citizenry or has arbitrarily, capriciously
or unreasonably acted." Howell, 207 N.J.Super. at 96,
504 A.2d 19; 🚩 Morris County Transfer Station, Inc. v.
Frank's Sanitation Serv., Inc., 260 N.J.Super. 570, 578,
617 A.2d 291 (App.Div.1992) (permitting private ERA

action where the NJDEP would not address violation for
three years and had taken no enforcement actions against
contaminating defendant who continued operating its illegal
facility two months after receiving a violation notice). Where
NJDEP "action subsequently proves sufficient to protect the
environment," however, NJDEP "action under the Spill Act
is preemptive of private rights under ERA." 🚩 Superior
Air Prod., 216 N.J.Super. at 61, 522 A.2d 1025. The
permissibility of private action must be evaluated on a case-
by-case basis. Id.

Here the record indicates consistent and pervasive NJDEP
oversight of the remediation process, requiring Defendant
to regularly test Plaintiffs' wells and institute interim and
permanent groundwater recovery systems. Plaintiffs have not
claimed that the NJDEP failed to act or acted unreasonably,
and there are no grounds for finding NJDEP inaction
sufficient to permit a private ERA suit. Furthermore, as
discussed below, Plaintiffs failed to give the NJDEP the
requisite notice of their private suit. Accordingly, Defendant's
motion for summary judgment of Plaintiffs' ERA claim will
be granted.

2. Notice
 *14 Before a private party may commence an action
under the ERA, the party must "at least 30 days prior to
the commencement thereof, direct a written notice of such
intention by certified mail, to the Attorney General, the
Department of Environmental Protection, the governing body
of the municipality in which the alleged conduct has, or
is likely to occur, and to the intended defendant." N.J.S.A.
2A:35A–11. The notice provision is intended to give the
government an adequate opportunity to intervene in the
litigation and to allow the NJDEP:

> to exercise value judgments in
> individual cases, e.g., whether it will
> join in that litigation or enforcement
> proceeding, whether other actions it
> may have taken already with respect
> to the particular problem or offender
> would render the litigation subject
> to collateral estoppel or res judicata
> principles, whether its expertise would
> assist the court, whether broad State
> interests would be sacrificed unduly to

regional or personal interests by the
instigators of that litigation, etc.

*Howell,* 504 A.2d at 95; *Morris County,* 260 N.J.Super. at
578, 617 A.2d 291 (quoting *Howell* for same).

Because Plaintiffs did not provide the required thirty day
notice to the NJDEP or the Attorney General, they are barred
from further pursuing their claim under the ERA. Plaintiffs
argue that Defendant is judicially estopped from claiming lack
of notice for failure to raise this issue at an earlier stage in
the case. Plaintiffs analogize the ERA requirement to that
of an affidavit of merit, required in certain cases to avoid
"unmeritorious and frivolous malpractice lawsuits at an early
stage of litigation." *Knorr v. Smeal,* 178 N.J. 169, 197–98,
836 A.2d 794 (2003) (holding judicially estopped defendant's
request for summary judgment for plaintiff's failure to file
affidavit of merit) (citing *Palanque v. Lambert–Woolley,*
168 N.J. 398, 404, 774 A.2d 501, 505 (2001)); *Ferreira
v. Rancocas Orthopedic Assoc.,* 178 N.J. 144, 836 A.2d 779,
(2003) (same).

Defendant argues that the ERA notice requirement is more
analogous to the notice of intent in the Resource Conservation
and Recovery Act (RCRA), which the Supreme Court held
to be a jurisdictional prerequisite to suit in *Hallstrom
v. Tillamook County,* 493 U.S. 20, 31, 110 S.Ct. 304, 107
L.Ed.2d 237 (1989) ("[C]ompliance with the 60–day notice
provision is a mandatory, not optional, condition precedent
for suit."); *Public Interest Research Group of N.J., Inc.
v. Windall,* 51 F.3d 1179, 1189 (3d Cir.1995) (holding
notice provision jurisdictional in context of Clean Water Act
("CWA")); *Hawksbill Sea Turtle v. Federal Emergency
Mgmt. Agency,* 126 F.3d 461, 471 (3d Cir.1997) (holding
notice provision jurisdictional in context of Endangered
Species Act ("ESA")).

However, the language of the notice requirement in RCRA is
not entirely analogous to that of the ERA. RCRA states, under
the heading of "Actions prohibited" that "No action may be
commenced ... prior to 60 days after the plaintiff has given
notice of the violation to" the Administrator, the state and the
alleged violator. 42 U.S.C.A. § 6972. The ERA lacks the "no
action may be commenced" language of the RCRA, CWA,
and ESA, and states only that notice must be sent "at least

30 days prior to the commencement" of suit. Consequently,
the argument that the plain language of the statute creates a
jurisdictional bar is not as strong in the context of the ERA.

**\*15** Nevertheless, because the purpose of the notice
provision is to provide the Attorney General and NJDEP with
notice of the suit and opportunity to intervene, *Howell,* 504
A.2d at 95, and not merely to protect defendants, as in the case
of the affidavit of merit, Defendant is not judicially estopped
from raising Plaintiffs' lack of compliance with the notice
provision and is entitled to summary judgment of Plaintiffs'
ERA claim.

**E. Spill Act Claim**
In their complaint, Plaintiffs assert a private right of action
under the Spill Act, N.J.S.A. 58:10–23.11 *et seq.* [26] As
amended in 1991, the Spill Act authorizes a private cause
of action for individuals to recover costs for environmental
damage to their property. *Housing Auth. of City of New
Brunswick v. Suydam Inv., L.L.C.,* 177 N.J. 2, 18, 826 A.2d
673 (2003). Actions under the Spill Act are limited to clean
up and removal costs, *Bahrle v. Exxon Corp.,* 145 N.J. 144,
155, 678 A.2d 225 (1996), defined as:

> all direct costs associated with a discharge, and those
> indirect costs that may be imposed by the department
> pursuant to section 1 of P.L.2002, c. 37 associated with a
> discharge, incurred by the State or its political subdivisions
> or their agents or any person with written approval from
> the department in the: (1) removal or attempted removal of
> hazardous substances, or (2) taking of reasonable measures
> to prevent or mitigate damage to the public health, safety,
> or welfare, including, but not limited to, public and private
> property.

N.J.S.A. 58:10–23.11b(d). The Act does not authorize
"damages arising from emotional distress, enhanced risk of
disease, loss of enjoyment of property, and other economic
and financial harm." *Bahrle,* 145 N.J. at 155, 678 A.2d 225.
Plaintiffs maintain that the investigation conducted by
Ellwood was a reimbursable clean up and removal cost under
the Spill Act. As Plaintiffs suggest, because "a discharge
cannot be addressed until the contaminants are defined
and the extent of the discharge determined," certain forms
of investigative costs are implicitly included in the Act.
*Metex Corp. v. Federal Ins. Co.,* 290 N.J.Super. 95, 115,
675 A.2d 220 (App.Div.1996).

Case 1:19-md-02875-RMB-SAK    Document 2325-6    Filed 04/11/23    Page 260 of 264
PageID: 83975
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

However, for a private party to obtain reimbursement under the Act, the party must have obtained "written approval from the department," for example, in a memorandum of agreement, prior to incurring the cost. N.J.S.A. 58:10–23.11b(d); *Id.* Such approval permits the NJDEP to "review and approve or disapprove its investigation to date, its proposed remedial action, and its report of the implementation of its action." *Id.; see also* ▢ *Interfaith Cmty Org. v. Honeywell Intern., Inc.,* 263 F.Supp.2d 796, 867 (D.N.J.2003) (concluding "that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable

under the Spill Act."). Because Plaintiffs have not obtained NJDEP approval for any cost incurred, including the Ellwood report, Defendant is entitled to summary judgment of Plaintiffs' Spill Act Claim.

**\*16** The accompanying Order shall enter today.

▢ *Elcock,* 233 F.3d at 741.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 166452

---

# Footnotes

1    The following facts are taken from Defendant's statement of undisputed material facts, filed June 24, 2005, ("Undisputed Facts") and Plaintiffs' counterstatement of undisputed facts, filed Oct. 14, 2005, ("Counterstatement Facts"). Plaintiffs did not provide a separate statement of undisputed facts.

     Although Plaintiffs dispute the majority of Defendant's statements of fact, Plaintiffs' counterstatements typically provide additional facts without setting forth any conflicting evidence. Where no actual disputes are presented, Defendant's statements will be treated as undisputed. *See e.g.,* ▢ *Tofano v. Reidel,* 61 F.Supp.2d 289, 292 n. 1 (D.N.J.1999) (citing Fed.R.Civ.P. 56(e)) ("This court will ... not consider assertions without evidential support as creating genuine issues of disputed fact."); *Talbot v. United States,* 2005 WL 2917463, *2 (D.N.J.2005) (noting that where the nonmoving party does not submit facts in opposition, "it is entirely appropriate for this court to treat all facts properly supported by the movant to be uncontroverted") (quoting *Allebach v. Sherrer,* No. 04–287, 2005 U.S. Dist. LEXIS 15626, at *5 (D.N.J.2005)).

     More generally, Plaintiffs' brief suffers from numerous typographical errors and a dearth of citations to page numbers in the record. This "alone warrants exclusion of the evidence." *See* ▢ *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774–75 (9th Cir.2002) (holding that party's failure to cite page and line numbers after referencing the deposition merits exclusion of evidence); ▢ *Huey v. UPS, Inc.,* 165 F.3d 1084, 1085 (7th Cir.1999) ( "[J]udges need not paw over the files without assistance from the parties."); ▢ *Nissho–Iwai Am. Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir.1988) (parties must designate specific facts and their location in the record).

2    Among the original litigants to the suit were also former plaintiffs Michael and Susan Kammerhoff and Norma Simmons. The Kammerhoff plaintiffs were voluntarily dismissed, and plaintiff Norma Simmons died on August 26, 2000.

3    VOCs generally associated with gasoline discharge include MTBE, benzene, toluene, ethylbenzene, xylene (collectively "BTEX"), and tertiary butyl alcohol ("TBA"). The NJDEP has issued a Ground Water Quality Standard ("GWQS") for each of these VOCs, also known as "gasoline-related compounds." MTBE, for example, has a GWQS of 70 parts per billion ("ppb").

Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)

2006 WL 166452

4    Although Motiva detected MTBE in thirteen residential wells, not all of these wells are owned by Plaintiffs to this litigation. Of the twenty-seven parcels of property at issue in this suit, only eight of the properties contain wells that ever tested positive for any gasoline-related compound.

5    The direction of water's flow in an aquifer is described as "downgradient," and the direction against the current is "upgradient."

6    In particular, testing revealed emissions in monitoring wells 6–Shallow ("MW–6S") and 7–Deep ("MW–7D"), which lie between the Motiva site and the residential properties. However, the majority of upgradient monitoring wells did not test positive for gasoline-related contaminants. (NJDEP Directive, March 21, 2001 ("March 2001 Directive"), Mairo Cert. in Supp. Def.'s Mot. Summ. J., filed June 24, 2005 ("Mairo Cert."), Ex. O, at 4.)

7    Plaintiffs dispute Defendant's characterization of the CEA, (Counterstatement Facts ¶ 31), on the basis that Defendant proposed the CEA prior to conducting an actual delineation of the plume and that "the Plaintiffs' residential wells could only had [sic] been included in the CEA, if Defendant intended to supply a permanent public water supply to Plaintiffs' properties." While Plaintiffs' contention with the CEA is not entirely clear, Plaintiffs have not provided any evidence indicating that the NJDEP improperly approved the CEA or that the CEA was an inaccurate representation of the boundaries of contaminants in excess of the GWQS.

8    Plaintiffs' properties are: 850 Sicklerville Road; 565, 569, 581, and 583 Berlin–Cross Keys Road; 6, 9, 10, 12, 13, 14, 1, 16, 17, 18, 20 Spring Hollow; 2, 4, 6, and 8 Latham Way; 3, 4, 5, 7, 12, 14, and 15 Donna Marie Court.

9    CW–8 is located approximately 1,000 feet downgradient of the contamination site. (March 2001 Directive at 2.) While active, CW–8 pumps approximately 500 gallons per minute and causes the groundwater to flow southwest. (Ellwood Report at 2.) When CW–8 is not pumping, the groundwater flow is more westerly. (Ellwood Report at 2.)

10    Plaintiff disputes these facts on the basis that:

The Defendant has no data for any portable [sic] water supply of the Plaintiffs prior to July 2000. The Defendant never performed any delineation of the groundwater plume in the areas of the residential properties despite having actual knowledge of such contamination in MW–6, MW–7 and MW–12. See Gallo Certification and Exhibits C, D and E.

(Counterstatement Facts ¶¶ 46–48.) However, because Defendant makes no averment of the presence or absence of contamination prior to July 2000, Defendant's statements are not actually in dispute. Plaintiffs provide no fact indicating an inaccuracy in Defendant's statements regarding the testing of Plaintiffs' wells. Consequently, there is no actual dispute regarding the presence or amount of *detected* gasoline-related compounds.

11    Plaintiffs dispute these statements by citing to Exhibit F of the McKenna certification; however, Exhibit F is the Ellwood report and therefore is not indicative of the NJDEP requirements. Plaintiffs nowhere cite to a statement by the NJDEP requiring Defendant to treat their water or provide them with an alternate water source, and therefore this fact is undisputed.

12    Because this Court will grant Defendant's motion for summary judgment, it will not reach the merits of Defendant's motions to exclude experts Gochfeld, Ellwood, and Gallo.

13    After *Daubert,* Rule 702 was amended to encompass the *Daubert* analysis:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. While *Daubert* itself addressed only the admissibility of scientific evidence, the Court has since noted that courts' gatekeeping obligations extend to all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

14    The Court noted that it had "misgivings" about the expert's qualifications in spite of:

(1) [the expert's] general training in "assessing" individuals, which he received while earning his Ph.D. in psychology; (2) his experience, twenty years previous, helping drug addicts reenter the workforce; (3) his experience primarily in the last two years dealing with the Virgin Islands Division of Workers' Compensation, which he had advised regarding the ability of approximately fifty to sixty-five disabled employees to return to their previous jobs; (4) his past experience as an expert witness making lost earning capacity assessments; (5) his attendance at two seminars regarding vocational rehabilitation, and his stated familiarity with the literature in the area; (6) his membership in two vocational rehabilitation organizations, both of which place no restrictions on membership; and (7) the fact that when [the expert] was in school, a degree in vocational rehabilitation therapy was not available, but that he received similar training nonetheless.

15    Plaintiffs also argue that "Defendant does not attack the methodology, standard or factual basis for the opinions," (Opp. at 31), however, it is quite clear from Defendant's motion that the reliability of McDonald's methodology is hotly disputed.

16    McDonald also appeared unaware of the fact that Plaintiffs' properties are served by potable wells, even though the potable wells contain the evidence of contamination.

Q: Do you know whether or not the plaintiffs' properties have potable wells?

A: It's my understanding that they are hooked to a public water system.

Q: If each of the properties did in fact have a potable well, would that be a factor that you were consider relevant in your analysis?

Mr. McKenna: You may want to review the documents that you referenced in your report to assist you in this area. Just separate the Ellwood and Gallo reports. I'm going to go to the men's room.

(Whereupon, a recess is taken.)

Mr. Mairo: I am going to object that Mr. McKenna was basically coaching the witness.

Back on the record.

A: Your question about whether or not each of these houses were, was, had their own private well on site-

Q: Uh-huh?

A: -it's my understanding that each house is served by wells within and around the neighborhood and that Consumer, Consumers Water Company owns those wells and supplies that water to the homes.

(McDonald Dep. at 36.)

17    McDonald reaches the 35% devaluation figure with the following methodology:

> The subject properties are in the early stages of monitoring, and clean up of the ground water contamination. The properties from Dover Twp. are beyond the clean up stage and into the final stage of recovery, yet they still show a 13% loss in value as compared to similar properties outside of the contaminated area. The subject area is in stage D of recovery, which is the beginning of the remediation process. Based on the acceptance of the Detrimental Condition Model as a viable process for valuing Detrimental Conditions to Real Estate, by the appraisal community and the Subcommittee on Housing and Community Opportunity of the House Committee on Financial Services, it would be logical to assume that the discount to the properties which are the subject of this report, would be 2 to 3 times that of properties in the final stage of recovery. In this case a discount of 35% would be considered reasonable.

(McDonald Report at 31.)

18    Interbay Funding, for example, qualified their statement that they would not lend by noting, "The property would have to be completely cleaned up. They would have to file all necessary documents to the state of NJ and we would require something from the state telling us the property is cleaned up." (McDonald Report at 32.) From this, McDonald concluded that Interbay Funding would not lend on properties such as Plaintiffs', without considering that none of Plaintiffs' properties were contaminated in excess of state standards.

19    In evaluating this data, McDonald states:

> The lenders that did respond have overwhelmingly stated that they would not approve the loan at all, or they would require substantial conditions to the loan. In the case of the subject properties, it can be assumed that a purchaser with private financing or cash would be the only potential buyer of houses in this area.

(McDonald Report at 32.)

20    Because the Court now finds that there is no evidence of any actual injury arising from Defendant's negligence, this Court will not address Defendant's causation argument.

21    Plaintiff argues that Defendant's motion for summary judgment of its negligence claim should be denied on the basis of the doctrine of *res ipsa loquitur.* However, *res ipsa loquitur* acts only to "permit[ ] an inference of defendant's negligence" (i.e., that defendant acted in an unreasonable manner) under particular circumstances. *Jerista v. Murray,* 185 N.J. 175, 192, 883 A.2d 350 (2005). The doctrine does not establish either causation or the presence of damages. *See e.g.,* *Bahrle v. Exxon Corp.,* 279 N.J.Super. 5, 35, 652 A.2d 178 (App.Div.1995) (holding *res ipsa* doctrine inapplicable where "there was a factual dispute as to whether the contamination was a result of plaintiffs' own voluntary acts or neglect"). Accordingly, because Defendant is contesting only causation and damages, the *res ipsa* doctrine does not apply.

22    Gochfeld testifies in his deposition that he created his report without any specific information about the Plaintiffs:

> Q: So, for example, in determining the percentage of the target population that was in high exposure category, that wasn't based on the ground water, your review of the ground water tables that were attached to Mr. Gallo's report?
>
> A: It was not.

Case 1:19-md-02875-RMB-SAK   Document 2325-6   Filed 04/11/23   Page 264 of 264
PageID: 83979
Player v. Motiva Enterprises LLC, Not Reported in F.Supp.2d (2006)
2006 WL 166452

Q: That was based purely on just an assumption of yours?

A: It was an assumption based on experience with previous programs or programs that are currently underway in our communities.

Q: Having no specific factual knowledge of the actual exposures in this case?

A: That's correct, these are hypotheticals.

(Gochfeld Dep. at 28–29.)

23   Gochfeld also states that he would not even recommend medical monitoring for the one property with by far the highest detection of MTBE (13.8 ppb at 4 Latham Way) "on this data alone" because "[i]t is possible that a person living there would only be drinking bottled water, would not be in the house very much." (Gochfeld Dep. at 50.)

24   Defendant argues further that New Jersey law does not permit Plaintiffs to recover for stigma damages in the absence of some physical harm to their property. Because Plaintiffs have provided no evidence of any stigma to their property, the Court will not reach Defendant's alternative argument.

25   It is unclear whether Plaintiffs allege negligent trespass since they discuss only the Restatement (Second) of Torts § 158, Intentional Trespass, in their Opposition. Unlike intentional trespass, negligent or reckless trespass requires evidence of "harm to the land, to the possessor, or to a thing or a third person." Rest. Torts 2d § 165; see also Burke v. Briggs, 239 N.J.Super. 269, 271, 571 A.2d 296 (App.Div.1990) (citing Rest.2d Torts § 158 with approval for another premise); Karpiak v. Russo, 450 Pa.Super. 471, 481, 676 A.2d 270 (Pa.Super.1996) (affirming dismissal of trespass claim for entry of dust onto property since the "evidence failed to establish that the dust caused appellants harm"). As discussed previously, Plaintiffs have not provided any evidence of injury to their persons or property. Consequently, to the extent that Plaintiffs are claiming negligent trespass, Defendant is entitled to summary judgment.

26   It is unclear whether Plaintiffs also raise a claim for cleanup and removal costs from the Spill Compensation Fund under N.J.S.A. 58:10–23.11g(a). (Opp. at 12–13.) However, the appropriate procedure to obtain compensation under the Fund is by filing a claim with the administrator of the Fund, "not later than one year after the date of discovery of damage. The administrator shall prescribe appropriate forms and procedures for such claims." N.J.S.A. 58:10–23.11k. In the event "a party, including a potentially responsible party ... contests the amount or validity of" a claim for reimbursement from the Spill Fund, "the dispute is referred to an arbitrator whose decision may be appealed to the Appellate Division," and the arbitrator's decision will be final unless it was "arbitrary, capricious, or unreasonable." Lacey Municipal Util. Auth. v. New Jersey Dept. of Envir. Prot., Envir. Claims Admin., 369 N.J.Super. 261, 273, 848 A.2d 843 (App.Div.2004). Accordingly, this is an improper forum for a Spill Compensation Fund claim.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.